PRISON LAW OFFICE
DONALD SPECTER Bar No.: 83925
STEVEN FAMA Bar No.: 99641
E. IVAN TRUJILLO Bar No.: 228790
1917 Fifth Street
Berkeley, California 94710-1916
Telephone: (510) 280-2621
Facsimile: (510) 280-2704

BINGHAM, McCUTCHEN, LLP
WARREN E. GEORGE Bar No.: 53588
GEOFFREY THOMAS HOLTZ Bar No.: 191370
KRISTEN A. PALUMBO Bar No.: 215857
Three Embarcadero Center
San Francisco, California 94111
Telephone: (415) 393-2000

ROSEN, BIEN & GALVAN, LLP
MICHAEL W. BIEN Bar No.: 096891
JANE E. KAHN Bar No.: 112239
ERNEST GALVAN Bar No.: 196065
LORI RIFKIN Bar No.: 244081
315 Montgomery Street, 10th Floor
San Francisco, California 94104
Telephone: (415) 433-6830

HELLER, EHRMAN, WHITE & McAULIFFE
RICHARD L. GOFF Bar No.: 36377
701 Fifth Avenue
Seattle, Washington 98104
Telephone: (206) 447-0900

THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
CLAUDIA CENTER Bar No.: 158255
600 Harrison Street, Suite 120
San Francisco, CA 94107
Telephone: (415) 864-8848

KIRKPATRICK & LOCKHART PRESTON GATES ELLIS LLP
JEFFREY L. BORNSTEIN, Bar No.: 99358
55 Second Street, Suite 1700
San Francisco, CA 94105-3493
Telephone: (415) 882-8200

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN,<br><br>            Plaintiffs,<br><br>      v.<br><br>ARNOLD SCHWARZENEGGER, et al.,<br><br>            Defendants. | Case No. Civ S 90-0520 LKK-JFM |
| JERRY VALDIVIA, et al.,<br><br>            Plaintiffs,<br><br>      v.<br><br>ARNOLD SCHWARZENEGGER, et al.,<br><br>            Defendants. | Case No. Civ. S-94-0671 LKK/GGH<br><br>**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR INJUNCTIVE RELIEF REQUIRING TIMELY ACCESS TO INPATIENT PSYCHIATRIC HOSPITALIZATION**<br><br>Hearing Date: July 25, 2008<br>Time:           10:00 a.m.<br>Location:      Courtroom 4<br>Judge:         Hon. Lawrence K. Karlton |

[219208-4]

1

## TABLE OF ABBREVIATIONS/ACRONYMS

2  CDCR:              California Department of Corrections and Rehabilitation

3  CIM:               California Institute for Men

4  DMH:               Department of Mental Health

5  DVI:               Deuel Vocational Institute

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

[219208-4]

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

STATEMENT OF FACTS ................................................................................... 3

    I.     There Is An Overlap *Coleman-Valdivia* Population Requiring Both
            Constitutional Mental Health Care And Due Process Rights Under The
            *Valdivia* Permanent Injunction ................................................................. 3

    II.    Defendants Deny Access To Inpatient Psychiatric Hospitalization To
            Individuals In CDCR Custody Based On Parole Revocation Status And
            Release Date ................................................................................................ 5

    III.   Mental Health Crisis Beds Do Not Provide Equivalent Treatment To
            Inpatient Hospitals Run By The Department Of Mental Health ............................... 9

    IV.   Defendants' Denial Of  Access To Department Of Mental Health
            Hospital Beds Violates *Coleman* Standards And Risks Serious Harm To
            The Plaintiff Classes ................................................................................. 10

ARGUMENT ..................................................................................................... 13

    I.     Defendants' Denial Of Inpatient Psychiatric Hospitalization To
            *Coleman-Valdivia* Class Members Violates The Constitution And The
            Orders Of This Court In *Coleman* And *Valdivia* ..................................... 13

    II.    Constitutional Due Process And State Law Allow Appropriate
            Psychiatric Hospitalization Of Persons Confined In CDCR Custody ................... 16

    III.   This Court Should Order Defendants To Provide Access To Inpatient
            Psychiatric Hospitalization To Persons With Serious Mental Illness In
            CDCR Custody Regardless Of Revocation Status Or Parole Date ........................ 17

CONCLUSION ................................................................................................ 17

ii

MEM. IN SUPPORT OF PLAINTIFFS' MOTION FOR INJUNCTIVE RELIEF REQUIRING TIMELY ACCESS TO
INPATIENT PSYCHIATRIC HOSPITALIZATION - Case Nos. Civ S 90-0520 LKK-JFM; Civ S-94-0671 LKK/GGH

[219208-4]

# <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

## <u>Cases</u>

*Coleman v. Wilson*,
  912 F.Supp. 1282 (E.D.Cal. 1995) ............................................................................. 13

*Vitek v. Jones*,
  445 U.S. 480 (1980) .................................................................................................... 16

## <u>Statutes</u>

California Code of Regulations,
  Title 15, Section 3369.1(a) ........................................................................................ 16

Penal Code section 2684 ............................................................................................. 16

[219208-4]

**INTRODUCTION**

*Coleman* and *Valdivia* plaintiffs jointly bring this motion to enforce the constitutional right to timely access to inpatient mental health care of persons being held in custody in California Department of Corrections and Rehabilitation ("CDCR") institutions on parole holds and parole revocation terms. Currently, defendants deny access to inpatient psychiatric hospitals operated by the Department of Mental Health ("DMH") to individuals held in CDCR institutions pursuant to parole holds who have not completed the revocation process. Declaration of Ernest Galvan in Support of Plaintiffs' Motion for Injunctive Relief Requiring Timely Access to Inpatient Psychiatric Hospitalization ("Galvan Decl.") ¶¶ 6, 17, 20. Defendants also deny access to those same inpatient psychiatric hospitals to individuals serving parole revocation terms in CDCR institutions who are scheduled to be re-released to parole in 35 or fewer days. *Id.* ¶¶ 17, 20.

Through its orders in the *Coleman* case, this Court has repeatedly found that timely access to psychiatric hospitalization at these high levels of care is a crucial part of the provision of constitutionally adequate mental health care to persons incarcerated in CDCR. Jane E. Kahn Declaration in Support of Plaintiffs' Motion for Injunctive Relief Requiring Timely Access to Inpatient Psychiatric Hospitalization ("Kahn Decl.") ¶ 4. However, defendants refuse to provide that care to a segment of the CDCR population who need inpatient psychiatric hospitalization and are members of both the *Valdivia* and *Coleman* classes. These are persons confined by CDCR, pending the outcome of their parole revocation hearings, or during parole revocation terms with release dates in 35 or fewer days. This dangerous practice violates the requirements of the Court-ordered *Coleman* Program Guide. *Id.* ¶¶ 5-13.

By blocking access to inpatient psychiatric hospitalization for this group, defendants are violating this Court's orders in *Valdivia* as well as *Coleman*. On January 15, 2008, this Court ordered defendants in *Valdivia* to "undertake and sustain work toward the earliest practical solution to providing due process to parolees who appear, either in the judgment of their attorneys or defendants' staff, too mentally ill to participate in revocation proceedings." Galvan Decl. ¶ 3, Exh. 1 at 1:21-25 (1/15/08 Order). The Court specifically required defendants to

1  develop policies and procedures that "include methods to expedite treatment." *Id.* at 2:10-11.

2  The arbitrary bar on admission to inpatient DMH beds, however, has halted progress toward

3  policies and procedures that ensure both treatment and due process.[1]

4      Defendants' represented to the *Valdivia* Special Master on September 26, 2007:

5          DMH ha[s] been directed to accept parolees in need of psychiatrist

6          treatment from CDCR regardless of their revocation status.  A
           Memorandum of Understanding between CDCR and DMH has been

7          updated to reflect the direction that parolees who are deemed unable
           to meaningfully participate in the revocation process are in within the

8          legal custody of CDCR and that DMH will accept such parolees for
           treatment, where possible, giving them the same priority/status as

9          other CDCR inmates are given.  The updated Memorandum of

10         Understanding is currently being approved by all necessary parties.

11  Galvan Decl. ¶ 6, Exh. 4 at 70 (CDCR *Valdivia* Compliance Rpt., June 1, 2006 to Sept. 26,

12  2007).  Now, defendants not only renounce this representation, but firmly embrace and defend

13  the denial of DMH inpatient care to these *Coleman* class members.  *See* Galvan Decl. ¶¶ 17, 20,

14  Exhs. 12, 14; *compare* Galvan Decl. ¶ 7, Exh. 5 at 22 (Third Rpt. of the Special Master On The

15  Status of Conditions of the Remedial Order) ("Defendants report that they have removed some

16  obstacles to placing these parolees in the Department of Mental Health when needed and

17  negotiations concerning those transfers are underway.") *with* Galvan Decl. ¶ 8, Exh. 6 at 28

18  (Fourth Rpt. of the Special Master On the Status of Conditions of the Remedial Order)

19  ("Ensuring that class members have access to Department of Mental Health care will be a critical

20  component of the plan. . .  Defendants have represented, since August 2007, that an agreement

21  on-point was imminent.  Recent developments indicate much more work remains.").

22      Defendants' current *Valdivia* proposals appear to be "workarounds" of this DMH barrier:

23  defendants propose to process acutely psychotic members of the plaintiff classes through

24  revocation hearings despite their inability to meaningfully participate due to mental illness.  This

25

26  _____
    [1] Defendants themselves have identified the DMH barrier as one of the most significant issues

27  that "must be resolved before a meaningful [revocation] process for the mentally ill parolee
    population can be developed and implemented."  Galvan Decl. ¶ 6, Exhibit 4 at 69 (CDCR

28  *Valdivia* Compliance Rpt., June 1, 2006 to Sept. 26, 2007).

[219208-4]

1  would be done in order to fast-track the accused prisoner to "revoked" status and thus overcome

2  the DMH bar challenged in this motion.  Galvan Decl. ¶¶ 10, 11, 13, 20, Exhs. 7, 9, 10, 14.

3  Defendants have previously recognized the untenable position the arbitrary and improper DMH

4  barrier to access creates:  "Many parolees in need of acute mental health care to restore the

5  ability to participate in the revocation process require DMH placement, but are not accepted

6  because they have not completed the revocation process.  This is a cycle which results in

7  suspension of the revocation process but the parolee is unable to receive the treatment necessary

8  to enable him/her to complete the process."  Galvan Decl. ¶ 6, Exh. 4 at 70 (CDCR *Valdivia*

9  Compliance Rpt., June 1, 2006 to Sept. 26, 2007).  Plaintiffs should not have to sacrifice their

10  due process rights in exchange for DMH care as a result of artificial barriers to DMH that

11  defendants themselves have created.

12    There are no legitimate legal or clinical reasons for the failure to provide psychiatric

13  hospitalization to persons pending revocation, or to persons who are serving parole revocation

14  terms with release dates in 35 or fewer days.  This artificial barrier to DMH access denies care to

15  persons who are acutely ill and who, under current policy, are subsequently re-released to parole

16  without ever having received the level of mental health care they clinically require.  Timely

17  inpatient psychiatric care must be provided to all persons incarcerated within CDCR prisons

18  based on clinical need.  Defendants' dangerous practice of delaying and refusing access to the

19  highest levels of mental health care available for this segment of the CDCR population should be

20  promptly enjoined.

21    This Court should order defendants to immediately provide access to all levels of inpatient

22  care to persons with serious mental illness requiring inpatient level mental health treatment who

23  are in CDCR custody, regardless of revocation status or parole date.

### STATEMENT OF FACTS

**I.    There Is An Overlap *Coleman-Valdivia* Population Requiring Both Constitutional Mental Health Care And Due Process Rights Under The *Valdivia* Permanent Injunction**

27    The overlap *Coleman-Valdivia* population—including defendant's failure to provide

28  DMH access—has been the subject of ongoing negotiations over the past two years between the

parties in *Coleman* and *Valdivia*. *See* Galvan Decl. ¶ 4, Exh. 2 at 49-54 (First Rpt. of the Special Master on the Status of the Conditions of the Remedial Order); Galvan Decl. ¶ 5, Exh. 3 at 11-17 (Second Rpt. of the Special Master on the Status of the Conditions of the Remedial Order); Galvan Decl. ¶ 7, Exh. 5 at 20-24, 77-78 (Third Rpt. of the Special Master on the Status of the Conditions of the Remedial Order); Galvan Decl. ¶ 8, Exh. 6 at 27-30 (Fourth Rpt. of the Special Master on the Status of the Conditions of the Remedial Order). These negotiations have been mediated by the *Valdivia* Special Master, with the participation of the *Coleman* Special Master, and have centered on the population of parolees and inmates with serious mental illness who cycle back and forth between parole and CDCR institutions. Galvan Decl. ¶¶ 16, 21. While on parole, often without adequate mental health care, some of these parolees decompensate as a result of unmet mental health needs. When they are returned to CDCR custody based on alleged parole violations—which are often technical or minor violations of parole that defendants themselves recognize to be primarily the result of unmet mental health needs—these individuals sometimes require inpatient psychiatric hospitalization. Declaration of Lori Rifkin in Support of Plaintiffs' Motion for Injunctive Relief Requiring Timely Access to Inpatient Psychiatric Hospitalization ("Rifkin Decl.") ¶¶ 3-5.

When these parolees are returned to CDCR custody based on alleged parole violations, they also must be afforded constitutional due process under the *Valdivia* Permanent Injunction, which provides that they be provided with notice and the opportunity to participate in a timely hearing on their parole violation charges.[2] Galvan Decl. ¶ 24, Exh. 16 (*Valdivia* Stipulated Order for Permanent Injunctive Relief). However, individuals with severe mental illness who have decompensated prior to their return to custody or who do not receive appropriate care when returned to custody and subsequently decompensate, are not always able to meaningfully participate in the revocation process. Defendants do not have a process to effectively address the

---

[2] The *Valdivia* Permanent Injunction requires that a probable cause hearing take place no later than 13 business days after the parole hold is placed, and a full revocation hearing take place no later than 35 calendar days after the parole hold is placed. Galvan Decl. ¶ 24, Exh. 16 (*Valdivia* Stipulated Order for Permanent Injunctive Relief (¶¶ 11(b)(iii); 11(b)(iv); 11(d); 13, 23).

4

MEM. IN SUPPORT OF PLAINTIFFS' MOTION FOR INJUNCTIVE RELIEF REQUIRING TIMELY ACCESS TO INPATIENT PSYCHIATRIC HOSPITALIZATION - Case Nos. Civ S 90-0520 LKK-JFM; Civ S-94-0671 LKK/GGH

[219208-4]

1  rights and needs of this population, which is estimated to be at least 200 parolees per year.

2  Rifkin Decl. ¶ 4.  Within this group of 200 there is a group of individuals who require the highest

3  levels of inpatient psychiatric hospitalization either immediately or within a short time of being

4  returned to custody.  Rifkin Decl. ¶ 5.  This smaller group of individuals who are in CDCR

5  custody on parole holds but are unable to complete the revocation process because they cannot

6  meaningfully participate, and need inpatient hospital care, are the focus of plaintiffs' present

7  motion.[3]

8        Under defendants' current procedures, if an individual cannot meaningfully participate in

9  the revocation process due to mental illness, the revocation proceedings are suspended until such

10 time as the parolee becomes stable enough to participate, or until the expiration of the revocation

11 term the parolee would be assessed on the parole violation charges if good cause were found,

12 which may be up to one year.  Parolees in the suspended process are held in CDCR custody

13 "pending revocation."  A decompensated individual may serve the equivalent of an entire

14 revocation term in CDCR custody—up to twelve months—in "pending revocation" status.

15 Galvan Decl. ¶¶ 19, 23.

16 **II.    Defendants Deny Access To Inpatient Psychiatric Hospitalization To Individuals In
         CDCR Custody Based On Parole Revocation Status And Release Date**

17

18       It is defendants' current practice, and the policy espoused in defendants' proposed plan for

19 revocation of parolees who are unable to participate due to mental illness, that CDCR clinicians

20 may refer only revoked parolees with a minimum 35-day term of confinement to the DMH for

21 inpatient care.  Galvan Decl. ¶¶ 17, 20.  Defendants refuse to provide any access to psychiatric

22 hospitals operated by DMH until an individual charged with a parole violation is placed into

23

24 _____

25 [3] Counsel for the parties and the *Valdivia* Special Master have agreed that other pending issues
   regarding *Valdivia* processes for individuals with mental illness should be subject to further

26 negotiations facilitated by the *Valdivia* Special Master.  Galvan Decl. ¶¶ 19, 23.  Information
   regarding defendants' overall proposal for revocation processes for parolees with mental illness

27 is provided for context only. Resolution of DMH access for this group of class members is a
   critical part of moving forward towards a constitutional overall plan.  *See* Galvan Decl. ¶ 6,

28 Exhibit 4 at 69.

1    "revoked" status, meaning that the revocation process mandated by *Valdivia* is completed and the

2    individual has been sentenced to a revocation term.  *Id.*  Nor will defendants provide DMH

3    psychiatric hospitalization  to revoked patients with less than 35 days left to serve.  *Id.*  The result

4    is a dangerous and unconstitutional exclusion from inpatient psychiatric hospitalization for a

5    segment of the *Coleman* and *Valdivia* classes that cycle in and out of CDCR's reception centers,

6    and parole without being psychiatrically stabilized and without any chance of success in the

7    community.

8        Under defendants' current practice, individuals whose revocation procedures are

9    suspended because they cannot meaningfully participate in the revocation process may be

10   "pending revocation" for weeks, months, or even a year.[4]  Defendants' tracking of 196 of the

11   individuals placed in this suspended status over the past year shows approximately 45 individuals

12   who were pending revocation for more than 90 days.  Rifkin Decl. ¶ 6.  Twenty-five of these

13   individuals were pending revocation for 120 days or more.  *Id.*  Some individuals were pending

14   revocation for more than 200 days.[5]  *Id.*

15       Throughout the entire time period that they are pending revocation, patients with acute

16   mental illness are barred from accessing inpatient psychiatric hospitalization, even though such

17   inpatient psychiatric hospitalization has been recommended by the CDCR clinical team

18   responsible for the patient's care.  Moreover, if an individual requiring inpatient care does

19

20   _____

     [4] Even if able to meaningfully participate, an individual with serious mental illness requiring
21   inpatient hospitalization cannot even be referred to DMH until after the probable cause hearing at
     thirteen business days (17 to 19 calendar days) at the earliest.  Assuming that the hearing occurs
22   on time, this is almost double the maximum ten days allowed under the *Coleman* Program Guide
     for an individual to spend in a Mental Health Crisis Bed.  *See* Kahn Decl. ¶ 5, Exh. A. This
23   directly contradicts the directives in the Program Guide that a patient should be referred to DMH
     whenever in the judgment of the treating clinician the inmate-patient's condition warrants
24   inpatient care.  Kahn Decl. ¶¶ 9, 13.

25   [5] Defendants' log shows that one individual was held pending revocation for 244 days, and when
26   he was stable enough to participate in his revocation hearing at the end of 244 days, the Deputy
     Commissioner did not find good cause on the violation charges and dismissed them.  Good cause
27   was not found and charges were dismissed at the revocation hearing for another individual who
     had been held pending revocation for 196 days.  Rifkin Decl. ¶ 7.

[219208-4]

1    stabilize enough to complete the revocation process, and is then revoked, time has been lost not

2    only in actual treatment, but in completing the referral, acceptance, and transfer process required

3    to actually physically effectuate transfer to DMH care.[6]  *See* Kahn Decl. ¶¶ 8, 10.  Because there

4    is currently a waiting list for DMH beds, all of these delays have an escalating negative effect on

5    an individual's probability of reaching DMH in a timely fashion, if at all, during a parole

6    revocation term, which can be anywhere from weeks to months to a year.  Meanwhile, these

7    individuals are often housed in crisis beds for long periods far exceeding the ten day maximum

8    allowed for Mental Health Crisis Bed placement, which means that—in addition to not receiving

9    the level of mental health treatment they actually need—these patients are also using the scarce

10   resources of crisis beds and staff desperately needed by other patients in CDCR institutions.  *See*

11   Kahn Decl. ¶ 16.

12          The arbitrary bar to DMH also harms persons serving short  parole revocation terms who

13   require inpatient hospitalization.  DMH not only denies access prior to the completion of the

14   revocation process, but also refuses access to individuals with 35 or fewer days until re-release to

15   parole.  This violates the explicit provision in the Program Guide that parole release date does

16   not affect eligibility for admission to inpatient programs.  Kahn Decl. ¶ 11.  Presently, the

17   enormous shortages of resources in the system mean that even if an individual is referred and

18   accepted for transfer to DMH, transfers are often extremely delayed.  Kahn Decl. ¶¶ 12-13.  For

19   parole violators, whose revocation terms are short (averaging three to four months and capped at

20   one year)[7], DMH's current restrictions hit individuals at both ends—delaying referral and

21

---

22   [6] Currently most CDCR prisons are unable to comply with the Program Guide's DMH transfer

23   timelines.  For example, CIM recently reported an average of 25 days from the time the IDTT

     initiates a DMH referral to the time the completed packet is actually sent to DMH.  Still

24   additional time is needed for review by DMH prior to acceptance.  Rifkin Decl. ¶ 14.

25   [7] Information about the average length of parole violation terms is provided in the Spring

26   Population Projects on the CDCR website,

     http://www.cdcr.ca.gov/Reports_Research/Offender_Information_Services_Branch/Projections/S

27   08Pub_Internet.pdf, at 15 (average male parole violator time server during 2007 fiscal year was

     4.0 months); *id.* at 17 (average female parole violator time server during 2007 fiscal year was 3.6

28   months).

7

1    acceptance process at the front end, and then cutting off access if all but 35 or fewer days of the

2    parole term have expired by the time the transfer could actually occur.

3        Plaintiffs have objected to this "suspended" process on several due process grounds in

4    *Valdivia*, and have objected to the denial of inpatient psychiatric hospitalization in both *Valdivia*

5    and *Coleman*.  Defendants acknowledged the barrier to DMH access and in September 2007

6    represented to the *Valdivia* Special Master that they had resolved this obstacle by directing DMH

7    "to accept parolees in need of psychiatric treatment from CDCR regardless of their revocation

8    status." Galvan Decl. ¶ 6, Exh. 4.  However, defendants have now renounced this position and

9    re-affirmed the exclusion of this population from DMH inpatient beds.  *See* Galvan Decl. ¶¶ 17,

10   20, Exhs. 12, 14.  The fourth report of the *Valdivia* Special Master, filed April 28, 2008, reflects

11   this about-face by defendants.  *See* Galvan Decl. ¶ 8, Exh. 6 at 28.

12       On January 15, 2008, pursuant to the Special Master's recommendations in the *Valdivia*

13   case, this Court ordered defendants to "undertake and sustain work toward the earliest practical

14   solution to providing due process to parolees who appear, either in the judgment of their

15   attorneys or defendants' staff, too mentally ill to participate in revocation proceedings."  Galvan

16   Decl. Exh. 1 at 1:21-25 (1/15/08 Order).  This Court specifically required that "[t]he policies and

17   procedures must include methods to expedite treatment and to provide due process and full rights

18   under the Permanent Injunction." *Id.* at 2:10-12.

19       To date, defendants have not created policies and procedures that satisfy the Court's

20   January 15, 2008 Order.  The parties requested and received an extension from the Special

21   Master to continue negotiations regarding these policies and procedures until August 15, 2008.

22   Galvan Decl. ¶ 19.  However, defendants' prohibitions on DMH access for the groups of

23   parolees who are pending revocation or who are scheduled to be re-released to parole in 35 or

24   fewer days is a problem in both the current "suspended" process procedures, and in every plan

25   defendants have thus far proffered in response to the Court's order.  Plaintiffs have tried to

26   resolve this issue without intervention in numerous meet and confer sessions, including a session

27   with key officials of DMH.  Galvan Decl. ¶¶ 21-22.

28       In order to resolve this problem, obtain access for individuals in acute need of inpatient

[219208-4]

1    psychiatric hospitalization, and enable the parties to make forward progress in their negotiations

2    regarding the overall policies and procedures for this group, defendants should be ordered to

3    provide access to DMH to all individuals in CDCR custody, regardless of revocation status or

4    parole date.

5    **III.    Mental Health Crisis Beds Do Not Provide Equivalent Treatment To Inpatient**

6    **Hospitals Run By The Department Of Mental Health**

7         Under defendants' current procedures, individuals who are pending revocation and need

8    an inpatient psychiatric hospitalization are, at best, usually housed in Mental Health Crisis Beds

9    for extended periods of time.  Mental Health Crisis Beds operated by CDCR provide a level of

10    psychiatric care that is very different from the treatment provided to individuals in the acute and

11    intermediate inpatient psychiatric hospitals operated by DMH.  Kahn Decl. ¶ 6.  The objective of

12    the MHCB program is immediate stabilization of a mental health crisis, whereas the objective of

13    DMH's acute psychiatric hospitalization is to "fully remit or significantly reduce the symptoms

14    of a presenting psychiatric illness, while providing education and guidance in developing basic

15    coping skills."  Kahn Decl. ¶¶ 8-9.  The objective of the DMH's intermediate psychiatric

16    hospitalization program is to "provide longer-term mental health intermediate and non-acute

17    treatment for inmate-patients who have a serious mental disorder requiring treatment that is not

18    available within CDCR."  Kahn Decl. ¶ 10 and Exh. B (Program Guide at 12-6-7).

19         The *Coleman* Program Guide limits stays in a Mental Health Crisis Bed to a maximum of

20    ten days, and the *Coleman* Special Master and monitors have reported that crisis beds are

21    severely restricted environments.  Kahn Decl. ¶ 9.  While housed in a crisis bed, patients do not

22    have access to yard or dayroom, have little to no access to recreational therapy, have little to no

23    access to groups, do not have access to personal property, and may not even have mattresses.  *Id.*

24    Mental health crisis beds are not appropriate environments for long-terms stays, nor as

25    replacements for inpatient care for individuals serving short revocation terms who need mental

26    health treatment plans that will maximize their chances of success on parole.  This Court has

27    repeatedly found that access to and availability of sufficient numbers of acute and intermediate

28

[219208-4]

1   inpatient psychiatric  hospital beds is a crucial part of the provision of necessary and

2   constitutionally adequate levels of care for the most seriously mentally ill inmates in the CDCR.

3   Kahn Decl. ¶ 4 and n.1 (summarizing multiple *Coleman* orders regarding inpatient resources).

4   **IV.    Defendants' Denial Of  Access To Department Of Mental Health Hospital Beds**
        **Violates *Coleman* Standards And Risks Serious Harm To The Plaintiff Classes**
5

6        Delayed access to appropriate psychiatric hospitalization risks serious harm to acutely ill

7   patients who require the intensive services of a psychiatric hospital.  The limited information

8   available to plaintiffs' counsel regarding the mental health treatment needs of the group of

9   individuals whose revocation proceedings were suspended since January 2007 shows numerous

10  examples of individuals identified by CDCR clinicians as needing DMH psychiatric

11  hospitalization.  However, these individuals could not be transferred to DMH because there were

12  pending revocation and defendants refused to provide DMH access.

13       Defendants' own tracking of individuals whose revocation process are suspended due to

14  mental illness provides examples of individuals who were identified as needing psychiatric

15  hospitalization, but were not even referred as a result of defendants' arbitrary restrictions on

16  access to DMH.  For example, defendants' tracking log entries show that one individual whose

17  revocation proceedings were suspended for more than four months, from June 12, 2007 to

18  October 26, 2007, was clinically identified as requiring DMH hospitalization on August 6, 2007.

19  Rifkin Decl. ¶ 8, Exh. C. However, defendants' log notes that he could not be referred until after

20  the revocation process was completed.  *Id.*  When revocation was completed more than two

21  months later, the individual was given credit for time served and released without ever having

22  received—or even being referred—to the level of mental health treatment he required.  *Id.*

23  Within six months, he was returned to custody based on allegations of another parole violation,

24  and again his revocation proceedings were suspended because he was too decompensated to

25  participate.  The hearing officer noted that the individual spoke in mumbled sentences that were

26  not comprehensible and "[h]is speech escalated with profanity to the point he became violent."

27  *Id.*, Exh. E.  Similarly, defendants' log shows that another individual in suspended status was

28

[219208-4]

1    identified for DMH referral within two months of his return to custody on a parole hold "but the

2    revocation action [was] still pending." *Id.* ¶ 9,Exh. C.

3         During recent *Coleman* monitoring tours, plaintiffs' counsel has directly observed or been

4    informed about individuals in reception centers pending revocation or serving parole revocation

5    terms who were clinically  appropriate for DMH inpatient psychiatric hospitalization, but who

6    were denied access to that care because of defendants' unlawful policies and practices at issue in

7    this motion.

8         During the *Coleman* tour of DVI on June 3, 2008, the institution reported that its

9    clinicians had identified prisoners requiring transfer to DMH inpatient care but that these

10   prisoners were not being referred because they did not have a parole date, or, in other words, had

11   not yet been assessed a parole revocation term.  Kahn Decl. ¶ 15, Exh. H.  For example, it was

12   reported that in October 2007 that "[o]ne inmate didn't have a parole date and so could not go,

13   another did get a parole date, but then paroled."  *Id*. ¶ 15, Exh. I at 3.  The institution also

14   reported that between September 2007 and January 2008, clinicians identified twenty-one

15   prisoners who required DMH inpatient level of care, but five of these prisoners were not referred

16   for transfer because they did not yet have a parole date or because of their short time to serve.  *Id.*

17   ¶ 15, Exh. J at 3.  Several of these prisoners were eventually transferred to a crisis bed in lieu of

18   their referral to DMH.  *Id.*

19        During the *Coleman* tour of CIM on May 14-16, 2008, plaintiffs' counsel observed one of

20   the individuals reported by defendants to be in the "suspended" revocation process.  Rifkin Decl.

21   ¶ 11, Exh. C.  He was returned to custody on November 16, 2007 on a parole hold.  When

22   plaintiffs' counsel observed him on May 16, 2008, he was housed in a crisis bed, and was listed

23   as being housed there since January 8, 2008, more than four months.  *Id.*  He had been referred

24   for DMH psychiatric hospitalization by his Interdisciplinary Treatment Team on January 31,

25   2008, more than three months earlier, but could not be accepted by DMH because he was

26   pending revocation.  *Id.*  This individual completed the revocation process on April 4, 2008, and,

27   according to a supervising clinician at the institution, was subsequently "accepted" at the DMH

28   intermediate care program at SVPP and is 26th on the waitlist for transfer.  His parole date,

[219208-4]

1    however, is July 13, 2008, and it is unlikely that he will transfer prior to parole.  The clinician

2    reported that he will likely spend the rest of his time in the crisis bed, *id.,* where, in addition to

3    the substantial difference in level of mental health treatment, he does not have access to yard,

4    dayroom, or regular groups.[8]  Another individual at CIM who transferred to DMH at the end of

5    April 2008 had been in a similar situation:  admitted to the crisis bed on January 27, 2008,

6    identified for DMH referral on January 31, 2008, but the referral was not completed until April 8,

7    2008 because he was pending revocation.  *Id.* ¶ 12, Exh. E.

8        CIM staff stated that individuals in the crisis beds at CIM rarely leave their cells and have

9    minimal access to basic needs.  Rifkin Decl. ¶ 13.  In the aggregate, CIM clinicians made 51

10   referrals to DMH hospitals between November 1, 2007 and April 8, 2008.  *Id.* ¶ 15.  Eleven of

11   CIM's  referrals were canceled because the patients paroled before they were transferred.  *Id.*

12   The restrictions on DMH access for individuals pending parole revocation were repeatedly cited

13   as problematic by clinicians and supervisors at CIM.  One psychologist stated that there are

14   individuals who are incarcerated pursuant to parole holds who should go to a DMH hospital on

15   day one, but cannot because they have to wait to complete the revocation process.  *Id*.

16   Supervisors variously estimated that 90 percent of DMH referrals are pending revocation but

17   cannot transfer because of the DMH restriction, and that at any time, CIM has a minimum of one

18   to two individuals who cannot transfer to DMH because they have not completed the revocation

19   process.  *Id*.

20       The *Coleman* Special Master has also identified defendants' failures to refer and transfer

21   prisoners to DMH because of approaching parole dates as an obstacle to care that must be

22   addressed.  Kahn Decl. ¶ 16.  For example, at CIM, during the seventeenth round of monitoring,

23   there were thirteen prisoners identified by clinicians as requiring DMH inpatient care who were

24   not referred to DMH because of upcoming parole dates.  The Special Master noted that "[t]he

25

26   _____

     [8] In addition to the denial of appropriate DMH inpatient care for individual patients, long stays in
27   MHCB beds by individuals in pending revocation status tie up scarce MHCB resources needed
     by other individuals in CDCR.  CIM reported that "MHCB beds continue to be tied-up with
28   inmate/patients awaiting DMH LOC…."  Rifkin Decl. ¶ 15, Exh. G.

1    number of inmates who needed acute care [at CIM] but did not receive it for one reason or

2    another was troubling." *Seventeenth Monitoring Report of the Special Master on the*

3    *Defendants' Compliance with Provisionally Approved Plans, Policies and Protocols, Part C*,

4    ("17C Report") filed June 13, 2007 [*Coleman* Docket 2274] at 24.  One such prisoner was

5    described as psychotic for "days or weeks before being sent to the MHCB.  Once there, he was

6    referred to a higher level of care, but the referral was rescinded because he had an imminent

7    parole date.  Three days before his release on parole he remained psychotic." *Id* at 29.  This

8    prisoner is another example like the others discussed above of patients who remained housed in

9    Mental Health Crises Beds or unlicensed infirmaries until they are released to the community

10   because defendants' dangerous and unconstitutional policy prevents their transfer to an

11   appropriate DMH inpatient facility.  Kahn Decl. ¶ 16.

**ARGUMENT**

13   **I.    Defendants' Denial Of Inpatient Psychiatric Hospitalization To *Coleman-Valdivia***
14        **Class Members Violates The Constitution And The Orders Of This Court In**
          ***Coleman* And *Valdivia***

15

16            On September 13, 1995 this Court held that defendants have a constitutional obligation to

17   provide timely access to mental health treatment at each level of care.  *Coleman v. Wilson*, 912

18   F.Supp. 1282, 1308 (E.D.Cal. 1995).  Since the 1995 decision, this Court has extensively

19   reviewed access to inpatient psychiatric hospitalization and issued numerous orders directed at

20   removing barriers to timely access to DMH inpatient hospitals and assuring that sufficient

21   hospital beds are available to the *Coleman* class.  Kahn Decl. ¶ 4 and n.1.  In May 2006, the

22   Court held hearings on defendants' proposed Statewide Mental Health Bed Plan.  In its order

23   following those hearings, the Court noted:  "[a]t issue is the access to necessary and

24   constitutionally adequate levels of care for the most seriously mentally ill inmates in the CDCR,

25   including the availability of sufficient numbers of acute inpatient beds, intermediate inpatient

26   beds and mental health crisis beds … It is undisputed that the shortage is leaving critically

27   mentally ill inmates languishing in horrific conditions without access to immediately necessary

28   mental health care."  5/2/06 Order at 2 [*Coleman* Docket 1800]; Kahn Decl. ¶ 4.  On June 28,

1   2006, the Court joined the Department of Mental Health as a defendant in the *Coleman* case in

2   order to ensure that the shortage of inpatient beds for CDCR patients could be more effectively

3   addressed.  6/28/06 Order ¶1 [*Coleman* Docket 1855]; Kahn Decl. ¶ 4.  The availability of

4   adequate inpatient beds for CDCR patients remains an essential component of the CDCR mental

5   health delivery system and a critical concern for this Court.  *See*, *e.g.* 10/18/07 Order [*Coleman*

6   Docket 2461] (approving defendants' August 2007 supplemental bed plan but also ordering

7   defendants to submit a proposal for construction of adequate mental health and treatment space

8   for the existing inpatient programs at SVSP and CMF); Kahn Decl. ¶ 4.

9        The *Coleman* Program Guide is the Court-approved operating manual for defendants'

10   mental health services delivery system.  There are no exceptions in the Program Guide for

11   individuals incarcerated in CDCR institutions because they are "pending" revocation or because

12   they have 35 or fewer days to parole.  Kahn Decl. ¶¶ 8-11.  Nor are such persons exempt from

13   the Eighth Amendment right to be free from deliberately indifferent mental health care.  The

14   Acute Psychiatric Program run by DMH is designed to be a short-term intensive treatment

15   program, no longer than 35-45 days, and the admission criteria are based on the clinical

16   presentation of the patient.  Kahn Decl. ¶¶ 8-9.  The Intermediate Inpatient Care Program run by

17   DMH is designed to provide longer-term mental health intermediate and non-acute inpatient

18   treatment that is not available within CDCR's regular mental health programs, and admission

19   criteria are based on the clinical presentation of the patient.  Kahn Decl. ¶¶ 10-11.  The

20   admission criteria explicitly state that parole release date does not affect eligibility for admission

21   to inpatient programs.  Kahn Decl. ¶ 11.

22        There is nothing in the Program Guide that justifies or permits defendants' policy and

23   practice of denying otherwise eligible CDCR patients admission to these inpatient programs

24   simply because they have not completed their parole revocation process or because they have 35

25   or fewer days until parole.  Kahn Decl. ¶¶ 8, 11.  Nor are there any statutory or regulatory

26   exclusions for the provision of inpatient care to these individuals by the Department of Mental

27   Health.  In short, there is no legitimate basis for the defendants' refusal to provide access to

28   inpatient care to these groups of *Coleman-Valdivia* class members.  Rather, the bar on inpatient

14

[219208-4]

1    care for these individuals forces clinicians to contradict their own clinical assessments by not

2    referring patients who they otherwise would refer to inpatient hospitalization as soon as clinically

3    indicated.

4         Similarly, due process cannot permit defendants' denial of constitutional levels of mental

5    health treatment to individuals who are being held in custody solely pursuant to unadjudicated

6    allegations of a parole violation.  By failing to provide the appropriate level of mental health care

7    to individuals pending revocation, defendants are effectively delaying the stabilization of these

8    individuals and impeding their ability to meaningfully participate in the revocation process—in

9    turn, increasing the likelihood that these individuals will remain unable to participate in the

10   revocation process and remain in the "pending" revocation status—in turn, perpetuating the

11   inability to access DMH treatment.  *See* Galvan Decl. ¶ 6, Exh. 4 at 70 (CDCR *Valdivia*

12   Compliance Rpt., June 1, 2006 to Sept. 26, 2007) ("Many parolees in need of acute mental health

13   care to restore the ability participate in the revocation process require DMH placement, but are

14   not accepted because they have not completed the revocation process.  This is a cycle which

15   results in suspension of the revocation process but the parolee is unable to receive the treatment

16   necessary to enable him/her to complete the process.")

17        Rather than taking steps to provide the expedited treatment required by this Court's

18   January 15, 2008 Order in *Valdivia*, defendants have chosen to construct and maintain artificial

19   barriers to care for this vulnerable group of individuals with mental illness.  Moreover, by the

20   time an individual who is barred from DMH because he or she is unable to meaningfully

21   participate in the revocation process stabilizes, and is able to participate, there is a great

22   likelihood that same individual will be barred from DMH on the other end because, by the time

23   the DMH referral, acceptance, and probable time spent on the waitlist is completed (all beginning

24   after the final completion of the revocation hearing), he or she now has fewer than 35 days until

25   release to parole.  Under the current process—and under any of defendants' various proposed

26

27

28

[219208-4]

1    plans to address the Court's January 15, 2008 Order[9]—defendants fail to provide this group of

2    individuals expedited mental health treatment, treatment necessary to be able to stabilize and

3    participate in the revocation process, or the mental health treatment required in *Coleman*.

4    **II.    Constitutional Due Process And State Law Allow Appropriate Psychiatric**

5    **Hospitalization Of Persons Confined In CDCR Custody**

6         Appropriate inpatient psychiatric hospitalization of persons confined in CDCR custody is

7    consistent with federal constitutional due process and California state law.  California Penal

8    Code, Section 2684 authorizes the transfer of persons confined in state prison to any of the state

9    hospitals under the jurisdiction of the Department of Mental Health.[10]  The *Coleman* Program

10   Guide requires that any CDCR prisoner to be transferred to DMH inpatient psychiatric programs

11   either consent in writing to treatment or be provided with a hearing—either before or after

12   hospitalization—pursuant to California Code of Regulations, Title 15, Section 3369.1(a).  Kahn

13   Decl. ¶¶ 7, 10, Exh. B.  Section 3369.1(a) provides for:  (1) notice of the hearing; (2) an

14   independent and qualified staff member to assist the inmate with preparation for the hearing; (3)

15   an opportunity to present evidence at the hearing; (4) a hearing officer who is not involved with

16   treating the inmate; and (5) a copy of the written decision which shall include the reason for the

17   decision and the evidence relied upon in making the decision.  These protections satisfy federal

18   constitutional due process requirements as set forth in *Vitek v. Jones*, 445 U.S. 480 (1980).

19

20

21

22

23

---

[9] *See* Galvan Decl. ¶ 8, Exh. 6 (Fourth Rpt. of the Special Master on the Status of the Conditions of the Remedial Order at 27) ("Staff have taken at least five very different approaches to this issue in 2007 and 2008; several were described as near completion when Defendants chose to reformulate major components…The most recent of these changes occurred two weeks before the Court-ordered deadline for a full implementation plan and is largely unformed as of this writing.")

[10] Defendants have stated that Penal Code Section 2684 covers "all persons confined to the custody of CDCR, which includes parolees pending revocation."  Galvan Decl. ¶ 6.

[219208-4]

III.     **This Court Should Order Defendants To Provide Access To Inpatient Psychiatric Hospitalization To Persons With Serious Mental Illness In CDCR Custody Regardless Of Revocation Status Or Parole Date**

Defendants are denying constitutionally adequate mental health care to the group of individuals described in this motion, and are doing so in complete disregard for previous orders of this Court in both *Coleman* and *Valdivia*. Plaintiffs have requested that defendants end the DMH ban for these individuals for more than two years in connection with negotiations concerning the revocation process for mentally ill parolees. Despite reports to the *Valdivia* Special Master that defendants would remove obstacles to placing individuals in the parole revocation process in DMH beds when needed, defendants have not in fact done so.

Defendants have been unwilling to alter their policy, and have instead focused on devising plans that contort due process in an effort to place mentally ill individuals in the "revoked" status now required to access DMH care. This is unacceptable. Access to timely and appropriate levels of mental health treatment should not be an impediment to affording class members due process and full rights under the *Valdivia* Permanent Injunction. Similarly, protecting the due process rights of class members should not require them to sacrifice their right to receive timely and appropriate levels of mental health treatment. Defendants have a constitutional obligation to provide both.

Defendants should not be allowed to shirk their obligation to provide constitutional mental health treatment to individuals who are incarcerated, acutely ill, and require inpatient care. The Court should order defendants to immediately provide access to all levels of inpatient care to persons with serious mental illness in CDCR custody regardless of revocation status or parole date.

## CONCLUSION

For the foregoing reasons, plaintiffs respectfully request that this Court issue the following order:

Defendants shall immediately take all necessary steps to provide timely access to all levels of inpatient psychiatric hospitalization, including inpatient hospital beds operated by the

17

[219208-4]

Department of Mental Health, to persons in CDCR custody regardless of parole revocation status or parole date.

Dated:  June 25, 2008                          Respectfully submitted,

                                               ROSEN, BIEN & GALVAN, LLP


                                               By: */s/ Lori Rifkin*
                                                   Lori Rifkin
                                                   Attorney for Plaintiffs

[219208-4]