PRISON LAW OFFICE
DONALD SPECTER Bar No.: 83925
STEVEN FAMA Bar No.: 99641
E. IVAN TRUJILLO Bar No.: 228790
1917 Fifth Street
Berkeley, California 94710-1916
Telephone: (510) 280-2621
Facsimile: (510) 280-2704

ROSEN, BIEN & GALVAN, LLP
MICHAEL W. BIEN Bar No.: 096891
JANE E. KAHN Bar No.: 112239
ERNEST GALVAN Bar No.: 196065
LORI RIFKIN Bar No.: 244081
315 Montgomery Street, 10th Floor
San Francisco, California 94104
Telephone: (415) 433-6830

THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
CLAUDIA CENTER Bar No.: 158255
600 Harrison Street, Suite 120
San Francisco, CA 94107
Telephone: (415) 864-8848

BINGHAM, McCUTCHEN, LLP
WARREN E. GEORGE Bar No.: 53588
GEOFFREY THOMAS HOLTZ Bar No.: 191370
KRISTEN A. PALUMBO Bar No.: 215857
Three Embarcadero Center
San Francisco, California 94111
Telephone: (415) 393-2000

HELLER, EHRMAN, WHITE & McAULIFFE
RICHARD L. GOFF Bar No.: 36377
701 Fifth Avenue
Seattle, Washington 98104
Telephone: (206) 447-0900

KIRKPATRICK & LOCKHART PRESTON GATES ELLIS LLP
JEFFREY L. BORNSTEIN, Bar No.: 99358
55 Second Street, Suite 1700
San Francisco, CA 94105-3493
Telephone: (415) 882-8200

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN,<br><br>Plaintiffs,<br><br>v.<br><br>ARNOLD SCHWARZENEGGER, et al.,<br><br>Defendants. | Case No. Civ S 90-0520 LKK-JFM |
| JERRY VALDIVIA, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>ARNOLD SCHWARZENEGGER, et al.,<br><br>Defendants. | Case No. Civ. S-94-0671 LKK/GGH<br><br>**DECLARATION OF ERNEST GALVAN IN SUPPORT OF PLAINTIFFS' MOTION FOR INJUNCTIVE RELIEF REQUIRING TIMELY ACCESS TO INPATIENT PSYCHIATRIC HOSPITALIZATION**<br><br>Hearing Date: July 25, 2008<br>Time: 10:00 a.m.<br>Location: Courtroom 4<br>Judge: Hon. Lawrence K. Karlton |

[219089-1]

DECL. OF E. GALVAN IN SUPPORT OF PLS.' MOTION FOR INJUNCTIVE RELIEF REQUIRING TIMELY ACCESS TO INPATIENT PSYCHIATRIC HOSPITALIZATION - Case Nos. Civ S 90-0520 LKK-JFM; Civ S-94-0671 LKK/GGH

# TABLE OF ABBREVIATIONS/ACRONYMS

| | |
|---|---|
| BPH: | Board of Parole Hearings |
| CCCMS: | Correctional Clinical Case Manager System |
| CDCR: | California Department of Corrections and Rehabilitation |
| CRIPA | Civil Rights of Institutionalized Persons Act |
| CTC: | Correctional Treatment Center |
| DC | Deputy Commissioner |
| DMH: | Department of Mental Health |
| DOF: | Director of Finance |
| EOP: | Enhanced Outpatient Program |
| HQ: | Headquarters |
| LOC: | Level of Care |
| MHCB: | Mental Health Crisis Bed |
| MOU: | Memorandum of Understanding |
| OHU: | Outpatient Housing Unit |
| PCH | Probable Cause Hearing |
| RC: | Reception Center |
| RSTS | Revocation Scheduling and Tracking System |
| RTC | Return to Custody |

DECL. OF E. GALVAN IN SUPPORT OF PLS.' MOTION FOR INJUNCTIVE RELIEF REQUIRING TIMELY ACCESS TO INPATIENT PSYCHIATRIC HOSPITALIZATION - Case Nos. Civ S 90-0520 LKK-JFM; Civ S-94-0671 LKK/GGH

[219089-1]

I, Ernest Galvan, do hereby declare as follows:

1.  I am an attorney admitted to practice law in California and a partner in the law firm Rosen, Bien & Galvan, one of the counsel of record for Plaintiff class in this case. I have personal knowledge of the matters set forth herein and if called as a witness I could competently so testify. I make this declaration in support of Plaintiffs' Motion for Injunctive Relief Requiring Timely Access To Inpatient Psychiatric Hospitalization.

2.  Plaintiffs' Motion is directed at defendants' policy and practice of denying otherwise eligible CDCR patients admission to DMH inpatient programs solely because they have not yet completed their parole revocation process or because they have thirty-five (35) days or less to serve.

3.  Attached hereto as Exhibit 1 is a true and correct copy of an Order in *Valdivia v. Schwarzenegger,* Civ. 94-671 LKK, dated January 15, 2008. The January 15, 2008 order requires that "defendants must undertake and sustain work toward the earliest practical solution to providing due process to parolees who appear, either in the judgment of their attorneys or defendants' staff, too mentally ill to participate in revocation proceedings." The January 15, 2008 Order requires the development of policies and procedures that "must include methods to expedite treatment and to provide due process . . . ."

4.  Prior to the issuance of the January 15, 2008 Order, the *Valdivia* Special Master documented systemic problems in ensuring that persons with severe mental illness received access to treatment during the parole violation hearing process. Attached hereto as Exhibit 2 is a true and correct copy of excerpts of the First Report of the Special Master on the Status of Conditions of the Remedial Order, filed on September 14, 2006 (*Valdivia* Docket No. 1302). The excerpts attached at Exhibit 2 hereto include the cover page and pages 49-54. The Special Master reported the following facts that are pertinent to this motion:

   a) On June 15, 2006, Plaintiffs' counsel in *Valdivia* sent a notice of violation to CDCR regarding the practice of returning parolees to prison "for psychiatric treatment." (Exhibit 2 at 50-51.) This process was often referred to as the "psychiatric return" process. (Id.) One of the defects of the psychiatric return process, according to Plaintiffs'

1

DECL. OF E. GALVAN IN SUPPORT OF PLS.' MOTION FOR INJUNCTIVE RELIEF REQUIRING TIMELY ACCESS TO INPATIENT PSYCHIATRIC HOSPITALIZATION - Case Nos. Civ S 90-0520 LKK-JFM; Civ S-94-0671 LKK/GGH

[219089-1]

1    notice of violation, was "'lack of adequate mental health care in the prison system.'"
2    (Exhibit 2 at 51.)   Under Defendants' practice, parolees were to be returned for a one-
3    year term "unless a CDCR clinician certifies mental health improvement sufficient for
4    earlier release." (Exhibit 2 at 50.)

   b) The Special Master noted that it appeared "that clinicians commonly are not familiar with the assessments needed to determine whether the parolees are stabilized sufficient for release, so there is a substantial risk that these parolees are held for months longer than necessary." (Exhibit 2 at 53.)

5.    Attached hereto as Exhibit 3 is a true and correct copy of an excerpt of the Second Report of the Special Master on the Status of Conditions of the Remedial Order, filed in *Valdivia* on June 11, 2007 (*Valdivia* Docket No. 1335).   The excerpted pages include pages 11-17 and 31-32.  The Special Master reported the following facts that are pertinent to this motion:

   a) Regarding the "psychiatric return" process, the Special Master noted that "[t]he purpose of the revocations – treatment – is undermined by the uncertainties of care provided in county jails; deficiencies in care in CDCR Reception Centers and other facilities, as documented in *Coleman v. Schwarzenegger*; and difficulty accessing Department of Mental Health (DMH) treatment, particularly with questions raised as to the legal bases for either system to retain custody.  There has not been a reliable mechanism to ensure that these parolees reach treatment expeditiously." (Exhibit 3 at 12.)

   b) The Special Master noted that "Significant numbers of parolees revoked under the psych return process in the last half of 2006 did not reach treatment, and/or did not appear to be reassessed for hearing participation, for prolonged periods." (Exhibit 3 at 14.)

   c) The Special Master noted that "On January 12, 2007, CDCR Secretary Tilton issued a memorandum terminating the return of mentally ill parolees to prison 'solely for psychiatric services.'" (Exhibit 3 at 16.)

   d) The Special Master noted: "Efforts have been directed at due process and stabilization for a particular subset of the mentally ill, as described above; that population is likely to be severely and chronically ill. Among them, there will be parolees whose treatment needs

2

exceed CDCR's capacity. As the parties finalize these processes, the Special Master will look for interagency coordination and agreement with the Department of Mental Health to ensure that this population has timely access to that agency's acute and intermediate care programs." (Exhibit 3 at 31-32.)

6. Attached hereto as Exhibit 4 is a true and correct copy of an excerpt of a document titled "CDCR *Valdivia* Compliance Report, June 1, 2006 to September 26, 2007." I received this document by email from Supervising Deputy Attorney General Vickie Whitney on September 26, 2007. The report states that it was produced by the CDCR Office of Legal Affairs Court Compliance Team at the direction of Special Master Chase Riveland. The excerpts attached at Exhibit 4 hereto include the cover page and pages 69-70. The CDCR *Valdivia* Compliance Report states the following regarding access to DMH inpatient facilities for persons pending parole revocation proceedings:

> CDCR has identified several key issues that must be resolved before a meaningful process for the mentally ill parolee population can be developed and implemented. The two most significant issues remaining are as follows:
>
> 1) Access to the Department of Mental Health (DMH) for parolees who may be or are found unable to meaningfully participate in the parole revocation process:
>
> *Issue: Whether a parolee must be in revoked status in order to be accepted at a DMH facility?*
>
> Plaintiffs have asked whether DMH has agreed to accept parolees who are not in revoked status. Plaintiffs have further requested that CDCR report on any legal barriers to access to DMH beds for parolees going through the revocation process or in revoked status.
>
> Penal Code Section 2684 is on point, dealing with transfer of inmates to state hospitals. That section provides, "If, in the opinion of the Director of Corrections, the rehabilitation on any mentally ill, mentally deficient, or insane person confined in a state prison may be expedited by treatment at any one of the state hospitals under the jurisdiction of the State Department of Mental Health or the State Department of Developmental Services, the Director of Corrections, with the approval of the Board of Prison Terms, shall certify that fact to the director of the appropriate department who shall evaluate the

3

DECL. OF E. GALVAN IN SUPPORT OF PLS.' MOTION FOR INJUNCTIVE RELIEF REQUIRING TIMELY ACCESS TO INPATIENT PSYCHIATRIC HOSPITALIZATION - Case Nos. Civ S 90-0520 LKK-JFM; Civ S-94-0671 LKK/GGH

[219089-1]

> prisoner to determine if he or she would benefit from care and treatment in a state hospital…"
>
> DMH has historically interpreted this section to require that a parolee be in revoked status in order for transfer pursuant to the above section. However, CDCR interprets the section to cover all persons confined to the custody of CDCR, which includes parolees pending revocation.
>
> At the time the parties began meeting in early 2007 to negotiate a process for the mentally ill parolee population unable to meaningfully participate in the revocation process, DMH refused to accept parolees unless they are in revoked status. However, the BPH cannot revoke a parolee who is too mentally ill to participate in the revocation process. Many parolees in need of acute mental health care to restore the ability to participate in the revocation process require DMH placement, but are not accepted because they have not completed the revocation process. This is a cycle which results in suspension of the revocation process but the parolee is unable to receive the treatment necessary to enable him/her to complete the process.
>
> DMH has been directed to accept parolees in need of psychiatric treatment from CDCR regardless of their revocation status. A Memorandum of Understanding between CDCR and DMH has been updated to reflect the direction that parolees who are deemed unable to meaningfully participate in the revocation process are in within the legal custody of CDCR and that DMH will accept such parolees for treatment, where possible, giving them the same priority/status as other CDCR inmates are given. The updated Memorandum of Understanding is currently being approved by all necessary parties.

7.   Attached hereto as <u>Exhibit 5</u> is a true and correct copy of an excerpt of the Third Report of the Special Master on the Status of Conditions of the Remedial Order, filed in *Valdivia* on November 28, 2007 (*Valdivia* Docket No. 1388.)  The excerpts attached at Exhibit 5 hereto include the cover page and pages 20-24, 74-75, 77-79.  The Special Master reported the following facts that are pertinent to this motion:

   a) The Special Master reported that Defendants had identified approximately 80 parolees in 2007 up to the time of the report for whom proceedings were suspended due for mental health reasons.  (<u>Exhibit 5</u> at 22.)

4

DECL. OF E. GALVAN IN SUPPORT OF PLS.' MOTION FOR INJUNCTIVE RELIEF REQUIRING TIMELY ACCESS TO INPATIENT PSYCHIATRIC HOSPITALIZATION - Case Nos. Civ S 90-0520 LKK-JFM; Civ S-94-0671 LKK/GGH

[219089-1]

b) The Special Master noted that those parolees held in suspended status at Reception Centers were generally treated in the Enhanced Outpatient Program and that "Defendants report that they have removed some obstacles to placing these parolees in the Department of Mental Health when needed and negotiations concerning those transfers are underway." (Exhibit 5 at 22; see also, id. at 75 ("Access to early referrals and treatment has improved and there is progress on the longstanding difficulty of transfers to the Department of Mental Health.")

c) The Special Master recommended that the Court order a timetable for "the earliest practical solution to providing due process for parolees who appear, either in the judgment of their attorneys or Defendants' staff, too mentally ill to participate in revocation proceedings," including the development of policies and procedures to that "include methods to expedite treatment ." (Exhibit 5 at 77-78.) These recommendations became the basis for the Court's January 15, 2008 Order, Exhibit 1 hereto.

8. Attached hereto as Exhibit 6 is a true and correct copy of an excerpt of the Fourth Report of the Special Master on the Status of Conditions of the Remedial Order, lodged with the Court in *Valdivia* by email on April 28, 2008 (and not yet entered on the docket). The excerpts attached at Exhibit 6 hereto include the cover page and pages 27-30, 73-74. The Special Master reported the following facts that are pertinent to this motion:

a) The Special Master noted that Defendants' efforts to develop policies and procedures in compliance with the January 15, 2008 Order was characterized by frequent changes of basic approach:

> Staff have taken at least five very different approaches to this issue in 2007 and 2008; several were described as near completion when Defendants chose to reformulate major components. While plan components are certainly within Defendants' discretion, such changes carry the risk of necessary features not being carried forward, ramifications of new components on other components not being anticipated, and delays attendant to working this through. The most recent of these changes occurred two weeks before the Court-ordered deadline for a full implementation plan and is largely unformed as of this writing.

5

DECL. OF E. GALVAN IN SUPPORT OF PLS.' MOTION FOR INJUNCTIVE RELIEF REQUIRING TIMELY ACCESS TO INPATIENT PSYCHIATRIC HOSPITALIZATION - Case Nos. Civ S 90-0520 LKK-JFM; Civ S-94-0671 LKK/GGH

[219089-1]

(Exhibit 6 at 27.)

b) The Special Master noted the importance of access to inpatient mental health beds:

> Ensuring that class members have access to Department of Mental Health care will be a critical component of the plan. The Special Master has been clear in his expectations, at least since his Second Report, that all involved agencies must address this issue. Defendants have represented, since August 2007, that an agreement on-point was imminent. Recent developments indicate much more work remains.

(Exhibit 6 at 28.)

c) The Special Master reported that parole proceedings had been suspended due to mental illness on "just over 180 occasions in the 13 months" since Defendants' "interim procedure" had been in place. *Id.* at 28.

d) The Special Master noted the areas of overlap between *Valdivia* and *Coleman:*

> *Valdivia* intersects with the *Coleman* case primarily in three instances. First, there is a need to house and treat parolees too mentally ill to participate in their hearings and to monitor their conditions so that hearings may be held consistent with due process. Second, a subset of those people may be diagnosed as needing treatment at the Department of Mental Health, and there have been historical barriers to their being placed there. Defendants have been negotiating an addendum to the Memorandum of Understanding between the two Departments, which would allow such placements, for at least nine months.
>
> The timeliness and quality of care for the mentally ill parolees in reception centers also intersects with *Coleman* to the extent that if the level of care available to any mentally ill parolee in those facilities is enhanced through *Coleman* activities it may correspondingly improve the care for parolees.

(Exhibit 6 at 73-74.)

9. During the meet-and-confer process arising from the January 15, 2008 Order, Plaintiffs' counsel has learned that the resolution of the DMH inpatient access issued promised in CDCR's September 26, 2007 Compliance Report (Exhibit 4 hereto), and anticipated by the Special Master in First (Exhibit 2), Second (Exhibit 3), Third (Exhibit 5), and Fourth (Exhibit 6) Special Master reports, has, in fact, never materialized.

6

DECL. OF E. GALVAN IN SUPPORT OF PLS.' MOTION FOR INJUNCTIVE RELIEF REQUIRING TIMELY ACCESS TO INPATIENT PSYCHIATRIC HOSPITALIZATION - Case Nos. Civ S 90-0520 LKK-JFM; Civ S-94-0671 LKK/GGH

[219089-1]

10. Instead of delivering on their promise to remove unfounded obstacles to DMH access, CDCR in late March and early April 2008 suddenly switched directions in their proposed procedures for handling revocation proceedings for persons whose mental illness prevented them from participating in hearings. Instead of suspending the proceedings to allow for treatment, CDCR proposed holding revocation hearing regardless of whether the parolee was competent to participate and assist counsel in defending against the charges.

11. The first written notice Plaintiffs received of this change was an in email of March 20, 2008. A true and correct copy of this email and its attachments is attached hereto as <u>Exhibit 7</u>. The March 20, 2008 letter refers at page 1 to a "modification to the approach by Defendants," which is further described at page 2 as including a revocation hearing regardless of the parolee's inability to participate and assist counsel. The Chart attached to Exhibit 7 includes questions from the Special Master in the left-hand column and answers from Defendants in the right-hand column. The first question on the Chart is: "Access to DMH for parolees pending revocation or in suspended revocation status: defendants reported that this issue is still being negotiated. What is the current status?" The answer is given in the next column as: "In the approach currently being contemplated by the Defendants, the parolee may be revoked and, if the parolee qualifies, would be sent to DMH via the standard Coleman guidelines. Given the change in direction, there will need to be further negotiations."

12. Attached hereto as <u>Exhibit 8</u> is a true and correct copy of an email I received from Deputy Attorney General Jessica Devencenzi on March 25, 2008, attaching a copy of 28 CFR § 2.8 (Matthew Bender 2008), and 68 Federal Register 70709 (Dec. 19, 2003) regarding the adoption of this regulation, governing parole revocation proceedings in the District of Columbia, as operated by the United States Parole Commission.

13. Attached hereto as <u>Exhibit 9</u> is a true and correct copy of a document I received by email from Deputy Attorney General Jessica Devencenzi on April 3, 2008, titled "Comprehensive Plan Addressing The Needs Of Parolees In The Revocation Process Who Are Mentally Incompetent." This document provides at pages 6-7 that the revocation hearing is take place regardless of the outcome of an evaluation of the parolee's ability to participate. In

7

DECL. OF E. GALVAN IN SUPPORT OF PLS.' MOTION FOR INJUNCTIVE RELIEF REQUIRING TIMELY ACCESS TO INPATIENT PSYCHIATRIC HOSPITALIZATION - Case Nos. Civ S 90-0520 LKK-JFM; Civ S-94-0671 LKK/GGH

[219089-1]

1 addition, this plan at pages 3-4 restricts the ability of parolees' appointment counsel to visit
2 clients in Mental Health Crisis Bed care, provides that proceedings should be postponed
3 indefinitely if the treatment facility declares that the parolee is "unavailable" to meet with
4 counsel.

5      14.    Attached hereto as <u>Exhibit 10</u> is a true and correct copy of a document I received
6 by email from Deputy Attorney General Jessica Devencenzi on April 25, 2008, titled
7 "Comprehensive Plan Addressing The Needs Of Parolees In The Revocation Process Who Are
8 Mentally Incompetent." This document states at page 1:

> Prior to revocation and during the revocation process, California Department of Corrections and Rehabilitation (CDCR) staff will consider, where appropriate and resources are available, mental health treatment for parolees who appear incompetent. In custody, these parolees may be placed in Mental Health Crisis Beds or the Enhanced Outpatient Program, if clinically appropriate. If appropriate, CDCR clinicians may refer revoked parolees to the California Department of Mental Health.

15 This April 25 plan, like the April 3 predecessor, carries over the prohibition on attorneys meeting
16 with clients in the Correctional Treatment Centers. (Exhibit 10 at page 4.)

17      15.    Attached hereto as <u>Exhibit 11</u> is a true and correct copy of a letter from my office
18 to Defendants dated April 30, 2008 (without attachments), responding to the April 25, 2008
19 version of the "Comprehensive Plan Addressing The Needs Of Parolees In The Revocation
20 Process Who Are Mentally Incompetent." This letter at page 7 requests that Defendants confirm
21 whether DMH has agreed to accept parolees at all stages of the revocation process:

> CDCR's plan does not confirm that parolees at all stages for the revocation process will have access to DMH if they require DMH level of care. DMH placements must be available on an expedited basis throughout the revocation process, from the time the parole hold is placed to re-release to parole. Please confirm agreement by DMH to accept parolees throughout the revocation process and produce the written Memorandum of Understanding executed by DMH and CDCR reciting this agreement. Plaintiffs request that counsel for DMH and a client representative from DMH be present at the meeting to address this issue.

8

DECL. OF E. GALVAN IN SUPPORT OF PLS.' MOTION FOR INJUNCTIVE RELIEF REQUIRING TIMELY ACCESS TO INPATIENT PSYCHIATRIC HOSPITALIZATION - Case Nos. Civ S 90-0520 LKK-JFM; Civ S-94-0671 LKK/GGH

[219089-1]

16. On May 5, 2008, I attended a meet-and-confer in Sacramento with representatives of the Board of Parole Hearings, CDCR Health Care Services Division, and the CDCR General Counsel. The CDCR participants at the meeting confirmed that DMH would not treat persons confined by CDCR on parole violation charges until parole revocation hearings were complete.

17. Attached hereto as <u>Exhibit 12</u> is a true and correct copy of a letter from Deputy Attorney General Jessica Devencenzi received in my office on May 12, 2008. The letter responds to the above-quoted request for confirmation that DMH will accept persons being held in CDCR institutions pending revocation by stating that DMH will only accept such parolees "once revoked," and then only "so long as the parolee''s [sic] term of confinement exceeds 35 days." (Exhibit 12 at page 4.) The entire passage reads as follows:

> **Confirm agreement by DMH to accept parolees throughout the revocation process and produce an MOU reciting this agreement. (April 30, 2008 Letter, page 7.)**
>
> DMH understands that parolees who are returned to a CDCR facility pending revocation will, upon entry into CDCR, be screened for mental health issues in accord with Reception Center protocols described in the Coleman Revised Program Guide. The screening occurs within 24 hours of the parolee''s arrival. Should a parolee awaiting revocation demonstrate mental health issues at this screening, the parolee will undergo a mental health assessment by CDCR clinicians and, if eligible, receive those levels of care provided by and within CDCR under Coleman Revised Program Guide standards (such as Coordinated Clinical Case Management System, Enhanced Outpatient Program, Mental Health Crisis Bed, and Outpatient Housing Unit.) Once revoked, the parolee like any other inmate, who requires inpatient (intermediate or acute) care from a Department of Mental Health facility, may be referred and accepted for such care so long as the parolee''s term of confinement following the revocation exceeds 35 days. As is the case with any and all inmates, this minimum 35-day period of confinement enables DMH to deliver, and the patient to benefit from, the recovery-based model of care mandated by the consent judgment with the United States Department of Justice under the Civil Rights of Institutionalized Persons Act (CRIPA).

18. Attached hereto as <u>Exhibit 13</u> is a true and correct copy (without attachments) of a letter from me to Defendants sent by my office on May 16, 2008, notifying Defendants that

DECL. OF E. GALVAN IN SUPPORT OF PLS.' MOTION FOR INJUNCTIVE RELIEF REQUIRING TIMELY ACCESS TO INPATIENT PSYCHIATRIC HOSPITALIZATION - Case Nos. Civ S 90-0520 LKK-JFM; Civ S-94-0671 LKK/GGH

[219089-1]

DMH's refusal to treat persons confined by CDCR on pending parole violation charges was a violation of orders in *Coleman* and would be brought to the attention of the Court.

19. On or about May 21, 2008, I participated in a series of telephone conferences at which the parties agree to jointly seek an extension of time of the June 15, 2008 implementation deadline in the January 15, 2008 Order (Exhibit 1 hereto) to August 15, 2008, to allow for a final meet and confer on the issue of access to DMH, and to present the issue to the *Coleman* Court if necessary. In addition, the parties intended to present the due process issues to the *Valdivia* Court. The parties agreed that in the interim, CDCR should improve and implement its current interim (or "gap") policies under which proceedings are suspended if a parolee cannot participate in parole proceedings due to mental illness. Under these procedures, proceedings are suspended for up to 12 months which the parolee receives treatment in CDCR.

20. On June 6, 2008, I received by email from Supervising Deputy Attorney General Vickie Whitney, a document titled "Comprehensive Plan Addressing the Needs of Parolees in the Revocation Process Who Are Mentally Incompetent And/Or Have Serious Mental Disorders Requiring Mental Health Care Under the Revised Program Guide." A true and correct copy of this document is attached hereto as Exhibit 14. This document confirms in several places that persons confined by CDCR pending revocation charges will not be allowed to access inpatient care at DMH facilities. The document states at page 1:

> CDCR clinicians may refer only revoked parolees with a minimum 35-day term of confinement to the California Department of Mental Health (DMH) for inpatient care in accord with the Revised Program Guide standards.

The document further provides at page 16:

> Parolees who are awaiting revocation are not eligible for referral to the California Department of Mental Health (DMH) for inpatient care in accord with the Revised Program Guide standards.
>
> Once placed in revoked status, the parolee who is eligible for inpatient DMH care under Revised Program Guide standards may be referred for such care so long as he or she has a minimum 35-day confinement term.

10

DECL. OF E. GALVAN IN SUPPORT OF PLS.' MOTION FOR INJUNCTIVE RELIEF REQUIRING TIMELY ACCESS TO INPATIENT PSYCHIATRIC HOSPITALIZATION - Case Nos. Civ S 90-0520 LKK-JFM; Civ S-94-0671 LKK/GGH

[219089-1]

The document at Exhibit 14 page 7 confirms restrictions on attorney access to clients in Mental Health Crisis Bed care, and provides for renewable 20-day postponements due to lack of attorney access to the clients.

21. To exhaust any and all possibilities of resolving this dispute without intervention, Plaintiffs' counsel requested a meeting among Plaintiffs' counsel, Defendants' Counsel, and the *Coleman* and *Valdivia* Special Masters, with DMH officials present. Deputy Attorney General Lisa Tillman stated that Defendants would only participate in such a meeting on two conditions, (1) that the Special Master Lopes be present, and, (2) that "DMH understands that any statements made by any person at the meeting will be viewed as made within the context of a negotiation and so not subject to use or reference at any later proceeding in this or any other matter." Attached as Exhibit 15 are true and correct copies of the June 3, 2008 email from Ms. Tillman stating these conditions, and the June 5, 2008 email from my office agreeing to these conditions.

22. I attended the above-mentioned meeting with CDCR and DMH on June 9, 2008. Also present for and participating in the meeting were *Valdivia* Special Master Chase Riveland, *Coleman* Special Master Matthew Lopes, *Coleman* expert Dr. Jeff Metzner, Deputy Attorneys General Lisa Tillman, Vickie Whitney, and Jessica Devencenzi, DMH Counsel Cynthia Rodriguez, Health and Human Services Agency Chief Counsel Frank Furtek, and DMH Deputy Director Cindy Radavsky.

23. On June 17, 2008, I attended a meet-and-confer session with *Valdivia* Special Master Chase Riveland, Deputy Special Master Ginny Morrison, and numerous representatives of CDCR regarding the procedures for accused parole violators with mental illness apart from DMH access. At that meeting Plaintiffs' counsel informed all present that we would bring this motion promptly regarding DMH access, but would defer a motion of the overall due process policies pending further changes, particularly to the lack of attorney access to clients in treatment, provided that immediate efforts were made to improve the interim or "gap" processes. Because the interim or "gap" processes leave parolees in "suspended" revocation state for up to twelve months, it is essential that the DMH access issue be resolved promptly.

11

DECL. OF E. GALVAN IN SUPPORT OF PLS.' MOTION FOR INJUNCTIVE RELIEF REQUIRING TIMELY ACCESS TO INPATIENT PSYCHIATRIC HOSPITALIZATION - Case Nos. Civ S 90-0520 LKK-JFM; Civ S-94-0671 LKK/GGH

[219089-1]

24. Attached hereto as <u>Exhibit 16</u> is a true and correct copy of the Stipulated Order for Permanent Injunctive Relief in *Valdivia,* Docket No. 1034. The *Valdivia* Permanent Injunction requires that accused parole violators receive notice of the charges against them no later than 3 business days after the parole hold, appointment of counsel with a consultation no later than 8 to 9 business days after the hold, a probable cause hearing no later than 13 business days after the parole hold is placed, and a full revocation hearing no later than 35 calendar days after the parole hold is placed. Exhibit 16 ¶¶ 11(b)(iii); 11(b)(iv); 11(d); 13, 23; *id.* at Exh. A, *Valdivia Remedial Plan* Outline.

I declare under penalty of perjury under the laws of California and the United States, that the foregoing is true and correct, and that this declaration is executed in San Francisco, California on June 25, 2008.

                                           */s/ Ernest Galvan*
                                           Ernest Galvan

12

DECL. OF E. GALVAN IN SUPPORT OF PLS.' MOTION FOR INJUNCTIVE RELIEF REQUIRING TIMELY ACCESS TO INPATIENT PSYCHIATRIC HOSPITALIZATION - Case Nos. Civ S 90-0520 LKK-JFM; Civ S-94-0671 LKK/GGH

[219089-1]