# EXHIBIT 1

1

2

3

4

5

6

7                    UNITED STATES DISTRICT COURT

8                   EASTERN DISTRICT OF CALIFORNIA

9

10   JERRY VALDIVIA, ALFRED YANCY,
     and HOSSIE WELCH, on their own
11   behalf and on behalf of the class
     of all persons similarly situated,
12                                              NO. CIV. S-94-671 LKK/GGH
             Plaintiffs,
13
         v.                                          O R D E R
14
     ARNOLD SCHWARZENEGGER, Governor of
15   the State of California, et al.,

16           Defendants.
     _____/
17

18       Based on the factual observations and recommendations of the

19   Special Master described in his Third Report of the Special Master

20   on the Status of the Condition of the Remedial Order, the court

21   ORDERS that defendants must undertake and sustain work toward the

22   earliest practical solution to providing due process to parolees

23   who  appear,  either  in  the  judgment  of  their  attorneys  or

24   defendants' staff, too mentally ill to participate in revocation

25   proceedings. These efforts must be undertaken in consultation with

26   plaintiffs' counsel and the Special Master. Defendants are further

                                    1

1   ORDERED as follows:

2       1.   Defendants must provide progress updates to the Special

3            Master and plaintiffs' counsel every three weeks,

4            beginning three weeks from the date of this order, until

5            the Special Master determines they are no longer

6            necessary.

7       2.   By March 1, 2008, the defendants must provide to the

8            Special Master and plaintiffs' counsel a status report

9            on the development of policies and procedures concerning

10           this population. The policies and procedures must

11           include methods to expedite treatment and to provide due

12           process and full rights under the Permanent Injunction.

13      3.   By March 15, 2008, defendants must provide to the

14           Special Master and plaintiffs' counsel the standards

15           defendants intend to use to determine whether a parolee

16           is unable to participate meaningfully in revocation

17           proceedings, by virtue of mental illness, and whether

18           that ability has been regained. The standards should

19           identify the types of staff or other service providers

20           responsible for applying the standards.

21      4.   By April 3, 2008, the defendants must provide to the

22           Special Master and plaintiffs' counsel a detailed plan

23           for implementing these policies and procedures and for

24           training all affected CDCR staff and CalPAP attorneys.

25           The plan must specify associated funding and timelines

26           regarding the implementation process, and any new

1        resources required.

2       5.   By June 15, 2008, these policies and procedures must be

3          implemented.

4     The Special Master may, in his discretion, grant an extension

5 of time on any of these deadlines upon either party's request and

6 a showing of good cause.

7     IT IS SO ORDERED.

8     DATED: January 14, 2008.

9

10

11                   LAWRENCE K. KARLTON

12                   SENIOR JUDGE

                       UNITED STATES DISTRICT COURT

13

14

15

16

17

18

19

20

21

22

23

24

25

26

# EXHIBIT 2

# FILED

SEP 1 4 2006



CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF CALIFORNIA

VALDIVIA, et al.,

    Plaintiffs,

      vs.                            No. CIV S-94-671 LKK/GGH

ARNOLD SCHWARZENEGGER, et al.,

    Defendants.

_____/

## FIRST REPORT OF THE SPECIAL MASTER
## ON THE STATUS OF
## CONDITIONS OF THE REMEDIAL ORDER

### Background

On May 2, 1994, the *Valdivia vs. Schwarzenegger* class action lawsuit was filed. The Court certified the case as a class action by order dated December 1, 1994. On June 13, 2002, the Court granted partial summary judgment in favor of the Plaintiffs. On July 23, 2003, the Court ordered the Defendants to submit a remedial plan, with specific guidance regarding: "...a preliminary probable cause hearing which (1) occurs no more than ten calendar days after a parolee is taken into custody for an alleged parole violation, and (2) affords the parolee rights provided by *Morrissey*, including notice of the alleged

1

- Time calculation issues, such as denial of work time credits if a parolee on revoked status remains in a non-CDCR facility

- Exclusion of parolees with disabilities from remedial sanctions such as the Parolee Substance Abuse Program

- Whether providing psychotropic medication is an obligation for carrying out effective communication with mentally ill parolees

### Relationship to Other Cases

In practical terms, a variety of issues in *Valdivia v. Schwarzenegger* arguably overlap with concurrent remedial orders in *Coleman v. Schwarzenegger* and *Armstrong v. Schwarzenegger.* *Coleman*

Defendants have not submitted to the Special Master any positions about the potential relationship of the practices in these lawsuits. Plaintiffs maintain that these areas overlap between *Coleman* and *Valdivia*:

- Pre-release and discharge planning
- Mentally ill parolees' technical violations
- Psychiatric revocations
- Remedial sanctions, overcrowding, and reception centers

Pre-release and discharge planning: Plaintiffs argue that CDCR's failure to provide mentally ill inmates who have impending paroles with adequate pre-release planning and treatment, as well as post-release services, results in their being immediately vulnerable to revocation, especially for being unable to obtain appropriate housing or treatment for mental illness in the community. Plaintiffs argue that CDCR's actions or omissions led to these violations and that a subsequent revocation proceeding is therefore fundamentally unfair, making it a *Valdivia* issue.

49

The Special Master declines to adopt Plaintiffs' view. The complained of practices concern services provided or omitted by staff outside DAPO and BPH and outside due process procedures and provision of remedial sanctions. While Plaintiffs seek to require services that are arguably much needed, *Valdivia* is not a source mandating them.

Technical violations: Plaintiffs also say that Defendants send some mentally ill parolees back to prison essentially for being mentally ill. Plaintiffs say that Defendants revoke a large number of these patients' paroles on technical violations as a substitute for their genuine reasons, and that the parolee behaviors underlying the revocations spring from the lack of treatment resources in the community.

Again, while there is ample reason to believe there is great need for more community mental health treatment, Plaintiffs' argument appears to be based, not in *Valdivia* mandates, but in judgments about the quality of decisions that are within DAPO and BPH discretion. As such, the Special Master is not convinced that this is a matter for the *Valdivia* court.

Psychiatric revocations: Under Title XV, DAPO and BPH staff may give a mentally ill parolee a one-year revocation term on the basis that his/her mental illness is not in remission and makes him/her likely to commit a crime ("psych returns"). This presupposes that the revocation is for purposes of treatment while incarcerated, and the full term must be served unless a CDCR clinician certifies mental health improvement sufficient for earlier release. Plaintiffs' counsel, on June 15, 2006, sent notice to Defendants that Plaintiffs believe Defendants are in violation of the *Valdivia* Permanent Injunction by continued use of the psychiatric return process. In August 2006, Defendants

told all parties that they had decided to cease using the psych return process. Some issues remain, however, as staff have not yet been notified of the change in policy and some parolees may continue to be revoked under these provisions for a time, and Defendants have a number of parolees currently in custody under these terms.

Plaintiffs state in their notice: "... the psychiatric return process presents serious due process concerns, and results in severely mentally ill parolees being placed in dangerous and life threatening situations. Both procedural problems in the psychiatric return process, and the use itself of psychiatric returns given the lack of adequate mental health care in the prison system, implicate the underlying concerns of the Permanent Injunction..."

The Plaintiffs' notice continues: "Defendants' current psychiatric returns practices are rife with procedural defects that directly violate specific terms of the Permanent Injunction:

- Withholding psychiatric evaluations from parolees' appointed counsel;
- Failure to timely serve mentally ill parolees with notice of charges;
- Failure to hold timely revocation hearings for mentally ill parolees;
- Failure to provide mentally ill parolees the opportunity for meaningful participation in revocation hearings; and
- The systematic exclusion of parolees with serious mental illness from remedial sanction programs."

The basis for these latter allegations is as yet unclear. A BPH review identified 44 parolees revoked under these terms in 2005, and examining them gives an initial indication of the handling of these cases. They were not concentrated in any particular parole units or regions.

Notice showed some of the problems inherent in this process. Five men apparently were never served and notes indicate another three impressed the notice agent

as not understanding what had transpired. The charges seven men received in the notice of rights concerned actions other than the psych return provisions. These were revised by the RTCA step and, while one cannot determine whether the parolee was independently advised of this, attorneys had the information when they usually receive the cases. Attorneys say they routinely receive the mental health evaluations and reports.

Many of these probable cause hearings were held substantially beyond timeframes. About 61% were held timely, with most of the remainder experiencing lengthy delays of one week to 2½ months. Occasionally, it appeared that the probable cause hearing did not occur. One cannot determine much about contributors to these delays.

The Parole Outpatient Clinic clinician does not participate at this step and, consequently, this step often contributes little. Patients who are in or nearing an acute state when returned to custody wait a minimum of 35 days for treatment, unless they decompensate and are sent to an inpatient unit. It seems advisable to reconsider clinician testimony at the probable cause hearing, routinely expediting the revocation hearing, or some other method to reduce what appears to be known and preventable lengths of time.

Only 64% of these parolees' revocation hearings were either held timely or concluded at the probable cause hearing step. Eight more were unnecessary, though three parolees were held over several weeks before the decision was made. The remaining hearings were held from 10 days to 7 weeks late. Most late hearings were not explained, but there were occasional, troubling cases where Parole Outpatient Clinic staff unavailability or failure to supply an evaluation delayed hearings up to two months after the deadline.

52

As to outcomes, one quarter of these cases were dismissed and this occurred at several stages of the process. The rest were given the full year term, with one exception, and defendants report that only two of these parolees were released before serving the full year.

Certainly, it is undisputed that such parolees may or may not get treatment – the purpose of the revocation – depending on their length of stay in Reception Centers, which are staffed only for screening and not for treatment. It also appears that clinicians commonly are not familiar with the assessments needed to determine whether the parolees are stabilized sufficient for release, so there is a substantial risk that these parolees are held for months longer than necessary.

In late August, Defendants convened an interdisciplinary task force to address several issues affecting the patients currently held under psych return provisions. Defendants committed to identifying all current and future cases; improving access to treatment; determining evaluation standards for clinicians to apply; evaluating all such patients; and addressing a variety of issues related to ongoing evaluation, patient release, and community placement. Defendants committed to routine communication practices on-point with the Special Master and Plaintiffs' counsel.

- The Special Master's team has not yet examined this issue sufficiently. We have neither a clear sense of the numbers of *Valdivia* class members involved nor their impact on resolving *Coleman* issues. This will be a priority issue in the coming term.

53

Remedial sanctions, overcrowding, and reception centers: The complex questions of the rapidly expanding prisoner and parole revocation populations, and the reasons for this, have implications for, and impact on, the *Valdivia* and *Coleman* classes. With reports of substantial staffing vacancies in the system, it is predictable that most classification, clinical, and custody processes are not prepared to keep pace with the volume. As assigned beds become impacted in CDCR, predictably prisoners will spend longer periods in Reception Centers, which, as noted, do not provide treatment according to *Coleman's* levels of care for mentally ill prisoners and parolees awaiting revocation or serving revocation terms.

While the numbers have not yet been established, observers note it is common for mentally ill parolees to incur technical violations resulting in short revocation terms; under current CDCR conditions, it is increasingly likely that those terms are too short for them ever to transfer to a facility offering their needed level of care during that term, and that such a cycle commonly repeats.

Whether and how much the use, or lack, of remedial sanctions contributes to population pressures in Reception Centers, or can alleviate them, is an open question of great significance, as is the question of how best to provide programming that meets the mandates of both lawsuits, the objectives of correcting parolee behavior and increasing successful paroles, and patients' clinical needs.

- Again, the Special Master's team has not yet examined this issue sufficiently. This will be a priority issue in the coming term.

# EXHIBIT 3

**FILED**

JUN 11 2007

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORN
BY _____
        DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF CALIFORNIA

VALDIVIA, et al.,

    Plaintiffs,

    vs.

                          No. CIV S-94-671 LKK/GGH

ARNOLD SCHWARZENEGGER, et al.,

    Defendants.

_____/

## SECOND REPORT OF THE SPECIAL MASTER
## ON THE STATUS OF
## CONDITIONS OF THE REMEDIAL ORDER

### Background

On May 2, 1994, the *Valdivia vs. Schwarzenegger* lawsuit was filed. The Court certified the case as a class action by order dated December 1, 1994. On June 13, 2002, the Court granted partial summary judgment in favor of the Plaintiffs. On July 23, 2003, the Court ordered the Defendants to submit a remedial plan, with specific guidance regarding "...a preliminary probable cause hearing which (1) occurs no more than ten calendar days after a parolee is taken into custody for an alleged parole violation, and (2) affords the parolee rights provided by *Morrissey*, including notice of the alleged violations, the opportunity to appear and present evidence, a conditional right to confront adverse witnesses, an independent decision-maker, and a written report of the hearing."

On March 8, 2004, the Court entered the Stipulated Order for Permanent Injunctive Relief ("Permanent Injunction") containing the agreed-upon elements of the settlement terms. On July 1, 2004, the Defendants submitted a variety of policies and procedures to the

sanctions. The memo was not released to the field quickly thereafter, as negotiated; as of this writing, it had not been released. A more comprehensive memorandum – another feature of the Stipulation -- has been drafted and the parties are scheduled to negotiate its contents on May 31, 2007 and thereafter.

The parties achieved the level of detail and specificity desired in some areas of the remedial plan through the stipulated order. More will be necessary as continued negotiations address access regionally and by special populations, the nature and scope of structured and supervised environments and self-help outpatient/aftercare programs available, and development of particular programs and strategies. Likewise Defendants must demonstrate that they have methods of program tracking and evaluation. There is progress in reaching agreement on a viable remedial sanctions plan. A number of outstanding questions regarding plan outcomes and implementation require resolution.

**Mentally Ill Parolees**

The parties concentrated on two somewhat overlapping issues related to parolees' mental illness: (1) revocations pursuant to Cal. Code of Reg., Title 15, Section 2467.1 and related provisions; and (2) due process for parolees unable to participate in revocation proceedings by virtue of their mental illness.

The parties had long been in conflict over the means by which revocations were handled under the above-cited regulation, referred to as "psych returns." In 2005 and 2006, the parties had "meet and confer" sessions, information requests were exchanged, and Defendants convened a multi-division task force to attempt to improve practices. Absent demonstrable change, on June 15, 2006, Plaintiffs' counsel issued a Notice of Violation.

The regulations permit revocation on the basis of "…conduct indicating that the parolee's mental condition has deteriorated such that the parolee is likely to engage in future criminal behavior." (Cal. Code of Reg., Title 15, Section 2616(a)(14)) Such revocations are automatically for the maximum term – 12 months, ineligible for good-time earning – but the parolee may be released before that time if he or she is found to no longer meet the standard that supported the revocation. Inherent in this regulation is the idea that the parolee is being returned to prison for the purposes of treatment.

Plaintiffs' counsel cites myriad bases for these practices violating constitutional and state law. In short, these regulations as applied do, in fact, raise substantial due process concerns. The regulations' standard permitting revocation is, itself, troubling. There is significant risk that such parolees would not be served their notices of charges and rights, or would not understand them, and could not participate meaningfully in their own defense. Plaintiffs' counsel contend that CalPAP attorneys have difficulty accessing psychiatric evaluations. The purpose of the revocations – treatment – is undermined by the uncertainties of care provided in county jails; deficiencies in care in CDCR Reception Centers and other facilities, as documented in *Coleman v. Schwarzenegger*; and difficulty accessing Department of Mental Health (DMH) treatment, particularly with questions raised as to the legal bases for either system to retain custody. There has not been a reliable mechanism to ensure that these parolees reach treatment expeditiously. These parolees have not been consistently assessed for readiness for release, and the parties disagree about the standard for release and whether Defendants are obliged to find community-based placements. Defendants, with some merit maintain that the local communities are responsible for funding the care and treatment of such parolees released to the community –

12

not the CDCR. Limited resources for mentally ill in most California communities frequently result in this being a "catch-22".

The Special Master's team convened "meet and confer" sessions on these issues in August and October 2006. Defendants represented that they planned to cease revoking parolees under this regulation after a reasonable period to determine alternative measures and prepare guidance for staff. They planned to reconvene their task force to address the outstanding issues for extant and future populations.

In fairly short order following the initial meet and confer session, Defendants identified a set of parolees in custody under these provisions and expedited their transfer into treatment programs at four mainline facilities with complex mental health programs. Some were placed in Department of Mental Health (DMH) intermediate care. The exception was a small number who remained in county jails with pending local charges; their mental health treatment is unknown. CDCR clinical staff at the four institutions reportedly were educated about these patients' unique needs and encouraged to emphasize community adjustment during treatment.

A critical component of according "psych returns" due process is reviewing them to determine when their mental illness is stabilized such that the state no longer has a right to hold them. The Special Master relied on the representation that CDCR Interdisciplinary Treatment Teams (IDTT) would be responsible for this review. Tracking sheets initially recorded recommendations for the level of care that these parolees would need if released to the community. When such recommendations were no longer included, the Special Master's team inquired about their absence. Staff responsible for overseeing these cases responded that  DAPO  staff  initially  sought  placements  consistent  with  the

recommendations but, when this was determined to be futile, staff ceased recording these recommendations. On multiple occasions, CDCR staff from different departments asserted that their position was that "psych returns" would only be released if they were able to maintain themselves in the community with outpatient care. This standard was not negotiated and is more stringent than the variety of levels of care originally recorded on tracking documents.

In Defendants' objections to the Special Master's draft report, Defendants assert that IDTT was never performing a review function. This is particularly disturbing as it would imply that the Special Master's reliance was misplaced and a critical due process obligation was not carried out for more than seven months. Defendants aver that the level of care information was provided to DAPO informationally and that DAPO was able to place some parolees at different levels of care in the community.

Centralized staff also began to maintain a list of these parolees that included updates on their clinical conditions and locations, including whether they had returned to parole. Throughout the last half of 2006, information about the above-described activity was difficult to come by. Descriptions were provided and questions answered only erratically. Tracking information sometimes seemed incomplete or internally inconsistent and, too often, updates indicated information had not been provided or baseline and ongoing clinical tasks had not been done. The result was that the methods used after the August meet and confer to expedite parolees into transfers and treatment were not sustained consistently. Significant numbers of parolees revoked under the psych return process in the last half of 2006 did not reach treatment, and/or did not appear to be reassessed for hearing participation, for prolonged periods.

Dispute remains about whether all relevant parolees were identified and tracked under this mechanism, whether standards were sufficiently defined and disseminated, and whether mechanisms functioned to timely identify parolees for whom retention in custody was no longer appropriate. Without setting up systems in which the Mastership and Plaintiffs' counsel could have confidence, and without answering some of the core questions it was convened to address, Defendants disbanded the task force, without notice, reportedly in late 2006.

During this period, BPH did undertake reviews and a significant subset of parolees was returned to parole earlier than the 12-month revocation term, according to the Special Master's analysis of tracking materials provided. In March 2007, CDCR leadership directed DAPO and BPH staff to identify community or DMH placements for all parolees in custody under the 2006 psych return procedure. As of this writing, all cases captured in the tracking mechanism had been released except four who were certified as mentally disordered offenders and were awaiting bed availability at DMH. Plaintiffs note, in their objections, that the level of care staff identified as needed before these parolees' release was higher than the level of care to which several were actually released.

Because of the aforementioned questions about the completeness of the tracking mechanism, Plaintiffs are concerned that some parolees may currently be held beyond the time for which CDCR had legal authority to do so. The Special Master's team will work with the parties to determine an adequate means to demonstrate whether any parolees recently subject to psych return regulations are in custody and reasonable information concerning their revocations and current status.

As noted above, the reason proffered for a delay in ceasing use of this regulation was the need to provide staff with alternatives and guidance. It is the Special Master's impression that no new measures materialized in the nearly five months that elapsed. On January 12, 2007, CDCR Secretary Tilton issued a memorandum terminating the return of mentally ill parolees to prison "solely for psychiatric services." It was accompanied by a memorandum summarizing the existing options for DAPO staff and setting an expectation of community placement for much of this population. A BPH memorandum added the outlines of a new hearing procedure for similarly situated parolees.

An open question is the future handling of parolees whose mental illness appears to be the basis of parole violations charged, or arguably caused the violation behavior. The parties disagree as to the likely numbers of such parolees and whether special measures will be needed to recognize them, adjust hold and revocation decisions, and facilitate treatment in the community or in custody.

While the above-described measures addressed problems arising from a regulatory basis for revoking some mentally ill parolees and retaining them in custody, a problem remained for mentally ill parolees facing revocation: some are too ill at the time of their parole holds or thereafter to be able to understand and meaningfully participate in revocation proceedings. The BPH memorandum was a step toward the difficult task of balancing this population's due process and treatment needs. Plaintiffs' counsel objected to the memorandum procedure as insufficiently protecting fair process and unreasonably distributing burdens, as well as on other grounds. The procedure devoted insufficient attention to placing parolees at a level of care needed to accomplish stabilization until such time as they are capable of participating in revocation proceedings. Neither did it include an

adequate mechanism for identifying when parolees were well enough to proceed. Additionally, it was issued without consultation with Plaintiffs' counsel as required by the Permanent Injunction.

Defendants' plans on-point in 2006 and 2007 involved several partial proposals lacking in necessary substance. Some promising approaches did not develop or were withdrawn. The project was riddled with the issues described elsewhere in this report, including poor communication and missed deadlines.

In response to the Special Master's request, Plaintiffs' counsel put forward a thoughtful, comprehensive proposal in March 2007. After the rocky start, Defendants and the Special Master's team convened a multidisciplinary group to more fully develop a proposal. Defendants produced a well-constructed, thorough proposal on the timeline requested.

As of late April, party negotiations were proceeding well toward a process that will incorporate:

- increased staff and CalPAP attorney familiarity with mental illness,

- consideration of remedial sanctions at each juncture,

- referrals for emergency treatment at any step,

- expedited transfer to CDCR from county jails where legally permissible,

- placement into levels of care needed for stabilization,

- independent evaluation of ability to meaningfully participate and means to challenge that determination,

- improved information exchange among agency staff and with parolees' attorneys,

addressed. The Special Master expects these to be the parties' focus in the nearest practical term.

According to the terms of the Order of Reference, the parties have reviewed a draft of this report and submitted objections. Some requests for clarification, factual correction, or addition have been incorporated above. Others, where the Special Master did not have sufficient information to assess, or did not agree with, the requested change, are incorporated to inform the Court of the nature of those objections.

The parties raised some objections based on information newly developed or newly provided to the Special Master after the draft report was issued. It is the Special Master's practice to reserve such information for the next Round's report rather than adding information to the instant report that the other party may not have had a chance to consider and comment upon. A small set of Plaintiffs' objections fell outside the scope of the Special Master's understanding of his authority. Finally, some objections raise points that deserve all parties' attention and are best handled through negotiation and internal Defendant decisionmaking at this juncture, rather than through recommendations as requested. The latter three categories of objections are generally not addressed in this report.

While the Special Master does not feel that any court orders are necessary or warranted at this time, two issues bear comment. Efforts have been directed at due process and stabilization for a particular subset of the mentally ill, as described above; that population is likely to be severely and chronically ill. Among them, there will be parolees whose treatment needs exceed CDCR's capacity. As the parties finalize these processes, the Special Master will look for interagency coordination and agreement with the Department

of Mental Health to ensure that this population has timely access to that agency's acute and intermediate care programs.

As the Special Master's team returns focus to core due process issues, four institutions are of particular interest. The Los Angeles County Jail, Pitchess Detention Center, California Institution for Men, and California Institution for Women account for a large percentage of the total parole holds and hearings in the state. Failure to provide timely and proper review, notice, and hearings to even a small percentage there may result in a large number of individuals being affected. Due to the large numbers, the amount of harm potentially being done is the greatest. The Special Master plans to encourage CDCR to appoint a small team to work with the Special Master team and the Plaintiffs' counsel to target these institutions to identify and address the practices that are not in compliance with the remedial order.

Respectfully submitted,


_/s/Chase Riveland
Chase Riveland
Special Master                                        DATED: June 4, 2007

# EXHIBIT 4

## Kate Richardson

| | |
|---|---|
| **From:** | Vickie Whitney [Vickie.Whitney@doj.ca.gov] |
| **Sent:** | Wednesday, September 26, 2007 2:18 PM |
| **To:** | Ginny Morrison; 'Nancy M Campbell'; Ernest Galvan; Michael W. Bien; riveland@rockisland.com |
| **Cc:** | Dylan Sullivan; Katherine Nelson; Russa Boyd; Jessica Devencenzi |
| **Subject:** | Valdivia Compliance Report |
| **Importance:** | High |
| **Attachments:** | Valdivia Compliance Report _09-26-07_.pdf |

All - Pursuant to The Stipulation and Order Re Special Master Order of Reference, paragraph II. A., attached please find the Defendants' Valdivia Compliance Report, for the period fo June 1, 2006, through September 26, 2007.

Please be advised that the exhibits to the report are voluminous. Accordingly, those have been sent to you by overnight mail service. You should receive them tomorrow. CDCR will also burn the exhibits onto a disk and include those in the mailing for your convenience. Any questions should be directed to Russa Boyd.

Regards,

Vickie

**CONFIDENTIALITY NOTICE:** This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

# CDCR Valdivia Compliance Report

## June 1, 2006 to September 26, 2007



CDCR has identified several key issues that must be resolved before a meaningful process for the mentally ill parolee population can be developed and implemented. The two most significant issues remaining are as follows:

1) Access to the Department of Mental Health (DMH) for parolees who may be or are found unable to meaningfully participate in the parole revocation process:

*Issue: Whether a parolee must be in revoked status in order to be accepted at a DMH facility?*

Plaintiffs have asked whether DMH has agreed to accept parolees who are not in revoked status. Plaintiffs have further requested that CDCR report on any legal barriers to access to DMH beds for parolees going through the revocation process or in revoked status.

Penal Code Section 2684 is on point, dealing with transfer of inmates to state hospitals. That section provides, "If, in the opinion of the Director of Corrections, the rehabilitation on any mentally ill, mentally deficient, or insane person confined in a state prison may be expedited by treatment at any one of the state hospitals under the jurisdiction of the State Department of Mental Health or the State Department of Developmental Services, the Director of Corrections, with the approval of the Board of Prison Terms, shall certify that fact to the director of the appropriate department who shall evaluate the prisoner to determine if he or she would benefit from care and treatment in a state hospital..."

DMH has historically interpreted this section to require that a parolee be in revoked status in order for transfer pursuant to the above section. However, CDCR interprets the section to cover all persons confined to the custody of CDCR, which includes parolees pending revocation.

69

At the time the parties began meeting in early 2007 to negotiate a process for the mentally ill parolee population unable to meaningfully participate in the revocation process, DMH refused to accept parolees unless they are in revoked status. However, the BPH cannot revoke a parolee who is too mentally ill to participate in the revocation process. Many parolees in need of acute mental health care to restore the ability to participate in the revocation process require DMH placement, but are not accepted because they have not completed the revocation process. This is a cycle which results in suspension of the revocation process but the parolee is unable to receive the treatment necessary to enable him/her to complete the process.

DMH has been directed to accept parolees in need of psychiatric treatment from CDCR regardless of their revocation status. A Memorandum of Understanding between CDCR and DMH has been updated to reflect the direction that parolees who are deemed unable to meaningfully participate in the revocation process are in within the legal custody of CDCR and that DMH will accept such parolees for treatment, where possible, giving them the same priority/status as other CDCR inmates are given. The updated Memorandum of Understanding is currently being approved by all necessary parties.


2) Mental Health care in county jails and reception centers:

*Issue: Whether defendants are obligated to expedite transfer of parolees who with mental illness from county jails to appropriate CDCR facilities in order to secure mental health treatment.*

Plaintiffs have objected to defendants' failure to commit to expedited transfers of parolees who may be incompetent from county jails to appropriate CDCR facilities.

# EXHIBIT 5

# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF CALIFORNIA

JERRY VALDIVIA, et al.,

    Plaintiffs,

    vs.                         No. CIV S-94-671 LKK/GGH

ARNOLD SCHWARZENEGGER, et al.,

    Defendants.

_____/

## THIRD REPORT OF THE SPECIAL MASTER
## ON THE STATUS OF
## CONDITIONS OF THE REMEDIAL ORDER

### Background

On May 2, 1994, the lawsuit now known as *Valdivia vs. Schwarzenegger* was filed. The Court certified the case as a class action by order dated December 1, 1994. On June 13, 2002, the Court granted partial summary judgment in favor of the Plaintiffs. On July 23, 2003, the Court ordered the Defendants to submit a remedial plan, with specific guidance regarding a prompt preliminary probable cause hearing that affords the parolee rights provided by *Morrissey*, including notice of the alleged violations, the opportunity to appear and present evidence, a conditional right to confront adverse witnesses, an independent decision-maker, and a written report of the hearing.

On March 8, 2004, the Court entered the Stipulated Order for Permanent Injunctive Relief ("Permanent Injunction") containing the agreed-upon elements of the settlement

months. The teams have continued meeting and working on the tool development. It is anticipated that by December 2007, the regions will begin pilot projects of the decision-making matrix.

### *Community Resources*

One of the small but significant accomplishments completed this term was creating greater access to existing community resources for decision-makers in the revocation process. This initiative is not part of the Remedial Sanctions Order.

Historically, some Deputy Commissioners and Parole Administrators have been handicapped in suggesting remedial sanctions because of their lack of knowledge about what services might exist in any particular community. It is always difficult in parole operations to create and maintain a current list of community-based resources. The rapidly changing nature of community programs and funding results in almost constant movement in what services exist. It is difficult for parole agents and unit supervisors who are located in communities to stay current regarding local resources and the challenge increases for decision-makers who are not in the community. Defendants have created an electronic database for resources in each region. The database is updated as often as possible. Access to this database was provided to Paroles Division, the Board and CalPAP to facilitate the use of community-based resources.

### **Mentally Ill Parolees**

In 2007, the parties' efforts concerning mentally ill parolees have largely focused on those who are too ill at the time of revocation proceedings to participate meaningfully. At

the time of the Special Master's Second Report, negotiations were proceeding well toward

a process whose necessary components are:

- increased Board and Paroles Division staff and CalPAP attorney familiarity with mental illness,
- consideration of remedial sanctions at each juncture,
- referrals for emergency treatment at any step,
- expedited transfer to CDCR from county jails where legally permissible,
- placement into levels of care needed for stabilization,
- independent evaluation of ability to meaningfully participate and means to challenge that determination,
- improved information exchange among agency staff and with parolees' attorneys,
- close monitoring for change in ability to participate and reliable assessment of same,
- fair interim probable cause determinations, and
- timely resumption of hearings when ability is restored.

As the parties neared agreement, each noted substantial components of the plan that

should be reconsidered because they were not sufficiently flexible or would be difficult to

sustain. In particular, Plaintiffs emphasized the standards for determining ability to

participate, and the requirements and process surrounding clinicians who were to conduct

assessments; each of these features carried the risk of unnecessarily delaying resumption of

hearings. Defendants were concerned about reliable standards, a feasible system of

monitoring parolees' conditions, and mitigating some of the impacts on the operations of

several related departments. Defendants reportedly discussed these issues internally, but the

parties have not exchanged any further information or proposals nor held further

negotiations. The Special Master has not been made aware of any progress or substantial

work on this topic since May 2007.

In the meantime, Defendants have been using interim measures to manage this

population and to reduce some of the problems previously observed. Greater awareness in

the field is evident; Board and Paroles Division staff and CalPAP attorneys interviewed at several locations were aware of the mechanism to suspend hearings and the means to refer parolees for treatment. Most said they had experience with parolees in this condition. Regional administrators tracked proceedings suspensions for mental health reasons, with periodic headquarters oversight. A total of 80 parolees have been identified to date in 2007.[xv] Some factors suggest the possibility of under-recognition[xvi] and oversight appeared limited. Documents indicated that there were often long intervals between Board staff's checks of whether parolees' conditions had improved sufficient to return to hearing. Although this was recorded on the logs, there was no apparent follow-up by those reviewing it. Tracking information was provided to Plaintiffs' counsel and the Special Master, but it was generally untimely.

The system worked sporadically in getting these parolees into treatment. More than one-third (29 parolees) were housed at county jails where their treatment is unknown. Some were determined to be capable of participating in hearings within a few weeks but others remained in jails longer term. Only two apparently were transferred to CDCR facilities; there is not information to determine whether, for another 14, there were local charges pending or the transfer system did not operate as intended. At Reception Centers, Defendants kept a commitment, with rare exception,[xvii] to treat this population in the Enhanced Outpatient Program and, while those programs provide limited treatment at this time, it is significantly more than was provided to many such parolees in the past. Defendants report that they have removed some obstacles to placing these parolees in the Department of Mental Health when needed and negotiations concerning those transfers are underway.

In the absence of guidance, staff made local decisions related to the revocation proceedings. The basis for decisions about the parolees' capabilities were unclear; some employed clinical input while others did not appear to, and the standards applied were unknown in any event. Some clinical staff chafed at the expectation that they would provide opinions under these conditions, raising clinical and ethical concerns. Occasionally, Deputy Commissioner decision-making seemed contrary to the clinical information sought or in the hearing record. Some regions appeared to adopt too-lengthy timelines for revisiting the suspension. All, however, appeared to follow department policy for assigning a revocation term and noting the need for a rescheduled hearing or release of the parolee as of that date.[xviii]

Two related issues remained from prior Rounds. Defendants chose, in early 2007, to release the parolees held after revocation for purposes of treatment. They sought CDCR clinical input concerning appropriate placements, placed the parolees in the community or the Department of Mental Health, and provided information about these efforts to the parties. Plaintiffs and the Special Master raised concerns about the completeness and clarity of the information provided, and the indication that the level of care staff identified as needed was higher than the level of care to which several were actually released. The parties negotiated a series of agreements for enhanced information, which ultimately were never satisfied.[xix] While Defendants were under no established obligation to release these parolees nor to provide placement information, once they undertook these agreements, the work product fell short of the commitments.

Additionally, Plaintiffs were concerned that some parolees previously incarcerated under these regulations might remain in custody and be illegally held. The Special Master

and Plaintiffs undertook an investigation of that question. Defendants provided documentation for each parolee potentially raising this concern from an extensive list compiled by Plaintiffs.[xx] The review determined that approximately half were in custody; none had been detained beyond their revocation terms, except two men serving additional revocation terms for disciplinary infractions while in custody. Each listed parolee was revoked for violations different from the "psych return" regulations. Further examination of the violations may raise mental health concerns in some cases, but Defendants have demonstrated that they are not illegally detaining parolees returned to custody as "psych returns," or whose revocations held that potential, prior to the change in policy in January 2007.

### Information Systems

This Court ordered in November 2006 that Defendants initiate information system changes aimed at accurately demonstrating compliance, and periodically report on their efforts. The relevant portion read:

> Because of the critical need to structure compliance activities, demonstrate compliance, and exercise effective internal oversight, Defendants must provide additional resources to make information system application changes for the purposes of data collection, analysis, aggregation, and management reports, and other modifications as needed by the Special Master and the Court, with input from Plaintiffs. The effort should be coordinated with the information system changes underway pursuant to the *Armstrong* court's order, to avoid unnecessarily duplicative or contradictory effort, and so that the changes serve the purposes of both remedial plans on the issues they have in common. To the extent that DAPO and BPH determine that certain of these functions can best be accomplished by modifying DAPO's information system, sufficient resources must also be available for that purpose. Major modifications will be needed in RSTS and likely in other databases.

> Planning for these changes must be initiated within 60 days of this order. Defendants must provide to the Special Master and Plaintiffs periodic reports on the progress of these changes; the first of these should be due six months after the date

delineate which programs satisfy this Court's requirements for self-help outpatient/aftercare programs, and those providing a structured and supervised environment, and demonstrate their use. To do this requires the hard work of changing the behavior of parole agents, unit supervisors, Parole Administrators and Deputy Commissioners. In short, it requires developing not just the programs but the systems that will encourage and support ongoing usage of such programs. This requires building the systems needed to support the policy direction and changing the values and beliefs of the system actors.

The Paroles Division and the Board have begun this work by collaborating to change policies and procedures to support the required direction. There is work to be done to create a true, ongoing collaboration between these two divisions. The history of not working well together still plagues the divisions and impedes the effective implementation of remedial sanctions. The work of changing the bureaucratic systems can not be accomplished unless these divisions partner well. The training in both divisions on the revocation process and remedial sanctions is a good step in supporting the field to understand both the process and the rationale for using remedial sanctions. There remains a significant amount of work to ensure that parole agents through Deputy Commissioners fully understand the nature and type of remedial sanctions available and to ensure that the agency policy encourages their use. The Paroles Division and the Board, with support from CDCR legal counsel, the Attorney General's office, and the Office of Court Compliance, can accomplish this task if they continue the forward movement gained during this reporting period.

Other areas of previous focus did not fare as well. Efforts to provide treatment and protect due process for severely mentally ill parolees stalled while substantial reworking is

necessary for viable practices. Access to early referrals and treatment has improved and there is progress on the longstanding difficulty of transfers to the Department of Mental Health. But local decision-making has begun to veer back in the direction that initiated these discussions – clinicians face ethical and clinical issues in providing patient assessments without training and standards, and administrative hearing staff are in a difficult position without that input and sometimes are making ill-advised decisions. Monitoring of readiness to return to hearing and other oversight is erratic and barriers to obtaining information from jail staff have not been overcome. Temporarily assigning revocation terms seems more established; the parties should return their attention to the other, deteriorating aspects of this vexing problem.

The information system implementation is adequate, though the extended time delays to initiation are of significant concern to the Special Master. Additionally, Defendants cannot continue to provide what are known as *Valdivia* Timeliness Reports with the expectation that they will be accepted as a complete representation of compliance.

<u>Numerical recap</u>: For those requirements where quantification is part of the compliance picture, the following are the <u>likely</u> compliance-related percentages, subject to the *caveats* given above:

|  | Compliance in known cases | % unknown |
|---|---|---|
| Probable cause determination | 98% | 12% |
| Notice to parolee<br>*cf* number of missed services | 90% | 7% |
| Parole Administrator review<br>*cf* possibly missed reviews | 98% | |

Moderate compliance:

- Self-monitoring
- Policy and procedure negotiations
- Timely attorney appointment
- Access to non-confidential documents
- Revocation hearings
- Probable cause hearings
- Designation of confidential information
- Effective communication
- Forms simplification and translation
- Presenting evidence at probable cause hearings
- Parole Administrator review
- Individual concerns and emergencies
- Hearing within 50 miles

Fair, poor or unknown practices:

- Mentally ill parolees unable to participate in revocation proceedings
- Attorney panel standards and guidelines
- Notice to parolees
- Evidence on the same terms as the state
- Confrontation rights and hearsay
- Expedited probable cause hearings
- Appeals
- Revocation extension

## Recommendations

The Special Master recommends that the Court order the following:

Defendants must undertake and sustain work toward the earliest practical solution to providing due process for parolees who appear, either in the judgment of their attorneys or Defendants' staff, too mentally ill to participate in revocation proceedings. These efforts must be undertaken in consultation with Plaintiffs' counsel and the Special Master. Defendants should be ordered to comply with the following requirements:

- Defendants must provide progress updates to the Special Master and Plaintiffs' counsel every three weeks, beginning three weeks after the signing of this order, until the Special Master determines they are no longer necessary.

- By March 1, 2008, Defendants must provide to the Special Master and Plaintiffs' counsel a status report on the development of policies

and procedures concerning this population. The policies and procedures must include methods to expedite treatment and to provide due process and full rights under the Permanent Injunction.

- By March 15, 2008, Defendants must provide to the Special Master and Plaintiffs' counsel the standards Defendants intend to use to determine whether a parolee is unable to participate meaningfully in revocation proceedings, by virtue of mental illness, and whether that ability has been regained. The standards should identify the types of staff or other service providers responsible for applying the standards.

- By April 3, 2008, Defendants must provide to the Special Master and Plaintiffs' counsel a detailed plan for implementing these policies and procedures and for training all affected CDCR staff and CalPAP attorneys. The plan must specify associated funding and timelines regarding the implementation process, any new resources required.

- By June 15, 2008, these policies and procedures must be implemented.

The Special Master may, in his discretion, grant an extension of time on any of these deadlines upon either party's request and a showing of good cause.

Respectfully submitted,

/s/Chase Riveland

Chase Riveland

Special Master                                  DATED: November 13, 2007

---

[i] Stipulation and Order Regarding Remedial Sanctions, Apr. 3, 2007
[ii] Interim Policy Memorandum Pertaining to the Use of Remedial Sanctions in the Parole Revocation Process, Policy 07-26
[iii] Examples of PSC and RMSC referrals and placements, as well as the aggregate placement data, can be found in serial email communication captured in a document titled RMSC-PSC referral info 10-12 email communication
[iv] Id.
[v] It is not clear whether this overlaps with the aggregate data that follows in the next paragraph. Source: Parole Administrator Statistics May 2007-Sept. 2007, one run for each DRU
[vi] Source material appears to contain a typographical error when referring to 2006

[vii] See Implementation Memo of Region III Director, Alfred Martinez, Sept. 4, 2007, and Region III ICDTP Provider List

[viii] *Id.*

[ix] ICDTP jail-based projections can be found in Jail-Based In-Custody Drug Treatment Program Matrix

[x] Data is taken from EID monthly regional reports

[xi] Provided for context

[xii] CDCR Policy 07-40

[xiii] CDCR Policies, 07-39, 07-41, and 07-42

[xiv] See Valdivia Refresher Power Point

[xv] Psych Suspension Log Aug. 30, 2007

[xvi] Region III reported for only one month in 2007. Region I South reported only four cases, far fewer than the other regions. Region II showed many cases at San Quentin but no other facilities.

[xvii] Two parolees were recorded as being at the CCCMS level of care but not to have had a hearing. The Special Master called these cases to the attention of CDCR.

[xviii] This paragraph is based on an analysis of Psych Suspension Log Aug. 30, 2007, related RSTS records, and Defendant interviews

[xix] Update on Released Psych Return Parolees; Summary Finalizing Psych-Return sent 9-24-07, with its Attachment B

[xx] Plaintiffs' List of Possible Psychiatric Returns 6/22/07; RSTS and OBIS records were provided in hard copy and many of the RSTS records were reviewed online

[xxi] This analysis examined totals of open and closed cases and made various comparisons between reports with and without "timeliness rules." As this is a snapshot, is serves as a baseline understanding. This study will need to be repeated and monitored to determine whether it is representative of practice over time. As to the "closed case" portions, numbers do hold true to those of reports for the preceding year.
Source: Open Case Summary and Open Case Summary per Valdivia Rules for each of these dates: Sept. 17 and 24, Oct. 1 and 8. Closed Case Summary and Closed Case Summary Timeliness for each of these dates: Aug. 18-Sept. 17, Aug. 25-Sept. 24, Sept. 1-30, and Sept. 9-Oct. 8.

[xxii] Each of the preceding three averages are based on an analysis of Closed Case Summary each month from May 2007 through Sept. 2007

[xxiii] Source: Closed Case Summary each month from Aug. 2006 through Sept. 2007. Some experienced staff describe this as a routine seasonal pattern. A Paroles Division data source lists many fewer cases overall and indicates there has been a decline in actions.

[xxiv] Defendants' Second Compliance Report

[xxv] California Parole Advocacy Program, "Add on Cases Summary" covering May through July 2007; California Parole Advocacy Program Add On Cases definition document; CalPAP interviews. CalPAP staff responsible for scheduling reportedly routinely record this data point on receipt of cases within this timeframe. The cases can be captured by a routine, automated report.

[xxvi] Defendants' Second Compliance Report

[xxvii] Defendants' Second Compliance Report; CalPAP interviews

[xxviii] Defendants' Second Compliance Report; RSTS Revocation Packet Scanning power point presentation

[xxix] Defendant interviews and email communication

[xxx] California Parole Advocacy Program, Date Case Assigned Compliance Report for each of May 2007 through Aug. 2007; Closed Case Summary by DRU for each of May 2007 through Aug. 2007

[xxxi] California Parole Advocacy Program, Notice of Rights Compliance Report for each of Feb. 2007 through Aug. 2007

[xxxii] 2007 data from California Parole Advocacy Program Statistics, Missing 1073 & Source Documents-Monthly Summary, provided as Exhibit 12 to Defendants' Compliance Report

[xxxiii] Defendants' Second Compliance Report and Plaintiffs' response letter

[xxxiv] CalPAP interviews

[xxxv] Defendants' data system records attempted service as equivalent to completed service. Its reports compile total actions taken (service or attempted service); all other data points in the system are compiled as total individuals, so no comparisons can be made.

[xxxvi] The CalPAP data also is not definitive for several reasons. Its total number of cases assigned is substantially fewer than the total cases in CDCR's data system for any given month. The data does not include

# EXHIBIT 6

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

JERRY VALDIVIA, et al.,

    Plaintiffs,

    vs.                      No. CIV S-94-671 LKK/GGH

ARNOLD SCHWARZENEGGER, et al.,

    Defendants.

_____/


## FOURTH REPORT OF THE SPECIAL MASTER
## ON THE STATUS OF
## CONDITIONS OF THE REMEDIAL ORDER


### Background

On May 2, 1994, the lawsuit now known as *Valdivia vs. Schwarzenegger* was filed. The Court certified the case as a class action by order dated December 1, 1994. On June 13, 2002, the Court granted partial summary judgment in favor of the Plaintiffs. On July 23, 2003, the Court ordered the Defendants to submit a remedial plan, with specific guidance regarding "...a prompt preliminary probable cause hearing that affords the parolee rights provided by *Morrissey*, including notice of the alleged violations, the opportunity to appear and present evidence, a conditional right to confront adverse witnesses, an independent decision-maker, and a written report of the hearing.

On March 8, 2004, the Court entered the Stipulated Order for Permanent Injunctive Relief ("Permanent Injunction") containing the agreed-upon elements of the

1

A final area that is worthy of note is improvement in the working relationship between the Board and the Paroles Division. The two divisions are collaboratively leading efforts such as the decision matrix. There has been a recent change in leadership with a new Executive Director of the Board.

### Mentally Ill Parolees

In January 2008, this Court ordered Defendants to prepare plans for providing due process to parolees unable to participate in revocation proceedings by virtue of their mental illness. The orders, detailed above, encompass a schedule for developing policies and procedures, reporting on progress, and implementing the plan.

While the overall issue of managing this population remains problematic, Defendants have complied with this Order to date, providing timely information according to the Court-ordered schedule. Staff have taken at least five very different approaches to this issue in 2007 and 2008; several were described as near completion when Defendants chose to reformulate major components. While plan components are certainly within Defendants' discretion, such changes carry the risk of necessary features not being carried forward, ramifications of new components on other components not being anticipated, and delays attendant to working this through. The most recent of these changes occurred two weeks before the Court-ordered deadline for a full implementation plan and is largely unformed as of this writing.[38] Plaintiffs have expressed particular concern about the absence of treatment focus in the progress updates and plan descriptions during the Round.

A developed plan was first provided to Plaintiffs on April 3, the date the Court ordered for providing a full implementation plan. Plaintiffs object in that they expected to

27

help shape the plan as it developed. This is based in an ongoing disagreement concerning the language and intent of the Permanent Injunction's requirement that "all policies, procedures, forms and plans developed under this Order" be shared in draft form. This disagreement merits attention by the Special Master and the parties.

Ensuring that class members have access to Department of Mental Health care will be a critical component of the plan. The Special Master has been clear in his expectations, at least since his Second Report, that all involved agencies must address this issue. Defendants have represented, since August 2007, that an agreement on-point was imminent. Recent developments indicate much more work remains.[39] The Special Master expects to see Defendants' commitment fulfilled in the very near future.

In the meantime, Defendants have been responsible for suspending proceedings and referring this population to treatment, monitoring ability to meaningfully participate, and returning parolees to hearings as soon as their conditions allow. Defendants tracked these efforts and improved the timeliness of providing this information. Proceedings have been suspended on just over 180 occasions in the 13 months this interim procedure has been in place.[40] Tracking suggests Defendants' staff and jails are becoming more familiar with referrals to treatment and exchanging information about parolees. During tours, all parties assessed staff's awareness of these procedures with favorable results.[41]

Monitoring parolees' condition and returning them to hearings has not fared as well. A small number of cases were not tracked, were included in tracking only months after an initiating event, or were dropped. Some cases do not document monitoring checks for intervals ranging from three weeks to three months, unacceptable periods when parolees are being held without a hearing.

Reportedly, it became increasingly difficult for the Board's staff to obtain clinical information or review of these parolees' conditions. It is problematic that this situation was known but not reported to the Special Master for months. Defendants believe they did provide this information in early February, but Plaintiffs counsel and the Special Master do not recall this.

Under these circumstances, many parolees were returned to hearing with no clinical assessment, though attorneys and Deputy Commissioners jointly applied their judgment as to whether the parolees were capable of participating. In a smaller set, however, the hearing record did not document any such discussion, which raises concerns about the judgment to go forward. Once a decision was made, some cases took three to four weeks to be placed on calendar. These cases may have been partially explained by the length of time needed to subpoena witnesses for revocation hearing, but the times appear unnecessarily extended despite that. Although the problems associated with these parolees were recorded, there was no apparent follow-up by those tracking or reviewing the logs. Each of these deficiencies impacts due process, and Defendants must take immediate steps to address them; this can no longer be held in abeyance for the anticipated policy changes. Defendants agreed, on March 12, 2008, to adopt an interim policy addressing several of these issues.

Tracking and the parties' monitoring reports also revealed rare occurrences of lengthy rescheduling times for postponed hearings and giving credit for time served – an action that assumes there has been a parole violation – when there has been no hearing. These issues merit attention as well.

- Although the issues in handling this population are complex and extremely difficult, and there have been well-intentioned efforts to develop and carry out

29

viable protections, failures of coordination and sustained effort have undermined both planning and necessary assurances of due process in the meantime. Progress has been limited and compliance is poor.

## Information Systems

This Court ordered in November 2006 that Defendants initiate information system changes aimed at accurately demonstrating compliance, and periodically report on their efforts. The relevant portion read:

> Because of the critical need to structure compliance activities, demonstrate compliance, and exercise effective internal oversight, Defendants must provide additional resources to make information system application changes for the purposes of data collection, analysis, aggregation, and management reports, and other modifications as needed by the Special Master and the Court, with input from Plaintiffs. The effort should be coordinated with the information system changes underway pursuant to the *Armstrong* court's order, to avoid unnecessarily duplicative or contradictory effort, and so that the changes serve the purposes of both remedial plans on the issues they have in common. To the extent that DAPO and BPH determine that certain of these functions can best be accomplished by modifying DAPO's information system, sufficient resources must also be available for that purpose. Major modifications will be needed in RSTS and likely in other databases.
>
> Planning for these changes must be initiated within 60 days of this order. Defendants must provide to the Special Master and Plaintiffs periodic reports on the progress of these changes; the first of these should be due six months after the date of this order, and every six months thereafter until the Special Master determines the improvements are complete The system changes must be completed within two years of this order.

In prior Rounds, Defendants acquired funding and contracted for services to accomplish this project, as well as gathering input as to necessary components from computer system users in different divisions, Plaintiffs, and the Special Master.

Defendants' documents indicate that the project has taken substantial steps. During the Round, Defendants and their contractors reportedly completed the project

- Whether there are sufficient provisions for attorney-client communications to be confidential in some locations

- Whether state employees and witnesses will be provided with attorney representation during hearings

3. Evidentiary questions

- Timely provision of all appropriate evidence to parolees' attorney

4. Other

- Delayed release times engendered by extended holds placed once the parolee is nearing release in order to complete a sexually violent predator screening

- Notice of the possibility of re-incarceration for life for life-term parolees who have been paroled and are facing parole revocation

- Notice concerning credit-earning for parolees housed at county jails

**Relationship to Other Cases**

*Valdivia* intersects with the *Coleman* case primarily in three instances. First, there is a need to house and treat parolees too mentally ill to participate in their hearings and to monitor their conditions so that hearings may be held consistent with due process. Second, a subset of those people may be diagnosed as needing treatment at the Department of Mental Health, and there have been historical barriers to their being placed there. Defendants have been negotiating an addendum to the Memorandum of Understanding between the two Departments, which would allow such placements, for at least nine months.

The timeliness and quality of care for the mentally ill parolees in reception centers also intersects with *Coleman* to the extent that if the level of care available to any

mentally ill parolee in those facilities is enhanced through *Coleman* activities it may correspondingly improve the care for parolees.

*Valdivia* also intersects with the *Armstrong* case by ensuring that effective communication assistance or other reasonable accommodation during the revocation process is provided to disabled class members. In addition, the jail and community-based ICDTP programs are monitored to ensure equal access for disabled class members.

At the request of the Special Master, Plaintiffs drafted monitoring guidelines for the community-based ICDTP programs. These guidelines are under review by the Defendants. The guidelines focus on eight subject areas with a major focus on ensuring equal access for disabled class members based on the requirements of the *Armstrong* case and the Americans With Disabilities Act.

## Summary

The importance of skilled and stable leadership was once again made evident during this Round. The Round began with good cooperation between the leaders of the Paroles Division and the Board. Turnover at the executive level of the Board, combined with vacancies in many senior level positions, resulted in multiple challenges. CDCR moved quickly to fill the Executive Officer of the Board. The new Executive has demonstrated his understanding and willingness to partner with the Paroles Division, counsel and compliance unit staff.

The decision made to transfer ICDTP from the Paroles Division to the Division of Addiction and Recovery Services has also resulted in transition challenges. Duties were transferred without the requisite staffing and despite the best efforts of both Divisions, role and task confusion has resulted. This has impacted program

# EXHIBIT 7

## Kate Richardson

| | |
|---|---|
| **From:** | Ernest Galvan [egalvan@RBG-Law.com] |
| **Sent:** | Thursday, March 20, 2008 5:32 PM |
| **To:** | Valdivia Team |
| **Subject:** | FW: Valdivia: Mentally Ill Update |
| **Attachments:** | Chart.pdf; March 20 Mentally Ill Update.wpd.pdf |

-------------------------------------------
**From:** Jessica Devencenzi[SMTP:JESSICA.DEVENCENZI@DOJ.CA.GOV]
**Sent:** Thursday, March 20, 2008 5:31:29 PM
**To:** Ginny Morrison; nancy@nmcampbell.com; Ernest Galvan; Chase Riveland
**Cc:** Alberto.Roldan@cdcr.ca.gov; Don Currier; Katherine Nelson;
Debbie Vorous; Vickie Whitney
**Subject:** Valdivia: Mentally Ill Update
**Auto forwarded by a Rule**


All:

Please see Defendants' update attached.

Thank you,


Jessica R. Devencenzi
Deputy Attorney General
Correctional Law Section
Office of the Attorney General
(916)322-6104

**CONFIDENTIALITY NOTICE:** This communication with its contents may contain confidential and/or
legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized
interception, review, use or disclosure is prohibited and may violate applicable laws including the
Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender
and destroy all copies of the communication.

**EDMUND G. BROWN JR.**
*Attorney General*

*State of California*
*DEPARTMENT OF JUSTICE*



1300 I STREET, SUITE 125
P.O. BOX 944255
SACRAMENTO, CA 94244-2550

Public: (916) 445-9555
Telephone: (916) 322-6104
Facsimile: (916) 324-5205
E-Mail: Jessica.Devencenzi@doj.ca.gov

March 20, 2008

Chase Riveland
Riveland Associates
5714 Deer Harbor Road
Deer Harbor, WA 98243

Nancy M. Campbell
Deputy Special Master
8232 Hansen Road NE
Bainbridge Island, WA 98110

Ernest Galvan
Rosen Bien & Galvan, LLP
315 Montgomery Street, 10th Floor
San Francisco, CA 94104

Virginia L. Morrison
Deputy Special Master
One Cedar Avenue
Kentfield, CA 94904

RE:    *Jerry Valdivia, et al. v. Arnold Schwarzenegger, et al.*
       USDC-ED (Sacramento), Case No. 2:94-cv-0671 LKK GGH P

Dear All:

        Per Chase's email of March 11, 2008, the Defendants are providing their status update on
the development of the plan, policies, and procedures for those parolees identified as unable to
understand the charges against them or assist in their defense because of a mental illness.

**<u>Status of Policies and Procedures</u>**

        Since the last submitted update, Defendants have continued to work to refine the policies
proposed in May 2007 and develop an implementation plan to meet the deadlines of recent
orders. As of March 10, 2008, Health Care Services Division, Division of Adult Parole
Operations and the Board of Parole Hearings have all revised the May 2007 plan. In addition,
CalPAP provided CDCR with a copy of their draft procedures on March 14, 2008. As the
policies were being revised there were concerns raised about the parolee's due process rights and
the Defendants' ability to hold these individuals without a hearing. This discussion resulted in a
modification to the approach by Defendants.

        The approach continues to involve a competency evaluation prior to the final revocation
hearing of any parolee whose competency is called into question, and the Deputy Commissioner
will ensure that the parolee is provided counsel. As previously proposed, if, at any step in the
process, the parolee exhibits signs of an inability to understand the charges against him or assist

in his defense because of a mental illness, either the Deputy Commissioner, the Parolee's attorney or any other personnel may bring this to the attention of the hearing officer. The Deputy Commissioner will then order a competency evaluation, and contact the parolee's attorney (CalPAP), who will schedule a competency evaluation. Once the evaluation is performed and the report is provided to the Board of Parole Hearings, the revocation hearing will go forward with the assistance of counsel. At the revocation hearing, counsel for the parolee may make arguments directly tied to the mental status of the parolee, including reliance on the evaluation obtained. The Deputy Commissioner may take into account all such facts and factors associated with the parolee's mental condition in determining an appropriate disposition.

Defendants appreciate the importance for an accused parole violator to be able to participate meaningfully in the revocation process. However, that need must be balanced with Defendants' obligation to provide due process in a timely fashion. Any prolonged delay, as a result of mental health issues, in holding the revocation hearing may result in the loss of witnesses, or the ability of witnesses to recall the events underlying a charged violation, which would impede the Commissioner's ability to make an accurate evaluation of the parolee's conduct and needs, and make an informed predictive judgment of the parolee's ability to live a law-abiding life.

The Defendants have been placed in a position in which they are forced to chose between competing due process interests, the parolee's right to confrontation and a timely hearing versus the parolee's ability to meaningfully participate in that hearing. Furthermore, the risks associated with the latter will be minimized by the early appointment of an attorney, a competency evaluation and the ability of both the parolee's attorney and the Deputy Commissioner to consider the parolee's mental condition in the ultimate decision rendered.

## **Items Per March 11 Email**

Item #2 in the Special Master's March 11, 2008 email asks that the status update report on each of the first 13 items listed in the correspondence of March 7, 2008, from Lori Rifkin. Ms. Rifkin's letter asks that Defendants confirm that the Defendants' final plan will, in fact, include the following elements to which the Defendants' response is set forth below:

(1) Expedited transfer from county jail when parolee is identified as having possible mental health concerns (5/2007 plan, 2/5/08 progress update)?

**If the parolee is an OHO (our hold only) and there are mental health concerns, the parolee will be transferred to a prison. If not OHO, CDCR cannot move them since they are first subject to county custody and it would then be up to the county to provide treatment. While the May 2007 plan states that transfers will be expedited when possible, the February 5, 2008 update did not describe an expedited process. CDCR will attempt to transfer parolees as quickly as possible; however, CDCR does not foresee the necessity for a special procedure for what is essentially a vague "expedited transfer."**

(2) Potential to be diverted into mental health revocation process at any point during rev procedure, such as NOR, RTCA, Attorney Consultation, PCH, rev hearing, and identified process for accomplishing this diversion (5/2007 plan at 1-5);

**If this question is inquiring about the potential of the parolee to be identified with mental health concerns at various points in the process, this is contained in the new procedures. At all steps in the revocation process prior to the PCH, the case may be flagged as a possible mental health concern case. At the PCH or revocation hearing is where the evaluation would be formally requested.**

(3) A preliminary screening by CDCR doctors after a parolee has been identified as unable to participate in the revocation process due to mental health concerns to determine whether the parolee is in need of short term treatment that will enable the parolee to participate, without further evaluation, or whether outside competency evaluation is needed (2/5/08 progress update);

**The present plan is to have the attorney obtain the evaluation upon order of the Deputy Commissioner.**

(4) Consideration of remedial sanctions at every step in the revocation process (5/2007 plan at 12);

**This is contained in the new plan.**

(5) A procedure for providing attorney visits for clients even when in crisis beds (5/2007 plan at 3);

**This is contained in the new procedures.**

(6) A procedure whereby a parolee may challenge the finding that he/she is not competent to participate in the revocation process due to mental health concerns (5/2007 plan at 6-7);

**CalPAP will be selecting the evaluators. There is no plan for the parolee to challenge the evaluation in the new procedure.**

(7) An opportunity for defense counsel to argue for dismissal of any charges unsupported by evidence on their face (5/2007 plan at 3);

**This is contained in the new plan.**

(8) A provision governing the maximum time that a parolee may be incarcerated without ever successfully participating in the revocation process (5/2007 plan at 7);

**As described above, the Defendants will bring the parolee to a revocation hearing, after the parolee has been given a competency evaluation and provided with counsel.**

(9) A procedure for returning the parolee to the revocation process if he/she becomes able to meaningfully participate (5/2007 plan at 9);

**As described above, the Defendants will bring the parolee to a revocation hearing, after the parolee has been given a competency evaluation and provided with counsel.**

(10) Expedited mental health treatment for parolees identified through this process immediately upon identification (5/2007 plan at 8);

**OHOs will be transported to CDCR prisons where they will be provided with Mental Health Care within the parameters of *Coleman*.**

(11) A mechanism for meaningfully tracking a parolee's mental health status while in suspended revocation status (5/2007 plan at 9-10) and a mechanism for tracking parolees in this suspended status (5/2007 plan at 13, 2/25/08 progress update);

**Tracking will be done by CalPAP as well as follow-ups with the parolee, per the new plan.**

(12) A process for transitioning mentally ill parolees from in-custody status to parole when in need of enhanced community-based services (5/2007 plan at 10-12);

**This is contained in the new plan.**

(13) Training for BPH, DAPO, Case records, clinicians, CalPAP and mental health staff and funding for such training (5/2007 plan at 13).

**This is contained in the new plan.**

Additionally, attached please find the chart forwarded by Chase, along with the Defendants' information provided therein as well.

**<u>Status of CalPAP Contract Amendment and Funding</u>**

On March 17, 2008, the Board of Parole Hearings received confirmation that funding has been secured for CalPAP to provide the competency evaluations. It has been determined that there is no need for a contract amendment and CalPAP has been given authorization to bill under the current contract for these services.

Sincerely,

/ s /  *Jessica R. Devencenzi*

JESSICA R. DEVENCENZI
Deputy Attorney General

For    EDMUND G. BROWN JR.
Attorney General

JRD:

30421127.wpd

| | Have current plan (please describe) | Have not included; plan to consider: (please note date and committee or individuals who will handle next) | Do not intend to include (please describe reasons) |
|---|---|---|---|
| Access to DMH for parolees pending revocation or in suspended revocation status: defendants reported that this issue is still being negotiated. What is the current status? | In the approach currently being contemplated by the Defendants, the parolee may be revoked and, if the parolee qualifies, would be sent to DMH via the standard *Coleman* guidelines. Given the change in direction, there will need to be further negotiations. | | |
| Training in signs and symptoms of mental illness, as well as the new procedures, for BPH, DAPO, Case records, clinicians, and CalPAP and funding for such training (5/2007 plan at 13). | DCs will receive training from HS in April 2008. CalPAP will undergo training once the assessment criteria and processes are coordinated with evaluating mental health clinicians. CalPAP procedures will include information in this regard. | | |
| Potential to be diverted into mental health revocation process at any point during rev procedure, such as NOR, RTCA, Attorney Consultation, PCH, rev hearing, and identified process for accomplishing this (5/2007 plan at 1-5) | Contained in new procedures. At all steps in the process prior to the PCH the case may be flagged as a possible mental health concern case. At the PCH or Revocation hearing is where the evaluation would be formally requested. | | |
| The updated memo recites that there is a "mandatory mental health screening" at "every reception center," and that "[a]ny inmate meeting Coleman criteria is then diverted for further evaluation and treatment." How is this screening relevant to the revocation process? Does it happen early enough to have any role in | This is only relevant to the extent that these individuals are provided with a mental health screening as they enter the institution and, if needed, they are expeditiously provided with mental health treatment within the parameters of Coleman. | | |

| | | |
|---|---|---|
| determining mental health status as early as the Notice of Rights or Probable Cause Hearing? | | |
| Expedited mental health treatment for parolees identified through this process immediately on identification (5/2007 plan at 8) | A mechanism is contained in the plan. | |
| A preliminary screening by CDCR doctors after a parolee has been identified as unable to participate in the revocation process due to mental health concerns to determine whether the parolee is in need of short term treatment that will enable the parolee to participate, without further evaluation, or whether outside competency evaluation is needed (2/5/08 progress update) | The decision has been made to have outside evaluators determine the parolee's ability to participate in the revocation proceedings. | |
| Expedited transfer from county jail when parolee is identified as having possible mental health concerns (5/2007 plan, 2/5/08 progress update) | This is contained in the plan. | |
| Mechanism for evaluating parolees and tracking their readiness for hearing if they remain in county jail but are not going through IST process<br><br> - include access to jail, permission for information-sharing<br><br> - include mechanism for learning status of local charges (so can transfer to CDCR as soon as resolved) | The plan will hold the attorney responsible to track their client. | |

| | | |
|---|---|---|
| Policy that, when a parolee remains in county jail on local charges and it is unlikely his ability to participate will be restored timely, ACDC considers dropping hold (5/2007 plan at 4) | Defendants will bring the parolee to a revocation hearing, after the parolee has been given a competency evaluation and provided with counsel. | |
| Consideration of remedial sanctions at every step in the revocation process (5/2007 plan at 12) | Still contained in plan. | |
| A procedure for providing attorney visits for clients even when in crisis beds (5/2007 plan at 3) | Still contained in plan. | |
| An opportunity for defense counsel to argue for dismissal of any charges unsupported by evidence on their face (5/2007 plan at 3)  - including: What will the CalPAP-appointed counsel do at that moment if the parolee-client chooses to dispute the question of competency to proceed, if CalPAP is responsible for retaining contract clinicians | Contained in plan.  Procedure developed for BPH to appoint clinician if this event occurs. | |
| A procedure whereby a parolee may challenge the finding that he/she is not competent to participate in the revocation process due to mental health concerns (5/2007 plan at 6-7) | | CalPAP will be selecting the evaluators. No plan for the parolee to challenge evaluation in new procedure because CalPAP will be selecting the evaluator. |
| Mechanism for assessment, access, information-sharing when parolee transfers | This is in the plan. | |

| | | |
|---|---|---|
| offsite to MHCB or DMH | | |
| A mechanism for meaningfully tracking a parolee's mental health status while in suspended revocation status (5/2007 plan at 9-10) and a mechanism for tracking parolees in this suspended status (5/2007 plan at 13, 2/25/08 progress update) - including interval for assessments | Tracking will be done by CalPAP as well as follow-ups with parolee in new plan. | |
| What control will CalPAP have over the use of the clinical report? If CalPAP is retaining the clinician, the report may be protected as work-product, subject to disclosure to the BPH only at the option of the parolee-client and counsel. | The evaluation will not be considered attorney work product, it is being ordered by BPH. To consider attorney work product defeats the purpose of the evaluation and process. The attorney and the DC may need to disclose to the parolee the purpose of the evaluation and what it will be used for. | |
| The updated memo states that "As the practices and performance of the contracted providers becomes apparent, CDCR reserves the right to remove those providers who are unable to meet the mandates of this process." This is troubling in that it implies that CDCR can remove clinicians from the defense panel's list if CDCR does not like the clinicians' findings. This would constitute interference with CalPAP's role as an advocate for the parolee-client. | | CDCR is ultimately responsible for the quality of the services and has no vested interest in the outcome of the evaluation. |
| A procedure for returning the parolee to the revocation process if he/she becomes able to meaningfully participate (5/2007 plan at 9) | Defendants will bring the parolee to a revocation hearing, after the parolee has been given a competency evaluation and provided | |

| | |
|---|---|
| - including expediting placement on calendar, specifying deadlines | with counsel. |
| A provision governing the maximum time that a parolee may be incarcerated without ever successfully participating in the revocation process (5/2007 plan at 7) | The Defendants are contemplating the option of bringing the parolee to a revocation hearing, which would dictate the time the parolee would be incarcerated. |
| Mechanism for ensuring that parolees who have not had a hearing are released when their RTCAs expire. | Under the new approach, this question is not relevant as the parolee would be released on the RRD. |
| Manner of counting time spent in custody while in suspended revocation status: how this time will be documented in a parolee's record, and whether it will be counted in future dispositional phases of hearings | Under the new approach, this question is not relevant as the parolees will not be in an extended suspended revocation status. |
| Mechanism for overseeing that the above procedures are operating as planned | CalPAP will track. |
| A process for transitioning mentally ill parolees from in-custody status to parole when in need of enhanced community-based services (5/2007 plan at 10-12) | In plan to notify AOR. |

# EXHIBIT 8

## Kate Richardson

| | |
|---|---|
| **From:** | Ernest Galvan [egalvan@RBG-Law.com] |
| **Sent:** | Tuesday, March 25, 2008 12:38 PM |
| **To:** | Valdivia Team |
| **Subject:** | FW: Valdivia: Revocation Proceedings for Parolees with Mental Health Concerns |
| **Attachments:** | 28 CFR 2.8.pdf |

-------------------------------------------
**From:** Jessica Devencenzi[SMTP:JESSICA.DEVENCENZI@DOJ.CA.GOV]
**Sent:** Tuesday, March 25, 2008 12:36:20 PM
**To:** Ginny Morrison; Ernest Galvan; Chase Riveland
**Cc:** Katherine Nelson; Debbie Vorous; Vickie Whitney
**Subject:** Valdivia: Revocation Proceedings for Parolees with Mental  Health Concerns
**Auto forwarded by a Rule**

All:

Attached please find 28 C.F.R. 2.8 and the corresponding sections of the Federal Register.  As indicated in the Defendants' status report of March 20, 2008, the Defendants are utilizing this section of the Code of Federal Regulations as the model for designing the system to be utilized in California because of its well-reasoned balance of the various rights involved for parolees in revocation proceedings and *Valdivia*.  The Defendants' model will not be identical to that set forth in the Regulation in that the Defendants' model will incorporate the due process requirements of *Valdivia* and various other nuances relating the administration of parole in California.  Defendants are providing the Regulation and Federal Register sections so that Plaintiffs may see the background against which the Defendants are preparing their Policies and Procedures in the development of this new process.

Defendants are currently working to incorporate the Regulation procedures into the draft of Policies and Procedures upon which negotiations with Plaintiffs will proceed.  As confirmed with the Special Master, the Defendants will provide those to the Plaintiffs and the Office of the Special Master as soon as possible, but in no event later than the April 3, 2008 deadline.  If you have questions or concerns please let us know.


Thank you,

Jessica


*Jessica R. Devencenzi*
*Deputy Attorney General*
*Correctional Law Section*
*Office of the Attorney General*
*(916)322-6104*

**CONFIDENTIALITY NOTICE:** This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

LEXSTAT 28 CFR 2.8

LEXISNEXIS' CODE OF FEDERAL REGULATIONS
Copyright © 2008, by Matthew Bender & Company, a member
of the LexisNexis Group. All rights reserved.

*** THIS SECTION IS CURRENT THROUGH THE MARCH 20, 2008 ISSUE OF ***
*** THE FEDERAL REGISTER ***

TITLE 28 -- JUDICIAL ADMINISTRATION
CHAPTER I -- DEPARTMENT OF JUSTICE
PART 2 -- PAROLE, RELEASE, SUPERVISION AND RECOMMITMENT OF PRISONERS, YOUTH
OFFENDERS, AND JUVENILE DELINQUENTS
SUBPART A -- UNITED STATES CODE PRISONERS AND PAROLEES

**Go to the CFR Archive Directory**

*28 CFR 2.8*

§ 2.8 Mental competency proceedings.

(a) Whenever a prisoner (or parolee) is scheduled for a hearing in accordance with the provisions of this part and reasonable doubt exists as to his mental competency, i.e., his ability to understand the nature of and participate in scheduled proceedings, a preliminary inquiry to determine his mental competency shall be conducted by the hearing panel, hearing examiner or other official (including a U.S. Probation Officer) designated by the Regional Commissioner.

(b) The hearing examiner(s) or designated official shall receive oral or written psychiatric or psychological testimony and other evidence that may be available. A preliminary determination of mental competency shall be made upon the testimony, evidence, and personal observation of the prisoner (or parolee). If the examiner(s) or designated official determines that the prisoner is mentally competent, the previously scheduled hearing shall be held. If they determine that the prisoner is not mentally competent, the previously scheduled hearing shall be temporarily postponed.

(c) Whenever the hearing examiner(s) or designated official determine that a prisoner is mentally incompetent and postpone the previously scheduled hearing, they shall forward the record of the preliminary hearing with their findings to the Regional Commissioner for review.

(1) In the case of a prisoner, if the Regional Commissioner concurs with their findings, the Commissioner shall order the temporarily postponed hearing to be postponed indefinitely until such time as it is determined that the prisoner has recovered sufficiently to understand the proceedings. The Regional Commissioner shall require a progress report on the mental health of the prisoner at least every six months. When the Regional Commissioner determines that the prisoner has recovered sufficiently, the Commissioner shall reschedule the hearing for the earliest feasible date.

(2) In the case of a parolee in a revocation proceeding, the Regional Commissioner shall postpone the revocation hearing and order that the parolee be given a mental health examination in a suitable facility of the Bureau of Prisons or the District of Columbia. The postponed revocation hearing shall be held within 60 days, or as soon as a satisfactory mental health report is submitted. The Regional Commissioner shall order that appointment of counsel be sought in any case where the parolee does not have counsel for the revocation hearing. If the parolee's mental incompetency is raised

at a preliminary interview or probable cause hearing, the Commission (or hearing official) will make a determination of probable cause and, if probable cause is found, schedule a revocation hearing as provided in this paragraph.

(d) If the Regional Commissioner disagrees with the findings of the hearing examiner(s) or designated official as to the mental competency of the prisoner, he shall take such action as he deems appropriate.

(e) At a postponed revocation hearing under this section, the hearing examiner shall make a preliminary determination as to the parolee's mental competency, taking into account all available mental health reports, any evidence submitted on the parolee's behalf, any report from counsel as to counsel's ability to communicate with the parolee, and the parolee's own responses to the examiner's questioning.

(1) If the hearing examiner determines the parolee to be mentally competent, the examiner shall conduct the revocation hearing. If counsel has previously asserted the parolee's incompetence, the examiner shall offer counsel a brief recess to consult with the parolee before proceeding.

(2) If the hearing examiner determines the parolee to be mentally incompetent, the examiner shall conduct the revocation hearing, and shall take into full account the parolee's mental condition in determining the facts and recommending a decision as to revocation and reparole.

(3) If the Commission revokes parole, the Commission may grant reparole conditioned on the parolee's acceptance into a particular type of mental health program prior to release from prison, or may grant reparole with a special condition of supervision that requires appropriate mental health treatment, including medication. In cases where no other option appears appropriate, the Commission may grant reparole conditioned upon the parolee's voluntary self-commitment to a mental health institution until such time as the parolee has sufficiently recovered for the Commission to permit the parolee's return to supervision.

(4) If the Commission finds that the parolee did not commit the charged violations of parole, but also finds that the parolee is unable to fulfill the normal obligations of a parolee by reason of his mental condition, the Commission may reinstate the parolee to parole with any appropriate special condition, including the special condition, if necessary, that the parolee voluntarily commit himself to a mental institution until such time as the parolee has sufficiently recovered for the Commission to permit a return to supervision.

**HISTORY:** *[44 FR 3408,* Jan. 16, 1979; *68 FR 70709, 70711,* Dec. 19, 2003]

**AUTHORITY:** AUTHORITY NOTE APPLICABLE TO ENTIRE PART:
*18 U.S.C. 4203*(a)(1) and 4204(a)(6).

**NOTES:** [EFFECTIVE DATE NOTE: *68 FR 70709, 70711,* Dec. 19, 2003, revised paragraph (c), and added paragraph (e), effective Jan. 20, 2004.]


NOTES APPLICABLE TO ENTIRE CHAPTER:
CROSS REFERENCES: Customs Service, Department of the Treasury: See Customs Duties, 19 CFR chapter I.
Internal Revenue Service, Department of the Treasury: See Internal Revenue Service, 26 CFR chapter I.
Employees' Benefits: See title 20.
Federal Trade Commission: See Commercial Practices, 16 CFR chapter I.
Other regulations issued by the Department of Justice appear in title 4; title 8; title 21; title 45; title 48.

850 words

LEXSEE 68 FR 70709

FEDERAL REGISTER

Vol. 68, No. 244

Rules and Regulations

DEPARTMENT OF JUSTICE (DOJ)

United States Parole Commission

**28 CFR Part 2**

**Paroling, Recommitting, and Supervising Federal Prisoners: Prisoners Serving Sentences Under the United States and District of Columbia Codes**

*68 FR 70709*

**DATE:** Friday, December 19, 2003

**ACTION:** Interim rule with request for comments.

**SUMMARY:** This interim rule is designed to provide a fair and expeditious means of handling the case of an accused parole violator who is found to be mentally incompetent to proceed with a scheduled parole revocation hearing. Under the Commission's present rule, such a parolee is sent to the Bureau of Prisons for a mental health examination, with a report every six months, until the parolee regains sufficient competence to participate in a revocation hearing. This rule can result in the indefinite detention of the mentally incompetent parolee, without any provision for bringing the revocation matter to resolution. The interim rule authorizes the Commission to conduct a revocation hearing notwithstanding the parolee's lack of mental competency, so long as the Commission obtains a current mental health report, ensures that the parolee has counsel to present a defense, and takes the parolee's mental condition into account in its determination.

**DATES:** *Effective date:* January 20, 2004. Comments must be received by February 17, 2004.

**ADDRESSES:** Send comments to Office of General Counsel, U.S. Parole Commission, 5550 Friendship Blvd., Chevy Chase, Maryland 20815.

**FOR FURTHER INFORMATION CONTACT:** Office of General Counsel, U.S. Parole Commission, 5550 Friendship Blvd., Chevy Chase, Maryland 20815, telephone (301) 492-5959. Questions about this publication are welcome, but inquiries concerning individual cases cannot be answered over the telephone.

**SUPPLEMENTARY INFORMATION:** A recent case in the District of Columbia has illustrated the problems that can arise when the Commission finds that a parolee who is charged with parole violations is not mentally competent to participate a revocation hearing, and successive efforts to hold a revocation hearing are frustrated by the

68 FR 70709, *

parolee's inability to regain competency. Other pending revocation cases potentially raise similar difficulties. Under the Commission's present regulation, *28 CFR 2.8*, such a parolee must be kept in prison with a report as to his mental competency submitted every six months. A revocation hearing is attempted only when the mental health report indicates that the parolee may be competent to proceed. The regulation can result in indefinite delays in holding the revocation hearing, because the rule lacks any provision for resolving the parolee's situation.

The rule at § 2.8 is grounded, in part, on the policy judgment that the Commission cannot responsibly return accused parole violators to parole supervision solely by reason of their mental incompetency. This result would be incompatible with a primary purpose of parole, *i.e.*, to promote the reintegration of criminal offenders into society as law-abiding citizens through closely supervising their activities in the community and facilitating their rehabilitation. Effective supervision can only be carried out when parolees [*70710] maintain sufficient mental capacity to report as directed to their supervision officers, to follow instructions, to comply with the conditions of parole, and to avoid committing new crimes. Given the overriding public interest in preventing new crimes by released offenders, the Commission may justifiably require any parolee who lacks the mental capacity to function successfully on parole to complete his sentence in prison.

The mental incompetency of a defendant facing a criminal prosecution has a far different consequence. A defendant who is found unable to regain competence to stand trial in the foreseeable future cannot be incarcerated indefinitely and must be released, as mandated by *Jackson v. Indiana, 406 U.S. 715 (1972)*. But this requirement does not apply to an accused parole violator, who is a convicted felon whose imprisonment will terminate with the expiration date of his sentence. Moreover, a parolee's mental condition is not a defense to revocation, though the parolee's condition is a factor for the decision-maker to consider in the disposition of the case. *E.g., United States v. Brown, 899 F.2d 189 (2d Cir. 1990); Steinberg v. Police Court of Albany, New York, 610 F. 2d 449 (6th Cir. 1979)*. A parolee cannot, therefore, gain immunity from revocation of parole, and force the government to resort to civil commitment procedures, merely by reason of mental incompetency.

On the other hand, maintaining an accused parole violator on a potentially indefinite six-month reporting cycle without a revocation hearing, as permitted by the present rule, fails to serve the interest of both society and the parolee in seeing that parole violation charges are resolved in a reasonable time. Conducting a revocation hearing notwithstanding the parolee's mental incompetency is the appropriate solution because, in the final analysis, revocation of parole is remedial in nature. *E.g., United States v. Pinjuv, 218 F.3d 1125, 1131 (9th Cir. 2000), citing, Standlee v. Rhay, 557 F.2d 1303, 1306 (9th Cir. 1977)*. Although it is obviously important for an accused parole violator to be able to participate meaningfully in the revocation process, the overriding consideration is that the Commission should avoid excessive delay in determining whether revocation is appropriate. A prolonged delay in holding the revocation hearing may result in the loss of witnesses, or the ability of witnesses to recall the events underlying a charged violation, which would impede the Commission's ability to make an accurate evaluation of the parolee's conduct and needs, and make an informed predictive judgment of the parolee's ability to live a law-abiding life. *Morrissey v. Brewer, 408 U.S. 471, 480 (1972)*. It can also keep the parolee in custody unjustly where the violation charges would otherwise be dismissed.

If revocation is ordered, depending on the seriousness of the violations committed and the risk of new criminal behavior, the Commission can take such measures as are best suited to protect the public, which may include a reparole under conditions of supervision adequate to support the parolee's mental health needs. If the charges are dismissed, or revocation is otherwise not found appropriate, the Commission can return the parolee to the community with a better understanding of the needs that must be addressed to improve the parolee's chances for success.

Consequently, the Commission's revised regulation requires that, whenever a parolee appears to be incompetent to go forward with a revocation hearing, the hearing examiner must temporarily postpone the hearing to obtain a report concerning the parolee's competency from mental health professionals. If the incompetency appears at the probable cause hearing stage, the examiner (or Commission) will make a finding as to probable cause and, if probable cause is found, will schedule a revocation hearing to be held with such a report.

At the postponed revocation hearing, the hearing examiner will make a preliminary determination as to the parolee's competency before proceeding with the revocation hearing. But the hearing examiner will proceed with the revocation hearing even if the examiner determines that the parolee is mentally incompetent to participate in the hearing. Under the interim rule, a finding of incompetency is not a reason for ordering further postponements or for canceling the hearing. In such a case, the purpose of the mental competency determination is to inform the examiner of the parolee's condition, so that the examiner can ensure that both a fair revocation hearing and a reasonable decision results.

In drafting this revised regulation, the Commission has taken account of the possibility that holding a revocation hearing in the case of an incompetent parolee could result in an increased risk of erroneous fact-finding. This risk will be controlled by the provision that any mentally incompetent parolee must be afforded representation by counsel at the revocation hearing. Counsel will be expected to investigate the charges by speaking to witnesses, family members, and others with relevant information. Counsel will be permitted to present any substantial defense to the charges which the circumstances suggest, even if the parolee is not able to testify or give counsel meaningful assistance. This is not an unfair expectation because counsel is not tasked with preparing a defense in a criminal trial under the standard of "beyond a reasonable doubt." Counsel is only tasked with preparing a defense in an informal administrative hearing, under the lesser standard of the "preponderance of the evidence," whereby counsel need only provide the Commission with the explanation of the facts which "best accords with reason and probability." *see 28 CFR 2.19(c)*. As the Supreme Court stated in *Morrissey v. Brewer, supra, 408 U.S. at 489*, a parole revocation hearing is not a criminal trial "in any sense."

Therefore, the absence of any readily evident defenses to the alleged parole violations will, in most cases, result in counsel emphasizing factors in mitigation. Even though a case may occur in which a parolee cannot communicate to counsel some defense that is known only to the parolee, it is still preferable for the Commission to hold a hearing and make the best decision it can, as opposed to postponing the hearing until such time as the parolee is able to regain his competence.

In sum, the only requirement of due process in such a case is that the Commission must take the parolee's mental condition fully into account in conducting the revocation hearing and making its decision. *Pierce v. State Department of Social and Health Services, 646 P. 2d 1382 (S. Ct. Wash. 1982) (en banc)*. Before making a finding as to whether the parolee violated parole as charged, the Commission will consider the parolee's difficulty in communicating his version of the facts, and weigh that factor in the balance in assessing the probabilities under *28 CFR 2.19(c)*. If the Commission finds that violations have occurred, the Commission will consider the parolee's inability to provide a coherent explanation of the reasons for his misconduct in determining whether revocation is the appropriate remedy.

Because this is a rule of procedure only, and implementation of the rule at the earliest opportunity is necessary for the Commission to be able to resolve any potential delays in its revocation caseload, this rule will go into effect as an interim rule with request for comments, in contrast to proposals for rulemaking on substantive matters such as paroling policy. [*70711]

**Implementation**

The amended rule will take effect January 20, 2004, and will apply to all cases, federal and District of Columbia, including District of Columbia offenders on supervised release.

**Executive Order 12866**

The U.S. Parole Commission has determined that this interim rule does not constitute a significant rule within the meaning of Executive Order 12866.

**Executive Order 13132**

This regulation will not have substantial direct effects on the States, on the relationship between the national government and the States, or on the distribution of power and responsibilities among the various levels of government. Under Executive Order 13132, this rule does not have sufficient federalism implications requiring a Federalism Assessment.

**Regulatory Flexibility Act**

The interim rule will not have a significant economic impact upon a substantial number of small entities within the meaning of the Regulatory Flexibility Act, *5 U.S.C. 605* (b), and is deemed by the Commission to be a rule of agency practice that does not substantially affect the rights or obligations of non-agency parties pursuant to section 804 (3) (c) of the Congressional Review Act.

**Unfunded Mandates Reform Act of 1995**

This rule will not cause State, local, or tribal governments, or the private sector, to spend $ 100,000,000 or more in any one year, and it will not significantly or uniquely affect small governments. No action under the Unfunded Mandates Reform Act of 1995 is necessary.

**Small Business Regulatory Enforcement Fairness Act of 1996**

This rule is not a major rule as defined by section 804 of the Small Business Regulatory Enforcement Fairness Act of 1996. This rule will not result in an annual effect on the economy of $ 100,000,000 or more; a major increase in costs or prices; or significant adverse effects on the ability of United States-based companies to compete with foreign-based companies.

**List of Subjects in 28 CFR Part 2**

Administrative practice and procedure, Prisoners, Probation and parole.

**The Interim Rule**

Accordingly, the U.S. Parole Commission is adopting the following amendment to 28 CFR Part 2.

**PART 2--[AMENDED]**

1. The authority citation for 28 CFR Part 2 continues to read as follows:

**Authority:** *18 U.S.C. 4203* (a) (1) and 4204 (a) (6).

2. Amend § 2.8 by revising paragraph (c) and adding paragraph (e). The revised and added texts read as follows:

**§ 2.8 -- Mental competency proceedings.**

\* \* \* \* \*

(c) Whenever the hearing examiner(s) or designated official determine that a prisoner is mentally incompetent and postpone the previously scheduled hearing, they shall forward the record of the preliminary hearing with their findings to the Regional Commissioner for review.

(1) In the case of a prisoner, if the Regional Commissioner concurs with their findings, the Commissioner shall order the temporarily postponed hearing to be postponed indefinitely until such time as it is determined that the prisoner has recovered sufficiently to understand the proceedings. The Regional Commissioner shall require a progress report on

the mental health of the prisoner at least every six months. When the Regional Commissioner determines that the prisoner has recovered sufficiently, the Commissioner shall reschedule the hearing for the earliest feasible date.

(2) In the case of a parolee in a revocation proceeding, the Regional Commissioner shall postpone the revocation hearing and order that the parolee be given a mental health examination in a suitable facility of the Bureau of Prisons or the District of Columbia. The postponed revocation hearing shall be held within 60 days, or as soon as a satisfactory mental health report is submitted. The Regional Commissioner shall order that appointment of counsel be sought in any case where the parolee does not have counsel for the revocation hearing. If the parolee's mental incompetency is raised at a preliminary interview or probable cause hearing, the Commission (or hearing official) will make a determination of probable cause and, if probable cause is found, schedule a revocation hearing as provided in this paragraph.

* * * * *

(e) At a postponed revocation hearing under this section, the hearing examiner shall make a preliminary determination as to the parolee's mental competency, taking into account all available mental health reports, any evidence submitted on the parolee's behalf, any report from counsel as to counsel's ability to communicate with the parolee, and the parolee's own responses to the examiner's questioning.

(1) If the hearing examiner determines the parolee to be mentally competent, the examiner shall conduct the revocation hearing. If counsel has previously asserted the parolee's incompetence, the examiner shall offer counsel a brief recess to consult with the parolee before proceeding.

(2) If the hearing examiner determines the parolee to be mentally incompetent, the examiner shall conduct the revocation hearing, and shall take into full account the parolee's mental condition in determining the facts and recommending a decision as to revocation and reparole.

(3) If the Commission revokes parole, the Commission may grant reparole conditioned on the parolee's acceptance into a particular type of mental health program prior to release from prison, or may grant reparole with a special condition of supervision that requires appropriate mental health treatment, including medication. In cases where no other option appears appropriate, the Commission may grant reparole conditioned upon the parolee's voluntary self-commitment to a mental health institution until such time as the parolee has sufficiently recovered for the Commission to permit the parolee's return to supervision.

(4) If the Commission finds that the parolee did not commit the charged violations of parole, but also finds that the parolee is unable to fulfill the normal obligations of a parolee by reason of his mental condition, the Commission may reinstate the parolee to parole with any appropriate special condition, including the special condition, if necessary, that the parolee voluntarily commit himself to a mental institution until such time as the parolee has sufficiently recovered for the Commission to permit a return to supervision.

Dated: December 12, 2003.

**Edward F. Reilly, Jr.,**

*Chairman, U.S. Parole Commission.*

[FR Doc. 03-31293 Filed 12-18-03; 8:45 am]

BILLING CODE 4410-31-P

# EXHIBIT 9

## Kate Richardson

| | |
|---|---|
| **From:** | Jessica Devencenzi [Jessica.Devencenzi@doj.ca.gov] |
| **Sent:** | Thursday, April 03, 2008 5:20 PM |
| **To:** | Ginny Morrison; Ernest Galvan; Lori E. Rifkin; Chase Riveland |
| **Cc:** | Bruce.Slavin@cdcr.ca.gov; Katherine Nelson; Debbie Vorous; Vickie Whitney |
| **Subject:** | Valdivia: Defendants' Plan relating to Incompetent Parolees |
| **Attachments:** | Ltr to SM Riveland.pdf; Ltr to SM Riveland.pdf; Ltr to SM Riveland.pdf; Ltr to SM Riveland.pdf; Ltr to SM Riveland.pdf; Ltr to SM Riveland.pdf |

All:

Attached please find Defendants' comprehensive plan relating to incompetent parolees, as well as the policies and procedures.

If you have questions please feel free to contact me.

Thank you,

Jessica

Jessica R. Devencenzi
Deputy Attorney General
Correctional Law Section
Office of the Attorney General
(916)322-6104

**CONFIDENTIALITY NOTICE:** This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

## COMPREHENSIVE PLAN ADDRESSING THE NEEDS OF PAROLEES IN THE REVOCATION PROCESS WHO ARE MENTALLY INCOMPETENT

### Procedure for Parolees in the Revocation Process who are Mentally Incompetent

#### Applicable Standard

The standard that will dictate the minimum level of competency required for determining whether a parolee can participate in his/her revocation hearing is as follows: "A parolee is mentally incompetent for purposes of participating in his/her revocation hearing if, as a result of a mental disorder, he/she is unable to understand the nature of the proceedings taken against him/her or to assist counsel in the conduct of a defense in a rational manner."

#### Parole Hold

The Parole hold is placed per current policy and procedure.

Upon arrival at a CDCR Reception Center (RC), parolees will continue to be screened by medical staff at the bus screening. If medical screening reveals the need for immediate psychiatric treatment, the parolee will be referred to CDCR Mental Health for evaluation and appropriate treatment. All incoming inmates are subsequently screened by mental health clinicians regardless of the outcome of the bus screening and those found positive at this screening receive further evaluation by Mental Health.

If the parolee is in custody at a county jail, and has been identified as being in need of a mental health assessment and/or treatment, transfer to a CDCR RC will be expedited, where possible, in order to secure psychiatric treatment within the CDCR. The transfer will occur promptly following the completion of Notice of Rights/Charges (NOR). If the parolee does not have local criminal charges pending, the BRR will facilitate the expedited transfer of the parolee to a CDCR institution.

If the parolee has pending local criminal charges, the BRR will contact the appropriate jail staff to advise that the parolee needs a psychiatric evaluation.

The BRR shall facilitate the applicable transfer or notification of jail staff immediately; preferably on the same day of notification by the Notice Agent, but no later than noon on the following business day.

#### Probable Cause Determination (PCD)

Probable Cause Determination/case conference occurs per current policy and procedure. The PCD will occur no later than two calendar days from placement of the parole hold (if time line expires on a weekend/holiday, the NLT date is the next business day).

1

**Notice of Rights/Charges (NOR)**

The parolee will be served with his/her Notice of Rights/Charges no later than three business days following placement of the parole hold.

A case may be flagged by the Agent of Record and/or Unit Supervisor, by noting the parolee's mental health concerns on the Charge Report (1502B) in the body of the report and/or in the Unit Supervisor's comments/recommendations.

When serving the NOR, if the Notice Agent determines that the parolee appears to have difficulty understanding his/her rights and/or charges and the Notice Agent believes the parolee's difficulty understanding may be the result of mental illness, the Notice Agent will indicate this on the Notice and Request for Assistance at a Parole Proceeding, BPT 1073. The Notice Agent who identifies a parolee with possible mental health concerns during the Notice of Rights/Charges shall:

For inmates/parolees housed in a county jail:

- Document the mental health concerns by checking the box "Appears to have difficulty understanding" on the BPT 1073 in Section III, Initial Service of Rights and writing in the "comments" section *"MH concern – notified BRR on XX/XX/XX* (date)".
- Notify the Board Revocation Representative (BRR). This shall involve direct contact, not voice mail.

For inmates/parolees housed in an institution:

- Document the mental health concerns by checking the box "Appears to have difficulty understanding" on the BPT 1073 in Section III, Initial Service of Rights and writing in the "comments" section *"MH concern – notified MH staff on XX/XX/XX* (date)".
- Telephonically contact the appropriate mental health staff at the institution in which the parolee is located in order to inform them that immediate mental health attention may be needed. This shall involve direct contract, not voice mail.

Information regarding the inmate's/parolee's perceived inability to understand information communicated and mental health concerns shall be entered into the Disability and Effective Communication System (DECS) within one business day. The completed NOR packet will be promptly returned to the respective field unit.

All Notice Agents will be provided with:
- A list of the institutional Chief of Mental Health [and their designee] and Registered Nurses for CDCR institutions

2

- County Jail Mental Health liaisons
- Board Revocation Representative (BRR) contact listing

The Supervising Notice Agent will be responsible for ensuring staff under their supervision receives adequate training, necessary contact information, and overall compliance with this portion of the process.

## Return to Custody Assessment (RTCA)

The RTCA will be completed no later than 10 business days from placement of the parole hold.

The DC will make a return to custody assessment based on the standard factors used in the parole revocation process. If at the RTCA the DC is presented with information that indicates the parolee may be incompetent (e.g. documents/information from DAPO, information entered into RSTS, or information from the parolee's attorney), the DC will note on the BPT 1104 that an evaluation to determine if the parolee is incompetent may be necessary. The final determination for the need of the evaluation will be determined at the PCH or Revocation Hearing.

## Attorney Consultation with Parolee

A case may be flagged as a "Mental Health concern case" at the attorney consultation step of the revocation process. When interviewing a parolee who is facing possible revocation, if the attorney determines that the parolee appears to have difficulty communicating with the attorney, and the parolee has a history of mental illness, or the attorney believes the parolee's difficulty understanding may be the result of mental health concerns, the attorney will contact DRU staff immediately following the initial attorney/client interview in order to flag the case for possible mental health concerns. DRU staff will make an entry into DECS noting that they received contact from the attorney expressing mental health concerns regarding their client.

If a parolee is being treated in a Mental Health Crisis Bed (MHCB) at the time of the attorney/client interview, the attorney will be able to contact MHCB IDTT staff to procure information regarding the parolee's ability to be escorted to an appropriate, secure visiting area in order to conduct the attorney/client interview. If MHCB IDTT staff informs the attorney that a clinical determination has been made that the parolee is unable to be escorted to the visiting area, then the attorney will defer to the judgment of the clinical staff. Defense counsel has the option to periodically follow-up with MHCB IDTT staff to determine when the parolee can be escorted to visiting. If more than 20 days expire and the attorney has not had access to his/her client, the attorney may schedule an appointment to enter the institution to check on the status of his/her client, if possible. Attorney visits will not occur within the CTC.

If a parolee in a MHCB is unavailable for the attorney consultation and/or the Probable Cause Hearing (PCH), the proceedings will be postponed due to parolee unavailability until the attorney can meet with the parolee.

## Probable Cause Hearing (PCH)

If at the PCH the DC is presented with information that indicates the parolee may be incompetent, (e.g. documents/information from DAPO, observations of the parolee, notation on the BPT 1104 or information from the parolee's attorney), the DC will consult with the parolee's attorney. If it is determined by the DC that the parolee may be incompetent the DC will make a determination of probable cause, if probable cause is found, the DC will assess a return to custody period (not to exceed the RTCA), putting the parolee in a revoked status. The DC will also order a competency evaluation and order that a revocation hearing be scheduled when advised by counsel that the evaluation is complete. The scheduling of the revocation hearing shall not exceed 60 days without a showing of good cause for the delay or a waiver of time by counsel.

The DC will review all the charges and supporting information to ensure the existence of probable cause to support each charge and probable cause to maintain the hold. Defense counsel will be given the opportunity to argue why the charges should be dismissed on their face. Unsupported charges will be dismissed. If all charges are dismissed, the DC will order the hold removed. If all of the charges have been dismissed, and the parolee appears to have mental health concerns, the BPH will notify the AOR of this circumstance which will be taken into account regarding the best method to assist the parolee in securing his/her release based on existing DAPO policies.

The order dropping the hold shall include language similar to "return to parole to occur no later than 5 business days from the date of this order, to provide the Division of Adult Parole Operations time to locate community-based continuity of care within existing resources." This will allow DAPO staff time to attempt to secure a proper community placement for the parolee.

If some but not all charges are dismissed an adjustment in the RTCA will be made if appropriate. The DC will document on the BPT 1103 PCH the assessed time (RTCA) and state that the dispositional phase of the revocation process is delayed in order to obtain a competency evaluation for the hearing.

The DC will prepare the witness list in preparation for the revocation hearing following the completion of the evaluation, approving or disapproving both the State and parolee's witnesses.

The parolee's attorney will be given a copy of the DC's decision and be responsible for having the evaluation completed. The DC will flag the file in order to notify the DRU staff of the need for an evaluation and a revocation hearing when notified by counsel that the evaluation has been completed. The BPH staff will update the Disability and Effective Communication System (DECS) upon receipt of new information.

4

In the event that the DC determines an evaluation is necessary and the parolee and attorney disagree, the DC will contact an ACDC to coordinate obtaining an evaluation. The evaluation, when received by the DRU staff will be included in the revocation file, faxed to the AOR and CalPAP.

Once the evaluation is received at the DRU from either the evaluator or counsel, DRU staff will schedule a second PCH or revocation hearing at the request of parolee's counsel. DRU staff will notify the attorney of the date and time of the hearing.

Once the evaluation is completed and the report is received from the parolee's attorney the report will be included in the revocation packet. The DRU staff will schedule the parolee on the next available calendar, either a second PCH or RH at the request of the parolee's counsel.

If the parolee is unavailable for the PCH hearing, due to verifiable and documented mental health treatment requirements, or he/she refuses to attend the hearing due to a mental illness, the DC may order an evaluation without the parolee's presence at the hearing. In order to determine whether an order for an evaluation is needed in this situation, the DC may rely on the attorney's statements, as well as past mental health information contained in the Disability and Effective Communication System (which contains information regarding past chronos identifying placement in a MHCB, EOP level of care, past BPT 1073s, etc.), as well as the current BPT 1073. This exception will apply only to those parolees who have serious mental disorders requiring acute psychiatric care in an in-patient type setting which would render the parolee unable to attend a hearing, or the parolee refuses to attend the hearing.

If the parolee is located at the county jail (but cannot be transferred to a CDCR facility because of pending local charges) the BRR, at the conclusion of the PCH, will notified the county jail liaison that there are mental health concerns and possible mental health treatment is needed. The BRR will notify the DRU staff of the need for treatment and/or an evaluation. The DRU staff will await the contact from the contract attorney. The assigned contract attorney will case conference the situation with their supervising staff attorney. The contract attorney and supervising staff attorney will determine who will contact the court attorney and track the parolee's criminal charges progress. The contract attorney or supervising staff counsel will contact the court attorney to inquire if the parolee's competency is being evaluated for the pending criminal proceedings and if so track the progress of the court proceedings. The contract attorney or supervising staff attorney will report the results of the contact to the DRU staff, who will enter the status into the RSTS comments section. If the parolee is pending a competency evaluation for his/her criminal proceedings the contract or supervising staff attorney will have regular contact with the criminal attorney and at the conclusion of the evaluation inform the DRU staff whether the parolee was determined competent or incompetent. In the event the parolee is not being evaluated for competency in his/her court proceedings or the competency evaluation is likely to exceed 45 days, the contract or supervising staff

5

attorney representing the parolee in the revocation process shall request the DC at the PCH or revocation hearing to order an evaluation.

### Health Care Services

This procedure applies to parolees who a DC determines may be incompetent. BPH will advise the Mental Health Program of its concerns. Upon receipt of such notification, the mental health program will make contact with the parolee and assess whether the parolee meets program guide criteria for inclusion in the Mental Health Treatment System. The procedure is as follows:

The Deputy Commissioner shall document his/her concerns on the 1103, describing the parolee's behavior in the hearing, notify the Decentralized Revocation Unit (DRU), and transmits (via fax or email) the referral document to the DRU.

- The DRU staff shall contact the Division of Correctional Health Care Services Mental Health Program headquarters in Sacramento (using a list of Senior Psychologist, Specialists, supervised by a Chief Psychologist) and delivers (via email or fax) the referral document.
- The Division of Correctional Heath Care Services, Mental Health Program headquarters shall contact the Chief of Mental Health (or designee) of the prison where the parolee is located who shall assign a mental health clinician to complete an assessment, and
- A mental health clinician shall assess the patient based on Mental Health Service Delivery System Program Guide criteria to determine whether placement in the Mental Health Treatment System is appropriate.

### Revocation Hearing (RH) or PCH Following Receipt of Evaluation

If at the RH, where no competency evaluation was requested at the PCH, the DC is presented with information that indicates the parolee may be incompetent, (e.g. documents/information from DAPO, observations of the parolee, notation on the BPT 1104 or information from the parolee's attorney), the DC shall complete the fact-finding phase of the revocation hearing. The dispositional phase of the revocation hearing shall be continued, if requested by the parolee, for a reasonable time, not to exceed 60 days, until the competency evaluation can be submitted to the board for consideration and inclusion in the dispositional phase of the hearing. The DC will notify the DRU staff of the need for treatment and/or an evaluation. The BPH staff will update the Disability and Effective Communication System (DECS) upon receipt of new information

The BPH staff will follow the same procedures as outlined above for the PCH.

If at a RH where a competency evaluation was requested, at a previous PCH, and the evaluation is present, the fact-finding phase of the hearing will be conducted as any other revocation hearing. The competency evaluation is to be considered in the dispositional phase of the hearing. The Board shall consider the results of the evaluation in making the

decision on whether or not to revoke, reinstate on parole, or recommend other remedial sanctions.

If at a RH where a competency evaluation was requested, at a previous RH, and the evaluation is present, the results of the fact-finding phase of the hearing will be summarized on the tape, but shall not be reheard. The competency evaluation is to be considered in the dispositional phase of the hearing. The Board shall consider the results of the evaluation in making the decision on whether or not to revoke, reinstate on parole, or recommend other remedial sanctions.

If at a PCH following an evaluation, the PCH negotiations will resume and the DC will consider the results of the evaluation in making the decision on whether or not to revoke, reinstate on parole, or recommend other remedial sanctions.

At the hearing requested by counsel after an evaluation has been obtained, either a second PCH or a RH, the DC will not be bound by the RTCA offer, but must consider the determination of competency at the dispositional phase.

At the hearing requested by counsel after an evaluation has been obtained, either a second PCH or a RH, the DC will not be bound by the RTCA offer, but will strongly consider the RTCA in assessing any return to custody. If the DC under these circumstances is assessing time which exceeds the RTCA the DC will clearly justify the higher assessment. The DC must also consider the determination of competency at the dispositional phase.

If good cause is found for one or more charged violations and the parolee is assessed time, and is subsequently determined to have recovered his or her competency, the parolee may request that the matter be reheard. Such request shall be made in writing. The BPH shall then reschedule a new RH for the earliest date practical. At the new hearing the DC may rely entirely on BPH 1103 PCH and Revocation Hearing decisions and shall not require the attendance of any witness who testified at the prior hearing in the absence of a finding of good cause.

### Competency Evaluation

The attorney representing the parolee shall obtain the services of the mental health clinician responsible for evaluating the parolee's competency. The evaluator shall be selected from a list of qualified clinicians maintained by CalPAP.

### Mental Health Treatment in CDCR

Once a parolee has been revoked at the PCH or RH and it has been determined the parolee may be in need of mental health treatment the parolee must be placed in treatment as any other inmate.

These individuals may require placement in a Reception Center EOP program while their mental health condition is addressed. DRU staff will track these parolees and notify the Chief of Mental Health or their designee (RC Senior Psychologist Supervisor) and the Reception Center Correctional Counselor III [RC CC III] of any inmate patient who arrives at an RC as a result of being found unable to meaningfully participate in their BPH hearing (and who as a result are remanded for treatment of this impediment). These patients will be placed in RC EOP or higher level of care to receive treatment at that level.

The Mental Health Program Guide describes additional treatment options which are available to inmates and parolees.

The Chief of Mental Health or their designee will be the primary clinical contact and will interface as requested with DAPO and/or POC.

**Follow-up to Determine Parolee's Mental Status**

DRU staff will be contacted by the parolee's attorney when the competency evaluation is completed. The competency evaluation will be faxed to the DRU and included in the revocation pack. The DRU staff will place the parolee on the next available PCH or RH calendar, at the request of counsel, after receiving the evaluation report. Information will be updated in RSTS comments.

The parolee's counsel will be notified of the new hearing date and time in order to prepare for the hearing(s). The time of the delay to obtain the evaluation will be added to the PCH NLT and the RH NLT.

The parolee will not be responsible for contacting the DRU to reactivate their case. Once DRU staff has been contacted by the parolee's attorney and received the evaluation stating the parolee is able to proceed, the DRU staff will schedule the PCH or Revocation Hearing.

If after the final PCH or RH the attorney contacts the DRU staff for a new hearing for reconsideration, the request must be in writing. The DRU staff will forward the written request in to the ACDC. If the request is granted the DRU staff will be instructed by the ACDC to schedule a new PCH or a new RH.

If an evaluation has been ordered by the DC, but prior to the evaluation being done the attorney and parolee determine the parolee is competent to go forward, the attorney shall send a written request for the cancellation of the order to have an evaluation and request that a hearing be scheduled based on the parolee's ability to go forward to the DRU. The DRU staff will forward the request to the ACDC or designee for review and decision. If the ACDC or designee agrees, the order for the evaluation will be cancelled and the DRU staff will be instructed to schedule a hearing.

**Remedial Sanctions**

Remedial sanctions will be considered throughout the revocation process for all parolees that meet the criteria for an alternate program.  Mentally ill parolees are not excluded from participation in remedial sanctions programs based solely on their mental illness.

## COMPREHENSIVE TRAINING PLAN

The DCs will be provided with training designed for the lay person, which will assist them in making a determination whether to suspend proceedings and request treatment and/or order an evaluation to determine whether the parolee is able to meaningfully participate in the parole revocation process. In determining whether or not a competency evaluation should be pursued, the DC should inquire, of the parolee and his/her counsel, about the parolee's:

- Level of unmanageable behavior
- The quality of his/her ability to relate to the attorney
- Ability to assist in planning a legal strategy or defense
- Understanding of the charges
- Understanding of the range and nature of possible penalties
- Ability to appraise likely outcomes
- Capacity to convey to his/her attorney pertinent facts about the offense/violation
- Capacity to testify in his/her own defense if need be
- Demonstration of self-serving as opposed to self-defeating actions

BPH, DAPO, Case Records, contract clinicians, CalPAP and Mental Health staff will be trained regarding this new process.

Case Records will train its staff using an instructional memorandum and follow-up conference call with pertinent staff involved in this process.

DAI will train its staff using an instructional memorandum and follow-up conference call (if needed) with pertinent staff involved in this process.

## DAPO Training

*Training for FUNA/DRUNA/SNA*

DAPO will utilize its existing budget to fund the training of the FUNAs, DRUNAs and SNAs. Providing the policy is finalized, during the month of May 2008, DAPO will conduct one training session at each Regional Headquarters for their respective FUNA/DRUNA/SNA staff.

DAPO anticipates that training can be accomplished by June 1, 2008, provided the policy memorandum is available prior to May 1, 2008. (If the memorandum is not available until after May 1, 2008, it may be necessary to reschedule training for a later date, as needed.)

Training will consist of:

**Instructors – Parole Outpatient Clinic (POC) Staff**

 1. Signs/Symptoms of Mental Illness – Using the departmental approved training module, POC staff will provide training. (60 minutes).

**Instructors – DAPO HQ's ADA/Revocation Unit Staff**

 1. Mentally Ill Policies and Procedures Overview **(30 minutes)**.  Will distribute copies of policy memorandum.  Review and allow for question/answer period.
 2. DEC system refresher training **(30 minutes)**. Training will consist of a Power Point presentation to ensure staff are familiar with navigating through various aspects of the DEC system, proper entry of data, and a Question/Answer period to allow staff opportunity to address problems/concerns and introduce new electronic worksheet to be used by field staff.

**Instructors – Supervising Notice Agent primary, DAPO HQ ADA/Revocation Unit Staff, secondary**

 1. Roles and Responsibilities of FUNAs/DRUNAs **(30 minutes)**.

*Training for DAPO Field Staff*

DAPO field staff will be provided training at the unit level via memorandum.   This includes, but is not limited: parole agents, unit support staff, and Parole Outpatient Clinic staff.

An instructional email will be sent to all DAPO field staff notifying them of the policy and availability of the document on DAPO's Policy Memorandum website.  The email will direct Unit Supervisors to ensure field staff are familiar with the policy by providing informal training, individually, or in a group setting, no later than June 1, 2008, or within 30 days of the issuance of the policy memorandum; whichever is later.

**BPH Training**

In the April 2008, DC, CC I & II and OSM I will be receiving training.

Included in the DCs training, scheduled to begin April 2008 will be training designed for the lay person, which will assist them in making a determination whether to suspend proceedings and request an evaluation to determine whether the parolee is able to meaningfully participate in the parole revocation process.

Before May 31, 2008, the BPH's Policy and Procedures will be mailed to the Associate Deputy Commissioners (ACDC), Office Service Managers Is (OSM I) and Correctional Counselor IIs (CCII).  Before May 31, 2008, by conference call, the ACDCs, OSM Is and CC IIs will be trained in the new process.

11

Before May 31, 2008 the BPH's Policy and Procedures (P&Ps) will be mailed to all DCs, BRRs, and DRU staff. ACDCs and CCIIs will, by conference call, review and answer questions regarding the new P&Ps.

## FINANCING FOR COMPETENCY EVALUATIONS

Financing is available for the present contract (ending June 30, 2008). The anticipated costs of the evaluations can be absorbed in the present funding. The funding for the next contract beginning July 1, 2008 (4 year duration) will be available when the contract is finalized and an amendment is submitted for the additional funding for the competency evaluations.

No additional funding is required to train BPH staff.

CalPAP is able to absorb the training costs associated with this process in their current contract with the state.

BPH has training dollars that they can use for training BPH staff on this new process. No additional funding is required to train BPH staff.

13

## STATEWIDE IMPLEMENTATION

The new process, if all negotiations have concluded or there is agreement pending conclusion of negotiation and finalization will be implemented June 15, 2008.