# EXHIBIT 10

## COMPREHENSIVE PLAN ADDRESSING THE NEEDS OF PAROLEES IN THE REVOCATION PROCESS WHO ARE MENTALLY INCOMPETENT

**Procedure for Parolees in the Revocation Process Who Are Mentally Incompetent**

**Preamble**

Prior to revocation and during the revocation process, California Department of Corrections and Rehabilitation (CDCR) staff will consider, where appropriate and resources are available, mental health treatment for parolees who appear incompetent. In custody, these parolees may be placed in Mental Health Crisis Beds or the Enhanced Outpatient Program, if clinically appropriate. If appropriate, CDCR clinicians may refer revoked parolees to the California Department of Mental Health.

The Deputy Commissioners hearing the cases of those inmates who appear to be incompetent may impose the following dispositions: dismissing or giving credit for time served, taking those actions coupled with a special condition for placement in treatment, placement in a remedial sanction, or return to custody.

**Applicable Standard**

The standard that will dictate the competency is as follows: "A parolee is mentally incompetent for purposes of participating in his or her revocation hearing if, as a result of a mental disorder, he or she is unable to understand the nature of the proceedings taken against him or her or to assist counsel in the conduct of a defense in a rational manner."

Currently, the Division of Adult Parole Operations (DAPO) will not refer a parolee for revocation because of mental illness but rather because of behavior that amounts to a violation.

**Parole Hold**

The parole hold is placed per current policy and procedure.

Upon arrival at a CDCR Reception Center (RC), parolees will continue to be screened by medical staff at the bus screening per *Coleman*. If medical screening reveals the need for immediate psychiatric treatment, the parolee will be referred to CDCR Mental Health for evaluation and appropriate treatment. CDCR will indicate the urgent nature of such a referral on the referral form. All incoming inmates are subsequently screened by mental health clinicians regardless of the outcome of the bus screening, and those found positive at this screening receive further evaluation by Mental Health.

If the parolee is in custody at a county jail and has been identified as being in need of a mental health assessment and/or treatment, transfer to a CDCR RC will be expedited, where possible, usually within 24 hours, in order to secure psychiatric treatment within CDCR. The transfer will occur promptly following the completion of Notice of Rights/Charges (NOR) because these parolees will be placed at the top of the transfer list.

1

If the parolee does not have local criminal charges pending, the Board Revocation Representative (BRR) will facilitate the expedited transfer of the parolee to a CDCR institution.

If the parolee has pending local criminal charges, the BRR will contact the appropriate jail staff to advise that the parolee needs a psychiatric evaluation.

The BRR shall facilitate the applicable transfer or notification of jail staff immediately, preferably on the same day of notification by the Notice Agent but no later than noon on the following business day.

## Probable Cause Determination (PCD)

Probable Cause Determination/case conference occurs per current policy and procedure. The PCD will occur no later than two calendar days from placement of the parole hold (if time line expires on a weekend/holiday, the No Later Than (NLT) date is the next business day).

## Notice of Rights/Charges (NOR)

The parolee will be served with his or her NOR no later than three business days following placement of the parole hold.

A case may be flagged by the Agent of Record (AOR) and/or Unit Supervisor by noting the parolee's mental health concerns on the Charge Report (1502B) in the body of the report and/or in the Unit Supervisor's comments/recommendations.

When serving the NOR, if the Notice Agent determines that the parolee appears to have difficulty understanding his or her rights and/or charges and the Notice Agent believes the parolee's difficulty understanding may be the result of mental illness, the Notice Agent will indicate this on the Notice and Request for Assistance at a Parole Proceeding, BPT 1073. The Notice Agent who identifies a parolee with possible mental health concerns during the NOR shall:

For inmates/parolees housed in a county jail:

- Document the mental health concerns by checking the box "Appears to have difficulty understanding" on the BPT 1073 in Section III, Initial Service of Rights and writing in the "comments" section *"MH concern—notified BRR on XX/XX/XX (date)."*
- Notify the BRR. This shall involve direct contact, not voice mail.

For inmates/parolees housed in an institution:

- Document the mental health concerns by checking the box "Appears to have difficulty understanding" on the BPT 1073 in Section III, Initial Service of Rights and

2

writing in the "comments" section *"MH concern—notified MH staff on XX/XX/XX (date)."*
- Telephonically contact the appropriate mental health staff at the institution where the parolee is located to indicate that immediate mental health attention may be needed. This shall involve direct contact, not voice mail.
- Fax the mental health referral to the Division of Correctional Health Care Services (DCHCS), Mental Health Program headquarters in Sacramento.

Information regarding the inmate's/parolee's perceived inability to understand information communicated and mental health concerns shall be entered into the Disability and Effective Communication System (DECS) within one business day. The completed NOR packet will be promptly returned to the respective field unit.

All Notice Agents will be provided with a list of:
- The institutional Chief of Mental Health (and his or her designee) and Supervising Registered Nurse II or III, as appropriate, for CDCR institutions,
- County jail Mental Health liaisons, and
- BRRs who will be responsible for contacting county-jail health staff.

The Supervising Notice Agent will be responsible for ensuring staff under his or her supervision receives adequate training and necessary contact information, and complies with this portion of the process.

## Return to Custody Assessment (RTCA)

The RTCA will be completed no later than 10 business days from placement of the parole hold.

The Deputy Commissioner (DC) will make an RTCA based on the standard factors used in the parole revocation process. If at the RTCA the DC is presented with information that indicates the parolee may be incompetent (e.g., documents/information from DAPO, information entered into RSTS, or information from the parolee's attorney), the DC will consider whether a remedial-sanctions placement is appropriate. If not, the DC will note on the BPT 1104 that an evaluation to determine if the parolee is incompetent may be necessary. The final determination for the need of the evaluation will be determined at the Probable Cause Hearing (PCH) or RH.

## Attorney Consultation with Parolee

A case may be flagged as a "Mental Health concern case" at the attorney-consultation step of the revocation process. If the attorney determines, while interviewing a parolee who is facing possible revocation, that the parolee appears to have difficulty communicating with the attorney and the parolee has a history of mental illness or the attorney believes the parolee's difficulty understanding may be the result of mental health concerns, the attorney will contact Decentralized Revocation Unit (DRU) staff immediately following the initial attorney/client interview to flag the case for possible

3

mental health concerns. DRU staff will make an entry into DECS, noting that they received contact from the attorney expressing mental health concerns regarding his or her client.

At any point during the process, any staff or California Parole Advocacy Project (CalPAP) attorney observing a parolee with a severe mental health concern must make an urgent referral to Mental Health.

If a parolee is being treated in a Mental Health Crisis Bed (MHCB) at the time of the attorney/client interview, the attorney will be able to contact the MHCB Interdisciplinary Treatment Team (IDTT) staff to procure information regarding the parolee's ability to be escorted to an appropriate, secure visiting area in order to conduct the attorney/client interview. If MHCB IDTT staff informs the attorney that a clinical determination has been made that the parolee is unable to be escorted to the visiting area, then the attorney will defer to the judgment of the clinical staff. Defense counsel has the option to periodically follow up with MHCB IDTT staff to determine when the parolee can be escorted to visiting. If more than 20 days expire and the attorney has not had access to his or her client, the attorney may schedule an appointment to enter the institution to check on the status of his or her client, if possible. Attorney visits will not occur within Correctional Treatment Centers (CTCs).

If a parolee in an MHCB is unavailable for the attorney consultation and/or the PCH, the proceedings will be postponed due to parolee unavailability until the attorney can meet with the parolee.

**Probable Cause Hearing (PCH)**

If at the PCH the DC is presented with information that indicates the parolee may be incompetent (e.g., documents/information from DAPO, observations of the parolee, notation on the BPT 1104, or information from the parolee's attorney), the DC will consult with the parolee's attorney. If it is determined by the DC that the parolee may be incompetent, the DC will make a determination about probable cause. If probable cause is found, the DC will assess a return-to-custody period (not to exceed the RTCA), putting the parolee in a revoked status. The DC will also order a competency evaluation and order that an RH be scheduled when advised by counsel that the evaluation is complete. Without a showing of good cause for the delay or a waiver of time by counsel, the scheduling of the RH shall not exceed 60 days from receipt of the evaluation.

The DC will review all the charges and supporting information to ensure that probable cause exists for each charge and to maintain the hold. Defense counsel will be given the opportunity to argue why the charges should be dismissed on their face. Unsupported charges will be dismissed. If all charges are dismissed, the DC will order the hold removed. If all of the charges have been dismissed and the parolee appears to have mental health concerns, the Board of Parole Hearings (BPH) will notify the AOR. This will be taken into account when determining the best method, based on existing DAPO policies, to assist the parolee in securing his or her release.

4

The order dropping the hold shall include language similar to, "Return to parole to occur no later than five business days from the date of this order to provide DAPO time to locate community-based care within existing resources." This will allow DAPO staff time to attempt to secure a proper community placement for the parolee.

Should a parolee or the parolee's attorney put forth evidence regarding the parolee's mental illness at the time of the alleged violation, the DC will take that into consideration as a possible factor in mitigation.

If some but not all charges are dismissed, an adjustment in the RTCA will be made if appropriate. The DC will document on the BPT 1103 PCH the assessed time (RTCA) and state that the dispositional phase of the revocation process is delayed in order to obtain a competency evaluation for the hearing.

The DC will prepare the witness list in preparation for the RH following the completion of the evaluation, approving or disapproving both the State's and parolee's witnesses.

The parolee's attorney will be given a copy of the DC's decision and be responsible for having the evaluation completed. The DC will flag the file in order to notify DRU staff of the need for an evaluation and an RH when notified by counsel that the evaluation has been completed. BPH staff will update DECS upon receipt of new information.

In the event that the DC determines an evaluation is necessary and the parolee and attorney disagree, the DC will contact an Associate Chief Deputy Commissioner (ACDC) to coordinate obtaining an evaluation. The evaluation, when received by the DRU staff, will be included in the revocation file and faxed to the AOR and CalPAP.

Once the evaluation is received at the DRU from either the evaluator or counsel, DRU staff will schedule a second PCH or RH at the request of parolee's counsel. DRU staff will notify the attorney of the date and time of the hearing.

Once the evaluation is completed and the report is received from the parolee's attorney, the report will be included in the revocation packet. DRU staff will schedule the parolee on the next available calendar for either a second PCH or RH at the request of the parolee's counsel.

If the parolee is unavailable for the PCH hearing due to verifiable and documented mental health treatment requirements or he or she refuses to attend the hearing due to a mental illness, the DC may order an evaluation without the parolee's presence at the hearing. In order to determine whether an order for an evaluation is needed in this situation, the DC may rely on the attorney's statements as well as past mental health information contained in DECS (which contains information regarding past chronos identifying placement the CDCR Mental Health Services Delivery System, such as CCCMS, MHCB, EOP, and DMH-based acute and intermediate care programs, past BPT 1073s, etc.), as well as the current BPT 1073. This exception will apply only to those parolees who have serious mental disorders requiring acute psychiatric care in inpatient-

5

type settings that would render them unable to attend hearings or those who refuse to attend.

If the parolee is located at the county jail (but cannot be transferred to a CDCR facility because of pending local charges) the BRR, at the conclusion of the PCH, will notify the county jail liaison that there are mental health concerns and possible mental health treatment is needed. The BRR will notify DRU staff of the need for treatment and/or an evaluation. DRU staff will await the contact from the contract attorney. The assigned contract attorney will case conference the situation with his or her supervising staff attorney. The contract attorney and supervising staff attorney will determine who will contact the court attorney and track the parolee's criminal charges progress. The contract attorney or supervising staff counsel will contact the court attorney to inquire if the parolee's competency is being evaluated for the pending criminal proceedings and, if so, track the progress of the court proceedings. The contract attorney or supervising staff attorney will report the results of the contact to the DRU staff, who will enter the status into the RSTS "comments" section. If the parolee is pending a competency evaluation for his or her criminal proceedings, the contract or supervising staff attorney will have regular contact with the criminal attorney, and at the conclusion of the evaluation, inform DRU staff whether the parolee was determined competent or incompetent. In the event the parolee is not being evaluated for competency in his or her court proceedings or the competency evaluation is likely to exceed 45 days, the contract or supervising staff attorney representing the parolee in the revocation process shall request that the DC at the PCH or RH order an evaluation. If a parolee in county jail pending local charges is found incompetent, an ACDC will consider dismissing the charges.

**Health Care Services**

This procedure applies to parolees who a DC determines may be incompetent. BPH will advise the CDCR Mental Health Program of its concerns. Upon receipt of such notification, the Mental Health Program will make contact with the parolee and assess whether the parolee should receive treatment within the CDCR Mental Health Service Delivery System under the standards of the revised Program Guide (Program Guide) criteria for inclusion in the Mental Health Service Delivery System or needs a higher level of care than he or she is currently receiving. The procedure is as follows:

The DC shall document his or her concerns on the 1103, describing the parolee's behavior in the hearing and notify the DRU.

- DRU staff shall contact DCHCS, Mental Health Program headquarters in Sacramento (using a list of Senior Psychologist Specialists, supervised by a Chief Psychologist) and deliver (via e-mail or fax) the referral document.
- DCHCS, Mental Health Program headquarters shall contact the Chief of Mental Health (or designee) of the prison where the parolee is located, who shall assign a mental health clinician to complete an assessment.
- A mental health clinician shall assess the patient based on Program Guide criteria to determine whether placement in the Mental Health Service Delivery System or higher level of care is appropriate.

This procedure will be used for tracking parolees determined, at a hearing, to be unable to participate in PCHs or RHs. The procedure is as follows:

BPH will send a list of parolees who are unable to participate in the revocation process due to mental illness to the DCHCS, Health Care Placement Unit (HCPU). Every two weeks, HCPU will provide BPH Headquarters with level-of-care status and placement information regarding those parolees. BPH will then forward that information to CalPAP.

**Scheduling of Hearings following Receipt of Evaluations**

DRU staff will be contacted by the parolee's attorney when the competency evaluation is completed. The competency evaluation will be faxed to the DRU and included in the revocation pack. DRU staff will place the parolee on the next available PCH or RH calendar, at the request of counsel, after receiving the evaluation report. Information will be updated in RSTS "comments."

The parolee's counsel will be notified of the new hearing date and time. The time of the delay to obtain the evaluation will be added to the PCH NLT date and the RH NLT date.

If an evaluation has been ordered by the DC, but prior to the evaluation being done the attorney and parolee determine the parolee is competent to go forward, the attorney shall send a written request to the DRU for the cancellation of the order to have an evaluation and request that a hearing be scheduled based on the parolee's ability to go forward. DRU staff will forward the request to the ACDC or designee for review and decision. If the ACDC or designee agrees, the order for the evaluation will be cancelled, and DRU staff will be instructed to schedule a hearing. The ACDC or designee will ordinarily grant the request unless there is cause to deny the request.

**Hearings Following Receipt of Evaluations**

If at the RH, where no competency evaluation was requested at the PCH, the DC is presented with information that indicates the parolee may be incompetent (e.g., documents/information from DAPO, observations of the parolee, notation on the BPT 1104, or information from the parolee's attorney), the DC shall complete the fact-finding phase of the RH. The dispositional phase of the RH shall be continued, if requested by the parolee, for a reasonable time not to exceed 60 days, until the competency evaluation can be submitted to BPH for consideration and inclusion in the dispositional phase of the hearing. The DC will notify DRU staff of the need for treatment and/or an evaluation. BPH staff will update DECS upon receipt of new information

BPH staff will follow the same procedures as outlined above for the PCH.

If at an RH where a competency evaluation was requested at a previous PCH and the evaluation is present, the fact-finding phase of the hearing will be conducted as any other RH. The competency evaluation is to be considered in the dispositional phase of the

hearing. BPH shall consider the results of the evaluation in deciding whether or not to revoke, reinstate on parole, or recommend other remedial sanctions.

If at an RH where a competency evaluation was requested at a previous RH and the evaluation is present, the results of the fact-finding phase of the hearing will be summarized on the tape but shall not be reheard. The competency evaluation is to be considered in the dispositional phase of the hearing. BPH shall consider the results of the evaluation in deciding whether or not to revoke, reinstate on parole, or recommend other remedial sanctions.

If at a PCH following an evaluation, the PCH negotiations will resume and the DC will consider the results of the evaluation in deciding whether or not to revoke, reinstate on parole, or recommend other remedial sanctions.

At the hearing requested by counsel after an evaluation has been obtained, either a second PCH or a RH, the DC will not be bound by the RTCA offer but must consider the determination of competency at the dispositional phase.

At the hearing requested by counsel after an evaluation has been obtained, either a second PCH or an RH, the DC will strongly consider the RTCA in assessing any return to custody. If the DC under these circumstances is assessing time that exceeds the RTCA, the DC will clearly justify the higher assessment. The DC must also consider the determination of competency at the dispositional phase.

Should a parolee or the parolee's attorney put forth evidence regarding the parolee's mental illness at the time of the alleged violation, the DC will take that into consideration as a possible factor in mitigation.

If good cause is found for one or more charged violations and the parolee is assessed time and is subsequently determined to have recovered his or her competency, the parolee may request that the matter be reheard. Such request shall be made in writing. BPH shall then reschedule a new RH for the earliest date practical. At the new hearing, the DC may rely entirely on BPH 1103 PCH and RH decisions. In the normal course of business, the DC shall not require the attendance of any witness who testified at the prior hearing unless the parolee's attorney wishes to cross-examine that witness and has made a showing of a good-faith basis for recalling that witness. The need for witnesses is to be determined at the time this RH is scheduled.

## Competency Evaluation

The attorney representing the parolee shall obtain the services of the mental health clinician responsible for evaluating the parolee's competency. The evaluator shall be selected from a list of qualified clinicians maintained by CalPAP. To the best of CalPAP's ability, the evaluation will be completed within 30 days from the date of the DC's order.

8

### Mental Health Treatment in CDCR

Once a parolee has been revoked at the PCH or RH, the revocation process ends. If it has been determined the parolee needs mental health treatment, the now revoked parolee must be placed in the appropriate level of care in accordance with the Program Guide.

These individuals may require placement in an RC EOP while their mental health conditions are addressed. DRU staff will track these parolees and notify Mental Health Headquarters of parolees who may be unable to meaningfully participate in their BPH hearings. These parolees will be placed in RC EOP or higher level of care to receive treatment at that level if appropriate. The Program Guide describes treatment options that are available to inmates and parolees.

The Chief of Mental Health or his or her designee will be the primary clinical contact and will interface as requested with DAPO and/or the POC.

### Hearing for Reconsideration

If after the final PCH or RH the attorney contacts DRU staff for a new hearing for reconsideration, the request must be in writing. DRU staff will forward the written request to the ACDC. The ACDC or designee will ordinarily grant the request unless there is cause to deny the request. If the request is granted, DRU staff will be instructed by the ACDC to schedule a new PCH or a new RH.

### Remedial Sanctions

Remedial sanctions will be considered throughout the revocation process for all parolees who meet the criteria for an alternate program. Mentally ill parolees are not excluded from participation in remedial-sanctions programs based solely on their mental illness. Recommended existing DAPO resources include, but are not limited to, Parole Outpatient Clinics, dual-diagnosis beds in In-Custody Drug Treatment Programs, Residential Multi-Service Centers, Parole Service Centers, and Day Reporting Centers.

## COMPREHENSIVE TRAINING PLAN

DCs will be provided with training designed for the layperson, which will assist them in making a determination whether to suspend proceedings and request treatment and/or order an evaluation to determine whether the parolee is able to meaningfully participate in the parole-revocation process. In determining whether or not a competency evaluation should be pursued, the DC should inquire of the parolee and his or her counsel about the parolee's:

- level of unmanageable behavior,
- quality of his or her ability to relate to the attorney,
- ability to assist in planning a legal strategy or defense,
- understanding of the charges,
- understanding of the range and nature of possible penalties,
- ability to appraise likely outcomes,
- capacity to convey to his or her attorney pertinent facts about the offense/violation,
- capacity to testify in his or her own defense if need be, and
- demonstration of self-serving as opposed to self-defeating actions.

BPH, DAPO, Case Records, contract clinicians, CalPAP, and Mental Health staff will be trained regarding this new process.

Case Records will train its staff using an instructional memorandum and follow-up conference call with pertinent staff involved in this process.

The Division of Adult Institutions will train its staff using an instructional memorandum and follow-up conference call (if needed) with pertinent staff involved in this process.

### DAPO Training

*Training for Field Unit Notice Agents (FUNAs)/Decentralized Revocation Unit Notice Agents (DRUNAs)/Supervising Notice Agents (SNAs)*

DAPO will utilize its existing budget to fund the training of FUNAs, DRUNAs, and SNAs. Providing the policy is finalized, during the month of May 2008, DAPO will conduct one training session at each Regional Headquarters for its respective FUNA/DRUNA/SNA staff. DAPO will also conduct one makeup session in each region for those who miss the May training.

DAPO anticipates that training can be accomplished by June 1, 2008, provided the policy memorandum is available prior to May 1, 2008. (If the memorandum is not available until after May 1, 2008, it may be necessary to reschedule training for a later date.)

Training will consist of:

**Instructors—Parole Outpatient Clinic (POC) Staff**

1. Signs/Symptoms of Mental Illness—Using the departmental-approved training module, POC staff will provide training (**60 minutes**).

**Instructors—DAPO HQ's Americans with Disabilities Act (ADA)/Revocation Unit Staff**

1. Mentally Ill Policies and Procedures Overview (**30 minutes**). Will distribute copies of policy memorandum. Review and allow for question/answer period.
2. DECS refresher training (**30 minutes**). Training will consist of a PowerPoint presentation to ensure staff is familiar with navigating various aspects of DECS, proper entry of data, and a question/answer period to allow staff opportunity to address problems/concerns and introduce new electronic worksheet to be used by field staff.

**Instructors—Supervising Notice Agent, Primary; DAPO HQ ADA/Revocation Unit Staff, Secondary**

1. Roles and Responsibilities of FUNAs/DRUNAs (**30 minutes**).

*Training for DAPO Field Staff*

DAPO field staff will be provided training at the unit level via memorandum. This includes but is not limited to: parole agents, unit support staff, and POC staff.

An instructional e-mail will be sent to all DAPO field staff notifying them of the policy and availability of the document on DAPO's Policy Memorandum Web site. The e-mail will direct Unit Supervisors to ensure field staff is familiar with the policy by providing informal training, individually or in a group setting, no later than June 1, 2008, or within 30 days of the issuance of the policy memorandum, whichever is later.

**BPH Training**

In April 2008, DCs, Correctional Counselor (CC) Is & IIs, and Office Service Manager (OSM) Is will be receiving training.

Included in the DC training, scheduled to begin April 2008, will be training designed for the layperson, which will assist them in determining whether to suspend proceedings and request an evaluation to determine whether the parolee is able to meaningfully participate in the parole-revocation process.

11

Before May 31, 2008, BPH's Policy and Procedures (P&Ps) will be mailed to the ACDCs, OSM Is, and CC IIs. Before May 31, 2008, by conference call, the ACDCs, OSM Is, and CC IIs will be trained in the new process.

Before May 31, 2008, BPH's P&Ps will be mailed to all DCs, BRRs, and DRU staff. ACDCs and CCIIs will, by conference call, review and answer questions regarding the new P&Ps.

## FINANCING FOR COMPETENCY EVALUATIONS

Financing is available for the present contract (ending June 30, 2008). The anticipated costs of the evaluations can be absorbed in the present funding. The funding for the next contract beginning July 1, 2008 (four-year duration), will be available when the contract is finalized and an amendment is submitted for the additional funding for the competency evaluations.

No additional funding is required to train BPH staff.

CalPAP is able to absorb the training costs associated with this process in its current contract with the state.

BPH has training dollars that it can use for training BPH staff on this new process. No additional funding is required to train BPH staff.

13

## **STATEWIDE IMPLEMENTATION**

The new process, if all negotiations have concluded or there is agreement pending conclusion of negotiation and finalization, will be implemented June 15, 2008.

# EXHIBIT 11

SANFORD JAY ROSEN[1]
MICHAEL W. BIEN
ERNEST GALVAN
GAY C. GRUNFELD

JANE KAHN[2]

# ROSEN, BIEN & GALVAN, LLP
ATTORNEYS AT LAW
315 MONTGOMERY STREET, TENTH FLOOR
SAN FRANCISCO, CALIFORNIA 94104
TELEPHONE: (415) 433-6830
FAX: (415) 433-7104
EMAIL: rbg@rbg-law.com
www.rbg-law.com

HOLLY BALDWIN
LISA ELLS
SHIRLEY HUEY[3]
MEGHAN LANG
SARAH LAUBACH
ANNE MANIA
NURA MAZNAVI
MARIA MORRIS[4]
THOMAS NOLAN
LORI RIFKIN[5]
LOREN STEWART
KENNETH WALCZAK[6]
AMY WHELAN
SARAH O. ZIMMERMAN[6]

April 30, 2008

**VIA E-MAIL**

Vickie Whitney
Supervising Deputy Attorney General
Correctional Law Section
State of California Department of Justice
vickie.whitney@doj.ca.gov

Jessica Devencenzi
Deputy Attorney General
Correctional Law Section
State of California Department of Justice
jessica.devencenzi@doj.ca.gov

Katherine Nelson
Office of Legal Affairs
CA Dept Of Corrections and Rehabilitation
katherine.nelson@cdcr.ca.gov
Chase Riveland
*Valdivia* Special Master
riveland@rockisland.com

Ginny Morrison
*Valdivia* Deputy Special Master
gmorrison@collaboration-specialists.com

Re:    Plaintiffs' Response to Defendants' April 25, 2008 Revocation Plan for
       Mentally Ill Parolees
       Our File No. 720-1

Dear All:

This letter is in response to defendants' April 25, 2008 submission of their "Comprehensive Plan Addressing the Needs of Parolees in the Revocation Process Who Are Mentally Incompetent."

On January 15, 2008, the *Valdivia* Court ordered defendants to "undertake and sustain work toward the earliest practical solution to providing due process to parolees who appear, either in the judgment of their attorneys or defendants' staff, too mentally ill to participate in revocation proceedings." The Court further ordered that "[t]he policies and procedures must include methods to expedite treatment and to provide due process and full rights under the Permanent Injunction."

[1]MEMBER OF THE CONNECTICUT AND THE CALIFORNIA BAR
[2]OF COUNSEL
[3]MEMBER OF THE WASHINGTON, D.C. AND THE CALIFORNIA BAR
[4]MEMBER OF THE NEW YORK AND THE CALIFORNIA BAR
[5]MEMBER OF THE CONNECTICUT, NEW YORK AND THE CALIFORNIA BAR
[6]MEMBER OF THE ILLINOIS AND THE CALIFORNIA BAR

[208246-4]

April 30, 2008
Page 2

        In accordance with the Court's order and the Special Master's requests, defendants
provided various status updates regarding their plan on February 5, February 15, and
February 25, 2008.  The February 5, 2008 update described the proposed competency
standard and stated that defendants had begun crafting an implementation process.  The
February 15 and February 25, 2008 updates repeated the standard and stated that
defendants were working to update their May 2007 proposed plan.  On March 3, 2008, in
response to the Court's order that they submit a status report on the "development of
policies and procedures concerning this population," defendants disclaimed the previous
month's status reports, and stated that new policies and procedures were being developed
without offering additional details as to that new plan.  In response to plaintiffs' March 7,
2008 letter requesting additional detail, on March 20, 2008 defendants briefly described
yet another new approach to the revocation plan and, for the first time, proposed that full
revocation hearings be held for parolees found to be incompetent to participate in those
hearings.  On March 25, 2008, defendants provided plaintiffs a copy of the federal
regulation on which they proposed to base their new plan.  On April 3, 2008, defendants
submitted draft policies and procedures for this new plan.  Following the parties' meet
and confer on April 8, 2008, the Special Master requested that defendants produce a new
draft plan.  This plan was produced on April 25, 2008.

        In order to prepare for a productive meeting, Plaintiffs ask that CDCR be prepared
to address the following issues.

> **1.** CDCR Should Present the Full Plan, Including the Range of
> Dispositions Available When the Hearing Officer Takes Mental Illness
> Into Consideration.

        CDCR's Plan is to hold revocation hearings even where the parolee cannot
participate or assist counsel due to mental illness.  Plaintiffs object to a plan that allows
the State may conduct revocation proceedings, including making findings of guilt and
returning individuals to custody for periods up to one year, for individuals who are
unable to meaningfully participate in these proceedings due to mental illness.  Such a
proposed plan does not comport with the "provi[sion] of due process and full rights under
the Permanent Injunction."

        CDCR asserts that their plan is based on a federal regulation, 28 C.F.R. 2.8,
regarding the U.S. Parole Commission procedures for the District of Columbia parole
system.  CDCR's plan, as presented so far, however, omits the critical protections
contained in that regulation.  The DC procedure strikes a balance in which the parolee
receives lesser process in return for a hearing in which the primary disposition is not
prison, but rather community-based treatment.[1]

---

[1] 28 C.F.R. 2.8 provides the following disposition options:  revoking parole and then granting reparole
1) conditioned on the parolee's acceptance into a particular type of mental health program prior to release from

[208246-4]

April 30, 2008
Page 3

      CDCR has asked Plaintiffs and the Special Master to review their DC-model plan in a vacuum, without any information about the range of dispositions that the parolees would receive in return for lesser process.

      Defendants have not, to date, provided plaintiffs with any information about possible alternative dispositions beyond the statements contained in defendants' plan that:

> "Prior to revocation and during the revocation process, California Department of Corrections and Rehabilitation (CDCR) staff will consider, where appropriate and resources are available, mental health treatment for parolees who appear incompetent"; and

> "Remedial sanctions will be considered throughout the revocation process for all parolees who meet the criteria for an alternate program...Recommended existing DAPO resources include, but are not limited to, Parole Outpatient Clinics, dual-diagnosis beds in In-Custody Drug Treatment Programs, Residential Multi-Service Centers, Parole Service Centers, and Day Reporting Centers."

Defs.' 4/25/08 Plan at 1, 9.  "[E]xisting DAPO resources" do not provide sufficient possible alternative dispositions and placements.  For example, CDCR has not provided evidence of a single placement in a dual diagnosis ICDTP bed to date.

      Plaintiffs request that at the upcoming meet and confer on May 5, 2008, CDCR be prepared to show what alternative placements now exist, and what alternative placements are being currently developed, for parolees with serious mental illness, that would constitute remedial sanctions and dispositions for parolees in the revocation process other than a return to custody.

      There are efforts now underway by the State to create services that may be relevant to evaluation of defendants' proposed revocation plan.  For example, attached to this letter is the agenda from the April 28, 2008 session on the Senate Committee on Budget and Finance Subcommittee Number 4.  In section six on page fourteen, this agenda refers to current funding and efforts to "support four positions and contract services to expand the continuum of treatment services available to parolees with mental illness" and reports that "[t]he department is currently using a portion of these funds to provide crisis intervention services on an as-needed basis. The department is also working on developing longer-term contracts for wrap-around services for the mentally

---

prison, 2) with a special condition of supervision that requires appropriate mental health treatment, including medication, or in cases where no other option appears appropriate, granting reparole conditioned upon the parolee's voluntary self-commitment to a mental health institution until such time as the parolee has sufficiently recovered for the Commission to permit the parolee's return to supervision.  None of these options are the return to custody that constitutes defendants' only actual option in this policy.

April 30, 2008
Page 4

ill parolee population." The Outcomes Report for this session, also attached, reports that the Subcommittee approved this use of funds and trailer bill language to clarify that these funds be used to support a continuum of services for mentally ill parolees as opposed to just day treatment. Additionally, at a recent meeting of the Council on Mentally Ill Offenders, former Secretary Tilton brought a report entitled "DAPO Mentally Ill Parolees Report" and dated March 19, 2008, which he opted not to distribute.

If such resources are to be made available to the hearing officers as part of the balancing of due process rights suggested in the DC-model, we ask that CDCR come forward with this information now. We make this request in the spirit of avoiding unnecessary litigation, as we are certain that if this matter is briefed to Judge Karlton, CDCR will, as they have in the past, place in the record every possible community-based placement that they have. Rather than reserving such information for wasteful litigation, CDCR should come forward with it now.

We have heard and understood CDCR's counsel's concerns about limiting the reach of enforcement of the *Valdivia* Injunction. This litigation-driven concern, however, is exaggerated to the point of absurdity when it cause CDCR to present only part of an overall plan, hiding so much of the plan that the parties cannot draw any conclusions about how the plan would operate in the real world. In order to move forward to compliance with the January 15, 2008 Order, we ask that CDCR disclose the entire plan for addressing the needs of parolees deemed incompetent to participate in revocation proceedings. Specifically, we ask that CDCR come prepared with information on the spectrum of dispositions that the hearing officers can consider in a DC-model hearing, and with information how the dispositions other than prison will be made available for use in individual hearings.

    **2.** Specific Problems with the Part of the Plan Presented Thus Far.

        a. Availability of Remedial Sanctions to Persons With Mental Illness But Not Incompetent to Participate In Hearings Has Not Been Addressed.

The availability of remedial sanctions as an alternative to re-incarceration to parolees with mental illness—even those who are not decompensated to the point of incompetency—is required by the *Valdivia* Permanent Injunction, and was part of plaintiffs' June 15, 2006 Notice of Permanent Injunction Violations Resulting from the Psychiatric Returns Process. Resolution of a competency procedure alone will not fully resolve ongoing violations of the Permanent Injunction for members of the plaintiff class with mental illness.

[208246-4]

April 30, 2008
Page 5

        b.  Mental Illness should be considered in Fact-Finding, Not Just Disposition.

In addition to the central problem identified above regarding dispositions, CDCR's plan is also missing another crucial facet of the D.C. regulation: consideration of the parolee's competency and mental condition in all phases of the revocation hearings, including the fact-finding phase. 28 C.F.R. 2.8 provides, "If the hearing examiner determines the parolee to be mentally incompetent, the examiner shall conduct the revocation hearing, and shall take into full account the parolee's mental condition in determining the facts and recommending a decision as to revocation and reparole." Defendants' proposed plan, on the other hand, relegates any consideration of competency solely to the dispositional phase of a Revocation Hearing.

        c.  Bar on Attorney Visits in CTCs:

CDCR's May 2007 proposal provided for access to the CTC by CalPAP staff attorneys (as opposed to the contract attorneys) so that staff attorneys could develop professional relationships with MHCB IDTT staff and in order to address CDCR security concerns. This was a productive compromise. Moreover, in the March 20, 2008 letter from Ms. Devencenzi to the Special Master and plaintiffs' counsel, defendants affirmed that a procedure for providing attorney visits to clients even when in crisis beds would be contained in the new procedure. Instead the current draft returns to the impermissible policy of holding clients incommunicado and interfering with their access to counsel during a critical period when they are being held without a hearing. What is CDCR's interest in cutting these parolees off from their counsel? Has CDCR made an estimate of the number of cases in which the escorts described here (of the parolee to an attorney meeting area) will and will not be possible?

        d.  Lack of Expedited Mental Health Treatment

           i.  Throughout the Revocation Process

CDCR's plan states: "[o]nce a parolee has been revoked at the PCH or RH, the revocation process ends" and proceeds to state that the "parolee will then be placed in the appropriate level of care in accordance with the Program Guide." The plan also states that every parolee will be placed "in a revoked status" at the PCH, regardless of competency. Thus, it appears that defendants are providing for a system in which even a potentially incompetent parolee is no longer a part of the revocation process as of the PCH.

However, defendants' obligation to provide expedited mental health treatment to parolees with mental illness who may be unable to participate in the revocation process does not end with the PCH, nor even with the Revocation Hearing. Defendants propose to hold parolees in custody who cannot meaningfully participate in the hearing process. The only lawful basis for doing so is on the premise that defendants are providing them

April 30, 2008
Page 6

with mental health care so that they may be restored to competency. Defendants' plan does not appear to contain a provision of mental health treatment specifically directed at restoring a parolee to competency within a timeframe applicable to the parole revocation process.

ii.  Involvement of Health Care Services (pages 6-7).

Plaintiffs request an explanation of this process at the May 5 meeting, and specifically how it will expedite treatment. As drafted this process does not even require the use of the "urgent" referral process under the Program Guide.

Reliance on the Program Guide standards along is not sufficient in a system that is currently in violation of the constitutional requirement of the provision of minimally adequate mental health care. The Court's order expressly requires that defendants' plan include efforts to "expedite" treatment. Defendants' current plan, however, seeks to end any obligation to expedite treatment at the conclusion of the PCH. There is no dispute in *Coleman* that patients are not transferred to the appropriate level of care within Program Guide timeframes.

The three bullet points at the bottom of page 6 and the top of page 7 all concern "assessment." There is nothing about actually implementing the result of the assessment, i.e., sending the parolee to the appropriate level of care on an expedited, prioritized basis.

e.  Lack of Appropriate Infrastructure to Secure Appropriate
    Placements outside CDCR Institutions.

Plaintiffs have previously suggested to defendants that they create an interdisciplinary group of staff to address the placement needs of this population of parolees. If alternative dispositions to a return to custody do exist for parolees who may be incompetent due to mental illness, it is unlikely that each individual Deputy Commissioner or ParAd in the far-flung network of DRUs will have the resources needed to access them. This is especially true in counties where no beds for mentally ill parolees are available.

In order to make appropriate use of alternative dispositions and remedial sanctions for mentally ill parolees, including inter-county transfers, defendants should establish a dedicated central team of BPH and DAPO staff who will track information about placements available and be resources for DCs, parole agents, and other staff who would be employing these dispositions and sanctions.

Please note that we are not suggesting the hearings be centralized. The function that should be centralized is the interdisciplinary task of matching the right parolee with the right program so that dispositions other than prison are actually available to the hearing officers. This central team should also reach out to community and county mental health programs so that a parolee charged with a violation, regardless of

April 30, 2008
Page 7

disposition, can be connected with the appropriate treatment resources upon community placement or release to parole.

Referral to a centralized interdisciplinary placement task force for community placement within a set time limit could itself be a disposition available to the local DC, thus removing from the DC the entire burden of approving a placement on the spot at the hearing with insufficient information about the available placements and public safety factors.

f.  New Hearing After Parolee Regains Competence.

i.  Fact-finding process.

CDCR's new plan provides that if a parolee who regains competency after a Revocation Hearing requests that the matter be reheard at a new Revocation Hearing, "[a]t the new hearing, the DC may rely entirely on BPH 1103 PCH and RH decisions." The only exception for this in the plan is if the parolee makes a showing of a good-faith basis for recalling that witness. What legal basis do defendants have for allowing a DC to rely on fact-finding that took place during a proceeding in which a parolee could not meaningfully participate because he or she was too incapacitated to understand the nature of the proceeding and to assist counsel?

ii.  Notice of right to re-hearing.

There is no procedure for informing the parolee of the right to a re-hearing in the event competency is restored. Some form of notice is necessary for this right to be meaningful. Notice could take the form of a visit by the CalPAP attorney, or a written notice to parolees who have stabilized. We would like to discuss this further at the meeting.

g.  Failure to Confirm DMH Agreement to Accept Parolees At All Stages of the Revocation Process

CDCR's plan does not confirm that parolees at all stages for the revocation process will have access to DMH if they require DMH level of care. DMH placements must be available on an expedited basis throughout the revocation process, from the time the parole hold is placed to re-release to parole. Please confirm agreement by DMH to accept parolees throughout the revocation process and produce the written Memorandum of Understanding executed by DMH and CDCR reciting this agreement. Plaintiffs request that counsel for DMH and a client representative from DMH be present at the meeting to address this issue.

April 30, 2008
Page 8


  Plaintiffs look forward to meeting and conferring with defendants and the Special
Master about these issues on May 5, 2008.  Please contact me with any questions.

              Sincerely,

              ROSEN, BIEN & GALVAN, LLP

              */s/ Lori Rifkin*

          By: Lori Rifkin

LR:dmc
cc:  Nancy Campbell (nancy@nmcampbell.com)
    Valdivia Co-Counsel
    Mary Swanson (mswanson@pacific.edu)
    Jeff Ball (jball@pacific.edu)
    Matthew Lopes, Jr. (mlopes@pldlaw.com)
    Lisa Tillman (lisa.tillman@doj.ca.gov)
    Misha Igra (misha.igra@doj.ca.gov)

# EXHIBIT 12



*EDMUND G. BROWN JR.*
*Attorney General*

*State of California*
*DEPARTMENT OF JUSTICE*

1300 I STREET, SUITE 125
P.O. BOX 944255
SACRAMENTO, CA 94244-2550

Public:  (916) 445-9555
Telephone:  (916) 322-6104
Facsimile:  (916) 324-5205
E-Mail:  Jessica.Devencenzi@doj.ca.gov

May 12, 2008

Lori Rifkin
Rosen, Bien & Galvan, LLP
Attorneys at Law
315 Montgomery Street, Tenth Floor
San Francisco, California 94104

RE:    *Jerry Valdivia, et al. v. Arnold Schwarzenegger, et al.*

Dear Ms. Rifkin

This letter will serve as Defendants' response to your letter of April 30, 2008, regarding Defendants' April 25, 2008 "Comprehensive Plan Addressing the Needs of Parolees in the Revocation Process who are Mentally Incompetent." The issues presented in your letter are addressed below. Also, attached please find the Defendants' most recent version of the Comprehensive Plan.

**Defendants should present the full plan, including the range of dispositions available when the hearing officer takes mental illness into consideration. (April 30, 2008 Letter, page 2.)**

A list of possible dispositions is included at page one of the April 25, 2008 Plan, in the section entitled "Preamble." The range described in that section includes dismissal, credit for time served, placement in treatment as a special condition of parole, remedial sanctions, or return to custody.

**Defendants should show what alternative placements exist and are being developed that would constitute remedial sanctions. (April 30, 2008 Letter, page 3.)**

Defendants maintain that remedial sanctions will be considered at every stage in the revocation process and that consideration will be afforded to mentally ill parolees as with all other parolees. Thus, a detailed description of current placements and future developments for remedial sanctions will not be included in this plan because it is covered elsewhere.

**Defendants should provide a list of all community-based placements available for mentally ill parolees. (April 30, 2008 Letter, page 4.)**

Defendants maintain that remedial sanctions will be considered at every stage in the revocation process and that consideration will be afforded to mentally ill parolees as with all

Lori Rifkin
May 12, 2008
Page 2

other parolees. Thus, a list of all community-based placements will not be included in this plan since such a list is covered elsewhere.

**Defendants have not addressed the availability of remedial sanctions for mentally ill parolees. (April 30, 2008 Letter, page 4.)**

Defendants maintain that remedial sanctions will be considered at every stage in the revocation process and that consideration will be afforded to mentally ill parolees as with all other parolees. Thus, a detailed description of current placements and future developments for remedial sanctions will not be included in this plan because it is covered elsewhere.

**Mental Illness should be considered in fact-finding, not just disposition (April 30, 2008 Letter, page 5.)**

The Deputy Commissioner will consider evidence concerning a parolee's mental illness that is put forth during the fact-finding phase.

**Attorney's access to mentally ill parolees in a mental health crisis bed, located in the Correctional Treatment Center and has CDCR made an estimate of the number of cases in which escorts will or will not be possible. (April 30, 2008 Letter, page 5.)**

As Plaintiffs have previously been advised, CDCR must not only take into account the safety and security of the institution and its personnel, but also the safety and security of the attorney, and the mental health status and safety of the parolee. Thus, this issue requires further discussion among the various divisions, including Health Care Services, Division of Adult Institutions and the Office of the Receiver. Resolution before the deadline to submit this plan was, therefore, not possible. However, suggested language to be added to page 4 of the April 25, 2008 plan, under the section entitled "Attorney Consultation with Parolee," is that determination of whether an attorney would be permitted to visit a parolee in an attorney visiting room would be made by an Interdisciplinary Treatment Team on a case-by-case basis, considering whether it is safe and appropriate (given the mental status of the parolee) to do so. As to the second part of the inquiry, CDCR has not estimated the number of cases that would involve escorting a parolee.

**Defendants' obligation to provide expedited mental health treatment and restore parolees to competency. (April 30, 2008 Letter, page 5.)**

First, the adequacy of mental health treatment is a *Coleman* issue and not included in *Valdivia.* That said, during the May 5, 2008 meet and confer the *Coleman* process was described to Plaintiffs' counsel in detail, including but not limited to the utilization of a 24-hour bus screening and a 72-hour mental health screening, if necessary under the *Coleman* program guides. Since the expeditious timeframes are already set forth in *Coleman*, the *Valdivia* plan pertaining to the due process rights of mentally ill parolees will not address treatment of these individuals.

Lori Rifkin
May 12, 2008
Page 3

Second, Defendants are not required under *Valdivia* or any other class action, to restore these individuals to competency.

**The current plan does not require the use of the "urgent" referral process. (April 30, 2008 Letter, page 5.)**

Urgent referrals are discussed on page 1 of the plan, under the section entitled "Parole Hold," and on page 4 of the plan, under the section entitled "Attorney Consultation with Parolee."

**Defendants should establish a team of BPH and DAPO staff to track information about available placements. (April 30, 2008 Letter, page 6.)**

It is Defendants' position that requiring familiarity with possible community-based treatment options for this population would be outside the scope of the *Valdivia* Permanent Injunction and will not be included in this plan.

**Referral of parolees to a centralized interdisciplinary placement task force for community placement. (April 30, 2008 Letter, page 7.)**

Defendants maintain that remedial sanctions will be considered at every stage in the revocation process and that consideration will be afforded to mentally ill parolees as with all other parolees. However, Defendants do not believe it is necessary to create a centralized interdisciplinary placement task force.

**What legal basis do defendants have for allowing a Deputy Commissioner to rely on fact-finding that took place during a proceeding where the parolee was too incapacitated to participate? (April 30, 2008 Letter, page 7.)**

It is Defendants' position that once the parolee regains competency and there is a new revocation hearing in which the Deputy Commissioner may include as part of his/her consideration, facts brought forth at the initial hearing (while the parolee had not yet regained competence), the legal determination on the charges will be based on admissible evidence presented to the Deputy Commissioner by the parolee's attorney. That evidence may include the evidence previously admitted as well as permitting for the evidence to be reopened in cases where the reliability of that evidence or the fact-finding based on that evidence could be called into question which Defendants would do in a rehearing type case.

**Notice of Right to a rehearing could take the form of a visit by the CalPAP attorney. (April 30, 2008 Letter, page 7.)**

CalPAP has agreed to add this to their policies.

Lori Rifkin
May 12, 2008
Page 4

**Confirm agreement by DMH to accept parolees throughout the revocation process and produce an MOU reciting this agreement. (April 30, 2008 Letter, page 7.)**

      DMH understands that parolees who are returned to a CDCR facility pending revocation will, upon entry into CDCR, be screened for mental health issues in accord with Reception Center protocols described in the Coleman Revised Program Guide. The screening occurs within 24 hours of the parolee''s arrival. Should a parolee awaiting revocation demonstrate mental health issues at this screening, the parolee will undergo a mental health assessment by CDCR clinicians and, if eligible, receive those levels of care provided by and within CDCR under Coleman Revised Program Guide standards (such as Coordinated Clinical Case Management System, Enhanced Outpatient Program, Mental Health Crisis Bed, and Outpatient Housing Unit.) Once revoked, the parolee like any other inmate, who requires inpatient (intermediate or acute) care from a Department of Mental Health facility, may be referred and accepted for such care so long as the parolee''s term of confinement following the revocation exceeds 35 days. As is the case with any and all inmates, this minimum 35-day period of confinement enables DMH to deliver, and the patient to benefit from, the recovery-based model of care mandated by the consent judgment with the United States Department of Justice under the Civil Rights of Institutionalized Persons Act (CRIPA).

                                      Sincerely,

                                        *Jessica R. Devencenzi*

                                      JESSICA R. DEVENCENZI
                                      Deputy Attorney General

                            For     EDMUND G. BROWN JR.
                                        Attorney General

Enclosure
cc:     Chase Riveland, Special Master
        Virginia Morrison, Deputy Special Master
        Katherine Nelson, Chief, Court Compliance Legal Team

# EXHIBIT 13

SANFORD JAY ROSEN[1]
MICHAEL W. BIEN
ERNEST GALVAN
GAY C. GRUNFELD

JANE KAHN[2]

**ROSEN, BIEN & GALVAN, LLP**
ATTORNEYS AT LAW
315 MONTGOMERY STREET, TENTH FLOOR
SAN FRANCISCO, CALIFORNIA 94104
TELEPHONE: (415) 433-6830
FAX: (415) 433-7104
EMAIL: rbg@rbg-law.com
www.rbg-law.com

HOLLY BALDWIN
LISA ELLS
SHIRLEY HUEY[3]
MEGHAN LANG
SARAH LAUBACH
ANNE MANIA
NURA MAZNAVI
MARIA MORRIS[4]
THOMAS NOLAN
LORI RIFKIN[5]
LOREN STEWART
KENNETH WALCZAK[6]
AMY WHELAN
SARAH O. ZIMMERMAN[6]

May 16, 2008

VIA EMAIL

Vickie Whitney
Supervising Deputy Attorney General
Vickie.Whitney@doj.ca.gov

Jessica Devencenzi
Deputy Attorney General
Jessica.devencenzi@doj.ca.gov

Katherine Nelson
Chief, CDCR Court Compliance Legal Team
katherine.nelson@cdcr.ca.gov

Lisa Tillman
Deputy Attorney General
lisa.tillman@doj.ca.gov

Re:   *Valdivia v. Schwarzenegger*, Civ. S 94-671 LKK (E.D. Cal.)
*Coleman v. Schwarzenegger*, Civ. S 90-0520 LKK JFM (E.D. Cal.)
Our File Nos. 720-1; 489-3

Dear All:

This letter is to follow up on our meet-and-confer session of May 5, 2008, and to respond to the revised draft procedures we received on May 12, 2008, titled "Comprehensive Plan Addressing the Needs of Parolees in the Revocation Process Who Are Mentally Incompetent" (hereinafter "May 12, 2008 Plan") (Enclosure 1). With the most recent exchange of letters, it appears that the parties have exhausted the meet-and-confer process without any agreement on the basics of a policy and procedure to comply with the *Valdivia* Court's January 15, 2008 Order (Enclosure 2). Plaintiffs therefore intend to move for relief from the Court in both *Valdivia* and *Coleman* to ensure that class members in both cases receive due process and adequate mental health care in the circumstances covered by the January 15, 2008 *Valdivia* Order.

The May 12, 2008 Plan does not comply with the two basic requirements of the *Valdivia* Court's January 15, 2008 Order because it fails to provide "methods to expedite treatment and to provide due process and full rights under the Permanent Injunction." (Jan. 15, 2008 Order at 2:10-12.) The principal due process defect of the May 12, 2008 Plan is that it expressly provides for sending accused parole violators back to prison after a "hearing" in which the parolee could not participate or assist counsel. The Plan makes no provision to "expedite treatment," and Defendants have refused to add any such provisions. Plaintiffs have set forth these principal defects and numerous ancillary

[1]MEMBER OF THE CONNECTICUT AND THE CALIFORNIA BAR
[2]OF COUNSEL
[3]MEMBER OF THE WASHINGTON, D.C. AND THE CALIFORNIA BAR
[4]MEMBER OF THE NEW YORK AND THE CALIFORNIA BAR
[5]MEMBER OF THE CONNECTICUT, NEW YORK AND THE CALIFORNIA BAR
[6]MEMBER OF THE ILLINOIS AND THE CALIFORNIA BAR

*Vickie Whitney, et al.*
May 16, 2008
Page 2

defects in writing several times, most recently in the letter of April 30, 2008 (Enclosure 3).

In addition to these violations of the *Valdivia* January 15, 2008 Order, the May 12, 2008 Plan and the explanations in the accompanying cover letter make it plain that the California Department of Corrections and Rehabilitation (CDCR) and the Department of Mental Health (DMH) are acting in open contempt of their obligations under the permanent injunction in *Coleman v. Schwarzenegger*, Civ. S 90-0520 LKK JFM (E.D. Cal.). CDCR persists in refusing to allow *Coleman* class members who are being held in CDCR prisons pending parole revocation hearings to receive treatment at the DMH levels of care. CDCR has offered no basis for denying such *Coleman* class members their Eighth Amendment rights to mental health care.

The parties have met and conferred in good faith and have been unable to resolve these core issues. There can be no question that a plan for holding revocation hearings despite an accused parolee's inability to participate is "central to the purpose of the Permanent Injunction" under the *Valdivia* Order of Reference (Aug. 18, 2005 Order of Reference at 9:13-17), and should therefore be presented directly to the district court for decision.

Plaintiffs will promptly bring these matters to the district court in *Valdivia* as well as *Coleman*. We will work with CDCR counsel on an appropriate briefing schedule.

Because briefing and decision in the district court will take time, it is critical that CDCR maintain and improve its current "gap" process for alleged parole violators who may be incompetent to participate in parole revocation proceedings. Most urgent are improvements in the "gap" or interim procedures to ensure that persons whose revocation proceedings are suspended receive urgent referrals for mental health care. During the briefing and decision of these issues, Plaintiffs request that Defendants work with the *Valdivia* Special Master to improve the interim process along the lines suggested in Plaintiffs' April 29, 2008 letter (Enclosure 4).

Sincerely,

ROSEN BIEN & GALVAN, LLP

By: Ernest Galvan

EG:

Enclosures:
(1) May 12, 2008 Transmittal and Draft Policy

[210832-2]

*Vickie Whitney, et al.*
May 16, 2008
Page 3


(2)  Jan. 15, 2008 *Valdivia* Order
(3)  April 30, 2008 Letter
(4)  April 29, 2008 Letter

cc:      Co-counsel (Valdivia Team, Coleman Team)
        Chase Riveland, Special Master (riveland@rockisland.com)
        Matthew Lopes, Special Master (mlopes@pldlaw.com)
        Ginny Morrison (gmorrison@collaboration-specialists.com)
        Nancy Campbell (nancy@nmcampbell.com)

        Mary Swanson (mswanson@pacific.edu)
        Jeff Ball (jball@pacific.edu)
        Andrew Walker (awalker@pacific.edu)

[210832-2]

# EXHIBIT 14

<u>COMPREHENSIVE PLAN ADDRESSING THE NEEDS OF PAROLEES IN THE
REVOCATION PROCESS WHO ARE MENTALLY INCOMPETENT AND/OR
HAVE SERIOUS MENTAL DISORDERS REQUIRING MENTAL HEALTH
CARE UNDER THE REVISED PROGRAM GUIDE</u>

I.        <u>Preamble</u>

The California Department of Corrections and Rehabilitation (CDCR) understands that
there are parolees in custody and awaiting revocation who may appear incompetent for
purposes of their revocation proceedings and/or may qualify for mental health treatment
under the Revised Program Guide policies.  This plan addresses the due process and
mental health needs of such parolees.[1]

   A. **Mental Health Treatment Before Transport to CDCR or County Jail**

Whenever a parole agent places a parolee in his custody and finds the parolee may pose a
danger to himself or others, the parole agent must directly take the parole to the nearest
community hospital for immediate psychiatric evaluation under California Welfare &
Institutions Code section 5150.

   B. **Mental Health Treatment Within CDCR Under the Revised Program Guide
      Standards.**

Prior to revocation and during the revocation process, CDCR staff will consider, where
appropriate and resources are available, mental health treatment for parolees who are in
custody and awaiting revocation.

Mental health treatment within CDCR may be provided so long as the parolee is eligible
under Revised Program Guide standards, regardless of whether the parolee appears
incompetent for their parole revocation hearing.  These parolees may be placed in accord
with the Revised Program Guide standards in the CDCR mental health services delivery
system for the following levels of care: Coordinated Clinical Case Management Services
(CCCMS), the Enhanced Outpatient Program (EOP), Mental Health Crisis Bed (MHCB)
or Psychiatric Services Unit (PSU).

CDCR clinicians may refer only revoked parolees with a minimum 35-day term of
confinement to the California Department of Mental Health (DMH) for inpatient care in
accord with the Revised Program Guide standards.

//

//

---

[1] For purposes of this plan only, the term "parolee" shall refer to a person under a *Valdivia* parole hold and
undergoing the process to determine whether his/her parole will be revoked.

### C. Available Dispositions for Parolees Who Appear Incompetent for Their Revocation Hearing.

The deputy commissioner hearing a probable cause and/or revocation matter must determine, on a case-by-case basis, each individual parolee's apparent competency for the hearing. The status of a parolee within or outside of the CDCR mental health services delivery system will not determine any judgment on his competency for a revocation hearing.

Where the deputy commissioner determines the parolee appears incompetent, then the parolee must be referred to CalPAP for an evaluation.

Once a parolee has been determined incompetent under applicable processes, then the deputy commissioner may issue any of the following dispositions on the parolee's case: (1) dismissal or credit for time served, with or without a special condition for placement in treatment;
(2) placement in a remedial sanction program (where an appropriate placement is available to address those mental health needs that have qualified the parolee for CDCR mental health services under the Revised Program Guide); or
(3) continued placement in custody.

## II.     Applicable Standard for Competency

The standard that will dictate the determination of a parolee's mental health competency is as follows: "A parolee is mentally incompetent for purposes of participating in his or her revocation hearing if, as a result of a mental disorder, he or she is unable to understand the nature of the proceedings taken against him or her or to assist counsel in the conduct of a defense in a rational manner."

This standard must be applied on a case-by-case basis. A parolee's past or present receipt of mental health services is not determinative of competency. A parolee's developmental disability is not a factor in determining mental health competency under this standard.

## III.    Parole Hold

The parole hold is placed per current policy and procedure.

### A. For Parolees in Custody at a County Jail with Criminal Charges Pending:

If these parolees are identified as being in need of a mental health assessment and/or treatment, then the BRR will advise appropriate county jail staff of the parolee's need for a mental health assessment and/or treatment. BRR must make this contact with appropriate county jail staff within one business day, if possible, of the CDCR Notice Agent's completion of the NOR.

### B. For All Parolees Arriving at a CDCR Reception Center:

Upon arrival at a CDCR Reception Center (RC), parolees will continue to be screened by medical staff at the bus screening per Revised Program Guide standards. If this medical screening reveals the need for immediate psychiatric treatment, the parolee will be referred to CDCR Mental Health for evaluation and appropriate treatment. CDCR will indicate the urgent nature of such a referral on the referral form. All incoming inmates are subsequently screened by mental health clinicians regardless of the outcome of the bus screening, and referred under Revised Program Guide standards for any necessary evaluation by CDCR Mental Health.

## IV.    Probable Cause Determination (PCD)

Probable Cause Determination/case conference occurs per current policy and procedure. The PCD will occur no later than two calendar days from placement of the parole hold (if time expires on a weekend/holiday, the No Later Than (NLT) date is the next business day).

## V.    Notice of Rights/Charges (NOR)

### A.    Timeframe

The parolee will be served with his or her NOR no later than **three** business days following placement of the parole hold.

### B.    Documentation of Apparent Mental Health Issues in BPT Forms

**1.    During parole and/or while completing the 1502 revocation documents**, the Agent of Record (AOR) may document any mental health issues demonstrated by the parolee. The documentation should be within the parolee's field file and may be flagged by the AOR and/or Unit Supervisor. Specifically, the parolee's mental health issues should be indicated in the body of the Charge Report (1502B) and/or in the Unit Supervisor's comments/recommendations.

**2.    During the service of the NOR**, the Notice Agent should determine if the parolee appears to have difficulty understanding his or her rights and/or charges due to mental health issues. If the Notice Agent determines the parolee has difficulty understanding their rights and/or charges due to mental health issues, then the Notice Agent shall complete on the Notice and Request for Assistance at a Parole Proceeding, BPT 1073.

The Notice Agent who identifies a parolee with apparent mental health issues during service of the NOR shall:

    **a.**    *For inmates/parolees housed in a county jail*:

1. Document the apparent mental health issues by checking the box "Appears to have difficulty understanding" on the BPT 1073 in Section III, Initial Service of Rights and writing in the "comments" section *"MH concern—notified BRR on XX/XX/XX* (date)," and
2. Notify the BRR. A voice mail containing such information will not be a sufficient form of notification. The notification must be sent to an appropriate person within BRR, with receipt acknowledged.

    **b.**    *For inmates/parolees housed in a CDCR institution*:

1. Document the apparent mental health issues by checking the box "Appears to have difficulty understanding" on the BPT 1073 in Section III, Initial Service of Rights and writing in the "comments" section *"MH concern—notified MH staff on XX/XX/XX* (date)," and
2. Provide a copy of the completed BPT 1073 form to the watch commander or designees of the parolee's CDCR housing unit for purposes of obtaining a referral for mental health assessment and/or treatment.

**C.    Documentation of Apparent Communication and Mental Health Issues in DECS**

If the parolee appears to have difficulty understanding information imparted verbally or in writing by the parole agent or appears to have mental health issues impeding his ability to understand such information, then the parole agent shall document that apparent difficulty in the Disability and Effective Communication System (DECS) within one business day.

**D.    Return of NOR**

The completed NOR packet will be promptly returned to the respective field unit.

**VI.    <u>Responding to Parolees' Apparent Mental Health Assessment and/or Treatment Needs During Parole Hold and Awaiting Revocation.</u>**

**A.  For Parolees in Custody at a County Jail and with No Local Criminal Charges Pending**

If these parolees have been identified as being in need of a mental health assessment and/or treatment, then Board Revocation Representative (BRR) will facilitate the transfer of the parole transfer to a CDCR RC within one business day, if possible, of the CDCR Notice Agent's completion of the Notice of Rights/Charges (NOR). These parolees

requiring such mental health assessment and/or treatment will be placed on the top of the transfer list in order to enable their expedited transfer to a CDCR RC.

### B. For Parolees in Custody at a County Jail with Criminal Charges Pending

If these parolees are identified as being in need of a mental health assessment and/or treatment, then the BRR will advise appropriate county jail staff of the parolee's need for a mental health assessment and/or treatment. BRR must make this contact with appropriate county jail staff within one business day, if possible, of the CDCR Notice Agent's completion of the NOR.

### C. Contact Information and Training

All Notice Agents will be provided with a list of:

- County jail Mental Health liaisons, and
- BRRs who will be responsible for contacting county jail health staff. (BRR lists will be updated, when changes are made, by the CCIIs and sent to CalPAP Headquarters in Sacramento).

The Supervising Notice Agent will be responsible for ensuring staff under his or her supervision receives adequate training and necessary contact information, and complies with this portion of the process.

## VII.    Return to Custody Assessment (RTCA)

### A.    Timeframe

The RTCA will be completed no later than 10 business days from placement of the parole hold.

### B.    Standard

The Deputy Commissioner (DC) will make an RTCA based on the standard practices stated in the Deputy Commissioner Manual, Resource Documents and California Code of Regulations, Title 15, division 2.

### C.    Mental Incompetence and the RTCA

### 1.    DC Placement Decision

If at the RTCA the DC is presented with appropriate evidence (such as official records from DAPO, from RSTS, from another acceptable source) that indicates the parolee is mentally incompetent, the DC will consider whether placement in a remedial sanctions program is appropriate.

If the parolee is receiving care within the CDCR mental health care services delivery system at the time of the RTCA, *and* has documented mental competency concerns, then the DC may place the parolee in a remedial sanctions program if an appropriate placement is available to address any mental health needs that have qualified the parolee for care under the CDCR mental health care services delivery system (per the Revised Program Guide).

If placement in a remedial sanctions program is *not* appropriate, the DC will note on the BPT 1104 that an evaluation to determine if the parolee is incompetent may be necessary. The final determination for the need for the evaluation will be made at either the Probable Cause Hearing (PCH) or RH.

## VIII. <u>Attorney's Notification to DRU of Parolee's Apparent Mental Incompetency</u>

### A.   Competency Issues Impeding Attorney-Client Consultation

The parolee's apparent lack of mental competency can be presented by a California Parole Advocacy Program (CalPAP) attorney or any other attorney consulting with the parolee during the attorney-consultation step of the revocation process.

The parolee's attorney may contact CDCR Decentralized Revocation Unit (DRU) staff if the attorney finds, while interviewing a parolee who is pending revocation that the parolee has difficulty communicating with the attorney due to apparent mental incompetency. The parolee's attorney will contact DRU staff immediately following the initial attorney/client interview to request DRU staff identify the parolee as possibly lacking mental competence for purposes of the PCH.

DRU staff will make an entry into DECS, noting that the parolee's attorney has expressed the parolee may have mental health issues impeding his attorney-client communications.

### B.   Referrals for Evaluation/Treatment of Mental Health Issues

### 1.   Parolee's Self-Referral for Mental Health Evaluation/Treatment

At any time before or after revocation, a parolee may self-refer to CDCR Mental Health for mental health evaluation and/or treatment under the Revised Program Guide.

### 2.   Attorney Request to LitCo for Referral for Mental Health Evaluation or Treatment

At any time before or after revocation, a California Parole Advocacy Program (CalPAP) attorney or any other attorney consulting with the parolee may file a written request for the referral of a parolee with an observed or admitted mental health issue. The parolee's expression of the intent to harm himself or others constitutes a significant mental health issue warranting such a request.

The written request shall be submitted (via email and/or facsimile) to the facility's litigation coordinator for immediate relay to the health care manager.

    **E.    Availability of the Parolee for Attorney Consultation Meeting(s) Before Revocation Hearing.**

    **1.    Written and Timely Request**

Attorneys seeking to meet with parolees must comply with the procedures stated in the California Code of Regulations, Title 15, section 3178.

    **2.    Meetings with Parolees Receiving Mental Health Care**

    **a.    *Clinical Determination:*** If a parolee is being treated within the CDCR mental health services delivery system, particularly at the MHCB or CTC level, the acuity of the parolee's mental health condition may preclude attorney-client meetings.

CDCR mental health clinicians may determine that the parolee's mental health status renders him unable to participate in the sought attorney client meeting. The litigation coordinator will so advise the attorney by telephone prior to the requested interview date.

The attorney will defer to the judgment of the clinical staff. If the parolee remains unable to participate in an attorney client meeting for more than sequential 20 days and the attorney has not had a reasonable opportunity to meet the parolee-client, then the attorney may schedule an appointment to enter the institution to check on the status of his or her client, if possible.

    **b.    *Postpone Hearing:*** The revocation proceedings will be postponed, *sua sponte* or upon motion of counsel, upon finding the attorney has not been able to meet with the parolee due to the parolee's mental health status. The hearing may not be continued beyond 20 days upon such a finding. Any additional continuances must be based upon new findings.

**IX.    <u>Probable Cause Hearing (PCH) Within 13 Days of the Parole Hold</u>**

    **A.    First Step: Determine Whether the Parolee May Be Mentally Incompetent**

The Deputy Commissioner (DC) at the PCH may determine that the parolee may be mentally incompetent. The determination must be made upon appropriate evidence, such as official records from DAPO, official records from RSTS, the DC's own observations of the parolee, notations on the BPT 1104, and any determination of competency made in any pending criminal action against the parolee.

The DC must inquire, on the record, if the parolee's attorney agrees or disagrees with the DC's determination that the parolee may lack mental competency. In the event that the DC determines an evaluation is necessary and the CalPAP attorney disagrees, the DC will contact an Associate Chief Deputy Commissioner (ACDC). The ACDC will then be responsible for contacting the listed vendors to obtain the competency evaluation.

The evaluation must be accomplished, if possible, within 30 days and certainly no later than 60 days after the date of the DC's order.

**B.    Second Step: If the Parolee May Be Mentally Incompetent, Determine Whether the Charges Should Be Dismissed.**

**Proceed with the Hearing**: When the DC determines a parolee may be mentally incompetent, the DC must proceed with the hearing for the purpose of determining whether probable cause supports the charges. A finding that probable cause exists will enable continued custody over the parolee in order to obtain a competency evaluation and then hold a hearing on an appropriate disposition of the charges.

**Standard for Return to Custody of Apparently Incompetent Parolee**: The DC will view the evidence if the light most favorable to the parolee in applying the probable cause standard for return to custody.

      **i.**    **If probable cause is found,** the DC will assess a return-to-custody period (not to exceed the RTCA date), and so place the parolee in a revoked status.[2] The DC will also order a competency evaluation to be accomplished within 30 days and order that a Revocation Hearing be scheduled within 30 days of the DC's receipt of the evaluation. A courtesy copy of the evaluation will be provided to the parolee's counsel.

      **ii.**    **If probable cause is not found and all charges are dismissed,** the DC will order the parole hold removed. If parolee has been receiving mental health services under the Revised Program Guide while awaiting the probable cause hearings, then the Board of Parole Hearings (BPH) will notify the AOR of the parolee's mental health service needs to ensure the best method, based on existing DAPO policies, to assist the parolee in ensuring his or her successful integration into the community.

      **iii.**    **If some but not all charges are dismissed,** an adjustment in the RTCA will be made if appropriate. The DC will document on the BPT 1103 PCH the assessed time (RTCA) and state that the dispositional phase of the revocation process is delayed in order to obtain a competency evaluation for the hearing.

---

[2] Once placed in this revoked status, the parolee who is eligible for inpatient DMH care may be referred for such under the Revised Program Guide standards so long as he has a minimum 35-day confinement term.

### C.  Third Step: Obtain Evaluation and Schedule Dispositional Hearing

**1.      Ordering the Evaluation:**

The evaluation must be accomplished, if possible, within 30 days and certainly no later than 60 days after the date of the DC's order.

CalPAP will be given a copy of the DC's decision and be responsible for ensuring the timely completion of the evaluation.

The DC will notify DRU staff of the order for an evaluation.  BPH staff will update DECS upon receipt of this order.

**2.      Canceling the Ordered Evaluation:**

A DC-ordered competency evaluation may be cancelled upon a finding that information, not previously presented or heard by the DC, shows the parolee is competent for purposes of a hearing.

**Timeframe**: The competency evaluation must be scheduled and completed within 30 days of the DC order for the evaluation.   Any request to cancel the ordered evaluation must be submitted with the DRU no later than five business days before the scheduled date and time of the evaluation.

**Procedure**: If before the DC-ordered competency evaluation the parolee's attorney discovers information, not previously presented or heard by the DC, showing the parolee's competence for purposes of a hearing, the parolee's may send a written request to the DRU stating the new information and requesting withdrawal or modification of the order for an evaluation.  DRU staff will forward the request to the ACDC or designee in which the hearing was held for review and decision.

**Findings**: If the ACDC or designee determine the submitted newly-discovered information warrants a finding of competence, then the ACDC or designee shall issue an order making that finding, the factual basis for the finding, and directing cancellation of the evaluation.

If the ACDC or designee determines the submitted newly-discovered information does not warrant a finding of competence, then the ACDC or designee shall issue an order denying the request.

### D.  Fourth Step: The Probable Cause Hearing After the Competency Evaluation.

A parolee who has undergone a competency evaluation may choose to have a PCH or a RH after the evaluation report has been received.  The PCH or RH shall be held within 30 days after receipt of the completed competency evaluation.

1.      **Scheduling of PCH or RH Following Receipt of Evaluations**

Once the evaluation report is completed, the hearing must be scheduled within 30 days of receipt.

     a.      **CalPAP Staff**: CalPAP staff will contact the DRU within two business days of receipt of the competency evaluation report is received. CalPAP must facsimile the competency evaluation to the DRU within two business days of receipt for inclusion in the revocation packet.

     b.      **DRU Staff**:
          i.      **Calendaring**: Upon receipt of the competency evaluation, DRU staff will place the parolee on the next available PCH or RH calendar. The parolee's counsel will inform DRU staff of which calendar – PCH or RH – for the hearing. DRU staff must calendar the parolee's hearing so the hearing occurs within 30 days of receipt of the competency evaluation. DRU staff will notify the attorney of record (CalPAP or privately-retained attorney) of the date and time of the hearing.

          ii.      **RSTS Update**: DRU staff will update the RSTS "comments" to reflect receipt of the evaluation. Update the PCH NLT date and the RH NLT date to reflect the 60-day timeframe from ordering the evaluation report to commencing the second hearing (e.g. 30 days to obtain evaluation and 30 days to commence the second hearing.)

          iii.      **File and Send Copies**: DRU staff will place the evaluation in the revocation file and facsimile a copy of the evaluation to AOR and, if the parolee is not represented by CalPAP attorney, to the parolee's attorney of record.

2.      **The RH or PCH Hearing Procedure**

     a. **Where a Previous PCH Occurred and RH Selected**: If a parolee selects a RH to occur after completion of the competency evaluation ordered at a previous PCH, the fact-finding phase of the hearing will be conducted under the established RH protocols.

     b. **Where a Previous PCH Occurred and PCH Selected**: If at parolee selects a PCH to occur after completion of the competency evaluation ordered at the PCH, then the PCH disposition phase will resume. The DC will consider the results of the competency evaluation in deciding whether or not to revoke, reinstate on parole, or recommend placement in a remedial sanctions program.

//

3.      **The RH or PCH Disposition Following Receipt of Competency Evaluation.**

The DC must consider the competency evaluation in the dispositional phase of the hearing, particularly in determining whether or not to terminate the revocation, reinstate on parole, or recommend other remedial sanctions. The DC will not be bound by the RTCA offer in making this disposition. If the DC imposes custody time in excess of the RTCA, the DC will state the factual basis for the imposed time.

4.      **Mitigation of the Charged Violation.**

A charged violation may be mitigated by admissible evidence of the parolee's mental condition at the time of the charged violation. The competency evaluation report will not serve as evidence of the parolee's mental health condition for purposes of mitigation of the charged violation.

If the DC under these circumstances is assessing time that exceeds the RTCA, the DC will clearly justify the higher assessment.

## X.      Revocation Hearing (RH) Within 35 Days of the Parole Hold

A revocation hearing need only occur within 35 calendar days if a parolee has not previously been revoked at the PCH for the revocation offense(s).

A.      **First Step: Determine Whether the Parolee May Be Mentally Incompetent**

A competency issue may be addressed by the Deputy Commissioner (DC) at the RH if there has been so prior competency determination at the PCH.

The determination must be made upon appropriate evidence, such as official records from DAPO, official records from RSTS, the DC's own observations of the parolee, notations on the BPT 1104, and any determination of competency made in any pending criminal action against the parolee.

The DC must inquire, on the record, if the parolee's attorney agrees or disagrees with the DC's determination that the parolee may lack mental competency. In the event that the DC determines an evaluation is necessary and the CalPAP attorney disagrees, the DC will contact an Associate Chief Deputy Commissioner (ACDC). The ACDC will then be responsible for contacting the listed vendors to obtain the competency evaluation.

The evaluation must be accomplished, if possible, within 30 days and certainly no later than 60 days after the date of the DC's order.

**B.    Second Step: If the Parolee May Be Mentally Incompetent, DC Shall Complete Fact-Finding Phase of RH.**

**Proceed with the Hearing**: When the DC determines a parolee may be mentally incompetent, the DC must proceed with the fact-finding phase of the RH for the purpose of determining whether good cause supports the revocation of parole.

**Standard for Revocation of Apparently Incompetent Parolee:**  The DC will view the evidence if the light most favorable to the parolee in applying the good cause standard for revocation.

     **i.    If good cause is found**, the DC will document the findings and conclusions in RSTS, and so place the parolee in a revoked status.[3]

     **ii.    If good cause is not found and all charges are dismissed**, the DC will order the parole hold be released.

     **iii.    If some but not all charges are dismissed**, the DC will document the findings and conclusions in RSTS.

**C.  Third Step: Obtain Evaluation and Schedule Dispositional Hearing**

**1.    Ordering the Evaluation:**

The evaluation must be accomplished, if possible, within 30 days and certainly no later than 60 days after the date of the DC's order.

CalPAP will be given a copy of the DC's decision and be responsible for ensuring the timely completion of the evaluation.

The DC will notify DRU staff of the order for an evaluation.  BPH staff will update DECS upon receipt of this order.

**2.    Canceling the Ordered Evaluation:**

A DC-ordered competency evaluation may be cancelled upon a finding that information, not previously presented or heard by the DC, shows the parolee is competent for purposes of a hearing.

**Timeframe**: The competency evaluation must be scheduled and completed within 30 days of the DC order for the evaluation.   Any request to cancel the ordered evaluation must be submitted with the DRU no later than five business days before the scheduled date and time of the evaluation.

---

[3] Once placed in this revoked status, the parolee who is eligible for inpatient DMH care may be referred for such under the Revised Program Guide standards so long as the parolee has a minimum 35-day confinement term.

**Procedure:** If before the DC-ordered competency evaluation the parolee's attorney discovers information, not previously presented or heard by the DC, showing the parolee's competence for purposes of a hearing, the parolee's may send a written request to the DRU stating the new information and requesting withdrawal or modification of the order for an evaluation. DRU staff will forward the request to the ACDC or designee in which the hearing was held for review and decision.

**Findings:** If the ACDC or designee determine the submitted newly-discovered information warrants a finding of competence, then the ACDC or designee shall issue an order making that finding, the factual basis for the finding, and directing cancellation of the evaluation.

If the ACDC or designee determines the submitted newly-discovered information does not warrant a finding of competence, then the ACDC or designee shall issue an order denying the request.

### D. Fourth Step: The Disposition Phase of the Revocation Hearing Upon Completion of the Competency Evaluation.

The RH shall be held within 30 days after receipt of the completed competency evaluation.

#### 1. Scheduling of RH Following Receipt of Evaluations

Once the evaluation report is completed, the hearing must be scheduled within 30 days of receip

  a.    **CalPAP Staff**: CalPAP staff will contact the DRU within two business days of receipt of the competency evaluation report is received. CalPAP must facsimile the competency evaluation to the DRU within two business days of receipt for inclusion in the revocation packet.

  b.    **DRU Staff:**

      i.    **Calendaring**: Upon receipt of the competency evaluation, DRU staff will place the parolee on the next available RH calendar. DRU staff must calendar the parolee's hearing so the hearing occurs within 30 days of receipt of the competency evaluation. DRU staff will notify the attorney of record (CalPAP or privately-retained attorney) of the date and time of the hearing.

      ii.   **RSTS Update**: DRU staff will update the RSTS "comments" to reflect receipt of the evaluation. Update the RH NLT date to reflect the 60-day timeframe from ordering the evaluation report to commencing the second hearing (e.g. 30 days to obtain evaluation and 30 days to commence the second hearing.)

       iii.    **File and Send Copies**: DRU staff will place the evaluation in the revocation file and facsimile a copy of the evaluation to AOR and, if the parolee is not represented by CalPAP attorney, to the parolee's attorney of record.

     **2.**    **The RH Disposition Phase Procedure**

     **a.**    **No Rehearing of Fact-Finding Phase**

The RH fact-finding phase has already occurred. Following receipt of the competency evaluation ordered at the previous RH, the dispositional phase of the RH commences. During this dispositional phase, the DC shall summarize the results of the previously-held fact-finding phase on the hearing tape and shall not otherwise rehear that phase.

     **b.**    **Competency Evaluation Considered in Disposition**

The competency evaluation is to be considered in the dispositional phase of the hearing. BPH shall consider the results of the evaluation in deciding whether or not to revoke, reinstate on parole, or recommend other remedial sanctions.

     **c.**    **Mitigation of the Charged Violation.**

A charged violation may be mitigated by admissible evidence of the parolee's mental condition at the time of the charged violation. The competency evaluation report will not serve as evidence of the parolee's mental health condition for purposes of mitigation of the charged violation.

**XI.**    **Motion for Post-Competency Revocation Hearing**

Once a parolee has been revoked at the PCH or RH, the revocation process ends. A new revocation hearing may be obtained if a parolee becomes competent.

     **A.**    **Making the Motion for an New Hearing**

     **1.**    **Timeframe:** A request for a post-competency revocation hearing may be made at any time during the parolee's stated term of confinement within CDCR for violation of his parole. Should the stated term of confinement be extended due to additional violations or convictions, this request will be limited to the initial and not extended term.

     **2.**    **Procedure:** If the parolee or the parolee's attorney discovers information, not previously presented or heard by the DC, showing the parolee's competence for purposes of a revocation hearing, the parolee or the parolee's attorney may send a written request to the DRU stating the new information and requesting order for an evaluation. DRU staff will forward the request to the ACDC or designee in which the hearing was held for review and decision.

**B.    Determination as to Whether the Parolee May Be Mentally Incompetent**

The DC at the New Hearing may determine that the parolee may be mentally incompetent. The determination must be made upon appropriate evidence, such as official records from DAPO, official records from RSTS, the DC's own observations of the parolee, notations on the BPT 1104, and any determination of competency made in any pending criminal action against the parolee.

The DC must inquire, on the record, if the parolee's attorney agrees or disagrees with the DC's determination that the parolee may lack mental competency. In the event that the DC determines an evaluation is necessary and the CalPAP attorney disagrees, the DC will contact an Associate Chief Deputy Commissioner (ACDC). The ACDC will then be responsible for contacting the listed vendors to obtain the competency evaluation.

The evaluation must be accomplished, if possible, within 30 days and certainly no later than 60 days after the date of the DC's order.

**C.    Procedure at New Hearing if Parolee is Not Mentally Incompetent:**

**1.    Reliance on Prior Decisions:**  At the new hearing, the DC may rely entirely on BPH 1103 PCH and RH decisions.

**2.    Witness Attendance:**  In the normal course of business, the DC shall not require the attendance of any witness who testified at the prior hearing unless the parolee's attorney wishes to cross-examine that witness and has made an offer of proof for recalling that witness. The offer of proof must be made upon a good faith basis.

The timeframe used for submitting witness lists and approving the witness lists for revocation hearings applies to these proceedings.

**D.    Procedure at New Hearing if Parolee is Mentally Incompetent:**

If the Deputy Commissioner and/or the parolee's attorney determine that the parolee may lack mental competency, that parolee will be given a second competency evaluation. Should the second competency evaluation state that the parolee is incompetent, that parolee will not be provided with a new hearing.

//

//

//

6/6/08                                          15

## XII.    Mental Health Treatment in CDCR

### A.    For Parolees Awaiting Revocation

#### 1.    Access to Mental Health Care

Prior to revocation and during the revocation process, CDCR staff will consider, where appropriate and resources are available, mental health treatment for parolees who are in within a CDCR institution and awaiting revocation. (See above discussion in section....regarding expedited transfer of those parolees with mental health treatment and/or assessment needs from county jail to reception center.)

Mental health treatment within CDCR may be provided so long as the parolee is eligible under Revised Program Guide standards, regardless of whether the parolee appears incompetent for their parole revocation hearing. These parolees may be placed in accord with the Revised Program Guide standards in the CDCR mental health services delivery system for the following levels of care: Coordinated Clinical Case Management Services (CCCMS), the Enhanced Outpatient Program (EOP), Mental Health Crisis Bed (MHCB) or Psychiatric Services Unit (PSU).

Parolees who are awaiting revocation are not eligible for referral to the California Department of Mental Health (DMH) for inpatient care in accord with the Revised Program Guide standards.

Once placed in revoked status, the parolee who is eligible for inpatient DMH care under Revised Program Guide standards may be referred for such care so long as he or she has a minimum 35-day confinement term.

#### 2.    Transfer to an Institution with Available Mental Health Beds

Should a parolee be eligible for EOP services, those services may be provided within a Reception Center while the parolee awaits transfer to a mainline institution with available EOP beds.

A parolee may be transferred to a mainline institution for CCCMS, EOP, MHCB, or PSU care while awaiting his or her PCH or RH. However, the parolee must be returned to an institution located within 50 miles of the place of alleged parole violation.

#### 3.    Referral for Mental Health Evaluation/Treatment

##### i.    Parolee's Self-Referral for Mental Health E Evaluation/Treatment

At any time before or after revocation, a parolee may self-refer to CDCR Mental Health for mental health evaluation and/or treatment under the Revised Program Guide.

### ii.    Attorney Request to LitCo for Referral for Mental Health Evaluation or Treatment

At any time before or after revocation, a California Parole Advocacy Program (CalPAP) attorney or any other attorney consulting with the parolee may file a written request for the referral of a parolee with an observed or admitted mental health issue. The parolee's expression of the intent to harm himself or others constitutes a significant mental health issue warranting such a request.

The written request shall be submitted (via email and/or facsimile) to the facility's litigation coordinator for immediate relay to the health care manager.

### B.    For Parolees Who Have Been Revoked

CDCR staff will consider, where appropriate and resources are available, mental health treatment for revoked parolees who are within a CDCR institution in the same fashion and under the same standards applicable to inmates within a CDCR institution. awaiting revocation.

Mental health treatment within CDCR may be provided so long as the parolee is eligible under Revised Program Guide standards, regardless of whether the parolee appeared incompetent for their parole revocation hearing. These parolees may be placed in accord with the Revised Program Guide standards in the CDCR mental health services delivery system for the following levels of care: Coordinated Clinical Case Management Services (CCCMS), the Enhanced Outpatient Program (EOP), Mental Health Crisis Bed (MHCB) or Psychiatric Services Unit (PSU).

A revoked parolee is eligible for referral to the California Department of Mental Health (DMH) for inpatient care in accord with the Revised Program Guide standards. Once placed in revoked status, the parolee who is eligible for inpatient DMH care under Revised Program Guide standards may be referred for such care so long as he or she has a minimum 35-day confinement term.

## XIV.  Remedial Sanctions

Remedial sanctions will be considered throughout the revocation process for all parolees who meet the criteria for an alternate program. Mentally ill parolees are not excluded from participation in remedial-sanctions programs based solely on their mental illness. Recommended existing DAPO resources include, but are not limited to, Parole Outpatient Clinics, dual-diagnosis beds in In-Custody Drug Treatment Programs, Residential Multi-Service Centers, Parole Service Centers, and Day Reporting Centers.

**COMPREHENSIVE TRAINING PLAN**

DCs will be provided with training designed for the layperson, which will assist them in making a determination whether to suspend proceedings and request treatment and/or order an evaluation to determine whether the parolee is able to meaningfully participate in the parole-revocation process.  In determining whether or not a competency evaluation should be pursued, the DC should inquire of the parolee and his or her counsel about the parolee's:

- level of unmanageable behavior,
- quality of his or her ability to relate to the attorney,
- ability to assist in planning a legal strategy or defense,
- understanding of the charges,
- understanding of the range and nature of possible penalties,
- ability to appraise likely outcomes,
- capacity to convey to his or her attorney pertinent facts about the offense/violation,
- capacity to testify in his or her own defense if need be, and
- demonstration of self-serving as opposed to self-defeating actions.

BPH, DAPO, Case Records, contract clinicians, CalPAP, and Mental Health staff will be trained regarding this new process.

Case Records will train its staff using an instructional memorandum and follow-up conference call with pertinent staff involved in this process.

The Division of Adult Institutions will train its staff using an instructional memorandum and follow-up conference call (if needed) with pertinent staff involved in this process.

**DAPO Training**

*Training for Field Unit Notice Agents (FUNAs)/Decentralized Revocation Unit Notice Agents (DRUNAs)/Supervising Notice Agents (SNAs)*

DAPO will utilize its existing budget to fund the training of FUNAs, DRUNAs, and SNAs. Providing the policy is finalized, during the month of May 2008, DAPO will conduct one training session at each Regional Headquarters for its respective FUNA/DRUNA/SNA staff. DAPO will also conduct one makeup session in each region for those who miss the May training.

DAPO anticipates that training can be accomplished by June 1, 2008, provided the policy memorandum is available prior to May 1, 2008.  (If the memorandum is not available until after May 1, 2008, it may be necessary to reschedule training for a later date.)

Training will consist of:

**Instructors—Parole Outpatient Clinic (POC) Staff**

1. Signs/Symptoms of Mental Illness—Using the departmental-approved training module, POC staff will provide training (**60 minutes**).

**Instructors—DAPO HQ's Americans with Disabilities Act (ADA)/Revocation Unit Staff**

1. Mentally Ill Policies and Procedures Overview (**30 minutes**). Will distribute copies of policy memorandum. Review and allow for question/answer period.
2. DECS refresher training (**30 minutes**). Training will consist of a PowerPoint presentation to ensure staff is familiar with navigating various aspects of DECS, proper entry of data, and a question/answer period to allow staff opportunity to address problems/concerns and introduce new electronic worksheet to be used by field staff.

**Instructors—Supervising Notice Agent, Primary; DAPO HQ ADA/Revocation Unit Staff, Secondary**

1. Roles and Responsibilities of FUNAs/DRUNAs (**30 minutes**).

*Training for DAPO Field Staff*

DAPO field staff will be provided training at the unit level via memorandum. This includes but is not limited to: parole agents, unit support staff, and POC staff.

An instructional e-mail will be sent to all DAPO field staff notifying them of the policy and availability of the document on DAPO's Policy Memorandum Web site. The e-mail will direct Unit Supervisors to ensure field staff is familiar with the policy by providing informal training, individually or in a group setting, no later than June 1, 2008, or within 30 days of the issuance of the policy memorandum, whichever is later.

**BPH Training**

In April 2008, DCs, Correctional Counselor (CC) Is & IIs, and Office Service Manager (OSM) Is will be receiving training.

Included in the DC training, scheduled to begin April 2008, will be training designed for the layperson, which will assist them in determining whether to suspend proceedings and request an evaluation to determine whether the parolee is able to meaningfully participate in the parole-revocation process.

//

Before May 31, 2008, BPH's Policy and Procedures (P&Ps) will be mailed to the ACDCs, OSM Is, and CC IIs.  Before May 31, 2008, by conference call, the ACDCs, OSM Is, and CC IIs will be trained in the new process.

Before May 31, 2008, BPH's P&Ps will be mailed to all DCs, BRRs, and DRU staff. ACDCs and CCIIs will, by conference call, review and answer questions regarding the new P&Ps.

## FINANCING FOR COMPETENCY EVALUATIONS

Financing is available for the present contract (ending June 30, 2008).  The anticipated costs of the evaluations can be absorbed in the present funding.  The funding for the next contract beginning July 1, 2008 (four-year duration), will be available when the contract is finalized and an amendment is submitted for the additional funding for the competency evaluations.

No additional funding is required to train BPH staff.

CalPAP is able to absorb the training costs associated with this process in its current contract with the state.

BPH has training dollars that it can use for training BPH staff on this new process.  No additional funding is required to train BPH staff.

## STATEWIDE IMPLEMENTATION

The new process, if all negotiations have concluded or there is agreement pending conclusion of negotiation and finalization, will be implemented June 15, 2008.

//

//

# EXHIBIT 15

## Kate Richardson

| | |
|---|---|
| **From:** | Holly M. Baldwin [hbaldwin@RBG-Law.com] |
| **Sent:** | Thursday, June 05, 2008 11:34 AM |
| **To:** | 'Vickie Whitney'; Lisa Tillman; Lori E. Rifkin |
| **Cc:** | Katherine Nelson; Ginny Morrison; Jessica Devencenzi; Fatima Do Vale; Matt Lopes; Coleman Team - RBG Only; Valdivia Team; riveland@rockisland.com |

**Subject:** RE: Coleman/Valdivia; access to DMH for persons in CDCR custody

Dear All:

Yes, we agree.  Please confirm the time and location of the meeting as soon as possible.  Thank you.

**Holly M. Baldwin**
ROSEN, BIEN & GALVAN, LLP
315 Montgomery Street, 10th Floor
San Francisco, CA 94104
Tel: (415) 433-6830
Fax: (415) 433-7104
Email: hbaldwin@rbg-law.com
Website: www.rbg-law.com

CONFIDENTIALITY NOTICE
The information contained in this e-mail message may be privileged, confidential and protected from disclosure. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited. If you think that you have received this e-mail message in error, please e-mail the sender at the above address.  IRS CIRCULAR 230 NOTICE: As required by United States Treasury Regulations, you should be aware that this communication is not intended by the sender to be used, and it cannot be used, for the purpose of avoiding penalties under United States federal tax laws.

---

**From:** Vickie Whitney [mailto:Vickie.Whitney@doj.ca.gov]
**Sent:** Thursday, June 05, 2008 11:30 AM
**To:** Lisa Tillman; Lori E. Rifkin
**Cc:** Katherine Nelson; Ginny Morrison; Jessica Devencenzi; Fatima Do Vale; Matt Lopes; Coleman Team - RBG Only; Valdivia Team; riveland@rockisland.com
**Subject:** RE: Coleman/Valdivia; access to DMH for persons in CDCR custody

Dear Lori - I realize that Lisa Tillman's email indicates that unless she hears from you otherwise, she will assume Plaintiffs' counsel agrees that all communications at the meeting on Monday will be treated as confidential settlement discussions.  However, just to be clear, can you affirmatively confirm your agreement as soon as possible so we can get the meeting confirmed for all??  Thank you!

Best,
Vickie

>>> Lisa Tillman 6/3/2008 4:11 PM >>>
June 3, 2008

Re: *Valdivia v. Schwarzenegger*
    *Coleman v. Schwarzenegger*

Dear Ms. Rifkin:

In response to your request, representatives of the Department of Mental Health (DMH) and their chief counsel will meet with your office and Special Master Riveland to discuss the provision of inpatient mental health care services. DMH understands this meeting will occur with the participation of Special Master Lopes to further enable a productive discussion of this dovetailing *Coleman/Valdivia* issue. DMH understands that any statements made by any person at the meeting will be viewed as made within the context of a negotiation and so not subject to use or reference at any later proceeding in this or any other matter.

Unless I hear otherwise from your office, I will assume your office agrees to and accepts these two conditions for the meeting.

Sincerely,

Lisa Tillman
Deputy Attorney General
Office of the Attorney General
Telephone: 916-327-7872


>>> "Lori E. Rifkin" <LRifkin@rbg-law.com> 5/29/2008 5:41 PM >>>
Dear Ms. Tillman,

You requested that plaintiffs clarify the issues we would like to discuss with DMH and the motion we intend to file. I am attaching an email and letter sent by plaintiffs' counsel on May 16, 2008 to you, as well as to *Valdivia* counsel. On page two of this letter, plaintiffs' counsel outlines the *Coleman* violation we have identified concerning DMH's refusal to accept *Coleman* class members in CDCR custody who are pending revocation. In that letter, we also state our intention to bring this matter to the district court.

As I also stated in my email to you on May 27, 2008, we intend to bring this issue before the Court for a hearing on July 25, 2008. We intend to file this motion in the *Coleman* case and will request relief from the State Defendants. DMH representatives have declined to attend previous meetings and negotiations concerning this issue. We continue to request that DMH commit to accepting any class member in CDCR custody who requires treatment at one of the DMH levels of care, regardless of revocation status. Because it is our understanding that DMH will not make this commitment, we intend to bring this issue before the Court. We would like to clarify DMH policy regarding this issue directly with DMH so that we may determine whether it is necessary to proceed with a motion and focus this issue for the Court.

Please let us know as soon as possible whether DMH will attend a meeting on June 9 or 10 to discuss this issue. If DMH does not attend we will inform Judge Karlton of our understanding of the DMH policy, as described to us by CDCR attorneys (including Bruce Slavin most recently), the DAGs representing CDCR in *Valdivia,* and CDCR mental health clinicians.

Sincerely,

**Lori Rifkin**
Associate
ROSEN, BIEN & GALVAN, LLP
315 Montgomery Street, Tenth Floor
San Francisco, CA  94104
415-433-6830 (tel)
415-433-7104 (fax)
lrifkin@rbg-law.com

CONFIDENTIALITY NOTICE

The information contained in this e-mail message may be privileged, confidential and protected from disclosure. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited. If you think that you have received this e-mail message in error, please e-mail the sender at the above address.

IRS CIRCULAR 230 NOTICE

As required by United States Treasury Regulations, you should be aware that this communication is not intended by the sender to be used, and it cannot be used, for the purpose of avoiding penalties under United States federal tax laws.

---

**From:** Lisa Tillman [mailto:Lisa.Tillman@doj.ca.gov]
**Sent:** Thursday, May 29, 2008 4:14 PM
**To:** Lori E. Rifkin
**Cc:** Katherine Nelson; Ginny Morrison; Jessica Devencenzi; Vickie Whitney; Fatima Do Vale; Matt Lopes; Coleman Team - RBG Only; Valdivia Team; riveland@rockisland.com
**Subject:** Re: Coleman/Valdivia; access to DMH for persons in CDCR custody

May 29, 2008

Re: *Valdivia/Coleman*

Dear Ms. Rifkin:

I have received your May 27, 2008 request for the Department of Mental Health (DMH), a defendant in the *Coleman* case, to attend a meeting in the *Valdivia* case regarding the care of parolees.

Because I am counsel of record for the Defendants in the *Coleman*, not *Valdivia*, case, I cannot say that I have complete knowledge about any active negotiations in the *Valdivia* case. So I must ask for a statement of the purpose of this meeting. Your letter intimates that your office is ready to file a motion in the *Valdivia* case. Please clarify what the motion will address and if it will address DMH in some fashion.

I notice Special Master Lopes was on the email list for your letter. Please inform me if you intend to file a motion in the *Coleman* case, too, and if so, the relief requested against which, if any, entity. Please inform me what commitment, if any, do you seek from DMH at this meeting to avoid such motion(s)? If there are specific discussion points for this meeting, please forward them to me.

Thank you for your professional courtesy.

Sincerely,

Lisa Tillman
Deputy Attorney General
Office of the Attorney General
Telephone: 916-327-7872


>>> "Lori E. Rifkin" <LRifkin@rbg-law.com> 5/27/2008 6:27 PM >>>
Dear Ms. Tillman,

As you know, we have been engaged in active negotiations with defendants concerning the
Coleman/Valdivia overlap issue of revocation procedures for mentally ill parolees.  Through that
process, as well as through the Coleman monitoring process, we have become aware that DMH will not
accept parolees who have been charged with violations of parole and are in CDCR custody, but whose
revocations have not been completed because they are too ill to participate in the revocation process.

We requested that a DMH representative and counsel attend a previous meet and confer with
defendants and the Valdivia Special Master regarding this issue on May 2, 2008.  However, DMH did
not attend.

We intend to bring this issue before the Court for a hearing on July 25, 2008.  However, in the hope of
avoiding this litigation, we have once again requested a meeting with DMH decision-makers to discuss
DMH policy directly.  We made this request to Vickie Whitney, the Deputy AG working on Valdivia, and
the Valdivia Special Master during a conference call earlier today.  The parties agreed on June 9 or 10
as possible dates for this meeting.  We are also making this request to you as the Deputy AG working
on Coleman.  Please let us know as soon as possible whether DMH will attend a meeting on June 9 or
10 to discuss this issue.

Thank you,

Sincerely,

**Lori Rifkin**
Associate
ROSEN, BIEN & GALVAN, LLP
315 Montgomery Street, Tenth Floor
San Francisco, CA  94104
415-433-6830 (tel)
415-433-7104 (fax)
lrifkin@rbg-law.com


CONFIDENTIALITY NOTICE


The information contained in this e-mail message may be privileged, confidential and protected from disclosure. If you are not the intended
recipient, any dissemination, distribution or copying is strictly prohibited. If you think that you have received this e-mail message in error,
please e-mail the sender at the above address.


IRS CIRCULAR 230 NOTICE


As required by United States Treasury Regulations, you should be aware that this communication is not intended by the sender to be
used, and it cannot be used, for the purpose of avoiding penalties under United States federal tax laws.

**CONFIDENTIALITY NOTICE:** This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

# EXHIBIT 16

FILED

MAR - 9 2004

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

DEPUTY CLERK

1  BINGHAM McCUTCHEN
   KAREN KENNARD – 141925
2  KRISTEN A. PALUMBO - 215857
   Three Embarcadero Center
3  San Francisco, California 94111-4067
   Telephone: (415) 393-2000
4
5  PRISON LAW OFFICE
   DONALD SPECTER – 83925
   General Delivery
6  San Quentin, California 94964
   Telephone: (415) 457-9144
7
8
9  STEPHEN J. PERRELLO, JR. – 56288
   P.O. Box 880738
   San Diego, California 92618
10 Telephone: (858) 277-5900

   ROSEN, BIEN & ASARO, LLP
   MICHAEL W. BIEN – 096891
   ERNEST GALVAN – 196065
   MARI L. WILLITS – 209612
   155 Montgomery Street, 8th Floor
   San Francisco, California 94104
   Telephone (415) 433-6830

   ALEX LANDON – 50957
   2442 Fourth Avenue
   San Diego, California 92101
   Telephone: (619) 232-6022

11
12  Attorneys for Plaintiffs

LODGED

NOV 1 8 2003

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY
        DEPUTY CLERK

13
14              UNITED STATES DISTRICT COURT
15              EASTERN DISTRICT OF CALIFORNIA
16
17  JERRY VALDIVIA, et al.,              No. Civ. S-94-0671 LKK/GGH
18        Plaintiffs,
                                         **STIPULATED ORDER FOR
19                                       PERMANENT INJUNCTIVE RELIEF**
20  v.
21  ARNOLD SCHWARZENEGGER, et al.,
22        Defendants.
23
24
25
26
27
28

1034

## I.  INTRODUCTION

1.    This action was filed on May 2, 1994.  Plaintiffs, on behalf of themselves and the class they represent, challenged the constitutionality of parole revocation procedures conducted by the California Board of Prison Terms ("BPT") and the California Department of Corrections ("CDC").

2.    The Court certified this case as a class action by order dated December 1, 1994.  The Plaintiff class consists of the following persons:  (1) California parolees who are at large; (2) California parolees in custody as alleged parole violators, and who are awaiting revocation of their state parole; and (3) California parolees who are in custody, having been found in violation of parole and sentenced to prison custody.

3.    The Defendants are state officials responsible for the policies and procedures by which California conducts parole revocation proceedings.

4.    On June 13, 2002, this Court granted partial summary judgment in favor of Plaintiffs, holding that California's unitary parole revocation system violates the due process rights of the Plaintiff class under Morrissey v. Brewer, 408 U.S. 481 (1972), Gagnon v. Scarpelli, 411 U.S. 778 (1973), and related authority.  The Court held that California's parole revocation system violated the due process clause of the Fourteenth Amendment by "allowing a delay of up to forty-five days or more before providing the parolee an opportunity to be heard regarding the reliability of the probable cause determination."  Valdivia v. Davis, 206 F. Supp. 2d 1068, 1078 (E.D. Cal. 2002).

5.    The parties stipulate that this is not a "civil case with respect to prison conditions," as those terms are defined and applied in the Prison Litigation Reform Act ("PLRA"), 18 U.S.C. § 3626, and that therefore this Order is not governed by the PLRA.

6.    The parties hereby stipulate that the Court shall ADJUDGE, DECLARE, AND DECREE as follows:

## II.  **PARTIES**

7.    The Plaintiff class consists of the following persons: (1) California parolees who are at large; (2) California parolees in custody as alleged parole violators, and who are awaiting revocation of their state parole; and (3) California parolees who are in custody, having been found in violation of parole and sentenced to prison custody.

8.    The Defendants are state officials responsible for the policies and procedures by which California conducts parole revocation proceedings. Defendant Arnold Schwarzenegger is Governor of the State of California and Chief Executive of the state government. Defendant Roderick Q. Hickman is the Secretary of the California Youth and Adult Correctional Agency. Defendant Edward S. Alameida, Jr., is Director of the California Department of Corrections. Defendant Richard Rimmer is Deputy Director of the California Department of Corrections, Parole and Community Services Division ("P&CSD"). Defendant Carol A. Daly is a Commissioner and Chair of the Board of Prison Terms ("BPT"). Defendants Alfred R. Angele, Sharon Lawin, Booker T. Welch, Jones M. Moore, and Kenneth L. Risen are Commissioners of the BPT. Defendant Kenneth E. Cater is Chief Deputy Commissioner of the BPT.

## III.  **DEFINITIONS**

9.    The following terms when used in this Order shall have the meanings specified below:

(a) "Parolee(s)" shall mean any member of the Plaintiff class.

(b) "Day(s)" shall mean calendar days, unless otherwise specified.

(c) "Revocation process" or "revocation proceedings" shall mean all stages of the process by which parole may be revoked, including placement of a parole hold, notice, waivers, service of Return to Custody Assessments, and hearings.

(d) "Return to Custody Assessments" ("RTCAs") shall mean the practice by which Defendants offer a parolee a specific disposition in return for a waiver of the

1    parolee's right to a preliminary or final revocation hearing, or both.

2        (e) "Parole hold" shall mean any invocation by Defendants of their authority to

3    involuntarily detain a parolee for revocation proceedings under Section 3056 of the

4    California Penal Code. This term shall not apply to the detention of a parolee who has

5    absconded from the State of California until he or she is physically returned to the State

6    of California and is in its custody.

7

8    **IV.    POLICIES, PROCEDURES, FORMS, AND PLANS**

9        10.    For all policies, procedures, forms, and plans developed under this Order,

10   the parties shall use the following process: Defendants shall meet periodically with

11   Plaintiffs' counsel to discuss their development of policies, procedures, forms, and

12   plans. In preparation for such meetings, Defendants will provide Plaintiffs' counsel

13   with copies of the proposed policies, procedures, forms, and plans in draft form no later

14   than 7 days before the meeting. If the parties reach an impasse on any particular issues,

15   they may bring the disputed issues to the Court in a motion to be heard on shortened

16   time.

17       11.    Using the procedure set forth above in Paragraph 10, Defendants shall do

18   the following:

19       (a)    Defendants shall develop and implement sufficiently specific Policies and

20   Procedures that will ensure continuous compliance with all of the requirements of this

21   Order. The Policies and Procedures will provide for implementation of the August 21,

22   2003 Remedial Plan Outline (attached hereto as Exhibit A), as well as the requirements

23   set forth below in Paragraphs 12–24. Defendants shall submit the completed Policies

24   and Procedures to the Court no later than July 1, 2004.

25       (b)    By July 1, 2004, Defendants shall begin implementing the following steps

26   in the parole revocation process, which shall be completely implemented by January 1,

27   2005:

28           (i) Defendants shall appoint counsel for all parolees beginning at the

1 | RTCA stage of the revocation proceeding. Defendants shall provide an expedited

2 | probable cause hearing upon a sufficient offer of proof by appointed counsel that there

3 | is a complete defense to all parole violation charges that are the basis of the parole hold.

4 |         (ii) No later than 48 hours after the parole hold, or no later than the next

5 | business day if the hold is placed on a weekend or holiday, the parole agent and unit

6 | supervisor will confer to determine whether probable cause exists to continue the parole

7 | hold, and will document their determination.

8 |         (iii) If the parole hold is continued thereafter, no later than 3 business days

9 | after the placement of the hold, the parolee will be served with actual notice of the

10 | alleged parole violation, including a short factual summary of the charged conduct and

11 | written notice of the parolee's rights regarding the revocation process and timeframes.

12 |         (iv) For all parolees who do not waive or seek a continuance of a final

13 | revocation hearing, Defendants shall provide a final revocation hearing on or before the

14 | 35th calendar day after the placement of the parole hold.

15 |     (c)    By July 1, 2004, Defendants shall serve on counsel for Plaintiffs an

16 | assessment of the availability of facilities and a plan to provide hearing space for

17 | separate probable cause hearings.

18 |     (d)    By July 1, 2005, in addition to the steps listed above, for all parolees who

19 | do not waive or seek a continuance of a probable cause hearing, Defendants shall

20 | provide a hearing to determine probable cause no later than 10 business days after the

21 | parolee has been served with notice of the charges and rights (at the 3rd business day

22 | after the placement of the hold).

23 |     (e)    Defendants shall complete implementation of the Policies and Procedures

24 | by July 1, 2005.

25 |     12.    In addition to the provisions of the August 21, 2003 Remedial Plan Outline,

26 | the Policies and Procedures shall ensure that the following requirements are met:

27 |     13.    At the time of appointment, counsel appointed to represent parolees who

28 | have difficulty in communicating or participating in revocation proceedings, shall be

1  informed of the nature of the difficulty, including but not limited to:  mental illness,

2  other cognitive or communication impairments, illiteracy, limited English-language

3  proficiency, and the need for a foreign language interpreter.  The appointment shall

4  allow counsel adequate time to represent the parolee properly at each stage of the

5  proceeding.

6      14.    At the time of appointment, counsel shall be provided with all non-

7  confidential reports and any other documents that the state intends to rely upon at the

8  probable cause or final revocation hearing.  After appointment, if the state learns of

9  additional evidence or documents, and intends to rely on such additional evidence or

10  documents, it shall produce them to counsel as soon as practicable before the hearing.

11      15.    Defendants shall develop and implement policies and procedures for the

12  designation of information as confidential that are consistent with the requirements of

13  due process.

14      16.    Non-confidential portions of parolees' field files shall be available to

15  parolees' counsel unless good cause exists for failure to provide access to such files.

16  Field file information shall be withheld from counsel as confidential only in accordance

17  with the policies and procedures referenced in Paragraph 15.

18      17.    Defendants shall develop standards, guidelines, and training for effective

19  assistance of state appointed counsel in the parole revocation process.

20      18.    Defendants will ensure that parolees receive effective communication

21  throughout the entire revocation process.

22      19.    Defendants will ensure that all BPT and CDC forms provided to parolees

23  are reviewed for accuracy and are simplified to the extent possible through a procedure

24  similar to that used to revise forms in <u>Armstrong v. Davis</u>, C94-2307 CW (N.D. Cal.).

25  This process will include translation of forms to Spanish.  Revised forms will be

26  submitted to Plaintiffs' counsel for review prior to finalization, dissemination, or

27  modification.

28      20.    Upon written request, parolees shall be provided access to tapes of parole

revocation hearings.

21.     Parolees' counsel shall have the ability to subpoena and present witnesses and evidence to the same extent and under the same terms as the state.

22.     At probable cause hearings, parolees shall be allowed to present evidence to defend or mitigate against the charges and proposed disposition. Such evidence shall be presented through documentary evidence or the charged parolee's testimony, either or both of which may include hearsay testimony.

23.     Final revocation hearings shall occur within 35 calendar days of the parole hold.

24.     The use of hearsay evidence shall be limited by the parolees' confrontation rights in the manner set forth under controlling law as currently stated in <u>United States v. Comito</u>, 177 F.3d 1166 (9th Cir. 1999). The Policies and Procedures shall include guidelines and standards derived from such law.

## V.     **STAFFING LEVELS**

Defendants shall maintain sufficient staffing levels in the CDC and BPT to meet all of the obligations of this Order.

## VI.     **MONITORING**

25.     The parties shall cooperate so that Plaintiffs' counsel has access to the information reasonably necessary to monitor Defendants' compliance with this Order and the Policies and Procedures adopted in response thereto. Such information shall include but not be limited to: access to documents, tours, observation of parole revocation proceedings, observation of training sessions, interviews of staff, and interviews with parolees. Plaintiffs' counsel may notice depositions under the Federal Rules of Civil Procedure either: (1) if Plaintiffs' counsel are unable to obtain relevant information through interviews and informal document requests, or (2) after notifying Defendants of non-compliance with this Order under Section VII, below. Before

1   noticing a deposition, Plaintiffs' counsel must consult with opposing counsel about the

2   deposition schedule so that the convenience of counsel, witnesses, and parties may be

3   accommodated, if possible.

4       26.    The parties shall meet regularly, and at least once every 90 days, to discuss

5   implementation issues.  At least once every 90 days, Defendants shall provide Plaintiffs'

6   counsel with a report on hold-to-hearing time in substantially the same form, and with

7   the same content as that currently used in Defendants' weekly "RSTS" meetings.

8       27.    The parties shall agree on a mechanism for promptly addressing concerns

9   raised by Plaintiffs' counsel regarding individual class members and emergencies.

10

11  **VII.  ENFORCEMENT**

12      28.    The Court shall retain jurisdiction to enforce the terms of this Order.  The

13  Court shall have the power to enforce the terms of this Order through specific

14  performance and all other remedies permitted by law or equity.

15      29.    If Plaintiffs' counsel believe that Defendants are not complying with any of

16  the acts required by this Order, the Remedial Plans, or Policies and Procedures produced

17  pursuant to it, they shall notify Defendants in writing of the facts supporting their belief.

18  Defendants shall investigate the allegations and respond in writing within 30 days.  If

19  Plaintiffs' counsel are not satisfied with Defendants' response, the parties shall conduct

20  negotiations to resolve the issue(s).  If the parties are unable to resolve the issue(s)

21  satisfactorily, Plaintiffs may move the Court for any relief permitted by law or equity.

22

23  **VIII.  ATTORNEY'S FEES AND COSTS**

24      30.    Plaintiffs are the prevailing party in this action.  Plaintiffs' counsel may

25  move for an award of reasonable attorney's fees and costs for obtaining relief for the

26  Plaintiff class pursuant to 42 U.S.C. § 1988 or any other applicable law.  Defendants

27  shall pay Plaintiffs' counsel reasonable attorney's fees for work performed in

28  connection with monitoring and enforcing this Order.  The parties reserve the right to

1   address at a future date whether 42 U.S.C § 1997e(d) applies to an award of attorney's

2   fees in this suit.

3   **IX.    RESOLUTION OF CLAIMS**

4       31.    This stipulated order resolves all the claims in this case, except the

5   following, to the extent that they are alleged in the Fifth Amended Complaint, if at all:

6       (a)    <u>Appeals</u>.  Plaintiffs assert that Defendants' administrative-appeals system

7   for parole-revocation and revocation-extension decisions violates the Due Process and

8   Equal Protection Clauses of the Fourteenth Amendment.

9       (b)    <u>Revocation-Extension Proceedings</u>.  Plaintiffs assert that Defendants'

10   policies, procedures, and practices for extending parole revocations based on alleged

11   rules violations while in custody violate the Due Process Clause.

12       32    The parties anticipate that these issues will be resolved informally, without

13   need for the Court's intervention.  The parties will inform the Court if this does not

14   occur.

15

16       **IT IS SO STIPULATED.**

17

18   Dated: _November 12_, 2003             ROSEN, BIEN & ASARO

19

20                 By _____

21                     MICHAEL BIEN

22

23   Dated: _November 12_, 2003             PRISON LAW OFFICE

24

25                 By _____

26                     DONALD SPECTER

27

28                     Attorneys for Plaintiffs

Dated: November 17, 2003

BILL LOCKYER, Attorney General
of the State of California,
ROBERT R. ANDERSON, Chief
Assistant Attorney General,
FRANCES T. GRUNDER, Senior
Assistant Attorney General,
JONATHAN L. WOLFF,
Supervising Deputy Attorney
General

By THOMAS S. PATTERSON,
Deputy Attorney General
Attorneys for Defendants

Dated: November 17, 2003

By RODERICK Q. HICKMAN
Secretary, Youth and Adult
Correctional Agency

Dated: November 17, 2003

By EDWARD S. ALAMEIDA, JR.
Director, California Department of
Corrections

Dated: November 17th, 2003

By CAROL A. DALY
Chair, California Board of Prison
Terms

## ORDER

The Court finds that this is not a "civil case with respect to prison conditions," as those terms are defined and applied in the Prison Litigation Reform Act ("PLRA"), 18 U.S.C. § 3626, and that therefore this Order is not governed by the PLRA. Defendants, their agents, employees, and successors in office are ordered to comply with all the terms stated above.

**IT IS SO ORDERED**

Dated: 3/8, 2004

LAWRENCE K. KARLTON
Chief Judge, Emeritus

**BILL LOCKYER**
*Attorney General*



*State of California*
**DEPARTMENT OF JUSTICE**



455 GOLDEN GATE AVENUE, SUITE 11000
SAN FRANCISCO, CA 94102-7004

Public: (415) 703-5500
Telephone: (415) 703-5727
Facsimile: (415) 703-5843
E-Mail: Thomas.Patterson@doj.ca.gov

August 20, 2003

The Honorable Lawrence K. Karlton
Chief Judge Emeritus
United States District Court, Eastern District
501 "I" Street
Sacramento, CA 95814

> **RECEIVED**
>
> **AUG 2 2 2003**
>
> ROSEN BIEN & ASARO

RE:    Jerry Valdivia, et al. v. Gray Davis, et al.
       USDC E.D. Cal., Case No. CIV-S-94-0671 LKK GGH P

Dear Judge Karlton:

The following is Defendants' revised remedial plan in this case. This plan represents a tremendous amount of work by the Defendants and other state officials since the July 23, 2003 order, much of which has been done recently while consulting Plaintiff's counsel.

Defendants continue to work with Plaintiffs' counsel to refine the revised remedial plan in efforts to perfect a viable revocation system that affords appropriate process.

With this in mind, neither Plaintiffs nor Defendants desire the Court to rule immediately on the adequacy of the revised remedial plan. Rather, they hope to resolve the issues soon and, of course, will advise the Court of the outcome of their efforts.

Sincerely,

*Thomas S. Patterson*

THOMAS S. PATTERSON
Deputy Attorney General
Attorney for Defendants

*Donald Specter*

DONALD SPECTER
Prison Law Office
Attorney for Plaintiffs

For    BILL LOCKYER
       Attorney General

Exh A

# Valdivia Remedial Plan



Violation Occurs

Remedial Sanctions-If Appropriate
(COP/SATCU/Alternate Placement)

Probable Cause Determination Review/Case
Conference regarding PC 3056 Hold

Within 48 Hours of
Hold Placement
(If on Weekend/Hol
no later than next
Business day)

* PCH Time starts 1st
day after Notice and
runs for 10 Bus days

Parolee Noticed of Charges
(Activity Report)/
Interviewed and Provided Copies
(Charges, BPT 1073, Notice of Rights)

3 Business Days
of Hold Placement

Violation Report Submitted by Agent of Record          *1-3 Bus Days
Violation Report Reviewed by Unit Supervisor          4 Bus Days
Rev Packet Reviewed by Parole Administrator (PAD)

COP/
Remedial
Sanction

Case
Resolved

Decentralized Revocation Unit
Revocation Packets Received - Data Entry (RSTS)          5-6 Bus Days
Attorneys Receive Revocation Packets
and Consult with Parolee

RTC Assessment by DC or PAD
Offers Communicated to Attorneys          6-8 Bus Days

Accepts/
COP/CTS/
NIC/
Remedial
Sanctions/
Dismiss

Expedited Hearing with Offer of Proof

Probable Cause Hearing
DC or PAD/Attorney/Parolee
Exculpatory/Documentary Evidence Presented          9-10 Bus Days

Rejection of offer
(Witness Selection/Hearing Location/ADA Review)

Case
Resolved

Revocation Hearing

On or Before
35 Calendar
Days of Hold
Placement

Revised 8/21/03 (1130 Hours)

# VALDIVIA REMEDIAL PLAN POLICY OUTLINE

## VIOLATION OCCURS

There are a myriad of circumstances under which a Parolee can violate his or her conditions of parole. There are approximately 100,000 parole violations referred to the Board of Prison Terms each calendar year.

Currently about 60% of the reported violations are the result of arrests by local law enforcement. Of that 60% arrested by local law enforcement, many are charged in the local jurisdictions for crimes against the state, while others are not charged locally but instead referred to the Board of Prison Terms for administrative disposition.

The remaining 40% are arrests that involve the Parole officer, which may also result in local charges or referral to the Board of Prison Terms for administrative disposition.

The average parole violator's term in prison is five and one half months.

Approximately 66% of the cases referred to the Board of Prison Terms are resolved prior to the revocation hearing. Last year, the Board of Prison Terms conducted approximately 37,000 revocation hearings.

## REMEDIAL SANCTIONS

As part of the overall reform of the revocation process, the Parole and Community Services Division of the Department of Corrections will begin using remedial sanctions/community based treatment placement in January of 2004.

Some of the remedial sanctions/community based treatment programs that will be used are the Substance Abuse Treatment Control Units, Electronic Monitoring, Self-Help Outpatient/aftercare programs, and alternative placement in structured and supervised environments.

1

These remedial sanctions are not considered violations of parole because participation in the remedial sanctions program is voluntary and participation in the remedial sanctions program will not make the parolee presumptively ineligible for discharge at 13 months.

The goal is to reduce the number of returns to prison for violations of parole by up to 10% in 2004 and by up to 30% by 2006.

**<u>IF REMEDIAL SANCTIONS ARE DEEMED INAPPROPRIATE AND A PAROLE HOLD IS PLACED ON THE PAROLEE, A PROBABLE CAUSE DETERMINATION/REVIEW WILL TAKE PLACE WITHIN 48 HOURS OF THE HOLD AND IF THE HOLD IS PLACED ON A WEEKEND OR HOLIDAY, THE PROBABLE CAUSE REVIEW WILL BE CONDUCTED NO LATER THAN THE NEXT BUSINESS DAY FOLLOWING THE HOLD BEING PLACED.</u>**

Although this probable cause review for parolees is not required under any of the current, relevant case law, it is being put in place in an attempt to take a second look at those individuals who have been placed into custody to determine if the "present danger to public safety" concern still exists or if remedial sanctions/community based treatment is possible at this juncture.

As an example, a parolee who was strung out on dope may have "dried out" sufficiently that he or she is no longer a danger to him or herself or the public and may be an appropriate candidate for community based treatment in a structured, supervised program.

Under such a scenario, the parolee would be released to a community based treatment program with the understanding that a specific condition of his or her release is the completion of the program and any other special conditions of parole that the Parole Agent deems appropriate.

Current regulation and case law require any special conditions of parole to have a nexus to the parolees' commitment offense or behavior.

2

**PAROLEE IS GIVEN ACTUAL WRITTEN NOTICE OF CHARGES WITH A SHORT FACTUAL SUMMARY OF THE BEHAVIOR; THE NOTICE OF RIGHTS REGARDING THE REVOCATION PROCESS; AND THE BPT 1073 ADA DETERMINATION IS MADE VIA A FACE TO FACE INTERVIEW WITHIN 3 BUSINESS DAYS OF THE HOLD BEING PLACED.**

If the remedial sanctions are deemed inappropriate, within three business days of the hold being placed, the parolee shall be served actual notice of the charges against him or her accompanied by a short factual summary of the behavior; he or she shall be interviewed; an a ADA determination shall be made; the BPT form 1073 shall be completed, and parolee shall be provided with a written notice of rights regarding the revocation process and time frames. (Hereinafter referred to as "notice.")

The principles of "effective communication" apply to the revocation process. ADA accommodation must be provided for all parolees when necessary. In addition, all forms shall be printed in Spanish and English and a Spanish speaking person shall be available to interpret and explain the forms to the parolee where necessary.

**THE PROBABLE CAUSE HEARING SHALL BE CONDUCTED WITHIN 10 BUSINESS DAYS FOLLOWING THE DATE OF ACTUAL SERVICE OF THE NOTICE OF CHARGES, THE ADA DETERMINATION, AND THE NOTICE OF RIGHTS.**

Within the first 3 days after the parolee has been served with notice, the violation report must be completed and submitted to the Parole Unit supervisor.

On or before the fourth business day, the Unit Supervisor must review the report and: (1) determine if there is sufficient basis for the revocation to go forward; (2) determine if the report is accurate, complete, and contains the correct Title 15 violation sections; and (3) review the report and consider whether or not remedial sanctions/community based treatment is appropriate in lieu of proceeding with referral to the Board of Prison Terms with a recommendation that the parolee be returned to prison.

3

On or before the 4th business day, the revocation packet is reviewed by the Parole Administrator to determine whether or not there is a sufficient basis for the case to move forward and whether or not Remedial Sanctions/Community Based Treatment is appropriate at this juncture.

On or before the 5th business day, the revocation packet is forwarded to the decentralized revocation unit where the parolee is being held.

On or before the 6th business day, the parolee (including non-Armstrong class members) shall be appointed an attorney and the attorney shall be provided with a copy of the revocation packet, which shall contain a signed copy of the notice of charges, notice of revocation of rights, and a completed BPT 1073.

Attorney shall meet with the Parolee, provide the parolee with a copy of the revocation packet, and shall communicate any offer or offers made by the Board of Prison Terms Deputy Commissioner/Parole Administrator prior to the probable cause hearing.

In the event the parolee can make a sufficient offer of proof of a complete defense to the charges the Board of Prison Terms Deputy Commissioner/Parole Administrator, an expedited Probable Cause Hearing with Documentary and/or live testimony shall be scheduled. As an example, if the parole has uncontroverted documentary evidence that he or she was in Santa Rita jail when this violation allegedly occurred in Los Angeles, parolee shall be allowed to present such evidence at an expedited probable cause hearing between the 6th and 8th business day or at the earliest time possible thereafter if parolee is unable to produce such evidence by the 6th to 8th day.

On or before the 6th to 8th business day, a return to custody assessment (an offer) is made by the Deputy Commissioner/Parole Administrator, and the offer shall be communicated to the parolee's attorney.

On or before the 10th business day, a Probable Cause Hearing shall be held with the Deputy Commissioner/Parole Administrator, the parolee, and parolee's attorney.

4

The Deputy Commissioner/Parole Administrator conducting the hearing shall be the same Deputy Commissioner/Parole Administrator who made the return to custody assessment (offer) where practicable.

Parolee shall be permitted to present documentary evidence and hearsay testimony by way of offer of proof through his or her attorney in mitigation or as a partial or complete defense to the charges and/or the proposed disposition.

The Deputy Commissioner/Parole Administrator shall have the complete range of options to resolve the case. (Continue on parole, credit for time served, release from custody with pending charges, remedial sanctions/community based treatment, reduce the offer downward, dismiss some or all of the charges)

The Deputy Commissioner shall not have the authority to adjust the return to custody assessment upward at or during the probable cause hearing.

Parolee shall have the right to waive time as to any of these hearing time constraints with or without good cause.

Attorney shall have the right to a continuance upon the showing of good cause in the absence of his or her client's consent in cases of emergency or illness or upon such other showing that the Deputy Commissioner/Parole Administrator can make a finding of good cause.

There shall be a written record of this proceeding and the basis for any decisions made therein.

It is not necessary that the Probable Cause Hearing be audio/video recorded.

If at the conclusion of the probable cause hearing, the parolee has rejected the offer, parolee shall provide the Deputy Commissioner/Parole Administrator with a list of witnesses he or she would like to call at the revocation hearing. The location of the hearing shall be determined (within 50 miles of the violation), and the Deputy Commissioner/Parole Administrator shall make an independent ADA accommodation determination.

## REVOCATION HEARING

The revocation hearing shall be held at the earliest possible time and in no case later than 35 calendar days after the parole hold has been placed.

## DECLARATION OF SERVICE BY U.S. MAIL

Case Name:   **JERRY VALDIVIA, et al. v. GRAY DAVIS, et al.**

No.:    **USDC E.D. #CIV-S-94-0671 LKK GGH P**

I declare:

I am employed in the Office of the Attorney General, which is the office of a member of the California State Bar which member's direction this service is made. I am 18 years of age and older and not a party to this matter. I am familiar with the business practice at the Office of the Attorney General for collection and processing of correspondence for mailing with the United States Postal Service. In accordance with that practice, correspondence placed in the internal mail collection system at the Office of the Attorney General is deposited with the United States Postal Service that same day in the ordinary course of business.

On <u>August 21, 2003</u>, I served the attached

### DEFENDANTS' REVISED REMEDIAL PLAN

by placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid, in the internal mail collection system at the Office of the Attorney General at 455 Golden Gate Avenue, San Francisco, California 94102-7004, addressed as follows:

Michael W. Bien, Esq.
Rosen, Bien & Asaro
155 Montgomery Street, 8th Floor
San Francisco, CA 94104

Donald Specter
Prison Law Office
General Delivery
San Quentin, CA 94964

Stephen J. Perrello, Jr.
P.O. Box 880738
San Diego, CA 92168

Alexander L. Landon
Law Offices of Alex Landon
2442 Fourth Avenue
San Diego, CA 92101

Karen Kennard
Kristen A. Palumbo
Bingham McCutchen LLP
Three Embarcadero Center
San Francisco, CA 94111-4067

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on August 21, 2003, at San Francisco, California.

_____
A. ALBANO
Declarant

_____
Signature

40006164.wpd

## DECLARATION OF SERVICE BY U.S. MAIL

Case Name:    *Jerry Valdivia, et al. v. Gray Davis, et al.*

No.:    **USDC, Eastern District of California, Case No. CIV-S-94-0671 LKK GGH P**

I declare:

I am employed in the Office of the Attorney General, which is the office of a member of the California State Bar which member's direction this service is made. I am 18 years of age and older and not a party to this matter. I am familiar with the business practice at the Office of the Attorney General for collection and processing of correspondence for mailing with the United States Postal Service. In accordance with that practice, correspondence placed in the internal mail collection system at the Office of the Attorney General is deposited with the United States Postal Service that same day in the ordinary course of business.

On November 18, 2003, I served the attached

### STIPULATED ORDER FOR PERMANENT INJUNCTIVE RELIEF

by placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid, in the internal mail collection system at the Office of the Attorney General at 1300 I Street, P.O. Box 944255, Sacramento, California 94244-2550, addressed as follows:

**Karen L. Kennard**
**Bingham McCutchen LLP**
**Three Embarcadero Center**
**San Francisco, CA 94111-4067**

**Alex Landon**
**Law Offices of Alex Landon**
**2442 Fourth Avenue**
**San Diego, CA  92101**

**Donald Specter**
**Prison Law Office**
**General Delivery**
**San Quentin, CA 94964**

**Stephen J. Perrello, Jr.**
**Law Offices of Stephen J. Perello**
**P.O. Box 880738**
**San Diego, CA  92168**

**Michael W. Bien**
**Rosen, Bien & Asaro**
**155 Montgomery Street, 8th Floor**
**San Francisco, CA  94104**

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on November 18, 2003, at Sacramento, California.

|  |  |
|---|---|
| R. Wells | *R Wells* |
| Declarant | Signature |

10025232.wpd

United States District Court
for the
Eastern District of California
March 9, 2004


* * CERTIFICATE OF SERVICE * *


2:94-cv-00671


Valdivias

    v.

Schwarzenegger

_____

I, the undersigned, hereby certify that I am an employee in the Office of
the Clerk, U.S. District Court, Eastern District of California.

That on  March 9, 2004, I SERVED a true and correct copy(ies) of
the attached, by placing said copy(ies) in a postage paid envelope
addressed to the person(s) hereinafter listed, by depositing said
envelope in the U.S. Mail, by placing said copy(ies) into an inter-office
delivery receptacle located in the Clerk's office, or, pursuant to prior
authorization by counsel, via facsimile.

        Stephen J Perrello Jr            AR/LKK
        Law Office of Stephen J Perrello
        P O Box 880738
        San Diego, CA  92168

        Alexander L Landon
        Law Offices of Alex Landon
        2442 Fourth Avenue
        San Diego, CA  92101

        Karen Kennard
        Bingham McCutchen LLP
        Three Embarcadero Center
        Suite 1800
        San Francisco, CA  94111

        Michael W Bien
        Rosen Bien and Asaro
        155 Montgomery Street
        Eighth Floor
        San Francisco, CA  94104

```
Donald Specter
Prison Law Office
General Delivery
San Quentin, CA  94964

William Vernon Cashdollar
Attorney General's Office for the State of California
PO Box 944255
1300 I Street
Suite 125
Sacramento, CA  94244-2550

Erika C Aljens
Attorney General's Office for the State of California
PO Box 944255
1300 I Street
Suite 125
Sacramento, CA  94244-2550

Benjamin Laurence Pavone
Law Office of Benjamin Pavone
7676 Hazard Center Drive
Fifth Floor
San Diego, CA  92108-4503

Thomas Stuart Patterson
California Attorney General's Office
455 Golden Gate Avenue
Suite 11000
San Francisco, CA  94102-7004

John T Philipsborn
Law Offices of John T Philipsborn
507 Polk Street
Suite 250
San Francisco, CA  94102

Kristen A Palumbo
Bingham McCutchen LLP
Three Embarcadero Center
San Francisco, CA  94111-4067

Peter D Nussbaum
Altshuler Berzon Nussbaum Rubin and Demain
177 Post Street
Suite 300
San Francisco, CA  94108

Mark F Adams
San Diego Criminal
Defense Bar Association
962 Fifth Avenue
Suite 214
San Diego, CA  92101

Michael J McCabe
Criminal Defense Lawyers
Club of San Diego
2442 Fourth Avenue
San Diego CA 92101
```

Jack L. Wagner, Clerk

by: Deputy Clerk