1  Brian M. Hoffstadt (State Bar No. 187003)
   bhoffstadt@jonesday.com
2  K. Chris Palamountain (State Bar No. 183246)
   kcpalamountain@jonesday.com
3  JONES DAY
   555 South Flower Street
4  Fiftieth Floor
   Los Angeles, CA 90071-2300
5  Telephone:    (213) 489-3939
   Facsimile:    (213) 243-2539
6
   Counsel for Referee and Consultant
7

8              IN THE UNITED STATES DISTRICT COURTS

9          FOR THE EASTERN DISTRICT OF CALIFORNIA

10         AND THE NORTHERN DISTRICT OF CALIFORNIA

11     UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

12     PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

13

| | |
|---|---|
| 14  **RALPH COLEMAN, et al.,** | **Case No.  CIV S-90-0520 LKK JFM P** |
| 15      **Plaintiffs,** | |
| 16      **v.** | **THREE-JUDGE COURT** |
| 17  **ARNOLD SCHWARZENEGGER, et al.,,** | |
| 18      **Defendants.** | |
| 19  **MARCIANO PLATA, et al.,** | **Case No. C01-1351 TEH** |
| 20      **Plaintiffs,** | |
| 21      **v.** | **THREE-JUDGE COURT** |
| 22  **ARNOLD SCHWARZENEGGER, et al.,** | **CONFIDENTIAL SUPPLEMENTAL** |
| 23      **Defendants.** | **STATUS REPORT** |
| 24 | |

25

26

27

28

## I.     INTRODUCTION

On May 30, 2008, this Court held a Status Conference in the above-referenced matter.  At that hearing (and in a previously filed Confidential Status Report), the court-appointed Settlement Referee and Settlement Consultant apprised the Court of the history and status of settlement negotiations.  More specifically, they informed this Court that the Parties (namely, the Plaintiffs and the State) as well as the five groups of Intervenors (namely, the California Correctional Peace Officers Association; several county governments; a group of District Attorneys; and group of Republican members of the California Legislature; and a group of law enforcement officials (police chiefs, chief probation officers, and sheriffs) had not yet reached a settlement but were in the process of considering a proposal issued by the Settlement Referee and Consultant that was based on empirical data as well as the prior negotiations in this matter (hereinafter, "the Referee's Proposal").  At the near-unanimous request of the Parties and Intervenors, this Court set a trial date in November 2008 but stayed discovery for 30 days in order to give the Parties and Intervenors the opportunity to acquire additional data, consider the Referee's Proposal (which the Court unsealed), and make any changes necessary to reach agreement.  The Court set ordered a follow-up Status Conference for June 27, 2008.  In this Supplemental Status Report, the Referee and Consultant provide this Court with an update of what has occurred since the May 30 Status Conference.[1]  None of the Parties or Intervenors has reviewed this Supplemental Status Report prior to its filing, but each has assented to its filing with this Court.

## II.    STATUS OF SETTLEMENT NEGOTIATIONS

The Referee and Consultant regret to inform the Court that the Parties and Intervenors have not been able to reach a settlement.  Since the May 30 Status Conference, the Referee and Consultant made the Referee's Proposal publicly available, requested the views of the Parties and Intervenors on that Proposal, and spent dozens of hours in discussions (both in person and telephonically) with the Parties and many of the Intervenors in the effort to move the settlement negotiations to closure.

---

[1] Several Intervenors have requested that this Report be publicly filed, but the Referee and Consultant have filed it under seal to enable this Court to make the determination regarding its confidential or non-confidential status.

1    Here is a summary of the Parties and Intervenors' views, as represented to the Referee and

2    Consultant:

3    • *The Parties (Plaintiffs and the State).*  Although the Plaintiffs and the State actively

4    continued their dialogue over the past month and were able to agree in principle upon the

5    approach to solving overcrowding embodied in the Referee's Proposal, they have yet to

6    agree upon (i) an ultimate population level (to be expressed in terms of a percentage of

7    design capacity) toward which to direct that approach; (ii) the interim population

8    benchmarks that the State would be expected to meet as it was in the process of reducing

9    the population to the agreed-upon amount; and (iii) the final date by which the state was

10    to comply with the ultimate population level .

11    • *The Law Enforcement (Police Chiefs, Chief Probation Officers, and Sheriffs) and County*

12    *Intervenors (except for Sonoma County).*[2]  These Intervenors strongly supported the

13    Referee's Proposal in principle, but raised relatively minor objections to some of the

14    tools set forth in the Proposal.  Of the more notable objections, these Intervenors

15    objected to the use of summary parole and also to the provision granting the Department

16    of Corrections and Rehabilitation Secretary the authority to release prisoners (unless, at a

17    minimum, the exercise of this authority was explicitly reserved for a "last-resort"

18    mechanism when all other measures to reach the interim population levels have failed).

19    The County intervenors also had concerns about the State's continuing obligation to fund

20    the programs identified in the proposal.

21    • *The District Attorney Intervenors.*  These Intervenors provided written comments on

22    June 19, 2008.  (A copy of these comments is attached as Exhibit A to this Supplemental

23    Status Report.)  In those comments, the D.A. Intervenors expressed their view that

24    overcrowding was not a cause of the unconstitutional conditions found to exist by the

25    District Courts in *Coleman et al. v. Schwarzenegger et al.*, No. CIV S-90-0520 LKK

26    JFM P (E.D. Cal.) and *Plata et al. v. Schwarzenegger et al.*, No. C01-1351 TEH (N.D.

27    ───────────────

28    [2] This Court granted Sonoma County permission to intervene separately from the other counties, but Sonoma County provided no written or oral comments on the Referee's Proposal except for their comments on the record at the May 30 Status Conference.

Cal.).  They stated that the Referee's Proposal was unacceptable to them because the Proposal (i) established a population level goal; (ii) proposed the diversion of low-risk inmates away from State prison; (iii) propose the use of summary parole; and (iv) envisioned the award of additional credits to inmates without carving out several categories of inmates who should remain ineligible.  In place of any of these measures, the D.A. Intervenors prefer implementation of Assembly Bill 900 and "the continued efforts of the *Plata* [R]eceiver."  (Exh. A, at p. 5.)

- *The Republican Legislator Intervenors.*  On June 21, 2008, these Intervenors first circulated written comments.  (A copy of these comments is attached as Exhibit B to this Supplemental Status Report.)  Their comments mirror those of the D.A. Intervenors insofar as they (i) question whether overcrowding is a cause of the unconstitutional conditions; (ii) oppose any population level goals; (iii) oppose diversion of low-risk inmates; (iv) oppose summary parole; and (v) favor reliance on AB 900 and the *Plata* Receiver's efforts.  These Intervenors also favor seeking additional funding from the federal government for housing alien inmates and use of "GPS-monitored house arrest for low-risk non-violent parole violators."

- *CCPOA Intervenors.*  These Intervenors have not provided any written or oral comments either for or against the Referee's Proposal.

**III.    NEXT STEPS**

At a June 23, 2008, meeting in Sacramento, the Referee and Consultant informed the Parties and Intervenors that there was insufficient support at this time for the Referee's Proposal or any other negotiated settlement.  Both the Referee and Consultant expressed their hope the parties will continue to explore settlement, and stated that they would be willing to continue to assist with settlement negotiations, even as trial preparation is underway, if either the Plaintiffs or the State seeks their involvement.[3]

---

[3] The Referee and Consultant will submit their expenses related to this matter to the State for reimbursement.

LAI-2958804v1
Plata / Coleman -- Supplemental Status Report - Version 2
File Unsealed

1  **IV.    CONCLUSION**

2          It is regrettable that the Parties and Intervenors have been unable to agree upon a

3  settlement that addresses the constitutional concerns raised in the *Plata* and *Coleman* lawsuits in a

4  fashion that could enhance public safety.  At times over the past eight months, a settlement

5  seemed close.  A settlement may yet be possible:  The Parties and Interevenors now have in the

6  Referee's Proposal a possible template upon which to build their efforts; at a minimum, they now

7  know the others' views on the myriad options available for resolving these matters.  The Referee

8  and Consultant have been honored to serve this Court, and remain willing to do so at the request

9  of the Court or the Parties, should either believe that the Referee's or Consultant's further

10  involvement would be fruitful.

11  Dated:  June 30, 2008

12  Respectfully submitted,

13

14

15  By _____    By: _____

16      Elwood Lui        Peter Siggins
       Settlement Referee        Settlement Consultant

17

18  Submitted by:

19  _____
   Brian M. Hoffstadt

20  Counsel for Referee and Consultant

21

22

23

24

25

26

27

28

EXHIBIT A

Position Statement of the
DISTRICT ATTORNEY INTERVENORS
Regarding
"DRAFT SETTLEMENT REFEREE PROPOSAL DATED MAY 27, 2008"
(Plata et al. v. Schwarzenegger, N.D. Cal. No. 01-1351; Coleman et al. v. Schwarzenegger, E.D. Cal. No. 90-0520)

As of April 2006, prison healthcare has been under the control of the courts in the *Plata* and *Coleman* matters and operated by a court-appointed receiver in the *Plata* case. Since the appointment of the receiver, massive changes and improvements to prison healthcare delivery and availability have been made and continue to be made. The Receiver's accomplishments, projects, and strategic plans for establishing a constitutional level of prison healthcare are available for review on the California Prison Health Care Receivership (CPR) website: www.cprinc.org.

Despite the State no longer operating prison healthcare, the plaintiff-prisoners in the *Plata* and *Coleman* actions successfully moved for a Three-Judge Court to consider an immediate reduction in the prison population in the form of a court-ordered mass prisoner release order pursuant to 18 U.S.C. § 3626(a)(3).

Twenty elected District Attorneys intervened in these proceedings pursuant to 18 U.S.C. § 3626(a)(3)(F) to oppose the court-ordered release of prison inmates. A group of Republican Legislators, California Sheriffs, Police Chiefs, and Probation Officers, and several counties have also intervened to oppose this grave threat to public safety.

While public safety is our over-riding concern, the District Attorney Intervenors recognize and acknowledge that the State of California has a legal obligation to establish and maintain a constitutional level of prison healthcare. We have fully cooperated with the Settlement Referee and Consultant appointed by the Court to mediate a resolution of these proceedings without the imposition of a prisoner release order. A "Draft Settlement Proposal" has been disseminated to the parties. The District Attorney Intervenors have reviewed the proposed settlement document.

Rather than seeking to remediate the constitutional problems with prison healthcare, the settlement proposal focuses on prison overcrowding utilizing several reforms and measures to reduce the prison population to an as-yet undetermined level over a period of four years. None of the proposed reforms are directly related to the improvement or provision of medical or mental health care services in the prisons. It appears that the underlying premise of the proposal is that a population reduction will cure the constitutional violations.

It cannot be disputed that California's high prison population is generally a function of the state's large population. "California's high prison population is NOT caused by a high [crime rate] or a heavy-handed use of prison sanctions relative to the nation. Instead, the state's high numbers are mostly a function of its high . . . population. As the most populous state in the country with more than 50% more people than its closest rival,

1

Texas – <u>California produces high numbers of prisoners simply by enforcing the law</u>. . . ."
(Petersilia, *Understanding California Corrections* (2006) p. 9.)

"The Bureau of Justice Statistics reports that California's incarceration rate – that is the percentage of its total population in prison . . . is not unusually high relative to U.S. standards. In fact, California's incarceration rate . . . is only slightly above the national average. Put another way, California residents are 12.2% of the total U.S. resident population, and California prisoners are 12.9% of the total U.S. prison population." (*Id.* at p. 6.) "Texas, with 22.9 million residents—13 million fewer than California—has virtually the same number of prisoners as California." (*Ibid.*)

California's slightly higher incarceration rate is easy to comprehend; California has the tenth highest violent crime rate in the nation. (U.S. Census Bureau, State Rankings, Violent Crime \ 1 per 100,000 Population – 2004.) Increases in California's prison population in recent years are attributable more to violent crime than to drug crime. Two-thirds of prison population growth since 1994 is attributable to crimes against the person (robbery, assault, murder), whereas only ten percent is due to drug-related convictions. (Petersilia, *supra*, at pp. xi, 55.)

It is the position of the District Attorney Intervenors that there are several problematic and objectionable terms in the settlement proposal. While the District Attorney Intervenors are not opposed to measures that would reduce the prison population that are well-reasoned, practicable and consistent with our responsibility to protect public safety, these measures must be primarily designed to encourage rehabilitation and reduce recidivism, rather than simply achieving a reduction in the prison population. We cannot measure success in a reduced number of inmates that results in an increased number of victims of violent and property crimes.

It is the position of the District Attorney Intervenors that the proposed settlement measures discussed herein, in combination with the full implementation of AB900 and the on-going efforts of the Prison Healthcare Receiver make it unnecessary to establish a prison population cap at this time. A prison population cap will not ensure, promote or encourage lawful behavior or rehabilitation. It does just the opposite.

The current dilemma with our prisons can be analogized to our schools. If the schools were overcrowded because of a growing student population, and people were complaining that the quality of education was falling because of the crowding, we would not be putting a cap on the schools and refusing entry to new students or graduating students early to make room for new ones. We would build more schools, hire more teachers, and fulfill our responsibilities to the community. To merely turn away or release prisoners early will unnecessarily endanger the residents of California because elected officials are unable to fulfill their responsibilities to the community for public safety.

Through the coordinated efforts of the parties and our criminal justice system partners on the state and local levels, we can accomplish the goals of providing all inmates with the

2

level of care required under the law, while ensuring that dangerous, violent criminals remain incarcerated, and that felons amenable to rehabilitation are afforded the resources and opportunities to successfully return to our communities. It is the State of California's responsibility, through CDCR, to maintain sufficient, well-managed and constitutional facilities to house and care for those individuals that our Legislature and courts have determined need to be separated from society.

*Local Diversionary Alternatives to Incarceration for Low-Risk Individuals*

Under this proposal, no qualifying defendant to be sentenced to state prison for a term of up to two years will serve any time in prison. These convicted defendants will be diverted to undefined and unfunded local programs or released immediately on parole, thereby creating nothing more than a "paper commitment" to prison for tens of thousands of convicted felons. This proposal will eviscerate the deterrent effect of a prison commitment for a wide range of crimes, from felony DUI and auto theft, to serious and violent felonies for which a court could find a defendant eligible for probation in unusual circumstances. This measure may actually lead to an increase in the commission of low-level felonies and property crimes when criminals realize they face no risk of going to prison.

The District Attorney Intervenors are opposed to this concept. This proposal will adversely affect public safety and the administration of justice on city and county levels. It also calls for the creation of a new bureaucracy to oversee and administer state funding of undefined alternatives to incarceration for a new class of convicted felons. Despite promises of future State funding, it will necessarily impose massive financial burdens on county and local governments which are already suffering the negative consequences of inadequate jail facilities and funding shortages for programs targeting criminal offenders. It would place enormous new burdens on county probation departments that are already severely underfunded and understaffed. Our county jails are already severely overcrowded. Thirty-three of California's fifty-eight counties are operating under population caps. In Riverside County, over 6,000 inmates were released early in 2007 alone. Defendants convicted of felonies and placed on probation and misdemeanor defendants serve much less than ten percent of their county jail sentences.

Rather than creating an ill-conceived intermediate level of offender that falls somewhere between probation eligibility and a prison commitment, the District Attorneys propose that state resources would be better spent funding re-entry facilities. The District Attorney Intervenors support the provisions of AB900 that provide for secure re-entry facilities to house prisoners who have less than twelve months left to serve on their prison commitments and parole violators who are returned to custody without a new conviction. These measures would operate to reduce the prison population and facilitate a positive, goal-directed, initial release on parole back into the community.

In order to assure the safety of our communities and protect the lives and property of our residents, the District Attorney Intervenors support and endorse the concept of preparing state prison inmates for community re-entry. The best chance for a parolee's successful

3

Exhibit A-8

transition back into general society will only occur if the parolee wants to be successful and has the basic skills and support to guarantee that success. The re-entry facilities must be more than just newer secure housing units closer to their point of release. There must also be a guarantee of a long-term commitment of sufficient funds dedicated to education and job skill training, drug and alcohol treatment, and support programs. The State also needs to fund post-release services for the monitoring and continued programming while on parole.

Rather than creating a new bureaucracy to administer programs to convicted felons as an alternative to prison at the local level, CDCR should increase its funding, staffing and contracting at the local level to ensure the smooth transition of inmates from prison to the communities. CDCR, not the local probation departments or law enforcement agencies, is best suited to balancing the rehabilitation needs of parolees with the public safety concerns of the community.

*Alternative Sanctions for Lower-Level Parole Violators*

The District Attorney Intervenors support the efforts of CDCR to reform its parole supervision strategies and are not opposed to the measures set forth in the proposed settlement that are designed to give CDCR more discretion in the supervision of parolees. CDCR, through its parole division, is best situated and equipped to handle the responsibility of supervising, monitoring, and attempting to rehabilitate convicted felons released on parole. CDCR's goal of assigning its resources where they are most needed, i.e., high risk parolees who are likely to commit new crimes is laudable.

However, the settlement document also purports to create a "Summary Parole" program under which convicted felons will receive no supervision on parole, and cannot be returned to State prison absent a new criminal conviction. Numerous academic studies and even CDCR statistical information substantiates that convicted felons have a substantial risk of recidivism and will commit new violent and property crimes in our communities if they are not incarcerated. In the context of this settlement agreement, the District Attorney Intervenors are opposed to the "Summary Parole" concept and believe it is not necessary to improve the quality of healthcare in California's prisons.

The proposed alternative sanctions properly involve the use of a validated risk assessment tool and decision-making instrument. These will allow CDCR to determine an appropriate level of supervision for individual parolees. Public safety is better served where the level of parole supervision required is individually determined based on risk assessment, criminal history and past performance on parole, rather than blind categorization based on commitment offense.

*Earned Credits for Inmates*

The settlement proposal would revamp the CDCR policy regarding the awarding of conduct and program credits by which inmates can reduce their prison terms with earned credit for good behavior and participation in educational or rehabilitative classes. The

4

District Attorney Intervenors agree with the policy that sentence reduction credits should be earned and not increased or freely given simply to shorten prison terms. Sentence reduction credits must be linked to actual participation in and completion of rehabilitative or training programs.

The "Yours to Lose" concept of a credit system as described in the settlement document is acceptable, as long as the custody credit limitations for violent felonies, sex crimes, and recidivist or "strike" cases remain fully in effect. Under the provisions of Penal Code section 2933.1, violent felons, as defined in Penal Code section 667, subdivision (c), cannot earn more than a 15-percent reduction of their sentences. Under Penal Code sections 667, subdivision (c)(5), and 1170.12, subdivision (a)(5), prisoners with one or more serious or violent felony prior conviction cannot earn more than a 20-percent reduction of their terms. Penal Code sections 190, subdivision (e), 2933.2, and 2933.5 preclude any credit reduction for murderers and specific sex crimes offenders. Moreover, because some of these restrictions to conduct credits have been implemented by voter initiative, the parties should be aware that it may be unconstitutional to enact simple legislation to increase conduct credits for many of these prisoners.

CDCR operates 39 Conservation Camps statewide that house nearly 4,000 inmates and wards. These crews are available to respond to all types of emergencies including wildfires, floods, search and rescue, and earthquakes. When not responding to emergencies, the crews are busy with conservation and community service work projects for state, federal, and local government agencies. Fire crews perform several million hours of emergency response each year, and more on work projects. Pursuant to Penal Code section 2933.3, inmates assigned to these crews earn two days of worktime credit for every one day of service. The settlement proposal contains a provision that extends the two-for-one credit earning status to "community crews" that are not defined. The District Attorney Intervenors are opposed to this extension of credit earning status to undefined groups of inmates for undefined purposes. We are not opposed to the expansion of CDCR Conservation Camps, as long as CDCR maintains its high standards in limiting participation to low-risk, non-violent inmates.

*Conclusion*

Significant measures to alleviate prison crowding and promote rehabilitation of inmates have already been signed into law in Assembly Bill 900, and the implementation of these measures should be prioritized and expedited. The District Attorney Intervenors support the full implementation of AB 900, and the continued efforts of the *Plata* receiver to improve the quality and delivery of healthcare in the prisons. It is critical that these efforts, the transfer of prisoners out of state, as well as any measures agreed upon as part of an overall settlement of these proceedings, be coordinated in order to maximize the efficient use of resources and to expedite the reforms that will alleviate the health and safety issues which concern us all.

AB 900 authorized the issuance of $7.4 billion in lease revenue bonds to support the construction of 53,000 new beds at existing prisons, re-entry center beds, health care facilities, and local jails. Undoubtedly, changes funded by this legislation will positively address overcrowding concerns, and will ease and facilitate the receiver's efforts to improve prison healthcare. Indeed, based on visits by counsel for the District Attorney Intervenors to many of California's prisons, and based on reports available on the Receiver's website, considerable improvements have been made to prison healthcare, and additional improvements are being made every day.

No solution to the healthcare crisis in California's prisons can ever be fashioned without identifying the scope of the actual problem. The focus of these proceedings and any settlement should be on prison healthcare. The *Plata* Receiver has the authority to identify prisoners with serious unmet medical needs which rise to the level of a constitutional deprivation and devise remedial plans to address those unmet needs. The Receiver has defined what a "constitutional" level of healthcare means and what it consists of in the context of California's prisons. Detailed and specific strategic plans to achieve the required reforms have been formulated, work is underway and significant progress has been made.

We support the ongoing efforts to improve prison health care. However, the prison population reduction measures advanced in the settlement proposal that would result in the release or non-admission of thousands of healthy felons have no apparent nexus to solving the issues that gave rise to these proceedings. The Three-Judge Court was convened to consider whether there should be a prisoner release order, and it has not been pre-determined that a population cap will be imposed as a component of any prisoner release order. With all of the promising work in progress designed to alleviate the conditions that gave rise to the possible need for a prisoner release order, reform legislation awaiting implementation, and the measures discussed herein that would result in a reduction of the prison population, a settlement of these proceedings does not need to include a prison population cap in order to succeed at this time.

William Mitchell
Asst. District Attorney
Riverside County District Attorney's Office
Lead Counsel
District Attorney Intervenors
June 19, 2008
(email: wemitchell@rivcoda.org)

EXHIBIT B

**LEGISLATOR INTERVENORS' POSITION STATEMENT
RE: DRAFT SETTLEMENT REFEREE PROPOSAL, DATED JUNE 2, 2008**

## I.    Introduction

The Legislator Intervenors intervened in this action in order to oppose issuance by the Federal Three-Judge Court of an order calling for early release of prisoners or the imposition of an arbitrary cap on the population of California prisons. Such early release and population limitations are contrary to public safety and unnecessary to achieve the goal of providing constitutional levels of medical and mental healthcare to California prisoners.

The Federal Three-Judge Court has yet to determine: (1) whether prison overcrowding is the primary cause of inadequate inmate medical and mental healthcare; and (2) in the event that overcrowding is determined to be the primary cause, whether there is any less intrusive remedy than early release of inmates or the imposition of an inmate population cap to improve inmate medical and mental healthcare.

Following several months of work with the parties to the litigation, Settlement Referee Justice Elwood Lui (ret.) and Settlement Consultant Justice Peter Siggins have presented the parties with a Proposed Settlement, dated June 2, 2008, and made public by order of the Federal Three-Judge Court. While the Legislator Intervenors cannot agree to the Proposed Settlement in its current form, we appreciate having the opportunity to share concerns and proposed solutions.

## II.    Concerns of the Legislator Intervenors

First, the Proposed Settlement unnecessarily and prematurely calls for institution of a prison population cap. This is contrary to public safety and unacceptable. California's prison population is directly tied to the fact that California is the most populous state in the nation, and its incarceration rates are typical, if not lower, than the majority of the states. The solution to any overcrowding in California prisons must be addressed head-on, through construction and rehabilitation efforts, rather than by imposing an arbitrary cap on the population at a risk to the public.

Second, the Proposed Settlement does not directly address the fundamental issue in the pending litigation which is achieving a constitutional level of medical and mental healthcare in the California prison system. Specifically, the Proposed Settlement fails to take into account the efforts of Receiver Kelso and his proposed program for bringing medical care to constitutional levels. Instead, the Proposed Settlement, in its current form, focuses exclusively on reducing the current prison population. Judge Henderson states directly in his May 22, 2008 correspondence to Senator Michael J. Machado that, "Without more, a reduction in prison overcrowding will not ensure that the delivery of medical care to California inmates will reach constitutional standards." Accordingly, there can be no assurance that the Court would even accept the Proposed Settlement.

Third, the Proposed Settlement is apparently proposed in addition to (a) the implementation of Assembly Bill 900; and (b) the current request of Receiver Kelso for over $7 billion in funding for implementation of his program to achieve constitutional levels of care. These efforts must be integrated and implemented in a consistent and cost effective manner. Combined, AB 900 and the Receiver's program call for over $14 billion in new spending on prisons. The Receiver's efforts aim to address the healthcare and housing concerns underlying the *Plata* and *Coleman* actions, as well as the disability and dental care concerns involved in the *Armstrong* and *Perez* actions. Not only has the Court approved the Receiver's program, Judge Henderson's May 22, 2008 correspondences states, "I believe strongly that the program – particularly in the phased fashion in which it will be undertaken – represents an appropriate, cost-effective plan that will address the major treatment and housing concerns in all four federal class action." The statements in Judge Henderson's correspondence seem to indicate that he not only believes funding of the Receiver's program is necessary to achieve constitutional levels of healthcare, but also that the Proposed Settlement is not necessary to achieve such levels of care if the Receiver's program is funded and implemented.

Fourth, the Proposed Settlement includes provisions that unduly jeopardize public safety. For example, the Proposed Settlement explicitly provides for the possibility of implementing summary parole as a means of prison population reduction and budget savings. This is unacceptable. The Legislator Intervenors are opposed to summary parole, which eliminates supervision of paroled felons and in so doing endangers public safety. Additionally, the Proposed Settlement calls for a new diversionary alternatives regime that compromises public safety by stripping away the consequences and accompanying deterrent value of incarceration for numerous crimes. The diversionary alternatives proposal is also contrary to public safety because it threatens to overburden city and county governments. The diversionary alternatives proposal saddles local governments with the primary responsibility for enacting a new, extensive regime for handling a range of offenders that are currently the responsibility of the State and the Department of Corrections and Rehabilitation.[1]

## III.    Suggested Alternatives

The Legislator Interveners believe that a less intrusive remedy does exist and can be achieved through a combination of the following measures:

- Issuance of the prison construction bond authorized previously by AB 900 with flexibility for high-level beds and design-build provisions consistent with Receiver Kelso's proposal;
- Facilitation of funding for the inmate medical facilities as proposed by Receiver Kelso;

---

[1]    As a critical procedural matter, the Proposed Settlement does not provide the Legislator Intervenors with sufficient means to participate in the implementation and monitoring of the settlement. Rather, the Proposed Settlement calls for the Legislator Intervenors' dismissal from the current litigation notwithstanding the fact that the Court would maintain continuing jurisdiction.

- Facilitation of the recruitment of additional medical personnel as proposed by Receiver Kelso;
- Further reduction of short-term population levels through authorization of GPS-monitored house arrest for low-risk, non-violent parole violators;
- Authorization of a comprehensive census of inmates to determine the current illegal alien population of the California prisons -- currently estimated at approximately 30,000 inmates -- and negotiation of full federal funding for the costs associated with housing these inmates.

## IV.    Conclusion

The goal of the Legislator Intervenors is to achieve constitutional levels of healthcare in an efficient, integrated and coordinated manner that does not compromise public safety. We believe this goal can be met through implementation of a combination of the solutions set forth above.