EXHIBIT I

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

MARCIANO PLATA, et al.,

        Plaintiffs,

        v.

ARNOLD SCHWARZENEGGER,
et al.,

        Defendants.

NO. C01-1351 TEH

CLASS ACTION

ORDER RE (1) RECEIVER'S MAY
2007 PRELIMINARY PLAN OF
ACTION, AND MOTION FOR
ORDER MODIFYING STIPULATED
INJUNCTION AND ORDERS
ENTERED HEREIN, AND (2)
PLAINTIFFS' MOTION FOR
ORDER DIRECTING RECEIVER
TO COMPLY WITH APRIL 4, 2003
ORDER ETC.

        This matter came before the Court on Monday, August 27, 2007 on the following

matters: (1) Plaintiffs' Responses to the Receiver's May 15, 2007 Plan of Action, (2) the

Receiver's Motion for an Order Modifying Stipulated Injunction and Orders Entered Herein,

and (3) Plaintiffs' Motion for Order Directing Receiver to Comply with April 4, 2003 Order

Re Production and Access to Documents.  Having carefully considered the written and oral

arguments presented, and the entire record herein, the Court addresses these matters in turn

as set forth below.

I.  BACKGROUND

        On February 14, 2006, this Court appointed a Receiver to "provide leadership and

executive management of the California prison medical health care delivery system with the

United States District Court
For the Northern District of California

1  goals of restructuring day-to-day operations and developing, implementing, and validating a

2  new, sustainable system that provides constitutionally adequate medical care to all class

3  members as soon as practicable." Order Appointing Receiver ("OAR") at 2.  To this end, the

4  Receiver was directed to develop a "detailed Plan of Action designed to effectuate the

5  restructuring and development of a constitutionally adequate medical health care delivery

6  system." *Id.*   The Court further ordered that "the Plan of Action . . . include a proposed time

7  line for all actions and a set of metrics by which to evaluate the Receiver's progress and

8  success." *Id.* at 2-3.  Because the Court contemplated that the Plan of Action would require

9  ongoing modifications, the Receiver was also directed to "update and/or modify this Plan as

10 necessary throughout the Receivership." *Id.* at 3.

11         As the above indicates, the Order Appointing Receiver envisioned that the Receiver

12 would develop a comprehensive, new medical care delivery system.  The Court further

13 contemplated that this new remedial plan would likely require modification of the two

14 stipulated remedial orders that had been negotiated between the Plaintiffs and Defendants in

15 2002 and 2004.  Indeed it was the Defendants' failure to implement these two orders that

16 ultimately led to the Court's appointment of the Receiver in 2006.  Accordingly, the OAR

17 also directed the Receiver to submit recommendations, along with his Plan of Action, as to

18 "which provisions of the (1) June 13, 2002 Stipulation for Injunctive Relief, and (2)

19 September 17, 2004 Stipulated Order re Quality of Patient Care and Staffing Order and

20 Injunction, should be carried forward and which, if any, should be modified or discontinued

21 due to changed circumstances." *Id.* at 2.

22         On May 10, 2007, the Receiver filed his first Plan of Action.[1]  The Plan presents an

23 "initial roadmap for the change necessary to bring the delivery of medical care in

24 California's prisons up to Constitutional levels." May 2007 Plan of Action ("Plan" or

25 _____

26         [1] The Plan of Action was originally due November 15, 2006.  The Court subsequently
27 granted the Receiver's request to extend the time to file the Plan of Action and proposed
   metrics until May 15, 2007.  The Court also directed the Receiver to file a revised Plan of
28 Action and metrics no later than November 15, 2007.

1    "POA") at 3.  Drawing upon established conceptual frameworks articulated by the Institute

2    of Medicine and the Malcolm Baldrige National Quality Program, the Plan of Action

3    identifies seven primary goals and roughly 200 corresponding objectives. Plan at 14-15, 16-

4    43; Hill Dec. ¶¶ 9, 11.

5         Also on May 10, 2007, the Receiver filed a motion to modify the June 13, 2002 and

6    September 17, 2004 stipulated orders, as well as a December 1, 2005 order regarding clinical

7    staffing (hereafter "Motion to Modify").  Plaintiffs subsequently filed a motion urging the

8    Court to direct the Receiver to provide Plaintiffs with additional information pursuant to an

9    April 4, 2003 Order regarding production of documents, and to take certain other actions

10   (hereafter Motion for Production of Documents").  Plaintiffs also raised objections to the

11   Plan of Action and opposed portions of the Receiver's Motion to Modify.  The Court now

12   addresses (1) Plaintiffs' objections to the Plan of Action,  (2) the Receiver's Motion to

13   Modify, and (3) the Plaintiff's Motion for Production of Documents.

14

15   II.  PLAINTIFFS' RESPONSES TO THE RECEIVER'S MAY 15, 2007 PLAN OF

16   ACTION

17        The Receiver's May 15 2007 preliminary POA presents a plan for a comprehensive

18   and systematic overhaul of the delivery of medical care within the California Department of

19   Corrections and Rehabilitation ("CDCR").  Upon receipt of the Plan of Action, the Court

20   provided the parties with an opportunity to file responses thereto. Defendants summarily

21   responded that they "support the Receiver's Plan of Action to deliver medical care in

22   California's prisons."  Defs.' Response at 2.  They further stated that they "remain committed

23   to working with the Receiver and to helping him implement the Plan of Action." *Id.*

24        Plaintiffs' response does not take issue with the overall framework of the Plan of

25   Action or the goals and objectives expressed therein.  Plaintiffs primarily object, however,

26   that the Plan lacks time lines, metrics, and concrete details as to how the goals and objectives

27   will be achieved.  The Court did not require, however, and does not expect, the Plan of

28   Action to spell out, on a step-by-step basis, exactly how the Receiver intends to achieve the

3

United States District Court

For the Northern District of California

1    extensive array of actions that will be required to implement every objective and goal set

2    forth in the Plan.

3         The Court does, however, expect that the Receiver will provide time lines identifying

4    when he expects to achieve the specific objectives set forth in the Plan.  The Court

5    understands that there are many variables in a complex undertaking such as this and that

6    initial time lines may be subject to change.  Restructuring of dysfunctional systems, however,

7    is always a complex undertaking and the Court is not persuaded that the particular

8    complexity of the task at hand makes it impossible to provide time lines for any of the

9    objectives or that such time lines would be meaningless.  Further, such bench marks are

10   critical to the Court's oversight obligations in this case. Accordingly, the Court will direct

11   that the next iteration of the Plan of Action, due November 15, 2007, identify those

12   objectives, and/or specific portions thereof, that the Receiver plans to achieve within six

13   months, 12 months, 24 months and 36 months from the date of the November 15, 2007 Plan

14   of Action.[2]

15        With respect to metrics, the Receiver has surveyed the field and is developing a new

16   standardized and rigorous system for measuring the delivery of medical care that utilizes

17   both quantitative and qualitative methods as well as balanced scorecards for each facility.

18   *See* POA at 43-50. By November 15, 2007, the Receiver intends to have met the following

19   short- term goals with respect to metrics:

20        (A) an operational system to objectively measure the basics of *Plata* remedial plan

21   compliance at no less than six pilot prisons;

22   _____

23

24        [2] Given that the Receiver is prudently piloting certain remedies before implementing
     them on a state-wide basis, the Receiver should, in those cases, indicate in his time lines one

25   date for piloting a remedy at a specified number of prisons and another for fully
     implementing the remedy (e.g.  Objective "x" will be implemented on a pilot basis at four
     prisons within 12 months and implemented state-wide within 24 months).

26        The time lines shall be presented in two formats. First, the Plan shall include a
     separate chart that lists all objectives or components thereof that are expected to be piloted or

27   achieved within six months, 12 months, 24, months and 36 months. Second, the text of the
     Plan shall indicate after each objective, whether the objective (or component thereof) is

28   expected to be piloted or achieved within 6 months, 12 months, 24 months or 36 months.

4

1    (B) an accurate and objective operational system of mortality reviews; and

2    (C) an operational pilot program for institutional inspections and Plata remedial plan

3    compliance.

4    *See* POA at 49-50.

5    These metric programs, and more sophisticated longer-term metrics will be developed

6    under the auspices of the Receiver's Office of Evaluation, Measurement and Compliance.

7    The Receiver plans to have this office operational by November 15, 2007.   The Court

8    concludes that this is a reasonable time frame.  It expects, however, that the Receiver shall,

9    consistent with the OAR, meet these deadlines and provide substantially more detail

10    regarding these shorter-term, as well as longer-term, metric plans in his November 2007

11    POA.

12

13    III.  Receiver's Motion for an Order Modifying Stipulated Injunction and Orders Entered

14        Herein

15        A.  Standard for Modification

16        Under Fed. R. Civ. P. 60, a court may modify a consent decree or stipulated judgment

17    upon a showing that "a significant change in circumstances warrants [a] revision." *Rufo v.*

18    *Inmates of Suffolk County Jail*, 502 U.S. 367, 383 (1992).  Once this standard is met, the

19    Court should consider whether "the proposed modification is suitably tailored to the changed

20    circumstance." *Id.*  The Court's authority to modify consent decrees pursuant to Rule 60 is

21    not affected by the Prison Litigation Reform Act ("PLRA").  *Gilmore v. State of California*

22    220 F.3d 987, 1007 (9th Cir. 2000).[3]

23        In this case, there has clearly been a significant, unanticipated change in

24    circumstances in this case since the entry of the stipulated orders referenced above – namely,

25

26    [3]The Court notes that a motion to modify a consent decree is typically brought by a
party to the decree. In this instance, the Receiver has been appointed by the Court to develop
27    and implement a remedy in the place of Defendants.  Further, the Defendants have joined in,
and incorporate by reference, the Receiver's Motion for an Order Modifying Stipulated
28    Injunction and Other Orders Entered Herein.

5

United States District Court

For the Northern District of California

1   the appointment of a Receiver to "provide leadership and executive management of the
2   California prison medical health care delivery system with the goals of restructuring day-to-
3   day operations and developing, implementing, and validating a *new*, sustainable system that
4   provides constitutionally adequate medical care to all class members as soon as practicable."
5   OAR at 2 (emphasis added).  This appointment was necessitated by the undisputed facts –
6   also originally unforeseen –  that (1) the medical delivery system was so grossly broken that
7   it required a restructuring that went well beyond the original stipulated order, and (2) the
8   State of California was incapable of effectively undertaking such a comprehensive remedy,
9   and indeed had admittedly been unable to implement even the more limited remedy
10  originally stipulated to by the parties.

11       Indeed, as indicated above, the Court contemplated at the time of the Receiver's
12  appointment that the new remedial scheme would require modifications of the original
13  stipulated orders.  In short, this is not a situation in which a receiver could simply take the
14  parties' agreed upon remedy and implement it.  Rather, in order to cure the constitutional
15  violations in this case a far more comprehensive, and in some respects, different, approach
16  than that originally stipulated to is warranted.  As the Court noted at the hearing, one of the
17  reasons the State was incapable of implementing the original stipulated remedy is that the
18  CDCR either completely lacked the basic infrastructure necessary to implement the remedy,
19  or where such infrastructure was in place, it was wholly dysfunctional. The Receiver must
20  now create a functional infrastructure in virtually every key area of operations.  The Receiver
21  is also pursuing a more team-based model of care rather than a solo-physician model, and is
22  prudently testing new remedies at select prisons on a pilot basis before implementing them
23  systemwide.

24       In sum, the Court readily finds that changed circumstances warrant review of the
25  stipulated orders at issue. Accordingly, the Court turns next to the merits of the specific
26  modifications requested – that is, to a determination of whether the requested changes are
27  "tailored to the changed circumstance." *Rufo*, 502 U.S. at 383.

28

Case 3:01-cv-01351-TEH    Document 826    Filed 09/06/2007    Page 7 of 20

B. June 13, 2002 Stipulation for Injunctive Relief

(1) *Policies and Procedures* (¶ 4)

Paragraph four directs the implementation of the "Health Care Services Division Policies and Procedures" ("Policies and Procedures"). These Polices and Procedures contain medical protocols that are designed to meet the minimum level of medical care required by the Eighth Amendment. The Receiver does not take issue with any particular protocol; on the contrary, he agrees that they must be part of the Plan of Action and represents that they currently remain in place. He seeks elimination of this element of the 2002 Stipulation, however, so that he has the flexibility to adapt, modify or jettison specific Policies or Procedures as the Plan of Action is further developed.

The Court understands and appreciates that, as this exceedingly complex remedial process moves forward, the Receiver must have the flexibility to set priorities, modify or replace existing medical related policies and procedures as needed, and respond to changing circumstances. At the same time, the Court is not persuaded that application of this general principle warrants eliminating all existing Policies and Procedures before the Receiver has determined which require modification or replacement and has replaced such Polices or Procedures with an alternative. Nor has the Receiver explained how retaining the Policies and Procedures pending these determinations would interfere with the remedial process. Rather, the Court concludes that the Receiver's need for flexibility can be accommodated by leaving the Policies and Procedures in place with the proviso that the Receiver can adapt, modify, eliminate, or create such policies as the Receivership progresses so long as the alternative Policies and Procedures meet minimum Eighth Amendment standards. In the event that the Receiver concludes that changes to a Policy or Procedure is warranted, he shall provide the parties with a copy of the modified or new Policy or Procedure and/or notice of

United States District Court

For the Northern District of California

7

1    elimination of an existing Policy or Procedure, within 7 days of the effective date of the

2    change.[4]

3

4        (2) *Roll out Schedule* (¶ 5)

5        The Court agrees that the "roll-out" schedule for implementing the policies and

6    procedures originally contemplated by the parties is obsolete and incompatible with the

7    current Receivership and POA.  This paragraph shall be discontinued.

8

9        (3) *State-wide practices and procedures* (¶ 6)

10        The Receiver does not take issue with the propriety of any of the state-wide practices

11    and procedures identified in paragraph 6 but states that the Receiver will be addressing and

12    modifying the relevant standards as the POA moves forward. The Court is not persuaded that

13    the Receiver's need for flexibility will be undermined by retaining these few, basic

14    requirements in critical areas pending redesign of these areas in future months.  Of course,

15    once the Receiver develops new plans for the state-wide requirements (either individually or

16    collectively) he may substitute such plans so long as they comport with the minimum

17    requirements of the Eighth Amendment. The Receiver shall provide the parties with a copy

18    of any substitute state-wide plan(s) governed by paragraph 6 within 7 days of the effective

19

20

21

22        [4] As discussed *infra*, the Receiver is in charge of the remedy. Accordingly, the parties
      need not review such changes in advance.  Thus, this procedure modifies ¶ 24 of the
23    Stipulation for Injunctive Relief which governs modification of the Stipulation.
          To the extent a dispute arises as to whether a change in a Policy or Procedure reduces
24    the level of medical care to below minimum Eighth Amendment standards, Plaintiffs shall
      provide the Receiver with a brief description of the perceived deficiencies and request that
25    the matter be addressed informally at the on-going monthly meetings between the Receiver
      and the Plaintiffs.  If no resolution is possible, Plaintiffs shall notify the Court of its position
26    that the change in a Policy or Procedure reduces the level of medical care to below minimum
      Eighth Amendment standards, along with supporting authority.  The Court shall at that point
27    determine what further proceedings, including possible referral to a Magistrate Judge,
      mediator, or outside expert, are appropriate. This procedure slightly modifies the dispute
28    resolution procedures set forth in ¶¶ 26-28 of the Stipulation for Injunctive Relief.

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1  date of the new plan.[5]  At this point in time, however, the request to eliminate ¶ 6 is

2  premature.

3

4      (4) *Access to Information /Monitoring by Plaintiffs' Counsel* (¶¶ 7, 9-15)

5      The Receiver requests that these provisions be eliminated.  He submits a rough draft

6  of a plan to substitute these provisions with monitoring by the California Office of Inspector

7  General ("OIG").  It appears to the Court that this request is at least in large part an

8  unfortunate consequence of the deterioration of the relationship between the Receiver and

9  Plaintiffs' counsel.  While the Court is not interested at this juncture in allocating fault for

10  this unseemly, and seriously distracting, situation it does expect that the Receiver and

11  Plaintiffs' counsel will act in a professional manner to promptly mend relations so that this

12  Court and all concerned can focus efficiently on the large task at hand.  To assist this process,

13  the Court shall appoint Starr Babcock,[6] on a *pro bono* basis, to facilitate discussions between

14  the Receiver and the parties for the purpose of developing a new monitoring system that

15  reflects the fact that this case is now in a new receivership phase – which necessarily and

16  fundamentally alters the roles of counsel from that envisioned by the June 2002 Stipulation.

17  In particular, the Receiver, not counsel, is in charge of developing the remedy, and the

18  Receiver reports to the Court – not counsel.  At the same time, Plaintiffs' counsel represents

19  the Plaintiff class and thus retains an important role in monitoring progress toward achieving

20  minimum constitutional standards as a part of this representation.  *Cf. Duran v. Carruthers*,

21

22  _____

23

24      [5] *See supra* note 4.  The Court contemplates that such notice shall only be required
    once a substitute plan is implemented state-wide, and not for every interim change that the
25  Receiver may take during the plan development process.  The Court expects, however, that
    significant interim changes will be addressed in the Receiver's quarterly progress reports.  To
26  extent that a dispute arises with respect to any substitute plan, the standards and procedures
    set forth in note 4 *supra* shall apply.

27

28      [6] A summary of Mr. Babcock's professional experience and background is attached to
    this Order.

9

United States District Court

For the Northern District of California

1   885 F.2d 1492, 1495 (10th Cir. 1989) (affirming propriety of monitoring by plaintiffs in

2   prison class action notwithstanding monitoring by defendants and special master).

3        In short, while the Court agrees that involvement of the OIG would be a positive

4   development for many of the reasons set forth by the Receiver, it does not warrant

5   eliminating Plaintiffs' monitoring role in this case.  Rather, as noted above, a new monitoring

6   system must be fashioned that takes into account the fact that the case is now in a new

7   receivership phase.  Such a system should provide Plaintiffs' counsel with the ability to

8   monitor, in a meaningful manner, the progress being made toward achieving constitutionally

9   adequate medical care while at the same time not unduly burdening or interfering with the

10  remedial process.  As stated at the hearing, the Court is confident that if the Receiver and

11  counsel work together with Mr. Babcock in good faith they are capable of developing an

12  effective and efficient monitoring system that serves the mutually shared goal of achieving a

13  full remedy in this case as soon as practicable.  If, for some reason, however, a complete,

14  informal resolution of this issue is not possible, Mr. Babcock shall provide a

15  recommendation to the Court with respect to any issues that remain.

16

17        (5) *Compliance Monitoring* (¶¶ 19-23)

18        The Court concludes that it is not practical to apply the compliance monitoring system

19  developed in the June 13, 2002 Stipulation, designed with the original remedy and approach

20  in mind, to the current circumstances.  Accordingly, these provisions will be discontinued.

21

22        C.  September 13, 2004 Stipulated Order Re Quality of Patient Care and Staffing

23        The Receiver seeks to eliminate six provisions of this Order.  Plaintiffs' counsel

24  oppose elimination of the following two:

25        (1) *Treatment of High Risk Patients* (¶¶ 13-16)

26        The Court agrees that paragraphs 13, 14, and 16 are obsolete as they refer to expired

27  dates and tasks to be undertaken by the parties, former Court experts, or "independent

28  physicians."  The Receiver has not adequately explained, however, why retaining paragraph

10

United States District Court

For the Northern District of California

1   15,[7] pending substitution with new procedures, pursuant to POA Objective B.3.1.2, would

2   interfere with the current remedial processes.  Accordingly, the Court will discontinue

3   paragraphs 13,14, and 16.   At this point, however, the discontinuation of paragraph 15

4   appears premature. The Receiver, however, may substitute a new plan for the treatment of

5   high risk inmates so long as it comports with the minimum requirements of the Eighth

6   Amendment.  The Receiver shall provide the parties with a copy of the substitute plan within

7   7 days of the effective date of the change. *See supra* note 4.

8

9        (2) *QMAT Positions* (¶ 24)

10       The Court agrees that paragraph 24 is obsolete and should be eliminated. The

11   September 13, 2004 Stipulation attempted to address the issue of peer review pursuant to

12   Quality Management Assistance Teams ("QMAT").   The QMAT plan, however, was

13   abandoned in 2005 before the appointment of the Receiver, due to a number of flaws

14   including unreliable data collection methods and results. *See* Hill Dec. ¶ ¶ 21, 24, 28; Hagar

15   Reply Dec. ¶ 10g; POA at 43-44.  Given this experience, the Receiver decided not to revive

16   the QMAT system but to move the few remaining QMAT clinicians into direct service

17   positions and to focus on developing a new quality review system pursuant to objectives A.7-

18   8, and C.6.  In light of this history, the Court agrees that paragraph 24 should be

19   discontinued.

20

21       D.  December 1, 2005 Order Re Interim Remedies Relating to Clinical Staffing

22       As noted above, the OAR explicitly directed the Receiver to make recommendations

23   with respect to the need for modifications in the June 2002 and September 2004 stipulations.

24   The Receiver, however, also requests that the Court discontinue eight requirements set forth

25

26   _____

27

28       [7] Paragraph 15 requires "all necessary steps to ensure that high-risk patients are
     treated by primary care providers that are designated to treat such patients."

1  in its December 1, 2005 Order Re Interim Remedies Relating to Clinical Staffing.[8]  This

2  Order  was based on recommendations made by the Court's then correctional expert, John

3  Hagar, and were designed to afford the class relief pending the search for, and appointment

4  of, a Receiver.  Plaintiffs oppose elimination of the following four requirements:

5

6       (1)-(2) *Clinical Staff Hiring Procedures* (¶ 3a-b)

7       This paragraph provides for (1) an expedited process for making employment offers to

8  clinicians within 10 days of receipt of an applicant's written job application, and (2)

9  monitoring of such process by Plaintiffs.   The Receiver is currently piloting a 24-hour hiring

10 process at certain prisons and expects to take this system state-wide within the next six to

11 twelve months.  While the Receiver states that the10-day process conflicts with the POA's

12 Objective A.8.3.3 of implementing a 24-hour system, it is not clear why this "conflict" would

13 interfere with the Receiver's remedial process since the December 1, 2005 order provides a

14 lower floor than the Receiver's POA.  Nor has the Receiver otherwise explained why,

15 beyond a general desire for flexibility, the 10-day requirement is proving burdensome or

16 otherwise interfering with the remedial process.  The Receiver, however, may substitute a

17 new hiring plan so long as it comports with the minimum requirements of the Eighth

18 Amendment.  The Receiver shall provide the parties with a copy of any such substitute plan

19 within 7 days of the effective date of the change. *See supra* note 4.

20      The Receiver also states that the paperwork and tracking processes related to the

21 monitoring requirements have proven unduly time consuming and expensive.  Accordingly,

22 the Court refers the monitoring portions of paragraphs 3a-b to Mr. Babcock to facilitate an

23 informal resolution of this issue.

24

25 _____

26      [8] While the December 1, 2005 Order is not a consent decree, and thus is not governed
   by *Rufo,* 502 U.S. 367, it is the "general rule" that every judicial tribunal has the inherent
27 authority "'to correct its own errors or otherwise appropriately [] modify its judgment,
   decree, or order.'" *Bookman v. United States,* 453 F.2d 1263, 1265 (Ct. Cl. 1972) (citation
28 omitted).

United States District Court

For the Northern District of California

(3) *Supervision of recently hired physicians* (¶ 5a)

This paragraph provides that recently hired physicians working in a state prison in which *both* the Chief Medical Officer and the Chief Physician and Surgeon positions are vacant shall be supervised by the Regional Medical Director. The Receiver states, in conclusory form, that this provision should be eliminated because it does not provide the Receiver with sufficient flexibility. *See e.g.* Hagar Dec. ¶ 26 (stating that paragraph 5(a) "is not conductive to providing a flexible yet appropriate program for adequate clinical supervision"). While, as noted above, the Court agrees, as a general principle, that the Receiver needs flexibility, and indeed, the Court has afforded him significant latitude, the Court is not persuaded that a generic invocation of the need for flexibility is sufficient to permit the Court to determine that the requested modification is appropriate at this time. Nor has the Receiver indicated that he currently has a policy that differs from that provided for in paragraph 5(a) or otherwise explained how paragraph 5(a) interferes with the remedial process. Accordingly, the requested modification is premature. The Receiver may, however, replace paragraph 5(a) with a substitute policy so long as it meets minimum Eighth Amendment standards. The Receiver shall provide the parties with a copy of any such substitute policy within 7 days of the effective date of such policy.

(4) *Program to monitor health services provided by Registries (CMG/MHA/Staff Care)* (¶ 6g)

It is clear that at a minimum this provision requires modification given that one of the identified registries no longer provides services to the State while other registries not identified do provide such services. It is unclear, however, whether modification or elimination is appropriate at this point in time. While it appears that the "program to monitor prisoner health services provided by [registries CMG/MHA/Staff Care]," *see* Dec. 1, 2005 Order at ¶ 6g, was never operational, the Court has not been provided with any information as to whether a program was developed and if so its adequacy or lack thereof, the Receiver's current actions with respect to registry monitoring or time table for action on this issue, or the

United States District Court
For the Northern District of California

1

2   actual impact of this provision on the remedial process. Accordingly, the motion to eliminate

3   paragraph 6g is denied. The Receiver may, however, substitute a new plan for the

4   monitoring of registries so long as it comports with the minimum requirements of the Eighth

5   Amendment. The Receiver shall provide the parties with a copy of any such substitute plan

6   within 7 days of the effective date of such plan.

7

8   IV.  PLAINTIFFS' MOTION FOR ORDER DIRECTING RECEIVER TO COMPLY WITH

9   APRIL 4, 2003 ORDER RE PRODUCTION AND ACCESS TO DOCUMENTS, ETC.

10          Plaintiffs raise four issues which are addressed in turn below.

11

12          A. Review of inmate letters to Receiver and medical follow up

13          Both the Receiver and counsel for Plaintiffs receive a significant volume of letters

14   from inmates relating to the issue of medical care. Plaintiffs seek an order directing the

15   Receiver to establish a process by which Plaintiffs' counsel can efficiently review (1) letters

16   sent by inmates to the Receiver that are related to medical care complaints and (2) the

17   Receiver's responses thereto (including any follow-up by clinicians). As the Court ruled at

18   the August 27, 2007 hearing, the Order Appointing Receiver was not intended to confer a

19   blanket confidentiality on all inmate letters sent to the Receiver. On the other hand, the

20   Court is not persuaded that Plaintiffs' counsel need to review the letters sent to the Receiver

21   or any clinical responses thereto for the purpose of effectively advising the class. Plaintiffs'

22   counsel receives enough letters directly to inform them of the issues being raised by such

23   letters . The Court will refer to Mr. Babcock, however, Plaintiffs' more limited request,

24   articulated at the hearing, that the Receiver provide them with his responses (including any

25   follow-up by clinicians on his behalf) in those few cases in which the Receiver has

26   intervened in an individual matter and determined that there is a serious medical issue. The

27   Court notes, however, that responding to individual letters by the Receiver is not part of the

28

14

United States District Court
For the Northern District of California

1

2 | systemic remedy that the Receiver has been charged with developing and implementing, and

3 | thus monitoring of these actions is not essential.

4 | Finally, the Court agrees that it is appropriate to develop a system to ensure that the

5 | Receiver and Plaintiffs' counsel are not engaging in a duplication of effort with respect to the

6 | same individual inmate. The Court concludes that if the Receiver and Plaintiffs' counsel

7 | approach this issue in a spirit of cooperation, they should be able to informally devise such a

8 | system with the assistance of Mr. Babcock. Accordingly, this matter will be referred to him

9 | as well.

10

11 | B. Death Reviews

12 | The current process for reviewing inmates is seriously flawed and is currently being

13 | revamped by the Receiver. According to the Receiver, he anticipates that the new system

14 | will be operational by November 2007, at which time adequate death review documentation

15 | will be available to the Plaintiffs. The Court concludes that Plaintiffs' request for additional

16 | information during this interim period would be unnecessarily burdensome and of limited

17 | benefit. Accordingly, this aspect of Plaintiffs' motion is denied.

18

19 | C. Short-Term Measures and Cooperation issues

20 | It appears to the Court that these last two matters are essentially a byproduct of the

21 | deterioration in the relationship between the Receiver and counsel for Plaintiffs. The Court

22 | has already discussed its plans to address this situation and thus denies this portion of

23 | Plaintiffs' motion.

24

25

26

27

28

15

V. **CONCLUSION**

Accordingly, and good cause appearing, it is HEREBY ORDERED that:

A.  The Receiver's November 15, 2007 revised Plan of Action shall identify those objectives, and/or specific portions thereof, that the Receiver plans to achieve within six months, 12 months, 24 months and 36 months from the date of the November 15, 2007 Plan of Action.

B.  The Receiver's Motion for Order Modifying Stipulated Injunction and Orders Entered Herein is granted in part and denied in part as follows:

    1.  June 13, 2002 Stipulated Order

        (a) *Paragraph 4* (policies and procedures)

        The motion to eliminate paragraph 4 is denied as premature.  The Receiver, however, may revise or replace an existing Policy or Procedure referenced in paragraph 4 so long as the alternative comports with the minimum requirements of the Eighth Amendment. The Receiver shall provide the parties with a copy of the revised or substituted and/or eliminated Policy or Procedure within 7 days of the effective date of the change.

        (b) *Paragraph 5* (roll-out requirements)

        The motion to eliminate paragraph 5 is granted.

        (c) *Paragraph 6* (state-wide requirements)

        The motion to eliminate paragraph 6 is denied as premature. The Receiver, however, may substitute a new plan for the state-wide requirements (individually or collectively) so long as the new plan(s) comport with the minimum requirements of the Eighth Amendment. The Receiver shall provide the parties with a copy of the substitute state-wide plan(s) within 7 days of the effective date of the new plan(s).

        (d) *Paragraphs 7, 9-15* (monitoring by Plaintiffs)

        The motion to eliminate paragraphs 7 and 9-15 is denied. The Court appoints Starr Babcock, on a *pro bono* basis, to facilitate discussions between the Receiver and the parties with respect to the development of a new monitoring system. If a partial or complete resolution of this matter is achieved, the Receiver and the parties shall submit a stipulation and proposed order to modify or replace paragraphs 7 and 9-

United States District Court
For the Northern District of California

1

2    15.  If a complete informal resolution is not possible, Mr. Babcock shall
3    provide a recommendation to the Court with respect to any issues that
     remain.

4

5        (e) *Paragraphs* 19-23 (compliance monitoring)

6        The motion to eliminate paragraphs 19-23 is granted.

7

8

9    2.   September 13, 2004 Stipulated Order Re Quality of Patient Care and
         Staffing

10       (a) The motion to eliminate paragraphs 13-14, 16-20, 23-24 is granted.

11       (b) The motion to eliminate paragraph 15 is denied as premature.
12       The Receiver, however, may substitute a new plan for the
         treatment of high risk inmates so long as it comports with the minimum
         requirements of the Eighth Amendment. The Receiver shall provide the
13       parties with a copy of the substitute plan within 7 days of the effective
         date of such plan.

14

15

16   3.  December 1, 2005 Order Re Interim Remedies Relating to Clinical Staffing

17       (a)  The motion to eliminate paragraphs 2a-c, 5c, and 6d-e is granted.

18       (b)  The motion to eliminate paragraphs 3a-b, 5a, and 6g is denied as
         premature and/or for lack of information. The Receiver may, however,
         replace one or more of these paragraphs with a substitute policy so long
19       as it meet minimum Eighth Amendment standards.  The Receiver shall
         provide the parties with a copy of any such substitute policy within 7
20       days of the effective date of such policy.

21       (c)  The Court refers to Starr Babcock, on a *pro bono* basis, the
         monitoring portions of ¶¶ 3a-b for the purpose of facilitating
22       an informal resolution of this issue.

23   Any dispute regarding substitutions or changes made pursuant to this paragraph

24   (Paragraph V(B) of this Order), shall be governed by the procedures set forth in note 4 *supra*.

25

26       C.  Plaintiffs' Motion for Order Directing Receiver to Comply with April 4, 2003

27   Order Re Production and Access to Documents is denied.  The Court, however, refers the

28   following issues to Mr. Babcock for the purpose of facilitating an information resolution: (1)

17

United States District Court
For the Northern District of California

the development of a system designed to avoid the duplication of effort with respect to letters received from individual inmates regarding medical care, and (2) whether the Receiver should provide Plaintiffs with his responses (including any follow-up by clinicians on his behalf) in those few cases in which the Receiver has, in response to a letter from an inmate, intervened in an individual case and determined that there is a serious medical issue. If a partial or complete resolution of these two matters is achieved, the Receiver and the parties shall submit a stipulation and proposed order.   If a complete informal resolution is not possible, Mr. Babcock shall provide a recommendation to the Court with respect to any issues that remain.

    D.  Plaintiffs' Motion to Strike Certain Evidence from Reply Brief is denied. Plaintiffs' Alternative Motion for Leave to File Sur-Reply is granted.


**IT IS SO ORDERED.**


Dated: September 6, 2007

THELTON E. HENDERSON
UNITED STATES DISTRICT JUDGE

18

**Starr Babcock**
**State Bar of California**
**180 Howard Street**
**San Francisco, CA 94117**

Senior Executive, State Bar of California

2000 – 2007     State Bar of California
                Special Assistant to the Executive Director and Senior Executive

Serve as the Special Assistant to Executive Director Judy Johnson and at the direction of the Board of Governors managed the implementation of a comprehensive governance and strategic planning initiative for the State Bar. (In 2004, the Board adopted a long-term strategic plan and a continuing operational planning model consistent with judicial branch standards). Other duties include serving as State Bar staff liaison to the California Supreme Court, Judicial Council, and the California Judge's Association. Also participated in the drafting and development of SB 479, The Attorney Diversion and Assistance Program, later named the Lawyer Assistance Program (LAP).

Current assignments also include the oversight and management of all member programs including the LAP, Minimum Continuing Legal Education, State Bar Section Administration, and the Member Service Division.

1996-2000       Administrative Office of the Courts
                Judicial Council of California
                Managing Attorney

Direct management and supervision of staff attorneys and supporting administrative staff providing advice and counsel to the Chief Justice, the Judicial Council and its advisory committees, and the appellate and trial courts. Management and oversight responsibility for all litigation affecting the Judicial Council, the Administrative Office of the Courts, the trial courts and trial judges, and the appellate courts and justices, and trial court employees. Other duties included staffing the Jury Instructions Task Force and the Complex Litigation Pilot Program. participating in the preparation and presentation of the Office of General Counsel budget proposals as part of the yearly judicial branch budget process, and participating in the judicial branch strategic planning process.

Project manager for the implementation of Proposition 220 which to the abolishment of municipal courts and the unification of all California trial courts as superior courts. The project required significant negotiation with many trial courts and compliance with the state finance budget change proposal process to ensure compliance with overall planning deadlines.

**Government Practice**

Prosecuted attorneys charged with ethics violations in administrative proceedings as a member of the State Bars' Office of the Chief Trial Counsel and the Office of General Counsel (1988 to 1996). Lead counsel in the Keller/ Brosterhous arbitrations. Also argued

12 discipline and admission cases before the California Supreme Court and gave advice and counsel to the Board of Governors and its standing committees.

**Private Practice**

Practiced for 12 years in a small firm and as a solo practitioner with an emphasis on medical and legal malpractice cases as part of a general personal injury practice. Tried cases to verdict in both state and federal courts and acted as an arbitrator/mediator by court appointment and agreement of private litigants.

**Other Public Service**

1995-- Appointed by then Chief Judge Thelton E. Henderson as Chair of a Magistrate Selection Committee for the Northern District of California.

1998-2000-- Served as a member of the State Bar Committee of Bar Examiners (CBX). CBX is a statutory committee within the State Bar that develops and administers the bar exam, screens applicants for good moral character, and regulates California's law schools.

2002-- Appointed by Chief Justice Ronald M. George to serve on the California Supreme Court's Advisory Committee on Lawyer Regulation.

**Education**

Georgetown University Law Center                    Licensed in California

# EXHIBIT J

1

2           IN THE UNITED STATES DISTRICT COURTS

3          FOR THE EASTERN DISTRICT OF CALIFORNIA

4         AND THE NORTHERN DISTRICT OF CALIFORNIA

5   UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

6    PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

7

8 RALPH COLEMAN, et al.,

9           Plaintiffs,                   NO. CIV S-90-0520 LKK JFM P

10       v.                        **THREE-JUDGE COURT**

11 ARNOLD SCHWARZENEGGER,
   et al.,

12

13          Defendants.

14 MARCIANO PLATA, et al.,         NO. C01-1351 TEH

15           Plaintiffs,           **THREE-JUDGE COURT**

16       v.

17                     PROTECTIVE ORDER RE:
   ARNOLD SCHWARZENEGGER,   DEPOSITION OF THE
   et al.,                     CALIFORNIA PRISON HEALTH

18                     CARE RECEIVERSHIP
            Defendants.         CORPORATION

19

20

21       The Court is in receipt of a notice of deposition of the California Prison Health Care

22 Receivership Corporation ("Receiver"), served by Defendant Arnold Schwarzenegger on

23 November 21, 2007, which notices the deposition of the person most knowledgeable at the

24 Receiver's office on a variety of topics, to commence on December 17, 2007.  The scope of

25 this notice of deposition is extremely broad and covers all of the Receiver's reports in *Plata*

26 *v. Schwarzenegger*, as well as topics as expansive as "[t]he causes of the problems and

27 deficiencies in the delivery of medical care to inmates at CDCR's adult institutions."  Notice

28 of Dep. Sch. A at 1.  Schwarzenegger also asks the Receiver to produce a broad range of

1   documents, including "[a]ny and all DOCUMENTS authored or prepared by [the Receiver's

2   office] that refer, relate to, or describe the level of medical services provided inmates housed

3   in CDCR's adult institutions from April 2006 to the present." *Id.* at 3. For the reasons

4   discussed below, this Court now enters a protective order barring the noticed deposition from

5   proceeding.

6        Under Federal Rule of Civil Procedure 26(c), and in the inherent discretion of a court

7   to manage its own discovery, a court may sua sponte enter a protective order for good cause

8   shown. *E.g., Lesal Interiors, Inc. v. Resolution Trust Corp.*, 153 F.R.D. 552, 558 n.4 (D.N.J.

9   1994); *McCoy v. Southwest Airlines, Inc.*, 211 F.R.D. 381, 385 (C.D. Cal. 2002). A

10  protective order may include an order that "discovery not be had." Fed. R. Civ. P. 26(c)(1).

11       In this case, although neither the Receiver nor any party has formally objected to the

12  noticed deposition, the Court finds good cause to bar the deposition based on immunity. The

13  Receiver was "imbued with the power and authority to act in the name of the Court as the

14  Court's officer." *Plata v. Schwarzenegger*, Case No. C01-1351 TEH, 2005 WL 2932253, at

15  *33 (N.D. Cal. Oct. 3, 2005). Thus, like court-appointed special masters, the Receiver

16  "assumed the duties and obligations of a judicial officer" when appointed, *In re Gilbert*, 276

17  U.S. 6, 9 (1928), and acts as a "surrogate[]" of the court, *Cordoza v. Pac. States Steel Corp.*,

18  320 F.3d 989, 995 (9th Cir. 2003) (quoting *Louisiana v. Mississippi*, 466 U.S. 921, 921

19  (1984)). Accordingly, just as quasi-judicial immunity applies to special masters appointed

20  under Federal Rule of Civil Procedure 53, *Atkinson-Baker & Assocs., Inc. v. Kolts*, 7 F.3d

21  1452, 1454-55 (9th Cir. 1993), this Court concludes that the Receiver is also protected by

22  quasi-judicial immunity. *See Antoine v. Byers & Anderson, Inc.*, 508 U.S. 429, 436 (1993)

23  (explaining that "[w]hen judicial immunity is extended to officials other than judges, it is

24  because their judgments are functionally comparable to those of judges – that is, because

25  they, too, exercise a discretionary judgment as a part of their function" (citation, internal

26  quotations, and alterations omitted)). Not only does this conclusion follow from the case

27  law, but it also follows from the *Plata* court's order that the Receiver and his staff "shall

28  have the status of officers and agents of this Court, and as such shall be vested with the same

1    immunities as vest with this Court." *Plata v. Schwarzenegger*, Case No. C01-1351 TEH,

2    Feb. 14, 2006 Order Appointing Receiver.

3         This Court therefore agrees with the result in *Gary W. v. Louisiana*, 861 F.2d 1366

4    (5th Cir. 1988), in which the court squarely held that a special master may not be deposed

5    regarding his or her findings.  A hearing was scheduled before a magistrate judge in that case

6    regarding the suitability of the special master's recommendations.  *Id.* at 1367.

7         Dr. Lyles [the special master] began the preparation of a report
8         on incidents of abuse and neglect to be submitted to the
          magistrate at the hearing on the recommendations she had made
9         as special master.  Seeking to discover the substance of this
          report, the state noticed Dr. Lyles' deposition and issued a
10        subpoena and a subpoena duces tecum to her.  The [plaintiff]
          classmembers moved to quash.  The magistrate quashed the
11        subpoenas because of Dr. Lyles' special relationship with the
          court.  The district court affirmed that ruling.  Dr. Lyles
12        completed her report and, as ordered by the magistrate,
          distributed copies to the parties before the scheduled hearing.
13        Following the hearing the magistrate ordered implementation of
          Dr. Lyles' formal recommendations.  The state appeals the ruling
14        on the motion to quash.

15   *Id.* at 1368.  The appellate court affirmed the quashing of the subpoena, explaining that,

16   "Dr. Lyles was performing a quasi-judicial function when, as special master, she submitted

17   her formal recommendation.  An examination of her mental processes in making that

18   recommendation would have been inappropriate and the magistrate and district court

19   correctly prevented such."  *Id.* at 1369 (citation omitted).

20        Likewise, in this case, the Receiver has filed numerous reports, as detailed by

21   Schwarzenegger in Schedule A of his notice of deposition listing subjects within the scope of

22   the desired testimony.  These reports speak for themselves, and any testimony about the

23   reports, as well as testimony about or the production of underlying documents considered by

24   the Receiver in his preparation of the reports, would impermissibly intrude on the Receiver's

25   mental processes.  *See, e.g., United States v. Roebuck*, 271 F. Supp. 2d 712 (D.V.I. 2003)

26   (explaining that "[t]he overwhelming authority concludes that a judge may not be compelled

27   to testify concerning the mental processes used in formulating official judgments or the

28   reasons that motivated him in the performance of his official duties").

1          Accordingly, with good cause appearing, the Court hereby enters a protective order

2   under Federal Rule of Civil Procedure 26(c) barring the deposition of the California Prison

3   Health Care Receivership Corporation from proceeding.

4

5   **IT IS SO ORDERED.**

6

7   Dated:   11/29/07                        _____/s/_____
                                             STEPHEN REINHARDT
8                                            UNITED STATES CIRCUIT JUDGE
                                             NINTH CIRCUIT COURT OF APPEALS
9

10

11  Dated:   11/29/07                        _____
                                             LAWRENCE K. KARLTON
12                                           SENIOR UNITED STATES DISTRICT JUDGE
                                             EASTERN DISTRICT OF CALIFORNIA
13

14

15  Dated:   11/29/07                        _____
                                             THELTON E. HENDERSON
16                                           SENIOR UNITED STATES DISTRICT JUDGE
                                             NORTHERN DISTRICT OF CALIFORNIA
17

18

19

20

21

22

23

24

25

26

27

28

                                             4

# EXHIBIT K

1       IN THE UNITED STATES DISTRICT COURTS

2       FOR THE EASTERN DISTRICT OF CALIFORNIA

3       AND THE NORTHERN DISTRICT OF CALIFORNIA

4    UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

5      PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

6

7    RALPH COLEMAN, et al.,

8                        Plaintiffs,                   NO. CIV S-90-0520 LKK JFM P

9            v.                                        **THREE-JUDGE COURT**

10   ARNOLD SCHWARZENEGGER,
     et al.,

11

12                       Defendants.

13   MARCIANO PLATA, et al.,

14                       Plaintiffs,                   NO. C01-1351 TEH

15           v.                                        **THREE-JUDGE COURT**

16   ARNOLD SCHWARZENEGGER,                            ORDER RE: ROLE OF
     et al.,                                           RECEIVER AND SPECIAL
17                                                     MASTER REGARDING PRISON
                         Defendants.                   POPULATION ADVISORY
18                                                     GROUP

19

20          At the status conference conducted in the above-captioned proceedings on May 30,

21   2008, there was a discussion concerning the membership of an advisory group that will

22   perform a detailed analysis of the operational capacity of each California prison facility in an

23   effort to arrive at an agreement on a prison population cap. *See also* Confidential Status

24   Report, filed June 2, 2008, at 8-9.

25          A question arose concerning what role, if any, the *Plata* Receiver and the *Coleman*

26   Special Master might have in connection with that advisory group. As the Court noted in its

27   November 29, 2007 order, both the *Plata* Receiver and the *Coleman* Special Master have

28   assumed duties and obligations of a judicial officer and are acting as surrogates of the *Plata*

1    and *Coleman* courts, respectively. *See* Nov. 29, 2008 Order at 2. For that reason, it would

2    not be appropriate for either the *Plata* Receiver or the *Coleman* Special Master, or any of

3    their staff members, to serve on the advisory group. By this order, both the Receiver and the

4    Special Master will be authorized to provide, in their discretion, on an informal basis such

5    information as the advisory group may seek from them that may be helpful to the goals of

6    said group. Nothing in this order shall be construed to permit any member of the advisory

7    group to request preparation of written reports by the Receiver or the Special Master or any

8    of their staff members, or to permit any party to these proceedings to request formal

9    testimony from the Receiver or the Special Master or any of their staff members at any stage

10   of these proceedings.

11

12   **IT IS SO ORDERED.**

13

14   Dated:   06/05/08
                                          /s/
15                                 STEPHEN REINHARDT
                                   UNITED STATES CIRCUIT JUDGE
16                                 NINTH CIRCUIT COURT OF APPEALS

17

18   Dated:   06/05/08

19                                 LAWRENCE K. KARLTON
                                   SENIOR UNITED STATES DISTRICT JUDGE
20                                 EASTERN DISTRICT OF CALIFORNIA

21

22   Dated:   06/05/08

23                                 THELTON E. HENDERSON
                                   SENIOR UNITED STATES DISTRICT JUDGE
24                                 NORTHERN DISTRICT OF CALIFORNIA

25

26

27

28

                                       2

EXHIBIT L

1

2

3        IN THE UNITED STATES DISTRICT COURT

4        FOR THE NORTHERN DISTRICT OF CALIFORNIA

5

6

7    MARCIANO PLATA, et al.,

8                    Plaintiffs,          NO. C01-1351 TEH

9         v.                              ORDER GRANTING
                                          PLAINTIFFS' MOTION TO
10   ARNOLD SCHWARZENEGGER,               CONVENE THREE-JUDGE
     et al.,                              COURT
11
                     Defendants.
12

13

14        This matter came before the Court on Wednesday, June 27, 2007, on Plaintiffs'

15   motion to convene a three-judge court to consider issuing a prisoner release order pursuant to

16   18 U.S.C. § 3626(a)(3).  The motion was heard jointly with a similar motion in *Coleman v.*

17   *Schwarzenegger*, Case No. Civ. S-90-0520 LKK JFM, a case presided over by the Honorable

18   Lawrence K. Karlton in the United States District Court for the Eastern District of California.

19   After carefully considering all of the written and oral arguments presented to the Court in this

20   case, including those contained in the parties' initial briefs filed in November and December

21   2006 and presented at the January 8, 2007 hearing, the Court now GRANTS Plaintiffs'

22   motion for the reasons discussed below.

23

24   **LEGAL STANDARD**

25        The Prison Litigation Reform Act ("PLRA") provides that:

26             no court shall enter a prisoner release order unless –

27             (i)    a court has previously entered an order for less intrusive
                      relief that has failed to remedy the deprivation of the
28

1    Federal right sought to be remedied through the prisoner
release order; and

2

3    (ii)    the defendant has had a reasonable amount of time to
comply with the previous court orders.

4    18 U.S.C. § 3626(a)(3)(A). The term "prisoner release order" does not necessarily mean an

5    order requiring the release of inmates; instead, the PLRA broadly defines the term as

6    including "any order, including a temporary restraining order or preliminary injunctive relief,

7    that has the purpose or effect of reducing or limiting the prison population, or that directs the

8    release from or nonadmission of prisoners to a prison." 18 U.S.C. § 3626(g)(4).

9        "A party seeking a prisoner release order in Federal court shall file with any request

10   for such relief, a request for a three-judge court and materials sufficient to demonstrate that

11   the requirements of subparagraph (A) have been met." 18 U.S.C. § 3626(a)(3)(C). A judge

12   may also sua sponte request that a three-judge court be convened, provided that the

13   requirements of subparagraph (A) have been met and the court "believes that a prison release

14   order should be considered." 18 U.S.C. § 3626(a)(3)(D).

15       The PLRA provides that a three-judge court may only enter a prisoner release order

16   "if the court finds by clear and convincing evidence that – (i) crowding is the primary cause

17   of the violation of a Federal right; and (ii) no other relief will remedy the violation of the

18   Federal right." 18 U.S.C. § 3626(a)(3)(E). However, the statute does not require a district

19   court deciding whether to convene a three-judge court to consider the likelihood that these

20   criteria for entering a prisoner release order will ultimately be satisfied, and neither the

21   parties' papers nor this Court's independent research revealed any authority for the

22   proposition that such criteria must be considered at this stage of the proceedings. Thus, the

23   Court's analysis in deciding Plaintiffs' motion necessarily focuses on the requirements of

24   18 U.S.C. § 3626(a)(3)(A). For purposes of deciding this motion, the Court therefore does

25   not consider, for example, whether overcrowding is the primary cause of the unconstitutional

26   nature of the delivery of medical health care in prisons, nor does the Court consider at this

27   time the type of relief that a three-judge court might impose if it finds that a prisoner release

28   order is warranted.

2

## PROCEDURAL HISTORY[1]

Plaintiffs filed their motion on November 13, 2006, and the Court heard argument on January 8, 2007. Following the hearing, the parties submitted supplemental briefs at the Court's request, and the Court issued an order on Plaintiffs' motion on February 15, 2007. In that order, the Court set Plaintiffs' motion for a further hearing on June 11, 2007, and also directed the Receiver to report to the Court his assessment of how "overcrowding is interfering with his ability to successfully remedy the constitutional violations at issue." Feb. 15, 2007 Order at 4-5. The Court also directed the State to file a report with the Court discussing: (1) specific, concrete measures the State "has taken, is taking, or is planning to take" to reduce the number of inmates confined in state prisons over the next two years; (2) an estimate of when the Governor anticipated rescinding his October 2006 emergency proclamation regarding prison overcrowding; and (3) the current total population of inmates confined by the California Department of Corrections and Rehabilitation ("CDCR"). *Id.* The Receiver and the State timely filed their reports on May 15 and 16, 2007, respectively, and the parties submitted timely responses to those reports on May 29, 2007.[2]

On June 6, 2007, this Court vacated the June 11 hearing and scheduled Plaintiffs' motion for a joint hearing with a similar motion in *Coleman* on June 27, 2007, to be held at the United States District Court in Sacramento. The Court also granted the Receiver's June 4 request to file a supplemental report on overcrowding, which the Receiver filed on June 11, 2007. The parties were given leave to respond to the Receiver's supplemental report by June 18, 2007. Defendants filed a timely response, but Plaintiffs chose not to file a response.

---

[1]The factual background and procedural history of this case have been well-documented elsewhere. *See, e.g.,* Oct. 3, 2005 Findings of Fact & Conclusions of Law Re: Appointment of Receiver. The Court focuses its attention in this order on the procedural history of Plaintiffs' motion to convene a three-judge court.

[2]In his May 15 report, the Receiver also recommended three remedial courses of action. Those recommendations are not discussed in this order because the Court agrees with the Receiver that the "recommendations . . . should be addressed independently of plaintiff's [sic] request for a population cap." Receiver's Request for Permission to File Mot. to Implement Recommendations in Overcrowding Report at 3. The Receiver's request to file a motion to implement his three recommendations remains pending, and the Court will issue a separate order addressing that request at a later time.

3

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    Subsequent to the motion hearing, the CDCR Expert Panel on Adult Offender Reentry

2  and Recidivism Reduction Programs published their "Report to the California State

3  Legislature: A Roadmap for Effective Offender Programming in California," which

4  Defendants submitted via a request for judicial notice on July 2, 2007.  The following day,

5  this Court ordered the parties to file supplemental briefs explaining "how, if at all, the courts

6  should consider the expert panel's report in resolving the pending motions to convene a

7  three-judge court."  July 3, 2007 Order Requesting Add'l Briefing on Pls.' Mot. to Convene

8  Three-Judge Court at 2.  Defendants and Plaintiffs filed timely supplemental briefs on

9  July 11 and 17, 2007, respectively.

10    The Court also received an amicus brief from Californians United for a Responsible

11  Budget ("CURB") on June 13, 2007, and a supplemental amicus brief from the California

12  Correctional Peace Officers Association ("CCPOA") on June 18, 2007.  Although neither of

13  these organizations sought leave to file amicus briefs, the Court nonetheless reviewed their

14  arguments, including the oral arguments presented by the CCPOA, in considering Plaintiffs'

15  motion.[3]  The Court finds, however, that both amici raise arguments that concern whether a

16  three-judge court should ultimately enter a prisoner release order and not whether this Court

17  should request that a three-judge court be convened.  Consequently, the amici's arguments

18  are more appropriately addressed to any three-judge court that is convened, rather than to this

19  Court at this time.  CCPOA, in fact, candidly states in its supplemental amicus brief that it

20  "does not purport to speak to constitutional violations or the question of whether a prisoner

21  release order would remedy constitutional violations or even what such an order would look

22  like," CCPOA Suppl. Amicus Br. at 5, and its arguments thus may not even be relevant to a

23  three-judge court considering whether a prisoner release order should be entered.

24

25

26    [3]The Court granted CCPOA leave to file an amicus brief on Plaintiffs' motion on
December 5, 2006, and CCPOA filed an amicus brief on December 11, 2006.  CCPOA failed
27  to seek leave from the Court to file a supplemental amicus brief and instead simply filed its
supplemental brief with the Court.  Similarly, although CURB included a request for leave in
28  its amicus brief, it filed its brief without waiting for the Court to grant that request for leave.

4

United States District Court

For the Northern District of California

**DISCUSSION**

In its February 15, 2007 order, this Court found that the remedial orders stipulated to by the parties and issued by the Court in June 2002 and September 2004 constituted "order[s] for less intrusive relief that [have] failed to remedy the deprivation of the Federal right sought to be remedied through the prisoner release order." 18 U.S.C. § 3626(a)(3)(A)(i). At the June 27, 2007 hearing, Defendants urged this Court to reconsider this finding, arguing that the order appointing the Receiver was a "culminating order" in this case and must be considered in determining whether to convene a three-judge court. The Court agrees with Defendants that the presence of the Receiver makes this case unique and, in fact, previously explained that Plaintiffs' motion "must be considered in the unique context of the recently initiated Receivership." Feb. 15, 2007 Order at 3. However, as Defendants acknowledged at the hearing, the stipulated orders from June 2002 and September 2004 are not irrelevant, and the Court continues to find them to be sufficient to satisfy the first requirement for convening a three-judge court. There can be no question that these orders were previously entered by the Court and constituted considerably less intrusive relief than a prisoner release order.

Moreover, as the Court noted in its order finding the appointment of a receiver to be appropriate, "[t]he Court has given defendants every reasonable opportunity to bring its prison medical system up to constitutional standards, and it is beyond reasonable dispute that the State has failed." Oct. 3, 2005 Findings of Fact & Conclusions of Law Re: Appointment of Receiver at 1. Similarly, the Court explained that it "has attempted to move defendants toward meeting constitutional standards by issuing a series of court orders with detailed objectives and measures. Unfortunately, defendants have repeatedly delayed their progress and ultimately failed to achieve even a semblance of compliance" with the June 13, 2002 stipulated order for injunctive relief or the September 17, 2004 stipulated order regarding the quality of patient care. *Id.* at 27. Thus, not only is it clear that the Court has previously entered orders for less intrusive relief; it is equally clear that Defendants have had a "reasonable amount of time" to comply with the June 2002 and September 2004 orders. 18 U.S.C. § 3626(a)(3)(A)(ii).

5

The only remaining question is how to interpret the "reasonable amount of time" requirement in the context of this case, where the Court appointed the Receiver to take control from Defendants over the medical health care system in California's prisons. It is true that the Receiver did not commence his duties until April 2006, and it is also true that the Receiver has only recently filed his proposed Plan of Action and is not due to file his final Plan of Action until November 2007. However, Defendants' position would essentially have this Court wait years to see if the Receiver's Plan of Action is able to remedy the constitutional deficiencies in this case, and the Court has already determined that such delay is neither necessary nor appropriate. Feb. 15, 2007 Order at 4. While the Court agrees that the Receiver has made much progress since his appointment, that fact does not render irrelevant the previous five years of complete and utter failure by Defendants to cure the constitutional deficiencies in their delivery of medical health care to prisoners. "Where life and death hang[] in the balance, courts must act to ensure that constitutional violations are cured sooner rather than later," *id.* at 3, and Defendants have already been given ample opportunity to attempt to bring the delivery of medical care to prisoners up to constitutional standards. It is beyond reason that a willing and competent institution would not be able to show – over a period of several years and with this Court virtually screaming at every step of the way – significant improvements in the hiring of medical personnel, the furnishing of adequate medical facilities, and the development of thoughtful and comprehensive plans for managing the delivery of medical health care. Yet that is precisely what has happened in this case, and it is why the appointment of the Receiver ultimately became necessary. To use the words of Defendants' counsel at the June 27, 2007 hearing, the appointment order was a "culminating order," and this Court finds it more reasonable to view such an order as the end of a series of less intrusive orders that failed to bring about any meaningful reform, rather than as a new beginning that requires this Court to wait more time, potentially years, to see whether the Receiver's plans will succeed or fail.

Had the Receiver reported to the Court that he did not view overcrowding to be a substantial impediment to implementing the reforms required in this case, the Court may well

United States District Court
For the Northern District of California

1  have reached a different conclusion regarding the appropriateness of convening a three-judge

2  court to consider a prisoner release order.  However, quite to the contrary, the Receiver's

3  reports indicate that overcrowding is a serious problem that impacts, for example, his ability

4  to develop adequate reception centers and health facilities because of the high numbers of

5  inmate transfers and the inadequate amount of available health care beds and other physical

6  space.  Receiver's Report Re: Overcrowding at 26-28.  Overcrowding also negatively

7  impacts the Receiver's ability to hire and retain competent medical and managerial staff.  *Id.*

8  at 24-26.  Beyond that, the Receiver reports that:

9
10 > Every element of the Plan of Action faces crowding related
   > obstacles.  Furthermore, overcrowding does not only adversely
11 > impact the Receiver's substantive plans, it also adversely impacts
   > on the very process of implementing remedies because
   > overcrowding, and the resulting day to day operational chaos of
12 > the CDCR, creates regular "crisis" situations which call for action
   > on the part of the Receivership and take time, energy, and person
13 > power away from important remedial programs.

14 *Id.* at 28-29.  Although the Receiver asserts that his "Plan of Action will work" because

15 "[f]ailure is not an option," and that "those . . . who think that population controls will solve

16 California's prison health care problems . . . are simply wrong," he also explains that

17 "[p]opulation limits may help effectuate a more timely and cost effective remedial process."

18 *Id.* at 41, 42.

19       Tellingly, the Receiver's concerns about the impacts of overcrowding on his ability to

20 reform the medical health care delivery system became even stronger in the weeks following

21 his initial report.  In his supplemental report, filed just four weeks after his initial report, the

22 Receiver concluded that: "Mission changes, yard flips, and prison-to-prison transfers,

23 aggravated by the limited alternatives imposed by overcrowding, are now assuming a size,

24 scope and frequency that will *clearly* extend the timeframes and costs of the receivership and

25 *may render adequate medical care impossible*, especially for patients who require longer

26 term chronic care."  Receiver's Suppl. Report Re: Overcrowding at 10 (emphases added).

27 While the Court appreciates Defendants' statements that greater coordination between the

28 State and the Receiver will alleviate some of the Receiver's concerns, such sentiments only

United States District Court
For the Northern District of California

1    underscore the Receiver's expressed concerns that overcrowding presents serious problems

2    not only because of the substantive ways in which it interferes with delivery of medical care,

3    but also because of the amount of time and attention the Receiver must devote to dealing

4    with crowding-related issues.  It is clear to the Court that the crowded conditions of

5    California's prisons, which are now packed well beyond their intended capacity, are having –

6    and in the absence of any intervening remedial action, will continue to have – a serious

7    impact on the Receiver's ability to complete the job for which he was appointed: namely, to

8    eliminate the unconstitutional conditions surrounding delivery of inmate medical health care.

9            The Court acknowledges that the State has recently attempted to take action to reduce

10   prison crowding through Assembly Bill 900 ("AB 900"), which Governor Schwarzenegger

11   signed into law on May 3, 2007.  Even assuming that the provisions of this legislation were

12   to be timely implemented, however – which the Court has doubts about given the history of

13   delays in this case, the highly controversial and political nature of the subject matter, and the

14   conflicts that may sometimes arise between meeting constitutional standards and the tough-

15   on-crime approach to law enforcement espoused by some members of the California

16   Legislature – it is unclear whether the legislation would reduce the impacts of overcrowding

17   in any meaningful way.  For instance, Defendants' own estimates show only a slight

18   projected reduction in the male inmate population: from approximately 162,848 male inmates

19   in May 2007 to 159,939 male inmates in March 2008, and back up to 162,674 male inmates

20   in March 2009 – a net projected decrease of less than 200 inmates over two years.  May 16,

21   2007 Kernan Decl. ¶¶ 5, 12.  Defendants do not discuss any projected reduction to the

22   current (as of May 2007) female inmate population of 12,141, which leads this Court to

23   believe that there will be no significant reduction in the female inmate population either.  *See*

24   *id.* ¶ 5 (projecting female inmate population of 12,200 in March 2008 and 12,562 in March

25   2009, without taking into account "the impact [of] AB 900 and other population reduction

26   strategies" planned by the State).  In addition, Defendants failed to respond to the Receiver's

27   analysis that the State's plans to create more in-fill beds under AB 900 "does nothing to

28   address the serious levels of crowding within the CDCR's most dangerous high security

United States District Court
For the Northern District of California

1  prisons" because only 190 in-fill beds are proposed for Level III, Level IV, and Security

2  Housing Unit ("SHU") inmates, whereas the State itself projects an increase of 7710 inmates

3  at these security levels between the 2007-08 and 2011-12 fiscal years. Receiver's Report Re:

4  Overcrowding at 39; *id.* at Ex. 26. Beyond that, AB 900 fails to address the critical

5  component of staffing – made even more critical by the undisputed fact that California's

6  prison system is currently severely understaffed in terms of both medical and correctional

7  officers – and fails to allocate adequate space for delivering health care, *id.* at 36-38.

8      In any event, the Court need not determine at this stage of the proceedings whether

9  AB 900 will prove to be effective at reducing crowding sufficiently so that it no longer has a

10  deleterious impact on the Receiver's ability to develop a constitutionally adequate medical

11  health care system in California's prisons. As Plaintiffs correctly argue, AB 900 and the

12  Receiver's Plan of Action may proceed simultaneously with a three-judge court's

13  consideration of the necessity for a prisoner release order. The same is true for any other

14  reforms being considered by the State, including those raised by the CDCR's expert panel

15  report. If, for example, the reforms in the expert panel report were actually implemented and

16  reduced levels of prison crowding as estimated, then a three-judge court may find that a

17  prisoner release order is not warranted. However, it would be premature for this Court to

18  make any determination at this time as to whether Plaintiffs will ultimately be able to bear

19  their burden of convincing a three-judge court "by clear and convincing evidence" that

20  "crowding is the primary cause" of the deprivation of constitutionally adequate medical

21  health care and that "no other relief will remedy" that deprivation. 18 U.S.C.

22  § 3626(a)(3)(E). To grant Plaintiffs' motion to convene a three-judge court, this Court need

23  only find that the two components of 18 U.S.C. § 3626(a)(3)(A) are satisfied – a finding the

24  Court reaches for all of the reasons discussed above and in its February 15, 2007 order.[4]

25      [4]Although no party raised this issue, it is unclear whether the requirement that the
26  court "believe[] that a prison release order should be considered" applies to courts ruling on
   motions to convene a three-judge court brought by a party or only to courts considering a
27  request to convene a three-judge court sua sponte. 18 U.S.C. § 3626(a)(3)(D). However, the
   Court need not decide that legal question because it concludes for all of the reasons discussed
28  in this order that a prisoner release order should be considered, and the requirement, if it
   applies, is therefore satisfied.

9

**CONCLUSION**

     As this Court has repeatedly stated, this case is unique because of the unprecedented size and scope of the Receivership, the appointment of which Defendants acknowledged was necessary given their own repeated failed attempts at meaningful reform.  Of relevance to the pending motion, this case is also somewhat unique in that even Defendants acknowledge the seriousness of the overcrowding problem, which led the Governor to declare a state of emergency in California's prisons in October 2006.  While there remains dispute over whether crowded conditions are the primary cause of the constitutional problems with the medical health care system in California prisons, or whether any relief other than a prisoner release order will remedy the constitutional deprivations in this case, there can be no dispute that overcrowding is at least part of the problem.  The record is equally clear that the Receiver will be unable to eliminate the constitutional deficiencies at issue in this case in a reasonable amount of time unless something is done to address the crowded conditions in California's prisons.  This Court therefore believes that a three-judge court should consider whether a prisoner release order is warranted under 18 U.S.C. § 3626(a)(3)(E).

     Accordingly, and because this Court finds that the conditions specified in 18 U.S.C. § 3626(a)(3)(A) have been satisfied, IT IS HEREBY ORDERED that Plaintiffs' motion to convene a three-judge court to consider a prisoner release order is GRANTED.  The Clerk shall serve a copy of this order on the Chief Judge of the United States Court of Appeals for the Ninth Circuit to satisfy the notification requirement of 28 U.S.C. § 2284(b)(1).  For purposes of judicial economy and avoiding the risk of inconsistent judgments, the Court recommends that this case be assigned to the same three-judge court convened to consider the issuance of a prisoner release order in *Coleman v. Schwarzenegger*, Case No. CIV S-90-0520 LKK JFM (E.D. Cal.).

     Although the Court has ordered that a three-judge court be convened, it also continues to encourage the parties to attempt an informal resolution of the issues raised by Plaintiffs' motion.  Contrary to the views expressed by the *Coleman* plaintiffs' counsel at the June 27, 2007 hearing, a prisoner release order would, indeed, be a radical step, particularly given the

*United States District Court*
For the Northern District of California

1   size of California's prison system.  Such a step may not be necessary if, for example, the

2   parties, in conjunction with the Receiver, were able to reach agreement that Plaintiffs'

3   motion has become moot because AB 900 or any other subsequent action by the State

4   removed overcrowding as a major impediment to bringing the delivery of inmate medical

5   health care up to constitutional standards.  This Court would like nothing more than to have

6   the three-judge court be able to enter a consent judgment without the need for a prisoner

7   release order.  *See Roberts v. County of Mahoning*, Case No. 4:03 CV 2329, 2007 WL

8   1655505 (N.D. Ohio June 4, 2007) (case where three-judge court was convened but in which

9   the parties reached agreement prior to the scheduled hearing on whether to issue a prisoner

10  release order).  However, unless and until such agreement is reached, the Court is convinced

11  that a three-judge court's consideration of a prisoner release order remains warranted, and

12  that it presents the most appropriate forum under the PLRA in which to weigh the impact of

13  crowded conditions on the ability of the Receiver and Defendants to develop a

14  constitutionally adequate inmate medical health care system.

15

16  **IT IS SO ORDERED.**

17

18  Dated:   07/23/07

19                                                   THELTON E. HENDERSON, JUDGE
                                                     UNITED STATES DISTRICT COURT

20

21

22

23

24

25

26

27

28