1

PRISON LAW OFFICE
DONALD SPECTER Bar No.: 83925
STEVEN FAMA Bar No.: 99641
E. IVAN TRUJILLO Bar No.: 228790
1917 Fifth Street
Berkeley, California 94710-1916
Telephone: (510) 280-2621
Facsimile: (510) 280-2704

BINGHAM, McCUTCHEN, LLP
WARREN E. GEORGE Bar No.: 53588
GEOFFREY THOMAS HOLTZ Bar No.: 191370
KRISTEN A. PALUMBO Bar No.: 215857
Three Embarcadero Center
San Francisco, California 94111
Telephone: (415) 393-2000

2

3

4

5

6

ROSEN, BIEN & GALVAN, LLP
MICHAEL W. BIEN Bar No.: 096891
JANE E. KAHN Bar No.: 112239
ERNEST GALVAN Bar No.: 196065
LORI RIFKIN Bar No.: 244081
315 Montgomery Street, 10th Floor
San Francisco, California 94104
Telephone: (415) 433-6830

HELLER, EHRMAN, WHITE & McAULIFFE
RICHARD L. GOFF Bar No.: 36377
701 Fifth Avenue
Seattle, Washington 98104
Telephone: (206) 447-0900

7

8

9

10

11

THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
CLAUDIA CENTER Bar No.: 158255
600 Harrison Street, Suite 120
San Francisco, CA 94107
Telephone: (415) 864-8848

KIRKPATRICK & LOCKHART PRESTON
GATES ELLIS LLP
JEFFREY L. BORNSTEIN, Bar No.: 99358
55 Second Street, Suite 1700
San Francisco, CA 94105-3493
Telephone: (415) 882-8200

12

13

14

15

16

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

17

EASTERN DISTRICT OF CALIFORNIA

18

RALPH COLEMAN,

Case No. Civ S 90-0520 LKK-JFM

19

        Plaintiffs,

20

    v.

21

ARNOLD SCHWARZENEGGER, et al.,

22

        Defendants.

23

JERRY VALDIVIA, et al.,

Case No. Civ. S-94-0671 LKK/GGH

24

        Plaintiffs,

**REPLY MEMORANDUM IN SUPPORT
OF PLAINTIFFS' MOTION FOR
INJUNCTIVE RELIEF REQUIRING
TIMELY ACCESS TO INPATIENT
PSYCHIATRIC HOSPITALIZATION**

25

    v.

26

ARNOLD SCHWARZENEGGER, et al.,

27

        Defendants.

Hearing Date: July 25, 2008
Time:          10:00 a.m.
Location:      Courtroom 4
Judge:         Hon. Lawrence K. Karlton

28

[225341-1]

REPLY MEM. IN SUPPORT OF PLAINTIFFS' MOTION FOR INJUNCTIVE RELIEF REQUIRING TIMELY ACCESS
TO INPATIENT PSYCHIATRIC HOSPITALIZATION - Case Nos. Civ S 90-0520 LKK-JFM; Civ S-94-0671 LKK/GGH

## TABLE OF ABBREVIATIONS/ACRONYMS

CDCR:            California Department of Corrections and Rehabilitation

CMF:             California Medical Facility

CRIPA            Civil Rights of Institutionalized Persons Act

DMH:             Department of Mental Health

SVSP:            Salinas Valley State Prison

[225341-1]

1

# TABLE OF CONTENTS

2
Page

INTRODUCTION ............................................................................................................... 1

ARGUMENT ...................................................................................................................... 2

I.   DEFENDANTS' ARBITRARY RESTRICTIONS ON  DMH ACCESS
     VIOLATE THE CONSTITUTION AND ORDERS OF THIS COURT .......................... 2

     A.   Defendants' Arbitrary Restrictions On DMH Access Violate Their
          Constitutional Obligation To Provide Adequate Mental Health
          Treatment ...................................................................................................... 2

     B.   Defendants' Arbitrary Restrictions On DMH Access Set Up A False
          Choice Between Plaintiffs' Constitutional Rights To Due Process And
          To Mental Health Treatment ........................................................................ 5

II.  THIS COURT HAS THE AUTHORITY TO ORDER DEFENDANTS TO
     PROVIDE ACCESS TO INPATIENT HOSPITALIZATION TO PERSONS
     WITH SERIOUS MENTAL ILLNESS IN CDCR CUSTODY REGARDLESS
     OF REVOCATION STATUS OR PAROLE DATE ........................................................ 7

     A.   The *Coleman* And *Valdivia* Classes Include Individuals Who Are
          Confined In CDCR Custody As Alleged Parole Violators And Who Are
          Awaiting Revocation Of Their State Parole ................................................. 7

     B.   This Court Has Jurisdiction to Order Defendants To Provide Access To
          Department Of Mental Health Beds ........................................................... 10

     C.   Plaintiffs' Motion Is Limited To Defendants' Provision Of Access to
          Inpatient Psychiatric Hospitalization Including DMH To Class Members
          Already Entitled To That Access ................................................................ 10

     D.   The Relief Requested By Plaintiffs Does Not Conflict With The Consent
          Decree Between DMH And The United States Department Of Justice
          Under The Civil Rights Of Institutionalized Persons Act ........................ 12

     E.   Injunctive Relief Is A Proper Exercise Of This Court's Power To
          Enforce The *Coleman* Judgment And The *Valdivia* Stipulated Permanent
          Injunction ................................................................................................... 13

     F.   Plaintiffs' Request for Relief Does Not Pose A Conflict Of Interest For
          the *Coleman* and *Valdivia* Classes ............................................................. 14

ii

[225341-1]

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

III.    CONSTITUTIONAL DUE PROCESS, THE *COLEMAN* REMEDY, AND CALIFORNIA LAW PROVIDE FOR APPROPRIATE PSYCHIATRIC HOSPITALIZATION OF PERSONS CONFINED IN CDCR CUSTODY REGARDLESS OF REVOCATION STATUS OR PAROLE DATE ............................ 15

IV.    DEFENDANTS' PROPOSED "COMPROMISE" OF RESTRICTING DMH ADMISSION FOR INDIVIDUALS IN CDCR CUSTODY PENDING REVOCATION TO CMF AND SVPP SHOULD BE REJECTED ................................ 17

CONCLUSION ..................................................................................................... 18

[225341-1]

# TABLE OF AUTHORITIES

**Page**

## Cases

*Coleman v. Wilson,*
    912 F. Supp. 1282 (E.D. Cal. 1995)......................................................................... 7

*Federal Home Loan Mortg. Corp. v. La Conchita Ranch Co.,*
    68 Cal. App. 4th 856 (1998) ............................................................................ 15

*Hutto v. Finney,*
    437 U.S. 678 (1978)......................................................................................... 13

*People v. Watson,*
    42 Cal. 4th 822 (2007) ...................................................................................... 8

*Peterson v. Los Angeles County,*
    185 Cal. App. 3d 705 (1986) .............................................................................. 8

*Toussaint v. McCarthy,*
    801 F.2d 1080 (9th Cir. 1986) ....................................................................... 13-14

*Vitek v. Jones,*
    445 U.S. 480 (1980) ........................................................................................ 17

## Statutes & Regulations

Cal. Code Regs., tit. 15, § 3000............................................................................ 8

Cal. Code Regs, tit. 15, § 3369.1(a) ..................................................................... 17

Cal. Gov. Code § 844 ........................................................................................ 8

Cal. Penal Code § 2684 ................................................................................. 6, 16

Cal. Penal Code § 3056 ..................................................................................... 8

Cal. Penal Code § 3060 ..................................................................................... 8

Cal. Penal Code § 4504 ............................................................................. 6, 8, 17

Cal. Welf. & Inst. Code § 5001(b), (c).................................................................. 17

Cal. Welf. & Inst. Code § 7227 .......................................................................... 17

Cal. Welf. & Inst. Code § 5000 .......................................................................... 17

[225341-1]

**Rules**

Fed. R. Evid. 1002 .................................................................................................................. 5

**Other Authorities**

1 Witkin, Cal. Proc. 4th
     (2007 supp.) Attys, § 133, p. 40 ("Abuse of Motion") ............................................ 15

[225341-1]

# INTRODUCTION

Plaintiffs filed a joint motion in *Coleman* and *Valdivia* to enforce the rights of persons who are members of both classes to receive adequate mental health treatment, including admission to inpatient psychiatric hospitalization when clinically appropriate.  In violation of the Eighth Amendment and orders of the *Coleman* Court, defendants currently refuse to provide inpatient mental health treatment to individuals held in CDCR custody pursuant to parole holds, and to individuals scheduled to be released to parole in 35 or fewer days.  Defendants are also using this refusal in the *Valdivia* case to sidestep their constitutional obligations to provide full due process to individuals confined in CDCR prisons on parole holds.

Defendants' two opposition filings (*Valdivia* Docket No. 1461 & *Coleman* Docket No. 2683, hereinafter "*Valdivia* Defs.' Opp." & "*Coleman* Defs.' Opp.") do not even dispute the material fact at issue:  defendants are refusing to provide constitutional levels of mental health treatment to persons confined in CDCR prisons on parole holds.  Rather, defendants assert that the Court does not have the power to enforce these constitutional rights and that defendants cannot meet their obligations in both *Valdivia* and *Coleman* simultaneously.  However, the so-called "Hobson's Choice" (*Coleman* Defs.' Opp. at 2:1) or "Morton's Fork"(*Valdivia* Defs.' Opp. at 3:25) that defendants allege exists between provision of mental health treatment and provision of due process is entirely of defendants' own creation.  The Court should not tolerate such machinations.

The issue presently before the Court is whether defendants should be ordered to provide access to psychiatric hospitalization to persons confined in CDCR custody who meet the clinical admission criteria for such treatment, regardless of revocation status or parole date.  The only barrier to such access is the bar defendants themselves have arbitrarily established, and it has no basis in the Constitution, California law, the Court-approved Program Guide, or in other orders of this Court.  Defendants do not dispute whatsoever the fact that their refusal to provide the most acute levels of mental health treatment risks serious harm to the plaintiff classes.  Rather than comply with their constitutional obligation to provide inpatient mental health treatment to acutely ill individuals within their custody and control, defendants vainly attempt to justify this

1

1    refusal by setting up a series of straw-man legal obstacles to the provision of this care.  This

2    Court should reject these mischaracterizations of the law and order defendants to immediately

3    provide access to all levels of inpatient care to persons with serious mental illness requiring

4    inpatient level mental health treatment who are in CDCR custody, regardless of revocation status

5    or parole date.

6                                              **ARGUMENT**

7    **I.    Defendants' Arbitrary Restrictions On DMH Access Violate The Constitution And
8            Orders Of This Court**

9            Defendants admit that they deny access to DMH to individuals in CDCR custody who are

10   pending revocation, and to individuals in CDCR custody with fewer than 35 days until their

11   parole release date.  *See, e.g., Coleman* Defs.' Opp. at 3:21-25 (DMH not available to parole

12   violators), 4:6-7 (DMH referral and placement may take place only after revocation), 11:7-25

13   (denial of DMH care to patients with fewer than 35 days until parole); Decl. of Cynthia A.

14   Radavsky In Support Of Defs.' Opp. to Pls.' Mot. For Injunctive Relief ("Radavsky Decl.") ¶ 14.

15   Defendants also do not dispute plaintiffs' underlying substantive argument that defendants'

16   denial of this treatment violates the Constitution.  Rather, defendants' opposition briefs, filed

17   separately in *Coleman* and *Valdivia*, misrepresent the relief requested by plaintiffs and fabricate a

18   series of procedural obstacles to argue that this Court cannot grant that relief.

19           **A.    Defendants' Arbitrary Restrictions On DMH Access Violate Their
20                   Constitutional Obligation To Provide Adequate Mental Health Treatment**

21           Defendants admit that alleged parole violators in CDCR custody are excluded from the

22   full array of mental health services available to other reception center inmates and may only be

23   provided mental health care in "one of three available levels of care, as appropriate (Correctional

24   Clinical Case Management Services, Enhanced Outpatient Program, or Mental Health Crisis

25   Bed)."  Decl. of Shama Chaiken In Support Of Defs.' Opp. to Pls.' Mot. For Injunctive Relief at

26   ¶ 7; Radavsky Decl. ¶ 14; *Coleman* Defs.' Opp. at 3:21-25.  They also admit that individuals

27   with fewer than 35 days until their scheduled release to parole are denied access to DMH

28   programs.  Radavsky Decl. ¶ 14; *Coleman* Defs.' Opp. at 11.  These restrictions on the level of

1  mental health treatment available to alleged parole violators and inmates with upcoming parole

2  dates are not present in the Program Guide, and in fact, the Program Guide expressly states that

3  "inmate-patients shall be eligible for admission to a DMH program regardless of parole date."

4  Reply Decl. of Jane E. Kahn In Support Of Pls.' Mot. For Injunctive Relief ("Kahn Reply

5  Decl.") ¶ 3.  Defendants do not dispute their failure to provide constitutional levels of mental

6  health treatment to this population.

7      Defendants attempt to rationalize these unconstitutional restrictions on mental health

8  treatment by arguing that the bar on DMH access has no practical effect.  Defendants state that a

9  "parole violator can be revoked as early as the probable cause hearing, and so available for

10  referral and placement in a DMH inpatient program if necessary, within 13 business days of

11  imposition of the hold…Because of the ongoing scarcity of appropriate inpatient beds, it is

12  doubtful that any earlier revocation of a parole violator would actually result in his immediate

13  placement in an inpatient DMH bed."  *Coleman* Defs.' Opp. at 4:6-11.  Defendants further imply

14  that because a patient may remain in a Mental Health Crisis Bed for ten days, refusal to refer and

15  transfer to DMH sooner than the tenth day is not problematic.  *Coleman* Defs.' Opp. at 3 n. 1.

16      These rationalizations cannot stand up to the facts.  First, plaintiffs have already

17  established, and defendants do not dispute, that the specific group of class members at issue in

18  this motion generally do not complete their revocation process in the minimum 13 business days

19  (actually 17-19 calendar days) because they are so acutely ill that they are not able to

20  meaningfully participate in their revocation hearings.  Plaintiffs described examples of alleged

21  parole violators identified as needing DMH level of care who were held in CDCR custody in

22  mental health crisis beds for as many as four months pending revocation because they were too

23  ill to meaningfully participate.  Mem. In Support Of Pls.' Mot. For Injunctive Relief Requiring

24  Timely Access to Inpatient Psychiatric Hopitalization ("Pls.' Mem.")  at 10-13.  Defendants did

25  not dispute, or even address, any of the examples plaintiffs described.  Second, while there is a

26  scarcity of DMH beds at some DMH locations, not all DMH beds available to CDCR inmates are

27  full and, in fact, could be utilized for these individuals.  Kahn Reply Decl. ¶ 10.  Third, while the

28  Program Guide allows for a maximum of ten days in a Mental Health Crisis Bed, there is no

1   requirement that a patient exhaust ten days in the Crisis Bed without regard to acuity.  On the

2   contrary, the Program Guide requires that clinicians make referrals to DMH as soon as the

3   clinician determines that the patient needs that level of care.  Pls.' Mem. at 6 n.4.  In fact, even

4   with the current delays in transfers, some patients are actually transferred to DMH beds within

5   days of the referral for such placement.  Kahn Reply Decl. ¶ 12 (recent examples of patients

6   referred and admitted to DMH within 1-6 days).  Mental Health Crisis Beds are not comparable

7   replacements for inpatient psychiatric hospitalization.  Pls.' Mem. at 9-10.

8           The Constitution and orders of this Court require that adequate mental health treatment be

9   provided for the level of acuity of a patient's mental health need.[1]  Defendants do not deny their

10  refusal to provide inpatient psychiatric hospitalization to inmates in CDCR custody who meet

11  clinical admission criteria for DMH treatment but are pending revocation.  Defendants'

12  rationalizations regarding the practical effects of this refusal are not only incorrect, but also

13  cannot excuse defendants' admitted constitutional violations and the serious harm to class

14  members that has and will continue to result from this practice.

15          Defendants also suggest that their constitutional violations are not ripe for consideration in

16  *Coleman* because a memorandum of understanding between DMH and CDCR is under

17  negotiation and review.  *Coleman* Defs.' Opp. at 8:7-9; Radavsky Decl. ¶ 12.  This is simply

18  another self-created false "barrier" thrown up by defendants to avoid accountability.  Defendants

19  previously represented to the *Valdivia* Special Master that the memorandum of understanding

20

21  _____

[1] Ms. Radavsky's statement in her declaration that she "believe[s] the best utilization of these
22  inpatient beds occurs upon an acuity-based determination of patient admission, with no regard
    for the patient's status as a parole violator or new commitment" supports plaintiffs' request in
23  this regard.  Radavsky Decl. ¶ 11.  However, her subsequent position that the current restrictions
    to DMH access are warranted regardless of acuity of need is a direct contradiction of this
24  statement. In fact, Ms. Radavsky has previously expressed DMH's desire to remove itself from
    the provision of care to CDCR inmates entirely, including to the population of high acuity
25  inmate-patients who cycle continuously between prison and parole.  Rifkin Reply Declaration In
    Support Of Pls.' Motions for Injunctive Relief and Leave to File Consolidated Motion ("Rifkin
26  Reply Decl."), ¶¶ 2-3, Exh. A.  These statements suggest that practical concerns of DMH about
    space and conflicting demands, rather than legal concerns about class members' due process
27  rights regarding mental health treatment, are driving the restrictions on access contested here.

28

4

1   was being revised specifically to clarify that DMH would accept individuals in CDCR custody

2   who are pending revocation, "giving them the same priority/status as other CDCR inmates are

3   given." Pls.' Mem. at 2. Defendants cannot contract with each other to avoid their constitutional

4   obligation to provide appropriate mental health treatment. Now, they are representing to the

5   Court that they have attempted to do exactly that—"updating" the memorandum of

6   understanding to expressly exclude these categories of inmates—even after previously admitting

7   that this exclusion violates their obligation and reporting to the *Valdivia* Special Master that the

8   exclusion would be removed. *See* Radvasky Decl. ¶ 12. In support of this misbegotten

9   argument, defendants simply offer the Court more unsubstantiated assertions as to the nature of

10  the information that allegedly is or will be contained in a document that they fail to attach in

11  violation of the best evidence rule. Fed. R. Evid. 1002. These inter-agency bureaucratic tactics

12  should be summarily rejected by the Court.

13          **B.    Defendants' Arbitrary Restrictions On DMH Access Set Up A False Choice
                    Between Plaintiffs' Constitutional Rights To Due Process and To Mental
14                  Health Treatment**

15          Defendants argue that because negotiations are ongoing concerning defendants' plan to

16  satisfy this Court's January 15, 2008 Order to provide due process to parolees who appear too

17  mentally ill to participate in revocation proceedings, including policies and procedures to

18  expedite treatment, this Court should not decide the limited issue of access to DMH for the

19  overlap *Coleman-Valdivia* class. Defendants do not address plaintiffs' showing, however, that

20  this limited issue is ripe for decision by the Court because the parties have reached an impasse

21  and, by defendants' own admission, the issue of DMH access is determinative of defendants'

22  ability to satisfy the Court's January 15, 2008 Order. *See* Pls.' Mem. at 2 n.1. Rather,

23  defendants merely allege, without support or explanation, that in order to provide timely due

24  process in *Valdivia*, they cannot provide appropriate mental health treatment if that treatment

25  requires inpatient psychiatric hospitalization. *See, e.g., Valdivia* Defs.' Opp. at 3:24-4:11.

26  Defendants do not explain why they cannot provide a plan that includes timely revocation

27  proceedings for the limited number of inmates who would be housed in beds run by DMH.

28          *Coleman* defendants further contend that the 35-day time limit for parole revocation

                                                    5

[225341-1]

REPLY MEM. IN SUPPORT OF PLAINTIFFS' MOTION FOR INJUNCTIVE RELIEF REQUIRING TIMELY ACCESS
TO INPATIENT PSYCHIATRIC HOSPITALIZATION - Case Nos. Civ S 90-0520 LKK-JFM; Civ S-94-0671 LKK/GGH

1  hearings under the *Valdivia* Permanent Injunction is somehow an obstacle to accessing DMH

2  inpatient hospitalization.  (*Coleman* Defs.' Opp. at 10: 5-16, 21-24).  This is another distraction.

3  During the days before the 35-day hearing limit, defendants are holding accused parole violators

4  in confinement in a CDCR prison, and must meet their treatment obligations under *Coleman* and

5  the Eighth Amendment.  After the 35th day, if defendants are still holding the individual, nothing

6  has changed about defendants' treatment obligations.  Defendants have not taken the position in

7  *Valdivia* that they must release the person if no hearing is held on the 35th day.  In fact, they

8  regularly hold people past the 35th day with no hearing based on findings of "good cause" for the

9  delay.  *See* Rifkin Reply Decl. Exh. D at 45-51.  Regardless of whether this continued hold

10 violates the law, the fact is that the person remains confined in a CDCR prison, and defendants

11 are obliged to provide treatment consistent with the *Coleman* orders and Program Guide,

12 including inpatient hospitalization when appropriate.  *See* Cal. Penal Code § 4504 (person

13 deemed confined in state prison if confined in any prisons and institutions specified in Section

14 5003 regardless of purpose of confinement and regardless of validity of order directing such

15 confinement); Cal. Penal Code § 2684 (any person confined in state prison may be transferred to

16 DMH); *see also infra* Sections II(A) & III.

17      Defendants' current and proposed policies regarding mentally ill individuals charged with

18 parole violations and pending revocation do not comply with the requirements of constitutional

19 due process and treatment.  Defendants have stated that—while the bar to DMH access exists—

20 they cannot provide due process while also providing constitutional mental health treatment for

21 the limited number of class members requiring inpatient hospitalization.  Pls.' Mem. at 2, n.1.

22 Defendants present this scenario to the Court as dilemma, suggesting that the bar to DMH access

23 forces a choice between constitutional due process rights and constitutional rights to mental

24
25
26
27
28

6

[225341-1]

health treatment.[2]  But this is a false dilemma because the barrier to DMH access is one of defendants' own creation, without any basis in legal authority or necessity.  Because defendants refuse, however, in the absence of specific direction by this Court, to remove the barrier, plaintiffs request that this Court order defendants to remove this bar.

II.    **This Court Has The Authority To Order Defendants To Provide Access To Inpatient Hospitalization To Persons With Serious Mental Illness In CDCR Custody Regardless Of Revocation Status Or Parole Date**

Defendants assert that this Court lacks the authority to order defendants to provide access to inpatient hospitalization for this group of individuals confined in CDCR custody.  Defendants' arguments lack legal merit and mischaracterize the applicable law.

A.    **The *Coleman* And *Valdivia* Classes Include Individuals Who Are Confined In CDCR Custody As Alleged Parole Violators And Who Are Awaiting Revocation Of Their State Parole**

Defendants allege that the *Coleman* class of "'all inmates with serious mental disorders who are now or who will in the future be confined within the California Department of Corrections'"[3] excludes that part of the *Valdivia* class who are individuals with serious mental disorders confined within CDCR as alleged parole violators and are awaiting revocation of their state parole.  *Coleman* Defs.' Opp. at 4-5.  The only legal support defendants offer for this proposition is the observation that the United State Supreme Court held in *Morrisey* that parolees have a qualified liberty interest subject to due process protection.  However, an individual's right to due process does not annul an individual's right to constitutionally adequate mental health treatment when incarcerated by the State, and no balancing of these rights is required to resolve plaintiffs' motion.

_____

[2] Defendants characterize the examples plaintiffs provided of parolees whose revocation proceedings have been suspended for 90 and more days because they are unable to participate due to mental illness as illustrations of how the provision of mental health treatment must conflict with the provision of due process.  *Valdivia* Defs.' Opp. at 3: 15-27.  Defendants do not provide information as to whether these individuals were being treated at clinically appropriate levels of care, or whether they instead languished in reception centers and mental health crisis beds because their revocation status precluded them from referral and admission to DMH.

[3]*Coleman v. Wilson*, 912 F. Supp. 1282, 1293 (E.D. Cal. 1995) (quoting Order Filed Nov. 14, 1991 at 4-5.)  .

7

[225341-1]

1    The individuals at issue in plaintiffs' motion are, in fact, members of both the *Coleman*

2   and *Valdivia* classes and thereby have standing to bring this motion.  California state law and

3   regulations establish that the terms "inmate" and "prisoner" are synonymous and both refer to

4   persons confined in a correctional facility or institution.  *See, e.g.,* Cal. Code Regs., tit. 15, §

5   3000 (defining "prisoner" and "inmate" as synonymous terms meaning "a person in custody of

6   the director and not paroled"), attached as Appendix A under the Local Rule 5-133(i); Cal. Gov.

7   Code § 844 (defining "prisoner" as "an inmate of a prison, jail, or penal or correctional facility");

8   *see also People v. Watson*, 42 Cal. 4th 822, 824-25 (2007); *Peterson v. Los Angeles County*, 185

9   Cal. App. 3d 705, 708-09 (1986).  Moreover, the California Penal Code explicitly provides that

10   "Prisoners on parole shall remain under the legal custody of the department and shall be subject

11   at any time to be taken back within the inclosure of the prison."  Cal. Penal Code § 3056.   A

12   parole hold provides for a return to actual custody:  "The parole authority shall have full power

13   to suspend or revoke any parole, and to order returned to prison any prisoner upon parole.  The

14   written order of the parole authority shall be a sufficient warrant for any peace officer to return to

15   actual custody any conditionally released or paroled prisoner."  Cal. Penal Code § 3060.  *See*

16   *also* CDCR Proposed Changes to Regulations, Cal. Code Regs., tit. 15 § 3000 (defining "parole

17   hold" as "authorization by a departmental employee to hold a parolee in custody pursuant to

18   section § 3056 of the Penal Code."), attached as Exhibit D to Rifkin Reply Decl.  Upon this

19   "return to actual custody," an individual becomes a person confined within the CDCR, or

20   "inmate," making him or her a *Coleman* class member.  *See* Cal. Penal Code § 4504 ("A person

21   is deemed confined in a 'state prison' if he is confined in any of the prisons and institutions

22   specified in Section 5003 by order made pursuant to law, including, but not limited to,

23   commitments to the Department of Corrections…regardless of the purpose of such confinement

24   and regardless of the validity of the order directing such confinement, until a judgment of a

25   competent court setting aside such order becomes final.")

26    The *Coleman* Special Master and monitoring team have monitored and reported on the

27   group of persons with serious mental illness in CDCR custody pending parole revocation like

28   any other *Coleman* class members.  Kahn Reply Decl. ¶¶ 6-7.  Examples of review of provision

[225341-1]

1    of care to these *Coleman* class members are found in the Special Master's Report on Suicides

2    Completed in the California Department of Corrections in Calendar Year 2003, and the

3    Fourteenth and Sixteenth Monitoring Reports of the Special Master on the Defendants'

4    Compliance with Provisionally Approved Plans, Policies and Protocols.  *Id.*  In fact, in the

5    Fourteenth Report, the Special Master reported on the very problem at issue in this motion, as

6    experienced by parolees at California Institute for Men, who had been referred to DMH and

7    accepted, but whose admissions were deferred for weeks until their parole had been revoked.  *Id.*

8    ¶ 6.  ("ASH regularly accepted, but deferred, the transfer of inmates with a pending parole

9    revocation hearing scheduled within three weeks.  As a result, some inmates, whose hearing

10   dates were subsequently postponed, a not infrequent occurrence, could end up at CIM for weeks

11   awaiting the indicated transfer for intermediate inpatient care.") The Special Master identified

12   defendants' failure to transfer alleged parole violators until they had completed their revocation

13   hearings as a continuing problem in the Sixteenth Report.  *Id.* ¶ 7.

14            Defendants did not object to the Special Master reporting on these issues on the grounds

15   that these individuals are not *Coleman* class members, that the Court lacked power to address

16   their mental health needs, or that there was a statutory or constitutional bar interfering with

17   admission of these inmate-patients to DMH hospitals.  Kahn Reply Decl. ¶ 7.  Indeed, defendants

18   themselves have recognized the jurisdiction of the *Coleman* Court and Special Master to monitor

19   the provision of mental health treatment to this group of inmates with serious mental illness.  *Id.*

20   ¶ 5.  For example, in the monthly statistical package of data produced to the *Coleman* Special

21   Master and plaintiffs' counsel, defendants provide data compiled at the reception centers on the

22   lengths of stay for patients in the mental health delivery system housed in the reception centers.

23   *Id.*  The purpose of this data is to enable the Special Master and CDCR to monitor the transfer of

24   patients from reception centers to designated mental health programs within court-ordered

25   timeframes.  In this data, defendants specifically report on inmate-patients who are pending

26   revocation.  *Id.*

27

28

[225341-1]

**B.**   **This Court Has Jurisdiction to Order Defendants To Provide Access To Department Of Mental Health Beds**

This Court properly has jurisdiction to order defendants to provide access to DMH beds to individuals with serious mental illness in CDCR custody regardless of revocation status or parole date.  DMH is a State agency under the control of the executive, and the Governor is a defendant in both *Coleman* and *Valdivia*.  Additionally, this Court specifically joined Stephen Mayberg, Director of DMH, as a defendant in the *Coleman* case on June 28, 2006 because of the "critical role" played by DMH "in creating sustainable and effective solutions for inpatient care within the California Department of Corrections and Rehabilitation." 6/28/06 Order (*Coleman* Docket No. 1855) at 2:1-2.  The Court found that DMH was failing to be responsive to court-ordered remedies and should be subject to the direct supervision of the Court and involvement of the Special Master.  *Id.* at 2:3-7.  The Court has issued multiple orders specifically directed at providing access to DMH beds.  Pls.' Mem. at 1:13-17.  Further, to the extent that defendants' argument regarding lack of jurisdiction over DMH is based in their argument that individuals confined in CDCR custody pending revocation are not *Coleman* class members, that argument has already been shown to be meritless.

**C.**   **Plaintiffs' Motion Is Limited To Defendants' Provision Of Access to Inpatient Psychiatric Hospitalization Including DMH To Class Members Already Entitled To That Access**

Defendants misconstrue the relief plaintiffs request in various ways throughout their opposition.

Defendants' argument that plaintiffs seek an injunction requiring DMH to provide *Coleman* class members with pre-release parole planning is misplaced.  *See Coleman* Defs.' Opp. at 7-8.  Although it is plaintiffs' position that DMH should provide *Coleman* class members with pre-release planning as they do for their non-CDCR patients, that is not the relief requested in plaintiffs' pending motion.  The Program Guide states that DMH will return CDCR inmates to CDCR institutions at least one day prior to release to parole.  Program Guide at 12-6-9 (attached as Exh. B to 6/25/08 Kahn Decl. In Support of Pls.' Mot. for Injunctive Relief) .  Defendants' present practice reflects this policy, routinely discharging patients back to CDCR just days before

10

[225341-1]

1    their release to parole. Rifkin Reply Decl. ¶ 4.  Defendants' assertion that "DMH returns CDCR

2    prisoners back to CDCR within 35 days of their final confinement day to enable their

3    participation in the pre-release planning provided by CDCR to prisoners" is unavailing.  Not only

4    does that misstate the actual current practice of DMH, but as the *Coleman* Special Master and

5    monitors have reported, meaningful pre-release planning for *Coleman* class members in

6    reception centers does not presently occur.[4] *See, e.g.,* Special Master's Report and

7    Recommendations on Defs.' Enhanced Outpatient Treatment Program in Reception Centers

8    (*Coleman* Docket No. 2302), filed 7/2/07, at 31-23.  An acutely ill inmate-patient would do far

9    better receiving the intensive level of mental health treatment provided by inpatient

10   hospitalization at DMH than to sit in a reception center that lacks the capability for even Program

11   Guide levels of EOP treatment waiting for the Godot-like promise of CDCR pre-release

12   planning.  Moreover, defendants reportedly are currently contracting with outside contractors to

13   provide pre-release planning, and those contractors should be able to meet with patients wherever

14   they are located, including DMH hospitals.  Rifkin Reply Decl. ¶ 5.

15          Defendants also mischaracterize the relief plaintiffs seek in this motion when they state,

16   "Plaintiffs appear to seek both restorative care for those parolees who are unable to meaningfully

17   participate in a revocation hearing and inpatient care for those parolees with *Coleman*-recognized

18   serious mental disorders." *Coleman* Defs.' Opp. at 2:21-23.  In their motion, plaintiffs have not

19   requested that this Court order DMH to provide restorative care to individuals who are unable to

20   participate in their hearing akin to the procedures for individuals found incompetent to stand

21   trial.  Rather, plaintiffs request that defendants be ordered to provide inpatient psychiatric

22   hospitalization per the existing *Coleman* remedy to *Coleman* class members who meet clinical

23

24   [4] Defendants' further assertion that DMH cannot treat inmate-patients within 35 days of their
     release date because "DMH does not have the ability to determine a patient's date of discharge

25   from CDCR custody" is patently ridiculous.  Defs.' Opp. at 7:8-10; Radavsky Decl. ¶ 15.  In the
     very next sentence defendants state that " DMH returns CDCR patients back to CDCR within 35

26   days of their final confinement day…"  If DMH is unable to independently determine a patient's
     date of discharge, or to determine this date based on information received from CDCR, then

27   DMH would similarly be unable to determine when an individual comes within 35 days of that
     release date.

28

11

[225341-1]

1    admission criteria for those levels of care, regardless of revocation status or parole release date.

2        Similarly, defendants' suggestion that plaintiffs are requesting that the Court "enjoin a

3    governmental agency, DMH, from failing to properly care for parolees" is also misleading.

4    *Coleman* Defs.' Opp. at 10:5-6.  Plaintiffs have not requested an order regarding the provision of

5    mental health care to the broad class of "parolees."  Plaintiffs do ask that defendants be ordered

6    to provide access to constitutional mental health treatment, including inpatient psychiatric

7    hospitalization when clinically appropriate, to all individuals confined in CDCR prisons.

8        **D.    The Relief Requested By Plaintiffs Does Not Conflict With The Consent
         Decree Between DMH And The United States Department Of Justice Under
9        The Civil Rights Of Institutionalized Persons Act**

10        Defendants erroneously assert that provision of inpatient treatment to inmates with fewer

11   than 35 days until parole "falls afoul" of a consent decree with the United States Department of

12   Justice under the Civil Rights of Institutionalized Persons Act (CRIPA).  *Coleman* Defs.' Opp. at

13   11.  Not only are the DMH programs at CMF, SVSP, and Coalinga outside the CRIPA consent

14   decree, but, contrary to defendants' implications, this consent decree does not contain

15   exclusionary language for patients with stays shorter than 35 days.  Kahn Reply Decl. ¶¶ 8-9 and

16   Exh. 2 (*Consent Judgment,* United States v. State of California, CV 06-2667 GPS (Ex) (C.D.

17   Cal. May 16, 2006).

18        Furthermore, provision of care to these individuals does not conflict with the Recovery

19   Philosophy of Care and Psychiatric Rehabilitative Model of service delivery set forth in the

20   CRIPA consent judgment.  Kahn Reply Decl. ¶ 9.  The evaluations and therapeutic plans

21   required by the consent decree occur rapidly in the admission process and a patient admitted with

22   only 35 days of treatment time would receive an initial therapeutic and rehabilitation plan within

23   24 hours, a master therapeutic and rehabilitation plan within 7 days, and, as treatment occurred, a

24   review of the therapeutic and rehabilitation plan every 14 days until he or she discharged from

25   the program.  *Id.*  Moreover, as plaintiffs explained in their opening brief, the Acute Psychiatric

26   Program operated by DMH is specifically designed to be a short-term intensive treatment

27   program, no longer than 35-45 days, and, in any event, is not even covered by the CRIPA

28   consent judgment.  Pls.' Mem. at 14:9-21;  Kahn Reply Decl. Exh. 2.

[225341-1]

1

2

**E.    Injunctive Relief Is A Proper Exercise of This Court's Power to Enforce the *Coleman* Judgment and the *Valdivia* Stipulated Permanent Injunction**

3        Defendants make a variety of assertions regarding this Court's power to issue the

4    injunctive relief plaintiffs request, none of which is applicable to the relief actually requested in

5    this joint motion.  The appropriate standard for the injunctive relief sought by plaintiffs is

6    whether the district court may issue further orders to enforce compliance with its earlier orders to

7    remedy constitutional violations.  *Hutto v. Finney*, 437 U.S. 678, 687 (1978) (finding that district

8    court had "ample authority to go beyond earlier orders" where state had not "fully complied with

9    the court's earlier orders" to remedy constitutional violations).  Instead of addressing the narrow

10   issue presented by the motion, defendants bring in other issues:  pre-release planning (*Coleman*

11   Defs.' Opp. at 7-8), restorative care (*Id.* at 2), and provision of mental health care services to

12   parolees not confined in CDCR prisons (*Id.* at 10).  Whatever the merits of those other issues,

13   they are not presented here.  Plaintiffs' motion asks for narrow relief that defendants are already

14   obligated to provide under the scope of the *Coleman* remedial orders:  plaintiffs request that this

15   Court order defendants to immediately provide access to all levels of inpatient care to persons

16   with serious mental illness requiring inpatient level mental health treatment who are in CDCR

17   custody, regardless of revocation status or parole date.

18        Thus, plaintiffs ask the Court to order defendants to do something that they are already

19   obligated but refuse to do:  provide constitutional levels of mental health care to *Coleman* class

20   members who are also part of the *Valdivia* class.  The Court has the power to enforce its orders

21   and has issued numerous orders in both *Coleman* and *Valdivia* directed at achieving compliance

22   with the remedies in those cases.  *See, e.g., Valdivia* 5/6/08 Order (Doc. 1439) at 15:7-15 ("The

23   changes ordered by the court…reflect its attempt to bring the defendants' policies and procedures

24   in line with the terms of the Permanent Injunction, which seeks, inter alia, to prevent on-going

25   due process violations as defined by *Morrisey* and *Gagnon*.  In other words, the [ ] order does not

26   create 'new' requirements, as the defendants claim, but rather makes explicit what the policies

27   and procedures should have contained upon their inception several years ago."); *see also Hutto*,

28   437 U.S. at 687; *Toussaint v. McCarthy*, 801 F.2d 1080, 1087 (9th Cir. 1986) (noting that "[a]

13

[225341-1]

1   defendant's history of noncompliance with prior orders is a relevant factor in determining the

2   necessary scope of an effective remedy").  Because the requested relief is encompassed within

3   the *Coleman* remedy and aimed at enforcing compliance with that remedy, defendants' further

4   allegation that this relief is barred by res judicata is similarly inapplicable.

5       **F.    Plaintiffs' Request For Relief Does Not Pose A Conflict Of Interest For The**
6           ***Coleman* And *Valdivia* Classes**

7           In defendants' desperation to defend the indefensible position that the State can hold

8   people in prison and deny them mental health treatment, defendants' counsel irresponsibly hurl

9   baseless ethical charges against plaintiffs' counsel.  *See Valdivia* Defs.' Opp. at 4-5.[5]

10          The alleged "conflict" of interest between the *Coleman* and *Valdivia* classes is entirely

11  manufactured by Defendants' arbitrary policy of barring persons in CDCR prisons who are

12  awaiting revocation hearings from accessing in-patient hospital care.  The only arguments CDCR

13  presents for the so-called "conflict" (they present no facts at all) are (1) that somehow plaintiffs

14  are asking that persons pending revocation be jumped to the head of the line for DMH care, and

15  (2) the so-called obstacles to DMH placement can only be removed by speeding accused parole

16  violators to "revoked" status without adequate hearings.

17          The first, "priority," argument, is a fictional straw man.  Plaintiffs do not seek "priority"

18  placement in this motion; they merely seek a ruling that *Coleman* class members held in CDCR

19  prisons pending revocation hearings be treated just like any other *Coleman* class members in

20

_____

21  [5] Page 4 of the *Valdivia* opposition cites "Rule 3-301 of the California Rules of Professional
22  [C]onduct."  There is no such-numbered rule.  Plaintiffs presume that defendants intended to cite
    Rule 3-110 of the California Rules of Professional Conduct, "Avoiding the Representation of
23  Adverse Interests."  Rule 3-310 is a compound rule, with five substantive subparts, each subpart
    addressing a distinct conflict scenario.  Defendants' filing does not specify which type of conflict
24  they are asserting.  Allegations of ethical conflict are a serious matter, and should be dealt with in
    a serious way that provides the accused attorney notice of the provision he or she is deemed to
25  have violated.  Defendants' loose and erroneous citation of an entire section of the rules exposes
    this tactic as a makeweight argument thrown against the wall with everything else in order to see
26  what sticks.  Such unfounded accusations are sanctionable when brought as a disqualification
27  motion.  *See Optyl Eyewear Fashion Intern. Corp. v. Style Companies, Ltd.,* 760 F.2d 1045 (9th
    Cir. 1985).
28

                                                    14

1  CDCR prisons.

2        The second, "obstacles," argument, does not show a conflict; rather it shows that

3  defendants have created an arbitrary obstacle to DMH placement which must be removed in the

4  interests of both classes.  That is what plaintiffs are attempting to do in this consolidated motion.

5  It is an axiom of the law of conflicts that a party should not be permitted to create a conflict by

6  its own conduct and then assert the conflict as a litigation tactic.  *See Federal Home Loan Mortg.*

7  *Corp. v. La Conchita Ranch Co.*, 68 Cal. App. 4th 856, 862 (1998); 1 Witkin, Cal. Proc. 4th

8  (2007 supp.) Attys, § 133, p. 40 ("Abuse of Motion").  *Valdivia* class members have a right to

9  due process.  *Coleman* class members have a right to treatment.  Nothing puts these rights in

10  conflict.  Defendants have interposed an arbitrary obstacle to treatment.  Defendants' asserted

11  "due process" justifications for this obstacle are frivolous, as demonstrated elsewhere in this

12  Reply.

13        Far from being conflicted, plaintiffs' counsel are required to seek removal of obstacles to

14  treatment.  Defendants' refusal to admit and transfer individuals to DMH beds until they have

15  completed the revocation process has a significant and hazardous practical effect on members of

16  the *Valdivia* and *Coleman* classes charged with parole violations.  Because these individuals

17  serve short terms in custody that average months and last a maximum of twelve months, any

18  delays in referral, admission, and transfer to inpatient care greatly diminish the possibility that

19  parole violators who meet clinical criteria for inpatient care will ever actually receive it during

20  their relatively short parole revocation terms.  Especially when combined with the other

21  restriction on DMH access that plaintiffs challenge in their motion—the bar on admission of

22  individuals with fewer than 35 days to parole—defendants' arbitrary and unfounded restrictions

23  on access have severe consequences for this group of *Coleman-Valdivia* class members.

24  **III.    Constitutional Due Process, The *Coleman* Remedy, And California Law Provide For
       Appropriate Psychiatric Hospitalization Of Persons Confined In CDCR Custody
25       Regardless Of Revocation Status Or Parole Date**

26        Appropriate inpatient psychiatric hospitalization of persons confined in CDCR custody is

27  consistent with federal constitutional due process, the *Coleman* remedy, and California law.

28  *Coleman* defendants' theatric opening sentence alleging that "Plaintiffs' counsel puts before this

1    Court a conflict within its own representation of the *Valdivia* class: the parolee's due process

2    interest in a timely revocation hearing versus the parolees' liberty interest in being free from

3    involuntary placement in a Department of Mental Health (DMH) hospital pending his revocation

4    hearings" is pure dramatization without basis in responsible legal argument.  *See Coleman* Defs.'

5    Opp. at 1.  This tactic again evidences defendants' desperation to defend their indefensible denial

6    of constitutionally adequate mental health care to acutely ill human beings.

7          Defendants misrepresent California statutes governing the transfer of CDCR inmates to

8    the Department of Mental Health for inpatient care.  Defendants state that California Penal Code

9    section 2684 "expressly applies to 'inmates' who have a far more minimal liberty interest in

10   release from state prison than a parolee on a parole hold….Absent the revocation of parole, the

11   State cannot use section 2684 nor the parole hold of the *Valdivia* injunction as the basis for the

12   literally holding the parolee for mental health care within or beyond the 35 days permitted for the

13   revocation hearing."[6]  *Coleman* Defs.' Opp. at 10:18-24.  Penal Code section 2684 actually

14   reads:

15
16
>        If, in the opinion of the Director of Corrections, the rehabilitation of
>        *any mentally ill, mentally deficient, or insane person confined in a*
>        *state prison* may be expedited by treatment at any one of the state
>        hospitals under the jurisdiction of the State Department of Mental
>        Health or the State Department of Developmental Services, the
>        Director of Corrections, with the approval of the Board of Prison
>        Terms for persons sentenced pursuant to subdivision (b) of Section
>        1168, shall certify that fact to the director of the appropriate
>        department who shall evaluate the prisoner to determine if he or she
>        would benefit from care and treatment in a state hospital.

17
18
19
20
21
22
23

24   [6] This position conflicts with that taken by the CDCR Office of Legal Affairs, who previously
25   stated that Penal Code Section 2684 covers "all persons confined to the custody of CDCR, which
     includes parolees pending revocation."   Declaration of Ernest Galvan in Support of Pls.' Mot.
26   for Injunctive Relief Requiring Timely Access to Inpatient Psychiatric Hospitalization, Exh. 4 at
     69 (CDCR's own report quoting Penal Code Section 2684, and stating that although "DMH has
27   historically interpreted this section to require that a parolee be in revoked status in order for
     transfer pursuant to the above section," "CDCR interprets the section to cover all persons
28   confined to the custody of CDCR, which includes parolees pending revocation").

1    (emphasis added).  The individuals at issue in plaintiffs' motion are mentally ill people confined

2    in state prisons pursuant to parole holds, and are subject to transfer under the authority of section

3    2684.  *See also* Cal. Penal Code § 4504 ("A person is deemed confined in a 'state prison' if he is

4    confined in any of the prisons and institutions specified in Section 5003 by order made pursuant

5    to law…").  Defendants' conclusion that the "extant liberty interest of the parolee awaiting

6    revocation means that state statutory prohibitions against involuntary placement in a state mental

7    health hospital apply, including the Lanterman-Petris-Short Act. Cal.  Welf. & Inst. Code § 5000

8    et seq." is grounded in no legal authority.  While an individual in CDCR custody pursuant to a

9    parole hold does maintain a due process interest regarding involuntary mental health treatment

10   that must be protected, this protection is afforded by the Program Guide and California Code of

11   Regulations, title 15, Section 3369.1(a), which provides for either consent or a hearing when a

12   CDCR prisoner is transferred to a DMH inpatient psychiatric program.  As defendants

13   acknowledge, these protections satisfy federal constitutional due process requirements as set

14   forth in *Vitek v. Jones*, 445 U.S. 480 (1980).  Defs.' Opp. at 10:20-21 ("Any lack of consent to

15   this transfer to a state hospital is addressed by a per-transfer *Vitek* hearing.").

16       The Lanterman-Petris-Short Act (LPS Act), California's historic law to deinstitutionalize

17   the mentally ill, does not restrict defendants' ability to provide inpatient mental health care for

18   persons already confined in CDCR institutions.  Cal. Welf. & Inst. Code § 5000 et seq.  The

19   California Welfare & Institutions Code expressly provides that "Mentally disordered prisoners in

20   the state prisons shall be admitted to the state hospitals in accordance with the provisions of the

21   Penal Code," not by the procedures of the LPS Act.  Cal. Welf. & Inst. Code § 7227.  The

22   defendants here are twisting the LPS Act into an excuse to deny treatment to persons defendants

23   have already deprived of liberty by confining them in state prison on a parole hold.  This is

24   contrary to the purposes of the LPS Act, which include the provision of "prompt evaluation and

25   treatment of persons with serious mental disorders," and "[t]o guarantee and protect public

26   safety."  Cal. Welf. & Inst. Code § 5001(b), (c).  As noted above, the due process interests of a

27   person confined in prison who is deemed to require inpatient psychiatric treatment are protected

28   by the process set forth in *Vitek*, not by the LPS Act.

17

[225341-1]

1

**IV.    Defendants' Proposed "Compromise" Of Restricting DMH Admission For
Individuals In CDCR Custody Pending Revocation To CMF And SVPP Should Be
Rejected**

2

3        Defendants offer the "compromise" of accepting plaintiffs pending revocation only into

4    the CMF and SVPP DMH programs.  This proposal should be rejected.  First, defendants'

5    rationale that these programs are more amenable to these individuals because they are not

6    covered by the CRIPA consent decree is not substantiated by fact or law.  The CRIPA consent

7    decree does not bar persons pending parole revocation hearings, or persons with fewer than 35

8    days to serve.  Second, these two programs are the highest security DMH programs with the

9    longest waitlists and the least chance of actual transfer for this group of short-term parole

10   violators.  Kahn Reply Decl. ¶ 10.  Plaintiffs have demonstrated that any barrier to DMH access

11   for these individuals is entirely of defendants' own making, unjustified by California law, and

12   violates defendants' constitutional obligations to the plaintiff classes.  This Court should order

13   defendants to remove the barriers to all DMH programs available to other CDCR inmates for

14   individuals in CDCR custody pending revocation who meet clinical admission criteria.

15                                    **CONCLUSION**

16       For the foregoing reasons, plaintiffs respectfully request that this Court issue the

17   following order:

18       Defendants shall immediately take all necessary steps to provide timely access to all

19   levels of inpatient psychiatric hospitalization, including inpatient hospital beds operated by the

20   Department of Mental Health, to persons in CDCR custody regardless of parole revocation status

21   or parole date.

22   Dated:  July 18, 2008                          Respectfully submitted,

23                                                  ROSEN, BIEN & GALVAN, LLP

24

25                                                  By: */s/ Lori Rifkin*
                                                        Lori Rifkin
26                                                      Attorney for Plaintiffs

27

28

                                              18

[225341-1]

# Appendix A

Pursuant to Local Rule 5-133(i), plaintiffs append hereto true and correct copies of California Code of Regulations, title 15, §§ 3000 & 3369.1

State of California

# California Code of Regulations

# Title 15.   Crime Prevention and Corrections



Division 3

## Department of Corrections and Rehabilitation

Chapter 1

*Rules and Regulations of*

Adult Institutions, Programs and Parole

Updated through September 7, 2007

# DIVISION 3.  ADULT INSTITUTIONS, PROGRAMS AND PAROLE

## CHAPTER 1.  RULES AND REGULATIONS OF ADULT OPERATIONS AND PROGRAMS

HISTORY:
1. Change without regulatory effect repealing preface filed 10-29-90 pursuant to section 100, title 1, California Code of Regulations (Register 91, No. 6).

### Article 1.   Behavior

**3000.  Definitions.**
The following are definitions of terms as used in these regulations:

Adverse Witness means a person who has given or will give information against a prisoner or parolee.

Appeal means a formal request for, or the act of requesting, an official change of a decision, action, or policy.

Appeal Form means Inmate/Parolee Appeal Form, CDC Form 602 (Rev. 12/87).

Architectural and Engineering Services means those services procured outside of the State's Civil Service procedures and which are rendered by an architect or engineer, but may include ancillary services logically or justifiably performed in connection therewith.

Asylum State means the state other than California in which a parolee-at-large is in custody.

Attempted Escape means an unsuccessful effort to breach a secured perimeter or the use of force against a person to attempt access into an unauthorized area. Some progress toward implementing an escape must be made to implement a plan. This includes, but is not limited to the following overt acts: acquiring unauthorized clothing or identification, preparing a hiding place in an unauthorized area, lying in wait for a potential hostage, attempting access to a perimeter that was unsupervised, unlawfully obtaining tools to aid in an escape, manufacturing a likeness of a person in order to substitute for the inmate's presence, or receiving assistance from other conspirators who acted upon an escape plan, e.g. a plan to escape uncovered from verbal, telephone or mail communication.

Board of Prison Terms (Board) means the state agency which is responsible for the administration of parole for those persons committed to the department under Penal Code section 1168 and those committed to the department under Penal Code section 1170 who also meet the criteria found in Penal Code section 2962.

California Agency Parolee means a person released from department facility to parole supervision in a California community who subsequently is within the custody of any California agency, or subdivision thereof, except the department.

California Agency Prisoner means a prisoner who has been transferred from the custody of the department to the custody of any other California agency or subdivision thereof.

California Concurrent Parolee means a person on parole for a California sentence and a sentence of another jurisdiction who is being supervised in a California community pursuant to the Uniform Act for Out-of-State Parole Supervision (Penal Code sections 11175–11179).

Case Conference means a documented conference between a parole agent and his/her supervisor to discuss a parolee's behavior.

Case records file means the file which contains the information concerning an inmate which is compiled by the department pursuant to Penal Code Section 2081.5 and includes such components as the central file, education file, visiting file and parole field file.

Central File (C-File) means a master file maintained by the department containing records regarding each person committed to its jurisdiction.

Central Office Calendar means the calendar which is composed of administrative hearing officers as designated by the deputy director, parole hearings division. They are authorized to make decisions regarding matters reported to the parole hearings division, including the decision to order a hearing scheduled.

Central Office Hearing Coordinator means the parole hearings division employee at headquarters who is responsible for hearing schedules, attorney appointments, and other hearing-related services.

Certification means that a business concern has obtained verification that it meets the definition of disabled veteran business enterprise pursuant to Military and Veterans Code section 999(g) from an agency that has been authorized by law to issue such certification.

Chaplain means an individual duly designated by a religious denomination to discharge specified religious duties, including a native American Indian spiritual leader.

Chronological History means a CDC Form 112 (Rev. 9/83), Chronological History, prepared for each inmate, upon which significant dates and commitment information affecting the inmate are logged.

Classification and Parole Representative (C&PR) means the department employee designated at each institution to be that institution's liaison with releasing boards and parole staff.

Concurrent Parolee means a person on parole for a California sentence and a sentence of another jurisdiction who is being supervised in a state other than California pursuant to the Uniform Act for Out-of-State Parole Supervision (Penal Code sections 11175–11179).

Conditions of Parole mean the specific conditions under which a prisoner is released to parole supervision.

Confinement to Quarters (CTQ) means an authorized disciplinary hearing action whereby an inmate is restricted to their assigned quarters for a period not to exceed five days for administrative rule violations and ten days for serious rule violations.

Contraband means anything which is not permitted, in excess of the maximum quantity permitted, or received or obtained from an unauthorized source.

Controlled Medication means any drug which is prescribed by a physician and is given to an inmate in controlled dosages.

Controlled Substance means any substance, drug, narcotic, opiate, hallucinogen, depressant, or stimulant as defined by California Health and Safety Code section 11007.

Cooperative Parolee means a person on parole for a California sentence who is under parole supervision in a state other than California pursuant to the Uniform Act for Out-of-State Parole Supervision (Penal Code sections 11175–11179).

Course of conduct means two or more acts over a period of time, however short, evidencing a continuity of purpose.

Criminal Identification and Investigation (CI&I) Report means the report defined by Penal Code section 11105, commonly referred to as "Rap Sheet".

Cumulative Case Summary means the cumulative summary of specific portions of the record maintained by the department regarding each person from reception to discharge.

Department means the department of corrections.

Designated Level II Housing means a housing facility encompassed by a facility security perimeter and constructed to provide celled housing for inmates with Level II classification scores.

Detainer means a written document received from an official representing a district attorney office, court, or correctional or law enforcement agent which indicates that an inmate is wanted by that office and the basis for the detainer.

§ 3000                    DEPARTMENT OF CORRECTIONS AND REHABILITATION                    **TITLE 15**

Determinate Sentencing Law (DSL) Prisoner means a person sentenced to prison under Penal Code section 1170 for a crime committed on or after July 1, 1977.

Direct and Constant Supervision means an inmate shall be monitored and observed by CDC staff, either custody staff or work supervisor as indicated in these regulations, sufficiently to account for the specific whereabouts of the inmate at all times.

Director means the director of the department of corrections.

Disabled Veteran Business Enterprise means a business concern as defined in Military and Veterans Code section 999(g).

Disabled Veteran Business Enterprise focus paper means a publication that meets all of the following criteria: (1) has an orientation relating to the disabled veteran business enterprise; (2) is known and utilized by members of the disabled veteran business enterprise community; (3) primarily offers articles, editorials (if any), and advertisements of business opportunities aimed at disabled veteran business enterprises; and (4) is readily available within the geographical area for which the advertisement is placed and for which the services are to be performed.

Disabled Veteran Business Enterprise focus paper and trade paper means a publication that meets all of the criteria of a disabled veteran business enterprise focus paper and all of the criteria of a trade paper.

Disciplinary Detention means a temporary housing status which confines inmates so assigned to designated rooms or cells for prescribed periods of time as punishment for serious rule violations.

Disciplinary Free means without any finding of guilt of a disciplinary infraction filed on a CDC Form 115, Rule Violation Report, classified as either administrative or serious.

Disruptive Group—means any gang, other than a prison gang.

Distribution means the sale or unlawful dispersing, by an inmate or parolee, of any controlled substance; or the solicitation of or conspiring with others in arranging for, the introduction of controlled substances into any institution, camp, contract health facility, or community correctional facility for the purpose of sales or distribution.

Drugs means substances intended for use in the diagnosis, cure, mitigation, treatment or prevention of disease, and as defined in Health and Safety Code section 11014. In may also include drug paraphernalia, as defined in Health and Safety Code section 11014.5.

Escape History refers to any reliable information or inmate self-admission in the central file to an escape, attempted escape, walkaway, or plan to escape. The available information describing the circumstances of the escape or attempted escape shall be evaluated in determining the level of risk to correctional safety and security posed by the inmate.

Examinee means a person who voluntarily takes a polygraph examination.

Ex-Offender means a person previously convicted of a felony in California or any other state, or convicted of an offense in another state which would have been a felony if committed in California.

Execution Type Murder describes the circumstances or manner of a fatal offense in which the victim is bound, cuffed, gagged, blindfolded, or forced to assume a position from which the victim is unable to resist or flee; the victim is shot at close range; or the manner of death demonstrates that the victim had no opportunity to defend himself or herself nor to flee.

Facility Security Perimeter is any combination of living unit, work area and recreation area perimeters that is set aside to routinely restrict inmate movement based on custody level. This perimeter will contract and expand depending upon the weather, lighting conditions and hours of operation.

Federal Consecutive Prisoner means a California prisoner who is also under sentence of the United States and is confined in a federal correctional facility, and whose California term shall commence upon completion of the United States' sentence.

Field File means a working file maintained by a parole unit office containing information about a parolee and his/her current parole.

Firm means any individual, firm, partnership, corporation, association, joint venture or other legal entity permitted by law to practice the professions of architecture, landscape architecture, engineering, environmental services, land surveying or construction project management.

Force, as applied to escape or Attempted Escape, refers to physical contact or threat of physical harm against a person to enable or attempt the escape.

Frequent and Direct Supervision means that staff supervision of an inmate shall be sufficient to ensure that the inmate is present within the area permitted.

Friendly Witness means any witness who is not an adverse witness.

Gang means any ongoing formal or informal organization, association or group of three or more persons which has a common name or identifying sign or symbol whose members and/or associates, individually or collectively, engage or have engaged, on behalf of that organization, association or group, in two or more acts which include, planning, organizing threatening, financing, soliciting, or committing unlawful acts or acts of misconduct classified as serious pursuant to section 3315.

General Chrono means a CDC Form 128-B (Rev. 4–74) which is used to document information about inmates and inmate behavior. Such information may include, but is not limited to, documentation of enemies, records of disciplinary or classification matters, pay reductions or inability to satisfactorily perform a job, refusal to comply with grooming standards, removal from a program, records of parole or social service matters.

Goal means a numerically expressed disabled veteran business enterprise objective as set out in Public Contract Code section 10115(c), that awarding departments and contractors are required to make efforts to achieve.

Good Cause means a finding based upon a preponderance of the evidence that there is a factual basis and good reason for the decision made.

Good Faith Effort means a concerted effort on the part of a potential contractor to seek out and consider disabled veteran-owned and operated business enterprises as potential contractors, and/or subcontractors in order to meet the program participation goals.

Grievance means a complaint about a decision, action, or policy which an inmate, parolee or staff wish to have changed.

Harassment means a willful course of conduct directed at a specific person, group, or entity which seriously alarms, annoys, or terrorizes that person, group, or entity and which serves no legitimate purpose.

Hearing Agent means the parole and community services division employee responsible for application of specific procedures pertaining to the parole revocation hearing process; the primary liaison between the parole and community services division and the releasing authorities in matters and procedures pertaining to the parole revocation hearing process.

Hearing Coordinator means an employee assigned to coordinate the revocation process within an institution or a parole and community services division region.

High Notoriety describes an inmate who must be treated as a significant escape risk due to the unusual level of public panic that his or her escape would likely cause. The risk of public panic is based upon the nature or circumstance of the inmate's crime, the inmate's criminal history, the inmate's behavior in custody, and extensive or prolonged media coverage of the crime beyond the closest large city and its surrounding communities. A High

TITLE 15            DEPARTMENT OF CORRECTIONS AND REHABILITATION            § 3000

Notoriety inmate is one who is perceived by the public to have criminal influence or access to significant amounts of money or drugs or power that may enable the inmate to escape, trigger a public disturbance, or victimize any person or a witness to their conviction offense. Bases for the High Notoriety designation include, but are not limited to, Execution Type Murder, Multiple Murders, mutilation of victims, an original sentence of Death, a sentence of Life Without the Possibility of Parole, a total term of 100 years or more.

Hold means to retain an inmate or parolee, who is under the director's jurisdiction, in custody at an institution or a local detention facility in response to the legal request of a law enforcement or correctional agency representative.

Immediate Family Members means legal spouse; natural parents; adoptive parents, if the adoption occurred and a family relationship existed prior to the inmate's incarceration; stepparents or foster parents; grandparents; natural, step, or foster brothers or sisters; the inmate's natural and adoptive children; grandchildren; and legal stepchildren of the inmate. Aunts, uncles and cousins are not immediate family members unless a verified foster relationship exists.

Incarcerating Jurisdiction means the jurisdiction where an Interstate or Western Interstate Corrections Compact, federal contract, federal concurrent, or concurrent prisoner is incarcerated.

Indeterminate Sentence Law (ISL) means a person sentenced to prison for a crime committed on or before June 30, 1977, who would have been sentenced under Penal Code section 1170 if he/she had committed the crime on or after July 1, 1977.

Indigent Inmate means an inmate who is wholly without funds at the time they were eligible for withdrawal of funds for canteen purchases.

Inmate means a person under the jurisdiction of the director and not paroled. Inmate and prisoner are synonymous terms.

Inmate Match means a one-on-one match of a citizen volunteer and an inmate who receives few or no visits to establish a relationship which encourages positive inmate behavior and programming.

Institution Head means a warden, regional parole administrator, or designated manager of a facility housing inmates.

Interstate Unit means the office of the parole and community services division which coordinates the supervision of California cooperative parolee and the return of parolees-at-large from asylum states. The unit is responsible for Interstate and Western Interstate Corrections Compacts, federal contract, federal concurrent, and consecutive prisoners and multijurisdiction parolees incarcerated in the prison of another jurisdiction.

Joint Venture Employer (JVE) means any public entity, nonprofit or for profit entity, organization, or business which contracts with the director for the purpose of employing inmate labor.

Joint Venture Program (JVP) means a contract entered into between the director and any public entity, nonprofit or for profit entity, organization, or business for the purpose of employing inmate labor.

Laboratory means any toxicological or criminalistic laboratory which has been recognized by the state, other certifying agency, or which is accepted by any local, county, or state prosecuting authority to provide evidence as to the presence of controlled substances in human body fluids or confirm that a substance is or contains any controlled substance.

Legal Status Sheet (LSS) means a CDC Form 188, Legal Status Summary, containing the commitment and release status of an inmate.

Life Prisoner means a prisoner serving a sentence of 15- or 25-years-to-life.

Lockdown means that a portion of the facility is affected by suspension of required programs or services, and inmates are not released except as determined by the facility administration on an

individuals, case-by-case basis. As determined by the facility administration, under such circumstances only critical inmate workers in the affected housing units/sub-facilities will be permitted to attend to work assignments under escort, and all but essential functions are suspended in those affected housing units or subfacilities, e.g., yard, canteen draws, religious services, and visiting.

Lockout means any refusal by an employer to permit any group of five or more employees to work as a result of a dispute with such employees affecting wages, hours or other terms or conditions of employment of such employees.

Management Concern means a behavior observed or documented in the inmate's criminal history that demonstrates to a classification committee that the inmate has a propensity towards violence against self or others; has a history of inciting or pressuring others toward criminal behavior; preys on more vulnerable members of society; or portrays a level of criminal sophistication and/or access to large amounts of drugs, money, or power. This may include disruptive groups and prison gang members or affiliates.

Manuscript means any written, typed or printed articles of fiction and nonfiction; poems; essays; gags; plays; skits; paintings; sketches; drawings; or musical compositions created by an inmate.

Material Evidence means evidence which has a substantial bearing on matters in dispute and legitimate and effective influence on the decision of a case.

Media representative means a print, wire service or broadcast reporter and their technical crew. A free-lance writer with assignment verification in the form of a letter from the represented outlet is also a media representative.

Minimum Eligible Parole Date (MEPD) means the earliest date on which an Indeterminate Sentence Law or life prisoner may legally be released on parole.

Multijurisdiction Parolee means any concurrent, California concurrent, California agency, or cooperative parolee.

Multijurisdiction Prisoner means any federal contract, federal concurrent, federal consecutive, concurrent, consecutive, California agency, Interstate or Western Interstate Corrections Compact prisoner.

Multiple Murders means the inmate killed or was involved in killing more than one victim during the commission of the crime for which the inmate is currently serving a Life term. This does not necessarily include an inmate who has killed more than one person during his or her criminal career.

Out-to-Court means an inmate is temporarily removed from a facility to be brought before a court to be tried for an offense, to be examined by a grand jury or magistrate, or for any other court proceedings.

Parole Agent means an employee and his/her supervisors in the department who are assigned to supervise those persons released from incarceration to the supervision of the parole and community services division.

Parole Hearings Division means the division of the department which is responsible for the department's administration of paroles for those persons committed to the department under Penal Code section 1170, except those who also meet the criteria of Penal Code section 2962.

Parole Violation means conduct by a parolee which violates the conditions of parole or otherwise provides good cause for the modification or revocation of parole.

Parole Violation Extension means an extension of return-to-custody time for a parolee in revoked status.

Parole Violator means a parolee who is found to have violated parole and who may be returned to custody pursuant to Penal Code section 3057.

Parolee means a felon or civil addict commitment released from confinement in state prison to supervision in the community.

Parolee-at-Large means an absconder from parole supervision, who is declared a fugitive by releasing authority action suspending parole.

Polygraph Examination means the procedure by which a polygraph examiner renders an opinion as to the veracity of statements made by an examinee.

Polygraph Examiner means a person who purports to be able to determine the truthfulness of statements through the use of a polygraph instrument.

Preprison Credit means credit for time in custody as certified by the court and provided for in Penal Code section 2900.5.

Prison Gang—means any gang which originated and has its roots within the department or any other prison system.

Prisoner means a person in custody of the director and not paroled. Prisoner and inmate are synonymous terms.

Probation Officer's Report means a CDC Form 174 (Rev. 3/87), Probation Officer's Report, prepared by the probation officer in the county where the offense was committed.

Program failure means any inmate who generates a significant disciplinary history within the last 180 days from the current date. A guilty finding for two serious Rules Violation Reports or one serious and two administrative Rules Violation Reports within that 180 day time period is reasonable evidence of a significant disciplinary history and may be considered a program failure.

Project, as used in sections 3475 through 3478, means a proposal of something to be done for which a contract has not yet been awarded.

Public Interest Case is a case identified by a Classification Staff Representative as involving a High Notoriety inmate who requires exceptional placement.

Received Date means the date an inmate is initially received into a facility of the department.

Receiving State means the state which supervises a cooperative parolee or a concurrent parolee.

Regional Parole Administrator means the department's administrator of a parole and community services division geographical region.

Relevant Evidence means evidence which tends to prove or disprove an issue or fact in dispute.

Religious Artifact means any bag, cross, medallion, totem, bible, pipe, or other item in which the possessor places religious or spiritual significance.

Religious Review Committee (RRC) means a committee formed and maintained at each institution that reviews and reaches a decision regarding requests for reasonable accommodation and/or access to religious services.

Responsible Bidder means, in addition to other State contracting requirements, a bidder who has either met the disabled veteran business enterprise goal or who has demonstrated that a good faith effort was made to meet the goal.

Restricted or controlled inmate movement means that the affected inmates are not permitted normal release schedules and that all or specified movement may require a greater degree of supervision than normal. Such restriction may include, but is not limited to controlled feeding, a section at a time, rather than the entire unit or sub-facility being released. Such restrictions do not constitute a State of Emergency as determined in Section 3383.

Review means formal investigation into facts related to appeal allegations, and documentation of the findings and the decision to grant or deny the appeal.

Room and Board means all that the department provides for the inmate's care, housing and retention.

Screening means evaluation by staff to ascertain that specified requirements or criteria are met.

Secure Perimeter means the largest Security Perimeter that physically retains inmates in custody on facility property.

Security Perimeter means any unbroken physical barrier or combination of physical barriers that restricts inmate movement to a contained area without being processed through a door, gate, or sallyport.

Serious injury means a serious impairment of physical condition, including, but not limited to, the following: loss of consciousness; concussion; bone fracture; protracted loss or impairment of function of any bodily member or organ; a wound requiring suturing; and disfigurement.

Significant work related disciplinary history means a guilty finding for two work-related serious rule violation reports or one serious and two administrative work-related rule violation reports within the last 180 days from the date of the current work-related disciplinary offense.

Small Business Firm means a business in which the principal office is located in California and the officers of such business are domiciled in California which is independently owned and operated and which is not dominant in its field of operation. The maximum dollar volume that a small business may generate shall vary from industry to industry to the extent necessary to reflect differing characteristics of such industries.

Special Assignment means a departmentally-approved special program, temporary or short-term assignment for departmental convenience, or medical or psychiatric treatment category with exceptional credit-earning provisions.

Street gang refers to a gang as defined herein except that it is not a prison gang.

Strike means any concerted act of more than 50 percent of the bargaining unit employees in a lawful refusal of such employees under applicable state or federal law to perform work or services for an employer, other than work stoppages based on conflicting union jurisdictions or work stoppages unauthorized by the proper union governing body.

Subcontractor means any person or entity that enters into a subcontract with a prime contractor for work, materials, supplies and/or labor.

Sweat Lodge means a native American Indian ceremonial hut.

Terminal illness means an incurable disease process with progression unresponsive to medical intervention where a medical doctor estimates that death will occur within a six-month period.

Time Computation means the department's uniform method for calculating an inmate's term and minimum and maximum release dates as governed by law.

Time Served means that time an inmate is imprisoned with the department between their received date and a given date.

Trade Paper means a publication that meets all of the following criteria: (1) has a business orientation relating to the trade or industry for which the advertisement is being placed; (2) is known and utilized by members of that trade or industry; (3) primarily offers articles, editorials (if any), and advertisements of business opportunities aimed at that trade or industry; and (4) is readily available within the geographical area for which the advertisement is placed and for which the services are to be performed.

Unit Supervisor means a supervisor of case-carrying parole agents in the parole and community services division.

Unusual Violence describes the circumstances of an offense wherein the inmate acted to torture the victim over a period of time or intentionally made the victim endure great pain and suffering. A single act of stabbing, shooting, or beating of a victim does not necessarily qualify.

Vexatious Litigant means a person who does any of the following: (1) in the immediately preceding seven-year period has commenced, prosecuted, or maintained in propria persona at least five litigations other than in a small claims court that have been (a) finally determined adversely to the person or; (b) unjustifiably permitted to remain pending at least two years without having been brought to trial or hearing; (2) after a litigation has been finally

**TITLE 15**　　　　　DEPARTMENT OF CORRECTIONS AND REHABILITATION　　　　　**§ 3000**

determined against the person, repeatedly relitigates or attempts to relitigate in propria persona either; (a) the validity of the determination against the same defendant or defendants as to whom the litigation was finally determined or; (b) the cause of action, claim, controversy, or any of the issues of fact or law, determined or concluded by the final determination against the same defendant or defendants as to whom the litigation was finally determined; (3) in any litigation while acting in propria persona, repeatedly files unmeritorious motions, pleadings, or other papers, conducts unnecessary discovery, or engages in other tactics that are frivolous or solely intended to cause unnecessary delay; (4) has previously been declared to be a vexatious litigant by any state or federal court of record in any actions or proceeding based upon the same or substantially similar facts, transaction, or occurrence. Pursuant to In re Bittaker, Writs of Habeas Corpus are not included under vexatious litigation.

Work Change Area means a portal controlled by staff and/or locking gates that is used to control access and includes the area where staff search inmates prior to permitting inmates in or out of adjacent areas such as Prison Industry Authority yards.

Worktime Credit means credit towards a prisoner's sentence for satisfactory performance in work, training or education programs.

NOTE: Authority cited: Sections 2717.3, 5058 and 5058.3, Penal Code; Section 10115.3(b), Public Contract Code; and Sections 4525(a), 4526 and 14837, Government Code. Reference: Sections 186.22, 243, 530, 532, 646.9, 653m, 832.5, 1389, 2080, 2081.5, 2600, 2601, 2700, 2717.1, 2717.6, 2932.5, 4570, 5009, 5054, 5068, and 7000 et seq., Penal Code; Sections 1132.4 and 1132.8, Labor Code; Sections 10106, 10108, 10108.5, 10115, 10115.1, 10115,2, 10115.3 and 10127, Public Contract Code; and Section 999, Military and Veterans Code; Section 391, Code of Civil Procedure; In re Bittaker, 55 Cal.App. 4th 1004, 64 Cal. Rptr. 2d 679; and Section 11007, Health and Safety Code.

HISTORY:
1. Amendment of subsection (a)(19) filed 12-1-78 as an emergency; designated effective 1-1-79 (Register 78, No. 48). For prior history, see Register 77, No. 40.
2. Certificate of Compliance filed 2-22-79 (Register 79, No. 8).
3. Amendment filed 11-20-79 as an emergency; designated effective 1-1-80 (Register 79, No. 47). A Certificate of Compliance must be filed within 120 days or emergency language will be repealed on 3-20-80.
4. Certificate of Compliance filed 2-15-80 (Register 80, No. 7).
5. Amendment filed 3-2-83: effective thirtieth day thereafter (Register 83, No. 12).
6. Change without regulatory effect repealing and adopting new section filed 10-29-90 pursuant to section 100, title 1, California Code of Regulations (Register 91, No. 6).
7. Amendment filed 11-28-90 as an emergency; operative 11-28-90 (Register 91, No. 6). A Certificate of Compliance must be transmitted to OAL by 3-28-91 or emergency language will be repealed by operation of law on the following day.
8. Amendment adding definitions of "disruptive group," "gang," and "prison gang" filed 5-20-91; operative 6-19-91 (Register 91, No. 26).
9. Amendment adding definition for "Media representative" filed 12-19-91 as an emergency; operative 12-19-91 (Register 92, No. 4).
10. Amendment adding definitions for "Disciplinary Free," "Inmate Match," and "Special Assignment" and amending Note filed 12-20-91 as an emergency; operative 12-20-91 (Register 92, No. 4). A Certificate of Compliance must be transmitted to OAL 4-20-92 or emergency language will be repealed by operation of law on the following day.
11. Amendment adding definition for "Case records file" and amendment of Note filed 12-20-91 as an emergency; operative 12-20-91 (Register 92, No. 4). A Certificate of Compliance must be transmitted to OAL 4-20-92 or emergency language will be repealed by operation of law on the following day.

12. Amendment adding definition for "Detainer" and amendment of Note filed 12-19-91 as an emergency; operative 12-19-91 (Register 92, No. 4). A Certificate of Compliance must be transmitted to OAL 4-17-92 or emergency language will be repealed by operation of law on the following day.
13. Amendment adding definitions for "Received Date," "Time Computation," and "Time Served" filed 12-20-91 as an emergency; operative 12-20-91 (Register 92, No. 4). A Certificate of Compliance must be transmitted to OAL 4-20-92 or emergency language will be repealed by operation of law on the following day.
14. Editorial correction of "Firm" and "Grievance" filed 12-20-91; operative 12-20-91 (Register 92, No. 4).
15. Amendment adding definition for "Terminal illness" filed 5-20-92; operative 5-20-92 (Register 92, No. 21). A Certificate of Compliance must be transmitted to OAL 9-17-92 or emergency language will be repealed by operation of law on the following day.
16. Editorial correction of printing error restoring inadvertently deleted definitions originally filed 12-20-91 (Register 92, No. 24).
17. Certificate of Compliance as to 12-20-91 order adding definition for "case records file" transmitted to OAL 4-15-92 and filed 5-27-92 (Register 92, No. 24).
18. Certificate of Compliance as to 12-29-91 order adding definitions for "Disciplinary Free," "Inmate Match," and "Special Assignment" transmitted to OAL 4-20-92 and filed 5-28-92 (Register 92, No. 24).
19. Certificate of Compliance as to 12-19-91 order adding definition of "Detainer" transmitted to OAL 4-20-92 and filed 5-28-92 (Register 92, No. 24).
20. Certificate of Compliance as to 12-19-91 order transmitted to OAL 4-17-92 and filed 6-1-92 (Register 92, No. 24).
21. Certificate of Compliance as to 12-20-91 order transmitted to OAL 4-20-92 and filed 6-2-92 (Register 92, No. 24).
22. Certificate of Compliance as to 5-20-92 order transmitted to OAL 9-9-92; disapproved by OAL and order of repeal of 5-20-92 order filed on 10-22-92 (Register 92, No. 43).
23. Amendment adding definition for "Terminal illness" refiled 10-23-92 as an emergency; operative 10-22-92 pursuant to Government Code section 11346.1(h) (Register 92, No. 43). A Certificate of Compliance must be transmitted to OAL 2-23-93 or emergency language will be repealed by operation of law on the following day.
24. Amendment adding "Cumulative case summary," "Chronological history," "Legal status sheet," "Probation officer's report" and "Criminal identification and investigation report" and amendment of Note filed 11-5-92; operative 12-7-92 (Register 92, No. 45).
25. Change without regulatory effect amending "Immediate Family Members" filed 1-26-93 pursuant to section 100, title 1, California Code of Regulations (Register 93, No. 5).
26. Certificate of Compliance as to 10-23-92 order transmitted to OAL 12-18-92 and filed 2-3-93 (Register 93, No. 6).
27. Amendment adding "Harassment" and amendment of Note filed 7-29-93 as an emergency; operative 7-29-93 (Register 93, No. 31). A Certificate of Compliance must be transmitted to OAL 11-26-93 or emergency language will be repealed by operation of law on the following day.
28. Amendment filed 9-3-93; operative 9-3-93 pursuant to Government Code section 11346.2(d) (Register 93, No. 36).
29. Amendment of "Good Faith Effort," "Minority Business Enterprise," "Responsible Bidder" and "Women Business Enterprise" and Note and new definitions "Disabled Veteran Business Enterprise." "Goal," "Minority and/or Women and/or Disabled Veteran Business Enterprise focus paper," "Minority and/or Women and/or Disabled Veteran Business Enterprise focus paper and trade paper," "Project," "Subcontractor," and "Trade Paper" filed 10-18-93 as an emergency; operative 10-18-93 (Register 93, No. 43). A Certificate of Compliance must be transmitted to OAL by 2-15-94 or emergency language will be repealed by operation of law on the following day.

13

§ 3000.5                    DEPARTMENT OF CORRECTIONS AND REHABILITATION                    TITLE 15

30. Definitions added for "Chaplain," "Religious Artifact," and "Sweat Lodge" and amendment of Note filed 11-1-93; operative 12-13-93 (Register 93, No. 45).
31. Amendment adding "Ex-Offender" filed 11-30-93; operative 12-30-93 (Register 93, No. 49).
32. Certificate of Compliance as to 7-29-93 order transmitted to OAL 11-18-93 and filed 12-31-93 (Register 94, No. 1).
33. Certificate of Compliance as to 10-18-93 order transmitted to OAL 2-15-94 and filed 3-16-94 (Register 94, No. 11).
34. Amendment of "Inmate," new definition "Serious injury," and amendment of Note filed 5-5-95; operative 6-5-95 (Register 95, No. 18).
35. Amendment of "Institution Head" filed 9-13-96 as an emergency; operative 9-13-96. A Certificate of Compliance must be transmitted to OAL by 2-24-97 or emergency language will be repealed by operation of law on the following day.
36. Amendment adding definition of "Certification" filed 11-22-96 as an emergency; operative 11-22-96 (Register 96, No. 47). A Certificate of Compliance must be transmitted to OAL by 5-1-97 pursuant to Penal Code section 5058(e) or emergency language will be repealed by operation of law on the following day.
37. Certificate of Compliance as to 9-13-96 order transmitted to OAL 11-22-96 and filed 1-6-97 (Register 97, No. 2).
38. Certificate of Compliance as to 11-22-96 order, including amendment of definition of "Certification," transmitted to OAL 3-20-97 and filed 5-1-97 (Register 97, No. 18).
39. Amendment adding definitions of "Lockdown" and "Restricted or controlled inmate movement" filed 10-16-97; operative 11-15-97 (Register 97, No. 42).
40. Amendment adding definition of "Program failure" filed 10-16-97 as an emergency; operative 10-16-97 (Register 97, No. 42). Pursuant to Penal Code section 5058(e), a Certificate of Compliance must be transmitted to OAL by 3-25-98 or emergency language will be repealed by operation of law on the following day.
41. Amendment adding definition of "Vexatious Litigant" and amending Note filed 11-12-97 as an emergency; operative 11-12-97 (Register 97, No. 46). A Certificate of Compliance must be transmitted to OAL by 3-13-98 or emergency language will be repealed by operation of law on the following day.
42. Editorial correction of definition of "Vexatious Litigant" and Histories 40 and 41 (Register 98, No. 18).
43. Amendment adding definition of "Vexatious Litigant" and amending Note refiled 4-29-98 as an emergency; operative 4-29-98 (Register 98, No. 18). A Certificate of Compliance must be transmitted to OAL by 10-6-98 or emergency language will be repealed by operation of law on the following day.
44. Certificate of Compliance as to 10-16-97 order, including removal of definition of "Program failure" to section 3062(n), transmitted to OAL 3-23-98 and filed 5-4-98 (Register 98, No. 19).
45. Certificate of Compliance as to 4-29-98 order, including further amendment of definition of "Vexatious Litigant" and Note, transmitted to OAL 6-12-98 and filed 7-21-98 (Register 98, No. 30).
46. Amendment adding new definitions of "Controlled Medication," "Controlled Substance," "Distribution" and "Laboratory" and amendment of Note filed 8-27-98 as an emergency; operative 8-27-98 (Register 98, No. 35). A Certificate of Compliance must be transmitted to OAL by 2-3-99 or emergency language will be repealed by operation of law on the following day.
47. Amendment filed 11-13-98 as an emergency; operative 11-13-98 (Register 98, No. 46). A Certificate of Compliance must be transmitted to OAL by 3-15-99 or emergency language will be repealed by operation of law on the following day.
48. Amendment adding new definitions of "Controlled Medication," "Controlled Substance," "Distribution" and "Laboratory" and amendment of Note refiled 2-3-99 as an emergency; operative 2-3-99 (Register 99, No. 6). Pursuant to Penal Code section 5058(e), a Certificate of Compliance must be transmitted to OAL by 7-13-99 or emergency language will be repealed by operation of law on the following day.

49. Certificate of Compliance as to 11-13-98 order transmitted to OAL 2-10-99 and filed 3-8-99 (Register 99, No. 11).
50. Certificate of Compliance as to 2-3-99 order transmitted to OAL 5-12-99 and filed 6-24-99 (Register 99, No. 26).
51. Amendment filed 3-27-2000 as an emergency; operative 3-27-2000 (Register 2000, No. 13). Pursuant to Penal Code section 5058(e), a Certificate of Compliance must be transmitted to OAL by 9-5-2000 or emergency language will be repealed by operation of law on the following day.
52. Amendment of definition of "Chronological History" filed 8-28-2000; operative 9-27-2000 (Register 2000, No. 35).
53. Certificate of Compliance as to 3-27-2000 order transmitted to OAL 9-5-2000; disapproval and order of repeal and deletion reinstating section as it existed prior to emergency amendment by operation of Government Code 11346.1(f) filed 10-18-2000 (Register 2000, No. 42).
54. Amendment filed 10-19-2000 deemed an emergency pursuant to Penal Code section 5058(e); operative 10-19-2000 (Register 2000, No. 42). Pursuant to Penal Code section 5058(e), a Certificate of Compliance must be transmitted to OAL by 3-27-2001 or emergency language will be repealed by operation of law on the following day.
55. Amendment adding definition of "General Chrono" filed 11-16-2000; operative 12-16-2000 (Register 2000, No. 46).
56. Certificate of Compliance as to 10-19-2000 order, including further amendment of definitions of "Execution Type Murder," "High Notoriety" and "Public Interest Case," transmitted to OAL 3-27-2001 and filed 5-3-2001 (Register 2001, No. 18).
57. Amendment of definitions of "Firm" and "Small Business Firm" and amendment of Note filed 7-12-2002; operative 8-11-2002 (Register 2002, No. 28).
58. Amendment adding definition of "Street gang" and amendment of Note filed 8-27-2002 as an emergency; operative 8-27-2002 (Register 2002, No. 35). Pursuant to Penal Code section 5058.3 a Certificate of Compliance must be transmitted to OAL by 2-4-2003 or emergency language will be repealed by operation of law on the following day.
59. Certificate of Compliance as to 8-27-2002 order transmitted to OAL 1-21-2003 and filed 3-6-2003 (Register 2003, No. 10).
60. Amendment adding definitions of "Program failure" and "Significant work related disciplinary history" filed 1-9-2004 as an emergency; operative 1-9-2004 (Register 2004, No. 2). Pursuant to Penal Code section 5058.3, a Certificate of Compliance must be transmitted to OAL by 6-17-2004 or emergency language will be repealed by operation of law on the following day.
61. Amendment adding definitions of "Program failure" and "Significant work related disciplinary history" refiled 6-17-2004 as an emergency; operative 6-17-2004 (Register 2004, No. 25). Pursuant to Penal Code section 5058.3, a Certificate of Compliance must be transmitted to OAL by 11-24-2004 or emergency language will be repealed by operation of law on the following day.
62. Certificate of Compliance as to 6-17-2004 order transmitted to OAL 11-16-2004 and filed 12-29-2004 (Register 2004, No. 53).
63. New definition of "Religious Review Committee (RRC)" filed 1-17-2006 as an emergency; operative 1-17-2006 (Register 2006, No. 3). Pursuant to Penal Code section 5058.3, a Certificate of Compliance must be transmitted to OAL by 6-26-2006 or emergency language will be repealed by operation of law on the following day.
64. Amendment of definition of "Program failure" filed 6-9-2006; operative 7-9-2006 (Register 2006, No. 23).
65. Certificate of Compliance as to 1-17-2006 order transmitted to OAL 6-22-2006 and filed 7-27-2006 (Register 2006, No. 30).

**3000.5.  Rules of Construction.**
The following rules of construction apply to these regulations, except where otherwise noted:
(a) The enumeration of some criteria for the making of discretionary decisions does not prohibit the application of other criteria reasonably related to the decision being made.

TITLE 15        DEPARTMENT OF CORRECTIONS AND REHABILITATION        § 3003

(b) The order in which criteria are listed does not indicate their relative weight or importance.

(c) "Shall" is mandatory, "should" is advisory, and "may" is permissive.

(d) The past, present, or future tense includes the others.

(e) The masculine gender includes the feminine gender; the singular includes the plural.

(f) The time limits specified in these regulations do not create a right to have the specified action taken within the time limits. The time limits are directory, and the failure to meet them does not preclude taking the specified action beyond the time limits.

NOTE: Authority cited: section 5058 and Stats. 1992, ch. 695, sec. 45. Reference: Sections 3000 and 5054, Penal Code.

HISTORY:

1. New section filed 9-3-93; operative 9-3-93 pursuant to Government Code section 11346.2(d) (Register 93, No. 36).

**3001. Subject to Regulations.**

Regardless of commitment circumstances, every person confined or residing in facilities of the department is subject to the rules and regulations of the director, and to the procedures established by the warden, superintendent, or parole region administrator responsible for the operation of that facility. Persons on parole or civil addict outpatient status are subject to such director's rules, regulations and parole region procedures as may be applicable to such persons.

**3001.5. Assignment to Caseworker.**

Upon reception at a facility, each inmate shall be assigned a caseworker.

NOTE: Authority cited: Section 5058, Penal Code. Reference: Sections 5054 and 5068, Penal Code.

HISTORY:

1. New section filed 10-15-92; operative 11-16-92 (Register 92, No. 42).

**3002. Notice of Program, Behavioral, and Participation Expectations.**

(a) Within 14 days of reception by the Department of Corrections or upon return to confinement in a departmental institution or facility, every inmate or parolee shall be issued a copy of the Rules and Regulations of the Director of Corrections and copies of all rule changes that have occurred since the last complete reprinting and reissue of the rules and regulations. Each inmate and parolee shall sign a receipt for the rules. The receipt shall be filed as a permanent record in the inmate's central file. In addition:

(1) Spanish language copies of the rules and regulations of the director shall be maintained at each reception center, institution and facility where inmates are confined. Notice shall be given in Spanish that a Spanish version of the rules is available for inspection. These rules shall be made available for review by Spanish speaking inmates who cannot read English.

(2) Within 14 days of transfer to another departmental institution or facility, the new arrival shall be given a written summary of local procedures governing the conduct and activities of inmates confined at that location and a summary of the range of work and training programs offered by and available at that institution or facility. The summary or summaries shall also include: procedures governing mail and visiting, the inmate's right to appeal and appeal procedures, the facility's basic daily schedule, and where and how additional procedural information of interest may be obtained. New arrivals shall also be given verbal staff instructions regarding the procedures.

Staff instructions shall also be given to newly received inmates regarding the possibility of receiving a one-third reduction of their sentence or minimum eligible parole date for refraining from acts or activities of misbehavior and by participating in assigned work and program activities.

(b) During regularly scheduled institution and reception center inmate orientation sessions each inmate or parolee shall be advised of the following:

(1) The ability to earn credits by participating in assigned work and program activities; and,

(2) The availability of work and program activities; and,

(3) The possible loss of credits resulting from acts or activities of misbehavior; and,

(4) The availability of and procedures for access to health care including daily sick call procedures.

(5) Reception centers shall incorporate the inmate's acknowledgement of the receipt of the summary of reception center work and program activities in the same form used as a receipt for issue of the rules and regulations to the inmate.

(6) When inmates are placed in specialized housing with specialized or limited program options and opportunities to participate, the initial classification committee shall explain the options and opportunities available to the inmate within that specialized unit. A copy of the committee's chrono reflecting the discussion shall be given to the inmate and a copy placed in the inmate's central file.

(7) The facility location where Board of Prison Terms' Rules may be reviewed by the inmate.

(8) Available institution social services.

(c) The issuance of rules and regulations and program information, summaries, and the inmate's receipt for same is required in order to comply with Sections 2080 and 2930 of the Penal Code. An inmate's refusal to sign a receipt for the issue of rules and regulations, work and program summaries, or work and program agreements or understandings, shall be noted by staff, and the receipt shall be filed in the inmate's central file. Refusal or failure to acknowledge the receipt of information shall not relieve the inmate from any responsibility to behave and participate as expected nor from the consequence for misbehavior or refusal or failure to participate.

(d) Each institution and reception center shall provide a means of advising inmates who cannot read English of the expectations contained in this section. The provisions shall include communication of the expectations to those inmates who also have impaired hearing.

NOTE: Authority cited: section 5058, Penal Code. Reference: Sections 2080, 2930, 2931 and 5054, Penal Code.

HISTORY:

1. Amendment filed 2-24-77; effective thirtieth day thereafter (Register 77, No. 9).
2. Amendment filed 5-13-77; effective thirtieth day thereafter (Register 77, No. 20).
3. Amendment filed 5-4-83; designated effective 6-1-83 pursuant to Government Code section 11346.2(d) (Register 83, No. 19).
4. Amendment of subsections (a), (b) and new subsection (d) filed 2-8-88; operative 3-9-88 (Register 88, No. 7).
5. Editorial correction of printing errors in subsections (a)(1) and (b)(3) (Register 92, No. 5).
6. New subsections (b)(7)–(8) filed 10-15-92; operative 11-16-92 (Register 92, No. 42).

**3003. Threats Against Public Officials.**

Any inmate away from a secure perimeter facility or parolee who makes a written or verbal threat against the life of any official specified in Penal Code section 76 with the intent and apparent ability to carry out the threat shall immediately be placed in custody at a jail or secure perimeter facility pending disposition of the charges.

NOTE: Authority cited: section 5058, Penal Code. Reference: Sections 76, 3056, 5054, and 6253, Penal Code.

HISTORY:

1. New section filed 10-18-93; operative 11-17-93 (Register 93, No. 43). For prior history, see Register 89, No. 41.

15

TITLE 15          DEPARTMENT OF CORRECTIONS AND REHABILITATION          § 3369.5

(e) Court Petition.

(1) An inmate, or inmate's attorney, guardian or conservator may file a petition with the superior court of the county in which the inmate is confined for an order to prohibit the administration of shock therapy upon the inmate. This petition must be served by the county clerk upon the warden or superintendent on the same day it is filed and constitutes a refusal of consent or withdrawal of any prior consent.

(2) The warden or superintendent has 10 days to file a response to the petition. The superior court may grant a continuance of 10 additional days. The response must be served upon the inmate, and upon the inmate's attorney, guardian or conservator on the same day it is filed with the clerk of the superior court.

(f) Correspondence Regarding Shock Therapy. The inmate is entitled to communicate in writing with his or her attorney, and by writing or visits with his or her parents, guardian or conservator regarding any proposed administration of shock therapy or organic therapy. Any mail regarding shock therapy will not be prevented from leaving the institution.

(g) Incapable of Informed Consent.

(1) If the inmate is incapable of giving informed consent to a program of shock therapy, and the attending physician believes that such treatment is required for the health and safety of the inmate, the attending physician may request the permission of the warden or superintendent. If the warden or superintendent agrees with the request and the committee, appointed pursuant to subsection (c)(1), also unanimously agrees that such therapy is required, the warden or superintendent will forward the request to the Chief, Medical Services for review and recommendation to the director. If the director concurs in the course of treatment, the warden or superintendent will petition the superior court for permission to conduct the hearing. No treatment will be conducted until after a hearing at which the inmate is represented by counsel and after a court order authorizing the treatment is issued.

(2) In an extraordinary case, the attending physician may determine that shock treatment is required for a longer period of time than three months, or more frequently than three months in the period of one year. The same procedures as in paragraph (1) of this subsection will be followed before any further shock therapy will be administered.

(h) Inmate Rights. If the attending physician determines that an inmate should be administered shock therapy, the inmate will be informed of his or her rights under this article. A copy of Penal Code Sections 2670 through 2680 will be made and will be given to the inmate at that time.

NOTE: Authority cited: Section 5058, Penal Code. Reference: Section 5054, Penal Code.

3369.1. Inmate/Parolee Placements in Department of Mental Health Hospitals.

(a) Inmates considered for placement in a Department of Mental Health hospital pursuant to Penal Code section 2684 shall be informed of their rights to a hearing on the placement and to waive such a hearing. Except as provided in (b) below, inmates who do not waive their right to the hearing shall be provided the following:

(1) A written notice of the placement hearing at least 72 hours prior to the hearing.

(2) An independent and qualified staff member to assist the inmate with their preparation for the hearing. Any costs or expenses incurred related to independent assistance obtained by the inmate on their own shall be the sole responsibility of the inmate.

(3) An opportunity to present documentary evidence and the oral or written testimony of witnesses, and to refute evidence and cross-examine witnesses unless the hearing officer indicates a good cause for prohibiting such evidence or witnesses.

(4) A hearing officer who shall be the institution head or a designee, which shall be a correctional administrator, physician, psychiatrist, or psychologist who is not involved with treating the inmate.

(5) A copy of the written decision within 72 hours after the hearing, which shall include the reason for the decision and the evidence, relied upon in making the decision.

(b) Inmates and parolees who require emergency psychiatric hospitalization shall be entitled to a certification review hearing pursuant to Welfare and Institutions Code section 5256 at the Department of Mental Health hospital in lieu of the above hearing and waiver requirements.

(c) Inmates and parolees housed in Department of Mental Health hospitals remain under the jurisdiction of the department and shall not be permitted to leave the hospital grounds without the specific authorization of the director.

NOTE: Authority cited: Section 5058, Penal Code. Reference: Sections 5150 and 5250 through 5256, Welfare and Institutions Code; Sections 2684, 2974 and 5054, Penal Code; and Vitek v. Jones (1980) 445 U.S. 480, 100 S.Ct. 1254.

HISTORY:
1. New section filed 7-22-93; operative 8-23-93 (Register 93, No. 30).

Article 9.1.   Research of Inmates/Parolees

3369.5.  Research.

(a) No research shall be conducted on inmates/parolees without approval of the research advisory committee established to oversee research activities within the department. Members of the research advisory committee shall be named by the Director, and may include departmental staff and nondepartmental persons who are community academic representatives engaged in criminal justice research.

(b) No research project shall be considered without submission of a research proposal that shall contain the following:

(1) A statement of the objectives of the study.
(2) The specific values of the project.
(3) A description of the research methods to be used.
(4) A description of the measuring devices to be used, or if they are to be developed as part of the project, a statement of their intended use and reason.
(5) The name of the facility or office where the data will be collected.
(6) The names and titles of personnel involved and their responsibilities in the project.
(7) An estimate of departmental staff time needed for the project.
(8) Starting and ending dates of the research.
(9) Any additional costs to the state.
(10) An estimate of the inmate/parolee subjects' time needed for the project and a plan for the compensation of the inmates/parolees.
(11) The source of funding.
(12) A copy of the informed consent form to be used in the project, which meets the requirements of Penal Code section 3521.
(13) A current resume for each professional staff member of the project.
(14) The full name, date of birth, and social security number of all project staff members who will enter an institution or other departmental facility to carry out the project.
(15) A certification of privacy signed by the project's principal investigator which outlines the procedure for protecting exempt personal information and certifies that the protective procedures shall be followed.
(16) If student research is involved, a letter from the student's faculty advisor stating that the student will be working under their supervision and the project is approved by their college/university.

151