PRISON LAW OFFICE
DONALD SPECTER Bar No.: 83925
STEVEN FAMA Bar No.: 99641
E. IVAN TRUJILLO Bar No.: 228790
1917 Fifth Street
Berkeley, California 94710-1916
Telephone: (510) 280-2621
Facsimile: (510) 280-2704

ROSEN, BIEN & GALVAN, LLP
MICHAEL W. BIEN Bar No.: 096891
JANE E. KAHN Bar No.: 112239
ERNEST GALVAN Bar No.: 196065
LORI RIFKIN Bar No.: 244081
315 Montgomery Street, 10th Floor
San Francisco, California 94104
Telephone: (415) 433-6830

THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
CLAUDIA CENTER Bar No.: 158255
600 Harrison Street, Suite 120
San Francisco, CA 94107
Telephone: (415) 864-8848

BINGHAM, McCUTCHEN, LLP
WARREN E. GEORGE Bar No.: 53588
GEOFFREY THOMAS HOLTZ Bar No.: 191370
KRISTEN A. PALUMBO Bar No.: 215857
Three Embarcadero Center
San Francisco, California 94111
Telephone: (415) 393-2000

HELLER, EHRMAN, WHITE & McAULIFFE
RICHARD L. GOFF Bar No.: 36377
701 Fifth Avenue
Seattle, Washington 98104
Telephone: (206) 447-0900

KIRKPATRICK & LOCKHART PRESTON GATES ELLIS LLP
JEFFREY L. BORNSTEIN, Bar No.: 99358
55 Second Street, Suite 1700
San Francisco, CA 94105-3493
Telephone: (415) 882-8200

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN,<br><br>　　　　Plaintiffs,<br><br>　v.<br><br>ARNOLD SCHWARZENEGGER, et al.,<br><br>　　　　Defendants. | Case No. Civ S 90-0520 LKK-JFM |
| JERRY VALDIVIA, et al.,<br><br>　　　　Plaintiffs,<br><br>　v.<br><br>ARNOLD SCHWARZENEGGER, et al.,<br><br>　　　　Defendants. | Case No. Civ. S-94-0671 LKK/GGH<br><br>**JANE E. KAHN REPLY DECLARATION IN SUPPORT OF PLAINTIFFS' MOTION FOR INJUNCTIVE RELIEF**<br><br>Hearing Date:　July 25, 2008<br>Time:　　　　10:00 a.m.<br>Location:　　Courtroom 4<br>Judge:　　　Hon. Lawrence K. Karlton |

JANE E. KAHN REPLY DECLARATION IN SUPPORT OF PLAINTIFFS' MOTION FOR INJUNCTIVE RELIEF - Case Nos. Civ S 90-0520 LKK-JFM; Civ S-94-0671 LKK/GGH

[222585-9]

# TABLE OF ABBREVIATIONS/ACRONYMS

| | |
|---|---|
| APP: | Acute Psychiatric Program at Vacaville |
| ASH: | Altascadero State Hospital |
| CCAT: | Coordinated Clinical Assessment Team |
| CCI: | California Correctional Institution |
| CCCMS: | Correctional Clinical Case Management System |
| CDCR: | California Department of Corrections and Rehabilitation |
| CIM: | California Institute for Men |
| CMF: | California Medical Facility |
| CRIPA | Civil Rights of Institutionalized Persons Act |
| CSH: | Coalinga State Hospital |
| DMH: | Department of Mental Health |
| DVI: | Deuel Vocational Institute |
| EOP: | Enhanced Outpatient Program |
| ICF: | Intermediate Care Facility |
| IDTT: | Interdisciplinary Treatment Team |
| MHCB: | Mental Health Crisis Bed |
| MHSDS: | Mental Health Services Delivery System |
| NKSP: | North Kern State Prison |
| SVSP: | Salinas Valley State Prison |
| WSP: | Wasco State Prison |

i

JANE E. KAHN REPLY DECLARATION IN SUPPORT OF PLAINTIFFS' REPLY TO DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR INJUNCTIVE RELIEF - Case Nos. Civ S 90-0520 LKK-JFM; Civ S-94-0671 LKK/GGH

[222585-9]

I, Jane E. Kahn, do hereby declare as follows:

1. I am an attorney admitted to practice law in California and of counsel in the law firm Rosen, Bien & Galvan, one of the counsel of record for the Plaintiff classes in *Coleman v. Schwarzenegger* and *Valdivia v. Schwarzenegger*. I have personal knowledge of the matters set forth herein and if called as a witness I could competently so testify. I make this reply declaration in support of Plaintiffs' Motion for Injunctive Relief Requiring Timely Access To Inpatient Psychiatric Hospitalization.

2. Plaintiffs' Motion is directed at defendants' policy and practice of denying otherwise eligible CDCR patients admission to DMH inpatient programs solely because they have not yet completed their parole revocation process or because they have thirty-five (35) days or less to serve.

**The Program Guide Does Not Permit Defendants' Exclusions From DMH Based On Parole Revocation Status Or Length of Remaining Term**

3. Shama Chaiken, Chief Psychologist for CDCR Headquarters Policy and Program Development, states that the Program Guide "addresses the care of patients from the time of their entry into a CDCR adult prison reception center." Declaration of Shama Chaiken in Support of Defendants' Opposition to Plaintiffs' Motion for Injunctive Relief ("Chaiken Decl.") filed 7/8/08, ¶ 3. According to Dr. Chaiken, the Program Guide mandates that reception centers provide initial bus screening for medical and mental health issues, further screening within seven days for possible mental health needs, and placement in the Mental Health Services Delivery System ("MHSDS") for those individuals who meet the criteria for the MHSDS. Chaiken Decl. ¶ 6. Dr. Chaiken states that parole violators are excluded from the full array of mental health services available to reception center patients and may only be provided mental health care in "one of three available levels of care, as appropriate (Correctional Clinical Case Management Services, Enhanced Outpatient Program, or Mental Health Crisis Bed)." Chaiken Decl. ¶ 7. She cites no Program Guide section in support of this bold statement, and, in fact, the Program Guide expressly states that "inmate-patients shall be eligible for admission to a DMH program regardless of parole date." *See* Exhibit B, Chapter 6, Program Guide at 12-6-9, attached to the

1

JANE E. KAHN REPLY DECLARATION IN SUPPORT OF PLAINTIFFS' REPLY TO DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR INJUNCTIVE RELIEF - Case Nos. Civ S 90-0520 LKK-JFM; Civ S-94-0671 LKK/GGH

[222585-9]

Jane E. Kahn Declaration in Support of Plaintiffs' Motion for Injunctive Relief Requiring Timely Access to Inpatient Psychiatric Hospitalization ("6/25/08 Kahn Decl."), filed 6/25/08 [Docket 2848].

4. I am the plaintiffs' attorney in *Coleman* who has been primarily responsible for negotiating and tracking changes and revisions to the Program Guide for at least the past five years. Since 2003, I have participated in numerous negotiations with defendants and the Special Master on the revisions to the Provisionally Approved Program Guide, as well as the updates to the Revised Program Guide. I regularly work with the Program Guide and have discussed the policies, procedures and practices set forth in the Program Guide with CDCR clinicians, custodial officers, officials, attorneys as well as with the Special Master and his staff. At no point during any of these negotiations and meetings have defendants ever proposed a revision to the Program Guide which would prevent reception center clinicians from referring parolees pending revocation to inpatient DMH programs. Nor am I aware of any provision of the Program Guide that would permit such an exclusion from a level of mental health care based on a patient's parole revocation status or the length of their remaining term.

**Defendants Regularly Include Individuals in CDCR Prisons Pending Revocation As Part of Their *Coleman* Reporting**

5. Defendants and the Special Master have considered parolees pending revocation to be full members of the *Coleman* class and entitled to mental health care to the same extent as any other person incarcerated in a CDCR prison. For example, in their monthly statistical package of data provided to the *Coleman* Special Master and plaintiffs' counsel, defendants provide data compiled at the reception centers on the lengths of stay for EOP and CCCMS patients housed in the reception centers. The purpose of this data is to enable the *Coleman* Special Master and CDCR Headquarters to monitor the reception centers' ability to transfer EOP and CCCMS reception center patients to mental health programs within court-ordered timeframes. The reported data provides reasons for the delayed transfers, including these delay factors: lack of available EOP or CCCMS beds, lack of available bus seats, missing medical records, pending court proceedings and pending revocation hearings. Attached hereto as

2

1  **Exhibit 1** is a true and correct copy of a California Correctional Institute ("CCI") Reception
2  Center Summary of EOP Transfer Data for March 31, 2008 (*e.g.*, Delay Code No. 21: Arrived at
3  RC pending revocation (PendRev)).  In their process of compiling and reporting this monthly
4  reception center transfer data, defendants do not separately designate EOP and CCCMS patients
5  who are pending revocation, but rather, treat all EOP and CCCMS reception center patients as a
6  single group, with transfer delay codes indicated when available.

### Coleman Special Master Reports Treat Parolees Pending Revocation With Serious Mental Illness Like Any Other Coleman Class Members

9  6.  The *Coleman* Special Master reviews and reports on transfers to higher levels of
10 care, including whether patients housed in reception centers have adequate access to inpatient
11 care.  *See* 6/25/08 Kahn Decl. ¶ 4.  The *Coleman* Special Master includes parolees pending
12 revocation in his review of reception center access to inpatient care.  For example, in the *Special*
13 *Master's Report on Suicides Completed in the California Department of Corrections in*
14 *Calendar Year 2003*, filed 4/28/05 [Docket 1658] at 11, the review included an EOP parolee
15 who committed suicide at CIM reception center on January 28, 2003, while awaiting his parole
16 revocation hearing.  The review identified various treatment failures for this EOP patient who
17 committed suicide after thirty (30) days in the reception center without any psychiatric
18 medications and with clear mental health decompensation.  *Id* at 15.  Likewise, in the *Fourteenth*
19 *Monitoring Report of the Special Master on the Defendants' Compliance with Provisionally*
20 *Approved Plans, Policies and Protocols* ("14th Report") filed 2/11/05 [Docket 1649],  the
21 Special Master reported on the very problem at issue in this motion, as experienced by parolees
22 at California Institute for Men ("CIM"), who had been referred to DMH and "accepted," but
23 whose admissions were deferred for weeks until their parole had been revoked:

24  A new glitch arose in the transfer of some inmates to the DMH
25  intermediate inpatient program at Atascadero State Hospital (ASH).
26  ASH regularly accepted, but deferred, the transfer of inmates with a
27  pending parole revocation hearing scheduled within the next three
28  weeks.  As a result, some inmates, whose hearing dates were

3

|   |   |
|---|---|
| 1 | subsequently postponed, a not infrequent occurrence, could end up at |
| 2 | CIM for weeks awaiting the indicated transfer for intermediate |
| 3 | inpatient care. 14th Report at 21. |

7. In subsequent monitoring reports, the *Coleman* Special Master has identified continuing transfer delays to DMH beds solely related to the parole status of patients referred from the reception centers. *See, e.g.*, *Sixteenth Monitoring Report of the Special Master on the Defendants' Compliance with Provisionally Approved Plans, Policies and Protocols,* ("16th Report"), filed 12/14/06 [Docket 2081] at 44-45, discussing delays at High Desert State Prison ("HDSP"), "[a]ccording to an institutional log, DMH/CMF would not accept parole violators until they had received a revocation hearing, causing some inmates to wait much longer." During the review of inpatient access at Deuel Vocational Institution ("DVI"), the Special Master reported that no progress had been made with respect to DMH referrals that remained low, and he noted that "[i]nstitutional minutes reflected a mistaken belief on the part of DVI staff that reception center inmates could not be sent to DMH acute care." *Id* at 144. For those reception center patients who were not transferred to DMH – because of their parole status or because of other administrative barriers – the alternative placements at many of these reception centers were noted to be quite dangerous:

> Prisons with poor access to DMH beds, including CIM, DVI, NKSP and WSP, relied heavily on holding cells. … Some of these inmates shuttled between holding cells and their housing unit on multiple occasions without ever having been fully evaluated by a clinician or their case being reviewed by an IDTT. At DVI, an inmate self-inflicted lacerations while in a holding cell located in administrative segregation, a second inmate committed suicide by hanging in a holding cell located in an infirmary and an EOP inmate whose death was attributed to cardiac arrest died while on a 15 – minute watch protocol but whose body was not discovered for hours. *Seventeenth Monitoring Report of the Special Master on the Defendants'*

4

*Compliance with Provisionally Approved Plans, Policies and Protocols, Part C* ("17C"), filed 6/13/07 [Docket 2274] at 178-9. Defendants did not object to the *Coleman* Special Master reporting on these issues or on the denial of care to incarcerated persons by DMH on the ground that they were not *Coleman* class members, that the Court lacked power to address their mental health needs, or that there was a statutory or Constitutional bar interfering with their access to necessary mental health care in DMH hospitals.

**The CRIPA Consent Decree And Recovery Model Does Not Support Exclusion Of Patients With Stays Of 35 Days Or Less**

8. Attached hereto as **Exhibit 2** is a true and correct copy of *Defendants' Production and Submission of Final CRIPA Agreement*, filed with the *Coleman* Court on 5/9/06 [Docket 1807]. This document includes the Stipulation for Consent Judgment and Agreement between the United States Department of Justice and the California Department of Mental Health. I have carefully reviewed the CRIPA Consent Judgment, which sets forth the basic requirements of care that must be provided within certain DMH State Hospitals, including Atascadero, Metropolitan and Napa State Hospitals. It is my understanding from reviewing the CRIPA decree and from my offices' review of the publicly available pleadings and reports of the CRIPA remedial process, that this CRIPA Consent Judgment does not include the DMH programs located at California Medical Facility ("CMF") and Salinas Valley State Prison ("SVSP") or Coalinga State Hospital ("CSH").

9. Cynthia A. Radavsky, Deputy Director of Long-Term Care Services, DMH, states in her declaration that the CRIPA Consent Judgment mandates a "recovery model of care," which justifies the DMH policy excluding patients with 35 or less days to serve. Ms. Radavsky states that the CRIPA decree necessitates during the initial 35-day period of the patient's stay for intermediate care "intensive diagnostic testing, observation and evaluation to enable the development of an accurate diagnosis and treatment plan." Declaration of Cynthia A. Radavsky in Support of Defendants' Opposition, filed 7/8/08, "Radavsky Decl." [Docket 2863] ¶ 7. She concludes that patients, who are unable to stay in DMH longer than 35 days, will not "fully

5

benefit from the inpatient treatment plan", and due to their short stay, DMH will not be able to meet the treatment modalities and plans mandated under the CRIPA Consent Judgment. Radavsky Decl. ¶ 8. I have reviewed the CRIPA Consent Judgment and there is no exclusionary language for patients with stays shorter than 35 days. Furthermore, the evaluations/therapeutic plans required by the CRIPA Consent Judgment occur rapidly in the admission process: within 24 hours of admission, the initial therapeutic and rehabilitation plan must be completed; within 7 days of admission, the master therapeutic and rehabilitation plan must be completed; and subsequent reviews of the therapeutic and rehabilitation plan must be provided every fourteen (14) days until the patient is discharged.[1] Ex. 2 at 9. Thus, a patient admitted with only 35 days of treatment time would receive an initial therapeutic and rehabilitation plan, a master therapeutic and rehabilitation plan within seven days, and as treatment occurred, a review of the therapeutic and rehabilitation plan every 14 days until he or she discharged from the program. There are no specific treatment modalities mandated by the CRIPA Consent Judgment that DMH clinicians would be unable to provide to patients admitted for less than 35 days. In fact, the CRIPA Consent Judgment specifies types of evaluations, reporting requirements, discharge planning[2], and other good practices that do not conflict with a reduced patient length of stay.

---

[1] During the first 24 hours of admission, the patient is provided with a medical history, physical exam, diagnostic impressions, and an admission psychiatric evaluation that includes a psychiatric history, a complete mental status exam, admission diagnosis, completed AIMS, laboratory testing, and consultation orders. *Id.* at 21. Within 7 days of admission, the patient has a completed Integrated Psychiatric Assessment, which includes a more complete psychiatric history, psychosocial history, a mental status exam, a list of strengths, psychiatric risk factors, diagnostic formulation, differential diagnosis, current psychiatric diagnoses, psychopharmacology treatment plan, and management of risk factors. *Id.* at 21-22.

[2] The CRIPA Consent Judgment requires that each DMH Hospital "shall ensure that, beginning at the time of admission and continuously throughout the individual's stay, the individual is an active participant in the discharge planning process, to the fullest extent possible." *Id* at 39. This discharge planning, which must first be considered during the 7-day therapeutic and rehabilitative service planning conference, and at all subsequence conferences, must consider factors likely to foster successful discharge, any barriers to preventing the individual from transitioning to a more integrated environment especially previous difficulties, and should identify the skills and supports that the individual will need to be successful. *Id.* at 38.

6

1 Nor does the basic philosophy of the "recovery model of care", which is set forth in the
2 beginning of the CRIPA Consent Judgment, conflict with the provision of care to patients
3 admitted for shorter stays. It specifically states that: *"Therapeutic and rehabilitative services*
4 *provided by each State Hospital shall be based on evidence-based practices and practice-based*
5 *evidence, shall be age-appropriate, and shall be designed to: strengthen and support*
6 *individuals' recovery, rehabilitation, and habilitation; enable individuals to grow and develop*
7 *in ways benefitting their mental health, physical health, and well being; and ensure individuals'*
8 *reasonable safety, security and freedom from undue bodily restraint."* Id at 5.

9     10. Ms. Radavsky states that "there are wait lists of CDCR inmates referred for and
10 awaiting placement in certain acute and intermediate care beds." Radavsky Decl. ¶10. In fact,
11 while some of the DMH programs reserved for CDCR patients are full, other DMH programs
12 have available beds. Attached hereto as **Exhibit 3** is a true and correct copy of CDCR's Referral
13 Strategy for Atascadero State Hospital Intermediate Care Facility, dated May 1, 2008. This
14 report, which was submitted by defendants to the *Coleman* Special Master, discusses the status
15 of the Atascadero ("ASH") Progress work group's efforts to "analyze the referral process and
16 outlines a referral strategy aimed at producing a sustainable process for case-by-case custody
17 review and timely referral of clinically appropriate patients to ASH." Ex. 3 at page 1. In the
18 Background section of the Report, it is noted that since November 30, 2007, when DMH
19 submitted its plan to make 231 ICF beds available at ASH to *Coleman* class members, "it has
20 become increasingly apparent that a substantial number of the available ASH beds are not
21 currently being used by *Coleman* class members." *Id*. The Plan adopts a two-prong approach
22 for increasing the ASH census: first, a long-term approach, which will review and revise the
23 guidelines for the case-by-case referral of high custody prisoners; and second, a short-term
24 approach aimed at increasing the number of CDCR referrals of patients to DMH by focusing on
25 the Level I-III EOP population located at three mainline EOP prisons and at some of the
26 reception center prisons, including CIM, WSP and DVI. As of May 31, 2008, there were only
27 142 of the 231 *Coleman* beds filled at ASH, in either the intermediate care or acute programs.
28 *See*, Defendant Department of Mental Health's Report on Monthly Bed Utilization ("DMH Bed

7

Utilization Report"), filed in the *Coleman* Court under seal on 6/16/08 [Docket 2820] (The DMH Bed Utilization Report for May 2008 lists all referrals, pending referrals, rejections and transfers timeframes for inmates from any level of outpatient mental health care to any level of inpatient mental health care, and from any level of inpatient mental health care to a different level of mental health care, including the list of all class members currently waiting for transfer to any level of DMH hospital care and those currently housed in any level of DMH hospital care.) Thus, on May 31, 2008, there were at least 89 empty beds at ASH available for *Coleman* class members who required intermediate or acute level of care. *Id.* On June 30, 2008, defendants reported that there were 8 open ICF beds at CMF (all lower security beds), but all of the high security ICF beds at CMF were full and there were also 164 CDCR patients listed on the SVPP waitlist. Attached hereto as **Exhibit 4** is a true and correct copy of the July 1, 2008 Monthly Report on the Licensure of Intermediate Care and Day Treatment Programs at the California Medical Facility, Vacaville and the Salinas Valley Psychiatric Program, Salinas Valley State Prison, at 1. In addition, defendants listed thirty-three (33) CDCR patients on the May 2008 APP waitlist. *See* Ex. F, to 6/25/08 Kahn Decl.

11. Ms. Radavsky states that "the best utilization of these inpatient beds occurs upon an acuity-based determination of patient admission, with no regard for the patient's status as a parole violator or new commitment." Radavsky Decl. ¶ 11. This process of admitting patients based upon acuity levels has been established and currently occurs on a regular basis through the Coordinated Clinical Assessment team ("CCAT"), which is comprised of a team of CDCR and DMH clinicians who daily review patients on the DMH and Mental Health Crisis Bed ("MHCB") waitlists. 6/25/08 Kahn Decl. ¶ 12; Exhibit B to 6/25/08 Kahn Decl. at 12-6-5. Indeed, a review of the current APP waitlist and APP census clearly illustrates the results of acuity-based determinations for patient admissions. *See*, *e.g.* Ex. F to 6/25/08 Kahn Decl. (listing patients on APP waitlist); DMH Bed Utilization Report, filed in the *Coleman* Court under seal on 6/16/08 [Docket 2820] (listing patients on the APP waitlist and patients transferred to APP).

12. While there are serious delays in transfers to higher levels of care, some CDCR

8

patients identified as requiring acute inpatient DMH care are transferred to APP within just a few days of referral. I reviewed the May 2008 DMH Bed Utilization Report, filed in the *Coleman* Court under seal [Docket 2820], and found examples of patients who have recently been referred, accepted and admitted within a few days of referral to APP. Those referred, accepted and admitted within a few days include: Patient No. 141 was referred from NKSP on March 17, 2008, accepted on March 20th and admitted that day; Patient 147 was referred from Pelican Bay State Prison on March 21, 2008, accepted on March 24, 2008 and admitted that day; Patient 154 was referred from Pelican Bay on April 1, 2008, accepted on April 3, 2008 and admitted that day; Patient 171 was referred from CCI on April 14, 2008, was accepted on April 18, 2008 and admitted that day; Patient 178 was referred from Wasco on April 21, 2008, was accepted on April 25th and admitted that day; Patient 183 was referred from Pelican Bay on April 24, 2008, was accepted on April 25, 2008 and admitted that day; and Patient 186 was referred from San Quentin on April 24, 2008, was accepted on April 30, 2008 and admitted that day. *See* Docket 2820. North Kern State Prison, San Quentin, Wasco and CCI have large reception centers.

I declare under penalty of perjury under the laws of California and the United States, that the foregoing is true and correct, and that this declaration is executed in San Francisco, California on July 18, 2008.

*/s/ Jane E. Kahn*
Jane E. Kahn

9

JANE E. KAHN REPLY DECLARATION IN SUPPORT OF PLAINTIFFS' REPLY TO DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR INJUNCTIVE RELIEF - Case Nos. Civ S 90-0520 LKK-JFM; Civ S-94-0671 LKK/GGH

[222585-9]

# EXHIBIT 1

STATE OF CALIFORNIA— DEPARTMENT OF CORRECTIONS AND REHABILITATION                ARNOLD SCHWARZENEGGER, GOVERNOR

**DIVISION OF CORRECTIONAL HEALTH CARE SERVICES**
P.O. Box 942883
Sacramento, CA 94283-0001

**RECEIVED**

MAY 1 6 2008



May 14, 2008

Rosen, Bien & Galvan

Matthew A. Lopes, Jr., Esq.            Via:   Lisa Tillman
Office of the Special Master                  Deputy Attorney General
Pannone Lopes & Devereaux LLC                 Department of Justice
317 Iron Horse Way, Suite 301                 1300 "I" Street, Suite 125
Providence, RI 02908                          P. O. Box 944255
                                              Sacramento, CA 94244-2550

**RE: COLEMAN MONTHLY REPORT OF INFORMATION REQUESTED AND RESPONSE TO JANUARY 19, 1999, COURT ORDER REGARDING STAFF VACANCIES**

Dear Mr. Lopes:

Enclosed is the disk with the *Coleman* monthly report reflective of March 2008 data (or as otherwise noted).

If you have any problems opening the disk, please contact me at (916) 928-5946.

Sincerely,

*Sharon*

SHARON RIEGEL
Health Program Specialist II
Mental Health Program
Division of Correctional Health Care Services

Enclosures

cc: Robin Dezember, Director, Division of Correctional Health Care Services (DCHCS)
    Karen Wong, Deputy Director (A), DCHCS
    Brenda Epperly-Ellis, Director, Statewide Mental Health Program, DCHCS
    Jeffrey L. Metzner, M.D., *Coleman* Expert (with enclosures)
    Dennis F. Koson, M.D., *Coleman* Expert (with enclosures)
    Kerry Hughes, M.D., *Coleman* Expert (with enclosures)
    Melissa G. Warren, Ph.D., *Coleman* Expert (with enclosures)
    Raymond F. Patterson, M.D., *Coleman* Expert (with enclosures)
    Paul Nicoll, *Coleman* Expert (with enclosures)
    Ted Ruggles, Ph.D., *Coleman* Expert (with enclosures)

STATE OF CALIFORNIA— DEPARTMENT OF CORRECTIONS AND REHABILITATION                    ARNOLD SCHWARZENEGGER, GOVERNOR

**DIVISION OF CORRECTIONAL HEALTH CARE SERVICES**
P.O. Box 942883
Sacramento, CA 94283-0001



Mary Perrien, Ph.D., *Coleman* Expert (with enclosures)
Mary-Joy Spencer, Esq., *Coleman* Expert (with enclosures)
Yong Joo Erwin, LCSW, *Coleman* Expert (with enclosures)
Kathryn A. Burns, M.D, MPH, *Coleman* Expert (with enclosures)
Henry A. Dlugacz, *Coleman* Expert (with enclosures)
Angela Shannon, *Coleman* Expert (with enclosures)
Lisa Tillman, Office of the Attorney General (with enclosures)
Misha Igra, Office of the Attorney General (with enclosures)
Michael Stone, Office of Legal Affairs (with enclosures)
Michael Bien, Rosen, Bien and Galvan (with enclosures)
Donald Specter, Prison Law Office (with enclosures)
Virginia Morrison, Esq., *Coleman* (with enclosures)
Mohamedu F. Jones, Esq., *Coleman* (with enclosures)
Patricia Williams, Esq., *Coleman* (with enclosures)
Linda Buffardi, *Coleman* (with enclosures)
Haunani Henry, *Coleman*, (with enclosures)
J. Ronald Metz, *Coleman*, (with enclosures)
Andrew Swanson, M.D., Director (A), Mental Health Program, DCHCS (with enclosures)
Marion Chiurazzi, Ph.D., DCHCS (w/o enclosures)
Judy Burleson, *Coleman* Compliance Manager, DCHCS
Mary Neade, Division of Adult Institutions (with enclosures)
Sharon Riegel, DCHCS (with enclosures)

# Enclosure 13

## RC Processing for MHSDS Inmate Patients

A California Department of Corrections Report  ──────── Date Printed: 4/22/2008 11:14 AM

**Distribution:**
Warden
Chief Psychiatrist
Classification and Parole Representative/CC III in RC
Case Records Manager
Health Records Supervisor
Health Care Manager (HCM)
Associate Wardens
Senior Psychologist
Health Care Administrator

**Report Criteria:**
LOC Required:       EOP
Case Manager:       All CM's
Work Status:        RC
Transfer Status:    Both Within & Out
Housing Prefix:     All Housing

## MHSDS Inmate Level of Care (LOC) Changes - Overdue Pending Only
All Overdue Pending Placements That Should Have Completed By: 03/31/2008

### California Correctional Institution

**Report Summary**

**PENDING SUMMARY**

TOTAL OVERDUE PENDING:            7
OVERDUE PENDING AVERAGE LENGTH:   152.86

**Pending Overdue Delay Summary**

TOTAL OVERDUE PENDING WITH DELAY CODES: 7

| Delay Code 1: 0 | Delay Code 6: 0 | Delay Code 11: 0 | Delay Code 16: 0 | Delay Code 21: 0 |
| Delay Code 2: 0 | Delay Code 7: 1 | Delay Code 12: 0 | Delay Code 17: 0 | Delay Code 22: 0 |
| Delay Code 3: 0 | Delay Code 8: 0 | Delay Code 13: 0 | Delay Code 18: 1 | Delay Code 23: 0 |
| Delay Code 4: 2 | Delay Code 9: 0 | Delay Code 14: 2 | Delay Code 19: 1 | |
| Delay Code 5: 0 | Delay Code 10: 0 | Delay Code 15: 0 | Delay Code 20: 0 | |

DELAYS: 1-Lack of available bus seats; 2-Lack of EOP or CCCMS bed availability; 3-Lockdown delayed medical/MH eval(s); 4-No vacancies at endorsed institution; 5-Inmate has safety concerns (enemies); 6-Pending MDO/SVP Review; 7-Prerelease (no Xfer with 30 days or less to serve); 8-IGI review (awaiting 128 B-2); 9-Awaiting Central or Medical File from Region; 10-C-File cannot be located/unavailable; 11-Other essential med Chrono's unavail/not located; 12-Inmate Medical record unavailable; 13-Inmate pending additional healthcare evals; 14-Other Delay; 15-Pending BPT revocation extension hearing; 16-DA Referral; 17-Non-Psychiatric Medical Hold; 18-Out to Court (OTC); 19-Pending 115; 20-Psychiatric Medical Hold; 21-Arrived at RC pending revocation (PendRev); 22-IM has add'l medical needs/requires ongoing med Tx; 23-PAROLED

This report includes confidential data and is governed by privacy laws and requirements. Unauthorized use is illegal. Shred to dispose.