# EXHIBIT 2

1 | BILL LOCKYER
Attorney General of the State of California
2 | JAMES M. HUMES
Chief Assistant Attorney General
3 | FRANCES T. GRUNDER
Senior Assistant Attorney General
4 | ROCHELLE C. EAST
Supervising Deputy Attorney General
5 | LISA A. TILLMAN, State Bar No. 126424
Deputy Attorney General
6 |   1300 I Street, Suite 125
P.O. Box 944255
7 |   Sacramento, CA 94244-2550
Telephone: (916) 327-7872
8 |   Fax: (916) 324-5205

9 | Attorneys for Defendants
CF1997CS0003

10

11

12 |                 IN THE UNITED STATES DISTRICT COURT

13 |             FOR THE EASTERN DISTRICT OF CALIFORNIA

14

15 | **RALPH COLEMAN, et al.,**                    CASE NO. CIV S-90-0520 LKK
                                              JFM P
16 |                              Plaintiffs,
                                            **DEFENDANTS'**
17 |       v.                                 **PRODUCTION AND**
                                            **SUBMISSION OF FINAL**
18 | **ARNOLD SCHWARZENEGGER, et al.,**        **CRIPA AGREEMENT**

19 |                             Defendants.

20

21 |         On May 3, 2006, this Court's ordered Defendants to file under seal a copy of the draft

22 | agreement reached between the Department of Mental Health (DMH) and the United States

23 | Department of Justice concerning allegations brought under the Civil Rights of Institutionalized

24 | Persons Act (CRIPA).  On May 3, 2006, the agreement between the DMH and United States

25 | Department of Justice was finalized.  A copy of the final agreement was provided to Plaintiffs'

26 | counsel in this matter.  Plaintiffs' counsel has agreed that there is no need for the production of

27 | ///

28 | ///

CRIPA AGREEMENT

1

1   the draft agreement.  Defendants provide this Court with the final agreement (stipulation and

2   consent judgment) attached as Exhibit A and request this Court find that the May 3, 2006 order

3   to produce the draft agreement has been mooted.

4           Dated: May 8, 2006

5                           Respectfully submitted,

6                           BILL LOCKYER
                            Attorney General of the State of California

7                           JAMES M. HUMES
8                           Chief Assistant Attorney General

                            FRANCES T. GRUNDER
9                           Senior Assistant Attorney General

                            ROCHELLE C. EAST
10                          Supervising Deputy Attorney General

11

12                          */s/ Lisa Tillman*
                            LISA A. TILLMAN
13                          Deputy Attorney General

14                          Attorneys for Defendants

15

16   30115893.wpd

17

18

19

20

21

22

23

24

25

26

27

28

CRIPA AGREEMENT
                                          2

## DECLARATION OF SERVICE BY U.S. MAIL

Case Name:   **Coleman v. Schwarzenegger, et al.**

No.:         **CIV S-90-0520 LKK JFM P**

I declare:

I am employed in the Office of the Attorney General, which is the office of a member of the California State Bar, at which member's direction this service is made.  I am 18 years of age and older and not a party to this matter.  I am familiar with the business practice at the Office of the Attorney General for collection and processing of correspondence for mailing with the United States Postal Service.  In accordance with that practice, correspondence placed in the internal mail collection system at the Office of the Attorney General is deposited with the United States Postal Service that same day in the ordinary course of business.

On May 8, 2006, I served the attached *Defendant's Production and Submission of Final Cripa Agreement* by placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid, in the internal mail collection system at the Office of the Attorney General at 1300 I Street, Suite 125, P.O. Box 944255, Sacramento, CA 94244-2550, addressed as follows:

Pete Cockeroft, H-86887
California State Prison, Sacramento
FA2-205 - H86887
P.O. Box 290066
Represa, CA 95671-0066

Kimberly S. Davenport
California Medical Association
221 Main Street
San Francisco CA 94105

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on May 8, 2006, at Sacramento, California.

| A. Buckley | /s/ A Buckley |
|---|---|
| Declarant | Signature |

30116705.wpd

**EXHIBIT A**

1   WAN J. KIM
    Assistant Attorney General
2   SHANETTA Y. CUTLAR (CA Bar No. 169849)
    Chief, Special Litigation Section
3   BENJAMIN O. TAYLOE, JR. (DC Bar No. 422910)
    LEE R. SELTMAN (CA Bar No. 168857)
4   MARY R. BOHAN (DC Bar No. 420628)
    WILLIAM G. MADDOX (DC Bar No. 000020540)
5   JACQUELINE CUNCANNAN (DC Bar No. 462985)
    MATTHEW J. DONNELLY (IL Bar No. 6281308)
6   ANITA C. SNYDER (NY Bar No. 3910494)
    Trial Attorneys
7   United States Department of Justice
    Civil Rights Division
8        Special Litigation Section
         950 Pennsylvania Avenue, N.W.
9        Washington D.C.   20035
         (202) 514-6255
10
    DEBRA W. YANG
11  United States Attorney
    LEON W. WEIDMAN
12  Assistant United States Attorney
    Chief, Civil Division
13  GARY L. PLESSMAN
    Assistant United States Attorney
14  Chief, Civil Fraud Section
    HOWARD DANIELS (CA Bar No. 081764)
15  Assistant United States Attorney
         300 North Los Angeles Street
16       Federal Building, Room 7516
         Los Angeles, CA  90012
17       (213) 894-4024

18  Attorneys for the United States of America

19
                 UNITED STATES DISTRICT COURT
20
          FOR THE CENTRAL DISTRICT OF CALIFORNIA
21
                      WESTERN DIVISION
22

23  UNITED STATES OF AMERICA,        )   CASE NO.
                                      )
24       Plaintiff,                   )
                                      )
25       vs.                          )   STIPULATION FOR CONSENT
                                      )   JUDGMENT AND AGREEMENT
26  STATE OF CALIFORNIA; THE          )
    HONORABLE ARNOLD SCHWARZENEGGER,  )
27  Governor of the State of          )
    California, in his official       )
28  capacity only; STEPHEN W. MAYBERG, )

1  Director of the California
   Department of Mental Health, in                )
2  his official capacity only;                    )
   SHARON SMITH NEVINS, Executive                 )
3  Director of Metropolitan State                 )
   Hospital, in her official                      )
4  capacity only; and DAVE GRAZIANI,              )
   Executive Director of Napa                     )
5  State Hospital, in his official                )
   capacity only,                                 )
6                                                 )
       Defendants.                                )
7  _____)

8      IT IS HEREBY STIPULATED AND AGREED by the parties hereto as

9  follows:

10     A.   This Stipulation and the proposed Consent Judgment at

11 Exhibit "A" represent a complete settlement of this case, the

12 Complaint in which was filed contemporaneously herewith.

13     B.   This matter was instituted by the United States of

14 America pursuant to the Civil Rights of Institutionalized Persons

15 Act, ("CRIPA") 42 U.S.C. § 1997.

16     C.   The United States is authorized to institute this civil

17 action by 42 U.S.C. § 1997a and has met all prerequisites for the

18 institution of this civil action prescribed by the statute.

19     D.   The parties to this Stipulation (collectively, "the

20 Parties") are the State of California ("State"); the Honorable

21 Arnold Schwarzenegger, Governor of the State of California;

22 Stephen W. Mayberg, Ph.D., Director of the California Department

23 of Mental Health; Sharon Smith Nevins, Executive Director of

24 Metropolitan State Hospital ("Metropolitan"); Dave Graziani,

25 Executive Director of Napa State Hospital ("Napa"), and their

26 successors, contractors, and agents (collectively, the

27 "California Parties" or "California"); and the United States (the

28 "United States" or "DOJ").

                                  2

1    E.   This Court has jurisdiction over this action pursuant to
2  28 U.S.C. § 1345.   Venue is appropriate pursuant to 28 U.S.C.
3  § 1391(b).   This Stipulation is governed by the laws of the
4  United States.   The Parties agree that the exclusive jurisdiction
5  and venue for any dispute arising between and among the Parties
6  under this Stipulation will be the United States District Court
7  for the Central District of California.

8    F.   The California Parties have authority and responsibility
9  for the operation of Metropolitan State Hospital, Napa State
10  Hospital, Patton State Hospital, and Atascadero State Hospital,
11  and of any facility that supplements or replaces these hospitals
12  (collectively, the "State Hospitals") and/or are officers of the
13  Executive Branch of the State of California.

14    G.   The State Hospitals are institutions covered by CRIPA
15  and operated by the State to provide psychiatric treatment and
16  other protections, supports, and services to persons with mental
17  illness.   The State has authority and responsibility for the
18  operation of the State Hospitals and is responsible for the
19  implementation of this Stipulation.

20    H.   On March 21, 2002, the Attorney General of the United
21  States, by and through the Assistant Attorney General, Civil
22  Rights Division, notified the Governor of the State of
23  California, the Attorney General of the State of California, the
24  Executive Director of Metropolitan, and the Director of the
25  California Department of Mental Health, of his intention to
26  investigate allegations of unconstitutional and unlawful
27  conditions at Metropolitan pursuant to 42 U.S.C. § 1997.
28

1      I.    Following a thorough investigation, on May 13, 2003, and

2  on February 19, 2004, the Attorney General of the United States,

3  by and through the Assistant Attorney General, Civil Rights

4  Division, issued findings letters pursuant to 42 U.S.C.

5  § 1997b(a)(1), which informed the Governor of the State of

6  California, the Attorney General of the State of California, the

7  Executive Director of Metropolitan, and the Director of the

8  California Department of Mental Health that the Attorney General

9  had reasonable cause to believe that persons residing in, or

10  confined to, Metropolitan were being subjected to conditions that

11  deprived them of their legal rights and of their rights,

12  privileges, and immunities secured by the Constitution of the

13  United States.

14      J.    On January 26, 2004, the Attorney General of the United

15  States, by and through the Assistant Attorney General, Civil

16  Rights Division, notified the Governor of the State of

17  California, the Attorney General of the State of California, the

18  Executive Director of Napa, and the Director of the California

19  Department of Mental Health, of his intention to investigate

20  allegations of unconstitutional and unlawful conditions at Napa

21  pursuant to 42 U.S.C. § 1997.

22      K.    Following a thorough investigation, on June 27, 2005,

23  the Attorney General of the United States, by and through the

24  Acting Assistant Attorney General, Civil Rights Division, issued

25  a findings letter pursuant to 42 U.S.C. § 1997b(a)(1), which

26  informed the Governor of the State of California, the Attorney

27  General of the State of California, the Executive Director of

28  Napa, and the Director of the California Department of Mental

4

1  Health, that the Attorney General had reasonable cause to believe
2  that persons residing in or confined to Napa were being subjected
3  to conditions that deprived them of their legal rights and of
4  their rights, privileges, and immunities secured by the
5  Constitution of the United States.

6      L.   On April 9, 2004, the Attorney General of the United
7  States, by and through the Assistant Attorney General, Civil
8  Rights Division, notified the Governor of the State of
9  California, the Attorney General of the State of California, the
10 Executive Director of Patton, and the Director of the California
11 Department of Mental Health, of his intention to investigate
12 allegations of unconstitutional and unlawful conditions at Patton
13 pursuant to 42 U.S.C. § 1997.

14     M.   Following a thorough investigation, on the date hereof,
15 the Attorney General of the United States, by and through the
16 Assistant Attorney General, Civil Rights Division, issued a
17 findings letter pursuant to 42 U.S.C. § 1997b(a)(1), which
18 informed the Governor of the State of California, the Attorney
19 General of the State of California, the Executive Director of
20 Patton, and the Director of the California Department of Mental
21 Health that the Attorney General had reasonable cause to believe
22 that persons residing in, or confined to, Patton were being
23 subjected to conditions that deprived them of their legal rights
24 and of their rights, privileges, and immunities secured by the
25 Constitution of the United States.

26     N.   On February 16, 2005, the Attorney General of the United
27 States, by and through the Assistant Attorney General, Civil
28 Rights Division, notified the Governor of the State of

1  California, the Attorney General of the State of California, the

2  Executive Director of Atascadero, and the Director of the

3  California Department of Mental Health, of his intention to

4  investigate allegations of unconstitutional and unlawful

5  conditions at Atascadero pursuant to 42 U.S.C. § 1997.

6      O.  Following a thorough investigation, on the date hereof,

7  the Attorney General of the United States, by and through the

8  Assistant Attorney General, Civil Rights Division, issued a

9  findings letter pursuant to 42 U.S.C. § 1997b(a)(1), which

10  informed the Governor of the State of California, the Attorney

11  General of the State of California, the Executive Director of

12  Atascadero, and the Director of the California Department of

13  Mental Health that the Attorney General had reasonable cause to

14  believe that persons residing in, or confined to, Atascadero were

15  being subjected to conditions that deprived them of their legal

16  rights and of their rights, privileges, and immunities secured by

17  the Constitution of the United States.

18      P.  In accordance with 42 U.S.C. § 1997b, after the passage

19  of 49 days hereof, the United States shall file an amended

20  complaint to address its claims of unlawful conditions at Patton

21  and Atascadero, and to name those facilities' Executive Directors

22  as Defendants in this matter.  With the amended complaint, the

23  United States shall file a motion to amend the proposed Consent

24  Judgment at Exhibit "A" hereto so that the proposed Consent

25  Judgment applies with equal force and effect to Patton,

26  Atascadero, Metropolitan, and Napa.  The California Parties shall

27  not oppose the United States' motion to amend the proposed

28

1   Consent Judgment at Exhibit "A" so that it applies with equal

2   force and effect to Patton, Atascadero, Metropolitan, and Napa.

3      Q.  The conditions of confinement, care, treatment, and

4   rehabilitation of the State Hospitals' residents ("residents")

5   implicate rights that are secured and protected by the

6   Constitution and laws of the United States.  The Parties entering

7   into this Stipulation recognize these legal interests, and for

8   the purpose of avoiding protracted and adversarial litigation,

9   agree to the provisions set forth herein.

10     R.  The provisions of this Stipulation and the proposed

11  Consent Judgment at Exhibit "A" are a lawful, fair, and

12  appropriate resolution of this case.

13     S.  This Stipulation is legally binding and judicially

14  enforceable by the Parties, and it shall be applicable to and

15  binding upon all of the Parties, their officers, agents,

16  employees, assigns, transferees, subsidiaries, and successors.

17     T.  With the exception of the findings letters referenced in

18  paragraphs I, K, M, and O hereof, and any technical assistance

19  recommendations by the United States regarding facility

20  conditions, no prior or contemporaneous communications, oral or

21  written, shall be relevant or admissible for purposes of

22  determining the meaning of any provisions herein.  This

23  Stipulation and the proposed Consent Judgment at Exhibit "A"

24  contain the entire agreement between the Parties and wholly

25  cancel, terminate, and supersede any and all previous and/or

26  contemporaneous oral agreements, negotiations, and commitments

27

28

7

1  and writings between the Parties thereto with respect to this
2  CRIPA action.

3    U.   Pursuant to a separate Settlement Agreement executed on
4  the date hereof, between the United States and the State, the
5  Parties have agreed that entry of the proposed Consent Judgment
6  at Exhibit "A" shall also resolve a contemporaneous investigation
7  by the United States Department of Justice related to
8  Medicare/Medicaid claims at Metropolitan.

9    V.   After notification of the initial CRIPA investigation of
10  Metropolitan in 2002, and continuing from time to time
11  thereafter, the State voluntarily undertook initiatives to
12  address outstanding concerns with regard to the protections,
13  services, and supports provided at the State Hospitals.
14  California and its officials have acted in good faith and have
15  voluntarily undertaken significant measures to enhance
16  confinement, care, treatment, and rehabilitation for residents.

17    W.   The Parties jointly have agreed upon the Enhancement
18  Plan (the "Plan"), to address outstanding concerns that affect or
19  have affected the State Hospitals' residents.  The provisions of
20  the Plan are set forth in their entirety in the proposed Consent
21  Judgment in Exhibit "A" attached hereto.

22    X.   The specific means to be employed in implementing the
23  Plan are matters within the California Parties' discretion, and
24  they shall be accepted so long as they are consistent with the
25  purpose of this Stipulation and the Plan, the purpose of which is
26  to secure the rights, privileges, and immunities of the State
27
28

1  Hospital residents that are protected by the Constitution of the

2  United States and federal laws.

3       Y.   The Parties reserve the right to withdraw consent to

4  this Stipulation in the event that the proposed Consent Judgment

5  at Exhibit "A" is not approved by the Court in its entirety.

6       Z.   The Parties agree that any records produced pursuant to

7  this Stipulation and the proposed Consent Judgment at Exhibit "A"

8  may be shared only with the following:

9       (1) the Court, including public submissions and filings;

10      (2) the Monitor, persons assisting the Monitor, and any

11  expert(s) or consultant(s) selected or retained by the Parties

12  pursuant to this Stipulation and the proposed Consent Judgment at

13  Exhibit "A";

14      (3) all counsel of record in this matter;

15      (4) staff and clerical personnel involved in the

16  preparation, and review of, the submissions and reports for

17  counsel of record; and

18      (5) United States and other governmental officials, as

19  necessary, in order to carry out law enforcement

20  responsibilities.

21  Notwithstanding the foregoing, the United States shall adhere to

22  the requirements of federal law, including the Freedom of

23  Information Act ("FOIA"), 5 U.S.C. § 552, and the State shall

24  adhere to state law, including the state Public Records Act

25  ("PRA"), Cal. Gov't Code § 6254, et seq.  In the event of a

26  request pursuant to FOIA or the PRA for records produced pursuant

27  to this Stipulation, the Parties agree to assert all applicable

28  exemptions in protecting the confidentiality of information

9

1  contained therein.  All Parties shall be responsible for
2  maintaining the confidentiality of records in their possession.
3  Submissions to the Court that contain identifying information of
4  residents (such as their full name, address, or social security
5  number) shall be filed with the Court using pseudonyms or the
6  residents' initials.

7      AA.  All Parties shall bear their own costs, including
8  attorney's fees.

9      BB.  The Parties agree to defend the provisions of this
10  Stipulation and the proposed Consent Judgment at Exhibit "A".
11  The Parties shall notify each other of any court or
12  administrative challenge to this Stipulation or the proposed
13  Consent Judgment at Exhibit "A".  In the event any provision of
14  this Stipulation or the proposed Consent Judgment at Exhibit "A"
15  is challenged in any local or state court, removal to the United
16  States District Court for the Central District of California
17  shall be sought.

18      CC.  Failure by any Party to enforce this entire Stipulation
19  and the proposed Consent Judgment at Exhibit "A" or any provision
20  thereof with respect to any deadline or any other provision shall
21  not be construed as a waiver of its right to enforce other
22  deadlines or provisions.  In the event any provision of this
23  Stipulation and the proposed Consent Judgment at Exhibit "A" is
24  declared invalid for any reason by a court of competent
25  jurisdiction, said finding shall not affect the remaining
26  provisions of this Stipulation or the proposed Consent Judgment
27  at Exhibit "A".

28

1    DD.  If any unforeseen circumstance occurs that causes a

2  failure to timely carry out any requirements of this Stipulation

3  and the proposed Consent Judgment at Exhibit "A" the California

4  Parties shall notify the Monitor and the United States in writing

5  within thirty (30) calendar days of the time that the California

6  Parties become aware of the unforeseen circumstance and its

7  impact on their ability to perform under the Agreement.  The

8  notice shall describe the cause of the failure to perform and the

9  measures taken to prevent or minimize the failure.  The

10  California Parties shall implement all reasonable measures to

11  avoid or minimize any such failure.

12    EE.  Notice under this Stipulation and the proposed Consent

13  Judgment at Exhibit "A" shall be provided by courier or overnight

14  delivery to the California Parties to:

15  Chief Counsel,
    California Department of Mental Health
16  1600 9th Street, Room 153
    Sacramento, CA  95814
17

18  and to the United States to:

19  Chief
    Special Litigation Section
20  Civil Rights Division
    United States Department of Justice
21  601 D Street, N.W.
    Washington, D.C.  20004
22

23    FF.  The California Parties will comply at all times with

24  42 U.S.C. § 1997d.

25    GG.  It is intended that the Parties will pursue a

26  problem-solving approach so that litigation will not be necessary

27  and any disagreements can be minimized and the energies of the

28  Parties can be focused on the task of meeting the needs of the

1  residents and achieving the outcomes set forth in this

2  Stipulation and the proposed Consent Judgment at Exhibit "A".

3  The Parties, notably two governmental agencies exercising their

4  expertise, intend to work together to resolve differences.  The

5  Parties will look to the Monitor to assist in measuring

6  compliance and providing assistance toward this goal and in

7  furtherance of the Parties' goals in reaching this Agreement.  It

8  is the intention of the Parties that there be no Special Master

9  assigned to this case.  The United States agrees to confer with

10  the State in a good faith effort to attempt to reach agreement

11  regarding remedy of the alleged deficiencies.  The United States

12  may seek enforcement of this Stipulation and the proposed Consent

13  Judgment at Exhibit "A" from the Court consistent with this

14  Stipulation and the proposed Consent Judgment at Exhibit "A" if

15  the United States determines, in its sole discretion, that

16  engaging in further good faith discussions with the State is

17  fruitless.

18      HH.  The individuals signing this Stipulation on behalf of

19  the California Parties represent and warrant that they are

20  authorized by such Parties to execute this Stipulation.  The

21  United States signatories represent that they are signing this

22  Stipulation in their official capacities and that they are

23  authorized to execute this Stipulation.

24      II.  This Stipulation may be executed in counterparts, each

25  of which constitutes an original and all of which constitute one

26  and the same agreement.  Facsimiles of signatures shall

27  constitute acceptable, binding signatures for purposes of this

28  Stipulation.

12

1    JJ.  The Parties stipulate and agree that a Consent Judgment

2    in the form of Exhibit "A" attached hereto may be entered

3    immediately without further notice or hearing.

5    DATED:   This _____ day of _____, 2006.

9    _____
     WAN J. KIM
10   Assistant Attorney General

13   _____
     SHANETTA Y. CUTLAR
     Chief, Special Litigation Section

16   _____
17   BENJAMIN O. TAYLOE, JR.
     LEE R. SELTMAN
18   MARY R. BOHAN
     WILLIAM G. MADDOX
     JACQUELINE CUNCANNAN
19   MATTHEW J. DONNELLY
     ANITA C. SNYDER
20   Trial Attorneys
     United States Department of Justice
21   Civil Rights Division

23   _____
     DEBRA W. YANG
24   United States Attorney
     LEON W. WEIDMAN
25   Assistant United States Attorney
     Chief, Civil Division
26   GARY L. PLESSMAN
     Assistant United States Attorney
     Chief, Civil Fraud Section
27   HOWARD DANIELS (CA Bar No. 081764)
     Assistant United States Attorney

by Frank Kortum (AUSA)
(per telephone authorization)

13

1

2     DATED:   This _1st_ day of _____May_____, 2006.

3

4                          _Kimberly Belshé_
5                          KIMBERLY BELSHÉ
       Secretary, State of California
6      Health and Human Services Agency

7

8

9                          FRANK S. FURTEK
       Chief Counsel, State of California
10     Health and Human Services Agency

11

12

13                         STEPHEN W. MAYBERG
       Director, California Department
14     Of Mental Health

15

16

17                         CYNTHIA RODRÍGUEZ
       Chief Counsel, California
18     Department of Mental Health

19

20

21

22

23

24

25

26

27

28

                              14

```
 1  WAN J. KIM
    Assistant Attorney General
 2  SHANETTA Y. CUTLAR (CA Bar No. 169849)
    Chief, Special Litigation Section
 3  BENJAMIN O. TAYLOE, JR. (DC Bar No. 422910)
    LEE R. SELTMAN (CA Bar No. 168857)
 4  MARY R. BOHAN (DC Bar No. 420628)
    WILLIAM G. MADDOX (DC Bar No. 000020540)
 5  JACQUELINE CUNCANNAN (DC Bar No. 462985)
    MATTHEW J. DONNELLY (IL Bar No. 6281308)
 6  ANITA C. SNYDER (NY Bar No. 3910494)
    Trial Attorneys
 7  United States Department of Justice
    Civil Rights Division
 8       Special Litigation Section
         950 Pennsylvania Avenue, N.W.
 9       Washington D.C.  20035
         (202) 514-6255
10
    DEBRA W. YANG
11  United States Attorney
    LEON W. WEIDMAN
12  Assistant United States Attorney
    Chief, Civil Division
13  GARY L. PLESSMAN
    Assistant United States Attorney
14  Chief, Civil Fraud Section
    HOWARD DANIELS (CA Bar No. 081764)
15  Assistant United States Attorney
         300 North Los Angeles Street
16       Federal Building, Room 7516
         Los Angeles, CA  90012
17       (213) 894-4024

18  Attorneys for the United States of America

19              UNITED STATES DISTRICT COURT

20        FOR THE CENTRAL DISTRICT OF CALIFORNIA

21                   WESTERN DIVISION

22  UNITED STATES OF AMERICA,        )   CASE NO. _____
         Plaintiff,                  )
23                                   )
         vs.                         )
24                                   )   CONSENT JUDGMENT
    STATE OF CALIFORNIA; THE         )
25  HONORABLE ARNOLD SCHWARZENEGGER, )
    Governor of the State of         )
26  California, in his official      )
    capacity only; STEPHEN W. MAYBERG,)
27  Director of the California       )
    Department of Mental Health, in  )
28  his official capacity only;      )
```

1  SHARON SMITH NEVINS, Executive    )
   Director of Metropolitan          )
2  State Hospital, in her            )
   official capacity only; and DAVE  )
3  GRAZIANI, Executive Director of   )
   Napa State Hospital, in his       )
4  official capacity only,           )
                    Defendants.      )
5  _____)

6       Simultaneously herewith, Plaintiff, the United States of

7  America filed a Complaint under the provisions of 42 U.S.C.

8  § 1997 against the Defendants, seeking to remedy an alleged

9  pattern or practice of conduct that was alleged to deprive

10 patients of Metropolitan State Hospital, in Norwalk, California,

11 and Napa State Hospital, in Napa, California (collectively, and

12 including any facility that supplements or replaces them, the

13 "State Hospitals") of rights, privileges, and immunities secured

14 or protected by the Constitution or laws of the United States.

15 On the same date, the Parties in this matter filed a Stipulation

16 for Consent Judgment and Agreement ("Stipulation").

17      Noting the general principle that settlements are to be

18 encouraged, particularly settlements between governmental

19 entities, and having considered the Stipulation and the terms of

20 the measures, set forth herein, that the Defendants agree to

21 undertake to improve conditions at the State Hospitals, it is

22 ORDERED, ADJUDGED AND DECREED that pursuant to the Stipulation,

23 and good and reasonable cause appearing therefore, Judgment shall

24 be entered in this matter pursuant to the following terms and

25 conditions:

26

27

28

PART I

ENHANCEMENT PLAN

----------------------------------------------------------------

Table of Contents

A.   Definitions  . . . . . . . . . . . . . . . . . .   - 5 -

　　　　1.   Effective Date . . . . . . . . . . . . .   - 5 -

　　　　2.   Consistent With Generally Accepted Professional
　　　　　　 Standards of Care  . . . . . . . . . . .   - 5 -

B.   Introduction . . . . . . . . . . . . . . . . . .   - 5 -

C.   Integrated Therapeutic and Rehabilitation Services
　　 Planning  . . . . . . . . . . . . . . . . . . .   - 6 -

　　　　1.   Interdisciplinary Teams  . . . . . . . .   - 6 -

　　　　2.   Integrated Therapeutic and Rehabilitation Service
　　　　　　 Planning . . . . . . . . . . . . . . . .   - 8 -

D.   Integrated Assessments . . . . . . . . . . . . .   - 19 -

　　　　1.   Psychiatric Assessments and Diagnoses  . .   - 20 -

　　　　2.   Psychological Assessments  . . . . . . .   - 24 -

　　　　3.   Nursing Assessments  . . . . . . . . . .   - 28 -

　　　　4.   Rehabilitation Therapy Assessments . . . .   - 30 -

　　　　5.   Nutrition Assessments  . . . . . . . . .   - 31 -

　　　　6.   Social History Assessments . . . . . . .   - 33 -

　　　　7.   Court Assessments  . . . . . . . . . . .   - 34 -

E.   Discharge Planning and Community Integration . . .   - 38 -

F.   Specific Therapeutic and Rehabilitation Services  . .   - 40 -

　　　　1.   Psychiatric Services . . . . . . . . . .   - 40 -

　　　　2.   Psychological Services . . . . . . . . .   - 45 -

3

        3.    Nursing Services . . . . . . . . . . . . .    – 49 –
        4.    Rehabilitation Therapy Services . . . . .    – 52 –
        5.    Nutrition Services . . . . . . . . . . .    – 53 –
        6.    Pharmacy Services  . . . . . . . . . . .    – 55 –
        7.    General Medical Services . . . . . . . .    – 55 –
        8.    Infection Control  . . . . . . . . . .    – 57 –
        9.    Dental Services  . . . . . . . . . . .    – 58 –
        10.   Special Education  . . . . . . . . . .    – 59 –
G.    Documentation  . . . . . . . . . . . . . . .    – 61 –
H.    Restraints, Seclusion, and PRN and Stat Medications    – 61 –
I.    Protection From Harm . . . . . . . . . . . .    – 65 –
        1.    Incident Management . . . . . . . . . .    – 65 –
        2.    Performance Improvement . . . . . . . .    – 72 –
        3.    Environmental Conditions . . . . . . .    – 74 –
J.    First Amendment and Due Process . . . . . . .    – 75 –

------------------------------------------------------------------

4

A. Definitions

   1.  Effective Date

      The Effective Date will be considered the first day of the month following the date of execution of the agreement by all parties. Unless otherwise specified, implementation of each provision of this Plan shall begin no later than 12 months after the Effective Date.

   2.  Consistent With Generally Accepted Professional Standards of Care

      A decision by a qualified professional that is substantially aligned with contemporary, accepted professional judgment, practice, or standards as to demonstrate that the person responsible based the decision on such accepted professional judgment.

B. Introduction

Each State Hospital shall use a Recovery philosophy of care and a Psychiatric Rehabilitation model of service delivery. Therapeutic and rehabilitative services provided by each State Hospital shall be based on evidence-based practices and practice-based evidence, shall be age-appropriate, and shall be designed to: strengthen and support individuals' recovery, rehabilitation, and habilitation; enable individuals to grow and develop in ways benefitting their mental health, physical health, and well being; and ensure individuals' reasonable safety, security, and freedom from undue bodily restraint. Relationships between each State Hospital's staff and the individuals whom they serve shall be positive, therapeutic, and respectful.

1        Each individual served by each State Hospital shall be
2    encouraged to participate in identifying his or her needs and
3    goals, and in selecting appropriate treatment options.
4    Therapeutic and rehabilitation services shall be designed to
5    address each individual's needs and to assist individuals in
6    meeting their specific recovery and wellness goals, consistent
7    with generally accepted professional standards of care.  Each
8    State Hospital shall ensure clinical and administrative
9    oversight, education, and support of its staff in planning and
10    providing care and treatment consistent with these standards.
11    C.    Integrated Therapeutic and Rehabilitation Services Planning
12        Each State Hospital shall provide coordinated,
13    comprehensive, individualized protections, services, supports,
14    and treatments (collectively "therapeutic and rehabilitation
15    services") for the individuals it serves, consistent with
16    generally accepted professional standards of care.  In addition
17    to implementing the therapeutic and rehabilitation planning
18    provisions set forth below, each State Hospital shall establish
19    and implement standards, policies, and practices to ensure that
20    therapeutic and rehabilitation service determinations are
21    consistently made by an interdisciplinary team through integrated
22    therapeutic and rehabilitation service planning and embodied in a
23    single, integrated therapeutic and rehabilitation service plan.
24        1.    Interdisciplinary Teams
25        The interdisciplinary team's membership shall be
26        dictated by the particular needs and strengths of the
27        individual in the team's care.  At a minimum, each State
28

6

| | | |
|---|---|---|
| 1 | | Hospital shall ensure that the team shall: |
| 2 | a. | Have as its primary objective the provision of |
| 3 | | individualized, integrated therapeutic and |
| 4 | | rehabilitation services that optimize the |
| 5 | | individual's recovery and ability to sustain |
| 6 | | himself/herself in the most integrated, |
| 7 | | appropriate setting based on the individual's |
| 8 | | strengths and functional and legal status and |
| 9 | | support the individual's ability to exercise |
| 10 | | his/her liberty interests, including the interests |
| 11 | | of self determination and independence; |
| 12 | b. | Be led by a clinical professional who is involved |
| 13 | | in the care of the individual; |
| 14 | c. | Function in an interdisciplinary fashion; |
| 15 | d. | Assume primary responsibility for the individual's |
| 16 | | therapeutic and rehabilitation services, and |
| 17 | | ensure the provision of competent, necessary, and |
| 18 | | appropriate psychiatric and medical care; |
| 19 | e. | Ensure that each member of the team participates |
| 20 | | appropriately, by competently and knowledgeably |
| 21 | | assessing the individual on an ongoing basis and |
| 22 | | by developing, monitoring, and, as necessary, |
| 23 | | revising the therapeutic and rehabilitation |
| 24 | | services; |
| 25 | f. | Ensure that assessment results and, as clinically |
| 26 | | relevant, consultation results, are communicated |
| 27 | | to the team members, along with the implications |
| 28 | | |

7

1           of those results for diagnosis, therapy and

2           rehabilitation by no later than the next review;

3      g.   Be responsible for the scheduling and coordination

4           of assessments and team meetings, the drafting of

5           integrated treatment plans, and the scheduling and

6           coordination of necessary progress reviews;

7      h.   Consist of a stable core of members, including at

8           least the individual served; the treating

9           psychiatrist; the treating psychologist; the

10          treating rehabilitation therapist; the treating

11          social worker; the registered nurse and

12          psychiatric technician who know the individual

13          best; one of the individual's teachers (for

14          school-age individuals); and, as appropriate, the

15          individual's family, guardian, advocates,

16          attorneys, and the pharmacist and other staff;

17     i.   Not include any core treatment team members with a

18          case load exceeding 1:15 in admission teams (new

19          admissions of 90 days or less) and, on average,

20          1:25 in all other teams at any point in time; and

21     j.   Not include staff that is not verifiably competent

22          in the development and implementation of

23          interdisciplinary treatment plans.

24  2.  Integrated Therapeutic and Rehabilitation Service

25      Planning.

26      Each State Hospital shall develop and implement

27  policies and protocols regarding the development of

28  therapeutic and rehabilitation service plans, referred to as

8

1   "Wellness and Recovery Plans" ("WRP") consistent with
2   generally accepted professional standards of care, to ensure
3   that:

4   a. Individuals have substantive input into the
5     therapeutic and rehabilitation service planning
6     process, including but not limited to input as to
7     mall groups and therapies appropriate to their
8     WRP.

9   b. Therapeutic and rehabilitation service planning
10     provides timely attention to the needs of each
11     individual, in particular:

12     i. initial therapeutic and rehabilitation
13      service plans (Admission Wellness and
14      Recovery Plan ("A-WRP")) are completed within
15      24 hours of admission;

16     ii. master therapeutic and rehabilitation service
17      plans (WRP) are completed within 7 days of
18      admission; and

19     iii. therapeutic and rehabilitation service plan
20      reviews are performed every 14 days during
21      the first 60 days of hospitalization and
22      every 30 days thereafter.  The third monthly
23      review is a quarterly review and the 12th
24      monthly review is the annual review.

25   c. Treatment, rehabilitation, and enrichment services
26     are goal-directed, individualized, and informed by
27     a thorough knowledge of the individual's

28

9

1           psychiatric, medical, and psychosocial history and

2           previous response to such services.

3     d.    Therapeutic and rehabilitation service planning is

4           based on a comprehensive case formulation for each

5           individual that emanates from interdisciplinary

6           assessments of the individual consistent with

7           generally accepted professional standards of care.

8           Specifically, the case formulation shall:

9      i.    be derived from analyses of the information

10           gathered from interdisciplinary assessments,

11           including diagnosis and differential

12           diagnosis;

13     ii.   include a review of:  pertinent history;

14           predisposing, precipitating and perpetuating

15           factors; previous treatment history; and

16           present status;

17     iii. consider biomedical, psychosocial, and

18           psychoeducational factors, as clinically

19           appropriate, for each category in § C.2.d.ii

20           above;

21     iv.   consider such factors as age, gender,

22           culture, treatment adherence, and medication

23           issues that may affect the outcomes of

24           treatment and rehabilitation interventions;

25      v.    support the diagnosis by diagnostic

26           formulation, differential diagnosis, and

27           Diagnostic and Statistical Manual-IV-TR (or

28           the most current edition) checklists; and

10

1          vi.   enable the interdisciplinary team to reach

2                sound determinations about each individual's

3                treatment, rehabilitation, enrichment and

4                wellness needs, the type of setting to which

5                the individual should be discharged, and the

6                changes that will be necessary to achieve

7                discharge.

8      e.   The therapeutic and rehabilitation service plan

9         specifies the individual's focus of

10       hospitalization (goals), assessed needs

11       (objectives), and how the staff will assist the

12       individual to achieve his or her goals/objectives

13       (interventions).

14     f.   Therapeutic and rehabilitation service planning is

15       driven by individualized needs, is strengths-based

16       (i.e., builds on an individual's current

17       strengths), addresses the individual's motivation

18       for engaging in wellness activities, and leads to

19       improvement in the individual's mental health,

20       physical health, and well being, consistent with

21       generally accepted professional standards of care.

22       Specifically, the interdisciplinary team shall:

23       i.   develop and prioritize reasonable and

24              attainable goals/objectives (e.g., at the

25              level of each individual's functioning) that

26              build on the individual's strengths and

27              address the individual's identified needs

28

1              and, if any identified need is not addressed,

2              provide a rationale for not addressing the

3              need;

4      ii.   ensure that the objectives/interventions

5              address treatment (e.g., for a disease or

6              disorder), rehabilitation (e.g.,

7              skills/supports, motivation and readiness),

8              and enrichment (e.g., quality of life

9              activities);

10    iii. write the objectives in behavioral,

11             observable, and/or measurable terms;

12     iv.  include all objectives from the individual's

13             current stage of change, or readiness for

14             rehabilitation, to the maintenance stage for

15             each focus of hospitalization, as clinically

16             appropriate;

17     v.   ensure that there are interventions that

18             relate to each objective, specifying who will

19             do what, within what time frame, to assist

20             the individual to meet his/her needs as

21             specified in the objective;

22    vi.   implement interventions appropriately

23             throughout the individual's day, with a

24             minimum of 20 hours of active treatment per

25             week.  Individual or group therapy included

26             in the individual's WRP shall be provided as

27             part of the 20 hours of active treatment per

28             week;

vii.  maximize, consistent with the individual's

treatment needs and legal status,

opportunities for treatment, programming,

schooling, and other activities in the most

appropriate integrated, non-institutional

settings, as clinically appropriate; and

viii.  ensure that each therapeutic and

rehabilitation service plan integrates and

coordinates all services, supports, and

treatments provided by or through the State

Hospital for the individual in a manner

specifically responsive to the plan's

therapeutic and rehabilitation goals.  This

requirement includes, but is not limited to,

ensuring that individuals are assigned to

mall groups that link directly to the

objectives of the individual's treatment plan

and needs;

g.  Therapeutic and rehabilitation service plans are

revised as appropriate to ensure that planning is

based on the individual's progress, or lack

thereof, as determined by the scheduled monitoring

of identified criteria or target variables,

consistent with generally accepted professional

standards of care.  Specifically, the

interdisciplinary team shall:

i.  revise the focus of hospitalization

objectives, as needed, to reflect the

13

1               individual's changing needs and develop new

2               interventions to facilitate attainment of new

3               objectives when old objectives are achieved

4               or when the individual fails to make progress

5               toward achieving these objectives;

6      ii.   review the focus of hospitalization, needs,

7               objectives, and interventions more frequently

8               if there are changes in the individual's

9               functional status or risk factors (i.e.,

10              behavioral, medical, and/or psychiatric risk

11              factors);

12     iii.   ensure that the review process includes an

13              assessment of progress related to discharge

14              to the most integrated setting appropriate to

15              meet the individual's assessed needs,

16              consistent with his/her legal status; and

17     iv.   base progress reviews and revision

18              recommendations on data collected as

19              specified in the therapeutic and

20              rehabilitation service plan.

21   h.  Individuals in need of positive behavior supports

22      in school or other settings receive such supports

23      consistent with generally accepted professional

24      standards of care.

25   i.  Adequate active psychosocial rehabilitation is

26      provided, consistent with generally accepted

27

28

1        professional standards of care, that:

2        i.    is based on the individual's assessed needs

3              and is directed toward increasing the

4              individual's ability to engage in more

5              independent life functions;

6        ii.   has documented objectives, measurable

7              outcomes, and standardized methodology;

8        iii.  is aligned with the individual's objectives

9              that are identified in the individual's WRP;

10       iv.   utilizes the individual's strengths,

11             preferences, and interests;

12       v.    focuses on the individual's vulnerabilities

13             to mental illness, substance abuse, and

14             readmission due to relapse, where

15             appropriate;

16       vi.   is provided in a manner consistent with each

17             individual's cognitive strengths and

18             limitations;

19       vii.  provides progress reports for review by the

20             Interdisciplinary Team as part of the WRP

21             review process;

22       viii. is provided 5 days a week, for a minimum of 4

23             hours a day (i.e., 2 hours in the morning and

24             2 hours in the afternoon each weekday), for

25             each individual or 2 hours a day when the

26             individual is in school, except days falling

27             on state holidays;

28

15

1    ix. is provided to individuals in bed-bound

2      status in a manner and for a period that is

3      commensurate with their medical status;

4    x. routinely takes place as scheduled;

5    xi. includes, in the evenings and weekends,

6      additional activities that enhance the

7      individual's quality of life; and

8    xii. is consistently reinforced by staff on the

9      therapeutic milieu, including living units.

10  j. Adequate individualized and group exercise and

11    recreational options are provided, consistent with

12    generally accepted professional standards of care.

13  k. Individuals who have an assessed need for family

14    therapy services receive such services in their

15    primary language, as feasible, consistent with

16    generally accepted professional standards of care

17    and that these services, and their effectiveness

18    for addressing the indicated problem, are

19    comprehensively documented in each individual's

20    chart.

21  l. Each individual's therapeutic and rehabilitation

22    service plan identifies general medical diagnoses,

23    the treatments to be employed, the related symptoms

24    to be monitored by nursing staff (i.e., registered

25    nurses ("RNs"), licensed vocational nurses

26    ("LVNs"), and psychiatric technicians) and the

27    means and frequency by which such staff shall

28

1       monitor such symptoms, consistent with generally

2       accepted professional standards of care.

3   m.  Children and adolescents receive, consistent with

4       generally accepted professional standards of care:

5      i.  therapy relating to traumatic family and

6         other traumatic experiences, as clinically

7         indicated; and

8      ii.  reasonable, clinically appropriate

9         opportunities to involve their families in

10         treatment and treatment decisions.

11   n.  Policies and procedures are developed and

12       implemented consistent with generally accepted

13       professional standards of care to ensure

14       appropriate screening for substance abuse, as

15       clinically indicated.

16   o.  Individuals who require treatment for substance

17       abuse are provided appropriate therapeutic and

18       rehabilitation services consistent with generally

19       accepted professional standards of care.

20   p.  Group facilitators and therapists providing

21       therapeutic and rehabilitation services (in groups

22       or individual therapy) are verifiably competent

23       regarding selection and implementation of

24       appropriate approaches and interventions to address

25       therapeutic and rehabilitation service objectives,

26       are verifiably competent in monitoring individuals'

27       responses to therapy and rehabilitation, and

28       receive regular, competent supervision.

q.  Group facilitators and therapists providing therapeutic and rehabilitation services in the field of substance abuse should be certified substance abuse counselors.

r.  Transportation and staffing issues do not preclude individuals from attending appointments.

s.  Adequate oversight to treatment, rehabilitation, and enrichment groups is provided to ensure that individuals are assigned to groups that are appropriate to their assessed needs, that groups are provided consistently and with appropriate frequency, and that issues particularly relevant for this population, including the use of psychotropic medications and substance abuse, are appropriately addressed, consistent with generally accepted professional standards of care.

t.  Treatment, rehabilitation, and enrichment services are monitored appropriately against rational, operationally-defined target variables and revised as appropriate in light of significant developments, and the individual's progress, or lack thereof.

u.  Individuals are educated regarding the purposes of their treatment, rehabilitation, and enrichment services. They will be provided a copy of their WRP when appropriate based on clinical judgment.

v.  Staff educate individuals about their medications, the expected results, and the potential common

18

1          and/or serious side effects of medications, and
2          staff regularly ask individuals about common and/or
3          serious side effects they may experience.
4      w.  Interdisciplinary teams review, assess, and develop
5          positive clinical strategies to overcome
6          individual's barriers to participation in
7          therapeutic and rehabilitation services.
8  D.  Integrated Assessments
9      Each State Hospital shall ensure that, consistent with
10 generally accepted professional standards of care, each
11 individual shall receive, promptly after admission to the State
12 Hospital, an accurate and comprehensive assessment of the
13 conditions responsible for the individual's admission, to the
14 degree possible given the obtainable information at the time of
15 admission.  Thereafter, each individual shall receive an accurate
16 and comprehensive reassessment of the reasons for the
17 individual's continued hospitalization whenever there has been a
18 significant change in the individual's status, or a lack of
19 expected improvement resulting from clinically indicated
20 treatment.  The individual's interdisciplinary team shall be
21 responsible for investigating the past and present medical,
22 nursing, psychiatric, and psychosocial factors bearing on the
23 individual's condition, and, when necessary, for revising
24 assessments and therapeutic and rehabilitation plans in
25 accordance with new information that comes to light.  Each State
26 Hospital shall monitor and promptly address deficiencies in the
27 quality and timeliness of such assessments.
28

19

1.   Psychiatric Assessments and Diagnoses

Each State Hospital shall provide all of the individuals it serves with routine and emergency psychiatric assessments and reassessments consistent with generally accepted professional standards of care; and:

    a.   Each State Hospital shall use the diagnostic criteria in the most current Diagnostic and Statistical Manual of Mental Disorders ("DSM") for reaching the most accurate psychiatric diagnoses.

    b.   Each State Hospital shall ensure that all psychiatrists responsible for performing or reviewing psychiatric assessments:

        i.   are certified by the American Board of Psychiatry and Neurology ("ABPN") or have successfully completed at least three years of psychiatric residency training in a Accreditation Counsel for Graduate Medical Education accredited program; and

        ii.   are verifiably competent (as defined by privileging at initial appointment and thereafter by reprivileging for continued appointment) in performing psychiatric assessments consistent with the State Hospital's standard diagnostic protocols.

    c.   Each State Hospital shall ensure that:

        i.   within 24 hours of an individual's admission to the State Hospital, the individual

20

1          receives an Admission Medical Assessment that

2          includes:

3              1)    a review of systems;

4              2)    medical history;

5              3)    physical examination;

6              4)    diagnostic impressions; and

7              5)    management of acute medical conditions.

8     ii.    within 24 hours of an individual's admission

9            to the State Hospital, the individual

10           receives an Admission Psychiatric Evaluation

11           that includes:

12             1)    psychiatric history, including a review

13                   of presenting symptoms;

14             2)    complete mental status examination;

15             3)    admission diagnoses;

16             4)    completed AIMS;

17             5)    laboratory tests ordered; and

18             6)    consultations ordered.

19    iii.   Within 7 days of an individual's admission to

20           the State Hospital, the individual receives

21           an Integrated Psychiatric Assessment that

22           includes:

23             1)    psychiatric history, including a review

24                   of present and past history;

25             2)    psychosocial history;

26             3)    mental status examination;

27             4)    strengths;

28             5)    psychiatric risk factors;

21

1        6)    diagnostic formulation;

2        7)    differential diagnosis;

3        8)    current psychiatric diagnoses;

4        9)    psychopharmacology treatment plan; and

5        10)   management of identified risks.

6    d.   Each State Hospital shall ensure that:

7        i.    clinically justifiable diagnoses are provided

8              for each individual, and all diagnoses that

9              cannot be clinically justified for an

10             individual are discontinued no later than the

11             next review;

12       ii.   the documented justification of the diagnoses

13             is in accord with the criteria contained in

14             the most current DSM (as per DSM-IV-TR

15             Checklist);

16       iii.  differential diagnoses, "deferred," or

17             "rule-out" diagnoses, and diagnoses listed as

18             "NOS" ("Not Otherwise Specified") are timely

19             addressed (i.e., within 60 days), through

20             clinically appropriate assessments, and

21             resolved in a clinically justifiable manner;

22             and

23       iv.   "no diagnosis" is clinically justified and

24             documented.

25   e.   Each State Hospital shall ensure that psychiatric

26        reassessments are conducted at a frequency that

27        reflects the individual's clinical needs.  At a

28        minimum the reassessments are completed weekly for

22

1    the first 60 days on the admissions units and

2    monthly on other units.

3    f.    Each State Hospital shall ensure that psychiatric

4    reassessments are documented in progress notes that

5    address the following:

6    i.    significant developments in the individual's

7    clinical status and appropriate psychiatric

8    follow up;

9    ii.    timely and justifiable updates of diagnosis

10    and treatment, as clinically appropriate;

11    iii.    analyses of risks and benefits of chosen

12    treatment interventions;

13    iv.    assessment of, and attention to, high-risk

14    behaviors (e.g., assaults, self-harm, falls)

15    including appropriate and timely monitoring

16    of individuals and interventions to reduce

17    risks;

18    v.    responses to and side effects of prescribed

19    medications, with particular attention to

20    risks associated with the use of

21    benzodiazepines, anticholinergic medications,

22    polypharmacy (use of multiple drugs to

23    address the same condition), and conventional

24    and atypical antipsychotic medications;

25    vi.    timely review of the use of "pro re nata" or

26    "as-needed" ("PRN") and "Stat" (i.e.,

27    emergency psychoactive) medications and

28

23

1           adjustment of regular treatment, as

2           indicated, based on such use; and

3      vii.  verification, in a clinically justifiable

4           manner, that psychiatric and behavioral

5           treatments are properly integrated.  The

6           psychiatrist shall review the positive

7           behavior support plan prior to implementation

8           to ensure consistency with psychiatric

9           formulation, document evidence of regular

10          exchange of data or information with

11          psychologists regarding differentiation of

12          learned behaviors and behaviors targeted for

13          psychopharmacological treatments, and

14          document evidence of integration of

15          treatments.

16    g.  When individuals are transferred between treatment

17       teams, a psychiatric transfer note shall be

18       completed addressing:  review of medical and

19       psychiatric course of hospitalization, including

20       medication trials; current target symptoms;

21       psychiatric risk assessment; current barriers to

22       discharge; and anticipated benefits of transfer.

23  2.   Psychological Assessments

24    a.  Each State Hospital shall develop and implement

25       standard psychological assessment protocols,

26       consistent with generally accepted professional

27       standards of care.  These protocols shall address,

28       at a minimum, diagnostic neuropsychological

1      assessments, cognitive assessments, and

2      I.Q./achievement assessments, to guide

3      psychoeducational (e.g., instruction regarding the

4      illness or disorder, and the purpose or objectives

5      of treatments for the same, including medications),

6      educational, rehabilitation, and habilitation

7      interventions, and behavioral assessments

8      (including functional assessment of behavior in

9      schools and other settings), and personality

10      assessments, to inform positive behavior support

11      plans and psychiatric diagnoses.

12    b.  Each State Hospital shall require the completion of

13      cognitive and academic assessments within 30 days

14      of admission of all school-age and other

15      individuals, as required by law, unless comparable

16      testing has been performed within one year of

17      admission and is available to the interdisciplinary

18      team.

19    c.  Each State Hospital shall ensure that all

20      clinicians responsible for performing or reviewing

21      psychological assessments and evaluations are

22      verifiably competent in the methodology required to

23      conduct the assessment.

24    d.  Each State Hospital shall ensure that all

25      psychological assessments, consistent with

26      generally accepted professional standards of care,

27      shall:

28

25

i.   expressly state the clinical question(s) for the assessment;

ii.  include findings specifically addressing the clinical question(s), but not limited to diagnoses and treatment recommendations;

iii. specify whether the individual would benefit from individual therapy or group therapy in addition to attendance at mall groups;

iv.  be based on current, accurate, and complete data;

v.   determine whether behavioral supports or interventions (e.g., behavior guidelines or mini-behavior plans) are warranted or whether a full positive behavior support plan is required;

vi.  include the implications of the findings for interventions;

vii. identify any unresolved issues encompassed by the assessment and, where appropriate, specify further observations, records review, interviews, or re-evaluations that should be performed or considered to resolve such issues; and

viii. Use assessment tools and techniques appropriate for the individuals assessed and in accordance with the American Psychological Association Ethical Standards and Guidelines for testing.

26

e.  Each State Hospital shall ensure that all psychological assessments of all individuals residing at the State Hospital who were admitted there before the Effective Date hereof shall be reviewed by qualified clinicians with demonstrated current competency in psychological testing and, as indicated, revised to meet the criteria in § D.2.a & d, above.

f.  Each State Hospital shall ensure that all appropriate psychological assessments shall be provided in a timely manner whenever clinically indicated, consistent with generally accepted professional standards of care, including whenever there has been a significant change in condition, a lack of expected improvement resulting from treatment, or an individual's behavior poses a significant barrier to treatment, therapeutic programming, safety to self or others, or school programming, and, in particular:

  i.  before an individual's therapeutic and rehabilitation service plan is developed, a psychological assessment of the individual shall be performed that will:

    1)  address the nature of the individual's impairments to inform the psychiatric diagnosis; and

    2)  provide an accurate evaluation of the individual's psychological functioning

27

to inform the therapeutic and
rehabilitation service planning process;

ii.  if behavioral interventions are indicated, a structural and functional assessment shall be performed, consistent with generally accepted professional standards of care, by a professional having demonstrated competency in positive behavior supports; and

iii.  additional psychological assessments shall be performed, as appropriate, where clinical information is otherwise insufficient, and to address unresolved clinical or diagnostic questions, including differential diagnosis, "rule-out," "deferred," "no-diagnosis" and "NOS" diagnoses.

g.  For individuals whose primary language is not English, each State Hospital shall endeavor to assess them in their own language; if this is not possible, each State Hospital will develop and implement a plan to meet the individual's assessment needs, including, but not limited to the use of interpreters in the individual's primary language and dialect, if feasible.

3.  Nursing Assessments

a.  Each State Hospital shall develop standard nursing assessment protocols, consistent with generally accepted professional standards of care. These protocols shall address, at a minimum:

28

         i.    a description of presenting conditions;

        ii.   current prescribed medications;

        iii.  vital signs;

        iv.   allergies;

        v.    pain;

        vi.   use of assistive devices;

        vii.  activities of daily living;

        viii. immediate alerts (e.g., escape risk, physical assault, choking risk, suicidal risk, homicide risk, fall risk, sexual assault, self-injurious behavior, arson, or fire setting); and

        ix.  conditions needing immediate nursing interventions.

b.  Nursing may use a systems model (e.g., Johnson Behavioral System Model) for the nursing evaluation.

c.  Each State Hospital shall ensure that all nurses responsible for performing or reviewing nursing assessments are verifiably competent in performing the assessments for which they are responsible. All nurses who are employed at Metropolitan State Hospital shall have graduated from an approved nursing program, shall have passed the NCLEX-RN and shall have a license to practice in the state of California.

29

d.  Each State Hospital shall ensure that nursing
    assessments are undertaken on a timely basis, and
    in particular, that:

    i.    initial nursing assessments are completed
          within 24 hours of the individual's
          admission;

    ii.   Further nursing assessments are completed and
          integrated into the individual's therapeutic
          and rehabilitation service plan within 7 days
          of admission; and

    iii.  nursing assessments are reviewed every 14
          days during the first 60 days of admission
          and every 30 days thereafter and updated as
          appropriate.  The 3rd monthly review shall be
          a quarterly review and the 12th monthly
          review shall be the annual review.

4.  Rehabilitation Therapy Assessments

    a.  Each State Hospital shall develop standard
        rehabilitation therapy assessment protocols,
        consistent with generally accepted professional
        standards of care, for satisfying the necessary
        components of a comprehensive rehabilitation
        therapy assessment.

    b.  Each State Hospital shall ensure that each
        individual served shall have a rehabilitation
        assessment that, consistent with generally accepted
        professional standards of care:

30

1          i.    is accurate and comprehensive as to the

2               individual's functional abilities;

3          ii.   identifies the individual's current

4               functional status and the skills and supports

5               needed to facilitate transfer to the next

6               level of care; and

7        iii.   identifies the individual's life goals,

8               strengths, and motivation for engaging in

9               wellness activities.

10     c.  Each State Hospital shall ensure that all

11       clinicians responsible for performing or reviewing

12       rehabilitation therapy assessments are verifiably

13       competent in performing the assessments for which

14       they are responsible.

15     d.  Each State Hospital shall ensure that all

16       rehabilitation therapy assessments of all

17       individuals who were admitted to the State Hospital

18       before the Effective Date hereof shall be reviewed

19       by qualified clinicians and, as indicated, revised

20       to meet the criteria in § D.4.b, above.

21  5.   Nutrition Assessments

22     Each State Hospital shall provide nutrition

23  assessments, reassessments, and interventions consistent

24  with generally accepted professional standards of care.  A

25  comprehensive nutrition assessment will include the

26  following:

27     a.  For new admissions with high risk referral (e.g.,

28       type I diabetes mellitus, enteral/parenteral

feeding, dysphagia/recent choking episode), or upon request by physician, a comprehensive Admission Nutrition Assessment will be completed within 24 hours of notification to the dietitcian.

b.  For new admissions directly into the medical-surgical unit, a comprehensive Admission Nutrition Assessment will be completed within 3 days of admission.

c.  For new admissions directly into the skilled nursing facility unit, a comprehensive Admission Nutrition Assessment will be completed within 7 days of admission.

d.  For new admissions with identified nutritional triggers from Nursing Admission Assessment or physician's consult (e.g., for severe food allergies, tube feeding, extensive dental problems or dental surgery, NPO/clear liquid diet for more than three days, uncontrolled diarrhea/vomiting more than 24 hours, and MAOI, as clinically indicated), a comprehensive Admission Nutrition Assessment will be completed within 7 days of admission.

e.  For new admissions with therapeutic diet orders for medical reasons, a comprehensive Admission Nutrition Assessment will be completed within 7 days of admission.

f.  For individuals with therapeutic diet orders for medical reason after admission, a comprehensive

32

1          Admission Nutrition Assessment will be completed

2          within 7 days of the therapeutic diet order but no

3          later than 30 days of admission.

4     g.  For all other individuals, a comprehensive

5          Admission Nutrition Assessment will be completed

6          within 30 days of admission.

7     h.  Acuity level of an individual at nutritional risk

8          will be determined by Nutritional Status Type

9          ("NST") which defines minimum services provided by

10        a registered dietitian.

11    i.  The frequency of a comprehensive Nutrition

12        Assessment Update will be determined by the NST.

13        Updates should include, but not be limited to:

14        subjective data, weight, body-mass index ("BMI"),

15        waist circumference, appropriate weight range, diet

16        order, changes in pertinent medication, changes in

17        pertinent medical/psychiatric problems, changes in

18        nutritional problem(s), progress toward

19        goals/objectives, effectiveness of interventions,

20        changes in goals/plan, recommendations, and

21        follow-up as needed.

22    j.  Every individual will be assessed annually.  In

23        addition, individuals will be reassessed when there

24        is a significant change in condition.

25  6.   Social History Assessments

26    Each State Hospital shall ensure that each individual

27 has a social history evaluation that, consistent with

28 generally accepted professional standards of care:

33

1          a.   Is, to the extent reasonably possible, accurate,
2               current and comprehensive;

3          b.   Expressly identifies factual inconsistencies among
4               sources, resolves or attempts to resolve
5               inconsistencies, and explains the rationale for the
6               resolution offered;

7          c.   Is included in the 7-day integrated assessment and
8               fully documented by the 30th day of an individual's
9               admission; and

10         d.   Reliably informs the individual's interdisciplinary
11              team about the individual's relevant social factors
12              and educational status.

13     7.   Court Assessments

14         a.   Each State Hospital shall develop and implement
15              policies and procedures to ensure an
16              interdisciplinary approach to the development of
17              court submissions for individuals adjudicated "not
18              guilty by reason of insanity" ("NGI") pursuant to
19              Penal Code Section 1026, based on accurate
20              information and individualized risk assessments.
21              The forensic reports should include the following,
22              as clinically indicated:

23              i.    clinical progress and achievement of
24                    stabilization of signs and symptoms of mental
25                    illness that were the cause, or contributing
26                    factor in the commission of the crime (i.e.,
27                    instant offense);

28

34

ii.   acts of both verbal and physical aggression
and property destruction during the past year
of hospitalization and, if relevant, past
acts of aggression and dangerous criminal
behavior;

iii.  understanding of potential for danger and
precursors of dangerous/criminal behavior,
including instant offense;

iv.   acceptance of mental illness and
understanding of the need for treatment, both
psychosocial and biological, and the need to
adhere to treatment;

v.    development of relapse prevention plan (i.e.,
Personal Wellness Recovery Plan or Wellness
Recovery Action Plan) for mental illness
symptoms, including the individual's
recognition of precursors and warning signs
and symptoms and precursors for dangerous
acts;

vi.   willingness to achieve understanding of
substance abuse issues and to develop an
effective relapse prevention plan (as defined
above);

vii.  previous community releases, if the
individual has had previous CONREP
revocations;

viii. social support, financial resources, family
conflicts, cultural marginalization, and

35

1   history of sexual and emotional abuse, if

2   applicable; and

3   ix.   relevant medical issues, all self-harm

4   behaviors, risks for self harm and risk of

5   harm to others, to inform the courts and the

6   facility where the individual will be housed

7   after discharge.

8   b.  Each State Hospital shall develop and implement

9   policies and procedures to ensure an

10  interdisciplinary approach to the development of

11  court submissions for individuals admitted to the

12  hospital pursuant to Penal Code Section 1370,

13  "incompetent to stand trial" ("IST"), based on

14  accurate information and individualized risk

15  assessments.  Consistent with the right of an

16  individual accused of a crime to a speedy trial,

17  the focus of the IST hospitalization shall be the

18  stabilization of the symptoms of mental illness so

19  as to enable the individual to understand the legal

20  proceedings and to assist his or her attorney in

21  the preparation of the defense.  The forensic

22  reports should include the following:

23  i.   relevant clinical description of initial

24  presentation, if available, which caused the

25  individual to be deemed incompetent to stand

26  trial by the court;

27  ii.  clinical description of the individual at the

28  time of admission to the hospital;

36

iii. course of hospital stay, describing any
progress or lack of progress, response to
treatment, current relevant mental status,
and reasoning to support the recommendation;
and

iv. all self-harm behaviors and relevant medical
issues, to inform the courts and the facility
where the individual will be housed after
discharge.

c. Each State Hospital shall establish a Forensic
Review Panel ("FRP") to serve as the internal body
that reviews and provides oversight of facility
practices and procedures regarding the forensic
status of all individuals admitted pursuant to
Penal Code 1026 and 1370. The FRP shall review and
approve all forensic court submissions by the
Wellness and Recovery teams and ensure that
individuals receive timely and adequate assessments
by the teams to evaluate changes in their
psychiatric condition, behavior and/or risk factors
that may warrant modifications in their forensic
status and/or level of restriction. The membership
of the FRP shall include the Director of Forensic
Psychiatry, Facility Director or designee, Medical
Director or designee, Chief of Psychology or
designee, Chief of Social Services or designee,
Chief of Nursing Services or designee, and Chief of
Rehabilitation Services or designee. The Director

37

1          of Forensic Psychiatry shall serve as the chair and

2          shall be a board certified forensic psychiatrist.

3          A quorum shall consist of a minimum of four FRP

4          members or their designees.

5  E.   Discharge Planning and Community Integration

6       Taking into account the limitations of court-imposed

7  confinement, the State shall pursue actively the appropriate

8  discharge of individuals under the State's care at each State

9  Hospital and, subject to legal limitations on the State's control

10 of the placement process, provide services in the most

11 integrated, appropriate setting in which they reasonably can be

12 accommodated, as clinically appropriate, that is consistent with

13 each individual's needs.

14      1.   Each State Hospital shall identify at the 7-day

15          therapeutic and rehabilitation service planning

16          conference, and address at all subsequent planning

17          conferences, the particular considerations for each

18          individual bearing on discharge, including:

19      a.   those factors that likely would foster successful

20          discharge, including the individual's strengths,

21          preferences, and personal life goals;

22      b.   the individual's level of psychosocial functioning;

23      c.   any barriers preventing the individual from

24          transitioning to a more integrated environment,

25          especially difficulties raised in previously

26          unsuccessful placements; and

27      d.   the skills and supports necessary to live in the

28          setting in which the individual will be placed.

38

2. Each State Hospital shall ensure that, beginning at the time of admission and continuously throughout the individual's stay, the individual is an active participant in the discharge planning process, to the fullest extent possible, given the individual's level of functioning and legal status.

3. Each State Hospital shall ensure that, consistent with generally accepted professional standards of care, each individual has a professionally developed discharge plan that is integrated within the individual's therapeutic and rehabilitation service plan, that addresses his or her particular discharge considerations, and that includes:

   a. Measurable interventions regarding these discharge considerations;

   b. The staff responsible for implementing the interventions; and

   c. The time frames for completion of the interventions.

4. Each State Hospital shall provide transition supports and services consistent with generally accepted professional standards of care. In particular, each State Hospital shall ensure that:

   a. Individuals who have met discharge criteria are discharged expeditiously, subject to the availability of suitable placements; and

   b. Individuals receive adequate assistance in transitioning to the new setting.

39

1       5.   For all children and adolescents it serves, each State

2          Hospital shall:

3          a.  Develop and implement policies and protocols that

4             identify individuals with lengths of stay exceeding

5             six months; and

6          b.  Establish a regular review forum, which includes

7             senior administration staff, to assess the children

8             and adolescents identified in § E.5.a, above, to

9             review their treatment plans, and to create an

10            individualized action plan for each such child or

11            adolescent that addresses the obstacles to

12            successful discharge to the most integrated,

13            appropriate placement as clinically and legally

14            indicated.

15  F.   Specific Therapeutic and Rehabilitation Services

16       1.   Psychiatric Services

17          a.  Each State Hospital shall develop and implement

18            policies and procedures to ensure system-wide

19            monitoring of the safety, efficacy, and

20            appropriateness of all psychotropic medication use,

21            consistent with generally accepted professional

22            standards of care.  In particular, policies and

23            procedures shall require monitoring of the use of

24            psychotropic medications to ensure that they are:

25            i.   specifically matched to current, clinically

26                justified diagnoses or clinical symptoms;

27

28

ii.  prescribed in therapeutic amounts, as
dictated by the needs of the individual
served;

iii.  tailored to each individual's symptoms;

iv.  monitored for effectiveness against clearly
identified target variables and time frames;

v.  monitored appropriately for side effects;

vi.  modified based on clinical rationales;

vii.  not inhibiting individuals from meaningfully
participating in treatment, rehabilitation,
or enrichment and educational services as a
result of excessive sedation; and

viii.  properly documented.

b.  Each State Hospital shall monitor the use of PRN
and Stat medications to ensure that these
medications are administered in a manner that is
clinically justified and are not used as a
substitute for appropriate long-term treatment of
the individual's condition.

c.  Each State Hospital shall monitor the psychiatric
use of benzodiazepines, anticholinergics, and
polypharmacy to ensure clinical justification and
attention to associated risks.

d.  Each State Hospital shall ensure the monitoring of
the metabolic and endocrine risks associated with
the use of new generation antipsychotic
medications.

41

e.  Each State Hospital shall ensure regular monitoring, using a validated rating instrument (such as AIMS or DISCUS), of tardive dyskinesia ("TD"); a baseline assessment shall be performed for each individual at admission with subsequent monitoring of the individual every 12 months while he/she is receiving antipsychotic medication, and every 3 months if the test is positive, TD is present, or the individual has a history of TD.

f.  Each State Hospital shall ensure timely identification, reporting, data analyses, and follow up remedial action regarding all adverse drug reactions ("ADR").

g.  Each State Hospital shall ensure drug utilization evaluation ("DUE") occurs in accord with established, up-to-date medication guidelines that shall specify indications, contraindications, and screening and monitoring requirements for all psychotropic medications; the guidelines shall be in accord with current professional literature.  A verifiably competent psychopharmacology consultant shall approve the guidelines and ensure adherence to the guidelines.

h.  Each State Hospital shall ensure documentation, reporting, data analyses, and follow up remedial action regarding actual and potential medication variances ("MVR") consistent with generally accepted professional standards of care.

42

i.   Each State Hospital shall ensure tracking of individual and group practitioner trends, including data derived from monitoring of the use of PRNs, Stat medications, benzodiazepines, anticholinergics, and polypharmacy, and of ADRs, DUE, and MVR consistent with generally accepted professional standards of care.

j.   Each State Hospital shall ensure feedback to the practitioner and educational/corrective actions in response to identified trends consistent with generally accepted professional standards of care.

k.   Each State Hospital shall ensure integration of information derived from ADRs, DUE, MVR, and the Pharmacy & Therapeutics, Therapeutics Review, and Mortality and Morbidity Committees consistent with generally accepted professional standards of care.

l.   Each State Hospital shall ensure that all physicians and clinicians are verifiably competent, consistent with generally accepted professional standards of care, in appropriate medication management, interdisciplinary team functioning, and the integration of behavioral and pharmacological treatments.

m.   Each State Hospital shall review and ensure the appropriateness and safety of the medication treatment, consistent with generally accepted professional standards of care, for:

43

     i.    all individuals prescribed continuous anticholinergic treatment for more than two months;

     ii.    all elderly individuals and individuals with cognitive disorders who are prescribed continuous anticholinergic treatment regardless of duration of treatment;

     iii.    all individuals prescribed benzodiazepines as a scheduled modality for more than two months;

     iv.    all individuals prescribed benzodiazepines with diagnoses of substance abuse or cognitive impairments, regardless of duration of treatment;

     v.    all individuals with a diagnosis or evidencing symptoms of tardive dyskinesia; and

     vi.    all individuals diagnosed with dyslipidemia, and/or obesity, and/or diabetes mellitus who are prescribed new generation antipsychotic medications.

n.  Each State Hospital shall ensure that the medication management of individuals with substance abuse disorders is provided consistent with generally accepted professional standards of care.

o.  Metropolitan State Hospital shall provide a minimum of 16 hours per year of psychopharmacology instruction, through conferences, seminars,

44

1           lectures and/or videotapes.  Such instruction may

2           be provided either on-site or through attendance at

3           conferences elsewhere.

4      2.   Psychological Services

5           Each State Hospital shall provide adequate and

6    appropriate psychological supports and services that are

7    derived from evidence-based practice or practice-based

8    evidence and are consistent with generally accepted

9    professional standards of care, to individuals who require

10    such services; and:

11        a.  Each State Hospital shall ensure that it has

12           positive behavior support teams (with 1 team for

13           each 300 individuals, consisting of 1 clinical

14           psychologist, 1 registered nurse, 2 psychiatric

15           technicians (1 of whom may be a behavior

16           specialist), and 1 data analyst (who may be a

17           behavior specialist) that have a demonstrated

18           competence, consistent with generally accepted

19           professional standards of care, in the following

20           areas:

21           i.    the development and use of positive behavior

22               support plans, including methods of

23               monitoring program interventions and the

24               effectiveness of the interventions, providing

25               staff training regarding program

26               implementation, and, as appropriate, revising

27               or terminating the program; and

28

1        ii.   the development and implementation of a

2              facility-wide behavioral incentive system,

3              referred to as "BY CHOICE," that encompasses

4              self-determination and choice by the

5              individuals served.

6     b.  Each State Hospital shall ensure that the Chief of

7       Psychology has the clinical and administrative

8       responsibility for the Positive Behavior Support

9       Team and the BY CHOICE incentive program.

10    c.  Each State Hospital shall ensure that:

11        i.   behavioral assessments include structural and

12              functional assessments, and, as necessary,

13              functional analysis;

14        ii.   hypotheses on the maladapative behavior are

15              based on structural and functional

16              assessments;

17       iii.  there is documentation of previous behavioral

18              interventions and their effects;

19        iv.   behavioral interventions, which shall include

20              positive behavior support plans, are based on

21              a positive behavior supports model and do not

22              include the use of aversive or punishment

23              contingencies;

24        v.   behavioral interventions are consistently

25              implemented across all settings, including

26              school settings;

27       vi.   triggers for instituting individualized

28              behavioral interventions are specified and

1           utilized, and that these triggers include

2           excessive use of seclusion, restraint, or

3           psychiatric PRN and Stat medication for

4           behavior control;

5    vii.  positive behavior support teams and team

6           psychologists integrate their therapies with

7           other treatment modalities, including drug

8           therapy;

9   viii. all positive behavior support plans are

10          specified in the objectives and interventions

11          sections of the individual's WRP;

12    ix.  all positive behavior support plans are

13          updated as indicated by outcome data and

14          reported at least quarterly in the present

15          status section of the case formulation in the

16          individual's WRP;

17    x.   all staff has received competency-based

18          training on implementing the specific

19          behavioral interventions for which they are

20          responsible, and performance improvement

21          measures are in place for monitoring the

22          implementation of such interventions;

23    xi.  all positive behavior support team members

24          shall have as their primary responsibility

25          the provision of behavioral interventions;

26          and

27    xii.  the BY CHOICE point allocation is updated

28          monthly in the individual's WRP.

47

d.  Each State Hospital shall ensure that it has at
    least one developmental and cognitive abilities
    team (consisting of 1 clinical psychologist, 1
    registered nurse, 1 social worker, 1 psychiatric
    technician, and 1 data analyst (who may be a
    behavior specialist)) who have a demonstrated
    competence, consistent with generally accepted
    professional standards of care, in:  assessing
    individuals with cognitive challenges/disorders;
    developing therapeutic interventions (including
    positive behavior supports); advising therapy and
    rehabilitation providers on the implementation of
    interventions at the cognitive level of the
    individuals; and managing discharge processes for
    individuals with developmental disabilities and
    cognitive challenges/disorders.  This team shall
    assume some of the functions of the positive
    behavior support teams if the individuals they
    serve also need positive behavior supports.

e.  Each State Hospital shall develop and implement a
    Behavioral Consultation Committee, chaired by the
    Chief of Psychology, and co-chaired by the Chief of
    Psychiatry, to review the WRP and maladaptive
    behavior(s) of individuals who have not made timely
    progress on positive behavior support plans.  The
    Chief of Psychology is responsible for the
    functions of this committee, together with members

48

1          of the positive behavior support team (in functions
2          of the committee that relate to individuals under
3          the care of those team members).  The committee
4          membership shall include all clinical discipline
5          heads, including the medical director, as well as
6          the clinical administrator of the facility.
7      f.  Each State Hospital shall ensure that it has
8          sufficient neuropsychological services for the
9          provision of adequate neuropsychological assessment
10         of individuals with persistent mental illness.
11     g.  All clinical psychologists with privileges at any
12         State Hospital shall have the authority to write
13         orders for the implementation of positive behavior
14         support plans, consultation for educational or
15         other testing, and behavior plan updates.
16  3.  Nursing Services
17      Each State Hospital shall provide adequate and
18  appropriate nursing care and services consistent with
19  generally accepted professional standards of care to
20  individuals who require such services.
21     a.  Each State Hospital shall develop and implement
22         policies and protocols regarding the administration
23         of medication, including pro re nata ("PRN") and
24         "Stat" medication (i.e., emergency use of
25         psychoactive medication), consistent with generally
26         accepted professional standards of care, to ensure:
27         i.   safe administration of PRN medications and
28              Stat medications;

49

           ii.    documentation of the circumstances requiring PRN and Stat administration of medications; and

           iii.   documentation of the individual's response to PRN and Stat medication.

b.  Each State Hospital shall ensure that all failures to properly sign the Medication and Treatment Record ("MTR") or the controlled medication log are treated as medication variances, and that appropriate follow-up occurs to prevent recurrence of such variances.

c.  Each State Hospital shall ensure that all nursing interventions are fully integrated into the therapeutic and rehabilitation service plan and that nursing interventions are written in a manner aligned with the rest of the interventions in the therapeutic and rehabilitation service plan, in particular, in observable, behavioral, and/or measurable terms.  No nursing care plans other than the nursing interventions integrated in the therapeutic and rehabilitation service plan are required.  No nursing diagnoses other than as specified in the therapeutic and rehabilitation service plan, in terms of the current DSM criteria, are required.

d.  All nursing staff working with an individual shall be familiar with the goals, objectives, and interventions for that individual.

50

1        e.  Each State Hospital shall ensure that nursing staff

2             timely monitor, document and report the status of

3             symptoms, target variables, health, and mental

4             health status of individuals in a manner that

5             enables interdisciplinary teams to assess each

6             individual's status and respond to interventions,

7             and to modify, as appropriate, individuals'

8             therapeutic and rehabilitation service plans.  Each

9             State Hospital shall ensure that all nursing shift

10            changes include a review of changes in status of

11            individuals on the unit.

12      f.  Each State Hospital shall develop and implement a

13            system to monitor nursing staff while administering

14            medication to ensure that:

15          i.    nursing staff are knowledgeable regarding

16                each individual's prescribed medications;

17          ii.   education is provided to individuals during

18                medication administration;

19          iii.  nursing staff are following the appropriate

20                medication administration protocol; and

21          iv.   medication administration is documented in

22                accordance with the appropriate medication

23                administration protocol.

24      g.  Each State Hospital shall ensure that individuals

25            remain in a "bed-bound" status only for clinically

26            justified reasons.

27      h.  Each State Hospital shall ensure that, before they

28            work directly with individuals, all nursing and

1  psychiatric technicians have successfully completed
2  competency-based training regarding:
3   i. mental health diagnoses, related symptoms,
4     psychotropic medications and their side
5     effects, monitoring of symptoms and target
6     variables, and documenting and reporting of
7     the individual's status;
8   ii. the provision of a therapeutic milieu on the
9     units and proactive, positive interventions
10    to prevent and de-escalate crises; and
11  iii. positive behavior support principles.
12  i. Each State Hospital shall ensure that, prior to
13   assuming their duties and on a regular basis
14   thereafter, all staff responsible for the
15   administration of medication have successfully
16   completed competency-based training on the
17   completion of the MTR and the controlled medication
18   log.
19 4. Rehabilitation Therapy Services
20  Each State Hospital shall provide adequate,
21 appropriate, and timely rehabilitation therapy services to
22 each individual in need of such services, consistent with
23 generally accepted professional standards of care.
24  a. Each State Hospital shall develop and implement
25   policies and procedures, consistent with generally
26   accepted professional standards of care, related to
27   the provision of rehabilitation therapy services
28   that address, at a minimum:

       i.    the provision of direct services by rehabilitation therapy services staff; and

     ii.    the oversight by rehabilitation therapists of individualized physical therapy programs implemented by nursing staff.

b.  Each State Hospital shall provide competency-based training to nursing staff, as appropriate, on the use and care of adaptive equipment, transferring, and positioning, as well as the need to promote individuals' independence.

c.  Each State Hospital shall ensure that individuals are provided with timely and adequate rehabilitation therapy services.

d.  Each State Hospital, consistent with generally accepted professional standards of care, shall ensure that each individual who requires adaptive equipment is provided with equipment that meets his/her assessed needs and promotes his/her independence, and shall provide individuals with training and support to use such equipment.

5.  Nutrition Services

Each State Hospital shall provide the individuals it serves, particularly those experiencing weight-related problems, adequate and appropriate dietary services consistent with generally accepted professional standards of care.

a. Each State Hospital shall modify policies and procedures to require that the therapeutic and rehabilitation service plans of individuals who experience weight problems and/or related health concerns include adequate strategies and methodologies to address the identified problems and that such strategies and methodologies are implemented in a timely manner, monitored appropriately, and revised, as warranted, consistent with generally accepted professional standards of care.

b. Each State Hospital shall ensure that one or more treatment team members demonstrate competence in the dietary and nutritional issues affecting the individuals they serve and the development and implementation of strategies and methodologies to address such issues.

c. Each State Hospital shall develop and implement policies and procedures to address the needs of individuals who are at risk for aspiration or dysphagia, including but not limited to, the development and implementation of assessments and interventions for mealtimes and other activities involving swallowing.

d. Each State Hospital shall ensure that staff with responsibilities for assessments and interventions regarding aspiration and dysphagia have

54

successfully completed competency-based training
commensurate with their responsibilities.

e. Each State Hospital shall develop and implement
policies and procedures requiring treatment of the
underlying causes for tube feeding placement, and
ongoing assessment of the individuals for whom
these treatment options are utilized, to determine
the feasibility of returning them to oral intake
status.

6. Pharmacy Services

Each State Hospital shall provide adequate and
appropriate pharmacy services consistent with generally
accepted professional standards of care. Each State
Hospital shall develop and implement policies and procedures
that require:

a. Upon the prescription of a new medication,
pharmacists to conduct reviews of each individual's
medication regimen and, as appropriate, make
recommendations to the prescribing physician about
possible drug-to-drug interactions, side effects,
and needs for laboratory work and testing; and

b. Physicians to consider pharmacists'
recommendations, and for any recommendations not
followed, document in the individual's medical
record an adequate clinical justification.

7. General Medical Services

a. Each State Hospital shall provide adequate,
appropriate, and timely preventive, routine,

55

specialized, and emergency medical care to all
individuals in need of such services, consistent
with generally accepted professional standards of
care. Each State Hospital shall ensure that
individuals with medical problems are promptly
identified, assessed, diagnosed, treated, monitored
and, as monitoring indicates is necessary,
reassessed, diagnosed, and treated, consistent with
generally accepted professional standards of care.

b. Each State Hospital shall develop and implement
protocols and procedures, consistent with generally
accepted professional standards of care, that:

   i.   require the timely provision of initial and
ongoing assessments relating to medical care,
including but not limited to, vision care,
dental care, and laboratory and consultation
services;

   ii.   require the timely provision of medical care,
including but not limited to, vision care,
dental care, and laboratory and consultation
services; timely and appropriate
communication between nursing staff and
physicians regarding changes in an
individual's physical status; and the
integration of each individual's mental
health and medical care;

   iii.   define the duties and responsibilities of
primary care (non-psychiatric) physicians;

56

iv.    ensure a system of after-hours coverage by primary care physicians with formal psychiatric training (i.e., privileging and proctorship) and psychiatric backup support after hours; and

v.    endeavor to obtain, on a consistent and timely basis, an individual's medical records after the individual is treated in another medical facility.

c.    Each State Hospital shall ensure that physicians monitor each individual's health status indicators in accordance with generally accepted professional standards of care, and, whenever appropriate, modify their therapeutic and rehabilitation service plans to address any problematic changes in health status indicators.

d.    Each State Hospital shall monitor, on a continuous basis, outcome indicators to identify trends and patterns in individuals' health status, assess the performance of medical systems, and provide corrective follow-up measures to improve outcomes.

8.    Infection Control

Each State Hospital shall develop and implement infection control policies and procedures to prevent the spread of infections or communicable diseases, consistent with generally accepted professional standards of care.

a.    Each State Hospital shall establish an effective infection control program that:

57

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

      i.     actively collects data regarding infections and communicable diseases;

     ii.    assesses these data for trends;

   iii.    initiates inquiries regarding problematic trends;

    iv.    identifies necessary corrective action;

     v.    monitors to ensure that appropriate remedies are achieved; and

    vi.    integrates this information into the State Hospital's quality assurance review.

9.   Dental Services

Each State Hospital shall provide individuals with adequate, appropriate and timely routine and emergency dental care and treatment, consistent with generally accepted professional standards of care.

    a.   Each State Hospital shall retain or contract with an adequate number of qualified dentists to provide timely and appropriate dental care and treatment to all individuals it serves;

    b.   Each State Hospital shall develop and implement policies and procedures that require:

       i.     comprehensive and timely provision of dental services;

      ii.    documentation of dental services, including but not limited to, findings, descriptions of any treatment provided, and the plans of care;

       iii.   use of preventive and restorative care
              whenever possible; and

       iv.   tooth extractions be used as a treatment of
              last resort, which, when performed, shall be
              justified in a manner subject to clinical
              review.

c.  Each State Hospital shall ensure that dentists
    demonstrate, in a documented fashion, an accurate
    understanding of individuals' physical health,
    medications, allergies, and current dental status
    and complaints.

d.  Each State Hospital shall ensure that
    transportation and staffing issues do not preclude
    individuals from attending dental appointments, and
    individuals' refusals are addressed to facilitate
    compliance.

e.  Each State Hospital shall ensure that
    interdisciplinary teams review, assess, and develop
    strategies to overcome individuals' refusals to
    participate in dental appointments.

10.  Special Education

Each State Hospital shall provide the school-age and
other residents, as required by law, who qualify for special
education ("students"), individualized educational programs
that are reasonably calculated to enable these students to
receive educational benefits, as defined by applicable law.

a.  Each State Hospital shall develop and implement
    uniform systems for assessing students' individual

1            educational needs and monitoring their individual

2            progress.

3        b.  Each State Hospital shall ensure that all

4            Individual Education Plans ("IEPs") are developed

5            and implemented consistent with the Individuals

6            with Disabilities Education Act, 20 U.S.C. § 1400

7            et seq. (2002) ("IDEA").

8        c.  Each State Hospital shall ensure that teachers

9            providing instruction to students at the State

10           Hospital have completed competency-based training

11           regarding teaching and academic instruction,

12           behavioral interventions, monitoring of academic

13           and behavioral progress, and incident management

14           and reporting.

15        d.  Each State Hospital shall ensure that students

16           receive instruction and behavioral supports

17           appropriate to their learning abilities and needs,

18           consistent with generally accepted professional

19           standards of care.

20        e.  Each State Hospital shall provide appropriate

21           literacy instruction, consistent with generally

22           accepted professional standards of care, for

23           students who show deficits in one or more common

24           areas of reading (e.g., decoding or comprehending).

25        f.  Each State Hospital shall, on admission and as

26           statutorily required thereafter, assess each

27           student's capacity to participate, with appropriate

28           supports and services, in an integrated, non-

1           institutional, education environment, and provide

2           access to an integrated education environment for

3           those students who can participate in one with

4           appropriate supports and services.  Each State

5           Hospital shall ensure that all students receive

6           their education in the least restrictive setting

7           pursuant to the requirements of the IDEA,

8           consistent with their legal and clinical status.

9  G.    Documentation

10     Each State Hospital shall ensure that an individual's

11 records accurately reflect the individual's response to all

12 treatment, rehabilitation and enrichment activities identified in

13 the individual's therapeutic and rehabilitation service plan,

14 including for children and adolescents, their education plan,

15 consistent with generally accepted professional standards of

16 care.  Each State Hospital shall develop and implement policies

17 and procedures setting forth clear standards regarding the

18 content and timeliness of progress notes, transfer notes, school

19 progress notes, and discharge notes, including, but not limited

20 to, an expectation that such records include meaningful,

21 accurate, and coherent assessments of the individual's progress

22 relating to treatment plans and treatment goals, and that

23 clinically relevant information remains readily accessible.

24 H.    Restraints, Seclusion, and PRN and Stat Medications

25     Each State Hospital shall ensure that restraints, seclusion,

26 psychiatric PRN medications, and Stat medications are used

27 consistent with generally accepted professional standards of

28 care.

1.   Each State Hospital shall revise, as appropriate, and
     implement policies and procedures regarding the use of
     seclusion, restraints, psychiatric PRN medications, and
     Stat medications consistent with generally accepted
     professional standards of care.  In particular, the
     policies and procedures shall expressly prohibit the
     use of prone restraints, prone containment and prone
     transportation and shall list the types of restraints
     that are acceptable for use.

2.   Each State Hospital shall ensure that restraints and
     seclusion:

     a.   Are used in a documented manner and only when
          individuals pose an imminent danger to self or
          others and after a hierarchy of less restrictive
          measures has been considered in a clinically
          justifiable manner or exhausted;

     b.   Are not used in the absence of, or as an
          alternative to, active treatment, as punishment, or
          for the convenience of staff;

     c.   Are not used as part of a behavioral intervention;
          and

     d.   Are terminated as soon as the individual is no
          longer an imminent danger to self or others.

3.   Each State Hospital shall comply with 42 C.F.R.
     § 483.360(f), requiring assessments by a physician or
     licensed clinical professional of any individual placed
     in seclusion or restraints within 1 hour.  Each State
     Hospital shall also ensure that any individual placed

62

1        in seclusion or restraints is continuously monitored by

2        a staff person who has successfully completed

3        competency-based training on the administration of

4        seclusion and restraints.

5    4.    Each State Hospital shall ensure the accuracy of data

6        regarding the use of restraints, seclusion, psychiatric

7        PRN medications, or Stat medications.

8    5.    Each State Hospital shall revise, as appropriate, and

9        implement policies and procedures to require the review

10       within 3 business days of individuals' therapeutic and

11       rehabilitation service plans for any individuals placed

12       in seclusion or restraints more than 3 times in any

13       4-week period, and modification of therapeutic and

14       rehabilitation service plans, as appropriate.

15    6.    Each State Hospital shall develop and implement

16       policies and procedures consistent with generally

17       accepted professional standards of care governing the

18       use of psychiatric PRN medication and Stat medication,

19       requiring that:

20    a.    Such medications are used in a manner that is

21        clinically justified and are not used as a

22        substitute for adequate treatment of the underlying

23        cause of the individual's distress; and

24    b.    PRN medications, other than for analgesia, are

25        prescribed for specified and individualized

26        behaviors;

27    c.    PRN medications are appropriately time-limited;

28

d. Nursing staff assess the individual within 1 hour of the administration of the psychiatric PRN medication and Stat medication and documents the individual's response; and  A psychiatrist conducts a face-to-face assessment of the individual within 24 hours of the administration of a Stat medication.  The assessment shall address the reason for the Stat administration, the individual's response, and, as appropriate, appropriateness of adjustment to current treatment and/or diagnosis.

7. Each State Hospital shall ensure that all staff whose responsibilities include the implementation or assessment of seclusion, restraints, psychiatric PRN medications, or Stat medications successfully complete competency-based training regarding implementation of all such policies and the use of less restrictive interventions.

8. Each State Hospital shall:

a. Develop and implement a plan to reduce the use of side rails as restraints in a systematic and gradual way to ensure individuals' safety; and

b. Ensure that, as to individuals who need side rails, their therapeutic and rehabilitation service plans expressly address the use of side rails, including identification of the medical symptoms that warrant the use of side rails, methods to address the underlying causes of such medical symptoms, and

64

1          strategies to reduce the use of side rails, if

2          appropriate.

3 I.    Protection From Harm

4     Each State Hospital shall provide the individuals it serves

5 with a safe and humane environment and ensure that these

6 individuals are protected from harm.

7      1.    Incident Management

8        Each State Hospital shall develop and implement across

9      all settings, including school settings, an integrated

10      incident management system that is consistent with generally

11      accepted professional standards of care.

12        a.   Each State Hospital shall review, revise, as

13           appropriate, and implement incident management

14           policies, procedures and practices that are

15           consistent with generally accepted professional

16           standards of care.  Such policies, procedures and

17           practices shall require:

18           i.    that the State Hospital not tolerate abuse or

19               neglect of individuals and that staff are

20               required to report abuse or neglect of

21               individuals;

22           ii.   identification of the categories and

23               definitions of incidents to be reported and

24               investigated; immediate reporting by staff to

25               supervisory personnel and the State

26               Hospital's executive director (or that

27               official's designee) of serious incidents,

28

1      including but not limited to, death, abuse,

2      neglect, and serious injury, using

3      standardized reporting across all settings,

4      including school settings;

5      iii.   mechanisms to ensure that when serious

6             incidents such as allegations of abuse,

7             neglect, and/or serious injury occur, staff

8             take immediate and appropriate action to

9             protect the individuals involved, including

10            removing alleged perpetrators from direct

11            contact with the involved individuals pending

12            the outcome of the facility's investigation;

13     iv.    adequate competency-based training for all

14            staff on recognizing and reporting potential

15            signs and symptoms of abuse or neglect,

16            including the precursors that may lead to

17            abuse;

18     v.     notification of all staff when commencing

19            employment and adequate training thereafter

20            of their obligation to report abuse or

21            neglect to the State Hospital and state

22            officials.  All staff persons who are

23            mandatory reporters of abuse or neglect shall

24            sign a statement that shall be kept with

25            their personnel records evidencing their

26            recognition of their reporting obligations.

27            Each State Hospital shall not tolerate any

28

66

1          mandatory reporter's failure to report abuse
2          or neglect;
3      vi.   mechanisms to inform individuals and their
4          conservators how to identify and report
5          suspected abuse or neglect;
6      vii.  posting in each living unit and day program
7          site a brief and easily understood statement
8          of individuals' rights, including information
9          about how to pursue such rights and how to
10         report violations of such rights;
11     viii. procedures for referring, as appropriate,
12         allegations of abuse or neglect to law
13         enforcement; and
14     ix.   mechanisms to ensure that any staff person,
15         individual, family member or visitor who in
16         good faith reports an allegation of abuse or
17         neglect is not subject to retaliatory action,
18         including but not limited to reprimands,
19         discipline, harassment, threats or censure,
20         except for appropriate counseling, reprimands
21         or discipline because of an employee's
22         failure to report an incident in an
23         appropriate or timely manner.
24   b.  Each State Hospital shall review, revise, as
25       appropriate, and implement policies and procedures
26       to ensure the timely and thorough performance of
27       investigations, consistent with generally accepted
28       professional standards of care.  Such policies and

procedures shall:

i.     require investigations of all deaths, as well as allegations of abuse, neglect, serious injury, and theft.  The investigations shall be conducted by qualified investigators who have no reporting obligations to the program or elements of the facility associated with the allegation and have expertise in conducting investigations and working with persons with mental disorders;

ii.     ensure that only the State Hospital staff who have successfully completed competency-based training on the conduct of investigations be allowed to conduct investigations of allegations of petty theft and all other unusual incidents;

iii.     for investigations required by paragraph I.1.b.i, above, provide for the safeguarding of evidence; and

iv.     for investigations required by paragraph I.1.b.i, above, require the development and implementation of standardized procedures and protocols for the conduct of investigations that are consistent with generally accepted professional standards.  Such procedures and protocols shall require that:

68

1)  investigations commence within 24 hours
    or sooner, if necessary, of the incident
    being reported;

2)  investigations be completed within 30
    business days of the incident being
    reported, except that investigations
    where material evidence is unavailable to
    the investigator, despite best efforts,
    may be completed within 5 business days
    of its availability;

3)  each investigation result in a written
    report, including a summary of the
    investigation, findings and, as
    appropriate, recommendations for
    corrective action.  The report's contents
    shall be sufficient to provide a clear
    basis for its conclusion.  The report
    shall set forth explicitly and
    separately:

    (i)    each allegation of wrongdoing
           investigated;

    (ii)   the names of all witnesses;

    (iii)  the names of all alleged victims
           and perpetrators;

    (iv)   the names of all persons
           interviewed during the
           investigation;

    (v)    a summary of each interview;

69

(vi)   a list of all documents reviewed during the investigation;

(vii)  sources of evidence considered, including previous investigations and their results, involving the alleged victim(s) and perpetrator(s);

(viii) the investigator's findings, including findings related to the substantiation of the allegations as well as findings about staff's adherence to programmatic requirements; and

(ix)   the investigator's reasons for his/her conclusions, including a summary indicating how potentially conflicting evidence was reconciled; and

4) staff supervising investigations review the written report, together with any other relevant documentation, to ensure that the investigation is thorough and complete and that the report is accurate, complete, and coherent. Any deficiencies or areas of further inquiry in the investigation and/or report shall be addressed promptly. As necessary, staff responsible for investigations shall be

70

1                provided with additional training and/or

2                technical assistance to ensure the

3                completion of investigations and

4                investigation reports consistent with

5                generally accepted professional standards

6                of care.

7    c.  Each State Hospital shall ensure that whenever

8       disciplinary or programmatic action is necessary to

9       correct a situation or prevent reoccurrence, each

10      State Hospital shall implement such action promptly

11      and thoroughly, and track and document such actions

12      and the corresponding outcomes.

13   d.  Each State Hospital shall have a system to allow

14      the tracking and trending of investigation results.

15      Trends shall be tracked by at least the following

16      categories:

17       i.    type of incident;

18       ii.   staff involved and staff present;

19       iii.  individuals directly and indirectly involved;

20       iv.   location of incident;

21       v.    date and time of incident;

22       vi.   cause(s) of incident; and

23       vii.  outcome of investigation.

24   e.  Each State Hospital shall ensure that before

25      permitting a staff person to work directly with any

26      individual, the State Hospital shall investigate

27      the criminal history and other relevant background

28      factors of that staff person, whether full-time or

1    part-time, temporary or permanent, or a person who

2    volunteers on a regular basis.  Facility staff

3    shall directly supervise volunteers for whom an

4    investigation has not been completed when they are

5    working directly with individuals living at the

6    facility.  The facility shall ensure that a staff

7    person or volunteer may not interact with

8    individuals at the State Hospital in instances

9    where the investigation indicates that the staff

10   person or volunteer may pose a risk of harm to such

11   individuals.

12   2.   Performance Improvement

13        Each State Hospital shall develop, revise as

14   appropriate, and implement performance improvement

15   mechanisms that enable it to comply fully with this Plan, to

16   detect timely and adequately problems with the provision of

17   protections, treatment, rehabilitation, services and

18   supports, and to ensure that appropriate corrective steps

19   are implemented.  Each State Hospital shall establish a risk

20   management process to improve the identification of

21   individuals at risk and the provision of timely

22   interventions and other corrective actions commensurate with

23   the level of risk.  The performance improvement mechanisms

24   shall be consistent with generally accepted professional

25   standards of care and shall include:

26        a.   Mechanisms for the proper and timely identification

27             of high-risk situations of an immediate nature as

28             well as long-term systemic problems.  These

72

mechanisms shall include, but not be limited to:

    i.    data collection tools and centralized databases to capture and provide information on various categories of high-risk situations;

    ii.   establishment of triggers and thresholds that address different levels of risk, as set forth in Appendix A of this Plan; and

    iii.  identification of systemic trends and patterns of high risk situations;

b.  Mechanisms for timely interventions and other corrective actions by teams and disciplines to prevent or minimize risk of harm to individuals. These mechanisms shall include, but not be limited to:

    i.    a hierarchy of interventions by clinical teams that correspond to triggers and thresholds;

    ii.   timely corrective actions by teams and/or disciplines to address systemic trends and patterns;

    iii.  formalized systems for the notification of teams and needed disciplines to support appropriate interventions and other corrective actions;

    iv.  formalized systems for feedback from teams and disciplines to the standards compliance department regarding completed actions; and

73

    v. monitoring and oversight systems to support timely implementation of interventions and corrective actions and appropriate follow up; and

  c. Utilize, on an ongoing basis, appropriate performance improvement mechanisms to assess and address the facility's compliance with its identified service goals.

3. Environmental Conditions

Each State Hospital shall develop and implement a system to review regularly all units and areas of the hospital to which individuals being served have access to identify any potential environmental safety hazards and to develop and implement a plan to remedy any identified issues, consistent with generally accepted professional standards of care. Such a system shall require that:

  a. Potential suicide hazards are identified and prioritized for systematic corrective action, and that such action is implemented on a priority basis as promptly as feasible;

  b. All areas of the hospital that are occupied by individuals being served have adequate temperature control and deviations shall be promptly corrected;

  c. Each State Hospital reviews, revises, as appropriate, and implements procedures and practices so that individuals who are incontinent are assisted to change in a timely manner;

74

d.   Each State Hospital thoroughly reviews and revises, as appropriate, its policy and practice regarding sexual contact among individuals served at the hospital.  Each State Hospital shall establish clear guidelines regarding staff response to reports of sexual contact and monitor staff response to incidents.  Each State Hospital documents comprehensively therapeutic interventions in the individual's charts in response to instances of sexual contact;

e.   Each State Hospital develops and implements clear guidelines stating the circumstances under which it is appropriate to utilize staff who are not trained to provide mental health services in addressing incidents involving individuals.  Each State Hospital ensures that persons who are likely to intervene in incidents are properly trained to work with individuals with mental health concerns; and

f.   Metropolitan State Hospital will institute roving patrols of treatment units, except for the skilled nursing facility, by Hospital Police Officers on a schedule and frequency to be determined by the hospital administration.

J.   First Amendment and Due Process

Each State Hospital unconditionally permits individuals to exercise their constitutional rights of free speech, including the right to petition the government for redress of grievances without state monitoring and provides them due process.

75

**ENHANCEMENT PLAN - APPENDIX A**

| Trigger | Thresholds |
|---|---|
| Aggressive Act to Self | 1.1 Any aggression to self resulting in major injury* <br> 1.2 2 or more aggressive acts to self in 7 consecutive days <br> 1.3 4 or more aggressive acts to self in 30 consecutive days |
| Aggressive Act to Others | 2.1 Any peer-to-peer aggression resulting in major injury <br> 2.2 Any aggression to staff resulting in major injury <br> 2.3 2 or more aggressive acts to others in 7 consecutive days <br> 2.4 4 or more aggressive acts to others in 30 |
| Alleged Abuse/ Neglect/Exploitation | 3.1 Any alleged abuse/neglect/exploitation if minor** or major injury |

76

| Body Weight | 4.1 | Body Mass Index (BMI) of 18.5 or less (underweight) |
| | 4.2 | Body Mass Index (BMI) between 25 and 29.9 (overweight) |
| | 4.3 | Body Mass Index (BMI) between 30 and 34.9 (Obesity-Grade I) |
| | 4.4 | Body Mass Index (BMI) between 35 and 39.9 (Obesity-Grade II) |
| | 4.5 | Body Mass Index (BMI) 40 or above (Obesity-Grade III) |
| | 4.6 | Weight Change ± 5% in 1 month |
| | 4.7 | Weight Change ± 7.5% in 3 months |
| | 4.8 | Weight Change ± 10% in 6 months |
| | 4.9 | Waist Circumference over 35″ for females or over 40″ for males |
| Combined Pharmacotherapy | 5.1 | More than 2 intra-class psychotropic medications for psychiatric reasons |
| | 5.2 | More than 3 inter-class psychotropic medications for psychiatric reasons |

| Escape/AWOL | 6.1 | Any escape attempt/unauthorized absence within facility |
| | 6.2 | Any escape attempt/unauthorized absence outside of facility |
| Falls | 7.1 | Any fall resulting in major injury |
| | 7.2 | Three or more falls in 30 consecutive days |
| Illicit Substances | 8.1 | Any incident of an individual testing positive for illicit substance (street drug) use |
| Medication Variance (Error) | 9.1 | Any medication error that results in major injury or exacerbation of a disease or disorder (i.e., prescribing, transcribing, ordering/procurement, dispensing/storage, administration, and documentation) |

78

| | |
|---|---|
| Mortality | 10.1 Expected deaths |
| | 10.2 Unexpected deaths |
| Non-Adherence to Wellness and Recovery Plan (WRP) | 11.1 Non-adherence to WRP for more than 20% of the interventions in 7 consecutive days (Note: For children and adolescents: include non-attendance at school for more than 20% of the time in 7 consecutive days) |
| One-to-One Observations | 12.1 1:1 for psychiatric/behavioral reasons over 24 hours in 7 consecutive days |
| | 12.2 Any 2:1 for psychiatric/behavioral reasons |
| PRN Medications | 13.1 2 PRNs in 24 hours (for psychiatric/behavioral reasons) |
| | 13.2 3 PRNs in 7 consecutive days |
| | 13.3 15 PRNs in 30 consecutive days |

79

| | |
|---|---|
| Restraint | 14.1 Restraint for more than 4 hours for adults (Note: more than 4 hours for adolescents and 2 hours for children) |
| | 14.2 More than 3 episodes of restraint in 7 consecutive days |
| | 14.3 More than 5 episodes of restraint in 30 consecutive days |
| Seclusion | 15.1 Seclusion for more than 4 hours for adults (Note: more than 4 hours for adolescents and 2 hours for children) |
| | 15.2 More than 3 episodes of seclusion in 7 consecutive days |
| | 15.3 More than 5 episodes of seclusion in 30 consecutive days |
| Stat Medications | 16.1 2 Stat medications in 24 hours |
| | 16.2 3 Stat medications in 7 consecutive days |
| | 16.3 15 Stat med in 30 consecutive days |

80

| Suicide Attempt | 17.1 Any suicide attempt |
| | 17.2 Any suicide threat or ideations |

\* A major injury is an injury that requires treatment of more than basic first aid by medical personnel or any injury resulting from alleged or suspected abuse or any injury judged to have potential for serious harm.

\*\* A minor injury is any injury, other than an injury caused by alleged or suspected abuse, that requires no treatment or only minor first aid and for which the potential for serious harm is judged to have been remote.

81

**PART II**

**ENFORCEMENT**

A.    Selection of Monitor

Mohamed El-Sabaawi, M.D. shall be appointed as the expert to monitor the State's implementation of this Agreement (the "Monitor"). The Monitor shall have full authority to assess, review, and report independently on the Defendants' implementation of and compliance with the provisions of the Agreement. No Party, nor any employee or agent of any Party, shall have any supervisory authority over the Monitor's activities, reports, findings, or recommendations. In the event that Dr. El-Sabaawi is unable to serve or continue serving as the Monitor, or in the event that the Parties for any reason agree to discontinue the use of Dr. El-Sabaawi, the Parties shall meet or otherwise confer within thirty (30) days of being notified of the incapacity or the decision to discontinue use of Dr. El-Sabaawi to select a new Monitor. If the Parties are unable to agree upon a selection, each Party shall submit two names, along with resumes or curricula vitae and cost proposals, to the Court and the Court shall appoint the Monitor from among the names submitted. The procedure described in this paragraph shall apply to all successor Monitors. The Parties agree that the Monitor may use consultants to assist the Monitor. Any such consultants shall be paid for time, services, and expenses pursuant to the Monitor's existing budget. In collaboration with the Monitor, the Parties shall meet or otherwise confer whenever necessary to agree upon which particular consultant(s) the Monitor shall use to assist the Monitor in his duties as Monitor.

82

1  B.    Budget of the Monitor

2      The Parties and the Monitor have agreed upon the annual

3  budget for the Monitor's work.

4  C,  Reimbursement and Payment Provisions

5      1.    The cost of the Monitor, including the cost of any

6            consultant to assist the Monitor, shall be borne by the

7            State in this action.  All reasonable expenses incurred

8            by the Monitor or any consultant, in the course of the

9            performance of the duties of the Monitor, pursuant to

10           the budget of the Monitor, shall be reimbursed by the

11           State.  The United States will bear its own expenses in

12           this matter.

13     2.    The Monitor shall submit monthly invoices to the

14           Defendants, with a copy to the United States, detailing

15           all expenses the Monitor incurred during the prior

16           month.  These invoices shall include daily records of

17           time spent and expenses incurred, and shall include

18           copies of any supporting documentation, including

19           receipts.  The Defendants agrees to pay each month's

20           invoice in full from the Monitor within thirty (30)

21           days of receipt of the monthly invoice from the

22           Monitor.  If the Defendants dispute all or part of the

23           invoice, the Defendants shall notify in writing the

24           Monitor and the United States within ten days of

25           receipt of the Monitor's monthly invoice.  The Monitor,

26           the Defendants and the United States will endeavor to

27           resolve any invoice disputes promptly and in good

28           faith.  Where the Monitor and the Parties are unable to

83

1          resolve any invoice dispute, the Monitor and/or the

2          Parties may petition the Court to resolve the dispute.

3   D.   Responsibilities and Powers of the Monitor

4      1.   The overall duties of the Monitor shall be to observe,

5          review, report findings, and make recommendations,

6          where appropriate, with regard to the implementation of

7          the foregoing Enhancement Plan at the State Hospitals.

8          The Monitor shall regularly review the therapeutic and

9          rehabilitation services provided to individuals to

10         determine the Defendants' implementation of and

11         compliance with this Consent Judgment.  During the

12         Monitor's review, the Monitor shall have full and

13         complete access to all of the State Hospitals'

14         buildings and facilities, staff, patients, patient

15         records, documentation, and information relating to the

16         issues addressed in this Consent Judgment.  The State

17         Hospitals' Executive Directors shall direct all

18         employees to cooperate fully with the Monitor.  The

19         Monitor shall be permitted to initiate and receive ex

20         parte communications with the Parties.  The Monitor

21         shall devote such time as is necessary to fulfill the

22         purposes of the duties and responsibilities of the

23         Monitor pursuant to this Consent Judgment.

24     2.   The Monitor shall consult with the Parties and shall

25         submit a written plan with regard to the methodologies

26         to be used by the Monitor to assess the Defendants'

27         compliance with and implementation of the Consent

28         Judgment.  The Monitor's evaluation shall include:

84

1      regular on-site inspection of the State Hospitals'

2      facilities and programs for patients, interviews with

3      administrators, professional and other staff,

4      contractors, and patients, and detailed review of

5      pertinent documents and patient records.  The Parties

6      envision that the Monitor may provide specific

7      recommendations to the Defendants with regard to steps

8      to be taken to come into compliance with the Consent

9      Judgment.  However, the Defendants retain the

10     discretion to achieve compliance by any legal means

11     available to them, and may choose to utilize methods

12     other than those that may be proposed by the Monitor or

13     the United States.  The Monitor shall not be empowered

14     to direct the Defendants to take, or to refrain from

15     taking, any specific action to achieve compliance with

16     the Consent Judgment.  The Parties do not intend for

17     the Monitor to have the role of a "Special Master."

18     The Agreement is the product of two governmental

19     agencies exercising their expertise.

20   3.   In any instance in which either party disagrees as to

21     compliance, the Court shall give appropriate deference

22     to the Monitor's assessment of compliance.

23   4.   The Parties envision that the United States and the

24     Monitor shall conduct a "baseline" evaluation of the

25     Defendants' compliance with the terms of this Consent

26     Judgment at the State Hospitals within the first 180

27     days after the filing of this Consent Judgment.  This

28     initial baseline evaluation is intended to inform the

1    Parties and the Monitor of the status of compliance

2    with this Enhancement Plan. The Monitor shall produce

3    a written report to the Parties with regard to the

4    State's compliance with particular provisions of the

5    Consent Judgment as soon as possible, but at least

6    within 60 days of each visit.

7    5.   Following the baseline tour, the Monitor shall conduct

8    subsequent tours of each State Hospital at least

9    semi-annually, upon reasonable notice to the State

10    Hospital, in order to fulfill his or her obligations

11    pursuant to this Consent Judgment. In connection with

12    the baseline tours, the Parties and the Monitor shall

13    attempt to agree upon a schedule of subsequent tours

14    and reports for the upcoming year, to be repeated

15    annually thereafter.

16    6.   The Monitor shall provide the Parties with a written

17    report as soon as possible, but at least within 60 days

18    of each tour and shall detail with as much specificity

19    as possible how the State is or is not in compliance

20    with particular provisions of the Consent Judgment.

21    Drafts of the Monitor's reports shall be provided to

22    the Parties for comment at least ten (10) business days

23    prior to issuance of the reports. Upon the achievement

24    of eighteen (18) months of substantial compliance with

25    any substantive paragraph(s) of this Agreement, no

26    further reporting shall be required on that paragraph.

27

28

7.    The Defendants shall notify the Monitor immediately upon the death of any current State Hospital patient, including any person who died following transfer due to medical condition from a State Hospital to another medical facility.  The Defendants shall forward to the Monitor copies of any completed incident reports related to deaths, autopsies and/or death summaries of residents, as well as all final reports of investigations that involve State Hospital patients.  The Defendants shall also notify the Monitor immediately if they receive a citation or threat to de-certify a State Hospital from the Centers for Medicaid and Medicare Services.

E.    The United States' Access to Information and the State Hospitals

1.    The United States shall have full access to, and shall, upon request, receive copies of any documents, records, databases, and information relating to the implementation of this Consent Judgment.  The Defendants shall provide any requested documents, records, databases, and information to the United States as soon as possible, but no later than within thirty (30) business days of the request, or within a time frame negotiated by the parties if the volume of requested material is too great to reasonably produce within thirty days.  The United States, upon reasonable notice, shall have full access to all of the State Hospitals' buildings and facilities, staff, patients,

1    patients' records, documentation, and information

2    relating to the issues addressed in this Consent

3    Judgment.  The State Hospitals' Executive Directors

4    shall direct all employees to cooperate fully with the

5    United States.  The United States may receive and

6    respond to unsolicited calls or contacts from State

7    personnel outside the presence of State

8    representatives.

9    **PART III**

10    **MODIFICATION OF TERMS**

11    A.    If the Parties reach a subsequent agreement that varies from

12    the Plan, the new agreement shall be reduced to writing, signed,

13    and filed with the Court for approval.

14    **PART IV**

15    **COMPLIANCE AND TERMINATION**

16    A.    The purpose of this Consent Judgment is that the Defendants

17    will be able to achieve desired outcomes for and provide the

18    necessary protections, supports, and services to the

19    individuals served by the State Hospitals.  All of the terms of

20    the Plan set forth in Part I hereof shall be implemented at the

21    State Hospitals within 36 months of the Enhancement Plan's

22    effective date, except that § I.3 of the Plan and all provisions

23    of the Plan having to do with suicide prevention measures shall

24    be implemented at the State Hospitals upon the effective date of

25    this Consent Judgment.  This Consent Judgment will be terminated

26    and the case dismissed five (5) years after the effective date of

27    the Consent Judgment.  This Consent Judgment may terminate at an

28    earlier date if the Parties agree that the Defendants are in

88

1   substantial compliance with each provision of the Consent

2   Judgment, and the State has maintained compliance for at least

3   eighteen (18) months ("maintained sustained compliance").  If

4   Defendants and the Monitor contend that the Defendants have

5   maintained sustained compliance and the United States disagrees,

6   Defendants may move this Court for an order terminating this

7   Consent Judgment.  In any instance in which the parties disagree

8   as to compliance, the Court shall give appropriate deference to

9   the Monitor's assessment of compliance.  Noncompliance with mere

10  technicalities, or temporary failure to comply during a period of

11  otherwise sustained compliance shall not constitute failure to

12  maintain substantial compliance.  At the same time, temporary

13  compliance during a period of sustained noncompliance shall not

14  constitute substantial compliance.

15  B.    At all times, the State shall comply with applicable federal

16  and state licensing requirements.

17  C.    If the United States maintains that the Defendants have

18  failed to carry out any requirement of this Consent Judgment, the

19  United States shall notify the Defendants with specificity of any

20  instance(s) in which it maintains that the Defendants have failed

21  to carry out the requirements of this Consent Judgment.

22  D.    With the exception of conditions or practices that pose an

23  immediate and serious threat to the life, health, or safety of

24  individuals served by the State Hospitals, the Defendants shall

25  have thirty (30) days from the date of a deficiency notice from

26  the United States to cure the claim of noncompliance.  During

27  this period, the Parties shall coordinate and shall discuss areas

28  of disagreement and attempt to resolve outstanding differences.

1   E.   Unless specified to the contrary elsewhere herein, in any

2   compliance or other adversarial hearing prior to final dismissal

3   of this action, the burden of proof will be on the Party moving

4   the Court.

5   F.   All provisions of this Consent Judgment shall have ongoing

6   effect until the final dismissal of this action.  The Court shall

7   retain jurisdiction for all purposes until such time as this

8   action dismissed.  Independent of the foregoing, if the United

9   States and the Defendants agree that the State Hospitals have

10  achieved substantial compliance with each section of this Consent

11  Judgment, the Parties shall file a joint motion to dismiss this

12  action.

13  G.   This case shall be treated administratively as inactive.

14  However, the Court retains jurisdiction to enforce the terms of

15  this Order.

16

17

18  DATED:    This _____ day of _____, 2006.

19

20

21                              _____

22                              UNITED STATES DISTRICT JUDGE

23

24

25

26

27

28

90

```
 1  APPROVED AS TO FORM AND CONTENT:

 2

 3

 4
    WAN J. KIM
 5  Assistant Attorney General

 6

 7

 8  SHANETTA Y. CUTLAR
    Chief, Special Litigation Section
 9

10

11
    BENJAMIN O. TAYLOE, JR.
12  LEE R. SELTMAN
    MARY R. BOHAN
13  WILLIAM G. MADDOX
    JACQUELINE CUNCANNAN
14  MATTHEW J. DONNELLY
    ANITA C. SNYDER
15  Trial Attorneys
    United States Department of Justice
16  Civil Rights Division

17                                    ┌─────────┐
                                      │ RJK *   │
18                                    └─────────┘
19  DEBRA W. YANG
    United States Attorney
20  LEON W. WEIDMAN
    Assistant United States Attorney
21  Chief, Civil Division
    GARY L. PLESSMAN
22  Assistant United States Attorney
    Chief, Civil Fraud Section
23  HOWARD DANIELS (CA Bar No. 081764)
    Assistant United States Attorney
24       300 North Los Angeles Street
         Federal Building, Room 7516
25       Los Angeles, CA 90012
         (213)894-4024
26

27  * by Aust find bottom
28    (per telephone authorization)

                                    91
```

1

2    _Kimberly Belshé_
KIMBERLY BELSHÉ
3    Secretary, State of California
Health and Human Services Agency
4    State of California
Health and Human Services Agency
5    1600 Ninth Street, Room 460
Sacramento, CA 95814

6

7

8    FRANK S. FURTEK
9    Chief Counsel, State of California
Health and Human Services Agency
10   1600 9th Street, Room 460
Sacramento, CA 95814

11

12

13

14   STEPHEN W. MAYBERG
Director, California Department
15   Of Mental Health
California Department of Mental Health
16   1600 9th Street
Sacramento, CA 95814

17

18

19
CYNTHIA RODRIGUEZ
20   Chief Counsel, California Department of Mental Health
Office of Legal Services
21   California Department of Mental Health
1600 9th Street, Room 153
22   Sacramento, CA 95814

23

24

25

26

27

28

# EXHIBIT 3

STATE OF CALIFORNIA — DEPARTMENT OF CORRECTIONS AND REHABILITATION                    ARNOLD SCHWARZENEGGER, GOVERNOR

**DIVISION OF CORRECTIONAL HEALTH CARE SERVICES**
P.O. Box 942883
Sacramento, CA 94283-0001



May 1, 2008

Matthew A. Lopes, Jr., Esq.              Via:  Lisa A. Tillman, Esq.
*Coleman* Special Master                       Deputy Attorney General
Pannone Lopes & Devereaux                      Department of Justice
317 Iron Horse Way, Suite 301                  P.O. Box 944255
Providence, RI  02908                          Sacramento, CA  94244-2550

Dear Mr. Lopes:

FIVE PLANS

The California Department of Corrections and Rehabilitation submits the following:

1.  Plan for mental health treatment of Enhanced Outpatient Program inmates in Reception Centers (in response to the *Coleman* Court Order dated May 1, 2006);

2.  Plan to improve Enhanced Outpatient Programs in Administrative Segregation Units (in response to the *Coleman* Court Order dated March 12, 2007);

3.  Plan to improve mental health assessments of Correctional Clinical Case Management Services inmate-patients subject to disciplinary processes (in response to the *Coleman* Court Order dated August 2, 2007);

4.  Recruitment plan (in response to the *Coleman* Court Order dated August 2, 2007); and

5.  Referral strategy for Atascadero State Hospital Intermediate Care Facility.

If you have any questions, please contact me at (916) 445-1116.

Sincerely,

ROBIN J. DEZEMBER
Chief Deputy Secretary
Correctional Health Care Services

Enclosures

**FOR SUBMISSION TO THE *COLEMAN* SPECIAL MASTER**

*California Department of Corrections and Rehabilitation's*
*Referral Strategy for Atascadero State Hospital Intermediate Care Facility*

## PURPOSE

A January 2008 review of the Salinas Valley Psychiatric Program (SVPP) waitlist by the *Coleman* Program Support Team revealed that the case-by-case custody screening guidelines are not functioning as designed. The guidelines were aimed at screening appropriate high custody inmate patients into Atascadero State Hospital (ASH). However, the support team's analysis shows that the guidelines have evolved into a de facto screen out criteria. In an effort to improve the flow of appropriate referrals to ASH, defendants have organized a work group, consisting of California Department of Corrections and Rehabilitation (CDCR) and Department of Mental Health (DMH) clinical and custody staff, to review and modify the current referral process to facilitate timely access to ASH Intermediate Care Facility (ICF) beds. This submission reports the progress of the ASH Project work group's efforts to analyze the referral process and outlines a referral strategy aimed at producing a sustainable process for case-by-case custody review and timely referral of clinically appropriate patients to ASH.

## BACKGROUND

On November 30, 2007, DMH submitted its plan to make 231 intermediate care beds at ASH available for *Coleman* class members. In the time since the submission of the DMH plan, it has become increasingly apparent that a substantial number of the available ASH beds are not currently being used by *Coleman* class members. In its review of the 115 cases on the SVPP waitlist, the *Coleman* Program Support Team concluded that patients were landing on the SVPP waitlist because the application of case-by-case guidelines has over time evolved into a screen out process as opposed to the screen in process they were designed to implement. During the course of its review, the team also identified a number of issues that impede transfers of inmates to the ASH program which are related to the breakdown of the case-by-case review process. The problems identified by this review included:

1. The policy governing case-by-case referral of higher custody inmates to ASH is poorly defined.

2. The lack of a clearly defined procedure for applying existing guidelines has led to a confusion of roles and responsibilities for the staff responsible for carrying out case-by-case referral.

3. The ineffectiveness of the case-by-case guidelines has over time caused frustration with the time-consuming referral process, and has resulted in fewer referrals being made to ASH.

4. The lack of central placement oversight by the Health Care Placement Unit contributed to inconsistencies in the way the case-by-case guidelines have been applied and a lack of quality control review of the clinical and custody components of the process.

## FORMATION OF ASH PROJECT WORK GROUP

In an effort to address these problems, CDCR organized the ASH Project work group consisting of relevant custodial and clinical staff from the CDCR Mental Health and Health Care Placement Units of the Division of Correctional Health Care Services and the Classification Services Unit of the Division of Adult Institutions (DAI). To insure that DMH was well-informed, and in an effort to secure a more cooperative working relationship, CDCR sought DMH participation in the work group. As the invitation was accepted, DMH administrators and clinicians from DMH Headquarters and ASH are participating in the work group.

On March 13, 2008, the ASH Project work group conducted a site tour of ASH to review site security and met with the executive director and other ASH staff to discuss how to address the issue of referrals to the facility. Since the impetus for the formation of the work group was a perceived breakdown in the application of the case-by-case screening process, the primary focus of the ASH Project work group is on re-engineering the case-by-case screening process through which custody factors are analyzed prior to referral to ASH.

The principle aim of the ASH Project is to arrive at a sustainable process that effectively removes unnecessary custodial barriers to access to ASH. The work group is tasked with reviewing and making any necessary revisions to existing case-by-case criteria; reviewing and revising the existing Case Factor Sheet; and producing a draft model procedure for establishing and maintaining a steady flow of appropriate referrals to ASH. This process will specifically identify each step in the CDCR referral process and specifically identify the person or group responsible for making clinical, custody screening, classification, approval, transfer, headquarters review, and statewide quality control decisions. The process will have a central placement oversight function that provides a streamlined quality review process aimed at promoting effective utilization management by tracking and monitoring the case-by-case review process to insure that clinically appropriate referrals are made based on a complete and accurate analysis of relevant custody factors.

In addition, the work group is charged with producing a plan for effective implementation of the process. The implementation plan must include a mechanism for monitoring and assessing the effectiveness of the new clinical and custodial procedures being developed by the work group in securing a steady flow of referrals of appropriate CDCR patients to available DMH beds. Because it is anticipated that this will be a lengthy and labor intensive process, it is expected that the work group will have developed drafts for executive staff review by the end of August 2008, and within 90 days, final versions will be sent to the *Coleman* Special Master. Table 1 provides an outline of the long-term measures to be undertaken by the work group.

**TABLE 1.  LONG-TERM MEASURES**

| Task |
|------|
| 1. As recommended by the *Coleman* Special Master, immediate and periodic oversight of the Interdisciplinary Treatment Teams (IDTT) and either the Institutional Classification Committee (ICC) or Case Factor Sheet processes responsible for ensuring timely and adequate referrals. |
| 2. Develop new, separate custody criteria for ASH, CMF-ICF, and SVPP to include revised, clarified and specific case-by-case criteria for Level IV, high custody, and Reception Center referrals to ASH and DMH CMF-ICF dorm beds with the understanding that DMH will give priority to higher custody placement in CMF-ICF.  Emphasis will be placed on directing those inmates with the lowest custody needs to ASH for their review, consistent with safety. |
| 3. Develop a revised and separate ICF Case Factor Sheet based on the new, separate custody criteria developed for ASH, CMF-ICF, and SVPP. |
| 4. Conduct training to impacted CDCR field custody/classification and Mental Health Program staff based on the new criteria and Case Factor Sheet, in conjunction with the upcoming training on the new CDCR-DMH Memorandum of Understanding (MOU) consistent with criteria identified in the CDCR-DMH MOU. |
| 5. Expand the CDCR Health Care Placement Unit's role to include a central placement oversight function that provides a streamlined process, in conjunction with nurse consultants under the Mental Health Program Utilization Management Unit, for quality review and effective utilization management of all DMH ICF referrals.  This will include all statewide referrals for DMH ICF level of care at ASH, Vacaville Psychiatric Program (VPP), and SVPP. |

Addressing these systemic problems in the referral process will take some time because of the need to coordinate with the different stakeholders and reach a consensus on the new custody criteria, and the need to develop a systematic clinical referral process (IDTT), ICF Case Factor Sheet, and training program.  In order to mitigate the impact of the delay, the ASH Project work group has adopted a short-term strategy to optimize the use of available DMH beds while the work group does the staff work outlined above and produces a sustainable referral process.

**Immediately Increasing CDCR Referrals of Qualified Inmates for ASH ICF Beds**

The short-term goal is to generate a steady flow of appropriate referrals under the existing process to ASH in order to optimize the use of available DMH beds while the work group re-engineers the CDCR referral process.  The ASH Project work group agreed that, within the next six months, CDCR and DMH would work within existing referral and custody guidelines to increase CDCR referrals of qualified inmates for ASH ICF beds by focusing on select institutions with a high population of Enhanced Outpatient Program (EOP) inmates.

DMH has made 231 ASH beds available for CDCR use, with the understanding that ASH must give priority admission to mentally disordered offenders (Penal Code, § 2962) and county inmates adjudicated as incompetent to stand trial (Penal Code, § 1370). DMH advises that the hospital may admit a statewide total of up to five CDCR inmate-patients (Penal Code, § 2684) per week based on their current 60-day admissions process and staffing. Since DMH may also place referred and qualified EOP inmates in available intermediate care beds at VPP and SVPP, this goal is stated with the understanding that the number of ASH beds is not a measure of CDCR's unmet bed need.

<u>Focus Population</u>

The work group is already examining the eligibility of inmate-patients currently in EOP for ASH care. EOP inmates were chosen as the focus group because they receive the most intensive level of outpatient mental health care within the Mental Health Services Delivery System (MHSDS) and because it is the group that will more likely have the highest number of referable patients under the existing MOU criteria. Based on the current MOU between CDCR and DMH,[1] criteria for inpatient care in the ICF program requires an Axis I major (severe) mental disorder with active symptoms and any of the following:

1. As a result of the major mental disorder, the patient is unable to adequately function within the structure of the CDCR Enhanced Outpatient Program (EOP) Level of Care.

2. The patient requires highly structured inpatient psychiatric care with 24-hour nursing supervision due to a major mental disorder; serious to major impairment of functioning in most life areas, stabilization or elimination of ritualistic or repetitive self-injurious/suicidal behavior; or stabilization of refractory psychiatric symptoms.

3. The patient requires a neurological/neuropsychological consultation.

4. The patient requires an inpatient diagnostic evaluation.

5. The patient would benefit from a comprehensive treatment program with an emphasis on skill (i.e. coping, daily living, medication compliance) development with increased programming and structured treatment environment.

6. The patient's psychiatric medication history indicates that a clozapine trial might be useful.

7. Inmate-patients who are deemed a significant assault risk, have a history of victimizing other inmate-patients (including inciting others to act in a dangerous manner) or present a high escape risk, shall be referred to the SVPP Intermediate Program. CDCR refers to these inmate-patients as high custody inmate-patients.

---

[1] The MOUs between CDCR and DMH for Acute Psychiatric Services, Intermediate Care/Non-Acute Services, and Day Treatment Program expire on June 30, 2008.

8. The patient's Global Assessment of Functioning indicates behavior that is considerably influenced by psychotic symptoms; OR serious impairment in communication or judgment; OR inability to function in almost all areas.

Both the clinical and custody criteria stated in the current MOU between CDCR and DMH for inpatient care in the ICF program will be applied.

Focus Institutions

In an attempt to capture those EOP inmates meeting custody criteria for referral and acceptance, CDCR's Health Care Placement Unit generated reports[2] through the Distributed Data Processing System (DDPS) to determine the number of EOP inmate-patients with less than the 52 points (the number of points necessary for Level IV placement) at Level III EOP institutions (Table 2) and Reception Center (RC) institutions (Table 3). It is necessary to limit this short-term search for appropriate ICF referrals to inmate-patients with less than 52 points because development of new standards and procedures for the application of case-by-case guidelines must be developed to make referral of persons with more than 52 points effective. Tables 2 and 3 summarize the potential pool of appropriate referrals for improving use of ASH beds in the short-term.

**TABLE 2. EOP INMATE-PATIENTS WITH LESS THAN 52 POINTS AT LEVEL III EOP INSTITUTIONS**

| Institution | # Inmate-Patients |
|---|---|
| CMC* | 539 |
| CMF* | 470 |
| COR | 146 |
| MCSP | 320 |
| RJD* | 295 |

* selected institution

**TABLE 3. EOP INMATE-PATIENTS WITH LESS THAN 52 POINTS AT RC INSTITUTIONS**

| Institution | # Inmate-Patients |
|---|---|
| CCI | 13 |
| CCWF | 2 |
| CIM* | 100 |
| RJD | 6 |
| DVI* | 42 |
| HDSP | 5 |
| LAC | 42 |
| NKSP | 30 |
| SQ | 17 |
| VSPW | 4 |
| WSP* | 52 |

* selected institution

---

[2] Data as of March 24, 2008.

The ASH Project work group agreed that movement out of Level III EOP institutions would also result in movement out of RC EOPs. The group determined that focusing first on mainline Level III EOP institutions will be more effective and will minimize delays in increasing referrals to ASH because RC institutions have a complex processing process, which precludes an immediate significant increase of referrals. These issues will be addressed as part of the system wide fix when the group develops new, separate custody criteria for ASH, CMF-ICF, and SVPP to include revised, clarified and specific case-by-case criteria for Level IV, high custody, and RC referrals to ASH and DMH CMF-ICF dorm beds.

Accordingly, based on the large number of identified Level I-III EOP population, the work group decided to focus on Level III EOP institutions at California Men's Colony (CMC), California Medical Facility (CMF), and Richard J. Donovan Correctional Facility (RJD). Focusing on these institutions will be more productive because of their clinical expertise and experience with DMH referrals. The initial screening will center on identifying Level I-III EOP inmate-patients with MED A custody and an Axis I major (serious) mental disorder with active symptoms, and that meet the clinical criteria for referral.

If the work group finds a nominal level of referrals from EOP inmate-patients at these mainline EOP institutions, then the group will also examine the pool of EOP inmate-patients at RC institutions, focusing on the California Institution for Men (CIM), Wasco State Prison (WSP), and Deuel Vocational Institute (DVI). These institutions also have clinical expertise, experience with DMH referrals, and a large number of identified Level I-III EOP population.

Flow of Referrals

CDCR's Mental Health Program staff contacted DMH coordinators and Chiefs of Mental Health at CMF, RJD, and CMC in early April. They were provided with lists of all Level II and III inmates currently in EOP and asked to: discuss these lists with the IDTTs to identify inmates who may meet the existing criteria for treatment at ASH; provide a list of inmates who meet current admission criteria, are clinically appropriate, and require inpatient ICF level of care; and provide referral packets to Headquarters. Referrals will be vetted through CDCR's Mental Health Program and Health Care Placement Unit to ensure established clinical and custody criteria are met before the referral package is sent to DMH. If there are aspects of the referrals that are lacking, they will be sent back to the institution for more information before forwarding them to DMH. Based on current MOU criteria, DMH will screen patients for admission to a DMH facility, including ASH, and will make the final decision to accept or reject inmate-patients. DMH staff can generally review such referrals within 24 hours. Transportation from the sending institution is usually not a barrier.

The Coordinated Clinical Assessment Team (CCAT) will continue to provide a centralized approach to expedite the review and decision-making process for referrals of CDCR inmate-patients that are rejected by DMH, and referrals where incomplete items are not resolved within two working days.

To ensure appropriate flow of referrals to DMH for ICF placement, CDCR intends to provide a steady flow of referrals from each of the examined institutions. Throughout this period, CDCR's Health Care Placement Unit will make every effort to be available for regular communication with ASH staff regarding its operational capability to receive CDCR patients.

Table 4 outlines the steps being taken by the ASH Project work group to realize a short-term increase in the number of appropriate ASH referrals while the work group tackles the bigger problem of revising the case-by-case guidelines and procedures.

### TABLE 4.  IMMEDIATE MEASURES

| Task | Target Date | Status |
|------|-------------|--------|
| 1. DAI to sort Level III EOP list generated by Health Care Placement Unit in order to identify MED A cases and CLOSE cases | By April 7, 2008 | Completed |
| 2. Mental Health Program staff to start conversations with CMC, CMF, and RJD about setting-up a process for referrals to ASH | By April 14, 2008 | Completed |
| 3. Institutions to identify first set of inmates appropriate for ASH referral | Week of April 14, 2008 | Completed |
| 4. Institutions to prepare first set of applications | Week of April 21, 2008 | Completed |
| 5. First set of applications to ASH | Week of April 28, 2008 | Completed |
| 6. Mental Health Program staff to start conversations with CIM, WSP, and DVI about identifying clinically appropriate referrals for ASH ICF | Week of April 28, 2008 | In Progress |
| 7. ASH will begin admitting CDCR patients who are accepted as beds become available | Week of May 5, 2008 | |
| 8. ASH will admit up to five CDCR patients per week who are accepted and as beds become available | May 5, 2008 – October 27, 2008 | |

CDCR notes that while the ASH Project work group has implemented a very specific short-term plan for increasing referrals to ASH ICF beds, no institution is being excluded from making referrals to ASH. The method described above for generating short-term referrals has already yielded eight new referrals. The work group will monitor the stream of referrals generated by the short-term process and continue to refine it to insure that the referrals generated are clinically and custodially appropriate. Now that the short-term infrastructure is in place and a stream of referrals is being generated, the ASH Project work group will begin its work to re-engineer the CDCR case-by-case referral process.

## CONCLUSION

In conclusion, CDCR and DMH have organized a multidisciplinary work group to develop a sustainable referral process aimed at providing timely inmate access to available beds at ASH. The ASH Project work group formulated a two-pronged referral strategy to improve the use of ASH beds. The long-term approach is aimed at reviewing and revising the guidelines for the case-by-case referral of appropriate high custody inmates. It is expected that the review and revisions will yield a draft model procedure for implementing the process, including identifying each step (clinical, custody screen, classification, approval, transfers, headquarters review, quality control statewide) and who is responsible for each decision. In addition, we expect the work group to produce a plan for effective implementation of the process.

The process of developing the new long-term approach outlined above will necessarily be time consuming because it involves the need to coordinate with the different stakeholders and reach a consensus on the new custody criteria, and the need to develop a systematic clinical referral process (IDTT), ICF Case Factor Sheet, and training program. In order to make more effective use of the available ASH beds while the work group develops the long-term process, the work group has adopted a short-term approach to identify appropriate referrals that qualify under the existing referral process. We anticipate that this short-term approach will yield an immediate increase in CDCR referrals of inmate-patients for DMH consideration to place in ASH beds.

An outgrowth of this plan may be the ability to measure the true need for these inpatient beds by the number of CDCR inmates qualifying, on a clinical and custody basis, for such care. By identifying the prevalence of CDCR inmates referred for ASH intermediate care beds, this strategy will also enable more informed bed-planning decisions by CDCR and DMH.

# EXHIBIT 4



CALIFORNIA DEPARTMENT OF

# Mental Health

1600 9th Street, Sacramento, CA 95814
(916) 654-2413

July 1, 2008

Matthew A. Lopes, Jr., Esq.          via:    Lisa Tillman
Office of Special Master                      Deputy Attorney General
Pannone, Lopes & Devereaux, LLC               1300 I Street, Suite 125
317 Iron Horse Way, Suite 301                 P.O. Box 944255
Providence, RI 02908                          Sacramento, CA 94244-2550

RE:    **MONTHLY REPORT ON THE LICENSURE OF INTERMEDIATE CARE AND DAY
       TREATMENT PROGRAMS AT THE CALIFORNIA MEDICAL FACILITY, VACAVILLE
       AND THE SALINAS VALLEY PSYCHIATRIC PROGRAM, SALINAS VALLEY STATE
       PRISON**

In accordance with the July 24, 2007 Court order issued by Judge Karlton, the California
Department of Mental Health (DMH) is to provide a monthly report on the implementation of the
expanded Intermediate Care Programs (ICPs) and Day Treatment Programs (DTPs) at the
California Medical Facility, Vacaville. In addition to the terms of the Court order, the DMH also is
providing information on the implementation of the expanded ICPs and DTPs at the Salinas Valley
Psychiatric Program to optimize transparency and provide the full scope of our expansion of
services.

Enclosed is the monthly report providing data on each program's census and wait list information.
The data reflects the time period of June 1, 2008 through June 30, 2008.

If you need clarification on any aspect of this report, please contact Nathan Stanley, Long Term
Care Services Division at (916) 654-2413.

Sincerely,

CYNTHIA A. RADAVSKY
Deputy Director

Enclosures

## STATUS OF IMPLEMENTATION OF PLAN FOR
## INCREASING CAPACITY OF INTERMEDIATE CARE FACILITY AND DAY TREATMENT PROGRAM BEDS
## AT THE CALIFORNIA MEDICAL FACILITY
### REPORT DATE:  6/30/2008

| UNIT VPP | CAPACITY | FILLED | HOLD | AVAILABLE |
|---|---|---|---|---|
| A-2 DTP | 44 | 39 | 1 | 4 |
| A-3 ICF | 40 | 30 | 1 | 9 |
| P-2 ICF Level IV | 36 | 31 | 5 | 0 |
| P-3 ICF Level IV | 30 | 27 | 3 | 0 |

| Unit | Single Cell Capacity | Single Cell Filled | Single Cell Hold | Single Cell Available | Dormitory Capacity | Dormitory Filled | Dormitory Hold | Dormitory Available |
|---|---|---|---|---|---|---|---|---|
| SVPP | 32 | 32 | 0 | 0 | 32 | 26 | 4 | 2 |

| SVPP Delta Units | Single Cell Capacity | Single Cell Filled | Single Cell Hold | Single Cell Available |
|---|---|---|---|---|
| D-5 | 56 | 56 | 0 | 0 |
| D-6 | 56 | 51 | 5 | 0 |

### WAIT LIST DATA

| UNIT | WAIT LIST |
|---|---|
| P2 ICF LEVEL IV | 0 |
| P3 ICF LEVEL IV | 0 |
| A3 ICF | 0 |
| A2 DTP | 0 |
| SVPP | 164 |

7/1/2008

1

## STATUS OF IMPLEMENTATION OF PLAN FOR
## INCREASING CAPACITY OF INTERMEDIATE CARE FACILITY AND DAY TREATMENT PROGRAM BEDS
## AT THE CALIFORNIA MEDICAL FACILITY
## REPORT DATE:  6/30/2008

### WAIT LIST DATA BY HOUSING UNIT/LEVEL OF CARE

| FACILITY | PSU | MHCB | ACUTE | AD. SEG - EOP | SHU | EOP | CCCMS | PC 1370 | TOTAL |
|---|---|---|---|---|---|---|---|---|---|
| P-2 ICF LEVEL IV | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| P-3 ICF LEVEL IV | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| A-3 ICF | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| A-2 DTP | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| SVPP | 11 | 19 | 3 | 33 | 0 | 68 | 2 | 28 | 164 |
| SVPP PC 1370 | 10 | 0 | 0 | 3 | 1 | 13 | 1 | --- | 28 |

7/2/2008