PRISON LAW OFFICE
DONALD SPECTER Bar No.: 83925
STEVEN FAMA Bar No.: 99641
E. IVAN TRUJILLO Bar No.: 228790
1917 Fifth Street
Berkeley, California 94710-1916
Telephone:  (510) 280-2621
Facsimile:   (510) 280-2704

BINGHAM, McCUTCHEN, LLP
WARREN E. GEORGE Bar No.: 53588
GEOFFREY THOMAS HOLTZ Bar No.: 191370
KRISTEN A. PALUMBO Bar No.: 215857
Three Embarcadero Center
San Francisco, California  94111
Telephone: (415) 393-2000

ROSEN, BIEN & GALVAN, LLP
MICHAEL W. BIEN Bar No.: 096891
JANE E. KAHN Bar No.: 112239
ERNEST GALVAN Bar No.: 196065
LORI RIFKIN Bar No.: 244081
315 Montgomery Street, 10th Floor
San Francisco, California  94104
Telephone: (415) 433-6830

HELLER, EHRMAN, WHITE & McAULIFFE
RICHARD L. GOFF Bar No.: 36377
701 Fifth Avenue
Seattle, Washington  98104
Telephone: (206) 447-0900

THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
CLAUDIA CENTER Bar No.: 158255
600 Harrison Street, Suite 120
San Francisco, CA  94107
Telephone:  (415) 864-8848

KIRKPATRICK & LOCKHART PRESTON GATES ELLIS LLP
JEFFREY L. BORNSTEIN, Bar No.: 99358
55 Second Street, Suite 1700
San Francisco, CA  94105-3493
Telephone:  (415) 882-8200

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN,<br><br>Plaintiffs,<br><br>v.<br><br>ARNOLD SCHWARZENEGGER, et al.,<br><br>Defendants. | Case No. Civ S 90-0520 LKK-JFM |
| JERRY VALDIVIA, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>ARNOLD SCHWARZENEGGER, et al.,<br><br>Defendants. | Case No. Civ. S-94-0671 LKK/GGH<br><br>**REPLY DECLARATION OF LORI RIFKIN IN SUPPORT OF PLAINTIFFS' MOTIONS FOR INJUNCTIVE RELIEF AND LEAVE TO FILE CONSOLIDATED MOTION**<br><br>Hearing Date:  July 25, 2008<br>Time:            10:00 a.m.<br>Location:       Courtroom 4<br>Judge:          Hon. Lawrence K. Karlton |

[225442-1]

REPLY DECL. OF LORI RIFKIN IN SUPPORT OF PLS.' MOTIONS FOR INJUNCTIVE RELIEF AND LEAVE TO
FILE CONSOLIDATED MOTION - Case Nos. Civ S 90-0520 LKK-JFM; Civ S-94-0671 LKK/GGH

# TABLE OF ABBREVIATIONS/ACRONYMS

ASH:                    Atascadero State Hospital

CDCR:                   California Department of Corrections and Rehabilitation

DMH:                    Department of Mental Health

[225442-1]

I, Lori Rifkin, do hereby declare as follows:

1.     I am an attorney admitted to practice law in California and an associate in the law firm Rosen, Bien & Galvan, one of the counsel of record for the Plaintiff classes in *Coleman v. Schwarzenegger* and *Valdivia v. Schwarzenegger*.  I have personal knowledge of the matters set forth herein and if called as a witness I could competently so testify.  I make this reply declaration in support of Plaintiffs' Motion for Injunctive Relief Requiring Timely Access To Inpatient Psychiatric Hospitalization and Plaintiffs' Motion for Leave to File Consolidated Motion and Request for Modification of Protective Orders.

2.     Attached hereto as **Exhibit A** is a true and correct copy of a document containing an e-mail chain between various individuals who are defendants' employees including Cindy Radvasky, Deputy Director of Long-Term Care Services in the Department of Mental Health. This document was produced to plaintiffs' counsel on compact disc on February 4, 2008 by defendants' counsel in response to plaintiffs' September 5, 2007 request for production of documents in *Coleman* in connection with discovery proceedings before the Three-Judge Court. The proof of service to the production of the disc is attached hereto as **Exhibit B**.  The data embedded in the file indicates that the custodian of this document was Doug McKeever, who was the Director of Mental Health for CDCR Division of Correctional Health Care Services. Although this document has a bates stamp with the abbreviation "Priv" on it because defendants at one time asserted a privilege for the document, defendants subsequently abandoned that assertion of privilege and produced the document.  This document was not part of the list of disputed documents submitted to the Magistrate Judge for resolution of privilege disputes on February 25, 2008, nor was it one of the documents ordered produced by the Magistrate Judge in his April 14, 2008 or May 29, 2008 Orders concerning defendants' assertions of attorney-client and deliberative process privilege, nor is it subject to appellate review by the Ninth Circuit as part of defendant's appeal of or potential appeal of those orders.

3.     On page two of **Exhibit A** (E_PRIV_085851), there is an e-mail from Ms. Radavsky dated December 12, 2006 stating DMH's plan to remove itself from the provision of care to CDCR inmates entirely, including to the population of high acuity inmate-patients who

1    cycle continuously between prison and parole.  This email is in response to a request  from

2    CDCR to DMH for hospitalization of individuals who were formerly a part of the "psychiatric

3    return" process, given CDCR's  plans to stop that process as of January 2007.  The "psychiatric

4    return" population, parolees who had decompensated to such a degree in the community that

5    defendants returned them to custody solely for mental health treatment, is an important part of

6    the population at issue in plaintiffs' present motion.  The email attached as Exhibit A shows that

7    at least since late 2006, defendants including DMH have been aware of this population of high

8    acuity mentally ill inmates who may clinically require inpatient psychiatric hospitalization.  It

9    also suggests that practical, rather than legal, considerations may in fact be the significant

10   motivating factor in DMH's refusal to accept this small population of individuals who require

11   inpatient mental health care and are pending revocation or have fewer than 35 days to serve.

12        4.    Attached hereto as **Exhibit C** is a true and correct copy of CDCR Proposed

13   Changes to Regulations, Cal. Code Regs. tit. 15 § 3000 that define "parole hold" as

14   "authorization by a departmental employee to hold a parolee in custody pursuant to section §

15   3056 of the Penal Code."  This document was downloaded from

16   http://www.cdcr.ca.gov/Regulations/Adult_Operations/docs/NCDR/2008NCR/08_02/DAPO_R

17   egs_Text_2.pdf on July 17, 2008.

18        5.    I participated in a *Coleman* monitoring tour of three DMH facilities that house

19   CDCR inmate-patients on February 21-22, 2007, Coalinga State Hospital, Atascadero State

20   Hospital, and Salinas Valley Psychiatric Program.  During this tour, the Director of Atascadero

21   State Hospital and other DMH employees stated that CDCR patients are routinely discharged

22   back to CDCR institutions from DMH just days prior to their release on parole.

23        6.    I attended a *Coleman* "all-parties'" meeting on March 11, 2008.  During this

24   meeting, when plaintiffs' counsel asked about access to DMH for individuals in CDCR custody

25   pending revocation, defendants' counsel deflected by saying the issue is for a *Valdivia* meeting.

26   During the same meeting defendants' representative from Division of Adult Parole Operations

27   described defendants' efforts to contract with outside contractors to provide pre-release

28   planning and benefits programming to CDCR inmates.  These outside contractors would come

2

1   into prisons to provide pre-release planning to inmates.  He reported that a contract was in place

2   covering 19 prisons and defendants were in the processing of negotiating contracts to cover the

3   remaining CDCR prisons.  He also reported that defendants were discussing whether to send

4   benefits workers into DMH to provide pre-release planning to CDCR inmates.

5         7.     Attached hereto as **Exhibit D** is a true and correct copy of an excerpt of the

6   Fourth Report of the Special Master on the Status of Conditions of the Remedial Order, lodged

7   with the Court in *Valdivia* by email on April 28, 2008 (and not yet entered on the docket).  The

8   excerpt attached includes the cover page and pages 45-51.  These pages include a discussion of

9   cases in which defendants asserted good cause to continue individuals' revocation proceedings

10  beyond 35 days.

11       I declare under penalty of perjury under the laws of California and the United States, that

12  the foregoing is true and correct, and that this declaration is executed in San Francisco,

13  California on July 18, 2008.

14

15

16                                      */s/ Lori Rifkin*
                                      Lori Rifkin

17

18

19

20

21

22

23

24

25

26

27

28

REPLY DECL. OF LORI RIFKIN IN SUPPORT OF PLS.' MOTIONS FOR INJUNCTIVE RELIEF AND LEAVE TO FILE CONSOLIDATED MOTION - Case Nos. Civ S 90-0520 LKK-JFM; Civ S-94-0671 LKK/GGH

# EXHIBIT A

**From:** McKeever, Doug
**Sent:** Wednesday, December 13, 2006 7:28:25 AM
**To:** Storms, Robert
**Subject:** RE: DMH Beds for Parolees

Robert, I am not aware of our taking over Coalinga. This is news to me. As far as Cindy's comments, our Long-Term Bed Plan that is due to the Coleman court next week recommends getting out of all the DMH hospitals by 2011/12, thus freeing up the 300 plus beds we currently have assigned to CDCR.

Hope this helps.

*Doug P. McKeever*
*Division of Correctional Health Care*
*Department of Corrections and Rehabilitation*
*916.327.1168 - office*
*916.799.0210 - mobile*
*doug.mckeever@corr.ca.gov*

-----Original Message-----
**From:** Storms, Robert
**Sent:** Tuesday, December 12, 2006 3:52 PM
**To:** McKeever, Doug
**Subject:** FW: DMH Beds for Parolees

Doug,

Please read my request to Cindy R and her response. Also mike Stone's remarks per Pam.

Can you provide me more info on Cindy's response?

Are Mike's comments on target, if not please elaborate.

Thanks,

Robert Storms

-----Original Message-----
**From:** Cantelmi, Pamela
**Sent:** Tuesday, December 12, 2006 3:32 PM
**To:** Storms, Robert
**Subject:** RE: DMH Beds for Parolees

Mike Stone said that he's known about this for over a month. Apparently, all SVPs and other MI inmates are going to go to Coalinga DMH, per an upcoming (anticipated) court order through the Receiver. (Guess we're going to take over the Coalinga DMH hospital - 1500 beds. Wow!)

Pam Cantelmi
Staff Counsel
Health Care Legal Team
(916) 324-8857

**CONFIDENTIALITY NOTICE**: This e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.

**From:** Storms, Robert
**Sent:** Tuesday, December 12, 2006 2:19 PM
**To:** Cantelmi, Pamela
**Subject:** FW: DMH Beds for Parolees


-----Original Message-----
**From:** Cindy Radavsky [mailto:Cindy.Radavsky@dmh.ca.gov]
**Sent:** Monday, December 11, 2006 1:21 PM
**To:** Storms, Robert
**Cc:** Char Schultz
**Subject:** Re: DMH Beds for Parolees

DMH does not have bed space for these parolees and in fact has asked CDCR to do bed planning to remove all of their inmates from the state hospitals due to our population issues and the new pressures under Jessicas law.


>>> "Storms, Robert" <Robert.Storms@cdcr.ca.gov> 12/8/2006 4:34:30 PM >>>

Cindy,

CDCR is currently planning to end the psych-return process effective 1/8/07. We will no longer return parolees to prison solely for psychiatric services.

Can you free up more bed (for more money) for conserved parolees?

Thanks

Robert Storms, SSMI
Division of Adult Parole Operations
Health Administration Unit
(916) 323-0152

E_PRIV_085851

# EXHIBIT B

RECEIVED

FEB 0 4 2008

**PROOF OF SERVICE**

*Plata, et al. v. Arnold Schwarzenegger, et al.*

Rosen, Bien & Galvan

**Case No C01-1351 THE**

        I, the undersigned, hereby declare that I am over the age of 18 years and not a party to the within action. My business address is Western Messenger, 75 Columbia Square, San Francisco, CA 94103. On February 4, 2008, I served the following CD's labelled:

**DEFENDANTS' FEBRUARY 4, 2008 PRODUCTION OF ELECTRONIC DOCUMENTS**

**DOCUMENTS PRODUCED BY DEFENDANTS PRD001 - PRD011**

on the party(ies) in said action by delivering a true copy thereof to the person(s) indicated below:

        Lori Rifkin, Associate
Rosen, Bien & Galvan, LLP
315 Montgomery Street, Tenth Floor
San Francisco, CA 94104

        Executed on February 4, 2008, at San Francisco, California. I declare under penalty of perjury that the foregoing is true and correct.

_____

PATRICK DRISCOLL
Print Name

- 1 -

PROOF OF SERVICE (CASE NO. C01-1351 TEH)

1414211.1

# EXHIBIT C

**TEXT OF PROPOSED REGULATIONS**

In the following, <u>underline</u> indicates additional added text, and ~~strikethrough~~ indicates additional deleted text.

**Section 3000. Definitions.**

**Section 3000 is amended to alphabetically merge the definitions below with those that exist in the regulations.**

\*

\*

\*

<u>Adverse Witness, for the purpose of conducting parole revocation hearings, means a person whose expected testimony supports the violation charged. The Agent of Record should request that the primary adverse witness (victim, on-the-scene police officer, complaining person, etc.) be present at the hearing.</u>

<u>Arrest means the taking of a person into custody, in a case and in a manner authorized by law.</u>

~~Board of Prison Terms (Board)~~ <u>Board of Parole Hearings (Board)</u> means the state agency which is responsible for the administration of paroles for those persons committed to the department under Penal Code section 1168 and those committed under Penal Code section 1170 who also meet the criteria found in Penal Code section 2962.

<u>Child means a person under the age of 18 years.</u>

<u>Collateral Contact means any communication between a Division of Adult Parole Operations staff and another person concerning a parolee.</u>

<u>Control Service means the middle supervision category of a person on parole.</u>

<u>Court Order means a custody determination decree, judgment, or order issued by a court of competent jurisdiction, whether permanent or temporary, initial or modified, that affects the custody or visitation of a child, when issued in the context of a custody proceeding. An order, once made, shall continue in effect until it expires, is modified, is rescinded, or terminates by operation of law.</u>

Department means the <u>California</u> ~~d~~<u>D</u>epartment of ~~c~~<u>C</u>orrections <u>and Rehabilitation</u>.

Deputy Regional Parole Administrator means the department's administrator within a Division of Adult Parole Operations region.

District Administrator means the department's administrator of a Division of Adult Parole Operations unit, district, or geographical area.

Face-to-Face Contact means an in-person contact with a parolee by Division of Adult Parole Operations staff.

Felony means a crime which is punishable with death or by imprisonment in the state prison.  Every other crime or public offense is a misdemeanor except those offenses that are classified as infractions.

Field Contact means face-to-face contact by Division of Adult Parole Operations staff with a parolee away from the parole office or office parking area.

General Conditions of Parole mean general rules regarding behavior required or prohibited during parole for all parolees.

~~Hearing Agent means the parole and community services division employee responsible for application of specific procedures pertaining to the parole revocation hearing process; the primary liaison between the parole and community services division and the releasing authorities in matters and procedures pertaining to the parole revocation hearing process.~~

~~Hearing Coordinator means an employee assigned to coordinate the revocation process within an institution or a parole and community services division region.~~

High Control means the highest supervision category of a person on parole.

Hold means to retain an inmate or parolee, who is under the ~~director's~~ Secretary's jurisdiction, in custody at an institution or a local detention facility in response to the legal request of a law enforcement or correctional agency representative.

Inmate means a person under the jurisdiction of the ~~director~~ <u>Secretary</u> and not paroled.  Inmate and prisoner are synonymous terms.

<u>Legal process means a writ, summons, warrant or mandate issued by a court.</u>

<u>Our Hold Only (OHO) means a parolee is in custody under a Penal Code section 3056 parole hold and has no other charges or detainers pending.</u>

Parole Agent means an employee and his/her supervisors in the department who are assigned to supervise those persons released from incarceration to the supervision of the ~~parole and community services d~~<u>D</u>ivision <u>of Adult Parole Operations</u>.

<u>Parolee</u> Field File means a ~~working~~ file maintained by a parole unit office containing information about a parolee and ~~his/her~~ <u>his or her</u> current parole.

<u>Parole Hold means authorization by a departmental employee to hold a parolee in custody pursuant to section 3056 of the Penal Code.</u>

Prisoner means a person in custody of the ~~director~~ <u>Secretary</u> and not paroled. Prisoner and inmate are synonymous terms.

Regional Parole Administrator means the department's administrator of a ~~parole and community services d~~<u>D</u>ivision <u>of Adult Parole Operations</u> ~~geographical~~ region.

<u>Residence means one or more addresses at which a person regularly resides, regardless of the number of days or nights spent there, such as a shelter or structure that can be located by a street address, including, but not limited to, houses, apartment buildings, motels, hotels, homeless shelters, and recreational and other vehicles.</u>

<u>Serious Offense, for the purpose of conducting parole revocation hearings, refers to any felony listed in section 1192.7 (c) of the Penal Code.</u>

Special Conditions of Parole means conditions of parole placed by the Board of Parole Hearings or Division of Adult Parole Operations and restricted to the individual.

Unit Supervisor means a supervisor of case-carrying parole agents in the ~~parole and community services d~~Division of Adult Parole Operations.

Violent Offense, for the purpose of conducting parole revocation hearings, refers to any felony listed in section 667.5 (c) of the Penal Code.

Writ means a court order in writing, requiring the performance of a specified act, or giving authority to have it done.

Note: Authority cited: Sections 2717.3, 5058 and 5058.3, Penal Code; Section 10115.3(b), Public Contract Code; and Sections 4525(a), 4526 and 14837, Government Code. Reference: Sections 186.22, 243, 314, 530, 532, 646.9, 653m, 832.5, 1389, 2080, 2081.5, 2600, 2601, 2700, 2717.1, 2717.6, 2932.5, 4570, 5009, 5054, 5068, and 7000 et seq., Penal Code; Sections 1132.4 and 1132.8, Labor Code; Sections 10106, 10108, 10108.5, 10115, 10115.1, 10115,2, 10115.3 and 10127, Public Contract Code; and Section 999, Military and Veterans Code; Section 391, Code of Civil Procedure; Section 297.5, Family Code; In re Bittaker, 55 Cal.App. 4th 1004, 64 Cal. Rptr. 2d 679; and Section 11007, Health and Safety Code.

*
*
*

**3001.  Subject to Regulations.**

**Section 3001 is amended to read:**

Regardless of commitment circumstances, every person confined or residing in facilities of the department is subject to the rules and regulations of the ~~director~~ Secretary, and to the procedures established by the warden, superintendent, or ~~parole region~~ regional parole administrator responsible for the operation of that facility.  Persons on parole or civil addict outpatient status are subject to such ~~director's~~ Secretary's rules, regulations and parole region procedures as may be applicable to such persons.

Note:  Authority cited: Section 5058, Penal Code.  Reference: Sections 5054 and 5068, Penal Code.

**3041.3.  Inmate/Parolee Access to Computers.**

**Subsections 3041.3(a) through 3041.3(m) are unchanged.**

**Subsection 3041.3(n) is amended to read:**

# EXHIBIT D

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA


JERRY VALDIVIA, et al.,

    Plaintiffs,

      vs.                         No. CIV S-94-671 LKK/GGH

ARNOLD SCHWARZENEGGER, et al.,

    Defendants.

_____/


### FOURTH REPORT OF THE SPECIAL MASTER ON THE STATUS OF CONDITIONS OF THE REMEDIAL ORDER

#### Background

On May 2, 1994, the lawsuit now known as *Valdivia vs. Schwarzenegger* was filed. The Court certified the case as a class action by order dated December 1, 1994. On June 13, 2002, the Court granted partial summary judgment in favor of the Plaintiffs. On July 23, 2003, the Court ordered the Defendants to submit a remedial plan, with specific guidance regarding "...a prompt preliminary probable cause hearing that affords the parolee rights provided by *Morrissey*, including notice of the alleged violations, the opportunity to appear and present evidence, a conditional right to confront adverse witnesses, an independent decision-maker, and a written report of the hearing.

On March 8, 2004, the Court entered the Stipulated Order for Permanent Injunctive Relief ("Permanent Injunction") containing the agreed-upon elements of the

.

This compliance rate remained essentially steady among the known cases. In absolute numbers, the institutions missing the deadline the most were Los Angeles County Jail and Wasco State Prison, but they were each at 95% compliance or better each month. Similar rates were observed in methodologically sound studies conducted for self-monitoring tours.[76] The Special Master did not undertake an analysis of the degree of lateness for the cases exceeding the deadline.

During the last Round, the Special Master learned that Unit Supervisors sometimes conduct an independent review when they are unable to discuss a case with the parole agents, which does not satisfy the conference requirement. The frequency of this practice is unknown, and the Special Master did not learn whether there was any change during this Round.

- There is good compliance on this requirement.

*Final hearing within 35 days of the placement of the parole hold*

Deputy Commissioners conduct some aspects of revocation hearings well, while other aspects impacting on due process require significant attention.[77] In the main, they are observed to conduct ADA reviews reasonably well to determine parolees' ability to understand and participate and to identify any reasonable accommodations needed. Self-monitoring reports mention some exceptions and that the monitors intervened with corrections. Reports comment only erratically on whether Deputy Commissioners verified that parolees received and understood notice of their charges and rights, and the Special Master has observed this occurring inconsistently in practice. Similarly, Deputy Commissioners do not always mention the right to object if the parolee believes the

hearing officer may not be impartial, nor the right of appeal and mechanisms for exercising it.[78]

Hearings do typically name the charges, lay the foundation for them, and take pleas.[79] The Special Master observed parolees being permitted to present all evidence they requested; reports in this Round do not cite any denials or unreasonable limits, although that has been cited as a rarely observed issue in the past. The parolee's attorney, the parole agent, and the Deputy Commissioner freely question witnesses. The parolee is permitted to testify and to present evidence going to the charges and to mitigation.

Practices with the state's evidence are more problematic. Monitors and the Special Master have seen instances of objections not recorded or handled inconsistent with policy and usual legal reasoning.[80] Examples came to the Special Master's attention during the Round of poor handling of objections concerning balancing proffered hearsay against a parolee's right of confrontation.[81] Defendants' data printouts show a significant number of postponements to gather more evidence, a problematic issue as to the state's evidence, as discussed below.[82]

Policy and practice concerning fearful witnesses is being renegotiated, but its current application is problematic. Some Deputy Commissioners examine the basis for a witness' request to testify outside the presence of the parolee; others permit such testimony based on witness request alone, with some of those Deputy Commissioners asserting that they understand this to be Board policy. This latter practice appears inconsistent with the law as stated in *Morrissey*, which excuses confrontation on the basis of fear only where the informant's identity is unknown to the parolee and requires a hearing officer determination of the risk of harm. Defendants note that there is a

Stipulated Order in this case, referenced in the Background section above, on a related topic. It permits Paroles Division to limit information shared based on a witness' subjective report of fearfulness; that Order covers the witness' contact information shared with the parolee's attorney, but does not discuss the circumstances of hearing testimony.

Previously, Deputy Commissioners dismissed charges in response to an objection that the Permanent Injunction's timeframes had been exceeded. The parties observed none of these dismissals in the Round's monitoring, and only one was apparent in Defendants' data analysis.[83] In the few timeframe objections observed, Deputy Commissioners found that a specified good cause justified the later hearing date, or held that the interest of public safety provided reason for going forward despite the timeframe violation. This latter practice is not based in case law or written policy, to the Special Master's knowledge. The parties acknowledge that public safety is not good cause for missing the ordered deadline.[84] However, tracking material and monitoring reports suggest that this practice happens rarely.[85] Plaintiffs argue that this practice occurs much more than is indicated in these documents, and that Defendants should be required to conduct more rigorous tracking and adopt procedures to ensure that these cases are prioritized in scheduling so that the Deputy Commissioners do not face the choice of violating timeframes or releasing someone thought to be a threat to public safety. Plaintiffs are concerned that this and other practices vitiate the 35-day requirement in the absence of evidence that cases are dismissed for violating the deadline.

There were certainly also examples of Deputy Commissioners sustaining objections or overruling them on sound bases and dismissing or amending charges for lack of competent evidence.[86] In order to satisfy due process, much more education and

guidance will be needed to ensure that these principles are more widely understood and practiced.

The Special Master and parties have seen remedial sanctions explicitly considered in hearings much more often than in the past, though documentation frequently omits mention of it. The bases for findings of good cause can be incomplete, both orally and in the written record.[87] The Board does routinely provide parolees a written record of the proceedings.

During the Round, there were an average of 2,370 revocation hearings handled each month, with timeliness numbers as follows.

| Timely: | 98% of known cases, the same as in the last Round[88] |
| Unknown: | 55%[89] |

Stated differently, this means that one can only verify that 44% of revocation hearings were timely;[90] the rest might or might not be timely.

The timeliness reflected in monitoring reports was 89%. Among the handful of cases late in that aggregate sample, only one was heard close to the deadline. Most were heard within two weeks after the timeframe, and two were further delayed.[91]

When looking at printouts of *all* open and closed cases together, the timeliness rate appears to be 51%,[92] indicating that the great majority of the unknown cases are untimely. The question, then, is whether those are justified by good cause, as Defendants indicate.

To assess this, Defendants review monthly all probable cause hearings and revocation hearings recorded as completed beyond timeframes.[93] A number of revocation hearings were determined not to have been late for one of several reasons: data entry errors, optional waiver cases heard timely after activation, interstate cases not subject to

*Valdivia* requirements, parolees returned from other states and seen timely after their reentry dates, not in custody hearings held not long after the 35-day timeframe, parolee waivers, and rehearings. In the latter case, it is troubling that a growing number of rehearings are necessary because of ineligibility for, or unavailability of, remedial sanctions. This may not be strictly a timeframe issue, as there has generally been a timely finding of probable cause, but is problematic for reasons discussed elsewhere in this report.

Among the completed cases, then, only 47 were late in a six-month period, with 11% missing by only a few days. About 30% were held after a very long period, as much as three weeks to more than four months late. This study did not include any open cases, a large proportion of cases at this step.

Reasons were only recorded in half of these cases. Most were single examples of a variety of problems. Delay for witnesses was one of the few repeated issues and took from one to three weeks after the deadline to be heard, as did operations obstacles.[94] A parolee refusal was rescheduled within four business days; parolee medical or mental health needs led to hearings held one and-one-half weeks to three months later. Where delay resulted from staff error, it was corrected quickly.[95]

Defendants' analysis, then, shows that less than 1/10% of completed revocation hearings were genuinely late during the Round. Open cases also carry the possibility of being late without good cause, and should also be examined in the future. While the lengthy time to hearing in some cases is problematic, the low frequency suggests excellent practice.

Other data reports show 750 postponed hearings during the Round, another possible source of information about delays and their reasons. This frequency of postponed hearings was cut almost in half from the preceding Round.[96] Some of these postponed hearings likely remain open, but the number of postponements being substantially higher than the number of late closed hearings suggests that many postponed hearings were rescheduled within timeframes.

The most frequent reasons were transportation issues (93; 1% of hearings), parolee request (165), and the need for other evidence (243; 3% of hearings).[97] A parolee request, of course, is good cause; transportation issues are not. It is heartening that postponements for other evidence, a potentially problematic practice, was reduced by *more* than half. While it is possible that these were generated by parolees, that was only clearly recorded in eight cases. When the state's witnesses are not present, exigent circumstances justify postponements, but only five entries reflected such unforeseeable delays. Otherwise, it does not appear proper for the state not to provide a final hearing under these circumstances.[98]

There were some issues with attorneys that may merit attention to whether systems need to be improved, or individual performance addressed; these included 51 occasions when the attorney was unavailable, was removed, had not obtained gate clearance, or had a conflict. These affected about ½% of the completed revocation hearings. CalPAP appropriately notes that, as with some other postponement reasons, exigent circumstances explain some cases and that fact is not captured in the categories of this data report. Those postponements that are cause for the greatest concern – rescheduling for arranging reasonable accommodation, Deputy Commissioner

unavailability, exceptions made for public safety -- were confined to a very small number of instances (each was six or fewer) in Defendants' report.[99]

In summary, the growing amount of information discernible about timeliness is consistent with Defendants' longstanding description that few revocation hearings are late and many of those are explained by good cause or alternative situations, which themselves are heard timely according to their alternate timeline expectations. For the known cases, timeliness is excellent. To the extent that numbers have improved, Defendants have not described any change in practices, so it is unclear whether the improvements were by design and, therefore, whether they are likely to be sustained. Additionally, as described above, several substantive practices are inadequately developed or practiced inconsistently, potentially undermining due process.

- On balance, then, performance on this requirement is adequate and progress is uncertain.

*By July 1, 2004, an assessment of availability of facilities and a plan to provide hearing space for probable cause hearings*

Defendants reported difficulty during the last Round in holding hearings in three county jails: San Joaquin, Kings, and Butte. They have continued with transporting parolees to other facilities for the hearings while negotiating other arrangements. In San Joaquin County, Defendants report the most recent development is an agreement to transport parolees to Deuel Vocational Institution for hearings.[100] Plaintiffs raise the concern of whether the additional distance to Deuel Vocational Institution would require the hearings to take place more than 50 miles from the alleged violation in some cases.