## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN, et al.

    Plaintiffs,

    vs.                            **No. CIV S-90-0520 LKK JFM P**

ARNOLD SCHWARZENEGGER, et al.

    Defendants


## NINETEENTH MONITORING REPORT OF THE SPECIAL MASTER ON THE DEFENDANTS' COMPLIANCE WITH PROVISIONALLY APPROVED PLANS, POLICIES AND PROTOCOLS

Matthew A. Lopes, Jr., Esq.
Special Master
PANNONE, LOPES & DEVEREAUX LLC
317 Iron Horse Way, Suite 301
(401) 824-5100
Fax: (401) 824-5123
July 25, 2008

{00051302 V 1}

## TABLE OF ABBREVIATIONS/ACRONYMS

| | |
|---|---|
| 3CMS: | Correctional Clinical Case Manager System |
| ADD: | Attention Deficit Disorder |
| ADHD: | Attention Deficit Hyperactivity Disorder |
| ADL: | Activities of Daily Living |
| AED: | Automatic Electronic Defibrillator |
| Ambu bag: | Ambulatory Bag Used for CPR |
| APP: | Acute Psychiatric Program at Vacaville |
| ASH: | Atascadero State Hospital |
| ASMHS: | Administrative Segregation Mental Health Services |
| ASP: | Avenal State Prison |
| ASU: | Administrative Segregation Unit |
| BLF: | Basic Life Support |
| BMU: | Behavioral Modification Unit |
| BPT: | Board of Prison Terms |
| C-file: | Central File |
| C & PP: | Clinical Policy and Programs |
| C&PR: | Classification and Parole Representative |
| CAL: | Calipatria State Prison |
| CAP: | Corrective Action Plan |
| CAT II: | Category II |

| | |
|---|---|
| CC I: | Correctional Counselor I |
| CC II: | Correctional Counselor II |
| CCAT: | Coordinated Clinical Assessment Team |
| CCC: | California Correctional Center |
| CCI: | California Correctional Institution |
| CCM: | Clinical Case Manager |
| CCPOA: | California Correctional Peace Officers Association |
| CCWF: | Central California Women's Facility |
| CDCR: | California Department of Corrections and Rehabilitation |
| CIM: | California Institutution for Men |
| CDCR: | California Department of Corrections and Rehabilitation |
| CEN: | Centinela State Prison |
| CIW: | California Institute for Women |
| CM: | Case Manager |
| CMC: | California Men's Colony |
| CMF: | California Medical Facility |
| CMO: | Chief Medical Officer |
| CO: | Correctional Officer |
| COR: | California State Prison/Corcoran |
| CPER: | Clinical Performance Enhancement and Review Subcommittee |
| CPR: | Cardiopulmonary Resuscitation |
| CRC: | California Rehabilitation Center |
| CSATF): | California Substance Abuse Treatment Facility |

CSH:                    Coalinga State Hospital

CSP/Corcoran:           California State Prison/Corcoran

CSP/LAC:                California State Prison/Los Angeles County

CSP/Sac:                California State Prison/Sacramento

CSP/Solano:             California State Prison/Solano

CTC:                    Correctional Treatment Center

CTF:                    Correctional Training Facility/Soledad

CTQ:                    Confined To Quarters

CVSP:                   Chuckawalla Valley State Prison

CYA:                    California Youth Authority

DAI:                    Division of Adult Institutions

DCHCS:                  Division of Correctional Health Care Services

DDP:                    Developmental Disabilities Program

DDPS:                   Distributed Data Processing System

DHS:                    Department of Health Services

DMH:                    Department of Mental Health

DNC:                    Death Notification Coordinator

DNR:                    Do Not Resuscitate

DOF:                    Director of Finance

DOT:                    Directly Observed Therapy

DRC:                    Death Review Coordinator

DRMC:                   Delano Regional Medical Center

DSM:                    Diagnostic and Statistical Manual

| | |
|---|---|
| DTP: | Day Treatment Program |
| DVI: | Deuel Vocational Institution |
| EOP: | Enhanced Outpatient Program |
| EPPD: | Earliest Possible Parole Date |
| EPRD: | Earliest Possible Release Date |
| ERDR: | Emergency Response and Death Review Committee |
| ERRC: | Emergency Response Review Committee |
| ERV: | Emergency Response Vehicle |
| ETV: | Emergency Transport Vehicle |
| FIT: | Focus Improvement Team |
| FOLSOM: | Folsom State Prison |
| GACH: | General Acute Care Hospital |
| GAF: | Global Assessment of Functioning |
| GP: | General Population |
| HCCUP: | Health Care Cost and Utilization Program |
| HCM: | Health Care Manager |
| HCPU: | Health Care Placement Unit |
| HCQMC: | Health Care Quality Management Committee |
| HDSP: | High Desert State Prison |
| HQ: | Headquarters |
| HS: | Hora Somni/Hour of Sleep |
| ICC: | Institutional Classification Committee |
| ICF: | Intermediate Care Facility |

| | |
|---|---|
| ICP: | Intermediate Care Program |
| ICU: | Intensive Care Unit |
| IDTT: | Interdisciplinary Treatment Team |
| IEX: | Indecent Exposure |
| IMHIS: | Inmate Mental Health Information System |
| INS: | Immigration and Naturalization Service |
| I/P: | Inmate/Patient |
| ISP: | Ironwood State Prison |
| IST: | In-Service Training |
| ISU: | Investigative Services Unit |
| KOP: | Keep on Person |
| KVSP: | Kern Valley State Prison |
| LLE: | Language Learning Enterprises |
| LOC: | Level of Care |
| LOU: | Locked Observation Unit |
| LOP: | Local Operating Procedure |
| LPN: | Licensed Practical Nurse |
| LPT: | Licensed Psychiatric Technician |
| LSW: | Limited Suicide Watch |
| LVN: | Licensed Vocational Nurse |
| MAR: | Medication Administration Record |
| MCSP: | Mule Creek State Prison |
| MDD: | Major Depressive Disorder |

| | |
|---|---|
| MHCB: | Mental Health Crisis Bed |
| MHOHU: | Mental Health Outpatient Housing Unit |
| MHS: | Mental Health Subcommittee |
| MHP: | Mental Health Program |
| MHQMS: | Mental Health Quality Management System |
| MHSDS: | Mental Health Services Delivery System |
| MHSPC: | Mental Health Suicide Prevention Coordinator |
| MHSR: | Mental Health Suicide Reviewer |
| MHTS: | Mental Health Tracking System |
| MOD: | Medical Officer of the Day |
| MOU: | Memorandum of Understanding |
| MPIMS: | Madrid Patient Information Management System |
| MSF: | Minimal Support Facility |
| NCF: | Normal Cognitive Functioning |
| NOS: | Not Otherwise Specified |
| MTA: | Medical Technical Assistant |
| NKSP: | North Kern State Prison |
| NVDRS: | National Violent Death Reporting System |
| OHU: | Outpatient Housing Unit |
| OIA: | Office of Investigative Affairs |
| OJT: | On the Job Training |
| OP: | Operating Procedure |
| OT: | Office Tech |

| | |
|---|---|
| PBSP: | Pelican Bay State Prison |
| PC: | Primary Clinician |
| PIA: | Prison Industry Authority |
| POC: | Parole Outpatient Clinic |
| POD: | Psychiatrist on Duty/Psychiatrist of the Day |
| PPE: | Personal Protective Equipment |
| PPEC: | Professional Practice Executive Committee |
| PSH: | Patton State Hospital |
| PSU: | Psychiatrist Services Unit |
| PSW: | Psychiatric Social Worker |
| PT: | Psychiatric Technician |
| PTSD: | Post Traumatic Stress Disorder |
| PVSP: | Pleasant Valley State Prison |
| QIP: | Quality Improvement Plan |
| QIT: | Quality Improvement Team |
| QMAT: | Quality Management Assessment Team |
| QMT: | Quality Management Team |
| QNC: | Quality Nurse Consultant |
| R&R: | Receiving and Release |
| RC: | Reception Center |
| RJD: | Richard J. Donovan Correctional Facility |
| RN: | Registered Nurse |
| RT: | Recreation Therapist |

| | |
|---|---|
| RVR: | Rule Violation Record |
| SAC: | California State Prison/Sacramento |
| SCC: | Sierra Conservation Center |
| SHU: | Security Housing Unit |
| SMTA: | Senior Medical Technical Assistant |
| SNF: | Skilled Nursing Facility |
| SNY: | Sensitive Needs Yard |
| SOAP: | Subjective Objective Assessment and Plan |
| SPRFIT: | Suicide Prevention and Response Focused Improvement Team |
| SPU: | Special Processing Unit |
| SQ: | San Quentin State Prison |
| SRA: | Suicide Risk Assessment |
| SRAC: | Suicide Risk Assessment Checklist |
| SRC: | Suicide Review Committee |
| SRN: | Senior Registered Nurse |
| SVP: | Sexually Violent Predator |
| SVPP: | Salinas Valley Psychiatric Program |
| SVSP: | Salinas Valley State Prison |
| TCMP: | Transitional Case Management Program |
| TTA: | Triage and Treatment Area |
| UCC: | Unit Classification Committee |
| UCSF: | University of California at San Francisco |
| UHR: | Unit Health Records |

| | |
|---|---|
| UNA: | Unidentified Needs Assessment |
| VSPW: | Valley State Prison for Women |
| VPP: | Vacaville Psychiatric Program |
| WSP: | Wasco State Prison |

{00051302 V 1}X

# TABLE OF CONTENTS

**TABLE OF ABBREVIATIONS**

**INSTITUTIONAL SUMMARIES**..................................................................4

**Service Area A**..............................................................................4

    California State Prison, Sacramento (CSP/Sac)..................................4

**Service Area D**..............................................................................9

    California Medical Facility (CMF)...................................................9

    San Quentin State Prison (SQ).......................................................19

    Deuel Vocational Institution (DVI)..................................................28

**Service Area E**..............................................................................36

    California State Prison at Corcoran (CSP/Corcoran)............................36

    Avenal State Prison (ASP)............................................................47

**Service Area G**..............................................................................55

    Wasco State Prison (WSP)...........................................................55

    Kern Valley State Prison (KVSP)...................................................62

    North Kern State Prison (NKSP)....................................................70

**Service Area H**..............................................................................80

    California State Prison, Los Angeles County (CSP/LAC)......................80

**Service Area I**...............................................................................90

    California Institution for Men (CIM)................................................90

**Service Area J**……………………………………………………………………97

    Richard J. Donovan Correctional Facility (RJD)……………………….............97


**Service Area L**…………………………………………………………………105

    Valley State Prison for Women (VSPW)………………………………………105

**SUMMARY**………………………………………………………………………113

**RECOMMENDATIONS**………………………………………………………...129

**EXHIBITS**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN, et al.
    **Plaintiffs,**

      **vs.**                   **No. CIV S-90-0520 LKK JFM P**

ARNOLD SCHWARZENEGGER, et al.
    **Defendants.**

## NINETEENTH MONITORING REPORT OF THE SPECIAL MASTER ON THE DEFENDANTS' COMPLIANCE WITH PROVISIONALLY APPROVED PLANS, POLICIES AND PROTOCOLS

      This report covers the monitor's nineteenth round review of the California Department of Corrections and Rehabilitation's (CDCR's) compliance with the revised Program Guide approved by the court in March 2006. Unlike the preceding monitoring period which covered all 33 CDCR institutions, this report covers only the 13 institutions that were visited by the monitor.[1] These institutions are Avenal State Prison; California Institution for Men; California Medical Facility; California State Prison, Corcoran; California State Prison, Los Angeles County; California State Prison, Sacramento; California State Prison, San Quentin; Deuel Vocational Institution; Kern Valley State Prison; North Kern State Prison; Richard J. Donovan Correctional Facility; Valley State Prison for Women and Wasco State Prison. No institutions in services areas B, C, F, or K were visited. The other 20 CDCR institutions were monitored by means of a paper

---

[1] The data collected and findings discussed in this report are the product of many members of different monitoring teams, but references to various monitors throughout the report shall be singular rather than plural. Clinical judgments of the monitor's psychiatric experts are explicitly attributed to an expert.

review, which required each of those facilities to file documentation on its compliance with the local corrective action plan and other issues of special focus in this monitoring period.

The dynamic conditions surrounding CDCR that were described in the Special Master's Eighteenth Monitoring Report largely carried over into the nineteenth round. Although staffing of mental health positions in the prisons remained a challenge for the defendants, there were preliminary signs of improvement in this area as the overall mental staffing vacancy rate dropped from 50 percent to 43 percent in the 13 visited institutions. The department expanded its already extensive use of contracted workers to cover unfilled allocations, particularly in psychiatry and social work.

Difficulties with access to higher levels of care and mental health crisis beds continued from the preceding monitoring period. The defendants submitted a revised mental health long-term bed plan that promises dramatic change. It calls for an overhaul of the mental health care delivery system that would have CDCR assume responsibility for direct care of caseload inmates in need of acute or intermediate inpatient care, who have been treated heretofore by the Department of Mental Health (DMH). In September 2007, the special master filed his report on the bed plan, in which he recommended approval of the plan, with further development and refinement.

As in the preceding monitoring period, review here focused on mental health staffing levels, quality management, suicide prevention, medication management, use of mental health assessments for use in the discipline of sexual misconduct violations and access to higher levels of care.

Institutional administrators and mental health staff at the 13 visited institutions continued to cooperate fully with the monitoring process. As in earlier rounds, plaintiffs' and defendants' counsel accompanied monitoring staff during several of the site visits.

The general format of this report includes a summary of compliance for each institution, with discussion on its performance in each of certain areas of focus.[2] The arrangement of the institutional summaries corresponds with defendants' regional service areas, which typically include a hub institution with a Mental Health Crisis Bed (MHCB) unit for inmates in crisis who need short-term intervention and stabilization and an intensive residential Enhanced Outpatient Program (EOP). The service areas also include anywhere from one to four facilities, each of which has a Correctional Clinical Case Management System (3CMS) program in the general population. The report concludes with a comparative analysis of compliance by focus area in the13 visited institutions, followed by a section for recommendations derived from the analysis.

The monitor's experts compiled numerous case reviews based on interviews with inmates and clinicians and chart reviews or a combination of all three, which are included as exhibits to this report. A total of 136 case reviews from 13 institutions are attached to this report. These case reviews are redacted to protect the privacy of inmates.

---

[2] Since the distribution of this Report in draft form, it has been edited for grammatical and punctuation corrections which do not affect the content of the draft Report.

## Institutional Summaries
## Service Area A

### California State Prison, Sacramento (CSP/Sac)
March 5, 2007 – March 8, 2007

Census:

CSP/Sac's overall census was 3,137, of which 1,377 inmates were participants in the MHSDS. There were 352 mainline EOP inmates, and an additional 102 EOP inmates in administrative segregation. There were 178 inmates in the Psychiatric Services Unit (PSU). There were 628 mainline 3CMS inmates and an additional 78 in administrative segregation.

Staffing:

CSP/Sac's clinical vacancy rate remained at 37.8 percent with 102.83 of its 271.87 allocated Mental Health Services Delivery System (MHSDS) positions vacant. Contractors covered the equivalent of 24 full-time psychiatrists, psychologists, psychiatric social workers, and psych techs. Vacancies, excluding those in the correctional treatment centers (CTCs), were generally spread evenly throughout the various mental health programs by re-direction of staff. In light of CSP/Sac's swelling EOP population and high staff vacancy rate, staff was unable to provide consistently planned services in accordance with Program Guide requirements. For example, 3CMS inmates were generally being seen every 120 days and only six hours of scheduled structured therapeutic activities per week were being offered to general population EOP inmates.

The chief psychiatrist and chief psychologist positions were filled. The institution had recently been allocated an additional senior psychiatrist position, which

was filled. An eighth senior psychologist position had been allocated, and all eight

positions were filled. Thirteen of the 20.5 staff psychiatry positions, or 63 percent, were

vacant.

      While the three senior psych tech positions were filled, 31.73, or 43

percent, of the 73 staff psych tech positions were vacant.

      Of the 64.83 allocated case manager positions, 30.83, or 48 percent, were

vacant. Half of the 43.83 allocated clinical psychologist positions were vacant, as were

nine, or 43 percent, of the 21.0 staff psychiatric social worker positions.

      Three of the 45.04 Registered Nurse[3] (RN) positions were vacant and none

of the Supervising Registered Nurse II (SRN II) positions were vacant. Of the 11.15

recreation therapist positions, 5.15 were vacant.

Quality Management:

      There was a very good structure in place for the quality management

process, including good working relationships between custody and mental health staff.

The quality management committee and mental health subcommittee were functioning

according to guidelines. The mental health subcommittee minutes were well kept, the

---

[3] Defendants have requested that the special master share the various references to nursing in the
Nineteenth Monitoring Report with the Plata receiver. They cite a letter from the receiver dated February
16, 2007, announcing that the receiver exercised management and control over the nursing function in
CDCR institutions. The special master has routinely shared Coleman monitoring reports with the receiver,
and produced the draft Nineteenth Monitoring Report to him on June 17, 2008, shortly after the draft had
been distributed to the Coleman parties. It is also noteworthy that the nineteenth round institutional site
visits took place from March to May 2007, shortly after the receiver's announcement had been issued.
During that period, the process of transitioning the management of nursing to the receiver was getting
underway, but was still largely under Coleman jurisdiction for oversight. There was some ambiguity
concerning which nurses were under the receiver's management, and which remained under CDCR's
control. In addition, much of the institutional nineteenth monitoring period data that was produced to the
Coleman monitors had been covered and had been gathered during the period prior to the receiver's
announcement. Accordingly, oversight of mental health nursing functions remained within the scope of
Coleman monitoring during the nineteenth round, and was appropriately covered in the Nineteenth
Monitoring Report.

subcommittee had an extensive agenda and the meetings were well attended. However, the local governing body had not met during the past two quarters. Multidisciplinary quality improvement teams (QITs) were active and addressed substantive mental health issues. Audits were done following completion of QITs but not on a routine basis.

Suicide Prevention:

The suicide prevention and response committee met monthly and maintained minutes of all its activities. Custody staff attendance had improved, but attendance by nursing staff remained problematic.

The institution was non-compliant with requirements for the provision of five-day clinical follow-up of suicidal inmates discharged from MHCB units or Mental Health Outpatient Housing Units (MHOHUs). Accurate monitoring of the issue remained problematic due to incomplete data collection.

The plan to reduce suicides in administrative segregation was partially implemented. Staff informed the monitor that there had not been any increase in out-of-cell time offered to inmates in administrative segregation despite the recent reduction of group activities. Mental health services were reduced and only limited property was allowed for EOP inmates in administrative segregation.

Thirty-minute welfare checks were occurring at staggered intervals for inmates in administrative segregation.

Medication Management:

Audits found that inmates consistently received medications on arrival and after new orders were written, but staff reported that interruptions continued for inmates arriving from other CDCR institutions. The institution was partially compliant in

avoiding interruptions of medications upon transfers to other living units within the facility.

Follow-up of medication noncompliance also remained problematic, particularly in those elements that involved psychiatry, with a compliance rate below 80 percent. Staff documentation of no-shows or refusals of medication also remained a problem.

Progress notes from prescribing physicians to support new, changed or discontinued medication orders were often missing. A staff audit indicated that CSP/Sac obtained informed medication consent forms, but the audit was methodologically flawed.

Audit results showed that the provision of appropriate laboratory tests for inmates on mood stabilizers was erratic. All EOP/PSU inmates continued to receive psychotropic medications via direct observation therapy (DOT). In addition, another 14 inmates were receiving medications via DOT for other clinical reasons. Failure to comply with timeframe requirements caused some Keyhea orders to lapse. The institution reported that 390 inmates were on HS (hour of sleep) medications.

Mental Health Assessments for Use in the Discipline of Sexual Misconduct Violations:

CSP/Sac continued to have problems related to compliance with directives on obtaining mental health input in the processing of rule violation reports (RVRs) for sexual misconduct. During November 2006 to February 2007, 46 inmates were charged with sexual misconduct. At the time of the monitor's visit, 29 inmates had been screened, and 20 of those 29 had received a subsequent Interdisciplinary Treatment Team (IDTT) meeting. Of these, two had been diagnosed with exhibitionism, and one was awaiting a comprehensive evaluation.

CSP/Sac reported that it lacked the resources to provide appropriate treatment for inmates diagnosed with exhibitionism. The institution was also unable to locate documentation in the Uniform Health Records (UHRs) of two inmates who had been diagnosed with exhibitionism.

Transfers:

Access to higher levels of care was poor. During the review period, there were 17 transfers from the MHCB level of care to the DMH. Of 31 inmates referred between October 14, 2006 and February 28, 2007 to the DMH acute care unit at California Medical Facility (CMF), 13, or 42 percent, were actually transferred. These transfers took between one and 25 days following referral. CSP/Sac reported that two referrals were rescinded.

Referrals were made to DMH's Salinas Valley Psychiatric Program (SVPP), but few transfers occurred. From October 14, 2006 to February 28, 2007, the institution referred eight inmates to SVPP. Six inmates were clinically accepted, but the log indicated that one was transferred.

There were no referrals to Atascadero State Hospital (ASH) from October 14, 2006 to February 28, 2007.

The MHCB units and the MHOHU had a combined capacity of 39 beds, with all three generally at or near full capacity. At the time of the monitor's visit, there were 20 MHSDS inmates in MHCBs at CSP/Sac. From October 2006 to February 2007, there were 189 admissions to the MHCB, with lengths of stay ranging from one to 49 days. The institution reported that 30 inmates had two or more MHCB admissions during the monitoring period.

From October 2006 to February 2007, there were 426 admissions to the MHOHU at CSP/Sac. Lengths of stay ranged from a half-day to 36 days, with 232 admissions, or 54 percent, lasting three days or less. Seventy-one inmates were admitted to the MHOHU two or more times during the period. There were 19 inmates in the MHOHU at the time of the monitor's visit.

Other CAP Issues:

CSP/Sac did not meet the requirement for offering a minimum of ten hours weekly of scheduled structured therapeutic activities for EOP inmates in either the general population or in administrative segregation. The institution reported that administrative segregation EOP inmates were offered an average of 7.3 hours per week between October 30, 2006 and February 2, 2007. Weekly case manager contacts with both EOP and 3CMS administrative segregation inmates were occurring, and occasionally inmates received more frequent contacts.

The PSU was nearly full, with a census of 178 and a capacity of 192. IDTT meetings were scheduled every 120 days. Psychiatric contacts were routinely conducted at cell front.

The institution was non-compliant with requirements for 3CMS treatment in that group treatment was not made available to 3CMS inmates. Only 3CMS inmates transitioning from the EOP to the 3CMS level of care were provided with group treatment.

### Service Area D

### California Medical Facility (CMF)
April 17, 2007 – April 19, 2007

Census:

In April 2007, the census at CMF stood at 3,066. There were 1,206 inmates on the mental health caseload, which made up 39 percent of the institutional census. The institution's EOP population stood at 525 or 93 percent of its newly rated capacity of 562. This number reflected a 19 percent decline in the size of the EOP caseload in the past nine months. The number of EOP inmates in administrative segregation was cut in half, falling from over 70 to 33 since January 2007. CMF held 220 3CMS inmates in administrative segregation.

The size of the 3CMS population remained stable, but well over its rated capacity of 500. There were 673 3CMS inmates, including 161 housed in Unit IV (the HIV unit), 45 in administrative segregation, and 31 in medical beds, with the remainder dispersed throughout the general population.

As previously reported, two wings formerly used by CMF, P-2 and P-3, were given over to DMH to expand the number of intermediate care beds accessible to inmates classified at security levels III and IV. Each wing had a capacity of 32 to 36. P-2 opened and began accepting patients on January 25, 2005, and P-3 opened and began accepting patients on June 20, 2007, for a total of 66 intermediate care beds.

Construction of a new 50-bed CTC was reportedly on schedule for completion by the end of 2007. Staff reported CMF's request to fund a task group that

would develop a staffing package and policies and procedures for the CTC was included in the May 2007 revised budget, which was pending in April 2007.

Staffing:

CMF's overall vacancy rate among mental health staff was largely unchanged. In April 2007, 42.14 of 151.39 allocated positions were unfilled, yielding a vacancy rate of 28 percent. Managers reported that higher salaries noticeably improved CMF's ability to attract mental health, pharmacy and nursing staff.

Six of the mental health department's 20 supervisory positions were vacant. Nearly all psychiatry positions were filled with CDCR employees or covered by contractors. Among staff psychiatrists, 2.75 of 12.5 allocated positions were vacant, with contractors covering the equivalent of 2.3 positions during January and February 2007. Roughly one third, 16.5 of 51, allocated psychologist and social worker positions were vacant, with contractors covering the equivalent of 12 positions during January and February 2007. Twenty of 21.97 psych tech positions were filled.

Nearly all mental health nursing positions assigned to the mental health department, nine of 11.62, were filled. Among all other RNs in CMF, 74.55 of 76.70 allocated positions were filled, as were all 11 SRN II and SRN III positions. Two of 6.8 allocated recreation therapist positions were filled.

In connection with a statewide directive to convert all medical technical assistant (MTA) positions to RN/licensed vocational nurse (LVN) positions by June 1, 2007, most of CMF's 60-odd vacant MTA positions were filled by contract LVNs and RNs, with the remaining 33 occupied positions slated to be filled by nurses by the deadline. In April 2007, 33 of 93.08 MTA positions were still occupied and 11 of 34.30

newly allocated LVN positions had been filled. Staff reported that the transition from MTAs to LVNs/RNs had created problems with the administration of medication, as described below.

Quality Management:

There was no appreciable change in the quality management process between January and April 2007. The equivalent of nearly two full-time positions was devoted to developing processes and auditing performance indicators. Audits covered a wide range of issues, addressed both quantitative and qualitative questions and were informative.

As previously reported, the mental health quality management committee met monthly. Meetings of the mental health subcommittee were not consistently attended by custody staff, although they actively participated in QITs and attended other meetings at which quality management issues were addressed. QITs were chartered and their activities were documented.

The disciplines of psychiatry and psychology continued to engage in peer review. Peer review was documented. Aside from peer review, which was narrowly focused, few members of the staff who were direct care providers participated in QITs. The quality management process was a useful management tool, but it did not serve as an avenue by which treatment providers could bring problems to the attention of higher levels of authority.

Suicide Prevention:

CMF's suicide prevention focus improvement team (SPRFIT) met monthly, save for one month when the meeting was cancelled. Minutes were kept and

agendas covered all required areas, as well as addressing a number of local suicide

prevention issues, including suicide attempts, self-injuries and practices that were

introduced recently to reduce the risk of suicide in administrative segregation.

Suicide prevention measures continued to focus on inmates returning from

DMH. DMH staff complied with CMF's request to complete a suicide risk assessment

checklist (SRAC) before discharging inmates to CMF. Staff audits found that all clinical

follow-ups and custody observations were made, but some signatures documenting

officers' observations were missing. Contrary to policy, following their discharge from

DMH, inmates were not housed in designated locations in order to facilitate five-day

follow-up and custody observations.

The suicide prevention committee did not address a long-standing

problem. Valid risk assessments were difficult to do when inmates were interviewed on

an urgent or emergency basis regarding risk of self-injury or suicide. As a matter of

standard procedure, suicide risk assessments precipitated by staff referrals, as well as

mental health screenings conducted prior to placement in administrative segregation,

were done in the B-1 clinic, which lacked a confidential interview area. Inmates were

assessed within view and earshot of all passersby, and conversation was typically

difficult due to high a noise level and a constant stream of traffic. These problems were

experienced daily by mental health clinicians.

Medication Management:

CMF provided audit results relevant to several areas of medication

management including, medical records, nursing and mental health. Audit results

regarding medication continuity showed that in January and February 2007, inadvertent

expirations of medication orders of caseload inmates were rare. CMF's location-specific audit process readily identified lapses and enabled supervisors to correct errors. A one-day audit that examined medication continuity for intra-institutional transfers sampled 30 cases that had a total of 239 medication orders. Results of that audit indicated that the day following transfer, 47 orders were not administered.

Staff reported that phasing out MTAs and training issues associated with new staff and contractors hampered medication management. For example, staff reported that availability of medication carts were irregular, and many were organized to suit individual distributors' preferences rather than in a standardized fashion. Medication carts ran on irregular schedules and continued to interrupt group treatment in the EOP units in unanticipated ways. For instance, more inmates spent more time locked in cells in connection with medication passes. Interruptions to group treatment varied by location of the unit. Groups that were shortened by medication passes or other events were counted as having been held.

CMF's noncompliance referral mechanism did not work as intended. A QIT was chartered, but it did not ameliorate the problem. Lack of sustained interdisciplinary collaboration appeared to be one stumbling block. A staff audit found that 3CMS inmates who were non-compliant were not seen within seven days. According to a February audit, the time it took for referrals made by MTAs to reach mental health staff increased from three to five days.

CMF had 913 orders for HS administration of medication. A memo had recently been circulated to all health care providers reminding them that HS orders were to be administered after 8:00 p.m.

Peer review in psychiatry meshed with selected aspects of medication management, including procurement of informed consent, documented rationales when polypharmacy was used, consistency between target symptoms and medication orders and matching medication classes with diagnoses. Audit results that were available were limited to a sample of 94 medical records of 3CMS inmates who resided in a specialized housing unit. According to an audit that examined four indicators, written informed medication consent was obtained in 90 percent of cases and a documented rationale for the use of polypharmacy was present in 80 percent of relevant cases. Rates of compliance exceeded 90 percent on the matches between target symptom and medication, and between diagnosis and medication class.

CMF staff continued to facilitate the work of transitional case management program (TCMP) staff, although they confessed that some of the information conveyed during group discharge planning sessions, such as telephone numbers and addresses of community resources, was inaccurate. Inmates who had recently come to CMF from another prison were not necessarily on lists used by TCMP counselors.

<u>Mental Health Assessments for Use in the Discipline of Sexual Misconduct Violations</u>:

Forty RVRs for indecent exposure were issued to 14 inmates between October 1, 2006 and April 6, 2007. Three quarters of the RVRs were issued to inmates in treatment at DMH. Just three inmates accounted for 65 percent of the incidents. One inmate incurred 13 RVRs for indecent exposure. A second inmate incurred eight, and a third inmate incurred five. DMH referred all inmates who incurred RVRs while there to CMF clinicians for completion of screenings for exhibitionism and for subsequent review

by an IDTT. Staff reported that the protocol requiring prompt screening and subsequent review by an IDTT was followed properly in the few instances of indecent exposure that occurred at CMF.

A psychologist at CMF completed five mental health evaluations during the covered period. Two inmates at CMF were diagnosed with exhibitionism and were in individual treatment that focused on reduction of sexually inappropriate behavior. Cases of indecent exposure were routinely referred to the district attorney.

Transfers:

At the time of the monitor's visit, the waiting list for acute care stood at 42. DMH's plan to meet the demand for crisis beds by mixing acute care and crisis bed inmates in two wings had not worked as intended. Staff requested permission to revamp. Several problems associated with the combined units had become apparent. First, the LOC provided did not vary according to clinical need or inmate status. Due to stringent custody procedures, the treatment provided was more similar to crisis care than acute care. There was little out of cell clinical contact or treatment, virtually no other out of cell activity, and severe restrictions on personal property were in effect. Despite these constraints, in many instances, length of stay was measured in weeks rather than days. Inmates admitted for crisis care were re-designated as being in acute care once their stays exceeded ten days. Few inmates with extended stays were transferred to wings that would have afforded them access to actual acute care.

Access to acute and intermediate inpatient care, which in some ways hinged on access to MHCBs, remained problematic overall but may have improved in one respect. In contrast to earlier practices, DMH staff considered discharging inmates in

MHCBs to intermediate care or the day treatment program. As previously reported, access to day treatment and intermediate care beds by inmates with certain medical conditions, or with mobility factors, was blocked.

At the time of the monitor's visit, wing S-1 had 25 beds designated as MHCBs that were open to admissions statewide; the remaining five beds in the wing were designated for acute care. On wing S-2, 20 of 30 beds were reserved for MHCB referrals from CMF; the remaining ten beds were designated for acute care.

Access to crisis beds remained problematic. Data provided by DMH and CMF regarding the use of crisis beds and admissions to higher levels of care were inconsistent. There were indications that there were lacunae in the communication between CMF and DMH staff. CMF staff continued to report that inmates were returned to the EOP level of care prematurely from DMH. During the monitoring period, there were four instances in which inmates sent by CMF for crisis care were returned by DMH within 24 hours. On the first day of the monitor's visit, DMH administrative staff announced that the practice of admitting CMF inmates to MHCBs for a 23-hour evaluation period was discontinued. A corresponding memo directed that all cases were to be reviewed for referral to intermediate care or day treatment, and decisions to discharge inmates from crisis beds were to be made by a treatment team.

CMF reported that six inmates were awaiting transfer to a PSU; four of them were at DMH. Two had languished on an endorsement list for seven weeks.

Other CAP Issues:

There were 33 EOP and 46 3CMS inmates in administrative segregation, congregated in several wings. Psych tech rounds were made daily and case manager

contacts were made weekly with few exceptions. In most wings, case manager contacts were made in a confidential setting. Roughly half of the 3CMS inmates did not have confidential meetings due to lack of space, lack of escorts, and scheduling conflicts. EOP inmates interviewed in administrative segregation reported that they were seen in a confidential setting weekly by a case manager and monthly by a psychiatrist. They also reported that psych techs made rounds daily, IDTT meetings were held quarterly and group treatment amounting to six to ten hours per week was offered to them. On the whole, they were satisfied with the mental health treatment they received with the exception of group treatment sessions attended by inmates with wide-ranging levels of functioning.

A shortage of treatment space and schedule conflicts remained obstacles to the delivery of mental health treatment at CMF. Staff continued to monitor the amount of treatment provided to EOP inmates closely. Tallies were more accurate than in the distant past and made useful comparisons possible, but the method resulted in an over-count of the amount of treatment actually received, as opposed to scheduled. However, at least ten hours of therapeutic activities were offered to nearly all EOP inmates each week. In some units, the amount of treatment offered was well over ten hours per week. The EOP as a whole remained an isolated self-contained unit. A small number of EOP inmates were permitted to leave their wing to attend religious services or report to work, but most were confined to their housing area. EOP inmates were not permitted to use the gym. In one EOP unit, inmates had not been allowed out for morning yard during the two weeks prior to the monitor's visit.

Clinicians cited disruptions associated with the arduous, time-consuming

process of gaining access to crisis beds and premature returns from crisis beds as two impediments to the provision of adequate treatment in the EOP. In the general population EOP wings, individual case manager contacts were at times limited to a cursory check-in and held in an office in which other staff was working. The kind of treatment provided continued to be driven more by location and cell assignment than by individual clinical factors, rendering the level of functioning largely irrelevant. Case managers attempted to offer specialty groups that addressed certain issues and were tailored to particular levels of functioning, but the sum total of those ad hoc efforts was small, as they were most vulnerable to being compromised by environmental pressures. IDTT meetings were held timely.

Regarding 3CMS treatment provided to inmates in general population, staff audits found that initial mental health evaluations, IDTT meetings, and treatment plans were all completed within the required time frames. Individualized treatment planning remained a focus of improvement. An IDTT meeting that was observed was attended by a full team, including the inmate. Multidisciplinary discussion took place and the meeting fulfilled its purpose.

The amount of group treatment offered to 3CMS inmates increased during the monitoring period. At the time of the monitor's visit, nearly 200 inmates were enrolled in a total of 16 treatment groups; the wait list stood at 75. Staff reported that during the previous three months, a total of 278 3CMS inmates participated in group treatment. As previously reported, the quality of individual treatment sessions was compromised by lack of suitable treatment space for individual contacts and by scheduling difficulties. Some IDTT meetings were truncated by scheduling demands.

Individual contacts were frequently made in unsuitable locations under poor conditions.

Audits done by staff found that routine referrals regarding inmates in the general population, including 3CMS inmates, elicited a clinical contact within one to five days.

### California State Prison, San Quentin (SQ)
April 10, 2007 - April 12, 2007

Census:

SQ's census on March 31, 2007 was 5,219. On April 5, 2007, 913 inmates were on the mental health caseload. The reception center (RC) housed 375 3CMS and 26 EOP inmates. There were 245 3CMS and two EOP inmates in the mainline. Administrative segregation contained 425 inmates including 26 EOP and 107 3CMS inmates. There were nine 3CMS and four EOP inmates in the OHU. Among the 614 condemned inmates, 105 were treated at the 3CMS level of care and 14 were designated EOP.

Staffing:

SQ continued to struggle with a high vacancy rate among mental health positions and heavy reliance upon contractual staff. Staff at SQ reported that 52 percent, or 41.6 of 79.6, mental health positions were vacant in April 2007. Contractors covered the equivalent of 18.5 mental health positions, reducing the functional vacancy rate to 29 percent. Three of the four allocated supervisory psychiatry positions were vacant. All six allocated supervisory psychology positions were filled.

The monitor noted that there was a substantial lack of adequate office space for the current mental health staff.

Of the nine allocated staff psychiatrist positions, six, or 67 percent, were vacant. Contractors covered two of these vacancies, resulting in a functional vacancy rate of 44 percent. Of the 39 staff psychologist positions, 21, or 54 percent, were vacant. Contractors covered 13 of these positions, resulting in a functional vacancy rate of 21 percent.

There were five allocated psychiatric social worker positions, of which two, or 40 percent, were vacant. Contractors covered one half-time position, reducing the functional vacancy rate to 30 percent.

The senior psych tech position was vacant. With 15.6 allocated positions and 8.6 vacant, there was a 55 percent vacancy rate among psych techs. Contractors covered three psych tech positions, reducing the functional vacancy rate among psych techs to 36 percent.

SQ reported that one of the two allocated mental health RN positions was vacant. The health program specialist position and the three allocated recreational therapist positions were also vacant.

<u>Issues Resolved:</u>

A formal procedure for the mental health screening of inmates newly admitted to the administrative segregation unit was in place at SQ. The quality improvement process at SQ regained a level of usefulness and functionality. The institution remained compliant in the area of outpatient housing unit (OHU) care, and the OHU staff at SQ contacted outside MHCB staff at other prisons in order to initiate and expedite transfers.

Quality Management:

   The mental health quality management subcommittee met weekly and was comprised of representatives from mental health, nursing and custody staff. Custody attendance at the mental health program subcommittee was not consistent. There were 13 active QITs. Ten audits were done.

   Professional development was facilitated by monthly lectures on relevant mental health topics by guest speakers from various institutions in the Bay Area. Quality management assessment teams (QMAT) were in the process of obtaining accreditation to become continuing education providers.

   The quality improvement process was hampered by the lack of a functioning institution-wide quality management committee (QMC). Its meetings had been suspended for several months due to implementation issues in connection with Plata v. Schwarzenegger, No. C01-1351 T.E.H., (N.D. Cal.).

   SQ reported that peer review had been reinstituted in December 2006 for psychologists and psychiatric social workers.

Suicide Prevention:

   Custody attendance remained problematic at the suicide prevention committee meetings. In general, staff attendance was poor despite a mandatory attendance requirement for a wide variety of staff. Meeting agendas did not conform to past headquarters' directives, and the minutes of the suicide prevention committee were substantively thin.

   Since the formation of a QIT, clinical five-day follow-up of suicidal inmates discharged from the OHU or returned from a MHCB elsewhere improved, and

current audits indicated that clinical practice was consistent with <u>Coleman</u> Program Guide expectations. Audit results showed that custody observations of suicidal inmates discharged from the OHU or returned from MHCBs remained problematic.

Staff reported that they had implemented suicide reduction practices in administrative segregation. Intake cells were designated. Psych techs made daily rounds and conducted mental health screenings in a confidential setting. Weekly case manager contacts were made, and the proportion made at cell front increased. Mental health contacts with inmates in the administrative segregation, condemned, and adjustment center areas continued to be impeded primarily by custody constraints, but also by frequent inmate refusals.

Without an increase in escort staffing, the increased number of group sessions placed a greater burden on custody for escort assistance. As a result, some groups started late or ended early. SQ implemented new procedures to improve response to referrals of inmates in administrative segregation, but an audit of the new procedure was incomplete at the time of the site visit.

The availability of yard time for EOP inmates in administrative segregation remained below ten hours per week despite the institution's re-examination of walk-alone status for all EOP administrative segregation inmates. EOP inmates in administrative segregation received six hours per week of unstructured recreational time in the walk-alone yards, an improvement since the preceding visit.

The institution reported that it had implemented mandated suicide prevention procedures in administrative segregation.

Medication Management:

SQ's medication management system remained deficient. Medication interruptions continued to follow intra-facility transfers of inmates. Partial compliance with requirements for follow-up of medication noncompliance was achieved. Inadequately documented medication administration records (MARs), as well as the process for the approval and distribution of non-formulary drugs, sometimes impeded mental health operations.

Medication administration records were inadequately documented. There were also problems with administration of medications, including those prescribed pursuant to a Keyhea order.

Twenty-nine additional LVNs had been hired to replace MTAs, resulting in some problems with the transition, particularly in the area of bus screening. Coordination between mental health staff and nursing staff was encountering some difficulties.

The institution reported problems with its procedure for providing a supply of discharge medication to paroling inmates. Nevertheless, there was progress in SQ's structure for the provision of discharge planning. During the site visit, psychologists and psychiatric social workers provided assistance to inmates in several aspects of pre-release planning, although overall release planning had not yet evolved into a systematic and structured activity. Mental health staff reported great difficulty in obtaining viable and useful dates for releases.

Mental Health Assessments for Use in the Discipline of Sexual Misconduct Violations:

SQ had completed and was awaiting final approval of a local operating procedure (LOP) to deal with instances of sexual misconduct. It had established a database to track the date of the incident, the charge, mental health referral, assignment, and completion of evaluation. Six sexual misconduct screenings had been conducted, with one inmate identified as meeting the criteria for exhibitionism. An inmate sexual misconduct QIT was developing a 12-week treatment protocol for inmates who elected to participate in a treatment program.

Transfers:

The institution experienced problems with a lack of access to DMH intermediate inpatient care and delays in transfers to acute inpatient care. From October 2, 2006 to April 10, 2007, there were four referrals to acute care, one to intermediate care and one to the DMH day treatment program at CMF. The four referrals to acute care were transferred within six to 59 days after referral. Their returns occurred from 20 to 111 days after their transfers to acute care. Three of these inmates had already been returned to SQ at the time of the monitor's visit, but two of them were returned at the EOP level of care. The fourth inmate paroled prior to his return. DMH's acceptance of the inmate referred to intermediate care was rescinded because of cutbacks in acceptances to ASH. The inmate referred to CMF was accepted and transferred within six days of referral.

Referrals to MHCBs were not timely, but once accepted, staff was diligent in effectuating transfers. SQ was in desperate need of access to an intermediate inpatient level of care for condemned inmates. However, current regulations only allowed condemned inmates to go to DMH/APP at CMF.

From September 2006 through February 2007, there was an average of 73 OHU placements per month. Thirty percent of the inmates who were placed in the OHU remained there beyond three days, and ten percent remained in the OHU beyond four days. An average of more than one contact per day by a psychiatrist and/or psychologist occurred for OHU inmates. One inmate was in the OHU for 125 days because of a series of court hearings; this inmate was in need of out-of-cell time. (See Exhibit C, Case Review No. 2).

Audits conducted on March 23, 2007 indicated that, in the reception center's south block housing units, no inmates were held in holding cells for more than four hours. However, there were reports of inmates who had threatened self-harm being handcuffed or placed in waist restraints while in holding cells. Audits also reflected sometimes improper review, retention and/or archiving of holding-cell logs.

Other Issues:

In the reception center, the evaluation and assessment of arriving inmates and the subsequent clinical management of inmates placed in a level of mental health care were functionally separated. A computerized management information system enabled SQ to schedule and track new arrivals with reasonable efficiency as they went through psychological screening and evaluation in reception. Lack of sufficient office space continued to be a problem.

On April 12, 2007, of 368 3CMS inmates in reception, 72 had been at SQ for 90 days or longer. On April 4, 2007, SQ reported that 64 3CMS inmates had been endorsed and were awaiting transfer to various programs, including facilities with SNY programs; some had been endorsed as far back as August 2006. Thirty of the endorsed

3CMS inmates were awaiting transfer to programs with SNY yards. Of 34 audited 3CMS inmates, 11 were assigned a clinician more than 30 days after their level of care placement. Of 3CMS inmates in reception over 90 days, ten of these 11 inmates had not received a timely follow-up case management contact.

On April 9, 2007 there were 24 EOP inmates in reception. At the time of the monitor's visit, four reception EOP inmates had been endorsed to CMC, CMF, and MCSP. Treatment problems for EOP inmates in reception were exacerbated by frequently inadequate clinical progress notes in UHRs and/or data entries in the MHTS.

SQ scheduled weekly IDTT meetings for EOP reception center inmates. An observed IDTT meeting was well attended, but staff needed a clearer understanding of their roles in these meetings, and supervisors needed to monitor more closely IDTT proceedings to ensure that expectations were met. Weekly contacts were provided. Psychotherapeutic groups for reception EOP inmates commenced on February 5, 2007. The institution exceeded minimum required clinical therapeutic activities.

In the adjustment center, clinical access to mental health treatment of inmates was problematic due primarily to custody staffing issues. EOP inmates in administrative segregation and the condemned men's unit were offered less than ten hours per week of structured therapeutic activities due to physical plant limitations and escort issues. While 9.8 hours of out-of-cell activities were scheduled in administrative segregation, only 8.6 hours were actually offered and just 3.7 hours were received. Weekly case manager contacts occurred in 90 to 95 percent of cases, but approximately half of them were cell-front due to lack of escort officers or space.

Required IDTT meetings occurred in administrative segregation, but needed improvement in clinical quality.

Problems also prevailed in the condemned men's unit. There were seven EOP inmates in the condemned men's unit. Although scheduled and offered a total of 11.5 hours per week of structured out-of-cell therapeutic activities, these inmates received only 1.7 hours per week of out-of-cell time. Reportedly, refusals were high because these inmates expressed doubt about any possible benefit in light of their sentences.

SQ's responses to referrals for mental health evaluation or care were often untimely. A QIT on referral responses was chartered and resulted in the assignment of two to three case managers to respond to referrals on a daily basis. A LOP was in the process of being written.

Staff reported that they had access to medical records for clinical contacts only about 50 percent of the time, and that documentation was frequently absent from UHRs.

### Deuel Vocational Institution (DVI)
April 5, 2007 – April 6, 2007

<u>Census</u>:

Of DVI's 3,918 inmates, 867 were on the caseload, of whom 38 were designated EOP. There were 116 MHSDS inmates in administrative segregation, eight of whom were treated at the EOP level of care. DVI's special processing unit housed 336 3CMS plus 14 EOP inmates. In the reception center, there were 351 3CMS and 13 EOP inmates. One inmate was out for MHCB care. Ten caseload inmates were in the OHU.

Staffing:

DVI continued to struggle with high vacancy rates among most direct care positions, although its psychiatry positions were fully covered by staff or via contractual arrangement. Of the allocated 5.5 psychiatry positions, DVI covered the equivalent of three positions by using registry staff and had three psychiatrists on staff. Supervisory positions for a chief psychiatrist and a chief psychologist were filled.

Over half of the psychology and psychiatric social work positions were vacant. One of 3.5 senior psychologist positions was vacant. Of 32.5 psychologist positions, 13 were filled by staff and five were covered by contractual staff. Two of four psychiatric social work positions were filled. Three non-clinical positions, those of health program specialist, staff services analyst and medical secretary, were filled, as were 6 of 7.5 office tech or office assistant positions.

Quality Management:

There was no indication that DVI's local governing body met quarterly. The institution-wide QMC met regularly and kept minutes. The committee addressed a wide variety of matters, including substantive items pertaining to the mental health service. The mental health subcommittee addressed a wide range of issues but it did not function as well, nor were its activities adequately documented. Peer review was resurrected once again; a QIT was established to restart it. Audits of medication management did not involve nursing staff and were compromised by poor and missing records of medication administration.

Suicide Prevention:

DVI's suicide prevention procedure had not been updated to reflect recent

state-wide directives. The suicide prevention committee continued to meet monthly and keep adequate minutes. Documentation indicated that the committee's composition and activities were largely consistent with local operating procedures and state-wide directives. The committee compiled records of suicide attempts, medication misuse, compliance with requirements regarding five-day follow-up and custody observations, as well as patterns of OHU usage. Available information, however, was neither examined nor used to inform or improve current practices.

DVI improved its suicide prevention practices in administrative segregation by doing initial mental health screenings in a private setting rather than at cell front. Staff audits showed that from December 12, 2006 through January 2007, 98 percent of screenings were done out-of-cell, in contrast to the previous monitoring period, when nearly all screenings were done at cell front. Staff audits found that the proportion of screenings done out-of-cell fell to 83 and 81 percent in February and March 2007, respectively. Mental health staff, including a psychologist and a psychiatrist, met with the lieutenant in charge of administrative segregation each morning. Information exchanged during those meetings was documented in a log kept on the unit. No information regarding weekly case manager contacts was provided.

Contrary to previous representations made to the monitor, records indicated that in the days immediately preceding the monitor's visit, at least three of 15 inmates who were placed in so-called "deep seg," an isolated, poorly lit area in administrative segregation, were on the mental health caseload. Records pertaining to the use of "deep seg" prior to March 26, 2007 were not readily available. Staff reported that they had been archived. Again, staff agreed to discontinue the use of "deep seg" to house

caseload inmates.

Records indicated that psych techs made daily rounds in administrative segregation units. Audits were conducted to examine whether meaningful mental health input was provided during institutional classification committee (ICC) meetings. Results indicated that risk management was addressed in ICC meetings 80 percent of the time, and general mental health indicators were addressed. Based on these audit results, a CAP item regarding meaningful input into ICC meetings will be resolved if compliance is sustained through the next monitoring period.

Caseload inmates in administrative segregation had less access to yard than required by Title 15. Staff reported that inmates on walk-alone status might be offered one hour of yard time once per week, while those not restricted by walk-alone status were offered approximately two hours of yard time thrice weekly, totaling six hours per week.

Medication Management:

The picture of medication management at DVI changed little. On the whole, audits of medication management done by mental health staff were compromised by methodological flaws and lack of participation by nursing staff. Records of medication administration were incomplete or missing. Identification of problems did not spur corrective action.

Available information pointed to problems with medication continuity upon arrival, as well as when inmates were relocated within the institution. Response to noncompliance with medication was haphazard as was monitoring of blood levels of inmates on psychotropics. Orders for lab tests were not consistently written by

prescribers.  Frequently, orders for lab tests that were written were not carried out.  DOT was used inconsistently; in some cases it was not ordered when clinically indicated. Although DOT orders were found in the records of some inmates with a reported history of medication misuse, a review of recent cases of cheeking, hoarding and overdose that had been reviewed by the suicide prevention committee found no DOT orders.

No inmates had current Keyhea orders.  HS medication orders were written but they were administered before 8:00 p.m., typically around 5:00 p.m. to 5:30 p.m.

There was a single bright spot in medication management.  A nursing audit found that a supply of medication was provided to nearly all inmates who were released on parole.  Although parole medication was found to be in compliance during the 17th monitoring period, no information was available on that topic during the 18th monitoring period. The problem will be considered resolved if compliance is sustained.

Transfers:

Staff reported that access to higher levels of care improved in recent months.  From October 25, 2006 through March 18, 2007, seven referrals were made to DMH for acute care and seven referrals were made to SVPP for intermediate care.  All referrals to intermediate care were accepted, but inmates were not transferred directly from DVI to SVPP.  Instead, at least three inmates accepted for intermediate care were transferred from DVI's OHU to the MHCB at CMF while awaiting an intermediate care bed.

Six of the seven inmates referred to acute care reached a higher level of care.  In two cases, referrals were accepted and inmates were transferred directly to acute

care. Those inmates were referred and transferred in 16 days in one case and 26 days in the second. Four referrals to acute care were short-circuited by transfers to MHCBs instead.

EOP inmates with multiple OHU admissions, however, were not always referred as clinically warranted. Access to acute care directly from DVI's OHU was restricted to two inmates and wait times were excessive, but four referrals to acute care resulted in transfers to the MHCB located at CMF within one or two days. Similarly, referrals made directly to other MHCBs resulted in transfers within one or two days. Roughly 30 percent of all admissions to the OHU were referred to an MHCB. A staff audit found that 93 percent of those who were transferred to an MHCB went within 1.68 days. Staff reported that some inmates who returned from MHCBs were not substantially improved over their conditions when they left. This was particularly the case for inmates returned from the MHCB at HDSP. The staff reported instances in which they requested that individuals be transferred directly from an MHCB to acute or intermediate care, but rarely were those requests granted. When these inmates were returned to DVI, they were typically placed in the OHU, where they waited up to three weeks for an acute care bed.

DVI provided crisis care in an increasingly busy OHU that comprised a total of 28 beds used for a combination of medical, long term care and mental health treatment. From October 2006 through March 2007, there were a total of 498 psychiatric admissions to the OHU. Data suggested that the average length of stay in the OHU was 2.1 days and that approximately 11 percent of all admissions remained longer than 72 hours. Information available on site indicated that the average daily psychiatric census of the OHU was 5.3. Surprisingly, staff at DVI did not have ready access to a database that

recorded admissions to the OHU; instead, all tracking was done manually and inmates with multiple admissions were identified anecdotally by staff who knew them. During the current monitoring period, the number of admissions per month rose from 72 in September 2006 to 96 in March 2007.

An IDTT meeting that was observed was missing only a correctional counselor. Relevant team discussion took place; custody staff and inmates participated. In one case, a missing medical record was an impediment to treatment, an occurrence that was reportedly commonplace.

The OHU had four designated quiet cells that were modified in the past to reduce opportunities for self-injurious behavior. Nonetheless, inmates on suicide watch and suicide observation were placed in OHU cells with unsafe conditions. Restraints were not used in the OHU.

A QIT was chartered to examine the use of holding cells. Holding cells were rarely used except for one particular month when the need for crisis beds spiked. There were a total of 15 admissions to overflow cells located in administrative segregation, 12 of them in February. Lengths of stay in the overflow cells appeared to be brief.

At the time of the monitor's visit, 38 EOP inmates awaited transfer from the reception center. Thirty-two of 38 had been at the EOP level of care for 30 days or longer. According to the results of a staff audit, DVI met transfer timelines for 90 percent of the EOP inmates in the reception center. In contrast, the monitor's review of EOP cases in the reception center at the time of the site visit found that nearly half of them had been at DVI longer than 60 days. Seventeen (45 percent) had been designated

as needing the EOP level of care for 60 days or longer. Fourteen were slated to go to a

SNY; 14 were in the reception center proper; eight were in administrative segregation;

and two were in the OHU. Collectively, these inmates had been awaiting transfer for as

little as two and as long as 308 days.

Other CAP Issues:

    Mental health treatment provided to EOP inmates in DVI's reception

center, the subject of a supplemental report (the <u>Special Master's Report and</u>

<u>Recommendations on Defendants' Enhanced Outpatient Treatment Program in Reception</u>

<u>Centers</u>, filed July 2, 2007), is described here briefly. DVI began to provide enhanced

mental health treatment to EOP inmates beginning in March 2007, four weeks before the

monitor's visit. Staff reported that all EOP inmates with an SNY designation plus 14

more, a total of 28, had for the past several weeks received weekly case manager contacts

and at least one hour of group treatment five days per week.

    The monitor's expert reviewed records of six EOP inmates, finding that

the disorganized and incomplete state of the medical records was likely to adversely

affect care. When supplemented by inmate histories generated by MHSDS, a fuller

clinical picture was derived. Mental health treatment was deemed adequate or better in

three cases and inadequate in three. The differences seemed to be accounted for by how

early an inmate was identified and the stability of his mental condition. Inmates

identified early in their stays and whose conditions were stable received treatment that

was adequate or better. Inmates who were unstable early in their stays and who

experienced multiple moves, including OHU admissions, received less than adequate

treatment.

IDTT meetings were held once per month for EOP inmates in the reception center. One meeting that was observed was attended by a full team, held in a confidential setting and fulfilled its purpose. However, C-files were rarely available at IDTT meetings. Group treatment was poorly documented and treatment plans were deficient. Treatment and yard schedules conflicted at times, further reducing EOP inmates' access to yard. Re-entry planning was nascent; staff called parole officers to pick up the least stable EOP inmates upon release.

A staff audit of response to mental health referrals throughout DVI found that during a recent quarter response time averaged 5.9 days. The audit included all 2,028 routine referrals received during the quarter. Staff reported that a total of 61 urgent and emergent referrals were received during that period and were tracked independently of routine referrals. No conclusions regarding response time for urgent and emergent referrals were reached.

Group treatment was offered to all mainline 3CMS inmates during the course of treatment planning. Close-ended groups met every other week for eight sessions. Typically, seven to 12 inmates were enrolled in each group.

<u>Other Issues</u>:

A problem that was discussed with staff during the previous monitoring period remained unresolved. Caseload inmates were typically required to sit outside for hours at a time waiting to be seen for their mental health appointments. Routine escort practices resulted in large numbers of caseload inmates waiting outdoors each day up to several hours at a time, regardless of temperature or rainfall. Many inmates lacked outer garments that were suitable for the conditions.

DVI was noncompliant with heat plan requirements regarding Stage II and Stage III heat alerts.

### Service Area E

### California State Prison, Corcoran (CSP/Corcoran)
April 23, 2007 – April 25, 2007

Census:

On March 31, 2007, CSP/Corcoran's census was 5,420 inmates, of which 1,262 inmates were participants in the MHSDS. An average of weekly reports from March 1, 2007 to March 31, 2007 reflected a total of 143 mainline EOP inmates and 50 EOP inmates in the administrative segregation hub unit. There were 381 3CMS inmates in general population or the protective housing unit (PHU), 143 3CMS inmates in administrative segregation and 538 3CMS inmates in the SHU.

Staffing:

CSP/Corcoran continued to have major problems with mental health staffing and support staff vacancies. Of the 17.29 allocated supervisory mental health positions, 12.5 were filled and 4.79, or 27.7 percent, were vacant. There were 180.76 allocated non-supervisory mental health positions of which 123 were filled, resulting in a vacancy rate of 32 percent. Contractors filled 12.25 positions for a functional vacancy rate of 25 percent.

The two supervisory psychiatry positions were vacant. The chief psychologist position was filled. Three of the four senior psychologist positions were filled, and an applicant for the one vacancy had been selected.

There were 17.8 allocated staff psychiatry positions and 15.3, or 86 percent, were vacant. Contractors covered 5.75 staff psychiatry positions, resulting in a

functional vacancy rate of 54 percent. There were 39.21 allocated clinical psychologist positions and 24.21, or 62, percent were vacant. Contractors covered 6.5 clinical psychologist positions, resulting in a functional vacancy rate of 45 percent.

Two of the 3.79 supervising licensed clinical social worker positions were filled. Of the 10.4 allocated staff clinical social worker positions, .4, or four percent, were vacant.

All four of the senior licensed psych tech positions were filled. Thirty-two, or 83 percent, of the 38.64 allocated licensed psych tech positions were filled.

The five supervising RN II positions were all filled. Two of the supervising RNs were assigned outside of mental health. The 1.5 office services supervisor (OSS) II positions were filled. The health program specialist position was vacant. Three of the 9.57 recreational therapist positions were filled. Forty-two of the 43.92 RN positions were filled. Of the 16.22 allocated office tech positions, 14.5 were filled.

Quality Management:

CSP/Corcoran's quality management process continued to function well. Audits were ongoing and utilized acceptable methodologies. Mandatory committees and sub-committees met regularly and minutes were well documented. Discipline-specific peer review was also occurring.

Suicide Prevention:

Thirty-one question screenings were occurring and confidential space was offered with the exception of one administrative segregation unit where there was a semi-private space in the day room. Staff showed the monitor confidential treatment and