therapeutic space in all administrative segregation facilities at the institution. Screening refusals following administrative segregation placement were below the 30 percent threshold and a system was in place for follow-ups.

Thirty-minute welfare checks of new arrivals were occurring. However, there were problems with documentation, and there was no system in place for periodic checking by supervisors. Psych tech rounds were occurring and were documented with weekly summaries. Audits for selected units indicated that from the period of September 1, 2006 to March 31, 2007 there was 99 percent compliance with psych tech rounds.

The institution was having difficulties with both case manager contacts and IDTT meetings in administrative segregation. Between September 2006 and March 2007, case manager contacts for 3CMS inmates in administrative segregation ranged from 68 percent to 93 percent and IDTT compliance ranged between 82 percent and 88 percent.

The institution reported that, with the exception of those housed in ASU I, administrative segregation inmates were receiving required yard time. Staffing issues prevented inmates in ASU I from getting required minimum yard time. Some administrative segregation inmates had television sets and others were awaiting delivery of television sets upon completion of the ICC process.

The monitor's review of an administrative segregation tracking log dated April 24, 2007 indicated that there were 15 inmates in administrative segregation housing units for longer than 30 days. One inmate was being held pending CSR endorsement for transfer to a SNY, one inmate was pending a toxicology report, a third inmate was in the hospital, and there was no indication of the reason for a fourth inmate's length of stay.

Thirteen cells were identified for retrofitting. A number of cells were designated as intake cells and placards were being utilized. CSP/Corcoran had a practice of double-celling all administrative segregation inmates following their appearance before an ICC.

The institution had not yet implemented the required pre-placement screening form; administrative segregation pre-placement screenings remained limited to medical examinations. However, staff reported that clinicians had completed suicide risk assessment checklists for approximately 60 percent of the institution's MHSDS inmates and the results of these assessments had been entered in the MHTS.

Medication Management:

Problems in medication management appeared to be related to the transition process of phasing out MTAs and hiring LVNs with variable correctional health care experience. Continuity of medication upon arrival and prescription renewals continued to be a problem. However, the institution reported that audits conducted in this area showed 100 percent compliance with psychotropic medications. In a sample of 15 inmates, 86 percent had their medications follow them in a timely manner after transfer. The same 86 percent were also given their medications in a timely manner. The institution was meeting timelines for the renewal of medication orders, and, on average, less than twenty medication renewals were conducted monthly by a designated mental health RN.

The institution experienced an increase in medication noncompliance. However, the institution was in partial compliance with the follow up of cases of noncompliance. Prior to the site visit, staff had recently initiated a weekly IDTT to review the ten most non-compliant inmates. As a result, five of the inmates became

compliant with medications and the other five inmates had their medications discontinued.

The institution stated that the delivery of medications was accomplished timely and with a considerable degree of regularity. The institution reported a 95 percent compliance rate for the timely processing of medication orders.

CSP/Corcoran did not consistently obtain or renew informed medication consent forms when required. A review in March 2007 showed that three out of 19 UHRs were missing the required consent form.

The institution continued to have problems related to lab requirements. CSP/Corcoran reported that blood levels for inmates on Valproic Acid, Lithium, and Carbamazepine were ordered routinely at a minimum of every six months. Complete blood counts (CBCs) were ordered for inmates on Clozapine routinely on a bi-weekly basis for inmates who were stable. Audit results showed that on March 27, 2007, there were 87 inmates on Valproic Acid for treatment of psychological disorders, and that 52 percent of these inmates had compliant lab work. Audits further showed that on March 15, 2007, five inmates were on Clozapine; 27 inmates were on Lithium; and 18 were on Carbamazepine. Audits conducted on the following day showed compliant lab work for 100 percent of the inmates on Clozapine, 51 percent of the inmates on Lithium and 50 percent of the inmates on Carbamazepine. The institution reported that proper blood level tests were subsequently ordered for all the inmates who had non-compliant lab work.

There were 1,704 medications given to 805 inmates as DOT medications, and the institution reported 100 percent compliance during the medication pass.

However, custody staff had found that psychotropic medications were sometimes cheeked and hoarded, particularly in administrative segregation.

The institution had a practice of issuing RVRs to Keyhea inmates in the acute care hospital who refused medications. CSP/Corcoran stated that HS mediations were being delivered after 8:00 p.m., but there was a significant drop in the number of inmates on HS medications. The institution reported that they had approximately half the prescriptions and inmates on HS medications that they had two months earlier. According to institutional reports, parole medication requirements were met for over 98 percent of discharged inmates.

Mental Health Assessments for Use in the Discipline of Sexual Misconduct Violations:

Fifty-nine RVRs for sexual misconduct by 43 different inmates were referred for evaluations in the period of September 1, 2006 through March 31, 2007. Ten inmates accounted for 26 of the referrals. There were 34 referrals at the 3CMS level of care, 11 for EOP inmates, one for an inmate in the MHCB unit and 13 for general population inmates. Among the referrals, three were diagnosed with exhibitionism. There were seven referrals requesting a more comprehensive evaluation.

Transfers:

Transfers to DMH were occurring. From September 1, 2006 to March 30, 2007, CSP/Corcoran referred 28 inmates to DMH/APP care. Twenty-six of these referrals were made to APP at CMF, and two were made to the APP at ASH.

The two inmates who were referred the acute program at ASH had to be referred twice before they were accepted, and one inmate was twice referred to DMH/APP at CMF prior to his acceptance. Of the 25 inmates referred only once, referral

to DMH/APP at CMF took between two and 14 days after the identification of their need for an inpatient level of care. For the inmate twice referred to the DMH/APP at CMF, acceptance occurred 12 days after the second referral. Twenty-two inmates were accepted by DMH/APP at CMF, and the timeline for referral and acceptance for these ranged from one to 36 days, with the acceptance of five referrals taking more than 20 days.

Inmates were transferred within 3.4 days or less of their acceptance by DMH/APP at CMF. One inmate was transferred outside this time frame in order to complete his Keyhea process. The transfers to ASH occurred within three days of acceptance. Completion of referral packages was not always timely.

Transfers to both CMF and SVPP were ongoing.

The institution's use of MHCB beds, as well as the provision of crisis bed service to other institutions, was extensive during the covered period. From September 2006 to March 2007, 620 inmates were admitted to the MHCB unit. Excluding inmates referred to DMH and those placed on a Keyhea order, the average lengths of stay were between 3.89 and six days. There were 54 admissions with lengths of stay of less than ten days.

Clinical follow-up of suicidal inmates after discharge from a MHCB did not occur as required. During the covered period, 25 inmates were placed in five-point restraints, and the average time in restraints was 26 hours and 58 minutes. The institution was only partially compliant with documenting rationales for use of restraints.

The institution continued to have problems with transfers to a PSU for both institutional and system-wide reasons, including lengthy waiting lists for PSU beds,

intervening admissions to MHCB and DMH and the absence of comprehensive information and data on all active EOP inmates with SHU terms. EOP inmates with SHU terms remained housed in the EOP administrative segregation unit while awaiting transfer to a PSU. From September 2006 to March 2007, the average length of stay after an endorsement to a PSU was 13 days. One exception, not figured into the average, was one inmate's stay of 66 days due to court appearances. As of April 13, 2007, there were 16 SHU inmates and 35 administrative segregation inmates in the EOP hub unit, while two SHU and six administrative segregation EOP inmates were in the MHCB unit pending their return to the administrative segregation hub unit. The institution continued to track one SHU EOP inmate and seven administrative segregation inmates who had been transferred to DMH.

Other CAP Issues:

The institution reported that EOP mainline inmates were offered less than ten hours of structured therapeutic activities per week, but EOP inmates in the administrative segregation hub unit were offered ten or more hours per week. There was a high level of treatment refusals, particularly for group therapy, in both the general population EOP and in the EOP administrative segregation hub unit. These refusals reportedly were related in part to the fact that inmates continued to be strip searched routinely for groups whether they were conducted on or off the unit. Inmates reported that group therapy was irrelevant to their specific needs, was frequently repetitious and was often conducted poorly by clinicians. In addition, the monitor noted that therapeutic modules were unclean, malodorous and unsanitary.

The institution was not providing case manager contacts weekly in the mainline EOP. However, compliance with case manager contacts was greater than 90 percent in the EOP administrative segregation hub unit. Inmates stated that many contacts occurred in interview areas that were separated by partitions, offering little to no audio confidentiality.

Compliance with the timely completion of IDTT meetings was over 90 percent in EOP mainline and administrative segregation hub units. An audit of the composition of all EOP IDTT meetings indicated that compliance rates were hurt by the limited participation of Correctional Counselors 1 (CC 1s) and inmates, both of whom were present roughly 70 percent of the time.

CSP/Corcoran was not meeting standards for mainline 3CMS case manager contacts and IDTT meetings consistently. Compliance with case manager contacts ranged from 85.03 percent to 97.6 percent during the review period. IDTT compliance ranged from 81.2 percent to 98.3 percent. Since the last week of January 2007, compliance rates for both case manager contacts and IDTT meetings were above 90 percent. Staff indicated that the primary problem with respect to IDTT meetings was the lack of psychiatric participation.

The institution reported significant problems with meeting requirements for case manager contacts and IDTT meetings in the SHU. Case manager contacts in the SHU were as low as 49 percent in October 2006 and 65 percent in March 2007. IDTT meeting compliance ranged from 36 percent in November 2006 to 64 percent in March 2007. No groups were offered in the SHU. Due to growing security concerns related to

the flow of contraband, all inmates were searched prior to being escorted to their mental health appointments.

The institution needed clarification on the application of the RVR process to incidents involving suicidal behavior, the refusal of medication by inmates on Keyhea orders and transfers of inmates from administrative segregation while referrals to the district attorney and the disposition of RVRs were pending.

Audit results showed that the institution was only partially compliant in the area of initial mental health assessments of newly arriving inmates at the institution. In many cases, either initial assessments were not occurring timely, or many inmates were not being seen by a psychiatrist.

According to an institutional audit, CSP/Corcoran was partially compliant in developing and documenting treatment plans consistent with Program Guide requirements.

From October 2006 to March 2007, there were 266 incidents among all inmates at CSP/Corcoran. These included incidents in which force was used as well as those in which force was not used. These also included all incidents without regard to whether they involved MHSDS or non-MHSDS inmates. Force was used in 116, or 51 percent, of all 266 incidents. This figure represents an increase in the rate of overall use of force among all inmates by eight percent over the 43 percent rate that was found during the preceding monitoring period, and has returned to earlier reported levels hovering around 50 percent.

Out of the total 266 incidents, 156, or 59 percent, involved MHSDS inmates, while 110, or 41 percent, involved non-MHSDS inmates. Among the 156

incidents involving MHSDS inmates during the period under review, 77, or 49 percent, involved the use of force. The rate of such use thus grew by one percent since the preceding monitoring period when the rate of use of force against MHSDS inmates was calculated at 48 percent.

Among the 110 incidents involving non-MHSDS inmates, force was used in 59, or 54 percent, of such incidents. This rate exceeds the rate for use against MHSDS inmates by five percent   It also represents an increase by five percent over the 49 percent rate reported for such use during the preceding monitoring period.

In short, the overall rate of use of force among all inmates grew by eight percent since the preceding monitoring period. As stated previously in the Special Master's Eighteenth Monitoring Report, "(t)he relatively high number of total incidents and the involvement of mental health inmates at CSP/Corcoran are not entirely surprising, given certain characteristics of this particular institution and its population. . . . CSP/Corcoran is the only CDCR institution which has a sizeable mental health caseload population in its secured housing units. The institution houses a large number of mental health inmates with histories of violence. It has the highest population in the CDCR of high security level mental health caseload inmates, while it has no Psychiatric Services Unit, nor any in-patient DMH programs for mental health inmates." Id. at 335-36. Nevertheless, the overall increase in the rate of use of force once again illustrates the need for continued vigilance in this area at CSP/Corcoran, which will be covered in the upcoming report for the twentieth monitoring period.

**Avenal State Prison (ASP)**
May 23, 2007 – May 25, 2007
Re-visit August 7, 2007

Census:

On May 22, 2007, the overall inmate population included 7,621 prisoners, including 1,155 3CMS and ten EOP inmates. Three EOP and 56 3CMS inmates were in administrative segregation.

Staffing:

The overall vacancy rate among allocated mental health positions was 25 percent. During the monitoring period, the institution received its first allocation for a chief psychologist position, which was filled. One of the two senior supervising psychologist positions was filled by a permanent employee, the other was covered by contracted registry staff. The permanent senior supervising psychologist, who was undergoing training at another institution at the time of the monitor's visit in May 2007, had returned to the institution by the August 2007 visit.

None of the five allocated staff psychiatrist positions were filled with permanent employees, but all five vacancies were covered by contractors.

Ten of 15 allocated psychologist positions were filled; 2.25 of the vacancies were covered by contractors, leaving a functional vacancy rate of roughly 18 percent. All of the 2.5 allocated psychiatric social worker positions were vacant, but in August 2007, a half-time position had been offered to one candidate and additional interviews for the remaining vacancies had been scheduled.

Seven of 11 allocated psych tech positions were filled. Contractors covered two more positions, reducing the functional vacancy rate among psych techs to about 18 percent.

In August 2007, the 1.15 allocated recreational therapist positions were vacant, but an offer to fill one full-time position was pending. The institution's two mental health RN positions were filled.

Five of the eight allocated office tech positions were filled, but the one OSS-II position was vacant.

Quality Management:

The quality management process at ASP was in partial compliance with applicable policies and procedures. Quality management, which began to show some improvement at the end of the monitoring period, was slowly evolving into a potentially viable process. The mental health subcommittee continued to conduct well attended bi-monthly meetings and report to the medical quality management committee.

By the end of the monitoring period, the institution's director of nursing had assembled an array of reasonably well-conceived audit tools for evaluating various aspects of the medication management process, although their consistent application was impeded by several factors, particularly the transition from reliance on MTAs to LVNs for the distribution of medications.

By August, the new chief psychologist had instituted a supervisory database system to track care delivery for management purposes. A QIT had recently been chartered to review the overall auditing process and develop key indicator reports.

Shortly before the monitor's May 2007 visit, QITs were chartered to study laboratory testing, medication delivery, the quality of documentation on mental health forms, treatment space and other relevant mental health issues. An additional QIT had recently been chartered to review the overall auditing process and develop "key indicator" reports.

<u>Suicide Prevention</u>:

ASP had still not formed a functioning suicide prevention response committee. Problems persisted with the provision of five-day clinical follow-up of suicidal inmates discharged from a MHCB unit elsewhere or from the OHU at ASP.

Similarly, routine administration of required Suicide Risk Assessments remained erratic at the time of OHU admission, and only 20 percent of inmates admitted to the OHU received a Suicide Risk Assessment on admission. The institution had still not implemented a viable suicide prevention committee. ASP had implemented parts of the plan to reduce suicide in administrative segregation. Eight cells in the administrative segregation unit had been identified for retrofitting as intake cells, but the work was still underway. The institution was using temporarily designated intake cells, placarded with the name and placement date of the occupant.

The monitor's review of cases found that initial screenings, suicide risk assessments and mental health evaluations were not consistently completed and/or documented for inmates newly placed in administrative segregation. There was also a high rate of refusal of mental health services. Staff attempted to decrease the number of cell-front contacts by making multiple offers of out-of-cell contacts to each inmate.

Mental health providers had access to three confidential interview and treatment areas in administrative segregation, although access was sometimes problematic when the rooms were being used by other health services providers or by custody staff.

Institutional audits found that daily psych tech rounds improved during the month preceding the monitor's May 2007 visit. The monitor's review of cases and institutional audits found that ASP was compliant with weekly case manager contacts in administrative segregation. Audits and the monitor's review also confirmed that initial contacts and 90-day IDTT meetings were held, but not all team members, particularly correctional counselors, were consistently present for IDTT meetings.

The monitor found that 30-minute welfare checks of newly-arrived inmates during their first 21 days in administrative segregation were not always logged, and that no system was in place for periodic inspection of the logs by supervisors. The monitor observed several entry gaps on different dates.

Medication Management:

An institutional audit of a small sample of inmates who arrived on psychotropic medication found that assessments by a psychiatrist for the purpose of reordering medication and renewing prescriptions were often untimely. Audits also indicated interruptions in medication continuity upon intra-institutional transfers.

Institutional audits found that follow-up of inmate refusals of medications occurred within five days in only 48 percent of surveyed cases. On May 16, 2007, ASP initiated a QIT on medication noncompliance. The institution did not have a methodologically adequate audit to measure the timeliness of renewals of medications.

For those psychotropic medications for which laboratory tests were required routinely every six months, such as Lithium, Depakene, Depakote and Tegretol, orders for laboratory tests were found in 85 percent of cases audited over a period of six months. Because the audit covered only six months, data was not available on laboratory tests associated with medications requiring annual laboratory testing, such as Zyprexa, Seroquel and Risperdal.

Once laboratory tests were ordered, it required an average of 13.6 days for the tests to be completed, representing a reduction from the average of 30 days reported for the preceding monitoring period. Institutional audits found that in 36 percent of the cases in which laboratory tests were ordered, results of completed lab work were not found in UHRs.

Although the facility initiated Keyhea orders on occasion, little data was available to determine whether orders were consistently sought for all inmates with a potential need for them.

Mental Health Assessments for Use in the Discipline of Sexual Misconduct Violations:

At the time of the monitor's May 2007 visit, the institution had a current procedure for addressing incidents of indecent exposure. During the monitoring period, a total of seven RVRs were issued to six different inmates for indecent exposure. Six of the seven RVRs resulted in referrals for mental health screenings. Screenings were conducted within four to 11 days following the referrals. Two of the six cases were referred for comprehensive evaluations; one inmate was diagnosed with exhibitionism but he declined an offer of treatment.

Transfers:

Throughout the monitoring period, referrals to acute or intermediate DMH inpatient programs did not appear to be consistently considered as a treatment option. Only one referral to DMH acute care had been made during the monitoring period.

Institutional audits indicated that inmates who were accepted into MHCB units at other facilities were generally transferred from ASP in a timely manner. Sixty percent were transferred within 24 hours, while the average time to transfer was 3.5 days.

ASP did not track OHU admissions through its Mental Health Tracking System (MHTS) or any other database, but instead used a handwritten log that was inadequate for the timely and accurate reporting of admissions data. Consequently, on multiple occasions, inmates who needed crisis care were not identified. There was also no systematic process through which inmates identified as potentially requiring higher levels of care were tracked and referred.

During the portion of the monitoring period prior to the May 2007 site visit, 94 inmates were reportedly admitted to the OHU. The average length of stay was 4.7 days. Approximately 44 percent of the admitted inmates remained there beyond 72 hours, with lengths of stay ranging from four to 42 days. Staff reported that inmates who remained in the OHU for the longest periods were generally awaiting transfer to DMH, or to developmental disability or EOP placements. At the time of the monitor's August 2007 follow-up visit, the OHU was covered by clinicians for part of each day on a daily basis, including weekends. A senior psychologist was assigned to supervise the clinicians and also to provide clinical coverage when necessary. Six of the 12 mental health inmates housed in the OHU were awaiting transfer to EOP programs. These individuals had essentially no out-of-cell time and received virtually no meaningful

treatment. The monitor's review of facility reports in August 2007 revealed that 45 admissions to the OHU for crisis care occurred between May and August 2007, but only 18 of these admitted inmates received a suicide risk assessment upon admission. Suicide risk assessments were completed for less than ten percent of discharged crisis care inmates at the end of their stays.

Institutional audits of inmates transferred to EOP programs between October 1, 2006 and April 30, 2007, indicated that 40 percent were transferred within 60 days of referral for endorsement. Among the 24 cases in which transfer deadlines were not met, five inmates paroled prior to their transfers but after the transfer deadline had expired.

Other Issues:

Eight cells in the administrative segregation unit had been identified for retrofit as intake cells, but the work was still ongoing. The institution was using temporarily designated intake cells, placarded with the name and placement date of the occupant.

The monitor's review of cases found that initial screenings, suicide risk assessments and mental health evaluations were not consistently completed and/or documented for inmates newly placed in administrative segregation. There was also a high rate of refusal of mental health services. To address this problem, ASP instituted a process of specifically inviting each newly arriving inmate to participate in mental health services three times during his first 72 hours in the unit, with two made by clinical staff and one by custody staff.

Mental health providers had access to three confidential interview and treatment areas in administrative segregation, although access was sometimes problematic when the rooms were being used by other health services providers or custody.

Psychotherapeutic groups were not offered to EOP inmates in any setting at ASP, but the institution had begun offering limited groups to some 3CMS inmates just prior to the monitor's May 2007 site visit.

Available data indicated that during the monitoring period, 92.67 percent of required IDTT meetings had been completed as of May 11, 2007. An institutional audit of 49 randomly selected treatment plans across programs found that psychiatrists participated in 40 of the 49 surveyed IDTT meetings, or 82 percent. Custody staff participated in 44 of those 49 IDTT meetings, or 90 percent.

Institutional MHTS reports and staff UHR audits of UHRs indicated that inmates referred to the 3CMS level of care received their first case manager contacts after an average of 22 days. The monitor's review of a sample of 3CMS cases found that inmates were seen by a psychiatrist at least once every 90 days and prior to medication renewals. Inmates whose medication had been discontinued were followed up in a manner consistent with Program Guide standards. Psychiatrists participated regularly in 3CMS IDTT meetings.

The monitor's analysis of provided institutional data indicated that mental health referrals were not assigned to clinicians for follow-up in an organized fashion. Documentation of completed contacts made in response to referrals was not maintained.

Severe lack of sufficient clinical office and treatment space hindered delivery of adequate mental health services in all programs.

### Service Area G

### Wasco State Prison (WSP)
May 2, 2007 – May 4, 2007

Census:

As of April 30, 2007, WSP housed 5,914 inmates. There were 1,324 inmates on the MHSDS caseload, down from 1,420 during the preceding monitoring round. The MHSDS census included 1,113 3CMS reception inmates, 37 3CMS inmates in administrative segregation and 67 in the general population, for a total of 1,237 3CMS inmates. There were ten EOP inmates in administrative segregation and 71 in reception center. Six caseload inmates were in the MHCB unit.

Staffing:

There were 92.72 authorized mental health positions at WSP at the time of the monitor's visit, of which 55.5 were vacant. Contracted services made up for 13.25 of the 37.22 vacancies, leaving the institution with an overall functional vacancy rate of 43.19 percent among its mental health staff.

At the time of the monitor's visit, the chief psychiatrist, chief psychologist, and the three supervising psychologists' positions were filled.

During the monitoring period, WSP received new allocations for 1.05 staff psychiatrists, 20.22 psychologists, 5.8 psychiatric social workers, four psych techs, a .65 recreational therapist position, a .82 RN, one health program specialist , one office tech, one medical transcriber, a .5 limited term office assistant, 7.4 correctional officers and a .3 correctional counselor II specialist position.

Of the institution's complement of 7.05 line psychiatry positions, 1.5 was filled, leaving 5.55 vacancies, 4.5 of which were covered by contractors. Two half-time psychiatrists reportedly were completing the hiring process at the time of the monitor's site visit.

Among 37.22 allocated psychologist positions, 15.0 were filled. One candidate for a full-time psychologist position was completing the hiring process at the time of the site visit. Of the eight allocated psychiatric social worker positions, 6.2 were filled with 1.8 vacancies.

The position for a senior psych tech and all seven psych tech positions were filled. The sole psychometrist position was also filled.

The .65 recreation therapist position was vacant. Of the 1.5 allocated medical transcriber positions, one full-time position was filled, while the half-time position was vacant. All 6.5 positions for office techs were filled, as were the three office assistant positions.

Quality Management:

The institution's quality management process continued to function adequately, but some problems were emerging. Meetings of the quality management committee occurred irregularly. When held, meeting attendance and agendas were broad and comported with Program Guide requirements.

WSP re-started psychology and psychiatric social worker peer reviews prior to the monitor's visit, while peer review in psychiatry was still being developed.

Suicide Prevention:

WSP was only partially compliant with the requirements for its suicide prevention committee. Attendance at meetings was poor and the composition of participating members varied widely. The committee's agendas were sparse and fell significantly short of Program Guide and policy requirements.

During the course of the monitor's visit, WSP initiated a system for placing inmates' suicide-related history in the "New Arrival Packs" distributed to psych techs assigned to the administrative segregation unit.

Audits found that the required five-day clinical follow up of suicidal inmates discharged from the MHCB unit occurred consistently. Although the compliance rate was above 90 percent, this was a measure that needed to reach 100 percent. The institution was not compliant with custody follow-up of suicidal inmates discharged from the MHCB unit, and only partially compliant with standards for the use of restraints in the MHCB unit.

Medication Management:

No medication management audits were conducted during the three months preceding the monitor's visit. In addition, access to the pharmacy database system was unavailable, and no data could be retrieved. This situation presumptively generated some significant medication interruptions.

Laboratory tests continued to be a problem. There were substantial delays in taking blood samples, and lab results were not consistently routed to requesting psychiatrists.

DOT was ordered for all psychotropic medication orders and was specified on the MAR. Staff reported that HS orders were written by psychiatrists when

clinically indicated, but there were no audits conducted to verify this, or that HS medications were delivered after 8:00 pm.

WSP was partially compliant in providing medications to paroling inmates, and noncompliant with continuity of medications on arrival, internal transfers or renewal of medication orders. Its measures for dealing with medication noncompliance were also inadequate.

Mental Health Assessments for Use in the Discipline of Sexual Misconduct Violations:

The monitor found that WSP was effective with its utilization of mental health evaluations in its disciplinary process for sexual misconduct violations and properly accounted for them in disciplinary hearings.

Transfers:

Clinicians rarely made referrals to DMH acute inpatient programs throughout the monitoring period. From January 1 to May 1, 2007, a total of four referrals were made to DMH acute care. The number of referrals to acute care had recently decreased substantially. In the four months prior to January 2007, clinicians referred ten inmates to DMH acute inpatient programs.

Staff reported that clinicians hesitated to make referrals to DMH intermediate inpatient programs because the long wait for beds in those programs inordinately delayed inmates' movement out of reception.

In WSP's 16-bed correctional treatment center (CTC), inmates in need of a MHCB level of mental health care regularly occupied ten to 11 beds, leaving the limited remaining beds for long term medical patients. CTC staff reported that it had become uncommon to move medical patients to outside hospitals to make room for

incoming MHCB inmates. The increasing number of chronic medical cases having to be housed in the CTC, placed limits on the use of CTC beds for MHCB inmates and resulted in increasing usage of alternative housing cells for mental health inmates in crisis. When all available CTC beds were filled, caseload inmates requiring crisis care were temporarily housed in holding cells located in the central health building, near the B-Facility chapel, or in holding cells within the administrative segregation unit.

Holding cell logs captured an inmate's mental health status and, if applicable, any need for suicide-related monitoring. In administrative segregation, custody checks for inmates on suicide precautions occurred every 15 minutes. Inmates on suicide watch in the CTC were provided with one-to-one observation on a continuous basis, while RNs also monitored them every 15 minutes.

Where mental health caseload inmates were held in holding cells beyond 24 hours, WSP called the CDCR Health Care Placement Unit and requested housing in an MHCB unit in another facility. In several cases, these requests resulted in the movement of inmates to MHCB units elsewhere, sometimes distant ones, such as at Pelican Bay State Prison.

The MHCB was covered by a psychiatrist, a psychologist, and a psychiatric social worker five days a week. A psych tech provided recreational therapy four days a week, including Saturdays. Weekends and holidays were staffed by psychiatrists, including a half-time staff psychiatrist and a combination of contract psychiatrists.

An IDTT consisting of a psychiatrist, psychologist, psychiatric social worker and a RN met as needed five days a week. The MHCB IDTT did not include a

correctional counselor. WSP also developed a modified IDTT process to hasten the admissions process for inmates identified as needing MHCB care on weekends.

Generally, discharges from crisis care did not involve a formal IDTT meeting, but required discussion among various IDTT members. During weekdays, discharge decisions were made by the psychologist and psychiatrist within the context of daily rounds, and with other team members, when available, participating in the process. Discharges on weekends could be ordered by the on-call psychiatrist.

Treatment plans in the MHCB unit were developed and maintained in accordance with applicable Program Guide standards.

Other Issues:

In administrative segregation, confidentiality of screening was only partially compliant. Due to treatment space shortages, psych techs were unable to conduct all mental health screens in private confidential settings.

Psych techs met daily with the administrative segregation sergeant and conducted daily rounds seven days a week. They completed daily progress notes and weekly summaries of their contacts. The daily progress notes and weekly summaries documented contacts with administrative segregation inmates and reported on the mental health conditions and symptoms of interviewed inmates. These daily progress notes and weekly summaries were reviewed by the senior psych tech and clinicians assigned to the administrative segregation unit.

Weekly case manager contacts occurred, and psychiatric services were available to inmates as required. Initial and follow-up IDTT meetings for inmates housed in administrative segregation were provided. In general, clinical services were provided

in private confidential settings, although some services were provided in areas where sight and sound privacy was compromised.

Although WSP does not have an EOP hub unit, and therefore was not required to provide structured therapeutic activities, psych techs started offering psycho-educational activities to caseload inmates in administrative segregation in March 2007.

Inmates in administrative segregation were not provided required yard time because of physical plant deficiencies. Location assessments and architectural drawings were completed for an additional 25 walk-alone yards and one large yard; but no date had been set for beginning their construction.

Thirty-minute welfare checks were occurring, and logs were checked monthly by the administrative segregation captain, weekly by the lieutenant, and daily by the sergeant.

WSP had identified 42 cells for retrofitting as intake cells, but work had not commenced at the time of the site visit. The institution initiated assessment of the physical plant in the administrative segregation unit on May 1, 2007 to determine whether it was feasible for inmates to have appliances in the unit.

One full-time case manager was assigned to the main line 3CMS population, while psychiatry coverage was provided by a contract psychiatrist. The institution did not provide group therapy to its general population 3CMS inmates.

Treatment plans reviewed by the monitor were consistently present in UHRs and identified problems that were consistent with diagnoses. Progress notes were well written and provided substantial information. The institution was compliant with meeting treatment plan standards for 3CMS inmates. IDTT meetings were consistently

held within 14 days of the inmate's referral to the program, and both initial and subsequent IDTT meetings typically included the participation of all required members. Still, the timely filing of documents in inmates' UHRs continued to be a major problem. At the time of the monitor's visit, there was a loose filing backlog of approximately 15 feet, including paperwork dating back as far as two months. Staff reported taking several remedial steps, including hiring additional staff to tackle the filing backlog.

The institution met the requirement for quarterly case management contacts with general population 3CMS inmates but continued to have difficulty in providing 90-day contacts for 3CMS inmates delayed in reception for extended periods.

WSP was partially compliant in meeting timeframes for responses to referrals to psychiatrists.

**Kern Valley State Prison (KVSP)**
June 5, 2007 - June 7, 2007

Census:

KVSP's MHSDS census on May 14, 2007 was 516, with a program capacity of 419. The mental health caseload was comprised of 489 3CMS inmates, 70 of whom were in administrative segregation. There were 15 EOP inmates awaiting transfer, eight of whom were in administrative segregation. There were 12 inmates at the MHCB level of care.

KVSP remained closed to the intake of further additional MHSDS inmates. The size of the MHSDS population continued to grow due to referrals for mental health services from the general non-caseload population. Treatment plans were not routinely completed for EOP or 3CMS inmates.

Staffing:

Mental health care at KVSP continued to be significantly inadequate with little change shown during the monitoring period. Mental health staffing vacancies adversely impacted the provision of adequate services. KVSP reported that 33 percent, or 17.5 of 53, of mental health positions were vacant. Contractors covered 3.15 mental health positions, reducing the functional vacancy rate to 27 percent.

The chief psychiatrist position was filled, the two supervisory psychology positions, and all four allocated staff psychiatrist positions were filled.

Of the 15 allocated case manager positions, 12, or 80 percent, were vacant. Eleven of twelve, or 92 percent, of clinical psychologist positions were vacant. Two of three psychiatric social worker positions were filled. Among the nine allocated psych tech positions, three, or 33 percent, were vacant.

The institution reported 11 allocated RN positions, all of which were filled. Also filled were one of the 1.5 allocated senior RN II positions, the health program specialist position, 4.5 of the 5.5 office tech positions, and two of three recreation therapist positions were filled.

Quality Management:

Meetings of the mental health subcommittee were not well attended by custody, nursing, pharmacy or administrative staff. Matters of quality assurance and clinical performance were not properly addressed. The sole QIT was in progress at the time of the monitor's review.

A meeting with psych techs revealed numerous problems including allegations of interference by custody officers in both administrative segregation and the Correctional Treatment Center (CTC), and little to no supervision by nursing staff.

Peer review was occurring for only psychiatrists. It focused largely on quantitative chart reviews with little or no emphasis on matters of substance or clinical judgment.

Suicide Prevention:

The suicide prevention and response committee did not comply with Program Guide requirements. Meetings were poorly attended. Five-day clinical follow-up of suicidal inmates following discharges from the MHCB unit appeared to have be completed, but there were no reports of custody observations.

Pre-placement health screenings of inmates newly placed in administrative segregation continued to utilize a form lacking a mental health component. Also, the institution had yet to begin implementing a suicide history profile for use by mental health staff. Institutional data showed that 44.7 percent of newly arriving inmates in administrative segregation were not screened. Psych techs complained that they were not given timely notice of these placements. Those screenings that were completed were held in confidential settings, but screening results were not consistently placed in inmates' UHRs. Daily rounds and weekly summaries were being done.

Thirty-minute welfare checks of intake inmates in administrative segregation were conducted regularly and were generally properly documented. There was a system in place to supervise their occurrence and documentation.

The institution did not provide regular weekly case manager contacts, IDTT meetings, or outdoor recreation for inmates in administrative segregation. KVSP did not permit administrative segregation inmates to have any appliances. Staff attributed this to a need to complete cable re-configuration to avoid risk to inmates. Staff reported

that the retrofitting of ten intake cells in administrative segregation, which consisted of changing ventilation screens, was completed prior to the monitor's visit.

The institution reported that constant observation for suicide watch was provided by correctional officers in the MHCB unit. Video equipment was not used for suicide watches.

Medication Management:

The nursing staff indicated to the monitor that the problems identified during the preceding monitoring period had not yet been resolved. Medication management practices at KVSP continued to be plagued with problems.

The methodology used in auditing medication continuity for new arrivals was inadequate, as was the auditing process in general. Charts reviewed during the monitor's visit indicated that medications were continued without interruption in only five percent of cases. Psych techs indicated that there was confusion regarding the causes of interruptions, and that gaps could last for days or even weeks. There was no process for investigating cases of noncompliance to determine underlying causes.

Newly ordered or changed medications were administered within one day only 50 percent of the time. Informed medication consent forms were found in only 67 percent of audited UHRs. Medications were renewed, changed or discontinued prior to their expiration dates in 82 percent of cases. Documentation of reasons for changing medication orders was found in 21 percent of sampled cases. The nursing department had just completed the transition from MTAs to LVNs at the time of the monitor's visit.

Refusals were accurately documented in MARs 89 percent of the time. However, inmates who were non-compliant or refused medications for three consecutive days, were seen by the physician within seven days in only 17 percent of cases.

During the monitoring period, six Keyhea petitions were initiated and two were rejected. Two of the six inmates transferred to another prison prior to the determinative administrative hearing. During the monitor's visit, three inmates with active Keyhea orders were in the institution.

As of May 14, 2007, there were 105 inmates on medications designated for HS distribution, all of which were administered at or after 8:00 p.m. No parole medication audits were conducted during the monitoring period.

<u>Mental Health Assessments for Use in the Discipline of Sexual Misconduct Violations</u>:

The institution failed to implement both the custody and mental health components of CDCR's sexual misconduct prevention and treatment standards. KVSP's sexual misconduct tracking log and indecent exposure reports were incomplete and contained errors. Screens were not completed timely. Clinical reports appeared to be pre-printed. Clinical staff appeared to not be reviewing inmates' C-files and rarely reviewing their medical records. In addition, staff did not appear to review RVRs that generated the referrals.

The information contained in some of the RVRs suggested strongly the likelihood of a positive screen, and that at least three inmates should have been referred for comprehensive evaluations. No inmate was diagnosed with exhibitionism, but no supporting documented analyses were available to support these diagnostic conclusions.

All inmates who were issued RVRs were referred to the district attorney's office for prosecution.

Transfers:

Access to both acute and intermediate inpatient care at DMH remained inadequate. There was no process in place to monitor DMH's acceptance or rejection of inmates. Between January and April 2007, four inmates were referred to DMH. Of the four, two were rejected (one for medical reasons) and one was returned to reception prior to receipt of DMH's response. Staff reported no response to the fourth referral, and the inmate was reclassified as EOP and referred elsewhere. No referrals were made to DMH intermediate programs during the monitoring period.

The MHCB unit appeared to be adequately staffed, but the monitor was concerned about the excessive use of restraints and seclusion. From January 1 through April 30, 2007, there were 126 admissions to the MHCB unit. Twenty two percent of all MHCB admissions had lengths of stay lasting longer than ten days. Those 22 percent lasted for 24 days on average. No formal review and approval process seemed to exist for inmates with lengths of stay exceeding ten days. Initial physical and intake assessments for MHCB inmates were not timely, and their initial treatment plans were not completed until they were housed in the MHCB. Clinicians' notes were fairly generic and often failed to state clearly the bases of decisions regarding levels of care.

Regardless of inmates' actual security classifications, all in the MHCB were treated as if they were administrative segregation inmates. Inmates in the MHCB were always restrained and escorted by two correctional officers when out of their cells and could not be seen outside of an individual treatment module unless cuffed. Staff in

the MHCB were required to wear vests whenever they saw an inmate, regardless of his custody status. When in inmates were placed in restraints in the MHCB for clinical reasons, documentation of the use of restraints was inadequate.

MHCB inmates were not provided with recreational opportunities if they were on suicide watch or precautions. Staff reported that, due to space constraints, there were significant challenges to seeing inmates individually in a private setting. No clinical groups occurred in the MHCB unit. Although MHCB IDTT meetings occurred bi-weekly, CCIs never participated in MHCB IDTTs and other custody staff was sometimes absent.

Cells located in administrative segregation were used as holding areas to house inmates awaiting placement in MHCBs. Staff stated that these inmates were monitored on a one-to-one ratio by custody staff. They indicated further that these placements usually did not exceed 48 hours, but the institution did not track the use of holding cells. Reportedly, self-injurious inmates who needed to be restrained while in holding cells were injected with sedatives instead of being placed in restraints. Although it appeared that daily rounds were occurring, the institution did not create inpatient files for these inmates until they were housed in the MHCB unit.

KVSP continued to have difficulties transferring EOP inmates to institutions that offered appropriate programming.

Other Issues:

Although there was some improvement, 3CMS inmates still did not receive clinical case management contacts at required intervals. The institution reported a compliance rate of 51 percent for quarterly case manager contacts. Reportedly, roughly

half of IDTT meetings occurred timely, but no audits were conducted to determine whether appropriate personnel participated. No group therapy was provided to 3CMS or EOP inmates.

Responses to routine referrals were not being scheduled due to insufficient case manager staffing. Although trained to do so, mental health office techs did not utilize the referral tracking report which is part of the MHTS. Clinicians often failed to properly fill out contact sheets to initiate referrals, but emergency referrals appeared to be well handled and documented.

Interviews with inmates produced allegations of inconsistent application of KVSP's heat plan, including lack of heat cards. Stage II and Stage III alerts were documented.

Psych techs reported a lack of effective communication between themselves and nursing supervisors. Psych techs in the MHCB unit stated that they did not have job descriptions that clearly stated their duties and responsibilities.

Inmates reported multiple instances of custody staff misconduct, such as taunting MHSDS inmates, not cooperating with the provision of services to MHSDS inmates, and not honoring their priority ducats. (See Exhibit H, Case Review No. 16).

### North Kern State Prison (NKSP)
April 17, 2007 – April 19, 2007

Census:

As of April 16, 2007, the overall institutional census was 5,386. The MHSDS caseload census was 952, of whom 782 were 3CMS and 48 were EOP inmates in reception. There were 44 3CMS and nine EOP inmates in administrative segregation and 69 3CMS inmates in the general population.

Staffing:

At the time of the monitor's visit in April 2007, allocated positions for a chief psychologist and three senior psychologists were filled. The senior psychiatrist position was vacant.

Among mental health line positions, five of 7.5 psychiatrist positions were filled and one additional position was filled by a contractor. Among 36.6 psychologist positions, 24.6 were vacant, of which three were covered by registry contractors, leaving a functional vacancy rate of 59 percent.

Two of the four positions for psychiatric social workers and one of the two recreation therapist positions were filled. All six psych tech positions were filled.

Six of the eight office technician positions were filled, as were two of the 3.5 allocated office assistant positions.

Quality Management:

NKSP continued to excel in quality management during the monitoring period. Its local governing body, quality management committee, and mental health subcommittee all met regularly and addressed substantive issues. Specific efforts focused on access to care in the 3CMS program, administrative segregation, reception center, the MHCB and for EOP inmates. Other issues addressed included peer review, the MHTS, referrals, medical records, RVR assessments, parole planning, EOP transfers, referrals to higher levels of care, the timeliness of IDTT meetings and case manager contacts and services for inmates charged with sexual misconduct.

QITs were ongoing as the primary quality assurance tool. Peer review among psychologists and psychiatric social workers occurred regularly and met necessary

standards, but there was no meaningful peer review for psychiatrists.

Suicide Prevention:

Membership on the suicide prevention committee continued to include representatives of mental health, medicine, nursing, pharmacy, and custody staff; although regular attendance was problematic. The committee took up five-point restraints, MHCB referrals, admissions, lengths of stay, discharge orders, multiple MHCB admissions, MHCB stays over ten days, EOP care, DMH referrals and transfers, post discharge clinical and custody follow-up, emergency and suicide-related referrals and holding cell admissions.

The monitor's review of data from March 2007 indicated that holding cells at NKSP were being used for those inmates who required suicide watch. During that month, inmates were placed on suicide watch in these alternative sites on at least seven occasions. They were reportedly provided with one-to-one monitoring, but remained in alternative holding location for up to five days before being transferred to a MHCB.

At the time of the monitor's visit, however, the institution no longer provided one-to-one cell front observation for all inmates placed in alternative holding cells on suicide precaution. One-to-one monitoring was provided only for inmates on suicide watch. Pursuant to this practice, an inmate on suicide precaution could be held in one of the holding cells for more than 24 hours without one-to-one monitoring. It was unclear what suicide precaution measures were provided to these inmates.

During the monitoring period, NKSP implemented its plan for the reduction of suicides in administrative segregation, including the use of intake cells for

new arrivals and the placement of a placard on intake cell doors with the date of arrival of the new inmate and the date of discharge from the 21-day 30-minute welfare check protocol. The monitor's review identified problems with documentation of the 30-minute checks, which supervisory staff agreed to address through training and progressive disciplinary measures.

Cells had been identified for retrofitting, but renovations had not been completed at the time of the monitor's visit.

The institution did not produce data on the timeliness of initial screenings of new admissions to administrative segregation. Psych techs continued to have access to private confidential settings to complete initial screenings. Institutional audits and the monitor's review showed that daily psych tech rounds were conducted. Psych techs reported that they were sometimes diverted from screening and rounding to carry out other nursing assignments.

NKSP did not comply fully with requirements for clinical and custody follow-up of suicidal inmates discharged from the MHCB unit.

Medication Management:

Audits of many aspects of the medication management process did not occur during most of a two-month period immediately preceding the monitor's visit, and earlier audits were either unavailable for the monitor's review or had not been conducted. Available information, obtained primarily from the institution's Summary of Medication Management Issues and interviews with nursing staff, indicated that there had been deterioration in the quality and timeliness of medication delivery at NKSP, particularly in the latter part of the monitoring period.

Data relevant to continuity of medication at the time of arrival were not available. Prior to the monitoring tour, NKSP commenced a process whereby psychiatry services were available at bus screening. This process permitted the timely resolution of cases in which a newly arriving inmate reported himself to be on psychiatric medication, but was unaccompanied by a confirming medication order. Following a bus screen referral, a psychiatrist reviewed and, where appropriate, renewed medications directly, correcting the earlier practice in which psychiatrists would prescribe medications for new arrivals without seeing them. The psychiatrists associated with the bus screening process also reviewed medication regimens and interviewed other incoming inmates as appropriate.

Long-standing problems with interruptions in the medications of newly arriving inmates continued to be noted during that portion of the monitoring period for which data were available. Thirty-one percent of audited cases in one sampling did not receive their medications by the following day.

NKSP was in partial compliance with renewing medications prior to expiration.

NKSP historically has had problems with medication continuity when inmates have moved between housing areas within the institution. Data from an audit conducted early in the monitoring period suggested significant improvement that saw the compliance rate on this issue climb from 86 to 94 percent.

The institution continued to be partially compliant with timely psychiatry responses to referrals for medication noncompliance. The monitor's review of relevant

information indicated that improving psychiatric staffing led to increased timeliness in scheduled follow-up to referrals for medication noncompliance.

Institutional audits of laboratory testing associated with prescriptions for Lithium, Depakote and Tegretol found inconsistent compliance with testing guidelines.

The institution continued to employ medications requiring HS delivery on a limited basis. All evening medications in the reception center, whether ordered as "p.m." or "HS" were delivered after 8:00 p.m., and it was unclear whether any medications were being ordered, or needed to be ordered as HS in reception. There was no HS medication delivery on A-Yard, and all evening medications were delivered between 5:00 and 5:30 pm.

At the time of the monitor's visit, the mandated discontinuation of Clozaril prescribed for inmates prior to their arrival at NKSP continued to be a problem. A QIT was chartered to "develop a Clozaril protocol to ensure continuity until the inmate transfers."

Inmates continued to receive medications reliably at the time of their parole.

Mental Health Assessments for Use in the Discipline of Sexual Misconduct Violations

The institution maintained a data base for tracking the occurrence of inappropriate sexual behavior, screenings, IDTT data and recommendations related to inmates charged with sexual misbehavior. From November 7, 2006 through April 5, 2007, a total of 15 incidents of indecent exposure or public masturbation were recorded in the data base.

At the time of the site visit, several comprehensive evaluations following RVRs for indecent exposure had been completed. At least two of these evaluations resulted in diagnoses of exhibitionism. These evaluations included recommendations for inclusion in appropriate treatment. At the time of the monitor's visit, however, no relevant treatment group was available at NKSP, and there was no indication that exhibitionism was being treated through individual counseling.

Transfers:

From November 1, 2006, through April 17, 2007, 11 inmates were referred to DMH inpatient programs. The time from referral to transfer ranged from 13 to 35 days. At the time of the monitor's visit, five referrals had been awaiting acceptance and transfer, with waits ranging from 28 to 82 days. Three referrals were withdrawn when inmates paroled after their referral but prior to transfer.

The lengthy time period required to transfer individuals into DMH beds contributed to the ongoing shortage of available MHCBs at NKSP and the expansive use of alternative holding cells. At the time of the monitor's visit, four of ten available crisis beds were occupied by inmates accepted for DMH placement and awaiting transfer. These four inmates had occupied MHCBs for 28, 35, 53 and 82 days respectively, an enormous drain on this scarce resource.

From November 2006 through February 2007, the monthly average length of stay in the MHCB unit ranged from 4.59 to 9.35 days. The average length of stay increased due to the growing number of inmates awaiting transfer for longer periods to DMH programs. The monthly percentage of stays in the MHCB unit that lasted more than ten days ranged from 13.6 to 38.7 percent during the monitoring period.

The monitor observed an IDTT meeting in the MHCB unit. The constitution of the IDTT was consistent with Program Guide requirements. The IDTT had access to some C-files and inmates' inpatient records. All UHRs were available.

The interaction between the inmate and the committee members was productive; IDTT members communicated their decisions and recommendations in a straightforward way. Various team members, as well as the inmate/patients, participated meaningfully in the process. It was apparent that the committee members were thoroughly familiar with the cases being reviewed.

NKSP was partially compliant with requirements for the development of treatment planning within the IDTT process, and staff regularly addressed important treatment issues in treatment planning. The monitor's review found progress notes to be generally informative and legible. Progress notes were generally recorded within the timelines prescribed in the Program Guide. Staff typically supplemented basic entries when they used forms, so that notes were meaningful.

Utilization of alternative holding areas for inmates awaiting placement in a MHCB had long been a major problem for this institution. There was some limited improvement during the monitoring period in moving inmates more rapidly from these alternative holding areas into MHCBs, where appropriate monitoring and treatment could be provided.

NKSP also took steps to mitigate some of the major obstacles to the provision of adequate mental health services to inmates placed temporarily in these alternative sites pending placement into a MHCB. The primary improvement was the

establishment of an IDTT that included a psychiatrist, psychologist, and nursing staff specifically for inmates held in the alternative locations.

Provider notes for inmates in these placements were filed in the progress notes section of their UHRs and not with MHCB admission notes, and holding area placements were not documented in MHCB "aging reports." In some cases, subsequent progress notes did not clearly document which elements of the treatment plan were being implemented.

At the time of the monitor's visit, NKSP had recently submitted a proposal for a six-bed OHU to address current problems arising from the statewide shortage in mental health crisis beds and the resultingt placement of large numbers of NKSP inmates into holding cells for crisis care.

Other CAP Issues:

As of April 17, 2007, there were 44 3CMS and six EOP inmates in administrative segregation. Among the six EOP inmates in administrative segregation, one had a length of stay that exceeded transfer deadlines. Institutional audits and the monitor's review indicated that case manager contacts occurred weekly, although most contacts took place at cell front. Group therapy was offered in administrative segregation four days a week. Institutional data showed that all administrative segregation inmates were offered groups on each group activity day. All administrative segregation inmates were not offered ten hours a week of outdoor exercise. The primary reason offered by staff for this deficiency was ongoing gang-related activities in the institution.

The monitor observed an IDTT meeting in administrative segregation on April 19, 2007. The full complement of required staff was present. In addition, the

senior psychologist and a psych tech were also present. Inmates' UHRs and C-files were present.

Presenting case managers were thorough, providing information about each inmate, indicating the reason for the administrative segregation placement, describing the inmate's response to treatment and current mental health condition and raising any clinical concerns, including medication issues. In each case, the team engaged and interacted with the inmate, and with each other. The psychiatrist addressed medication matters and provided opportunity for the inmate to respond and/or make inquiries. The correctional counselor spoke to issues of custody and reviewed the C-file when necessary, offering responses to inquiries from both inmates and team members. The case manager explained to the inmate the content of the treatment plan as developed by the IDTT. After the inmate was offered an opportunity to ask questions or respond to questions from the members, and then left, the team discussed the case and completed the required IDTT documentation.

NKSP was partially compliant in providing weekly case manager contacts and offering required structured therapeutic activities to its EOP inmates, all of whom were in reception awaiting transfers. The institution was utilizing the IDTT process to develop treatment plans for its EOP inmates.

NKSP was compliant with holding and documenting IDTT meetings for its 3CMS inmates. It also met requirements for providing quarterly case management contact with 3CMS inmates. Psychiatric care in the 3CMS program continued to be problematic. A limited number of 3CMS inmates were offered and received psychotherapeutic groups.

Institutional data and the monitor's review demonstrated that NKSP was compliant with the utilization of mental health assessments for inmates charged with disciplinary infractions in the RVR process, and with the presentation to and consideration by hearing officers of pertinent mental health assessments.

Other Issues:

At the time of the monitor's visit, 92 NKSP staff members required CPR training. NKSP did not have a system in place to track correctional officers not yet trained on their return to work to ensure that the needed training was taken. The institution planned to add CPR training to its annual refresher training course curriculum.

NKSP had implemented its heat plan fully. The warden adopted a local heat policy which maintained the required heat triggers and activities related to inmates on heat medications, and, in addition, permitted any inmate to return to his housing unit when the temperature reached or exceeded 90 degrees Fahrenheit.

## Service Area H

### California State Prison, Los Angeles County (CSP/LAC)
May 15, 2007 – May 18, 2007

Census:

During the week of May 15, 2007, CSP/LAC's census was 4,656 inmates in a prison with a total capacity of 4, 440 inmates. The mental health caseload was 1,286, or 27 percent of the overall population. There were 353 EOP inmates, 226 in mainline, 64 in reception and 63 in administrative segregation. There were 926 3CMS inmates, 401 in mainline, 384 in reception center and 141 in administrative segregation. Seven inmates were in MHCBs.

Staffing:

CSP/LAC's functional vacancy rate among mental health staff improved from 24 percent to 16.23 percent. The chief psychiatrist position was vacant. The senior psychiatrist position remained filled, and only 2.5 of the 10.5 staff psychiatrist positions were filled. Psychiatry contract coverage increased from 6.2 to 8.5 positions during the monitoring period, effectively covering the vacant psychiatry positions.

The chief psychologist position was no longer filled by the health care manager, but by a senior psychologist (acting). Despite the improvement in the overall functional staffing vacancy rate, vacancies among psychologists and social workers increased to 70 percent. One of six senior psychologists and 28 of 39 staff psychologist positions were vacant. Six of the ten psychiatric social worker positions were vacant. The two senior psych tech positions were filled, but nine of the 24 psych tech positions were vacant. Only 30 percent of the case manager vacancies were covered by contractors during the monitoring period. Five of seven recreation therapist positions were vacant.

Clerical positions were equally problematic with 8.5 of the 12.5 office tech positions vacant and one of the two office assistant positions vacant. The positions of office manager and medical secretary were filled.

Quality Management:

Quality management at CSP/LAC improved during this monitoring period. Documentation of meetings of the mental health quality management subcommittee indicated that the committee met at least bi-weekly during the monitoring period. The committee regularly had a reasonable agenda, with an appropriate focus on clinical operations.

QIT activity slowed during the monitoring period. Only three QITs were

active, and two of them were connected to previously formed work groups.   The only new QIT was chartered to review DMH referrals.  All QITs included appropriate staff.

Peer review was conducted by psychology, but it was largely quantitative and did not focus on qualitative aspects of clinical issues.  Psychiatric social worker peer review re-started just prior to the site visit.

Psychiatry reportedly conducted some peer review activities, but documentation was unclear.  Minutes suggested that psychiatric clinical discussions were occurring, but that peer review was not occurring.

Suicide Prevention:

The suicide prevention committee met monthly.  The composition was generally consistent with CDCR Program Guide requirements, and attendance was stable at approximately ten to 14 staff.  Correctional staff attendance was low.  Only one action item was created during the entire year of 2007, and no action was taken to implement it.  An abundance of raw data was gathered, but there was no substantive analysis or discussion by the committee.

Lapses continued in five-day clinical follow-up of suicidal inmates discharged from a MHCB.  Staff reported that lapses were due to case managers' inability to determine the inmates' locations.

The emergency response review committee resumed meetings during the monitoring period.  The monitor attended a meeting and again found problems related to the agenda and the use of raw data without substantive discussion and/or analysis.  CSP/LAC improved with its implementation of the administrative segregation suicide prevention plan.  Newly admitted inmates were identified for the first 21 days following

placement which resulted in 30-minute checks by correctional officers. The seven intake cells had not been retrofitted and were not enough to accommodate the number of inmates on intake status at CSP/LAC.

Compliance had significantly improved for timely completion of mental health screens for new arrivals in administrative segregation, improving from zero to 81 percent compliance.

Access to ten hours per week of outdoor recreational time in administrative segregation remained problematic.

Increased property for administrative segregation inmates had not been implemented due to a lack of access to electrical outlets.

Medication Management:

Medication continuity and management of noncompliance remained problematic at CSP/LAC. Institutional audits were limited to a series of ten charts reviewed only once in the monitoring period. Timely medication orders were written for newly arriving inmates and the inmates received their medications within 24 hours of arrival whether coming from a CDCR institution or an outside facility.

Chronic problems continued with continuity of medication prior to expiration and internal institutional movements. Staff reported only 60 percent compliance for timely renewals or discontinuance of medication.

Medication delivery during lockdowns remained problematic. Several general population housing units with 3CMS inmates had been locked down since October 2006, and medications were delivered to the units. Medication delivery times were variable so that 8:00 a.m. medications were often not received until 11:00 a.m.

Similarly, HS medications were sometimes delivered at dinner time as opposed to 8:00 p.m. Medication order changes took about one week to reach the medication carts and medication order expirations took five days to several weeks to resume during lockdowns.

Medication noncompliance was not properly documented and referred; therefore, the actual prevalence of noncompliance was unknown.

MARs were problematic as they were often illegible, improperly completed and not filed timely in the UHR. Staff reported that informed medication consent forms were found in 83 to 91 percent of reviewed UHRs on different yards.

It was also not clear whether inmates associated with histories or suspicions of hoarding or cheeking medications actually received DOT orders when clinically indicated.

There was no data available to support the institutional claim that blood levels of inmates on mood stabilizers were monitored every six months.

There was continued compliance with parole medication distribution.

<u>Mental Health Assessments for Use in the Discipline of Sexual Misconduct Violations</u>:

In April 2007, CSP/LAC revised its LOP addressing the occurrence of sexual misconduct. The new policy did not include specifications for the contents of the mental health screenings and comprehensive evaluations.

Logs were maintained of inmates charged with indecent exposure. However, CSP/LAC did not track the occurrence of indecent exposure, referral and completion of mental health screens, IDTT consideration, referral for comprehensive evaluation or imposition of behaviorally based procedures. There was no institutional

committee that reviewed indecent exposure occurrences and interventions at CSP/LAC.

The monitor's expert reviewed a sample of mental health screenings following sexual misconduct from October 24, 2006 through April 12, 2007. Evaluation formats were inconsistent; although most addressed whether the inmate's behavior was influenced by mental illness. Many evaluations did not include a review of relevant information from the UHR. Documentation of IDTT consideration of these evaluations was generally present.

No comprehensive evaluations for possible diagnosis of exhibitionism occurred during the monitoring period. No inmates were diagnosed with exhibitionism. Several inmates who had been diagnosed with exhibitionism in previous monitoring rounds were involved in treatment directed at impulse control.

<u>Transfers</u>:

CSP/LAC continued to struggle with referring, processing and documenting referrals to DMH. A QIT was chartered in response to these difficulties. Logs of referrals to DMH acute and intermediate inpatient programs were not maintained.

CSP/LAC made no referrals to ASH, and only seven inmates were referred to the DMH/APP at CMF. One inmate transferred to the DMH/APP and two referrals were rescinded. Referrals were usually initiated by MHCB clinicians two to three days after admission to the MHCB, but CSP/LAC took an average of 42 days to complete and forward the referral to APP. Four to 44 days elapsed between a referral and the assignment of a bed number. Actual transfer data was not available.

The monitor's review of very limited data on referrals to DMH

intermediate inpatient programs revealed significant internal delays in processing referral

packets. Packets continued to take 30 to 80 days to complete. Acceptance and transfer

data was not available.

CSP/LAC reported 11 beds in the CTC designated as MHCBs, an increase

from the previously reported ten beds. Access to the MHCB remained problematic. On

May 15, 2007, six of the 11 MHCBs were occupied by long-term medical patients. Staff

reported other impediments to access included the use of holding cells regardless of bed

availability, an apparent bias against admitting certain inmates perceived to be

manipulative and difficulty with on-call psychiatric staff refusing to return pages during

off hours.

From January 1, 2007 through May 5, 2007, there were 32 admissions to

MHCBs. The numbers of admissions per month ranged from three to 15. The average

daily census was six inmates, and lengths of stay ranged from one to 114 days, inclusive

of inmates awaiting DMH transfer. Excluding DMH transfers, only two stays exceeded

ten days. The average length of stay for the six inmates awaiting DMH transfer was 92

days.

Inadequate documentation of the use of holding cells pending MHCB

placement made it impossible to determine the frequency of use and the duration of time

inmates spent in such cells. The log only contained the date of admission. Time of

admission, location of admission (holding cell or tank, and release date and time were not

included, rendering the log useless for monitoring lengths of stay. Psychiatric staff

reported that inmates were moved out of the holding cells the following weekday

morning, indicating that inmates remained in the holding cells overnight and perhaps

longer on weekends.

Logs documenting the use of restraints in MHCB were highly deficient. CSP/LAC did not follow Program Guide requirements for the use of physical restraints, such as having the ordering practitioner conduct a face-to-face examination of the inmate within one hour of the application of four or five point restraints, or reducing the duration of both the initial and continuing restraint order to two hours. Inadequate documentation made it impossible to determine whether restraints were used only as a last resort and discontinued at the earliest possible time.

Other CAP Issues:

During the monitoring period, the EOP reception center inmates moved to housing unit D-2 with EOP general population inmates. Housing unit D-1 housed the remaining population of EOP general population inmates.

In an effort to decrease the historic disparity in programming hours between housing units D-1 and D-2, one supervising psychologist was assigned to oversee both units. While early signs of intended improvements were noted, no data were available for review due to clerical backlog.

Inmate interviews and documentation confirmed weekly case manager contacts and adequate access to psychiatry. However, case manager and psychiatry contacts continued to occur in non-confidential settings. Only 50 percent of case manager contacts were conducted in a private setting in both D-1 and D-2, and all psychiatric appointments were conducted in the open dayroom of the housing units.

Inmates reported that medication changes were implemented the same day or within one to two days. Some inmates continued to experience episodes of medication

order expiration which took three to four days to remedy.

All inmates reported being seen by an IDTT every three months, and were generally pleased with the number and types of group treatments being provided to them.

EOP group programming was organized into several different tracks, or clusters, specific to the various types of presenting problems experienced by the inmates. Clusters included groups for thought disorders, mood disorders, impulse control problems, and elective groups. Inmates were assigned to thought, mood, and impulse control groups as part of their "core" treatment, and electives were based on the inmate's level of functioning, need, and/or preferences. Examples of elective groups included groups for persons who engaged in self-injury, music groups, leisure groups and groups for Spanish-speaking inmates. Assignments were made pursuant to IDTT recommendations.

Due to prior concerns around the staffing ratio of recreational therapists to inmates, only two hours per week of structured yard time were credited to the ten hours of structured therapeutic activity during the monitoring period.

Housing unit D-1 inmates were consistently offered more than ten hours of out-of-cell programming weekly. The percentage of D-1 inmates actually receiving ten hours per week ranged from 31 percent to 66 percent.

Housing unit D-2 data on the provision of ten hours weekly of therapeutic activities reflected greater variability. Only 25 to 52 percent of D-2 inmates received more than ten hours of structured therapeutic activity per week during the monitoring period.

The monitor's expert attended EOP IDTT meetings and found the