treatment team composition improved. The team consisted of a psychiatrist, psychologists, a psychiatric social worker, correctional counselors and correctional officers. The quality of IDTT meetings was adequate with good interactions among team members and clinically relevant discussions. Inmate feedback was permitted and medication issues were referred for follow-up by the psychiatrist.

The institution had taken some steps to redress issues related to mental health and custody relations, which remain an ongoing issue. A joint training was conducted and regular meetings between mental health staff and correctional staff from second and third watch occurred twice monthly during the monitoring period.

EOP inmates continued to complain about treatment by third watch officers. Prior reports included reference to specific incident reports and an identified correctional officer with problematic interactions reported by both inmates and staff.

The monitor's expert's review of UHRs and interviews of randomly selected 3CMS general population inmates revealed almost no contact with case managers during the monitoring period. When contacts occurred, they were conducted by different case managers for each visit and occurred regularly at cell front. None of the 21 interviewed inmates were in mental health treatment groups.

Psychiatry access was reportedly adequate, but contacts were not always conducted by the same psychiatrist which led to frequent medication changes. Psychiatry contacts were also conducted at cell front.

Administrative segregation data demonstrated consistent weekly case manager contacts, although more than half were completed at cell front

Psych tech rounds in administrative segregation were completed in a

competent manner. Psych techs completed rounds in overflow administrative segregation unit A-3 during the monitoring period.

IDTT meetings were occurring regularly in administrative segregation during the monitoring period. IDTT attendance by the case manager, psychiatrist and correctional counselor improved.

CSP/LAC reported meeting requirements for weekly case manager contact and weekly scheduled structured therapeutic activities for EOP inmates in administrative segregation. Institutional audits revealed 98 percent compliance for weekly case manager contacts. Similarly, group therapy compliance had been at or above 98 percent with only a few exceptions due to custody lockdowns.

Audits demonstrated that EOP inmates in administrative segregation were offered approximately 11.4 hours weekly, and received an average of 6.7 hours of group therapy from January 2007 to May 2007. EOP inmates reported satisfaction with the group treatment provided.

## Service Area I

## California Institution for Men (CIM)
April 2, 2007 – April 4, 2007

Census:

As of April 2, 2007, CIM housed 6,595 inmates, including 1,518 on the mental health caseload. Among caseload inmates, 172, or 11.3 percent, required an EOP level of care. Of a total of 358 inmates in administrative segregation, 95, or 26.5 percent, were on the MHSDS caseload, including 27 EOP inmates. There were 31 inmates in MHCBs.

Staffing:

Mental health staffing vacancies increased to 30 percent, and coverage of the increasing vacancies with contracted services was inadequate. The vacancy rate among both psychiatrists and psychologists was over 40 percent, while 38 percent of allocated psychiatric social worker positions were also vacant. Clerical position vacancies also rose to 36 percent. Staffing allocations for the MHCB remain inadequate, with an average daily census of 33 inmates in an MHCB unit that was staffed for just 18 inmates in crisis.

Quality Management:

The mental health quality management committee continued its quality assurance audits, peer review and QIT processes. Medication management audits demonstrated sound methodology, and improved compliance was noted in several medication areas.

The suicide prevention committee met monthly. Consistent attendance by both custody and mental health staff remained problematic. Problems identified and discussed during meetings were not addressed in subsequent minutes. Minutes of both the suicide prevention committee meeting and the health care quality management committee meeting indicated that an audit of five-day clinical follow-up of suicidal inmates discharged from the MHCB was to be conducted. Subsequent minutes of committee meetings did not refer to the audit. The suicide prevention committee also failed to address the role and responsibilities of custody staff in providing the follow-up services.

An audit of discharges of suicidal inmates from the MHCB unit with an order for five-day clinical follow-up recorded zero compliance. There was no consistent

procedure in place for alerting receiving clinicians of the need for clinical follow-up of inmates discharged from a MHCB. On April 4, 2007, the monitor's expert found five of 12 inmates missing from the clinician notification list.

Suicide risk assessments were not regularly conducted prior to discharge from the MHCB program.

Medication Management:

Medications were ordered within eight hours for most inmates arriving from other CDCR institutions or county facilities. For newly arriving inmates with new orders resulting from initial screenings, 75 percent of first doses were received by the end of the following day. Medication continuity following internal transfers to different housing areas was documented for 69 percent of inmates undergoing such moves. Documentation of first doses of new and changed orders that were received on the same day occurred in 75 percent of audited cases. Providers made progress notes of medication initiations, changes, or discontinuances in 87 percent of audited cases. Renewals or discontinuations of expiring medications occurred before expiration 95 percent of the time.

In instances when an inmate failed to appear, refused a medication governed by a Keyhea order, refused psychotropic medication for three consecutive days or missed 50 percent of prescribed psychotropic medications over a seven-day period, staff made a referral for medication follow-up with a primary care physician in 62 percent of audited cases. In 51 percent of those documented cases, follow-up counseling occurred within seven calendar days.

Staff documented noncompliance, circling their written initials in the

MAR space for medication date and time entry, along with a reason for noncompliance on the reverse side of the MAR in 97 percent of audited cases. A health care coordinator monitored MARs biweekly for completeness and legibility of nursing documentation.

Prior months' MARs were filed in 97 percent of reviewed UHRs, and 86 percent of entries on MARs were complete and legible.

Audits found that informed medication consent forms were obtained for each class of ordered psychotropic medication in 82 percent of cases; appropriate administration of HS orders was documented in 93 percent of surveyed cases; and CDCR forms for pharmacy and medication supplies were signed by inmates at the time of release in 95 percent of audited cases.

The process for initiating and maintaining Keyhea orders remained problematic.

<u>Transfers</u>:

During the monitoring period, 29 inmates, or approximately seven per month, were referred to DMH acute or intermediate inpatient programs. At the time of the monitor's visit, 14 had been accepted and transported to DMH, six paroled before their transfer, three were returned to lower levels of care, five were on a wait list, and one referral was still in process. Times from referral to acceptance and transfer were 31 days on average. It took an average of 14 days for CIM's completion of a referral package. On April 2, 2007, one inmate had been awaiting a notification of acceptance or rejection from a DMH acute inpatient program for 59 days. The same inmate's referral took 11 days from the date of his IDTT's recommendation of the referral to DMH.

In the three months preceding the monitor's visit, a daily average of five

inmates and a total of 474 inmates were admitted to a MHCB in CIM. The average daily census in the MHCB unit dropped from 34.6 to 32.5, or 15 above its licensed capacity. The average length of stay remained at seven days.

Of these 474 MHCB admissions, 93, or 20 percent, had three or more admissions during the preceding six months. Some of these repeat admissions were likely due to the limited availability of beds in DMH intermediate inpatient programs, which tended to discourage referrals to that level of care.

Stays in the MHCB unit that lasted longer than ten days decreased from 14 percent to 11 percent of all admissions during the monitoring period. All inmates with stays over ten days reportedly were considered for a DMH level of care. Of the 51 inmates with stays over ten days, 43 percent were referred to a DMH inpatient program.

Holding tanks were used in the reception center to temporarily house inmates waiting for transfer to a MHCB. Placement logs were incomplete and inconsistent in different units. The time of use of these alternative holding placements ranged from four to 7.25 hours.

CIM did not track EOP inmate administrative segregation hub transfers. The monitor's review of a sample of transfers revealed an average of some 50 days to transfer, while 70 percent of the transfers exceeded 30 days.

The average delay for EOP transfers out of reception increased from 86 to 108 days, although there was some improvement during the monitoring period. In February 2007, 54 EOP inmates arrived, 31 paroled, and 24 transferred, while in March 2007, 35 EOP inmates arrived, 31 paroled, and 29 transferred. However, the institution's March 31, 2007 tracking report showed that of 191 EOP reception center inmates at CIM,

only 16 were endorsed for transfer. CIM did not track expedited EOP transfers or 3CMS transfers out of the reception center.

Other Issues:

CIM continued to provide MHCB services to a daily average of 33 inmates with a staffing allocation for 18 beds. CIM's 18 formally designated MHCBs were in an 18-bed wing (Station IV) of its general acute care hospital (GACH), while the remaining 15-plus MHCBs were housed in an adjacent 18-bed high security area. Overflow areas were operational in two reception units, Del Norte on East Yard, and Birch on Central Yard. Clinical coverage for the overflow areas in reception continued to be provided by diverting staff from their reception duties, which undermined clinical coverage in the reception center.

A local operating procedure was in place for the overflow units. The LOP required daily psychiatrist visits and 24-hour nursing oversight. The procedure also prohibited inmates needing suicide watch from being housed in the overflow units, while inmates on suicide precaution might be housed there.

During March 2007, there were 106 admissions to the Del Norte overflow MHCBs. Fifty-seven percent of these inmates were subsequently moved from the overflow unit to a *bona fide* MHCB; 61 percent of these admissions to the MHCB unit occurred on the same day or within one working day; 18 percent occurred within two days; 13 percent occurred within three days; and two admissions took four or more days. Admission and discharge information was not provided for Birch Hall.

In MHCB overflow units, nursing coverage with rounding every 30 minutes for inmates on suicide watch was documented. However, access to RNs between

rounds was problematic due to the remote location of the nursing station. On April 3, 2007, interviewed nursing staff were unfamiliar with operating procedures for the unit. There was no documentation of daily psychiatrist rounds on the unit.

Suicide smocks and blankets were permitted in the overflow units. Procurement of tear-proof suicide smocks, blankets and mattresses continued to be a problem. Cells in the Del Norte overflow unit were inadequate for potentially suicidal or agitated inmates. The cells had large-grate vents, unsafe beds and blind spots.

The number of MHCB inmates "red tagged" and identified as administrative segregation inmates remained high. The additional escort requirement flowing from this designation further impeded access to care. Attendance at IDTT meetings by nursing and correctional staffs remained problematic due to multiple IDTT meetings occurring at the same time for various units. Access to healthcare records improved, although filing problems reduced the usefulness of available UHRs. Daily discussions among mental health and custody staff members proved beneficial.

The mental health population in the administrative segregation unit increased from a daily average of 99 to 113 inmates. The EOP population in administrative segregation rose to a daily average of 27 inmates.

All mental health caseload inmates were seen weekly by case managers. Only forty-two percent of all mental health inmate contacts were conducted in a confidential setting; the rest occurred at cell front.

The refusal rate for mental health appointments in the administrative segregation unit remained high. All inmates who refused an appointment were seen at cell front by a case manager.

Inmates began attending IDTT meetings only on the eve of the monitor's visit. The monitor found in observed IDTT meetings little interdisciplinary discussion, treatment plans that were only rudimentary, frequently absent UHRs and high rates of inmate refusal to participate.

Caseload inmates continued to be housed overnight in the physically dangerous "deep seg" of CIM's administrative segregation unit. CIM had implemented only some elements of the administrative segregation unit suicide prevention plan and did not meet all required standards in those elements implemented. Required out-of-cell recreational activity was not provided for all inmates. Not all newly arriving inmates were screened for suicide risk prior to their admission, nor were any entertainment appliances permitted for non-disciplinary placements.

The turnover among medical records staff was high during the monitoring period and the backlog of filing increased, but UHRs reportedly were available 88 percent of the time. Staff reported that progress notes and lab results were often not filed.

The mental health tracking system continued to be ineffective due to a design that is incompatible with the physical configuration of CIM. Data entries were up to date but entered data was not consistently accurate. A system outage stalled usage for a significant portion of the monitoring period.

Discharge planning remains largely unchanged. No data were provided on the parole plans prepared for inmates discharged on parole. The communication between CIM clinical staff and TCMP social workers was ineffective and needed improvement.

The emergency response review committee met monthly. It was questionable if all appropriate incidents were forwarded to the committee for review.

### Service Area J

### Richard J. Donovan Correctional Facility (RJD)
May 30, 2007-June 1, 2007

Census:

In May 2007, RJD's census was 4,664 inmates. The caseload population was 1,510, or 32 percent of the prison's population. There were 487 caseload inmates in general population, including 255 3CMS inmates and 232 EOP inmates. There were 485 caseload inmates in the reception center, including 407 3CMS inmates and 78 EOP inmates. There were 197 inmates in administrative segregation, including 144 3CMS inmates and 53 EOP inmates. There were 331 3CMS inmates on SNYs, and ten inmates were in MHCBs.

Staffing:

The vacancy rate in mental health positions increased to 42 percent during this monitoring period, due to the establishment of 35.56 new mental health positions. Over 90 percent of the vacancies were covered utilizing contract staff. The chief psychiatrist and chief psychologist positions were filled. Psych tech vacancies were extremely high at 75 percent, or 18 of 24.

Significant vacancies were also present in clerical staffing. Three of four office assistant and medical transcriber positions were vacant, and 5.20 of the 15.20 office tech positions were vacant.

Issues Resolved:

Medications were renewed before their expiration. Continuity of medication upon arrival at RJD from other CDCR institutions was maintained. Continuity of medication upon transfers to other housing units within RJD was also

maintained. A system to track and respond to medication noncompliance functioned adequately. A formal mechanism existed to ensure medications were renewed prior to expiration. Psychiatry follow-up occurred for medication noncompliance as a result of no shows and refusals.

Quality Management:

There was a decline in quality management activities during the monitoring period, including frequency of committee meetings and decreased QITs. In fact, there were only two QITs identified in the committee minutes. Meetings were reasonably well attended with the associate warden of health care services present.

Peer review for psychiatry was established, but functioned inadequately or more like a quality assessment process than peer review. Staff reported concerns about the legal discoverability of peer review documents as the reason for lack of full implementation of the process.

Suicide Prevention:

The suicide prevention committee did not meet regularly during the monitoring period. Those meetings that did take place were not well attended, with sometimes only five or six of the 20 members present. The meeting format was inconsistent with the department protocol, and mandated review items were not consistently addressed. Identified issues requiring follow-up were not addressed in subsequent meeting minutes.

Members of the suicide prevention committee sometimes appeared unfamiliar with departmental policy, and meetings focused primarily on reports rather than quality improvement.

Medication Management:

The medication management system improved and was working well at RJD, largely due to the excellent working relationship between the chief psychiatrist and director of nursing. A "MAR czar" position was established to focus solely on medication management issues. The occupant of this position, either a pharmacy technician or medical assistant, reviewed the daily movement sheet each morning and tracked all mental health caseload inmate moves to ensure the inmate's medication moved as well as the inmate.

Audit results showed 93 percent compliance for continuity of medications upon movement within RJD. Medication continuity upon discharge from the MHCB was 100 percent compliant, upon parole was 93 percent compliant, and upon arrival from another CDCR institution was 97 percent compliant. Medication continuity upon transfer from county jails was at 80 percent compliance.

The system in place at RJD for timely renewal of medications was working well with a compliance rate of 92 percent. In instances when the inmate failed to appear, refused one dose of Keyhea ordered medication, refused psychotropic medication for three consecutive days, or missed 50 percent of his psychotropic medication over a seven-day period, staff documented referral for medication follow-up with a physician in 90 percent of cases. RJD began distributing medication at cell side during the monitoring period, and the approach has led to significant reductions in incidents of medication noncompliance.

Wait times in pill lines were no longer problematic. The longest pill line at RJD was approximately 15 minutes. Compliance for the procurement of informed

{00051302 v 1}100

medication consent forms from inmates decreased to 78 percent from 84 percent. Blood level monitoring for inmates on mood stabilizing medication ranged between 80 percent and 90 percent compliant.

HS medications were administered after 8:00 p.m. to more that 200 inmates.

Transfers:

RJD continued to refer inmates to all DMH programs during the monitoring period. RJD continued to utilize its process for monitoring high-risk inmates, but the process had little impact on RJD clinicians' longstanding hesitation to make referrals to higher levels of care. The log of referrals improved, but pertinent information such as date of admittance to a MHCB was not included.

Staff reported adequate access to DMH acute care inpatient programs. Referral data revealed only nine referrals to acute inpatient care during the monitoring period. No referrals were rescinded or rejected, and 66 percent of referred inmates transferred within eight days. One inmate took 17 days to transfer due to an intervening referral to DMH intermediate inpatient care, and another inmate was number 25 on the waiting list.

Completion of intermediate inpatient referrals remained sluggish and took an average of three weeks. RJD made 45 referrals to DMH intermediate inpatient programs (20 to SVPP; seven to CMF programs; 18 to ASH). Thirty-one, or 68 percent, of the referrals resulted in transfer.

Eleven inmates transferred to SVPP. Referral to acceptance took an average of 17 days. Excluding one outlier and three waitlisted inmates, the average time

between referral and transfer was 36 days.

RJD referred seven inmates to CMF. One referral was rescinded and the remaining six referrals were accepted and transferred.

RJD reported relatively open access to ASH from September 2006 through December 2006. During that period, RJD referred 17 inmates with only three rejections. Average transfer from referral took one week. As of January 2007, referrals to ASH stopped due to ASH's closure to intake.

Access to the DMH day treatment program at CMF remained swift during this monitoring period. Three referrals were made and transfers occurred within two weeks.

The licensed CTC continued to have 15 beds used for MHCBs. Staff reported adequate access to the MHCBs. Temporary holding cells were not used in lieu of admission to crisis beds during the monitoring period. From September 2006 through February 2007, there were 208 discharges from the MHCB unit or an average of 34 per month. The average length of stay was eight days, including administrative days. Seventeen percent of the admissions to RJD's MHCB exceeded ten calendar days, a decrease from 25 percent in previous monitoring periods. Staff reported that custody was required to hold an inmate's cell bed for ten days which decreased extra administrative days to one day.

Twelve inmates, or five percent, were admitted three or more times during a six month period.

There were only two transfers to PSUs during the monitoring period. An accurate log was not maintained with dates of referral. Therefore, it was impossible to

determine any delays in endorsement. Once endorsed, one inmate transferred to Pelican Bay State Prison in six days and the other transferred to CSP/Sac in 18 days. All inmates were reportedly transported via special transport.

RJD reported 60 percent compliance with timelines for EOP reception center inmate transfers and 66 percent compliance for 3CMS reception center inmate transfers during the month of April 2007. The monitor's examination of the data for reception center inmates raised significant concerns about the reliability of the data presented. Staff was unable to verify inmate arrival dates to the institution, calling into question the length of stay data.

Other CAP Issues:

EOP treatment for general population inmates improved during the monitoring period. EOP inmates were offered an average of 9.96 hours of structured therapeutic activities, with an average of 7.09 hours received.

RJD continued to conduct separate clinical weekly high risk meetings for the ASU, EOP and RC programs, and the 3CMS program as needed. A high risk monitoring list was used to track all inmates designated as decompensating or high risk for decompensating or engaging in dangerous behaviors. Inmates were considered for the high risk monitoring list if they were a danger to self or others, returning from DMH, decompensating, on a Keyhea order or had multiple MHCB admissions and/or DMH referrals.

Planned training sessions on improved documentation of decompensating inmates, as well as improved DMH referrals, had not yet occurred.

The administrative segregation EOP population stayed below the

mandated capacity of 63 inmates during the monitoring period. On May 29, 2007, there were 141 3CMS inmates and 58 EOP inmates housed in administrative segregation. There were two psychiatrists, ten case managers, one senior psychologist and six licensed psych techs assigned to provide services to the mental health caseload in the unit.

Post-placement screening (31-question screen) was completed at cell front by psych techs. There was no documentation verifying timely completion of post-placement screens in the UHRs, health records, logs or audits.

Psych tech rounds occurred during morning medication administration when a custody officer was required to be present in violation of confidentiality. Psych tech weekly summaries were completed on a form that covered the entire month, not allowing for adequate documentation of daily activities. Psych tech vacancies were cited as the reason for these deficiencies.

RJD had not yet begun completion of suicide risk profiles for inmates placed in administrative segregation. RJD was completing 30-minute welfare checks, although some correctional officers were documenting the checks in blocks of hours as opposed to 30 minute intervals. There were also gaps in documentation of required checks. There was a system in place for the supervision of monitoring the checks and its documentation, but no process in place for dealing with identified deficiencies.

Case reviews showed that only 50 percent of required weekly case manager contacts were occurring in administrative segregation. A significant number of the contacts occurred at cell front. The remaining contacts occurred in therapeutic modules in the day room, which were not private.

RJD consistently offered more than ten hours of structured therapeutic

activities per week to EOP administrative segregation inmates. The activities were offered in dayroom areas with little visual or auditory privacy. Inmates and staff reported difficulty hearing and communicating during group sessions, which discouraged inmate participation in treatment. As a result, inmates received only four to six hours. Administrative segregation inmates were not receiving ten hours of recreational yard per week. RJD had not implemented allowing appliances in administrative segregation and was in the process of reviewing whether it was feasible within the current physical plant.

RJD did not maintain accurate length of stay data for administrative segregation inmates.

Compliance continued for 3CMS inmate quarterly contacts at 95 percent.

The quality of RJD's UHRs remained problematic. The UHRs were disorganized and missing significant amounts of material. Staff reported that filing was approximately 45 days behind.

Other Issues:

Heat plan implementation significantly improved during the monitoring period. Heat risk lists were readily available for review in all housing units, cooling units were installed in particularly hot housing units and heat posters were located in conspicuous areas in all housing units. RJD remained partially compliant with the distribution of heat cards, with a compliance rate of 74 percent.

The emergency response and death review committee met weekly and maintained minutes. The committee engaged in a high level of scrutiny of incidents resulting in many recommendations for improvement.

The MHTS continued to function in a fragile state primarily due to clerical

vacancies, chronic turnover and lack of office supervision. Staff continued to rely on supplemental automated systems to maintain an EOP group roster and track group attendance. Data entry was approximately one month behind.

RJD continued to write RVRs for attempted suicide related activities without following required departmental policy.

### Service Area L

### Valley State Prison for Women (VSPW)
May 7, 2007 – May 9, 2007

Census:

In May 2007, VSPW's total inmate population was 3,947. Of that number, 1,125, or 29 percent, were participants in the MHSDS. The size of the caseload grew by roughly 150 within four months, reaching 850 in the general population alone, exclusive of the reception center, administrative segregation and the SHU. The reception center held 193 3CMS and 15 EOP inmates. There were 26 3CMS and seven EOP inmates in administrative segregation. The SHU held 31 3CMS and three EOP inmates.

Staffing:

At the end of the previous monitoring period, VSPW received authorization to establish 37.84 new mental health positions, an 88 percent increase in its overall mental health staffing allocation. The new allocations, associated with an increase in the size of the caseload and providing treatment to EOP inmates in the reception center, included positions for 2.5 staff psychiatrists, a senior psychologist and 14 staff psychologists, one supervisory psychiatric social worker and one staff psychiatric social worker, a senior psych tech and 8.65 psych techs, 2.75 recreation therapists, 2.44 RNs, and 3.5 clerical positions. Staff concerns that nearly doubling the size of the mental

health department would exacerbate the institution's shortage of office and program space were realized.

During the current monitoring period, staff reported that lack of space was an impediment to recruitment. VSPW continued to struggle with mental health staffing vacancies. The chief psychologist served as acting health care manager, while another psychologist served the acting chief psychologist. Three of four senior psychologist positions were filled. Five of six psychiatrist positions were vacant. In contrast to the previous monitoring period, when contractors covered nearly all vacant psychiatry positions, just 60 percent of vacant psychiatry positions were covered by contractual staff.

Over half of the case manager positions were vacant. Of the 27.2 allocated staff psychologist positions, 11. 5 were filled and 57 percent were vacant. VSPW was unable to obtain coverage for a significant proportion of vacant case manager positions. During the monitoring period, just eight percent of vacant psychology and 53 percent of vacant psychiatric social work positions were covered by contractors. Four of 6.3 psychiatric social worker positions were vacant, as was the position of supervising psychiatric social worker. The sole supervising psych tech position was vacant. Ten of 15.66 psych tech positions were filled, yielding a vacancy rate of 36 percent among psych techs.

Apart from direct service positions, the positions for health program specialist and associate governmental program analyst positions were both filled. Seven of eight OA or OT positions were filled; a half-time term-limited OA position was vacant.

Quality Management:

VSPW continued to have a functional quality management process. The local governing body, quality management committee, and mental health subcommittee met regularly and kept minutes. There were several QITs related to mental health issues. Methodologically sound audits were used to monitor selected targets. However, important aspects of mental health treatment were not audited during the monitoring period. All three mental health disciplines continued to engage in peer review.

Suicide Prevention:

In administrative segregation, two intake cells were retrofitted for use as intake cells, but demand exceeded supply. During the monitor's visit, a number of cells bore placards indicating date of placement and intake status. Medical staff continued to perform pre-placement screenings but without reference to suicide risk. Mental health screenings were completed timely; some were done in modules that were semi-confidential in that they did not afford complete visual or auditory privacy. Psych techs met each morning with the unit sergeant. A problem with daily psych tech rounds reported during the previous monitoring period appeared to have been remedied. Officers made 30-minute welfare checks, but documentation of the observations was not adequately monitored by supervisors. The monitor found forms that were filled out in advance of checks being made. Inmates, including those on walk-alone status, were offered at least ten hours of yard time per week. VSPW had begun the process to allow appliances in administrative segregation, but electrical work had to be completed before all cells could accommodate appliances.

Six case managers, eight psych techs and a nurse were assigned to cover

administrative segregation. Case managers made weekly contacts out of cell. Contacts were usually made in a confidential setting, but some were made in modules located in the day room within view of other inmates. EOP inmates in administrative segregation were offered 14 to 15 hours of treatment weekly; most received at least ten hours. EOP inmates were first priority, with 3CMS filling any remaining space in treatment groups. The treatment plans of some inmates were insufficiently individualized and did not adequately address their needs. One of the main obstacles to the provision of mental health treatment was access to suitable space. Although lack of space was an institution-wide problem, in administrative segregation the amount of shared space and collaboration between custody and mental health staff declined noticeably during the monitoring period.

At the time of the monitor's visit, mental health staff had not begun using inmate profiles when screening inmates placed in administrative segregation or transferring them to other prisons. Senior officers, however, were completing an inmate segregation profile that included annotations regarding previous suicide attempts.

Staff audited compliance with five-day clinical observation following an episode of suicidality. Of 13 inmates returned from an MHCB, 11 were slated for five-day follow-up; only one was seen as planned. In that case, four of five scheduled follow-ups were made. Follow-up was not carried out as consistently subsequent to placement in safety cells. Of the 76 inmates placed in safety cells, 31 were slated for five-day follow-up. Two were returned to safety cells during the five-day follow-up period, and 21 were seen as scheduled. A total of ten follow-up contacts were missed in the remaining eight cases.

Medication Management:

   Staff reported that medication continuity was sustained when inmates arrived with verified medication orders. As the staff's audit included fewer than two dozen cases, it was unclear that the finding reflected sustained compliance in this previously resolved aspect of medication continuity. Inmates arriving with unverified reports of having been on medication were evaluated more promptly than in the past, but not early enough. They saw a psychiatrist in 18 days, on average, an interval that was problematic when medication was clinically indicated. A staff audit of medication continuity when inmates were relocated within the institution included all relevant cases for the month of January 2007; it found 100 percent compliance. Although the problem of sustained medication continuity across moves was currently in compliance and was once resolved, procedures were in flux, as pharmacy techs were to assume the task of ensuring continuity during intra-institution transfers.

   Audits of timely renewal of medication orders found sustained compliance from November 2006 through April 2007; audits found that at least 90 percent of orders were renewed timely. Efforts to respond appropriately to noncompliance with medication were stymied by inconsistent psychiatric coverage. The mechanism for detection, referral and tracking worked well, but referrals did not result in timely follow-up contacts. Performance was unimproved over that reported during the previous monitoring period. Roughly half of the inmates referred to mental health for medication refusals or noncompliance were seen by a psychiatrist within a week. On average, psychiatrists responded to noncompliance referrals within 16 days.

   Staff reported two problems that thwarted appropriate monitoring via lab

tests. One source of error was blood not being drawn because orders did not reach the lab. A second problem was lab results being misdirected to physicians who had not ordered a test and therefore did not act on the results. There were harbingers of change regarding the monitoring of blood levels of mood stabilizers and the use of atypical antipsychotics. Two newly hired nurses and new software were devoted to solving the problems, and a committee developed two protocols that were under review but not yet adopted.

VSPW reported that no inmates had current Keyhea orders. No orders were initiated nor did any lapse.

The number of HS medication orders rose from 25 in January 2007, to 116 in May 2007. In contrast to findings of the previous monitoring period, when psychiatrists reported reluctance to write HS orders based on the presumption that medication would be administered too early, staff reported that the use of HS medication was compliant with the policy everywhere with the exception of administrative segregation, where officer availability and officer schedules were factors. Officers went off duty at 8:00 pm. and occasionally declined to open food ports or turn on cell lights during medication passes.

Medication was consistently provided to paroling caseload inmates. A staff audit covering the months of January and February 2007, found that nearly all of the 47 paroling MHSDS inmates with current psychotropic prescriptions were given a supply of medication.

Transfers:

Transfers to DMH continued to be rare. One inmate was referred and

transferred to DMH during the monitoring period. As in the past, approximately four inmates per month were sent to MHCBs; all were moved expeditiously. All transfers occurred on the day of referral save one that took place the following day.

A new local operating procedure was adopted for VSPW's new MHOHU, which also contained ten medical beds and three vulcanized safety cells. Consistent with previous practices, MHCBs, located next door at CCWF, were underutilized. Prolonged MHOHU stays, including stays exceeding one week in safety cells, did not prompt MHCB referrals.

Restraints were not used in the MHOHU. Mattresses were available; safety smocks and blankets were in use. IDTT meetings were held each weekday in concert with a general management meeting at which all cases were discussed. The meetings were attended by mental health and nursing staff but not by custody representatives.

VSPW tracked the use of safety cells and observation rooms; use was heavy and some stays were excessively lengthy. During the monitoring period, there were 116 placements in the observation rooms. Lengths of stay in observation rooms ranged from nine to 415 hours. During the same period, 17 inmates were housed in safety cells longer than 72 hours. Four of the 17 inmates that remained in safety cells longer than 72 hours were referred to a MHCB, eight were moved from safety cells to observation rooms and five were released to housing units. Staff reported that inmates on suicide watch were monitored in person by a correctional officer posted at the door of the room in which they were observed.

EOP inmates continued to be transferred from the reception center within

mandated time frames. Nine inmates were sent to the new PSU at CIW.

Other CAP Issues:

The number of 3CMS inmates in the general population grew by 100 during the monitoring period, rising to 850. No audit results regarding case manager contacts, group treatment or IDTT meetings were available, but circumstances and anecdotal reports indicated that Program Guide requirements were not consistently met. As previously reported, lack of suitable space hampered confidential case manager contacts and group treatment. Space that had been used for mental health purposes was diverted to medical use. Staff reported that caseloads exceeded 200 during the monitoring period, but realignment of six case managers reduced caseloads to roughly 140 by the time of the monitor's visit. The equivalent of 2.5 psychiatrists covered the general population caseload.

IDTT meetings were reportedly timely, but the quality of the meetings did not meet Program Guide requirements. Although C-files and correctional counselors were present, their contribution was minimal. Treatment plans were completed late and were insufficiently individualized. Group treatment was available to 3CMS inmates but it was unclear whether the amount and type of treatment offered was responsive to the needs of the population.

Referrals to mental health did not elicit timely responses. A staff audit that employed a generous timeline, (i.e. the date a referral was received in the mental health office), found that 78 percent of 1,362 self-referrals resulted in contact within five days of the referral reaching the mental health office.

An institutional audit found that staff attempted to obtain records of

previous psychiatric treatment in the case of four of 34 new arrivals. Records were received in two cases.

## SUMMARY

Staffing:

According to data for May 2007 reported by the CDCR Division of Correctional Health Care Services[4], vacancy rates among the mental health disciplines in the 13 institutions covered in this report were approximately six percent lower than the vacancy rate for all 33 CDCR institutions covered during the preceding monitoring period. For staff psychiatrists, psychologists, psychiatric social workers and psych techs, the overall vacancy rate was 43 percent, with 366.13 vacancies among a total of 853.32 allocated positions in the 13 institutions. With use of contractors, the overall functional vacancy rate for these disciplines was reduced to 32 percent.

Meanwhile, the MHSDS caseload at the 13 institutions during May 2007 was 14,941, down approximately two percent from 15,281 during the preceding monitoring period.

Among administrative and supervisory psychiatrists and psychologists at the 13 institutions, the vacancy rate was 19 percent. Allocations were covered fully at CSP/Sac, SQ, KVSP and NKSP and were nearly fully covered at ASP, CIM and CSP/LAC. VSPW had the highest vacancy rate at 52 percent.

While the vacancy rate for staff psychiatrist positions remained high at 47 percent, the 13 institutions fared better overall, covering more of these positions with contractual help, as compared to the preceding monitoring period. The average

---

[4] Source of staffing data reported in this section: *CDCR Coleman Monthly Report of Information Requested and Response to January 19, 1999 Court Order Regarding Staff Vacancies*, as of May 31, 2007, reported by CDCR August 21, 2007.

functional vacancy rate in psychiatry fell to 16 percent, although some institutions achieved better results than others. KVSP continued to have its four full time staff psychiatry positions fully staffed, without use of contractors. ASP, CMF, DVI, CSP/Sac, VSPW and WSP managed to reduce their vacancy rates to zero to three percent, and CIM, NKSP and RJD reduced theirs to the 20 to 35 percent range. CSP/Corcoran and CSP/LAC each reduced their functional vacancy rates to approximately 40 percent, down from vacancy rates among permanent staff of 80 and 60 percent respectively. SQ fared worst among the group, with a psychiatry vacancy rate of 69 percent unmitigated by the use of any contractors.

In psychology, vacancy rates remained high at an average of 49 percent. Institutions were not as successful as they were in psychiatry with use of contractors. Employment of contractors reduced the average functional vacancy rate in psychology to 40 percent. Exceptions were CSP/Sac, which achieved complete coverage, and CMF, which brought its vacancy rate down to 13 percent. Apart from these two institutions, functional vacancy rates for most of the 13 institutions ranged from 30 to 50 percent. Rates at DVI, NKSP, VSPW and WSP were in the 55 to 60 percent range, while KVSP had the highest vacancy rate at 91 percent.

Overall, the institutions did well with filling psychiatric social work allocations. Collectively, 32 percent of positions were not filled by permanent staff. Use of contract psychiatric social workers lowered the average functional vacancy rate to 13 percent. CSP/Corcoran, CSP/LAC and CSP/Sac accomplished full coverage, while CIM, CMF, SQ, VSPW and WSP reduced their functional vacancy rates to less than 20 percent with use of contractors. None of the four psychiatric social work allocations at ASP was

filled or covered by contractors, nor was the one vacancy among the four allocations at
DVI or the unfilled sole allocation at RJD.

For the total 466.5 case manager position allocations at the 13 institutions,
there were 213.5 vacancies, for a vacancy rate of 46 percent. With use of the contracted
equivalent of 164.07 full-time workers, the functional vacancy rate among case managers
was reduced to 35 percent.

Psych tech positions remained unfilled at an average rate of 35 percent.
Minimal use of contractors accomplished little, reducing the average functional vacancy
rate by only one percent. NKSP and WSP were exceptions, filling all of their psych tech
allocations with full-time employees, while CSP/Corcoran and CMF did nearly as well
with vacancy rates of four and 11 percent respectively. At the other end of the spectrum
were CIM, RJD and DVI which had vacancy rates of 59, 62 and 74 percent respectively,
with no contractual coverage. The balance of the 13 institutions had functional vacancy
rates in the range of 35 to 43 percent.

Quality Management:

The scope and extent of quality management efforts varied across the 13
institutions. After a decline during the preceding monitoring period, CSP/Sac resumed
its generally good structure for quality management with the help of a good relationship
between custody and mental health. At RJD, however, quality assurance activity
declined, with fewer meetings that did not function well and lacked attendance by the
warden.

Quality management committee meetings were held regularly and
appropriately at CSP/Sac, DVI, NKSP and VSPW. At DVI, the committee addressed a

wide variety of substantive mental health matters. The range of disciplines was well represented at meetings at VSPW, which were also well documented. WSP's quality management committee met irregularly but its agendas were broad and satisfied Program Guide requirements. At RJD, the quality management committee met frequently, but custody presence was lacking. SQ suspended its quality management committee function for several months, due in part to Plata implementation issues.

The majority of the 13 institutions' mental health subcommittees met regularly and functioned well, with appropriately selected and varied content, and good attendance and documentation. These institutions included ASP, CSP/Corcoran, CSP/LAC, CSP/Sac, SQ, NKSP and WSP. NKSP's subcommittee took up a wide variety of important issues including transfers of EOP inmates, referrals of inmates to higher levels of care and case manager contacts. At a smaller number of other institutions, including CMF, DVI and KVSP, mental health subcommittees did less well. DVI's subcommittee did not function effectively, while at CMF few direct care providers participated or brought important issues to the table. KVSP was unable to generate attendance by custody, nursing or administration and did not address pertinent issues.

A majority of the reviewed institutions used the QIT process appropriately and effectively. QITs were numerous, well-attended and active at ASP, CIM, CMF, CSP/Sac, SQ, NKSP and VSPW. ASP chartered a number of new QITs, including one to review the overall auditing process and develop a means of assembling key-indicator reports. A lesser number of institutions including KVSP, CSP/LAC and RJD failed to utilize the QIT process. The sole QIT at KVSP was inactive. The two QITs at RJD

functioned more like standing committees than QITs, and of the three QITs at CSP/LAC, two were connected to pre-existing work groups.

For the most part, peer review at the institutions was occurring only partially among the three mental health disciplines. It was conducted among all three disciplines at CIM, CSP/Corcoran and VSPW, but for only psychiatry at KVSP and RJD, where it lacked emphasis on clinical quality or judgments at the former and functioned more like a quality improvement process than true peer review at the latter. At CSP/LAC peer review was active for psychology, and at CMF, it occurred for both psychiatry and psychology. NKSP and WSP had peer review for both psychology and psychiatric social workers. The latter institution was in the process of developing it for psychiatry. DVI was attempting to reinstitute peer review via organization of a QIT.

Some institutions, including CIM and CSP/Corcoran, developed good audit processes with sound methodologies, and utilized them effectively. Others, such as ASP, DVI and VSPW had not perfected their auditing practices. DVI conducted audits of medication management concerns, but its results were compromised by poor or missing records and failure to involve nursing staff. At ASP, tools for auditing the medication management process were good, but implementation was inconsistent, prompting the chief psychologist to institute use of a database to track medication management procedures. VSPW's audit practices were methodologically sound for certain areas, but gave insufficient attention to important areas in mental health.

Suicide Prevention:

Appropriate use of suicide prevention committees was generally deficient at multiple institutions. Suicide prevention committees met with reasonably good

attendance and addressed meaningful agenda items at CMF, DVI and CSP/Sac, although CMF did not address the issue of conducting suicide risk assessments in confidential space. At CIM and CSP/LAC, meetings were held regularly, but attendance and meeting content were lacking. ASP, SQ, KVSP, NKSP, RJD and WSP were generally noncompliant in this area.

A majority of the 13 institutions were noncompliant with post-DMH or post-MCHB discharge five-day clinical follow-up. CMF fared best among the group in this area, focusing its effort on inmates returning from DMH, where suicide risk assessment checklists were completed before inmates were discharged to CMF. Housing assignments accommodated post-discharge follow-up, although custody officers' observations were lacking in some cases. The rest of the 13 institutions did poorly in this area. CSP/Sac was noncompliant and failed to compile data adequately for monitoring purposes. SQ showed improvement, but custody observations remained problematic. ASP, CIM, CSP/LAC, NKSP, VSPW and WSP were all noncompliant. At VSPW, among 13 inmates who should have received five-day clinical follow-up, only one received it.

Several institutions including CSP/Corcoran, CSP/LAC, NKSP, VSPW, and SQ, implemented 30-minute welfare checks in administrative segregation, a significant feature of the defendant's plan to reduce suicides there. At VSPW, however, supervision was lacking and the monitor discovered that welfare checks were being documented before they were actually made.

EOP inmates in administrative segregation at CSP/Sac were allowed limited personal property within their cells, but inmates at VSPW were not, due to lack of electrical outlets.

AT CSP/LAC and DVI, initial mental health screenings were conducted in private locations, but not at VSPW, where suicide history was overlooked. At CSP/Corcoran, the suicide history tracking process had not yet been implemented and pre-placement screenings for administrative segregation remained limited to medical examinations.

Out of-cell time was not increased at CSP/Sac. Yard time was insufficient to satisfy Title 15 requirements at DVI.

Identification of recently-arrived inmates in administrative segregation was implemented at CSP/LAC and NKSP. At WSP, inmate suicide histories for newly arriving inmates in administrative segregation were placed in packets for psych techs.

DVI continued to house three mental health caseload inmates in its "deep seg" area which was isolated and poorly lit. Staff reported that "deep seg" records had been archived and were not available to the monitor for review, but agreed to discontinue placing caseload inmates in "deep seg."

Medication Management:

A handful of institutions, namely ASP, CMF, CSP/Corcoran, KVSP and SQ, reported that medication management was adversely affected by the phasing out of MTAs and the transition to using LVNs. During the transition, there were problems with medication administration and discharge medications. At KVSP, problems with

timeliness of medication orders and renewals were attributed to the changeover in personnel.

Medication Continuity for Newly Arriving Inmates: Success with continuity of medication for newly arriving inmates continued to vary among institutions. Continuity was accomplished generally at CSP/LAC and CSP/Sac, but not for inmates transferring from other institutions. Continuity was also sustained at VSPW, but not for inmates arriving without verified orders. Arriving inmates received their medication within one day at CIM in 75 percent of cases, and at NKSP in 69 percent of cases.

ASP, CSP/Corcoran, DVI, KVSP and WSP did not provide medication to newly arriving inmates in a timely manner. KVSP was the most severely noncompliant with a compliance rate of five percent.

Medication Continuity on Intra-Institutional Transfers: Some of the 13 reviewed institutions were fully or partially compliant with timely provision of medication to inmates upon housing changes within the same institution. VSPW reported full compliance, closely followed by RJD with a compliance rate of 93 to 97 percent. NKSP improved since the preceding monitoring period, with a compliance rate of 86 to 94 percent. ASP, CSP/Corcoran and CSP/Sac were all partially compliant in this area.

CIM managed to reach a medication continuity compliance rate of 69 percent. Other institutions which remained non-compliant in this area included CMF, (where a QIT was chartered but could not solve the problem), as well as CSP/LAC, SQ and WSP.

Medication Order Filling and Renewals: CSP/Corcoran complied with timelines for filling medication orders in 95 percent of cases. NKSP, however, filled and

delivered ordered medications within one day in only 50 percent of cases, and at CSP/LAC there were delays of up to one week before ordered medications reached carts.

More than half of the institutions complied or partially complied with timely medication order renewals. Expirations were rare and readily culled out in the audit process at CMF. CIM, RJD and VSPW achieved compliance rates of 95 percent, 92 percent and 90 percent, respectively, while NKSP was partially compliant in this area. Compliance rates were lower at WSP, and at CSP/LAC and KVSP which had compliance rates of 60 percent and 82 percent, respectively.

Medication Noncompliance: Predominantly, institutions did not meet timelines in responding to instances of medication noncompliance. One exception was RJD where, as in other aspects of medication management, its performance improved. Cases of medication noncompliance were referred for follow-up in 90 percent of cases, according to staff documentation. CSP/Corcoran, SQ and NKSP were partially compliant in responding to medication noncompliance. NKSP's improvement was probably due to its better psychiatric staffing. WSP was non-compliant, while DVI's performance in this respect was inconsistent.

At CSP/Sac, referrals to psychiatry for noncompliance fell below 80 percent, and staff failed to document cases of no-shows or medication refusals. At KVSP, medication refusals were documented in MARs 89 percent of the time, but refusing inmates were seen within seven days in only 17 percent of cases. The rate of documentation of medication noncompliance at CIM was high at 97 percent, but referrals for follow-up were documented in only 62 percent of cases. Of those, follow up occurred within seven days in 51 percent of cases. Follow-up on noncompliance was timely in

only 48 percent of cases at ASP, which chartered a QIT although its audit was methodologically unsound. Documentation of noncompliance was deficient at CSP/LAC and at VSPW, which showed no improvement in this area during the monitoring period. Compliance was probably hindered by inconsistency in psychiatric coverage which led to delays in follow-up contacts, with only half of referrals seen within one week.

Pill Lines:  RJD initiated cell-front delivery, which led to reduced noncompliance.  Pill line waits were reduced to 15 minutes, at most.  At NKSP, however, medication delivery times grew longer, while at CSP/LAC pill line waits exceeded acceptable time periods by up to three hours.

Informed Consent:  The institutions were about evenly divided in compliance with informed consent practices.  At CMF and CSP/LAC, compliance rates were 90 percent and 83 to 91 percent, respectively.  CSP/Sac was also compliant, although its audit was flawed.

Several institutions, including CSP/Corcoran, continued to be non-compliant with proper use of informed consent forms.  RJD lost ground in this area with its compliance rate slipping to the 78 to 84 percent range.  CIM and NKSP had compliance rates of 82 percent and 67 percent, respectively.

Laboratory Testing:  A clear majority of the institutions were non-compliant with laboratory testing standards.  Only ASP and RJD managed to maintain compliance rates in the range of 80 to 90 percent, although the picture was not altogether positive at ASP.  Although it reduced average times from completion of laboratory testing to medication orders from 30 days to 13.6 days since the preceding monitoring

period, 36 percent of laboratory test results were missing from UHRs. CSP/LAC claimed that inmate blood levels were tested every six months, but produced no supporting data.

Monitoring of blood levels for inmates on psychotropic medications was inconsistent at DVI and NKSP. At WSP, the monitor found delays in drawing blood samples and gaps in routing of test results to psychiatry. An audit at CSP/Corcoran found variations in compliance rates, but some were as low as 50 percent for a number of medications. Problems with laboratory testing persisted at VSPW, where orders for testing did not reach the laboratory and test results were misdirected

DOT: All psychotropic medication was administered DOT at WSP, and at CSP/Sac for all EOP inmates in the PSU. CSP/Corcoran reported 100 percent compliance, but custody staff found cheeking and hoarding, particularly in administrative segregation.

Institutions including SQ were predominantly non-compliant in this area. DVI used DOT inconsistently. They had inmates for whom it should have been ordered but was not. At CSP/LAC it was unclear whether inmates who cheeked or hoarded medication received DOT orders. Unlike other areas of medication management at RJD, compliance fell from a rate of 84 percent to 73 percent.

KVSP and RJD used the Keyhea process appropriately for the most part. Some orders were allowed to lapse at CSP/Sac, and CIM and SQ had difficulty with correct execution of the orders that they had obtained. DVI and VSPW had no inmates on Keyhea orders. There was insufficient data at ASP for the monitor to evaluate its use of the Keyhea process.

HS Orders: KVSP and RJD were compliant with use of HS medications. CIM accomplished a compliance rate of 93 percent. At VSPW, the use of HS orders more than quadrupled during the monitoring period, except in administrative segregation. At NKSP, all medication was delivered after 8:00 p.m. except on A-Yard. CSP/Corcoran reported that the number of inmates on HS medications dropped by half during the two-month period preceding the monitor's visit. DVI was non-compliant, delivering all medications between 5:00 to 5:30 pm.

Discharge Planning and Parole Medications: With only one exception, the institutions were compliant with the provision of parole medications. CMF staff continued to facilitate the work of the TCMP staff, but recent transfers into the institution were often missing from lists used by TCMP counselors. Compliance rates for provision of parole medications ranged from 93 to 100 percent at CSP/Corcoran, CSP/LAC, DVI, NKSP, RJD and VSPW, while WSP was partially compliant. Only SQ was non-compliant in this area.

Mental Health Assessments for Use in the Discipline of Sexual Misconduct Violations:

Institutional compliance with protocol in this area remained mixed. Generally, NKSP and WSP were found compliant, while endemic problems in this area persisted at CSP/LAC and KVSP. At CSP/LAC, occurrences of indecent exposure, referral and completion of screens, IDTT consideration, referral for comprehensive evaluation or imposition of behaviorally based procedures were not tracked, although mental health input was taken into account in RVR dispositions. Problems also persisted at KVSP, where tracking logs were incomplete and contained errors, reports appeared to have been pre-printed and RVRs that prompted referrals were not being read.

Information in some of those RVRs should have resulted in positive screens and referrals for comprehensive evaluations, but did not.

Screenings for exhibitionism were done at CMF, CSP/Corcoran, CSP/LAC and SQ. At CSP/LAC, formats were inconsistent and often did not include review of information from the inmate's UHR, although most addressed the influence of mental illness on the inmate's conduct and documented IDTT consideration. Screenings were done but not timely at KVSP. However, at CSP/Sac, only 29 of 46 referred inmates were screened.

Comprehensive evaluations were done at CMF. None was done during this monitoring period at CSP/LAC, although some inmates who had tested positive for exhibitionism after comprehensive evaluation during preceding monitoring periods were undergoing treatment there. At SQ, a QIT was developing a 12-week voluntary treatment program. CSP/Sac, however, offered no treatment for the four inmates who screened positive for exhibitionism.

Incidents of sexual misconduct at CMF and KVSP were referred routinely to the district attorney for prosecution.

Transfers:

Acute Care: By the end of the 19th monitoring period, CMF reduced its acute care beds from 150 to 130 following conversion of 20 beds to MHCBs. The result was not as favorable as intended, with a wait list of 42 inmates. Inmates received little out-of-cell contact or activity and endured severe restrictions on personal property. Transfers to acute care were delayed at SQ, with times to transfer ranging from six to 59 days following referral. At WSP, already-low rates of referrals decreased further, and

transfers were delayed. Access to acute care was adequate at RJD according to staff, where reportedly 66 percent of referrals resulted in transfers within eight days. Six of seven inmates referred from DVI were transferred to acute care, but another four were sent to MHCBs instead. CSP/LAC made only seven referrals to the DMH acute inpatient program at CMF, only one of which resulted in a transfer. Those referrals that were made took an average of 42 days to completion. CSP/Sac made few referrals to SVPP, and only 42 percent of its referrals to the DMH acute inpatient program at CMF transferred, taking from one to 25 days.

DMH Intermediate Care: Access to higher levels of care at DMH remained slow and inadequate at CSP/Corcoran, CSP/LAC, CSP/Sac, KVSP and NKSP. At CIM and RJD, transfers were occurring but there was still hesitation to refer at RJD. At CIM the average time from referral to transfer was 31 days. Lack of referrals at NKSP led to a shortage of CTC beds and heavy use of holding areas. At CSP/Corcoran, referral times from identification for DMH level of care to referral ranged from two to 14 days. Referrals were considered rarely at ASP and VSPW. CSP/LAC and CSP/Sac made no referrals to ASH.

MHCBs: Use of MHCBs remained a mainstay for crisis care for most institutions. MHCB space was fully utilized at CIM, CSP/Corcoran, CSP/LAC, CSP/Sac, SQ, DVI, KVSP, NKSP and RJD. RJD used 15 CTC beds as MHCBs, for which staff reported adequate access, and no holding cells, resulting in a drop of 25 percent in the average length of stay in the MHCB unit during the monitoring period. Referrals to MHCBs were timely at DVI, but conditions of some inmates returning from

MHCB stays were not improved, resulting in OHU stays averaging three weeks while awaiting transfers to acute care beds.

MHCB access at CMF remained problematic. Although data provided on MHCB admissions was inconsistent, staff reported that inmates were returned from DMH to EOP level of care prematurely. The institution's practice of admitting CMF inmates to MHCBs for 23-hour evaluation was discontinued in favor of review by a treatment team of all cases which had been referred to intermediate care or day treatment and discharged from MHCBs.

Referrals from MHCBs to higher levels of care were untimely at SQ, but once referrals were made, transfers were prompt, as at ASP and VSPW. However, suicide risk assessments were lacking at both admission and discharge from MHCBs at ASP. Transfers out of KVSP's busy MHCB unit were late in 22 percent of cases. At NKSP, nearly half of MHCBs were occupied by inmates awaiting DMH transfers. Stays exceeding ten days increased to 38.7 percent. CSP/LAC added another bed to its MHCB unit within the CTC. Lengths of stay ranged from one to 114 days, except for inmates awaiting transfer to DMH, for whom only two stays exceeded timeframes. At CIM, average length of stay decreased to seven days, and any inmate who remained in an MHCB was automatically considered for DMH level of care. CIM used overflow areas which were inappropriate for potentially suicidal inmates and were covered by diverting psychiatrists from other areas, including the reception center. Transfers out of MHCBs at VSPW were generally timely and expeditious.

OHUs and MHOHUs: Lengths of stay in OHUs and MHOHUs continued to exceed the 72-hour timeframe, with a few exceptions. At DVI, the average length of

stay was 2.1 days, with 11 percent exceeding timeframes. However, use of the OHU was increasing while access to acute care was restricted, and waits for transfers were overly long. Inmates on suicide watch and suicide observation were placed in the OHU without use of restraints, but conditions were unsafe.

Stays in the MHOHU at CSP/Sac ranged from 0.5 days to 36 days in length, with only 54 percent of admissions lasting three days or less. At SQ, 30 percent of placements exceeded three days, and ten percent exceeded four days. One inmate was in the OHU for 125 days because of court hearings, without adequate out-of-cell time. Average length of stay in the OHU at ASP was 4.7 days, with 44 percent of stays ranging from four to 42 days. Stays in the OHU at VSPW were also overly long and did not prompt moves into MHCBs. Use of safety cells and observation rooms was also heavy, with long stays.

Use of Holding Cells: Use of holding cells as a back-up for unavailable MHCBs continued. Audits at SQ found no stays in holding cells that exceeded four hours, but inmates who threatened self-harm were placed in handcuffs or waist restraints. Logs were problematic. NKSP and WSP used holding cells because of CTC space unavailability, while CSP/LAC used them without regard to bed availability. NKSP improved its use of holding cells by transferring 45 percent of occupants to MHCBs before their release to other housing. Holding cells were used in the reception center at CIM for inmates awaiting MHCB placement. Stays ranged from four to 7.25 hours.

Transfer of EOP and 3CMS Inmates: KVSP had difficulty with transfers of EOP inmates to appropriate programs. For transfers of EOP inmates out of reception centers, VSPW satisfied timelines, and WSP was partially compliant. At the time of the

monitor's visit at DVI, among 38 EOP inmates in reception center, nearly half had been waiting 60 days or longer, with waiting times ranging from two to 308 days. Other institutions also missed the 60-day timeline. The average waiting period for EOP inmates in the CIM reception center increased from 86 to 108 days. RJD reported a compliance rate of 60 percent for transfers of EOP inmates and a rate of 66 percent for 3CMS inmates, although the monitor's examination of data raised questions about the reliability of that report.

## RECOMMENDATIONS

As during many previous monitoring periods, the nineteenth round saw changing conditions and new developments that will affect the future delivery of mental health services within CDCR institutions. Some of these changes were specific to existing mental health programming, while others involved CDCR as a whole.

One positive change was a modest indication of relief from the high staffing vacancy rates in mental health that were reported for the two preceding monitoring periods. Significant contractual coverage within some disciplines reduced their functional vacancy rates to levels well below those of the preceding monitoring period.

The overall mental health staffing vacancy rate in the 13 institutions covered in this report was 43 percent, which was seven percent lower than the rate reported for all 33 CDCR institutions during the eighteenth monitoring period. Use of contractors reduced the overall mental health functional vacancy rate to 32 percent. Actual vacancy rates for line psychiatrists and psychologist barely moved from the near-fifty percent levels of the two preceding monitoring periods, but prodigious use of

contractors lowered functional vacancy rates to 16 percent and 40 percent, respectively. The institutions were able to cover their social work allocations which had an actual vacancy rate of 32 percent but a functional vacancy rate of only 13 percent with use of contractors.

Meanwhile, however, CDCR's mental health caseload continued to exceed its overall program capacity by some 13 percent during the monitoring period. This meant that, at any one time, defendants' allocated mental health staff, the size of which was driven by program capacity, presumptively lacked sufficient resources to treat many of its seriously mentally disordered inmates.

Moreover, while institutional success in attracting increased contractual coverage during the monitoring period is commendable, the use of contractors is not a satisfactory long-term solution for staffing mental health positions. Continuity of care is an important ingredient for effective mental health treatment of the caseload inmate. Numerous interviews with inmates have corroborated the opinions of the special master's experts that seeing different case managers at successive clinical contacts fails to promote the growth of therapeutic relationships so necessary for the successful stabilization of seriously mentally disordered inmates. The master's recommendations for improvement in mental health staffing, detailed in part C of the Special Master's Seventeenth Round Monitoring Report, should remain the focus of the effort to raise the standard of mental health care in CDCR institutions.

Access to higher levels of mental health care at the DMH level remained slow. In addition, the ongoing need for sufficient MHCBs continued to challenge the institutional capacity to provide crisis care. Inmates' overly long stays in institutional

OHUs and MHOHUs and their placements in holding areas reflect not only the

continuing need for more MHCBs, but also the deferred access to inpatient levels of care

needed by the more severely mentally inmates.  For several years the defendants have

been struggling with assessing their mental health bed needs, particularly at the most

intensive levels of care, and developing a responsive long-term plan.  Undoubtedly, the

task has been challenging, for no less reason than the shifting nature of many conditions

that affect CDCR and its mental health care.  These challenges have included

unprecedented growth in the prison population and resulting changes to population

projections; understaffing of personnel at CDCR's own headquarters to execute the many

parts of the planning task; and coordination with the California Prison Receivership,

which has become engaged in the redesign of medical care, and to some extent mental

health care, within CDCR institutions.

   CDCR also must confront the ongoing problem of long delays in the

transfers of its EOP inmates from reception centers to appropriate programming within

the system.  The care and timely transfer of EOP inmates, particularly those who were

housed in the institutions' reception centers, remained as an area of concern through the

nineteenth monitoring period.  During the nineteenth monitoring period, only one of the

13 visited institutions was compliant with transferring EOP inmates out of reception

centers, and only one other institution was partially compliant.  The remaining

institutions housed EOP inmates in reception centers for excessive periods of time.  Since

the distribution of the eighteenth monitoring report in June 2007, the special master filed

his initial report and supplemental report with recommendations for necessary changes in

the early identification, treatment and expeditious transfers of EOP inmates to appropriate programs.

Apart from mental health-related matters, the nineteenth monitoring period saw a major advancement in the movement to address overcrowding in general in CDCR institutions. The plaintiffs' motion to convene a three-judge panel to consider a limitation on CDCR's population was granted, and a trial is scheduled for November, 2008. In that regard as well, defendants' already-strained resources will be tapped further.

Presently, the defendants are required to prepare a variety of plans and proposals in order to comply with this Court's order of October 17, 2007. Their outstanding obligations in this regard include:

- o A plan for the recruitment and compensation of hospital administrators to develop and run the CDCR's overall inpatient treatment program and the specific institutional inpatient programs in its proposed consolidated care centers.

- o A memorandum of understanding on the California Department of Mental Health's mentoring and direct service obligations under the Defendants' August 2007 Supplemental Bed Plan for integration in an inter-agency agreement.

- o A plan identifying anticipated clinical and custody staffing needs and a program for providing the personnel required to recruit, vett, hire and retain adequate staffing.

The special master's upcoming Twentieth Monitoring Report will cover a number of areas in addition to the more usual focus areas that appear in regular monitoring reports. These include:

- o The defendants' plan for making available the full complement of 231 intermediate inpatient care beds for Coleman class members who have been referred to Atascadero State Hospital (per order of June 28, 2007)

o The defendants' plan to improve EOP programming in administrative segregation (per order of August 2, 2007)

o The defendants' plan for identifying and developing the changes deemed necessary to broaden the impact of the mental health assessment process in prison disciplinary matters involving 3CMS inmates, the testing of chose changes, and their implementation statewide (per order of August 2, 2007)

o The adequacy of the defendants' plan, funding proposal, and timetable for implementing an effective staff recruitment capability and strategy (per order of August 2, 2007)

o Programming for EOP inmates awaiting transfers in reception centers (per order of October 2, 2007)

o EOP beds for female inmates in administrative segregation (per order of October 17, 2007)

o Use of force on mental health caseload inmates at CSP/Corcoran (per order of August 27, 2007).

o Staffing needed to facilitate inmate access to higher levels of care at DMH (Special Master's Eighteenth Monitoring Report)

o Institutional response to cases of inmate indecent exposure (Special Master's Eighteenth Monitoring Report)

The defendants' obligations to draw and implement effective plans and to comply with outstanding Coleman orders, while continuing their ongoing efforts to achieve higher rates of compliance with Coleman Program Guide standards, necessitate a high degree of vigilance and responsiveness on their part.  As noted in the Special Master's Eighteenth Monitoring Report, these responsibilities add up to a tall order that demands and realistically will absorb CDCR's existing resources.  Rather than recommend additional orders that will add yet another layer of responsibilities, the defendants should be afforded time to concentrate on achieving the tasks already before them and engage in meaningful, long-term preparation for mental health care of the

CDCR inmate population into the next decade. For this reason, the special master does not submit formal recommendations for further orders at this time.

Respectfully submitted,

/s/

_____
Matthew A. Lopes, Jr., Esq.
Special Master

July 25, 2008