EXHIBIT A

California State Prison, Sacramento (CSP/Sac)
March 5, 2007 – March 8, 2007

1.    Inmate A

Plaintiffs' attorneys requested that this inmate's treatment be reviewed for the following reasons:

> Inmate A is an EOP inmate housed on A Facility who reported that he and other SNY EOPs have been forced to cell up with GP EOPs at great risk to themselves. As a result of this he writes that he has been engaging in self-injurious behavior to relieve the anxiety. Plaintiffs requested a review of the SNY/general population EOP co-mingling described by inmate A in A Facility, as well as a review of his current treatment plan to address his SIB. Are there any plans to move inmate A and other EOP SNY patients on A Facility to the B Facility program?

This inmate was briefly interviewed in A Yard. He indicated that he and other SNY EOP inmates were being "bulldogged" by general population EOP inmates. He indicated that his anxiety level had consequently increased, which had resulted in self-harm behaviors. He also stated that his Risperdal Consta was not renewed, which has exacerbated his problems.

The healthcare record of this inmate was reviewed. His last psychiatrist appointment was 2/8/07. The Risperdal Consta was discontinued at that time and an order initiated for short-term use of Seroquel. He had not had any further appointments with the psychiatrist.

This inmate had been seen on a weekly basis by his clinical case manager. He had expressed anxiety related to SNY issues and decreased EOP programming. He had made it clear that he wanted a higher level of care and/or a transfer back to Mule Creek State Prison.

Assessment:

This inmate should function better within an SNY EOP environment. Apparently SNY EOP inmates were in the process of being transferred back to Mule Creek State Prison. His follow-up with the psychiatrist had not been timely since discontinuation of his Risperdal Consta.

Following the interview, the inmate reported that his medication issues had been resolved.

2.    Inmate B

This inmate was interviewed at the request of plaintiffs' attorneys who indicated the following:

> Inmate B is an EOP inmate who uses a wheelchair. He has been moved to the infirmary because the EOP program cannot accommodate his wheelchair. He is not being provided with appropriate mental health care and has been experiencing significant mental health decompensation as a result. Plaintiffs request a review of the institution's plan to meet inmate B's mental health needs.

This 41 year old African American male reported that he had two strokes (November 2004 and February 2006) related to his adult onset diabetes. He had experienced significant residual symptoms that included a right lower extremity paralysis and left lower extremity paresis. He also had essentially lost function in his right upper extremity. This inmate stated that he had experienced an aphasia following his first stroke that had subsequently cleared.

This inmate provided a history, related to his strokes, that was characterized by his perception of receiving inadequate treatment, including rehabilitative therapy, following his strokes. He stated that he was designated as requiring an EOP level of care while at California Medical Facility in order to be transferred back to CSP/Sac. He reported being housed in one of the two CTCs within CSP/Sac for about the past year. Until the past several days, he stated that most of his time was spent lying in bed due to the lack of access to a motorized wheelchair. He had recently been provided access to a motorized wheelchair that had significantly improved his functioning according to both correctional officers and his physical therapist. However, he had been told that he would not be able to keep this motorized wheelchair once he was transferred from the CTC. Such information was very distressing to him.

Review of his CTC chart indicated very frequent contact with his treating psychiatrist and other healthcare staff. His presentation had been consistent with the presence of a Major Depressive Disorder. He received a physical therapy evaluation during early February 2007. Information obtained from his physical therapist indicated ongoing PT treatments, although such treatment was not documented in his UHR. This inmate minimized the interventions being provided to him by the physical therapist.

The UHR of this inmate was reviewed. This inmate was hospitalized at DMH-Vacaville from 12/2/06 to 12/11/06. He was serving a life sentence related to a third strike conviction. A long history of psychiatric issues was described, which included affective and psychotic symptoms as well as cluster B personality symptoms. There was also a history of serious suicide attempts. His discharge diagnosis was Delusional Disorder, Depression, NOS, Polysubstance Dependence in institutional remission, and Antisocial Personality Disorder with borderline features. He was assessed to require an EOP level of care.

Assessment:

This inmate was not considered to be a reliable historian. However, it was clear that he had had significant medical problems and concerns regarding his rehabilitative care and

current placement. He had received significant benefit from the use of a motorized wheelchair. It was concerning that he reportedly had been told that he would not be able to keep this motorized wheelchair once he was discharged from the CTC. The healthcare manager has since stated that this issue would be resolved in the inmate's favor.

Based on the brief interview with this inmate, it was unclear whether he was in need of full EOP level of care, although he clearly needed an increased frequency of clinical contact that was generally not provided within a 3CMS level of care due to resource issues.

3.    Inmate C

This inmate was interviewed at the request of plaintiffs' attorneys, who reported the following:

> Inmate C is a PSU inmate who has a long history of exhibitionism and has been reviewed previously by the *Coleman* monitors prior to his arrival at CSP-Sacramento. He desires treatment for his Exhibitionism, although he reports that he has been re-diagnosed with Bipolar Disorder. He has been serving a SHU term since August 2005 for RVRs issued for Indecent Exposure. Plaintiffs request a review of the appropriateness of inmate C's recent change in diagnosis and treatment plan.

This inmate had previously been evaluated during July 2006 and the following was reported:

> Patient Identification:
>
> This EOP inmate was housed in the PSU at CSP/SAC. He was diagnosed with Psychotic Disorder, NOS and Depressive Disorder, NOS. He was treated with the following medications: Trileptal 1200 mg/day and Risperdal M tab 3 mg/day. He was on a Keyhea order, expiring 9/5/06, due to danger to self and grave disability. He had a history of multiple suicide attempts and was serving an indeterminate SHU term for sexual misconduct.
>
> Clinical Course:
>
> This inmate was housed at Corcoran during 2004. While there, he was provided with a diagnosis of Exhibitionism. A Comprehensive Mental Health Evaluation for indecent exposure was completed by [Dr. A, Ph.D] (not dated) which indicated that he had a diagnosis of ASPD and no diagnosis of Exhibitionism. A separate Mental Health Evaluation for Indecent Exposure Behavior was completed by [Dr. B, Ph.D]. This psychologist did provide a diagnosis of Exhibitionism. This evaluation again was not dated, but the clinician recommended further, more in-depth

assessment and made group therapy recommendations. The medical record indicated that the inmate was scheduled for group therapy at Corcoran that was specific for his paraphilia; however, he did not attend. The inmate was transferred to CMF/DMH where he remained from 3/1/06-5/16/06. He was transferred to the PSU at CSP/SAC after discharge. Since his transfer to the PSU, there was documentation of weekly CCM contacts as well as consistent psychiatric contacts. The initial treatment plan completed on 5/22/06 mentioned that the inmate had a history of indecent exposure incidents with multiple RVRs. He was not provided with a diagnosis of Exhibitionism in the treatment plan or on subsequent progress notes. The listed target objectives indicated that the inmate should "demonstrate control over inappropriate impulses" and the need to decrease the number of RVRs for indecent exposure. There were no specific interventions outlined in the treatment plan.

Central File Review:

While housed at MCSP, this DD2/EOP inmate received RVRs for indecent exposure on 11/10/05, 9/29/05, 8/15/05 and 8/11/05, with prior 115s noted on 1/5/03, 1/14/04 and 5/3/04. He was assessed a total of 420 days loss of credit for the four RVRs issued by MCSP. All of the related DA referrals were declined. Involuntary medications were initiated on 2/1/06 and ordered by an administrative law judge on 3/9/06. The DRB approved an indeterminate SHU term for repeated sexual misconduct on 2/24/06. He was transferred from MCSP to DMH/APP via psych and return protocols on March 1, 2006. He was discharged to CSP/SAC on 5/16/06 and placed in the PSU. He had not received an RVR for indecent exposure since arriving at SAC. He remained in the PSU as of 7/18/06.

Findings:

There were differing opinions regarding whether this inmate had a diagnosis of Exhibitionism. Although his treatment plan listed his multiple RVRs for exhibitionism, there was no specific treatment interventions listed to assist the inmate in decreasing this behavior. Furthermore, the current clinical encounters did not document assessment or treatment interventions regarding this issue.

This inmate was evaluated during June 2004 and the following was reported:

This inmate had been referred to SVPP but was not accepted by [Dr. C, M.D.] (senior supervising psychiatrist) because there had not been "sufficient documentation in the referral to SVPP to justify major mental illness Axis I diagnosis. Nor was there documentation of a need for diagnostic clarification of the diagnosis. This lack of documentation was present even after requests by SVPP staff for further documentation to

substantiate major mental illness diagnosis." The SVPP "rejection letter" further stated the following:

"SVPP does not have a behavioral modification program at the time. The STEP Program in place at SVPP is, at best, a Token Economy that is aimed at helping motivate the inmates to attend Program Activities."

This inmate expressed frustration relevant to the treatment being provided to him at CSP-Corcoran. He stated in the group that he had a paraphilia and was not receiving treatment for this condition.

Inmate C was subsequently interviewed on an individual basis. His report of being admitted to the administrative segregation hub during March 2003 was confirmed by review of records. This 17 year old male reported that he was prescribed Haldol, Depakote, Seroquel, Benadryl, and Wellbutrin. He reported a chronic history of experiencing auditory hallucinations and feeling depressed. He stated that he had a paraphilia but was unable to provide an explanation of what this term meant to him. This inmate did receive a CDC 115 during January 14, 2004 due to masturbation. He also reported being harassed by correctional officers.

Staff indicated that this inmate had some form of developmental disability.

The healthcare record of this inmate was reviewed with a focus on progress notes written since April 2004. Weekly progress notes by his clinical case manager discussed issues relevant to apparent compulsive masturbation, which have resulted in at least two RVRs. This inmate's SVPP rejection was in the process of being appealed as documented in progress notes written by his CCM during April 2004.

[Dr. D] met with this inmate on 5/21/04. Risperdal was discontinued and Haldol started. Wellbutrin and Depakote were also prescribed. Ongoing conflicts with the correctional officers were discussed with his case manager, which apparently were related to his masturbatory behaviors.

This inmate was admitted to the MHCB during the middle of May 2004 apparently related to suicidal thinking and disruptive behaviors (e.g., flooding the tier).

On 5/19/04 this inmate reported the presence of auditory hallucinations. A progress note indicated that a second level appeal relevant to the SVPP rejection had been initiated.

Assessment:

The reasons for this inmate's rejection from SVPP did not appear
consistent with clinical observations reported by the CSP-Corcoran staff.
A decision relevant to the second level appeal was pending.

The healthcare record of this inmate was reviewed. The most recent clinical case
manager progress note was dated 2/20/07. Medications included Trileptal and Geodon.

Although an extensive history of indecent exposure incidents was noted, the progress
notes did not address interventions relevant to this issue. The most recent treatment plan
did not adequately address this problem area.

This inmate was again briefly interviewed in the PSU during the afternoon of 3/7/07. He
reported that he continued to regularly expose himself when provided the opportunity to
do so. He apparently was receiving medications via a Keyhea order. He expressed a
willingness to participate in sex offender specific treatment, even if it was provided at
PBSP.

Assessment:

The opinion was reached that this inmate was appropriate for sex offender specific group
therapy. He was currently not receiving such treatment at CSP/Sac.

4.     Inmate D

This inmate was seen at the request of plaintiffs' attorneys, who reported the following:

> Inmate D is an EOP inmate facing an indeterminate SHU for
> exhibitionism. He reports that he was held in the MHOHU for weeks in
> very bad conditions on suicide precautions. His windows are covered but
> he was not receiving any treatment for his behavior. Plaintiffs request a
> review of his treatment needs.

This inmate was recently transferred from general population EOP to the administrative
segregation EOP related to indecent exposures. He stated that he had exhibited such
behavior since 1996. He had been incarcerated since 2004 due to a sentence of 84 years
to life. During the past year he reportedly has received 30 to 35 115s due to indecent
exposure incidents. He stated that he had requested treatment for a paraphilia and was
willing to receive such treatment at PBSP if that was where it was offered.

The healthcare record was reviewed. On 1/26/07, a rules violation report-mental health
assessment interview indicated that this inmate did not have a mental disorder that
contributed to the behavior that led to the RVR related to his indecent exposure.

A 2/13/07 evaluation by [Dr. E, M.D.] was reviewed. His presentation was consistent
with Bipolar Disorder, depressed type, with psychotic features and a Personality Disorder
with Borderline, Narcissistic and Antisocial Traits. He was noted to have a significant

indecent exposure history and had complained that he was not being treated for exhibitionism. "In fact he has been evaluated and not deemed to be an exhibitionist, but rather an antisocial personality." Medications included Trileptal, Zydis, and Mirtazapine.

This inmate had been admitted to the MHOHU on 2/11/07 after taking an overdose of pills. He attempted to hang himself in the MHOHU the following day, and as a result, he was apparently partially unconscious and had a swollen neck.

Assessment:

This inmate was appropriate for a sex offender specific treatment program. He was also considered to have significant risk factors relevant to suicide that warranted continued monitoring and vigilance.

EXHIBIT B

California Medical Facility (CMF)
April 17, 2007 – April 19, 2007

1.    Inmate A

This transgender inmate had a history of multiple acute care admissions for depression, suicidal thoughts and self-injurious behavior over the course of the last several months. He underwent a right orchiectomy in January 2007 following self-mutilation of his scrotum because he wanted to "be a woman." He was prescribed hormonal therapy.

He also reportedly had a history of Bipolar or other affective disorder with prior treatment in the community as well as in prison. He had been in prison in the past. He was admitted to RJD on 12/19/06. As recently as this year, he had been prescribed antipsychotic and antidepressant medications.

This inmate was admitted to acute care, Q unit, at CMF on 3/15/07. His Axis I diagnosis was amended to Adjustment Disorder with mixed disturbance of emotions, in addition to Gender Identity Disorder. He was discharged from Q Unit on 3/21/07 on no psychotropic medications and was placed in administrative segregation.

There were two additional progress notes in the chart on 4/12/07 and 4/16/07 following his discharge from acute care indicating that the inmate had attended programming and was pleased to be at CMF. A mental health intake evaluation was in process on 4/19/07 during the site visit.

Assessment:

In light of this inmate's history of multiple MHCB admissions, acute care DMH hospitalization and recent, serious self-injurious behavior, his current level of care was inappropriate. A higher level of care should have been pursued. The major change in diagnostic formulation and the discontinuation of psychotropic medication were also clinically inappropriate.

2.    Inmate B

This inmate had five admissions to either MHCB or acute care at DMH, with subsequent discharges to EOP. A chart review indicated serious and persistent mental illness, (Schizophrenia versus Depressive Disorder with psychotic features), which required treatment with multiple antipsychotic medications, including Quetiapine, Chlorpromazine and Haloperidol simultaneously for adequate symptom control.

His admissions to the inpatient level of care were precipitated by prominent psychotic symptoms, including command auditory hallucinations as well as prominent negative symptoms, depression, suicidal ideation and marked weight loss (60 pounds). He was under a Keyhea order for six months in 2006. There was no indication in his medical record whether consideration had been given for DMH intermediate care referral.

Assessment:

The level of care provided to this inmate was clinically inappropriate in light of his serious and persistent mental illness and multiple MHCB and acute care admissions. He should have been evaluated for possible transfer to DMH for intermediate care.

3.    Inmate C

This inmate had been treated at the EOP level of care for over one year. He had diagnoses of Major Depressive Disorder, severe with psychotic features, Pedophilia by history and APD. He recently had open heart surgery and also had a diagnosis of asthma. Mental health treatment focused on his history of trauma and current feelings of victimization. Notes indicated that he had raised issues of personal concern in individual sessions and had participated to a moderate degree in group treatment.

During the monitoring period he was moved from one EOP wing to another due to safety concerns. Progress notes suggested that he wrote names and numbers of people in his wing that might be using illicit substances and communicated with custody staff about that activity. He felt victimized and persecuted by the transfer but continued to participate in group activities at a rate of roughly 70 percent.

He was seen monthly by a psychiatrist and weekly by a case manager. His regimen included Seroquel 800 mg at HS DOT, Depakote 500 mg at HS DOT, Paxil 50 mg/day DOT, Amlodipine and a statin medication. His weight was monitored, and it fluctuated between 229 and 265 pounds over the past three years; in April 2007, his weight was 251 pounds. He was seen once by his psychiatrist, who apparently did not have his UHR for the clinical contact; he apparently did have a printed page that summarized pertinent information. A case manager contact was missing from the UHR for the month of March 2007.

The UHR contained records of his participation in group treatment accompanied by a note regarding the level and quality of his participation. A summary of group therapy information regarding his treatment compliance in January 2007 indicated that 36 hours of structured therapeutic activity were offered for the month; however, he received only 17 hours. He refused roughly 12 hours of recreational therapy. A summary of information regarding his treatment compliance in February 2007 showed that 70 hours were offered; he received only 33 hours, and refused roughly 20 hours of recreational therapy.

The most recent treatment plan was dated 1/24/07. The treatment plan indicated that the inmate might have difficulty with an impending housing move. At the time of this move, a suicide risk assessment was completed and indicated that the inmate posed low risk for self harm.

Assessment:

The care that this inmate received in the EOP appeared to meet Program Guide requirements. The staff reported that many activities were cancelled at this time due to

an outbreak of Norovirus. Treatment with Seroquel was of concern in light of the inmate's elevated lipid levels and weight gain.

4.    Inmate D

This case was reviewed because the inmate was returned to CMF from DMH after a stay of less than 24 hours.

This EOP inmate had diagnoses of Major Depressive Disorder, recurrent, moderate, in remission and Psychotic Disorder, NOS (PRO), Amphetamine Dependence, Personality Disorder NOS and APD. A progress note written in March 2007 indicated that he was in administrative segregation because he had made allegations of battery by a chaplain. According to a summary in the UHR, in February 2007 he was offered 24 hours of group treatment and received 17 hours. No signs of depression were noted but he reported recent auditory hallucinations of a haunting nature. His presentation during recent weeks was reportedly labile, ranging from cheerful and upbeat with pressured speech to crying and lamenting his mistakes in life.

He was seen for five-day follow-up on 2/6/07 and 2/7/07, following a DMH hospitalization of less than 24 hours that concluded on 2/6/07. An admission note written on 2/5/07 indicated that no bed in S-2 was available, prompting the staff to identify an inmate to discharge from S-2 to open a bed. When seen in the B-1 clinic for clearance for administrative segregation, he threatened to kill himself if he were locked down. The staff took the threat seriously, and a series of discussions among various staff members ensued.

On 2/7/07 he was in L-3, a general population EOP unit, where he said he was fine and happy that he was not in administrative segregation and was not suicidal.

An initial IDTT meeting was held on 2/20/07 in M-3, EOP administrative segregation. He attended the meeting and once again expressed the wish that he had never complained about staff behavior. An individualized treatment plan noted a history of a suicide attempt by hanging in 1992.

Assessment:

Mental health evaluations, risk assessment, referral to an MHCB and treatment were appropriately completed while the inmate was in the EOP. Suicide prevention measures, including psych tech rounds in administrative segregation, five-day follow-up and an IDTT meeting were carried out in accordance with policy.

Documentation regarding his admission to the MHCB indicated that no beds were available when he presented for admission, prompting staff to find an inmate to discharge in order to open a bed.

5.    Inmate E

This 3CMS inmate's IDTT meeting was observed by the reviewer.[1] He was in the 3CMS program due to medical necessity. He had attended an anger management group and was enrolled in a coping skills group. He had a work assignment in culinary. He was not on psychotropic medications, but he was prescribed Benadryl for sleep. During the IDTT meeting he reported that he was sleeping five hours per night and expressed his enjoyment of group treatment. He also reported situational stressors.

He reported that he was not getting the Benadryl ordered for him and could not ascertain the reason why. He reported that his requests to the psychiatrist had not yet been answered. The IDTT discussed discharge from the caseload with him and queried him about why he stopped taking an antidepressant. In reference to Trazodone, he said he stopped because it was "hard for me to get them" and "they couldn't give it to me no more." He was not housed at CMF at that time.

Because his current need for psychotropic medication was unclear, he was scheduled to see his psychiatrist in two weeks to talk more about it then.

His mobility impairment was also discussed. His correctional counselor invited him to come to open line to check on his official mobility status, i.e., lower bunk chrono, first floor housing, and the like. He had lower bunk chrono, but it was not honored as it was from another CDCR facility.

Assessment:

The IDTT meeting was attended by the necessary participants, including the inmate's correctional counselor. Medical records and the C-file were available. Clinically relevant interdisciplinary discussion ensued, including participation by the inmate. Medication administration was raised as an issue. Although this inmate had a current order for Benadryl, he did not receive it. He reported that self-referral slips had elicited no response. Appropriately, he was scheduled to see a psychiatrist in the near future.

6.    Inmate F

This 3CMS level III inmate was recently moved from CCI to CMF, around 1/27/07, in part because he was scheduled to be paroled in September 2007. This inmate's IDTT meeting was observed. Although he had an IDTT meeting two weeks before, he was being seen a second time for "non-clinical reasons."

This inmate's command of English was not complete. His expressive and receptive language was minimally adequate, and his communication in English was labored. He said that he had been in the Bridge Program; but shortly thereafter, he incurred an RVR for being out of bounds and was therefore disqualified. During the IDTT meeting he said that he could not attend education classes because his ID was lost when he was at the hospital. Reportedly, attending education classes was a condition of the Bridge Program

---

[1] The terms "expert," "monitor's expert," and "reviewer" are used interchangeably in these case reviews.

and early release. His correctional counselor, who was present at the meeting, said he would get the inmate a new ID that day.

Diagnoses included Mood Disorder NOS, with no diagnosis on Axis II. He had a history of head trauma stemming from a gunshot wound to the head two years prior. He did not receive psychiatric treatment while in the community. At CCI he was non-compliant with orders for Remeron and Risperdal. He reportedly had problems with substance abuse, had lost his temper and had engaged in fights.

The team decided to retain him at the 3CMS level of care until he paroled.

Assessment:

The IDTT meeting was attended by the necessary participants, including the inmate's correctional counselor. Medical records and the C-file were available. The IDTT meeting was clinical relevant with active participation from the various disciplines as well as from the inmate.

7.    Inmate G

This case was reviewed because the inmate was returned to CMF from DMH after a stay of less than 24 hours.

This 69 year old EOP inmate was at DMH for less than 24 hours in February 2007. He was also hospitalized in the MHCB in January 2007 but may have stayed less than one day. It was not possible based upon the UHR review to discern the inmate's movement in and out of DMH or between DMH units and levels of care.

According to the last volume of his UHR, he had several medical problems in addition to diagnoses of Major Depressive Disorder, recurrent, in full remission, ADHD combined type by history, Amphetamine Abuse by history, and APD. His psychiatric regimen included Geodon, Paxil and Artane. A history of attempted overdose in 2005 was included on his most recent treatment plan. Recent risk assessments consistently found him to be at low to no risk of self harm.

Additional DMH diagnoses found in the UHR included Schizotypal Personality Disorder and Anxiety Disorder NOS. He may also have had PTSD, which was listed on his DMH discharge summary but not on his EOP treatment plan.

He was admitted to a MHCB on 1/5/07. Five-day follow-up was documented in the UHR from 1/9/07 to 1/13/07.

He was admitted to S-2 on 1/25/07 or 1/26/07 and both dates were reflected in DMH documents found in the UHR. His admission was precipitated by the loss of his single cell status and threats to injure himself if he had to accept a cellmate. According to

clinical notes, he said he had been assaulted by a cellmate in the past and would rather hurt himself than to have a cell mate.

He appeared to have been transferred to Q-3 on 2/9/07.

A discharge summary dated 2/15/07 indicated that he was transferred to Q-3 from S-2 on 2/8/07 because a bed was needed for someone else on S-2.

In March 2007, he reported depression, insomnia and auditory hallucinations. He had difficulties with the behavior of his cellmate, who was reportedly mentally unstable. He also had periods during which his level of distress was low, and his mood was euthymic.

A treatment plan was completed timely, and an IDTT meeting held after he arrived in the EOP. Five-day follow-up was documented in the UHR from 3/1/07 to 3/5/07. The staff reported that all inmates on five-day follow-up were placed in L-1 to facilitate observations.

He experienced an interruption in medication during the week following his discharge from DMH, as orders for Paxil were not rewritten. He stated that he began cheeking Geodon because when he took it without Paxil it made him feel bad. His eyeglasses had been in need of repair for several weeks, and the UHR documented that the treatment team was concerned because a piece of broken frame sticking out appeared to pose a safety risk.

In mid-March, his Foley catheter had not been changed as required by the 30-day schedule. The problem was followed closely by an EOP clinician, requiring several phone calls to the medical staff. The rationale for not changing it was reportedly that there was no order to change it and the inmate said that it was usually changed in a different clinic. He was seen again in the medical clinic the following day at the insistence of EOP staff.

Assessment:

Documentation regarding changes in levels of care and in/out of DMH was terribly unclear. The inmate did not appear to require stabilization in an MHCB after he adjusted to the loss of single cell status.

Medication continuity, maintenance or replacement of his corrective lenses and of his Foley catheter were poor. Mental health staff was unable to obtain necessary medical follow-up care for this inmate. There was also documentation that his medication was interrupted when he was discharged from DMH to the EOP.

Five-day follow-up was carried out as required, but it was performed in a specialized unit where the inmate was housed prior to transfer to his assigned housing unit.

In the EOP, a timely IDTT meeting was held and an individualized treatment plan was written.

8.    Inmate H

This 38 year old inmate was placed at the 3CMS level of care in June 2006 for medical necessity. Several chronos written in June 2006 seemed to indicate that he was hospitalized in the MHCB that month and also moved on and off the MHSDS roster. After moving from CSP/Corcoran to CMF, he contacted plaintiffs' counsel and stated that he was not doing well.

The most recent treatment plan in the UHR was dated 7/12/06. It noted that he was treated at the 3CMS level of care; he indicated that he desired removal from the MHSDS. He was provided diagnoses of Adjustment Disorder with depressed mood, GID, Personality Disorder NOS and a GAF of 70. He was not prescribed psychotropic medication. He was discharged from the caseload at that time.

There were anecdotal reports that he was treated at DMH in 2007 but there was no documentation associated with that event in the UHR, nor did his name appear on a list of admissions during that time frame.

There was no documentation in the UHR that he had been seen since 12/11/06. He was overdue for a 90-day contact.

Assessment:

There were problems with information that was missing from the UHR. Missing documentation regarding admissions to a MHCB and movement on and off of the roster made review this inmate's recent course of treatment very difficult. Although chronos and other sources of information indicated that he was in crisis care and moved on and off of the mental health caseload in June 2006, no corresponding clinical documentation was found in the medical record, nor was his name listed on logs of admissions/discharges. If he was in a MHCB in June 2006, he likely warranted closer monitoring. He was overdue for a 3CMS 90-day case manager contact.

EXHIBIT C

California State Prison at San Quentin (SQ)
April 10, 2007 – April 12, 2007

1.    Inmate A

This inmate was housed in the OHU, and his UHR and ward chart were reviewed. He arrived at SQ on 12/22/06 from Alameda County jail. His diagnosis was Schizophrenia, paranoid type, and he was treated with Abilify 10 mg HS (verified) at the time. There was no referral to mental health. Doctor's orders for the day of arrival listed a telephone order for Abilify 10 mg HS and "R&R Psych". While it was possible that the latter constituted a referral, there was no response by mental health. Between arrival and 3/12/07, there were four staff referrals. There was no documentation of a response to these referrals by mental health. The inmate had been referred to nursing staff in the TTA on 2/4/07 for urgent psychiatric evaluation. In consultation with the psychiatrist on call, it was determined that no emergency existed based on the facts presented to the psychiatrist. There was no psychiatric evaluation. The inmate was returned to housing and was re-referred more than one month later as indicated above.

The inmate was admitted to the OHU on 4/7/07 on referral from custody staff. Because the admitting progress notes were illegible, it was unclear why he was referred and admitted. The initial orders called for Abilify 15 mg every morning, monitoring of food and fluid intake and nutritional supplementation. He was placed on suicide precautions with a diagnosis of Mood Disorder NOS and Psychotic Disorder NOS. The notes generally indicated over the next several days that the inmate was either unresponsive to staff communications, or was unwilling to leave the cell requiring that he be escorted to an office for evaluation. At times, he was observed banging his head and mumbling to himself. The progress notes indicated that while he agreed to take Abilify, he would not sign a consent form. It was subsequently determined that he never received any medication. Three days after admission, he was referred to the MHCB.

The history and physical of this inmate indicated psychosis and selective mutism; a history of paranoid Schizophrenia was also present in the UHR. He was said to be "allergic to Potassium". On interview, a nursing supervisor indicated that the latter might mean that he had a reaction to intravenous KCl. There was no other explanation offered. He was also said to be off Abilify since the end of December 2006. There was no nursing care plan, and vital signs from the beginning, especially pulse, were elevated.

Subsequent nursing notes indicated that he rarely responded verbally, although some commands were followed. He took his nutritional supplement, but often refused meals. The physician's order to "monitor food and fluid intake" was not interpreted as a formal order to document the inmate's intake and output. A review of the MAR revealed that Abilify was refused on 4/8/07. The nurse's initials were circled. Based on an interview with the supervising nurse, that apparently meant a refusal. The rest of the MAR consisted of blanks, which according to nursing staff, indicated that the medication was not given for unspecified. It was later determined by interview with nursing staff, that Abilify was a non-formulary drug, and due to problems in the pharmacy, was never provided to the inmate. His MAR nonetheless indicated that it was (offered and) refused.

Assessment:

There was a failed mental health referral from the bus screen. There was no medication renewal referral to mental health; the inmate's medication expired without renewal or mental health referral. The reception center mental health team failed to screen the inmate. There was also a failed off-formulary drug approval process. Nursing operations were inadequate, including poor MAR documentation, lack of any nursing plan or assessment. Nursing operations were also of concern as there was documentation that medication was offered and refused; however, in fact the medication was never dispensed by the pharmacy. There was also an untimely MHCB referral (three days post-admission).

2.    Inmate B

This RC-EOP inmate arrived on 12/7/06 from APP. He was diagnosed with Bipolar Disorder I, and he was treated with Tegretol and Haldol upon his return. Information from his treating psychiatrist indicated that at the end of last year, he had made a serious suicide attempt by hanging, was sent to an outside hospital and then to APP. As a result, he incurred some additional brain-damage, exacerbating his previous Axis I diagnoses of cognitive disorder secondary to prenatal head trauma and alcoholism. His OHU stay was prolonged by a series of court hearings related to new charges secondary to some 115s including an assault on a CO. The last of his 115 charges (for assault) was the one which was referred to the DA. He was unable to go to an EOP until those court matters were resolved.

Progress notes revealed that near the end of December 2006, he had been seen on a daily basis and experienced ongoing suicidal ideation. He was anticipating an upcoming parole, but progress notes indicated that he had received a parole hold and additional time from new charges. He was often considered to be "malingering" when reporting suicidal ideation in the absence of any sign of objective symptoms. By March 2007, he was prescribed increasing dosages of Thorazine, due to his anxiety regarding sentencing hearings etc. He had also been treated with Geodon, Trazodone and Vistaril since February 2007. He was reportedly clinically stable and without evidence of psychosis during 2007. He was generally seen on a daily basis by clinicians with the exception of out-to-court dates.

Assessment:

There was overall good mental health care and support for this long term OHU inmate. He was seen at least daily by OHU clinicians. There was adequate medication management. The inmate, however, needed more out-of-cell time.

3.    Inmate C

This OHU inmate was admitted on 4/10/07 on suicide precautions, with a diagnosis of Psychosis, Depression NOS. Initial orders of 4/10/07 were included orders for property, clothing, diets, initial medications, any precautions and diagnosis. On 4/11/07, Geodon

240 mg HS for 90 days DOT was prescribed. He had not been seen prior to that time. An admitting note of the same day reflected an evaluation in the TTC prior to OHU admission. He was distressed at that time and experiencing suicidal ideation according to the evaluating psychiatrist. Later that day, he was seen by the psychologist who elicited plans to commit suicide and depression. He was placed on suicide precautions at that point. The psychiatric note of 4/11/07 indicated that the Geodon had started and there was an excellent psychiatric progress note written which provided a rationale for medications, psychiatric history, and a mental status evaluation upon which a diagnosis of MDD was based. Suicide precautions were continued.

Assessment:

There was excellent intake and mental health and psychiatric care for this new OHU inmate.

4.    Inmate D

This RC-EOP inmate's chart was reviewed. He had an EOP chrono from October 2006. He spent substantial time in administrative segregation until early January 2007. His last treatment plan was completed on 10/31/06, citing diagnoses of Mood Disorder NOS, R/O Bipolar Disorder, R/O Anxiety Disorder, PSA, and Mixed Personality Disorder. He was treated with psychotropic medications, and he was provided with a GAF of 45. In January 2007, he had two OHU admissions. He had decompensated frequently, largely due to medication discontinuity. He was at times agitated, with self injurious behavior and numerous crisis referrals. His treatment plan cited self-mutilation, anger and impulse control problems as well as mood disorders.

For reasons that were unclear in the UHR, the inmate was not placed into the RC-EOP treatment program until 3/1/07. Between the first of January 2007 and the first of March 2007, the inmate history profile indicated that the inmate had 23 urgent or emergent referrals for decompensation, several of which resulted in the OHU admissions. Medication discontinuity associated with failed renewals and lapses after housing moves complicated his transition problems to the RC-EOP.

On 3/1/07, progress notes indicated that he had been highly motivated to attend case manager sessions and administrative segregation EOP groups. On 3/1/07 he commenced group in the RC-EOP. He was in that group every day and had one case manager contact every week. The inmate history also indicated that between 3/1/07 and 4/6/07, the inmate had been in 28 RC-EOP groups. During that time, he also had four case manager contacts and two psychiatric contacts. There were no further self-mutilations or OHU admissions. His behavior stabilized considerably, and his compliance with the program was significantly improved.

Assessment:

There was no current treatment plan or IDTT meetings. Numerous medication discontinuities existed which were significant and led to episodes of decompensation. The transition from administrative segregation EOP to RC-EOP was poor. Despite lack of treatment planning, mental health care (including psychiatric) resulted in substantial clinical improvement and stabilization. This inmate received approximately 5.7 hours of structured clinical activities per week.

5.    Inmate E

This RC-EOP inmate arrived on 1/19/07; at the time of arrival he was not prescribed psychotropic medications. His mental health screen was positive, and he had a history of Schizophrenia and treatment with Zyprexa at this institution during the fall of 2006. The results of the bus screen led to referral to mental health. He was next seen pursuant to an emergency referral on 1/25/07 when his MH-7 was done. At that time the inmate was psychotic and suicidal and was admitted to the OHU. He was discharged the next day and followed up by the OHU psychiatrist who prescribed Zydis 10 mg b.i.d. He never received this medication as it was never approved by the chief medical officer (as an off-formulary drug) for lack of a clinical justification. On 2/27/07, Risperdal 2 mg at HS was prescribed. His February MAR stopped on 2/27/07, but he never got the Risperdal until 3/12/07. In addition, the Trazodone which had been prescribed stopped two days short of its expiration. On 3/12/07, Risperdal M-tabs 6 mg HS were prescribed along with Trazodone 100 mg HS. Those medications were not given until 3/14/07. At that point he entered the housing unit in which the EOP was based.

A very thorough MH-7 was completed on 1/25/07 culminating 3CMS level of care placement on no medications. As indicated above, he had been referred on an emergency basis because he was grossly psychotic and suicidal. On 3/12/07, he was upgraded to EOP level of care, and medications were prescribed. There was no treatment plan in the chart or in the inmate history since 2005. The MH-7 of 1/25/07 was thorough, citing command hallucinations to jump off the tier and distress over his mother's recent death. The diagnosis at that time was Major Depressive Disorder, recent, severe with psychotic features. He was continued in the 3CMS program despite the fact that he was placed in the OHU on that same day. He had been a 3CMS inmate during 2006. He was referred to psychiatry on that day.

A case manager progress note dated 3/16/07 indicated that the inmate had finally received his prescribed medications; subsequent progress notes indicated that he showed improvement. There was no admitting note or any note after the 3/16/07 case manager contact. The inmate subsequently averaged four hours per week of structured clinical activities.

Assessment:

There was a failed referral to mental health after the bus screening process. Numerous failures to administer medications and continuity lapses existed. There was an unreasonable failure to approve Zydis which had been previously prescribed without

incident at this institution. The MH-7 was clinically appropriate; however, the inmate was virtually lost to follow-up until 3/12/07 when he was placed in the RC-EOP. The inmate was doing well in the RC-EOP with only four hours per week of structured therapeutic activities. There was no treatment planning, admission note or even a justification underlying the EOP chrono. Documentation was generally poor in the UHR.

6.     Inmate F

This RC-EOP inmate arrived in July 2006. His mental health screen was negative for mental health concerns. In September of that year, a correctional officer referred him to mental health where he exhibited markedly poor hygiene, disorganized behavior and speech, and blunted affect. He was then diagnosed with Schizophrenia, disorganized type, and he was placed into the 3CMS program. In November 2006, he was transferred to administrative segregation after assaulting his cellmate; he was then described as grossly disorganized, speech impoverished and incomprehensible, with poor hygiene. The medical record indicated that "attempts to refer to the psychiatrist were unsuccessful" (largely because the inmate refused to leave his cell). When seen by the LPT in administrative segregation, he was not eating, was very depressed and was selectively mute. He was then referred for EOP level of care, and weekly case manager visits were planned. He was again unsuccessfully referred to psychiatry. He was very resistant to mental health care during his stay in administrative segregation, and generally refused groups or mental health treatment and often would not come out of his cell. He was consequently seen primarily at cell front. He was seen individually at least weekly until early December 2006. Thereafter he was not seen again individually until February 2007. His first IDTT did not occur until 1/22/07. He was not seen by psychiatry until March 2007.

He was released from administrative segregation on 3/16/07. The last progress note in the chart was dated 3/16/07, when a case manager tried unsuccessfully to find him in West Block. No further notes were present, but the inmate history profile indicated that two weeks following his release, he received two group contacts beginning on 3/29/07 and an individual contact on 4/5/07. Those appeared to be the only reference to his inclusion in the RC-EOP. There was no admission note or treatment plan.

Assessment:

There was inadequate RC-EOP mental health care with only one group contact and one individual contact in three and a half weeks. The inmate was seen only once by psychiatry, four months after placement into the EOP. There was no psychological evaluation for RC-EOP and no treatment planning. Administrative segregation EOP mental health care was also inadequate; the IDTT was greatly delayed, and there was no documentation of treatment planning.

7.     Inmate G

This RC-EOP inmate arrived on 1/24/07. At that time he was on estrogens as well as steroids for a presumptive transgender issue. His mental health screen was positive on 2/8/07. The MH-7 documented a history of suicide attempts by cutting as well as a history of treatment with psychotropic medications and past mental health hospitalization. He had a history of delusional thinking and was a former EOP inmate at this facility. Diagnoses at that time included Psychotic Disorder NOS and Gender Identity Disorder, PSA. His GAF was 45, and a chrono was written placing him at the EOP level of care. He was also referred to psychiatry. He was seen more than one month later, when Remeron 15 mg HS was prescribed and Sertraline was discontinued. There was a prior doctor's order of 2/28/07 written to "continue Sertraline 50 mg HS." There was not a previous order for this medication, and contrary to what the psychiatrist believed, this medication had not been prescribed at the county jail at the time of arrival during January 2007. He also wrote an order for estrogen which had expired sometime prior. All of these medications were renewed or written without face-to-face evaluation. In addition, the MARs for January 2007 and February 2007 listed no psychotropic medications being given. The progress notes revealed various no-show entries for the case manager.

The inmate's first EOP group took place only 12 days following the MH-7, and one week after his first case manager contact. Over the next 40 days, the inmate received almost daily EOP groups (30 in all), six case manager contacts and one psychiatric contact.

Assessment:

Mental health care was clinically appropriate for this RC-EOP inmate who received almost daily individual or group contacts (five hours per week of structured clinical services). There was inadequate psychiatric medication management (e.g. medication renewed which had never been ordered and without benefit of an actual face-to-face evaluation). Also, the case manager did not follow-up after the inmate missed multiple clinical appointments.

8.    Inmate H

This 46 year old EOP inmate was housed on SQ's condemned unit. He had been in the EOP since at least April 2006. This inmate was under a Keyhea order which was approved on 2/27/07. An existing medication order indicated that he was prescribed Abilify 25 mg every morning.

Review of this inmate's medical record revealed that, during the span of at least one year (since at least 2/7/06), he had frequently been delusional, isolative and poorly groomed. He had typically refused groups and refused to leave his cell for extended periods of time. He had typically been diagnosed with chronic Paranoid Schizophrenia.

This inmate had displayed motor limitations (difficulties with ambulation) that were evaluated by several physician visits during September 2006; it was not clear that these

difficulties were ever definitively diagnosed. The medical record suggested that these difficulties were at least partially attributable to the inmate's lack of activity.

This inmate exhibited a considerable level of disorganization, occasional dysphoria and a variety of delusional symptoms in spite of apparent medication compliance. In a recent assessment, he was characterized as "stable at a severe level of impairment."

This inmate was interviewed during the 19th monitoring tour. The inmate agreed to be interviewed in a confidential setting, despite his apprehension regarding the possibility that his "batteries required replacement" prior to the time that the interview could be completed. He was obese and quite disheveled. His clothing was soiled, and he ambulated with the assistance of a walker. He reported that he "never" goes to yard or to groups. He described his recent activities as "working on removing" his brain "so that parts could be replaced." He appeared to be overtly delusional. Despite this presentation, he was cordial and displayed a range of affect. His speech was clear and of normal rate and volume. He reported that he might possibly enjoy periodically contacts with clinicians.

The staff appeared to be active in attempting to address this inmate's needs. They moved the inmate from an isolated area of the cellblock to an area with more natural light and greater activity. They reported that the officers in this area of the cellblock had worked well with a number of the more disabled inmates who had been moved to this area.

Assessment:

This inmate remained grossly disorganized despite medication management. He was marginally groomed and very delusional. His active psychotic symptoms have been associated with limited mobility, and staff reported that his difficulties with ambulation were attributable to this fact.

It appeared that this inmate might benefit from a higher level of care. Consideration should also be given for a trial of treatment with Clozaril.

9.    Inmate I

This 47year old inmate was housed in the East Block (condemned unit).

A 9/19/06 evaluation noted low to borderline intellectual functioning, marginal grooming and disorganized thinking. He had been diagnosed with Schizophrenia. Progress notes indicated that he had consistently presented with disorganization and delusional thinking, but his behavior was generally not threatening. He had typically refused to come out of his cell for interview and had not participated in offered groups. Notes also indicated that he required consistent reminders to keep his cell clean.

This inmate's attorneys had brought an injunctive procedure into federal court to prevent the inmate from being medicated based on his informed consent. A letter to SQ

administrative staff from the State Attorney General (in 2003) indicated that although the inmate could not provide voluntary consent for medication, the prison was not precluded from seeking an order for involuntary medication via a Keyhea order.

When seen at cell front, this inmate was marginally groomed. His cell had numerous stacks of paperwork which he reported was his legal work. He was quite disorganized. He asked if the reviewer had any knowledge of CMF. His case manager reported that he had, in fact, gone to CMF for a short period of time. He reported that he "went there for first grade mental health, took up social work – went white brown, white black." The 114D revealed that the inmate showered approximately once per week through March 2007 and had refused the last several showers that were offered to him.

Assessment:

This inmate appeared to be actively psychotic. At the time of the visit, he had not been medicated as a result of an existing order preventing voluntary medication. The staff appropriately initiated the process of seeking a Keyhea order. A higher level of care appeared to be indicated pending determination of improvement with psychotropic medication treatment.

10.    Inmate J

This inmate had been moved from one side of East Block to an area on "Bayside" where there was more light and more contact with officers, etc. This inmate agreed to be interviewed in a confidential setting. The officers reported that his care of his cell was better than average. He was reasonably well groomed and quite sociable. His speech was clear, and his thinking appeared organized. He reported that he saw a psychologist regularly, and he had daily contact with a psychiatric technician. He described himself as "paranoid"; however, he exhibited good insight regarding his symptoms. He reported that he had recently gone to yard and believed that he would likely do so more frequently. He reported that he was beginning to feel more comfortable regarding the prospect of coming out to group. He was very cooperative with the interview.

Assessment:

This inmate's condition had reportedly improved substantially in the time since he had been moved to his present housing area. He appeared to be at the appropriate level of care.

11.    Inmate K

This inmate agreed to be interviewed in a confidential setting. The officers on the tier reported that his maintenance of his cell and his grooming had been "fair." He was rather marginally groomed and wore clean clothing. He reported that he was "doing ok." He was coherent and cooperated fully with the interview. He reported that he did not

typically come out of his cell for yard. He was seen approximately weekly by a psychologist. He reported that he had no interest in groups regardless of the content. The treatment team reported that the inmate had a long history of refusing groups and would not likely change. The team considered a change to 3CMS level of care; however, the treatment plan indicated that the inmate should be seen clinically on a weekly basis.

Assessment:

It appeared that this inmate was psychiatrically stable albeit at a less than optimal level of adaptive functioning. He had reported that he would not likely attend groups or avail himself of all aspects of mental health care. It appeared that he was appropriately maintained at EOP level of care.

EXHIBIT D

Deuel Vocational Institution (DVI)
April 5, 2007 – April 6, 2007

1.    Inmate A

The inmate arrived on 2/14/07 from a county jail on psychotropic medications (verified) and diagnoses of Mental Retardation and Bipolar Disorder. His medications included Lexapro 20 mg a.m., Depakote 250 mg t.i.d., Benadryl 100 mg HS, and Risperdal 4 mg b.i.d. for 30 days. These medications were reordered on the same day with an increase in Depakote as well as an order for a Depakote level. He was referred to mental health by nursing.

On 2/23/07, he was admitted to a quiet cell in the OHU on the same medications that he was taking on arrival. He was placed on suicide precautions, seen daily for two days and then discharged back to the reception center on five-day follow-up. During that time a psychiatrist increased his Depakote to 1000 mg per day. He subsequently screened mental health positive and received an MH-7 on 2/27/07, which placed him at the EOP level of care. He was actively psychotic at the time of that evaluation and received a diagnosis of Psychotic Disorder, NOS. His GAF was 35, and the plan was to refer him to psychiatry (he had already been seen by a psychiatrist in the OHU) and to offer weekly case manager visits.

There had been no response to the mental health referral at the time of the bus screen, but the psychiatrist responded to the mental health staff referral of 2/27/07 within three days. On 3/2/07, the psychiatrist indicated that the inmate had depression, as well as audio-visual hallucinations without evidence of a thought disorder. He was oriented only to time and place, and concentration and attention were diminished. He had a history of brain trauma and a suicide attempt by overdose. The psychiatrist increased the inmate's Depakote to 500 mg b.i.d. (which had already been done), Risperdal was tapered over two days, and Abilify 20 mg a.m. added. On 3/8/07, the staff reported that the inmate hallucinating, and he was referred to the psychiatrist again. He was seen the next day by psychiatry, and his Abilify was increased to 30 mg at a.m., with a return visit scheduled within one week. On that day, an EOP-IDTT met. He did not receive a formal treatment plan (MH-2) and had in fact already been placed in EOP group. He was subsequently seen again by the psychiatrist within one week (without benefit of the UHR) and was noted to be stabilizing, but with a hypothyroid condition. A return visit for two weeks was indicated. The psychiatrist had also ordered a Depakote level on 3/13/07. No blood level of any psychotropic medication was found in the chart.

By the latter part of March 2007, the inmate experienced side effects and complained of his Abilify. He was changed to Geodon, his Depakote ER 1000 mg per day was continued and Trazodone 100 mg at p.m. and Artane 5 mg b.i.d. was written. He was only partially stabilized at that point. The inmate history revealed that he received 17 EOP contacts (including five psychiatric and 12 EOP groups) between 2/27/07 and 4/2/07 (average of three sessions per week). There were no case manager contacts documented either in the inmate history profile or the medical record.

Assessment:

The documentation of mental health care was poor, and treatment efforts were uncoordinated. There was no documentation of groups, treatment planning or case manager progress notes. Medication changes all had an accompanying progress note by the psychiatrist. There was, however, no treatment plan present. Psychiatric care and medication management were generally adequate for this difficult inmate. There were no laboratory studies or blood levels for treatment with Depakote present in the medical record, and there were insufficient clinical contacts for an inadequately treated inmate.

2.    Inmate B

The inmate arrived on 1/24/07 after having been prescribed Risperdal 1 mg; this medication was verified. No order was written for this medication. He was diagnosed with Schizophrenia. He screened mental health positive the next day. The MHTS indicated that he was not seen until two weeks later by a case manager and the week after that by a psychiatrist. The case manager contact resulted in an MH-7 assessment diagnosing the inmate with Schizophrenia, paranoid type; he was then included in the 3CMS program. The MH-7 also called for improved coping skills as well as psychiatric and case manager contacts; however, the psychiatric contact was undocumented. By 2/18/07, he was admitted to the OHU on suicide observation. Risperdal 1 mg b.i.d. was ordered, and he was referred to the MHCB. He was described as agitated, throwing food, bizarre, assaultive and with grossly poor hygiene. He had a history of suicide attempts.

The MARs for January 2007 and February 2007 were blank until his admission to the OHU on 2/18/07. There was a two-day medication gap after his discharge from the OHU on 2/20/07. By 3/7/07, the psychiatrist indicated that he was grossly psychotic after a recent OHU admission. Orders were written to increase his Risperdal to 2 mg b.i.d., then 3 mg b.i.d. after three days. In addition, Klonopin .5 mg b.i.d. and Seroquel 100 mg at p.m. were ordered. The Risperdal and Klonopin were ordered DOT. The pharmacy label on the MAR still read Risperdal 1 mg b.i.d., and medication was given at that erroneous dosage. On 3/21/07, psychiatric orders were written renewing the medications ordered on 3/7/07. The MAR for March 2007 reflected the fact that the correct medication dosages were never given. Numerous housing moves appeared to be responsible for this error. On that same day, the case manager noted that the inmate appeared to be extremely paranoid with delusional thinking, and had recently received a 115 for an outburst in the dining room. ADLs appeared to be improved.

Assessment:

Overall, there was inadequate and poorly documented care (e.g. many case manager notes were missing). The inmate had always been listed as 3CMS, although he was treated appropriately as an EOP inmate. There was very little case manager documentation and no group documentation. There was good psychiatric medication management, including notes for medication changes, which was negated by poor medication administration. MARs were poor with numerous lapses with housing moves, failure to administer medications and an incorrect pharmacy label. There were also failed medication continuity orders upon arrival, leading to early decompensation.

3.    Inmate C

The inmate arrived on 1/17/07 with no mental health history or medications. His bus screen was negative for mental health issues. Notwithstanding his negative bus screen, he was admitted to the OHU on the day of arrival on suicide precautions due to depression and possible dementia. He was discharged on 1/19/07 with two-day follow-up. On 1/23/07, his mental health screen was positive; it was then learned that he was a former EOP inmate at this facility, having been released in September 2006. An evaluation for dementia was recommended. Case notes reflected that he was seen for two consecutive days following his release. A MH-7 was completed on 1/31/07 with a diagnosis of questionable Thought Disorder and Organic Brain Syndrome. He was reportedly delusional, and ADLs were diminished. He was diagnosed with Delusional Disorder. His GAF was 40, and he was referred to the psychiatrist and for EOP level of care.

He was evaluated on 2/7/07 for his first psychiatric evaluation, and he refused medications. The diagnosis of Delusional Disorder was continued, and the return visit for further evaluation was planned for one month. He was seen at that time by the EOP IDTT and placed in an EOP group without benefit of a treatment plan. He was seen on three occasions for follow-up by the case manager and on 3/9/07 was seen in EOP-IDTT. At that time he was reevaluated by the psychiatrist and a treatment plan was documented on the new EOP treatment plan form (form 7328). During March and April 2007, he received a total of 58 contacts including one to one sessions and group therapy. This represented an average of greater than five hours per week of structured therapeutic activity.

Assessment:

Overall, mental health and psychiatric care for an EOP inmate who was symptomatic, although stable, was clinically appropriate. Apparently the bus screen was inadequate. Documentation of group therapy was also inadequate. There was, however, adequate treatment planning for an EOP inmate.

4.    Inmate D

This inmate arrived on 12/26/06 and his bus screen was positive for mental health issues. He was not on psychotropic medication at the time. He appeared to be visibly depressed and a referral was made. He was seen the next day by psychiatry who prescribed Risperdal 4 mg at p.m., Buspar 30 mg b.i.d., Trazodone and Vistaril 100 mg at p.m. His Vistaril was increased to 50 mg at a.m. and 200 mg at HS on 1/18/07. Risperdal was changed to 1 mg at a.m. and 4 mg at HS. One month later, Remeron 7.5 mg at HS was added and increased to 15 mg at HS on 3/9/07. Except for the orders of 12/27/06, psychiatric progress notes accompanied each order.

On 1/8/07, a MH-7 assessment was completed. Depression, sleep disturbance, hallucinations and frequent crying with nervousness were noted. Diagnoses of Psychotic Disorder, NOS and Mood Disorder, NOS were provided. His GAF was 45. He was referred to psychiatry for medication evaluation (suggesting that he in fact had not been seen by the psychiatrist on 12/27/06). He was then referred to the EOP for case management and group therapy as well as monitoring of his condition and functioning. A SRA was completed and indicated low risk for suicidality. By the end of January 2007, the inmate was showing signs of improvement. Progress notes by both psychiatry and case management indicated that he continued to improve and stabilize. During February, March and April of 2007, the inmate received 40 clinical contacts including case manager, group, and psychiatric contacts. This represented an average of 3.5 hours of structured clinical activities per week.

Assessment:

Psychiatric and mental health care for a stable EOP inmate was clinically acceptable. Some visits were completed without an accompanying medical record. Orders for new medication and changes were accompanied by a psychiatric progress note and a rationale, except for the first visit. Psychiatric medications were readily accessible as were the various aspects of the EOP.

5.    Inmate E

The inmate arrived on 2/7/07, and a bus screen was positive for mental health problems. He was not prescribed psychiatric medications at that time, but arrived with a diagnosis of Anxiety Disorder. A mental health referral was made and documented in the chart. He was seen for the first time by psychiatry on 2/15/07 when Seroquel 200 mg at HS, Lithium 300 mg t.i.d. and Zoloft 100 mg every a.m. and 200 mg at HS were prescribed. These orders were accompanied by a psychiatric progress note documenting the rationale for treatment. His mental health screen completed on 2/8/07 was positive.

They were many misfiled notes, including progress notes, chronos, etc. It appeared that he was immediately sent to administrative segregation and was seen by mental health staff in that unit who described him as depressed, very fearful and cognitively deficient. He was seen by the case manager every week, and by the psychiatrist for initial medication review. He received a MH-7 assessment on 2/12/07 and a formal IDTT on the next day. The diagnosis at that time was MDD, moderate, recurrent. His GAF was 45, and he was assigned to an EOP level of care. There was only one weekly summary of PT rounds (not daily) during his stay in administrative segregation.

The inmate history profile reflected his entry into the RC-EOP group. On 3/9/07, an EOP-IDTT was conducted and an adequate treatment plan update was documented on the new form 7388. That plan indicated that his medications were very effective, that he needed a reading program, and that he was clinically stable. The summary and treatment plan were judged to be adequate. During the one month in which he was in the RC-EOP,

he received 12 contacts, representing an average of three hours per week of structured clinical services.

Assessment:

Clinically appropriate psychiatric and mental health care were provided, both in the administrative segregation EOP as well as in the RC-EOP. No Lithium levels were ordered. The lack of documentation of some clinical contacts may have been an issue of extensive misfiling in the medical record. The MHTS inmate history reliably documented clinical contacts.

6.    Inmate F

This inmate arrived in early February 2007, but there was no bus screen available in the chart to indicate his exact date of arrival. The MHTS history suggested that he probably arrived on approximately 2/2/07. This chart was disorganized with misfiling, no OHU information and very few documents relating to early February 2007. The first mental health note was dated 2/7/07 and documented a two-day follow-up after an OHU admission. He was admitted on 2/2/07 and seen daily by both a psychiatrist and a psychologist. Inexplicably, while in the OHU, he received a 31-question mental health screen. He was discharged on 2/7/07 to follow-up. The case manager following up the inmate indicated that he had seen the inmate in R&R on arrival, and in a note dated 2/9/07, indicated that he, "... looks much better." On 2/15/07, the inmate was assessed as volatile, pressured and euphoric by the reviewing psychiatrist who ordered medications. These were the only orders available in the chart during 2007 due to missing documentation. The orders consisted of Trileptal 150 mg b.i.d., increasing to 300 mg b.i.d. after 10 days, Abilify 5 mg every a.m., increasing to 10 mg every a.m. after 10 days and Klonopin 1 mg every a.m. and 2 mg at HS for seven days. A return visit was set for one week. He was, however, admitted to the OHU the following day. On 2/27/07, he was referred to the MHCB where he was admitted on 3/6/07 and discharged on 3/7/07. He was readmitted to the OHU upon his return.

From that time, the clinical picture of care provided was unclear. There had been well documented five-day clinical and custodial follow-up after his return from the MHCB. On 3/15/07, a chrono was filed placing him at the 3CMS level of care. One week later, on 3/22/07, he received his first MH-7 assessment with a diagnosis of Mood Disorder, NOS and history of Bipolar I Disorder. It indicated that he would be placed at the EOP level of care and involved in anger management group therapy. That plan had first been articulated in a progress note dated 2/15/07, when in a clinical note, he was described as grossly psychotic and requiring EOP level of care. He was never placed into the EOP, nor did he receive any EOP group therapy.

Assessment:

Generally, there was poor psychiatric and mental health care for an inmate whose stability and level of care fluctuated. There were no Depakote orders or levels. The

UHR was disorganized with missing orders and progress notes. All psychiatric orders were accompanied by a note which contained no rationale for the medication order or changes. Despite being recommended for the EOP level of care on several occasions, he was never treated in the EOP. The reasons for this were unclear. Clinical and custodial follow-up upon discharge from MHCB were clinically appropriate.

EXHIBIT E

California State Prison, Corcoran (CSP/Corcoran)
April 23, 2007 – April 25, 2007

1.    Inmate A

This EOP inmate was housed in the administrative segregation hub. There were various diagnoses included in his medical record. The most recent diagnoses were Mood Disorder, NOS and Adjustment Disorder. He was treated with Prozac 20 mg/day and Geodon 60 mg/day.

This inmate was transferred from Sierra Conservation Center to CSP/Corcoran on 7/27/07, where he was upgraded from 3CMS level of care to EOP. He was initially transferred to the mainline EOP. He was transferred to the administrative segregation hub in October 2006. Progress notes indicated that he had periods of sporadic treatment compliance, missing groups and medications at times. He was at times described as angry, paranoid, uncooperative and exhibiting evidence of cognitive deficits. There were other times that he was described as cooperative and compliant with group attendance. He was given diagnoses of Psychotic Disorder, NOS, Depressive Disorder, NOS and Traumatic Brain Injury. He was diagnosed with Schizoaffective Disorder as recently as January 2007. He was admitted to the CTC twice for suicidal ideation from 1/22/07 to 1/23/07 and 3/20/07 to 3/26/07. An IDTT on 3/20/07 recommended 3CMS level of care, and the progress note indicated that he was angry regarding the decision. He was admitted to the MHCB on that date. He was discharged back to the EOP hub with diagnoses of Mood Disorder, NOS and Adjustment Disorder. During his five-day follow-up, he was described as "mentally unstable" and was returned to the emergency room for MHCB admission. Although the inpatient information was not present in the UHR, it appeared that he was discharged on 4/2/07. He was seen by a clinician on that date when he presented with psychosis, poor ADLs and a dirty cell. A chrono was then submitted for EOP level of care; this change in level of care was never approved by an IDTT. A staff meeting was held with the Chief of Mental Health, the EOP manager, CCM, MHCB and other clinicians. Although the documentation in the UHR was unclear, it appeared that this inmate was ultimately retained in the EOP pending transfer.

The inmate produced a chrono indicating that he had been endorsed to the CMC EOP prior to his downgrade to 3CMS.

Assessment:

This inmate was housed in the EOP administrative segregation hub due to his reported predatory behavior in the EOP. EOP was the recommended level of care for this inmate based upon the interview with him and mental health staff as well as the review of his medical record.

There was documentation of five-day follow-up after discharge from the MHCB. There was considerable disagreement and inconsistency regarding this inmate's diagnoses and a need for diagnostic clarification. The EOP supervisor clarified that this inmate was included in the EOP and would continue to receive EOP level of care where the above clarification would occur. The inmate was scheduled for an IDTT during the site visit when his treatment plan would be updated.

2. Inmate B

This EOP inmate was housed in the administrative segregation hub. He was diagnosed with Mood Disorder, NOS. An alternative diagnosis of Major Depressive Disorder with psychotic features was also present in the medical record. He was treated with Geodon 120 mg/day, Cogentin 4 mg/day, Lithium 1200 mg/day and Prozac 40 mg/day. He was on a Keyhea order that expired 10/1/07.

This inmate had been housed at CSP/Corcoran since June 2004 for SHU placement. He was in the 3CMS program since that time where he was housed in the SHU. His SHU term would not expire until 2037. This inmate had a history of severe depression with significant suicidal ideation off medications. He had been on a prior Keyhea order from 12/02/06 to 5/05/07 for danger to self. It appeared that he had been hospitalized in the MHCB during March 2007. The inpatient information was not present in the medical record. He was upgraded to EOP level of care on 3/5/07. At the ICC on 3/29/07 he was referred to the CSR for transfer to PBSP or CSP/SAC PSU.

He was readmitted from 4/21/07 to 4/27/07 due to suicidal ideation. While in the MHCB, he was observed banging his head "with great force" and he had tied a ligature around his neck with evidence of prior attempts to asphyxiate himself. He was then placed on a Keyhea order and subsequently discharged from the MHCB. At the time of the site visit, he was housed in the administrative segregation hub.

Assessment:

This inmate was observed during one of the group therapy sessions. He presented with severely withdrawn behavior, no eye contact, rocking behavior, holding his head down and covering his face the entire interview. He did not respond to verbal questioning. The group facilitator confirmed the presence of past similar behavior.

In light of this inmate's observed symptoms and his significant history of mental illness and suicidal behavior, transfer to inpatient care appeared to be indicated. This case was discussed with the EOP manager who stated that she would have the inmate evaluated immediately.

This inmate was appropriately placed into the EOP and a Keyhea order was pursued. There was documentation of weekly CCM contact after the inmate was placed into the EOP. The last documented Lithium level was during 2005. Lithium levels should be routinely monitored. This inmate had an abnormally low TSH level on 10/10/06. He was referred by the psychiatrist to medical for follow-up on 11/30/06. A medical note dated 12/11/06 indicated that labs were ordered, however, there was no documentation of repeated levels located in the medical record. These thyroid abnormalities were of additional concern as hypothyroidism might result in depression, and Lithium (which the inmate was prescribed) might result in decreased thyroid levels. The inpatient records

from the inmate's most recent MHCB hospitalizations were not located in the medical record.

3.    Inmate C

This 3CMS inmate was housed in the SHU. He was diagnosed with Mood Disorder, NOS. He was not treated with psychotropic medications at the time of the visit. His medical record was reviewed at the request of the plaintiffs' attorneys regarding his possible removal from the MHSDS.

This inmate appeared to have been housed in the SHU for most of the review period. Mental health placement chronos indicated that he was admitted to the MHCB during December 2006 and again from 3/30/07 to 4/3/07. He had a history of multiple MHCB admissions that preceded these. His most recent hospitalization occurred when he was reportedly agitated after medical treatment when he presented with paranoia. Subsequent progress notes described the inmate as having paranoid ideation regarding medical services and custody.

Assessment:

Prior inpatient records from recent MHCB hospitalizations were not located in the medical record. There was documentation of five-day follow-up after discharge from the MHCB in April 2007. This inmate appropriately remained in the 3CMS program.

4.    Inmate D

This 3CMS inmate was housed in the 3B02 building. He was diagnosed with Antisocial Personality Disorder. Another clinician provided a diagnosis of Mood Disorder, NOS with consideration of a diagnosis of Schizophrenia. He was treated with Remeron 30 mg/day, Geodon 120 mg/day, Wellbutrin 400 gm/day and Benadryl 200 mg/day. His medical record was reviewed at the request of the plaintiffs' attorneys to evaluate his current treatment plan.

This inmate had been in the EOP where he reportedly presented with differing presentations to the clinical staff. He generally presented with uncooperative behavior with his CCM, but presented otherwise with other inmates and staff. Due to concerns regarding the validity of his mental health complaints, he was downgraded to 3CMS at an IDTT on 4/12/07. Subsequently, he reportedly made threatening statements to his CCM.

Assessment:

The medical record documented inconsistent presentation of symptoms by this inmate. It noted that he presented with calm, cooperative behavior when interacting with custody staff and other inmates, but significantly problematic relations with his case manager. His presentation was also inconsistent with his initial DD testing that indicated that he was D1A on 9/13/06. Repeat testing on 2/20/07 indicated that he had no developmental

disability. The findings of this evaluation were consistent with progress notes describing his functioning in the EOP. A review of his medical record indicated that the staff had attempted to prepare the inmate for the 3CMS program and that he was sent to the 3B-2 building, a quasi-step down/overflow building next door to the EOP building. Based upon this information, downgrade to 3CMS appeared clinically appropriate.

5.    Inmate E

This 3CMS inmate was housed in the 4A SHU. He was diagnosed with Bipolar Disorder, NOS and Impulse Control Disorder, NOS. He was not prescribed psychotropic medications at the time of the site visit. His medical record was reviewed at the request of the plaintiffs' attorneys regarding his access to yard and functioning in the SHU.

This inmate was transferred from PVSP to CSP/Corcoran SHU on 12/28/06. He was receiving 3CMS level of care at the time of the visit. Progress notes indicated that he consistently presented with hypomanic symptoms of lability, poor impulse control, rapid speech and hypersexual behavior. A sexual misconduct evaluation was completed on 1/24/07 after he received a 115 for sexual misconduct (masturbation). He had received 23 past 115s for this behavior. The evaluation concluded that his behavior did not appear to be the result of a paraphilia and that further evaluation was not warranted, but further extensive evaluation would be considered after another incident.

The inmate was prescribed Seroquel, but he refused to take this medication despite staff encouragement. The most recent progress notes indicated that he was focused upon his concerns regarding yard access.

Assessment:

There was some ambiguity regarding this inmate's cooperation and possible refusal of yard. The case manager had been involved in evaluating this issue and had communicated with the sergeant to clarify the issue and to ensure that he would consistently be offered yard. The custody staff have documented that inmates on that unit receive eight to nine hours of yard per week.

This 3CMS SHU inmate presented with symptoms of hypomania. His history of hypersexual and inappropriate behavior might be a result of his mental illness. The inmate has refused medications which could address these symptoms. It did not appear that he met the criteria for a Keyhea order or for hospitalization at the time of the site visit. This issue was addressed in his treatment plan and appeared to be an ongoing issue in his treatment. He was seen monthly by his case manager. She indicated that he would be seen more frequently and in conjunction with the psychiatrist to encourage treatment compliance and for closer monitoring.

6.    Inmate F

This 3CMS inmate was housed in 3-C, which was a SNY. He was diagnosed with Adjustment Disorder with mixed anxiety and depression. He was not prescribed psychotropic medications at the time of the visit.

A review of this inmate's medical record indicated that he was stable from a psychiatric standpoint. However, the CCM notes were preprinted and deficient in details. He reportedly had been stable off medications.

A review of his C-file indicated that he was evaluated and approved for SNY on 1/10/07. He had previously been housed in administrative segregation and subsequently in the SHU when he was transferred to the SNY on 3-C. He was originally endorsed for SVSP III SNY or PVSP III SNY on 1/10/07. He had an increase in points, and at UCC on 3/15/07 was endorsed to RJD IV or SATF IV SNY.

Assessment:

It was difficult to adequately review this inmate's symptoms based upon the CCM notes, however, the psychiatrist reported that he was stable. He was housed on the SNY yard pending transfer to RJD IV or SATF IV SNY.