EXHIBIT J

California State Prison, Los Angeles County (CSP/LAC)
May 15, 2007 – May 18, 2007

1.    Inmate A

This inmate had been at the EOP level of care since at least 3/1/07.  The mental health screening on 2/16/07 was positive, and a follow-up evaluation was indicated.  An initial evaluation on 2/22/07 reported a history of psychiatric hospitalization and a history of head injury with a resultant coma for approximately one month.  There was a reported history of three suicide attempts.  In the initial interview the inmate was described as "actively responding to internal stimuli" and was diagnosed with Schizophrenia, paranoid type.  An adaptive review (which was undated) indicated that the inmate had significant adaptive deficits across all areas which were sampled by this instrument.

A MH-2 completed on 2/25/07 cited the inmate's adaptive difficulties, a diagnosis of Schizophrenia and Psychotic Disorder, and "some organic issue."  The diagnosis on Axis II was "deferred v. mild mental retardation."  A chrono dated 2/28/07 however, indicated that the inmate was found to meet criteria for classification as "DD2" (developmentally disabled).

The "Problems" cited on the MH-2 included "reduce auditory hallucinations by providing medication management."  Recommended "Interventions" included, "case management," "group therapy," "IDTT," and "medication management."  There was no elaboration of the nature of the groups in which the inmate should have been involved.  The MH-2 included documentation that the treatment plan was developed by an IDTT.

The inmate was seen by psychiatry on 2/27/07, 3/27/07(at cell side), and 4/16/07.  Some psychiatry notes were very difficult to understand.

On 3/8/07, the inmate expressed the thought that "people are trying to kill me" (seen by clinician).  He was seen by mental health clinicians on 3/7/07 and 3/14/07, and the case was discussed by the IDTT on 3/21/07.  He was seen by a clinician for follow-up on 4/4/07, 4/17/07, and 5/10/07.  Appointments often occurred in non-confidential settings as the inmate refused private meetings.

He was offered and refused group on 3/21/07 and then attended group on 4/13/07, 4/19/07, offered and refused group on 4/26/07, did not show up for group on 5/8/07,  and attended group on 5/11/07.

Assessment:

This inmate was incarcerated for vehicular manslaughter and had a history of two significant head injuries. He was quite frightened by this setting. There were likely symptoms which had been attributed to Schizophrenia that were at least partially attributable to the history of head injury.  It appeared that this inmate was seen at the required intervals by a case manager and by psychiatry.  Progress notes were generally adequate, although some notes written by psychiatry staff were marginally legible.  The treatment plan made no mention of the nature of the groups that this inmate should have been involved with.  It appeared that the inmate was offered group once per week and

that he attended approximately one half of the offered groups. Notes regarding his group attendance were in the record, but did not provide data regarding the inmate's participation in the group.

2.    Inmate B

This 32 year old inmate was placed at the EOP level of care. He was incarcerated for trafficking narcotics. An evaluation on 3/15/07 resulted in Axis I diagnoses of Bipolar Disorder, Methamphetamine Abuse and "Sexual Identity Disorder." He had been designated at the EOP level of care since 1998. There was a history of multiple suicide attempts and mood swings. His suicide attempts apparently began at age 14 when he cut himself after his grandfather died. The UHR indicated that he had a sister who committed suicide. The inmate was apparently due to be released within the next few months.

Notes on 4/10/07 indicated that the inmate was a pre-operative transsexual, reported a history of mood disorder and reported that he no longer took Haldol because "it doesn't work anymore."

An MH-2 completed by the IDTT on 3/12/07 (including psychologist, psychiatrist, CCI, and inmate) resulted in the diagnosis of "schizoaffective disorder" and "Borderline Personality Disorder." The problem list included "unstable mood, major history of drug abuse." The interventions included "continue working on issues related to drug abuse - … get ready for his upcoming discharge…."

"Interventions" listed on the MH-2 included a list of contacts but did not specify the professional who was responsible.

There were several suicide risk assessments in the record (from 12/18/05 through 5/13/07). The inmate had a history of self-injury and threats of self-injury that appeared to occur more as manipulative gestures than as an actual intent to injure himself (in fact, the inmate was quoted as reporting that he injured himself "to get what I want"). In June 2006, a SRA cited the fact that the inmate had taken 101 pills from a supply of hoarded medication. When asked, the inmate reported that he took the medication because he was not ducated for a medical appointment. The inmate was apparently at DMH for suicidality in November 2006. The inmate was in MHCB from 9/27/06 to 10/31/06, then in DMH Vacaville from 10/31/06 to 11/20/06, and transferred back to CSP/LAC on 11/20/06.

On 4/18/07, the inmate again reported that he overdosed on medications. This occurred approximately three hours after he cut himself. There was also an apparent suicide attempt on 5/1/07.

Psych tech notes were reviewed which consisted of check sheets. In some very few instances the notes were blank. The check sheets were generally filled in and provided

information regarding the inmate's participation. It appeared that rounds were generally occurring.

The inmate was seen weekly by a clinician. These notes were generally well written and complete, but there was no mention in the progress notes of the objectives in the treatment plan. There was no indication that the treatment plan had been consistently implemented, although there were notes regarding group participation. Group notes were present, indicating his attendance at group therapy on 4/3/07. He refused a socialization group on 4/5/07 and refused other groups on 4/19/07, 4/26/07 and 5/8/07. Groups were cancelled on 5/4/07. The inmate participated in a group on 5/11/07.

Assessment:

The inmate was seen on a near-weekly basis by clinicians. Notes from these contacts were complete, generally legible and presented relevant impressions. Weekly psychiatric technician rounds were documented, but some check sheets used for these notes were blank. The inmate was offered groups approximately one day per week (at least during the past two months), but he attended these groups inconsistently. This inmate made recurrent suicide "gestures" which included self-injury and overdose. It appeared that he had prominent features of "borderline personality disorder," which included frequent suicide threats. Although this inmate had several placements into MHCB care, no clear evidence was found that there had been an IDTT consideration of whether this inmate required a higher level of care (perhaps ICF).

3.    Inmate C

This inmate arrived at CSP/LAC on 3/30/07. Of note was the fact that this inmate had no health care record but instead had a " floppy" (essentially an "out card") from the medical records office with all of the information collected during the period since his entrance into the facility (it was unclear whether a permanent medical record had not yet been developed). A MH-7 on 3/30/07 resulted in a diagnosis of "r/o psychotic disorder NOS "and "r/o bipolar disorder." There was a note in the record on 3/30/07 which indicated that an EOP chrono was generated on that date.

The initial health care screening indicated that he had a history of Bipolar Disorder.

The inmate was seen by a psychiatrist on 4/5/07. He was seen again by a psychiatrist on 4/17/07, but the note was very brief and uninformative.

On 4/7/07, the inmate was sent to the TTA for evaluation after he reported that his father was President. The Health Care Record was not available, and the psychiatrist ordered "stat" Risperdal and Cogentin. Progress notes indicated that the inmate was placed into a holding cell at that time.

There was documentation that the inmate attended group on 4/19/07 and again on 4/27/07. He was seen by a case manager on 5/4/07.

A treatment plan dated 4/17/07 included a diagnosis of Schizoaffective Disorder. The problem list included "AH" (auditory hallucinations). "Interventions" included only a list of the activities which were included in the treatment plan (including medication management, group therapy and IDTT). There were no specifics as to the nature of group therapy offered.

Assessment:

This inmate was seen by a case manager within the context of an IDTT meeting on 3/30/07. He was seen for a suicide risk assessment on 4/7/07. He was seen again in an IDTT meeting on 4/17/07. Despite apparently being assigned to EOP care, there was no documentation of one-to-one contact with a case manager until 5/4/07, and then the contact occurred in the day room. There were only two documented groups offered.

Though this inmate had been housed at CSP/LAC since 3/30/07, there was no permanent chart (only a flimsy).

4.    Inmate D

This 45 year old reception center inmate was designated as requiring an EOP level of care. He was apparently screened on 10/19/06. The evaluation resulted in a diagnosis of "rule out bipolar disorder." There was a suicide assessment on 10/25/06, and the inmate was seen several times per week, sometimes daily, by a clinician in October, November, and December 2006. He was elevated to an EOP level of care on 12/12/06. There were several notes per week through December 2006 by the psychologist. It appeared that many of these were documentations of observations during daily rounds (done at cell front). The inmate presented as highly agitated on many of these visits, demanding better medication, complaining of not being able to sleep and hearing voices etc.

A note on 12/6/06 indicated that the inmate was given an RVR for "obstructing a peace officer." He was characterized as highly agitated by this charge.

On 12/18/06, the inmate cut himself on the top of the head (and reported that he "tried to cut the voices out of my head"). He was seen by a psychiatrist for medication adjustment on 12/16/06. During this visit he was again described as highly agitated. He was seen again by a psychiatrist in response to self-referral on 12/20/07.

A SRA on 12/16/06 indicated that the inmate was at "low" risk of suicide. Psychiatric technician rounds were documented for the first time during the week of 12/27/06. There were blanks on many of the weekly sheets for documentation of psych tech rounds during January 2007. Notes were very inconsistent (with many "blank sheets" through March 2007). It appeared that after approximately 12/27/06, the near daily clinician contacts stopped, and instead, the case manager contacts were documented on 1/19/07, 1/24/07, 2/21/07, 3/6/07, 3/12/07, 3/20/07, 3/23/07, 3/28/07, 4/6/07, 4/11/07, 4/17/07, 4/27/07, 5/1/07, 5/7/07 (day room), and 5/8/07.

On 1/30/07 the inmate again cut the top of his head requiring evaluation in the TTA, but no sutures were required.

A treatment plan dated 3/20/07 indicated that the inmate had a history of self-injurious behavior and was diagnosed with "Schizoaffective Disorder v Bipolar Disorder Secondary to TBI." The treatment plan cited "anger." The "interventions" included "CCM," "Group Therapy," Medication and IDTT. There were no specific treatment activities specified within the plan.

The inmate was seen by a psychiatrist on 3/8/07, 3/20/07 and 5/10/07. He attended group on 3/5/07, 3/21/07, 4/17/07, 4/19/07, 5/8/07 and 5/9/07.

Assessment:

This inmate was housed in the RC at EOP level of care for more than six months. During the initial portion of this period, he was seen by clinical staff several times per week. Beginning in January 2007, contacts with psychologists were reduced to approximately once per week. Though there were some psych tech record forms in the chart, there was no evidence that these were completed on a daily basis. Many of the forms in the record had several blanks or were entirely blank.

The inmate was in an unstable state throughout the period since October 2006. There were at least two incidents of self-injury, and there was much documentation describing that the inmate as agitated and demanding. More recently (since approximately April 2007), he was seen in groups.

Notes from psychologists and psychiatrists were good, generally legible and contained useful information. The treatment plan did not include specific recommendations regarding inclusion in groups, and there was no mention in the treatment plan of the groups that he attended. Psychiatric technician rounds appeared to be quite problematic.

5.    Inmate E

This inmate was seen for mental health screening on 3/14/07 and was referred for a mental health evaluation which occurred on 3/20/07. He was seen by a psychiatrist and determined to be "stable" on 3/23/07. He was placed at the EOP level of care on 4/2/07. Weekly case manager contacts were documented. Some of these contacts were at cell front, and progress notes were often minimal. He refused group on 4/13/07 and 5/4/07 and appeared to have attended group on 4/19/07 and 5/8/07.

Assessment:

This inmate had no health care record except for notes and other documents which were kept within the "out card". Since being characterized as requiring EOP care, this inmate was generally seen weekly by a case manager. Notes documenting this contact were

sometimes rather minimal. Groups were offered from at least mid-April 2007. Progress notes indicated that this inmate was somewhat delusional, but was generally stable. There were no psych tech rounds noted in this inmate's health record.

6.      Inmate F

This inmate's case was reviewed in response to a request from the plaintiffs' attorneys at the time of the monitoring tour. He was initially placed at CSP/LAC while going through his parole revocation process. This process was suspended when it was determined that he required further evaluation of his psychiatric state.

Review of the record indicated that he had been at the EOP level of care since at least 5/2/07.

A chrono dated 1/24/07 indicated that the inmate did not require mental health treatment at that time. He was screened on 2/6/07, and a diagnosis of Schizophrenia was provided. A chrono on 2/6/07 placed him into the mental health population at the EOP level of care. On 2/13/07, he was seen by a psychiatrist who noted no Axis I Disorder and reported that the inmate did not require medication. Notes on 2/27/07 indicated that the inmate was experiencing mood swings, but was characterized as "stable." He was described as "stable on medication" on 3/5/07 (but it would appear that, at that time, he was prescribed only Dilantin for seizures). He was prescribed Remeron beginning on 5/14/07.

The inmate had been seen weekly by case managers since late February 2007. The case was discussed by an IDTT on 3/16/07. Progress notes described inmate complaints regarding physical problems and difficulty with sleep. On 4/10/07 he was only diagnosed with Adjustment Disorder.

An evaluation on 4/18/07 found him "stable off medication," but noted sleep problems and problems with agitation at times. His diagnosis at that time was "Mood Disorder, NOS," and the inmate was prescribed Trazodone.

Progress notes indicated that the inmate was attending groups intermittently beginning approximately 3/12/07. He did at times refused groups.

The medical record included documentation of a contact with the inmate's parole agent on 5/4/07. The parole agent reported the inmate's history of escape from a hospital setting.

Psych tech rounds were documented only occasionally.

Assessment:

This inmate appeared stable on medication. It appeared that he was placed at an appropriate level of care and was awaiting transfer. His psychotropic medication was

appropriately managed. The documentation of psychiatric technician rounds was inconsistent.

7.    Inmate G

This 26 year old inmate had a mental health diagnosis of Major Depressive Disorder, recurrent with psychotic features and Antisocial Personality Disorder. He had been in the EOP since last fall for treatment of suicidal thoughts, brief psychosis and depression. He was prescribed Paxil and Geodon in appropriate doses and had shown improvement. He participated in groups (including a college course) and received 1:1 counseling.

Assessment:

There was documentation that this inmate had received appropriate mental health care.

8.    Inmate H

This 41 year old inmate had a diagnosis of Bipolar Disorder and was in the EOP. He was prescribed Depakote in an appropriate dose and dosing schedule. His Valproic Acid level was last tested in August 2006 and it was 74.2 (within therapeutic range).

Assessment:

There was documentation that this inmate had received appropriate mental health care.

9.    Inmate I

This inmate's medical record was reviewed because the inmate was in the MHCB awaiting DMH transfer when the transfer was rescinded. He was in the CTC from 4/5/07 to 4/24/07. He was admitted from the EOP after having been described as nearly mute, not eating, lying in bed and not participating in scheduled activities. He was admitted to the CTC where he continued to lie on his mattress inside the cell, refused to come out or respond to questions, ate very little, refused medication and did not cooperate with vital sign monitoring. His historical mental health file reported that he had been transferred to DMH in 2004 and 2005 and was found to be malingering. It was determined that he was likely malingering symptoms of mental illness again in order to return to DMH. He was released back to the EOP on 4/24/07 with "5-day step-down." He was seen by a case manager on 4/27/07 who saw him at the door because the inmate refused to come out of his cell. He was lying on the bed in a fetal position and did not respond to questions. He was not seen again until 5/15/07, when the psychiatrist evaluated him and resumed Geodon.

The inmate was seen privately in the mental health office building. He complained of hearing voices "all the time" but when asked for detail (including quoting the voices), he was vague and contradicted himself on a number of points. Medications helped the voices but he was not taking them (even though he had agreed two days previously). The

voices were not present while we met, but later he said they occurred all the time. He was polite and well groomed. His speech was spontaneous, and he answered all questions posed to him. His mood was in the normal range, he did not appear depressed, and his affect was not blunted. His thought processes were organized and logical.

Assessment:

The inmate appeared to have received an appropriate mental health care. Transfer to DMH transfer was appropriately rescinded; however, follow up after MHCB discharge was inadequate and might possibly have resulted in tragic consequences.

10.    Inmate J

This inmate was evaluated by two psychiatrists in TTA on 4/9/07 based upon staff referral for his complaints of feeling sad and having thoughts of hurting himself. He had a history of cutting his wrists in the past. A suicide risk assessment was conducted with plans to return the inmate to his housing unit on his medications with follow-up with the psychiatrist within 24 to 48 hours. There was no subsequent psychiatric assessment as of 5/17/07. The case manager saw the inmate at the cell door 4/16/07. There was no reference to the case manager having any awareness of the problems that occurred on the previous week. The note was generic. The previous case manager visit was on 11/27/06 and also occurred at the cell front. (Inmate attended the group meeting with the monitor's expert[2] and was stable at that time.)

Assessment:

This inmate was not seen for required psychiatric follow-up after presenting with suicidal ideation. Case manager contacts occurred at cell front with poor documentation and apparently poor communication and/or review of the medical record regarding this inmate's recent suicide related history.

11.    Inmate K

This inmate was in the EOP from 5/2/05 to 10/5/06 and was then discharged to the 3CMS program. There was no contact from mental health until 1/10/07, which was a case manager visit at the cell front. The inmate had been seen by different psychiatrists on 1/29/07, 3/2/07, 3/11/07 and 4/12/07. There was nothing in the documentation that suggested that this inmate needed to be seen by the psychiatrists two days in a row, nor did the second note reference the fist, suggesting poor communication/coordination by the psychiatrists. The next case manager visit was on 4/16/07 and indicated that the unit health record was not available and that the inmate was seen at the cell door. There was also a different case manager who evaluated the inmate than the January cell front assessment.

Assessment:

---

[2] The terms "expert," "monitor's expert," and "reviewer" are used interchangeably in these case reviews.

Clinical encounters occurred in non-confidential settings (cell front) and without a medical record. Continuity of care was impaired with the use of different psychiatrists and case managers and poor communication between clinicians.

12.    Inmate L

This inmate was at the 3CMS level of care with a history of hospitalization at DMH Vacaville in 2004 for hearing voices telling him to kill himself. Multiple past psychiatric diagnoses included Anxiety Disorder, Psychotic Disorder R/O Malingering, Bipolar Affective Disorder, Chronic Paranoid Schizophrenia and Polysubstance Abuse. There was documentation of case manager sessions on 4/11/07, 4/24/07, 4/27/07, 4/30/07 and 5/10/07 indicating that he was being seen at an increased frequency in response to his experiencing stressors as related to issues with his cellmate(s).

Assessment:

This 3CMS inmate was appropriately evaluated as was clinically indicated by the CCM.

13.    Inmate M

The plaintiffs' attorneys requested review of this inmate's medical record and interview based upon the concern that this D-2 EOP inmate had jumped off the tier in a suicide attempt and had a history of cutting, but was not referred to the MHCB.

The chart review indicated that this 22 year old African American man had mental health diagnoses of mood disorder, borderline personality, developmental disability (DDP), and a recently added diagnosis of acute bereavement following the unexpected death of his mother earlier this year. He attended scheduled groups, was seen individually by his case manager, and was prescribed the following psychotropic medications: Geodon, Depakote, and Zoloft. Psychotropic medications were prescribed in appropriate doses and for appropriate clinical indications. There was no evidence in the chart of his having jumped off the tier. There was one incident this spring in which inmate stumbled down the last couple of stairs on the unit and did fall. He was taken to medical and examined. At the time he reported having felt weak and "blacking out." He sustained no injury, and there was no documentation of his having blacked out or losing consciousness.

There was a history of self-inflicted arm lacerations (mainly on the posterior aspect of the right forearm) which inmate reported happened when he felt overwhelmed, angry or depressed, and was not done to kill himself. He was seen by mental health and medical after such instances, and his level of suicide risk was assessed. He had never been referred for psychiatric hospitalization or to MHCB. His cutting behaviors decreased for periods of several months but increased again following the death of his mother. He had been cutting himself approximately every other week. Lacerations were generally superficial and when seen by mental health, inmate consistently denied suicidal intent.

In an individual interview, inmate reported feeling "really good" that day. He denied that he jumped off the tier and said other inmates had told him that he blacked out and fell from the top of the stairs. He did not recall falling from the top of the stairs but did recall feeling weak. He was taken to medical and examined. He was not injured except for a small cut/scrape on the palm of his hand which did not require medical attention. He was taking his medication, and was seen by the psychiatrist and his case manager regularly. He reported that his groups included: stress management, self-inflicted group, film group, and socialization among others. He said he was having a hard time dealing with the death of his mother. He repeated that he cuts himself at times when he is angry or feels bad or sad in an attempt to make his "pain" go away. He was pleasant and cooperative during his interview with the monitor's expert. His thought processes were organized and easy to follow. He denied experiencing hallucinations during the interview but reported that he heard voices periodically and had for many years. His speech was spontaneous, and he spoke at a normal rate and tone of voice. He did not appear depressed until discussing missing his mother, when he appeared sad and briefly tearful. His displayed emotions were appropriate to the occasion and the content of his speech. He denied having any thoughts or plans for suicide and said he was also working on not cutting himself anymore. His primary issue and complaint was regarding medical services. He said he had a great deal of difficulty getting medical to take him seriously about the pain in his throat which he had experienced for at least six months and which he feared was cancer. He also had other vague physical complaints (episodic weakness, numbness, chest discomfort, etc.) Follow-up appointments for his complaint of throat pain were scheduled.

Assessment:

From a mental health perspective, inmate was receiving appropriate mental health care. The inmate received appropriate dosages and types of medications, was participating in groups that had been assigned based on his clinical need, was seen weekly for individual therapy (with the psychologist who also lead the self-injury group), and appeared to be making some progress.

14.    Inmate N

The plaintiffs' attorneys requested that the reviewer's expert review this inmate's medical record and to interview the inmate due to his reports of significant distress and dysfunction. He was received at CSP/LAC in November 2006 and was seen for initial case management contact on 12/17/06. (He had been transferred from RJD to CSP/LAC administrative segregation for possession of a knife. He spent a month on A Yard due to lack of bed space and was transferred to D1 a week prior to his case manager contact.) He had been seen at intervals of two to four weeks and had been requesting transfer back to CSP/LAC to be nearer to his family. He had been seen by a psychiatrist on 12/24/06 (no clear Axis I disorder, no meds), on 2/23/07 (complaining of being unable to sleep and having received Seroquel for same in the past, Benadryl was ordered for him), on 3/9/07 (Risperdal ordered), and on 4/12/07 (Risperdal and Remeron ordered).

Assessment:

Each time the inmate was seen, it was by a different psychiatrist with a different approach and prescribing practices. Further, there was little documentation of the inmate's condition and functioning in the chart other than the psychiatric assessments which were, by default, essentially only based upon the inmate's self-report. However, there was no documentation to support the need for an increased level of mental health care (or for some of the medications prescribed).

15.    Inmate O

This inmate had been provided with the following diagnoses: Generalized Anxiety Disorder, Mood Disorder NOS, Alcohol Dependence and Major Depression with psychosis. He was involved in group therapy on the D5 unit. The medical record review revealed that psychiatric contacts had occurred for the last four months; however, there was no documentation of case management contacts. The inmate was evaluated by a different psychiatrist each encounter. He reported having swallowed razor blades in March 2007, but X-rays were negative. He had been in the EOP several years ago, but was discharged as having "no Axis I disorder, primarily drug-seeking." He was prescribed Risperdal and Artane and told the psychiatrist in March 2007 that he was feeling better, was not pacing, and was hearing no voices. He was scheduled for follow-up in 60 days.

Assessment:
Based upon the medical record review, this inmate did not appear to require a higher level of mental health care, but documentation was fairly scant and only consisted primarily of psychiatrist visits. Case manager contacts were not documented, and there was poor psychiatric continuity of care.

16.    Inmate P

This medical record was reviewed to determine the appropriateness of the inmate's level of care. This inmate was in the 3CMS program, and he had a diagnosis of Anxiety Disorder NOS. He reported that his anxiety symptoms increased when he was locked down. He reported that he had cut his wrist to plaintiffs' attorneys, but there was no documentation to support this in the medical record either by medical or mental health staff. He was seen regularly by psychiatry and was prescribed an appropriate dosage of SSRI for the treatment of anxiety. He was actually seen privately by his case manager outside of his cell when referred by security staff earlier this month when he was having a hard time.

Assessment:

This inmate's level of care appeared to be appropriate at the time of the site visit.

EXHIBIT K

California Institution for Men (CIM)
April 2, 2007 – April 4, 2007

1.     Inmate A

This inmate's UHR was reviewed to evaluate his treatment after presenting with suicidal
ideation. A staff referral dated 3/12/07 indicated that the inmate "claims world coming to
an end." A physician's note dated 3/12/07 ordered admission to the hospital on suicide
precaution. There was no documentation of admission or follow-up.

Assessment:

The medical record was in very poor chronological order with probable missing
information. There was no documentation of MHCB admission or observation in an
alternative MHCB setting. There was no documentation of five day follow-up after
discharge.

A review of the inmate history indicated that he was seen for follow-up on 3/16/07 and
3/19/07. There was not documentation of five-day follow-up.

2.     Inmate B

This inmate's UHR was reviewed to evaluate his treatment after presenting with suicidal
ideation.

This inmate was seen by a clinician (note was unsigned) on 3/1/07 when he presented
with suicidal ideation and plan. The note indicated that he would be admitted to the
MHCB. He was admitted to the MHCB where a SRA was completed on 3/2/07. Suicide
precautions were discontinued at that time. There was an order for discharge to general
population on 3/5/07 with five-day follow-up.

Assessment:

The medical record was in very poor chronological order with probable missing
information. There was no documentation of five-day follow-up after discharge from the
MHCB. It was unclear if this was due to medical records issues or actual lack of contact.

The inmate history also did not document five-day follow-up after discharge from the
MHCB.

3.     Inmate C

This inmate was included in a log of admissions to the Del Norte MHCB overflow unit.
The log of admissions and discharges from Del Norte MHCB overflow unit indicated that
he was admitted on 3/23/07 and was discharged on 3/26/07. There was no
documentation of clinical contact during or after this period.

Assessment:

The medical record was in very poor chronological order with probable missing information. There was no documentation of his stay in the alternative MHCB housing unit or five-day follow-up after his release. There was also no documentation of a SRA prior to release from Del Norte.

A review of the MHTS inmate history indicated that he was not seen for five-day follow-up after he was discharged on 3/26/07. It was possible that this was due to MHTS data entry delays.

4.     Inmate D

This inmate's medical record was reviewed to evaluate his treatment after presenting with suicidal ideation.

This inmate presented to the emergency room on 2/24/07 with suicidal ideation with plan and report of auditory hallucinations. The note indicated that he had been cleared for transfer to TBH (temporary bed housing). The next documented contact occurred on 2/26/07 when he was admitted to the MHCB. There was a physician's order for discharge to general population on 3/6/07 with five-day follow-up.

Assessment:

The medical record was in very poor chronological order with probable missing information. There was no documentation of where he was housed or monitored after he was cleared for transfer to the TBH. There was also no documentation of five-day follow-up after his release or a SRA prior to release from the MHCB.

A review of the MHTS inmate history indicated that he was seen four of the five days for follow-up after he was discharged on 3/26/07.

5.     Inmate E

This 24 year old inmate had been housed at CIM as an EOP inmate since 1/30/07. He was apparently processed through the reception center in late January 2007. A chrono placing him at the EOP level of care was dated 2/8/07 (he had been placed at 3CMS level of care the day prior).

Notes indicated that the inmate was seen by a clinician on 12/29/06, 2/5/07 (for an updated MH3), 2/9/07 (in which the inmate was noted to be depressed but that "psychiatric symptoms are decreased"), 2/18/07, 2/23/07, 2/26/07, 3/13/07, 3/14/07 and 3/20/07. It appeared that all case manager contacts occurred at cell front as each note indicated that the inmate refused the ducated appointment. The quality of the notes documenting these contacts was poor, consisting only of a check sheet documenting that

the individual was seen at cell front, whether the cell appeared clean, whether the inmate had any complaints and whether there were suicidal thoughts reported.

A psychiatrist's progress note on 2/9/07 diagnosed him with Major Depressive Disorder, recurrent. He was seen again by a psychiatrist on 3/23/07. Psychiatric technician rounds are summarized for the weeks of 1/28/07, 2/4/07, 2/18/07 and 3/11/07. There were no notes indicating that the inmate had participated in groups.

There was a treatment plan dated 2/20/07 that was done "in absentia" when the "inmate was sleeping and refused". Of concern was the fact that this note recommended that this inmate be at 3CMS level of care (apparently there was no follow-up action). There was no documentation of any IDTT consideration since July 2006.

Assessment:

It appeared that this inmate had been seen on a near-weekly basis in February 2007, but was seen less often in January 2007 and March 2007. The documented case manager contacts appeared to have occurred primarily at cell front, apparently as a result of the inmate's refusal of confidential meetings. There was no evidence that any recent IDTT consideration of this case had occurred. There was no indication that this individual had been referred for group involvement. Case manager progress notes were uninformative.

6.    Inmate F

This 25 year old inmate had been at the EOP level of care within the reception center since at least 11/7/06. He had been seen on a near-weekly basis by his case manager since 11/13/06. He was seen by a psychiatrist on 12/26/06 for a medication adjustment. There were no notes in the chart after 2/2/07, but MHTS records indicated that contacts had occurred since that date (indicating the likelihood that a backlog of approximately two months of filing existed). Reference to the MHTS records appeared to indicate that entering data into this system to "close out" appointments was approximately one month behind. Materials in the UHR were not filed in chronological order.

There were excellent, recent clinical notes in the record (made by a clinical intern) documenting weekly case management contacts.

There was no indication that there had been an IDTT consideration of this case since November 2006.

There was no actual documentation that this inmate was involved in groups, but there was one case management contact in which the inmate remarked that he did not like the groups.

There was a treatment plan prepared within the context of the IDTT in January 2006, and there was no evidence that there had been an IDTT consideration of this case since that time. There had been no update to this treatment plan.

Clinical notes appeared to indicate that this inmate was stable.

Assessment:

This inmate had generally been seen on a weekly basis. There was some evidence that this inmate had been seen for group therapy, but the documentation was incidental and not informative. There had not been an IDTT consideration of this case for over one year. There was no current treatment plan.

7.    Inmate G

This 28 year old inmate had been at CIM with a designation of EOP level of care since 1/23/07. This inmate was apparently admitted to the MHCB on 1/23/07 for "rule out" of psychosis. He had been hospitalized in an MHCB during 2004 as well.

The MHTS indicated that the inmate was seen weekly by a case manager through January 2007, seen only once in February 2007, and was seen approximately weekly since early March 2007. There was documentation in the MHTS records of an IDTT meeting on 2/22/07. This meeting was documented in the record and appeared to have included psychologists and a psychiatrist. It did not appear that the inmate attended. There was an adequate treatment plan in the record dated 2/22/07. There were no notes documenting that this inmate had been involved in group therapy. The treatment plan prescribed cognitive behavioral therapy which had apparently also not occurred.

The weekly case manager notes in this record were well done, including a listing of the diagnoses. Some of the notes, however, were not legible.

This record had no documentation of psychiatric technician contact.

Assessment:

The inmate likely required expedited placement into an EOP.

EXHIBIT L

Richard J. Donovan Correctional Facility (RJD)
May 30, 2007 – June 1, 2007

1.     Inmate A

The healthcare record of this inmate was reviewed. His initial health care screening at
RJD was completed on 3/1/07. It was positive from a mental health perspective. The
most recent MH-4 was dated 5/17/06.

A 3/2/07 mental health placement chrono was present in the chart. It indicated that this
inmate did not meet criteria for inclusion in the mental health treatment program, despite
a documented past history of mental health treatment received through the CDCR. He
was evaluated by a psychiatrist on 3/2/07 who indicated that medications were not
indicated at that time. Claustrophobia and PTSD were considered in the differential
diagnosis. On 3/23/07, nursing staff referred this inmate for mental health assessment
due to depression and hearing voices. He was noted to have a depressive disorder with
psychotic features. He was referred to the psychiatrist for medication assessment.

This inmate was evaluated on 3/23/07. His presentation was consistent with the
differential diagnoses of Bipolar Disorder, Depressive Disorder and/or an Anxiety
Disorder. Risperdal and Remeron were prescribed. The plan was to see him again in
three weeks.

On 4/4/07, he was again seen by the clinical case manager who indicated there was no
evidence for an Axis I diagnosis.

A 4/27/07 mental health placement chrono indicated that this inmate did meet such
inclusion criteria. On 5/2/07, he was assessed to require an EOP level of care.

Assessment:

There were significant documents missing in this inmate's UHR from the reception center
assessment process. In addition, there was an apparent lack of communication among his
clinicians as evidenced by significant conflicting diagnoses. Finally, this inmate was not
receiving the follow-up care as planned by the psychiatrist.

This inmate was not receiving treatment consistent with RC EOP requirements.

2.     Inmate B

Plaintiffs requested the following:

> That defendants prepare a written response as to why EOP patient inmate
> B has not been transferred to a mainline EOP program. My understanding
> is that inmate B is a Level IV patient who has been housed in the reception
> center for an excessive period of time, and only until recently, has reported
> receiving any structured therapeutic treatment activities for his mental
> illness. Plaintiffs raised inmate B's individual case in the context of our

Round 18 pre-tour correspondence to your office on September 15, 2006, and to the *Coleman Project Team* in July 2006 (regarding suicidal ideation and the transfer delay).

The healthcare record of this inmate was reviewed with a focus on notes written since January 2007. A 1/10/07 progress note indicated that this inmate was experiencing problems with his cellmate. These problems were brought to the attention of the custody staff.

A psychiatrist note dated 1/22/07, which was difficult to read, indicated that this inmate had a Mood Disorder, NOS. It appeared that his Wellbutrin was increased.

Weekly progress notes written by his CCM were generally present in the UHR. Weekly summaries of group therapies were also periodically present.

On 3/8/07, this inmate indicated difficulties with his new cellmate.

A psychiatrist note dated 3/29/07 described this inmate as doing well on his current medications. This inmate was admitted to the CTC related to suicidal thinking during early April 2007. Subsequent progress notes were timely and useful from a content perspective.

A 3/10/07 orthopedic progress note indicated that he had arthroscopy in his right knee several weeks earlier. A neoprene knee brace was recommended, and Ultram was ordered. Range of motion exercises were prescribed.

Assessment:

This inmate's UHR was reasonably well organized. He was receiving weekly clinical case manager contact and group treatment, although the reviewer was unable to determine the average number of hours of group therapy offered to him on a weekly basis.

The reason for his extended reception center status was not clear from a review of his UHR. His C-file was reviewed, which indicated that he had been at RJD since May 2007. Due to various administrative segregation admissions, he essentially fell through the cracks and had not been endorsed for transfer. The expert's concerns were brought to the attention of the appropriate custody officials, who indicated that his situation would be remedied in the very near future.

3.      Inmate C

A 1/5/07 medical examination was present in the chart. An undated bus screening assessment was present in the chart. A MH-7 form was completed on 1/10/07, although it was misfiled in the UHR. The assessment included diagnoses of Schizophrenia, bipolar type and ASPD.

The first progress note in the UHR was dated 1/31/07, which was written by the senior psychologist. A weekly LPT clinical summary dated 1/16/07 was present. Other weekly LPT clinical summaries were present. On 2/7/07, he was assessed to meet inclusion criteria for mental health treatment at an EOP level of care. Progress notes written by the CCM were dated 2/5/07 and 4/4/07.

A MH-2 was completed on 5/4/07. The diagnosis was depression with psychosis and ADHD. A 5/10/07 case manager progress note indicated that this inmate was requesting to come to group every day. Other case manager progress notes were dated 5/8/07 and 5/15/07. A 5/25/07 psychiatrist note was present but was very sparse in content.

Assessment:

This inmate's UHR review was consistent with the information obtained during the group interview that was summarized in this report. He was not receiving treatment consistent with reception center EOP requirements.

4.    Inmate D

The healthcare record (which was a thick "flimsy") of this inmate was reviewed. It appeared that he was admitted to RJD during early April 2007 and was quickly identified as posing risk of suicide. He was initially assessed to require 3CMS level of care. It was determined that he required EOP level of care following an MHCB admission on 4/25/07.

A 4/25/07 psychiatrist note indicated that this inmate was well known to the psychiatrist due to multiple clinical contacts. It appeared that he had improved after treatment with Prozac.

Other clinical case manager contacts were documented during 5/4/07, 5/10/07 and 5/17/07. Documentation was also present regarding weekly group therapies being offered, although only for the week of 3/14/07.

Assessment:

This inmate received mental health treatment although it did not appear to be consistent with reception center EOP requirements based on documentation in the UHR. The information reported by the RC EOP inmates was consistent with the review of this inmate's UHR.

5.    Inmate E

The initial health screening of this inmate at RJD was completed on 4/16/07. It was positive from a mental health perspective. A 4/19/07 MH-7 assessment was consistent with the diagnosis of a Psychotic Disorder, NOS. He was assessed to require a 3CMS level of care.

A 5/16/07 Clark assessment indicated that this inmate did not appear to meet the criteria for placement in the DDP.

A progress note written on 5/6/07 was reviewed. Consideration for an EOP level of care was documented. On 5/7/07, this inmate reported experiencing auditory hallucinations. However, he was not assessed to be psychotic by a psychologist. A 5/15/07 psychiatrist progress note indicated that this inmate was told that "he cannot go to a low level yard if he is EOP...." Prolixin was added to his medication. The plan was to see him again in three to four weeks.

Assessment:

There was concern about the planned three to four week follow-up in light of his reported symptoms and underlying reasons for the increase in this inmate's medications.

6.    Inmate F

This inmate's initial health care screen was completed on 12/21/06. It was positive from a mental health perspective. He had previously been released from RJD on 11/16/06. He was evaluated on 12/27/06. His history was consistent with Bipolar Affective Disorder. The plan was to see him again in four weeks. A progress note that same day was written by a clinician who did not sign his/her name. Another progress note was written two days later, apparently by the same clinician, who did not sign his/her name.

The next progress note was written by a psychiatrist during February 2007. His Risperidone was decreased, and Zoloft was started. He was to be seen again in five to six weeks. Another psychiatrist note was dated 5/4/07. This inmate's condition was consistent with Depression, NOS and rule out psychosis. He was noted to have responded well to Zoloft. A clinical case manager note was dated 5/14/07.

A 4/17/07 chrono indicated that this inmate was assessed to require an EOP level of care. Documentation was present during May 2007 that this inmate was receiving four groups per week.

Assessment:

This inmate did not appear to be receiving mental health treatment consistent with reception center EOP or Program Guide requirements.

7.    Inmate G

The temporary UHR of this inmate was reviewed. A 5/23/07 mental health screening chrono indicated that referral for further evaluation had been initiated. Another 5/23/07 mental health placement chrono indicated that this inmate had been assessed to meet criteria for EOP level of care. This inmate's 5/22/07 mental health assessment was

consistent with a diagnosis of a Mood Disorder, NOS and ruled out polysubstance dependence. No other progress notes were present in the chart although it was clear that this inmate had attended at least one EOP group.

A bus screening assessment was not present in the chart.

Assessment:

It was unclear why a bus screening was not present in the chart despite finding a medical examination form completed on 5/23/07. It appeared that other documentation was also missing from the temporary medical record, such as placement into and documentation of group therapy involvement.

8.    Inmate H

A 4/2/07 bus screening form was not completed except for the disposition, which indicated that this inmate could be released to custody. However, the medical examination indicated that this inmate was delusional, receiving antipsychotic medications, and had a diagnosis of Schizophrenia.

A 4/3/07 mental health placement chrono indicated that this inmate met the criteria for inclusion in the EOP. A 4/31/07 mental health screen chrono indicated that this inmate was referred for further assessment.

During March 2007, this inmate apparently had been discharged and was scheduled to be followed by the parole outpatient clinic. On 4/3/07, a MH-7 form was completed, which indicated a differential diagnosis of PTSD versus psychotic disorder NOS. On 4/6/07, a CCM note indicated that this inmate had been paroled from RJD the previous month.

A note by the psychiatrist on 4/2/07 documented a diagnosis of Schizophrenia. This inmate's non-adherence to medications was noted. The plan was to see him again in two weeks.

There were no further progress notes in the UHR. There was one group form note that indicated he attended one group during the week of 5/1/07.

Assessment:

This inmate was not receiving treatment consistent with either reception center EOP mandates or Program Guide requirements.

9.    Inmate I

This inmate's medical examination was performed on 4/5/07. A bus screen relevant to this admission was not located in the medical record. A 4/5/07 mental health screening chrono indicated that this inmate was referred for further mental health evaluation. A

4/17/07 placement chrono indicated that this inmate was assessed to receive EOP level of care. Subsequent progress notes were dated 4/17/07, 4/24/07, 5/4/07, 5/14/07 and 5/22/07.

Documentation was present from 4/23/07 to 5/14/07 that this inmate participated in group therapy, although it was unclear the number of groups assigned.

Assessment:

The reviewer was unable to determine compliance with reception center EOP treatment requirements based on the lack of documentation in the UHR.

10.    Inmate J

This was an EOP inmate who was also on the High Risk Monitoring List. He had a history of DMH placements prior to incarceration. While at RJD, he was described throughout the progress notes as actively psychotic for a long period of time by the staff. He was placed in administrative segregation on 5/27/07 after reporting that he had been a victim of sexual assault by another inmate. He was sent out to a hospital for examination and/or treatment. However, mental health staff did not follow up regarding his allegation or status since his return. The special master's expert spent a great deal of time talking with supervisory staff about their PREA policy and follow-up process because of risk of self-injurious behavior in cases such as these. The staff reacted defensively and vested in blaming the inmate's psychotic state. However, when pressed about treatment for his ongoing psychotic state, the supervisory staff became increasingly defensive and then appeared to minimize the psychosis.

This inmate had a current Keyhea order for forced medication and was prescribed the following medications: Risperidone 50 mg intramuscularly every two weeks, Geodon 40 mg by mouth at bedtime, Benadryl 50 mg at bedtime, and Haldol 5 mg intramuscularly with Cogentin 2 mg as needed for agitation.

The medical record had an MH-4 dated 2/28/07 and a chrono on that date indicating that an IDTT had been held. However, there was no actual documentation of an IDTT meeting or treatment plan on that date located in the medical record. The evaluation indicated that the inmate had a history of command hallucinations to harm others and that those were the basis of his crime of murder. According to staff, the inmate believed that his victim was a robot and that he had done the right thing by murdering her. Staff reported that he continued to have no insight into his mental illness or crime. He had a diagnosis of Schizophrenia, paranoid type, Polysubstance Dependence and Antisocial Personality Disorder.

The medical record documented that this inmate was not attending most groups throughout the months of March and April 2007 and was repeatedly described as floridly psychotic. The staff had assigned this inmate to low functioning groups because of his active psychosis, but they did not appear to take any more assertive treatment action

based on the record. There was documentation by the case manager and psychiatrist on two separate days that the inmate was experiencing "florid delusions" and was "very paranoid" as well as exhibiting disorganized speech. However, a group note during this time identified this inmate as "organized and cooperative and an active appropriate participant" in group. This group documentation seemed unlikely to be accurate in light of this inmate's constant decompensated state.

In March 2007, there was a note that indicated the inmate was not referred to DMH because he "does not meet criteria." The reasons that the staff felt that this inmate did not meet criteria were not documented in the UHR. However, during a High Risk Monitoring List meeting, staff seemed to believe that this inmate had demonstrated recent improvement because he had come out of his cell to several groups, although he was not an active participant. The staff did not seem to have a thorough understanding of the referral criteria for ICF level of care. In addition, administrative segregation staff did not seem to be aware of this inmate's recent placement with them, and EOP mainline staff did not seem aware that he had been placed in administrative segregation as it was never discussed during the High Risk Monitoring List meeting. Supervisory staff acknowledged that they were unaware of this placement.

The record reflected that this inmate further deteriorated in May 2007 as evidenced by increased delusional verbalizations, perseveration, disorganized speech, irritability and grandiosity. The inmate was described in notes as disheveled during clinical contacts and as demonstrating racing thoughts. He clearly seemed to meet criteria for referral for DMH-ICF care.

Assessment:

This inmate's record indicated that the staff was not compliant with weekly case management contacts and the structured therapeutic activity was not well documented. The High Risk meeting did not appropriately address this inmate's need for a higher level of care. Communication and knowledge of this inmate's treatment appeared to be disjointed. He clearly seemed to meet criteria for referral for DMH-ICF care.


11.    Inmate K

This inmate was placed in administrative segregation on 2/3/07 because of "high notoriety security" but was not assessed until 3/23/07. His IDTT did not occur until 3/27/07. There was a treatment plan from that date in his chart, although the treatment plan was quite minimal and generally inadequate. However, his weekly contacts while in administrative segregation were compliant. This inmate was being treated at the 3CMS level of care which seemed appropriate. He had only one consent form for medication in his chart, dated 3/6/07, which did not cover all of the medications prescribed. His medications as of 5/24/07 were Sertraline 200 mg by mouth and Quetiapine 600 mg by mouth.

An MH-4 dated 3/23/07 listed Adjustment Disorder with Mixed Mood, Anxiety and Depression, and Acute Stress Disorder as his primary diagnoses; these diagnoses were not consistent with major mental illnesses included within the criteria for MHSDS placement, with the exception of placement due to medical necessity. The Axis II diagnosis was deferred.

Assessment:

The IDTT in administrative segregation was delayed, and the treatment plan was not individualized. Weekly clinical case manager contacts occurred as required. Informed consent was not present for all prescribed psychotropic medications. The inmate's provided diagnoses were not consistent with those qualifying for inclusion within the MHSDS.


12.    Inmate L

This inmate was on the High Risk Monitoring List reviewed during the visit. Based on staff comments, it initially appeared that this inmate should have also been referred to DMH-ICF level of care. However, based upon a review of the record, this inmate appeared to have received progressively assertive treatment at RJD prior to referral to DMH-ICF determination.

This inmate was a DD2 level 3CMS inmate with a history of self-injurious behavior. Staff described him as a "cutter." In April 2007 the inmate reported suicidal ideation but case manager documents indicated that the inmate "contracts" with the case manager to tell someone prior to harming himself. It was not clear from the chart that there was a therapeutic relationship established between the inmate and case manager to provide some basis for the "contract." The staff did not appear to understand the issues related to such "contracts" when queried privately. The inmate reported at that time that he was afraid to go to 3CMS groups because of fear of gangs.

Staff did seem to take the inmate's concerns about gang activity seriously, but did not appear to know how to address these issues on the inmate's behalf. The expert spoke with supervisory staff later about the importance of addressing these fears with security staff and the inmate to minimize self-injurious behaviors in the future.

Assessment:

The use of suicide prevention contracts was not an effective prevention of future suicidal behavior. The staff should more assertively address the inmate's safety concerns. This inmate appeared to have received progressively assertive treatment at RJD prior to referral to DMH-ICF determination.


13.    Inmate M

This inmate was at the EOP level of care per a chrono dated 4/30/07. He had been placed in administrative segregation on 1/16/07 for possession of weapon but was awaiting DA review. This inmate's IDTTs occurred timely with appropriate personnel present but treatment plans were minimal. The case manager contacts did not occur weekly as required. The inmate's medications as of 5/30/07 were: Valproic Acid 500 mg/day, Fluoxetine 60 mg/day and 400 mg Carbamazepine 400 mg/day. There was only one consent for medication form in the chart, and it did not include consent for these medications.

The diagnosis during the quarterly review IDTT in April 2007 was Adjustment Disorder, and the inmate was placed at the 3CMS level of care. However, the inmate was admitted to the MHCB soon thereafter and was discharged on 4/30/07 at the EOP level of care with a diagnosis of Psychotic Disorder, NOS (provisional) and Depressive Disorder, NOS with an Axis II diagnosis of Antisocial Personality Disorder. Five-day follow-up were completed after MHCB discharge.

While it was difficult to discern from the medical record, it appeared that this inmate received minimal care while in administrative segregation and was allowed to decompensate to the point that he required MHCB placement. In light of his disciplinary charge, it was likely that he would remain in administrative segregation for an extended period of time and would require consistent care to avoid further decompensation. This inmate was also interviewed while this expert was in administrative segregation and he indicated that he found the environment to be very difficult due to the noise and lack of privacy. He also complained about the difficulty with doing anything productive in groups as they were conducted on the dayroom floor. This expert spoke with supervisory staff about concerns regarding this inmate specifically and the administrative segregation EOP structure in general.

Assessment:

There was documentation of timely IDTT meetings that included the necessary participants; however, treatment plans were not clinically relevant. There was not documentation of weekly CCM contacts. Informed consent was not present for all prescribed psychotropic medications. Five-day follow-up at MHCB discharge was well documented. There was concern regarding the lack of adequate treatment in the administrative segregation unit that allowed the inmate to decompensate and require MHCB hospitalization.

14.    Inmate N

This EOP inmate (chrono dated 11/3/06) was placed in administrative segregation on 4/2/07 as a suspected rape victim pending investigation by facility staff. A previous progress note referred to an allegation by the inmate that he had been raped by staff in November 2006. It was not clear if these allegations were the result of this inmate's psychosis as the note seemed to suggest. The issue of sexual victimization appeared to be

mostly ignored by mental health staff in this case as in the other such case reviewed. There was no documentation that the allegations that resulted in his April 2007 lockup were ever addressed from a mental health standpoint.

Weekly case manager contacts and weekly psych tech round documentation were non-compliant for this inmate and although he had an IDTT meeting, it was not completed in a timely manner consistent with the Program Guide. An evaluation completed on 4/24/07 indicated that the inmate complained of anal pain and was given the diagnosis of Schizophrenia, paranoid type and PTSD; the Axis II diagnosis was deferred. The treatment plan was minimal and did not address the issue of sexual victimization at all. The treatment plan dated 5/8/07 listed Schizoaffective Disorder, PTSD, and a rule out of Delusional Disorder without providing the basis for these diagnoses or the change from the previous evaluation. This inmate was receiving Olanzapine 15 mg/day the time of the IDTT.

The medical record indicated that this inmate was not attending group prior to his administrative segregation placement and had not been attending group while in administrative segregation. It was troubling to this expert that someone who might be a victim of sexual assault would be placed in administrative segregation for such a long period of time. Ideally, staff would quickly determine if there was a chance that this inmate had perpetrated a sexual assault, and if not, be released while the alleged perpetrator remained locked up while staff investigated. This concern was exacerbated by this inmate's mental status and apparent decompensation. This expert spoke with supervisory staff about reviewing this case for a possible DMH-ICF referral.

Assessment:

This and a previous case reviewed suggested that complaints of sexual assault were routinely ignored by mental health staff. There was no documentation that the allegations that resulted in his April 2007 lockup were ever addressed from a mental health standpoint.
Weekly case manager contacts and weekly psych tech round documentation were non-compliant for this inmate and although he had an IDTT, it was not completed in a timely manner. Treatment plans were not individualized, and there was no mention of sexual assault in the plan. The treatment plan was also deficient as there was a significant change in diagnosis; however, there was no accompanying rationale for this change present in the plan. It was also troubling that this inmate remained in administrative segregation for such a long period of time; this concern was exacerbated by the inmate's apparent decompensation and need for transfer to a higher level of care.

15.    Inmate O

This was an EOP level of care inmate with a Keyhea order for forced medications. His medications at the time of the site visit were: Haldol Decanoate 100 mg intramuscularly every four weeks; Haloperidol 10 mg intramuscularly as needed for each refused dose of

Risperdone; Benadryl 50 mg intramuscularly for each as needed dose of Haloperidol given; and Risperidone 4 mg by mouth in evening.

This inmate was placed in administrative segregation on a 5/19/06 battery on a peace officer and battery on an inmate. These were pending DA referrals and RVR adjudications. The staff was not compliant with any of the requirements of the Program Guide for this inmate. There were no case manager weekly contacts, psych tech weekly round summaries, and IDTTs based on chart review. This was particularly troubling, especially in light of this inmate's level of care, Keyhea order and lengthy administrative segregation placement.

The chart for this inmate was particularly disorganized with little clinical documentation available. There were two placement chronos indicating EOP level of care dated 3/17/07 and 5/1/07.

Assessment:

There were no case manager weekly contacts, psych tech weekly round summaries, and IDTTs based on chart review. This was particularly troubling, especially in light of this inmate's level of care, Keyhea order and lengthy administrative segregation placement. The chart for this inmate was particularly disorganized with little clinical documentation available.

16.    Inmate P

This inmate was placed in administrative segregation on 7/1/04 for gang validation. A review of the CC 2 log for administrative segregation indicated that this inmate was "pending RC processing and indeterminate SHU." It seemed unlikely that this inmate would still be pending reception center processing almost three years following his arrival, but documentation in the record was very poor.

This inmate was recommended for EOP level of care on 5/9/06 although documentation of this was inadequate. The clinical contact notes throughout his administrative segregation stay were also inadequate, appearing more like rounds. There was no subjective objective assessment and plan (SOAP) format and information was minimal. However, they were completed weekly during this monitoring period. Consequently, the institution was technically compliant with this aspect of the Program Guide although the lack of quality made the notes relatively useless. RJD staff was not compliant with IDTTs during this monitoring period.

Assessment:

The lack of a current treatment plan and meaningful clinical documentation was particularly disturbing in light of the length of time that this inmate had been in administrative segregation. While there was not enough information to indicate

precipitating factors behind this inmate's deterioration to an EOP level of care in 2006, one could safely assume that the lengthy administrative segregation placement with no end in sight contributed to his deteriorating mental health status. Supervisory staff had no meaningful explanation for this placement.

EXHIBIT M

Valley State Prison for Women (VSPW)
May 7, 2007 – May 9, 2007

1.    Inmate A

On 3/8/07, this inmate was evaluated in R&R. The CDCR 7277A indicated Depression and a past medication history of treatment with Zoloft. The county jail medical transfer form did not provide any information regarding depression or medication history. The R&R RN failed to refer the inmate for mental health evaluation.

On 3/9/07, the routine RC mental health screening was done and found that the inmate needing further evaluation. The Mental Health Placement Chrono dated 3/15/07 indicated that the inmate did not meet the criteria for inclusion in the MHSDS, although past history of mental health treatment and medication (Prozac and Zoloft) was documented in the MH-7. The inmate was subsequently cleared for general population. No release of information was submitted. Documentation of mental health history would have been based upon the inmate's report, but the reason for not requesting records was not indicated.

On 4/1/07, a staff referral was made by a custody officer that stated, "[T]he inmate is depressed and thinks a lot about her child" who was killed by her boyfriend.

On 4/6/07, the inmate was seen by a clinician and placed at the 3CMS level of care due to medical necessity with a GAF of 69. No treatment recommendation was made.

On 4/12/07, Lexapro 10 mg every a.m. was ordered. Laboratory studies were ordered on the same day. Consent for medication was also obtained. As of 5/8/07, there was no indication in the UHR that the laboratory order was implemented.

On 5/8/07, the inmate was seen in the initial IDTT meeting. The attendees were the assigned CCM, a psychiatrist, the 2nd CCM recently assigned to the yard and the CC-I. A MH-2 mental health treatment plan was completed during the meeting.

The C-File was available for IDTT. However, no pertinent case factors were discussed either through the C-File review or verbal presentation by the attending CC-I during the IDTT.

IDTT notes were on a pre-printed form. Documentation on the pre-printed form was limited to the name of the inmate, the team members in attendance, and that the MH-2 was approved by the IDTT. The treatment plan was not individualized to meet the specific treatment needs of the inmate. There was no documentation in the summary section of the form.

During the IDTT, the inmate reported that she had discontinued her prescribed medication two weeks ago. As of 5/8/07, the inmate had not been referred to see a psychiatrist.

Assessment:

The chart review of this inmate demonstrated inconsistent implementation of policies involving referral to mental health, medication continuity, timelines for laboratory testing, the quality of IDTT meetings, timeliness and the quality of treatment planning, response to unverified medications and obtaining release of information for past mental health treatment.

2.    Inmate B

On 2/14/07, this inmate was seen at R&R. The initial health screening documented a positive history of mental health issues, and an immediate MH referral was made.

An SRA was performed on 2/27/07, and the inmate was determined to be at high risk of self harm. No recommended action was, however, documented in the medical record.

On 3/8/07, Remeron 15 mg every p.m. for one week and then 30 mg every pm for 90 days were ordered. A consent form was signed. The inmate was also followed in chronic care clinic for hypertension and Hepatitis C. During the IDTT meeting, the inmate stated that she had been refusing meds since 4/24/07. She had not been seen by a psychiatrist as of 5/8/07, despite multiple medical physician notes requesting that the inmate be ducated. An April MAR was not located in the UHR.

The MH Placement Chrono dated 5/8/07 indicated placement in the 3CMS program for medical necessity, with a GAF of 62. The MH-4 indicated a positive history of psychotropic medication in the past two years and outpatient treatment. Past mental health records had not been requested. The reason for not requesting the records was not documented. Documentation was illegible. The diagnoses provided included Depressive Disorder, NOS and PTSD.

On 5/8/07, the inmate was seen in the initial IDTT meeting. The attendees were the assigned CCM, a psychiatrist, the 2nd CCM recently assigned to the yard and the CC 1. An MH-2 mental health treatment plan was completed during the meeting.

The C-File was available for IDTT. However, no pertinent case factors were discussed either through the C-File review or the verbal presentation by the attending CC-I during the IDTT.

IDTT notes were on a pre-printed form. The pre-printed form only documented the name of the inmate, the team members in attendance, and the fact that the MH-2 was approved by the IDTT. The treatment plan was not individualized to meet the specific treatment needs of the inmate. There was no documentation in the summary section of the form.

Assessment:

The chart review of this inmate demonstrated inconsistent implementation of policies involving medication continuity, quality of IDTT, timeliness and quality of treatment planning and request for release of information for past mental health treatment records.

3.    Inmate C

This inmate was placed into the 3CMS program on 2/13/07 for medical necessity with Axis I diagnoses of Depressive Disorder, NOS and Methamphetamine Dependence. An MH-4 was completed on 4/17/07, and an MH-2 treatment plan was completed on 5/8/07.

The IDTT determined that the inmate no longer required 3CMS LOC, and subsequently the inmate was removed from the program. At that time he was provided with a GAF of 71. The inmate was referred to SAP program, and the inmate appeared to be motivated for the new program.

The C-File was available for IDTT meeting. However, no pertinent case factors were discussed either through the C-file review or the verbal presentation by the attending CC 1 during the IDTT.

IDTT notes were on a pre-printed form. The pre-printed form only documented the name of the inmate, the team members in attendance, and the fact the MH-2 was approved by the IDTT. The treatment plan was not individualized to meet the specific treatment needs of the inmate. There was no documentation in the summary section of the form.

Assessment:

There was noncompliance with timely intake evaluation and development of the treatment plan, the quality of IDTT meeting as well as treatment planning and documentation.

4.    Inmate D

This 45 year old female inmate arrived at VSPW on 1/29/07 and was placed into the 3CMS program for medical necessity with a diagnosis of Bipolar Disorder, NOS, and a GAF of 60. A SRA was performed on 2/5/07, and the inmate was evaluated to be at low risk of self-harm. The inmate was treated with psychotropic medications and seemed to be compliant with these medications. Laboratory testing was performed, and the inmate was notified of the result in a timely manner.

EPRD was reported to be 7/4/07. On 5/8/07, the inmate was seen in an IDTT meeting and expressed her anxiety regarding her parole in July 2007. The IDTT failed to address her anxiety over her parole within the next few weeks. There was no documentation of any pre-release planning for this inmate.

The C-file was available for the IDTT meeting. However, no pertinent case factors were discussed either through the C-file review or the verbal presentation by the attending CC-I during the IDTT.

IDTT notes were on a pre-printed form. The pre-printed form only documented the name of the inmate, the team members in attendance, and the fact the MH-2 was approved by the IDTT. The treatment plan was not individualized to meet the specific treatment needs of the inmate. There was no documentation in the summary section of the form.

Assessment:

There was a lack of pre-release planning. In addition, the CC 1 participation in the treatment team process was inadequate, as was the quality of IDTT meetings and treatment planning.

5.    Inmate E

This 58 year old female inmate arrived at VSPW on 4/3/07 and was referred to mental health for evaluation. The inmate reported a history of suicidal attempts. The SRA was completed on 4/10/07, and the inmate was evaluated as having low risk for self harm. The inmate had signed a refusal form on numerous occasions. She refused to take prescribed psychotropic medications, including Haldol, Remeron, and Valproic Acid. The inmate was also treated with Lexapro 5mg every a.m., and she appeared to be compliant with this medication.

Mental Health Placement Chronos dated 4/10/07 and 5/10/07 indicated an EOP level of care with a GAF of 42. The MH-4 dated 4/10/07 documented past history of five inpatient hospitalizations with diagnoses of Mood Disorder, NOS and Psychotic Disorder, NOS. It also documented a history of substance abuse and Hepatitis C.

On 4/14/07, the psychiatrist recommended a change in the level of care from EOP to 3CMS, and stated "definitely not EOP" in the progress notes. The inmate agreed to continue with Lexapro and denied suicidal and homicidal ideation and hallucinations. The diagnosis provided at that time was Mood Disorder, NOS.

Assessment:

There appeared to be some information that was missing from the UHR. As of 5/8/07, the doctor's recommendation for a level of care change had not been addressed. The inmate remained at EOP level of care based upon the MHTS data. Release of information was not signed.