# EXHIBIT X

1  PRISON LAW OFFICE
   DONALD SPECTER Bar No.: 83925
2  STEVEN FAMA Bar No.: 99641
   E. IVAN TRUJILLO Bar No.: 228790
3  General Delivery
   San Quentin, California  94964
4  Telephone: (415) 457-9144
   •
5  ROSEN, BIEN & GALVAN, LLP
   MICHAEL W. BIEN Bar No.: 096891
6  JANE E. KAHN Bar No.: 112239
   AMY WHELAN Bar No.: 215675
7  LORI RIFKIN Bar No.: 244081
   SARAH M. LAUBACH Bar No.: 240526
8  315 Montgomery Street, 10th Floor
   San Francisco, California  94104
9  Telephone: (415) 433-6830

10 THE LEGAL AID SOCIETY–
   EMPLOYMENT LAW CENTER
11 CLAUDIA CENTER Bar No.: 158255
   LEWIS BOSSING Bar No.: 227402
12 600 Harrison Street, Suite 120
   San Francisco, CA  94107
13 Telephone:  (415) 864-8848

14 Attorneys for Plaintiffs

BINGHAM, McCUTCHEN, LLP
WARREN E. GEORGE Bar No.: 53588
Three Embarcadero Center
San Francisco, California  94111
Telephone: (415) 393-2000


HELLER, EHRMAN, WHITE &
McAULIFFE
RICHARD L. GOFF Bar No.: 36377
701 Fifth Avenue
Seattle, Washington  98104
Telephone: (206) 447-0900

15           IN THE UNITED STATES DISTRICT COURTS

16          FOR THE EASTERN DISTRICT OF CALIFORNIA

            AND THE NORTHERN DISTRICT OF CALIFORNIA
17
       UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES
18        PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

19 RALPH COLEMAN, et al.,                    )  No.: Civ S 90-0520 LKK-JFM P
                                             )
20        Plaintiffs,                        )  **THREE-JUDGE COURT**
                                             )
21    vs.                                    )
                                             )
22 ARNOLD SCHWARZENEGGER, et al.,            )
                                             )
23        Defendants                         )
                                             )
24 MARCIANO PLATA ,et al.,                   )  No. C01-1351 TEH
                                             )
25        Plaintiffs,                        )  **THREE-JUDGE COURT**
      vs.                                    )
26                                           )
27 ARNOLD SCHWARZENEGGER, et al.,            )
                                             )  **PLAINTIFF RALPH COLEMAN'S**
      vs.                                    )  **FIRST SET OF INTERROGATORIES**
28        Defendants                         )  **TO DEFENDANT TILTON**

1  **PROPOUNDING PARTIES:**    PLAINTIFF RALPH COLEMAN

2  **RESPONDING PARTIES:**    DEFENDANT TILTON

3  **SET NUMBER:**    ONE

4  **TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

5  　　　PLEASE TAKE NOTICE that, pursuant to Federal Rules of Civil Procedure Rule 33,

6  Plaintiff Ralph Coleman submits the following First Set of Interrogatories to Defendant Tilton

7  ('Defendant') to be answered separately and fully in writing, under oath, based upon all

8  knowledge reasonably available to them, within 30 days after service hereof.

9  　　　　　　　　　　　　　　　**DEFINITIONS**

10  　　　1.　　　'DOCUMENT' or 'DOCUMENTS' as used herein is intended to have the broadest

11  possible meaning and to include anything coming within the definition of 'writings' and

12  'recordings' as set forth in Rule 1001(1) of the Federal Rules of Evidence. The term refers to but

13  is not limited to the product of any method of recording information, whether by writing or

14  otherwise, including without limitation: any written, electronic, or computerized files, data or

15  software; memoranda; correspondence; communications; reports; summaries; studies;

16  analyses; evaluations; notes or notebooks; indices; logs; books, booklets or binders; pamphlets;

17  calendar or diary entries; ledger entries; press clippings; graphs; tables; charts; drawings; maps;

18  meeting minutes; photographs; transcripts; audio or video recordings or tapes; facsimile

19  transmissions; electronic mail messages; and the like. 'DOCUMENT' shall include each copy of

20  any whole or part of a document on which there appears any marking or deletion which does

21  not appear on the original or other copies thereof, together with all drafts or notes for the

22  preparation of each document.  If the original of a document is not available or was not

23  reviewed or received by a particular PERSON, 'DOCUMENT' includes any identical copy of

24  the original.

25  　　　2.　　　'YOU' and 'YOURS' as used herein refers to James Tilton, his agents,

26  representatives, attorneys, and all other persons or entities acting on his behalf.

27

28

3.     As used herein, the term "IDENTIFY," when used with respect to a person, means to state the following: name of entity; telephone number; location of its business and nature of its business.

4.     As used herein, the term "IDENTIFY," when used with respect to a document, means to state the following, if available, for each document: the name(s) of the author(s) and the recipient(s); the date; the title; the form of document (e.g. letter, memorandum, report, chart or other descriptive term); a description of the contents of the document; and its present or last known location and custodian. If you claim that any such document was, but is no longer, in your possession or subject to your control, state what disposition was made of such document and when. Documents to be identified shall include both documents in your possession, custody and control, and all other documents of which you have knowledge. To the extent that the answers to the preceding questions are determinable by an examination of the document itself, you may respond by supplying such document as part of your answers to these interrogatories so long as you identify the interrogatory to which such document is responsive.

5.     'REFER' or 'RELATE TO' means constituting, representing, defining, depicting, concerning, embodying, reflecting, identifying, stating, mentioning, addressing, or pertaining to the subject matter of the request, directly or indirectly, in whole or in part.

6.     The terms "and," "or," and "and/or" should be construed disjunctively or conjunctively as necessary to make the request inclusive rather than exclusive.

7.     'NON-TRADITIONAL HOUSING' or 'NON-TRADITIONAL BEDS' means beds in gyms, dayrooms, or other locations not intended to house inmates and includes those beds commonly referred to as "bad beds" by Defendants, inclusive of triple-bunks.

8.     'CDCR PRISON" and "PRISONS" mean any and all facilities in which class members in this litigation are or can be incarcerated, including housing units within DMH facilities that house CDCR prisoners.

9.     'COLEMAN CLASS MEMBERS' or 'PLAINTIFFS' means the class of state prisoners with serious mental disorders, including but not limited to those CDCR inmate-

-2-

patients within the Correctional Clinical Case Management System (CCCMS), the Enhanced Outpatient Program (EOP), Day Treatment Program (DTP), intermediate care beds, mental health crisis beds, and acute care beds.

10.    "PRISONER RELEASE ORDER" means any order "that has the purpose or effect of reducing or limiting the prison population, or that directs the release from or nonadmission of prisoners to prison" as set forth in the Prison Litigation Reform Act at 18 U.S.C. §3626(g)(7).

## INSTRUCTIONS

The preceding definitions apply to each interrogatory and are deemed incorporated in each of the following interrogatories and these instructions.

1.    In answering these interrogatories, quote each interrogatory before each answer.

2.    These interrogatories shall be deemed to be continuing interrogatories so as to require proper supplemental answers if further information is obtained or developed by you or your counsel after the time that you serve answers to these interrogatories.

3.    In answering these interrogatories, furnish all information available to you, including information in the possession of your employees, attorneys, or otherwise subject to your possession and/or control, and not merely information known of your own personal knowledge.

4.    If you cannot answer a particular interrogatory in full after exercising due diligence to secure the information to do so, answer to the extent possible, specify your inability to answer the remainder, state whatever knowledge you have concerning the unanswered portion.

5.    If you object to any part of an interrogatory, answer all parts of such interrogatory to which you do not object and, as to each part to which you do object, set forth the specific basis for you objection.

6.    If any information is within the scope of any interrogatory but is being withheld pursuant to any claim of privilege, identify the relevant interrogatories, the grounds upon which the information is being withheld, the nature of the information withheld, the author,

1   date, recipients, and subject matter of any documents containing such information, and the

2   identity of the person on whose behalf the privilege is asserted.

3         7.     Whenever the information requested by these interrogatories is contained in or

4   may otherwise be derived or ascertained from a document:  (a) identify the documents(s) from

5   which the answer may be derived or ascertained and (b) produce the document(s) for

6   inspection and copying or deliver a copy of the document(s) to Plaintiffs' counsel at the time

7   the answers hereto are filed.

8         8.     Some of the following consist of a number of related parts.  A complete and

9   separate answer is requested with respect to each such part with the same effect as if it were

10  stated as a separate interrogatory.

11  **INTERROGATORIES**

12

13  **INTERROGATORY NO. 1:**

14       Do YOU contend that some cause other than overcrowding is the primary cause of

15  YOUR ongoing violations of PLAINTIFFS' rights to constitutionally adequate mental health

16  care as set forth in the Court-approved Revised Program Guide?

17  **INTERROGATORY NO. 2:**

18       If YOUR response to interrogatory number one is affirmative, IDENTIFY what YOU

19  contend to be the primary cause(s) of YOUR violation of PLAINTIFFS' rights to

20  constitutionally adequate mental health care as set forth in the Court-approved Revised

21  Program Guide, and state all facts and IDENTIFY all DOCUMENTS and witnesses in support

22  of YOUR contention.

23  **INTERROGATORY NO. 3:**

24       IDENTIFY all obstacles and barriers preventing YOU from delivering constitutionally

25  adequate mental health care pursuant to the Court-approved Revised Program Guide at the

26  present time.

27  **INTERROGATORY NO. 4:**

28

1    By what date do YOU contend that YOU can provide constitutionally adequate mental

2    health care as set forth in the Court-approved Revised Program Guide to PLAINTIFFS without

3    a reduction in the number of prisoners housed in CDCR PRISONS?

4    **INTERROGATORY NO. 5:**

5    IDENTIFY all steps necessary for YOU to take to provide constitutionally adequate

6    mental health care as set forth in the Court-approved Revised Program Guide to PLAINTIFFS

7    without a reduction in the number of prisoners housed in CDCR PRISONS by the date YOU

8    specified in YOUR answer to interrogatory number four.

9    **INTERROGATORY NO. 6:**

10   Do YOU contend that the Court could enter an order or orders that will provide

11   effective relief for the ongoing violations of PLAINTIFFS' rights to constitutionally adequate

12   mental health care as set forth in the Court-approved Revised Program Guide without the

13   issuance of a PRISONER RELEASE ORDER?

14   **INTERROGATORY NO. 7:**

15   If YOUR response to interrogatory number six is affirmative, please IDENTIFY each

16   such order/remedy that the Court should issue in lieu of a PRISONER RELEASE ORDER.

17   **INTERROGATORY NO. 8:**

18   For each order/remedy IDENTIFIED in YOUR response to interrogatory number seven,

19   please state the date by which YOU contend that the ongoing constitutional violations will be

20   remedied by YOUR compliance with the order.

21   **INTERROGATORY NO. 9:**

22   For each order IDENTIFIED in YOUR response to interrogatory number seven,

23   IDENTIFY any known obstacles and barriers to YOUR compliance with the order by the date

24   IDENTIFIED in response to interrogatory number eight.

25   **INTERROGATORY NO. 10:**

26   IDENTIFY each action, program, policy or procedure that YOU have adopted or

27   undertaken since October 2006 that YOU contend will limit or reduce the number of prisoners

28   housed in CDCR PRISONS.

**INTERROGATORY NO. 11:**

For each such action, program, policy or procedure IDENTIFIED in YOUR response to interrogatory number ten, state the time frame for implementation, the size of the anticipated population reduction, and the date by which the population reduction will be effected.

**INTERROGATORY NO. 12:**

IDENTIFY each and every population model relied upon for YOUR answer to interrogatory eleven by its source, including but not limited to author, entity, and publication.

**INTERROGATORY NO. 13:**

IDENTIFY each action, program, policy or procedure that YOU have adopted since October 2006 that YOU contend will limit or reduce the number of *COLEMAN* CLASS MEMBERS housed in CDCR PRISONS.

**INTERROGATORY NO. 14:**

For each such action, program, policy or procedure IDENTIFIED in YOUR response to interrogatory number thirteen, state the time frame for implementation, the size of the anticipated population reduction, and the date by which the population reduction will be effected.

**INTERROGATORY NO. 15:**

IDENTIFY each and every population model relied upon for YOUR answer to interrogatory fourteen by its source, including but not limited to author, entity, and publication.

**INTERROGATORY NO. 16:**

IDENTIFY the number of prisoners housed in each CDCR PRISON on October 17, 2007, by housing unit, security level (I-IV), MHSDS membership (CCCMS or EOP), and other administrative placement factors and categories (SNY, administrative segregation, OHU, CTC, MHCB, reception, Security Housing Unit (SHU), Department of Mental Health (DMH)).

**INTERROGATORY NO. 17:**

For each CDCR PRISON, IDENTIFY the number of prisoners housed in NON-TRADITIONAL HOUSING and the location of such housing as of October 17, 2007.

**INTERROGATORY NO. 18:**

1    For each such NON-TRADITIONAL HOUSING location, IDENTIFY the number of

2    prisoners in the MHSDS (EOP, CCCMS) and security level (I-IV), as well as other

3    administrative placement factors (SNY administrative segregation, CTC, MHCB, OHU,

4    Reception Center, Security Housing Unit (SHU), or Department of Mental Health program

5    (DMH)), as of October 17, 2007.

6    **INTERROGATORY NO. 19:**

7    Describe any restrictions YOU place on the housing of *COLEMAN* CLASS MEMBERS

8    in NON-TRADITIONAL HOUSING BEDS identified in YOUR response to interrogatory

9    seventeen.

10   **INTERROGATORY NO. 20:**

11   For each CDCR PRISON housing unit that houses or has housed *COLEMAN* CLASS

12   MEMBERS in the past five years, IDENTIFY the original stated capacity for housing

13   *COLEMAN* CLASS MEMBERS, and any adjustments YOU have made to the stated capacity,

14   including the size and date of the adjustment.

15   **INTERROGATORY NO. 21:**

16   For each housing unit IDENTIFIED in response to interrogatory number twenty,

17   IDENTIFY any changes in the number of staff, treatment space, office space, or other

18   resources related to adjustments in capacity, including, when applicable, the dates those

19   changes were allocated, funded, and filled.

20   **INTERROGATORY NO. 22:**

21   IDENTIFY any and all housing units by prison, including Reception Centers, and

22   housing type (for example, dorm or cell housing) where EOP inmates are currently housed

23   with general population inmates.

24   **INTERROGATORY NO. 23:**

25   State the number of EOP and CCCMS PLAINTIFFS who paroled directly out of

26   Reception Centers each month since March 3, 2006.

27   **INTERROGATORY NO. 24:**

28

State the number of EOP and CCCMS PLAINTIFFS in each Reception Center who have remained in the Reception Center beyond the transfer timelines stated in the Revised Program Guide (60 days for EOP and 90 days for CCCMS) since March 3, 2006.

**INTERROGATORY NO. 25:**

IDENTIFY any and all lockdowns or partial lockdowns, including dates and duration, that affected housing units housing *COLEMAN* CLASS MEMBERS at CDCR PRISONS since March 3, 2006.

Dated:    10/17/07                        Respectfully submitted,


Lori Rifkin
Rosen, Bien & Galvan
Attorneys for Plaintiffs

# EXHIBIT Y

**DIVISION OF CORRECTIONAL HEALTH CARE SERVICES**
P.O. Box 942883
Sacramento, CA 94283-0001



DEC 0 3 2007

Matthew A. Lopes, Jr., Esq.                    Via:    Lisa Tillman
Office of the Special Master                           Deputy Attorney General
Pannone Lopes & Devereaux LLC                          Department of Justice
317 Iron Horse Way, Suite 301                          1300 "I" Street, Suite 125
Providence, RI  02908                                  P. O. Box 944255
                                                       Sacramento, CA  94244-2550

## RE:  REVISED RECEPTION CENTER ENHANCHED OUTPATIENT PROGRAM PLAN

Dear Mr. Lopes:

Enclosed please find our plan in response to the October 2, 2007 Court Order regarding the Enhanced Outpatient Program in Reception Centers.

If you have any questions, please contact me at (916) 323-0229.

Sincerely,

ROBIN J. DEZEMBER
Chief Deputy Secretary
Correctional Health Care Services

Enclosures

cc: Suzan Hubbard, Director, Division of Adult Institutions
    Deborah Hysen, Chief Deputy Secretary, Facilities Planning, Construction and
        Management
    Nancy Bither, Deputy Director, Human Resources
    Doug McKeever, Director, Mental Health Program
    Scott Carney, Deputy Director, Administration
    Karen Wong, Deputy Director, DCHCS
    Jeffrey L. Metzner, M.D., *Coleman* Expert
    Dennis F. Koson, M.D., *Coleman* Expert
    Kerry Hughes, M.D., *Coleman* Expert
    Melissa G. Warren, Ph.D., *Coleman* Expert
    Raymond F. Patterson, M.D., *Coleman* Expert

**DIVISION OF CORRECTIONAL HEALTH CARE SERVICES**
P.O. Box 942883
Sacramento, CA 94283-0001



Paul Nicoll, *Coleman* Expert
Ted Ruggles, Ph.D., *Coleman* Expert
Mary Perrien, Ph.D., *Coleman* Expert
Mary-Joy Spencer, Esq., *Coleman* Expert
Yong Joo Erwin, LCSW, *Coleman* Expert
Kathryn A. Burns, M.D, MPH, *Coleman* Expert
Henry A. Dlugacz, *Coleman* Expert
Angela Shannon, *Coleman* Expert
Lisa Tillman, Office of the Attorney General
Misha Igra, Office of the Attorney General
Don Currier, Assistant Secretary, Office of Legal Affairs
Katherine Nelson, Office of Legal Affairs
Michael Stone, Office of Legal Affairs
Michael Bien, Rosen, Bien and Galvan
Donald Specter, Prison Law Office
Virginia Morrison, Esq., *Coleman*
Mohamedu F. Jones, Esq., *Coleman*
Patricia Williams, Esq., *Coleman*
Linda Buffardi, *Coleman*
Haunani Henry, *Coleman*
J. Ronald Metz, *Coleman*
Andrew Swanson, M.D., Chief Psychiatrist, DCHCS
Shama Chaiken, Ph.D., DCHCS
Marion Chiurazzi, Ph.D., DCHCS
Joe Moss, Division of Adult Institutions
Mary Neade, Division of Adult Institutions
Sharon Riegel, DCHCS

| Revised Plan for Mental Health Treatment of |
| Enhanced Outpatient Program Inmates in Reception centers |
| December 2007 |

## Background

In July 2006 the California Department of Corrections and Rehabilitation (CDCR) submitted a plan for mental health treatment of enhanced outpatient inmates in reception centers (RC) in accordance with a May 1, 2006 court order. The document outlined a treatment plan for inmates placed into the Enhanced Outpatient Program (EOP) level of care at reception centers, and addressed the anticipated use of housing and treatment space as well as staffing allocations. Implementation was planned pending evaluation of additional resources and approval of funding through the annual budget process.

The initial court order had identified the following seven reception centers for focus of this plan: California Institution for Men (CIM), Deuel Vocational Institute (DVI), California State Prison at San Quentin (SQ), North Kern State Prison (NKSP), Wasco State Prison (WSP), California State Prison, Los Angeles County (CSP/LAC), and Richard J. Donovan Correctional Facility (RJD). Court monitors and experts examined the EOP programming at these seven reception centers from April through June 2007 and, on July 2, 2007, filed a report with the court, summarizing their findings regarding each institution's compliance with the plan. While the degree of implementation varied by institution, none of the seven reception centers met all required standards. In addition, program implementation was only in the beginning stages at the time of the monitors and experts' site visits. The Special Master recommended to the court that CDCR submit a revised plan that specifies allocation of necessary staffing and space, requirements for initial screening and accelerated intake evaluations, timeframes for Interdisciplinary Treatment Team (IDTT) meetings for inmates identified as needing EOP level of care in reception, early identification of all reception center EOP inmates with release dates within 60 to 120 days, and training of all IDTT members regarding re-entry planning.

In response to the Special Master's report, on October 2, 2007, Judge Karlton ordered that the recommendations of the Special Master are adopted, and that within 60 days from the date of his order (due December 3, 2007), CDCR submit to the Special Master a revised plan for the provision of EOP treatment at the seven identified reception centers. This plan is in response to that order.

## Reception Center Treatment Plan

Mental health services for EOP inmate-patients at reception centers shall be provided as follows:

1. All inmates arriving at reception centers are screened for health care needs within 24 hours of arrival during the initial bus screening. Any inmate identified during this screening by self-report, review of medical records, or inmate data bases as

1

having a history of prior EOP placement will be referred for an expedited clinical mental health evaluation.

2. Inmates identified as having a history of EOP placement will be assessed by a mental health clinician in an initial intake evaluation within seven days of arrival.

3. RC EOP inmates will be seen in an initial IDTT within 14 days of arrival, with a follow-up IDTT scheduled at intervals not to exceed 30 days until the inmate is transferred out of the reception center.

4. While housed in a reception center, EOP inmate-patients will be seen at least once per week by a clinical case manager (CCM) in a face-to-face contact. Case management activities are described in detail in the Mental Health Services Delivery System Program Guide and in the CDCR's plan previously submitted to the Special Master on July 31, 2006.

5. Out-of-cell structured therapeutic activities will be provided on a daily basis to allow for a minimum of one hour per day, five days per week for EOP patients at reception centers. Typical group offerings will include orientation to prison living, medication management, anger management and conflict resolution, social skills and daily living, emotional regulation, and goal planning, and are described further in the plan submitted on July 31, 2006. Group placement be a function of the IDTT.

6. RC EOP inmates with release dates within 60 to 120 days will be identified prior to their initial IDTT whenever possible so that their treatment plans can incorporate individualized re-entry needs. Mental health and classification staff will work together to identify these inmate patients as early as possible and to arrive at the best estimate of the inmates' earliest possible release dates.

## Status of Implementation of Court Order

A teleconference was conducted on October 15, 2007 during which the implementation status of the RC EOP plan and the requirements of the court orders where discussed with reception center mental health program supervisors, and they were asked to provide information specific to the directives in this Court's order dated October 2, 2007 of which they had a copy. In response to that teleconference, eleven reception centers submitted their reports. The following information is based on the information provided by the seven reception centers at focus of the Court Order.

- Reception centers were allocated additional positions as of January 2007 to ensure staffing for compliance with reception center EOP programming. Three institutions (LAC, RJD, and NKSP) reported that positions allocated and filled are sufficient to comply with RC EOP standards. The other four reception centers (SQ, WSP, CIM, and DVI) reported a need for additional resources (further detail provided in the Revised Implementation Plan below).

2

- The lack of dedicated treatment space remains a primary obstacle to program compliance. RC mental health programs continue to utilize space shared with custody, medical departments, and religious programs.

- Six of the seven reception centers (LAC, RJD, NKSP, CIM, DVI, and SQ) reported that newly arriving inmates with a history of EOP placement are being identified during the initial bus screening. Inmates are being assessed during the initial bus screening within 24 hours of arrival, and those with a history of prior participation in MHSDS at the EOP level of care are identified by means of self-report, records reviews, or inmate data bases.

- Four reception centers (LAC, RJD, NKSP, and DVI) reported that at least 90 percent of inmates identified with a history of EOP programming receive a mental health intake evaluation within seven days of arrival. Others have implemented the standard into their operating procedures but have not tracked or audited data sufficiently to verify compliance.

- Direction was provided during the teleconference on October 15, 2007 that initial IDTTs must occur within 14 days of the inmate's arrival, and follow-up IDTTs will be scheduled at intervals no greater than 30 days until the inmate transfers from reception. Four institutions (LAC, RJD, NKSP, and DVI) reported compliance with 30-day IDTTs at 90 percent or better while two reception centers (CIM and DVI) reported compliance with 14-day initial IDTTs. WSP reported an 80 percent compliance rate with initial IDTT requirements due to staffing shortages.

- Early identification of RC EOP inmates with release dates within 60 to 120 days from arrival has been problematic; no consistent processes have been developed to ensure timely notification to IDTTs to incorporate this information into treatment planning in a systematic fashion. Two institutions (DVI and WSP) reported receiving regular lists of parole dates through classification staff but generally there is an absence of timely information prior to the initial IDTT. As indicated in our original plan, this effort is hindered by the lack of a comprehensive Information Technology system, which is under the control of the Receiver.

  Historically, institutions have relied in the past on outside services through the Transitional Case Management Program (TCMP). When services are provided, they occur to the extent that resources are made available and have been dedicated at each institution; however, there is not follow a uniform standard. Three reception centers (LAC, NKSP, and DVI) reported they have dedicated mental health staff to track EOP inmate-patients with imminent parole dates and to provide services. A fourth institution reported providing re-entry services in the context of RC EOP group treatment.

3

The Division of Adult Parole Operations (DAPO) has made progress with its program that utilizes contracted benefits workers to assist inmates with applications for federal and state benefit entitlements from the United States Social Security Administration (SSA), the California Department of Health Care Services, and the United States Veteran's Affairs (VA). A Public Entity contract was approved by the California Department of General Services on October 29, 2007, and recruitment and staffing has begun for 18 prisons including NKSP and WSP. A second contract for 15 additional institutions including CIM, DVI, LAC, RJD and SQ is pending approval within the first quarter of 2008. Agreements between CDCR and Division of Health Care Services (DHCS) with SSA and VA are pending final reviews and signatures.

## **Revised Implementation Plan and Monitoring**

### Staffing

Additional positions were allocated to RC EOP programs in January 2007 to allow for compliance with revised program requirements. A listing of position distribution to reception centers for the EOP RC plan is attached. Positions requested were determined based upon population and did not factor in considerations such as physical plant and other facility constraints. Therefore, CDCR will continue to evaluate staffing needs for each reception center and ensure recruitment efforts include the positions allocated in January 2007. In addition, once the workload study is approved we will evaluate the staffing recommendations of the study to determine if sufficient staffing is in place to adequately manage the RC EOP program.

### Treatment Space

Treatment space for group and individual treatment is being provided in existing classrooms, offices shared with custody and medical staff, chapels, and other available space as determined by each institution. Six reception centers have identified a potential need for additional or improved treatment space for individual and group therapy to provide settings with adequate privacy and confidentiality the RC EOP program. These space needs are being developed, and if additional resources are required to support these needs, funding will be requested through the 2009-10 Budget development process.

### Treatment Planning

A memorandum dated December 3, 2007 will be distributed to Chiefs of Mental Health, reiterating and clarifying requirements and timeframes under this Court's order to provide EOP care in Reception Centers (attached). Compliance with timely screenings, intake evaluations, initial and subsequent IDTTs, case management contacts, and group participation will be monitored by use of data provided through Mental Health Screening System (MHSS) and the Mental Health Tracking System (MHTS) databases on an ongoing basis. Where these databases are not functional, institutional staff will utilize

4

alternate methods of monitoring (such as chart audits and use of logs) to provide verification of compliance.

#### Pre-Release Planning

A focused improvement team (FIT) will be chartered to develop a systematic approach for the early identification of RC EOP inmate-patients with parole dates within 60 to 120 days of arrival. The anticipated completion date for this FIT will be 120 days from the approval of this plan, and instructions and training will be provided to institutional staff within 60 days thereafter.

To ensure consistent re-entry planning, a focused improvement team will develop a training outline that identifies CDCR, parole, and community resources available to inmate-patients re-entering the community, and to the clinicians providing their mental health care in reception centers. The anticipated completion date for this FIT will be 120 days from the approval of this plan, and training for all members of RC EOP treatment teams will be scheduled for each institution for completion within 60 days thereafter. Videotapes will be provided to each institution after this initial training to be viewed by new staff hired after the training dates.

#### Oversight of Plan Implementation

A project manager has been assigned at the Mental Health Program, Division of Correctional Health Care Services to oversee the implementation of this plan and follow up with each RC on a monthly basis. The project manager will serve as a liaison between institutional mental health programs and central office to facilitate the collection of data to ensure all elements of the RC EOP plan are being implemented. When data from programs such as MHSS and MHTS indicates an institution is not meeting key performance indicators, the Program Support Teams will be utilized to provide assistance to bring the institution into compliance. In addition, the project manager will monitor recruitment and hiring efforts for RC EOP programs and work with the Office of Workforce Planning to identify Reception centers with high vacancy rates in order to prioritize recruitment efforts.

# EXHIBIT Z



*California Rehabilitation Oversight Board*

# BIANNUAL REPORT
# JULY 15, 2008

# STATE OF CALIFORNIA

# CALIFORNIA REHABILITATION OVERSIGHT BOARD MEMBERS

**David R. Shaw, Inspector General and Chair**

**Matthew Cate, Secretary, California Department of Corrections and Rehabilitation**

**Debra Jones, Administrator, Adult Education Programs (Designee for Jack O'Connell, State Superintendent of Public Instruction)**

**José Millan, Vice Chancellor (Designee for Diane Woodruff, Interim Chancellor, California Community Colleges)**

**Renée Zito, Director, California Department of Alcohol and Drug Programs**

**Stephen Mayberg, Director, Department of Mental Health**

**Susan Turner, Professor, University of California, Irvine (Appointed by the President of the University of California)**

**Bruce L. Bikle, Professor, California State University, Sacramento (Appointed by the Chancellor of the California State University)**

**Gary R. Stanton, Sheriff, County of Solano (Appointed by the Governor)**

**Loren Buddress, Chief Probation Officer, County of San Mateo (Appointed by the Senate President pro Tempore)**

**William Arroyo, Regional Medical Director, Los Angeles County Department of Mental Health (Appointed by the Speaker of the Assembly)**

# PREFACE

Pursuant to Penal Code section 6141, the California Rehabilitation Oversight Board (C-ROB or the board) is mandated to regularly examine and report biannually to the Governor and the Legislature regarding rehabilitative programming provided to inmates and parolees by the California Department of Corrections and Rehabilitation (CDCR or the department). The C-ROB held its first meeting on June 19, 2007.

According to statute, C-ROB must submit reports on January 15 and July 15 to the Governor and the Legislature. These biannual reports must minimally include findings on:

- ✓ Effectiveness of treatment efforts
- ✓ Rehabilitation needs of offenders
- ✓ Gaps in rehabilitation services
- ✓ Levels of offender participation and success

As required by statute, this report uses the findings and recommendations published by the Expert Panel on Adult Offender and Recidivism Reduction Programs. In addition, this report reflects information that CDCR provided during public hearings as well as supplemental materials that CDCR provided directly to C-ROB.

# TABLE OF CONTENTS

Executive Summary.................................................................................. 1

Part I:     Background .............................................................................. 3

Part II:    Methodology............................................................................. 4

Part III:   Implementing the California Logic Model.................................. 5

    A. Assess High Risk and Needs ............................................................. 5
    B. Develop Behavior Management Plan.............................................. 10
    C. Deliver Programs ........................................................................... 12
    D. Measure Progress........................................................................... 17
    E. Prep for Re-Entry, Reintegrate, and Follow-Up.......................... 19

Part IV:    Capacity for Rehabilitative Efforts.......................................... 24

    A. Reduce Overcrowding.................................................................... 24
    B. Expand Incentives ......................................................................... 27
    C. Staff Development and Training..................................................... 29

Part V:     Conclusion .............................................................................. 31

## APPENDICES

Appendix A:  Identifying the Rehabilitative Needs of Offenders
Appendix B:  Determining Gaps in Rehabilitative Services
Appendix C:  Determining Levels of Offender Participation and Offender Success
Appendix D:  Determining the Effectiveness of Rehabilitative Programming
Appendix E:  Determining Adherence to Evidence-Based Principles
Appendix F:   Status of Expert Panel Recommendations
Appendix G:  Expert Panel Report, California Logic Model

# EXECUTIVE SUMMARY

This is C-ROB's third and most comprehensive report. Since the last C-ROB report, published six months ago, CDCR has made extraordinary progress in laying the groundwork for rehabilitative programming. One of the most significant achievements is the department's creation of the Master Work Plan for Rehabilitative Programming. The scope and detail of the Master Work Plan cannot be understated. It organizes and lists in detail the hundreds of individual tasks that the department will need to complete before fundamental rehabilitative reform can be implemented throughout California's correctional system.

As evidenced from the Master Work Plan, the challenge before CDCR is monumental. Achieving lasting reform will require leadership, vision, and support from many state and local government entities. Support from the public and elected officials will be especially crucial.

This report also represents the board's first report with data to evaluate CDCR's efforts to implement rehabilitative programming. Further, this report marks a shift in the board's reporting of CDCR progress. The C-ROB is using the California Logic Model as the basis for most of this report. The reader will see under each segment of the logic model a series of recommendations that must be implemented by both the department and by external entities. By presenting the full range of recommended actions, the board hopes that the reader will gain a clear understanding of the magnitude and complexity of the challenges facing correctional reform in California.

The CDCR has made significant progress in identifying the work and effort needed, and C-ROB is encouraged by the planning the department has engaged in to set up the foundations for successful implementation of rehabilitation programming. The leadership of CDCR Secretary James Tilton (retired) and now Secretary Matt Cate and their dedication to the department's mission is particularly encouraging. Moreover, the board has found CDCR staff members responsible for organizing and implementing rehabilitative programming are dedicated and passionate about making this work.

With the department's Master Work Plan developed, it is now up to the department and the political will of the Governor, the Legislature, and the public to support the implementation of the plan. The road to effective rehabilitation programming in California's correctional system will be long and arduous. The C-ROB cannot emphasize enough the need for all interested parties to remain focused on the long-term objectives. Improving public safety by reforming the state's correctional system into a sustainable and effective rehabilitation-based model will require substantial investment and many years of committed leadership and political will.

## SUMMARY OF C-ROB FINDINGS

Significant findings discussed in this report include:

- The C-ROB is encouraged by the department's significant progress in the area of risk and needs assessments. The C-ROB remains concerned, however, about the large number of inmates for which assessments have not yet been conducted.

- The C-ROB commends the department on its progress in developing a proposed case management process and identifying a potential interim IT solution to automate it.

- The C-ROB commends the department for completing the evaluation of its existing programs and supports the department's request for additional resources for its Office of Research.

- The C-ROB has not received sufficient information upon which to fully evaluate the department's efforts concerning re-entry and reintegration. Preliminary information received suggests the need for increased collaboration between CDCR's Adult Programs, the Division of Adult Parole Operations (DAPO), and the Board of Parole Hearings. To date, C-ROB has worked most closely with CDCR's Adult Programs. The board intends to work more directly with the DAPO and the Board of Parole Hearings in preparation for its next biannual report.

- Although the department has shown considerable progress in coordinating its efforts with the receiver's office concerning the construction of additional inmate beds, C-ROB remains concerned about the department's coordination with the receiver's office on a variety of other issues where there may be competing interests, such as the need for programming space, additional staff, and resources.

- The C-ROB finds that enacting legislation to expand incentives for inmates and parolees to successfully complete rehabilitation programming, comply with institutional rules in prison, and fulfill their parole obligations in the community needs to be a priority for the Legislature and Governor.

- The C-ROB finds that if parole reform is to be successfully implemented, there needs to be better coordination between the DAPO and the Board of Parole Hearings. In addition, the growing disparity between DAPO recommendations to discharge parolees from parole and Board of Parole Hearings' parole discharge decisions needs to be examined.

- The C-ROB supports the department's staff training and development efforts. Related tasks identified in CDCR's Master Work Plan are both impressive and daunting. The board will continue to monitor the department's progress in staff development and training as it begins implementing the work plan.

- The C-ROB finds that CDCR is still primarily in the planning stages of rehabilitation programming reform. The department needs to move more into the implementation phases to demonstrate true progress.

# I. BACKGROUND

## A. C-ROB AND ASSEMBLY BILL 900

The California Rehabilitation Oversight Board (C-ROB) was established by Assembly Bill (AB) 900, the Public Safety and Offender Rehabilitation Services Act of 2007.[1] The C-ROB is a multidisciplinary public board with members from various state and local entities.

Assembly Bill 900 also gave CDCR the authority and funding to construct and renovate up to 40,000 state prison beds and funding for approximately 13,000 county jail beds. Assembly Bill 900 requires, however, that any new beds constructed must be associated with full rehabilitative programming.[2] Moreover, AB 900 provides funding in two phases and requires the department to meet certain benchmarks, some of which are related to rehabilitative programming, before the department can obtain the second phase funding.[3] Specifically, the oversight of AB 900 is described in Penal Code section 7021, which states that phase II of the construction funding (as outlined in section 15819.41 of the Government Code) may not be released until a three-member panel, composed of the State Auditor, the Inspector General, and an appointee of the Judicial Council of California, verifies that all 13 benchmarks, which are outlined in paragraphs 1 to 13 of Penal Code section 7021, have been met.

Given the interrelation between AB 900 and C-ROB, some have assumed that the board's mandate is to oversee the implementation of AB 900. However, this is not the case. The board is mandated to examine and report on rehabilitative programming and the implementation of an effective treatment model *throughout* CDCR, including programming provided to inmates and parolees, not just rehabilitation programming associated with the construction of new inmate beds.

## B. EXPERT PANEL REPORT

In performing its duties, C-ROB is required by statute to use the work of the Expert Panel on Adult Offender and Recidivism Reduction Programs.[4] The CDCR created the expert panel in response to authorization language placed in the Budget Act of 2006-07. The Legislature directed CDCR to contract with correctional program experts to assess California's adult prison and parole programs designed to reduce recidivism.

In addition, CDCR asked the expert panel to provide it with recommendations for improving the programming in California's prison and parole system. The expert panel published a report in June 2007, entitled, *A Roadmap for Effective Offender Programming in California* (Expert Panel Report). The department adopted the recommendations of the Expert Panel Report, except for the recommendation and discussion on reducing the offender population, which the department is still evaluating. Therefore, as C-ROB examines the department's progress in developing an effective

---

[1]  Assembly Bill 900 (Solorio), Chapter 7, Statutes 2007.
[2]  Government Code section 15819.40 (AB 900) mandates that "any new beds constructed pursuant to this section shall be supported by rehabilitative programming for inmates, including, but not limited to, education, vocational programs, substance abuse treatment programs, employment programs, and pre-release planning."
[3]  Penal Code section 7021 (AB 900), paragraphs 1 to 13.
[4]  Specifically, Penal Code section 6141 requires: "In performing its duties, the board shall use the work products developed for the department as a result of the provisions of the 2006 Budget Act, including Provision 18 of Item 5225-001-0001."

treatment model, C-ROB will evaluate the department's efforts to implement the expert panel's recommendations.

The expert panel identified eight evidenced-based principles and practices collectively called the California Logic Model. The California Logic Model shows what effective rehabilitation programming would look like if California implemented the expert panel's recommendations.[5] The California Logic Model provides the framework for effective rehabilitation programming as an offender moves through the state correctional system. Part III of the report examines the department's progress toward implementing the California Logic Model.

## C.  REHABILITATION STRIKE TEAM REPORT

In May 2007, Governor Arnold Schwarzenegger created two strike teams to assist CDCR in implementing AB 900. The Facilities Strike Team focused on prison construction issues and the Rehabilitation Strike Team focused on developing and implementing prison and parole programs. The Rehabilitation Strike Team issued a final report in December 2007, entitled, *Meeting the Challenges of Rehabilitation in California's Prison and Parole System* (the Strike Team Report). The report provides a four-pronged strategy for improving rehabilitation programs in the California corrections system:

- Develop an Offender Accountability and Rehabilitation Plan (OARP) designed to assess inmates' needs at intake and direct inmates to appropriate rehabilitation programs and services in prison and on parole;

- Identify rehabilitation-oriented training curriculum for correctional and rehabilitation staff, and a method of delivering that curriculum;

- Install a Prison to Employment Program designed to facilitate offenders' successful employment after release; and,

- Implement parole reform based on the structural possibility of earned discharge from parole or "banked" caseloads, and guided by a new risk assessment tool and a parole violation decision-making matrix.

Because the Strike Team Report provides CDCR with guidelines for implementing the Expert Panel Report and because CDCR adopted the report, C-ROB will evaluate the department's efforts to implement the Strike Team Report recommendations.

# II. METHODOLOGY

In preparing this biannual report, C-ROB received testimony at three public meetings as well as information from CDCR representatives. The findings and scope of this report are based primarily on information received up to the board's meeting on July 8, 2008.

Much of this report is included as appendices. The C-ROB began working with the department on collecting data for these appendices shortly after the January 15, 2008, report was published. As expected, CDCR is not yet able to collect a significant amount of the data that C-ROB requested. In

---

[5] A full-size copy of the expert panel's California Logic Model is included as Appendix G.

most cases, the department is still developing a method for collecting relevant data. Therefore, the majority of appendices are included to show the reader the type of data that the board intends to obtain and analyze for future reports.

# III. IMPLEMENTING THE CALIFORNIA LOGIC MODEL

The CDCR has developed a comprehensive Master Work Plan for Rehabilitative Programming that details an exhaustive list of steps necessary for fully implementing the California Logic Model throughout the correctional system. Please refer to Appendix G for a copy of the California Logic Model. The Master Work Plan provides CDCR with three tracks for implementing the California Logic Model. The first track is aimed at improving utilization of existing programs. The second track establishes a demonstration project that will implement the full scope of the California Logic Model using a selected inmate population in Northern California, as recommended by the Rehabilitation Strike Team. The demonstration project is intended to serve as a model that CDCR will eventually implement statewide. The final track details how the department intends to roll out the California Logic Model statewide once it is implemented, tested, and re-tooled through the demonstration project.

The three tracks are not sequential: there are tasks associated with each track that are being pursued simultaneously by CDCR. This report, therefore, addresses the department's progress in implementing each of the eight steps identified in the California Logic Model based on the tasks identified in each of the three tracks, as applicable.

## A. ASSESSING HIGH RISK AND NEEDS

### 1. Expert Panel Report

According to the Expert Panel Report,

> "Research shows that offenders with different levels of risk to reoffend respond
> differently to rehabilitation programming. Yet, CDCR is not currently using a risk-
> based assessment tool to assign offenders to rehabilitation programming. We found
> that in many instances, CDCR assigned offenders to programs on a first-come, first-
> served basis regardless of risk level. The probability of the right offenders receiving
> the right programs using this approach is extremely low. Research also shows that
> programs that target appropriate offenders are more likely to reduce recidivism."

As a result of this finding, the expert panel made the following recommendations:

**"Select and utilize a risk assessment tool to assess offender risk to reoffend."**



**a. Adopt a risk assessment instrument for the prison population.** The expert panel commended the department for implementing a pilot of the Correctional Offender Management Profiling for Alternative Sanctions (COMPAS) tool in four of its 12 reception centers to assess the risk to reoffend levels of offenders. However, the panel recognized the difficulty in implementing a complex tool such as COMPAS in the prison setting, especially given CDCR's lack of networked computer resources. The expert panel, therefore, recommended that the department pilot a static risk factor instrument in four additional prisons.

*Department Progress: The department has implemented COMPAS assessments for inmates meeting specified criteria at all 12 prisons that serve as reception centers. Specifically, the department is targeting new inmates who have more than 240 days to serve and parole violators who are committed to CDCR after being convicted of new crimes. This approach is consistent with the recommendations of the Rehabilitation Strike Team. Although this group is the target population CDCR has identified, the department is not able to assess the entire group with current resources. The CDCR has provided C-ROB with weekly tallies of the number of COMPAS assessments completed. As of May 29, 2008, the department had completed over 12,000 assessments.*

**b. Utilize the COMPAS or similar assessment tool for the parole population.** The expert panel recommended that CDCR adopt COMPAS if, after validating the results of the tool, CDCR found it was valid and that CDCR staff found it useful.

*Department Progress: CDCR developed and incorporated within the COMPAS assessment instrument a re-entry assessment tool for both male and female parolees. Staff training and implementation of the tool began in May 2008.*

**c. Develop a risk assessment tool normed for the female inmate and parolee populations.** Research shows that when correctional agencies assess female offenders with instruments designed to assess the risk to reoffend levels for male offenders they often receive invalid results. The expert panel, therefore, recommended that CDCR adopt an instrument that it then norms and validates for female offenders to assess their risk to reoffend levels.

*Department Progress: The department, working with national gender-responsive experts, has successfully completed the two-year design, development, and implementation of a gender-responsive women's COMPAS assessment tool. In May 2008, institutional staff at the California Institution for Women, Central California Women's Facility, Valley State Prison for Women, and parole staff were trained on the new instruments. In June 2008, use of the new COMPAS began in the women's prisons and at the new Female Residential Multi Service Center for parolees.*

**d. Develop a risk assessment tool normed for the young adult inmate and parolee populations.** Like female offenders, youthful offenders (18-25 years old) also have unique characteristics. As a result, the expert panel recommended that CDCR norm and validate an assessment tool for this subset of offenders as well.

*Department Progress: Work plan pending development. The CDCR has not yet moved forward on this recommendation due to the amount of work currently underway in making changes to the COMPAS assessment tool, as described above.*

**e. Norm and validate all the selected risk assessment instruments for CDCR's adult offender population and validate these tools at least every five years.** The expert panel recommended that CDCR use a standard research-based methodology to validate and norm its risk to reoffend assessment tools on the California offender population at least once every five years to ensure the department is accurately predicting outcomes.

*Department Progress: The California Static Risk Assessment (CSRA) has been developed. The CSRA will be included as part of the COMPAS assessment instrument. The CSRA was normed to a California offender cohort of more than 100,000 offenders released during fiscal year 2002-03. The CSRA takes California Department of Justice information about an offender's criminal history and uses it to populate information in the COMPAS assessment instrument. The information will then be used to construct the offender's COMPAS assessment's risk to recidivate score and criminogenic needs. The addition of CSRA is expected to provide the department with a high ability to predict an offender's risk to reoffend. The CSRA was developed by CDCR's Office of Research, the Center for Evidence-Based Corrections at the University of California, Irvine, and Dr. Robert Barnoski of the Washington State Institute for Public Policy. The CSRA will also be used as a component of the proposed parole violation decision-making matrix discussed in more detail in section III(E) of this report.*

**f. When assigning rehabilitation treatment programming slots, give highest priority to those offenders with high and moderate risk to reoffend scores.** Research shows that high and moderate risk to reoffend inmates and parolees achieve the greatest gains in recidivism reduction. Because rehabilitation treatment resources are limited, the expert panel recommended that CDCR allocate its rehabilitation treatment programming slots first to its high and moderate risk to reoffend inmates and parolees.

*Department Progress: The department has begun to use the assessments to determine the number of inmates who are high-risk and moderate-risk to reoffend for purposes of identifying future inmate programming resource needs. As of May 2008, preliminary data indicate more than 60% of offenders assessed rated as having a probable or highly probable risk to reoffend and only slightly less rated as having a probable or highly probable risk of violence. The department is following this recommendation in the design of the demonstration project.*

**g. Provide low risk offenders with rehabilitation programs that focus on work, life skills, and personal growth rather than rehabilitation treatment programs.** Low-risk to reoffend inmates' and parolees' need for more expensive rehabilitation treatment programs is minimal or nonexistent. In fact, research has found that providing intensive rehabilitation treatment to these offenders may actually increase their likelihood to recidivate. As a result, the expert panel recommended that that CDCR provide its low risk offenders, who have such needs, with rehabilitation programs that focus on work, life skills, and personal growth,

such as vocational or educational programming, but not rehabilitation treatment programming.

*Department Progress: Work plan developed and this recommendation is included in the design of the demonstration project.*

**h. Provide short-term inmates with re-entry services and reintegration skills training rather than rehabilitation treatment programs.** Most credible rehabilitation treatment programs require the offender to participate for at least six months to gain any measurable and sustainable benefit from the program. The expert panel acknowledged that nearly 70,000 of CDCR's inmates will spend only a few weeks or months in prison. This group of offenders simply does not have time to participate in or benefit from rehabilitation treatment programs. Accordingly, the expert panel recommended that CDCR offer them rehabilitation programs and services that develop their community reintegration and re-entry skills.

*Department Progress: Work plan developed and this recommendation is included in the design of the demonstration project.*

The expert panel also made the following recommendations:

**"Determine offender rehabilitation treatment programming based on the results of assessment tools that identify and measure criminogenic[6] and other needs."**



**i. Do not assess the criminogenic needs of low risk to reoffend offenders.** As mentioned above, low-risk offenders are not likely to need rehabilitative treatment, and may actually be adversely affected by it. The expert panel recommended, therefore, that CDCR not use its limited resources to assess the criminogenic needs of low risk offenders. Instead, the expert panel suggested that CDCR select needs instruments that identify and measure the work, life skills, personal growth, and other programming needs of low-risk offenders and assign them to rehabilitation programs based on those assessments.

*Department Progress: Work plan developed and this recommendation will be included as part of the demonstration project.*

**j. Utilize additional evidence-based tools to supplement criminogenic needs assessments.** General risk assessment instruments do not make distinctions between kinds of behaviors assessed, and this becomes especially important when dealing with certain offenders, such as violent or sex offenders. To address this issue the expert panel recommended that CDCR investigate and then utilize additional evidence-based tools (i.e.,

---

[6] The Expert Panel Report describes criminogenic needs, or "dynamic risk factors" as those factors that have been found to drive criminal behavior in male offenders. The report lists seven main criminogenic needs: (1) educational-vocational-financial deficits and achievement skills; (2) anti-social attitudes and beliefs; (3) anti-social and pro-criminal associates and isolation for pro-social others; (4) temperament and impulsiveness (weak self control) factors; (5) familial-marital-dysfunctional relationship (lack of nurturance-caring and/or monitoring-supervision); (6) alcohol and other drug disorders; and, (7) deviant sexual preferences and arousal patterns.

"secondary assessments") to supplement the criminogenic needs assessments given to its high and moderate risk to reoffend offenders.

*Department Progress: CDCR has identified six secondary assessment tools for high and moderate-risk inmates and a matrix for determining when an offender should be referred for a secondary assessment.[7] The department indicates that it will evaluate the initial selection of secondary assessment instruments and may change or augment the tools as additional experience is gained. Initial experience will be gained during the demonstration project implementation. Some of the secondary assessments are being used now, with the remainder expected to be phased in statewide over the next three years. The department requested eight new positions to conduct secondary assessments at each prison, which will also be phased in over the next three years. These positions are included in the budget bill for fiscal year 2008-09, currently pending before the Legislature.*

## 2. Rehabilitation Strike Team Report

In an effort to assist CDCR in implementing the above recommendations, the Rehabilitation Strike Team worked with CDCR administrators to create an Offender Accountability and Rehabilitation Plan (OARP) for individual offenders. The OARP is designed to capture both static and dynamic information on offenders' assessed risks and needs at various points in their movement through the correctional system. As the Strike Team Report explained, risk factors that cannot change, such as criminal history, are *static*, whereas risk factors such as drug dependence that can change through treatment are *dynamic*. The OARP is intended to link individual offenders to the appropriate services and treatment programming and to provide the documentation necessary to measure the quality of the treatment and outcomes.

In general, the OARP calls for five tasks to be completed when an offender is first received at a CDCR reception center: (a) verification of the offender's identity; (b) assessment of the offender's custodial risk (i.e., risk of escape, custody level, gang affiliation, safety concerns, etc.); (c) assessment of the offender's physical health status and immediate needs; (d) assessment of the offender's mental health and immediate needs; and, (e) assessment of the offender's criminogenic profile and programming needs. The Rehabilitation Strike Team recognized that the first four tasks are already routinely accomplished in CDCR reception centers. It is the assessment of the offender's criminogenic profile and programming needs that represents a key innovation most crucial to developing an OARP. The strike team recommended that eventually, an OARP be developed for every inmate within 60 days of arriving at a reception center.

*Department Progress: The department has begun to use the COMPAS assessments in its classification process at reception centers to assign inmates to specific institutions, pursuant to instructions issued to staff in February 2008. The goal is to send inmates to facilities that offer the custody level and program services suggested by their COMPAS assessment, when possible. At this early point in the implementation process, this means that any inmate with an identified need for substance abuse treatment is to be referred only to an institution with a substance abuse program, although the department acknowledges there will be exceptions.*

---

[7] The CDCR has chosen the following secondary assessment tools: Criminal Sentiments Scale-Modified (CSS-M) for anti-social attitudes, beliefs, and associations; Hostile Interpretations Questionnaire (HIQ) for anger, hostility and aggression; Test of Adult Basic Education (TABE) and the Comprehensive Adult Student Achievement System (CASAS) for educational needs; Interest Determination, Exploration, & Assessment System (IDEAS) for vocational needs; Texas Christian University Drug Screen II (TCUDS II) and the Addiction Severity Index (ASI) for substance abuse; Static 99 for sex offending. The department indicates it has yet to choose an assessment tool for marital and family relationships.

*In addition, CDCR requested resources to expand the number of COMPAS assessments conducted in the reception centers. The budget bill for fiscal year 2008-09, currently pending before the Legislature, includes an additional 19 positions to augment the existing 22 positions performing COMPAS assessments. If approved, the positions would be available beginning fiscal year 2008-09. The budget bill also includes an additional three positions to review and amend current inmate classification procedures to reflect the assessed risk and needs of each inmate.*

### 3.  C-ROB Findings

In the January 2008 C-ROB report, the board expressed several concerns about the department's efforts to assess the risk and needs of offenders, including:

- The department's efforts to conduct COMPAS assessments were fragmented. The board observed that the efforts to conduct COMPAS assessments at intake were entirely separate from the efforts to conduct COMPAS assessments prior to release.

- It was not clear how effectively, if at all, the staff members working directly with inmates and parolees were using the assessments.

- Significant numbers of inmates were still not being assessed and, more importantly, the assessment's value was questionable because the department had not yet developed a case management plan to connect inmates and parolees to the programs they need.

- The department had not yet identified secondary assessments.

**The C-ROB is encouraged by the department's significant progress in the area of risk and needs assessments. The C-ROB remains concerned, however, about the large number of inmates for which assessments have not yet been conducted.**

## B.  DEVELOP BEHAVIOR MANAGEMENT PLAN

Behavior management plans are essential for matching the right offender to the right program in the right order. They link the assessment process to rehabilitation programming and ensure continuity of rehabilitation programs and services between the prison, parole system, and other community-based providers.

### 1.  Expert Panel Report

According to the Expert Panel Report, effective behavior management planning includes these major tasks:

- Administering risk-needs assessment tools when inmates are first received and when parolees are first released on parole to identify their programming needs;

- Developing a behavior management plan for each offender based on the risks and needs levels identified by the assessment tools;

- Updating behavior management plans whenever an inmate or parolee does one of the following: completes assigned programming, fails to comply with the plan requirements, or completes a new risk-needs assessment; and,

- For inmates about to parole, update their existing behavior management plan to include additional programming required for their successful re-entry into the community.

The Expert Panel Report made the following recommendation concerning behavior management plans:

## "Create and monitor a behavior management plan for each offender."

The expert panel recommended that CDCR create a behavior management (or case) plan for each of its adult offenders in prison and on parole. It also recommended that CDCR actively monitor the plans to track offender progress toward achieving their rehabilitation programming objectives.

*Department Progress: The department developed a draft case planning prototype identifying multidisciplinary team responsibilities and case managers. The draft plan also calls for periodic monitoring and oversight of case plans to track offender progress toward achieving programming objectives. The plan will determine triggers (i.e., planned or unplanned events) requiring inmate reassessment as well as individual programming establishing the priority and sequence of treatment programs for each offender. This recommendation will also be included as part of the demonstration project.*



*The department requested 66 new positions to conduct the multidisciplinary case planning and management process, to be phased in over three years to match the anticipated schedule for statewide implementation of the case planning and management process.*

### 2. Rehabilitation Strike Team Report

The Rehabilitation Strike Team Report addressed behavior management plans in more detail. As previously noted, the strike team worked with CDCR to develop the Offender Accountability and Rehabilitation Plan (OARP), which will be implemented as part of the demonstration project in Northern California. Preliminary implementation of the demonstration project has begun. The demonstration project will continue to be implemented in phases and will serve as a model for the OARP to ultimately migrate to other institutional sites throughout CDCR.

The OARP is designed to target higher risk offenders with the appropriate dosage and sequencing of treatment to maximize the offender's ability to benefit from rehabilitation. The OARP consists of several components. One OARP component calls for training and installing a multidisciplinary team that will be responsible for determining an offender's risks and needs, directing where the inmate is housed, determining what programming the inmate receives, and specifying the re-entry plan as the offender moves to parole. The Rehabilitation Strike Team Report identified the classification of personnel to serve as multidisciplinary team leaders. In the reception centers, a correctional counselor with expertise in classification and endorsement is to serve as the leader of the

multidisciplinary team. In the prison, a correctional counselor with expertise in treatment programming related to criminogenic needs will serve as the leader of the team, and in the parole region a parole agent will serve as the multidisciplinary team leader.

A second OARP component requires developing and utilizing modern information technology (IT) to automate the behavior management plans so they are accessible from reception center to parole. A third OARP component will routinely assess offenders' risk to reoffend and criminogenic needs to measure treatment gains and revise rehabilitation plans as needed (i.e., using the COMPAS assessment tool), which the department is already implementing.

*Department Progress: The department has developed a draft case planning prototype, as described above.*

### 3. C-ROB Findings

In its last report, C-ROB made the following statements concerning behavior management plans:

- The board had not been informed as to which staff members will comprise the multidisciplinary teams, how their roles will be defined, or who will serve as the case planner. The board also recognized that successful implementation would require that these staff members are adequately trained and assigned reasonable caseloads to effectively complete their jobs.

- The board expressed that effective case management, multidisciplinary treatment, and continuity between treatment in prison and parole settings will be virtually impossible without an effective IT system. Therefore, efforts to improve CDCR's IT system must be expedited.

*Department Progress: Since January, CDCR has identified a potential interim IT solution for the case management process. Specifically, the department has completed a feasibility study for expanding use of the automated COMPAS assessment instrument to all 33 adult facilities. The feasibility study is in the review process. In addition, CDCR has identified that the COMPAS assessment instrument includes functionality for case notes, case plans, and a resource repository that may adequately serve as an interim IT solution pending implementation of CDCR's more comprehensive IT solutions.*

**The C-ROB commends the department on its progress in developing a proposed case management process and identifying a potential interim IT solution to automate it.**

### C. DELIVER PROGRAMS

### 1. Expert Panel Report

The expert panel found that "the CDCR does not offer a sufficient quantity of evidence-based rehabilitation programs designed to reduce recidivism to its adult offenders." The expert panel explained that the effectiveness of rehabilitation programs services depend on the quality, quantity, and content of the programs. The panel suggested that CDCR focus on a small set of programs so that it could establish quality programs and hire and train qualified staff to deliver the programs.

The expert panel made the following specific recommendations:

**"Select and deliver in prison and in the community a core set of programs that covers the six major offender programming areas – (a) Academic, Vocational, and Financial; (b) Alcohol and other Drugs; (c) Aggression, Hostility, Anger, and Violence; (d) Criminal thinking, Behaviors, and Associations; (e) Family, marital, and Relationships; and (f) Sex Offending."**



*Department Progress:  CDCR has selected at least one program for each of the major offender programming areas, with the exception of sex offending. The CDCR is reviewing the research, best practices in other states, and developing options for providing sex offender programming. The department anticipates development of an approach by the next CROB report.*

*An additional resource is the California Sex Offender Management Board's initial report entitled, "An Assessment of Current Management of Adult Sex Offenders in California" in January 2005. The report provides an assessment of treatment options for sex offenders.*

**a. Develop and offer rehabilitation treatment programs to those offenders with high and moderate risk-to-reoffend scores and lengths of stay of six months or more.** Targeting this population of offenders will achieve the greatest gains in recidivism reduction. Treatment for offenders serving life sentences should be assigned based on their release dates.

*Department Progress:  Work plan developed and this recommendation will be included as part of the demonstration project.*

**b. Develop and offer rehabilitation programs focused on work, life skills, and personal growth for all low risk-to-reoffend inmates and parolees who have lengths of stay of six months or more.** Studies show that low risk-to-reoffend inmates and parolees will not benefit from and may be adversely affected by more intensive rehabilitative treatment; it is therefore recommended they be provided programs focused on work, life skills, and personal growth.

*Department Progress:  CDCR has developed initial prototypes for integrated rehabilitative treatment models for in-prison and secure re-entry program settings. The prototypes depart from CDCR's current treatment model which typically allows an offender to engage in only one form of full-day programming at a time (i.e., education, then vocational training, then work). The prototypes provide for a full-day of integrated and varied treatment programming, with tracks based on the predominate needs of the offender and constrained by the offender's time left to serve. These prototypes have been developed for use in the demonstration project.*

**c. Develop and offer re-entry programming for all offenders who have lengths of stay of less than six months.** These offenders do not have sufficient time to enter and complete rehabilitation treatment programs. Therefore, it is recommended they receive re-entry programming to prepare them for reintegrating into their families and communities. The CDCR should provide re-entry programming that includes access to services that will assist offenders in maintaining sobriety, locating housing, and obtaining employment.

*Department Progress:  Work plan developed.*

**d. Develop and offer "booster" programs before re-entry and within the community to maintain treatment gains.** The CDCR should deliver booster programs to its high risk to reoffend inmates before releasing them from prison. They should stack these programs on top of core programs in the major offending programming areas, and they should focus on providing offenders with skills to prevent criminal behavior relapses (i.e., avoiding high risk situations, responding differently, identifying behavioral triggers, etc.).

*Department Progress:  Work plan developed.*

**e. Assign offenders to programs based on responsivity factors relating to their motivation and readiness; personality and psychological factors; cognitive-intellectual levels; and demographics.** Research demonstrates that effective rehabilitation programs identify and account for individual differences in motivational and readiness levels, personality and psychological traits, levels of cognitive and intellectual functioning, and demographic variables. The CDCR should create and deliver front-end, pre-rehabilitation treatment programs to address motivation and readiness factors in its offender population.

*Department Progress:  Work plan developed.*

**f. Develop and offer a core set of programs that is responsive to the specific needs of female offenders.** Research demonstrates that female offenders have different rehabilitation programming needs than their male counterparts.

*Department Progress:  The department has released a Female Offender Master Plan for female offenders closely aligned with the research and recommendations made by the Little Hoover Commission, the National Institute of Corrections, and the American Correctional Association. As recommended by the Little Hoover Commission, the plan provides the framework for a gender-responsive system focused on rehabilitation. This system is supported by a continuum of care that is sensitive to the issues and needs of the female offenders and their families. It includes programs and services within the institutions as well as a strong emphasis on community placement and eventual re-entry into the general community as these women return to their families.*

*Key programs currently being implemented include:*

- *Female Rehabilitative Community Correctional Centers:  Designed with the help of nationally-recognized experts, these facilities provide an evidence-based continuum of care and re-entry model for low-level female offenders housed in the community. Participants will receive wrap-around treatment services. Fourteen pre-activation staff positions were approved in the 2007-08 Budget Act and funding to activate 1,275 beds as well as authority to approve up to 2,000 beds is included in the budget bill for fiscal year 2008-09, currently pending before the Legislature.*

- *Female Residential Multi Service Centers: These facilities provide the continuum of care needed for female parolees. The first 25-bed facility was activated on April 28, 2008, in Sacramento. The department has the authority to contract for 275 beds.*

- *Gender Responsive Substance Abuse and Trauma Treatment: With assistance of a national expert, existing programs were redesigned to include a new trauma-informed treatment model for female offenders. The first 200-bed, Trauma-Informed Substance Abuse Program will be activated at the Leo Chesney Community Correctional Facility by September 2008. Existing in-prison substance abuse programs have also been updated based on the expert's recommendations and are currently being rebid.*

**g. Develop and offer a core set of programs that is responsive to the specific needs of youthful offenders.** Like female offenders, youthful offenders (18-24 years old) also have different programming needs than their older counterparts.

*Department Progress: Work plan pending development.*

## 2. Rehabilitation Strike Team Report

The Rehabilitative Strike Team Report states that in order to meet these crucial objectives, CDCR needs to develop and implement training programs designed to ensure that the case management system is well supported by trained employees and that rehabilitation programs are implemented by well-trained professionals. Staff development and training is addressed in section IV of this report.

The Rehabilitation Strike Team Report also provides significant guidance and specific recommendations concerning rehabilitation programs aimed at increasing an offender's employability once released from prison. The Strike Team Report found that California has several offender employment programs but they are uncoordinated, unevaluated, their capacity is limited, and there are few mechanisms to connect training to post-prison jobs. It also found that the training offered often does not reflect labor market conditions.

The Rehabilitation Strike Team Report strongly recommended CDCR establish a partnership with the California Workforce Investment Board (CWIB) to allow for better coordination of existing employment related programs. The CWIB's mission is to develop policy for the employment of all Californians. The CWIB collaborates with 49 local workforce investment boards and 200 One-Stop centers throughout the state that are authorized by federal law to provide employment assistance to all Californians. The Strike Team Report states,

> "By strategically utilizing this integrated and comprehensive statewide network of One-Stop Centers, the CWIB has the potential to marshal existing resources, including a well-established infrastructure, to support the employment of parolees in their local communities."

The Strike Team Report further recommends that in the long-term, a streamlined offender placement delivery system, New Start, be installed to enable CDCR to partner with an external workforce provider such as the CWIB and its One-Stop Centers to provide a uniform and integrated system for offender placement.

*Department Progress:* CDCR has drafted a plan for implementing the New Start Prison-to-Employment program that will, among other things: use labor market data to determine the types of jobs that will actually be available in each county with projections 10 years out; map existing training and work opportunities in prison to jobs available in communities; provide offenders with individual documents needed to secure employment prior to release (e.g., social security card, birth certificate, etc.), and provide support to seek, secure and maintain employment through a collaborative partnership with the CWIB, local Workforce Investment Boards, and One-Stop Centers to establish the direct connection to employment for offenders returning to communities.

*The department entered into a memorandum of understanding with the Labor and Workforce Development Agency, which oversees the CWIB, local Workforce Investment Boards, and One-Stop Centers, committing to work together in securing employment for offenders being released from prison.*

*The CDCR and the CWIB are also negotiating an interagency agreement to delineate the respective roles and responsibilities of each party in securing jobs for parolees. The interagency agreement is in the process of being finalized. The CDCR and the CWIB are joining efforts to implement the California New Start program using a phased approach to implementation; phase I begins with ten counties and six local workforce investment boards. The CDCR has allocated funds to support this agreement using Recidivism Reduction Strategies monies ($600,000 in fiscal year 2007-08 and $2 million in fiscal year 2008-09).*

*The CDCR has begun to collect and analyze job market data to determine the types of jobs that will be available in each county, which will be used to validate or alter existing vocational programs and to plan new vocational programs to meet future labor market needs. The department has focused on job market data for 10 counties chosen for phase I implementation of the Prison-to-Employment program.*

*The department requested six new positions to establish a CDCR Employment Program Office, which has been included in the budget bill for fiscal year 2008-09, currently pending before the Legislature.*

### 3. **C-ROB Findings**

The C-ROB made the following comments concerning program delivery in its January 15, 2008, report:

- The CDCR must be provided with sufficient resources to ensure effective rehabilitative programming for offenders.

- The CDCR must ensure that appropriate space is constructed or made available for rehabilitative programming.

- Until CDCR has adequate and appropriate rehabilitative programming, C-ROB is concerned about how the department will allocate its limited programs among various offenders.

- Without a complete inventory of existing rehabilitative programs and a statewide assessment of rehabilitative needs, C-ROB cannot determine the gap between available and needed services.

- Eventually, a range of rehabilitative programming will need to be available statewide. At a minimum, at least one program in each of the six major offender programming areas must be available for the demonstration project.

*Department Progress: CDCR has completed inventories of in-prison and CDCR-funded community-based programs. The CDCR has also completed a feasibility study (which is pending final review and approval) exploring the possibility of expanding its COMPAS assessment instrument to make the inventories available electronically throughout CDCR.*

**The C-ROB's concerns regarding program delivery remain unchanged since its last report.**

### D. MEASURE PROGRESS

#### 1. Expert Panel Report

The expert panel found that CDCR does not always measure the quality or effectiveness of its adult offender programs. The panel stated that a commitment to evidence-based rehabilitation programming that works requires correctional agencies to collect programming data from every program delivered and every offender assigned to programming in an automated, systematic, and consistent fashion. The panel further explained that this also means that every program must have clearly defined outcomes. Below are the expert panel recommendations:

**"Develop systems and procedures to collect and utilize programming process and outcome measures."**



**a. The CDCR should develop a system to measure and improve quality in its adult offender programming.** The CDCR should use its programming process and outcome measures data to: (a) determine the effectiveness of its programming as it relates to reducing recidivism or any other stated objective, (b) modify programming that is not achieving desired outcomes, and (c) provide research data for future correctional research projects.

*Department Progress: The department has reported to the board that it has completed extensive research on quality assurance models used to evaluate correctional evidence-based programming and designed an initial quality assurance system. The department has also formed a Quality Assurance Workgroup comprised of CDCR staff from throughout the department to provide feedback and assist in further developing the plan. The workgroup began meeting in May 2008.*

**b. The CDCR should develop the capability to conduct internal research and evaluation that measures and makes recommendations to improve the quality of its programming.** The CDCR should continue to fund and expand its Office of Research. This will give it the internal capability of conducting research projects of varying complexity and allow CDCR to internally measure and improve the quality of its rehabilitation programming by collecting and assessing benchmark data.

*Department Progress: CDCR requested additional resources to expand the capacity of its Office of Research to support implementation and ongoing operation of evidence-based rehabilitative programs. The budget bill for fiscal year 2008-09, currently pending before the Legislature, includes 10 new positions for this purpose.*

c. **The Legislature should create an independent capability to assist with developing and monitoring CDCR's quality assurance system.** The Legislature should permanently fund an independent research entity to assist CDCR Office of Research in: (a) establishing performance measures and outcome objectives for all adult offender programs, (b) analyzing outcome data to measure the effectiveness of all adult offender programming, and (c) recommending cancellation, modification, or addition of programming based on outcome results and current research and best practices.

In addition to the above, the expert panel recommended that CDCR complete the evaluation of its 34 currently offered programs. The expert panel reviewed 11 of the programs using the California Program Assessment Process (CPAP), a tool developed by the University of California, Davis, to determine the extent to which offender risk reduction programs incorporate evidence-based treatment and practices. The panel recommended that CDCR use the CPAP to evaluate the remaining 23 programs.

*Department Progress: CDCR contracted with the Center for Evidence-Based Corrections at the University of California, Irvine, to complete evaluations of the remaining 23 existing CDCR programs, as recommended by the expert panel. Seven of the programs were ultimately excluded from the project because they did not meet the minimum requirements necessary to be considered a "program" for purposes of the project. The evaluations of remaining 16 programs indicate that they have some elements that are in-line with evidence-based practices, although several of the programs received low overall scores.[8]*

## 2. Rehabilitation Strike Team Report

The Rehabilitation Strike Team stated that the OARP will be designed to enable the system to be evaluated in terms of relevant process and outcome measures. The strike team recommended that research address the type and intensity of services provided as well as the appropriateness of services received relative to risk and needs identified in the OARP. Outcome measures will include the rate of recidivism of all offenders provided with OARP-designated treatment programming and services, the level and type of improvements made, successful program completion, compliance with laws and regulations within prison, employment performance, job attainment and retention outcomes, educational and vocation outcomes, and measures related to reintegration into family and other support systems.

*Department Progress: Work plan developed.*

## 3. C-ROB Findings

The CDCR has made some preliminary progress in this area since the last C-ROB report. The bulk of the department's efforts to date appear to have been directed toward establishing baseline measures for existing offender programs, new core programs offered through the demonstration project, the prison-to-employment program, and community-based self help, volunteer, and inmate-led programs.

The C-ROB commented in its January 2008 report that it has not been provided with sufficient information regarding the department's intent to monitor and evaluate ongoing programs. The

---

[8] See, Appendix E.

Board was informed, however, that the department is in the process of developing a comprehensive evaluation plan, which it will share with the board as soon as it is completed.

**The C-ROB commends the department for completing the evaluation of its existing programs and supports the department's request for additional resources for its Office of Research.**

### E. PREP FOR RE-ENTRY, REINTEGRATE, AND FOLLOW-UP

#### 1. Expert Panel Report

The expert panel found that CDCR had begun to focus on offender re-entry issues and initiatives, but that it needed to expand those efforts. Specifically, the expert panel recommended that CDCR establish interagency steering committees at both the statewide and community levels to ensure the appropriate coordination of transition services for offenders being released on parole. In addition to coordinating transition services, the panel recommended that the steering committees be responsible for:

- Ensuring parolees receive access to programs and services in the community that will help them obtain employment, find housing, support their families, and participate in needed counseling;

- Creating formal procedures to improve information exchange between agencies;

- Developing formal protocols to allow agencies to share programming outcomes and offender behavior management program progress;

- Creating training curricula that will ensure program providers and parole staff are cross-trained; and,

- Developing a strategy to educate the public and others about the importance of being involved in the re-entry process of offenders.

*Department Progress: CDCR continues to operate and use the advice of the Statewide Re-entry Advisory Committee to establish successful re-entry models and partnerships.*

The expert panel also made the following recommendations:

## "Continue to develop and strengthen its formal partnerships with community stakeholders."

*Department Progress: CDCR has established a regional community program structure within CDCR to facilitate formal relationships with communities and local governments to plan for offender re-entry. There will be seven regions, each headed by a Regional Community Program Administrator who will be responsible for establishing formal agreements with local governments. The agreements are intended to delineate roles and responsibilities for transitioning offenders from state custody to communities. The goal is to develop a comprehensive approach to targeting services and support to parolees that will reduce recidivism. The regional program administrator positions have already been established and hiring is under way.*

*The department requested resources to establish a local government liaison unit. The budget bill for fiscal year 2008-09, currently pending before the Legislature, includes five new positions for this purpose. It is envisioned that these positions will also be used as part of the regional community program structure mentioned above.*

**a. Develop formal re-entry plans for those offenders with high and moderate risk to reoffend scores.** The re-entry plans should address specific issues including housing, employment, and aftercare treatment related to their rehabilitation treatment programs in prison.

*Department Progress: Work plan developed.*

**b. Provide offenders who have high risks to reoffend with intensive transition services for at least their first 90 days on parole.** In addition to a formal re-entry plan, the expert panel recommended that CDCR provide all of its high risk to reoffend offenders with intensive transition services for a minimum of 90 days.

*Department Progress: Work plan pending.*

**c. Ensure that transition and re-entry programming includes family member participation and addresses family unit integration skills development.** Because healthy family relationships and dynamics are an important aspect of treatment programs designed to reduce offending, the expert panel recommended that CDCR transition and re-entry programming include programs designed to provide offenders with the skills to successfully reintegrate with their families upon release from prison. The programs should include the participation of the offenders' family members whenever possible.

*Department Progress: Work plan developed.*

**d. Ensure that parole programming and transition services respond to the specific needs of female offenders.** Female offenders face specific challenges as they reenter the community from prison. The expert panel recommended that CDCR ensure that its own internal transition programming, as well as those programs and services delivered by community-based partners, are responsive to the specific needs of female offenders.

*Department Progress: Work plan developed.*

The expert panel recognized that reducing recidivism not only involves changing individual offender behavior, but also making changes in the communities – reducing the opportunities for offenders to commit crimes. Therefore, the panel determined that offender programming in the community must include programs designed to continue to reduce offender risk to reoffend and that parole supervision must include a focus on the opportunities to commit crimes that exist in communities where certain neighborhoods or places present unique risks to safety and access to specified victim populations.

As a result, the expert panel made the following recommendations:

**"Modify programs and services delivered in the community (parole supervision and community-based programs and services) to ensure that those services: (a) target the criminogenic needs areas of high and moderate risk offenders, (b) assist all returning offenders maintain their sobriety, locate housing, and obtain employment, and (c) identify and reduce the risk factors within specific neighborhoods and communities."**



> **e. Based on a normed and validated instrument assessing risk to reoffend, release low-risk, non-violent, non-sex registrants from prison without placing them on parole supervision.** Create a "stabilization track" that would provide low-risk offenders the opportunity to receive voluntary services in relation to housing, job placement, and referrals to other needed social services. The offenders on the stabilization track would not be under the authority of CDCR.

*Department Progress: Work plan developed.*

**f. Focus programs and services on the highest-criminogenic needs.** Successful parole strategies must include specific steps directed at reducing the dynamic risk factors related to the criminal behaviors of offenders and those risk factors associated with public safety in the community. The CDCR should target its parole programming resources on the criminogenic needs of its high and moderate risk parolees, from highest needs to lowest, based on their objective risk assessments.

*Department Progress: Work plan developed.*

**g. Ensure that community-based providers develop and deliver programming that addresses criminal thinking for male offenders.** Current experience shows that most community-based programs do not address the criminal thinking patterns of offenders. The CDCR should require all of its community-based service providers to develop and deliver cognitive-behavioral based programming to address these needs.

*Department Progress: Work plan developed.*

**h. Train parole agents how to deal with unmotivated and resistant offenders.** Successful parole programming is enhanced by trained supervision agents. The expert panel recommends that CDCR include courses on how to deal with unmotivated and resistant offenders in its training program for parole agents. This training should include motivational interviewing and engagement skills.

*Department Progress: Work plan developed.*

**i. Train parole agents how to mitigate the community risk factors.** Routine activity theory research indicates that identifying and addressing factors related to the safety of places and access to victims are important considerations for reducing crime. Some geographic locations are criminogenic by virtue of: (a) what activities are occurring there, (b) who is congregating there, and (c) what is not being done there to make those places safe. Therefore, it is extremely important that parole agents become aware of how offenders might access victim pools related to their criminal behavior patterns.

*Department Progress: Work plan developed.*

The expert panel also recognized that communities provide networks of informal social controls that research has found to be more powerful in controlling behavior than more formal social control agencies such as corrections. Informal controls include families, non-criminally involved peers, religious institutions, etc. The expert panel made the following recommendations:

**"Develop the community as a protective factor against continuing involvement in the criminal justice system for offenders reentering the community on parole and-or in other correctional statuses (e.g., probation, diversion, etc.)."**



**j. Develop a strategy for ensuring that the community is able to provide the necessary health and social services to inmates and parolees after they are discharged from the criminal justice system.** Offender populations have significantly higher incidences of substance abuse, mental health concerns, and other debilitating diseases than the general population. Yet, some are not universally available to the offender when they are released. California should develop a strategy for providing released offenders with various services that address their health and social needs.

*Department Progress: CDCR is in the process of inventorying available community resources that serve parolees, including other state agency-funded programs (e.g., alcohol and drug programs, mental health, and women's health programs) as well as programs operated by community-based organizations and volunteer groups. This information will be used to expand the community resource database already established and housed in the COMPAS instrument. It will also be used to identify gaps in community services and support that are most important to successful offender re-entry, based on needs information and geographic location as collected through COMPAS assessments.*

The expert panel also made the following recommendations:

## "Develop structured guidelines to respond to technical parole violations based on risk to reoffend level of the offender and the seriousness of the violation."

The expert panel recognized that there is no evidence to support that CDCR's practice of incarcerating parolees for technical parole violations reduced crime. On the contrary, incarceration is a destabilizing factor for the offender, family, and community, and therefore, even short-term incarceration has a negative impact. In addition, research has shown that difficulties in reintegration are only exacerbated by repeated incarceration periods. As a result, the expert panel found that CDCR does not have a graduated parole sanctions policy to provide community-based alternatives to incarceration for parolees who violate their parole conditions.

**k. Restrict the use of total confinement for parole-violations to only certain violations.** The expert panel recommended that California enact legislation that restricts the use of total confinement for technical parole violations to only those violations that are: (a) a new felony or (b) technical parole violations that are directly related to the offender's criminal behavior patterns, specific dynamic risk factors, and that also threaten public safety. All other parole violations should result in intermediate, community-based sanctions other than prison.

*Department Progress: Although the board has not been provided with information concerning legislation addressing this issue, the department has expanded its use of remedial sanctions as an alternative to incarceration for parole violators. The department's use of remedial sanctions was discussed in more detail in the board's January 15, 2008, biannual report.*

**l. Develop a parole sanctions matrix that will provide parole agents with guidelines for determining sanctions for parole violations.** The matrix should incorporate graduated responses in the parole supervision process that support supervision goals and facilitate successful re-entry. Having agency structured parole guidelines for responding to parole violations will, among other things: (a) allow responses to violations to be more fair and consistent throughout the agency, based on a common set of options appropriate to offender risk level and the seriousness of the violation, (b) provide parolees with clear supervision expectations and consequences for violations, (c) hold offenders accountable by responding swiftly and with certainty to all violations, and (d) support maintaining treatment in the community and pro-social activities.

*Department Progress: CDCR has developed a parole sanctions matrix, which is also called a parole structured decision-making tool for parole violations. The matrix is expected to be implemented in September 2008, along with statewide training of parole agents on how to use the tool. The matrix has both an offender*

*risk score as one dimension and offender behavior as another. Together, they are used to provide parole agents with choices for what they can do in response to individual parole violations.*

### 2. Rehabilitation Strike Team Report

The Rehabilitation Strike Team Report notes that every major report on the California corrections system since the early 1980s has recommended fundamental parole reform. The strike team emphasized the need for, among other parole reforms, use of remedial sanctions, a parole sanctions matrix, and incentives for parolees to participate in rehabilitative programming. These recommendations are addressed above and in section IV.

### 3. C-ROB Findings

In January 2008, C-ROB found that although the department appeared to be working hard to coordinate re-entry efforts, the stigma and resistance to identifying sites for these facilities continued to be problematic. The board also found that the department would benefit from expanding its collaborative efforts with law enforcement to include key leaders of community service systems to maximize support for re-entry efforts.

**The C-ROB has not received sufficient information upon which to fully evaluate the department's efforts concerning re-entry and reintegration. The preliminary information received suggests the need for increased collaboration between CDCR's Adult Programs, the Division of Adult Parole Operations, and the Board of Parole Hearings. To date, C-ROB has worked most closely with CDCR's Adult Programs. The board intends to work more directly with the Division of Adult Parole Operations, the Corrections Standards Authority, and the Board of Parole Hearings in preparation for its next biannual report.**

## IV. CAPACITY FOR REHABILITATIVE EFFORTS

While the primary focus of C-ROB's mission and its biannual reports is to examine the availability and effectiveness of rehabilitative programming throughout CDCR, the expert panel and the department have recognized that some basic capacity issues must be addressed in order to achieve sustainable change. Toward that end, C-ROB includes information in its biannual reports related to those areas considered essential to establishing the necessary capacity for rehabilitative programming, including reducing overcrowding, expanding incentives for offenders to engage in rehabilitative programming, and improving staff development and training.

### A. REDUCE OVERCROWDING

#### 1. Expert Panel Report

The expert panel found that the state of overcrowding in CDCR prisons was the largest barrier to delivering effective programming in CDCR facilities. The panel examined available space for offender programming, including treatment beds and classrooms as well as institutional safety issues. The Expert Panel Report stated that CDCR facilities were built to hold 100,000 inmates; however, as of June 2007, CDCR was housing 172,385 inmates. Approximately 18,000 of those inmates were living in spaces designed for inmate programming. The expert panel recognized that overcrowded prisons present serious safety concerns for inmates and correctional staff. When violent incidences

and other disturbances occur, CDCR responds by significantly reducing inmate movements and cancelling most inmate programs in the affected area.

In addition to overcrowding in prisons, the expert panel also found that the large number of offenders on parole had resulted in unmanageable case loads for parole agents and more offenders needing treatment than the community-based program providers could treat. In response, the expert panel made the following recommendation to CDCR:

### *"Reduce overcrowding in its prison facilities and parole offices."*

As previously reported by C-ROB, the board has received testimony from the department regarding its efforts to reduce overcrowding through its infill bed plan and out-of-state transfers. Both of these processes are specifically authorized by AB 900. However, there are several other significant considerations that must be taken into account as part of the department's overall plan to reduce overcrowding in its prisons and parole offices. For example, the construction of health-related facilities by the health care receiver's office, acquisition and construction of secure re-entry facilities, updated inmate and parolee population projections, and significant parole reforms must be taken into consideration.

> *Department Progress:  On June 18, 2008, CDCR released a report entitled, "Integrated Strategy to Address Overcrowding in CDCR's Adult Institutions." The report provides an overview of significant considerations the department must take into account in addressing prison overcrowding. Specifically, the department's strategy takes into account the following considerations:*
>
> - *Expanded capacity through implementation of AB 900;*
>
> - *Construction of health-related facilities by the Receiver;*
>
> - *The Administration's proposed budget and policy reforms;*
>
> - *Analysis of short and long-term population trends; and,*
>
> - *Three-Judge Panel proceedings*
>
> *The CDCR expressed its commitment to immediately begin construction of AB 900 infill beds. Assembly Bill 900 authorized the construction or renovation of up to 16,000 infill beds. The CDCR has yet to build any of the infill beds. To date, the department has commenced architectural programming, environmental reviews, community outreach, building code revisions and site assessments for infill construction of 4,800 beds at the following locations:  El Paso Robles (former juvenile justice facility), Kern Valley State Prison, North Kern State Prison, and Wasco State Prison. The program designs include housing capacity that provides full programming and medical treatment space. These beds are slated for groundbreaking between December 2008 and June 2009.*
>
> *In addition, the budget bill for fiscal year 2008-09, currently pending before the Legislature. includes funding for constructing an additional 1,702 beds at San Quentin State Prison, primarily to house condemned inmates. It also includes funding for the department to contract for up to 2,000 additional beds for female adult offenders. These projects will also increase CDCR's inmate capacity.*

*The medical receiver appointed by the federal court announced his intent to construct health-related facilities housing up to 1,500 inmates each, for a total of 10,000 inmates. The department is operating under the assumption that the receiver will receive the authority and funding to construct these beds. The beds are projected to be built by the end of fiscal year 2012-13, with 5,000 of them expected to be completed in fiscal year 2011-12.*

*Assembly Bill 900 also authorized 16,000 secure re-entry beds. The CDCR plans to build 3,000 re-entry beds as part of phase I and up to 11,000 re-entry beds in total. The department has begun developing the building prototypes, determined site acquisition parameters, and begun negotiations for re-entry facility construction.*

*Assembly Bill 900 tied funding for construction of new local jails to the establishment of secure re-entry facilities. The Corrections Standards Authority has conditionally awarded $750 million to 13 counties that have agreed to assist the state in identifying sites for future secure re-entry facilities. The CDCR will be identifying which sites are ready to begin the acquisition process at the Corrections Standards Authority's meeting in September 2008. The CDCR will then develop a re-entry facility plan and schedule based on the initial sites.*

*Plans to convert the former women's facility in Stockton into CDCR's first re-entry facility are underway. When completed, the facility will house up to 500 inmates. The CDCR expects the facility to be ready for inmates by Summer 2009.*

*Please refer to Section C, below for a discussion of parole reforms (proposed and implemented) affecting inmate and parole populations.*

*For the first time in six years, the inmate population is projected to decrease. According to the Spring 2008 population projections, CDCR's inmate population was projected to be 171,126 on June 30, 2008, which is 4,292 fewer inmates than the department projected it would have at that time when it released its populations projections in Fall 2007. The CDCR attributes this reduction in projected inmate population to a decrease in the number of inmates being sentenced to state prison and a decrease in the number of parole violators returned to custody.*

*In addition to the above, CDCR has continued to expand its program for transferring inmates to contracted facilities out-of-state. The CDCR has contracted for 8,132 beds with six out-of-state facilities. As of May 2008, the department has transferred 4,020 inmates to these facilities. The department expects to transfer a total of 8,000 inmates to out-of-state facilities by May 2009.*

## 2. Rehabilitation Strike Team Report

The Rehabilitation Strike Team Report reemphasized the critical need to reduce overcrowding. However, it did not make specific recommendations other than those associated with parole reforms, which are discussed in section III(E), above.

## 3. C-ROB Findings

In its last report, C-ROB expressed concern about the potential for significant overlap between the department's efforts and those of the medical receiver appointed by the federal court. The board found that effective coordination will be required to address this overlap.

*Department Progress: CDCR has shown considerable progress in coordinating its efforts to construct new infill beds with the receiver's office plans to construct health-related facilities. This is evidenced by the department's "Integrated Strategy to Address Overcrowding in CDCR's Adult Institutions" report discussed above.*

**Although the department has shown considerable progress in coordinating its efforts with the receiver's office concerning the construction of additional inmate beds, C-ROB remains concerned about the department's coordination with the receiver's office on a variety of other issues where there may be competing interests, such as the need for programming space, additional staff, and resources.**

## B.  EXPAND INCENTIVES

### 1.  Expert Panel Report

The Expert Panel Report states, "If California wants its offenders to participate in rehabilitation programming, it must motivate them to complete rehabilitation programs and positively manage their behaviors." The panel found that CDCR treats offenders who successfully complete rehabilitation programs and positively manage their behaviors in roughly the same manner as those who do not.

The expert panel made the following recommendation:

***"Enact legislation to expand its system of positive reinforcements for offenders who successfully complete their rehabilitation program requirements, comply with institutional rules in prison, and fulfill their parole obligations in the community."***

*Department Progress: The board has not received testimony from the department regarding legislation to expand positive reinforcements for offender programming. However, CDCR has drafted a comprehensive discussion paper on the various options for expanding offender incentives. The paper suggests reinstituting privilege and disciplinary processes; revisiting the current inmate assignment process; and, establishing tangible earned incentives both financial and work time credit. In addition, the paper discusses the need to extend incentives to parole by potentially linking behavior to earned discharges from parole or special conditions of parole. The department is considering creating a menu of incentives, some of which would not require legislation or new funding. Examples include enhanced yard time for inmates, or allowing inmates time out on the yard at nighttime, expansion of inmate visiting, increased phone access, additional quarterly packages or canteen draw, etc. The CDCR has also identified potential incentives specific to academic and vocational education. The draft discussion paper is pending review.*

**a. Award earned credits to offenders who complete any rehabilitation program in prison and on parole.** As explained in the Expert Panel Report, earned credits are currently awarded to offenders assigned to conservation camps to fight fires and perform other public services tasks. They are also awarded to offenders who participate in the Bridging Educational Program. The panel recommended that this incentive be expanded to offenders who participate in any rehabilitation program.

*Department Progress: Discussion paper pending, as described above.*

**b. Replace work incentive program credits with statutorily-based good time incentive credits.** Currently, many offenders can receive "good time" credits to reduce their sentences by up to 50% but only if they are able to receive work incentive program credits. Inmates are able to receive these credits if they are able to access specified programs. However, many inmates cannot access the programs due to limited program capacity. The expert panel recommended that the Legislature pass a law that would allow CDCR to grant "good time" credits to inmates who comply with institutional rules. This would motivate inmates to manage their behaviors in prison.

*Department Progress:  C-ROB is unaware of any pending legislation.*

**c. Implement an earned discharge parole supervision strategy for all parolees released from prison after serving a period of incarceration for an offense other than those listed as serious and violent under CPC 1192.7(c) and 667.5(c) criteria.** The expert panel recommended that legislation be enacted that would authorize CDCR to discharge specified parolees from parole supervision earlier, based on a variety of positive behaviors.

*Department Progress:  C-ROB is unaware of any pending legislation. However, CDCR unveiled a small "earned discharge" pilot program in the Counties of Orange and San Bernardino in September 2007. The project is currently under evaluation.*

## 2. Rehabilitation Strike Team Report

The Rehabilitation Strike Team Report examined the need to expand incentives for parolees to participate in rehabilitative programming such as drug treatment, job training, and educational programs. The report found that one of the most powerful incentives for parolees is the ability to earn a shorter parole supervision period, or "earned discharge." The strike team recommended that CDCR provide incentives to encourage parole success and accelerate parole discharge for exemplary parolees. The report states,

> "By providing the opportunity for an accelerated release date as an incentive, parole agents and the Board of Parole Hearings can motivate prisoners to participate in targeted interventions and behavior that will increase their chances of successful transition into society."

The report explains the laws governing parole discharge. Specifically, it states that California Penal Code section 3000 authorizes the Board of Parole Hearings to discharge a parolee at any time during the parole period. It further explains that non-violent, non-serious offenders are mandated to be discharged from parole 30 days after serving 12 continuous months of violation-free parole. Serious and violent offenders are eligible to be discharged 30 days after serving 24 continuous months of violation-free parole. The report also explains the process for discharging a parolee from parole. The current process requires DAPO to submit a recommendation for discharge to the Board of Parole Hearings.

According to the Rehabilitation Strike Team Report, one of the significant challenges to implementing the earned discharge proposal is the growing disparity between DAPO recommendations and Board of Parole Hearing decisions. During 1995-96, the Board of Parole hearings agreed with DAPO recommendations to discharge offenders from parole about 50 percent

of the time. In 2006-07, the Board of Parole Hearings agreed with DAPO recommendations in only 20 percent of the cases.

The strike team identified an additional impediment to overall parole reform involving the Board of Parole Hearings. Approximately one-third of parolees were committed to state prison as a result of a violent or serious offense. When these parolees violate any condition of their parole, the determination of whether the violation results in a revocation of their parole status (and, therefore, a return to prison) rests with the Board of Parole Hearings.

For the above reasons, the strike team concluded that none of the parole reforms recommended in the Strike Team Report can occur without Board of Parole Hearings support.

> *Department Progress: CDCR's earned discharge pilot project in the counties of Orange and San Bernardino has been implemented and is currently under evaluation.*

### 3.  C-ROB Findings

The previous C-ROB report did not include findings concerning the expansion of offender incentives for behavior modification and rehabilitative programming participation.

**The C-ROB finds that enacting legislation to expand incentives for inmates and parolees to successfully complete rehabilitation programming, comply with institutional rules in prison, and fulfill their parole obligations in the community needs to be a priority for the Legislature and Governor.**

**The C-ROB finds that if parole reform is to be successfully implemented, there needs to be better coordination between the DAPO and the Board of Parole Hearings. In addition, the growing disparity between DAPO recommendations to discharge parolees from parole and Board of Parole Hearings' parole discharge decisions needs to be examined.**

## C.  STAFF DEVELOPMENT AND TRAINING

### 1.  Expert Panel Report

The Expert Panel Report recognized the critical importance of having well-training security-supervision and rehabilitation treatment-programming staff. However, the expert panel did not make any specific recommendations regarding staff development and training other than those listed in section III of this report.

## 2. Rehabilitation Strike Team Report

The strike team emphasized throughout its report how crucial proper training of CDCR employees is to successful rehabilitation programming. Properly trained employees are needed to assure rehabilitation is achieved through proper means while in prison and on parole. The strike team recommended that CDCR direct its Office of Training and Professional Development (OTPD) to focus on providing relevant training in rehabilitation techniques to CDCR employees. Due to the large number of CDCR employees and their various locations, the strike team recommended CDCR partner with the California Community College System for employee training. Again because of the large number of employees it was recommended that CDCR train staff involved in the demonstration project first, and based on that experience, consider how best to train and educate the remaining CDCR employees.

In addition to training parole agents as recommended in the Expert Panel Report (discussed above in section III(F)), the Strike Team Report emphasized the need for CDCR to develop and implement training programs designed to ensure that: (a) the case management system designed to utilize the OARP and the second-order needs assessments are well supported by trained employees charged with implementing the OARP in reception centers, prisons, re-entry facilities, and parole regions, and (b) rehabilitation programs are routinely implemented by well-trained professionals charged with providing key services to offenders in reception centers, prison, re-entry facilities, and parole regions.

*Department Progress:  CDCR is entering into a service level agreement with OTPD to define the roles and responsibilities of OTPD and Adult Programs in planning, designing, and delivering rehabilitative programming training for CDCR staff. Staff have also been redirected to OTPD to create a unit that will concentrate on managing delivery of rehabilitative programming training.*

*The CDCR has completed a staff analysis to determine training needs of all employees by location and job function. Through this they have created a staff training matrix to identify high priority training needs. The department is in the process of entering into interagency agreements with Community Colleges for training courses and staff professional certification. The department requested resources to implement staff training on rehabilitative programming.*

*The department is in the process of making and distributing an orientation video about rehabilitation programming for CDCR employees. They have determined an order in which employees will view the video by job classification as well. The Assistant Director of the Office of Research has conducted an orientation for executives and other key staff on evidence-based principles and practices in correctional rehabilitative programming.*

*They also completed a schedule and began delivery of training to staff administering the COMPAS instrument at reception centers. The department is in the process of completing instructional materials for staff administering the COMPAS instrument at reception centers. The CDCR has started motivational interviewing training for the staff administering the COMPAS instrument at reception centers as well.*

3.  **C-ROB Findings**

The C-ROB did not make any staff development or training findings in its last report.

**The C-ROB supports the department's staff training and development efforts. The tasks identified in CDCR's Master Work Plan are both impressive and daunting, and the board will continue to monitor the department's progress as it begins implementing its Master Work Plan.**

# V. CONCLUSION

Due to the significant achievements of CDCR in recent months, this bi-annual C-ROB report is the most comprehensive to date. The department's development of its comprehensive Master Work Plan for Rehabilitative Programming is an extraordinary step toward improving rehabilitation programming in California's correctional system. The Master Work Plan will serve as a strong foundation for change, and it is now up to the department, the Governor, Legislature, and the public to support the plan's implementation.

The road to effective rehabilitation programming in California's correctional system will be long and arduous; however, C-ROB cannot emphasize enough the need for all stakeholders to remain focused on the long-term objectives.  Improving public safety by reforming the state's correctional system into a sustainable and effective rehabilitation-based model will require substantial investment and many years of committed leadership and political will.