# EXHIBIT AA

**FOR SUBMISSION TO THE *COLEMAN* SPECIAL MASTER**
*California Department of Corrections and Rehabilitation's*
*Mental Health Bed Plan*
*July 16, 2008*

## I.     Overview

### A.     Background

On December 19, 2006, the California Department of Corrections and Rehabilitation (CDCR) submitted to the *Coleman* Court the Mental Health Bed Plan – December 2006, which was a plan to meet through construction and reorganization, the treatment and office space, outpatient housing and inpatient bed needs for the projected mental health inmate-patient population.  In reply to the Special Master's response to that plan, in August 2007, CDCR submitted a supplemental bed plan that included more detail regarding the CDCR's plan to assume responsibility for treating inmate-patients in acute and intermediate care (inpatient) settings.  By order on October 17, 2007, the *Coleman* Court approved the Special Master's report and approved the August 2007 Supplemental Bed Plan with the requirement for further planning on the issues identified below.

Since the August 2007 Supplemental Bed Plan was approved, the CDCR, the Department of Mental Health (DMH), the *Coleman* Special Master and the *Plata* Medical Receiver (Receiver) have been working in partnership to implement the plan in conjunction with the Receiver's facility plan.  Intensive collaborative, programmatic and preliminary design planning efforts were commenced and are continuing.  Adjunctive to the collaboration effort, the CDCR has continued to pursue the planning processes, including the Capital Outlay funding process, to implement the "Consolidated Care Centers" as outlined in the Supplemental Bed Plan.

On February 26, 2008, the *Coleman, Plata, Perez* and *Armstrong* courts approved the "construction agreement" for collaborative "construction of approximately 5,000 additional CDCR medical beds and approximately 5,000 CDCR mental heath beds." The construction agreement provides that the Receiver "will assume leadership responsibility for each of the…projects."  Additionally, the order states, "Given the significant need to coordinate the long-term treatment and care of mentally ill patients who also have serious medical problems, there exist both strong patient care and fiscal incentive to plan, design, and construct health care facilities that will effectuate coordinated medical and mental health treatment.  Therefore participation by *Coleman* representatives in this construction program is imperative." The CDCR's Mental Health Program of the Division of Correctional Health Care Services, along with the DMH, participates regularly in the planning for these facilities.  This court mandated collaboration has required reconfiguration of the long term mental health bed plan approved by the *Coleman* court on October 17, 2007 in order to conform to the "construction agreement" order and the design and location requirements of these facilities.

Furthermore, in June 2008, CDCR and the DMH reached agreement that the DMH would continue to provide all inpatient acute and intermediate mental health services instead of transferring responsibilities to provide those services to the CDCR. The reconfiguration of the bed plan also incorporates this decision.

Two of the Receiver's new health care facilities will accommodate the DMH inpatient acute and intermediate mental health services. These mental health programs will be operated by the DMH in collaboration with the Receiver's medical, the CDCR mental health and the CDCR/Receiver custody programs. At each facility, these four discreet but interrelated programs are proposed to be under the overall management of a Health Care Chief Executive Officer who will be the controlling administrative authority for each facility's development and operations.

In addition, the projected number and types of beds identified in the December 2006 Mental Health Bed Plan and the August 2007 Supplemental Bed Plan are based on the June 2006 Mental Health Bed Need Study – 2006 Update ("Bed Need Forecast"). The current bed plan and this response identifies projected mental health bed need based on the "Mental Health Bed Need Study – Based on Spring 2008 Population Projections, June 2008," which updates the previous plan.

**B.    Purpose of Report**

In addition to updating the long term mental health bed plan, this report responds to the October 17, 2007, *Coleman* Court order, requiring the CDCR to submit to the *Coleman* Special Master the following plans:

- A plan for identifying anticipated clinical and custody staffing needs and a program for providing the personnel required to recruit, vet, hire and retain adequate staffing;

- A plan for the recruitment and compensation of hospital administrators to develop and run California Department of Corrections and Rehabilitation's overall inpatient treatment program and the specific institutional inpatient programs in its consolidated care centers;

- Preparation of a memorandum of understanding (MOU) on California Department of Mental Health's mentoring and direct service obligations under the revised plan for integration in an inter-agency agreement; and

- An analysis justifying the reduction and/or elimination of mental health crisis beds (MHCB) (as recommended) in the revised August 2007 plan in the 29 California Department of Corrections and Rehabilitation institutions that are not scheduled to deliver consolidated care.

- A plan with time frames for meeting and procuring for all CDCR-operated inpatient programs applicable State Licensure and Joint Commission on Accreditation of Healthcare Organizations accreditation.

The numerous proposed modifications to the August 2007 Supplemental Bed Plan, based in a variety of issues, render some of the plans requested above irrelevant or significantly altered.  This document identifies the bases for the originally requested plans as well as the changes that have occurred that drive the revisions.

## C.    Context

There have been four elemental changes since the August 2007 Supplemental Bed Plan:  the construction collaboration order which made formal the coordination of the construction of mental health beds with the Receiver; the consolidation of the acute and intermediate care beds into fewer facilities; the agreement that the DMH continue to manage and provide inpatient acute and intermediate mental health services; and the incorporation of female mental health facilities into the collaboration agreement.  In addition, the coordination agreement provided for the inclusion within the Receiver's facility program, the mental health beds that were contained in the original bed plan (with few exceptions that are described later in this document) and the ability to consider the most appropriate use of beds within existing facilities.

Based on historical evidence of the existence of co-morbidity between mental illness and physical illness, there are strong patient care and fiscal incentives to plan, design and construct health care facilities that will coordinate medical and mental health treatment.  The construction collaboration agreement establishes a significant change to the substance of the mental health bed plan.  Instead of constructing "consolidated care centers" for mental health services only, the bed needs have now become integrated into a series of stand-alone health care facilities, California Health Care Facilities (CHCF), which will provide comprehensive medical and mental health services.  While this integration supports the essential and appropriate relationship of these major health care disciplines and provides substantial economies related to their joint construction and operation, it also requires significant coordination of these elements.

As the planning for mental health services has continued to evolve, strategies for the provision of the highest levels of mental health care, inpatient acute and intermediate have changed significantly from both the December 2006 and August 2007 Bed Plans.  Originally, the consolidated care centers would each have intermediate care as part of the continuum of mental health care provided in each facility.  The current plan is based on the decision that the DMH continue to provide inpatient intermediate and acute mental health services, and allocates space in two of the CHCFs, one in the northern part of the state and one in the south.  All inmate-patient intermediate and acute mental health services will occur in these two new facilities, thereby allowing *Coleman* court ordered state hospital beds to be returned to community use.  These DMH inpatient mental health programs will be operated by the DMH in collaboration with the Receiver's medical, the CDCR mental health and the CDCR/Receiver custody programs.  Furthermore, when both of these CHCFs are operational, there will be no provision of acute or intermediate levels of care outside the CHCFs.

During the evolutionary process, the female mental health bed need was incorporated into the planning of these facilities.  The women's facilities would be co-located with up

to two of the men's facilities, thereby allowing for some shared services and economies of scale. In these settings, the women's facility will share a secure perimeter with the men's facility. The interior of the facility will have gender-separating sight, sound and physical barriers formed from walls naturally occurring from building--housing and treatment--space that would normally be separate even in a single gender facility. It is the task of the architects to develop a design that does this effectively and efficiently.

Construction sites and schedules for the CHCFs are still in development, with anticipation of the first 1500-bed facility targeted to begin construction in January 2009, anticipating completion by January 2011. There are eight sites being considered; land availability, infrastructure capability, environmental concerns, and political climate, among others, drive the ability to select, schedule and begin construction.

The planning for the delivery of mental health services for the CHCFs is based on the Receiver's current construction schedule and is the basis for the current plan and the response to the five issues. Once sites, facility bed configuration and construction schedules are known, a further update and status report can be provided to the Special Master. It is recommended that these status reports key on specific elements that are necessary to provide a full response to the questions: (1) projected dates for completion of each of the CHCFs; (2) the configuration of both the CDCR and the DMH mental health beds that correspond with the final planning and design for these facilities; and (3) the operational plan for the facilities, which will include the governance, administrative and clinical structure and authority of the Receiver, the CDCR and the DMH. The operational plan for the CHCFs will address licensure, the medical staff function, the role of the DMH Governing Body, pharmacy licensing and medication issues, and the overall operating process and procedures. Finally, we expect to conform the entire bed plan documentation to these determinations when they are made, which will culminate in a motion to the court requesting the formal adoption of the changes made from the current approved plan.

## D.    Updates/Changes

In the bed planning process, all essential elements of the August 2007 Supplemental Bed Plan are being upheld using the same methodology for determining the number and type of beds. For their programs, the CDCR will continue to plan and provide for a continuum of care within the CDCR Mental Health Program Guidelines. The CDCR remains responsible for providing the appropriate number of beds, office and treatment space for the required levels of care. However, in collaborating with the *Plata* Receiver, several specifics have changed from the August 2007 bed plan. This section of this document reflects the changes that have occurred that drive these alterations to date. Areas with updates and changes are: facility planning and locations, division of construction activities, delivery of clinical services, and population projections.

| Facility Planning and Locations | | |
|---|---|---|
| Date | Decision/Proposal | Impact |
| August 2007 | Began informal collaboration with the Receiver regarding the design and construction of consolidated care centers. | Staff was dedicated to collaborating with the Receiver while continuing to pursue funding for the consolidated care centers should the collaboration not occur. |
| October 2007 | The original bed plan called for five new facilities of varying size. The Receiver proposed seven facilities with approximately 1500 beds each—750 Medical and 750 Mental Health. | Required a change from the August 2007 Supplemental Bed Plan and plan for a new distribution of beds across undetermined sites. (Compare Attachment A: August 2007 bed chart to Attachment B: June 2008 chart)<br><br>Created the need to continue on two planning tracks (the normal Capital Outlay –Budget Change Proposal process and the Receiver's planning track) in order to stay in process for either eventuality. |
| November 2007 | The five sites in the August bed plan were partially inconsistent with the Receiver's seven proposed sites. | Created a conflict with the August 2007 Supplemental Bed Plan which was crafted with specific sites on which to build consolidated care centers. The logic behind the original proposed creation of new beds at specific sites and the proposed decommissioning of mental health beds at other sites (returning them to the institution) was no longer as valid as long as different sites were proposed. |
| | The eight sites currently proposed for consideration are:<br>• Northern California Youth Center, Stockton<br>• California State Prison (CSP) – Sacramento (SAC)<br>• Deuel Vocational Institution, Tracy<br>• Ventura Youth Facility<br>• R. J. Donovan Correctional Facility (RJD)<br>• California Institution for Men (CIM), Chino<br>• Nellis/Whittier<br>• California Medical Facility (CMF)/CSP-Solano | Required reconfiguration of supplemental bed plan beds and a change in the bed plan chart. (Compare Attachment A: August 2007 bed chart to Attachment B: June 2008 chart) |

| Feb. 2008 | Courts approved the "construction agreement" for collaborative "construction of approximately 5,000 additional CDCR medical beds and approximately 5,000 CDCR mental heath beds." Order gave the Receiver the lead in the construction process. | Gave the Receiver the authority to lead the planning, design and construction projects for health care. Tied the CDCR construction schedules and locations to Receiver's plan. |
|---|---|---|
| January-June 2008 | Reduced number of sites planned to include Intermediate Care (ICF) beds from five identified in the August 2007 Supplemental Bed Plan to two facilities built by the Receiver's program.<br><br>This change is to provide for all ICF and acute bed need in new facilities to accommodate the DMH's continuing provision of these services. | Required multiple reconfigurations of supplemental bed plan beds and changes in the bed plan chart to reflect changing locations of ICF beds. (Compare Attachment A: August 2007 bed chart to Attachment B: June 2008 chart)<br><br>Creates the ability to provide ICF and acute care in both northern and southern locations. Allows state hospitals to redirect beds to community care and away from inmate care. Allows for institution beds to be returned to institutional use. |
| March 2008 | Included women's beds in Receiver's CHCF projects at two locations. Women's facilities are to be built with sight and sound barriers to share some services and create economies of scale. | A larger number of beds, and therefore larger facilities, are planned for two sites: one in the North and one in the South. Required reconfiguration of bed plan chart. (Compare Attachment A: August 2007 bed chart to Attachment B: June 2008 chart) |
| May 2008 | Redistributed 5 MHCB from Ironwood State Prison to:<br>1-Pleasant Valley State Prison (1 bed) and Substance Abuse Treatment Facility (4 beds) | Required reconfiguration of MHCB in bed plan chart(Compare Attachment A: August 2007 bed chart to Attachment B: June 2008 chart) |
| June 2008 | Planned decommissioning of existing Enhanced Outpatient Programs (EOP) and Administrative Segregation Units (ASU) at RJD, CSP-Los Angeles County (LAC) and SVSP. | Required reconfiguration of bed plan chart to accommodate changes. |

|  | Increased by these numbers of beds the mental health program within the Receiver's CHCF project. | Requires additional transition planning for both staff and inmate-patients. |
|---|---|---|

| Division of Construction Activities | | |
|---|---|---|
| **Date** | **Decision/Proposal** | **Impact** |
| March 2008 | Maintained the following projects by CDCR:<br>• 64-bed ICF at Salinas Valley State Prison (SVSP)/Salinas Valley Psychiatric Program (SVPP)<br>• 64 bed ICF at CMF/Vacaville Psychiatric Program (VPP)<br>• 50 bed MHCB at California Men's Colony (CMC)<br>• 32 bed MHCB at San Quentin State Prison (SQ)<br>• 50 bed MHCB at CMF<br>• 67 EOP beds at CMF | Required update to original bed chart to delineate between Receiver's project and CDCR's projects. (Compare Attachment A: August 2007 bed chart to Attachment B: June 2008 chart) |
| June 2008 | To accommodate agreement whereby the DMH assumes responsibility for the inpatient acute and intermediate mental health services, the CDCR has moved the new and existing ICF beds from CDCR projects (SVSP/SVPP and CMF/VPP) into the CHCF construction projects. | Required update to chart and placement of all ICF bed need into CHCFs. (Compare Attachment A: August 2007 bed chart to Attachment B: June 2008 chart) |
|  | Maintained the following projects to be constructed by CDCR:<br>• 50 bed MHCB at CMC<br>• 32 bed MHCB at SQ<br>• 67 EOP beds at CMF<br>• (50-bed MHCB at CMF is activated.) | Treatment space must still be built to provide treatment until new facilities are built and activated. |
| June 2008 | Decision to move EOP programs from RJD, LAC, and SVSP into the CHCFs. | Placed more beds into the CHCFs. Allows for these beds to be returned to institutional use and eliminates the requirement for additional treatment and office space at LAC. |

| | | Requires update to bed plan. (Compare Attachment A: August 2007 bed chart to Attachment B: June 2008 chart) |
|---|---|---|

| Delivery of Clinical Services | | |
|---|---|---|
| **Date** | **Decision/Proposal** | **Impact** |
| November 2007 | Interpreted philosophy of behavior-based treatment and placement by replacing the Psychiatric Services Unit (PSU) and ASU with EOP-High and creating an ICF-High instead of using the current classification system | Discussion is ongoing about creating another system by which patients are placed in certain beds. This system will be clinically based and will depend on current behavior. This creates concern among custody staff that relies on the current classification system for placement. It may create the need to staff differently and create new policies and procedures. |
| April 2008 | The Courts ordered a coordination agreement regarding the Chief Executive Officer Pilot program. | This new governance structure is expected to be incorporated into the management structure of the operational plan for the joint facilities.<br><br>Requires modification of Supplemental Bed Plan regarding administrative/ management structure. |
| June 2008 | The decision for the DMH to continue to provide inpatient acute and intermediate mental health services to CDCR inmate-patients in the newly constructed health care facilities. | Required modifications to the August 2007 Bed Plan. The modifications are as follows:<br>• Two new CHCFs will accommodate the DMH inpatient acute and intermediate mental health services. These mental health programs will be operated by DMH in collaboration with the Receiver's medical, the CDCR mental health and the CDCR/Receiver's custody programs.<br>• Inmates requiring inpatient acute and intermediate mental health services removed from the DMH *Coleman* court ordered state hospital, VPP and SVPP beds and placed in new facilities.<br>• Requires the addition of beds for inmates identified as PC1370 inmates.<br>• Eliminates mentoring aspect of the August 2007 Supplemental Bed Plan |

| | | |
|---|---|---|
| | | in that DMH will staff and run the inpatient program.<br>• The current inpatient ICF and Acute beds at CMF/VPP and SVSP/SVPP will be put to another use.<br>(Compare Attachment A: August 2007 bed chart to Attachment B: June 2008 chart)<br><br>Additionally an Interagency Agreement between DMH and CDCR is required to clarify and formalize the clinical services agreement. |
| June 2008 | Mental Health Staffing Workload Study Model approved. | The workload study model will provide the mechanism for appropriate clinical staffing of the Correctional Clinical Case Management System (CCCMS), EOP and MHCB levels of mental health care within CDCR. |
| June 2008 | Activated 50-bed MHCB at CMF. | Shown as operational. (See Attachment B: June 2008 Chart.) |

| Population Projections | | |
|---|---|---|
| **Date** | **Decision/Proposal** | **Impact** |
| June 2008 | Mental Health Bed Need Study – Based on Spring 2008 Population Projections was published. | Required creation of bed plans with bed need projections to 2017. Alters new bed need numbers; requires reallocation of beds in Receiver's building program. (Compare August 2007 to June 2008 chart.) |

**E.   Compilation of *Coleman* Court Orders related to the Long-term Mental Health Bed Plan**

The preceding table of changes variously addresses and impacts multiple orders from the *Coleman* Court regarding the creation of mental health beds, treatment space, and office space. Attachment C of this document maps each *Coleman* court order related to creation of space by date and content; the actual and/or proposed entity with which the responsibility for providing that space lies; and the status of each of the projects emanating from the orders.

## II.    Specific Plans Required by the October 17, 2007 *Coleman* Order

### A.    Identifying Clinical and Custody Staffing Needs and a Program for Providing the Personnel to Recruit, Vet, Hire and Retain Adequate Staffing

**Identifying Staffing Needs**

Historically, the CDCR has had difficulty in obtaining adequate staffing and filling clinical vacancies within its mental health program.  Initially, staffing requirements for each level of care were outlined in the Mental Health Program Guide.  As long as the program guide's original assumptions remained static, the clinician to inmate-patient ratios identified were appropriate.  However, as the mental health program developed and grew, and as the inmate-patient population grew with the prison population, the original assumptions began to change and the appropriateness of staffing levels was thrown into question.

In Fiscal Year 2006-2007, in order to re-establish credible and viable staffing complements, a workload study was commissioned.  The completed study, called the Mental Health Staffing Workload Study – June 2007, identified actual workload and workload drivers and developed a comprehensive compendium of tasks required by level of clinical staff to fully achieve the objectives of the Mental Health Program Guide. The workload study, which proposed revised program staffing levels, and a corresponding Budget Change Proposal (BCP) requesting additional positions to support the recommendations of the workload study were submitted to the Legislature on April 1, 2008.   In June 2008, the BCP was approved by the Joint Legislative Conference Committee on the Budget.

The Mental Health Staffing Workload Study – June 2007 also created a template from which future CCCMS, EOP and MHCB can be clinically staffed.  The CDCR is using this study and the incorporated staffing formula for planning purposes.  The level and size of treatment program, as well as the type of facility in which the program is housed, dictate the numbers and classifications of clinical and support staff required in order to be consistent with the mental health program guidelines and requirements.   Projected staffing patterns are being determined through the use of the workload study formulas for the EOP and MHCB levels of care.

Under the administrative oversight of the Chief Executive Officer of the CHCF, the DMH will be responsible for operating and providing inpatient acute and intermediate mental health services in collaboration with medical, CDCR mental health and CDCR/Receiver custody programs.   This requires that DMH be responsible for planning for and obtaining appropriate staffing (including Registered Nurses and Medical Technical Assistants – Psychiatric) for the respective levels of care.  It is anticipated that the staffing will be similar to those already established and used by the DMH at SVPP and VPP.

Under the direction of the Receiver's office, comprehensive operational planning for these facilities has begun but has not yet been completed. Upon completion of the Operational Plan, and the establishment of firm construction locations and dates, staffing plans will be produced which include recruitment, hiring and retention planning. Custody staffing patterns for mental health operations are also being determined through joint operational planning with the Receiver.

**Functional Staffing Areas**

The August 2007 Supplemental Bed Plan describes a CDCR headquarters management structure in which a Deputy Director reports to the Statewide Director of Mental Health. The plan further states that the Deputy Director position (which has been established) will administer two functions: 1) the statewide development and oversight of the mental health programs in the joint facilities and 2) the statewide support of these programs. Reporting to the Deputy Director will be mental health program managers of each facility and an Assistant Deputy Director who is responsible for the statewide support function.

As part of administrative and management planning, CDCR and the Receiver have collaborated on a proposed "shared governance" agreement, whereby a health care Chief Executive Officer is to be "responsible for health care delivery systems within one or more specified institutions as a means of ensuring coordinated multi-functional services and interdisciplinary interactions within a prison that are vital to a manage care delivery system." This governance structure is expected to be incorporated into the management structure of the operational plan for the CHCFs. It is anticipated that the "shared governance" agreement will significantly alter the headquarters management structure described in the August 2007 Supplemental Bed Plan. It has yet to be determined how the separate DMH inpatient mental health programs will be integrated into the governance, administrative and management planning of the two CHCFs where the DMH has programs.

Three functional areas of the CDCR mental health program staffing are in development: (1) the headquarters-based team tasked with conceptualizing, planning, designing, developing, and ultimately, providing state-level support for the programs; (2) an Activation Team that works within the operational plan and is charged with establishing the site-specific mental health programs, and becomes the initial program management staff for particular sites and transitions to the site as activation begins; and (3) mental health staff that provide clinical and support services will be recruited, hired and assigned consistent with the joint operational plan.

There is an agreement between the CDCR and the DMH for the DMH to operate the inpatient mental health programs within the CHCFs. The DMH will develop a plan to administer and manage the inpatient acute and intermediate mental health program using and building upon the expertise it has already demonstrated. Discussions that involve joint CDCR and DMH clinical hiring and privileging processes are being planned

and the training syllabi and lesson plans for all DMH staffing needs have been developed.

Both the CDCR and the DMH headquarters management and administrative support will be developed as needed consistent with the evolving plan.

**Clinical Recruitment and Retention**

A major aspect of recruitment and retention planning for the CDCR mental health facility staff is the design of the program and facility for the intended purpose of health care. Clinicians want to work in settings conducive to treatment, they want to have therapeutic contact with patients, and they want clinical interventions to be supported within the residential milieu. The ability to work within an intentionally therapeutic environment will be a valuable tool in assisting with the recruitment and retention of clinicians.

In selecting the sites for the new medical/mental health facilities, the clinical candidate pool in the surrounding geographical area of the facilities is, among other concerns, a primary consideration. A pilot project to incorporate Licensed Marriage and Family Therapists into the staffing complements is currently underway. Statewide implementation of that project would create a larger recruitment pool that will help alleviate mental health clinical staffing shortages.

The CDCR is also considering methods (e.g., hiring a recruitment consultant) to train departmental recruiters and improve recruitment methods within the department. Given therapeutic facilities and programming, sufficient remuneration, and community amenities and support, mental health clinical staff is recruited by using institution-based workshops, recruitment presences at schools, universities and professional conferences in and out of state, advertisements in professional journals and any other methods that can practicably be implemented. Additionally, student and pre-licensure clinical internships and forensic/correctional curricula are under development to create and employ a pool of candidates whose primary interest is in correctional mental health. An increased and accurate web presence along with user friendly application and credentialing processes will contribute to achieving clinical recruitment goals.

The DMH shall continue to recruit using recruitment presence at schools, universities, and professional workshops. Advertisements in professional journals and publications have also helped to increase the DMH recruitment efforts. Student practica, pre-licensed internships and post-doctoral fellowships have been a valuable tool for recruitment. At the VPP and SVPP student and pre-licensure internship programs are used for clinical advancement and as a recruitment method for certain classifications. The VPP has an Accredited American Psychological Association (APA) Internship Program. The VPP and SVPP utilize Nursing Rotation programs for Registered Nurses (RN), Licensed Vocational Nurses (LVN) and Psychiatric Technicians (PT). Both Programs also have internship programs for Social Workers and Rehabilitation Therapists.

**Custody Recruitment and Retention**

Facility planning to date is emphasizing a "direct supervision" philosophy as the primary and overarching custody approach within the CHCFs. This approach combines line of sight architecture, a manageable and consistent inmate to officer ratio, leadership and communication competency training, and an understanding and embodiment of fairness and justice as fundamental tenets. The direct supervision philosophy has been shown over time to be cost effective by minimizing construction costs and damage repair costs. It has also been shown to be safe because officers are in positions to be proactive and resolve tension before it escalates into violence.

Discussions are in progress regarding the provision of specialized training for custody staff who work in both the CDCR mental health programs and the DMH inpatient mental health programs. With these principles at the forefront, custody staff can be recruited both from within CDCR and by using currently established successful recruitment efforts. However it has yet to be determined how the custody operations will be integrated into the separate DMH Milieu. More detail is expected to be developed through the joint operational plan.

**Administrative and Support Staff Recruitment and Retention**

The CDCR and the DMH headquarters and mental health administrative and support staff will be recruited from within state civil service and, wherever possible, from open examinations. The CDCR mental health staff will be hired and credentialed through the currently established processes. The DMH inpatient mental health services staff will be hired by DMH and credentialed and governed through mutually developed and agreed upon processes.

It is understood that all staff must be well trained to work in these types of facilities. The August 2007 Supplemental Bed Plan described in some detail the training and mentoring that the DMH was to provide the CDCR staff hired to work at the intermediate and acute health care facilities. The decision for the DMH, and not the CDCR, to manage and operate the intermediate and acute health care facilities, the training and mentoring of the CDCR staff by the DMH will no longer be required.

**B.    Recruitment and Compensation of "Hospital Administrators"**

In his September 24, 2007 response to the August 2007 Supplemental Bed Plan, the Special Master identified concerns about the need to find, vet, hire and compensate qualified and experienced hospital administrators to obtain and retain licensing and accreditation for inpatient beds built and operated by the CDCR. The court then ordered the CDCR to create a plan for the recruitment and compensation of hospital administrators to develop and run the CDCR's inpatient program. As a result of the new agreement with the DMH there is now a need to create a plan for the recruitment and compensation of the DMH hospital administrators to develop and operate its inpatient mental health programs within the CHCFs.

The August 2007 Supplemental Bed Plan described a management structure with a Deputy Director, who reports to the Statewide Director of Mental Health. Each facility mental health program was proposed to have an Executive Director who would report to the headquarters Deputy Director. This management structure has changed significantly since the CDCR and the Receiver, as part of the administrative and management planning, collaborated on a proposed "shared governance" agreement. The current plan is to have a Chief Executive Officer responsible for the health care delivery in one or more specific institutions.

The Division of Correctional Health Care Services within the CDCR is in the process of creating the classification of Chief of Mental Health. The coordination of reporting responsibilities of this position in the entire context of the new facilities is being researched and is expected to be determined consistent with both the pending operational plan and the new governance structure.

Currently, the DMH employs a Career Executive Assignment (CEA) III as Executive Director and a CEA I as the Assistant Executive Director over both SVPP and VPP. Since the DMH inpatient program will be part of the CHCF facility, the DMH will need to create a plan for recruitment of Hospital Administrators to develop and mange the DMH's inpatient mental health program.

The August 2007 Supplemental Bed Plan required the inclusion of "executive personnel and staff from the CDCR...with expertise necessary to plan, direct, and manage large-scale and complex projects similar in nature to the new facilities." To that end, the CDCR has retained a consultant with decades of local, state and national expertise in the development and delivery of correctional mental health programs to lead the development, activation and delivery of the requirements of the supplemental bed plan.

The primary assumption within this plan is that the overarching concern of the court and the Special Master is that the CDCR have an adequate and appropriate management structure and expertise to successfully develop, implement and deliver mental health services within the approved bed plan concept. The August 2007 Supplemental Bed Plan stated that, "a portion of the (new facility) project team staff will be designated from existing resources, with remaining staff positions to be requested through the annual State budget process." Current efforts to create a division management team include the hiring of the consultant and the redirection of a special projects team, which includes a staff services manager and two analyst staff. This team has begun the fiscal and program planning that lays the ground work for the mental health programs in the new facilities.

**C.    Memorandum of Understanding for California Department of Mental Health's Mentoring and Direct Service Obligations under the Revised Plan for Integration in an Inter-agency Agreement**

Within the August 2007 Supplemental Bed Plan and in response to the concerns noted in the Special Master's report, CDCR included the following:

- The DMH would continue to operate the Acute, ICF and Day Treatment Program (DTP) programs at CMF and SVSP, inclusive of new intermediate care beds to be built at each of these prisons (until such time as the CDCR is determined to be able to provide a DMH standard of care);
- The DMH will, in collaboration with the CDCR, implement the intermediate care program at SAC;
- The DMH will initially operate the intermediate care program at SAC with the CDCR continuing in a training modality, with the understanding that the operation of that program would eventually transfer to the CDCR with the DMH monitoring and, eventually, advisory only;
- The DMH would assume an oversight role in the implementation of the intermediate care beds at the other consolidated care centers and California Institution for Women (CIW); however, at California Institution for Men (CIM), DMH would initially operate the acute beds with eventual transfer to CDCR; and
- The planned acute beds would be consolidated at CIM.

With the recent decision that the DMH provide all inpatient intermediate and acute care mental health services within the new facilities, the current acute, intermediate and day treatment mental health MOUs will no longer apply. The CDCR and the DMH will develop an interagency agreement and MOUs for the ongoing coordination and collaboration for access of care to the DMH inpatient acute and intermediate programs.

**D.    Analysis Justifying the Reduction and/or Elimination of Mental Health Crisis Beds**

The December 2006 and the August 2007 Bed Plans anticipated the construction of a 50-bed MHCB at CMC and the 50-bed MHCB at CMF. Spring 2008 population projections (including a reserve) anticipate the need for 410 MHCB statewide by 2017. The new bed plan (see Attachment B -- June 2008 bed chart) anticipates satisfaction of that bed need in new construction within CHCFs, in maintaining MHCBs disbursed statewide, in the planned construction of the CMC 50-bed facility and in the activation in June 2008 of the CMF facility.

The 50-bed MHCB at CMC was court ordered only in the circumstance that CMC would not become a site for a consolidated care center. In the August 2007 Supplemental Bed Plan, the current EOP was proposed to be eliminated because a new consolidated care center facility was proposed to be built there. It now appears that CMC is not going to be a site for a new consolidated care center or CHCF thereby requiring the construction of the 50-bed crisis facility. The new proposed bed plan anticipates leaving the current EOP at CMC as it stands. The new 50-bed crisis facility will serve the crisis needs of that EOP population and will replace the 36 bed interim facility.

The reallocation of the MHCB, as outlined in the bed plans, was designed to locate the highest levels of CDCR mental health services in specific locations and is predicated on the construction of new crisis beds at CMF, CMC and in the new facilities. New EOP beds also are planned to be located in the new facilities and, because this level of care is a high user of MHCB, the preponderance of crisis beds will be co-located there. The EOP population is, by definition, less stable than the general population (GP) and is thus more prone to crisis. However, there is also an, albeit smaller, need for crisis beds in GP institutions. It is the intention of the CDCR to have crisis beds operational throughout the state. In some institutions, the crisis beds will eventually be at a reduced level, but only when it is determined that the overall statewide need has been met elsewhere.

There is no plan to reduce any mental health crisis beds currently operational until enough additional crisis beds are available to meet need and there is no waiting list for that level of care. Careful analysis of crisis bed use, wait lists and population trends over time will inform how, when and where crisis beds will be decommissioned. As new crisis beds are built and activated, this analysis will become more critical and detailed. If a downward trend in crisis bed use to numbers of beds available is validated, a schedule for reduction will be developed. Included in any deactivation schedule will be an additional detailed review of population trends, bed use and wait lists. The Correctional Treatment Centers will remain in place and active, with only the crisis bed use considered for deactivation.

E.    **Timeframes for Joint Commission Accreditation for CDCR Operated Inpatient Facilities**

On October 18, 2007, the *Coleman* court issued an order that in a pertinent part stated: "Defendants shall submit to the Special Master a plan with timeframes for meeting and procuring for all California Department of Corrections and Rehabilitation operated inpatient programs applicable State licensure and accreditation by the Joint Commission on Accreditation of Healthcare Organizations."

The DMH has been the CDCR's longtime contractor of inpatient acute and intermediate mental health services for both male and female inmate-patients. The August 2007 Mental Health Bed Plan indicated CDCR would assume responsibility for operating the new inpatient acute and intermediate care beds.

In June 2008, a proposal was created whereby the DMH would be responsible for managing and operating the intermediate and acute inpatient clinical services instead of transferring the operation to the CDCR. These mental health programs will be operated by the DMH in collaboration with the Receiver's medical, the CDCR mental health and the CDCR/Receiver's custody program in two of the CHCFs.

The following page is a proposed timeframe for the DMH to achieve State licensure and Joint Commission (JC) accreditation for the proposed inpatient programs.

## TIMEFRAMES FOR STATE LICENSURE AND JOINT COMMISSION ACCREDITATION FOR THE DMH's PROPOSED ACUTE AND INTERMEDIATE INPATIENT TREATMENT PROGRAM.

(Adapted from the April 2008 DMH facility project overview)

| Summary Task | Proposed Timeframe |
|---|---|
| Develop Operating Manuals, Staff Bi-laws, Governing Body, etc. in accordance with State and Joint Commission standards. | Approximately 2 years prior to estimated activation (Begin January 2009) |
| Verification of program manuals, staff orientation and training. | 2010 to 2011 |
| Completion of construction of facility and installation of equipment, supplies, furniture, staff, etc. Begin State licensing preparation. | 2010 to 2011 |
| Facility inspections, Department of Health Services' licensure. | December 2010 to January 2011 |
| Begin patient admissions. | February 2011 |
| Joint Commission Self Survey. | February 2011 to February 2012 |
| Self Survey Correction, Mock Joint Commission Survey, submission of Joint Commission Application. | February 2012 to November 2012 |
| First Joint Commission survey. | 2 years status post activation (approx. November 2013 to November 2014) |

Initial survey: . Application for survey is valid for six months.  Normally takes three-four months after receipt of application to conduct survey. Most organizations take one full year from the point of decision to be accredited until time of first survey.

## III.    Outline of Changes to Bed Plan Charts

**Attachment A:**
**Entitled:  Mental Health Bed Plan, December 2006 – Enclosure II (Amended)**

This chart was in the December 2006 Mental Health Bed Plan and was amended for the August 2007, Supplemental Bed Plan.  It uses bed need projections through 2011 based on the Mental Health Bed Need Study – 2006 Update.  The intent of this chart was to show the progression from scattered mental health programs into consolidated care centers, using current planning. This chart forms the basis for the ensuing charts.

Incorporated into this chart are the following assumptions:
1)    Table #1 would become fully activated and operational by 2011.  This table includes several projects that were in various planning stages with funding ranging from none to through specific design stages.  Specifically the chart assumed that the following projects would be constructed and activated by June 2011:
- The 50 bed MHCB at CMC;
- The treatment and office space for 150 EOP beds at LAC;
- The 64 bed ICF at SVSP;
- The 64 bed ICF at CMF; and
- The 50 bed MHCB at CMF.

2)    Table #2 proposes the Consolidated Care Center locations at the following locations:
- SAC
- RJD
- CMC
- CIM
- LAC

3)    Table #2 proposes the decommissioning of the following beds:
- COR:          150 EOP; 54 ASU; 23 MHCB
- MCSP:        510 EOP; 36 ASU:  3 MHCB
- CMC:          580 EOP; 54 ASU and
- MHCBs at the following locations:
    o  HDSP – 5
    o  KVSP – 12
    o  NKSP – 5
    o  SATF – 11
    o  SOL – 9
    o  WSP – 1
    o  CIM – 18
4)    The female chart assumed the construction of all new women's beds at California Institution for Women (CIW).

**Attachment B:**
**Entitled:  California Health Care Facilities--Mental Health Program--June, 2008**

The "California Health Care Facilities--Mental Health Program--June, 2008" bed plan is the culmination of several iterations of bed planning.  This final chart is intended to perform several functions:

1) To clearly delineate currently active mental health beds from bed creation projects that are not yet built or activated;
2) To clearly define the bed need projections in appropriate levels of care;
3) To identify project responsibility (i.e., which projects are proposed to be incorporated into the Receiver's "Joint Project" and which were to be maintained to be built by CDCR); and
4) To reflect current planning for level of care placement in CHCFs.

This chart incorporates several changes resulting in decisions made and studies finalized in June 2008:

1) The Mental Health Bed Need Study – Based on Spring 2008 Population Projections, June 2008 was finalized.
   - This study makes projections of the mental health population to 2017.
   - These projections, plus a "target reserve" calculated using the same method as in the August 2007 Supplemental Bed Plan, are used as the bed need.
   - This represents an increase in the bed need.

2) The decision for DMH to provide the inpatient acute and intermediate mental health services created several changes to the bed plan.
   - The entire Intermediate and Acute bed need will be provided in the new facilities.  This means decommissioning SVSP/SVPP ICF beds and CMF/VPP Acute and ICF beds as well as the beds currently located in the DMH state hospitals.
   - Part of the decision was also to include ICF beds for inmates requiring DMH care under Penal Code 1370, individuals found by the court to be incompetent to stand trial.
   - This required major shifting of the program beds and the addition of additional beds to the Receiver's project.

3) In keeping with the court order to build the 50-bed MHCB at CMC, the EOP beds will remain active at CMC.
   - The EOPs at LAC, RJD, and SVSP will be decommissioned (as well as those at Mule Creek State Prison, and CSP – Corcoran, which were identified to be decommissioned in the August 2007 Supplemental Bed Plan).
   - This required major shifting of the program sites and a reconfiguration of the beds in the Receiver's project.

**Attachment B (continued)**

From left to right the "California Health Care Facilities--Mental Health Program--June, 2008" bed plan reads as follows:

1)  Table #A reflects the actual beds in operation as of June, 2008.

2)  Table #B reflects new beds proposed to be built.
    *   Clearly separates Joint Project beds from CDCR beds:  yellow represents the Joint Project beds; black represents those retained by the CDCR.
    *   Alters the original locations of CCCs to unnamed sites to be considered CHCFs.
    *   Alters the plan from building ICF beds in all sites to building two sites with ICF and acute beds: one in the northern part of the state and one in the south.

3)  Table #C reflects the proposed beds to be decommissioned.

4)  Table #D reflects the total beds at each site after construction and activation of the supplemental bed plan beds.

5)  The Female chart reflects the decision to incorporate the female mental health bed need into the Receiver's Joint Project, placing the female beds in two sites – one north and one south.

## IV.   Summary

This Bed Plan is subject to the receipt of funding by the *Plata* Receiver necessary for the design and construction of his planned 1500-bed Correctional Health Care Facilities.

The culmination of this evolving process and the coordination with the Receiver's office has resulted in a greatly improved bed plan for the provision of mental health services to inmate-patients.  It provides a very real opportunity to provide improved services to mental health treatment population that complies with the requirements of the program and the court.

Attachment A

# California Department of Corrections and Rehabilitation
## Mental Health Bed Plan, December 2006 - Enclosure II (Amended#)

## MALES

**Introduction:** As a general rule, the following proposal uses existing beds at five (5) Consolidated Care Center (CCC) sites*(the CCC sites are SAC, RJD, CMC, CIM, and LAC), plus at SVSP and CMF, and proposes to build additional capacity to meet and exceed Navigant's projected mental health bed need for June 2011, (based upon Spring 2006 population projections).

**PROPOSAL** - Assumes that the CDCR will operate the Acute and ICF programs and that there is no bed capacity at DMH hospitals (i.e. no beds at ASH, CSH, Napa, or Metro).

---

### INITIAL
**Expected Permanent Bed Capacity, June 2011**
**NO NEW BEDS**
**(Status Quo)**

**Table #1:** Number of permanent mental health beds anticipated in June 2011** with no construction of additional beds, (except where noted).

| Institution | EOP | ASU | PSU | MHCB | Acute | ICF | ICF-High Custody | Total |
|---|---|---|---|---|---|---|---|---|
| SAC | 384 | 124 | 192 | 24 | | | | 724 |
| RJD | 330 | 63 | | 14 | | | | 407 |
| CMC¹ | 580 | 54 | | 50 | | | | 684 |
| CIM | | | | 18 | | | | 18 |
| LAC¹ | 450 | 54 | | 12 | | | | 516 |
| SVSP³ | 192 | 45 | | 10 | | 128 | | 375 |
| CMF⁴ | 600 | 58 | | 50 | 150 | 84 | | 942 |
| PBSP⁵ | 64 | | 128 | 10 | | | | 202 |
| **Sub-Total** | 2,600 | 398 | 320 | 188 | 150 | 84 | 192 | 3,932 |

**REDUCTION OF EXISTING BEDS**

| Institution | EOP | ASU | PSU | MHCB | Acute | ICF | ICF-High Custody | Total |
|---|---|---|---|---|---|---|---|---|
| COR | 510 | 54 | | 23 | | | | 227 |
| MCSP | 510 | 36 | | | | | | 564 |
| SQ | | 36 | | | | | | 68 |
| HDSP | | | | | | | | 10 |
| ISP | | | | | | | | 5 |
| KVSP | | | | 12 | | | | 12 |
| NKSP | | | | 10 | | | | 10 |
| PVSP | | | | 5 | | | | 5 |
| SATF | | | | 16 | | | | 16 |
| SOL¹ | | | | 9 | | | | 9 |
| WSP | | | | 6 | | | | 6 |
| **Sub-Total** | 660 | 126 | 0 | 136 | | | | 922 |
| **Grand Total** | 3,260 | 524 | 320 | 324 | 150 | 84 | 192 | 4,854 |

**Navigant Bed Need, June 2011** (Bed Need - Grand Total Beds Table #1): 1,452

*Note: will not use existing EOP, ASU, or MCHBs at CMC and CIM.
** Data sources for number of beds: Health Care Placement Unit, Licensing Unit, and Office of Facilities Management.
¹ Assumption: CMC - The 50 bed MHCB project proposed in the Interim ICF and MHCB Plan, June 2006 will be constructed.
² Assumption: LAC - The 150 bed EOP project as proposed in the April 2006 plan will be constructed.
³ Assumptions: SVSP - 1. The 64 bed ICF project will be constructed.
 2. All 128 ICF beds are counted as High Custody.
⁴ Assumptions: CMF - 1. ICF - The 84 bed ICF facility as proposed in the April 2006 plan will be constructed.
 2. EOP: The 30 temporary ICF beds at P-3 will be returned to 67 EOP beds.
 3. MHCB: The 50 bed MHCB unit is constructed.
⁵ PBSP: 4 of the 10 MHCBs are not-covered under budgeted/drafted plant issues. Covered under registry or overtime.
⁶ SOL: CTC can test only 9 MHCB patients because of physical plant issues.

August 17, 2007

---

### PROPOSAL
**New Beds to be Constructed**
**+ Reduction of Existing Beds**

**Table #2:** Estimated number of new permanent beds to be constructed by June 2011, and reduction of existing permanent beds to meet the bed deficiency in Table #1.

| Institution | EOP | ASU | PSU | MHCB | Acute | ICF | ICF-High Custody | Total |
|---|---|---|---|---|---|---|---|---|
| SAC | 336 | | | 26 | | 46 | 24 | 432 |
| RJD | 390 | 62 | 128 | | 0 | 46 | 24 | 666 |
| CMC¹ | 720 | 125 | 128 | 30 | 90 | 46 | 24 | 1,043 |
| CIM² | 720 | 125 | | | | 46 | 24 | 1,035 |
| LAC | 270 | 71 | | 38 | | 46 | 24 | 449 |
| SVSP³ | 96 | 70 | | | | | | 166 |
| CMF | | | | | | | | 0 |
| PBSP | | | | | | | | 0 |
| **Sub-Total** | 2,532 | 453 | 256 | 110 | 90 | 230 | 120 | 3,791 |

**REDUCTION OF EXISTING BEDS**

| Institution | EOP | ASU | PSU | MHCB | Acute | ICF | ICF-High Custody | Total |
|---|---|---|---|---|---|---|---|---|
| COR | -150 | -54 | | -23 | | | | -227 |
| MCSP | -510 | -36 | | | | | | -549 |
| SQ | | -36 | | -5 | | | | -36 |
| HDSP | | | | | | | | -5 |
| ISP | | | | | | | | -5 |
| KVSP | | | | -12 | | | | -12 |
| NKSP | | | | -5 | | | | -5 |
| PVSP | | | | | | | | |
| SATF | | | | -11 | | | | -11 |
| SOL | | | | -9 | | | | -9 |
| WSP | | | | -1 | | | | -1 |
| CMC | -580 | -54 | | | | | | -634 |
| CIM | | | | -18 | | | | -18 |
| SVSP³⁰ | | | | -45 | | | | -45 |
| **Sub-Total (net)** | -1,240 | -225 | 0 | -87 | | | | -1,552 |
| **Grand Total (net)** | 1,292 | 228 | 256 | 23 | 90 | 230 | 120 | 2,239 |

Adjustment - Add Reserve** from Table #3 ... 787
Bed Deficiency Adjusted for Reserve ... 2,239

¹ Assumption: CMC: not using existing EOP and ASU population facilities, and the 50 bed MHCB unit is constructed (see Table #1, footnote #1).
² Assumption: CIM: not using the existing 18 GACH acute psych. beds as MHCBs. Total equals all new beds.
³ Assumption: SVSP - The 128 bed ICF facility as proposed in the Statewide Mental Health Bed Need Study (Plan, April 2006) will be re-scoped to construct a 70 bed EOP-ASU, and will convert existing space at SVSP III to accommodate an additional 96 EOP beds.
⁴ Assumption: SVSP - The current 45 ASU beds will be included in the proposed new 70 bed EOP-ASU construction project.
³⁰ Note: Does not include the count of temporary beds. (I.e. 36 MHCBs at CMC, 112 ICF Beds at SVSP, and 36 ICF beds at CMF P-2.)

---

### FINAL
**Expected Permanent Bed Capacity**
**WITH CONSTRUCTION OF NEW BEDS**
**Post Implementation of Mental Health Bed Plan, December 2006**
**(Proposal)**

**Table #3:** Number of permanent mental health beds anticipated through construction of new beds.

| Institution | EOP | ASU | PSU | MHCB | Acute | ICF | ICF-High Custody | ICF-Sub-total | Total |
|---|---|---|---|---|---|---|---|---|---|
| SAC | 720 | 124 | 192 | 50 | | 46 | 24 | 70 | 1,156 |
| RJD | 720 | 125 | 128 | 30 | 0 | 46 | 24 | 70 | 1,073 |
| CMC | 720 | 125 | 128 | 50 | 90 | 46 | 24 | 70 | 1,093 |
| CIM | 720 | 125 | | | 90 | 46 | 24 | 70 | 1,035 |
| LAC | 720 | 125 | | 50 | | 46 | 24 | 70 | 965 |
| SVSP | 288 | 70 | | 10 | | | 128 | 128 | 496 |
| CMF | 600 | 58 | | 50 | 150 | 84 | 148 | 148 | 1,006 |
| PBSP | 64 | | 128 | 10 | | | | 10 | 202 |
| **Sub-Total** | 4,552 | 752 | 576 | 290 | 240 | 314 | 312 | 626 | 7,026 |
| Navigant* | 4,175 | 675 | 401 | 268 | 224 | 299 | 264 | 563 | 6,306 |
| Reserve*** | 377 | 77 | 175 | 79 | 16 | 15 | 48 | 63 | 787 |
| % Reserve | 9.0% | 11.4% | 43.6% | 29.5% | 7.1% | 5.0% | 18.2% | 11.2% | |

* Source: Mental Health Bed Need Study - Board Update, Navigant Consulting, June 2006.
*** The reserve is the number of beds above the forecasted mental health bed need in the Navigant study. The reserve is included in the Mental Health Bed Plan, December 2006, to allow additional program flexibility in an effort to ensure sufficient bed capacity exists once the facilities are constructed. See Table #4 below on Page 2 of 3, for further detail.

**SPRING 2007 FORECASTED BED NEED FOR FISCAL YEAR 2011/2012:**

| | MHCB | Acute | ICF-H | ICF-L | Total |
|---|---|---|---|---|---|
| Navigant^^^ | 222 | 304 | 301 | 68 | 895 |
| Reserve* | 68 | 113 | 17 | 18 | 15 | ... |
| % Reserve | 23.6% | 17.7% | 40.8% | 5.2% | 8.1% | 3.3% | 1.6% | 2.5% | |

^^^ Source: Spring 2007 Population Projection, Navigant Consulting, June 2007. Note: For this study the Acute projected bed need was taken from the Mental Health Bed Need Study - Based on 2006 Population Projections, Navigant Consulting, March 2007.

# The Supplemental Bed Plan Report - August 2007 amends the December Bed Plan - 2006. Modifications to the original December Bed Plan - 2006 Enclosure II are underlined and shaded.

Attachment A

Page 2 of 3

# California Department of Corrections and Rehabilitation
## Mental Health Bed Plan, December 2006 - Enclosure II (Amended)[#]

## MALES

Table #4: Actual vs. Target Reserve: The reserve is the number of beds above the forecasted mental health bed need in the Navigant study. The reserve is included in the Mental Health Bed Plan, December 2006, to allow additional program flexibility in an effort to ensure sufficient bed capacity exists once the facilities are constructed.

Table 4-A: Indicates how the target reserve was calculated using the percent increase in projected populations for the years indicated in the Spring 2006 Navigant Study as minimums and maximums and calculating a target reserve based on the midpoint of the two.*

Table 4-B: Indicates actual reserve for the proposal along with the difference between the actual and the target reserve.*

| Table 4-A: | Minimum | | | Maximum | | | Midpoint | | Table 4.B: | Actual Reserve for Proposal | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Navigant Spring 2006: Projected Population By Year and Percent Increase | | | | | | | | | | Difference Between |
| | 2010 | 2011 | % | 2007 | 2011 | % | Target % Reserve | Target Reserve | Actual % Reserve | Actual Reserve | Actual and Target Reserve |
| EOP | 4,123 | 4175 | 1% | 3,672 | 4175 | 14% | 7.5% | 312 | 9.0% | 377 | 65 |
| ASU | 666 | 675 | 1% | 572 | 675 | 18% | 9.7% | 65 | 11.4% | 77 | 12 |
| PSU | 390 | 401 | 3% | 332 | 401 | 21% | 11.8% | 47 | 43.5% | 175 | 128 |
| MHCB | 266 | 268 | 1% | 252 | 268 | 6% | 3.6% | 10 | 29.5% | 79 | 69 |
| Acute | 222 | 224 | 1% | 203 | 224 | 10% | 5.6% | 13 | 7.1% | 16 | 3 |
| ICF | 294 | 299 | 2% | 267 | 299 | 12% | 6.8% | 20 | 5.0% | 15 | -5 |
| ICF (High Custody) | 261 | 264 | 1% | 197 | 264 | 34% | 17.6% | 46 | 18.2% | 48 | 2 |
| | | | | | | | Total: | 513 | Total: | 787 | 274 |

* Differences in the reserve numbers in Table 4-A and Table 4-B are due to rounding.

Attachment A

California Department of Corrections and Rehabilitation
Mental Health Bed Plan, December 2006 - Enclosure II (Amended #)

**MALES**

| LIST OF ACRONYMS (Arranged in Alphabetical Order) | |
|---|---|
| ASH | Atascadero State Hospital - DMH (Male) |
| ASU | Administrative Segregation Unit |
| CCC | Consolidated Care Center |
| CDCR | California Department of Corrections and Rehabilitation |
| CIM | California Institution for Men |
| CIW | California Institution for Women |
| CMC | California Men's Colony |
| CMF | California Medical Facility |
| COR | California State Prison - Corcoran |
| CSH | Coalinga State Hospital - DMH (Male) |
| CTC | Correctional Treatment Center |
| DHS | Department of Health Services |
| DMH | Department of Mental Health |
| DOF | Department of Finance |
| DPA | Department of Personnel Administration |
| DTP | Day Treatment Program |
| DVI | Deuel Vocational Institution |
| EOP | Enhanced Outpatient Program |
| GACH | General Acute Care Hospital Bed |
| HDSP | High Desert State Prison |
| ICF | Intermediate Care Facility |
| ISP | Ironwood State Prison |
| KVSP | Kern Valley State Prison |
| LAC | California State Prison - Los Angeles County |
| MCSP | Mule Creek State Prison |
| MHCB | Mental Health Crisis Bed |
| NKSP | North Kern State Prison |
| PBSP | Pelican Bay State Prison |
| PSH | Patton State Hospital - DMH (Female) |
| PSU | Psychiatric Services Unit |
| PVSP | Pleasant Valley State Prison |
| RJD | Richard J. Donovan Correctional Facility |
| SAC | California State Prison - Sacramento |
| SATF | Substance Abuse Treatment Facility at Corcoran |
| SOL | California State Prison - Solano |
| SQ | California State Prison San Quentin |
| SVSP | Salinas Valley State Prison |
| WSP | Wasco State Prison |

August 17, 2007

Page 3 of 3

# California Department of Corrections and Rehabilitation
## Mental Health Bed Plan, December 2006 Enclosure III (Corrected#)

## FEMALES

Introduction: The following proposal uses existing beds at female institutions, and proposes to build additional capacity to meet and exceed the mental health bed need for June 2011 as projected by Navigant, (based upon Spring 2006 population projections).

PROPOSAL - Assumes that the CDCR will operate the Acute and ICF programs and that there will be no bed capacity at DMH hospitals. (i.e. no beds at PSH).

### INITIAL
Expected Permanent Bed Capacity, June 2011
NO NEW BEDS
(Status Quo)

Table #1: Number of permanent mental health beds anticipated in June 2011*, with no construction of additional beds, (except where noted).

| Institution | Level of Care | | | | | Total |
|---|---|---|---|---|---|---|
| | EOP | ASU | PSU | MHCB | Acute/ICF | |
| CCWF | 54 | | | 12 | | 66 |
| CIW* | 75 | | 20 | 10 | 25 | 130 |
| VSPW | | 9 | | | | 9 |
| Total: | 129 | 9 | 20 | 22 | 25 | 205 |

| | |
|---|---|
| Navigant Bed Need, June 2011* ^ | 345 |
| Beds Deficient (Bed Need - Total Beds Table #1) | 140 |
| Adjustment - PSU beds not projected and added back in | 20 |
| Total Bed Deficiency with Adjustment (20 PSU Beds + Beds Deficient) | 160 |

* Data sources for number of beds: Health Care Placement Unit, Licensing Unit, and Office of Facilities Management.

^ Assumptions: CIW - 1. The 25 bed Acute/ICF facility proposed in the April 2006 plan will be constructed. Note if this proposal is approved, this project will require a scope change to include the MHCB and Acute/ICF beds in Table #2.
2. The 20 bed PSU project is completed.

### PROPOSAL
New Beds to be Constructed

Table #2: Estimated number of new permanent beds to be constructed by June 2011* with no bed deficiency in Table #1.

| Institution | Level of Care | | | | | Total |
|---|---|---|---|---|---|---|
| | EOP | ASU | PSU | MHCB | Acute/ICF | |
| CCWF | | | | | | 0 |
| CIW* | 168 | 15 | | 3 | 17 | 203 |
| VSPW | | | | | | 0 |
| Total: | 168 | 15 | 0 | 3 | 17 | 203 |

| | |
|---|---|
| Bed Deficiency Table #3 | 160 |
| Adjustment - Add Reserve ** from Table #3 | 43 |
| Bed Deficiency Adjusted for PSU beds and Reserve | 203 |

* Assumptions: CIW - 1. EOP and ASU - New beds through conversion of existing spaces.
2. Acute/ICF and MHCB - 20 new beds will be added to the 25 bed Acute/ICF project proposed in the April 2006 plan.

### FINAL
Expected Permanent Bed Capacity, June 2011
WITH CONSTRUCTION OF NEW BEDS
Post Implementation Mental Health Bed Plan, December 2006
(Proposal)

Table #3: Number of permanent mental health beds anticipated through construction of new beds.

| Institution | Level of Care | | | | | Total |
|---|---|---|---|---|---|---|
| | EOP | ASU | PSU | MHCB | Acute/ICF | |
| CCWF | 54 | | | 12 | | 66 |
| CIW | 243 | 15 | 20 | 13 | 42 | 333 |
| VSPW | | 9 | | | | 9 |
| Total: | 297 | 24 | 20 | 25 | 42 | 408 |

| | EOP | ASU | PSU | MHCB | Acute/ICF | Total |
|---|---|---|---|---|---|---|
| Navigant^ ^ | 262 | 22 | N/A | 22 | 39 | 345 |
| Reserve^ ^ ^ | 35 | 2 | | 3 | 3 | 43 |
| % Reserve* | 13.4% | 9.1% | | 13.6% | 7.7% | |

* Source: Mental Health Bed Need Study - 2006 Update. Navigant Consulting, June 2006.

** The reserve is the number of beds above the forecasted mental health bed need in the Navigant study. The reserve is included in the Mental Health Bed Plan, December 2006, to allow additional program flexibility in an effort to ensure sufficient bed capacity exists once the facilities are constructed. See Table #4 below on Page 2 of 3 for further detail.

### SPRING 2007 FORECASTED BED NEED FOR FISCAL YEAR 2011/2012:

| | EOP | ASU | PSU | MHCB | Acute/ICF | Total |
|---|---|---|---|---|---|---|
| Navigant^ ^ | 336 | 27 | N/A | 33 | 9 | 412 |
| Reserve | -39 | -3 | | 9 | -9 | -24 |
| % Reserve | -11.6% | -11.1% | | 56.3% | 27.3% | |

Based on Spring 2007 Population Projections, Navigant Consulting, July 2007.

# This document corrects a typographical error noted in the original Mental Health Bed Plan - December 2006 Enclosure III and provides an updated forecasted bed need. Corrections are limited to the PSU Table #3 with all changes underlined and shaded.

Attachment A

# California Department of Corrections and Rehabilitation
## Mental Health Bed Plan, December 2006 Enclosure III (Corrected #)

### FEMALES

Table #4: Actual vs. Target Reserve: The reserve is the number of beds above the forecasted mental health bed need in the Navigant study. The reserve is included in the Mental Health Bed Plan, December 2006, to allow additional program flexibility in an effort to ensure sufficient bed capacity exists once the facilities are constructed.

Table 4-A: Indicates how the target reserve was calculated using the percent increase in projected populations for the years indicated in the Spring 2006 Navigant Study as minimums and maximums and calculating a target reserve based on the midpoint of the two.*

Table 4.B: Indicates actual reserve for the proposal along with the difference between the actual and the target reserve.*

| Table 4.4:A | Minimum | | | Maximum | | | Midpoint | | Table 4.B: | Actual Reserve for Proposal | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Navigant Spring 2006: Projected Population By Year and Percent Increase | | | | | | | | | | | Difference Between Actual and Target Reserve |
| | 2010 | 2011 | % | 2007 | 2011 | % | Target % Reserve | Target Reserve | | Actual % Reserve | Actual Reserve | |
| EOP | 256 | 262 | 2% | 211 | 262 | 24% | 13.3% | 35 | | 13.4% | 35 | 0 |
| ASU | 21 | 22 | 5% | 19 | 22 | 16% | 10.3% | 2 | | 9.1% | 2 | 0 |
| MHCB | 22 | 22 | 0% | 17 | 22 | 29% | 14.7% | 3 | | 13.6% | 3 | 0 |
| Acute/ICF | 39 | 39 | 0% | 34 | 39 | 15% | 7.4% | 3 | | 7.7% | 3 | 0 |
| | | | | | | | Total: | 43 | | Total: | 43 | 0 |

* Differences in the reserve numbers in Table 4.A. and Table 4.B are due to rounding.

August 17, 2007

Page 2 of 3

Attachment A

California Department of Corrections and Rehabilitation
Mental Health Bed Plan, December 2006 Enclosure III (Corrected *)

FEMALES

| LIST OF ACRONYMS (Arranged in Alphabetical Order) | |
|---|---|
| ASH | Atascadero State Hospital – DMH (Male) |
| ASU | Administrative Segregation Unit |
| CCC | Consolidated Care Center |
| CCWF | Central California Women's Facility |
| CDCR | California Department of Corrections and Rehabilitation |
| CIM | California Institution for Men |
| CIW | California Institution for Women |
| CMC | California Men's Colony |
| CMF | California Medical Facility |
| COR | California State Prison - Corcoran |
| CSH | Coalinga State Hospital – DMH (Male) |
| CTC | Correctional Treatment Center |
| DHS | Department of Health Services |
| DMH | Department of Mental Health |
| DOF | Department of Finance |
| DPA | Department of Personnel Administration |
| DTP | Day Treatment Program |
| DVI | Deuel Vocational Institution |
| EOP | Enhanced Outpatient Program |
| GACH | General Acute Care Hospital Bed |
| HDSP | High Desert State Prison |
| ICF | Intermediate Care Facility |
| ISP | Ironwood State Prison |
| KVSP | Kern Valley State Prison |
| LAC | California State Prison - Los Angeles County |
| MCSP | Mule Creek State Prison |
| MHCB | Mental Health Crisis Bed |
| NKSP | North Kern State Prison |
| PBSP | Pelican Bay State Prison |
| PSH | Patton State Hospital – DMH (Female) |
| PSU | Psychiatric Services Unit |
| PVSP | Pleasant Valley State Prison |
| RJD | Richard J. Donovan Correctional Facility |
| SAC | California State Prison - Sacramento |
| SATF | Substance Abuse Treatment Facility at Corcoran |
| SOL | California State Prison - Solano |
| SQ | California State Prison San Quentin |
| SVSP | Salinas Valley State Prison |
| VSPW | Valley State Prison for Women |
| WSP | Wasco State Prison |

Attachment B

## CONFIDENTIAL - Spring 2008 Projections through 2017

# MALES - CALIFORNIA HEALTH CARE FACILITIES - MENTAL HEALTH PROGRAM

### INCLUDES: All new ICF/acute beds plus 50-1370 PC beds. Uses Spring 2008 population projections to 2017 with a target reserve.

*Bed Need Source: Mental Health Bed Need Study - Spring 2008 Population Projections, June 2008*

** Target reserve is a mathematical equation.

**Table #A:** Number of mental health beds as of June 6, 2008 ***

Attachment B

# FEMALES - CALIFORNIA HEALTH CARE FACILITIES - MENTAL HEALTH PROGRAM

## CONFIDENTIAL - Spring 2008 Projections through 2017

INCLUDES: All female bed need less MHCB at two institutions. Uses Spring 2008 population projections to 2017 with a target reserve.

| Level of Care | Current Beds | Proposed New Joint Program Beds | Returned Beds | Net Adjusted Beds | Bed Need to 2017* | Bed Need plus target reserve** | Reserve beds |
|---|---|---|---|---|---|---|---|
| EOP | | 255 | 129 | 255 | 224 | 255 | 29 |
| ASU | | 0 | 9 | | 13 | 15 | 2 |
| PSU | | 27 | 10 | | 11 | 12 | 1 |
| MHCB | | 10 | 0 | | 18 | 20 | 2 |
| Acute/CF | | 29 | 0 | | 26 | 29 | 3 |
| Total | | 321 | 158 | | 294 | 331 | 37 |

* Bed Need Source: Mental Health Bed Need Study - Based on Spring 2008 Population Projections, May 2008
** Target reserve is a mathematical equation for MHCB with none decommissioned.

### Table #A:  Number of mental health beds as of June 6, 2008.***

| Institution | EOP | ASU[2] | PSU[1] | MHCB[3] | Acute/CF | Total |
|---|---|---|---|---|---|---|
| CCWF | 54 | | | 12 | | 66 |
| CIW | 75 | 10 | 10 | | | 95 |
| VSPW | | 9 | | | | 9 |
| SOUTHERN**** | | | | | | |
| NORTHERN**** | | | | | | |
| Total | 129 | 9 | 10 | 22 | | 0 |
| Department of Mental Health Hospital Beds: | | | | | | |
| PSH | | | | | 30 | 30 |
| Total | 0 | 0 | 0 | 0 | 30 | 30 |
| Grand Total (DMH Hospital + CDCR) | 129 | 9 | 10 | 22 | 30 | 200 |

### Table #B:  Estimated number of new permanent beds proposed to be constructed by the Joint Program.

| Institution | EOP | ASU[2] | PSU[1] | MHCB[3] | Acute/CF | Total |
|---|---|---|---|---|---|---|
| CCWF | | | | | | |
| CIW | | | | | | |
| VSPW | | | | | | |
| Site S (south) | 170 | 18 | 0 | 6 | 19 | 213 |
| Site 1 (north) | 85 | 9 | 0 | 4 | 10 | 108 |
| Total | 255 | 27 | 0 | 10 | 29 | 321 |
| Department of Mental Health Hospital Beds: | | | | | | |
| PSH | | | | | 0 | 0 |
| Total | 0 | 0 | 0 | 0 | 0 | 0 |
| Grand Total (DMH Hospital + CDCR) | 255 | 27 | 0 | 10 | 29 | 321 |

### Table #C:  Number of mental health beds returned to alternate use.

| Institution | EOP | ASU | PSU | MHCB | Acute/CF | Total |
|---|---|---|---|---|---|---|
| CCWF | -54 | | | -6 | | -60 |
| CIW* | -75 | -10 | -4 | | | -89 |
| VSPW | | -9 | | | | -9 |
| SOUTHERN | | | | | | |
| NORTHERN | | | | | | |
| Total | -129 | -9 | -10 | | | -158 |
| Department of Mental Health Hospital Beds: | | | | | | |
| PSH | | | | | -30 | -30 |
| Total | 0 | 0 | 0 | 0 | -30 | -30 |
| Grand Total (DMH Hospital + CDCR) | -129 | -9 | -10 | 0 | -30 | -188 |

*Temporary PSU beds at CIW will be decommissioned and returned to alternative use.

### Table #D:  Net number of mental health beds.

| Institution | EOP | ASU[2] | PSU[1] | MHCB | Acute/CF | Total |
|---|---|---|---|---|---|---|
| CCWF | | | | 6 | | 6 |
| CIW | | | | | | 0 |
| VSPW | | | | | | 0 |
| Site S (south) | 170 | 18 | 0 | 6 | 19 | 213 |
| Site 1 (north) | 85 | 9 | 0 | 4 | 10 | 108 |
| Total | 255 | 27 | 0 | 22 | 29 | 333 |
| Department of Mental Health Hospital Beds: | | | | | | |
| PSH | | | | | 0 | 0 |
| Total | 0 | 0 | 0 | 0 | 0 | 0 |
| Grand Total (DMH Hospital + CDCR) | 255 | 27 | 0 | 22 | 29 | 333 |

[1] Although only 20 MHCB are projected in the Spring population Projections, this plan proposes leaving all current MHCB operational.

[2] The Spring 2008 projections do not project an increase in MHCB need.

[3] ASU and PSU beds are combined in the Joint Projects plan.

*** Data sources for number of beds: Health Care Placement Unit, Licensing Unit, and Office of Facilities Management.

**** Both southern and northern sites are proposed to be co-located (with sight and sound barriers) with both male and female inmates.

CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
Mental Health Program
Coleman Court-ordered Construction
CONFIDENTIAL

Attachment C

| Date Court Ordered | Plan Name | Inst | Program | Status | Responsible Party | Comments |
|---|---|---|---|---|---|---|
| 2006-0502 | April 2006 - Long Term Bed Plan | CMC | 36 Crisis Beds - Building 7 LOU Conversion Modules (renovation of existing space) | Aug 07- June 08 | CDCR | Construction completed. Activation in process. |
| 2007-0201 | | CMF | Renovate 124 cells in Q1-3 and S2 Wings | April 08 - Aug 09 | CDCR | Project pending full activation of the MHCB per request of the Coleman Special Master. |
| 2007-0301 | | MCSP | Temporary EOP treatment space | Apr 08 - Oct 08 | CDCR | Activation anticipated October 2008.  On schedule. |
| 2007-0514 | | SW Renovation ASU | Intake cells (340 stand alone and 66 non stand alone) @ 33 prisons | Nov 07 - Sept 08 | CDCR | Completion targeted for September 2008.  On schedule. |
| 2007-1018 | August 2007 Supplemental Bed Plan | SVSP | Construction of 6 additional group rooms (renovation) for Temporary ICF in D5/D6 | FY 2010/11 | CDCR | Funding for Preliminary Plans and Working Drawings are included in the 2008-09 Governor's Budget. |
| 2007-1018 | August 2007 Supplemental Bed Plan | CIW | 20-Bed PSU | Pending | Receiver | This bed-need is proposed to be incorporated into the CDCR/Receiver CHCF project. |
| 2007-1018 | August 2007 Supplemental Bed Plan | CIW | 45 Bed Acute Care / ICF | Pending | Receiver | This bed-need is proposed to be incorporated into the CDCR/Receiver CHCF project. |
| 2007-1018 | August 2007 Supplemental Bed Plan | CMF | 64-Bed ICF (New stand alone) | Pending | Receiver | This bed-need is proposed to be incorporated into the CDCR/Receiver CHCF project. |
| 2007-1018 | August 2007 Supplemental Bed Plan | LAC | 150 EOP | Pending | Receiver | This bed-need is proposed to be incorporated into the CDCR/Receiver CHCF project. |
| 2007-1018 | August 2007 Supplemental Bed Plan | SVSP | 70-Bed EOP/ASU (New stand alone) | Pending | Receiver | This bed-need is proposed to be incorporated into the CDCR/Receiver CHCF project. |
| 2007-1018 | August 2007 Supplemental Bed Plan | SVSP | 96-bed EOP | Pending | Receiver | This bed-need is proposed to be incorporated into the CDCR/Receiver CHCF project. |
| 2007-1018 | August 2007 Supplemental Bed Plan | CMF | 600 EOP/58 ASU Office and Treatment space | To be determined | CDCR | A 30-day letter is being prepared to request AB 900 funding. |
| 2007-1018 | August 2007 Supplemental Bed Plan | CMF | 50 Mental Health Crisis Beds (New stand alone) | 5/06 - 4/08 | CDCR | This project is complete and is being activated. |
| 2007-1018 | August 2007 Supplemental Bed Plan | SAC | 192 EOP Treatment space (renovation office & treatment space) | FY 2010/11 | CDCR | July 2007 PWB submittal for approval of Preliminary Plans was reviewed by Control Agencies who raised concerns regarding scope and cost.  Upon further review, CDCR has determined project was over programmed (should have only been programmed for 192 in lieu of 384) and is developing a budget package to re-scope the project. Funding for preliminary plans is included in the 2008-09 Governors Budget. |
| 2007-1018 | August 2007 Supplemental Bed Plan | SVSP | 64-Bed mental Health ICF (New stand alone) | 4/07 - 11/08 | CDCR | Completion of construction is targeted for November 2008. |
| 2008-0226 | Coordination Order | SAC, CIM, LAC, RJD, CMC | Long-term new bed need | Pending | Receiver | This bed-need is proposed to be incorporated into the CDCR/Receiver CHCF project. |
| 2008-0226 | August 2007 Supplemental Bed Plan | CMC | 50 Mental Health Crisis Beds (New stand alone 50-bed) | To be determined | CDCR | 2007 Budget Act authorizes funding this project from AB 900 if the Department of Finance certifies that the Coleman court has resolved to construct this facility rather than the proposed larger Consolidated Care Center at this same prison. The current mental health program is now proposed to remain at CMC. |

Yellow area represents those projects proposed to be incorporated into the Receiver's CHCF Joint Project.

Attachment D

| LIST OF ACRONYMS (Arranged in Alphabetical Order) | |
|---|---|
| ASH | Atascadero State Hospital - DMH (Male) |
| ASU | Administrative Segregation Unit |
| CCC | Consolidated Care Center |
| CDCR | California Department of Corrections and Rehabilitation |
| CIM | California Institution for Men |
| CIW | California Institution for Women |
| CHCF | California Health Care Facility |
| CMC | California Men's Colony |
| CMF | California Medical Facility |
| COR | California State Prison - Corcoran |
| CSH | Coalinga State Hospital - DMH (Male) |
| CTC | Correctional Treatment Center |
| EOP | Enhanced Outpatient Program |
| DHS | Department of Health Services |
| DCHCS | Division of Correctional Health Care Services |
| DMH | Department of Mental Health |
| DOF | Department of Finance |
| DPA | Department of Personnel Administration |
| DTP | Day Treatment Program |
| DVI | Deuel Vocational Institution |
| EOP | Enhanced Outpatient Program |
| GACH | General Acute Care Hospital Bed |
| LOU | Locked Observation Unit |
| HDSP | High Desert State Prison |
| ICF | Intermediate Care Facility |
| ISP | Ironwood State Prison |
| IWL | Inmate/Ward Labor |
| KVSP | Kern Valley State Prison |
| LAC | California State Prison - Los Angeles County |
| MCSP | Mule Creek State Prison |
| MHCB | Mental Health Crisis Bed |
| MSH | Metro State Hospital |
| NKSP | North Kern State Prison |
| NSH | Napa State Hospital |
| PBSP | Pelican Bay State Prison |
| PSH | Patton State Hospital - DMH (Female) |
| PSU | Psychiatric Services Unit |
| PVSP | Pleasant Valley State Prison |
| PWB | Public Works Board |
| RJD | Richard J. Donovan Correctional Facility |
| SAC | California State Prison - Sacramento |
| SATF | Substance Abuse Treatment Facility at Corcoran |
| SOL | California State Prison - Solano |
| SQ | California State Prison San Quentin |
| SVSP | Salinas Valley State Prison |
| SW | Statewide |
| WSP | Wasco State Prison |

# EXHIBIT BB

**Questions from the AB 900 Jail Construction
Request for Proposals Bidders' Conference
January 8, 2008
Sacramento, CA**

The following is a complete list of questions from the Bidders' Conference, either submitted ahead in writing and restated at the conference, or asked the day of the event.  For ease in reading, the questions and answers have been grouped into four broad categories – General; Lease-Revenue Bond Financing/State Public Works Board Process; Parolee Mental Health Services Funding Preference; and Reentry Facility Funding Preference.  For answers that include additional information from what was provided at the Bidders' Conference, it is noted in the answer that clarification has been added.  Any additional questions regarding the Request for Proposals (RFP) process may be directed at any time to Corrections Standards Authority (CSA) staff (contact information is located on page 3 of the RFP document).

## GENERAL

**Under Section 3, Project Timetable, it is stated that occupancy must occur within 90 days of construction. Does this refer to a specific level of occupancy, or can occupancy be underway by this period in the form of transitional occupancy?**

*At 90 days from completion of construction, all detention facility areas within the project scope must be fully staffed and operational, therefore transitional occupancy must occur within this timeframe.  A portion of unoccupied beds to allow for appropriate and optimal classification is acceptable, as long as all housing units and other spaces within the project scope are staffed and operating.*

**Construction bids submitted to the county may turn out to be higher than what is stipulated in the county's proposal.  The RFP states that the scope of the project cannot be reduced.  Is this scope of work specific to bed count?**

*Yes, the scope of work is specific to bed count as well as other factors.  In part, the county's proposal was rated, and thus funded, based on the number of beds to be gained.  Net gain in beds is a significant factor in this funding process.*

**Under Section 4 of the Proposal Form, Narrative, Item B.6 asks for a list of non-compliance findings or recommendations. Is this list specific to the selected jail construction site, or does this refer to all jails in any one county's jurisdiction?**

*The referenced list is to include all jails in any one county's system. Further, this is an opportunity for the county to describe the relationship between the non-compliance issues and the proposed project.*

**Title 24 guidelines require the submission of a Letter of Intent to the CSA whenever there is intent to build a detention facility. Is this required in conjunction with the RFP, or does the RFP supersede this requirement?**

*Proposal submissions will be considered a Letter of Intent as required by Title 24.*

**In Section 1 of the Proposal Form, the county is asked to check a box to indicate whether the proposed project is for a *new* or *existing* facility. Since we are building a new facility on a current jail site, what box should be checked?**

*If adding a new stand-alone jail facility, even if on an existing site, a county should check the box indicating it is building a new facility.*

**A question in the RFP asks: Will the proposed project be used to replace an existing facility – yes or no? If replacement is the long term goal but not a forgone conclusion, how should this box be checked?**

*If an existing facility will be closed within months of the completion of the proposed project, then the new project would be considered a replacement facility. If the existing facility will not be closed for some years after completion of the proposed project, then the proposed project is not a replacement facility.*

**It is our understanding the same RFP will be used to award second phase funding. Is there something that we must do in the first RFP to indicate that we also want to be considered for second phase funding?**

*While CSA intends to issue a second and separate RFP for Phase II funding, there is no guarantee that will occur. It is unknown how quickly Phase II funding can be accessed once conditional awards are made for Phase I funding. With this said, any county wanting to compete for funding, whether Phase I or Phase II, is advised to submit a proposal for Phase I funding. There is nothing more a county needs to do at this time to be considered for second phase funding.*

**Our county may temporarily close a section of the old jail to do upgrades and repairs though it will reopen as soon as those are completed. Currently the costs related to this are not intended to be part of the county's submission on the RFP. This temporary loss of beds should not count against our project net gain in beds in our opinion, but will CSA look at it that way?**

*If the county clearly states this situation and its intentions in their proposal, and provides a reasonable timeline committing to the reopening of the beds that are subject to the upgrades and maintenance, then this would not be considered an elimination of beds affecting the net gain.*

**Page 9 of the RFP, bottom paragraph reads "Subject to these maximum state funding limits, the state has no overall limit on the total cost of an eligible county project, so long as the county demonstrates adequate local funding for the local match and ongoing operational costs of the facility." What sort of demonstration is necessary to meet this expectation?**

*At this point in time there is no further demonstration required beyond what is requested in the RFP – Proposal Form. Awarded counties will be notified if the State Public Works Board (SPWB) requests additional information at a later date, although this is not anticipated.*

**With respect to page 11 of the RFP – Technical Requirements Review of Draft Proposal, how do we make a draft submission for review, to whom specifically, and when is the final date for a submission? When can we anticipate a response from the CSA?**

*Counties choosing to submit a draft proposal for CSA staff to review prior to the formal submission required by March 18, 2008, may do so up to two weeks prior to the submittal deadline. Two weeks prior would mean no later than March 4, 2008. Page 3 of the RFP lists staff contact information that may be used for submitting draft proposals in whatever concise format the county desires (email or paper). CSA staff will turn draft proposal reviews around as quickly as possible, recognizing that timeframes for that may vary depending on the number of draft proposals submitted at any given time.*

**Regarding county presentations of their projects in April 2008 (page 11 of RFP), do we schedule a time now, and how much time are we allowed for our presentation, or will we be advised? How many from the county can attend? Can the consultants attend the presentation to clarify to the county representatives specific points, or are they not allowed to be present at all?**

*County presentations will be scheduled for either April 23 or 24, 2008 in Sacramento. Once it is known which counties have submitted a proposal by March 18, 2008, county presentations will be scheduled. Presentations will be brief (5 to 10 minutes generally), and counties will be notified of the exact timeframe to be allowed. There is not an anticipated limit on the number of county representatives that may be present. The presentation must be done by county representatives although consultants for the county may be present in the audience.*

1/18/08                                            3

**Regarding the retention referenced on page 24 of the RFP, is the referenced 20% retention amount the first 20% of reimbursable expenses that is being held back?**

*The non-negotiable 20% retention to be held will occur when the balance of state funds reaches 20%. In other words, the 20% withheld will be the last 20% of state dollars to be paid out to the county towards the end of the project. This amount is withheld until all contractual obligations between the state and county are met (i.e., staffing and operating the facility and completing the final audit within 90 days from construction completion).*

**Assuming additional questions will come up in this process, how long can we continue to ask questions beyond the pre-proposal? And, who is the point of contact and in what form should the questions be submitted?**

*CSA staff will be available to answer questions throughout the entire process; there is no cutoff date. Questions may come in the form desired by the county (i.e., phone call, email). Page 3 of the RFP lists staff contact information.*

**With the ability for small counties to potentially have up to 20% of in-kind match reduced through petition to the CSA Board, does that mean the state dollars will cover more costs?**

*Yes, it is possible; however, fundamental rules that do not change are that: 1) state dollars will pay for actual construction costs only, up to the maximum allowable state dollar project cap for small counties of $30 million, and 2) all small counties will be responsible for the 5% minimum cash match. The county is still responsible for paying for all match-only items, as are identified in the project budget depicted on page 5 of the Proposal Form, even if there is a reduction in match granted by the CSA Board. Depending on project size, this could mean that the state dollars will pay for 95% of construction costs. This scenario will play out differently for different counties. Small counties are strongly encouraged to contact CSA staff to discuss options for maximizing state dollars on the project.*

**What is the petition format small counties are to use when petitioning the CSA Board for a reduction in match?**

*Each small county that intends to petition the CSA Board for a reduction in match must submit a letter from the authorized county representative, justifying the request for a reduction in match, and how much reduction is being requested. Keep in mind this request needs to explain to the broad-based 19-member CSA Board why the county feels this reduction is needed and how the county will benefit. Letters to the Board may be submitted via CSA staff.*

**Will state staff be in place by May 2008 to assist counties that are ready to proceed and either have complete, or nearly complete design documents?**

*Yes, state staff will be available to assist counties with their projects following the notice of conditional award for state funding in May 2008.*

**The provided timelines appear to add one to two years to projects that are "ready to go," with a contributing factor being a limited number of state staff dedicated to jail construction. Can the process be expedited and state staff available to reduce this time frame?**

*One to two years may be longer than required. The timeframes provided in the RFP are not a function of limited staff, but rather of processes. The significant and new lease-revenue bond financing process is far different than what has been experienced previously in California with local detention facility construction administered by the state. Each county must assess the information provided in the RFP and determine timeline impacts for their project.*

**What building code will CSA be using to review plans and specifications?**

*CSA does not review for building codes, but does review plans and specifications using the Minimum Standards for Local Detention Facilities as contained in Titles 15 and 24, California Code of Regulations (CCR). The State Fire Marshal will also be onsite at CSA doing plan reviews pertinent to fire and life safety regulations.*

**Is there a dollar amount that determines what is cost effective in terms of cost per bed?**

*No, CSA does not have a cost per bed figure to use as a base, largely because there is a lack of current jail construction cost data. The last significant amount of jail construction in our state was completed by the early 1990s.*

**Does the state offer any advice as to where in the budget to put cost escalation and contingency?**

*Escalation and contingency on construction costs should be built into the project's construction budget. Counties are allowed up to 10% of the state funds requested for construction contingency.*

**On page 26 of the RFP – Project Timelines, it states that the county is to provide CSA with a copy of the California Environmental Quality Act (CEQA) determination within the first 6 months. This may not be realistic as CEQA could take up to a year to complete.**

*This activity chart with approximate timeframes was provided only as a guide, and primarily for the purpose of displaying the SPWB process. The timeline begins when the county receives the notice of intent to award conditional funding. It is recognized some processes may take longer than estimated on the activity chart.*

**On page 20 of the RFP there is an explanation of cash match. Can you expand on how the points will be assigned by the Executive Steering Committee (ESC)?**

*For each proposal, percentage cash match will be calculated by dividing cash match by total state funds requested (and multiplying by 100). The distribution of calculated percentages, arranged from highest to lowest, will be provided to the ESC members for review and discussion. The ESC members will then decide how to assign points (up to a maximum of 25) for this evaluation factor.*

**How does the fact that the state is under federal receivership affect a county jail project?**

*The state is under federal receivership for health care in the prison system. Any county operating a reentry facility or co-locating a reentry facility with a county jail will have to submit to and comply with the federal receiver's orders. There will be a boiler-plate, non-negotiable agreement that the county will have to sign to this effect.*

**Is the one-page abstract required by the RFP to be single or double spaced?**

*The one page abstract is to be double spaced.*

**The RFP states that state funding can only be used to build to 2011 needs. How does a county build to needs beyond 2011 in this project if desired?**

*Ideally, the county would be able to separate out the portion of the new construction that addresses needs to 2011. Any county intending to build beyond 2011 needs is encouraged to contact CSA staff immediately to discuss ramifications and options.*

**How will the escalation of construction costs be factored into the cost effectiveness evaluation criteria, as some county projects will take longer to complete than others?**

*The cost effectiveness evaluation factor is based on the amount of state dollars the county is requesting divided by the net gain in beds. The evaluation factor formula does not, and is not intended to, consider escalation of construction costs.*

**Does the cost effectiveness formula take into consideration the type of bed you are building, dormitory vs. cell?**

*No it does not, and is not intended to do so.  On a related note, your needs assessment must support the type of bed the county is proposing to build.*

**Does construction need to be complete within three years from when you get the intent to award?**

*Federal tax law affecting this financing process requires that construction be substantially complete (approximately 90%) within three years after the county begins construction (the notice to proceed is issued).  (Note: clarification added.)*

**Is a program statement required with the submittal of the proposal?**

*No, the operational program statement required by Title 24 must accompany the schematic design submittal.  The proposal submittal must include only that information requested in the RFP, accompanied by a needs assessment.  The information provided in a county's proposal must be supported by what is contained in their needs assessment.*

**Is there a deadline for when schematic design must be submitted?**

*While there is no specific deadline, each county needs to provide a reasonable timeline in their proposal.*

**Will there be any consideration to projects that propose using a design-build construction process?**

*CSA will need to work with a county individually as the design-build process may not be compatible with the SPWB process.*

**Can a county withdraw from the funding program after they are given a letter of intent to award conditional funding if they realize by then they can not meet the three year timeline to complete construction?**

*Yes, counties can withdraw early on in the process after receiving the notice they are being conditionally awarded the state funding, and before starting construction.  The three year timeline to complete construction begins when the county issues the notice to proceed for construction.*

**In establishing current market value for the county property for the jail to be used as in-kind match, what kind of price comparison vehicle must be used?**

*In using site acquisition as match, a county must stipulate the land cost/value in the Board of Supervisors' resolution required with the proposal submittal. Actual on-site land cost documentation (i.e., bill of sale) or an independent appraisal value will be required as a pre-agreement condition. (Note: clarification added.)*

## LEASE-REVENUE BOND FINANCING/STATE PUBLIC WORKS BOARD PROCESS

**Does the county's land for the jail construction project transfer to the state?**

*The county maintains title on the land. Through a series of agreements and leases the state obtains ownership interest in the land.*

**On page 7 of the RFP, paragraph 1, it states "It is expected that facility ownership will then vest with the participating county." How else might this take place? Is it possible that the state will retain ownership?**

*There is no plan for the facility ownership to vest with any jurisdiction other than the county once the bond indebtedness is paid off. The state does not intend to retain ownership interest.*

**Our project scope includes the remodel of portions of the kitchen, laundry and video visitation, all of which are located within the existing facility. If the cost of this work is included as part of our eligible project costs, must these areas (or the entire building that these areas are located in) be brought up to current seismic and fire/life safety requirements? Also, must these areas be segregated from the existing facility, and included as part of the project site?**

*All areas of a facility that are being remodeled and included as part of the project scope (or eligible project costs), will be subject to current seismic and fire and life safety standards. Segregating portions of an existing facility that are under one roof will not be possible for purposes of determining project scope.*

**May a county identify a scope of work as an alternate bid item, and undertake that portion of the construction contract with the use of county funding only, and not include it in the scope of work on the proposed jail construction project?**

*Yes, that is possible. Contact CSA staff for guidance on this issue.*

**When completed, the entire facility (new and old), must work as an integrated unit, including such systems as the following: site utilities, telecommunications, security locking systems, video surveillance, video**

1/18/08                                          8

**visitation, inmate monitoring, life safety, fire alarm, etc. Must all of these infrastructure improvements in the existing facility be included as part of the project site if they are included as eligible project costs? If these systems are not included as an eligible project cost and are funded solely with local funds as a separate bid item, may the systems interconnect with the state funded buildings?**

*Construction work in an existing facility, and included in the project scope or eligible project costs, must be included in the project site. State funded buildings may interconnect with non-funded existing facilities in terms of infrastructure, although the state funded building must be able to be functionally independent in terms of operating its own controls for those infrastructure tie-ins. As an example, it would not be acceptable for the existing facility to be able to turn off the HVAC system for the new facility, without the new facility portion being able to override.*

**Under what conditions will the SPWB waive the 5 to 15 foot buffer requirement and allow a seismic joint to serve as the separation to provide for a "clean footprint"?**

*There is no waiver criteria set for this situation. CSA encourages each county to meet the 5 – 15 foot buffer if desiring to create a truly separate project and "clean footprint" that does not involve the existing facility. Otherwise, exceptions to this requirement will be considered by the SPWB on a case-by-case basis, although to date the SPWB has not given any indication of waiving this requirement.*

**Will a free standing secured breezeway be allowed to span the 5 – 15 foot buffer between the state financed portion of the building and an existing structure that is not part of the lease-revenue bond funded portion?**

*Direction from SPWB indicates that permanent structures joining the new portion of the facility with the existing building will likely cause the existing facility to become part of the footprint or project site. These issues will have to be worked out with SPWB.*

**Regarding the metes and bounds survey as referenced on page 25 of the RFP, must there be a separate parcel and Assessor's Parcel Number (APN), or just a public document providing definition?**

*A separate APN is not required for determining the project site for purposes of this funding. The survey/legal description will determine the project site including the appropriate buffer zone.*

**Zero setbacks are common, so why is there the requirement for a 5 – 15 foot buffer from other buildings? This adds costs and reduces efficiency.**

*Some counties have indicated they choose to keep the boundaries of the project site at a minimum, i.e., that area of a project subject to state ownership interest, approval and oversight. This is where the buffer may be used by the county in creating a separation and minimizing the project site or footprint. Otherwise, having the buffer between buildings is not necessarily a requirement of this funding.*

**Inability to share infrastructure with other buildings (water, power, sewer) increases costs and lessens the number of beds provided with scarce funding. Is this a requirement of the bond?**

*Shared infrastructure is allowable, although when the new construction is separated by a buffer from the existing facility for purposes of limiting the project site or footprint, the new construction must be functionally independent. This requires that the new portion have its own controls of the infrastructure components so that it cannot be shut off by the existing facility without the ability to override. This is a bond marketing requirement.*

**What are the specific requirements that must be met for the building to be eligible for bond funding? Can we get a copy of the requirements now so we can see if we can meet them?**

*A list of lease-revenue bond financing requirements is not available, as each project will be reviewed for its unique qualities, and will be assessed by the SPWB for the state's ability to sell bonds on that project. Many of the requirements are market driven, rather than from regulatory or statutory codes. CSA staff is available as a conduit to the SPWB to facilitate assessment of individual and specific project situations when needed. On a separate track, projects must comply with Titles 15 and 24, CCR (minimum jail standards and state fire marshal's fire and life safety regulations). Other building codes also apply.*

**If a county wants to enlarge the kitchen to accommodate the increase in beds, does the kitchen remodel become part of the project and does it have to be brought up to current seismic and fire safety codes?**

*If the kitchen remodel is part of the county's scope of work and proposed project under this program, then the kitchen would have to be brought up to current seismic and fire and life safety codes. Generally speaking, this would also apply to the remainder of the facility in which the kitchen is located, as it would be subject to state ownership interest. CSA staff can provide more information to individual counties, taking into account a particular county's facility layout and how that may work within the lease-revenue financing process.*

**If the newly constructed building is 5 – 15 feet away from the existing facility, can the two buildings be connected with a tunnel?**

1/18/08                                    10

*A tunnel would be considered a permanent structure attaching the newly constructed building to the existing facility, thus requiring the existing facility to be part of the project footprint and subject to current seismic and fire and life safety code requirements.*

**If not a tunnel, what if the new building were connected to the existing building with a chain-link breezeway?**

*A chain-link connection would be considered less permanent and not connecting the new construction to the existing facility. Counties will have to work out the specifics of the breezeway construction and the potential impact on their facility operations.*

**On page 25 of the RFP under Project Scope it states that a project with less than a 5 – 15 buffer will have to be evaluated on a case-by-case basis. Is there someone at the SPWB a county can contact to discuss this?**

*CSA is the contact for counties with questions regarding the SPWB process. If a county has a specific situation that can be clearly articulated, CSA will assist in attempting to get a response from SPWB to the county's proposed scenario, recognizing the buffer is generally required when wanting to separate an existing facility from new construction.*

**In Section 4 of the Proposal Form under Project Need there are several criteria listed. Will the ESC break down the 250 points for each of the criteria, and if so, can that be made public?**

*There is no breakdown of the points for each of the items that must be included in each section of the narrative. It will be up to each ESC member to assign a point value of up to 250 points for project need, based upon their independent assessment of the narrative response.*

**Regarding the 5 – 15 foot buffer, can that buffer zone be crossed with computer lines for such things as video visitation and security systems? What about sewer connections and electrical?**

*The new building must be functionally independent of other existing buildings (having its own controls of the systems), but may tie in to existing infrastructure.*

**What is the revenue stream to pay back the lease-revenue bonds and how will the state budget deficit affect the lease-revenue bond process?**

*The state's general fund is the revenue source to pay the lease payments on the bonds. It is not expected that the state budget deficit will have an effect on the lease-revenue bond process.*

**What is the timeline to issue the bonds?**

*The bonds are not sold until the construction of the facility is nearly complete. The interim funding until the bonds are sold comes from sources such as the Pooled Money Investment Board loans. If the state cannot sell the bonds, the California Department of Corrections and Rehabilitation's (CDCR) budget is responsible for payment of the outstanding loans. However, this scenario is unlikely.*

**The RFP states that the cost of the real estate due diligence is to be charged to the county. Where does this get reflected in the county's budget summary?**

*The cost of real estate due diligence itself is not part of the eligible costs in the budget, and CSA does not know what amount to advise counties to budget for this. CSA has been told that on prison projects the real estate due diligence can cost as much as $50,000, but it could be less. The cost will vary project by project.*

**If the county has already performed some of the real estate due diligence activities, can that be used for the state's purpose? Will the state charge staff time to the county's project?**

*It is true that the counties will be preparing their own CEQA and EIR documents for their projects. It is unknown at this point whether or not those documents will be utilized by the state for their real estate due diligence process. The state will charge counties for the cost of completing the real estate due diligence, which may be conducted by the state's Department of General Services staff or contracted out to an independent engineering firm. CSA staff time related to real estate due diligence, if any, will not be charged to the counties.*

## PAROLEE MENTAL HEALTH SERVICES FUNDING PREFERENCE

**Mental Health Sites – Does the state prefer vacant land, existing vacant buildings or some other option for locating mental health day treatment and crisis care for parolees (the reference to physical location is vague)?**

*Interested counties are encouraged to contact Robert Storms, Staff Services Manager II, of the Division of Adult Parole Operations to initiate discussion on mentally ill parolee needs, and current services available in their county. CDCR would like to refer mentally ill parolees to services that currently exist, whether they are site specific or not. It is the goal to match the needs to currently available services whether provided directly by the counties, or contracted out. CDCR has sought funding for the contracted services, and plans to pay for*

*contracted services. Rather than the high cost of building or leasing sites for these services, CDCR would prefer supplementing the counties to increase capacity so that the mentally ill parolees can receive services within their current infrastructure. (Note: clarification added.)*

**If access is provided to existing mental health and substance abuse treatment programs for parolees and post-parole individuals, does this satisfy the requirements for awarding preference points?**

*As far as qualifying for the funding preference points, the county need only indicate that they agree to assist the state, and do so in the format prescribed in the RFP.*

**Are there any minimum standard guidelines or approaches to mental health day treatment, like a specific risk-needs assessment tool that must be used?**

*During negotiations with the interested counties, mental health service availability and parolee needs in each geographical location will be identified. A mutually agreed upon scope of services will then be developed by both parties, and will include an eligibility determination process with exclusionary criteria. (Note: clarification added.)*

**Can a county contract out to a private company to provide the services, e.g. day treatment program?**

*Yes, a county can contract with a private company for the mental health and substance abuse services to the parolee population. (Note: clarification added.)*

**An increase in services for the parolee population means an increase in costs. This sounds like a shift in costs with the county paying for the parolee treatment instead of the state?**

*There is no expectation that the county pay for the costs of parolee mental health services that are referenced in the RFP and that relate to the preference factor for assisting the state with providing these services. CDCR has sought funding for the contracted services with counties for the parolee population, and plans to pay for the contracted services. However, when it comes to the preference factor of assisting with the continuum of care to parolees so that they can receive services at the conclusion of their period of parole, there would be no state funding for this as the ex-parolee would be a citizen of the community without a connection to the state at this point.*

**Has CDCR defined "day treatment?" This is an old model that is not used much anymore.**

*CDCR, with input from various county representatives and the California Mental Health Directors Association has defined day treatment as "Mental Health Rehabilitative Services designed to target individual needs of mentally ill parolee-clients." In addition, the term crisis care has been defined as "In-Patient Mental Health Services designed to stabilize and treat mentally ill parolee-patients in need of an acute level of care." (Note: clarification added.)*

**Are there going to be future meetings to address the mental health/parolee questions?**

*There are no future meetings planned to discuss mental health services for parolees; however, CSA has listed contact information in the FAQs for parole program and reentry questions. We encourage counties to contact them directly.*

## REENTRY FACILITY FUNDING PREFERENCE

**As it relates to siting a reentry facility, if a county considers the use of an existing jail facility, can this be conditioned upon receiving maximum funding?**

*If a county offers to assist the state in siting a reentry facility, that offer may be conditioned upon receiving state funding for the county's proposed jail project.*

**Does CDCR view the operation of the reentry facilities part of the county's obligation to receive funds?**

*Counties do not need to operate reentry facilities; CDCR would prefer to operate the state prison reentry facilities with its own staff.*

**Will counties be more favorably rated in their jail construction proposal if they desire to operate the reentry program?**

*The operation of the actual reentry program is not within the rating factors for jail construction proposals. There will not be additional points afforded for reentry programming operations.*

**Regarding the gradation of reentry preference points of up to 300 points, is that gradation either 150 points or 300 points, or is there a scale in between?**

*It is either 150 points or 300 points. The criterion for gaining each is outlined in the RFP.*

1/18/08                                    14

**If a county chooses not to assist the state with those issues tied to funding preferences (reentry siting and parolee mental health services), what are the ramifications?**

*Other than not gaining the preference points, there are no other ramifications.*

**On page 14 of the RFP, Co-locating Jails and State Secure Reentry Program Facilities, is there any kind of guidance from the state to determine what is reasonable to share?**

*State dollars from this RFP process can only pay for jail construction costs. If a county chooses to co-locate a jail and a reentry facility, CSA staff will have to work with the county to help apportion those costs so that they clearly represent only jail construction and not reentry facility costs.*

**Will there be funding to staff the reentry facilities?**

*CDCR prefers to staff and operate the reentry facilities with state employees, and the operational funding is proposed through the state budget process on a year-to-year basis.*

**Will Parole fund the necessary services for parolees once they are released from the reentry facility?**

*Yes, CDCR intends to fund AB 900 authorized mental health services provided in the county for parolees by way of contracts. In addition, CDCR continues to provide outpatient mental health treatment and medication management by way of its Parole Outpatient Clinics.*

# EXHIBIT CC



FRCP Rule 37                                                                    Page 1
Fed.Rules Civ.Proc. Rule **37** , 28 U.S.C.A.

COPR. © WEST 1992 No Claim to Orig. Govt. Works

**UNITED STATES CODE ANNOTATED**
**RULES OF CIVIL PROCEDURE** FOR THE UNITED STATES DISTRICT COURTS
**V. DEPOSITIONS AND DISCOVERY**

Rule 37. Failure to Make or Cooperate in Discovery: Sanctions

  **(a) Motion For Order Compelling Discovery.** A party, upon reasonable notice to other parties and all persons affected thereby, may apply for an order compelling discovery as follows:

  **(1) Appropriate court.** An application for an order to a party may be made to the court in which the action is pending, or, on matters relating to a deposition, to the court in the district where the deposition is being taken. An application for an order to a deponent who is not a party shall be made to the court in the district where the deposition is being taken.

  **(2) Motion.** If a deponent fails to answer a question propounded or submitted under Rules 30 or 31, or a corporation or other entity fails to make a designation under Rule 30(b)(6) or 31(a), or a party fails to answer an interrogatory submitted under Rule 33, or if a party, in response to a request for inspection submitted under Rule 34, fails to respond that inspection will be permitted as requested or fails to permit inspection as requested, the discovering party may move for an order compelling an answer, or a designation, or an order compelling inspection in accordance with the request. When taking a deposition on oral examination, the proponent of the question may complete or adjourn the examination before applying for an order.

If the court denies the motion in whole or in part, it may make such protective order as it would have been empowered to make on a motion made pursuant to Rule 26(c).

  **(3) Evasive or incomplete answer.** For purposes of this subdivision an evasive or incomplete answer is to be treated as a failure to answer.

  **(4) Award of expenses of motion.** If the motion is granted, the court shall, after opportunity for hearing, require the party or deponent whose conduct necessitated the motion or the party or attorney advising such conduct or both of them to pay to the moving party the reasonable expenses incurred in obtaining the order, including attorney's fees, unless the court finds that the opposition to the motion was substantially justified or that other circumstances make an award of expenses unjust.

If the motion is denied, the court shall, after opportunity for hearing, require the moving party or the attorney advising the motion or both of them to pay to the party or deponent who opposed the motion the reasonable expenses incurred in opposing the motion, including attorney's fees, unless the court finds that the making of the motion was substantially justified or that other circumstances make an award of expenses unjust.

If the motion is granted in part and denied in part, the court may apportion the reasonable expenses incurred in relation to the motion among the parties and persons in a just manner.

  **(b) Failure to comply with order.**

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

FRCP Rule 37                                                          Page 2
Fed.Rules Civ.Proc. Rule **37**, 28 U.S.C.A.

**(1) Sanctions by court in district where deposition is taken.** If a deponent fails to be sworn or to answer a question after being directed to do so by the court in the district in which the deposition is being taken, the failure may be considered a contempt of that court.

**(2) Sanctions by Court in Which Action Is Pending.** If a party or an officer, director, or managing agent of a party or a person designated under Rule 30(b)(6) or 31(a) to testify on behalf of a party fails to obey an order to provide or permit discovery, including an order made under subdivision (a) of this rule or Rule 35, or if a party fails to obey an order entered under Rule 26(f), the court in which the action is pending may make such orders in regard to the failure as are just, and among others the following:

**(A)** An order that the matters regarding which the order was made or any other designated facts shall be taken to be established for the purposes of the action in accordance with the claim of the party obtaining the order;

**(B)** An order refusing to allow the disobedient party to support or oppose designated claims or defenses, or prohibiting that party from introducing designated matters in evidence;

**(C)** An order striking out pleadings or parts thereof, or staying further proceedings until the order is obeyed, or dismissing the action or proceeding or any part thereof, or rendering a judgment by default against the disobedient party;

**(D)** In lieu of any of the foregoing orders or in addition thereto, an order treating as a contempt of court the failure to obey any orders except an order to submit to a physical or mental examination;

**(E)** Where a party has failed to comply with an order under Rule 35(a) requiring that party to produce another for examination, such orders as are listed in paragraphs (A), (B), and (C) of this subdivision, unless the party failing to comply shows that that party is unable to produce such person for examination.

In lieu of any of the foregoing orders or in addition thereto, the court shall require the party failing to obey the order or the attorney advising that party or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the court finds that the failure was substantially justified or that other circumstances make an award of expenses unjust.

**(c) Expenses on Failure to Admit.** If a party fails to admit the genuineness of any document or the truth of any matter as requested under Rule 36, and if the party requesting the admissions thereafter proves the genuineness of the document or the truth of the matter, the requesting party may apply to the court for an order requiring the other party to pay the reasonable expenses incurred in making that proof, including reasonable attorney's fees. The court shall make the order unless it finds that (1) the request was held objectionable pursuant to Rule 36(a), or (2) the admission sought was of no substantial importance, or (3) the party failing to admit had reasonable ground to believe that the party might prevail on the matter, or (4) there was other good reason for the failure to admit.

**(d) Failure of Party to Attend at Own Deposition or Serve Answers to** Interrogatories or Respond to Request for Inspection. **If a party or an** officer, director, or managing agent of a party or a person designated under Rule 30(b)(6) or 31(a) to testify on behalf of a party fails (1) to appear before the officer who is to take the deposition, after being served with a proper notice, or (2) to serve answers or objections to interrogatories submitted under Rule 33, after proper service of the interrogatories, or (3) to serve a written response to a request for inspection submitted under Rule 34, after proper service of the request, the court in which the action is

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

FRCP Rule 37                                                                          Page 3
Fed.Rules Civ.Proc. Rule **37** , 28 U.S.C.A.

pending on motion may make such orders in regard to the failure as are just, and among others it may take any action authorized under paragraphs (A), (B), and (C) of subdivision (b)(2) of this rule. In lieu of any order or in addition thereto, the court shall require the party failing to act or the attorney advising that party or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the court finds that the failure was substantially justified or that other circumstances make an award of expenses unjust.

The failure to act described in this subdivision may not be excused on the ground that the discovery sought is objectionable unless the party failing to act has applied for a protective order as provided by Rule 26(c).

**(e) [Abrogated]**

**(f) [Repealed. Pub.L. 96-481, Title II, § 205(a), Oct. 21, 1980, 94 Stat.** 2330]

**(g) Failure to Participate in The Framing of a Discovery Plan.** If a party or a party's attorney fails to participate in good faith in the framing of a discovery plan by agreement as is required by Rule 26(f), the court may, after opportunity for hearing, require such party or attorney to pay to any other party the reasonable expenses, including attorney's fees, caused by the failure.

(As amended Dec. 29, 1948, effective Oct. 20, 1949.)

(As amended Mar. 30, 1970, eff. July 1, 1970; Apr. 29, 1980, eff. Aug. 1, 1980; Pub.L. 96-481, Title II, § 205(a), Oct. 21, 1980, 94 Stat. 2330; Mar. 2, 1987, eff. Aug. 1, 1987.)

HISTORICAL NOTES

**1980 Amendment**

Subd. (f). Pub.L. 96-481 repealed subd. (f), which provided that except to the extent permitted by statute, expenses and fees may not be awarded against the United States under this rule.

**Effective Date of 1980 Amendment**

Amendment by Pub.L. 96-481 effective Oct. 1, 1981, and applicable to civil actions and adversary adjudications described in section 2412 of Title 28, Judiciary and Judicial Procedure, which are pending on, or commenced on or after Oct. 1, 1981, see section 208 of Pub.L. 96-481, set out as a note under section 2412 of Title 28, Judiciary and Judicial Procedure.

**Failure of United States to Participate in Good Faith in Discovery**

Rule 37 authorizes the court to direct that parties or attorneys who fail to participate in good faith in the discovery process pay the expenses, including attorneys' fees, incurred by other parties as a result of that failure. Since attorneys' fees cannot ordinarily be awarded against the United States (28 U.S.C. § 2412 [section 2412 of this title] ), there is often no practical remedy for the misconduct of its officers and attorneys. However, in the case of a government attorney who fails to participate in good faith in discovery, nothing prevents a court in an appropriate case from giving written notification of that fact to the Attorney General of the United States and other appropriate heads of offices or agencies thereof.

ADVISORY COMMITTEE NOTES

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.