PRISON LAW OFFICE
DONALD SPECTER, Bar No. 83925
STEVEN FAMA, Bar No. 99641
ALISON HARDY, Bar No. 135966
SARA NORMAN, Bar No. 189536
REBEKAH EVENSON, Bar No. 207825
E. IVAN TRUJILLO, Bar No. 228790
1917 Fifth Street
Berkeley, CA  94710
Telephone:  (510) 280-2621

KIRKPATRICK & LOCKHART PRESTON
GATES ELLIS LLP
JEFFREY L. BORNSTEIN, Bar No. 99358
EDWARD P. SANGSTER, Bar No. 121041
RAYMOND E. LOUGHREY, Bar No. 194363
55 Second Street, Suite 1700
San Francisco, CA  94105-3493
Telephone:  (415) 882-8200

THE LEGAL AID SOCIETY–
EMPLOYMENT LAW CENTER
CLAUDIA CENTER, Bar No. 158255
600 Harrison Street, Suite 120
San Francisco, CA  94107
Telephone:  (415) 864-8848

ROSEN, BIEN & GALVAN, LLP
MICHAEL W. BIEN, Bar No. 96891
JANE E. KAHN, Bar No. 112239
AMY WHELAN, Bar No. 215675
LORI RIFKIN, Bar No. 244081
LISA ELLS, Bar No. 243657
315 Montgomery Street, 10th Floor
San Francisco, California  94104
Telephone: (415) 433-6830

BINGHAM, McCUTCHEN, LLP
WARREN E. GEORGE, Bar No. 53588
Three Embarcadero Center
San Francisco, California  94111
Telephone: (415) 393-2000

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURTS

FOR THE EASTERN DISTRICT OF CALIFORNIA

AND THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>Plaintiffs,<br><br>vs.<br><br>ARNOLD SCHWARZENEGGER, et al.,<br><br>Defendants | No.  Civ S 90-0520 LKK-JFM P<br>**THREE-JUDGE COURT** |
| MARCIANO PLATA ,et al.,<br><br>Plaintiffs,<br><br>vs.<br><br>ARNOLD SCHWARZENEGGER, et al.,<br><br>Defendants | No. C01-1351 TEH<br>**THREE-JUDGE COURT**<br>**PLAINTIFFS' OPPOSITION TO**<br>**DEFENDANTS' REQUEST FOR**<br>**RECONSIDERATION OF MAGISTRATE**<br>**JUDGE'S RULING REQUIRING**<br>**DEPOSITIONS (E.D. L.R. 72-303)** |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES..................................................................................................ii

I. INTRODUCTION ..........................................................................................................1

II. PROCEDURAL BACKGROUND ..............................................................................4

III. STANDARD OF REVIEW..........................................................................................5

IV. ARGUMENT ...............................................................................................................6

    A.  Plaintiffs Intend to Call The Governor, Mr. Gore and Ms. Kennedy as Trial Witnesses, and Plaintiffs' Position Regarding these Depositions Would be Unaffected by Whether the Witnesses are Allowed to Testify at Trial .................... 6

    B.  Plaintiffs Seek to Elicit Information From the Three Identified Witnesses that Cannot be Obtained through Other Means......................................................7

        1.  Governor Schwarzenegger has unique personal knowledge of matters critical to plaintiffs' cause of action and defendants' defenses...........................7

        2.  Robert Gore has unique personal knowledge of matters critical to plaintiffs' cause of action and defendants' defenses ............................................ 12

        3.  Susan Kennedy has unique personal knowledge of matters critical to plaintiffs' cause of action and defendants' defenses ............................................ 14

        4.  Written Discovery is not an adequate substitute for a deposition ........................ 15

        5.  Plaintiffs cannot obtain this critical information by deposing other Witnesses ...................................................................................................... 17

V.  CONCLUSION ........................................................................................................ 18

# TABLE OF AUTHORITIES

## CASES

*Ainsworth v. Vasquez*, 759 F. Supp. 1467 (E.D. Cal.1991) ........................................................ 7

*Atlanta Journal and Constitution v. City of Atlanta*,
    175 F.R.D. 347 (N.D. Ga. 1997) ........................................................................................ 13

*Bagley v. Blagojevich*, 486 F. Supp. 2d 786 (C.D. Ill., 2007) .................................................. 13

*Brown v. Wesley's Quaker Maid, Inc.*, 771 F.2d 952 (6th Cir. 1985) ......................................... 8

*Champagne v. Whitman*, 2006 WL. 2522381 (E.D. Cal. Aug. 28, 2006) ................................... 8

*Church of Scientology of Boston v. I.R.S.*, 138 F.R.D. 9 (D.Mass.1990) ................................. 13

*Culp v. Devlin*, 78 F.R.D. 136 (E.D. Pa. 1978)....................................................................... 13

*In re: David A. Kessler*, 100 F.3d 1015 (D.C. Cir. 1996) ...................................................... 13

*Green v. Baca*, 226 F.R.D. 624 (C.D.Cal. 2005) .................................................. 12, 13, 14, 15

*Hadnot v. Amos*, 291 F. Supp. 309 (M.D. Ala. 1968)............................................................ 13

*Lederman v. Giuliani*,
    No. 98-CV-2024, 2002 WL. 31357810 (S.D.N.Y. Oct. 17, 2002) ................................... 13

*National Wildlife Federation v. United States Forest Serv.*,
    861 F.2d 1114 (9th Cir. 1988)............................................................................................. 8

*Northwestern University v. City of Evanston*, 2001 WL. 743756 (N.D. Ill. 2001)................... 13

*Pension Benefit Guaranty Corp. v. LTV Steel*, 119 F.R.D. 339 (S.D.N.Y. 1988) ................... 13

*Prisma Zona Exploratoria De Puerto Rico, Inc. v. Calderon*,
    154 F. Supp. 2d 245 (D. P.R. 2001) ................................................................................. 13

*RTC v. Drumond*, 137 F.R.D. 634 (S.D.N.Y. 1991) .............................................................. 13

*Richlin v. Sigma Design West, Ltd.*, 88 F.R.D. 634 (C.D.Cal. 1980) ...................................... 17

*Trunk v. San Diego*, 2007 WL. 1110715 (S.D. Cal. 2007)..................................................... 18

*United States v. United States Gypsum Co.*, 333 U.S. 364 (1948) ............................................ 8

*Virgo Corp. v. Paiewonsky*, 39 F.R.D. 9 (D.V.I. 1966)........................................................... 13

*Weeks v. Bayer*, 246 F.3d 1231 (9th Cir. 2001)........................................................................ 8

[19945-1]

1

# STATUTES

2

28 United States Code
    § 636(b)(1)(A) ................................................................................................ 7

3

    § 2284 ............................................................................................................... 6

4

18 United States Code
    §3626(a)(2) .................................................................................................. 3, 12

5

    §3626(a)(3)(E)(i) and (ii) ................................................................................ 3

6

# MISCELLENIOUS

7

California Practice Guide of Federal Civil Procedure Before Trial,
    Ch. 11(IV)-B, §11:1662 ................................................................................ 17

8

E.D. Local Rule 72-303(f) ..................................................................................... 7

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

iii

[19945-1]

## I.   INTRODUCTION

Governor Arnold Schwarzenegger, Robert Gore and Susan Kennedy have unique personal knowledge of critical facts in this case, and the Magistrate Judge correctly ordered that they appear for their depositions.  While high-ranking officials are not typically subject to deposition, this is not an ordinary case in which a governor is named as a matter of form.  As the Magistrate Judge correctly found, the Governor, Mr. Gore and Ms. Kennedy should be subjected to deposition because they have personal knowledge of facts related to, or direct involvement in, the key issues in this case. Defendants have failed to demonstrate that the Magistrate Judge committed clear error, and the motion for reconsideration should be denied.

The central allegations in these proceedings are that California's prisons are overcrowded and that the overcrowding is the primary cause of violations of prisoners' constitutional rights to adequate medical and mental health care.  Plaintiffs seek a court order requiring the State to reduce its prison population.  Under the Prison Litigation Reform Act (PLRA), in order to obtain a "prisoner release order," plaintiffs need to demonstrate to a specially-constituted Three-Judge Panel that "crowding is the primary cause of the violation of a Federal Right" (here, the rights to medical and mental health care), and that "no other relief will remedy the violation of the Federal Right." 18 U.S.C. §§3626(a)(3)(E)(i) and (ii).  The PLRA also requires any Three-Judge Panel hearing such a motion to consider whether a "prisoner release order" would have an "adverse impact on public safety." 18 U.S.C. §3626(a)(2).

Defendants contend that even a four-hour deposition of the governor, and six hour depositions of his aides, are inappropriate because the Governor does not know the facts on the ground in individual prisons.  But this is not entirely true; as we demonstrate below, the Governor has personally toured overcrowded prisons and made public statements about the impacts of overcrowding;  in any event, plaintiffs do not seek to focus on their deposition questions about prison conditions.  Rather, plaintiffs primarily seek to question the Governor, Mr. Gore, and Ms. Kennedy about two other elements of the case:  whether any relief, other than a prison release order, would remedy the constitutional violation, and whether a prisoner release order would have an adverse impact on public safety.

1

As demonstrated below, the Governor, Mr. Gore, and Ms. Kennedy have unique personal information relevant to both of these elements of the case. For example, the Governor submitted a budget proposal in early 2008 that contemplated releasing more than 22,000 prisoners, while at the same time the Governor claims in this case that releasing prisoners would adversely affect public safety; the Governor's public and private statements that the state needs "clean-up legislation to fix AB 900 (prison construction legislation passed in 2007) contradicts his litigation position that AB 900 is a panacea for the overcrowding problem; and the Governor's continued effectuation of the emergency proclamation contradicts his apparent litigation position that conditions are improving and the prison conditions to do not pose an immediate risk to inmate health.

The Governor was not just acting as a figurehead when he issued these policies. Documents produced thus far in discovery demonstrate that the Governor, Mr. Gore and Ms. Kennedy were deeply, and personally, involved in each of these matters. The Magistrate Judge's ruling recognizes a critical fact in this litigation: the defendants' response to the state prison system's overcrowding crisis is being directed at the highest level of state government, and not by CDCR officials. The Governor himself has visited prisons and met with high-level officials in state government and in the CDCR in attempts to resolve the overcrowding crisis. It was Governor Schwarzenegger who called the Legislature into special session in June 2006 to consider his reform proposals, including building more prisons and establishing reentry facilities, redirecting non-violent women prisoners, and expediting state contracting to streamline facility construction plans. Evenson Decl., Exh. A (6/26/06 Governor's Press Release). When the Governor's proposals failed to gain legislative approval, he issued an emergency proclamation in October 2006, in part to facilitate contracting with out-of-state prison facilities to house California prisoners and the expedited construction of additional prison facilities. Evenson Decl., Exh. B (10/4/06 Governor's Press Release). Two months later, the Governor put forth a three-part proposal to address the prison crisis that included building 78,000 new "desperately needed" prison beds, parole reform and a sentencing commission. Evenson Decl., Exh. C (12/21/06 Governor's Remarks).

The Governor's May 2007 Fact Sheet regarding Assembly Bill 900, the bill aimed at reducing overcrowding through expanding facilities and improving rehabilitation, reported that the Governor

1  would take aggressive steps to immediately relieve overcrowding, and would continue "to press for
2  many of the innovative reforms in his January 2007 proposal." Evenson Decl., Exh. D (Fact Sheet:
3  Governor signs AB 900, the Public Safety and Offender Rehabilitation Services Act of 2007). In that
4  Fact Sheet, the Governor set forth steps he was taking to address the crisis, including expediting
5  construction of prison beds, directing better parole practices, and instructing the CDCR Secretary Jim
6  Tilton to improve management at the prisons. *Id.*

7       Shortly after signing AB 900, the Governor announced his creation of two "strike teams" to
8  expedite implementation of AB 900, one to support prison reform efforts, and the other to expedite
9  construction of prison facilities. Evenson Decl., Exh. E (5/11/07 Governor's Press Release). The
10  Governor announced, "My administration is taking immediate action to implement California's
11  historic reform plan," and further stated that he would "not tolerate bureaucratic hang ups and delays
12  when it comes to public safety." *Id.* at 1. The strike teams report, not to CDCR officials, but to the
13  Governor's own Cabinet Secretaries, Robert Gore and Dan Dunmoyer.

14       Defendants' position in this case is that the overcrowding crisis can be resolved by building
15  more beds, but AB 900 implementation is badly behind schedule, and it has become apparent that
16  CDCR cannot come close to building the number of beds authorized by that statute. Evenson Decl.,
17  Exh. F. (CDCR's "Integrated Strategy to Address Overcrowding in CDCR's Adult Institutions",
18  6/18/08). And while CDCR has indicated full support of the *Plata* Receiver's plan to build 10,000
19  medical beds (*see id.* at 4), the Governor has taken a different position. The Governor wrote to the
20  Receiver stating that he (the Governor) was "not in a position to provide [the Receiver] with written
21  assurance that [his] request of $204.6 million would be met." Evenson Decl., Exh. G at 2. (The
22  Receiver subsequently moved for contempt against the Governor and the State Controller for failing
23  and refusing to fund the Receiver's capital projects). The Governor and his executive staff are plainly
24  the critical decisionmakers in the prison crisis, and plaintiffs are entitled to ask them how they intend
25  to address the overcrowding crisis in light of the shortfalls in AB 900 and the Governor's unwillingness
26  to fund the Receiver's medical beds.

27       Defendants are simply wrong to contend that "neither the Governor nor his Cabinet staff have
28  direct involvement" in CDCR's operations or the matters at issue here. The documents show a

1  surprising level of mircro-management.  For example, in a string of emails Ms. Kennedy, writing to

2  several CDCR and Administration officials, stated "We need to make sure no 'bad' beds get backfilled

3  when inmates are transferred out of state.  Is that happening right now or is there some ExO needed to

4  give CDCR the authority to close down those beds?"  Evenson Decl., Exh. H at E_PRIV_009601.

5  After a series of exchanges, then-Secretary of CDCR James Tilton forwarded the emails to Scott

6  Kernan, CDCR's Chief Deputy Secretary of Adult Operations, and Mr. Kernan replied, "Think we are

7  not at the table, but bet sk [Susan Kennedy] is.  We hold the bag."  *Id.* at E_PRIV_009598.  In another

8  email message, Ms. Kennedy specifically suggested that money for certain "recidivism reduction

9  grants" be cut from CDCR's budget.  Evenson Decl., Exh. II.

10       While plaintiffs have scheduled depositions of the CDCR officials responsible for day-to-day

11  operation of the prisons, those officials simply do not have the relevant information regarding the

12  establishment of policies, and alternative methods for reducing overcrowding that the Governor

13  considered.  The Magistrate Judge correctly found that Governor, Mr. Gore, and Ms. Kennedy should

14  be required to appear for their depositions.

15  **II.    PROCEDURAL BACKGROUND**

16       Plaintiffs are classes of state prisoners with serious medical needs (*Plata v. Schwarzenegger*)

17  and serious mental illness (*Coleman v. Schwarzenegger*) (hereinafter "plaintiffs").  On November 13,

18  2006, the plaintiff classes separately filed motions in the Northern and Eastern Districts of California

19  to convene a three-judge court to limit the prison population in the CDCR, pursuant to 28 U.S.C. §

20  2284 and 18 U.S.C. § 3626(a)(3).  On July 23, 2007, the *Plata* and *Coleman* Courts separately granted

21  plaintiffs' motions and on July 26, 2007, the Chief Judge of the Ninth Circuit appointed a single three-

22  judge court to consider plaintiffs' requests in both cases for a prisoner release order, pursuant to 18

23  U.S.C. § 3626(a)(3).  The two cases were consolidated for the limited purpose of proceedings before

24  the three-judge court.

25       On August 17, 2007, this Court issued an order referring all discovery disputes arising in these

26  proceedings to Magistrate Judge Moulds in the Eastern District of California.  8/17/07 Order at 4:3-5.

27  On June 30, 2008, plaintiffs initially noticed the depositions of the Governor, Mr. Gore, and Ms.

28  Kennedy for late September, 2008.  In its July 2, 2008 Order, this Court imposed a September 8, 2008

discovery cutoff.  On July 10, 2008, plaintiffs re-noticed the depositions of the Governor, Mr. Gore and Ms. Kennedy for dates in early September.  Evenson Decl., Exh. I.[1]  Plaintiffs' counsel indicated flexibility in re-scheduling the depositions if necessary, and asked defense counsel to propose alternative dates. Evenson Decl., ¶ 12, Exh. J.  Defense counsel did not propose alternative dates, and stated instead that they would not produce the witnesses absent a court order. Evenson Decl., ¶ 13, Exh. K.

After meeting and conferring without resolution, the parties set forth their disputes in a joint statement submitted to the Magistrate Judge on August 1, 2008.  The Magistrate Judge heard argument on August 7, 2008, and on August 14, 2008, issued an order granting plaintiffs' motion to compel the depositions of Governor Schwarzenegger, Mr. Gore and Ms. Kennedy.  Specifically, the Magistrate Judge ordered Governor Schwarzenegger to appear for a deposition not to exceed four hours, and Mr. Gore and Ms. Kennedy to appear for depositions not to exceed six hours each.

On August 15, defendants filed their request for reconsideration with this Court, and requested a stay of the order pending this Court's decision on their request.  On August 19, this Court issued a scheduling order requiring plaintiffs to file an opposition on or before August 25, 2008 and to address:

(1) whether Plaintiffs intend to call the three named individuals as witnesses at trial;
(2) to what extent Plaintiffs' position regarding depositions is affected by whether the witnesses are called and allowed to testify at trial; and
(3) what testimony Plaintiffs seek to elicit from the three identified witnesses that could not be obtained through other means, including, for example, requests for admissions or interrogatories.

## III. STANDARD OF REVIEW

District Courts review a Magistrate Judge's ruling for whether the decision of the Magistrate Judge was "clearly erroneous" or "contrary to law." *See* 28 U.S.C. § 636(b)(1)(A); E.D. Local Rule 72-303(f); *Ainsworth v. Vasquez*, 759 F. Supp. 1467, 1469 (E.D. Cal.1991). Discovery motions are non-dispositive pretrial motions within the scope of Rule 72(a) and 28 U.S.C. § 636(b)(1)(A), and thus

---

[1] Plaintiffs initially noticed the Governor's deposition for the Governor's office, and Mr. Gore and Ms. Kennedy's depositions for the offices of plaintiffs' counsel.  Pursuant to defendants' request, all three depositions will proceed at the State Capitol.

[234978-1]

1   subject to the "clearly erroneous or contrary to law" standard of review. *See Brown v. Wesley's Quaker*

2   *Maid, Inc.*, 771 F.2d 952, 954 (6th Cir. 1985). A finding is "clearly erroneous" only when the

3   reviewing Court considering the entire evidence is left with the definite and firm conviction that a

4   mistake has been committed. *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948);

5   *Nat'l Wildlife Fed'n. v. United States Forest Serv.*, 861 F.2d 1114, 1116 (9th Cir. 1988); *Champagne v.*

6   *Whitman*, 2006 WL 2522381, at *1 (E.D. Cal. Aug. 28, 2006) (noting that "[m]otions to reconsider [a

7   magistrate's ruling] are committed to the discretion of the trial court" and that "[t]o succeed [on a

8   motion for reconsideration], a party must set forth facts or law of a strongly convincing nature to

9   induce the court to reverse its prior decision"); *cf. Weeks v. Bayer*, 246 F.3d 1231, 1236 (9th Cir.2001)

10  (warning that reconsideration standard presents "high hurdle").

11  **IV.   ARGUMENT**

12          **A.   Plaintiffs Intend to Call The Governor, Mr. Gore, and Ms. Kennedy as Trial
                   Witnesses, and Plaintiffs' Position Regarding these Depositions Would be**
13          **Unaffected by Whether the Witnesses are Allowed to Testify at Trial.**

14          Plaintiffs intend to call Governor Arnold Schwarzenegger, Robert Gore and Susan Kennedy to

15  testify at trial. Each of these individuals is named in plaintiffs' disclosure of non-expert witnesses.

16  Following the depositions, plaintiffs will consider submitting deposition excerpts in lieu of calling

17  these three officials as trial witnesses.

18          The three witnesses possess critical information on whether any other relief other than a

19  prisoner release order will remedy the violation, and the impact a release order would have on public

20  safety and the operation of the criminal justice system. Whether or not these witnesses are called by

21  plaintiffs, defendants or intervenors as trial witnesses, they possess information that no other witness

22  has regarding, among other things, the Governor's Emergency Proclamation regarding the prison

23  overcrowding crisis (which is still in effect), Assembly Bill 900 (passed in 2007 to address

24  overcrowding), AB 900 clean-up legislation, out-of-state transfers, the Governor's January 2008 budget

25  proposal, and early release for some offenders. Thus, plaintiffs would notice their depositions even if

26  the three officials were not trial witnesses.

27          This Court's July 2, 2008 Order for Pre-Trial Preparation specifies that depositions of non-

28  testifying witnesses are prohibited, absent a showing of "very good cause." Order at 2. Plaintiffs did

list the Governor, Ms. Kennedy and Mr. Gore as plaintiffs' trial witnesses, thus their depositions are

not barred by this Court's Pre-Trial Preparation Order.  Moreover, the Magistrate Judge concluded that

plaintiffs have demonstrated "very good cause" to take the proposed depositions.  Magistrate Judge's

August 14, 2008 Order at 4, fn. 2.

**B.    Plaintiffs Seek to Elicit Information From the Three Identified Witnesses that Cannot be Obtained through Other Means.**

Plaintiffs seek to elicit from the Governor, Robert Gore and Susan Kennedy critical testimony

at the core of plaintiffs' case in chief and defendants' defenses.  As we demonstrate below, plaintiffs

cannot obtain this critical information via interrogatories or requests for admission, nor can they obtain

this information from any other witnesses.

**1.    Governor Schwarzenegger has unique personal knowledge of matters critical to plaintiffs' cause of action and defendants' defenses.**

Governor Schwarzenegger is not just the State official ultimately responsible for the

administration of California's overcrowded prisons, he and his top aides have also been personally and

actively involved in the State's attempts to address prison overcrowding.  Indeed, by issuing the

Emergency Proclamation, pushing for the enactment of AB 900 (the prison construction measure that

is the center of the defense to this case), organizing strike teams reporting to the Governor's staff, and

thus taking direct responsibility for the implementation of AB 900, the Governor has essentially taken

the management and control of the overcrowding crisis out of the hands of the CDCR.

The Magistrate Judge correctly agreed with plaintiffs that "the Governor has made a number of

public pronouncements on matters that will be at issue at the trial of this matter, [] the Governor has

been personally involved in meetings and strategy sessions with state legislative leaders and others

concerning prison overcrowding, and [] the Governor has personal information relevant to several

defenses tendered in these proceedings." 8/14/08 Order at 6.

The Governor has issued numerous public statements demonstrating his involvement in matters

key to this case.  For example, in his June 26, 2006 press release announcing a special legislative

session, the Governor emphasized that the prison system had reached a "crisis point" because it had

not adequately planned for the future, resulting in too little space and too few officers.  Evenson Decl.,

[234978-1]

1   Exh. A.  Then, in his October 4, 2006 emergency proclamation, the Governor admitted that

2   overcrowding causes a health crisis, which implies that overcrowding must be solved before those

3   crisis conditions can be remedied. Evenson Decl., Exh. L at 1-2. (California's prisons "are so

4   overcrowded that the CDCR is required to house more than 15,000 inmates in conditions that pose

5   substantial safety risks," overcrowding "has caused substantial risk to the health and safety of the men

6   and women who work inside these prisons and the inmates housed in them," overcrowding has resulted

7   in "overloading" of local electrical systems, sewerage systems, and wastewater systems, which results

8   in "an increased, substantial risk of harm to the health and safety of CDCR staff, inmates and the

9   public," and overcrowding has resulted in increased violence and creates the risk of deadly prison

10   riots.)  Likewise, on December 21, 2006, the Governor proposed, among other things, building 78,000

11   new prison beds, explaining that his "administration has inherited a system that was dangerously

12   overcrowded, poorly managed and totally out of control."  Evenson Decl., Exh. C (12/21/06

13   Governor's Remarks).

14          The Governor engaged in closed-door sessions with legislators in February, 2007 to come up

15   with a strategy to address the overcrowding problem.  Evenson Dec., Exh. M  And later in 2007, he

16   toured an overcrowded prison, stating that "[t]his facility is like so many others throughout California

17   with inmates living in gymnasiums and overcrowded conditions that are very dangerous for our staff

18   and the inmates, with no room for important rehabilitation programs." *See*

19   http://gov.ca.gov/index.php?/press-release/5564/ (site last visited 8/25/08).  The Governor touts

20   photographs and videos from this prison tour on his official website. *Id.*

21          The Governor's statements provide important evidence about central elements of plaintiff's

22   case: that overcrowding causes a health crisis, and that overcrowding must be solved before the health

23   crisis can be remedied.  Plaintiffs are entitled to know the basis of the Governor's findings and the

24   alternatives considered.  Plaintiffs are unable to obtain this information from any other source.  The

25   Governor was not just acting as a figurehead when he issued the emergency proclamation; he

26   continued to be personally involved in meetings and strategy sessions to identify and address

27   overcrowding problems.  *See, e.g.,* Evenson Decl., Exh. M (Governor acknowledged overcrowding

28

1  problem, acknowledged engaging in meetings with key players regarding resolving the problem, stated

2  that "if we don't clean up the mess, the federal courts will do it for us.")

3       The Governor also possesses information directly relevant to defendants' defenses regarding

4  their response to the crisis. For example, defendants apparently contend that a prisoner release order is

5  not necessary because they can just build more prison beds. But the Governor was personally involved

6  in the passage of AB 900, a statute that was supposed to fund construction of new prison beds and

7  solve the overcrowding crisis. *See, e.g.,* Evenson Decl., Exh. N (letter from Governor lauding Senate

8  Republican leader's "leadership in prison reform" and applauding passage of AB 900).  Mr. Gore has

9  recounted numerous roadblocks to implementing AB 900.  Evenson Dec**.,** Exh. O.  Indeed, as set forth

10  in the CDCR's June 2008 report entitled "Integrated Strategy to Address Overcrowding in CDCR's

11  Adult Institutions," no new beds have been built for a number of reasons, including "unforeseen

12  limitations on infrastructure, community concerns with prison expansion, staffing difficulties, and

13  scope of construction . . ."  Evenson Decl., Exh. F (CDCR Integrated Strategy to Address

14  Overcrowding at CDCR Institutions, at 2.)

15       Even after passage of AB 900 and the creation of the "Strike Teams," the Governor has

16  remained heavily involved in the effort to implement the statute and reduce overcrowding.  Just two

17  months ago the Governor personally sent a letter to several legislative leaders detailing progress in

18  implementing AB 900, but emphasizing that further legislation "must be dealt with quickly by the

19  Governor and the Legislature. We cannot delay, and if this isn't done *by* us, it will be done *for* us by the

20  federal courts." Evenson Decl., Exh. P (emphasis in original). The Governor is the only one with

21  personal knowledge about what additional measures he was referring to in his letter, what steps he

22  believes are necessary to fix AB 900, how such measures would impact overcrowding, and whether he,

23  as the ultimate decisionmaker, continues to adhere to defendants' position that AB 900 alone will

24  resolve the overcrowding crisis.

25       Moreover, the Governor has charged that the Legislature has repeatedly failed to act on the

26  Governor's proposals to solve the overcrowding crisis.  Evenson Decl., Exh. L at 7- 8.  If defendants

27  contend that AB 900 "clean up" legislation will resolve overcrowding, plaintiffs are entitled to question

28  the Governor about his newest proposed legislative fix, which would require quick legislative action if

9

[234978-1]     PLAINTIFFS' OPPOSITION TO DEFENDANTS' REQUEST FOR RECONSIDERATION , NOS.: CIV S 90-0520 LKK-JFM, C01-1351 TEH

it were to be a viable alternative to a court order.  Again, plaintiffs are unable to obtain this information from any other source.

Defendants also appear to contend that prison conditions have improved since the issuance of the emergency proclamation. *See, e.g.,* Evenson Decl., ¶ 38.  But the emergency proclamation is still in effect, meaning that the Governor maintains that the emergency conditions persist.  Plaintiffs are entitled to question the Governor about the factual basis for keeping the proclamation in effect while at the same time contending (in this litigation) that the conditions have improved.

Most recently, the *Plata* Receiver wrote the Governor seeking assistance in procuring funds to build new medical beds that would alleviate overcrowding.  Evenson Decl., Exh G.  Governor Schwarzenegger disputed that he had any authority to assist the receiver.  *Id.*  Plaintiffs are entitled to question the Governor about this response, and alternatives considered.  *Id.*

The Governor also has information relevant to the question whether any "prisoner release order" that the Court might enter would have an "adverse impact on public safety." 18 U.S.C. §§ 3626(a)(2).  Defendants contend that reducing the prison population *would* have an adverse impact on public safety, but the Governor not only agreed to consider releasing prisoners early (Evenson Decl., Exh. M at E-CDCR_017809), he also submitted a proposed budget to the California Legislature that, among other things, contemplated reducing California's prison population by more than 22,000 inmates.  Evenson Decl., Exh. Q at 178.  Although the Governor has subsequently backed away from this proposal, plaintiffs are still entitled to enquire about the specifics of the population reduction plan, and the Governor's reasons for changing his mind are relevant to the defenses in this case.  Having offered the plan in the first place, the Governor has unique personal information about how the State could reduce the prison population.

In short, the Governor has direct personal factual information about material issues that is unavailable through another source, and he should be subject to deposition.  While high-ranking public officials are not normally subject to depositions in matters about which they have no personal knowledge, a well-established exception exists for depositions of "'top officials who have direct personal factual information pertaining to material issues ... [and] where the information to be gained ... is not available through any other source.'" *Green v. Baca*, 226 F.R.D. 624, 648 (C.D.Cal. 2005)

1    (permitting plaintiff to depose the Los Angeles Sheriff) (*quoting Church of Scientology of Boston v.*

2    *I.R.S.*, 138 F.R.D. 9, 12 (D.Mass.1990)).  Thus, courts have regularly permitted depositions of

3    governors who were personally involved in, or approved, the governmental policies or practices that

4    gave rise to the litigation.  *See, e.g., Bagley v. Blagojevich*, 486 F.Supp.2d 786, 789 (C.D. Ill., 2007)

5    (allowing deposition of Governor of Illinois where Governor was either ultimate decisionmaker or

6    involved in making the challenged decision); *Prisma Zona Exploratoria De Puerto Rico, Inc. v.*

7    *Calderon*, 154 F. Supp.2d 245 (D. P.R. 2001) (permitting deposition of Governor of Puerto Rico who

8    approved challenged actions); *Hadnot v. Amos*, 291 F. Supp. 309 (M.D. Ala. 1968) (allowing

9    deposition of Governor of Alabama); *Virgo Corp. v. Paiewonsky,* 39 F.R.D. 9 (D.V.I. 1966)

10   (allowing deposition of Governor of Virgin Islands because he was ultimate decisionmaker with

11   respect to challenged policy).

12         Courts have also permitted the depositions of other high-ranking governmental officials where

13   those officials had some involvement in the challenged governmental action. *See, e.g., In re: David A.*

14   *Kessler*, 100 F.3d 1015 (D.C. Cir. 1996) (permitting deposition of Commissioner of the Food and

15   Drug Administration where plaintiffs alleged the deponent played a key role in formulating a

16   challenged policy); *RTC v. Drumond*, 137 F.R.D. 634, 644-45 (S.D.N.Y. 1991) (allowing deposition

17   of the head of a federal agency "to determine reasons for the decisionmaker's choice -- and by

18   extension, the factors taken into account by the decisionmaker -- in the absence of 'formal

19   administrative findings'") (quotation omitted); *Green v. Baca*, 226 F.R.D. 226 F.R.D. at 648

20   (permitting plaintiff to depose the Los Angeles Sheriff because Sheriff is "final policymaker for the

21   County in setting and implementing" challenged policies); *Atlanta Journal and Constitution v. City of*

22   *Atlanta*, 175 F.R.D. 347, 348 (N.D. Ga. 1997) (permitting deposition of mayor where one of mayor's

23   aides "was responsible for ushering the [challenged] ordinance."); *Northwestern Univ. v. City of*

24   *Evanston,* 2001 WL 743756 (N.D. Ill. 2001) (permitting deposition of mayor who vetoed challenged

25   ordinance and city manager who was involved in drafting a memorandum regarding the challenged

26   ordinance; *Culp v. Devlin*, 78 F.R.D. 136, 140-41 (E.D. Pa. 1978) (allowing deposition of mayor and

27   chief of police); *Pension Benefit Guaranty Corp. v. LTV Steel*, 119 F.R.D. 339, 342 (S.D.N.Y. 1988)

28   (allowing deposition of agency head because, inter alia, case "raises novel and complex legal issues of

11

first impression whose resolution will have a substantial impact" on statutory interpretation and numerous individuals); *see also Lederman v. Giuliani,* No. 98-CV-2024, 2002 WL 31357810, at *1 (S.D.N.Y. Oct. 17, 2002) (noting that New York Mayor Giuliani's deposition was to go forward).

Defendants claim that Governor lacks "direct personal factual information" about the subject of the case, (Def Req. for Reconsideration, at 7), but as demonstrated above, the Governor has been directly and personally involved in matters key to plaintiffs' claims and defendants' defenses, and this Court should affirm the Magistrate Judge's order requiring him to appear for his deposition.

### 2. Robert Gore has unique personal knowledge of matters critical to plaintiffs' cause of action and defendants' defenses

Mr. Gore (the Governor's deputy cabinet secretary) has also played an essential role in addressing the overcrowding crisis, and he personally possesses information that cannot be obtained from any other source. *Green,* 226 F.R.D. at 648.

Immediately after signing AB 900, the Governor appointed his Cabinet Secretary Robert Gore as the manager of the Governor's "Strike Teams" to implement AB 900. Evenson Dec., Exh. R at GOVPRIV001412. As manager of the Governor's Strike Teams on AB 900, Mr. Gore has been centrally involved in the AB 900 implementation process, and in monitoring overcrowding, and has personally led a number of meetings with top CDCR officials and consultants on the subject. Evenson Decl., Exhs. S-ZZ, AA-CC. Indeed, Mr. Gore is in charge of matters identified as being of "[h]air on fire" importance, including "parole policy emergency regulations, recruiting staff, marketing RFPs [Requests For Proposals], staffing Facilities, out-of state transfers" and "reducing lockdowns and movements." Evenson Decl., Exh. R at GOVPRIV001412. Plaintiffs are entitled to question Mr. Gore about his progress in implementing AB 900, and whether he has accomplished those "hair on fire" duties assigned to him.

Defendants produced documents showing that Mr. Gore kept Ms. Kennedy updated about the AB 900 Strike Teams, including by regularly providing detailed updates about the Strike Teams' progress in implementing AB 900 as well as the various "roadblocks" hindering full implementation of the statute. Evenson Decl., Exhs. O, Y-Z, AA-CC. In those updates, Mr. Gore reported that the Governor's office directive that CDCR "bad" beds vacated by prisoners transferred out of state should

12

1   not be re-filled had not been implemented "due to a perfect storm of adverse conditions."  Evenson

2   Decl., Exh. Y. (July 9, 2007 Briefing at 1.)  The "Actions" listed by Mr. Gore included directing

3   CDCR to make full use of all existing parole laws to reduce parole caseload, and ordering CDCR to

4   devote all available resources to out of state "ramp-up." Evenson Decl., Exh. Y. "Cabinet Actions"

5   include "monitor[ing] the out-of-state transfer pipeline daily" Evenson Decl., Exh. AA (August 24,

6   2007 Briefing at 4.)  Plaintiffs intend to ask Mr. Gore about the Strike Teams' progress, the

7   "roadblocks" they have encountered, and their progress in alleviating the overcrowding crisis.

8            Mr. Gore has also produced correspondence indicating he is involved in an effort to pass AB

9   900 "clean up" legislation. Evenson Decl., ¶18, Exhs. W-X.  He has stated that he hopes that the

10  Legislature will enact "[p]arole reform" as well as "most of the IRP [Independent Review Panel] and

11  Expert Panel recommendations, including staff training, program participation incentives, enhanced

12  good time credits, expanded risk assessments and treatment plans, and *more reforms.*" Evenson Decl.,

13  Exh. DD at E PRIV 171287 (emphasis added). Mr. Gore entreated former Republican Governor

14  George Deukmejian to use his political clout to convince members of the Republican caucus to go

15  along with the administration's legislative agenda. *Id.* Plaintiffs are entitled to ask Mr. Gore about the

16  specific reforms he proposes to remedy the overcrowding crisis, what provisions in AB need to be

17  "cleaned up" and whether AB 900, as it is, will resolve the overcrowding crisis.

18           Additionally, Mr. Gore has stated that "[e]nhanced parole tools . . . are the most immediate way

19  to reduce overcrowding and improve public safety." Evenson Decl., Exh.T; *see also Id.,* Exh. DD.

20  However, in their responses to plaintiffs' interrogatories, defendants claimed that a parole reform

21  program (involving the use of a range of sanctions other than a return to prison based on the use of a

22  validated risk assessment tool) may have an adverse effect on public safety.  Evenson Decl., Exh. EE

23  (Defendant Cate's Responses to Coleman Plaintiffs' Interrogatories, Set One, Interrogatory # 9.)

24  Plaintiffs are entitled to ask Mr. Gore about the factual basis for his assertions that "enhanced parole

25  tools" will reduce overcrowding, and about how they will "improve public safety," particularly in light

26  of defendants' seemingly contradictory interrogatory responses, as these are two key elements in the

27  case.

28

'234978-1]

### 3.   Susan Kennedy has unique personal knowledge of matters critical to plaintiffs' cause of action and defendants' defenses

Susan Kennedy is the Governor's chief of staff, and is integrally involved in nearly everything the Governor does, including the Governor's efforts to address the overcrowding crisis. Ms. Kennedy has repeatedly described California's prisons as a "powder keg," stating at one point that the prisons are part of "a system that is so broken it's a powder keg," and at another point that "We have now hit a wall on programming based on overcrowding. We are now sitting on a powder keg over here." Evenson Decl., Exh. FF at 1, 3. Ms. Kennedy also admitted that even if the State builds more than 40,000 new prison beds by 2021, 1) "[w]e'll always be over the design capacity [of the prisons];" and 2) additional funds would be necessary to fund space for medical treatment and rehabilitation programs. *Id.* at 2. She also acknowledged – in 2006 – that a central element of AB 900 (construction of reentry facilities in local communities) was "never going to be an easy sell." *Id.* at 3.

In addition to tracking Mr. Gore's work and the progress of AB 900 implementation (see *supra*), Ms. Kennedy also inserted herself into the implementation process, at one point admonishing the AB 900 Strike Team that it must bring about "radical change" to the prison system and that "failure is not an option." Evenson Decl., Exh. S.  Shortly after AB 900 was passed, she emailed CDCR Director Jim Tilton and others, ordering that "bad" beds not be backfilled following out-of-state transfers. Evenson Decl., Exh H.  (June 2, 2007 email to Jim Tilton at el.)  As she explained:

> We've been having this conversation for months and months, and we've always said it makes no sense to declare an emergency, tranfer [sic] inmates out of state to get them out of bad beds and relieve overcrowding, only to backfill the bad beds.  We're not releasing prisoners.  We can't take new inmates from counties if there is not a bed to put them in.  What possible argument would we have with the courts not to impose a cap if we're doing absolutely nothing to relieve the overcrowding for the next two years?

*Id.* at E_Priv_009599. Ms. Kennedy also directed the CDCR director to speed up out-of-state transfers after the media reported that the CDCR lost out on an opportunity to send California prisoners to an Indiana prison.  Evenson Decl., Exh. GG (December 22, 2006 Email from Kennedy to Tilton et al E-Priv_053403-053409.)  At the same time, however, Ms. Kennedy apparently advocated that the Governor cut funding for CDCR programs aimed at reducing recidivism, a policy which, if adopted, would have the long-term affect of increasing crime and increasing the prison population.  Evenson

1    Dec., Exh. II.  Plaintiffs must have the opportunity to question Ms. Kennedy about these and other

2    directives she issued in an effort to resolve the ongoing health care crisis in the state prison system, as

3    they are matters about which she has unique personal information.  *Green,* 226 F.R.D. at 648.

4                    **4.        Written Discovery is not an adequate substitute for a deposition.**

5            The Magistrate Judge correctly found that plaintiffs cannot obtain the information they require

6    by serving defendants with additional written discovery.  8/1/408 Order at 7.  Neither interrogatories

7    nor requests for admission would be an adequate substitute for depositions, particularly in this case.

8    That is because "[a]t a deposition the examining party has great flexibility and can frame his questions

9    on the basis of answers to previous questions.  Moreover, the party being examined does not have the

10   opportunity to study the questions in advance and to consult with his attorney before answering, as he

11   does if interrogatories are used. Attempts at evasion, which might be met by a persistent oral

12   examination, cannot be easily dealt with by interrogatories." *Richlin v. Sigma Design West, Ltd.*, 88

13   F.R.D. 634, 637 (C.D.Cal. 1980). By comparison, "[t]he flexibility and the potency of oral depositions

14   is in large part lacking in written interrogatories. It is for these reasons that depositions are, in federal

15   court at least, by far the most widely used of the discovery devices." *Id.* See also *Rutter,* Cal. Prac.

16   Guide Fed. Civ. Pro. Before Trial, Ch. 11(IV)-B, §11:1662 ("Answers to interrogatories are normally

17   prepared by or with the assistance of opposing counsel, who usually read the questions narrowly and

18   provide as little information as possible. There is little likelihood of unguarded responses; nor any

19   chance for follow-up questioning.")  The same is true for requests for admissions.

20           Defendants' interrogatory responses vividly illustrate this point.  In response to direct questions

21   about the Governor's contentions in this matter, the Governor provided evasive, boilerplate responses.

22   Evenson Dec., Exh. HH.  For example, the Governor never gave a direct answer to the numerous

23   questions posed regarding whether the Governor contends that conditions remain as stated in his

24   emergency proclamation.  Instead, the Governor repeated the same rote reply "The Governor has not

25   terminated the Emergency Proclamation, and his administration continues to aggressively use the

26   emergency authority to address overcrowding in ways that are less intrusive than a prisoner release

27   order." *Id.*  With no ability to ask follow-up questions, plaintiffs will not be able to get answers to

28   these or other questions about the Governor's contentions in this matter.

[234978-1]

1    Similarly instructive are CDCR Secretary Matthew Cate's responses to interrogatories.

2    Evenson Decl., Exh. EE.  Secretary Cate responded to numerous different questions regarding the

3    impact on public safety of a prisoner release order, prisoner "diversion" programs, parole reforms, the

4    Governor's proposal to release 22,159 inmates, and others, by reciting nearly identical, vague answers:

5    "there remains the possibility of a prisoner engaging in criminal activity under such a program."

6    For plaintiffs to serve more interrogatories or requests for admission, and accept more vague,

7    evasive responses drafted by lawyers, is no replacement for sitting in the same room with the

8    defendant and asking direct questions and follow-up questions.

9    Moreover, the type of inquiry that plaintiffs need to make – inquiring into contradictions

10   between the Governors' out-of-court actions and his litigation position, or delving into the meaning of

11   Ms. Kennedy's statements that the prisons are a "powder keg" (see § III.A.3.c above) -- are not well-

12   suited to interrogatory or requests for admission. These are matters that will require answers from the

13   parties (not the lawyers) and will almost certainly require follow-up questions.

14   Defendants cite *Trunk v. San Diego,* 2007 WL 1110715 (S.D. Cal. 2007) to support their

15   contention that interrogatories are an appropriate substitute for a deposition of an official with personal

16   knowledge of relevant facts. In fact, the case fails to support defendants' position. In *Trunk,* a plaintiff

17   brought an Establishment Clause challenge to a city's transfer of a monument to the federal

18   government, and needed to demonstrate that the legislature had an illicit purpose in effectuating the

19   transfer. The plaintiff sought to depose the city mayor to determine *his* motive for supporting the

20   transfer. But the court found that the mayor's subjective motive was irrelevant and the mayor's

21   deposition was therefore inappropriate. *Id.* at *5-6.  The only relevant information was the official

22   legislative history, and the court found that the plaintiff could obtain the relevant legislative history

23   documents through written discovery. *Id.* at *7.  The case does not support the contention that

24   interrogatories are an appropriate substitute for the deposition of a witness with *relevant* information.

25   In the case at hand, plaintiffs have pursued document requests, interrogatories and requests for

26   admission aimed at learning as much background information as possible about the various defendants'

27   actions. The written discovery has laid the groundwork, but at this stage, plaintiffs need to take

28

16

1  depositions to discover matters that are within the personal knowledge of the Governor, Mr. Gore and

2  Ms. Kennedy. That information cannot be learned by serving more written discovery.

3        **5.    Plaintiffs cannot obtain this critical information by deposing other witnesses.**

4        Defendants have argued that plaintiffs can obtain the necessary information from other

5  deponents. The Magistrate Judge correctly rejected that argument. Defendants do not identify a single

6  individual who has the same knowledge as the Governor, Mr. Gore and Ms. Kennedy about the salient

7  matters and who would be available for deposition. Nor are plaintiffs aware of anyone with such

8  knowledge.

9        Defendants fail to support their position that it is appropriate to substitute someone who does

10  *not* have personal knowledge for a public official who does. Defendants claim that CDCR secretary

11  Matt Cate is an appropriate stand-in, but they fail to note that Mr. Cate became CDCR secretary on

12  May 16, 2008 (see CDCR website, http://www.cdcr.ca.gov/About_CDCR/cate.html (site last visited

13  7/30/08), nearly two years after the Governor issued his 2006 emergency proclamation, more than one

14  year after AB 900 was signed into law, and several months after the Governor submitted his January

15  2008 proposed budget. Mr. Cate was not privy to the factual bases for any of those decisions, nor to

16  what alternatives the Governor considered. Indeed, Mr. Cate's litigation position is directly contrary to

17  Mr. Gore's and the Governor's. *Compare* Evenson Decl, Exh. T (Gore states that "[e]nhanced parole

18  tools . . . are the most immediate way to reduce overcrowding and improve public safety") and *Id.* Exh.

19  Q (Governor's proposal to reduce prison population by 22,159 inmates) *with Id.*, Exh. EE (Cate asserts

20  that parole reform and Governor's budget proposal would have an adverse impact on public safety).

21        Nor will former CDCR Secretary James Tilten or lower-level CDCR officials Scott Kernan,

22  Kathy Jett or Deborah Hysen be appropriate substitutes for the Governor, Mr. Gore or Ms. Kennedy.

23  None of those individuals worked in the Governor's office, and Mr. Tilton no longer even works for

24  the state. As Scott Kernan himself acknowledged, neither he nor Secretary Tilton were "sitting at the

25  table" on issues involving out-of-state transfers and "bad" beds. Evenson Decl., Exh. H (6/3/07 Email

26  string, E_Priv_009598). Accordingly, those individuals cannot identify the factual underpinnings for

27

28

1  the Governor's actions or the factors he considered in declaring a state of emergency, meeting with key

2  decisionmakers about drafting or passing AB 900, or proposing the January 2008 budget.

3       The Governor, Mr. Gore and Ms. Kennedy are the *only* individuals who possess the relevant

4  information plaintiffs seek.  Plaintiffs have identified specific positions that the Governor, Mr. Gore

5  and Ms. Kennedy have taken that are directly relevant to the elements of the case. No one else can

6  explain the contradictions between the Governor's out-of-court statements and his litigation position;

7  no one else can identify the alternative population-reducing programs that the governor considered; no-

8  one else can explain the Governor's proposal for fixing AB 900.  Plaintiffs need to inquire into the

9  circumstances of the underlying facts, decisions, and apparent contradictions in order to effectively

10  present their case.

11  **V. CONCLUSION**

12       In a case of this magnitude, involving serious questions regarding public safety, and in which

13  the Governor's office was extensively involved in the issues, a four-hour deposition of the Governor in

14  his own office, and six hour depositions of his aides in their offices, is eminently reasonable.

15  Defendants have failed to demonstrate that the Magistrate Judge's order was clearly erroneous, and this

16  Court should deny defendants' motion for reconsideration.

17  Date:   August 25, 2008

18

19                      Respectfully submitted,

20

21                      */s/ Rebekah Evenson*
                    Rebekah Evenson

22

23

24

25

26

27

28

[234978-1]