EXHIBIT A



ARNOLD SCHWARZENEGGER
THE PEOPLE'S GOVERNOR

# PRESS RELEASE

06/26/2006  GAAS:402:06   FOR IMMEDIATE RELEASE

## Gov. Schwarzenegger Calls Special Session of the Legislature to Address Prison Crowding, Recidivism

Governor Schwarzenegger issued a proclamation today calling the Legislature into special session starting June 27 to address critical prison crowding and recidivism measures. The Governor has proposed several reforms to build new state prisons and local jail facilities, reduce crowding and move female inmates into community-based correctional facilities. Calling a special session enables the Governor to press for passage of these measures before the close of the Legislative session in August.

"Our prisons are at the crisis point because the State of California has not planned adequately for its future and has not faced up to the need to build new prisons as well as hire and train more officers. I am calling on my partners in the Legislature to join me in taking action to face these challenges head on," said Gov. Schwarzenegger. "By building more prisons, managing the inmate population more effectively and implementing common-sense measures that target the most dangerous criminals, we can greatly improve our prison and rehabilitation system.

"We can enact meaningful reform that ensures the safety of our correctional staff and makes sure more of our parolees stay out of prison after they're released. If we work together, I know we can do this and once again give California a model prison system."

California's prison population is at an all time high of more than 171,000 inmates.  The CDCR is double-bunking inmates and there are currently more than 16,000 inmates housed in prison gyms and day rooms throughout the various 33 correctional institutions.

The Governor outlined his legislative proposals in his official proclamation convening the special session including:

· Building more prisons - The Governor is proposing using lease-revenue bonds to build additional prisons, providing critically needed additional beds.  This type of financing will allow prisons to be built more quickly.

· Establishing local secure re-entry facilities- With a measure to relieve overcrowding and reduce the number of paroled inmates returning to prison, the Governor is proposing to create transitional local facilities where inmates about to be released would be detained. The facilities would be highly secured buildings that hold inmates and provide them with counseling services and other help to re-enter society safely and productively.  The facilities would also serve as centers to confine parole violators for technical violations that would normally result in a short return to prison.  Serious or high-risk parole violators would go back to prison, as they do now.

· Placing non-violent women in community correctional facilities - The Governor proposed a measure to move 4,500 non-violent women out of state prisons into community correctional facilities. This reform would also allow low-risk, non-violent inmates, women who are near the time of their release, to be closer to their families in their final months of custody.  Experts have said that this type of program is effective in reducing recidivism.  Moving these women inmates out of prison, which consists of approximately 40 percent of the total female population, would make room for an entire prison worth of space that could be used for male prisoners.

· Expediting state contracting - The Governor is proposing legislation to expedite and streamline the state contracting process for implementing programs and construction of additional prisons and secure re-entry facilities.

Gov. Schwarzenegger has made prison reform a priority in his administration. Under his leadership in 2005, the Governor's historic reorganization proposal was passed by the Legislature with bipartisan support to improve the California Department of Corrections. The reorganization focuses on safer working environments, better service to crime victims, organizational effectiveness, a changed prison culture, use of enhanced agency-wide information technology, validation of rehabilitation and re-entry programs, development of offender re-entry programs and an increased role for rehabilitation. The California Department of Corrections added Rehabilitation to its title, a change that reflects a desire to move away from three decades that the concept of rehabilitation was not a priority. The change reflects a shift in attitude that has the potential to improve public safety, save money and make it more likely that those who have committed crimes will chose to turn their lives around.

The Governor's 2006-07 budget proposes $52.8 million for rehabilitation programs including vocational and job training and education.

Below is the text of the Governor's proclamation, and attached are fact sheets on each of the four legislative proposals.

## A PROCLAMATION

## BY THE GOVERNOR OF THE STATE OF CALIFORNIA

**WHEREAS**, an extraordinary occasion has arisen and now exists requiring that the Legislature of the State of California be convened in extraordinary session; now therefore,

**I, ARNOLD SCHWARZENEGGER**, Governor of the State of California, by virtue of the power and authority vested in me by Section 3(b) Article IV of the Constitution of the State of California, do hereby convene the Legislature of the State of California to meet in extraordinary session at Sacramento, California on the 27th day of June 2006, at a time to be determined, for the following purpose and to legislate upon the following subjects:

1. To consider and act upon legislation to transfer low-risk women inmates out of state prison and into community correctional facilities.

2. To consider and act upon legislation to appropriate funds, including appropriations for lease-revenue bonds, to build additional prisons.

3. To consider and act upon legislation to establish and fund secure re-entry facilities.

4. To consider and act upon legislation to expedite and streamline the state contracting process for implementing programs and construction of additional prisons and secure re-entry facilities.

IN WITNESS WHEREOF I have hereunto set my hand and caused the Great Seal of the State of California to be affixed this 26th day of June, 2006.

_____

ARNOLD SCHWARZENEGGER

Governor of California

ATTEST:

_____

BRUCE McPHERSON

Secretary of State

EXHIBIT B



**Office of the Governor**    ARNOLD SCHWARZENEGGER
THE PEOPLE'S GOVERNOR

# PRESS RELEASE

10/04/2006  GAAS:739:06  FOR IMMEDIATE RELEASE

## Governor Uses Executive Authority to Relieve Prison Overcrowding, Proclaims Emergency to Allow Inmate Transfer

Governor Schwarzenegger issued an emergency proclamation for California's prison system today, citing severe overcrowding as a threat to health and safety in 29 of the State's 33 prisons. The emergency proclamation will allow Corrections officials to immediately contract with out-of-state correctional facilities to temporarily house California inmates.

"Our prisons are now beyond maximum capacity, and we must act immediately and aggressively to resolve this issue," said Governor Schwarzenegger. "I've ordered the Department of Corrections and Rehabilitation to begin contracting with facilities in other states to transfer inmates to available beds outside of California. These actions are necessary to protect the safety and well being of the officers, inmates and the public."

The Governor issued the emergency proclamation after his legislative package failed to win support during a Special Session of the Legislature called to address prison overcrowding. California Corrections officials estimate that CDCR will run out of bed space for inmates as early as June of 2007. Overcrowding is so critical that CDCR is forced to house more than 15,000 inmates in areas not designed for living space, including gymnasiums, dayrooms, and program rooms, as well as 1,500 inmates sleeping in triple-bunks.

The Governor introduced proposals for new prison and local jail facilities in January as part of his Strategic Growth Plan but the prison/jail proposals were not included in the bond package passed by the Legislature. The Governor also proposed moving non-violent women inmates out of the prison system and into community correctional facilities as part of his proposed Fiscal Year 2006-07 Budget, but that proposal also failed passage. The emergency declaration allows CDCR to streamline contracting to transfer inmates to out-of-state facilities for a period of 3-5 years. The Governor will re-introduce plans to build new prison and jail facilities, re-entry facilities and community correctional facilities when the Legislature reconvenes in December.

During the month of September, the Department of Corrections and Rehabilitation performed an informal survey of inmates and found that more than 19,000 expressed interest in transferring to a correctional facility outside of California. The number of inmates who can be transferred will depend on the type of beds available in out-of-state facilities selected through negotiations.

Once the volunteer pool of inmates is exhausted, the Governor's emergency proclamation orders CDCR to move inmates out-of-state involuntarily, if necessary, by meeting certain criteria and in compliance with all interstate agreements. The Governor ordered the CDCR to work in consultation with the court appointed Receiver in the Plata litigation and Special Master in the Coleman case before moving any inmates who require medical and mental health treatment.

CDCR officials are currently inspecting prison facilities in nine states -- including Arizona, New Mexico, Oklahoma, Oregon, Indiana, Michigan, Louisiana, Tennessee and Alabama -- to evaluate whether they meet California's security needs and other criteria. These facilities had expressed interest in housing California inmates earlier this year by responding to CDCR's Request for Information. Some of the interested facilities are government-run by county sheriff departments and others are operated by private correctional companies.

CDCR expects to enter into contracts three to five years in length that could result in housing for 2,000 to 5,000 California inmates. In addition to providing much needed relief to overcrowding, it is anticipated that the contracts

could reduce the cost of housing compared to costs in California. CDCR is seeking a total of up to 5,000 available beds outside California for immediate housing of inmates.

The emergency proclamation also will allow the Department to contract for facility space, inmate transportation, inmate screenings, and the services of qualified personnel and/or for supplies, materials, equipment and other services needed to immediately mitigate severe overcrowding.

The severe overcrowding crisis not only affects state prisons, but overflows local jails beyond their capacity. According to a report by the California State Sheriff's Association, adult jails average 80,000 inmates a day while 32 of the state's 58 counties operate their jails under self-imposed or court-ordered population limits. The report concludes that 233,388 county inmates statewide avoided incarceration or were released early from jails because they were displaced by prison inmates.

For more information on prison overcrowding, visit the CDCR web site at www.cdcr.ca.gov and visit the "Prison Reform and Rehabilitation" icon.

EXHIBIT C



# GOVERNOR'S REMARKS

Thursday, 12/21/2006 4:19 pm

## Transcript of Governor Arnold Schwarzenegger's Press Conference to Unveil Comprehensive Prison Reform Proposal

GOVERNOR SCHWARZENEGGER:

Hello, everybody, and thank you for being here. Today we want to talk a little bit about prison reform. Now, everyone in this room knows that our prisons are in a crisis and in desperate need of reform. For years state government has failed to deal with this problem, and my administration has inherited a system that was dangerously overcrowded, poorly managed, and totally out of control.

Since I took office we have put forward a variety of different proposals, whether it was through the budget or through our strategic growth plan, or a special session in the legislature to create extra space and also to create other reforms.

Now we are at the point where if we don't clean up the mess the federal court is going to do the job for us. Now, that means bad news, because they will order the immediate release of criminals, and they will dig into our general funds, which means they will take money away from education and from health care. Now, as governor, I cannot let that happen, and I know that if all of us put our heads together and if we have the will, and if we put everything on the table and really focus on this problem, we can be very successful in solving this. And that is why I am so happy to see Democrats and Republicans, as well as some of our partners in law enforcement, standing up here on the stage with me, and they're all here today to pledge their support to make sure that we are successful in this. We are all committed to working on this problem until we get it solved.

Now, today I am putting forward three broad proposals:

1. A building program that will add 78,000 new beds, and I call them desperately needed beds

2. Changes in our broken parole system that will bring California into alignment with other states and reduce our recidivism rate, our unacceptably high recidivism rate, and also without jeopardizing public safety. These changes will also allow us to designate an additional 200 parole agents to enforce Jessica's Law, which increases parole time for the most serious sex crimes. With additional money in our budget we will also make sure that sex offenders don't prey on our children here in California. And;

3. We are proposing a sentencing commission to make recommendations on further sentencing guidelines and parole policies so that we can continue to be tough on criminals but at the same time be prudent with our money.

These are tough challenges, but we have to face them and we must solve those problems. We have no choice. We can no longer tolerate prisons that are dangerous to staff, dangerous to our inmates, and dangerous to the public. And we can no longer tolerate a broken parole system, outmoded sentencing laws, and prisons that are so overcrowded that rehabilitation programs are being squeezed out because of a lack of space.

So I have total faith, and I have confidence, that if both Democrats and Republicans come together on that that we can solve this problem. And now I would like to hear and have a few words said by Senator Gloria Romero. Please.

SENATOR ROMERO:

Thank you, Mr. Governor, for once again having the opportunity to work with me on prison reform. I have told people this is an opportunity for a sequel, so let's be successful in that.

And I'm here today really as a demonstration of a commitment, a commitment to continuing to engage in prison reform, both in helping to shape and also helping to shepherd a comprehensive package of prison reform for this 2007 legislative session. I applaud the Governor for actually spending a great deal of time during the interim in talking not only with myself but other members of the Legislature, advocates for prison reform, and many others who have a common concern, and that is making sure that we address the dire circumstances that stand before us or face those dire consequences.

I've had an opportunity to discuss with the Governor a number of opportunities, and what excites me is that this sets the parameters for a broad discussion, a comprehensive discussion, including a number of factors that we all know needs to be done. I emphasize, and I believe that others do emphasize, that this will be a package. Hopefully it will be a strong, bipartisan package, and I think a package that seeks not just to work things out in order to avoid judges' threats of takeover, but really to move us forward in a fashion that California needs to move forward.

Some people have asked me, "Well, what's new?" After all, last year's packages blew up. Some, in fact, this year have even suggested to me, "Just let the Governor do it. Sit back and wait," others have said, "Just let the courts do it." And I reject both of those approaches. Neither inertia nor cynicism will, or should, define how we deal with the

2007 legislative session when it comes to prison reform. Many of us have worked too hard for too long, and the stakes are too high. It's a new year, it's a new opportunity for us once again to recommit ourselves, and that's the reason why I'm here today.

We know what needs to be done; the experts have told us what needs to be done over and over. We do have to address prison capacity, and not just to build, but to use that space wisely. Depending upon how we structure that capacity we can move California's system of corrections in a way that offers further opportunities for rehabilitation and successful re-entry into our communities.

Secondly, I think that part of this discussion recognizes that this is a criminal justice system in California, and that what happens at the state level doesn't just stay at the state level; it impacts and it affects local jails and local communities. So this package, this discussion that is underway, recognizes that we've got to form partnerships with our local elected officials and our local law enforcement officials in order to realize safer communities. I'm from Los Angeles County, and I will tell you, the pressure to release early from our county jails is overwhelming in the public discourse in Los Angeles.

We know we've got to talk about parole reform, and we've debated for some time about locking folks up. I think that we have historically paid too little attention to what happens after that; you get that 200 dollars and a bus ticket out. And if these ex-prisoners are not able to lead law abiding lives, we all pay the price in new crimes that are being committed and new taxes that are going to rectify wrongs that are basically created within our own system.

We all know that California has a billion dollar parole failure, and we will never merely build ourselves out of the problem. But this package, this discussion then on parole reform is a vital part of moving us forward in a way that emphasizes not only re-entry into a community, but I would emphasize earned re-entry, and that's part of the discussion I think we're going to have when we talk about parole reform, the earned and the opportunity for parole success, even more so than just talking about parole reform.

And finally, the part that really I come to the table really eager and optimistic over, and that is about sentencing reform. This, to some extent though, is where the debate does get tough, but I will work with the Governor this year to create a sentencing commission for California. Eighteen other states have already done so, and I believe as we examine other models—and I look forward to having folks at the table to give their views—this has brought about jurisdiction-wide uniformity in sentencing. It's also reduced disparities in prison sentences, it has resulted in greater certainty of punishment. I think it brings about much logic and rationality in sentencing. And this is not just about shortening sentences; far from it. In fact, if it works well, we probably will see a lengthening of sentences where those sentences need to be lengthened. And as the new Chair of Public Safety Committee for the Senate, I fully intend to make this a major source of work, and an opportunity for all to dialogue.

Some folks have asked if this will be an abdication of legislative authority, to create a sentencing commission. Absolutely not. In fact, I would argue that, to the contrary, creating a sentencing commission is an exercise of legislative authority. Criminal sentencing is one of the most important areas the legislature addresses, and we must be responsible to our constituents to ensure that our sentencing decisions are based not on political whims but on real, reasoned judgment and evidence that links that sentence to reduce recidivism and enhance public safety. That's what good sentencing really is about.

So I look forward to participating in this next year with the Governor, my colleagues. There are 120 legislators, and I'm just one of them, and each one has an equal vote. But I will tell you that with this mandate, and with this pressure, but more so with the leadership and the recognition from the administration, through the legislature, and even from the courts, there is no reason why we cannot move expeditiously and wisely to restore the sheen to California's correctional system and really make it a system that enhances and moves for public safety, not just locks folks up.

So, Mr. Governor, thank you for your leadership. I look forward to working with you once again. You've got to be the eternal optimist to do prison reform, and that optimism has never faded. And it's even, I think, with a stronger sense of commitment that I will enter Sacramento in January with a strong mission and mandate before me. Thank you.

### SENATOR RUNNER:

Good afternoon, Senator George Runner. I think we all know that the clock is ticking for us here in the State of California. If, I guess, this was a basketball game, we'd be in the final minutes. And we are being asked to make some decisions and we are needing to do those, because that is our job. And so I appreciate greatly the fact that the Governor has stepped up, has not only continued his commitment to dealing with the crisis that we have in California prisons, but has now even gone even farther in regards to expanding a comprehensive package in regards to how we can do that.

I'm glad to be standing here with colleagues both from the Senate and the Assembly, because it is our job to begin to help deal with this issue. Some of these issues are very difficult. Some of these are difficult for us as Republicans; some of them are difficult, I'm sure, for my Democratic colleagues. But the fact is, we're at the table, and we need to come to resolution on this issue.

First of all, let me just say we cannot delay. Like I said, the clock is ticking for us. We must work together, move forward to enact a plan that will solve these problems. There's no doubt in my mind, and I think for many of my colleagues, and I think for Californians in general, that public safety is the Number 1 role for us as policy makers. That's why we have government, in order to keep our families safe. And we all know that it's dangerous to release felons into our communities when they should be staying in prison. The issue of sentence reform is a challenge for us. It's going to be an issue much debated within our caucuses. The fact is, when Californians have had a choice about sentencing, Californians consistently vote to increase sentences, because they believe that their streets should be safe, and they believe criminals should be behind bars. So as we open up that door of discussion, we're going to be there, we're going to be at that table. But I must tell you, sentencing commission is a challenge for us, and we hope it's not a codeword for a lessened sentence, less sentence, less time in prison.

The other issue that I appreciate about this, and that is that we must understand that there is a direct link and a relationship between what happens in our jails, and what happens in our prisons, that the two are very much the same system. And so I think it's important and right for the state to step up and take a role of leadership and partner with

our counties as they deal with their challenges in their jails. And I believe that goes beyond just the idea of construction. We must address the idea and the issue of ongoing cost, because if we're going to be putting state prisoners in those areas, then we have an obligation to step up and take on some of those issues, and not just shift that cost to the local governments.

It's very clear that in all of these systems, that what we're talking about is more personnel. We're talking about more parole agents, we're talking about more probation agents, we're talking about more correctional peace officers. All of those folks have got to be a part of this solution. We cannot move forward with this plan, we cannot implement a plan successfully, unless we have the line officers, whether it be parole, probation, whether it be correctional peace officers, on board making and rolling in the same direction. It is essential if we are to have a successful implanted program.

I also would like to thank the Governor specifically for his commitment, both in passing and helping with the passage of Jessica's Law, Proposition 83, and now following through on the commitment. Because when voters voted for Proposition 83 they said a couple of things. They want their children safe, but they also knew it was going to be expensive. And so when they voted for it, they said this is how we want our tax dollar spent. And this is what it is that the Governor is bringing to the table, and we appreciate that greatly.

We need to work every day, and hard, until we get this reform package done. We must continue to prioritize public safety. The Legislature has clearly run out of time, and we are in the final moments and we must work together in order to see it accomplished successfully.

Let me introduce to you Assemblymember Greg Aghazarian, a follow-up from the Republican side of the Assembly.

ASSEMBLYMEMBER AGHAZARIAN:

Thank you very much. We have a system on the verge of collapse, and I applaud the Governor's efforts, I applaud everything he's doing to address this problem before it turns disastrous. We made progress last year as we began the discussions of what to do with this looming crisis with the prison system. We made a lot of progress, we defined a lot of issues, we isolated a lot of questions.

This is the year we have to put the meat on the bones of the skeleton we created last year. This is the time to act. If the Legislature and the Governor working together in a bipartisan fashion does not act this year, we run the risk of not only abdicating our roles as the legislative and executive process, but handing it over to the judge, handing it over to someone that's not accountable to the hardworking families and voters of this state. And what does that mean? We're elected. The Governor is elected, 120 of us are elected to represent the people. And as we all can agree, the most important role of state government is the public safety, the safety and security of our communities. I would even go so far as to say it's a right that we have to feel safe and secure in our own homes. After all, all the economic prosperity, all the work we're doing on the environment, all the work we're doing in transportation, what does it matter if we can't feel safe in our homes, in our communities, in our schools, when we're on the streets?

That's why it's important we take this initiative and we act now to solve this problem. I applaud the Governor for his bold, decisive leadership. I look forward to working with him on a bipartisan nature, because we do need to address these issues. We need to work to make sure there are an appropriate number of beds to house these violent criminals that need to be off the streets. We need to make sure we modernize, and we make sure we have an effective parole and probation system that takes into account the needs of what is going on, and make sure the people of our streets are safe from violent criminals. We need to do what it takes, and this is the time to do it.

You know, there are a lot of details in this proposal, and there is going to be a lot of debate on what things say, what they should say, what they shouldn't say, and there's going to be a lot of partisan rancor back and forth. But at the end of the day we know what our Job 1 is this year. We know that public safety is where we need to be. We need to increase the number of beds, we need to build more prisons. Yes, we get that.

But it's also important that we open the dialogue with the local communities. The counties are very integral in this. The local jails, the local communities, the decision makers at the local levels, they need to be an integral part of this discussion. We can't expect them to be handed mandates and not have the appropriate funds to fulfill those mandates. We need to make sure they have the appropriate tools to handle this. They're an equal partner with us in handling this crisis.

When it comes to sentencing, we need to be careful as we proceed with that. Previous proposals have, let's face it, not passed muster. Previous proposals have not given a level of satisfaction that sentences would be hard, sentences will be fulfilled, and sentences will be increased where they need to be increased. We need to make sure, as we're looking at the proposal, that we're not moving backwards, we're moving forward; this is about the safety of our communities.

When it comes to death row improvements, that's a function of this, and this is a great opportunity, and I applaud the Governor for taking immediate action to address the issues that were raised this past week with the death penalty system. It's important that we take a look and address that, to make sure justice is carried out. There are many people that have been given the death penalty, and we need to make sure that is addressed in this. It's an excellent opportunity to address those questions and we need to make sure that is addressed.

But in general, I'm looking forward to working in a bipartisan nature, to make sure the right thing is done. We cannot abdicate our responsibility here. We cannot leave this to a federal judge with a blank check drawing out of the general funds of the State of California. We were all elected to do a job, and let's work together and do it.

Right now I want to introduce one of our local county sheriffs, Sacramento's own Sheriff John McGinness, to say a few words.

SHERIFF McGINNESS:

Thank you. First of all, on behalf of the California State Sheriffs Association I'd like to sincerely thank Governor Schwarzenegger for having the leadership and drive to recognize that this is not a particularly popular issue. People want to have better schools, they want to have parks, they want to have nice communities where you can enjoy the quality of life, and these are not the kinds of things that people see in a positive area, that they want to see their tax dollars spent on. But reality tells us, experience tells us, that there are those people within society who have so graphically demonstrated and illustrated their tendency to behave in a dangerous manner that you need to be protected from them, and that protection comes through incarceration and it's absolutely essential to quality of life.

There are three component parts to this comprehensive plan that are terribly important. The, first of all, brick and mortar to build new facilities and expand those existing facilities so we have the bed space to house those people to whom I refer.

In addition to that, we know that not everybody who is incarcerated, or sentenced to periods of incarceration, is going to be there forever. They're going to come back into your communities, and our communities, and as a result of that, if we're going to be effective in the future we need to invest in programs today that will absolutely make a difference and reduce recidivism in the future.

And finally, the third component part that's absolutely critical, and we've heard a lot about that this week, is youthful offenders, juveniles in the criminal justice system, those who behave in a manner outside the accepted norm, that draw attention to themselves and absolutely mandate that those of us who are entrusted with the responsibility in the criminal justice system take appropriate steps to make sure that they are in a position where they can have access to programs, and again, society can be protected from them in the most extreme cases.

We have a report that we have completed some time back on this. It's available to members of the media, the full report. It's called "Do the Crime, Do the Time, Maybe," and it's at the State Sheriffs website at www.calsheriffs.org, and I encourage you to take a look at that.

And once again, a very sincere thanks to the Governor, the Members of the Legislature, and the staff, for taking this matter seriously. And I think the efforts of this comprehensive plan are very likely going to make a difference, a significant difference, in the quality of life that we all enjoy in the future. So thank you very much.

GOVERNOR SHWARZENEGGER:

Thank you. Someone has taken my folder, but that's okay. Maybe it was here?

SHERIFF McGINNESS:

I think George has it.

SENATOR RUNNER:

I was holding it for you, Governor.

GOVERNOR SCHWARZENEGGER:

Thank you very much.

SENATOR RUNNER:

Protecting it. I didn't want the Sheriff to take it.

GOVERNOR SCHWARZENEGGER:

You have the papers, though. Thank you very much, I really appreciate it. George always take care of my papers. Very nice.

SHERIFF McGINNESS:

Oh, I'm never coming to one of these again.

GOVERNOR SCHWARZENEGGER:

I really appreciate it. Any questions about any of this? Yes, please.

QUESTIONS/ANSWERS

Q:    Yesterday in federal court former Corrections Secretary, Acting Secretary Woodford, said that sentencing reform was postponed earlier this year out of political considerations. Was that accurate?

GOVERNOR:    No, but I'm not here to talk about what she said, and what I say, and all those things. I think we are way beyond that. I think the important thing is that you should know that this comes out of a discussion that Senator Romero and I had where Senator Romero, when I talked to her after the elections were over, I said, "Look, we got stuck in our special session. Where did we fall short?" And she said, "Well, you know, time was short, and also I think not everything was on the table." And so I turned to her and I said, "Well, if that's the problem, I will put everything on the table. I think we should address all of the issues." And we had a long, great conversation about building prisons. We have talked about creating a sentencing commission. We talked about paroles, we talked about all kinds of issues, and talked about for an hour. And I think that this conversation was really crucial. So this is actually where this came from, when we talk about building more local jails and talking about the sentencing commission and all those ideas.

Q:   Governor?

GOVERNOR:   Yes?

Q:   In proposing a sentencing commission, what are your concerns currently about sentencing in California?

GOVERNOR:   I think we want to move forward in a way like other states have shown us. I mean, there are many states that have sentencing commissions—I think there are 17 or so states that have sentencing commissions—and I think that we can learn from that. I think that we don't have to redesign the wheel. We just think that the key thing is just who do we appoint to that, that we really have the most experienced people in the profession that really can help us with looking at that and making recommendations.

Q:   Are you open to any change to three strikes? I mean, that's the sentencing issue that seems to come up a lot in terms of non-violent offenders getting lengthy sentences. You've obviously campaigned against the proposition a few years ago. What are your thoughts now about that, and do you think the sentencing commission should look at three strikes?

GOVERNOR:   I don't want to tamper with the three strike system.

Q:   Governor, can you tell us how much money you were talking about in terms of spending and how we're going to pay for it?

GOVERNOR:   Yes. I think there is approximately 10.9 billion dollars, approximately 11 billion dollars, that we are talking about for the whole package. And we're talking here about 45,000 local beds and we'll also talk about moving the 17-some thousand inmates that are right now in bad beds out of there as quickly as possible. We are building facilities, like I said, for 78,000 new beds, and that's the key thing. Now, the ones in the prisons on the state level, there will be not new jails, but we are going to add on to the facilities that are already existing. And I think that the key thing to this whole thing is to create really a good partnership with the sheriffs, with the local law enforcement, and with the local community.

Q:   And how are we paying for this? Is it revenue bonds?

GOVERNOR:   Yes, lease revenue bonds is one, and some of it comes from the budget, some of the ideas when it

comes to parole, or probation officers I should say, comes a certain amount, 50 million dollars or so, and bonds. And the key thing is again that we do it the right way, and that we think about—to save money, I think, is the key thing here, because we want to do it in a way where we create the vision, Democrats and Republicans, rather than a judge coming in and creating his vision.

And you know, when we talk about sentencing reform and all of those kind of things—I mean, let's just think about, and not forget, that right now there are approximately 18,000 inmates that are being released every month, because there is a shortage of space. Think about the amount of people that are being sentenced and are not even put in jail because there is not enough space. I mean, think about all of that. So we have to really put all of this into the mix when we make decisions.

And I think the key thing as we move forward is that we keep the people also safe, because we don't' want to have the wrong people go out, and right now, you know, there really is no way of judging. I mean, people are just released. They say, you know, "We are 18,000 short of beds, so let's get 18,000 out." That's the way the decisions are made now. So with a sentencing reform and all of those things I think we will really—we will guide in which direction we want to go.

And also, like I said, when it comes to spending money—I mean, think about when the federal court will go into our general fund. I mean, they can take out whatever they want. And I think that is a huge danger, because that will take money away from education, and that will take money away from health care, because those are the three big components, is health care, education, and prisons, when you talk about the budget. So that's not what we want.

So it's, again, I think, one of those things. Do we want to take charge of it and take control, pretty much like the infrastructure bonds? Do we want other forces out there always to make the decisions over how we're going to spend our money? Or should we in this building make the decisions and create a great direction and think ahead, where do we want to be 10 years from now with this prison system?

Q:   Governor --

GOVERNOR:   Yes?

Q:   How many prisoners have we sent to other states, to other jails?

GOVERNOR:    Maybe Jim, you can answer that?

TILTON:    Sure can.  We've got about 120 that have gone to date.  We've got about 600 additional inmates that are getting ready to go.

Q:    Are you going to continue with this?

GOVERNOR:    Yes.  We will continue to do everything we can, to look in every way possible to free up beds, because as I've said earlier in my speech, and as you have heard everyone else mention, that we can't keep squeezing out rehabilitation programs.  It's again something that Senator Runner and I talked about, that rehabilitation is important, because as you have heard, every one of those inmates--except if you are on death row--eventually you come out into your neighborhoods.

So do we want to have someone just get his 200 dollars and a bus ticket and he doesn't know how to connect and how to get a job?  Do we want this person to be trained, educated and prepared for getting out and getting a job and being good at that job so they can continue keeping that job?  That's how we cut down the recidivism rate.

And like I said, it's unacceptable, the recidivism rate we have.  It's probably the highest —Jim, would you say it's the highest in the nation?  I think it's the highest in the nation.  We have, like we were talking here about anywhere between 65 and 70 percent.  And imagine, that means that every—out of 10 people that go out, 7 come back in again.  This is unacceptable.  We can do better.  I mean, we are such an innovative state, such a creative state, and we have shown this past year that we can make the impossible possible if we work together, and I think this is such a great spirit now of all of us coming together, Democrats and Republicans.

And like I said, Senator Romero and I, we had great discussions where we just said, "Okay, we've got to the extra step.  Let's not get stuck with our party kind of philosophies.  Let's go beyond that and let's really go and move forward with it and come to some kind of an agreement that works for everyone.  And the key thing is, it keeps the people, the public, safe, because that's the key thing; keep the public safe and not have someone go in to our general funds.  Okay?

Q:    Governor, I noticed some sort of nuanced differences between the way that various legislators on stage are describing how the sentencing commission or the parole thing might work.  I mean, how hard is it going to be to come together on some really tough topics?

GOVERNOR:   You have heard it.  It's going to be tough—it's going to be tough.  But it is possible.  Why is it possible?  Because decisions will be made this coming year, just like the decisions that were made this year, and that is what is best for California rather than what is best for your party.  We've got to go beyond our philosophy in order to meet and in order to come to an agreement.

And I think this is what everyone is willing to do, because we have learned from this past year that we could do things because people went a little bit beyond, and that's how we can make things happen.  And we are a model to the rest of the nation because of what our legislators have done, and I always say thank you to them because of the great work they have done.

And I know that this year they will do the same thing, that they will come through.  Yes, it will be tough.  It is not easy when you are stuck in something for so many years, and you don't want to bend here or bend there.  But they will do it, they will break through that, and this is what is so great about this whole new atmosphere here.

Thank you very much.  Thank you.

# EXHIBIT D





Office of the Governor

Home   About Arnold   About Maria   Newsroom   Multimedia   Issues   Blog   Interact   Appointments   Español

**Fact Sheet**

RELATED CONTENT

### Governor signs AB 900, the Public Safety and Offender Rehabilitation Services Act of 2007

*On May 2, at the State Capitol Governor Schwarzenegger signed AB 900, the Public Safety and Offender Rehabilitation Services Act of 2007. This important legislation fundamentally reforms California's system of incarcerating and rehabilitating prisoners. While AB 900 doesn't end our prison crisis, it gives California critically important tools to reduce prison overcrowding and lower recidivism. The Governor will be joined by Legislative leaders and representatives from the state's law enforcement, legal, rehabilitation and victims' rights communities at the event.*

**AB 900 is a major step forward. Now the real work begins.**

- *AB 900 fundamentally improves our corrections system.* This legislation moves California away from an outdated, ineffective model of massive, remote prisoner warehouses that breed better criminals. It introduces a model where smaller facilities and stronger rehabilitation programs prepare offenders for life outside prison. And it expands our prison capacity so that dangerous, violent criminals stay locked up.

- *AB 900 adds 53,000 new beds, the most in a generation, to California's prisons.* Today the state's prisons house more than 170,000 in facilities designed for about half that. This staggering overcrowding endangers correctional officers, severely limits rehabilitation and contributes to early release. A federal judge has threatened to cap California's prison population in mid-May, which could put thousands of criminals on our streets.

- *The Governor is expediting construction to make conditions safer, faster.* Governor Schwarzenegger has ordered his administration to expedite construction of all 53,000 new beds funded by AB 900.

- *AB 900 will improve prison management.* Expanding bed capacity isn't enough. Our prisons must be efficiently managed to maximize the new space and programs enabled by AB 900. Governor Schwarzenegger has instructed California Department of Corrections and Rehabilitation (CDCR) Secretary Jim Tilton to improve management and operations at every state prison.
  - The Governor will direct his Administration to establish strike teams within CDCR's management to speed up construction and overhaul rehabilitation, substance abuse, education and job training programs.

**AB 900 invests in rehabilitation to increase public safety.**

- *Offenders are returning to our communities whether they're rehabilitated or not—and 70 percent will violate parole.* By law, offenders are already returned to their last county of legal residence when released. Seven out of 10 will violate their parole and return to prison. Rehabilitation prepares offenders for post-prison life, reducing the likelihood that they'll commit more crimes and create more victims.

- *This agreement ties rehabilitation to all 53,000 beds.* AB 900 will provide 53,000 prison and jail beds in two phases. Rehabilitation services—like substance abuse treatment, mental health services and vocational education—will accompany every new bed.

- *AB 900 increases rehabilitation in existing prisons.* The legislation specifically provides 16,000 beds in existing state prisons. As a result, every prisoner currently in a "bad bed" will be moved into appropriate housing. Bad beds are located in prison libraries, gymnasiums and day rooms, freeing up these spaces for rehabilitation programs.

- *AB 900's smaller, community-based centers provide intensive rehabilitation.* This legislation funds 16,000 beds in Secure Re-Entry Facilities, small and secure rehabilitation centers that will give every offender job training, mental health and substance abuse counseling, housing placement, and other services in the critical few months just prior to their release.

Governor Schwarzenegger will take aggressive steps to immediately relieve overcrowding.

- *Prisoner transfers will move forward.* The Administration has fought to transfer prisoners out of state since Governor Schwarzenegger declared a state of emergency in October 2006. AB 900 gives the Legislature clear statutory authority to continue voluntary and involuntary transfer prisoners.
- *On-the-books parole policies will go into effect.* Governor Schwarzenegger has directed his Administration to enforce smart, existing parole policies that reward successful rehabilitation and lower recidivism for technical violations.
  - Chapter 875, Statutes of 2006 provides that certain inmates can be discharged from parole if they have successfully completed drug treatment both in and out of prison—and requires CDCR to regularly to the State and Legislature on the program's success. Governor Schwarzenegger established this law when he signed SB 1453 (Speier).

**The Governor will continue to press for many of the innovative reforms in his January 2007 proposal.**

- Governor Schwarzenegger will continue to aggressively pursue many aspects of the prison reforms he introduced in January, including improvements to probation and juvenile services and transferring 4,500 low-risk female offenders into local facilities.

Text Version | Email the Governor | Email Alerts | Internship Program | Technical Contact |
RSS Feeds | Site Map | Privacy Policy | Conditions of Use

CA State Homepage

© 2008 State of California

# EXHIBIT E

 **Office of the Governor**    ARNOLD SCHWARZENEGGER
                                                    THE PEOPLE'S GOVERNOR

# PRESS RELEASE

05/11/2007  GAAS:372:07  FOR IMMEDIATE RELEASE

## Gov. Schwarzenegger Creates Strike Teams to Implement Historic Prison Reform Plan

Governor Arnold Schwarzenegger today announced the creation of two strike teams to expedite implementation of AB 900, the historic $7.7 billion measure to help reform California's overburdened correctional system.  Composed of nationally recognized rehabilitation and prison construction experts, the strike teams will ensure that the California Department of Corrections and Rehabilitation has the programs and resources to add the "R" to CDC and build 53,000 beds.

One strike team will fundamentally reform California's prison rehabilitation programs; the other will expedite the construction of correctional facilities.  The teams are being launched with 20 experts from universities, community organizations and state government; others will be added.

"My administration is taking immediate action to implement California's historic prison reform plan," said Governor Schwarzenegger.  "With these strike teams, we are aggressively moving forward to shift our approach to rehabilitating prisoners in California. And, we will cut through the red tape to expedite construction, just as we have done with California's levees, and recently with the collapsed overpass in the Bay Area.  I will not tolerate bureaucratic hang ups and delay when it comes to public safety."

"Building the re-entry facilities – is another historic task in my prison reform act – and I have asked CDCR Secretary Jim Tilton to assign Chief Deputy Marisela Montes to work with local governments and community groups to build the 16,000 beds and arrange for program services delivery."

The Rehabilitation Strike Team will focus on evaluating existing education, training and substance abuse programs; on developing leading-edge rehabilitation classes; on delivering the services to inmates and parolees in order to improve public safety; on designing facilities to best accommodate program and on working with communities to continue services in local settings.

Kathy Jett, Director of CDCR's Division of Addiction and Recovery Services and former Director of the Department of Alcohol and Drug Programs (ADP), will chair the Rehabilitation Strike Team.  She will be joined by a public-private team that includes: Joan Petersilia, PhD, Professor, Criminology, Law & Society Director, UCI Center on Evidence-Based Corrections; Jose' Millan, Vice Chancellor, Economic Development &Workforce Preparation, California Community Colleges; Nena Messina, PhD, Principal Researcher, UCLA Institute of Substance Abuse Treatment; Matt Powers, Director, PRIDE Industries (Sacramento); Mimi Budd,

retired Chief Counsel, ADP;

Also, Cherry Short, PhD, Assistant Dean, USC School of Social Work; Joe Lehman, retired Washington State Director of Corrections and National Institute of Corrections consultant; Barbara Bloom, PhD, Associate Professor, Department of Criminology and Criminal Justice Sonoma State University and Frank Russell, the lead CDCR education executive. Todd Jerue, Department of Finance Corrections Principal Program Budget Manager, and Julie Chapman, Deputy Director, Department of Personnel Administration, will assist.

The Facilities Construction Strike Team will restore CDCR's major project management capability and begin work immediately to build re-entry, infill, medical and jail beds. Deborah Hysen, former Department of General Services (DGS) Chief Deputy and California Performance Review leader, will chair the team. Other members include: Robert Denham, retired Chief Deputy Sheriff, Sacramento County; Kevin Carruth, retired Undersecretary, CDCR; Jim Varney, Major Damage Engineer, Department of Transportation; Ben Martin, Acquisition Manager, DGS Procurement; Scott Harris, Executive Director, Corrections Standards Authority. Karen Finn, Department of Finance Capital Outlay Principal Program Budget Manager, and Doug Button, Deputy Director, Real Estate Services, DGS, will assist.

Among the tasks, the Facilities Construction Strike Team will:

- Evaluate all alternative construction methods for the construction of reentry facilities and infill capacity.
- Look at any options for housing inmates in existing facilities within the state that are not being utilized before inmates are transferred.
- Develop cost containments for proposed construction.
- Evaluate regulatory impediments to construction and whether waiver of regulations benefit the state.
- Address local mitigation issues for communities that are impacted by current prison facilities.

Strike team members from the private sector will be compensated by CDCR for professional services and travel from its 2007-08 budget; state employees will be loaned by their respective departments. It is anticipated the Strike Team will take from 6-12 months to complete its work, under the direction of Cabinet Secretary Dan Dunmoyer and Deputy Cabinet Secretary Robert J. Gore.

The strike teams held an introductory session Wednesday. They will work, depending on the individual member's commitment and tasks, full- and part-time. Additional members will be added as necessary, and other experts will be invited to participate for short-term assignments.

"This is a core group of senior, experienced, widely recognized experts," Dunmoyer said, "who will work fast to move CDCR into a new era of both rehabilitation and construction. The teams are designed to be innovative, flexible and lean."

Team leaders will meet weekly with CDCR senior managers to provide direction and to coordinate action steps, according to Dunmoyer. The Strike Teams will work together to fully

integrate and install new, effective and efficient rehabilitative programs at CDCR and to build beds quickly and at the lowest cost to relieve overcrowding. The Strike Teams will also focus on management improvements, include filling vacancies, recruiting and retention, improving accountability and communications.

Assembly Bill 900, also known as the Public Safety and Offender Rehabilitation Services Act of 2007, provides $7.7 billion to add 53,000 prison and jail beds in two phases and fundamentally shift how the CDCR approaches rehabilitation for California's prisoners.

###

EXHIBIT F

# Integrated Strategy
# to Address Overcrowding
# In CDCR's Adult Institutions



# Integrated Strategy to Address Overcrowding in CDCR's Adult Institutions

In order to effectively manage population and improve rehabilitative outcomes, CDCR must implement an integrated strategy that takes into consideration:

- Expanded capacity through implementation of Assembly Bill (AB) 900;
- Construction of the Receiver's health-related facilities;
- Administration's proposed budget and policy reforms;
- Analysis of short and long-term population trends; and
- Three judge panel proceedings.

All of these factors must be carefully considered and strategically implemented to ensure public safety. Recognizing that a number of factors shifted since AB 900 was enacted in May 2007, CDCR's leadership has established a multi-disciplinary team to develop an integrated strategy to reduce overcrowding. This strategy takes into account the many "moving pieces" described above.

After accounting for numerous factors, CDCR has concluded that the following key components of an integrated approach are necessary:

- Immediately begin construction of AB 900 infill beds: 4,800 beds in Phase I/Priority 1 (up to 8,600 total in both phases)
- Support the Receiver's construction of health-related facilities: 10,000 beds
- Continue acquisition and construction of AB 900 secure reentry facilities: 3,000 in Phase 1 (up to 11,000 total)
- Implement policy reforms

The overall impact of this approach on California's correctional system should not be underestimated. For the first time in many years, the State will be able to end its practice of using "temporary" beds in adult prisons; begin to show a reduction in overcrowding; and position itself to demonstrate to external stakeholders, including our partners in local government and the courts, that we are committed to addressing overcrowded institutions, reducing recidivism, and enhancing public safety.

## Key Components fo the Integrated Strategy

### AB 900 Infill

AB 900 authorized the construction or renovation of up to 16,000 infill beds. CDCR has yet to build any of the infill beds authorized by AB 900 for a number of reasons. Detailed analyses of a number of complicating factors — e.g., the availability and appropriateness of selected sites, unforeseen limitations of infrastructure, community concerns with prison expansion, staffing difficulties, and scope of construction, including facility and bed type – have necessitated the identification of alternative sites, which have also been further modified to reflect coordination with the Receiver's planned construction for health care expansion. Most recently, however, the projects have been on hold because CDCR, like others, began to recognize that there were a number of different factors that

had changed since the last analysis, e.g., the recent population projections, the budget crisis, and settlement deliberations in the Three Judge Panel proceedings.

Nonetheless, CDCR has accomplished a significant amount of work necessary for construction, including the commencement of architectural programming, environmental reviews, community outreach, building code revisions and site assessments for its infill construction program.

In order to begin addressing overcrowding, CDCR must begin construction of Phase I/ Priority 1 of the Infill Plan. (Refer to the attached project chart.)

Phase I/Priority 1 includes:
- El Paso DJJ – Level II (Paso Robles)
- Kern Valley State Prison – Level IV (Delano)
- North Kern State Prison – Reception (Delano)
- Wasco State Prison – Level IV (Wasco)

CDCR has completed all the necessary programming detail to immediately design and construct a total of 4,800 infill beds at these sites at a housing capacity that provides full programming, medical treatment space and the necessary infrastructure to support this new capacity.

The above projects would address the shortage of reception and high security housing units needed by CDCR to meet its population management strategies. Additionally, this portion of Phase I includes a lesser-priced conversion of an existing juvenile facility slated for closure to add dorm bed capacity (in addition to secure level housing). These facilities are all slated for groundbreaking in the next 6-12 months.

As population needs warrant, CDCR is already preparing to construct the balance of its proposed infill construction to meet the projected needs as follows:

- California Correctional Institution (Tehachapi)
- High Desert State Prison (Susanville)
- Deuel Vocational Institution (Tracy)
- Centinela State Prison (Imperial)
- Other site(s) to be determined dependent upon funding availability

While AB 900 authorized up to 16,000 infill beds, current cost estimates indicate no more than 8,600 beds can be constructed at the initial allocation. In part, these cost increases are the result of modifying the infill plan from lower-level dormitory style housing to secure, Level IV housing. CDCR will continue to value engineer its designs to reduce the costs and increase the potential number of beds.

In addition to AB 900 infill construction, CDCR has two additional projects proposed in the 2008/09 Governor's Budget that will add capacity to CDCR's existing prison and contracted capacity. Therefore, these proposals have also been included in the attached gap analysis charts. The proposed Condemned Inmate Complex planned for San Quentin

will add 1,152 beds for condemned inmates plus 550 vacated beds (shown on the attached charts as "special" beds). The Female Residential Community Correctional Services Program is authorized to add up to 2,000 contracted beds for female adult offenders and these are reflected on the attached charts.

## Medical Receiver's Planned Construction

As part of his Strategic Plan, the Receiver has announced his intent to complete health-related facilities housing up to 1,500 inmates each for a total of 10,000 inmates. The Administration continues to fully support the Receiver's building plans.

At this time, CDCR is operating under the assumption that the Receiver will receive the authority he needs. Therefore, our strategy incorporates the 10,000 beds he plans to build by the end of fiscal year 2012/13, with 5,000 beds in 2011/12 and the remainder in 2012/13. The breakdown by classification level indicated in the attached gap analysis charts (i.e., Reception Center or Level I-IV) is based on information provided by the Receiver.

The Receiver has predicted that his construction will create "bonus beds," i.e., additional beds beyond the 10,000 due to the fact that CDCR can double-bunk some of the cells he is vacating. Because the Receiver has reserved the right to curtail his building plans should circumstances dictate, our strategy does not assume any "bonus beds." In addition, CDCR is concerned that some of the potential increase in bed capacity may be offset by other factors, including the likelihood that some of the Receiver's beds may be filled by inmates not currently housed in any of CDCR's institutions, (i.e., those housed in Department of Mental Health or other facilities) and some others will likely be what CDCR has traditionally considered "transient capacity" (i.e., short-term beds for inmates who must maintain a permanent bed elsewhere in the system). Finally, CDCR has not yet completed its analysis of which beds will be vacated by placing inmates in the Receiver's constructed facilities. Once the impact of the Receiver's construction program is fully analyzed, the CDCR capacity charts will be amended accordingly.

## AB 900 Secure Reentry Facilities

AB 900 also authorized 16,000 secure reentry beds. These reentry beds remain a cornerstone of CDCR's effort to reduce recidivism by ensuring that offenders are better prepared to reenter their communities. CDCR plans to build at least 3,000 beds as part of Phase I and up to 11,000 reentry beds in total. To date, we have begun development of the building prototypes, determined site acquisition parameters, and begun negotiations and initial due diligence for reentry facility construction.

While AB 900 authorized 16,000 reentry facility beds, the current cost estimates CDCR has received suggest that at the current time, no more than 11,000 beds can be constructed at the initial allocation. CDCR will continue to value engineer its designs to reduce the costs and, if possible, increase the total beds provided.

AB 900 established a nexus between funding for local jail construction and the establish-

ment of secure reentry facilities. The Corrections Standards Authority (CSA) has conditionally awarded jail funds to thirteen counties who have agreed to assist the state in siting reentry facilities. CDCR is performing due diligence on sites offered by the counties for purchase and will be updating CSA and the counties at CSA's September 2008 board hearing as to which county sites are ready to begin acquisition and hence, begin the process for obtaining jail funding. CDCR will then develop a Reentry Facility plan and schedule based on the initial sites.

CDCR's first reentry, located in Stockton at the site of the former adult women's facility currently being used as a correctional academy, is currently under program development. This facility will house up to 500 inmates from the counties of San Joaquin, Amador and Calaveras operating under a regional consortium arrangement. CDCR hosts monthly planning sessions with representatives from these counties in design development. In addition to general renovation of housing and support areas, additional programming space, security enhancements, and a new medical treatment facility will be added. This project is expected to be occupied by Summer 2009.

### Reform/Policy Changes

In order to effectively reduce overcrowding consistent with CDCR's mission to reduce recidivism, our integrated strategy relies upon a reform component to reduce the constant "churning" of low-level parole violators who return to custody without enough time for rehabilitation. This churning is costly, does little or nothing to promote public safety and frustrates real efforts at rehabilitation. Therefore, our integrated approach incorporates summary parole or an alternative reform measure that would safely reduce average daily population by approximately 8,000 inmates when fully implemented. CDCR understands the Legislature and external stakeholders have expressed concerns about summary parole and we remain open to exploring ways to improve the final reform package, but we believe that a reform package with at least this level of impact on population is necessary to safely reduce overcrowding. We are also committed to maintaining a level of savings equal to what was identified in the May Revision.

## Putting The Pieces Together

As the attached charts demonstrate, each of the components identified above are critical to begin addressing the overcrowding problem in California's prison system. The effectiveness of this strategy, however, will depend significantly on whether or not CDCR's population continues to decline as projected in the Spring 2008 projections.

### The Impact of Population Changes

The population projections released with the Governor's May Revision forecast a decrease in CDCR's adult inmate population. After many years of a relatively stable growth rate averaging about 1% per year, the projections began to level off between 2006 and 2007, and for the first time in six years, are now projected to decrease. The reasons for this projected decrease include a reduction in the number of new admissions from courts and a decrease in the number of parole violators returned either administratively or with new terms. As noted in the 2008 spring population projections, however, in times when trends shift, CDCR's population projections are increasingly unreli-

able in-out years. Most corrections experts agree that projections beyond two to three years are difficult, at best. As indicated by the Bureau of State Audits (BSA) in their 2005 audit, CDCR's "projection is useful for assessing the next two years' budget needs but has limited usefulness for longer-range planning, such as the need to build new prisons." In fact, for facility construction purposes, BSA determined that the Department "would be more accurate in its long-term planning if it simply used the actual inmate population at the time it created each projection and assumed the population would not change over the six-year projection period." CDCR agrees that it is very risky to rely on the Spring 2008 population projections for long-term planning, particularly given that no steady reduction in population has lasted more than three years. Therefore, it is doubtful that these projections will hold true over the next six years absent any further changes in policy or practice to prevent population growth.

Because CDCR's population projections remain CDCR's official estimates, as represented in the May Revision, the spring population projections are assumed for the baseline in the gap analysis (Charts 1A and 2A) provided with this document. However, we also completed the analysis assuming a steady 1% population growth (based on the actual average inmate population growth over the past 10 years) to provide a possible range of population projections (Charts 1B and 2B).

**Interpreting the Gap Analysis**
The gap analysis charts attached to this document demonstrate the impact of implementing CDCR's integrated strategy. There are two alternative strategies and four possible outcomes presented in these charts.

The gap analysis charts attached to this document include:

| | |
|---|---|
| Chart 1A: | Integrated Strategy including Phase I/Priority 1 of the Infill Plan with Spring Population Projections |
| Chart 1B: | Integrated Strategy including Phase I/Priority 1 of the Infill Plan with 1% Population Growth |
| Chart 2A: | Integrated Strategy including the entire Infill Plan with Spring Population Projections |
| Chart 2B: | Integrated Strategy including the entire Infill Plan with 1% Population Growth |

Charts 1A and 1B assume that CDCR implements only Phase I/Priority 1 of its Infill Plan. Specifically, charts 1A and 1B assume the following:

- Construction of 10,000 beds by the Medical Care Receiver by FY 2012/13
- Implementation of a policy reform (equivalent to summary parole) in FY 2008/09 with full implementation by FY 2010/11
- Construction of 3,000 reentry beds by FY 2012/13
- Construction of 4,800 beds (Phase I/Priority 1) by 2011/12
- Interim transfer of 8,000 inmates out of state through 2010/11

Charts 2A and 2B include the same components of the integrated strategy, except they assume full implementation of the Infill Plan. Chart 2A presents this option based on the spring population projections and Chart 2B presents it at a 1% population growth.

According to the gap analysis charts, if CDCR constructs the beds in Phase I/Priority 1 of its Infill Plan (as shown in Charts 1A and 1B), we should be able to end the use of "temporary beds" for male inmates by the beginning of FY 2009/10 (if the spring population figures hold) or by the beginning of FY 2013/14 (if the population grows at one percent as it has historically). The most significant gaps in these charts exist for Reception Center and Level IV beds. (Even though the charts also show a deficit of Level I and II beds, CDCR is only proposing to construct one Level II project because we anticipate that the impact of the parole reforms is likely to disproportionately affect the lower-level populations.)

If CDCR begins construction of all phases on the Infill Plan (as shown in Charts 2A and 2B), we would still experience a gap in Reception Center and Level IV beds in the near-term, but we could find ourselves with a surplus of beds in the out-years, particularly if the population continues to decline consistent with the spring projections.

Therefore, given the uncertainty of the population projections, CDCR proposes to begin implementation of Phase I/Priority 1 of the Infill Plan immediately and to plan for implementation of Priority 2 (near-term) and Phase II (longer-term) depending on changes in information regarding population growth and the types of beds needed.

It should be noted that this strategy is dependent upon the enactment of proposed AB 900 clean up language, which is necessary for CDCR to obtain a clean bond opinion from the Attorney General's Office. In addition, the schedules identified in this strategy can only be met if the Administration is able to successfully overcome existing and prospective legal challenges.

Impact of Potential Settlement or Adverse Decision in the Three Judge Panel Proceedings

In November 2007, the Three Judge Court appointed a settlement referee and consultant who were charged with ascertaining whether it was possible to craft a settlement agreement in lieu of proceeding to trial. Since that time, the Administration has worked diligently and in good faith to determine whether a settlement is in the State's best interest.

Until June 2, 2008, the discussions and terms of any draft settlement were under gag order and therefore the Department was precluded from discussing these negotiations with the full Legislature or any other party outside of the settlement negotiations.

The integrated strategy identified in this report recognizes the potential of a settlement. However, given that the likelihood of a settlement remains unknown, CDCR did not prepare this document by relying on the terms of a draft settlement. Depending on the terms, a settlement could be an integral part to addressing the overcrowding problem. If a settlement is not reached, the Administration will continue to prepare for trial and it will be essential that the State be able to demonstrate a reliable plan and actual progress toward reducing overcrowding.

It is important to note that the components of this integrated strategy may not be enough—by themselves—to reach an operational capacity of 158% or 154% (the range indicated in the settlement drafted by the settlement referee). If the court requires CDCR to reach and sustain that level of operational capacity either through a settlement or court order, CDCR would seek to

build Phase I/Priority 2 and Phase II of the Infill Plan immediately, extend its authority to transfer inmates out-of-state, and might still need additional reforms, depending on population trends.

CDCR believes that, at a minimum, the construction, reform, and interim components (e.g., out-of-state transfer) described as part of this integrated strategy are necessary regardless of whether or not a settlement is negotiated in the Three Judge Panel proceedings.

## Conclusion

Given the critical need to begin reducing overcrowding, CDCR proposes to begin implementation of this integrated strategy immediately. Given the uncertainty of future population changes, we are seeking to implement Phase I/Priority 1 of the Infill Plan at this time while continuing to evaluate the timing and direction for Phase I/Priority 2 and Phase 2 based on changes in the inmate population or direction from the court in the Three Judge Panel proceedings.

## AB 900 Revised Infill Bed Plan

| Institution | City | County | Beds at DBC | Beds at HOC | Level | Cost per Bed at DBC | Cost per Bed at HOC | Estimated Total Project Costs | Construction Start | Occupa... |
|---|---|---|---|---|---|---|---|---|---|---|
| **rity I** | | | | | | | | | | |
| ...tional Facility | Paso Robles | San Luis Obispo | 1,000 | 1,000 | II | $100,000 | $100,000 | $100,000,000 | 2008-09 | 2009- |
| ...te Prison (KVSP) | Delano | Kern | 500 | 950 | IV | $581,650 | $306,132 | $290,825,000 | 2008-09 | 2011- |
| ...te Prison (NKSP) | Delano | Kern | 500 | 950 | Reception | $474,928 | $249,962 | $237,464,102 | 2008-09 | 2011- |
| ...rison (WSP) | Wasco | Kern | 1,000 | 1,900 | IV | $550,065 | $289,508 | $550,064,928 | 2008-09 | 2011- |
| **I - Priority I:** | | | 3,000 | 4,800 | - | - | - | **$1,178,354,030** | - | - |
| **ority II** | | | | | | | | | | |
| ...rectional Institution (CCI) | Tehachapi | Kern | 500 | 950 | TBD | $612,948 | $322,604 | $306,474,000 | 2009-10 | 2011- |
| ...tate Prison (HDSP) | Susanville | Lassen | 500 | 950 | TBD | $631,304 | $332,265 | $315,652,000 | 2009-10 | 2012- |
| **I - Priority II:** | | | 1,000 | 1,900 | - | - | - | **$622,126,000** | - | - |
| **AB 900 Infill:** | | | 4,000 | 6,700 | | $491,816 (Avg. Cost @ DBC) | $266,745 (Avg. Cost @ HOC) | **$1,800,480,030** | | |
| ...onal Institute (DVI) | Tracy | San Joaquin | 500 | 950 | TBD | $636,774 | $335,144 | $318,387,000 | 2009-10 | 2012- |
| ...te Prison (CEN) | Imperial | Imperial | 500 | 950 | TBD | $657,222 | $345,906 | $328,611,000 | 2010-11 | 2013- |
| **l AB 900 Infill:** | | | 1,000 | 1,900 | - | - | - | **$646,998,000** | - | - |
| **sed AB 900 Infill (Phase I and II):** | | | 5,000 | 8,600 | | | | **$2,447,478,030** | | |

reduces Jurisdiction-requirements within jurisdictions negation.

i- added to include. Numbers added to attempt after relocation upon feasibility.

is the alternative of convection, levels in the design or at levels depending on the need. This will not result in a net loss of total capacity but would be ...ing to favorably impact survival details by level

...lly exploring options to suit interim at the ... of the meet population needs. This will reduce ongoing verse pressures in an ... Phase II population

...er of construction, bed count, level, start dates for design and construction, may be subject to change.

## Priority Projects - May Revision Pop

| | 2008-09 | 2009-10 | 2010-11 | 2011-12 | 2012-13 | 2013-14 |
|---|---|---|---|---|---|---|
| Spring Population Projection | 164,929 | 160,656 | 159,672 | 159,146 | 159,682 | 160,483 |
| | | | | | | |
| **Bed Capacity** | | | | | | |
| | | | | | | |
| Existing Traditional Beds | 157,476 | 157,476 | 157,476 | 157,476 | 157,476 | 157,476 |
| Out of state Beds | 8,000 | 8,000 | 8,000 | - | - | - |
| In-fill Beds (phases I & II) | - | - | 1,000 | 4,800 | 4,800 | 4,800 |
| FRCCC Beds | 200 | 1,000 | 1,800 | 2,000 | 2,000 | 2,000 |
| Re-entry Beds (phases I & II) | - | 500 | 1,000 | 2,000 | 3,000 | 4,000 |
| Other Construction | - | - | - | 1,152 | 1,702 | 1,702 |
| Receiver Beds | - | - | - | 5,000 | 10,000 | 10,000 |
| | | | | | | |
| Capacity | 165,676 | 166,976 | 169,276 | 172,428 | 178,978 | 179,978 |
| | | | | | | |
| Surplus/Deficit | 747 | 6,320 | 9,604 | 13,282 | 19,296 | 19,495 |
| | | | | | | |
| **Surplus/Deficit by Classification Level[1]:** | | | | | | |
| | | | | | | |
| All Female | 362 | 1,591 | 2,336 | 2,704 | 2,786 | 2,351 |
| Reception Center | (2,215) | (1,057) | (744) | 215 | 434 | 655 |
| Level I | (4,751) | (2,926) | (1,786) | 716 | 2,882 | 3,819 |
| Level II | (704) | 1,152 | 2,953 | 5,294 | 7,435 | 7,853 |
| Level III | 3,674 | 3,359 | 2,919 | 3,750 | 4,541 | 4,597 |
| Level IV | (4,400) | (4,560) | (4,810) | (1,355) | (815) | (1,683) |
| Special | 781 | 761 | 736 | 1,958 | 2,033 | 1,903 |

[1] - Out of State Beds are not included

Chart 1A

## Priority Projects - 1% Growth

| | 2008-09 | 2009-10 | 2010-11 | 2011-12 | 2012-13 | 2013-14 |
|---|---|---|---|---|---|---|
| Spring Population Projection | 168,063 | 166,766 | 168,458 | 170,222 | 172,002 | 173,802 |
| **Bed Capacity** | | | | | | |
| Existing Traditional Beds | 157,476 | 157,476 | 157,476 | 157,476 | 157,476 | 157,476 |
| Out of state Beds | 8,000 | 8,000 | 8,000 | - | - | - |
| In-fill Beds (phases I & II) | - | - | 1,000 | 4,800 | 4,800 | 4,800 |
| FRCCC Beds | 200 | 1,000 | 1,800 | 2,000 | 2,000 | 2,000 |
| Re-entry Beds (phases I & II) | - | 500 | 1,000 | 2,000 | 3,000 | 4,000 |
| Other Construction | - | - | - | 1,152 | 1,702 | 1,702 |
| Receiver Beds | - | - | - | 5,000 | 10,000 | 10,000 |
| Capacity | 165,676 | 166,976 | 169,276 | 172,428 | 178,978 | 179,978 |
| Surplus/Deficit | (2,387) | 210 | 818 | 2,206 | 6,976 | 6,176 |
| **Surplus/Deficit by Classification Level[1]:** | | | | | | |
| All Female | 247 | 1,384 | 2,074 | 2,537 | 2,798 | 2,676 |
| Reception Center | (2,925) | (2,135) | (2,387) | (1,711) | (1,438) | (1,718) |
| Level I | (5,172) | (4,484) | (4,543) | (3,397) | (2,253) | (2,109) |
| Level II | (2,412) | (1,885) | (1,104) | 295 | 1,690 | 1,630 |
| Level III | 3,616 | 3,345 | 3,071 | 4,029 | 4,984 | 4,769 |
| Level IV | (4,510) | (4,752) | (4,997) | (1,480) | (815) | (1,048) |
| Special | 769 | 737 | 704 | 1,933 | 2,010 | 1,976 |

[1] - Out of State Beds are not included

Chart 1B

## All Phases - May Revision Pop

| | 2008-09 | 2009-10 | 2010-11 | 2011-12 | 2012-13 | 2013-14 |
|---|---|---|---|---|---|---|
| **Spring Population Projection** | 164,929 | 160,656 | 159,672 | 159,146 | 159,682 | 160,483 |
| | | | | | | |
| **Bed Capacity** | | | | | | |
| | | | | | | |
| Existing Traditional Beds | 157,476 | 157,476 | 157,476 | 157,476 | 157,476 | 157,476 |
| Out of state Beds | 8,000 | 8,000 | 8,000 | - | - | - |
| In-fill Beds (phases I & II) | - | - | 1,000 | 5,750 | 7,650 | 8,600 |
| FRCCC Beds | 200 | 1,000 | 1,800 | 2,000 | 2,000 | 2,000 |
| Re-entry Beds (phases I & II) | - | 500 | 1,000 | 2,000 | 3,000 | 4,000 |
| Other Construction | - | - | - | 1,152 | 1,702 | 1,702 |
| Receiver Beds | - | - | - | 5,000 | 10,000 | 10,000 |
| | | | | | | |
| Capacity | 165,676 | 166,976 | 169,276 | 173,378 | 181,828 | 183,778 |
| | | | | | | |
| Surplus/Deficit | 747 | 6,320 | 9,604 | 14,232 | 22,146 | 23,295 |
| | | | | | | |
| **Surplus/Deficit by Classification Level[1]:** | | | | | | |
| | | | | | | |
| All Female | 362 | 1,591 | 2,336 | 2,704 | 2,786 | 2,351 |
| Reception Center | (2,215) | (1,057) | (744) | 215 | 434 | 655 |
| Level I | (4,751) | (2,926) | (1,786) | 716 | 2,882 | 3,819 |
| Level II | (704) | 1,152 | 2,953 | 5,294 | 7,435 | 7,853 |
| Level III | 3,674 | 3,359 | 2,919 | 3,750 | 4,541 | 4,597 |
| Level IV | (4,400) | (4,560) | (4,810) | (405) | 2,035 | 2,117 |
| Special | 781 | 761 | 736 | 1,958 | 2,033 | 1,903 |

[1] - Out of State Beds are not included

Chart 2A

## All Phases - 1% Growth

| | 2008-09 | 2009-10 | 2010-11 | 2011-12 | 2012-13 | 2013-14 |
|---|---|---|---|---|---|---|
| Spring Population Projection | 168,063 | 166,766 | 168,458 | 170,222 | 172,002 | 173,802 |
| **Bed Capacity** | | | | | | |
| Existing Traditional Beds | 157,476 | 157,476 | 157,476 | 157,476 | 157,476 | 157,476 |
| Out of state Beds | 8,000 | 8,000 | 8,000 | - | - | - |
| In-fill Beds (phases I & II) | - | - | 1,000 | 5,750 | 7,650 | 8,600 |
| FRCCC Beds | 200 | 1,000 | 1,800 | 2,000 | 2,000 | 2,000 |
| Re-entry Beds (phases I & II) | - | 500 | 1,000 | 2,000 | 3,000 | 4,000 |
| Other Construction | - | - | - | 1,152 | 1,702 | 1,702 |
| Receiver Beds | - | - | - | 5,000 | 10,000 | 10,000 |
| Capacity | 165,676 | 166,976 | 169,276 | 173,378 | 181,828 | 183,778 |
| Surplus/Deficit | (2,387) | 210 | 818 | 3,156 | 9,826 | 9,976 |
| **Surplus/Deficit by Classification Level[1]:** | | | | | | |
| All Female | 247 | 1,384 | 2,074 | 2,537 | 2,798 | 2,676 |
| Reception Center | (2,925) | (2,135) | (2,387) | (1,711) | (1,438) | (1,718) |
| Level I | (5,172) | (4,484) | (4,543) | (3,397) | (2,253) | (2,109) |
| Level II | (2,412) | (1,885) | (1,104) | 295 | 1,690 | 1,630 |
| Level III | 3,616 | 3,345 | 3,071 | 4,029 | 4,984 | 4,769 |
| Level IV | (4,510) | (4,752) | (4,997) | (530) | 2,035 | 2,752 |
| Special | 769 | 737 | 704 | 1,933 | 2,010 | 1,976 |
| | (10,387) | (7,790) | (7,182) | 3,156 | 9,826 | 9,976 |

1 - Out of State Beds are not included

Chart 2B

Permanent
Contracted
Health Care
Prison Reform
Total Capacity
Surplus(Def/ill)

Permanent
Contracted
Health Care
Infill
Other Construction
Total Capacity
Surplus(Def/ill)

Permanent
Contracted
Health Care
Reentry
Prison Reform
Total Capacity
Surplus(Def/ill)

Permanent
Contracted
Health Care
Reentry
Infill
Total Capacity
Surplus(Def/ill)

Permanent
Other Construction
Health Care
Reentry
Total Capacity
Surplus(Def/ill)

CDCR Contract

LAST SAVED DATE & TIME
12:05PM

NOTE: The Male and Female overcrowded rows are projected to decline as represented in the Spring 2008 Population Projections. The decline was calculated by using the unsentenced year-end average percentage beginning with the 2008-09 population of 169,764.

[illegible]

| | | | | | | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [illegible] | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Permanent | 11,582 | 10,133 | 11,698 | 10,133 | 11,815 | 10,133 | 11,933 | 10,133 | 12,052 | 10,133 | 12,173 | 10,515 | 12,295 | 10,897 | 12,417 | 10,897 | 12,542 | 10,897 | 12,667 | 10,897 | 12,794 | 10,897 | 12,922 | 10,897 | 13,051 | 10,897 | |
| Contracted | | 896 | | 1,096 | | 1,896 | | 2,696 | | 2,896 | | 2,896 | | 2,896 | | 2,896 | | 2,896 | | 2,896 | | 2,896 | | 2,896 | | 2,896 | |
| Health Care | | 0 | | 0 | | 0 | | 0 | | 382 | | 382 | | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | 764 |
| Policy Reform | | 0 | (716) | 0 | (1,170) | 0 | (1,178) | 0 | (1,178) | 0 | (1,178) | 0 | (1,178) | 0 | (1,178) | 0 | (1,178) | 0 | (1,178) | 0 | (1,178) | 0 | (1,178) | 0 | (1,178) | 0 | |
| Total Capacity | | 11,029 | | 11,229 | | 12,029 | | 12,829 | | 13,411 | | 13,793 | | 13,793 | | 13,793 | | 13,793 | | 13,793 | | 13,793 | | 13,793 | | 13,793 | |
| Surplus/(Deficit) | | (553) | | 247 | | 1,384 | | 2,074 | | 2,537 | | 2,798 | | 2,676 | | 2,554 | | 2,429 | | 2,304 | | 2,177 | | 2,049 | | 1,920 | |
| [illegible] | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Permanent | 26,608 | 21,278 | 26,874 | 21,278 | 27,143 | 21,278 | 27,414 | 21,278 | 27,688 | 21,278 | 27,965 | 22,228 | 28,245 | 22,778 | 28,527 | 22,778 | 28,813 | 22,778 | 29,101 | 22,778 | 29,392 | 22,778 | 29,686 | 22,778 | 29,983 | 22,778 | |
| Contracted | | 1,000 | | 1,000 | | 1,000 | | 1,000 | | 1,000 | | 1,000 | | 1,000 | | 1,000 | | 1,000 | | 1,000 | | 1,000 | | 1,000 | | 1,000 | |
| Infill | | 0 | | 0 | | 0 | | 0 | | 950 | | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | 950 |
| Other Construction | | 0 | | 0 | | 0 | | 0 | | 0 | | 550 | | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | 550 |
| Policy Reform | | 0 | (1,671) | 0 | (2,730) | 0 | (2,749) | 0 | (2,749) | 0 | (2,749) | 0 | (2,749) | 0 | (2,749) | 0 | (2,749) | 0 | (2,749) | 0 | (2,749) | 0 | (2,749) | 0 | (2,749) | 0 | |
| Total Capacity | | 22,278 | | 22,278 | | 22,278 | | 22,278 | | 23,228 | | 23,778 | | 23,778 | | 23,778 | | 23,778 | | 23,778 | | 23,778 | | 23,778 | | 23,778 | |
| Surplus/(Deficit) | | (4,330) | | (2,925) | | (2,135) | | (2,387) | | (1,711) | | (1,438) | | (1,718) | | (2,000) | | (2,286) | | (2,574) | | (2,865) | | (3,159) | | (3,456) | |
| [illegible] | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Permanent | 29,077 | 20,355 | 29,368 | 20,355 | 29,661 | 20,355 | 29,958 | 20,580 | 30,256 | 20,805 | 30,560 | 22,251 | 30,866 | 23,697 | 31,174 | 24,147 | 31,486 | 25,047 | 31,801 | 25,947 | 32,119 | 26,847 | 32,440 | 27,297 | 32,765 | 27,297 | |
| Contracted | | 2,647 | | 2,647 | | 2,647 | | 2,647 | | 2,647 | | 2,647 | | 2,647 | | 2,647 | | 2,647 | | 2,647 | | 2,647 | | 2,647 | | 2,647 | |
| Health Care | | 0 | | 0 | | 0 | | 0 | | 996 | | 996 | | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | 1,992 |
| Reentry | | 0 | | 0 | | 225 | | 225 | | 450 | | 450 | | 450 | | 900 | | 900 | | 900 | | 450 | | 0 | | 0 | 4,950 |
| Policy Reform | | 0 | (1,194) | 0 | (1,950) | 0 | (1,963) | 0 | (1,963) | 0 | (1,963) | 0 | (1,963) | 0 | (1,963) | 0 | (1,963) | 0 | (1,963) | 0 | (1,963) | 0 | (1,963) | 0 | (1,963) | 0 | |
| Total Capacity | | 23,002 | | 23,002 | | 23,227 | | 23,452 | | 24,898 | | 26,344 | | 26,794 | | 27,694 | | 28,594 | | 29,494 | | 29,944 | | 29,944 | | 29,944 | |
| Surplus/(Deficit) | | (6,075) | | (5,172) | | (4,484) | | (4,543) | | (3,397) | | (2,253) | | (2,109) | | (1,517) | | (929) | | (344) | | (212) | | (533) | | (858) | |
| [illegible] | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Permanent | 40,924 | 33,966 | 41,333 | 33,966 | 41,747 | 33,966 | 42,164 | 34,151 | 42,586 | 35,336 | 43,012 | 37,157 | 43,442 | 38,978 | 43,876 | 39,348 | 44,315 | 40,088 | 44,758 | 40,826 | 45,206 | 41,568 | 45,658 | 41,938 | 46,114 | 41,938 | |
| Contracted | | 3,761 | | 3,761 | | 3,761 | | 3,761 | | 3,761 | | 3,761 | | 3,761 | | 3,761 | | 3,761 | | 3,761 | | 3,761 | | 3,761 | | 3,761 | |
| Infill | | 0 | | 0 | | 0 | | 1,000 | | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | 1,000 |
| Health Care | | 0 | | 0 | | 0 | | 0 | | 1,451 | | 1,451 | | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | 2,902 |
| Reentry | | 0 | | 0 | | 185 | | 185 | | 370 | | 370 | | 370 | | 740 | | 740 | | 740 | | 370 | | 0 | | 0 | 4,070 |
| Policy Reform | | 0 | (1,194) | 0 | (1,950) | 0 | (1,963) | 0 | (1,963) | 0 | (1,963) | 0 | (1,963) | 0 | (1,963) | 0 | (1,963) | 0 | (1,963) | 0 | (1,963) | 0 | (1,963) | 0 | (1,963) | 0 | |
| Total Capacity | | 37,727 | | 37,727 | | 37,912 | | 39,097 | | 40,918 | | 42,739 | | 43,109 | | 43,849 | | 44,589 | | 45,329 | | 45,699 | | 45,699 | | 45,699 | |
| Surplus/(Deficit) | | (3,197) | | (2,412) | | (1,885) | | (1,104) | | 295 | | 1,690 | | 1,630 | | 1,936 | | 2,237 | | 2,534 | | 2,456 | | 2,004 | | 1,548 | |
| [illegible] | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Permanent | 33,765 | 37,719 | 34,103 | 37,719 | 34,444 | 37,719 | 34,788 | 37,789 | 35,136 | 37,859 | 35,487 | 39,165 | 35,842 | 40,471 | 36,201 | 40,611 | 36,563 | 40,891 | 36,928 | 41,171 | 37,298 | 41,451 | 37,671 | 41,591 | 38,047 | 41,591 | |
| Health Care | | 0 | | 0 | | 0 | | 0 | | 1,166 | | 1,166 | | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | 2,332 |
| Reentry | | 0 | | 0 | | 70 | | 70 | | 140 | | 140 | | 140 | | 280 | | 280 | | 280 | | 140 | | 0 | | 0 | 1,540 |
| Total Capacity | | 37,719 | | 37,719 | | 37,789 | | 37,859 | | 39,165 | | 40,471 | | 40,611 | | 40,891 | | 41,171 | | 41,451 | | 41,591 | | 41,591 | | 41,591 | |
| Surplus/(Deficit) | | 3,954 | | 3,616 | | 3,345 | | 3,071 | | 4,029 | | 4,984 | | 4,769 | | 4,690 | | 4,608 | | 4,523 | | 4,293 | | 3,920 | | 3,544 | |
| [illegible] | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Permanent | 25,975 | 21,725 | 26,235 | 21,725 | 26,497 | 21,725 | 26,762 | 21,745 | 27,030 | 21,765 | 27,300 | 25,550 | 27,573 | 26,485 | 27,849 | 26,525 | 28,127 | 26,605 | 28,408 | 26,685 | 28,693 | 26,765 | 28,979 | 26,805 | 29,269 | 26,805 | |
| Infill | | 0 | | 0 | | 0 | | 0 | | 2,850 | | | | | | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | 2,850 |
| Health Care | | 0 | | 0 | | 0 | | 0 | | 895 | | 895 | | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | 1,790 |
| Reentry | | 0 | | 0 | | 20 | | 20 | | 40 | | 40 | | 40 | | 80 | | 80 | | 80 | | 40 | | 0 | | 0 | 440 |
| Total Capacity | | 21,725 | | 21,725 | | 21,745 | | 21,765 | | 25,550 | | 26,485 | | 26,525 | | 26,605 | | 26,685 | | 26,765 | | 26,805 | | 26,805 | | 26,805 | |
| Surplus/(Deficit) | | (4,250) | | (4,510) | | (4,752) | | (4,997) | | (1,480) | | (815) | | (1,048) | | (1,244) | | (1,442) | | (1,643) | | (1,888) | | (2,174) | | (2,464) | |
| [illegible] | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Permanent | 3,195 | 3,996 | 3,227 | 3,996 | 3,259 | 3,996 | 3,292 | 3,996 | 3,325 | 3,996 | 3,358 | 5,258 | 3,392 | 5,368 | 3,425 | 5,368 | 3,460 | 5,368 | 3,494 | 5,368 | 3,529 | 5,368 | 3,565 | 5,368 | 3,600 | 5,368 | |
| Other Construction | | 0 | | 0 | | 0 | | 0 | | 1,152 | | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | 1,152 |
| Health Care | | 0 | | 0 | | 0 | | 0 | | 110 | | 110 | | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | 220 |
| Total Capacity | | 3,996 | | 3,996 | | 3,996 | | 3,996 | | 5,258 | | 5,368 | | 5,368 | | 5,368 | | 5,368 | | 5,368 | | 5,368 | | 5,368 | | 5,368 | |
| Surplus/(Deficit) | | 801 | | 769 | | 737 | | 704 | | 1,933 | | 2,010 | | 1,976 | | 1,943 | | 1,908 | | 1,874 | | 1,839 | | 1,803 | | 1,768 | |
| [illegible] | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| COCF Contract | | 5,000 | | 8,000 | | 8,000 | | 8,000 | | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | |
| Surplus/(Deficit) | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| [illegible] | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| [illegible] | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| [illegible] | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| [illegible] | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| [illegible] | | | | | | | | | | | | | | | | | | | | | | | | | | | |

NOTE: The Male and Female populations are projected to increase at a rate of 1 percent per Fiscal Year. The Female Level I, Level II, and Reception Security Level populations are reduced for projected Policy Reform.

[1] The Male % Overcrowded row represents the percentage of overcrowding based upon the projected Male Population divided by the Male Design Bed Capacity (excluding Males housed in Lease/Contracted beds).

[2] The Female % Overcrowded row represents the percentage of overcrowding based upon the Female Population divided by the Female Design Bed Capacity (excluding Females housed in Lease/Contracted beds).

[3] The Total % Overcrowded row represents the percentage of overcrowding based upon the Total projected Population divided by the Total Design Bed Capacity (excluding Males and Females housed in Lease/Contracted beds).

[4] Depicts all AB 900 Infill Phases. (Phase II construction starting 2009-10 reflected as Level IV facilities for cost estimates only.) Construction at existing prisons by CDCR is based on Housing Overcrowding Capacity (HOC) percentages. All others, including health care beds, are based on design bed capacity.

LAST SAVED DATE & TIME
12:05PM 6/10/08

Permanent
Contracted
Health Care
Policy Reform
Total Capacity
Surplus/(Deficit)

Permanent
Contracted
Health Care
Infill
Other Construction
Reentry
Total Capacity
Surplus/(Deficit)

Permanent
Contracted
Health Care
Reentry
Policy Reform
Total Capacity
Surplus/(Deficit)

Permanent
Contracted
Infill
Health Care
Reentry
Policy Reform
Total Capacity
Surplus/(Deficit)

Permanent
Contracted
Infill
Health Care
Reentry
Total Capacity
Surplus/(Deficit)

Permanent
Other Construction
Health Care
Total Capacity
Surplus/(Deficit)
CDCR (Contract)
Surplus/(Deficit)

LAST SAVED DATE & TIME
11:31 AM

NOTE: The Male and Female populations are projected to decline as represented in the Spring 2008 Population Projection. The percentage was calculated by dividing the year-end population percentage beginning with the 2008-09 Population of 166,704.

SPRING 2008 BAP CHART ANALYSIS with 1% GROWTH @ HOUSING OVERCROWDING CAPACITY (HOC)

| [illegible] | Pop | HOC | Pop | HOC | Pop | HOC | Pop | HOC | Pop | HOC | Pop | HOC | Pop | HOC | Pop | HOC | Pop | HOC | Pop | HOC | Pop | HOC | Pop | HOC | Pop | HOC | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Permanent | 11,582 | 10,133 | 11,698 | 10,133 | 11,815 | 10,133 | 11,933 | 10,133 | 12,052 | 10,133 | 12,173 | 10,515 | 12,295 | 10,897 | 12,417 | 10,897 | 12,542 | 10,897 | 12,667 | 10,897 | 12,794 | 10,897 | 12,922 | 10,897 | 13,051 | 10,897 | |
| Contracted | | 896 | | 1,096 | | 1,896 | | 2,696 | | 2,896 | | 2,896 | | 2,896 | | 2,896 | | 2,896 | | 2,896 | | 2,896 | | 2,896 | | 2,896 | |
| Health Care | | 0 | | 0 | | 0 | | 0 | | 382 | | 382 | | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | 764 |
| Policy Reform | | 0 | (716) | 0 | (1,170) | 0 | (1,178) | 0 | (1,178) | 0 | (1,178) | 0 | (1,178) | 0 | (1,178) | 0 | (1,178) | 0 | (1,178) | 0 | (1,178) | 0 | (1,178) | 0 | (1,178) | 0 | |
| Total Capacity | | 11,029 | | 11,229 | | 12,029 | | 12,829 | | 13,411 | | 13,793 | | 13,793 | | 13,793 | | 13,793 | | 13,793 | | 13,793 | | 13,793 | | 13,793 | |
| Surplus/(Deficit) | | (553) | | 247 | | 1,384 | | 2,074 | | 2,537 | | 2,798 | | 2,676 | | 2,554 | | 2,429 | | 2,304 | | 2,177 | | 2,049 | | 1,920 | |
| Permanent | 26,608 | 21,278 | 26,874 | 21,278 | 27,143 | 21,278 | 27,414 | 21,278 | 27,688 | 21,278 | 27,965 | 22,228 | 28,245 | 22,778 | 28,527 | 22,778 | 28,813 | 22,778 | 29,101 | 22,778 | 29,392 | 22,778 | 29,686 | 22,778 | 29,983 | 22,778 | |
| Contracted | | 1,000 | | 1,000 | | 1,000 | | 1,000 | | 1,000 | | 1,000 | | 1,000 | | 1,000 | | 1,000 | | 1,000 | | 1,000 | | 1,000 | | 1,000 | |
| Infill | | 0 | | 0 | | 0 | | 0 | | 950 | | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | 950 |
| Other Construction | | 0 | | 0 | | 0 | | 0 | | 0 | | 550 | | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | 550 |
| Policy Reform | | 0 | (1,671) | 0 | (2,730) | 0 | (2,749) | 0 | (2,749) | 0 | (2,749) | 0 | (2,749) | 0 | (2,749) | 0 | (2,749) | 0 | (2,749) | 0 | (2,749) | 0 | (2,749) | 0 | (2,749) | 0 | |
| Total Capacity | | 22,278 | | 22,278 | | 22,278 | | 22,278 | | 23,228 | | 23,778 | | 23,778 | | 23,778 | | 23,778 | | 23,778 | | 23,778 | | 23,778 | | 23,778 | |
| Surplus/(Deficit) | | (4,330) | | (2,925) | | (2,135) | | (2,387) | | (1,711) | | (1,438) | | (1,718) | | (2,000) | | (2,286) | | (2,574) | | (2,865) | | (3,159) | | (3,456) | |
| Permanent | 29,077 | 20,355 | 29,368 | 20,355 | 29,661 | 20,355 | 29,958 | 20,580 | 30,258 | 20,805 | 30,560 | 22,251 | 30,866 | 23,697 | 31,174 | 24,147 | 31,486 | 25,047 | 31,801 | 25,947 | 32,119 | 26,847 | 32,440 | 27,297 | 32,765 | 27,297 | |
| Contracted | | 2,647 | | 2,647 | | 2,647 | | 2,647 | | 2,647 | | 2,647 | | 2,647 | | 2,647 | | 2,647 | | 2,647 | | 2,647 | | 2,647 | | 2,647 | |
| Health Care | | 0 | | 0 | | 0 | | 0 | | 996 | | 996 | | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | 1,992 |
| Reentry | | 0 | | 0 | | 225 | | 225 | | 450 | | 450 | | 450 | | 900 | | 900 | | 900 | | 450 | | 0 | | 0 | 4,950 |
| Policy Reform | | 0 | (1,194) | 0 | (1,950) | 0 | (1,963) | 0 | (1,963) | 0 | (1,963) | 0 | (1,963) | 0 | (1,963) | 0 | (1,963) | 0 | (1,963) | 0 | (1,963) | 0 | (1,963) | 0 | (1,963) | 0 | |
| Total Capacity | | 23,002 | | 23,002 | | 23,227 | | 23,452 | | 24,898 | | 26,344 | | 26,794 | | 27,694 | | 28,594 | | 29,494 | | 29,944 | | 29,944 | | 29,944 | |
| Surplus/(Deficit) | | (6,075) | | (5,172) | | (4,484) | | (4,543) | | (3,397) | | (2,253) | | (2,109) | | (1,517) | | (929) | | (344) | | (212) | | (533) | | (858) | |
| Permanent | 40,924 | 33,966 | 41,333 | 33,966 | 41,747 | 33,966 | 42,164 | 34,151 | 42,586 | 35,336 | 43,012 | 37,157 | 43,442 | 38,978 | 43,876 | 39,348 | 44,315 | 40,088 | 44,758 | 40,828 | 45,206 | 41,568 | 45,658 | 41,938 | 46,114 | 41,938 | |
| Contracted | | 3,761 | | 3,761 | | 3,761 | | 3,761 | | 3,761 | | 3,761 | | 3,761 | | 3,761 | | 3,761 | | 3,761 | | 3,761 | | 3,761 | | 3,761 | |
| Infill | | 0 | | 0 | | 0 | | 1,000 | | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | 1,000 |
| Health Care | | 0 | | 0 | | 0 | | 0 | | 1,451 | | 1,451 | | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | 2,902 |
| Reentry | | 0 | | 0 | | 185 | | 185 | | 370 | | 370 | | 370 | | 740 | | 740 | | 740 | | 370 | | 0 | | 0 | 4,070 |
| Policy Reform | | 0 | (1,194) | 0 | (1,950) | 0 | (1,963) | 0 | (1,963) | 0 | (1,963) | 0 | (1,963) | 0 | (1,963) | 0 | (1,963) | 0 | (1,963) | 0 | (1,963) | 0 | (1,963) | 0 | (1,963) | 0 | |
| Total Capacity | | 37,727 | | 37,727 | | 37,912 | | 39,097 | | 40,916 | | 42,739 | | 43,109 | | 43,849 | | 44,589 | | 45,329 | | 45,699 | | 45,699 | | 45,699 | |
| Surplus/(Deficit) | | (3,197) | | (2,412) | | (1,885) | | (1,104) | | 295 | | 1,690 | | 1,630 | | 1,936 | | 2,237 | | 2,534 | | 2,456 | | 2,004 | | 1,548 | |
| Permanent | 33,765 | 37,719 | 34,103 | 37,719 | 34,444 | 37,719 | 34,788 | 37,789 | 35,136 | 37,859 | 35,487 | 39,165 | 35,842 | 40,471 | 36,201 | 40,611 | 36,563 | 40,891 | 36,928 | 41,171 | 37,298 | 41,451 | 37,671 | 41,591 | 38,047 | 41,591 | |
| Health Care | | 0 | | 0 | | 0 | | 0 | | 1,166 | | 1,166 | | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | 2,332 |
| Reentry | | 0 | | 0 | | 70 | | 70 | | 140 | | 140 | | 140 | | 280 | | 280 | | 280 | | 140 | | 0 | | 0 | 1,540 |
| Total Capacity | | 37,719 | | 37,719 | | 37,789 | | 37,859 | | 39,165 | | 40,471 | | 40,611 | | 40,891 | | 41,171 | | 41,451 | | 41,591 | | 41,591 | | 41,591 | |
| Surplus/(Deficit) | | 3,954 | | 3,616 | | 3,345 | | 3,071 | | 4,029 | | 4,984 | | 4,769 | | 4,690 | | 4,608 | | 4,523 | | 4,293 | | 3,920 | | 3,544 | |
| Permanent | 25,975 | 21,725 | 26,235 | 21,725 | 26,497 | 21,725 | 26,762 | 21,745 | 27,030 | 21,765 | 27,300 | 26,500 | 27,573 | 29,335 | 27,849 | 30,325 | 28,127 | 30,405 | 28,408 | 30,485 | 28,693 | 30,565 | 28,979 | 30,605 | 29,269 | 30,605 | |
| Infill | | 0 | | 0 | | 0 | | 0 | | 3,800 | | 1,900 | | 950 | | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | 6,650 |
| Health Care | | 0 | | 0 | | 0 | | 0 | | 895 | | 895 | | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | 1,790 |
| Reentry | | 0 | | 0 | | 20 | | 20 | | 40 | | 40 | | 40 | | 80 | | 80 | | 80 | | 40 | | 0 | | 0 | 440 |
| Total Capacity | | 21,725 | | 21,725 | | 21,745 | | 21,765 | | 26,500 | | 29,335 | | 30,325 | | 30,405 | | 30,485 | | 30,565 | | 30,605 | | 30,605 | | 30,605 | |
| Surplus/(Deficit) | | (4,250) | | (4,510) | | (4,752) | | (4,997) | | (530) | | 2,035 | | 2,752 | | 2,556 | | 2,358 | | 2,157 | | 1,912 | | 1,626 | | 1,336 | |
| Permanent | 3,195 | 3,996 | 3,227 | 3,996 | 3,259 | 3,996 | 3,292 | 3,996 | 3,325 | 3,996 | 3,358 | 5,258 | 3,392 | 5,368 | 3,425 | 5,368 | 3,460 | 5,368 | 3,494 | 5,368 | 3,529 | 5,368 | 3,565 | 5,368 | 3,600 | 5,368 | |
| Other Construction | | 0 | | 0 | | 0 | | 0 | | 1,152 | | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | 1,152 |
| Health Care | | 0 | | 0 | | 0 | | 0 | | 110 | | 110 | | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | 220 |
| Total Capacity | | 3,996 | | 3,996 | | 3,996 | | 3,996 | | 5,258 | | 5,368 | | 5,368 | | 5,368 | | 5,368 | | 5,368 | | 5,368 | | 5,368 | | 5,368 | |
| Surplus/(Deficit) | | 801 | | 769 | | 737 | | 704 | | 1,933 | | 2,010 | | 1,976 | | 1,943 | | 1,908 | | 1,874 | | 1,839 | | 1,803 | | 1,768 | |
| COCF Contract | | 5,000 | | 8,000 | | 8,000 | | 8,000 | | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | |

NOTE: The Male and Female populations are projected to increase at a rate of 1 percent per Fiscal Year. The Female, Level I, Level II, and Reception Security Level populations are reduced for projected Policy Reform.

[1] The Male % Overcrowded row represents the percentage of overcrowding based upon the projected Male Population divided by the Male Design Bed Capacity (excluding Males housed in Lease/Contracted beds).

[2] The Female % Overcrowded row represents the percentage of overcrowding based upon the Female Population divided by the Female Design Bed Capacity (excluding Females housed in Lease/Contracted beds).

[3] The Total % Overcrowded row represents the percentage of overcrowding based upon the Total projected Population divided by the Total Design Bed Capacity (excluding Males and Females housed in Lease/Contracted beds).

[*] Depicts all AB 900 Infill Phases. (Phase II construction starting 2009-10 reflected as Level IV facilities for cost estimates only.) Construction at existing prisons by CDCR is based on Housing Overcrowding Capacity (HOC) percentages. All others, including health care beds, are based on design bed capacity.

LAST SAVED DATE & TIME
11:31 AM 6/11/08