EXHIBIT W

Robert Gore

| | |
|---|---|
| From: | Robert Gore |
| Sent: | Friday, July 13, 2007 3:00 PM |
| To: | 'Hayhoe, Joyce'; Kathy.Jett@cdcr.ca.gov |
| Cc: | Tilton, Jim; Bud.Prunty@cdcr.ca.gov; Andrea Hoch; Benjamin Rice |
| Subject: | AB900 cleanup |

Importance:            High

Complete the review of the AB900 clean-up language as you requested.
One addition:
GO, CDCR and a representative of the federal courts earlier this week identified as critical obtaining 1800 or more drug diversion beds in community programs at the earliest possible date to house diverted parole violators. Please ensure that the cleanup bill contains language similar to that for OSTs, that provides for expedited contracting with vendors.
Kathy and Ben will work with you on this.
It is imperative that the bill address this issue; be glad to provide further information.

Thanks, Joyce.

Robert J. Gore
Deputy Cabinet Secretary
Office of Governor Arnold Schwarzenegger
State Capitol
Sacramento, CA 95814
916.445.6131

*CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.*

1

GOVPRIV001341

EXHIBIT X

| From: | Robert Gore |
|---|---|
| Sent: | Sunday, August 26, 2007 4:09 PM |
| To: | Chris Ryan |
| Subject: | Fw: AB900 Cleanup |

----- Original Message -----
From: Robert Gore
To: 'Christopher.Ryan@asm.ca.gov' <Christopher.Ryan@asm.ca.gov>;
'joyce.hayhoe@cdcr.ca.gov' <joyce.hayhoe@cdcr.ca.gov>
Sent: Sun Aug 26 16:08:55 2007
Subject: AB900 Cleanup

Perhaps I missed it, but there appears to be no reference to waiving contracting
requirements for obtaining drug diversion beds -- similar to the OST language. Section 22
might be a good place. These beds are critical to achieving fast pop reduction, as GAS and
the federal judges wish. Kathy Jett can provide details. Please advise.

1

GOVPRIV001340

# EXHIBIT Y

## CONFIDENTIAL & URGENT
## CRITICAL ISSUE BRIEFING

**SUBJECT:**    **Prison Population Management**

**To:**    **Susan Kennedy, Dan Dunmoyer, Andrea Hoch**

**From:**    **Bob Gore**

**July 9, 2007**


**Issue**:  GO on June 2 directed CDCR to fill good beds opened by out-of-state transfers (OST) with inmates from bad beds, and not backfill with new admissions from jails.  However, this objective is not being achieved, due to a perfect storm of adverse conditions, prison population is ramping up.

**Background:**  Since June 2:

- Bad beds increased 7% to 19,435, primarily because of converting the only co-ed prison, Norco, to male-only, and maintenance problems.  Females were moved out of Norco to bad beds in existing women's facilities.
- OST is failing to meet federal court commitments.  While promising to move 300 inmates in June, CDCR moved out 38 – the last of the volunteers.  About half of the involuntaries are being denied permission to leave the state by Receiver-supervised medical personnel and nearly all are filing legal appeals.  CDCR estimates it will be 50% short of July and August goals.  OST was expected to move 5,000 inmates in FY0708 to accommodate 4,500 new admissions and to remove 500 bad beds.  Arizona contract prisons are full; CDCR is arranging for a total of 2,600 beds in Mississippi and Michigan.  Mississippi is scheduled to open July 20.

E_PRIV_171297

E00084455

- CDCR estimates that 1,600 High-Risk Sex Offenders violate Jessica's Law by living too close to schools and parks. The Department is requesting GO guidance via a GOAR. One option is enforcing the law, which would result in new parole violations to immediately return these 1,500 parolees to prison, and more monthly after that. A second option is shifting the parolees out of the county of origin to another location. A third is to pay $77 million annually for CDCR to subsidize housing.
- LA County, which houses about 1,300 parole violators awaiting hearing and another 1,300 serving a <4 month sentence, in June sought a new contract that would have essentially sent 90% of those inmates to CDCR. LASD withdrew the request, but nearly 5,000 state inmates will be in county jails by 6/30/08. Jails are strained to capacity. Cases like Paris Hilton exacerbate the problem, as Sheriffs are quick to blame CDCR.

**Actions:**
1. Order CDCR to devote all available existing resources to OST ramp-up.
2. Determine response to Jessica's Law violators. Note: If jails close, in response to a wave of PVs, it will force direct booking into prison. This, in turn, will likely violate the terms of the *Valdivia* lawsuit, which requires timely PV hearings held within 50 miles of the county of commitment.
*Consider the following 3 actions of both the Deukmejian Commission and Expert Panel, using the Governor's CDCR Rehab Strike Team to complete the recommendations.*
3. Direct CDCR to immediately make full use of existing laws to reduce parole load. (3001PC, allows nonviolent offenders, as defined, to be discharged from parole after 12 months clean time. Ch 875, Statutes of 2006, allows discharge of drug offenders who complete in-prison program and 150 days of residential community program.) Authorize on an

urgency basis the use of part of the $50M in AB900 funds to fund enhanced residential rehab contracts.

4. To retain technical PVs on parole with graduated sanctions, direct the Rehab Strike Team to develop a skeleton PV matrix by 9/1 and the full matrix by 12/1. The matrix is a set of guidelines to provide Parole Agents with authority and clarity in keeping technical violators on the street.

5. Sponsor urgency legislation to:

   a) Permit the earned direct release of nonserious, nonviolent offenders with 12 months good time, while retaining banked parole and warrantless search for one year.

   b) Study and determine, based on risk assessment, which additional inmates are eligible for direct release to banked parole.

   c) Expand "good time" credits to provide for enhanced release credits and program participation incentives. (At least one-half sentence would be served.)

   d) Create community beds for female offenders and enhanced programs.

6. Direct CDCR to develop a bad bed deactivation plan for specific facilities at specific dates. (In progress.)

7. Approve continued back channel communications with Receiver's COS, John Hagar. At our first session, he committed to federal judicial authorization of design build prison bed construction (which accelerates occupancy by 6 months), jointly siting the 8,000 medical beds and joint venture hiring of architects and engineers and program and construction management services. We are scheduled to meet July 11 for a second session – Hagar is quite enthusiastic. (In progress.)

E_PRIV_171299

E00084455

EXHIBIT Z

# CRITICAL ISSUE BRIEFING

**SUBJECT:**    **REHAB STRIKE TEAM FIRST REPORT**

**TO:**    **SUSAN KENNEDY & DAN DUNMOYER**
   **CC:**    **ANDREA HOCH**

**FROM:**    **BOB GORE**

**August 20, 2007**

**BACKGROUND:** The Governor's CDCR Rehabilitation Strike Team (RST) is one of two formed in May to direct the Department on the implementation of AB 900 and other reforms.   The RST's first report, as submitted by Kathy Jett, is attached.  She is available to brief you. (The Facilities Strike Team submitted its report in June and was incorporated into CDCR by Governor's action.)

**SUMMARY:** The RST acted immediately to quickly reduce prison overcrowding by:
- Creating the phase I risk assessment tool to enable parole agents to discharge more parolees at the 13th month, as authorized by PC 3001.  Tool will be done by Sept. 14.
- Contracting for 1,800 community facility drug beds for parolee treatment.
- Expediting the hiring of teachers.
- Working with the Facilities Strike Team and CDCR to ensure prison design achieves AB 900 programming goals.
- Working with CDCR to deliver the first Re-Entry Center plan, for Stockton; and the first proposal for a full vocational education center, proposed for the former juvenile facility in Paso Robles.

- Fast-tracking new programs with an innovative RFP to all prison wardens to compete for a significant portion of the $50 million in program funds in AB 900.
- Identifying barriers to successful programs.
- Recommending creation of new classes of employees (such as rehabilitation specialists), management practices and cultural change. To put the "R" with CDC, the Governor should appoint an Undersecretary of Adult Programs.
- Drafting technical amendments to AB 900.
- Identifying external roadblocks with other state control agencies and beginning to remove them.

The RST makes this guidance to CDCR:

- Proceed immediately with the recommendations of the CDCR Expert Panel. This includes a rehab program for each inmate, program incentives, security revisions to permit full programming, accountability measures for inmates and staff, enhanced staff training, parole reforms, re-entry centers, earned release and others.
- Remove the civil addict cap at the California Rehabilitation Center, permitting increased addict treatment with inmate status.
- Coordinate with Board of Parole Hearings to develop a formal drug diversion program that includes BPH Deputy Commissioners in each parole region trained to work with addicts.
- By Oct. 31 complete work on implementation plans for all AB 900 reforms, as well as an inmate needs assessment, full risk assessment tool and matrix, with RST lead.

This report on near-term reforms will be followed Oct. 31 by a report on long-term reforms and 0809 budget recommendations. RST will conclude its business Dec. 31 with a closing report. At that time, selected members will be retained as a part of a CDCR advisory group.

E_PRIV_171301

E00084456

EXHIBIT AA

## CONFIDENTIAL & PRIVILEGED
## CRITICAL ISSUE BRIEFING

**TO:**     **SUSAN KENNEDY & DAN DUNMOYER**
        **CC: ANDREA HOCH, CHRIS KAHN & ADAM MENDELSOHN**

**FROM:**   **BOB GORE**

**August 24, 2007**

**Background:** AB 900 was signed into law in May. Federal courts created an unprecedented 3-judge panel to possibly intervene in overcrowding management. The Governor recently directed Cabinet to ensure CDCR achieves substantial progress on population reduction within 60 days. This follow-up briefing covers progress to date and near-term plans in the areas of inmate population reduction, recidivism reduction, construction and management changes. This week there were 172,858 prison inmates, a decrease of 216 from the week before and 2,520 below projections; however, CDCR forecasts continued 100-200 per week increases this FY.

**Summary:**
Inmate Population Reduction
- *OUT-OF-STATE TRANSFERS* – About 700 inmates housed out of state, reaching a minimum of 1,300 by Sept. 30. CDCR this week located 500 new beds in Michigan. Cabinet contacted a private vendor that reported 2,000 beds available by Dec. 31; another 3,000 next year. CDCR is evaluating 1,700 beds from a second vendor. Roadblocks: CCPOA legal action on appeal to overturn such transfers. Receiver's medical reviews could slow transfers. Courts could sentence more offenders to prison; county jails could quit holding about 2,000 parole violators.

E_PRIV_170589

E00084308

- *PAROLE REFORM* – There are 127,735 parolees, an increase of 4,391 from a year ago. Parole violations decreased 14% in the 2nd quarter of 2007, compared to the same period last year. The Board of Parole Hearings (BPH) retained 46% of violators on parole in FY0607, compared to 41% the prior year. (Parole violators can account for up to 60% of prison admissions.) Penal Code 3001 permits discharge at the 13th month of the 3-year parole period, accounting for 39% of all discharges in August, up from 33% a year ago. A special risk assessment tool, developed by the Governor's Rehabilitation Strike Team (RST), will be rolled out Sept. 14 to enhance public safety and the PC3001 process. There are 460 offenders in the SB1453 drug diversion beds; the first offenders graduated this week. The Governor's RST located 1,800 new community drug program beds. Special drug diversion programs will be established in each Parole Region in the third quarter to keep these beds filled. Roadblocks: CCPOA may use legal action to block enactments. Training is required by labor contract.

Recidivism Reduction

- *RE-ENTRY FACILITIES* – A total of 20 county sheriffs have signed letters of intent to negotiate 4,800 re-entry beds and program space. (AB 900 Phase I requires 6,000.) CDCR finishes its 9th community presentation Oct. 5 and was directed to obtain a legal opinion on immediately opening negotiations with willing parties, before the outreach process is done. Two facilities are available, the former women's prison in Stockton and juvenile prison in Paso Robles. The latter would be for vocational education. Cabinet placed Tom Sawyer in an oversight role of re-entry negotiations. Roadblocks: The Correctional Standards Authority by law is required to negotiate the co-sited jails before re-entry construction can begin. Community opposition may emerge as the process progresses.

E_PRIV_170590

E00084308

- *GOVERNOR'S RST* – The RST expedited the hiring of 200 teachers by CDCR. In September it will fast-track new programs with an innovative RFP to all prison wardens to compete for a significant portion of the $50 million in program funds in AB 900. The panel is creating several tools that will reduce population and protect public safety, such as incentives for inmate program participation and better supervision training for parole agents. It is also working with CDCR to expand the number of civil addict commitments. It is designing specific ways to meet all 13 AB900 Phase I goals. Roadblocks: CDCR middle management adoption of RST ideas, which requires senior management diligence.

Construction
- *NEW BEDS* – 4,100 of 12,000 infill beds were this week scheduled to start construction in 2008, following Cabinet direction to move up from 2009. An RFP for private firms to build 2,000 infill beds will be open for bids in October, moved up from December. Roadblocks: The Receiver's medical bed siting could slow the process, though he has been working with CDCR. The expedited schedule is dependent upon CEQA negative declarations and procurement waivers, with which the Receiver may assist Cabinet. Most of the infill beds are proposed for Central Valley prisons, and the Receiver is citing Valley Fever as a concern. Director of Public Health Dr. Mark Horton said this can be mitigated, and Cabinet directed DPH to work with CDCR.
- *BAD BEDS* – There are 19,566 bad beds, up 108 from the week before, after 3 weeks of declines. CDCR this week, with Cabinet direction, developed a new plan to eliminate about 1,400 bad beds by December 31; the previous total was 300 for the whole FY.

E_PRIV_170591

E00084308

- *PROGRAM SPACE* – The Governor's RST is working closely with CDCR to ensure prison design achieves AB 900 programming goals. CDCR completed Cabinet-ordered systemwide inventory of space for RST on Thursday.

Management
- To put the "R" with CDC, the Governor should appoint RST Chair Kathy Jett to the new post of Undersecretary of Adult Programs.
- Add more proven "can-do" executives: Dave Runnels as the Operations Undersecretary (Bud Prunty is retiring) and Don Currier as Chief Counsel. Others are being evaluated.
- Cabinet is working with Office of Inspector General, DOF and DPA in developing detailed direction for CDCR management, such as creation of new classes of employees (such as rehabilitation specialists) to drive cultural change.
- CDCR is finished installing LAPD Comstat process. As OIG told Cabinet, "If Comstat measures it, it works." This involves monthly meetings where Wardens are held personally responsible for meeting certain goals, as measured by selected performance indicators.

**Cabinet Actions:**
- Monitor out-of-state transfer pipeline daily. Drive CDCR to sign and fill as many available OST beds as possible as soon as possible.
- Achieve CDCR increases in PC3001 parole discharges, utilization of SB1453 program and drug diversion beds.
- Ensure re-entry bed negotiations begin as soon as legally permissible and that CSA jail awards are expedited.
- Assist RST in meeting program goals.
- Aggressively monitor bad beds; get planned reduction.

- Coordinate Legal, Receiver and DOF to assist CDCR in obtaining infill bed construction waivers to break ground in 2008.
- Achieve the October release date for 2,000 infill bed RFP from private sector.
- Designate CDCR management performance improvement benchmarks.

E_PRIV_170593

E00084308

# EXHIBIT BB

## BRIEFING

**SUBJECT:**     **CDCR INFILL BED CONSTRUCTION**

**TO:**     **SUSAN KENNEDY, DAN DUNMOYER,
ANDREA HOCH & ADAM MENDELSOHN**

**FROM:**     **BOB GORE**

**September 6, 2007**

**Background:**
The Governor signed his prison reform plan May 3, including
40,000 new state prison beds.  It authorized 16,000 infill beds,
16,000 re-entry beds and 8,000 medical beds.  Built at existing
prisons, the infill beds will have to most immediate impact on
reducing overcrowding.  The Governor's Facilities Strike Team, at
Cabinet direction, investigated CDCR's ability to build the beds,
and reported to the Governor that it needed vast improvement.  The
Governor appointed Strike Team Chair Deborah Hysen, a former
DGS Chief Deputy, as the new CDCR Chief Deputy of
construction.  Hysen hired senior staff.  Cabinet obtained
cooperation of the *Plata* court in joint management of sites,
designs and construction.  Now that medical beds are proceeding
we are working with both the court and Legislature on CEQA and
procurement waivers to speed the process.

**Summary:**
CDCR, as directed, developed an accelerated construction
schedule to begin construction of 2,550 beds in 2008.  These beds
would accommodate about 4,500 inmates if used at current CDCR
capacity.  The attached AB 900 Phase I Proposed Infill Bed Plan
shows construction starting between July-September on 1,050 beds

E_PRIV_171285

E00084450

at Wasco, 1,000 beds at North Kern and 500 beds at Kern Valley.
Another 500 beds at Tehachapi begin in January 2009.

For another 2,000 beds, CDCR in October will roll-out an RFP for
private developers.

The CDCR construction team is using private sector fast-track
construction management techniques, hiring technical staff,
creating innovative procurements and scheduling simultaneous
EIR and design processes.

To address one issue – the Receiver voiced concerns about Valley
Fever at the Phase I sites – Cabinet asked Dr. Mark Horton,
Director of the Department of Public Health, to work with CDCR
in developing mitigation plans.

**E_PRIV_171286**

E00084450

# EXHIBIT CC

# BRIEFING

**SUBJECT:**   **CDCR AB 900 PERFORMANCE MEASURES**

**TO:**   **SUSAN KENNEDY, DAN DUNMOYER,
CHRIS KAHN, ANDREA HOCH**

**FROM:**   **BOB GORE**

**October 12, 2007**

**Background:**
CDCR was directed by Cabinet to prepare GANTT charts to
measure performance of the Department's AB 900 progress. To
provide an independent standard to further track CDCR's AB 900
compliance, the Governor's Rehabilitation Strike Team (RST) is
guiding development of inmate program and staff training efforts.

**Action Summary:**
GANTT charts attached. The charts are a first cut, and provide
initial benchmarks. These are headline benchmarks – charts with a
deeper level of detail are available if desired. These charts will be
issued – and improved – quarterly. Attached:

- *Population Management* – Benchmarks for out-of-state;
  shows the 3,060-bed Arizona facility open for initial
  occupancy in July. Deactivation of nearly 4,000 bad beds and
  occupancy of a like number of infill beds are also charted.
- *Infill Bed Construction Phase I* – Regular dorm and celled
  housing, as well as reception centers, are charted for four
  Kern County prisons – schedule accelerated for 2008
  groundbreaking at Cabinet direction. Although Valley Fever
  mitigation is a factor, the Receiver yesterday formally
  commended CDCR for its cooperation.

**E_PRIV_171291**

E00084453

- *Reentry Facilities* – Shows county selection begins November and stand-alone facilities (with no jail agreements) beginning construction in early 2008 in Solano, Contra Costa and San Diego counties.
- *Jails* – Correctional Standards Authority has jurisdiction, and can move faster, based on this chart. CDCR agreed to have a private construction consultant scrub the benchmarks.
- *Management* – The Legislature through AB 900 expressed concern about lack of accountability, communications and training. Timelines and projects are shown through the first half of 2008 – adequate.

Joan Petersilia, the new RST Chair, in her attached Status Report and Roadmap, outlines with goals, responsibilities and timelines, the four projects that will be coordinated with CDCR through the team's 12/31 sunset. The four significant RST projects:

1. *Develop and implement an Offender Accountability and Rehabilitation Plan.* This is the Behavioral Management Plan that will program each inmate according to assessed needs and risks. It ensures core programs launched in academic, vocational, substance abuse, anger management, criminal thinking and family relationships.
2. *Complete the parole earned discharge tool and risk matrix.*
3. *Create and start the prison-to-work program.* Includes innovative partnerships with LWA and job training directed to the offender's county.
4. *Develop middle-management staff training in conjunction with Community Colleges.*

E_PRIV_171292

E00084453

# EXHIBIT DD

CONFIDENTIAL

July 16, 2007

Governor George Deukmejian



Governor,

The California Independent Review Panel's (IRP) report is a seminal document that will guide the Governor's Cabinet Office in managing the expedited development more effective and efficient correctional policy. The Legislature subsequently passed and Governor Schwarzenegger signed the Public Safety & Offender Rehabilitation Services Act of 2007 (AB 900), which authorized new rehabilitation programs, such as re-entry facilities, and the construction of 53,000 prison and jail beds.

A few weeks ago, the CDCR Expert Panel reinforced all of the IRP's recommendations and provided some additional concepts. Governor Schwarzenegger asked me to form and direct Rehabilitation and Facilities Strike Teams, composed of a few key experts and CDCR staff, to implement the IRP and Expert Panel findings in conjunction with meeting the terms of AB 900.

Federal Judges Henderson and Karlton are overseeing three cases that will likely result in the formation of a 3-judge panel to examine prison overcrowding. Representatives of the court have privately informed Cabinet that an immediate effort to reduce overcrowding could forestall drastic measures. Failing that, "you might have 90 days to release 20,000 inmates."

Parole reform is the quickest way to reduce overcrowding, as your IRP concluded. Cabinet is in the final few days of drafting new regulations and administrative procedures to authorize the use of a parole violate matrix and intermediate sanctions, to allow parole agents to revoke fewer nonserious, nonviolent technical parole violators, to divert more addicts into community substance abuse beds and to requite CDCR and the Board of Parole Hearings to coordinate various processes that will reduce the revolving door effect.

Longer term, we are planning to enact most of the IRP and Expert Panel recommendations, including staff training, program participation incentives, enhanced good time credits, expanded risk assessments and treatment plans, and more reforms.

The legislative Republican Caucuses indicate they are strongly opposed to such measures, particularly any move that results in fewer parole violators returning to prison. We disagree. As Sheriff Kolender says, putting an inmate on a bunk for four months – after you have taken away his new residence, disconnected his family again and perhaps lost his new job – creates more anger and actually endangers public safety.

Governor, your voice is one of the few that can start this historic public safety reform. If you consider it, with all due deference and respect, your contacts with Sen. Ackerman and Asm. Villines, would resolve the debate before it begins.

Before I joined the current Administration on Feb. 1 to manage criminal justice and healthcare policies, for the past two years I had been asked by the past three CDCR Secretaries to serve as a volunteer consultant. As such, I was very familiar with the IRP's report, and will continue to strive to make its work a reality.

Very Truly Yours,




Robert J. Gore
Deputy Cabinet Secretary

PS — ████████████ the 7-year-old girl who formerly ran errands for you, is now a 24-year-old wife and mother... ███████████████████████████████████████ She still cherishes the photo of you, Mrs. Deukmejian and her. Hope life is well and full.

# EXHIBIT EE

EDMUND G. BROWN JR.
Attorney General of the State of California
DAVID S. CHANEY
Chief Assistant Attorney General
FRANCES T. GRUNDER
Senior Assistant Attorney General
ROCHELLE C. EAST
Supervising Deputy Attorney General
LISA A. TILLMAN – 126424
Deputy Attorney General
CHARLES ANTONEN – 221207
Deputy Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
Telephone: (415) 703-5443
Facsimile: (415) 703-5843
rochelle.east@doj.ca.gov
lisa.tillman@doj.ca.gov
charles.antonen@doj.ca.gov

HANSON BRIDGETT LLP
JERROLD C. SCHAEFER - 39374
PAUL B. MELLO - 179755
S. ANNE JOHNSON - 197415
SAMANTHA TAMA - 240280
RENJU P. JACOB - 242388
425 Market Street, 26th Floor
San Francisco, CA  94105
Telephone: (415) 777-3200
Facsimile: (415) 541-9366
jschaefer@hansonbridgett.com
pmello@hansonbridgett.com
ajohnson@hansonbridgett.com
stama@hansonbridgett.com
rjacob@hansonbridgett.com

Attorneys for Defendants

# UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

## AND THE NORTHERN DISTRICT OF CALIFORNIA

## UNITED STATES DISTRICT COURT COMPOSED OF THREE

## PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

| | |
|---|---|
| RALPH COLEMAN, et al., | No.  2:90-CV-00520 LKK JFM P |
| Plaintiffs, | **THREE-JUDGE COURT** |
| v. | **DEFENDANT CATE'S RESPONSES TO PLAINTIFF COLEMAN'S FIRST SET OF INTERROGATORIES** |
| ARNOLD SCHWARZENEGGER, et al., | |
| Defendants. | |
| MARCIANO PLATA, et al., | No. C-01-1351 TEH |
| Plaintiffs, | **THREE-JUDGE COURT** |
| v. | |
| ARNOLD SCHWARZENEGGER, et al., | |
| Defendants. | |

- 1 -

PROPOUNDING PARTY: PLAINTIFFS RALPH COLEMAN, et al.

RESPONDING PARTY:    DEFENDANT CATE

SET NO.:                ONE

### DEFINITIONS

In construing these discovery responses, the following definitions shall apply:

1.    "PLAINTIFFS" shall mean class representatives Ralph Coleman, et al., the named plaintiffs in the action *Coleman v. Schwarzenegger,* Case No. 90-0520 LKK JFM (E.D. Cal.) (*Coleman*).

2.    "DEFENDANT" shall mean Matthew Cate, a named defendant in the case of *Coleman* v. *Schwarzenegger.*

3.    "DEFENDANTS" shall mean each of the named defendants in the case of *Coleman* v. *Schwarzenegger*, including Matthew Cate in his official capacity on behalf of the California Department of Corrections and Rehabilitation (CDCR), Stephen Mayberg in his official capacity on behalf of the Department of Mental Health (DMH), Michael Genest in his official capacity on behalf of the Department of Finance (DOF), and the Governor.

4.    "PROCEEDING" shall mean the three-judge panel proceeding convened under 28 U.S.C. Section 2284 in the cases of *Coleman* and *Plata*.

### OVERALL OBJECTIONS TO INTERROGATORIES

1.    DEFENDANT objects to Plaintiffs' definition of a California Department of Corrections and Rehabilitation (CDCR) prison and a "prison" to include those housing units within Department of Mental Health (DMH) facilities that house CDCR prisoners. That definition mischaracterizes the role of DMH as a provider of housing for incarcerated inmates. DMH's true role is defined by California Penal Code section 2684

- 2 -

as a provider of inpatient mental health treatment to CDCR inmate-patients.  Further, that definition erroneously assumes the Governor's Emergency Proclamation of October 4, 2006 addressed DMH as a provider of housing for incarcerated inmates. DEFENDANT will interpret the terms "CDCR prison" and "prison" for the purposes of this request to mean those prisons within the jurisdiction of the California Department of Corrections and Rehabilitation, pursuant to California Penal Code section 5054.  Further, DEFENDANTS object to Plaintiffs' definition of a CDCR prison to include "any planned redesigns of, construction to, or renovations of such facilities, and any new such facilities contemplated by AB 900" as an inaccurate statement of the scope of AB 900, vague, and calling for speculation.

2.    DEFENDANT objects that the discovery seeks INFORMATION that is neither relevant to PLAINTIFFS' claims in this PROCEEDING nor reasonably calculated to lead to the discovery of admissible evidence.  PLAINTIFFS have refused to identify what if any claims they will be asserting in the PROCEEDING.  Consequently, DEFENDANT objects that the discovery requires DEFENDANT to speculate what claims may or may not be asserted by PLAINTIFFS.

3.    DEFENDANT objects that the requests seek information equally available to PLAINTIFFS, and that the requests are overbroad and unduly burdensome.  In accordance with the *Coleman* and *Plata* remedial orders, PLAINTIFFS receive monthly document productions and other discovery from DEFENDANT and the Receiver appointed in *Plata*.

4.    DEFENDANT states that PLAINTIFFS are already in possession of DEFENDANTS' filed plans for the provision of mental health care beds, for the recruitment and retention of staffing for those mental health beds, and for the

- 3 -

implementation of appropriate mental health care in those beds. DEFENDANT asserts

the deliberative process privilege to all information sought or contained in drafts of those

*Coleman* plans, all drafts of any budget proposals to fund those plans, and inter- and

intra-Defendant emails concerning those plans.

5.      Given the shortened time for DEFENDANT'S responses to these requests,

DEFENDANT hereby reserves the right to supplement these responses at a later date,

including after the issuance and/or receipt of expert reports and witness declarations in

this matter.

6.      To the extent any request seeks information from documents prepared,

created, or generated by the Office of the Inspector General, DEFENDANT objects to

the discovery of such information on the basis of the official information privilege and on

the basis of the right to privacy in medical, mental health, and personnel matters. Non-

privileged reports of the Office of the Inspector General are available on its public web

site.

## RESPONSES AND OBJECTIONS TO INTERROGATORIES

<u>INTERROGATORY NO. 1:</u>

Do YOU contend that imposition of a PRISONER RELEASE ORDER by the Court

will have an adverse effect on public safety?

<u>RESPONSE TO INTERROGATORY NO. 1:</u>

Defendant objects to this interrogatory as vague, as imposing an improper

hypothetical, and as calling for speculation.

Without waiving these objections, Defendant states that the court has not issued a

prisoner release order, and this interrogatory improperly asks Defendant to speculate on

what "will" happen if such an unknown and unwritten order were to issue at some

- 4 -

unknown point in the future. Although Defendant cannot speculate, it is Defendant's position that a court-mandated release of prisoners from state prisons, even if it included some unknown pre-release screening and post-release safeguards, could have a serious adverse effect on public safety.

## INTERROGATORY NO. 2:

If YOUR response to interrogatory number one is affirmative, IDENTIFY what YOU contend to be the adverse effect(s) on public safety of any PRISONER RELEASE ORDER, and state all facts and IDENTIFY all DOCUMENTS and witnesses in support of YOUR contention.

## RESPONSE TO INTERROGATORY NO. 2:

Defendant objects to this interrogatory as vague, as imposing an improper hypothetical, and as calling for speculation. Defendant further objects to this interrogatory to the extent it seeks information protected from disclosure by the attorney client privilege, attorney work product privilege, deliberative process privilege, self-critical analysis privilege, and official information privilege.

Without waiving these objections, Defendant states that the court has not issued a prisoner release order, and this interrogatory improperly asks Defendant to identify all facts and witnesses in support of speculation as to what "will" happen if such an unknown and unwritten order were to issue at some unknown point in the future. Although Defendant cannot speculate, it is Defendant's position that a court-mandated release of prisoners from state prisons, even if it included some unknown pre-release screening and post-release safeguards, could have a serious adverse effect on public safety, because there would still be a risk that released prisoners would engage in criminal activity once released. Although Defendant cannot speculate, Defendant states

- 5 -

the witnesses in support of this statement are Kathy Jett and Joan Petersilia. The documents in support of this statement are the Governor's Rehabilitation Strike Team Report and the published writings of Joan Petersilia.

**INTERROGATORY NO. 3:**

Do YOU contend that a PRISONER RELEASE ORDER cannot be narrowly drawn so as to have no adverse impact on public safety?

**RESPONSE TO INTERROGATORY NO. 3:**

Defendant objects to this interrogatory as vague, as imposing an improper hypothetical, and as calling for speculation. Defendant further objects to this interrogatory to the extent it seeks information protected from disclosure by the attorney client privilege, attorney work product privilege, deliberative process privilege, self-critical analysis privilege, and official information privilege.

Without waiving these objections, Defendant states that the court has not issued a prisoner release order, and this interrogatory improperly asks Defendant to speculate as to the impact of an unknown and unwritten order at some unknown point in the future. Although Defendant cannot speculate, it is Defendant's position that a court-mandated release of prisoners from state prisons, even if it included some unknown pre-release screening and post-release safeguards, could have a serious adverse effect on public safety, because there would still be a risk that released prisoners would engage in criminal activity once released.

To the extent Plaintiffs' refer to a hypothetical prisoner release order crafted under applicable law that would not require the release of prisoners currently incarcerated in a California state prison, and would not require the diversion of any person committed to a California state prison in the future, then such an order might or might not negatively

- 6 -

1  impact public safety.

2  <u>INTERROGATORY NO. 4:</u>

3      If YOUR response to interrogatory number three is affirmative, state all facts and

4  5  IDENTIFY all DOCUMENTS and witnesses in support of YOUR contention.

6  <u>RESPONSE TO INTERROGATORY NO. 4:</u>

7      Defendant objects to this interrogatory as vague, as imposing an improper

8  hypothetical, and as calling for speculation.  Defendant further objects to this

9  interrogatory to the extent it seeks information protected from disclosure by the attorney

10  client privilege, attorney work product privilege, deliberative process privilege, self-critical

11  analysis privilege, and official information privilege.

12  13      Without waiving these objections, Defendant states that the court has not issued a

14  prisoner release order, and this interrogatory improperly asks Defendant to speculate as

15  to the impact of an unknown and unwritten order at some unknown point in the future.

16  Although Defendant cannot speculate, it is Defendant's position that a court-mandated

17  release of prisoners from state prisons, even if it included some unknown pre-release

18  screening and post-release safeguards, could have a serious adverse effect on public

19  20  safety, because there would still be a risk that released prisoners would engage in

21  criminal activity once released.  Defendant states the witnesses in support of this

22  statement are Kathy Jett and Joan Petersilia.  The documents in support of this

23  statement are the Governor's Rehabilitation Strike Team Report and the published

24  writings of Joan Petersilia.

25  <u>INTERROGATORY NO. 5:</u>

26      Do YOU contend that implementation of programs that divert individuals who are

27  convicted of a probation-eligible offense and have less than 12 months to serve in state

28

- 7 -

1556987.2

1    prison at the time of sentencing and into local programs rather than into state prison

2    facilities will have an adverse effect on public safety?

3    **RESPONSE TO INTERROGATORY NO. 5:**

4
5        Defendant objects to this interrogatory as vague, as imposing an improper

hypothetical, and as calling for speculation.  Defendant further objects to this
6
7    interrogatory to the extent it seeks information protected from disclosure by the attorney

8    client privilege, attorney work product privilege, deliberative process privilege, self-critical

9    analysis privilege, and official information privilege.

10        Without waiving these objections, Defendant states that the court has not issued a

11    prisoner release order, and this interrogatory improperly asks Defendant to speculate as

12
13    to the impact of an unknown and unwritten order at some unknown point in the future.

Although Defendant cannot speculate, Defendant states that such diversion programs
14
15    may have an adverse effect on public safety because, even if accompanied by an

16    unknown set of assessments and criteria for determining an inmate's fitness for

17    diversion, there remains the possibility of a diverted convict engaging in criminal activity

18    once released.

19    **INTERROGATORY NO. 6:**

20
21        If YOUR response to interrogatory number 5 is affirmative, IDENTIFY what YOU

contend to be the adverse effect(s) on public safety of the implementation of such
22
23    programs, and state all facts and IDENTIFY all DOCUMENTS and witnesses in support

24    of YOUR contention.

25    **RESPONSE TO INTERROGATORY NO. 6:**

26        Defendant objects to this interrogatory as vague, as imposing an improper

27    hypothetical, and as calling for speculation.  Defendant further objects to this

28

- 8 -

1    interrogatory to the extent it seeks information protected from disclosure by the attorney

2    client privilege, attorney work product privilege, deliberative process privilege, self-critical

3    analysis privilege, and official information privilege.

4         Without waiving these objections, Defendant states that the court has not issued a

5    prisoner release order, and this interrogatory improperly asks Defendant to speculate as

6    to the impact of an unknown and unwritten order at some unknown point in the future.

7    Although Defendant cannot speculate, Defendant states that such diversion programs

8    may have an adverse effect on public safety because, even if accompanied by an

9    unknown set of assessments and criteria for determining an inmate's fitness for

10   diversion, there remains the possibility of a diverted convict engaging in criminal activity

11   once released.  The witnesses in support of this statement are Kathy Jett and Joan

12   Petersilia.  The documents in support of this statement are the Governor's Rehabilitation

13   Strike Team Report and the published writings of Joan Petersilia.

14

15

16   <u>INTERROGATORY NO. 7:</u>

17        Do YOU contend that implementation of programs that divert individuals who are

18   on probation and commit a new probation-eligible offense that could subject them to

19   revocation into local programs rather than into state prison facilities will have an adverse

20   effect on public safety?

21

22   <u>RESPONSE TO INTERROGATORY NO. 7:</u>

23        Defendant objects to this interrogatory as vague, as imposing an improper

24   hypothetical, and as calling for speculation.  Defendant further objects to this

25   interrogatory to the extent it seeks information protected from disclosure by the attorney

26   client privilege, attorney work product privilege, deliberative process privilege, self-critical

27   analysis privilege, and official information privilege.

28

- 9 -

1   Without waiving these objections, Defendant states that the court has not issued a

2   prisoner release order, and this interrogatory improperly asks Defendant to speculate as

3   to the impact of an unknown and unwritten order at some unknown point in the future.

4   Although Defendant cannot speculate, Defendant states that such diversion programs

5   may have an adverse effect on public safety because, even if accompanied by an

6   
7   unknown set of assessments and criteria for determining an inmate's fitness for

8   diversion, there remains the possibility of a diverted convict engaging in criminal activity

9   once released.

10  **INTERROGATORY NO. 8:**

11      If YOUR response to interrogatory number seven is affirmative, IDENTIFY what

12  YOU contend to be the adverse effect(s) on public safety of the implementation of such

13  
14  programs, and state all facts and IDENTIFY all DOCUMENTS and witnesses in support

15  of YOUR contention.

16  **RESPONSE TO INTERROGATORY NO. 8:**

17      Defendant objects to this interrogatory as vague, as imposing an improper

18  hypothetical, and as calling for speculation.  Defendant further objects to this

19  interrogatory to the extent it seeks information protected from disclosure by the attorney

20  
21  client privilege, attorney work product privilege, deliberative process privilege, self-critical

22  analysis privilege, and official information privilege.

23      Without waiving these objections, Defendant states that the court has not issued a

24  prisoner release order, and this interrogatory improperly asks Defendant to speculate as

25  to the impact of an unknown and unwritten order at some unknown point in the future.

26  Although Defendant cannot speculate, Defendant states that such diversion programs

27  may have an adverse effect on public safety because, even if accompanied by an

28

- 10 -

unknown set of assessments and criteria for determining an inmate's fitness for diversion, there remains the possibility of a diverted convict engaging in criminal activity once released. The witnesses in support of this statement are Kathy Jett and Joan Petersilia. The documents in support of this statement are the Governor's Rehabilitation Strike Team Report and the published writings of Joan Petersilia.

## INTERROGATORY NO. 9:

Do YOU contend that implementation of a program by which parole agents are directed to use a range of sanctions other than return to CDCR PRISON for parole violators based on the use of a validated risk assessment tool will have an adverse effect on public safety?

## RESPONSE TO INTERROGATORY NO. 9:

Defendant objects to this interrogatory as vague, as imposing an improper hypothetical, and as calling for speculation. Defendant further objects to this interrogatory to the extent it seeks information protected from disclosure by the attorney client privilege, attorney work product privilege, deliberative process privilege, self-critical analysis privilege, and official information privilege.

Without waiving these objections, Defendant states that the court has not issued a prisoner release order, and this interrogatory improperly asks Defendant to speculate as to the impact of an unknown and unwritten order at some unknown point in the future. Although Defendant cannot speculate, Defendant states that such parole sanction programs may have an adverse effect on public safety because there remains the possibility of a prisoner engaging in criminal activity under such a program. Further, given the State's deficit, funding these resources is problematic.

//

- 11 -

DEFENDANT CATE'S RESPONSES TO COLEMAN PLAINTIFFS'
INTERROGATORIES, SET ONE

1556987.2

**INTERROGATORY NO. 10:**

If YOUR response to interrogatory number nine is affirmative, IDENTIFY what YOU contend to be the adverse effect(s) on public safety of the implementation of such alternative sanctions, and state all facts and IDENTIFY all DOCUMENTS and witnesses in support of YOUR contention.

**RESPONSE TO INTERROGATORY NO. 10:**

Defendant objects to this interrogatory as vague, as imposing an improper hypothetical, and as calling for speculation. Defendant further objects to this interrogatory to the extent it seeks information protected from disclosure by the attorney client privilege, attorney work product privilege, deliberative process privilege, self-critical analysis privilege, and official information privilege.

Without waiving these objections, Defendant states that the court has not issued a prisoner release order, and this interrogatory improperly asks Defendant to speculate as to the impact of an unknown and unwritten order at some unknown point in the future. Although Defendant cannot speculate, Defendant states that such parole sanction programs may have an adverse effect on public safety because there remains the possibility of a prisoner engaging in criminal activity under such a program. The witnesses in support of this statement are Kathy Jett and Joan Petersilia. The documents in support of this statement are the Governor's Rehabilitation Strike Team Report and the published writings of Joan Petersilia.

**INTERROGATORY NO. 11:**

Do YOU contend that amending the current credit earning system for inmates in CDCR PRISONS to the system outlined by the CDCR Expert Panel on Adult Offender Reentry and Receidivsm Reduction Programs in its June 29, 2007 "Report to the

- 12 -

California Legislature: A Roadmap for Effective Offender Programming in California" at

Appendix E, pages 92-94 would have an adverse effect on public safety?

## RESPONSE TO INTERROGATORY NO. 11:

Defendant objects to this interrogatory as vague, as imposing an improper

hypothetical, and as calling for speculation. Defendant further objects to this

interrogatory to the extent it seeks information protected from disclosure by the attorney

client privilege, attorney work product privilege, deliberative process privilege, self-critical

analysis privilege, and official information privilege.

Without waiving these objections, Defendant states that the court has not issued a

prisoner release order, and this interrogatory improperly asks Defendant to speculate as

to the impact of an unknown and unwritten order at some unknown point in the future.

Although Defendant cannot speculate, Defendant states that a credit earning program

may have an adverse effect on public safety because there remains the possibility of a

prisoner engaging in criminal activity under such a program.

## INTERROGATORY NO. 12:

If YOUR response to interrogatory number eleven is affirmative, IDENTIFY what

YOU contend to be the adverse effect(s) on public safety of such an amendment to the

current credit earning system, and all state all facts and IDENTIFY all DOCUMENTS and

witnesses in support of YOUR contention.

## RESPONSE TO INTERROGATORY NO. 12:

Defendant objects to this interrogatory as vague, as imposing an improper

hypothetical, and as calling for speculation. Defendant further objects to this

interrogatory to the extent it seeks information protected from disclosure by the attorney

client privilege, attorney work product privilege, deliberative process privilege, self-critical

- 13 -

analysis privilege, and official information privilege.

Without waiving these objections, Defendant states that the court has not issued a prisoner release order, and this interrogatory improperly asks Defendant to speculate as to the impact of an unknown and unwritten order at some unknown point in the future. Although Defendant cannot speculate, Defendant states that a credit earning program may have an adverse effect on public safety because there remains the possibility of a prisoner engaging in criminal activity under such a program. The witnesses in support of this statement are Kathy Jett and Joan Petersilia. The documents in support of this statement are the Governor's Rehabilitation Strike Team Report and the published writings of Joan Petersilia.

**INTERROGATORY NO. 13:**

Do YOU contend that the proposal to release 22,159 inmates contained in the Governor's January 10, 2008-2009 budget proposal, if implemented, would have an adverse effect on public safety?

**RESPONSE TO INTERROGATORY NO. 13:**

Defendant objects to this interrogatory as argumentative and misleading, as vague, as imposing an improper hypothetical, and as calling for speculation. Defendant further objects to this interrogatory to the extent it seeks information protected from disclosure by the attorney client privilege, attorney work product privilege, deliberative process privilege, self-critical analysis privilege, and official information privilege.

Without waiving these objections, Defendant states that this was merely a proposal introduced in the Governor's January 2008 proposed budget and it was not included in the Governor's May Revise 2008 budget proposal. It was not adopted and it has not been implemented. Defendant cannot speculate on what "would" have

- 14 -

1  happened if the proposal were adopted by the Legislature and implemented.  Although

2  Defendant cannot speculate, it is Defendant's position that a mandated release of

3  prisoners from state prisons could have an adverse effect on public safety, because

4  there would still be a risk that released prisoners would engage in criminal activity once

5

6  released.

7  <u>INTERROGATORY NO. 14:</u>

8      If YOUR response to interrogatory number thirteen is affirmative, IDENTIFY what

9  YOU contend to be the adverse effect(s) on public safety of the implementation of the

10  Governor's proposal, and state all facts and IDENTIFY all DOCUMENTS and witnesses

11  in support of YOUR contention.

12  <u>RESPONSE TO INTERROGATORY NO. 14:</u>

13

14      Defendant objects to this interrogatory as argumentative and misleading, as

15  vague, as imposing an improper hypothetical, and as calling for speculation.  Defendant

16  further objects to this interrogatory to the extent it seeks information protected from

17  disclosure by the attorney client privilege, attorney work product privilege, deliberative

18  process privilege, self-critical analysis privilege, and official information privilege.

19      Without waiving these objections, Defendant states that this was merely a

20  proposal introduced in the Governor's January 2008 proposed budget and it was not

21

22  included in the Governor's May Revise 2008 budget proposal.  It was not adopted and it

23  has not been implemented.  Defendant cannot speculate on what "would" have

24  happened if the proposal were adopted by the Legislature and implemented.  Although

25  Defendant cannot speculate, it is Defendant's position that a mandated release of

26  prisoners from state prisons could have an adverse effect on public safety, because

27  there would still be a risk that released prisoners would engage in criminal activity once

28

- 15 -

released. The witnesses in support of this statement are Kathy Jett and Joan Petersilia. The documents in support of this statement are the Governor's Rehabilitation Strike Team Report and the published writings of Joan Petersilia.

INTERROGATORY NO. 15:

If YOUR response to interrogatory number thirteen is **other** than affirmative, state all facts and IDENTIFY all DOCUMENTS and witnesses in support of YOUR contention.

RESPONSE TO INTERROGATORY NO. 15:

Defendant objects to this interrogatory as argumentative and misleading, as vague, as imposing an improper hypothetical, and as calling for speculation. Defendant further objects to this interrogatory to the extent it seeks information protected from disclosure by the attorney client privilege, attorney work product privilege, deliberative process privilege, self-critical analysis privilege, and official information privilege.

Without waiving these objections, it is Defendant's position that a mandated release of prisoners from state prisons could have an adverse effect on public safety, because there would still be a risk that released prisoners would engage in criminal activity once released. Accordingly, this interrogatory is inapplicable.

INTERROGATORY NO. 16:

IDENTIFY the number of prisoners housed in each CDCR PRISON on July 1, 2008, by housing unit, security level (I-IV), MHSDS membership (CCCMS, EOP, or "medical necessity"), and other administrative placement factors and categories (SNY, administrative segregation, OHU, CTC, MHCB, reception, Security Housing Unit (SHU), Psychiatric Services Unit (PSU), Department of Mental Health (DMH)).

RESPONSE TO INTERROGATORY NO. 16:

Defendant objects that this interrogatory seeks information protected from

- 16 -

disclosure by the attorney client privilege, attorney work product privilege, deliberative process privilege, self-critical analysis privilege, and official information privilege.  Such information is already provided to Plaintiffs through the Defendants' monthly statistical reports to the *Coleman* Special Master and through *Coleman* monitoring tours and exit teleconferences.  Further, this interrogatory is improperly duplicative of Plaintiffs' previous discovery.  (See Defendant Tilton's Response to Plaintiff Coleman's Interrogatories, Set One, Interrogatory Number 16.)

Without waiving said objections, Defendant states that such data will be provided.

**INTERROGATORY NO. 17:**

For each CDCR PRISON, IDENTIFY the number of prisoners housed in NON-TRADITIONAL HOUSING and the location of such housing as of July 1, 2008.

**RESPONSE TO INTERROGATORY NO. 17:**

Defendant objects that this interrogatory seeks information protected from disclosure by the attorney client privilege, attorney work product privilege, deliberative process privilege, self-critical analysis privilege, and official information privilege.  Such information is already provided to Plaintiffs through the Defendants' monthly statistical reports to the *Coleman* Special Master and through *Coleman* monitoring tours and exit teleconferences.  Further, this interrogatory is improperly duplicative of Plaintiffs' previous discovery.  (See Defendant Tilton's Response to Plaintiff Coleman's Interrogatories, Set One, Interrogatory Number 17.)

Without waiving said objections, Defendant states that such data is provided as an attachment to this response.

//

//

1556987.2

**INTERROGATORY NO. 18:**

For each such NON-TRADITIONAL HOUSING location, IDENTIFY the number of prisoners in the MHSDS (EOP, CCCMS, or "medical necessity") and security level (I-IV), as well as other administrative placement factors (SNY administrative segregation, CTC, MHCB, OHU, Reception Center, Security Housing Unit (SHU), Psychiatric Services Unit (PSU), or Department of Mental Health program (DMH)), as of July 1, 2008.

**RESPONSE TO INTERROGATORY NO. 18:**

Defendant objects that this interrogatory seeks information protected from disclosure by the attorney client privilege, attorney work product privilege, deliberative process privilege, self-critical analysis privilege, and official information privilege. Such information is already provided to Plaintiffs through the Defendants' monthly statistical reports to the *Coleman* Special Master and through *Coleman* monitoring tours and exit teleconferences. Further, this interrogatory is improperly duplicative of Plaintiffs' previous discovery. (See Defendant Tilton's Response to Plaintiff Coleman's Interrogatories, Set One, Interrogatory Number 18.)

Without waiving said objections, Defendant states such data is provided as an attachment to this response.

**INTERROGATORY NO. 19:**

IDENTIFY the number of CDCR prisoners housed outside of their classification level (classification overrides) as of July 1, 2008, including the reasons for any such overrides or out-of-level placements.

**RESPONSE TO INTERROGATORY NO. 19:**

Defendants object that this interrogatory seeks information protected from disclosure by the attorney client privilege, attorney work product privilege, deliberative

- 18 -

process privilege, self-critical analysis privilege, and official information privilege.

Without waiving said objections, Defendant states that such data is provided as an attachment to this response.

**INTERROGATORY NO. 20:**

IDENTIFY the number of vacancies in custodial staff positions in the DEPARTMENT including each CDCR PRISON as of July 1, 2008.

**RESPONSE TO INTERROGATORY NO. 20:**

Defendants object that this interrogatory seeks information protected from disclosure by the attorney client privilege, attorney work product privilege, deliberative process privilege, self-critical analysis privilege, and official information privilege.

Without waiving said objections, Defendant states that such data is provided as an attachment to this response. The existence of a vacant custodial position does not necessarily equate to a posted position being unfilled.

Dated: July 25, 2008

Respectfully submitted,

EDMUND G. BROWN JR.
Attorney General of the State of California
DAVID S. CHANEY
Chief Assistant Attorney General
FRANCES T. GRUNDER
Senior Assistant Attorney General
ROCHELLE C. EAST
Acting Senior Assistant Attorney General

LISA A. TILLMAN
Deputy Attorney General
Attorneys for Defendants

- 19 -

DEFENDANT CATE'S RESPONSES TO COLEMAN PLAINTIFFS'
INTERROGATORIES, SET ONE

1556987.2

<u>VERIFICATION</u>

I, MATTHEW CATE, declare:

I am the Secretary of the California Department of Corrections and Rehabilitation and in that official capacity am a party in the pending action entitled *Coleman v. Schwarzenegger*. I have read the foregoing Responses to the First Set of Interrogatories propounded by Plaintiff Ralph Coleman, and state upon my information and belief that they are true and correct.

I declare under penalty of perjury, under the laws of the United States of America, that the foregoing is true and correct.

Executed this 25th day of July 2008.

_____
MATTHEW CATE

30506934.wpd
SF2007200670

1

## PROOF OF SERVICE

2

I, MICHELLE EMBREE, declare:

3

I am over the age of 18 years, and not a party to the above-entitled action. I am

4 employed in the County of Sacramento and my business address is 700 H Street, Suite 2650, Sacramento, California, 95814.

5

6 On August 12, 2008, I served a copy of the following document(s):
**OPPOSITION TO MODIFICATION OF COURT ORDER** on interested parties in

7 this action by:

8

_X_  **mail** by enclosing a true copy in a sealed envelope in a designated area for

9 outgoing mail, addressed as set forth below. I am readily familiar with the business practices of the Office of the Sacramento County Counsel for collection and processing

10 of correspondence for mailing with the United States Postal Service, and correspondence so collected and processed is deposited with the United States Postal Service on the same

11 date in the ordinary course of business.

12

Don Specter

13 Zoe Schonfeld                                      Mark S. Mayfield
Prison Law Office                                    9608 Kiefer Boulevard, Suite 1

14 1917 5th Street                                       Sacramento, CA 95827
Berkeley, CA 95710

15
Donna Morgan

16 Rick Lewkowitz                                    P O Box 6262
Deputy District Attorney                       Folsom, CA 95763-6262

17 4100 Branch Center Road
Sacramento, CA 95827                          Wray Plummer

18                                                               770 L St Ste 950

19 Arthur Bowie                                          Sacramento, CA 95814
Assistant Public Defender

20 9591 Kiefer Boulevard                          Ildefonso Ruiz
Sacramento, CA 95827                          2020 29th St #211

21                                                               Sacramento, CA 95817-1119

22 Kevin Adamson
9608 Kiefer Boulevard, Suite 1            Dale Wilson

23 Sacramento, CA 95827                          2001 21st St #200
Sacramento, CA 95818

24
Patricia Anderson

25 11930 Heritage Oak Place, Suite 6      Hiram Martin
Auburn, CA 95603                                 8139 Sunset Avenue, Suite 141

26                                                               Fair Oaks, CA 95628

27

28

-1-