# EXHIBIT G



GOVERNOR ARNOLD SCHWARZENEGGER

July 25, 2008

Mr. J. Clark Kelso
Receiver
501 J Street
Suite 100
Sacramento, California 95814

Dear Mr. Kelso,

I am writing in response to your July 16 letter regarding funding for your proposed construction projects. You state that you now require $204.6 million to meet unfunded needs of your construction programs through December 21, 2008, and ask that I provide written assurance no later than July 25, 2008, that the requested funding will be provided.

As you know, I support your Turnaround Plan of Action and the construction programs that you have determined are necessary to fulfill your duties as receiver and improve the quality and delivery of medical care in the state prison system. I continue to prefer and support the use of lease revenue bonds to provide the funding mechanism for these proposed construction projects.

As you are also aware, my administration has been working with you to explore other funding mechanisms for your proposed construction projects. To this end, our offices discussed the possibility of providing funding under my Prison Overcrowding State of Emergency Proclamation. However, my office concluded that this was not a legal option. Recently, on July 22, 2008, the state's counsel provided a detailed response to a list of 11 questions sent by your counsel regarding different funding mechanisms for your proposed construction projects. Currently, my office and the Department of Finance are working with your office on revenue bonds to be issued by the Infrastructure Bank in the event that lease revenue bond funding is not authorized by the Legislature.

As Governor, I am bound by the Constitution and state law. As you recognize in your letter, only the Legislature has the authority to make appropriations. In the absence of legislative authorization, it is not within my power to appropriate state funds for the Receiver's construction projects. Therefore, I am not in a position to provide you with written assurance that your request of $204.6 million will be met. I remain committed to working with you and Judge Henderson to bring California's prison health care system up to constitutional standards, and I will continue to work with you and the Legislature to obtain funds necessary to complete your mission.

Sincerely,

Arnold Schwarzenegger

/la

J. Clark Kelso, Receiver
501 J Street, Suite 100
Sacramento, CA 95814
(916) 323-1923
Clark.Kelso@cdcr.ca.gov
www.cprinc.org

July 16, 2008

Governor Arnold Schwarzenegger
Office of the Governor
State Capitol
Sacramento, CA 95814

Dear Governor Schwarzenegger:

I notified Director Genest on May 30, 2008, in a letter copied to you, of the need for $70 million to satisfy the unfunded requirements of the construction programs in my Turnaround Plan of Action through the end of Fiscal Year 2007-2008. That time has passed, and I now require a total of $204.6 million to meet the unfunded needs of the construction programs through December 31, 2008. The Legislature has not provided the $70 million in funding previously requested. You have taken no action to provide funding, even on an interim basis, despite your authority to do so under applicable law, including the California Emergency Services Act.

The obligation of all *Plata* defendants to fund the construction programs in the Turnaround Plan of Action is beyond dispute. The February 14, 2006 Order Appointing Receiver ("OAR") provides that "[a]ll costs incurred in the implementation of the policies, plans, and decisions of the Receiver relating to the fulfillment of his duties under this Order shall be borne by Defendants." (OAR, pg. 7.) The *Plata* defendants did not appeal from the OAR. The Court has deemed the Turnaround Plan of Action "the plan of action for moving this case forward," and has specifically found that the strategic goals in the plan, including those related to construction, are "necessary to bring California's medical health care system up to constitutional standards." (Order Approving Receiver's Turnaround Plan of Action, pgs. 3-4.)   Despite the obligation placed on the *Plata* defendants collectively, and you individually, to provide the funding necessary to bring these projects to fruition, no funding has yet been provided.

Without additional funding, my cash on hand for construction costs, as incurred, will be exhausted in October or November. This will likely cause my construction program management and design-build teams to stand down and disassemble, resulting in irreparable delays and thereby posing a grave threat to the health and safety of our inmate-patients. I will not, indeed cannot, let this occur. The OAR is clear that any person who "thwarts or delays the Receiver's performance of his duties under this Order, shall be subject to contempt proceedings before this Court." (OAR, pg. 8.) Unless you

take immediate action to provide funding, interim or otherwise, for the construction programs in the Turnaround Plan of Action, I intend to move the Court for whatever remedy may be necessary to compel the State's funding of the programs, including, but not limited to, commencing contempt proceedings against you and the other *Plata* defendants. I recognize that you are not wholly responsible for the unconstitutional conditions in the prison system. However, you presently hold the position and authority that will enable us to resolve this crisis. Please provide written assurance no later than Friday, July 25, 2008 that the funding requested above will be provided.

Yours truly,

J. Clark Kelso
Receiver

# EXHIBIT H

**From:** Kernan, Scott
**Sent:** Sunday, June 03, 2007 [illegible] PM
**To:** Quackenbush, Timothy; Gaddi, Kathy
**Subject:** FW: backfilling bad beds

---

**From:** Tilton, Jim
**Sent:** Sunday, June 03, 2007 8:31:15 PM
**To:** Kernan, Scott
**Subject:** Re: backfilling bad beds
**Auto forwarded by a Rule**

No problem. I am heading home from horse show myself. I will talk to you in the morning..

----- Original Message -----
From: Kernan, Scott
To: Tilton, Jim
Sent: Sun Jun 03 20:20:50 2007
Subject: Re: backfilling bad beds

To late to call. Played 36 today and just getting home

----- Original Message -----
From: Tilton, Jim
To: Kernan, Scott
Sent: Sat Jun 02 10:44:10 2007
Subject: Re: backfilling bad beds

I think you are right.

----- Original Message -----
From: Kernan, Scott
To: Tilton, Jim
Sent: Sat Jun 02 10:42:43 2007
Subject: Re: backfilling bad beds

Under statement, ill call you later. I know your gone next week, but will start working on it. I think she knows Receiver is going to announce a cap. Hagar would not let me reschedule for wednesday and keating just came out with damning report on pop. Think we are not at the table, but bet sk is. We hold the bag. Call you.

Scott

----- Original Message -----
From: Tilton, Jim
To: Kernan, Scott
Sent: Sat Jun 02 08:13:07 2007
Subject: Fw: backfilling bad beds

Wow!!!! This is big. Give me a call when you get a chance this weekend.

----- Original Message -----
From: Tilton, Jim
To: 'Louis.Mauro@GOV.CA.GOV' <Louis.Mauro@GOV.CA.GOV>; 'SPKennedy[redacted] <SPKennedy[redacted]

'andrea.hoch@GOV.CA.GOV' <andrea.hoch@GOV.CA.GOV>; 'dan.dunmoyer@gov.ca.gov' <dan.dunmoyer@gov.ca.gov>; 'alice.dowdin.calvillo@gov.ca.gov' <alice.dowdin.calvillo@gov.ca.gov>

Cc: Kernan, Scott
Sent: Sat Jun 02 08:04:30 2007
Subject: Re: backfilling bad beds

I know that has been the goal. We will get on board. I was probably mislead because ab 900 links the infill beds to the bad beds. I think it says for every infill bed created a bad bed must be taken down. I will sit down on monday and set up a mechanism to implement this policy and run it by you.

----- Original Message -----
From: Louis.Mauro@GOV.CA.GOV <Louis.Mauro@GOV.CA.GOV>
To: SPKennedy4[redacted] <SPKennedy[redacted]>; Tilton, Jim; Andrea.Hoch@GOV.CA.GOV <Andrea.Hoch@GOV.CA.GOV>; Dan.Dunmoyer@GOV.CA.GOV <Dan.Dunmoyer@GOV.CA.GOV>; alice.dowdin.calvillo@gov.ca.gov <alice.dowdin.calvillo@gov.ca.gov>

Cc: Kernan, Scott
Sent: Sat Jun 02 07:57:37 2007
Subject: Re: backfilling bad beds

That's right, we've said all along that the bad beds need to be eliminated because they create a danger to health and safety. And now AB 900 also requires that the bad beds be eliminated.

--------------------------
Sent from my BlackBerry Wireless Device

----- Original Message -----
From: SPKennedy[redacted] <SPKennedy[redacted]>
To: Jim.Tilton@cdcr.ca.gov <Jim.Tilton@cdcr.ca.gov>; andrea.hoch@GOV.CA.GOV <andrea.hoch@GOV.CA.GOV>; dan.dunmoyer@gov.ca.gov <dan.dunmoyer@gov.ca.gov>; alice.dowdin.calvillo@GOV.CA.GOV <alice.dowdin.calvillo@GOV.CA.GOV>; Louis.Mauro@GOV.CA.GOV <Louis.Mauro@GOV.CA.GOV>
Cc: Scott.Kernan@cdcr.ca.gov <Scott.Kernan@cdcr.ca.gov>
Sent: Sat Jun 02 07:51:35 2007
Subject: Re: backfilling bad beds

We've been having this conversation for months and months, and we've always said it makes no sense to declare an emergency, tranfer inmates out of state to get them out of bad beds and relieve overcrowding, only to backfill the bad beds. We're not releasing prisoners. We can't take new inmates from counties if there is not a bed to put them in. What possible argument would we have with the courts not to impose a cap if we're doing absolutely nothing to relieve the overcrowding for the next 2 years?

In a message dated 6/2/2007 7:42:51 AM Pacific Daylight Time, Jim.Tilton@cdcr.ca.gov writes:

It is not difficult it is just the first time I have heard us describe bad beds as unconstitutional. We have been saying we should not release in mates because of the lack of beds. If the bad beds are unconstitutional it can be argued we should not wait for ost to reduce them. Many of these beds have been used for years and we have made the point they create an unsafe

E_PRIV_009599

condition and restrict the ability to program inmates.

----- Original Message -----
From: SPKennedy[redacted] <SPKennedy[redacted]>
To: Tilton, Jim; andrea.hoch@GOV.CA.GOV <andrea.hoch@GOV.CA.GOV>;
dan.dunmoyer@gov.ca.gov <dan.dunmoyer@gov.ca.gov>;
alice.dowdin.calvillo@GOV.CA.GOV <alice.dowdin.calvillo@GOV.CA.GOV>;
Louis.Mauro@GOV.CA.GOV <Louis.Mauro@GOV.CA.GOV>
Cc: Kernan, Scott
Sent: Sat Jun 02 07:33:33 2007
Subject: Re: backfilling bad beds

restrict intake to only good beds. how can you fill a bed that is not legally there? we're inviting a court imposed cap if we backfill the bad beds. why is that difficult?

In a message dated 6/2/2007 7:29:30 AM Pacific Daylight Time, Jim.Tilton@cdcr.ca.gov writes:

Does that mean you want us to impose a declining population cap and stop or reduce intake?

----- Original Message -----
From: SPKennedy[redacted]<SPKennedy[redacted]>
To: Tilton, Jim; andrea.hoch@GOV.CA.GOV <andrea.hoch@GOV.CA.GOV>;
dan.dunmoyer@GOV.CA.GOV <dan.dunmoyer@GOV.CA.GOV>;
alice.dowdin.calvillo@GOV.CA.GOV <alice.dowdin.calvillo@GOV.CA.GOV>;
Louis.Mauro@GOV.CA.GOV <Louis.Mauro@GOV.CA.GOV>
Cc: Kernan, Scott
Sent: Sat Jun 02 07:25:32 2007
Subject: Re: backfilling bad beds

That's not what I"m saying. When a bad bed is emptied - for whatever reason - it should not be an available bed any longer. Nobody can force us to take an inmate if the bed would be in an unconsitutional location.

In a message dated 6/2/2007 7:22:19 AM Pacific Daylight Time, Jim.Tilton@cdcr.ca.gov writes:

Susan there is no way to make sure every ost is from a bad bed. That can only be done if population stays stable. For now pop is down so we are out of some bad beds we have used before. La continues to try to reduce the number of beds we can use in the county. What we can do is keep a running count of bad beds and report that.

----- Original Message -----
From: SPKennedy[redacted]<SPKennedy[redacted]>
To: Andrea.Hoch@GOV.CA.GOV <Andrea.Hoch@GOV.CA.GOV>;
dan.dunmoyer@gov.ca.gov <dan.dunmoyer@gov.ca.gov>;
alice.dowdin.calvillo@gov.ca.gov <alice.dowdin.calvillo@gov.ca.gov>; Tilton, Jim; Louis.Mauro@GOV.CA.GOV <Louis.Mauro@GOV.CA.GOV>
Sent: Sat Jun 02 07:16:39 2007
Subject: backfilling bad beds

We need to make sure no "bad" bed gets backfilled when inmates are transferred out of state. Is that happening right now or is there some ExO needed to give CDCR the authority to close down those beds?

---

See what's free at AOL.com < http://www.aol.com?ncid=AOLAOF00020000000503 > > .

---

See what's free at AOL.com < <http://www.aol.com/?ncid=AOLAOF00020000000503 > http://www.aol.com?ncid=AOLAOF00020000000503 < http://www.aol.com/?ncid=AOLAOF00020000000503> > .

---

See what's free at AOL.com < http://www.aol.com?ncid=AOLAOF00020000000503> .

---

See what's free at AOL.com.

# EXHIBIT I

PRISON LAW OFFICE
DONALD SPECTER, Bar No. 83925
STEVEN FAMA, Bar No. 99641
ALISON HARDY, Bar No. 135966
SARA NORMAN, Bar No. 189536
REBEKAH EVENSON, Bar No. 207825
1917 Fifth Street
Berkeley, CA 94710
Telephone: (510) 280-2621

ROSEN, BIEN & GALVAN, LLP
MICHAEL W. BIEN, Bar No. 96891
JANE E. KAHN, Bar No. 112239
AMY WHELAN, Bar No. 215675
LORI RIFKIN, Bar No. 244081
LISA ELLS, Bar No. 243657
315 Montgomery Street, 10th Floor
San Francisco, California 94104
Telephone: (415) 433-6830

KIRKPATRICK & LOCKHART PRESTON GATES ELLIS LLP
JEFFREY L. BORNSTEIN, Bar No. 99358
EDWARD P. SANGSTER, Bar No. 121041
RAYMOND E. LOUGHREY, Bar No. 194363
55 Second Street, Suite 1700
San Francisco, CA 94105-3493
Telephone: (415) 882-8200

BINGHAM, McCUTCHEN, LLP
WARREN E. GEORGE, Bar No. 53588
Three Embarcadero Center
San Francisco, California 94111
Telephone: (415) 393-2000

THE LEGAL AID SOCIETY – EMPLOYMENT LAW CENTER
CLAUDIA CENTER, Bar No. 158255
600 Harrison Street, Suite 120
San Francisco, CA 94107
Telephone: (415) 864-8848

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURTS
FOR THE EASTERN DISTRICT OF CALIFORNIA
AND THE NORTHERN DISTRICT OF CALIFORNIA
UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES
PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

| | |
|---|---|
| RALPH COLEMAN, et al., Plaintiffs, vs. ARNOLD SCHWARZENEGGER, et al., Defendants | No. Civ S 90-0520 LKK-JFM P<br>THREE-JUDGE COURT<br>**PLAINTIFFS' NOTICE OF DEPOSITION AND REVISED NOTICE OF DEPOSITION OF DEFENDANT WITNESSES** |
| MARCIANO PLATA, et al., Plaintiffs, vs. ARNOLD SCHWARZENEGGER, et al., Defendants | No. C01-1351 TEH<br>THREE-JUDGE COURT |

TO EACH PARTY AND EACH ATTORNEY OF RECORD:

YOU ARE HEREBY NOTIFIED THAT THE DEPOSITION OF the following persons will be taken on the dates, and at the times and locations, listed below:

| Witness | Date | Time | Location |
|---|---|---|---|
| Victor Brewer | August 4, 2008 | 9:30 a.m. | Rosen, Bien & Galvan<br>315 Montgomery St., 10th Fl<br>San Francisco, CA 94104 |
| Scott Kernan | August 27, 2008 | 9:30 a.m. | Prison Law Office<br>1917 Fifth Street<br>Berkeley, CA 94710-1916 |
| Matthew Cate | August 29, 2008 | 9:30 a.m. | Prison Law Office<br>1917 Fifth Street<br>Berkeley, CA 94710-1916 |
| Susan Kennedy | September 2, 2008 | 9:30 a.m. | Prison Law Office<br>1917 Fifth Street<br>Berkeley, CA 94710-1916 |
| Governor Arnold Schwarzenegger | September 3, 2008 | 9:30 a.m. | Office of the Governor<br>State Capitol Building,<br>Sacramento, California |
| Robert Gore | September 4, 2008 | 9:30 a.m. | Prison Law Office<br>1917 Fifth Street<br>Berkeley, CA 94710-1916 |
| Kathy Jett | August 28, 2008 | 9:30 a.m. | Prison Law Office<br>1917 Fifth Street<br>Berkeley, CA 94710-1916 |
| Deborah Hysen | August 29, 2008 | 9:30 a.m. | Prison Law Office<br>1917 Fifth Street<br>Berkeley, CA 94710-1916 |

The deponents are parties to this action. These depositions will be recorded by stenographic means and may be videotaped.

Dated: July 10. 2008

Respectfully submitted,

Rebekah Evenson
Prison Law Office
Attorneys for Plaintiffs

DECLARATION OF SERVICE BY MAIL

Case Name: Plata et al., Plaintiffs v. Schwarzenegger et al., Defendants.
United States District Court
Northern District of California No. C-01-1351 T.E.H.

I am employed in the County of Berkeley, California. I am over the age of 18 years and not a party to the within entitled cause: my business address is Prison Law Office, 1917 Fifth Street, Berkeley, CA 94710

On July 10, 2008, I served the attached:

**PLATA PLAINTIFFS' NOTICE OF DEPOSITION AND REVISED NOTICE OF DEPOSITION OF DEFENDANT WITNESSES**

in said cause, placing, or causing to be placed, a true copy thereof, enclosed in a sealed envelope with postage thereon fully prepaid in the United States Mail at Berkeley, California, addressed as follows:

STEVEN A. KAUFHOLD
Akin Gump Straus Hauer & Feld LLP
580 California St., 15th Floor
San Francisco, CA 94104-1036

PAUL MELLO
Hanson Bridgett Marcus Vlahos & Rudy, LLP
333 Market Street, 21st Floor
San Francisco, CA 94105

GREGG MACCLEAN ADAM
NATALIE LEONARD
Carroll, Burdick, McDonough, LLP
44 Montgomery Street, Suite 400
San Francisco, 94104

ROCHELL EAST
Deputy Attorney General
455 Golden Gate Ave., Suite 11000
San Francisco, CA 94102

ANN MILLER RAVEL
Office of the County Counsel
County of Santa Clara
70 West Hedding, East Wing 9th Fl.
San Jose, CA 94110

MARTIN J. MAYER
Kimberly Hall Barlow
Jones & Mayer
3777 North Harbor Blvd.
Fullerton, CA 92835

STEVEN WOODSIDE
Office of the County Counsel
County of Sonoma
575 Admin. Dr., Rm 105A
Santa Rosa, CA 95403

LISA TILLMAN
Deputy Attorney General
Office of the Attorney General
PO Box 944255
Sacramento, CA 94244-2550

WILLIAM E. MITCHELL
Office of the Attorney General
County of Riverside
4075 Main Street, First Floor
Riverside, CA 92501

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct, and that this declaration was executed at Berkeley, California on July 10, 2008.

A Fewell
Ashley Fewell

# EXHIBIT J



PRISON LAW OFFICE
General Delivery, San Quentin CA 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

*Director:*
Donald Specter

*Staff Attorneys:*
Susan Christian
Rebekah Evenson
Steven Fama
Penny Godbold
Megan Hagler
Alison Hardy
Kelly Knapp
Millard Murphy
Sara Norman
Judith Rosenberg
Zoe Schonfeld
E. Ivan Trujillo

July 10, 2008

VIA EMAIL AND U.S. MAIL

Paul Mello, Hanson Bridgett
425 Market Street, 26th Floor
San Francisco CA 94105
(Attorney for *Plata* defendants)

Rochelle East, DAG
455 Golden Gate Ave., Ste 11000
San Francisco, CA 94102-7004
(Attorney for *Plata* and *Coleman* defendants)

Lisa Tillman, DAG
P.O. Box 944255
Sacramento, CA 94244-9555
(Attorney for *Coleman* defendants)

Steven S. Kaufhold and Chad Stegeman
Akin, Gump, Strauss Hauer & Feld, LLP
580 California Street, 15th Floor
San Francisco, CA 94104-1036
(Attorneys for Republican Intervenors)

Steven M. Woodside, County Counsel
Anne L. Keck, Deputy County Counsel
575 Administration Drive, Room 105A
Santa Rosa, CA 95403-2815
(Attorneys for Sonoma County Intervenor)

Martin J. Mayer and Kimberly Hall Barlow
Jones & Mayer
3777 North Harbor Boulevard
Fullerton, CA 92835
(Attorneys for California Sheriff, Probation, Police Chief and Corrections Intervenors)

Rod Pacheco, District Attorney
County of Riverside
4075 Main Street, First Floor
Riverside, CA 92501
(Attorneys for District Attorney Intervenors)

Ann Miller Ravel and Theresa Fuentes
Office of the County Counsel
70 West Hedding, East Wing, 9th Floor
San Jose, CA 95110-1770
(Attorneys for County Intervenors)

Natalie Leonard and Gregg MacClean Adam
Carroll, Burdick & McDonough, LLP
44 Montgomery Street, Suite 400
San Francisco, CA 94104
(Attorneys for CCPOA Intervenors)

Board of Directors
Penelope Cooper, President • Michele WalkinHawk, Vice President • Marshall Krause, Treasurer
Honorable John Burton • Felecia Gaston • Christiane Hipps • Margaret Johns
Cesar Lagleva • Laura Magnani • Michael Marcum • Ruth Morgan • Dennis Roberts

Dear Counsel:

I am writing to schedule depositions that the *Plata* and *Coleman* plaintiffs have noticed or are noticing today. All of the individuals are persons for whom we have "very good cause" to take depositions, and most will also be designated as trial witnesses for Plaintiffs.

In light of the short timeframe in which all parties must complete outstanding discovery, we need to move quickly to schedule the remaining depositions and, if there are any disputes, to obtain resolution from the Magistrate Judge as soon as possible. Following is a proposed list of depositions, dates and locations.

| DEPONENT | DATE | LOCATION |
|---|---|---|
| State Defendants | | |
| Victor Brewer | August 4, 2008 | Rosen Bien & Galvan |
| Scott Kernan | August 27, 2008 | Prison Law Office |
| Matthew Cate | August 29, 2008 | Prison Law Office |
| Susan Kennedy | September 2, 2008 | Prison Law Office |
| Governor Arnold Schwarzenegger | September 3, 2008 | Governor's office |
| Robert Gore | September 4, 2008 | Prison Law Office |
| Kathy Jett | August 28, 2008 | Prison Law Office |
| Deborah Hysen | August 29, 2008 | Prison Law Office |
| Intervenors | | |
| Dave Cogdill | July 16, 2008 | Phillips (Sacramento) |
| Dick Ackerman | July 18, 2008 | Phillips (Sacramento) |
| Michael M. Villines | July 25, 2008 | Phillips (Sacramento) |
| Todd Spitzer | July 29, 2008 | Phillips (Sacramento) |
| Jerry Powers | July 31, 2008 | K&L Gates (San Francisco) |
| Sonoma 30(b)(6) designee | August 4, 2008 | K&L Gates (San Francisco) |
| Lee Baca | August 5, 2008 | K&L Gates (Los Angeles) |
| William B. Kolender | August 7, 2008 | K&L Gates (Irvine) |
| Loren Buddress | August 11, 2008 | K&L Gates (San Francisco) |
| Non-party witnesses | | |
| Joan Petersilia | July 31, 2008 | Prison Law Office |

(Plaintiffs reserve the right to notice depositions of any additional individuals designated as trial witnesses or experts by the parties.)

In light of the impending discovery cutoff, we request that you let us know by the end of the day on Monday, July 14, 2008 whether the proposed deposition dates are agreeable to you, or whether you intend to suggest alternative dates. Also, please inform us by the end of the day on Monday, July 14, 2008 whether you intend to object to the taking of any of these depositions.

We expect that we will be able to work cooperatively with you to schedule all of the proposed depositions. However, in light of recent difficulties we have encountered in informally resolving discovery matters, and the short timeframes for completing discovery, we need a firm deadline to settle the desposition schedule. Accordingly, if we do not hear from you by the end of the day on Monday, July 14, 2008, we will have no choice but to assume that you object to all of the proposed depositions, and we will file a motion to compel before the Magistrate Judge. I hope that such a motion will be unnecessary.

Sincerely,

Rebekah Evenson

cc: Michael Bien, Rosen, Bien & Galvan

# EXHIBIT K

HansonBridgett

SAMANTHA D. TAMA
ATTORNEY
DIRECT DIAL 415 995 5020
DIRECT FAX 415 995 3547
E-MAIL stama@hansonbridgett.com

July 14, 2008

VIA ELECTRONIC MAIL AND U.S. MAIL

Rebekah Evenson
Prison Law Office
1917 Fifth Street
Berkeley, CA 94710-1916

Re: Plaintiffs' Deposition Notices
*Plata v. Schwarzenegger*, U.S. District Court, Northern District of California, Case No. 01-1351 TEH;
*Coleman v. Schwarzenegger*, U.S. District Court, Eastern District of California, Case No. 2:90-cv-0520 LKK

Dear Ms. Evenson:

I write this letter in response to your letter dated July 10, 2008 with regard to scheduling depositions in both *Plata* and *Coleman*. As a preliminary matter, Defendants take no position with respect to the Intervenors' depositions.

With regard to the depositions of Scott Kernan, Matthew Cate, Kathy Jett, and Deborah Hysen, Defendants were not provided with sufficient time to confirm these deponents' availability for the dates their depositions were noticed.[1] Indeed, Defendants were not consulted before Plaintiffs unilaterally scheduled the dates for the above individuals' depositions. However, Defendants are willing to work with Plaintiffs to find mutually agreeable dates and locations for these depositions, and will contact you when we obtain these deponents' availability.

Susan Kennedy, Victor Brewer, Governor Arnold Schwarzenegger, and Robert Gore, however, have not been identified as testifying witnesses by Plaintiffs or Defendants. Nor do Defendants intend to call these individuals to testify at trial. Defendants therefore assume that Plaintiffs will either withdraw the deposition notices for these individuals, or will appropriately file a motion to depose a non-testifying witness with Magistrate Judge Moulds demonstrating "very good cause" in compliance with the Three Judge Court's July 2, 2008 order. Defendants will oppose the depositions of these non-testifying witnesses in the absence of an order from Magistrate Judge Moulds.

[1] Defendants received Plaintiffs' letter noticing various depositions on Thursday, July 10, 2008 at 4:35 p.m., and Plaintiffs requested a response no later than Monday, July 14, 2008.

Defendants will send you a separate communication regarding your deposition notice of Dr. Joan Petersilia.

Sincerely,

Samantha D. Tama

cc (via electronic mail):

     Paul Mello
     Rochelle East
     Kyle Lewis
     Lisa Tillman
     Steven Kaufhold
     Chad Stegeman
     Theresa Wang
     William Mitchell
     Natalie Leonard
     Theresa Fuentes
     Anne Keck
     Kimberly Hall Barlow
     Martin Mayer

# EXHIBIT L

# PROCLAMATION

10/04/2006

## Prison Overcrowding State of Emergency Proclamation

PROCLAMATION
by the
Governor of the State of California

**WHEREAS,** the California Department of Corrections and Rehabilitation (CDCR) is required by California law to house inmates committed to state prison; and

**WHEREAS,** various trends and factors, including population increases, parole policies, sentencing laws, and recidivism rates have created circumstances in which the CDCR is now required to house a record number of inmates in the CDCR prison system, making the CDCR prison system the largest state correctional system in the United States, with a total inmate population currently at an all-time high of more than 170,000 inmates; and

**WHEREAS,** due to the record number of inmates currently housed in prison in California, all 33 CDCR prisons are now at or above maximum operational capacity, and 29 of the prisons are so overcrowded that the CDCR is required to house more than 15,000 inmates in conditions that pose substantial safety risks, namely, prison areas never designed or intended for inmate housing, including, but not limited to, common areas such as prison gymnasiums, dayrooms, and program rooms, with approximately 1,500 inmates sleeping in triple-bunks; and

**WHEREAS,** the current severe overcrowding in 29 CDCR prisons has caused substantial risk to the health and safety of the men and women who work inside these prisons and the inmates housed in them, because:

With so many inmates housed in large common areas, there is an increased, substantial risk of violence, and greater difficulty controlling large inmate populations.

With large numbers of inmates housed together in triple-bunks, there is an increased, substantial risk for transmission of infectious illnesses.

The triple-bunks and tight quarters create line-of-sight problems for correctional officers by blocking views,

**WHEREAS,** the current severe overcrowding in these 29 prisons has also overwhelmed the electrical systems and/or wastewater/sewer systems, because those systems are now often required to operate at or above the maximum intended capacity, resulting in an increased, substantial risk to the health and safety of CDCR staff, inmates, and the public, because:

Overloading the prison electrical systems has resulted in power failures and blackouts within the prisons, creating increased security threats. It has also damaged fuses and transformers.

Overloading the prison sewage and wastewater systems has resulted in the discharge of waste beyond treatment capacity, resulting in thousands of gallons of sewage spills and environmental contamination.

And when the prisons "overdischarge" waste, bacteria can contaminate the drinking water supply, putting the public's health at an increased, substantial risk.

**WHEREAS,** overloading the prison sewage and water systems has resulted in increased, substantial risk of damage to state and privately owned property and has resulted in multiple fines, penalties and/or notices of violations to the CDCR related to wastewater/sewer system overloading such as groundwater contamination and environmental pollution; and

**WHEREAS,** overcrowding causes harm to people and property, leads to inmate unrest and misconduct, reduces or eliminates programs, and increases recidivism as shown within this state and in others; and

**WHEREAS,** in addition to all of the above, in the 29 prisons with severe overcrowding, the following circumstances exist:

Avenal State Prison has an operational housing capacity of 5,768 inmates, but it currently houses 7,422 inmates, with 1,654 inmates housed in areas designed for other purposes. At the same time, in the last year, there were 64 incidents of assault/battery by inmates — 31 of them against CDCR staff — along with 15 riots/melees, and 27 weapon confiscations.

The California Correctional Center has an operational housing capacity of 5,724 inmates, but it currently houses 6,174 inmates, with 450 inmates housed in areas designed for other purposes. At the same time, in the last year, there were 128 incidents of assault/battery by inmates — 16 of them against CDCR staff — along with 34 riots/melees, and 21 weapon confiscations.

The California Correctional Institution has an operational housing capacity of 4,931, but it currently houses 5,702 inmates, with 771 inmates housed in areas designed for other purposes. At the same time, in the last year, there

57 weapon confiscations.

Centinela State Prison has an operational housing capacity of 4,368, but it currently houses 4,956 inmates, with 588 inmates housed in areas designed for other purposes. At the same time, in the last year, there were 141 incidents of assault/battery by inmates — 30 of them against CDCR staff — along with 10 riots/melees, and 151 weapon confiscations.

The California Institution for Men has an operational housing capacity of 5,372, but it currently houses 6,615 inmates, with 1,243 inmates housed in areas designed for other purposes. At the same time, in the last year, there were 170 incidents of assault/battery by inmates — 57 of them against CDCR staff — along with 21 riots/melees, and 47 weapon confiscations.

The California Institution for Women has an operational housing capacity of 2,228, but it currently houses 2,624 inmates, with 396 inmates housed in areas designed for other purposes. At the same time, in the last year, there were 65 incidents of assault/battery by inmates — 26 of them against CDCR staff — and 6 weapon confiscations.

The California Men's Colony has an operational housing capacity of 6,294, but it currently houses 6,574 inmates, with 280 inmates housed in areas designed for other purposes. At the same time, in the last year, there were 151 incidents of assault/battery by inmates — 33 of them against CDCR staff — along with 11 riots/melees, and 29 weapon confiscations.

The California State Prison at Corcoran has an operational housing capacity of 4,954, but it currently houses 5,317 inmates, with 363 inmates housed in areas designed for other purposes. At the same time, in the last year, there were 147 incidents of assault/battery by inmates — 58 of them against CDCR staff — along with 5 riots/melees, and 111 weapon confiscations.

The California Rehabilitation Center has an operational housing capacity of 4,660, but it currently houses 4,856 inmates, with 196 inmates housed in areas designed for other purposes. At the same time, in the last year, there were 65 incidents of assault/battery by inmates — 28 of them against CDCR staff — 9 riots/melees, and 34 weapon confiscations.

The Correctional Training Facility has an operational housing capacity of 6,157, but it currently houses 7,027 inmates, with 870 inmates housed in areas designed for other purposes. At the same time, in the last year, there were 85 incidents of assault/battery by inmates — 26 of them against CDCR staff — along with 9 riots/melees, and 27 weapon confiscations.

Chuckawalla Valley State Prison has an operational housing capacity of 3,443, but it currently houses 4,292 inmates, with 849 inmates housed in areas designed for other purposes. At the same time, in the last year, there were 50 incidents of assault/battery by inmates — 11 of them against CDCR staff — along with 5 riots/melees, and 21 weapon confiscations.

Deuel Vocational Institution has an operational housing capacity of 3,115, but it currently houses 3,911 inmates, with 796 inmates housed in areas designed for other purposes. At the same time, in the last year, there were 114 incidents of assault/battery by inmates — 54 of them against CDCR staff — along with 7 riots/melees, and 57 weapon confiscations.

High Desert State Prison has an operational housing capacity of 4,346, but it currently houses 4,706 inmates, with 360 inmates housed in areas designed for other purposes. At the same time, in the last year, there were 351 incidents of assault/battery by inmates — 44 of them against CDCR staff — along with 6 riots/melees, and 289 weapon confiscations.

Ironwood State Prison has an operational housing capacity of 4,185, but it currently houses 4,665 inmates, with 480 inmates housed in areas designed for other purposes. At the same time, in the last year, there were 96 incidents of assault/battery by inmates — 19 of them against CDCR staff — along with 14 riots/melees, and 52 weapon confiscations.

Kern Valley State Prison has an operational housing capacity of 4,566, but it currently houses 4,686 inmates, with 120 inmates housed in areas designed for other purposes. At the same time, in the last year, there were 146 incidents of assault/battery by inmates — 60 of them against CDCR staff — along with 10 riots/melees, and 46 weapon confiscations.

TheCalifornia State Prison at Los Angeles has an operational housing capacity of 4,230, but it currently houses 4,698 inmates, with 468 inmates housed in areas designed for other purposes. At the same time, in the last year, there were 211 incidents of assault/battery by inmates — 123 of them against CDCR staff — along with 4 riots/melees, and 101 weapon confiscations.

Mule Creek State Prison has an operational housing capacity of 3,197, but it currently houses 3,929 inmates, with 732 inmates housed in areas designed for other purposes. At the same time, in the last year, there were 65 incidents of assault/battery by inmates — 35 of them against CDCR staff — along with 1 riot/melee, and 28 weapon confiscations.

North Kern State Prison has an operational housing capacity of 5,189, but it currently houses 5,365 inmates, with 176 inmates housed in areas designed for other purposes. At the same time, in the last year, there were 135 incidents of assault/battery by inmates — 43 of them against CDCR staff — along with 16 riots/melees, and 70 weapon confiscations.

Pelican Bay State Prison has an operational housing capacity of 3,444, but it currently houses 3,604 inmates, with 160 inmates housed in areas designed for other purposes. At the same time, in the last year, there were 256 incidents of assault/battery by inmates — 88 of them against CDCR staff — along with 9 riots/melees, and 106 weapon confiscations.

Pleasant Valley State Prison has an operational housing capacity of 4,368, but it currently houses 5,112 inmates, with 744 inmates housed in areas designed for other purposes. At the same time, in the last year, there were

weapon confiscations.

The Richard J. Donovan Correctional Facility has an operational housing capacity of 4,120, but it currently houses 4,720 inmates, with 600 inmates housed in areas designed for other purposes. At the same time, in the last year, there were 244 incidents of assault/battery by inmates — 118 of them against CDCR staff — along with 11 riots/melees, and 96 weapon confiscations.

The California State Prison at Sacramento has an operational housing capacity of 2,973, but it currently houses 3,213 inmates, with 240 inmates housed in areas designed for other purposes. At the same time, in the last year, there were 264 incidents of assault/battery by inmates — 159 of them against CDCR staff — along with 5 riots/melees, and 118 weapon confiscations.

The California Substance Abuse Treatment Facility and State Prison at Corcoran has an operational housing capacity of 6,360, but it currently houses 7,593 inmates, with 1,233 inmates housed in areas designed for other purposes. At the same time, in the last year, there were 120 incidents of assault/battery by inmates — 53 of them against CDCR staff — along with 20 riots/melees, and 124 weapon confiscations.

The Sierra Conservation Center has an operational housing capacity of 5,657, but it currently houses 6,107 inmates, with 450 inmates housed in areas designed for other purposes. At the same time, in the last year, there were 61 incidents of assault/battery by inmates — 18 of them against CDCR staff — along with 19 riots/melees, and 50 weapon confiscations.

The California State Prison at Solano has an operational housing capacity of 5,070, but it currently houses 5,858 inmates, with 788 inmates housed in areas designed for other purposes. At the same time, in the last year, there were 60 incidents of assault/battery by inmates — 26 of them against CDCR staff — along with 4 riots/melees, and 114 weapon confiscations.

San Quentin State Prison has an operational housing capacity of 4,933, but it currently houses 5,183 inmates, with 287 inmates housed in areas designed for other purposes. At the same time, in the last year, there were 262 incidents of assault/battery by inmates — 123 of them against CDCR staff — along with 15 riots/melees, and 118 weapon confiscations.

Salinas Valley State Prison has an operational housing capacity of 4,200, but it currently houses 4,680 inmates, with 480 inmates housed in areas designed for other purposes. At the same time, in the last year, there were 181 incidents of assault/battery by inmates — 82 of them against CDCR staff — along with 7 riots/melees, and 91 weapon confiscations.

Valley State Prison for Women has an operational housing capacity of 3,902, but it currently houses 3,958 inmates, with 56 inmates housed in areas designed for other purposes. At the same time, in the last year, there were 125 incidents of assault/battery by inmates — 75 of them against CDCR staff — and 15 weapon confiscations.

Wasco State Prison has an operational housing capacity of 5,838, but it currently houses 6,098 inmates, with 260 inmates housed in areas designed for other purposes. At the same time, in the last year, there were 226 incidents of assault/battery by inmates — 97 of them against CDCR staff — along with 32 riots/melees, and 82 weapon confiscations.

**WHEREAS,** some of these 29 severely overcrowded prisons may even be housing more inmates, because the inmate population continually fluctuates among the CDCR prisons; and

**WHEREAS,** in addition to the 1,671 incidents of violence perpetrated in these 29 severely overcrowded prisons by inmates against CDCR staff last year, and the 2,642 incidents of violence perpetrated in these prisons on inmates by other inmates in the last year, the suicide rate in these 29 prisons is approaching an average of one per week; and

**WHEREAS,** the federal court in the *Coleman* case found mental-health care in CDCR prisons to be below federal constitutional standards due in part to the lack of appropriate beds and space; and

**WHEREAS,** the use of common areas for inmate housing has severely modified or eliminated certain inmate programs in the 29 prisons with severe overcrowding; and

**WHEREAS,** the severe overcrowding has also substantially limited or restricted inmate movement, causing significantly reduced inmate attendance in academic, vocational, and rehabilitation programs; and

**WHEREAS,** overcrowded prisons in other states have experienced some of the deadliest prison riots in American history, including:

In 1971, the nation's deadliest prison riot occurred in Attica, New York, resulting in the death of 43 people. On the day of this riot, the prison — which was built for 1600 — housed approximately 2,300 inmates.

In 1981, a riot occurred in the New Mexico State Penitentiary. More than 30 inmates were killed, more than 100 people were injured, and 12 officers were taken hostage, some of whom were beaten, sexually assaulted, and/or raped. On the day of this riot, the prison — which was built for 900 — housed approximately 1,136 inmates.

In 1993, a riot occurred in Lucasville, Ohio. One officer was murdered, four officers were seriously injured, and nine inmates were killed. On the day of this riot, the prison — which was built for 1600 — housed approximately 2,300 inmates.

**WHEREAS,** I believe immediate action is necessary to prevent death and harm caused by California's severe prison overcrowding; and

**WHEREAS,** because of the housing shortage in CDCR prisons, the CDCR has current contracts with four California counties to house 2,352 additional state inmates in local adult jails, but this creates the following overcrowding problem in the county jails:

According to a report by the California State Sheriffs' Association in June 2006, adult jails recently averaged a daily population of approximately 80,000 inmates. On a typical day, the county jails lacked space for more than 4,900 inmates across the state.

Based on the same report, 20 of California's 58 counties have court-imposed population caps resulting from litigation brought by or on behalf of inmates in crowded jails and another 12 counties have self-imposed caps.

Most of California's jail population consists of felony inmates, but when county jails are full, someone in custody must be released before a new inmate can be admitted.

The 2006 Sheriffs' Association report states that last year, 233,388 individuals statewide avoided incarceration or were released early into local communities because of the lack of jail space.

**WHEREAS,** overcrowding conditions are projected to get even worse in the coming year, to the point that the CDCR expects to run out of all common area space to house prisoners in mid-2007, and will be unable to receive any new inmates; and

**WHEREAS,** in January 2006, I proposed $6 billion in the Strategic Growth Plan to help manage inmate population at all levels of government by increasing the number of available local jail beds and providing for two new prisons and space for 83,000 prisoners to address California's current and future incarceration needs; and

**WHEREAS,** the California Legislature failed to act upon this proposal; and

**WHEREAS,** in March 2006, a proposal was submitted as part of my 2006-07 budget to enable the CDCR to contract for a total of 8,500 beds in community correctional facilities within the state; and

**WHEREAS,** the California Legislature denied this proposal; and

**WHEREAS,** on June 26, 2006, I issued a proclamation calling the Legislature into special session because I believed urgent action was needed to address this severe problem in California's prisons, and I wanted to give the Legislature a further opportunity to address this crisis; and

**WHEREAS,** the CDCR submitted detailed proposals to the Legislature to address the immediate and longer-term needs of the prison system in an effort resolve the overcrowding crisis; and

**WHEREAS,** the California Legislature failed to adopt the proposals submitted by the CDCR, and also failed to adopt any proposals of its own; and

**WHEREAS,** in response, my office directed the CDCR to conduct a survey of certain inmates in California's general population to determine how many might voluntarily transfer to out-of-state correctional facilities; and

**WHEREAS,** the CDCR reports that more than 19,000 inmates expressed interest in voluntarily transferring to a correctional facility outside of California; and

**WHEREAS,** the overcrowding crisis gets worse with each passing day, creating an emergency in the California prison system.

**NOW, THEREFORE, I, ARNOLD SCHWARZENEGGER,** Governor of the State of California, in light of the aforementioned, find that conditions of extreme peril to the safety of persons and property exist in the 29 CDCR prisons identified above, due to severe overcrowding, and that the magnitude of the circumstances exceeds the capabilities of the services, personnel, equipment, and facilities of any geographical area in this state. Additionally, the counties within the state are harmed by this situation, as the inability to appropriately house inmates directly impacts local jail capacity and the early release of felons. This crisis spans the eastern, western, northern, and southern parts of the state and compromises the public's safety, and I find that local authority is inadequate to cope with the emergency. Accordingly, under the authority of the California Emergency Services Act, set forth at Title 2, Division 1, Chapter 7 of the California Government Code, commencing with section 8550, I hereby proclaim that a State of Emergency exists within the State of California's prison system.

Pursuant to this proclamation:

I. The CDCR shall, consistent with state law and as deemed appropriate by the CDCR Secretary for the sole purpose of immediately mitigating the severe overcrowding in these 29 prisons and the resulting impacts within California, immediately contract for out-of-state correctional facilities to effectuate voluntary transfers of California prison inmates to facilities outside of this state for incarceration consisting of constitutionally adequate housing, care, and programming.

II. The CDCR Secretary shall, after exhausting all possibilities for voluntary transfers of inmates, and in compliance with the Interstate Corrections Compact and the Western Interstate Corrections Compact, and as he deems necessary and appropriate to mitigate this emergency, effectuate involuntary transfers of California prison inmates, based on criteria set forth below, to institutions in other states and those of the federal government for incarceration consisting of constitutionally adequate housing, care, and programming. In such instance, because strict compliance with California Penal Code sections 11191 and 2911 would prevent, hinder, or delay the mitigation of the severe overcrowding in these prisons, applicable provisions of these statutes are suspended to the extent necessary to

the federal government without consent. This suspension is limited to the scope and duration of this emergency.

A. The CDCR Secretary shall prioritize for involuntary transfer the inmates who meet the following criteria:

1. Inmates who: (a) have been previously deported by the federal government and are criminal aliens subject to immediate deportation; or (b) have committed an aggravated felony as defined by federal statute and are subject to deportation.

2. Inmates who are paroling outside of California.

3. Inmates who have limited or no family or supportive ties in California based on visitation records and/or other information deemed relevant and appropriate by the CDCR Secretary.

4. Inmates who have family or supportive ties in a transfer state.

5. Other inmates as deemed appropriate by the CDCR Secretary.

B. No person under commitment to the Division of Juvenile Justice may be considered for such transfer.

III. The CDCR Secretary shall, before selecting any inmate for transfer who has individual medical and/or mental-health needs, consult with the court-appointed Receiver of the CDCR medical system and/or the court-assigned Special Master in the *Coleman* mental-health case, depending on the healthcare needs of the inmate, to determine whether a transfer would be appropriate.

IV. The CDCR Secretary shall, before effectuating any inmate transfer, carefully and thoroughly evaluate all appropriate factors, including, but not limited to, the cost-effectiveness of any such transfer and whether an inmate selected for transfer has any pending appeals or hearings that may be impacted by such transfer.

V. The CDCR shall, as deemed appropriate by the CDCR Secretary, contract for facility space, inmate transportation, inmate screening, the services of qualified personnel, and/or for the supplies, materials, equipment, and other services needed to immediately mitigate the severe overcrowding and the resulting impacts within California. Because strict compliance with the provisions of the Government Code and the Public Contract Code applicable to state contracts would prevent, hinder, or delay the mitigation of the severe overcrowding in these prisons, applicable provisions of these statutes, including, but not limited to, advertising and competitive bidding requirements, are suspended to the extent necessary to enable the CDCR to enter into such contracts as expeditiously as possible. This suspension is limited to the scope and duration of this emergency.

**I FURTHER DIRECT** that as soon as hereafter possible, this proclamation be filed in the Office of the Secretary of State and that widespread publicity and notice be given of this proclamation.

IN WITNESS WHEREOF I have hereunto set my hand and caused the Great Seal of the State of California to be affixed this 4th day of October 2006.



Governor of California

ATTEST:

BRUCE McPHERSON

Secretary of State

# EXHIBIT M

**From:** Bonnie8888@aol.com
**Sent:** Friday, February 23, 2007 10:39:03 AM
**To:** Najera, Elizabeth; jeff.adachi@sfgov.org; chuck.alexander@ccpoa.org; rabarpro@pacbell.net; Lucy.Armendariz@sen.ca.gov; ashbyconsultinggroup@yahoo.com; dauclair@mhsinc.org; Bach, Margot; Blaylock, Janet; bloom@sonoma.edu; Bracy, Jean; wbroughton@mhsinc.org; Brown, Cynthia; MBuell@bop.gov; Susan@anewwayoflife.org; KimC@TimeForChange.us; Cates, Sid; echarles@mhsinc.org; Chen, Bubpha; Conneally-Salazar, Catherine; lindalca@sbcglobal.net; Davison, Dawn; Dillon, Shannon; Dobson-Davis, Velda; admin@crossroadswomen.org; pdouglas@gtemail.net; veisen@waldenhouse.org; families@filo7.org; Feryance, Mary H; lgarcia_2020@yahoo.com; Cgeiger007@aol.com; Grannis, Nola; rigreenb@lanset.com; phaire@mhsinc.org; Hall, Guillermina; Harman, Dalinda; Harpe, Shideler; Harrington, Robin; Hatter, Robin; Hayhoe, Joyce; Hubbard, Suzan; sjabro@earthlink.net; Jackson, Sharon; Johnson, Karen; ccip@earthlink.net; Johnston, Riccardo; Keller, Darc; Koshell, Merrie; Laduke, Tifani D.; LLAMBE@cpinc.org; leslie.levitas@sfgov.org; jlewen@earthlink.net; Bonnie8888@aol.com; Long, Jacqueline; nancy.lyons@lhc.ca.gov; Malone, Sara; WTMPhD@aol.com; micdotcom@yahoo.com; McCune, Margie; dmcdermott@cacatholic.org; Nunez, Ruben; Kenneth.orduna@asm.ca.gov; MOShea@co.sanmateo.ca.us; Ossmann, Joseph; SOstermann@phoenixhouse.org; barbarao@csufresno.edu; judyp@womensfoundca.org; price@waldenhouse.org; josefina.ramirez@asm.ca.gov; sasca-pm@mhsinc.org; Robinson, David L; anne@clarkeronce.com; rosalinda.rosalez@sen.ca.gov; Nettie.Sabelhaus@sen.ca.gov; marlene@cywd.org; Sayles-Owen, Del; Shilay, Chris; Smalley, Janine; Monica.Smith@asm.ca.gov; rsmith@waldenhouse.org; Stephens, Regina; Still, Wendy; Heidi@prisonerswithchildren.org; Temple, Vicky; Virga, Tim; lwanner@cacatholic.org; Warner, Bernard; mwiberg@women.ca.gov; Dzobel@bop.gov; azometa@medasf.org; Fortner, Bart; Christine.Archibald@asm.ca.gov; bmcgovern@women.ca.gov; cgumacal@women.ca.gov; tspira@ucsc.edu; Patrick, Deborah; Lattimore, Mary; aspmrs@yahoo.com; carole.d'elia@lhc.ca.gov; susanf@womensfoundca.org; gnewby@friendsoutside.org; mraeder@swlaw.edu; Barnes, Dodie; Tfarmon@aol.com
**Subject:** Governor to consider early inmate release

SFGate.com

# Governor to consider early inmate release

## Giving nonviolent convicts a break could ease crowding, stave off judges

Mark Martin, Chronicle Sacramento Bureau

Friday, February 23, 2007

(02-23) 04:00 PST Sacramento -- Gov. Arnold Schwarzenegger said Thursday he would consider releasing some inmates before they complete their sentences to alleviate prison overcrowding, marking a significant shift in position by the governor as he faces mounting pressure from federal judges to address the state's jam-packed prisons.

Schwarzenegger said at a news conference that he was open to discussing early release for some inmates without violent histories as a way to create space in prisons and to head off potential federal court intervention.

Schwarzenegger, who has proposed spending nearly $11 billion to add prison space to accommodate more inmates,

E_CDCR_017808

faces a summer deadline from three federal judges who are considering imposing a population limit on the system. He made his comments a week after U.S. District Court Judge Thelton Henderson scheduled a hearing for June to consider a limit and seemed to indicate he wanted fewer people behind bars.

In his order, Henderson asked the administration to tell him within 90 days how it would reduce the inmate population by next year -- a question that suggests the judge will not accept proposals to build more prisons as an answer to overcrowding.

"The judge seems to be saying it's not possible for the state to build its way out of the problem," said Steve Fama, an attorney for the Prison Law Office, which is seeking the population limit on behalf of inmates with medical problems, mental health problems and disabilities.

Two other federal judges, Lawrence Karlton and Claudia Wilken, also have scheduled hearings for this summer to consider population limits, and Karlton promised in December that he would begin procedures to implement a limit if the state didn't improve prison conditions this year.

Schwarzenegger said Henderson's order, issued last week, was a factor in his decision to put all options on the table. A court-imposed cap could potentially lead to early releases anyway; the governor said, "If we don't clean up the mess, the federal courts will do it for us."

Asked by a reporter if he would consider releasing some inmates early, Schwarzenegger said, "We have to look at all the different possibilities on how to free up some beds."

Schwarzenegger, who met behind closed doors with legislative leaders for about an hour Thursday morning to discuss prison issues, has previously said he would oppose any effort to reduce sentences of inmates

But the political feasibility of releasing some inmates early remained a major question mark.

Schwarzenegger's aides released a comment from the governor late in the day trying to clarify his remarks, suggesting there had been a discussion with lawmakers about "the potential release of the old, feeble and sick who pose no threat to the public" but that the governor didn't favor releasing anyone early -- he is only open to discussing it. Neither Assembly Speaker Fabian Núñez, D-Los Angeles, nor Senate President Pro Tem Don Perata, D-Oakland, would comment on the early release possibility.

Assembly Republican Leader Michael Villines, R-Clovis (Fresno County), issued a statement saying, "We will not support releasing those who have committed crimes until they have served their time."

The nonpartisan Legislative Analyst's Office recommended in 2003 and 2004 releasing some elderly inmates early, noting that a federal study found that only 3 percent of ex-convicts over the age of 55 committed a new crime once let out of prison, compared with a 45 percent recidivism rate among 18- to 49-year-olds.

The state currently has more than 9,000 inmates 55 and older.

And the state's prison guards union, known for promoting tough-on-crime issues, issued a proposal last month to help solve the overcrowding crisis that included releasing some nonviolent inmates 30 days early.

The state houses more than 86,000 inmates for nonviolent crimes, including more than 36,000 for drug crimes, although it is unclear how many of those inmates have past violent crimes on their records.

With 171,000 inmates living in prison space built for 100,000, Schwarzenegger and legislative leaders have pledged to reach consensus on prison reforms this year.

The governor has proposed adding space at existing prisons and building 45,000 new county jail beds and new re-entry facilities in urban areas. Schwarzenegger also has suggested creating a commission to study changes to sentencing and parole policies, and he is proposing in his budget plan to eliminate parole for some felons and lessen the length of parole for others. The parole changes would probably reduce the prison population because it would mean fewer parolees returning to prison for violating conditions of their parole.

But with the governor's only short-term solution to overcrowding facing a legal challenge -- he is appealing a Superior Court judge's ruling against a plan to ship inmates to prisons in other states -- reducing the prison population by early releases might be the only way to appease the judges this year.

"By the governor's own admission, the prisons are dangerously overcrowded right now," said Michael Bien, a San Francisco attorney working with the Prison Law Office on the population cap requests. "Building new buildings, which will

take years, won't do."

*E-mail the writer at markmartin@sfchronicle.com.*

http://sfgate.com/cgi-bin/article.cgi?f=/chronicle/archive/2007/02/23/MNGD7O9UNN1.DTL

**************************************
AOL now offers free email to everyone. Find out more about what's free from AOL at http://www.aol.com.

EXHIBIT N

GOVERNOR ARNOLD SCHWARZENEGGER

April 26, 2007

The Honorable Dick Ackerman
Senate Republican Leader
State Capitol
Room 305
Sacramento, California 95814

Dear Senator Ackerman,

Thank you for your continued leadership on prison reform and for the work you have accomplished with respect to the need to add capacity to our local jails. Without your efforts, California would be facing certain early release of felons ordered by the federal court.

In order to address some of the concerns raised by your Caucus, I will be immediately exploring all options, including issuing an Executive Order, introducing subsequent legislation or directing the Secretary of the Department of Corrections and Rehabilitation to do the following:

- Evaluate all alternative construction methods for construction of reentry facilities and infill capacity within the prisons;
- Looking at any options for housing inmates in existing facilities within the state that are not being utilized before inmates are transferred out of state;
- Developing cost containments for proposed construction;
- Evaluating regulatory impediments to construction and whether waiver of regulations benefit the state; and
- Addressing local mitigation issues for communities that are impacted by current prison facilities.

Passage of AB 900, along with addressing the issues outlined above, will ensure that the state can continue to protect public safety. Again, thank you for your efforts.

Sincerely,

Arnold Schwarzenegger

/ck

# EXHIBIT FF

Article

SFGate.com

# Uncertainty in the ranks over prison plan

## Schwarzenegger's proposal not enough, say 2 of his officials

James Sterngold, Chronicle Staff Writer

Sunday, July 23, 2006

She became what kind of "dancer"?!

Broadway

Showgirl

Exotic

Two top Schwarzenegger administration officials said in an interview that the governor's nearly $4 billion emergency plan for repairing the failing state corrections system will still leave the prisons crowded far beyond their capacity and does not address costly problems such as a major crisis in staff vacancies and medical care.

Gov. Arnold Schwarzenegger has called for a special session of the Legislature, to begin Aug. 7, to address what his administration now describes as a public safety emergency in the state's 33 prisons. With a record 172,000 inmates, the system is operating at double capacity and, by the administration's own admission, nearly every service and treatment program is in a state of collapse.

In the interview, Susan Kennedy, the governor's chief of staff, defended the governor's record but described the prisons as part of "a system that is so broken it's a powder keg."

In fact, she used the expression "powder keg" twice, and James Tilton, the director of the Department of Corrections and Rehabilitation, acknowledged in the interview that, because of the breakdown in training and therapeutic programs, 75 percent of the inmates in some prisons have no activities at all during the day, which he described as a volatile and unsustainable problem.

"That scares me to death, but I can't do anything about programs if I haven't got any space," Tilton said.

With an election approaching, the Republican governor has offered a large, expensive package of corrective measures for the Legislature to debate, relying heavily on a massive construction scheme for expanding existing prisons and building new ones. In addition, the governor proposed building as many as 25 new types of smaller prisons, called "re-entry program facilities," focused on treatment and therapy for inmates nearing release.

Most of these re-entry prisons, which would be intended to keep more parolees out of prison by helping them find jobs and stay off drugs, would be located within urban areas throughout the state where the inmates came from, which means a large number would be in the Bay Area and the Los Angeles area.

But, if anything, the new plan understates the total costs taxpayers will have to bear to fix the ailing system. The corrections department currently spends close to $9 billion a year. That figure would likely soar under the governor's plan because of the need to pay for large increases in staff, the costs of a proposal to transfer thousands of prisoners to for-pay prisons in other states and unprecedented increases in the number of parole agents and drug treatment experts envisioned.

Kennedy and Tilton admitted in the interview that the governor's package is riddled with unanswered questions, includes an ambitious construction schedule and leaves out some potentially costly issues that will have to be addressed later -- such as the need to fill the high number of vacancies in critical staff jobs.

With 172,000 inmates, the system already has about 85,000 more inmates than it was designed for, and 16,000 inmates are living in makeshift facilities such as tents and gyms, which Kennedy called unacceptable.

"I've overcrowded all I can safely," Tilton said.

In addition, the corrections department projects the population will swell to 193,000 by 2011. Making matters worse, the state has been ordered by a federal judge to spend what could amount to more than $1 billion on separate new facilities for the rising number of severely mentally ill inmates.

A number of prison experts have harshly criticized Schwarzenegger's latest plan because, they say, there is no way he can build prisons fast enough to keep up with the expected inflow of convicted criminals and the constant reincarceration of parolees. (The governor's Democratic challenger, Phil Angelides, has offered a plan that similarly relies heavily on new prison construction.)

California has one of the highest recidivism rates in the country, with close to 70 percent of inmates ending up back in prison within three years, a cycle that Schwarzenegger came into office pledging to break, but with no success. Many experts have urged more spending to try to sharply reduce the rate at which parolees return to prison, through drug treatment, education, rehabilitation and therapy rather than spending to build new prison cells.

Kennedy said that if the state succeeds in creating more than 40,000 new beds by 2021, as envisioned, the prison system still would be operating at far more than its designed capacity. She said it would be less than double, but neither she nor Tilton said they knew what the level would be.

"We'll always be over the design capacity," Kennedy said.

And both officials said additional money would be needed to construct space for rehabilitation, treatment, medical care and training programs -- costs that are not included in the governor's plan.

Adding all the new beds under the plan itself is a stretch, the two officials admitted. For instance, Tilton said, it could be difficult to win approvals from the communities where the small re-entry prisons would be located because of concerns over public safety.

Kennedy said there had already been some conversations with local [illegible] refused to even permit their names or locations to be disclosed.

"That issue is so real," Kennedy said. "It's never going to be easy to sell" the idea of constructing these new prisons in crowded communities.

Kennedy acknowledged that, although it has made many proposals, the Schwarzenegger administration had failed to make much headway in prison reform and that the prospects for building new rehabilitation programs were limited at best.

"We have now hit a wall on programming based on overcrowding," Kennedy said. "We are now sitting on a powder keg over here."

The governor came into office promising, for instance, that a new parole reform program, which would send many nonviolent parole violators into treatment programs rather than back to prison, would slash the inmate population by nearly 20,000. But within a year he abandoned the program, allowing the population to grow even larger.

A federal judge ordered the governor to reinstate the programs but, eight months later, the state has failed.

Kennedy bitterly criticized Schwarzenegger's predecessor, Gov. Gray Davis, for accelerating the decline of the state's prisons by slashing budgets and leaving the corrections department strapped. Kennedy has been the subject of much controversy because she is a Democrat and was Davis' chief of staff, which means she was intimately involved in policy planning. But she blamed herself and her colleagues for creating the current prison crisis.

"It wasn't just a reduction in programs," said Kennedy of the Davis administration. "We gutted programs."

Schwarzenegger's new package does not include what would probably be rocketing increases in the prison system's $9 billion operating costs.

In addition, Tilton said, the plan includes no allowance for expected increases in costs for operating the prison health care system, which has been seized by a federal district court judge and placed under a receiver because of its failures.

Tilton said the department would have to wait for the receiver to issue his recovery plan before beginning to account for those expenses, which the receiver has indicated could come to billions of dollars in the coming years.

Among the problems hampering the Department of Corrections and Rehabilitation has been the fact that the longtime director, Roderick Hickman, resigned abruptly in April, followed a few weeks later by his successor.

A court-appointed receiver recently accused Kennedy of playing a role in those disruptions, saying she had undermined the directors by going behind their backs to deal directly with the leaders of the powerful prison guards union -- which has always been a big influence in state elections.

Kennedy flatly denied in the interview that she had done anything wrong, and she defended her conversations with union officials as essential for improving the ailing prisons. She insisted that she would do nothing differently, and that the governor had supported both directors before they quit.

Asked if the governor's latest plan involved election-year politics, Kennedy denied it.

"Whether or not this is seen as political is out of our hands," said Kennedy, noting that some elements of the plan, such as moving many female inmates to community facilities closer to their homes, have been discussed for many months.

"There's no more room for delay," she said.

*E-mail James Sterngold at jsterngold@sfchronicle.com.*

http://sfgate.com/cgi-bin/article.cgi?f=/c/a/2006/07/23/MNG18K42CC1.DTL

This article appeared on page **A - 2** of the San Francisco Chronicle

San Francisco Chronicle Sections Go

© 2006 Hearst Communications Inc. | Privacy Policy | Feedback | RSS Feeds | FAQ | Site Index | Contact