EXHIBIT FF

**SFGate**.com   Print This Article | Back to Article

**SFGate**.com

# Uncertainty in the ranks over prison plan

## Schwarzenegger's proposal not enough, say 2 of his officials

James Sterngold, Chronicle Staff Writer
Sunday, July 23, 2006



She became what kind of "dancer"?!



⊙ Broadway    ⊙ Showgirl    ⦿ Exotic





Two top Schwarzenegger administration officials said in an interview that the governor's nearly $4 billion emergency plan for repairing the failing state corrections system will still leave the prisons crowded far beyond their capacity and does not address costly problems such as a major crisis in staff vacancies and medical care.

Gov. Arnold Schwarzenegger has called for a special session of the Legislature, to begin Aug. 7, to address what his administration now describes as a public safety emergency in the state's 33 prisons. With a record 172,000 inmates, the system is operating at double capacity and, by the administration's own admission, nearly every service and treatment program is in a state of collapse.

In the interview, Susan Kennedy, the governor's chief of staff, defended the governor's record but described the prisons as part of "a system that is so broken it's a powder keg."

In fact, she used the expression "powder keg" twice, and James Tilton, the director of the Department of Corrections and Rehabilitation, acknowledged in the interview that, because of the breakdown in training and therapeutic programs, 75 percent of the inmates in some prisons have no activities at all during the day, which he described as a volatile and unsustainable problem.

"That scares me to death, but I can't do anything about programs if I haven't got any space," Tilton said.

With an election approaching, the Republican governor has offered a large, expensive package of corrective measures for the Legislature to debate, relying heavily on a massive construction scheme for expanding existing prisons and building new ones. In addition, the governor proposed building as many as 25 new types of smaller prisons, called "re-entry program facilities," focused on treatment and therapy for inmates nearing release.

Most of these re-entry prisons, which would be intended to keep more parolees out of prison by helping them find jobs and stay off drugs, would be located within urban areas throughout the state where the inmates came from, which means a large number would be in the Bay Area and the Los Angeles area.

But, if anything, the cost is also the retail that total costs taxpayers will have to bear to fix the ailing system. The corrections department currently spends close to $9 billion a year. That figure would likely soar under the governor's plan because of the need to pay for large increases in staff, the costs of a proposal to transfer thousands of prisoners to for-pay prisons in other states and unprecedented increases in the number of parole agents and drug treatment experts envisioned.

Kennedy and Tilton admitted in the interview that the governor's package is riddled with unanswered questions, includes an ambitious construction schedule and leaves out some potentially costly issues that will have to be addressed later -- such as the need to fill the high number of vacancies in critical staff jobs.

With 172,000 inmates, the system already has about 85,000 more inmates than it was designed for, and 16,000 inmates are living in makeshift facilities such as tents and gyms, which Kennedy called unacceptable.

"I've overcrowded all I can safely," Tilton said.

In addition, the corrections department projects the population will swell to 193,000 by 2011. Making matters worse, the state has been ordered by a federal judge to spend what could amount to more than $1 billion on separate new facilities for the rising number of severely mentally ill inmates.

A number of prison experts have harshly criticized Schwarzenegger's latest plan because, they say, there is no way he can build prisons fast enough to keep up with the expected inflow of convicted criminals and the constant reincarceration of parolees. (The governor's Democratic challenger, Phil Angelides, has offered a plan that similarly relies heavily on new prison construction.)

California has one of the highest recidivism rates in the country, with close to 70 percent of inmates ending up back in prison within three years, a cycle that Schwarzenegger came into office pledging to break, but with no success. Many experts have urged more spending to try to sharply reduce the rate at which parolees return to prison, through drug treatment, education, rehabilitation and therapy rather than spending to build new prison cells.

Kennedy said that if the state succeeds in creating more than 40,000 new beds by 2021, as envisioned, the prison system still would be operating at far more than its designed capacity. She said it would be less than double, but neither she nor Tilton said they knew what the level would be.

"We'll always be over the design capacity," Kennedy said.

And both officials said additional money would be needed to construct space for rehabilitation, treatment, medical care and training programs -- costs that are not included in the governor's plan.

Adding all the new beds under the plan itself is a stretch, the two officials admitted. For instance, Tilton said, it could be difficult to win approvals from the communities where the small re-entry prisons would be located because of concerns over public safety.

Kennedy said there had already been some conversations with local police officials, but that they refused to even permit their names or locations to be disclosed.

"That issue is so real," Kennedy said. "It's never going to be easy to sell" the idea of constructing these new prisons in crowded communities.

Kennedy acknowledged that, although it has made many proposals, the Schwarzenegger administration had failed to make much headway in prison reform and that the prospects for building new rehabilitation programs were limited at best.

"We have now hit a wall on programming based on overcrowding," Kennedy said. "We are now sitting on a powder keg over here."

The governor came into office promising, for instance, that a new parole reform program, which would send many nonviolent parole violators into treatment programs rather than back to prison, would slash the inmate population by nearly 20,000. But within a year he abandoned the program, allowing the population to grow even larger.

A federal judge ordered the governor to reinstate the programs but, eight months later, the state has failed.

Kennedy bitterly criticized Schwarzenegger's predecessor, Gov. Gray Davis, for accelerating the decline of the state's prisons by slashing budgets and leaving the corrections department strapped. Kennedy has been the subject of much controversy because she is a Democrat and was Davis' chief of staff, which means she was intimately involved in policy planning. But she blamed herself and her colleagues for creating the current prison crisis.

"It wasn't just a reduction in programs," said Kennedy of the Davis administration. "We gutted programs."

Schwarzenegger's new package does not include what would probably be rocketing increases in the prison system's $9 billion operating costs.

In addition, Tilton said, the plan includes no allowance for expected increases in costs for operating the prison health care system, which has been seized by a federal district court judge and placed under a receiver because of its failures.

Tilton said the department would have to wait for the receiver to issue his recovery plan before beginning to account for those expenses, which the receiver has indicated could come to billions of dollars in the coming years.

Among the problems hampering the Department of Corrections and Rehabilitation has been the fact that the longtime director, Roderick Hickman, resigned abruptly in April, followed a few weeks later by his successor.

A court-appointed receiver recently accused Kennedy of playing a role in those disruptions, saying she had undermined the directors by going behind their backs to deal directly with the leaders of the powerful prison guards union -- which has always been a big influence in state elections.

Kennedy flatly denied in the interview that she had done anything wrong, and she defended her conversations with union officials as essential for improving the ailing prisons. She insisted that she would do nothing differently, and that the governor had supported both directors before they quit.

Asked if the governor's latest plan involved election-year politics, Kennedy denied it.

"Whether or not this is seen as political is out of our hands," said Kennedy, noting that some elements of the plan, such as moving many female inmates to community facilities closer to their homes, have been discussed for many months.

"There's no more room for delay," she said.

*E-mail James Sterngold at jsterngold@sfchronicle.com.*

http://sfgate.com/cgi-bin/article.cgi?f=/c/a/2006/07/23/MNG18K42CC1.DTL

This article appeared on page **A - 2** of the San Francisco Chronicle

| San Francisco Chronicle Sections | Go |

© 2006 Hearst Communications Inc. | Privacy Policy | Feedback | RSS Feeds | FAQ | Site Index | Contact

7/24/2008 9:06 AM

EXHIBIT GG

**From:** Dan.Dunmoyer@GOV.CA.GOV
**Sent:** Saturday, December 23, 2006 9:42:38 AM
**To:** Tilton, Jim
**CC:** Jennifer.Grutzius@GOV.CA.GOV
**Subject:** Re: SF CHRON: Gang Intimidation Threatens Schwarzenegger's Prison Plan n

Let's do it. I will work with Jennifer to set this up. D2

-----Original Message-----
From: Tilton, Jim <Jim.Tilton@cdcr.ca.gov>
To: Dan.Dunmoyer@GOV.CA.GOV <Dan.Dunmoyer@GOV.CA.GOV>
Sent: Sat Dec 23 09:42:50 2006
Subject: Re: SF CHRON: Gang Intimidation Threatens Schwarzenegger's Prison
Plan n

If you can give me an hour next week I would like to give you a run down on
the hot button issues I have been dealing with in the last 6 months.

----- Original Message -----
From: Dan.Dunmoyer@GOV.CA.GOV <Dan.Dunmoyer@GOV.CA.GOV>
To: Tilton, Jim
Sent: Sat Dec 23 09:30:51 2006
Subject: Re: SF CHRON: Gang Intimidation Threatens Schwarzenegger's Prison
Plan n

Jim, I could have sworn you told me yesterday that we could not legally do
this, and thus would not do it. Sorry for the miscommunication to Susan.
Please be more blunt with me in the future on these options. I missed this
nuance. Thx D2

-----Original Message-----
From: Tilton, Jim <Jim.Tilton@cdcr.ca.gov>
To: Louis.Mauro@GOV.CA.GOV <Louis.Mauro@GOV.CA.GOV>; SPKenned█████
<SPKenned██████████>; Dan.Dunmoyer@GOV.CA.GOV <Dan.Dunmoyer@GOV.CA.GOV>;
andrea.hoch█████@GOV.CA.GOV <andrea.hoch@GOV.CA.GOV>
CC: fred.aguiar@gov.ca.gov <fred.aguiar@gov.ca.gov>; Tami.Bogert@GOV.CA.GOV
<Tami.Bogert@GOV.CA.GOV>; Runnels, David <David.Runnels@cdcr.ca.gov>;
Prunty, Kingston "Bud" <Bud.Prunty@cdcr.ca.gov>; Kernan, Scott
<Scott.Kernan@cdcr.ca.gov>
Sent: Sat Dec 23 09:17:34 2006
Subject: Re: SF CHRON: Gang Intimidation Threatens Schwarzenegger's Prison
Plan n

Took my nquil and went to bed early last night trying to break this cold.
Here is the current status as I see it. We have 500 inmates being
transported to arizona on a flow basis with the final mental health
screening controlling the speed, about 80 per week. The 560 beds in arizona
will be full by the end of january. My staff have been working on criteria
for involluntary transfers with legal. The main issue I think is do we use
the exec order criteria with the focus on ice inmates or do we do all
inmates but look at those that don't have visiters. I will. Check on
tuesday, but I think I can contract with liberty to start the mental health
screening of involuntary transfers. Of course, I will have to get keating's

ok. Dropping the involuntary issue on the table now will minimize the delay
and help us with our contractors. Are ability to fill beds beyond tenn and
arizona is based on the success of involuntary transfers.

----- Original Message -----
From: Louis.Mauro@GOV.CA.GOV <Louis.Mauro@GOV.CA.GOV>
To: SPKennedy███████<SPKennedy████████; Dan.Dunmoyer@GOV.CA.GOV
<Dan.Dunmoyer@GOV.CA.GOV>; Tilton, Jim; Andrea.Hoch@GOV.CA.GOV
<Andrea.Hoch@GOV.CA.GOV>
Cc: Fred.Aguiar@GOV.CA.GOV <Fred.Aguiar@GOV.CA.GOV>; Tami.Bogert@GOV.CA.GOV
<Tami.Bogert@GOV.CA.GOV>
Sent: Fri Dec 22 23:16:43 2006
Subject: Re: SF CHRON: Gang Intimidation Threatens Schwarzenegger's Prison
Plan n

Yes, involuntary transfers were included, but we told CDCR to be sure to
completely exhaust voluntary transfers first, and then to provide us with
the precise criteria for who would be involuntarily transferred.

---------------------------
Sent from my BlackBerry Wireless Device


-----Original Message-----
From: SPKennedy███████<SPKennedy████████>
To: Dan.Dunmoyer@GOV.CA.GOV <Dan.Dunmoyer@GOV.CA.GOV>;
jim.tilton@cdcr.ca.gov <jim.tilton@cdcr.ca.gov>; Andrea.Hoch@GOV.CA.GOV
<Andrea.Hoch@GOV.CA.GOV>; Louis.Mauro@GOV.CA.GOV <Louis.Mauro@GOV.CA.GOV>
CC: Fred.Aguiar@GOV.CA.GOV <Fred.Aguiar@GOV.CA.GOV>
Sent: Fri Dec 22 22:55:15 2006
Subject: Re: SF CHRON: Gang Intimidation Threatens Schwarzenegger's Prison
Plan n

let me be technically accurate. the declaration allows for the suspension.
the executive order that began the transfers specifically said we would go
voluntary first, then involuntary. yes we will be sued, but we always knew
that. right now we look like weenies.

In a message dated 12/22/2006 10:48:07 PM Pacific Standard Time,
Dan.Dunmoyer@GOV.CA.GOV writes:

Jim. Since this is the case what are the next steps to get this done? D2

-----Original Message-----
From: SPKennedy███████<SPKennedy████████>
To: Dan.Dunmoyer@GOV.CA.GOV <Dan.Dunmoyer@GOV.CA.GOV>;
Jim.Tilton@cdcr.ca.gov <Jim.Tilton@cdcr.ca.gov>; Andrea.Hoch@GOV.CA.GOV
<Andrea.Hoch@GOV.CA.GOV>; Louis.Mauro@GOV.CA.GOV <Louis.Mauro@GOV.CA.GOV>
CC: Fred.Aguiar@GOV.CA.GOV <Fred.Aguiar@GOV.CA.GOV>
Sent: Fri Dec 22 22:44:09 2006
Subject: Re: SF CHRON: Gang Intimidation Threatens Schwarzenegger's Prison
Plan n

E_PRIV_053404

wrong.  we specifically wrote the executive order declaring an emergency to
suspend that statutory requirement.  we have been planning to go voluntary
first and involuntary when necessary.  we signed contracts that put us on
hook for beds.  we told political leaders and the public we were prepared to
go involuntary.  no one made a decision to change that strategy

In a message dated 12/22/2006 10:36:03 PM Pacific Standard Time,
Dan.Dunmoyer@GOV.CA.GOV writes:


Jim gave me the heads up on this today.  The problem is that the law
precludes us to move inmates unless the movement is voluntary.  Last year in
the Special Session we tried to change the law to allow involuntary movement
but the Senate Dems killed the proposal.  We need to make involuntary
movement legal to address this problem (which Jim has said CDCR will push
for again).  Even though we "lost " the beds there are other beds that are
committed to us once we have the voluntary prisoners.  D2



-----Original Message-----
From: SPKenned███████████[ mailto:SPKennedy██████
Sent: Friday, December 22, 2006 10:25 PM
To: Jim.Tilton@cdcr.ca.gov; Andrea.Hoch@GOV.CA.GOV; Louis.Mauro@GOV.CA.GOV
Cc: dan.dunmoyer@gov.ca.gov; Fred.Aguiar@GOV.CA.GOV
Subject: Fwd: SF CHRON: Gang Intimidation Threatens Schwarzenegger's Prison
Pla n


why are we not moving on involuntary?  why did we not move faster so as not
to lose the arizona facility?


In a message dated 12/22/2006 5:39:39 PM Pacific Standard Time,
NewsRoom@GOV.CA.GOV writes:

http://www.sfgate.com/cgi-bin/article.cgi?f=/c/a/2006/12/22/BAG9ON2INC21.DTL


San Francisco Chronicle: Gang Intimidation Threatens Schwarzenegger's Prison
Plan


Few inmates volunteer to move to other states


Sacramento -- Gov. Arnold Schwarzenegger's plan to ship thousands of

California inmates to prisons in other states to reduce overcrowding is faltering because few prisoners - some intimidated by powerful gangs -- have volunteered to move.

Well entrenched prison gangs worried about losing numbers, and control, have ordered inmates not to cooperate with corrections officials looking for volunteers to go to prisons in states like Tennessee and Arizona, according to sources familiar with the prison system.

Rumors are also spreading throughout the state's 33 prisons that federal judges are poised to take over the jam-packed system and release thousands of inmates, leaving many unwilling to ship out now and potentially miss out on going free.

The shortage of volunteers threatens the only short-term proposal the administration has come up with to handle overcrowding so severe that the system is on the verge of running out of room. It may lead to corrections officials forcing unwilling inmates to leave the state, something that would likely draw lawsuits and potentially spark violence.

To help drum up interest, the administration is showing a 20-minute video in prisons across the state featuring interviews with a handful of inmates that have moved to a Tennessee lockup. The video includes prisoners praising their new home for amenities like cable television and better hot meals, as well as access to educational classes that are largely unavailable in California prisons.

"We have ESPN," says one inmate with a tattoo of barbed wire running around his neck as he looks into the camera.

With nearly 173,000 inmates crammed into a system designed to hold about 100,000, Schwarzenegger in October declared a state of emergency as he acknowledged that overcrowding was at dangerous levels. More than 16,000 inmates are sleeping on bunk beds in dayrooms and other areas not intended as living quarters, and secretary of corrections Jim Tilton has predicted even those spaces will be filled by next summer.

Schwarzenegger this week announced proposals to deal with overcrowding, but virtually all of his plan is long-term: building facilities with 78,000 new

E_PRIV_053406

beds, as he has called for, will take years. The governor also called for a
commission to study ways to change sentencing and parole policies that might
cut the inmate population, but that too is years away.

The only short-term solution was announced in October, when the
administration entered into contracts with two private prison companies to
send inmates to out-of-state facilities. At the time, Tilton said he hoped
to ship 5,000 inmates out of state and that a preliminary survey of inmates
indicated 19,000 were interested in leaving their cramped quarters for
less-crowded facilities.

Now, however, the department acknowledges it is having difficulty finding
volunteers.

So far, only 118 inmates have left the state, with 80 going to a Tennessee
prison last month and 38 to an Arizona prison this week.

The department lost out on an opportunity this month to send as many as
1,200 inmates to an Indiana prison run by the company Geo Group because it
couldn't round up enough willing inmates. The company got an offer from the
state of Arizona to fill the prison with Arizona inmates. The company's CEO
flew out to Sacramento to tell the state it was going to make a deal with
Arizona.

"There's no question that it's been harder than we thought," said Bill
Sessa, a spokesman for the Department of Corrections and Rehabilitation.

Sessa said the department was preparing to send about 500 more inmates to
Arizona within the next six weeks, but "peer pressure and gang pressure are
factors" in discouraging inmates from leaving.

California's prison system is dominated by ethnically based gangs that wield
tremendous power in each yard.

At Pleasant Valley State Prison in Coalinga, for example, orders from gang
leaders - referred to as shot-callers - of two Latino gangs instructing
members to fight each other immediately upon crossing paths has led the

E_PRIV_053407

prison to keep every gang member locked in their cell for months. A prison near Sacramento dispersed thousands of members of one prison gang to other prisons in the state last year because officials believed they had too much control over the prison. Prison officials in each lockup must consider gang affiliations when assigning inmates to cellblocks.

Sources familiar with prison operations who spoke on the condition of anonymity because they are not authorized to speak on behalf of the department say that gang leaders have instructed members not to take the offer of moving out-of-state because it will upset balances of power in prisons and leave gang members left vulnerable due to reduced numbers.

"The last thing they want is to have their lines of communication broken, which is what would happen if they have gang members move out of state," noted Joan Petersilia, a UC Irvine professor of criminology who has studied the California corrections system extensively. "The resistance of gangs was predictable to the transfer plan."

Along with the gang resistance, rumors are swirling among prisoners that overcrowding will soon lead to a federal takeover of the system.

One source who asked not to be named because he is in frequent contact with inmates said he had been to three separate prisons in the last few weeks and heard the same rumor at each prison: a judge would soon control the corrections department and release 40,000 inmates.

Inmates fear they will not be among those chosen to go free if they are in another state.

While lawyers representing inmates have asked three federal judges to impose a population cap on the system, it is improbable that any judge would order mass releases.

Other factors are also affecting the state's plan.

Maximum-security prisoners and those with medical or mental-health problems are not eligible to go, limiting the pool.

E_PRIV_053408

The inability to find volunteer inmates could lead to involuntary transfers. The governor's emergency declaration in October calls for waiving a state law requiring the permission of an inmate to send him outside the state.

While the department has had internal discussions about forcing inmates to leave California, Sessa said the goal was still to find volunteers.

"We still believe if you're the middle guy in the middle bunk in the middle of a dayroom you will find it appealing to leave," he said.

Sessa noted the department hopes that inmates who are trying to leave a gang situation might be tempted to leave the state, noting that the 80 inmates who moved to Tennessee apparently agreed on the plane ride to their new home to disregard the gang and race issues that are an integral part of California prisons.

The inmates in Tennessee are housed two to a cell and have racially integrated cells, something that is uncommon in California.

Forced transfers would bring scrutiny from the Prison Law Office, which represents inmates.

"We have very serious questions about the legality of forcing someone to go thousands of miles from their families and from the area where they will ultimately parole," said Steve Fama, whose group has sued the state countless times over poor conditions in state prisons.

And a spokesman for the state's prison guards union warned that moving unwilling inmates to other states would be dangerous.

"We have a lot of concern over being asked to wrestle someone out of their cell and force them on to a bus to Louisiana or someplace," said Chuck Alexander, an executive vice president of the California Correctional Peace Officers Association.

E_PRIV_053409

EXHIBIT HH

1  EDMUND G. BROWN JR.
   Attorney General of the State of California
2  DAVID S. CHANEY
   Chief Assistant Attorney General
3  FRANCES T. GRUNDER
   Senior Assistant Attorney General
4  ROCHELLE C. EAST
   Supervising Deputy Attorney General
5  LISA A. TILLMAN, State Bar No. 126424
   Deputy Attorney General
6   1300 I Street, Suite 125
    P.O. Box 944255
7   Sacramento, CA 94244-2550
    Telephone: (916) 327-7872
8   Fax: (916) 324-5205
    Email: Lisa.Tillman@doj.ca.gov
9

HANSON BRIDGETT MARCUS
VLAHOS & RUDY, LLP
JERROLD C. SCHAEFER - 39374
PAUL B. MELLO - 179775
425 Market Street, 26th Floor
San Francisco, CA 94105
Telephone: (415) 777–3200
Facsimile: (415) 541- 9366
jschaefer@hansonbridgett.com
pmello@hansonbridgett.com

10  Attorneys for Defendants

11

12

13          IN THE UNITED STATES DISTRICT COURT
14          FOR THE EASTERN DISTRICT OF CALIFORNIA
            AND THE NORTHERN DISTRICT OF CALIFORNIA
15  UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES
    PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

16

17  RALPH COLEMAN, et al.,                          2:90-cv-00520 LKK JFM P

18                              Plaintiffs,

19              v.                                   THREE-JUDGE COURT

20

21  ARNOLD SCHWARZENEGGER, et al.,

22                              Defendants.
                                                    No. C01-1351
23  MARCIANO PLATA,

24                              Plaintiffs,          THREE JUDGE COURT

25              v.
                                                    DEFENDANT GOVERNOR
26  ARNOLD SCHWARZENEGGER,                          SCHWARZENEGGER'S
                                                    RESPONSES TO PLAINTIFF
27                              Defendants.          COLEMAN'S FIRST SET OF
                                                    INTERROGATORIES
28  //

1  Propounding Party:  Ralph Coleman

2  Responding Party:  Defendant Governor Arnold Schwarzenegger

3  Set No.:          One

### DEFINITIONS

5      In construing these discovery responses, the following definitions shall apply:

6      1.   "PLAINTIFFS" shall mean class representatives Ralph Coleman, et al., the named

7  plaintiffs in the action *Coleman v. Schwarzenegger,* Case No. 90-0520 LKK JFM (E.D. Cal.)

8  (*Coleman*).

9      2.   "DEFENDANT" shall mean Governor Arnold Schwarzenegger, a named defendant in

10  the case of *Coleman* v. *Schwarzenegger.*

11      3.   "DEFENDANTS" shall mean each of the named defendants in the case of *Coleman* v.

12  *Schwarzenegger,* including James Tilton in his official capacity on behalf of the California

13  Department of Corrections and Rehabilitation (CDCR), Stephen Mayberg in his official capacity

14  on behalf of the Department of Mental Health (DMH), Michael Genest in his official capacity on

15  behalf of the Department of Finance (DOF), and the Governor.

16      4.   "PROCEEDING" shall mean the three-judge panel proceeding convened under 28

17  U.S.C. Section 2284 in the cases of *Coleman* and *Plata.*

### OVERALL OBJECTIONS TO INTERROGATORIES

19      1.   DEFENDANT objects to Plaintiffs' definition of a California Department of

20  Corrections and Rehabilitation (CDCR) prison and a "prison" to include those housing units

21  within Department of Mental Health (DMH) facilities that house CDCR prisoners.

22  (Interrogatories, p. 2.)  That definition mischaracterizes the role of DMH as a provider of housing

23  for incarcerated inmates.  DMH's true role is defined by California Penal Code section 2684 as a

24  provider of inpatient mental health treatment to CDCR inmate-patients.  Further, that definition

25  erroneously assumes the Governor's Emergency Proclamation of October 4, 2006 addressed

26  DMH as a provider of housing for incarcerated inmates.  DEFENDANT will interpret the terms

27  "CDCR prison" and "prison" for the purposes of this request to mean those prisons within the

28  jurisdiction of the California Department of Corrections and Rehabilitation, pursuant to

Governor's Responses to Coleman Interrogatories, Set One

1  California Penal Code section 5054.

2      2.    DEFENDANT objects that the discovery seeks INFORMATION that is neither

3  relevant PLAINTIFFS' claims in this PROCEEDING nor reasonably calculated to lead to the

4  discovery of admissible evidence.  PLAINTIFFS have refused to identify what if any claims they

5  will be asserting in the PROCEEDING.  Consequently, DEFENDANT objects that the discovery

6  requires DEFENDANT to speculate what claims may or may not be asserted by PLAINTIFFS.

7      3.    DEFENDANT objects that the requests are seek information equally available to

8  PLAINTIFFS, and that the requests are overbroad and unduly burdensome.  In accordance with

9  the *Coleman* and *Plata* remedial orders, PLAINTIFFS receive a monthly document productions

10  and other discovery from DEFENDANT and the Receiver appointed in *Plata*.

11      4.    DEFENDANT states that PLAINTIFFS are already in possession of DEFENDANTS'

12  filed plans for the provision of mental health care beds, for the recruitment and retention of

13  staffing for those mental health beds, and for the implementation of appropriate mental health

14  care in those beds. DEFENDANT asserts the deliberative process privilege to all information

15  sought or contained in drafts of those *Coleman* plans, all drafts of any budget proposals to fund

16  those plans, and inter- and intra-Defendant emails concerning those plans.

17      5.    Given the shortened time for DEFENDANT'S responses to these interrogatories,

18  DEFENDANT hereby reserves the right to supplement these responses at a later date.

19      6.    To the extent any request seeks information from documents prepared, created, or

20  generated by the Office of the Inspector General, DEFENDANTS object to the discovery of such

21  information on the basis of the official information privilege and on the basis of the right to

22  privacy in medical, mental health, and personnel matters.  Non-privileged reports of the Office of

23  the Inspector General are available on its public web site.

24          **RESPONSES AND OBJECTIONS TO INTERROGATORIES**

25  INTERROGATORY NO. 1:

26          Do you contend that the state of emergency in the California prison system that you

27  declared, pursuant to your October 4, 2006 overcrowding proclamation, is now over?

28  //

1  RESPONSE TO INTERROGATORY NO. 1:

2      DEFENDANT objects that this request seeks information protected from disclosure by

3  the attorney-client privilege, attorney work product privilege, deliberative process privilege, self

4  critical analysis privilege, and official information privilege. DEFENDANT objects that this

5  interrogatory seeks information concerning the overall population of CDCR and so exceeds

6  Plaintiff Coleman's standing as a representative of the certified class of seriously mentally

7  disordered inmates and exceeds the jurisdiction of the *Coleman* case.

8      Subject to and without waiving the foregoing objections, DEFENDANT responds as

9  follows: No, the Governor has not terminated the Emergency Proclamation, and his

10  administration continues to aggressively use the emergency authority to address overcrowding in

11  ways that are less intrusive than a prisoner release order.

12  INTERROGATORY NO. 2:

13      If your response to interrogatory number one is affirmative, state all facts and identify all

14  documents and witnesses in support of your contention.

15  RESPONSE TO INTERROGATORY NO. 2:

16      Not applicable. See the objections and response to interrogatory number 1.

17  INTERROGATORY NO. 3:

18      Do you contend that the substantial risk to the health and safety of staff and inmates in

19  CDCR prisons caused by severe overcrowding in CDCR prisons that you cited in your

20  overcrowding proclamation has been alleviated?

21  RESPONSE TO INTERROGATORY NO. 3:

22      DEFENDANT objects that this request seeks information protected from disclosure by

23  the attorney-client privilege, attorney work product privilege, deliberative process privilege, self

24  critical analysis privilege, and official information privilege. DEFENDANT objects that this

25  interrogatory seeks information concerning the overall population of CDCR and so exceeds

26  Plaintiff Coleman's standing as a representative of the certified class of seriously mentally

27  disordered inmates and exceeds the jurisdiction of the *Coleman* case. Further, the interrogatory

28  is vague in the use of the word 'alleviated', as this word is subject to different meanings and is

1  not defined in the interrogatories.

2  　　　Subject to and without waiving the foregoing objections, DEFENDANT responds as

3  follows: The Governor has not terminated the Emergency Proclamation, and his

4  administration continues to aggressively use the emergency authority to address overcrowding in

5  ways that are less intrusive than a prisoner release order.

6  INTERROGATORY NO. 4:

7  　　　If your response to interrogatory number three is affirmative, state all facts and identify all

8  documents and witnesses in support of your contention.

9  RESPONSE TO INTERROGATORY NO. 4:

10  　　　Not applicable. See the objections and response to interrogatory number 3.

11  INTERROGATORY NO. 5:

12  　　　Do you contend that the substantial risk of violence in CDCR prisons caused by severe

13  overcrowding in CDCR prisons that you cited in your overcrowding proclamation has been

14  alleviated?

15  RESPONSE TO INTERROGATORY NO. 5:

16  　　　DEFENDANT objects that this request seeks information protected from disclosure by

17  the attorney-client privilege, attorney work product privilege, deliberative process privilege, self

18  critical analysis privilege, and official information privilege. DEFENDANT objects that this

19  interrogatory seeks information concerning the overall population of CDCR and so exceeds

20  Plaintiff Coleman's standing as a representative of the certified class of seriously mentally

21  disordered inmates and exceeds the jurisdiction of the *Coleman* case. Further, the interrogatory

22  is vague in the use of the word 'alleviated', as this word is subject to different meanings and is

23  not defined in the interrogatories.

24  　　　Subject to and without waiving the foregoing objections, DEFENDANT responds as

25  follows: The Governor has not terminated the Emergency Proclamation, and his

26  administration continues to aggressively use the emergency authority to address overcrowding in

27  ways that are less intrusive than a prisoner release order.

28  //

Governor's Responses to Coleman Interrogatories, Set One

1  INTERROGATORY NO. 6:

2       If your response to interrogatory number five is affirmative, state all facts and identify all

3  documents and witnesses in support of your contention.

4  RESPONSE TO INTERROGATORY NO. 6:

5       Not applicable.  See the objections and response to interrogatory number 5.

6  INTERROGATORY NO. 7:

7       Do you contend that the substantial risk of transmission of infectious diseases in CDCR

8  prisons caused by severe overcrowding in CDCR prisons that you cited in your overcrowding

9  proclamation has been alleviated?

10  RESPONSE TO INTERROGATORY NO. 7:

11       DEFENDANT objects that this request seeks information protected from disclosure by

12  the attorney-client privilege, attorney work product privilege, deliberative process privilege, self

13  critical analysis privilege, and official information privilege.  DEFENDANT objects that this

14  interrogatory seeks information concerning the overall population of CDCR and so exceeds

15  Plaintiff Coleman's standing as a representative of the certified class of seriously mentally

16  disordered inmates and exceeds the jurisdiction of the *Coleman* case.  Further, the interrogatory

17  is vague in the use of the word 'alleviated' as this word is subject to different meanings and is

18  not defined in the interrogatories.

19       Subject to and without waiving the foregoing objections, DEFENDANT responds as

20  follows:  The Governor has not terminated the Emergency Proclamation, and his

21  administration continues to aggressively use the emergency authority to address overcrowding in

22  ways that are less intrusive than a prisoner release order.

23  INTERROGATORY NO. 8:

24       If your response to interrogatory number seven is affirmative, state all facts and identify

25  all documents and witnesses in support of your contention.

26  RESPONSE TO INTERROGATORY NO. 8:

27       Not applicable.  See the objections and response to interrogatory number 7.

28  //

1  INTERROGATORY NO. 9:

2      Do you contend that the substantial security risk in CDCR prisons caused by severe

3  overcrowding in CDCR prisons that you cited in your overcrowding proclamation has been

4  alleviated?

5  RESPONSE TO INTERROGATORY NO. 9:

6      DEFENDANT objects that this request seeks information protected from disclosure by

7  the attorney-client privilege, attorney work product privilege, deliberative process privilege, self

8  critical analysis privilege, and official information privilege. DEFENDANT objects that this

9  interrogatory seeks information concerning the overall population of CDCR and so exceeds

10 Plaintiff Coleman's standing as a representative of the certified class of seriously mentally

11 disordered inmates and exceeds the jurisdiction of the *Coleman* case. Further, the interrogatory

12 is vague in the use of the word 'alleviated' as this word is subject to different meanings and is

13 not defined in the interrogatories.

14     Subject to and without waiving the foregoing objections, DEFENDANT responds as

15 follows: The Governor has not terminated the Emergency Proclamation, and his administration

16 continues to aggressively use the emergency authority to address overcrowding in ways that are

17 less intrusive than a prisoner release order.

18 INTERROGATORY NO. 10:

19     If your response to interrogatory number nine is affirmative, state all facts and identify all

20 documents and witnesses in support of your contention.

21 RESPONSE TO INTERROGATORY NO. 10:

22     Not applicable. See the objections and response to interrogatory number 9.

23 INTERROGATORY NO. 11:

24     Do you contend that the burdens on infrastructure (electrical systems and/or

25 wastewater/sewer systems) caused by severe overcrowding in CDCR prisons that you cited in

26 your overcrowding proclamation has been alleviated?

27 RESPONSE TO INTERROGATORY NO. 11:

28     DEFENDANT objects that this request seeks information protected from disclosure by

Governor's Responses to Coleman Interrogatories, Set One

1  the attorney-client privilege, attorney work product privilege, deliberative process privilege, self

2  critical analysis privilege, and official information privilege.  DEFENDANT objects that this

3  interrogatory seeks information concerning the overall population of CDCR and so exceeds

4  Plaintiff Coleman's standing as a representative of the certified class of seriously mentally

5  disordered inmates and exceeds the jurisdiction of the *Coleman* case.  Further, the interrogatory

6  is vague in the use of the word 'alleviated' as this word is subject to different meanings and is

7  not defined in the interrogatories.

8          Subject to and without waiving the foregoing objections, DEFENDANT responds as

9  follows: The Governor has not terminated the Emergency Proclamation, and his

10  administration continues to aggressively use the emergency authority to address overcrowding in

11  ways that are less intrusive than a prisoner release order.

12  INTERROGATORY NO. 12:

13          If your response to interrogatory number eleven is affirmative, state all facts and identify

14  all documents and witnesses in support of your contention.

15  RESPONSE TO INTERROGATORY NO. 12:

16          Not applicable.  See the objections and response to interrogatory number 11.

17  INTERROGATORY NO. 13:

18          Do you contend that the effects of overcrowding that you described in your overcrowding

19  proclamation as harm to people and property, inmate unrest and misconduct, reduc[tion] or

20  eliminat[ion] of programs, and increase[d] recidivism have been alleviated?

21  RESPONSE TO INTERROGATORY NO. 13:

22          DEFENDANT objects that this request seeks information protected from disclosure by

23  the attorney-client privilege, attorney work product privilege, deliberative process privilege, self

24  critical analysis privilege, and official information privilege.  DEFENDANT objects that this

25  interrogatory seeks information concerning the overall population of CDCR and so exceeds

26  Plaintiff Coleman's standing as a representative of the certified class of seriously mentally

27  disordered inmates and exceeds the jurisdiction of the *Coleman* case.  Further, the interrogatory

28  is vague in the use of the word 'alleviated' as this word is subject to different meanings and is

Governor's Responses to Coleman Interrogatories, Set One

1  not defined in the interrogatories.

2  Subject to and without waiving the foregoing objections, DEFENDANT responds as

3  follows: The Governor has not terminated the Emergency Proclamation, and his

4  administration continues to aggressively use the emergency authority to address overcrowding in

5  ways that are less intrusive than a prisoner release order.

6  INTERROGATORY NO. 14:

7  If your response to interrogatory number thirteen is affirmative, state all facts and identify

8  all documents and witnesses in support of your contention.

9  RESPONSE TO INTERROGATORY NO. 14:

10  Not applicable. See the objections and response to interrogatory number 13.

11  INTERROGATORY NO. 15:

12  Do you contend that the severe overcrowding at any of the 29 CDCR prisons that you

13  cited in your overcrowding proclamation has been alleviated?

14  RESPONSE TO INTERROGATORY NO.15:

15  DEFENDANT objects that this request seeks information protected from disclosure by

16  the attorney-client privilege, attorney work product privilege, deliberative process privilege, self

17  critical analysis privilege, and official information privilege. DEFENDANT objects that this

18  interrogatory seeks information concerning the overall population of CDCR and so exceeds

19  Plaintiff Coleman's standing as a representative of the certified class of seriously mentally

20  disordered inmates and exceeds the jurisdiction of the *Coleman* case. Further, the interrogatory

21  is vague in the use of the word 'alleviated' is subject to different meanings and is not defined in

22  the interrogatories.

23  Subject to and without waiving the foregoing objections, DEFENDANT responds as

24  follows: The Governor has not terminated the Emergency Proclamation, and his

25  administration continues to aggressively use the emergency authority to address overcrowding in

26  ways that are less intrusive than a prisoner release order.

27  INTERROGATORY NO. 16:

28  If your response to interrogatory number fifteen is affirmative, for each prison at which

1    you contend that severe overcrowding has been alleviated, state all facts and identify all

2    documents and witnesses in support of your contention.

3    RESPONSE TO INTERROGATORY NO. 16:

4        Not applicable. See the objections and response to interrogatory number 15.

5    INTERROGATORY NO. 17:

6        Do you contend that the use of non-traditional beds for inmate housing that you cited in

7    your overcrowding proclamation has been reduced or eliminated in any CDCR prison?

8    RESPONSE TO INTERROGATORY NO. 17:

9        DEFENDANT objects that this request seeks information protected from disclosure by

10   the attorney-client privilege, attorney work product privilege, deliberative process privilege, self

11   critical analysis privilege, and official information privilege. DEFENDANT objects that this

12   interrogatory seeks information concerning the overall population of CDCR and so exceeds

13   Plaintiff Coleman's standing as a representative of the certified class of seriously mentally

14   disordered inmates and exceeds the jurisdiction of the *Coleman* case. Further, DEFENDANT

15   objects to this interrogatory as compound and as phrased in the disjunctive.

16       Subject to and without waiving the foregoing objections, DEFENDANT responds as

17   follows: The Governor has not terminated the Emergency Proclamation, and his

18   administration continues to aggressively use the emergency authority to address overcrowding in

19   ways that are less intrusive than a prisoner release order. For example, more than a thousand

20   inmates have been moved to out-of-state prisons since October 2006, and thousands more will be

21   transferred. These out-of-state transfers have already resulted in the removal of hundreds of non-

22   traditional beds, and the plan is to remove thousands of non-traditional beds as further efforts to

23   address overcrowding are implemented.

24   INTERROGATORY NO. 18:

25       If your response to interrogatory number seventeen is affirmative, identify each CDCR

26   prison in which the use of non-traditional beds for inmate housing has been reduced or

27   eliminated, the specific location(s) in the prison where the use of non-traditional beds has been

28   reduced or eliminated.

1  RESPONSE TO INTERROGATORY NO. 18:

2      DEFENDANT objects to this interrogatory as compound and as phrased in the

3  conjunctive.

4      Subject to and without waiving the foregoing objections, DEFENDANT responds as

5  follows:  Not applicable. See the objections and response to interrogatory number 17.

6  INTERROGATORY NO. 19:

7      Do you contend that the severe overcrowding is no longer causing reduction in inmate

8  participation in academic, vocational, and rehabilitation programs that you described in your

9  overcrowding proclamation?

10  RESPONSE TO INTERROGATORY NO. 19:

11      DEFENDANT objects that this request seeks information protected from disclosure by

12  the attorney-client privilege, attorney work product privilege, deliberative process privilege, self

13  critical analysis privilege, and official information privilege.  DEFENDANT objects that this

14  interrogatory seeks information concerning the overall population of CDCR and so exceeds

15  Plaintiff Coleman's standing as a representative of the certified class of seriously mentally

16  disordered inmates and exceeds the jurisdiction of the *Coleman* case.  Further, DEFENDANT

17  objects to this interrogatory as compound and as phrased in the disjunctive.

18      Subject to and without waiving the foregoing objections, DEFENDANT responds as

19  follows: No, the Governor has not terminated the Emergency Proclamation, and his

20  administration continues to aggressively use the emergency authority to address overcrowding in

21  ways that are less intrusive than a prisoner release order.

22  INTERROGATORY NO. 20:

23      If your response to interrogatory number nineteen is affirmative, state all facts and

24  identify all documents and witnesses in support of your contention.

25  RESPONSE TO INTERROGATORY NO. 20:

26      Not applicable. See the objections and response to interrogatory number 19.

27  INTERROGATORY NO. 21:

28      Do you contend that the deficiency of appropriate beds and space for the *Coleman* class

1  members that you cited in your overcrowding proclamation has been remedied or reduced?

2  RESPONSE TO INTERROGATORY NO. 21:

3  DEFENDANT objects that this request seeks information protected from disclosure by

4  the attorney-client privilege, attorney work product privilege, deliberative process privilege, self

5  critical analysis privilege, and official information privilege. DEFENDANT objects that this

6  interrogatory seeks information concerning the overall population of CDCR and so exceeds

7  Plaintiff Coleman's standing as a representative of the certified class of seriously mentally

8  disordered inmates and exceeds the jurisdiction of the *Coleman* case. Further, DEFENDANT

9  objects to this interrogatory as compound and as phrased in the conjunctive.

10  Subject to and without waiving the foregoing objections, DEFENDANT responds as

11  follows: The Governor has not terminated the Emergency Proclamation, and his

12  administration continues to aggressively use the emergency authority to address overcrowding in

13  ways that are less intrusive than a prisoner release order. Indeed, in the past few months,

14  Coleman class members have been provided a significant increase in mental health beds to

15  enable appropriate care in the following institutions: California Medical Facility, Vacaville

16  increased intermediate care beds by 30, with additional 50 mental health crisis care beds to

17  activate in 2008; Salinas Valley State Prison activated 112 additional intermediate care beds;

18  California State Prison, Sacramento activated 192 more Enhanced Outpatient Program beds;

19  Mule Creek State Prison provided an additional 295 beds to meet the needs of Level III and

20  Level IV inmates requiring Sensitive Needs Yard placement within the Enhanced Outpatient

21  Program. In the next few months, the Administration will provide additional treatment space at

22  Mule Creek State Prison, and will prepare a plan for additional bed and treatment space at

23  California Medical Facility, Vacaville for mental health care patients.

24  The issues cited in the Emergency Proclamation will be alleviated upon further

25  implementation of the reforms and plans stated in (a) DEFENDANT'S filed briefs in opposition

26  to Plaintiffs' motion to convene a three-judge panel in the *Coleman* and *Plata* cases, (b)

27  DEFENDANT'S plans filed with the *Coleman* court to provide mental health beds (the Mental

28  Health Bed Plan of August 2007), to enhance recruitment of mental health clinicians (filed

1  October 1, 2007), to increase the pay of mental health clinicians within the California

2  Department of Corrections and Rehabilitation and the Department of Mental Health (filed June

3  28, 2007), and to increase small management yards (filed October 29, 2007). In addition,

4  DEFENDANT awaits the Receiver's Plan of Action, due on November 15, 2007. With the

5  *Coleman* court's approval of DEFENDANT'S plan to create consolidated care centers for

6  mental health care patients, the Administration will move forward on those plans to develop

7  appropriate mental health beds for the present and forecasted *Coleman* population.

8  INTERROGATORY NO. 22:

9        If your response to interrogatory number twenty-one is affirmative, state all facts and

10  identify all documents and witnesses in support of your contention.

11  RESPONSE TO INTERROGATORY NO. 22:

12        DEFENDANT objects that this request seeks information protected from disclosure by

13  the attorney-client privilege, attorney work product privilege, deliberative process privilege, self

14  critical analysis privilege, and official information privilege. DEFENDANT objects that this

15  interrogatory seeks information concerning the overall population of CDCR and so exceeds

16  Plaintiff Coleman's standing as a representative of the certified class of seriously mentally

17  disordered inmates and exceeds the jurisdiction of the *Coleman* case. Further, DEFENDANT

18  objects that this interrogatory seeks information equally available to Plaintiffs.

19        Subject to and without waiving the foregoing objections, DEFENDANT responds as

20  follows: Plaintiffs have already been provided with the non-privileged documents that are

21  responsive to this request. Those documents have been filed with the *Coleman* court by

22  DEFENDANT in the course of the *Coleman* case and include: Defendant's August 2007 mental

23  health bed, Defendant's response to Special Master Keating's report on the August 2007 bed

24  plan. In addition, DEFENDANT has provided status reports on the construction, staffing and

25  licensure of mental health beds at the regularly scheduled meetings with the Special Master and

26  Plaintiffs, known as Policy Meetings.

27        The witnesses to this contention include and are not limited to: Doug McKeever of

28  CDCR, Cindy Radavsky of DMH, Deborah Hysen of CDCR.

1  INTERROGATORY NO. 23:

2      What is the current projected time period when you or CDCR expect to run out of all

3  common area space to house prisoners, previously described by you in your overcrowding

4  proclamation as mid-2007?

5  RESPONSE TO INTERROGATORY NO. 23:

6      DEFENDANT objects that this request seeks information protected from disclosure by

7  the attorney-client privilege, attorney work product privilege, deliberative process privilege, self

8  critical analysis privilege, and official information privilege.  DEFENDANT objects that this

9  interrogatory seeks information concerning the overall population of CDCR and so exceeds

10  Plaintiff Coleman's standing as a representative of the certified class of seriously mentally

11  disordered inmates and exceeds the jurisdiction of the *Coleman* case.  Further, DEFENDANT

12  objects that this interrogatory is argumentative and assumes facts not in evidence.

13      Subject to and without waiving the foregoing objections, DEFENDANT responds as

14  follows: The Administration's less intrusive efforts to address overcrowding are having a

15  positive effect.  CDCR is currently reducing the number of non-traditional beds.

16  INTERROGATORY NO. 24:

17      Do you contend that the magnitude of the circumstances due to severe overcrowding that

18  you stated in your overcrowding proclamation to exceed the capabilities of services, personnel,

19  equipment, and facilities of any geographical area in California, have been reduced or alleviated?

20  RESPONSE TO INTERROGATORY NO. 24:

21      DEFENDANT objects that this request seeks information protected from disclosure by

22  the attorney-client privilege, attorney work product privilege, deliberative process privilege, self

23  critical analysis privilege, and official information privilege.  DEFENDANT objects that this

24  interrogatory seeks information concerning the overall population of CDCR and so exceeds

25  Plaintiff Coleman's standing as a representative of the certified class of seriously mentally

26  disordered inmates and exceeds the jurisdiction of the *Coleman* case.  Further, the interrogatory

27  is vague in the use of the word 'alleviated', as this word is subject to different meanings and is

28  not defined in the interrogatories.

1    Subject to and without waiving the foregoing objections, DEFENDANT responds as

2    follows: The Governor has not terminated the Emergency Proclamation, and his administration

3    continues to aggressively use the emergency authority to address overcrowding in ways that are

4    less intrusive than a prisoner release order.

5    INTERROGATORY NO. 25:

6    If your response to interrogatory number twenty-four is affirmative, state all facts and

7    identify all documents and witnesses in support of your contention.

8    RESPONSE TO INTERROGATORY NO. 25:

9    Not applicable. See the objections and response to interrogatory number 24.

10    Dated: November 9, 2007

11    Respectfully submitted,

12    EDMUND G. BROWN JR.
      Attorney General of the State of California

13    DAVID S. CHANEY
      Chief Assistant Attorney General

14    FRANCES T. GRUNDER
15    Senior Assistant Attorney General

      ROCHELLE C. EAST
16    Supervising Deputy Attorney General

17

18

19    LISA A. TILLMAN
      Deputy Attorney General
20    Attorneys for Defendants

21

      response.gov.colemanrogsl.wpd
22    CF1997CS0003

23

24

25

26

27

28

Governor's Responses to Coleman Interrogatories, Set One

## VERIFICATION

I, ROBERT GORE, declare:

I am the Acting Chief Deputy Cabinet Secretary for the California Governor's Office.
Prior to serving in this role, I was the Deputy Cabinet Secretary. In these roles, I am actively
involved with, and review, budgets and corrections issues for the Office of the Governor, a
defendant in his official capacity in this pending action entitled *Coleman v. Schwarzenegger*.
I have read the foregoing responses to the First Request for Production propounded by Plaintiff
Ralph Coleman, and the foregoing responses to the First Set of Interrogatories propounded
by Plaintiff Ralph Coleman, and state upon my information and belief that they are true and
correct.

I declare under penalty of perjury, under the laws of the United States of America, that the
foregoing is true and correct.

Executed this _____ day of November, 2007.

ROBERT GORE

## DECLARATION OF SERVICE BY U.S. MAIL

Case Name:   *Coleman v. Schwarzenegger, et al.*; *Plata v. Schwarzenegger, et al.*
Nos.:   **01-1351 & 90-0520**

I declare:

I am employed in the Office of the Attorney General, which is the office of a member of the
California State Bar, at which member's direction this service is made. I am 18 years of age or
older and not a party to this matter. I am familiar with the business practice at the Office of the
Attorney General for collection and processing of correspondence for mailing with the United
States Postal Service. In accordance with that practice, correspondence placed in the internal
mail collection system at the Office of the Attorney General is deposited with the United States
Postal Service that same day in the ordinary course of business.

On **November 07, 2007**, I served the attached **: DEFENDANT GOVERNOR
SCHWAREZENEGGER'S RESPONSES TO PLAINTIFF COLEMAN'S FIRST SET OF
INTERROGATORIES** by placing a true copy thereof enclosed in a sealed envelope with
postage thereon fully prepaid, in the internal mail collection system at the Office of the Attorney
General at 1300 I Street, Sacramento, California 94244, addressed as follows:

| | |
|---|---|
| Claudia Center<br>The Legal Aid Society<br>Employment law Center<br>600 Harrison Street, Suite 120<br>San Francisco, CA 94107 | Richard Goff<br>Heller, Ehrman White & McAuliffe<br>701 Fifth Avenue<br>Seattle, WA 98104 |
| Warren E. George<br>Bingham McCutchen<br>3 Embarcadero Ctr., Fl. 24<br>San Francisco, CA 94111 | Martin H. Dodd<br>Futterman & Dupree<br>160 Sansome Street, 17th Street<br>San Francisco, CA 94109 |
| Ronald Yank<br>Carroll, Burdick & McDonough, LLP<br>44 Montgomery Street, Suite 400<br>San Francisco, CA 94104 | Ann Miller Ravel<br>Office of the County Counsel<br>County of Santa Clara<br>70 West Hedding, East Wing, 9th Floor<br>San Jose, CA 95110 |
| Jared Goldman<br>California Prison Healthcare Receivership<br>1731 Technology Dr., Suite 700<br>San Jose, CA 95110 | Steven s. Kaufhold<br>Akin Gump Straus Hauer & Feld LLP<br>580 California Street, 15th Floor<br>San Francisco, CA 94102 |

| | |
|---|---|
| Rod Pacheco<br>Chuck Hughes<br>Office of the District Attorney<br>County of Riverside<br>4075 Main Street, First Floor<br>Riverside, CA 92501 | Steven Woodside<br>Office of the County Counsel<br>575 Administration Dr., Room 105A<br>Santa Rosa, CA 95403 |
| Donald Specter<br>Prison Law Office<br>2173 'E' Francisco Blvd., Suite M<br>San Rafael, CA 94901 | Michael Bien<br>Rosen, Bien and Galvan<br>315 Montgomery Street, 10th Floor<br>San Francisco, CA 94104 |

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on **November 07, 2007**, at Sacramento, California.

_____
S. Burke
Declarant

_____
Signature

EXHIBIT II

**From:** Genest, Mike
**Sent:** Wednesday, May 02, 2007 3:25:53 PM
**To:** 'SPKennedy██████████'
**Subject:** RE: net operating

Todd says he is not aware of any program called that, but we do have $52.8 million in 6-7, growing to $94 million in 7-8 for inmate and parolee programs. This was adding the "R" to CDCR. We have put this on lists before, but cutting these programs would be viewed as backtracking on inmate programs. We also have $45 million for Mentally Ill Offender Crime Reduction Grants that is on the options list.

I'm not smokin' anything. I'm just thinking about writing the Intro to the May Revision, which is where we will state the major themes. If we do only the cuts that he leaned toward in the meeting, we will have a reserve of just under $1 billion and a net operating deficit of about the same amount. In the intro, we'll clearly want to foot back to Jan 10 and acknowledge that due to cost pressures and some revenue slippage, it is necessary to make additional tough decisions to get back to a decent reserve, but that even with these our budget is structurally out of balance. We would then say that if we get the lottery deal we'll restore structural balance and if not, we'll have to make more difficult decisions in next year's budget, but even then this year's is balanced and responsible.

It's a tougher sell is all.

---

**From:** SPKennedy██████████ [mailto:SPKennedy██████████]
**Sent:** Wednesday, May 02, 2007 2:54 PM
**To:** Genest, Mike
**Cc:** Sheehan, Anne; Brown, Vince; Klass, Fred; Palmer, H.D.
**Subject:** Re: net operating

stop smoking that stuff. he won't go back on the compacts and he won't start a war he can't win with cta.

i came across a program at cdcr for $50 million or so for "recidivism reduction grants" - not the $50 million we got in the legislation - a different $50 million. Why don't programs like that show up on the cut list?

In a message dated 5/2/2007 2:45:57 PM Pacific Daylight Time, Mike.Genest@dof.ca.gov writes:

> Now that I've had time to think about it, a simplistic estimate of where we would stand given yesterday's numbers is a net operating deficit of about $1.5 billion.
>
> Looking at the HHS cuts we were leaning to in the meeting, I can get to about $600 million. The only way I can think of to get the additional $900 million would be to freeze the compacts on both higher ed and the judiciary for one year $493 million and do the STRS thing, $501 million. We could say that the last two items would be pulled back if we get the lottery deal. I could argue that with the lottery, we don't need any of the new cuts to get back to structural balance.
>
> Just something to mull over.

---

See what's free at AOL.com.