# EXHIBIT L

1  EDMUND G. BROWN JR.
   Attorney General of the State of California
2  DAVID S. CHANEY
   Chief Assistant Attorney General
3  FRANCES T. GRUNDER
   Senior Assistant Attorney General
4  ROCHELLE C. EAST
   Supervising Deputy Attorney General
5  LISA A. TILLMAN – State Bar No. 126424
   Deputy Attorney General
6  CHARLES ANTONEN - 221207
   Deputy Attorney General
7  455 Golden Gate Avenue, Suite 11000
   San Francisco, CA 94102-7004
8  Telephone: (415) 703-5443
   Facsimile:  (415) 703-5843
9  rochelle.east@doj.ca.gov
   lisa.tillman@doj.ca.gov
10 charles.antonen@doj.ca.gov

HANSON BRIDGETT LLP
JERROLD C. SCHAEFER - 39374
PAUL B. MELLO - 179755
S. ANNE JOHNSON - 197415
SAMANTHA TAMA - 240280
RENJU P. JACOB - 242388
425 Market Street, 26th Floor
San Francisco, CA  94105
Telephone: (415) 777-3200
Facsimile:  (415) 541-9366
jschaefer@hansonbridgett.com
pmello@hansonbridgett.com
ajohnson@hansonbridgett.com
stama@hansonbridgett.com
rjacob@hansonbridgett.com

11 Attorneys for Defendants

12            UNITED STATES DISTRICT COURT

13        FOR THE EASTERN DISTRICT OF CALIFORNIA

14        AND THE NORTHERN DISTRICT OF CALIFORNIA

15      UNITED STATES DISTRICT COURT COMPOSED OF THREE

16    PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

17 RALPH COLEMAN, et al.,                No.  2:90-CV-00520 LKK JFM P

18        Plaintiffs,                    **THREE-JUDGE COURT**

19    v.

20 ARNOLD SCHWARZENEGGER, et al.,

21

22        Defendants.

23 MARCIANO PLATA, et al.,              No. C-01-1351 TEH

24        Plaintiffs,                    **THREE-JUDGE COURT**

25    v.                                 **NOTICE OF DEPOSITION OF
                                         CHRISTOPHER MUMOLA BY WRITTEN**
26 ARNOLD SCHWARZENEGGER, et al.,        **QUESTIONS**
                                         **[Fed.R.Civ.P. Rule 31, 28 CFR § 16.22]**
27        Defendants.

28
                                    - 1 -

1   TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

2         YOU ARE HEREBY NOTIFIED that Defendant Arnold Schwarzenegger

3   (Defendant) will take the deposition of Christopher Mumola, in the above entitled action,

4   by written questions pursuant to Rule 31 of the Federal Rules of Civil Procedure at LAD

5   Reporting, 1100 Connecticut Avenue N.W., Suite 850, Washington D.C. 20036

6   commencing on August 25, 2008 at 10:00 a.m. and continuing from day to day

7   thereafter, excluding Saturdays, Sundays, and legal holidays, until completed.  LAD

8   Reporting will serve as the officer taking the deposition.  This deposition will be recorded

9   stenographically and will be conducted in accordance with Fed.R.Civ.P. 31.

10         YOU ARE FURTHER NOTIFIED that the deponent is not a party to this action.

11   So far as is known to defendant, the deponent's contact information is:

12         Bureau of Justice Statistics.
13         U.S. Dept. of Justice
      810 Seventh Street, NW
14         Washington, DC 20531
      202-353-2132

15         YOU ARE FURTHER NOTIFIED that the deponent will be required to testify to

16   the matters described in the 28 CFR §16.22 statement, and is also requested to produce

17   documents and things as described in the 28 CFR §16.22 statement, a copy of which is

18   attached hereto.

19         **DEFENDANT'S WRITTEN DEPOSITION QUESTIONS**

20

21       Defendant submits the following written deposition questions pursuant to Rule 31

22   of the Federal Rules of Civil Procedure.

23         1.     Court reporter, please swear in the witness.

24         2.     Please state and spell your full name for the record.

25         3.     The following questions are being asked by Defendant Arnold

26   Schwarzenegger, Governor of California.  This deposition is being taken as part of a

27   consolidated proceeding before a Three Judge Panel of two cases —*Coleman v.*

28   *Schwarzenegger, et. al.* case number 2:90-CV-00520 LKK JFM P and *Plata v.*

NOTICE OF DEPOSITION OF CHRISTOPHER MUMOLA BY WRITTEN
QUESTIONS (C01-1351 TEH)
    1534822.2

1   *Schwarzenegger, et. al.* case number C-01-1351 TEH — to determine whether a

2   prisoner release order should be issued.  We are here today to take your deposition

3   pursuant to Rule 31 of the Federal Rules of Civil Procedure.

4       4.    Although a deposition is an out of court proceeding, you are under oath

5   and this deposition does have all the formal sanctity of a court proceeding.  The

6   deposition officer will ask you some questions.  The purpose of these questions is to

7   obtain information to assist in the litigation of the *Coleman* and *Plata* cases.

8       5.    Are you represented by counsel here, today?

9       6.    If so, please identify your counsel.

10      7.    Are you familiar with how a deposition is taken?

11      8.    Have you ever been deposed before?

12      9.    If so, how many times have you been deposed?

13      10.    If you have been deposed before, when have you been deposed?

14      11.    If you have been deposed before, in what matters were you deposed?

15      12.    If you would like to take a break, or if you would like to consult with your

16  attorney, just ask.  If you need some water, just ask.  If you need to use the restroom

17  facilities, just ask.  Do you understand this?

18      13.    At this deposition, we have a court reporter who will record your answers.

19  When we are finished, a written transcript will be prepared.  The transcript will be sent to

20  you for your review and signature, again under oath.  While you can make corrections to

21  your testimony at that time, if you do so counsel can comment on those changes and

22  ask why they were made.  So, it is best that you keep your testimony today as complete

23  and accurate as possible.

24      14.    Do you understand that you have an obligation to testify truthfully under

25  penalty of perjury?

26      15.    Do you understand that even though we are in an informal conference

27  room, your testimony has the same force and effect as if you were testifying in a court of

28  law before a judge?

- 3 -

NOTICE OF DEPOSITION OF CHRISTOPHER MUMOLA BY WRITTEN
QUESTIONS (C01-1351 TEH)

1534822.2

16.    Do you understand that the court reporter will take down everything that is said during this deposition and that the court reporter will prepare a written transcript of today's testimony which will be in booklet form and read like a script?

17.    Do you understand that the transcript will be then sent to you for your review and signature attesting to the accuracy of the transcription and the truth of your testimony under penalty of perjury?

18.    Do you understand that while you will be given an opportunity to change or correct the transcription testimony at that time, if you do so, counsel can comment on each and every one of those changes at trial and ask you why those changes were made?

19.    You may come across a question that you may not understand.  If you do not understand a question, please state that fact, describe your understanding of the question and respond based upon your understanding.  Do you understand?

20.    Do you understand that if you realize an answer you have given earlier in this deposition is inaccurate or incomplete in any way, and you notify the Deposition Officer that you wish to correct or supplement that answer, you will be allowed to do so?

21.    If you do not know or remember the information I request, please inform the Deposition Officer.  You should not speculate or guess as to your answers. However, you should know that I am entitled to your best estimate if you can give one. Do you understand this?

22.    Is there any reason you are unable to give your best testimony today?

23.    From time to time I will ask you if you aware of any documents evidencing or relating to a certain fact.  By document, I mean any kind of written, typewritten, printed or recorded material, such as notes, diaries, memoranda, letters, notebooks, reports, telegrams, publications, contracts, recordings, transcriptions of recordings, and business records, whether or not in your possession or under your control.  This includes originals, copies and all drafts prepared in connection with such documents, whether used or not. Do you understand?

- 4 -

24. Other than speaking with your attorney, what did you do to prepare for this deposition?

25. Did you review any documents?

26. Identify each and every document that you reviewed.

27. Can you produce those documents to Defendants in the *Coleman* and *Plata* cases?

28. Did you attend college?

29. Where did you attend college?

30. When did you attend college?

31. What was your major?

32. Did you receive any honors or award in college?

33. Did you attend any post-secondary schools?

34. What was the name of each post-secondary school you attended?

35. Did you graduate from each post-secondary school?

36. When did you graduate from each post-secondary school?

37. State all of the post-secondary degrees you obtained and the school from which you obtained the degree.

38. Have you received any other certifications?

39. If so, describe each certification that you have received.

40. When did you receive each certification?

41. Have you provided a complete listing of all educational institutions and classes you have attended?

42. If not, please supplement any information that you have not provided concerning the educational institutions and classes you have attended.

43. Have you authored or co-authored any writings or publications?

44. For each writing you have authored or co-authored, provide the title of the publication.

45. For each writing you have authored or co-authored, provide the date it was

- 5 -

1    published.

2        46.    For each writing you have authored or co-authored, briefly summarize the

3    writing.

4        47.    Where do you currently work?

5        48.    What is the particular division that you work for your employer?

6        49.    Describe what your unit is responsible for.

7        50.    What is your job title?

8        51.    Describe your job duties and responsibilities.

9        52.    State all of previous job titles you had with your current employer.

10       53.    How long did you hold each of these job titles?

11       54.    What are your qualifications to perform your current duties?

12       55.    Is your work supervised by anyone?

13       56.    If so, who?

14       57.    What are your supervisor's qualifications?

15       58.    How long have you worked with your current employer?

16       59.    Did you have prior employment, before working at the United States

17   Department of Justice, Bureau of Justice Statistics?

18       60.    If yes, please state all employers and titles held after college.

19       61.    What is the Bureau of Justice Statistics?

20       62.    How many published reports have you authored while working for the

21   Bureau of Justice Statistics?

22       63.    What are their titles?

23       64.    When were they published?

24       65.    I am handing you what is being marked as Defendant's Exhibit A, a

25   document titled, "Medical Causes of Death in State Prisons, 2001-2004".

26       66.    Please review Exhibit A and let me know when you are done.

27       67.    Are you familiar with Exhibit A?

28       68.    Were you the author of Exhibit A?

- 6 -

NOTICE OF DEPOSITION OF CHRISTOPHER MUMOLA BY WRITTEN
QUESTIONS (C01-1351 TEH)                                      1534822.2

1    69.    Is Exhibit A a true and accurate copy of the original?

2    70.    What is the Deaths in Custody Reporting Act of 2000?

3    71.    What is the Deaths in Custody Reporting Program?

4    72.    What is the connection between the Bureau of Justice Statistics and the

5    Deaths in Custody Reporting Program, if any?

6    73.    What is your connection to the Deaths in Custody Reporting Program, if

7    any?

8    74.    From where did the Bureau of Justice Statistics obtain the data that is

9    analyzed in Exhibit A?

10    75.    As the author of Exhibit A, what role did you play in its preparation?

11    76.    In general, what was the methodology used to prepare Exhibit A?

12    77.    Is the statement of the methodology on page 4 of Exhibit A accurate?

13    78.    Page 4 of Exhibit A states that Margaret E. Noonan verified the report. Are

14    you familiar with what Ms. Noonan did to verify the report?

15    79.    If so, please describe how the report was verified?

16    80.    Is Exhibit A an official publication of the Bureau of Justice Statistics?

17    81.    Please turn to Appendix Table 9 of Exhibit A. What does this table

18    represent?

19    82.    What was the particular methodology used to create Appendix Table 9?

20    83.    What was the average annual mortality rate for all illnesses per 100,000

21    State prison inmates from 2001 to 2004, for the entire United States?

22    84.    What was the average annual mortality for all illnesses per 100,000 State

23    prison inmates from 2001 to 2004, for the West region?

24    85.    What was the average annual mortality rate for all illnesses per 100,000

25    State prison inmates from 2001-2004 for inmates for California?

26    86.    Was the average annual mortality rate for all illnesses per 100,000 State

27    prison inmates from 2001-2004 in California lower than the same rate for the entire

28    United States?

- 7 -

87.    Was the average annual mortality rate for all illnesses per 100,000 State prison inmates from 2001-2004 in California lower than the same rate for the West region?

88.    Page 3 of the body of Exhibit A identifies the States with the five highest illness mortality rates per 100,000 State inmates from 2001-2004. Is California among them?

89.    How many States had a higher average annual mortality rate for all illnesses per 100,000 State prison inmates from 2001-2004 than California?

90.    Is California among the 15 States with the lowest average annual mortality rates per 100,000 State inmates from 2001-2004?

91.    Page 3 of the body of Exhibit A identifies California as among the five States with the highest number of prisoner deaths. Please explain the difference between the number of deaths and the mortality rate from illness.

92.    Is it possible to determine from the information in Exhibit A, including the Appendix Table 11, whether California's average annual mortality rate per 100,000 State prisoners from 2001-2004, was lower than the same rate for U.S. residents age 15-64 from 2001-2003?

93.    If so, how much lower was California's average annual mortality rate than the rate for U.S. residents age 15-64?

94.    If it is not possible to determine from the information in Exhibit A whether California's average annual mortality rate for State prisoners from 2001-2004 was lower than the same rate for U.S. residents age 15-64 from 2001-2003, what additional information would you need to make that determination?

95.    Have you made the determination of whether California's average annual mortality rate for State prisoners from 2001-2004 was lower than the same rate for U.S. residents age 15-64 from 2001-2003?

96.    If so, how did you make that the determination?

97.    What was your conclusion?

- 8 -

1    98.    Is there any document evidencing this conclusion?

2    99.    If you have not, are you aware whether anyone else at the Bureau of

3    Justice Statistics has determined whether California's average annual mortality rate for

4    State prisoners from 2001-2004 was lower than the same rate for U.S. residents age 15-

5    64 from 2001-2003?

6    100.    If so, what was the conclusion?

7    101.    How was that conclusion reached, to your knowledge?

8    102.    Is there any document evidencing this conclusion?

9    103.    I am handing you what is being marked as Defendant's Exhibit B, which is

10    a letter dated December 18, 2007 from Jeffrey L. Sedgwick, Director of the Office of

11    Justice Programs, Bureau of Justice Statistics to S. Anne Johnson, counsel for

12    Defendants in this matter, which contains 2 attachments.  Are you familiar with Exhibit B,

13    including the attachments?

14    104.    Is Exhibit B a true and accurate copy of the original?

15    105.    Did you have any role in creating Exhibit B, including the attachments?

16    106.    What does Attachment 1 represent?

17    107.    To your knowledge, who prepared Attachment 1?

18    108.    To your knowledge, what methodology was used to prepare Attachment 1?

19    109.    Does Attachment 1 to Exhibit B present similar information to Appendix

20    Table 9 to Exhibit A, except that it also includes the year 2005?

21    110.    What was the source of the data for the year 2005?

22    111.    What was the average annual mortality rate for all illnesses per 100,000

23    State prison inmates from 2001 to 2005, for the entire United States?

24    112.    What was the average annual mortality for all illnesses per 100,000 State

25    prison inmates from 2001 to 2005, for the West region?

26    113.    What was the average annual mortality rate for all illnesses per 100,000

27    State prison inmates from 2001-2005 for inmates for California?

28    114.    Was the average annual mortality rate for all illnesses per 100,000 State

- 9 -

1    prison inmates from 2001-2005 in California lower than the same rate for the entire

2    United States?

3        115.    Was the average annual mortality rate for all illnesses per 100,000 State

4    prison inmates from 2001-2005 in California lower than the same rate for the West

5    region?

6        116.    How many States had a higher average annual mortality rate for all

7    illnesses per 100,000 State prison inmates from 2001-2005 than California?

8        117.    Is California among the 15 States with the lowest average annual mortality

9    rates per 100,000 State inmates from 2001-2005?

10       118.    Attachment 1 also contains "highlights" at the bottom. Number 1 says, "For

11   each year in this period (2001-2005), California prisoners had a lower rate of illness

12   deaths than the total of all other Western States, ranging from 5% lower in 2004 (182

13   illness deaths per 100,000 inmates v. 191 per 100,000 for all other West States to 27%

14   lower in 2001." Is this conclusion accurate?

15       119.    To your knowledge, how was this conclusion reached?

16       120.    Attachment 1 "Highlight" No. 1 also says, "Over the entire 5 year period,

17   California's average annual death rate from illness (172 per 100,000) was 14% lower

18   than that of all other Western States (201 per 100,000)." Is this conclusion accurate?

19       121.    To your knowledge, how was this conclusion reached?

20       122.    Attachment 1 "Highlight" No. 2 says, "For each year in this period, the

21   California prisoner death rate from illness was lower than the total for all other States

22   nationwide, ranging from 16% lower in 2002 (187 per 100,000 compared to 223 per

23   100,000) to 38% lower in 2001 (141 per 100,000 compared to 229 per 100,000)." Is this

24   conclusion accurate?

25       123.    To your knowledge, how was this conclusion reached?

26       124.    Attachment 1 "highlight" No. 2 also says, "Over the entire 5 year period,

27   California's average annual illness mortality rate (172 per 100,000) was 26% lower than

28   that of all other States (232 per 100,000)." Is this conclusion accurate?

- 10 -

1    125.    To your knowledge, how was this conclusion reached?

2    126.    Attachment 1 "Highlight" No. 3 states, "California's prisoner death rate from

3    illness was lowest in 2001 (141 per 100,000), then peaked the following year in 2002

4    (187 per 100,000)." Is this conclusion accurate?

5    127.    To your knowledge, how was this conclusion reached?

6    128.    Attachment 1 "Highlight" No. 3 also states: "In the most recent years for

7    which data were available, the illness death rate in California prisons was virtually

8    unchanged (182 per 100,000) in 2004; 181 per 100,000 in 2005)." Is this conclusion

9    accurate?

10    129.    To your knowledge, how was this conclusion reached?

11    130.    What does Attachment 2 to Exhibit B represent?

12    131.    To your knowledge, who prepared Attachment 2?

13    132.    To your knowledge, what methodology was used to prepare Attachment 2?

14    133.    Attachment 2 also contains "highlights". Number 1 states, "The tables

15    above provides a comparison of California and all other States for the data presented in

16    Tables 1 & 3 of our online tables of State prisoner mortality data." What is this statement

17    referring to?

18    134.    I am handing you a document marked as Exhibit C, which is entitled

19    "Deaths in Custody Statistical Tables." Are you familiar with Exhibit C?

20    135.    Is Exhibit C a true and accurate copy of the information available on the

21    website?

22    136.    The first page of Exhibit C references data tables for State Prison Deaths,

23    2001-2005. Are these the tables referred to in Highlight No. 1 of Attachment 2 to Exhibit

24    B?

25    137.    Exhibit B, Attachment 2 Highlight No. 2 says, "As these data show, the

26    illness death rate in California prisons was below that of the rate for all other States in

27    each year, averaging 23% lower for the entire 5 year period (161 illness deaths per

28    100,000 inmates v. 208 illness deaths per 100,000 inmates)." Is this conclusion

- 11 -

1  accurate?

2         138.   To your knowledge, how was this conclusion reached?

3         139.   Exhibit B, Attachment 2 Highlight No. 3 states, "The rate of death from

4  AIDS in California prisons was lower than that of all other States combined in each year

5  as well, averaging about one-third lower over the entire period (11 AIDS deaths per

6  100,000 inmates vs. 17 AIDS deaths per 100,000 inmates)." Is this conclusion

7  accurate?

8         140.   To your knowledge, how was this conclusion reached?

9         141.   In the letter which is the first page of Exhibit, Mr. Sedgwick writes, "In

10  November, you requested that Bureau of Justice Statistics (BJS) staff produce statistical

11  tables of State prisoner death records that would allow for comparisons between

12  California and other States. Attached you will find the data requested. These data are

13  unpublished, but have been verified by BJS staff as accurate."

14         142.   Do you know what was done to verify the data on Attachments 1 and 2 to

15  Exhibit B as accurate?

16         143.   If so, please explain what was done to verify the data on Attachments 1

17  and 2 to Exhibit B as accurate?

18         144.   Although it is not published, does Exhibit B reflect the official analysis of

19  the Bureau of Justice Statistics performed in the course of its duties?

20         145.   I am handing what is being marked as Exhibit D, titled "Suicide and

21  Homicide in State Prisons and Local Jails." Are you familiar with Exhibit D?

22         146.   Were you the author of Exhibit D?

23         147.   Is Exhibit D a true and accurate copy of the original?

24         148.   Is it correct that Exhibit D was published in August 2005 in the Bureau of

25  Justice Statistics Special Report?

26         149.   Is it correct that Exhibit D analyzes the suicide and homicide rates of

27  county jails and state prisons from 2000 to 2002 from data submitted by those entities?

28         150.   Since the preparation of Exhibit D, have you prepared any article

NOTICE OF DEPOSITION OF CHRISTOPHER MUMOLA BY WRITTEN
QUESTIONS (C01-1351 TEH)                                                    1534822.2

1  analyzing the suicide and homicide rates of state prisons from 2003 to present?

2      151.  If you have prepared an article analyzing the suicide and homicide rates of

3  state prisons from 2003 to present, please state where and when it was published.

4      152.  On page 3 of Exhibit D, you report that for the time period of 2000 to 2002

5  42% of all suicides took place in four states: California (52), Texas (49), New York (21)

6  and Illinois (20). Is that correct?

7      153.  Since your article (Exhibit D) states at page 11 that "the demographic

8  compositions of the inmate populations do not reflect those of the U.S. resident

9  population", would you agree that the demographic composition of the California inmate

10  population does not reflect those of the U.S. resident population?

11      154.  Is it correct that your article (Exhibit D) also states at page 11 that state

12  prisoners had a higher rate of suicide (14 per 100,000) than the overall resident

13  population (11) and that once standardized by age, race and gender to match the State

14  prisoner population, the U.S. resident rate of suicide (18) exceeded that of state

15  prisoners in 2002?

16      155.  Would you agree that once standardized by age, race and gender to match

17  the California state prisoner population, the U.S. rate of suicide would exceed that of

18  California prisoners in 2002?

19      156.  Have you standardized the inmate populations of those state prisons with

20  less than 10 suicides per year  to match the age, race and gender population of

21  California state prison?  If so, what was the comparative data on suicides within

22  California and within other state prisons using such standardized population?

23      157.  Have you ever discussed the California prison population's suicide rates

24  with Dr. Ray Patterson?

25      158.  Have you received any data from Dr. Ray Patterson concerning the

26  California prison population?

27      159.  Have you reviewed an article, published in Psychiatric Services June 2008

28  edition and authored by Raymond  Patterson M.D. and Dr. Kerry Hughes M.D., entitled,

1     "Review of Completed Suicides in California Department of Corrections and

2     Rehabilitation, 1999 to 2004?"

3          160.    Did you provide any data to Dr. Patterson and Dr. Hughes regarding

4     suicide rates with the California Department of Corrections and Rehabilitation at any

5     time?

6          161.    If you did provide any data to Dr. Patterson and Dr. Hughes regarding

7     suicide rates, please identify the data that was provided.

8          162.    Did Dr. Patterson and Dr. Hughes provide you any data regarding suicide

9     rates with the California Department of Corrections and Rehabilitation at any time?

10         163.    If Dr. Patterson and Dr. Hughes did provide you with data, please identify

11    the data that was provided.

12         164.    Has anyone at any time informed you of any errors in the data, findings,

13    and conclusions you reported in Exhibit D?

14         165.    If so, please state the name of that person and the identified errors.

15         166.    If errors in Exhibit D were identified to you, did you confirm or disaffirm the

16    existence of those identified errors?

17         167.    Is it true that Exhibit D reflects the official analysis of the Bureau of Justice

18    Statistics performed in the course of its duties?

19         168.    Has anyone representing the Plaintiffs in this matter contacted you to

20    consult on this matter?

21         169.    Please detail all discussions you have had with any persons representing

22    the Plaintiffs in this matter.

23         170.    Please detail all written communications you have had with any persons

24    representing the Plaintiffs in this matter.

25

26

27

28

NOTICE OF DEPOSITION OF CHRISTOPHER MUMOLA BY WRITTEN
QUESTIONS (C01-1351 TEH)                                                    1534822.2

1

2    DATED:  July 2 , 2008                    HANSON BRIDGETT LLP

3                                             By:  _Renju P. Jacob_

4                                             PAUL B. MELLO
                                              S. ANNE JOHNSON
5                                             RENJU P. JACOB
                                              Attorneys for Defendants
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 15 -
NOTICE OF DEPOSITION OF CHRISTOPHER MUMOLA BY WRITTEN
QUESTIONS  (C01-1351 TEH)                                          1534822.2

**PROOF OF SERVICE BY MAIL**

**Coleman v. Schwarzenegger - Case No 2:90- cv00520 LKK JFM P**

**Plata v. Schwarzenegger - Case No. C01-1351 TEH**

I, declare that I am a resident of the State of California. I am over the age of 18 years and not a party to the action entitled *Coleman v. Schwarzenegger/Plata v. Schwarzenegger*; that my business address is 425 Market Street, 26th Floor, San Francisco, California 94105. On July 2, 2008, I served a true and accurate copy of the document(s) entitled:

**NOTICE OF DEPOSITION OF CHRISTOPHER MUMOLA BY WRITTEN QUESTIONS; 28 CFR SEC. 16.22 STATEMENT OF RENJU P. JACOB IN SUPPORT OF NOTICE OF DEPOSITION OF CHRISTOPHER MUMOLA**

on the party(ies) in this action by placing said copy(ies) in a sealed envelope, each addressed to the last address(es) given by the party(ies) as follows:

| | |
|---|---|
| KIMBERLY HALL BARLOW<br>Jones & Mayer<br>3777 North Harbor Boulevard<br>Fullerton, CA 92835 | STEVEN S. KAUFHOLD<br>CHAD A. STEGEMAN<br>TERESA WANG<br>Akin Gump Straus Hauer & Feld LLP<br>580 California Street, 15th Floor<br>San Francisco, CA 94102 |
| ANN MILLER RAVEL<br>THERESA FUENTES<br>Office of the County Counsel<br>County of Santa Clara<br>70 West Hedding, East Wing, 9th Floor<br>San Jose, CA 95110 | STEVEN WOODSIDE<br>ANNE L. KECK<br>Office of County Counsel<br>575 Administration Dr., Room 105A<br>Santa Rosa, CA 95403 |
| MICHAEL BIEN<br>Rosen Bien & Galvan, LLP<br>315 Montgomery St., 10th Fl.<br>San Francisco, CA 94104 | PRISON LAW OFFICE<br>DONALD SPECTER<br>2173 E. Francisco Boulevard, Suite M<br>San Rafael, CA 94964 |
| MARTIN H. DODD<br>FUTTERMAN & DUPREE<br>160 Sansome Street, 17th Floor<br>San Francisco, CA 94109 | JOHN HAGAR<br>LAW OFFICE OF JOHN HAGAR<br>PMB 314<br>1819 Polk Street<br>San Francisco, CA 94109 |
| ROD PACHECO<br>WILLIAM MITCHELL<br>Office of the District Attorney<br>County of Riverside<br>4075 Main Street, First Floor<br>Riverside, CA 92501 | GREGG ADAM<br>NATALIE LEONARD<br>Carroll, Burdick & McDonough, LLP<br>44 Montgomery Street, Suite 400<br>San Francisco, CA 94104 |

- 1 -

PROOF OF SERVICE

1549180.1

| | |
|---|---|
| MICHAEL P. MURPHY<br>CAROL L. WOODWARD<br>Hall of Justice and Records<br>400 County Center, 6th Floor<br>Redwood City, CA 94063 | DENNIS BUNTING<br>ALAN COHEN<br>Office of County Counsel<br>County of Solano<br>675 Texas Street, Suite 6600<br>Fairfield, CA 94533 |
| DANIEL J. WALLACE<br>KELLY DUNCAN SCOTT<br>County of Santa Barbara<br>105 E. Anapamu St., Suite 201<br>Santa Barbara, CA 93101 | ROCHELLE C. EAST<br>Office of the Attorney General<br>455 Golden Gate Avenue<br>Suite 1100<br>San Francisco, CA 94102 |
| LISA TILLMAN<br>Office of the Attorney General<br>1300 I Street, Suite 125<br>Sacramento, CA 94244 | DORIS COLES-HUFF<br>U.S. Attorney's Office<br>555 4th Street, NW<br>Washington, D.C. 20530 |
| PETER M. BRIEN<br>U.S. Attorney's Office<br>555 4th Street, NW<br>Washington, D.C. 20530 | ALEXANDER SHOAIBI<br>U.S. Attorney's Office<br>555 4th Street, NW<br>Washington, D.C. 20530 |

☒ (By First Class Mail pursuant to Code of Civil Procedure section 1013.) I am readily familiar with (firm name)'s practices for collecting and processing documents for mailing with United States Postal Service. Following these ordinary business practices, I placed the above referenced sealed envelope(s) for collection and mailing with the United States Postal Service on the date listed herein at 425 Market Street, 26th Floor, San Francisco, California 94105. The above referenced sealed envelope(s) will be deposited with the United States Postal Service on the date listed herein in the ordinary course of business.

☐ (By Express Mail pursuant to Code of Civil Procedure section 1013.) I deposited each sealed envelope, with the postage prepaid, to be delivered via _____ to the party(ies) so designated on the service list.

☐ (By Telecopy Fax pursuant to Code of Civil Procedure section 1013.) I am readily familiar with (firm name)'s practice for processing of documents via Telefax. Following these ordinary business practices, I directed that the above referenced documents(s) be placed in the Telefax machine, with all costs of Telefaxing prepaid, directed to each of the party(ies) listed on the attached service list using the last Telefax numbers(s) given by the party(ies), and processed through the Telefax equipment, until a report is provided by that equipment indicating that the Telefax operation was successful. A copy of the Telefax report indicating successful transmission is attached hereto.

PROOF OF SERVICE

1549180.1

1

        I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

2

3

Tanya R. Williams

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 3 -

1549180.1

# EXHIBIT M

## Knotz, Galit

| | |
|---|---|
| **From:** | Stegeman, Chad |
| **Sent:** | Friday, August 15, 2008 6:28 PM |
| **To:** | ed.sangster@klgates.com |
| **Cc:** | Leonard, Natalie; Takahata, Carrie; Wang, Teresa; khb@jones-mayer.com; ann.ravel@cco.sccgov.org; cathy.grijalva@cco.sccgov.org; javier.serrano@cco.sccgov.org; lori.pegg@cco.sccgov.org; theresa.fuentes@cco.sccgov.org; winifred.botha@cco.sccgov.org; Kyle.Lewis@doj.ca.gov; rochelle.east@doj.ca.gov; pmello@hansonbridgett.com; rjacob@hansonbridgett.com; imt@jones-mayer.com; ahardy@prisonlaw.com; dspecter@prisonlaw.com; revenson@prisonlaw.com; awhelan@rbg-law.com; fred.heather@klgates.com; jeff.bornstein@klgates.com; mbien@rbg-law.com; mrc@jones-mayer.com; wemitchell@rivcoda.org; akeck@sonoma-county.org; cwoodward@co.sanmateo.ca.us; kscott@co.santa-barbara.ca.us; smingram@solanocounty.com; lisa.tillman@doj.ca.gov; Charles.Antonen@doj.ca.gov; cathy.stephenson@sdcda.org; snorman@prisonlaw.com; raymond.loughrey@klgates.com; timothy.fredricks@klgates.com; rmmargherio@solanocounty.com; Kaufhold, Steven; Knotz, Galit |
| **Subject:** | RE: Plata, et al. v. Schwarzenegger, et al. (U.S.D.C., Northern Dist. of Cal., Case No. C01-1351 T.E.H.); Coleman, et al. v. Schwarzenegger, et al. (U.S.D.C., Eastern Dist. of Cal., Case No. CIV S-90-0520) THREE-JUDGE COURT (File No. 034400) |

**Attachments:** document2008-08-15-181359.pdf

Ed:

Per our discussions, we have memorialized our objections to the depositions of the Legislator Intervenors you had scheduled for next week. As indicated earlier this week, these depositions will not proceed as noticed. Again, we urge you to reconsider your position regarding the depositions of all four legislators, and to depose Assemblyman Spitzer and Senator Runner by written questions.

Regards,

Chad A. Stegeman
Akin Gump Strauss Hauer & Feld LLP
580 California St.
San Francisco, CA 94104
Direct: 415.765.9526
Fax: 415.765.9501

1  STEVEN S. KAUFHOLD (SBN 157195) skaufhold@akingump.com
2  CHAD A. STEGEMAN (SBN 225745) cstegeman@akingump.com
   Akin Gump Strauss Hauer & Feld LLP
3  580 California, 15th Floor
   San Francisco, California 94104-1036
4  Telephone:    415-765-9500
   Facsimile:    415-765-9501
5  Attorneys for Petitioners Republican Assembly and
   Senate Intervenors
6

7

8              IN THE UNITED STATES DISTRICT COURTS

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10            AND THE NORTHERN DISTRICT OF CALIFORNIA

11      UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

12        PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

13

| | |
|---|---|
| 14  RALPH COLEMAN, et al., | Case No.: CIV S-90-0520 LKK JFM P |
| 15              Plaintiffs, | **THREE-JUDGE COURT** |
| 16       vs. | |
| 17  ARNOLD SCHWARZENEGGER, et al., | |
| 18              Defendants. | |
| 19  MARCIANO PLATA, et al., | Case No.: C01-1351 THE |
| 20              Plaintiffs, | **THREE-JUDGE COURT** |
| 21       vs. | |
| 22  ARNOLD SCHWARZENEGGER, et al., | **OBJECTIONS TO PLAINTIFFS'** |
| 23              Defendants. | **NOTICE OF DEPOSITIONS** |

24

25

26

27

28

                                    1

1    Republican Assembly and Senate Intervenors ("Legislator Intervenors") object to Plaintiffs'

2    Notice of Deposition served by mail on August 8, 2008, on the following grounds:

3        1.    The Notice is not reasonable because the Notice of Deposition provided the Legislator

4    Intervenors less than 10 days to prepare for deposition; this case is exceedingly complex; Plaintiffs

5    have scheduled several other depositions for the same date and time; and the Legislator Intervenors are

6    extremely busy given that the California Legislature is in session.

7        2.    Plaintiffs have exceeded the 10-deposition limit set by Federal Rule of Civil Procedure

8    30 without leave of Court.

9        3.    Plaintiffs have violated the Three-Judge Court's July 2, 2008 Order.  The Legislator

10   Intervenors did not designate two of the individuals that Plaintiffs wish to depose (Assemblyman

11   Villines or Senator Cogdill) as trial witnesses.

12       4.    The depositions of Assemblyman Villines and Senator Cogdill are duplicative,

13   cumulative, burdensome, and redundant.

14       5.    The Legislator Intervenors informed Plaintiffs that the individuals listed in the Notice

15   are not available on the dates that Plaintiffs unilaterally chose.

16       6.    Plaintiffs have failed to justify their refusal to accommodate the Legislator Intervenors'

17   compromise regarding the depositions of Assemblyman Spitzer and Senator Runner that Plaintiffs take

18   these depositions by written questions pursuant to Federal Rule of Civil Procedure 31.

19       7.    Assemblyman Villines and Senator Cogdill are entitled to limited immunity from

20   depositions afforded to high-ranking government officials because the testimony of Assemblyman

21   Villines and Senator Cogdill will be substantially similar to the testimony of Assemblyman Spitzer and

22   Senator Runner, the two Legislators who are listed as trial witnesses.  The benefit of such duplicative

23   testimony is far outweighed by the cost that Assemblyman Villines and Senator Cogdill will bear by

24   the distraction these depositions will pose to their legislative duties.

25   DATED: August 15, 2008          AKIN GUMP STRAUSS HAUER & FELD LLP

26                       By:

27                          Chad A. Stegeman
                            Attorney for Republican Assembly and Senator

28                          Defendant-Intervenors

OBJECTIONS TO PLAINTIFFS' NOTICE OF DEPOSITIONS

# EXHIBIT N

USNEWS.com

July 24, 2008 Thursday

In Budget Showdown, Schwarzenegger Threatens Minimum Wage for State Employees

BYLINE: Justin Ewers

California's legislature is 24 days overdue on passing a budget, and the governor is fed up.

SAN FRANCISCO--The Governator appears to have had enough. After months of watching Democrats and Republicans in California's state legislature squabble over how best to close a $15.2 billion budget deficit, Gov. Arnold Schwarzenegger is ready to put his foot down. According to a draft copy of an executive order leaked yesterday to the Sacramento Bee, Schwarzenegger plans next week to slash the pay of more than 200,000 state government employees to the federal minimum wage of $6.55 per hour, saving the state an estimated $1.2 billion a month--and putting a huge amount of pressure on recalcitrant lawmakers to finally come to an agreement on the budget.

In the order, which has not yet been officially released, Schwarzenegger acknowledges that the pay cut is a drastic measure, but he seems to believe push has finally come to shove. The legislature here was required to pass the more than $100 billion state budget by July 1, but legislators have been at loggerheads ever since, with Democrats demanding tax increases to close the shortfall and Republicans insisting on spending cuts. In the last week, negotiations between the two sides have largely broken down. Schwarzenegger, with this new order, is giving both sides a powerful nudge--and bringing what would normally be the late stages of a humdrum budget negotiation process into the political spotlight. "As a result of the late state budget, there is a real and substantial risk that the state will have insufficient cash to pay for state expenditures," the order reads. The governor's staff has so far refused to comment on Schwarzenegger's plans.

Needless to say, the prospect of almost a quarter-million state employees receiving a drastic pay cut has sent the political establishment in the nation's most populous state into a frenzy. Schwarzenegger has been trying to reform the state's perennial budget problems since he took office. In January, he proposed a dramatic 10 percent cut to all state agencies, including trimming $4 billion from the K-12 budget. This spring, he softened his approach, suggesting the state instead borrow against its future lottery proceeds to close the deficit. Schwarzenegger threatened to raise taxes if he didn't get his way. "Our crisis is real and it's very serious," he warned at a press conference announcing the proposal. "We need additional revenues, and we've got to get creative without raising taxes."

State legislators, though, have refused to follow his lead. Republicans in the State Assembly called the lottery plan dead on arrival because of its proposed tax hikes, and Democrats have defied the governor--and their colleagues across the aisle--by coming up with a budget that includes more than $10 billion in tax increases. The state's budget deadline came and went 24 days ago with no sign of progress, and lawmakers have watched their approval ratings sag. According to a poll released this week, 3 in 5 Californians say they disapprove of the job the

state legislature is doing. Nearly half disapprove of Schwarzenegger. More than two thirds say the state is now "seriously off track."

With this new move, Schwarzenegger has embraced a policy of mutually assured destruction--and turned the budget battle into a political cage match. While there is some question about whether or not he could actually push through his proposed pay cut--the state controller insists the state has enough cash to make payments through September--there's no doubt that Schwarzenegger is on firm legal ground. In 2003, the California Supreme Court ruled that the state may cut workers' salaries to the federal minimum in the absence of a state budget. Once the budget is passed, workers' salaries would return to their normal levels, and they would receive back pay, as well.

**For now, Schwarzenegger's brawling tactics appear to be having the desired effect. Lawmakers in Sacramento yesterday were quick to display their willingness to return to the negotiating table. "I don't believe the governor would put public servants in the crossfire of this budget battle," said Karen Bass, the Democratic speaker of the State Assembly. "But this action would speak to the need for all us--including the governor--to negotiate a balanced, responsible budget that protects our schools and the safety net before we run out of cash." GOP leaders also seemed chastened: "Republicans understand the urgency of getting the budget done as soon as possible, which is our main focus right now," Dave Cogdill, the Senate Republican leader, and Mike Villines, the party's Assembly leader, said in a joint statement. "We are working very hard to avoid drastic measures like the one that is being proposed."**

As lawmakers haul themselves back to their budget talks, experts say there is no guarantee they will be able to bridge their differences. This state, after all, has a long history of political gridlock: In 1992, Gov. Pete Wilson paid 93,000 state workers with IOUs during a then-record 64-day budget impasse. Today's state workers, meanwhile, are girding themselves for the worst. As one told the Bee: "I guess people will start working on Monday like they're making $6.55 an hour."

Copyright 2008 McClatchy Newspapers, Inc.

All Rights Reserved

Sacramento Bee (California)

July 21, 2008 Monday

Bid to sell billions in state surplus property is bogged down

BYLINE: Aurelio Rojas arojas@sacbee.com

When the **California Senate approved legislation last week to sell a 13-acre parking lot at the historic Cow Palace, it was a rare instance of Democrats and Republicans agreeing to dispose of underused state land.**

Since Gov. Arnold Schwarzenegger ordered state agencies in 2004 to expedite the sale of an estimated $5 billion in surplus property to help lower the state's budget deficit -- currently $15.2 billion -- less than $60 million in property has been sold, according to the state Department of Finance.

Administration officials blame several political and legal impediments for the state's failure to unload property identified in the governor's California Performance Review, an audit he ordered shortly after he was elected.

The biggest obstacle has been the California Environmental Quality Act, which requires a review of the potential environmental impact of the sale of state land.

Democrats who control the Legislature have declined to waive the requirement, arguing that to do so would threaten the environment.

The Republican governor, meanwhile, has vetoed property sales that do not include CEQA exemptions. He argues the land has to undergo environmental review at the local level anyway.

Sen. Jeff Denham, R-Atwater, the most vocal advocate in the Legislature for selling state property, said the governor bears some blame for the standstill.

Schwarzenegger has vetoed individual property sales even when environmental review is not required, Denham said, because he wants a CEQA-exempt bill that would sell a long list of properties.

The senator cites, as an example, the governor's three vetoes of legislation that Denham carried to sell a prison sewage treatment plant operated by the city of Soledad to the city.

In each instance, the governor vetoed the legislation because it was not included in an omnibus surplus property bill.

Without such legislation, the state won't be able to generate much money from sales of surplus property, said Beth Mills, spokeswoman for the Department of General Services, which is responsible for selling state land.

She said the Legislature has not passed a surplus property omnibus bill since 2004.

That year, voters passed a ballot measure requiring that proceeds from the sale of surplus property be used to pay down the state's deficit reduction bonds.

"Without (legislation), there's only so much land the state can actually can sell," Mills said.

Mills said the governor's audit may have overstated the amount the state can raise because local politics makes it difficult to move expensive properties like San Quentin, the Del Mar Race Track and the Orange County Fairgrounds.

In May, the Senate rejected Denham's bid to sell the land under the Los Angeles Memorial Coliseum and the adjoining Los Angeles Memorial Sports Arena.

Sen. Mark Ridley-Thomas, a Los Angeles Democrat who led the opposition to selling the properties in his district, argued the sales would undercut efforts to improve public facilities in the surrounding area.

Like the Coliseum, the Cow Palace in Daly City has a rich history. Built in 1941, it was used as a staging area for combat troops during World War II. The Beatles played there. So did the NBA's Warriors.

But these days, the arena, which has fallen into disrepair, hosts only about 60 events a year.

In February, Sen. Leland Yee, D-San Francisco, introduced legislation that would have allowed Daly City to purchase the 68-acre site, tear down the Cow Palace and redevelop the area.

But after an outpouring of nostalgic support for the arena, Yee agreed to amend his legislation -- SB 1527-- to let the state enter negotiations to sell only a 13-acre parking lot on the site.

Whether the sale ever occurs, Yee said on the floor of the Senate last week, will be determined by the Department of General Services.

"All this bill does is to allow the negotiations to proceed," Yee told his colleagues.

In a rare show of bipartisanship, Sen. Mark Wyland, R-Del Mar, joined Yee in urging senators to back the legislation, which was approved on a 27-9 vote.

"We talk and talk and talk -- many of us -- about trying to divest excess property," Wyland said.

"It's time to actually take a property that's not being used and divest it through a reasonable process and proceed to some of the other thousands of unnecessary pieces of state property," he said.

In an interview, Denham said the state needs to develop "a justification process on all state property."

"Either it provides a benefit to people around the entire state -- or it provides a regional use -- or it should not be on our asset list," he said.

Monterey County Herald (California)

July 17, 2008 Thursday

HEADLINE: Lawmakers move to protect turtles

The Monterey County Herald Herald Staff Report


The California Legislature has adopted a resolution urging the National Marine Fisheries Service to deny or delay consideration of new West Coast fishing permits for swordfish.

**The resolution adopted Tuesday asks for critical habitat to be designated for the Pacific leatherback sea turtle and calls for studies to determine whether added protections are warranted for the Pacific loggerhead sea turtle.**

Santi Roberts, California project manager for Oceana, an ocean protection and restoration advocacy group, said the turtles are near extinction partly because they drown in industrial longline and gillnet fishing gear intended to catch swordfish, shark and tuna.

"They are critically in danger, and every sea turtle counts," said Roberts.

Fishing for swordfish puts turtles at risk because longline fishing takes place in shallow water using lines that stretch for miles. Each line has thousands of hooks, Roberts said. The method can leave sharks, albatrosses, dolphins, other marine mammals and sea turtles caught in the line.

"They should be trying to figure out ways to catch seafood without catching too much, without catching animals they don't mean to catch and without causing destruction to the seafloor," he said.

Debris and loss of nesting beaches as a result of global warming threaten sea turtles, Roberts said.

Pacific leatherback sea turtles are the last members of an ancient lineage that has outlived the dinosaurs, and can grow to the size of a small car.

The turtles migrate across the Pacific Ocean from their nesting grounds in New Guinea and Indonesia to feed in the waters off California and Oregon.

Roberts said it is rare to see a leatherback sea turtle, but they are known to migrate to Monterey and San Francisco Bay waters during the fall.

Copyright 2008 San Francisco Chronicle

All Rights Reserved

The San Francisco Chronicle (California)

July 16, 2008 Wednesday

FINAL Edition

SECTION: Metro; Pg. B1

Governor frets over dawdling on budget; He says he'll hang tough on plans to reform the process

Matthew Yi, Chronicle Sacramento Bureau

Gov. Arnold Schwarzenegger said Tuesday he is frustrated by the Legislature's inability to broker a state budget on time but will hold out to make sure the state's spending plan, which is more than two weeks late, includes changes in the budget process.

"I think if it takes another two, three weeks, budget reform is worth it because I think it's extremely important that we have budget reform," the governor said in an interview with The Chronicle.

The state is facing a $17.2 billion deficit and Schwarzenegger has been touting his ideas for change, which include setting a spending cap based on an average of the previous decade's revenue; instituting automatic spending cuts during a fiscal crisis; and borrowing against future state lottery sales to close the deficit and create a rainy-day fund.

"If we don't have budget reform, we're basically saying to the people of California ... that even though we have the worst budget system, we're not willing to fix it," said Schwarzenegger.

But garnering support in the Democrat-controlled Legislature has not been easy.

"We're also in favor of a real budget reform, and having a rainy-day fund. ... But it's been raining for years, and we're not going to adopt a plan that was overwhelmingly rejected by voters in 2005," said Assembly Speaker Karen Bass, D-Baldwin Vista Los Angeles County, referring to the governor's ballot measure three years ago to reform the budget process.

Bass said she's open to beefing up the state's cash reserves for tough budget years like this one, but is not willing to accept a spending cap, which Republican legislators support. She said California's tax system must be changed so state revenues are more predictable, a point that Schwarzenegger said he agrees with.

"The day after the budget is signed, the legislative leaders have agreed to launch an independent tax commission," Bass said.

But the big question is when the budget will be approved.

**California has a poor track record of getting a spending plan in place before the start of the fiscal year that begins on July 1, and this year is no exception, with legislative leaders continuing to hammer out a compromise.**

"I'm one of many California governors that are frustrated," Schwarzenegger said in Tuesday's interview, while noting that he's met his deadlines in releasing a budget in January and revising it in May.

That criticism wasn't taken lightly by some lawmakers.

"In meeting his deadlines, he's only had to negotiate with himself," Bass said. "I need to build a two-thirds majority support. If I was making the budget by myself, I would be done, too."

Still, while the legislative leaders on both sides of the political aisle have met consistently in recent weeks, there has been little progress on finding middle ground, with Republicans demanding spending cuts and Democrats proposing $10 billion worth of taxes.

But both sides agree the governor's controversial plan to borrow against future state lottery revenues won't work to close the current year's enormous deficit.

Schwarzenegger wants to sell up to $15 billion in bonds over three years to help close the budget gap and jump-start the state's rainy day fund, with the debt repaid over three decades using state lottery revenues.

The proposal would require voter approval in November, but if it is rejected, the governor wants a temporary 1 percent increase in the sales tax, which would expire in 2011.

"I just think it's unrealistic that something that needs voter approval in November should be used as a budget solution," said Sen. Denise Ducheny, D-San Diego, chairwoman of the Legislature's budget conference committee.

But Schwarzenegger said he's convinced it can work.

"We wouldn't propose it if we didn't think it was reasonable," he said, adding that he plans to invite lottery and financial experts to speak to legislative leaders on why his plan would work.

# EXHIBIT O



*The Best Sun of THE SACRAMENTO BEE*

Politics: Local | State | National | Wire | Blogs | My Elected Officials | Capitol Alert*More in this section*

# The Buzz: California Senate called in to work on Labor Day

Published 12:00 am PDT Tuesday, September 2, 2008
Story appeared in MAIN NEWS section, Page A3

**Today at the Capitol**

The state Senate will meet again at 4 p.m. Senate President Pro Tem Don Perata has vowed to call his house into session each day this week.

**Worth repeating**



"Things are bad, and they're going to get worse."
**Don Perata**, Senate president pro tem

**Budget Standoff Day 64**

The California Senate met in an unusual Labor Day session, but made no progress on a budget deal. Sen. President Pro Tem Don

Perata, D-Oakland, banged the gavel at 4:04 p.m. Senate Republican leader Dave Cogdill, R-Modesto, immediately called his caucus into a 40-minute private meeting. Democrats and Republicans then debated for about an hour about who is to blame for California's record-setting legislative budget impasse. The Assembly did not meet and is not scheduled to do so until Wednesday.

The Sacramento Bee Unique content, exceptional value. **SUBSCRIBE NOW!**

 

## SILENCE DOESN'T WORK HERE

An awareness building program designed to help employers reduce the financial impact of domestic violence while creating a safe and functional workplace for all employees.

To request a presentation or materials click here

News | Sports | Business | Politics | Opinion | Entertainment | Living Here | Travel | Blogs | Cars | Homes | Jobs | Classifieds/Shopping

Privacy Policy | Terms of Use | Site Map | Advertise | Guide to The Bee | Bee Jobs | FAQs | RSS

Contact Us | e-edition | Subscribe | Manage Your Subscription | E-newsletters | Sacbeemail | Archives

sacbee.com | Sacramento.com | Capitol Alert | SacMomsClub.com | SacPaws.com | SacWineRegion.com

Copyright © The Sacramento Bee

2100 Q St. P.O. Box 15779 Sacramento, CA 95816 (916) 321-1000