EXHIBIT A

08.08.29 rough Cate

```
 1              UNITED STATES DISTRICT COURT

 2         FOR THE EASTERN DISTRICT OF CALIFORNIA

 3         AND THE NORTHERN DISTRICT OF CALIFORNIA

 4                     ---oOo---

 5   RALPH COLEMAN, et al.,          )
                                     )
 6                  Plaintiffs,      )
                 vs.                 )
 7                                   )  No. 2:90-cv-00520
                                     )       LKK JFM P
 8   ARNOLD SCHWARZENEGGER, et       )
     al.,                            )
 9                                   )
                    Defendants.      )
10   _____)
     MARCIANO PLATA, et al.,         )
11                                   )
                    Plaintiffs,      )
12                                   )
                 vs.                 )  No. C:01 1351 TEH
13                                   )
     ARNOLD SCHWARZENEGGER, et       )
14   al.,                            )
                                     )
15                  Defendants.      )
     _____)
16

17

18         UNCERTIFIED ROUGH DRAFT TRANSCRIPT

19                  DEPOSITION OF

20                MATTHEW L. CATE

21        _____

22            FRIDAY, AUGUST 29, 2008

23

24   REPORTED BY:  HOLLY THUMAN, CSR No. 6834, RMR, CRR

25                              (1-412303)
```

1

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

```
 1   YOU HAVE REQUESTED AN UNEDITED, NONCERTIFIED ROUGH

 2   DRAFT  TRANSCRIPT.  THE ROUGH DRAFT TRANSCRIPT HAS
```

08.08.29 rough Cate

3   BEEN REQUESTED IN THE FORMAT OF A ROUGH DRAFT, ASCII

4   DISK AND/OR INSTANTANEOUS TRANSMISSION.

5   THIS CERTIFIED SHORTHAND REPORTER MAKES NO

6   REPRESENTATIONS REGARDING THE ACCURACY AND

7   COMPLETENESS OF SAID REAL-TIME TRANSCRIPT/ROUGH

8   DRAFT.  THERE MAY BE MISTRANSLATED OR UNTRANSLATED

9   TEXT, INCLUDING BUT NOT                    LIMITED TO

10  OCCURRENCES WITHIN QUESTIONS BY COUNSEL,

11  ANSWERS GIVEN BY THE WITNESS, COLLOQUY AND

12  GRAMMATICAL                    INACCURACIES.  THESE

13  WILL BE CORRECTED ON THE FINAL

14  CERTIFIED TRANSCRIPT.  THE ABOVE-LISTED LIMITATIONS

15  MAY BE DUE TO THE REAL-TIME SOFTWARE PROGRAM AND/OR

16  TIME CONSTRAINTS PLACED  ON THIS REPORTER IN

17  PROVIDING THIS UNEDITED, NONCERTIFIED  REAL-TIME

18  TRANSCRIPT/ROUGH DRAFT.

19  THIS REAL-TIME COMPUTERIZED TRANSCRIPT/ROUGH DRAFT

20  IS A SERVICE FOR YOUR REVIEW OF THE

21  PROCEEDINGS AND IS NOT PROVIDED FOR, NOR MEANT TO BE

22  USED OR CITED IN ANY TYPE OF COURT PROCEEDINGS.   IT

23  SHALL NOT BE USED BY THE WITNESS TO CORRECT AND

24  SIGN.  ONLY THE FINAL, CERTIFIED TRANSCRIPT SHALL BE

25  USED FOR PURPOSES OF READING AND SIGNING BY THE

DO NOT CITE PER CCP2025(b)

2

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1   WITNESS.                 THE COMPLETED CERTIFIED

2   TRANSCRIPT AND CERTIFIED COPIES SHALL BE DELIVERED

3   IN APPROXIMATELY ONE TO TWO                  WEEKS,

4   UNLESS ALTERNATE ARRANGEMENTS ARE MADE.

5   REALTIME AND/OR ROUGH DRAFT TRANSCRIPTS WILL NOT BE

08.08.29 rough Cate

6    PROVIDED UNLESS A FINAL, CERTIFIED COPY OF THE

7    TRANSCRIPT IS ORDERED.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DO NOT CITE PER CCP2025(b)

3

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1                    --oOo--

2        Deposition of MATTHEW L. CATE, taken by the

3    Plaintiffs, at PRISON LAW OFFICE, 1917 Fifth Street,

4    Berkeley, California 94710,commencing at 9:30 a.m.,

5    on FRIDAY, AUGUST 29, 2008, before me, HOLLY THUMAN,

6    CSR, RMR, CRR.

7                    --oOo--

8                   APPEARANCES

9    FOR THE PLAINTIFFS:

Page 3

08.08.29 rough Cate

```
10        PRISON LAW OFFICE
          1917 Fifth Street
11        Berkeley, California 94710
          By:  DONALD SPECTER, Attorney at Law
12

13    FOR DEFENDANTS:

14        HANSON BRIDGETT LLP
          425 Market Street, 26th Floor
15        San Francisco, California 94105
          By:   PAUL MELLO, Attorney at Law
16

17        STATE OF CALIFORNIA
          DEPARTMENT OF CORRECTIONS & REHABILITATION
18        Office of Legal Affairs
          1515 S Street, Suite 502
19        By:   BENJAMIN T. RICE, Assistant Secretary

20

21    FOR DISTRICT ATTORNEY INTERVENORS:

22        DISTRICT ATTORNEY, COUNTY OF RIVERSIDE
          82-675 Highwayy 111, Fourth Floor
23        Indio, California 92201
          By:   WILLIAM E. MITCHELL, Assistant District
24    Attorney

25
```

DO NOT CITE PER CCP2025(b)

4

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

```
 1    ALSO PRESENT:   PATRICK MURRAY, Videographer.

 2

 3

 4

 5

 6

 7

 8

 9

10

11

12
```

08.08.29 rough Cate

13

14

15

16

17

18

19

20

21

22

23

24

25

DO NOT CITE PER CCP2025(b)

5

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1    SAN FRANCISCO, CALIFORNIA; FRIDAY, AUGUST 29, 2008

2                    9:30 a.m.

3                    --oOo--

4                  PROCEEDINGS

5          THE VIDEO OPERATOR:  Here begins Volume 1,

6    Videotape No. 1 in the deposition of Matthew Cate in

7    the matter of Coleman versus Schwarzenegger and

8    related case in US District Court, Northern and

9    Eastern District of California.

10          The case number is 2:90-C-V-00520.  Today's

11   date is August 29th, 2008.

12          The time on the video monitor is 9:30.  The

13   video operator today is Patrick Murray, contracted

14   by Merrill Legal Solutions, San Francisco,

15   California.

16          This video deposition is taking place at

Page 5

08.08.29 rough Cate

17    1917 Fifth Ave., Berkeley.

18          Counsel, please identify yourselves and

19    state whom you represent.

20          MR. SPECTER:  Donald Specter for the

21    plaintiffs.

22          MR. MELLO:  Paul Mello for defendants.

23          MR. RICE:  Ben Rice, CDCR legal.

24          MR. MITCHELL:  Mitchell, Riverside DA's

25    attorneys, for the District Attorney intervenors.

DO NOT CITE PER CCP2025(b)

6

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1          THE VIDEO OPERATOR:  The court reporter

2    today is Holly Thuman of Merrill.

3          Will the court reporter please swear in the

4    witness.

5                          --oOo--

6                    MATTHEW L. CATE,

7    _____

8    called as a witness, who, having been first duly

9    sworn, was examined and testified as follows:

10                         --oOo--

11          EXAMINATION BY MR. SPECTER.

12          MR. SPECTER:  Q.  Would you please state

13    your name and spell your last name?

14    A.    My name is Matthew Cate, C-A-T-E.

15    Q.    I usually ask whether somebody has been

16    deposed before, but I'm going to ask you whether

17    you've ever taken a deposition before.

18    A.    I've assisted in taking depositions in

19    private practice.  I was too low down the totem pole

Page 6

08.08.29 rough Cate

20    to be charged with any really important work in my

21    private practice work, but --

22        Q.    Okay.  So you're familiar with the

23    deposition procedures?

24        A.    I am.

25        Q.    Okay.  And you've had a chance to talk with

DO NOT CITE PER CCP2025(b)

7

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1    Mr. Mello about this deposition?

2        A.    I have.

3        Q.    Okay.  So I'm not going to go through all

4    of them, since you're a lawyer and you've done this

5    before.

6            Just my own personal points are that wait

7    till I finish the question, which you usually do

8    when we talk.  And if you don't understand the

9    question, please let me know or else I'll assume you

10   understand the question.  Okay?

11       A.    Okay.

12       Q.    You went to law school, university of

13   Oregon.  Right?

14       A.    Right.

15       Q.    You're admitted to the bar in California?

16       A.    I am.

17       Q.    Your bar membership is active?

18       A.    It is.

19       Q.    And you were the -- at the Attorney

20   General's office at some point in your career.

21   Correct?

22       A.    Right.  Through -- from 20 -- from 1996 to

23   2004.

Page 7

08.08.29 rough Cate

24          Q.   And then you were appointed by the governor

25     as the Inspector General of the State of California.

DO NOT CITE PER CCP2025(b)

8

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1      Correct?

2          A.   Correct.

3          Q.   And you served in that capacity till May

4      14th of this year?

5          A.   Correct.

6          Q.   And then you became the Secretary of the

7      CDCR.  Correct?

8          A.   That's correct.

9          Q.   So in preparation for your deposition

10     today, other than your lawyers, Mr. Mello or

11     Mr. Rice, did you talk to anybody about the content

12     of the deposition?

13         A.   No.

14         Q.   Okay.  Did you review any documents in

15     preparation for today's deposition?

16         A.   I did.

17         Q.   And what were those?

18         A.   The ones contained in this red folder,

19     and -- I mean, in -- you know, throughout the course

20     of the last 2 weeks, I've, you know, looked at --

21     have known I was going to be deposed and have had

22     this in mind as I've done my daily work.

23              But specifically, Mr. Rice provided me with

24     these documents, and said it would probably be a

25     good idea for me to review them, so I read them in

DO NOT CITE PER CCP2025(b)

9

08.08.29 rough Cate

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1     the car on the way up here while he drove.

2          Q.  Okay.  So could you tell me what those

3     documents are?

4          A.  The first one is entitled, Prison Reforms,

5     Achieving Results.  This was produced by the

6     Department before my arrival.

7              The second one is the governor's

8     proclamation concerning prison overcrowding state of

9     emergency.

10             The third is the Integrated Strategy to

11    Address Overcrowding in CDCR's Adult Institutions,

12    and this was created by the Department after my

13    arrival.

14             The next is a notice of filing of the

15    receiver's turnaround plan of action.  Oh, and I

16    think the plan itself is a part of this.

17             The -- my supplemental responses to

18    then-secretary Tilton's November 2007 responses to

19    Plaintiff Coleman's interrogatories, set one.

20             My supplemental responses to Plaintiff

21    Plata's first set of interrogatories to former

22    defendant till ton.

23             My responses to the second set of

24    interrogatories from Plaintiff Coleman.

25             That's it.

                 DO NOT CITE PER CCP2025(b)

                                                        10


                UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1          Q.  Okay.  Could I see the first document you

2     mentioned?

08.08.29 rough Cate

3          MR. MELLO:  He'll answer questions about
4     the 2nd and 4th pages.  They're blank.
5          MR. SPECTER:  Q.  Oh.  Okay.  Do you mind
6     if I just put this aside?  I'll make copies on the
7     break.
8          A.  Okay.
9          Q.  Good.  So as secretary, you're head of the
10    Department of Corrections.  And so who reports to
11    you directly?
12         A.  The chief of staff, Brett Morgan, reports
13    to me directly.
14              The -- I mean, I think that's the only
15    important on the org chart, but in practice, I meet
16    regularly with what I call the secretary's office,
17    which includes the current two undersecretaries,
18    Scott Kernan, who's the acting undersecretary of
19    operations, and is filling in in administration;
20    Kathy Jett, undersecretary of program.  Elizabeth
21    Siggins, senior policy adviser.  Lee Seale, deputy
22    chief of staff.  Ben Rice, general counsel.  I think
23    that's everybody.
24         Q.  Okay.  What about Mr. Runnels?
25         A.  Mr. Runnels works for the Receiver now.
                    DO NOT CITE PER CCP2025(b)
                                                      11


              UNCERTIFIED ROUGH DRAFT TRANSCRIPT
1          Q.  I see.
2          A.  Well, actually, he may not work for the
3     Receiver yet.  I think he's still -- today may be
4     his last day at corrections, but he's been on
5     vacation this week during transition and he'll start
                         Page 10

08.08.29 rough Cate

6    with the Receiver on Monday.  So we've appointed

7    Mr. Kernan as acting undersecretary in his absence,

8    and he gave us notice a few weeks ago, and we've

9    been interviewing and we'll ultimately submit a name

10   follow the governor's office and make a selection

11   for a replacement.

12       Q.  Okay.  I also heard that Wendy Still is

13   leaving from the -- to the Receiver's office.  Is

14   that correct?

15       A.  That's correct.

16       Q.  And what position was she --

17       A.  She was associate director of our female

18   institutions.

19       Q.  And those are two -- boat two important

20   positions in your department.  What was your

21   reaction to the fact that they were leaving for the

22   Receiver's office?

23       A.  Mixed.  I think both are very good

24   correctional practitioners, and have a great deal of

25   expertise.  I also understand that during a time of

DO NOT CITE PER CCP2025(b)

12

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1    leadership transition, that many professionals use

2    that as an opportunity to reevaluate what they want

3    to do.  They've both indicated to me that they saw

4    it as an opportunity to kind of create something

5    from the ground floor which they had never been able

6    to do as part of an existing organization, so that

7    was attractive to them.

8            My commandment to all them employees is I

9    want the best for them personally, so on a personal

Page 11

08.08.29 rough Cate

10    level, I really wish them well and every success as

11    they go.

12        There's -- you know, there's a transition

13    period that makes things lease efficient for a

14    period of time as you have to get new people in.  On

15    the other hand, there are some benefits to starting

16    with a fresh team and getting everybody on the same

17    page right from the beginning, and so there are some

18    pros and cons to it.

19        Q.  Are you concerned at all about the Receiver

20    picking off your top people?

21        A.  I'm concerned any time I lose top people to

22    anybody.

23        My management philosophy is that I recruit

24    the best possible people, and understand that when

25    you do that, you're going to lose people as they

DO NOT CITE PER CCP2025(b)

13

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1    take advantage of other opportunities.  That's just

2    what happens when you have good people.

3        It's -- if -- I actually believe that we'll

4    see a short-term movement of people to the Receiver,

5    and then I think they'll slow, and we may actually

6    see people wanting to come back.  In my mind, the

7    real action is in corrections.  I think we have the

8    biggest impact on public policy and I think it's a

9    more exciting job.  So ...

10        Q.  Okay.  who do you report to?

11        A.  I report to Dan Dunmoyer.

12        Q.  Can you spell his last name?

08.08.29 rough Cate

13      A.   D-U-N-M-O-Y-E-R.

14      Q.   Okay.  And what's his position?

15      A.   He's cabinet secretary.  So each of the

16   agency secretaries report to Mr. Dunmoyer.

17      Q.   I see.  And what's your reporting

18   relationship to Robert Gore?

19      A.   Mr. Gore is a deputy to Mr. Dunmoyer.

20      Q.   Oh, I see.

21      A.   So I don't have a reporting responsibility

22   to him, although informally, if Mr. Dunmoyer asked

23   Mr. Gore to ask me to do something, and I understand

24   it's what Mr. Dunmoyer wants, then I'll respond to

25   that.

DO NOT CITE PER CCP2025(b)

14

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1        And, you know, the way Mr. Gore works is an

2   intermediary between us, oftentimes.  But primarily,

3   Mr. Gore works with my subordinates, and my

4   subordinates work with him, and Mr. Dunmoyer and I

5   communicate directly fairly regularly.

6      Q.   I see.  And as I understand it.  From the

7   outside at least, Mr. Gore has quite a bit of

8   responsibility for corrections issues, criminal

9   justice issues in the governor's office.  Is that

10   correct?

11      A.   It depends what you mean by that.  I'll

12   take a stab and it, and you tell me if I'm on track.

13        His portfolio is corrections, I think

14   emergency services and food and ag.  And those are

15   big for the folios, and so he's fully engaged in

16   that.

Page 13

08.08.29 rough Cate

17          He certainly has a lot of responsibility in

18    tracking all the things that happen in corrections,

19    is he the governor's office is informed about what's

20    happening on a big-picture policy level.

21          You know, from communications to ledg,

22    et cetera, so he's got a great deal of

23    responsibility in keeping the two connected.

24       Q.  So would he be more familiar with the kind

25    of day-to-day issues on corrections than

DO NOT CITE PER CCP2025(b)

15

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1    Mr. Dunmoyer, for example?

2          MR. MELLO:  Calls for speculation.  It's

3    vague.

4          You can answer.

5          THE WITNESS:  I think Mr. Dunmoyer stays

6    really well in tune on the big issues.  On I think

7    day to day, certainly, Mr. Gore is more familiar, in

8    that his job is to sift out those things that are

9    routine and make some determinations about what

10    needs to go further up the chain.  What's important

11    enough for Mr. Dunmoyer to concern himself with.  So

12    I think it's fair.

13          MR. SPECTER:  Q.  Okay.  And then

14    Mr. Dunmoyer, does he report to Susan Kennedy?

15       A.  I believe so.  Well, he reports -- he

16    reports to her and to the governor.  I'm not exactly

17    sure if it's a direct reporting relationship or if

18    he has dual reporting relationship.  My

19    understanding is in practice the three work together

08.08.29 rough Cate

20    closely on these kind of issues.

21        Q.   Okay.  And do you have regular meetings

22    with Mr. Dunmoyer?

23        A.   I do.

24        Q.   And how often is that?

25        A.   Every other week, approximately.  I've got

DO NOT CITE PER CCP2025(b)

16

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1    a formal meeting set once a month.  In practice, we

2    talk a couple of times a week.

3        Q.   And in these regular meetings, are minutes

4    kept of those meetings, or --

5        A.   No.

6        Q.   -- are they informal?

7        A.   They are informal.

8        Q.   Okay.  And what are the subjects that you

9    talk to Mr. Dunmoyer about?

10            MR. MELLO:  I'm going to object on the

11    basis of deliberative process and potentially

12    attorney-client to the extent that there are

13    attorneys at this meeting.

14            And allow you to lay the foundation, but I

15    think I'm going to instruct him not to answer on the

16    basis of the executive privilege.  And, if

17    appropriate, the attorney-client privilege.

18            MR. SPECTER:  Okay.  Well -- okay.  I just

19    asked him what the subjects were.  I didn't ask him

20    what was said.  So --

21            MR. MELLO:  Understood.

22            MR. SPECTER:  It seems a fair question.

23            MR. MELLO:  Just the subjects.

Page 15

08.08.29 rough Cate

24          MR. SPECTER:  Huh?

25          MR. MELLO:  You just want to know the
                DO NOT CITE PER CCP2025(b)
                                                        17


UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1    subjects?

2          MR. SPECTER:  Well, you wanted -- in terms

3    of the foundation I was trying to --

4          MR. MELLO:  Well, why dent you lay the

5    foundation and figure out who was at the meeting so

6    we can decide whether or not to assert the

7    privilege.

8          MR. SPECTER:  Okay.

9      Q.  So who is normally at the meetings with

10   Mr. Dunmoyer and yourself?

11     A.  If you're -- I think you're referencing the

12   regular meetings --

13     Q.  Yes, thank you.

14     A.  -- just between us.  If -- on -- at those,

15   it's typically -- well, it's only been 3 months or

16   3 1/2 months, so I don't know if anything's really

17   typical.

18          The the three or four we've had so far,

19   it's always been Mr. Dunmoyer and myself.  Mr. Gore

20   has typically attended; he may have missed one.  And

21   I've brought Mr. Morgan to one or two.

22          So --

23     Q.  Three or four of you.

24     A.  Yes.

25     Q.  Right, okay.  And generally, what are the
                DO NOT CITE PER CCP2025(b)
                                                        18
                Page 16

08.08.29 rough Cate

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1    subjects of these meetings, of the three or four

2    meetings that you've had with him?

3          MR. MELLO:  And same objection with respect

4    to deliberative process and executive privilege.

5          I'll allow him to identify the subjects.

6          THE WITNESS:  One subject was a -- my plans

7    for the first hundred days or so of my becoming the

8    secretary of CDCR.  In other words, what did I plan

9    to do in the short term as the leader of the

10   department.

11         Other topics will typically flow from the

12   events of that time period.  So we have discussed

13   the document entitled "The Integrated Strategy to

14   Address Overcrowding," for example.

15         MR. SPECTER:  Q.  Well, let me narrow it

16   down a little bit, try to see if we can -- so you've

17   discussed the overcrowding issues within the

18   department.  Correct?

19         A.  Yes.

20         Q.  And have you discussed that on more than

21   one occasion, or is that a normal part of your three

22   or four meetings?

23         A.  I -- you know, it's -- to the extent that

24   that would include discussions related to our

25   building plans, you know, really we're talking about

DO NOT CITE PER CCP2025(b)

19

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1    construction of new facilities or new components of

2    facilities, nor example, that touches on the issue

Page 17

08.08.29 rough Cate

 3    of overcrowding.

 4         The --

 5         MR. MELLO:  So again, remember, he's just

 6    asking you about the subjects.  Don't go into the

 7    details.

 8         THE WITNESS:  Parole reform, the budget,

 9    personnel.  Vision, mission, goals of the

10    department.

11         And now I can't recall what the -- was

12    the -- what was the question again?

13         MR. SPECTER:  Q.  That's rightall right.

14    Did you fine.

15         A.  I mean, I think I've covered the topics.

16         Q.  How about, have you discussed healthcare?

17         A.  Yes.

18         Q.  Have you discussed the three-judge panel

19    proceeding?

20         MR. MELLO:  With Mr. Dunmoyer?

21         MR. SPECTER:  Q.  Yes.

22         A.  In these meetings?

23         Q.  Yes.

24         A.  I don't recall if in our regular meetings

25    we discussed that topic.

                DO NOT CITE PER CCP2025(b)
                                                    20


            UNCERTIFIED ROUGH DRAFT TRANSCRIPT

 1         Q.  Have you discussed the three-judge panel

 2    proceedings with Mr. Dunmoyer at times other than in

 3    these meetings?

 4         A.  Certainly.

 5         Q.  Do you know on approximately how many

                        Page 18

08.08.29 rough Cate

6   occasions?  I'm not going to hold you to every

7   conversation, but ...

8       A.  Ten times.  Again, that's a rough

9   approximation.  You know, 3 months divided by every

10   couple of weeks, you know.

11       Q.  Right.  I understand.

12           And would these typically occur as phone

13   calls?

14       A.  Yes.  Well, I don't -- actually, there was

15   probably a blend of --

16       Q.  Phone calls and --

17       A.  Informal meetings, you know, hallway

18   conversation, a phone call.

19       Q.  Okay.  I'm just looking through my notes to

20   see if there's any other --

21           Have you discussed with him the legislative

22   proposals that are contained in the senate

23   conference -- that the senate passed out in terms of

24   population reduction measures?

25           MR. MELLO:  It's vague, and it's probably

                DO NOT CITE PER CCP2025(b)
                                                        21


            UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1   just vague to me.

2           MR. SPECTER:  It is.  I think --

3           MR. MELLO:  But, vague as to time, too.  Do

4   you mean just passed out yesterday, date before?

5           MR. SPECTER:  Q.  No, I think in June of

6   this year, the Senate passed out a bunch of

7   proposals.  I have them here if you'd like to --

8       A.  I think I know --

9       Q.  You know what I've talking about?

                    Page 19

08.08.29 rough Cate

10          MR. MELLO:  So the question is, have you

11    guys discussed those proposals that you guys know

12    what you're talking about, yes or no?

13          MR. SPECTER:  That's the question.

14          MR. MELLO:  Yes or no.

15          MR. SPECTER:  Q.  Outcomes from the --

16          MR. MELLO:  Without going into the

17    substance of your discussions.

18          MR. SPECTER:  Q.  Their outcomes of the

19    June 5th meeting of the Senate Budget Committee in

20    which there's an appendix which lists corrections

21    reform packages, which I'm sure you've seen before.

22       A.   I have not had a conversation with him

23    where we have gone over each of these and discussed

24    them.  They have come up as part of other

25    conversations that I'd had with him, though.

DO NOT CITE PER CCP2025(b)

22

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1          MR. MELLO:  Just for the record, the

2    witness was referring to a document entitled

3    "California State Senate Committee on Budget and

4    Fiscal Reform, Senator Denise Moreno -- I can't

5    say -- Ducheney -- June 5, 2008 outcomes.

6          MR. SPECTER:  It's not important.

7          MR. MELLO:  Perfect.  Perfect.  What was

8    that?

9          MR. SPECTER:  It's called being inaudible.

10    Okay.

11          MR. MELLO:  We'll have one correction to

12    the transcript for sure to add that back in.

Page 20

08.08.29 rough Cate

13          MR. SPECTER:  Q.  You mentioned that you

14    discussed healthcare with Mr. Dunmoyer.  Have you --

15    well, let me ask you what I hope is a simpler

16    question.

17          Have you -- of the subjects that you --

18    I'll strike that question.

19          You mentioned that you discussed healthcare

20    issues with Mr. Dunmoyer.  Would that include

21    medical and mental healthcare?

22          A.  Yes.

23          Q.  And what were the -- what did you talk

24    about about that with Mr. Dunmoyer?

25          MR. MELLO:  Now I'm going to instruct the
                    DO NOT CITE PER CCP2025(b)
                                                              23


                UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1    witness not to answer on the basis the executive and

2    deliberative process privilege.

3          MR. SPECTER:  Okay.  Are you going to

4    instruct him not to answer on all the -- on all

5    conversations he had with Mr. Dunmoyer about any of

6    the topics that he mentioned?

7          MR. MELLO:  Any of the deliberative topics

8    that you have just mentioned, yes.

9          MR. SPECTER:  And all follow-up questions

10    relating to that?

11          MR. MELLO:  Yes.

12          MR. SPECTER:  So I don't have to ask him a

13    hundred questions here?

14          MR. MELLO:  Right.

15          MR. SPECTER:  Okay.

16          MR. MELLO:  If you could explain to me how
                    Page 21

08.08.29 rough Cate

17  it's relevant to the issues in this case as to why

18  crowds is the primary cause of the unconstitutional

19  delivery of healthcare and why the only fix is a

20  prisoner release order, and why -- how it relates to

21  whether there will be an adverse impact on public

22  safety, how those discussions, which are protected

23  by the executive privilege, are relevant, I'm

24  willing to rethink the issue.

25          But I just don't know how -- why we would

DO NOT CITE PER CCP2025(b)

24

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1   waste the time talking about those discussions when

2   I'm sure there are topics he can answer your

3   questions about and you can get the information you

4   need with respect to the actual issues before

5   this -- before this three-judge panel.

6           MR. SPECTER:  Well, I don't understand you

7   to be making a relevance objection, Paul.  I mean --

8           MR. MELLO:  I'm literally just trying to

9   move the ball forward here.  The last thing I want

10  to do is instruct my witness not to answer all day

11  long.

12          But what I think I'm going to get, because

13  what I think you're going at is, discussions that

14  are clearly protected.  I -- I think a real court

15  would clearly protect the communications with the

16  governor's chief of staff and the governor's cabinet

17  secretary, those deliberative communications I think

18  a real court would protect those, and therefore I'm

19  going to instruct the witness not to answer those

Page 22

08.08.29 rough Cate
20    questions.

21         But as to moving the ball forward and

22    trying to get the discovery that you within the, I

23    think that there's other ways you can do it.  Gist

24    don't -- I mean, probably I just don't understand

25    why those discussions matter.  Isn't what matters

DO NOT CITE PER CCP2025(b)

25

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1    what actually happens, what they have done, what

2    they haven't done?

3         MR. SPECTER:  Well, what -- the things you

4    talk about matter, too.  But -- and I know I can ask

5    Mr. Cate questions about some of these issues which

6    don't real to what was discussed.

7         But I believe I'm also entitled, since

8    Mr. Dunmoyer is Mr. Cate's boss, to know what was

9    said during those meetings bay Mr. Dunmoyer and

10    Mr. Cate, and I can't do that if you're going to

11    instruct him not to answer.

12         MR. MELLO:  Understood.  So we're probably

13    at an impasse, is what you're saying.

14         MR. SPECTER:  That's right.

15         MR. MELLO:  Okay.

16         MR. SPECTER:  Q.  So we will take this up

17    with the Court --

18         MR. MELLO:  I'm sure we will.

19         MR. SPECTER:  And see what they say.

20         And would all of the -- I was going to ask

21    him whether he's had any discussions with Mr. --

22    well, with Ms. Kennedy about any of these subjects.

23         MR. MELLO:  And he'll get the same --
Page 23

08.08.29 rough Cate

24      whether he's had those discussions?

25              MR. SPECTER:  Uh-huh.

                DO NOT CITE PER CCP2025(b)

                                                    26


            UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1               MR. MELLO:  I think I'd allow him to answer

2       the foundation question.  With -- I'll make the

3       objection, but he can answer whether he's had

4       discussions on these topics if you'd like.

5               MR. SPECTER:  That would be helpful.

6               MR. MELLO:  Okay.

7               MR. SPECTER:  Q.  Mr. Cate, I have a list

8       of the things you mentioned, so why don't you just

9       say yes or no is to whether you've discussed them

10      with Ms. Kennedy.

11          A.  All right.

12          Q.  And then I will ask you if there's anything

13      else after we get done with this.

14          A.  Okay.

15          Q.  Plans for your first hundred days?

16          A.  In part.

17          Q.  Okay.  The integrative strategy on

18      overcrowding?

19          A.  Again, not directly.  To the extent it

20      covers construction -- component parts of it, yes.

21          Q.  Okay.  Parole reform?

22          A.  Yes.

23          Q.  Budget?

24          A.  Yes.

25          Q.  Vision, mission, goals of the department?

                DO NOT CITE PER CCP2025(b)

                                                    27

Page 24

08.08.29 rough Cate

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1      A.   In part.

2      Q.   Okay.  Medical and mental healthcare?

3      A.   Yes.

4      Q.   The three-judge panel proceedings?

5      A.   Yes.

6      Q.   The legislative proposals that we just

7   referred to?

8      A.   Same answer as with Mr. Dunmoyer.

9      Q.   Okay.

10     A.   In part.

11          MR. SPECTER:  And Paul, as I understand it,

12   you would instruct him not to answer based on the --

13   well, why don't you make your objection.

14          MR. MELLO:  Based on the deliberative

15   process and executive privileges, as well as, if any

16   of those discussions occurred in the presence of

17   counsel, the attorney-client privilege.

18          MR. SPECTER:  Q.  Did any of the

19   discussions you had with Ms. Kennedy occur within --

20   with a lawyer present other than yourself?

21     A.   Yes.

22     Q.   And who is the lawyer?

23          MR. MELLO:  Or lawyers?

24          MR. SPECTER:  Q.  Or lawyers?

25     A.   Some of them occurred with Andrea Hoch, the

DO NOT CITE PER CCP2025(b)

28

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1   governor's legal affairs secretary, present.  And

2   I'm not sure whether Mr. Rice or any other lawyer

Page 25

08.08.29 rough Cate

 3    might have been present.  I don't believe so,

 4    though.

 5       Q.  Okay.  During the time that Ms. Hoch was

 6    present, would she participate in these discussions?

 7       A.  Yes.

 8       Q.  And was the nature of her participation to

 9    provide legal advice?

10       A.  Primarily.  I'd say yes, she --

11            MR. MELLO:  You've answered.

12            MR. SPECTER:  Q.  But you can't cut him

13    off, Paul.

14            MR. MELLO:  I just did.  Maybe I shouldn't,

15    but I just did.  Okay.

16            MR. SPECTER:  Just let him answer the

17    question.

18            THE WITNESS:  If she -- the only caveat is,

19    she may have commented on her own opinion on a

20    policy during a discussion.  They're informal.  But

21    primarily, she provides counsel.

22            MR. SPECTER:  Q.  So but you discussed

23    other matters beside -- you had discussions on

24    policy issues with Ms. Kennedy.  Correct?

25       A.  Yes.

                DO NOT CITE PER CCP2025(b)
                                              29


            UNCERTIFIED ROUGH DRAFT TRANSCRIPT

 1       Q.  And while you were discussing those

 2    policies issues between you and Ms. Kennedy, there

 3    were times when Ms. Hoch wasn't providing legal

 4    advice.  Is that correct?

 5            MR. MELLO:  I think that misstates his

08.08.29 rough Cate

6    testimony.  And I think we're getting dangerously

7    close to reveal the substance of the communications.

8    And I don't think you want to do that.  Right?

9        MR. SPECTER:  Well, I just -- I didn't ask

10    him about substance.  I just asked him if --

11        MR. MELLO:  If you understand the question,

12    and you can provide an answer that doesn't go to the

13    substance of the communication, feel free to answer

14    it.  Otherwise, I will instruct you not to answer.

15        THE WITNESS:  My understanding is that

16    she's there primarily to provide legal advice.

17    There were policy discussions that took place in her

18    presence.  I couldn't say at what moment she was --

19    I assume she's always acting in her capacity as the

20    governor's lawyer.  That's her job.  And so I would

21    have to guess as to whether she was at any one

22    moment herself acting -- trying to act in that

23    capacity or not.

24        MR. SPECTER:  Q.  Right.  And what I was

25    getting at, in a meeting with three or four people,

DO NOT CITE PER CCP2025(b)

30

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1    often people talk to each other, and some -- on --

2    the third person is sometimes silent and not

3    providing legal advice.

4        Well, let me ask you this other question:

5        Were the nature of these discussions having

6    to do with legal strategies for the defense of the

7    current cases?

8        MR. MELLO:  Without going into the

9    substance, if you can answer that question.

Page 27

08.08.29 rough Cate

10      Otherwise, I'll instruct you not to answer.

11              THE WITNESS:  Sometimes.

12              MR. SPECTER:  Q.  Sometimes.  Sometimes

13      not?

14          A.  Right.

15          Q.  Okay.  So have you -- when was the last

16      time you met with the governor?  Or let me strike

17      that and rephrase it.

18              When was the last time you spoke to the

19      governor?

20          A.  It seems like it would be 3 weeks ago.

21          Q.  Okay.  And what was the subject of that

22      conversation?

23              MR. MELLO:  Objection.  Oh, the subject.

24              MR. SPECTER:  Yes.

25              MR. MELLO:  You can tell him the subject.

                DO NOT CITE PER CCP2025(b)

                                                            31


                UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1               THE WITNESS:  The difficulty is, is that if

2       seeing him and talked with him informally, you know,

3       every week or every other week, and sometimes it's a

4       substantive conversation that relates to my subject

5       area of expertise -- or not expertise, but

6       corrections, you know, where I'm reporting to him on

7       an issue related to corrections, and sometimes it's

8       in a bigger format of correctional -- of government

9       officials.

10              I think the last time I talked to him was

11      at the Border Governors' Conference.

12              MR. SPECTER:  Q.  When was the last time

                Page 28

08.08.29 rough Cate

13    you talked to him about issues concerning your job

14    responsibilities, or anything falling within --

15    under the department?

16         A.  I think we spoke briefly about this at the

17    border governors' concerns, which would have been

18    about 2 weeks ago.

19         Q.  And by this, you mean --

20         A.  I mean the Department of Corrections.

21         Q.  I see.

22         A.  But it would have been a 2- or 3-minute

23    conversation.

24         Q.  I see.  Did you -- of all the things that

25    we listed before, the plans for the first hundred

                    DO NOT CITE PER CCP2025(b)

                                                              32


                    UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1     days, have you had a discussion with him about that?

2          A.  In part.

3          Q.  Okay.  The integrated strategy for -- about

4     crowding?

5          A.  In part.

6          Q.  Parole reform?

7          A.  Yes.

8          Q.  The budget?

9          A.  Yes.

10         Q.  Your vision, mission, goals of the

11    department?

12         A.  Again, the highlights, yes.

13         Q.  Yes.  Healthcare, medical and mental

14    healthcare?

15         A.  Yes.

16         Q.  The three-judge panel proceeding?

                          Page 29

08.08.29 rough Cate

17 A. I believe so, yes.

18 Q. And the legislative proposals we've

19 discussed earlier?

20 A. I don't believe so.

21 Q. Okay.

22   MR. SPECTER:  Do you --

23   MR. MELLO:  Same objection if you go into

24 the substance.

25   MR. SPECTER:  So we have an agreement

     DO NOT CITE PER CCP2025(b)

             33

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1 that --

2   MR. MELLO:  That --

3   MR. SPECTER:  You're going to --

4   MR. MELLO:  We've a disagreement.

5   MR. SPECTER:  We have an agreement that

6 you're going to invoice the deliberative process

7 privilege --

8   MR. MELLO:  For his substantive

9 conversations with the governor, yes.

10   Done, I assume you're also not asking -- I

11 mean, it seems to me that some of these meetings may

12 relate to settlement discussions in this case, and I

13 assume those are off limits.  Right?  You're not

14 asking him to testify about any of those things, are

15 you?

16   MR. SPECTER:  Well, he hasn't even -- we

17 haven't even established that he has had a

18 discussion with the judge about settlement.  So I

19 don't know.

      Page 30

08.08.29 rough Cate
20          MR. MELLO:  The judge?

21          MR. SPECTER:  I mean, I'm sorry, the

22     governor or any of these other people.

23          MR. MELLO:  Okay, that's fine.

24          MR. SPECTER:  You know, why don't we do

25     that so we can sort of -- I mean, if they're within

                    DO NOT CITE PER CCP2025(b)

                                                        34

               UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1      the settlement privilege --

2           MR. MELLO:  You're in the asking him to

3      speak about any discussions that he had with the

4      governor's office -- those three individuals we've

5      identified regarding settlement discussions.

6      Correct?

7           MR. SPECTER:  Well, I have to look at the

8      rule.  But anything which comes within the rule, I'm

9      not asking him about, right.  I don't have the rule

10     in front of me.

11          Q.  Do you know the rule by heart?

12          A.  No.

13          Q.  Let me just ask you, of the areas we

14     mentioned in terms of the governor, have you had

15     discussions with him apart from the settlement

16     negotiations that were occurring in the spring of

17     this year?

18          A.  I'm not sure I understand.

19          MR. MELLO:  Yeah, objection.  Vague.

20          MR. SPECTER:  Q.  You were part of

21     settlement negotiations in this case --

22          A.  Right.

23          Q.  -- from the time even before you became

                         Page 31

08.08.29 rough Cate

24    secretary until the end of June.  Correct?

25        A.  Correct.

DO NOT CITE PER CCP2025(b)

35

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1        Q.  During that time period, did you have

2    discussions with the governor about the settlement

3    of this -- the potential for settling this case or

4    anything surrounding that?

5        A.  Yes.

6        Q.  Okay.  Did you have discussions with the

7    governor on the subjects that we just mentioned

8    which weren't involved in the settlement process?

9        A.  It's a difficult question only in this

10    respect, in that the settlement process involved --

11    it was so broad, the topics were so broad, I could

12    have conversations that related to a specific area,

13    that of course are connected to a potential

14    resolution of this matter.

15            But not in the context -- not in the direct

16    context at that moment of particular settlement

17    offer.

18            Does that make sense?

19        Q.  Yes, perfect sense?

20            MR. MELLO:  So I think what he's saying is

21    every discussion he had with these three people was

22    part of the settlement process.

23            MR. SPECTER:  You're free to characterize

24    it that way.  But we'll respectfully disagree.

25            MR. MELLO:  That's what I heard.

DO NOT CITE PER CCP2025(b)

36

Page 32

08.08.29 rough Cate

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1          MR. SPECTER:  Huh?

2          MR. MELLO:  That's what I heard.

3          MR. SPECTER:  I know.  You're free to make

4    your argument.

5          Q.  And the same -- does the same hold true for

6    Susan Kennedy?

7          A.  I think my answers would be slightly

8    different.

9          Q.  And how so?  Why don't you give your answer

10    then.

11          A.  Can you go over your list?

12          Q.  Yes.  Plans for your first hundred days?

13          A.  In less detail than with Mr. Dunmoyer and

14    probably in somewhat more detail than with the

15    governor.

16          Q.  Okay.  That seems appropriate.

17          The integrative strategy to discuss

18    overcrowding?

19          MR. MELLO:  Is the question whether he

20    discussed those in -- as part of settlement

21    discussions?

22          MR. SPECTER:  Well, I think --

23          MR. MELLO:  With those focus?

24          MR. SPECTER:  Did I ask -- can we go off

25    the record for a second?

DO NOT CITE PER CCP2025(b)

37

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1          THE VIDEO OPERATOR:  Going off the record,

2    the time is 10:11.

Page 33

08.08.29 rough Cate

3          (Recess from 10:11 a.m. to 10:19 a.m.)

4          THE VIDEO OPERATOR:  We are back on the

5    record at 10:20.

6          MR. SPECTER:  Q.  Okay.  Matt -- I'm going

7    to eliminate the formality here, and you can do the

8    same, of you're choosing.

9          A.  Are you instructing me to loosen my tie?

10          Q.  Yes.  It's not quite up to your collar, by

11    the way.  I have to stare at it the whole time.

12          A.  How's that?

13          Q.  Good.  So you're good on your picture.

14          A.  One follow-up from before, you had asked me

15    about documents.

16          I had left out one, and that's a -- I

17    had -- we had retained David Bogard to act as our

18    expert when you retained Mr. Scott.

19          Q.  Right.

20          A.  And he provided a report to me on his

21    discussions with Mr. Scott and giving me advice on

22    what he thought about the three-judge panel case as

23    our expert.  And I looked at that as well, but I

24    didn't bring that up today, and I didn't bring it

25    with me.

DO NOT CITE PER CCP2025(b)

38

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1          Q.  Okay, that's fine.  Thanks.

2          Before we went off the record, your

3    attorney instructed you not to answer based on

4    various privileges.

5          A.  Right.

Page 34

08.08.29 rough Cate

6      Q.  Are you going to follow that instruction,
7  or are you going to answer the question?
8      A.  I will follow the advice of my counsel.
9      Q.  So you're refusing to answer all the
10  questions I asked but those subjects?
11      A.  On the advice of counsel, yes.
12          MR. RICE:  Conversations.  Not the subject
13  areas.
14          MR. MELLO:  Conversations yes,.  The
15  record's clear.
16          THE WITNESS:  I'm happy to discuss all the
17  subject areas and all the things I know about them,
18  just not the conversations with the people you
19  mentioned.
20          MR. SPECTER:  Q.  That's fine, okay.
21  Paragraph do you know that you have been designated
22  as a witness in this case?
23      A.  I wasn't sure of any formal designation,
24  but that makes sense to me.
25      Q.  I'm going to give you a -- well, let me
              DO NOT CITE PER CCP2025(b)
                                                    39

              UNCERTIFIED ROUGH DRAFT TRANSCRIPT
1  ask -- I'm going to show you what's called an
2  initial disclosure.  It's what the parties use to
3  say who's going to be a witness and what they're
4  going to testify about.
5      A.  Okay.
6      Q.  And this is the Coleman Defendants'
7  supplement to initial disclosures filed by -- or
8  dated August 7th, 2008 by Lisa Tillman.
9          And on the second page, it says that
              Page 35

08.08.29 rough Cate

10    secretary Cate is expected to give testimony on the

11    size of the CDCR population and the means of

12    addressing that population through a combination of

13    programs such as reduced recidivism through parole

14    reform, direct release of certain offenders and

15    enhanced clerical support to enable timely discharge

16    of parolees.

17              Do you see that?

18      A.   I do.

19      Q.   Had you been informed -- were you aware

20    that you were likely to give testimony about those

21    subjects?

22      A.   Yes.

23      Q.   Were there any other subjects that you

24    expect to give testimony about?

25              MR. MELLO:   In Coleman?

                  DO NOT CITE PER CCP2025(b)

                                                        40

          UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1              MR. SPECTER:   Q.   In either of the cases.

2       A.   I expected that I'd be asked about all

3    relevant information concerning the subject of this

4    litigation.

5       Q.   Okay.   Are there any areas within the

6    subject of this litigation other than those

7    mentioned here that you specifically desire to give

8    testimony about, since you're the defendant.   You

9    get to choose.

10              MR. MELLO:   And/or which may be listed in

11    the Plata initial disclosures?

12              MR. SPECTER:   They're exactly the same.

                      Page 36

08.08.29 rough Cate

13          MR. MELLO:  Are they?

14          MR. SPECTER:  Yes.

15          MR. MELLO:  He's asking you whether there

16     are other subjects that you want to speak about in

17     this litigation as a witness.

18          THE WITNESS:  I think it would be difficult

19     for me to tell you with any specificity all --

20     everything I'd like to say in accordance -- in this

21     litigation right now.  I note, for example, that our

22     construction plan is not included in this.  I

23     would -- I note that our re-entry planning is not

24     included.  Our staffing increases are not included.

25     I note that our general reform efforts related to

DO NOT CITE PER CCP2025(b)

41

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1     the rehabilitation of California's offenders are not

2     included.

3          Our work -- our collaborative efforts with

4     individual courts concerning mental health and

5     medical care.  Again, those are the ones that come

6     to mind immediately.  There may be others that --

7          MR. SPECTER:  Q.  Okay.  When you said

8     individual courts, you meant the Henderson court and

9     the Carlton court?  SPELL?

10         A.  Correct.  And by that I really meant our

11     efforts to improve inmate access to care, for

12     example, by collaborating the Receiver and our

13     efforts to improve mental healthcare through our own

14     work in the mental health field, which includes

15     collaboration with the Court and the special master

16     in that case, in the Coleman case.

08.08.29 rough Cate

17      Q.  Okay.  Okay, good.

18      A.  Out-of-state transfers would be another

19   that's not listed here.

20      Q.  Okay.  Have you had any conversations with

21   legislators about this case?

22      A.  Yes.

23      Q.  Which legislators?

24      A.  I've had conversations with numerous

25   legislators about issues that are the subject of

DO NOT CITE PER CCP2025(b)

                                                    42


UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1   this case:  Construction, parole reform,

2   overcrowding in general, the Receiver's plans, the

3   budget.  All those have impact on this case, and

4   some of those conversations we actually talked about

5   the three -- in the context of the three-judge panel

6   case, and other conversations were just about, you

7   know, expanding capacity or decreasing population

8   through reform.  And so -- but we didn't mention the

9   context of this case in those conversations.

10      Q.  I understand.

11          Have you had a conversation about any of

12   those subjects with a person you might know just

13   vaguely, Todd Spitzer?

14      A.  I have.

15      Q.  And have you discussed all of those

16   subjects with Mr. Spitzer?  Or why don't you just

17   tell me what you've discussed with Mr. Spitzer.

18   That might make it easier, if you can recall.

19      A.  I've talked with Mr. Spitzer about AB 900.

08.08.29 rough Cate

20    The necessity for amendment, statutory cleanup

21    language in order to get a clean bond opinion, which

22    would enable us to obtain the funding which is

23    necessary to begin construction of our additional

24    capacity.

25              I've had discussions about the three-judge

DO NOT CITE PER CCP2025(b)

43

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1    panel case in particular, because he's an

2    intervenor.

3              He's talked to me about his views on a

4    number of these issues from time to time.  I -- it's

5    been, though, probably 4 or 6 weeks since I talked

6    to him at all.  So I don't recall the specifics of

7    the conversations now.

8         Q.  Okay.  Did Assemblyman Spitzer complain

9    about -- or complain is a word which I didn't mean

10    to be pejorative, but was he concerned about the

11    delays in building more space?

12         A.  Yes.

13              MR. MELLO:  During --

14              THE WITNESS:  Sorry.

15              MR. MELLO:  During discussions, that was

16    your question, with Mr. Cate?

17              MR. SPECTER:  Q.  Yes.

18         A.  Yeah, that's what I assumed you were

19    meaning, yeah.

20         Q.  And he -- and when you talked about the

21    need for this cleanup language, was he supportive of

22    that position, if you --

23         A.  I think generally, Mr. Spitzer was in favor

Page 39

08.08.29 rough Cate

24    of anything which would speed up the construction of

25    what's commonly called the in-fill beds.

DO NOT CITE PER CCP2025(b)

44

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1        Q.  And in terms of the three-judge panel

2    proceeding, what were the -- what were the substance

3    of those conversations with Mr. Spitzer?

4        A.  He discussed the need to expand capacity to

5    put the state in a better position to defend this

6    lawsuit.  He discussed his own hopes for a

7    resolution of the matter, which included, as I

8    recall, some but not all necessarily of the

9    components of the settlement that was published by

10   justice Louie SPELL and -- or Judge Louie and

11   Justice Siggins.

12       Q.  And when you say hopes, you meant that in a

13   positive way.  A positive resolution of the case.

14   Is that what you meant?

15       A.  I --

16       Q.  Is that the understanding that you had from

17   talking to him?

18       A.  What I meant was that he thought that there

19   was a possibility that we could reach a resolution

20   of this matter short of trial that would meet his

21   expectation, or his goals for the litigation.

22       Q.  Okay.  Other than Mr. Spitzer, who have

23   you -- what other legislators have you talked to

24   about AB 900?

25       A.  I've talked to senator runner SPELL, I

DO NOT CITE PER CCP2025(b)

45

08.08.29 rough Cate

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1  believe I spoke to assemblyman Arambula.  I spoke to
2  the Republican Caucus.  I believe I spoke to Speaker
3  Nunez, former Speaker Nunez on that topic.
4      Q.  And was this in terms of your progress in
5  meeting the legislative mandates of AB 900?
6      A.  I think that's fair, a general
7  characterization.  What I've done so far, what still
8  needs to be done, what they could do to help.
9      Q.  Right.  Have you talked to any probation
10 officials, like chief probation officers, about this
11 case?
12     A.  Yes.
13     Q.  And what was the substance of those
14 discussions?
15     A.  In conversation with Mr. Harper --
16     Q.  Jerry Harper?
17     A.  Right.  From either before or after the
18 formal meetings of the parties and intervenors, we
19 would discuss options for -- or possible ways that
20 the case might be resolved.
21     Q.  And did Mr. -- what was Mr. Harper's
22 thoughts on that issue?
23     A.  My recollection is he was concerned about
24 the impact of the court's proposal regarding
25 diversion on local government and the cost associate

DO NOT CITE PER CCP2025(b)

46

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1  with that.  But generally thought there was some
2  hope for resolution based upon other aspects of the

Page 41

08.08.29 rough Cate

3    proposal by the settlement referee and his assistant

4    or his expert related to the other areas that were

5    proposed.

6        Q.  Have you -- with the exception of Wayne

7    Scott, have you had conversations with other

8    correctional administrators from other jurisdictions

9    about the overcrowding problem in California?

10       A.  Yes.

11       Q.  And who would they be?

12       A.  I discussed our overcrowding problem with

13   attendees at the American -- or sorry, the

14   association of state correctional administrators,

15   who were members of that group who were present at

16   what's known as new directors training, which

17   occurred in Denver in the last 30 days, 45 days ago,

18   in that range.

19       Q.  And did any of them have advice for you?

20       A.  Well, I found that the director from Rhode

21   Island has the same problems that we do, but that

22   they just are two zeros smaller than ours.  That

23   most directors have some difficulty with crowding at

24   one time or another.  Many of them who were present

25   discussed that they struggled in this area to try to

DO NOT CITE PER CCP2025(b)

47

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1    utilize various tools from additional capacity to

2    out of state transfers to deal with the population

3    that they are sent from the local jurisdictions, and

4    that sometimes they do better than others at keeping

5    the flow in and the flow out the same.  It's a

08.08.29 rough Cate

6   common struggle among all correctional at minimum

7   straight ores.  It's one of the things that I came

8   out of there with, is that it's not -- we're not

9   alone in California working -- having to work out

10  this problem.

11       Q.  Did you discuss the fact that our parole

12  revocation rate is much higher than the national

13  average with them?

14       A.  I think I did, yes.

15       Q.  And did they have any advice for you on how

16  to bring that down?

17       A.  That group did not.

18       Q.  Did other group -- another --

19       A.  Well, I've gained information from other

20  sources about that, yeah, sure.

21       Q.  So why don't you share with me what --

22       A.  Well, the --

23       Q.  what you've learned.

24       A.  For example, I've -- before I became the

25  secretary, I was aware that the State of Washington

DO NOT CITE PER CCP2025(b)

48

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1   had taken drastic measures related to parole,

2   eliminating it at one point and then bringing it

3   back.

4            I know from the correctional experts that

5   there are ways related to, for example, many

6   statutes utilize a risk assessment tool to make

7   smarter decisions about which parolees should be

8   returned to custody and which can be kept locally.

9   That very few states place all inmates on parole,

Page 43

08.08.29 rough Cate

10    and we're one of those states, and so that makes our

11    problems somewhat unique in side.

12         I know that some states deal -- for

13    example, many states don't revoke on their criminal

14    violations.  Those are handled by the district

15    attorneys.  They revoke on their failure to comply

16    with the conditions of their parole, and so that's a

17    difference.  And so it kind of comes down to who you

18    have on parole, what you do with their violations,

19    are the kind of primary places that you can impact

20    the revolving door or the churning issue that has

21    been identified by many people.

22         Q.  And from the alternatives you have

23    mentioned, have you learned that those alternatives

24    are unsafe for public safety?

25              MR. MELLO:  Objection.  Overbroad.  Calls

                   DO NOT CITE PER CCP2025(b)

                                                        49

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1    for speculation.  Maybe lacks foundation.  And it's

2    vague.

3              You can answer.

4              THE WITNESS:  It depends.

5         I think common sense tells us that you need

6    to be careful in how you implement any reform

7    evident to ensure that you're balancing -- there's

8    risk associated with doing nothing, and there's

9    risks associated with change.  And so you just need

10    to be extraordinarily careful to make sure that

11    you're utilizing the best possible correctional

12    science when you consider any change.

                        Page 44

08.08.29 rough Cate

13           I think that also, that there's individual

14   safety concerns, so I worry about individual victims

15   out there, and I also have to worry about the

16   overall crime rate.  And so, you know, there may be

17   a situation where an individual gets harmed who

18   might not have -- for example, you choose reform

19   measure A, you could go back in history and say,

20   this person would have still been in custody, and so

21   this victim wouldn't have been harmed.  It was

22   unsafe for that victim for you to do that particular

23   parole reform measure, for example.

24          On the other hand, if you haven't changed

25   the overall crime rate, then you can say as a

DO NOT CITE PER CCP2025(b)

50

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1   general rule that society as a whole was just as

2   safe or even safer if the fewer inmates allows you

3   to then work for effectively in rehabilitating your

4   current population, that can have a decrease in

5   crime in the future.

6          And so I guess it's your perspective.  If

7   you're the individual victim then it's unsafe for

8   you and that reform measure has been unsafe.

9          Looking at society's view, you you somebody

10   advicely don't want to do anything that's going to

11   raise the crime rate.  You look in the future view

12   and you also have to be concerned about trying to

13   rehabilitate the inmates that are currently in our

14   care, especially those that, you know, have a

15   propensity for violence.  So that's -- it's

16   complicated.  That's my concern.

Page 45

08.08.29 rough Cate

17          MR. SPECTER:  Q.  Those are -- I appreciate

18    those concerns.

19          Of the three views which you mentioned, do

20    you look at all of them when you're the secretary in

21    making decisions about parole issues, or do you

22    emphasize one over the other, or --

23          A.  I think you look at all of them.

24    Undoubtedly, you try to emphasize the greatest good

25    for the greatest number when you're in charge of

DO NOT CITE PER CCP2025(b)

                                                    51

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1     170,000 inmates and 125,000 parole offenders, you

2     try to look at it in the pick picture to the extent

3     that you can.

4           Q.  And if you looked at it in the small

5     picture in terms of how individual -- in terms of

6     how policy decisions would impact certain

7     individuals other than -- rather than other

8     individuals, you would be paralyzed, wouldn't you

9     agree with that?

10          A.  I think that you certainly have to realize

11    that very -- or that it's very difficult to keep in

12    mind those crimes that aren't committed, because

13    there's -- no one calls attention to the crimes that

14    aren't committed as a result of a particular policy.

15    And so I think need to keep those in mind, while at

16    the same time, you need to ask yourself very serious

17    questions about, have we done everything we can to

18    prevent those crimes that were committed.

19          So to the extent that any individual

08.08.29 rough Cate

20    represents a poor policy choice, then that

21    individual is obviously not only important as -- you

22    know, for their own situation, but also then

23    indicative of a problem, a larger problem.

24         But your point is well taken as to the fact

25    that you've got to try to act on what you see as the

DO NOT CITE PER CCP2025(b)

52

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1    best for public safety for the entire state.  I

2    think that's my charge.

3         Q.  And you would agree, would you not, that

4    the current situation is not the best for public

5    safety, is it?

6         MR. MELLO:  Objection.  Vague, it's

7    overbroad, it lacks foundation, it calls for

8    speculation.

9         You can answer.

10        THE WITNESS:  I think that I'd like to see

11   the prison population reduced, and if we could see a

12   reduction in crime as well, then that's the --

13   that's the best of all circumstances.

14        I know that crime rates are down from where

15   they once were, and so I think, you know, if you go

16   by the first do no harm philosophy, you certainly

17   would want to ensure that whatever you do to try to

18   impact your prison population you don't cause more

19   victimization in our society.

20        MR. SPECTER:  Q.  Your aim would be to

21   cause less.

22        A.  Right.

23        Q.  Is that right?

Page 47

08.08.29 rough Cate

24    A.  Right.

25    Q.  The current situation, isn't it true, that

DO NOT CITE PER CCP2025(b)

53

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1    policies can be implemented which would cause less

2    harm?

3         MR. MELLO:  Objection.  Vague, lacks

4    foundation, calls for speculation.  Vague as to the

5    term "policies."  which policies?

6         You can answer if you understand it.

7         THE WITNESS:  what I understand is that

8    correctional experts indicate that you can, if done

9    correctly, reduce practice object population without

10   negatively impacting crime rates in society.

11        I don't honestly know whether I could

12   expect to see both a decrease in the prison

13   population and a decrease in the crime rates, but I

14   think that, you know, that -- maybe if what you're

15   getting at is, the long-term benefits of being able

16   to more effectively work with offenders who remain

17   might impact society positively as far as them --

18   those long-term offenders committing fewer crimes on

19   the outside, I can see that.  But --

20        MR. SPECTER:  Q.  That's -- what I was

21   talking at is, we have a 70 percent parole

22   recidivism rate.  You're aware of that.  Correct?

23   A.  Right.

24        Q.  That's -- it's been described as being

25   twice the national average.  You're aware of that.

DO NOT CITE PER CCP2025(b)

54

08.08.29 rough Cate

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1    Correct?

2        A.   I'm aware that it's been described as that.

3        Q.   Yes.  At least, it's the highest -- you are

4    also aware that it's at the highest of -- in the

5    nation.  Correct?

6        A.   Depending on the measure.

7        Q.   When you're -- so my point was, is that

8    you've learned from other correctional

9    administrators that other things can be done with

10   the parole population so that -- so as to reduce

11   the -- he was commonly known as recidivism, which

12   translates into parolees committing less crimes and

13   less violations of parole.

14       A.   Yeah, the --

15           MR. MELLO:  I think it misstates his

16   testimony slightly.

17           If you understand the statement/question,

18   you can answer it.

19           THE WITNESS:  And I don't know that I agree

20   a hundred percent with it.  But I think I can get at

21   your point, which is that our recidivism rate is

22   measured in a couple of different ways.  One is our

23   rearrest rate, and that has historically been at 70

24   percent.  That doesn't necessarily mean that all

25   those people have committed crimes of course.  It

DO NOT CITE PER CCP2025(b)

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1    just means that they have been arrested for crimes,

2    and that includes all types of offenses.

08.08.29 rough Cate

3        And we also measure our returns to custody

4    or return to prison within 3 years, and that is

5    somewhere between 66 and 68 percent.  And that

6    includes the whole parole violation area, and I

7    think sometimes people refer to that as our

8    recidivism rate.

9        So it's -- the number of our offenders who

10    are on parole and commit new crimes is nothing close

11    to 70 percent.  It's less than that.

12        That being said, it's that population that

13    I'm most concerned about.  So I agree that if you

14    reform parole and you're able to discern that some

15    violators are actually a low risk to commit a new

16    offense, they may be safe to -- for example, if they

17    have -- began to use an illegal substance on parole,

18    you learn that through a risk assessment instrument

19    that they're not particularly likely to commit a new

20    crime outside of that infraction.  Well, then it's

21    safe to make a decision to keep them on the outside

22    in a new -- in a higher form of drug treatment.

23        That being said, that person has still

24    committed a violation of parole.  It's just that

25    society is not less safe as a result of the reform

DO NOT CITE PER CCP2025(b)

56

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1    efforts.

2        My concern is that we not, by keeping more

3    people who are deemed safe for relative -- nobody's,

4    of course, completely safe, but relative safe in the

5    program, that we don't impact what you've described

08.08.29 rough Cate

6   as kind of the core, the real definition, gut

7   definition of recidivism, which is new crimes, new

8   victims in our society.

9        So I think you can -- and I guess the

10   reason that's important is, we don't want to be in a

11   situation where, through parole reform, we can say

12   we have less violations, because we have less people

13   on parole, so there's going to be obviously -- if

14   you're not on parole at all, you can't violate.

15   You're going to see a reduction in violations.

16        We just have to watch to make sure we don't

17   see a cause and effect associated with the overall

18   crime rate.  So does that answer your question?

19    Q.  I'm not sure, to tell you the truth.  But

20   it was informative nonetheless.

21        Let me get at it another way.

22        I asked you before whether we did -- there

23   are measures taken in other states, some of which

24   you've described, which suggest that parole -- the

25   parole system in California can be improved so that

DO NOT CITE PER CCP2025(b)

57

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1   the public is safe, and prisoners commit -- or

2   parolees commit less crimes as a group.

3        And you --

4    A.  Let me just say this:  I don't necessarily

5   know that I agree with your -- the foundation of

6   that.  And --

7    Q.  Premise?

8    A.  Yeah, thank you, the premise.  So what I

9   understood is that you could effectively reform

Page 51

08.08.29 rough Cate

10    parole according to these prick tissue nurse without

11    seeing a rise in crime.

12          I don't know that you would see a decrease

13    in crime as a result, and maybe that's a technical

14    difference, but --

15       Q.  But you would at least be -- the public, at

16    least, would be as safe?

17       A.  Yeah, according to the prick tissue nurse,

18    if these reforms are con directly and in the manner

19    they've done them in other states, they didn't see a

20    requisite -- or a cause and effect with their crime

21    rate, yes, in their states.

22          I just don't know that they saw a reduction

23    in crime as a result of these -- maybe you have more

24    information on this than I do, or maybe I'm not

25    remembering it correctly exactly, but ...

DO NOT CITE PER CCP2025(b)

58

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1        Q.  Well, there are -- while we're talking

2    instead of deposing, there are studies, and Barry

3    Krisberg has done then that show when people are

4    released under certain conditions the crime rate can

5    go down, but it's generally associated with getting

6    them into programs.

7        A.  And I don't mean to quibble, but

8    Dr. Krisberg's not really a correctional

9    practitioner.

10       Q.  Fair enough.  And that's why his -- your

11    answer wouldn't have included his comments.

12          There is a -- but the -- you understand,

08.08.29 rough Cate

13    and I think this is the words you used, that there's
14    a risk associated with doing nothing in this context
15    of parole reform.  Correct?
16        A.  Yes.
17        Q.  So if you implemented some of these reform
18    measures, your aim would be to minimize the risks.
19    Correct?
20        A.  Correct.
21        Q.  Or they would be even to reduce the risk of
22    harm to the public.  Correct?
23        A.  I'm not entirely sure we're talking about
24    the same risks or the same population.  Can you put
25    a little more meat on that?

DO NOT CITE PER CCP2025(b)

59

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1        Q.  Sure.  If you reduce the parole recidivism,
2    parolee -- if you reduce parolee recidivism, you
3    would increase the safety of the public.  Right?
4            MR. MELLO:  That lacks foundation.  Calls
5    for speculation.  Depends on the crimes, I would
6    assume, but you can answer if you understand.
7            THE WITNESS:  I'll answer by telling you
8    what I meant.
9            MR. SPECTER:  Q.  Okay.
10        A.  To the extent that there's a greater influx
11    and outflux of parole violators in the system, it
12    has the secretary of causing a number of logistical
13    problems in the prison, meaning, you know, the
14    reception centers are -- spend all their time
15    processing, and so they have less time to spend on
16    evidence-based rehabilitative programming.
Page 53

08.08.29 rough Cate

17              So if your officers are working to

18      reclassify a parole violator, they don't have time

19      to monitor an academic program.  And so you either

20      have to bring in another officer, a at some point

21      there's a lack of space available for those -- for

22      that hypothetical academic program.  we know that

23      generally an evidence-based academic program can

24      reduce recidivism by 5 percent, and so over the

25      long-term, if your crowding is impacting your

                    DO NOT CITE PER CCP2025(b)

                                                        60

              UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1       ability to provide rehabilitative programming, then

2       in the long-term, you can impact, by reducing the

3       churning, it can help you to run better program and

4       reduce crime.

5              You can also do that by expanding capacity,

6       of the prisons, obviously.  That's another way to do

7       that.

8              So -- and then the other thing I would

9       mention is that, again, the -- the goal on parole

10      reform, as I understand it, is to try to deal in

11      particular with the -- what are called technical

12      violations.  Acts committed by parolees, parole

13      offenders, that are -- violate the terms of parole

14      but would not be illegal if committed by someone

15      else:  Failure to attend a batterer's treatment

16      program, for example.

17              If you can effectively reduce people who

18      have, you know, missed a 12-step program class, if

19      you cannot churn those people, put them in prison

                        Page 54

08.08.29 rough Cate

20    and put them out of prison, instead put them in a

21    program, if it's done safely, then you've reduced

22    your prison population without impacting overall

23    public safety.  Again, assuming that all of that is

24    done appropriately and carefully.

25             That's my understanding of what the

DO NOT CITE PER CCP2025(b)

61

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1    correctional administrators have made in other

2    states.

3        Q.   Okay, fair enough.

4             So with the -- your -- in order to provide

5    programs to the existing prison population while

6    they're in prison, you're in what I call a chicken

7    and egg problem in the sense that you've partially

8    described half of it, which is that you need space

9    to provide the programs, you need sort of a reduced

10   number of people to stop the with a we'll call

11   churning, if you understand what I mean, in order to

12   begin the programs.  But you can't really begin the

13   programs until you have those reductions.

14             So what does that make -- is that accurate?

15       A.   It makes sense.  I'm not sure I agree

16   though,.

17       Q.   why did you disagree?

18       A.   I don't know that -- parole reform doesn't

19   have to happen in the prisons.  Parole reform can

20   happen on the streets.  And so you don't need more

21   room in prison to start reforming your parole

22   system.  And that will have an impact of reducing

23   your prison population without first needing more

Page 55

08.08.29 rough Cate

24    room to reduce your prison population.

25         Q.  So in terms of parole reform, you're

DO NOT CITE PER CCP2025(b)

62

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1    talking about not sending technical parole violators

2    back to prison, but one way?

3         A.  I would -- I would not put it that way.

4    I -- well, in part.  The -- as I understand it, the

5    best correctional science would say that you need

6    first to accurately assess the risk of any offender

7    committing a violent crime, a property crime or a

8    drug crime.  Then you need to apply a parole

9    violation decision-making instrument which would

10    help guide the parole officer and ultimately the

11    parole board or deputy commissioner in making better

12    parole decisions, better decisions around

13    revocations.

14         So that for those who aren't at high risk

15    to recidivate or commit another crime, yes, you

16    would -- rather than sending them to prison for a

17    technical violation, you would use a lesser sanction

18    that would hopefully keep that person in a place

19    where they're law-abiding and not take up another

20    bed in the institution.

21         Q.  And would that same -- could that same

22    process be applied to parolees who commit

23    misdemeanors?

24         MR. MELLO:  Lacks foundation and calls for

25    speculation.

DO NOT CITE PER CCP2025(b)

63

08.08.29 rough Cate

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1        You can answer.

2        THE WITNESS:  In -- again, in California,

3    we're a little unique, because typically the DAs

4    handing those cases in other states and they deal

5    with them through the court system and the offender

6    gets what he or she gets.

7        In California, oftentimes, especially on

8    misdemeanors, in some counties, the -- it's elected

9    official DA will make a discussion that we're just

10   going to let the parole system revoke the person and

11   send them back, we're going to get the same amount

12   of time as they would in a -- after a misdemeanor

13   adjudication and conviction and sentence, and so it

14   does play and it is important in California as to

15   what you do with misdemeanors.

16       Now, it becomes more complicated than with

17   technical violations, because, you know, some

18   misdemeanors are, for example -- less of a concern

19   than others depending on the inmate.  So if you have

20   a drug-addicted inmate who possesses more than an

21   ounce of marijuana, they may be found to have

22   committed a misdemeanor as opposed to an infraction

23   but still be concerned determined to be safely

24   handled through a more serious form of drug

25   treatment, so now we're going to put you in an

DO NOT CITE PER CCP2025(b)

64

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1    inpatient drug frame instead of your current

2    outpatient program.  We're not going to send you a

Page 57

08.08.29 rough Cate

3    prison because that's still a safe thing to do,
4    whereas someone who has a high propensity for
5    violence, has missed a batterer's -- or has
6    committed a battery, a misdemeanor battery, well,
7    that person may need to go back to be revoked for
8    the safety of his family, his community.
9        So with -- you're right that misdemeanors
10   are part of this mix.  It's just that it's more
11   complicated with them.
12       Q.  well, right.  So you would agree, then, you
13   would put them -- you could put them through the
14   same risk assessment process to determine what the
15   appropriate sanction is, whether it would include
16   going back to prison or nothing, and letting the
17   district attorneys decide whether they want to
18   fulfill their duties by charging or not charging
19   this person with a crime?
20       A.  I'll agree in part.  I don't think we're --
21   it's good policy to do nothing.
22       Q.  No, I meant by -- I'm sorry, I meant on a
23   particular individual basis.
24       A.  well --
25       Q.  Yeah, okay.  I'm sorry I interrupted you.
                DO NOT CITE PER CCP2025(b)
                                                65


            UNCERTIFIED ROUGH DRAFT TRANSCRIPT
1    why don't you go ahead.  I think I understand what
2    you meant.
3        A.  Yeah.  So the short answer is, can --
4    should misdemeanor violations be viewed ideally
5    through a risk assessment tool and a parole
                Page 58

08.08.29 rough Cate

6     violation decision-making instrument?  Yes.

7            I think it's unlikely we would ever do

8     nothing as a result of a --

9         Q.  Misdemeanor --

10        A.  -- misdemeanor recognizing that if a DA is

11    prosecuting and the judge has sentenced the person

12    to a certain time in custody, that may be the result

13    that is appropriate for that offense.

14        Q.  And you could also -- but you could also

15    recognize that if the -- you could -- you, the --

16    I'm sorry, let me start that over again.

17            Wouldn't it be fair to say that if the

18    state Department of Corrections didn't revoke, that

19    doesn't mean that the person wouldn't be sanctioned

20    for his criminal behavior, because the District

21    Attorney had the option of charging that person with

22    a crime and seeking criminal sanctions?

23        MR. MELLO:  Lacks foundation, it's an

24    incomplete hypothetical.

25            You can answer.

                DO NOT CITE PER CCP2025(b)
                                                        66


            UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1            THE WITNESS:  The systems run separately

2     from one another.  The district attorneys and

3     elected official makes determinations as to which

4     crimes to prosecute based on his or her own policies

5     and discretion.

6            I think that most often, a parole agent or

7     a deputy commissioner in this kind of case would, if

8     they -- if the DA had gone forward and the defendant

9     had, for example, entered a plea early and had
                    Page 59

08.08.29 rough Cate

10    agreed to 3 months in the county jail, it may be

11    then that what they decide to do is impose an

12    additional program on that person, or other -- other

13    sanctions that relate to his or her criminality.

14    And recognize that the term in custody is sufficient

15    as a deterrent to future conduct.

16        Q.  Okay.  Let's go to AB 900 a little bit.

17    I'm just checking the time.

18            (Discussion off the record.)

19            MR. MELLO:  He's.

20            THE WITNESS:  Note for the record, he

21    didn't ask me?

22            MR. SPECTER:  Q.  Are you okay?

23        A.  I'm fine, thank you.

24        Q.  You're welcome.

25            It's true, is it not, that no in-fill bed

                DO NOT CITE PER CCP2025(b)

                                                    67


            UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1    have been built to date?

2        A.  Yes.

3        Q.  when do you really -- when do you

4    realistically expect a prisoner to fill the first

5    in-fill bed?

6        A.  which --

7            MR. MELLO:  Objection.  Vague, calls for

8    speculation.

9            You can answer.

10            THE WITNESS:  I was going to answer with a

11    snide question about when you expect we will have a

12    budget.  But it is -- seriously, it depends on our

                        Page 60

08.08.29 rough Cate

13    ability for this budget to come out, because there

14    is budget trailer language that includes the

15    necessary amendments to AB 900 which would

16    facilitate a clean bond opinion by the Attorney

17    General which would allow us to access the funds

18    necessary to build those facilities, and bring those

19    inmates into them.

20        So I really can't say exactly when we would

21    be able to open them.  It depends what the

22    legislature does.

23        MR. SPECTER:  Q.  Okay.  Let's assume the

24    legislature agrees with Senator Perata's budget

25    proposal and they pass a budget today, as I

DO NOT CITE PER CCP2025(b)

68

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1    understand from the news that there's going to be a

2    vote.

3        When would you expect the first prisoner

4    would be able to occupy a bed if the budget was

5    passed today?

6        MR. MELLO:  Just so I'm clear, and that

7    will budget would include the --

8        MR. SPECTER:  As it -- yes, the --

9        MR. MELLO:  Okay.  Calls for speculation.

10    Lacks foundation, you can answer.

11        THE WITNESS:  I think -- assuming that we

12    had a clean bond opinion that came out of the

13    legislature and -- I'm sorry --

14        MR. SPECTER:  Q.  The Attorney General's

15    office?

16        A.  A -- an amendment in AB 900 facilitate ago

Page 61

08.08.29 rough Cate

17 clean bond opinion, and that the finance and the

18 Public Works board and everything did -- got

19 everything done in a single day, I think we would be

20 able to open -- and this is really a matter outside

21 of my expertise, in that Deborah Hysen is our

22 facilities expert and is in charge of these things,

23 but she keeps me posted obviously on her opinions

24 about when things could be built.

25   But the facility at Paso Robles, which is a

DO NOT CITE PER CCP2025(b)

69

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1 former youth facility and is going to be, according

2 to our overcrowding plan, converted into a level

3 2 -- 1000 level 2 bed could be opened in 2010.

4  Q.  Do you know when in 2010?  That's a lot of

5 days.

6   MR. MELLO:  How many?  Sorry.

7   THE WITNESS:  She has told me.  But as I

8 sit here, I don't recall.

9   MR. SPECTER:  Q.  That's all right.  We can

10 get if from --

11  A.  I don't remember specifically.

12  Q.  She's on our list next week so we'll ask

13 her.

14   And what about the new construction?  I

15 think North Kern, as far as I understand it, is the

16 first up.  Is that your understanding?

17  A.  Yeah.  Can I refer to our building plan?

18  Q.  Sure.

19  A.  It'll give me better information.

08.08.29 rough Cate

20    Q.  Do you want bigger charts?

21    A.  No, that's okay.

22        So the Paso facility she has as 2009, 2010,

23    and she indicated to me that that was still on

24    schedule, even as a result -- even with the delays

25    that we've experienced that I described earlier.

DO NOT CITE PER CCP2025(b)

70

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1        And the same thing is true of the other

2    facilities:  Kern Valley, North Kern and Wasco, all

3    in the 2011, 2012 time frames.  And again, her

4    estimates as to exactly when those will happen

5    change as delays occur.

6        There's also cutoffs associated with, you

7    know, Public works boards meetings and when those

8    occur and so forth.  And then the other caveat is

9    that we have to get through the environmental

10    process.  And so we would have to successfully

11    negotiate our way through the environmental impact

12    report and get those cleared in order to build

13    these.

14        And that's an unknowable for us.

15        But she still has told me that our AB 900

16    revised info plan is accurate.

17    Q.  Okay.  And the Paso, how many beds would be

18    in Paso?

19    A.  I spoke to her about this in the last 2 or

20    3 weeks, and I think it's in the neighborhood of 7-

21    to 800.

22    Q.  Okay.  So --

23    A.  I mean, that's -- I think that's the

Page 63

08.08.29 rough Cate

24     planned occupancy.

25          Q.   Right.  And North Kern would be another

DO NOT CITE PER CCP2025(b)

71

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1    thousand or so.  Correct?

2         A.   North Kern, 950.  Kern Valley, 950, and

3    Wasco, 1900.

4              Those are -- it may be that we don't fill

5    every one of those beds, that we do something less

6    than that with -- as a matter of just exercising our

7    discretion to facilitate the best possible operation

8    of those.  I was just indicating what -- the number

9    of beds.

10        Q.   Right.  Is that -- does that assume

11   doubling celling?

12        A.   Yes.  I think two bed are being built into

13   each cell.  Some of these at the Estrella

14   Correctional Facility would be dorm style, and

15   that's a different --

16        Q.   Right.

17        A.   -- issue, obviously.

18        Q.   So -- and then on the re-entry facilities,

19   there hasn't been a re-entry bed -- well, I guess

20   you have the Stockton facility, which you don't need

21   to build something.  Right?

22        A.   Right.  That's being renovated.

23        Q.   Renovated.  And do you know when that's

24   going to be available for occupancy?

25        A.   Again, I -- my last update with Ms. Hysen,

DO NOT CITE PER CCP2025(b)

72

08.08.29 rough Cate

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1    there are -- the renovation plan is under way.

2    Again, parts of it are in the budget, so we're

3    waiting for the budget to come through to provide

4    the funds necessary to accomplish that.  So it's in

5    flux a little bit.

6         But it should come online before the -- any

7    of the others.  And I think that the current goal is

8    to -- the last stated goal was December of 2009, for

9    becoming operational and having all the inmates in.

10   If there are delays associated with the financing

11   and the budgets and lawsuits and et cetera, then

12   that gets bumped backward.

13       Q.  So we're basically talking at least 2010

14   for the --

15       A.  Yeah.  It would particular everybody

16   falling into place to get it built in 2009.  I mean,

17   and occupied and with the programs in place -- I

18   mean, it's -- you know, obviously we're going to

19   create a new type of facility that's not going to be

20   a standard institution, and so Ms. Jett's group is

21   making sure that all the programs are in place and

22   Mr. Kernan is ensuring that all the safety standards

23   are met and Ms. Hysen's working on the construction

24   and there's a communications piece and the legal

25   team is involved, and it turns out it's rather

DO NOT CITE PER CCP2025(b)

73

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1    complicated.

2         Q.  So realistically, it seems that I would

08.08.29 rough Cate

3    hope you would agree that at least in the next 2 to

4    3, even 4 years, you're not going to get much

5    relief -- well, I guess the -- from AB 900 in terms

6    of population pressures and overcrowding?

7         MR. MELLO:  Objection.  Lacks foundation,

8    that calls for speculation, it's an incomplete

9    hypothetical.

10         THE WITNESS:  Concerning AB 900

11    construction piece, I think is what you're referring

12    to, we'll get the relief that I've described in the

13    time period that I've described them, I think.

14         MR. SPECTER:  Q.  All right.  But in terms

15    of there are a hundred and -- you know, 165- to

16    170,000 prisoners, we're talking here about, you

17    know, in the next 2 years of a couple of -- a few

18    thousand.  It's not going to make much of a dent in

19    the crowding problem.  Wouldn't you agree with that?

20         MR. MELLO:  It misstates the facts.  It

21    calls for speculation.  It's vague.

22         You can answer.

23         THE WITNESS:  Well, it'll -- it'll make the

24    difference that's described here.  The -- you know,

25    between 4- and 5,000 in-fill, a and the -- I think

DO NOT CITE PER CCP2025(b)

74

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1    that, you know, you'll see between 500 and a

2    thousand, 1500 reentry.

3         Now, the -- once re-entry is underway, we

4    may be able to build those within the same time

5    frames ultimately that we build the in-fill --

08.08.29 rough Cate

6   reentry beds we may be able to build in the same

7   time frame that we build these in-fill beds.  So --

8   but again, you know, you're talking about at most

9   another 3000 beds within this time frame, so I mean,

10  I think your point is that it's still somewhere

11  between, you know, four 4- and 7- or 8,000 at the

12  most that you'd see within the next 3 years.

13       Q.  3 to 4 years.  It's 2008 now.  You're

14  talking 2012 for North Kern?

15       A.  Right.

16       Q.  In terms of the counties, you recently

17  wrote a letter to the counties saying that the

18  facilities -- reentry facilities would have to be

19  operated by state personnel.  Is that right?

20       A.  That's correct.

21       Q.  And to your knowledge that, was contrary to

22  the representations that had been made to the

23  counties by other -- by prior directors and

24  employees of the department?

25       A.  My understanding is that secretary Tilden

                    DO NOT CITE PER CCP2025(b)

                                                      75


              UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1   and others may have told some counties that they

2   thought the counties -- they were under the

3   impression the counties could operate.

4           I think sand Barbara and Orange County were

5   the two that were interested in that, and they

6   certainly I think came away from the impression from

7   the former administration that that was a

8   possibility.

9       Q.  And so what was the reaction -- was there a

                    Page 67

08.08.29 rough Cate

10    reaction that you're aware of to your letter of July
11    3rd?
12         A.  Yes.
13         Q.  And what was that reaction?
14         A.  Well, I spoke to Sheriff Brown in
15    particular in Santa Barbara, and he was
16    disappointed, primarily because Santa Barbara has
17    really been out front on re-entry and had planned to
18    do this with or without the state's help.  They
19    really think it's a good policy for them, and they
20    had a good plan in place, and so they thought they
21    could effectively run this, and so this -- having
22    the state employees run it, or operate portions of
23    it, anyway, was disappointing to him.
24              And I've heard through intermediaries -- I
25    don't know if anybody in Orange County has spoken to

DO NOT CITE PER CCP2025(b)

76

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1    me directly on this issue, but I understand from
2    other correctional employees that Orange County is
3    also interested in operating, and although may not
4    have had as strong a reaction, were also
5    dis/pointed.
6         Q.  Okay.  At the current time, how many
7    counties have committed to having these re-entry
8    facilities?
9              And when I say committed, you may have to
10    qualify that, because I understand there are --
11    there are different levels of commitment, sort of
12    like when you get a scholarship as a pro -- as a

08.08.29 rough Cate
13  college baseball -- high school athlete.

14          MR. MELLO:  Object.  Are you -- I'm sorry.

15          MR. SPECTER:  I'm done.

16          MR. MELLO:  Objection to the term

17  "committed" as vague.

18          You can answer.

19          THE WITNESS:  All right.  I believe it's 12

20  counties have indicated a commitment to site

21  recentry facilities.  That's an approximation,

22  though.  There's -- the correctional standards

23  authority has a number of counties, I think it's

24  about 12, who have indicated a willingness to site

25  re-entry facilities in their counties, and there may

DO NOT CITE PER CCP2025(b)

77

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1  be a few more than that that are on the waiting list

2  but aren't currently being considered, because this

3  process is appended to counties receiving AB 900

4  funds to build jails, and so some counties are

5  interested in siting re-entry facilities, and

6  getting jail money to build jail beds.  Others have

7  said that they'll site reentry facilities regardless

8  of whether they get jail money or not.  Some have

9  said they want jail money and they don't want

10  re-entry beds.

11          But I think there's 12 or 15 in that mix

12  who are interested.

13      Q.  And as I understand AB 900, and please

14  correct me if I'm wrong, if you -- if you want the

15  money to construct jails, you have to agree to site

16  a recentry facility.  Is that correct?

Page 69

08.08.29 rough Cate

17      A.  In part.  I think that the correctional

18  standards authority board has interpreted AB 900 to

19  say that in order to receive all of the points

20  available in ranking to rank the counties, to

21  receive your full points, you have to agree to have

22  a recentry facility sited on land in your county.

23      Q.  Are you implying that it wouldn't

24  necessarily disqualify somebody if they didn't agree

25  to have a re-entry facility?

DO NOT CITE PER CCP2025(b)

78

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1      A.  I think that's technically true.  It's just

2  that I think as it currently sits, there's more

3  counties who want jail money and who are willing to

4  site recently facilities than there are -- than

5  there is money available, and so if you were a

6  county who said, hey, I need jail bed but I'm not

7  willing to site re-entry, it's just very unlikely

8  that you would work your way up into the mix of --

9  because there's other counties waiting in the wings

10  who are ready to do both.

11      Q.  I see.

12      A.  But that's a -- that's not my decision,

13  that's a CSA board decision.

14      Q.  Right, I understand that.

15      A.  Okay.

16      Q.  I understand Los Angeles County isn't one

17  of the counties that have signed up for a re-entry

18  facility.  Is that correct?

19      A.  I think Los Angeles County is still on the

Page 70

08.08.29 rough Cate

20    list of those who are interested in siting a

21    recentry facility.  The part corrections plays is

22    that Deborah Hysen's employees in the facility

23    construction management area are tasked by CSA with

24    evaluating the sites that are proposed, and they

25    have to do that by, I believe it's September 14th.

DO NOT CITE PER CCP2025(b)

79

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1    And then they report to CSA on who has provided a

2    viable site.  And LA county has not provided a

3    viable site as of yet.  They could come in tomorrow

4    with a site, though, and --

5        Q.  They could, but I've -- I will represent to

6    you that I've seen documents, internal documents

7    from the Department saying that Los Angeles County

8    has refused to, you know, cooperate in this process,

9    and therefore, it -- those documents imply that

10    they're out of the running.  Is that consistent with

11    your understanding?

12        A.  I know that they have not put forward any

13    land yet, and -- but frankly, there -- that

14    situation is pretty fluid.  So I understand that,

15    you know, various employees at various times try to

16    gauge counties' interests, but I think honestly that

17    could change any time.

18            And they still are on the official list.

19        Q.  I see.

20        A.  So --

21        Q.  So as I understand it, if they don't do

22    something within the next 2 weeks, that'll be out of

23    the running.  Is that right?

Page 71

08.08.29 rough Cate

24          A.  I think that if they don't come up with

25     even a -- an offer of some site, that that'll drop

DO NOT CITE PER CCP2025(b)

80

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1     out.  Again, this is a CSA decision, so I've got to

2     be a little careful with that, because I'm going to

3     judge each county independently once I assume the

4     role at the CSA board meeting.  But if they don't

5     have a site it, appears there are other counties

6     that aral and able to come forward and offer a site.

7               Now again, if those counties fall out

8     because their sites aren't viable, then LA County

9     could conceivably come back in without a site,

10    because there are not enough counties without a site

11    for interested.  It's unlikely.

12              There's also Phase 2 of this process in

13    which we'll go through this once again, and there

14    will be more fund available for both re-entry

15    facilities and for jail construction.

16          Q.  Okay.  You're aware that LA County sends

17    about 33 percent, about a third of your population

18    is from LA County.  Right?

19          A.  Yes.

20          Q.  AB 900 required the department to submit to

21    the legislature a management plan by January 15th of

22    next year.  Are you aware of that requirement?

23          A.  Yes.  I think -- well, if you're referring

24    to one of the benchmarks that are in this achieving

25    results document, and -- there's a plan to improve

DO NOT CITE PER CCP2025(b)

81

08.08.29 rough Cate

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1    management within CDCR that's required, yes.

2          Q.   Right.   That's what I'm referring to.

3          A.   Okay.

4          Q.   Has that been -- are you on track to be

5    able to provide that plan to the legislature?

6          A.   Yes.

7          Q.   Have there been drafts of the plan?

8          A.   Can I refer to my --

9          Q.   Sure.

10         A.   -- document?

11              I say that, because I think it's done.

12         Q.   Oh, okay.   Well, that would be good.

13         A.   Yeah, so benchmark 10, as -- 10B as it's

14   referenced here is the CDC develop and implement a

15   plan to address management deficiencies within the

16   department.

17              And secretary till den, in his

18   administration in this document had described that

19   as being complied, because the plan was submitted to

20   the legislature on January 15th, 2008.

21         Q.   Oh, being.

22         A.   Great.   AB 900 also had $50 million for

23   rehabilitation programming.   You're aware of that.

24   Right.

25         A.   Yes.

DO NOT CITE PER CCP2025(b)

82

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1          Q.   And was that kind of for each year, or does

2    it have to be reauthorized every year, do you know?

Page 73

08.08.29 rough Cate

3          MR. MELLO:  Lacks foundation.  Calls for
4     speculation.
5          THE WITNESS:  I don't recall, and I know
6     that we didn't spend all 50 million.  It was one of
7     my criticisms of the department while I was the
8     Inspector General.
9          As I sit here, I don't know if it's an
10     ongoing allotment or whether it was one-time money
11     to -- for -- to get started.  Kathy Jett, the
12     undersecretary of the program, would know that
13     better than I do.
14          Q.  Okay.  I'll just jump ahead here.
15          The -- you made a statement in -- at the
16     C-ROB's July 15th meeting where you said you were
17     going to need more money to implement the plans that
18     the department had to implement AB 900 to implement
19     the expert panel report, but you didn't say how
20     much.
21          Do you have an idea of how much you're
22     going to need?
23          A.  I don't.  We have budget before -- a budget
24     plan before the legislature, and I've conferred with
25     Ms. Jett and Carol Hood, the Chief Deputy Secretary
                    DO NOT CITE PER CCP2025(b)
                                                      83


              UNCERTIFIED ROUGH DRAFT TRANSCRIPT
1     in this area, and they have indicated to me that the
2     budget we've put together will be sufficient to
3     address what's necessary for next year.  We're going
4     to be reviewing that budget, our budget proposals in
5     the next week or two to finalize them.

08.08.29 rough Cate

6      Q.   I see.

7      A.   So I'll see at that point exactly what

8   their proposal is and I'll make an assessment about

9   whether I agree that that number is sufficient.  But

10   keep in mind that converting, you know, the largest

11   prison system in the United States from one way of

12   doing business to another will be a multi-year

13   process, and so undoubtedly there are other

14   allocation out years that will be necessary.

15      Q.   Okay?

16          MR. SPECTER:  What does that mean.

17          THE VIDEO OPERATOR:  We have 5 minutes

18   testimony.

19          MR. SPECTER:  I thought they were going to

20   pull the plug in 5 minutes.

21          (Discussion off the record.)

22          MR. SPECTER:  Q.  Okay.  Well, let's see

23   what time it is.

24          Okay.  You want to just change it now?

25          THE VIDEO OPERATOR:  Sure.

                DO NOT CITE PER CCP2025(b)
                                                    84


                UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1          This marks the end of Tape No. 1, Volume 1

2   in the deposition of Matthew Cate.  We're off the

3   record at 11:32.

4          (Recess from 11:32 a.m. to 11:45 a.m.)

5          THE VIDEO OPERATOR:  We are back on the

6   record.  This marks the beginning of Tape No. 2,

7   Volume 1 in the deposition of Matthew Cate.  The

8   time is 11:45.

9          MR. SPECTER:  Q.  Okay.  So as the

08.08.29 rough Cate

10    Inspector General, you were the chairman of what's

11    called C-ROB, which will is spelled C dash ROB, all

12    in capital letters.  Correct?

13        A.  Correct.

14        Q.  What does C-ROB stand for?

15        A.  California Rehabilitation Oversight Board.

16        Q.  Okay.  And now that you're the secretary of

17    the department, are you still on the board?

18        A.  Moved one seat to the right.

19        Q.  So what is the function and purpose of that

20    board?

21        A.  It really follows the title.  It provide

22    public oversight and public reporting of the

23    agency's progress in providing rehabilitative

24    programs for inmates, and it's charged with

25    utilizing the report by the expert panel on

DO NOT CITE PER CCP2025(b)

85

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1    recidivism retucks for that purpose.

2        Q.  So they have regular meetings and there's a

3    staff which compiles -- well, I won't do a compound

4    question.

5            The oversight board has regular meetings?

6        A.  Yes.

7        Q.  And they issue reports on the department's

8    progress semi-annually?

9        A.  Yes.  Correct.

10        Q.  And the basic blueprint for the department

11    is the expert panel report which was issued in --

12    was it June of last year?

Page 76

08.08.29 rough Cate

13       A.   Yes.

14       Q.   And you're familiar with the

15   recommendations of the expert panel report?

16       A.   Yes.

17       Q.   And do you agree with them?

18       A.   There were hundreds of recommendations.  I

19   agree with the vast majority.

20       Q.   Okay.  Well, I have a list of them.  Or at

21   least the major once.

22            I'm going to give to you -- you can mark

23   this as the first exhibit.

24            (Deposition Exhibit 1 was marked for

25   identification.)

DO NOT CITE PER CCP2025(b)

86

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1        MR. SPECTER:  Q.   What I've handed you is a

2   document which is titled Appendix F, status of the

3   expert panel recommendations.  And I will represent

4   to you if you haven't seen it already that this is

5   an appendix to the July 15th report from C-ROB.

6   Have you seen that document before?

7        A.   I mean, obviously there are -- I've seen a

8   document that appears to be the same as this one.  I

9   don't know if there's a subtle difference between

10  your copy and the other so --

11       Q.   Well, we copied it right off the website.

12       A.   So if it's the same one that's on the

13  website, then I've seen it, yes.

14       Q.   And the Board voted -- you as a board

15  member would have voted to -- or you did vote to

16  approve that report on July 15th.  Correct?

Page 77

08.08.29 rough Cate

17      A.  Correct.

18      Q.  So this list, as you can see, this lists a

19  number of different recommendations.

20          So what I'd like to -- you to do briefly is

21  to look over this -- these recommendations and tell

22  me if there are any which you've told -- well, let

23  me ask it this way:  Is it your understanding that

24  the department is going to be implementing all of

25  these recommendations?

DO NOT CITE PER CCP2025(b)

87

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1           MR. MELLO:  The Department?

2           MR. SPECTER:  Pardon me?

3           MR. MELLO:  The Department, is the

4  question?

5           MR. SPECTER:  Yes.

6           MR. MELLO:  Because there are some that are

7  recommendations about the legislature.

8           MR. SPECTER:  Well, the -- right, thank

9  you.

10      Q.  With that qualification.

11          MR. MELLO:  I'll just object to the

12  question lacks foundation, calls for speculation.

13  And if you can answer.

14          THE WITNESS:  Okay, I'm sorry, I reviewed

15  these.  what is the question again?

16          MR. SPECTER:  Q.  The question is -- I'll

17  ask a different question if that's all right, since

18  you don't remember the first one?

19          MR. MELLO:  Objection.  Different.

08.08.29 rough Cate

20          MR. SPECTER:  Q.  And the question is

21   whether or not you've directed your staff not to

22   implement any of the ones that you're Department is

23   capable of implementing, or, you know, to -- in

24   other words, is there any one that you disagree with

25   that you don't want implemented?

DO NOT CITE PER CCP2025(b)

88


UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1           MR. MELLO:  That's a different question.

2    Objection, vague.

3           You can answer if you understand his

4    question.

5           MR. SPECTER:  Q.  If you want me to ask a

6    different question.

7           MR. RICE:  I don't.  Can you reask it?

8           MR. SPECTER:  Q.  Okay.  There are all

9    these recommendations.  They're all in some stage of

10   some beginning process of being implemented.  Is

11   that correct?

12          MR. MELLO:  Misstates the document.

13          MR. SPECTER:  It's that's not an objection.

14          THE WITNESS:  with the exception of those

15   that are listed as unknown.

16          MR. SPECTER:  Q.  Right.  So as far as you

17   know, the department is working on implementing all

18   of the recommendations which it has the capacity to

19   implement, or the authority, I should say, to

20   implement?

21       A.  All the recommendation that is are directed

22   to the department, we are in the process of

23   attempting to implement.

Page 79

08.08.29 rough Cate

24      Q.   Okay.  And so it's your view that these
25   recommendations would not have such an adverse

DO NOT CITE PER CCP2025(b)

89

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1    impact on public safety that they shouldn't be
2    implemented.  Correct?
3            MR. MELLO:  Lacks foundation and calls for
4    speculation, it's an incomplete hypothetical.  I
5    think it's vague.
6            But you can answer it if you understand his
7    question.
8            THE WITNESS:  I don't -- I don't think that
9    these recommendations, if implemented appropriately
10   and under the best and right conditions, et cetera,
11   would negativively -- or maybe I should put it this
12   way.  Is that what you're asking, whether --
13           MR. SPECTER:  Q.  Put it in your own words,
14   yeah.
15      A.   So the expert panel's report was designed
16   to put forward recommendations which in their view
17   would reduce recidivism.  And that's the -- what
18   these are intended to do, and that's why we're
19   implementing them.
20      Q.   And you are implementing them consistent
21   with your view of public safety.  Correct?
22           MR. MELLO:  Same objections.  It lacks
23   foundation, it's an incomplete hypothetical, calls
24   for speculation.  It's vague.
25           You can answer.

DO NOT CITE PER CCP2025(b)

90

Page 80

08.08.29 rough Cate

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1          THE WITNESS:  Again, to the extent that my

2     previous answer relating to each -- you know, our

3     concerns about individual victims or concerns about

4     larger groups and our long-term concerns about

5     reducing is recidivism, recognizing that there may

6     be a different impact on each of those things, yes,

7     we are implementing these in a way that we think is

8     consistent with public safety.

9          MR. SPECTER:  Q.  The first recommendation

10    says, reduce overcrowding.  And the status of it is,

11    in process.

12         A.  Right.

13         Q.  With a level of overcrowding do you believe

14    would be necessary to fulfill this recommendation?

15         MR. MELLO:  The recommendation is to reduce

16    overcrowding.

17         MR. SPECTER:  Yeah, but it's vague as to

18    how -- what the level is.  You could reduce it --

19         Q.  Is it to reduce it by -- do you believe to

20    reduce the number of people by one prisoner would

21    fulfill the recommendation of the expert panel?

22         MR. MELLO:  Objection.  It's vague,

23    ambiguous, it calls for speculation as to what the

24    expert panel was thinking.  It lacks foundation.

25         You can answer it if you understand.

DO NOT CITE PER CCP2025(b)

91

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1          THE WITNESS:  Reducing it by one inmate

2     would meet the literal recommendation.

Page 81

08.08.29 rough Cate

3    I think the intent was to produce

4  overcrowding to such an extent that you can

5  effectively -- or more effectively address the other

6  issues in the institutions related to providing

7  evidence-based program for our offenders.

8    MR. SPECTER:  Q.  Okay.  So what's your

9  goal in terms of the level of population that you

10  want to reduce it to so that you can accomplish the

11  things that you just mentioned?

12    MR. MELLO:  That misstates his testimony,

13  lacks foundation, and calls for speculation.  It's

14  an incomplete hypothetical.

15    THE WITNESS:  I don't have -- my

16  correctional experts have not provided me with a

17  certain percentage that they think is absolutely

18  necessary to -- in order to reach -- to reduce

19  overcrowding to the extent that you could accomplish

20  these.  It's basically -- I mean, common sense tells

21  you that as you reduce overcrowding, these become

22  easier to implement.  The example is the

23  nontraditional bed.  If you have nontraditional beds

24  in a gymnasium then you can't run a recreational

25  program, or you can't hold an anger management class

DO NOT CITE PER CCP2025(b)

92

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1  in that area, and so that makes it more difficult to

2  implement the rest.

3    I don't -- I can't tell you exactly what

4  percentage is necessary.  It's all a matter of --

5  it's a sliding scale of efficiencies, basically.

08.08.29 rough Cate

6      Q.   I understood all of that except the sliding

7   scale part.  Could you elaborate on that a little

8   bit?

9      A.   Only that reduction by one prisoner does

10   almost nothing.

11      Q.   Right.

12      A.   Conference production by 5,000 does more,

13   and reduction of all your bad beds, all your

14   nontraditional beds is even more helpful than that,

15   and it goes on from there.

16          The problem, of course, is that as you

17   reduce overcrowding, you become less efficient, it

18   becomes more expensive, et cetera.  If we had one

19   inmate, clearly you -- we'd have plenty of room, and

20   that's what -- I just meant that it's -- again, it's

21   a common-sense conversation about that you need --

22   you need space and fewer inmates allows to do that.

23   I just can't tell you the percent -- the per percent

24   is X.

25      Q.   Okay.  Do you have anybody working on that

DO NOT CITE PER CCP2025(b)

93

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1   question about what your -- what percent you would

2   like to drop the population to?

3      A.   No.  Because that's not our -- we can't

4   control that.  So -- all of that.  We can control

5   only pieces of that.  And so, you know, to the

6   extent that we can reform parole, then that piece,

7   we can see our population be reduced.

8          But I can't control the criminal laws,

9   obviously, can't control the activities of local

Page 83

08.08.29 rough Cate

10    district attorneys or the courts.  And so it doesn't

11    do they me any good to say, my goal is X when I

12    can't control the influx of inmates coming in.

13    All -- what I can do, though, is say, we have a goal

14    to eliminate our nontraditional beds, for example,

15    because we know that those make correctional

16    practices more difficult.

17         Q.   But you've been the Inspector General,

18    you've done audits to hold people accountable to --

19    for implementing programs.  Correct?

20         A.   Correct.

21         Q.   And when you're the chairman of the C-ROB

22    board, you're responsible for leading that body

23    which is overseeing the implementation of these

24    recommendations.  Right?

25         A.   Yes.

DO NOT CITE PER CCP2025(b)

94

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1         Q.   And in terms of determining -- and when you

2    were Inspector General, it was very important to you

3    to find out what the -- whether the practice was

4    consistent with the Department's policy or their

5    goals.  Correct?  That's how you measured progress.

6    Correct?

7         A.   Correct.

8         Q.   So wouldn't you say that it's important for

9    the Department to have a goal so that the C-ROB and

10    the public and the legislature can evaluate your

11    progress in meeting the -- this recommendation?

12         MR. MELLO:  Objection.  I think it's asked

08.08.29 rough Cate

13    and answered.  I think's answered this question.

14         I also think it is argumentative, and I

15    think it's an incomplete hypothetical and it lacks

16    foundation.

17         You can answer.

18         THE WITNESS:  The general premise that I --

19    you need to -- a manager should set a goal and then

20    try to meet that goal is true.

21         The California Rehabilitation Oversight

22    Board has not asked the department to set a goal

23    related to overcrowding.  Neither has the

24    legislature.  Again, I think it's because the

25    department can't control that issue.  And so for me

DO NOT CITE PER CCP2025(b)

95

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1    to set a goal of, I want to be at 172 percent of

2    capacity, if that -- I can't control that, and so it

3    doesn't help me as a manager to say to my people,

4    you haven't met this goal, when they tell me that's

5    correct because LA County sent an extra 5,000

6    inmates over the weekend.  They can't control that.

7         We have set a goat to remove all our

8    nontraditional beds because we know that makes

9    correctional practice more difficult.  And it will

10    increase the safety of our officers and our inmates

11    and allow us additional space for programming.  And

12    so that's a concrete goat that we can do.

13         Setting a goal on something we can't

14    control like that doesn't help us.

15         MR. SPECTER:  Q.  Okay.  I understand it

16    doesn't help you.  I understand that answer.

Page 85

08.08.29 rough Cate

17          But the intent of the expert panel's

18     recommendations, as I understand it, was to provide

19     more rehabilitative programming to prisoners.

20     Correct?

21          A.  Correct.

22          Q.  That's you're understanding, too?

23          A.  That's one of the purposes, yes.

24          Q.  One of the purposes.  And the intent, as I

25     understand it, of the recommendation to reduce

                DO NOT CITE PER CCP2025(b)
                                                        96


                UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1      overcrowding, was their first recommendation, was to

2      reduce the overcrowding so you could meet that goal.

3      Is that correct?

4          A.  Yes.

5          Q.  So wouldn't it be --

6          A.  Well, it's so you can more easily meet that

7      goal.

8          Q.  More easily meet that goal.  Wouldn't it be

9      fair for the department to determine what level of

10     overcrowding would enable it to meet that goal of --

11     the goal of rehabilitation, regardless of whether

12     you can actually meet the goal or not because of

13     factors outside of your control?

14          MR. MELLO:  Lacks foundation, it calls for

15     speculation, it assumes that the Department can't

16     meet those goals at certain populations.

17          You can answer it if you understand the

18     question.

19          THE WITNESS:  It becomes increasingly -- it

                        Page 86

08.08.29 rough Cate
20   just becomes increasingly more difficult.

21       So for example, you can spend the money to

22   higher educators to come in and work third -- first

23   watch, and you'd have to pay them an extraordinary

24   amount of money to work all through the night.  You

25   could run three shifts on rehabilitation; it's just

DO NOT CITE PER CCP2025(b)

97

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1   not very practical, and it's extraordinarily

2   expensive.

3       And so it's a -- it's a -- as I understand

4   it, from, again, conversations with Ms. Jett, with

5   Mr. Kernan, with others that are working, you know,

6   collaboratively, it's true that as you reduce

7   population, all those things become easier to do.

8   It becomes easier to award -- keep track of credits,

9   because if you have 160,000 and if you have 170,000,

10   obviously, all of those things are certainly true.

11       But we -- again, I can't say that, well,

12   gee, if we were just at percentage X, then we could

13   meet our goals, because it's always going to be --

14   there's going to be a dollar question and there's

15   going to be a time, it's going to take longer the

16   more inmates, it's going to be more expensive if

17   there are more inmates.  And there are certainly

18   some situations with your say to yourself, you know

19   what, I think it's better to build capacity here and

20   address this situation versus reducing our

21   population, and there's other situations where you

22   say, you know with a, the nontraditional beds, I've

23   got to get out of the nontraditional beds or I can't

Page 87

08.08.29 rough Cate

24    effectively program these inmates.

25          So -- but the short answer is, we have not

DO NOT CITE PER CCP2025(b)

98

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1    done that.  We just have -- we have tried to program

2    the best we can with what the counties send us.

3          MR. SPECTER:  Q.  Well, let me ask another

4    question, then.

5          Do you have an idea of -- let me ask

6    another question.

7          You have to plan -- in order to provide

8    programs, you have to provide the staff and the

9    space.  Correct?

10         A.  Correct.

11         Q.  And in order to know how many staff and how

12   much space, you have to know how many prisoners

13   you're going to provide programs to.  Correct?

14         A.  Correct.

15         Q.  How many prisoners do you want to provide

16   panels to?  Do you have that in mind?

17         A.  Kathy Jett would know the exact number.

18   It's not 170,000, or however many we have, because

19   it's not appropriate to provide criminogenic

20   programming to inmates who are only going to stay

21   for 6 months or less.  And --

22         Q.  For example, in one of your reports about

23   substance abuse, the substance abuse program, you

24   said there was about 45 percent of the people in

25   prison with drug problems, and 52 percent with

DO NOT CITE PER CCP2025(b)

99

Page 88

08.08.29 rough Cate

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1    alcohol-related problems.

2            Is it your intent to provide programs for

3    that percentage of prisoners?

4        A.  Assuming that's true, I'm -- I assume your

5    memory is probably better than mine on the actual

6    percentages --

7        Q.  I just read the reports yesterday, so it

8    probably is --

9        A.  Okay.  The answer is, yes, but not all at

10   once.  So the science tells us that you should --

11   those inmates would be better served to go through

12   those programs within -- in their last year, and

13   then immediately go to after care.  And my current

14   assessment is that the Department isn't utility

15   lying all its bed for those inmates who are in their

16   last year.

17           The reason I say that's important is

18   because obviously if you've got an inmate with a

19   drug problem with a year to sever they should have

20   the priority, and the inmate with 5 years to serve,

21   that is right of that same 45 percent, but you don't

22   need 45 percent of your drug and alcohol treatment

23   bed to meet those need.  You can meet this inmate's

24   need now and this inmate's need 4 years from now

25   when he's a year before he gets out.  So --

                DO NOT CITE PER CCP2025(b)

                                                    100


                UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1        Q.  Right.  So you have to have some idea of

2    the total population, then you divide it by the

                        Page 89

08.08.29 rough Cate

3    percentage, then you run the numbers to figure out

4    when they are, quote, eligible for the program.

5    Right?

6         A.  Right.

7         Q.  And so once you have that number, then you

8    can determine how much staff you need, how much

9    space you need, and you can make your budget

10   requests accordingly.  Correct?

11        A.  Correct.

12        Q.  San what you're telling me now, though, is

13   that you don't have that first number, so that

14   therefore you really can't -- is that correct?

15        A.  No.

16             MR. MELLO:  Misstates his testimony.

17             MR. SPECTER:  Q.  Okay.  So what's the

18   number of prisoners in which you want to provide

19   programs for?  That was the first number, that I was

20   mentioning.

21        A.  Our goal is to manage our entire population

22   as it exists today.  So like for example, as to drug

23   and alcohol programs which you had described, my

24   last conversation with Ms. Jett and Ms. Hood is that

25   they're expanding those programs to be able to deal

DO NOT CITE PER CCP2025(b)

101

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1    with every inmate we have in there today that needs

2    those programs at current levels of crowding.  They

3    would know, obviously, better than I would as far as

4    the details.

5             I don't think we're there yet, but they

Page 90

08.08.29 rough Cate

6   have a figure that says, my last conversation with

7   them was that if we build the beds that we're

8   planning to build, the drug treatment beds, then

9   we -- and we effectively manage our population such

10  that we the question the right inmate in the right

11  bet at the right time, that we can provide did you

12  go and alcohol treatment or all 170,000 inmates,

13  recognizing that when I say that, I mean that the

14  subset of that population that need them.

15          I don't have those same figures for every

16  program, or for all six criminogenics needs.  I

17  don't know what the numbers are off the top of my he

18  had.  I just happen to know that one because we

19  discussed it recently.

20      Q.  I see, okay.

21          So while we're talking about substance

22  abuse, let's talk about the Department's audit of

23  the substance abuse program.

24          Could you make this the next exhibit?

25          (Deposition Exhibit 2 was marked for

                DO NOT CITE PER CCP2025(b)
                                                    102


            UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1           identification.)

2           MR. SPECTER:  Q.  What I've handed to you,

3   Matt, is a press release that was dated February

4   21st, 2007, Office of the Inspector General.  I'd

5   like you to take a moment to review that.

6           MR. SPECTER:  Q.  I'm going to ask you

7   about specific parts of it, so I just wanted you to

8   make sure that you were comfortable that that's the

9   press release that was issued under -- while you

                        Page 91

08.08.29 rough Cate

10    were Inspector General.

11        A.  It appears so.

12        Q.  Okay.  And before a press release is

13    issued, especially one which has quotes from you,

14    you read this press release and authorized it to be

15    released before it was released.  Correct?

16        A.  Probably edited it myself.

17        Q.  I think so.  So the first paragraph says

18    that, quote:

19            "California has spent for than $1 billion

20    since 1989 to provide somebody substance abuse

21    treatment to California inmates and parolees in an

22    effort to reduce the state's high recidivism rate,

23    but the programs have had no effect on recidivism

24    and in that regard appear to represent a complete

25    waste of money, the Office of the Inspector General

                DO NOT CITE PER CCP2025(b)
                                                    103


                UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1    said today."

2            That was what you wrote in 2007.  Correct?

3        A.  Yes.

4        Q.  And that was what you believed to be true.

5    Right?

6        A.  Yes.

7        Q.  And the little Hoover commission -- I'm

8    sorry.

9            The -- one could infer from that paragraph

10    that the substance abuse program in the California

11    department of corrections is a billion dollar

12    failure.  Would that be a reasonable inference?

                        Page 92

08.08.29 rough Cate

13    MR. MELLO:  As of February 21, 2007?

14    MR. SPECTER:  Q.  Yes.

15    A.  In regards to its impact on recidivism,

16    yes.

17    Q.  And it was put -- right.

18    And it also -- you are quoted as saying:

19    Effective treatment for substance abuse offers one

20    of state's best hopes of reducing the number of

21    inmates who repeatedly cycle in and out of the

22    prisons.

23    That's an accurate quote?

24    A.  Yes.

25    Q.  And you believe that to be true?

DO NOT CITE PER CCP2025(b)

104

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1    A.  Yes.

2    Q.  And you believe that successful -- quote,

3    successful treatment programs could reduce the cost

4    to society of criminal activity related to drug

5    abuse, change lives and help relieve the states

6    prison overcrowding crisis.

7    You believe that to be true?

8    A.  Yes.

9    Q.  But so far the Department of Corrections

10    has squandered that opportunity.

11    Do you believe that to be true?

12    A.  Yes.  As of then.

13    Q.  As of then.  Do you believe that the

14    Department is still squandering its opportunity to

15    provide that opportunity?

16    A.  I think the Department has improved from

Page 93

08.08.29 rough Cate

17    February of 2007 till today.

18        Q.  And in what ways?

19        A.  You'd have to talk to Ms. Jett about the

20    particulars, but for example, I'm aware that we've

21    moved drug and alcohol treatment programs from

22    institutions that were locked down a greet deal to

23    institutions that are not locked down as often.  We

24    have a greater rate of participation in those

25    programs than we had before.

DO NOT CITE PER CCP2025(b)

105

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1        Q.  Can you tell me whether or not the

2    Department has improved the -- on the rate of

3    recidivism?

4        A.  The studies that this document was based on

5    were conducted by UCLA over the course of -- I don't

6    remember how many years.  Multiple years.  I have

7    not seen the most recent reports.  But I can say

8    that drug and alcohol treatment programs, when run

9    correctly, are, quote, evidence-based which means

10    that other states have demonstrated that running a

11    program in accordance with the proper policies and

12    procedures will have an aggregate reduction in

13    recidivism, and so the fact that we're running the

14    programs in a more evidence-based way should yield a

15    lower overall recidivism rate.  I just don't have

16    those numbers right now.

17        Q.  And you would agree, would you not, that

18    this -- your report stands for the proposition that

19    if you run an evidence-based program, in a way

Page 94

08.08.29 rough Cate

20    that's not correct, you don't get the result you're

21    seeking.  Correct?

22            MR. MELLO:  Objection.  Vague.  Calls for

23    speculation.

24            If you understand, answer.

25            THE WITNESS:  To the extent that you're

DO NOT CITE PER CCP2025(b)

106

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1    seeking a reduction in recidivism and you don't run

2    the programs in an evidence-based way, you will not

3    get that -- either the -- the maximum benefit -- you

4    may get something less than that, which is still

5    beneficial, so -- or you -- if you run them poorly

6    enough, you will get no benefit on recidivism

7    reduction, although it may make the prison safer,

8    because it keeps the inmates occupied and interested

9    and so forth.  But you won't see reductions in

10    recidivism.  I think that's true.

11        Q.  So it's important, then, to study the

12    effects of the programs, or the outcomes of the

13    programs, to determine whether or not they're being

14    run in a -- in the way that they're supposed to be,

15    or that -- in a way that's consistent with their

16    design.  Correct?

17        A.  what do you mean by the outcomes?

18        Q.  Effect on recidivism.

19        A.  Yes.  Ultimately, yes.

20        Q.  So just the fact that a program was running

21    in, say, Nebraska that had good results, if you put

22    that same program in California, you won't know if

23    it's doing what you want it to do unless you measure

Page 95

08.08.29 rough Cate

24    the results.  Correct?

25         A.  I -- I'll differ a little bit with that

DO NOT CITE PER CCP2025(b)

107

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1    statement in that what I learned is that the whole

2    point of evidence-based programs is if you run a

3    program according to the specifications, you will

4    get that result.  And so you don't necessarily have

5    to measure what that result is to have confidential

6    that a particular program will achieve results.

7         In our case, we do track return to custody

8    rates for our individual programs.  But my

9    understanding is it's not necessarily required.

10        Q.  Then you'd have to have some audit to make

11   sure that it's running exactly like the programs

12   where they did have that results in order to have

13   any confidence that it was going to give you the

14   outcomes you desire.  Right?

15        A.  Correct.

16        Q.  So one of those two things.  Either you

17   have to measure the outcome or you have to measure

18   its operation.

19        A.  Correct.

20        Q.  Correct?  Okay.

21        So you don't -- as you sit here today, you

22   don't have any statistics to tell you whether or not

23   that the substance abuse program operated by the

24   Department has improved its ability to affect

25   recidivism.  Correct?

DO NOT CITE PER CCP2025(b)

108

08.08.29 rough Cate

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1      A.  I don't believe that's true.

2      Q.  Okay.

3      A.  On either point.  We -- it's true that

4   we -- I don't -- I haven't seen another UCLA or

5   other university study measuring 3-year recidivism

6   rates op individual who have gone through the

7   program since 2007, because most of those individual

8   won't have been released yet, or would have been

9   just released, and so it's impossible to know what

10  the recidivism rate is for individual who began

11  after these reforms took place until now.

12           It hasn't -- enough time hasn't passed.

13  But we do get return to custody rates on every

14  program.  I just looked at them a couple of days

15  ago.  And we do send -- or we do ask for studies

16  about the effectiveness of our programs, and I saw,

17  again, just a few days ago, which -- which programs

18  were being studied internally, so we could determine

19  had a they were or were not running a true

20  therapeutic community.

21      Q.  Okay.  So what do the statistics on this

22  program show?

23      A.  Well, there's 20 something of these

24  programs, and statistics are different for each one.

25      Q.  Right.  Well, I was just -- my question

DO NOT CITE PER CCP2025(b)

109

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1   was, can you say that the outcomes are different

2   now?  And by outcomes, I mean its effect on

Page 97

08.08.29 rough Cate

3    recidivism.

4            And so you said yes, that you had some

5    data.  And so I want to know what the data says to

6    your best recollection on this program.  If you know

7    it.

8        A.  And I'm saying, there isn't a -- it is

9    impossible to have an overall --

10       Q.  Right.

11       A.  -- recidivism rate.

12       Q.  But then you said you saw some other

13   figures.

14       A.  Right.  We know that we keep track of

15   returns to custody from programs, but those were

16   likely returns based upon inmates who were in the

17   program before the changes.

18           And as I said, there's every program has

19   its own return to custody rates, and so as I sit

20   here, I don't remember the specifics of -- I

21   remember some did better than others, and et cetera,

22   and again, I know that we did some substantive work

23   that indicated to me that our programs are running

24   better because we're occupying more hours of -- we

25   are getting inmates there more often.  So I think

                DO NOT CITE PER CCP2025(b)

                                                    110


                UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1    that's a positive indicator, because that was one of

2    the major problems we found here.

3            But it's too soon for us to say that the

4    row forms that have taken place in the last 18

5    months are -- were sufficient to impact the overall

08.08.29 rough Cate

6   recidivism rates.  We'll have to wait and see on

7   that.

8        Q.  Okay.  If you turn the page and you look at

9   the first paragraph, you'll see that I lied about

10  the second percent.  It was 42 percent of inmates on

11  alcohol treatment and 56 percent on drug treatment.

12          But hose are basically in the ballpark of

13  what I mentioned before.  Correct?

14          MR. MELLO:  Objection.  Lie.

15          THE WITNESS:  Yes.  Because you're correct

16  now.

17          MR. SPECTER:  Q.  If you go down to the

18  second full paragraph on that page --

19       A.  Okay.

20       Q.  It said:  Another recent study shows that

21  inmates who received in-prison treatment followed

22  bile at least 90 days of community-based after care

23  did have significantly lower recidivism rates than

24  nonparticipants.

25          And you -- is that something you believe to

DO NOT CITE PER CCP2025(b)

111

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1   be true when you wrote it?

2        A.  Yes.

3        Q.  Okay.  Do you know what percentage of

4   prisoners who are -- who paroled after receiving

5   these in-prison treatment now -- received after care

6   and how many attended for at least 90 days?

7        A.  I recently read a report provided to me by

8   the -- addiction services personnel in our

9   department, and they broke these numbers down by

Page 99

08.08.29 rough Cate

10    specific institutions, how many of the inmates at

11    each institution had attended after care and had

12    attended it for a certain period of time.

13            It appeared to me that these numbers, the

14    numbers I read the day before yesterday, were better

15    than what's reported here.  But again, it was an

16    institution-by-institution breakdown rather than an

17    aggregate, and so I wouldn't be sure as to the

18    totals right now.

19        Q.  So you don't -- okay.  So this says, 30

20    percent received in-prison -- the 30 percent of

21    those who received in-prison treatment attended

22    after care and fewer than 10 percent attended after

23    care on these 90 days.

24            So you don't recall the figures for the

25    current --

DO NOT CITE PER CCP2025(b)

112

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1        A.  I don't, although I had a strong impression

2    that the numbers were better.

3        Q.  Do you know how much better?

4        A.  It depended on the institution, but my

5    recollection is, is that the lowest numbers I saw

6    were in the 8, 9, 10 percent, and most of them were

7    twice that.  Or more.

8        Q.  Okay.  If you go down two more paragraphs,

9    it said that the programs have the capacity to

10    provide services to about 9200 inmates at a time.

11            Do you know what the capacity is today?

12        A.  Carol Hood would know off the top of her

Page 100

08.08.29 rough Cate

13    head.  But it is definitely above 10,000, and I

14    think it's -- somewhere between -- I think 10- to

15    12,000, but again, I'm sorry, that's a rough

16    estimate based upon my last briefing from our drug

17    and alcohol staff.

18         Q.  If you could turn to the last page.

19         A.  Yes.

20         Q.  The third paragraph down, beginning with,

21    we recommend?

22         A.  Yes.

23         Q.  It's, you -- this is a quote from you,

24    quote:  "We recommend that state officials and

25    policymakers work in a bipartisan manner to device

DO NOT CITE PER CCP2025(b)

113

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1    comprehensive solution -- solutions, bringing

2    together substance abuse treatment experts and

3    representatives from a broad political spectrum to

4    remake the system from the ground up."

5         That's an accurate quote.  Correct?

6         A.  Yes.

7         Q.  And is that what -- is that true today,

8    too?

9         A.  I think that that's what was done through

10    the expert panel.

11         Q.  So these programs have been remade from the

12    ground up, in your opinion, or in your perception?

13         A.  I think that the difference is that we now

14    have a plan to assess our inmates both generally as

15    to their need for drug and alcohol care and also to

16    do secondary assessments that would assess the

Page 101

08.08.29 rough Cate

17    severity of their addiction, which will allow us to

18    get the right inmates into programs, so that is a

19    ground-up kind of difference.

20         I think the expert panel has pointed out

21    that the timing of this care is important.  We

22    still -- we have not accomplished that as of yet,

23    but we now understand that the timing of who you at

24    the time and when is important, and that's kind of a

25    ground-up foundational component.

DO NOT CITE PER CCP2025(b)

114

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1         We now understand the connection of

2    after-care, I think, better, and our planning for

3    new beds always includes planning for after care and

4    provision of that kind of treatment, which is

5    foundational.

6         We are also now implementing both a

7    therapeutic community and cognitive behavioral

8    program, and we weren't doing cognitive behavioral

9    very much, and I think the recognition that some

10   inmates may be served better in one way or another

11   is foundational to this.

12        So -- and then, you know, just the notes

13   and bolts of running good program for these inmates

14   is -- the discipline associated with that, the need

15   to make sure that the providers are there on time

16   and that the officers are able to keep the -- get

17   the inmates to the program and so forth, I think I

18   would consider that just better daily operation.

19        So I think the goal is accurately stated

Page 102

08.08.29 rough Cate

20    here, and I think we've made some good foundational

21    progress.  I wouldn't say, however, that in the 18

22    months or so since this report came out, that all

23    that work has been done, certainly.

24        Q.  Thank you.  Do you have any -- you

25    understand that counties have similar programs.

DO NOT CITE PER CCP2025(b)

115


UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1    Correct?

2        A.  Yes.

3        Q.  Counties are a lot smaller than the state.

4    Correct?

5        A.  Yes.

6        Q.  In some ways, that makes them able to act

7    faster and quicker and -- especially since they're

8    dealing with a smaller population.  Would you agree

9    with that statement?

10        A.  Yes.

11        Q.  Do you think that it would be -- do you

12    think as a general matter that the counties would be

13    able to -- if given the resources, implement these

14    programs in a way that's -- in a successful way,

15    faster than the department of corrections?

16            MR. MELLO:  Object.  Calls for speculation

17    and lacks foundation.  You can answer.

18            THE WITNESS:  I honestly could only answer

19    in a generalities, in that --

20            MR. SPECTER:  Q.  Right.

21        A.  -- you know, my experience is, some

22    counties are more advanced than others, and 58

23    counties, you would find 58 different levels of

Page 103

08.08.29 rough Cate

24    readiness to handle a project like this, I would

25    assume.

DO NOT CITE PER CCP2025(b)

116

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1        Q.    And some of them would be able to do it

2    quicker and in some cases better than the department

3    of corrections.   Right?

4        A.    What do you mean by quicker?

5        Q.    Get them up and running, have more

6    people -- not -- well, just -- not more people, but

7    get them up and running, functioning, providing

8    services.

9            MR. MELLO:   Calls for speculation.   Lacks

10    foundation.

11            MR. SPECTER:   Q.   Isn't that the whole

12    theory behind the re-entry facility is that you make

13    some of these programs local?

14            MR. MELLO:   Misstates the facts, calls

15    for -- it's an incomplete hypothetical.

16            You can answer.

17            THE WITNESS:   The point of the re-entry

18    facilities is that these inmates are going to be

19    returning to their communities in the next year, and

20    their communities would be better served if they

21    knew who these inmates were and if they were able to

22    provide services to the inmates to provide a smooth

23    transition.   And if the state and the locals were

24    able to collaborate on treatment such that an inmate

25    might be treated by the same treatment provider

DO NOT CITE PER CCP2025(b)

117

08.08.29 rough Cate

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1    during that last year as he is in his first year

2    of -- on parole, all those are benefits to re-entry.

3            Some communities do those kinds of things

4    very well.  I'll tell you, though, that some prisons

5    do those things well.  And so it's hard to paint

6    with a broad brush on these issues.

7            MR. SPECTER:  Q.  So but in any event, it

8    seems to me that you agree that the more local the

9    program -- if programs can be in the community to

10   which the offender is going to return, that would be

11   better than doing it in prison.  Is that right?

12       A.  I wouldn't say that.  On the whole.

13   Juvenile offenders who are definitely benefit bide

14   working in their own communities because their

15   families are there.  Family -- strong family support

16   is a stabilizing factor for a parolee.  That helps.

17           But whether you -- if you're incarcerated,

18   I think -- and, you know, you can get a visit from

19   your family, that's beneficial.  I don't know that

20   you need to be in your county, the same county, to

21   have that happen.

22       Q.  So then there's no point in doing these

23   re-entry facilities in the local community.  You

24   could just do them wherever you wanted in the state.

25   Right?

                DO NOT CITE PER CCP2025(b)

                                            118


                UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1            MR. MELLO:  It's argumentative, it

2    misstates his testimony.
                        Page 105

08.08.29 rough Cate

3          MR. SPECTER:  Q.  I'm trying to figure out

4     what -- you're giving me inconsistent answers.

5          A.  I'm not trying to, and I don't think I

6     have.

7               The programs, you know, for an inmate

8     that's serving 10 years, the -- what I'm saying is

9     that the state can provide those services, drug and

10    alcohol services for that inmate.  During the last

11    year, I think there is additional benefits to

12    providing those services near their community for

13    the reasons I've stated earlier.

14          MR. SPECTER:  Okay.  It's 12:30.  Are you

15    guys hungry, do you want to keep going for what?

16          MR. MELLO:  Unless you think you have like

17    a half an hour left.  I'm kidding.  I'm fine

18    breaking.  It's up to Mr. Cate.

19          MR. RICE:  I think it's on timing.  If you

20    have another 2, but if you're an hour or two away,

21    weak -- it's up to Matt.

22          MR. SPECTER:  He doesn't eat lunch.

23          THE WITNESS:  My preference is to have

24    dinner with my family.  I don't care who I have

25    lunch with here.  No offense to any of you.

DO NOT CITE PER CCP2025(b)

                                                   119


UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1          MR. SPECTER:  It's a reasonable goal.

2     Well, we're not -- we can make the lunch break

3     pretty short so we can go through it, but I start

4     losing it if I don't get some food.  But it doesn't

5     matter to me whether we break now or later.

Page 106

08.08.29 rough Cate

6          THE WITNESS:  Well, why don't you pick a

7      good breaking time for you're questions, and then

8      we'll take whatever, 30 minutes or whatever you

9      think is reasonable.

10          (Discussion off the record.)

11          MR. SPECTER:  Q.  Okay.  Parole.

12          We talked a little bit about parole

13     already.  As he understand it, the department is

14     going to initiate a pilot project to evaluate its

15     risk assessment instrument.  Is that right?  Am I

16     understanding that correctly?

17          And --

18     A.  That's not correct.

19     Q.  Well, I want to ask you this question.

20     There's a parole-related pilot project in the works,

21     is there not?

22     A.  Yes.

23     Q.  And what does that pilot project consist

24     of?

25     A.  Again, it doesn't exist yet.

                    DO NOT CITE PER CCP2025(b)

                                                120

              UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1      Q.  Okay.

2      A.  But it would exist of -- or be comprised of

3      utilizing a risk assessment tool which I had

4      described earlier, and then utilizing that risk

5      assessment tool to evaluate or -- to evaluate the

6      offender and make a determination based upon a

7      parole violation decision-making instrument what the

8      proper sanction is for particular conduct, for a

9      particular offender.

                    Page 107

08.08.29 rough Cate

10    Q.  And it would -- it contemplates having what

11  are known as intermediate sanctions?

12    A.  Yes.

13    Q.  And by intermediate sanctions I mean

14  they're less than incarceration.  Correct?

15    A.  I assume that's what you mean.

16    Q.  Yes.  That's what I mean, just for the

17  record.

18        Do you have an expectation of when that

19  pilot project will be started?

20    A.  It's -- my understanding is, is that it's

21  being contemplated by the legislature.

22    Q.  Oh.  So it's not something that you would

23  authorize on your own?

24    A.  Either of those things could happen.  The

25  legislature could order it, or the department could

DO NOT CITE PER CCP2025(b)

121

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1  do it on its own.  So we are continuing to do our

2  work right now without regard to what the

3  legislature is doing.

4    Q.  Okay.  So for the work that you're doing,

5  do you have an expectation of when or if you'll

6  implement a pilot project on --

7    A.  Yeah.  This fall.

8    Q.  And within the next month or two, or -- I

9  mean, fall starts soon?

10    A.  Yeah.  Again, it depends upon the budget

11  to -- you know, obviously it takes resources to do

12  these kinds of things, so it's a little bit outside

Page 108

08.08.29 rough Cate

13      of our control.

14              But, you know, we're going to do some -- we

15      need to bring in some experts to train our trainers,

16      those kinds of things, and that's set for next

17      month.  Is it September -- I'm sorry, for October.

18      So that's a big -- that's the first big step.

19          Q.  I see.

20          A.  But it would roll out sometime thereafter,

21      again, depending on resources, et cetera.

22          Q.  Okay.  And after -- if the pilot project is

23      successful, however you decide what success is, do

24      you have an idea of how long it would take to --

25      before it would be rolled out statewide?

DO NOT CITE PER CCP2025(b)

                                                        122

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1              Well, let me ask another question.  Is the

2       pilot project going to be for 90 days?  That's the

3       last document I saw, said 90 days.

4           A.  Our parole director would know specifically

5       how many days.  But our typical pilot runs about

6       that duration.

7           Q.  Okay.  And after the pilot is over, do you

8       have an understanding of how long it would then take

9       to roll out statewide if it was something you wanted

10      to roll out statewide?

11              MR. MELLO:  Lacks foundation, calls for

12      speculation.

13              THE WITNESS:  Again --

14              MR. MELLO:  Go ahead.

15              THE WITNESS:  Depends on what you learned

16      from the pilot.

Page 109

08.08.29 rough Cate

17          MR. SPECTER:  Q.  Right.

18          A.  If it -- you know, they never -- a pilot

19    never is perfect.  That's the point of the pilot, so

20    you have to fix whatever you think needs to be

21    fixed, and again, our -- Mr. Kernan, the

22    Undersecretary of Operations would know exactly, or

23    Mr. Hoffman, the Director of Parole, would know

24    exactly what the rollout period is.  I'm not sure.

25          MR. SPECTER:  Q.  There's one little

                    DO NOT CITE PER CCP2025(b)

                                                    123


                    UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1     document which I want to -- oh, here it is.

2            Make this -- mark this as --

3            (Deposition Exhibit 3 was marked for

4            identification.)

5            MR. SPECTER:  Q.  Matt, this is an email

6     from Joan Petersilia to you on June 20th of this

7     year, attaching the memorandum from a guy named

8     Steven.

9            Do you recall that email, receiving that

10    email?  Of first paragraph of the memo that you have

11    your left hand on is -- explains the memo in pretty

12    good detail.

13           MR. MELLO:  I'm going to object to the

14    introduction of the attachment to the memo as being

15    a privileged document under -- it was identified as

16    a privileged document, but obviously that's been

17    ruled upon, so I'll allow him to answer questions.

18           MR. SPECTER:  Q.  So have you seen this

19    email and the memo before?

                    Page 110

08.08.29 rough Cate

20    A.  Yes.

21    Q.  And as I understand it, correct me if I'm

22  wrong, this professor Raphael suggested that if the

23  rate of return of parolees was put to the -- was

24  reduced to the national average, you would be --

25  have -- as of -- as of 2005, between 21- and 36

DO NOT CITE PER CCP2025(b)

124

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1  fewer inmates on any given day.  Is that your

2  understanding?

3    A.  That's what it says.

4    Q.  Right.  And I was -- the first question I

5  had was, did you ever do anything more with this

6  memo?  And by doing anything more, I mean that in

7  the cloak we go source.

8    MR. MELLO:  Objection.

9    MR. SPECTER:  Q.  Was there any follow up?

10    A.  As I recall, I read it, and I may have

11  discussed it with Ms. Siggins.  May have had a

12  conversation with Dr. Petersilia about it.

13    I did not contact professor Raphael.

14    Q.  Okay.  In terms of the goal of reducing the

15  parole revocation rate to the national average, to

16  me that seems -- I'll ask you if you agree with

17  me -- to me that seems like a reasonable goal.  Does

18  that strike you as a reasonable goal?

19    MR. MELLO:  Objection.  Vague.  You can

20  answer.

21    THE WITNESS:  Not necessarily.  What I

22  wasn't sure of is that -- whether he was comparing

23  apples to apples.  And I certainly think that -- I

Page 111

08.08.29 rough Cate

24    recognize we revoke at three times the national

25    average.  And that's what makes us primarily

DO NOT CITE PER CCP2025(b)

125

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1    different from other states.  And that's the reason

2    that we're looking at parole reform, to address our

3    overcrowding issues.

4           But Dr. Petersilia has told me that in her

5    view, we need to be careful , because our inmates

6    are also different, in that they're incarcerated

7    more often, for more serious claims than other

8    states, and so I don't know if going to the national

9    average is reasonable, and I assume you mean

10   relatively safe and appropriate and all those kinds

11   of things when you say that.

12          And so it gives me pause to say whether a

13   reduction of this letter is appropriate in

14   California.

15          MR. SPECTER:  Q.  So -- well, if that's

16   not -- if you have pause about that goal, do you

17   have a goal in mind?

18          MR. MELLO:  Objection.  Asked and answered.

19          THE WITNESS:  We're not -- I don't think

20   parole reform should be driven by a population goal

21   per se.  I think parole reform should be driven by

22   asking, can we effectively reduce the number of

23   inmates that are churning through our system such

24   that we reduce our prison population without

25   increasing the risk to public safety.  And whatever

DO NOT CITE PER CCP2025(b)

126

08.08.29 rough Cate

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1    that number turns out to be, then that's the number

2    you get.

3         I understand that experts have estimated

4    you might save between 5- and 8,000.  That's their

5    view on what you might see out of a prom like that.

6    But that's not -- but I don't have a specific goal

7    that I think we need to reach, and certainly

8    wouldn't attempt to reach a goal at risk of public

9    safety.

10        Q.  well, public safety, you would agree with

11   me, is a relative term.  Isn't that correct?

12        A.  Correct.

13        Q.  So what it really is, is some sort of risk,

14   because no matter if you let prisoners out in the

15   numbers that you let them out, in any kind of

16   system, you're going to have a risk to public --

17   some risk to public safety.  Correct?

18        A.  I'm sorry, can you repeat that?

19        Q.  You're always going to have a risk to

20   public safety when you let people out of prison who

21   have been convicted of felonies.  Right?

22        A.  As opposed to never letting them out, yes.

23        Q.  Right.  So the question is -- the question

24   for you, as I understand it, is, you have to live

25   with some risk.  There's always going to be some

DO NOT CITE PER CCP2025(b)

127

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1    risk in a parole system.  Correct?

2         A.  Yes.

Page 113

08.08.29 rough Cate

3       Q.   And you have -- one of your determinations

4    has to be what level of risk is appropriate.

5    Correct?

6            MR. MELLO:  Objection.  Vague.  Calls for

7    speculation.

8            THE WITNESS:  The reason I hesitate is that

9    currently using the -- if one assumes that the

10   current situation or current model, the current set

11   of laws is what society has deemed the appropriate

12   level of risk associated with releasing inmates from

13   institutions, that's a policy decision that

14   policymakers make.  That legislators make and

15   governors make.  It's not one that I make.

16           What I can do is advise the governor and

17   advise policymakers that we can -- we can reduce our

18   prison population if done correctly by some amount

19   without adversely affecting the level of risk that

20   society has currently accepted.

21       Q.   Okay.  So that -- so the level of risk that

22   society has currently accepted is measured how?

23   Well, I -- again, just a roughly way of describing

24   it is by, it's measured through its length of

25   sentence, sentencing structure, through who is --

DO NOT CITE PER CCP2025(b)

128

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1    which offenders are placed on parole and which are

2    not, through the -- the sanctions imposed for a

3    violation of parole, for example.  Those are all

4    ways in which society has either adjusted its risk

5    levels up or down.

08.08.29 rough Cate

6     I don't know that there's -- policymakers

7   may look at crime rates and then adjust each of

8   those calculuses -- could lie -- calculuses up or

9   down depending on crime rates.  But again, that's

10  out of my area of expertise, a and I don't know

11  whether it's as thoughtful a process as that in

12  changing our -- the state's laws.  But --

13       Q.  So as I understand it -- well, one

14  preliminary question, the department, or at least

15  the state, has the ability without legislature who

16  change its parole -- some of its parole practices,

17  particularly who they revoke, what kind of

18  punishments are afforded to them.  Correct?

19       A.  Yeah.  There's a statutory structure, but

20  within that statutory structure, there's -- the

21  state has rule-making ability, and has the ability

22  to also train its staff to adhere to those rules in

23  a particular way.  So there's some leeway that there

24  are that the executive branch has to deal within

25  that statutory structure.

DO NOT CITE PER CCP2025(b)

129

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1       Q.  And when you adjust that structure, within

2   your statutory authority, that will affect, or it

3   could affect, actually, the risk to public safety.

4   Correct?

5       A.  It -- yes.  Depending on what you did, it

6   could impact that, yes.

7       Q.  Right.  And so as I understand your answer,

8   you believe that you don't have the authority to

9   adjust that structure.  That's a decision to be made

Page 115

08.08.29 rough Cate

10    by the legislature and the governor.  Is that

11    correct or incorrect?

12         A.  I can't adjust the statutory structure,

13    that's true.

14         Q.  No, I'm not talking -- I didn't sate

15    statutory structure.  I meant the regulatory

16    structure.  You have the authority to do that.  The

17    administration has the authority to adjust the

18    regulatory fracture.

19         Q.  Right.  But it's not something that you

20    would do on your own.  Would you get -- seek

21    approval from the governor before you did it.  Is

22    that correct?

23         A.  I would certainly work with the governor's

24    office to ensure that the policies and goals related

25    to a significant change in our parole rule-making

DO NOT CITE PER CCP2025(b)

130

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1    structure or the way we deal with these issues are

2    consistent with one another.

3              So --

4         Q.  So you wouldn't do it without his approval,

5    essentially?

6         A.  Not -- I wouldn't make a big change without

7    making sure that it was consistent with the goals of

8    the administration.

9         Q.  So are you -- let me see -- why don't we

10    just take a break now.

11              THE VIDEO OPERATOR:  Off the record at

12    12:54.

Page 116

08.08.29 rough Cate

13    (Lunch recess from 12:54 p.m. to 1:37 p.m.)

14

15    --o0o--

16    AFTERNOON SESSION.

17    MR. SPECTER:  Q.  Okay.  When we broke, we

18    were talking about parole reform and pilot projects.

19    And I know this was before you became secretary, but

20    I wondered whether you were aware of the parole

21    pilot project that they did in Orange County a short

22    while ago, a few months ago, or a year ago, I don't

23    remember.

24    A.  Yeah, I'm -- I've heard about it.  I hadn't

25    read anything about it or --

DO NOT CITE PER CCP2025(b)

131

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1    Q.  Right.

2    A.  Studied it at all.

3    Q.  Right.  Have you talked to Todd Spitzer

4    about it, just to --

5    A.  I think he's mentioned it.

6    Q.  And do you understand that in that pilot

7    project, it was -- as I understand it, they let the

8    local law enforcement folks veto offenders that they

9    didn't want to place back in prison, and that they

10    came away with two people that the law enforcement

11    folks would allow back in the community?

12    A.  I think that -- oh, I'm sorry.

13    MR. MELLO:  No, any question is, or my

14    objection is, that's compound.  I think it also

15    calls for speculation, because he told you he didn't

16    know.  But you can answer.

Page 117

08.08.29 rough Cate

17          THE WITNESS:  I don't have, obviously,

18   those details.  I do know that they -- they meaning

19   the Department, worked with -- whether it was local

20   legislature or local law enforcement to decide who

21   the pool was, and the pool got smaller and smaller

22   until the pilot failed.

23          I don't know the details about who decided

24   what, though.

25          MR. SPECTER:  Q.  Okay.  You became the
                    DO NOT CITE PER CCP2025(b)
                                                        132


            UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1    Inspector General in 200 -- what year?

2          A.   -4.

3          Q.   -4.  And that was -- right.  So when you

4    were the Inspector General, Rod Hickman was the

5    secretary.  Correct?

6          A.   When I started, yes.

7          Q.   And are you aware of the fact that

8    Mr. Hickman initiated a parole reform program of his

9    own where prisoners were going to be -- parolees

10   were going to be eligible for intermediate sanctions

11   instead of just always going back to prison?

12         A.   Yes.

13         Q.   And are you aware that that program was

14   halted in 2005?

15         A.   Yes.

16         Q.   And are you aware that the victims rights

17   groups were vehemently opposed to that program?

18         A.   I know there was opposition, and my

19   recollection in seeing television advertisements

                    Page 118

08.08.29 rough Cate
20    against parole reform, assertings from unsafe.  I

21    don't know who funded those.  And my guess is, is

22    the victims rights groups were probably of mixed

23    opinions.  I mean, there's a number of them, and

24    some -- and they don't share common views on

25    everything, so ...

DO NOT CITE PER CCP2025(b)

133

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1        Q.  Right.  And did you have any knowledge

2    about whether the governor's office directed Hickman

3    to cancel the program?

4            MR. MELLO:  Does he have any knowledge

5    whether the governor's office, in 2005, directed

6    Mr. Hickman to halt the program?

7            MR. SPECTER:  Yes.

8            THE WITNESS:  I don't know.  T who made the

9    decision to halt the program.  I know the

10    administration did.  I really don't know who was --

11    who decided -- who made that final call within the

12    administration.

13            MR. SPECTER:  Q.  But have you heard -- or

14    have any information to believe it was from the

15    governor's office?

16            MR. MELLO:  I think it's asked and

17    answered.  He told you his knowledge.  He can

18    answer.

19            MR. SPECTER:  He told me his knowledge.

20    That's why I asked the question, Paul.

21            MR. MELLO:  Don't get mad.

22            THE WITNESS:  I don't -- you know, I would

23    have to assume it was -- when I say an
                    Page 119

08.08.29 rough Cate

24    administration decision, I mean, it's a big -- you

25    know, that's a -- it was an important -- or a

DO NOT CITE PER CCP2025(b)

134

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1    high-profile situation, because the television ads

2    against it.  And so I assume that the administration

3    as a whole made that decision.  I really don't know

4    who within the administration decided it.  I

5    would -- I'd have to speculate that it was someone

6    other than Mr. Hickman, but ...

7        Q.  Well, the only -- as far as I know, the

8    only people who can direct Mr. Hickman to do

9    something are people within the governor's office.

10    Is there --

11        A.  That's right.

12        Q.  Am I wrong about that?

13        A.  No, that's true well, and the courts.

14        Q.  Okay.  So when you say administration,

15    you're referring to the governor's office,

16    essentially?

17        A.  Well, what I'm trying to say; it's possible

18    Mr. Hickman made that decision himself.  It's more

19    likely it was in conjunction with the governor's

20    office.  I just don't know that.

21        Q.  Okay.  But you are aware that the parole --

22    parole reform is a politically charged subject?

23        A.  Yes.

24        Q.  And it -- any kind of parole reform which

25    would reduce the number of parolees who are parole

DO NOT CITE PER CCP2025(b)

135

08.08.29 rough Cate

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1    violators who are going back to prison would have

2    substantial political implications.  Correct?

3        A.  I would assume so.

4        Q.  And that's one of the reasons why we

5    were -- when you were testifying before lunch, you

6    wouldn't make a decision about changing the

7    structure without consulting the governor's office

8    first.  Correct?

9            MR. MELLO:  Objection.  Lacks foundation.

10           THE WITNESS:  What I said was that I

11   wouldn't make any decisions around parole reform

12   that was inconsistent with the governor's vision and

13   direction for the department.

14           And so whether that knowledge is gained

15   from directives or conversations or a general

16   understanding about where he wants to go and

17   governor's office wants to go as a matter of policy,

18   I would want to make sure I was consistent with it.

19           MR. SPECTER:  Q.  Okay.  So what you're

20   saying; you would implement changes without specific

21   approval of the specific policy --

22           MR. MELLO:  Objection.

23           MR. SPECTER:  Q.  -- as long as you had a

24   general understanding of what their thinking was?

25   Is that what you're saying?  I'm trying to parse

                DO NOT CITE PER CCP2025(b)

                                                    136


UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1    your words here.

2            MR. MELLO:  Misstates his testimony.

                Page 121

08.08.29 rough Cate

3          THE WITNESS:  I have discretion that's

4    granted me by the governor's office --

5          MR. SPECTER:  Q.  Right.

6      A.  -- to implement reform, and to fix the

7    system.  That's what they hired me to try to do is

8    lead the department to improve itself.

9      Q.  Right.

10     A.  And so there's lots of decisions that go

11   along with that.

12         Parole reform is -- you know, the -- one of

13   those decisions that I'm going to make sure that

14   we're on the same page on.  I just don't -- again,

15   all the details of it may or may not be discussed.

16     Q.  Okay.

17     A.  But --

18     Q.  Do you know -- okay.

19         This is an excerpt from the little Hoover

20   commission.  Would you mark that as an exhibit?

21         (Deposition Exhibit 4 was marked for

22         identification.)

23         MR. SPECTER:  Q.  Matt, just to give you

24   some context for this, this is a -- I didn't want to

25   print out the whole report and waste a lot of

                DO NOT CITE PER CCP2025(b)

                                              137


                UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1    pages -- this is an excerpt from the report which

2    they issued on overcrowding called, Time Is Running

3    Out.  You'll see that on the next page.

4          MR. MELLO:  Do you know when it was issued,

5    for the record?

08.08.29 rough Cate

6          MR. SPECTER:  I'm thinking -- -- '06 or

7     '07.  You can find out, I can find out.

8          MR. MELLO:  I know.

9          MR. SPECTER:  I tried to print out the

10    cover page, but it was not -- the cover page wasn't

11    on the website, believe it or not.

12          THE WITNESS:  Okay.

13          MR. SPECTER:  Q.  So do you understand that

14    the policy was halted -- or this reform effort was

15    halted without an evaluation to determine whether it

16    was working?

17        A.  Well, according to the document,

18    Mr. Hickman indicated that it was the absence of an

19    evaluation that was part of this decision to stop

20    it.

21        Q.  Right.  I'll just represent to you that the

22    state auditor found that there was the data there

23    that could have been used to evaluate it.

24          So my question to you is, are you

25    concerned, given the events that happened in 2005

DO NOT CITE PER CCP2025(b)

138

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1     with the same governor, that your -- whatever reform

2     efforts you take to reform the parole system will be

3     halted in the same way due to political pressures?

4          MR. MELLO:  Lacks foundation, and misstates

5     the record, it calls for speculation.

6          You could answer.

7          THE WITNESS:  As part of our -- any plan to

8     change a component of corrections that's going to

9     have political implications, it's part of good

Page 123

08.08.29 rough Cate

10    administrative practice to ensure that the -- we
11    communicate well with the community, that we
12    communicate well with victims' groups, we
13    communicate well with labor, we communicate well
14    with the legislature, with our reform advocates, all
15    of the stakeholders, including the governor's
16    office, to make sure people understand what we're
17    doing and why, and to try to answer as many
18    questions as we can, allay as many concerns as we
19    can, both within and without the administration.
20            And I think that that's an important part
21    of this, because any proposal, parole reform or any
22    other, can be subject to change or undue scrutiny or
23    criticism, due or undue, based upon political
24    influence.  I think that's true from DMV to CalTrans
25    to corrections.  It's just that corrections is more

DO NOT CITE PER CCP2025(b)

139

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1    often in the spotlight.
2            MR. SPECTER:  And this is the next exhibit.
3            (Deposition Exhibit 5 was marked for
4            identification.)
5            MR. SPECTER:  Q.  So, one of the benefits
6    of being a secretary of the largest state agency in
7    the state is that you are invited to speak on radio
8    shows such as KQED's forum.  Correct?
9        A.  Correct.
10       Q.  And the real benefit is that they drive up
11   to see you instead of making you have to come into
12   San Francisco like they do for me on the few

08.08.29 rough Cate

13    occasions that I've had.

14          So you gave an interview a few weeks --

15    about a month or so ago with KQED.  Correct?

16          A.  I did.

17          Q.  And that was on the Forum show by Michael

18    Krasny.  Correct?

19          A.  Yes.

20          Q.  And what we've done, the exhibit I've given

21    you, is a transcript of that interview.  And I will

22    ask you -- I will point you to particular pages

23    to -- you know, that I want to talk about.

24          But in general, when you answered

25    Mr. Krasny's questions, you were trying to be as

DO NOT CITE PER CCP2025(b)

140

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1     truthful and honest as you could be.  Correct?

2           A.  Yes.

3           Q.  Okay.  So first, we wrote the page numbers

4     down at the bottom, so if you go to page 5, and line

5     22, do you see where Mr. Krasny asks you that

6     question?

7           A.  Yes.

8           Q.  And this is in the context of the

9     Receiver's request for $7 billion.

10          Mr. Krasny says, quote:  "The real problem

11    seems to be overcrowding to a great degree.  You

12    need more beds, you need more medical facilities,

13    you've got too many people in cells.  In fact, the

14    numbers are running well over 100 percent now in

15    terms -- I think in terms of what the capacity is

16    supposed to hold, aren't they?

08.08.29 rough Cate

17          And you're answer was, "That's right."
18          Correct?
19    A.   Yes.
20    Q.   And you believe that to be true?
21    A.   Well, I think that I my answer here speaks
22   for itself.  I wasn't necessarily saying that's
23   rightto everything he said above, but I agree that
24   over crowding makes everything more difficult in the
25   institutions.  I mean, I think that's a common --

                DO NOT CITE PER CCP2025(b)
                                                    141


            UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1   that's a common-sense, non-expert view, but when it
2   comes to providing program, we need space to provide
3   program, and the same thing is true for provision of
4   medical care.  You've got to transport inmates and
5   provide space for them and so forth.
6          And so crowding, if you're overcrowded,
7   that's a challenge that has to be overcome in order
8   to do those things.  That's what I was tying to get
9   across.
10    Q.   I see.  So you said, "a challenge for
11   mental and medical healthcare because of -- again,
12   of the clinical spaces needed."
13          Did you see that on line --
14    A.   Yes.
15    Q.   -- yes, 10 through 11.  And you called
16   overcrowding a difficult issue on the next line.  Is
17   that right?
18    A.   Yes.
19    Q.   You believe that to be true?
                Page 126

08.08.29 rough Cate

20      A.   I think it is a difficult issue.

21      Q.   And since it -- and your testimony is, is

22   that it affects everything you do.

23      A.   Yes.  In one degree or another.

24      Q.   So it's a pervasive problem.  Correct?

25      A.   In the extent that it has some impact on a

DO NOT CITE PER CCP2025(b)

142

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1   number of our efforts in the institutions, yes.

2       Q.   Right.  So -- okay.  So in terms of

3   overcrowding -- well, I'll lay that -- if you turn

4   to page 7 -- have you turned to page 7?

5       A.   I have.

6       Q.   Before I even asked you to?

7       A.   There's a checkmark here.

8            MR. MELLO:  If you want to give your

9   outline to him, we might get done faster.

10           MR. SPECTER:  Q.  It says, on line 4, it

11   says:  The situation where, as I said, we bring in

12   inmates in and out of 4 months at a time which isn't

13   enough time to address there what we call cripple

14   general I can needs, the things that cause them to

15   commit crimes in the first place, we really can't

16   address any of that in a short period of time.  And

17   so we need to make a determination, I think, as a

18   society which one of these inmates do we really want

19   to keep in because they're dangerous and which ones

20   could be handled through treatment or through

21   partnerships with our local law enforcement to

22   handle them locally.

23           Did you -- is that a true statement of your

Page 127

08.08.29 rough Cate

24   beliefs?

25      A.  It is.

DO NOT CITE PER CCP2025(b)

143

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1      Q.  And it would suggest that when you keep a

2   person in prison nor 4 months and then let them out,

3   which I think you said later in the interview, they

4   don't learn anything, perhaps, except more about

5   crime.  Would that be correct?

6      MR. MELLO:  I think that's compound.  It

7   misstates his testimony, lacks foundation, calls for

8   speculation.

9      MR. SPECTER:  All right.  I'll actually

10   withdraw that question.

11      Q.  So one could infer from the first part of

12   that statement that if you are putting somebody in

13   there for 4 months, and then letting them out again

14   without addressing their cripple general I can need,

15   you're really not doing anything for public safety.

16   Is that true?

17      A.  What we can do during the 4 months is

18   address life skills that can help make an inmate

19   more successful.  We can address their criminogenic

20   need.  And again, I'm only relaying what I'm told by

21   these experts in this area.  And it's also true

22   that, you know, the -- when you have 60,000 parole

23   violate ores in your system at any one time which we

24   do, that means there are 60,000 fewer offenders on

25   the streets, and so there's a -- there's some

DO NOT CITE PER CCP2025(b)

144

08.08.29 rough Cate

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1    reduction in crime as a result of keeping all of

2    those individuals in.  But that's -- that -- the

3    benefit to public safety is mitigated by the fact

4    that they're rotating in and out.

5            So my point kind of comes back to the

6    reason for parole reform in the first place, is that

7    if done correctly, the goal would be to keep those

8    crime rates the same, while not costing the state

9    the money necessary to incarcerate those people,

10   have them in programs or something else.

11           That's the -- that would be the -- that's

12   kind of what I was trying to get at here with this

13   statement again.

14       Q.  I see.  And do you have any -- what leads

15   you to believe that putting these 60,000 people in

16   prison has any effect on the crime rate?

17       A.  Really, a common sense tells me that 60,000

18   offenders, all of whom have committed crimes before,

19   even the very, very low-risk offenders have, you

20   know, a 10 or 15 percent likelihood of reoffence,

21   and so if they're not -- if, you know, if they are

22   not in the society, they can't commit those crimes,

23   and so that tells me there will be that many fewer

24   crimes committed.

25           The flaw in that logic, if you will, is

                DO NOT CITE PER CCP2025(b)

                                                145


UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1    that there's -- that there's -- we can't keep

2    everybody locked up, obviously, because it becomes

                        Page 129

08.08.29 rough Cate

3    too expensive and, you know, you run out of space

4    and that causes all the problems we discussed

5    before, and so you try to be as smart as you can

6    about keeping the people in custody that are the

7    most dangerous.

8        Q.  And you've had conversations with Joan

9    Petersilia about these issues?

10       A.  I have.

11       Q.  And she's undoubtedly told that you when

12   you remove prisoners from their -- parolees from

13   their community and thereby separating them from

14   their support system, from their jobs, from their

15   local community, it actually has a negative effect

16   on the prisoner -- the parolees's ability to

17   reintegrate into society?

18           MR. MELLO:  I think that's compound, and it

19   lacks foundation.  You can answer it.

20           THE WITNESS:  She hasn't told me all of

21   that.

22           MR. SPECTER:  Q.  Okay.

23           MR. MELLO:  Do you want us to guess?

24           MR. SPECTER:  I got it.

25       Q.  So on page 16, you said:  Right now, I

DO NOT CITE PER CCP2025(b)

146

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1    don't think people realize that you can have an

2    inmate one day who is in shackles and has to be

3    escorted everywhere he goes because he's considered

4    dangerous in prison, and the next day they get $200

5    minus the cost bus fare and they're dropped off at

08.08.29 rough Cate

6    the Greyhound bus, and that's not safe.

7         Do you believe that?

8    A.   Yes.

9    Q.   And then you continue and say:  And so

10   we've got to do something with these inmates who

11   have served their terms, they can't be incarcerated

12   any longer, but they've served their terms but need

13   to make sure that they're safely reintegrated into

14   society.

15        You believe that, too, do you not?

16   A.   I do.

17   Q.   And you continue:

18        I think for a long time we've just ignored

19   the problem and hoped they wouldn't -- they would go

20   away or that they wouldn't arrive back in our

21   community.  And the fact is that if they are

22   convicted in their community, they are coming back

23   to your community, that's the law, and so we need to

24   do something to improve that situation in a hurry.

25        Do you believe that, too?

DO NOT CITE PER CCP2025(b)
                                         147


UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1    A.   Yes.

2    Q.   What does a hurry mean to you?

3    A.   As fast as practicable.

4    Q.   And in terms of chronological time, what

5    does that mean?

6    A.   I didn't intend any particular

7    chronological time.  I think that we need to start

8    acting immediately on multiple fronts.  One is a

9    formal re-entry process that's a part of AB 900,

Page 131

08.08.29 rough Cate

10    building reentry facilities, as many as we can.  But

11    another is to improve our relationship with local

12    law enforcement so we get a good handoff from prison

13    to parole and parole to the local community.

14            Another is that we reach out to the

15    community via our community liaisons to let the

16    local providers know who's coming out and when so

17    they can get services to those people right away and

18    know who we are and what their need are.  That's

19    especially true with our meantry ill parole

20    population to ensure that we get a good handoff on

21    all of -- for those people.

22            I think all of that is -- you know, we talk

23    about re-entry with a big R.  That means all of

24    those kind of service as opposed to just meaning a

25    reentry facility.

DO NOT CITE PER CCP2025(b)

148

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1            So we're doing some of that -- some of that

2    started happening long before I became the

3    secretary.  I've agreed with what Mr. Hickman,

4    Woodford and Mr. Tilton, we all have believed the

5    same things in those regards and are making progress

6    to try to ease that transition.

7        Q.  But as we sit here today, you really can't

8    tell me when that continuum of services will be

9    available for, say, you know, 50 percent of the

10    people who are released or -- can you?

11        A.  Not for every community.  As I said, in the

12    jail, some communities are much further along the

08.08.29 rough Cate

13    continuum than others.  Some really get this, and

14    some are still on the learning curve.

15         Q.  Okay.  On line 23 of that same page, you

16    think -- I do think it's true that we need to make

17    sure that we take a hard look at who we're

18    incarcerating and why.

19         And you believe that, too.  Is that right?

20         A.  Yes.

21         Q.  Yes.  That would imply that if you're going

22    to take a hard look at it, that there may be people

23    who are incarcerated who don't need to be

24    incarcerated in terms of public safety.  Is that a

25    fair inference?

DO NOT CITE PER CCP2025(b)

149

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1         A.  If you read what I say in context, they're

2    talking about the parole side of the shop, and I

3    indicate above that it's -- again, it's an issue for

4    the policymakers, the legislature and the governor's

5    office to decide concerning the strike thatry frame

6    work.

7         But again, within the parole side, we

8    should be looking at who we're bringing back in to

9    prison and who we're not, and ensuring that we're

10    treating those locally that we can safely.

11         Q.  Right.  I understand that.  We've covered

12    that before.

13         But my question was whether that -- my

14    inference that I -- that I suggested, which was that

15    this statement implies from the fact that you want

16    to take a hard look at who we're incarcerating and

Page 133

08.08.29 rough Cate

17    why, that you believe that there may be people who

18    we're incarcerating that we don't need to

19    incarcerate while maintaining public safety.  Is

20    that --

21            MR. MELLO:  I think that's asked and

22    answered.  I think's answered the question.

23            MR. SPECTER:  It's a simple yes or no

24    answer.

25            MR. MELLO:  I think it's up to him to

                    DO NOT CITE PER CCP2025(b)

                                                    150


              UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1    decide whether it's yes or no.

2            MR. SPECTER:  Q.  Is that fair or is it not

3    a fair inference?

4        A.  It's fair as to these parole violators,

5    which is what I was saying in this statement.

6            MR. SPECTER:  Q.  Okay, fair enough.

7            So you also testified on page 17 that -- on

8    line 6:  Again, when you are incarcerating 10,000 a

9    month and releasing 10,000 a month, 120,000 a year,

10   which is just an extraordinary number, it is a

11   burden on our staff and mistakes get made, and

12   that's just another reason for trying to handle our

13   overcrowding issue.

14           MR. MELLO:  Objection to the word

15   "testified" in the question.

16           MR. SPECTER:  I'm sorry.  I take that back.

17       Q.  You stated --

18       A.  what page are you on?

19       Q.  Page 17, lines -- it's the second 6.  Do

                    Page 134

08.08.29 rough Cate
20    you see where it is on the bottom?

21        A.  Yes.

22        Q.  Sorry.  Why don't you take a second to read

23    it.  Line 6 through 10.

24        A.  Okay, I've read it.

25        Q.  Okay.  Is that statement true?

DO NOT CITE PER CCP2025(b)

151

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1        A.  Yes.

2        Q.  Okay.  You said:  Some of the facilities

3    are housed at 200 percent of their design capacity

4    and you can't program at that level of overcrowding.

5            Is that true?

6        A.  No, it's not entirely true.  It's a -- I

7    think I was illustrating a point here.  There's

8    actually -- what I what I meant was, you can't fully

9    program at that level of overcrowding.  And that at

10   every institution there's program available and some

11   are crowded at more than 200 percent.  It's just

12   that you can't program everybody the way you would

13   like to at that percentage rate.

14       Q.  And a while ago, you mentioned that, you

15   know, in the 4 months, you can give people life

16   skills.  But how many prisoners today are getting

17   life -- how many of these parole violators who are

18   in for an average of 4 months are getting life

19   skills?

20       A.  Some are getting life skills.  And some are

21   being helped with academic program.  But not as many

22   as I would like, and I don't have the numbers in

23   front of me to tell you.  I don't think it's a -- a

Page 135

08.08.29 rough Cate

24    large number.  It's frankly not as high a priority

25    as getting the programs that will address

DO NOT CITE PER CCP2025(b)

152

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1    criminogenic need on board.  Because again, that's

2    something that can be handled locally or through a

3    family member after parole.

4         Q.  So would you agree that it's the great

5    majority aren't getting those services?

6              MR. MELLO:  Objection.  Vague.

7              THE WITNESS:  You know, I'm not sure

8    whether it's the majority or the minority.  You'd

9    have to talk to Ms. Jett.  But I don't -- I think

10   you're correct.  I think it's not the majority that

11   are -- I think the majority are not getting any kind

12   of systematic life skills training.  Which I would

13   think that's what you're getting at.

14             MR. SPECTER:  Q.  Right.  I mean, I have

15   just been through the prisons in the reception

16   centers, and I assume you have been, too?

17        A.  I have.

18        Q.  Recently?  I didn't see very many, if any,

19   that did -- mostly they were sitting on their bunks

20   all day and going to the yard.  That's what they

21   told us.

22             Has your experience been different than

23   that?

24        A.  I was thinking of bridging program and

25   other similar programs which encompass part of a

DO NOT CITE PER CCP2025(b)

153

Page 136

08.08.29 rough Cate

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1   life skills training, but -- that's what I was

2   referring to.

3         But I would agree that -- with your

4   statement that the majority are not getting any kind

5   of full life skills program.

6         Q.  And you don't think of the bridging program

7   as an effective program, do you?

8         A.  My preference would be to take the

9   resources used in bridging and put it toward more

10  academic teachers and to try to deal with that

11  issue, the academic deficiencies in a more active

12  way that I think could be made more efficient than

13  the current system.

14        Q.  You're familiar with -- are you familiar

15  with the study -- or the studies that suggest that

16  for every dollar you spend on education programs,

17  you get $2 in reduced incarceration costs?  Have you

18  heard that?

19        A.  I haven't.  Although it makes some sense to

20  me.

21        Q.  It's in the Washington Institute policy --

22  you know that website?

23        A.  I do.

24        Q.  So if -- do you know what percentage of

25  prisoners are getting any education program?

              DO NOT CITE PER CCP2025(b)
                                                    154


              UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1         A.  I don't know that number off the top of my

2   head.

08.08.29 rough Cate

3      Q.  Okay.  Would that be something -- if I were

4   the -- if I were in your shoes, I would be flooding

5   the prisons with teachers, because it sort of seems

6   to suggest that you could reduce recidivism that way

7   and improve the lives of the offenders.

8           Is that something that's consistent with

9   with your view?

10     A.  Yes.  To the -- we have asked Ms. Jett her

11   plans in that regard, and they're consistent with

12   mine and what you've described it basically, which

13   is, try to improve the current use of our teachers

14   in our programs, in other words, to make sure that

15   inmates spend more hours in a classroom, get -- we

16   see more GEDs, more high school diplomas.  I think

17   all that is beneficial and we should spend our

18   resources to meet those needs.

19           The only way I would differ a little bit is

20   that vocational training is also valuable, meeting

21   criminogenic needs is valuable.  So there's always

22   going to be competing time for an inmate's day and

23   resources, et cetera.  But I think academic programs

24   are valuable, yes.

25     Q.  If you go to page 19 and look at the third

DO NOT CITE PER CCP2025(b)

155


UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1   checkmark.

2      A.  Yes.

3      Q.  It says:  Right now, about 50 percent of

4   our inmates will walk out of prison having done

5   nothing but lie on their bunk and walk the yard.

08.08.29 rough Cate

6       Is that true?

7       A.   Yes.

8       Q.   So that sort of answers the question we

9    were talking about a few minutes ago.

10           And you said:  We cannot expect that those

11   inmates are going to come out any different from how

12   they came in, except for perhaps having learned how

13   to be better criminal from being around serious

14   criminals.

15      A.   That's true.

16      Q.   That's what I meant when I was looking at

17   it before.

18           And if you go to page 21, on page -- on

19   line 14, the middle of the page there, it says,

20   thanks to academics and correctional science we

21   understand that nationwide, as I said, we can reduce

22   recidivism 5 percent through literacy, 12 percent

23   through vocational training, and another 5 to 8

24   percent through drug and alcohol programs.

25           Do you believe that that statement is true?

DO NOT CITE PER CCP2025(b)

156

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1       A.   I do.  Again, that assumes that you used an

2    evidence-based program, but --

3       Q.   And operated correctly.  Right?

4       A.   Right.

5       Q.   Right.  And on the next page -- well, on

6    page 22, online -- the top of the -- the first full

7    paragraph, we have to move within the will of the

8    people, and so right now I think that we really

9    have, as I've said, a window to try to deal with our

Page 139

08.08.29 rough Cate

10    overcrowding problem because it makes sense
11    physically and it makes sense socially.
12            Is that statement true?
13        A.  I'm not sure exactly what I meant by that.
14        Q.  Well, I was going to ask you, that's my
15    next question.
16            What kind of window are you talking about?
17    Because I'd like to go through it..  I think what I
18    was trying to indicate is that there's a greater
19    level of understanding in our communities that
20    prisons are expensive and that we have a crowding
21    problem, and that we need to try to deal with these
22    issues in a real comprehensive way, and that
23    provider, I think, an opportunity for us to act in
24    the best interests of the institutions, and the
25    CDCR, and within the framework of really what the

DO NOT CITE PER CCP2025(b)

157

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1    populace want us to do, as opposed to trying to do
2    something and -- that would be somehow against what
3    people think is right or most people.
4        Q.  Okay.  You mentioned that crowding has an
5    effect on the delivery of healthcare?  We talked
6    about that earlier.  Do you recall that?
7        A.  Yes.
8        Q.  Do you have an idea of how much the
9    population needs to be reduced in order to minimize
10    the crudding's effect on healthcare?
11            MR. MELLO:  Calls for speculation, it's an
12    incomplete hypothetical.  Lacks foundation.  He's

Page 140

08.08.29 rough Cate

13    not an expert.

14         You can answer.

15         THE WITNESS:  Well, it seems to me you can

16    deal with the issues with healthcare in a number of

17    ways.  One, you can reduce the number of inmates

18    helping you with your transportation and security

19    and -- you would require less space.

20         MR. SPECTER:  Q.  Less staff?

21         A.  Less staff.  Or, you can spend more money,

22    send more inmates to outside hospitals, which is an

23    expensive solution.  Or some combination of, again,

24    increasing your medical capacity through a building

25    program, building clinical space, increasing your

DO NOT CITE PER CCP2025(b)

158

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1    access to care through hiring more officers and

2    getting -- hiring more doctors, or -- and/or

3    reducing your crowding problem.

4         So I mean, there's lots of ways to attack,

5    it seems to me, the issues related to medical care.

6    One of those -- one of the one -- anyway, those are

7    the different ways that it seems to me, again, from

8    a layman's perspective, that a healthcare

9    administrator to get at those problems.

10        Q.  And my question was, if you were going to

11   attack it from the crowding part, how much would

12   you -- do you have an opinion, if you have one,

13   about how much you'd have to reduce the population

14   in order to be able to provide adequate services, or

15   constitutionally adequate services?

16        MR. MELLO:  Objection.  Constitutionally

Page 141

08.08.29 rough Cate

17    adequate is vague and ambiguous, it calls for

18    speculation, it lacks foundation, it's an incomplete

19    hypothetical, he's not an expert witness on this

20    subject.

21         You can answer.

22         THE WITNESS:  Well, I mean, the Receiver

23    has said he can provide constitutional level of care

24    at the current level of capacity, at the current

25    population.

DO NOT CITE PER CCP2025(b)

159

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1         MR. SPECTER:  Q.  Where has he said that?

2         A.  It's the whole premise behind his

3    construction plan.  My understanding from talking to

4    the Receiver is that he's -- his building plan is

5    based around the current number of inmates that we

6    have today.  And I assume he's not doing that to

7    build an unconstitutional level of care for these

8    inmates.

9         Q.  But that construction plan is not now.

10    It's in the future.  Right?

11         A.  Well, the -- 10,000 bed he's going to build

12    over time, and he's -- currently, right now,

13    building out clinical space, and he's also doing

14    that at the -- my understanding, again, is that for

15    the current level of population.

16         My point earlier is that he -- that --

17         Q.  So is it your --

18         A.  That's one way to attack it.  I'm sorry.

19         Q.  That's all right.  So you -- but you

Page 142

08.08.29 rough Cate

20    understand that the -- there's more to providing

21    healthcare than to have these beds for the -- you

22    know, the prisoners who need them, who are going to

23    fill them.  Correct?

24        A.  I do.

25        Q.  And you understand also that there's mental

DO NOT CITE PER CCP2025(b)

160

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1    healthcare which is at issue, too.  Right?

2        A.  Correct.

3        Q.  And that's been found unconstitutional.

4    Correct?

5        A.  Correct.

6        Q.  And doesn't have a Receiver.  Correct?

7        A.  That's right.

8        Q.  And there's -- the -- are you of the

9    opinion that one of the ways around the -- to solve

10    the healthcare problem -- well, the medical care

11    problem is to, you know, just let the Receiver do

12    what he's doing, or -- or -- this is a pretty

13    inarticulate question.

14            Let me start over again.

15        Q.  We have an overcrowding crisis now.

16    Correct?

17        A.  Yes.

18        Q.  And the Receiver's construction plans are

19    going to take years to complete the correct?

20            MR. MELLO:  Objection.  Vague as to

21    construction plans and years.  I think it's

22    multifaceted plan.  But you can answer the question.

23            THE WITNESS:  I think he's right.  It's a
                     Page 143

08.08.29 rough Cate

24    multifaceted plan.

25         MR. SPECTER:   Q.   You looked at the

DO NOT CITE PER CCP2025(b)

161

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1    turnaround plan on your way here today.

2         A.   Right.

3         Q.   It talks in terms of years.  It doesn't

4    talk in terms of months or weeks, does it?

5         A.   Well, again, at some institutions he's

6    already working.

7         Q.   Right.

8         A.   But to reach all the the institutions,

9    it'll certainly take years.

10         Q.   Right.  So is it your position as the

11    secretary that the -- the population shouldn't be

12    reduced to provide care in the interim between the

13    time -- between now and the time he completes his

14    turnaround plan?

15         MR. MELLO:  It lacks foundation, it calls

16    for speculation.  He's not an expert, so it's an

17    incomplete hypothetical.

18         I think it's vague as to what you're

19    getting at.  If you understand the question, go

20    ahead and answer it.

21         THE WITNESS:  I think we need to reduce

22    overcrowding, because it makes everything easier to

23    do in a prison.  It'll have the impact, I assume, of

24    easing somewhat the Receiver's job, but my point

25    was, is that he's -- that doesn't mean it can't be

DO NOT CITE PER CCP2025(b)

162

Page 144

08.08.29 rough Cate

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1    done at the current level.  And I think he's

2    planning to make the provision of healthcare

3    constitutional at the current level.

4         My assumption as a layman is that it

5    takes -- it'll take more money to do that, and I

6    think that's the best I can say about that.

7         MR. SPECTER:  Q.  I see.  Your lawyers, at

8    least, have put forth the position in court that the

9    courts should not issue a prisoner release order.

10   Instead, they should wait for the Receiver's plan to

11   be fully implemented.

12        Is that your position?

13        A.  It is.

14        Q.  And you are aware, although there is some

15   overlap, that the receivership only covers medical

16   care.  It doesn't cover mental healthcare.  Correct?

17        MR. MELLO:  Objection to the term "overlap"

18   and "some" as being vague and ambiguous, and I think

19   it's more than some overlap.

20        You can answer.

21        THE WITNESS:  I understand that the

22   Receiver and the court in Coleman are working could

23   he cooperatively, especially on the facilities

24   portion of the remedies in those two cases to

25   provide constitutional level of care.

DO NOT CITE PER CCP2025(b)

163

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1         I understand that the provision of that

2    care in the case of Plata is being managed by the

Page 145

08.08.29 rough Cate

3    Receiver, whereas the provision of care in Coleman

4    is still within the hand of the department.

5         MR. SPECTER:  Q.  Right.  And so all the

6    power that the Receiver has to raise salaries, to

7    make policy changes on his own don't exist in

8    Coleman.  Correct?

9         MR. MELLO:  It lacks foundation, misstates

10   some of the facts.

11        You can answer the question.

12        THE WITNESS:  I think you're right, you're

13   getting it -- yes, the Receiver certainly has powers

14   that the Coleman court has not yet taken.  The

15   Coleman court has to issue direct orders, which the

16   state has to then follow.

17        MR. SPECTER:  Q.  And you're aware that at

18   least in journal Carlton's opinion, he's issued

19   730 -- well, you're aware that -- well, let me just

20   ask you whether you believe that the alternative of

21   appointing a Receiver in Coleman is preferable to an

22   overcrowding -- a prisoner release order at Coleman?

23        MR. MELLO:  I think that calls for

24   speculation, it calls for a legal opinion.  It lacks

25   foundation.  Paragraph you can answer it if you

                DO NOT CITE PER CCP2025(b)
                                                  164


        UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1    understand.

2         THE WITNESS:  I don't think either are

3    needed.

4         MR. SPECTER:  Q.  You don't think either

5    are needed?

08.08.29 rough Cate

6    A.  I don't.

7    Q.  So you would oppose the appointment of a

8  Receiver if -- in Coleman?

9    A.  That's -- what I believe is is that the

10  state can handle the issue and provide

11  constitutional level of care for its mental health

12  population without that -- taking that approach.

13    Q.  Okay.  And what gives -- you know, Coleman

14  there's been an injunction since 1995.  Did you know

15  that?

16    A.  I -- generally aware of how long the case

17  has been around, yes.

18    Q.  It's 13 years?

19    A.  Correct.

20    Q.  Over 13 years, because I think it was

21  issued sometime before this date.

22        When do you believe the system will be

23  constitutional?

24        MR. MELLO:  Let's -- I think that lacks

25  foundation.  It assumes that the constitutional care

DO NOT CITE PER CCP2025(b)

165

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1  isn't being provided now in Coleman.  And it's

2  somewhat argumentative.

3        You can answer it.  I think it's vague,

4  too.

5        THE WITNESS:  Well, my understanding is, is

6  that account case has -- the conditions have

7  improved or deteriorated in Judge Carlton's mind

8  over time.  That he thought it was better at some

9  times than others.

Page 147

08.08.29 rough Cate

10          But ultimately, Judge Carlton or the Ninth

11    Circuit or the US Supreme Court will have to decide

12    when it's reached a level, when its care is --

13    constitutional level of care is being provided.

14          I just think that it's the executive branch

15    of government's job to do that.

16          MR. SPECTER:  Q.  And what gives you, after

17    13 years, a -- and the conditions being what they

18    are today, what is it that gives you confidence that

19    in the next -- in subsequent time period, whatever

20    time period you want, the state can do it now when

21    it hasn't done it for the last 13 years?

22          MR. MELLO:  It's argumentative.  I think --

23    you can answer.

24          THE WITNESS:  I think that there's -- one

25    of the differences is an understanding, again, in

DO NOT CITE PER CCP2025(b)

166

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1    our society that it need to be done.  I'm not sure

2    that for those years the state really understood its

3    obligations towards caring for the mental health of

4    our population.

5          I don't -- I haven't heard from anyone in

6    state government, whether the legislature, the

7    judicial branch, the administrative branch, anyone

8    who thinks that we shouldn't be providing mental

9    healthcare to our inmates.  I'm not sure that that

10    was always the case.

11          And I think given a chance, I can work with

12    the legislature and improve the system.  I'm not

Page 148

08.08.29 rough Cate
13    sure to -- ultimately the Court's going to decide

14    that, but I'm an optimist.

15            THE VIDEO OPERATOR:  This marks the end of

16    Tape No. 2, Volume 1, in the deposition of Matthew

17    Cate.  We're off the record at 2:29.

18            (Recess from 2:29 p.m. to 2:33 p.m.)

19            THE VIDEO OPERATOR:  We are back on the

20    record.  This marks the beginning of Tape No. 3,

21    Volume 1 in the deposition of Matthew Cate.  The

22    time is 2:33.

23            MR. SPECTER:  Okay.  Let's mark this as the

24    next in order, please.

25            (Deposition Exhibit 6 was marked for

                DO NOT CITE PER CCP2025(b)
                                                    167


        UNCERTIFIED ROUGH DRAFT TRANSCRIPT
1           identification.)

2           MR. SPECTER:  Q.  Matt, what I've just

3    handed you is an excerpt of the executive summary of

4    the Little Hoover Commission's report on parole that

5    was issued in November 2003.

6           I don't know if -- whether you've ever seen

7    it before.  Have you?

8       A.  I don't think I have.

9       Q.  Okay.  The first line in the executive

10    summary says:  California's parole system is a

11    billion dollar failure.

12           Do you see that?

13       A.  I do.

14       Q.  And then they say, therefore, fundamental

15    problems.  Do you see that?

16       A.  I do.
                Page 149

08.08.29 rough Cate

17      Q.   Okay.  The first problem says:  The time in

18   prison is not being used to prepare inmates for

19   their eventual release.

20           Do you see that?

21      A.   I do.

22      Q.   And isn't that true today as well?

23      A.   For some inmates, it's true.

24      Q.   For a lot of inmates it's true.  Isn't that

25   true?

DO NOT CITE PER CCP2025(b)

168

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1       A.   Well, as I said before, I think about half

2    are not utilizing their time to prepare for their

3    release.

4       Q.   2:  Available resources, particularly those

5    in communities are, not being used to help parolees

6    who have -- who, with some assistance, could get a

7    job and stay out of trouble.

8            Isn't that true today as well?

9       A.   I don't think it's any -- I think it's much

10   improved since 2003.  For example, I went to a

11   parole and community meeting in Sacramento that

12   happens every Tuesday, where every parolee, parolee

13   in Sacramento has an opportunity to he meet all the

14   community providers and connect with those that meet

15   the needs of those offenders.

16           So I think programs like that are in place

17   that weren't then that are helping.  I also know

18   that we have put a plan to the legislature called

19   prison to employment that pools our resources,

Page 150

08.08.29 rough Cate

20    vocational education, PIA, community jobs, to try to

21    improve ourselves -- improve the situation on this

22    issue.

23         Q.   And that legislative proposal, is that in

24    this year' budget?

25         A.   I believe so.

DO NOT CITE PER CCP2025(b)

169

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1         Q.   So it hasn't been implemented yet?

2         A.   Well, the portions that -- require

3    additional funding for this yes have not.  But

4    prison industries authority has improved, expanded,

5    without that funding.  As I said, we have programs

6    in place that are independent of that funding.

7              We've entered into a MOU with a label

8    agency to work cooperatively that's not dependent

9    upon that funding.

10             But we'll get another boost, certainly,

11    from the -- based on the current next year's budget.

12         Q.   So let's try to quantify that a little bit.

13             Can you give me any data on how many

14    parolees -- how many more parolees have been given

15    assistance in getting jobs and other productive

16    activity in the community this year as opposed to

17    last year, for example?

18         A.   I don't have that information off the top

19    of my head.  I don't know.

20         Q.   And how many of the -- you mentioned that

21    program in Sacramento.  How many other programs are

22    there in the state like that?

23         A.   Quite a number.

Page 151

08.08.29 rough Cate

24      Q.  Do you know how many prisoners, parolees

25   they serve?

DO NOT CITE PER CCP2025(b)

170

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1       A.  I don't know exactly.  I know that

2    Mr. Hoffman would know, or Ms. Hood.

3       Q.  And so you don't know in any kind of

4    quantitative way how much the situation is improved

5    since 2003, do you?

6       A.  I don't have the 2003 numbers, and

7    depending on which aspects of this, I don't know the

8    2008 numbers thus far.

9       Q.  Okay.  No. 3 is, when inmates do get into

10   trouble, the vast majority of them go back to

11   prison, even if drug treatment, short jail stays or

12   some other intervention would cost less or do more

13   to help them straighten up.

14          That's still true today, isn't it?

15      A.  I don't know exactly what the numbers are

16   now.  I -- we have thousands of more program slots

17   now than the department did even a couple of years

18   ago for alternative sanctions.  So I know this is

19   greatly improved.  It may still be that the majority

20   go back to -- I'm sure the majority eventually go

21   back to prison.  I mean, that's --

22      Q.  But the statement is also true.  Although

23   there may be some improvements, the statement is

24   still true.  Correct?

25      A.  I think so.

DO NOT CITE PER CCP2025(b)

171

08.08.29 rough Cate

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1          Well, let me say this:  The statement is a
2    little vague, in that it's true that the vast
3    majority of -- or a majority of our inmates go back
4    to prison.  I don't know what vast means.  I think
5    also that that -- I don't know if that's true still
6    on our technical violators.  whether the numbers on
7    our technical violators he, those that go back and
8    those that don't, have changed since 2003.  I just
9    know that there are a -- there's a -- been a
10   significant ex pans in programs for those folks that
11   weren't there then.
12          I'm sorry to parse that but --
13     Q.  No, that's fair.  You're the guy who's
14   testifying, so -- but when you say -- but then I can
15   parse your parsing, which is, when you say
16   significant, what does that mean to you, exactly?
17     A.  well, thousands more.
18     Q.  Thousands more.  And how many people --
19     A.  Beds.
20     Q.  -- thousands more beds for parole
21   violators?
22     A.  Yes.
23     Q.  And there are how many people on parole at
24   any given time?
25     A.  125,000, approximately.
              DO NOT CITE PER CCP2025(b)
                                                172

UNCERTIFIED ROUGH DRAFT TRANSCRIPT
1     Q.  So when you say thousands, are we talking
2    more than 10,000 or less?

08.08.29 rough Cate

3    A.  The improvement has been less than 10,000.

4    Q.  Okay.  And the fourth point; thousands of

5    times each year parole revocation is used in lieu of

6    prosecutions for parolees who are suspected of

7    committing new crimes.

8         Do you know if that's still true?

9    A.  I don't have the numbers, but in light of

10   the total parole population, I'm sure there's

11   thousands who are revoked for committing offenses

12   that aren't otherwise prosecuted.

13   Q.  Okay.

14        MR. SPECTER:  The next document.

15        (Deposition Exhibit 7 was marked for

16        identification.)

17        MR. SPECTER:  Q.  With an I've handed you

18   is another impression release dated April 18th,

19   2006.

20   A.  Yes.

21   Q.  And we don't -- I hope we don't have to go

22   over the same foundational issues that we did last

23   time.

24        You wrote this, you approved it before it

25   went out.  Correct?

DO NOT CITE PER CCP2025(b)

173

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1    A.  Just give me one second.

2    Q.  No.  Sure.

3    A.  Okay.  It appears to be the press release

4    of an audit that the office of the Inspector General

5    put out in April of 2006.

Page 154

08.08.29 rough Cate

6       Q.   Right.   And you were still the Inspector

7   General at that time?

8       A.   I was.

9       Q.   And the statements in here attributed to

10  you are true.   Correct?

11      A.   Yes.

12      Q.   You said that the -- at that time, that the

13  department has still not addressed three of its most

14  troubling problems:   Fulfilling its broader public

15  safety mission of preparing inmates for release.

16          Is that still true?

17          MR. MELLO:   Where is this?

18          MR. SPECTER:   On the first paragraph,

19  second sentence.

20          THE WITNESS:   Again, I believe the

21  Department is doing much more now than it was then.

22  But I don't believe that we're doing enough yet.

23          MR. SPECTER:   Q.   Okay.   Overhauling its

24  antiquated technology system.

25          That was true then.   Correct?

DO NOT CITE PER CCP2025(b)

174

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1       A.   It was true then.

2       Q.   It's still true now?

3       A.   Yes.   It's being overhauled now, but it's

4   not there yet.

5       Q.   And providing inmates with adequate medical

6   care and in a fiscally sound manner.

7           That was true then.   Correct?

8       A.   That was true then.

9       Q.   It's still true now?

08.08.29 rough Cate

10    A.  I don't know.

11    Q.  Okay.  Can you turn to the next page,

12  please?

13       Second paragraph, it says:  Severely

14  hampering the department's ability to address its

15  problems, the Inspector General noted, is an inmate

16  population that has prisons straining at almost

17  double design capacity.

18       Was that true then?

19    A.  Yes.

20    Q.  Is that true now?

21    A.  Yes.

22    Q.  As the inmate population increases, the

23  inspector said -- I'm sorry, the Inspector General

24  said, the Department's problems, controlling

25  violence, offering education, delivering healthcare,

DO NOT CITE PER CCP2025(b)

175

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1  managing overcrowding and controlling costs become

2  more difficult.

3       Is that true?

4    A.  Yes.

5    Q.  And is that true now?

6    A.  Yes.

7    Q.  And in the next paragraph you say:  The

8  department can't solve these problems alone.

9       And you go on to talk about how it requires

10  policymakers and the public to address available

11  options.

12       Do you see that?

Page 156

08.08.29 rough Cate

13    A.  Yes.

14    Q.  And you believed that then.  Right?

15    A.  Yes.

16    Q.  And one of those options was increasing

17  prison capacity.  Correct?

18    A.  Right.

19    Q.  And they have I dressed that in your mind

20  by AB 900.  Correct?

21    A.  And the out of state prison -- well, I

22  guess that's a temporary -- it provides additional

23  capacity to send inmates out of state.  But that and

24  AB 900, yes.

25    Q.  Well, AB 900 includes --

DO NOT CITE PER CCP2025(b)

176

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1    A.  Right.

2    Q.  -- that, too.

3    A.  Yeah.

4    Q.  Examining sentencing and parole policies.

5        The department is examining parole

6  policies.  Are you aware of any effort by the

7  government to examine sentence policies?

8    A.  I think sentencing laws change year to

9  year.

10    Q.  In the way you intended it here.

11    A.  I don't know of any extensive sentence

12  reform legislation.

13    Q.  Okay.

14    A.  I think there's some.  There's been some in

15  the Senate's budget proposal, for example, related

16  to misdemeanors and property crimes, but --

08.08.29 rough Cate

17    Q.  Right.  In the last paragraph on this page,

18  it says:  while the numerous factors are driving the

19  numbers the inspector general said, the department

20  must do more to control inmate population growth by

21  reducing the state's recidivism rate.

22       And you agreed with that then?  It was your

23  belief then?

24    A.  Yes.

25    Q.  And it's your belief now?

DO NOT CITE PER CCP2025(b)

177

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1    A.  Yes.

2    MR. SPECTER:  Next exhibit.

3    (Deposition Exhibit 8 was marked for

4    identification.)

5    MR. SPECTER: Q.  Was this one of the

6  documents you reviewed in the car coming down here

7  today?

8    A.  I believe so.

9    Q.  All right.  And on the last page, on the

10  back, I think it has -- well, maybe not on the back,

11  but that's your signature verifying --

12    A.  It is.

13    Q.  And so you read these rogs before -- I

14  mean, the answer to these interrogatories before you

15  signed the document?

16    A.  I did.

17    Q.  And you believe them to be true?

18    A.  I do.

19    Q.  And these represent your position in this

08.08.29 rough Cate
20   matter?

21       A.   They do.

22       Q.   Okay.   The first Interrogatory asks --

23   whoops -- yeah -- whether you contend that a

24   prisoner release order would have an adverse effect

25   on public safety.

DO NOT CITE PER CCP2025(b)

178

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1           And you said, in substantial, that it could

2    have an adverse effect on public safety.

3           Do you see that on page 5, just so you

4    follow along with me?

5        A.   Yes.

6        Q.   Let me ask you mother question.

7           Do you believe a prisoner release order

8    could be tailored in a way that couldn't have an

9    adverse effect on public safety?

10          MR. MELLO:   Objection.   It lacks,

11   foundation, it calls for speculation, and I think

12   it's vague, because it front provide the necessary

13   yesterday cats.

14          You can answer the question.

15          THE WITNESS:   Sure.   If you release someone

16   who is a low-level offender with a low-level risk to

17   Rio fend and they're going to be released tomorrow

18   and you're releasing them today, I think that has no

19   impact on public safety.

20          If you release a lot of inmates, it has an

21   impact on public safety.   Wrong inmates, an impact

22   on public safety.   Some combination of those, an

23   impact on public safety.

Page 159

08.08.29 rough Cate

24          MR. SPECTER:  Q.  So if you look at

25     Interrogatory No. 2, it asks if you think it could

DO NOT CITE PER CCP2025(b)

179

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1     have an adverse effect on public safety, state all

2     the facts and/all the documents and witnesses about

3     what impact it would have, or could have.

4          And your answer is:  It is Defendant's

5     position that a court-mandated release of prisoners

6     from state prison, even if it included some unknown

7     prerelease screening and post-release safeguard to

8     have a serious adverse effect on public safety

9     because there would still be a risk that the

10    released prisoners would engage in criminal activity

11    once released. CHECK

12          Do you see that?

13     A.  Yes.

14     Q.  When you release prisoners now, there's a

15    risk that they will be engaged in criminal activity.

16    Correct?

17     A.  Yes.

18     Q.  In fact, it's not a risk.  It's a known

19    fact that a certain percentage of them will engage

20    in criminal activity.  Correct?

21     A.  Correct.

22     Q.  And it's true that you believe that if

23    prisoners got certain programs, either when they're

24    in prison or on parole, you would reduce that risk

25    of criminal activity.  Correct?

DO NOT CITE PER CCP2025(b)

180

08.08.29 rough Cate

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1    A.  Correct.

2    Q.  And that -- and that would reduce the

3  number of crimes that are committed.  Correct?

4        MR. MELLO:  It lacks foundation, calls for

5  speculation.  It may misstate his testimony.

6        THE WITNESS:  I'm only hesitating because

7  there are a number of factors that impact

8  criminality:  Enforcement, the local law enforcement

9  security measures that are put in place, the efforts

10  of local communities, the economy.

11        MR. SPECTER:  Q.  Right.

12    A.  It's complicated.  But I'd agree that

13  evidence-based programs provided at institutions

14  make it some percent less likely that a certain

15  percentage of inmates will commit new offenses on

16  the outside.  At least that's what the studies have

17  shown.

18    Q.  Right.  And the same thing with programs

19  outside of prison.  These are used as intermediate

20  sanctions or in other ways, as a substitute for

21  incarceration.  Correct?

22    A.  If they're evidence-based, yes.

23    Q.  Right.  So that in fact, if you released

24  more prisoners, but you gave them programs, you had

25  a prisoner release order which gave them

DO NOT CITE PER CCP2025(b)

181

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1  evidence-based programs, isn't it true that you

2  could structure it so that there would be a reduced

Page 161

08.08.29 rough Cate

3    risk to public safety as opposed to the current

4    situation?

5           MR. MELLO:  It lacks foundation, it calls

6    for speculation, it's an incomplete hypothetical.

7    He's not an expert.  I think it misstates his

8    testimony, and it's vague.

9           THE WITNESS:  I really don't know what

10   would happen in those circumstances, because it

11   depends on so many factors, among those you've

12   described.

13          MR. SPECTER:  Q.  Okay.  So you don't --

14   okay.  Okay.

15          Let's go to -- do you -- are you familiar

16   with the studies -- have you read the expert panel

17   report?

18          A.  I have.

19          Q.  And you're aware that in that expert panel

20   report, there's a discussion of the studies which

21   show that the length of incarceration doesn't have

22   an effect on recidivism rate?

23          A.  I don't recall that specifically.

24          Q.  It was a Justice Department study.  Does

25   that help you recollect?  Help your recollection?

                DO NOT CITE PER CCP2025(b)

                                                  182


                UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1           A.  I don't remember that.

2           Q.  Okay, that's fine.

3           Are you aware of Dr. Krisberg's study of

4    jurisdictions which have released prisoners early?

5           A.  I don't recall Dr. Krisberg's study in

                         Page 162

08.08.29 rough Cate

 6    particular.  I'm aware generally of studies that

 7    have addressed that issue.  I can't remember is it

 8    was Dr. Krisberg or someone else.

 9        Q.  Do they generally conclude that early

10    release doesn't have -- necessarily have an effect

11    on the crime rate.  Is that your understanding of

12    them?

13        A.  I have read -- I couldn't even say some

14    studies.  I've at least seen the results of one

15    study that said that.

16        Q.  Okay.  Given that study, and let's just

17    assume for the purpose of this discussion that there

18    are about at least 10 or 15 of them which

19    Dr. Krisberg analyzed and came to that conclusion --

20        A.  Okay.

21        Q.  -- would you still agree that prisoner

22    release order, if it's done appropriately, with --

23    well, I'm sorry, that a prisoner release order could

24    be crafted in a way that wouldn't have an adverse

25    effect on public safety?

                DO NOT CITE PER CCP2025(b)
                                                    183


                UNCERTIFIED ROUGH DRAFT TRANSCRIPT

 1        MR. MELLO:  Lacks foundation, and calls for

 2    speculation.  It's an incomplete hypothetical, it's

 3    not an expert, it's vague.  You can answer.

 4        THE WITNESS:  I didn't -- I haven't read

 5    all the studies.  I don't know whether they're --

 6        MR. SPECTER:  Q.  I'm asking you to assume

 7    that they're true and that they're valid, and if I'm

 8    wrong about that, fine.  But let's just take that it

 9    is a assumption --

                Page 163

08.08.29 rough Cate

10          MR. MELLO:  Same objections.

11          THE WITNESS:  Then my concern would be, is

12   California like every other state.  Are our inmates

13   like other states, are they valid here and with this

14   population, and would it all be done in the same

15   way.

16          Those are frankly my concerns about this

17   whole thing, is that people will be hurt.

18          MR. SPECTER:  Q.  And you understand that

19   people are hurt now when they're released -- when

20   prisoners are released from prison.  Isn't that

21   right?

22          A.  That's right.

23          Q.  If you look at Interrogatory No. 3 and 4,

24   which says:  Do you contend that -- 3 says:  Do you

25   contend that a prisoner release order cannot be

DO NOT CITE PER CCP2025(b)

                                                    184


UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1    narrowly drawn so as to have no adverse impact on

2    public safety, and that you -- your answer to that

3    was that it would have an adverse impact on public

4    safety.

5          And then number -- or should I just led let

6    you read 3 and 4 instead of summarizing it?

7          A.  Maybe just give me a minute.

8          Q.  Sure.  Okay.

9          Q.  Okay.  So on page 7, at lines 16, starting

10   at line 16, you say:  It is Defendants' position

11   that a court-mandated release of prisoners from

12   state prison, even if it included some unknown

08.08.29 rough Cate

13    pre-release screening and post-release safequards

14    could have a serious adverse effect on public safety

15    because there would still be a risk that released

16    prisoners would engage in primmial activity once

17    released.

18         Right?

19    A.   Right.

20         Q.   Well, that's false, isn't it, because he

21    prisoners engage in criminal activity once released

22    now.  Isn't that true?

23         MR. MELLO:   It's argumentative.  It lacks

24    foundation.

25         You can answer.

DO NOT CITE PER CCP2025(b)

185

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1         THE WITNESS:   I think that -- I don't think

2    it's false.  It seems to me that if you release

3    however many thousands of inmates, then you're going

4    to have that many more inmates on the streets at the

5    same time, and you're going to have that many more

6    crimes, necessarily.

7         So it would have a negative impact on

8    public safety.

9         MR. SPECTER:   Q.   Well, let me ask you

10    this:  So your assumption is, is that if you had

11    more prisoners out of custody, you would have more

12    prisoners -- I mean, more people who are in the

13    community who would commit more crimes.  Is that

14    right?

15    A.   That's right.

16         Q.   But the -- isn't it -- well, not but -- but

Page 165

08.08.29 rough Cate

17   isn't the question in terms of public safety, is

18   whether or not the prisoners, the -- the release of

19   prisoners would cause more crimes than what's going

20   on now?

21        MR. MELLO:  I think that that's -- it's

22   asked and answered.  He told you what his answer to

23   the question is.  I think you had -- to the extent

24   you're asking a legal question, I think it calls for

25   a legal conclusion.  I think it also arguably asks

DO NOT CITE PER CCP2025(b)

186

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1    for expert testimony, and he's not designated as an

2    expert in this case.

3         If you understand his question, which is

4    also vague, you can answer it.

5         THE WITNESS:  Can you restate it?

6         MR. SPECTER:  Q.  Sure.  Isn't the real

7    question not whether the prisoners who are released

8    are going to commit crimes.  The question is

9    whether, if the prisoners are going to commit more

10   crimes if they're released than the crimes being

11   committed if they weren't released?  Isn't that

12   right?

13        MR. MELLO:  Objection.  Circular,

14   incomprehensible to me, vague, lacks foundation,

15   calls for speculation.

16        You can answer.

17        THE WITNESS:  To the extent that you're

18   getting at that we're talking about the release

19   of -- I mean, the commission of more crimes after

Page 166

08.08.29 rough Cate

20    something is done than before something is done, I

21    would agree that's a standard, not whether any

22    crimes are committed.

23              MR. SPECTER:    Q.    Right and when you mean

24    something, you're talking about the prisoner release

25    order?

              DO NOT CITE PER CCP2025(b)

                                                        187

              UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1        A.    Right.

2        Q.    Right.    Okay.    So if you go to

3    interrogatory No. 5 -- why don't you read that

4    question and answer.

5        A.    Okay.

6        Q.    And so isn't it true -- well, the

7    interrogatory suggests that it would have an adverse

8    impact on public safety because it -- going down to

9    the end there, it says:    There remains the

10    possibility of a diverted conduct engaging in

11    criminal activity once released.    Right?

12        A.    Right.

13        Q.    So if you did diversion in line with

14    evidence-based rehabilitative programs, you would

15    have less risk of people who were going to engage in

16    criminal activities than you would now.    Isn't that

17    right?

18              MR. MELLO:    Lacks foundation as to what

19    programs, it calls for speculation, it's an

20    incomplete hypothetical.

21              You can answer.

22              THE WITNESS:    Again, I think it depends on

23    which inmates, which programs.    But even assuming

                        Page 167

08.08.29 rough Cate

24    that, you could still see a bump in criminal

25    activity because of the shear numbers that are out.

DO NOT CITE PER CCP2025(b)

188

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1           The question would be whether society

2    decides that's an appropriate trade-off.  Obviously

3    the goal would be not to have any bump at all --

4           MR. SPECTER:  Q.  Right.

5        A.  But my point is that there could be.

6        Q.  Right.  But if you provided the people who

7    were diverted with programs, which they don't get

8    now, --

9        A.  That would lessen the impact.

10       Q.  That would lessen the impact.  And you

11   don't know whether or not the reduction in the

12   impact would be more or less than the current crime

13   rate.  Right?

14       A.  I don't know.

15       Q.  Right.  Okay.

16           So the other Interrogatories ask about

17   similar things.  You know, putting them into

18   probation -- having probation eligible -- I'm

19   reading from No. 7 now -- having

20   probational-eligible offenses, subjecting them to

21   revocation into local programs rather than coming

22   back into state prison.

23           That's a population-reducing measure, isn't

24   it?

25       A.  I'm sorry, I was distracted.  Which one?

DO NOT CITE PER CCP2025(b)

189

Page 168

08.08.29 rough Cate

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1    Q.  No. 7, I'm sorry.

2    A.  Yeah, and my answer was that it may have an

3  adverse impact on public safety.

4    Q.  Right.  But it also may have a positive

5  impact on public safety if done right.  Correct?

6    A.  That I don't know.

7    Q.  You don't know.

8    A.  I mean, that's the point is, we don't know

9  one way or the other, depending on how many and who

10  and with a programs and what assessments and all

11  those things.

12    Q.  Okay.  So in other words, you're saying you

13  don't really know whether it would have an adverse

14  effect or a positive effect.  Correct?

15    A.  I -- it would all depend on the -- on all

16  those factors I described.  Correct.

17    Q.  Okay.  Okay.  You have this document

18  already.  I think you said you read it.

19         Next in order.

20         (Deposition Exhibit 9 was marked for

21         identification.)

22         MR. SPECTER:  It's the integrated strategy.

23         THE WITNESS:  Right.

24         MR. SPECTER:  Q.  So this came out around

25  June of this year.  Right?

DO NOT CITE PER CCP2025(b)

190

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1    A.  Correct.

2    Q.  And it's essentially, if I understand it

Page 169

08.08.29 rough Cate

3      right, the department's -- or the administration's

4      response to the overcrowding crisis.  Correct?

5          A.  As drafted by the department, but

6      represents I think the administration's response.

7      And at least in this part.

8          Q.  Yeah.  Well, the governor signed a letter

9      sort of a cover letter when it was distributed to

10     the legislature.  Isn't that right?

11             MR. MELLO:  I think that misstates -- I

12     don't -- I think that misstates the facts.  And it

13     lacks foundation.

14             MR. SPECTER:  Okay.  We won't argue about

15     it here.

16         Q.  Oh, yeah, one question, one -- when -- sort

17     of totally unrelated question is, in -- as part of

18     the budget for this year, was the Department told to

19     cut its budget by a certain amount of money?  You

20     know, each department was given targets, I thought

21     they had to cut costs.

22             MR. MELLO:  Vague as to time.

23             THE WITNESS:  The --

24             MR. SPECTER:  Q.  The fiscal year.

25         A.  When I came -- when I joined the department

                 DO NOT CITE PER CCP2025(b)
                                                        191


              UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1      was basically the same time the may revise came out

2      and summary parole was a part of the may revise

3      which I think reduced our costs by about

4      $174 million.

5              MR. SPECTER:  Q.  And so in terms of that

                        Page 170

08.08.29 rough Cate

6    budget proposal, did you support the governor's may

7    revise?

8         A.   Yes.

9         Q.   And that included the summary parole part

10   of it?

11        A.   Yes.

12        Q.   Okay.  And as far as I understand summary

13   parole is -- what do you mean by summary parole?

14        A.   Well, it would mean a -- again, our parole

15   folks can give you all the details.

16        Q.   Right.

17        A.   But it basically means that we're going to

18   have certain individuals would go on to a much

19   larger than normal case load, and they wouldn't be

20   actively monitored by agents, and if they're not

21   actively monitored, then they're not going to be

22   picked up on a technical violation.  It would

23   require a new criminal offense to have them

24   reincarcerated.

25              That's kind of the broad, general

DO NOT CITE PER CCP2025(b)

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1    parameters of it.

2         Q.   I understand -- okay, grate.

3              And is that still part of the budget?

4         A.   It is.

5         Q.   Okay.

6         A.   At least it was when we started today.

7         Q.   Okay.  And do you know how many -- how much

8    that program will reduce the population by?

9         A.   I did at one point.  I don't know if I can

Page 171

08.08.29 rough Cate

10    recall that number now.

11        Q.  Okay.

12        A.  Although it seemed like it was, again,

13    between -- well, I'm -- again, I would -- I'd have

14    to guess.  I can't recall exactly.

15        Q.  And?

16            MR. MELLO:  And Mr. Specter, just so I'm

17    clear, when you say the population of folks on

18    parole or in this --

19            MR. SPECTER:  I meant from the practice

20    object.

21        Q.  Did you understand that's what I meant,

22    Matt?

23        A.  Yes.

24        Q.  Okay.  So what I take from this document --

25    well, let me ask this.  Is this still the

                    DO NOT CITE PER CCP2025(b)
                                                        193


              UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1     Department's primary response to the overcrowding

2     crisis, or has it been modified at all or something

3     new issued?

4         A.  I don't think anything new has been issued.

5     I don't mean -- you know, the -- like everything,

6     it's fluid as far as the response, and it might be

7     enhanced by, depending possible what happens in the

8     budget or what happens in this lawsuit, or other

9     things, but I think this still represents the

10    primary push of the Department to address

11    overcrowding.

12        Q.  Okay.  And so I understand that that push

                    Page 172

08.08.29 rough Cate

13    is AB 900.  Right?

14        A.  Right.

15        Q.  which includes out of state bed.  Right?

16        A.  Right.

17        Q.  The Receiver's healthcare facilities.

18    Right?

19        A.  Right.

20        Q.  And it says, budget and policy reforms.

21            And by that, do you -- did you mean the

22    summary parole?  If you look on page 5 of the

23    document, it discusses that.

24        A.  well, it says it incorporates either

25    summary parole or an alternative reform measure that

DO NOT CITE PER CCP2025(b)

194

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1    would safely reduce average daily population by

2    approximately 8,000.

3        Q.  Right.  So if you -- so here's an example

4    of a measure that in your opinion would reduce the

5    prison population and not adversely affect the crime

6    rate.  Is that right?

7        A.  If done correctly.

8        Q.  That would -- if the Court ordered that, it

9    would be a prisoner release order.  I'm just telling

10    you that.  And I would like you to assume it for

11    the --

12            MR. MELLO:  Objection.

13            MR. SPECTER:  Q.  -- purposes of this

14    discussion.

15            MR. MELLO:  Calls for a legal conclusion,

16    lacks foundation.

Page 173

08.08.29 rough Cate

17          MR. SPECTER:  Q.  Okay?

18          MR. MELLO:  So he's asking you to assume

19     that.

20          THE WITNESS:  Okay.

21          MR. MELLO:  That that is, notwithstanding

22     my feelings.

23          MR. SPECTER:  We don't count feelings here.

24          Q.  A prisoner release order is anything that

25     directly or indirectly limits or -- the population

          DO NOT CITE PER CCP2025(b)

                                                     195


          UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1     or --

2          A.  Okay.

3          Q.  You know.  So for example, if the

4     legislature takes out your summary parole provision,

5     would you -- you wouldn't believe that it would --

6     that -- if the court ordered the exact same program,

7     it wouldn't have an add vest effect on public

8     safety.  Correct?

9          MR. MELLO:  Lacks foundation, calls for

10    speculation.  It assumes that the court orders --

11    well, it lacks foundation, calls for speculation.

12          THE WITNESS:  Well, the difficulty is, is

13    that the administrative branch can implement a

14    program a assess it and change it much more nimblely

15    than the courts can, because I'm -- that's my job,

16    and I think it's so -- it's more cumbersome, and it

17    frankly concerns me to have the Court dictate our

18    policies, because we may decide, you know what,

19    we're only going to safe 4000 bed because we don't

                    Page 174

08.08.29 rough Cate

20   have enough of the right kind of inmates or, you

21   know, it can be amended a little more easily.

22          So that's what concerns me about that.  If

23   we -- if you in your hypothetical you had the best

24   possible program and the Court mirrored that

25   exactly, you would have the same result, would I

DO NOT CITE PER CCP2025(b)

196

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1   assume.

2          MR. SPECTER:  Q.  Well, that's assuming you

3   would have the best possible program.

4          A.  Correct.

5          Q.  Which I'm not willing to grant you, but --

6          A.  Okay.

7          Q.  Anyway, okay.  And at the same time, this

8   reduction would also save you money.  Right?  The

9   reduction in the population would save you money?

10         A.  It would.

11         Q.  So could you reduce the population and save

12   money at the same time.

13         A.  That would be the goal.

14         Q.  That's the goal.  And you think it can be

15   done safely?

16         MR. MELLO:  Objection.  That lacks

17   foundation, calls for speculation, it's an

18   incomplete hypothetical.

19         THE WITNESS:  I think that the

20   administration could do so.

21         MR. SPECTER:  Q.  Okay.  What other

22   alternative reform measures could the administrative

23   do safely?

08.08.29 rough Cate

24      A.   I think here we were referring to the

25   parole reform measures we discussed earlier.

DO NOT CITE PER CCP2025(b)

197

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1       Q.   So the risk assessment?

2       A.   Right.

3       Q.   Alternative sanctions?

4       A.   Right.

5       Q.   Okay.  Do you know how -- have any sense of

6    how many -- how many -- how much the prison

7    population can be reduced through that -- through a

8    successful -- if that program was successful?

9           MR. MELLO:  Lacks foundation, calls for

10   speculation, it's an incomplete hypothetical.

11          You can answer.

12          THE WITNESS:  I think between 5- and 8,000.

13   But that -- remember that, includes most it have

14   these inmates that are currently here on summary

15   parole would be some of those same inmates, so it's

16   not like you can do both and make it work, but --

17          MR. SPECTER:  Q.  So you won't add them you

18   will r up together.

19      A.   Right.

20      Q.   The spring population projections actually

21   projected a slight decline in population.

22      A.   Right.

23      Q.   But there was a discussion in this document

24   that those predictions are often -- don't come to be

25   true, at least -- right?

DO NOT CITE PER CCP2025(b)

198

08.08.29 rough Cate

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1      A.  Yeah, they're really good in the first

2  couple of years, and as they get into the out years,

3  they become far less reliable.

4      Q.  It says on the next page that in fact, for

5  facility construction purposes -- do you see that?

6      A.  Right.

7      Q.  -- BSA, which is the bureau of state audit,

8  determined that the Department would be more

9  accurate in its long-term planning in it simply used

10  the actual inmate population at the time it created

11  each projection and assumed the population would not

12  change over a 6-year period.

13          Does that make any sense to you?

14      A.  I think that -- my recollection is the BSA

15  was just pointing out that the projection numbers

16  have gone up and down dramatically, and that a flat

17  line would have statistically been better.  But --

18      Q.  For your planning purposes, are you

19  assuming that there's going to be a decline in the

20  population?

21      A.  We actually have left that to the

22  policymakers.  So we provide in here two scenarios.

23  One is that the population would conform to the

24  spring projections and decline -- continue to

25  decline over time.  And the other would be taking

DO NOT CITE PER CCP2025(b)

199

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1  the 10-year average for the department, which is a 1

2  percent growth, and kind of mirrors the population

Page 177

08.08.29 rough Cate

3  of the state, slightly -- you know, less than that,

4  but that's the -- those are the two options, and

5  then we demonstrate here in our -- not in this

6  document, but in the charts that you've seen, two

7  different -- what would happen under those two

8  different scenarios, so the policymakers can decide

9  whether to invest in -- or not whether, but how much

10  capacity to invest in.

11      Q.  And what's your -- which do you think would

12  most closely resemble what happens in the future?

13  which of those two options?

14          MR. MELLO:  False tore --

15          MR. SPECTER:  Q.  which one do you think is

16  going to be most accurate?

17          MR. MELLO:  Calls for speculation.

18          THE WITNESS:  I don't know.  But I'll say

19  that, you know, as the correctional administrator,

20  the more capacity I have, the easier it is for us to

21  provide rehabilitate I have programs to our inmates

22  and to make sure our staff is kept safe.

23          And so that's that's what I favor, but no

24  one voted for me.

25          MR. SPECTER:  Q.  I voted for you.

              DO NOT CITE PER CCP2025(b)

                                                    200

              UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1          Are you trying to get more out-of-state

2  beds?

3      A.  Yes.

4      Q.  And how many more?

5      A.  Well, at a minimum, about 3000 more.

                    Page 178

08.08.29 rough Cate

6      Q.   And do you view out of state beds as a

7  temporary or permanent part of the system?

8      A.   There --

9          MR. MELLO:  Objection.  Vague.

10         THE WITNESS:  There are some -- this is

11  something I can answer.

12         MR. MELLO:  Yeah.

13         THE WITNESS:  There are some states that

14  use it as a fairly long-term solution, but most

15  don't.

16         Most use it to overcome a period where

17  their capacity is too small for their population,

18  they utilize out-of-state beds as a relieve valve to

19  address that issue, and then as population comes

20  down or in state capacity grows, they send to bring

21  those inmates back from out of state, because it's

22  less expensive.  You don't have the travel costs and

23  east easier to administrate.

24         That's typically what perhaps.  California

25  tends to be different, but I mean, I think that's --

DO NOT CITE PER CCP2025(b)

201

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1  if you looked at the kind of the national model,

2  that's the most likely scenario.

3          MR. SPECTER:  Q.  Okay.  The last page,

4  page 78, it says:  It is important to note that the

5  components of this integrated strategy may not be

6  enough by themselves to reach an operational

7  capacity of 158 to 154 percent.

8          Do you see that, on the --

9      A.   Sorry.  I was on the wrong page.

Page 179

08.08.29 rough Cate

10      Q.  It's the third paragraph.

11      A.  Got it.  Yes.

12      Q.  And that number, 158 to 154 percent was

13  from the settlement proposal --

14      A.  Correct.

15      Q.  -- of '03.  And that 158 percent in the

16  settlement proposal was basically a number that your

17  department came up with.  Correct?

18          MR. MELLO:  Objection.  I think it

19  misstates the facts in the case.  It lacks

20  foundation.

21          You can answer.

22          THE WITNESS:  Can I confer with counsel?

23          MR. MELLO:  Yeah.

24          THE VIDEO OPERATOR:  Should we go off the

25  record?

DO NOT CITE PER CCP2025(b)

                                              202

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1           MR. MELLO:  And one further objection.  I

2   think it actually also goes to the settlement

3   privilege that we spoke about.

4           MR. SPECTER:  Are we off the record?

5           THE COURT REPORTER:  Not yet.

6           (Discussion off the record.)

7           (Recess from 3:23 p.m. to 3:31 p.m.)

8           THE VIDEO OPERATOR:  We are back on the

9   record at 3:31.

10          MR. SPECTER:  Q.  So Matt, I was just

11  asking where the 158 percent number came from, and

12  it's my very clear recollection that it was the

Page 180

08.08.29 rough Cate

13    number that was proposed by the State as a -- during

14    the settlement process?

15         MR. MELLO:  I think that misstates the

16    facts.

17    Q.  Why don't you just tell me --

18         MR. MELLO:  It goes into the settlement

19    discussions.  You can answer the question.

20         THE WITNESS:  My recollection is, during

21    the settlement negotiations, the state put forward a

22    number based upon our -- the ease -- a number that

23    would represent a way for the facility operators,

24    the wardens and those folks, to efficiently run

25    their facility.  So --

DO NOT CITE PER CCP2025(b)

203

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1         MR. SPECTER:  Q.  And that was the number?

2    A.  That was the number.

3    Q.  158.  Right?

4    A.  Right.

5    Q.  Okay.  So other than with a we've talked

6    about here today so far, parole reform, summary

7    parole programs -- well, let me -- here, let's talk

8    about the legislative proposals for a minute.

9         (Deposition Exhibit 10 was marked for

10         identification.)

11         MR. SPECTER:  Q.  We've just given you

12    Exhibit No. 10.  And on the second page are listings

13    of policy changes that have been passed out of the

14    Senate Budget Committee.  Right?

15         MR. MELLO:  What page, I'm sorry?

16         MR. SPECTER:  Second page.

Page 181

08.08.29 rough Cate

17          THE WITNESS:  It's listed as page 6.

18          It appears so, yes.

19          MR. SPECTER:  Q.  So the first one is,

20    direct discharge.

21          So as I understand it, this would allow you

22    to decide which offenders to release from prison

23    without parole at all.  Correct?

24      A.   I don't think so.  I think it's decided

25    based upon the offenders' commitment offense.  Oh,

                DO NOT CITE PER CCP2025(b)
                                                    204


            UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1    and prior offenses.

2      Q.  Right.

3      A.   In other words, it wouldn't be a

4    discretionary decision on my part.  It would be just

5    an application of the standard set here.

6      Q.  Oh, I see.  So have you seen the language,

7    the criteria that they're using?

8      A.   Just what's stated here.

9      Q.  What -- all it says is, convicted of

10    nonserious, nonviolent offenses and that have no

11    priors that are serious or violent?

12      A.   Right.

13      Q.  So you would be mandated to discharge from

14    parole such prisoners?

15      A.   Correct.

16      Q.  And is that something that you think would

17    have an adverse effect on public safety?

18          MR. MELLO:  Lacks foundation and calls for

19    speculation.  It's an incomplete hypothetical.

                Page 182

08.08.29 rough Cate

20          You can answer it.

21          THE WITNESS:  I think it could, yes.

22          MR. SPECTER:  Q.  Okay.  Is the

23   administration opposed to this provision?

24          MR. MELLO:  Objection.  Lacks foundation

25   and calls for speculation.

DO NOT CITE PER CCP2025(b)

205

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1          THE WITNESS:  I don't know the

2   administration's position.

3          MR. SPECTER:  Q.  Are you opposed to this

4   provision?

5          MR. MELLO:  Lacks foundation, it's an

6   incomplete hypothetical.

7          THE WITNESS:  Yes.

8          MR. SPECTER:  Q.  Okay.  The next one talks

9   about, earned -- earned discharge from parole.

10          And it has nonserious, nonviolent would be

11   discharged after 5 months of clean time and serious

12   and violent would be discharged after 16 months of

13   clean time.

14          Is it your opinion that that would have an

15   adverse effect on public safety?

16          MR. MELLO:  Lacks foundation, it's an

17   incomplete hypothetical.  He's not an expert.  Calls

18   for speculation.

19          You can answer.

20          THE WITNESS:  I think it could.

21          MR. SPECTER:  Q.  Are you opposed to

22   this --

23       A.  Yes.
                    Page 183

08.08.29 rough Cate

24        Q.  -- provision?

25        Q.  Yes.  Will you be urging the governor to

                    DO NOT CITE PER CCP2025(b)

                                                        206

                UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1    veto it?

2            MR. MELLO:  Objection.  Instruct him not to

3    answer as to his deliberative discussions with the

4    Chief Executive of the State of California.

5            MR. SPECTER:  Q.  Are you going to follow

6    your lawyer's instruction?

7        A.  Yes.

8        Q.  Is it your intent to take steps to --

9    whatever steps you have available to you to try to

10   block this provision from becoming law?

11           MR. MELLO:  Objection.  To the term

12   "block."

13           MR. SPECTER:  Prevent --

14           MR. MELLO:  I don't know what you mean.

15           MR. SPECTER:  Prevent.  That's a better

16   word.  Thank you.

17           MR. MELLO:  I don't know what it means --

18   well, you can answer.

19           THE WITNESS:  I don't know what you -- what

20   I would do to block it.

21           MR. SPECTER:  Q.  You could urge your

22   superiors to veto it.  That's one thing.

23       A.  Are you talking about the first two?

24       Q.  Yeah.

25           MR. MELLO:  It calls for speculation.  Are

                    DO NOT CITE PER CCP2025(b)

                                                        207

                        Page 184

08.08.29 rough Cate

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1    you asking him whether he's going to urge his

2    superiors to veto something that hasn't been passed

3    into law?

4              MR. SPECTER:  Yes.

5              MR. MELLO:  Okay.  Calls for speculation

6    and lacks foundation.

7              THE WITNESS:  It would depend on the whole

8    package.

9              MR. SPECTER:  Q.  So even though it -- it

10   could have an adverse effect on public safety,

11   you -- it might be acceptable to you under certain

12   circumstances?  Is that a fair restatement of what

13   you're saying?

14             MR. MELLO:  I think it misstates his

15   testimony and misstates the record and lacks

16   foundation, it's an incomplete hypothetical.

17             THE WITNESS:  My concern is that this isn't

18   very good public policy.  Not as good as it could

19   be.  Whether it's better than nothing would depend

20   on what the entire package is.

21             MR. SPECTER:  Q.  I see.  How does the

22   first one differ from summary parole?

23        A.   So eye.

24             MR. MELLO:  So Item No. 1?

25             MR. SPECTER:  Q.  Yes.

                DO NOT CITE PER CCP2025(b)

                                                    208


                UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1        A.   Well, summary parole is -- would leave

2    these individual on parole, would allow the local

                        Page 185

08.08.29 rough Cate

3    law enforcement agencies to utilize the search and

4    seizure provisions that are included in parole for

5    enforcement, and would allow us to have a modicum of

6    additional safety as to these offenders.

7        Q.  Would summary parole -- remind me if you

8    said this before.  I apologize.  But under summary

9    parole, is it true that the prisoner would have to

10   commit a crime in order to go back to prison?

11       MR. MELLO:  I think it's vague as to -- and

12   lacks foundation.  And it may also be asked and

13   answered.

14       THE WITNESS:  I think that's the -- I don't

15   know that the language mandates that or if that's

16   just the common sense application to not monitoring

17   individual very chosely.  As closely as you normally

18   would.

19       MR. SPECTER:  Q.  I see.  No. 3 is,

20   increase funding to reduce parole ratios.

21       Are you in favor of that?

22       A.  Again, it depends on the entirety of the

23   package.

24       Q.  Okay.  Look at No. 6, please.  It says:

25   Establish a pilot program in ten trial courts that

                DO NOT CITE PER CCP2025(b)

                                                209

            UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1    will divert certain parolees that would otherwise be

2    revoked and sent back to prison to alternative

3    community sanctions using a drug court model.

4        Do you believe that would have an adverse

5    effect on public safety?

                    Page 186

08.08.29 rough Cate

6          MR. MELLO:  Lacks foundation and calls for

7     speculation.  It's an incomplete hypothetical.

8          You can answer.  Vague.

9          THE WITNESS:  I think there are components

10    of this that are a good idea, and -- for example, I

11    think that, you know, the mental health court model

12    is a -- seems to be working where it's utilized,

13    and -- but I'm not familiar enough with the language

14    that's in front of the legislature to know what my

15    position on it would be in particular.

16          MR. SPECTER:  Q.  Okay.  I'm not sure how

17    this stuff works, so you can tell me.  When it says

18    approve trailer bill language, does that mean

19    they've already drafted the language and this is a

20    summary of it, or they will draft the language

21    later, once this is approved?

22          MR. MELLO:  Calls for speculation.

23          MR. SPECTER:  Q.  Do you know?

24    A.  I don't know whether it's been drafted or

25    it hasn't.  I would assume at this point it has

DO NOT CITE PER CCP2025(b)

210

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1     been.  But I haven't seen it.

2          Q.  Okay.  What about the early release of

3     prisoners who, you know, basically -- well, they say

4     infirm, but I think you know what their intent is.

5     Is that right?  They're medical condition makes it

6     very unlikely that they would be able to commit any

7     more serious claims?

8          A.  I think this is the law already.

9          Q.  It is?

Page 187

08.08.29 rough Cate

10      A.  I think so.  We --

11      Q.  Really?

12      A.  The -- there have been several high-profile

13  cases that have been approved by the director of

14  adult institutions for referral to the parole board,

15  and that they have -- they've ruled affirmatively on

16  one recently that went to the trial court for a

17  determination of compassionate release.

18      Q.  I thought some person had to be close to

19  dying before that was -- they were eligible for

20  compassionate release?

21      A.  Well, and maybe that's the difference.

22  Maybe they mean something different by infirm here.

23  But again, without seeing the language itself, I

24  couldn't tell you how different it is from the

25  current situation or whether there would be a

DO NOT CITE PER CCP2025(b)

211

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1  review.

2          You know, the concern, obviously, is you

3  get someone who's temporarily infirm or who's a

4  danger despite being in part infirm -- I don't know.

5  I mean, it's in the details, of course.

6      Q.  Well, it's in the application, too.  Right.

7      A.  Right.

8      Q.  Okay.  On the next -- on page 8, I guess,

9  of this, it talks about -- the first one, I don't

10  understand, maybe you have more insight into it:

11  Establish consistent day-for-day credit for

12  offenders currently eligible for day-for-day credit.

08.08.29 rough Cate

13          Do you know what that means?

14              MR. MELLO:  Objection.  Vague.  Poorly

15    drafted.

16              MR. SPECTER:  Q.  So you don't.  Right?

17      A.  I don't.

18      Q.  B:  Authorized department to reward

19    enhanced credit up to 4 months to offenders that

20    complete rehabilitation, education and Vallejo

21    occasion programs in prison.

22              Would you think that would have an adverse

23    effect on public safety?

24              MR. MELLO:  Objection.  Lacks foundation,

25    calls for speculation, it's an incomplete

DO NOT CITE PER CCP2025(b)

                                                    212


UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1    hypothetical.

2              THE WITNESS:  I like the idea of giving

3    inmates some type of credit incentive to complete a

4    program.  I think that's -- that makes sense to me,

5    and I think it -- it's a way to -- that you can

6    actually increase public safety, as you've

7    described.

8              Meaning, while that inmate, you know, may

9    get out a month or 2 or 3 months early, they've got

10    a GED and a vocational -- they are vocationally

11    trained and drug and alcohol free, they're going to

12    have a much better chance on the outside.

13              You know, it would need to be appropriate,

14    the amount of time for the effort and it would have

15    to be, you know, -- it would have to apply fairly to

16    all inmates all those kinds of things, but I think

Page 189

08.08.29 rough Cate

17    it's in general a good idea.

18        Q.  Okay.  You know -- you -- we talked about

19    the bridging program a little bit earlier.

20        A.  Right.

21        Q.  And that provides day for day credit for

22    prisoners in the reception center.  Right?

23        A.  Right.

24        Q.  And you also agree with me, I think, to --

25    with the idea that the bridging program isn't in and

                    DO NOT CITE PER CCP2025(b)
                                                    213


              UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1    of itself an evidence-based program that's, you

2    know, been shown to reduce recidivism.  Correct?

3        A.  That's true.

4        Q.  So -- that's all on that.

5            You said earlier that you have had

6    conversations with the Receiver.  I assume you're

7    talking about Mr. Kelso now?

8        A.  Yes.

9        Q.  And --

10            MR. MELLO:  when is that deposition, Don?

11            MR. SPECTER:  whose deposition?

12            MR. MELLO:  Mr. Kelso's.

13            MR. SPECTER:  You haven't noticed it.

14            MR. MELLO:  I did, once.

15            MR. SPECTER:  Once, yeah.  Right.

16            MR. MELLO:  I bet if you asked, we'd get a

17    different answer.

18            MR. SPECTER:  Paul, you're so cynical.

19            MR. MELLO:  Practical K. realistic.
                        Page 190

08.08.29 rough Cate
20    MR. SPECTER:   Q.   And do you meet with

21    Mr. Kelso won a regular basis, or his chief of

22    staff?

23        A.   Both.

24        Q.   Okay.   And what do you meet about,

25    generally?

DO NOT CITE PER CCP2025(b)

214

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1        A.   It's typically about coordination.

2        Q.   Coordination of what?

3        A.   Between the Receiver's employees and

4    efforts and the Department's employees and efforts

5    to ensure that the two -- that -- to use a

6    colloquial term, aren't stepping on each other's

7    feet.

8        Q.   Okay.   The -- one of the -- one of the

9    Receiver's plans calls for the -- the remodeling, I

10   guess, of Ventura, the DJJ facility.

11            Do you know what the current status of that

12   is?

13       A.   I don't think he's announced his final

14   intentions concerning Ventura.   I know that he's

15   told the public it's one of the first sites he's

16   considering, meaning within that first four or five.

17       Q.   Right.

18       A.   -- that he's considering, but I don't think

19   he has issued a public statement that would have the

20   legal impact of noticing the public that he's

21   planning to build there.

22       Q.   I see.   And is the Department's position

23   that that's okay to do?

Page 191

08.08.29 rough Cate

24       A.   The Department's position is that we need

25   to care for the ward who are placed in our care by

DO NOT CITE PER CCP2025(b)

215

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1    the state courts, and so we would be opposed to the

2    Receiver taking down Ventura, unless we could be

3    sure that the wards could be adequately cared for

4    somewhere else.   That in other words, that harm --

5    any potential harm could be mitigated.

6        Q.   And have you seen the plan to mitigate that

7    harm?

8        A.   I've -- I've been in discussion where

9    that's -- where the terms of a plan have been

10   discussed, but I haven't seen a final plan.

11            MR. MELLO:   Do you have any more questions

12   on Farrell?

13            MR. SPECTER:   Well, it relates to this,

14   too, but no.   To answer your question.

15       Q.   Has the Receiver in any way offered to help

16   you implement AB 900?

17       A.   Yes.   I don't know if offer is the right

18   word.   He -- and I'm not sure it was from him

19   directly, either.   I have heard that he's interested

20   in -- or that he could be interested in building or

21   assisting us in building beds, but I don't even know

22   where that may be -- I don't think Mr. Kelso has

23   told me that himself.

24       Q.   Okay.   Who told you that?

25       A.   I don't recall.   It could have been

DO NOT CITE PER CCP2025(b)

216

Page 192

08.08.29 rough Cate

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1    Mr. Runnels, it could have been Mr. Kernan, it could

2    have been Mr. Rice, or Ms. Hoch.

3        Q.  So when you're talking about the beds,

4    you're talking about the non-medical beds from

5    AB 900.  Is that right?

6        A.  Right.  Right.

7        Q.  And he would use his -- the idea that you

8    understood was that he would use his authority under

9    the receivership to get the beds built quicker.  Is

10   that the gist of it?

11       A.  That wasn't clear.  I don't know if the

12   idea was that it would be better coordinated or if

13   he thought that he had the authority to do something

14   more than this.  I don't -- I really don't -- I

15   can't say what the idea was.  Like I said, it was

16   just floated by -- someone told me that they thought

17   that that's what he was talking about.

18       Q.  Okay.  So it's -- maybe I should ask him.

19   Okay.

20           Have you talked with them about this case?

21   Them being Higger or Kelso or --

22       A.  I'm sure I have.

23       Q.  And what were those -- what were the

24   discussions about?

25       A.  I don't recall specifically.

DO NOT CITE PER CCP2025(b)

217

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1        Q.  Did it have to do with the 10,000 beds that

2    they were building?

Page 193

08.08.29 rough Cate

3      A.   I'm sure in discussing their 10,000 beds,

4    the context of it -- oh, sure, so for example, one

5    of the things we talked about with the Receiver was

6    bonus beds, the idea that if he builds 10,000, it

7    may actually free up 12,000 or 15,000 or whatever

8    number of beds, because some inmates who are

9    single-celled now in California state prison beds

10   would go to the Receiver, and then we could fill

11   that with two -- that cell with two inmates.  And so

12   as -- and then coordination efforts.  We've talked

13   about if we build that in-fill in the Central

14   Valley, could he provide sufficient clinicians to

15   care for those inmates.

16           Seen before I issued this plan to the

17   public, I said, could you do this if we built it?

18      Q.   Could you do what?

19      A.   Could you staff it with medical providers

20   and make sure that the inmates get care.

21      Q.   If you built what?

22      A.   The in-fill projects.

23      Q.   Oh, okay.  And he said he could?

24      A.   Yes.  It would be -- you know, he would

25   have to jump through hoops and take care of things

DO NOT CITE PER CCP2025(b)

218

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1    and those kinds of things it, but he thought we

2    could get it done.

3      Q.   Robin December reports to you, or -- you

4    talk to Robin about mental healthcare?

5      A.   I do.

08.08.29 rough Cate

6        Q.  And does he give you reports on the state

7    of compliance with the court orders?

8        A.  He reports through Ms. Jett formally.  But

9    I talk informally with Robin from time to time, yes.

10        Q.  And is he satisfied with the progress that

11    the Department is making?

12        A.  He's indicated our challenges are building

13    the clinical space that the Court's ordered, and

14    recruiting sufficient clinicians to provide the

15    mental healthcare that's needed.

16        Q.  And did he is any proposals about how to

17    increase the recruitment efforts, recruitment and

18    retention efforts?

19        A.  Yeah.  There's some -- what I would call,

20    you know, soft ideas, meaning like not hard cash

21    ideas, but soft ideas like, recruiting at the

22    universities and out of state, and, you know,

23    improving employee morale and wellness, and kind of

24    all those things that go around HR to make a job

25    more attractive, and then there's just the -- the

DO NOT CITE PER CCP2025(b)

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1    down and dirty pay them more, and eventually they'll

2    come.

3            So I mean though, are kind of your two

4    options for recruiting and retaining staff.

5        Q.  And did he have a recommendation as to

6    which one or whether you should use both or one

7    or --

8        A.  Well, his recommendation is, is that we

9    need to get this -- that -- well first of all, he

08.08.29 rough Cate

10    indicated it's been about a year now since we raised

11    salaries, and so it may be time to evaluate --

12    re-eval wait whether that raise in salaries was

13    sufficient to draw the clinicians.

14          And then look at that issue again.  And,

15    you know, it was more a discussion where he and I

16    shared ideas about that, recognizing that there's a

17    shortage of clinicians in California in both the

18    private and public something tore that, in my view,

19    our inmates are more important than -- for the

20    department, than -- well, I guess I shouldn't put it

21    that way:

22          The truth is that all mental healthcare is

23    important to all Californians, and so it's a

24    difficult deal, but it seems to me if you raise

25    salaries enough, you can draw out of state

DO NOT CITE PER CCP2025(b)

220

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1    clinicians into California to work in the California

2    prisons.  It's supply and demand.  And we've got a

3    constitutional obligation to do that, to do

4    whatever's necessary to make sure they are cared

5    for.  So -- but there's lots of other things you can

6    do.  And we don't want to hurt the department of

7    I'll health for example during that process, so it's

8    got to be careful done.

9          Q.  But doesn't you agree with me that all

10    those other things you could could have either been

11    tried or you can't do them or it's been ineffective?

12    I mean, it's been 13 years, you know --

Page 196

08.08.29 rough Cate
13        MR. MELLO:  Misstates the facts, misstates

14    the -- it's argumentative, calls for speculation.

15    Lacks foundation.

16        THE WITNESS:  The answer is, I don't know

17    if they have all been tried.

18        MR. SPECTER:  Q.  Well, I do.  I'm not

19    testifying.

20        So let me see.

21        You mentioned you had plans for the first

22    hundred days.  I won't ask you what you talked about

23    with Mr. Dunmoyer, because your lawyer's instructed

24    you not to answer.

25        But did any of them involve healthcare, the

DO NOT CITE PER CCP2025(b)

221

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1    plans themselves?

2        A.  Well, this -- this integrated strategy to

3    address overcrowding was one of them.  And as I've

4    discussed before, that has at least a tangential

5    relationship to healthcare.  Depending on how one

6    goes about trying to reach constitutional level of

7    care, whether through the Receiver's method or

8    through some combined approach that I discussed

9    earlier.

10        But other than that, no.

11        Q.  And in terms of parole reform, we've

12    discussed all the parole reform ideas that are --

13    that the department has on the table?  Is there

14    anything else?

15        A.  I believe so, yes.

16        Q.  Can I see that No. 1, I think it was.
Page 197

08.08.29 rough Cate

17          I was looking for the initial disclosures.

18          MR. MELLO:  That's the one that you tricked

19     me.  You didn't mark it.

20          MR. SPECTER:  Q.  So I don't wants you to

21     repeat anything we've talked about here today, at

22     least that you know you can recall.

23          But the disclosures say that you're

24     expected to difficult testimony on the size of the

25     CDCR population.  That's rather vague and known what

DO NOT CITE PER CCP2025(b)

                                                  222

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1      it means.

2           Do you have any intention -- have any

3      expectation of what about the size of the population

4      you would be talking about?

5           MR. MELLO:  To the extent that he's asking

6      you to reveal communications with counsel, provide

7      that, but --

8           MR. SPECTER:  I didn't ask him about

9      communication.

10          THE WITNESS:  It's about 170,000 inmates.

11          MR. SPECTER:  Q.  Yeah.  We don't need to

12     call the secretary of the department of corrections

13     down there to let the judges know about that.

14          A.  I don't know, beyond the numbers that we

15     have, what that refers to.

16          Q.  Okay.  And the second part is:  The means

17     of addressing the population through a combination

18     of programs, and we talked about them today.

19          Is there anything we haven't talked about,

08.08.29 rough Cate
20  means of addressing the population?

21      A.  We haven't talked about every single

22  program -- there's hundreds of programs in the

23  department that each one -- all the recidivism

24  reduction programs, all the parole programs, all the

25  the alternative sanctions programs we discussed, the

DO NOT CITE PER CCP2025(b)
223

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1   entire California logic model that was developed by

2   the expert panel which has been planned by the

3   department's program administrators and is now

4   moving towards implementation, parole reform, the

5   other ideas that the legislature is bouncing around.

6           And I mean, there's a panoply, but --

7       Q.  Right.  I'm not asking you for individual

8   programs.  I'm asking for general categories of

9   things?

10      A.  I think that's -- those are the general

11  categories.

12      Q.  The last thing says you were going to talk

13  about enhanced clerical support to enable timely

14  discharge of paroleees.

15          What's that about?

16      A.  Well, one of the issues that we found --

17  one of the Inspector General's reports related to

18  case records staff, and the need to augment the

19  number of case records analysts and supervisors that

20  we have.  I know efforts are underway to recruit

21  more of those folks so that we can move our inmates

22  through the processing at a more advanced rate.

23          So maybe that's what that refers to.
Page 199

08.08.29 rough Cate

24      Q.  And does that mean that there's a backlog

25   that you're aware of of people that are waiting to

DO NOT CITE PER CCP2025(b)

224

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1   be charged?

2      A.  At some prisons at some times, there is a

3   lack charge.

4      Q.  And do you have any idea, like for example,

5   if -- well, if summary parole goes ahead, you

6   wouldn't need really more clerical staff, because

7   they would just -- they wouldn't need to be

8   discharged from parole.  But if some of the

9   legislative proposals that we talked about in terms

10  of direct discharge, would you need enhanced

11  clerical staff to do that, do you know?

12      MR. MELLO:  I think it's compound, lacks

13  foundation, and calls for speculation.  As to what

14  the legislature is going to do and what the package;

15  et cetera.

16      You can answer the question if you

17  understand.  It's vague, too.

18      THE WITNESS:  It would depend on what the

19  exact proposal is.  There's some -- one can envision

20  that would be more complicated, credits, for

21  example, would have to be recalculated that might

22  require more staff.  Others where it's a more

23  formulaic might not require additional staff.

24      MR. SPECTER:  Q.  Okay.  Let me just take a

25  moment and look at my notes, and I think we're done.

DO NOT CITE PER CCP2025(b)

225

Page 200

08.08.29 rough Cate

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1        Okay, I'm done.

2        MR. MELLO:   Thanks a lot.

3        THE VIDEO OPERATOR:   This marks the ends of

4   Tape No. 3, Volume 1 in the deposition of Matthew

5   Cate.   We're off the record at 4:05.

6        (Time noted, 4:05 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DO NOT CITE PER CCP2025(b)

226

Page 201