# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN, et al.,

    Plaintiffs

      vs.                   No. CIV S-90-0520 LKK JFM P

ARNOLD SCHWARZENEGGER, et al.,

    Defendants

## TWENTIETH MONITORING REPORT OF THE SPECIAL MASTER ON THE DEFENDANTS' COMPLIANCE WITH PROVISIONALLY APPROVED  PLANS, POLICIES AND PROTOCOLS

## PART A

The Twentieth Monitoring Report of the special master on the Defendants' Compliance with Provisionally Approved Plans, Policies, and Protocols (Report) covers the monitor's twentieth round review of compliance by the California Department of Corrections and Rehabilitation (CDCR or "the Department") with the plans, policies, and protocols provisionally approved by this Court in mid-1997 and now known as the Revised Coleman Program Guide (Revised Program Guide or Program Guide).  The period covered was September 2007 through February 2008.  Unlike the preceding Nineteenth Monitoring Report, which

covered only the 13 institutions that were visited by the monitor[1], this report offers a comprehensive review of all 33 CDCR institutions.

The monitor visited 28 of these institutions: Avenal State Prison (ASP), California Correctional Institution (CCI), California Institution for Men (CIM), California Institution for Women (CIW), California Men's Colony (CMC), California Medical Facility (CMF), California Rehabilitation Center (CRC), California State Prison, Los Angeles County (CSP/LAC), California State Prison, Sacramento (CSP/Sac), California State Prison, Solano (CSP/Solano), California Substance Abuse Treatment Facility (CSATF), Central California Women's Facility (CCWF), California State Prison at Corcoran (CSP/Corcoran), Correctional Training Facility (CTF), Deuel Vocational Institution (DVI), Folsom State Prison (Folsom), High Desert State Prison (HDSP), Kern Valley State Prison (KVSP), Mule Creek State Prison (MCSP), North Kern State Prison (NKSP), Pelican Bay State Prison (PBSP), Pleasant Valley State Prison (PVSP), Richard J. Donovan Correctional Facility (RJD), Salinas Valley State Prison (SVSP), California State Prison at San Quentin (SQ), Sierra Conservation Center (SCC), Valley State Prison for Women (VSPW), and Wasco State Prison (WSP).

The remaining five institutions were monitored by means of a paper review which required each of them to provide documentation on their compliance with local corrective action plans (CAPs) and other issues and court-ordered mental health programs covered during this monitoring period. These institutions were California Correctional Center (CCC), Calipatria State Prison (CAL), Centinela State Prison (CEN), Chuckawalla Valley State Prison (CVSP), and Ironwood State Prison (ISP).

---

[1] The data collected and findings discussed in this report are the product of many members of different monitoring teams, but references to various monitors throughout the report are singular rather than plural. Clinical judgments of the special master's psychiatric experts are explicitly attributed to an expert.

The twentieth monitoring period was a phase of transition and rapid new developments which have the potential to improve mental health care in the institutions of the CDCR in a more significant and lasting way than has ever been seen since the beginning of court-ordered monitoring in the <u>Coleman</u> case.  The backdrop to this opportunity for change, however, was a continuation of many of the profound challenges that for years have plagued CDCR's efforts to achieve adequate mental health care within its institutions.

During the monitoring period, the <u>Coleman</u> special master and his experts and monitors were actively involved in a number of activities at the core of these dynamic conditions.  Among the most notable was the work by the special master and members of his team to coordinate the <u>Coleman</u> case with the <u>Armstrong</u>[2], <u>Perez</u>[3], and <u>Plata</u>[4] cases, as ordered in these cases.  This work involved not only detailed assessments of needs and planning with the court representatives of the coordinating cases, but also ongoing consultation with the CDCR's Division of Correctional Health Care Services' (DCHCS') staff on a myriad of issues.  As of this writing, these efforts have been ongoing for nearly two years.

The special master's experts and monitors participated actively in what is perhaps the most significant aspect of the coordination process -- the development of plans to construct 10,000 inpatient health care beds for CDCR inmates.  This project, on which the <u>Plata</u> receiver has taken is the lead, will distribute 5,000 medical beds and 5,000 mental health beds among seven new facilities that will be designated as California Health Care Facilities (CHCFs or 10,000 beds).  Each of these facilities is expected to house from 1,400 to 1,700 inmate-patients.  As envisioned, these new beds would change dramatically the health care landscape for inpatient medical and mental health care provided to CDCR inmates.  In the <u>Plata</u> receiver's Eighth

---

[2] <u>Armstrong v. Schwarzenegger</u>, No. C 94-2307 CW (N.D. Cal.).
[3] <u>Perez v. Tilton</u>, No. C 05-05421 JSW (N.D. Cal.).
[4] <u>Plata v. Schwarzenegger</u>, No. C 01-1351 THE (N.D. Cal.)

Quarterly Report, he indicated that each CHCF will offer appropriate therapeutic settings to address CDCR's bed needs for high levels of care. This echoes a major ongoing concern that has been expressed again and again in past Coleman special master's reports. The mental health beds in the CHCFs would provide for in-patient crisis-level, intermediate, and acute-care needs, as well as mental health Enhanced Outpatient Program (EOP) level of care, and would offer centralized clinical, administrative, and support service space. It is not an overstatement to say that the CHCFs are the single most far-reaching step toward the delivery of adequate, up to date mental health care within the CDCR thus far. As of the time of this writing, construction plans are moving forward but funding has not yet been allocated.

Another important aspect of the coordination effort involved participation by the special master and his staff to develop various memoranda of understanding, which are known informally in the coordination process as the group's one-page agreements. These agreements embody the core goals and missions for coordinating the overlapping areas of construction, information technology, governance, improvements to the general acute care hospital (GACH) at CIM, oversight of contracting functions of the mental health program, credentialing and privileging functions for the mental health program, staff recruitment and hiring, and pharmacy services. These agreements were circulated among the coordination group for review and revision, and then submitted to the courts of the respective cases for their approval. Performance of the tasks described in the one-page agreements is underway and ongoing. In addition to working on the 10,000 bed project, the special master's staff has also been working with the Plata receiver's teams that are responsible for evaluating various health care-related construction projects within CDCR's 33 institutions. Members of the special master's staff have also served

4

on and provided valuable input to the coordination standing committees on Pharmacy and Therapeutics (P&T) and on Healthcare Information Technology (HITEC).

The twentieth monitoring period also entailed extensive review and analysis of the status of defendants' implementation of a variety of court-ordered plans.   It provided the first opportunity to comprehensively review and assess the defendants' plan to reduce suicides in administrative segregation, which was initiated pursuant to this Court's order of May 31, 2007. The status of the implementation of this plan within specific institutions is covered briefly in some of the institutional summaries that appear in this report.

The special master's experts and monitors also continued their work with the parties on the defendants' plans for the administrative segregation EOP, mental health staff recruitment, access to intermediate care beds at Atascadero State Hospital (ASH), improvement of mental health assessments of correctional clinical case manager system (3CMS) inmates in the disciplinary process, the EOP in reception centers, and women's EOP bed needs in mainline and administrative segregation. The team actively worked on these plans with the defendants, participating in numerous meetings and discussions, and analyzing and taking into consideration plaintiffs' input on each plan.  This analysis and evaluation of these plans necessitated extensive review of documents and underlying data.  There will be an additional installment to this report, Part B, which will provide the special master's review and recommendations with respect to these plans, and with regard to the use of force on mental health caseload inmates at CSP/Corcoran.  Part B of the Special Master's Twentieth Monitoring Report is currently in preparation and will be issued in the near future.

The twentieth monitoring period also saw progress in the litigation to consider limiting the CDCR population in order to ease current prison overcrowding conditions.

Currently, the trial in that litigation is scheduled for November 2008. During the interim, the special master's experts and monitors remained involved in reviewing the procedures for selection and transfer of limited groups of CDCR inmates to out-of-state facilities to ease the overcrowding. They visited sites in Arizona, Tennessee, and Mississippi to inspect and evaluate their capacity to detect and manage care for any mentally ill CDCR inmates pending their return to CDCR institutions.

The special master and his team were also engaged in the parties' annual updating and revision of the Program Guide, and in the ongoing review and analysis of CDCR's Workload Study that was completed in accordance with this Court's order of July 28, 2006.

For this review, institutional administrators and mental health staff at the 28 visited institutions and the five paper-reviewed institutions cooperated fully with the monitoring process. As in earlier monitoring periods, plaintiffs' and defendants' counsel accompanied monitoring staff during several of the site visits. The monitor focused on mental health staffing levels, quality management, medication management, and access to higher levels of care. The two additional focal areas that were initiated during the eighteenth monitoring period -- suicide prevention and use of mental health assessments in the discipline of sexual misconduct violations -- were carried forward into the twentieth monitoring period. In addition, the review addressed availability of treatment and program space, as well as such other issues which merited discussion.

Overall, the monitor's review found that several CDCR institutions were substantially compliant with Program Guide and court-ordered standards. In the near future, some of these institutions may be considered and recommended for transition from on-site

monitoring to paper review.   Meanwhile, other institutions continued to struggle with attaining compliance but were unable to achieve it, and will remain subject to on-site monitoring.

Like previous monitoring reports, this one also provides a summary of each institution's compliance, with discussion of its performance in the specific areas of focus and the mental health programs available at that institution.  As in past reports, these summaries are grouped according to the CDCR's regional service areas.  These typically include a hub institution with a mental health crisis bed (MHCB), which is the unit for providing inpatient care to inmates in crisis who need short-term intervention and stabilization, and an intensive residential EOP.  CDCR service areas also include from one to four facilities, each of which has a 3CMS program in the general population.  The report concludes with a comparative analysis of compliance, organized by focus areas and mental health program areas, for all 33 institutions, followed by the special master's recommendations.

In addition, the monitor's experts compiled numerous case reviews which are appended as exhibits to this report.  A total of 195 case reviews from 25 of the 28 visited institutions appear in these exhibits.  These case reviews were based on interviews with inmates and clinicians, chart reviews, or a combination of both.  Inmate identities have been redacted from these case reviews in order to protect the privacy of the inmates.

This report would not be complete without due acknowledgment and expression of our deepest gratitude to J. Michael Keating for his twelve years of extraordinary leadership as the original Coleman special master.  Mr. Keating was appointed special master at the inception of court-ordered monitoring in Coleman in 1995.  He retired during the twentieth monitoring period, effective November 1, 2007, concluding a distinguished and highly accomplished career as a prison special master.  Mr. Keating fulfilled the mandate of this court, working tirelessly "to

assist the court in fulfilling its obligation to fashion a remedy for the constitutional violations in the delivery of mental health care to members of the plaintiff class and to monitor implementation of that remedy," as was ordered on November 14, 1995.  He formulated the monitoring system that is used to this day, and helped shape the development and implementation of the provisionally approved plans, policies and protocols into what is now known as the revised Coleman Program Guide.

Mr. Keating's remarkable career as a special master began in the 1970's in one of the landmark American cases on prison reform, Palmigiano v. Garrahy, 443 F. Supp. 956 (D.R.I.1977).  In that case, the overcrowded, oppressive conditions in the Rhode Island state prison system were challenged as tantamount to cruel and unusual punishment.  The Palmigiano court found that these conditions did indeed amount to a violation of inmates' rights that reached constitutional proportions.  As the court-appointed special master in Palmigiano, Mr. Keating first demonstrated his talent for working with both state prison officials and with inmates and their legal counsel to effectuate a more humane, constitutionally adequate prison environment. He was instrumental in the enactment of legislation that established Rhode Island's State Prison Overcrowding Commission.  Following the Palmigiano special mastership, Mr. Keating went on to serve in a similar capacity in other states including Georgia, Massachusetts, and Texas.

All of the people who work on the Coleman special master's team are grateful to Michael Keating for the standard of excellence that he set for this prison special mastership.  We hope to maintain that degree of professionalism for as long as it takes to conclude our task, and to leave the State of California with a prison system that can care for its mentally ill population at a level that is constitutionally sound and appropriate to the unmet mental health needs that were the very reason this case was filed.

## INSTITUTIONAL SUMMARIES

### Service Area A

Service Area A includes CSP/Sac and Folsom.

### California State Prison, Sacramento (CSP/Sac)
October 29, 2007 – October 31, 2007

Census:

As of October 4, 2007, CSP/Sac reported a population of 3,253, or about 30 higher than its rated maximum capacity. There were 1,430 inmates on the mental health caseload, with 190 inmates in the EOP I and 175 inmates in EOP II. The psychiatric services unit (PSU) I held 118 inmates while the PSU II held 62. The correctional treatment center (CTC) I held 14 inmates and the CTC II had 11 inmates. There were 18 inmates in the mental health outpatient housing unit (MHOHU). In administrative segregation there were 72 3CMS inmates and 123 EOP inmates. For 3CMS inmates, A-facility held 88 inmates, B-facility held 186 inmates, C-facility held 363 inmates, B-dormitory held four inmates, and C-dormitory held six inmates.

In September 2007, PSU beds at CSP/Sac were to be increased by 64 beds. The plan was to move all PSU beds to blocks one to four in A-facility, general population EOP I to blocks six and seven in A-facility, and administrative segregation EOP to block five. To accomplish this, the institution initiated planning among plant operations, pharmacy, nursing, and the program directors.

As of September 2007, CSP/Sac was to receive the first inmates for treatment of Exhibitionism. Staff had been trained and treatment space was adequate. Two inmates had been

transferred into the program.  Both inmates declined participation in the treatment program, which was not yet implemented as a result.

Staffing:

      CSP/Sac's mental health vacancy rate[5] dropped to 15.8 percent, down from a vacancy rate of 38 percent during the preceding monitoring period.  Improved staffing was attributed to salary increases, recruitment efforts and an improved central office hiring process. The sole health program specialist, chief psychiatrist, and chief psychologist positions were all filled.

      The senior psychiatric specialist position was filled.  Out of 20 psychiatry positions, 6.4 or 32 percent of positions were vacant.

      Seven of the eight supervising psychologist positions were filled, for a vacancy rate of 13 percent.  Of 42.33 clinical psychologist positions, 6.33 or 15 percent were vacant.

      The sole supervising psychiatric social worker position was filled, as was the sole unit supervisor position.  There were two vacancies out of 25.5 allocated psychiatric social worker positions, for a vacancy rate of eight percent.

      Among psych techs, all three senior positions were filled.  Of the 71.9 allocated psych tech positions, 16.9 were vacant, for a vacancy rate of 24 percent.  Ten psych tech vacancies were covered by contractors, reducing the functional vacancy rate to about ten percent.

      All three senior registered nurse II positions were filled.  Of the 45.72 allocated RN positions, 7.95 or 17 percent were vacant.

      The 2.9 allocated office assistant positions and two office service specialist positions were both filled.  Of the 23.8 office technician positions, 23.5 were filled, for near-full

---

[5] Unless otherwise indicated, all data on mental health staffing of each institution was obtained from the institution itself.

coverage.  Two of the five transcriber positions were vacant, leaving a vacancy rate of 40 percent.

All 11 RT positions were filled.

Quality Management:

The warden continued to chair the institution's local governing body which resumed its quarterly meetings.  The quality management committee and mental health subcommittee remained compliant in terms of composition and weekly meetings.

Minutes of mental health subcommittee meetings showed extensive agendas and multi-disciplinary participation.  A quality management committee attended by the monitor was organized and compliant with pertinent policies and procedures.

Audits covering many varied aspects of the health care delivery system found that CSP/Sac's system of quality improvement remained in place.  Quality improvement teams (QITs) had the required multi-disciplinary composition to address problems.  Twenty recent and current QITs covered, among other things, suicide five-day follow-up, planning to improve treatment in administrative segregation facilities, the Exhibitionism treatment plan, and a tracking system for medical records and loose filings.  Audits followed completion of QITs when clinically indicated, but not routinely.   Documentation was reasonably good.  However, line staff reported limited knowledge of the quality improvement process and little feedback from quality improvement studies.

Peer review for case managers was suspended during the monitoring period due to understaffing.  Minutes for only one meeting of one group, CTC physicians, were provided and showed little detail apart from noting that the standard of care was met in the six cases reviewed over a six-month period.

Suicide Prevention:

The suicide prevention committee (SPC) met monthly and recorded minutes of all of its activities.  It continued to cover all items mandated by the SPC policy, although examination of suicide attempts was suspended for several months during a staffing shortage.

A QIT was organized to formulate suicide prevention policies and practices. Psych techs complained that "bad news" screenings were included in bus screenings, but that findings were rarely communicated to the unit psych techs who had to rely on inmates for such information.  Staff also reported that nursing had begun pre-placement screenings which resulted in a significant number of referrals.  Custody staff provided mental health service delivery system (MHSDS) orientation packets for all new placements.

Correctional officers said that their daily checks of paperwork reliably detected mistaken placements of caseload inmates in the stand-alone administrative segregation unit on the same day or one day later, and that in those rare instances of mistaken placements, re-housing was addressed within one day.  A mental health clerical worker also checked reports each weekday for the stand-alone building.

Psych techs administered the 31-question screen for all new stand-alone units but said that it was rejected almost universally by general population inmates.  The monitor observed two private spaces reportedly used for this task.  Tracking data was incomplete.  In a log showing 372 entries in a six-month period, 23 percent showed no screening date, and 22 or six percent were shown as released from administrative segregation before the screening deadline had been reached.  Another 17 percent were logged as completed late, many by a day or two, but the longest times reached 19 days.  Two social workers were assigned to follow-up when

indicated by the screening.  According to staff, removals from the stand-alone administrative segregation unit were typically generated from this contact.

The lieutenant, sergeant, senior psychologists, and senior psych tech assigned to the unit met each morning to discuss new arrivals and other inmates of concern, and to review the mental health tracking system (MHTS) for inmate suicide profiles.  The same group also met weekly with the captain.  Psych techs had daily contact with the sergeant to review new admissions and other issues.

Retrofitting of administrative segregation intake cells was incomplete, with only five completed in the stand-alone unit.  They were not centralized and staff could not reserve them for inmates on intake status.  No cells in the non-stand-alone units had been retrofitted. The institution reported that it had implemented directives concerning televisions and radios in the regular administrative segregation units, but the stand-alone was not wired for this purpose.

For 30-minute welfare checks, staff demonstrated good systems for alerting the units to new intakes and assuming responsibility for conducting the checks.  The monitor's review of several weeks of documentation for two units found that checks were recorded routinely, with a few missed entries per week.  Some recorded times were reasonable, while others suggested insufficient time to appropriately complete a welfare check.  A few sheets were missing.  Review of a few inmates' records showed routine checks, but at least one gap of several hours each month.

Cut-down kits with ambu bags were available in the control room of each administrative segregation unit.  All unit staff except one had mouth shields for cardiopulmonary resuscitation (CPR) emergencies.  Training records showed that all or nearly all custody staff had

received CPR training.  Required training doubled to eight annual hours during the monitoring period.

Reportedly, emergency response drills were conducted monthly in the administrative segregation units.  Although documentation showed that drills occurred routinely in the four administrative segregation buildings, several shifts were missed nearly every month, particularly on first watch.  Drills covered self-cutting, jumping from tiers, and hanging. Responses were generally good.

Staff acknowledged that five-day follow-up remained only partially compliant, although the policy and procedure were well-designed.  To minimize staff inconsistency and excessive inmate movement, CSP/Sac appointed one clinician to be responsible for all cases, another to serve as back-up, and psych techs to complete checks on weekends, and created a mechanism for information transfer among them.  The MHCB log showed that all but three of its suicide-related admissions were identified for follow-up, but of 263 such admissions, only 58 percent were shown as completed or readmitted for further observation.

Because the MHOHU tracking log did not show reasons for admissions, cases of missed follow-up could not be determined.  The log showed that 550 inmates from the MHOHU required follow-up.  Seventy eight percent of them either received follow-up or were returned to MHOHU or MHCB.  A staff audit for the same period showed a compliance rate of 51 percent for clinical follow-up.

Medication Management:

For inmates arriving from other institutions, audits found overall compliance with ongoing and/or new medication being received by the end of the day after arrival or the writing of a new order.  However, sending institutions did not consistently provide arriving inmates with

14

their prescribed medications.  The supervisory registered nurse II (SRN II) for receiving and release (R&R) periodically reviewed the log to identify and communicate with the most severely noncompliant sending institutions to improve compliance in this area.

For inmates transferred to other housing areas within CSP/Sac, an institutional audit found continuity of medications in 95 percent of cases.  A draft local operating procedure was written to ensure timely notification of housing changes to nurses.

Medications were renewed or discontinued before expiration in 96.7 percent of cases.  Although psychiatrists generally wrote orders of appropriate length and planned appropriate follow-up intervals with inmates, 120-day orders were permitted under some circumstances for 3CMS inmates.

Referrals of non-compliant inmates were made in 66.4 percent of cases, up from a compliance rate of 45 percent in March 2007.  Systems were in place to notify the prescriber once refusals were identified.  Weekly, third watch registered nurses (RNs) reviewed medication administration records (MARS) for refusals of three consecutive days or 50 percent of the time, with referrals written and 128Cs generated.  Unit SRN IIs and senior psych techs continued monitoring for compliance and trained staff in the unit where the non-compliance occurred.  Compliance with follow-up appointments with psychiatrists within seven calendar days of the referral occurred in 43.85 percent of cases.

Audits found that informed consent was being obtained appropriately, although sample sizes were too small.

Based on audit results, ordering, obtaining, and reviewing appropriate laboratory tests and results remained problematic.

All EOP inmates in the PSU and caseload inmates in administrative segregation continued to receive psychotropic medications via directly observed therapy (DOT), as did some other inmates for clinical reasons. Staff issued DOT chronos and tracked inmates' housing and anticipated expiration dates, for reassessment at that time. Staff reported few incidents of medication hoarding. Only five rule violation reports (RVRs) involved hoarding.

Lists showed 232 inmates on Keyhea orders during the monitoring period. Tracking showed 82 hearings resulting in only two denials, and 211 scheduled hearings. Staff reported five cases in which legal counsel decided not to seek orders as recommended. Orders expired in several instances, which were few compared to the large number of orders. Staff reported that refusals of Keyhea-ordered medications were unusual.

There were 347 inmates on *hora somni* (HS) medications at the time of the monitor's visit.

For inmates being paroled or released, the compliance rate for the presence of signed pharmacy supply and medication releases in unit health records (UHRs) was 62 percent. A new SRN II implemented measures to improve compliance, including training of R&R staff, review of the pharmacy supplies and medication release records, increased communication with pharmacist regarding timely delivery of parole medications, and increased communication with the officer of the day to facilitate pick-ups of parole medications on weekends and holidays. Some clinicians coordinated with transitional case management program (TCMP), and some case managers coordinated with parole outpatient clinics (POCs). Clinicians offered pre-release groups in mainline EOP and administrative segregation EOP.

Filing of medical records was backlogged three to four weeks, and records were described as chronologically disorganized. The previous month's MARs were filed in UHRs in

90 percent of cases, but institutional audits found a compliance rate of 63.4 percent for the presence of providers' progress notes supporting each order for new, changed, or discontinued medication.  Overall compliance with completeness and legibility of entries on MARs was reported at 85 percent.  Training by SRN IIs and senior psych techs for units that had incomplete and illegible entries on the MAR was reportedly ongoing.  Timely access to medical records continued to be problematic, with staff estimating that only half of their requests were filled.  A QIT was formed but appeared to be of little help.

Mental Health Assessments for Use in the Discipline of Sexual Misconduct Violations**:**

Statistics maintained by staff found up to 137 referrals for mental health assessments for sexual misconduct violations during a seven-month period.  All but five of the inmates involved were on the MHSDS caseload.  Nearly 40 percent of these instances occurred while the inmates were in MHCBs or alternate settings on suicide watch.  It appeared that assessments were not generated for 20 percent of the referrals, including a few that were marked "not applicable" for unknown reasons.  It was unclear whether IDTT meetings occurred consistently.  Although staff records reflected awareness of this requirement, many entries were missing, predated the offense, or were too remote in time to indicate whether an IDTT meeting was held.

Several inmates had multiple RVRs.  Seven of them had five to 12 violations each.  Mental health evaluations after screenings were requested for five inmates, two of whom were ultimately diagnosed with Exhibitionism.  Custody tracking logs or documentation covered many useful details.  It showed that 58 inmates had "IEX" status at the time of the monitor's visit, among whom eight were 3CMS and 45 were EOP, and that five inmates had been assigned special clothing.

Transfers:

Staff referred 40 inmates to the Department of Mental Health (DMH) at CMF, consistent with past referral rates.  Outcomes were recorded in only half of cases, and no case was close to transferring within timeframes.   Four inmates received a bed number within a week, but more typically it took from three weeks to over three months.  Six referrals to CMF were rescinded.  Ultimately, tracking showed that 16 inmates transferred.

CSP/Sac referred 33 inmates to Salinas Valley Psychiatric Program (SVPP), with fifteen transfers, six of which were within timeframes, and none were rescinded.  Issuance of bed numbers for those transferred took three to ten weeks.  Once issued, transportation took five to seven days, in excess of Program Guide requirements.

Three inmates were referred and transferred to ASH, after having been in MHCBs for two to three weeks before referrals were initiated.  Transfers occurred two to three weeks after that.  Staff thought that inmates were not a priority for acute care unless they were actively suicidal.

Staff described plans to remedy instances of clinicians not being informed of inmates' returns from DMH and not receiving discharge summaries.

Both CTCs were full.  Logs showed 328 MHCB admissions during the monitoring period, at a rate somewhat higher than during the preceding monitoring period.  Staff also reported sending 33 inmates to MHCBs at other institutions.  The average length of stay was 14.8 days.  Fifty eight percent were discharged timely or within a few days afterward.  The longest stays exceeded those during the preceding monitoring period, with some reaching two months, and one lasting four months.

Of the 40 inmates whose multiple admissions were expected to trigger consideration for a higher level of care, six were referred.

The IDTT saw or reviewed every inmate twice per week. Psychiatrists and case managers knew their inmate-patients well, and discussions were thorough and useful. Medical records, MARs, and central files (C-files) were all available. MHCB openings were filled from the MHOHU immediately. Except for one psychiatric vacancy, staffing was sufficient. Procedures appeared to work well. Audits found compliance rates of 90 percent or better for admissions within 24 hours, suicide risk assessments (SRAs), treatment plans with twice-weekly updates and discharge plans, daily clinical rounds, weekend discharge follow-ups and contacts with facility case managers.

MHCB operations were affected by local custody requirements and staff opinion that inmates should not be motivated to remain in the CTC. All inmates were escorted into the interdisciplinary treatment team (IDTT) room in handcuffs and designated clothing regardless of their actual security status, and all staff in the IDTT meeting were required to wear vests when administrative segregation or PSU inmates were seen. Eligible inmates generally received out-of-cell time for only clinical services. A few compliant and clinically appropriate inmates were allowed an occasional escort to the CTC yard with a recreation therapist (RT).

The MHOHU was a 20-bed single-cell housing unit which was full. Tracking showed 896 admissions over a seven-month period to either the MHOHU or outpatient housing unit (OHU), without distinction between those units or time spent time in more than one setting during an admission. Lengths of stay were similar to those of the preceding monitoring period. Slightly more than half of admissions were discharged or moved to a higher level of care within

three days. Among the rest, 16 percent were one day late, 19 percent were up to one week late,

11 percent were up to two weeks late, and 14 inmates or two percent were up to 40 days late.

Staff used the MHOHU for various purposes, including step-down care and for

fragile EOP inmates. Five-day follow-up was not occurring after MHOHU admissions.

Increases in administrative segregation EOP and PSU populations led to increased

use of holding and ZZ cells. During a six-week period, 39 inmates were in holding cells, with

stays lasting up to eight hours. Staff adhered to the continuous watch requirement, but rarely

recorded 15-minute observations.

Monthly audits found 12 inmates in restraint or seclusion on 23 occasions during

a four-month period. Almost half lasted over 24 hours, with one case lasting eight days, another

lasting four days, and one lasting three days.

Other Issues:

Administrative Segregation EOP

Staff audits found that about 70 percent of administrative segregation EOP

placements came from the MHOHU. All but four EOP inmates were single-celled. Two case

managers handled intake functions, completed reviews of new inmates' charts and C-files, and

generated assessment and treatment planning documentation including SRAs. They created

input for MHTS suicide tracking and summaries, and presented cases to the institutional

classification committee (ICC) and IDTT before handing them over to assigned case managers.

Case managers' caseloads exceeded Program Guide size standards by about 50

percent. Weekly audits continued to find consistency with initial evaluations, initial IDTT

meetings and treatment plans, IDTT updates, and weekly case manager contacts. Staff revised

the IDTT form to prompt consideration for higher levels of care on each review.

At least 64 percent of clinical contacts occurred in private settings or were contacts that occurred appropriately at cell front.  However, about 12 percent of cell-front contacts inappropriately involved SRAs and initial evaluations.  Tracking of therapeutic activities over a six-week period found that about 80 percent of inmates were routinely offered eight or more hours of structured therapeutic activities, including structured yard time.  Refusals were problematic, with a 53 percent refusal rate.  Staff attributed the high refusal rate to the introduction of radios and televisions to the unit, transport time requirements, and lack of bathroom breaks during some two-hour groups.  A QIT was formed to address the refusal problem.

Minimum yard time requirements were not met consistently.  Most EOP inmates were on walk-alone status and were permitted 2.5 hours of yard time every other day, for a maximum of 7.5 hours some weeks and ten in others.   Documentation and tracking were not consistently maintained.

Thorough tracking of lengths of stay in administrative segregation found that average stays for caseload inmates ranged from 95 to 108 days, with about 25 percent of stays exceeding 90 days.

Administrative Segregation 3CMS:

Daily psych tech rounds continued in three buildings and in the administrative segregation stand-alone unit.  Monthly audits found that documentation of psych tech rounding was not filed in one third of UHRs.  Audits found three cases with almost no psych tech contacts for one to two-month periods.  Initial IDTT meeting requirements were not met in 16 percent of cases.  Generally, contacts were offered in confidential settings.

Pyschiatric Services Unit:

In PSU I & II, initial and follow-up IDTT meetings were timely.  The monitor's expert found the meetings to be handled competently and appropriately. Increased staff and expansion of programming to the third watch enabled initiation of ten hours of therapeutic treatment per week for each inmate, but about eight to ten percent of inmates were offered only about one hour per week.  Approximately 40 percent of inmates refused half or more groups, according to the monitor's sample.

EOP:

Audits found timely initial and IDTT meetings and evaluations for EOP inmates. Requests for outside medical records were frequent.  Staff comparisons of audited charts and inmate histories found consistent weekly case manager contacts.

With increased staffing, EOP programming increased during the monitoring period.  However, staff reported that in general population EOP and at least one administrative segregation EOP unit, structured therapeutic programming was assigned randomly rather that treatment plan-driven.  Ninety to 130 inmates participated each weekday with a typical recreation therapist staff-to-inmate ratio of one to 30.  Tracking was well-structured.  Some newly hired mental health staff described relationships with custody staff as strained.

EOP I A – Facility held 190 inmates, two less than its capacity.  All SNY EOP inmates were transferred to the MCSP sensitive needs yard (SNY) EOP.  Staff reported that out-of-cell therapeutic activities increased to eight hours of scheduled group and three hours of structured yard time, although interviewed inmates complained about the quality of the groups offered.  The 15 education slots were filled, with four hours scheduled for each inmate per week. Thirty one of 35 inmate job assignments were filled.  As of July 1, 2007, scheduling of follow-up

IDTT meetings was restored to every 90 days. The only medication management issue was delay in replacing Wellbutrin, which had been discontinued.

During the monitoring period, CSP/Sac constructed temporary treatment space to meet the needs of its expanding EOP program in EOP II – B facility. CDCR has since initiated an expansion to house 192 EOP inmates and provide EOP programming there. Preliminary funding for adequate permanent office and treatment space was requested through the 2008/2009 budget process.

In EOP II – B Facility, there were 175 inmates; the facility was under its rated capacity of 192. Staff reported that group hours were increased to eight per week. Three hours of RT-supervised yard time was offered. Twenty seven EOP inmates were assigned to jobs. IDTT follow-up meetings were occurring every 90 days.

Mainline 3CMS:

For mainline 3CMS inmates, initial and annual IDTT meetings were timely, but case manager contacts remained noncompliant, largely due to understaffing. Caseload sizes were imbalanced, ranging from 90 to 182. Many contacts occurred at four to five-month intervals. Only one group, Transition from EOP to 3CMS, was offered during the monitoring period.

Referrals:

Logs showed 235 inmate self-referrals during the monitoring period, with approximately two thirds seen timely. Many of the late contacts occurred within two weeks, although the longest responses took up to two months.

**Folsom State Prison (Folsom)**
January 29, 2008-January 30, 2008

Census:

In January 2008, the inmate census at Folsom was 4,100. The caseload population was 700, or 17 percent of the prison's population. There were 532 caseload inmates in general population, including 531 3CMS inmates and one EOP inmate. There were 168 inmates housed in administrative segregation, including 44 3CMS inmates and three EOP inmates.

Staffing:

Folsom achieved full mental health clinical staffing, with the exception of a .75 RT, during this monitoring period. At the time of the site visit, Folsom clinical staffing consisted of three psychiatrists, two senior psychologists, six staff psychologists, and three psychiatric social workers. The sole health program specialist position was vacant. Folsom did not utilize any contract services during the reporting period.

Psych tech vacancies improved during the monitoring period with only one of six full-time equivalent (FTE) positions vacant. The senior psych tech position remained vacant from July 2007. All nursing positions were filled.

Quality Management:

Quality management was an area of sustained progress. Required committees were functioning and there were a number of active QITs. There was documentation of good interdisciplinary representation in the various meetings and committees, and the minutes of meetings detailed the comprehensive functioning of quality management at this institution.

The QIT process continued to identify new issues and corrective actions, as well as monitoring the outcomes. Many issues were addressed through the QIT structure and problem-solving discussions. Audits and remedies for poor results continued to be noted.

Peer review remained operational for pertinent disciplines.

Suicide Prevention:

Folsom continued to have a functioning SPC, however, internal auditing, attendance of appropriate staff, and monitoring were affected by the turnover of nursing supervisory staff.

The Emergency Response Review Committee (ERRC) met only twice during the year 2007.

Five-day post MHCB follow-up was non-compliant during this monitoring period. While there was a process in place during the weekdays, inadequate weekend coverage resulted in missed follow-ups.

Medication Management:

Medication management systems remained problematic at Folsom, and very few audits were completed during the monitoring period. Medication continuity reached only 60 percent compliance, and medication noncompliance and follow-up procedures were not well implemented. Pill lines remained disorganized and lengthy, resulting in inmate refusals and increased conflicts with custody staff.

A procedure for obtaining blood levels of mood stabilizers was in draft form and not close to implementation.

DOT procedures reached 100 percent compliance during the monitoring period. HS medication administration after 8:00 pm while improved, needed continued monitoring and auditing. An adequate process was in place for the provision of parole medications, which was

at 90 percent compliance.

Mental Health Assessments for Use in the Discipline of Sexual Misconduct Violations:

Folsom was partially compliant with implementation of the mental heath assessment process for RVRs. During the monitoring period, Folsom issued 1,845 RVRs, including 474 to 3CMS inmates, and nine to EOP inmates. Twenty-seven mental health assessments were completed, including 18 for 3CMS inmates, six for EOP inmates, and three for non-MHSDS inmates. Mental health assessments were not completed for three EOP inmates. There were no RVRs issued for attempted suicide or self-mutilation during this monitoring period.

Mental health assessments provided useful information in easily understood terminology, and hearing officers considered clinicians' assessments. Folsom conducted routine audits of all mental health assessments during this monitoring period, as well as audits of all RVRs issued to 3CMS inmates for which mental health assessments were not requested.

Transfers:

Folsom did not make direct referrals to DMH, and continued to refer all inmates requiring a higher level of care to MHCBs at CSP/Sac. If beds were unavailable at CSP/Sac, Folsom contacted CDCR headquarters for referral to another MHCB unit.

During the monitoring period, Folsom referred 104 inmates to MHCB units. One hundred inmates transferred to CSP/Sac on the day of referral, one inmate transferred to another MHCB, and three inmates were treated at Folsom, as there were no beds available system-wide. The inmates treated at Folsom were discharged within 48 hours.

Holding cells were used periodically for inmates awaiting transfer to MHCB units, but no inmate stayed in such a cell longer than four hours during this monitoring period.

One-to-one custody observation of inmates awaiting transfer in holding cells was well documented.

There were no problems with notification regarding inmates returning from MHCBs.

Timeliness of EOP transfers remained compliant over the monitoring period. All of the 25 EOP general population inmates transferred within timeframe guidelines, and they were all seen weekly by case managers while awaiting transfer.

EOP administrative segregation inmate transfers were completed within 30 days with two exceptions (three days and 13 days). During the monitoring period, 21 EOP inmates transferred to an administrative segregation hub.

Other Issues:

Administrative Segregation:

On January 29, 2008, there were forty-four 3CMS and three EOP inmates in administrative segregation. Eight intake cells were retrofitted with new ventilation grates.

For a six-month period during the monitoring period, an administrative segregation overflow operated in Building 1. Psych tech coverage and rounding were problematic, and thus noncompliant.

Pre-placement screening was implemented just prior to the monitoring visit. Post placement screens were noncompliant with only 72 percent of the screens completed timely. The 30-minute welfare checks for new intakes were well documented in a staggered fashion.

There was adequate confidential treatment space for mental health contacts in administrative segregation. Over 90 percent of clinical contacts occurred out of cell in a confidential setting.

EOP and 3CMS inmates housed in administrative segregation were seen weekly by their case managers, and daily psych tech rounds were documented. There were no problems noted with medication administration.

Folsom had inadequate space to provide ten hours of yard time for all administrative segregation inmates.

The institution had not implemented the allowance of appliances in administrative segregation, and did not plan to undertake renovation of permit appliances there.

3CMS:

The 3CMS program at Folsom continued to run well, with only three outstanding issues. Medication management issues were previously discussed. Also, the quality of the treatment plans remained deficient, and group therapy availability was minimal. During the monitoring visit, there were only six groups available, with a waiting list of 20 inmates over several months. There were approximately 40 inmates involved in group therapy. Space and lockdowns were the limiting factors in providing more groups.

During 2007, Folsom was on total or partial lockdown for 57 days. The longest total lockdown was for 13 days for emergency generator repairs and testing.

Referrals:

Folsom had an adequate procedure in place for collecting, assigning and recording mental health referrals. A QIT had been in place for over one year examining the timeliness of responses to referral requests. Emergent and urgent referrals were timely; however, routine referrals took an average of 9.1 days. Folsom responded to 2,151 referrals during the year 2007.

Medical Records/MHTS:

The MHTS worked well at Folsom over the monitoring period.  Data was current and matched UHRs.  Folsom utilized the MHTS for all designed purposes, including but not limited to ducating, noncompliance reports, and inmate histories/profiles.

Heat Plan:

Folsom demonstrated continued compliance with heat monitoring and logging practices.  Review of heat logs revealed appropriate documentation of temperatures, heat alert activation and cooling measures implemented during Stage II alerts.  The monitor did not find any Stage III alerts in the heat logs, and there were no heat-related documented illnesses.

## Service Area B

Service Area B includes PBSP, HDSP, and CCC.

## Pelican Bay State Prison (PBSP)
November 19, 2007 – November 20, 2007

Census:

PBSP's census declined by one percent during 2007 and stood at 3,491.  The institution's MHSDS population declined by eight percent during this period, due to a 13 percent decrease in the number of 3CMS inmates.  As of November, 2007, there were 481 MHSDS inmates, including 294 3CMS, 64 EOP, and 127 PSU inmates.  Seven inmates were in MHCBs.  There were 66 3CMS inmates in administrative segregation, seven in security housing unit (SHU), five in the transitional housing unit (THU) and eight in the behavioral modification unit (BMU).  The remaining 208 3CMS inmates were housed in traditional general population units.  All administrative segregation-status EOP inmates were housed in the PSU.

There were no lockdowns at PBSP during the reporting period.  Inmate participation in prison programs was "modified," or curtailed, for security reasons on a handful

of occasions throughout the reporting period. Modified programs, lasting three to ten days, reportedly delayed the delivery of mental health services in the affected areas of the prison. Communication and cooperation between custody and mental health staffs were reportedly improved.

Staffing:

PBSP's mental health administrative structure was expanded and reorganized during the reporting period. Positions for a chief of mental health, a supervising psychiatric social worker and three senior psychologists were added. One of 16 supervisory positions, that of a senior psychologist, remained vacant.

Enhanced recruitment efforts significantly improved staffing at PBSP during the monitoring period. The vacancy rate among mental health staff fell from 27 to 17 percent during 2007, and contractors reduced the functional vacancy rate to 14 percent. One of 7.5 allocated psychiatrist positions remained vacant. A psychiatric nurse practitioner provided additional psychiatric coverage as part of a local initiative. Among case managers, one of 18.5 staff psychologist positions and two of 11 psychiatric social worker positions were vacant. Three of 3.65 recreation therapist positions were filled, as were 21.5 of 25.5 psych tech positions. Among nursing staff assigned to mental health, positions for three senior psych techs, two supervising RNs, 21.4 of 25.5 psych techs, seven of 11.5 RNs, and one licensed vocational nurse (LVN) were filled. Positions for a health analyst, staff services analyst, standards and compliance coordinator, associate government program analyst, and correctional counselor (CC) II were also filled.

Quality Management:

PBSP was in the process of rebounding from a lull in quality assurance activities noted during the last reporting period. Staff was primarily focused on rejuvenation of various quality assurance committees, utilization of management information systems to collect and analyze performance data, and reorganization of the mental health department's administrative structure.

PBSP used a handful of management information systems, including the Madrid Patient Information Management System (MPIMS), MHTS and other home-grown tracking reports, to gather and present compliance data. It appeared unlikely that the institution would realize its long-term goal to utilize MPIMS for all data collection and analysis within the system's projected lifetime.

The governing body met twice, in July and September, during the last six months of 2007. Minutes indicated that the mental health department was represented at both meetings and that issues related to mental health services were appropriately addressed.

The health care quality management committee met weekly during the reporting period and kept minutes. The mental health department was well-represented in these meetings, though attendance overall was sub-optimal. Issues and activities related to mental health services were not generally presented or discussed at meetings. A better exchange of information between the two committees was needed.

The mental health quality management subcommittee met weekly during the reporting period and kept minutes. All required participants did not attend the meetings, although personnel from key program areas were routinely present. Meetings addressed a range of topics relevant to the delivery of mental health services, placing increased emphasis on

programmatic and quality of care issues during the second half of 2007.   However, remedial actions tended to focus on data collection and entry processes to the exclusion of interventions designed to address the systemic problems underlying poor compliance in some areas.

Several QITs were chartered during the reporting period, most of which were focused on a variety of medication management issues.  Other QIT topics included out-of-cell therapy activities in the PSU and submission of requests for inmates' prior medical records.

Peer review activities increased for psychiatrists, psychologists, psychiatric social workers and psych techs during the reporting period.  Increased emphasis on improving congruence between diagnoses and treatment plan interventions, while still in its nascent stages, was a promising step toward more sophisticated peer review.

Suicide Prevention:

In June, 2007, PBSP's SPC was reconfigured to conform to the Department's suicide prevention and response focused improvement team (SPR-FIT) model.  The newly formed SPR-FIT, which met monthly during the second half of 2007, was chaired by a senior psychologist and comprised of administrative and supervisory staff.  According to meeting minutes, the participation rate for "key" personnel ranged from 60 to 100 percent, indicating that attendance was sometimes problematic.  Custody participation was also found to be inadequate.

The SPR-FIT reviewed completed suicides, attempted suicides, suicidal gestures, incidents of self-mutilation and performance data, including the results of quarterly audits of five-day follow-up.  Information gleaned from these reviews was used to inform staff education and training initiatives, as well as to evaluate the effectiveness of local policies and interventions.

Clerical staff entered the results of completed suicide risk assessment checklists (SRACs) into the MHTS and produced inmate profiles, which accompanied all inmates

transferred from PBSP.

There was one completed suicide and three attempted suicides during the reporting period.

The ERRC was scheduled to meet monthly.  However, meetings were not held during two months of the reporting period.  The committee reviewed all incidents involving emergency responses and issued findings as to whether staff responded timely to the emergency in a manner that was appropriate and consistent with institutional policies and procedures.

Medication Management:

PBSP's revitalized quality assurance program completed several audits related to medication management.  Audited areas included medication non-compliance procedures, monitoring blood levels of mood stabilizers, completion of informed consent forms, weight monitoring of inmates prescribed atypical antipsychotic medications, consistency between prescribed medication and diagnosis, medication renewals, medication continuity upon arrival, and medication continuity following discharge from the MHCB unit and when moved to or from administrative segregation.  These audits generally showed good compliance, though sample sizes were often too small to obtain reliable results.  Future audits will reportedly utilize larger, more representative, samples.

An internal audit showed that the institution successfully implemented a reliable procedure for obtaining and documenting informed consent relevant to the use of psychotropic medications.  Another audit yielded an 85 percent compliance rate for timely obtaining blood levels relevant to the use of mood stabilizing medication.

Staff reported continued problems with the Keyhea process.  Mental health staff reported that two Keyhea petitions were lost for "technical reasons" during the reporting period.

Electronic MARs produced by MPIMS significantly improved medication management processes and the institution's ability to monitor performance.

Staff reported that pre-release planning was a routine part of case management. However, the institution had not developed uniform protocols or guidelines for pre-release planning and did not audit performance in this area.

Mental Health Assessments for Use in the Discipline of Sexual Misconduct Violations:

PBSP is one of three CDCR prisons with a treatment program for inmates diagnosed with Exhibitionism. At the time of the site visit, four inmates were enrolled in a psychotherapeutic group for indecent exposure.

Transfers:

PBSP appropriately utilized DMH resources, referring inmates to the acute care programs at CMF and ASH and to the intermediate care program at SVSP.

Access to acute care was, in most cases, timely. From June through October, 2007, PBSP generated 28 referrals to the acute care program at CMF; an average of five to six referrals a month. Of these referrals, 26 resulted in transfer to acute care, one was rejected and one was pending transfer at the time of site visit. The inmate rejected for acute care was subsequently placed in the PSU. DMH took three days or less to accept 21 of the 26 referrals that resulted in transfer. The delay between referral and acceptance was four to five days in three cases, eleven days in one instance and twelve days in another case. All cases were issued a bed number on the day of acceptance and all but two referred inmates were transferred within four days of acceptance. The delay between acceptance and transfer was five days in one case and 21 days in another.

Two inmates were referred to the acute care program at ASH. Both inmates were

accepted within one day and transferred within six days of referral.

Access to SVPP was slow. During the reporting period, five inmates were referred to SVPP, two of whom were transferred. Both of these inmates were accepted within five days of referral. Transfer took 28 days in one case and 50 days in the other. Two additional inmates had been accepted by SVPP, but were pending transfer at the time of the site visit. One inmate, referred to SVPP in August, 2007, remained at PBSP because he was deemed to be too medically unstable for transfer.

Access to MHCBs was adequate. The MHCB unit consisted of ten licensed mental health beds and an unlicensed observation room. The observation room, located in front of the nurses' station, was physically similar to licensed rooms and was used as mental health swing space when all ten MHCBs were occupied. According to staff, the observation room was used 24 times during the reporting period. All inmates placed in the observation room were discharged to a licensed MHCB within seven to 62 hours. Local policy required transfer of medical patients to a local hospital if more beds were needed to accommodate MHCB admissions.

From July through October, 2007, there were 136 MHCB admissions; an average of 34 admissions a month. Twenty percent, or 28 of 136, admissions lasted longer than ten days. One inmate was admitted four times, five inmates were admitted three times, 16 inmates were admitted twice and 85 inmates were admitted once, generating a multiple admission rate of eight percent during this four-month period.

During weekdays, the MHCB was staffed with a senior psychologist, psychiatrist, psychologist, psychiatric social worker and psych tech, all of whom worked full-time. During weekends, staffing consisted of a psychiatrist and psychiatric social worker, as well as an on-call

psychologist.

A psych tech provided out-of-cell activities to MHCB inmates during weekdays. A part-time recreation therapist was recently hired to provide recreational activities to MHCB inmates during weekends and was expected to start work in January 2008.

IDTT reviews in the MHCB unit were timely and routinely attended by all required disciplines, including a psychiatrist. Hard copies of treatment plans were produced for treating clinicians and were updated during IDTT reviews – an area of notable improvement. Staff was taking steps to resolve remaining problems related to incomplete IDTT documentation.

All psychiatrists received training regarding proper completion of SRACs. SRACs were routinely completed during the admission process; another area of improvement.

During the reporting period, 51 inmates transferred into PBSP's PSU program. The tracking data did not differentiate between PBSP inmates and inmates from other CDCR prisons. Consequently, access to PSU beds could not be evaluated.

Other Issues:

Administrative Segregation:

PBSP complied with most elements of the Department's suicide reduction program for administrative segregation. Prior to an inmate's placement in administrative segregation, nursing staff administered a screen which included questions about current and past suicidal behaviors and feelings. Psych techs stopped administering 31-question screens in mid-September, 2007 as a result of a misunderstanding regarding the way in which various responsibilities were shared among mental health staff assigned to administrative segregation units. This misunderstanding was subsequently resolved. Psych techs received remedial training

and, at the time of the site visit, all non-MHSDS inmates were screened within a day or two of their placement in administrative segregation.

Psych techs completed daily rounds in all administrative segregation units. Unit psych tech rounds were appropriately recorded in isolation logs and rounds on MHSDS inmates were documented and filed in the UHR.

Thirty-minute welfare checks were conducted on all inmates throughout their stays in administrative segregation. Performance data related to welfare checks showed a compliance rate of 97 percent in Unit A-1 and 89 percent in Unit A-2. The monitor's review of administrative segregation logs confirmed that completion of 30-minute welfare checks was routinely recorded and that documentation was reviewed daily by unit supervisors and monthly by facility captains.

Administrative segregation units were reportedly equipped with a sufficient number of exercise yards to afford all inmates access to ten hours of outdoor recreation per week. Many inmates in administrative segregation reportedly refused to go to yard.

Administrative Segregation EOP:

Administrative segregation-status EOP inmates were housed in the PSU. From June through October 2007, the average weekly number of group hours offered to PSU inmates ranged from 7.9 to 10.4. These figures did not include other out-of-cell therapeutic activities, such as case manager contacts and psychiatric appointments. The inmate refusal rate for group activities hovered at approximately 40 percent during the reporting period.

Administrative Segregation 3CMS:

Administrative segregation-status 3CMS inmates were housed in a new unit on Facility A that was constructed as part of the administrative segregation mental health project

under the <u>Madrid</u> case. At the time of the site visit, 66 3CMS inmates were housed in the new unit, which activated in March, 2007. Mental health staff reported they were pleased with the openness and functionality of the new space, and that custody support and escort resources were good.

The 3CMS administrative segregation program utilized a privilege level system whereby inmates earned access to more privileges by participating in mental health and custody programs, accepting a cellmate and avoiding behaviors that result in disciplinary infractions. Mental health services were consistent with Program Guide requirements, consisting of weekly case manager contacts, monthly psychiatric appointments and quarterly IDTT reviews. In addition, all 3CMS inmates in administrative segregation were offered one, two-hour group session per week. Offered groups included current events, anger management, life skills, substance abuse, art and music, blood sugar and health, and Alcoholics Anonymous twelve-step.

Institutional data showed consistent compliance with weekly case manager contacts and timely IDTT reviews in the 3CMS administrative segregation program and PSU. In both programs, IDTT meetings were held in rooms that were equipped with computers so that each inmate's electronic medical record was readily available.

<u>Mainline 3CMS</u>:

Approximately six percent of the mainline 3CMS population was enrolled in group therapy at any given time. At the time of site visit, PBSP offered two anger management groups to mainline 3CMS inmates; one on A yard and one on B yard. Adequate group space was located on both yards and custody cooperation was reported to be good. The groups enrolled eight to ten inmates, met weekly and consisted of twelve sessions. Attrition, related to conflicting job assignments and disinterest, among other things, usually reduced the number of

participants to seven by the end of twelve sessions. Two unexcused absences prompted consideration of an inmate's removal from the group.

Medical Records/MHTS:

Mental health administrators and line staff continued to work hard to fully implement MPIMS, an electronic medical record and data collection system designed to facilitate the provision and monitoring of medical and mental health services at PBSP. While the institution had yet to find solutions to many of the system's flaws, the development of uniform training protocols and increased accountability had produced a higher degree of competence and acceptance among mental health clinicians.

### High Desert State Prison (HDSP)
September 19, 2007 – September 21, 2007

Census:

HDSP's total inmate population was approximately 4,600, which included 612 RC inmates and 517 inmates in administrative segregation. The 3CMS population continued to grow at an annual rate of six percent. As of the end of September 2007, there were 817 3CMS inmates, including 580 in mainline, 81 in administrative segregation, four in the BMU and 152 in the RC. HDSP's MHSDS rated capacity, which did not include RC inmates, was raised from 649 to 699 in mid-2006. The current 3CMS caseload, excluding RC inmates, was 665, or 95 percent of the institution's rated MHSDS capacity.

There were 12 EOP inmates at HDSP pending transfer. This included eight in the RC, three in administrative segregation and one in the MHCB unit.

Staffing:

In January 2007, HDSP received a substantial mental health staffing package, which increased the institution's total staffing allocation by 48 percent. HDSP also received a

full-time sergeant and 2.8 FTE correctional officers dedicated to facilitating mental health staff access MHSDS inmates.

Among supervisory positions, all but a half-time senior psychologist position was filled. However, a full-time senior psychologist's work schedule will be reduced to half-time for about a year in order to address accumulated leave credit, resulting in one FTE functional vacancy among supervisors.

HDSP was unable to recruit psychiatrists, which had a deleterious impact on medication management as a whole, such as upon treatment continuity and the clinical content of IDTT meetings. All seven psychiatry positions remained vacant, rendering it necessary for the institution to rely on a combination of telemedicine and contract psychiatrists, which together nearly covered vacancies during most of the monitoring period. However, speculation regarding the fate of the state's emergency contract for psychiatry at the end of August 2007 reduced contract coverage to one full-time psychiatrist during September 2007.

Reliance on a revolving cadre of contract psychiatrists compromised treatment continuity, as inmates were often seen by as many as five different doctors during the monitoring period. Treatment continuity for those inmates assigned to telemedicine was better.

Nine of 24 allocated staff psychologist and psychiatric social worker positions were vacant and a full-time psychiatric social worker was on long-term medical leave. Contractors covered the equivalent of 2.8 FTE positions during most of the reporting period.

Despite a 30 percent functional vacancy rate among case managers and a growing 3CMS population, mainline caseloads remained manageable in size, averaging about 96. MHTS data confirmed consistent compliance with quarterly case manager contacts and annual IDTT reviews and RC services appeared to substantially comply with Program Guide requirements.

However, two full-time clinicians assigned to administrative segregation carried caseloads of 36 and 50 inmates, respectively. Faced with these numbers, the clinicians were unable to meet requirements for weekly out-of-cell contacts.

As for nursing staff, 68.22 of 77.35, or 88 percent, of allocated RN and LVN positions were filled. Four of six pharmacy positions were filled, with two candidates expected to start in the near future. Of four allocated lab positions, 2.5 were filled. In medical records, 23 of 27.6 allocated positions were filled.

HDSP continued to struggle to fill correctional officer positions, in large part due to its remote location. Staff reported 83 budgeted vacancies among correctional officers. Nonetheless, custody administrators reported that inmate programs were rarely modified or reduced as a result of custody staff shortages.

Quality Management:

The mental health quality management subcommittee generally met bi-weekly with attendance ranging from four to ten of the standing members. Meetings were not held during May and June 2007 due to "scheduling conflicts." Meeting minutes were maintained.

QITs were not an integral part of the quality management program at HDSP. In August 2007, a representative from central office's QMAT directed the subcommittee to charter QITs to address filing backlogs, the lack of out-of-cell contacts in administrative segregation and the prescription of non-formulary medications. It did not appear that these QITs had formed as of the end of September 2007.

A QIT tasked with assessing space needs in the RC was chartered in January 2007, met once and submitted recommendations to the mental health subcommittee. It did not appear that anything had been done to implement the QIT's recommendations. A QIT that was

chartered to review current procedures and policies and activities in administrative segregation issued a report in mid-September, 2007. The QIT consisted of two clinicians and did not include custody staff. Again, it was unclear what, if anything, would be done with the QIT's recommendations.

Peer review had not been established at HDSP.

Suicide Prevention:

The SPC, while meeting basic requirements for frequency and attendance, failed to fully realize its overarching mission to spearhead suicide prevention efforts at HDSP. Standing agenda items included an accounting of completed and attempted suicides, a review of compliance with clinical follow-up upon discharge from the MHCB, and review of data pertaining to MHCB admissions, DOT orders and MHSDS inmates in administrative segregation. These compiled data were presented each month, but did not appear to inform any meaningful discussion or policy revision related to suicide prevention. Similarly, other matters brought to the fore, such as noncompliance with DOT protocols, failed to prompt action or follow-up of any kind. Most concerning was the committee's failure to discuss or address circumstances and CAPs associated with completed suicides, of which there were four during 2007. The SPC also did not routinely track instances of hoarding, cheeking, trafficking or overdose, and administration of DOT medications had not been audited during 2007.

It appeared that HDSP had achieved substantial compliance with five-day follow-up after discharge from the MHCB. However, the monitor's attempt to confirm compliance was foiled by missing documentation in the UHR resulting from a substantial filing backlog.

The results of SRACs were entered into the MHTS and presented on the last page of an MHTS report called an "inmate profile." Procedures were in place to ensure that inmate

profiles accompanied all inmates transferred from HDSP. Inmate profiles were not used as part of the screening process for administrative segregation.

The institution's ERRC met nearly monthly during the reporting period and maintained minutes. Meetings were usually attended by four to six individuals, including the chief medical officer, nursing staff and a sergeant or associate warden. In most reviewed cases, the committee found that response times were "good." However, a handful of cases noted slow transport to the triage and treatment area (TTA) of the CTC, delayed notification of an ambulance, slow recognition of significant symptoms, and failure to immediately initiate medical treatment. Documentation deficiencies involving TTA staff, physicians-on-call, correctional officers and transport staff were noted in a large number of the incident reports reviewed by the committee.

Incident reports reviewed by the monitor also highlighted several deficiencies. Documentation was poor in that key times were not noted and responding medical personnel did not submit staff reports. In some cases, custody staff failed to initiate life-saving measures and/or failed to properly monitor an inmate while awaiting the arrival of medical personnel. In other cases, security protocols appeared to have delayed the initiation of life-saving measures.

Medication Management:

Nursing audits related to medication management were rendered unreliable by small sample sizes and missing paperwork in medical records. Believing that the nursing audits underreported compliance, mental health staff conducted small, independent audits in discrete areas of medication management, which tended to produce higher compliance rates. Mental health staff intended to work more closely with nursing staff to improve medication audits.

43

Other areas, including distribution of parole medications and monitoring of mood-stabilizer drugs, needed to be incorporated into auditing efforts.

Anecdotal information suggested that the institution's inability to recruit and retain psychiatrists continued to compromise nearly every aspect of medication management. Staff reported significant problems with medication continuity and the management of medication noncompliance. For example, it was not uncommon for RC inmates to miss medication for as much as a week, and continuity related to inter-facility moves, particularly when inmates were discharged from the CTC, was described as problematic. Medication renewal procedures were also reportedly unreliable.

Psychiatrists ordered DOT medications more frequently during 2007 and some medications, including Seroquel and Wellbutrin, were routinely crushed. In addition, some DOT orders were prompted by an inmate's history of medication noncompliance or suicidal behavior.

At the time of the site visit, there was one inmate at HDSP on a Keyhea order and two inmates for whom Keyhea petitions had been initiated. Both of these latter inmates were housed in the CTC pending transfer to DMH. Five inmates were issued involuntary medications during 2007, two of whom were determined by staff to meet Keyhea criteria. In both cases, staff stated that conflict between CDCR's office of legal affairs and the office of administrative hearings thwarted the institution's efforts to obtain a Keyhea order. Both of these inmates were assessed by the Coleman expert during the monitoring visit and found to be clinically improved and no longer in need of involuntary medications.

The pharmacy produced a list of 36 orders for HS psychotropic medications.

A TCMP social worker visited HDSP on a regular basis. However, the social worker often had difficulty arranging face-to-face interviews with paroling inmates due to

44

ducating problems related to lockdowns, modified programs and inmate movement/mingling restrictions.

Mental Health Assessments for Use in the Discipline of Sexual Misconduct Violations:

During the reporting period, HDSP issued 62 RVRs for indecent exposure involving 30 non-MHSDS inmates, 29 3CMS inmates and three EOP inmates. All of these cases were referred to mental health for completion of a screen and an IDTT review. Most, or 51 of 62, screens were completed within 72 hours of the incident. One case was referred for further evaluation which resulted in a diagnosis of "rule out Exhibitionism." This inmate, housed in administrative segregation since February 2007, was not offered specialized treatment for Exhibitionism. HDSP staff mistakenly believed that the CDCR's centralized treatment programs for Exhibitionism were "on hold."

Transfers:

Access to DMH acute care was slow. HDSP staff attributed delays to a growing waiting list and the low priority assigned to referrals involving non-suicidal inmates. During this reporting period, HDSP referred four inmates to DMH acute care: two inmates were transferred in ten and 38 days, respectively; one referral was rescinded; and one inmate had been awaiting transfer for 51 days. This latter inmate, while acutely psychotic, was not suicidal and, therefore, was considered low priority for acute care.

One inmate was referred to SVPP during the monitoring period and had been awaiting transfer for 29 days at the time of the site visit. This inmate was improving slowly and appeared to be treatable within an EOP environment.

The CTC was comprised of 32 beds, including twelve MHCBs and two mental observation cells. Staff reported that two to four MHCBs were typically occupied by medical

patients and both mental observation cells were occupied by long-term, chronic medical patients. The six to eight MHCBs available to mental health inmates were usually filled. Staff reported that the diminished MHCB capacity had not, to date, necessitated the use of temporary holding cells. The number of admissions from other CDCR prisons, which generally comprised about half of all admissions, had not dropped during the monitoring period.

During this reporting period, there were 252 MHCB admissions, or an average of 28 a month. The average length of stay was 5.9 days, with ten percent of admissions lasting longer than ten days. Only five inmates had been admitted to the MHCB three or more times during the preceding six months.

Internal audits continued to find that most aspects of the MHCB program complied with Program Guide requirements. The compliance rate for daily psychiatric rounds hovered around 70 percent. Early on in the monitoring period, staff failed to routinely complete SRACs upon admission to and discharge from the MHCB, though compliance notably improved during recent months.

The monitor's expert observed an IDTT meeting in the MHCB unit, which was well-conducted and compliant with Program Guide requirements. C-files and UHRs were available and consideration of higher levels of care was evident.

Mental health and custody staff assigned to the MHCB were unfamiliar with a local operating procedure which required staff to review a newly admitted inmate's medical, mental health and custodial eligibility to participate in out-of-cell activities, including outdoor yard. As a result, inmates in the MHCB unit for long periods of time, such as those waiting for DMH beds, languished in their cells. A newly hired RT was assigned to the CTC in July 2007 and the warden indicated that compliance with the local operating procedure would be restored.

HDSP continued to struggle to transfer MHSDS inmates from the RC within mandated timeframes.  There were 152 3CMS in the RC, a quarter, or 35, of whom were beyond the 90-day transfer deadline; many exceeding the deadline by several weeks.  Transfer delays were largely attributed to a system-wide lack of beds for inmates with complicated case factors (e.g., SNY, medical conditions, physical disabilities, developmentally disabled) and the institution's failure to timely produce documentation of medical clearance.

There were eight EOP inmates in the RC, two of whom had been waiting longer than 60 days.  Forty EOP inmates were transferred from HDSP during the reporting period, about 40 percent of whom waited longer than 60 days.  Outliers included stays of 182 days, 148 days, 139 days and 120 days.  Most of the delayed transfers were attributed to a system-wide lack of certain kinds of beds (e.g., Level IV EOP SNY).

Other Issues:

RC:

The RC was staffed with one half-time and three full-time clinicians.  Additional coverage was provided by a "rover" clinician.  Sound partitions were set up on dayroom floors and were used for one-on-one clinical interviews.  While the newly upgraded partitions afforded adequate sound privacy, clinicians and inmates complained about the lack of visual privacy.  Space recommendations issued by a QIT in January 2007 had not been implemented.  The institution did not have long-term plans to identify or construct more confidential program space in the RC.

Six months prior to the site visit, a clinician was assigned to provide enhanced services to EOP inmates in the RC.  EOP inmates in the RC were generally congregated in one building.  EOP inmates were timely screened, evaluated and reviewed by an initial IDTT.

Thereafter, each EOP inmate was seen daily by the assigned case manager and reviewed monthly by an IDTT.

Following a brief orientation period, EOP inmates were afforded access to outdoor yard approximately six hours a week.  EOP inmates also had access to dayroom and other routine privileges, such as showers.  The pre-parole planning component of the EOP RC program had yet to be implemented.  Paroling EOP inmates were reportedly reviewed by TCMP social workers prior to release.  The current population of EOP inmates was unable to mingle due to security concerns, which precluded group therapy.

RC staff reported spending an inordinate amount of time completing court-ordered mental health evaluations for pre-sentenced inmates, so called "Z cases."  RC staff completed ten to twenty "Z case" evaluations per month, each taking about five hours to prepare.

Administrative Segregation:

Following a staff assault in February 2007, the number of inmates in administrative segregation tripled to 517 as custody staff intensified efforts to address gang-related activities and violence.  The number of 3CMS inmates in administrative segregation grew by 27 percent during this period.  As of the end of September 2007, half of the 3CMS inmates in administrative segregation had been there longer than 90 days.

Two case managers were assigned to administrative segregation and carried caseloads of 36 and 50 inmates, respectively.  Excessive caseloads in administrative segregation necessitated cell front contacts, which, during some periods, represented 90 percent of all case manager contacts.

Many components of the CDCR's suicide reduction plan had been implemented.  Newly arrived non-MHSDS inmates were screened within 72 hours of placement and daily

psych tech rounds routinely occurred.  New intake inmates were identified and received 30-minute welfare checks during their first 21 days in administrative segregation.  All inmates were offered six to ten hours of outdoor yard a week.  Custody staff participated in monthly medical emergency response training, and a "bad news" question was added to the standard bus screening form and was part of the receive and release screening process.

Other elements of the suicide reduction plan were pending.  Welfare checks were not consistently staggered.  Identified intake cells had not received new beds or doors and were not used to house new arrivals to administrative segregation.  Work to retrofit cells to accommodate appliances was ongoing.  The nursing pre-screen for suicidal behavior had yet to be implemented, and the inmate history section of the inmate profile was not used during screening.

Treatment Plans:

Internal audits, completed from November 2006 through May 2007, found that compliance rates varied from 73 to 92 percent for timely completion of initial assessments and from 58 percent to 92 percent for completion of initial treatment plans and IDTT reviews within 14 working days.  Psychiatric participation in IDTT meetings, except for those held in the CTC, was rare.  Staff believed that the lower compliance rates were largely attributable to substantial filing backlogs, which often rendered UHR-based audits inconclusive due to missing paperwork.  Staff also acknowledged that the institution's adoption of CDCR's new mental health forms in February 2007 had temporarily reduced compliance, as staff gained familiarity with the longer mental health assessment procedure.

The number of group sessions completed per month dropped from 145 in November 2006 to just nine in September 2007.  Similarly, the number of inmate participants

declined from 43 in November 2006 to 18 in September 2007.  Staff attributed this precipitous

decline in group activity to lockdowns, modified programs and more stringent movement and

mingling restrictions imposed on the inmate population following an inmate assault on staff in

February 2007.

Medical Records/MHTS:

A substantial filing backlog, measuring some eight to nine feet, rendered UHR

audits meaningless and often left contract clinicians in the difficult position of evaluating

unfamiliar inmates without the guidance of the most current orders and progress notes.  Medical

records staff collected UHRs by 2:30 p.m., leaving clinicians with the option to forego afternoon

appointments or to see inmates without a UHR.  In order to prolong daily access to UHRs and,

thereby, extend the work day, HDSP was in the process of establishing third watch (3:00 p.m.-

11:00 p.m.) positions in medical records.

MHTS data indicated that response to referrals varied from month to month

during the reporting period, with twelve to 34 percent of received referrals failing to generate a

response within five working days.  The institution reported that mental health staff responded to

urgent referrals within 72 hours and emergency referrals within 24 hours.  However, referrals

designated as urgent and emergency were not captured by the provided MHTS data.

Behavior Modification Unit:

HDSP's BMU did not function properly in that a significant proportion of the

inmates placed in the unit refused to cooperate with program requirements and, consequently,

languished for months at the first privilege level with no hope of being released from the unit.

The BMU was comprised of 13 cells and enrolled 16 inmates as of the end of

September 2007.  The BMU housed four 3CMS inmates with arrival dates of 8/4/07 (45 days),