1/30/07 (231 days), 10/10/06 (343 days) and 5/30/06 (476 days), none of whom had advanced beyond the first privilege stage as a result of their refusal to accept a cellmate and/or participate in BMU programming.  The monitor interviewed two 3CMS inmates in the BMU, both of whom reported vague safety concerns and appeared to have made rational decisions to forego certain privileges in order to protect their single-cell status.  The interviewed inmates, while clearly disgruntled, appeared emotionally stable, rational and lucid.  Another 3CMS inmate in the BMU, there since May 2006, was admitted to the CTC during the monitor's visit after attempting suicide.

The case manager assigned to the BMU provided 3CMS services and attended all monthly ICC hearings.

## California Correctional Center (CCC)
Paper Review

Census:

The total number of inmates in the institution, including camps, was 6,095.  There were 195 inmates in administrative segregation.  There was one MHSDS inmate at CCC; a 3CMS inmate in general population.

Staffing:

The institution was richly staffed for its small MHSDS population and it did not have difficulty filling its positions with permanent staff.  Staff reported that the administration had been forward-looking about identifying space for newly allocated mental health positions.

Suicide Prevention:

During the reporting period, the SPC met monthly, with the exception of one month.  Its members varied, but represented an appropriate, multidisciplinary group.  Minutes

indicated that the committee regularly addressed general mental health topics and had reviewed statewide suicide statistics. Other than that, the committee did not appear to consider conditions or contributors to suicide risk or devise strategies for improving the management of suicide risk.

A log provided by the institution indicated that inmates in need of monitoring following discharge from the OHU were properly identified and consistently received five-day clinical follow-up. Custody checks were appropriately completed in conjunction with mental health oversight and direction regarding the appropriate frequency and duration.

Staff reported that nurses and psych techs were recently trained to complete the new pre-screen on all inmates placed in administrative segregation, which included questions regarding past and present suicidal feelings and behaviors. It was too soon to assess with the new screening requirement.

The institution's review of nearly 1,000 administrative segregation placements yielded a 97 percent compliance rate for the completion of 31-question screens. Screens not completed within 72 hours were one to two days late, with one outlier of nine days. Refused screens were rare and prompted case manager follow-up.

SRACs were reportedly completed when referrals referenced and inmates reported depressive symptoms or intended self-harm. Other activities, including telemedicine appointments, referral to MHCB and OHU, discharge from OHU and return from MHCB, and initiation of and discharge from five-day clinical follow-up, triggered automatic completion of SRAs. An OHU admission log confirmed that SRACs were routinely completed upon admission to and discharge from the OHU.

Thirty-minute welfare checks were initiated for new arrival inmates in administrative segregation. Provided documentation recorded rare misses of an hour or two, as

well as one isolated occasion in which an entire work shift was missed. Welfare checks were not completed at staggered intervals, as required.

CCC provided documentation of medical emergency drills, which were completed monthly in administrative segregation on all work shifts. Only one of the drill scenarios involved an attempted suicide and none required staff to simulate CPR. Staff had previously demonstrated good use of inmate profiles, compliance with required CPR training schedules, and adequate availability and inventorying of suicide response equipment in housing units.

Monthly reviews showed that daily psych tech rounds in administrative segregation were missed on eight days during the ten-month monitoring period. This was fewer missed days than was reported during preceding reporting periods.

Transfers:

CCC generally housed very few MHSDS inmates and routinely ensured their rapid endorsement and transfer. During the ten-month reporting period, ten 3CMS inmates were identified and transferred, all within 34 days. The sole MHSDS inmate on site at the time of reporting, a 3CMS inmate in general population, had been awaiting transfer for less than 90 days.

During the reporting period, CCC received three 3CMS inmates and one EOP inmate who were inappropriately transferred from other CDCR prisons. The EOP inmate was transported to an MHCB within two days of arrival and did not return to CCC. The 3CMS inmates were transferred from CCC within a month or so of arrival.

Transfers to the MHCB at HDSP occurred within 24 hours of referral. Given this direct and rapid access to an MHCB unit, CCC generated very few psychiatric OHU admissions. During 2007, there were eight OHU admissions, six of which were discharged within 72 hours.

One inmate was observed in the OHU for eight days and the length of stay of another was unclear.  CCC did not refer inmates to DMH.

Other Issues:

        Referrals:

        Average response times for routine mental health referrals fell within the five-working-day standard.

        Staff prepared an excellent local operating procedure regarding the Program Guide changes.

## **Service Area C**

Service Area C includes MCSP and SCC.

## **Mule Creek State Prison (MCSP)**
### November 28, 2007 – November 30, 2007

Census:

        MCSP's inmate population stood at 3,660, about eight percent fewer inmates than were reported in January 2007.  Nonetheless, chronic overcrowding required the operation of 1,000 "E Beds" (i.e., temporary bunk beds located on dayroom floors) and the conversion of two gymnasiums to triple-bunked dorms.  There were 1,668 MHSDS inmates, which included 1,101 3CMS inmates, 556 EOP inmates, five MHCB inmates and six OHU inmates.

        MCSP's 3CMS population had decreased by about twelve percent since January 2007.  Of the 1,101 3CMS inmates, 56, or five percent, were housed in administrative segregation.  Nearly one third of the 3CMS population was housed in E Beds and converted gyms, and over two-thirds of the 3CMS population was designated medical necessity.

        Due to full activation of the Level III and Level IV EOP program expansions, MCSP's EOP population more than doubled during the monitoring period. Both Level III and

Level IV programs were closed to new intakes one week prior to the monitoring visit.  Of the 556 EOP inmates, 49 (nine percent) were in administrative segregation, 139 (25 percent) were in the Level IV program and 365 (66 percent) were in the Level III program.  EOP inmates were not assigned to gyms or E beds.

Staffing:

Mental health staffing at MCSP substantially improved during the monitoring period.  Total MHSDS allocations increased by 48 percent, climbing from 80.5 FTE positions to 119.02 FTE positions.  The overall vacancy rate fell from 27 percent in January 2007 to 18 percent at the end of November 2007.  Contractors covered 86 percent of the remaining vacancies.

Two of 13 supervisory positions were functionally vacant, with one senior psychiatrist position unfilled and a senior psychologist on long-term military leave. Improvement was most notable among psychiatrists.  Two of 10.75 positions were vacant, with contractors covering the equivalent of 5.6 FTE positions during the reporting period.  Forty percent of case manager positions remained vacant, with 19.5 of 32.5 positions filled.  Contractors covered 96 percent of the vacancies during the preceding five months.  Only two of 26 psych tech positions remained vacant, with two recently hired candidates expected to start work during December 2007.  All RT and RN positions were filled, as were the health program specialist and medical secretary positions.  One of 13 clerical positions remained vacant, with an identified candidate pending hire.

Despite substantial improvement in the overall staffing picture, recent increases in the EOP population at MCSP had pushed average case manager caseloads to nearly 40 inmates. Managers and line staff complained that a 1:40 clinician-to-inmate ratio was excessive for

EOP/SNY inmates, who were considered by staff to be generally more anxious and fragile than their non-SNY counterparts. EOP clinicians were also burdened by the extra work associated with evaluating high numbers of new admissions to the EOP programs.

In the EOP administrative segregation hub, case managers treated both EOP and 3CMS inmates housed in the building and carried caseloads of 13 to 19 inmates. It could not be determined from review of the provided information if MCSP complied with the mandated one-to-nine clinician-to-inmate ratio.

Caseloads within the mainline 3CMS program ranged from 64 for a half-time clinician to 160 for a full-time clinician. In administrative segregation, a full-time clinician covered 30 3CMS inmates.

All pharmacy positions, including a Pharmacist I, five Pharmacist IIs and 10.5 Pharmacy Techs, were filled. Nearly all allocated nursing positions, including two senior RN IIIs, 4.84 senior RN IIs, 24.79 RNs and 25 LVNs, were filled. Only a .60 LVN position remained vacant. Seven of eight medical records positions were filled, with one medical transcriber position remaining vacant. One of two laboratory positions was filled; the other was covered by a contractor.

Quality Management:

MCSP's mental health quality management subcommittee did not consistently meet on a monthly basis during the monitoring period and meeting attendance was poor. Minutes indicated that only half, and sometimes fewer, of the required attendees participated in most meetings and that custody staff rarely attended meetings. The subcommittee focused largely on audits related to CAP items, but ignored significant problems such as poor UHR organization, excessive case manager workloads, the questionable clinical efficacy of large

group therapy sessions and the widely purported rising acuity among 3CMS and EOP inmates at MCSP.

MCSP continued to audit most CAP items, though sample sizes were frequently too small to produce reliable results. Peer review was conducted for all mental health disciplines, but, again, failed to focus on critical areas, such as the quality of treatment planning and the appropriate completion of SRAs.

Suicide Prevention:

SPC meetings, like the quality assurance subcommittee meetings, were not held monthly and were poorly attended, most notably by custody staff.

There were no completed suicides at MCSP since the last monitoring visit. Meeting minutes indicated that the SPC reviewed six attempted suicides during the first ten months of 2007.

Internal audits found that compliance rates for five-day follow-up contacts and completion of SRACs fell below 90 percent during the reporting period. Continued noncompliance with five-day follow-up was attributed to breakdowns of coverage during weekends and scheduled days off. UHRs and data reviewed by the monitor's expert included a few cases in which a discharged inmate was not seen at all upon his return to housing.

The institution did not track five-day follow-up contacts for inmates discharged from the MHOHU or observation cells in administrative segregation. Staff reported, and a small number of reviewed UHRs confirmed, that a significant number of the inmates discharged from these alternative settings were not monitored for five consecutive days upon their return to housing.

Medication Management:

   Staff identified three factors that had recently substantially impacted medication management.  First, receipt of additional nursing resources had, thus far, been a mixed blessing. On the one hand, increased nursing allocations and the near elimination of vacancies had provided the institution with the personnel needed to manage the daily administration distribution of 1,200-1,400 medication orders.  However, the large influx of inexperienced RNs and LVNs had presented myriad supervisory challenges and errors in all areas of medication management had increased during the monitoring period.  A concomitant increase in nursing supervisor allocations was welcomed and was expected to help the institution navigate the challenges associated with employing large numbers of inexperienced nursing staff.

   Pharmacy operations were transformed by a 100 percent increase in staffing and installation of Maxor National Pharmacy Services Corporation's (Maxor's) new management information system.  These notable improvements also presented new challenges.  Increased staffing, while vital to the operation of the pharmacy, had increased the stress and inefficiencies related to operating from an exceedingly cramped office.  Similarly, the new management information system had introduced safeguards that ensured sounder practice and better accountability, but often slowed distribution of medications as staff was forced to handle large numbers of medication orders without the use of initiatives, such as packing medications to be distributed the following day.  In addition, implementation of the new system was in "Stage I," during which doctors were not permitted to access the prescription database – a source of frustration among interviewed psychiatrists.

   Third, staff had developed an omnibus audit tool for medication management that combined elements of separate <u>Coleman</u> and <u>Plata</u> instruments, and had devised a new audit

protocol that was designed to ensure adequate review of all components of medication management throughout the institution.

Medication continuity upon arrival improved during the monitoring period. An internal audit found that 88 percent of new arrivals received prescribed medications within 24 hours of their arrival. Continuity during intra-facility transfers worsened during the monitoring period, with audits yielding a compliance rate of 75 percent. Declining performance in this area was attributed to breakdowns in established transfer protocols.

MCSP continued to struggle with medication noncompliance protocols. Audits found that MARs appropriately recorded no shows and refusals 84 percent of the time. However, recorded noncompliance prompted referral to mental health only 59 percent of the time and less than half of referrals submitted for noncompliance generated contact within seven calendar days.

Inmates and staff reported that inmates routinely stood in outdoor pill lines for 45 to 60 minutes to receive prescribed medications. In contrast to these anecdotal reports, audits from the third quarter of 2007 found that observed inmates waited on line, on average, less than seven minutes.

Nursing staff reviewed 390 UHRs during the first three quarters of 2007, 95 percent of which contained completed and signed informed consent forms for currently prescribed medications.

Audits found that DOT protocols were followed greater than 90 percent of the time. However, enhanced DOT did not occur as indicated in the administrative segregation.

Keyhea processes appeared to work well. During the monitoring period, MCSP initiated nine Keyhea petitions and renewed 19 petitions. One Keyhea petition was denied. In

59

nineteen cases in which involuntary medications were initiated, the inmate was transferred from MCSP prior to the hearing.  There were 26 inmates with active Keyhea orders at the time of the monitor's visit.  Staff reported that no Keyhea petitions were withdrawn during the monitoring period on advice of CDCR office of legal affairs.

There were 354 MHSDS inmates at MCSP receiving psychotropic medications administered at HS during the monitor's visit.  All HS medications were administered indoors and audits found that HS prescriptions were consistently administered at or after 8:00 p.m. Accordingly, this CAP issue was recommended for resolution.

HS medications were appropriately prescribed and properly administered.

Nursing audits found continued compliance with distribution of parole medications and maintenance of current informed consent forms.

Mental Health Assessments for Use in the Discipline of Sexual Misconduct Violations:

MCSP's compliance with sexual misconduct protocols had improved since the last review, though more progress was needed.  Information provided by the institution indicated that not all incidents involving sexually inappropriate behavior were referred to mental health for completion of sexual misconduct screens, nor were screens completed within 72 hours of the incident.  Evaluations, based on a review of the UHR and C-file and an interview with the inmate, were thorough.  It appeared that all screened cases were reviewed by an IDTT.

During the monitoring period, four inmates were diagnosed with Exhibitionism and recommended for treatment related to their sexually inappropriate behavior.  Three of four inmates reportedly refused such treatment and were not endorsed for transfer to one of CDCR's treatment programs.  The remaining inmate was pending transfer to the treatment program at CSP/Sac.

Transfers:

        MCSP's computer-generated referral log was poorly maintained, which rendered it impossible to fully evaluate access to DMH programs.  It appeared that 35 inmates were referred to DMH acute and intermediate programs during the first ten months of 2007.  None of the relevant data points were recorded in eleven cases, and half of the data points were missing for another 19 referrals.  The number of days between referral and transfer could not be determined in 13 cases.  The DMH program to which the inmate was referred was not identified in seven cases.

        Based on information gleaned from the incomplete log, it appeared that six referrals were rescinded by MCSP.  At least 23 referrals were directed to the acute  program at CMF.  The delay between referral and transfer ranged from seven to 131 days, with most taking two to three weeks.  At least one inmate was referred to ASH, though no transfer information was recorded in this case.  At least three inmates were referred to units P-2 and P-3 at CMF.  The transfer date was not recorded in one case; transfer delays were 100 days and 102 days in the other two cases.

        The inadequacy of MCSP's eight-bed MHCB unit, a long-standing and serious deficiency, grew more dire during the monitoring period as the institution's EOP programs expanded to full capacity.  Two of eight MHCBs were occupied by medical patients during the monitor's visit, leaving six crisis beds for 1,668 MHSDS inmates.

        The average number of monthly MHCB admissions and length of stay declined during the monitoring period.  During the first nine months of 2007 there were 219 MHCB admissions, an average of 24 a month – 17 percent fewer than were reported during the last six

months of 2006.  About a fifth, or 47, of MHCB admissions lasted longer than ten days and six

percent, or 14, of the admissions lasted longer than 20 days.

   Faced with a chronic shortage of crisis beds, MCSP operated a six-bed MHOHU

and used five cells in administrative segregation to monitor inmates waiting for MHCBs.

Utilization of MHOHU beds increased by 28 percent during the monitoring period, although the

percentage of admissions that lasted longer than 72 hours declined from 32 percent during the

last six months of 2006 to 18 percent during first nine months of 2007.  During the first nine

months of 2007 there were 208 admissions to the MHOHU, an average of 23 admissions a

month.  Slightly less than a fifth, or 38, of the admissions lasted longer than 72 hours.

   Two full-time nurses provided seven-day coverage in the MHOHU during second

watch.  Psych techs were assigned to the MHOHU during the first and third watches seven days

a week.  A psychiatrist completed daily rounds in the MHOHU.  However, clinical interviews in

the MHOHU continued to occur cell-front, affording little to no auditory and visual privacy.

   Five cells in administrative segregation were used to monitor administrative

segregation-status inmates waiting for MHCBs.  The institution did not track the number or

duration of placements in these cells.  Inmates placed in the holding cells were reportedly

monitored by custody staff on a one-to-one basis until they were either admitted to an MHCB or

returned to their cell in administrative segregation.  Inmates placed in holding cells in

administrative segregation reportedly received daily clinical contacts, most of which occurred

cell-front.  Contacts routinely occurred without the inmate's UHR, as the medical records for

inmates retained in the observation cells were stored in the TTA of the CTC.

   All five observation cells were occupied during the monitoring visit.  Four of five

inmates were on suicide precautions with continuous one-to-one observation.  A sixth inmate

was on continuous one-to-one suicide watch in a nearby management cell. Nursing staff was usually assigned to provide monitoring related to suicidal behavior.

Other Issues:

Administrative Segregation:

During the monitor's visit, administrative segregation (Building C-12) held 41 3CMS inmates, 49 EOP inmates and 34 non-MHSDS inmates.  Case managers assigned to this building carried caseloads comprised of both 3CMS and EOP inmates.  Administrative segregation overflow (Building C-13) housed 15 3CMS inmates and 21 non-MHSDS inmates.  A single case manager covered all 3CMS inmates in Building C-13 and 15 of the 3CMS inmates in Building C-12; a combined caseload of 30 inmates.

Mental health treatment services in administrative segregation deteriorated during the reporting period, largely due to limited clinical supervision in the area.  In the absence of supervision, custody escorts were frequently redirected and, in one case, reassigned to perform duties for medical staff.  Mental health staff's access to office space declined and their relationship with custody staff reportedly suffered.

Group therapy space in administrative segregation, consisting of eight holding cells, continued to be woefully inadequate.  EOP inmates in administrative segregation were not offered ten activity hours a week and refusal rates for offered groups continued to be high.

Internal audits yielded a 95 percent compliance rate for completion of weekly case manager contacts with MHSDS inmates in administrative segregation.  Clinical contacts occurred in holding cells that afforded minimal sound privacy.

According to a log maintained by the institution, about half of the psychiatric referrals from administrative segregation failed to result in contact within five working days.

MCSP implemented the Department's suicide reduction plan for administrative segregation in October 2006.  There were 17 inmates in administrative segregation (Building C-12) on intake status, all of whom were identified by yellow placards on the cell door.  However, staff reported that thirty-minute welfare checks were completed on all inmates throughout their stays.  Documentation maintained by custody staff indicated that the welfare checks were not conducted at staggered intervals as required.

Psych techs screened all non-MHSDS inmates within 72 hours of their placement in administrative segregation.  Most inmates were screened in holding cells located in the administrative segregation unit.  The inmate profile, which included the results of past SRAs, was reviewed as part of the screening process.

Internal audits showed continued compliance with daily psych tech rounds.  Custody staff reportedly participated in monthly medical emergency response drills, though supporting documentation was not provided by the institution.

Inmates in administrative segregation did not have access to ten hours of yard a week.  Due to an inadequate number of walk-alone yards, inmates on walk-alone status had access to outdoor yard approximately six hours a week.  EOP inmates authorized to use the general population yard were offered approximately eight hours of yard a week.

Cells in administrative segregation and administrative segregation overflow were equipped with working outlets and, following the initial classification review, all inmates were permitted to have one appliance.

EOP:

MCSP's Level III EOP program, which expanded to include two buildings on B Yard, slightly exceeded its capacity with a census of 365 inmates during the monitoring visit.

Internal audits yielded 60 percent compliance rates for bi-weekly case manager contacts during the second and third quarters of 2007.  Noncompliance was attributed to the extra intake work for case managers associated with the program's rapid expansion, excessive case manager caseloads, inadequate clinical supervision and an overall lack of cooperation from custody officers.  Case manager contacts continued to occur in cubicle spaces on the day room floor, which afforded inadequate auditory and visual privacy.

EOP group sessions were held in a mental health building located on B Yard. Audit data presented by the institution indicated that about half of the EOP inmates on B Yard were offered ten or more therapeutic activity hours a week during the reporting period, while the other half was offered slightly less than ten hours a week.  Compliance appeared to be within reach.

A combined unit classification committee (UCC)/IDTT meeting observed by the monitor's expert was attended by all required disciplines and adequately addressed important and clinically necessary treatment issues.

MCSP's Level IV EOP program reached its capacity of 150 inmates shortly before the monitoring tour.  Internal audits covering the first three quarters of 2007 yielded 96 percent compliance with respect to the revised Program Guide requirement for completion of bi-weekly case manager contacts.

Group sessions were held in the new mental health building on A Yard, which opened in January 2007.  Audit data presented by the institution indicated that less than half (43 percent) of the EOP inmates on B Yard were offered ten or more therapeutic activity hours a week during the reporting period.  However, the average number of offered hours per week for

all inmates was reported to be 9.83, indicating that compliance with the ten-hour mark was within reach.

In both the Level III and Level IV EOP programs, structured therapeutic activities included group therapy, individual psychiatric and case manager contacts, recreation therapy and up to four hours of work or education a week. Jobs and educational classes were reportedly readily available to EOP inmates and recreation therapy, which often comprised a significant proportion of offered activities, appeared to be adequately structured and supervised. Groups were large, routinely approaching 20 participants, and often included inmates with widely variable levels of functioning – factors that presented challenges to clinicians and, sometimes, compromised the quality of the group.

3CMS:

MCSP's mainline 3CMS program continued to meet minimum Program Guide standards, but quality issues remained unresolved.

Case manager caseloads within the mainline 3CMS program ranged from 46 to 64 inmates for half-time clinicians and from 75 to 160 inmates for full-time clinicians. MHTS data, institutional audits and the monitor's UHR reviews indicated that quarterly case manager contacts regularly occurred. However, the quality of contacts reportedly ranged from excellent to quite poor and reviewed progress notes reflected this. Some progress notes were thorough and thoughtful, while others contained little to no information about the inmate's current presentation, symptoms, or progress relative to treatment goals. Finally, office space on Yards A and B offered limited sound privacy and several interviewed inmates reported being reluctant to discuss personal issues during meetings with their case managers. Office space on Yard C was described as adequate.

UHRs reviewed by the monitor documented frequent and appropriate psychiatric monitoring, as well as timely responses to referrals for psychiatric services. Medication orders were timely renewed.

Initial and annual IDTT reviews were timely completed. However, in two reviewed cases, it did not appear that the most recent IDTT meetings were attended by a psychiatrist and CC I. In addition, interviewed inmates described treatment team meetings as little more than perfunctory check-ins, usually lasting two to three minutes. Treatment plan documentation was poor. In four of eight reviewed cases, the current treatment plan was either missing from the UHR or incomplete. In other cases, the treatment plan was cursory in that it failed to discuss in any meaningful detail how identified target problems would be addressed.

More than two-thirds of MCSP's 3CMS population was designated medical necessity, and many of these inmates appeared to have carried this designation for several years. UHR reviews suggested that the treatment plan process was not used to identify treatment goals or propose treatment milestones that would permit one to measure progress or determine whether an inmate had resolved the issues that led to placement via medical necessity. Treatment generally consisted of unfocused and unrelated case manager contacts, sporadic assignments to various groups and largely meaningless annual treatment plan reviews.

Most interviewed inmates had, at some point during their incarceration at MCSP, participated in group therapy. The groups were described as helpful and well-run. However, the demand for group therapy was much larger than MCSP's capacity to provide group therapy, which resulted in lengthy wait lists for and slow access to groups.

Interviewed inmates reported, and many of the higher quality progress notes documented, the underlying stress, anxiety and frustration associated with inmate movement in and out of E Beds and triple-bunked dorms.

Inmates complained that custody officers used the threat of transfer to discourage them from filing written complaints against staff. For many inmates, the threat of transfer from the unique SNY environment at MCSP discouraged them from utilizing the inmate grievance process to document inmate complaints.

Referrals:

Provided tracking data indicated that mental health staff often failed to respond to routine referrals within five working days. An MHTS tracking report indicated that staff did not respond to 39 percent of submitted referrals within five working days. Staff took 15 days or longer to respond to 20 percent of submitted referrals. Noncompliance was attributed to the large volume of referrals (about 200 a month) and the delays inherent to routing, triaging and ducating.

Medical Records/MHTS:

UHR organization and availability notably declined during the monitoring period. In some cases, medical records were not "thinned" appropriately in that required paperwork was not maintained in the current volume of the UHR. In other cases, years of paperwork were stuffed into heavy UHRs held together with duct tape. Loose filing had recently improved and stood at an estimated 30 inches during the monitoring visit. However, paperwork was often misfiled. Slippage in this area was attributed to staff turnover in medical records. In addition, staffing allocations for the medical records department were not sufficiently increased to accommodate the substantial expansion of the institution's EOP programs. The institution's

audit of 15 UHRs found that paperwork associated with the completion of mental health evaluations for RVRs was not consistently filed in the medical record.

MCSP did not have a coordinated system for scheduling mental health, medical and dental appointments.  Consequently, it was not uncommon for inmates to be scheduled for two to three health appointments on the same day, in which case priority was given to medical ducats, followed by dental and mental health ducats.  Staff estimated that UHRs were available for 60 to 65 percent of scheduled EOP appointments and about 80 percent of 3CMS appointments.

Space:

Additional health care facility improvements and modifications became available during this monitoring period as a result of the Plata receiver's short term space project.

**Sierra Conservation Center (SCC)**
January 16, 2008

Census:

During January 2008, SCC's census was 6,025 inmates (including fire camps).  The caseload population was 631 inmates, or ten percent of the prison's population.  The mental health population included 18 EOP inmates and 613 3CMS inmates.  Thirty percent of the 156 inmates in administrative segregation were on the mental health caseload, including, 41 3CMS inmates and six EOP inmates.  There were seven inmates in the OHU during the monitoring visit.

Staffing:

Due to an outbreak of the Noro Virus at SCC, the monitor's visit was abbreviated and staffing figures for specific disciplines could not be obtained at the institution. Nevertheless, it was reported that the institution continued to have no vacancies and remained richly staffed insofar as inmate-to-clinician ratios.

Quality Management:

Quality management continued to work well at SCC. The quality management committee met regularly on a bi-weekly basis during the monitoring period, and meeting minutes were maintained.

Suicide Prevention:

The SPC met monthly during the monitoring period. There were continued problems with five-day follow-up completion. The SRAC was implemented in February 2007, and initial audits found full compliance.

Medication Management:

Newly arriving inmates continued to receive their medications without interruptions during this monitoring period, and previous problems with timely initial psychiatric contacts were resolved. All new arrivals were seen by the on-site psychiatrist, as opposed to via telemedicine, over 90 percent of the time during the monitoring period.

Medication continuity upon intra-institutional transfers remained at 90 percent compliance. It should be noted that SCC maintained this level of compliance while undergoing a complete yard changeover to a SNY.

Medication orders were renewed before expirations with 100 percent compliance, and pill line wait times were ameliorated and were no longer problematic due to additional windows running throughout the institution.

There was improvement in the presence of updated and signed consent forms in the UHRs, however, full compliance had not yet been achieved.

Orders for laboratory testing of blood levels of inmates on psychotropic medication continued to be made, drawn, and completed timely.

Administration of DOT medication was problematic over the monitoring period and medication hoarding was discovered in administrative segregation.

There were no inmates on Keyhea orders during the monitoring period.  Inmates were transferred to MCSP for initiation of the Keyhea process.  HS medication distribution occurred after 8:00 p.m. daily.

Medication was provided to paroling inmates without problem; however, SCC remained noncompliant for individualized parole discharge planning by mental health staff. SCC had not yet received the discharge planning psychiatric social worker position.  Further, the identification of paroling inmates by TCMP remained problematic, largely due to an inadequate tracking system.  As a result, a large number of inmates who paroled during the monitoring period were not seen by the TCMP social worker prior to their release.

Medication noncompliance and follow-up was tracked and audits revealed compliance.  MAR documentation remained problematic, particularly because the monitor observed a large number of blanks in MARs entries.

Transfers:

        SCC referred one inmate to DMH during the monitoring period.  There was no information provided regarding referral, acceptance or transfer date, nor to which program the inmate was referred.

        Referrals to MHCBs were sluggish during this monitoring period.  Of the 141 inmates admitted to the OHU for psychiatric reasons, only 28 inmates (20 percent) were referred to an MHCB.  Only 17 inmates ultimately transferred, and the remaining 11 inmates stabilized while awaiting acceptance.  On average, inmates remained in the OHU for four days prior to transfer to an MHCB.

        Operationally, SCC's OHU improved during the monitoring period, however, lengths of stay and documentation remained problematic.  There were 141 inmates admitted to the OHU with an average length of stay of four days.  Delays in discharge and/or transfer were largely attributed to the lack of MHCB beds and housing of EOP inmates who could not function on the general population yard.  Housing of EOP inmates in OHU was decided through the IDTT process pursuant to the Program Guide.  SCC utilized the expedited transfer process to move all EOP inmates from the OHU; however, documentation of transfers was poor.

        On-site clinical coverage improved during the monitoring period and was provided seven days per week by psychology, and six days per week by psychiatry. Additionally, 24-hour on-call psychiatry coverage was provided.

        General population EOP inmates transferred swiftly during the monitoring period. SCC endorsed 36 inmates for transfer to institutions with EOP units.  All endorsements were completed within two weeks of referral.  Ninety-five percent of general population EOP inmates

transferred within 60 days.  EOP inmates received case manager contacts at least weekly while awaiting transfer.

Administrative segregation EOP inmate transfers slowed significantly during the monitoring period.  Only 13 inmates, or 42 percent, of EOP administrative segregation inmates transferred to an EOP hub institution within 30 days.  Delays were attributed to availability of beds system-wide.

Other Issues:

Administrative Segregation:

Administrative segregation housed 47 3CMS and six EOP inmates at the time of the monitor's visit.  Mental health staffing included one full time psychiatrist, two psychologists, and two psych techs.

Daily psych tech rounds remained compliant, and confidential case manager contacts continued to exceed the required frequency.

A variety of therapeutic groups were provided by psych techs in administrative segregation.  Group sessions were conducted in a group room with six therapeutic modules positioned in a semi-circle to ensure privacy and confidentiality.

Timeliness of IDTT meetings remained compliant; however, regular attendance by psychiatrists remained noncompliant.  CC attendance improved during the monitoring period.

Pre-placement screening was implemented, however, compliance was not confirmed.  Inmate suicide profiles were available to administrative segregation staff within the first 24 hours of inmate placement in the unit.

Twelve cells were retrofitted as intake cells during the monitoring period.  Thirty-minute welfare checks occurred with regular monitoring of the process by the unit lieutenant.

All administrative segregation inmates were offered 10.5 hours of yard time per week, and SCC had not implemented the allowance of appliances due to physical plant issues.

The general population 3CMS program at SCC continued to run well. During the monitoring period, there was a significant increase in the number of therapeutic groups provided to 3CMS inmates. Approximately 63 active groups were provided in two yards. Over 50 percent of the 3CMS population at SCC participated in various groups including Lifer group, Veteran's group, Transition group, NA, AA, Adult Children of Alcoholics group, Recovery group, PTSD group, Parenting classes, Depression, Self-esteem group, Anger Management, Sports group, and Personal Transformation group. There was no waiting list for most of the groups, and some of the groups were open to non-MHSDS general population inmates. Clinical documentation of inmate participation, and response to group therapy in the UHR was not consistent. SCC was only partially compliant with group therapy requirements.

SCC was compliant with initial and annual updates of treatment plans, and the monitor's expert found that interventions were consistent with the diagnosis.

Clinical case manager contacts were compliant.

Problems with processing of mental health ducats during institutional lockdowns were resolved.

Referrals:

SCC's response to self-referrals remained partially compliant. Response to referrals took over five days throughout the monitoring period.

Medical Records/ MHTS:

Medical records improved during the monitoring period. Mental health filing was completed by the mental health department office assistants and was two weeks behind. Access to records significantly improved as well.

There were no problems reported with MHTS. Clerical staff reported that ducating was working well and reports were current and useful.

**Service Area D**

Service Area D includes CMF, CSP/Solano, SQ, and DVI.

**California Medical Facility (CMF)**
December 4, 2007 – December 6, 2007

Census:

In December 2007, the census at CMF stood at 3,048. On November 20, 2007, there were 1,226 inmates on the mental health caseload. There were 594 EOP inmates, 44 of them in administrative segregation. There were 708 3CMS inmates, 36 of them in administrative segregation.

Staffing:

The overall vacancy rate among 139 mental health positions was 23 percent. Those data showed that 2.75 of 14.5, or 19 percent of allocated psychiatry positions were vacant. Six of 34, or 18 percent of allocated psychology positions were vacant. Seven of 21 social work positions were vacant. Four of 24, or 17 percent of allocated psych tech positions were vacant. Nearly one third of 45.42 allocated positions classified as other, which included mental health nurses, office techs, occupational, recreation and rehabilitation therapists, as well as other disciplines were vacant. Staffing information provided by the institution was nearly the same as

central office data, save for its degree of specificity and a difference of seven case manager positions reported as vacant by central office but as filled by CMF.

Large, long-term shortfalls of staff in the nursing department had an effect upon the administration of medication throughout CMF. The institution reported a 65 percent vacancy among LVNs and a 28 percent vacancy among RNs. Heavy reliance on registry staff, the transition from the use of medical technical assistants (MTAs) to LVNs, and having a large number of personnel who were relatively new to CMF and to corrections compounded the difficulties.

There were a number of major changes at CMF during the monitoring period. The positions of warden and the health care manager turned over. Both intermediate care wings operated by DMH were functioning at capacity. DMH continued to operate the crisis bed unit that served CMF inmates, but modified certain key practices in the operations of the unit. The practice of evaluating candidates for 23 hours to decide whether or not to admit them to a crisis bed was abolished. The new 50-bed MHCB was to be completed in January 2008 and open to admissions in February 2008. Organizationally, the unit was divided into two pods, each with 25 beds.

Quality Management:

The mental health quality management committee met monthly. CMF audited a standing list of performance indicators to gauge compliance with many Program Guide requirements. Audits were sound. Staff reported that the burden of documenting work for auditing purposes was onerous. Four to six QITS were active during the monitoring period. QITs were typically standing committees chaired by supervisory staff.

The sole QIT that addressed a problem identified by treating clinicians was

chartered because many 3CMS appointments were not kept, resulting in diminished productivity and wasted clinical time. The QIT was able to identify holes in CMF's centralized ducating process. The problems were associated with personnel rather than procedures. Despite months of sustained attention by the QIT the problem was recurrent.

The disciplines of psychiatry and psychology continued to engage in peer review. Social workers did not have a peer review process.

Suicide Prevention:

CMF's SPR-FIT met monthly and fulfilled its mandate. It was attended by staff from several disciplines. Representatives of custody staff and staff assigned to administrative segregation frequently attended. Minutes were kept and agendas covered all required areas, as well as addressed a number of local suicide prevention issues.

Staff audits found that from March through September, nearly all five-day follow-ups were done with very few one-day misses. Hourly observation by officers improved, and reached 96 to 100 percent compliance during four months and 86 to 90 percent during the three remaining months. The committee also audited compliance with SRAs prior to discharge from an MHCB or higher level of care. CMF prevailed upon DMH staff to perform risk assessments using the Department's SRAC. DMH staff assessed all discharges with an SRAC in March, April and May 2007 but compliance dropped to zero to 14 percent during the following three months due to the use of a different form. The compliance rate climbed to 82 percent in September after an agreement was reached between CMF and DMH.

A long-standing problem, lack of a confidential interview area in a clinic where most SRAs were done when inmates were referred on an ad hoc basis, was remedied. A glassed office that afforded sound privacy but allowed full visual contact with staff posted outside was

used for mental health interviews. CMF staff learned of the new space on the day of the monitor's site visit. It was apparently recently completed and had not been in routine use previously.

Primary responsibility for coordination of the ERRC was passed from custody to medical staff roughly six months before the monitor's visit. At the time of the transition the committee was nearly one year behind reviewing emergency responses but reportedly was catching up. In November 2007, it was reviewing incidents that occurred in June 2007. An associate warden chaired weekly meetings, which were attended by medical and custody staff.

The ERRC reviewed incidents for timely custody response, including life support, as well as medical response times. Although summaries of reviews were unavailable at the time of the monitor's site visit, informed members of the administrative staff were certain that custody response times were always short due to a long-standing policy regarding the use of alarms and demonstrably immediate response times to every alarm.

Medication Management:

CMF staff at all levels reported that medication management was a broken system. Problems included continuity of medication when inmates were moved between housing units, handling medication non-compliance, medication errors, implementation of DOT orders and considerable variation in the quality of documentation on MARs. Many inmates who were interviewed reported that they frequently received the wrong medication. Some inmates reported that they had to choose whether to go to yard or stay inside in order to receive medication, while others had difficulty getting medication during scheduled work assignments. Staff confirmed that medication errors included wrong medication, wrong recipient and wrong time of administration. Staff attributed errors to human factors, changes in the pharmacy

associated with implementation of the Maxor system, orders going astray and transcription errors.

As reported in the staffing section, all aspects of medication management were affected by the 65 percent LVN vacancy rate and the 28 percent vacancy rate among RNs. Heavy reliance upon registry staff, the conversion from use of MTAs to LVNs, and a large proportion of fairly new staff members who lacked knowledge of institutional operations and the population were also cited as contributing factors.

While it was clear that vacancies had an effect, the pharmacy was also said to be a major source of the dysfunction of the medication management system. Clinical administrators reported that the EOP population of roughly 600 inmates accounted for a surprisingly high number, some 4,000 medication orders, all of which were DOT. Administrators cited this imbalance as illustrative of problems with the pharmacy's database and tracking system. The DMH formulary at CMF did not reflect the most recent changes in CDCR's formulary.

Staff expressed concerns regarding the Keyhea process. The Keyhea coordinator reported that in November a breakdown in CDCR's handling of the Keyhea process negatively affected both CDCR and DMH inmates. CMF's records showed that from May through October 2007, staff petitioned to initiate or renew approximately 52 Keyhea orders. Most petitions were sustained. The administrative judge ruled against the petitioner in four cases. The office of legal affairs declined to pursue an order in one case on grounds of insufficient documentation. Two inmates left CMF before rulings were made. The outcome of Keyhea petitions changed markedly in November, when seven of nine petitions were lost. The administrative judge found fault with the legal preparation of the petitions. CMF staff reported the problem to the office of legal affairs and received assurances that the office's Keyhea process would be overhauled

within the next few weeks.  It appeared that personnel issues had a deleterious effect upon the office's ability to handle Keyhea cases.

Diligent attempts to improve medication management made under the auspices of the mental health quality management subcommittee were insufficient.  Medication management was a serious and pervasive problem that demanded strategic collaborative effort across domains.

<u>Mental Health Assessments for Use in the Discipline of Sexual Misconduct Violations</u>:

From April through November 2007, a total of 34 RVRs issued for indecent exposure were logged in CMF's database.  An initial mental health screening was done in each case, with the exception of those individuals who were transferred within a few days of the incident or who were in a DMH bed.  No IDTT review of the screening was documented in 16 cases.

Three inmates were diagnosed with Exhibitionism.  Staff reported that inmates that were given a SHU term were transferred to a facility with a treatment program.  Staff reported that they had developed treatment plans for those individuals who were not sentenced to a SHU term but were uncertain about how to proceed.

<u>Transfers</u>:

CMF housed six acute care wings and four intermediate care wings, all operated by DMH.  DMH also operated a day treatment program that was housed in one of the intermediate care wings.  One of the acute care wings designated 20 MHCBs for use by CMF, and was also operated by DMH.  Construction of a new 50-bed MHCB was nearing completion at the time of the monitor's visit.  DMH staff reported that there was a waiting list of 34 for the 130 acute care beds, and that all intermediate care and day treatment beds were occupied or

assigned to cases that had been accepted.  DMH staff reported a waiting list of 118 for Level IV intermediate care beds.

Access to the MHCB improved.  Logs indicated that a total of 189 MHCB referrals were made from March 1 through September 2007, an average of 27 per month. CMF staff reported that referrals resulted in admission within several hours.  No referrals were rejected on clinical grounds but several were denied admission due to medical issues.  All stays were at least three days in duration.

The picture of access to acute care lacked clarity.  No inmates were admitted directly from CMF to acute care; those in need were referred from the MHCB by DMH staff. CMF staff reported that access to acute care was adequate. As reported above, inmates were no longer evaluated for 23 hours prior to admission and communication had improved between CMF and DMH staff.  Coherent information regarding length of stay in an MHCB prior to admission to acute care was not readily available.  Most inmates who were originally admitted to DMH for crisis care and whose level of care was subsequently elevated to acute did not receive more intensive treatment after their status changed.  More intensive treatment was provided only for those few who were moved to a different wing.

Access to intermediate care and the day treatment program was reportedly good for inmates with lower security scores and unremarkable case factors.  Records maintained by CMF, however, indicated that a significant number of referrals did not result in transfer to intermediate care.  CMF staff recognized and improved a problem with timely completion of referrals.

In a sample of 37 cases transferred by November 1, 2007, on average, 60 days elapsed between an IDTT recommendation and transfer to an intermediate care bed.  For all

referrals, an average of 38 days was required to complete and submit the referral packet. A number of inmates were transferred to intermediate care or the day treatment program within 14 days of referral. The wait time for Level IV inmates who needed intermediate care was typically several months due to the length of the waiting list.

Access to the MHCB, acute and intermediate care was inadequate for inmates with certain case factors, certain chronic medical conditions or those with physical attributes that might conceivably impair mobility. DMH was reportedly not required to admit inmates with certain medical conditions, thus barring access to MHCBs and acute care. Inmates barred due to medical conditions were housed in the institution's medical wing and placed on suicide watch or suicide precautions. The monitor's expert found that there was no established local operating procedure or understanding that afforded acute care to inmates with colostomies, IV therapies or other medical interventions. Inmates with possible mobility impairments were barred from the day treatment program and intermediate care beds located at CMF because of fire safety issues.

Other Issues:

Administrative Segregation:

There were 44 EOP and 36 3CMS inmates in administrative segregation. Clinical contacts and IDTT meetings were timely. A significant proportion of the treatment hours received by half of the EOP inmates were provided in-cell. While the number of hours offered per inmate exceeded ten hours per week, review of records and inmate interviews suggested that the number of hours that they typically received was on the order of five to seven hours per week. In many cases, five of the ten hours were outdoor recreation therapy. Inmates who were interviewed reported problems with medication when they were moved. They thought that the quality of groups needed improvement and were critical of dated videos that they had seen too

82

many times.

CMF had implemented many aspects of the administrative segregation suicide reduction plan, but implementation was far from complete. Inmates were not offered ten hours of out-of-cell therapeutic activities a week.

Psych tech rounds were made daily in all segregation units. Staff audits spanning March through October 2007 found no missed dates and nearly perfect documentation. Psych tech rounds of non-caseload inmates were documented in each unit's log that was checked regularly by supervisors. Psych tech rounds of caseload inmates were documented in logs as well as in weekly summaries that were filed in UHRs. Psych techs met with the lieutenant daily. New admissions to all administrative segregation units were monitored to facilitate medication continuity, identify caseload inmates who were housed erroneously in certain units and to perform mental health screenings. Audits found that all screenings were performed within required timeframes. Many were done prior to placement in administrative segregation, a procedure that CMF adopted early in the monitoring period. Most screenings were done out of cell in a confidential setting. Medical pre-placement screenings, in place for several months, included questions regarding current and historical suicidal behaviors and feelings.

Most EOP inmates in administrative segregation were offered ten or more hours of yard time per week. Officers reported that the number of walk alone yards was sufficient to allow all inmates who chose to go to yard to receive the required number of hours of yard per week. This report was predicated on the fact that many inmates usually refused yard. Staff was uncertain that sufficient yard space would be available if all inmates elected to go to yard.

Caseload inmates in administrative segregation did not have access to appliances. One unit reportedly had no electrical capacity. A second unit had electrical outlets that were

apparently covered over in the past. Staff did not know whether those outlets could be uncovered and used for appliances.

Throughout administrative segregation units, newly arrived inmates were identified by placards on or by the cell. Logs noting the times of 30-minute welfare checks were compiled but were neither filed nor reviewed by supervisors.

The Willis unit reportedly held no caseload inmates, although a tracking sheet, which later proved to be inaccurate, incorrectly identified a handful of Willis inmates being treated at the 3CMS level of care.

EOP:

Cancellations, interruptions, refusals and inadvertent absences reduced the number of hours of treatment EOP inmates received. Most units offered over ten hours of treatment weekly throughout the monitoring period, save for two months when fewer than 40 hours were offered in some units. Medication cart arrivals and custody factors were the two main reasons for cancellations. Poor attendance widened the gap between hours of treatment offered and hours received. Roughly one in five EOP inmates attended as many as ten hours of therapeutic activities per week. CMF identified roughly 12 percent of inmates as chronic refusers and devoted more individual sessions to those inmates, as well as considering them for referral to higher levels of care.

The EOP as a whole remained a locked down, self-contained unit. Inmates were vociferous in their complaints regarding lack of access to institutional resources available to other general population inmates at CMF. Inmates reported that very few of them had access to the law library or were able to attend religious services. Staff confirmed that EOP inmates were rarely permitted to leave their housing wings save to attend occupational therapy

sessions and medical or mental health appointments.  EOP inmates contended that they were locked in their cells many more hours than were general population inmates housed elsewhere at CMF.

       The quality of EOP group treatment varied.  A cognitive behavioral approach was used in anger management, impulse control and recovery groups.  Nurses and psych techs led groups that addressed health, medication management and activities of daily living.

       While most inmates evaluated group treatment favorably, a significant minority who were interviewed did not.  Dated and inadequate materials, lack of treatment that addressed traumatic responses and being in groups with inmates who were much lower functioning were commonly cited as shortcomings, even by inmates whose overall opinion was favorable.  On the other hand, inmates uniformly reported that they found recreation therapy and occupational therapy to be beneficial.  Inmates wanted individual and group treatment for trauma reactions, contending that while they could discuss some things in a group, other trauma related issues had to be restricted to individual meetings.

       EOP case manager contacts were made individually twice monthly.  On alternate weeks the contacts were made in groups.  The group case management contacts that were observed did not appear to be therapeutic.  Psychiatry contacts and individual case management contacts were made in confidential settings.  Inmates in some EOP wings reported that they had not had individual contacts for weeks.  Many inmates complained of frequent turnover or reassignment of psychiatrists and case managers.  Managers acknowledged that staff assignments had been in flux.

       Although IDTT meetings were timely, recreation, rehabilitation therapy and occupational therapy were scheduled when IDTT meetings were held, precluding participation

by individuals in those disciplines. Since the bulk of therapeutic hours received by many inmates were recreation and occupational therapy, teams felt the absence of those therapists.

3CMS:

Regarding 3CMS treatment, staff reported that roughly one in four case manager contacts could not be made in a suitably confidential setting. The staff was cognizant of the essential elements of effective treatment and frustrated by the barriers they faced. Recurrent impediments to treatment delivery, such as custody coverage at the door of the clinic, ducats routinely going astray, and systematic medication management issues cut deeply into staff productivity but were not elevated to the levels of authority at which they could be solved.

A variety of treatment groups were offered to 3CMS inmates on a rotating basis. All inmates for whom group treatment was planned, over one-third of the caseload, had the opportunity to enroll in a group. Case managers found it difficult to find time to develop specialized groups that were responsive to identified needs.

As reported above, the mechanism for handling non-compliance did not work as intended. Myriad problems with medication management reportedly led some inmates to discontinue taking psychotropic medication.

Clinical Contacts:

EOP treatment at CMF was not individualized. The sizes of EOP and 3CMS caseloads were within prescribed ratios. The mental health department did a good job of auditing the provision of treatment. Audits showed that clinical contacts and IDTT meetings were timely. Some audits included qualitative items. At both the 3CMS and EOP levels of care, the clinical value of treatment was diminished, and in some instances undermined, by lack of suitable space, a department-wide choice to give compliance with timeframe requirements

priority over providing clinically meaningful treatment and case managers stretching to cover caseloads of colleagues on leave.

### California State Prison – Solano (CSP/Solano)
December 4, 2007 - December 6, 2007

Census:

CSP/Solano's 3CMS population was stable during the reporting period.  As of early December 2007, CSP/Solano housed 1,539 3CMS inmates; 19 fewer than were reported during the fourth quarter of 2006 and 340, or 28 percent, above the institution's rated capacity of 1,199.  There were 1,423 mainline 3CMS inmates.

The institution's administrative segregation census fell by 13 percent during 2007 and stood at 329 in early December 2007.  Nonetheless, the number of 3CMS inmates in administrative segregation increased slightly from 111 during the Fall of 2006 to 116 in early December 2007.

There were six EOP inmates pending transfer on the first day of the site visit, two of whom were transferred from the institution during the tour.  There were eight inmates in MHCBs.

Staffing:

CSP/Solano's staffing picture was mixed.  During the monitoring period, mental health staffing allocations increased by 31 percent.  Slightly more than a quarter of the allocated positions were vacant, with contractors covering less than half of the vacancies.

Five of six supervisory positions were filled, with one senior psych tech position remaining vacant.  Four of five psychiatrist positions were vacant, with contractors reducing the functional vacancy rate to approximately 24 percent. Six of 24.5 psychologist and psychiatric social worker positions were vacant, with contractors reducing the functional vacancy rate

among case managers to eleven percent.  Case manager caseloads within the mainline 3CMS program ranged from 80 to 120 inmates and were reported to be manageable.  3CMS caseloads in administrative segregation averaged 50 inmates; too large to offer weekly confidential face-to-face contacts.

All three RT positions were filled, as were six of 8.5 psych tech positions.  Eight of 9.5 clerical positions were filled. A health program specialist position remained vacant.

Correctional officer vacancies were low, hovering around five to six percent.

Quality Management:

Quality assurance was an active and inclusive component of the mental health program at CSP/Solano.  Minutes showed that all mental health clinicians were invited to participate in mental health quality management subcommittee meetings, which occurred weekly during the monitoring period.  The local quality management committee also met weekly.  The local governing body had not met during 2007.

Six QITs were active during the monitoring period.  Areas of focus included UHR availability, high group cancellation rates, five-day follow-up protocols, the composition and timing of IDTT meetings, treatment planning, work space and communication issues, and peer review.

Peer review had not been implemented.  A peer review QIT met twice during the monitoring period and was in the process of developing general protocols and a case presentation system.

Suicide Prevention:

The SPC generally met monthly, missing only July in 2007.  About half of the listed committee members attended meetings.  Custody attendance was particularly poor, although the associate warden for health care was regularly present and actively involved.

Internal audits found consistent compliance with clinical five-day follow-up but irregular compliance with custody checks.  A QIT recommended revisions to local policy whereby housing lieutenants were required to sign a form documenting their receipt of an inmate discharged from the MHCB with five-day follow-up orders, and acknowledging that the inmate was interviewed and that housing officers were informed of the inmate's presence.  Compliance with the new policy had not been audited.

The institution's SPR-FIT was considered a standing QIT.  Team findings and recommendations were documented in minutes and reported to the mental health quality management committee.

Medication Management:

Increased nursing staff allocations and better leadership related to the presence of a chief psychiatrist, as well as upgraded pharmacy software, led to improvements in some areas of medication management.  Steps were taken to improve medication continuity for new arrivals and inmates moved within the institution, and clearer guidelines were developed for documenting, reporting and addressing medication noncompliance.  However, performance in these areas had not been audited at the time of the monitor's visit.  Compliance related to informed consent forms, parole medications and labs was more closely monitored, and Keyhea activities were more clearly documented, when compared to the last site visit.

Despite these improvements, medication management as a whole continued to be problematic. Pharmacy services, hobbled by inadequate space and staffing vacancies, dispensed over a thousand medication orders a day in stock fashion; a system that reportedly led to a notable increase in administration errors during the monitoring period.

Long outdoor pill lines continued to be a problem at CSP/Solano. The institution planned to study the feasibility of administering all medications in housing units.

Compliance with the completion of informed consent forms notably improved during the reporting period. The institution reviewed 146 UHRs, 89 percent of which contained current informed consent forms for all prescribed psychotropic medications.

Increased clerical and medical records staffing allocations permitted more timely filing of laboratory reports; a CAP item that will be resolved if compliance is sustained. An internal audit found that abnormal lab results prompted psychiatric follow-up in 83 percent of the reviewed cases. However, the institution needed to develop a mechanism for ordering labs related to administration of anti-psychotic medications.

CSP/Solano instituted a new policy whereby all psychiatric medications were to be administered via DOT protocols. The institution had not audited performance at the time of the site visit. Interviewed inmates acknowledged that it was not difficult to cheek medications and staff reported seeing medications on the ground following pill lines, indicating that DOT protocols were not fully implemented.

HS medications were not prescribed at CSP/Solano. Continued noncompliance in this area was attributed to inadequate staffing resources.

Paroling caseload inmates were interviewed by a TCMP social worker, usually 90 days prior to their scheduled release. Other pre-release activities were available through outside

programs and the institution's education department, though participation in these adjunct services was voluntary.

Requests for prior clinical treatment information from outside facilities were processed and tracked by the medical records department and documented in the UHR.

Mental Health Assessments for Use in the Discipline of Sexual Misconduct Violations:

This was an area of noncompliance related to poor record keeping.  Staff reported that RVRs involving indecent exposure were referred to mental health for screening, but provided no log, data or proof of practice documentation related to this issue.  Nor was any information provided related to the completion of IDTT reviews. Contrary to CDCR policy, sexual misconduct RVRs were not consistently referred to mental health for an evaluation of whether mental illness may have influenced the inmate's behavior.  Staff reported that no comprehensive evaluations were requested or completed and that no inmates had been diagnosed with Exhibitionism during the monitoring period.

Transfers:

Access to DMH acute care was slow during most of 2007, particularly for psychotic inmates who were not suicidal.  During 2007, 18 inmates were referred and transferred to the acute psychiatric program at CMF.  Two transfers took between two to three weeks and seven transfers, or 40 percent of all transfers, took longer than three weeks, with outliers of 74 and 86 days.  Reactivation of the acute program at ASH reportedly improved access to DMH acute care toward the end of the monitoring period.

Staff reported delayed DMH transfers that were unrelated to bed availability and referral processes.  According to staff, DMH did not accept referrals involving inmates who were scheduled to parole within 30 days.  Nor did DMH accept inmates without parole dates who had

yet to complete the parole revocation process.  Consequently, unprocessed inmates from RCs and inmates close to parole sometimes languished in MHCBs for long periods of time because DMH services were unavailable.

One inmate was referred to ASH during the monitoring period and transferred within six days.

The CTC had 15 beds, nine of which were designated MHCBs.  The average number of monthly MHCB admissions increased from 19 in 2006 to 22 in 2007; an increase of sixteen percent.  Average length of stay also increased during 2007, as slightly over a quarter of admissions lasted longer than ten days.  The increased average MHCB length of stay was attributed to slow transfers to DMH and other DMH access issues related to classification, mentally disordered offender (MDO), and parole status.  Nonetheless, clinical staff continued to report adequate access to MHCBs and inmates were not placed in alternative holding areas pending admission to the CTC.

Performance monitoring, record-keeping and organization within the MHCB improved under the direction of the institution's chief psychiatrist.  A log used to document the use of restraints was complete and well maintained.  Internal audits and the monitor's expert's observations and interviews indicated that utilization of restraint was clinically appropriate.  An IDTT meeting in the MHCB observed by the monitor's expert was well attended, organized and competent.

CSP/Solano usually housed fewer than ten EOP inmates and continued to meet the 60-day transfer goal in most cases.  However, a lack of EOP beds system-wide slightly increased transfer delays during the reporting period.  Ten of the 46 EOP inmates transferred from CSP/Solano during 2007 waited longer than 60 days.  Most noncompliant cases missed the

deadline by no more than a week or two, although there were outliers of 90 days and 121 days. On the first day of the monitoring tour, six EOP inmates were pending transfer, one of whom had been waiting 69 days.

EOP inmates pending transfer were consistently seen on a weekly basis by an assigned psychiatric social worker. In addition, a RT was recently assigned to work with EOP inmates awaiting transfer.

Other Issues:

Administrative Segregation:

CSP/Solano did not always meet Program Guide requirements in its administrative segregation units. While internal audits indicated that weekly case manager contacts occurred, nearly two-thirds of the interviews took place cell-front. The high rate of cell-front contacts was attributed to excessive caseloads, averaging more than 50 inmates, and a lack of confidential office space. All individual clinical and psychiatric contacts, as well as treatment team meetings, occurred within partitioned areas on the dayroom floor that afforded limited auditory and visual privacy; conditions that reportedly discouraged inmate participation. Ambient noise in the unit continuously intruded on and, at times, interrupted oral communication between clinicians and inmates.

Mental health staff met regularly with custody staff in administrative segregation and uniformly reported excellent coordination and cooperation. Four dedicated correctional officers reportedly provided adequate escort coverage.

Psych techs completed intake screens on all non-MHSDS inmates within 72 hours of their placement in administrative segregation. However, nearly all screens were completed cell-front. An inmate profile report, which records the results of SRAs, was not used in the

screening process.  A nursing pre-placement screen, which included questions regarding past and present suicidal feelings and behaviors, was initiated in August 2007.

Internal audits found consistent compliance with daily psych tech rounds in administrative segregation.  However, the monitor's review of records indicated that daily psych tech rounds were sometimes missed when administrative segregation inmates were placed in an overflow unit.

Many cells in administrative segregation did not have working electrical outlets, thereby rendering it impossible for inmates to have in-cell appliances.  Yard capacity was inadequate.  Consequently, walk-alone status inmates, who comprised nearly a third of the population in administrative segregation, were not offered ten yard hours a week.

Newly placed inmates were identified by paper placards, which remained attached to their cell doors for 21 days.  Thirty-minute welfare checks were reportedly completed on all inmates throughout their stay in administrative segregation, although related documentation indicated that entire work shifts were missed and that welfare checks were not consistently completed at staggered intervals.

New intake cells were identified and were retrofitted with suicide-resistant vents. The intake cells were not used to house new arrival inmates during their first 72 hours in administrative segregation.  Staff reported that continuous traffic in and out of administrative segregation rendered it impractical to use the intake cells for this purpose.

Documentation indicated that monthly emergency medical response drills were completed in all administrative segregation buildings on all watches during August, September and October 2007.  The drills, most of which lasted about 60 minutes, used various scenarios (e.g., inmate seizure, inmate unresponsive, inmate found hanging in cell, man down situation,

inmate with chest pains, uncontrolled vomiting, bleeding from both wrists) to reinforce proper procedure for responding to medical emergencies.

Staff reported that there were 22 SNY-endorsed inmates in administrative segregation; about seven percent of the unit's population. Staff was unable to produce a list of 3CMS inmates who had been in administrative segregation longer than 90 days.

3CMS:

There were 1,423 3CMS inmates in mainline and case manager caseloads ranged from 80 to 120 inmates. Internal audits found that intake assessments were timely completed. Only about a quarter of audited initial IDTT reviews were completed within 14 working days. Noncompliance was attributed to scheduling difficulties related to prolonged lockdowns on Level III yards and substantial inmate turnover on Level II yards. The institution's audits found continued compliance with annual IDTT reviews, although documentation of CC participation was inconsistent and C-files were unavailable in nearly half of recently reviewed cases.

Faced with chronic psychiatric vacancies, CSP/Solano continued to rely on contract psychiatrists. Treatment continuity was poor in that many inmates rarely saw the same psychiatrist from one visit to the next. The institution did not audit unexplained and unwarranted medication changes, the subject of a CAP item, and lacked the permanent staff to perform psychiatric peer review. Consequently, it could not be determined if poor treatment continuity continued to be associated with unexplained, unjustified, and unwarranted changes in medications.

Compliance with 90-day case manager contacts improved during the monitoring period, with 131 of 141, or 93 percent, of UHRs reviewed by the institution documenting timely contacts. The quality of contacts remained problematic. Many case manager contacts occurred

cell-front during lockdowns, and progress notes reviewed by the monitor's expert often lacked meaningful clinical information.

Group therapy was not fully developed at CSP/Solano. Groups were offered to a growing, but still small, number of mainline 3CMS inmates. Recreation therapy was recently introduced. An internal audit found that nearly three quarters of reviewed treatment plans did not document consideration of group therapy. There were 29 3CMS inmates on wait lists for groups at the time of the monitoring tour.

Medical Records/MHTS:

MHTS data and UHR reviews indicated that CSP/Solano continued to struggle to respond to routine referrals within five working days. The average response time was over twelve days and outliers of weeks were not uncommon. Staff complained of inconsistent referral triage practices between yards.

UHR access and organization were universally described as excellent. Improvement in this area was attributed to increased clerical allocations and fewer vacancies within the medical records department. UHR organization and availability for scheduled appointments was routinely adequate.

MARs needed to be more legible.

Heat Plan:

After finding inconsistent compliance with heat plan protocols during previous tours of CSP/Solano, the monitor recommended that four CAP items related to the heat plan (28, 43, 44, and 45) be replaced by a single, more general, CAP problem: The institution failed to consistently comply with all heat plan protocols. As of this monitoring period, the institution had not made the recommended revisions to its CAP.

**California State Prison at San Quentin (SQ)**

October 23, 2007– October 25, 2007

Census:

On October 23, 2007, SQ's census was 5,379 inmates, with 898 inmates on the mental health caseload. There were 306 3CMS and two EOP inmates in mainline, and 420 3CMS and 26 EOP inmates in the RC. MHSDS inmates on condemned row included 82 3CMS and 15 EOP; there were 157 3CMS and 14 EOP inmates in administrative segregation. There were four 3CMS and seven EOP inmates in the OHU. The total number of inmates in administrative segregation was 433 and on condemned row there were 630 inmates.

Staffing:

Functional staff vacancies at SQ had significantly decreased, especially regarding psychiatrist positions. Hiring of new staff had significantly improved related to more aggressive recruitment occurring at the local level and the availability of more personnel resources at the institution. Moreover, continuity in the chief psychologist and warden positions over several monitoring periods helped to maintain stable and effective leadership of the mental health program, although continuity of leadership in psychiatry remained an issue with vacant chief and senior psychiatrist positions.

At the time of the site visit, the chief psychologist position was filled; the chief psychiatrist position and the senior psychiatrist position were both vacant. Of the six allocated senior psychologist positions, four were filled by staff and two were vacant. The two vacant positions were covered by contract staff.

SQ had 8.55 allocated positions for staff psychiatrists, four of which were filled, resulting in a 53 percent vacancy rate. Registry staff generally filled these vacant positions.

There was a vacancy rate of 22 percent among staff psychologists.  Of 37.6 allocated positions, 8.2 were vacant, and 29.4 positions were filled by staff.  Vacancies for staff psychologists at SQ were generally filled by long term contractors.

Social workers had an actual vacancy rate of 20 percent; of the five allocated positions, four were filled by staff, and the one vacant position was filled by registry staff.

The senior psych tech position remained vacant.  Twelve of the 14 allocated psych tech positions were filled by staff and 1.6 positions were vacant, resulting in a vacancy rate of 11 percent for psych techs.  The functional vacancy rate was four percent, with one psych tech vacancy covered by registry.

One of the three allocated RN positions was vacant, resulting in a 33 percent vacancy rate.  The health program specialist position was filled.  Of the three allocated RT positions, 2.25 were filled by staff.

During interviews with staff, several described morale as very low related to management issues and the division of staff into teams responsible for providing services across program areas.

Quality Management:

The quality improvement process at SQ remained very active for supervisory and monitoring purposes under the auspices of the quality management and continuous improvement team.  SQ also had an active and functioning quality management assessment team (QMAT) in place.

The mental health program subcommittee continued to meet weekly, and encompassed standing membership from nursing and custody.  Custody representation at the weekly meetings also improved during this monitoring round.  At the time of the site visit, SQ

had 12 active QITs, 14 audits, and four status reports in process, which varied in completeness and quality.

Suicide Prevention:

The institution's SPC had monthly meetings and was functional; however, the committee did not meet the requirements of the Program Guide for composition of a local SPR-FIT.

Five-day follow-up of suicidal inmates was routinely analyzed and summarized by the committee, which had an active QIT on this issue. Performance of mental health follow-up had improved; audits showed that SQ had been in substantial compliance for over six months. Custody performance, however, lagged well behind; responsibility over a QIT on this subject was transferred to custody for resolution.

The required administrative segregation pre-placement screening had not been implemented at SQ. Timely post-placement 31-question screenings were occurring; an increasing number of inmates were seen out of their cells for this screening with the licensed psychiatric technician (LPT).

Administrative segregation intake cells were identified by placards.

Properly documented 30-minute welfare checks were occurring in all but one administrative segregation unit. In the Carson Unit, the forms were not consistently completed with the start and stop times, officers' names and signatures were missing and there were no review signatures by the supervisors.

At the time of the site visit, the first phase of the administrative segregation intake cell project was completed, which involved the replacement of vents with new suicide–resistant vents. The second phase of the project was scheduled to start in February 2008.

Appliances were not permitted in administrative segregation because of electrical infrastructure limitations.

Medication Management:

The medication management process at SQ had undergone significant changes since the previous site visit, and at least preliminarily, showed some improvement.

SQ reported that it had implemented a new procedure to address medication continuity upon arrival; audits of the new procedure had not yet been completed at the time of the tour.

A new procedure was also in place to address ongoing problems with medication continuity with housing moves, an area that was partially compliant. The audits performed indicated 80 to 87 percent compliance.

Audits for August 2007 noted continuing problems with identifying and referring Keyhea inmates who were medication noncompliant.

Formalized audits of pill lines had not occurred at the time of the site visit.

SQ had not audited informed consent forms for psychotropic medications at the time of the site visit.

Laboratory testing for indicated medication remained problematic at SQ. Audits were performed for initial laboratory testing during the first month rather than during the entire course of treatment. These audits yielded an average compliance rate of 76 percent during April to September 2007.

All psychotropic medications were reportedly administered by DOT. Information was not provided regarding the number of inmates receiving psychotropic medications at HS.

100