A number of problems were reported regarding discharge medications.  Inmates continued to be transferred or paroled out with no documentation of receiving medications. Three inmates were released during September without medications, two inmates in August, and three inmates in July did not receive discharge medications.

The local operating procedure regarding mental health pre-release planning was recently completed and approved, although training had not yet begun at the time of the site visit.

The referral process remained problematic and was noncompliant.  A QIT formed to address the issue was not functioning.

New procedures were also reportedly implemented to address medication expirations; no data regarding the efficacy of the new procedure were presented.

Mental Health Assessments for Use in the Discipline of Sexual Misconduct Violations:

The institution reported that in the period from April through August 2007, there were 12 incidents of sexual misconduct at SQ.  A sexual misconduct screening was completed for 14 cases, including two that had occurred prior to April 1, 2007, with screening occurring in a range of five days following the incident to over a month after the occurrences.  Of these 14 sexual misconducts, four were referred for IDTT action, of which two were extended comprehensive evaluations.  Two inmates were diagnosed with Exhibitionism; one had been transferred to another prison and the other was near his parole date and remained at SQ.

Transfers:

Referrals to DMH acute care occasionally occurred.  There were two referrals to DMH during the reporting period, one took approximately ten weeks for transfer (nine weeks elapsed before the inmate was accepted) and the other was rescinded and discharged back to

housing after nine days in the OHU.  One inmate returned from DMH in June 2007 at the EOP

level of care; there were no compliance issues regarding his "psych and return" protocols.

The OHU staff referred 120 inmates to MHCBs during the reporting period, the

majority of which (67 percent) were accepted and transferred.  Two referrals were canceled for

lack of medical clearance, two paroled, and the rest (37) were rescinded after substantial clinical

improvement.  The average time from referral to MHCB and transfer increased from 2.1 days in

April 2007 to 6.1 in August and 5.5 in September.  Of 14 accepted by MHCBs in April, 80

percent were sent within two days.  In September, by contrast, only one of 12 that were accepted

was transferred within two days and 67 percent were transferred after more than three days.

The OHU had good clinical operations with increasing ability to access an

MHCB.  In April 2007, the average daily census was 8.1 and in September it was 14.2.  There

were anywhere from 60 to 80 admissions per month, with an average length of stay varying from

three to five days.  Operational data demonstrated that daily contacts and contacts for admission

evaluations averaged nearly one contact per day.  Approximately 75 percent of those contacts

occurred in an interview room.  The percentage of dispositional decisions made within 48 hours

varied from 62 percent in August to 89 percent in April 2007.

The number of inmates seen in IDTT meetings in the OHU was approximately 50

percent, most of whom were inmates with three or more OHU placements within the preceding

90 days (approximately 13 inmates per month).  IDTT composition in the OHU was reported to

be compliant; however, UHR and C-File availability remained problematic.

Eighty percent of OHU inmates who were not referred to DMH or MHCB but re-

housed in SQ from the OHU were discharged within one day of admission.  The remaining 20

percent were discharged in two or more days, with outliers remaining in the OHU for up to 132

days due to medical problems, neurological issues, or while awaiting transfer to a higher level of care.

SQ reported that in the period June 1 to October 2, 2007, the average length of stay for RC general population or SNY 3CMS inmates who were paroled or discharged from the institution was 87 days and for those transferred to other facilities, the lengths of stay averaged 109 days. 3CMS inmates in administrative segregation who were paroled or discharged from the institution had average lengths of stay of 147 days and for those transferred to other CDCR institutions, their lengths of stay averaged 269 days.

In the review period, the average length of stay for RC general population or SNY EOP inmates who were paroled or discharged from the institution was 107.3 days and for those transferred to other facilities, the lengths of stay averaged 116 days. EOP inmates in administrative segregation who were paroled or discharged from the institution had average lengths of stay of 143 days and for those transferred to other CDCR institution, their lengths of stay averaged 220 days.

Presented data for October 2, 2007 indicated that there was one inmate at SQ who was endorsed to an EOP facility; the endorsement had occurred on October 24, 2007. On that same date, there were 71 3CMS inmates awaiting transfers following endorsements to various CDCR facilities. MHSDS inmates who had been transferred from SQ since the last tour had lengths of stay ranging from 22 days to 595 days. Data for October 2, 2007 showed that the 56 EOP inmates had remained in the RC beyond their transfer deadlines. On September 28, 2007, 110 inmates had remained in the RC beyond transfer deadlines.

Other Issues:

RC:

As of September 12, 2007, all inmates arriving at SQ's RC had timely completion of their mental health screening. Inmates who had been identified in the initial mental health screening as having a possible mental health need or who refused screening were referred for a full psychological evaluation.

Identification and tracking of RC inmates was accomplished using Filemaker Pro, a software program that enabled clinicians to schedule and track inmates who completed a mental health screening and were referred for further evaluation.

The EOP RC program demonstrated continued positive growth during this monitoring period. A review of institutional data, as well as a sample of case and inmate histories, indicated that weekly case manager contacts at SQ were occurring, yielding a compliance rate for case manager contacts in the range of 75 percent to 95 percent during April to August 2007. Audit data for the same period indicated that case manager contacts occurred in private confidential settings in 90 to 100 percent of such contacts.

Case reviews and inmate history reviews, as well as presented audit data for July 2007, reported that the institution was exceeding minimum structured therapeutic activity requirements in RC EOP. Recreational therapy was also available to RC EOP inmates. Staff reported that there were no waiting lists for group therapy in RC EOP.

Timeliness of the EOP RC IDTT meetings, like all IDTT meetings at SQ, continued to be problematic, although composition appeared to be improving. Institutional data reported that compliance with timely EOP RC IDTT meetings ranged between 44 percent and 57 percent. The institution indicated that the primary factors associated with noncompliance related

to information technology problems. At the time of the site visit, SQ was also in the process of utilizing Filemaker Pro to address this problem.

Pre-release planning continued to grow and expand; however, pre-release planning was not a consistent subject matter in RC EOP IDTT meetings. Staffing to provide adequate pre-release planning remained problematic at SQ. The institution also provided a ten session pre-release planning transitional psychotherapeutic group in its RC EOP.

Administrative Segregation:

Daily mental health and custody meetings and psych tech rounds were not consistently and uniformly documented. Audit materials and review of weekly summaries showed shortages of staff and a power outage were some of the reasons that psych tech rounds were not being completed during this monitoring period in some units. In others, sampling of psych tech progress notes in UHRs indicated that psych tech rounds were properly completed.

Two confidential and private rooms in the South Block infirmary were available to EOP inmates housed in South Block - Donnor and Carson Units and East Block for psychotherapeutic groups.

Available group rooms contained therapeutic modules; however, staff acknowledged that these therapeutic modules did not meet the Coleman standard. Staff also reported environmental issues with ventilation; noise from cooling fans impacted on the acoustical quality of the sessions and was distracting to the participants. Staff reported ongoing efforts to enhance the quality of the sessions in these rooms.

There was noted improvement in availability of group therapy in administrative segregation. Group participation was, however, affected by conflicting appointments in addition

to problems with timely delivery/escorts by custody and early retrieval of participating inmates by custody prior to the end of group sessions.

On average, administrative segregation EOP inmates had 10.17 psychotherapeutic group hours scheduled; 8.82 hours were offered, and 5.45 hours were received. Audit data revealed a range of group offerings between seven and 11 hours each week, of which between three and 7.3 hours were received.

Yard time for the EOP inmates in administrative segregation continued to be limited. Audit material substantiated there were not enough yards to meet the requirements for yard time in administrative segregation.

Weekly case manager contacts continued to average 90 percent to 95 percent with few exceptions. Extra efforts were being made to encourage out-of-cell sessions and the percentage of EOP inmates seen in offices as opposed to cell-front had increased to an average of 58 percent.

Meeting timeliness and composition standards for administrative segregation IDTTs continued to pose problems for the institution, although they had improved. UHR reviews showed that IDTT reports contained relevant progress notes.

The institution developed and implemented a treatment program for inmates who chronically refused mental health services. At the time of the visit, 11 EOP inmates were in this treatment program. RTs were providing additional treatment through this program to these resistant inmates.

IDTT meeting timeliness data in the period April 30, 2007 to August 30, 2007 indicated that in 3CMS administrative segregation, IDTT meetings were held timely at a rate

ranging from 65 percent to 83 percent and for EOP administrative segregation inmates, the rate of timely IDTT meetings ranged from 67 percent to 81 percent.

SQ was found compliant with respect to case manager contacts in administrative segregation. A review of audit data for case manager contacts reported that in the period April 2, 2007 to October 19, 2007, the institution was compliant with weekly case manager contacts, including in administrative segregation, in a range of 94.4 percent to 100 percent of the time. These contacts occurred in private confidential treatment areas in a range of 38.9 percent to 67.1 percent.

Condemned EOP:

Conditions in the condemned men's unit's EOP were substandard and included filthy and badly lit cells, with many inmates in poor, unsanitary conditions. Several inmates were symptomatically psychotic on sight; inmates complained of harassment by other inmates and staff and being compelled to make choices between going to health and mental health appointments, visits or yard.

There were about 15 EOP inmates in the condemned men's unit. Generally ten of these inmates were on a "modified" program, and were offered less than five hours per week of structured therapeutic out-of-cell activities; they were provided increased individual encouragement to attend groups. The refusal rate for offered groups remained high.

The other five condemned men's unit EOP inmates were offered more than ten hours per week of structured therapeutic out-of-cell activities. The refusal rate was noted to be significantly decreased when the group was conducted by co-therapists.

3CMS:

SQ offered three single themed groups to 3CMS inmates, two substance abuse groups and one stress management, as well as for one dually diagnosed 3CMS in the mainline. Forty to 64 inmates were scheduled each week and there was a waiting list of 25 inmates for groups.

Condemned 3CMS:

Condemned row inmates were not offered 3CMS groups.

Referrals:

The institution had finalized procedures to improve its responses to referrals, which was in the process of being implemented at the time of the site visit.

Space:

The need for additional treatment and office space continued to be problematic. Efforts had been initiated to expand treatment space as an interim solution pending the construction of the new central health services center (CHSC), part of the Plata receiver's SQ facility plan.  The CHSC is scheduled to be completed by April 2010.  It will include 50 medical and mental health beds, outpatient clinics, mental health and dental services, R&R, as well as medical records and pharmacy.

Mental Health – Custody Relations:

The institution reported that communication had been enhanced between mental health and custody with improved custody attendance at mental health program subcommittee meetings and through the mental health treatment space QIT, which was chartered to optimize use of available treatment space and escort officers.  SQ also reported that the appointment of the new mental health custody sergeant had been

accompanied by improvement in the timeliness and responsiveness of the custody escorts.

### Duel Vocational Institute ( DVI)
October 2, 2007 – October 4, 2007

Census:

DVI's inmate population stood at 3,914, of whom 2,964 were in mainline, 439 were in the RC, 386 were in the special processing unit (SPU) and 125 were in administrative segregation.  The number of MHSDS inmates grew from 856 in April, 2007 to 988 in October, 2007 – a growth rate of approximately 30 percent on an annualized basis.  There were 939 3CMS inmates, of whom 424 were in the RC, 367 were in the SPU, 116 were in administrative segregation, 23 were in mainline and nine were in the OHU.  There were 45 EOP inmates; 29 in the RC, five in the SPU, nine in administrative segregation, and two off-site in another prison's MHCB unit.

Staffing:

DVI's mental health staffing allocations increased by 65 percent during the preceding year and stood at 57 positions at the time of the site visit.  This included six supervisory positions, 41.75 clinical positions and nine support positions.  Aggressive recruitment resulted in the hiring of 19 staff psychologists, five psychiatric social workers and two psychiatrists during the reporting period.  Despite having filled many vacancies, the institution continued to rely heavily on registry services.  Contract psychiatrists, psychologists and psychiatric social workers covered the equivalent of 17.5 positions during August 2007.

Quality Management:

DVI's quality management program, while improved in discrete areas, needed more work.  Most medication management audits continued to be grossly inadequate and QITs often failed to advance needed change and progress.

A quality management committee meeting observed by the monitor during the site visit was attended by all required personnel, including the warden, associate warden for health care, health care manager, chief psychiatrist and chief psychologist, as well as representatives from other health care departments, custody supervisors and administrators.  The committee addressed, among other things, mental health issues and QITs, reports related to a suicide CAP, the institution's ERRC, approved changes to the formulary, and medication management classes offered by pharmacy staff.

The mental health subcommittee met regularly during the reporting period and was attended by required personnel.  Minutes indicated that the committee addressed, among other things, mental health referrals and scheduling issues, staffing, medication continuity upon arrival, RC and OHU processing, suicide prevention, mental health services in administrative segregation, and QIT activities.

The institution planned to convene a local governing body and start meetings during the first quarter of 2008.

QITs were chartered to study numerous issues, including out-of-cell screens and contacts, documentation of group participation, tracking and scheduling mental health appointments, new arrival medication continuity, and five-day follow-up contacts and custody checks.  Some QITs were appropriately composed, while others failed to include disciplines that were likely to be most familiar with the issues under review.  For example, the QIT tasked with

improving appointment tracking and scheduling did not include clerical staff.  Similarly, the team assembled to examine medication continuity upon arrival did not include representatives from pharmacy, nursing or medical.

QITs often studied and defined problems, and then dissolved before developing and testing remedies.  Four QITs ceased activity after meeting once or twice, leaving it unclear as to whether their work would continue.  Another QIT, chartered in response to a CAP resulting from a completed suicide, reviewed only one SRAC per clinician.

DVI had peer review programs for psychiatrists, psychologists and psychiatric social workers.  The psychiatry program emphasized documenting diagnosis as part of initial evaluations, providing a clinical rationale when medications were initiated or changed, providing appropriate documentation related to the prescription of more than one anti-depressant and anti-psychotic medication, recording all known drug allergies and completing medication informed consent forms.

Suicide Prevention:

DVI's SPC was unfocused.  Minutes indicated that the committee met only three times during the five-month reporting period and that attendance was poor, particularly for custody and nursing staff.  Issues relevant to suicide prevention (e.g., compliance with five-day follow-up and restraint protocols, review of suicide attempts and instances of medication overdose and hoarding) were routinely raised but did not appear to produce substantive discussion, recommendations, or conclusions.  For example, review of serious suicide attempts did not prompt the committee to explore strategies for improving risk management.  Some agenda items (e.g., parole medications, mental health services in the RC, mental health referrals)

had no apparent connection to suicide prevention.  A relevant topic, utilization of OHU overflow beds, was inexplicably dropped from the meeting agenda.

The institution's local operating procedure for suicide prevention was not consistent with several elements of the SPR-FIT outlined in the Program Guide.

Monthly emergency medical drills were conducted in administrative segregation buildings on a fairly consistent basis, with sporadic misses by individual units and work shifts. Nearly all custody staff received CPR training during 2006 or 2007.

Fifteen-minute suicide precaution checks in the OHU were appropriately staggered and adequately documented.

ERRC reports from July and August 2007 were incomplete and inadequate. Incident summaries were not standardized and were poorly drafted.  Of the fifteen incident summaries prepared during this period, none described the actions of first-responders and four contained no medical information whatsoever.  In those cases in which medical information was provided, the summary failed to provide a qualitative judgment as to the adequacy of the medical response.

Medication Management:

Problems persisted in all areas of medication management, although methodologically flawed audits rendered it impossible, in most cases, to ascertain the magnitude of noncompliance or to identify the underlying causes.  Medication continuity upon arrivals and transfers within the institution remained poor, as did the institution's  response to medication noncompliance.  The institution had not taken steps to remedy deficiencies noted during the preceding site visit relative to ordering DOT in response to medication cheeking, hoarding, and

overdose.  An audit of distribution of parole medications was too small to produce meaningful results.

Some pill line areas remained unprotected from the elements, which likely encouraged medication noncompliance during hot and inclement weather.

Information gathered by the institution indicated that protocols for monitoring blood levels of inmates prescribed mood-stabilizing medications were not working.  From July 20 to September 19, 2007, more than half, or 75 of 134 ordered labs were not drawn for unknown reasons.  In addition, UHRs reviewed by the monitor and chief psychiatrist during the site visit indicated that blood work was not always ordered when indicated.  None of the reviewed UHRs belonging to EOP inmates contained required lab reports for currently prescribed medications.

According to nursing staff, most HS medications were given to inmates between 5:00 and 5:30 p.m.

There were no inmates at DVI with current Keyhea orders at the time of the site visit.

MARs in UHRs reviewed by the monitor were legible and complete.

Mental Health Assessments for Use in the Discipline of Sexual Misconduct Violations:

A log provided by the institution indicated that, from May 6 to August 21, 2007, ten inmates were referred to mental health for completion of a screen to rule out a diagnosis of Exhibitionism.  Screens were not completed within 72 hours of the incident, as required. Requests for screens were typically forwarded to mental health within six days of the incident and completed within 20 days of the incident.  The provided log did not record the outcome of the screen, or indicate whether a comprehensive evaluation was requested.  However, staff

113

reported that no cases were referred for a comprehensive evaluation, no inmates were diagnosed with Exhibitionism and no inmates were referred to an Exhibitionism treatment program during the reporting period.  Screens reviewed by the monitor's expert were adequate.  Information provided by the institution indicated that none of the incidents recorded on the indecent exposure log were referred to the local district attorney.

Transfers:

      During the reporting period, DVI referred six inmates to DMH acute care; an average of slightly less than one referral a month.  Four inmates were transferred to acute care, one inmate paroled prior to his transfer to DMH and one inmate was placed on a waiting list. DVI generated 13 referrals to DMH intermediate care, six of which resulted in transfer.  One referral was rescinded by the institution.  Two referred inmates left DVI prior to being transferred to DMH, and four referred inmates were pending transfer at the time of the site visit.

      The institution's newly assigned DMH coordinator recently switched from a hand-written log to a computerized database to track referrals and transfers to DMH.  The new system captured acceptance, rejection and transfer dates; information that was not reliably recorded in the manual log.

      In lieu of a licensed CTC, DVI had an unlicensed OHU designed for short-term acute medical and mental health treatment.  Mental health inmates were to be returned to housing or transferred to a licensed MHCB in another CDCR prison within 72 hours of their placement in the OHU.  There were no-length-of stay restrictions for medical patients.

      A large proportion of the OHU beds were filled with long-term, chronic care medical patients, leaving an inadequate number of beds for psychiatric admissions. In response to the shortage of OHU beds, DVI converted beds in K-Wing, an administrative segregation unit,

to "overflow" beds – an area found during previous monitoring visits to be isolated and poorly suited for acute psychiatric patients.

From May 1 through June 2007, 21 mental health inmates were placed in overflow OHU beds. Utilization of these beds was increasing toward the end of 2007. Most inmates were transferred to the OHU after a day or so in an overflow bed. On one extreme and disturbing occasion, there was not enough staff available to provide one-to-one continuous monitoring to all six inmates in overflow beds. Accordingly, in lieu of suicide watch, one inmate was hand-cuffed to a gurney.

The institution had nearly completed renovations to eleven cells in L-Wing, another administrative segregation unit, which will be used to replace the OHU overflow beds in K-Wing. Cell renovations included new Lexan window panes, suicide-resistant vents and enclosed light fixtures. Administrators needed to address remaining risks posed by the design of the bunk beds in each cell. Other advantages to L-Wing included the assignment of a full-time mental health escort officer, proximity to the mental health treatment team assigned to administrative segregation and adequate confidential space for IDTT meetings and individual interviews. Activation of the new overflow cells appeared imminent.

From May through August 2007, there were 390 OHU admissions – an average of nearly 100 admissions a month. Average length of stay ranged from 1.8 days to 3.2 days and nearly a third of OHU admissions resulted in referral to an outside MHCB. During the four-month period, DVI generated 120 MHCB referrals, 88, or 73 percent, of which resulted in transfer.

All OHU inmates received daily IDTT reviews, Monday through Friday. Participants typically included the treating psychiatrist, the OHU psychologist, a psych tech,

correctional officers assigned to the OHU and the inmate. A CC I was reportedly summoned if needed. C-files were not routinely available for IDTT meetings. An IDTT meeting observed by the monitor was noted to be interactive, thorough, respectful, and appropriate.

Inmates with multiple OHU admissions were reviewed by a Coordinated Clinical Assessment Team (CCAT) comprised of the OHU treatment team and clinicians from CDCR headquarters. The purpose of the special CCAT review was to ensure that higher levels of care, including DMH acute and intermediate programs, were considered for all multiple admissions. Since August 31, 2007, the point at which tracking commenced, the CCAT had reviewed seven cases, one of which had resulted in transfer to DMH. A second inmate, in an MHCB at the time of the site visit, was to be transferred to DMH upon his return to DVI.

Over 90 percent, or 81 of 88, of the EOP inmates transferred from DVI during the reporting period met the 60-day deadline. At the time of the site visit, there were 45 EOP inmates at DVI, twelve, or 27 percent, of whom had been waiting longer than 60 days. Most of the delayed transfers were no more than a month overdue. Four EOP inmates had been waiting six to eight months related to MHCB admissions and SNY status. The case manager assigned to the EOP RC program reported that expedited transfers, while rare, were arranged when clinically indicated. Data regarding expedited transfers was not gathered by the institution.

3CMS inmates were transferred out of the RC within 90 days. According to the institution's status update, all 583 3CMS inmates transferred from the RC from July 1 through August 2007 met the 90-day deadline.

Other Issues:

RC:

DVI was partially compliant with RC protocols for EOP inmates. EOP inmates entering the RC were timely identified and routinely seen by a mental health clinician within five days of arrival. Overall compliance with IDTT requirements improved during the reporting period, but initial IDTT reviews were not timely completed in many cases. About half of the EOP cases reviewed by the monitor indicated that the initial IDTT meeting was not held within two weeks of the inmate's arrival in the RC. Provided data indicated that monthly IDTT reviews occurred on a consistent basis.

Weekly case manager contacts consistently occurred, and most EOP inmates in the RC and SPU were seen by a psychiatrist in accordance with Program Guide timeframes. However, the monitor's review of six UHRs – about 13 percent of the EOP population in the RC - indicated that mental health care was, in some cases, inadequate. In four of six reviewed cases, mental health services were negatively impacted by poor documentation of care, missing paperwork and disorganized UHRs. Ordered blood levels were not drawn, reported or filed in the UHR. Treatment planning was insufficient or missing altogether. Prescribed daily individual and group treatment was not provided. Psychiatric services were often provided during IDTT meetings, rather than during one-on-one interviews.

Staff and inmates reported that EOP inmates in the RC and SPU were routinely provided structured therapeutic activity once a day, Monday through Friday. However, data provided by the institution, limited by gaps and inconsistencies, indicated that EOP inmates were offered approximately three such hours per week. Ten to 25 inmates were enrolled in each

117

group.  Clinical leaders and co-leaders were assigned to each group, which minimized

cancellations, improved continuity and permitted adequate management of large groups.

Documentation of an inmate's level of participation in group therapy substantially improved

during the reporting period.  Seven to twelve percent of EOP RC inmates refused groups on a

regular basis.  Yard and medical appointments continued to conflict with group schedules.

A RC group observed by the monitor was private and well run.  The clinical

leader and co-leader elicited enthusiastic participation from group participants and inmates

described group sessions as valuable and supportive.  Group treatment in the SPU was not

confidential in that two officers reportedly remained in the room during group sessions.

Pre-release planning did not consistently occur for EOP inmates in the RC.  A

pre-release packet of information, developed by the education department at DVI, was reportedly

distributed to and reviewed with EOP inmates.  Case managers in the RC received weekly lists

of paroling inmates, and some clinicians took it upon themselves to provide inmates with

information regarding benefits, arrange contact with family members and parole clinics, and

make arrangements with outside program providers.  However, such practices were not routine,

codified in local policy or uniformly embraced by all clinicians.  Clinicians did not help paroling

EOP inmates apply for entitlements or benefits programs.  The TCMP assigned to DVI

reportedly helped some inmates complete benefits applications.

EOP inmates in the RC and SPU were not offered ten hours of outdoor yard a

week.  Staff reported that inmates in the RC were offered one, three-hour yard session a week.

Inmates in the SPU reportedly had access to slightly more yard time than was available to

inmates in the RC.

EOP inmates in the RC were not congregated.  Staff reported that this arrangement did not appear to compromise access to treatment or inmate safety.  The institution recently activated a separate program for EOP inmates in the RC with verified safety concerns. The new program was expected to increase access to mental health services for this subset of the population.

Correctional officers in the RC were described by inmates as receptive to their concerns and helpful.

Administrative Segregation:

There were two administrative segregation units at DVI, one in L-Wing and one in K-Wing.   DVI had not adopted all components of the Department's suicide reduction plan for administrative segregation.  A revised local operating procedure required nursing staff to screen all inmates prior to their placement in administrative segregation.  However, the new policy had yet to be implemented.  Inmates in administrative segregation did not have access to in-cell appliances due to physical plant limitations, and were offered only three to six hours a week of outdoor yard.

There were twenty-five new intake cells in K-Wing, all of which were equipped with suicide-resistant vents.  Most new arrivals to administrative segregation were processed through L-Wing and subsequently transferred to K-Wing.  Consequently, the new intake cells were not used to house inmates during their first 72 hours in administrative segregation, as envisioned by the Department's suicide reduction plan.

Magnetized door placards were used to identify new intake inmates in administrative segregation.  Documentation maintained by custody staff indicated that 30-minute welfare checks were usually completed at staggered intervals, and clinical staff confirmed that

welfare checks were typically completed in a competent manner.  On occasion, time blocks lasting several hours were missed.  In addition, documentation indicated that some welfare checks lasted only two minutes, which raised questions about the quality and utility of the welfare checks.

Due to augmented staffing, mental health services in administrative segregation were improved.  Mental health staff met daily with custody staff in administrative segregation, as required.  Case managers administered 31-question screens to all inmates placed in administrative segregation.  The screen was conducted as part of an inmate's initial meeting with custody to determine if continued retention in administrative segregation was warranted.  This arrangement guaranteed that all inmates placed in administrative segregation were timely identified and screened, substantially minimized inmate refusals, and reduced the percentage of cell-front screens to ten percent.  However, adequate confidentiality was not afforded to inmates in that custody staff was present during screening.  Staff offered to revise this arrangement by giving an inmate the option to have a confidential screening interview.  The inmate profile was not used as part the administrative segregation screening process.

Previously reported conflict regarding the role of psych techs in administrative segregation was resolved and compliance with daily psych tech rounds was restored to 90 percent.  Weekly summaries of psych tech rounds were completed and filed in the UHR, though the summaries generally lacked sufficient detail.  In addition, the summaries were not timely placed in UHRs due to substantial filing backlogs in medical records.

Compliance with weekly case manager contacts improved during the reporting period.  Internal audits yielded a compliance rate of 80 percent and inmate histories reviewed by the monitor netted a compliance rate of 86 percent for completion of weekly case manager

120

contacts.  A methodologically sound study conducted by the institution found that 25 percent of case manager contacts in L-Wing occurred cell-front.  Three-quarters of the case manager contacts in K-Wing occurred cell-front.  The institution did not provide an explanation as to why K-Wing generated more cell-front case manager contacts than L-Wing.  All mental health evaluations and nearly all 31-question screenings were reportedly conducted outside of the cell.

Institutional audits showed that the composition of IDTT meetings in administrative segregation routinely complied with Program Guide requirements during the reporting period.  Initial IDTT meetings were not consistently completed prior to the initial ICC hearing.  Timely initial IDTT reviews were not documented in two of three UHRs and four of 19 inmate histories reviewed by the monitor.  Of four cases involving inmates who had been in administrative segregation long enough to receive a quarterly treatment plan update, three were timely and one was one week late.  Mental health clinicians provided meaningful input at ICC hearings for seriously mentally ill prisoners.

An administrative segregation IDTT meeting observed by the monitor was attended by all required disciplines, including a psych tech.  Case managers presented the individuals on their caseloads and all attendees, including the inmate, participated in the discussion.   In one case, the team helped the inmate consider arrangements for his pending parole.

There were nine EOP inmates in administrative segregation, three of whom were pending placement in an SNY program.  Groups were not offered to EOP inmates in administrative segregation.

A recently updated local operating procedure for mental health treatment in administrative segregation contained several outdated, redundant and conflicting requirements.

121

Information regarding self-referrals, ICC frequency, transfers to EOP hubs and IDTT composition was inaccurate.

Correctional officers in administrative segregation carried micro-shields. Boxes, recently installed on all tiers in administrative segregation buildings, contained cut-down tools and ambu bags. All officers assigned to administrative segregation had keys to open the boxes. Regular inventories were not conducted, though glass fronts permitted visual inspection of the contents of each box.

3CMS:

The institution's limited review of ten UHRs belonging to 3CMS inmates indicated that initial evaluations and treatment plans were timely completed. Groups were offered to the small number of 3CMS inmates in general population, but were not available to 3CMS inmates in the RC, SPU or administrative segregation, which together held 84 percent of the 3CMS population.

Referrals:

DVI did not consistently respond to routine referrals within five working days. The monitor reviewed MHTS data related to 83 mental health referrals. These data yielded an 87 percent compliance rate for completion of case manager interviews within five working days. About half of the psychiatric referrals captured in the data generated a response within five working days. Psychiatric responses often took as long as a month and, in a handful of cases, were not documented. Most delayed or dropped psychiatric referrals involved cancelled appointments that needed to be rescheduled. The monitor's expert reviewed 47 referrals for which there were complete data. Slightly more than half of these referrals prompted a response

within five working days.  Eight-five percent of the referrals resulted in contact within ten calendar days.

The bus screening process was adequate.  Nurses screened inmates in confidential offices using the new form, which included a question about the recent receipt of bad news. Staff reported that completed bus screens were not timely filed in UHRs.

Heat Plan:

Compliance with heat protocols remained problematic.  Heat logs indicated that temperatures inside inmate housing units reached or exceeded 95 degrees Fahrenheit on seven days during the reporting period, and that these periods of excessive heat often lasted as long as six hours.  During two recent months alone, 14 inmates suffered heat-related illnesses.  Despite these dangerous conditions, nursing rounds continued to be inadequate.  Documentation indicated that nursing rounds were often initiated one to two hours after indoor temperature reached 95 degrees and were not repeated every two hours thereafter, as required.   Even though they were aware of these longstanding deficiencies, administrators had not taken corrective action.

## Service Area E

Service Area E includes CSP/Corcoran, CSATF, PVSP, and ASP.

### California State Prison – Corcoran (CSP/Corcoran)
January 7, 2008 – January 10, 2008

Census:

CSP/Corcoran's census on January 7, 2008 was 5,683; 321 more inmates than was reported in September 2006.  Despite a six percent increase in CSP/Corcoran's overall population during the reporting period, the number of inmates in administrative segregation and SHU decreased by six and four percent, respectively.  In January, there were 409 inmates in

administrative segregation and 1,074 inmates in SHU.

The MHSDS population at CSP/Corcoran increased by 22 percent, growing from 1,150 in August 2006 to 1,400 in January 2008. The larger MHSDS census was the result of a significant increase in the number of 3CMS inmates in general population and administrative segregation. The general population 3CMS census more than doubled, growing from 271 in August 2006 to 582 in January, 2008. The number of 3CMS inmates in administrative segregation increased by 39 percent, growing from 119 in August 2006 to 165 in January 2008.

The overall EOP census declined during the reporting period. The number of EOP inmates in the administrative segregation hub remained stable at 60, slightly above its capacity of 54. The general population EOP program shrank by about twelve percent and stood at 128 in January 2008.

Staffing:

Contractors and state employees filled approximately 69 of 104.25 allocated mental health positions, yielding a functional vacancy rate of 25 percent. The vacancy rate among clinical positions, including staff psychiatrists, psychologists, psychiatric social workers, psych techs and RTs, was 46 percent. Contractors covered about 40 percent of the vacancies.

CSP/Corcoran had 17.29 allocated clinical supervisory positions, 3.79, or 22 percent, of which were vacant. Only 2.5 of CSP/Corcoran's 17.8 allocated psychiatry positions were filled with state employees. Contract psychiatrists covered the equivalent of 10.5 FTE positions, reducing the functional vacancy rate to 27 percent.

Among case managers, 23.61 of 39.21 clinical psychologist positions and 1.4 of 13.4 psychiatric social worker positions were vacant. Contractors covered the equivalent of 10.75 positions, generating a functional vacancy rate of 41 percent for case managers. Four of

eight RT positions were filled, as were 29 of 37.59 psych tech positions and all four senior psych tech positions. The health program specialist position was also filled. Among clerical staff, 15.45 of 15.65 office technician and office assistant positions were filled, as were all three medical transcriber positions.

Nearly all of the 43.92 allocated RN positions were filled (1.92 were vacant), and all six pharmacist and pharmacy tech positions were filled. All 19 allocated medical records positions were filled.

Quality Management:

The local governing body met monthly during the reporting period and maintained minutes. The meetings, routinely attended by custody, medical and mental health supervisors, provided an interdisciplinary forum for reviewing and shaping institutional policy in numerous areas, including heat protocols, OHU operations, sexual misconduct interventions, the EOP program, psych tech rounds on non-MHSDS inmates in the SHU and the provision of 3CMS services in the SHU, among others. The local governing body reviewed and approved minutes generated by the quality management committee.

The quality management committee met monthly during the reporting period. Required staff attended the meetings and minutes were kept. The committee was active, approving operating procedures related to MHCB operations, interventions for high risk inmates and processing mental health referrals, and considering broader issues such as mental health staffing and space. The committee also reviewed and approved minutes generated by the mental health subcommittee and SPR-FIT.

The mental health subcommittee met bi-weekly during the monitoring period and kept minutes. The meetings, routinely attended by required personnel, provided a useful forum

for discussing issues related to each MHSDS program, suicide prevention, MHCB and DMH referrals, the MHTS, and out-of-state transfers, among other things.  The mental health subcommittee initiated and reviewed audits related to psych tech rounds, daily meetings and welfare checks in administrative segregation, CPR and cut-down kits, custody checks of inmates discharged from the MHCB, IDTT attendance, UHR availability, escort resources, Program Guide requirements for new arrivals, and use of force.

There were two active QITs.  One focused on the mental health referral process and the other was tasked with improving documentation of custody checks on inmates released from the MHCB with orders for five-day follow-up.

Formal psychiatry peer review, interrupted in June 2007 following the departure of a senior psychiatrist, was expected to resume in early 2008.  UHR reviews, which reportedly continued during the reporting period, found inadequate compliance with monitoring blood levels, documenting informed consent and performing abnormal involuntary movement scale evaluations.  In response to these deficiencies, psychiatrists were directed to complete six-month reviews of all inmates taking psychotropic medications.  At a minimum, the reviews include the inmate's diagnosis, a detailed description of prescribed medications, the date of all current informed consent forms, results of all blood level monitoring, the inmate's recorded weight, and the dates and results of the last two abnormal involuntary movement scale.

Peer review for psychologists was on hiatus for much of the reporting period but restarted in October 2007.  Peer review reports from October, November, and December 2007 indicated that initial mental health assessments were properly completed, thorough and integrated.  The quality of treatment plans varied.  Some treatment plans reportedly contained detailed treatment goals and interventions that were consistent with the diagnosis, while others

126

were described as "sparse and non-specific." SRACs and supporting progress notes were consistently filed in UHRs, and progress notes were generally thorough and presented in subjective objective assessment and plan (SOA&P) format.

Psychiatric social worker peer review resumed prior to the site visit after a period of inactivity. A panel of psychiatric social workers was to select two colleagues a month and review initial mental health assessments, treatment plans, SRACs, progress notes, informed consent forms and MHSDS placement chronos. The results of these reviews were not yet available.

Suicide Prevention:

CSP/Corcoran's SPC, which included an active SPR-FIT, met monthly, was well-attended and kept minutes. The committee routinely reviewed reports and data on completed and attempted suicides, DMH and MHCB admissions and Keyhea petitions. The committee oversaw implementation of suicide prevention training for all staff at the institution and reported that the majority of mental health clinicians had completed an orientation regarding utilization of the SRAC.

According to data collected by the SPC, there were 39 suicidal gestures, ten suicide attempts and one completed suicide during the reporting period. Data collected by the institution indicated that the compliance rate for completion of five-day follow-up contacts upon discharge from the MHCB ranged from 84 to 100 percent during the reporting period. The compliance rate for completion and documentation of custody checks following discharge from the MHCB varied from housing unit to housing unit, with a low of 49 percent recorded in Unit 4A (SHU) and a high of 92 percent documented in Unit 3C (general population). A QIT was chartered to address inconsistent performance in this area.

The institution's ERRC met monthly during the reporting period. Minutes were maintained and indicated that all required staff, including the suicide prevention coordinator, attended the meetings. The committee reviewed all incidents involving emergency responses, including suicide attempts. The committee issued findings as to whether staff responded timely to the emergency in a manner that was appropriate and consistent with institutional policies and procedures. Response times and staff compliance were found to be acceptable for all incidents reviewed during the reporting period. Training was recommended in some cases in which documentation was found to be inadequate.

Medication Management:

CSP/Corcoran used methodologically sound audits to monitor compliance in most areas of medication management.

Medication continuity upon arrival was excellent. An audit of 17 percent of all inmates arriving at CSP/Corcoran with current orders for psychotropic medications during a 15-month period yielded compliance rates of 100 percent for re-ordering medications within eight hours of arrival and 95 percent for distributing medications within 24 hours of arrival.

Medical continuity associated with inmate movement within the institution was slightly less reliable. Audits conducted during the reporting period generated compliance rates that ranged from 83 to 90 percent. Identified problems were reportedly immediately addressed.

Psychiatrists routinely wrote 90-day orders for psychotropic medications. Thirty-day bridge orders were used to avoid administration gaps when prescribed medications were due to expire prior to the next scheduled psychiatric appointment. On average, fewer than 20 bridge orders for psychotropic medications were written a month during the reporting period.

Medication bridge orders were typically written by a mental health RN under the supervision of a psychiatrist.

Medication noncompliance protocols were not consistently followed. Audits conducted during the reporting period found that 16 to 50 percent of inmate refusals and no-shows were not properly recorded on the MAR and/or referred to mental health. Staff training and increased utilization of telemedicine and registry staff were strategies employed by the institution to improve performance in this area.

Inmates regularly waited up to an hour in pill lines. Performance in this area notably worsened during the reporting period.

Nursing reviews indicated that MAR documentation needed improvement. Staff did not consistently initial and sign the top of the MAR, and no-shows and refusals were not always recorded on the back of the MAR with documentation of the consequent action taken.

Informed consent forms were not consistently completed and updated for prescribed psychotropic medications. Audits yielded a 51 percent compliance rate in this area.

Audits related to monitoring blood levels for certain psychotropic medications were methodologically flawed. Psychiatrists reported untimely access to laboratory results.

A significant decline in the number of DOT medication orders noted during the reporting period was attributed to problems with the Keyhea process, staff error and the decreased use of Wellbutrin. Audits showed consistent compliance with DOT protocols.

During the reporting period, staff petitioned to initiate or renew 111 Keyhea orders, with an average of approximately six new orders a month. Most petitions were sustained. The administrative judge ruled against the petitioner in three cases. The office of legal affairs declined to pursue orders in five cases on grounds of insufficient legal basis. Three inmates left

CSP/Corcoran and one inmate paroled before a scheduled Keyhea hearing was completed. Psychiatric staff declined to renew 25 Keyhea petitions due to inadequate clinical justification for continued involuntary medication.  There were 59 active Keyhea orders at the time of the site visit; substantially more than were reported during the preceding site visit.  A full-time Keyhea coordinator provided in-service Keyhea training to newly hired doctors and nursing staff.

Staff reported that inefficiencies within the CDCR's Office of Legal Affairs resulted in failed Keyhea petitions in some cases.  Institutional data showed that petitions to initiate two Keyhea orders and to renew two others were rejected because the Office of Legal Affairs failed to timely submit the petitions to the Office of Administrative Hearings.  The institution also acknowledged that it was sometimes unable to arrange timely transport to scheduled Keyhea hearings.  However, as of the time of this writing, the list of inmates on Keyhea orders has been going out to the field on a weekly basis since the end of February 2008, and is intended for the Keyhea coordinators.

Quarterly nursing showed that HS medication orders were routinely administered at or after 8:00 p.m.  Periodic evaluations and spot checks performed by nursing staff were discontinued during the reporting period as a result of sustained compliance in this area.

Quarterly reviews of parole medication logbooks indicated that 98 percent of the inmates listed in the logbooks were recorded as having received a supply of medication upon their release from CSP/Corcoran.  The audit findings were limited in that they could not be used to ascertain if  the pharmacy correctly identified all paroling inmates with active medication orders, or whether all inmates identified by the pharmacy were listed in the parole medication logbook.

Mental Health Assessments for Use in the Discipline of Sexual Misconduct Violations:

CSP/Corcoran's Exhibitionism treatment program started in November 2007.  In early January 2008, the program consisted of ten inmates who were divided into two treatment groups that met once a week for an hour.  The therapist who launched the new Exhibitionism treatment program subsequently requested another assignment and was replaced with another clinician, at which point the groups started anew.  Staff reported that about half of the inmates referred to the program from other prisons denied having a sexual disorder and refused to participate in the specialized treatment.  In addition, inmates sent to the Exhibitionism treatment program from other prisons sometimes arrived without formal notification or sufficient clinical information.

During the reporting period, CSP/Corcoran issued 24 RVRs for sexual to EOP inmates, 53 to 3CMS inmates, and 21 to general population inmates.

Transfers:

From April 1 through November 2007, CSP/Corcoran generated 21 referrals to DMH acute care; an average of two to three referrals a month.  Two referrals were rescinded by the institution and two referred inmates were transferred elsewhere from CSP/Corcoran prior to being transported to DMH.  The remaining 17 inmates were transferred to either DMH acute care or intermediate care facilities.

A lack of DMH beds resulted in delayed access for six of 17 transferred inmates. In these cases, the delay between referral and clinical acceptance ranged from eight to 60 days. Typically, inmates were not transferred to DMH within 72 hours of acceptance.

CSP/Corcoran generated 15 referrals to intermediate care during the reporting period, all of which involved EOP and MHCB inmates.  Two of these referrals were rescinded

by the institution. Two referred inmates left CSP/Corcoran prior to transfer to DMH and three referred inmates were pending transfer at the time of the site visit. The remaining eight inmates were transferred to SVPP. The average delay between referral and clinical acceptance for these inmates was about 16 days and the average delay between the receipt of a bed assignment and transfer was just shy of three days.

Twenty inmates returned to CSP/Corcoran from DMH during the reporting period. Length of stay in DMH for these inmates ranged from 14 to 420 days and averaged approximately 117 days. Most inmates returned from DMH were initially placed at an EOP level of care.

Institutional audits found that consideration of a higher level of care was considered in 86 percent of MHCB admissions during the reporting period. Thirty percent of inmates admitted three or more times to the MHCB unit within a six month period were referred to DMH.

Access to MHCBs for CSP/Corcoran inmates remained adequate, despite routine utilization of overflow beds, inadequate staffing allocations, and limited space. The MHCB, located in one of the four wings of the GACH, comprised 23 beds. The daily census, which averaged 28 during the reporting period, often exceeded the unit's capacity. Eight safety cells located in an adjacent medical wing were used for overflow.

The number of MHCB admissions increased by 20 percent during the reporting period, while the average monthly percentage of admissions from other CDCR prisons decreased from seven to 2.5 percent. Staff reported that 75 percent of admissions were related to suicidal behavior, most of which was characterized as self-reported suicidal feelings and thoughts of self-

harm.  In an effort to provide better continuity of care, a psychiatrist and psychologist were recently assigned to the MHCB Thursday through Monday.

Space in the MHCB was inadequate.  IDTT meetings were held in a converted cell, the psychologist and psychiatrist assigned to the MHCB shared an office and the recreation therapy room was used for storage.  Two escort officers were assigned to the MHCB Monday through Thursday.

There were 750 MHCB admissions during the period reviewed; an average of 94 admissions a month.  Forty-four, or six percent, of these admissions lasted longer than ten days. Data provided by the institution appeared to overstate the percentage of repeat admissions. According to these data, thirty percent of MHCB admissions from April through November 2007 involved inmates with three or more admissions within the preceding six months.  Staff assigned to the MHCB estimated that the actual repeat admission rate was about ten percent.

An IDTT meeting observed by the monitor's expert was attended by all required disciplines and provided a useful forum for interdisciplinary discussion.  Staff reported continued problems obtaining mattresses and blankets, as well as issues related to worn-out patient gowns.

From April through November 2007, CSP/Corcoran produced 31 PSU endorsements, 25 of which resulted in transfer.  The number of days between endorsement and transfer ranged from seven to 45.  Transfer was prevented in the remaining cases as a result of parole, expiration of the SHU term or a change in the inmate's level of care from EOP to 3CMS. At the time of the site visit, 16 inmates in the EOP hub were endorsed for transfer to PSU.  These inmates had been waiting one to three months for a PSU bed.

Other Issues:

    Administrative Segregation:

    CSP/Corcoran's EOP administrative segregation hub held 60 inmates. While the unit had a rated capacity of 54, it was currently staffed for 63 inmates in order to comply with the one-to-nine clinician-to-inmate ratio. All inmates in the EOP hub were offered more than ten therapeutic activity hours a week, and received, on average, 10.7 hours a week. Offered groups included anger management, education, recreation therapy, cognitive restructuring and activities of daily living (ADLs). Groups were led by mental health clinicians, RTs, psych techs and a credentialed teacher. Resources and supplies for groups were reported to be inadequate.

    The inmate refusal rate for therapeutic activities was reduced to eleven percent, in part due to implementation of routine cleaning schedules for therapeutic modules and discontinuation of strip searches during escorts to and from group sessions. Remaining participation disincentives, including conflicting yard schedules and inadequate group supplies and materials, were to be addressed by a recently chartered QIT.

    Seven case managers were assigned to cover 60 inmates in the EOP administrative segregation hub. Case managers had access to four offices for individual contacts, one of which was the classification hearing room that was shared with custody staff. A second room was shared with clinicians assigned to the 3CMS SHU program. Despite having restricted space for individual contacts, the overall compliance rate for weekly case manager contacts remained stable at 95 percent. Internal audits indicated that the percentage of cell-front contacts decreased during the reporting period, reaching a low of about 20 percent. Staff reported that most cell-front contacts were the result of an inmate's refusal to participate in a scheduled, confidential, appointment.

Internal audits yielded a compliance rate of 98 percent for timely completion of IDTT reviews in the EOP administrative segregation hub.  The staff reported adequate escort support and continued good working relations with custody staff on the unit.

Mainline EOP:

A QIT, tasked with implementing the Department's EOP administrative segregation hub improvement plan, met for the first time during the monitor's visit.

Six full-time case managers covered 128 inmates in the mainline EOP program, each carrying a caseload of 20 to 25 inmates.  Nearly all case manager contacts occurred in designated areas within the housing unit which afforded limited confidentiality.  When a more confidential setting was desired, an inmate could be escorted to the EOP treatment building.

In addition to case managers, the mainline EOP program was staffed with one and a half psychiatrists, a full-time RT, psych techs, an RN, and escort officers.  A second full-time RT joined the program in early December 2007.  Assigned officers provided escort five days a week for group sessions, IDTT meetings and psychiatric appointments, all of which took place in the EOP treatment building.

Institutional data indicated that inmates in the mainline EOP program were offered, on average, six hours of therapeutic activities a week during the reporting period.  While staff doubted the accuracy of these data, information gleaned from inmate interviews appeared to confirm continued noncompliance in this area.  Inmates uniformly reported being offered three one-hour groups a week, as well as one case manager appointment and one community meeting each week.  The therapy sessions were generally considered helpful, though some groups were described as irrelevant.  Group activities were facilitated by clinical staff, a RT, a nurse, and psych techs.

Inmate refusal rates for group therapy declined from 28 percent in April 2007 to nine percent in November 2007.  Progress in this area was attributed to staffs' efforts to identify the underlying reasons for inmate refusals and to address these obstacles in individualized treatment plans.

Inmates in the mainline EOP program reported that daily out-of-cell activities included two to three hours of dayroom and two hours of outdoor yard.

3CMS Mainline:

Despite a 116 percent increase in the number of 3CMS general population inmates at CSP/Corcoran during the preceding 17 months, the institution remained compliant with most Program Guide requirements.  During the reporting period, compliance rates for quarterly case manager contacts and timely completion of IDTT reviews remained above 92 percent.  The monitor's review of a small number of UHRs yielded comparable compliance rates.

A psychiatrist did not consistently attend mainline 3CMS IDTT meetings. Facility 3B did not have regular psychiatric coverage and was awaiting the assignment of a telemedicine doctor.  Two part-time psychiatrists were assigned to Facility 3C and efforts were underway to better coordinate their schedules in order to ensure more consistent psychiatric participation in IDTT meetings.

The monitor observed an IDTT meeting on Facility 3C that was attended by all required disciplines.  All IDTT participants, including the inmates, were actively involved in the treatment planning process.  The IDTT meeting took place in the case manager's office, which was too small to appropriately accommodate the team and observers.  Facility 3C did not have a group room for IDTT meetings that was routinely available.  The institution planned to convert a

136

portion of the hobby shop on the yard to clinical space, including clinician offices and two group rooms. However, as currently planned, the renovated space would not provide adequate confidentiality.

Institutional records indicated that 246 3CMS mainline inmates participated in group therapy from April 1 through December 2007. At the time of the site visit, six groups were active, including three anger management groups, a rehabilitation group, a behavior awareness group, and a coping skills group. As part of an ongoing collaborative effort to offer as many groups as practicable, case managers worked closely with clinical and custodial supervisors to identify confidential and safe group space.

UHRs were not consistently available for ICC and UCC hearings, but were accessible and well-organized, with mental health paperwork was timely filed.

<u>3CMS Administrative Segregation</u>:

There were 460 inmates in administrative segregation, 44 percent, or 201, of whom were MHSDS participants. The number of 3CMS inmates in administrative segregation grew by 39 percent during the preceding 17 months, reaching 165 in January, 2008. The increased number of 3CMS inmates in administrative segregation was, in part, attributed to behaviors on the part of non-MHSDS inmates seeking transfer from the stand-alone administrative segregation unit, which was not equipped to accommodate in-cell appliances, to the administrative segregation units in buildings 3A03 and 4B1R, both of which permitted the use of in-cell appliances. In an effort to screen-out questionable requests for mental health services, an IDTT comprised of mental health and custody staff reviewed all decisions concerning an inmate's level of care.

137

There were 4.75 case managers assigned to building 3A03 and 2.5 case managers assigned to building 4B1R, all of whom carried caseloads of 32 to 40 3CMS inmates. Internal audits yielded a 95 percent compliance rate for completion of weekly case manager contacts. However, 65 percent of case manager contacts were cell-front. While it was unclear what percentage of cell-front contacts resulted from inmate refusals, audit data indicated that cell-front percentages notably differed from clinician to clinician. Factors identified by staff that were thought to contribute to this variance among clinicians included work experience, skill level, degree of rapport with inmates, and general attitude about work. Shortened work weeks resulting from holidays, vacation days, staff training obligations and unplanned absences were also identified as a reason clinicians might resort to cell-front contacts.

Internal audits showed more than 90 percent compliance with timely completion of initial and quarterly IDTT reviews in administrative segregation. However, CC 1s did not consistently participate in IDTT meetings.

At the time of the site visit, 12 administrative segregation-status 3CMS inmates were enrolled in a recreation therapy group in building 4B1R. Another 30 3CMS inmates were on a waiting list for this group. Space limitations in the building restricted the number of participants. Group therapy was not offered to 3CMS inmates in building 3A03 due to a lack of appropriate space.

A pre-screen, which included questions regarding past and current suicidal behaviors and feelings, was reportedly administered to all inmates prior to their placement in administrative segregation. Chronos used to document completion of the pre-screens were not consistently filed in UHRs.

138

Psych techs completed 31-question screens on all non-MHSDS inmates within 72 hours of their placement in administrative segregation. Inmate profiles, which included the results of completed SRACs, were generated for all 3CMS inmates placed in administrative segregation. Inmate profiles were not generated for EOP inmates placed in administrative segregation. The administrative segregation sergeant met daily with psych techs and mental health clinicians.

Psych techs conducted daily rounds on all administrative segregation-status inmates, including those housed in the SHU. Psych tech rounds on MHSDS inmates were documented daily on progress notes, which were subsequently reviewed by administrative segregation case managers and filed in the UHR. Documentation of daily psych tech rounds in the stand-alone administrative segregation unit was inconsistent, reportedly due to turnover among psych techs during the reporting period. On occasion, psych techs were not timely informed of an inmate's transition from SHU to administrative segregation status. In these instances, daily psych tech rounds did not commence immediately following the inmate's transition to administrative segregation. Custody officers assigned to escort psych techs during rounds were reportedly trained to maintain sufficient distance to permit adequate confidentiality.

All inmates newly admitted to administrative segregation were identified by placards on their cell door. New intake inmates received 30-minute welfare checks during their first 21 days in administrative segregation. Documentation of welfare checks was well maintained, reviewed and signed daily by the unit supervisor, and indicated that welfare checks were completed at staggered intervals.

There were six new intake cells in building 3A03 and another three in building 4B1R, all of which had been retrofitted with suicide-resistant vents. All nine of these cells were

scheduled to receive new doors by April 4, 2008.  Currently, there were no plans to retrofit new intake cells in the EOP administrative segregation hub and no funding to retrofit new intake cells in the stand-alone administrative segregation unit.

According to staff, there was sufficient yard capacity to offer outdoor recreation ten hours a week to all administrative segregation-status inmates in building 3A03, the stand-alone unit and SHU.  There was not sufficient yard capacity in building 4B1R to provide all administrative segregation-status inmates housed there ten hours of outdoor recreation a week.  However, due to inmate refusals, the unit was able meet the ten-hour requirement for all inmates who accepted offers to go to yard.

Secure Housing Unit:

Increased staffing led to substantially improved 3CMS services in SHU.  The number of case managers allocated to the program reached 8.5 in October 2007 and caseloads ranged from 50 to 70 inmates as of early January 2008.  In addition, psychiatric coverage increased, a RT was brought on board and additional escort officers were assigned to SHU.  As a result, toward the end of the reporting period, 3CMS inmates were consistently seen monthly by their case manager, quarterly IDTT reviews consistently occurred and routinely included a psychiatrist and CC I, and all SHU buildings were covered by a regular psychiatrist.  Psych tech rounds were conducted in SHU on a regular basis.

The percentage of out-of-cell contacts decreased from over 70 percent in May and June 2007 to between 50 and 60 percent after August 2007.  Falling performance in this area was, in part, attributed to a rise in inmate refusals related to the increased frequency of case manager contacts and IDTT reviews; reportedly the focus of numerous inmate complaints.  Decreased inmate participation also appeared to be related to stricter search protocols that were

implemented in August 2007.  In response to growing security concerns related to the flow of contraband within and in and out of  SHU, all inmates were required to be searched prior to being escorted to their mental health appointments.

At the time of site visit, 52 3CMS inmates in the SHU were enrolled in two therapy groups, and another 36 inmates were on waiting lists.  Limited group space in the SHU restricted the number of inmates that could participate in group therapy at any given time.

### California Substance Abuse Treatment Facility (CSATF)
November 6, 2007 – November 8, 2007

Census:

As of October 31, 2007, CSATF housed a total of 7,522 inmates – the same number that was reported in September 2006.  After growing by 18 percent during the period from September 2006 to April 2007, the 3CMS population decreased by seven percent during this reporting period.  As of October 31, 2007, there were 1,247 3CMS inmates, which included 94 in administrative segregation.  The number of EOP inmates awaiting transfer continued to increase, growing from eight in September 2006 to 16 in April 2007, and then reaching 23 by the end of October 2007.  There were 15 EOP inmates in mainline housing and eight EOP inmates in administrative segregation.  There were 11 inmates in MHCBs.

Staffing:

CSATF's mental health staffing allocations increased substantially during the reporting period and 93 percent of allocated positions were filled during the monitor's visit. Contractors and telemedicine covered vacancies.  Nonetheless, staff turnover continued to have a deleterious impact on the delivery of mental health treatment.  At the time of the monitor's visit, over half of CSATF's allocated case manager positions were filled with clinicians who had been hired within the preceding seven months.  Continuous turnover prompted managers to shift

clinicians among programs and yards, consumed managerial resources related to new employee training and orientation and, ultimately, negatively impacted compliance with basic Program Guide requirements. A task force was assembled by the institution in October 2007 to develop strategies for improving staff retention.

Clinical leadership at CSATF remained strong, with seven of 7.5 supervisory positions filled. All 10.5 psych tech positions, as well as a senior psych tech position, were filled. All 11 clerical positions were filled, though one full-time office tech was assigned to radiology. One of 1.65 allocated RT positions was filled.

Among case managers, which included psychologists and psychiatric social workers, 20.5 of 22 allocated positions were filled yielding a vacancy rate of seven percent. All vacancies were covered by contractors. CSATF continued to rely on contract and telemedicine doctors to fill long-vacant psychiatric positions. As of the end of October 2007, 1.5 vacancies and a full-time employee on long-term medical leave rendered 2.5 of 5.5 allocated psychiatric positions functionally vacant. Throughout the reporting period, contractors covered the equivalent of 3.4 FTE positions and telemedicine provided an average of 32 treatment hours a month, more than covering all vacancies.

Five allocated pharmacist positions were filled, as were six of eight pharmacy technician positions. All 60 allocated RN positions were filled, as were eight SRN positions. Thirty-eight of 40 allocated LVN positions were filled.

Quality Management:

CSATF continued its institution-wide quality management activities. The health care quality management committee and the mental health subcommittee met regularly. CSATF routinely audited all components of the MHSDS, as well as open and previously resolved CAP

items.  Audit findings revealed a number of ongoing and, in some cases, worsening problems.

Peer review had not yet been initiated.

CSATF's mental health subcommittee kept thorough minutes and focused on

appropriate areas of concern, such a parole planning, five-day follow-up monitoring and the

composition and timeliness of IDTT meetings, among other issues.  The composition of the

mental health subcommittee was consistent with CDCR policy, though attendance was

inconsistent.

CSATF used QITs to focus on a small number of complex issues.  A work group

was convened in October 2007 to develop strategies for improving staff retention.  A QIT was

chartered during the reporting period to focus on a wide range of medication-related issues.  A

QIT tasked with improving response times for routine referrals remained intact, but was inactive

during the reporting period.

Suicide Prevention:

The SPC met regularly with appropriate members and properly focused on

strategies for reducing suicidal behavior.  Minutes indicated that the committee regularly

reviewed MHCB admissions related to suicide attempts and had led an internal review of a

completed suicide that occurred in July 2007.  Institutional data indicated that inmates released

from the MHCB with five-day follow-up orders were consistently monitored for five consecutive

days following discharge.

Minutes provided by the institution indicated that CSATF's ERRC met on May

31, 2007, August 31, 2007, and October 19, 2007.  During these meetings, the subcommittee

reviewed 35 emergency responses.  The minutes included a brief description, response timeline

and evaluation of each incident.  The evaluation focused on five questions: 1) Was the inmate

appropriately transferred to an outside facility? 2) Were timelines appropriate? 3) Were staff's actions compliant? 4) Was on-the-job training (OJT) indicated? and 5) Was corrective action required?  None of the reviewed cases were deemed to require corrective action.  OJT was recommended in a few cases.

Medication Management:

        Some areas within medication management struggled during the reporting period due to turnover among nursing staff, as well as staff's inability to keep pace with the large number of daily medication deliveries, reaching 1,800 on some days.  Inadequate MAR documentation and inconsistent compliance with medication noncompliance protocols were attributed to turnover among nursing staff.  Performance in other areas could not be accurately gauged due to methodologically flawed audits and the lack of tracking systems.  Medication management audits were often difficult to interpret due to small sample sizes and the inclusion of psychiatric and non-psychiatric medications.  For example, a review of medication continuity upon arrival included nine cases, only two of which involved psychotropic orders.  A QIT was chartered to address several of these shortcomings, but had yet to issue final recommendations at the time of monitor's visit.

        Nursing audits indicated that half of arriving inmates received their first dose of prescribed medication within eight hours of arrival.

        Nursing audits completed during the second and third quarters of 2007 found that 13 to 17 percent of inmates transferred within the institution missed medication doses.  In some cases, medications were transferred with the inmate but were not administered.  In other cases, medications were not transferred with the inmate.  The institution had recently made a number of procedural adjustments in order to improve compliance in this area.

Audits regarding timely renewal of medication orders were inconclusive. Staff reported that medications were consistently ordered prior to expiration, though 30-day bridge orders were increasingly utilized to avoid expiration gaps. New medication orders were reportedly processed within 24 hours during week days and within 72 hours during weekends. However, nursing staff reportedly sometimes delayed noting and forwarding orders to the pharmacy, which affected the pharmacy's ability to timely process medication orders.

CSATF struggled to implement medication noncompliance protocols during the reporting period. Internal audits showed that nursing staff failed to appropriately document and refer pill line no-shows 74 percent of the time and inmate refusals 48 percent of the time. Noncompliance was attributed to a recent influx of about 40 newly hired LVNs. Supervisors planned to conduct daily MAR reviews and increase OJT for nursing staff on the yards.

Inmates regularly stood in outdoor pill lines for 45 to 60 minutes, exposed to excessive temperatures and inclement weather in order to receive prescribed medications.

CSATF's compliance with protocols for monitoring blood levels of mood stabilizers could not be ascertained. The institution had not developed an adequate system for tracking whether or not blood levels were timely ordered, processed and reviewed. Nor was the institution able to determine whether or not abnormal lab results prompted appropriate psychiatric intervention.

Internal audits found that nursing staff consistently followed DOT protocols. Custody presence during pill lines, a component of DOT, improved during the reporting period but reached a compliance rate of no higher than 76 percent.

CSATF initiated 17 Keyhea petitions during the reporting period. In four cases, the petition was dropped or denied and two inmates were transferred from CSATF prior to the

145

Keyhea hearing.  Eleven petitions were approved.  There were 14 inmates subject to current Keyhea orders at the time of the monitor's visit.

There were 788 inmates at CSATF with HS medication orders during the monitor's visit. Nursing audits, based on direct observation of 29 to 79 inmates a month, found that HS medications were consistently administered at 8:00 p.m. or later.  Nursing audits also found that 86 to 100 percent of reviewed MARs appropriately specified that prescribed medications were to be administered at HS.

An internal review found that 94 to 98 percent of inmates who paroled from CSATF with current medication orders during the reporting period received a supply of medications at the time of their departure.  In the remaining two to six percent of the cases, the inmate either documented his refusal to accept the parole medications or failed, for unexplained reasons, to sign the form used to confirm receipt of the medications.

There were ongoing problems with the exchange of information among seven satellite clinics, which negatively impacted the facility's management of medication and ability to schedule psychiatric appointments.

Mental Health Assessments for Use in the Discipline of Sexual Misconduct Violations:

CSATF continued to comply with CDCR protocols related to sexual misconduct. During the reporting period, mental health staff completed 34 sexual misconduct screens.  Nearly three-quarters, or 24, of the screens were not completed within 72 hours of the incident.  Eight, or about a quarter of the screens, were completed more than two weeks after the incident.  IDTTs reviewed all completed screens, and three cases were referred for a more thorough evaluation. According to the institution's inmate sexual misconduct log, one inmate was provisionally

diagnosed with Exhibitionism, but was paroled from CSATF prior to his transfer to CSP/Corcoran for Exhibitionism treatment.

There was confusion regarding the status of a second inmate who claimed to have an Exhibitionism diagnosis when interviewed by the monitor's expert. MHTS data confirmed that this inmate carried diagnoses of Mood Disorder NOS and Exhibitionism. However, a recent IDTT convened to review a sexual misconduct screen concluded that mental health factors had not contributed to this inmate's sexually inappropriate behavior and that a more thorough evaluation was not indicated.

Transfers:

CSATF generated an average of two referrals a month to DMH acute care during the reporting period. Eleven of 13 acute care referrals were submitted within ten days of the inmate's admission to the MHCB; an area of improvement during this reporting period. The number of days between referral and transfer averaged 11 and ranged from four to 20 days, indicating that access to DMH acute care remained slow in some cases.

During the reporting period, CSATF generated four referrals to DMH intermediate care, one of which was rescinded by the institution. In the remaining three cases, the number of days between referral and transfer were 19, 29, and 47.

CSATF's CTC included 14 MHCBs, 24 medical beds, four safety cells and two observation cells. From April through September 2007, there were 196 admissions to the MHCB unit, roughly 33 a month – a nine percent increase compared to 2006 admission figures. Staff reported a substantial increase in MHCB admissions from CSATF, which routinely pushed the mental health census to more than 20 inmates. In addition, 17 of 24 medical beds were occupied by long-term medical patients. As a result, CSATF's CTC routinely operated at full capacity,

and the percentage of MHCB admissions from outside prisons had fallen from an average of approximately 38 percent during 2006, to an average of 24 percent during April and May 2007 to close to zero during July, August, and September 2007.

Average length of stay during the reporting period ranged from 7.8 to 13.2 days, but averaged less than ten days during four of five months.  Twelve inmates were admitted to the MHCB three or more times during the reporting period.  Nearly all of them were either, placed under a Keyhea order, discharged to an EOP level of care, or referred to DMH.  However, documentation of the IDTT's consideration of higher levels of care in these cases was often lacking.

Internal audits found that initial IDTT meetings consistently occurred within 72 hours of admission.  Audit results from the third quarter of 2007 yielded a 75 percent compliance rate for the completion of SRACs upon admission to the MHCB and an 81 percent compliance rate upon discharge.  Access to weekly recreational therapy sessions improved from zero percent during the second quarter of 2007 to 76 percent during the third quarter of 2007.  Consideration of recreation therapy was consistently documented in treatment plans.  Access to outdoor yard, conveyed via physician's order as per local policy, was inconsistent for MHCB inmates.

CSATF developed a local operating procedure regarding the use of holding cells for inmates awaiting placement in an MHCB.  A log maintained by the institution indicated that, during the reporting period, two inmates were placed in a holding cell for less than an hour while awaiting placement in a CTC bed.  Both inmates received fifteen minute checks for the duration of their placement in the holding cell.

CSATF struggled to meet the 60-day transfer requirement for EOP inmates. Approximately 42 percent of EOP inmates transferred from CSATF during the reporting period

waited longer than 60 days.  As of the end of October 2007, there were 23 EOP inmates pending

transfer, up from eight reported in September 2006; an annual growth rate of 188 percent.

Seven, or 41 percent, of these inmates had been waiting longer than 60 days.  Transfer delays

were attributed by staff to the system-wide shortage of Level III and Level IV EOP beds, and in

particular the lack of SNY beds at MCSP and EOP hub beds at CSP/Corcoran.  Disciplinary

proceedings, such as pending RVRs and reissued/reheard RVRs, also delayed transfers in some

cases.  The increasing number of EOP inmates who were awaiting transfer at CSATF and were

dispersed throughout the prison, presented a growing challenge for mental health clinicians.  The

compliance rate for completing weekly contacts hovered at 78 percent.

Other Issues:

        Administrative Segregation

        CSATF's administrative segregation units held 278 inmates, which included 94

3CMS inmates and eight EOP inmates.  Length of stay exceeded 90 days for 38 percent of

3CMS inmates in administrative segregation, and 42 percent of the 3CMS inmates in

administrative segregation were retained for safety reasons.

        Three full-time case managers were assigned to administrative segregation and

carried caseloads of 29, 33, and 39, respectively.  A half-time mental health clinician was

assigned to respond to referrals from CSATF's stand-alone administrative segregation unit.  Case

managers had access to a private office that was equipped with a holding cell.  The percentage of

cell-front contacts decreased from 49 percent during the second quarter of 2007 to 28 percent

during the third quarter of 2007.  Due to lack of appropriate space, group therapy was not offered

to inmates in administrative segregation.

Nursing staff started completing the revised administrative segregation pre-screen a few months prior to the monitor's visit, the results of which were documented on a chrono that was filed in the UHR. The revised pre-screen included questions related to the inmate's past and current suicidal behaviors and feelings. A revised bus screen, which included a question about whether or not the inmate had recently received bad news, was used to screen inmates processed through R&R.

Starting June 1, 2007, following the state-wide discontinuation of MTA positions, psych techs were given the responsibility of passing all medications in administrative segregation. While some psych techs welcomed this expanded role, most of the psych techs and case managers assigned to the unit believed that the new responsibilities compromised the delivery of mental health services. Psych techs reportedly spent a growing proportion of their time addressing inmate medical concerns. Case managers complained that access to psych techs had decreased and clerical staff noted a growing backlog of paperwork related to daily psych tech rounds, a slower response to psychiatric referrals, delayed psychiatric ducating and increased utilization of bridge orders to avoid unintended expirations – all attributed to the expanded duties assigned to psych techs and the resultant increase in their daily workloads.

Despite the demands placed on psych techs, intake screens and daily psych tech rounds continued to occur on a routine basis. An internal audit yielded a 92 percent compliance rate for timely completion of mental health screens. CSATF's updated CAP indicated that the compliance rate for documentation of psych tech rounds in UHRs had slipped to 78 percent. However, 96 percent of UHRs reviewed during the third quarter of 2007 contained documentation of daily psych tech rounds, indicating recent progress in this area.

150