Custody escort in administrative segregation was described as adequate, with two full-time mental health security and escort officers assigned to second watch and one full-time mental health security and escort officer assigned to third watch, Monday through Friday. Mental health staff reportedly talked with the facility captain assigned to administrative segregation every morning. Mental health staff also reported more formal bi-monthly meetings with custody staff in administrative segregation that were described as important and helpful.

The stand-alone unit and Building E-1 each had five designated intake cells, all of which were retrofitted with new, suicide-resistant vents. None of the cells had received the cement bunks or modified doors outlined in the CDCR's suicide reduction plan. Nor were the intake cells used to house new intake inmates during their first 72 hours in administrative segregation, as envisioned by CDCR's suicide reduction plan. Staff explained that the high volume of traffic in and out of the unit rendered it impossible to use the intake cells as intended.

There were 57 inmates on new intake status in administrative segregation; 31 in the stand-alone unit and 26 in Building E-1. Intake status inmates were identified by paper placards on the cell door. Thirty-minute welfare checks were reportedly completed at staggered intervals and appropriately documented.

The stand-alone unit was equipped with twenty walk-alone yards and Building E-1 was equipped with ten walk-alone yards and two group yards. Interviewed inmates reported being offered ten yard hours a week on a consistent basis, with some interruptions due to fog and other security-related issues.

Cells in Building E-1 were equipped with outlets and all inmates in this unit were permitted to have a television or radio. Inmates housed in the stand-alone administrative

segregation unit were able to have radios.  However, additional cell modifications were needed to accommodate televisions.

Monthly emergency medical drills were documented on all watches in the stand-alone unit and Building E-1 during the reporting period.  However, paperwork submitted for first watch drills performed in the stand-alone unit indicated that the same drill was performed at the same time each month, involving the same cell, same scenario and staff assignments.  The paperwork raised questions as to whether or not the monthly drills were, in fact, completed.

The monitor observed an IDTT meeting held in Building E-1.  All required disciplines were present, though most of the team was new to administrative segregation.  Most, but not all, UHRs and C-Files were present for the inmates scheduled to be reviewed that day. The observed clinical reviews were cursory in that they did not delve deeply into the inmate's current diagnosis, symptoms or presentation or address behavioral issues related to the inmate's placement in administrative segregation.  The treatment team's diagnostic impressions, therapeutic goals and treatment strategies were ill-defined and unclear.

3CMS:

CSATF's ability to meet Program Guide requirements within the general population 3CMS program appeared to rise and fall with the institution's success at recruiting and retaining clinical staff.  Chronic staff turnover clearly compromised 3CMS services during much of the reporting period. However, staffing increases, as well as stabilization of the 3CMS population, appeared to have contributed to improved performance in discrete areas toward the end of the reporting period.

Compliance with timely completion of initial assessments reached 91 percent during the second quarter of 2007, then fell to 63 percent the following quarter.  The monitor's

UHR reviews confirmed erratic compliance in this area. Similarly, compliance with quarterly case manager contacts, a previously resolved CAP item, climbed to 97 percent during the second quarter of 2007, only to fall by 33 percent during July. Thereafter, the compliance rate improved, reaching 75 percent in September 2007. UHRs reviewed by the monitor's expert confirmed recent improvement in this area and, in some cases, documented more frequent contacts than prescribed by the inmate's treatment plan. Increased staffing stability also appeared to have improved treatment continuity toward the end of the reporting period. However, case manager progress notes were often inadequate in that they did not relate in any meaningful way back to the treatment goals articulated in the treatment plan.

Compliance rates for timely completion of initial and annual IDTT reviews fell to 67 percent and 76 percent, respectively, during the reporting period. Again, performance appeared to have improved in recent months as a result of staffing augmentations and supervisory intervention. UHRs contained treatment plans. However, many of the plans reviewed by the monitor's expert did not demonstrate a sufficient degree of individualization or identify measurable treatment goals.

Group therapy offerings increased by 26 percent on five of seven yards during the reporting period; an improvement related to staffing augmentations. Despite this progress, inmate demand for groups outpaced CSATF's ability to provide them and wait lists for groups were lengthy. A substance abuse program, managed by an outside contractor, was located on yards F and G. 3CMS inmates on these yards were reportedly offered up to four substance abuse program groups a day, but did not have access to mental health groups. There appeared to be an artificial disconnect between substance abuse programs and MHSDS services. UHRs belonging to substance abuse program inmates did not contain any information relative to their drug

treatment activities, and progress notes and treatment plans did not discuss or address substance abuse issues – ostensibly central to the overall treatment of these dually diagnosed inmates.

Internal audits found inconsistent performance regarding the provision of pre-release planning for paroling inmates, with compliance rates ranging from 27 percent to 100 percent during the reporting period. UHRs belonging to newly arrived inmates noted parole dates and the institution had developed a thoughtful one-page evaluation which guided staff toward the appropriate assessment domains.

Referrals:

CSATF continued to struggle to respond to routine mental health referrals within five working days. MHTS data indicated that staff responded to routine referrals, on average, within 10.6 days. The monitor reviewed 243 routine referrals, a quarter of which generated contact more than two weeks after the referral date. Staff took more than three weeks to respond to 30, or twelve percent, of these referrals.

Medical Records/MHTS:

Despite the use of overtime, UHR organization continued to be poor. Institutional audits covering the months of April, September, and October 2007 found that UHRs often contained documentation belonging to the wrong inmate and that paperwork was regularly filed in the wrong section of the UHR. MHTS data was timely and accurate.

Behavior Modification Unit:

CSATF's BMU, which had an average census of 33 inmates during the reporting period, held 34 inmates at the time of the monitor's visit. This included two 3CMS inmates, both of whom were termed "SHU kick-outs." The first inmate, part of the program for six months, had progressed to the third privilege stage and was soon to be released to general population.

154

The second inmate, in the program less than a month, was programming and expected to graduate to stage two following his next monthly UCC hearing.  Both inmates reported receiving quarterly case manager contacts while in the BMU.

### Pleasant Valley State Prison (PVSP)
November 15, 2007 – November 16, 2007

Census:

At the time of the monitor's visit, PVSP had a total population of 5,360 inmates. The number of inmates on the MHSDS caseload was 1,686, which included 12 EOP inmates awaiting transfer and 151 inmates housed in administrative segregation. PVSP's mental health census was 26 less than during the preceding monitoring period, but it was well above the cap of 1,199 for this institution.

Staffing:

The overall vacancy rate for mental health clinicians and ancillary mental health staff except nursing was approximately 31 percent.  Staffing rates improved during the monitoring period.  PVSP was active and successful in recruiting and hiring clinicians since the salary increase, adding one chief psychiatrist, one psychiatrist,  two senior psychologists, six line psychologists and a health program advisor between July and November 2007.

Of 6.5 psychiatry positions, 3.5 were vacant.  Use of 1.75 FTE contractors reduced the functional vacancy rate in psychiatry to 27 percent.

One of the four senior psychology positions was open, for a vacancy rate of 25 percent.  Among line psychologists, there were 2.62 positions open among the 20.12 full time allocations.  Contractors covered the equivalent of 7.09 positions, for full coverage.

One of the 1.5 licensed clinical social worker positions was not filled.

For LVNs, 26 of 27.4 positions were filled. Similarly, of the 28 nursing positions, only 1.42 was not filled, for near-full coverage of these posts.

Office tech positions numbered 8.5 but 3.5 of them were not filled, for a vacancy rate of 41 percent.

Quality Management:

PVSP's quality management committee included representation by all appropriate disciplines. Issues from the various QITs and the mental health subcommittee were brought before it when necessary.

The mental health subcommittee met in May, June, September, and October 2007; minutes for July and August were unavailable. Attendance ranged from six to 14 but was sometimes less than optimal. Topics of discussion included new operational procedures and policies, audits of records, and training issues. Minutes were adequate.

Issues under QIT consideration included medication management, RVR process, new arrivals, and laboratory testing. One medication management QIT covered medication delivery, medication non-compliance, and completion of laboratory studies required for psychoactive medications. Minutes of medication management QIT meetings showed that although meetings were brief, there was adequate focus, activity, and attendance. The RVR QIT was chartered on May 5, 2006 and met fairly regularly. Available minutes indicated that the process was functioning well. A medication management QIT on non-compliance and no-shows was chartered and began meeting during the monitoring period. It developed a solution involving communication between nursing and mental health. This QIT noted that noncompliant inmates must be referred to the prescriber or his designee. Minutes of meetings indicated difficulty ensuring that nursing staff complete documentation on the back of MARs regarding

156

non-compliance, and that psychiatric referrals for noncompliance often required up to three weeks for the inmate to be seen.  A summary of issues identified by this QIT indicated that orders for crushed medication were not being followed by nursing staff.

Another medication-related QIT chartered during the monitoring period round functioned more as an ongoing meeting for medication problems rather than a focused QIT.  The QIT covered pill lines, issues with administration of Wellbutrin and Neurontin, and medication no-shows.  Minutes of August 2007 identified medication continuity for intra-institution transfers and medication renewal as problematic.  They also indicated a decision to charter four additional QITs, but this decision should have been referred back to the mental health subcommittee for chartering.  Another QIT that was chartered during this period focused on difficulties with obtaining custody escorts and problems with new arrival medications.  The primary task appeared to be initiation of housing unit medication administration rather than pill lines at the clinic.

PVSP's peer review process was not well established.  The peer review process for psychiatrists had only recently been reinstituted.  Its September 2007 meeting, the only one held for some time, included a preliminary discussion of how the process should operate.  It did not appear that psychology peer review had met consistently for some time.  The committee met in October and planned to meet quarterly.  Each clinician was to review ten UHRs per quarter using a standard format.  Plans called for the development of a process through which issues regarding quality of practice will be communicated to clinicians

Suicide Prevention:

The SPC met in April, May, June, August, and September 2007, attended by eight to 14 persons, including representation from custody and nursing staff.  Documented discussions

covered recent deaths, procedures for suicide prevention, and responses to in-cell emergencies. The committee appeared to have considered relevant topics and was an educational resource for staff. Given the importance of the information considered by this committee, effort should be made to increase attendance at its meetings to include required mental health staff.

The ERRC met monthly to review all emergency medical responses. Membership on this committee includes the warden, nurses, medical, and chief medical officer and mental health directors.

Medication Management:

There were problems with timeliness of psychoactive medications for inmates following their arrivals at the institution and following intra-institutional moves. Institutional data samples showed that upon entry into the institution, inmates generally received their medication within two days. After housing transfers, delays ranged from zero to three days. Delays often occurred because custody staff were not taking inmates to the facility clinic prior to moves and were not transporting the required red bag (which contained MARs and medications). The QIT which addressed medication continuity found that delays for newly arriving inmates ranged from two to 18 days. At times, these delays were brought about by PVSP's previous pharmacist not honoring prescriptions from other prisons. The institution did not present data showing the number or percentage of inmates who experienced disruptions in their medications as a result of this practice.

Medication continuity was also problematic following MHCB discharges, which should be a high priority. Institutional audit results found that it took an average of .95 days for an inmate discharged from the MHCB. An audit of administrative segregation transfers indicated that it took an average of 1.4 days for inmates transferred there to receive their

prescribed medications.  There were nine inmates who received their medications on the same day for a range of zero to five days overall.  Audit results intra-institutional transfers other than MHCB discharges and administrative segregation placements indicated that, on average, it took 1.3 days for an inmate to receive his medications.  However, these audits were methodologically flawed due to the small sample.

According to minutes of the September 2007, medication management and compliance QIT meeting, medications were not being renewed timely, but did not include data showing the extent of the problem.  Mental health supervisory staff reported that all inmates were seen within 90 days for their medication renewals and that all psychotropic medications were ordered DOT.  If the inmate was unavailable, psychiatrists could write renewal orders based on record reviews, although this practice was strongly discouraged.  Ninety-day prescriptions, however, were not allowed unless the inmates were seen by the psychiatrist.

The institution said that it had an operating policy on medication non-compliance, which it reported was being tracked.  Medication non-compliant inmates were scheduled to be seen by their case managers, who, after consulting with the inmate, determined if a psychiatrist referral was appropriate.

PVSP instituted a process of medication delivery inside A-Facility in September 2007.  The institution planned to implement this process yard by yard, with a goal of ending pill lines.  Results were described as "promising," with staff reporting that it had reduced medication refusals by more than a third and that no-shows had decreased.

The monitor's review of records found that medication informed consent forms were current.

There was no available list of inmates whose medications were prescribed HS, and HS orders were not observed in record reviews.  However, supervisory staff indicated that psychiatrists may prescribe medications HS and were not discouraged from doing so.

Information provided by the institution with respect to the CAP on laboratory testing contradicted information found in QIT reports on the same subject.  In the CAP, the institution reported that testing was ordered and tracked, that tests for Lithium, Depakote, and Divalproex Sodium were ordered appropriately, and that laboratory orders included inmates prescribed certain atypical anti-psychotic medication.  It also reported that all labs were reviewed by psychiatry upon availability of results.  As for the QITs, however, one of the four reported in October 2007 revealed a lack of compliance with tracking, ordering and reviewing of laboratory tests/results for inmates on Seroquel, Zyprexa, Risperdal, Lithium, and Depakote.  A progress update form indicated that for August 2007, there were 359 inmates identified who met criteria (on one or more of the medications listed above) to be tracked for required lab testing, but only 58 percent or 209 of these inmates had blood draws/labs ordered, while seven inmates refused the draw.  Of the remaining 202 inmates, only 50 percent had their labs reviewed by a psychiatrist within a two-week timeframe, while the remaining lab orders had not been completed.  The QIT also found that lab results were not being returned in a timely manner to psychiatrists for their review.  PVSP did not have a clear plan available to address the problems with psychiatrists ordering labs and with reviewing results timely.

It was not possible to determine from the data reviewed if PVSP was utilizing the Keyhea process as warranted.  In contrast to each of the two previous monitoring periods in which more than ten Keyhea orders were initiated, two inmates were on Keyhea orders during

the monitoring period, and one was transferred from the institution after the renewal process began.  No inmates, however, were on Keyhea orders during the site visit.

Staff reported no problems with parole medications.

The establishment of an SNY at PVSP raised complications with regard to medication administration.  A second window was installed in the medical services clinics on all yards, and two medication lines were run.  A medication management QIT observed the medication lines and determined that wait times in the morning lines ranged from ten to 40 minutes.  Evening line wait times ranged from 15 minutes to an hour.  Staff reported that a survey found that most inmates felt uncomfortable in medication lines.  Line length, line-cutting, fights, arguments, and paranoid feelings accounted for most of such discomfort.  Inclement weather and being "bullied" to relinquish certain medications were also noted as factors.

Mental Health Assessments for Use in the Discipline of Sexual Misconduct Violations:

From May 1, 2007 through October 12, 2007, a total of 19 incidents of alleged indecent exposure were documented.  Staff reported that that there was a process through which inmates were seen for screening and consideration by the IDTT.  It appeared that, at times, staff diagnosed Exhibitionism.  When that occurred, the inmate was transferred to a designated treatment facility.  It was not clear that these evaluations were consistent with existing policy, however.

A review of several files of inmates who were identified as engaging in indecent exposure indicated that some form of mental status evaluation was generally completed and that this process appeared to meet the criteria for "screening."  These initial evaluations did not include consideration of issues in the C-file.  Generally, but not always, there were chronos indicating that the IDTT considered the case.  Many cases resulted in some alteration in the

treatment plan to address inappropriate sexual behavior. Of concern, however, was that after these plans were entered into the record, subsequent progress notes did not reflect that the proposed treatment activities occurred.

In the absence of a database to track completion of the various elements of the existing policy regarding indecent exposure, it was quite difficult to ensure that each required step was completed.

Transfers:

Referrals to DMH acute and intermediate levels of care decreased during the monitoring period, indicating under-utilization of this process. MHCB staff appeared to focus on only referring to DMH acute psychiatric program, and made only two referrals there, one of which was rescinded when the inmate improved. It took almost three months for the second inmate to receive a bed assignment. He was transferred two days after the bed was assigned.

A varying portion of the 12 CTC beds at PVSP served as MHCBs, depending on need at any given time. Assessment of access to MHCBs was hampered because PVSP did not keep a log of referrals who were not admitted, although staff reports indicated that access was not problematic. PVSP did not use any type of holding or overflow cells to house inmates awaiting MHCB admission. Staff reported that when someone was identified as requiring MHCB placement and beds were filled, they worked to move any medical patient(s) to another treatment setting and to place the MHCB inmate in that bed.

There were 105 MHCB admissions during the monitoring period. Two inmates were admitted on three or more admissions within a six-month period. Neither of these inmates was referred to DMH for treatment. The average daily census was 5.9 inmates. Approximately 20 percent of admissions had stays longer than ten days, due primarily to the wait for custody to

find appropriate housing. There were some extended stays that were for clinical reasons (e.g., improvement close to the ten-day point, staff belief that extending stays would be clinically beneficial). It appeared that staff often waited until late in the inmate's stay to make DMH referrals, which fostered extended stays. When inmates were discharged back to their housing units, it did appear that they were consistently receiving five-day clinical follow-up.

There were ten EOP inmates housed at PVSP, and 12 EOP transferred from the institution during the monitoring period. Transfers generally occurred within timeframes, with nine or 75 percent transferred within 60 days. The average time to transfer was 43.7 days, with the longest wait to transfer at 76 days.

Other Issues:

Administrative Segregation:

The stand-alone administrative segregation unit at PVSP (administrative segregation I) housed non-MHSDS caseload inmates. In building D-4 (administrative segregation II), there were 151 MHSDS caseload inmates housed at the time of the monitor's visit. Two of these inmates were designated as requiring EOP level of care, and were endorsed for transfer to an EOP hub institution. The monitor toured both units and interviewed both clinical and custodial staff.

Institutional audits indicated, and assigned psych techs verified, that 100 percent of inmates placed into administrative segregation I were offered a mental health screen in a private interview space within 72 hours of admission. However, both sources also confirmed that 90 percent of inmates refused this screening. All new placements were provided with mental health orientation packets. Per institutional audit, psych tech rounds were conducted daily in administrative segregation Unit I 98 percent of the time, with only two missed psych

163

tech rounds from May through September of 2007.  On administrative segregation unit II, psych tech rounds were performed on all days.  All MHSDS caseload inmates in administrative segregation II were interviewed privately by the assigned case manager, a psychologist. Subsequent weekly contacts with case managers occurred for approximately 78 percent of inmates, per institutional tracking.  These contacts were provided in one of two available interview rooms that provide confidentiality.  A third, larger office was available for IDTT reviews.  Ninety percent of all MHSDS caseload inmates had received an IDTT review within the preceding quarter.

Two weekly therapy groups were provided in a semi-confidential space consisting of eight holding cells arranged in a semi-circle behind a partial wall.  Group therapy was given on referral from the unit psychologist.  These groups were facilitated by the psych tech and dealt with anger control and prison adjustment issues.  One of the issues recently addressed was the inappropriateness of indecent exposure.

No intake cells were available in either unit.  Staff in administrative segregation II indicated that inmates identified as having histories of suicidality or having recently received "bad news" were placed into a cell immediately across from the control room for observation, but staff could not recall when this had last occurred.  MHSDS caseload inmates in administrative segregation II were provided three weekly out-of-cell exercise periods, usually within the unit, rather than on the yard, for two to three hours each period.  No administrative segregation overflow unit was being utilized, although up to six inmates at any one time had been retained in "confined-to-quarters" status while awaiting administrative segregation placement.

164

Per institutional report, prior to September of 2007, wellness checks were not being completed in all cases, particularly in administrative segregation I (the non-MHSDS unit). This problem was addressed in a meeting with custody staff, and two new institutional local operating procedures were developed to implement these required checks in each unit. A subsequent audit revealed that missed checks dropped from 275 in July 2007 to only three in September 2007 in administrative segregation I. However, in administrative segregation II (the MHSDS unit), missed checks increased from two in August 2007 to 12 for September 2007. Review of records of these checks confirmed that they were being conducted on a regular 30-minute basis, with staggered initiation times.

Inmates in administrative segregation I did not have access to electronic equipment, but MHSDS inmates in administrative segregation II were allowed either a TV or radio, as a privilege. Staff reported that this provided a positive incentive for cooperative behavior.

Custodial staff in both units indicated they had received CPR training updates within the past year. No cells had frosted windows. Clinical and custodial staff both reported a high degree of cooperation with each other.

Inmate interviews in a private setting confirmed general satisfaction with the level of mental health care being provided. They confirmed daily contacts with psych techs and weekly contacts with the unit psychologist. They expressed enthusiastic support for the group therapy sessions, stating that they provided an opportunity to discuss real problems and offered relief from the tedium of confinement. Only one inmate, who had been endorsed for EOP transfer, criticized his interim care and said he was considering self-harm if his transfer was not

165

accomplished soon. Both the unit psych tech and the psychologist were alerted and indicated they would immediately conduct an assessment.

MHCB:

A MHCB IDTT meeting was observed at the time of the monitor's visit. All required members were present, as were the medical records, inpatient files, and C-files. Staff engaged in extensive discussion about cases. Custody issues affecting MHCB placement were part of the treatment planning process. However, all treatment plans were pre-printed, including those for psychosis and suicidality, with no individualization.

All inmates in the MHCB were generally treated like administrative segregation inmates. Although not under double escort, they were handcuffed for treatment team meetings, evaluations, and any other activities.

Individual confidential contacts occurred in empty rooms, with the inmate placed in the room, the staff member in the "anteroom," with the hallway door closed for sound privacy. Regardless of the inmate's status, the staff member spoke to the inmate through a food port in the door. Staff reported infrequent individual therapeutic contact after the initial evaluation. MHCB treatment was primarily via medication management with informal seclusion. Although inmates were not formally secluded, they remained alone in their cells much of the time. Interaction generally occurred at cell front and staff rarely entered inmates' cells for any reason. Lack of yard time and recreational therapy for this population raised concern among clinical staff. Non-clinical staff, on the other hand, seemed to focus on security issues when asked about this.

The institutional log showed that six inmates were placed in restraints during the monitoring period. The log did not reflect lengths of time in restraints, and was confusing and

contained contradictory information.  The average time spent in restraints was 12.44 hours, with times ranging from 3.25 to almost 23.5 hours.

3CMS:

Available information generally indicated that 3CMS inmates were seen within required timeframes.  UHRs included documentation of these contacts although notes were often sparse and uninformative with overuse of preprinted forms and check boxes.  Treatment plans were generally present in the records but often consisted of a simple listing of the disciplines that were to provide services.  At times, activities which were cited in the treatment plans were not mentioned again in subsequent notes.

The issue of completion of clinical intake assessments within five working days, was resolved as of September 2006.  However, data gathered for this monitoring period was reported in terms of the "average" number of days required for completion, thus making it impossible to determine the percentage of cases completed within ten working days.  There appeared to be compliance regarding the presence of treatment plans in UHRs, although the data provided did state the number of cases that had required annual updates.

The institution offered eight therapy groups which involved 146 general population 3CMS inmates.  Two additional groups were offered in administrative segregation each week.

PVSP used telemedicine to supplement their psychiatric care.  Management staff reported utilizing an average of approximately 44 hours per month of this service.  When clinical contact duration data were available, it appeared that the contacts averaged two to 41 minutes.

167

Referrals:

The referral system at PVSP incorporated the new Program Guide standards for timeframes. The monitor was provided with a MHTS report that includes all referral types, including 602 complaints, RVR assessments, and Olsen reviews, but no audit results.

Management staff reported that because a separately maintained database was lost with clerical turnover, they relied on the MHTS referral tracking database. However, the MHTS did not allow for sorting by urgency of referral (i.e., emergent, urgent, routine). As a result, all referrals entered into the system were used in the calculation of average days to appointment, making the results of little value. The database showed 2,637 referrals entered, with 2,529 of those resulting in scheduled appointments.

Mental health supervisory staff indicated that emergency referrals were generally received by telephone and a mental health provider was immediately deployed to see the inmate. There was no written documentation of emergency referrals provided to the monitor. Written referrals by staff or inmates were submitted through institutional mail, taking three to four days to reach the mental health department. Once mental health requests for care were received in the mental health department, they were logged into the referral system by date of receipt, and provided to a senior psychologist who triaged the referral. Staff reported that if the referral was triaged as urgent, the inmate was seen within 24 hours of receipt of the referral; all other referrals were scheduled for the next available appointment. Significant delays resulted from use of this system. Information provided by the institution indicated that responses to self-referrals occurred on average within 5.7 days of submission of the referral. It was not possible to determine the proportion of cases in compliance with Program Guide specifications because only an "average" was reported.

Medical Records/MHTS:

Review of medical records revealed a number of significant problems including misfiled, missing, and out-of-order documents, and lack of organizational consistency for creation of new volumes.  Some new volumes had old documents but not the most recent ones.

Corrective Action Plan:

The institution's reporting on the status of its CAP gave rise to some concerns about whether its auditing and data review processes were capturing information that was meaningful to ongoing internal review of its mental health program.  In some instances, the CAP report stated the number of times that an event or a process occurred or stated merely averages, but it lacked any reference point regarding the opportunity for the event or process to occur, making it impossible to determine how consistently the relevant policy was followed.  In other instances, inexact terms such as "rarely" or "almost always" were used to state how consistently any given standard had been followed.  At other times, the information provided did not adequately address the substance of the issue, and gave only a description of the process without reporting the status of the institution's compliance with the particular CAP.

**Avenal State Prison (ASP)**
November 28, 2007 – November 30, 2007

Census:

On November 27, 2007, the inmate census was 7,339 prisoners.  Included in this were 1,275 MHSDS inmates, of whom 1,250 were 3CMS, and 20 were EOP inmates.

Staffing:

The overall vacancy rate among allocated mental health positions was 38 percent; the functional vacancy rate was ten percent taking into account registry staff.

169

The chief psychologist position was filled as was one of two supervising psychologist positions; the other supervising psychologist position was filled by a contractor.

None of the five allocated staff psychiatrist positions was filled with permanent employees, but all five vacancies were covered by registry staff.

Fourteen of 15 allocated psychologist positions were filled; contract staff provided services at the equivalent of three FTE positions resulting in a net staffing increase.

All of the three allocated psychiatric social worker positions were vacant. Nine of 11 allocated psych tech positions were filled. The 1.15 allocated RT positions were covered by contract staff. The institution's two mental health RN positions were filled.

The institution had a sufficient number of psychiatric technicians and clerical staff assigned to mental health. Eight of the 8.5 allocated office tech positions were filled; the remaining .5 FTE was filled by registry staff. The one allocated OSS-II position was vacant, while the one allocated health program specialist I position was filled.

Quality Management:

The quality management process at ASP continued to improve, but remained in partial compliance with applicable policies and procedures. The mental health subcommittee continued to conduct well-attended bi-monthly meetings and report to the medical quality management committee. Documentation of the subcommittee's activities remained problematic because of poorly constructed minutes.

QITs were chartered regarding increased IDTT participation by psych techs, medication availability, completion of psychotropic medication laboratory tests, and mental health referrals. The institution reported that although its QIT process had improved, there

remained major problems with follow through, documentation of activities, and implementation of recommendations resulting from QITs.

Although it was captioned a "peer review" process, case reviews at ASP were conducted across disciplines. The institution was advised that an appropriate peer review occurred within clinical disciplines.

Suicide Prevention:

ASP had formed an appropriate SPC at the time of the site visit, but remained noncompliant in this area. A quorums was not regularly present for meetings, and minutes of previous meetings were not routinely available or reviewed.

Although ASP had implemented the suicide reduction program in administrative segregation units, the institution was not compliant with pre-placement screening; audits indicated a compliance rate of 57.1 percent.

Review of local operating procedures showed that ASP was compliant with daily meetings between clinical and custody staff, as it was with daily psych tech rounds, which audits reported at 98 percent. Audits showed that the 31-question screenings were being completed within the required time, and the generation of inmate profiles at the time of placement in administrative segregation was started during the monitoring visit.

Audits of psych tech weekly summaries indicated that ASP was compliant with completing required psych tech week summaries, and that the institution was conducting the 30-minute welfare check at staggered times. ASP routinely completed daily supervisory reviews and periodic audits of welfare checks.

Staff reported that the institution was failing to meet yard time for inmates on walk-alone status.

Seven cells had been retrofitted for use as intake cells at the time of the site visit and cells holding inmates requiring the 30-minute welfare checks continued to have placards indicating intake status.

ASP did not have the electrical infrastructure to permit the use of entertainment devices in administrative segregation.

An ERRC had not been established at ASP at the time of the site visit.

<u>Medication Management</u>:

Audits showed that over the monitoring period, there had been considerable improvements in the medication management process at ASP.  Ongoing QITs played an important role in this improvement, as well as the development of a medication monitoring system.

Audits reported that dispensation of arrival medications within 24 hours occurred at a rate of 84 percent, representing marked improvement.

Audits found that medication distribution within 24 hours following housing transfer also occurred at an improved rate of 86 percent.

ASP was not compliant with timely medication distribution following intra-facility housing transfers into administrative segregation.  Audits, however, showed that medication was available to newly arrived inmates into administrative segregation within 36 hours at a rate of 72 percent.

Psychiatric evaluations occurred prior to medication renewals.  There was a formal process for addressing medication noncompliance.

Information made available to the monitor regarding pill lines varied from yard to yard in the institution.  In areas that were monitored by custody officers, lines were described as

"timely and orderly."  In other areas of the institution, inmates and staff described pill line wait times as "excessive."  Staff reported that inmates who received medications three times per day conceivably spent more than three hours each day standing in pill lines.

ASP's practice of dispensing all psychotropic medications via DOT, whether or not DOT was prescribed, was problematic and was reported to be a contributing factor to long pill lines.

Some ASP yards were not compliant with appropriately distributing medications prescribed at HS, while other yards distributed HS medications at 8:00 p.m. or later.

Staff and inmates reported that during morning pill lines, many inmates were conflicted between receiving their medications or going to work or education assignments.  The monitor's review of C-files confirmed that inmates were disciplined as a result of this conflict.

Although there was noted improvement, ASP continued to be noncompliant with timely renewal of expiring medications.  Clinically indicated follow-up for inmates who were discontinued from psychotropic medications resumed.

Institutional audits showed that although 99 percent of psychiatrists' orders were submitted to the pharmacy within 24 hours of being written, only 50 percent of medication orders were timely filled by the pharmacy.

ASP was compliant with current psychotropic medication consent forms.  Interviewed inmates, however, expressed concern that psychiatrists did not sufficiently explain side effects related to their medications.

A new tracking and auditing system reported compliance with timely order and review of laboratory tests, as well as timely actions regarding results.

Not one Keyhea order initiated at ASP during the monitoring period was completed. Two initiated processes were discontinued at ASP because the inmates were transferred for crisis placements and a third was rescinded.

The institution reported that it did not audit parole medications during this monitoring period.

Mental Health Assessments for Use in the Discipline of Sexual Misconduct Violations:

The institution maintained a database that tracked and reported occurrences, mental health screenings, and comprehensive evaluations regarding sexual misconduct. Over the monitoring period, one inmate was diagnosed with Exhibitionism and transferred to a treatment program.

Transfers:

As reported in previous monitoring reports, ASP did not appear to consistently consider referrals to acute or intermediate DMH inpatient programs as treatment options, notwithstanding that half of all inmates placed in the OHU remained for longer periods than 72 hours, or had significant multiple admissions. The DMH transfer log tracked all required information.

Tracking data showed that at the time of the site visit, seven of the 24 beds in the OHU were occupied by inmates with chronic medical conditions and seven beds were occupied by mentally ill inmates.

The OHU lacked appropriate confidential space for mental health treatment; mental health staff workspace in the OHU was limited to a table located in a hall adjacent to the nurse's station.

Across the period from May 15, 2007 through November 12, 2007, audits showed a total of 135 admissions to the OHU; 19 percent of these inmates were referred to MHCB. Institutional audits showed that approximately one-fifth of inmates placed in the OHU were referred for MHCB placement; a third of those referred were rescinded before transfers occurred.

Chart reviews and audit data indicated that referrals to MHCBs were often unnecessarily delayed.

The institution was not compliant with IDTT meetings for inmates in the OHU.

Institutional data reported that it took an average of 38 days from the time an inmate's level of care was raised to the EOP level of care for transfer to occur. Two EOP inmates were transferred within 60 days and two outliers required more than 100 days to transfer.

ASP maintained a reliable report regarding EOP transfer information for each inmate at that level of care.

EOP weekly case manager contacts were compliant; however, continuity of care was affected because a different clinician might see an EOP inmate during any given week.

EOP treatment plans were not consistently or comprehensively prepared or filed in UHRs.

Other Issues:

Administrative Segregation:

ASP did not provide psychotherapeutic activities to inmates in administrative segregation due to the unavailability of group space. Weekly case manager contacts occurred in ASP's administrative segregation units.

3CMS:

The 3CMS census at ASP increased by 30 percent since the monitor's preceding visit.

There was notable improvement in the timeliness of IDTT meetings and compliance with required staffing composition.

Documentation of appropriate treatment plans for 3CMS was improved.

The institution was compliant with the requirement for the presence of both the UHR and C-file at IDTT meetings. Psychiatrists participated in IDTT meetings.

Medical Records/MHTS:

Staff reported and chart reviews showed that UHRs were problematic, containing misfiled and improperly filed items. As a result, staff experienced major problems locating relevant clinical notes in medical records. MHSDS placement chronos were not consistently filed in UHRs. Staff also estimated that filing of MARS lagged for at least two months. The monitor observed several feet of unfiled records in the department.

Heat Plan:

Inmates had heat cards.

**Service Area F**

Service Area F includes SVSP and CTF.

**Salinas Valley State Prison (SVSP)**
October 1, 2007 – October 4, 2007
October 26, 2007

Census:

In October 2007, the population at SVSP was 4,237, which included 413 inmates in administrative segregation. Caseload inmates numbered 1,397, or 33 percent of the total

population.  There were 1,177 inmates on the 3CMS caseload, with 157 of them in

administrative segregation.  The EOP had 220 inmates, 42 of whom were in the administrative

segregation hub.

Staffing:

  According to central office figures, the overall vacancy rate among mental health

staff at SVSP was 44 percent as of September 30, 2007.  Staff reported that with use of

contractors, full coverage in psychiatry had a beneficial effect on mental health treatment

throughout the institution.  However, the largest staffing deficit was among case managers,

which the institution was unable to cover with use of contractors.  Treatment of EOP inmates and

mental health caseload inmates in administrative segregation were the areas affected most

severely by this.

  A chief psychiatrist and a senior psychiatrist had been hired and had begun work

as of the time of the monitor's visit.  Psychiatrists were members of treatment teams and

assigned to cover caseloads.  Central office data showed that 2.5 of 8.5 allocated psychiatry

positions were vacant, for a vacancy rate of approximately 29 percent, but use of contract

psychiatrists provided full coverage.

  The position of chief psychologist remained filled.  Two of four senior

psychologist positions were vacant; one of them was covered by an acting senior psychologist.

  Central office data showed that 14 of 32, or 44 percent, of psychology positions

were vacant.  SVSP covered the equivalent of 6.5 vacant psychology positions with contracted

help, reducing the functional vacancy rate to 23 percent.

  Of 7.9 social work positions, 5.9 or 75 percent were vacant.  SVSP did not cover

these positions with contractors.

The institution filled one of its two vacant senior psych tech positions. Central office data showed that 10.5 of 22.5, or 47 percent, of psych tech positions were vacant. With contract staff covering the equivalent of seven vacancies, the psych tech functional vacancy rate fell to 16 percent.

SVSP had nearly a full complement of RTs at work. Of 4.5 allocated RT positions, 2.5 were vacant, but contractual staff covered the equivalent of two positions, reducing the functional vacancy rate to 11 percent.

Positions for a director of nursing, a supervising nurse, four SRNs, a public health nurse and a utilization management nurse were filled. Only nine of 35.1 RN positions were filled, but the 26.1 vacant positions were covered by registry staff.

Of 27 LVN positions that were established to cover duties previously carried out by MTAs, 14 of 15 were filled, and 12 were covered by registry staff.

SVSP reported that the position of office supervisor and all eight OT positions were filled.

Of 800 allocated correctional officer positions, 110 or 14 percent were vacant. There was a vacancy rate of 24 percent among sergeants.

Quality Management:

SVSP's quality management committee met weekly, received reports from its subcommittees, and maintained minutes. The mental health subcommittee continued to meet weekly and keep minutes. Quality management activities in mental health were largely unchanged, except for more effort to involve non-supervisory staff. Custody staff was represented at meetings by either the associate warden for health care or his lieutenant.

178

Quality management audits of medication management improved. A wide variety of program indicators were audited regularly, with most audits performed by the staff whose work was being audited or by direct supervisors, rather than by a quality management coordinator. Quality management remained a useful management tool.

Psychologists continued to engage in peer review. With the recent hiring of psychiatrists, peer review by psychiatrists was reinvigorated.

Suicide Prevention:

There were monthly meetings of the SPC that were attended by the requisite staff and covered most required agenda items. The committee identified and addressed local suicide prevention issues, including five-day follow-up, suicide attempts or self-injuries, multiple admissions to the MHCB, and referrals to higher levels of care. Minutes were kept but lacked substantive content. Audits found that five-day follow-ups were typically carried out as planned, but improvement was needed with documentation of 24-hour observation by custody staff.

The SPR-FIT committee did not review the appropriateness of treatment plans that were revised after suicide attempts, nor did it promote the use of alternative treatment options. The use of holding cells for interventions triggered by actual or threatened self-harm warranted ongoing attention. The SPR-FIT needed to address how best to fulfill this need.

The ERRC met monthly and kept minutes. The monitor's expert observed a meeting of the ERRC and reviewed minutes of prior meetings. The committee was chaired by the health care manager. Membership was multidisciplinary, and custody staff was represented by the associate warden for health care or his lieutenant. The committee reviewed 13 incidents that occurred during the preceding month, eight of which involved mental health matters. Discussion of the cases was useful but limited by time constraints. Staff reported that monthly

179

emergency response drills were conducted in the administrative segregation units.  These drills were reviewed outside of the ERRC, but an annual drill was critiqued by the ERRC.

SVSP implemented many provisions of the suicide reduction plan in the free-standing administrative segregation unit, which did not house caseload inmates. Mental health staff was integrated into routine daily operations.  Case managers were in the unit frequently, responding to referrals promptly.  Psych techs met each morning with the lieutenant, and discussions were reportedly useful.

Thirty-minute welfare checks were done and documented by officers in all administrative segregation units.  Supervisory sign-offs appeared to be appropriate in the free-standing administrative segregation unit, but the supervisor of the unit that housed caseload inmates signed off on checks before they were completed.  In the free-standing unit, officers announced mental health appointments as health appointments, and intake cells were designated with placards but were not distinct from the rest in terms of location.

Staff audits of nursing and mental health functions found high levels of compliance with requirements.  Daily psych tech rounds were made.  Pre-placement screenings were timely.  They were done by medical staff and included questions related to suicidality and mental condition.  Out-of-cell contacts were made when inmates consented to come out of their cells, and were done in a holding cell located in an area that afforded sight and sound privacy from other inmates, although not necessarily from staff.  Staff audits and the monitor's review found that despite timely completion, mental health screenings were not reliably filed in UHRs.

Medication Management:

Medication management generally improved, with greater supervision in nursing and psychiatry, and better psychiatric practices.  Nursing staff conducted more

audits than in previous monitoring periods.  MARs were legible and typically were found in UHRs.

Audits and MARs both indicated improved continuity of medication orders.  Audits showed that continuity was sustained in over 90 percent of cases when inmates were relocated within the prison, discharged from the CTC, had a change in regimen, or needed renewed orders.

Audits also showed that handling of medication noncompliance appeared to have improved, although the audit was methodologically flawed.

There were improvements with ordering and obtaining results of laboratory tests. The monitor's expert reviewed a small sample of UHRs and found that in many cases, psychiatrists had ordered laboratory tests, annotated results, and referred to those results in progress notes.  Audits of ordering appropriate laboratory studies found compliance rates in excess of 90 percent, but methodological flaws may have affected the results.

There were anecdotal reports that certain medications were routinely crushed, including sustained release and combined medications.  Supervisors observed medication administration regularly and found that DOT orders were administered appropriately.  However, the large number of inmates given DOT orders, plus several instances of medication misuse, raised questions about whether protocols for DOT were followed routinely.

Efforts to improve use of the Keyhea process were sustained.  Records appeared to be current and complete, and staff reported no inadvertent expirations.  The number of inmates with current Keyhea orders (23) did not rebound to previous high levels but was significantly higher than one year earlier.

Staff and inmates reported that HS medication was administered after 8 p.m.

Mental Health Assessments for Use in the Discipline of Sexual Misconduct Violations:

In 2007, 11 full evaluations were done in connection with RVRs for sexual misconduct. No inmates were diagnosed with Exhibitionism, but four were endorsed to be sent for treatment.

Transfers to PSUs were slowed by dilatory RVR adjudications, waits lasting two to three months for CSR endorsement, and possibly by lack of beds. One inmate who was endorsed to a PSU had been in administrative segregation for approximately seven months.

Transfers:

SVSP did not move inmates when transfers were warranted. Higher levels of care were rarely used. Despite having a busy MHCB and making regular use of holding cells, SVSP made only one referral to acute care in six months.

Five inmates were referred to intermediate care. Staff took too long to complete necessary paperwork. Waiting times for intermediate care beds ranged from a few days to over four months. SVSP staff explained that no referrals to ASH were made because Level IV inmates were ineligible for admission due to their security level.

Because medical use of beds in the CTC limited bed availability for mental health needs, SVSP used five to eight beds as MHCBs, fewer than the official capacity of ten. Logs showed that from May through August 2007, 60 to 70 inmates were evaluated each month for MHCB admission, and 56 were actually admitted during the four-month period. Many of those not admitted were given a plan for five-day follow-up.

The monitor's expert's review of available records found an average 15-day length of stay in the MHCB.  Thirty stays exceeded ten days.  A handful of inmates had multiple admissions.  During clinic hours, inmates awaiting evaluation or placement in an MHCB were kept in small stand-up holding cells in the TTA.  The cells were fitted with a stool.  Stays in excess of four hours were not unusual, as staff did not know of the four-hour limit.  When inmates awaiting an MHCB remained overnight, they were moved to large, plumbed TTA cells used as group waiting rooms.  Staff in the CTC reported that holding cells located in SVSP's four yards were used for a variety of purposes, but rarely or not at all for psychiatric purposes, although there were also reports that once or twice per week, holding cells in the CTC were used overnight by psychiatric patients.  There were also anecdotal accounts by persons in the yards about the informal use of stand-up holding cells when inmates threatened suicide or engaged in disruptive behavior.  Nursing staff maintained logs of holding cell use that did not track frequency or duration of cell use for psychiatric reasons.

Transfers to PSUs were slow and were not expedited when clinically warranted.

The transitional program unit remained small.  Of the 37 inmates housed there, 23 were on the mental health caseload including 17 at the 3CMS level of care.  Inmates identified as requiring EOP treatment typically waited two to three weeks in the transitional program unit for a bed to become available.  At the time of the monitor's visit, four inmates were awaiting an EOP bed.  Staff reported that property and privileges in the transitional program unit were consistent with an operating procedure allowing the same privileges as for general population.  According to staff, transitional program unit inmates had access to an outdoor grass yard ten hours per week.

Other Issues:

Medical Records/MHTS:

SVSP relied heavily upon MHTS reports to manage caseloads and conduct audits. Staff were aware of required Program Guide timeframes for handling referrals and believed they were met in most instances. They had more confidence in data recorded in the MHTS than in UHR entries. Struggles continued with the accuracy of an institution-wide tracking system for mental health referrals. Staff reported that the MHTS did not permit differentiation between critical points in the referral mechanism or entry of information on timeliness of response to referrals.

BMU:

SVSP's behavior modification unit continued to operate in accordance with its local operating procedure which was reportedly unchanged for over one year. The BMU operated independently of the yard in which it was located. It was not locked down or placed on modified status unless an incident occurred in the BMU itself. Of 24 inmates in the BMU, there were five mental health inmates, all at the 3CMS level of care, and all at Phase I. Their lengths of stay ranged from four to ten weeks. It appeared that access to mental health treatment was adequate, with a case manager who was involved and attended their committee reviews. Mental health treatment was delivered as planned. Clinical meetings were held in a confidential setting outside the unit.

Administrative Segregation:

There were 157 3CMS and 42 EOP inmates in administrative segregation. There were insufficient contractors to maintain the inmate/case manager ratio of nine to one for segregated EOP inmates. Clinical staffing, space, scheduling, and the arrangement of holding

cells used for group treatment were among the factors that thwarted the delivery of adequate mental health treatment.  Due to lack of staffing in the EOP administrative segregation hub, case managers continued to follow inmates on their caseloads who were in segregation.

In the free-standing administrative segregation unit, which did not house caseload inmates, mental health staff had been in the building and were integrated into its daily routine, and custody supervisors worked well with the integration of mental health staff there.  However, in the administrative segregation unit that housed mental health caseload inmates, the relationship between mental health staff and custody was severely strained.

Some EOP inmates remained in administrative segregation for long periods of time.  ICC reviews appeared to overlook factors that might have allowed SVSP to reduce the number of inmates in administrative segregation or shorten the stays of some inmates.

Few segregated EOP inmates were offered the minimum number of structured therapeutic hours per week.  Refusal rates were high.  In one of the two rooms containing holding cells for group treatment, cells were arranged in a straight line.  In the other group room, noise from nearby machinery was problematic.  Due to the limited amount of treatment that could be offered, groups were restricted to EOP inmates.

Over half of weekly case manager contacts with both 3CMS and EOP inmates were cell-front.  Some out-of-cell contacts took place in an office that afforded confidentiality.  Others were in a holding cell in the day room of the tier, which was noisy and afforded no visual privacy from other inmates.

EOP:

There were 178 inmates in the general population EOP.  Case manager staffing vacancies were problematic.  In addition, each case manager also carried cases in administrative

segregation.  Both staff audits and a small sample of cases reviewed during the monitor's visit indicated that Program Guide requirements regarding frequency and type of clinical contact were met.  Many case manager contacts were made cell-front due to staffing, space and scheduling constraints.  Staff audits found that individual case manager contacts were made weekly, psychiatry contacts were made monthly, and IDTT meetings were held timely and attended by a full team.  EOP treatment plans were individualized in terms of problems but interventions were generic.

Interviews with EOP staff indicated that they were familiar with inmates and tailored treatment to individuals to a greater degree than reflected in documentation.   Progress notes by case managers and psychiatrists were clinically informative with the exception of a lack of diagnostic clarification.  Psychiatrists were attentive to lab tests, medication compliance and salient clinical issues.  Some notes indicated that inmates were seen without a UHR.  Staff audits showed that informed consent was obtained in over 90 percent of cases.

Most EOP inmates did not have the opportunity to participate in meaningful structured therapeutic activities.  Cancelled group activities accounted for some of this.  In a troubling development, staff audits found that during the summer of 2007, most cancellations were for custody or security reasons, and some for mental health staff absences.  Inmate refusal rates ranged from 32 to 49 percent during those months.  Rules and routines also thwarted participation in treatment.  These included custody searches of inmates' cells while inmates were at mental health appointments.

Mental health staff reduced the amount of treatment provided to selected inmates below minimum requirements.  According to staff analyses, roughly 25 to 30 higher functioning inmates engaged in over ten hours of structured therapeutic activities per week, typically

comprised of ten hours of education plus four group sessions of cognitive behavioral treatment. However, roughly 40 inmates with long tenure in the EOP and low rates of participation were offered approximately three hours per week of non-verbal therapeutic activity and twice weekly individual contacts.  The monitor's expert's review of a sample of those cases found weak or no clinical justification for reduced treatment.

Normal activities were adversely affected by rules and practices.  Chores were performed during times of peak activity rather than off hours.  Job assignments were limited with elimination of outdoor yard work; most assignments were of the "make work" variety.  Most EOP inmates were credited with four hours of work toward their ten weekly hours.  In addition to work, the bulk of therapeutic hours comprised outdoor recreational or rehabilitation therapy.

3CMS:

Despite obstacles with lost ducats and missed contacts, 3CMS treatment improved significantly overall.  Mental health groups were usually held as scheduled in two of the three general population yards.

The size of 3CMS caseloads was typically about 100.  Treatment provided to general population 3CMS inmates was the strongest part of the mental health program, but systemic improvements were needed.  Mental health treatment was individualized.  Staff audits showed that Program Guide requirements were nearly always met regarding timeliness of IDTT meetings, treatment plan updates, and individual contacts by psychiatrists and case managers. Case managers met with inmates at intervals that were driven by clinical need.  Psychiatrists followed up appropriately after initiating new medication or changing a regimen.  Progress notes were informative regarding clinical status and course of treatment.  Five to six group treatment

sessions met weekly in two of the three yards.  No group treatment was provided in the C yard, due to cancellations for modified programming or lockdown status.

Confidentiality was sometimes compromised or lost due to scheduling and space constraints caused by conflicting needs and schedules among departments.  The relationship between custody and mental health staff was broken.  Tension between the two groups was readily apparent, causing breakdowns in the delivery of services.  Mental health staff was no longer permitted to use empty chapels.  In the two yards with the best access to treatment, confidentiality was compromised by space configuration and the uses of nearby areas.  Ducats did not function reliably.  There were contradictory reports about whether inmates refused to attend or were not released, causing many appointments to be rescheduled.  Making clinical contacts occur seemed to depend more on personnel and relationships than on rules and practices.

Custody - Mental Health Relations, Space Issues:

A pervasive and disturbing pattern of custodial dysfunction was apparent at SVSP.  Line officers and custodial supervisors assigned to 3CMS and EOP buildings reportedly taunted inmates about mental disabilities, enforced rules arbitrarily, restricted utilization of space set aside for mental health programs in an inexplicable manner, and failed to properly manage the priority ducat system.  This dysfunction created tension and animosity between custody and mental health staffs and discouraged inmate participation in treatment, thereby thwarting access to mental health programs.

Similar findings were noted during a June 2008 tour of SVSP, compelling the special master to depart from usual practice and discuss Twenty First Monitoring Period findings in this report.  The dysfunction reported in October 2007 had grown more widespread,

pronounced, and destructive to SVSP's substantial and expanding mental health mission. There appeared to be a permissive institutional culture that promoted an environment in which custody line staff and supervisors were free to harbor attitudes and engage in behaviors that were overtly hostile to the provision of mental health care.

In addition, custodial practices undermined DMH's ability to provide intermediate care to inmates in SVPP and Units D5 and D6. DMH clinicians were not permitted to have keys to any of the doors in Units D5 and D6, most of which were locked at all times for security reasons. Consequently, clinicians were unable to move freely within or between the units.

Inmates housed in Units D5 and D6 continued to have limited access to outdoor yard. Plans to use a concrete yard adjacent to the units were reportedly derailed by unresolved correctional officer union issues. As an alternative, inmates in Units D5 and D6 were permitted to use the large grass yard. However, yard schedules and staffing coverage issues reportedly limited access to one hour a day. In addition, custody staff prohibited DMH clinicians from accompanying their patients to the yard. Taken together, these custody- and security-related policies and practices restricted clinician access to patients, and compromised the program's therapeutic milieu and mental health mission.

The monitor's review, in September 2007, of the process for determining a SHU inmate's level of access to intermediate treatment programs indicated that IDTT recommendations were generally, but not always, accepted by the ICC. Some ICC hearings were held late, which in some cases delayed an inmate's access to the treatment level recommended by DMH staff. In addition, IDTT and ICC recommendations were rarely documented in C-files.

189

When SHU terms were held in abeyance, instead of being suspended or commuted, full access to treatment programs was permitted, but it was also likely that SHU terms would be re-imposed when inmates were discharged from SVPP, regardless of positive treatment results in inmates' functioning and behavior.

To date, efforts to fully utilize dormitory beds and address SVPP's rapidly growing wait list had made little progress, as shown in the bed utilization and waitlist data presented in the table below:

**SVPP Bed Utilization and Wait List**

| Month | Number of Cell Beds Full/On Hold | Number of Empty Cell Beds | Number of Dorm Beds Full/On Hold | Number of Empty Dorm Beds | Number on Waitlist |
|---|---|---|---|---|---|
| September 2007 | 32 | 0 | 22 | 10 | 99 |
| October 2007 | 32 | 0 | 23 | 9 | 82 |
| November 2007 | 32 | 0 | 22 | 10 | 108 |
| December 2007 | 32 | 0 | 20 | 12 | 118 |
| January 2008 | 31 | 1 | 23 | 9 | 115 |
| February 2008 | 32 | 0 | 32 | 0 | 100 |
| March 2008 | 32 | 0 | 28 | 4 | 99 |
| April 2008 | 32 | 0 | 25 | 7 | 113 |
| May 2008 | 32 | 0 | 29 | 3 | 138 |
| June 2008 | 32 | 0 | 28 | 4 | 162 |
| July 2008 | 32 | 0 | 30 | 2 | 164 |
| Eleven-Mo.Avg. | 31.9 | 0.1 | 25.6 | 6.4 | 118 |

190

From September 2007 to July 2008, an average of 6.4 dormitory beds in SVPP remained empty while the number of inmates waiting to get into SVPP averaged 118. More recently, the number on the wait list has soared steadily, from 99 on the wait list in March 2008 to 164 in July 2008. The number on the wait list has doubled since October 2007 when there were 82 on list. Sorely needed intermediate care resources continued to be under-utilized.

The above issues, troubling as they are, take on even greater urgency when viewed against the backdrop of long-unresolved space deficiencies within Units D5 and D6. In his response to defendants' August 2007 supplemental long-range bed plan, the special master recommended that the department develop a proposal for adequate mental health treatment and counseling space in these units; a recommendation that was embraced by the court in its October 17, 2007 order. In mid-February 2008, the defendants submitted their plan to provide six group rooms in the dining area shared by Units D5 and D6. Funds for preliminary plans, working drawings and construction were to be requested in future budgetary cycles and construction was expected to be completed by January 2011, assuming legislative approval was timely obtained at each phase of the project.

The defendants' plan, while adequate in terms of the type and amount of proposed new space, offers a projected completion date that is simply too far away. Due to the urgency of this matter, the special master raised this problem with the Plata receiver. After meeting with the various stakeholders in May and June 2008, the receiver developed an Emergency Mental Health Improvement Plan for SVSP, pursuant to which Vanir Construction Management would oversee the construction of program space in Units D5 and D6 utilizing pre-engineered treatment rooms.

191

The proposed Emergency Mental Health Improvement Plan would take five to six months to complete at an estimated cost of $635,580.00. Funding, however, must be provided by CDCR.

Considering all of the problems outlined above, and the serious limitations they impose on the treatment provided to inmates in Units D5 and D6, the special master strongly urges defendants' to avail themselves of the receiver's offer and expeditiously obtain the authorization and funds needed to proceed with the Emergency Mental Health Improvement Plan for SVSP.

**Correctional Training Facility (CTF)**
September 24, 2007 – September 26, 2007

Census:

CTF's mental health population continued to grow at an annual rate of 16 percent, largely due to the expansion of the 3CMS program into all three of the institution's facilities (Central, North, and South). The 3CMS population stood at 891, which was 27 percent above the institution's rated capacity of 699. This included 843 mainline inmates and 48 inmates in administrative segregation. There were four EOP inmates pending transfer at the time of site visit.

Staffing:

CTF received a staffing package in January 2007 that increased the institution's total allocation of mental health staff by 62 percent. In this package, the institution received 1.5 senior psychologists, a senior psych tech, a staff psychiatrist, three staff psychologists, a psychiatric social worker, four psych techs, three clerical staff, a health program specialist and a part-time RT.

Three of 3.5 supervisory positions were filled. However, it was increasingly clear that CTF's expanding 3CMS program justified the creation of a chief psychologist position. Staff reported that efforts were underway to create this position.

Three of 3.5 allocated psychiatric positions were vacant. Ten contract psychiatrists and a telemedicine doctor covered the equivalent of 4.3 FTE positions during the period from May through August 2007. While contractors and telemedicine more than covered vacancies, the revolving cadre of doctors and their ever fluctuating working hours compromised continuity of care.

Vacancies were most acute among case managers. After accounting for vacancies, long-term absences and contract coverage, the functional vacancy rate for case managers was 28 percent. Mainline and administrative segregation case managers maintained average caseloads of 100 and 25, respectively. However, with the MHSDS caseload spread among different facilities located far from one another and the influx of 30 to 50 new admissions a week, workloads were more challenging than the caseload numbers indicated.

During the monitoring period, about five percent of the MHSDS population participated in groups. Following the recent loss of two clinicians toward the end of the reporting period, the number of offered groups dwindled to only two. A third pre-release group met for the first time during September's site visit. Groups were not offered to inmates in North and South Facilities.

Quality Management:

CTF had a functioning quality management committee, as well as subcommittees for mental health, suicide prevention, pharmacy and therapeutics, and medical. The warden did not chair the quality management committee, though all of the meetings were attended by a chief

193

deputy warden.  The quality management committee chartered one QIT during the reporting period.  Documentation relative to the activities of this QIT was not provided to the monitor.

CTF's mental health subcommittee struggled during the first six months of 2007.  No meetings occurred during January or February and two meetings scheduled in May failed to reach quorum requirements.  Attendance was erratic during this period, with participants changing from one meeting to the next.  During the third quarter of 2007, the committee met twice monthly and attendance stabilized.  Minutes indicated that staff utilized the forum effectively to discuss and address issues relative to the MHSDS and the committee chair routinely presented mental health concerns at quality management committee meetings.

Three QITs were chartered during the first nine months of 2007.  Documentation related to the QITs was incomplete and confusing and the monitor was unable to determine the status of the teams' activities.

Peer review was initiated for psychologists and psychiatrists.  Minutes suggested that the peer review process entailed little more than presence/absence audits and that qualitative clinical issues were not discussed.

Suicide Prevention:

Despite efforts on the part of the suicide prevention coordinator to make the meetings relevant and interesting, CTF's SPC failed to meet regularly and struggled with attendance.  The committee failed to meet during January, February, March, and May and minutes reflected a general lack of focus and relevance.  For example, data regarding repeat admissions to the OHU were compiled and presented, though apparently failed to prompt discussion regarding possible reasons for repeat admissions or the development of a plan to reduce repeat admissions.

From May through August 2007, eleven inmates were released from the OHU with orders for five-day follow-up. Internal audits yielded a 90 percent compliance rate for the completion of five-day follow-up for inmates discharged from the OHU and returned from outside MHCB units. Custody checks occurred every 20 minutes during the first 24 hours after discharge/return, then at increasing intervals for four days.

Medication Management:

Despite the recent development of a new tracking protocol, CTF continued to struggle to adequately monitor inmates prescribed mood-stabilizing medications – another problem attributed to inadequate psychiatric coverage. Despite these difficulties, internal audits suggested the medications were timely renewed following face-to-face psychiatric contact on a consistent basis. Interviewed inmates indicated that bridge orders were used on a fairly regular basis to avoid expiration gaps. Medication continuity related to housing moves within the institution was generally good, though staff reported that medications did not always follow inmates placed in administrative segregation. Psych techs, responsible for the distribution of psychotropic medications to MHSDS inmates in administrative segregation, reportedly quickly addressed such glitches. Internal audits indicated that medication continuity upon arrival remained problematic, with an average compliance rate of 76 percent during the reporting period.

Psychiatric follow-up appointments were appropriately rescheduled more than 90 percent of the time, but did not always occur within 30 days – the institution's internal goal. The institution's audits indicated that psychiatrists routinely noted and addressed medication side effects. However, staff reported, and UHR reviews confirmed, that psychiatrists continued to change medication orders without providing a rationale in progress notes and, in some cases,

failed to document a response to reported side effects. Internal audits and UHR reviews found inconsistent compliance with the completion of informed consent forms.

Staff indicated that few inmates were prescribed DOT for psychotropic medications and reported that DOT protocols were followed. However, officers were not assigned to monitor pill lines and compliance with DOT protocols had not been audited during the reporting period.

There were reportedly more than 100 inmates prescribed psychotropic medications at HS and staff stated that HS medications were routinely delivered at or after 8:00 p.m. However, some interviewed inmates were unaware of the fact that their medications were ordered at HS, and several other inmates stated that the pill line closed prior to 8:00 p.m. and that they sometimes had to choose between going to the dining hall and standing in pill line. Nursing staff disputed these claims.

Staff reported that a 30-day supply of medications was routinely issued to inmates prior to their release from prison. Compliance in this area was not audited during the reporting period. Pre-release planning was largely relegated to TCMP social workers. Internal audits and UHRs reviewed by the monitor's expert each yielded an 80 percent compliance rate for completion of TCMP contacts with documentation in the UHR. Declining performance was attributed to the TCMP's unwillingness to complete pre-parole assessments without the inmate's UHR. UHRs indicated that case manager contacts and IDTT reviews often failed to acknowledge, much less address, impending paroles. After a prolonged hiatus, a pre-release group was formed and held its first session during the site visit.

<u>Mental Health Assessments for Use in the Discipline of Sexual Misconduct Violations</u>:

From May through August 2007, the institution issued five RVRs for sexual misconduct, all of which were referred to mental health for completion of a screen to rule out a diagnosis of Exhibitionism. There were no inmates diagnosed with Exhibitionism at CTF during the monitor's visit.

Hearing officers did not consistently consider input provided by mental health clinicians as part of the disciplinary process. During the reporting period, the institution reviewed 122 RVRs, 27 of which were referred to mental health for completion of a mental health evaluation. The clinician concluded that mental illness may have influenced the inmate's behavior in six cases. The hearing officer failed to document consideration of the clinician's input in three cases.

<u>Transfers</u>:

CTF did not refer inmates to DMH during the reporting period. In practice, acute patients who failed to stabilize in the OHU were transferred to an MHCB unit and sub-acute inmates in need of a higher level of care were transferred to an EOP program.

The OHU was comprised of eight single cells and two four-bed dorms, yielding a total capacity of 16. Nine other single cells in the OHU had been converted to clinical office space. From March through August 2007, there were 86 mental health admissions, an average of approximately 14 admissions a month. Length of stay in the OHU often exceeded 72 hours and average length of stay during the reporting period was over six days. Staff reported, and admission data confirmed, that average length of stay substantially increased following the departure of an OHU coordinator in August 2007, at which point this task was performed by an array of contractors. OHU length of stay often exceeded 72 hours, reportedly the result of

irregular psychiatric coverage in the infirmary.  CTF maintained an electronic tracking log for OHU admissions.

MHCB transfer records were incomplete and access to MHCBs was slow. From May through August 2007, seven inmates were referred and transferred to an MHCB unit in another CDCR prison.  Referral and/or transfer dates were not recorded for two of these inmates. Three of the remaining five cases were transferred to an MHCB unit within three days of referral.  One inmate was transferred within five days of referral and one was transferred within 16 days of referral.

CTF had few EOP inmates during the monitoring period and consistently complied with the 60-day transfer timeframe.  There were four EOP inmates pending transfer at the time of site visit, none of whom had been awaiting transfer longer than 60 days.  One clinician, designated the EOP coordinator, was responsible for seeing all EOP inmates weekly. UHR reviews found that EOP inmates were not consistently seen by the EOP coordinator on a weekly basis.  However, noncompliance was generally limited to one missed week.

Other Issues:

Administrative Segregation:

There were 310 inmates in administrative segregation, 49 or 16 percent of whom were at the 3CMS level of care.  There were no EOP inmates in administrative segregation.  Two full-time case managers were assigned to the unit, each with a caseload of about 24 inmates.

Internal audits yielded an 85 percent compliance rate for the completion of 31-question mental health screens and indicated that daily psych tech rounds were properly completed and documented.  Nursing staff started pre-screening inmates related to suicidal behavior/feelings prior to placement in administrative segregation in early September 2007.

The institution identified confidential clinical office space in the unit and succeeded in reducing the percentage of cell-front contacts from approximately 80 percent during a preceding monitoring round to 39 percent during this reporting period. IDTT meetings took place in private offices and were typically attended by all required disciplines.  UHRs were usually available.  C-files were rarely requested or available.

New arrivals were identified and received 30-minutes welfare checks during their first three weeks.  Documentation indicated that most welfare checks were not completed at staggered intervals as required.  Medical emergency response drills were performed twice during September 2007.

Inmates in administrative segregation were permitted to have a TV or radio in their cells and interviewed inmates reported having consistent access to outdoor yard ten hours a week.

Nursing staff used the new bus screening form, which included a question regarding "bad news."  For each screen, staff interviewed the inmate in a private office with the door closed, reviewed the inmate profile and consulted the UHR.  The screening process was exemplary.

Programs were modified or reduced on 29 occasions during the first eight months of 2007.  Program reductions typically targeted one or more ethnic group and lasted one to ten days, though one lockdown period following a riot lasted 22 days.

3CMS:

Performance was mixed within the mainline 3CMS program.  Internal audits yielded an 87 percent compliance rate for completion and documentation of quarterly case manager contacts, and various audits suggested sustained compliance with annual IDTT reviews.

However, CTF continued to struggle in other areas.  Documentation associated with IDTT reviews was often incomplete or missing.  Several treatment plans reviewed by the monitor were undated, incomplete, under-developed, generic, and cursory.  CC representation and C-file availability at IDTT meetings remained inconsistent.  CTF continued to struggle to complete initial IDTT reviews and mental health evaluations within 14 days of arrival.  CTF's ongoing reliance on a patchwork of contract psychiatrists, while necessary to provide psychiatric coverage, compromised the continuity and quality of services.  Interviewed inmates and UHR reviews indicated that individuals rarely saw the same doctor from one psychiatric contact to the next.

Referrals:

Clinicians were assigned on a rotating basis to respond to emergency referrals. Records suggested that emergency referrals consistently prompted contact within 24 hours.  The institution's monthly audits of routine referrals indicated that 78 to 93 percent, or an average of 84 percent, resulted in contact within five working days.

Institutional data indicated that 77 to 92 percent of mental health ducats resulted in a completed appointment.  Ducats for medical, dental and mental health appointments often conflicted and some custody staff did not know that all mental health appointments were considered priority ducats.  Consequently, mental health clinicians spent an inordinate amount of time tracking down inmates who, for myriad reasons, failed to show for scheduled appointments.

Medical Records/MHTS:

Access to UHRs worsened after activation of the MHSDS programs in North and South Facilities due to logistical complications associated with the expansion. UHR availability varied from facility to facility, South Facility being the most problematic.  Reviewed UHRs were

200