often in disarray. Paperwork was missing and filed incorrectly, records were not thinned

appropriately and progress notes were often illegible. Poorly organized UHRs and messy

documentation often made it difficult to identify treatment goals, follow the course of treatment

or discern the clinical rationale for provided treatment.

## Service Area G

Service Area G includes CMC, WSP, KVSP, and NKSP.

## California Men's Colony (CMC)
January 8, 2008 – January 11, 2008

Census:

On January 8, 2008, CMC held 3,722 inmates, 295 of whom were in

administrative segregation. The MHSDS population stood at 1,712, which was 46 percent of

institution's inmate population. There were 1,075 3CMS inmates in general population and 47

3CMS inmates in administrative segregation. There were 520 mainline EOP inmates and 36

EOP inmates in the administrative segregation hub. There were 34 inmates in the temporary

MHCB (the locked observation unit (LOU)).

Staffing:

Mental health staffing allocations increased and the overall vacancy rate

decreased during the reporting period. The institution filled several supervisory positions,

including six supervising psychiatric social worker positions, a senior psychologist position, a

senior psychiatrist position and a senior psych tech position.

Among psychiatrists, 3.5 of 24.5 allocated positions were vacant, with contractors

reducing the functional vacancy rate to nine percent. For psychologists, 13.75 of 47.5 allocated

positions were vacant, with contractors reducing the functional vacancy rate to 22 percent. There

were 21 allocated psych social worker positions, 5.5 of which remained vacant. Contract social

workers covered the equivalent of 4.3 positions, reducing the functional vacancy rate to six percent. Half of 11.8 allocated RT positions were uncovered. All psych tech positions were filled.

Inmate caseloads were high for case managers assigned to the 3CMS general population and administrative segregation programs, as well as for half of the case managers assigned to the mainline EOP program. In the EOP administrative segregation hub, case managers carried caseloads of ten to 17 EOP inmates plus a roughly equal number of 3CMS inmates.

Five of 123 allocated RN positions were vacant, and three of the five vacant RN positions were covered with contractors. Contractors and state employees covered 38 of 41 allocated LVN positions. Within medical records, eight of twelve newly allocated medical transcriptionist positions remained vacant. The remaining 24.7 positions were filled and staff turnover in medical records had reportedly declined.

Quality Management:

CMC had an exemplary quality improvement program for mental health. A team comprised of mental health clinicians, clerical support and compliance staff, employed sound audit principles and utilized technology effectively. Audit results informed practical corrective actions, and protocols were often used to increase the ease and effectiveness of remedial interventions. The team provided to each case manager a monthly printout covering key performance indicators and compliance with Program Guide timeframes, as well as useful clinical information about each inmate on their caseload.

The quality management committee and the mental health subcommittee met regularly with good, multidisciplinary composition and covered a wide range of germane topics. Peer review operated reasonably and consistently for all three disciplines.

QITs were frequently chartered to develop protocols for new requirements, to determine whether suspected problems required intervention, and to remedy known problems. Eight QITs were active during this reporting period; all generally with appropriate composition.

Mental health staff conducted audits on several aspects of administrative segregation and MHCB treatment, suicide prevention, and medication management. Most new program requirements were proactively audited to ensure successful implementation. Institutional audits generally employed sound methodology, included an analysis of the results and recommended interventions.

Suicide Prevention:

The SPC met monthly during the reporting period. Some key aspects of CMC's suicide prevention program remained noncompliant. For example, institutional audits yielded a compliance rate of 71 percent for completion of SRACs upon admission to the LOU and 62 percent upon discharge. In addition, internal audits of clinical five-day follow-up and custody checks following discharge from the LOU yielded compliance rates of 43 and 37 percent, respectively. Following discharge from the LOU, inmates were sometimes placed in the transitional living unit (TLU) for five-day follow-up monitoring. Eight inmates were housed in the TLU for this reason during the site visit.

CMC also continued to be noncompliant with several components of the Department's suicide reduction plan for administrative segregation. Institutional audits showed

poor compliance with the nursing pre-screenings and 31-question screenings, although the latter showed recent improvement in response to increased oversight.

There were 17 designated intake cells in administrative segregation, all of which were equipped with suicide-resistant vents. The intake cells could accommodate only a small fraction of the inmates on intake status at any given time. Newly arriving inmates were identified and received 30-minute welfare checks during their first 21 days in administrative segregation. Reviewed documentation indicated that welfare checks were conducted at staggered intervals.

Clinical and custody staff assigned to administrative segregation met twice daily and reviewed inmate profiles belonging to new arrival inmates. Daily psych tech rounds consistently occurred. Weekly summaries of psych tech rounds were produced and reviewed by case managers, though only half of the summaries ended up in UHRs.

The cost associated with installing cable and electrical outlets in administrative segregation cells was determined by the institution to be prohibitive, and inmates in administrative segregation were not permitted to have batteries for security reasons. Consequently, inmates in administrative segregation did not have access to in-cell appliances.

Correctional officers were trained in CPR and first aid. Monthly medical emergency drills occurred during all work shifts in administrative segregation. Related documentation suggested that the drills were nothing more than discussions, though administrators stated that the drills involved simulated responses to various emergency scenarios.

The ERRC met regularly and conducted excellent reviews of incidents that required an emergency response. No incidents required CPR during the last half of 2007.

An inmate profile, which included the results of completed SRACs, accompanied all inmates transferred from CMC.

Medication Management:

Difficulty recruiting LVNs and a change in pharmacy software complicated medication management during this reporting period. Nursing staff conducted a QIT focused on medication management issues. The audit tool utilized by nursing staff sometimes relied on sample sizes that were too small to be reliable given the size of CMC's MHSDS population.

Serial audits of the same medication management issues yielded variable results. Studies of medication continuity on arrival yielded compliance rates of 80 percent and above. Some audits found that only 60 percent of inmates received medication in a timely manner after a prescription was initiated or changed, while other studies showed full compliance in this area. Compliance rates related to medication continuity when inmates moved within the institution dipped as low as 40 percent. Audits indicated that medications were timely renewed at least 90 percent of the time, though larger sample sizes were required to produce reliable results.

CMC adopted a more stringent definition of medication noncompliance than used by CDCR, and institutional audits showed variable compliance with these internal standards. Per local policy, medication noncompliance prompted nurse contact within a week and hundreds of such contacts were documented during the reporting period. Psychiatrists were provided weekly lists of inmates on their caseload identified as noncompliant with prescribed psychotropic medications. Psychiatric response to these lists had not been studied.

Methodologically limited UHR reviews yielded compliance rates of 75 percent for informed consent forms and 80 percent for lab results related to mood stabilizing medications.

According to documents provided by the institution, psychiatrists were not permitted to write HS medication orders for more than seven inmates on their caseload. Consequently, less than eight percent of inmates taking psychotropic medications had HS prescriptions.

Psychiatrists did not write DOT orders.  Rather, CMC was moving toward a system whereby pairs of LVNs would distribute all medication; one administering medication and one following DOT procedures.

CMC initiated and renewed 36 Keyhea petitions, six of which were denied.  Staff reported that, in an increasing number of cases, Keyhea petitions were not timely processed and hearings were not promptly scheduled; factors that reportedly contributed to failed petitions and lengthy interruptions in medication administration.

Methodologically sound audits showed full compliance with supplying parole medications.  CMC offered a parenting group for inmates due to parole within a year and parole planning group for inmates due to be released within three months.  Both groups were offered to EOP and 3CMS inmates and together enrolled 36 inmates at the time of the site visit.  The groups reportedly included assistance with supplemental security income (SSI) applications for EOP inmates, and provided information about county resources, jobs, and education for all participants.

Mental Health Assessments for Use in the Discipline of Sexual Misconduct Violations:

CMC had implemented protocols related to sexual misconduct, but improvement was needed.  A sexual misconduct log indicated that CMC issued 43 RVRs for indecent exposure during the reporting period.  Information provided by the institution indicated that 14

percent of these RVRs were not referred to mental health for completion of screens to rule out Exhibitionism.

With the exception of eight cases involving inmates who were previously evaluated for prior infractions, all referred cases were screened and reviewed by an IDTT, an area of noted improvement. Seven comprehensive evaluations were completed during the reporting period. Five inmates were diagnosed with Exhibitionism and referred to a centralized treatment program. None of these individuals had transferred, either because repeated LOU admissions interrupted the transfer process or because they paroled prior to transfer.

Mental health input did not influence the outcome of disciplinary hearings related to indecent exposure.

Transfers:

CMC had a DMH referral team, comprised of a senior psych social worker, a psych tech and clerical staffer, which increased the number of referrals and transfers to all DMH programs during the reporting period. Most ASH referrals were completed within established timeframes, while access to SVPP and acute care was often slow.

CMC generated approximately 93 acute care referrals during the reporting period. Referral decisions were usually made within a week of an inmate's admission to the LOU, but untimely completion of referral paperwork delayed transfer to DMH in about a of third all cases. No referrals were rejected, though some acceptance decisions were substantially delayed, taking as long as three months. In addition, nearly half, or 44, of the referrals were rescinded by the institution, often after waiting weeks for an acute bed. Approximately 49 acute care referrals resulted in transfer, 78 percent of which occurred within ten days of referral, as required.

CMC generated 44 intermediate care referrals.  Completion of referral paperwork was delayed in more than half of these cases, taking up to six weeks.  Seven of the intermediate care referrals were subsequently changed to acute care.

CMC generated 24 ASH referrals, one of which was rescinded by the institution.  All other ASH referrals were accepted within five weeks and all transfers occurred within 30 days or so.  The single intermediate care referral to CMF was accepted within six weeks, and transfer occurred two weeks after the 30-day deadline.

CMC generated 19 SVPP referrals.  SVPP accepted inmates three to twelve weeks after referral.  Six referrals were subsequently rescinded; three after many weeks on the waiting list.  Of the 13 SVPP referrals that resulted in transfer, less than a third occurred within 30 days.

Access to the LOU was adequate.  During the reporting period, there were 838 LOU admissions, 21 percent of which lasted longer than ten days.  The rate of multiple admissions increased during the reporting period, with 76 inmates admitted to the LOU three or more times within six months.  A substantial number of inmates were admitted to the LOU six to nine times.  The unit's average daily census during the reporting period was just over 33 inmates, or 79 percent of its capacity.  Holding cells reportedly were used infrequently and only for a few hours.

Staffing for the LOU was adequate in most respects.  Exceptions included the recent loss of a half-time RT, which had interrupted the provision of in-cell activities to MHCB inmates.  In addition, staff reported that the allocation of a half-time physician, responsible for completing histories and physical examinations for five to six new admissions a day and conducting daily sick call, was inadequate.  Failure to take a history and do physical

examinations within 24 hours was a serious problem.  Finally, LOU staffing allocations did not include a CC.  As a result, most IDTTs suffered from the lack of custody representation.

Space for individual and group treatment in the LOU was inadequate.  Holding cells located in the adjacent mental health building were used for some individual contacts and efforts were underway to clear a storage room in the mental health building so that it could be used for MHCB groups.  IDTT meetings were held in a cramped, narrow all-purpose room that was shared by custody and mental health staff.  Throughout the IDTT observed by the monitor's expert, discussion was interrupted by custody and mental health staff coming and going, as well as ringing phones and fax machines.

Despite space limitations in the LOU, two clinical teams conducted daily IDTT reviews Monday through Friday, during which treatment and discharge decisions were made.  In addition, all MHCB inmates were evaluated daily by a psychiatrist or psychologist and received at least two medication reviews a week – practices that were confirmed by institutional audits and documented in records reviewed by the monitor's expert.

Nursing coverage was provided 24 hours a day, seven days a week.  Nursing staff rounded on all MHCB inmates every 15 to 30 minutes, and monitored inmates on suicide precautions every 15 minutes.  Inmates placed on suicide watch were transferred to the GACH at CMC.

During the monitoring period, revised policies and procedures regarding restraints and seclusion were submitted to CMC's health care manager for approval as an "emergency interim" policy and procedure pending further action by the medical staff of the institution through its normal process.  The emergency interim policy grew out of a review by CMC, DCHCS, and the Plata receiver following the death of an inmate in restraints at CMC.  In the

monitoring period, restraint was used 34 times; a third of these instances concluded within a day. Following the new policy and during the four-month period immediately preceding the monitor's visit, only one inmate was restrained, and the duration of that restraint lasted less than 24 hours.

In response to ventilation concerns, boxes were placed around cell windows in the LOU so that windows could be opened. The increased risk of suicide posed by the boxes warranted enhanced routine monitoring.

An outside yard remained under renovation and was not available to inmates housed in the LOU.

Access to PSUs remained slow in some cases. During the reporting period, CMC transferred 17 inmates to a PSU, two-thirds of whom were transferred within two months of endorsement. A third of the PSU transfers were delayed, the longest taking nine months. At the time of the site visit, there were nine inmates at CMC with current PSU endorsements. These inmates had been waiting to be transferred for periods of six weeks to four months.

Other Issues:

EOP Administrative Segregation:

Five case managers, a psychiatrist, a senior psychologist and an office tech shared two offices, an anteroom and four converted cells in the EOP hub. Due to limited space, 45 percent of psychiatric contacts and 30 percent of case manger contacts occurred at the cell front.

Access to structured therapeutic activities in the EOP hub program improved during the reporting period. Provided data indicated that inmates were offered, on average, 13 hours of structured therapeutic activities per week, and received just over eight hours. The disparity between offered and received group hours was largely due to inmate refusals, most of

which were reportedly related to local security procedures that required all inmates to be strip searched before going to group.

About 75 percent of the offered structured therapeutic activities were treatment plan-specific specialty groups. The remaining 25 percent was recreation therapy, some of which involved in-cell activities. Group treatment space in the EOP hub was moved to a new area shortly before the site visit. It consisted of two horseshoe-configured groups of seven treatment modules. The new space afforded increased confidentiality and comfort, but was somewhat noisy.

The institution activated 45 newly constructed small management yards during the reporting period. Consequently, access to yard for inmates in the EOP hub had substantially increased.

Approximately 42 percent of the EOP inmates in administrative segregation had been there longer than 90 days. Three EOP inmates had been in administrative segregation 18 months; two had multiple RVRs for indecent exposure and one SHU-status inmate was involved in court proceedings.

<u>3CMS Administrative Segregation</u>:

Institutional audits yielded compliance rates of over 90 percent for regular and timely completion of case manager contacts, psychiatric reviews and IDTT updates. These findings were confirmed by reviews completed by the monitor during the site visit.

An IDTT in administrative segregation observed by the monitor's expert was interdisciplinary, but did not include a classification representative. Staff reported that 2.5 CCs were assigned to administrative segregation and that they usually attended all or part of IDTT meetings. C-files were not routinely available for IDTT reviews, although pertinent information

211

in the C-file was reportedly summarized by the CC, and shared with IDTT participants as needed. Noise surrounding the meeting room in which the IDTT was held was distracting and made it difficult to hear what was being said.

3CMS inmates in administrative segregation were offered anywhere from three to 14 hours of therapeutic activities a week, at least 60 percent of which were provided in the cell. Twenty percent of 3CMS inmates in administrative segregation had been there longer than 90 days; the longest stay of 11 months was related to safety concerns.

Mainline EOP:

The mainline EOP census remained well below its rated capacity of 634. CMC continued to be compliant with basic Program Guide requirements. Weekly case manager contacts and monthly psychiatric interviews occurred in private offices. Initial IDTT reviews and quarterly updates were timely completed. In addition, EOP inmates had excellent access to work, vocation and educational programs.

Inmate access to, and participation in, meaningful, treatment specific therapeutic activities appeared limited. Data provided by the institution indicated that EOP inmates were offered, on average, 8.5 activity hours a week. Over half of the offered activities consisted of large indoor and outdoor leisure and ADL groups, many of which had more than 60 inmate participants and only one RT. This lopsided staff-to-inmate ratio raised serious questions as to whether meaningful instruction and support were possible. Approximately 19 percent of offered activities were "tier" groups, community meetings, and other large dayroom groups led by psych techs. Less than a third of the offered activities were "treatment goal specific" specialty groups.

The monitor's review of a limited number of cases indicated that inmates refused three to five offered activities a week and participated in few specialty groups. Work

212

assignments, vocational sessions and educational classes were often scheduled during group activities, which may have contributed to the high inmate refusal rate.

Mainline 3CMS:

Large caseloads, ranging from 160 to 246 inmates, appeared to contribute to poor compliance with some of the basic Program Guide requirements for 3CMS inmates. The monitor's review of a large sample of 3CMS inmates showed that 29 percent of new arrivals were not timely evaluated and that 60 percent of initial IDTT reviews were not completed within the required timeframe. In addition, case managers did not see all 3CMS inmates individually at least once every 90 days.

Other aspects of the 3CMS program worked well. Psychiatric contacts were frequent and treatment plans were consistently reviewed and updated on an annual basis. Lastly, two-thirds of the large 3CMS population was enrolled in groups.

Referrals:

CMC implemented reliable systems for tracking and triaging referrals as part of its plan to reach compliance regarding referrals. During the monitoring period, nearly all emergent referrals were addressed immediately, while only 66 percent of urgent referrals prompted contact within 24 hours. Just over 80 percent of routine referrals were addressed within five working days.

**Wasco State Prison (WSP)**
December 10, 2007 – December 12, 2007

Since the monitor's preceding site visit, this institution made significant strides in reducing its functional vacancy rate in mental health. There were 90.22 authorized MHSDS positions at WSP at the time of the site visit, of which 61.3 were filled with staff and 18.15 FTE

contract positions, leaving 10.77 functional vacancies at a rate of 13.5 percent, with the largest proportion of them being staff psychologist positions.  There were 6.5 staff psychologist hires in process at the time of the site visit.

Both the chief psychiatrist and chief psychologist positions were filled, as were the one senior psychiatrist and three senior psychologist positions.  Of the seven psychiatrist positions, one was filled by staff and six FTEs were covered by contactors, leaving no functional vacancies in psychiatry.  Among psychologists, there were 18 on staff in addition to the equivalent of 10.75 registry psychologists.  All 9.8 psychiatric social worker positions were filled, as were all seven psych tech positions and the sole senior psych tech position.  The sole health program specialist and 12.5 of the 13 mental health clerical positions were filled.

Quality Management:

Although previously resolved, quality management at WSP was found partially compliant during the monitor's current review.  The institution's quality management committee met regularly with appropriate multidisciplinary attendance and activities.  However, quality improvement activities decreased during the monitoring period.  The mental health quality management committee did not meet outside of the licensed inpatient committee, and did not include any non-supervisory mental health staff.  Psychiatry peer review did not occur regularly, and psychology peer review documentation was not available during the monitor's visit.

Suicide Prevention:

Activities of the SPC at WSP improved during the monitoring period.  The committee met monthly and covered substantively appropriate issues.  Five-day follow-up was noncompliant due to incomplete documentation of custody checks.  Clinical five-day follow-up remained compliant.  Emergency drills in administrative segregation were also noncompliant.

214

Drills were performed for custody staff; however, no clinical staff was included.  Further, while many of the practice drill fact patterns involved signs and symptoms of mental illness and suicidality, none of the follow-up discussions related to addressing these issues.

The ERRC met monthly and remained compliant.

Medication Management:

More audits were done; however, many areas remained unchecked during the monitoring period.  Further, auditing was performed by a program specialist with no medical background.  For this reason many clinical judgments could not be audited.  Audits were not performed for laboratory studies, timeliness of psychiatric response to medication noncompliance, HS medication administration and parole medication distribution.  WSP utilized a flawed audit instrument that checked for the presence of a progress note, rather than whether there was documentation of a rationale for medication changes.  Also, supervisory staff was not aware that clinical discretion was allowed regarding DOT, and all psychotropic medications were considered DOT regardless of whether or not DOT was clinically indicated.

Mental Health Assessments for Use in the Discipline of Sexual Misconduct Violations:

There were 21 documented occurrences of RVRs issued for sexual misconduct during the period from May 29, 2007 through December 10, 2007.  WSP was noncompliant with completing required mental health screenings for sexual misconduct; screenings were completed in only 12, or 57 percent, of the 21 incidents.

WSP also implemented a policy of covering the windows of inpatient unit cells of inmate's with RVRs for sexual misconduct, including inmates on suicide watch.

Transfers:

Access to DMH improved with an increased number of referrals during the

215

monitoring period. However, over one third of all referrals to DMH were made after multiple MHCB admissions and well after the inmate was discharged from the MHCB.

Eighteen inmates were referred to DMH at CMF during the review period. There was no pattern to bed number issuance, which ranged from one to 37 days. Transportation occurred timely once the bed number was issued.

Five inmates were transferred timely and six transfers took approximately six weeks after referral. One referral was rescinded, and two were redirected to intermediate care. Four referrals were rejected due to upcoming parole dates.

WSP resumed making referrals to ASH six weeks prior to the monitor's visit. WSP referred four inmates and bed numbers were issued within one week. Transportation was timely.

Three inmates were referred to SVPP during the monitoring period. Two inmates were rejected due to close parole dates and one inmate was accepted; he had been waiting to be transferred for two months.

Two inmates were referred to intermediate care at DMH at CMF. Transfers were pending for four and six weeks at the time of the monitor's visit.

There were 356 MHCB admissions during the monitoring period, although distinctions were not made between time spent in holding cells and actual MHCB admission time. Consequently, the reported number of admissions included inmates who were never physically admitted to the CTC. Eighty-nine percent of MHCB admissions were discharged in ten days or less. Documentation was not available for the remaining 11 percent for the delay in discharges. Eight inmates had lengths of stay longer than one month.

Thirty inmates had three or more admissions in the preceding six-month period.

216

Only 40 percent of the repeat admission inmates were referred to DMH.  DMH referrals were not usually generated until the fifth or sixth admission, and one inmate had 12 admissions over a six-month period prior to DMH consideration.

There were no instances of the use of restraints during the monitoring period.

The use of holding cells pending MHCB admission was problematic.  Lengths of stay often exceeded four hours, and one inmate was on suicide watch in a holding cell for five days.  Alternative holding cells were utilized frequently, and for prolonged periods of time in many different settings throughout the institution.  There was no indication that the CTC was used as the priority setting.  Documentation revealed suicide watches conducted in the CTC, holding cells, administrative segregation, and R&R.  Records showed at least 134 uses of alternative cell placement in a six-month period, including several inmates with multiple admissions.  One quarter of the inmates in the alternative settings were held on suicide watch for three to nine days.

All EOP inmates at WSP at the time of the monitor's visit were on RC status.  Thirty percent of the EOP inmates were housed at WSP beyond timeframe guidelines.  One inmate had a length of stay of 11 months.  WSP did not utilize the expedited transfer process for EOP inmates during the monitoring period.

Other Issues:

RC:

WSP implemented an adequate system of identifying returning EOP inmates within three days during the monitoring period.  Thirty EOP inmates returned to WSP during this timeframe and all but one were seen within the first week of arrival.

WSP was noncompliant in providing five hours of structured therapeutic activities

per week to EOP RC inmates.  Documentation demonstrated that WSP provided only three hours or less per week due to cancellations and logistics of scheduling and transporting inmates.

Group assignments were not treatment plan-driven.  Set schedules of four topics were provided to all inmates living in a particular building.  Custody escorts were not problematic.

Access to yard decreased during the monitoring period to two one-hour blocks per week.  Similarly, two one-hour blocks per week of dayroom use were permitted.  Inmates living on D yard received less out of cell time due to frequent gang related lockdowns.

Clinical contacts decreased over the review period.  Fewer than 20 percent of the monitor's large sample had consistent weekly contact with case managers.  Almost half of the sample had no documented individual clinical contacts in the most recent month or two.  Monthly psychiatry contacts were compliant.

IDTT meetings occurred over the monitoring period; however, over half of the initial meetings were one to two weeks late.  IDTT updates were compliant.  However, a large number of IDTT meetings, both initial and updates, were completed with the EOP inmate "in absentia."

Psych tech rounds were performed five days per week in the RC EOP.

WSP implemented pre-release planning during the monitoring period, but the EOP staff was notified of parole dates only once a month by classification staff.  Only eight inmates were receiving pre-release services at the time of the monitor's visit.

While offered in a group setting, the content of the pre-release planning at WSP was advanced relative to other institutions system-wide.  Individualized planning was provided, including completion of SSI applications, mock job interviews, and resource lists.  WSP did not

contact the POC or service agencies, nor were they aware of how to initiate conservatorships.

At least 20 percent of the EOP inmates housed at WSP at the time of the monitor's visit had recently been treated at the community hospital according to their inmate histories.  Reasons were not provided for these transfers.

RC 3CMS inmates were receiving enhanced services at the time of the monitor's visit.  WSP had 258 RC 3CMS inmates enrolled in group therapy, including pre-release planning.  Group assignment was voluntary and driven by housing unit not treatment plan.

WSP remained partially compliant for seeing arriving 3CMS inmates for initial assessments within 30 days of arrival.  The institution was compliant for subsequent routine 90-day case manager contacts in RC 3CMS.

Administrative Segregation:

Three EOP inmates were housed in administrative segregation for over 120 days, and the longest stay was for 259 days.  Of the 41 3CMS inmates housed in administrative segregation, 17 had been housed in the unit for over 60 days with the longest stay at 325 days.

A revised procedure for pre-placement screening for administrative segregation was implemented over the monitoring period, and documentation revealed compliance.  WSP was also compliant for timely completion of post-placement mental health screens.

Psych tech rounds were completed daily, seven days per week in administrative segregation.  Contacts were recorded on the isolation logs and all mental heath caseload inmates were documented.  Cell check sheets were validated and signed weekly by the administrative segregation clinical case managers who submitted the sheets to the administrative segregation mental heath supervisor who verified and signed each sheet prior to filing in the inmate's UHR.

Weekly clinical case manager contacts were at 94 percent; however, WSP

remained partially compliant as 46 percent occurred cell-front.  Programming space in administrative segregation remained very problematic during the monitoring period.  WSP offered anger management, co-dependency and self esteem groups to EOP inmates in administrative segregation.

At the time of the monitor's visit, there were 38 3CMS inmates in administrative segregation.  WSP had three 3CMS groups running in administrative segregation, with a total of ten participants.  These ten inmates participated in four hours of group per week.

Thirty-minute welfare checks were compliant and documented appropriately.

Staff reported that inmates in administrative segregation were offered more than ten hours per week of outdoor recreation time.  Audits regarding administrative segregation recreation access were not available for review.

3CMS Mainline:

WSP also remained compliant for completing quarterly clinical case manager contacts for mainline 3CMS inmates.  IDTT meetings in the mainline 3CMS program were also timely and well attended by all disciplines.  Treatment plans were complete and present in the UHRs.  In addition, WSP started at least ten psychotherapeutic groups in the 3CMS program during the monitoring period and was in partial compliance regarding group therapy for 3CMS inmates in general population.

Referrals:

Psychiatry response to staff and self-referrals remained partially compliant.  Only 22 percent of a ten percent sample met timeframes for response to a self-referral.  Staff referrals fared slightly better with 57 percent compliance.  Problems were noted with delivery of referrals to the mental health department.  Response to emergency referrals was compliant.

Medical Records/MHTS:

There were 1,074 3CMS inmates at WSP at the time of the monitor's visit. Due to information management problems with MHTS, transfer printouts captured only 867 of these inmates. Twenty eight percent of the tracked inmates had lengths of stay beyond 90 days.

Medical record filing remained noncompliant. At the time of the monitor's visit, there was seven to eight feet of unfiled material. UHRs were disorganized, and reviewed charts contained information belonging to other inmates.

Heat Plan:

WSP continued to implement their heat plan consistently throughout the monitoring period.

**Kern Valley State Prison (KVSP)**
October 10, 2007 – October 12, 2007

As the most recently opened CDCR institution, KVSP did not have a CAP. The special master believes that a CAP for KVSP would be beneficial and will work with the institution to develop one in the upcoming twenty-second monitoring period.

Census:

As of October 2007, KVSP housed 5,050 inmates, 486 of whom were in MHSDS inmates. There were 468 3CMS inmates; 49, or ten percent, above its rated capacity of 419. There were approximately 77 3CMS inmates in administrative segregation. There were 18 EOP inmates awaiting transfer; six in administrative segregation. There were seven inmates in MHCBs.

KVSP accepted MHCB admissions from other CDCR prisons, but remained closed to 3CMS intake. Consequently, its MHSDS population remained stable throughout the reporting period.

221

Staffing:

Recent salary increases for mental health positions appeared to improve KVSP's ability to fill vacancies. The overall vacancy rate among 53 allocated mental health positions fell from 33 percent in June 2007 to 20 percent in October 2007, with contractors reducing the functional vacancy rate to 13 percent.

All supervisory positions, including a chief psychiatrist, chief psychologist, senior psychologist and senior LPT, were filled. All four allocated staff psychiatrist positions were filled, and contract psychiatrists provided the equivalent of a half-time coverage from July through September 2007.

All six allocated psychiatric social worker positions were filled, while eight of ten allocated staff psychologist positions remained vacant. Contract clinicians reduced the functional vacancy rate among case managers to 31 percent during the reporting period.

All seven allocated psych tech positions were filled, as were eleven allocated RN positions and the associate health program advisor position. One of three RT positions and one of 5.5 office tech positions remained vacant, as did a half-time SRN II position.

Improved staffing positively impacted the general population 3CMS program at KVSP. Quarterly, and in some cases bi-monthly and monthly, case manager contacts had recently become routine. Annual IDTT reviews consistently occurred and staff had started to respond to routine mental health referrals within timeframes.

On the other hand, case manager caseloads in administrative segregation remained excessive, which continued to prevent compliance with applicable Program Guide requirements.

A warden was permanently assigned to KVSP for the first time and vacancy rates among correctional positions were low relative to other CDCR prisons. The vacancy rates were four percent for correctional officers, nine percent for sergeants, and 14 percent for lieutenants.

Quality Management:

KVSP's quality management program improved during the reporting period, but much more progress was needed. The mental health subcommittee met regularly during the reporting period and on a weekly basis in September, immediately prior to the monitor's site visit. Attendance, while improved, continued to be inadequate; approximately half of the required participants failed to attend meetings on a consistent basis.

The mental health subcommittee considered issues that were relevant to mental health, including reports from the institution's SPR-FIT, medication management audits and performance data relative to several mental health issues. However, the subcommittee's efforts often lacked focus and follow-up. There were no QITs active at the time of the site visit. A QIT, initially chartered in 2006 to study the troubled referral system, remained largely inactive during the reporting period.

Psychiatric peer review consisted of tri-monthly meetings during which participants conducted quantitative reviews of 20 UHRs. Peer review by other clinical disciplines had not been implemented. In August 2007, mental health clinicians reviewed UHRs in order to establish a baseline for numerous quality-of-care and Program Guide compliance indices against which to gauge future progress.

223

Suicide Prevention:

SPC meetings were held nearly every month, except June 2007.  Meetings were poorly attended, with 24 to 68 percent of required participants in attendance during the monitoring period.

Tracking logs and UHR documentation indicated that KVSP continued to be 100 percent compliant with the completion of five-day clinical follow-up upon discharge from the MHCB.  Staff reported that inmates released to the housing unit from temporary holding cells also received five-day follow-up, though the monitor's review of two such cases indicated that only half of the required contacts were completed.

KVSP implemented some, but not all, of the requirements set forth in the Department's suicide reduction plan for administrative segregation.  Staff reported, and a small number of UHRs reviewed by the monitor indicated, that nursing staff asked inmates about past and present suicidal feeling and behaviors prior to their placement in administrative segregation. There was no formal audit to confirm compliance in this area.

Institutional audits and tracking records also indicated that staff utilized the 31-question form to screen non-MHSDS inmates within 72 hours of their placement in administrative segregation.  Inmate profiles, which included the results of SRACs, were not used as part of screening process.

Audits and tracking records provided by the institution, as well as the monitor's review of isolation logs, indicated that psych techs completed daily rounds in all administrative segregation and overflow units.

All new admissions to administrative segregation were identified by paper placards on their cell doors and received 30-minute welfare checks during their first 21 days in

administrative segregation.  Completion of 30-minute welfare checks was well documented, though many of the checks were completed at regular, rather than staggered, intervals.

There were eight intake cells in Unit B-1 and seven intake cells in both stand-alone administrative segregation units, all of which were equipped with suicide-resistant vents. Staff did not know of any plans to change the doors and beds in these cells.  Staff acknowledged that the intake cells were not used to monitor new admission inmates, as the "revolving door" to the unit and constant need to re-house inmates made the use of designated intake cells impractical.

Inmates housed in the stand-alone administrative segregation units had access to twenty walk-alone yards and were routinely offered approximately ten hours of yard a week. Inmates housed in Unit B-1, which included all MHSDS inmates in administrative segregation, were offered four to six hours of yard a week due to insufficient yard space.

Cells in Unit B-1 were equipped with electrical outlets and inmates housed in these buildings were permitted to have a television or radio.  Cells in the stand-alone units were not equipped with electrical outlets and staff had not yet devised an alternative means to provide in-cell appliances to inmates housed in these units.

Provided documentation indicated that monthly medical emergency drills occurred in all administrative segregation units on all three watches during September, 2007. The drills, which lasted 20 minutes to an hour, required staff to respond to various incidents, many of which involved attempted suicides and other mental health-related scenarios.

The institution's ERRC had begun to address poor documentation and inadequate response procedures associated with medical emergencies.  ERRC reviews focused on adherence

to response protocols and timeframes and did not appear to address the appropriateness of medical interventions or quality of correctional emergency efforts.

Medication Management:

Medication management audits continued to be grossly inadequate. Audit periods were not defined and samples sizes were not adequate to produce reliable results. Consequently, the institution was unable to produce reliable data on which to assess medication continuity, the provision of informed consent and procedures for monitoring blood levels. However, limited record reviews conducted by psychiatric staff suggested continued noncompliance in these areas and there was anecdotal evidence of medication disruptions when inmates were discharged from the MHCB and placed in administrative segregation.

Nursing supervisors completed monthly reviews of MARs, which indicated that three consecutive days of missed or refused medications consistently triggered referrals to mental health. Other definitions of medication noncompliance (e.g., 50 percent of all doses missed during a seven-day period) were not captured in the monthly reviews.

There were 746 inmates on DOT medications.

Two Keyhea petitions were initiated during the reporting period, one of which was rejected. There was one inmate at KVSP with an active Keyhea order at the time of the site visit.

As of October 2, 2007, there were 340 inmates on HS medications, representing a significant increase compared to the number reported during the preceding site visit. Nursing staff reported, and reviewed MARs confirmed, that HS medications were routinely administered at or after 8:00 p.m.

226

Pharmacy data indicated that of 15 inmates paroling on psychotropic medications during the reporting period, one was not given a supply of medication upon his release from KVSP.

Transfers:

The institution's DMH referral log commingled DMH and EOP referrals and did not consistently record all required data points, making it difficult to fully evaluate access to DMH. Nonetheless, the provided data suggested that access to DMH was slow in some cases. It appeared that KVSP generated 19 DMH referrals during the reporting period, 15 of which had all required facility information. The time lapse between referral to acceptance for these 15 cases ranged from two to 54 days and averaged nearly 19 days. Following acceptance, inmates were transferred to DMH, on average, within two to three days.

Institutional data indicated that DMH referrals were initiated later than clinically indicated. Staff information, in addition to the monitor's review of inmates with multiple MHCB admissions and discussions with clinical staff, indicated that KVSP underutilized DMH intermediate care.

KVSP had a 22-bed CTC, which included twelve MHCBs and ten medical beds. The MHCB unit typically operated close to full capacity and, when at full capacity, inmates were placed in holding cells pending admission.

From June through September 2007, there were 142 MHCB admissions; an average of 36 admissions a month. The percentage of admissions that lasted longer than ten days declined from 22 percent during the preceding reporting period to 15 percent during this reporting period. The mean length of stay was 19 days for these admissions, some of which were related to DMH referrals. Six inmates were admitted to the MHCB three or more times

during the reporting period, and there were a number of incidents in which inmates were discharged and readmitted to the MHCB within 24 hours. The institution did not track MHCB referrals that were ultimately rejected.

Staff reported that mental health inmates could not be temporarily placed in CTC beds designated for medical patients when all MHCBs were occupied. Consequently, holding cells located in an area adjacent to administrative segregation were used to monitor inmates waiting for a crisis bed, even when medical beds were available. A log, started in July 2007, indicated that nine inmates were placed in these holding cells from July 1 through October 2007. Four inmates were returned to housing units after spending less than 24 hours in the holding cells. Three inmates spent less than twelve hours in the holding cells before being transferred to the CTC. One inmate was held in a holding cell for two days before receiving MHCB placement.

Administrators reported that custody staff provided continuous one-on-one observation and that daily rounds were completed by a psychiatrist and psychologist throughout an inmate's stay in a holding cell. These activities were not documented and could not be verified. The institution had developed an operating procedure governing the utilization of these holding cells. Intake assessments and SRACs were reportedly completed upon an inmate's transfer to the MHCB unit.

All MHCB inmates, regardless of their security status, were managed similarly to administrative segregation-status inmates. When moved within the CTC, all MHCB inmates were handcuffed and escorted by two correctional officers. All MHCB clinicians were required to wear stab-proof vests and inmates were required to be handcuffed or placed in a holding cell during one-on-one interviews, even if they were not on administrative segregation status.

Inmates on suicide watch or precautions were not afforded access to recreational activities and therapy groups were not available in the MHCB unit. Space limitations in the CTC reportedly presented challenges to seeing inmates in appropriate confidential settings.

IDTT meetings were held twice a week in the MHCB. Clinical staff were noted to provide appropriate clinical interface with inmates during an IDTT meeting observed by the monitor's expert. CCs did not attend IDTT meetings in the MHCB.

Nine mental health inmates were placed in seclusion during the reporting period, and length of stay ranged from three for 35.6 hours. Seven mental health inmates were placed in restraints for durations of two minutes to 19 hours.

Timely transfer of EOP inmates from KVSP had improved, but remained problematic. From June 1 to October 4, 2007, 27 EOP inmates were transferred from KVSP. One case involved an EOP inmate who was temporarily housed at KVSP to attend court proceedings, to which transfer guidelines did not apply. In another case, the transfer report did not include the date the inmate was designated EOP, rendering it impossible to ascertain the transfer timeline.

Nine, or 36 percent, of the remaining 25 EOP transfers took longer than 60 days. Delays were excessive in some cases; 88 days, 100 days, 149 days, and 524 days. Some of the transfer delays were attributed to complicated case factors, such as sensitive needs status and medical conditions. In other cases, transfers were postponed pending the resolution of disciplinary hearings and district attorney referrals.

There were twelve EOP inmates at KVSP as of October 3, 2007. Five of twelve inmates had been at KVSP longer than 60 days; four were a few days overdue and one had been waiting 103 days.

Other Issues:

Administrative Segregation:

During the October 2007 site visit, KVSP operated three administrative segregation units; two stand-alone units and an overflow unit for MHSDS inmates in Building B-1.  When needed, Building B-2 was used as a second overflow unit for MHSDS inmates.  B-2 was used throughout the reporting period, but was inactive at the time of the monitor's visit.

One stand-alone administrative segregation unit held 168 inmates and the other held 158 inmates, none of whom were participants in the MHSDS.  Information provided by the institution indicated that KVSP failed to remove MHSDS inmates from the stand-alone units within 24 hours.  During the reporting period, eight 3CMS inmates were mistakenly placed in the stand-alone units.  The removal date was not recorded in one case.  Two of the remaining seven inmates were not removed from the units within 24 hours; one waited two days and the other four days.

During the same period, five inmates housed in the stand-alone units were designated 3CMS.  Three of those five inmates were not removed from the unit within 24 hours of their placement in the MHSDS.  One inmate waited for two days, another for three days and the third for 15 days.  In this latter case, a clinician reportedly failed to properly document the inmate's placement in the MHSDS.

In mid-October 2007, Building B-1 held 96 administrative segregation inmates, including approximately 88 3CMS inmates and four EOP inmates.  During most of the reporting period, one full-time clinician was assigned to cover Unit B-1, as well as Unit B-2 when it was activated.  With a caseload ranging from 85 to over 110 inmates, the clinician was unable to offer weekly out-of-cell contacts to 3CMS inmates in administrative segregation.  Rather, the

230

clinician was compelled to adopt a cell-front triage system whereby a small fraction of the caseload could access out-of-cell clinical contacts.

Shortly before the monitor's site visit, a second full-time case manager was assigned to administrative segregation, reducing caseloads to 40 to 45 inmates. In addition, contractors were assigned to provide ten hours of coverage in administrative segregation on both Saturday and Sunday, largely using this time to respond to referrals and screen new admissions so that assigned case managers could focus more of their time on weekly contacts.

Limited office space and inappropriate custodial practices rendered most clinical contacts non-confidential. There was one office in Unit B-1 for all health appointments, including sick-call (first priority), psychiatric appointments (second priority) and case manager contacts (third priority). Case managers rarely had access to the office and were forced to use holding cells located in the dayroom for out-of-cell contacts. The holding cells afforded no visual privacy and very little sound privacy. Statistics regarding the prevalence of cell-front contacts were not available.

Most psychiatric appointments were held in the office. However, a correctional officer routinely stood behind the inmate in the office throughout the interview, thereby nullifying confidentiality. IDTT meetings and ICC hearings were held at a table set up in the vestibule area of the housing unit. Custodial and mental health staff reported that the arrangement was adequate in terms of space and privacy. Large caseloads and limited space precluded the provision of groups in administrative segregation.

3CMS:

Staff reported that, as of mid-October, the overall compliance rates for quarterly case manager contacts and annual IDTT reviews had surpassed 90 percent. The monitor's

review of inmate contact histories confirmed compliance with case manager contacts and IDTT reviews. Case manager contact gaps were usually attributed to cancelled or missed appointments.

Psychiatric contacts were slightly more sporadic, with some long gaps between contacts and medication orders without corresponding psychiatric contacts recorded in progress notes or on MHTS contact printouts. Response to referrals was slow at the beginning of the reporting period but had been reduced to a week or two by September 2007.

Only a few anger management groups were available on one yard.

Referrals:

Toward the end of the reporting period, additional staffing resources permitted responses to most routine mental health referrals within reasonable timeframes. However, a proportion of responses to routine referrals remained slow and erratic during much of the reporting period. MHTS tracking data, covering the period from July 1 through September 2007, failed to record appointment dates for nearly 40 percent of submitted referrals and indicated that it took staff ten to 30 days to respond to the remaining referrals.

KVSP had an effective system for logging and responding to emergency referrals. Each yard had an assigned clinician responsible for responding to emergency referrals, all of which were logged by clerical staff.

Medical Records/MHTS:

Medical records continued to be in disarray. Items were misfiled and documents were rarely in chronological order. There was no clear process for beginning a new volume of a medical file and, consequently, very old documents could be found in a new volume while recent critical documents were missing.

232

Heat Plan:

KVSP reported no Stage II heat alerts during the summer of 2007. Temperature logs indicated that temperatures in all housing units hovered between 82 degrees and 86 degrees Fahrenheit during July 2007, despite outdoor temperatures in excess of 100 degrees throughout that month. However, staff and inmates reported that temperature in dayrooms and cells was often uncomfortable and likely exceeded 90 degrees. Interviewed clinicians and inmates also claimed that thermometers in dayrooms were either inaccurate or intentionally cooled with fans to ensure that the displayed temperature stayed below 90 degrees. This claim was not verifiable.

**North Kern State Prison (NKSP)**
January 16, 2008 – January 17, 2008

Census:

The institutional census for January 15, 2008 was 5,469 inmates. There were 4,479 RC inmates, including 823 3CMS and 51 EOP inmates. There were 138 inmates in administrative segregation, including 49 3CMS and four EOP inmates. There were 466 mainline inmates, including 73 3CMS inmates. Ten inmates were in MHCBs. The remaining 376 inmates were housed in minimum security dorms.

Staffing:

Staffing issues at NKSP improved over the monitoring period, except in the area of staff psychologists. The actual clinical vacancy rate was 28.8 percent; however, the functional vacancy rate, including contractor usage, was 17.6 percent.

At the time of the monitor's visit, the chief psychologist, the senior psychiatrist and the three senior psychologist positions were filled. NKSP struggled to fill psychologist positions, and 18 of 36 positions remained vacant. Contractors covered approximately 40 percent of the vacant positions. There were no vacancies among supervisors, psychiatrists, social

workers and psych techs.  Both RT positions were filled, as was a health program specialist position.  Only 1.5 of 10.5 clerical positions were vacant.

The pharmacist II position was filled, as were all 11 pharmacy tech positions. Only one of 6.5 pharmacist I positions were filled; however all vacant positions were covered by contractors.

Ninety-five percent of medical records positions (30.4 of 32 positions) were filled, as were 94 percent of registered nursing positions.  Forty-one percent of the LVN positions were vacant (18.5 of 43.5 positions); however, contractors covered 97 percent of the vacancies.

Quality Management:

NKSP remained compliant in quality management over the monitoring period. Local governing body, quality management committee and mental health subcommittee meetings were held regularly with adequate or good quorum attendance.  Appropriate substantive issues of mental health care were addressed by these bodies.

The previously established psychologist peer review was changed to case manager peer review to include social workers.  Peer review in psychiatry commenced in November 2007.

Suicide Prevention:

NKSP's SPC met regularly from April 2007 through December 2007.  Partial compliance was noted, however, as member attendance was not verifiable.  Issues addressed by the committee included five-point restraint and seclusion, length of stay in crisis bed and referrals to DMH.  Also considered were post-discharge orders, DMH transfers, and multiple crisis bed admissions.  The committee also focused on issues related to the use of holding cells as

234

alternatives to a crisis bed, as this was a significant problem during the review period.

Five-day post MHCB discharge follow-up was noncompliant.

Medication Management:

NKSP developed and implemented a new protocol for medication continuity for newly arriving inmates. Additionally, a new protocol was developed for the ordering, administration and monitoring of newly arriving inmates who were prescribed Clozaril, although it had not been implemented at the time of the monitor's visit.

For newly arriving inmates, medication was ordered within eight hours of arrival in 100 percent of cases. Partial compliance remains, however, as delivery time of the medication was not reported and had been problematic during the preceding monitoring period. The maximum length of medication orders was 90 days, and bridge orders were for a maximum of 30 days.

Improvement was noted for compliance with medication renewals prior to expirations. Audits revealed 100 percent compliance during the monitoring period.

Handling of medication noncompliance was partially compliant. Limited audit data revealed that inmate refusals and no shows were properly documented on the MARs. Three of four noncompliant cases were appropriately referred to mental health staff, and seventy percent of noncompliance referrals generated a clinical contact within seven calendar days.

Documentation of informed consent was 100 percent compliant.

Laboratory testing of blood levels of inmates on psychotropic medication improved, however, it remained partially compliant. A policy and procedure was developed and implemented related to appropriate ordering of laboratory tests, but significant problems remained with addressing order results.

The DOT policy at NKSP for psychiatric medication was based on the inmate being on Keyhea orders, which was usually also associated with a documented history of medication noncompliance. At the time of the monitor's visit, there were 281 inmates on DOT for psychiatric medication.

NKSP appropriately utilized Keyhea orders during the monitoring period. Forty-four Keyhea petitions were initiated during 2007. In 28 cases, the inmate transferred from NKSP prior to completion of the process. Eight petitions were approved, six were denied or discontinued and one was pending at the time of the monitor's visit. There were six inmates with active Keyhea orders at NKSP during the monitor's visit.

NKSP prescribed medications HS during the monitoring period, although there was no separate HS medication distribution, and the regular pill line began at 7:30 p.m.

Mental Health Assessments for Use in the Discipline of Sexual Misconduct Violations:

NKSP was partially compliant for sexual misconduct protocols. RVRs issued for sexual misconduct were referred to mental health staff, and in most cases, screens were completed within one or two days of the incident. Comprehensive mental health evaluations were thorough and well-presented. Evaluations were appropriately based on review of the inmate's UHR and C-file, as well as an interview with the inmate. Inmates diagnosed with Exhibitionism were referred for transfer to one of CDCR's centralized treatment programs for Exhibitionism.

Thirty-seven sexual misconduct screens were completed from April through December 2007. Eleven screens (30 percent) prompted a comprehensive evaluation, and five inmates were diagnosed with Exhibitionism. Three of the five inmates were transferred from NKSP; the remaining two were in administrative segregation at NKSP at the time of the

236

monitoring visit.

All incidents of indecent exposure were referred to the local district attorney's office.

NKSP was partially compliant with the use of mental health assessments in the RVR hearing process. A significant number of reviewed RVRs did not account for the results of the mental health assessments and what impact, if any, they had on the dispositions of the RVRs.

Transfers:

Access to DMH acute care was inadequate over the monitoring period. From April 1, 2007 through January 7, 2008, NKSP generated 14 referrals to DMH. Four resulted in transfer to DMH acute care. One referral resulted in a transfer to ASH. One referral was rescinded. Nine referred inmates were pending transfer as of January 7, 2008, four of whom were referred on that day. NKSP reported that slow access to DMH acute care usually involved gravely disabled psychotic inmates who were not suicidal.

Access to MHCBs also remained problematic. As a result, holding cell usage continued. According to staff, poor MHCB access was related to delays in DMH transfers and extended MHCB stays. While centralization of the ten alternative holding cells was an improvement, the physical set up remained grossly inadequate for proper monitoring of often high-risk inmates. Further, the cell doors were metal with numerous tiny holes for ventilation obscuring vision into the cell. Twenty-four hour, on-site nursing staff coverage of the temporary holding facility was documented. Rounds were performed, and IDTT meetings were done daily, including weekends, in an attempt to move inmates out of the holding cells quickly. Custody staff monitored the holding cells using one staff member to five inmates.

During 2007, there were 360 MHCB admissions, or an average of 30 per month.

From March 2007 through November 2007, the average length of stay was 6.67 days.  Twenty-seven percent of the 350 discharges during the period had lengths of stay over ten calendar days.  Outliers included 74 days, 87 days, 98 days, and 104 days.  From March through November 2007, the multiple admission rate was 11 percent.

Transfers out of the RC remained noncompliant.  As of January 2, 2008, 17 of the 56 EOP inmates (34 percent) had been awaiting transfer longer than 60 days.  Eight inmates had lengths of stay exceeding 110 days, with the longest at 280 days.  Over 40 percent of EOP transfers since October 31, 2007 exceeded 60 days.  Transfer delays were attributed to lack of beds around the state, as opposed to internal institutional delays.  NKSP was noncompliant for tracking of 3CMS inmate transfers from the RC.

Other Issues:

Administrative Segregation:

As of January 2008, there were 138 inmates in administrative segregation, including 49 3CMS inmates and four EOP inmates.  On January 8, 2008, 35 percent of the 3CMS inmates had lengths of stay over 90 days.  Of the seven EOP inmates, 57 percent (four inmates) had been housed in administrative segregation longer than 90 days with an average of 184 days.

At the time of the monitor's visit, implementation of approved portions of CDCR's suicide reduction plan for administrative segregation was partially compliant.  Post placement screens of non-mental health caseload inmates and daily rounding by psych techs were compliant.  Further, pre-placement screenings by nursing staff was compliant.  The bad news protocol was implemented.

Four case managers with a caseload of 15 inmates each were assigned to

administrative segregation.  Weekly case manger contacts in a confidential setting were compliant.  IDTT meetings were also timely and compliant.

Intake cell retrofitting was not completed during the monitoring period.  Five cells were retrofitted with suicide prevention vents; however, door and bed retrofitting was not completed.

Inmates newly admitted to administrative segregation were identified with paper placards on the cell door.  Thirty-minute welfare checks were documented; however, they were not always staggered.

Walk-alone status inmates in administrative segregation were not offered ten hours of outdoor yard per week, due to a shortage of yards.  Over half of the administrative segregation population was on walk-alone status at the time of the monitor's visit.

Administrative segregation inmates did not have access to personal electrical appliances.  The inmate profile report was not implemented into the administrative segregation intake screening process during the monitoring period.

RC EOP:

Staffing for the RC EOP at NKSP included one psychiatrist, one senior psychologist, three staff psychologists, two psychiatric social workers, five psych techs, and one RT.  Four correctional officers were also assigned to the program, and a CC II was assigned to participate in each IDTT meeting.

NKSP continued to hold its weekly meeting attended by the warden, chief deputy warden, health care manager, associate wardens, custody captains, CCs and standards and compliance coordinator to disseminate current information on EOP inmates, and to take institutional action as needed to facilitate transfers.

A limited sample demonstrated compliance for new arrival screens within 72 hours and subsequent evaluations completed within one week.  Psych tech rounds were completed daily, seven days per week.  Periodic summaries were completed and filed in the UHRs.

NKSP was also compliant for timely completion of initial and subsequent IDTT meetings in the RC EOP.  IDTT meetings were well attended, organized and interactive.  The IDTT meeting oriented the inmate and permitted adequate interfacing with the inmate and among staff.  NKSP continued clinical case manager contacts weekly at 99 percent compliance.

Delivery of structured therapeutic activities was partially compliant.  From July 9, 2007 through December 31, 2007, RC EOP inmates received an average of 5.23 hours of structured therapeutic activities per week.  Adequate programming and treatment space remained problematic.  Groups, for instance, were conducted in non-therapeutic conditions on the dayroom floor.

Recreation therapy offerings included weekly socialization, exercise, and art.

Re-entry planning was in its early stages of implementation at the time of the monitor's visit.  Pre-release planning was provided by a psychiatric social worker beginning 60 to 120 days prior to an inmate's parole.  Inmates were identified through the NKSP EOP transfer log, as well as through referrals from clinicians.  Once identified, inmates were offered an initial psychosocial needs assessment, development of an individualized case plan, bi-weekly case management contacts related specifically to re-entry needs (federal and state benefit applications, conservatorship applications), and information and linkage to community resources.

Access to dayroom and yard time was limited for RC EOP inmates.  Inmates received 1.5 hours of outside yard, two days per week.  The dayroom was only accessible to

240

inmates for one hour, four days per week.

Referrals:

Routine referrals to case managers and psychiatrists were noncompliant with timelines. MHTS data showed an average of 12 days to appointment.

IDTTs:

IDTT meetings were compliant in administrative segregation, mainline and the RC. Observed meetings in all areas were attended by all required disciplines with UHRs and C-files present. Translators were provided when necessary and all cases were well presented.

Medical Records/MHTS:

Utilization of the MHTS at NKSP remained compliant, although not without problems. NKSP was unable to produce a priority tracking report for 3CMS inmates in the RC. Further, staff assigned to administrative segregation reported that they did not use the inmate profile report during screening, as the section of the inmate profile that lists the results of the completed suicide risk assessment was unreliable. Also, various MHTS reports did not accurately record current pharmacy information. Clerical staff also reported problems related to data entry of EOP contacts.

**Service Area H**

Service Area H includes CSP/LAC and CCI.

**California State Prison, Los Angeles County (CSP/LAC)**
November 13, 2007-November 16, 2007

Census:

At the time of the monitor's visit, CSP/LAC's census was 5,032 inmates, of which, 1,244, or 24 percent, were MHSDS inmates. There were 239 mainline and 122 RC EOP

inmates, 204 mainline and 450 RC 3CMS inmates.  There were 175 3CMS inmates and 52 EOP inmates in administrative segregation, and two inmates in the MHCB unit.

Staffing:

Salary increases coupled with streamlined hiring practices at the institutional and central office levels resulted in a significant improvement in the hiring of mental health staff throughout this monitoring period.  While filling the vacant chief psychiatrist position remained problematic, the overall functional clinical vacancy rate was reduced to 14.33 percent from 24 percent during the preceding monitoring period.  Two senior psychologists, nine psychologists, the equivalent of five and one half psychiatrists, four psychiatric social workers, two RTs and one health program specialist were hired during the monitoring period.

Quality Management:

The quality management program at CSP/LAC showed continuing improvement. At the time of the monitor's visit, there were four active QITs in place that met regularly and appeared to generate appropriate means for addressing problematic issues. The quality management committee met weekly, and considered information brought forward from the mental health subcommittee.  Attendance by the necessary disciplines improved.

Peer review remained partially compliant due to the quality of the process. Meetings for psychologists and psychiatric social workers were problematic, and psychiatry peer review consisted only of notations of the presence or absence of documentation.

Suicide Prevention:

The SPC remained partially compliant, as psych techs rarely participated. Minutes were maintained and demonstrated that pertinent issues were discussed over the course of the monitoring period.  Five-day clinical follow-up and documentation of custody follow-up

after placement for suicide watch or precaution was compliant.

The institutional EERC was also partially compliant, as they did not meet monthly during the monitoring period.  Minutes were maintained; however, they did not clearly demonstrate the extent of the committee discussions regarding pertinent issues.

Medication Management:

Medication management remained problematic.  New procedures were implemented just prior to the monitor's visit; however, it was too early to determine the effectiveness of the changes.  Further, CSP/LAC failed to provide adequate audits.

Medication continuity upon arrival improved, with limited data reflecting 88 percent compliance.  Problems remained, however, for new arrivals after hours and during weekends.  Further, problems with medication continuity accompanying housing transfers were unchanged.

Renewals of medications prior to expiration remained noncompliant.  Tracking of medication noncompliance and pill line length was also unchanged and noncompliant.

Peer review data revealed that the presence of informed consents was partially compliant at 72.5 percent.  Laboratory monitoring for mood stabilizing medications was noncompliant.

DOT medication distribution was noncompliant.  An audit of DOT for Keyhea inmates revealed significant problems, particularly in administrative segregation with a zero compliance rate.

At the time of the monitor's visit, there were 24 inmates with current Keyhea orders at CSP/LAC.  There were two inmates with pending Keyhea orders and two cases were denied during the monitoring period.  Two Keyhea cases were lost.

243

HS medication administration was partially compliant. HS medication was administered after 8:00 p.m. during the monitoring period. Staff reported that 245 inmates were prescribed medication to be administered at HS. However, CSP/LAC limited HS medication to only Trazadone and Benadryl, while other medications that should be considered for HS administration were not included.

CSP/LAC had an adequate process for providing parole medications; however, verifiable audit information was not available to demonstrate compliance.

Mental Health Assessments for Use in the Discipline of Sexual Misconduct Violations:

CSP/LAC did not complete comprehensive evaluations for Exhibitionism during the monitoring period due to a misunderstanding of the statewide policy. CSP/LAC referred all inmates for inclusion in the Exhibitionism treatment program if they evidenced two occurrences of indecent exposure within a six-month period.

Over the monitoring period, 31 inmates received one or more RVRs related to sexual misconduct. Thirteen inmates were referred and awaiting transfer to treatment for Exhibitionism; however, only one had a diagnosis of it. A handwritten log of referrals and screenings was maintained.

Transfers:

While a good relationship was reported between CSP/LAC and DMH at CMF, referrals to DMH for acute care remained slow. A QIT was chartered and training was provided to encourage initiation of referrals. Tracking of DMH referrals remained problematic.

CSP/LAC referred seven inmates to DMH at CMF over a six-month period. One referral was rescinded due to remission of symptoms, four inmates transferred, and two inmates were pending placement. Transfers following referrals ranged from 15 to 20 days.

The process for ICF referrals improved considerably due to the assignment of a clerical position to monitor the cases, training provided to case managers on the referral process, and the assignment of a DMH coordinator.  Significant delays in referral completion continued; however, reportedly due to Vitek hearings and obtaining case factor sheets from custody personnel.

During the monitoring period, 13 inmates were referred to intermediate care at SVPP.  One referral was rescinded for medical reasons.  Two inmates were accepted and had been awaiting a bed opening for three to five months.  Six inmates' referral packets were in process with processing times from 35 to 80 days at the time of the monitor's visit.  Four inmates transferred, however, dates of acceptance and transfer were not available for review.

CSP/LAC continued to struggle with availability of MHCBs in the CTC.  During the monitoring period, an average of only five of the designated ten MHCBs in the CTC were available for mental health inmates.  An increased population of chronic medical patients requiring skilled nursing care adversely impacted the availability of beds for mental health care. At the time of the monitor's visit, there were three inmates in the MHCB unit.  The average length of stay was 7.6 days.  Reasons for extended lengths of stay during the monitoring period were clearly documented.  Due to the shortage of MHCBs, holding cell use continued and documentation remained problematic.

Other Issues:

RC:

CSP/LAC was noncompliant with timely EOP transfers from the RC.   From June through October 2007, 166 EOP inmates transferred from the RC at CSP/LAC.  Sixty-five percent paroled prior to transfer.  Forty percent of the inmates remained in the RC for more than

60 days, and 15 percent of the inmates remained in the RC for more than 150 days prior to parole, release or transfer.

At the time of the monitor's visit, 30 percent of the EOP inmates were awaiting transfer for more than 60 days. Fifteen percent of the EOP inmates were awaiting transfer for more than 150 days, and 11 inmates were waiting for over 200 days. Of note, however, is that there were 21 empty EOP beds in the general population at CSP/LAC.

RC 3CMS transfers were also noncompliant. From June through October 2007, 614 3CMS inmates transferred, released or paroled from the RC at CSP/LAC. Fifty percent of the inmates transferred after 90 days. The expedited transfer process was implemented just prior to the monitor's visit.

The RC at CSP/LAC expanded to a third yard during the monitoring period. At the time of the monitor's visit, there were 3,185 inmates in the RC including 156 EOP inmates and 431 3CMS inmates. The RC population was substantially beyond the prison's capacity and housing included gymnasiums on three yards. RC inmates were also housed in the day rooms of 11 buildings on the yards. EOP inmates were primarily housed in housing units D2 and D3; however, 3CMS inmates were housed among all of the aforementioned areas.

The RC was staffed with two senior psychologists, nine staff psychologists, three psychiatric social workers, and one RT. RC screening staff included an additional 8.25 staff psychologists. At the time of the monitor's visit, there were five vacant staff psychologist positions (three RC treatment and two intake screening psychologists). All other positions were filled.

Newly arriving inmates were screened on the day of arrival 100 percent of the time. Daily workload for screening varied and reached 70 to 80 inmates on some days.

Screenings occurred in confidential settings.

CSP/LAC received additional standardized testing materials and equipment for scoring the tests, however, they had not incorporated the elements into the intake process over the review period.

Programming for EOP inmates in the RC was going well.  On average, EOP inmates were offered seven hours per week of structured therapeutic activity, as well as one individual clinical contact with the case manager.  Group attendance was consistently high, and inmates actively participated in the sessions observed.  Group materials were adequate and groups were well facilitated.  A full time psychiatric social worker provided parole planning/re-entry services to RC inmates.

Yard time for all inmates in the RC varied by yard and was wholly insufficient.

Administrative Segregation:

CSP/LAC's mental health program in administrative segregation significantly improved during the monitoring period; however, lack of adequate treatment space continued to impede compliance.  Three new clinicians, including a full time psychiatrist, were assigned to provide services to the increased population.

Daily psych tech rounds were 100 percent compliant.  Completion of mental health screens were 100 percent compliant for timeliness; however, the majority were completed cell-front.  The psychiatrist saw new admissions within five to seven days of arrival.

At the time of the monitor's visit, caseload inmates were offered ten hours of combined group and walk alone yard time per week.

No cells were retrofitted as intake cells during the monitoring period; however, six cells were under renovation at the time of the monitor's visit.  New admissions were

247

identified with large placards on the outside of their cells.  Lexan was removed from cell windows, although some covers existed for indecent exposure cases.

Administrative segregation inmates did not have access to appliances; however, a pending budget change proposal was submitted for cell retrofitting.

Thirty-minute welfare checks were implemented in all administrative segregation units, although times were not staggered due to staff misunderstanding of the policy.  Five-day MHCB step down welfare checks were recorded hourly.  Staff was unaware of bad news screening requirements.

EOP:

CSP/LAC continued to house all mainline EOP inmates on D yard in housing units D1 and D2.  During the monitoring period, mainline EOP services were consolidated under the supervision of a senior psychologist supervisor on D yard to ensure equal availability to both D1 and D2.  RC and mainline EOP inmates attended recreation and dayroom activities together; however, all other programming was separate.

Ten or more hours of structured therapeutic activities were offered to nearly all mainline EOP inmates weekly.  Only 50 percent of D1 inmates and between 20 percent to 70 percent of D2 inmates received ten hours each week.  Refusal rates remained high.

Clinical case manager contacts occurred weekly; however, confidentiality remained problematic.  Similarly, psychiatry contacts were appropriate for timeliness, but occurred in the dayrooms with neither sound, nor visual privacy.  There were no psychiatry offices in the entire institution.

IDTT meetings were compliant for timeliness, attendance and content.  The monitor's expert observed clinically relevant discussion and good information sharing among

disciplines.  EOP group assignments were clinically driven by the IDTT.

Daily psych tech rounding was compliant, and psych techs attended IDTT meetings during the monitoring period.  Psych techs reported insufficient training on the Program Guide.

Medical Records/MHTS:

UHR documentation remained problematic.  While filing was up to date, access to charts and quality of documentation need improvement.

3CMS:

Clinical case management for mainline 3CMS inmates was noncompliant over the review period.  Additionally, updated treatment plans were present in the charts; however, the content remained generic.

Frequency and consistency of provider significantly improved with the addition of psychiatric staff during the monitoring period.  Contacts remained problematic due to the lack of confidentiality.

Lockdowns:

Lockdown procedures were modified over the review period to require approval by the warden, health care manager, or designee.  Lower level custody personnel were no longer permitted to initiate a lockdown.  During the review period, there were 14 lockdowns or modified programming incidents.  Only one of the lockdowns included the entire institution; it lasted three days.  The longest instance of lockdown occurred on Facility C and lasted one month during September 2007.

During lockdowns, programming continued and ducats were honored; medications were brought to housing units.

<u>**California Correctional Institute (CCI)**</u>
January 16, 2008 – January 17, 2008

<u>Census</u>:

The institution's inmate population decreased by six percent during 2007 and stood at 5,491 on January 1, 2008. The 3CMS population declined by five percent, falling from 1,479 in October 2006 to 1,399 in January 2008; four percent above the institution's rated capacity of 1,349. There were 189 3CMS inmates in SHU and 88 in administrative segregation.

The EOP population doubled during 2007, climbing from 34 in October 2006 to 68 on January 1, 2008. EOP inmates were housed throughout the institution: two in the Level I facility, eight in general population, eight in SHU, 16 in administrative segregation, 29 in the RC and five in the OHU. By mid-January, the number of EOP inmates in the RC had grown to 42.

<u>Staffing</u>:

The vacancy rate among mental health positions at CCI exceeded 50 percent, necessitating a continued heavy reliance on contractors. Eight of nine supervisory positions were filled, including positions for a chief psychologist, six senior psychologists and a senior psych tech. A senior psychiatrist position remained vacant. Among psychiatrists, 5.5 of 8.5, or 65 percent, of allocated positions were vacant. Contract psychiatrists more than covered vacancies during November 2007, providing the equivalent of 8.2 positions that month. Two of three allocated psychiatric social worker positions were vacant, as were 18 of 35 allocated staff psychologist positions, generating an overall vacancy rate of 53 percent among case managers. Contract psychologists covered the equivalent of 9.9 positions during November 2007, reducing the functional vacancy rate to 27 percent.

Thirteen of 20 allocated psych tech positions were vacant, as were seven of 18 allocated clerical positions and all three RT positions. Positions for an associate government

250