program analyst, health program specialist and half-time psych RN were vacant. Nearly all non-mental health nursing positions were filled. As of the beginning of January 2008, 44.6 of 49 RN positions and 35.6 of 37 LVN positions, or 93 percent of all nursing positions, were filled.

Quality Management:

CCI's quality assurance program continued to function well. The quality management committee met regularly, was well attended, and reportedly responded appropriately to issues brought to the fore by the mental health subcommittee. Well-attended mental health subcommittee meetings occurred bi-weekly during the reporting period and focused on appropriate areas of concern. Staff provided specific examples of issues that were resolved through cooperation between the quality management committee and the mental health subcommittee.

MHTS data and audits were used to monitor performance within program areas and to measure compliance with active CAP items. Audit reports were candid and provided straightforward assessments of performance. MHTS data were periodically compared with UHR documentation to ensure accuracy. Most audits related to medication management were problematic.

QITs were chartered when indicated. Areas of focus included protocols for monitoring blood levels, access to UHRs, EOP transfers, and access to care in Level IV and lock-up units.

Peer review for psychiatrists and psychologists restarted in 2007 after a hiatus. Peer review meetings for psychiatrists reportedly met quarterly during 2007, though staff was unable to locate records for three of four meetings. Psychiatric peer review focused on a range of issues, including the conformity of mental health assessments, diagnoses and medication

251

prescriptions.  The psychology group met monthly during 2007 and focused largely on compliance with basic Program Guide requirements by yard.  Staff reported that, during 2008, peer review for psychologists would increasingly focus on qualitative reviews of individual clinicians.  There were too few psychiatric social workers at CCI to support a peer review program.

Suicide Prevention:

CCI's SPR-FIT met monthly during the reporting period, considered relevant procedural issues and kept minutes.  Mental health and medical supervisors and staff consistently attended meetings.  Custody staff did not consistently participate in SPR FIT meetings.

Institutional audits covering more than a year showed 100 percent compliance with five-day clinical follow-up subsequent to discharge from an MHCB or OHU.

In November 2007, institutional audits revealed that nursing staff was not appropriately documenting 15-minute suicide precaution checks in the OHU.  Staff reported that this deficiency was immediately redressed by the SPR FIT.  However, at the time of the site visit (January 2008), performance had not been re-audited to confirm compliance in this area.  The institution's quality management committee worked with the mental health subcommittee to resolve problems associated with improper placement of mental health inmates upon their discharge from the OHU.

Inmates received five-day clinical follow-up subsequent to their discharge from an MHCB or OHU.

Medication Management:

Most areas within medication management remained problematic.  On the positive side, CCI had taken steps to address a small number of complex medication issues.  For

252

example, a QIT conducted a thorough study of the institution's process for monitoring blood levels for inmates taking certain psychotropic medications, identified numerous problems and was in the process of developing a comprehensive CAP. Similarly, an in depth audit of performance related to the distribution of parole medications had identified several problems and recommended comprehensive corrective action.

CCI's audits produced an unorganized and scattered collection of data that were difficult to collate for purposes of overview and management. Audits of medication renewals and continuity, medication noncompliance, MAR documentation and pill lines produced questionable or unusable findings.

Staff reported that CDCR's office of legal affairs stopped circulating updated lists of inmates with current Keyhea orders. Consequently, timely identification of newly arrived Keyhea inmates was solely dependant on intake screening conducted by nursing staff in R&R. Four Keyhea petitions were successfully renewed or initiated during the reporting period. Two inmates were transferred to other prisons prior to their hearing.

As of mid-January 2008, HS medications were ordered for 258 inmates at CCI. Staff reported that all HS medications were administered at or after 8:00 p.m.

<u>Mental Health Assessments for Use in the Discipline of Sexual Misconduct Violations</u>:

From May through November 2007, CCI issued 30 RVRs for indecent exposure, 25 of which were referred to mental health staff for completion of a screen to rule out a diagnosis of Exhibitionism. All 25 cases referred to mental health involved MHSDS inmates, including 22 3CMS inmates and three EOP inmates. Three of the five cases not referred to mental health involved inmates who had been previously screened for Exhibitionism related to prior RVRs for indecent exposure.

The institution completed a comprehensive evaluation of all 22 inmates referred to mental health following an RVR for sexual misconduct. It appeared from the documentation that the Exhibitionism screens and evaluations were routinely completed together during the same clinical interview. The screening and evaluation forms were largely the same, with a few more questions added to the evaluation. The comprehensive evaluations included references to relevant background information, though it did not appear that C-files were reviewed to obtain information about behaviors prior to incarceration.

Five inmates had been diagnosed with Exhibitionism. Four of these inmates were transferred to centralized Exhibitionism treatment programs. One inmate remained at CCI due to his close proximity to parole.

An audit of RVR protocols, covering the period from May 4 to November 4, 2007, found that hearing officers consistently documented consideration of mental health input. The audit did not indicate how or if mental health input was used to mitigate penalties.

Transfers:

CCI generated a small number of DMH acute care referrals. In practice, inmates in need of acute care were transferred from the institution's OHU to an MHCB unit in another prison. Referrals to DMH intermediate care were rare.

CCI's OHU was comprised of 16 beds, eight of which were usually reserved for mental health inmates. At the time of the site visit, three of eight designated medical beds were occupied by patients with long-term chronic medical needs. An institutional policy whereby medical patients were to be transferred to outside hospitals to accommodate mental health admissions when necessary had proven unworkable because local hospitals reportedly were not licensed to care for patients with chronic medical conditions. Consequently, approximately

seven percent of inmates referred to the OHU were placed in "alternative" holding cells pending admission to OHU beds.  In addition, audits conducted in May and December 2007 indicated that mental health inmates were released from OHU beds to make room for medical patients.

About a third of all OHU admissions lasted longer than 72 hours and inmates referred to an MHCB were not transferred within 24 hours.  From June through November 2007, there were 189 OHU admission; an average of 31 to 32 a month.  Just shy of 30 percent, or 54 of 189 OHU admissions, were referred to an MHCB.  Provided statistics did not indicate how many MHCB referrals resulted in transfer.

Inmates admitted to the OHU three or more times during a six-month period were closely monitored and considered for higher levels of care.  From June through November 2007, 12 inmates were admitted to the OHU three or more times.  All of these inmates received weekly IDTT reviews.  The level of care for nine of these inmates was changed from 3CMS to EOP and five were referred to DMH.

Eight mental health cells, as well as overflow cells in the medical waiting area, were retrofitted with suicide resistant air vents.  Staff reported that one person was assigned to simultaneously monitor two inmates placed on suicide watch in adjacent overflow cells; an arrangement deemed to be inadequate by the monitor's expert based on the location of the cells.  Supervisory staff agreed to assign staff to observe suicide watch in overflow cells.  Staff also reported a recurring shortage of safety mattresses and suicide smocks.  As a result, inmates were sometimes placed on suicide watch with nothing more than boxer shorts.

Adherence to EOP transfer deadlines notably declined during the reporting period.  From mid-July to mid-September 2007, the number of EOP inmates at CCI awaiting transfer ranged from 36 to 52.  During this period, the percentage of EOP inmates that waited

longer than 60 days to transfer ranged from ten to 38 percent.  Staff reported that all EOP inmates awaiting transfer continued to be reviewed weekly by an IDTT.

Other Issues:

RC EOP:

CCI implemented the department's EOP RC program during the first quarter of 2007.  EOP inmates in the RC, of whom there were 31 to 41 during recent months, were consistently seen weekly by their case managers.  The percentage of out-of-cell, confidential case manager contacts ranged from 67 percent to 100 percent.   Eleven groups were offered; six in a chapel that afforded adequate confidentiality, and five in a housing unit dayroom that did not afford adequate sound or sight privacy.  Staff reported that EOP inmates in the RC were consistently scheduled for five or more group hours a week.  However, staff estimated that security-related program cancellations reduced group offerings to less than five hours a week about half of the time.  The results of inmate questionnaires indicated that EOP inmates in the RC were generally complimentary of the program.

Administrative Segregation:

CCI operated two administrative segregation units – one Level II and one Level IV – and a SHU.  The Level II administrative segregation unit, comprised of 24 cells, housed 18 to 22 MHSDS inmates during the reporting period.  Compliance rates for the completion of weekly case manager contacts in the Level II unit were consistently above 90 percent.  However, limited program space often forced clinicians to interview inmates in non-confidential settings.  From May 1 to November 1, 2007, more than half of clinical contacts in the Level II program occurred cell-front.  Two groups were offered to MHSDS inmates in the Level II program at the time of the site visit.

There were 88 3CMS inmates and 16 EOP inmates in the Level IV administrative segregation unit, and 89 3CMS and eight EOP inmates in the SHU.  MHSDS inmates in these programs consistently received weekly case manager contacts. The percentage of confidential clinical contacts increased substantially in both units during the reporting period.  Institutional audits, covering the second half of 2007, showed that the percentage of clinical contacts conducted in confidential settings increased from less than 40 percent to 89 percent in the Level IV administrative segregation unit.  Similarly, during the second half of 2007, the percentage of private clinical contacts in the SHU increased from 51 to 95 percent.

Group space for EOP inmates in the Level IV administrative segregation unit and SHU consisted of one area that could accommodate seven participants.  Staff reported that foot traffic through the group area sometimes interrupted sessions and compromised confidentiality.  EOP inmates in the administrative segregation unit were reportedly offered five group hours a week.

The institution had recently received ten new therapeutic modules, which will be used to create additional clinical space in the Level IV administrative segregation and SHU programs.  Office space for these programs was inadequate, consisting of three offices shared by a mental health supervisor, psychiatrist, and six psychologists.

CCI was largely compliant with screening and rounding requirements for administrative segregation.  Nursing staff reportedly screened all inmates for past and present suicidal feelings and behaviors prior to their placement in administrative segregation.  Compliance with this requirement was not audited during the reporting period.  Non-MHSDS inmates were screened within 24 hours of their placement, though the institution reported that the bulk of these screens were conducted cell-front.  Institutional audits, covering the period from

May 1 through December 2007, yielded compliance rates of 98 to 100 percent for the completion of daily psych tech rounds.

Identifying placards were placed on the cell doors of all new arrivals to administrative segregation. Staff reports and reviewed documentation indicated that 30-minute welfare checks were consistently conducted on all new arrival inmates during their first 21 days in administrative segregation.

Behavior Modification Unit:

Mental health clinicians were actively involved in CCI's 48-bed BMU. 3CMS inmates consistently comprised about a quarter of the BMU's population. EOP inmates were not placed in the BMU.

Referrals:

Institutional data showed that, from September through November 2007, staff responded to routine mental health referrals within an average of 8.8 days. Staff did not report the percentage of routine referrals that resulted in contact within five working days, although the average response time indicated that the institution did not consistently meet this standard.

Medical Records/MHTS:

UHR availability and filing backlogs continued to be problematic. Institutional audits showed that a quarter to 30 percent of UHRs requested for scheduled mental health appointments were not available. A QIT had been chartered to study this ongoing problem. The institution planned to request additional staffing allocations for the medical records department to address a three to four-foot filing backlog.

## **Service Area I**

Service Area I includes CIM and CRC.

## California Institution for Men (CIM)
October 10, 2007 – October 12, 2007

Census:

On October 11, 2007, CIM housed 6,202 inmates. The mental health census rate of 23 percent remained unchanged from the previous monitoring period, with 1,445 inmates. Among them, 136 inmates, or 9.4 percent, required an EOP level of care. There were 364 inmates in administrative segregation, including 94 mental health caseload inmates or 25.8 percent. Twenty-three inmates housed in administrative segregation were receiving EOP services. Twenty-seven inmates were in the MHCB unit, and the remaining 1,282 inmates were at the 3CMS level of care.

Staffing:

Mental health vacancies significantly improved, dropping from 40 percent to only 12 percent during this monitoring period. Remaining vacancies included six staff psychologists of 42 positions, two staff psychiatrists of ten positions, and one clerical position. All supervising clinical positions were filled, and contractors adequately covered the two staff psychiatrist positions. Contractors also covered one of the six vacant staff psychologist positions.

Staffing allocations substantially increased in the MHCB and the institution achieved significant levels for both clinical and correctional positions.

Quality Management:

Quality management activities improved during the monitoring period. The quality management committee and mental health subcommittee met regularly with required attendees, and both committees maintained appropriate minutes. The QIT and quality management audit process continued and covered pertinent issues throughout the institution.

Peer review was initiated for psychologists; however, no process was in place for

psychiatry or psychiatric social workers.

Suicide Prevention:

   Suicide prevention activity improved during the monitoring period.  The institution's SPR-FIT met regularly from May through September and reviewed and identified several areas in need of improvement.

   CIM completed implementation of the suicide CAP by providing in-service training to both psychiatrists and nurses.

   The ERRC remained noncompliant and met only two times during a five-month period.

Medication Management:

   Significant medication management issues persisted during the monitoring period. A three to four week medical records filing backlog, as well as methodological flaws related to some of the audits may have negatively impacted many audit results.

   Medications were ordered within eight hours in 40 percent of cases of inmates arriving from CDCR institutions or county facilities.  Further, only 59 percent for arriving inmates received their first doses of medication by the end of the following day after the order was written.

   CIM remained compliant with timely renewals and discontinuations of expiring orders.  Also, compliance continued for adequate documentation in UHRs following medication orders for new, changed or discontinued medications.

   MAR legibility remained problematic, as was the timely filing of the prior month's MARS in the UHR.

   The presence of consent forms for inmates newly arriving at CIM on psychotropic

260

medication was noncompliant.  Laboratory testing relevant to psychotropic medications was noncompliant, as was administration of HS medications after 8:00 pm.  Policies and procedures relevant to medication noncompliance were not followed.

Completion of CDCR forms related to discharge medications at the time of parole was compliant during the monitoring period.

Mental Health Assessments for Use in the Discipline of Sexual Misconduct Violations:

CIM did not fully implement the required process related to sexual misconduct during the monitoring period.  There was no clearly established process for ensuring referral of these inmates for mental health screening following sexually inappropriate behavior or for tracking the completion of the various required steps of the process.

From April 13, 2007 to September 15, 2007, there were 25 incidents characterized as "indecent exposure."  Mental health consults were requested for six of these inmates and one inmate was found to evidence Exhibitionism.

CIM appropriately referred caseload inmates for mental health assessments, including 3CMS inmates, following an occurrence of an indecent exposure incident.  Clinical assessments were adequate, and mitigation was noted on occasion.

Transfers:

DMH referrals remain problematic at CIM.  For the monitoring period, 47 inmates, or approximately seven per month, were referred to DMH acute or intermediate care. As of October 10, 2007, 25 inmates transferred, two were placed on waiting lists, and 14 were "in process" at CIM.

Delays in referrals were attributed to custody classification issues.  Inmates awaiting transfer to DMH did not consistently receive weekly contacts, and UHR documentation

was poor.

Times from referral to acceptance and transfer were not provided.

Due to the removal of licensure during the monitoring period, there was considerable uncertainty at the institution regarding the provision of mental health crisis care within the facility. Significant confusion surrounded the process for admission to the MHCB due to the loss of the emergency room and uncertainty about whether the unit would become an infirmary or remain a GACH.

As of September 14, 2007, there were 912 MHCB admissions over a period of 5.5 to six months, or an average of 5.5 admissions daily. The average daily census decreased from 32.5 to 31.35 inmates, and the average length of stay decreased to six days.

Of the 912 infirmary MHCB admissions this monitoring period, 114 inmates, or 13 percent had three or more admissions during the preceding six-month period. This decrease was attributed to the development of the RC EOP treatment during this time period. There was significant improvement with DMH consideration for repeat admissions.

MHCB lengths of stay over ten days remained problematic with an increase from 11 percent of all admissions to 14 percent. Of the 109 inmates with lengths of stay over ten days, only 35 percent were referred to DMH, as compared to 43 percent during the previous monitoring period. Forty-seven percent of DMH referrals were made after the tenth day. Further, 65 percent of the inmates with lengths of stay over ten days were not referred to DMH and had an average length of stay of 20 days.

Medical patients occupied MHCBs, which contributed to the continued use of overflow areas to provide crisis care. Non-mental health inmates occupied five of the 18 MHCBs during the monitor's visit.

Overflow areas remained operational periodically throughout the monitoring period in Del Norte on East yard and Birch on Central yard. Multiple operational problems and inadequate tracking of overflow use remained very problematic.

Admission, discharge, and length of stay data were maintained and reported separately from infirmary MHCB data. Additionally, repeat admissions to the overflow units were not tracked.

From April 14, 2007, through October 9, 2007, there were 304 admissions to Del Norte overflow MHCBs. Sixty-two percent of the inmates discharged from Del Norte were admitted to the infirmary MHCB. Eighty-three percent of the admissions were moved in two days or less, 27 inmates or nine percent moved in three days, and 22 inmates or seven percent of the admissions remained in the unit for four days or longer.

During that same time period, 80 inmates were admitted to Birch/Cypress overflow MHCBs. Limited data revealed that 15 percent of documented admissions remained in the units for four days or longer.

Documentation of 30-minute nursing rounds was present; however, access to nursing between rounds remained problematic due to the nurse's station location. Documentation of daily psychiatric rounds was not present, and problems remained with nursing staff unfamiliarity with the operating procedures of the unit.

Suicide smocks and blankets were permitted and accessible in the overflow units. There were no physical plant modifications, and cells in Del Norte were inadequate for potentially suicidal or agitated inmates. Large grate vents, unsafe bunk beds and blind spots were not addressed.

MHCB IDTT meetings remained partially compliant. CC attendance was poor,

and nursing staff and unit custody officer did not attend regularly.  Additionally, inmates' C-files were not available during the meetings.  IDTT referrals to DMH were frequently delayed due to the lack of CC assistance with the completion of the referral process during the monitoring period.

Access to the yard was problematic for inmates in MHCBs, however, not for inmates admitted to the infirmary for medical reasons.  Clinical program space for group and recreation therapy was very limited.

The practice of "red tagging" mental health inmates, with its resultant constriction of access to care, was reinstituted during the monitoring period.  Red-tagged inmates required two correctional officers for any movement, significantly impeding access to clinical care.  Group therapy was not permitted on "red tag status."  At the time of the monitor's visit, it was CIM's practice to "red tag" all mental health inmates in the unit.

CIM continued to utilize holding cells for RC inmates awaiting transfer to a crisis bed.  Placement logs, while inconsistent among facilities in the institution, were more complete during the review period.  Holding cell usage times exceeded policy mandates of four hours, with averages of seven hours in RC central and five hours in RC East.

EOP transfers from RC remained noncompliant.  Board of Parole hearings, frequent clerical staff turnover and lack of computers continued to encumber inmate processing.  CC staffing in the RC increased during the monitoring period, with four CCs starting just prior to the monitoring visit.

During the monitoring period, CIM processed 58 RC EOP inmates, with an average length of stay of 70 days.  At the time of the monitor's visit, 65 percent of the RC EOP inmates' lengths of stay exceeded 60 days.  Endorsements of EOP inmates from CIM remained

slow, and actual transfers from the institution were equally problematic.

CIM remained noncompliant for timely completion of administrative segregation EOP hub transfers with an average length of stay of 66 days over the monitoring period. Seventy percent of the transfers exceeded 30 days, and sixteen percent of the transfers exceed 120 days.

CIM did not track expedited transfers or 3CMS transfers out of the RC.

At the time of the monitoring visit, there were six inmates endorsed to the PSU at CSP/Sac. One inmate arrived at CIM with a SHU term; however, the remaining five received SHU terms while at the institution. CIM did not maintain adequate tracking documentation of current or past PSU referrals, consequently no other information was available for the monitor's review.

Other Issues:

EOP RC:

All components of the EOP RC program were in place at CIM, although, implementation remained only partially compliant. Staffing and information technology shortcomings remained the major barriers to compliance.

Initial screens and evaluations were compliant. However, due to significant delays in assignment of case managers, many EOP RC inmates did not receive services until several weeks after arrival. IDTT meetings remained problematic for timeliness and availability of inmates' UHRs and C-files.

RC EOP inmates were provided with five hours of structured therapeutic activity per week. Pre-release planning was implemented as part of the initial IDTT process and was reflected in the inmates' treatment plans. CIM remained only partially compliant with meeting the pre-release planning requirements in its EOP RC due to deficiencies in management

information, staffing, and workspace problems.

3CMS RC:

A small number of 3CMS inmates at CIM participated in psychotherapeutic groups during the monitoring period.

Administrative Segregation:

Improvements were made over the monitoring period in administrative segregation; however, the provision of mental health services in the unit remained partially compliant. Due to ever increasing caseload population demands, mental health staffing increased by three psychologists and one RT. Office space problems were exacerbated by the additional staff, and ten clinicians shared two small offices during the monitoring period.

Physical plant renovations were completed to create a group therapy area, however, the therapeutic modules in place were not consistent with approved prototypes. At the time of the monitor's visit, ten groups were operating in the newly renovated space.

CIM was noncompliant with pre-placement screenings and the 30-minute welfare checks in administrative segregation. Confidential case manager contacts remained problematic, and only 39 percent of all clinical contacts occurred in a confidential setting during the monitoring period. Documentation of contacts was sparse, consisting only of check sheets, and many UHRs lacked current treatment plans.

Refusal rates for mental health appointments remained high due to gang affiliations, as well as excessive waits in holding cells prior to and after clinical contacts.

At the time of the monitor's visit, CIM was not compliant with Title 15 required outdoor yard time for administrative segregation inmates. The institution had not implemented the use of appliances in the unit due to infrastructural limitations. Use of inmate profiles in

266

administrative segregation screening was not implemented.

Medical Records/MHTS:

UHR issues remained in partial compliance.  CIM experienced significant retention issues of office assistants in the medical records department, and at the time of the monitor's visit, there were eight vacancies.  As a result, medical record filing was three to four weeks behind.

The MHTS at CIM remained unchanged and was noncompliant.  The MHTS continues to run with inherent deficiencies in the context of RC needs.  Data entry remained backlogged and was often inaccurate.

Lockdowns:

Frequent lockdowns adversely impacted programming in the RC over the monitoring period.

**California Rehabilitation Center (CRC)**
January 24, 2008 - January 25, 2008

Census:

On January 18, 2008, the inmate census at CRC was 4,660 inmates.    There were 971 3CMS inmates in the facility at the time of the monitoring visit, with an expected increase to a total of 1,100 inmates in the period following the review.  Approximately 1,300 inmates at CRC were committed to its substance abuse treatment program.

Staffing:

The two allocated senior psychologist positions were filled; one other senior psychologist served as chief of mental health.  The one allocated senior psychiatrist position and two staff psychiatry positions were filled.

Overall, there was a 25 percent vacancy rate among case managers.  There were 18 allocated psychologist positions, two of which were designated <u>Clark</u> psychologists.  Fourteen of the 18 allocated positions were filed, leaving four vacancies.  One of the two allocated licensed clinical social worker positions was filled.

The allocated 1.15 RT position was vacant.  Two of the three allocated psych tech positions were filled.

All four SRN positions were filled, as were 39 of 40 allocated RN positions.  Contractual staff provided additional RN coverage.

There were 21 LVN positions filled, with no vacancies.  Of the allocated 6.5 office technicians, one was vacant.

Staff reported that the present staffing level was adequate to handle the anticipated arrival of 3CMS inmates.

<u>Quality Management</u>:

Presented minutes documented that the institutional quality management committee met monthly with required quorums present.  The minutes documented that the committee addressed substantive areas related to mental health care at CRC.

The mental health subcommittee met during the period from March 2007 through January 2, 2008; there were no quorums present in June and August 2007.  The committee chartered only a limited number of QITs, but did monitor the status of the institution's CAPs and other elements of the program such as addressing suicide related issues, medications, seclusion and restraint, inmates' rights and responsibilities in the OHU, access to higher levels of care, and laboratory tests.

Peer review for psychologists was functioning at CRC; resulting quality improvement/assurance information gleaned from the process was reported to be routinely reviewed by the senior psychologist.

QITs appeared to play a limited role in quality improvement at CRC. Routine audits were expected to increase with the appointment of a health care specialist.

Suicide Prevention:

CRC's mental health subcommittee also served as the SPC and addressed suicide related issues. As reported above, the mental health subcommittee failed to meet in July and August 2007 for lack of a quorum.

Medication Management:

Compliance with medication requirements at CRC was significantly compromised around issues of space, staffing, UHR unavailability, filing backlog, as well as issues of custody-mental health staff relationship.

In general, arriving inmates received prescribed medication within 24 hours of arrival at CRC; however, a notable number of arriving inmates did not receive medications timely as a result of delays in completing initial mental health evaluations.

Audit reports showed that CRC was compliant with timely psychiatric evaluations of inmates arriving with medication orders. Audit data also showed that the institution's compliance with psychiatric follow-up planned by the psychiatrist occurred timely in a range of 77 percent to 99 percent.

Audit results conflicted with information provided to the monitor by staff. Audit data indicated that there was a backlog of RC inmates who needed to be assessed, including inmates with prior histories of being prescribed psychiatric medications.

Audit data for one month from a single area in the institution indicated a medication non-compliance rate of 37 percent.  Staff reported that the level of compliance had increased since the audit with the establishment of additional pill lines, including an HS pill lines and the opening of a pill line on Facility 1.  HS medications were prescribed and dispensed between 8:00 p.m. and 8:30 p.m.

CRC local policy was noncompliant with the Program Guide timeline requirement for psychiatry follow-up within ten days for medication written without an evaluation.

Audit data and chart reviews confirmed compliance with the presence of informed consents in UHRs for all current psychotropic medications.

A random audit confirmed that laboratory tests required for mood stabilizers were consistently ordered; however, data regarding tests required for other types of medication was not available.

No DOT medication orders involved psychotropic medications.

CRC continued to transfer inmates requiring Keyhea to institutions capable of providing services to inmates needing higher levels of care.

Audits revealed that MARS were generally available in UHRs, with a finding of 87 percent.  Audits also showed problems related to UHR accessibility for clinical contacts.

No audits were conducted regarding parole medications.

Mental Health Assessments for Use in the Discipline of Sexual Misconduct Violations:

It appeared that CRC did not maintain a comprehensive record of the RVRs for sexual misconduct, nor for the various steps required by the existing policy regarding mental health screening and assessment following these incidents.  Because of the existing process through which CRC inmates who received RVRs for sexual misconduct were transferred to CIM

or to other facilities for placement into administrative segregation, most screens were completed by mental health staff in other facilities. A review of sexual misconduct screens completed at CRC documented the clinician's opinion regarding the possible role of mental illness in the misconduct, but in a number of cases notes were unclear. There was also no indication that IDTTs at CRC either considered the results of mental health screenings due to sexual misconduct or referred inmates for comprehensive evaluations.

Transfers:

CRC did not typically retain administrative segregation inmates including those who are found to require EOP level of care, but transferred these inmates to CIM. Staff reported that these transfers often occurred within 24 hours. There was no tracking data available to confirm movements within the reported timeframe.

According to staff, the responsibility for tracking and facilitating CRC's administrative segregation inmates transferred to CIM remained with CRC's custody staff. The C-files of inmates from CRC who were transferred to administrative segregation at CIM remained at CRC; however, their medical records were transferred with them to CIM.

From June 1 through December 12, 2007, a total of 35 CRC inmates were identified as requiring an EOP level of care. Five of these inmates paroled prior to the time that they were transferred to EOP programs. One inmate was returned to CRC as a 3CMS inmate.

Of the 14 inmates who had been transferred by December 13, 2007, 11 of 14 or 79 percent were transferred within the 60 day timeframe required by the Program Guide. The remaining inmates were transferred in 69, 89, and 119 days. There were 15 EOP transfers pending on December 13, 2007. Of the pending transfers six or 40 percent were beyond the 60-

271

day timeframe; for these inmates, the time from referral to the time of the site visit ranged from 67 to 97 days.

CRC had a ten-bed OHU which was used for both medical and mental health care.

Inmates in psychiatric crisis remained in CRC's small OHU under constant observation until they could be transferred; presented data showed that transfers took two to more than ten days.

Staff further reported that on rare occasions, cells within R&R were used as temporary housing for mental health crisis cases, pending availability of a regular OHU bed or transfer to an MHCB. In some instances, suicidal inmates had been housed in rooms with medical patients.

From June 9 through December 25, 2007 there were a total of 33 inmate placements into the OHU. The length of stay in the OHU was beyond the three day limit in only one case. Twenty three of the 33 total cases, or 70 percent, were returned to CRC housing units from the OHU; six inmates were transferred to MHCBs in other institutions; two were elevated to the EOP level of care and transferred; one was transferred to administrative segregation; and one was transferred to a hospital.

CRC did not make referrals directly to DMH.

Other Issues:

3CMS:

Institutional audits of 185 inmates who arrived between June and November 2007 found that in 95 percent of the cases, initial assessments were completed within five working

days.  Audits found that for those inmates who arrived from June to November 2007, 95 percent received initial IDTT meetings within 14 working days of their arrival.

Data collected confirmed that initial psychiatric evaluations were consistently completed within 14 days of the inmate's arrival; 100 percent of inmates arriving within the 3CMS program with an existing medication order were seen within 14 days of arrival.

UHR and mental health history reviews indicated that 90-day case manager visits generally occurred within required timeframes; however, there were clinical indications of a need to see some inmates more frequently than the minimum 90-days, which had not happened. In addition, progress notes indicated clinicians did not consistently reference or comply with previously approved treatment plans.

CRC conducted a limited number of psychotherapeutic groups for 3CMS inmates. Documentation existed of the IDTT consideration of group placement.  Staff reported that all 3CMS inmates for whom group was appropriately indicated were in groups or part of the 42 3CMS inmates on existing waiting lists for group therapy.

Institutional data showed that 292 3CMS inmates participated in substance abuse programs five or six days each week.  It was concerning that documentation of  participation in existing substance abuse programs by 3CMS inmates were not included within the UHRs; there was also no formal collaboration between mental health clinicians and substance abuse counselors at CRC.

Referrals:

Presented data indicated that CRC was not consistently meeting timelines for responding to mental health referrals.  CRC staff stated that the DCHCS needed to provide clear

directions on the timeframe within which an inmate arriving on medication who was continued for 30 days on arrival was subsequently required to be seen by psychiatry.

Scheduling for medical and mental health appointments occurred on two separate and non-integrated computer systems.  As a result inmates were scheduled for two conflicting health care appointments at the same time in some instances.

IDTTs:

Available information indicated that the composition of CRC's IDTTs was typically compliant with the Program Guide, representing an improvement.  Audits found that for those inmates who arrived between June and November 2007, 95 percent of their IDTT meetings were held within 14 days.

Although medical records were consistently available at IDTT meetings, C-files were not typically brought to IDTT meetings.  Supervisory staff reported that clinicians typically reviewed C-files during ICC meetings and were familiar with their contents at the subsequent IDTT meeting.  Staff reported that medical records were not always available for individual mental health clinician's appointments.

Treatment and Office Space:

The lack of suitable clinical space was perhaps the most substantial barrier to CRC's ability to provide adequate mental health care.  Inmates continued to be housed in 60 year old military barracks buildings, and many of the clinical treatment areas were observed to be substantially deteriorated.

It appeared that psychiatrists had access to office space.  Psychologists and social workers typically shared office space with one other clinician and these staff typically saw inmates in their offices.  It did not appear that there was alternative space available in which

274

these clinicians could conduct required clinical contact.  There was little or no group space available for RC inmates.

## Service Area J

Service Area J includes the RJD, ISP, CAL, CEN, and CVSP.

### Richard J. Donovan Correctional Facility (RJD)
December 4, 2007 - December 6, 2007

Census:

In December 2007, RJD's census was 4,681 inmates.  The caseload population was 1,645, an increase from 32 percent to 35 percent of the prison's population.  There were 1,545 caseload inmates in general population, including 1229 3CMS inmates (412 of which were 3CMS SNY) and 316 EOP inmates.  There were 503 caseload inmates in the RC, including 417 3CMS inmates and 86 EOP inmates.  There were 169 inmates in administrative segregation, including 125 3CMS inmates and 44 EOP inmates.  There were 412 3CMS inmates on the SNY, and 13 inmates were in MHCBs.

Staffing:

Overall vacancies improved at RJD during this monitoring period.  The vacancy rate in mental health positions decreased to 30 percent (48.76 of 161.76 positions) from 42 percent, due to various recruiting efforts including hiring workshops.  Over 90 percent of the vacancies were covered utilizing contract staff, resulting in a functional vacancy rate of .03 percent.  Psychiatric technician vacancies decreased with the hiring of seven new employees, and three new senior psychologist supervisor positions were established to attend to the MHTS and quality assurance.

The institution reported that the chief psychiatrist and chief psychologist positions remain filled, and all but one half-time psychiatry position were full.  However, central office

data showed that in January 2008, none of the institution's 12.5 line psychiatrist positions were filled, and that only 1.44 FTE contract psychiatrists covered these vacancies, for a functional vacancy rate of 88 percent among staff psychiatrists.[6]  An additional half-time psychiatrist position was requested due to increased MHSDS inmate census.

Quality Management:

      Quality management activities improved during the monitoring period, including frequency of meetings and increased QITs.  Meetings were generally well attended by the necessary disciplines and documentation existed demonstrating discussion of pertinent mental health issues.  However, important issues regarding the mental health program not already captured in CAP items were not always addressed, and a primary focus of the meetings remained the audit results of CAP issues.  The facility maintained good documentation of QIT activities and results.  QITs continued to function like standing committees focused solely on noncompliant CAP items.

      Peer review for psychiatry remained active, and recent changes increased the qualitative aspect of this discipline's peer review.  There continued to be no similar process for psychologists and psychiatric social workers.

Suicide Prevention:

      SPC activity improved during this monitoring period.  The committee met monthly and there was good documentation of committee activities.  Attendance at meetings remained problematic and did not consistently include the necessary disciplines.  Minutes also did not document necessary discussions of pertinent issues such as suicide attempts and preventative measures.

---

[6] Institutional staffing data is obtained at the time of the monitor's site visit.  CDCR also periodically presents mental health staffing data to the special master.  From time to time, significant discrepancies appear between institutional and central office staffing data, which need to be resolved.

The ERRC met at least monthly. Minutes revealed discussion of responses to emergencies and deaths; however, there was no evaluation noted of timeliness of CPR provision when indicated.

Five-day post MHCB follow-up was non-compliant during this monitoring period. While there is an adequate process in place for case manager notification, UHRs revealed missed days of follow-up.

Medication Management:

The medication management system worked well at RJD as evidenced by relevant audits. RJD continued to have either a pharmacy tech or medical assistant called the "MAR czar" facilitating medication management issues.

Medication continuity upon arrival from another CDCR institution decreased to only 77 percent compliant, whereas medication continuity upon transfer from county jails increased from 80 percent to 98 percent compliant during this monitoring period.

Compliance was noted for continuity of medications upon movement within RJD and specifically, medication continuity upon discharge from the MHCB continued to be 100 percent compliant. Medication noncompliance audits demonstrated only 80 percent compliance. Compliance for presence of medication informed consent from inmates improved to 91 percent. The system in place to renew medications in a timely fashion worked well with 100 percent compliance during the specific audit period.

RJD was partially compliant in obtaining blood levels of mood stabilizers, as well as other relevant laboratory results with compliance rates ranging from 73 percent to 100 percent. Compliance for laboratory studies pertinent to the use of atypical antipsychotic medications ranged from 83 percent to 89 percent.

Compliance rates for DOT procedures moderately improved during this monitoring period.  Training related to new and registry staff was necessary because many had not been following DOT procedures.

Keyhea orders continued to be closely monitored and timely renewed.  Eleven inmates were under Keyhea orders, and another 15 Keyhea petitions were initiated during the monitoring period.  No Keyhea orders lapsed or expired due to staff error.

HS medication administration after 8:00 pm while improved, needed continued monitoring with 84 percent compliance.  Pill line length remained compliant at approximately 19 minutes.  Provision of heat cards remained only partially compliant at 67 percent.

Mental Health Assessments for Use in the Discipline of Sexual Misconduct Violations:

RJD remained partially compliant with implementation of the indecent exposure evaluation process.  RJD did not monitor or audit the area, and documentation was not complete. There were 26 reported cases of indecent exposure during the monitoring period. Documentation was provided for only 11 cases.  RJD staff routinely completed indecent-exposure screenings only.  There were no evaluations and no diagnosis of Exhibitionism.  In fact, most staff at RJD were unfamiliar with the process for screenings and evaluations for the referrals.

Transfers:

RJD referred inmates to all DMH programs and the number of referrals increased during the monitoring period. Staff reported continued access to DMH acute care. Documentation revealed 17 referrals to DMH at CMF with six accepted and transferred, and two accepted and transferred to ASH for acute care beds.  Two referrals were rescinded, and four were redirected to ASH for intermediate level of care.  There were no rejections during the

monitoring period. Referral packet completion improved to an average of eight days and acceptance took an additional four days. The average number of days from referral initiation to transfer was 35 days during this monitoring period.

Completion of intermediate care facility referrals remained slow at approximately three weeks. RJD made 29 referrals to intermediate care facilities: 13 to SVPP, 11 to ASH, five to CMF. Twenty-six, or 89 percent of the referrals resulted in transfer.

Ten inmates transferred to SVPP and two inmates were on a waiting list for 69 days and 154 days following acceptance. Acceptance timeframes improved to seven days from 17 days during the preceding monitoring period. The average time between acceptance and transfer remained constant at 38.3 days.

RJD referred five inmates to intermediate care at CMF. Four inmates transferred and one referral was rescinded. Average time from referral initiation to transfer increased from 25 days to 28.5 days. Three referrals took an average of six days for a decision and one referral took 22 days. There were no referrals to DMH's day treatment program at CMF during the monitoring period. RJD reported no problems with psych and return protocols.

ASH reopened and referrals from RJD resumed in July 2007. Since that time, RJD referred and transferred 11 inmates. Average time from referral initiation to transfer increased from one week to 20 days. Decisions took only two days, and transfers took an additional five days.

RJD continued to operate a 15-bed MHCB including one seclusion room and one mobile restraint bed. Staff continued to report adequate access to the MHCB unit. Temporary holding cells were not used in lieu of admission to crisis beds during this monitoring period. When at capacity, RJD transferred medical patients to outside hospital facilities and in-patient

beds were used for mental health inmates. The unit was staffed during weekdays by two full-time psychiatrists, one full-time psychologist or psychiatric social worker, one RT, as well as nursing, custody, dietary and maintenance staff. During the weekends, a psychiatrist was on call and was on site at least three hours per day. There was also 13 hours per day of coverage split by two psychologists or a psychologist and a psychiatric social worker.

From May through November 2007, there were 294 discharges from the MHCB, or an average of 42 per month, an increase from 34 discharges per month during the preceding monitoring period. Average length of stay, including administrative days, decreased to six days, and administrative delays remained less than one day. Sixteen percent of admissions had lengths of stay over ten days, a one percent decrease from the previous monitoring period.

Repeat admissions remained minimal with 11 inmates admitted three times or more during this monitoring period. Seven inmates were admitted three times, two inmates were admitted four times, and five inmates were admitted five times. Documentation of DMH referral consideration was not routinely found on the treatment plans for the repeat admissions.

Restraint logs were complete and revealed that restraints were used infrequently with five months when no inmate was restrained for mental health purposes. The usual duration of restraints was short.

Holding cells were used for inmates transferred to the CTC while awaiting beds. Cumulative lengths of stay were not attainable due to incomplete logs. One log entry revealed a suicidal inmate who remained in the holding cell for approximately seven hours, three hours longer than the four hour maximum allowed by the DOM.

RJD again failed to maintain an accurate log regarding transfer to PSUs, consequently, the monitor was unable to reach conclusions regarding compliance with transfer

requirements to PSUs.  During the monitoring period, RJD transferred only two inmates to PSUs and an additional two inmates were endorsed for transfer to the PSU at CSP/Sac.

RC transfer compliance decreased during the monitoring period.  Only 57 percent of EOP inmates, and 63 percent of 3CMS inmates transferred within timeframe guidelines.

Other Issues:

RC EOP:

The RC EOP was staffed by one full-time senior psychologist, four full-time staff psychologists and two contract psych techs.  Initial mental health screenings and mental health evaluations occurred within time frames.  Ninety-five percent of case manager contacts with accompanying progress notes occurred weekly during the monitoring period.  An increasing number of visits occurred cell-front as the monitoring period progressed.  In the period of August to October 2007, cell-front visits progressively ranged between 11 and 35 percent (August-11 percent, September 21 percent and October 35 percent).

Initial IDTT meetings began in June 2007 and RJD had not yet met the required 14-day timeline.  RJD was compliant with the 30-day follow-up IDTT meeting when indicated. Treatment plans did not reflect appropriate team member signatures, however, the meetings observed by the monitor were appropriately attended and run.

RJD exceeded the minimal requirements of provision of structured therapeutic activity in the RC EOP.  Approximately 95 percent of RC EOP inmates were provided with five hours of structured therapeutic activity weekly.  RJD continued to struggle with providing outdoor recreation in RC EOP, particularly in multiple group yards.

Re-entry planning for RC EOP inmates began in June 2007.  A full-time case manager was dedicated to re-entry planning and planning was also integrated into the IDTT

process to form part of the treatment plan.  Planning included contact with the parole agent, the POC, and referral to therapeutic programs and housing in the community.  Contact with outside agencies and processing of financial information for application to government programs such as Social Security, Medicare, Medicaid, etc. had not been initiated due to the absence of training from headquarters.  RJD also met problems with initiating conservatorships.  The lack of access to computers adversely impacted the pre-release case manager's effectiveness and efficiency.

RJD conducted separate weekly high-risk meetings for the administrative segregation RC EOP and 3CMS programs as needed.

Administrative Segregation:

On December 4, 2007, there were 36 3CMS and 41 EOP inmates in administrative segregation Unit 6, 40 3CMS and two EOP inmates in Unit 7, 51 3CMS inmates in Unit 8, three 3CMS inmates in temporary Overflow Unit 16 and six 3CMS in temporary Overflow Unit 11.

No intake cells were retrofitted during the monitoring period.  RJD continued to utilize temporary intake cells placarded with "intake," "begin," and "end" dates.

Pre-placement screening was problematic.  There was no documentation in the UHRs of any screenings during the monitoring period.  Mental health screenings were completed by case managers.  Psych techs completed screens on holidays and weekends due to commitment of the psych techs to medical duties during weekdays.  Post-placement screens were completed in confidential settings in non-overflow units, but the overflow units had no confidential space available.  Documentation of the post-placement screens was located in the UHRs.  However, RJD remained noncompliant with timely completion of the screens.

As of December 4, 2007, there were ten psych tech vacancies at RJD.  Psych tech

rounds did not occur daily, and there were other problems with psych tech coverage.  Further, conflicts continued between nursing and mental health regarding the duties of the psych techs at RJD.

Use of the inmate profile was implemented during the monitoring period. Problems continued with welfare checks for inmates on intake status.  Several welfare checks did not occur at 30-minute intervals.  The monitor's expert also noted problems with the validity of many of the documented checks, and with inmates covering the windows with paper.

Weekly case manager contacts improved from 50 to 90 percent during the monitoring period.  Confidentiality of the contacts remained problematic, with a significant number occurring cell front.

Initial treatment team meetings and treatment plans were noncompliant in administrative segregation.  Quarterly IDTT meetings were compliant for EOP inmates, but not for 3CMS inmates.  Also, treatment plans for 3CMS inmates were minimally compliant for content.

RJD continued to offer more than ten hours per week of structured therapeutic activity for EOP administrative segregation inmates.  Staff and inmates continued to report difficulty hearing and communicating during group sessions due to the location of the groups in dayroom areas.  Attendance also remained problematic at only 30 to 50 percent.  Quality of content and accompanying resource materials adversely impacted the nature of the groups. Groups were not offered to 3CMS administrative segregation inmates.

Yard time for inmates in administrative segregation continued to be  problematic. RJD does not have walk-alone yards, and the yard schedule for the mainline units demonstrated that it was impossible to meet the ten hours of required yard time for all of the inmates.

Overflow Units 8 and 16 did not have any yards in which to offer outdoor activities.

RJD had not implemented the allowance of appliances in administrative segregation and had determined that it was cost prohibitive.

As noted in previous monitoring reports, the monitor's expert found administrative segregation overflow housing Unit 16 completely inappropriate for housing MHSDS inmates. The lack of inmate mental health status identification, medication administration and clinical services were extremely problematic.

RJD did not maintain accurate length of stay data for administrative segregation inmates.

EOP:

Case managers met with their caseload weekly, in compliance with Program Guide requirements.

The EOP consistently offered greater than ten hours of structured therapeutic activities weekly; however, lockdowns occasionally affected group provision. Case managers facilitated groups, as well as two full-time group therapists. A pre-release group was offered.

Education was available to all EOP inmates during this monitoring period; however, it was not included in the group hours due to lack of standardization and escort difficulties. Qualified inmates were identified in IDTT meetings for vocational training, although there were only two jobs available: clerk and porter. Four hours of unstructured physical recreation therapy in supervised yard settings were counted toward the required ten hours of structured therapeutic activities.

Although night yard was implemented during the monitoring period, EOP inmates continued to receive 42 percent less dayroom and yard time than general population inmates

housed on the same yard.  The average weekly yard/dayroom time for mainline EOP inmates was 17.75 hours as compared to 42.5 hours for general population inmates.

There were significant problems regarding medication passes in the EOP housing units.

Medical Records/MHTS:

The medical records department markedly improved during the monitoring period.  Mental health filing was only a few days behind as compared to 45 days during the last monitoring period.  The medical records department implemented a bar coding system that enabled them to track the medical record at all times.  This system significantly improved access to records problems previously noted at RJD.

Staff turnover and ongoing vacancies continued to impede full implementation of the MHTS at RJD.  Improvement was noted in the timeliness of data entry from one month behind to approximately one week behind.  A problem was reported in the interface between the distributed data processing system and the MHTS that changed an EOP inmate's level of care to 3CMS following transfer to RJD from another CDCR institution.  This problem resulted in at least 56 inmates sent to RJD from other CDCR institutions and DMH, not having access to mental health care for which they were indicated.

Heat Plan:

Compliance with distribution of heat cards decreased to 67 percent.

Treatment and Office Space:

Clinical space remained problematic at RJD.

**Ironwood State Prison (ISP)**
Paper Review

Census:

The total number of inmates in the institution was 4,702, including 195 in administrative segregation.  There were 25 3CMS inmates, including six in administrative segregation and 18 in general population.

Staffing:

The staffing picture appeared strong at ISP.  Positions for two full-time psychiatrists were filled, as were three of 3.5 psychologist positions and a RT position.  Three of six psych tech positions were vacant, as was one of six clerical positions.   All nursing positions were filled.  Telemedicine services were not used and contractors had not been used since March 2007.

Suicide Prevention:

A single SPC meeting was held during the reporting period, in October 2007.  Minutes from that meeting showed a multidisciplinary composition and indicated that a reasonable range of relevant topics was covered.

ISP's MHCB was permanently closed, rendering moot issues related to daily psychiatric contact and IDTT meetings in the MHCB.  Inmates with suicidal symptoms were transferred to the OHU at CVSP and rarely returned to ISP.  According to staff, returned cases were identified by the screening nurse in R&R and referred to mental health for five-day follow-up.  Custody checks were not performed.  Documents provided by the institution indicated that, at least, three inmates returned to ISP during 2007 for whom five-day follow-up should have been provided.  The institution identified only one of these inmates and clinical follow-up for this inmate was incomplete.

286

Nursing staff pre-screened all inmates placed in administrative segregation. The screen included questions regarding past and present suicidal feelings and behaviors. The monitor reviewed nine cases, a few of which did not document the completion of pre-screens. It was not clear if noncompliance in these cases was due to missing paperwork or staffs' failure to complete the screen.

Locally adopted protocols ensured that a large proportion of non-MHSDS inmates placed in administrative segregation were not properly screened. In practice, psych techs and officers reportedly identified new arrivals to administrative segregation during morning meetings, which prompted psych techs to conduct cell-front checks on each of the new inmates. If concerns were raised during cell-front interviews, 31-question screens were completed. Inmates deemed to be okay during cell-front checks were not screened. ISP's failure to follow its own protocol resulted in even fewer screens. Data provided by the institution indicated that many cell-front checks on new arrivals were either untimely or missed altogether. Lastly, inmates who refused screens were not referred to mental health.

No cells in administrative segregation had been retrofitted for intake.

Logs used to record the completion of thirty-minute welfare checks contained sporadic misses, some as long as two to four hours. Welfare checks were generally completed at staggered intervals, though documentation indicated that some checks were too short to have permitted a thorough check of all new arrivals.

Staff continued to have access to emergency response equipment in administrative segregation and inventory practice was adequate.

Provided documentation indicated that monthly medical emergency drills were completed on all watches during the reporting period. Drill scenarios included responding to

inmates with lacerations and inmates found hanging. Some of the write-ups indicated that staff reacted inappropriately to a hanging incident and that supervisors failed to correct the responding officers. Tracking materials related to CPR training were unclear.

Medication Management:

Provided documentation described medication delivery delays, renewal gaps and problems with distribution of parole medications. There was no indication that these problems were studied or remedied.

Staff described adequate mechanisms for identifying inmates arriving with Keyhea orders and communicating that information to staff on a daily basis. ISP received no inmates with current Keyhea orders during the reporting period, nor did it initiate or renew any Keyhea petitions.

Transfers:

Due to vacancies among clerical staff, tracking data relevant to EOP and 3CMS transfers were incomplete and unreliable. The flawed data indicated that ISP treated approximately 122 3CMS during the reporting period, at least 45 of whom were housed in administrative segregation. It appeared from the data that all of these inmates left ISP within applicable timeframes. At the time of the document production, none of the 25 3CMS at ISP had surpassed the transfer deadline.

According to the incomplete tracking information, three EOP inmates were housed at ISP during the reporting period. All of these inmates were transferred from ISP within the established timeframe.

Three MHSDS inmates were reportedly inappropriately transferred to ISP during the reporting period; many fewer than were reported during preceding monitoring cycles. The

reduced number of inappropriate transfers may have been an artifact of incomplete records. All of the listed individuals were either returned to a treating facility in a timely manner, or had been awaiting transfer a short time when materials were produced for this review.

All inmates referred to an OHU were sent to the OHU at CVSP, located adjacent to ISP. Nine inmates were referred an OHU level of care, five of whom returned to ISP within 72 hours. Length of stay for the remaining four inmates ranged from four to eleven days.

Access to MHCBs was slow. Twenty-five inmates were referred to an MHCB, 80 percent of whom were not timely transferred. MHCB length of stay varied considerably, ranging from a few to 26 days. No MHCB referrals were rescinded. ISP did not refer inmates to DMH.

Other Issues:

Administrative Segregation:

Provided performance data showed slippage regarding timely completion of IDTT reviews and reduced compliance with weekly case manager contacts in administrative segregation. It was not clear whether slippage in these areas was related to incomplete documentation or declining performance.

3CMS:

According to MHTS contact histories, general population 3CMS inmates at ISP at the time of the paper production were seen frequently by a case manager. Historical data were less clear. The monitor's review of a large sample of inmate histories of 3CMS inmates who were treated at ISP during the reporting period indicated that while many inmates were seen at least quarterly, a significant number were not seen at all. It was not clear to what extent noncompliance was the result of incomplete documentation.

**Calipatria State Prison (CAL)**
Paper Review

Census:

       CAL's total inmate population was 4,158, with 21 inmates in the MHSDS.  There were 257 inmates in administrative segregation, including four 3CMS inmates and one EOP inmate.  There were eight 3CMS inmates and three EOP inmates in general population.  The OHU held one 3CMS inmate and four EOP inmates.

Staffing:

       CAL's staffing allocation jumped substantially during 2007 and there were many vacancies.  Institutional data showed that one of two psychiatry positions was vacant, half of psychology positions were vacant, and half of the 10.5 psych tech positions were vacant.  All clerical positions were filled.  Office space was limited and cramped and treatment space on the yards was often relegated to storage areas and staff break rooms.  A psychologist was assigned to administrative segregation.

Suicide Prevention:

       Staff reported that the SPC met monthly, but the minutes for two months were lost.  Documents showed erratic custody staff participation.  The committee undertook useful activities, including detailed reviews of inmates with suicide-related behavior.

       Staff reportedly prescribed five-day follow-up for inmates discharged from the OHU, as well as for individual inmates about whom they had concerns.  Provided data indicated that 23 inmates required five-day clinical follow-up during the reporting period and that only one day of clinical follow-up was missing in one case. However, the monitor's review of related data indicated that follow-up was initiated several days after discharge in two cases and that two inmates were overlooked for needed follow-up.

Inmates on suicide precautions were generally observed in the OHU. CAL continued to fail to provide any information regarding compliance with custody checks associated with OHU discharges. Data provided by the institution indicated that SRACs were routinely and timely completed as part of the OHU admission process.

CAL was compliant with many, but not all, of the screening, rounding and monitoring requirements set forth in the Department's suicide reduction plan for administrative segregation. After receiving training in July 2007, nursing staff reportedly started screening all inmates prior to their placement in administrative segregation, which included questions about past and present suicidal feelings and behaviors. Compliance with the new pre-screening requirement had not been audited.

Enhanced oversight by the institution's senior psych tech substantially increased compliance with the timely completion of 31-question intake screens. Psych techs reportedly reviewed the UHR as part of the screening process. Inmate profiles, which list the results of completed SRACs, were not provided for screens. Psych techs utilized three private offices for screening inmates. A refused screen, reported to be common, prompted a cell-side assessment of the inmate's mental status. Psych techs distributed puzzles to inmates in administrative segregation, which increased inmate contact and provided the context for informal assessment of an inmate's mental status.

Institutional audits found that MHSDS inmates placed in administrative segregation were identified within 24 hours, seen daily by a psych tech, contacted weekly by a case manager and timely reviewed by an IDTT. Staff reported that efforts to increase the number of confidential case manager contacts in administrative segregation had resulted in

substantial improvement. However, the provided audit information did not indicate what percentage of case manager contacts occurred cell-front.

Welfare checks were poorly implemented. Reviewed logs indicated that small and large blocks of time on all watches were missed. Checks were not completed at staggered intervals and recorded times sometimes indicated that checks were impractically short. Oversight was inadequate in that custodial supervisors inconsistently signed logs and permitted line officers to follow their own, idiosyncratic methods for documenting welfare checks.

Documentation related to completion of monthly medical emergency drills was excellent. Monthly drills, involving complex medical and mental health-related scenarios, were completed in both administrative segregation units. Only three first watch shifts were missed during the reporting period. Regular CPR training continued to occur.

Two-thirds of inmates in administrative segregation were double-celled.

Mental Health Assessments for Use in the Discipline of Sexual Misconduct Violations:

Documentation related to mental health input into disciplinary proceedings in general, and in particular for indecent exposure, was inadequate. It could not be determined from the materials provided by CAL how many inmates were issued RVRs for indecent exposure, how many inmates were referred to mental health for completion of Exhibitionism screens, or how many inmates were deemed to require a thorough evaluation to rule out a diagnosis of Exhibitionism.

Documentation provided by the institution indicated that mental health staff was asked to provide written input for five RVRs issued to three EOP inmates and two non-MHSDS inmates during the reporting period. Two of these RVRs were related to indecent exposure; one involving an EOP inmate and one involving a non-MHSDS inmate. It could not be determined

from the documentation provided if these two cases were screened in accordance with the Department's Exhibitionism protocols.

With respect to those cases in which clinical input was requested, CAL's log remained inadequate as it did not record the results of the mental health assessment, whether the hearing officer documented consideration of mental health input in the RVR, or whether mental health input had an effect on the hearing officer's disposition of the case.

Transfers:

Various sources of OHU admission data, though flawed in that they were incomplete and inconsistent with one another, indicated that greater numbers of inmates spent longer periods of time in the OHU. There were approximately 48 OHU admissions over a six-month period; far fewer than were reported during recent monitoring periods. Length of stay for about half of the admissions was appropriate; 72 hours or less for routine admissions and up to a month for fragile EOP inmates pending transfer. A quarter of routine OHU admissions lasted four to sixteen days without explanation. The remaining 25 percent lasted up to three and a half months and involved inmates awaiting transfer to MHCB and EOP programs. OHU inmates consistently received treatment plans through the IDTT process.

Current policy permitted return of MHCB inmates to CAL. Referrals and transfers to MHCB units in other prisons often were not completed within required timeframes. Nearly half, or 21 of the inmates admitted to the OHU admissions were referred to an MHCB. About two-thirds of these referrals were initiated within 48 hours, and the remaining third took up to eight days to initiate. Nine referrals were rescinded; a much higher rescission rate than was reported during previous monitoring periods. Eight of twelve inmates transferred to an MHCB unit waited one to two weeks for a bed. CAL did not refer inmates directly to DMH.

Access to OHU beds was sometimes inadequate. Records indicated that inmates referred to the OHU were placed in holding cells on four occasions because beds were not available. One inmate, re-referred to the OHU during five-day follow-up, spent three days in a holding cell on suicide watch pending placement in an OHU bed. A suicide risk assessment was not completed in this case.

EOP transfers continued to be timely. Printouts showed eight current EOP inmates, all of whom had been awaiting transfer less than 60 days. During the reporting period, CAL transferred 34 EOP inmates, 32 of whom had lengths of stay of 60 days or less. One case missed the deadline by two weeks, the other by three months.

3CMS transfers were also timely. Twelve of 13 3CMS inmates currently at CAL had been awaiting transfer less than 90 days. One inmate, at CAL to participate in court proceedings, had been there eight months. Only one of 118 3CMS inmates transferred from CAL during the reporting period missed the 90-day deadline.

During the reporting period, CAL received 22 3CMS inmates and four EOP inmates that were inappropriately transferred from RCs. Staff reported that a large proportion of the inappropriate transfers came from the RJD. Only half of the inmates inappropriately transferred to CAL were returned to MHSDS programs within required timeframes (i.e., 21 days for EOP inmates and 30 days for 3CMS inmates). The institution took two weeks to identify two inappropriately transferred 3CMS inmates, raising concerns about the reliability of the bus screening process.

Other Issues:

3CMS:

Newly arrived 3CMS inmates were evaluated timely. Institutional audits indicated sustained compliance with IDTT meetings, responses to self-referrals, group therapy, removal of decompensated inmates from administrative segregation, daily psych tech rounds in administrative segregation, use of force policy, UHR filing, and implementation of an early suicide prevention policy.

Staff had not yet formulated a local operating procedure for implementing Program Guide changes, although they noted that all but one staff member had completed the training provided by central office.

Medical Records/MHTS:

Staff reported that initial problems associated with an upgrade to the MHTS had been addressed.  However, clerical staff was inexperienced and MHTS training had not been offered to CAL staff during the current or preceding two monitoring periods.  Suicide attempts were tracked.  Staff requested missing health records from sending CDCR institutions.  Bus screen forms were consistently filed in UHRs.

Medication Informed Consent:

An institutional review of 25 MHSDS inmates taking psychotropic medications found that current medical consent forms were maintained.

Pre-Release Planning:

Staff reported that a TCMP social worker had not visited CAL in years and that CAL clinicians did not provide pre-release planning.  It could not be determined from provided materials how many MHSDS inmates paroled from CAL during the reporting period.

295

Heat Plan:

There were procedures in place to ensure that inmates had heat cards and understood their purpose.

## Centinela State Prison (CEN)
Paper Review

CEN made great progress and its paper review production could be considered a model for other desert institutions.  MHSDS inmates were identified and transferred well ahead of timelines, and compliance was attained or sustained in most areas related to suicide prevention, administrative segregation, 3CMS, and OHU services.  Inmates consistently attended IDTT meetings.  The following areas required attention to reach full compliance: EOP weekly contacts, IDTTs, SRAs in OHU, medication delivery, quality management, case manager follow-up to 31-question screening refusals, custody checks following discharge from the OHU, and response time to bus screening referrals.

Census:

The institution's census increased by nearly 200 inmates during the reporting period and stood at 5,250 as of mid-September 2007.  The number of inmates in administrative segregation remained stable at 226.  There were 35 MHSDS inmates, slightly more than were reported during the last reporting period.  This included eleven 3CMS inmates and one EOP inmate in administrative segregation, 19 3CMS inmates and one EOP inmate in general population, and three inmates in the OHU.

Staffing:

Staffing notably improved during the reporting period in that a staff psychiatrist was hired and all but one psych tech position was filled.  Staff reported that use of contractors permitted clinical coverage seven days a week.  However, it could not be determined from the

296

information provided if contractors fully covered vacancies among psychiatrists and case managers.

Mental health space in administrative segregation improved during the reporting period in that mental health staff was given two treatment rooms that were equipped with holding cells with seats. Elsewhere in the institution, an expansion of medical services increasingly forced mental health clinicians to share treatment space with medical staff. Additional escort resources were provided for mental health contacts.

Suicide Prevention:

Local operating procedures for suicide prevention and response and administrative segregation together incorporated all Coleman-related suicide prevention protocols. Through increased oversight and auditing, the institution had proactively addressed problems in high-risk areas, including screening and case manager contacts in administrative segregation, weekly contact of EOP inmates and five-day follow-up upon discharge from the OHU.

The composition and impact of the institution's SPC improved tremendously during the reporting period. The committee met nearly monthly, was well attended and provided a useful forum for multidisciplinary discussion of a wide range of topics impacting suicide prevention.

The SPC developed several tracking and oversight protocols to improve compliance with five-day clinical follow-up and custody checks associated with OHU discharges. Five-day follow-up was close to compliance, while the compliance rate for custody checks remained low at 37 percent. Documentation indicated that custody checks were timely initiated, but that short and long lapses, sometimes entire shifts and whole days, were common.

Staff was trained in the completion of pre-screens for administrative segregation. Bus screens included a question regarding the receipt of bad news. The institution acknowledged that it was not yet fully compliant with these new screening requirements, but had taken several remedial steps to improve compliance.

Mental health and custody staff continued to meet daily in administrative segregation. Inmate profiles, which included the results of completed SRACs, were reviewed during the daily meetings. Logs listed 453 administrative segregation placements, 98 percent of which were timely screened using the 31-question form. Institutional audits showed that the inmate was removed from the cell for 91 percent of these screens. Refused screens were reportedly referred to mental health. However, inmate histories recorded follow-up contact in only 60 percent of refusals referred to mental health. It was unclear if this was related to poor performance or incomplete documentation.

Compliance with completion of SRACs upon admission to the OHU declined during the reporting period. Institutional audits found that assessments were either late or missing for 32 percent of OHU admissions. The compliance rate for the completion of SRACs upon discharge improved, but remained low at 60 percent.

Certified nursing assistants continued to carry out one-on-one suicide watch and suicide precautions orders in the OHU and documentation related these activities was notably improved.

Logs indicated that 112 MHSDS inmates left CEN since mid-May, 2007, 84 percent of whom were transferred with an inmate profile. Provided inmates profiles generally captured useful, descriptive information, and suicide risk codes were usually consistent with the narrative information provided.

The institution provided logs that recorded the completion of 30-minute welfare checks in administrative segregation, 90 percent of which were completed without misses. One to two 30-minute welfare checks were missed on a few days, and there were isolated occasions when an entire watch was missed. The provided logs indicated that checks were consistently completed at staggered intervals.

Monthly medical emergency drills were documented on all watches in every administrative segregation unit throughout the reporting period. This was an area of notable improvement.

Medication Management:

Staff reported daily monitoring of and consistent compliance with medication continuity on inmates' arrival and when moved within the institution. According to tracking records provided by the institution, one MHSDS inmate paroled from CEN during the reporting period and was provided a supply of medication upon his release.

Transfers:

During the reporting period, there were 43 mental health-related OHU admissions, 22 of which were referred to an MHCB at another CDCR prison. Five MHCB referrals were rescinded and 16 resulted in transfer.

OHU length of stay often exceeded the Program Guide timeframe. Admission data provided by the institution showed that 45 percent of OHU admissions lasted longer than 72 hours. Two thirds of excessive OHU stays (beyond 72 hours) were related to delays in MHCB transfer. Transfers routinely took up to a week and, in one case, it took fifteen days for the transfer to occur.

299

Referrals to MHCB were consistently completed within 48 hours of OHU placement during the second half of the monitoring period, representing an area of improvement. However, MHCB acceptance decisions were often delayed.  Inmates referred to an MHCB from the OHU frequently were not transferred within 24 hours of acceptance.

Inmates who were not referred to an MHCB rarely stayed in the OHU longer than the maximum 72-hour timeframe, and in the event of such delays, they normally did not extend longer than one day beyond the maximum 72 hour period.

Inmates were routinely assessed within a day of admission to the OHU and consistently seen daily by a clinician until discharged.  No inmates were involuntarily medicated or placed in restraints during the monitoring period.  CEN did not refer inmates to DMH.

The institution reported that 117 3CMS inmates were treated at the institution during the reporting period – a decline of about 50 percent relative to the preceding period.  The number of EOP inmates treated at CEN during the reporting period increased six fold to 24. Twenty-three of these inmates were placed at that level of care while at the institution.  It was unclear why the number of EOP referrals grew dramatically during the reporting period.

MHSDS inmates did not languish at CEN.  Caseload inmates were either transferred within required timeframes, admitted to an MHCB, discharged from the MHSDS within a short time or released from prison.   Twenty eight MHSDS inmates, including 27 3CMS inmates and one EOP inmate, were inappropriately transferred to CEN during the reporting period.  Logs showed that most of these inmates were transferred from CEN within a week or so of arrival.

Newly arriving inmates were screened by nursing staff.  However, response to bus screen referrals was slow.  The monitor reviewed 19 inmate histories belonging to inmates who