were referred to mental health as a result of positive bus screen. Two-thirds of the reviewed histories indicated that mental health staff took longer than 72 hours to respond to the bus screen referral.

Other Issues:

Administrative Segregation:

During the reporting period, CEN housed 37 3CMS inmates and four EOP inmates in administrative segregation, all of whom were timely transferred. MHSDS inmates mistakenly placed in the stand-alone administrative segregation unit were removed within 24 hours.

MHSDS inmates placed in administrative segregation continued to be timely identified and seen daily by a psych tech. Inmate histories showed near-perfect compliance with weekly case manager contacts, most of which continued to occur in a private setting. This was an area of substantial improvement.

EOP:

Meeting minutes reported inconsistent compliance with weekly contact of EOP inmates, and provided inmate histories yielded a compliance rate of 71 percent for this requirement. Most noncompliant cases involved no more than one to two missed weeks.

An RT reportedly ran group therapy in the OHU and on general population yards. Topics included stress management, effective problem solving, anger management, and general wellness. CEN reportedly received four Coleman-design treatment modules for individual contacts in administrative segregation. An additional eight cells were ordered and allocation of a second RT was approved so that group therapy could be offered in both administrative segregation units.

3CMS:

The institution had not generated a local operating procedure for implementing changes to the Program Guide.  However, custody and health care staff were reportedly alerted to procedural changes through staff meetings, memoranda, and OJT.  Mental health staff was asked to follow the training plan prepared by the CDCR DCHCS.

Referrals:

Staff reported improved performance with regard to processing and responding to routine mental health referrals.  Corrective action reportedly reduced the time it took to receive submitted referrals and inmate histories indicated that approximately 92 percent of routine referrals generated a clinical response within five working days.  Performance with regard to rescheduling missed appointments was not as good.  In about a third of 19 reviewed cases, rescheduled appointments took two to three weeks to complete.

IDTTs:

Staff reported continued noncompliance with IDTT requirements, stating that formal IDTT meetings were not held regularly in administrative segregation.  In addition, MHTS data documented IDTT reviews for just over half of the MHSDS inmates that were treated at CEN during the reporting period.  When completed, IDTT meetings were usually timely.

Heat Plan:

Additional buildings had been designated so that there was a heat risk building available for inmates at each custody level.

### Chuckawalla Valley State Prison (CVSP)
Paper Review

Staff continued a comprehensive system of tracking and review for many aspects of inmate care.  Documents provided indicated that all corrective action items that had been

resolved remained compliant. Large audits and other oversight mechanisms indicated that nearly 100 percent compliance was sustained within the 3CMS, EOP and administrative segregation programs, as well as for most components of medication management.

Census:

The overall MHSDS population, and in particular the number of 3CMS inmates and MHSDS inmates in administrative segregation, decreased during the monitoring period. Inappropriate transfers to CVSP continued to account for about half of its MHSDS population.

The total number of inmates at CVSP was 3,155 and there were 14 MHSDS inmates. There were 118 inmates in administrative segregation, including three 3CMS inmates. There were no EOP inmates in administrative segregation. There were nine 3CMS inmates and two EOP inmates in general population. No mental health inmates were in the CTC for psychiatric treatment.

Staffing:

CVSP saw significant allocation increases and did reasonably well in filling them. Positions for 1.5 psychiatrists were filled throughout the reporting period. Three of the five psychology positions were filled, as were four of 6.5 psych tech positions. Staff made concerted efforts to address space pressures related to increased medical and mental health staffing allocations, and reported no major complications.

Suicide Prevention:

The SPC met monthly with good, multidisciplinary participation. Minutes indicated that the committee covered a reasonable range of appropriate topics.

Performance related to the completion of SRACs had improved.  Tracking showed that all CVSP inmates admitted to the OHU received an SRAC on admission.  The sole inmate retained at CVSP after a suicide-related admission also received an SRAC on discharge.

Five-day clinical follow-up upon discharge from the OHU or return from an MHCB was rarely required.  A newly designed tracking tool indicated that two inmates required five-day follow-up during the reporting period.  One received clinical follow-up and one did not.

All inmates placed in administrative segregation were reportedly pre-screened relative to past and present suicidal indications.  An excellent tracking tool listed 727 administration segregation placements, 99 percent of which were timely screened using a 31-question form.  Inmate profiles, which included the results of completed SRACs, were utilized as part of the screening process.  The refusal rate for 31-questions screens was reduced to 23 percent during the reporting period.  Refused screens were referred to mental health and usually resulted in follow-up within a few days, though staff took one to three weeks to respond to approximately 17 percent of these referrals.

Staff previously established good practices in accessing and inventorying emergency response equipment, as well as CPR training.  Monthly medical emergency drills were routinely conducted during second and third watches in administrative segregation.  Drills were not documented during first watch.

Welfare checks were logged and logs indicated that 30-minute welfare checks were completed for new intake inmates in administrative segregation on a consistent basis.  A limited review of the logs indicated that the checks were not conducted at staggered intervals.

<u>Mental Health Assessments for Use in the Discipline of Sexual Misconduct Violations</u>:

CVSP had an effective system for providing mental health input in the disciplinary process. This was an area of improvement. Provided logs indicated that five non-MHSDS inmates were evaluated to rule out a diagnosis of Exhibitionism following receipt of an RVR for indecent exposure. IDTTs reviewed each case and one inmate was diagnosed with Exhibitionism. This latter case was also referred to the local district attorney's office.

<u>Transfers</u>:

During the reporting period, CVSP transferred 16 EOP inmates from the general population and two EOP inmates from administrative segregation, all of whom were moved within required timeframes.

During the reporting period, CVSP placed 86 inmates in the 3CMS caseload, 85 of whom were transferred, admitted to an MHCB or paroled within the appropriate timeframes. Another 63 3CMS inmates were inappropriately transferred to CVSP, the majority of whom were from CIM, NKSP, DVI, RJD and WSP. Most of these inmates were seen by a psychiatrist within a day of arrival; all were seen within a week. All but one of these inmates was returned to the sending institution within 30 days, as required. In the sole noncompliant case, the inmate was not immediately identified as 3CMS because he arrived at CVSP without mental health paperwork. Transfer from CVSP was further complicated by safety concerns at the sending institution.

Inmate often remained in the OHU for longer than 72 hours related to slow access to MHCBs. During the reporting period, there were twelve OHU admissions from CVSP and 35 OHU admissions from ISP. Three CVSP admissions were released to housing; two within 72 hours and one within four days of admission. Nine CVSP admissions were referred to

an MHCB within 48 hours, two of whom were transferred within 24 hours of referral. The remaining seven inmates waited up to 18 days to be transferred to an MHCB. No MHCB referrals were rescinded. CVSP did not refer inmates to DMH.

Other Issues:

During the reporting period, a second yard was converted to an SNY. Another yard had been closed for over a month for air conditioning installations.

### Service Area K

Service Area K includes the CIW.

### California Institution for Women (CIW)
November 7, 2007

Census:

In November 2007, CIW's census was 2,960 inmates including 305 fire camp inmates. The mental health caseload population was 731 inmates, or 25 percent of the prison's population. There were 463 inmates in the mainline 3CMS program and 83 inmates in the mainline EOP. There were an additional 118 3CMS inmates and 18 EOP inmates in the RC. Twelve inmates were in the CTC, six inmates were in the PSU, and 18 inmates (15 3CMS and 3 EOP) were housed in administrative segregation.

Staffing:

CIW achieved nearly full staffing during this monitoring period, with a mental health clinical position vacancy rate of only .018. Registry staff was not utilized after June 2007. Allocated positions at CIW included one chief psychiatrist, one chief psychologist, one senior psychiatrist, five senior psychologists, and two supervising psych techs. Additionally, CIW had 9.5 staff psychiatrists, 27 staff psychologists, 7.5 psychiatric social workers, four RTs and 17 psych techs. One unfilled psychologist and 1.5 unfilled clerical positions were the only

vacancies at the time of the monitor's visit.

Quality Management:

    Quality management was problematic during the monitoring period.  While CIW gathered an abundance of data, there were no analyses or corrective actions taken from such data.  Further, several QITs were chartered, however, line staff participation remained minimal.

    The mental health subcommittee did not meet regularly, and peer review for psychiatry occurred only once during the monitoring period.  Peer review did occur monthly for psychologists and psychiatric social workers.

Suicide Prevention:

    SPC activity remained compliant during this monitoring period.  The ERRC convened at least monthly.  Attendance at meetings remained good and minutes were maintained.

    Five-day post MHCB follow-up was non-compliant during this monitoring period.

Medication Management:

    Medication management at CIW remained partially compliant.  At the time of the monitor's visit, the institution's medication management local operating procedure was under review, and implementation of new policies recommended by Maxor, the Plata receiver's planning management consulting service, had not yet begun.

    Medication continuity upon arrival was 100 percent compliant.  Continuity of medications upon movement within CIW was not tracked, as a new policy was implemented just prior to the monitor's visit.

    CIW did not have a comprehensive medication noncompliance policy.  The status

307

of informed consents for psychotropic medications was not reported for the monitoring period. A new system was developed to ensure timely renewals of medication prior to expiration; however, it was not implemented at the time of the monitoring visit. Medication orders by psychiatrists were for no longer than ten days for MHCB inmates and 90 days for 3CMS and EOP inmates during the monitoring period. Bridge orders did not exceed 30 days.

CIW only obtained blood levels for inmates prescribed mood stabilizers upon admission to the MHCB, prior to referrals to DMH, and when inmate compliance was in question. CIW did not have a protocol in place for monitoring blood levels for mood stabilizers at any other time.

CIW did not monitor compliance rates for DOT procedures during the monitoring period.

Keyhea orders continued to be monitored and timely renewed. Five inmates were under Keyhea orders, and three Keyhea petitions were pending at the time of the monitor's visit. No Keyhea orders lapsed or expired during the monitoring period. No inmates with pending Keyhea hearings left the institution prior to the hearing date.

CIW did not audit HS medication administration during the monitoring period. Twenty five percent of the mental health caseload inmates were prescribed HS medication. The chief medical officer's approval was no longer required to prescribe medication HS; prescribing practices regulating HS medications were reportedly reviewed via the psychiatry peer review process at CIW.

Pill line length remained problematic. All necessary authorizations for construction of two additional pill administration windows were received just prior to the monitor's visit.

Overall MAR documentation remained poor. A new policy and forms for reporting medication errors and adverse drug reactions were developed during the monitoring period, however, they were not yet implemented.

CIW did not monitor compliance with parole medication distribution. CIW continued to provide parole discharge plans to all mental health caseload inmates, including a pre-parole IDTT meeting to inform and summarize the discharge plan for the inmate.

Mental Health Assessments for Use in the Discipline of Sexual Misconduct Violations:

CIW completed only one screening for indecent exposure during the monitoring period. There were no district attorney referrals related to sexual behavior.

Transfers:

CIW referred only eight inmates to DMH at Patton State Hospital over the monitoring period. Five inmates were accepted, three were rejected, and one appeal was denied. Sixty-two percent of all DMH referrals were made after MCHB lengths of stay over ten days with an average of 13 days for a referral. DMH decisions averaged seven days and bed assignment took an additional four days. CIW moved all inmates on the date of bed assignment.

There were no problems with psych and return protocols during the monitoring period.

CIW's CTC opened in August 2006, and received permanent licensure from the California Department of Health Services in June 2007. CIW operated an 18-bed MHCB unit within the CTC that was staffed with a full-time senior psychologist specialist, a full-time psychiatrist, two full-time psychologists, a half-time psychiatric social worker and a full-time RT.

Staff reported adequate access to the MHCB unit, and temporary holding cells

were not used in lieu of admission to crisis beds during this monitoring period.  There were 226

discharges from the MHCB, or an average of 37 discharges per month, during the monitoring

period.  The average length of stay was 6.65 days, and 12 percent of all admissions had clinical

lengths of stay longer than ten days.  Nearly ten percent, or 21 inmates, had three or more

admissions within a six-month period.

        CIW was compliant with timely completion of initial and weekly IDTT meetings

with appropriate disciplines present.  Also, compliance was noted for daily psychiatric rounds.

        Completion of SRACs upon admission to the MHCB was noncompliant, with

only 67 percent completed.  However, CIW completed 97 percent of SRACs upon discharge

from the MHCB, and was compliant.

        Restraint logs were complete and revealed that restraints were used 18 times for

mental health purposes.  There were two uses of restraints documented that exceeded four hours

with no renewal orders noted.

        The PSU at CIW is the only PSU for female inmates in the CDCR.  This ten-bed

facility opened in January 2007; it was fully operational and running well at the time of the

monitor's visit.  The PSU received inmates from VSPW and CCWF.

        CIW adopted the "behavioral incentive program" model from CSP/Sac with

modifications appropriate for the female population.  The PSU clinical staff at CIW included a

part-time psychiatrist, two full-time psychologists, one part-time psychiatric social worker and

one part-time RT.  Psych tech services were provided on second and third watch only.

        The PSU at CIW was temporarily located in part of the refurbished OHU.  Two

outdoor individual exercise yards were constructed, as well as a group room with five therapeutic

modules, and a single interview room with one therapeutic module.  A permanent 20-bed PSU is

planned for the East wing of the special care unit building at CIW with an activation date yet to be determined.

Following initial activation of the PSU in January 2007, the census remained high, with nearly all beds occupied. Shortly thereafter, the census began to drop, and averaged around five to six inmates with a SHU endorsement. Since January 2007, there were only 13 admissions to the PSU. Groups, individual contacts, and yard time for inmates were all in compliance during the monitoring period. CIW offered 11 hours of group therapy per week, plus one incentive group. Yard time was offered in addition, and inmates were seen individually on a weekly basis.

CIW remained in compliance for timely transfers of EOP RC inmates. During the monitoring period, 73 EOP inmates transferred from CIW RC in 51 days on average. One hundred percent of the RC EOP inmates were endorsed for transfer within 60 days.

EOP administrative segregation hub transfers were noncompliant. From May through September 2007, CIW transferred 26 EOP administrative segregation inmates to the hub at VSPW. Only 74 percent transferred within 30 days. Delays were largely due to lack of bus transportation, close parole dates and extensions. Two inmates were delayed due to CTC admissions and one inmate was delayed due to a PSU admission.

3CMS RC transfers remained compliant during the monitoring period as well. CIW processed 307 3CMS inmates through its RC with an average of 44 days to endorsement, six days faster on average than reported during the previous monitoring round.

Other Issues:

    Administrative Segregation:

    Administrative segregation services at CIW remain partially compliant. During

the monitor's visit, there were 18 mental health caseload inmates (15 3CMS and three EOP) housed in administrative segregation. The average daily census for caseload inmates during the review period decreased to 20 inmates. Staffing for the unit included a .75 psychiatrist, two full-time psychologists, and a half-time psychiatric social worker.

Case managers saw EOP inmates individually daily, and no group therapy was provided due to a lack of therapeutic modules. Case managers saw 3CMS inmates individually weekly. Clinical contacts occurred at the dayroom tables with very little sound privacy and no visual privacy. Over 20 percent of individual contacts occurred cell-front.

IDTT meetings remained problematic with no change since last the visit, with inconsistent attendance by CCs. C-files were rarely available for IDTT meetings.

Seven cells were retrofitted for intake cells. An additional correctional officer was assigned to each shift in the unit to facilitate the 30-minute welfare checks.

Pre-placement screening was problematic. There was no documentation in UHRs of completed screenings during the monitoring period. CIW was compliant with mental health screenings. Daily psych tech rounds were compliant during the monitoring period, and use of the suicide profile was implemented during the monitoring period.

EOP:

The EOP at CIW continued to operate in compliance with Program Guide requirements. The EOP physical plant was renovated and painted; new mattresses and new air conditioning were installed throughout the unit. The EOP was restructured during the monitoring period, and adopted the CSP/Sac EOP curriculum of eight weeks of group therapy participation followed by one week off. The clinicians used the off-week to prepare new programs for the next eight-week cycle.

The EOP consistently offered greater than ten hours of structured therapeutic activities, and attendance doubled since the previous monitoring period. New groups were developed, including exercise and diet programs as well as dialectical behavioral therapy. Group cancellations were no longer problematic, and inmate, correctional staff and clinical staff relations improved significantly.

3CMS:

The 3CMS program remained compliant during the monitoring period, even with the increase of 140 caseload inmates transferred from CRC as part of the "Right Prison, Right Mission" realignment project in CDCR. No additional clinical staff was allocated with the increased population, and clinical treatment space was problematic.

CIW restructured the 3CMS program to consist of four teams. Teams one and two provide clinical services to 80 percent of the 3CMS population and each included one full-time psychiatrist, one full-time psychologist and one full-time psychiatric social worker. Team three also included one full-time psychiatrist, psychologist, and psychiatric social worker, and provided clinical services to the remaining 20 percent of the 3CMS population. Team three's psychiatrist was assigned to the PSU, the psychologist was assigned to the methadone maintenance program and attends UCC meetings, and the psychiatric social worker provided pre-release planning to the administrative segregation population.

Team four included one full-time psychologist, one part-time RT, and a full-time psych tech. Team four was tasked with developing and providing therapeutic group activities for 3CMS inmates at risk of clinical deterioration, and 3CMS inmates recently removed from EOP.

CIW was compliant for timely IDTT meetings, completed treatment plans and case manager clinical contacts. At the time of the monitor's visit, there were 11 psychotherapy

groups with eight to ten inmates offered to 3CMS inmates, or approximately 19 percent of the 3CMS population.  There were 65 3CMS inmates on waiting lists for group therapy.

Medical Records/MHTS:

Access to UHRs was problematic during the monitoring period.  CIW had no system in place to track movement of records among clinicians within the institution.

## **Service Area L**

Service Area L includes the CCWF and VSPW.

### **Central California Woman's Facility (CCWF)**
February 13, 2008 – February 15, 2008

Census:

On February 15, 2008, CCWF's inmate population was 4,033 inmates.  CCWF's total caseload population included 1,116 inmates, a slight decrease from the preceding monitoring period.  The EOP had 67 inmates, two of whom were in the RC and were on unendorsed status.  The 3CMS population was 726 inmates, including 575 inmates in the RC, and 110 inmates in general population.  There were 37 3CMS inmates and no EOP inmates housed in the main administrative segregation, and four 3CMS inmates were housed in the administrative segregation overflow unit.  Two inmates were in MHCBs.

Staffing:

Staffing vacancies remained problematic, particularly for supervisory personnel. The chief of mental health position, the supervising senior psychiatrist position, the chief psychologist position, a senior psychologist position and a senior psych tech position were all vacant during the monitoring period.  Further, 60 percent (18.24 of 30.24 positions) of the staff psychology positions, 1.5 of seven psychiatric social worker positions and 1.5 of 4.15 RT positions were vacant.

CCWF filled five psychiatry positions during the monitoring period to reach a full complement of 8.5 staff psychiatrists. Additionally, all eight psych tech positions were filled.

During the monitoring period, the director of nursing was reassigned to another institution and a new director of nursing was recently appointed. Two supervising registered nurses II were dedicated to the mental health program, as well as nine RNs.

Three clerical staff members were hired during the monitoring period. All seven health records technician positions and two health records technician supervising positions were filled.

Two of three allocated pharmacist I positions were vacant, but filled by registry pharmacists. The pharmacist II and the seven pharmacy tech positions were filled.

The vacancy rate during the monitoring period was 47 percent. Use of contractors, including three contract psychologists, reduced the functional vacancy rate to 41 percent. Clinical vacancies resulted in a lack of consistency throughout the mental health program that, in turn, adversely affected the delivery and quality of treatment at the institution.

Quality Management:

CCWF did not have a fully operational quality management program in place. There continued to be no documented activity by the institution's local governing body or health care quality management committee. The mental health subcommittee met regularly and attempted to improve methodology of audits; however, reviews remained limited to CAP items. Custody attendance was problematic at the meetings, and dissemination of information to line staff remained minimal.

Peer review activities increased during November and December 2007; however the process remained at a rudimentary level.

<u>Suicide Prevention</u>:

CCWF partially implemented the administrative segregation suicide prevention plan during the monitoring period. Intake cells were clearly marked and custody wellness checks were performed as required. Screenings were appropriately completed and occurred in clinically appropriate settings.

Five-day post-MHCB daily clinical contacts were 96 percent compliant.

<u>Medication Management</u>:

Medication management at CCWF remained problematic. Flawed auditing continued throughout the monitoring period, consequently, assessments were based on very limited data. The process used for continuation of medication for newly arriving inmates was troublesome at best. A clear medication order was rarely noted on the physician order sheet.

Medication continuity upon housing transfers remained partially compliant, with variable compliance rates from yard to yard.

Notation of medication noncompliance was 97 percent compliant; however, only 79 percent of the noncompliant inmates were referred. Timely clinical follow-up was provided to only 75 percent of those referred inmates. Long pill lines were a noted as a reason for medication noncompliance at CCWF.

CCWF reportedly provided DOT, though no data were provided to support compliance. The delivery of HS medications remained unchanged and noncompliant. HS medications were only prescribed to administrative segregation and EOP inmates, as both populations were housed in the same building.

CCWF remained compliant with laboratory testing for mood stabilizing medications.

Parole medications were appropriately provided upon release.

<u>Transfers</u>:

There were significant delays in referring inmates to a higher level of care from CCWF. In most instances, inmates were not referred to DMH until after their tenth day in an MHCB. During the monitoring period, CCWF referred only six inmates to Patton State Hospital. CCWF did not record whether the referral was to acute or intermediate levels of care. Delays were noted for acceptance notifications from Patton State Hospital. There were no rejections during the monitoring period.

The MHCB at CCWF has six beds, including one observation room, and served both CCWF and VSPW. The unit was staffed with one psychiatrist, one psychologist, two RTs and one half-time supervising senior psychologist. During the monitoring period, there were 76 admissions to the MHCB unit, 17 of which were from VSPW. The average length of stay was seven days.

During the monitoring period, there were 61 inmates admitted to the observation cell for 23-hour observation. These admissions were based on a pre-screening by a psychiatrist for inmates requiring psychiatric observation and stabilization not to exceed 23 hours. There were eight repeat admissions involving six inmates to the observation cell. Twenty-four percent, or 15 inmates were admitted to the MHCB unit for further observation and treatment.

No inmates were placed in restraints or seclusion, and alternative holding cells were not utilized for inmates awaiting admission to the MHCB during the review period.

CCWF transferred two inmates to the EOP administrative segregation hub unit at VSPW. Transfer timelines were not met for either inmate, with lengths of stay at 41 days and 47 days.

Other Issues:

RC:

RC processing remained compliant.  Initial health screenings, mental health screenings and mental health evaluations occurred timely.  CCWF was compliant with weekly clinical case management contacts, group therapy, recreation therapy, dayroom provision and IDTT meetings.  EOP RC inmates were offered a minimum of ten hours of therapeutic activities weekly.

Processing of 3CMS RC inmates was also compliant.

Administrative Segregation:

Weekly clinical case manager contacts were conducted in a private, confidential treatment setting.  Daily psych tech rounds were documented, and screenings and IDTT meetings were timely.  CCWF did not provide group therapy for administrative segregation caseload inmates.

CCWF implemented many aspects of the administrative segregation suicide prevention plan during the monitoring period.  Four cells were identified as intake cells; however, they were not yet retrofitted.  Pre-placement medical screens were completed timely, and new arrivals had placards on the cell doors identifying them as intake status for 21 days.

Thirty-minute wellness checks were documented appropriately.  Inmates were offered greater than ten hours of yard per week, including inmates on walk alone status.

All administrative segregation cells had electrical outlets, and inmates were allowed one personal electrical appliance after initial classification committee approval.

EOP:

The EOP at CCWF was partially compliant throughout the monitoring period.

318

The 90-bed mainline EOP shares a housing unit with administrative segregation. The EOP averaged 61 inmates from July 1, 2007 through December 31, 2007. Therefore, it was not uncommon for the administrative segregation population to exceed the EOP population. Consequently, it was difficult to provide a therapeutic milieu for EOP programming. EOP inmates reported feeling disturbed and often intimidated and/or threatened by the presence of administrative segregation inmates.

The EOP at CCWF was staffed with one supervising senior psychologist, six clinical case managers, one psychiatrist, four RTs, and one occupational therapist. After-hours and weekend coverage was provided by the on-call psychiatrist.

The EOP at CCWF operated on a privilege-based "phase" program. Phase 1 was the most restrictive, with limited access to phone privileges, personal property, visitation and in-cell dining. Phase 2 inmates were permitted an increased number of phone calls, had access to more personal property, and ate in the dining hall. Phase 3 was the least restrictive phase.

Weekly clinical case manager contacts were partially compliant at 87 percent. Psychiatric appointments occurred at least every 30 days, and inmates reported that the psychiatrist was accessible and responsive. However, clinical contacts for both psychiatry and case managers occurred in the dayroom with no visual or auditory privacy. Reportedly a budget change proposal was submitted in September 2007, for space additions and modifications for CCWF.

CCWF offered 12 hours of structured therapeutic activities weekly, and inmates received an average of nine hours throughout the monitoring period.

Pre-release planning remained partially compliant.

Of noted concern during the monitoring period was the large number of inmates

who rapidly discharged from EOP to 3CMS, only to quickly return to EOP level of care via the

MHCB unit.  Coupled with the privilege-based phase system in place operated, this operated in

some instances as a disincentive to desirable behavior.  As an EOP inmate stabilized and became

mostly capable of complying with the expectations of the higher, less restrictive phases, she

became subject to discharge from the EOP.

      3CMS:

      Overall, the 3CMS program at CCWF remained partially compliant.  Staffing for

the 3CMS program included six psychiatrists, five psychologists, four psychiatric social workers,

one psychology practicum student and one and one-half contract LVN.

      Initial intake assessments were noncompliant.  Between July and October 2007,

31.7 percent of all MH-4 intake assessments were completed timely.

      IDTT compliance was also poor during the monitoring period.  Not one

psychiatrist attended IDTT meetings during the month of July 2007, and overall compliance for

psychiatry participation throughout the monitoring period was 65 percent.  Inmates attended

IDTT meetings at a rate of only 68 percent.

      Treatment plans were routinely completed but their quality was poor due to the

lack of consistent principal diagnoses, individualized treatment goals and objectives, intervention

types, frequency and duration.  Treatment plans were often incomplete and contained inaccurate

information.  UHRs and C-files were often unavailable for IDTT meetings.

      Clinical case manager contacts for 3CMS inmates reached 88 percent compliance

from July 2007 to November 2007.  Group therapy was available to 3CMS inmates as well as

non-caseload inmates.  The need for group therapy was discussed in IDTT meetings and

identified as part of the interventions in the treatment plans.  At the time of the monitor's visit,

there were 17 groups offered at CCWF.  There were 313 inmates on the waiting list, including 240 non-caseload inmates.  The average waiting period was 182 days and 3CMS inmates on the waiting list were not given priority status.

Referrals:

Aspects of the referral process at CCWF were troubling.  The average length of time from referral to appointment was almost ten days.  Further, CCWF had an internal policy that mental health clinicians, including psychiatrists, were strongly discouraged from making medical referrals.  This practice of discouraging mental health clinicians from directly communicating with medical professionals regarding their shared patients was counterproductive.

Medical Records/MHTS:

Improvement with UHRs was noted for filing of inmate records including discharge summaries.  From July to October 2007, audits showed 100 percent compliance for filing.  There was no backlog in medical records at the time of the monitor's visit.  However, 32 percent of the reviewed records had documents filed in the wrong inmate record.

The medical records department had outgrown its space and was utilizing storage boxes to hold extra volumes of health records.  This space issue posed numerous problems including potential destruction of records by weather and inaccessibility of information after normal work hours.

MHTS remained problematic.  Audits revealed significant discrepancies between the MHTS data, UHRs, and other manual logs.

**Valley State Prison for Women (VSPW)**
September 25, 2007 – September 27, 2007

Census:

There was an overall increase in the institutional population and the number of mental health caseload inmates since the last monitoring visit in May 2007. In September 2007, VSPW's total inmate population was 4,286, up from 3,947 inmates in May 2007. Of these, 1,221 inmates, or 28 percent, were participants in the MHSDS. The 3CMS caseload increased from 966 inmates during May 2007, to 1202 inmates. Of these, 915 inmates were in general population, 213 inmates were in the RC, 38 inmates were in SHU, 24 inmates were in administrative segregation and 12 inmates were in the OHU. There were 19 inmates receiving EOP services, including 13 inmates in the RC, one inmate in general population, one inmate in the SHU, three inmates in administrative segregation, and one inmate in the OHU.

Staffing:

VSPW continued to have a high vacancy rate among clinicians. At the time of the monitor's visit, the actual vacancy rate for clinicians was 35 percent. The functional vacancy rate, including contractor coverage, was 20 percent.

The mental health services administrative team at VSPW included an acting health care manager, an acting chief of mental health, two senior psychologists (one of whom was acting), and the associate warden for health care. Despite the areas of concern related to the use of long-term acting positions, the key mental health administrative and management team has maintained consistency in its composition, providing stability to the overall operation of the MHSDS at the institution. Since the last monitoring visit, there was an influx of new hires in clinical and support positions.

Of the four allocated senior psychologist-supervisors, two were vacant; interviews

322

to fill the vacancies were scheduled for September 19, 2007.  Five of the six allocated

psychiatrist positions were vacant, as were 5.7 of the 28.8 allocated clinical psychologist

positions.  Two psychologists were on long-term sick leave.  Of the 6.3 psychiatric social worker

positions, 2.3 were vacant, and the 1.2 supervising psychiatric social worker positions also

remained vacant.  VSPW established a successful psychology internship program and was able

to recruit several clinicians upon their completion of the program.

        Only .44 of the 4.44 allocated RN positions were vacant, and 2.66 of the 14.66

psych tech allocated positions remained vacant.  The one senior psych tech position was filled.

Both the one health program specialist and the one associate governmental program analyst

positions were filled.  Two of the eight allotted office technician positions were vacant.  The .5

limited term office assistant position was also vacant.

        During August 2007, contractors covered 4.9 of the six psychiatry vacancies, 2.1

of the 5.7 psychology vacancies, and none of the 2.3 psychiatric social worker vacancies.

Psychology vacancies were down to 5.7 from 15.2 positions during the last tour.  A senior

supervising psychologist was assigned to review caseloads weekly and make monthly adjustment

to retain manageable caseloads.

Quality Management:

        VSPW's quality management activities were maintained throughout the

monitoring period.  The quality management committee and local governing board were current

with regular meetings with appropriate staff attendance, and minutes were maintained.  During

the monitoring period, VSPW formed and institutionalized a laboratory monitoring committee.

Further, they implemented the revised pre-placement administrative segregation medical

evaluation and the bad news screening process.  QITs were formed as needed, and the institution

323

utilized audit procedures with acceptable methodologies.

Peer review continued to meet on a monthly basis for psychiatry, psychology and psychiatric social workers, and recently added nursing and psych techs.

<u>Suicide Prevention</u>:

VSPW's SPC met regularly with suitable attendance throughout the monitoring period. Committee discussions were appropriate and included issues related to admission to suicide-risk status, safety cells, crisis beds transfers and transportation, and post-suicide watch custody and clinical observations.

Pre-placement administrative segregation screens and "bad news" screens were not implemented. Post-placement screens were compliant, and were completed within 72 hours of placement into the unit by a psychologist during the weekday or by psych techs on weekends.

VSPW had not implemented the use of the inmate suicide profile for administrative segregation inmates. However, correctional officers completed an inmate segregation profile, which included notations of prior suicide attempts, on the date of placement into the unit. Clinical and correctional staff met daily and identified new arrivals in administrative segregation.

VSPW was compliant with completion of 30-minute welfare checks in administrative segregation. VSPW did not retrofit any cells for intake inmates in administrative segregation. Newly arriving inmates were housed in cells close to each other and near high traffic areas or control booths to allow closer observation. Intake placards with beginning and ending dates were visible on the cell doors.

Five-day post MHCB follow-up remained partially compliant.

The ERRC met regularly, and reviewed numerous emergencies during the

monitoring period.  The committee did not recommend any remedial training with regards to the reviews.

Medication Management:

Medication continuity was an area of sustained progress during the monitoring period.  However, significant staff vacancies and the absence of psychiatric supervision stalled compliance in several medication management areas.

Medication continuity upon arrival was compliant, although, psychiatric follow-up related to the continuation of orders remained problematic.  There were no problems related to medication continuity upon transfer within VSPW.  Medication renewals and refills were timely and compliant.

VSPW did not have a clear mechanism in place for handling medication noncompliance.  Also problematic was the lack of appropriate documentation for medication changes and of responses to reports of side effects.

Presence of informed consents was noncompliant.  HS medications were delivered after 8:00 p.m. throughout the monitoring period.

VSPW was partially compliant in obtaining blood levels for mood stabilizers, as well as other relevant laboratory results.

Transfers:

Referrals to DMH remained minimal.  During the monitoring period, VSPW referred only two inmates to Patton State Hospital, and the transfers were not timely.  One referral took eight days to transfer and the other took 17 days due to a medical issue.

VSPW referred 22 inmates of 176 OHU admissions to MHCBs.  Data was not provided regarding length of stay from admission to the OHU to referral to the MHCB.  Once

referred and accepted, transfers occurred on the same day.  There were no inmates with multiple admissions to MHCBs.

VSPW did not make any referrals to the PSU at CIW.

The OHU at VSPW contained ten medical beds and 13 mental health beds.  Ten of the 13 cells were designated as observation cells and the remaining three were safety cells. The safety cells were used to monitor suicidal inmates.  Video monitoring of these cells was discontinued since the preceding monitoring visit.

There were 176 admissions to the OHU during the monitoring period, with an average length of stay of 115 hours or 4.8 days.  Holding cells were utilized for inmates waiting transfer into the OHU or out to MHCBs.  Lengths of stay in the holding cells did not exceed four hours.

Restraints were not utilized during the monitoring period, and mattresses and safety gowns and blankets were available.

Daily IDTT meetings were held in the OHU, excluding weekends and holidays. Mental health and nursing staff routinely attended IDTT meetings.  Correctional staff attendance significantly improved, and UHRs and C-files were available at the meetings.

General population EOP inmates transferred within mandated time frames. Thirty-one EOP inmates transferred during the monitoring period and waited 20 days, on average.

Other Issues:

RC:

The RC at VSPW was staffed with seven psychologists, two psychiatrists, one psychiatric social worker, one registered nurse, three clinical psychology interns, and five

326

psychology practicum students.

At the time of the monitor's visit, there were 13 EOP inmates in the RC.  Weekly case manager contacts occurred in a confidential setting, and weekly IDTT meetings were compliant.  RC EOP inmates received five hours of structured therapeutic activity per week. Activities included coping skills, medication management, anger management, social skills, and art/music therapy.

Pre-release planning was fully available to RC EOP inmates.

Administrative Segregation:

At the time of the monitor's visit, 67 or 50 percent of the administrative segregation population were on the mental health caseload.  The unit was staffed with one supervising senior psychologist, three full-time and three half-time case managers, one half-time psychiatrist, one half-time registered nurse and up to five psych techs per shift.  Clinical case management contacts occurred weekly, however, due to space limitations, they were often in non-confidential settings.  VSPW was compliant with timely initial and subsequent IDTT meetings in administrative segregation.

Structured therapeutic activity offerings were noncompliant, as less than ten hours were offered for two months of the four-month monitoring period.  VSPW expanded group offerings to the weekends and evenings, however, space limitations, a staffing shortage, and movement restrictions continued in the unit.  Further, while there were five therapeutic modules in the unit, their placement in a straight line did not promote peer interaction and limited the quality of the group setting.

Inmates in administrative segregation were offered ten hours of yard time weekly during the monitoring period.

Psych tech rounds remain partially compliant.  Although the psych tech rounds were completed, documentation was poor, and filing of the documentation in the UHR was not timely.

Personal appliances were allowed in administrative segregation.

3CMS:

During September 2007, there were 915 3CMS inmates at VSPW.  Staffing for the program included one acting senior psychologist, six psychologists, two psychiatric social workers and four psychiatrists.  There were two case manager vacancies and three psychiatry vacancies during the monitor's visit.  Contractors covered all of the psychiatry vacancies.

Staffing shortages and limited clinical space continued to impede mental health services in the 3CMS program during the monitoring period.  IDTTs remained only partially compliant for attendance and quality of the treatment plans.  Ten percent of the 3CMS population participated in group therapy.  Appropriateness for group therapy was determined by the IDTT, and an average of 20 referrals per week were made during the monitoring period.

Referrals:

Time of responses to staff referrals and self-referrals improved, however, lack of appropriate space for clinical interviews remained problematic.  Urgent referrals were handled within 24 hours.

Medical Records/MHTS:

Requests for prior mental health records, although improved during the monitoring period, remained partially compliant.

## SUMMARY

Staffing:

As of January 31, 2008, vacancy rates in mental health staffing[7] throughout CDCR institutions remained high among chief and supervising psychiatrists, at respectively 42 percent and 47 percent, for all 33 CDCR institutions.  For chief and supervising psychologists, however, vacancy rates were significantly lower, at eight and 12 percent respectively, as was the vacancy rate for supervising psychiatric social workers at nine percent.

Among line mental health staff in CDCR institutions, vacancy rates declined during the preceding year.  The overall vacancy rate among psychiatrists, psychologists, psychiatric social workers, and psych techs was 28 percent.  Use of contractors lowered the functional vacancy rate for these disciplines to 17 percent.

For psychiatrists, the vacancy rate of 51 percent for all 33 institutions was reduced to a functional vacancy rate of 20 percent with use of contractors.  There was a  vacancy rate of 27 percent for psychologists, which was lowered to a functional vacancy rate of 17 percent with contracted help.  The vacancy rate of 18 percent for psychiatric social workers was likewise reduced to a functional vacancy rate of eight percent, and the psych tech vacancy rate of 20 percent was lowered modestly to a functional vacancy rate of 19 percent.

 CCWF, CVSP, Folsom, KVSP, NKSP, and SCC had no vacancies in psychiatry. ASP, CCI, CIM, CSATF, CTF, DVI, ISP, MCSP, VSPW, and WSP were able to achieve full coverage in psychiatry with use of contractors.  CIW, CMC, and CRC had functional vacancy rates in the range of 11 to 15 percent, while functional vacancy rates at CAL, CSP/Corcoran, CSP/LAC, CSP/Sac, CSP/Solano, PBSP, PVSP, and SQ ranged from 22 to 38 percent.  Another

---

[7] Source of staffing data reported in this section: *CDCR Coleman Monthly Report of Information Requested and Response to January 19, 1999 Court Order Regarding Staff Vacancies as of January 31, 2008*, reported by CDCR on February 28, 2008.

group of institutions including CMF, HDSP, and SVSP fared relatively poorly in covering their psychiatry positions, with functional vacancy rates ranging from 41 to 66 percent. Three institutions had very little to no coverage in psychiatry, with functional vacancy rates of 88 percent at RJD, and 100 percent at CCC and CEN.

In psychology, ASP, CTF, DVI, Folsom, PVSP, and SQ achieved full coverage, while at CIM, CIW, CMF, CSP/Sac, CSP/Solano, PBSP, and RJD, functional vacancy rates ranged from three to 12 percent. At CRC, CAL, HDSP, ISP, SCC, and WSP, functional vacancy rates in psychology ranged from 14 to 20 percent. Another group of institutions, CCI, CMC, CSP/Corcoran, CSATF, MCSP, SVSP, and VSPW, covered psychology positions sufficiently to bring vacancy rates to the range of 21 to 26 percent. However, psychology functional vacancy rates ranged from 31 to 52 percent at CSP/LAC, CCWF, CVSP, KVSP, and NKSP, and were the worst at CEN and CCC which had rates of 82 and 100 percent, respectively.

Thirteen institutions achieved full coverage in psychiatric social work. These were CSP/LAC, CSP/Corcoran, CTF, CSATF, DVI, Folsom, KVSP, MCSP, NKSP, RJD, SQ, SCC, and WSP. Functional vacancy rates of four to 11 percent were found at CSP/Solano, CCWF, CIW, and PBSP. Other institutions did less well in social work, with functional vacancy rates of 14 to 26 percent at CMC, CSP/Sac, and HDSP, and 20 to 41 percent at CCI, CIM, CMF, and VSPW. Institutions that fared the worst with covering social work positions were CRC, PVSP, and SVSP, with functional vacancy rates of 50 to 67 percent, and ASP and CEN which both had functional vacancy rates of 100 percent according to CDCR central office staffing data.

Insofar as psych tech positions, there was little use of contractors to cover vacancies. Four institutions, CCC, CIW, NKSP, and WSP, covered all of their psych tech positions. A fairly large group had functional vacancy rates for psych techs ranging from two to

11 percent.  These institutions were ASP, CMF, CSP/Corcoran, CSP/LAC, CSATF, CMC, CCWF, DVI, HDSP, MCSP, and SCC.  Functional vacancy rates ranging from 21 to 29 percent were found at CIM, CSP/Sac, CSP/Solano, CTF, Folsom, KVSP, and SQ, and rates ranging from 32 to 39 percent were found at CCI, CRC, CAL, CEN, CVSP, PVSP, and SVSP.  The worst coverage of psych tech positions was found at PBSP, RJD, and ISP, which had functional vacancy rates of 45, 48, and 61 percent, respectively.

Quality Management:

        During this monitoring period, institutions were at different stages in the implementation of their mental health quality management systems.  There were institutions with well-developed quality assurance infrastructures and tools.  Required boards and committees were formed, methodologically sound audits were conducted, and appropriately formulated QITs were utilized to address substantive mental health issues. There were also institutions that had adopted structured peer review in the various mental health disciplines.  Other institutions continued to struggle with putting into place basic elements of a quality assurance system; they experienced problems with poor attendance, faulty audit methodology and problems compiling and maintaining adequate documentation of the quality assurance processes.

        Over the monitoring period, the local governing bodies of CSP/Corcoran, NKSP, PBSP, and VSPW continued to meet regularly, with appropriate representation and attendance. Each of these institutions had well-developed processes for their governing bodies that included extensive agendas and adequate interface with other components of the quality assurance process.  CSP/Sac's local governing body resumed its meetings during the monitoring period with appropriate composition and content; DVI reported that it planned to resume activities of its local governing body during the next monitoring period.

There were a number of institutions that had an established administrative structure for quality management that included an oversight health care quality management committee (QMC). These QMCs shaped institutional health care policies. Institutions that had functioning QMCs with broad interdisciplinary representation including custody were ASP, CCI, CIM, CMF, CMC, CRC, CSP/Corcoran, CSP/LAC, CSP/Sac, CSP/Solano, CSATF, CTF, DVI, FSP, NKSP, RJD, SVSP, SQ, SCC, VSPW, and WSP.

The deliberations of the QMCs of these institutions covered appropriate content and functioned reasonably well in addressing pertinent institutional health care issues, including mental health. In general, these institutional QMCs approved health care operational procedures, addressed issues that were raised by the subordinate mental health subcommittee, and had general supervision of health care programs at the institution.

There were also a number of institutions with problematic quality management systems. At PVSP, one of the problems impacting quality management was poor attendance at meetings including of the QMC. In addition, the minutes of meetings were not always available. PBSP and KVSP also had problems with regular attendance at meetings, but were progressing in developing their quality management system. MCSP's QMC did not meet monthly. Meetings at HDSP were also irregular.

CCWF did not have a fully operational quality management system in place at the time of the monitor's site visit. CIW experienced multiple problems with quality management; the institution gathered data, but did not complete analyses or use the data as the basis for formulating corrective actions.

At a number of institutions, the mental health subcommittee was functional, had regular meetings with the right composition, and maintained well documented records of their

activities. These subcommittees brought appropriate attention to mental health issues, focused their deliberations on measures to address problems and engaged in monitoring and improving the quality of mental health care. Institutions with well developed functioning mental health subcommittees included CCI, CIM, CMF, CMC, CSP/Corcoran, CSP/LAC, CSP/Sac, CSP/Solano, CSATF, CTF, DVI, FSP, NKSP, SVSP, SQ, and VSPW.

The mental health subcommittee at SCC met regularly with proper attendance and maintained good minutes. The mental health subcommittee at CAL also met regularly, but was unstructured. At CCWF the MHS met regularly, but operated in the absence of a functioning local governing body or QMC. CIW's mental health subcommittee did not meet regularly; documentation of the activities of the mental health subcommittee at ASP was poor.

The mental health subcommittee at WSP was not properly structured with the required composition; attendance at CRC, KVSP, PBSP, and PVSP's subcommittees was problematic. Quality management meetings, including the MHS, were irregular at MCSP and HDSP, and attendance at MCSP was a problem when meetings were held. The mental health subcommittee at RJD focused primarily on its CAPs and did not address issues of compliance to other Program Guide requirements.

Throughout the monitoring period, several institutions appropriately chartered and used QITs effectively. QITs at these institutions produced useful conclusions and recommendations, tested outcomes and participated in their implementation. In general, these institutions established and organized their QIT process appropriately. Institutions that chartered QITs to address substantive mental health issues included CCI, CIM, CMC, CSP/Corcoran, CSP/Sac, CSP/Solano, CTF, PVSP, and VSPW.

The scope of QITs varied at many other institutions. A single QIT at CMF was established to address a single mental health issue. QIT charter documents at CTF did not provide adequate information about the basis for the QIT. At DVI, QITs were prematurely disbanded without testing results. There were no mental health QITs chartered at HDSP even after the institution was instructed to charter such QITs by CDCR Central Office. SQ's QITs varied in completeness and quality. ASP had problems documenting QIT activities, and with implementing plans that resulted from their QITs. CRC chartered limited QITs that did not monitor CAPs or Program Guide compliance; RJD's QITs focused exclusively on CAPs and operated in the nature of a standing committee. KVSP did not charter any QITs during the monitoring period.

In a number of institutions, audits were methodologically sound and directed to important areas of mental health care. At these institutions, auditing practices were adequate, they utilized appropriate samples, and compiled data for internal supervision and external monitoring. Audits at these institutions were integral to the quality management system.

At ASP, CCI, CIM, CMF, CMC, CSP/Corcoran, CSTAF, DVI, FSP, PBSP, PVSP, and VSPW, regular and routine audits informed corrective action and protocols and were used to increase effectiveness. Audits at these institutions examined compliance with key performance indicators, including CAPs and Program Guide requirements.

There were several institutions where audits were regularly conducted, but were too limited or circumscribed. At CSP/Sac appropriate audits were conducted but resulting information was not effectively provided to line staff. The quality and usefulness of audits at SQ varied over the monitoring period. ISP's auditing tools did not include basic instructions. CCC and CCWF's audits were limited to CAPs and did not address other pertinent mental health

issues.  CRC, CTF, CAL, RJD, and WSP and did not audit several substantive mental health issues during the monitoring period.  SVSP conducted regular mental health audits; however these audits were carried out by the very staff being audited.  Audit data at NKSP was limited for several important mental health care issues; some audits conducted at CSP/LAC were inadequate.  Some audit instruments at CEN lacked appropriate instructions.

At several other institutions were problematic.  MCSP audited its CAP items; however, the samples were too small to produce statistically significant results. Medication management audits at HDSP were deemed unreliable due to small sample sizes and missing paperwork in medical records.  At SCC, chart audits were completed only periodically; audits of various medication issues were not regularly done at CSP/Solano.  Medication management audits at KVSP were grossly inadequate; CIW did not report any completed audits during the period.

Peer review processes advanced across institutions and were at varying stages of development.  The peer review process at CMC continued and was occurring in the various mental health disciplines.  There were also institutions where after hiatuses, peer review was restarting.  During the monitoring period, peer reviews for psychiatrists, psychologists and social workers resumed at CSP/Corcoran.  Peer review process was rudimentary at CCWF, did not exist at HDSP, and was just beginning at CTF.

At DVI and VSPW, peer review in the mental health disciplines operated reasonable well.  On the other hand, while KVSP's psychiatry peer review was conducting quantitative analysis of psychiatric practices, the institution was just beginning to develop a baseline for commencement of its case manager peer review. CSP/Sac suspended peer review for

case managers during the monitoring period. MCSP's peer review process did not focus on critical areas of mental health care.

The peer review process at PVSP was not well established; CSP/Solano chartered a QIT to develop peer review for its mental health clinicians.  ASP was conducting multidisciplinary case reviews as the precursor to appropriate peer review.  At WSP, psychiatry peer review was not occurring, and while it was occurring for psychologists, there were problems with maintaining proper documentation of the process.

CRC's psychology peer review procedures were directed at quality improvement/assurance and findings from the process were submitted to mental health management.  Peer review did not occur at CAL, CSATF, and ISP, and peer review was in its early stages at CEN.  Peer review for psychologists at CCI was functional, and the institution planned to focus on quality of care issues in the next monitoring period; psychiatry peer review at CCI was problematic.

CMF had adequate peer review for psychiatrists and psychologists, but there were no procedures in place for social workers.  At CIW, peer review in psychiatry was irregular and did not exist for psychologists and social workers.  Peer review procedures at CSP/LAC were problematic in psychology and social work and psychiatrists' peer review was limited to quantitative reviews rather than qualitative evaluation.  Psychiatry peer review at RJD was active and recent changes had improved quality; peer review did not occur in social work or psychology at RJD during the monitoring period.  NKSP had recently commenced psychiatry peer review at the time of the site visit and converted to case manager peer review for other clinicians.  Psychology peer review was ongoing at SVSP and psychiatry peer review at the institution was revamped.

Suicide Prevention:

One quarter of the institutional SPCs fulfilled their mandates regarding appropriate attendance and consideration of essential agenda items. These institutions included CIM, CIW, CMF, CSATF, CSP/Corcoran, SCC, and VSPW.

At CCI, CSP/LAC, CSP/Solano, KVSP, NKSP, PBSP, PVSP, RJD, SQ and WSP, the SPCs satisfied requirements in meeting regularly and keeping minutes; however, they struggled to achieve appropriate attendance by all disciplines.

At CSP/Sac, the SPC suspended the review of suicide attempts for several months due to staffing shortages. Folsom had a functioning SPC; however, auditing, attendance and monitoring were impacted by the frequent turnover of nursing supervisory staff.

While HDSP's SPC met the basic meeting and attendance requirements, the committee failed to address substantive issues of suicide prevention at the institution. Meetings were *pro forma* and did not focus on essential suicide prevention agenda items.

SVSP's SPC met regularly and addressed essential agenda items, although the meeting minutes were poorly maintained and lacked substantive content.

A group of institutional SPCs were not compliant in fulfilling their meeting requirements. These institutions included ASP, CRC, CTF, DVI, and MCSP.

Institutional EERCs functioned well at CIW, CMF, CSP/Corcoran, DVI, PVSP, SVSP, VSPW, and WSP. KVSP's ERRC met regularly, but failed to speak to the appropriateness of interventions. Similarly, RJD's ERRC was well attended and met regularly, though they did not address the timeliness of emergency responses for the reviewed incidents.

The institutional ERRCs at Folsom, CIM, CSATF, and CSP/LAC did not meet regularly.

ASP did not have an established institutional ERRC.

A large group of institutions performed well with five-day follow-up of inmates discharged from an MHCB or, in some instances, returned from DMH or moved from an OHU. These institutions included CCC, CCI, CMF, CSP/Corcoran, CSP/LAC, CSATF, CTF, CAL, CEN, HDSP, and SQ.  KVSP was substantially compliant; however, problems remained with discharges from temporary holding cells.

Compliance with hourly custody observation for the first 24 hours post discharge was problematic at CCWF, CSP/Corcoran, CSP/Solano, SVSP, SQ, and WSP.  At CSP/Corcoran, completed clinical follow-up ranged from 84 to 100 percent compliance; however, custody follow-up compliance varied according to housing unit.  Institutional audits revealed a 92 percent compliance rate in general population housing, while a 49 percent compliance rate was noted in the segregated housing unit.

Folsom was compliant for completion of five-day follow-up during weekdays; however, weekend follow-up was not provided.  Likewise, MCSP did not provide follow-up during weekends or days off.  MCSP also failed to track mental health OHU discharges identified for five-day follow-up.

CSP/Sac audited its performance and found that for 263 suicide related admissions identified for follow-up, only 58 percent were completed or readmitted for further observation.

ISP experienced difficulty with identifying inmates returning from MHCBs.  ISP documentation showed that at least three inmates returned to ISP for whom five-day follow-up should have been provided.  However, only one of these inmates was appropriately identified. In that case, clinical follow-up was incomplete, and no custody checks were performed.

CVSP implemented a new tracking tool for five-day follow-up completion.  Of two inmates who required follow-up during the reporting period, only one received clinical follow-up.

Implementation of the multipart administrative segregation suicide reduction program was well underway at most of the institutions.  CCC, CIW, CSP/Sac, CEN, CVSP, MCSP, PBSP, RJD and SCC included the inmate history section of the MHTS inmate profile containing past suicidal behavior information into their initial screening process early in the monitoring period.  ASP began inclusion of the profiles toward the end of the monitoring period.  CSP/Corcoran utilized the inmate profiles for the 3CMS population entering administrative segregation, though not the EOP population.  CIM, CSP/LAC, CSP/Solano, CAL, DVI, HDSP, KVSP, NKSP, and VSPW did not review the inmate profiles as part of the initial screening process for administrative segregation.

Few institutions routinely utilized the new bus screening form, which included a question regarding "bad news."  Those that did included CTF, HDSP and NKSP.

Over half of the institutions administered the pre-placement screens for suicidal behavior to inmates newly placed in administrative segregation.  CCI, CCWF, CMF, CSP/Corcoran, CSP/Solano, CTF, CVSP, NKSP, PBSP, SCC, SVSP, and WSP had well developed systems in place.  CCC, CSP/Sac, CAL, CEN, Folsom, and KVSP had newly implemented systems that were also working well.  ASP, CIM, CIW, CEN, DVI, HDSP, RJD, SQ, and VSPW were not in compliance with completion of the screens.

Post-placement, 31-question screens were completed within 72 hours at 70 percent of the institutions.  ASP, CCC, CIW, CMF, CSATF, CSP/Corcoran, CAL, CEN, CVSP, DVI, HDSP, KVSP, MCSP, NKSP, PVSP, SQ, and VSPW reached full compliance for timely

completion of the screens in a confidential setting, with subsequent filing in the UHR.  CCI, CSP/LAC and CSP/Solano were compliant for timeliness; however, the screens were completed cell-front.  SVSP completed screens timely and in confidential settings; though the screens were not filed in the inmates' UHRs.  Overflow administrative segregation units were problematic for RJD, as there was not enough staff to complete the task.  CTF reached a compliance level of 85 percent with timely and confidential completion.

CSP/Sac, Folsom, ISP, and PBSP were not compliant for completion of pre-placement screens prior to placement in administrative segregation.

Several institutions had begun retrofitting intake cells for new administrative segregation arrivals.  ASP, CIW, CSP/Corcoran, CSP/Sac, Folsom, HDSP, NKSP, and SCC had renovated cells, however, most doors and beds had not been changed.  Staff at CSATF, CSP/Solano, DVI, and KVSP reported that the cells were retrofitted, though they are not always used for the new arrival inmates.  SQ had only recently started cell renovations.

Cell retrofitting had not begun at CCWF, CSP/LAC, ISP, PVSP, RJD and VSPW.

ASP, CCI, CCWF, CSATF, CSP/Corcoran, CSP/LAC, CSP/Solano, DVI, Folsom, HDSP, KVSP, NKSP, RJD, SVSP, SQ, and VSPW had clearly visible placards on the cell doors of inmates newly placed in administrative segregation.

Custody 30-minute welfare checks were well established at the majority of the institutions.  Almost half of the institutions had suitably documented staggered checks during the inmates' first 21 days in administrative segregation.  These institutions included ASP, CCC, CCWF, CIW, CSATF, CSP/Corcoran, CSP/LAC, CSP/Sac, CEN, Folsom, PBSP, SCC, VSPW, and WSP.  Others had implemented practices, although the checks were often not staggered, including CTF, CSP/LAC, CVSP, KVSP, MCSP, and NKSP.

CMF, CSP/Solano, DVI, HDSP, PVSP, SQ, and SVSP had adequate systems in place, however there were a number of missed checks or poor documentation. CIM, CAL, ISP, and RJD did not adequately implement custodial 30-minute welfare checks for newly arriving inmates in administrative segregation.

Daily documented psych tech rounds were well established and compliant at nearly 70 percent of the institutions. ASP, CCI, CCWF, CIW, CMF, CSATF, CSP/Corcoran, CSP/LAC, CTF, DVI, HDSP, KVSP, MCSP, NKSP, PBSP, PVSP, RJD, SCC, SVSP, and WSP all demonstrated high levels of compliance. VSPW was substantially compliant, but for a series of a few missed rounds. Lack of psych tech coverage in overflow units precluded compliance at CCC, Folsom, and SCC.

Most institutions struggled to comply with CAL. ADMIN. CODE, title 15 § 3343(h) that requires the provision of not less than ten hours per week of out of cell exercise for inmates housed in special purpose segregated housing such as administrative segregation. Space limitations were largely responsible for the inability to meet the requirement at the institutions. By order dated January 15, 2008, the court required defendants to complete 1,162 small management yards in administrative segregation by the end of fiscal year 2008/2009. CCWF, CMF, CSATF, CSP/LAC, CTF, HDSP, KVSP, SCC, VSPW, and WSP all met the ten-hour requirement. CSP/Corcoran was able to offer ten hours in building 3A03, the stand-alone administrative segregation unit, and the SHU. They were not able to offer ten hours in building 4B1R.

Inmates in administrative segregation at CCWF, CSATF, CTF, KVSP, MCSP, PVSP, and VSPW had access to electrical appliances.

Medication Management:

        Medication Continuity for Newly Arriving Inmates:  Medications for newly arriving inmates were continued without interruption at a number of institutions. First doses after arrival were generally timely at CIW, CSP/Corcoran, CSP/Sac, CRC, SCC, and VSPW.  PBSP appeared to be compliant although there were questions about the reliability of its audits.  In general, while inmates continued to receive first medications timely following arrival, there was some slippage at ASP.  There was continued improvement in medication continuity on arrival at MCSP and the institution was close to compliance.  CSP/LAC similarly improved although the data used for its audits was limited.  CMC's audit was also limited by sample size.  CSTAF reported compliance but established a QIT regarding medication management when it was discovered that audits did not include appropriate samples of inmates receiving psychotropic medications.

        A notable group of institutions was unable to provide medication to its newly arriving inmates in a timely manner.  These institutions included CCI, CCWF, CIM, CTF, DVI, Folsom, KVSP, NKSP, PVSP, and RJD.  The compliance rate at CTF was 76 percent, while CIM and Folsom hovered around 60 percent. SQ had implemented but did not audit new procedures regulating arrival medications prior to the site visit.

        Medication Continuity on Intra-Institutional Transfers:  A number of institutions were compliant with medication continuity on intra-institutional transfers.   Compliance rates were good at CSP/Sac, SCC, RJD, SVSP, and VSPW.  CTF was compliant with housing moves within the institution other than into administrative segregation.  PBSP reported compliance, but with small sample size; SQ was close to compliance with audits showing compliance range of 80 percent to 87 percent, as was CSP/Corcoran with a range of 83 percent to 90 percent.  CSATF

was similarly close to compliance with a range of 83 percent to 87 percent.  ASP was also near

compliance except for movement into administrative segregation where the institution was

noncompliant.

Institutions that were noncompliant on intra-institutional transfers included CMC,

CMF, Folsom, HDSP, KVSP, MCSP, and PVSP.  CMC's compliance rate was particularly low,

at 40 percent. CMF attributed its noncompliance in this regard to significant nursing and

pharmacy vacancies. MCSP attributed its medication management shortcomings to staffing

problems and the Maxor roll-out at the institution.

Medication Order Renewals:  Renewals of orders were timely at CIM, CSATF,

CSP/Corcoran, CSP/Sac, CRC, CTF, NKSP, RJD, SCC, SVSP, and VSPW.  Audits at CMC and

PBSP reported timely renewals; however, their reliability was limited by small sample sizes.

Medication renewals at CSP/Corcoran, CTF and CSATF were dependent on bridge orders.

CRC's local procedure was inconsistent with Program Guide timeline requirements for

psychiatry follow-up for medications written without a psychiatric evaluation.  CSATF's audits

regarding timely renewal orders were inconclusive.

Renewals were untimely at ASP, CSP/LAC, HDSP, and PVSP.

Medication Non-Compliance:  Responsiveness to medication non-compliance

was another area in which many institutions failed to comply with guidelines. Audits at SCC

showed standards for appropriate response to medication non-compliance were met.  PBSP

reported compliance; however, its sample size again limited the reliability of its findings.  RJD

reported significant improvement in this area with 80 percent compliance, as did CCWF and

NKSP with a range of 70 percent to 79 percent compliance.  Generally CCWF, CIM, CMF,

CRC, CSATF, CSP/Corcoran, CSP/LAC, CSP/Sac, DVI, Folsom, HDSP, KVSP, MCSP, PVSP,

SCC, SQ, and VSPW were not meeting Program Guide requirements regarding medication non-

compliance. WSP did not audit medication non-compliance during this monitoring period.

Regarding responsiveness to medication non-compliance, problems included inadequate

documentation and/or failure to generate a psychiatric referral for medication non-compliance a

CCWF, CIM, CMF, CSATF, CSP/Corcoran, CSP/LAC, Folsom, and MCSP, as well as the

failure to schedule and complete a psychiatric follow-up at Folsom, MCSP, CCWF, CSP/Sac.

CMC adopted a more stringent policy than CDCR's regarding medication noncompliance,

although the results were not evaluated by the institution prior to the site visit.

Pill Lines:  Lengths of pill lines and waits were appropriate at MCSP, SCC, and

RJD.  Pill lines at CSATF and PVSP were reported to last one hour or less; CSP/Corcoran's pill

line length remained under an hour but wait time had increased since the preceding monitoring

period.  At ASP, pill line lengths varied from facility to facility and included both appropriate

and excessive wait times.  Pill lines continued to be a problem at CCWF, CIW, CSP/LAC,

CSP/Solano, and Folsom.  At CRC, pill lines improved with the establishment of additional

lines.  Pill line audits were not completed at SQ; inmates waiting in pill lines at CSATF and DVI

were exposed to the elements.  Pill line schedules conflicted with work and education

assignments and resulted in disciplinary actions for inmates at ASP, and CCWF noted pill line

lengths as a contributory reason for medication non-compliance.

Informed Consent:  Institutions that complied with the requirement to obtain

informed medication consent forms from inmates on psychotropic medications included ASP,

CRC, MCSP, NKSP, PVSP, RJD, and VSPW.  As with other areas of medication management,

sample size limited the reliability of audits at PBSP, which reported compliance.  CSP/Sac also

reported compliance following audit utilizing a small sample; audits as HDSP were also

methodologically flawed due to sample problems. CSP/Solano was on the cusp of compliance with an 89 percent compliance rate; CSP/LAC and SCC reported improvement regarding informed consents. CIM, CSP/Corcoran, CTF, KVSP, and VSPW were non-compliant with this standard.  Audits regarding informed consent were not completed at SQ.

   <u>Laboratory Testing</u>:  Laboratory testing of blood levels of inmates on certain psychotropic medications was compliant at ASP, CCWF, CIW, CSP/Sac, and SCC.  Utilizing limited audit samples, PBSP reported near compliance with laboratory tests; SVSP also reported compliance but its instrument was methodologically flawed. Limited audits at CMC showed compliance regarding laboratory testing at 80 percent.

 NKSP, RJD, and SQ improved compliance in this area.

   Laboratory testing was non-compliant at CCI, CIM, CIW, CSATF, CSP/LAC, CSP/Solano, DVI, Folsom, and KVSP. CSP/Solano was compliant with psychiatric follow-ups due to abnormal test results, but did not have a mechanism in place for routine laboratory tests related to the administration of psychotropic medications.

   Folsom's local procedure regulating laboratory test was in draft form at the time of the site visit.  CSATF did not have an adequate system for tracking laboratory tests; PVSP provided inconsistent results regarding this issue.  CIW only obtained blood levels on admission to the MHCB or prior to DMH admission and did not have a protocol in place for monitoring blood levels for mood stabilizers.  WSP did not conduct laboratory audits.

   <u>DOT Medication Administration</u>:

   Numerous institutions ordered psychotropic medications to be administered DOT based on level of care or housing, including CMF (EOP), CSP/Sac (in the PSU and administrative segregation), and NKSP (Keyhea).  CSATF, CSP/Corcoran, CTF, Folsom,

MCSP, and SVSP reported compliance with DOT orders.  HDSP reported that its DOT orders were clinically indicated.  RJD reported improved compliance with following DOT procedures.

ASP, CSP/Solano, PVSP, SQ, and WSP ordered all psychotropic medications to be administered DOT, regardless of clinical indications.  DVI was not compliant to utilizing DOT in cases of ongoing medication non-compliance; CMF and CRC/LAC were non-compliant with carrying out DOT orders.  CMC's psychiatrists did not write DOT orders.

Keyhea Process:  Keyhea process was used appropriately at ASP, CRC, CSATF, HDSP, KVSP, MCSP, NKSP, RJD, and CIW.  CSP/Solano and SVSP reported improvements related to Keyhea.  Keyhea orders at CSP/Sac expired; PBSP reported continuing problems with the process; SQ continued to have problems with identifying and referring inmates clinically indicated for Keyhea; CMC had problems with timely processing of Keyhea proceedings. Inmates at SCC who required Keyhea were transferred to MCSP.  CSP/LAC reported problems with documentation in a small number of cases.  In each case of problems with Keyhea, the result was interruption in medication administration.

CDCR's Division of Legal Affairs resumed distribution of its current Keyhea list in February 2008 after a hiatus that deleteriously affected institutional  information regarding incoming Keyhea inmates.

HS Medications: HS medication orders were used appropriately at a number of institutions including, CCI, CRC, CSP/Corcoran, CSP/Sac, HDSP, KVSP, MCSP, SCC, SVSP, and VSPW.  CSATF was close to compliance regarding time of delivery, and Folsom improved in this area.  CTF reported compliance but required continued monitoring due to inconsistent information regarding HS medications. CSP/LAC did not prescribe HS all medications that were clinically indicated to be ordered as such.

Institutions that were non-compliant with HS medication orders included ASP, CCWF, CIM, CMC, CSP/Solano, DVI, and NKSP.  CSP/Solano did not prescribe medications HS due to staffing limitations.  CIW and WSP did not audit their compliance with HS medications.

Parole Medications:  Institutional compliance with provision of medications to inmates leaving the institution was appropriate at CSATF, CIM, CCWF, CSP/Corcoran, CTF, Folsom, MCSP, PVSP, and SCC.  CTF reported compliance but did not produce relevant audit data.  The process for delivery of parole medications at CSP/LAC was sufficiently adequate; however, the institution did not provide relevant data to verify compliance with parole medication delivery.  KVSP reported that one inmate out of fifteen released on psychotropic medications did not receive his supply.

CCI and CSP/Sac were noncompliant with delivery of parole medications to paroling inmates.  SQ completed and implemented a new local operating procedure regarding parole medications during the monitoring period.  CIW and WSP did not audit compliance with parole medications.

Mental Health Assessments for Use in the Discipline of Sexual Misconduct Violations

The monitor reported on defendants' "Procedures for Mental Health Assessment of Inmate Indecent Exposure and Treatment for Exhibitionism," dated October 10, 2004, during the eighteenth and nineteenth monitoring periods and continued into the twentieth monitoring period.  Pursuant to a court order dated March 1, 2007 directing defendants to inaugurate an appropriately staffed program for inmates diagnosed with Exhibitionism or a Paraphilia associated with Exhibitionist behaviors in at least three institutions, defendants started programs at CSP/Sac, CSP/Corcoran, and PBSP.

347

Institutional compliance with protocols regulating mental health assessments related to discipline of sexual misconduct violations continue to be mixed during the twentieth monitoring period; however, the number of institutions in compliance continued to grow during that time. ASP, CCI, CSATF, CTF, NKSP, and SQ were compliant with required protocols. WSP, which had been compliant during the previous monitoring period, regressed significantly because the institution completed only 57 percent of required screenings in cases of sexual misconduct RVRs.

At CSP/Sac, mental health assessments were not generated in all indicated cases, and it was unclear whether IDTTs related to sexual misconduct consistently occurred. Folsom was partially compliant with the protocols; MCSP's compliance notably improved, but the institution continued to be partially compliant. Although HDSP completed required screenings, as well as IDTT reviews, and comprehensive evaluations when indicated, staff at HDSP mistakenly believed that transfers to treatment institutions had been placed on "hold." DVI continued to experience difficulties completing requires screenings within 72 hours of incidents; CSP/LAC did not complete any comprehensive evaluations during the monitoring period. The institution did, however, refer all inmates for Exhibitionism treatment who evidenced two occurrences of indecent exposure within a six-month period. At CAL, documentation related to is implementation of sexual misconduct protocols were inadequate.

CMF completed all required initial mental health screenings for sexual misconduct, however, IDTT reviews were not documented in all cases referred for review. CSP/Solano also continued to be noncompliant as a result of incomplete documentation of their implementation of the protocols. Comprehensive evaluations at PVSP did not appear to be consistent with existing policy. CIM did not fully implement the protocol during this monitoring

period, while CRC did not maintain data related to its implementation of the sexual misconduct protocols. RJD remained partially compliant with implementing CDCR's indecent exposure protocols. SVSP did not reach diagnoses of Exhibitionism in any case; however, four inmates from this institution were referred for treatment.

PBSP was one of the institutions designated as a treatment facility for inmates diagnosed with Exhibitionism. During the site visit, four inmates were enrolled in a psychotherapeutic group for indecent exposure. At CSP/Corcoran, another designated Exhibitionism treatment facility, staff reported that about 50 percent of the inmates referred to the program from other prisons denied having a sexual disorder and refused to participate in specialized treatment. In addition, some inmates were transferred to CSP/Corcoran for Exhibitionism treatment without formal notification to the facility; in some instances, inmates arrived without sufficient clinical information.

Transfers:

Timely access to appropriate levels of care, essential to the efficacy of a mental health delivery service, continued to elude CDCR.

DMH acute care resources for male inmates consisted of 130 beds at CMF and 25 beds at ASH, the latter of which re-opened to admissions in July 2007. Slow access, coupled with a growing wait list and increasing numbers of rescinded referrals, made it clear that these resources could not adequately accommodate CDCR's expanding mental health population.

Of the 18 prisons that referred inmates to the acute programs at CMF and ASH, 13 reported delayed access. The most commonly cited cases, and the longest delays, were associated with referrals involving acutely psychotic inmates who were not suicidal. Such referrals, considered low priority, were routinely placed on a wait list and commonly rescinded

by the institution.  Other referrals, involving inmates within 30 days of parole and inmates without parole dates, were denied in accordance with DMH policy.  Consequently, a large number of referrals failed to result in transfer, despite a low rejection rate.  The percentage of acute care referrals that resulted in transfer was 40 percent for CSP/Sac, hovered around 50 percent for CMC and RJD, and barely exceeded 60 percent at DVI and WSP.

Despite slow access and declining success rates, many institutions with substantial mental health programs continued to generate a reasonable number of acute care referrals.  CIM, CMC, CSP/Corcoran, CSP/Sac, MCSP, and PBSP each produced more than 20 referrals to acute care during the reporting period.  CSATF, CSP/Solano, KVSP, NKSP, RJD, and WSP each generated between ten and 19 referrals, and CSP/LAC, DVI, HDSP, PVSP, SQ, and SVSP each produced fewer than ten referrals.  SVSP, with a population of approximately 220 EOP inmates, appeared to seriously under-utilize acute care resources, generating only one referral during the reporting period.

CMF continued to utilize 20 beds within DMH's acute psychiatric hospital as MHCBs.  Oddly, this arrangement hindered access to DMH acute care for most CMF inmates.  CMF inmates deemed to require acute services after spending time in the MHCB unit rarely moved from the MHCB wing to another wing of the hospital.  Inmates on the MHCB wing did not have access to the enhanced programs and services provided to acute care patients on the other three wings of the hospital.

Fourteen institutions referred inmates to DMH intermediate care programs during the reporting period.  Access to SVPP, which received far more referrals than ASH and the ICF programs at CMF, continued to be hampered.  The number of inmates on the wait list averaged 118 during the eleven-month period from September 2007 to July 2008, and steadily rose from