March 2008, when the wait list stood at 99, to July 2008, when the number on the wait list reached 164. Institutional records, albeit incomplete and unclear in some instances, indicated that just over half of the SVPP referrals generated during the reporting period resulted in transfer. Referred inmates commonly spent months waiting to be either transferred to SVPP or removed from that waitlist.

Most ASH referrals resulted in transfer within 30 days. However, only a handful of institutions referred inmates to ASH. CMC and RJD generated 76 percent of all ASH referrals, with 11 and 24, respectively. CSP/Sac, CSP/Solano, MCSP, PBSP and WSP together referred eleven inmates to ASH during the reporting period.

CMF and DMH generated nearly all referrals to the ICF programs at CMF. Access to intermediate care and the day treatment program was reportedly good for CMF inmates with lower security scores and uncomplicated case factors. However, a significant number of intermediate care referrals from CMF were rejected. CMC, MCSP and RJD together transferred eight inmates to these programs during the reporting period. Half of these transfers occurred within 30 days of referral.

CIM, CSP/Sac, KVSP, and MCSP continued to struggle to maintain complete and reliable records of DMH referrals and transfers.

There continued to be too few MHCBs to accommodate CDCR's mental health population. Inadequate capacity was exacerbated by delayed access to DMH and EOP programs, as needed MHCBs were too often filled with decompensated or fragile inmates waiting weeks and months to be transferred to an appropriate level of care. The ongoing challenge to find beds for inmates with chronic, long-term medical conditions regularly reduced MHCB capacity at CSP/LAC, HDSP, MCSP, and SVSP.

CSATF, CSP/Corcoran, CSP/Solano, HDSP, PBSP, PVSP and RJD reported having adequate and timely access to licensed MHCBs within their institutions. However, CSATF, CSP/Corcoran, and HDSP - all MHCB hubs for their geographic region - accepted significantly fewer referrals from other CDCR prisons because excess capacity was reduced by internal demand for mental health crisis care and medical treatment. OHU inmates at CCC and Folsom had adequate and rapid access to MHCBs in neighboring institutions.

As a result of the scarcity of MHCBs throughout the system, institutions continued to resort to the use of alternative beds to house inmates pending MHCB transfers. These alternative locations were uniformly inappropriate for acute care. Throughout the monitoring period, inmates were admitted to alternative areas for stays lasting longer than 72 hours. Many of them had multiple admissions. Inmates who might have been clinically considered for DMH levels of care if they had been admitted to MHCBs were not given that consideration. Complete and reliable data regarding the locations and uses of these alternative cells was rarely available.

Fourteen institutions that did not have adequate access to licensed crisis beds resorted to using a variety of temporary monitoring arrangements, most of which were grossly inappropriate alternatives to acute care. Despite having 26 CTC beds and a 20-bed MHOHU, CSP/Sac referred inmates in holding cells for up to eight hours, held half of all MHOHU admissions for longer than 72 hours, and transferred 33 inmates to MHCB units in other prisons. MCSP used six MHOHU beds and five observation cells in administrative segregation to monitor inmates it was not able to admit to its eight-bed MHCB unit. CSP/LAC, KVSP, NKSP, SVSP, and WSP, all with licensed CTCs, routinely used holding cells and tanks to monitor inmates for whom MHCBs were not available. CCI, CIM, and DVI used alternative sites to

352

monitor inmates for whom OHU beds were unavailable. OHU admissions at ASP, CRC, CTF, SCC, and SQ routinely exceeded 72 hours because inmates were not timely referred and/or transferred to MHCB units.

Most inmates at CMF in need of acute care were timely referred and transferred to an MHCB wing within DMH's acute psychiatric program. However, DMH did not accept inmates with certain medical conditions, which put clinicians in the untenable position of trying to provide enhanced mental health treatment to inmates in non-acute MHSDS settings.

Over a third of inappropriately housed male EOP inmates waited longer than 60 days to be transferred to an EOP program. Among 17 non-desert, male institutions, only CTF, FSP, and SCC consistently transferred EOP inmates within 60 days. In the remaining 14 non-desert institutions, the percentage of EOP transfers that did not meet the 60-day standard ranged from eight to 53 percent, and averaged 35 percent. Excessive waits of many months were common and utilization of protocols for expedited, 30-day transfers were underutilized.

Complete and reliable data regarding transfers to EOP administrative segregation hubs and PSU beds were rarely available. Accurate transfer data from a few institutions and an abundance of anecdotal information indicated that access to both programs was limited and slow.

Only DVI consistently transferred 3CMS inmates from its RC within 90 days. HDSP, RJD, and WSP reported compliance rates of 77, 72 and 53 percent, respectively, for timely completion of 3CMS transfers. SQ reported that the average length of stay for 3CMS inmates transferred to general population programs was 109 days, while 3CMS inmates sent to administrative segregation units waited an average of 269 days. NKSP did not record transfers or track length of stay for 3CMS inmates in its RC.

Women's prisons fared better than their male counterparts with regard to compliance with the transfer guidelines. Female inmates had adequate access to MHCBs. CCWF and CIW, each with licensed CTCs, did not use holding areas to monitor inmates pending admission to MHCBs. VSPW timely referred and transferred OHU inmates to the MHCB at CCWF.

The RC at CIW processed 73 EOP transfers and 307 3CMS transfers, nearly all of which met applicable timeframes. All EOP inmates transferred from VSPW during the reporting period occurred within 20 days. CCWF transferred two inmates to the EOP administrative segregation hub at VSPW; one took 41 days and the other 47 days.

Sixteen female inmates were referred to Patton State Hospital during the reporting period. Five of eight referrals generated by CIW were not timely completed, and three of eight referrals were rejected by DMH. All referrals from VSPW and CCWF were accepted, though CCWF reported that acceptance decisions were sometimes delayed.

Routine 3CMS and EOP transfers from desert institutions were timely. All MHSDS inmates mistakenly transferred to CCC, ISP, and CEN were returned to appropriate programs within applicable timeframes. Half of the 26 MHSDS inmates inappropriately transferred to CAL were not timely identified and returned.

Desert prisons, like most other CDCR prisons, did not have adequate access to MHCBs. Nearly half of the OHU admissions at CEN lasted longer than 72 hours, and two-thirds of these excessive stays were related to delayed access to MHCBs. CAL rescinded nine of 21 MHCB referrals because beds were not immediately available, and eight of 12 transfers to an MHCB took one to two weeks. ISP reported that 80 percent of transfers to an MHCB were untimely.

354

## CONCLUSION

The fast-paced changing conditions and new developments in CDCR that were reported during many previous monitoring periods continued into the twentieth round. Among the most significant developments having great potential to improve mental health services within CDCR is the plan to develop new mental health beds in seven new California Heath Care Facilities (CHCFs). This plan is being worked out and implemented in coordination with the Plata receiver. As of this writing, approval and funding for the CHCFs remains on hold in the California State Legislature.

This plan is the foundation of a new direction in correctional health care in California that will deliver a continuum of services along an access-to-care model. In the interim, as outlined in this report and pursuant to order of this Court, CDCR has completed some construction and is in the process of constructing some inpatient beds in a variety of its institutions.

In addition, the defendants are in the process of implementing a number of plans. These include the EOP in reception centers, EOP inmates in administrative segregation, mental health assessments of 3CMS inmates in the disciplinary process, mental health staff recruitment, utilization of intermediate care beds at Atascadero State Hospital, and women's EOP bed needs in mainline and administrative segregation. The special master's report on these plans, as well as on the use of force on mental health caseload inmates at CSP/Corcoran, will be submitted separately as Part B of this Report.

The positive changes with mental health staffing that were reported during the preceding monitoring period continued. However, vacancy rates among chief and supervising psychiatrists remained significantly high, averaging 45 percent for all 33 CDCR institutions for

both positions. For chief and supervising psychologists the picture was very different; vacancy rates averaged ten percent, and for supervising psychiatric social workers, the vacancy rate was nine percent.

The overall vacancy rate among line psychiatrists, psychologists, psychiatric social workers, and psych techs was further lowered to 28 percent in this monitoring period. With the use of contractors, the functional vacancy rate for these disciplines was reduced further to 17 percent. Moreover, a number of institutions had no vacancies in psychiatry or were able to achieve full coverage with the use of contractors. This was also true for psychologists and psychiatric social workers in several institutions.

One of the results of the significant improvement in staffing was a commensurate rise in the demand for individual and group treatment space, particularly in EOP programs, as well as in administrative segregation. Many institutions completed court ordered construction or benefited from the Plata receiver's health care improvement projects in existing institutions. Mental health treatment space throughout the system, however, remained severely limited. Many institutions are still not capable of substantial remediation prior to the construction and implementation of the CHCFs.

Regular and routine completion of methodologically appropriate audits of medication management at many institutions continued to pose major challenges during this monitoring period. While several institutions were generally compliant with the various requirements concerning appropriate medication management for inmates receiving psychotropic medications, many other institutions were unable to meet standards in all areas of their medication management systems. As a nursing function, medication management and its difficulties are ripe for a comprehensive coordinated approach with the Plata receiver. To that

356

end, the special master has been producing a copy of each of his reports, including this one, to the receiver.

Transfers to higher levels of care continued to present major challenges to the delivery of adequate mental health care system wide. Acceptances and transfers to acute level DMH care remained significantly limited. There was greater access to intermediate care at ASH and CMF, although higher level custody access remained severely limited. Again, defendants' plan to increase access to ASH will be covered in Part B of this Report. Access to intermediate care at SVSP (SVPP and Units D5 and D6) continued to be significantly slow and affected by an apparently dysfunctional relationship between custody and mental health staffs at this essential mental health program institution. Women inmates continued to have access to DMH care at Patton State Hospital (PSH) during the monitoring period.

As in previous monitoring periods, access to MHCBs remained very problematic, primarily due to inadequate system resources at this level of care. For only seven of the institutions that had MHCBs on site -- CSATF, CSP/Corcoran, CSP/Solano, HDSP, PBSP, PVSP, and RJD -- referral and transfers to crisis beds posed no problems. In general, those institutions did not use alternative placements. Women's institutions and several institutions that were adjacent to MHCBs also did not typically experience problems of access to MHCBs.

However, the remaining institutions in CDCR generally experienced excessive transfer delays, long OHU stays, multiple OHU admissions, and high use of alternative cells.

One of the results of the extensive use of alternative cells, particularly outside of designated inpatient facilities, was the need to require appropriate tracking and logging of their use. This was particularly important in light of multiple admissions to these alternative areas and stays in excess of 72 hours.

357

During the monitoring period, EOP transfers were excessively delayed in all directions. EOP transfers into mainline EOP programs, hubs, or PSUs generally exceeded transfer deadlines throughout the system. 3CMS transfers to mainline programs also generally exceeded timelines. MHSDS transfers from the five desert institutions tended to occur timely, as did transfers for female inmates.

The twentieth monitoring period saw more and more institutions making major advances with their quality management infrastructures and tools. Several institutions formed and maintained required bodies and committees, conducted regular meetings with required attendees, kept adequate records of their meetings, and addressed appropriate issues of mental health care. A number of institutions also conducted methodologically adequate audits, chartered QITs that examined key performance indicators and compliance with Program Guide requirements, and conducted peer review that addressed quality of care issues. At the same time, several other institutions continued to have problems forming their bodies and committees, assembling quorums for meetings, maintaining adequate minutes, and focusing on mental health issues. In some case institutions gathered data in methodologically unsound fashion, and some institutions had major problems with the basic elements of QITs and peer review.

As with quality management systems at institutions, compliance with suicide prevention mandates varied among institutions. Many institutions met the requirements with regular meetings, appropriate attendance, and essential agenda items. Several institutions also complied with the SPRFIT model that was introduced during this monitoring period. The efficacy of institutional ERRCs also varied among institutions, including those that met standards regarding meetings, activities, documentation, and remedial actions, but also those that had not established ERRCs.

358

Clinical five-day follow-up after MHCB discharge was compliant in many institutions, with continuing problems in others. Several had implemented the hourly custody observation in the initial 24 hour period following such discharges, although it continued to be problematic at several other institutions.

During the monitoring period, the multi-part suicide reduction program in administrative segregation was implemented in all CDCR institutions. Utilization of inmate profiles, "bad news," and to a lesser extent pre-placement screening, continued to be the areas with the most wide-spread problems. Post-placement 31-question screens, 30-minute welfare checks, and psych tech rounds became established in this monitoring period. Initial problems with implementing the 30-minute checks in a staggered fashion, and with proper documentation and supervision, were largely overcome. Due to space limitations, institutions also continued to struggle with meeting ten-hours per week of out-of-cell exercise in administrative segregation. CDCR commenced construction of additional walk-alone exercise modules, pursuant to an order of this Court. The special master will report on the status of the construction of these modules in his twenty first monitoring report.

It was too early to assess the efficacy of CDCR's designated Exhibitionism treatment programs at CSP/Sac, CSP/Corcoran, and PBSP, which started during this monitoring period. Moreover, although the number of institutions that had fully implemented CDCR's sexual misconduct protocols increased during the monitoring period, many institutions remained partially compliant or noncompliant with the protocols. This was for the most part due to the need for training of custody staff regarding referrals, and the training of mental health staff regarding initial assessment or screening, IDTT action, and comprehensive evaluations.

359

Institutions also needed to develop and implement appropriate tracking and monitoring systems of the various components of the protocols.

As discussed in detail in the institutional summary for SVSP above, a pervasive and disturbing pattern of custodial dysfunction has continued to afflict this institution. It has appeared that a permissive institutional culture has led to an environment in which custody line staff and supervisors were free to harbor attitudes and engage in behaviors that were overtly hostile to the provision of mental health care. These conditions call for a systemic overhaul that will curb the anti-therapeutic character of the environment at SVSP once and for all. In a related context, SVPP resources have remained underutilized while the number of inmates awaiting SVPP beds grew steadily to 164 in July 2008. Long-term space deficiencies in Units D5 and D6 have also lingered on unresolved. The need for appropriate use of these resources is real and critical, and must be accorded high priority by the defendants.

On October 18, 2007, the Coleman court entered an order requiring defendants to submit to the special master their proposals for the development of adequate mental health treatment and counseling space at SVSP and CMF. Defendants submitted their proposals in February and March 2008, respectively. Part of the defendants' proposal for SVSP addresses the space deficiencies in Units D5 and D6, which, as discussed above, should be constructed on an expedited basis in order to address current pressing needs. Their proposal for SVSP also included a plan to provide additional treatment and office space for a general population EOP for 288 inmates (that is, for the existing general population EOP for 192 inmates and an additional 96-inmate expansion). Defendants' projected completion date was September 2011, subject to authorization for funding as proposed by the defendants. The special master finds this aspect of the defendants' proposal for SVSP to be adequate. As for CMF, defendants proposed to

360

construct additional treatment and programming space to support 600 EOP inmates and 58 EOP administrative segregation inmates. They propose a new structure(s) that will include but not be limited to 16 group therapy rooms, 28 interview rooms, four recreational therapy rooms, six education classrooms, plus appropriate support space for staff. The defendants' projected completion date for the CMF improvements is late 2012, subject to authorization for funding as proposed by the defendants. The special master also finds the defendants' proposal for CMF to be adequate.

A different but no less important aspect of the defendants' compliance involves their duty to provide regular, accurate, and up to date information to the special master. Consistent provision of such data is essential to his ability to monitor and report effectively. Paragraph B(5) of the Order of Reference entered by this Court December 11, 1995 specifically grants the special master access to the defendants' data so that his duties may be carried out:

> B.  Powers of the Special Master
>
> IT IS FURTHER ORDERED that the powers of the special master are and shall be limited to the following:
>
> \*   \*   \*
>
> 5. To have unlimited access to the records, files and papers maintained by defendant to the extent that such access is related to the performance of the special master's duties under this Order of Reference. Such access shall include all departmental, institutional, and inmate records, including but not limited to, central files, medical records, and mental health records. The special master may obtain copies of all such relevant records, files, and papers.

A particularly useful source of information for the special master is the Department's *Coleman Monthly Report of Information Requested and Response to January 19, 1999 Court Order Regarding Staff Vacancies*. For approximately the past year, however, the Department has not been producing this report on a regular monthly basis, and has been omitting

361

significant relevant portions of it, including but not limited to its data on mental health staffing vacancies and its use of contractors to cover them. This is not the first period of time in which the Department has failed to produce these regular monthly reports. The special master stated in his draft Seventeenth Monitoring Report Part A that defendants had not been regularly providing their monthly statistical report, and recommended that consistent preparation and submission of it "be restored as quickly as possible." On January 23, 2007, defendants filed their response to the draft Seventeenth Monitoring Report Part A, stating on page four, "(d)efendants are addressing the preparation of the monthly report and hope to return to a routine submission of the monthly report shortly." Their submission of a report in late January 2007 caused the special master to suspend his recommendation at that time. Although some monthly reports have been issued since that time, many have not been received. The most recent report was received in May 2008, covering data for March 2008. It omits important content such as data on staffing allocations and vacancies, MHSDS hiring activity, telemedicine hours, the impact of contract hours on staff vacancies, and the monthly summary of MHCB use by institution.

   Another important and useful report is the *CDCR Mental Health Crisis Bed Monthly Report*. This report also has not been produced in a regular timely manner. As of the time of this writing in July 2008, the most recent issues were produced in April 2008, covering data for the months of December 2007 and January 2008.

   The importance of these two monthly reports to the special master's monitoring and reporting duties is obvious. Defendants should resume providing them in a regular and complete manner as quickly as possible.

## RECOMMENDATIONS

For the foregoing reasons, the special master submits formal recommendations for further orders of this Court, as follows:

1. The Defendants should be ordered to develop a plan to address the overall dysfunction in custody/mental health relations at SVSP. This plan should be submitted to the special master within 90 days. It should be designed to resolve the discord between custody and mental health staffs, foster an environment that will facilitate the provision of mental health treatment, and promote a therapeutic milieu in SVSP, SVPP, and Units D5 and D6. The plan may provide for periodic meetings among the special master and his staff, the secretary of the CDCR, and appropriate CDCR and DMH administrators. It may incorporate a variety of initiatives, including, but not limited to, the following:

    - a review by SVSP administrative staff of the cultural assessment at SVSP that was completed by the Criminal Justice Institute in 2005;

    - the development of a new cultural assessment similar to one that was previously completed at CSP/Corcoran;[8]

    - provision of specialized mental health training for correctional officers to increase their understanding of mental illness, improve their recognition of and reaction to behaviors related to mental illness, and heighten their familiarity with the relationships and interactions that typically occur between mental health clinicians and their patients; and

    - conduct of monthly meetings at which custodial and mental health supervisors and line staff may share with the warden and the deputy warden for health care their concerns and observations with regard to the MHSDS and DMH programs; and

2. The defendants should be ordered to develop a plan for maximum utilization of all dormitory beds at SVPP, to be submitted to the special master within 90 days.

---

[8] In their response to the draft version of this Report, defendants requested that this recommendation be modified to direct SVSP administrative staff to review the SVSP cultural assessment that was performed by the Criminal Justice Institute in August 2005. To date, defendants have not shared that assessment with the special master nor with the plaintiffs. The special master agrees with defendants' request, particularly in light of the monitor's findings which indicate that administrative staff at SVSP failed to heed whatever remedial measures were offered in the 2005 assessment. Further, because defendants seek to utilize the 2005 assessment to address current problems, the special master also requests that defendants now produce it to him and the plaintiffs. However, this does not supersede the special master's recommendation that a new assessment be prepared, as three years have passed since the 2005 assessment and conditions at SVSP may have evolved to such an extent that a fresh look at the problems is required. Defendants may wish to consider having a new assessment prepared in addition to reviewing the 2005 assessment.

363

3.  The defendants should be ordered to implement and maintain institutional electronic and manual tracking logs for inmates who have been placed into alternative housing pending MHCB transfers, and the dates, times, and places of return to regular housing, for inmate-patients not transferred to an MHCB.  The tracking logs should also indicate the specific levels of clinical monitoring that were required (suicide watch, suicide precaution, or psychiatric observation), and the clinical monitoring that occurred. When an inmate is referred to an MHCB for treatment of a suicidal threat or behavior, and the referral is rescinded or the inmate-patient is not admitted to an MHCB, the inmate shall receive follow-up treatment including daily contact for five (5) consecutive days following his or her return to regular housing.  Quality management for implementation of discharge planning, required when an inmate is discharged from an MHCB, shall be implemented for these inmates.[9]

4.  The defendants should be ordered to construct the mental health treatment and counseling space at SVSP, and the mental health treatment and programming space at CMF, as described in their development proposals submitted in response to the court order of October 18, 2007.  Construction of that portion of defendants' proposal concerning Units D5 and D6 at SVSP should be expedited in order to address the heightened level of need that exits there.

5.  The defendants should be ordered to disseminate the complete *Coleman Monthly Report of Information Requested and Response to January 19, 1999 Court Order Regarding Staff Vacancies* and *CDCR Mental Health Crisis Bed Monthly Report*, on a regular and timely basis.

                                    Respectfully submitted,

                                    /s/

                                  Matthew A. Lopes, Jr., Esq.
                                  Special Master

September 12, 2008

---

[9] In their response to the draft version of this Report, defendants objected to inclusion in these logs of specific levels of clinical monitoring that were required and that occurred.  The grounds for their objection were that such information is already contained within inmates' unit health records, that the use of staff for suicide observation is already tracked by individual institutions, and that the gathering of such data will unduly burden non-clinical staff work hours over weekends, holidays, and nights. These grounds for objection do not overcome the importance of including this information in the logs. Their purpose is to identify and track inmates who are languishing in temporary housing units and to avoid gaps in essential clinical care of these inmates while they await MHCB transfers.  Without this information, the effectiveness of these logs for identifying such cases will be diminished. Clinical care information that is buried in inmates' UHRs does not facilitate the identification of these gaps in care. While this recommendation may increase the staff workload, this burden is outweighed by the importance of identifying cases of gaps in care of inmates who are already so seriously in need of crisis level care that they have been identified for admission to an MHCB.