EXHIBIT A
California State Prison, Sacramento (CSP/Sac)
October 29, 2007 – October 31, 2007

**Inmate A**

This administrative segregation EOP inmate was reported by housing officers as not doing well. His medical record was reviewed.

The initial health care screening indicated that this inmate was admitted to CSP/Sac during 5/29/06.

The most recent treatment plan was dated 10/18/07. The listed problems included psychosis, medication refusal and anger/irritability. This inmate was noted to have a violent history and numerous RVRs for assaultive behavior. He discontinued his medications against medical advice. The treatment plan included attempting to place him on a Keyhea order. His presentation was consistent with the diagnoses of Schizoaffective Disorder, Bipolar Type and Antisocial Personality Disorder.

The progress notes since June 2007 were reviewed. These notes were not in chronological order within the medical record. A 6/12/07 progress note indicated that this inmate was seen at cell front due to time constraints. He was uncooperative with the interview process. Other June 2007 progress notes were present but were not summarized in this review. He was again seen at the cell front on 6/27/07 due to the case manager's "short week." He was described as paranoid and suspicious. The inmate refused a clinical case manager contact on 7/2/07. He was receiving 3CMS level of care at that time. A similar refusal occurred on 7/5/07. On 7/10/07 his level of care was changed to EOP through the IDTT process.

A 7/11/07 psychiatrist note indicated that this inmate was started on Zydis. His presentation was consistent with Psychotic Disorder, NOS. He appeared to be responding to internal stimuli at that time. He was subsequently transferred to the mental health OHU due to disorganized and paranoid thinking. A clinician evaluated this inmate in the mental health OHU on the following day. He was described as demonstrating hypomanic and likely delusional symptoms. He continued to refuse medications. The inmate was placed on suicide precautions.

It appeared that this inmate was discharged from the mental health OHU on 7/15/07 with little apparent improvement. His diagnosis was listed as Mood Disorder, NOS.

An IDTT progress note on 7/26/07 indicated that the inmate refused to attend the IDTT meeting. The only other relevant clinical information regarding this note was the lack of referral to DMH.

An 8/11/07 a psych tech note indicated that this inmate continued to be noncompliant with his medications. He continued to refuse out of cell clinical contacts. No significant clinical changes were noted by his clinical case manager. Little change was noted during either 9/14/07 or 9/19/07.

During 9/27/07 this inmate was reported by correctional officers to be throwing feces on the tier and urinating in his cell. Paranoid ideation was apparent. The plan outlined was to help the inmate to identify symptoms that indicated he was decompensating. Progress notes during the next several weeks documented very little change.

*Findings:*

This inmate's presentation was consistent with a diagnosis of a Schizoaffective Disorder, Bipolar Type with Acute Exacerbation. Information was subsequently obtained from the treatment staff that indicated this inmate had recently been appropriately referred to DMH.

**Inmate B**

This general population EOP inmate was transferred from CMF to CSP/Sac during 8/6/07. He was briefly interviewed in the EOP yard, where he complained of discrimination throughout the CDCR. This inmate was also very dissatisfied with the treatment in EOP; this appeared to be a function of his paranoid thinking.

This inmate's medical record was reviewed. The most recent treatment plan was dated 9/10/07. His working diagnosis was Psychotic Disorder, NOS. Medications prescribed included Olanzapine and Seroquel. He was described as being paranoid with control issues. The specific treatment plan objectives were unclear based upon a review of his treatment plan.

An 8/29/07 progress note described this inmate as having multiple EOP placements since 2003 as well as at least one DMH hospitalization. He also had multiple past and current mental health OHU and administrative segregation admissions related to his mental illness. The inmate indicated a willingness to program into the EOP.

Weekly progress notes were written by his clinical case manager. Notes by the psychiatrist were also timely documented. During September 2007 this inmate was readmitted to the mental health OHU due to suicidal ideation.

It was difficult determining which group therapies were attended by this inmate due to lack of progress notes relevant to such treatment.

*Findings:*

This inmate clearly had a serious mental disorder associated with chronic psychotic symptoms. It was encouraging that he was seen on a weekly basis by his clinical case manager and on a timely and consistent basis by the psychiatrists. However, his treatment plan was vague, and it was difficult to assess his current treatment as documentation was not present other than contacts with his clinical case manager and psychiatrist. His EOP level of care was appropriate, although a higher level of mental health care should also be considered.

367

**Inmate C**

This general population EOP inmate reported that his Wellbutrin was discontinued about three weeks prior to the site visit due to the statewide formulary restriction. He was to be started on Strattera, but he reported that he had not received this medication.

The medical record of this inmate was reviewed. This inmate was transferred from CSP/Solano to CSP/Sac during 9/5/07. This inmate's clinical presentation was consistent with the diagnosis of Mood Disorder with psychotic features. Review of his medical record indicated that he had been treated with Wellbutrin during the summer of 2007, but apparently not immediately prior to his transfer to CSP/Sac. He was prescribed Strattera during 10/18/07. However, it was unclear whether he was receiving his medication based on review of his medical record.

Information obtained from the pharmacy indicated that this medication order (i.e. formulary exception request) was disapproved by the chief psychiatrist during 10/22/07. Another 10/26/07 order was pending a decision for approval.

*Findings:*

This case was discussed with the chief psychiatrist who will ensure that the inmate is informed of the decision regarding the use of this medication.

**Inmate D**

This inmate approached the court expert during the general population EOP yard time to voice his dissatisfaction with the treatment program at CSP/Sac. He exhibited extremely disorganized thinking.

This inmate was previously known to the monitor based on a referral from a Magistrate Judge dated 4/12/07.

Information was initially obtained from this inmate's treating clinician in response to the order by Magistrate John Moulds that a report be submitted concerning the inmate's clinical condition and treatment, due to the nature and content of legal motions and letters received by the court from the inmate.

The following was a copy of the most recent treatment plan developed for this inmate based on an interdisciplinary treatment team meeting during 4/2/07. It included the following:

> *II. CURRENT MENTAL STATUS*
> *IM continues to present as paranoid, specifically as it pertains to security.*
> *This clinician has worked with the IM to help reduce his vigilance,*
> *distrust, and suspicion of others, all to no avail. Pt. continues to voice*

*persistent complaints about poor medical treatment and has filed
numerous 602"s. According to the patient he feels as though this is the
reason why staff are trying to "persecute" him.*

*III. WORKING DIAGNOSES:*
*AXIS I: 295.30 Schizophrenia, Paranoid Type 304.80 Polysubstance
Dep. In Institutional Remission*
*AXIS II: 301.7 Anti-Social Personality Disorder*
*AXIS III: Seizures by hx.*

*IV. SUMMARY OF RECENT FUNCTIONING (Past 90 days):*
*1). CASE MANAGER VISITS: Attends all his scheduled 1:1's w/ this
    clinician*
*2). GROUP ATTENDANCE: Refuses to attend*
*3). YARD ATTENDANCE: Refuses to attend*
*4). SOCIAL INTERACTION: Poor, specifically with security.*
*5). ADL's: Poor, Chronic complainer.*
*6). MHCB ADMISSIONS: None during this reporting period*
*7). CDC 115's: None since last reporting period*
*8). MEDICATION COMPLIANCE: Yes*

*VI. DISCHARGE PLAN*
*IM has a projected MERD date of 5/5/07. This is also the date that the IM
will be discharged from CDC. According to the IM it was his goal to be
discharged without being placed on parole. He will accomplish this
objective if he can refrain from serious rule infractions. However, once
released to the community he will lack family and/or a support system to
lend guidance.*

*VII. ADDITIONAL COMMENTS*
*IM remains adamant about being placed on single cell status. With his
intense suspiciousness and paranoia this might be in the best interest of
the IM and any other IM who would have the misfortune of sharing a cell
with [Inmate D].*

*It is also noteworthy that due to the patients continued refusal to attend
Groups, he was placed on the "Reduced/Modified Program." This
clinician will continue to encourage the patient to attend Group Therapy
to help appropriate social interaction and to induce more socially
appropriate behavior.*

*This clinician is the only person the IM will see on a regular basis.
However, the patient has always presented as hostile and angry. He is
extremely demanding, and negative and will go into a verbal tirade if his
demands are not met immediately. I have assisted the patient with a
variety of requests (most recently information for parole readiness). Most*

> *IM's would show their appreciation by saying thank you, however [Inmate D] reports it's my job, so why should he say "thank you." It is also noteworthy that the IM refused to sign his release to parole papers over (4) years ago, therefore requiring his continued incarceration, and the acquisition of CDCR 115's, the most recent for attempted battery on a peace officer.*

Additional information obtained from the case manager included the following:

> *Currently [Inmate D] is taking Atenolol 25mg, Tramadol 50mg and Carbamazepine 200mg. Psychotropic medication has been recommended, but the IM refuses. The patient does not present as gravely disabled, therefore Keyhea is not an option. IM was originally assigned to my caseload 8/27/06. He had a release to parole date of April,2007, and after a 60-90 day assessment time for this clinician to come up with a viable recommendation, it was determined he would not have enough time left for a possible transfer, before his release date. However, the IM received additional time for Attempted Battery on a Peace Officer and was extended to his Discharge date. This is what the IM wanted, since he repeatedly stated he did not want to be on Parole. Again, not enough time for referral, acceptance, and eventual transfer, if accepted. I also have to assume the IM would have stood a good chance of being rejected for a higher level of care due to his open defiance, which consist of being verbally and physically abusive on most occasions.*

The above summary essentially indicated that this inmate had not been referred to a higher level of care related to his treatment refusal and impending discharge date. He continued to refuse psychotropic medications, which were recommended due to his psychotic symptoms.

The chief psychiatrist at CSP/Sac was contacted to further discuss relevant clinical concerns. Arrangements were made for a psychiatrist to assess the inmate's clinical condition with particular attention to assessing the appropriateness of transfer to a higher level of care.

The psychiatrist assessed the inmate's presentation to be consistent with the differential diagnoses of Schizophrenia, Paranoid Type, chronic versus Delusional Disorder. Related to his chronic psychotic symptoms, general treatment refusal and the nature of his symptoms, the inmate was referred for inpatient psychiatric treatment at DMH-Vacaville. He was transferred to the mental health OHU and will be transferred to a MHCB when a bed is available prior to his DMH transfer (assuming acceptance and bed availability).

*Findings:*

The limitations of this evaluation included the lack of a face to face psychiatric examination of the inmate and not having reviewed his medical record. However, review

370

of his most current treatment plan and prior review of excerpts of his writings to the court were very consistent with the diagnosis of Schizophrenia, Paranoid Type with active psychotic symptoms versus Delusional Disorder.

Referral to DMH was clinically indicated for the reasons previously summarized.

**10/31/07 update:**

Based on a medical record review, it appeared that the referral to DMH was rejected by DMH.

The inmate continued to demonstrate fixed paranoid delusions.  During May 2007 he was transferred to the A Yard EOP from the administrative segregation EOP unit.  A key issue was his release date, which continued to be moved, and at the time of the visit was reportedly within five months.  In the past, he had not paroled because he refused to sign parole papers.

Review of progress notes during the past month indicated that the inmate had not participated in group or individual treatment.  He had been refused entrance to the treatment center because custody would not allow him to wear his hat in the treatment center due to apparent security regulations.

*Findings:*

Issues regarding this inmate were discussed with the staff, including the risks associated with not providing treatment for this inmate as compared to the risks associated with him wearing a hat in the treatment center.  Recommendation was made that this issue be further discussed with custody staff and in an IDTT meeting.

EXHIBIT B
Folsom State Prison (Folsom)
January 29, 2008-January 30, 2008

**Inmate A**

This EOP inmate was housed in the administrative segregation unit. He was diagnosed with Schizophrenia, disorganized type. He was treated with Trazodone 200 mg/day, Paxil 20 mg/day and Trileptal 1200 mg/day.

This inmate was transferred from CSP/Corcoran to Folsom on 7/2/07; he was in the 3CMS program at the time of transfer. He had a history of treatment at both the EOP and 3CMS levels of care. Progress notes indicated that he was followed consistently by the psychiatrist and the clinical case manager in general population. He was transferred to the administrative segregation unit on 10/23/07 due to battery on a peace officer. Subsequent contacts indicated that he presented at times with disorganization and paranoia. He was placed into the EOP on 1/25/08.

*Findings:*

There was documentation of weekly clinical case manager contacts in administrative segregation. There was also documentation of quarterly clinical case manager contacts in general population. Daily psych tech rounds were well documented. The treatment plan was clinically appropriate, but the plan lacked individualization.

**Inmate B**

This EOP inmate was diagnosed with Bipolar Disorder, NOS. He was treated with Zyprexa 20 mg/day, Lithium 600 mg/day and Wellbutrin 200 mg/day.

This inmate was transferred from CTF to Folsom on 12/29/04. Progress notes indicated that he was receiving 3CMS level of care for the majority of his stay at Folsom. He was reportedly stable until December 2007 when he began presenting with manic symptoms; his medications were adjusted at that time. His symptoms became increasing more delusional. He was transferred to administrative segregation on 1/12/08 for threatening staff. There was also documentation that the inmate was hoarding medications in his room. A suicide risk assessment was completed. At the most recent psychiatric contact, his Zyprexa was changed to Zydis for improved compliance.

*Findings:*

The treatment plan was not individualized to address this inmate's increasing manic symptoms. There was documentation of weekly clinical case manager contacts in administrative segregation. There was also documentation of quarterly clinical case manager contacts in general population. Daily psych tech rounds were well documented. It was troubling that this inmate had received an RVR after custody reported prior unusual behavior. This case was discussed with the senior psychologist to determine if a mental health evaluation was completed as this inmate had received an RVR at a time of documented psychotic symptoms and custody staff report of unusual and bizarre behavior.

**Inmate C**

This EOP inmate was housed in the administrative segregation unit. He was diagnosed with Schizoaffective Disorder. He was treated with Abilify 10mg/day.

The inmate was transferred from RJD to Folsom on 12/19/06. Progress notes indicated that he was stable in general population. He began refusing his Geodon during August 2007 due to side effect complaints; his medications were then discontinued. On 1/9/08 he was placed into administrative segregation due to refusing an order and for safety reasons. On 1/16/08 he was seen by the psychiatrist who noted that he had been off his medications for six months, and that he was presenting with recurrent paranoia. He was treated with Abilify. An IDTT on 1/25/08 recommended EOP level of care. The most recent progress note indicated that he was stable on medications in the administrative segregation unit.

*Findings*:

There was documentation of weekly clinical case manager contacts in administrative segregation. There was also documentation of quarterly clinical case manager contacts in general population. The treatment plan was clinically appropriate but lacked individualization.

**Inmate D**

This EOP inmate was housed in general population. He was diagnosed with Psychotic Disorder, NOS. He was treated with Seroquel 500 mg/day, Haldol 20 mg/day and Cogentin 4 mg/day.

This inmate was transferred from WSP to Folsom on 12/11/07. While at WSP he was hospitalized in the MHCB (12/6/07) and was placed into the EOP on the following day. There was a chrono dated 12/24/07 that indicated that he was placed into the 3CMS program. Subsequent progress notes documented that he reported auditory hallucinations. There was also a note possibly indicating that the officers would not escort the inmate for missed sessions during a lockdown. He was placed into the EOP on 1/22/08 due to the above mentioned concerns.

*Findings*:

It was difficult to determine from the medical record; however, it appeared that this inmate was transferred to Folsom as an EOP inmate. This transfer should not have occurred as Folsom did not have an EOP at the facility. The inmate required return to EOP level of care within one month of his arrival. There was also documentation that custody failed to escort the inmate for a needed evaluation during the lockdown. The initial treatment plan was general and not specific to this inmate's clinical needs.

EXHIBIT C
Pelican Bay State Prison (PBSP)
November 19, 2007 – November 20, 2007

**Inmate A**

This EOP inmate was housed in B-3.  The inmate had a bowel condition that resulted in significant stress during the course of his mental health treatment. The plaintiffs' attorneys requested a review of the inmate's treatment plan and a determination whether a need existed for transfer to an alternative treatment setting to address the inmate's reported medical and mental health related treatment concerns.

_Findings_:

The medical record of this inmate was reviewed.  He was evaluated by a physician during August 2007 related to an appeal regarding his medical complaints, with specific reference to his gastrointestinal symptoms.  The progress note adequately documented the physician's rationale for determining that this inmate was receiving adequate medical care for his gastrointestinal complaints; transfer to an alternative treatment setting was not indicated for this inmate.

EXHIBIT D
High Desert State Prison (HDSP)
September 19, 2007 – September 21, 2007

**Inmate A**

This inmate was placed at the EOP level of care on 8/22/07. He was diagnosed with Schizoaffective Disorder, and he had an extensive history of inpatient treatment at CTF during 2006 to 2007. He had been treated with Geodon, Depakote and Wellbutrin. He paroled during May 2007, and he returned to HDSP as a parole violator on 8/20/07. The inmate was evaluated by mental health two days after his arrival to the facility. Laboratory studies were performed on 8/28/07.

Medication orders for psychotropic medications were not located in the medical record. There was no MAR for the month of August, nor was an informed consent form present. Despite this, Seroquel 100 mg was administered at night on 8/31/07, and the inmate history profile revealed that he was seen by the psychiatrist on 8/29/07. There was documentation that an IDTT meeting had occurred, and a treatment plan update was also completed thirty days following the initial comprehensive evaluation and treatment plan. The inmate was seen by the case manager on nearly a daily basis.

*Findings:*

This EOP RC inmate was seen almost daily by his case manager. Laboratory testing was also performed as was clinically indicated. There was, however, a problem with the documentation present in the medical record. Information was absent from the medication record, and it appeared that loose filing was a major problem. There were no MARs, informed consent for treatment with psychotropic medications, or psychiatric medication orders present in the medical record. The psychiatric progress note was also absent. The condition of the medical record made it difficult to determine whether the inmate was actually seen by the psychiatrist for clinical contact.

**Inmate B**

This inmate was placed into the EOP on 6/12/07. The medical record revealed that he was seen for clinical contacts on a daily basis since his placement into the EOP. After the inmate was seen for a mental health evaluation, an initial IDTT meeting and treatment plan were documented in the medical record. Progress notes revealed that the inmate had significant cognitive deficiencies. Psychological testing had not been performed. The most recent IDTT meeting occurred on 9/11/07; references to discharge planning were mentioned during this meeting. The mental health staff indicated that this inmate was seen by the TCMP social worker for community pre-release planning.

*Findings:*

This EOP inmate was timely screened and evaluated. He was seen almost daily for clinical contacts. There was documentation that discharge planning was discussed during the IDTT meeting. In light of the inmate's apparent cognitive difficulties, psychological testing should have been considered.

**Inmate C**

The mental health care for this inmate was reviewed at the request of the plaintiffs' attorneys to determine the appropriate level of care.  The inmate had been in the EOP one year prior; he was discharged from the EOP as he was reportedly clinically appropriate for general population and he had taken advantage of lower functioning inmates in the EOP.  The inmate was evaluated by his case manager and a senior psychologist after an inquiry regarding his care was made by the plaintiffs' counsel.  He was subsequently admitted to the MHCB, and he was discharged on 8/7/07.  He was evaluated three days later by the case manager.  On 8/21/07 the inmate was evaluated by the psychiatrist when his medications, Risperdal, Remeron and Vistaril were renewed, and he was scheduled for follow-up in thirty days.

*Findings*:

This inmate was followed consistently by the case manager and the psychiatrist.  He appeared to be at the appropriate level of care at the time of the visit.  He was appropriately transferred to the MHCB when admission was clinically indicated.

**Inmate D**

This inmate was housed in the MHCB at the time of the site visit.  He was admitted to the MHCB on 9/18/07 due to suicidal ideation while housed at DVI.  The inmate was reported exhibiting psychotic symptoms at DVI with delusional thinking.  He was initially treated with Risperdal.  He was initially placed on suicide precautions; these precautions were discontinued on the following day.  He was followed consistently by the case manager and the psychiatrist.  He was also involved in therapy with the recreation therapist.

He was interviewed in the MHCB within the context of an IDTT meeting.  The inmate presented with disorganized thinking and behavior.  His speech was mildly pressured, and he denied suicidal ideation at the time of the IDTT meeting.

*Findings*:

This inmate was appropriately housed in the MHCB.  He was psychotic and was clearly in need of psychiatric stabilization.  There was documentation of appropriate evaluation by the case manager and psychiatrist with timely clinical contacts.

**Inmate E**

This inmate was housed in the MHCB.  He was admitted on 9/18/07 from the administrative segregation unit due to psychotic decompensation.  The inmate initially presented with muteness.  His administrative segregation cell was reportedly filthy with debris and maggots present.  His self care was very poor.

379

After his admission to the MHCB, the inmate was evaluated by the psychiatrist and the case manager.  He was diagnosed with Major Depressive Disorder with psychotic features.  Zyprexa was prescribed; however, the inmate refused medications.

At the time of the visit, the inmate remained with severe and significant depressive and psychotic symptoms.  He continued to refuse to take prescribed medications as well as ordered laboratory studies and vital signs.  At the time of the IDTT meeting on 9/20/07, the inmate remained was still wearing a suicide gown and was in a safety cell.  His suicide precautions and safety cell were discontinued on 9/21/07, and the inmate was allowed to shower.

*Findings:*

This inmate presented with significant evidence of severe depression and psychosis.  He continued to refuse treatment interventions including laboratory studies and medications.  Keyhea should have been considered.  Referral to DMH acute care may have been indicated in light of the severity of this inmate's symptoms.

EXHIBIT E
Mule Creek State Prison (MCSP)
November 28, 2007 – November 30, 2007

**Inmate A**

This inmate was referred by plaintiffs' attorneys who reported that the inmate had stated that he remained depressed and suicidal after removal from suicide watch.  The inmate was interviewed in the MHCB where he was admitted on 11/28/07 from administrative segregation.  He was interviewed extensively, and reported that he wanted to kill himself because he was dissatisfied with his treatment in the CDCR; he also reported that the custody staff had treated him unfairly.  He reported that he had filed 602s and had sent letters to the plaintiffs' attorneys, but he believed that their responses to him were inadequate.

The inmate was treated with an antidepressant and an antipsychotic medication; he was monitored on suicide watch at the time of the interview.  An additional factor that contributed to the inmate's suicidal ideation was his concern that he had been referred for transfer to a different prison.  The inmate did not exhibit symptoms of psychosis or depression during the interview, and his medical record indicated that his mental health concerns had been addressed by clinicians.

*Findings*:

This inmate's mental health care and treatment appeared to be appropriate.  The inmate was appropriately housed in the MHCB due to suicidal ideation.  Appropriate disposition and planning after discharge from the MHCB were indicated for this inmate.

**Inmate B**

This inmate was referred by plaintiffs' attorneys who reported that the inmate had expressed thoughts of self harm and other symptoms of mental illness.  The inmate had also reported that his case manager had been unresponsive to his complaints. The inmate was admitted to the CDCR on 1/22/06; he was transferred to the Level IV EOP yard on 4/18/07.  He was prescribed Abilify, Lamictal and Celexa.  The inmate had a history of suicidal ideation with admissions to DMH as well as EOP placements.

The medical record indicated that the inmate attended greater than ninety percent of his offered groups.  The inmate was seen by a psychiatrist on 11/13/07; he reported suicidal thoughts at that time, but he denied suicide plan.  He had been refusing Celexa for approximately one week; the psychiatrist changed his Celexa to Cymbalta and scheduled follow-up within two weeks.  A treatment plan dated 11/15/07 provided a diagnosis of Major Depressive Disorder with psychotic features, PTSD, Hepatitis C, and Hypothyroidism and provided a clinically appropriate plan for addressing the inmate's mental health symptoms.

*Findings*:

The mental health care that was provided to this inmate appeared to be appropriate for his mental health needs. Treatment planning was clinically appropriate in addressing this inmate's mental health symptoms.

**Inmate C**

This inmate was referred by plaintiffs' attorneys as the inmate reported that he had not received group therapy and had been removed from the EOP level of care. Concern was also noted regarding possible suicidal ideation.

The inmate was transferred to MCSP on 5/4/07 from CSP/Sac. There appeared to be some discrepancy regarding whether this inmate was assigned to the 3CMS or EOP level of care. A treatment plan on 5/4/07 provided diagnoses of Mood Disorder, NOS and Psychotic Disorder, NOS; however, there was no psychiatrist in attendance at the IDTT meeting. One week later a psychiatrist reported that the inmate was receiving appropriate treatment including his medications, Wellbutrin and Depakote. The psychiatrist also indicated that the inmate had no suicidal ideation. Subsequent progress notes expressed confusion regarding the assigned level of care or did not provide information regarding the actual level of care.

*Findings*:

This inmate's care and treatment required reassessment; a new treatment plan should be developed to determine the appropriateness of his current level of care. It appeared that the inmate was in the 3CMS program; however, the record was so disorganized that it was very difficult to track chronos or other information regarding level of care changes. The most recent treatment plan was inadequate as it was not interdisciplinary. There was documentation that the inmate was seen at least every ninety days by the clinical case manager, and medication management was clinically appropriate.

**Inmate D**

This EOP inmate was housed in the level four SNY. He was treated with Risperdal and Neurontin. A review of his medical record indicated that the inmate had a history of multiple batteries prior to his transfer to MCSP. It did not appear that he had received any RVRs since his transfer to MCSP in the SNY program. He was diagnosed with Major Depressive Disorder. A treatment plan dated 10/23/07 indicated interdisciplinary participation. Upon interview in an EOP group; the inmate reported that he attended several groups, and he denied problems with receiving his prescribed medications. He reported no complaints regarding his mental health care and treatment.

*Findings*:

This inmate's care and treatment appeared to be appropriate for his mental health needs.

383

**Inmate E**

This inmate was transferred to MCSP during August 2003; he was receiving 3CMS level of care at the time of transfer.  His level of care was subsequently changed to EOP, and he was treated with Geodon for his psychotic symptoms.  A treatment plan dated 10/25/07 provided diagnoses of Psychotic Disorder, NOS and Antisocial Personality Disorder, and the IDTT meeting had interdisciplinary participation.  The inmate reported that he attended three to six groups per week, as well as recreation therapy with a recreation therapist.  He reported that he was seen by his case manager weekly.  The inmate was satisfied with his mental health treatment.

*Findings*:

This inmate's care and treatment appeared to be appropriate for his mental health needs.

**Inmate F**

This inmate was admitted to MCSP on 2/7/07.  A treatment plan on 7/25/07 indicated that the inmate was in the 3CMS program.  He subsequently decompensated, and he was admitted to the MHCB on 9/24/07.  At that time he was placed on a Keyhea order.  A suicide risk assessment completed on 10/5/07 indicated that the assessment was based solely upon the inmate interview.  After his discharge from the MHCB, he was seen for five-day follow-up; however, he was not seen on the first and fourth days of scheduled follow-up.

*Findings*:

This inmate's care and treatment were inadequate as he did not receive the appropriate five-day follow-up after discharge from the MHCB.  Furthermore the suicide risk assessment relied solely upon the inmate interview for determination of suicide risk.

**Inmate G**

This EOP inmate was diagnosed with Psychotic Disorder, NOS, and he was treated with Seroquel, Wellbutrin, Sinequan and Haldol.  A psychiatric progress note on 11/25/07 was blank without any information, except for the names of the psychiatrist and inmate.  The treatment plan dated 8/2/07 indicated that the inmate was an active participant in at least ten hours of group and recreation therapies.

*Findings*:

This inmate's care and treatment appeared to be appropriate; however, the psychiatric assessment and treatment plan required update.  It was unclear whether the treatment plan which was due on 11/2/07 had not been completed, or had not yet been filed in the medical record.

**Inmate H**

This inmate was transferred to MCSP on 7/12/06.  A treatment plan on 9/4/07 indicated that the inmate was receiving four hours of group therapy and five hours of recreation therapy every week.  He was diagnosed with Bipolar Disorder.  He was admitted to the MHCB where a comprehensive psychiatric assessment on 9/24/07 adequately summarized the inmate's past and current treatment.

*Findings:*
This inmate's care and treatment appeared to be appropriate for his mental health needs.

**Inmate I**

This 3CMS inmate was transferred to MCSP on 9/1/05.  He was hospitalized in a MHCB from 8/2/07 through 8/6/07 when he was transferred to administrative segregation.  Although the inmate was provided with a diagnosis of an Adjustment Disorder in the MHCB; he was treated with Risperdal, an antipsychotic medication.  Five-day follow-up was scheduled; however, there were lapses in consecutive daily contacts.

*Findings:*

This inmate's overall care and treatment appeared to be appropriate; however, five-day follow-up was not adequately performed after the inmate was discharged from the MHCB.  The inmate's diagnosis required reassessment as this inmate with a non-psychotic diagnosis was treated with an antipsychotic medication.

EXHIBIT F
California Medical Facility (CMF)
December 4, 2007 – December 6, 2007

**Inmate A**

The inmate was seen during the course of an IDTT on S2, the MHCB program. The inmate had been admitted to the MHCB on 11/28/07 from the EOP program after he reported voices telling him to kill himself. The inmate was being seen for disposition planning by the treatment team. The treatment team was fully staffed and also included supervisory and consulting staff. The inmate was known to the staff as he had been admitted to Q1 for approximately one month after he had cut himself following a refusal by his family to take his calls. The inmate was requesting that he return to Q1 for further treatment. The identified treatment goals included controlling the inmate's "anger" and issues related to his disappointment with family. The interview and discussion by the treatment team regarding the ultimate disposition for this inmate was very effective, and determination was made that the inmate would be appropriate for transfer to Q1 and possibly to an intermediate care program based on further review.

*Findings*:

This inmate's care and treatment were appropriate for his mental health needs. The treatment planning and discussion regarding the disposition of this inmate were excellent and clinically relevant.

**Inmate B**

This inmate was seen in the IDTT on S2, the MHCB program for CMF. The inmate was on a Keyhea order, and he was being seen for a follow-up mental status evaluation prior to his transfer to the Acute Psychiatric Program (APP).

The inmate's medications had been changed to Risperdal Consta, and he had been in the MHCB/APP on S2 for approximately five weeks. The inmate was interviewed effectively, and there was excellent staff discussion regarding the inmate's progress. The staff reported that the inmate had improved significantly and was no longer required to wear a spit mask. The inmate reported that he believed his brain had a "new transmission."

The inmate's medical record was reviewed and indicated that he had a diagnosis of Schizoaffective Disorder, bipolar type and that he had been transferred on 11/20/07 from S2 to the APP program on S2. He had not yet been moved to Q1. The inmate had a past admission to DMH with a diagnosis of Major Depressive Disorder, recurrent, severe with psychotic features as well as PTSD. The medical record revealed that there were substantive progress notes. As this inmate was not clinically stable; the plan for transfer to APP was appropriate.

*Findings*:

This inmate's care and treatment were appropriate to his mental health needs, and the treatment team discussion was clinically relevant.

**Inmate C**

This inmate was seen during a case conference review on 2/1/07. The inmate had been a resident on Q1 for approximately 565 days, despite the fact that this was an acute care program.

The inmate was primarily Spanish-speaking. A Spanish-speaking social worker attempted to interview him, but he would not respond to questioning. He was described as being selectively mute in the past and exhibited paranoid symptoms. The inmate was receiving two injectable antipsychotic medications, and in the words of the DMH psychiatrist treating him "this is the best place for him."

The inmate was a Level IV inmate who had a number of issues including severe mental illness with impulsive and at times violent behavior, borderline intellectual functioning, and significant disruption in his activities of daily living including poor hygiene and defecating in his cell. He had been treated at ASH, where he had engaged in violent behavior. He did not appear to be appropriate for DMH intermediate level of care given his impulsivity and acting out; however, he also was not appropriate for return to the EOP level of care.

As part of the case conference discussion, there was consideration that this inmate had not had a full neurological work-up. He had, however, been seen by a neurologist who found no major neurological deficits. It was suggested that he was not a good candidate for a magnetic resonance imaging (MRI). A CT scan, with or without contrast, and possibly even a skull series were considered by the conference participants.

_Findings:_

This inmate's care and treatment appeared to be appropriate as he represented a very difficult management challenge given his myriad psychiatric and additional concurrent issues.

**Inmate D**

This inmate was an EOP inmate who was seen on the M3, EOP administrative segregation unit. He reported that he was transferred from Delano and had been in the EOP administrative segregation unit program at CMF for the last five months. He reported that he was seen by his clinical case manager weekly out of cell, and that he attended groups four times per week. He reported that the average size of the groups was seven inmates, and he found his attendance in groups to be helpful. He also reported that he was receiving Trazodone at night on a daily basis.

_Findings:_

This inmate's care and treatment appeared to be appropriate to his mental health needs.

**Inmate E**

This inmate was seen in the EOP administrative segregation unit and reported that he had been housed at CMF since 10/29/07.  He reported that he was prescribed Abilify, Haldol and Lithium; however, his medications were handed to him, and the staff did not observe him taking his medication.  He further reported that he frequently received the "wrong pill" and had told the staff that the medication was given in error.  He stated that, depending on the staff member, his explanation was accepted and at other times he was told to take the medication.  The inmate reported that he came out of cell for groups, but he was unsure how many groups he attended per week.  The inmate also reported that he saw his clinical case manager weekly.

*Findings*:

This inmate's care and treatment appeared to be appropriate with the exception of medication management, which, by the inmate's report, did not reflect appropriate DOT procedures.

**Inmate F**

This inmate was seen in the EOP administrative segregation unit on M3, and he reported that he had been in the administrative segregation unit since 10/30/07.  The inmate was interviewed by the expert at cell front as well as in a group during this site visit.

The inmate reported that he had also been interviewed by the expert during a past site visit in April 2007, and he confirmed that his major concern at that point was treatment for Exhibitionism.  The inmate reported that he had been receiving treatment that was provided by a psychologist.  However, this treatment was discontinued pending approval by the chief psychiatrist to resume.  The inmate reported that he had a nine month SHU term which was suspended; he was awaiting transfer to P3, the intermediate care program for the past three weeks.  The inmate reported that he had been referred to ASH, but his transfer was denied because of his custody level.

Of note was the presence of a yellow cone taped to the side of the inmate's cell.  Interviews with the staff revealed that these cones were placed outside of cells to alert the staff of inmates who had histories of masturbating in front of staff.  Upon further discussion, the staff revealed that not only were the yellow cones placed, but inmates with an Exhibitionism diagnosis and/or histories of masturbating openly were identified on the census board and in the log book on the M3 unit.  This procedure was also utilized on other EOP units as well.  The staff reported this inmate had been referred and was awaiting transfer to the ICF.

According to clinical progress notes, the inmate's commitment offense was indecent exposure with prior incident, and he was issued RVRs for indecent exposure while incarcerated.  He had a SHU term with a MERD of 5/24/08.  He was scheduled for parole

during November 2007; however, due to RVRs, he was expected to be released during January 2008.

CMF's DMH coordinator reported that at the end of November 2007, an ICC suspended the inmate's SHU term and reduced his custody level to make him eligible to participate in group treatment. As of 12/4/07, it was unclear whether the inmate would be placed on a waiting list for transfer to SVPP, or whether he would be sent to the level IV ICF located at CMF.

The inmate had diagnoses of Psychotic Disorder NOS, PTSD, Exhibitionism and Borderline Personality Disorder. He also had a history of head trauma. He was treated with Abilify, Risperdal, Celexa, Tegretol and Benadryl.

It was not possible to obtain a clear picture of the inmate's recent treatment from the information present in the medical record. Although references to critical events were mentioned throughout the progress notes, few of those events were explicitly documented by an entry generated on the date of the event that recorded the action. It appeared that the inmate was doing well in the EOP for several months. He was admitted to the MHCB during October 2007 where he remained for three weeks. It appeared that he was discharged from the MHCB to the administrative segregation unit, where he quickly decompensated. He was referred to DMH intermediate care; however, delays due to unresolved custody issues resulted in three weeks before transfer. During that time the inmate received one or two RVRs for sexual misconduct.

Progress notes indicated that the inmate participated fully in the EOP in July, August, and September 2007. He typically attended more than forty hours of therapeutic activities per month and held a job as a porter. He was described as well groomed, well organized, pleasant and cooperative. Early in October 2007 he incurred an RVR for exposing himself to a clinician and was placed in the administrative segregation unit. A short time later, he was sent to DMH and admitted to S2, where he received DMH acute level of care for twenty days prior to discharge back to CMF and placement in the administrative segregation unit.

A progress note written in mid-November 2007, which was roughly ten days after he was discharged from acute care, described the inmate as experiencing worsening depression and decompensation due to the stress of receiving another RVR for exhibitionism. His case manager referred him for consideration of referral to DMH intermediate care. Progress notes also described him as having a history of "extensive serious sexual abuse with post-traumatic sequelae." In the administrative segregation unit, the inmate reported that he had suicidal ideation, but he did not think that he would act on those thoughts.

While the inmate was housed in the administrative segregation unit, daily psych tech rounds were documented as were weekly case manager contacts. This inmate was approved for transfer for treatment of Exhibitionism in September 2007. In August 2007 he was scheduled for individual treatment sessions to address sexual misconduct; however, these sessions were cancelled because the clinician was redirected.

390

There was no documentation in the medical record that the inmate was seen by TCMP forty-five or ninety days before his original parole date during November 2007.

This inmate was diagnosed with Exhibitionism, and he had been scheduled for weekly individual treatment sessions to address that issue. A SHU term was imposed, but he was not scheduled for transfer to a SHU or an institution designated to provide specialized treatment for sexual misconduct. He continued to incur RVRs for exhibitionistic acts.

*Findings:*

This inmate's care and treatment appeared to be inappropriate as he was evaluated and recommended for transfer to an Exhibitionism program; however, transfer delays made it unlikely that he would receive this needed treatment before he was released. Also of concern was the standard practice at CMF of identifying inmates with Exhibitionism with a yellow cone on the wall outside of the inmate's cell.

The treatment provided in the EOP met Program Guide requirements in terms of frequency and timeliness of contacts. Although there was ample documentation of contacts made for treatment, timely and appropriate documentation of events such as RVR evaluations and referrals to higher levels of care were not located in the medical record.

Access to crisis care was good. However, documentation of crisis care was conflated with acute care documentation. Access to intermediate care was not timely; access was delayed by review and modification of custody factors that prevented his participation in group treatment. Minimal treatment for Exhibitionism was provided; the inmate continued to incur RVRs, including during a period of decompensation. There was no indication that this inmate received discharge planning in preparation for his original November 2007 release date, or before his imminent release during January 2008.

**Inmate G**

This EOP inmate was interviewed in the administrative segregation unit. As the inmate's cell was very dark, he was questioned regarding the darkness of his cell. The inmate responded that "I'm blind." He reported that he went to mental health groups, and he was evaluated by his clinical case manager on a weekly basis. He reported that his major problem was that he had not received his property. The staff was interviewed, and they confirmed this report. The inmate had been housed on the unit for several weeks, and he had not received his property; however, the explanation provided was that he "hasn't sent a request." Upon further discussion with mental health staff regarding these issues, they agreed that the mental health staff should assist the inmate in obtaining his property.

*Findings*:

This inmate's care and treatment were inadequate, as he had not received the full range of assistance that he required based on his mental health and disability needs.

**Inmate H**

This EOP inmate was interviewed in the administrative segregation unit on I3. It was reported that he had been in the administrative segregation unit for two months after having been in the general EOP program at CMF for four to five months. The inmate reported that he had begun attending five two-hour long groups. He was on close B custody level. He also reported that he was evaluated by his clinical case manager weekly and was involved in group therapy. He had been in the 3CMS program where he was seen by his psychiatrist monthly, and he was not scheduled for any group therapy. He reported that the EOP program was beneficial for him. He also reported that he was prescribed Prozac which he missed for several days when he was transferred from P1 to I3. The inmate reported that he thought that the EOP Administrative Segregation program would be better if they could utilize writing and reading materials. He reported that it took one month for him to receive writing materials when he was housed at CSP/LAC, and he hoped he would receive materials sooner at CMF.

*Findings*:

This inmate's care and treatment appeared to be appropriate for his mental health needs. As was the case with all EOP inmates housed in the administrative segregation unit at CMF, a significant portion of therapeutic activities occurred in cell rather than out of cell.

**Inmate I**

This EOP inmate was interviewed in the administrative segregation unit on the I3 unit. He reported that his mental health care was very appropriate, but he was very unhappy that the cable television system had not been activated for inmates in the EOP program. He reported that there was cable hardware in a column that ran along the side of his cell, and he showed this to the interviewer. He also presented a 602 that he filed regarding access to cable and TV. The inmate had a history of SHU placement for six and one-half years.

A review of the inmate's medical record revealed that he was prescribed Celexa as well as a number of other medications. An IDTT dated 11/6/07 included the necessary participants and provided a diagnosis of Major Depressive Disorder in partial remission. The medical records also documented weekly clinical case manager contacts.

The inmate reported that he had no problems with the mental health program except for his medications which he reportedly did not receive when he was on the yard. He reported that these medications included Celexa and HIV medication. He stated that his

medications should be provided and that inmates should not have to choose between going to the yard or staying in their cells in order to receive their medications.

*Findings:*

This inmate's care and treatment appeared to be appropriate with the exception of occasions when he did not receive his medications as prescribed. His issue with regards to access to cable in the cells was being pursued through the appropriate channels.

## Inmate J

This inmate was housed in the EOP administrative segregation unit, and he was interviewed on the I3 unit. He reported that he had been transferred there on 10/4/07 from the 3CMS program. The inmate reported that he had been housed at CMF since 10/1/02; he had recently (October 2007) been upgraded to EOP level of care. The inmate reported that he had no complaints regarding the mental health staff or services; however, he noted custody related problems. He stated that the custody staff had an "attitude," and they interfered with the mental health staff in their provision of services. When questioned regarding the interferences that occurred, the inmate reported that the real problems were with not having cable TV.

*Findings:*

This inmate's care and treatment appeared to be appropriate for his mental health needs.

## Inmate K

This inmate had been interviewed during a prior site visit. His medical record was reviewed as well as a summary of his treatment since that time. The inmate was a post-operative transsexual inmate who reported that she was very uncomfortable in the male population at CMF. There was a Departmental Review Board (DRB) scheduled for 12/20/07 to make an ultimate determination regarding placement of this inmate.

This inmate's case had been reviewed locally at CMF as well as via a consult with the chief psychiatrist from CIW with a recommendation to the DRB that the inmate be transferred to a women's prison.

Review of the medical records indicated that the inmate was not participating in the MHSDS as she began refusing medications in December 2006; the inmate refused groups as well as showers and other activities involving male inmates. The inmate was not prescribed medications and was awaiting a decision by the DRB. The records indicated that the inmate had a history of having been sexually assaulted by male inmates on three past occasions, and the consensus of the clinical staff at CMF and CIW was that the inmate should be transferred to a woman's facility.

393

*Findings*:

This inmate's care and treatment were inadequate based on the examination of the comprehensive reviews of clinical staff within the CDCR. There was a clear need for resolution of this matter to be determined at the DRB. This review had been scheduled and then postponed because the Attorney General's report had not been available. It is critical that the care, treatment and ultimate placement of this inmate be timely resolved.

**Inmate L**

This EOP administrative segregation inmate's medical record was reviewed. The inmate was transferred to CMF on 7/3/07, and he was placed in the EOP program on the following day. The inmate had a diagnosis of Schizophrenia, paranoid type and was prescribed Thorazine. A review of the medical record demonstrated multiple blanks on the MARs, as well as no shows during October 2007. There was inadequate documentation and follow-up. The inmate's medical record indicated that he was offered forty hours of structured therapeutic activities during October 2007, but only twenty-five hours were received. An IDTT of 10/23/07 included the necessary participants; the inmate's level of care was changed to 3CMS at this meeting based on the inmate refusal of medications and groups as well as his high level of functioning and lack of symptoms.

*Findings*:

This inmate's care and treatment appeared to be appropriate for his mental health needs. As was the case with all EOP inmates housed in the administrative segregation unit at CMF, a significant portion of therapeutic activities occurred in cell rather than out of cell. The inmate will require close monitoring for signs of decompensation due to the recent level of care change.

**Inmate M**

This inmate was an EOP inmate housed in administrative segregation unit. He was transferred to CMF on 3/14/07. He had a diagnosis of Schizophrenia and was treated with Risperdal, Haldol, Vistaril and Cogentin as part of a Keyhea order. The MARs in his medical record were completed appropriately, and he had variable participation in group therapy in part because of his arthritis and pain in both legs. An IDTT meeting of 9/18/07 was multidisciplinary and appropriate in content.

*Findings*:

This inmate's care and treatment appeared to be appropriate for his mental health needs.

**Inmate N**

This inmate had been receiving EOP level of care since 9/1/05. He was transferred to CMF on 11/29/06. An IDTT of 10/23/07 and the treatment plan generated at that

meeting were clinically appropriate; the inmate was provided with a diagnosis of Psychotic Disorder, NOS. He received approximately thirty-four hours of structured therapeutic activity during the month of October 2007.

This inmate was interviewed while he was involved in an unstructured EOP administrative segregation unit group. The inmate appeared to be clinically appropriate for that group. His medical record was reviewed. The medical record indicated that the inmate had been admitted to the EOP administrative segregation unit on 11/13/07. The inmate was diagnosed at this time with Bipolar Disorder, manic type. The inmate was prescribed Geodon, Vistaril and Benadryl. The MARs were very difficult to understand and included a number of overlapping medication orders. His Keyhea order had expired on 9/26/07.

The inmate had been hospitalized at DMH on S2 from 8/1/07 through 8/9/07. He was housed on S2 again from 8/9/07 through 8/31/07. He was housed on S1 from 8/31/07 through 10/16/07, secondary to suicidal ideation and agitation.

*Findings*:

The documentation of this inmate's care and treatment was difficult to follow in the medical record. His care was variable but appeared to be grossly appropriate. His treatment course, including his response to treatment while at DMH for MHCB and acute care, were unclear from the medical record. The dates of his DMH stay suggested that he was in distress following his first two hospitalizations, and he was readmitted on the day of discharge.

Medication management was nearly impossible to follow based on the documentation in the medical record. The outcome of his Keyhea order was unclear. The inmate was offered ten hours or more of structured therapeutic activities weekly in October 2007. This inmate required consistent management of his mental health needs.

**Inmate O**

This 51 year old EOP inmate had a diagnosis of Schizoaffective Disorder, depressive type. He was treated with Abilify, Venlafaxine, Trazodone and Thorazine. Throughout the monitoring period, the inmate was described as high functioning. He was seen at the requisite intervals by his case manager and psychiatry. IDTT meetings were timely.

In June and July he participated in fifty-four and sixty-six hours of therapeutic activity, respectively. During July 2007, his treatment included twenty-four hours of education, nine hours of occupational therapy and twenty hours of recreational therapy.

During October 2007 the IDTT found that he was ready to be discharged to the 3CMS level of care. He expressed concerns for his personal safety if he were moved to a dormitory in the general population. He was concerned due to the nature of his

commitment offense. He was referred to the Day Treatment Program. The reason cited for referral was to help the inmate to adjust to dormitory living and to manage anxiety.

According to the referral log, this EOP inmate's IDTT recommended referral to DMH on 10/18/07. He was referred to the Day Treatment Program on 11/6/07, just over two weeks later. Custody clearance took four days, and medical clearance took six days. The inmate was admitted to the Day Treatment Program on 11/13/07.

*Findings*:

This inmate's EOP treatment was consistent with Program Guide requirements. Access to a higher level of care was good but not quite timely, as completion of the referral took one week too long. His transfer following the referral, however, was accomplished very quickly, within one week. This inmate's housing concerns were significant; however, in light of his level of functioning, these issues did not necessarily require a higher level of care.

**Inmate P**

This 38 year old EOP inmate was identified by his IDTT as requiring a higher level of care on 10/18/07. A referral was completed and forwarded to DMH within two weeks. The inmate was accepted and transferred to the Day Treatment Program within two weeks of acceptance.

The inmate had diagnoses of Psychotic Disorder, NOS, in remission and Polysubstance Dependence. He was treated with Seroquel, Depakote and Abilify during the monitoring period. The psychiatrist was in the process of tapering Seroquel during October 2007. A blood level for treatment with Depakote was ordered during June 2007. The laboratory results were obtained within one week and were noted a few days later.

In the EOP he was described as fairly high functioning, but his typical well-organized presentation was punctuated by outbursts of anger, hostility and aggression towards other inmates.

During July 2007 the inmate participated in forty-one hours of therapeutic activities. In August 2007 the inmate attended fifty-nine hours of therapeutic activities, including twenty-three hours of recreational therapy, twenty hours of work and fourteen hours of group treatment. He was credited with therapeutic work hours for his job as a porter on the unit.

The inmate was evaluated bimonthly by his case manager and monthly by a psychiatrist. Since July 2007, the inmate and his case manager had discussed his trepidation about moving to a dormitory at the time of discharge to the 3CMS level of care. During October 2007 the inmate was found to be appropriate for discharge to the 3CMS level of care.

396

*Findings*:

This inmate's EOP treatment was consistent with Program Guide requirements.  Access to a higher level of care was timely.

This inmate's housing concerns were significant; however, in light of his level of functioning, a higher level of care was unnecessary.

**Inmate Q**

This case was reviewed due to CMF staff difficulty in placing the inmate.  This 45 year old EOP inmate was deemed as requiring a higher level of care by CMF staff.  He used a wheelchair and was hearing impaired.  He had a Keyhea order that was active until April 2007.  The progress notes indicated that the petition for renewal was denied.  He refused to take his prescribed medication during May, and he decompensated soon after.

After the inmate's return from DMH to the EOP during August 2007, a progress note in the medical record indicated that a Keyhea order was sought in July 2007.  There was, however, no official record of that action in the medical record or on CMF's Keyhea log.  It was possible that the petition was initiated while the inmate was hospitalized at DMH.

The inmate was referred to ASH and found suitable clinically; however admission was denied on the grounds of his Close B custody level.  Intermediate care at CMF was considered, but he was barred from admission there as well as from the Day Treatment Program, due to his mobility impairment and use of a wheelchair.  He was also considered but found ineligible for admission to SVPP for intermediate care due to a medical condition.

According to a DMH discharge summary written during August 2007, the inmate had a history of many DMH admissions.  He was in a crisis bed and treated at the acute care level in May 2007.  According to one document, he was admitted to a crisis bed three times during 2007   He had diagnoses of Schizophrenia, undifferentiated type, Polysubstance Dependence and Antisocial Personality Disorder.  He was treated with Haldol Decanoate, Cogentin and Zydis.  MARs indicated that he was compliant with medication during September and October, 2007.  There were no MARs in the medical record for the months of April, May, June, July or August 2007.  It appeared that he was hospitalized at DMH for much of that time.

The inmate had limited participation in EOP treatment during September and October 2007, and he required encouragement to attend groups.  During September 2007 the inmate attended eighteen hours of group therapy, seven hours of which were recreational therapy.  He attended twenty-two hours during October 2007; eight of the hours were recreational therapy.  His demeanor reportedly alternated from threatening to cooperative.  He reported continued auditory hallucinations, but he reported that the voices were non-intrusive.  He consistently denied suicidal ideation.  He was evaluated bimonthly by his case manager and monthly by his psychiatrist.  He had a current treatment plan that was

developed in an IDTT meeting.  The IDTT recommended hospitalization for the inmate at ASH.

_Findings_:

Records upon which the above summary and the following conclusions resulted may not have been reliable.  Information in the medical record did not convey an accurate or complete account of referrals or admissions to MHCBs.  Further, the medical record was missing important information regarding the inmate's recent history of treatment to such an extent that any treating clinician would be unable to piece together crucial facts.

For unknown reasons, a petition to renew the Keyhea order was denied.  This denial was shortly followed by decompensation.  Although he received crisis and acute care over a period of several months during September 2007, it was clear that this inmate required a higher level of care.  His access to appropriate care appeared to be impeded by custody factors and a mobility issue.  Review of the C-file pointed to the conclusion that while he might have been an escape risk at one time, as indicated by his Close B status, he did not pose that risk at present.  A thorough review of his custody status at the time he was referred would likely have cleared the obstacle that barred his admission to ASH.

EXHIBIT G
California State Prison at Solano (CSP/Solano)
December 4, 2007 - December 6, 2007

**Inmate A**

This inmate arrived at CSP/Solano on 12/15/05 from NKSP. His primary language was Spanish. His bus screen was negative for mental health concerns. The inmate was placed into the 3CMS program for medical necessity on August 3, 2006. Psychiatric and case manager progress notes indicated that the inmate required the use of a translator due to his limited English; however, a case manager also reported the contrary. Upon interview, it was apparent that interpreter services were required for this inmate.

*Findings*:
This inmate required the services of an interpreter; however, interpreter service was not requested or provided on a consistent basis. Custody was not present at the IDTT meeting.

**Inmate B**

This inmate was transferred to CSP/Solano during March 2004. At the time of the site visit, the inmate was prescribed Prozac, Risperdal and Benadryl. The annual IDTT meeting occurred during April 2007. There was no documentation of the presence of a CCI at that meeting. A handwritten note on the treatment plan stated that the inmate believed that he would be released from prison at the end of 2007. Institution data indicated that his EPRD was 9/25/12.

*Findings*:

There was no CCI in attendance at the IDTT meeting; custody presence would have assisted in clarification of the correct release date for this inmate. No medication informed consent form was located in the medical record for treatment with Risperdal and Benadryl.

**Inmate C**

This inmate was transferred to CSP/Solano during January 2005. The inmate was removed from the 3CMS program on the following month, and he was returned to the MHSDS during August 2005 at the 3CMS level of care for medical necessity. It appeared that the nursing staff had documented that the inmate had consistently refused his morning medications during February 2007 and March 2007. However, psych tech documentation indicated medication compliance during the same time period. The most recent progress notes indicated that the inmate was essentially stable.

*Findings*:

Informed consent for Remeron was outdated. Psych tech weekly summaries regarding medication compliance conflicted with nursing reports of noncompliance with morning medications.

**Inmate D**

This inmate was transferred to CSP/Solano during August 2005 from DVI.  His bus screen was negative for mental health concerns.  The inmate was placed into the 3CMS program on 4/14/007 for medical necessity.  He was not prescribed psychotropic medications; however, the mental health placement chrono dated 4/14/07 indicated that the inmate was prescribed psychotropic medication.  A psychiatric progress note dated 9/14/07 documented a recommendation for medication evaluation.  Group therapy was recommended, but was not offered.

*Findings:*

There was confusing and conflicting documentation regarding medication management in the UHR.

EXHIBIT H
California State Prison at San Quentin (SQ)
October 23, 2007− October 25, 2007

**Inmate A**

This EOP inmate was housed in the reception center. He was diagnosed with Psychotic Disorder, NOS and Depressive Disorder, NOS. He was treated with Abilify 15 mg/day and Remeron 30 mg/day.

This inmate arrived at SQ on 9/5/07. His medications from the county jail were ordered on the day of arrival. He was seen two days later by the psychiatrist when his Celexa was discontinued, and Abilify was started due to depressive and psychotic symptoms. Subsequent progress notes indicated that he was involved in group therapy and was seen consistently by the case manager.

*Findings:*

There was documentation that the inmate's medications were ordered on the day of arrival to the facility. A review of the September MAR revealed medication continuity and compliance. There was documentation of weekly clinical case manager visits in the reception center.

The CDC form 7277 health screening form was not located in the medical record.

**Inmate B**

This EOP inmate was housed on condemned row. He was diagnosed with Schizophrenia, Paranoid Type. He was treated with Geodon 200 mg/day.

He was followed by the clinical case manager, psych techs, recreational therapist and a psychiatrist in condemned row. Progress notes indicated that he presented with chronic paranoid delusional thinking, specifically regarding custody harming him. He was admitted to the OHU from 9/3/07 to 9/4/07 due to his delusional thinking and possible suicidal ideation. He was discharged back to his housing unit where he remained with delusional thinking, but without evidence of suicidal ideation. The clinical case manager indicated that the inmate had sporadic medication compliance, and the inmate was encouraged to consistently take his medications. He was reportedly involved in group therapy.

*Findings:*

There was documentation of weekly clinical case manager contacts for this EOP inmate. There was documentation of involvement in group therapy; however, it was difficult to determine from the medical record whether the inmate was offered ten hours of group therapy per week.

This inmate was appropriately admitted to the OHU for evaluation of suicide risk. A suicide risk assessment was completed upon the inmate's release from the OHU. A review of the MARs did not reveal evidence of consistent medication noncompliance or medication lapses.

**Inmate C**

This 3CMS inmate was diagnosed with Major Depressive Disorder and Alcohol Induced Psychotic Disorder with hallucinations; an alternative diagnosis of Anxiety Disorder, NOS was also present.  He was treated with Zoloft 150 mg/day, Cogentin 1 mg/day, Risperdal M tabs 2 mg/day and Buspar 20 mg/day.  His medical record was reviewed at the request of the plaintiffs' attorneys regarding his medication regimen, treatment planning and the need for transfer to an appropriate treatment setting.

This inmate arrived at SQ on 5/17/07.  The mental health evaluation was completed on 5/22/07, and he was placed into the 3CMS program.  He submitted a referral requesting resumption of his medication (Klonopin).  The progress note indicated that the psychologist believed that the inmate was malingering to obtain Klonopin; the staff had reportedly observed conflicting behavior exhibited by the inmate regarding psychosis.  Subsequent progress notes indicated that he remained with significant complaints of anxiety and probable delusional thinking.  He was treated with the above medications.  The last psychiatric progress note on 9/25/07 indicated that the inmate's Klonopin had been tapered, and he was treated with Buspar for anxiety.  The note indicated that the inmate would be seen for follow-up in two weeks and that Buspar would be increased.

*Findings*:

This inmate remained in the reception center in a SNY overflow unit.  He was endorsed to ASP on 7/11/07; however, he remained at SQ due to the lack of Level 2 SNY beds.  This inmate did not have a treatment plan due to his 3CMS reception center status.  It appeared that he had been followed closely by the psychiatrist with medication adjustments to address his symptoms (delusional thinking and anxiety).  His initial medication concern was regarding treatment with Klonopin; however, this medication was prescribed by medical in conjunction with his medical treatment.  Klonopin was subsequently tapered and discontinued, and he was treated with Buspar on 9/25/07.  There was no documentation of psychiatric follow-up and Buspar increase as was indicated in the psychiatric progress note.  He was seen by a psychiatrist on 10/17/07 in response to a 602; the psychiatrist indicated that the medical record would be provided to the treating psychiatrist for possible order revision (there was no documentation that this actually occurred).

**Inmate D**

This EOP inmate was housed in the EOP reception center unit.  He was diagnosed with Psychotic Disorder, NOS.  He was treated with Paxil 20 mg/day.  His medical record was reviewed at the request of the plaintiffs' attorneys regarding his medication regimen, treatment planning and the need for a higher level of care.

A review of this inmate's medical record indicated a long history of involvement in the mental health program within the CDCR since the mid 1990s.  He had routinely been placed into the 3CMS program during previous incarcerations.  Various past diagnoses

were present in the medical record, including Schizophrenia, Psychotic Disorder, Borderline Personality Disorder and Schizoaffective Disorder. He had intermittently been treated with Navane since that time with periods of sporadic compliance and uncertainty regarding the validity of his symptom presentation.

This inmate was transferred from the county jail to SQ on 7/23/07. He was reportedly not treated with psychotropic medications while housed at the county jail; however, he was treated with Navane and Cogentin during his past incarceration at SQ during early 2007. He was not prescribed these medications at the time of his return to SQ. He was screened on July 25, 2007, and he received his mental health evaluation on that date. He was placed into the 3CMS program in the reception center.

He was seen by the psychiatrist on 8/23/07 when he presented with symptoms that were described as possibly exaggerated. He was restarted on Navane and Cogentin at that time with a change to EOP level of care and indication of the need for further diagnostic clarification. He was admitted to the OHU from 8/31/07 to 9/5/07 due to possible danger to self. He was increased to EOP level of care on 9/12/07. After his release from the OHU, subsequent progress notes described him as presenting with inconsistent behavior when he was not aware that he was observed. It appeared that his Navane was allowed to lapse; he was seen by the psychiatrist on 10/11/07 when he requested treatment with Navane. It appeared that his ninety day order was only filled for thirty days. There was no documentation that he was seen for psychiatric evaluation after this error was noted. The inmate continued to request Navane. There was documentation of group therapy attendance.

An IDTT occurred on 10/24/07 that was attended by the monitor; a recommendation for downgrade to 3CMS was made with continued monitoring off Navane. The inmate angrily left the meeting.

*Findings:*

This inmate had a long and complicated history of mental health treatment as well as disagreement regarding the validity of his symptoms. He was treated with Navane in the past. This medication was recently discontinued due to observations by the mental health staff of inconsistent and conflicting symptom presentation. This inmate presented at the IDTT meeting with flat affect, psychomotor agitation and anger regarding his possible downgrade to 3CMS level of care and discontinuation of Navane.

The EOP reception center treatment plan did not elaborate regarding specific intervention to address this inmate's difficulties.

Based upon his history, it appeared that this inmate functioned adequately at the 3CMS level of care; however, he had received treatment with an antipsychotic medication for many years in the past. Resumption of treatment with an antipsychotic medication, such as an atypical antipsychotic medication should be considered in light of his history and possible tardive dyskinesia. A request was made to the treatment team to closely monitor

this inmate for self injurious or harmful behavior due to his reaction in IDTT meeting to his medication and level of care requests.  Absent from admission to the OHU for possible suicidal ideation, a higher level of care did not appear to be warranted at the time of the visit.

EXHIBIT I
Deuel Vocational Institution (DVI)
October 23, 2007− October 25, 2007

**Inmate A**

This reception center EOP inmate arrived at DVI on 9/5/07; he had been prescribed
Seroquel and Lithium.  Those medications had been ordered on 9/3/07 in the county jail.
The Seroquel order was written for 500 mg at night and 50 mg at night to increase every
day until 1000 mg at night was reached.  He was also apparently prescribed Trilafon 20
mg/day.  His Lithium dosage included Eskalith CR 450 mg in addition to Lithium
Carbonate 300 mg every morning and 600 mg at night.  At 0850 a.m. on 9/6/07, the
physician wrote an order to have the psychiatrist review the unusual Seroquel order as
soon as possible.  On that same day at 12:30 p.m., a "bridging order" was written by the
psychiatrist for Seroquel 500 mg every afternoon.  A review of the MARs revealed that
the inmate received his Eskalith and Lithium carbonate (a total of 1350 mg per day) to
begin on the morning of 9/7/07.  No blood levels of the medication were ordered at that
time.

The inmate was seen on the same day by the case manager when he was identified as a
previous EOP inmate; a call was placed to the POC to obtain additional information.  The
POC noted that the inmate had not been seen there since January 2005; he was not
prescribed psychotropic medications at that time.  He received a mental health screen on
the same day, and the interdisciplinary progress note was completed on the following
day.  This evaluation provided provisional diagnoses of Amphetamine-Induced Psychotic
Disorder and Bipolar Disorder.  He was next seen on 9/17/07 for a reception center EOP
group on problem-solving; the inmate requested a medication review due to medication
side effects.  A treatment plan was developed on the following day.  The inmate was
housed in the SPU because he was a registered sex offender.  The psychiatrist in the
IDTT meeting noted important history including the inmate's extensive drug history, a
history of hypothyroidism secondary to Lithium, and that the inmate was HIV-positive.
He had a history of suicide attempts including hanging (twice) and overdose; the last
attempt occurred during January 2007.  A TSH and full Lithium laboratory protocol were
ordered by the psychiatrist.  Those studies were never drawn, and consequently, there
was never a blood level of Lithium obtained.  The psychiatrist, nevertheless, wrote orders
for Seroquel 500 mg/day, Lithium Carbonate CR 450 mg every morning and Lithium
carbonate 600 mg every evening.

A review of the medical record revealed progress notes indicating involvement in
problem solving and anger management groups.  The inmate was reportedly clinically
stable without medication related concerns.  The last psychiatric progress note dated
9/21/07 noted that the inmate reported that he did not receive his Seroquel.  A return visit
was scheduled for three weeks.  A review of the MAR for September confirmed that the
inmate missed his Seroquel the day prior.  Seroquel was reordered.  During the sixteen
days following arrival, the inmate received one case manager visit, two groups, a mental
health evaluation and treatment plan and two psychiatric contacts.  It was possible that
one of those contacts occurred within the context of an IDTT meeting.

*Findings*:

There was good medication continuity for this inmate who arrived at the facility with verified psychotropic medications.  Treatment planning was inadequate, and diagnostic clarification was indicated.  This inmate was timely identified as requiring EOP level of care at the time of arrival and was placed into the reception center EOP program.  The inmate was screened upon arrival timely; the initial mental health evaluation was, however, not timely.  The appropriate laboratory studies for treatment with Lithium were not performed; laboratory orders were never drawn, and the inmate never had a Lithium blood level.  There was also a failure to order an initial Lithium level on arrival.  It did appear that this inmate was involved in group therapy in the reception center.  Case manager contacts were, however, insufficient.  The inmate history profile was reviewed, and this information conformed closely to the documentation in the medical record.

**Inmate B**

This EOP inmate was housed in the reception center in the SPU.  He arrived at DVI on 9/4/07 from the county jail where he had not been treated with psychotropic medications.  His bus screen was positive for a history of mental health treatment, recent suicidal ideation and auditory hallucinations.  His mental health screening on the following day was remarkable for mental health concerns.  An interdisciplinary progress note was completed on 9/12/07.  Diagnoses included PTSD and Psychotic Disorder, NOS; and the inmate was placed at the EOP level of care.  The inmate was seen by two case managers on the two days immediately following his screening.  He received no further case management visits.  On 9/6/07 the inmate was evaluated by a social worker who placed him in the SPU because he was a gang drop-out.  A history of prior command hallucinations was elicited.  There were three group notes which were informative regarding group activities.  A psychiatric progress note dated 9/18/07 indicated that the inmate had refused medications and had signed a medication refusal form.  A review of the inmate history profile and the medical record did not reveal an IDTT meeting or evidence of treatment planning.  The inmate history profile indicated that the inmate received an interdisciplinary progress note on 9/12/07; however, this document was not located in the medical record.

*Findings*:

This inmate received timely mental health screening and evaluations that were comprehensive and thorough.  Group progress notes also provided detail regarding group therapy issues.  There was no documentation of an IDTT meeting or treatment planning.  Case manager progress notes were sparse in content, and clinical contacts occurred less frequently than was clinically indicated.  It appeared that at least four group sessions were cancelled due to custody reasons.

**Inmate C**

This reception center EOP inmate arrived on 7/13/07 from a county jail.  At that time his bus screen was positive for a history of mental health treatment, including treatment with Librium which was being tapered at the time of the transfer from jail.  The screen also included diagnoses of "severe PTSD, bipolar."  The inmate had tremors at the time of screening.  He also had gastritis, hematemesis, possible Ativan (Librium) withdrawal, and possible toxic encephalopathy.  He was transferred to outside hospital directly from intake on 7/13/07, and he was returned on the same day.  He was treated jointly by mental health and medicine in the OHU from 7/13/07 through 7/19/07.  On 7/14/07 he was seen by the psychiatrist who provided a diagnosis of PTSD with anxiety and hallucinations stemming from childhood sexual abuse.  He was seen by mental health again on 7/15/07; however, the inmate was too agitated for screening.  He received his mental health screening on the following day; the screen was positive.

On 7/30/07, the inmate received a comprehensive mental health evaluation.  A treatment plan was also completed.  He was provided with a diagnosis of severe PTSD, and Adjustment Disorder with anxiety and depression; hydrocephalus with a Holter valve (shunt) resulting in occasional bowel and bladder incontinence was also added as an Axis III diagnosis.  He was prescribed Lexapro and Seroquel at that time; this medication had been initially ordered on 7/22/07.  On 7/25/07 laboratory studies for antipsychotic medications were ordered.  A review of the medical records progress notes revealed consistent individual and group therapy clinical contacts.

On 9/28/07, the inmate was described as presenting with irritability, depressed and anxious mood.  He was referred to see the psychiatrist.  A TCMP chrono indicated that the inmate's pre-release assessment had been completed.  There was no mention of pre-release or re-entry planning in the progress notes.

*Findings*:

The mental health care provided to this inmate appeared to be clinically appropriate and comprehensive.  This was of particular note in light of the inmate's complex co-morbid medical requirements.  Psychotropic laboratory studies were ordered as indicated and were present in the medical record.  The initial mental health evaluation was one week delayed; however, this evaluation was complete and thorough.  Treatment planning was clinically based.  The mental health screening was timely and was administered when clinically feasible.  Although the inmate had been seen by TCMP, there was no other evidence of pre-release planning noted in the medical record.

**Inmate D**

This EOP inmate arrived at DVI on 8/14/07 from the county jail.  He was housed in the RC.  He had been treated with Risperdal, Effexor and Seroquel at the county jail; they were ordered upon his arrival to DVI.  The bus screen was significant for a history of mental health treatment, including EOP level of care and medical concerns; he was

referred to mental health. His mental health screen was completed on 8/15/07, and an interdisciplinary progress note was completed on 8/23/07. A chrono placing him at the EOP level of care was completed on 8/23/07 indicating a GAF of 45. He was seen by the psychiatrist on 8/28/07 as his medications were soon to expire. The inmate was diagnosed with Psychotic Disorder, NOS and Depressive Disorder, NOS.

A review of MARs indicated some missed dosages of medications, but the level of missed dosages did not meet the level of reporting for noncompliance. A summary of the inmate history profile for the six weeks following his arrival revealed consistent case manager contacts and group therapy involvement.

*Findings:*

A review of the information available indicated that there were timely and adequate screening and mental health evaluations. There did appear to be a two day delay in medication continuity following a new medication order. Overall there appeared to be acceptable mental health care provided for this reception center EOP inmate who reportedly had been doing well.

**Inmate E**

The arrival date for this inmate was unclear, but he had been housed in the reception center in the administrative segregation unit since mid-2006. It appeared that he was released from administrative segregation during January 2007. Between then and his entry into the OHU after a cutting incident on 9/6/07, he was seen only periodically by psychiatrists who treated him with medications for Major Depressive Disorder with psychotic features.

The information present in the medical record was somewhat confusing regarding the medications that were prescribed and the course of treatment. The progress notes indicated that the inmate was housed in the OHU for nine days, having been referred to the MHCB. On the day before his release to the reception center, he was described as "...still feeling suicidal…" and "…still awaiting MHCB." He was seen for five-day follow-up after release from the OHU, and he was referred to an IDTT for EOP level of care on 9/19/07. While there was no chrono in the medical record, the inmate presumptively was placed into the EOP at that time. He began EOP group therapy on the following day. There was no mental health evaluation or treatment plan. It appeared that he was being treated for Bipolar Disorder. Also unclear was whether the inmate was being treated with Abilify and Celexa. Progress notes from late September 2007 indicated that the inmate was stable and doing well.

*Findings:*

The mental health care that was provided to this inmate was poor. The documentation in the medical record made it difficult to follow the course of treatment. There was no mental health evaluation or treatment plan located in the medical record. Psychiatric

progress notes and group therapy notes were also not present in the medical record to document such treatments.

**Inmate F**

This 3CMS inmate apparently arrived at DVI during August 2007. He was evaluated through the reception center process on 8/20/07. He was housed in the OHU on 8/29/07, 9/2/07 and 9/23/07. The inpatient records from the 8/29/07 and 9/2/07 placements into the OHU were not located within the medical record.

The documentation regarding the 9/23/07 OHU placement indicated that the inmate was discharged on 9/25/07 with diagnoses including Adjustment Disorder, Polysubstance Abuse and Antisocial Personality Disorder. At the time of his placement into the OHU, he had reported that he "wanted to die."

Suicide risk assessments were completed on 9/6/07 and again on 10/2/07. Five-day follow-up after OHU placement was documented on 9/5/07.

He was seen on 9/7/07 by a clinician, and an IDTT in the administrative segregation unit occurred on 9/25/07. A chrono placing the inmate into the 3CMS program was dated 9/25/07. The medical record did not include a treatment plan.

*Findings*:

This inmate arrived at DVI during August 2007 and was placed in the OHU on three occasions since that time. He was placed into the MHSDS on 9/25/07 following his third OHU placement. The documentation from the two initial OHU placements was not located within the medical record. Furthermore no treatment plan was located in the medical record. The clinical progress notes were well written, typed and readily legible. There was no documentation that the inmate had been considered for higher levels of care.

**Inmate G**

This EOP inmate was referred for mental health assessment on 5/29/07 after he cut his arms with a piece of glass. A chrono dated 5/31/07 indicated that the inmate was being referred for transfer to DMH acute care; however, it was not clear that this referral was completed. Chronos located within the medical record documented that he was receiving 3CMS level of care on 5/31/07. On 6/5/07, he was discharged from the MHCB at CSATF to 3CMS level of care. He was elevated to EOP level of care on 6/15/07, and then he was returned to the 3CMS level of care on 6/27/07.

It was unclear when the inmate was returned to the EOP level of care, but the mental health roster suggested that this occurred on 9/26/07. Of particular note was the mental health roster date that suggested that this inmate "arrived" at the institution on 9/26/07. He had, in fact, been housed at DVI prior to that time. The fact that this inmate's level of

care had fluctuated between EOP and 3CMS levels of care essentially delayed his transfer to an appropriate level of care by several months.

The inpatient record suggested that this inmate was transferred to Kern Valley State Prison for MHCB care; he was discharged on 6/12/07.  He had refused food, water and medications prior to this transfer.  At that time, he was diagnosed with Mood Disorder with psychotic features and Marijuana Dependence.

On 9/9/07 the inmate was again admitted to the OHU after he set his mattress on fire.  He was diagnosed with Mood Disorder and Bipolar Disorder.  On 9/14/07 he was transferred to the MHCB at CSP/Corcoran.  He was described as suicidal with severe agitation, tearing the sink from the wall.  He was eventually given Haldol for agitation.  He remained at CSP/Corcoran for ten days, and he was discharged to DVI in stable condition.  He remained in the OHU at DVI until 9/26/07.  Clinicians there indicated that they believed that the inmate's symptoms were due to a personality disorder rather than a major mental illness.

On 9/20/07, while the inmate was hospitalized at CSP/Corcoran in the MHCB, his case was considered by the Coordinated Clinical Assessment Team (CCAT) committee.  The plan proposed was for the inmate to return to DVI and to refer him to DMH.  An additional recommendation was made to consider a Keyhea order.  There were progress notes of an actual IDTT meeting at DVI.  However, it appeared that the team meeting in regards to the CCAT referral had the same composition of participants as was required for an IDTT meeting.

The inmate was seen by the case manager on 10/3/07 when he was still housed at DVI.  There was no progress note in the medical record, so it was unclear if the case manager was aware of the DMH referral.  It appeared likely that some of the progress notes regarding encounters with this inmate were not in the medical record as there were no progress notes beyond 7/25/07.  No treatment plan was located in the medical record.

*Findings:*

This inmate had a history of several MHCB placements for behaviors that, though likely intended to cause self injury, may or may not have been attempts at suicide.  The medical record lacked the most current progress notes and a current treatment plan.  It would appear that, in this case, the coordinated clinical assessment team process replaced the IDTT in consideration of whether this individual required a higher level of care.  It was unclear whether the recommendation for referral to DMH was executed.


**Inmate H**

This EOP inmate was apparently placed into the OHU on 8/20/07, 9/2/07 and 9/4/07.  At the time of the coordinated clinical assessment team consideration on 9/13/07, the

recommendation was to change the inmate's level of care from 3CMS to EOP and to obtain blood levels for prescribed medications as well as to consider Keyhea.

Progress notes from the OHU placement on 8/21/07 indicated that the inmate was diagnosed with Schizoaffective Disorder. He apparently decompensated during a period of poor medication compliance. He reportedly exhibited psychotic symptoms with disorganization and sexual preoccupation. He was transferred to the MHCB at CSP/ Solano, and he was discharged on 8/30/07. At the time of discharge he was reportedly stable.

The inmate was again admitted to the OHU on 9/2/07 on suicide precautions, and he was discharged on 9/3/07. He was re-admitted on 9/4/07 when he began "acting bizarrely." Progress notes indicated that he "remained stable through admission" and was discharged on 9/6/07.

Subsequent progress notes by the case managers and psych techs indicated that the inmate appeared to be stable up to the time of clinical contacts on 8/16/07. By 8/20/07 he was displaying bizarre behavior including rapid and delusional speech. He was admitted to the OHU where his medication was increased. He was seen for follow on 9/4/07 after an incident of indecent exposure; the inmate was referred to the coordinated clinical assessment team for evaluation of the need for a higher level of care.

*Findings:*

This inmate had decompensated and required placement into the OHU and/or MHCB on at least two occasions during recent months. During this period, he had exhibited bizarre behavior including indecent exposure. Although there was a reference to the inmate being considered by the coordinated clinical assessment team (in the 9/5/07 note), there was no clear record of the details or recommendations resulting from this consideration. This inmate clearly required a higher level of care; his level of care had, in fact, been increased from 3CMS to EOP. There was a need for more active management of this case. It was unclear that there had been consideration of the need for DMH acute or intermediate care or for expedited transfer to an EOP.

It did appear that the inmate had been seen approximately weekly by clinicians and monitored as appropriate by the psych techs. There were no records indicating that the IDTT had considered this case for a higher level of care in light of the repeated OHU admissions.

**Inmate I**

This EOP inmate arrived at DVI on 9/28/07. A chrono dated 11/27/06 placed him into the EOP. Information in his medical record indicated that he had a history of EOP placement, several suicide attempts and a history of a sexually related offense.

414