A mental health evaluation was completed on 8/22/07; this evaluation resulted in a recommendation for placement at the EOP level of care.

He was admitted to the OHU on 8/17/07, and he was discharged on 8/24/07. A progress note written at the time of discharge indicated that he "remained depressed with suicidal ideation." He was characterized as remaining at high risk of suicide and that he "will be referred to MHCB pending DMH acceptance." He apparently did go to ASH for a very brief stay, and he returned on 9/25/07. He was referred for consideration by the CCAT on 9/28/07. There was no information in the medical record from ASH. There were interim treatment plans in the medical record for this inmate.

*Findings:*

The documentation of the care that this inmate received within the OHU was adequate. He was referred to and went to ASH for a brief period and was then returned to DVI. It appeared that he had received adequate treatment while housed at DVI.

**Inmate J**

This EOP inmate was receiving mental health services at the EOP level of care. The medical record indicated that he was placed in the OHU on 6/26/07, 6/29/07 and again on 9/5/07. A chrono placed him at 3CMS level of care on 7/17/07. Another chrono indicated that he was changed to the EOP level of care on 9/17/07.

He was apparently placed into the OHU on 6/26/07 and was diagnosed with Schizophrenia, chronic undifferentiated type. He was admitted to the MHCB at PBSP, and he was reportedly stable upon his return to DVI.

He was re-admitted to OHU on 6/29/07 due to bizarre behavior; he was transferred to the OHU after a sheet tied in a "loop" was found in his room. He was transferred to MHCB, and he was returned after discharge. He was admitted to OHU again on 7/10/07 after returning from MHCB. He was again admitted to OHU on 9/11/07 for suicide precautions. Progress notes on 9/16/07 indicated that he was "grossly psychotic."

A progress note dated 9/12/07 indicated that the inmate was being monitored "while awaiting MHCB" and that he was to be "referred to coordinated clinical assessment team for multiple admissions."

This case was apparently considered by the coordinated clinical assessment team on 9/20/07. The recommendation was to "increase contacts and to "do parole planning;" the progress note further indicated that this inmate was to parole soon. There were no notes indicating that parole planning or any other intervention occurred however.

*Findings:*

There was no indication of an IDTT consideration of a higher level of care in this case despite many OHU admissions. The progress notes indicated that the inmate was in need of a higher level of care for some time. There was no evidence that DVI's IDTT considered this inmate's need for referral to DMH or at least for expedited placement to EOP level of care. The plan of treatment presented indicated that the inmate would be maintained at DVI while awaiting his parole; this treatment option was inadequate for the mental health needs of this inmate. No actual treatment plan was located in the inmate's medical record. There was no evidence that meaningful parole planning had occurred for this inmate.

It appeared that the process for considering cases of multiple admissions at DVI was to refer those cases to the coordinated clinical assessment team for review. This was apparent in all of the cases of multiple OHU admissions that were reviewed. Although this was one approach to insure that cases of multiple OHU admissions were reviewed, the process had not consistently resulted in the timely referral of individuals who obviously required a higher level of care. There was no evidence that a local IDTT routinely considered these cases; in fact, in most of these cases, the need for a higher level of care should have been recognized and some action initiated prior to the time that coordinated clinical assessment team consideration occurred. The local IDTT should consider these cases and act to initiate referrals as clinically indicated.

**Inmate K**

This inmate apparently arrived at DVI on 8/23/07. He was evaluated and diagnosed with Bipolar Disorder with psychotic features and Antisocial Personality Disorder. The case was reviewed by the treatment team on 8/28/07.

Progress notes indicated a history of MHCB placement during prior incarcerations. Prior evaluations also indicated that he had a history of hospitalization at a state facility for individuals with developmental disabilities. He had also been diagnosed with Polysubstance Abuse, Schizophrenia and Major Depressive Disorder. His substance abuse allegedly included the use of inhalants beginning at age ten.

An MH-2 was completed on 10/06/03, and this was the most recent treatment plan located in the medical record.

The inmate was seen by the IDTT on 8/28/07 and was apparently recommended for EOP level of care at that time. He was seen by a psychologist on 9/5/07, 9/13/07, 9/20/07 and 9/28/07 for individual counseling. He was seen by psychiatrist on 9/13/07. He was involved in group therapy three to four days per week since 8/27/07.

Clinical notes were adequate. It appeared that the individual was seen by the treatment team. There was no current treatment plan in his medical record; despite the fact that he was involved in a number of groups as well as individual counseling.

_Findings_:

416

With the exception of the lack of a current treatment plan located within the medical record, it appeared that this inmate received adequate mental health care.

EXHIBIT J
California State Prison at Corcoran (CSP/Corcoran)
January 7, 2008 – January 10, 2008

**Inmate A**

This EOP inmate was housed in the EOP administrative segregation hub. He was diagnosed with Schizoaffective Disorder, bipolar type. He was treated with Geodon 160 mg/day and Zoloft 50 mg/day. This inmate was transferred from SVSP to CSP/Corcoran on 9/14/07. He was receiving EOP level of care at the time of his transfer. He was transferred to the EOP hub upon his arrival to CSP/Corcoran. The ICC note indicated that he had received a twelve month SHU term after assaulting his cellmate and was awaiting transfer to a PSU. He was retained in the EOP at the time of his initial IDTT meeting. Progress notes indicated that he was involved in group therapy; however, he frequently refused out of cell clinical contacts. It appeared that the inmate was essentially stable and was involved in therapy. The most recent psychiatric progress note indicated that the inmate had been refusing laboratory testing for treatment with Depakote. Depakote ER was discontinued at that time (12/28/07) due to complaints of alopecia.

*Findings:*

It appeared that this inmate's medications were ordered at the time of transfer to CSP/Corcoran. There was documentation of administrative segregation pre-placement screening prior to administrative segregation placement. There was also documentation of mental health screening by the psych techs at the time of administrative segregation arrival. Daily psych tech rounds were documented. Documentation was provided indicating that the necessary disciplines were present at the initial EOP IDTT meeting. There was documentation of weekly clinical case manager contacts. There was also documentation of attempts at obtaining laboratory testing for mood stabilizing medications. Documentation of informed consent for treatment with psychotropic medications was present in the medical record.

**Inmate B**

This 3CMS inmate was housed in one of the SHU units. He was diagnosed with Mood Disorder, NOS. He was treated with the following medications: Lithium 1200 mg/day, Seroquel 300 mg/day and Prozac 40 mg/day. This inmate's medical record was reviewed and he was interviewed at the request of the plaintiffs' attorneys regarding possible decompensation.

This inmate was transferred from PVSP to CSP/Corcoran on 7/6/07. He was admitted to the MHCB on the day of arrival after reporting auditory hallucinations and suicidal ideation. He was discharged on the above medications with a diagnosis of Antisocial Personality Disorder. Five-day follow-up was also ordered, and he was discharged to the EOP administrative segregation hub reportedly with an indeterminate SHU term. He was seen briefly in the emergency room after presenting with agitation during ICC; he was evaluated and returned to the hub after evaluation. Progress notes described him as presenting with impulsivity as well as labile, dramatic and irritable mood. He was initially uncooperative with his clinical case manager for out of cell clinical interviews;

419

this improved near the end of the review period. The inmate was also focused on his access to pain medications that had been discontinued by the medical department; it appeared that the clinical case manager did attempt to address this issue. The most recent progress notes indicated that although the inmate remained with residual symptoms, he was reportedly stable on medications.

This inmate was interviewed by the monitor's expert. The inmate presented with depressed mood, significant feelings of hopelessness and frustration. He noted that he had been sporadically compliant with prescribed medications due to his feelings of hopelessness and side effect concerns. He questioned his involvement in a recent altercation with custody, noting that the incident was unnecessary and had resulted in bad relations with custody. He did not appear to exhibit current suicidal ideation or psychotic thinking.

*Findings:*

The appropriate laboratory testing for treatment with Lithium was conducted. There was documentation of clinical five-day follow-up after the inmate was discharged from the MHCB for suicidal reasons. There was also documentation of monthly clinical case manager contacts in the SHU.

This inmate's case was discussed with his clinical case manager and the chief psychologist. Recommendations were made for possible change in level of care to EOP. This inmate requested, and would probably benefit, from more frequent clinical contacts and group therapy. Furthermore, recommendations were also made for psychiatric evaluation due to the inmate's medication noncompliance. It did not appear that he required inpatient treatment at the time of interview; however, he required close monitored due to the severity of his depressive symptoms.

**Inmate C**

This 3CMS inmate was housed in one of the SHU units. He was diagnosed with Delusional Disorder, NOS. He was not treated with psychotropic medications at the time of the visit. His medical record was reviewed, and he was interviewed at the request of the plaintiffs' attorneys regarding his reported prolonged SHU placement and mental health care.

This inmate had been housed at CSP/Corcoran since 2001. He had a history of EOP level of care from 2/05-6/06 when he was downgraded to 3CMS level of care. He was housed in SHU. An IDTT note dated 2/6/07 indicated that the inmate's symptoms were primarily due to a personality disorder and not a major mental illness, and that he would be discharged from MHSDS. He was next seen for clinical contact on 5/4/07 when he was evaluated for alleged sexual misconduct due to Exhibitionism. An IDTT on 5/15/07 in response to this evaluation indicated that the inmate denied the episode of Exhibitionism and that he did not want help from mental health. He was seen by a psychologist on 7/13/07 in response to a staff referral; it was unclear what the reason for this referral was as the chrono was illegible. The psychologist's progress note indicated

that the inmate wanted EOP placement.  A subsequent progress note one week later indicated that the inmate did not meet the criteria for MHSDS inclusion.  He was again seen by the clinical case manager on 8/15/07; the clinician indicated that the inmate would be placed into the 3CMS program.  This change in level of care did not occur at that time.  On 10/11/07 a 3CMS chrono was submitted.  Subsequent clinical case manager notes provided more detailed description of the inmate's symptoms, including the presence of paranoid persecutory delusional thinking.  He continued to refuse psychotropic medications.

This inmate was interviewed by the monitor's expert during the site visit.  The inmate presented with calm and cooperative behavior.  His thinking was delusional with paranoid content; he believed that several unlikely public individuals had conspired to initiate and prolong his incarceration.  He furthermore believed that a machine in a Sacramento hospital was monitoring and broadcasting his thoughts and behavior to others.  He did not present with suicidal ideation at the time of the interview.

*Findings*:

This inmate was removed from the mental health caseload after clinicians thought that he did not have a major mental illness.  Although his removal was within Program Guide limitations, he had a history of probable delusional thinking and treatment noncompliance.  His subsequent, though delayed, return to 3CMS level of care was clinically indicated.

There was documentation of monthly clinical case manager contacts for the inmate while on the MHSDS caseload in SHU.  This inmate refused psychotropic medications; although he would probably benefit from this treatment with medications, he did not meet Keyhea criteria.

This inmate's case was discussed with his case manager and the chief psychologist.  They agreed to provide more frequent clinical contacts and to consider transfer to a higher level of care.  The inmate's lack of insight regarding his illness made treatment with an antipsychotic medication unlikely; however, he required close monitoring to prevent decompensation.

**Inmate D**

This EOP inmate was housed in the EOP administrative segregation hub.  He was diagnosed with Psychotic Disorder, NOS.  An alternative diagnosis of Mood Disorder, NOS was also present in the medical record.  He was treated with Seroquel 300 mg/day and Effexor XR 75 mg/day.

The inmate arrived at CSP/Corcoran from SATF on 10/2/07.  He was receiving EOP level of care at the time of his transfer.  He was given a SHU term for battery on an inmate and was transferred to EOP administrative segregation hub.  His medications were continued upon his arrival to CSP/Corcoran.  Subsequent progress notes indicated that he was involved in group therapy with intermittent attendance.  There was an incident when

he reportedly hoarded medications in his cell, but this was not determined to be a suicidal gesture; he had a history of similar hoarding behavior. He was followed consistently by the clinical case manager. On 12/28/07 he was admitted to the MHCB after reporting suicidal ideation. He was hospitalized there from 12/28/07-1/3/08. After his discharge, he was treated with Remeron; he did not exhibit suicidal ideation at the time of clinical contact. An IDTT meeting note on 1/8/08 indicated that psychological testing would be considered for diagnostic clarity. He was maintained in the EOP.

*Findings*:

Although medications were ordered at the time of arrival at CSP/Corcoran, the MARs reflected possible delay in delivery of ordered medications. There was documentation that administrative segregation pre-placement screening was performed. There was also documentation of daily psych tech rounds and weekly clinical case manager contacts. The IDTT meetings included the necessary participants. Although there was no documentation of five-day follow-up after discharge from the MHCB, this was probably due the close proximity to the site visit.

**Inmate E**

This 3CMS inmate was housed in the administrative segregation unit. He was diagnosed with Major Depressive Disorder with psychotic features in remission. He was not treated with psychotropic medications at the time of the visit.

This inmate was transferred from CIM to CSP/Corcoran on 5/23/07. He was receiving 3CMS level of care at the time of his transfer. At his initial IDTT, it was reported that the inmate was not interested in group therapy, and that he was stable. He was initially placed into the Chronic Infectious Disease (CID) program; it appeared that he was transferred to the administrative segregation unit on 7/4/07 after receiving an RVR for indecent exposure. The evaluation that was completed on 7/13/07 did not provide a diagnosis of Exhibitionism. He was followed consistently by the clinical case manager and was reportedly stable. He received another RVR for indecent exposure on 9/16/07.

On 12/5/07 a psychiatric progress note indicated that the inmate requested removal from the 3CMS program, and that he would not be eligible until May 2008 as he was last treated with psychotropic medications during November 2007.

*Findings*:

There was documentation that administrative segregation pre-placement screening was performed. There was not documentation of CCI or psychiatry presence in the administrative segregation/sexual misconduct IDTT meeting. Daily psych tech rounds were documented as were weekly clinical case manager contacts; however, progress notes indicated that all contacts occurred at cell front. The inmate's treatment plan did address relevant clinical issues, such as his treatment refusal.

**Inmate F**

This EOP inmate was housed in the EOP housing unit in general population.  He was diagnosed with Depressive Disorder, NOS.  He was treated with Remeron 15 mg/day and Paliperidone ER 6 mg/day.

This inmate was transferred from NKSP to CSP/Corcoran on 9/24/07.  He was receiving EOP level of care at the time of transfer.  Progress notes indicated that he was seen consistently by the clinical case manager and psychiatrist.  He was also involved in group therapy activities.  He did occasionally report auditory hallucinations and possible medication side effects that were addressed by the psychiatrist.

*Findings:*

There was documentation of medication continuity upon arrival to the facility.  The initial IDTT included the necessary participants; an IDTT on 12/26/07 did not document custody presence.  There was documentation of weekly clinical case manager contacts as well as consistent psychiatric follow-up.

**Inmate G**

This EOP inmate was housed in the EOP housing unit in general population.  He was diagnosed with Psychotic Disorder, NOS.  He was treated with Geodon 120 mg/day, Remeron 15 mg/day and Benadryl 50 mg/day.

This inmate was transferred from RJD to CSP/Corcoran on 12/5/07.  He was placed into the EOP while housed at RJD where he was treated with Seroquel and Effexor.  The inmate history profile and progress notes indicated that he was followed consistently by the clinical case manager and was involved in recreational activities with the recreational therapist.

*Findings:*

There was documentation of weekly clinical case manager contacts.  There was also documentation of some group therapy involvement with the recreational therapist; however, the inmate had not yet been assigned to groups.

A review of the MAR and physician medication orders did not clarify whether medications were continued at the time of transfer to CSP/Corcoran.  He was evaluated by the psychiatrist six days after his arrival.

**Inmate H**

This EOP inmate was housed in the EOP housing unit in general population.  He was diagnosed with Mood Disorder, NOS.  He was on Keyhea due to dangerousness to self; the Keyhea order will expire 3/31/08.  He was treated with Risperdal LA 37.5 mg every 2

weeks, Risperdal 3 mg/day, Cogentin 2 mg/day, Depakote ER 1000 mg/day and Remeron 30 mg/day. He was also classified as DDI.

This inmate was transferred from RJD to CSP/Corcoran on 3/22/06. He was receiving 3CMS level of care and was housed in the administrative segregation unit during early 2007. Progress notes indicated that the inmate refused out of cell contacts and was reportedly stable. There was discussion of release to general population during May 2007, despite his requests to remain in administrative segregation due to safety concerns. It did appear that the inmate remained in administrative segregation. He was seen by the psychiatrist on 6/13/07 when it was noted that he was consistently refusing medications. His medications were discontinued at that time.

The medical record indicated that this inmate had multiple admissions to the MHCB including the following dates: 8/23/07-8/27/07, 8/27/07-9/18/07, 9/19/07-9/20/07, 9/24/07-10/4/07, and 10/7/07-10/16/07. These admissions were preceded by suicidal ideation and/or gestures and at times auditory hallucinations. While in the MHCB, he was placed on Keyhea for danger to self after cutting his wrist and reopening the wounds on the day of discharge from the MHCB. During his last MHCB admission, he was upgraded to EOP level of care. He was discharged to the EOP. Subsequent progress notes indicated that he showed significant improvement with more cooperative behavior, improved treatment compliance and resolution of suicidal behaviors.

*Findings*:

There was documentation of weekly clinical case manager contacts when the inmate was in 3CMS administrative segregation; however, all of the contacts occurred at cell front. This was of concern as the inmate was described as stable, and then subsequently was admitted to the MHCB on several occasions.

This inmate was appropriately upgraded to EOP level of care with resulting increase in treatment and decrease in symptoms. There was documentation of weekly EOP clinical case manager contact in the administrative segregation unit. There was also documentation of five-day follow-up after discharge from the MHCB when indicated.

The appropriate laboratory testing for treatment with Depakote was conducted. There was also documentation of pre-release needs assessment by TCMP on 1/4/08. His parole date was 2/2/08.

## Inmate I

This 3CMS inmate was housed in the administrative segregation unit. He was diagnosed with Psychotic Disorder, NOS. He was treated with Remeron 15 mg/day, Seroquel 300 mg/day and Benadryl 50 mg/day.

This inmate was transferred to CSP/Corcoran from SVSP on 5/18/07 for SHU placement. Progress notes indicated that he was seen consistently by the clinical case manager;

however, he consistently refused out of cell clinical contacts. He was reportedly stable. His SHU term expired on 11/14/07. It appeared that he remained in the SHU unit until 12/27/07 when he was seen by the administrative segregation clinical case manager. After that time, he was seen weekly by the administrative segregation clinical case manager.

*Findings:*

The SHU IDTT meeting did not consist of the necessary participants (lack of psychiatrist). It did appear that the treatment plan and IDTT addressed the inmate's lack of cooperation with out of cell clinical contacts. There was documentation of weekly psych tech rounds. There was also documentation of monthly clinical case manager contacts in the SHU, although more than half occurred at cell front.

There was not documentation of weekly clinical case manager contacts when the inmate was in the 3CMS administrative segregation unit. It did not appear that he was immediately identified as being on administrative segregation status after his SHU term expired, resulting in lapses in psych tech and clinical case manager administrative segregation contacts.

**Inmate J**

This 3CMS inmate was housed in the administrative segregation unit. He was diagnosed with Major Depressive Disorder, recurrent in partial remission and Psychotic Disorder, NOS. He was treated with Prozac 30 mg/day and Seroquel 300 mg/day.

This inmate was transferred from CIM to CSP/Corcoran on 3/19/07. He was initially on SHU status and was housed in one of the SHU units. He was transferred to administrative segregation status during late July 2007. Progress notes indicated that he was essentially stable, but with situational stressors.

*Findings:*

The SHU IDTT meeting did not include documentation of CCI presence at the meeting. There was documentation of weekly psych tech rounds in SHU and daily rounds in administrative segregation. There was documentation of psych tech administrative segregation screening upon arrival to that unit.

The inmate was seen consistently by the clinical case manager in SHU, but not always on a monthly basis. There was documentation of weekly clinical case manager contacts when the inmate was in 3CMS administrative segregation; however, most of the contacts occurred at cell front.

EXHIBIT K
California Substance Abuse Treatment Facility (CSATF)
November 6, 2007 – November 8, 2007

Inmate A

This 3CMS inmate arrived at CSATF on 3/14/07 and was housed on the G yard, a Substance Abuse Program (SAP) yard. The intake evaluation indicated a history of psychotropic medication treatment as well as a history of numerous incarcerations. He had previous treatment with Seroquel and Effexor, and these medications were continued upon his arrival at CSATF.

His first contact with a case manager at CSATF occurred on 4/12/07 followed by contacts on 5/14, 7/16, 9/7, and 10/5/07. He was evaluated by a psychiatrist on 3/31, 4/12, 8/17, 9/14 and then by tele-medicine on 10/11/07.

*Findings:*

This inmate was appropriately placed into and maintained in the 3CMS program. He was, however, not evaluated during the first fourteen days of his arrival in the facility. His first several encounters with case managers and psychiatrists were conducted by different clinicians with insufficient continuity or appreciation of previous evaluations or assessments. There was improvement in continuity of care during the months prior to the visit. This observation echoed a concern frequently voiced by inmates during the group discussions during this monitoring visit; they reported that they were rarely seen by the same case manager or psychiatrist.

Problems were also noted regarding medication management and psychiatric assessment. There was a two week lapse in continuity of one medication. A progress note indicated that the psychiatrist was discontinuing Seroquel, which was prescribed at 200 mg every morning and 600 mg at night, because the medication was being utilized primarily as a sleep medication. This was of concern because the Seroquel was prescribed twice per day rather than at night time, and that the medications were in fact renewed. There were also lapses in psychiatric contact.

Some of the case manager progress notes were generic in nature; this made it difficult to determine the actual focus of treatment. Treatment goals were not measurable. Although the inmate was in a substance abuse treatment program and his prior history indicated substance abuse difficulties, the inmate was not provided with a substance abuse diagnosis. Furthermore there was not documentation that this issue was a focus of his mental health treatment or that coordination with the substance abuse treatment providers occurred.

**Inmate B**

This 3CMS inmate was housed on the G yard, a SAP yard. He was on Level II custody status and was scheduled for parole on 11/16/07. He arrived at CSATF on 7/30/07. Past diagnoses included Schizophrenia and Bipolar Disorder.

The inmate was seen for intake assessment on 8/2/07. An IDTT was conducted on 8/4/07. He was seen by a case manager on 9/18/07 and again on 10/24/07. The inmate was seen by a psychiatrist via tele-medicine on 8/14/07 when his medications were discontinued. He was seen by a psychiatrist on 8/17/07; the inmate was continued off medications with follow-up scheduled for ninety days.

The treatment plan that was developed on 8/2/07 focused upon sleep disturbance; there was no discussion of sleep disturbance as a possible manifestation of depression. Medication compliance was noted as the main focus of treatment to achieve this goal.

*Findings*:

This 3CMS inmate was seen clinically at least every ninety days. The treatment plans did not note measurable goals and were not sufficiently connected to identified clinical issues. Of note was the mention of sleep disturbance and treatment with medications; however, medications were discontinued without change in the treatment plan or identification of the need for intensive monitoring to prevent recurrence of the inmate's chronic mental illness without medications. Furthermore there was no discussion of the rationale for removing the diagnosis of Schizophrenia.

There was evidence of pre-release planning efforts and acknowledgement at the time of intake of upcoming parole.

**Inmate C**

This 3CMS inmate arrived at CSATF on 4/13/07 from RJD. He had a diagnosis of Schizophrenia, paranoid type; depressive symptoms were also noted for which the inmate had been treated with Depakote, Risperdal and Remeron. An initial mental health screening was conducted three days after arrival. At that time, the clinician noted a history of social anxiety and alcohol abuse. Based upon the suicide risk assessment, clinicians determined that the inmate presented with no significant risk for self-harm; this assessment was dubious given a number of static risk factors, including feelings of worthlessness and a history of poor impulse control. A comprehensive mental health evaluation indicated that the inmate had a long history of multiple psychiatric hospitalizations for psychosis and a history of substance abuse.

An IDTT meeting was conducted on 4/27/07. The treatment plan noted anger as a major focus of treatment without explanation of the rationale for this focus. The treatment intervention mentioned was to place the inmate on a waiting list for an anger management group. There was good assessment of post-release needs, and the plan was comprehensive. An IDTT meeting on 6/4/07 indicated that the inmate had been placed into the administrative segregation unit for safety concerns.

The inmate was followed consistently by the case manager. Progress notes addressed his report of social anxiety and depression, as well as his placement on a waiting list for a

depression group. He was also followed consistently by the psychiatrists. These contacts addressed similar issues that were addressed by the case managers.

*Findings:*

This inmate was seen frequently by the psychiatrists and the case managers. Some treatment plans were excellent in that they delineated appropriate goals which were measurable and included multimodal treatment; however, there were discontinuities among clinicians in diagnosis and treatment approaches. Some of the treatment plans were more generic and less related to primary problem areas.

**Inmate D**

This 3CMS inmate arrived at CSATF on 6/1/07. He was provided with the following diagnoses: Schizophrenia, paranoid type, Bipolar Disorder and Alcohol Dependence. He was treated with Seroquel. He was initially evaluated by a mental health clinician on 6/7/07, approximately six days after arrival. The initial IDTT meeting occurred on 6/8/07; this meeting included the necessary participants. The treatment plan noted "no weaknesses" which was not plausible. This plan, however, did have measurable goals which were related to the inmate's diagnoses. This inmate was placed on waiting lists for groups.

He was seen consistently by the case manager as well as the psychiatrist. Some of the case manager progress notes addressed treatment goals, but some of the notes did not address specific treatment goals.

*Findings:*

This 3CMS inmate was seen within, or at times exceeded, Program Guide requirements for frequency of both psychiatric and case manager contacts. The treatment plans contained appropriate target goals; however, assessment of progress towards these goals was not sufficiently evident in the content of the subsequent clinical progress notes. There was good documentation of parole discharge planning.

**Inmate E**

This 3CMS inmate was provided several diagnoses including the following: Depressive Disorder, NOS, Schizoaffective Disorder and PTSD (provisional). He was treated with Zoloft and Zyprexa. He was seen regularly by psychiatry from June-November 2007; prior to June, 2007, there was a lapse in psychiatric contact between 1/9/07 and 6/27/07.

During his psychiatrist assessment on 6/27/07, the inmate exhibited overt psychotic symptoms, including paranoia and auditory hallucinations. Some of these psychotic symptoms remained present and were described at the next psychiatric assessment on 8/26/07. By 11/2/07 some improvement was reported. There was an appropriate plan for

429

monthly psychiatric evaluation during a period of Seroquel tapering. Progress notes documented that the inmate was followed consistently by the case managers.

*Findings:*

The inmate was placed at the required level of care in the 3CMS program. He was appropriately seen for frequent psychiatric follow-up during periods of medication adjustment and psychiatric instability. The inmate's treatment was not guided by meaningful treatment planning. Although the focus of case management contacts appropriately addressed depressive symptoms, this was to the exclusion of other serious symptoms of paranoia and hallucinations.

**Inmate F**

This 3CMS inmate was diagnosed with Schizoaffective Disorder, bipolar type, Opioid Dependence, Antisocial Personality Disorder. He had a history of treatment with Zyprexa for mood instability and psychosis, as well as a suicide attempt nine years prior. On 7/12/07 the inmate was evaluated by the MHCB staff after expressing suicidal ideation. The MHCB staff described the inmate's suicidal ideation as a "ploy" to avoid a physical altercation, and he was provided with a diagnosis of an Adjustment Disorder. A suicide risk assessment was completed. The inmate was admitted to the MHCB on 7/12/07 despite concerns regarding the validity of his presentation, and he was discharged to the 3CMS level of care on 7/16/07.

The inmate was seen for five-day follow-up after his discharge from the MHCB. The medical record had evidence of pre-release planning and case management contacts on 4/26/07; there was a progress note indicating that a treatment plan was completed, but no actual treatment plan was located in the medical record. There was a lapse in case management contacts from 5/16 -9/20/07. Subsequently clinical contacts occurred as required.

*Findings:*

This 3CMS inmate was evaluated by the case managers and psychiatrists as required by the Program Guide. He also received timely five-day follow-ups after his discharge from the MHCB. While there was a progress note indicating that a treatment plan was completed during April 2007; there was no corresponding treatment plan located in the medical record. The medical record documented appropriate suicide risk assessment prior to MHCB admission, as well as pre-release planning.

EXHIBIT L
Pleasant Valley State Prison (PVSP)
November 15, 2007 – November 16, 2007

**Inmate A**

This inmate's case was reviewed at the request of the plaintiffs' attorneys regarding possible decompensation due to inadequate mental health care. At the time of the site visit, the inmate was housed in the MHCB. He was admitted to the MHCB on 10/3/07 following a period of decompensation that included symptoms of social withdrawal. Prior to his MHCB hospitalization, the staff had attempted to see the inmate for weekly clinical contacts; however, he refused contacts for several months. The clinical staff did document their communications with the custody housing staff regarding the inmate's behavior. The inmate was eating and showering. The mental health staff documented their belief that the inmate did not meet the criteria for a Keyhea order. Ultimately, the inmate was observed throwing his food on the ground and then eating it. It then took almost two weeks for him to be admitted to the MHCB after those events.

After he was admitted to the MHCB, the staff did review his case for a Keyhea order; however, there was reportedly insufficient documentation to support pursuing such an order. The inmate continued to refuse medication or to interact with the treatment team. He had, however, begun to interact in an extremely limited fashion with some of the female staff. At the time of the visit, a referral to DMH ICF level of care had been pursued.

_Findings_:

Although the clinical staff attempted to monitor and engage this inmate prior to his MHCB hospitalization; this hospitalization was delayed, and the inmate was allowed to decompensate for several months prior to his admission to the MHCB. Referral to DMH ICF level of care was clearly indicated for this inmate due to his continued resistance to therapeutic interventions and medication refusal.

**Inmate B**

This 3CMS inmate arrived at PVSP on 10/4/04. He was diagnosed with Depressive Disorder, NOS and Alcohol Dependence. He had not been prescribed psychotropic medications during the monitoring period. This inmate was primarily provided psychiatric contact via telemedicine. The medical record reflected numerous canceled appointments due to technical difficulties that were not reflected in the telemedicine log. The last treatment plan was completed during April 2005, and there were treatment plan updates that were completed yearly. The last update was completed during March 2007 which was generic in content with pre-printed forms that did not provide individualized treatment recommendations.

_Findings_:

This inmate was not provided with adequate treatment planning. It was unclear if the IDTT had met to discuss the inmate's long-standing stability without medications and whether continued mental health services were indicated.

**Inmate C**

This 3CMS inmate had been housed at PVSP since 2004. He had Hepatitis C. He was also diagnosed with Bipolar Disorder and was prescribed Lithium 900 mg/day. The last full mental health evaluation was completed during 2004, and the most recent update was completed during May 2006. There was a treatment plan completed during May 2007. That treatment plan changed the inmate's diagnosis to Mood Disorder, NOS without providing justification. This inmate was generally seen by the case manager every ninety days.

*Findings:*

The appropriate laboratory testing for treatment with Lithium was performed. Informed consent for psychotropic medications was documented. No suicide risk assessment was documented in the medical record. The treatment plan should have documented the rationale for changes in diagnosis.

**Inmate D**

This 3CMS inmate was diagnosed with Bipolar Disorder, NOS. He was determined to have a GAF of 65. He arrived at PVSP during April 2007. This inmate was prescribed Remeron 30 mg/day, Risperdal 2 mg/day and Lithium 1200 mg/day. Laboratory tests were ordered by a psychiatrist on September 17, 2007. However, it appeared that the results were never noted by the psychiatrist, and there were no progress notes indicating that psychiatry had reviewed the results.

A treatment plan completed during May 2007 listed diagnoses of Bipolar Disorder and Impulse Control Disorder. The IDTT consisted of a psychiatrist, the case manager, and the inmate. The treatment plan was pre-printed and minimal in content. The inmate was seen by his clinical case manager in accordance with Program Guide requirements.

*Findings:*

The appropriate laboratory testing for treatment with Lithium was performed; however, it was unclear if the psychiatrist had reviewed the laboratory results. Informed consent for psychotropic medications was documented. The IDTT meeting did not include the necessary participants. The treatment plan was generic, pre-printed and not individualized. Although clinical contacts occurred at the required frequency, some of the progress notes were illegible, making an assessment of the quality of the treatment provided impossible.

EXHIBIT M
Avenal State Prison (ASP)
November 28, 2007 – November 30, 2007

**Inmate A**

This 3CMS inmate arrived at ASP on 10/29/07, when he was diagnosed with Dysthymic Disorder. On 10/30/07 the following medications were discontinued: Seroquel 200 mg/day and Prozac 20 mg/day. There was, however, no documentation indicating that the inmate was actually seen by the psychiatrist at the time of this medication discontinuation. The staff referred him to mental health on 11/7/07. The inmate was seen by a different psychiatrist on 11/7/07. He was not seen by his case manager until 11/15/007. On 11/19/07, yet another psychiatrist ordered the following medications: Prozac 40 mg/day, Benadryl 50 mg/day and Abilify 10 mg/day. There was also no documentation that the inmate was actually seen by the psychiatrist at that time. It was not clear what precipitated the prescribing of those medications. The inmate was finally seen in IDTT on 11/27/07, and it appeared that all required members were in attendance.

*Findings:*

The treatment that this newly arriving inmate received was not in accordance with Program Guide. There was a delay in initial mental health contact despite this inmate's new arrival status. There was poor continuity of psychiatric care provided, and the inmate was seen by several different psychiatrists with discontinuation and changes in prescribed medications. Of significant concern was that the UHR lacked documentation indicating that this inmate was seen by a psychiatrist before the psychotropic medications were prescribed. There was also very poor documentation of the clinical rationale for medication changes and discontinuations.

**Inmate B**

This 3CMS inmate had been housed at ASP since 2005, and he was provided with a diagnosis of Intermittent Explosive Disorder. He was prescribed Zoloft 200 mg/day. He was seen consistently by a clinical case manager and a psychiatrist; however, the documentation of these contacts suggested that they were minimal in nature with an emphasis on medication management, even for the clinical case manager. The treatment plan was current; however, it was generic in content and did not support the diagnosis given to this inmate.

*Findings:*

There was documentation that the inmate was seen by his clinical case manager and psychiatrist as per the Program Guide. Case manager contacts were however, limited in content and focused upon aspects of medication management. The treatment plan was not specific to the inmate's treatment requirements. It was unclear how the minimal treatment plan and brief clinical case manager contacts adequately addressed the inmate's clinical symptomatology.

435

**Inmate C**

This 3CMS inmate arrived at ASP on 9/26/07.  He was seen by a psychiatrist on 9/28/07 when he was prescribed Remeron 15 mg/day and Depakote ER 1000 mg/day.  He was diagnosed with an Adjustment Disorder with Depressed Mood.  There was no placement chrono in the medical record to indicate if the level of care was due to medical necessity.  The treatment plan (dated 10/2/07) did not provide clarification regarding this issue.

The inmate was seen by the clinical case manager on 10/1/07.  An IDTT meeting was held on the following day, and all of the necessary attendees appeared to be present.  The treatment plan was generic in nature and did not address the nature of the diagnosis and how it related to the level of care.

_Findings_:

This inmate was seen in accordance with the Program Guide for new arrivals.  His treatment plan was minimally adequate.  The necessary participants were present at the IDTT meeting.

**Inmate D**

This 3CMS inmate arrived at ASP on 11/5/07 based upon MHTS information.  A current bus screen was not located in the medical record.  The arrival date in the MHTS appeared to be in error as there was documentation that the inmate was first seen by the clinical case manager as a new arrival on 9/27/07.  He was seen by a psychiatrist on 9/28/07.  Another psychiatrist saw him on 10/2/07.  An IDTT was also held that day, and all required attendees appeared to have been present.  A treatment plan was completed, and the inmate was provided with a diagnosis of Depressive Disorder, NOS.  The inmate was seen again by the psychiatrist on 10/23/07.  He was prescribed no psychotropic medications.

This inmate was also interviewed by members of the monitoring team, and he appeared to be responding to internal stimuli.  He laughed inappropriately and appeared to have difficulty focusing upon the discussion around him.  His case was referred to mental health supervisory staff for follow-up.

_Findings_:

It could not be determined if this inmate was seen in accordance with the Program Guide for new arrivals because his actual date of arrival could not be determined.  The treatment plan was minimal and generic.  Documentation of clinical case manager contacts lacked necessary therapeutic focus.  Due to his presentation during the site visit, concerns were noted regarding his diagnosis, medication treatment and the need for improved monitoring and stabilization.

**Inmate E**

This 3CMS inmate arrived at ASP on 7/30/07. He was seen by a clinical case manager on 8/2/07 and by a psychiatrist on 8/7/07. On 7/31/07, a physician discontinued his previous psychotropic medications which included Risperdal 3 mg/day, Buspar 60 mg/day and Vistaril 150 mg/day. It appeared that these medications were discontinued in the absence of clinical contact as there was no documentation of clinical contact in either the medical record or the MHTS. At the time of the visit, the inmate was prescribed Buspar 60 mg/day and Vistaril 150 mg/day. An IDTT meeting was held on 8/7/07 by a different clinical case manager than the one who conducted the initial evaluation. Despite that, all other required attendees appeared to be present. The treatment plan was minimal in nature. He was seen by his original clinical case manager in October for his quarterly clinical case manager contact. Documentation of this contact indicated that it was minimal in content.

This inmate reported during a group interview with members of the site visit team that he had received a disciplinary for not going to pill call. His central file was reviewed, and he had in fact received a RVR as well as a 128 chrono for failure to appear at pill call. He explained that his work detail and pill call times conflicted, and that he was forced to choose between the two. He was clearly very anxious about the situation and had submitted a request to have his medications discontinued as a result. The inmate reported that he had submitted a request to be seen one month prior but had still not been seen. This was confirmed by a review of the MHTS which indicated he had submitted a request to see psychiatry on 11/1/07 and had no pending appointment. The mental health supervisory staff was informed.

*Findings*:

Some problems were noted regarding the care provided to this inmate. Psychotropic medications were discontinued without documentation of clinical contact. This appeared to be a facility-wide pattern, and may confirm staff reports that the prior health care manager refused to honor other CDCR institutional providers' prescriptions. The inmate was not seen in accordance with the Program Guide requirements regarding timely response to referrals/requests. Finally this inmate's care and mental status were negatively impacted by the facility's systemic conflict with work and pill call times, and for the institution's decision to give disciplinary sanctions to inmates for not appearing for their medications.

**Inmate F**

This inmate arrived at ASP on 10/9/07. His status upon arrival appeared to be uncertain. He was included in the 3CMS program. However, the MHTS indicated that he was a general population inmate. There was no placement chrono located in the medical record. Despite the confusion regarding his level of care, this inmate was seen by his clinical case manager on 10/18/07. He was seen by a psychiatrist on 10/24/07; an IDTT meeting also occurred on that date. The IDTT meeting and psychiatric contact occurred

late.  The delay in psychiatric contact date was especially disturbing as this inmate had been referred to psychiatry for medication non-compliance on 10/14/07.  It appeared that this delay may have resulted from the referral being initially routed to the clinical case manager rather than to the psychiatrist.  The mental health supervisory staff indicated that this procedure had been changed, so that referrals were now going directly to the prescriber.

This inmate's medications could not be identified at the time of the visit.  The chart was in complete disarray; there were no MARs or physician orders (that coincided with contact dates) located in the medical record and progress notes.  The MHTS reflected that the inmate was again referred for medication non-compliance on 10/29/07.

*Findings:*

This inmate's care was likely negatively impacted by the poorly maintained medical record and conflicting data in the MHTS.  Due to the condition of the medical record, it was difficult to adequately assess the care provided to this inmate.  Delays in psychiatric follow-up for medication noncompliance were also noted.

**Inmate G**

This 3CMS inmate was housed at ASP since 2005.  He was diagnosed with Bipolar I Disorder, single manic episode; he had not been prescribed psychotropic medications since 4/ 24/07.  He had previously been prescribed Wellbutrin 400 mg/day and Celexa 20 mg/day.  The inmate had been referred during March, April and May of 2007 for medication non-compliance.  It was unclear why he would have been referred for non-compliance when his medications had been discontinued.  Data available through the MHTS conflicted with documentation in the medical record; specifically, dates entered into the MHTS were not consistent with dates that psychiatrists had actually completed contacts.  These discrepancies were not adequately explained by the supervisory staff.

The clinical case manager began attempting to remove the inmate from the MHSDS in early September 2007, despite the lack of a six-month period of remission with no medication.  The inmate refused to attend the IDTT meeting.  The medical record did not include documentation justifying the clinical case manager's decision to reduce the level of care.  During a group interview, the inmate acknowledged to site team members that he refused to attend the IDTT meeting because he did not want to be removed from the MHSDS.  The MHTS indicated that the inmate was the subject of an IDTT meeting on 10/30/07; however, no treatment plan or other documentation could be located in the chart.  The MHTS also indicated that a clinical case manager contact had occurred on 11/26/07; however, there was no documentation present in the medical record.  According to the MHTS, the appointment was completed despite the fact that the inmate refused to be seen.  It was unclear how the appointment could have been considered completed.

438

*Findings*:

Concerns were noted regarding the care provided to this inmate. There appeared to be problems with the information present in the MHTS; examples were noted of incorrect or absent information regarding clinical contacts. The system for monitoring medication noncompliance also appeared to be problematic as this inmate continued to be referred after his medications had been discontinued. It also appeared that there was some misunderstanding with the clinical case manager regarding the criteria for removal from the MHSDS and the documentation needed for such a removal.

**Inmate H**

This inmate was placed at the EOP level of care on 10/17/07. He was scheduled to parole on 12/10/07. A review of the medical record indicated that he had been receiving weekly clinical case manager contacts in accordance with Program Guide, and that those contacts appeared to be clinically focused. There was no documentation of pre-release planning in the medical record. The inmate appeared to be somewhat anxious regarding his release at a group interview during the visit.

He was provided a diagnosis of PTSD and Psychotic Disorder, NOS. He was seen in IDTT on 10/10/07. The inmate appeared to be very delusional with limited insight, as demonstrated by his refusal of psychotropic medications. He expressed some delusional beliefs about medications and attributed any difficulties in functioning to his "PTSD." Despite his refusal to take psychotropic medications, he was evaluated by a psychiatrist.

*Findings*:

This inmate was seen in accordance with the EOP clinical contact requirements as outlined in the Program Guide. He was, however, scheduled to parole within 60 days of placement at the EOP level of care but had not received any substantive pre-release planning. The treatment plan was generic in nature and did not address the inmate's individual clinical needs.

**Inmate I**

This inmate arrived at ASP during August 2007 and was placed into the EOP on 11/14/07. A current treatment plan was present in the medical record; although it was not specific for the inmate's treatment requirements. The medical record indicated and the inmate confirmed that he had been seen weekly by the clinical case manager and monthly by the psychiatrist. These contacts appeared to be substantive in nature. This inmate expressed significant anxiety and fearfulness of harm by other inmates. He expressed concern that he and other vulnerable inmates shared a yard with predatory inmates. He was also very angry about having been placed into the 3CMS program at his prior institution prior to transport to ASP. He was actually pending transfer back to that same facility as a result of his placement at the EOP level of care. The inmate appeared quite delusional and appropriate for EOP level of care.

*Findings:*

This inmate was seen in accordance with Program Guide for EOP clinical contacts. It appeared from the medical record that he had been inappropriately downgraded to 3CMS level of care at his prior institution.

**Inmate J**

This inmate was placed into the EOP on 10/19/07. He was housed on the sensitive needs yard. There was a timely treatment plan in the medical record that was minimally adequate, and an IDTT was held with all of the required participants. The inmate was upset about having been placed into the EOP. He had little insight regarding his mental illness and feared that his EOP status would result in movement to another institution. He also feared that an institutional move would jeopardize his safety. According to the medical record and the inmate, he was seen weekly by the clinical case manger since being upgraded to the EOP level of care. This inmate had a February 2008 release date. There was no documentation of any pre-release planning in his medical record.

*Findings:*

This inmate was seen by the clinical case manager on a weekly basis since placement at the EOP level of care. There was a lack of documentation of pre-release planning for this EOP inmate with an upcoming release date. The treatment plan was not specific for this inmate's individual treatment needs.

**Inmate K**

This inmate had been housed at ASP for two years. He was listed on the EOP roster; however, the medical record contained no documentation (treatment plan or placement chrono) to confirm placement into the EOP level of care. There was one clinical case manager contact that appeared to be a weekly contact in November. This inmate was very upset regarding the mental health care that he had received. He presented with symptoms of a thought disorder and delusional thinking. The inmate had apparently been forcibly medicated in the past (which occurred, according to the medical record, two years before his review) and he connected his EOP level of care to the psychiatrist's ability to forcibly medicate him. He was extremely anxious that he might be forcibly medicated in the future. He refused to sign his parole papers because he did not want to participate in mental health aftercare. Consequently, his parole date was delayed. He had no insight into his mental illness and did not trust the mental health staff, believing that his EOP level of care was a punishment. The medical record indicated that he had been seen weekly by the clinical case manager and monthly by the psychiatrist. The medical record further documented that the clinical case manager was uncertain as to how to address the inmate's concerns and agitation.

*Findings*:

This inmate was seen for clinical contact by the clinical case manager and psychiatrist in accordance with Program Guide for EOP level of care.  He appeared to be receiving care at the appropriate level of care.  It appeared that the treatment team should address the inmate's treatment resistance, pre-release planning and paranoia with interdisciplinary treatment planning and a treatment plan update.

EXHIBIT N
Salinas Valley State Prison (SVSP)
October 1, 2007 – October 4, 2007
October 26, 2007

**Inmate A**

This EOP inmate was in housed in administrative segregation beginning April 2007.  He had a SHU term with a minimum eligible release date of 10/2/07.  He was serving a four year term; his EPRD was 10/24/07.

Several diagnoses were provided for this inmate.  These diagnoses included Mood Disorder, NOS, Bipolar I Disorder and Antisocial Personality Disorder.  During June 2007 he was treated with Seroquel, Wellbutrin and Paxil.  Those medication orders were in effect through August 2007, but the medications were discontinued at the end of June 2007, when he was discovered hoarding medications, including Prilosec and inhalers.  The psychiatrist who treated him in the EOP discontinued his psychotropic medication at that time.  The psychiatrist went to the inmate's cell and told him that unless he came out to discuss the issue, the medications would be discontinued due to the discovery of misuse.  The inmate refused to leave his cell to see the psychiatrist.  He was evaluated again by the psychiatrist one month later.

Psych tech rounds were conducted daily during June 2007 and July 2007.  The medical record provided documentation that the inmate was seen weekly by a case manager in June, July, and August 2007; one contact per month occurred out of cell, the other three occurred at cell front.  Progress notes written by his case manager indicated that a DMH referral would be considered, but there was no subsequent action noted in the medical record.  He was seen weekly by psychiatry; progress notes were complete, integrating clinical observation and historical information coherently.

The inmate was housed in the administrative segregation unit due to battery on an officer that occurred at SVSP.  He was released from administrative segregation within days of his minimum eligible release date.

During August 2007 the case manager evaluated the inmate for an out of cell clinical contact; the inmate exhibited increased depressive symptoms at that time.  The progress note indicated that treatment with an antidepressant might be warranted.  He was seen out of cell by a psychiatrist three weeks later, when he presented in a demanding manner that escalated to hostility.  He insisted that he required treatment with Seroquel.  He refused to take Abilify or Geodon.  No medication was ordered.  During September 2007 he was seen weekly at cell front by his case manager.  He did not appear to be impaired or distressed.

*Findings:*

EOP treatment fell short of Program Guide requirements.  The amount of therapeutic activity offered was insufficient, and most case manager contacts occurred primarily at cell front.  This EOP inmate was not offered ten hours of group treatment per week.  There was an interval of six weeks between two psychiatry contacts, while other contacts were at one month intervals.  IDTT meetings were timely and were attended by the required participants.  Treatment plans were individualized, but they were not

thoughtfully developed. Diagnostic formulation was lacking, as was re-evaluation of the need for follow-up and re-evaluation of his clinical needs and functioning subsequent to the discovery that he had hoarded medications. He did not appear to decompensate or become depressed during a three month period without psychotropic medications.

**Inmate B**

This EOP inmate was placed in administrative segregation on 8/23/07. He was suspected of being involved in a plan to injure a particular member of the staff. He was placed in administrative segregation while the report was investigated.

The inmate was provided with different diagnoses including the following: Psychotic Disorder, NOS with depressive and paranoid features, Schizophrenia, paranoid type, Polysubstance Abuse in remission and Antisocial Personality Disorder. He was prescribed Seroquel and Lexapro. IDTT meetings were held quarterly; these meetings involved the required participants. Treatment plans were individualized. The inmate was seen monthly by a psychiatrist. Laboratory studies were performed, and his lipid levels were reviewed by his psychiatrist during July 2007.

While the inmate was housed in the general population unit of the EOP during June 2007, he attended four hours of group treatment. His treatment plan indicated that he was scheduled to attend ten hours per week. Documentation of group meetings that was present in the medical record indicated that roughly half of the group meetings that were scheduled were not held. During August 2007 he was seen weekly by his case manager for out of cell clinical contact, these contacts continued after the inmate was moved to administrative segregation.

A timely IDTT meeting was conducted after the inmate was placed in administrative segregation. The meeting was attended by the necessary participants, and the corresponding treatment plan was individualized. According to summaries in the medical record, he attended six hours of group treatment during August 2007, and he refused to attend two sessions. Six hours of meetings were cancelled.

According to the MAR, medication continuity was sustained when the inmate was moved to administrative segregation.

*Findings:*

In both the general population and administrative segregation, approximately half of scheduled therapeutic hours that the inmate was slated to attend were not conducted. Clinical contacts and IDTT meetings were compliant with Program Guide requirements, as was laboratory testing. Diagnostic clarity was lacking.

**Inmate C**

This inmate's case was reviewed at the request of plaintiffs' counsel, after he sent confusing letters to them and indicated that he wanted more treatment.

It was not clear from the records whether this 3CMS inmate was released from administrative segregation to the BMU during July 2007 or August 2007. A clinical progress note indicated that this inmate was considered a program failure. The inmate had an initial UCC in the BMU on 9/12/07; it was attended by a case manager. It appeared that he would be enrolled in three treatment groups, one of which was Narcotics Anonymous; two other groups seemed to have a mental health component. It was unclear whether these groups were custodial, educational or treatment based.

A recent progress note in the medical record opined that this inmate's demand to be placed in the EOP, and certain of his other behaviors, indicated that he might be attempting to use mental health symptoms to improve his living conditions.

He was evaluated out of cell on 9/11/07 by a case manager. He did not appear to be in distress; his GAF was assessed as 80.

He was seen by a case manager on 8/15/07 for a full mental health evaluation. An IDTT meeting was held the following day; this meeting included the required participants. He was continued at the 3CMS level of care due to medical necessity. A suicide risk assessment was performed to establish a baseline; the level of risk was assessed as negligible. He had diagnoses of Alcohol Dependence, Cannabis Dependence and Personality Disorder, NOS.

He was seen in ICC by a case manager who referred him for an evaluation; the case manager indicated that the inmate might be inappropriate for administrative segregation.

*Findings*:

Access to mental health treatment in the BMU was good. 3CMS treatment met Program Guide requirements and seemed appropriate given the inmate's clinical needs.

**Inmate D**

This EOP inmate had four admissions to the MHCB between June and October 2007. Information documenting these MHCB admissions was incomplete, and it was not filed in the medical record. According to a progress note in the medical record, the staff very recently began the process of referring the inmate to DMH for intermediate care. This inmate had a Keyhea order that extended to the end of 2007. MARs indicated that he was compliant with his prescribed medication, which was in liquid form.

A case manager progress note dated 7/25/07 stated that the inmate remained delusional and refused to accept medication. He was described as having disorientation with

445

tangential speech, delusional thinking with bizarre content and constricted affect. He also exhibited perseveration with impulsivity and a lack of energy.

During August 2007, the inmate admitted to medication noncompliance; however, MARs indicated that the inmate had been taking his medications without interruption.

A case manager progress note dated 9/27/07 described the inmate as subdued with markedly delusional thinking; the note also indicated that the inmate had recently returned from the MHCB.

Progress notes indicated that he was seen by clinicians at the requisite frequency throughout July, August and September 2007. IDTT meetings were timely and were attended by the necessary participants.

The staff reported that the inmate became psychotic when he refused his medications, which was a frequent occurrence; however, he stabilized within three days of medication compliance. Two of the MHCB hospitalizations were brief. Two others, however, were lengthy; one hospitalization lasted for ten days, and another lasted for sixteen days.

*Findings:*

There was a discrepancy between MAR entries, which indicated uninterrupted administration of medication, and this inmate's behaviors and self-report, which demonstrated that he was noncompliant with medications for a sustained period of time on several occasions.

The medical record contained documentation of many clinical contacts, but important information regarding his recent treatment was missing, such as MHCB admissions and participation in group treatment. Like all EOP inmates at SVSP during the monitoring period, he did not receive the minimum amount of treatment required.

This inmate required a more individualized approach to medication management. Such an approach might have included more vigilant medication administration, more frequent monitoring of laboratory testing or a behavioral treatment plan with rewards and response costs. Failing that, his admissions to the MHCB and lengths of stay should have been subject to scrutiny, and a referral to DMH should have been considered earlier.

**Inmate E**

This EOP inmate was admitted to the MHCB on two or three occasions during the monitoring period. Information regarding these admissions was incomplete in the medical record, although the admissions occurred several months before the medical record was reviewed. It was not possible to determine a complete overview of his history of treatment.

446

This inmate apparently experienced suicidal ideation, possibly for four months or longer, during 2007. One progress note seemed to indicate that he had attempted to jump off of the tier in the housing unit prior to April 2007. He was admitted to the MHCB during late May due to suicidal ideation and depressive symptoms.

An IDTT meeting conducted in the MHCB during June 2007 assessed his GAF as 20 at the time of admission; the GAF was 40 at the time of discharge. His diagnosis was Mood Disorder, NOS. He was discharged with orders for Lexapro and Risperdal. Medication continuity was sustained when he was discharged from the MHCB. His case manager saw him frequently when he was not in the MHCB. Progress notes contained pertinent clinical information. Shortly after his discharge in June 2007, a progress note indicated that he would have a modified treatment plan and be referred to DMH intermediate care. A modified treatment plan meant that the inmate would be enrolled in fewer than ten hours of therapeutic activities per week. The staff reported that typically an inmate on a modified treatment plan would be scheduled to attend three or four hours of groups per week. It was not possible to discern from the medical record how much or what type of group treatment was planned for this inmate. A progress note indicated that the inmate said that he was afraid of what he might do.

He remained despondent and expressed feelings of shame and hopelessness during the next several weeks. It was not possible to discern from the medical record when he was referred to DMH intermediate care or the nature of DMH's response to the referral. Progress notes implied that he was referred to intermediate care during July 2007. An institutional log confirmed that a referral was made.

According to an August psychiatric progress note, he was treated for Major Depressive Disorder with psychotic features, with Risperdal and Lexapro. Laboratory testing for lipid levels was performed during May 2007, and the results were noted by the psychiatrist, who saw him in August 2007. During that time, the inmate admitted that he had not been taking his medications. MARs showed that it was administered without interruption.

It appeared that he was accepted by DMH and was awaiting an intermediate care bed.

*Findings*:

The medical record did not provide a coherent picture of this inmate's mental health treatment. Information regarding MHCB admissions and a referral to DMH were missing. His treatment plan did not specify why a reduced level of therapeutic activity was clinically warranted, nor was there a record of what kind or amount of group treatment was planned for him. There was a discrepancy between MAR entries, which indicated uninterrupted administration of medications, and this inmate's self-report.

Many Program Guide requirements were met. He was seen frequently by his case manager and at least monthly by a psychiatrist, five-day follow-up was performed as planned, suicide risk assessments were completed and IDTT meetings were conducted

timely. The medical record did not, however, portray a sufficiently aggressive clinical response to a high risk episode of depression. In light of his subjective report regarding possible loss of behavioral control, social withdrawal and prolonged period of elevated risk, it appeared that this inmate's mental health needs might better be addressed at DMH acute care.

**Inmate F**

This EOP inmate was receiving a modified EOP program that began on 6/14/07. He was scheduled for four hours of groups and four hours of work weekly according to the mental health database. He consistently refused all groups, but he did participate in his four hours of work every week. The medical record did not contain indication of how many or which groups the inmate attended, nor did it indicate why his treatment was modified.

The inmate was originally admitted to the EOP during November 2003 with a history of anxiety, low frustration tolerance and poor anger control. His actual diagnoses were unclear in the medical record. An IDTT meeting during February 2006 provided diagnoses of Generalized Anxiety Disorder, Polysubstance Dependence in institutional remission and Antisocial Personality Disorder (which was a provisional diagnosis). An IDTT meeting during June 2007 indicated that the inmate was diagnosed with Bipolar Disorder, mixed type with psychotic features, Methamphetamine Dependence (in institutional remission), Antisocial Personality Disorder and Narcissistic Personality Disorder. A psychiatrist diagnosed the inmate as having Schizoaffective Disorder.

Medications that were prescribed included Depakote ER (levels checked during February and June 2007), Risperdal, Paxil and Buspar (which was added during May 2007). The inmate was seen monthly by the psychiatrist, and he was seen weekly for case manager contacts (one-third occurred out of cell and two-thirds occurred at cell front). There was no apparent documentation in the medical record regarding clinical interventions that were attempted, intensified, modified or otherwise changed in order to return the inmate to standard EOP treatment. Anxiety appeared to be the inmate's primary issue at the time of the review.

The rationale for modified program was not apparent from the medical records review. The medical record also did not mention the inmate's work assignment. A separate document prepared by the case manager for his supervisor indicated that the inmate's treatment was modified because he "experiences high levels of anxiety and paranoia which make it difficult for him to attend groups or come out to yard…chronic mental illness and level of functioning is unchanging over time…receiving adequate supports; DMH referral would not appear to offer anything that is not already being done with inmate by modifying his program at this time. Treatment plan will be reviewed on a monthly basis. Has begun to show regular attendance to his five groups – not ready for another group…" The MHTS revealed that the inmate was enrolled in four groups.

448

*Findings*:

Documentation regarding actual diagnosis, current mental health level of functioning, and the reason for modified programming in EOP during June 2007 after three and one half years in the EOP was not apparent in the medical record. There was no written plan that addressed how the inmate was to resume regular EOP treatment.

**Inmate G**

This inmate was placed on modified EOP treatment during September 2007 for medical reasons. He was recently hospitalized at an outside facility with fever, pancytopenia and hemolytic anemia. According to a case manager's progress note, the inmate returned after a several week hospitalization in a physically weakened state and was placed on modified program "for 90 days or less to permit him time to recover physically." He was scheduled to attend two groups per week.

He was prescribed Risperdal 6 mg/day. The IDTT provided diagnoses of Mood Disorder due to Hepatitis C medical treatment, Antisocial Personality Disorder, and Hepatitis C. The psychiatrist provided a diagnosis of Schizophrenia, undifferentiated type.

The inmate was seen for weekly contact by his case manager; approximately half the contacts occurred out of cell, half occurred at cell front. When he was seen at cell front the notes sometimes indicated lockdown as the reason that he was not seen out of cell.

*Findings*:

Temporary assignment to modified EOP treatment appeared to be clinically appropriate due to the severity of the inmate's recent medical illness and recuperation. Case manager contacts occurred weekly and psychiatry contacts occurred monthly, but many of the case manager contacts occurred at cell front. Although the case manager and the psychiatrist both signed the IDTT documentation, it was clear that diagnostic considerations were not part of the team's discussion. Treatment appeared to be parallel rather than integrated as exhibited by the differing diagnoses provided.

**Inmate H**

This inmate was treated for Depressive Disorder, NOS. He had been in EOP for several years; he was first housed in general population, and then he was housed in administrative segregation. At the time of the site visit, he was on modified treatment status, ostensibly for a "30 day assessment," while his multiple medical complaints were being assessed. Prior to this time, he frequently refused to participate in treatment activities.

449

*Findings*:

The temporary use of modified EOP treatment during assessment of medical complaints was appropriate. Whether or not this inmate required the EOP level of care was not discernable from the medical record.

**Inmate I**

This 3CMS inmate was a provided with a diagnosis of Major Depressive Disorder, in remission. He was housed in a SNY. He had a history of his first depressive episode at age eleven which resulted in a four month hospitalization. He had been maintained on various antidepressants with reasonably good result. He was seen by the psychiatrist at increased frequency when issues of compliance or changes in medications occurred.

Clinical contacts occurred out of cell. Case manager contacts occurred on 3/20/07 and 6/29/07. Psychiatric contacts occurred at least monthly from January, 2007 to May 2007. The inmate was seen for evaluation one month following the discontinuation of his medications. An IDTT meeting occurred on 3/21/07.

*Findings*:
The mental health treatment that was provided to this inmate met Program Guide requirements. His treatment plan was generic, although adequate. He was seen with the frequency that was clinically indicated by both his case manager and by the psychiatrist.

450

EXHIBIT O
Correctional Treatment Facility (CTF)
September 24, 2007 – September 26, 2007

**Inmate A**

Inmate A arrived at a CDCR reception center on 6/3/07.  He was placed into the 3CMS program and was provided with diagnoses of Substance-Induced Persisting Psychotic Disorder with delusions, Polysubstance Dependence and Tourette's Disorder (provisional).  He arrived at CTF on 7/11/07.  A CDC form MH-4 was completed on 7/26/08.  The following diagnoses were provided:  Psychotic Disorder, NOS, Major Depressive Disorder, moderate to severe (provisional), "substance use," and a deferred diagnosis on Axis II.

The inmate was prescribed Remeron 15 mg/day, Risperdal 2 mg/day and Klonopin 1 mg/day on 9/6/07.  His recent history of psychiatric contacts included the 9/6/07 visit when all previous psychiatric medications were discontinued without explanation.  The inmate was seen one week earlier (8/31/07) by a different psychiatrist who had continued a previous order for Remeron (15 mg) and added Benadryl (150 mg) for insomnia.  The inmate reported at that time that he had not been receiving his medications.  However, he had been seen the previous day (8/30/07) by a different psychiatrist who noted that the inmate did not want any medications because of concerns about side effects.  This inmate was seen on 8/19/07 by yet a different psychiatrist who had discontinued all prior psychotropic medications because the inmate refused to take them; the psychiatrist began Remeron 15mg at that time.  One week earlier the inmate had been seen by a different psychiatrist when he stated "I need Seroquel."  That psychiatrist discontinued Zyprexa and began Seroquel.  The diagnostic impression of the various psychiatrists involved in this case ranged from Adjustment Disorder, NOS to Schizophrenia, paranoid type.  The lack of continuity in psychiatric care appeared to have a negative impact on this inmate.  He continued to deteriorate until he was ultimately placed on EOP status.  This inmate had been receiving 3CMS level of care until 8/30/07 when an IDTT progress note indicated that the team recommended EOP level of care.  However, a placement chrono reflecting this level of care was not completed until 9/6/2/07, when the medical record indicated that another IDTT had occurred; this was documented by an IDTT progress note.  There were no treatment plans found in the record.  This inmate was seen weekly after the change to EOP level of care, but the progress notes suggested cursory clinical contacts.

*Findings*:

Problems were noted regarding the care provided to this inmate.  There were problems with continuity of psychiatric care; this inmate was seen by different psychiatrists with many changes in medications.  Furthermore, there was a need for diagnostic clarity.  The lack of continuity in psychiatric care appeared to have a negative impact on this inmate.  He continued to deteriorate until he was ultimately placed at the EOP level of care.  There was some confusion regarding a possible delay in the change to EOP level of care.  After this change occurred, it appeared that the inmate was seen weekly by the case manager; however, progress notes provided little information regarding clinical progress and treatment.  Treatment plans were not located in the medical record.

**Inmate B**

This inmate arrived at CTF on 7/23/07.  On 7/29/07, he was seen by a psychologist in response to a staff referral.  The psychologist provided the following diagnostic possibilities:  Adjustment Disorder with mixed disturbance of emotions and conduct, Obsessive Compulsive Disorder, and ADHD, NOS.  The inmate was seen by a psychiatrist on 8/9/07.  The psychiatrist's diagnostic impression was "thought disorder with delusional thoughts."  The progress note indicated that the inmate had been refusing medications, but he did not meet the criteria for an involuntary Keyhea medication order.

There was an undated treatment plan that indicated the diagnoses of Major Depressive Disorder and Substance Abuse.  The plan was minimal and provided little information regarding treatment.  There was an IDTT progress note dated 8/20/07.  On 9/11/07, a CDCR form 7388 (treatment plan) was completed that indicated that the inmate had been diagnosed with Psychotic Disorder, NOS and provided a GAF of 40.  There were no clinical case manager contacts since that time according to the medical record.

*Findings*:

The lack of adequate treatment planning appeared to result in poor diagnostic certainty and treatment focus.  Case manager contacts were not adequately documented in the medical record.


**Inmate C**

This inmate arrived at CTF on 8/1/07.  On 8/2/07, a CDCR MH-4 was completed that provided a GAF of 30 and a diagnosis of Dementia due to alcoholism.  He was also placed at the EOP level of care.  On 8/3/07, he was seen by the psychiatrist and was prescribed Risperdal 1mg /day, Thorazine 50 mg/day and Hydroxyzine 200 mg/day; he had also previously been prescribed Zoloft.  On 8/31/07, the inmate was seen by the same psychiatrist who discontinued the Zoloft; this psychiatrist prescribed all of the same medications he had prescribed on 8/3/07.

There was an undated treatment plan in the medical record, and a suicide risk assessment that was not completed until 8/22/07.  An EOP placement chrono dated 8/3/07 was also present in the medical record, but there was no record that an IDTT had been held.  According to the medical record this inmate had no clinical contact during one week, but he was seen weekly by his clinical case manager otherwise.  The medical record had documents misfiled, and documents were not in chronological order.  It appeared that information was missing from the medical record.


*Findings*:

The medical record was in disarray, making it difficult to determine whether clinical contacts or meetings occurred or if the information was missing from the record. An adequate evaluation of the inmate's mental health care was difficult due to these issues.

**Inmate D**

This inmate arrived at CDCR on 2/8/06. He was transferred to CTF on 6/21/06. He was placed into the 3CMS program due to medical necessity on 2/21/06. There were several placement chronos after this date; all chronos noted that the inmate was at the 3CMS level of care for medical necessity. There were two MH-7s in the medical record that were dated 6/29/06 and 5/24/07. The most recent evaluation initially had "No diagnostic condition on Axis I", but that was changed to Depressive Disorder, NOS; a suicide risk assessment was also completed at that time.

The medical record indicated that the inmate was generally seen by the case manager for quarterly contacts, with the exception of one occasion. At the inmate's request, his medications were discontinued on 6/4/06. Significant documentation in the medical record was illegible. Consequently it was unclear why this inmate remained in the 3CMS program for medical necessity long past the acceptable timeframe.

This inmate was scheduled for release during January 2008. Despite this, there was no mention in the progress notes of any pre-release planning or discussion.

*Findings*:

The poor condition of the medical record made it difficult to adequately evaluate the course and rationale for treatment. For this reason, it was difficult to determine the reason for continuation of this inmate in the MHSDS for medical necessity beyond the timeframe outlined in the Program Guide. There was also no documentation of pre-release planning as was indicated for this inmate with an upcoming parole date.

**Inmate E**

This inmate arrived at CTF on 8/26/04. His most recent treatment plan was dated 9/18/07, and no prior treatment plan was located in the chart. The diagnosis provided in the treatment plan was PTSD.

This inmate was prescribed Prozac 40mg/week and Benadryl 50 mg/day. The progress note for this date indicated that the inmate had informed the psychiatrist that he (the inmate) would like to take Prozac once per week "if he can remember" and to restart Benadryl. The psychiatrist's diagnostic impression was PTSD. There was a current, signed consent for treatment with Prozac located in the medical record.

*Findings*:

The inmate was seen by the case manager in accordance with the Program Guide requirements for clinical contact at the 3CMS level of care. However, the progress notes were frequently illegible, making it difficult to follow the course of therapy.

**Inmate F**

This inmate arrived at CTF on 12/5/05; the bus screen indicated no history of mental health issues. He was placed into the MHSDS on 3/7/07, at the 3CMS level of care for medical necessity. A minimally completed MH-4 dated 3/1/07 indicated a diagnosis of Bipolar Disorder, NOS and Methamphetamine Abuse. A suicide risk assessment was not completed until June 9, 2007. The inmate was prescribed Prozac 20 mg/day and Benadryl 50 mg/day on 4/17/07. A different psychiatrist changed his medication to Wellbutrin 400 mg/day on 7/30/07; the psychiatrist also prescribed an additional Benadryl 25mg in the morning for anxiety. The psychiatric progress note indicated that the inmate had discontinued his Prozac due to medication side effect concerns. The inmate was seen consistently for clinical contacts by the 3CMS case manager. A treatment plan dated 3/1/07 included some behavioral goals, but there was no target date for completion or acknowledgement of the limited nature of continuation within the 3CMS program for medical necessity.

This inmate was scheduled for release during March 2008, but there was no discussion in the medical record regarding pre-release planning. The inmate reported during a pre-release group that he had seen a sign in the infirmary announcing the group, and consequently he had requested to participate.

*Findings:*

This inmate remained in the 3CMS program for medical necessity for longer than the Program Guide limits for such inclusion. The treatment plan did not address this discrepancy. Adequate pre-release planning had not occurred, and the inmate's involvement in a pre-release group was initiated by the inmate and not the mental health staff.

**Inmate G**

This inmate arrived at CTF on 2/7/07. The bus screen indicated a history of depression and treatment with Benadryl; he was prescribed this medication at the time of arrival. The medical record that was available for review was a temporary file, so information was possibly missing from the medical record. A placement chrono dated 6/5/07 indicated placement in the 3CMS program for medical necessity; the most recent placement chrono dated 9/4/07 maintained this inmate in the 3CMS program due to medical necessity. The medical record contained two suicide risk assessments that were dated 6/4/07 and 8/27/07; each assessment indicated that the inmate was at no apparent significant risk of self-harm. The most recent assessment did not, however, mention the inmate's self-injurious behavior that occurred on 7/17/07 which resulted in sutures to one

arm and placement on suicide watch.  A progress note on that date indicated that the contact occurred at cell front.  The inmate later reported that he had put his fist through a window, but the minutes for the suicide prevention committee did not document that the incident had occurred.  The inmate's laceration was approximately 5cm long according to the medical record.  He had been evaluated by the administrative segregation psychologist the day before this incident occurred, and the documentation noted that the inmate's mood and affect were within normal limits.  The inmate was evaluated six days after the injury, but he refused out of cell contact.  He told his psychologist that he felt "so so" but was still considered to be within normal limits.  The psychologist indicated in the note that the cell door window had been broken by the inmate when he learned that his television set had not arrived.  He was described as listless, agitated and tearful upon arrival at the OHU.  Subsequent progress notes documented an increasing frustration with his long term administrative segregation placement and his desire to decline to participate in the ongoing trial process.

This inmate was placed in the administrative segregation unit on 2/20/07 because he was testifying in an ongoing criminal case against his assailant in an assault that occurred during 2006 (according to a psychologist's progress note).  The progress note indicated that the trial was not expected to begin until October 2007, so it was unclear if the inmate requested administrative segregation placement during the trial or if custody staff elected to place him there.

This inmate's diagnosis was Adjustment Disorder, unspecified and Methamphetamine Dependence.  There were two treatment plans in the medical record, one plan was dated 6/5/07 and an identical plan was dated 9/4/07.  There was no documentation of a plan to modify the medical necessity status in either treatment plan.  A psychiatric note dated 9/25/07 was the first note to mention the need to consider removal from the 3CMS program.

_Findings_:
It appeared that at least one of the suicide risk assessments did not fully evaluate the inmate's level of suicide risk as it omitted mention of a recent suicide attempt.  There also appeared to be problems related to the adequate tracking of suicide attempts at the facility.   The suicide risk assessments may not have occurred in confidential settings that would have better elicited critical information.  This inmate remained in the 3CMS program for medical necessity; the treatment plans did not address plans to modify this status or possible removal from the program.

**Inmate H**

This inmate's date of arrival to CTF was unavailable, because the available medical record was the third volume which did not include the bus screen.  There were no placement chronos located in the medical chart either, but there were progress notes dating back to 2003.  This inmate was prescribed the following medications:  Geodon 80 mg/day, Remeron 45 mg/day and Benadryl 100 mg/day.  He had been evaluated by two different psychiatrists; despite this, his medications had remained the same with only

changes in dosage over time.  The medical record was not chronological, and it was extremely difficult to find specific items as they were filed in the wrong sections.  The most recent treatment plan was undated, but was based on a mental status exam from 9/13/07.  The diagnosis provided in this plan was "Psychotic Disorder, NOS in medication remission."  The treatment plan did indicate that the inmate was scheduled to parole in October of 2008.  The treatment plan was somewhat generic; although it did include a referral for parole programming.

*Findings*:

There were no continuity of care issues noted for this inmate. The medical record was so disorganized that no evaluation of therapeutic goals and progress was possible.  The most recent progress notes were completely illegible.


**Inmate I**

This inmate arrived at CTF on 5/16/07.  He was not prescribed psychotropic medications by a psychiatrist.  He was prescribed Elavil 25 mg at night, but this medication was apparently prescribed for non-psychiatric reasons by a general practitioner.  The inmate had previously been in the 3CMS program during 2006, but there was no chrono removing him from the MHSDS.  On 6/5/07 the CTF mental health staff saw the inmate during an IDTT meeting and completed a placement chrono indicating that the inmate was placed into the 3CMS program due to medical necessity.  An MH-4 was completed at CTF on 5/25/07.  The diagnosis provided was "Adjustment Disorder, conduct", and the main problem identified was anger management.  The MH-4 was incomplete, and there was no current suicide risk assessment in the record.  The undated MH-2/treatment plan did note that the inmate was in the 3CMS program due to medical necessity and referred to "protocol with 90-day follow-up".  The plan also listed brief cognitive therapy as an intervention to address anger issues as well as anger management groups.  This inmate reported during the site visit that he had received no such services despite still being highly motivated to participate in such programming.  The treatment plan and evaluation were completed by a different psychologist than the one present in the IDTT meeting, and there was no documentation in the IDTT placing this inmate on a waiting list for anger management group.

This inmate was evaluated by a different clinician on 7/1/07.  He expressed frustration at that time that his clinician had again been changed.  The progress note on that date did not acknowledge the inmate's placement in the 3CMS program on medical necessity status and referred to follow-up within ninety days.

*Findings*:

This inmate had previously been involved in the MHSDS, and he was readmitted for medical necessity.  The treatment plan was incomplete, and the inmate was not adequately assessed for suicide risk. Although the treatment plan listed specific

interventions, it did not appear that these interventions had occurred to date. Continuity of care issues negatively affected the mental health care provided to this inmate. The inmate was seen by his case manager at least every ninety days for clinical contact.

**Inmate J**

This inmate arrived at CTF on 12/19/06; he was prescribed Remeron at the time of arrival. He was seen by different psychiatrists throughout his stay, although his medication remained consistent. This inmate had limited communication skills in English (he was from Korea), but he reported that he was never provided with interpretive services. He did submit a health services request in April 2007 indicating that his medications were changed without his knowledge. The form was dated 4/8/07, and he was to be ducated for 4/24/07. He was finally seen on 4/26/07.

An MH-4 and MH-2 were completed for this inmate on 1/4/07, and the inmate was seen in IDTT meeting on 1/11/07. He was diagnosed at that time with Major Depressive Disorder, single episode, in partial remission, despite documentation of significant depressive symptoms for the prior ten years. The treatment plan was pre-printed, not individualized, and the language issues were not addressed. There was no suicide risk assessment until 6/6/07. This inmate was not seen by the case manager in accordance with Program Guide requirements.

*Findings:*

The clinicians treating this inmate failed to provide needed interpretive services; furthermore, the treatment plan also failed to address this issue. The inmate was not seen for clinical contacts as required. In addition to the significant omission regarding language issues, the treatment plan was generic and clearly not individualized for this inmate's treatment requirements.

**Inmate K**

This inmate arrived at CTF on 12/3/99. He was evaluated by several different psychiatrists during this monitoring period, but he was seen by the same psychiatrist for the two months prior to the visit. There were multiple medication changes that occurred during that time. The inmate was treated with Zoloft 100 mg/day. He was placed into the 3CMS program due to medical necessity on 4/12/07. The record was somewhat confusing as it did not indicate that there were multiple volumes, yet the first mental health placement chrono was dated April 2007. The inmate, however, reported that he was not receiving his Paxil during February 2006, which would indicate mental health involvement at that time.

*Findings:*

458

There were problems with continuity of psychiatric care that was provided to this inmate. Medication management suffered as a result of the various psychiatrists involved in his care; despite this, informed consent for treatment with psychotropic medications was located in the medical record.  It also appeared that the inmate was not seen by the case managers as was required by the Program Guide.

**Inmate L**

This inmate arrived at CTF on 8/10/05.  He had been seen by the same psychiatrist for the nine months prior to the site visit.  The inmate was prescribed the following medications: Lithium 900 mg/day, Paxil 40 mg/day, Buspar 30 mg/day and Benadryl 150 mg/day. The last laboratory test for Lithium occurred on 5/1/07; it appeared that testing was performed annually rather than semi-annually.

An updated MH-4 was completed on 7/17/07; a suicide risk assessment was not completed at that time.  A treatment plan was also completed on that date; this plan listed the inmate's diagnosis as Bipolar Disorder.   The treatment plan was minimal; although, it did reference a 12/16/07 parole date and the need for pre-release group therapy.  The inmate reported that he had not received any pre-release planning services to date; and the medical record confirmed this report.

*Findings:*

Informed consent for treatment with psychotropic medications was present in the medical record.

There was good documentation of psychiatric continuity of care.  Laboratory testing for treatment with Lithium had been performed, but was not timely.  Although the treatment plan identified the need for pre-release planning; none of these services had been provided at the time of the visit.  This inmate was seen by the clinical case manager for clinical contacts within Program Guide timeframes.

**Inmate M**

This inmate arrived at CTF 11/4/02.  He had generally been treated by the same psychiatrist during this monitoring period, and his medication informed consent form was current.  He was prescribed Zyprexa 5 mg/day and Benadryl 100 mg/day.  The medical record contained a current MH-4 that provided the inmate with a diagnosis of Mood Disorder, NOS.  The treatment plan was also current, but it listed symptoms that did not seem to support the diagnosis ("psychotic symptoms in remission and delusions"); these symptoms had not been noted elsewhere.  The treatment plan itself was individualized; however, the plan was minimally adequate in the identifying interventions to address the targeted problems.  Based on a review of the record, this inmate was not seen in accordance with Program Guide requirements.

*Findings*:

There was good continuity of psychiatric care.  Informed consent for treatment with psychotropic medications was present in the medical record.  The treatment plan required update to refine and to identify required interventions and possibly to address inconsistencies in symptoms listed and the diagnosis provided.

EXHIBIT P
Wasco State Prison (WSP)
December 10, 2007 – December 12, 2007

**Inmate A**

This EOP inmate was housed in administrative segregation.  He was provided with a diagnosis of Major Depressive Disorder, recurrent with psychotic features.  He was on a Keyhea order that will expire on 10/2/08.  The IDTT treatment plan was individualized and contained a problem list and detailed interventions.  The plan included lists of groups with specific target symptoms: anger management for assaultive behavior and institutional coping for suicidal ideation.  The inmate was seen by his case manager weekly, and he was seen daily by the psych techs during administrative segregation rounds.  He was evaluated at least monthly by a psychiatrist.

This inmate's care was discussed during his IDTT meeting.  He had apparently recently decompensated; he reportedly was not eating and was grossly psychotic.  He had lost twenty-two pounds during the previous month, and he had been hospitalized in the MHCB one week prior due to his refusal to eat.  The IDTT reported that the inmate had not received his prescribed medications for up to three weeks, despite his active Keyhea order.  They reported that the MAR had not transferred with the inmate.  The treatment team decided to return the inmate to the MHCB with a recommendation for DMH acute care referral.

_Findings_:

Medication management issues resulted in unnecessary exacerbation of this inmate's illness and subsequent MHCB hospitalizations and DMH referral.  The IDTT appropriately discussed the events that led to the inmate's decompensation and appropriately referred him to the MHCB.  The medical record was in disarray and consisted of two separate folders including the inmate's information.

**Inmate B**

This inmate was prescribed Lithium, Depakote and three different antipsychotic medications.  The medical record provided conflicting and confusing information regarding the level of care for the inmate.  Some documentation indicated that he was receiving EOP level of care, while other documents indicated that he was at the 3CMS level of care.

Serum valproic acid and Lithium levels were ordered on 9/25/07; only the result of the Lithium level was located in the medical record, and there was no documentation of the results of the valproic acid level.  Although the Lithium level was sub-therapeutic, psychiatric progress notes did not address this issue in the progress notes or with a dosage adjustment.  Furthermore, medications were ordered to be administered at hour of sleep; however, the MAR indicated that these medications were not administered at that time.  There was no treatment plan located in the medical record.

*Findings*:

It was difficult to assess whether this inmate received appropriate care due to the inadequate, confusing and contradictory documentation in the medical record. It was of concern that there was significant ambiguity regarding the recommended level of care. Psychiatric response to the sub-therapeutic Lithium level was inadequate. Medications were not administered at the hour of sleep as ordered by the psychiatrists.

## Inmate C

This EOP inmate was diagnosed with Schizoaffective Disorder. He arrived at WSP on 10/17/07; the inmate was screened by medical staff on that date. No referral to mental health was made at that time. On two days later, the inmate received his mental health screening and was determined to require further evaluation. He had a full mental health evaluation on 10/29/07; this evaluation determined that the inmate required EOP level of care. An urgent referral for psychiatric evaluation was initiated at that time. The inmate was seen by the psychiatrist in response to the referral on 11/2/07.

The inmate was subsequently seen by the case manager on a weekly basis, and he was seen by the psychiatrist every two weeks. The inmate refused to take psychotropic medications, despite recommendations that he would benefit from medication therapy. An IDTT meeting was conducted on 11/20/07. The inmate refused to participate in group therapy. Progress notes were generally generic.

*Findings*:

Although the inmate was recommended for EOP level of care, the mental health care that he received was not consistent with the requirements for this level of care. There was no documentation in the medical record that any efforts had been made to expedite the inmate's transfer to an EOP institution for more intensive mental health treatment. General progress notes made it difficult to assess the extent of the inmate's psychotic symptoms.

## Inmate D

This inmate arrived at WSP on 9/26/07. The mental health screening was conducted on the day of arrival, and the inmate was referred for a complete mental health evaluation on the same day. The transfer information from the county jail indicated that the inmate had a history of Schizophrenia. As a result of the mental health evaluation, a provisional diagnosis of Psychotic Disorder, NOS was provided, and he was assigned to the EOP level of care. He was evaluated by the psychiatrist on 10/2/07. The inmate was treated with Risperdal and Cogentin at that time. The inmate had been considered for referral to DMH, but he exhibited improvement after treatment with psychotropic medications. The progress notes indicated that the inmate was also considered for expedited transfer to an EOP institution, but it was unclear from the progress notes what measures were

463

undertaken to accomplish expedited transfer. There were no monthly group summary notes located in the medical record.

*Findings:*

This inmate appeared to be assigned to the appropriate level of care in the EOP.

**Inmate E**

This inmate arrived at WSP on 5/21/07; he had previously received mental health services at the EOP level of care. He was immediately returned to the EOP. An IDTT meeting that occurred on 6/4/07 provided the inmate with diagnoses that included Mood Disorder, NOS, secondary to drug usage (methamphetamine) with persisting hallucinosis, Polysubstance Dependence and Antisocial Personality Disorder; psychiatric progress notes conversely indicated a diagnosis of Schizophrenia. Psychotropic medications were ordered on the day of arrival; his medications included two antidepressants and two antipsychotic medications. Informed consents for medications prescribed were present in the medical record. There was no laboratory testing or record of body weight in medical record, despite treatment with antipsychotic medications including Zyprexa for which these measures were clinically indicated.

*Findings:*

This inmate appeared to have received adequate mental health care. There were problems regarding the treatment team working in a coordinated manner regarding diagnostic clarification, as the inmate was provided with multiple, conflicting diagnoses.

**Inmate F**

This 3CMS inmate arrived at WSP on 7/24/07. At the time of his physical examination, he reported that he had been treated with Lithium and Haldol. His mental health screening was completed two days later, and the inmate was subsequently referred for further evaluation. A mental health evaluation was conducted on 8/7/07, and diagnoses of Mood Disorder NOS and Polysubstance Dependence were provided. He was referred to the psychiatrist for medication evaluation. He was seen twice by the psychiatrist since the time of his arrival, and psychotropic medications were adjusted in response to his symptoms and response to treatment. He was determined to require 3CMS level of care. He had recently been assigned to anger management group, but there were no group progress notes present in the medical record at the time of the visit. There was also no evidence of an IDTT meeting located in the medical record.

*Findings:*

This inmate appeared to have received adequate mental health care.

**Inmate G**

This inmate arrived at WSP on 11/21/07; his mental health screen was completed one week after his arrival to the facility.  The mental health screen indicated that (it was) "entirely negative for significant symptoms of a serious mental disorder," and no further evaluation was recommended.  Consistent with this finding, there were no other mental health progress notes or information located in the medical record.  This inmate's medical record was reviewed as he was included in a random list of 3CMS inmates.

*Findings:*

The institution had no mechanisms in place to verify the accuracy of their own data concerning MHSDS inmates; this had significant implications in ensuring that the appropriate level of care was provided and that monitoring for intervention timeliness and Program Guide requirements actually occurred.

**Inmate H**

This 3CMS inmate arrived at WSP on 10/31/07.  He was treated with Depakote, Vistaril and Celexa.  Medication orders were written on the day of arrival.  The mental health screening was conducted three days later, and the inmate was referred for evaluation.  The evaluation was conducted 11/9/07; a diagnosis of Schizoaffective Disorder was provided.  A referral was submitted to psychiatry for medication evaluation.  The inmate was not evaluated by the psychiatrist until 12/2/07, when Depakote, Vistaril and Celexa were reordered.

*Findings:*

Poor documentation did not permit adequate assessment regarding the appropriate level of mental health for this inmate.  The treatment team should revisit the diagnosis and medication management, as the inmate was provided with a diagnosis (Schizoaffective Disorder) that had psychosis as a prominent symptom; however, he was not treated with an antipsychotic medication.  There was also no evidence of treatment planning or appropriate laboratory testing.

**Inmate I**

This 3CMS inmate arrived at WSP on 10/31/07.  He had been treated with Trilafon and Sinequan.  Trilafon and Remeron were ordered on that date.  Subsequently a different psychiatrist discontinued those medications, and the psychiatrist ordered Seroquel, Prozac and Trileptal.  The inmate was provided with the following diagnoses:  Heroin Dependence, Methamphetamine Dependence and Bipolar Disorder (this was a provisional diagnosis).  There was insufficient documentation to support these diagnoses.