*Findings*:

There was poor continuity of psychiatric care with resulting medication changes without documentation of clinical rationale.  Additionally the medical record did not provide documentation to support the diagnoses that were provided to this inmate.

**Inmate J**

This 3CMS inmate arrived at WSP on 10/16/07; his mental health screening was conducted two days later, and further evaluation was recommended.  He was seen by the psychiatrist on 10/26/07; he was prescribed Depakote, Abilify and Trazodone.

*Findings*:

Based upon available documentation, this inmate appeared to be receiving appropriate mental health care.

EXHIBIT Q
Kern Valley State Prison (KVSP)
October 10, 2007 – October 12, 2007

**Inmate A**

This EOP inmate was housed at KVSP. The inmate arrived at CEN on 9/6/07, after returning from court. This court hearing resulted in the inmate receiving an additional eighteen years to his prison sentence, according to the bus screen. He was admitted to the MHCB at KVSP on 9/8/07 from CEN. Once discharged from the MHCB on 9/19/07, he remained housed at KVSP as his sending institution did not accept MHSDS inmates. The medical record did not provide specific information of the reason for the eleven-day MHCB hospitalization. The inmate was involved in recreation therapy during his MHCB hospitalization. He was discharged to the 3CMS level of care; he was provided with a GAF of 65.

On 9/24/07, suicide risk assessment was completed while the inmate was placed in administrative segregation. The inmate was evaluated daily for five-days following his discharge from the MHCB. There were no subsequent progress notes, evaluations or treatment plans present in the medical record. There was, however, an IDTT progress note dated 10/3/07 in which the staff reported that the "I/M moved to EOP."

*Findings*:

The additional prison sentence that this inmate received at court was not addressed on the CDCR 7386 mental health evaluation that occurred in the MHCB, despite the information being highlighted in red ink on the bus screen in the medical record. The MHCB treatment plan was generic and was pre-printed with minimal individualized information. Admission and discharge suicide risk assessments were completed and were present in the medical record. There was no placement chrono for the MHCB placement, 3CMS level of care or EOP level of care; the MHTS reflected these levels of care at various times for this inmate. There was documentation that five-day follow-up occurred after the inmate was discharged from the MHCB.

After the inmate's discharge from the MHCB, there was very poor documentation of clinical contact or treatment planning, with the exception of the five-day follow-up. After the inmate was apparently changed to EOP level of care, there was no supporting documentation to explain this level of care change. It appeared from a progress note that the inmate had been changed to the EOP level of care; however, other documentation indicated that he was not a participant in the MHSDS.

**Inmate B**

This inmate arrived at KVSP on 11/22/05. He was not included in the MHSDS. The inmate's medical record was reviewed because the psychiatric staff placed the inmate into an MHCB overflow cell on the evening of 10/5/07. He was released from suicide watch, and he was returned to his housing unit approximately thirteen hours later by a different psychiatrist. A review of the medical record revealed no documentation from this date. There were no progress notes, no suicide risk assessment, no treatment plan, and no physician orders in the medical record related to this inmate's care while he was

housed in the MHCB overflow cell. A request was made for staff to obtain any loose filing regarding this inmate. The staff produced only one psychologist progress note dated 10/7/07. This document indicated that the inmate reported that he had taken sixteen to eighteen Indocin pills on 10/5/07 to "get attention for his back pain". There was no further elaboration regarding this issue or mental health follow-up for this inmate.

*Findings*:

The care provided to this inmate was very poor. The placement of an inmate into an MHCB overflow cell on suicide watch and subsequent return to a housing unit without appropriate evaluation or follow-up was very troubling. It was unclear what if any treatment and monitoring was provided to this inmate while he was housed in the overflow cell, if the inmate was adequately evaluated for suicide risk upon release from the cell, or if any subsequent follow-up occurred.

**Inmate C**

On 8/29/07, an IDTT progress note indicated that this inmate had been seen and was continued at the 3CMS level of care. This inmate was changed to the EOP level of care on 9/11/07, according to a placement chrono issued on that date. There was no current treatment plan, mental health evaluation or suicide risk assessment in the medical record. Psych tech rounds in Administrative Segregation documented that this inmate's behavior was "appropriate" and "within normal limits" during the week that the level of care change occurred (9/10/07-9/16/07). There was no documentation from the preceding week that indicated any behavior supporting a level of care increase. There was also duplicate documentation in the medical record for psych tech rounds; two separate progress notes covering the dates from 9/10/07-9/14/07 were completed for this inmate by separate staff.

A progress note completed on 9/14/07 indicated that the inmate was seen at cell front in administrative segregation; this note questioned the inmate's EOP status. When the inmate expressed his request to have an IDTT meeting, he was told by the clinical case manager seeing him to "discuss request with case manager." It was unclear from the progress note why the case manager making the clinical contact did not address this matter with the inmate and/or the inmate's assigned case manager (assuming that this was not his clinician).

A progress note dated 9/18/07 by another clinical case manager explained to the inmate that he had been given a diagnosis of "IEX," assumed to be Exhibitionism; therefore, he required a higher level of care. This inmate was not treated with any medications. An undated Indecent Exposure Screen listed a GAF of 70, and there appeared to be no other basis for the EOP level of care change other than the finding that the inmate met the criteria for Exhibitionism. A progress note dated 10/1/07 by yet another clinician indicated that the inmate had requested to be removed from the EOP level of care, but the clinician found that the inmate had been placed at that level of care due to "his IEX status." The GAF provided in that progress note was 68. According to the medical

469

record, this inmate had not been seen weekly in accordance with his EOP and administrative segregation status.  The inmate was extremely frustrated regarding this level of care issue when he was interviewed during the site visit.

*Findings*:

It appeared that this inmate was changed from 3CMS to the EOP level of care; however, there was no documentation present in the medical record that provided rationale for the change in level of care.  The care provided to this inmate was poor, as there was no documentation of required clinical contacts, suicide risk assessments, mental health evaluation or treatment planning.  Duplicate information regarding psych tech rounds in the administrative segregation unit led to concerns regarding the validity of the provided documentation.  It appeared that clinicians at the facility incorrectly believed that a diagnosis of Exhibitionism necessitated a change to EOP level of care.  The inmate was placed at this level of care despite maintaining high GAF scores and no documented evidence of psychiatric instability.  Despite this change in level of care and the inmate's administrative segregation status, he was not seen weekly by the case manager for clinical contact.  Improved communication with this inmate was clearly indicated.

**Inmate D**

This 60 year old inmate had multiple medical issues, including diabetes and a seizure disorder.  The inmate was noncompliant with his medications for these medical conditions.  There were no mental health placement chronos located in the medical record.  The medical record that was reviewed was the third volume of the medical record for this inmate.  It appeared that there was no specific process in place at the facility to reduce medical files and to include relevant data in the most recent volume of the medical record.  For example, while there were no placement chronos in the record, there was a Mentally Disordered Offender Evaluation dated 1993 and a P.C. 2684 Atascadero State Hospital evaluation from 1984 in the most recent volume of the medical record.

This inmate's medical record was reviewed because he was placed in a MHCB overflow cell on 10/6/07.  He was removed from suicide watch on 10/7/07, approximately seventeen hours later; and he was returned to his housing unit.  However, he was placed back on suicide watch in another overflow cell within three hours of release.  The inmate was subsequently placed into the MHCB on 10/9/07, where he remained at the time of the site visit.

The history and physical, suicide risk assessment, and physician orders were completed on the day of admission, but no mental health evaluation was completed.

After further review of this case, it was determined that this inmate had placed a plastic bag over his head while in administrative segregation.  A progress note on that date indicated that the inmate stated that he was not suicidal; he stated that he was upset with medical, because he had not received enough medications and would not take the ones that were prescribed.  The staff apparently did not consider the inmate to be at risk of

self-harm, and he was released him back to his housing unit. When the mental health supervisory staff learned of his return to the housing unit, they returned him to the overflow cell on suicide watch status. The inmate was apparently released by a new contract psychiatrist who was unfamiliar with required procedures.

This inmate was not prescribed psychotropic medications. The inmate was seen weekly in administrative segregation, suggesting that he had been placed at the 3CMS level of care. There was other documentation that this inmate was at the 3CMS level of care, despite the lack of a placement chrono.

*Findings:*

It appeared that there was no clear process for reducing medical records and bringing relevant data forward in the medical record. The condition of the medical record and the lack of relevant documentation made it difficult to even determine the level of care that this inmate was supposed to be receiving. The care provided to this inmate was concerning due to the lack of knowledge of CDCR procedures by the contract clinician, and the lack of documentation of required clinical contacts in the administrative segregation unit.


**Inmate E**

This inmate was placed into the EOP on 8/1/07, apparently as a result of his diagnosis of Exhibitionism. There was no current mental health evaluation located in the medical record. A mental health screening performed on 7/30/07 indicated diagnoses of Exhibitionism and Antisocial Personality Disorder; the inmate was provided with a GAF of 39. The medical record illustrated significant confusion regarding the inmate's level of care amongst the mental health staff. The recreation therapist identified the inmate as an EOP inmate as early as 7/18/07. Other documentation did not support this level of care. An IDTT progress note dated 8/1/07 indicated that the level of care was EOP, again due to the Exhibitionism diagnosis.

This inmate had previously been prescribed Wellbutrin 200 mg/day, but this medication was discontinued on 9/24/07 due to inmate refusal. There was, however, no progress note by the psychiatrist supporting the inmate's statement that he had refused medications, and there was no signed refusal located in the medical record. In fact, a progress note by the clinical case manager the preceding week indicated that the inmate stated that he had been compliant with his medications. Based on a review of the medical record, this inmate was not seen weekly as required by the Program Guide.

*Findings:*

The mental health care provided to this inmate was poor. Documentation was lacking for critical mental health evaluations and clinical contacts. This EOP inmate was not seen weekly by the clinical case manager in the administrative segregation unit. Although it

471

was unclear from the documentation in the medical record, it appeared that this inmate may have been placed into the EOP due to his diagnosis of Exhibitionism. There was poor monitoring of medication compliance. Lastly the medical record was in complete disarray with misfiling and information that was not filed in chronological order.

**Inmate F**

This inmate had been placed into the EOP on 9/5/07 according to the placement chrono; although no mental health evaluation or treatment plan was located in the medical record. A psychiatric progress note dated 9/20/07 listed the inmate's diagnosis as Bipolar Disorder, NOS. He was prescribed Zyprexa 20 mg/day, Paxil 20 mg/day and Depakote 1500 mg/day; all medications were ordered for DOT. Current informed consent forms were present in the medical record. There was an IDTT progress note dated 9/5/07 in the chart, but it was minimal in content and indicated that the inmate was not present for the IDTT meeting. The inmate was in administrative segregation at that time; although the EOP roster listed the inmate as housed in a general population housing unit. There was a lapse in the documentation of daily psych tech rounds that may or may not have occurred when the inmate was in administrative segregation. The psych techs utilized the same forms for daily administrative segregation rounds as they did for daily contact with non-administrative segregation EOP inmates.

A review of the medical record indicated that the inmate was not seen weekly for clinical contact as required by the Program Guide. He was evaluated consistently by the psychiatrist.

*Findings:*

This inmate did not receive adequate mental health care. He was not seen weekly by the clinical case manager. Treatment plans and mental health evaluation were not documented in the medical record. As was described in the reviews of other inmates housed at KVSP, there appeared to be confusion regarding the required level of care that this inmate was assigned. Daily psych tech rounds may not have been documented as required.

**Inmate G**

This inmate was prescribed Thorazine 200 mg/day and Cogentin 2 mg/day; however, these medications were discontinued on 8/22/07 when the psychiatrist reported that the inmate signed a medication refusal form. However, a refusal form could not be found in the chart. There was an updated CDCR 7386 mental health evaluation dated 7/20/07. The inmate had been admitted to the MHCB on four occasions during 2007. According to the updated mental health evaluation, a packet was completed for DMH referral. There was insufficient documentation to determine if the referral was actually sent to DMH. The diagnoses listed in this evaluation were Mood Disorder, NOS and Antisocial Personality Disorder. A suicide risk assessment was also completed at that time. There was an IDTT progress note completed on 8/15/07, but there was no corresponding

472

treatment plan located in the medical record. The IDTT meeting was conducted without the inmate, and the progress note did not explain the reason for the inmate's absence. This inmate was seen regularly by the psych techs in the administrative segregation unit, but he was not seen by a clinical case manager for weekly clinical contacts.

*Findings*:

The mental health care that was provided to this inmate was clinically inadequate. This inmate's medications were discontinued reportedly after the inmate refused medications and signed a medication refusal form. This form was not located in the medical record. Although the updated mental health evaluation indicated that the inmate had been appropriately referred to DMH due to his multiple MHCB admissions, there was inadequate documentation to confirm that the referral was actually submitted. This EOP administrative segregation inmate was not seen for weekly clinical contacts by the clinical case manager.

**Inmate H**

This inmate was receiving mental health care in the 3CMS program. He was treated with Celexa 20 mg/day. The medical record did not contain a mental health evaluation, suicide risk assessments or treatment plans. The fourth volume of the medical record was provided for review, and it appeared that pertinent documents were not present in this volume of the medical record. This inmate was not seen by the clinical case manager on a weekly basis. The inmate was seen daily for psych tech rounds in administrative segregation.

*Findings*:

Informed consent for treatment with Celexa and a placement chrono were present in the medical record. There was documentation of daily psych tech rounds in the administrative segregation unit. This inmate was not seen weekly by the clinical case manager. The medical record required reorganization to include pertinent, current clinical information.

**Inmate I**

The IDTT meeting for this inmate occurred on 8/28/07; the meeting noted that the inmate had a supportive family, a confrontational demeanor, and poor impulse control. He was continued in the 3CMS program. A treatment plan was not located in the medical record. On 9/18/07 the inmate refused to attend a clinical case manager visit; he was seen by a clinical case manager on 9/21/07 when it was noted that he had been stable off medications for one year.

*Findings*:

The 3CMS inmate appeared to be stable from a mental health standpoint. He was seen periodically by the clinical case manager. There was no treatment planning documented or diagnosis provided.


**Inmate J**

This inmate was treated for Major Depressive Disorder with Wellbutrin 300 mg/day. He was seen by the clinical case manager on four occasions during the quarter prior to the site visit. The clinical case manager progress notes were minimal, but they indicated that the inmate was stable and compliant with prescribed medications. The psychiatrist also reported that the inmate was stable and was without complaints.

*Findings*:

The mental health care that was provided to this inmate appeared to be adequate. He was reportedly stable on his prescribed medications. The clinical case manager progress notes were, however, minimal in content.

EXHIBIT R
North Kern State Prison (NKSP)
January 16, 2008 – January 17, 2008

**Inmate A**

This EOP inmate arrived at NKSP on 11/19/07.  There were two diagnoses present in the medical record; these diagnoses were Schizophrenia and Schizoaffective Disorder. Although the bus screen documented that the inmate arrived on 11/19/07, his initial medication orders and psychiatric referral for medication continuity were dated 11/15/07. He was prescribed Seroquel 300 mg/day.   Lipid and glucose blood levels were also ordered on that same date.  According to the MAR, the inmate received his first dosage of medication on 11/18/07 which was one day prior to documented bus screen arrival date, but three days after the date of his initial orders.  The informed consent for prescribed medications was dated the same as the medication orders (11/15/07).

The inmate was scheduled for an EOP IDTT meeting on 11/29/07.  On 12/7/07, the inmate was seen by the psychiatrist in response to a referral.  He reported auditory hallucinations and exhibited disorganized thinking at the time of this evaluation.  The psychiatrist increased the inmate's Seroquel to address these psychotic symptoms.  The inmate continued to exhibit disorganized thinking, and at his next psychiatric evaluation on 1/7/08, his medication administration was changed to DOT to address possible medication noncompliance.

*Findings:*

There were lapses noted regarding the frequency of clinical contacts.  Discrepancies regarding the date of arrival to the facility made it difficult to determine if medications were continued without disruption at the time of arrival to the facility.  In spite of these issues, the medication management appeared to be clinically appropriate.  Informed consent for treatment with prescribed medications was present in the medical record, and the appropriate laboratory testing for prescribed medications was obtained.

**Inmate B**

This inmate arrived at NKSP on 12/12/07.  The bus screen indicated that the inmate had denied a history of mental health treatment.  He was seen by a psychologist on 12/20/07, and a psychiatric referral was submitted.  He was seen by a psychiatrist 16 days later when he was prescribed Seroquel 300 mg/day.

*Findings:*

Informed consent was present for treatment with prescribed medications.  Laboratory studies were also documented, as was the completion of a suicide risk assessment.  Due to the disarray of the medical record, it was extremely difficult to follow the course of treatment for this inmate.

476

**Inmate C**

This 3CMS inmate arrived at NKSP on 4/30/07.  He was provided with diagnoses of Bipolar Disorder, Polysubstance Dependence and Antisocial Personality Disorder.  He was treated with Depakote ER 2000 mg/day and Seroquel 500 mg/day.  The inmate's medications were ordered on the date of arrival, and laboratory testing was also obtained at that time.

On 5/1/07, this inmate was evaluated by mental health in response to a nursing referral due to aggressive behavior that was exhibited by the inmate.  He was placed into the 3CMS program at that time.  This inmate was seen for psychiatric follow-up on 7/27/07 and again on 12/27/07.

*Findings:*

Medications were continued upon the inmate's arrival at NKSP.  The medical record was in such a state of disorder that it was very difficult to determine the frequency and existence of clinical contacts.  There was even an instance of another inmate's information being filed in this inmate's medical record.  The inmate was initially evaluated by the psychiatrist timely; however, subsequent follow-up with the psychiatrist was delayed.

**Inmate D**

This 3CMS inmate was provided with diagnoses of Bipolar Disorder and Alcohol Dependence.  On 10/17/07 the following medications were ordered: Klonopin, Depakote, Vistaril and Paxil.  These medications were administered to the inmate on the following day.  Seroquel was later added to the medication regimen.  Laboratory testing for Depakote was ordered on 12/29/07.

*Findings:*

The mental health care that was provided for this inmate appeared to be clinically appropriate.  There was documentation for the rationale of medication changes and adjustments.  The appropriate laboratory testing was performed.  The inmate was followed consistently for clinical contacts.  An area of needed improvement was the organization and timely filing of medical records information.

**Inmate E**

This inmate was referred to the MHSDS program for psychiatric evaluation because a full medical evaluation concluded that there was no medical basis for his chest pain.  He was provided with diagnoses of Generalized Anxiety Disorder and Panic Disorder without Agoraphobia.  During the IDTT meeting the inmate continued to exhibit anxiety related symptoms.  The treatment team recommended evaluation by the psychiatrist for

477

medication management as well as cognitive behavioral therapy to address the inmate's panic symptoms.

*Findings*:

The mental health evaluation and treatment that was provided to this inmate was clinically appropriate.

**Inmate F**

This 3CMS inmate was diagnosed with Anxiety Disorder. His mental health history was significant for suicidal ideation that occurred during December 2007; he was treated with Seroquel at that time. The inmate was evaluated in an IDTT meeting during the site visit due to his medication noncompliance. At the time of the IDTT meeting, the inmate denied suicidal ideation and denied the need for continued medication treatment. The treatment team recommended continued involvement in the 3CMS program.

*Findings*:

The treatment team's recommendation for continued monitoring and treatment in the 3CMS program was clinically sound in light of this inmate's recent history of suicidal ideation.

**Inmate G**

This inmate was provided with a diagnosis of Schizoaffective Disorder. He was treated with Risperdal Consta 50 mg intramuscularly every two weeks, Seroquel 800 mg/day and Depakote ER 2000 mg/day.

This inmate had been admitted to the MHCB on five occasions. A Keyhea order was sought and granted during the second MHCB admission; this Keyhea was effective until July 2008. The inmate was also referred to DMH. He was also classified as a MDO; he was scheduled for parole to ASH on 1/31/08. Clinical relevant laboratory testing was ordered.

*Findings*:

It did not appear that this inmate was receiving maximum benefit from his current medication regimen. Given this inmate's history of multiple MHCB admissions, his history of previous suicide attempts, and his inability to function in administrative segregation, transfer to DMH was indicated.

EXHIBIT S
California State Prison, Los Angeles County (CSP/LAC)
November 13, 2007-November 16, 2007

**Inmate A**

This EOP inmate was provided with a diagnosis of Psychotic Disorder, NOS.  He arrived at CSP/LAC on 10/10/06.  On 10/25/07 the inmate's Risperdal was discontinued, and his antipsychotic medication was changed to Haldol Decanoate 100 mg intramuscular every four weeks.  The MAR reflected that the inmate did not receive his medications until four days after the order was written.  There was timely documentation of clinical case manager contacts.

*Findings:*

This inmate was seen for weekly clinical contacts.  There were problems regarding medication management.  There appeared to be a delay in the inmate's receipt of prescribed medications.  There was also a problem with the ordering and monitoring of necessary laboratory studies for treatment with atypical psychotropic medications.

**Inmate B**

This 3CMS inmate was transferred to CSP/LAC on 1/10/07.  He was prescribed Thorazine and Geodon.  There was documentation of informed consent for treatment with Effexor and Desyrel; however, consent was not present for Thorazine and Geodon.

*Findings:*

Pharmacological treatment appeared to be clinically appropriate; improvement was required, however, in obtaining the necessary informed consent for treatment with all prescribed psychotropic medications.  Clinical contacts by the case manager were documented at the required intervals.

**Inmate C**

This 3CMS inmate was housed in the administrative segregation unit.  He was diagnosed with Depressive Disorder, NOS.  He was treated with Remeron 15 mg/day.

The inmate was transferred from a county jail to CSP/LAC on 9/12/07.  There was no documentation of psychotropic medication treatment while the inmate was housed at the county jail.  The inmate was previously incarcerated at DVI in the 3CMS program during 2006, when he reportedly was treated with Seroquel, Depakote and Wellbutrin.  These medications were discontinued prior to the inmate's release during April 2006.

A mental health evaluation (MH-7) was completed on 9/12/07, and the inmate did not meet the criteria for inclusion in the MHSDS.  A routine mental health screening resulted in referral for future evaluation.  The inmate was placed into the administrative segregation unit as he had paroled from administrative segregation at DVI.  He was seen by the psychiatrist on 9/20/07 when he was treated with Remeron, and follow-up was

ordered for one month.  He was then seen by the psychiatrist on 11/8/07 when he was reportedly stable on medications.

*Findings:*

There was documentation of timely mental health screening and evaluation of this inmate at the time of intake. It was appropriate that he was not initially placed on medications as these were discontinued prior to his parole from DVI.  There was no chrono documenting his placement into the 3CMS program.  There was also no documentation of clinical case manager contact for this inmate.  It was unclear if the inmate had actually been placed into the mental health program.

An IDTT meeting was completed on 11/9/07; however, there was no other documentation of clinical case manager contact.

**Inmate D**

This EOP inmate was housed in the mainline EOP housing unit.  He was diagnosed with Schizophrenia, Paranoid Type; a provisional diagnosis of Delusional Disorder was also provided.  The inmate had been referred to mental health by the custody staff as the inmate had presented with paranoid behavior.  The inmate presented at that time with significant symptoms of paranoia, including delusional thinking, labile mood and agitation.  He was also guarded regarding acknowledgment of a history of, or the need for, current mental health treatment.  These symptoms led to numerous problems and assaultive behavior toward the custody staff and other inmates.  He was housed in a single cell, and the case manager obtained permission for the inmate to eat alone in his cell.  The inmate refused to consider treatment with psychotropic medications and lacked insight regarding his mental illness.   The mental health staff reported that they did not think that the inmate met Keyhea criteria because if left alone in his cell, he functioned adequately.  He was scheduled for parole within several months of the visit.

*Findings:*

This inmate presented with significant symptoms of paranoia, delusional thinking, assaultive behavior, limited functioning and poor insight regarding his mental illness. Keyhea should have been pursued in light of the severity of his presentation.  DMH intermediate care should have also been considered for this inmate with very poor functioning within the EOP.  There was no documentation of discharge planning for this inmate with significant mental health concerns.

**Inmate E**

This EOP inmate was housed in the mainline EOP unit.  He was treated with Zoloft, Geodon and Depakote ER.  Although he was reportedly compliant with medications, he continued to display prominent positive symptoms of psychosis including hallucinations, thought disorganization, guardedness and paranoia.  He was unable to tolerate having a

cellmate.  At an IDTT meeting on 12/13/07, the treatment team discussed psychotropic medication adjustment in addition to referral to DMH for ICF level of care.

*Findings:*

There was no documentation of a valproic acid level in the medical record, despite this inmate's treatment with Depakote for greater than one year.  An order for a valproic acid blood level was written 11/2/07.  More aggressive psychopharmacological intervention was indicated in light of the persistence of this inmate's symptoms.  Referral to a higher level of care should have occurred more timely.

**Inmate F**

This EOP inmate was diagnosed with Delusional Disorder.  He was seen weekly by his clinical case manager and monthly by the psychiatrist.  He had initially been refusing psychotropic medications, but he later agreed to medication treatment.  Zyprexa and Benadryl were prescribed on 11/14/07.  He was also assigned to group therapy.

*Findings:*

There was no informed consent for prescribed medications located in the medical record.  Quarterly IDTT meetings were documented and included the necessary participants.  This inmate appeared to be receiving appropriate mental health care.

**Inmate G**

This EOP inmate was housed in the mainline EOP unit.  He was diagnosed with Schizoaffective Disorder.  He was prescribed Zoloft and Risperdal.  Progress notes indicated that this inmate was stable on his prescribed psychotropic medications.

*Findings:*

There were no informed consent forms for prescribed medications located in the medical record.  It appeared that the inmate was involved in group therapy.  The inmate was seen by the case manager on a weekly basis for individual therapy.  The EOP level of care was appropriate for this inmate.

**Inmate H**

This EOP inmate was housed in the mainline EOP unit.  He was serving a life sentence.  The inmate had a history of removal from the EOP after exhibiting improvement and stabilization; he was then transferred to the 3CMS program.  The inmate was returned to EOP level of care during August 2007 when he decompensated while housed in general population.

Upon his return to the EOP, the inmate presented with mild agitation, disorganized speech and thinking. He was prescribed Trazodone, Risperdal and Cogentin. An IDTT review conducted on 11/13/07 indicated that the inmate remained psychotic and was partially compliant with taking prescribed medications. The treatment team indicated that the inmate would remain in the EOP for the next ninety days, and he would be referred to DMH if no improvement was noted with increased medication compliance. The psychiatrist also agreed to re-evaluate the inmate's medications due to the presence of continued symptoms.

*Findings*:

This inmate required more aggressive treatment than was provided. The delay for ninety days in evaluation of the need for a higher level of care was unwarranted. The inmate should have been considered for transfer to a higher level of care based upon his continued psychotic symptoms and partial medication compliance.

## Inmate I

This transsexual 3CMS inmate was housed in general population. Prior to entering prison, the inmate had undergone sexual reassignment surgery. Psychotropic medications included Remeron, Prozac and Benadryl. The inmate was also prescribed hormonal therapy. The inmate was evaluated on a weekly basis by the case manager and monthly by the psychiatrist.

*Findings*:

This inmate appeared to be receiving adequate mental health services. Concern was noted regarding possible victimization of this inmate in general population. This issue was brought to the attention of the CDCR Central Office for review.

## Inmate J

This 3CMS inmate was treated for obsessive compulsive symptoms with Paxil. The progress notes indicated that the inmate had good response to medications with decrease in target behaviors of checking and hand washing. He was seen by the psychiatrist on 6/14/07 and his medication was renewed for ninety days. The inmate was not seen again by the psychiatrist until 10/10/07 when he reported that his medication had stopped on 8/22/07. The inmate reported that he felt ill for two weeks after his medication was abruptly discontinued. For this reason, he stated that he did not wish to resume the medication.

The inmate was seen by his case manager at irregular intervals. He was seen twice during April 2007 and once during July, 2007. The most recent treatment plan was dated 6/4/07. It had not been updated to reflect the discontinuation of psychotropic medications. This inmate attended one of the 3CMS groups.

*Findings*:

There was a lapse in psychiatric clinical contact between June and October 2007. This lapse resulted in medication discontinuity for Paxil, a medication for which abrupt withdrawal can result in significant medication side effects. The inmate refused to continue Paxil as a result of the abrupt discontinuation of his medication with resulting unpleasant side effects. This inmate was not seen at least every ninety days for individual therapy by the case manager. The treatment plan had not been updated to reflect current treatment concerns. The inmate, however, did appear to be stable. Transfer to a higher level of care was not clinically indicated.

**Inmate K**

This inmate's case was reviewed at the request of the plaintiffs' attorneys due to the inmate's report of staff misconduct and increasing suicide ideation and depression. He was transferred to CSP/LAC from CEN for EOP level of care. He was diagnosed with Anxiety Disorder, NOS; a provisional diagnosis of Adjustment Disorder with anxious mood was also present in the medical record. He refused to attend many groups, indicating that he did not require mental health services. When he did not display signs or symptoms of serious mental illness, he was changed to 3CMS level of care (June 2007). The inmate stated that he wanted to return to the EOP program, as the groups were beneficial for him.

The inmate was evaluated weekly by his case manager. He frequently declined to come out of his cell for clinical contacts. He was seen monthly by the psychiatrist. He was prescribed Zoloft, Benadryl, Buspar and Thorazine. However, he frequently refused medications as was documented in the MAR. He reportedly did not exhibit evidence of psychosis or a mood disorder. The inmate was followed consistently by the case manager and the psychiatrist.

*Findings*:

This inmate was receiving mental health services at the appropriate level of care. He was followed consistently by clinicians at the required frequency.

**Inmate L**

This inmate was housed in the administrative segregation unit where he was serving a SHU term for indecent exposure. This case was reviewed at the request of the plaintiffs' attorneys to determine the reason why this inmate with a history of documented episodes of exhibitionism, had not been referred to the CDCR Exhibitionism Treatment Program.

*Findings*:

A review of the information provided revealed that this inmate had been referred to the Exhibitionism Treatment Program based on the frequency of his episodes of indecent

484

exposure.  He was referred to the program on 10/25/07.  The inmate had only been referred within three weeks of the site visit, and follow-up with C&PR had already occurred regarding transfer.

EXHIBIT T
California Correctional Institution (CCI)
January 16, 2008 – January 17, 2008

**Inmate A**

This inmate's case was reviewed at the request of the plaintiffs' attorneys.  He was classified as an EOP inmate, who had been housed in the administrative segregation unit for safety concerns since August 2007.  In correspondence with the plaintiffs' attorneys, he had reported that he was experiencing increased anxiety, fear, depression and insomnia related to the reasons for his administrative segregation unit placement and the conditions in the administrative segregation unit.

At the time of the monitoring tour, this inmate was receiving EOP level of care. Since September 2007, this individual had been seen consistently by the mental health staff on a weekly and occasionally biweekly basis.  Most contacts in September and October were at cell front.  Clinical contacts after that time appeared to have occurred within confidential settings.  Progress notes indicated that this inmate was described as exhibiting evidence of depressed mood during his case manager clinical contacts for several months prior to the monitoring visit.  He had been awaiting transfer to an EOP since 8/9/07; the deadline for transfer was 10/8/07.  He was apparently awaiting transfer to MCSP.

There was no documentation that this inmate was involved in mental health services other than weekly clinical contacts until 1/5/07 when he was involved in a group. It should be noted that few groups had been offered to administrative segregation unit inmates before several weeks prior to the monitoring visit.

A treatment plan developed on 11/15/07 did not include a problem list or interventions for this inmate.  Signatures on the treatment plan indicated that the IDTT consisted of two psychologists and a psychiatrist.

*Findings*:

This inmate presented with mildly depressive symptoms that persisted for the past several months prior to the visit.  Consideration for expedited transfer to an EOP, although unlikely, should have been discussed by the treatment team.  Furthermore, consideration for referral to ICF level of care should have occurred.  These recommendations were made to the facility staff during the site visit.

**Inmate B**

This inmate's case was reviewed at the request of the plaintiffs' attorneys.  He was classified as an EOP inmate who was housed in administrative segregation unit for safety reasons.  He had a history of crisis bed admissions at KVSP.  He wrote to the attorneys that he was experiencing difficulty coping with his long stay in the administrative segregation unit.  This inmate had been awaiting transfer since mid August 2007; the transfer deadline was 10/15/07.  He was seen consistently for weekly case manager

contacts but had only recently had the opportunity to participate in group therapy. He had a history of periodic decompensation and was hospitalized in the MHCB from 6/6/07 through 6/13/07, and 7/3/07 through 7/17/07. He was diagnosed with Major Depressive Disorder with psychosis. At the time of the monitoring tour, he was prescribed Haldol, Risperdal Consta (intramuscular) and Effexor. He had a history of significant decompensation with auditory and visual hallucinations. The recent medical record entries indicated that this inmate presented with consistently blunted affect, diminished level of functioning and depressive symptoms.

*Findings:*

Due to his persistent symptoms and diminished level of functioning, this inmate should have been considered for referral to ICF level of care. Recommendations for ICF referral and EOP expedited transfer were provided to the facility staff at the time of the site visit.

**Inmate C**

This inmate's case was reviewed at the request of the plaintiffs' attorneys. He had a history of EOP treatment; however, he was transferred to the CCI SHU. The inmate had reported to the attorneys that he had been placed on suicide watch for several days in his cell during October 2007.

Although the inmate was seen for weekly case manager contacts, a substantial proportion of these visits occurred at cell front. He had not been participating in groups. He was hospitalized at DMH acute care during 2005, and he was discharged with a diagnosis of Psychotic Disorder, NOS. He was housed in the OHU at CCI from 10/1/07 through 10/3/07 as a "conservative" intervention when he was informed of his grandmother's death. Despite this intervention, the inmate reported that he was not suicidal at that time. He was discharged with a diagnosis of Schizoaffective Disorder.

The medical records revealed a history of suicide attempts since the inmate was fifteen years of age. There was a significant family history of suicide, including his mother and an uncle. Since early December 2006, the medical records progress notes consistently described this inmate as "despondent," confused and experiencing auditory hallucinations. Significantly, the most recent chart entry indicated that "while not at this moment, the danger for suicide is real and significant."

*Findings:*

This inmate had a significant family history of suicide, several recent losses and a diagnosis of psychosis. There were consistent notations in the medical record describing his despondent mood. This inmate should have been considered for referral to ICF level of care when his placement into EOP could not be expedited.

**Inmate D**

This 3CMS inmate was diagnosed with Schizoaffective Disorder.  He arrived at CCI from WSP on 11/7/07.  He was treated with Risperdal 0.5 mg/day and Remeron 30 mg/day.  His bus screen was completed, and the relevant history noted upon his arrival to CCI.  He was seen promptly by the psychiatrist at CCI on 11/15/07, the same day of his IDTT.  Another psychiatrist proved a diagnosis of Major Depressive Disorder with psychotic features.  The inmate's history included two suicide attempts by overdose.  The second psychiatrist noted the presence of delusions with paranoia, and he increased the inmate's medication with follow-up scheduled for three months.

The treatment plan of 11/15/07 noted that the inmate was considered for, but not referred to DMH.  The plan noted his poor coping skills and the need to maintain medication compliance.  The symptoms of irritability, depressed mood, low energy, hallucinations and delusions were to be treated with medications.  The plan suggested that the inmate might be "manipulating" to get access to a cane; the plan also speculated whether he might have below average intellectual functioning, and that he had mild to moderate impairment in attention and memory.

*Findings*:

This inmate was evaluated timely upon arrival and throughout his stay at CCI.  This inmate's mental health history, current symptoms, increased medication and the consideration of the need for a higher level of care, even though this was apparently not thought to be indicated, warranted consideration for more frequent clinical contact than follow-up with the psychiatrist in three months.  The possibility that the inmate might have below average intellectual functioning was mentioned in passing without rationale for the basis for this possibility, or a plan for conducting the further assessment which might have been warranted.

**Inmate E**

This 60 year old 3CMS inmate arrived at CCI from NKSP on 4/18/07.  He was diagnosed with Mood Disorder, NOS, Polysubstance Abuse and Substance-Induced Psychotic Disorder with delusions.  He was treated with Risperdal 2mg/day.

He was seen on a monthly basis by psychiatry during his stay at CCI, particularly during periods of medication adjustment.  These adjustments included tapering the inmate off Seroquel, increasing Paxil and adding Risperdal secondary to the presence of psychotic symptoms.  There were different opinions regarding his diagnosis; a new psychiatrist changed the diagnosis on 7/14/07 to Mood Disorder, NOS, and this diagnosis was changed by the original psychiatrist on 8/7/07 to Depressive Disorder, NOS.  Despite these changes in diagnoses, the diagnosis in MHTS was noted as Mood Disorder, NOS, Polysubstance Abuse and Substance-Induced Psychotic Disorder with delusions.  One psychiatric progress note indicated that the inmate, who was apparently predominately Spanish-speaking, was seen with the assistance of a translator.

489

The inmate was generally seen for follow-up by the case managers within minimal program guidelines, but there was an unexplained gap between contacts on 2/20/07 and 8/3/07. The case manager notes described the limited English spoken by the inmate and also noted the presence of auditory and visual hallucinations. On 11/1/07 a case manager entry documented the presence of auditory and visual hallucinations that appeared to be improving with medications. The progress note also indicated the need for a social worker at CCI to assist with SSI due to the inmate's pending release in September, 2008. The incompleteness of the assessment was attributed to the language barrier. The inmate was seen for follow-up by the case manager on 11/30/07; however, it was not clear from the entry whether the language issue was addressed.

The IDTT of 2/7/07 noted that the inmate was primarily Spanish speaking; his diagnosis was changed Substance-Induced Psychotic Disorder, Mood Disorder, NOS and Cocaine Abuse. The problem list listed "depression" and "cocaine" as target behaviors, in addition to negative thoughts and mood liability. The objectives related to cocaine use were sobriety, increased medication compliance and stabilization of mood and sleep.

_Findings_:

The inmate was generally seen for clinical contact within Program Guide timelines. Overall, the case manager's progress notes were sparse, seemingly related to the on-going issue of language and communication. The inmate's English was repeatedly described as limited, and the staff apparently spoke varying degrees of Spanish; however, only one clinician utilized the services of a translator. A translator should be used for any clinical contacts with non-English speaking inmates.

The inmate was evaluated by the psychiatrists frequently; although, his diagnoses remained preliminary and changed based upon each individual clinician. The goals in the treatment plans were vague and not clearly reflected in the documentation of case manager contacts.

490

EXHIBIT U
California Institute for Men (CIM)
October 10, 2007 – October 12, 2007

**Inmate A**

This inmate's medical record was reviewed due to several referrals for crisis care. After he reported that he was an EOP inmate and had not received his medications, the inmate was admitted to the MHCB on 6/18/07, and he was discharged on 6/21/07. He was reportedly discharged after he did not demonstrate any discernable symptomology. On 6/22/07, he was reportedly "suicidal;" he was apparently readmitted to the MHCB at that time.

The inmate was again readmitted to the MHCB due to suicidal ideation on 7/21/07, and he was discharged on 8/6/07. Progress notes at the time of this admission indicated that the inmate had reported suicidal ideation within one day of discharge after an earlier admission to the MHCB; however, documentation of that admission was not located in the medical record. On 8/6/07 a progress note indicated that "the patient has reached maximum benefit from MHCB treatment since 7/21/07." The inmate was described as having a history of exaggerating symptoms in an effort to remain in the hospital. Progress notes indicated that he was deemed not to be appropriate for DMH referral "due to the absence of significant psychiatric symptoms."

There were several chronos in the inmate's medical record that documented that this inmate was maintained at the EOP level of care through most of 2005 and 2006. There was a chrono in the medical record dated 12/11/06 that documented that the inmate appeared to be exhibiting significant psychotic symptoms. The medical record documented the presence of EOP treatment plans since at least August, 2006 when he was housed at CMC East. The treatment plan was updated by the IDTT as recently as 8/29/07. The most recent treatment plan was clinically appropriate and included recommendations for group therapy in which the inmate was involved at the time of the visit. There was also documentation that indicated conflicts between group therapy and yard times.

A psychiatric progress note dated 7/5/07 indicated that the inmate's medications were apparently discontinued on approximately 8/14/07 as a result of his medication refusal. A progress note dated 8/8/07 was essentially a blank page.

*Findings*:

This inmate had a history of EOP placement for an extended period of time and remained at this level of care. He was hospitalized in the MHCB on at least two, and possibly three occasions during the months preceding the visit. Progress notes described the inmate as having a history of exaggeration of symptoms. There was at least one IDTT consideration of the need for a higher level of care. With a few exceptions, progress notes were generally adequate. It would appear that the inmate's participation in groups was impacted by simultaneous scheduling of yard as well as occasional cancellation of groups. Psych tech rounds were documented in the medical record.

**Inmate B**

This 27 year-old inmate was in the EOP and was housed in the administrative segregation unit at CIM.  He was placed in the administrative segregation unit on approximately 9/5/07 for multiple occurrences of indecent exposure.  A progress note on 9/6/07 indicated that the inmate was to be referred to the IDTT for evaluation of exhibitionism; however, this did not occur.  There was no evidence that this inmate was screened prior to his placement in administrative segregation unit.  He was admitted to the MHCB on 8/7/07, and he remained there until 8/20/07 due to depression and suicidal ideation.  He was described as "somewhat psychotic" and experiencing auditory hallucinations.  He was characterized as "stable" at the time of discharge.

There were progress notes by a psychologist dated 9/5/07 that were present in the medical record; however, the notes were uninformative and consisted of notes on a preprinted form indicating that the inmate was seen at cell front, had no complaints and reported no suicidal thoughts.  The inmate was seen by the psychologist in ICC on 9/6/07, 9/10/07, 9/17/07 and 9/27/07.  Other progress notes documented the inmate's participation in group therapy as well as an evaluation by the psychiatrist and a clinician.  Psych tech rounds were also summarized in the medical record.  A treatment plan dated 2/27/07 did not include a treatment plan update

_Findings_:

This inmate had a history of at least one MHCB placement for depression, suicidal ideation and psychosis.  He was not screened at the time that he was placed into the administrative segregation unit, nor was he screened as per the existing policy regarding incidents of indecent exposure that resulted in administrative segregation unit placement.  It appeared that he was seen by clinicians on approximately a weekly basis since the time that he was placed into the administrative segregation unit.  Some progress notes indicated that the inmate attended groups, but there was no current treatment plan regarding this involvement.  The progress notes were often very sparse.

**Inmate C**

This 43 year old inmate had a history of several MHCB placements from 4/4/07 through 6/28/07.  These hospitalizations occurred from 4/4/07 through 4/9/07; he was also admitted again on 5/4/07 and again on 6/28/07.  The diagnoses provided to the inmate included Adjustment Disorder and Major Depressive Disorder.  During these hospitalizations, it appeared that the inmate stabilized quickly.

The medical record indicated that the inmate had been housed in the administrative segregation unit since March 2006.  Most of the clinical contacts for this inmate during the months prior to the visit appeared to have occurred at cell front.  Several progress notes indicated that the inmate had expressed suicidal ideation, and this resulted in the above noted transfers to the MHCB.  Many of the clinical notes were very sparse and

consisted of check-sheets documenting the cell front contacts, provided brief information regarding the condition of his cell and provided very little elaboration regarding his clinical condition. There was generally documentation of weekly contacts. The medical record contained no documentation of psych tech rounds since early April 2007.

*Findings:*

The inmate had a history of several MHCB placements secondary to threats of suicide. There was no documentation of IDTT consideration of the need for higher levels of care. It would appear that this inmate had been awaiting transfer to an EOP program for over two hundred days. There were no progress notes in the medical record that indicated that the IDTT had attempted or advocated expediting the inmate's transfer or considered referral for ICF level of care.

There was also no documentation that the inmate was screened prior to administrative segregation unit placement. There was no current treatment plan located in the medical record, nor was there documentation of the inmate's participation in group therapy. It did appear that the inmate was seen for the required follow-up after discharge from the MHCB for suicidal reasons.


**Inmate D**

This 40-year old inmate was receiving care at the 3CMS level of care in 2003. A progress note dated 1/8/07 stated that the inmate exhibited no significant symptoms and was essentially "stable." A chrono written on 3/4/07 stated that he did not meet the criteria for receiving mental health treatment, and another chrono on 3/14/07 apparently removed the inmate from the mental health caseload. Other information in the medical record, however, indicated that the inmate was referred for ICF treatment on 6/12/07. Despite this information, the medical record did not include documentation that explained the basis for the initiation of ICF referral. Furthermore, there was no indication that this referral was pursued by the IDTT.

There were no further progress notes for this inmate until 10/9/07; this note and a treatment plan indicated that the inmate was in the EOP. On that date, the treatment team provided a diagnosis of Bipolar Disorder. He had apparently been placed on Keyhea on 10/1/07, and the medical record indicated that he was hospitalized in the MHCB at that time. A suicide risk assessment was completed on 10/9/07.

*Findings:*

It appeared that information was missing from the medical record. This inmate had recently been hospitalized in the MHCB, and this information was not present in the medical record. The initial referral for ICF had been pending for several months, and there was no documentation in the record for the reason for referral. In fact, there was no documentation of this referral at all.

494

**Inmate E**

A chrono dated 4/19/07 documented that this inmate had been placed into the EOP on that date.  He was hospitalized in the MHCB on 3/29/07 and again on 4/4/07 for suicidal ideation.  He was also hospitalized in the MHCB within a few weeks prior to the monitoring visit, but information regarding this placement was not present in the medical record.  A referral to Atascadero State Hospital was initiated on 9/7/07; this referral was incomplete pending additional custody information.  There were some progress notes that documented a previous referral for ICF care.  However, this referral was also incomplete.

Although the progress note of a clinical contact on 4/19/07 indicated a plan for weekly follow-up, the next documented clinical contact occurred on 5/18/07.  He was evaluated by a psychiatrist on 8/16/07 and again on 10/9/07 (without the medical record).  The medical record did not contain evidence of IDTT consideration of the circumstances of the initial ICF referral.

*Findings*:

Due to the absence of critical information from the medical record, it was difficult to follow the progression of this case.  It appeared that, at the very least, the inmate was pending the completion of a referral for ICF care; this referral had been pending for a significant period of time.  Documentation of IDTT consideration of the need for ICF referral was also lacking.

EXHIBIT V
California Rehabilitation Center (CRC)
January 24, 2008 - January 25, 2008

**Inmate A**

This inmate arrived at CRC on 3/19/07.  The initial screening indicated a history of previous mental health treatment and a diagnosis of Schizophrenia.  A diagnosis of Depressive Disorder, NOS was also documented.  Upon arrival to CRC, Risperdal 2 mg/day and Remeron 15 mg/day were ordered.  A review of the MAR revealed that these medications were received within twenty-four hours after the inmate arrived to CRC. Informed consent was documented.  The initial orders for medications were written for thirty days, and psychiatric follow-up was also ordered at this time.  The inmate was seen by the psychiatrist within one week of arrival to the facility.  Remeron was increased to 30 mg/day due to the inmate's report of residual depressive symptoms.  This medication was subsequently decreased to 15 mg/day due to complaints of sedation.

The inmate was seen by the case manager three days after arrival; he was reportedly stable at that time. The initial IDTT occurred on 3/26/07, one week after arrival; the IDTT meeting consisted of the required participants.  He was then scheduled for follow-up within two weeks.

On 1/4/08, this inmate completed a Health Care Services Request Form requesting a change of his Risperdal on the basis of an unspecified problem.  He was seen by the psychiatrist one week later, when his Risperdal was discontinued at the inmate's request.

*Findings:*

The medications that the psychiatrist prescribed were clinically appropriate.  Changes in prescribed medications were responsive to documented complaints.  The inmate was seen by the 3CMS case manager as required by the Program Guide.  It appeared that the care provided to this inmate was clinically appropriate.

**Inmate B**

This inmate was transferred to CRC on 12/29/05.  The inmate had a history of mental health treatment, and he was diagnosed with Bipolar Disorder.  He was treated with Trilafon 4 mg/day, Benadryl 50 mg/day and Trileptal 1200 mg/day.

An IDTT meeting occurred on 1/24/08, and the appropriate staff was in attendance.  At the IDTT meeting, the inmate denied complaints and was focused on parole assistance. He was last seen by the therapist 1/4/08.  The inmate was seen by the psychiatrist on 11/19/07 and 10/19/07.

*Findings:*

Based on an inmate interview and medical record review, the mental health care provided to this inmate appeared to be clinically appropriate.  The medications that were prescribed were appropriate to the documented diagnosis and inmate symptoms.

497

Medications changes correlated with documented medication side effect complaints and clinical rationale.

**Inmate C**

This inmate arrived at CRC on 3/1/07. His screening form indicated a past history of treatment with Seroquel and Prozac. He had diagnoses of Bipolar Disorder and Polysubstance Abuse.

The initial IDTT occurred fifteen days after his arrival to CRC; the inmate was placed into the 3CMS program. He was followed consistently by the case manager. He was also seen for evaluation by the psych tech on several occasions with complaints of medication side effects. He was seen for follow-up by the case manager on 1/15/08 when he requested removal from the 3CMS program as he reported that he was doing well without psychiatric medication. An IDTT meeting occurred nine days later on 1/24/08; the inmate continued to report that he was doing well without medications. The appropriate composition of participants was present at the meeting. As the inmate was not forthcoming regarding information about his mental health history and presented with guarded and possibly paranoid demeanor, the IDTT recommended that the inmate return in thirty days for review of his case.

*Findings*:

Medication management appeared to be clinically appropriate. The decision of the IDTT to review, in 30 days, their decision to remove this inmate from 3CMS level of care also appeared to be clinically appropriate. Continued follow-up was recommended given the inconsistencies between inmate reports and information present in his C-file; these inconsistencies coupled with the inmate's paranoia and guardedness confirmed the need for continued monitoring.

**Inmate D**

This inmate arrived at CRC on 7/19/07. He had diagnoses of Major Depressive Disorder and Amphetamine Dependence. He had a history of past treatment with Prozac 80 mg/day. This inmate reported a history of a suicide attempt six years prior by cutting his wrist. The initial IDTT occurred six days after his 7/19/07 arrival. Two days later, a referral was made due to medication noncompliance. Although there was an 8/6/07 progress note which referenced the discontinuation of the inmate's Prozac, no corresponding physician's order was located in the medical record.

The inmate was seen by a psychologist on 12/17/2007 and 10/12/2007. An IDTT on 1/24/08 occurred due to the inmate's request to discontinue his 3CMS status. The IDTT meeting was attended by the required participants. The inmate reported that he had been doing well for six months in the absence of psychiatric medication. As the inmate had reportedly been stable, he was removed from the 3CMS caseload as per his request.

498

*Findings*:

The IDTT decision to remove the inmate from the MHSDS caseload was appropriate given the inmate's observed and reported level of functioning. The medical record, however, was poorly organized, resulting in difficulty in locating information within the record.

**Inmate E**

This inmate was transferred to CRC on November 9, 2007. He was diagnosed with Post Traumatic Stress Disorder (PTSD) and Methamphetamine Dependence. He was treated with Celexa 20 mg/day, Tenex 2 mg/day and Seroquel 200 mg/day. This inmate was seen by the psychiatrist on 12/3/07 which was delayed. The initial IDTT occurred on 1/24/08. The informed consent was present in the medical record; however, there was no MAR located within the UHR. Although the MHTS documented that a suicide risk assessment was completed during December 2007, it had not yet been filed at the time of the site visit.

*Findings*:

The poor condition of the UHR made it difficult to accurately track the inmate's course of treatment.

**Inmate F**

This inmate's case was reviewed as he had at least two placements into the OHU in recent months. The inmate arrived at CRC sometime prior to 7/13/07. He was seen by case managers at intervals of less than 90 days since that time. He self-referred on 7/1/07, 10/1/07, 12/15/07 and 1/20/08 and was referred to the psychiatrist on 11/21/07. It appeared that the self-referrals to psychiatry were processed within Program Guide timeframes. An IDTT occurred on 8/23/07.

The medical record was requested but was not available.

*Findings*:

It appeared that this inmate had been evaluated at the intervals specified within the Program Guide. Self-referrals were evaluated in a timely fashion. The mental health contact history indicated that the inmate was often seen on the same day that the self-referral was logged.

**Inmate G**

At the time of the monitoring tour, this inmate was receiving 3CMS level of care. He was seen on 7/11/07, and he reported that he was doing well. The progress note indicated

499

that the inmate was "euthymic" with no indication of major mental illness.  He was seen again on 8/21/07, 11/29/07 and again on 12/13/07.

The inmate was seen by the psychiatrist on 7/17/07 and 8/22/07, and he was diagnosed with Mood Disorder NOS.  He was prescribed Prozac, Buspar, and Seroquel at the time of review.

A treatment plan dated 8/21/07 indicated that the inmate should have "1:1 individual sessions" regarding depression.  It did not appear that this treatment plan had been revised, and there was no indication that the prescribed treatment activities have occurred during individual sessions.

The inmate was apparently housed in the OHU on 11/22/07 and 11/23/07.  Records indicated that he was placed on suicide watch.  There was no indication that this inmate was seen for five-day follow-up after this stay in the OHU.

*Findings*:

Case manager and psychiatric contacts occurred within the required timeframes.  There was a treatment plan in the medical record that was minimal in content, and the prescribed treatment (with the exception of medication) was not documented in the medical record.  The IDTT meeting had the necessary participants.  The documentation regarding the OHU placement was insufficient, and there was no indication that five-day follow-up after discharge from the OHU placement occurred.

**Inmate H**

This inmate was housed in the OHU from 9/21/07 to 9/24/07.  He reportedly presented with agitation and head-banging that precipitating this placement.  He was placed in restraints on one to one monitoring.  There was no indication that the inmate was considered suicidal or that he was on suicide watch.  The medical record indicated that by 9/24/07, he was calm and coherent, and he was released from restraints.  He was transferred back to his housing unit with no orders for five-day follow-up.

The inmate apparently arrived at CRC on 7/24/07; the initial IDTT did not occur until 8/20/07.  A treatment plan was completed on 8/7/07 and prescribed "cognitive therapy" as well as psychotropic medication.  A form 7389 was completed on 7/24/07 and included a diagnosis of "major depressive disorder; recurrent, moderate in remission."

Progress notes within the medical record indicated that the inmate was seen by a case manager on 9/24/07 and 9/25/07 as follow-up to OHU placement.  He was also seen on 9/26/07; although it was not clear whether this was in response to the five-day follow-up requirement. These follow-up visits were not noted within the Mental Health Contact History; this suggested inconsistency in the entering of contact information into this data base.

500

This inmate was seen by psychiatry staff on 8/9/07, 9/23/07, 9/27/07, 10/10/07, 11/23/07, 11/24/07, 11/25/07, 11/26/07, and 12/10/07.  It appeared that the inmate displayed manic symptoms including grandiosity, and frequent psychiatrist contacts occurred in an attempt to stabilize the inmate on medications.  He was prescribed Zyprexa and Depakote.

*Findings:*

There was no indication that the treatment plan had been followed.  The inconsistency between the information present within the inmate's medical record and the notations in the Mental Health Contact History suggested problems in entering accurate data of appointments into the MHTS.

EXHIBIT W
Richard J Donovan Correctional Facility (RJD)
December 4, 2007 - December 6, 2007

**Inmate A**

This 3CMS inmate arrived at RJD on 11/6/07, and was placed into an administrative segregation overflow unit on 12/3/07. The bus screen incorrectly indicated that the inmate had no mental illness, despite the fact that he reported taking Neurontin, Klonopin and Prozac and having depression. The inmate's mental health screen was positive, and following evaluation, he was ultimately placed into the MHSDS at the 3CMS level of care. A psychiatric progress note indicated that the inmate was seen by the psychiatrist on 11/6/07, and he was provided with a diagnosis of Major Depressive Disorder, recurrent, and Alcohol Abuse. He was prescribed Prozac 40 mg/day. There was no documentation in the chart of any contact following the inmate's placement in administrative segregation or of an administrative segregation pre-placement screen.

Upon interview, the inmate was extremely anxious and expressed frustration at being unable to obtain medical care for his swollen toe that he believed to be broken. He reported that he had not been given his full issue of property for administrative segregation and was experiencing significant anxiety of fears for his safety.

The inmate also expressed thoughts of self-harm. When the monitor indicated to custody staff that the inmate should not be returned to cell and should be moved to a safe place under constant observation, the THU sergeant responded by contacting the mental health staff. One housing officer repeatedly told the monitors that he was uncomfortable with keeping the inmate out and wanted to place him in the cell. When told that regardless of location, the inmate needed to remain under constant visual observation, the officer clearly became increasingly agitated. There was a psychologist in the building who could have initiated the risk assessment immediately, but none of the custody staff seemed to know or understand his role because they did not approach him. Eventually another mental health staff member not assigned to the administrative segregation portion of the overflow unit came to the housing unit. He was in the housing unit for less than five minutes to conduct the suicide risk evaluation. Consequently, the senior psychologist was contacted to ensure that the inmate's risk of self-harm was adequately assessed. A review of the documentation indicated that the original provider did not complete a suicide risk assessment or a progress note. There was absolutely no information documenting that any contact had occurred. There was a progress note from the second provider sent to see the inmate that documented a lengthy clinical contact. There was no administrative segregation pre-placement screen located in the medical record.

_Findings_:

This inmate's care has been negatively impacted by his placement in administrative segregation, particularly in the administrative segregation overflow unit. It was unclear if he was seen in accordance with Program Guide requirements for administrative segregation. The staff in the administrative segregation overflow unit (custody and mental health) did not appear to function as a team. The custody staff in the administrative segregation overflow unit did not appear to understand their role within the administrative segregation and appeared to have a problematic attitude toward

inmates and inmate safety. The lack of appropriate initial assessment of suicide risk was also very troubling.

**Inmate B**

This 3CMS inmate arrived at RJD on 10/22/07. A psychiatric chrono dated 10/5/07, indicated that the inmate was treated with Effexor and Seroquel. He was also prescribed Abilify, Buspar and Trazodone. A mental health evaluation was completed on 11/2/07 and provided the following diagnoses: Mood Disorder, NOS, Polysubstance Dependence and Antisocial Personality Disorder. There was no corresponding progress note in the medical record, nor was there any evidence of an IDTT meeting.

This inmate was placed into the administrative segregation overflow unit (building 16) on 11/29/07. There was documentation in the medical record that psych tech rounds were completed. There was no evidence that a pre-placement screen was completed, nor was there any other administrative segregation documentation in the medical record. A review of loose document filing indicated that this lack of information was not a medical records issue.

This inmate disclosed in an interview with the monitor that he had tied a rope around his light, and that it was hanging in his cell. He implied that he was having thoughts of self-harm. The custody staff appeared to be unconcerned after hearing this information. The monitor had to specifically request that they remove the rope from the light, if it was indeed present. The monitor observed that the inmate had indeed torn part of his sheet and had tied it around his light with one end hanging. The presence of this make-shift rope called into question the quality of the welfare checks and psych tech rounds in this overflow unit. The monitor asked the mental health staff to evaluate this inmate for suicide risk. There was a suicide risk assessment and a progress note that documented this clinical contact.

*Findings*:

This inmate was not seen for clinical contact in accordance with Program Guide requirements. The custody staff in the administrative segregation overflow unit did not appear to comprehend their role in suicide prevention on this unit.

**Inmate C**

This 3CMS inmate was housed in the administrative segregation overflow unit (building 16). According to the staff he arrived at RJD on 11/30/07, and was immediately placed into administrative segregation. No information was available regarding the reason for this placement. There was no medical record in existence for this inmate, according to the staff. Some documents were located, specifically a chrono that indicated that the inmate had been seen on 12/1/07 and was in the 3CMS program. This loose filing was still in the mental health offices and had not yet been submitted to the medical records department. There were no bus screens or other documents available, and the staff

reported that the inmate had not yet been seen by medical or dental for reception center evaluations. The inmate was scheduled to go to ICC on 12/5/07. There was no documentation that a pre-placement screen had occurred.

*Findings*:

This inmate's care was negatively impacted by the lack of an adequate medical record and documentation of his treatment, and possibly by his placement in the administrative segregation overflow unit.

**Inmate D**

This EOP inmate had been housed at RJD since 2006. He had apparently been in the EOP since September 2006, although there was no corresponding placement chrono. His mental health evaluation had not been updated since that time. He was diagnosed with Schizoaffective Disorder, Bipolar Type. He was prescribed Haldol, Zydis, Valproic Acid and Benadryl. In November 2007 the inmate was seen for quarterly treatment planning. All of the required participants were present at the meeting, but no treatment interventions were listed in the abbreviated treatment plan update. The previous treatment plan was generic in content. There was documentation of group therapy involvement, but it was difficult to determine the actual hours of therapy offered. The progress notes documented that the inmate was seen weekly for clinical contacts.

*Findings*:

Treatment planning was evident, but was not individualized. The inmate was involved in group therapy and was seen weekly by the case manager.

**Inmate E**

This EOP inmate arrived at RJD during March 2007. He was diagnosed with Bipolar Disorder, mixed, severe with psychotic symptoms. He was treated with Seroquel and Depakote. According to the medical record, this inmate was scheduled for eight hours of group therapy. There was no current treatment plan in the medical record; the prior treatment plan was generic in content. There was no documentation that the inmate was seen weekly for clinical contacts.

*Findings*:

There were lapses in the care that was provided to this inmate. He was not seen weekly by the case manager. Treatment planning was inadequate.

**Inmate F**

505

This 3CMS inmate had been housed at RJD throughout this monitoring period.  He was seen consistently by his case manager, more frequently than was required by Program Guide.  He had previously refused medications and did not appear for a scheduled psychiatric follow-up for that non-.appearance.  There were no subsequent psychiatric contacts.  An appointment was scheduled for 11/6/07, but it was canceled by the psychiatrist.  The inmate was seen by a different case manager for each clinical contact.  Based on a review of the medical record, it did not appear that any psychotropic medication had been prescribed for this inmate.

*Findings:*

Although this inmate was seen in accordance with Program Guide requirements for 3CMS case manager contacts.  There was not continuity of care for providers.  In addition, the psychiatric follow-up for this inmate appeared to be inadequate based on noted previous cancellations and no-shows for psychiatric appointments.

**Inmate G**

This 3CMS inmate was diagnosed with Mood Disorder, NOS.  The medical record was unavailable, so MHTS data was reviewed.  There was no prescription history available through the MHTS.  In addition, the MHTS arrival date information was clearly inaccurate when compared with the contact history (i.e., the inmate's arrival date at RJD occurred after multiple clinical contacts at RJD).  During this monitoring round, this inmate was housed in both administrative segregation and the Facility 3 gymnasium.  While housed in administrative segregation, more than 50 percent (four of seven) of the case manager contacts occurred at cell front.  In addition, on four dates the MHTS indicated that appointments had been refused by the inmate, while also indicating that the appointments had been completed.  The mental health supervisory staff could not explain these discrepancies, but they did state that they knew there was a problem with the communication between the DDPS and MHTS.

*Findings:*

A review of the MHTS without the UHR does not provide an adequate basis to assess this inmate's mental health treatment.

**Inmate H**

This EOP inmate was housed in one of the EOP housing units.  He was diagnosed with ADHD and Bipolar Disorder.  He was treated with Lithium 600 mg/day, Buspar 20 mg/day and Effexor 300 mg/day.  He was also classified as DD2 (a developmental disabled level of care).  His medical record was reviewed to evaluate whether appropriate medical referral was made regarding his severe tremor.

506

This inmate had been in the EOP at RJD since at least August 2006.  Progress notes indicated that he frequently presented with affective symptoms of anxiety.  He was seen consistently by the psychiatrist and the clinical case manager in the EOP.  The most recent progress notes indicated that the inmate was concerned regarding severe upper extremity tremor.  He was referred to the psychiatrist who subsequently referred him for evaluation by a MRI of the basal ganglia.

_Findings_:

There was generally documentation of weekly clinical case manager contacts.  There was also documentation of appropriate medical referral for this inmate.  This inmate was seen consistently by the psychiatrist.  The appropriate laboratory testing for treatment with Lithium was conducted.

EXHIBIT X
Central California Women's Facility (CCWF)
February 13, 2008 – February 15, 2008

**Inmate A**

This 3CMS inmate was housed in general population.  She was diagnosed with PTSD, Major Depressive Disorder and Panic Disorder.  She was treated with Zyprexa 15 mg/day, Hydroxyzine 150 mg/day and Paxil 60 mg/day.

This inmate was transferred from a county jail to CCWF on 11/14/07.  She was treated with Paxil, Risperdal and Cogentin at the county jail.  She was seen on the following day by a psychologist who noted that she had high levels of anxiety and depressions that were long-standing.  On 11/16/07, she was seen by the psychiatrist when her medications were changed from Risperdal to Trilafon, and Hydroxyzine was added.  She was seen again by the psychiatrist on 11/30 when Trilafon was changed to Zyprexa due to concerns of medication side effects.  Her medications were further adjusted after subsequent psychiatric evaluations.  She was seen by the clinical case manager on 1/30/08 when she presented with situational anxiety.

*Findings:*

The following comments were noted regarding the care provided to this inmate:
- This inmate was treated with several psychotropic medications at the time of transfer to CCWF.  Although there was documentation from the county jail, there was no documentation on the physician orders that these medications were ordered upon arrival to CCWF.  The MAR did indicate that medications were ordered on the day of arrival to the facility.

- There was documentation of informed consent for treatment with psychotropic medications.

**Inmate B**

This EOP inmate was housed in the EOP housing unit.  She was diagnosed with Schizoaffective Disorder.  She was treated with Remeron 45 mg/day and Benadryl 100 mg/day.

This inmate was transferred from a county jail to CCWF on 10/4/07.  She was treated with Seroquel and Celexa while housed at the county jail, and her medications were ordered on the day of arrival.  A mental health evaluation was completed on 10/10/07, and it indicated that the inmate would be referred to the psychiatrist.  She did not show for her initial appointment; however, she was seen on 10/25/07 when her medications were adjusted to address her continued depressive symptoms.  On 11/2/07, she reported suicidal ideation with threats of self harm.  She was seen by two clinicians on that date and was then placed into the EOP.  There was a lapse in documentation of clinical contact; she was then seen on 12/27/07.  The progress note indicated that she had been removed from the EOP at that time and that she was experiencing auditory hallucinations of self harm.  Subsequent progress notes indicated that she was noncompliant with

509

medications and had made repeated threats of self harm.  She was returned to the EOP on or about 1/10/08.

*Findings*:

The following comments were noted regarding the care provided to this inmate:
- This inmate presented chronically with suicidal ideation and threats.  Only one suicide risk assessment was located in the medical record, despite this inmate's repeated threats of self harm.

- There was documentation of involvement in EOP groups.

- There was documentation of treatment planning; however, the treatment plan was generic.

- There was not documentation of CCI participation in the IDTT meeting.

- There were lapses in the documentation of weekly EOP contacts.

- It was of concern that this inmate was transferred in and out of the EOP in such a short period of time.


**Inmate C**

This 3CMS inmate was housed in the administrative segregation unit.  She was diagnosed with Depressive Disorder, NOS.  She was treated with Prozac 20 mg/day.

This inmate was transferred from a county jail to CCWF on 8/15/07.  She was treated with Seroquel and Zoloft at the county jail.  Zoloft was continued upon arrival to CCWF.  She was screened on 8/17/07 and was then referred to mental health.  An MH-7 was completed on the same date, and she was placed into the 3CMS program.  She was seen on 8/23/07 by the psychiatrist, and Zoloft was continued.  She continued to report depressive symptoms; her medications were changed several times, ultimately to Prozac.  She was followed consistently by the clinical case manager and psychiatrist.  She reported that she had enemy concerns and was moved to the administrative segregation unit on 1/18/08.  Subsequent progress notes indicated that she was doing well on Prozac.  She reportedly refused her clinical case manager contact scheduled for 2/7/08.

*Findings*:

The following comments were noted regarding the care provided to this inmate:
- Although it appeared that the inmate's Zoloft was continued upon arrival to CCWF, there was no documentation of physician orders located in the UHR.  The MAR did reflect that this medication was ordered on the day of arrival.

- The IDTT meeting in the administrative segregation unit did not document the presence of required participants.

- The administrative segregation unit treatment plan was generic and not individualized.

- There was documentation of mental health screening upon arrival to the administrative segregation unit.

- There was documentation of daily psych tech rounds.

- There was a lapse in the documentation of weekly clinical case manager contacts in the administrative segregation unit for the weeks prior to the site visit; it was unclear if this was a medical records filing issue as the facility reported no mental health filing backlog.

**Inmate D**

This inmate arrived at CCWF on 1/3/08 from a county jail. The initial health screening form indicated a history of prior mental health treatment, and the inmate was referred and scheduled to be seen by mental health in three days. The mental health evaluation was completed on 1/8/08. The following diagnoses were provided: Mood Disorder, NOS, Alcohol Dependence and Methamphetamine Dependence. She was determined to have a GAF of 60. She was subsequently placed into the 3CMS program for medical necessity and was referred to a psychiatrist for medication evaluation. The clinician noted that the C-file and UHR were not available at the time of the evaluation.

The information from the county jail indicated treatment with the following medications: Risperdal, Depakote and Benadryl. Despite this information, the initial medication order on the physician order sheet was dated 1/15/08, which was twelve days after the inmate's arrival at this institution. The lack of initial medication orders upon arrival and the absence of an MAR for January 2008, made it difficult to assess whether the medications were continued upon arrival.

On 2/8/08, the psychiatrist noted that the inmate had been moved to the EOP. There was no 128C placement chrono to document the level of care change to EOP located in the UHR. The staff reported that 128C probably had not yet been filed into the medical record.

*Findings*:

There appeared to be a lapse in continuity of medications upon the inmate's arrival to the institution as there was a lack of documentation of initial physician orders in the inmate's UHR. There was no documentation that outside mental health records were requested. Both the medical record and C-file were not available to the clinician for initial mental health evaluation. There was documentation that the appropriate laboratory testing for Depakote was performed.

511

**Inmate E**

This inmate arrived at CCWF on 12/7/06 from a county jail. She was treated with Risperdal and Zoloft at the county jail. Her initial health screening revealed a mental health history of auditory hallucinations. A referral was made to mental health for follow-up within fourteen days. She was seen for her mental health evaluation on 12/11/06 when she was placed into the 3CMS program; she was evaluated to have a GAF of 60 at that time. On 12/14/06 Desyrel and Risperdal were ordered. A chrono dated 2/8/08 indicated that the inmate's medical record had been reviewed by the TCMP; it did not appear that this review included an inmate interview or C-file review. An evaluation on 1/31/07 provided the following diagnoses: Cocaine Dependence, Alcohol Dependence and Psychotic Disorder, NOS. The inmate was subsequently referred to the psychiatrist for medication evaluation.

Subsequent progress notes by the case manager indicated that the inmate exhibited suicidal ideation as well as visual and auditory hallucinations. Despite these symptoms, the clinician recommended clinical contacts every ninety days. She was seen consistently by the clinical case manager contacts. The last updated treatment plan was dated 2/1/07; there was no recent annual review present in the medical record.

*Findings:*

Despite this inmate's documented history of psychotropic medication treatment at the county jail, there was no documentation that medications were continued without disruption upon the inmate's arrival at CCWF. This inmate was described as having suicidal ideation; however, there was no documentation of adequate assessment of suicide risk or the completion of a suicide risk assessment. More aggressive therapy was clearly indicated regarding the mental health services provided. This would include the need for updated treatment planning.

**Inmate F**

This inmate had been housed at CCWF since December 2005 when she was transferred from a county jail. Her initial health screening was completed in a timely manner and indicated a positive history of mental illness and treatment with psychotropic medications; she was subsequently referred to mental health. This inmate had been placed into the 3CMS program more than once during her stay at CCWF. At the time of the mental health evaluation, she was diagnosed with possible Antisocial Personality Disorder, Depressive Disorder, NOS and Polysubstance Dependence. The most recent treatment plan, that was dated 10/5/07, recommended group therapy referral and clinical case manager follow-up every 90 days. The inmate was seen by the psychiatrist at least on a monthly basis; however, there was no documentation of subsequent clinical case manager follow-up or evidence of group referral or participation located in medical record.

*Findings*:

The mental health care that was provided to this inmate was of concern. It was unclear if the numerous omissions in the medical record were due to medical records filing issues or an actual lack of care provided. There was poor documentation regarding level of care changes, incomplete and untimely treatment plans and lack of documentation of clinical follow-up as required. Furthermore, despite recommendation of group therapy referral, there was no documentation that this was actually completed.

**Inmate G**

This inmate arrived at CCWF on 8/7/07 after she was transferred from CIW as an EOP inmate. This inmate had an extensive history of mental health treatment, including inpatient hospitalization at Patton State Hospital. On 9/4/07, the inmate's level of care was changed to 3CMS, but she remained in the EOP housing unit. A treatment plan completed on 9/19/07 documented the presence of auditory hallucinations, mania, depression, delusions, disorganized thoughts, poor sleep and appetite. Interventions listed included medication management, continuation in the 3CMS program and follow-up with the case manager every ninety days.

The clinicians' progress notes indicated that the inmate was returned to EOP level of care during October 2007. On 12/19/07 the inmate was again discharged from the EOP to 3CMS level of care. On 1/3/08 the 3CMS IDTT provided the following diagnoses: Psychotic Disorder, NOS. with continued symptoms of hallucination, mania, and depression. Alternative diagnoses were present in the medical record including Schizophrenia, Paranoid Type, Cocaine Dependence and Bipolar Disorder. On 1/7/08 the inmate signed a refusal form, and Risperdal was discontinued; this medication was resumed on 1/13/08 without a corresponding progress note by the psychiatrist.

This inmate was eventually screened and admitted to the MHCB on 1/22/08 for observation which lasted twenty-three hours. The admitting diagnosis was Schizophrenia, chronic, in acute exacerbation. The pre-screening progress note indicated that the inmate had been noncompliant with medications. She was discharged on Haldol Decanoate 100 mg IM every four weeks, Depakote, Benadryl and Risperdal. The inmate received her first Haldol injection on 1/22/08 prior to release from the MHCB.

*Findings*:

This inmate appeared to have the dual diagnoses of a chronic mental illness and a substance dependence issue. These issues and the inmate's medication noncompliance were not adequately addressed, based on the medical records review. In spite of an extensive history of prior hospitalization and mental health treatment, there was no documentation of attempts in obtaining outside mental health records. Changes in level of care occurred without documentation of clinical rationale and apparently occurred prior to stabilization based upon the frequent level of care changes. The inmate's placement in the EOP for a brief period of time and subsequent release to the 3CMS

program when she continued to exhibit psychotic symptoms was particularly troubling. The medical record was also problematic; progress notes were not filed chronologically or were missing, two different birthdates appeared in record, and release of information was not obtained.

## Inmate H

This inmate was admitted to the MHCB on 2/7/08 from the administrative segregation unit. At the time of admission, she was described as exhibiting highly agitated, violent and bizarre behavior with delusional ideations and auditory hallucinations. Prior to the admission, she was receiving 3CMS level of care in the administrative segregation unit.

The inmate was described as exhibiting threatening and bizarre behavior in the ICC on 12/20/07 and during the IDTT meeting on 12/7/07. Despite these descriptions, she remained in 3CMS program. LPT progress notes from 12/10/07 through 2/3/08 described one incident of medication noncompliance that occurred on 1/31/08. Prior to that date, the inmate reportedly required prompting for medication compliance.

The inmate was prescribed Haldol 20 mg/day, Cogentin 4 mg/day, Risperdal 8 mg/day and Vistaril 100 mg/day. Since admission to MHCB, she was verbally unresponsive to the staff, refusing to take medications, to allow vital signs or to participate in any other nursing intervention. She also consistently refused participation in recreational therapy. She received a Haldol Decanoate injection on 2/8/08. A progress note dated 2/11/08 stated that the inmate was a danger to self, and continued to remain noncompliant with medications. A suicide risk assessment was completed on 2/8/08, and the inmate was evaluated to be at low risk for suicide.

### _Findings_:

The care provided to this inmate was of concern. She remained noncompliant with treatment interventions and showed no improvement during her MHCB hospitalization. It was also of concern that this inmate refused to sign a consent form for treatment with psychotropic medications; however, she was treated with Haldol Decanoate, a medication administered by injection. Keyhea or a higher level of care should have been considered in light of the inmate's history and instability. The inmate's medication noncompliance was also not addressed adequately.

## Inmate I

At the time of the site visit, this inmate was receiving EOP level of care at CCWF, although she had received 3CMS level of care during much of the review period. She was diagnosed as having "psychotic disorder", and she was treated with Trilafon. As recently as 11/21/07, she was described by the psychiatrist as "stable" and asymptomatic with a GAF of 75. She was also was reportedly noncompliant with her psychotropic medications for the preceding two weeks. She agreed to continue taking Trilafon and Cogentin, but she refused to take antidepressant medications that were recommended by

514

her psychiatrist.  The psychiatrist indicated that she would be seen for follow-up in 60 days.  A case management contact on 12/10/07 noted that the inmate was "doing well personally and socially"; the inmate reported that her mood had been stabilized by medication.  She no longer reported auditory hallucinations as she had in the past. There was no mention of the change in medications.  A psychiatry progress note of 1/14/08, stated that the inmate was a "no show" for her scheduled appointment.

No further mental health contacts were located in the medical record until 1/16/08 when the inmate was referred by her teacher due to bizarre behavior and appearing "very distracted."  Four or five-days earlier, she had, again, stopped taking her medications. At that time, it was determined that she had decompensated due to medication noncompliance.  She again refused treatment with antidepressant medication, but she agreed to resume the anti-psychotic medication.  The psychiatrist suggested consideration of a long-acting antipsychotic medication, presumably to address her fluctuating compliance.  A case manager saw her on this same day after she was referred by her teacher secondary to crying, and being curled in a ball.  She noted that the inmate had not taken her medication. The inmate was referred to the physician on duty for medication adjustment with a plan for follow-up "ASAP."

The inmate was seen by a case manager on 1/17/08 who noted the crisis call of the previous day. She was described as exhibiting signs of decompensation; however, the inmate did not wish transfer to the EOP.  No plan was presented in this progress note; furthermore, there was a question mark next to "denied" for suicidal and homicidal ideation.

The chrono indicated a transfer to EOP on 1/17/08. A case management note of the following day revealed the inmate to be disheveled, sad, and generally unable to answer questions.

An abnormal involuntary movement scale was conducted on 1/18/08, that was negative for all indicators.  Upon assessment by the psychiatrist on 1/24/08, Celexa was added to the medication regimen.  An LVN discussed the inmate's poor medication compliance on this same day.  She was seen on the 1/24/08 by the same case manager as the previous week; the progress note was essentially the same (some details were added regarding the lack of family contact).  The same, somewhat confusing plan for treatment that was previously described was outlined.  The inmate was involved in group and recreational therapies; there was documentation that she did not attend due either to her refusal or group cancellations.

Case management notes of 1/28/08 indicated that the inmate had previously been in the EOP and the MHCB about three years prior.  She was described as sad with soft speech and circumstantial thinking.

An IDTT meeting on 1/29/08 recommended admission to the EOP.  She continued to refuse most recreational groups.  She was seen by a psychiatrist on 2/7/08 and again in two weeks.

*Findings*:

This inmate was seen consistently upon her arrival to the EOP and within program guide requirements. Increased attention and awareness of the inmate's medication noncompliance and decompensation while she was in the 3CMS program might have led to swifter intervention and stabilization in 3CMS or a more orderly transfer to EOP prior to her reaching a crisis state. Her original treatment plan in EOP was appropriate but nonspecific and not measurable.

**Inmate J**

This was a 57 year old EOP inmate who by self report was serving a life sentence. She reported that she had been incarcerated since 1994. The inmate was diagnosed with Schizophrenia, paranoid type; an alternative provisional diagnosis of Bipolar Disorder with psychotic features was also present in the medical record. She had been treated with Risperdal, Depakote and Haldol Decanoate. She had experienced periods of suicidal ideation with intent and medication noncompliance. She had numerous rules violations, including assaults on staff secondary to paranoia. The inmate also reported a history of suicide attempts and inpatient psychiatric treatment approximately 10 years prior. According to the information provided by the staff, she has been in the EOP since 1/30/08 during this admission following hospitalization in the MHCB. This was confirmed by the inmate who was interviewed as part of a group interview by this writer.

A progress note entry dated 8/2/07, seemingly from VSPW but not so noted, appeared to indicate that the inmate had returned from the EOP at CCWF. A note from VSPW on 9/27/07 indicated that the inmate was endorsed for the EOP at CCWF, and the transfer was pending. A suicide risk assessment conducted at VSPW on 10/16/07 revealed various risk factors including suicidal intent. The note accompanying this risk assessment indicated that the inmate had made threats of suicide, taking off her clothes and that she was progressively decompensating while awaiting EOP placement. The inmate was referred to the psychiatrist for OHU placement; she remained there from 10/16/07 through 10/31/07.

A mental health assessment on 10/31/07 indicated that the inmate had transferred to the EOP at CCWF; a progress note on the following day from CCWF indicated that she would be retained in the EOP pending further evaluation. She was evaluated by the psychiatrist on 11/5/07; Depakote was discontinued, and the inmate was scheduled for follow-up in thirty days or as needed. At the IDTT meeting on 11/13/07, the decision was made to retain the inmate in the EOP for further stabilization on medications. A follow-up note on 11/14/07 noted that the inmate was manic and loud, with rapid pressured speech and flight of ideas; however, the diagnosis was changed to Schizophrenia. The plan outlined included stabilization of the inmate and "discharge to C3MS when criteria are met."

Subsequent progress notes during November and December 2007 documented consistent clinical contact with the psychiatrist and case manager and some group therapy

516