Raymond F. Patterson, M.D.
1904 R Street, N.W.
Washington, D.C.   20009
Telephone:  301-292-3737
Facsimile:  301-292-6272

REPORT ON SUICIDES COMPLETED
IN THE CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
IN CALENDAR YEAR 2006

I.     **Introduction**

This is the eighth annual report on completed suicides in the California Department of Corrections and Rehabilitation ("CDCR" or "Department").  It is submitted as part of the Special Master's continuing review of the Defendants' compliance with court-ordered remediation in Coleman v. Schwarzenegger.  This report includes the demographic and mental health characteristics of those CDCR inmates who completed suicides during calendar year 2006, the timeframes for clinical and executive review and documentation of those suicides, plus individual case reviews by the Special Master's psychiatric expert ("this reviewer") of all 43 inmate deaths that, more likely than not, were the result of suicide.

As in past years, the Coleman Special Master's experts and monitors reviewed completed suicides during their regular site visits to CDCR institutions.  They examined institutional records on completed suicides[1] and implementation of corrective action plans that were developed in response to past suicides.  The Special Master's experts and staff further reviewed this information, which helped clarify the roles and responsibilities of the CDCR institutional and central office staff in the suicide review and prevention process.

In addition, Plaintiffs notified the CDCR and the Special Master of their objections to the classification of some inmate deaths as non-suicides, the adequacy of the corrective action recommendations that emanated from the CDCR suicide review process, and facility responses concerning both clinical and custodial operations.

The demographic and mental health characteristics of the inmates who committed suicide are summarized in Tables 1 and 2, respectively.  Appendix A summarizes the timeframes for clinical and executive review and documentation of completed suicides.  Appendix B contains the case

---

[1] Following the Special Master's distribution of this Report in draft form and accompanying case reviews of each completed suicide in 2006, defendants stated in their response that they had failed to provide any of the mental health records within the Unit Health Record for "Inmate T." Defendants then produced the missing records and asked this reviewer to conduct a second review of Inmate T's suicide, which has been done and is attached as part of Exhibit B.  Defendants must ensure that no such lapses in their production of information occur again.  Review of incomplete records can lead to erroneous conclusions and recommendations, and ultimately to allowing deficiencies in the defendants' suicide prevention efforts to remain undetected and uncorrected.

1

reviews by this reviewer of all inmate deaths by suicide in 2006. Appendix C is a glossary of acronyms which appear in this report.

## II.     Overview

For calendar year 2006, the CDCR and this reviewer agree that there were 43 deaths that, more likely than not, were the result of suicide. The suicide rate for calendar year 2006 is 25.1 per 100,000, based on an average daily population of 171,340.[2] Since 2003, the suicide rate has ranged from 15.9 per 100,000 to 26.2 per 100,000 for inmates in the custody of the CDCR. In contrast, the annual prison suicide rate reported by the U.S. Department of Justice has been 14 per 100,000 inmates since 2001.

In 2006, thirteen or 30 percent of the suicides in 2006 were committed by hanging from ventilation grates. None were by inmates in the California Department of Mental Health (DMH) facilities or mental health crisis beds (MHCBs). In contrast to many previous years, four of the 43 suicides were by women. They were housed in the California Institution for Women (CIW), Valley State Prison for Women (VSPW), and the Central California Women's Facility (CCWF).

The CDCR continued to improve its suicide prevention program by providing training on cardiopulmonary resuscitation (CPR) requirements and on the suicide review process. However, it was apparent that CPR was not performed in a timely and/or appropriate manner in 17 or 44 percent of the 43 suicides. This rate of non-compliance is higher than in calendar year 2005 when there were 15 such cases.

As reported in previous years, staff completion of Suicide Risk Assessment Checklists (SRACs) remained problematic, despite efforts by CDCR to train staff on their proper use. In a number of cases, staff did not prepare SRACs according to CDCR policy by failing to:

- obtain information that was available in records or via staff referrals, and instead relying only on inmates' self-reports;

- assess risk and/or protective factors;

- define an estimate of the risk based on the evaluation as "high," "moderate," "low," or "none";

- develop and implement appropriate plans for follow-up evaluation and care; and/or

- transfer the inmate to a more appropriate clinical and custodial setting.

*See* Tables 1 and 2, and Appendix B, for discussion of specific instances of these deficiencies, in summarized and detailed fashion, respectively.

---

[2] Source: *Average Daily Prison Population, Calendar Year 2006*, CDCR official website.

2

### III.     Terminology and Definitions

In this report, the terms "foreseeable" and "preventable" are used as they have been in previous reports. They describe the adequacy and implications of the CDCR suicide prevention policies and procedures, the training and supervision of staff, clinical judgments, and utilization of clinical and custodial alternatives in order to reduce the likelihood of completed suicides.

"Foreseeable" refers to those cases in which available information about an inmate indicates the presence of a substantial or high risk for suicide, and requires reasonable clinical, custodial and/or administrative intervention(s). Assessment of the degree of risk, whether high, moderate, or low to none, is an important component in determining foreseeability. In contrast to a high and immediately detectable risk, a "moderate risk" of suicide indicates a more ambiguous set of circumstances that requires significant clinical judgment based on adequate training, as well as a timely assessment to determine the level of risk and the most appropriate and relevant interventions to prevent suicide. These interventions may include, but are not limited to, changes in clinical level of care (LOC), placement on suicide precautions or suicide watch, and changes in housing, including utilization of safe cells and transfers to higher LOCs. Individuals evaluated as "low risk," "no risk," or "negligible risk" may continue to require some degree of clinical and custodial monitoring and subsequent evaluation, with appropriate notification of clinical staff for the potential for self injury and/or suicidal ideation or activity.

"Preventable" refers to those cases in which the likelihood of completed suicide might have been reduced substantially, had some additional information been gathered and/or some additional intervention(s) undertaken, usually as required in existing policy.

In September 2006 and November 2007, the CDCR generated its *Annual Report on Suicides and Suicide Prevention in the California Department of Corrections and Rehabilitation*, which covered suicides completed in 2005 and 2006 respectively, utilizing the following definitions of suicide:

> World Health Organization: Suicide is the result of an act deliberately initiated and performed by a person in the full knowledge or expectation of its fatal outcome.
>
> National Violent Death Reporting System, National Center for Injury Prevention and Control, Centers for Disease Control and Prevention: Suicide is a death resulting from the intentional use of force against oneself. A preponderance of evidence should indicate that the use of force was intentional.

Deaths under the circumstances described below should be classified as suicides:

- A person committed a suicidal act, then changed his mind, but still died as a result of the act.

- A person intended only to injure rather than kill himself, for example by playing "Russian roulette" voluntarily with a firearm.

3

- Assisted suicide, including passive assistance to the decedent, for example, by supplying only information or the means needed to complete the act.

- Intentional, self-inflicted death committed while under the influence of a voluntarily-taken mind-altering drug.

- Intentional, self-inflicted death committed while under the influence of a mental illness.

Deaths under the circumstances described below should *not* be classified as suicides:

- The physical consequences of chronic substance abuse, including alcohol or drugs (natural death).

- Acute substance abuse, including alcohol or drugs, with less than a preponderance of evidence showing intent to use the substance(s) against oneself (undetermined or unintentional injury or death).

- Death as a result of autoerotic behavior, e.g., self-strangulation during sexual activity (death by unintentional injury).

## IV. Discussion

Tables 1 and 2 summarize the 43 suicides by various characteristics as indicated:

## TABLE 1

- Frequency of 43 total suicides, by facility:

| Facility | Count |
|---|---|
| SVSP | 5 |
| CIM | 3 |
| SAC | 3 |
| SQ | 3 |
| COR | 3 |
| LAC | 3 |
| CCWF | 2 |
| PVSP | 2 |
| HDSP | 2 |
| CMC | 2 |
| KVSP | 2 |
| CMF | 2 |
| VSPW | 1 |
| CIW | 1 |
| WSP | 1 |
| CEN | 1 |
| SOL | 1 |
| RJD | 1 |
| ISP | 1 |
| FOL | 1 |
| SCC | 1 |
| CTF | 1 |
| CVSP | 1 |
| TOTAL: | 43 |

5

## TABLE 2

- <u>Single-Cell Housing</u>

    32 of 43        (74%)

- <u>Inmates Incarcerated for Sex Offenses ("R" Suffix)</u>

    9 of 43         (21%)

- <u>Method</u>

    - <u>Hanging</u>

        40 of 43        (93 %)

    - <u>Exsanguination</u>

        3 of 43         (7%)

- <u>History of Suicidal Behavior</u>

    28 of 43        (65%)

- <u>History of Past Mental Health Treatment</u>

    36 of 43        (84%)

- <u>Housed in Infirmary, MHCB, Outpatient Housing Unit (OHU), Psychiatric Services Unit, or DMH</u>

    0 of 43         (0%)

- <u>Housed in Administrative Segregation or Security Housing Unit (SHU)</u>

    ASU:  18 of 43   (42%)
    SHU:  1 of 43    (2%)

- <u>Inmates on Keyhea Order for Involuntary Medication</u>

    1 of 43         (2%)

- <u>Concomitant Severe or Life-Threatening Medical Illness</u>

    7 of 43         (16%)

- On Mental Health Service Delivery System (MHSDS) Caseload at Time of Death

    20 of 43    (47%)

    - 4 Enhanced Outpatient Program (EOP) (nine percent of all suicides, 25 percent of suicides by inmates on the MHSDS caseload)

    - 16 Correctional Clinical Case Management System (3CMS) (37 percent of all suicides, 75 percent of suicides by inmates on MHSDS caseload)

- Age Range

    | | |
    |---|---|
    | Under 18 | 0 (0%) |
    | 18-30 | 11 of 43 (26%) |
    | 31-40 | 15 of 43 (35%) |
    | 41-50 | 15 of 43 (35%) |
    | 50+ | 2 of 43 (5%) |

- Race

    | | |
    |---|---|
    | Caucasian | 19 of 43 (44%) |
    | Hispanic | 15 of 43 (35%) |
    | African-American | 7 of 43 (16%) |
    | Asian | 2 of 43 (5%) |

- Gender

    | | |
    |---|---|
    | Male | 39 of 43 (91%) |
    | Female | 4 of 43 (9%) |

- Significant Indications of Inadequate Treatment

    31 of 43    (72.1%)

    Instances of inadequate treatment included:

    - canceled appointments that were not rescheduled
    - lack of responses to referrals
    - diagnoses that were unsupported
    - failure to reassess inmates' noncompliance with treatments
    - assignment of inmates to inappropriate levels of care
    - failure to provide five-day clinical follow-up
    - failure to provide immediate and/or appropriate CPR

7

- insufficient communication among clinical, medical, and custodial staffs
- failure to review documented histories in medical records, central files and/or referral forms
- lack of adequate and timely screenings and assessments of inmates on intake, placement in administrative segregation, transfers to other facilities, and referrals to clinicians for assessment of suicide potential in correctional treatment centers or other clinical settings

The finding that 72.1 percent of completed suicides in 2006 involved some measure of inadequate treatment or intervention and were, therefore, most probably foreseeable and/or preventable is consistent with findings of 74.4 percent in 2005, 76.9 percent in 2004, and 74.2 percent for 2003. These numbers are marked increases over the 45 percent rate of inadequate treatment that was found for suicides that occurred in 2002. In 2006, there continued to be inmates who were not considered for referral to higher levels of care, or were not placed on the mental health caseload, despite indications of their need for mental health interventions and/or psychotropic medications. There were also cases with documented concerns about the need for assessment of inmates who demonstrated significant mental illness, past suicidal behavior, or suicidal ideation or statements, and for their placement in higher levels of care.

The annual suicide rate per 100,000 inmates in CDCR since 1998 has been as follows:

   1998 - 22 suicides in a population of approximately 158,159
          Completed suicide rate of 13.9/100,000

   1999 - 25 suicides in a population of approximately 160,970
          Completed suicide rate of 15.5/100,000

   2000 - 15 suicides in a population of approximately 160,855
          Completed suicide rate of 9.3/100,000

   2001 - 30 suicides in a population of approximately 155,365
          Completed suicide rate of 19.3/100,000

   2002 - 22 suicides in a population of approximately 158,099
          Completed suicide rate of 13.9/100,000

   2003 - 36 suicides in a population of approximately 155,722
          Completed suicide rate of 23.1/100,000

   2004 - 26 suicides in a population of approximately 163,346
          Completed suicide rate of 15.9/100,000

   2005 - Population of approximately 164,179.
          Completed suicide rate for 43 suicides of 26.2/100,000

8

>2006 – Population of approximately 171,340
>      Competed suicide rate for 43 suicides of 25.1/100,000

### III.     Summary of Observations and Recommendations

From 1999 to 2006, the suicide rate for inmates in CDCR ranged from a low of 9.3 per 100,000 in 2000 to a high of 26.2 per 100,000 in 2005. Overall, for this eight-year period, the average annual suicide rate for suicides per 100,000 inmates was 18.5. For 2006, there was a slight drop in the suicide rate to 25.1 per 100,000, down from 26.2 per 100,000 in 2005.

As in past reports, a contrast appears between these rates and the national average for correctional institutions which was estimated at 14 to 17 per 100,000 during the period from 1998 through 2006, and most recently at 14 per 100,000. The difference between the national rates and CDCR rates has provided a standard by which the Department's record in dealing with suicides can be measured. It also provides a measure against which to determine the adequacy of the Department's suicide prevention efforts.

This report indicates that 72.1 percent of the suicides completed in 2006 involved some measure of inadequate assessment, treatment, or intervention, and were therefore most probably foreseeable and/or preventable, based on the definitions used in this review and the information that was or should have been available to clinical staff. This finding is consistent with similar findings in 2003, 2004, and 2005, as stated above. There continued to be significant substantive inconsistencies and inadequacies in the application of policies and procedures, as well as in staff performance with regard to suicide prevention and management.

As in past years, in 2006 there were improvements in the Department's policies and procedures. There were some advancements by CDCR toward improved suicide prevention policies and procedures during 2006. On October 2, 2006, CDCR submitted to the Coleman court its Plan to Address Suicide Trends in Administrative Segregation Units ("Plan"), and on December 1, 2006, it filed its amended Plan. This Plan was drawn in response to a court order entered on June 7, 2006, following a set of recommendations made by the Coleman Special Master to curb a disturbing rising trend of completed suicides in CDCR administrative segregation units. Although development and implementation of the Plan was still incomplete by the end of 2006, CDCR had begun taking positive steps toward it implementation. In October 2006, CDCR began requiring thirty-minute welfare checks of inmates during the initial three weeks of their stays in administrative segregation. It had also devised a plan to modify the large-mesh ventilation screens in 406 administrative segregation intake cells, with a schedule to modify 61 by April 2007, 85 by July 2007, and the remaining 255 by September 2007. In addition, CDCR submitted as part of its Plan a procedure and timetable for pre-placement screening of inmates endorsed for transfer to administrative segregation units, to be implemented by June 2007. CDCR also committed in its Plan to reviewing and proposing revised regulations in order to allow certain items of personal property for those inmates in administrative segregation for non-disciplinary reasons, and to providing those proposed revisions by December 29, 2006 to CDCR executive staff for their review.

9

A Coleman court order entered on June 9, 2005 directed the Defendants to develop and implement a policy that requires custody staff to provide immediate life support, if trained to do so, until medical staff arrives or to continue life support measures, irrespective of whether the obligation to do so is part of the particular custody staff member's duty statement.  After extensive negotiation between the parties, CDCR reported to the Coleman court on January 31, 2006 that training on the amended CPR policy and use of the mouth-shield, preparation of procedures for taking inventories of cut-down kits, and the conduct of such inventories had occurred system-wide.  In addition, CDCR directed wardens to ensure that any Incident Report form for incidents requiring the initiation of CPR must cover whether CPR was performed, if it was not performed the details as to why not, the classification of persons who provided the CPR, and the outcome of CPR efforts.

Another change in suicide prevention procedures during 2006 concerned CDCR's method for observation of inmates on suicide watch.  CDCR voluntarily placed a moratorium on the use of video monitoring as the sole means of conducting suicide watches, as of April 10, 2006.  This suicide prevention measure was embodied an agreed-to stipulation signed by the Coleman parties and entered as an order by the Coleman court on August 8, 2006.

An analysis of the case reviews provided in Appendix B supports a number of findings, many of which are consistent with conclusions reached in earlier annual reports on suicides in the CDCR.  These findings include the following:

- o   In 2006, four, or nine percent, of the 43 suicides were completed by women.  This is in contrast to there having been no suicides completed by women in 2005, 2003, 2002 and 2000, and to one in 2001.  The suicide rate for women in 2006 is comparable to the rate in 2004, when three, or 11.5 percent, of the 26 suicides were completed by women.

- o   In 17, or 39.5 percent, of the 43 suicide cases reviewed, CPR was not performed or not initiated in a timely manner.  Of these, there were five cases in which CPR was determined to be not applicable or not indicated, based on the inmate's condition at the time of discovery.  These determinations were made by various clinical staff members including registered nurses and medical technical assistants.  However, none of these determinations were made initially by a physician. In one case involving a woman, other inmates began CPR.  In two of three cases in which inmates lacerated themselves, first aid in order to stop the bleeding was not initiated promptly.
- o   As has been previously reported, clinicians continued to fail to make use of available information that was located in the unit health records or central files during 2006.  In addition, custody referral information was not incorporated in all of the reviews in which they applied, and was frequently absent from SRACs.  Inadequate and untimely completion of the SRACs remained ongoing problems that were identified in a number of the suicide reviews.  Facilities varied with respect to conducting screening of inmates who were placed in administrative segregation units, as well as with conducting SRACs in confidential settings.  This continued to negatively impact on the adequacy of information that

10

    clinicians were able to obtain and incorporate into their overall assessments. Although policies have directed that such screenings and SRACs are to be conducted in confidential settings, and the video training instituted by CDCR administrative staff continued, there appeared to be inadequate supervision at the facility level to ensure that these policies were being followed.

- In 2006, there were ongoing concerns about appropriate screening and assessment, suicide risk assessments when applicable, psych tech daily rounding, and placement of inmates in cells presenting the lowest possible opportunity for suicide completion. The Defendants had not yet achieved full compliance with the Coleman Court order of June 9, 2005 requiring them to develop, among other things, a plan to alleviate the suicide risk posed by large-mesh ventilation screens in administrative segregation cells.

- Of the 43 completed suicides in 2006, 19 (18 or 42 percent in administrative segregation and one in a SHU) involved hangings by inmates who were single-celled.

- Availability of DMH in-patient beds was a significant factor in the prompt referral and transfer of inmates in need of hospital level care. Continuing use of ZZ cells and other holding cells for inmates awaiting transfers to *bona fide* CTCs with MHCBs, and placements in OHUs that exceeded the 72-hour time limitation, were ongoing obstacles to the care of inmates in need of constant or close monitoring or timely transfer to higher levels of care.

- The majority of the 43 inmates who committed suicide had histories of past mental treatment and/or suicidal behavior. Thirty six, or 84 percent, of the 43 suicides were committed by inmates who had histories of past mental health treatment. Twenty eight, or 65 percent, had histories of suicidal ideation or behavior.

- The Department continued to improve its performance in the internal CDCR suicide review process, which resulted in the development of corrective action recommendations at both the facility and departmental levels. However, the suicide review process was lacking in some respects. Timelines set forth in Appendix A in were exceeded in many cases. In some cases, there was inadequate documentation of achievement of the goals and outcomes for corrective actions that had been specified. Some facility responses were inadequate in that they were "repeats" of previous responses to deaths that occurred during other years at some of the same facilities.

- As has been stated in the past, CDCR suicide reports were varied. Many reflected appropriate quality of care standards, and were very thoughtful and well crafted by clinicians who demonstrated a very good understanding of some of the challenges encountered by facility clinicians and custody staff. However, there continued to be some Departmental suicide reports that appeared to ignore

11

failures at the facility level, as well as some inadequate facility responses to the Department's corrective action recommendations.

The need continues for CDCR to redouble its efforts in carrying out the existing plans and complying with the various court orders that have been crafted to curb inmate suicides, as well as heeding the recommendations made in past suicide reports by this reviewer. The tasks for CDCR have been defined, and they are multiple and complex. Now it is up to the Department to accomplish these tasks and advance toward the ultimate goal of suicide prevention. Because much work remains to be done, this is not a time for additional recommendations. That notwithstanding, certain aspects of the suicide prevention effort as a whole call for particular focus of the Department's energy and resources. These are:

1. Full implementation of the suicide prevention and review processes that were already in place at both the institutional and department levels, as well as incorporation of revised policy and procedural guidelines and court orders into those processes. This would entail the identification of deficiencies at the facility and systemic levels, appropriate follow-up of corrective action plans, and submission of documentation to the Special Master on the outcomes of investigations of staff misconduct, negligence, and errors.

2. Completion and full implementation of the Defendants' Plan to Address Suicide Trends in Administrative Segregation Units, discussed *infra*. Among the 18 suicides that occurred in administrative segregation units, one was in a stand-alone unit in which the presence of inmates with active mental illness was prohibited. This inmate had been discontinued in the MHSDS in late 2003. Within one week, he was recommended for return to the 3CMS level of care, but that never occurred. Six months before his suicide, he was assessed as having a mood disorder but again, he was not returned to the MHSDS. On the same day as this inmate's suicide, a psych tech opined that he had poor adaptive functioning and met the criteria for major depression. However, the inmate was scheduled for mental health follow-up in five days, rather than as an emergency referral. Thus, although the requirement for exclusion of inmate participants in the MHSDS from stand-alone administrative segregation units may have been satisfied technically in that case, it was violated in spirit, failing to avert the greater potential risk of suicide by an inmate who had a significant mental health history and should have been returned to the MHSDS. Defendants must be mindful of the ongoing concern of the Coleman court with reducing the rate of suicides in administrative segregation units, as evidenced by its order entered June 1, 2007.

3. Continuation of implementation of the defendants system for tracking in the Mental Health Tracking System of suicidal histories of inmates in the CDCR's mental health caseload and/or any successor management information system utilized by the Department.

4. Prioritization by the Department of access to inpatient care at DMH, particularly with respect to Level III and Level IV inmates. This would involve requiring clinical staff to properly assess suicide risk factors for inmates whose mental health functioning may have changed, particularly when placed in administrative segregation or other single-cell

housing. This underscores the need for appropriate screening, assessment, and referrals to higher levels of care, especially DMH, when indicated. The need to provide appropriate crisis-level services in appropriate treatment settings such as MHCBs, or appropriate limited treatment within OHUs, until transfers can be achieved is also a vital component of this process.

# TABLE 1

| Case No. | Date | Inmate # | Facility | Age | Race | Housing | R-Suffix | Method |
|---|---|---|---|---|---|---|---|---|
| 1 | 01/10/06 | A | COR | 32 | Caucasian | SHU-S | NO | Hanging |
| 2 | 01/15/06 | B | SAC | 35 | Caucasian | D-GP | NO | Hanging |
| 3 | 01/18/06 | C | RJD | 29 | Caucasian | ASU-S | NO | Hanging |
| 4 | 01/20/06 | D | SVSP | 35 | African American | S-GP | NO | Hanging |
| 5 | 02/01/06 | E | COR | 46 | Caucasian | S-GP | NO | Hanging |
| 6 | 02/18/06 | F | SQ | 26 | Hispanic | ASU-S | NO | Hanging |
| 7 | 02/18/06 | G | CMC | 43 | Caucasian | S-GP | NO | Hanging |
| 8 | 02/21/06 | H | CMC | 43 | Asian | S-GP | NO | Hanging |
| 9 | 02/22/06 | I | HDSP | 34 | African American | D-GP | NO | Hanging |
| 10 | 03/02/06 | J | PVSP | 49 | Caucasian | D-GP | NO | Hanging |
| 11 | 03/16/06 | K | SVSP | 47 | Hispanic | D-GP | NO | Exsanguination |
| 12 | 03/28/06 | L | KVSP | 35 | African American | ASU-S | YES | Hanging |
| 13 | 03/31/06 | M | SVSP | 47 | Caucasian | ASU-S | YES | Hanging |
| 14 | 05/01/06 | N | ISP | 25 | Hispanic | ASU-S | NO | Hanging |
| 15 | 05/01/06 | O | CIW | 40 | Hispanic | ASU-S | NO | Hanging |
| 16 | 05/08/06 | P | VSPW | 29 | Hispanic | D-GP | NO | Hanging |
| 17 | 05/10/06 | Q | SOL | 44 | Caucasian | D-GP | NO | Hanging |
| 18 | 05/11/06 | R | COR | 62 | Caucasian | PHU-S | NO | Hanging |
| 19 | 05/22/06 | S | SQ | 28 | Caucasian | ASU-S | NO | Hanging |
| 20 | 06/04/06 | T | CVSP | 26 | Hispanic | ASU-S | NO | Hanging |
| 21 | 06/05/06 | U | CCWF | 44 | Caucasian | ASU-S | NO | Hanging |
| 22 | 06/14/06 | V | LAC | 50 | African American | ASU-S | NO | Hanging |
| 23 | 06/26/06 | W | CMF | 49 | African American | EOP-S | NO | Hanging |
| 24 | 06/29/06 | X | KVSP | 45 | Caucasian | ASU-S | NO | Hanging |
| 25 | 07/01/06 | Y | CTF | 35 | Caucasian | ASU-S | NO | Hanging |
| 26 | 07/08/06 | Z | SAC | 25 | Hispanic | ASU-S | NO | Hanging |
| 27 | 07/10/06 | AA | SVSP | 39 | Caucasian | EOP-S | NO | Hanging |
| 28 | 07/13/06 | BB | FSP | 35 | Caucasian | S-GP | NO | Hanging |
| 29 | 07/18/06 | CC | SAC | 24 | African American | ASU-S | YES | Hanging |
| 30 | 07/31/06 | DD | SCC | 19 | Hispanic | D-GP | YES | Hanging |
| 31 | 08/05/06 | EE | PVSP | 33 | Hispanic | ASU-S | YES | Hanging |
| 32 | 08/13/06 | FF | CIM | 31 | Hispanic | ASU-S | NO | Hanging |
| 33 | 08/19/06 | GG | CIM | 38 | Hispanic | S-GP | NO | Hanging |
| 34 | 08/29/06 | HH | LAC | 29 | Hispanic | ASU-S | NO | Hanging |
| 35 | 10/01/06 | II | CCWF | 25 | Hispanic | Dorm-GP | NO | Hanging |
| 36 | 10/15/06 | JJ | WSP | 51 | Caucasian | D-GP | NO | Hanging |
| 37 | 11/05/06 | KK | SVSP | 48 | Caucasian | ASU-S | YES | Hanging |
| 38 | 11/30/06 | LL | CIM | 37 | Caucasian | S-GP | NO | Hanging |
| 39 | 11/30/06 | MM | SQ | 46 | Caucasian | S-Cond | YES | Hanging |
| 40 | 12/04/06 | NN | HDSP | 47 | Hispanic | S-GP | YES | Hanging |
| 41 | 12/08/06 | OO | CMF | 44 | African American | D-EOP | NO | Hanging |
| 42 | 12/21/06 | PP | CEN | 31 | Hispanic | D-GP | YES | Exsanguination |
| 43 | 12/26/06 | QQ | LAC | 32 | Asian | S-EOP | NO | Exsanguination |

14

# TABLE 2

| Case No. | Date | Inmate # | Past MHTx | Past SB | Medical | MHCB | Five Day FU | CPR | Fore/Prev |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 01/10/06 | A | Y-CCCMS | YES | NO | NO | YES | YES | YES |
| 2 | 01/15/06 | B | Y-CCCMS | YES | NO | NO | NO | NO | YES |
| 3 | 01/18/06 | C | Y-CCCMS | YES | NO | NO | NO | NO | YES |
| 4 | 01/20/06 | D | Y-CCCMS | YES | NO | NO | NO | YES | NO |
| 5 | 02/01/06 | E | Y-CCCMS | YES | YES | NO | NO | YES | YES |
| 6 | 02/18/06 | F | Y-CCCMS | YES | NO | NO | NO | NO | YES |
| 7 | 02/18/06 | G | Y-CCCMS | YES | YES | NO | NO | YES | YES |
| 8 | 02/21/06 | H | Y-CCCMS | YES | NO | NO | NO | YES | UTD |
| 9 | 02/22/06 | I | NO | NO | NO | NO | NO | YES | NO |
| 10 | 03/02/06 | J | YES | NO | NO | NO | NO | YES | NO |
| 11 | 03/16/06 | K | YES | YES | NO | NO | NO | NO | YES |
| 12 | 03/28/06 | L | YES | YES | NO | NO | NO | NO | NO |
| 13 | 03/31/06 | M | Y-CCCMS | YES | NO | NO | NO | YES | YES |
| 14 | 05/01/06 | N | NO | NO | NO | NO | NO | NO | YES |
| 15 | 05/01/06 | O | Y-EOP | YES | NO | NO | YES | YES | YES |
| 16 | 05/08/06 | P | YES | YES | NO | NO | NO | YES | YES |
| 17 | 05/10/06 | Q | Y-CCCMS | NO | YES | NO | NO | NO | YES |
| 18 | 05/11/06 | R | YES | YES | YES | NO | NO | YES | NO |
| 19 | 05/22/06 | S | YES | YES | YES | NO | NO | NO | YES |
| 20 | 06/04/06 | T | Y-CCCMS | NO | NO | NO | NO | NO | YES |
| 21 | 06/05/06 | U | YES | NO | NO | NO | NO | YES | YES |
| 22 | 06/14/06 | V | NO | NO | NO | NO | NO | YES | NO |
| 23 | 06/26/06 | W | Y-EOP | YES | YES | NO | NO | YES | YES |
| 24 | 06/29/06 | X | YES | NO | NO | NO | NO | YES | YES |
| 25 | 07/01/06 | Y | NO | NO | NO | NO | NO | YES | YES |
| 26 | 07/08/06 | Z | NO | NO | NO | NO | NO | NO | YES |
| 27 | 07/10/06 | AA | Y-EOP | YES | NO | NO | NO | YES | YES |
| 28 | 07/13/06 | BB | NO | NO | NO | NO | NO | NO | YES |
| 29 | 07/18/06 | CC | Y-CCCMS | NO | NO | NO | NO | YES | YES |
| 30 | 07/31/06 | DD | Y-CCCMS | YES | NO | NO | NO | YES | YES |
| 31 | 08/05/06 | EE | Y-CCCMS | YES | NO | NO | NO | YES | YES |
| 32 | 08/13/06 | FF | NO | YES | NO | NO | NO | YES | YES |
| 33 | 08/19/06 | GG | YES | NO | NO | NO | NO | YES | NO |
| 34 | 08/29/06 | HH | YES | YES | NO | NO | NO | YES | YES |
| 35 | 10/01/06 | II | YES | YES | NO | NO | NO | YES | NO |
| 36 | 10/15/06 | JJ | YES | YES | NO | NO | NO | NO | YES |
| 37 | 11/05/06 | KK | YES | YES | NO | NO | NO | NO | YES |
| 38 | 11/30/06 | LL | YES | NO | NO | NO | NO | NO | YES |
| 39 | 11/30/06 | MM | Y-CCCMS | YES | YES | NO | YES | NO | YES |
| 40 | 12/04/06 | NN | YES | YES | NO | NO | NO | NO | YES |
| 41 | 12/08/06 | OO | Y-EOP | NO | NO | NO | NO | YES | NO |
| 42 | 12/21/06 | PP | YES | YES | NO | NO | NO | YES | NO |
| 43 | 12/26/06 | QQ | Y-CCCMS | YES | NO | NO | NO | NO | YES |

*8  UTD – Unable to Determine

15

Appendix A

Tracking Timelines for Preparation of Documents on Completed Suicides

|    | Event/Documents | Timeline |
|----|-----------------|----------|
| 1  | Date of Death | 0 hour |
| 2  | Chief Medical Officer to Death Review Coordinator | 8 hours |
| 3  | Initial Inmate Suicide Report (Form 7229B) by Suicide Prevention Coordinator to Death Review Coordinator | 2 business days |
| 4  | Death Review Coordinator to Mental Health Suicide Prevention Coordinator | 3 business days |
| 5  | Mental Health Suicide Prevention Coordinator appoints Mental Health Suicide Reviewer | 5 business days |
| 6  | Mental Health Suicide Reviewer writes Preliminary Report; Notifications of suspected misconduct to Suicide Review Committee | 15 days |
| 7  | Suicide Review Committee completes Review and Adds Corrective Action Plan; Review to Mental Health Suicide Reviewer to Complete Executive Report | 30 days |
| 8  | Mental Health Suicide Reviewer submits Executive Report and all documents to Suicide Review Committee to complete Final Suicide Report | 60 days |
| 9  | Facility, Warden, and Chief Medical Officer or Health Care Manager implement Corrective Action Plan | 120 days |
| 10 | Report on implementation of Corrective Action Plan by facility Warden and Chief Medical Officer or Health Care Manager to Suicide Review Committee | 150 days |