# REPORT ON SUICIDES COMPLETED
## IN THE CALIFORNIA DEPARTENT OF CORRECTIONS AND REHABILITATION IN CALENDAR YEAR 2006

### Appendix B

## Case Reviews

### 1. Inmate A

Brief History:  This inmate was a 32-year-old Caucasian male who committed suicide on 1/10/06 in the security housing unit (SHU) at the California State Prison, Corcoran (CSP/Corcoran).  The inmate was a part of the Mental Health Services Delivery System (MHSDS) at the Correctional Clinical Case Management System (3CMS) level of care, and was the sole occupant of his SHU cell.  The inmate was returned to the California Department of Corrections and Rehabilitation (CDCR) on 3/15/04 via the Wasco State Prison (WSP) Reception Center (RC).  He had paroled from CDCR in April 2001, with a parole transfer to the state of Oregon.  However, he was re-arrested in April 2002 for an assault on police officers who were attempting to take him into custody for outstanding warrants from Orange County, California.  He was subsequently convicted of battery on a peace officer and sentenced to serve six years with a return to CDCR on 6/10/02 via the North Kern State Prison (NKSP) RC.  He was transferred from NKSP to the Sierra Conservation Center (SCC), and on 1/10/03 escaped when returning from his job in the facility's snack bar.  He ultimately made his way to Los Angeles where he was re-arrested on 2/2/03 for drugs and drug paraphernalia in his possession; he remained in the Orange County jail for 13 months until his return to CDCR custody on 3/15/04 via the WSP RC.  Following his return to CDCR custody, he was convicted of escape and the offenses which occurred while he was on escape, which included auto theft, burglary, and drug possessions.  As a result, his original term of four years was extended to a term of 22 years with eligibility for parole in 2022.

The inmate was discovered at approximately 4:22 p.m. by a licensed vocational nurse (LVN) who was making the evening medication pass.  The inmate was observed sitting with his back against the cell door, not responding to verbal stimuli.  The LVN notified correctional officers and a sergeant was called.  The cell door was opened and the inmate was observed to be sitting with what appeared to be a "braided rope" around his neck and tied to the cell door.  Officers cut the ligature from the cell door, placed the inmate on a Stokes litter, and carried the inmate to the rotunda area were cardiopulmonary resuscitation (CPR) was begun.  The inmate was transported by ambulance to the acute care hospital (ACH) at CSP/Corcoran where CPR continued; however, he did not respond and was subsequently pronounced dead by a physician at approximately 4:40 p.m.  An autopsy report was provided by the Kings County Coroner noting that the autopsy was performed on 1/12/06, and the cause of death was "ligature hanging

(minutes)."[1]  Toxicology results revealed no alcohol or illicit drugs in his system at the time of his death.

The suicide report contained information regarding the inmate's criminal justice history and described the commitment offense as his having been convicted of a series of burglaries, car theft, and embezzlement with a two-year sentence in the CDCR beginning on 11/4/98.  The inmate paroled on 5/17/00, was re-arrested and returned to the CDCR on 10/12/00.  He then paroled on 4/25/01 with a transfer of his parole to the state of Oregon on 8/28/01, where his mother had relocated.  It was reported, however, that he began using drugs while in Oregon and returned to southern California several months later where he was re-arrested in April 2002 and convicted of battery on a peace/police officer, as described above.  He was subsequently transferred to SCC on 3/30/04.  His initial health screenings from 11/4/98 through 3/30/04, including screenings at WSP, SCC, and Reception Center Central for California Institution for Men (RCC), were all negative for mental health pathology.

The inmate self-referred to mental health in April 2004.  On 4/7/04 an assessment by a psychologist indicated the inmate was requesting medications for sleep and treatment to help him with anger management.  The inmate reported he saw a psychologist in high school but there was no history of psychiatric treatment in the CDCR.  The psychologist stated that the inmate had a "strong Axis II personality disorder."  The psychologist saw the inmate for follow-up appointments on 4/15/04, 4/22/04, and 5/6/04 and the inmate remained in the administrative segregation unit at that time.  The psychologist determined not to place the inmate in the MHSDS because the inmate's only complaint was for "sleep meds."   However, he was referred to a psychiatrist for a review.  The psychologist noted the inmate was described by custody as upsetting other inmates by making racist statements and on 5/6/04 the inmate was referred by staff because of his abusive shouting and verbal threats at other inmates.  Staff referred the inmate again with similar complaints on 6/22/04.

On 6/25/04 the inmate was reported as having taken a possible overdose of Seroquel which, according to the records, had not been prescribed for him.  The inmate was sent to Doctor's Hospital where he reported he took "20 tablets" in a suicide attempt but would not cooperate with the hospital staff.  He returned to SCC on 6/26/04, refused a Suicide Risk Assessment (SRA), but agreed to cooperate on 6/27/04.  There was no evaluation of risk noted on the SRA; however, he was referred to a case manager and psychiatrist for medication review.  The inmate reported that he was never suicidal but was taking pills to help him sleep.  Suicide precautions were discontinued by 6/29/04.  He remained in the outpatient housing unit (OHU) from 6/26/04 through 7/1/04 and was referred to an interdisciplinary treatment team (IDTT) for placement in the MHSDS at the 3CMS level of care as medical necessity.

The Mental Health Assessment (MH-4) was completed on 7/6/04 and indicated the inmate "frequently changed his story regarding psychiatric symptoms."  The inmate had

---

[1] References to "minutes" in coroners' reports that are cited in these case reviews refer to the amount of time in which inmates died following suicidal acts.

reported at various times that he had heard voices and had made racial slurs and other derogatory remarks because he perceived others "appropriately," and that he would only be serving four years of his sentence. The toxicology screen taken at Doctor's Hospital showed he had no drugs in his system. The inmate was also noted to have reported two previous suicide attempts while in the CDCR prior to his paroles; however, these were not verified. The IDTT on 7/7/04 determined his diagnosis as Adjustment Disorder and Narcissistic Personality Disorder. He was continued in administrative segregation with weekly clinical case manager visits and no medications were prescribed. Approximately one week later, the IDTT indicated that the inmate's functioning had deteriorated; he continued to have "out of control, self-destructive behavior" and then opined that he had a severe Personality Disorder. They also indicated that he might be exhibiting delusional symptoms. At this point the inmate was prescribed Ativan and Risperdal, and referred to the enhanced outpatient program (EOP) level of care. The Risperdal was changed on 7/21/04 to Seroquel. The inmate also received a rule violation report (RVR) because he spit on a custody officer prior to his IDTT on 7/14/04. His medication compliance was intermittent and his behavior continued to escalate with slurs against other inmates and custody staff. According to the suicide report, this inmate was also in court at this time and accepted a plea bargain for an additional 18-year sentence, which resulted in the total 22-year sentence.

This inmate was transferred to Mule Creek State Prison (MCSP) on 8/17/04 where he was diagnosed by a psychiatrist with Psychosis, Not Otherwise Specified (NOS) and his Seroquel was increased. An SRA was completed but was unsigned and undated. The suicide report refers to this particular SRA as having been completed on 8/19/04 and, despite the inmate having a number of static, slowly changing and dynamic risk factors and only minimal protective factors, including family and religious support, the clinician evaluated the risk as "absent or trace." The inmate was in the EOP administrative segregation unit at MCSP. He was seen on 8/26/04 by the IDTT which indicated that he was "improving," marked his suicide risk as "absent," raised his global assessment of functioning (GAF) to 51, and changed his level of care from EOP to 3CMS. The inmate was described as improved with a normal mental status and transferred back to SCC as 3CMS on 9/13/04.

Upon his return to SCC, the inmate was described as having poor activities of daily living (ADLs), "yelling out at peers," and reportedly was not sleeping. The inmate was also described as appearing "internally preoccupied," but denied suicidal ideation (SI). His condition appeared to deteriorate in administrative segregation as he had drawings on his stomach and arms which he refused to wash off. He refused to shower, and had waste in his toilet stating that he "forgot" to flush his toilet. On 9/23/04 the inmate was yelling racial slurs, reporting he could not think right because of "all this noise" and was banging his head on the cell door. He reported he was not trying to hurt himself but getting his aggression out. His medication compliance was sporadic and his condition continued to deteriorate. By the end of September, the psychiatrist was again recommending that the inmate be at the EOP level of care and described him as having a Personality Disorder as well as a Delusional Disorder. Progress notes described the inmate as continuing to

3

decompensate to the point of custody staff ordering the inmate to stand at the back of his cell facing the wall whenever his food port was opened.

On 10/28/04 the inmate was transferred once again to MCSP. The initial health screening from SCC to MCSP on 10/28/04 indicated diagnoses of Schizoaffective Disorder NOS, Bipolar Disorder, Major Depressive Disorder, and history of SI. This inmate was prescribed Seroquel. He was seen by a psychiatrist at MCSP on 11/2/04 who diagnosed Attention Deficit Hyperactivity Disorder (ADHD) and Bipolar Disorder. The psychiatrist decreased the inmate's Seroquel and began Zyprexa and Wellbutrin, and noted that he would consider Lithium and Strattera, with a plan to return to clinic in 30 days. The inmate was seen by the administrative segregation unit IDTT and was given diagnoses of Adjustment Disorder, Polysubstance Dependence, Narcissistic Personality Disorder, and Antisocial Personality Disorder with a GAF of 60 and the recommendation for a level-of-care change to 3CMS. The institutional classification committee (ICC) action was to return the inmate to SCC at the 3CMS level of care on 11/4/04. The inmate was transferred on that same day back to SCC after an approximately seven-day stay in the MCSP EOP administrative segregation unit.

He was seen by the administrative segregation unit IDTT and the case manager on 11/9/04. He was described as being able to control his antagonistic behavior when he was transferred to the EOP hub. He was stating that he was quieting down; however, within a half an hour of return to his cell, "he was yelling at staff and inmates." The inmate continued to deteriorate in the administrative segregation unit, with cell-front interviews as he refused to come out of his cell. He was required to wear the spit mask, and was noted to have incidents of "gassing" officers. He had additional RVRs and referrals to the District Attorney (DA). The inmate was described as delusional. On 12/22/04 a psychologist wrote that he consulted with a supervisory staff member regarding the inmate's functioning. It was determined that he did not warrant an OHU or mental health crisis bed (MHCB) placement, but that the "ongoing ASU setting is detrimental" to the inmate's psychological functioning, with a plan to continue to monitor the inmate. By 1/20/05 the inmate had been placed in a management cell because of gassing a correctional officer again. The case manager noted that the inmate stated his "work here is almost done." The case manager described the inmate reporting that he receives guidance from his dreams, has bizarre and grandiose delusions, but in consultation with a supervisory staff member, they agreed that the inmate did not pose an imminent danger to himself or others and therefore did not warrant OHU/MHCB placement. It was noted that the inmate could not be transferred to an EOP because of his custody status and that the plan was to continue follow-up. The inmate was also noted to be refusing medications and to be sleeping poorly.

On 1/31/05, the inmate was transferred to the CSP/Corcoran SHU. A condensed mental health assessment (MH-4) was completed on 2/9/05 and described the inmate's level of cooperation as good, his having a history of three gassings, impaired judgment, "long history of masturbation," a history of substance abuse, and a history of attempted overdose on Seroquel in June 2004. He was described as having manic behavior, labile mood, impaired cognition and extreme impairment in insight and judgment. The

diagnoses were Bipolar II Disorder, Polysubstance Abuse and Antisocial Personality Disorder.  An SRA done on 2/9/05 indicated a "moderate risk with numerous risk factors" and family support as the only protective factor (even though the family had re-located to Oregon).  The SRA was done with no unit health record (UHR) available.  On 2/14/05, after attempting to gas another inmate and stating intent to harm himself, the inmate was admitted to an MHCB at CSP/Corcoran.  His diagnosis was Psychosis NOS, and he was placed on suicide precautions.  He was described with similar symptoms as noted on the MH-4 as well as the same diagnoses and was prescribed Seroquel, Geodon and Zoloft.  Another MH-4 was completed on 2/25/05 and his diagnosis was changed to Schizoaffective Disorder.  Another but undated SRA done by a social worker during the course of the inmate's admission at the MHCB indicated family and religious support as protective factors and numerous static, slowly changing, and dynamic risk factors, but evaluated the risk as "negligible risk" with no recommendations.  He remained in the MHCB because of ongoing suicidal threats, poor judgment and delusional thinking until 3/9/05.  His diagnosis at the time of discharge to the Department of Mental Health (DMH) was Schizophrenia, Chronic.

On 3/9/05 the inmate was admitted to the DMH program at the California Medical Facility (CMF), because of SI. On admission, the inmate was described as having an elevated mood that was incongruent with the subject matter, reporting "rather bizarre incidents with very peculiar super-ego monitoring," cooperative with good cognition and comprehension, impaired judgment, limited insight and denying any current SI or intent to harm himself or others.  The diagnoses were Adjustment Disorder, with Depressed Mood rule out Bipolar Disorder; Polysubstance Dependence; Narcissistic Personality Disorder; and a GAF of 20.  His prognosis was guarded and he was prescribed Seroquel and Abilify.  He continued to receive these medications and was discharged having received maximum benefit on 3/29/05 with return to CSP/Corcoran.

The inmate returned to CSP/Corcoran on 4/5/05, was seen in the emergency room because of his complaint "I am suicidal" and was admitted to the CSP/Corcoran ACH. The inmate was described as "loose delusional overly broad affect like a hysterical adolescent" as well as "pressured speech."  It was reported the inmate stated that he "manipulated the system" to get back to the ACH and related his "foul" treatment at DMH.  An SRA done on 4/6/05 indicated negligible risk, and the inmate was discharged from the MHCB on 4/7/05, at the EOP level of care.  The inmate actually remained at the MHCB until 4/13/05 when he was transferred back to the SHU at the EOP level of care. The SHU IDTT met and changed this inmate's level of care to 3CMS on 5/3/05.  The inmate did not attend this meeting.  The mental health assessment (MH-2) completed by the IDTT on 5/3/05 indicated the inmate's cognition was within normal limits and his thought content had no delusions, but his auditory hallucinations were controlled by medications and his insight and judgment were poor.  They reported he had no current suicidality or violence risk.  The diagnoses were Adjustment Disorder, rule out Bipolar Disorder II, Polysubstance Dependence and Narcissistic Personality Disorder.

After his return to the SHU, the inmate's behavior appeared to regress to his previous level of functioning, with continuing conflicts with other inmates and with staff, bizarre

5

behavior, yelling of racial and other slurs, and his request to his case manager to return to the EOP.

By 6/22/05 the inmate had been refusing his medications for at least two weeks, and complaining that he could not sleep and was hearing a woman's voice as an auditory hallucination. He was seen via telemedicine. The diagnosis, changed to Schizoaffective Disorder rule out Bipolar Disorder, was entered. The inmate was also placed on Depakote for mood stabilization. Approximately weekly, case manager notes indicated that the inmate reports that he had taken his medication and as of 7/18/05 he was alert, with appropriate mood appropriate, cognition and speech, and no mental health issues or concerns in addition to denying suicidal or homicidal ideation and hallucinations. However, by 7/28/05, custody staff requested mental health assistance because the inmate was disruptive and yelling and the medical technical assistant (MTA) reported that the inmate had not been taking his medications since 7/2/05. The inmate was seen at cell front because he refused to come out of his cell. He was assessed as having a strong Axis II disorder but was considered for a "possible Keyhea." Subsequently, the inmate refused telemedicine contacts for medication management, and on 8/18/05 was taken to the MHCB because of making a suicidal statement, but he was not admitted. The medical officer indicates in his note of 8/18/05 that the inmate stated that he had not been taking his Seroquel for approximately one week and began hearing voices talking about him, and had "some suicidal thoughts and planned to hang himself." The plan at that time was to admit the inmate to the ACH; however, the admission was cancelled by the psychiatrist. The suicide report refers to the decision being made to return the inmate to the SHU "with the understanding that he would begin taking medication again."

On 9/15/05 the ICC met with the inmate in attendance. He reported a "mix up with his medication regimen," and had flat affect and inappropriate behavior. The plan was to refer the inmate to a psychiatrist for medication evaluation. On 9/28/05 the case manager indicated his intention to refer the inmate for the EOP level of care. The inmate had documented non-compliance with Depakote throughout this period. On 10/5/05 the licensed psych tech noted the inmate's possible self-inflicted injuries to his hands due to punching walls, and recommended that the case manager evaluate the inmate for possible MHCB admission. The inmate's refusal of medications and his non-compliance was noted sporadically. In response to a telemedicine clinic appointment that was scheduled for that date, the inmate signed a refusal-of-examination and/or treatment form dated 8/3/05 in which the inmate stated, "I refuse to attend due to the fact that I quit using prescription drugs because they don't work anyway."

The inmate continued to refuse medications and out-of-cell contacts, and his behavior continued to deteriorate. He was seen in October by mental health staff because of custody staff complaints about his behavior. On 10/29/05, he refused to see a psychiatrist for an interview. However, the psychiatrist wrote that he was "stable off psych meds" and indicated the inmate was non-acute and had no complaints. On 11/26/05 he was seen at cell side by a psychiatrist who indicated the inmate was yelling out of his cell and refusing psych meds, indicating that he was "not crazy." The psychiatrist stated that the inmate had been off medications since September 2005 and denied SI. Although the

psychiatrist diagnosed Bipolar Disorder, he did not refer the inmate for any higher level of care or change in treatment.  In December 2005, the inmate was noted as being suspicious that there was something wrong with his food and began refusing meals.  He continued to disrupt the environment and was described as having poor ADLs and cell maintenance.  He is reported to have denied SI or intent during the times that he was seen by clinical staff nearly exclusively at cell front.

The inmate's condition continued to deteriorate.  On 1/4/06, custody staff requested mental health assistance because the inmate continued to decompensate.  A case manager did see the inmate and noted the presence of auditory hallucinations as well as grandiose delusional thinking.  Custody staff even photographed the inmate's cell on 1/4/06.  Copies of the photos were provided.  The inmate's cell was littered with food and clothing on the floor.  One photograph showed a jumpsuit hanging from the cell light, making the cell extremely dark.  The cell was described as malodorous with the smell of urine and feces emanating from the cell.  On the same date, the case manger referred the inmate to the CSP/Corcoran MHCB for grave disability.  The inmate did agree to come out of the cell and meet with the case manager in a confidential setting.  He was described as loud and kicking and banging on the door on a daily basis.  He is reported to have stated "I am done with this place. I want to get even.  I am not going to conform and that is not going to happen."  He continued, "I am either going to win or I am going to die trying."  He continued with other statements of "everyone" attacking and teasing him.  The case manager documented that the inmate "denied suicidal ideation at the present time," but his thinking was disorganized and he had been hearing voices, but not at that time.

The inmate was admitted to the CSP/Corcoran ACH on 1/4/06 with a diagnosis of Schizoaffective Disorder and was ordered Risperdal Consta and Depakote.  The nursing treatment summary described the inmate as being admitted for not keeping his cell or himself clean, and angry concerning custody and medication issues.  His course was described as having denied suicidal and homicidal ideation and visual and auditory hallucinations, and being calm with appropriate and good eye contact and clear thought processes.  He is described by the psychiatrist as voluntarily taking Risperdal and Depakote and not being eligible for Keyhea.  An SRA completed on 1/5/06 indicated a number of static, slowly changing, and dynamic risk factors including multiple suicidal threats in the past and an overdose attempt in June 2004, but identified such protective factors as family support, religious support, and "exercises regularly."  The evaluation of risk was determined as "no apparent significant risk." However, the inmate was placed in a crisis bed on suicide precautions.  A subsequent SRA indicated no history of SI or threats, but it did identify a previous suicide attempt (without specifying when it had occurred), several other risk factors, no protective factors, and no other sources of information other than the inmate.  It concluded that there was "no apparent significant risk" and that the inmate should be discharged to a lower level of care, on 1/9/06.  The treatment plan completed on 1/5/06 in the ACH at the MHCB level of care was signed by the social worker/case manager, "psych intern," and correctional counselor 1.  There was no documented attendance by a psychiatrist, psychologist, nurse or other custody staff at the treatment plan meeting.  The only problem identified on the problem list was "not

programming." The diagnosis remained "Schizoaffective" and Antisocial Personality Disorder with a GAF of 29, and the discharge plan was to discharge the inmate to the 3CMS level of care.

The inmate was discharged on 1/9/06, described as taking his medications as prescribed, "alert, pleasant, polite and in no acute distress," with good grooming and hygiene. It was also noted that his cell was neat and clean. He was advised that if he stopped taking his medication or had a dirty cell, he likely would be returned to the ACH. As part of the discharge plan, five-day follow-up by clinical, and hourly checks for the first 24 hours by custody were ordered.

The following morning on 1/10/06, custody staff once again called clinicians, this time in the MHCB to report that the inmate was again engaged in the same kind of behavior as before, and that he needed to be seen. A psych tech saw the inmate at 1:30 p.m., noted that he denied suicidal, ideation and psychotic symptoms. The psych tech noted that the inmate appeared to be "better than when he went to the MHCB," according to the suicide report. He also refused his oral medications that day. At approximately 4:22 p.m. the inmate was discovered hanging from the door of his cell. No suicide note was discovered in the inmate's cell.

The suicide report identified one problem, with recommendation, as follows:

> Problem:  Inmate was transferred to EOP hub at MCSP twice in 2004, only to be quickly transferred back to SCC before his psychopathology could be adequately assessed and documented. Documentation at MCSP of the inmate's second stay there was particularly sparse.
>
> Recommendation:  System. Consider a mandate that an inmate that is new to both the institution and at a higher level of care be retained for at least thirty days to allow an adequate assessment. There were no recommendations for the institution.

On 8/14/06, the Director of the Division of Correctional Health Care Services (DCHCS) and Division of Adult Institutions (DAI) submitted a report on implementation of quality improvement plan (QIP) for suicide of Inmate A which stated: the problem as described in the Executive Summary is being addressed in the plan to decrease suicides in administrative segregation units that is being submitted to the Court in the Coleman case on 8/31/06. The plan for this item is to require inmates sent to an administrative segregation EOP hub to be evaluated for a minimum of 60 days before being returned to a lower level of care.

**Findings:**  This inmate's death does not appear to have been foreseeable as he did not express any overt intent to harm himself in the short term before his death. He did indeed have a history of SIs and at least one reported suicide attempt as attempted overdose of unknown medication in 2004. This inmate's death does appear, however, to have been preventable because there were multiple failures by clinical staff to appropriately follow policies and procedures and/or to adequately assess the inmate's level of functioning and

treatment needs.  These failures occurred at MCSP in that the inmate was returned to SCC at a lower level of care after inadequate times for proper evaluations to assess the inmate's overall functioning.  These failures continued at SCC and were also multiple at CSP/Corcoran in that the inmate was downgraded from the EOP to the 3CMS level of care after his return from DMH, and when he had been participating in the EOP programming and other activities.  His participation in programmatic activities, out-of-cell contacts with clinicians, and most particularly medication compliance were well documented as sporadic at best.  His medication non-compliance was prolonged, since at least April 2005.  Despite the inmate's continuing deterioration in his hygiene, grooming and cell maintenance, as well as his disruptive behaviors in the administrative segregation unit and SHU environments (with appropriate referrals by custody staff), the inmate was returned to these environments after short stays in the MHCB, DMH, and transfers to MCSP.  In every case, his condition deteriorated after his return, with the exception of his return to an EOP for a very short time after his DMH placement, only to be placed at the 3CMS level of care with, again, deterioration and decompensation.  He was placed in the SHU in January 2005 but was never referred to a psychiatric services unit (PSU) because his level of care had been changed from EOP to 3CMS.  Custody staff repeatedly referred this inmate to clinicians for further evaluation and treatment and possible placement at a higher level of care.  Clinicians repeatedly returned him to the administrative segregation unit or SHU environment at a 3CMS level of care, despite his decompensation and non-compliance.  Most distressing was his last admission to the MHCB in the ACH at CSP/Corcoran.  The documentation provided was inadequate, and staff did not appear to have considered or been aware of this inmate's long-term course of decompensation and non-compliance.  The staff documented the inmate's willingness to "say anything" to get out of the hospital, including promises to take medication despite the record to the contrary.  The IDTT meeting did not appear to have been attended by a psychiatrist or psychologist.  The mental status examination that was recorded was in stark contrast to the inmate's presenting complaints as well as his long-term functioning which were very clearly represented in the UHR.  This inmate's care and treatment were clearly inadequate.  Had he received appropriate assessment and treatment, and particularly placement at a higher level of care and Keyhea orders to ensure his medication compliance if necessary, his death may have been preventable.

## 2.  Inmate B

Brief History:  This inmate was a 35-year-old Caucasian male who committed suicide by hanging on 1/15/06 in the Sensitive Needs/General Population Yard at California State Prison – Sacramento (CSP/Sac).  The inmate was in the MHSDS at the 3CMS level of care.  He was doubled-celled at the time of his death.  The inmate returned to the CDCR on 3/6/96 with a sentence of 55 years to life.  It was based on a third strike conviction for carjacking, for which he received a sentence of 25 years to life, plus a five-year enhancement for possession of a weapon and assault with a deadly weapon.  He attempted to stab his attorney in the courtroom at the time of his sentencing on the above charges, and was sentenced to an additional 25 years to life, for a total sentence of 55 years to life.

The inmate was discovered on 1/15/06 at approximately 6:55 a.m. by a correctional officer on the tier who observed that two sack lunches were sitting on the food port of the inmate's cell and that the inmate's cell was dark. The inmate and his cellmate were inside of the cell. When the officer used his flashlight to look into the cell, he saw the inmate partially suspended from a noose made from a sheet that was attached to the air vent above the toilet and tied around his neck. The officer sounded his alarm, and a second officer also activated his alarm. When responding staff initially arrived at the block, they were mistakenly informed that the alarm was false. Shortly afterward, staff was informed that the emergency was real and the emergency response to the cell was made. The inmate's cellmate who had been asleep on the top bunk woke up with all the commotion and was told to lie back down on his bunk by the officers. A sergeant, MTA and other staff responded. The cell door was opened and the noose was cut. The inmate was placed on a Stokes litter, carried down the stairs to a rolling gurney, and transported to the triage and treatment area (TTA) in Facility A. En route, the MTA checked for a pulse, but was not sure if he could feel one. Once the inmate arrived at the TTA at approximately 7:02 a.m., oxygen was started and his vital signs were monitored. CPR was not begun until approximately 7:08 a.m. Life-saving measures continued until 7:24 a.m. when paramedics from the City of Folsom arrived. The inmate was pronounced dead at approximately 7:26 a.m. The inmate was noted to have had a cut and dried blood on his left wrist. A preliminary report by the CSP/Sac investigations officer who witnessed the autopsy stated that the preliminary cause of death was determined to be asphyxiation; toxicology studies were pending. Two suicide letters dated 1/14/06 were discovered in the inmate's belongings. The first was addressed to the warden and the chief deputy warden. The second was addressed to the inmate's significant other, "Theresa my soul mate." The inmate's letter to the warden and chief deputy warden described the inmate deciding to end his own life and not having any help to do so. He also reported that he had an issue with a particular sergeant in the visiting hall and that he had never brought in drugs which had resulted in his permanent loss of visits from his significant other. The inmate also stated to the chief deputy warden that he did not try to escape but that he "escaped tonight." He asked that the warden and chief deputy warden get his letter to Theresa. His letter to Theresa stated his love for her and other statements regarding their relationship, and other statements related to his decision to end his life.

The inmate was first committed to the CDCR in September 1989 and sentenced to four years due to convictions for second degree robbery and first degree burglary. These convictions followed his several arrests as a juvenile, beginning in 1984 for crimes including petty theft, burglary, battery, assault with a deadly weapon, vehicle theft, possession of stolen property, and escapes from county facilities resulting in his commitment to the California Youth Authority (CYA) in 1988. After his release from the CYA, he was arrested for trespass and obstruction/resisting a public officer. However, the disposition of those charges is not included in the records reviewed. After his commitment to the CDCR in 1989, he was paroled in November 1991. However, he was charged with vehicle theft in 1992 for which he received a three-year sentence. The inmate subsequently paroled in June 1994 and was arrested approximately two weeks later for carjacking. He was ultimately convicted in June 1995 as a third-strike

conviction. Again, his total term was 55 years to life with a minimum eligible parole date of November 2047.

The inmate was re-admitted to the CDCR on 3/6/96 via the NKSP RC. The initial health screening from Orange County to NKSP dated 3/6/96 recorded the inmate stating he had a history of "paranoid schizophrenia," a history of attempting suicide, treatment for mental illness, and a current mental health problem. He was placed at the 3CMS level of care shortly after admission. The inmate gave a history of physical and emotional child abuse, particularly at the hands of his mother, a suicide attempt by hanging at age nine, as well as a second attempt by cutting his wrists at age 21. He also reported a history of substance abuse including methamphetamine, alcohol, marijuana, and cocaine, beginning at age 17. He was transferred to CSP/Corcoran in the SHU. His initial treatment plan in May 1996 established diagnoses of Depressive Disorder NOS, rule out Schizoaffective Disorder, and Antisocial Personality Disorder. His diagnoses were updated in August 1996 to include Bipolar Disorder. He was prescribed Lithium, Sinequan and Thorazine, which he continued to take until approximately November 1996. During this period, his diagnoses were updated once again to include Borderline Personality Disorder, but the Axis I diagnoses were discontinued. Despite this, he appeared to have continued to receive Lithium after his request to be taken off the medication. He began refusing medication during that period. He remained at the 3CMS level of care until he was discharged from the MHSDS in February 1998. In August 1998, the inmate was sent to Doctor's Hospital for abdominal surgery for adhesions and ischemic bowel, as he had had a history of bowel obstruction. He appeared to have fully recovered from this episode.

The inmate was returned to the MHSDS in May 2004 after he had been placed in a ZZ cell at CSP/Sac because he had reported SI. He had been seen by clinicians twice in 2000 and once in 2001 for self-referrals and for an administrative segregation clearance, and was determined not to require mental health services during those three interviews.

On 5/26/04 the inmate was assessed in the ZZ cell where he had been placed the night before, and removed from the stand-alone administrative segregation unit after reporting SI. The inmate reported that he had sent an Inmate Heath Request for mental health but had not been seen. The psychologist who evaluated him confirmed that the request dated 5/18/04 was not received until approximately 5/25/04. The inmate reported that he felt he was suffering from severe depression, lost 30 pounds in the past two months, slept poorly, and was becoming more withdrawn, isolated, and hopeless. He also reported that he was having "constant current suicidal ideation," and that he had made a noose two weeks ago but "couldn't do it." The inmate also reported auditory and visual hallucinations in the past as well as homicidal ideation. He reported that his history included a diagnosis of Bipolar Disorder, and that he had suffered some head trauma with loss of consciousness but no seizures. The psychologist assessed that the inmate was significantly depressed and was a potentially high suicide risk. He was admitted to the correctional treatment center (CTC)/MHCB on suicide precautions. The psychologist completed an SRA in which she indicated that she interviewed the inmate and staff, and reviewed the UHR. The SRA was done well with regard to risk and protective factors. However, it did not include an evaluation of risk. The progress note did indicate

potential high risk.  Both the progress note and the SRA indicated a plan to have the inmate placed in an MHCB on suicide precautions.  A second SRA completed on 5/27/04 was complete, including inmate interview, staff interview and UHR review, with the exception of specification of risk evaluation.  The plan was to discharge to a lower level of care as 3CMS and to place in administrative segregation.  In the MHCB, the inmate was diagnosed with Major Depressive Disorder, placed on Mirtazapine, and discharged from the MHCB on 5/27/04 with five-day follow-up which he did receive.  The inmate was returned to administrative segregation at the 3CMS medical necessity level of care.  He had been placed there due to receiving an RVR for unauthorized use of a phone.

After his return to administrative segregation, the inmate received treatment plans in June, August, and November 2004 in which his diagnosis was Depressive Disorder NOS.  His diagnosis was changed to Bipolar Disorder NOS in December 2004, and it was noted that his medication was discontinued.  His treatment plan of 4/19/05 indicated Bipolar Disorder, Most Recent Episode Hypomanic in Remission, and he was not receiving medications.

On 6/8/04 the inmate was again seen by a psychologist and described as in crisis.  When seen, he reported "I'm stressing out a lot more."  He continued "I can't stand being locked in a cell."  The inmate also told the case manager that he had put a noose around his neck when he was on the mainline, but on the progress note, the box for "suicide/homicidal ideation" was left blank.  The box for "hallucination/delusion" was checked "yes – paranoid."  The inmate was seen in the "dining room cage" by the psychologist and the inmate reported that he was under a lot of stress and had been moved several times to the CTC while in administrative segregation and in the stand-alone administrative segregation unit, but there was nothing to do and "I got crazy."  The psychologist assessed the inmate as having labile and unstable mood, but his thought content and processes were normal and organized.  The psychologist reported "chronic suicidal ideations especially when mood is depressed/anxious."  He continued that the inmate was not suicidal at that moment and had no plan or intention of harming himself, but feared that his mood may change and that he might go into a panic.  The psychologist diagnosed Adjustment Disorder NOS and referred to a psychiatrist "for a mood stabilization and high suicidal risk (chronic)."  The psychologist provided counseling for suicide prevention techniques in contacting staff.   The case manager referred the inmate to a psychiatrist who saw him that same day.  The psychiatrist described the inmate as "sad, despondent" and reported questionable loss of 30 pounds in the last month.  The psychiatrist diagnosed Dysthymia, with a plan to continue "AD" and for the inmate to continue to take medication.  The inmate was started on Lithium Carbonate on 6/21/04 as per the medication administration record (MAR).  However, there did not appear to be a progress note by the psychiatrist on that date.  The MAR indicated that the inmate refused Lithium or did not receive it (there were blanks on the MAR in June, July, August, September, and October 2004 on at least 25 occasions).  Celexa was started on 8/24/04 but discontinued on 9/29/04, as the inmate had refused it on at least ten occasions.  The inmate appeared to be essentially compliant with Lithium in November 2004.  The Lithium, however, was discontinued after the inmate's complaints regarding it on

12/22/04, after he had stopped taking it altogether in mid-December 2004.  Laboratory testing reports during that time did not indicate that Lithium blood levels were drawn.

After the inmate's Celexa was discontinued on 9/29/04 and Lithium was discontinued on 12/22/04, he did not receive any other psychotropic medications.  He did remain at the 3CMS level of care.  The inmate returned to general population in December 2004.  He had remained in administrative segregation from 5/27/04 until shortly after the ICC meeting on 12/15/04 when he was released to general population.

After his release from administrative segregation, the inmate was seen on 12/22/04 and 1/19/05 for follow-up visits by the case manager.  He reported that he was adjusting well, had no suicidal or homicidal ideation, and that he had a very positive relationship with his girlfriend.  He was also enrolled in a transition group which he attended in January 2005.  Although the inmate was scheduled for transition group through December 2005 it appeared from the notes that his participation stopped in January 2005.

The inmate reported in February 2005 to his case manager that he had impregnated his girlfriend approximately six weeks prior to that day, but that she had suffered a spontaneous abortion during the prior week.  The inmate reported his sadness and difficulty in attempting to help his girlfriend cope with the loss.  He did continue with case manager appointments and compliance with requirements, at times as frequently as once per month.  He was seen on 12/6/05 in a confidential setting as he requested a one-to-one with the case manager.  The inmate reported that he had been on potty watch secondary to an accusation of his possibly smuggling drugs that were allegedly brought in by his girlfriend.  He reported to his case manager that he had not engaged in that activity and the case manager planned to see him for follow-up approximately every two weeks for supportive counseling.

The suicide report refers to a visit that the inmate had with his girlfriend 11/27/05 when it was suspected he was receiving drugs from her.  As it turned out, he had small heart shaped magnets in his mouth that he was exchanging with his girlfriend as a gift, and also had a silver ring that she had given to him that was not on his property card.  His girlfriend was found to have contraband items in her purse including cough drops, a breath mint, a lip gloss, and a Motrin tablet, and she was excluded from visiting any inmate at CSP/Sac as of 12/19/05.  The suicide report stated that "corrections staff were perplexed that the inmate did not write an appeal because contraband was not drugs."  The report also stated that "on 12/28/05, the inmate wrote a letter to prison administration protesting that his visits had been improperly denied per Title XV and should be reinstated," but that there was no documentation of a response from the administration.

On 12/20/05 he met with his case manager, with whom he discussed his loss of spousal visitation.  The case manager recorded his mental status as stable and he had no active serious symptoms.  The case manager reported that the inmate was addressing his RVR by comparing himself to other inmates and that he was exhibiting "self-deception" and minimizing his offense.  This was the inmate's last contact with a mental health clinician.

The inmate subsequently lost his job as a clerk in the chaplain's office based on an accusation of his being "out of bounds" by unauthorized use of the chaplain's telephone and computer.

The suicide report identified one problem, with recommendation, as follows:

> Problem:  Inmate was discovered hanging at 0655 hours.  He was cut down and transported to the TTA.  CPR was started at 0708 hours, 13 minutes after discovery.  To be effective, CPR should be started within four minutes, i.e., right away.
> Recommendation:  The CSP/Sac Emergency Response and Review Committee (ERRC) are to do an in depth review of his case, determine why CPR was not initiated at cell front, and make recommendations for improvement.

On 10/19/06 the Directors of the DCHCS and DAI issued a report on implementation of quality improvement plan for suicide of Inmate B.  The CAP approved by the warden and health care manager of CSP/Sac on 10/2/06 stated that staff had questions about the actual timeframe of 13 minutes and "other factors" "suggested a much shorter delay likely occurred."  The response includes references to clocks at the institution varying by several minutes, delay caused by the erroneous initial belief that the alarm activation was false, and that CPR was not initiated while the inmate was being transported to the TTA because the MTA was unable to determine the presence of a pulse.  Lastly, the staff reported that another MTA reported that he had entered the TTA at 0700 hours and that CPR was being performed on this inmate.  The plan of corrections submitted by CSP/Sac included (l.) proof of practice of the re-training of staff on the emergency response protocol and (2.) a copy of the emergency response protocol (Chapter 12-A First Aid and Emergency Medical Treatment) was attached.

**Findings**:  This inmate's suicide does not appear to have been foreseeable.  His death may have been preventable had there been timely and appropriate initiation of CPR.  The inmate was not administered CPR by first responders.  The documented timeframe from his discovery to the initiation of CPR was 13 minutes.  The explanation that a pulse could not be determined was inadequate.  The MTA arriving on the scene should have taken the necessary time prior to the inmate leaving the cell, or cell side, to establish that he did or did not have a pulse and respirations.  The initiation of CPR would have been appropriate to establish cardiac and respiratory function at cell side and throughout the period of transport to the TTA.

The inmate had a long history of sporadic treatment by mental health staff at the 3CMS level of care.  This treatment was consistent with regard to case manager and psychiatric contacts as well as placement of the inmate at a higher level of care when indicated.  The treatment was inconsistent with regard to the inmate's medication management.  There were multiple incidents of his having non-compliance or refusals with medication, with very minimal documentation of efforts to address his non-compliance in a timely and appropriate manner.  Indeed, the UHR had MARs with documented refusals and non-compliance.  However, there was very minimal documentation of efforts to educate the

inmate and to address the issues of his non-compliance.  Ultimately, when the inmate reported non-compliance to his psychiatrist, appropriate discussions took place with regard to the need to continue medication, and appropriate dispositions were made.  The inmate clearly had precipitating factors that probably caused his stress level to increase.  However, he did not report any SI or intent related to these stressors, and his mental status had not significantly changed with regard to increased risk for suicide.


**3.  Inmate C**

Brief History:  This inmate was a 29-year-old Caucasian male who committed suicide by hanging on 1/18/06.  He was in the administrative segregation unit, in which he was the sole occupant of a double cell at the Richard J. Donovan Correctional Facility (RJD).  The inmate was a part of the MHSDS at the 3CMS level of care.  The inmate re-entered the CDCR via the RJD RC on 10/3/05, having had two felony convictions for trespassing and vandalism.  The disposition of a possible assault on a police officer who was transporting him to the county jail was unclear from the records provided.  The inmate's earliest possible release date was scheduled for 2/26/06.

The inmate was discovered on 1/18/06 at approximately 8:48 p.m. in his administrative segregation cell by a housing officer on the tier.  The inmate was the sole occupant of the cell and was discovered sitting on the floor of the cell with a torn sheet tied around his neck and the other end attached to a light fixture in the ceiling.  When the officer discovered that the inmate was hanging, he yelled "inmate hanging," and a sergeant requested the emergency transport vehicle (ETV) via institutional radio.  Four officers and an MTA responded to the cell. The cell was opened, and the sheet was cut from the light fixture and from around the inmate's neck.  According to the suicide report, the sergeant and MTA began CPR and used an ambu bag.  However, the inmate's death report dated 1/19/06 stated "the inmate-patient was unresponsive and non-communicative when arrived to the TTA.  CPR and ACLS were started upon arrival to the TTA."  The arrival time was noted as 8:53 p.m.  The suicide report stated that the sergeant and MTA began CPR after entering the cell, but also stated "the ETV arrived at the TTA at approximately 2053 hours and medical staff initiated CPR."  911 was called, and at approximately 9:10 p.m. the American Emergency Response Team arrived at the TTA.  At approximately 9:22 p.m., via telephone, a physician pronounced the inmate dead. An autopsy report was provided by the Office of the Medical Examiner for the County of San Diego.  It stated that the inmate was being treated for depression.  The medical questionnaire showed that he denied any history of suicidality.  Upon examination, the inmate had multiple deep and superficial healing incision-like wounds to his interior wrists.  The cause of death was noted as hanging and the manner of death as suicide.  Toxicology studies revealed no alcohol or drugs of abuse in the inmate's system at the time of his death.

The suicide report recounts the inmate's criminal justice history which began when he was a juvenile.  He had arrests for vandalism, joyriding, petty theft, and ultimately battery with serious bodily injury and use of a deadly and dangerous weapon against his father which occurred in October 2000.  The inmate had been placed in a juvenile camp as well

as a residential treatment program but had escaped from both. He was ordered to the CDCR in December 2001 under another inmate number for a diagnostic evaluation. The findings of that evaluation indicated that he would be a marginal candidate for probation and should not live with his father. The inmate reported that he had been physically and emotionally abused by his mother and grandmother and by various step-fathers, as his biological parents divorced when he was two years old. In subsequent interviews the inmate reported that his mother had sexually abused him. The inmate also had a history as a juvenile of alcohol dependence and abuse of marijuana, methamphetamine, cocaine, and LSD. The inmate was placed on a three-year probation in February 2001 related to past offenses, and on a three-year probation in March 2001 related to the battery on his father. However, he did not comply with the conditions of the probation, including not living with his father. He was subsequently arrested on probation violations. The inmate, however, was released to probation in September 2001 and allowed to live with his father. He violated probation in March 2002 when he was arrested for speeding, failing a sobriety test, and resisting and spitting on the arresting officers. The inmate ultimately was sentenced to two years and entered the CDCR for the first time on 8/19/02, paroling on 5/11/03. He returned to the CDCR in July 2004 as a parole violator with a new term because of possession of a weapon and driving under the influence of alcohol/drugs in addition to other charges, but again paroled in November 2004. He was re-arrested on 9/8/05 for trespassing and vandalism, as well as spitting on the arresting officer at this time, and was returned to the CDCR on 10/3/05 for his current commitment as a parole violator, as noted above.

During a pre-trial evaluation the inmate reported much of the history as noted above, but also reported that he had been seen by a psychiatrist when he was 18 years old because of psychological problems. During the pre-trial evaluation, he was diagnosed with Alcohol Dependence, Cannabis Abuse, and Mixed Personality Disorder. This evaluation occurred in November 2000. However, a health screening (bus screening) that was completed in December 2000 at the CDCR stated that the inmate denied any history of mental illness or treatment for mental illness, suicidal thinking or attempted suicide. He also denied any current mental health problems. He was diagnosed with depression and was prescribed Zoloft at that time. In 2002, when the inmate returned to the CDCR, records indicated that he had a history of Anxiety Disorder NOS rule out Bipolar Disorder, rule out Psychosis NOS. However, he denied any current or past thoughts of suicide or current mental health problems. He was not placed in the MHSDS. Again, in 2004, when the inmate was returned to CDCR, he reported that he had no current mental health problems and no current or past suicidal thoughts. He was, however, placed at the 3CMS level of care as medical necessity in October 2004. There was a reference to his not being on medications. He was paroled in November 2004. The UHR indicated that his parole medication in November 2004 was Remeron, an anti-depressant, at low dosage. By the time the inmate returned to the CDCR on 10/3/05, the transfer sheet indicated that he had a history of Psychosis NOS and Mood Disorder NOS and was receiving Seroquel.

The initial health screening (bus screening) dated 10/3/05 when he arrived at RJD indicated the above information regarding Psychosis NOS and Mood Disorder NOS, that the inmate was receiving Seroquel, that he had been treated for mental illness, and that he

had a current mental health problem.  The inmate was seen by a psychiatrist on 10/4/05 and reported to the psychiatrist that he had been receiving Depakote at the parole outpatient clinic that "made me psychotic."  The inmate also indicated he had a diagnosis change from ADHD to Bipolar Disorder at the parole outpatient clinic and had been receiving Seroquel at the county jail.  The inmate reported that he had received Ritalin for ADHD as a child, and that he had never had suicidal or homicidal ideation.  The psychiatrist noted on the mental status examination that the inmate was alert and cooperative, denied present suicidal or homicidal ideation, and that the diagnostic impression was Mixed Dependence, ADHD, and "drug induced" psychosis.  The GAF was estimated at 55, and the psychiatrist prescribed Seroquel with return to the clinic in one month.  The doctor's orders indicated the Seroquel was being tapered from 400 mgs to 200 mgs and that it should be crushed in water.

The inmate sent a Health Care Services Request form (sick call slip) requesting to see a psychiatrist/psychologist to remain on meds and to start taking "something along with it to level me out."  He was noted to have been seen on 11/3/05 in response to this request. He had been seen however on 10/18/05 in the emergency care area.  The emergency care flow sheet indicated the inmate reported "my thoughts are being transmitted, yes I'm hearing voices."  The inmate is reported to have stated that he did not want to hurt himself, but that if he goes back to his cell "they will kill me."  The inmate reported that he had not had his medications for the last five or six days, hadn't slept for the last three days, and was noted to be holding a Bible and "legal papers."  On that same date the medical report of injury or unusual occurrence for pre-administrative segregation admission recorded the inmate stating "I am getting clean for ASU."

On that same day, a psychiatrist increased his Seroquel to 600 mgs and ordered it to be crushed and administered with directly observed therapy (DOT).  The suicide report indicated that the psychiatrist evaluated him on that day, and stated that the inmate told the psychiatrist that he had stopped taking his medications and that "the voices tell me they are going to kill me."  The suicide report also indicated the psychiatrist was told that the inmate expressed concerns about being housed in a Transitional Program Unit (TPU) because of "all the social politics," although this is a protective housing unit (PHU). There was no progress note by the psychiatrist on 10/18/05 documenting this interaction in the documents provided.  The suicide report indicated that the psychiatrist's note recorded a prescription for Seroquel 400 mgs.  However, the physician's orders indicated 600 mgs and the pharmacy profile did not show the order at all.  The pharmacy patient profile showed an order on 10/11/05 to run until 10/18/05.  There was, however, no doctor's order sheet indicating the Seroquel order of 10/11/05.  There was also no MAR indicating that staff administered medication after the 10/18/05 order for the rest of October.  The MAR for November 2005 indicated that the inmate received Seroquel 600 mgs, except for two days, and for December 2005, he did not receive Seroquel for the first four days.  It also indicated that he received Seroquel 600 mgs from 12/5 through 12/11, even though the 600 mgs order had been discontinued on 12/6.  It was replaced with Seroquel 800 mgs, which the inmate did not receive until 12/12 and 12/13.  The MAR for December indicated that the inmate did not receive any medication after

12/13/05 although the order was good through 3/6/06.  The January 2006 MAR was not provided.

The inmate was placed in administrative segregation for safety reasons based on his statement that he feared someone would kill him after he left the emergency care area on 10/18/05.  The suicide report indicated that the inmate was evaluated by a psychologist on 10/19/05 in the administrative segregation unit.  The psychologist wrote that the inmate was housed there for safety reasons, and that the inmate was reporting increased auditory hallucinations and stated that he thought his medications needed to be evaluated.  The psychiatrist also was reported to have noted that the inmate stated that he had a history of increased auditory hallucinations and violence when his medications were changed, but denied thoughts of harm toward himself or others.  The psychologist is reported to have noted that the inmate would be released on 10/19/05 after his ICC meeting.  This note was not located in the records provided.

The suicide report referred to the inmate having been evaluated on 11/3/05 by a different psychiatrist.  The health care services request form dated 10/6/05 by the inmate indicated that he was seen on 11/3/05.  However, there was no psychiatric progress note in the documents received.  The suicide report indicated that the psychiatrist wrote a note that was difficult to read, but that the inmate had reported his auditory hallucinations had stopped and that the "same medication" was to be prescribed with return visit in one month.

On 12/3/05 the inmate sent another Health Care Services Request form, stating the problem as "having some depression problems.  Feeling catty.  Need to see the doctor.  Delusions."  The form states that he was seen on 12/6/05 by a physician.  No note was provided in the documents received; however, the suicide report makes reference to a 12/6/05 evaluation by a psychiatrist and indicates the inmate reported "some daytime paranoia such as thinking cellmate is poisoning his food."  This psychiatrist diagnosed the inmate with Psychosis NOS and increased his Seroquel to 800 mgs for 90 days and ordered lab studies.  The doctor's order sheet of that same date recorded that order for Seroquel 800 mgs, times 90 days, and follow-up in four weeks with psychiatrist.  The medication was noted to be DOT and "crushed and float Seroquel in H2O."  As noted above, this increase in Seroquel appeared to have only been given on 12/12 and 12/13/05, and between 12/6 and 12/12/05 the inmate continued to receive Seroquel 600 mgs from the previous order.  The suicide report indicated that a MAR for January 2006 was reviewed and indicated the inmate received Seroquel on 1/17/06 and 1/18/06 when he was housed in the administrative segregation unit, but no MAR for 1/1/06 through 11/16/06 when he was housed in the TPU was available.

The suicide report referred to a mental health screening completed by "a mental health staff" dated 1/10/06 which concluded that the inmate needed further evaluation to rule out a mood disorder.  The suicide report also referred to an evaluation by a mental health professional on that date placing the inmate at the 3CMS level of care for medical necessity with a GAF of 60.  Neither of these documents was provided in the documents

received.  The suicide report also referenced that there were no treatment plans in the UHR or documentation indicating that an IDTT had reviewed the inmate's case.

On 1/17/06 a note in the record indicated that the inmate was seen in the TTA after self-inflicted lacerations to both wrists "for a gambler's debt."  The note indicated longitudinal lacerations to both wrists with multiple cuts, "many superficial, some deep," with some flesh missing on the left wrist.  The wounds were addressed with seven sutures to the left wrist and five to the right wrist and sterile tape, and the note ended with "psyche notified of need to see."  The suicide report referred to a psychologist having evaluated the inmate, but once again this document was not provided in the documents received.  The suicide report indicated the psychologist was told by the inmate that he had gambling debts, that he denied any history of suicidal behavior, and "stated that the current incident was only to get out of housing unit 17 and the perceived threat to him."  The inmate told the psychologist he was paroling on 2/26/06, and the psychologist referred him to correctional staff to address his safety concerns.  The suicide report referred to the psychologist informing the reviewer that he did not have the inmate's UHR and that this was his first contact with the inmate.  The suicide report indicated custody staff interviewed the inmate and placed him in administrative segregation, pending review for appropriate housing.  The suicide report continued that the inmate was interviewed on 1/18/06, the date of his death, by a lieutenant and the facility captain and the inmate told them that he had cut himself to be removed from the TPU.  He also said that he had gambling debts but could not remember the names of the individuals to whom he owed money.  The suicide report stated the captain concluded that the inmate was withholding information and decided to keep him in administrative segregation until he was seen by the ICC.  According to the suicide report, the captain told the inmate that he would be double-celled in the administrative segregation unit.  The suicide report reviewer stated that the inmate's concern about possibly having a cellmate may have "again created paranoia, fear and anxiety about being assaulted by a cellmate, and this may have contributed to his decision to take his life."  It was later that same day, at approximately 8:48 p.m., that the inmate was discovered hanging in his assigned cell.

The suicide report indicated that the inmate's final diagnosis, based on the 1/10/06 psychological evaluation, was Mood Disorder on Axis I with a GAF of 60.  The suicide report referred interviews with the psych tech and the case manager, who both reported they had spoken with the inmate after his placement in administrative segregation.  However, there were no notes provided in the documents received regarding these interactions.  The suicide report indicated that neither the psych tech nor the case manager were aware of the inmate having cut his wrist prior to being housed in the administrative segregation unit.

The suicide report identified six problems, and recommendations, as follows:

> Problem 1:  On 1/17/06, the day before the suicide, the inmate made multiple lacerations to both wrists.  A physician treated him, the inmate required seven sutures on his left wrist and five sutures on his right wrist.  Custody staff did not prepare a CDCR-837 incident report for this event, nor communicate to medical

or mental health staff how they became aware of this incident. This type of information could have provided additional data about the level of risk for self-harm (e.g., did the inmate inform staff that he cut himself or did staff actually accidentally discover the cutting?).

Recommendation: Captain of the TPU is requested to conduct a review of this incident and determine whether custody documentation of this incident was appropriate and adequate, and if not, to take corrective action.

Problem 2: The mental health clinician who evaluated the inmate after he cut his wrists did not conduct a SRA using the SRAC.

Recommendation: Provide training to this clinician on how and when to use the SRAC. Ensure that all clinicians have received the mandatory seven-hour SRA training of 4/20/05.

Problem 3: Custody staff placed the inmate in the administrative segregation unit after he cut his wrists. The administrative segregation clinical staff reported that they had no knowledge that the inmate had cut himself just before he was re-housed in the administrative segregation unit.

Recommendation: Provide training on the importance of communicating critical information to the appropriate staff. Refer to DCHCS memo of 4/9/05 for increasing communication between clinical and custody staff in administrative segregation and provide verification that this directive continues to be implemented.

Problem 4: There was no documentation in the UHR indicating that the inmate received a timely mental health screening or evaluation after his arrival on 10/3/05. A placement chrono indicated that the inmate was screened and evaluated on 1/10/06 but there was no MH-7 in the UHR.

Recommendation: Conduct a one-month audit of RC mental health screening and evaluations to demonstrate timeliness (85 percent compliance). Form a QIT to determine whether the missing MH-7 was a filing problem or whether it was never done; form a plan of correction and implement plan of correction.

Problem 5: There was no MAR for 1/1/06 -1/16/06 in the UHR (i.e. for 16 days prior to this inmate's placement in the administrative segregation unit), and health information systems staff were unable to locate the MAR. Therefore, it is not known whether this inmate received his prescribed medication for the month of January 2006.

Recommendation: Form a QIT to determine whether the missing MAR was a filing problem, or whether it never existed; form a plan of correction, and implement it. (This cannot be the same QIT as in Problem 4 above.)

Problem 6: There were disturbing discrepancies between the medication orders, pharmacy records and the medication administration record (MAR). Only two orders for psychiatric medications appeared in the UHR. The MAR reflected five

separate medication orders while the Pharmacy Profile listed four. There can be no discrepancies among the UHR, the Pharmacy Profile, and the MAR. Recommendation: Form a QIT to review the institutional process and any local procedures for transferring orders from the UHR to the Pharmacy Profile and MAR. Implement a plan of correction that may include an updated written procedure. Conduct a three-month audit to ensure consistency between orders as written and medications dispensed.

On 6/30/06 the Deputy Directors of the DCHCS and DAI issued a report on implementation of quality improvement plan for suicide of Inmate C in response to the recommendations in the executive summary of the suicide report dated 4/6/06. The responses from the facility were stated as follows: (1) there was no 837 incident report done on this inmate, but see enclosed copy of 128B and 114D. Associate warden did on-the-job training with the TPU captain regarding the need for the 837, and proof of this training was enclose, (2) please see enclosed proof of training on need for SRAC on this patient, and (3) "it is really not accurate to say that the clinical staff in ASU had no knowledge that the inmate-patient had hurt himself just before his re-house in the ASU." The response went on to say that the inmate arrived with a bandage on his wrists that were clearly visible and obvious to clinical staff, and on the day he cut his wrists he went to administrative segregation. It continued on to say that he was seen on 1/17/06 and 1/18/06 by the psych tech and on 1/18/06 by the case manager, and expressed no complaints, nor any suicidal intent, thoughts or plans, and that the case manager clearly saw his bandage. Nonetheless, a memo from DCHCS of 5/9/05 was enclosed as proof of training by an administrative segregation senior psychologist. There was an additional response that the captain of the TPU reviewed the actions of supervisors on duty the day prior to the inmate's suicide, and found it to have been actually within the scope of their responsibility, based on the doctor's diagnoses. The memo continued that CDC 128B and the crime incident/unusual occurrence report was not completed based on the inmate's claim of secondary gain as the reason for cutting his wrists. However, based on the injuries to his wrists, this would have met the requirement for an unusual occurrence and therefore an incident package should have been prepared. The memo concluded by stating that training will be completed for the lieutenant who supervised this incident. Attendance sheets and memorandum were provided in support of the above three responses.

With regard to Problem 4, the facility response stated that the inmate did not receive an initial suicide risk assessment checklist (SRAC) screening until 1/10/05 (*sic*) and received a MH-7 evaluation that same day. Further review of the UHR produced the mis-filed MH-7 that was previously not found, and an MH-7 mental health placement chrono was present in the UHR. The requested UHR audit for March 2006 was done, and RC screens and MH-7s were well above the 85 percent compliance range. Also attached was the mental health screening systems "screening, evaluation, mental disorder rate" report from March.

With regard to Problem 5, there was information provided that the facility staff did review a MAR for the entire month of January on site and that the inmate was

medication-compliant.  However, the MAR for 1/1/06 to 1/16/06 was missing.  There was also the response from the facility that local operating procedure 80, medication management plan, had been changed so that captains and lieutenants on each yard would be required to sign the CDC-154 acknowledging and taking full responsibility for acknowledging that MARs move with the inmates.  It also provided that recent audits for Coleman showed 74 percent compliance, and that a pharmacy tech would be hired the following week to review every CDC-154 everyday to assure "every MAR off yard and on yard gets to the right location daily!"

With regard to Problem 6, the facility response stated "the Pharmacy Profile listed four medications, but one was the previous Seroquel order and one was the newly adjusted Seroquel order."  It went on to state that the other two were medical medications which don't get placed on the MARs "at this facility."  The response concluded that there really was no discrepancy between the orders in the Pharmacy Profile and the medication orders in the UHR.  The response continued that there was an order written on 10/14/05 to gradually wean the inmate off Seroquel by one psychiatrist, an order on 10/18/05 to continue Seroquel at 600 mgs for three months by a second psychiatrist, and on 12/6/05 Seroquel was increased to 800 mgs by a third psychiatrist with the conclusion, "therefore I don't really agree with this identified problem."  The responses to these particular problems were provided by the chief psychiatrist at RJD.

There was no further response by the facility or by DCHCS.

**Findings:**  This inmate's death appears to have been both foreseeable and preventable.  There were clearly a number of failures to appropriately follow established policies and procedures at RJD with regard to this inmate's care and treatment, and many are identified in the suicide report problem list.  That having been said, the inmate had self-inflicted lacerations the day prior to his suicide, and despite the responses from RJD, the suicide report reviewer indicated that interviews with the psych tech and case manager resulted in both clinicians stating that they were not aware of the inmate having inflicted self-injuries which may have been suicide attempts on the day prior to his admission to administrative segregation.  Indeed, the most recent evaluation by a mental health clinician apparently was done without the UHR being available, and therefore the inmate's history could not be adequately reviewed.  The failure to provide an SRA at crucial times in this inmate's course, most specifically on the day prior to his suicide when he had been treated for self-inflicted wounds and ultimately returned to administrative segregation in a cell alone, is indefensible.  The failure to produce records to the CDCR reviewer and to this reviewer, as well as discrepancies in the record regarding medication prescription and administration, were also serious failures in the process.  Finally, while the incident report stated that CPR was begun by a sergeant and MTA at the cell, the TTA report and note as well as the Inmate Death Report indicated that CPR was not begun until the inmate arrived at the TTA.  The suicide report did not even mention this as a possible failure in documentation and/or, more seriously, a possible failure in the timely provision of CPR.  The records from RJD also indicate this inmate was not assessed in a timely manner and never received any form of treatment plan during his incarceration at RJD.  The response by RJD staff indicating greater than

85 percent compliance with timely mental health screening and completion of MH-7s for an audit for the month of March 2006 failed to reference that on five days during that month, when there were one or two admissions to RJD, none of those inmates received screenings or a MH-7 in a timely manner. The problems identified in the suicide report and through this review represent serious failures at RJD in following already-established policies and procedures from a custodial/clinical communications respective. The apparent acceptance of the RJD corrective actions by DCHCS, without further requirements to appropriately address the identified problems, was also a serious deficiency.

**4. Inmate D**

Brief History: This inmate was a 35-year-old African-American male who committed suicide by hanging on 1/20/06 in his single cell in general population at Salinas Valley State Prison (SVSP). The inmate was a part of the MHSDS at the 3CMS level of care. He was returned to the CDCR via the NKSP RC having been convicted of five counts of robbery in the first degree with use of a firearm, and possession of a firearm by an ex-felon, related to home invasion robberies, for which he received a sentence of 49 years and eight months. In addition, he received a concurrent sentence of two years for assault with a deadly weapon for assaulting other inmates in the county jail while awaiting adjudication of the above charges. The inmate was transferred to Calipatria State Prison (CAL) in July 1997.

The inmate was discovered by a correctional officer making an institutional count at approximately 6:07 p.m. on 1/20/06. The inmate was the sole occupant of his cell and was observed hanging by a noose made from a torn sheet and attached to the light fixture and tied around his neck. The officer activated his alarm and the cut-own tool was retrieved. The cell door was opened at 6:08 p.m. Staff cut the noose from the light fixture and the inmate's neck and an MTA began CPR and applied the Automatic Electronic Defibrillator (AED). The emergency response vehicle (ERV) responded by 6:10 p.m. and a correctional officer continued chest compressions in the ERV en route to the CTC where the ERV arrived at 6:13 p.m. Lifesaving measures continued until a physician pronounced the inmate dead at 6:28 p.m. An autopsy report issued by a forensic pathologist for Monterey County indicated the case of death as asphyxia (minutes) due to hanging (minutes) and the manner of death suicide. A toxicology report indicated that there was the cocaine metabolite (benzoylecgonine) detected in the inmate's blood sample but there were no other illegal drugs or alcohol detected. A suicide note was discovered in the inmate's cell in which he stated, "I blame no one but myself." The note even goes on to recount instances in his life that he regretted and mistakes he had made resulting in his lengthy prison sentence "for something you didn't do let alone even no of." He also recorded the deaths of several family members and the arrest of his son for murder. He indicated that there was no reason for living when all hope was lost, and concluded, "all I want is to be cremated" and "remember me but only the good memories."

The suicide report contained the inmate's criminal history and described the inmate admitting a juvenile arrest history, but the details of that history were unknown. The inmate first entered the CDCR in August 1993 for convictions for vehicle theft and cocaine possession with parole in November 1994. He was returned to prison in May 1995 for violations of his parole, and having a gun in his car. He paroled in October 1995. In 1996, he was arrested on robbery charges and ultimately convicted of the instant offenses that are referenced above, with a total prison term of 49 years and eight months resulting in a minimally eligible parole date of 10/16/39.

The inmate received a mental health screening when readmitted to CDCR in July 1997 and was cleared for general population. He did not receive any mental health services prior to 2002 after placement in the CAL administrative segregation unit. The suicide report referred to the inmate having had some contacts with mental health staff and receiving Vistaril for sleep between 2002 and 2004, and a diagnosis of Adjustment Disorder with Depressed Mood. He was seen for a mental health screening at his cell door on 9/28/04, one day after his placement in administrative segregation, and was referred for further mental health evaluation. He was seen by a psychologist on 9/30/04 and reported that he had tried to work through his case, but his last appeal had fallen through, and that he was in administrative segregation for possession of a knife. He was tearful and depressed and reported that he had had thoughts of suicide (perhaps by hanging). He also expressed hopelessness and no support with the exception of limited contact with his mother. The psychologist diagnosed Major Depression and Narcissistic Personality Disorder and referred him to the OHU. The psychologist completed an SRA in which he interviewed the inmate and reviewed the UHR. Although he did not state an evaluation of imminent risk, his comments included the inmate's questioning what it would be like to "end it," "knows would be better" and the inmate's thoughts of hanging. The inmate was admitted to the OHU on that same day and a treatment plan was completed. He was placed on suicide watch which was discontinued on 10/1/04. He was prescribed Paxil, and placed at the 3CMS level of care as medical necessity. An SRA was completed on 10/4/04 while the inmate remained in the OHU. It noted a number of risk factors and one protective factor, "a son he cares about." Although there was no evaluation of imminent risk assigned, the inmate was noted to deny immediate plans for suicide, appeared to have been engaged in treatment and motivated to participate. The inmate reported that he did not have any current thoughts of suicide but that he admitted to "on and off thoughts about suicide," but added, "I will tell someone if I was going to do it." He was discharged back to administrative segregation. He was seen for four of five days for the five-day follow-up after his release from OHU, with the fifth day not being completed by the psych tech because he was "out of cell."

On 10/27/04 the inmate was transferred from CAL administrative segregation to California State Prison – Los Angeles County (CSP/LAC) administrative segregation. The inmate had a treatment plan on 11/8/04 at CSP/LAC which maintained the same diagnoses and same level of care. He continued to report depression and trouble sleeping. It appeared that the inmate did not receive his Paxil after transfer to CSP/LAC on 10/27/04 until he was seen by a psychiatrist who re-ordered it on 11/16/04. The inmate maintained contacts with his case manager while at CSP/LAC and reported that

he had depressed mood "on and off" and suicidal thoughts "on and off" related to his beliefs that he had been imprisoned on crimes that he did not commit and had lost "everything."

On 2/17/05 he reported to a psychiatrist that the medications were not helping and that he believed he would have a "violent death" because he would not spend many years in prison, prompting the psychiatrist to increase his Paxil and add Trazodone and Geodon to his treatment regimen. The inmate's movement history indicated that he was housed at SVSP from 3/2/05 to 6/7/05. However, this appeared to be an error as the clinical records and the suicide report indicated that he was transferred to the California Correctional Institute (CCI) in the SHU in March 2005. He remained in the SHU and informed his case manager on 6/1/05 that he had stopped taking medications at the end of May 2005. The inmate was described as "intense" and his diagnosis remained Major Depressive Disorder Recurrent, Severe with Psychotic Features. This diagnosis had been established at his treatment plan of 3/4/05 at CCI.

The inmate was transferred from CCI to SVSP where he received a treatment plan on 6/16/05, establishing a diagnosis of Depressive Disorder NOS, Personality Disorder NOS and Cannabis and Alcohol Dependence in Remission. His medications were discontinued on 7/1/05. He was subsequently transferred from SVSP to CAL and was seen by a case manager on 11/16/05, one day after he arrived, and the mental health assessment, SRA and treatment plan were completed. The diagnosis was recorded as Mood Disorder NOS with Psychotic Features in remission, and he was continued at the 3CMS level of care for further observation and treatment, although his condition was described as in remission and his mental status was stable. The inmate had been returned to CAL on 11/15/05 to go to court on a weapon possession charge and had been placed in administrative segregation. He returned to SVSP on 12/20/05 but was not seen for his first 3CMS contact until 1/4/06 when a mental health assessment and treatment plan were completed.

The inmate's last mental health contacts were with his IDTT on 1/12/06 where his mental status was described as stable, he was on no medications and his GAF was rated as 70. He was continued at the 3CMS level of care as medical necessity.

The suicide report provided no recommendations to the facility as the determination was made that all policies and procedures were followed.

**Findings:** This inmate's suicide does not appear to have been foreseeable or preventable. Although the inmate did have a history of "on and off" SI, specifically related to his claims that he was innocent of the crimes for which he had been convicted, and his feelings that he had lost the support of his mother and access to his son, he had improved with mental health treatment and did not express any indication that he was imminently suicidal during his most recent mental health contacts including his last mental health treatment team meeting. Although there were some deviations from policy during the course of his incarceration, including incomplete five-day follow-up after release from

OHU for SI in 2004 and lapses in his medication prescription, neither of these appear to be contributory to his death.

**5. Inmate E**

Brief History:  This inmate was a 46-year-old Caucasian male who committed suicide by hanging on 2/1/06 in his general population cell of which he was the sole occupant at CSP/Corcoran.  The inmate was part of the MHSDS at the 3CMS level of care.  He re-entered the CDCR on 7/3/00 after being convicted of the first degree murder of his father-in-law for which he received a sentence of life in prison without the possibility of parole, and an additional consecutive sentence of 25 years to life for a third-strike conviction for possession of a controlled substance while in custody.  The inmate returned to the CDCR via the California State Prison/San Quentin (SQ) RC on 7/3/00 from a county jail.

The inmate was discovered on 2/1/06 at approximately 3:56 p.m. when officers who were releasing inmates from the housing unit for the evening meal observed the inmate hanging by a sheet attached to the upper bunk and the inmate's neck.  The officers radioed for assistance in the housing unit and their personal alarm devices were activated.  The noose was removed and one of the officers began CPR utilizing the micro-shield breathing mask.  Additional staff arrived and the inmate was moved to the floor outside of his cell and CPR continued.  A MTA arrived and assisted at the scene, and the ERV arrived at the unit from the ACH.  The inmate was transferred to the ACH while CPR continued with arrival at approximately 4:07 p.m.  Lifesaving efforts were continued.  However, the inmate did not respond and was pronounced dead at 4:10 p.m. by a physician.  An autopsy report was provided by the Kings County Coroner stating that the autopsy had been performed on 2/3/06 and the cause of death was stated as ligature hanging (minutes).  Toxicology report indicated no illegal drugs or alcohol were found in the inmate's system at the time of his death.

The suicide report contained the inmate's criminal history and described the commitment offense as having occurred on 12/17/98 at which time the inmate waited for his father-in-law with a rifle in the latter's workshop and shot him to death. The victim had called 911 and was taken to a local hospital where he subsequently died.  The inmate was found guilty of first degree murder and sentenced to life in prison without parole.  He also received an additional consecutive sentence of 25 years to life for possession of heroin while in custody in the county jail after the offense was committed.

He had previous convictions beginning in August 1982 for receiving stolen property and burglary with a five-year eight-month prison term.  He was released to a work furlough program in March 1985 and paroled in August 1985.  He re-entered the CDCR as a parole violator in May 1986 and paroled in October 1986.  He returned again to the CDCR as a parole violator in June 1987 and was paroled again in 1987.  He was returned to CDCR custody in September 1988 having been found guilty of possession of illicit substances in jail and was released in November 1988.  He returned to CDCR custody in September 1989 after a conviction of child abuse and paroled in January 1990.  He again

returned to the CDCR in December 1990 under a new CDCR number, having been convicted of burglary and paroled in January 1992. He was returned to custody in February 1992 for a parole violation, but then again paroled in March 1992 with another parole violation and re-incarceration in October 1992. He subsequently paroled in March 1993 and did not return to CDCR custody until this commitment offense.

The inmate is described as having had a history of heroin addiction since his early teens and a number of his offenses appear to have been related to that addiction. He also had significant history of physical and verbal abuse by his father, and growing animosity between himself and his ex-wife's family, cumulating in the killing of her father. He had a history of head trauma and back injury secondary to a 1997 motor vehicle accident while he was intoxicated on cocaine. He was supported on public disability benefits from that time until the time of his arrest on these offenses.

Prior to his current incarceration, the inmate did not have any past history of mental health treatment since 7/3/00. When he received the Initial Health Screening (bus screening) on 7/14/00, the inmate reported a history of psychiatric treatment and current mental health problem, which may have included his having been evaluated by DMH during his pre-trial status on these charges and his overdose on heroin while incarcerated in a county jail.

Curiously, he began to receive mental health treatment from a primary care physician beginning in May 2001 after he had been transferred to SVSP. He had a psych referral pending but there is no documentation that he was seen by a psychiatrist. He was, however, prescribed Effexor, an anti-depressant, by the primary care physician in May 2001 and was referred to the DMH facility at SVSP. This referral was never completed. However, the inmate continued to receive Effexor through August 2002 when he was interviewed by a psychiatrist. There was no documentation in the UHR that he ever had a mental health assessment or a mental health treatment plan, IDTT meeting or mental health placement chrono prior to being seen by a psychiatrist in August 2002. The psychiatrist opined that this inmate did not have an Axis I diagnosis, was not in the MHSDS, as the inmate denied having any psychiatric problems, denied suicidal or homicidal thinking, and therefore discontinued the Effexor.

On 12/15/03 the inmate was seen by a mental health clinician based on his self-referral via the sick-call process. The inmate requested "some kind of mood stabilizer" and although the clinician did not review the UHR and made a referral to the psychiatrist, the inmate was not seen for a follow-up appointment by a psychiatrist.

The inmate was next seen by a psychiatrist in July 2004. The psychiatrist noted that the inmate was requesting mental health services and had no Axis I diagnosis. The inmate self-referred again in August 2004. He was seen on 8/31/04, requesting medications for pain and sleep, and was again referred to a psychiatrist for evaluation. A psychiatrist did see him on 9/17/04, diagnosed "brain trauma" and, based on the inmate's request, prescribed Seroquel and placed him at the 3CMS level of care as medical necessity. This was the first time that the inmate had been placed in the MHSDS since his admission in

July 2000, over four years earlier, despite his having had various encounters with mental health professionals and treatment with an anti-depressant by a primary care physician.

On 9/22/04 the inmate was found unresponsive. He was evaluated at the SVSP emergency room and sent to Natividad Medical Center. He was admitted on 9/22/04 and discharged on 9/30/04. The inmate had been prescribed Seroquel, Neurontin, Baclofen, Elavil, and Catapres. He was unresponsive and intubated, and diagnosed as "likely suicide attempt." The Natividad Medical Center did not perform any toxicology studies indicating what may have been the cause of the overdose. The suicide report referred to the inmate possibly having overdosed on Elavil which had been prescribed for him for pain control secondary to his chronic back pain. After his return, he was seen in an IDTT meeting on 10/4/04 and formally placed in the MHSDS as medical necessity with a diagnosis of Adjustment Disorder with Depressed Mood. Although the discharge summary recommended that he have five-day follow-up as well as group therapy and bibliotherapy, the inmate was placed in administrative segregation after his release from the MHCB because of fights with other inmates. He continued on Zoloft and Remeron, but could not participate in group therapies, etc. given his administrative segregation status.

The inmate remained in administrative segregation until he was transferred to CSP/Corcoran on 12/21/04, again at the 3CMS level of care. On 1/13/05, he was seen by a psychiatrist who diagnosed Post-Traumatic Stress Disorder (PTSD) and discontinued his Zoloft. An IDTT saw the inmate on 1/26/05 and continued PTSD with the addition of Depression NOS as his diagnoses. In February 2005, the inmate threatened to kill his cellmate, was seen in the ACH for evaluation and placed in administrative segregation until 4/13/05. The suicide report referred to the inmate having been seen by a case manager for only four of the required ten weekly visits during the next ten weeks. During his stay in administrative segregation he was seen by the IDTT on 3/1/05. A completed SRA indicated that he had "moderate risk." However, there was no plan for any change in his housing or in his treatment. The treatment plan was incomplete and no actions were taken regarding the estimate of "moderate risk."

The inmate returned to general population housing in April 2005 and continued to receive Remeron as his medication until the end of April when he was refusing Remeron. By 5/13/05, it was discontinued. On 8/10/05 the inmate was seen in the pain clinic. He showed the physician articles describing increased suicide risk in pain-ridden patients. He became angry and dissatisfied with his treatment for pain and reported that he wanted weekly nerve blocks. The inmate was admitted to MHCB in the ACH and was prescribed Depakote and Zyprexa prn for agitation. He was diagnosed by the IDTT with Mood Disorder NOS and discharged from the ACH on 8/15/05. His SRA on that date indicated negligible risk. He was discharged with five-day follow-up. After his discharge from the MHCB he was seen by a case manager in September 2005, November 2005, and lastly on 1/26/06 according to the suicide report, as there was no note in the UHR. The major complaints by the inmate had to do with his pain relating to his back injury and his wanting to remain single-celled. The case manager had authored a chrono stating the inmate did not meet the requirements for a single-cell placement in December

2005.  According to the suicide report, the inmate continued with his usual activities, including his porter's job, even on the day of his death and had interactions with other inmates.

The suicide report identified two problems, with recommendations, as follows:

Problem 1:  In May 2001 at SVSP, the inmate was prescribed an antidepressant medication by a non-psychiatrist.  Also, two referrals for psychiatric consultation were made on physicians' orders, on 3/25/01 and 5/23/01, but no documentation of these referrals was found in the records.  After discovering the inmate was taking antidepressant medication prescribed by a non-psychiatrist, the mental health staff at SVSP did not perform an evaluation, hold an IDTT, or formulate a treatment plan as required by the Coleman Program guide.  In addition, because the inmate was not entered into the MHSDS and had no assigned case manager, he did not receive the services required by the Program Guide from February 2002 to August 2002.
Recommendation:  SVSP to provide MHTS [mental health tracking system] listing of all inmates on psychotropic medications and their mental health levels of care.  Ensure that all inmates receiving psychotropic medications are in the MHSDS.

Problem 2:  At CSP/Corcoran, the inmate's case manager, a contract psychologist, did not conduct weekly case management visits while the inmate was housed in the administrative segregation unit.  The psychologist also did not document some case management visits that were made, or complete the mental health treatment plan (MH-2) as required by MHSDS program guidelines.
Recommendation:  This clinician was subsequently terminated from the state service for professional problems, including those documented in this case.  Details of this case with clinician's name and license will be forwarded to the DCHCS Professional Practice Executive Committee (PPEC) with recommendation to place a credentialing alert preventing future hire.

A death review summary was completed by a physician in the CDCR to review the inmate's medical care.  The physician opines that the medical care provided to this inmate and pain management was quite good at CSP/Corcoran.  He also states, however, that the pain assessment form from the visit of 1/15/06 could not be found in the record to guarantee that exacerbation of his pain was not an issue in his suicide.  He also notes no shows for the inmate's mental health appointments on 12/27/05 and podiatry appointment on 1/19/06 which could be "red flags" for increasing depression; however, that could not be further determined.

On 8/17/06, the Deputy Directors of the DCHCS and DAI provided a report on implementation of quality improvement plan for suicide of Inmate E.  This report included the response from SVSP dated 7/3/06 regarding Problem 1. A memorandum from the warden and health care manager of SVSP stated that the existing process was reviewed.  The mental health sub-committee directed that a report of all non-mental

health inmates on psychotropic medications be added to the list of suicide corrective actions being monitored on a weekly basis, for review by the senior psychologist or designee responsible for the area where the inmates are housed. A listing of non-MHSDS inmates on psych meds was provided in July 2006. In addition, it was noted that all seven of the inmates on psychotropic meds who were not on the MHSDS caseload who were identified in June 2006 had been scheduled to see, or were seen, by their case managers or taken to an IDTT. This weekly report was to be a continuing report.

With regard to Problem 2, DCHCS Interim PPEC reviewed the credentialing of the identified psychologist. It had placed in the psychologist's file a credentialing alert sheet stating "in no circumstances is this practitioner to be allowed to treat CDCR patients until administrators at the DCHCS have conducted a pattern of practice review or other investigation into the practitioner's ability to provide appropriate care." The clinician was terminated by CSP/Corcoran administrators.

**Findings:** This inmate's suicide does not appear to have been foreseeable but may very well have been preventable. There were failings in the treatment administered at both SVSP and CSP/Corcoran. The problem identifications and recommendations in the suicide report referred to each. However, there were continuing problems with his inmate's overall care and management, including changes in diagnoses, the inmate's non-compliance and discontinuation of medication, and his chronic medical condition i.e. back pain. The inmate had a number of static and dynamic risk factors with very limited protective factors regarding suicidality. There did not appear to have been a therapeutic alliance established with this inmate by mental health staff, nor was there recognition of his withdrawal from his treatment activities while he continued to complain of chronic pain.

**6. Inmate F**

Brief History: This inmate was a 26-year-old Hispanic male who committed suicide by hanging on 2/18/06 in the administrative segregation unit at SQ. He was a part of the MHSDS at the 3CMS level of care, and was the sole occupant of his administrative segregation cell. The inmate re-entered the CDCR on 9/6/05 via the SQ RC after violation of parole and arrest for receiving stolen property. His earliest possible release date was 4/14/06.

The inmate was discovered on 2/18/06 at approximately 11:40 p.m. by a correctional officer conducting count in administrative segregation. The officer observed the inmate, sitting beside his bunk with an inmate-manufactured rope fashioned from a torn bed sheet around his neck. The inmate was the sole occupant of the cell. The rope was attached to the upper bunk. The officer activated his personal alarm and notified central control via institutional radio. Central control notified the TTA and an MTA, and officers including a sergeant responded to the scene. A cell extraction team was assembled, the cell was unlocked and opened, and the rope was cut using the cut-down tool while a second officer supported the inmate's body. The inmate was carried out of his cell and placed on a Stokes litter and transported to the TTA. The incident report indicated that at

approximately 11:45 p.m., the MTA and registered nurse (RN) initiated CPR, and at 11:47 p.m., a Code 3 ambulance was summoned.  At approximately 11:55 p.m., a physician arrived; at 12:04 a.m. the ambulance arrived; and at 12:05 a.m. the physician pronounced the inmate dead.  An autopsy report was received from the Office of the Coroner for Marin County indicating the autopsy was performed on 2/21/06 and the cause of death was asphyxia (minutes) due to hanging (minutes).  Toxicology studies were submitted but the results were not included in the documents received. A suicide letter was discovered in the inmate's property and addressed to his sister and dated "Friday/17/2006."  The letter stated that the inmate was sorry for what he had done and that he wanted to go and take care of his little brother who apparently was deceased.  The letter went on to express his love for other members of the family, his forgiveness of his mother, and concluded with, "I just want to leave this world okay."  The letter had an attached sheet addressed to correctional officers requesting they make sure his sister received the letter.

The suicide report contained the inmate's criminal justice history including his juvenile history which began at approximately age 13 with arrests for arson, theft and vandalism.  It included commitment to the CYA with parole in 1998 and discharge from that commitment in 2000.  He was convicted of assault with a deadly weapon in July 2000 for which he received three years' probation.  He also received probation for possession of stolen checks.  He had several other arrests for burglary and auto theft charges until 2004 and received probation for these offenses.  However, in February 2004 he received a suspended sentence with the condition that he complete a 180-day substance abuse treatment program, which he failed to complete.  Several of these crimes appear to have been related to the need to obtain money to support his methamphetamine abuse which he reported had begun in his late teens and increased to snorting approximately one gram per day by 2004.

The inmate initially entered the CDCR in July 2004 because of his violation of the conditions of his suspended sentence. He paroled in June 2005 and returned to CDCR for this new term on 9/6/05 as a parole violator, with a new two-year eight-month sentence.

When he arrived at SQ on 9/6/05 he received an Initial Health Screening which identified no mental health needs, and was cleared for general population.  He subsequently told a psychiatrist that he had taken Ritalin as a child, but this was the only reference to any past mental health treatment prior to his incarceration.  On 10/21/05 this inmate was charged with battery on an inmate with a weapon which involved a "slashing incident."  He received a 15-month SHU term which was to be re-heard because the inmate's 3CMS status at that time had not been raised during the adjudication process.  He did receive an administrative segregation mental health screening for clearance to be placed in administrative segregation; however, the screening was not done until 10/29/05, well beyond the three-day requirement in place at that time.  He was seen by medical on 10/21/05 with complaints of pain and bleeding from a wound in his left palm that was apparently related to the slashing incident.  The wound was treated with sterile strips and he received tetanus toxoid.

The inmate sent two health care services request forms (sick-call slips). The first was on 10/31/05 after being placed in administrative segregation requesting treatment for an ear infection as his medications including ear drops had been taken from him with his other property when he was placed in administrative segregation. The second was on 12/12/05 when the inmate requested assistance from mental health because he reported he was not sleeping at night, his head was hurting and he was depressed "all day long." The inmate stated "please help me with my problems. Thank you." The suicide report stated that he was seen on 12/22/05 in response to the self-referral of 12/12/05, but there was no documentation in the UHR.

Curiously, on 12/27/05 the inmate had two mental health treatment plans (MH-2s) completed by two different teams. Both teams diagnosed the inmate with Major Depressive Disorder, Single Episode. However, one team estimated his GAF at 65 and the other estimated it at 55. He was placed in the 3CMS level of care within the MHSDS at that time. He reported depressed mood and poor sleep and was noted to appear sad. He denied suicidality and was estimated at a low risk for violence to self or others. An SRA was performed by one of the psychologists who was at the treatment team meeting. However, the SRA was undated and based only on an inmate interview. The risk factors included his history of substance abuse, current administrative segregation single cell placement, loss of his nephew on 6/1/05, disturbance of mood, insomnia, poor appetite, and hopelessness or helplessness. Protective factors included family support, helping others and exercise. The evaluation of imminent risk was "low risk." The inmate was referred to the case manager and psychiatrist for medication review.

During this time the inmate was prescribed Prozac and Trazodone and had a trial of Trileptal which was discontinued. He was seen by his case manager on 1/6/06, 1/10/06, 1/17/06, 1/24/06, 1/31/06, 2/3/06, 2/7/06, and 2/14/06, with notations that he continued to have sleep problems and depression until the 2/14/06 visit when he reported, "I'm pretty good." He was also seen by a psychiatrist on 1/12/06 and 1/27/06 when his Prozac was increased, Trazodone was added, and his Trileptal was discontinued. The notes indicated that the inmate denied suicidal and homicidal ideation. Both the case manager and psychiatrist reported the inmate's ruminations about his being a "failure." On 2/3/06 when the inmate was evaluated by the psychiatrist, it was noted that the inmate was sleeping better but his depression was still the same, and both his Prozac and Trazodone were increased.

The suicide report refers to a review of the inmate's property including letters from family and friends in which there was no reference to any SI or intent. The report also makes reference to interviews conducted with two inmates on the same unit with references that this inmate's girlfriend was planning to leave him and that the inmate had begun giving away his property on the day of his death as well as stating to another inmate "I'm out of here for good" and similar statements. The inmate also was noted to have been involved in the 10/21/05 altercation with another inmate, which was reported as likely to have been gang-related. He was subsequently found guilty on the charges of battery on 1/28/06 with a very likely SHU term which would have extended longer than his expected release date.

32

The suicide report identified four problems, with recommendations, as follows:

> Problem 1:  CPR was not started until the inmate arrived at the TTA, rather than being initiated on the scene by custody staff and was thus delayed.
> Recommendation:  SQ to initiate an investigation into the failure of custody staff to initiate CPR and take appropriate action.
>
> Problem 2:  A referral for mental health evaluation was received on 12/14/05, but the inmate was not seen by a clinician within five working days.
> Recommendation:  Ensure all mental health referrals and requests are triaged the day they are received, prioritized as emergent, urgent, or routine, and assign a clinical to follow-up in a timely manner.  Audit the process for a minimum of one month.
>
> Problem 3:  Inmates evaluated for mental health treatment are required to have a current mental health evaluation (e.g., MH-7, MH-4).  No evaluations were found in inmate's UHR.
> Recommendation:  Conduct audit of ten randomly selected UHRs of RC inmates who are screened positive for mental health issues, for inclusion of follow-up evaluation.  If 85 percent compliance is not reached, form a quality improvement team (QIT) to address the problem.
>
> Problem 4:  No weekly summaries of mental health rounds for inmate were found in his UHR.  Inmates housed in the administrative segregation unit who are participants in the MHSDS are to have weekly records of mental health psych tech rounds placed in the UHR (*sic*).
> Recommendation:  Audit UHRs of MHSDS inmates in administrative segregation for minimum of one month, for inclusion of weekly rounds summaries.  Conduct remedial training of staff if indicated.  Form QIT to address problem of health record filing not being current.

There were two reports on implementation of quality improvement plan for suicide of Inmate F submitted by the Deputy Directors of the DCHCS and DAI.  The first report was submitted on 9/27/06 and included a report from SQ dated 8/18/06 which stated with regard to the four problems, actions as follows:

With regard to Problem 1, "this recommendation has been acted upon and is in progress" and indicated that an internal affairs investigation memo was attached and the outcome will be made available upon completion.

With regard to Problem 2, "this recommendation has been implemented" and included an audit dated 8/9/06 and the local operating procedure (LOP) for the mental health referral system.  Also a corrective action memo dated 8/15/06 was issued.  Documentation indicated the audit was from 6/12/06 – 7/12/06, with every fifth referral for each day being selected for the audit.  The date the referral was received was used as the referral

date "per (a CDCR senior psychologist)," the results of the audit were that a sample of 204 referrals (16 percent) that were received were audited during that time period and that 96 percent were seen by a clinician. However, only 50 percent were seen within five working days of the date received, or not seen as of the data collection date. The inmates that remained in custody were assigned to be seen by various clinicians. The majority of those inmates who were not seen on time were assigned to a psychiatrist and it was reported that the majority of referrals go to psychiatrists in the RC at administrative segregation. An SQ LOP was put in place to address this problem.

With regard to Problem 3, "this recommendation has been implemented" and an audit was conducted for March, April and May 2006 with a report attached dated 6/15/06. Ten UHRs were randomly selected and all ten had MH-7s, indicating 100 percent compliance and no need for a QIT.

With regard to Problem 4, "this recommendation has been implemented" with an audit conducted from 4/30/06 to 5/27/06, in which approximately 54 of 203 administrative segregation inmates met the requirements, with another 41 records added to the sample. The audit revealed that compliance ranged from 25 to 97.9 percent with an overall compliance of 63 percent.

The second submission by the Deputy Directors of the DCHCS and DAI was dated 3/13/07 as the "final report on implementation of quality improvement plan for suicide of Inmate F." This report includes a submission from SQ in response to a 9/27/06 memorandum from the Directors of DCHCS and DAI for follow-up audits regarding Problems 2 and 4.

With regard to Problem 2, another audit was performed from 10/18/06 – 11/17/06 including every fifth referral each day. Results were that a total sample of 278 referrals representing 18 percent of referrals received for the same time period was reviewed. Eighty six percent of the referrals were completed, but only 40 percent of referrals were completed within five working days, with a break down of the staff category for the same referrals seen after five working days or not seen, and accompanying documentation. This audit showed the majority of late responses were assigned to RC clinicians.

With regard to Problem 4, audits were conducted for June, July, August and September 2006 and compliance rates were 88 percent, 82 percent, 80 percent and 83.5 percent respectively for those months. There were no additional documents submitted after the "final report on implementation."

**Findings:** This inmate's suicide does not appear to have been foreseeable as he was not reporting or assessed to have any signs or symptoms of increased risk of suicide by clinical or custody staff. This suicide may very well have been preventable, however, had he had the appropriate evaluations and emergency response, as well as daily psych tech rounding, as required by the Program Guide. The inmate did not have the appropriate mental health assessment. There was a delay in responses to his self-generated referral and the daily psych tech rounds were not documented. The inmate had

static and dynamic risk factors that were noted on an SRA in December 2005 and, although his condition improved only in terms of his reporting improved sleep and feeling better several days before his completed suicide, he was consistent in his reporting of continuing depression despite medication adjustments. Had there been the required psych tech contacts on a daily basis, this inmate's change in behavior and mental status may have been discovered and appropriate referral made for full assessment, which was never done during the course of his incarceration during this term. Lastly, the delay in providing CPR for approximately five minutes from the time of discovery of the inmate until he arrived in the TTA is a clear violation of the Program Guide and may have also contributed to this inmate's death.

### 7.  Inmate G

Brief History:  This inmate was a 43-year-old Caucasian male who committed suicide by hanging on 2/18/06 in his single cell in general population at the California Men's Colony (CMC).  The inmate was a part of the MHSDS at the 3CMS level of care.  The inmate entered the CDCR via the WSP RC having been found guilty of inflicting corporal injury on spouse/cohabitant/child's parent, and evading peace officer/willful disregard for safety, for which he received a prison term of seven years and eight months.

The inmate was discovered on 2/18/06 at approximately 8:17 a.m. when a correctional officer responded to an unknown inmate's call of "man down" in cell 7233 which was solely occupied by this inmate.  As the officer was responding to the cell an unidentified inmate yelled "hanger" and the officer activated his personal alarm device, observed the inmate through the cell door window standing in the cell across from and facing away from the cell toilet.  A second officer responded to the cell, and a third officer obtained a cut-down tool and also responded to the cell.  The three officers attempted to open the cell door.  However, there were various items jammed into the opening between the cell door and the wall preventing the door from opening.  The officers forced the door open and observed the inmate hanging by a torn bed sheet from a clothing hook anchored into the cell ceiling with the other end attached to his neck.  The sheet was cut by one officer as the other two supported the inmate's body.  However, the inmate fell back and struck his head on the toilet.  The inmate was observed to also have a fresh laceration to his left wrist.  The inmate was placed on the floor, chest compressions were begun, and the ambu bag requested.  A MTA responded with the ambu bag, and CPR continued in the cell.  The ETV was requested and the inmate was transported to the CMC-East Medical Clinic with CPR continuing by the ETV crew.  Medical staff continued CPR in the clinic.  However, the inmate did not respond, and at 8:59 a.m. he was pronounced dead by a physician.  An autopsy report was submitted by the San Luis Obispo Coroner's Office indicating the autopsy was performed on 2/23/06 and the cause of death was cardio-respiratory arrest (minutes) due to cerebral anoxia (minutes) due to ligature strangulation (minutes).  A toxicology report indicated that there was no evidence of alcohol or illicit drugs in the specimen; however, Atropine 0.35 mg/L (potentially toxic greater than 0.2 mg/L), and Bupropion 0.18 mg/L (effective level 0.025-0.10 mg/L, potentially toxic – unknown) were found in the blood specimen.  The inmate left three suicide notes addressed to his parents, his sister and a friend.  In his letters the inmate thanked his parents, expressed his love for them, and wrote, "the only way I know to stop this pain in

my life" with regard to his decision to end his life. He also thanked his sister, expressed his love to her and asked her to "be there" for their parents and his being sorry that he had hurt others. He thanked his friend for their friendship and apologized for not telling him of his plans to end his life because, "I know you would have stopped me and I didn't want that." In all three letters he referred to his children and wanting each of the individuals to understand how important his children were to him. One additional item found in the inmate's cell was an invoice dated 2/1/06 for a total of $49,802.00 for child support payments on which the inmate had written "paid in full" and "2/18/06."

The suicide report contained the inmate's criminal history and described the commitment offense as involving an altercation that he had with his wife from whom he had been separated since September 1999. His wife sought a restraining order on 1/4/00. On 1/9/00, the inmate threatened his wife over the phone and later appeared at her house and began beating her with a metal pipe. He also rammed his wife's car twice with his truck. He was pursued by sheriff's deputies and almost hit a deputy who ran out of the way to avoid being struck by his truck. There were additional charges related to incidents in the prior six months in which the inmate was alleged to have physically and sexually assaulted his wife. The events of 1/9/00 and the prior six months resulted in ten charges against the inmate including (1) inflicting corporal injury on spouse/cohabitant/child's parent, (2) assault with a deadly weapon (not firearm) likely to cause bodily injury, (3) terrorist threats, (4) evading peace officer/willful disregard for safety, (5) assault on peace officer, firefighter, (6) inflicting corporal injury on spouse/cohabitant/child's parent, (7) spousal rape, (8) child custody deprivation, (9) assault with a deadly weapon (not firearm) likely to cause bodily injury, and (10) vandalism. He was sentenced on two of the ten counts as stated above. The inmate had no prior juvenile or adult criminal history prior to the instance offenses.

The inmate had no past mental health history or treatment for mental illness prior to his incarceration. He had a mental health screening on 6/22/00 which indicated there was no evidence of symptoms of a serious mental disorder and no further evaluation was recommended, and he was cleared for general population.

The inmate was admitted to the WSP MHCB on 11/5/00 after he attempted to hang himself with a leather strip. During that admission the inmate was described as severely depressed with feelings of hopelessness and helplessness, problems with eating and sleeping, and possible auditory hallucinations with diagnoses of Mood Disorder NOS and Psychosis NOS. He was placed on suicide precautions and treated with Depakote, Trazodone and Paxil.

The inmate was subsequently transferred to CMC on 11/14/00 at the EOP level of care with request for evaluation for possible transfer to Atascadero State Hospital (ASH). The suicide report referred to a note indicating that records were never sent from WSP to CMC and that he was admitted to the locked observation unit (LOU) at CMC. The records indicated that, when interviewed on 11/15/00 in the LOU, the inmate made little eye contact, stated that he wanted to die, and was withdrawn, depressed and hopeless, with psychomotor retardation. He was diagnosed with Major Depressive Disorder Single

Episode, Severe with Psychotic Features. His GAF was estimated at 20. He was placed on suicide precautions and started on Zyprexa. During the admission it was also learned that his SI and depression appeared to be related to learning that his wife and children wanted no further contact with him. The inmate remained on observation status housed in the LOU and on 12/5/00 it was noted that he had no real change in his symptoms, was still depressed and hopeless, but denied auditory and visual hallucinations and was not suicidal or homicidal. His eating and sleeping were fair and he was tolerating his medication.

On 12/7/00 the inmate was admitted to ASH and seen by a psychiatrist who assessed the inmate as having essentially a normal mental status except for reporting mild depression, a history of feelings of paranoia, and impaired judgment and insight due to chronic mental disorder. He was treated with Paxil, Zyprexa and Diphenhydramine. He was noted to have denied committing the offenses and did not want to be engaged in sex offender treatment. He completed a 12-week anger management group by the end of April 2001, but did not make any significant connection between the issues dealt with in the anger management group and his commitment offenses. He was engaged in additional groups, the GED program, and social activities on the ward as prescribed. His final diagnosis was Schizoaffective Disorder Depressed Type with no Axis II diagnosis and a GAF of 75. He was discharged on the above medications and returned to court on 8/29/01, with return to ASH on 9/10/01 where his condition continued to remain stable. He was ultimately returned to CMC to the LOU on 1/16/02. When he returned to the LOU he was seen by a psych tech on 1/16/02 and asked why he had been admitted to the LOU for observation. The inmate stated, "because I don't care about living." The psych tech also noted that he didn't have any plans to hurt himself. The psychiatrist stated that he continued to have depressed mood, helplessness, and passive SI, but denied any suicide plan or intent. At that time he was continued on Zyprexa, Prozac, Trazodone and Wellbutrin; his Klonopin was decreased. It was unclear from the record when these additional medications were prescribed, but they appeared to have been prescribed after his return from court to ASH in September 2001. It did not appear that there was any SRA conducted at that time. The inmate was transferred from the LOU to the Transitional Living Unit (TLU) on 1/22/02. The IDTT recorded that he was stable on medications. On 1/28/02 he was discharged at the EOP level of care to the intake unit at CMC. He also reported to the mental health staff at CMC that he had never assaulted his wife and that she and her boyfriend lied to get him sent to prison.

The inmate remained in the EOP and participated in groups. His motivation and participation were rated as average for most of his groups; however, he was dropped from some groups including stress management due to non-attendance. His Zoloft was tapered and discontinued in May 2002, and his Wellbutrin, Olanzapine and Trazodone were adjusted in response to his report of increases and decreases in his depressed mood. It was noted that he denied SI and intent during this time period. His group participation declined over the course of 2003. By September 2003, he was not attending any of his monthly groups, and in October 2003, he continued to report that he was sleeping approximately three and one-half to four hours per night, but continued to state, "I'm doing all right" during his case manager contacts.

The inmate had an IDTT meeting on 10/31/03 and was recommended for the 3CMS level of care. He was placed at that level of care in November 2003. On 11/12/03, the inmate was seen by his new case manager who wrote an extensive note reporting that the inmate had been at ASH for 15 months and that his medications at ASH "were much more effective for him than current meds." It added that the inmate stated that the psychiatrist at CMC did not listen to him. The inmate further reported that he attempted suicide at the time of his arrest and subsequently had attempted hanging himself while at WSP. His case manager reported that his protective factors included his elderly parents who visit him approximately once per month. She opined that his risk for suicide would "skyrocket" if his parents died. She described him as a very depressed man who was not suicidal with a plan to refer the inmate to the psychiatrist for medication re-evaluation and assistance, as well as sleep group. The case manager also completed an SRA at that time, and although she did not provide an evaluation of risk, she referred the reader to her progress note.

On 2/4/04, the inmate was seen by a psychiatrist who adjusted his Trazodone and started Seroquel, in addition to continuing his Wellbutrin. Despite these changes, by August 2004 his work performance had deteriorated. On 9/15/04 he was returned to the EOP level of care. At that time he did begin to participate in group therapies. However, his motivation/participation was less than average. His insight remained impaired; he continued to deny his crime, and refused to participate in a domestic violence group. In May 2005 he was recommended for return to the 3CMS level of care.

A curious note of 6/21/05 indicated the IDTT discussed the team's attempt to place the inmate at the 3CMS level of care previously but "a custody officer prevented it." The suicide report referred to a correctional officer not wanting the inmate to move out of EOP housing because he did not want to loose such a good worker, as the inmate's job was lead porter. The inmate was housed on an "honor hall" and had earned the privilege of a single cell. The team decided that a level-of-care change was appropriate on 6/21/05 and recorded that the inmate "seems to feel okay about 3CMS change." On 6/28/05 the team approved the inmate's level-of-care change to 3CMS. Follow-up case manager notes indicated that the inmate had visits from his parents and sister in April 2005, after his parents had moved to Ohio. Also noted was the inmate's plan to parole to Ohio. He was noted as being medication-compliant, having stable mood, with focus on future plans, and no evidence or concern regarding self-harm. At this point, his diagnosis was Major Depression, currently stable. The inmate did report supra-pubic pain and associated problems of difficulties voiding on urination and impotence. He received a work up for a possible pelvic mass and a CT scan revealed that there was no evidence of a pelvic mass in October 2005. The inmate complained of chronic pain.

The psychiatrist saw the inmate on 12/29/05 and reported the inmate was looking forward to his parole with his parents in Cleveland, Ohio, but he continued to experience insomnia. The psychiatrist offered the inmate alternative medication but the inmate did not want to change medication so close to his parole. On 1/17/06 the case manager wrote that the inmate was looking forward to his parole in July 2006 and that "everything is in

motion for him to parole to Cleveland to be with family." The case manager noted "no SI" (suicidal ideation) and no other problems. On 2/15/06 he was seen by a psychiatrist and requested to stop taking Trazodone. The psychiatrist discontinued the Trazodone and continued to monitor his Wellbutrin. This was his last contact with mental health staff, three days prior to his suicide.

The suicide report identified six problems, and recommendations, as follows:

> Problem 1: Records from WSP not sent with inmate when transferred to CMC in 2000.
> Recommendation: Ensure that current practice at WSP complied with the Inmate Medical System Policy (IMSP) to send the UHR with inmates whenever they are transferred.

> Problem 2: Medications were changed as soon as the inmate returned from ASH placement and the ASH diagnosis was questioned. Inmates are observed far more intensively in a DMH setting than they could ever possibly be in any prison setting. Medications and diagnoses should never be changed for DMH returnees until the inmate has had ample time to adjust to new environment and the clinical team has ample time to observe and be confident of their decisions.
> Recommendation: System Issue: DCHCS discussion to be held in state-wide suicide prevention video conference.

> Problem 3: Inmate continued depressed and appeared to be under medicated at time of death.
> Recommendation: Case review at local level (CMC) and in state-wide (DCHCS) suicide prevention video conference regarding issue of adequate medication.

> Problem 4: The last MH-2 in the UHR was for EOP. When the inmate was placed in the 3CMS, an IDTT should have been held and a new treatment plan (MH-2) written for transition from EOP.
> Recommendation: CMC: Audit of MH-2s and UHRs from inmates moved from EOP to 3CMS.

> Problem 5: The most recent MH-2 diagnosis was incomplete and imprecise. It consisted of (1) "NOS," (2) provisional "rule/out," (3) a personality disorder name that doesn't exist, and (4) a GAF range of 15 points. The inmate had been there for over three years, more than enough time to resolve diagnostic questions. Correctly stated DSM [Diagnostic and Statistical Manual]-IV diagnosis is the standard.
> Recommendation: CMC: Conduct ongoing peer review for all clinicians, and in quality of diagnosis as a routine peer review item. Provide remedial training to staff with a pattern of poor diagnostic practice.

Problem 6: Some inmates on the "honor wing" report a perception that if they tell staff about mental health problems such as suicidal feelings and are sent to the OHU, they may loose their housing status.

Recommendation: CMC to form a quality improvement team (QIT) to explore this perception and to address the problem (suggest including inmates in the QIT).

On 8/3/06, the Deputy Directors of the DCHCS and DAI provided a report on implementation of quality improvement plan for suicide of Inmate G. This report included responses from WSP dated 5/12/06 and 5/15/06 and from CMC dated 7/6/06. In addition there was a memorandum of 8/15/06 reporting on the CAP item for Inmate G and a memorandum dated 2/8/07 from CMC regarding inmate and staff education regarding suicide risk.

The response from WSP dated 5/12/06 states that WSP was in compliance with the IMSP policy in 2000 and continued to be in 2006. It went on to state that since the incident "occurred six years ago, there is no way to prove or disprove whether the unit health record was sent and misplaced or misplaced and not sent." The Health Care Manager continued that he could certify that the inmate did have mental health evaluations prior to his transfer to the EOP level of care and would not have been classified EOP nor transferred without that evaluation. The 5/15/06 response from WSP was identical to the 5/12/06 response.

With regard to Problem 2, there was a notice of the suicide prevention monthly noon video conference scheduled for 5/9/06 including discussion of "medication changes after D/C from DMH."

With regard to Problem 4, a memorandum from the Chair, Department of Psychiatry to the Chief Psychiatrist at CMC stated that there had been a meeting of members of the Department of Psychiatry on 6/15/06 and they formally assessed the identified problem. The response indicated that the psychiatrists "did not see specific problems in the medication changes" for this inmate and that another psychiatrist's opinions that the inmate may have been under-medicated at the time of his death was "speculation done at the time of intense soul searching." The recommendations by the Chief Psychiatrist to the Department of Psychiatry to evaluate inmates frequently and thoroughly for a three-month period after reduction of medications was stated as "clearly appropriate," and that there was acceptance of the general guidelines to develop a policy for medication changes when inmates are returned from ASH or DMH. The response states that the psychiatrists will indicate in their notes their reasoning for medication changes.

With regard to Problem 5 in this same memorandum the Chair, Department of Psychiatry, stated that the psychiatrists agreed to critically evaluate how they make and modify DSM diagnoses of inmates, especially regarding Mood Disorder NOS and Psychotic NOS diagnoses. They reported they would do a review for at least six months of the appropriateness of diagnoses listed on MH-4s and initial notes on new patients. He indicated they would follow the guidelines of DSM-IV and submit a report of the

proceedings at the end of 2006. Extensive medication history for this inmate was also provided with associated comments and the documents reviewed.

With regard to Problem 4, a MH-2 audit of EOP to 3CMS transfers was conducted and included a review of inmate transfer from EOP to 3CMS within the previous seven months as generated from the MHTS. The actual data appeared to have included inmates transferred between February and May 2006. A list was generated with 196 inmates with 50 of these inmates UHRs audited. An analysis concluded that of the 49 UHRs that were reviewed (one case returned to EOP soon after transfer), 17 (35 percent were found to have an adequate updated MH-2, in compliance with the CDCR requirement to develop a new MH-2 when inmate/patient transfers to another level of care. There was also a memorandum from the C-quad supervisor indicating that there have been several meetings with case manager regarding the 35 percent compliance and mandated training was to be scheduled for all mental health staff addressing the treatment plan update in approximately July 2006. The memorandum also stated that an appropriate policy would accompany a presentation in the mandated training. It concluded that an additional audit could be conducted for both EOP/3CMS programs after the mandated training. An audit was conducted regarding licensed clinical social worker case managers involving EOP/3CMS programs consisting of an audit of thirty UHRs with questions of whether or not the MH-2 diagnoses were (1) clinically relevant, (2) supported by MH-2 data, (3) illegible, (4) "differing diagnosis addressed," and (5) R/O and provisional diagnoses used for more than one year. The compliance rate with these questions ranged from 57 percent to 87 percent. The plan was to strengthen diagnostic formulations during initial social work assessments, recognize an opportunity for improved clinical practice to include more detailed documentation, to have a brief educational component during scheduled departmental meetings, and to include elements of the audit in the peer review process. A similar audit was conducted by the psychology staff with a sample of 58 IDTT-approved MH-2s. The psychologists found a compliance rate with a range of 71 percent to 94.8 percent for the same questions, and determined that there will be a discussion of diagnostic issues in their departmental meeting, in-services on Axis III documentation, and continued ongoing departmental efforts to improve diagnostic clarification through psychological testing.

With regard to Problem 6, a QIT was chartered and held its first meeting on 8/2/06. It included two psychologists, one psychiatrist, and one social worker. On 2/8/07 CMC submitted a memorandum on "Inmate and Staff Education re: Suicide Risk" which referenced a report from the Suicide Prevention and Single Cell QIT dated 12/20/06 to specifically address the problem identified as Problem 6. This report was based on the QIT meeting for four sessions and conducting a survey of 44 inmates. The recommendations included focus on the importance of developing a therapeutic relationship, re-evaluation of the need for double cell six months to one year after discharge, increased clinical contact as inmates approach parole, utilizing peer educators/mentors for reporting SI, using CORE to address issues, to educate custody staff and provide a checklist for identifying high risk for suicide behavior, a quarterly mandatory CORE group for inmates on the single cell tier, and a list of EOP/3CMS case managers and their numbers for tier officers.

The second memorandum dated 8/15/06 was submitted by the CMC Suicide Prevention Coordinator. It stated that the initial report dated 7/11/06 indicating that the social work, psychiatry and psychology departments have each handled item number five differently. A training package was put together. It was noted there was 100 percent compliance with the training requirement to improve inclusion of Axis III diagnoses on the mental health treatment plans.

**Findings:** This inmate's suicide does not appear to have been foreseeable as he was not reporting, or assessed as having, imminent SI or intent in the weeks before his death, and his mental status did not appear to have significantly changed over the course of his last clinical contacts prior to his death. The inmate's suicide may very well have been preventable. However, it appears there were multiple failures to appropriately implement CDCR policies, as referenced in the suicide report. This included inadequate and incomplete diagnoses, medication changes without adequate documentation, and the lack of available records to clinicians who became involved with the inmate's care. The suicide report provided a number of recommendations regarding medication management as well as inadequate treatment planning with changes in level of care, and inadequate and incomplete diagnoses. It appeared that this inmate was anticipating parole and re-location to another state with his parents. However, the anxiety and increasing level of depression that the inmate appeared to be experiencing was under-appreciated by the clinical treatment staff. Moreover, his medications were changed and decreased at his request despite his continuing to report disturbances in his sleep, depressed mood, and declining participation in treatment activities. Lastly, the inmate's consistent denial of his commitment offenses, refusal to participate in any domestic violence or sex offender groups, and his stated fears that other inmates might harm him based on their perceptions that he was charged with (as indeed he was) but not convicted of a sex offense, may all have contributed to the inmate's decision to commit suicide. In addition to his hanging, he also had what appeared to be a self-inflicted laceration to his wrists, and toxic levels of Atropine and elevated levels of Bupropion in his blood sample at autopsy.

The corrective actions by CMC to review clinician performance indicated some areas of serious deficiency for which they have undertaken several actions as referenced in their responses. These actions include not only staff training and audits but also inclusion of inmates in the suicide prevention program.

### 8. Inmate H

Brief History: This inmate was a 43-year-old Asian male who committed suicide by hanging on 2/21/06 in the general population housing unit at CMC. The inmate was a part of the MHSDS at the 3CMS level of care. He entered the CDCR via the NKSP RC on 5/1/97 having been convicted of involuntary manslaughter with a weapon enhancement, and sentenced to 12 years. His earliest possible release date was 3/15/06; however, there was an Immigration and Naturalization Service (INS) hold on the inmate, and records indicated that he was to be deported to South Korea upon his release from CDCR.

The inmate was discovered on 2/21/06 at approximately 8:15 a.m. by a correctional officer who was attempting to locate the inmate after his job called and said that he had not reported for work. The officer asked the inmate-porter who was on the third floor tier to see if the inmate was in his cell. Within seconds the porter approached the officer and stated "he hung himself." The officer responded to the cell, saw the inmate standing against the left wall of the cell with his eyes closed and his feet not making contact with the floor of his cell, indicating that he was hanging. The inmate did not respond to efforts to call him. The officer activated her personal alarm device and yelled to a second officer that she had "a hanger." The second officer retrieved the cut-down tool and responded to the cell. As other officers arrived, she opened the cell door and the ligature which was a state-issue belt was cut from the inmate's neck. The belt had been tied to a steel towel rod attached to the wall and a chair was near where the inmate was found hanging. An MTA had arrived just behind the responding officers, and he and an officer immediately began CPR. The fire department ETV had been notified and arrived shortly after CPR was begun. The inmate was then transported on a Stokes litter to the ETV and the CMC East Clinic. At approximately 8:52 a.m. a physician pronounced the inmate dead. An autopsy report was provided by the San Luis Obispo Coroner's Office and indicated that the autopsy was performed on 2/23/06 and stated the cause of death as cardio-respiratory arrest (minutes) due to cerebral anoxia (minutes) due to ligature strangulation (minutes). The toxicology report indicated that Atropine 0.51 mg/L and Risperdal 0.5 mg/L were found in the inmate's blood sample. The toxic level for Atropine is greater than 0.2 mg/L and there is no known toxic level for Risperdal however the effective level is 0.01-0.09 mg/L. There was no alcohol or illicit drugs detected in the blood specimen.

The suicide report contained the inmate's criminal history and described the commitment offense as his first known involvement with the criminal justice system as a juvenile or adult. The details of the commitment offense include the inmate having used a belt to strangle his wife on 12/23/95 and driving with his wife's body and his six-year-old son in the car to another city and calling 911. The inmate told the 911 operator that he had killed his wife and planned to kill himself. However, he was arrested before this could occur. The inmate was convicted of involuntary manslaughter with weapon enhancement and sentenced to 12 years to be served in the CDCR.

The inmate was treated for mental health problems in the LA County jail including treatment for laceration of his wrists in 1996. He also had been admitted to the Patton State Hospital (PSH) having been found incompetent to stand trial and received psychiatric treatment to restore his competence. At PSH, the inmate was diagnosed with Schizophrenia Paranoid Type, rule out Delusional Disorder, and was treatment with both antipsychotic and anti-depressant medication. His competency was restored and he returned to court to stand trial on 6/20/96 and was subsequently convicted and sentenced.

A Sheriff's Department Confidential Medical/Mental Health Transfer Summary dated 5/1/97 indicated the inmate had a diagnosis of "Psychosis + Prostate CA?" and he was prescribed Risperdal. The standardized bus screening form repeated that information and also indicated he had a laceration to his wrist in 1996 as a suicide attempt, and was

referred for mental health services. On 5/12/97 a mental health assessment (MH-7) was completed and repeated the above information but also quoted the inmate as saying "no more voices now; I'm not crazy: I don't need meds." It had been noted that the inmate had difficulty with the English language during his pre-trial evaluation at PSH, and was provided a Korean-speaking interpreter. The diagnosis given by the psychologist who completed the MH-7 was Adjustment Disorder, and Alcohol Abuse with a GAF of 65. The inmate was not included on the MHSDS at that time, cleared for general population. The inmate was seen on 6/6/97 by a psychologist based on a referral by custody which stated the inmate had "poor appetite…fearful…withdrawn …problems with celly." The inmate reported that he had eaten and stated "I'm not crazy." The inmate also claimed that he went out in the yard and participated in the dayroom, and the psychologist opined that he had increased anxiety, "labile," oriented times three and "cognitive basically WNL." The inmate refused to see a psychiatrist and no referral was made. He transferred to Ironwood State Prison (ISP) on 6/10/97. The standardized bus screening form at that time indicated the inmate had problems with urination and stomach problems but did not identify any mental health problems or past treatment for mental illness. The inmate was cleared for general population.

In September 1997 the inmate was referred to the ISP MHCB because he was depressed, suicidal, and acutely psychotic with paranoid delusions believing that staff and other "agents" were trying to kill him. He was placed in the MHCB from 3/3/97 to 9/9/97 and transferred to the MHCB at RJD on 9/9/97. While in the MHCB at RJD the inmate's level of care was changed from MHCB to EOP with a GAF of 46. The treatment plan of 9/12/97 at RJD MHCB indicated a diagnosis of Psychotic Disorder NOS, Personality Disorder NOS with Borderline and Antisocial Features and reported the inmate's thought content as possibly paranoid, poor insight and judgment and described his cognition as "difficult to determine due to language barrier."

The inmate had another treatment plan on 10/24/97 as an "outpatient." However, it is unclear from the records as to when he was transferred from the MHCB to outpatient status. On 2/2/98 the inmate had a mental health assessment and treatment setting transfer (MH-4) indicating that the inmate was guarded, and his cognition could not be assessed because of the language barrier and his guardedness. However, he was described as having auditory hallucinations and visions of his wife, poor insight and judgment and was "possibly manipulative and even malingering." His diagnoses remained Psychotic Disorder NOS and Personality Disorder NOS. His GAF was raised to 51 and based on IDTT on 2/5/98 he was placed at the 3CMS level of care.

While at RDJ in November 1998 the inmate was placed in administrative segregation for one day because of an investigation of assault on another inmate that involved several Asian inmates, for which he was ultimately cleared. He had had a previous episode of combative behavior in September 1997 while at ISP and was described as "acutely psychotic, paranoid, delusional and combative." However, no RVR was written regarding this incident.

On 12/4/98, the inmate had an IDTT meeting.  A treatment plan (MH-2) once again indicated the inmate was "limited English-speaking," and his cognitive functioning was not able to be clearly determined, although there was an indication that he had auditory hallucinations "sometimes."  The diagnosis of Psychotic NOS was continued as well as Personality Disorder NOS and he remained at the 3CMS level of care.  He remained on Risperdal that had begun in September 1997.  Several progress notes by case managers and psychiatrists in 1998 refer to the inmate stating that his wife was not dead as a "delusion (?)," as well as to the inmate reporting that he heard his wife's voice calling him and that she "talk shit."

On 3/22/99 the inmate was admitted to the MHCB at RJD with complaints that he believed his cellmate was trying to kill him.  The inmate had stopped taking his medication for one to two months prior to this admission, and was described as clearly paranoid on admission.  His diagnosis at that time was Schizophrenia Chronic Paranoid Type which was consistent with the diagnosis given for his previous MHCB admission at RJD on 9/12/97 as "probable chronic paranoid schizophrenia exacerbation quickly resolving with medications."  He remained in the MHCB until 3/27/99 and was discharged to the EOP.

On 8/25/99 the inmate was transferred to the CMC LOU and an evaluation for PC 2684 admission to ASH for his long term psychiatric treatment was performed.  He was described with flat affect and depressed mood, and on interview by the clinician, he was also described as withdrawn and experiencing ongoing SI and delusions.  The inmate remained in the LOU until 9/16/99 when he was transferred to ASH.  With regard to his urinary frequency and complaints of pain, the impression of the neurologist was that he had lower genitourinary tract obstruction symptoms with a "(?)" history of prostatitis.  The diagnosis was Rule Out Urethral Stricture.

When the inmate arrived at ASH on 9/16/99, he was described as depressed, withdrawn and delusional with ongoing SI.  He described ongoing auditory hallucinations of his wife's voice speaking to him, paranoid ideation believing that different people have wanted to kill him over the years, and that currently the black inmates were all out to kill him.  His insight and judgment were poor and his intellect appeared to be at least average.  His cognitive functioning also appeared to be relatively intact, but he was unable to interpret proverbs due to his language barrier and because the Korean interpreter used at ASH did not know the proverbs in Korean.  The inmate's diagnoses at ASH were Schizophrenia Paranoid Type Chronic, Depression NOS, Schizoaffective Disorder Depressed Type (provisional), alcohol abuse, and benign prostatic hypertrophy.  His GAF was estimated at 30.  The inmate was continued on Risperdal and Remeron.  His treatment planning conferences were held with Korean interpreters.  His medication was changed to Risperdal only, and he was discharged from ASH as having received maximum benefit.  A diagnosis of positive Hepatitis B was also added while he was at ASH.

The inmate returned to CMC on 7/12/00 and remained at the EOP level of care until 10/17/00 when his level of care was changed to 3CMS.  He remained at the 3CMS level

of care until his death.  The inmate continued to receive case manager and psychiatric contacts consistent with Program Guide requirements at the 3CMS level of care.  His last IDTT meeting was on 5/5/05; it stated the inmate was doing well on Risperdal 3 mgs and his diagnosis was Psychotic Disorder NOS in remission with medication.  The inmate's last psychiatric contact was on 1/3/06 with a psychiatrist who wrote that the inmate was "doing very well" and had no suicidal or homicidal ideation or auditory hallucination, and indicated that the inmate would parole in August 2006 and will be deported back to his family in South Korea.  He was to return in ten weeks.  His final mental health contact was on 1/4/06 with a case manager for 90-day follow-up and he was described as having logical and goal-directed thought processes with fair insight and no delusions or hallucinations with medication.  He continued to work at the special print plant, did not attend any groups, played cards and socialized with other inmates.  This note indicated the inmate was scheduled to parole in March 2006 and would be deported to Korea, noting that his parents were there.

The suicide report writer indicated that she had interviewed a Korean psychiatrist working at a different CDCR institution and that valuable information about Korea, social, family and culture issues were provided.  This information included the psychiatrist's view that given the inmate's crime and subsequent incarceration, it would be highly likely that upon returning to Korea, "everyone would know what happened; and what about his murdered wife's family in Korea?  He would rather commit suicide than face the shame."  The reviewer opined "it appears that inmate (H) just could not cope with his upcoming parole and return to Korea."


The suicide report identified one problem, and recommendation, as follows:

> Problem:  Inmate H was never provided with a Korean-speaking interpreter while at CDCR.  This would have been extremely useful in establishing his true level of English-speaking and comprehension skills.  It would have also been beneficial to assess cultural issues impacting treatment, unmet needs, personality dynamics, mental status and any concerns about upcoming parole.
> Recommendation:  Provide multi-cultural training to mental health clinicians on how to determine whether inmates whose primary language is not English need an interpreter.  At least one mental health assessment with a culturally appropriate interpreter to assess the inmate's ability and willingness to communicate about his/her mental status in English is recommended.  A decision as to whether or not to use an interpreter for mental health contact must be documented with the rationale provided.

On 8/14/06, the Deputy Directors of the DCHCS and DAI provided a report on implementation of quality improvement plan for suicide of Inmate H.  The report included a submission dated 8/3/06 from the CMC Suicide Prevention Coordinator documenting that multi-cultural training had occurred on 8/2/06 with copies of the in-service training attendance sheets.  The training also included information on how to use the language line.

**Findings:**  It is unclear as to whether or not this inmate's suicide may have been foreseeable or preventable because important information may have been available but was not pursued regarding the inmate's ideation and plan for suicide related to his upcoming parole.  The suicide report refers to there not being documentation that a Korean interpreter was used for any of the evaluations, assessments or treatment planning relative to this inmate's care and treatment while he was housed in the CDCR.  The suicide report and the ASH record clearly refer to the inmate having been interviewed with Korean interpreters while housed at ASH and indeed while housed at PSH prior to his incarceration in the CDCR.  Unfortunately, there was no documentation that interpreters or the language line were utilized to assist with this inmate's care and treatment.  Remarkably, the suicide reviewer for CDCR who authored the suicide report referred to having consulted a Korean psychiatrist in another CDCR institution who provided very important information with regard to the potential impact of this inmate returning to Korea and his relatedness to Korean culture.  The psychiatrist referred to the inmate's shame, and that he may rather commit suicide than face the shame he anticipated in returning to Korea.  Had this information been sought and known prior to the inmate's suicide, either by the utilization of a Korean-speaking interpreter or by consultation with the Korean psychiatrist or other Korean clinicians within the CDCR, it may have led to assisting the inmate with a better understanding of the Foreign Prisoner Transfer Treaty Program provided through the Board of Prison Terms (BPT) while he was incarcerated, or to possible modification of his discharge plan to facilitate his return to Korea, if that were the only option.  The failure of staff to appreciate the need for proper assessment and treatment despite the inmate's language problems, and the need to incorporate his cultural values into the treatment and discharge process, were clearly underestimated and undervalued by the treatment staff.


## 9.  Inmate I

Brief History:  This inmate was a 34-year-old African-American male who committed suicide by hanging on 2/22/06 in general population at High Desert State Prison (HDSP).  The inmate was not a participant in the MHSDS at the time of his death.  The inmate re-entered the CDCR on 11/27/01 via the NKSP RC, on a third strike conviction related to his and an accomplice's entering a market with a handgun, threatening two victims, receiving $300 and fleeing the scene.  An escape with pursuit by the California Highway Patrol ensued. The inmate was driving in a reckless and hazardous manner and crashed the vehicle into a sign post.  He attempted to run away but was apprehended.  This was a third strike offense because the inmate had been convicted of two strikes offenses related to his and two accomplices' convictions of several counts of robbery in the second degree, force/assault with a deadly weapon no firearm, great bodily injury likely, and kidnapping, resulting in a 15-year sentence in July 1991.  As a result of the third strike conviction, the inmate received a sentence of 25 years to life, plus 50 years' enhancement, for a total sentence of 75 years to life.

The inmate was discovered on 2/22/06 at approximately 12:03 p.m. by an officer conducting the institutional close-custody count.  The inmate was doubled-celled with

another close-custody inmate.  They had been cellmates since 9/16/05.As the officer looked into the cell, he saw this inmate with what appeared to be a rope around his neck, with the other end tied to the corner of the upper bunk nearest the cell door.  The inmate was suspended in the air by the rope with his buttocks off the cell floor but below the lower edge of the bottom bunk.  The officer yelled to the control booth officer to activate the personal alarm device and staff responded.  Two officers opened the cell, instructed the cellmate to exit the cell, and entered the cell.  A third officer utilized the cut-down scissors and cut the rope above the knot as the first two officers held the inmate's body up to alleviate the pressure.  The noose was removed from the inmate's neck, and a MTA who arrived, examined the inmate and the inmate was placed on a Stokes litter where the MTA and an officer began CPR.  The ETV was summoned, and the lieutenant notified the medical clinic to respond with a gurney.  The gurney arrived, the inmate was placed on the Stokes litter, and the gurney was taken to the vehicle sally port with CPR continuing en route.  The inmate was placed on the gurney at the back of the van which took him to the CTC emergency room, while an officer was utilizing the ambu bag in the back of the ETV.  Medical attention was continued in the CTC emergency room.  However, the inmate did not respond.  At approximately 12:45 p.m. the inmate was pronounced dead by a physician.  An autopsy report provided by the Washoe County Medical Examiner/Coroner stated that the autopsy was performed on 2/23/06, and that the cause of death was hanging and the manner of death was suicide. The toxicology study indicated no common drugs of abuse and no alcohol in the peripheral blood sample. In the inmate's property was discovered a half page letter entitled "last will and testament" with the inmate's name and dates 9/8/71 – 2/22/06 recorded.  The document was apparently signed by the inmate, listed contact numbers for his wife and mother, and request that his property be mailed to his mother at a specified address.

The suicide report contained the inmate's criminal justice history which consisted essentially of the above-referenced offenses in 1991 resulting in a first and second strike conviction, and the commitment offenses in 2001 resulting in his sentence of 75 years to life..

A mental health screening chrono dated 11/29/01 indicated the inmate was cleared for general population.  The suicide report referenced a brief mental health screening at NKSP-RC; however, this screening was not included in the documents received, nor was a standardized bus screening.  The only standardized bus screening in the records provided was dated 8/15/05 when the inmate was transferred from CSP/Corcoran to HDSP.  This screening was negative for any history of mental illness, treatment for mental illness, and any current mental health problems or SI or attempts.  There was no known mental health history for this inmate; however, the records from his previous incarceration from 1991 through 1998 were not included, and, according to the suicide report, were not reviewed by that reviewer.  The inmate was never included as a part of the MHSDS throughout this incarceration.

This inmate was a Level 4 inmate in general population on close-custody status at the time of his death.  The inmate had received two RVRs and three counseling chronos during his incarceration.  However, none of these resulted in his being placed in

administrative segregation. The inmate's course through the CDCR since 11/27/01 via the NKSP-RC included transfers to CCI on 1/9/02, CSP/Corcoran on 4/3/03, and HDSP on 8/15/05. Since his arrival at HDSP the inmate was noted to have been involved in recreational activities as sports on the yard, and had a job as a recreation clerk on the yard.

The suicide report referred to a possible precipitating event. It was a publication in the LA Times in January 2006 which included information from an interview with this inmate regarding what had happened to players on the USC Rose Bowl Team of 1990. The article was described as bleak and indicated the inmate "could not make it" outside of prison and was going to die in prison. An interview with the cellmate revealed that he had gone to breakfast and out to yard, while Inmate I attempted to get a phone call to his girlfriend rather than go to the yard. The cellmate stated that upon his return from the yard, he began talking to the inmate who was sitting on the floor. He then realized that the inmate was in trouble. When the officers came by, the cellmate reportedly stated to them, "I don't think he's playing." The inmate's girlfriend, who had been barred from visits for six months as a consequence of an RVR involving herself and the inmate having sex in the patio area during a visit, had not been notified of the death. She came to the prison the weekend following the inmate's death to resume her visits.

The suicide report identified no problems and no recommendations for this case.

**Findings:** This inmate's suicide does not appear to have been foreseeable or preventable. The inmate had not received mental health services during this incarceration, and did not indicate to staff or his cellmate that he was contemplating suicide. Review of the documents indicated that there were failings in policy and procedure in obtaining standardized bus screenings when this inmate was initially admitted at NKSP and transferred between facilities, with the exception of his last transfer to HDSP. However, these failings did not appear to have any contributory impact on the inmate's death.

### 10. Inmate J

Brief History: This inmate was a 49-year old Caucasian male who committed suicide by hanging on 3/2/06 in a general population housing unit at Pleasant Valley State Prison (PVSP). The inmate was not a part of the MHSDS at the time of his death and was doubled-celled in general population. The inmate returned to the CDCR via the WSP RC as a parole violator with two life terms related to convictions on aggravated mayhem, torture, kidnapping, false imprisonment, spousal abuse, and two counts of terrorist threats resulting in a 12-year plus two life sentences with the possibility of parole. His minimum eligible parole date was 8/13/21.

The inmate was discovered on 3/2/06 at approximately 1:42 p.m. when his cellmate reported to an officer during the in-line from the recreation yard "my celly hung himself." The officer responded to this inmate's cell and observed the cell was dark. When he looked into the cell he saw this inmate sitting on the floor between the toilet and the bed and observed a thin rope tied from the cell ventilation vent leading to the inmate's neck

area.  The officer activated his personal alarm device, responded to the housing unit control booth to retrieve the cut-down knife and informed responding staff, including a sergeant, of the situation.  The officer and the sergeant cut the rope above the inmate's neck and an MTA utilizing scissors cut the rope from around the inmate's neck.  The inmate was lying on the floor and the MTA began CPR.  The ERV was summoned and the inmate was placed on a Stokes litter and carried to the ERV.  An RN responding with the ERV took over CPR duties from the MTA and the inmate was transported to the Correctional Treatment Center (CTC) while CPR was continued.  At approximately 2:00 p.m. a licensed nurse practitioner examined the inmate and ordered CPR stopped and pronounced the inmate dead.  An autopsy report was provided by the Fresno County Coroner's Officer.  It stated that the autopsy was performed on 3/4/06, concluded that the cause of death was hanging ,and the manner of death suicide.  No toxicology studies were provided.  Among the inmate's property was discovered a suicide note dated 3/1/06 and addressed "dear mom and family."  In the note the inmate asked forgiveness from his family, stated that he knew his family did not understand that he was "harassed by inmates, officers, and counselors!," and that he just couldn't live with "all the hate and filth anymore."  He went on to say that the situation was "all my fault" and asked that his family pray for him.  He concluded that he loved all of his family very much and thanked them for the happy years in his life.

The suicide report contained the inmate's criminal history and included his having been arrested in the past for insufficient funds, burglary, hit and run, and several crimes involving threats and violence against women, specifically wives and girlfriends, involving death threats, brutal beatings, and involuntary confinements of his victims.  He received jail time in 1988 and 1992 as well as court orders to complete substance abuse treatment programs during probation periods.  The records indicated that the inmate was most likely committed to the CDCR for the first time in April 1995 for assault with a deadly weapon on his wife, and paroled in November 1995.  The inmate returned to the CDCR on 7/3/97 on his commitment offenses which were related to his guilty plea to the charges as listed above.  These involved his holding his girlfriend captive for approximately seven days in June 1996 when he beat her with a baseball bat, kicked her with steel toed boots and burned her with a homemade torch on various parts of her body.  This occurred after the girlfriend learned of the inmate's criminal justice history from child protective services.  She subsequently escaped from his captivity seven days later and contacted the police.  Based on these charges, he received the 12 years plus two life sentences with the possibility of parole adjudication.

The inmate was returned to the CDCR on 7/3/97.  He saw a psychiatrist on 7/9/97 after a referral from an MTA because of a history of depression.  The standardized bus screening for new admissions was not provided in the records received.  The psychiatrist did note the inmate had been treated for depression in the Fresno County jail, and for insomnia and nightmares with Sinequan and Benadryl.  The psychiatrist diagnosed Depressive Disorder NOS, Obsessive Compulsive Disorder, and Personality Disorder and prescribed Sinequan and Benadryl.  The inmate's mental health history did not indicate that he received treatment prior to incarceration or during his first CDCR term.  However, he did receive treatment while on parole from the parole outpatient clinic via referral to an