Alcoholics Anonymous and a domestic violence program because of his history of abusing alcohol and methamphetamines and his abuse toward women. He was diagnosed as that time as Personality Disorder NOS. His treatment consisted of referral for substance abuse. There was no formal mental health treatment prior to the inmate's second incarceration.

In July 1997, a second psychiatrist saw the inmate and diagnosed ADHD as well as "Reactive Depression by History," and prescribed Cylert for treatment of ADHD. The inmate was placed in the MHSDS at the 3CMS level of care on July 25, 1997 by a psychologist who diagnosed Dysthymia and ADHD as well as "Impulse Disorder." The inmate was seen by four different psychiatrists following the first two psychiatrists with the last seeing him on 12/20/97 who noted that the inmate was refusing all medications except Cylert. The psychiatrist also reported that the inmate stated that he had lied about his symptoms of depression and psychosis to obtain a transfer to CMC. The record was unclear with regard to when the inmate may have discontinued medications; however, the psychologist noted in January 1998 that the inmate was not taking psychotropic medications, was doing well and gave a GAF of 70. He also indicated the inmate did not meet criteria for continuation in the MHSDS. It appeared that the inmate was removed from the MHSDS at that time, based on review of the provided information.

The inmate was seen again in April 1998 by a psychiatrist who diagnosed Adjustment Disorder with Depressed Mood and prescribed Benadryl. However, there was no follow-up in the UHR with the exception of the inmate seeing a physician (unclear psychiatrist or non-psychiatrist) who prescribed Benadryl in September 1998. There were no additional mental health contacts. A bus screening on 1/3/02 when the inmate was transferred to PVSP from HDSP indicated no history of mental illness or current mental health problems.

On 10/17/04 the inmate sent a health care services request form stating he had "nausea, chest crushing feeling since celly moved into cell." He also reported that his "celly smells after he cleaned cell." Although this request was addressed to medical and the inmate was seen on 10/17/04 he was referred to "psych" for anxiety and being constantly awake. On 10/21/04 the inmate was evaluated by a psychiatrist and he confirmed that he was having problems with his cellmate. The psychiatrist diagnosed Adjustment Disorder with Anxiety but stated no medications were needed by the inmate at that time. The inmate was once again seen on 12/9/04 by a psychiatrist when the inmate had complained that he was allergic to his "cellmate's _____," and the psychiatrist opined that the inmate was suffering Situational Stress related to an allergic reaction and directed the inmate to inform correctional staff.

There are no further contacts with mental health staff until 2/21/06 when the inmate once again submitted a health care services request form stating, "my life is not going well and many times I feel I want to commit suicide or fight my cellie. I am having a hard time remembering things from one day to next. I hate building 3 and everyone in there," and stated his need for help. The inmate was seen on that same day; however, the clinician wrote on the form "I/M claims he did not write this request. I/M denies suicidality." The

form had a statement by the inmate that he did not write this; it was signed by the inmate. This was his last contact with any mental health staff. He had not been in the MHSDS since 1998.

The suicide report referred to the inmate having listed his mother, three sisters, step-father, wife and three friends for approved visits, but none had visited him. It also stated that he had attempted to contact his sister for approximately eight months in 2005, more than 98 times, but she only accepted one call on 12/24/05, and that he had no money in his trust account. The suicide report also referred to contacts with family describing the inmate as being more estranged from them. It referred to his revealing his frustration and sense of abandonment due to their not answering telephone calls or visiting him, and not sending him a package for Christmas 2005 or for his birthday in February 2006. The suicide report reviewer also reviewed taped telephone conversations with his sister and mother, and reported that the inmate sounded depressed and that the conversation suggested that he had a sense of depression, hopelessness, and disappointment with them. The suicide report reviewer also interviewed inmates and was able to identify an inmate who stated he had told a correctional counselor that this inmate had told him four or five days before his suicide that he was going to kill himself. The inmate reporting this information thought this inmate was serious about it. The inmate was seen by a mental health clinician on 2/21/06; however, he denied having any problems and denied having sent the health care services request form at that time. In contrast, the inmate's last cellmate, who had been his cellmate for months, told the suicide report reviewer that the inmate had never talked about any personal problems nor mentioned suicide.

The suicide report indicated that the inmate had been removed from the MHSDS at the 3CMS level of care six months after his placement at that level of care in July 1997 with less than the year of medication free follow-up required by the program guide at that time. This is noted to have occurred eight years previously and therefore the suicide report had no recommendations as otherwise all policies and procedures appear to have been followed.

**Findings:** This inmate's suicide did not appear to have been foreseeable or preventable. He was not receiving mental health services at the time of his death and indeed had not been a part of the MHSDS for more than seven years. The inmate was seen by a mental health clinician approximately nine days prior to his suicide, in response to a health care services request form requesting services from mental health. However, the inmate denied that he had sent this form and indicated he was not in need of any mental health services. The Program Guide is silent as to whether or not an inmate requires an SRA if the inmate denies having requested services and there is no indication that there was any SI or intent. As indicated in the suicide report, it appeared that all policies and procedures were followed with the exception of the inmate not being maintained at the 3CMS level of care according to the program guides in 1998 and 1999.

**11. Inmate K**

Brief History:  This inmate was a 47-year-old Hispanic male who committed suicide by laceration of the neck with massive blood loss on 3/16/06 in general population on the Sensitive Needs Yard (SNY) at SVSP.  The inmate was not receiving services in the MHSDS at the time of his death and was doubled-celled in general population.  The inmate was returned to the CDCR on 5/21/04 as a parole violator with a new term of three years after he was arrested for being under the influence of a controlled substance (methamphetamine).  His original term, for which he was on probation, began in January 2001 as a six-year term for burglary.  He had paroled in March 2004 prior to his return in May 2004.  His earliest possible release date was May 2008.

The inmate was discovered on 3/16/06 at approximately 4:12 p.m. by laundry staff who were providing laundry.  The inmate was lying in his cell face down in a puddle of blood and his cellmate was standing in the corner in the back of the cell.  The personal alarm was activated and the cellmate was ordered out of the cell.  Medical staff were notified by institutional radio.  The Correctional Treatment Center (CTC) was also contacted by institutional radio to have the ERV respond to the building.  Medical staff arrived and checked the inmate for vital signs and the ERV also arrived.  The inmate's neck was bandaged and he was placed on a gurney and lifted into the ERV.  The ambu bag was utilized while the inmate was in the ERV.  The ambu bag was continued after arrival at the CTC.  At 4:38 p.m. a physician again took the inmate's vital signs and pronounced the inmate dead.  The incident report did not refer to the actual readings of the inmate's vital signs, nor whether he had a pulse, or whether full CPR was instituted.  An autopsy report was provided by the Monterrey County Sheriff-Coroner's Office.  It indicated an autopsy was performed on 3/17/06.  The report indicated the cause of death was Incised Wounds of Neck (minutes) and the manner of death was suicide.  A toxicology report indicated that a femoral blood sample revealed acetaminophen 1.9 mg/L (potentially toxic 30-300 mg/L) and Bupropion 3.9 mg/L (effective level 0.025-0.10 mg/L, potentially toxic level not known).  The records indicate that the inmate was not prescribed Bupropion or any other medication for treatment of any mental illness.

The suicide report contained the inmate's criminal history and described multiple arrests and convictions beginning with his having been committed to the CYA at reportedly age 19 for the offense of receiving stolen property.  His first commitment to the CDCR was in April 1983 with a two-year sentence for burglary.  He paroled in October 1984 and was returned to custody in March 1985, with a subsequent discharge in January 1986.  His next CDCR term began in June 1989 for inflicting corporal injury on his spouse, for which he received a three-year sentence with parole in November 1990.  He was returned to custody in July 1991, with discharge in August 1991, secondary to a parole violation.  His next CDCR term began in September 1994 with a conviction for burglary, subsequent parole in 1995, return in 1997, and ultimate discharge in August 1999.  The inmate again entered the CDCR with a conviction for burglary in January 2001 with parole in March 2004.  The inmate is known to have had an extensive drug history, most notably for methamphetamine. In April 2004, he was arrested for being under the influence of a controlled substance after he had called police reporting that he was being chased by people who had broken into his house.  He was returned to the CDCR via

NKSP with a new term of three years that begin on 3/21/04. He transferred from NKSP to PVSP in October 2004 and ultimately to SVSP in October 2005.

The inmate's mental health history appeared to have begun while in the community during his adolescence, related to a suicide attempt by cutting his wrist in the early 1980s. He was also reported to have attempted to overdose on heroin at some point; however, the date was not available in the records. He did not receive mental health treatment in the CDCR until November 1997 while in prison at the California Institution for Men (CIM), having been returned as a parole violator due to driving under the influence of alcohol and drugs. Although he was prescribed Depakene and Navane at that time, a chrono dated 11/21/97 indicated that he did not meet criteria for inclusion in the mental health treatment program. He was subsequently diagnosed as having Major Depressive Disorder in December 1997 with a GAF of 54, and was placed at the 3CMS level of care on 1/16/98. He was subsequently diagnosed with Bipolar Disorder, and Lithium was added to his treatment regimen. It appeared that the Depakene was discontinued in June 1998; however, the Lithium and Navane were continued until October 1998. During this period, the inmate had SNY status and was housed in administrative segregation. The inmate was evaluated for a mentally disordered status and he was determined not to meet criteria in 1998.

After his return to custody in January 2001, the inmate was transferred to the Substance Abuse Treatment Facility (SATF). While there, he was admitted to an MHCB on 11/19/03. The records indicated that he was in the MHCB from 11/19/03 to 11/24/03 with a diagnosis of Psychotic Disorder NOS and discharged with orders for suicide prevention five-day follow-up. A mental health treatment plan that appeared to be dated 11/20/03, although the date was not clearly legible, indicated the problem as "suicidal ideation" and "possible attempt" and offered a GAF of 29. The diagnoses on his treatment plan were Adjustment Disorder and Antisocial Personality Disorder. The inmate did receive five-day follow-up; however, a mental health placement chrono of 11/24/03 indicated that he "did not meet criteria for further services."

On December 6, 2003, the inmate was readmitted to the MHCB after telling a clinician that he was depressed several days prior to that admission. On admission to the MHCB, he was described as agitated, paranoid, and screaming and yelling with fears that people in the yard would kill him and that he did not know what to do. He also reported that he was depressed because "there is no way out" and that everyone was against him. He also reported auditory hallucinations and, based on these findings, Geodon was started. He was diagnosed with Psychotic Disorder NOS and his SRA of 12/11/03 indicated the inmate's family history of suicide (his brother hanged himself at CMC in December 1989) as well as this inmate's previous suicide attempt by cutting his wrist. The SRA did not include an evaluation of imminent risk, and no recommendations were made. The inmate remained in the MHCB until 12/15/03 when it was reported that he denied suicide thoughts and hallucinations, stating "I'm ready to go," and that the inmate was compliant with medications. He did receive five-day suicide prevention follow-up. The inmate remained at the 3CMS level of care. An SRA of 12/30/03 did provide an evaluation of

risk as "low risk." His Geodon was changed to Risperdal and subsequently to Zoloft. The inmate remained at the 3CMS level of care in population and paroled on 3/10/04.

The inmate's initial health screening when he was transferred from the county to NKSP indicated the inmate had a history of Psychiatric Disorder, had a current mental health problem, and was taking Wellbutrin. The inmate returned for his final incarceration on 5/21/04 as a parole violator with new charges related to his methamphetamine abuse. His NKSP RC evaluation on 6/3/04 indicated diagnoses of cocaine dependence and Antisocial Personality Disorder, a GAF of 72, and he was not placed at any level of mental health care "based on GAF and diagnosis." It was noted "no referrals indicated at this time." An SRA done at that time also indicated that the inmate was at "low risk" and, while noting his family history of suicide (brother), did not note his past previous suicide attempts, or SI. The SRA did note several risk factors and indicated no protective factors. The clinician completing the mental health evaluation also noted the inmate's history of long term substance abuse and lack of coping skills, referencing the substances as heroin or cocaine, and that the inmate did not want to participate in the mental health system. The clinician noted that he advised the inmate how to access mental health services should he need them.

When the inmate was transferred from NKSP to PVSP on 10/8/04, the initial health screening indicated he had been treated for mental illness "depression," and that he had attempted suicide in 1981. The screening, however, noted that the inmate stated "no" to having a mental health problem and to all of the questions on the screening. The inmate was subsequently transferred from PVSP to SVSP on 10/4/05 and answered "yes" to questions regarding his having "hep c," having been in treatment for a mental illness as "admit MHCB 12/03 psych d.o.," as well as his having attempted suicide in 1981. There was no referral stated on this initial health screening. It appeared in the records received that this inmate did not receive any further contact with mental health staff as he was cleared at NKSP in May 2004, at his transfer to PVSP in October 2004, and ultimately at his transfer to SVSP in May 2005, despite there being positive answers to questions regarding his history of treatment for mental illness and past history of suicide attempts.

The suicide report referred to the reviewer interviewing officers and the inmate's cellmate. The reviewer described the inmate's cellmate as stating that he told an officer that this inmate had been acting "strange," had been inhaling crushed Bupropion, and that the inmate continued to inhale crushed Bupropion while he sliced away at his neck. The cellmate was reported to have told the reviewer that he had observed this inmate getting high in the morning. The cellmate went to sleep, and when he woke up, "it was near the end." The cellmate reported to the reviewer that he did not intervene because he did not want to get cut or accused of killing this inmate, and reportedly stated "if he wasn't high or crazy, he'd still be here." The reviewer opined that the evidence suggested that the inmate's suicide "was an impulsive act secondary to being intoxicated on [B]upropion."

The suicide report identified two problems, with recommendations, as follows:

Problem 1:  The inmate, who was not prescribed any psychotropic medication, was able to obtain a large quantity of Bupropion on the yard at SVSP.  Bupropion is commonly abused by inmates.

Recommendation:  (A) Involve all regular psychiatrists in a discussion of prescribing practices and the CDCR policy of prescribing Bupropion as a "TIER 2" medication, and (B) nursing supervisor to conduct audits of medication passes on the yard (i.e. observe passes) at random intervals to ensure that proper practices are followed for nurse administered and crushed medications. Bupropion must always be crushed per CDCR policy.  Conduct audits of minimum twice weekly on different shifts for two months.

Problem 2:  The inmate records for his first MHCB admission at [California Substance Abuse Treatment Facility] CSATF, 11/19/03-24/03, were not in the Unit Health Record.

Recommendation:  CSATF to locate these records and send a copy to SVSP for the UHR, and a copy to the DCHCS.

On 8/17/06, the Directors of the DCHCS and DAI provided a report on implementation of the quality improvement plan for the suicide of Inmate K.  They indicated that the first item of the quality improvement plan was completed by SVSP and received at the DCHCS on 8/8/06, that the second item regarding the MHCB records to be provided by CSATF had been received earlier, and that they were on file but not attached to the report.

With regard to the response from SVSP, the staff reported "observational audits" had been conducted a minimum of twice weekly on different shifts for two months.  This involved the auditor accompanying the MTAs/psych techs and observing their techniques regarding medication administration.  The audits indicated that all the Bupropion was crushed, but it had not been "floated" i.e. dissolved in a cup of water.  An in-service was provided to staff informally during the week of 7/3/06 and formally on 7/10/06 to the MTA/Licensed Practical Nurse (LPN) staff.  Audits subsequently indicated that all Bupropion was crushed and floated.  The audit also indicated that nurse-administered and DOT procedures were "carried out well about 80 percent of the time," and that nursing staff were reminded to do mouth checks and obtain assistance from custody as needed.  It was also noted that the psychiatrists have decided to "radically reduce the amount of Bupropion to be prescribed," as part of the discussion of prescribing practices for Bupropion as a "TIER 2" medication.  In-service training sheets were provided.

**Findings:**  This inmate's death did not appear to have been foreseeable but may very well have been preventable.  Although the suicide report did appropriately identify two problems, including a need for better supervision and administration of Bupropion to reduce the likelihood of inmates obtaining it for abuse purposes, and the need for complete records to be provided from one facility to the next, the suicide report did not address several other problems with this inmate's care and treatment, as follows:  (1) This inmate had an extensive history of treatment for mental illness while in the CDCR on previous admissions as well as a history of SI and suicide attempt.  Despite this being

identified as part of the initial health screening when the inmate was returned to custody in May 2004 at NKSP, the mental health assessment of 6/3/04 did not adequately include this information and cleared the inmate for general population. This omission/inadequate assessment of information not only occurred at NKSP but was repeated at PVSP and at SVSP, despite the inmate's long history and despite initial health screenings identifying the inmate's past treatment for mental illness and suicide history. At NKSP, at least the referral was made but the information was not adequately assessed. It was unclear but it appeared that referrals were not made at PVSP or SVSP despite the screenings indicating referrals were required; and (2) The emergency response to this inmate's discovery included observation by correctional officers and an LPN that the inmate was bleeding and that he did have active vital signs. Despite these observations, neither the correctional officers nor the LPN provided immediate bandaging or other first-aid to stop the inmate's bleeding from his obvious neck wound. It took approximately six minutes for the RN to arrive with the ETV before the wound was bandaged and the bleeding was stopped. This is an inadequate emergency response, as first responders are not only required to provide CPR when necessary, but also first-aid including stoppage of bleeding when they arrive.

Had this inmate been properly assessed and referred for continuing mental health services as he had been during previous incarcerations, and immediate and appropriate first-aid been provided his death may very well have been preventable.

## 12. Inmate L

Brief History: This inmate was a 35-year-old African-American male who committed suicide by hanging on 3/28/06 in the administrative segregation unit at the Kern Valley State Prison (KVSP). The inmate was not a part of the MHSDS at the time of his death and was the sole occupant of his administrative segregation cell. This inmate entered the CDCR via the WSP RC on 4/29/92 after convictions by two juries for numerous crimes occurring in 1998, including several counts of forcible rape, kidnapping, robbery and forcible oral copulation. He was sentenced to four consecutive life terms plus a total of 67 years and four months of enhancements. His minimum eligible parole date was October 3, 2053.

The inmate was discovered on 3/28/06 at approximately 6:40 a.m. by a correctional officer distributing the morning meals. The time of discovery noted on the incident report was 6:50 a.m. However, the time of discovery reported in the suicide report was as 6:40 a.m., occurring during a security check. The incident report continued that this inmate was lying face down on the floor with his head turned to his left, both hands crossed under his right cheek and his left leg bent at the knee raised towards his torso. The officer noted the inmate appeared to be sleeping and made several attempts to wake him up. The inmate did not respond to these attempts and a second officer arrived at the cell with the inmate's food tray. The incident report indicated that the second officer attempted to provide the inmate with his food tray, and that the first officer shined his light into to the cell and did not observe the inmate's chest or body moving as it would if he had been breathing. The first officer called to a third officer advising they had an

unresponsive inmate. The control booth officer was notified to activate his personal alarm and open the cell door. When the cell door was opened, the first two officers entered the cell and ordered the inmate to stay down. However, when the officers attempted to pull the inmate from under the desk by the leg to place him in handcuffs the inmate was discovered to be stiff and the leg did not straighten out. The officers noted that the inmate's hands remained tightly tucked under his head and that his body remained stiff. The officers observed that there appeared to be blood under the desk and a torn sheet tied around the inmate's neck, which they attempted to remove but was too tight for them to get off. The officers attempted to turn the inmate over onto his back to place him on a Stokes litter that was brought by a third officer, but his body was too stiff. The officers then lifted the inmate and placed him on the Stokes litter face down because they could not turn him over and took the inmate out onto the tier as medical staff responded. An LVN and MTA arrived, determined the inmate had no pulse and that his body was cold to touch. The inmate was transported to the ERV and the cut-down tool was retrieved to cut the noose off the inmate's neck. The inmate was loaded into the ERV and transported to the Correctional Treatment Center (CTC) where the incident report stated the investigative services unit (ISU) responded to process the body. The incident report indicated that the inmate was pronounced dead at approximately 7:33 a.m. by a physician. The suicide report stated that during the transport of the inmate, the gurney on which he was secured rolled forward and struck the cage door area of the transport van. The report also noted that the inmate's temperature was taken at approximately 8:15 a.m. and noted to be 76.8 degrees Fahrenheit. An autopsy report was provided by the Kern County Coroner's Office and indicated the autopsy was performed on 3/29/06. The autopsy concluded that the cause of death was hanging and the manner of death was suicide. In addition, the autopsy report indicated blunt force head trauma and blunt force extremity trauma. The time of cutting the noose from the inmate's neck was approximately 7:00 a.m. according to the Coroner's report. The suicide report also makes reference to a message written in soap on the wall of this inmate's administrative segregation cell which read, "MOM I'M SORRY 18 YEAR TO MUCH PAIN." The description included the inmate's body having rigor mortis. A toxicology analysis was not provided.

The suicide report contained the inmate's criminal justice history and stated this inmate had a number of juvenile placements prior to his adult incarceration. His arrest record began at age 14 for petit theft and continued with a number of other charges including the instant offenses. The inmate was allegedly affiliated with the Broadway Crips street gang and at least some of his criminal activity was related to that affiliation. After his incarceration in the CDCR beginning at WSP he was transferred to several other facilities including CAL, Pelican Bay State Prison (PBSP), CSP/Corcoran, CSATF, Centinela State Prison (CEN), NKSP, CCI, and finally KVSP on 2/7/06. These transfers included four administrative segregation placements and two SHU placements as well as an additional two years added to his term for a district attorney-referral for possession of a weapon.

The inmate was admitted to the CDCR in 1992 and received periodic mental health screenings including three in 1997 and 1998. The only positive finding was of the inmate

having been treated with an antidepressant/antipsychotic, Triavil, while in the county jail prior to his incarceration in the CDCR. However in October 1998, the inmate was admitted to an MHCB at CSATF and diagnosed with Reactive Depression with Suicidal Ideation and was placed on suicide precautions. The inmate remained in the MHCB from 10/25/98 to 10/29/98 and was prescribed Elavil. His condition improved such that he was discharged to general population. He was to have received follow-up by a psychiatrist in CSATF; however, the suicide report indicated that there was no record of his having received follow-up, and that he was not seen by a mental health clinician again until 10/13/00 with a complaint of depression. Although his previous contact with mental health staff had occurred approximately two years prior to his being evaluated by a psychiatrist on 10/13/00, the inmate reported that he had been having feelings of hopelessness, helplessness, and worthlessness for approximately seven months, according to the suicide report. He also reported SI and was diagnosed with Adjustment Disorder rule out Major Depression. At this time he was placed in the MHSDS at the 3CMS level of care due to medical necessity, and placed on Prozac with a recommendation for psychotherapy. The inmate was seen by mental health staff for follow-up appointments while at CSATF. However, he also missed several appointments with the psychiatrist in 2000 and 2001.

The inmate was transferred to CSP/LAC to administrative segregation because of a weapon found in his cell. When seen by the ICC, he reported that he was suicidal and was sent to the infirmary with a diagnosis of Major Depression. The inmate was seen by a psychiatrist who diagnosed Depression NOS, was prescribed Prozac and Vistaril, and was released back to the yard. The inmate had an IDTT meeting on 2/28/01. His diagnosis was then reported as Depressive Disorder NOS and he was continued on the same medications. He continued in administrative segregation, was reported as complying with medications, and his mental status improved. On 4/30/01, at his request, his Prozac and Vistaril were reduced. In May 2001, he was refusing all medications; they were discontinued by a psychiatrist.

The inmate was referred for psychotherapy in June 2001. However, it appeared that he received psych tech contacts only until April 2002 when a psychiatrist evaluated him as stable and the inmate expressed an interest in attending groups. He did not appear to have received any groups. On 4/2/02, was described as stable with a plan to remove him from the 3CMS level of care on 6/24/02. He had been scheduled to start an anger management group on 6/12/02; however, it did not appear that he ever attended this group.

He was, however, placed back on the 3CMS caseload after seeing a psychologist in July 2002 who reported that the inmate was depressed. He remained on the caseload until 10/22/02 when he was seen by the IDTT that removed him from the MHSDS, but indicated that he would continue to be followed by staff in administrative segregation. He was removed once again from the MHSDS on 11/14/02.

On 1/20/03 the inmate was evaluated at the emergency room at CSP/LAC when he failed to pass a metal detector scan. He admitted swallowing razor blades, metal buttons and a

paper clip. The inmate denied any suicidal intent and received a 15-month SHU term for possession of a weapon. On 2/28/03 the inmate reportedly refused to complete a mental health screening as per the suicide report. However, on 5/9/03 he did complete a mental health screening answering all the questions regarding mental health treatment or mental health problems as "no," except that he did report that he had taken Prozac. A subsequent health screening dated 8/27/03 indicated that the inmate reported that he had been treated for mental illness at the 3CMS level of care. Additional comments included "opc return-psych." On 10/31/03 an initial health screening completed at CCI after his transfer from LAC indicated the inmate answered no to all screening questions including mental health questions. The inmate remained at CCI until 2/7/06 when he was transferred to KVSP. The suicide report indicated that an initial health screening was completed at KVSP on 2/7/06, that all questions were answered "no," and that no referrals were made.

The suicide report referred to a number of legal activities the inmate was engaged in, including asking his mother in February 2006 to help him find a lawyer to fight his SHU placement at CSP/LAC. The report also referenced his attempting to re-establish contact with a woman that he had corresponded with previously. However, no evidence of that contact being re-established was discovered. The inmate also filed grievances against NKSP regarding his program placement and library access. There was also reference in the suicide report to the inmate having received "bad news" regarding one of his appeals during the week preceding his suicide, as reported by a correctional officer. The inmate was seen by a sergeant and lieutenant in the program office on 3/27/06 and informed custody staff that he had been involved in a stabbing of a rival gang member, a "Blood" at SVSP and that he did not believe the Crips would protect him. He also had his belongings packed up and reported to the sergeant that he was "tired of looking over my shoulder," according to the suicide report. The inmate also reported to the sergeant, "if you put my back on the yard you might as well shoot me in the head right now." Based on review of the central file (C-file) the inmate was placed in administrative segregation pending further review to determine his future housing at approximately 7:25 p.m. on 3/27/06. An administrative segregation screening was attempted at that time and the inmate reported stated "no comment" in response to questions by a MTA.

The suicide report identified one problem, and recommendation, as follows:

> Problem:  Because of the presence of rigor mortis in Inmate L's body there was an obvious, although unknown length of time between Inmate L's death and the discovery of his body. Therefore, there was a possibility that staff may have counted Inmate L without detection of a suicide, for one or more security counts. Recommendation:  The Office of Internal Affairs was reportedly conducting an investigation as of this writing. DCHCS must be informed of the findings and outcome.

**Findings:**  This inmate's suicide does not appear to have been foreseeable or preventable. The inmate did not inform any mental health, medical or correctional staff of any overt plans to end his life. He did, however, make obscure references to it being "over" and

that he was in fear that placing him back on the yard was tantamount to "putting a bullet in my head." He also had packed up all of his belongings but his cellmate did not take any particular notice of that. Of concern was the MTA screening for placement in administrative segregation, in which the inmate responded "no comment" when asked the screening questions. Although this may have been an error in judgment in that the MTA did not then refer the inmate for any form of mental health assessment, and did not place the inmate on any form of observation, policy and procedure at the time of the inmate's death did not require that the MTA do this. While there were a number of missed appointments or failures for the inmate to have been seen when scheduled at other facilities, there was no evidence that these variances contributed to his death in 2006. The last initial health screening that he received at KVSP was not included in the documents reviewed. However, the suicide report referred to all the answers to questions being "no." This was in stark contrast to the inmate having received mental health treatment in the past for depression and reported SI without a plan or intent. The requirement to review medical record documentation did not appear to have been done either at the initial screening or at the clearance for placement in administrative segregation.

## 13. Inmate M

Brief History: This inmate was a 47-year-old Caucasian male who committed suicide by hanging on 3/31/06 in the administrative segregation unit at SVSP. The inmate was the sole occupant of his cell at the time of his death and was included in the MHSDS at the 3CMS level of care. The inmate entered the CDCR on 1/26/93 via the Deuel Vocational Institution (DVI) RC. He had been sentenced to life in prison with the possibility of parole plus 15 years for enhancement in 1992 on charges of attempted first degree murder with enhancements for prior convictions, use of a firearm and great bodily injury. The inmate also had an "R"-suffix CDCR number. His minimum eligible parole date was 12/15/07.

The inmate was discovered on 3/31/06 at approximately 4:00 p.m. by a correctional officer who was distributing the evening meal in the administrative segregation unit. The inmate had a manufactured noose made from his bed sheet attached around his neck with the other end attached to the top bunk, and was found hanging in a seated position. The officer activated his personal alarm device, and attempted verbal communication with the inmate who did not respond. The correctional sergeant responded to the cell front, notified central control via the institutional radio of an unresponsive inmate and requested the ERV with medical staff. Two additional officers responded to the cell front with a cell extraction shield and the sergeant instructed one of the officers to enter with the shield placed against the inmate's body, and the second officer to place handcuffs on the inmate. The inmate was handcuffed and then the cut-down tool was used to cut the noose around the inmate's neck. The inmate was lowered to the floor and the sergeant checked for pulse and respiration with negative results. The sergeant and an officer began CPR at approximately 4:02 p.m. At 4:04 p.m., the psych tech and additional medical staff arrived at the cell. The medical staff attempted to utilize the ambu bag which did not work and the AED was retrieved. At 4:08 p.m. the ERV arrived with additional medical

staff and an AED machine was connected but was not utilized because the inmate had no pulse or rhythm. The inmate was placed on a back board, removed from the cell and CPR continued. The inmate was transported to the ERV which left the building at approximately 4:14 p.m. and the inmate was transported to the CTC. After arrival at the CTC, the inmate was pronounced dead at 4:22 p.m. by a physician. An autopsy report was provided by the Monterey County Coroner's Office and indicated the autopsy was performed on 4/2/06. The report indicated the cause of death was asphyxia (minutes) due to hanging (minutes) and the manner of death as suicide. The toxicology screen was done; however, the toxicology results were not provided in the documents received.

The suicide report contained the inmate's criminal history and stated that he had been committed to the CYA as a juvenile and had served at least one prior prison term for armed robbery and a possible second prison term for child molestation. His history of arrest included arrests for burglary, forgery, vehicle theft, possession of a dangerous weapon, disturbing the peace, vandalism, defrauding an innkeeper, resisting arrest, drinking alcohol in public, armed robbery, assault with a deadly weapon, and having sex with a minor. The suicide report also stated that the inmate told the social worker at DMH when he was hospitalized at ASH in 1999 that he had suffocated his mother with a washcloth to end her suffering from terminal cancer. Further, his C-file contained information that he had claimed to have molested nine juveniles over a 20-year period. This information was reportedly provided to the San Joaquin County DA's Office. However, there was no evidence of their having pursued investigations of any of these reported offenses.

His commitment offense occurred in September 1992 and involved his shooting at and wounding his stepson, which appeared to be related to family disputes, including an allegation that the stepson had molested the inmate's step-granddaughter. After the inmate was admitted to the CDCR at DVI in January 1993, he was transferred to CMF in April 1993 and admitted to the DMH program at CMF on two occasions. Ultimately, he was transferred to ASH in June 1996 and again in September 1996. During the second hospitalization, he remained at ASH from September 1999 to April 2000, and was returned to CMF where he was admitted to the DMH program at CMF on multiple occasions. The inmate committed battery against a correctional officer at CMF in June 2004 and pled guilty to battery in June 2005, which resulted in an additional two-year sentence in prison. He had been transferred to SVSP from January through May 2005 when he went out to court and returned to SVSP for one day in June 2005, with his ultimate return to CMF on 6/15/05. His final transfer was to SVSP on 6/22/05 where he remained until his death on 3/31/06.

Prior to his incarceration and beginning in his adolescence, the inmate reported a history of substance abuse including alcohol, marijuana, cocaine, heroin and methamphetamine. The records reviewed stated that he attempted to kill himself by cutting himself with a kitchen knife in 1981 at approximately age 22, and was hospitalized for a short period of time. He also had a family history of Bipolar Disorder in his mother as well as a possible Psychotic Disorder in his father. The records also stated that he reported having been sexually molested by his step-father, and that the inmate himself had sexually molested

his stepdaughter as well as two nephews and two other children who were family members. The suicide report stated that the inmate reported that in December 1997, he was raped by three other prisoners while at CMF.

The inmate was admitted to DVI on 1/26/93 and placed in administrative segregation for safety reasons on 1/28/93. On 1/29/93 he was discovered crying in his cell and told the staff that he had attempted to hang himself with a shoe string because of enemies, and concerns and fears for his safety. He was placed at the CDCR "Category J" program and transferred to CMF in April 1993. This began a long history of treatment for mental illness in the CDCR and included his having approximately 14 admissions to the DMH program at CMF, and two admissions to ASH, with the first from June 1996 through April 1997 and the second from September 1999 through April 2000. The inmate is reported to have attempted to hang himself six times between 1994 and 1998 and attempted to cut his wrist in 1993 when he was admitted to CDCR. In February 2002, the inmate again attempted to hang himself, and in June 2004, when staff responded, he attempted to assault staff who were trying to stop him from hanging himself. At that time he was again transferred to the DMH program at CMF and was evaluated to be in a psychotic state with both assaultive and self-injurious behaviors.

Based on his behaviors in June 2004, he was placed on a Keyhea order for 180 days through February 2005, and was placed at the EOP level of care. The records indicated the inmate appeared to participate in the EOP while under the Keyhea order, including group therapy, individual meetings with his case manager. There were no reports of attempts at self harm until 2/7/05 when the inmate once again attempted to hang himself. The inmate continued on his medications, but attempted to overdose on his Seroquel and Wellbutrin on 4/25/05, and was treated in Natividad Medical Center.

On 6/6/05 the inmate was sent out to court from CMF and was returned to SVSP on that same day. He was placed in administrative segregation on 6/7/05, and on 6/14/05 he attempted to hang himself again, telling staff he wanted to end his life. He was double-celled at the time. His cellmate witnessed his attempted hanging and notified staff. The inmate was again transferred to the CMF DMH program (acute psychiatric program or APP) on 6/15/05. A new Keyhea order was approved by an administrative law judge on 6/16/05 which was good for 180 days until 12/13/05. He was placed at the EOP level of care on 6/17/05, but was returned to SVSP on 6/22/05 where he remained until his death on 3/31/06.

While at SVSP, the inmate's participation in the EOP was noted as very good, according to the records reviewed. His diagnoses of Mood Disorder NOS and Antisocial Personality Disorder were continued. By October 2005, a psychiatrist note indicated that the Keyhea order would not be petitioned for renewal as the inmate was doing well and "competent to give consent." An IDTT held on 2/1/06 in the EOP noted that the inmate had been stable and was awaiting transfer to a SNY EOP. However, they also noted the inmate had requested a change to the 3CMS level of care. They noted that the inmate had "significant safety issues" and that the "inmate has used mental health and suicide to affect custody status." On that same date, a review by his case manager indicated the

inmate had reached maximum benefit from the EOP and could function within the 3CMS program.

At the initiation of the new Keyhea order, the inmate's medications had been changed in November 2005 to Haldol Decanoate IM every two weeks, Prozac and Benadryl. The inmate was placed at the 3CMS level of care after the IDTT review on 2/1/06, and on 2/28/06 his medications were changed again. His Haldol Decanoate, Prozac and Benadryl were discontinued and he was started on Seroquel twice a day with DOT. The inmate appeared to be adherent to these medications. However, on 3/22/06 he reported to staff that he had taken approximately 15 Seroquel tablets, including both 200 and 300 milligram tablets. He was seen by medical staff and reported that he felt that his life was not worth living. He had unsteady gait and slurred speech and was treated with gastric lavage and charcoal. He was placed in an MHCB on suicide watch, and remaining medications were held on 3/22/06. His medications, however, were administered on 3/23/06 but not 3/24/06, 3/25/06, or 3/26/06 at the ordered times. The records indicate that the inmate reported to medical staff that he had "stashed" his medications, but also told his case manager that he had gotten pills from other inmates. He reported his effort to overdose was because he had fears for his own safety, as other inmates were asking for his paperwork, and that he owed money on the yard. Custody did follow-up, and the inmate informed a correctional officer that he did have a debt on the yard related to his using heroin the year before, and that he had attempted to overdose to get out of a particular administrative segregation unit where he felt he was unsafe. The inmate was ordered to provide a urine sample and was placed in the administrative segregation unit on that same day.

After his return to the administrative segregation unit, the inmate was seen daily by clinical staff from 3/24/08 to 3/28/08. He saw his case manager at cell front on 3/28/08 and would not come out for an evaluation, but reported that he was taking his medications and not in distress. On 3/30/08, he also refused to come out of his cell for an interview with a psychologist who noted he was "controlled with meds," but described a flat affect.

The suicide report referred to the inmate on 3/30/08 giving a note to an officer during an ICC meeting stating that he had taken the 15 tablets of Seroquel, and "I was trying to end it all because of a past crime that Dr. _____ knows all about. He is out get me, so are all the doctors. I need to be put on single cell status and transferred out of here asap." The inmate went on to say that he did not know how to program on the mainline and that he could program in segregation in a single cell and asked the officer to help him. The suicide report referred to a psychologist in the ICC asking the inmate if he was suicidal, and the inmate stating that he was not. However, the ICC referred him for further evaluation. The psychologist who evaluated him used the "SRAC (local version)." The psychologist noted multiple risk factors including mental illness, substance abuse, life prison term, fear for his safety, current administrative segregation housing, recent hoarding of medications, recent SI, family history of suicide, numerous previous suicide attempts and poor compliance with treatment however evaluated the risk of suicide as "low." The inmate also told the psychologist that he believed he suffered from "Major

64

Depressive Disorder with Psychotic Features in Partial Remission." The psychologist reported that the inmate was coping adequately and recommended routine administrative segregation and 3CMS follow-up. The following day the inmate committed suicide by hanging.

The suicide report referred to institutional staff being unable to provide the Inmate Segregation Records after 3/5/06, and that after some point following 3/5/06, the inmate had been transferred to the Temporary Protective Unit (TPU) for orientation to the SNY. It was noted in the suicide report that an administrative segregation placement notice to the inmate stated, "you informed staff that you can not program on this yard (D7-TPU) because you are concerned for your safety."

The CDCR reviewer who prepared the suicide report opined that the inmate was at chronic high risk for self-harm, and that the inmate's behavior one day before suicide, his showing to the correctional officer the note regarding his overdose approximately one week earlier stating that he was refusing medications so he would not hoard it, and his stating his diagnoses "suggest that he may have been fighting urges to kill himself." He further opined that his mental decompensation and suicidal behavior elevated his risk for self harm.


The suicide report identified five problems, with recommendations, as follows:

> Problem 1: An ambu bag that did not function hampered the emergency response to the hanging.
> Recommendation: SVSP. Ensure regularly scheduled testing of this equipment and timely correction or replacement of malfunctioning equipment.

> Problem 2: Staff were unable to locate missing CDC114A Inmate Segregation Records for the period 3/5/06 through 3/31/06 (date of the suicide).
> Recommendation: SVSP. Locate the missing documents or determine the reason that they could not be located. If necessary, form a quality improvement team (QIT) to develop a mechanism for establishing accountability for 114A logs so that they can be readily located at any time for any inmate.

> Problem 3: Adequate documentation of the rationale for the treatment decisions at SVSP was lacking. For example, the MH-2 of 2/1/06, when the IDTT changed the treatment level from EOP to 3CMS, did not appear to take into consideration the inmate's long history of severe mental illness and extensive self-harm history requiring inpatient care. Further, in the weeks following this change in treatment level, the inmate deteriorated significantly, but mental health staff did not consider returning him to the EOP level of care, adjusting his medication or referring him for inpatient treatment, and again the rationale for continuing him in 3CMS was not explained in the documentation. A review of the three most recent MH-2 treatment plans demonstrated that mental health staff did not document significant clinical information in the updated treatment plans, and instead used an

unchanging template. For example, the MH-2s did not mention suicidal behaviors leading to inpatient care and placement on involuntary medication (i.e., Keyhea order), or document the reason for not renewing the Keyhea. The treatment plans did not appear to be individualized based on this inmate's needs or suicide risk factors.

Recommendation: DCHCS will provide training at the upcoming Chief's of Mental Health meeting on the importance of adequate individualized documentation and treatment rationale and the importance of taking historical factors into account when making treatment decisions, particularly with inmate-patients who may be deteriorating and in need of a higher level of care. This case will be presented at an upcoming Suicide Video Conference with an emphasis on the documentation and treatment deficiencies noted. SVSP to conduct an audit of ten EOP and ten 3CMS cases selected at random that have had IDTT reviews following these trainings to review for individualized documentation and inadequate rationale for treatment decisions. The audit should be conducted by a supervisor from a different program than the one being audited.

Problem 4: On 3/30/06, one day prior to the suicide, the case manager evaluated the inmate-patient regarding a note he showed to staff explaining why he had taken an overdose of medication one week earlier. The note suggested that he had been suicidal because of shame and guilt related to a past crime (i.e., most likely the sexual molestation), was experiencing paranoia about mental health staff, was fearful about being at this prison, particularly having the mainline and having a cellmate. During the interview, the inmate-patient denied suicidal thoughts but admitted he was refusing medications so he would not hoard them again (the MAR is unclear as to whether he refused his morning medication but it appeared he received his HS [hora somni] medication for the past five days). The case manager completed the SRAC and noted the extensive list of risk factors. Nonetheless, the case manager concluded that he was coping adequately, was a low risk for suicide and recommended routine administrative segregation/3CMS follow-up.

Recommendation: DCHCS will refer this case manager to the PPEC for a pattern of practice review.

Problem 5: The MAR showed that staff gave the inmate his HS medications on 3/31/06. However, staff discovered the hanging at 1600 hours on that day and a physician pronounced him dead at 1622 hours. There were other medication problems such as the dispensing of medication on 3/23/06, one day after the inmate allegedly overdosed on his medication and the psychiatrist ordered medications stopped.

Recommendation: SVSP Nursing Supervisors to ensure that these medication errors were appropriately documented, review these errors with responsible staff, and take corrective action.

On 2/27/07 the Directors of the DCHCS and DAI provided a report on implementation of quality improvement plan for suicide of Inmate M. The report included responses from SVSP as follows: Regarding CAPs 1, 2, 3 and 5 of the CAP for his inmate, CAP number

1 was being addressed by the Director of Nursing (DON). Steps had been initiated to ensure the functionality of an ambu bag. Additional training had been conducted to ensure staff is trained to use the piece of equipment properly. Regarding CAP 2, it had been resolved, and enclosure 1 was the CDC114A Inmate Segregation Records for the period of 3/5/06 through 3/31/06. Regarding CAP 3, a summary of actions was enclosed reflecting the sequence of steps taken to date to address this CAP item. The mental health department implemented an ongoing review of treatment plans and a peer review process conducted by supervisors and yard leads. The documents included consisted of a mental health audit form and MH-2 quality audits conducted by senior staff on 34 inmates. These audits included 11 EOP and 23 3CMS inmates. The result of the audit indicated that "none of the audits of EOP level of care inmates had more than nine of the 34 questionnaire items scored," "need improvement," "unacceptable," or "missing." The auditor reported that the majority of MH-2s were judged to be acceptable or better with regard to quality of documentation. The audit also indicated that three of the 24 3CMS audits had serious problems with regard to quality of documentation on the MH-2, and 21 of the audits were judged to be acceptable or better with regard to quality of documentation. Three memos presented to the mental health sub-committee providing a detailed analysis of specific recurrent deficiencies are to be provided to DCHCS in December 2006. The Psychology Peer Review Committee minutes were also provided from May through August 2006. A memorandum dated 11/15/06 from the Chief Psychologist of the Mental Health Program (MHP) at DCHCS indicated that the training for state-wide mental heath leadership was held on 6/19/06 through 6/21/06 and would be presented at a video conference on 11/30/06 for all mental health clinicians.

With regard to Problem 5, the response from the senior MTA at SVSP stated the documentation that the inmate was given medication at 2000 hours although he had been pronounced dead at 1620 hours was a documentation error by an LPN who has received training on MAR documentation. An additional memorandum by the SVSP DON indicated that the inmate had been admitted to the TTA in a holding cell and that there were charting omissions including MD and RN signatures and nursing notes absent for second watch on 3/23/06. It also indicated that the medications were restarted on the yard without specific order from a psychiatrist to do so. This memorandum indicated that a separate memo had been written by a senior psychiatrist instructing the psychiatrists to discharge patients from holding cells with specific discharge orders and renewal of medication orders.

With regard to Problem 4, a response from the Chair of the professional practice review committee (PPRC) indicated that the PPRC reviewed the participation of a psychologist, "Dr. X" as per the recommendations of the suicide report, as Dr. X was referred for a pattern of practice review. A summary of suspension of clinical privileges was issued by the Chief Psychiatrist and Chief Psychologist from DCHCS until the psychologist completed an eight-hour training on SRA. The memorandum went on to state the PPRC will again "assess the quality of her care and will take actions appropriate to protect patient safety" when the pattern of practice review has been completed.

**Findings:** This inmate's suicide appears to have been both foreseeable and preventable. The CDCR suicide reviewer appropriately identified a number of problems in the care and treatment this inmate received at SVSP, including his change of level of care from EOP to 3CMS, failure to pursue a Keyhea order for an inmate who had consistently demonstrated decompensations when not on medications, the administration of medications on the next day after the inmate had reported attempting to overdose on those medications, and a very poorly conducted SRA by a clinician. These failings of the IDTT to appropriately review and incorporate this inmate's history of serious mental illness, decompensation, suicide attempts, and poor adherence to medications in the past are inexplicable.

Further, to determine he could be adequately managed with less intensive mental health services, i.e., 3CMS, rather than EOP or DMH Intermediate Care does not appropriately reflect his history and treatment/management needs.

The suicide report also identified problems with documentation. A response from SVSP included the inmate segregation records as well as the holding cell log. Review of this documentation further complicated understanding of the management of this inmate because the holding cell log indicated that on 3/23/06 the inmate was placed in a holding cell in the TTA on suicide watch from 9:00 a.m. to 12:45 p.m. for a total of three hours and forty-five minutes, and then returned to the housing unit in administrative segregation. The inmate segregation record records the inmate was placed in "holding cell number three on D yard" at 2:35 p.m. on 3/23/06. There are also two pages of q 15 minute checks starting at 2335 hours with a notation "inmate moved from ER to holding cell 114" that goes on until 1400 hours the following day noting, "inmate talking with Dr. Thompson." These two sheets were undated and therefore would appear to indicate that the inmate was placed in the holding cell on 3/22/06 on D yard because a notation at 0600 hours indicates "CO (correctional officer) Rivera on duty 3/23/06 Z/W." There was no further clarification of this information in the documents provided.

The suicide report, however, does not address the issue of DOT versus the inmate being able to obtain medications while in administrative segregation, as both a clinical and custody issue, given that he did not go out on the yard or participate in out of cell activities for extended periods of time. The suicide report did not address SVSP's use of a "local version" of the SRAC rather than the DCHCS approved document. Lastly, the Coroner's Report states it took 20 minutes (6:40 – 7:00a.m.) to remove the noose from the inmate's neck. These failings by the staff at SVSP were unacceptable and, in my opinion, contributed to this inmate's death being both foreseeable and preventable.

## 14. Inmate N

Brief History: This inmate was a 25-year-old Hispanic male who committed suicide by hanging on 5/1/06 in the administrative segregation unit at ISP. The inmate was the sole occupant of his cell at the time of his death. The inmate was not involved in the MHSDS. The inmate entered the CDCR on 9/1/04 via the NKSP RC. The inmate was convicted of mayhem in 2004 and received a sentence of eight years.

The inmate was discovered on 5/1/06 at approximately 7:03 p.m. by a correctional officer who was walking a tier in administrative segregation. The inmate was the sole occupant of the cell and was observed by the officer hanging in a kneeling position with a sheet tied around the top bed at one end, and the other end tied around the inmate's neck. The correctional officer went down the stairs to the committee room to notify the sergeant and approximately 30 seconds later the sergeant went up to check on the inmate. When the sergeant went up to the inmate's cell and banged on the cell door in an attempt to receive a response from the inmate, he got no response, and a second correctional officer stood by the door to provide security. The sergeant then went back down the stairs to retrieve the cut-down tool from the control booth officer, informing the control booth officer they were going to do an emergency extraction. At approximately 7:05 p.m. the sergeant informed four staff of the situation and instructed the control booth officer to sound the building alarm and request medical staff to respond. An extraction team returned to the cell front at approximately 7:06 p.m., the cell was opened and the sergeant and officer entered the cell and cut the sheet above the knot that was around the inmate's neck and laid the inmate on the floor. An MTA arrived at the door at that time and the officers placed the inmate onto a Stokes litter while the MTA attempted to assess the inmate's pulse and respiration. The MTA attempted to place an ambu bag on the inmate as the officers carried him out of the cell and down the stairs to a waiting ERV. The inmate was placed in the ERV and medical staff arriving with the ERV began CPR at approximately 7:07 p.m. The AED was placed on the inmate but advised no shock. The ERV arrived at the TTA at approximately 7:12 p.m. and staff continued CPR and placed an IV line. At approximately 7:14 p.m. an MTA called 911 and advised a watch officer to assemble a transport team. At 7:22 p.m. the AED advised "shock"; however, none of the staff pushed the button to shock the inmate. The incident reports indicate that an MTA stated that the button had to be pushed but was told by other staff that it shocked automatically. No shock was delivered and at 7:23 p.m. the AED again advised "shock" and the MTA attempted to push the button but the time period for delivering the shock had passed. At 7:25 p.m. the AED again advised "shock" and the MTA was able to push the button in time and shock the inmate. At 7:30 p.m. at the request of medical staff, the sergeant cut the sheet from around the inmate's neck which had remained in place since the inmate had been discovered and CPR had begun. An RN and MTA continued CPR and requested assistance from "one of you bigger guys" (i.e. officers). However, none of the officers responded to assist with CPR. Epinephrine and Atropine were administered IV between 7:19 p.m. and 7:35 p.m. and an ambulance service arrived at the TTA at 7:37 p.m. Paramedics assumed CPR and called a local hospital to advise them of the situation. The incident reports indicate the paramedic stated he was not going to transport the inmate because he was unresponsive. At 8:02 p.m., the paramedic announced the time of death per the physician at the hospital emergency room via telephone. CPR at that point was discontinued. At 8:15 p.m. an ISP staff physician also pronounced the inmate dead. The suicide report stated that the local hospital emergency room physician reportedly refused to sign the death certificate because he had not physically observed the inmate and therefore the official time of death was 8:15 p.m. as pronounced by the ISP staff physician, approximately 13 minutes after CPR was discontinued. An autopsy report was provided by the Riverside County Sheriff-Coroner's office and stated the autopsy was

performed on 5/3/06 and the cause of death was stated as hanging, with the manner of death as suicide.  Toxicology analysis was performed and indicated there was no alcohol or illicit drugs found in the blood or urine samples.  Three letters were found in the inmate's property to his two aunts, mother and significant other, all of which indicated his intent to end his life, thanking them for what they had done for him and stating his love for them.  He also requested that he be buried in El Salvador and signed his letter to his significant other "Downer N/S."  He also left an undated note on his desk to a counselor stating "just tell the truth why they framed me (set me up) ok because if you don't I will never be at peace" and left a phone number indicating "my family."  All the letters and note were written in Spanish and provided with translations.  However, in the inmate's records he had written requests for medical services in English regarding medical complaints of hemorrhoids and stomach pain.  He had been prescribed medications for gastro esophageal reflux disease (GERD) and constipation.

The suicide report contained the inmate's criminal justice history.  The inmate was a native of El Salvador and a member of the Mara Salvatrucha gang known as "MS-13."  The suicide report makes reference to a probation officer's report that list arrests and convictions starting in March 2002 for multiple offenses including assault with a deadly weapon, vandalism, battery on a peace officer, and terrorist threats as well as arrest for oral copulation with force.  The inmate was deported in April 2003; however, his commitment offense was in October 2003 after he returned to California.  In this offense the inmate entered the residence of a former friend, slapped the friend in the face with a handgun, blinding him in his right eye and took $300 in cash and a money order.  He was committed on 9/1/04 on a charge of mayhem.  The inmate was transferred to ISP on 11/10/04.

There is no known mental health history for this inmate prior to his entering the CDCR.  He received a brief mental health screening on 9/3/04 at NKSP which stated there was no indication that the offender was suffering from a mental illness and no referral to a mental health professional was indicated.  An initial health screening dated 11/10/04 when the inmate was transferred from NKSP to ISP indicated "yes" answers to positive PPD and TB meds, but no "yes" answers to any mental health questions.  The only other contact the inmate had with mental health clinicians was when he was placed in administrative segregation at ISP on 3/22/06, when he was offered a mental health screening.  However, he declined to participate in the screening which was attempted by a psych tech.  The inmate was never a participant in the MSHDS.

The inmate was a member of the MS-13 gang which was affiliated with the southern Hispanic prison gang (Sureno).  The inmate appeared to be programming well and had a job as a porter until March 2006.  On 3/21/06 the inmate was assaulted by two other Hispanic inmates and a different assault was occurring against another Hispanic inmate by two other Hispanic inmates simultaneously.  All six of the inmates were placed in administrative segregation pending an investigation and the inmate reportedly received a stab wound, but did not report known enemies or safety concerns.  The inmate subsequently reported to the correctional counselor that he had concerns about there possibly being an "R" suffix to his number, indicating that he was a sex offender based

on the oral copulation charge in his record.  At the time of his death, the correctional counselor (CC1) was continuing to work on clarifying this situation, and the inmate's note to the correctional counselor appeared to indicate these concerns were of great significance to him.  Just prior to his death on 4/29/06, an inmate neighbor reported to a correctional officer that this inmate had been crying in his cell.  This information was passed on to a psych tech.  The psych tech did see the inmate at the cell door but did not speak Spanish and had him brought to the administrative segregation committee room and requested an interpreter.  A Spanish-speaking officer translated and a sergeant also sat in on the interview by the psych tech.  During the interview, the inmate reported that other Surenos were calling him a rapist because of the oral copulation charge and he wanted the information removed from his paperwork.  The psych tech assessed the inmate, who admitted he had been crying and hitting the walls, but that he was "fine now" and wanted to do the rest of his time in a SHU.  He was told that he could not do that as he was in administrative segregation as a victim.  The inmate stated that he would inform staff if he felt suicidal or needed any mental health attention.  The psych tech did not write a note at the time of his interview but later wrote a note after the inmate's death dated 5/2/06, and stated that the inmate had said he wanted to do his time and "go to my country, Mexico."  The psych tech saw the inmate again on the following day which was 5/1/06 at cell front and reported that the inmate said he was okay and did not want to see a clinician.  The inmate did request seeing the CC1 and was told the CC1 would be informed that he wanted to see him.  It was also noted in the suicide report that the inmate had asked several officers during the day if the CC1 was in and at times was banging on his door.  The same inmate neighbor who had reported to the correctional officer that this inmate had been crying reported after the inmate's death that the inmate had been "cut loose" by the Surenos and the Border Brothers, and that other inmates were yelling at this inmate that he would be taken care of on the yard.  The inmate reported that other inmates had struck him three times, asking about his paperwork and stated that he had suffered an injustice in prison in the letters that he had written to his family and significant other.

The suicide report identified two problems, with recommendations, as follows:

Problem 1:  There were multiple failures in the emergency response that may have contributed to the loss of life:

- The correctional officer who discovered the inmate hanging should have immediately hit his alarm.
- The noose should have been cut from around the inmate's neck at the same time that he was cut down to open the airway.
- CPR should have been initiated at the cell by the correctional officers saving many minutes of precious time.
- MTA should have taken charge of the emergency response when she arrived on the scene.
- Nursing staff in the TTA should have ordered correctional officers to assist with CPR.
- Staff should have known how to use the AED.

Recommendation:  Institution to conduct an investigation into the emergency response by custody.  Remedial training and practice drills are recommended for both custody and nursing staff.

Problem 2:  The psych tech did not document her interventions with Inmate N until after the suicide.  In her notes, she indicated the inmate told her he wanted to "go home to Mexico" when in fact he was from El Salvador.  This questions the accuracy of the psych tech's memory for the incident when she documented it two days later.

Recommendation:  The nursing supervisor is to take necessary corrective action to train the psych tech on the importance of timely and accurate documentation.

On 10/27/06 the Directors of the DCHCS and DAI issued a memorandum to ISP regarding the overdue quality improvement plan for suicide of Inmate N.  In that memorandum, the Directors reminded the institution of the 10/22/01 memorandum on new suicidal reporting and review policy, and the court order dated 6/13/02 in Coleman v. Schwarzenegger mandating that a copy of the implementation of follow-up suicide quality improvement plan be provided to the Special Master's experts within 180 days of the completed suicide.  They directed the institution to provide the quality improvement plan upon receipt of this memo to DCHCS.

On 2/27/07 the Directors of DCHCS and DAI provided a report on implementation of quality improvement plan for suicide of Inmate  N.  In their report, they include a memorandum dated 11/26/06 from the warden and health care services CMO from ISP that indicated that documentation was being provided regarding (1) referral and acceptance of internal affairs for allegations for the following with a list of a number of custody and clinical staff; (2) training of two medical staff on the use of the AED, and (3) training of psych techs about the importance of timely and accurate documentation in the unit health record.  They also included in-service training sign-in sheets for training provided to psych techs on 9/21/06, remedial training on the AED dated 9/21/06, and acceptance by internal affairs for review of this case dated 10/25/06.

**Findings:**  This inmate's death does not appear to have been foreseeable in that he did not report to mental health or custody staff any imminent SI or intent to harm himself.  He was interviewed by a psych tech based on referral from custody staff of the report of his crying in his cell, but according to the psych tech's note written after the inmate's death, the inmate reportedly denied any suicidal intent or thoughts of harming himself.  Of note, there was no SRA performed at the time of the psych tech's evaluation, and the psych tech reports a memory for the inmate saying that he was from Mexico rather than from El-Salvador which as the suicide reviewer opined raises questions about the accuracy of the psych tech's memory.  This inmate's death, however, may very well have been preventable, based largely on the grossly inadequate emergency response by both custody and medical staff.  The failure of custody staff to initiate CPR promptly and to engage in a cell extraction and other security measures, rather than cutting the inmate down and starting CPR, was inexcusable.  Further, the very long delay in removing the noose from the inmate's neck (approximately 27 minutes) very likely made any efforts at

CPR inadequate as the inmate was not receiving proper ventilation. Thirdly, the correctional officer' refusal to assist in CPR when medical staff were tiring is another gross failure on the part of custody staff. Lastly, the failure of medical staff to know how to effective utilize the AED, which based on several indications to shock the inmate implies that the inmate may have been salvageable with proper emergency procedures, is a significant deviation from medical practice and the standard of care.

In addition to the deficiencies and performance by ISP staff, the refusal of the ambulance paramedics to transport the inmate because he was "unresponsive" and the emergency room physician's refusal to sign a death certificate when he was reportedly the physician who pronounced the inmate dead should be matters pursued by CDCR with these particular health care providers. The recommendations from DCHCS and the responses from ISP do not address these latter issues in any way in the documents provided.


## 15. Inmate O

Brief History: This inmate was a 40-year-old Hispanic female who committed suicide by hanging on 5/1/06 in the special housing unit/administrative segregation unit at the California Institution for Women (CIW). The inmate was a part of the MHSDS receiving EOP level of care, and was the sole occupant of her cell at the time of her death. The inmate entered the CDCR for her first term via the Central California Women's Facility (CCWF) on 8/9/05. She was sentenced to two years to be served in the CDCR for violating probation requirements that included a restraining order and that she participate in a residential drug treatment program based on her conviction on 12/12/04 of possession of a controlled substance for which she had received a two year sentence that was converted to probation.

The inmate was discovered on 5/1/06 at approximately 9:50 p.m. by a first watch officer assigned to the special housing unit which is the administrative segregation unit at CIW. The inmate was the sole occupant of the cell and was observed by the officer hanging by a sheet that was attached to the air vent on the side wall of the cell and to her neck. The officer activated his personal alarm device and two other officers responded to the inmate's cell. The control officer passed the cut down scissors to the first officer who had responded, and, as indicated in the Incident Report, The three officers made an emergency entrance into the cell and one of the officers utilized the cut down scissors to remove the noose. The officers lowered the inmate to the ground and utilizing universal precautions, began giving CPR to the inmate. One officer began chest compressions while another officer began ventilation with the ambu bag. The third officer continued to check the inmate for a pulse and respiration, and a lieutenant on-site notified central control for the need for an ambulance. The OHU medical staff arrived and a MTA took over chest compressions, and an RN took over ventilation with the ambu bag. The inmate was secured to a gurney and transported to the OHU where the American Medical Response ambulance arrived and assumed emergency treatment. At 10:20 p.m. the American Medical Response staff informed the OHU medical staff that the inmate was pronounced deceased by telephone by a doctor at Chino Valley Medical Center, and all medical treatment stopped. An autopsy report was provided by the San Bernardino

73

County Sheriff's Department and stated that an autopsy was performed on 5/3/06. The cause of death was stated as hanging (minutes) and the manner of death as suicide. A toxicology report stated that no alcohol or illicit substances were found in the specimens tested. However, lab specimens did indicate carbamazapine and carbamazapine epoxide. The carbamazapine blood level was 7.8 mg/L. The records indicated that a family member contacted the San Bernardino County Sheriff's Department, Coroner's Division, and requested that an examination for rape be done. A Sex Offense Kit document dated 5/3/06 by the San Bernardino County Sheriff's Department Scientific Investigations Division showed no abnormal findings as a preliminary report. Final results of the examination were pending and not provided by the time of this review.

The suicide report contained the inmate's criminal history and indicated that she was first arrested in 1999 at age 34 for possession of a controlled substance. There is no known juvenile criminal history and her adult history included essentially arrests and convictions for drug related offenses. The inmate's instant offense involved her being arrested while under the influence of methamphetamine and possession of methamphetamine in a glass pipe, for which she received a three year sentence for possession of a controlled substance. She was granted supervised probation with conditions of her participating in a residential drug treatment program and a restraining order that she was not to be involved with her husband and four children. On 5/8/05 she was arrested for trespassing during an attempt to see her family, and on 5/17/05 she was arrested on a warrant for failure to appear on felony charges. On 7/28/05, she was subsequently sentenced to two years to be served in the CDCR. After she was admitted to CCWF on 8/9/05, she remained there until 10/25/05 when she was transferred to CIW where she remained until her death. Her earliest possible release date was 6/6/06, approximately five weeks after her death.

Admission health screening at CCWF on 8/9/05 indicated the inmate was currently under treatment for Bipolar Disorder and receiving Risperdal and Depakote. The RC mental health assessment also stated that the inmate had been receiving treatment for Bipolar Disorder since 1998, that she had been hospitalized three times in 2004, and had five suicide attempts by overdosing. This was in contrast to the initial health screening in which she did not report any history of suicidal behavior or hospitalization. The mental health assessment also recorded the inmate stating that she "took 40 pills so I could get singled cell." Her diagnoses were Bipolar I Disorder and Amphetamine Dependence with a GAF of 68. The inmate was placed at the 3CMS level of care on 8/12/05 and was prescribed Risperdal and Depakote. The MARs indicated that she took the Risperdal and Depakote for approximately three days, and then had a series of refusals, refusing each from approximately 8/14 through 8/22 when they were both discontinued. The inmate signed a refusal form for "any psychiatric medication including Depakote and Risperdal" on 10/19/05. The inmate also reported that she had been using methamphetamine for over twenty years during the RC assessment. She did not appear to have had a treatment plan completed while she was at CCWF.

On 10/25/05, she was transferred from CCWF to CIW. An initial health screening indicated "no" answers to all questions, although with regard to the question of having ever been treated for mental illness, it was noted "bipolar (denies)." She was admitted to

the OHU on suicide precautions with video monitoring, after she was discovered walking near the mental health trailer area and refusing to follow directions or acknowledging instructions from the correctional officer. The inmate reported, "I am very angry. I lost my brother Wednesday," and elaborated she had lost three family members in seven months. She was described as agitated, abrupt and refusing offers for psychiatric services; however she was very verbal about the need for chaplain services. She was also prescribed Ativan, Risperdal and Depakote; the Depakote and Risperdal were discontinued on 10/29/05 and the Ativan was discontinued on 10/31/05. She was diagnosed with Bereavement and history of Bipolar Disorder. The SRA was done on 10/31/05 which indicated the inmate denied SI and was refusing medication. At discharge, the inmate was prescribed Benadryl for five days for sleep.

On 10/31/05 she also received a condensed mental health assessment and treatment setting transfer that made reference to the inmate denying her history of mental health treatment, psychiatric hospitalizations, and attempted overdoses. The inmate reported that she was doing fine, did not want medications and wanted removal from the MHSDS. A treatment plan completed that same day indicated that her diagnosis was Mood Disorder NOS secondary to Amphetamine Dependence and Alcohol Dependence. She remained at the 3CMS level of care. Her case manager saw her on 11/3/05, reporting a diagnosis of Bipolar Disorder NOS. The inmate denied current suicidality but acknowledged her five previous suicide attempts by overdosing. She also denied that she had been at the 3CMS level of care at CCWF and stated she did not need any medication. Of note, the inmate reported that during mania she would become "rageful."

The inmate was next seen by a psychologist on 11/7/05 after a correctional officer phone referral. The psychologist noted "no chart found" and saw the inmate who was handcuffed at the time by the correctional officer who stated that she had been verbally hostile, and that although staff understood she had just loss her brother, they "can not just leave her alone due to prison rules." The inmate reported that she didn't want to talk about the loss of her brother, did not want to take medications, and that her brother had overdosed on drugs. The inmate denied suicidal and homicidal ideation as well as auditory and visual hallucinations, but also denied a history of suicide attempts and history of mental health treatment. The psychologist noted that the inmate was "little guarded and angry" but that she was able to "contract for safety." The psychologist also noted the inmate "also appears depressed" with a plan to have follow-up with her case manager. Later that day, the inmate was seen in medical because she had punched her locker with a closed fist, reporting, "I just punched the locker one time. I went into the office to ask for psychiatric help." She was sent to an outside hospital for examination of her hand and the assessment was that she had contusions and superficial lacerations with recommendations for an ace wrap, cold packs and antibiotics with Motrin for pain.

On 11/9/05, she was referred to mental health by an MTA because of refusal to take medications; however, these medications had been discontinued while she was in the OHU. It appeared from the records that she continued to be offered medications and continued to refuse them because they had been discontinued on 10/29 and 10/31. The inmate was seen by a psychiatrist on 11/16/05 reporting that she had been in the OHU the

week before, but "now feels tired of getting into trouble and needs help with her emotions." She did sign a consent for Seroquel, and an order was written for her to begin Seroquel on 11/16/05.

She was seen in the OHU again on 11/21/05 and stated "I went to the lieutenant and asked him a question. This is what happens when I ask a question." However, there was no further description of the question or the reason for referral to the OHU. Her next mental health contact was on 11/23/05 when she stated to the same psychiatrist who prescribed the Seroquel, "I feel like I don't care anymore." The psychiatrist reported that she stated she felt frustrated, hopeless, and helpless. The psychiatrist continued the diagnosis of Bipolar Disorder and increased her Seroquel to 500 mgs daily. There did not appear to have been an SRA conducted at the time that the inmate made these statements to the psychiatrist.

Her next psychiatric appointment was 1/4/06 when she was seen by a staff psychiatrist who noted she admitted skipping her medication sometimes. The MAR for January noted "cheeking" at the top of the page. The back of the MAR indicated that the inmate had refused medication on at least seven occasions in January. The February MAR had written at the top of the page "crushed," but also revealed multiple refusals of medication until the morning Seroquel was discontinued on 2/9/06, such that her dosage was reduced to 300 mgs daily. Her medication adherence was again spotty in March and April, with the April MAR having another notation at the top of the page, "checking meds!!!." A second MAR for April had three medications written on one line including Haldol, Ativan and Benadryl on 4/25/06, all written "IM Q 4H max four dose times five days."

The inmate's housing changed in January 2006 when she was admitted to the substance abuse program. During this period, she once again began non adherence to medications and a formal refusal of medications on 2/6/06, with her morning Seroquel subsequently being discontinued, as noted above. She was seen by a case manager on 2/27/06 who noted she had a stable mood and that her parole was anticipated for June 2006. The psychologist recommended that a social work case manager be assigned to the inmate to assist with discharge planning.

On 4/14/06 the inmate was seen in the OHU for again punching her locker and stated "I punched my locker, I'm upset because the cops had been fucking with me for the last couple of days." It was suspected that she may have fractured her right hand and she was sent to an outside hospital. X-rays were negative for fracture and it was determined she had a superficial cut and received two sutures. The records indicate the inmate removed her sutures herself against medical advice. The inmate was placed in the OHU on 4/16/06, although there was no documentation as to why she was placed there. On 4/17/06 she was seen by a psychiatrist who noted that her IDTT was conducted. The inmate was described as having multiple psychosocial stressors including three RVRs and getting kicked out of the substance abuse program. She was described as agitated and irritable but denying any active suicidal or homicidal ideation. She was described as cooperative, but angry and preoccupied with medication. Her diagnosis was Mood Disorder NOS and she was to be discharged with a five-day step-down. The SRA of that

day indicated very few risk factors but included a history of substance abuse, history of mental illness, history of poor impulse control, and recent SI. The SRA did not record previous suicide attempts or previous SI. It also did not record any recent suicide attempt or self-injury despite her punching the locker on at least two occasions. There was no evaluation of risk indicated on the SRA and the inmate was discharged to a lower level of care. Although no recent suicide attempt or self-injury was recorded, there were comments regarding the inmate's injury to her right hand on 4/14/06, and that she had been placed in the OHU on 4/16/06 because "she claimed that she couldn't be accountable for what she might do if she didn't get her meds."

The step down monitoring, had it been for five days, would have gone from 4/18/06 to 4/22/06. However, it actually went from 4/18/06 to 4/25/06. During this time the inmate was described as irritable, depressed, having no appetite, "overwhelmed" and "angry." By 4/25/06 the inmate was described as "not sleeping, mildly depressed, anxious and angry." The inmate reported she would not "take myself out" and elaborated that she liked to punch walls. She reported that she was punching the wall that morning, and again denied that she would kill herself or had any SI. Later that day the inmate was placed in the OHU once again on suicide precautions with video monitoring with a provisional diagnosis of "Psychosis NOS." This inmate, according to the nursing note of 4/26/06, was solely on video monitoring, in violation of CDCR policy. On this date the doctor's order included Ativan, Haldol and Benadryl for five days, written on one order line in the MAR. An SRA was completed on 4/25/06 and stated the source of the information was the inmate only. It indicated that the only risk factors were "ethnicity: White," and "history of violence." There were no protective factors identified. There was no evaluation or risk based on the factors and no recommended plan, but comments stating the inmate "denies S/I but is punching walls. R hand swollen. Inmate took stitches out herself." The SRA did not include review of UHR or staff interview, and did not make any reference to the risk factors previously identified on other SRAs.

An OHU discharge note dated 4/26/06 by a psychiatrist stated that the inmate was recently in the OHU and on step-down to the yard. The psychiatrist reported he was told that over the weekend, the inmate was starting to be more angry and agitated and had been punching walls. It appeared that the inmate was seen in the OHU because the psychiatrist wrote, "the inmate refused to be placed on suicide precautions in suicidal gown." On mental status, the psychiatrist described the inmate as never suicidal, but that she was frustrated and did not want to return to the dorm. The plan was for the inmate to be transferred to the special care unit and placed at the EOP level of care with a five-day step-down.

A final SRA was completed on the inmate on 4/26/06 by a psychologist who reported the inmate denied any history of suicide ideation or attempts, stating "inmate was punching holes in walls – was housed on the yard, severe anger issues, no history of suicide." This psychologist indicated that the UHR was a source of information, but did not note any other significant risk factors including the inmate's first prison term. As with the other SRAs, there was no evaluation of risk noted on this SRA.

Five-day step-down was conducted from 4/27/06 to 5/1/06 and indicated that the inmate was mildly depressed, had racing thoughts/agitation, decreased appetite, history of violence, labile mood as well as a history of taking Depakote, but did not want to take it because of weight gain. She was also described as "unpredictable, poor self-control, blunt, bizarre behavior" and the inmate reported she thought her celly had taken some of her personal things. On 4/29/06 the clinician reported "she has been up since 3:00 a.m. kicking the floor and stomping at her celly." The psych tech also reported on 4/29/06 the inmate stated "to this writer that she is going to answer all questions no so she can get off of step down and go back to the yard." During her last two days of step down, 4/30/06 and 5/1/06, she reported she was irritable, and had not been sleeping for the past three days and nights. On 5/1/06 at 8:45 a.m., the last day of her step-down, she reported she was worried about her family outside, but continued to deny suicidal thoughts, suicidal intent and suicide plan. During this time period, the inmate was seen by a psychologist on 4/27/06, after referral by a psych tech, due to agitation. The psychologist reported the inmate stated she needed meds "to calm me down" and requested a prn due to her agitation. The following day, 4/28/06, the inmate was seen by a psychiatrist. In his 4/28/06 note, the psychiatrist stated that the inmate was referred by a psychologist with concerns for anger issues. He reported that the inmate reported having an anger problem, and further described that "she is loosing control and wants help." He diagnosed Bipolar Disorder Type I Mania Moderate and prescribed Tegretol and Seroquel.

The inmate was seen at 8:45 a.m. on 5/1/06 for her fifth day of step down monitoring. The notations by staff are reflected above. The inmate received an RVR on 5/1/06 because she went to an EOP group meeting to which she was not assigned. She was described by custody as actively aggressive, being disrespectful, and being "loud, yelling, cursing, disruptive and making a spectacle about not wanting to be here." The inmate worker notified custody of what was going on, and when the custody staff escorted the inmate out of the room, the inmate became disruptive, refusing to leave. While walking down the hallway, she intentionally rammed her shoulder into the chest of the inmate worker who had reported her behavior. This resulted in her receiving a RVR for battery on an inmate and was evidence of her escalating behavior. She was housed in administrative segregation based on this behavior. She was reportedly administered Tegretol and Seroquel at approximately 8:00 p.m. on 5/1/06, which was her first day of being back on medications since approximately 4/16/06. She was discovered at approximately 9:50 p.m. on 5/1/06 hanging in her cell and did not recover.

The suicide report identified three problems, and recommendations, as follows:

> Problem 1: Inmate exhibited ongoing signs and symptoms of irritability, rage, depression, lability, and indication of danger to self and others, which did not remit with her prescribed medications. Furthermore, there was no documented response to her non-compliance by a psychiatry staff, in terms of considering alternative forms of medication administration such as crushed, dissolvable, injectable or DOT.

Recommendation:  Psychiatry staff as a group shall conduct a case review of this inmate to consider how care could have been improved.  Forward conclusions to the PPEC for final review.

Problem 2:  A physician's order written upon discharge from OHU on 4/17/06, was noted but never filled, and inmate was without medication (except for a prn) for the last two weeks of her life.
Recommendation:  Medication continuity from OHU to the yard must be audited for one month.  Compare discharge orders to pharmacy printouts and MARs on the yard.  Medication for discharged inmates should be available on yard by the next day.  (Suggestion:  Audit can be clinician in conjunction with five-day follow-ups).
If results are poor, charter a quality improvement team (QIT) to include pharmacy staff to analyze the cause of the problem and develop a recommendation.

Problem 3:  Several problems were noted with the SRAs completed in April 2006.  On 4/17/06 and 4/26/06, the clinicians indicated that the UHR was reviewed.  However, previously documented information regarding past suicide attempts was not noted.  On 4/25/06, the SRA was based entirely on inmate interview and missed numerous significant risk factors, to the point of being fairly useless.  None of these SRAs was accompanied by a corresponding MH-3, as trained in mandatory state-wide training in April 2005.
Recommendation:  Supervising psychologist shall audit a representative sample (at least ten percent or minimum of two per clinician) of SRAs conducted by all clinicians for one month.  Ensure that at least two sources of information are used and the checklist represents data available.  Ensure that a conclusion indicating level of risk and rationale are documented on corresponding note.  Also, be sure to use most current version of form which includes check boxes for level of risk.

On 2/27/07, the Directors of the DCHCS and DAI provided a report on implementation of quality improvement plan for suicide of Inmate O.  This report included a memorandum by the staff at CIW in which they addressed the problems and recommendations from the suicide report.  With regard to Problem 1, the psychiatry staff, including civil service and registry, met on 10/26/06 and discussed the diagnoses, poor documentation, inappropriateness of pharmacological selection, symptom targeting, and dosing strategies.  The staff also reviewed department policy regarding missed dosages of medications and follow-up with the psychiatrist, and the various ways inmates conceal medications.  The staff also discussed alternative routes of administration, basic fundamentals of adequate documentation of clinical encounters, and assessment and treatment strategies.  The response indicated that only the suicide report was available, as this inmate's chart was not, and that, based on review of the suicide report, the Chief Psychiatrist did not believe that there was any reason to refer any psychiatrist to the PPEC.  It did not appear that these conclusions were reported to the PPEC for final review as per the suicide report recommendations.

With regard to Problem 2, the chief psychiatrist decided to skip the audit and to form a QIT to address a longstanding and frustrating problem at CIW with regard to medication continuity. During the interim between the suicide report dated 8/3/06 and the response dated 11/14/06, the OHU had closed and the CTC had opened. The QIT met in September 2006 and identified three areas of focus including (1) equipment, (2) connectivity, and (3) pharmacy workload, and a fourth area identified in subsequent meetings as (4) intra-institutional moves. The results of the QIT were to make recommendations for repairing broken fax machines and installing copiers and fax machines in areas where they were not currently installed, look into a way to install needed computer connectivity, propose to headquarters the need for a division of labor between the main pharmacy and the CTC pharmacy, and recognize the need for additional staffing and enforce existing policy and/or establish a LPN position to address the issues of intra-institutional moves. The QIT work was anticipated to be concluded by January 2007, and a report with recommendations was to be submitted after that time. There was no additional report provided in the documents submitted regarding Problem 2.

With regard to Problem 3, an audit was conducted between 9/5/06 and 10/3/06 which included five items on the SRAs. Compliance rates for these five items ranged from 25 percent to 75 percent. For the 16 SRAs reviewed, the 25 percent compliance was for (1) the rationale for the level of risk documented, and the 35 percent compliance was for (2) indicating that the sources of information were checked. The other three items were (3) the current level of care and housing checked, (4) use of at least two sources of information, and (5) check of a conclusionary level of risk. Given the results, in-service education was provided to all staff on 10/18/06. There was no documentation provided that there was any additional audit conducted after the training was done.

**Findings:** This inmate's death appeared to have been both foreseeable and preventable. The suicide report clearly identified the breakdowns in the overall treatment and management of this inmate particularly with regard to her escalating behavior, with agitation, anger, irritability and wall-punching, and decompensating mental status with increasing periods of depression, hopelessness, helplessness, and frustration. Her non-adherence with medication was also clearly documented but not responded to in an appropriate manner by clinical staff. In addition, CIW placed this inmate solely on video monitoring after the prohibition of the use of this practice. On the day of her suicide, she also was completing a five-day follow-up, and during the five days, she had demonstrated that she had not stabilized and was continuing to have the very same issues that had resulted in previous admissions to crisis beds. Further, on the day of her suicide, she disrupted a group in which she was not a scheduled participant, committed a battery against another inmate, and appeared to have been placed in administrative segregation without the proper mental health clearance. The suicide report very clearly identified the deficiencies in the SRAs provided by CIW staff. These deficiencies were again demonstrated based on the audit of SRAs done in response to this inmate's suicide. Not only did the UHR have very important information regarding this inmate's Bipolar Disorder and her decompensations when not taking medication, but it also appeared the staff at CIW simply wrote off her behavior as secondary to her being "angry." Staff

failed to recognize that she was being grossly under-treated in terms of medication management and, despite her previously noted risk factors, either ignored or did not incorporate these risk factors into their continuing assessments of her risk of harm to self and others. The records indicated that because the inmate denied SI, she was therefore not at risk, despite the numerous factors that, had they been properly reviewed, would have indicated a substantial to high risk for suicide. The responses by CIW to the suicide report recommendations stated that there was no reason to refer any psychiatrist to the PPEC despite these deficiencies, and that training on existing policy would be done regarding SRAs. There was no documentation that any additional corrective actions were demanded by DCHCS in response to these conclusions by the staff at CIW.

## 16. Inmate P

Brief History: This inmate was a 29-year-old Hispanic female who committed suicide by hanging on 5/8/06 in the RC at Valley State Prison for Women (VSPW). The inmate was double-celled but alone in her cell at the time of her death. She was not a participant in the MHSDS. The inmate returned to VSPW on 3/23/06 on a parole violation. She had initially been admitted to the CDCR on 7/7/05 via the CCWF RC, transferred to VSPW on 8/23/05, and paroled on 1/9/06.

The inmate was discovered on 5/8/06 at approximately 3:36 p.m. during a unit recall by a correctional officer who observed the inmate sitting in her assigned cell at the end of the lower bunk, hunched over forward and unresponsive. The officer observed a white sheet wrapped around the inmate's neck with the other end tied to the end of the top bunk. The officer immediately activated his personal alarm device and an additional officer responded to the cell. Both officers entered the cell and one officer began to untie the two knots in the sheet near the inmate's neck. Once the knots were untied, the two correctional officers laid the inmate on her back on the cell floor and attempted to find a pulse. A third correctional officer arrived and based on there being no pulse, CPR was begun by two officers. At approximately 3:38 p.m., an MTA and RN arrived and relieved the officers performing CPR. The MTA placed the defibrillator on the inmate's chest, attempting to revive the inmate, but she did not respond. CPR was continued, and at approximately 3:40 p.m., an ambulance service and an Institutional Investigative Services' lieutenant were contacted. The RN and MTA continued to administer CPR. By 3:54 p.m. the ambulance and ISU staff arrived. At approximately 3:56 p.m. a paramedic pronounced the inmate dead. An autopsy report was provided by the Sheriff-Coroner for the County of Madera and indicated the autopsy was performed on 5/10/06. The cause of death was determined to be hanging; however, no manner of death was specified. Toxicology report indicated that no alcohol or common acidic, neutral or basic drugs were detected. This inmate's cellmate had been let out of her cell for a medical ducat at approximately 3:00 p.m. on the day of this inmate's death.

The suicide report contained the inmate's criminal history and described her commitment offense as being a parole violator with a new term of 16 months. This new term was secondary to her having been arrested for possession of a controlled substance and being under the influence, approximately two and one-half months after she had been placed on

parole.  The inmate appeared to have had a juvenile arrest at age 13 for battery. However, there was no disposition available in the records.  She was also arrested at age 26 for driving without a license.  After this arrest, however, she appeared to have several arrests for possession of controlled substance and paraphernalia, unauthorized entry of a non-commercial dwelling, petty theft, contempt of court, theft, disobeying a court order, possession of narcotics, and battery, all resulting in her being placed in jail or on probation.  In April 2005, she was arrested for evading a police officer and reckless driving which involved a high speed pursuit by the officers.  She received a sentence of 16 months for disregard for public safety and possession of a controlled substance.  She subsequently entered the CDCR on 7/7/05 and was paroled on 1/9/06.  She returned to VSPW on 3/23/06.

A confidential medical/mental health transfer summary from the Sheriff's Department dated 7/7/05 indicated the inmate had a diagnosis of Schizophrenia and dental problems. While in the jail she had been prescribed Seroquel as part of her mental health treatment. The initial health screening done on 7/7/05 when she arrived at CCWF also indicated Schizophrenia and tooth infection, and that she was receiving Seroquel.  Her RC mental health evaluation of 7/11/05 stated that she had been hospitalized twice, had been treated with Seroquel, Depakote, Zoloft and Risperdal, and recorded that the inmate stated "I started hearing voices two years."  She elaborated, "some times voices tell me to hurt people."  She was diagnosed with Schizophrenia, Paranoid Type with a GAF score of 60 and placed at the 3CMS level of care.

She was seen by a psychiatrist on 7/22 and 7/29/05 and was described as having difficulty sleeping, depressed mood, and crying.  At that time she had been placed on Trazodone, which was discontinued, and Remeron was added to her Seroquel.

The inmate was transferred to VSPW on 8/23/05.  An initial health screening indicated that she was suffering from Depression and taking Risperdal, Vistaril and Remeron.  On 8/29/05 the inmate received a crisis referral from a psychologist, stating the inmate was pregnant and that the baby's father had been killed.  It was also reported that the inmate refused a pass to the infirmary.  On 9/7/05 a condensed mental health assessment and treatment setting transfer were both completed and indicated the inmate seemed confused and not forthcoming with information.  She confirmed her two past psychiatric hospitalizations and elaborated that both occurred following the death of a child.  The inmate was also noted to deny any drug and alcohol history, denied medical issues, and "appears to be avoiding her history of auditory hallucinations."  She was diagnosed with Psychotic Disorder NOS.  The treatment plan of 9/13/05 contained minimal information and referred the reader to the condensed assessment dated 9/7/05.  This treatment plan essentially had two dates, the signature of the psychologist, and identification of the target problem as hallucinations.  No diagnosis was included on the treatment plan.  On 9/19/05 she was seen by a psychiatrist who reported she was cooperative with the interview and pleasant, her speech was clear, she was calm and her mood euthymic with broad affect.  The psychiatrist reported the inmate stated that she felt she was doing well so "she quit psych meds."  He further reported the inmate presented as stable with no

psychiatric concerns.  His assessment stated that she was in remission of psychiatric symptoms and that she agreed to see him for follow-up in two months.

The inmate was seen by a case manager for follow-up on 12/5/05, but the inmate stated that she did not know why she was being seen.  The progress notes stated the diagnosis continued to be Psychotic Disorder NOS, and the inmate denied history of visual and auditory hallucinations and history of suicide attempts or thoughts.  An SRA was completed on that same date and stated the sources of information were the inmate and the UHR.  The only risk factor documented was "first prison term."  It was noted the inmate stated she had never attempted suicide or had suicidal thoughts, and the evaluation of risk was "no apparent significant risk."  The inmate paroled on 1/9/06.

When the inmate returned to VSPW on 3/23/06 an initial health screening indicated "no" answers to all questions with the exception of history of Schizophrenia "three or four years ago."  The inmate however became unresponsive during the interview and received an immediate referral to mental health.  The emergency care flow sheet indicated the inmate was having difficulty expressing herself and answering questions, and was easily distracted.  The assessment was that the inmate had an alteration in thought processes.  She was placed in the OHU for psychiatric observation.  She was given a safety blanket and gown and prescribed Risperdal, Remeron and Vistaril.  She was seen by a psychiatrist who stated she was cooperative in answering a few questions but "drifts off and appears to be preoccupied with internal stimuli."  His impression was Psychotic Disorder NOS.  She was seen by a psychologist on 3/24/06.  The inmate reported, "I can think better today and talk."  The psychologist noted the inmate appeared to be fatigued but cooperative, and reported that she had not taken her medications for a while.  The inmate denied suicidal and homicidal ideation as well as auditory and visual hallucinations.  It was decided to discharge her from the safety cell and place her on five-day follow-up.  The psychiatrist also saw her on that same day and decided to reduce her Risperdal, discontinue her Remeron, and change the Vistaril to Benadryl.

The inmate did receive five-day follow-up from 3/24/06 to 3/28/06, and continued to deny suicidal or homicidal ideation.  On 4/5/06 she saw a psychiatrist who reported the inmate stated that she "signed off" the meds two days ago.  The inmate reported that she did not like the way the medications made her feel, and denied voices.  The psychiatrist noted the chart was not available and that he did not want to discontinue her medications without review of the chart.  The same psychiatrist saw the inmate one week later on 4/12/06 and again noted that no chart was available.  Despite the chart being unavailable, the psychiatrist noted the inmate, "does seem adequately stable today" and continues that she was in no distress, was coherent and not highly verbal, but it was clear that she did not want to continue medications.  She continued that the inmate had no SI and denied voices.  Her assessment was Anxiety Disorder NOS currently, and she discontinued the inmate's Risperdal and Benadryl.

An SRA was conducted on 4/4/06.  However, the reason for this assessment was not documented.  The source of information was the UHR and the inmate, and the only risk or protective factor that was documented was "hopelessness or helplessness."  The

evaluation of risk was determined to be "no apparent significant risk," and there was no recommendation/plan. A RC mental health evaluation was also completed on 4/4/06 and indicated the inmate had no prior psychiatric hospitalizations and no psychotropic medications in the last two years, and her mental status was all within normal limits with the exception of mild depression. The diagnosis was Depressive Disorder NOS and her GAF was estimated at 70. It was noted that she refused a medication evaluation. Based on the psychologist's MH-7 mental health evaluation of 4/4/06 and the SRA, the inmate was cleared for general population. The suicide report referred to the reviewer and interviewing this psychologist. It concluded that it was clear that the psychologist had not reviewed the UHR, that the psychologist appeared "surprised" to learn the inmate had been on suicide observation just 11 days prior to his evaluation, and that she had been placed at the 3CMS level of care and was prescribed medication.

The psychiatric interview of 4/12/06 was the last documented mental health contact in the records. At that time, the inmate had been placed at the 3CMS level of care when she was admitted to the OHU for one day from 3/23/ to 3/24/06, but she had been cleared for general population and no further mental health services by the psychologist who performed the RC mental health evaluation on 4/4/06. All medications were discontinued at the inmate's request on 4/12/06.

The suicide report referred to the inmate having punched another inmate on 4/10/06, reporting that they had had "a small conflict." However, an interview with the other inmate indicated that she did not know this inmate nor had she had any conflict with her. A referral was submitted by custody to mental health on 5/6/06, stating the inmate was "disoriented, can't follow simple orders." This referral was received by mental health on the following Monday, 5/8/06, and the inmate was scheduled for an appointment with a clinician for 5/9/06. The inmate hanged herself on 5/8/06. The suicide report also referred to the reviewer having interviewed other inmates, including this inmate's cellmate. According to the reviewer, the cellmate stated that the inmate was "crazy" and that she had tried to tell custody staff "but was brushed off."

 The suicide report identified three problems, and recommendations, as follows:

> Problem 1: The contract psychologist who completed the MH-7 dated 4/4/06 did not appear to understand the overall process.
> Recommendation: (a) Conduct an immediate review of all inmates still at VSPW that were evaluated by this psychologist to identify any others who may have been inappropriately removed from the MHSDS. (b) Refer this psychologist for a pattern of practice review to the local PPEC.

> Problem 2: This inmate was removed from the MHSDS by a placement chrono that indicated "GP" (general population). Once an inmate has been placed in the MHSDS, she can not be removed without a mental health removal chrono. The inmate should have been kept in the 3CMS for at least six months per program guidelines.

Recommendation:  Ensure the data entry staff is trained on the requirements for removal from the MHSDS.  If they receive a placement chrono indicating "GP" (general population) for an inmate who is already in the MHSDS, they should be trained to notify the supervising psychologist.

Problem 3:  A mental health referral submitted on a Saturday was scheduled for the following Tuesday.  Evidently there was no mechanism at VSPW for triaging MH referrals to determine the level of urgency.  The comment "disoriented, can't follow simple orders" suggested a level of urgency that was not recognized.
Recommendation:  CDCR policy required all medical referrals, including those for mental health, to be processed the same day.  Staff must be available to triage the inmate referred, to determine the urgency of referral.  The VSPW must include this requirement in the local operating procedure (LOP), and train all nursing staff.

On 12/14/06 and 2/27/07, the Directors of the DCHCS and DAI issued what, for the most part, were identical reports on implementation of the quality improvement plan for suicide of Inmate P.  The only difference between the two reports was that the report of 2/27/07 had a memorandum dated 11/22/06 by the warden and chief psychologist at VSPW providing an overview of the actions taken in response to the suicide report.  This overview stated that, with regard to Problem 1, a review was conducted of patients removed this year from the MHSDS and otherwise cleared, and the committee examined this work using the quality management model.  It also stated that several local management decisions were made regarding staffing at the RC after these reviews.  More detail was provided in the documents submitted indicating that 144 patients had been cleared of mental illness on the MH-7 form and were reviewed, and several memoranda regarding training on mental health removals and chronos for various levels of staff were included.  The results of the review of the 144 patients removed were not included.  With regard to the referral of the psychologist for pattern of practice review by the local PPEC, the response from VSPW was that the psychologist never viewed the training video by Dr. ___ and was instructed to do so.  A training meeting was held on 5/17/06 and 7/11/06.  The senior psychologist noted that it had been brought to his attention that the same psychologist had removed a patient who had been at the EOP level of care on a previous term to general population status on 9/9/06 after consultation with experienced staff.  Determination was that the 3CMS level of care may have been more appropriate.  The psychologist in question was noted to have received a full day of suicide prevention training via the video by Dr. _____, and had been counseled on mental health removals, but would be off for one week for medical reasons and would complete his contract assignment at VSPW by the end of the month (memo dated 10/9/06).

With regard to Problem 2, the facility response stated that "all mental health staff were already aware not to remove patients from the MHSDS without a 128-C removal chrono."  It was stated that this is more complicated in a RC, where MH-7 forms are used as a placement chrono rather than as a removal chrono, and staff who enter chronos have been trained to watch for this and notify supervisors.  There were additional memoranda on the training of staff at various levels and in-service training sheets documenting that

staff had attended training for these areas.  With regard to Problem 3, staff reported there was a review of the current urgent/emergent response operational procedure #10099, December 2005.  A revision to specifically include mental health procedures would be added with the December 2006 revision.  Additional training on the policy was being developed in a joint effort between mental health and custody.  This reviewer's analysis of the actual December 2005 LOP referenced above revealed that it did state that on weekends and holidays, the TTA RN shall review each mental health staff referral form and shall refer accordingly to a mental health clinician, medical officer of the day (MOD) or psychiatrist on call.  A memorandum dated 11/1/06 by the senior psychologist recommended that all mental health referrals on weekends and holidays should be reviewed by an RN stating, "all 128-B referrals would need to be carried to the RN on these days."

**Findings:**  This inmate's suicide did not appear to have been foreseeable, as she was not reporting SI or intent to custody or clinical staff, although post-death interviews with inmates indicated that some of them may have observed behavior that was unusual, depressed or bizarre, and at least by the cellmate, characterized as "crazy."  The cellmate indicated that she attempted to alert custody staff but was "brushed off."  This inmate's death did, however, appear to have been preventable.  The suicide reviewer identified serious problems with the performance of an individual psychologist and breakdowns in the process of completing assessments and referrals, including the removal of this inmate from the MHSDS in a manner that was absolutely contrary to CDCR policy.  The documentation by the psychologist who removed this inmate from the MHSDS indicated that they had reviewed the UHR, when in fact they had not.  Further, the SRA was seriously flawed and erroneous.  Lastly, the decision to remove the inmate from MHSDS without having knowledge that she had been on suicide precaution 11 days prior to being seen was clearly unacceptable.  The response of the local PPEC to provide training to the contract psychologist also appeared to be a grossly inadequate response.  Similarly, the psychiatrist who last saw this inmate for two appointments noted that she did so without the chart.  Curiously, in her first note, she indicated that she was reluctant to take the inmate off medications without the chart, but based on her face-to-face interview with the inmate one week later, she decided to discontinue all medications as per the inmate's request.  There was very clearly no recognition of the seriousness of this inmate's severe and persistent mental illness, nor of her deterioration in function and escalation to more aggressive behaviors towards others that had been clearly documented.  Finally, the referral from custody that came on a Saturday did not receive any triage, but was received by mental health on a Monday, and the inmate was scheduled to be seen the following day, even though the referral described her as "disoriented, can't follow simple orders."  Given that the referral was initiated on 5/6/06 and received two days later on 5/8/06, for mental health staff to allow more time to elapse and for her not to be evaluated until 5/9/06 was also inexplicable.  The responses by VSPW appeared to center around training staff on policies that were already in existence, and it appeared that no disciplinary actions were taken despite the recommendation for review by the PPEC from DCHCS.

**17. Inmate Q**

Brief History:  This inmate was a 44-year-old Caucasian male who committed suicide by hanging on 5/10/06 in general population at California State Prison Solano (CSP/Solano). The inmate was double-celled at the time, and his cellmate was present in the cell when he committed suicide.  The inmate was involved in the MHSDS at the 3CMS level of care.  The inmate entered the CDCR for the second time on 6/29/00 through the SQ RC. He was convicted of possession of a controlled substance and on a third strike conviction, he received a term of 25 years to life.

The inmate was discovered on 5/10/06 at approximately 3:44 p.m. when officers responded to a "man down" yell from the inmate's cell.  The "man down" call was initiated by his cellmate who stated, "I woke up and found my celly hanging."  The cellmate subsequently reported that he awoke and the "privacy sheet" had been pulled around the toilet by this inmate.  When the cellmate heard no sound, he pulled the curtain back and found this inmate hanging from the air vent in the cell.  The cellmate reported that he poked at this inmate several times, pulled him down, and yelled "man down." When the officers arrived, they ordered the cellmate to move to the rear of the cell and instructed the control booth officer to open the cell door.  When the cell door opened, the inmate fell fully to the ground.  White bedding from a bed sheet was wrapped around his neck area.  The inmate's head and right shoulder were noted to be purple in color.  An officer radioed a medical code over the institutional radio.  An MTA and another officer were the next to respond.  The MTA checked for vital signs while the officer informed central control that they had a "Code 3."  An RN arrived and applied the AED to this inmate's chest to check for cardio-conversion signs.  There were no signs of movement and no pulse was detected.  At 3:55 p.m. an officer called central control to request a Code 3 ambulance and, at approximately 4:05 p.m., a physician in the CMF Fire Department to assess the situation.  At approximately 4:08 p.m. the Vacaville Fire Department ambulance arrived, the noose was cut off the inmate's neck, and CPR was started.  At approximately 4:29 p.m. the inmate was pronounced dead by the outside Vaca Valley Hospital by a physician.  An autopsy was provided by the Solano County Sheriff/Coroner/Public Administrator's Office, stating that the autopsy was performed on 5/11/06 and determined the cause of death to be asphyxia due to hanging (minutes).  The toxicology report indicated Paroxetine was detected in the femoral blood sample at 0.51 mg/L (potentially toxic, greater than 0.3 mg/L).

The suicide report contained the inmate's criminal history.  It stated that he was first incarcerated on a charge of burglary and sentenced to five years in the Oregon State Correctional Institute; however, he only served from June 1981 to September 1982, when he was paroled.  Prior to that, he had been in the Army for approximately three months and received an honorable discharge.  The reasons for his early discharge were not available.  After his release from the Oregon Prison System, he reportedly began to use drugs and alcohol.  He was convicted in 1985 of driving under the influence in Washington State.  However, the disposition was not listed.  In May 1989, he was arrested again for burglary and stealing a credit card, and on 8/3/89 was sentenced to the CDCR as a civil addict with a four year term.  He entered the CDCR for his first term on 8/18/89 via the Northern RC and was transferred to the California Rehabilitation Center

(CRC) at the end of that month. He paroled from CRC in July 1990 and while on parole tested positive for drugs. However, his parole was not revoked and he discharged from that parole term in November 1992. The inmate appeared to have begun using methamphetamine again in 1998. He was arrested in January and March 1999 for drug-related offenses. He was arrested in August and October again for drug and theft charges as well as vehicle charges, and he attempted to escape from court in October 1999. He was sentenced on 6/7/00 under the three strikes law to 25 years to life, and re-entered the CDCR on 6/29/00 via the SQ RC.

The inmate's initial mental health screening at SQ was negative for any current mental health problems. However, he did report that he had been prescribed Mellaril for sleep while in the county jail. He was not placed in the MHSDS. Transfer screenings at the Substance Abuse Treatment Facility (SATF), and SVSP did not result in his receiving any mental health services, as he did not report mental health needs. He was transferred to CSP/Solano on 1/10/02 where he remained until his death on 5/10/06.

In April 2002, he sent an inmate health services request to mental health because of anxiety and concerns about his medical problems. The medical problems consisted of gastrointestinal problems that were subsequently diagnosed as Irritable Bowel Syndrome, and Hypertension. The inmate was seen by a clinician in April 2002 who determined that he did not require treatment. The inmate sent another inmate request form and was seen by a psychiatrist in June 2002 who diagnosed him with Panic Disorder and prescribed Paxil. In November 2002, the inmate was seen for a treatment plan by the IDTT and placed in the MHSDS at the 3CMS level of care. He had not been in the MHSDS prior to this review by the IDTT, despite his treatment with Paxil for several months. At this time he was diagnosed with Panic Disorder and Depression. However, he did not receive the mental health assessment or documented treatment plan. The inmate continued on Paxil through January 2003 and requested a change in medication because he believed that it was not helping him. He was placed on Zoloft, but approximately two weeks later, he reported that he wanted to be off Zoloft because of "side effects" and requested Klonopin. The inmate was offered Paxil; Klonopin was not prescribed at that time. The first documented treatment plan in the records reviewed was 3/28/03. There was also a mental health assessment completed at that time. The inmate remained at the 3CMS level of care and next saw a psychiatrist in June 2003, reporting chest pain, difficulty breathing, and nightmares such that anxiety was diagnosed and the inmate was again placed on Paxil as well as Benadryl for sleep. By October 2003, the inmate continued to report anxiety. A trial of Buspar was instituted, but was discontinued because he had stopped taking the medication. The inmate continued at the 3CMS level of care and, according to the suicide report, on 11/24/04 the IDTT met and removed the inmate from the MHSDS. There was no documentation in the UHR of this meeting. However, the suicide report referenced the meeting having been noted in the MHTS.

The records also indicated that during 2004, the inmate began taking Methadone and Neurontin and had a number of epidural injections for pain in his neck. After the first cervical epidural injection in September 2004, he received additional epidural injections

and reported some relief from his pain.  An MRI showed diffuse generative cervical disc disease on 6/15/05.

The inmate filed 602s as well as grievances, and requested copies of his MRIs from medical staff.  He informed them that he was sending copies of his requests to his attorneys, the Prison Law Office, and to the Attorney General's office (examples of his concerns regarding his medical conditions and treatment).  He also received Tylenol #3 and Toidel.  The inmate demonstrated a pattern of refusing various medical medications and medical interventions, as he did not believe that they were done in precisely the way that he thought they should have been, or were prescribed in the dosages that he believed would be effective.  The inmate also received Decadron for pain and, on at least one occasion, he refused the Decadron injection stating that it had not been prepared for the neck injection by a neurologist and therefore he was refusing it.

The inmate's next mental health contact occurred on 6/14/05.  It was based on an Inmate Health Services Request to mental health because of anxiety and medical problems.  He subsequently saw a psychiatrist and reported continuing anxiety, panic attacks, physical pain and weight loss of 40 pounds.  The psychiatrist prescribed the anti-depressant Effexor for the inmate.  However, he objected to the Effexor because of side effects.  He was seen again on 6/27/05 when he reported that he would agree to take the Effexor because his concerns regarding side effects had been discussed with a different psychiatrist.  A mental health treatment plan (MH-2) was completed on 7/20/05, and the inmate was returned to the MHSDS at the 3CMS level of care.  The diagnosis of Depressive Disorder NOS was once again reinstated.  On 7/29/05, the inmate had a meeting with a psychiatrist who changed his medication once again to Paxil because the inmate reported that he had stopped taking Effexor earlier in July 2005.  The Paxil was renewed and the inmate appeared to be adherent to it through the time of his death.  He had psychiatric follow-up in September and December 2005, as well as case manager contacts at least every 90 days.  The inmate was described in all of the notes as essentially stable, calm and reporting that his medication was effective, although he once again reported more somatic symptoms to the psychiatrist and the case manager.  In 2006, he was seen by his case manager on 2/17/06, and again he was described as having no apparent distress, good reality contact and a calm affect.  He saw a psychiatrist on 3/17/06 and once again, more somatic complaints were reported including "occasional panic attacks" consisting of chest pain and palpitations, and continuing anxiety.  The inmate reported and the records indicated that he had some ER visits related to these symptoms.  Based on the symptoms the inmate was reporting, the psychiatrist concluded that he was in need of additional medication support and continued his Paxil at 60 mgs per day, but added Seroquel at 300 mgs HS to assist for "severe anxiety."  The psychiatrist indicated that the inmate was not reporting any SI or intent.  The psychiatrist diagnosed Panic Disorder with Agoraphobia.  This was the inmate's last contact with a mental health clinician.

The suicide report referred to there being pruno (inmate-manufactured alcohol) found in the cell at the time of the inmate's death, and the cellmate's admission that both he and this inmate drank pruno together.  This may have contributed to his gastrointestinal

distress. The suicide reviewer also indicated he had spoken with the inmate's mother who believed that the inmate was using drugs while incarcerated "in part to relieve his chronic pain." His mother and his cellmate expressed concerns that the inmate may have been incurring debts on the yard, possibly secondary to drug use, which may have contributed to his anxiety. This inmate's medical concerns including his cervical pain, gastrointestinal problems and chest pain, shortness of breath and palpitations, which all appeared to be related to his anxiety disorder, were of substantial concern to him during the later years of his incarceration.

The suicide report identified two problems, with recommendations, as follows:

> Problem 1: Emergency response by both custody and medical staff was grossly inadequate. Custody officers failed to start CPR after the discovery of inmate. Medical staff also failed to start CPR (although they evaluated the inmate and used an AED). Local ambulance was not called immediately. Additionally, the cut-down tool was accessed on the scene but the noose was not cut off the inmate's neck until the paramedics arrived.
> Recommendation: Initiate an investigation into this emergency response for both custody and medical staff who were present and address failures with appropriate corrective and/or disciplinary actions.

> Problem 2: In 2002 at CSP/Solano, there was a delay in enrollment in MHSDS, IDTT meeting and documentation; however documentation was timely and timeframes were met when he re-entered MHSDS at CSP/Solano in 2005.
> Recommendation: The MHSDS enrollment process demonstrated improvement in 2005; therefore no QIP is recommended.

**Findings:** This inmate's suicide did not appear to have been foreseeable, but may have been preventable. Although there were some failures in proper assessment and documentation when the inmate first arrived at CSP/Solano in 2002, and he was receiving treatment without being properly placed in the MHSDS, he was eventually placed in the MHSDS and his treatment appeared to have been appropriate. The suicide report appropriately reflected these placements on the MHSDS and documentation failures. His care and treatment for his anxiety disorder did appear to be appropriate during the last few years of his life. The inmate was clearly very concerned about his medical condition and complaints, and not only expressed these concerns directly to clinical staff but also in writing various 602s, grievances and letters to outside advocates and to his mother. Review of the records indicated that his concerns were taken seriously. There were multiple efforts to address his clinical conditions including his degenerative cervical disc disease, his irritable bowel syndrome and other gastrointestinal complaints, his hypertension, and his anxiety and anxiety-related symptoms. The inmate's death may very well have been preventable, however, had there been the appropriate emergency response. The suicide report identified quite clearly the deficiencies in both the custodial and clinical responses when the inmate was discovered hanging. The failure to provide immediate CPR and other lifesaving efforts, including the failure to cut the noose from around the inmate's neck, were serious failures on the part of staff. The suicide report

indicated that an investigation was recommended regarding staff performance; however, there were no documents provided regarding the status of this investigation or whether indeed it had occurred.  Lastly, the inmate was discovered to have six times the therapeutic blood level and almost twice the toxic level of Paroxetine in his blood stream, but the notes in the record indicated that he was medication compliant.  There was no problem identified in the suicide report with regard to either DOT, nurse-administered, or possible trading of medication by this inmate.  Given that this was his prescribed medication, the issue of hoarding and the failures in the medication administration process should have been identified as a problem for further review by the staff at CSP/Solano.


**18. Inmate R**
Brief History:  This inmate was a 62-year old Caucasian male who committed suicide by hanging on 5/11/06 in the PHU at CSP/Corcoran.  The inmate was the sole occupant of his cell at the time of his death.  He was not involved in the MHSDS at the time of his death.  He entered the CDCR on 8/24/73 at the Northern RC-CMF after pleading guilty to murder and receiving a life sentence.  The inmate also received an additional six-month to five-year sentence to be served concurrent with his life sentence for pleading guilty to escape from SQ in 1974.

The inmate was discovered on 5/11/06 at approximately 2:24 a.m. by a correctional officer who was conducting an institutional count.  The inmate was observed unresponsive and hanging from a rope in his cell.  He was the sole occupant of the cell and was lying on his back on the right side of the bed with a noose around his neck, with the other end of the rope attached to a horizontal bar under the shelf above the head of the bunk.  The correctional officer notified a second officer who activated his personal alarm device, and responding staff arrived. Staff entered the cell and a correctional sergeant used a pair of scissors from the unit's cut-down kit to cut the rope above the knot to release the tension, and then removed the rope from the inmate's neck.  The inmate was unresponsive and quickly removed from the cell by correctional officers.  CPR was initiated by two officers and an MTA.  The ERV was called and at approximately 2:32 a.m., it ERV arrived.  Two RNs arrived with the ERV and continued CPR.  At approximately 2:35 a.m., the ERV arrived at the ACH emergency room.  The Code Blue team was standing by and immediately began treating the inmate in an attempt to resuscitate him.  However, he did not respond and was pronounced dead at 2:43 a.m.  An autopsy report was provided by the Office of the Sheriff of King's County, and stated the autopsy was performed on 5/12/06.  The cause of death was determined to be ligature hanging (minutes).  A toxicology report indicated that there was no alcohol and no positive findings on a drug screen, with the exception that methadone was detected in the blood specimen at 0.92 ug/ml (toxic level greater than 1.0 ug/ml).  The inmate also left a will in his cell, with his name and inmate number dated 5/9/06 indicating "this will supersedes the will in my C-file."  The inmate went on to give instructions to dispose of his body in the cheapest possible way if the next of kin did not take his body.  He indicated, "note all staff and inmates treated me very well and they have no effect in this decision and action, it is based entirely on my free will choice (and the only causes are

age, family problems, health problem, and pain, too much time with no hope from BPTs
let the cost spent on me be put to better use by the State and prison) other than that God
bless CDC and all staff.  I apologize for any inconvenience."  It went on to state how his
funds and personal property should be disposed of, and he signed it as true and correct,
with his name and CDC number.

The suicide report contained the inmate's criminal history.   It described his having
committed a bank robbery at age 19 and spending one year at a federal reformatory.
Three years later, he entered the CDCR with a six-month to 14-year term for assault with
intent to commit murder.  Records, although unclear, indicated that he was re-tried and
convicted in 1971 and placed on probation for two years.  The inmate's commitment
offense occurred on 6/8/73 when he shot his estranged wife to death after she told him
they were going to a hospital to see his daughter, but he learned that this was not true and
that she wanted him to go to the hospital with her to receive counseling for their marital
problems and for him to receive psychiatric care.  After killing his wife, he left the area
and forced a citizen to drive him to another city, commandeered a second vehicle when
the first one broke down and subsequently contacted his mother.  The mother convinced
the inmate to return to Sacramento and turn himself in.  However, he was apprehended by
the Vallejo police officers at the Greyhound bus depot.  The inmate attempted to escape
from court on 6/12/73 with a gun made of paper, but he was apprehended.  Later in June
1973, he was examined by a psychiatrist at the request of his attorney and appeared to be
attempting to establish a defense of "not guilty by reason of insanity."  In July 1973, the
inmate escaped from the Sacramento Main Jail by using a makeshift knife to subdue an
officer, but he was apprehended in a nearby railroad yard.  In July 1973, the inmate was
arraigned on charges of murder, escape with force and violence, attempted escape with
force and violence, assault with a deadly weapon upon a deputy sheriff, assault with a
deadly weapon upon a person, and attempted kidnapping. He had two prior convictions in
Colorado for bank robbery and assault with a deadly weapon in California.  The inmate
subsequently pled guilty to murder; all the other charges were dropped, and he entered
the CDCR on 8/24/73.

On 6/25/74 the inmate escaped from SQ.  He was apprehended in July 1974 in Victoria,
British Columbia.  He returned to California in October 1974 and pled guilty to escape
with force and received a six-month to five-year sentence, to serve concurrent with his
life sentence.  He had been housed at Folsom, SQ, CMC, CMF, DVI, California Training
Facility (CTF), and CCI at various times until his final transfer on 6/1/92 to the
CSP/Corcoran SHU.  He was transferred from the SHU to the PHU on 6/10/92 and
remained there until his death on 5/11/06.  He had initially been eligible for parole on
6/9/80 for the original murder charge; however, parole was repeatedly denied.

The inmate had extensive medical records, and although he was noted to have pled not
guilty by reason of insanity in 1973 to his original charges, he was also noted to have
admitted that he lied to the psychiatrist.  There was no further information regarding his
ever having been treated for mental illness prior to his incarceration.  In October 1973
and prior to his escape in June 1974, he was diagnosed at the Reception Guidance Clinic
and Center at CMF with Psychosis with Drug Intoxication and Brain Trauma and as

92

having Passive Aggressive Personality.  This diagnosis was based on the inmate's request for therapy.  He was also diagnosed with Depressive Neurosis, Acute in 1976 while at CMC, and was later hospitalized with reports of hearing voices, and diagnosed with an Acute Schizophrenic episode.  In November 1978, while at CMF, he was diagnosed with Antisocial Personality and Passive Aggressive Personality with evidence of depression.  He reportedly became psychotic and stated he was hearing whispers and seeing yellow patterns.  He was also noted to have stated, "don't give me sheets or I will hang myself."  Further, according to the suicide report in March 1979, he was diagnosed with Situational Anxiety and Self-Mutilation after he burned his forehead and was hospitalized while at Folsom.  In September 1979, he was admitted to the psychiatric ward at SQ with a diagnosis of Severe Acute Agitated Depression, but was discharged with a diagnosis of Antisocial Personality Disorder.  In October 1987, the inmate was reported to have attempted suicide.  However, he subsequently reported that this was a "fake" suicide attempt to achieve a housing change.

The suicide report referred to there having been multiple times when the inmate reported psychiatric symptoms or mental health distress, with subsequent findings that he was reporting symptoms to obtain housing changes or for reasons other than to obtain psychiatric treatment.  After the inmate arrived at CSP/Corcoran, he was evaluated by a psychiatrist as he had requested a single cell, but the psychiatrist determined that he was being dishonest in his reporting of symptoms.

The inmate did not appear to have had any mental health contacts from July 1992 until September 1995, when he was being treated by a psychiatrist for depression and anxiety, as per the suicide report.  It appeared that he may have been placed on the MHSDS at the 3CMS level of care in 1997, although the records reviewed indicated that this was more likely to have been in 1999 when he was housed at the CSP/Corcoran Protective Housing Unit (PHU) and seen by an IDTT.  At that time, he was diagnosed with Alcohol Abuse, Polysubstance Abuse, PTSD and Antisocial Personality Disorder and was prescribed Prozac and Depakote.  Bipolar Disorder was added to his diagnosis approximately three months later.  The records indicated that he continued to receive medication and mental health contacts, but the next IDTT meeting was not noted until March 2001, when the inmate was diagnosed with Panic Disorder with Agoraphobia.

The medical staff also determined that this inmate began in approximately 1995 to report false medical complaints and symptoms based on his having learned information from other inmates about their legitimate medical illnesses or from information he read in books, so that he could simulate medical conditions and file lawsuits against the State or influence his housing.  The suicide report referred to a 1995 correctional staff investigation in which the staff concluded that the inmate did indeed simulate medical conditions to file lawsuits, but also staged incidents for which he claimed injuries so that he could file lawsuits or become unassigned from work.  According to the suicide report, the medical staff in 1995 opined that the inmate had had a number of tests and medical treatments, and that "after all these tests had been done I would have to come to the conclusion that this man is malingering and has costs the State a lot of money over the years."  The records indicated that the inmate did have legitimate degenerative disc

disease on the lumbar spine and that he had been treated for back pain with Methadone, from 2003 until his death. He was also diagnosed with Hepatitis C and Bursitis in his shoulders.

An IDTT diagnosed the inmate with a Mood Disorder due to medical treatment related to his depression and having stopped Methadone treatment and starting Ultram. He did, however, return to receiving Methadone shortly after this evaluation. In March 2002, the inmate was removed from the MHSDS as significantly improved. However, by October 2002, he was returned to the MHSDS at the 3CMS level of care as medical necessity because of depression. On 11/14/02 the IDTT removed him from the MHSDS and he was never placed at any level of care within the MHSDS after that time. He did, however, see mental health staff periodically through health services request forms that he initiated through 6/6/05 which, as per the suicide report, were suggested to be efforts for mental health staff to advocate for him regarding custody and medical issues and to impress the BPT. The inmate did have MRIs of the lumbar and cervical spine. In addition to having degenerative disc disease in L3-4, L4-5, and L5-S1, he had mild broad-based L4-5 lumbar disk herniation, and mild cervical disc herniation at C3-4, C4-5, and C5-6.

The inmate was seen by a psychologist on 2/15/05 as per his self-request. The psychologist noted the inmate "admits that he puts in requests for 1:1 sessions in an attempt to gain favorable regards from the BPT." The psychologist reported that the inmate's insight into his life, crime and criminal thinking is extremely limited, and she provided psycho-education regarding the appropriate use of mental health services. She opined that the inmate did not meet the criteria for 3CMS services at that time.

The inmate had received approximately 16 RVRs. There was some suspicion that the inmate may have been cheeking his medication in order to hoard it; there are several notes to this effect including one on 10/8/04 in which the inmate was given an RVR for hoarding medication (Methadone). He had several Board of Prison Terms (BPT) psychological and psychiatric evaluations completed during his incarceration. He also, according to the suicide reviewer's interviews with other inmates, had at various times been a "born again Christian," a "mansonite," a "Buddhist," and "Christian republican."

The suicide report referred to the inmate's last BPT review of November 2005 and provided information that members of the BPT believed the psychiatric and psychological evaluations were incorrect. This conclusion was reportedly based on the members having access to confidential information including letters from family members expressing their concerns and fears regarding the possible parole of this inmate. There were references in the suicide report that this inmate became aware of his family's opposition to his parole, and he had written a petition in April 2006 stating he believed the BPT's decisions were arbitrary and there had been no evidence since 1973 that he posed an unreasonable risk for parole. The suicide reviewer also referenced his conversations with his mother and reported her phone conversations with her son in which this inmate advised her to write to the BPT and warden to explain that the

threatening letters this inmate had written to her and other family members were part of a "manuscript," and that they were not in fear for their safety should he be paroled.

The suicide report determined that all policies and procedures had been followed and that there was no recommendation in this case.

**Findings:**  This inmate's suicide does not appear to have been foreseeable or preventable. He had a very long history of 32 years within the CDCR and was very much aware of how to access mental health services had he chosen to do so.  Although he had been seen periodically by mental health staff based on health services request forms that he initiated, those of the most recent years appeared to have been linked to his wanting to be involved in programming to have some influence on the BPT or his medical or custodial issues.  In my opinion, he was appropriately removed from the MHSDS, and the mental health staff was responsive and professional in their dealings with him after his removal from MHSDS.  He did not alert custody or clinical staff to any SI or intent and the emergency response when he was discovered was fully appropriate.


### 19.  Inmate S

Brief History:  This inmate was a 28-year-old Caucasian male who committed suicide by hanging on 5/22/06 in the administrative segregation unit at SQ.  The inmate was not a part of the MHSDS.  The inmate was single-celled at the time of his death.  The inmate entered the CDCR via the SQ RC on 1/25/01 as a parole violator from a 1998 conviction of corporal injury on a cohabitant to which he had been sentenced to four years in CDCR (suspended) and three years probation.  Based on his parole violation his original sentence was imposed.  He was again paroled in July 2002, but because of continued parole violations, his parole was revoked and he returned to SQ on 6/2/04.  He was paroled again on 8/8/04 and once again his parole was suspended on 12/2/05 and he was re-incarcerated at SQ for the last time on 3/8/06.  The inmate's anticipated release date was 7/16/06.

The inmate was discovered on 5/22/06 at approximately 3:30 p.m. by a correctional officer who was preparing the fourth tier for the evening meal.  The officer approached this inmate's cell and observed the entire cell front covered with a state-issued blanket. The inmate was the sole occupant of the cell. The officer ordered him to remove the blanket with negative results.  The officer opened the food port, reached into the cell and pulled the blanket from the cell front, observing the inmate's body at the cell front hanging in an upright position facing the cell front with a state-issued sheet tied around his neck.  The other end of the sheet was tied to the top locker area.  The officer activated his personal alarm and when staff arrived, he and a correctional sergeant unlocked the door, entered the cell and the inmate was cut down.  The inmate was carried out of the cell by the officers and they awaited the arrival of a Stokes litter.  After the arrival of the Stokes litter, the inmate was transported to the TTA by correctional staff.  It was noted in the incident report that correctional staff did not begin CPR due to having to carry the Stokes litter down four flights of stairs.  At approximately 3:33 p.m., the inmate arrived at the TTA and medical staff immediately began CPR.  At 3:45 p.m. a physician

pronounced the inmate deceased.  An autopsy report was provided by the Marin County Coroner's Office and stated the autopsy had been conducted on 5/24/06.  The autopsy concluded the cause of death was hanging (minutes) and noted a significant contributing factor as "Mood Disorder (Depression)."

The suicide report contained the inmate's criminal history and stated it was unknown whether or not the inmate had any juvenile history.  He did, however, have his first arrest at age 18 for being under the influence of a controlled substance.  The inmate appeared to have had a history in adolescence of the use of various substances including marijuana, methamphetamine, cocaine, hallucinogens and inhalants, as well as alcohol.  The inmate apparently spent approximately one year in the county jail after conviction of assault in 1997, and subsequently was arrested in that same year for petty theft; however, the case was dismissed.  The inmate's commitment offense began in January 1998 when he had an argument and physical shoving of his girlfriend resulting in injuries.  He was convicted of corporal injury on a cohabitant in January 1998, followed by the sequence of his sentencing, probation, probation violations and return to the CDCR, noted above.

The records from his initial admission to CDCR in January 2001 were not provided.  However, the suicide report indicated that he was transferred from SQ to CMF in March 2001, assigned to a minimum support facility, obtained excellent job ratings and was paroled to a Humboldt County in July 2002.  Similarly records for his return to SQ in June 2004 and subsequent parole in August 2004 were also not provided however the records from Humboldt County were provided.  These records were obtained by SQ staff with the inmate's consent.  They described his having received treatment in Humboldt County beginning in April 2005 for detoxification from alcohol, and an overdose from Neurontin which appeared to have resulted in a seizure. The Humboldt County mental health staff indicated that the inmate had not attempted suicide, but this was an accidental overdose of his prescribed medication while he was drunk.  The Humboldt County record also referred to the inmate having been detoxed from Methadone in a 30-day program, as well as his having been agitated and treated with Zyprexa and Ativan on a prn basis.  While a client of the Humboldt Mental Health branch, he also reported SI to his friends and was hospitalized for detoxification purposes.  His diagnosis during treatment at Humboldt Mental Health was Mood Disorder NOS, Methadone and Cannabis Abuse, and ADHD as per client.

When the inmate was returned to CDCR custody on 3/8/06 from the Humboldt County jail to SQ, his initial health screening was positive for a seizure disorder, and for being treated for a mental illness and taking Neurontin at that time.  A mental health brief screening report dated 3/22/06 indicated that, based on the initial screening, the inmate did not have an indication that he was suffering from a mental illness and no referral was noted.  His RC mental health evaluation on that same date provided a history including the inmate stating that he had been sexually, mentally and physically abused by his mother's boyfriend in childhood from age four to age 13, and that his brother had died from an accidental hanging when the inmate was 13 years old.  The inmate reported that he had been receiving mental health treatment since childhood until 2002, and that he had been hospitalized in 2003 because of taking a double dose of Neurontin while drinking.

He reported that the Neurontin had been prescribed for seizures for approximately ten years. He also reported that he had been receiving outpatient mental health treatment in Humboldt County Mental Health since 2002. Additionally, the inmate stated in this evaluation that he had attempted to kill himself on three to four occasions, beginning at age 18, with his most recent attempt at age 19. He elaborated that his attempts were "usually over break ups," and many times he cut his arms "to avoid exploding, to relieve pain." The inmate's mental status was described as essentially within normal limits. It was noted he had no mental health meds for approximately ten years, no symptoms of depression, mania or psychosis, and no need for mental health treatment at present. His diagnosis was Amphetamine Dependence and Cannabis Dependence. It was noted that he did not want meds and he did not meet the criteria for inclusion in the mental health treatment program. On 3/29/06, he was seen by another psychologist who referred to the MH-7 mental health evaluation and concluded that the inmate had no SI and that no further follow-up was needed.

He was next seen by a social worker on 4/28/06 when an MH-4 Condensed Mental Health Assessment and Treatment Setting Transfer was completed. It indicated that the inmate had been cleared on the MH-7 referenced above. The social worker stated, "I don't know why he was scheduled for an MH-4." The social worker noted that he had been taking Ritalin as a child, but stopped at age 18. The social worker also noted that at age 18, the inmate "cut wrist, 2004 accidental OD Neurontin" and referred to the inmate's brother having died by hanging accidentally at age 13. The diagnosis of Polysubstance Dependence, including marijuana, methamphetamine and heroin was continued, as well as Muscular Dystrophy, Hepatitis C and Spina Bifida. The inmate continued to receive Neurontin for seizures and Midrin for migraine headaches. The inmate did send health care services request forms for an infection of the right side of his neck and for herbal treatment for hepatitis C, but there was no documentation that he requested any further mental health services.

The last note by a mental health professional was on 5/4/06 by the same social worker who had seen him on 4/28/06. It stated that the inmate "came to IDTT but a review of the chart shows the inmate was cleared in RC and is now GP" (general population). The note went on to state that the inmate remained clear, did not need to be in the 3CMS program, but was interested in a meditation group and was encouraged to go to one in "the success dorm." This was the last documented mental health contact for this inmate prior to his death on 5/22/06. Three days prior to his death, on 5/19/06, the inmate was placed in the administrative segregation unit and the suicide report referred to his having been seen by a psych tech as part of the rounds for those three days. However, there were no notations in the records received regarding this inmate's contact with the psych tech.

The suicide report referred to his having been placed in administrative segregation on 5/19/06 for safety concerns related to his having "been warned to get off the yard by other inmates due to promiscuous sexual activity with Hispanic inmates." The inmate's suicide occurred less than two months from his anticipated release date. On the day of his death, the inmate had an administrative segregation placement hearing approximately four hours prior to the inmate's suicide. The correctional counselor was interviewed by

the suicide reviewer and reported "nothing unusual or concerning" in the interactions with the inmate.

The suicide report identified one problem, with a recommendation, as follows:

> Problem:  SQ custody officers did not begin CPR at cell front but instead transported the inmate to the adjacent TTA, delaying CPR by three minutes. Custodial staff also informed this evaluator that medical personnel had at one time instructed the custody staff that. due to the proximity of the TTA to the Carson Unit, custodial staff should bring suicide emergencies directly to the TTA rather than start CPR on the tier.
> CDCR policy requires that unless otherwise indicated, custodial staff shall begin CPR immediately upon finding a hanging inmate and to continue until relieved by medical staff.
> Recommendation:  Custody staff at SQ, especially in Carson Unit, shall be redirected to the current CDCR policy via memo reminding them that CPR must be started at the cell front.
> Medical staff at the SQ TTA shall also be reminded and informed of the current CDCR CPR policy, and shall be instructed to respond to cell front to assist and relieve custody staff who are performing CPR.

On 2/27/07, the Directors of the DCHCS and DAI provided a report on implementation of quality improvement plan for suicide of Inmate S.  The report included a memorandum dated 10/31/06 from SQ Chief of Mental Health to the SQ associate warden for health care and CMO, stating that medical and custody staff had been informed of the requirements recommended in the suicide report at two Suicide Prevention Committee meetings and two Quality Management Committee meetings.  The supporting documentation, including the CPR memo and signatures of all staff receiving the memo, had yet to be received by the responsible clinician.  The memorandum also noted that during round XVIII, the Coleman court monitors were not satisfied with the memo from the warden dated 10/11/06 as not being strong enough.  The memorandum requested that a copy of the requested materials be sent to the Chief Psychologist and forwarded to the Suicide Prevention Focus Improvement Team at headquarters.  There was no additional documentation provided regarding these requests in the documents received.

**Findings:**  This inmate's death did not appear to have been foreseeable, as he did not indicate to clinical or custody staff any intention or ideation regarding ending his life. However, it may have been preventable had the policy been followed by custody and medical staff with regard to CPR as first responders.  The CDCR suicide reviewer appropriately identified this as a substantial problem; however, the response to the recommendation from SQ appeared to be inadequate based on the information provided.

## 20.  Inmate T

Brief History:  This inmate was a 26-year-old Hispanic male who committed suicide by hanging on 6/4/06 in an administrative segregation unit at Chuckawalla Valley State

Prison (CVSP). The inmate was the sole occupant of his cell and was at the 3CMS level of care in the MHSDS. The inmate was returned to the CDCR via the NKSP RC on 8/10/05 as a parole violator with a new term for possession of a controlled substance (methamphetamine). His minimum eligible parole date was 12/31/07.

The inmate was discovered on 6/4/06 at approximately 11:50 p.m. by a correctional officer performing routine security checks in the administrative segregation unit. The inmate was observed hanging from the top bunk with a bed sheet tied around his neck. The officer activated his personal alarm device and began shouting to the inmate for him to get up. However, the inmate did not respond. The officer then ran towards the control booth and yelled for the control booth officer to notify the facility sergeant of a medical emergency. The officer retrieved from the control booth officer the cell bar which is used to manually open administrative segregation unit doors during the first watch. Central control and central health staff were notified by institutional radio of the medical emergency. The sergeant and two officers responded to the cell which was manually opened and the two officers entered. The officer had forgotten to retrieve the cut-down tool and therefore cut through the sheet around the inmate's neck with a state-issued Folger Adams Key. The officer attempted to locate a pulse but was unable to do so. An MTA arrived and examined the inmate, finding him to have obvious mottling (skin discoloration) throughout his body, his tongue black in color, significant swelling around the neck and pitting edema where the hanging device was placed. The inmate had no pulse and his pupils were fixed and unresponsive. According to the incident report, CPR was not initiated because of the inmate's manifested obvious signs and symptoms of death. Central health was notified at 12:03 a.m. of the inmate's condition, and the Chief Medical Officer was notified at 12:07 a.m. There was no provided documentation that the inmate was formally pronounced dead by anyone. According to the suicide report, the temperature inside the inmate's cell was 120 degrees, and this inmate had not been out to the yard for seven weeks as he was on protective custody status. There were two baby pictures found in the inmate's cell which will be described later in this report. However, there was no suicide note or other communication. An autopsy report was provided by the Riverside Sheriff-Coroner's Office which stated that the autopsy was performed on 6/5/06 and determined the cause of death to be hanging – immersion. The Coroner's Report also provided an investigative narrative in which the investigator described the inmate as having wrapped strips of bed sheet around his lower legs and the ligature ran from his lower legs under and behind the bottom bunk, behind and over the top bunk, and then around the inmate's neck, such that the investigator believed the inmate used himself as ballast. A toxicology report was also included; there was no alcohol or illicit drugs found in the sample. However, Phenytoin 11 mgs/L and Olanzapine 0.095 mgs/L were found in his blood samples.

The inmate's criminal justice history was contained in the suicide report, and made no reference to any juvenile history. His adult criminal history was stated to have begun in 2002 with arrests and convictions for narcotic offenses and burglary, which resulted in local jail time or probation. His initial commitment offense was burglary, for which he received a two-year sentence in the CDCR. He was admitted at the NKSP RC on 12/12/02, was transferred to a community correctional facility and ultimately to CIM on

10/9/03. The inmate paroled on 11/12/03, and on 11/14/03 was listed as a parole violator with a new term based on a Riverside County drug related offense with an additional two year sentence. He was, however, paroled that same day, only to be re-arrested on 9/24/04 as a parole violator in possession of a knife, with return to custody on 10/4/04. He once again paroled on 2/8/05, and was involved in a major motor vehicle accident while under the influence of methamphetamine; his parole was revoked and he was returned to CDCR on 8/10/05 as noted above. After the motor vehicle accident, the inmate reported hearing loud voices in his head and difficulty sleeping, and he reportedly continued to use methamphetamine. The inmate was transferred to CVSP on 1/12/06 where he remained until his death on 6/4/06.

Initially, this inmate's mental health history was obtained by this reviewer from the CDCR suicide report because the records originally provided to this reviewer were incomplete. After CDCR was provided with a draft of this Report, it responded that the mental health section of this inmate's UHR had erroneously not been sent to this reviewer. These records were requested and subsequently received by this reviewer on 7/18/08.

This inmate's first admission to the CDCR was 12/12/02. His initial health screening was not included in the documents received. He received a RC mental health evaluation on 1/10/03 and was cleared for general population with no need for further service. He did not receive any mental health services during this first incarceration and ultimately paroled on 11/14/03. He returned to custody on 10/4/04; however, the initial health screening at that time was not included in the first set of documents received. He received no mental health services during that incarceration and was paroled on 2/8/05. His last admission to the CDCR was on 8/10/05 via NKSP and once again there was no initial health screening for that date included in the initial documents received. His complaint of hearing voices in his head and difficulty sleeping after his vehicular accident in 2005 was noted when he was returned to custody on 8/10/05.

On 3/30/06 the inmate was seen by a psychologist after being referred to mental health because in an ICC hearing he was described as "acting spacey." The psychologist noted the inmate had a history of seizures, methamphetamine abuse, and auditory and visual hallucinations, but also noted the inmate "can bring himself back to reality when he wishes." The plan was for follow-up in three weeks. The inmate was not seen again by a mental health clinician until 5/12/06 based on his "self-referral," according to the note by the psychiatrist who saw him.

The mental health records in this inmate's UHR that were received by this reviewer following distribution of the draft Report indicate that inmate had brief mental health screenings on 12/16/02, 12/24/04, 8/12/05, as well as mental health screenings when placed in administrative segregation on 3/6/05 and 3/25/06. Only the brief screening report of 12/16/02 indicated that the offender was possibly suffering from mental illness as a possible mood disorder. He received a reception center screening on 1/10/03 that concluded he was not in need of mental health services and he was cleared for general population. He had subsequent mental health chronos clearing him for general