population on 10/5/04, 8/12/05, 3/18/06, and 3/25/06.  A mental health assessment by a psychiatrist was completed on 5/12/06 and described the inmate as "26 year old male who used amphetamines and LSD heavily, has symptoms of 'tornado thoughts,' anxiety, nightmares, whispering voices, echoing voices, etc."  The inmate is noted to have denied suicidal or homicidal behavior.  He was diagnosed with Drug Induced Psychosis and Grand Mal Epilepsy, with a GAF of 50.  He was prescribed Olanzapine for "hallucinations and insomnia."  An SRAC was completed on that same date to formulate treatment planning as the inmate was currently in administrative segregation and the SRAC` concluded the inmate was not a suicide risk and was "eager to receive medication and comply with our treatment program."

An IDTT meeting was held on 5/1/06 with essentially the same information as the mental health assessment and a plan to medicate the inmate and "transfer to a mental health treatment institution."  A special ICC review was held on 5/25/06 and stated that the inmate's response to treatment was good, his ADLs were adequate, and the plan was to transfer him to a mental health treatment institution.

The inmate had been seen by a psychiatrist on 5/12/06, as noted above, and according to the suicide report, the psychiatrist wrote that he was seen as a "self-referral," with the inmate stating that he was feeling hyper and hearing voices, and the psychiatrist including symptoms of "echolalia, horrible nightmares, mind racing – tornado of thoughts."  There was documentation that the inmate was seen by licensed psych techs on 5/13, 5/14, 5/20 and 5/26/06.  The inmate was described as denying problems, taking his medications, with sleep and appetite "okay," and noted on 5/26/06 as "not been to yard in over seven weeks (will address with  mental health manager and ASU staff.)"  The inmate was also seen by the case manager on 5/15, 5/24, and 5/30/06.  The case manage noted the inmate was taking his medication, reported feeling better, and denied suicidal ideation/intent, and denied auditory hallucinations.  The inmate was noted to have been asking about the timeframe for his transfer.  The inmate's condition appears to have deteriorated by 5/30/06, as the psychologist stated the inmate was "somewhat better" but also reported "some nightmares, people chasing him."  The psychologist also stated that the inmate wanted to know where he would be transferred after completion of his SHU term.  It should be noted that the inmate had a chrono dated 5/30/06 stating that the inmate met the SHU exclusionary criteria. The psychiatrist last saw the inmate on 5/26/06 and noted the inmate's Dilantin had been increased to 500mg/day and that the inmate had "better seizure control."  The psychiatrist also continued the inmate's Olanzapine, which had initially been prescribed at 5mg/day on 5/12/06 but reduced to 2.5mg/day on 5/19/06. This decrease was continued even though the inmate reported he was not having "as deep a sleep" as when on 5mg, but could think more clearly.  The psychiatrist's plan was to see the inmate for follow-up "2 weeks 15."  This would appear to indicate a plan to see the inmate for 15 minutes two weeks from 5/26/06.  However, on 6/2/06 the chief medical officer increased the inmate's Olanzapine to 7.5 mgs after receiving a report from the psych tech that the inmate had reported increasing anxiety. The psych tech had seen the inmate during psych tech rounds, noted on 5/13/06 that the medication had started, and noted on 5/27/06 that the inmate had not been out to yard in over seven weeks, with a plan to have him referred to the administrative segregation staff and mental

health case manager. This reviewer's review of the mental health records including progress notes, treatment plans, and SRACs concludes there is no documentation that referral to an MHCB or higher level of care was ever initiated.

The inmate's administrative segregation unit placements appear to have been primarily for conflicts with other inmates. The inmate also received an RVR for possession of a controlled substance (heroin), in which it was reported that the inmate admitted to snorting heroin and tobacco on 3/7/06. He received RVRs on 9/3/05 for battery on an inmate; on 4/4/06 for battery on an inmate resulting in use of force on the administrative segregation protective custody yard, in which he was hit with several pellets fired by officers when he refused to stop battering an inmate; and on 5/23/06 for assault on an inmate with physical force insufficient to cause physical injury. He also had been a victim of assault on 3/21/06, when he was assaulted by other inmates related to his involvement with a gang of white inmates known as the "woodpile," according to the suicide report. This inmate was Hispanic but the suicide report referred to his confidential file indicating that he "runs with Whites" and that after his battery on another inmate on 4/4/06, as directed by the "woodpile," he learned that the "woodpile" wanted him on their yard so that he could be further disciplined. From this point on the inmate remained in protective custody. According to the suicide report, he received a SHU term and was to be transferred to CCI or CSP/Corcoran SHU. The inmate was reported to have been informed of this action on 5/25/06.

While in administrative segregation, the inmate was seen in an ICC meeting on 3/30/06. Because his behavior was unusual and he had a history of possible head injury from assault by other inmates on 3/20/06, he was referred for a mental health evaluation. A psychologist saw him on 3/30/06, when the inmate admitted to his history of seizures and heavy methamphetamine abuse. He stated that he occasionally was "spacing out," and was scheduled for a follow-up in three weeks, but there was no documentation that such a follow-up occurred. Referral by the ICC on 3/30/06 was for both mental health and medical evaluation. Based on that referral, he was seen by medical, and was noted to have been assaulted by other inmates on 3/20/06, when he suffered facial trauma and a concussion with loss of consciousness. There were concerns that he may have had a fracture of the left orbit or possible fracture of the jaw; however, he was medically cleared on 4/11/06 and was reported to be healing well. X-rays on 4/13/06 suggested a possible blow-out fracture of the left orbit; a CT scan was recommended but did not appear to have been done.

The suicide report referred to documents found in the inmate's property. These documents included a letter to his uncle dated 6/2/06 which was described as being positive in tone and future-oriented; it requested that his uncle visit him after his transfer to San Diego and indicated that the inmate would write again after his transfer to the new institution. The other document referenced in the suicide report was also provided in the documents received and included two pictures of a baby. The first picture was of a baby frowning with its hands over its ears and had written above it "TOUCH DOWN!" and "NO NOT AGAIN?" and under the picture "MAKE THEM STOP!!!" and "NOOOOOO!!!." There also appeared to be symbols on the baby's arms and stomach

and the name Dave, which may have been gang references.  On the other baby picture, which was of the head of a crying baby, was written "WHY ME HANS?" "WHY IS IT ALWAYS ME?" and "WHY???" and "THANK YOU!!!."  The suicide report referred to the name "Hans" as a member of the "woodpile" gang and associated this with the warning to the inmate that he would receive further discipline.

Of additional significance was the inmate's having a seizure disorder and a statement on the death review/suicide summary for this inmate that was completed by a physician after the inmate's death.  The physician noted that the inmate had seizures and was receiving Dilantin 500 mgs per day and Zyprexa 7.5 mgs per day.  The physician also noted, however, that the Dilantin blood levels were never at therapeutic levels and that "seizures were infrequent."  The physician concluded "overall there seemed to be no significant health or health treatment issues related to Mr. _____ suicide," and there were no recommendations.  The suicide report also referred to this inmate being housed in a cell other than those cells that were designated for inmates with heat risk conditions.  This inmate not only was on an antipsychotic medication, but he also had a known history of seizure disorder, was noted to have infrequent seizures, and his Phenytoin blood levels were never in the therapeutic range.

The suicide report identified one problem, with recommendation, as follows:

> Problem:  A number of policy violations in administrative segregation reported from several sources:
> - Inmate not housed appropriately for heat medications.
> - Inmate was reportedly not offered opportunity for yard for over seven weeks.
> - Inmate was single celled even though he expressed a desire for a cellmate.

> Recommendation:  Conduct a fact finding into these allegations.

On 11/14/06, the Directors of the DCHCS and DAI provided a report on implementation of the quality improvement plan for the suicide of Inmate T.  In their report was a memorandum dated 9/28/06 from the warden and health care manager at CVSP, in response to the suicide report recommendation, which stated the following:  With regard to the inmate not being housed appropriately for heat medication, the response stated that the inmate was not moved to a heat risk cell (110-117) because he requested that he remain in cell 150 due to his self-proclaimed safety concerns.  It also stated that the inmate "felt comfortable staying in cell 150."  It continued to state that administrative segregation staff concurred with the inmate's request to stay in cell 150, and placed a floor fan directly in front of his cell, due to his 3CMS status.  The inmate was housed in that cell for 23 days as a 3CMS inmate.  The response further noted, however, that even though the staff thought they acted in the best interest of the inmate, they failed to follow procedure and did not document his request to remain in cell 150.  Further, all administrative segregation unit staff/supervisors received documented training on housing MHSDS inmates in the administrative segregation unit.

With regard to the inmate not being offered an opportunity for yard for over seven weeks, the response stated that the record of daily activity indicated that the inmate was offered yard on 4/24/06 and 5/21/06, but refused.  It also stated that the regular administrative segregation unit yard officer stated that every time the inmate was offered yard, he refused.  However, the officer failed to document the refusals on the 114A.  The response concluded that custody staff failed to properly document the inmate's yard refusals, and that documented training on yard policy has been given to all administrative segregation unit staff.

With regard to the inmate being single-celled although he expressed a desire for a cellmate, the response stated that the review of the inmate's file failed to indicate that an administrative segregation double-cell review request for a cellmate or any other written request was filed, and that no staff recalled this inmate ever requesting a cellmate.  It concluded that after review of the C-file, the alleged request for a cellmate could not be confirmed and that the inmate had a single cell and "walk alone" yard due to safety concerns.  Further, the inmate when initially housed in the administrative segregation unit on 3/7/06 checked and signed the incoming segregation placement document, noting his request not to be double-celled.  In-service training sign-in sheets were also included in this response.

**Findings:**  This inmate's death did not appear to have been foreseeable; however, it may very well have been preventable.  It appeared that there were a combination of factors that contributed to this inmate's overall distress, including his having not been out to yard for seven weeks and his being housed in a cell that was not designated as a heat-risk cell while there was excessive heat for an unspecified but certainly prolonged period of time, based on the reports at the time of his death, with the temperature reportedly 120 degrees inside the cell.  This temperature report of 120 degrees inside the cell is referenced in the suicide report which states on page eight, "the temperature inside the cells was 120 degrees and even the wall was hot," and on page ten, "some nursing staff that participated in the emergency response said that the cell was extremely hot, one report citing a temperature of 120 degrees."  His being housed without yard for an extended period of time while on an antipsychotic medication, as well as his having uncontrolled seizures that, by review of the record and response of the physician in the "Death Review/Suicide" document dated 8/7/06, were in my opinion, contributing factors to his death.  In addition, the inmate's Olanzapine, which had been started after he was seen on 5/12/06, based on his own self-referral rather than the follow-up which was to have been scheduled for three weeks after he was seen on 3/30/06, had been cut in half from 5 to 2.5 mgs, and then was suddenly tripled to 7.5 mgs on 6/2/06 because of the inmate's increased anxiety.  There was no documented evaluation by a case manager or psychiatrist noted in the record on 6/2/06 to support the tripling of his medication or to document the reasons for the inmate's increase in anxiety after he had been reportedly improved enough to reduce his medication on 5/19/06.  Even with the inmate's Olanzapine being tripled, there was still not documentation of consideration of transferring this inmate to an MHCB or higher level of care. His mental status changes were acute, given he was returned to custody in August 2005, and he was placed on the

104

mental health caseload and prescribed an antipsychotic medication on 5/12/06. Although the policy on transfers from desert institutions to mental health treatment institutions requires transfer within 90 days or expedited transfer within 60 days, there is no prohibition by policy against emergency referral of inmates who are acutely mentally ill to an appropriate higher level of care. However, the failure to refer this inmate for crisis care is, in my opinion, another factor that makes this death very possibly preventable. Although CPR was not performed on this inmate, his clinical condition at the time of his discovery appeared to be consistent with the exclusion criteria for not performing CPR, including rigor mortis and lividity. The possible role of excessive heat and the conditions of the inmate's body at the time of discovery were not addressed in any in the documents reviewed.

The initial documentation of mental health contacts, including the progress notes, was provided to me on CD, and was among the worst that this reviewer had ever seen within the CDCR because it was incomplete. The progress notes consisted of a stamped "site visit" and the clinician's signature, with no details of the inmate's actual mental status, symptoms, etc., with the exception of a note by the CMO in which he referred to a report by the psych tech, but the CMO appeared not to have personally evaluated the inmate. This reviewer concluded that the suicide report was silent on this abysmal documentation, which made it virtually impossible to have any retrospective review of the status of the inmate during the course of his treatment by mental health staff. This was not only a failure at the facility level, but a failure at the DCHCS level to allow such documentation to exist without there being corrective actions, including possible referrals to the PPEC regarding the specific clinicians. Unbeknownst to me or the Special Master, and apparently the CDCR, the facility had not copied the mental health section of the inmate's UHR. Therefore, the discovery that the documentation provided to this reviewer was incomplete was revealed only after the Special Master's distribution of this Report in draft form, for comment within 30 days. Lastly, there was no additional response by DCHCS to the CVSP CAP or to the "explanations" of failures to follow policies or failures in documentation, including the recommendation for a CT scan of the left orbit to rule out possible fracture, the tripling of the Olanzapine dosage, and the consideration for referral to a crisis bed or higher level of care.

**21. Inmate U**
Brief History: This inmate was a 44-year-old Caucasian female who committed suicide by hanging on 6/5/06 in the administrative segregation unit at the CCWF. The inmate was the sole occupant of her cell at the time of her death, and was not involved in the MHSDS. The inmate re-entered the CDCR via CCWF on 10/30/03, following convictions for corporal injury to spouse, use of a deadly weapon, making a terrorist threat, and possession of a controlled substance, for which she received a six year term plus 16 years enhancement. Her earliest possible release date was 4/23/22.

The inmate was discovered on 6/5/06 at approximately 9:08 p.m. during routine medical rounds by an LVN after she was asked by another inmate to check on this inmate. When the LVN went to this inmate's cell, she found her sitting on the floor with a torn sheet

wrapped around her neck, hanging from the bed frame. The LVN called for help and several custody staff responded, one of whom activated his personal alarm. The custody sergeant ordered the door opened and officers attempted to remove the sheet from around the inmate's neck but were unable to do so. The sergeant entered the cell and cut the inmate down using the cut-down tool, and she was laid on the floor next to her bed. Two officers then began CPR and were relieved by an MTA and the LVN who had discovered the inmate. The inmate was subsequently placed on a Stokes litter and carried off the tier to a movable gurney and subsequently to the ETV. The firehouse response team also arrived as the inmate was being placed in the ETV, and followed the ETV to the emergency treatment center where the fire captain and inmate firefighter subsequently assisted with CPR. An outside ambulance arrived and paramedics continued CPR. The inmate was transported to the Madera Community Hospital. The watch commander was subsequently notified that the inmate had been pronounced dead by a physician at the hospital at 10:30 p.m. An autopsy report was received from the sheriff-coroner for the County of Madera and stated that the autopsy was performed on 6/6/06. The cause of death was determined to have been hanging. A toxicology report determined the inmate had Mirtazapine at 26 mg/ml (effective level 5-90 mg/ml) in a blood sample. There was no alcohol or common acidic, neutral or basic drugs detected. The inmate also left what appeared to be a suicide note that stated, "if I can get the courage to kill myself it is because of how CCWF kept me from the only other person I truly loved," and specified another inmate's name. There was also a statement to the other inmate stating "and to you _____ for the blame, doubt and hate you feel for me." The note concluded with "God forgive me but this life is to cruel and callucos of me (sic)."

The suicide report contained the inmate's criminal history and stated there was no information found regarding any juvenile criminal record, but that her adult criminal record began with her first conviction in 1981 at age 19 for drug and weapons related charges. She had additional convictions from age 27 to 36 with charges related to controlled substances, as well as a conviction for assault and another for robbery. She first entered the CDCR at CIW on 8/14/91 for possession of a controlled substance, and paroled on 2/22/92. From 1992 through 2002 she received new charges and parole violations with re-incarceration for a total of six times. Her last parole was from VSPW in December 2002, and she re-entered the CDCR on 10/30/03 as stated above.

The inmate had a long history of substance abuse which included methamphetamine, cocaine, heroin and hallucinogens. There was no information provided that she had received any mental health treatment or treatment for substance abuse prior to incarceration, but there was a reference to her cutting her wrist at age 17 and to telling her husband that she had wished many, many times that she had the courage to end her own life. During a previous incarceration, she had been placed at the 3CMS level of care, from January 2001 through June 2002, with diagnoses of Depressive Disorder NOS, Cocaine Dependence, and Antisocial Personality Disorder. She was subsequently removed from the MHSDS in August 2002, prior to her parole in December 2002. During the period that she was at the 3CMS level of care, she had been treated with anti-depressants and Seroquel. On her initial health screening when she returned to CDCR on 10/30/03, she answered positively to having a history of mental health treatment and

having taken medications. An RC mental health assessment also documented this history with her being placed at the 3CMS level of care as medical necessity on 11/5/03. On 4/1/04, she was re-evaluated and was removed from the MHSDS caseload.

During the course of her incarceration the inmate received several mental health assessments related to disciplinary charges that indicated that she did understand the disciplinary process and was not suffering from any mental health problems that would have impacted upon her alleged behavior.

The inmate sent an inmate health request form in November 2005 and was scheduled for an appointment, but it was reported that she did not appear for that appointment on 11/7/05. She was placed in administrative segregation on 11/9/05, was seen for administrative segregation screening on 11/10/05, and cleared for administrative segregation placement. After return to general population on 12/15/05, she was scheduled for case management contacts on 12/23/05, 12/27/05, and 1/3/06, but no case management contacts were documented to have occurred in the records reviewed.

The inmate's last contact with mental health staff appeared to have been on 6/1/06, once again in administrative segregation, where she had been placed on 5/30/06. A progress note was completed; however, the 31-question mental health screening was not completed. This last contact appeared to have occurred at the cell door, as stated in the suicide report. The inmate was not receiving treatment in the MHSDS, had not been seen after her self-referrals since 11/10/05, and was not prescribed any psychotropic medication. There was no explanation in the suicide report or the records reviewed for her having been discovered to have ingested Mirtazapine, an antidepressant, in what would be considered therapeutic dosages, as discovered in the toxicology sample from her autopsy.

The inmate had received medical treatment for difficulty breathing, which was determined to be secondary to a hole in her nasal septum with surgery recommended, but the inmate declined the surgery. She was also positive for Hepatitis-C, and received medication for migraine headaches. The CDCR suicide reviewer opined that the inmate had a personality style and behavior pattern consistent with Borderline Personality Disorder as well as features of Antisocial Personality Disorder. The suicide report also referred to the administrative segregation 114-A log, and stated that during a cell search on the day before her suicide, a torn sheet, hoarded medications, and a trust withdrawal were found. There was no follow-up action and no referral to mental health staff regarding the discovery of these items. The log also reflected that psych tech rounds were conducted daily as required by policy.

The "Death Review/Suicide" form for this inmate completed by a physician dated 8/5/06 stated that no suicide note was left. An inmate reported that the patient had been crying for two days. The reviewer also noted that he would have thought that staff would have noticed the inmate had been crying for two days, and while they did notice her torn sheet, the only thing they did about it was to take it away. The reviewer also documented the time sequence from the time of discovery at 9:08 p.m., pointing out that 911 was not

called until 9:25 p.m. and that an IV and oxygen were not started until 9:37 p.m. and 9:42 p.m., respectively. Further, at 9:30 p.m., on a cardiac monitor, a faint bradycardic rhythm was noted. When the ambulance departed at 10:03 p.m., there was notation that the inmate's pulse was 133. The physician reviewer made recommendations that were included in the suicide report recommendations.

The suicide report identified four problems, with recommendations, as follows:

> Problem 1: Administrative segregation mental health screening was conducted informally, at cell side. Administrative segregation mental health screening must utilize the 31-item questionnaire, and a confidential setting must be offered.
> Recommendation: CCWF: Implement a local procedure for conducting administrative segregation mental health screening in a confidential setting using the 31-item tool. Conduct audit for one month to ensure this procedure is followed.

> Problem 2: Torn sheets, cheeked meds, and a trust withdrawal discovered during a cell search were not followed up on. A referral to mental health may have been indicated.
> Recommendation: CCWF: Conduct fact finding into whether a mental health referral should have been made in response to this discovery.

> Problem 3: Institutional staff expressed concern with the increased risk of suicide among single-celled inmates and requested central office support for modifying single cells to make them safer.
> Recommendation: Central Office is currently developing a proposal to modify a percentage of administrative segregation cells for new, single-celled inmates to decrease suicide risk.

> Problem 4: The inmate was discovered hanging at 2108 hours. 911 was not called until 2125 hours. This 17-minute delay is unacceptable. Furthermore, staff was much too slow to place the inmate on a monitor, start oxygen, and start an IV.
> Recommendation: CCWF: Conduct a timely review in the institution's Emergency Response and Review Committee (ERRC), and refer for nursing review at DCHCS level via PPEC.

On 11/14/06, the Directors of the DCHCS and DAI issued a report on implementation of quality improvement plan for suicide of Inmate U. This report included a memorandum and attachments from CCWF dated 10/4/06 stating that the corrective actions/recommendations from the suicide report had been completed and provided supporting documents and proof of practice.

With regard to Problem 1, a memorandum dated 9/22/06 and approved by the CCWF Chief of Mental Health and the Chief Medical Officer stated that non-mental health inmates would be seen and administered the 31-item questionnaire within 72 hours of being admitted to administrative segregation, and that the inmate would be escorted by

custody from her cell to a secure interview room.  The memorandum also stated that if the interview room was not available, efforts would be made to achieve confidentiality consistent with clinical standards and institutional safety and security.  There were attachments of an audit conducted from 8/16/06 to 9/28/06 that included 20 non-mental health inmates admitted to administrative segregation.  Those who remained in administrative segregation were offered a confidential setting for screenings.  An in-service training was also provided on the 31-item questionnaire and confidentiality.

With regard to Problem 2, the response from a CCWF facility captain dated 10/2/06 stated that the two hoarded tablets found in the inmate's cell were Tylenol, and that short torn pieces of sheet are commonly found in inmate's cells for hanging underpants.  The memo also stated that the trust withdrawal was not significant.  The captain concluded that the items were so commonplace "that without additional factors, such as the inmate's behavior, confidential or non-confidential information leading us to believe there is a concern, a psych referral would not have been made."

With regard to Problem 3, a memorandum dated 10/2/06 from the Directors of the DCHCS and DAI referred to a court order of 6/8/06 and included the "administrative segregation unit suicide reduction plan" as the central office response.

With regard to Problem 4, a memorandum dated 7/19/06 documented the meeting of the Emergency Response Review Committee and a review of this inmate's suicide.  The committee's findings were that a memo from the CCWF nurse instructor dated 6/22/05 reported some of the same problems that occurred during this incident, based on emergency drills conducted during June 2005, including $O_2$ not being measured and the ambu bag being used without oxygen.  The problems identified for this inmate's death included delays in calling 911, delay in starting supportive measures, inadequate monitoring in the TTA, failure of nursing staff to attach oxygen to the ambu bag, and Epinephrine and Atropine given only one time.  Corrective actions were for the DON to (1) provide individual instruction to three RNs who cared for the patient in the TTA, (2) submit evaluation of 2006 emergency response drills and follow-up on any problems identified, (3) submit findings of ERRC review of this case, (4) ensure all staff who respond to mental health emergencies or are assigned to a TTA or yard clinics be aware that oxygen should be given via ambu bag, (5) provide an explanation for delay in calling 911 and for the delay in initiating supportive measures and (6) report whether nursing staff reported to the physician that nurse-administered medications were found in the cell and whether the physician then ordered the meds to be given as DOT.  On 11/1/06, memoranda from the DCHCS Death Review Committee and the Nursing Professional Practice Executive Committee (NPPEC) regarding their review of this case determined that RNs at CCWF failed to appropriately manage the emergency response, delayed calling 911, did not adequately monitor the patient, failed to implement support measures including oxygen in a timely manner, and were not appropriately supervised.  The corrective actions referenced above are repeated in this memorandum with specific timeframes of no more than 30 days for completion.  There was no additional information provided indicating that the corrective actions identified by the Death Review Committee and NPPEC were completed.

**Findings:**  This inmate's death did not appear to have been foreseeable, although the inmate's behavior had changed significantly, and she may have been crying for the two days prior to her death, which did not result in referral to mental health staff nor documentation of unusual behavior by the licensed psych tech who was making daily rounds as per the administrative segregation log.  The references to the torn sheets, cheeked meds and trust withdrawal were determined to be "common" and "without evidence of behavior change would not have resulted in a referral to mental health." Neither custody nor clinical staff apparently noticed her behavioral change.  The suicide report correctly identified several appointments that were scheduled for this inmate in response to inmate health service request forms initiated by her.  However, these appointments were not completed.  She was also removed from the MHSDS at the 3CMS level of care after only five months.  There was no evidence in the records received that she ever had an IDTT meeting during her last incarceration from 10/30/03 to review her care and treatment.  These factors certainly appeared to have contributed to the limited information that was available in the record and that staff appeared to have about this inmate's mental health history and change in behavior.  This inmate's death appeared to have been clearly preventable had the emergency response been appropriate and timely. The suicide reviewer, physician reviewer, and NPPEC all referred to failures in the emergency response and included information indicating that at various points during that response, the inmate did have a detectable pulse.  Although these areas were identified in the suicide report and corrective actions were required, the documents received did not indicate that these actions had been completed.  Lastly, the inmate had Mirtazapine in her toxicology screen at autopsy (a medication that she was not prescribed), and this was not identified in the suicide report as a problem requiring review and corrective action.

## 22. Inmate V

Brief History:  This inmate was a 50-year-old African-American male who committed suicide by hanging on 6/14/06 in the administrative segregation unit at CSP/LAC.  The inmate was the sole occupant of the cell at the time of his death and was not on the MHSDS caseload.  The inmate re-entered the CDCR on 2/24/78 via the RCC as a parole violator with new convictions on three counts of first degree robbery, attempted first degree robbery, and first degree murder, with sentences ranging from five years to life with the possibility of parole.  His minimal eligible parole date was 2/24/83.

The inmate was discovered on 6/14/06 at approximately 11:00 p.m. by an administrative segregation floor officer conducting an institutional count.  The correctional officer observed the inmate through the cell door window hanging from a noose attached to the cell air vent above the sink and toilet.  The correctional officer activated his personal alarm and utilized the institutional radio to contact central control.  The correctional officer then retrieved a cut down tool and the bar box key as responding correctional officers entered the unit.  The correctional officers entered the inmate's cell and one officer cut the noose from the air vent.  The inmate was removed from the cell and the noose and bindings that were around the inmate's wrists were cut by a lieutenant.  CPR was initiated by custody officers as first responders, and an MTA arrived at the cell.  The inmate was placed on a gurney and transported to the correctional treatment center (CTC)

110

via ETV.  At approximately 11:03 p.m., 911 was called. CPR continued after the inmate arrived at the CTC TTA at 11:13 p.m.  Los Angeles County paramedics arrived at 11:20 p.m. and continued CPR and other lifesaving measures.  However, the inmate did not respond and was pronounced dead at 11:41 p.m. by telephone by a physician at Holy Cross Hospital.  An autopsy report was issued by the Department of the Coroner for Los Angeles County and determined the inmate's death was due to asphyxia due to ligature hanging.  The manner of death was deemed suicide.  A toxicology report of a blood specimen indicated that there was no alcohol or illicit drugs found in the blood sample at the time of the inmate's death.  A suicide note was discovered in the inmate's cell dated 6/14/06 and addressed to "Big Boo."  The note was apparently signed by the inmate and wished "peace and God's blessings" to this individual identified as his friend and brother in Christ, and went on to thank him for all his support and letters.  There was a second page to the note addressed "to all the people who believed in me."  It identified particular individuals, including some who appeared to have been correctional staff.  It asked for their forgiveness and stated that he was struggling with many issues without seeking help. It concluded with his thanking other individuals by name and asking them to keep him close to their hearts.

The suicide report contained the inmate's criminal history.  It described his commitment offense as originally involving 23 counts of armed robbery and one count of first degree murder which resulted from his and his codefendants' robbery spree.  The inmate shot a victim at close range in the chest, and the victim ultimately died.  Reportedly, the inmate had been on parole for 62 days when he committed the robberies and murder.  This was the inmate's second term in the CDCR.  His first adult incarceration began in February 1974, when at age 18 he was convicted of first degree armed robbery with great bodily injury likely, and for which he received a sentence of six months to life.  He paroled on 6/30/76.  The inmate had an extensive juvenile history beginning at approximately age 11.  He was reportedly a founding member of the Harlem Crips street gang in the 1970s and had been identified as a shot caller within the gang.  The suicide report referred to his having been arrested approximately 20 times for gang-related incidents by the time he was 16.  Eventually, he was remanded to state prison after being declared unfit for juvenile court proceedings.

The inmate was reported to not have had any involvement with mental health care and treatment prior to or after his placement in the CDCR.  He was never a participant in the MHSDS, and although he entered the CDCR before the MHSDS was created, he was never brought to the attention of mental health staff, nor had he requested mental health services during his entire incarceration.  He did, however, have a reported history of Polysubstance Abuse which included marijuana, barbiturates, inhalants and alcohol, and had been an active participant in Narcotics Anonymous and Alcoholics Anonymous during his incarceration.  These treatment efforts occurred during the last seven years of his incarceration, in striking contrast to his activities when he was first incarcerated which included his becoming one of the founding members of the Consolidated Crips Organization (CCO), an institutional gang, including his writing a constitution for the gang.  However, he became a dropout of the CCO which eventually dissolved.  He had received approximately 24 RVRs and had been placed in administrative segregation a

number of times related to his gang activities through 1987. He did not receive any RVRs after 1987. Later in his incarceration, he had various jobs, received above average ratings, seemed to have a positive change in his criminal behavior, and was accepting responsibilities for his past behaviors. He had been a spokesman for Convicts Reaching Out to People (CROP), a youth diversion program and resided in the CSP/LAC honor yard until his transfer to administrative segregation on 6/13/06.

The inmate was placed in administrative segregation on 6/13/06, after he had spoken with the lieutenant from the institutional gang investigators on 6/12/06 and requested placement in administrative segregation reportedly stating, "my past is catching up with me and I can't be on that yard anymore." The lieutenant reported to the suicide reviewer that this inmate continued to be a current validated Crip, but that he was programming and was placed in administrative segregation pending further investigation of his safety concerns. The lieutenant reported that although the inmate appeared troubled and different, he had no inclination that the inmate was suicidal. The suicide report also had a disturbing reference to a former cellie who allegedly approached a mental health worker and asked him to see this inmate because the inmate was talking about suicide and had had razors that he flushed down the toilet on 6/10/06. There is no reference in the record that any mental health professional saw the inmate in response to this reported request. The inmate did, however, see a psych tech after he was transferred to the administrative segregation unit on 6/13/06. The psych tech who conducted the mental health screening noted the inmate had difficulty sleeping, but "denies any symptoms at this time," and reported that he had no history of mental health treatment in the MHSDS. The inmate was reportedly seen by the psych tech between 3:30 p.m. and 4:10 p.m. on 6/13/06, and again between 11:00 a.m. and 12:30 p.m. on 6/14/06. The inmate was discovered hanging on 6/14/06 at 11:00 p.m.

The suicide report referred to the standard 24-hour administrative segregation placement review done on 6/13/06 by a lieutenant for the purpose of deciding whether or not an inmate should be released or retained in administrative segregation. The lieutenant reported that the inmate was interviewed out of his cell for several hours but was vague and didn't tell them anything other than he had been stabbed in the Prison Industry Authority (PIA) laundry (where he had worked since 2002) a few days earlier. He displayed a small wound on his abdomen and then took back that statement, saying that the wound was self-inflicted. It was also noted that the inmate was expecting a BPT hearing on 6/5/06 in which he anticipated his custody level would be dropped from level four to level three. However, the hearing was postponed.

The suicide report identified one problem, with a recommendation, as follows:

> Problem: Custody staff failed to refer the inmate to mental health despite his obvious distress when he asked to be placed in administrative segregation on 6/12/06. Furthermore the inmate indicated during his 114D hearing the next day that he had a self-inflicted stab wound and still no referral was made to mental health.

112

<u>Recommendation</u>:  Custody staff should be well aware of the need to refer to mental health when they notice a significant change in mood and behavior of any inmate.  Refer to warden for positive progressive discipline based on the custody staff's failure to refer the inmate for a mental health evaluation.

There was also a "Death Review/Suicide" assessment completed by a physician dated 8/5/06.  It indicated that the health and health treatment issues were not significant in this inmate's death and that, for the most part, CPR and running of the code was appropriate.  However, it raised questions about some sequence discrepancies that identified "911 being called at 2303 or 2305," the inmate arrived at the TTA "at 2305 or 2313," IV started "at 2305 or 2320," and CPR "restarted" at 2314 with a question as to why it was stopped.  There was also a concern that the paramedic response time was too slow at either 16 or 18 minutes, and the paramedics did not intubate the inmate until six minutes after they arrived.  The recommendations from the physician reviewer were for more accurate documentation regarding response times and sequencing, and for a faster paramedic response time.

On 2/27/07, the Directors of the DCHCS and DAI provided a report on implementation of quality improvement plan for suicide of Inmate V.  The report included the response from CSP/LAC dated 12/29/06, in which the warden indicated that he found the CAP regarding custody referral to be an issue of staff training rather than progressive discipline, and had directed training for custody staff to ensure mental health staff was contacted for assistance when they observe bizarre or unusual behavior in the inmate population.  In-service training sign-in sheets were also provided for this training dated 11/21/06 and 12/4/06.  In addition, two memoranda dated 11/7/06 and including suicide prevention awareness were distributed to custody staff and to the CSP/LAC administrative segregation unit by the senior psychologist supervisor.  This same memorandum was to be published as the weekly training topic for the week of 12/11/06.

**Findings:**  This inmate's suicide did not appear to have been foreseeable and was probably not preventable.  The inmate did not report intent to harm himself in the future or SI to custody or clinical staff who saw him during the two days prior to his suicide.  However, he did reveal to custody staff a small puncture wound to the abdomen that he reported he had received at his job site.  He then changed that story and said that he had self-inflicted the wound.  Given that he was placed in administrative segregation because of reported safety concerns, but was vague in explaining what those concerns were, a referral to mental health by custody staff would have certainly been appropriate at that time.  Although the inmate reportedly denied any symptoms when seen by the psych tech the day before and the day of his suicide, he may have been more forthcoming had there been a full confidential assessment done by a mental health clinician, based on his behavioral change and possibly on his self-inflicted wound.

## 23.  Inmate W
Brief History:  This inmate was a 49-year-old African-American male who committed suicide by hanging on 6/26/06 in the EOP at CMF.  The inmate was single-celled at the

time of his death.  He had also been placed on a four-day extended observation because of his unprovoked attack against another inmate during the days prior to his death.  The inmate entered CDCR through the RC at DVI on 4/12/91 after pleading guilty to second degree murder with a sentence of 38 years to life.  His minimum eligible parole date was 12/13/13.

The inmate was discovered on 6/26/06 at approximately 9:55 a.m. by another inmate who was returning from the showers to his assigned cell.  The returning inmate saw this inmate sitting on the floor in his cell with a cord wrapped around his neck, and yelled "man down!  Hanger in 210!"  An officer looked into the cell and saw the inmate sitting at the back of it.  The officer observed a pair of cords that there attached to the window frame and the other end to the inmate's neck.  The officer announced on her institutional radio that she needed medical assistance and that she had a "hanger."  She activated her personal alarm and other officers responded.  The second officer to respond entered the cell and noticed what appeared to have been an electrical cord and a TV cable cord tied around this inmate's neck, with the other end tied to a window frame.  The second officer attempted to lift the inmate's body to relieve pressure.  The first officer who was alerted to the inmate's suicide used the cut-down tool to cut the extension cord.  Only the electrical cord was attached to the window frame.  After this cord was cut, the officers placed the inmate on the ground as other officers arrived.  A sergeant and officer placed the inmate in the corridor and CPR began.  After approximately two minute, a nurse responded and relieved the sergeant who was providing ventilation via the ambu bag, and a gurney arrived on the unit with clinic staff.  The clinic staff took over CPR and the inmate was placed on the gurney and transported to the B-1 Clinic.  At approximately 10:27 a.m., a physician declared the inmate deceased.  The temperature in the cell was noted to be 81.5 degrees and the temperature of the inmate's body was noted to be 99.6 degrees.  An autopsy report was provided by the Solano County Coroner's Office and stated that the autopsy was performed on 6/27/06 and determined the cause of death as asphyxia (minutes) due to hanging (minutes).  No toxicology report was provided.

The suicide report contained the inmate's criminal history.  It stated that this inmate had one previous arrest in May 1989 for being under the influence of an illegal substance for which he was referred to a residential drug treatment program.  The instant offense, which occurred in November 1989, involved the inmate shooting and killing his ex-wife, firing a total of five shots with the final shot at a range of less than two inches.  The inmate then shot another victim in the elbow, walked out of his front door, and hid in some nearby bushes.  The police arrived; the inmate surrendered and was taken into custody, and he subsequently pleaded guilty as stated above.

The inmate's difficulties with his marriage, which ended in 1988, appeared to have been related to his substance abuse which included alcohol and cocaine abuse.  The marriage ended in divorce in 1988, and the instant offense occurred in November 1989.  The records also indicated that the inmate suffered serious injury on his job as a construction worker in 1987, and that he had a very erratic work history from that time until his arrest in November 1989.  The inmate had been placed in residential alcohol and drug treatment programs in 1982, 1986 and three times in 1989, but there was no record of his having

114

any treatment for mental health reasons until March 1989, when he called a county
mental health provider.  Although he did walk into the county mental health clinic, he
was placed on a waiting list.  When he did not return for his appointment, he was
removed from the waiting list.  In June 1989, he was found approximately one mile from
the hotel where he was staying, naked and yelling that he had not killed anyone.  He was
placed on a 72-hour hold in Sacramento County.  He made an appointment with the same
county mental health provider as before, and was again placed on the waiting list.  When
he did not respond to a subsequent letter, he was removed from the waiting list in
October 1989.  Staff from the same county mental health provider visited the inmate after
he was arrested for the commitment offense in November 1989 and described him as
agitated.  He was on 15-minute checks as suicide precautions because he had made
suicidal statements.  He was scheduled to see a psychiatrist in December 1989 but
refused.  He did see staff from the county mental health provider on two occasions in
December 1989.  The suicide report referred to the inmate's attempts to obtain mental
health treatment prior to his incarceration, and to a possible exacerbation of psychotic
symptoms by his cocaine and alcohol use.

The inmate entered the CDCR via DVI.  He was placed at the EOP level of care on
12/3/01, after having been seen in an IDTT meeting on 11/13/01 where the IDTT noted
"the patient can escalate quickly and does not have good coping skills.  History of suicide
attempts and assaults."  He was subsequently transferred to Folsom, and in April 1993 he
was transferred to CMF where he was described as being psychotic and refusing to
follow rules.  The inmate was diagnosed with Schizoaffective Disorder Bipolar Type and
Polysubstance Dependence in a Controlled Environment.  He had over 15 referrals to the
CMF Vacaville Psychiatric Program and ASH from 1993 until the time of his death, and
had been placed in the EOP in the late 1990s.  The inmate was sent to DMH in April
2003 for lithium toxicity from 4/7/03 to 4/21/03.  He was transferred to Queen of the
Valley Hospital on 4/9/03 for treatment, and diagnosed with Nephrogenic Diabetes
Insipidus Secondary to Lithium Toxicity.  His last hospitalization at the CMF Vacaville
Psychiatric Program was from October 2004 through January 2005.  He had been placed
on a Keyhea order for involuntary medication administration in December 2004.

The inmate continued to have psychotic symptoms and continued to participate in the
EOP until shortly before his death.  Surprisingly, given his history, when his Keyhea
should have been renewed in December 2005, it was allowed to expire.  He did, however,
continue in the EOP and was transferred from one unit within the CMF EOP to a
different unit in approximately May 2006.  When he changed EOP units, his treatment
team and his cell made changed.  In late April, he began reporting to his case manager
that he was feeling depressed and lonely but initially denied suicidal or homicidal
ideation and psychotic symptoms including auditory and visual hallucinations.  On
4/25/06, the inmate's case manager recorded the inmate stating, "I am thinking about
death.  I have thoughts about hurting myself."  The case manager described the inmate as
having "fleeting suicidal ideation," and he had reported the inmate had been cleared in
the triage clinic after reporting chest pain.  His stream of thought was reported as
disorganized, but he was "able to contract for safety to self, other."

On 6/15/06 the inmate was issued a single cell chrono after he had attacked another inmate in the dayroom. It was unclear from the records how serious the attack was. This was the inmate's fourth inmate assault, with the first occurring while he was at Folsom in August 1992, the second occurring in July 2003, and the third in May 2004 when he was charged with battery on an inmate with serious bodily harm after he had broken the jaw of another inmate.

After the inmate moved on 5/10/06 from the "M" Tower to the "N" Tower in the EOP at CMF, he had a new case manager and new psychiatrist. The new case manager saw him on 5/15/06, 5/26/06, 5/27/06, 6/13/06, and 6/15/06. The notes by the case manager indicated that the inmate was describing his decompensating mental status, including difficulty sleeping, poor appetite, feeling overwhelmed and unsafe, and increasing symptoms of depression and anxiety. On 5/19/06, the inmate reported that a peer had taken some of his canteen and wanted the case manager to check his canteen purchase. He subsequently reported that he had concerns about his brother having multiple sclerosis and was worried about his brother's condition. The case manager also described him as becoming increasingly paranoid with disorganized thinking and reporting auditory hallucinations. A summary of his group therapy attendance and participation in the EOP programming for the month of May 2006 indicated that the inmate had attended appropriately 50 percent of his groups, and since his move to N2, his auditory hallucinations and paranoia "appear to have increased and group attendance and participation has decreased."

In June 2006, the inmate reported his belief that his cellmate was taking his things, that others were stealing his ideas about designing shoes and toys, and that he could hear other people's conversations describing how they had taken things from him. Curiously, on 6/13/06, however, the case manager did not refer to the inmate's paranoia and other symptoms, and described the inmate as denying suicidal and homicidal ideation and having no at-risk behavior. Two days later, the inmate described his level of depression as a "ten" on a scale of one to ten with, ten being a high level of depression, but again denied SI. He admitted that he had not been going to meals, participating in groups, or going to the yard, and the case manager described him as depressed and anxious. Even though the case manager described him as not having any at-risk behavior on 6/13/06, he was referred to a psychiatrist, who saw him on that date, described him as depressed and frightened, and increased his Abilify on that date.

The psychiatric note of 6/15/06 indicated the inmate was paranoid, resulting in him hitting another inmate without any provocation. The inmate was interviewed, reported paranoid ideation, heard somebody say "nigger," and reported hearing voices calling him a homosexual. He also reported "I can see people on TV" saying "they going kill you." The psychiatrist noted the inmate denied wanting to harm someone or hurt himself. He was embarrassed that he had hit somebody. The psychiatrist's plan stated temporary single cell, five-day follow-up, and follow-up for his diabetes, and confined to quarters. The psychiatrist added additional medications to his current treatment.

116

The inmate was of concern to the custody staff because they discovered he had been giving away his personal property. He was referred to the B-1 clinic for a psychiatric appointment on 6/16/06. In the psychiatrist on duty (POD) note of 6/16/06, the psychiatrist stated that the inmate said that he was hearing voices telling him someone was going to kill him and was hearing noises on the roof, but he was not hearing voices "right now." The inmate was noted to deny being suicidal and wanting to go back to his room to read. The psychiatrist noted that he was speaking slowly, the he had trouble organizing his thoughts at times, and that his affect was constricted and "serious." The psychiatrist noted "he is now adjusting to the new medications. He refused his Risperdal this a.m. He now agrees to take it." No SRA was completed. The psychiatrist did not refer to the reason for custody's bringing the inmate to the B-1 clinic, which was that he was giving away his property. The case manager did, however, complete an SRA on 6/16/06 and endorsed a number of risk factors including previous suicide attempts, history of violence, history of substance abuse, longer or life sentence, history of poor impulse control, and dynamic factors including agitated or fearful, disturbance in mood, affective instability or irritability, current insomnia, poor appetite or anorexia, hopelessness or helplessness, feeling of guilt or worthlessness, and that he was fearful for his own safety, but gave no evaluation of the risk and recommended no referral needed. The only other notation was "denied S/I or H/I at this time, 6/16/06." On 6/19/06, the inmate was seen by a psychiatrist who noted that he continued to demonstrate and report paranoid feelings and was fearful, but denied suicidal or homicidal ideations such that he was returned to the EOP despite his non-participation in the EOP activities or out-of-cell activities. A psychiatric note of 6/20/06 listed the inmate's medications and noted that he was "alert, slow to respond, seems confused, vague, still endorses auditory hallucinations and paranoia but less." The psychiatrist also noted that the inmate denied suicide ideation and homicidal ideation, but "compliance with regimen is marginal." Much of the note was illegible, including the actual plan which appeared to increase his antipsychotics and continue other meds.

In a case manager's note of 6/23/06, he indicated that the inmate's hallucinations, paranoia and disorganized thinking "appears to be getting worse" but risk assessments for suicide, aggressive, self-injury or unpredictable were all "low." The case manager reported that the inmate was having a "hard time," and was "still worried (about people hurting me)." The case manager noted that the inmate was appropriately dressed and well groomed, but that there were prolonged pauses between each response, that his mouth appeared to be dry, and that it was sometimes difficult for the inmate to form words. The case manager concluded that the inmate was adjusting to a recent change in medication and appeared less depressed than during the preceding week.

A laboratory blood test drawn during the emergency response on 6/26/06 indicated that there were no detectable levels of any medications or drugs in the inmate's system, which indicated that he had been non-adherent to medications, despite his request for medication increases and the psychiatrist's response by increasing them. It appeared that, because the inmate denied suicidal and homicidal ideations despite his decompensating condition, he was never referred to a higher level of care. The suicide report referred to a memorandum submitted by the institution stating that "a higher level of care referral was

being discussed with this patient and in clinical supervision but one had not yet been initiated.  The reason for this is that the M.D. was working actively to adjust the patient's medications to see if there would be any improvement."  The suicide reviewer stated that the medical record did not support this assertion.  This reviewer's review of the record indicated that this inmate's mental status was decompensating, and that his new psychiatrist and case manager did not appear to recognize these symptoms or take appropriate actions to refer him to a higher level of care, nor did they consult with the previous treatment team or review the record in detail to determine his previous level of functioning.

With regard to referrals to a higher level of care, in addition to the CDCR suicide reviewer stating that the UHR documentation did not support the assertion that the inmate was being considered for a higher level of care, she also stated that "staff suggested the difficulty of referring inmate-patients to crises beds might have delayed such referral in this case."

The suicide report identified eight problems, with recommendations, as follows:

> Problem 1:  The conduct of emergency life support measures and running of the code was not clearly documented.  From the records, it was not clear when the officers arrived at the cell and started CPR.  Nor was it clear if or when 911 was called, or what happened during transport to the clinic.
>
> Recommendation:  CMF:  Warden should initiate review of the 837-A incident report for clarification of timelines in the emergency response for custody and medical staff, and take appropriate actions as indicated.  DCHCS:  Nursing PPEC shall review the emergency response and make recommendations to improve emergency response and documentation in the future.

> Problem 2:  Inmate W showed clear signs of depression and decompensation in the weeks leading up to his suicide.  Several days before his death, he was referred to the B-1 clinic for evaluation after trying to give away his property.  No SRA considering all the suicide risk factors was completed as part of that evaluation, in spite of the many case manager contacts and referrals to psychiatrist.
>
> Recommendation:  CMF:  Ensure that all psychiatrists including those on call after hours have received the seven hour SRA training (originally provided on 4/20/05 and available on videotape) and understand that such assessment, including documentation of how risk factors and protective factors are utilized to make a determination of risk in a corresponding progress note must be conducted whenever an inmate is referred for suicidal reasons.

> Problem 3:  Several recent SRAs were completed, and despite endorsing a number of risk factors, the conclusion was no referral needed.  Clinicians appear to rely primarily on the inmate's denial of suicidal intent in making their determination.

Recommendation:  Inmates who successfully complete suicide usually deny intent.  Clinicians must consider the entire clinical picture in formulating their assessment.  CMF:  Ensure that all clinicians including interns have had the mandated seven hour training as in Problem 2.  All new clinicians and interns must receive this training ongoing.

Problem 4:  Inmate W was experiencing severe deterioration and had a number of risk factors for suicidality.  Clinical staff was obviously concerned, as evidenced by frequent referrals to psychiatrists, and isolating him in a single cell due to his threats to other inmates.  However, no referral was made to a higher level of care.  Inmates who are not responding to treatment should not be allowed to continue to decompensate (a similar problem was addressed in the suicide of Inmate L in 2005).

Recommendation:  DCHCS:  Held a teleconference with CMF on 9/27/06 regarding barriers to making referrals to higher levels of care that are unique to CMF.  CMF:  Reported that this problem also identified at their most recent Coleman monitoring tour is being addressed via (1) a Quality Improvement Team, (2) staff training on making referrals as clinically indicated and utilizing the appeals process, and (3) audit the number of referrals made to the DMH Inpatient Care.

Problem 5:  Inmate W was recommended for single-cell status and confined to quarters, even though the precipitating attack upon another inmate did not occur in cell, nor was it upon his cellmate.  While a review of his disciplinary history did confirm that Inmate W had in the past fought with other inmates, this history was not excessive.  Inmate W continued to request a cellmate and to express deeper levels of depression, anxiety, and fears as a result of his single cell placement.  Inmate W's single cell status contributed to his deterioration, and was not justified by his history.  If he had been double-celled the suicide may have been prevented.

Recommendation:  Clinical staff must be very careful about recommending single-cell status, as it is statistically the single highest risk factor for suicide in prison.  Factors favoring single-celling must be weighed carefully against factors militating against single-celling, such as depression.  However, no state-wide guidelines for such recommendations by clinicians currently exist.  CMF shall form a QIT to propose guidelines for clinical staff to both recommend and to rescind single cell chronos.  The results may form the basis for a system-wide policy.

Problem 6:  Psychiatrists made numerous medication changes in an apparent effort to stabilize the inmate, yet the issue of compliance did not appear to be addressed.  (It is noted that the treating psychiatrist is currently on medical leave and is not expected to return).

Recommendation:  DMH has found that inmates referred to inpatient programs often have very low blood levels of medications, indicating a failure of

institutions to monitor medications using lab studies.  The DCHCS shall address this issue in a state-wide videoconference.

Problem 7:  Inmate W was on a Keyhea order that expired in December 2005, and there was no documentation that anyone noticed or considered whether a renewal was needed or if so what the basis of the decision was.
Recommendation:  CMF:  Ensure that an effective process for Keyhea renewals is currently in place.  If necessary, charter a QIT.

Problem 8:  Inmate W had significant health problems including hypertension, diabetes and hepatitis that were not well handled by medical staff.
Recommendation:  Refer to DCHCS Medical Professional Practice Executive Committee for further review and recommendations.

A DCHCS physician reviewed the medical care provided at CMF.  In his summary dated 8/19/06, the physician noted several items including (1) on 4/7/06 the case manager deemed the patient to be a "moderate suicide risk," (2) on 5/16/06 the case manager noted the patient stated that he "feels helpless" and is "moderately depressed;" however the suicide risk at that time was assessed as "low," (3) on 6/6/06 the case manager noted the patient had "been isolating and not attending groups or going to the yard," and the suicide risk was assessed as "low" at that time, (4) on 6/13/06 the case manager noted the patient's depression reported as "10" on a scale of  "1-10," (5) a note on 6/23/06 stated the patient was "decompensating," but again the suicide risk was assessed as "low," (6) the patient was gaining weight and his hypertension, diabetes, peripheral neuropathy, and triglycerides were not well controlled, and the patient often refused his medications.  The physician noted in his area for comment and concern that the inmate "had significant health problems that were not well handled by staff physicians;" nevertheless there seemed to be no immediate health or health issues related "to this inmate's suicide, that the conduct of CPR and the running of the Code was not all that clear nor was it clear if and when 911 was called or what happened during the patient's transport to the ER," and finally, "it seemed clear that the patient was very depressed and decompensating," "yet these practitioners rated his suicide risk as low.  My sense from the patient's statements was that the patient's suicide risk was high and as a result he should have been on suicide watch which may or may not have made a difference."

On 3/14/07, the Directors of the DCHCS and DAI provided a report on implementation of quality improvement plan for suicide of Inmate W.  This report contained several memoranda and various attachments dated 1/9/07 from CMF staff.  The CMF and DCHCS responses were reported by CAP numbers as follows:

CAP 1:  CMF has completed the Crime/Incident Report Part C1 supplement (CDC-837 C1) which clarified details of the timeline of the response by custody and medical staff.

The DCHCS response to CAP 1 included the NPPEC review of nursing management of this inmate and concluded that several problems were identified regarding the inmate's management by nursing and pharmacy, in particular with regard to his non-compliance

with medications, via no shows, not coming out for medications or refusals as well as the Keyhea order expiration in December 2005. The actions identified were (1) for the pharmacy to be required as per DCHCS policy to develop and implement a process for automatic refills of prescription medication that is not dependent on patient request, and inmates should be ducated by the scheduler for a visit with the prescriber. This problem was referred to pharmacy; (2) CMF did not comply with the requirements of the DCHCS Access to Primary Care Policy, including timely RN review and RN assessments; (3) CMF did not document specific times during the emergency response (custody and RN); and (4) CMF did not apply C-spine collar to support the neck before moving the patient. A series of corrective actions were assigned primarily to the DON as well as to the Health Care Manager, CMO and Chief of Mental Health to (a) hold mandatory ERRC meeting to discuss the areas of concern; (b) ensure emergency response exercises are developed and implemented targeting nurse response assessment, treatment, referral, and documentation; (c) hold monthly drills at least once per shift to ensure that first emergency response exercise developed and implemented is for a hanging scenario, with at least one such drill each shift with written evaluations and staff attendance/participation; (d) conduct a supervisory conference with the RNs who participated in the emergency response but failed to document specific times; (e) provide a written description of the clinical supervision and oversight of nursing staff to ensure that RNs review 7362s in a timely manner and perform adequate face-to-face assessments; and (f) ensure that first responders receive training in regards to the use of C spine collars if trauma is evident or suspected. Depending on the particular corrective action item, all of these items were to be completed within either 14 or 30 days of the 1/10/07 review.

CAP 2: CMF response stated that a summary of all psychiatrists rotating as PODs was attached, and that three psychiatrists had not completed the training which will be completed by 1/31/07, with in-service training sign-in sheets attached.

CAP 3: CMF response stated training had been completed for all clinical case managers in the EOP at CMF, with a summary and in-service training sign-in sheets attached, but that the 13 clinicians working with the 3CMS population would complete training by 1/31/06.

CAP 4: CMF response stated that a QIT was chartered, with in-service sign-in sheets, a training agenda, and an attached audit of the number of inpatient referrals made since the suicide. Other documents including an MOU [memorandum of understanding] between DMH and CDCR regarding acute psychiatric care services, a post-test, and sample referral forms were also attached.

CAP 5: CMF response stated a local operating procedure on temporary clinical single-cell chronos that became effective 12/22/06 was attached, providing guidelines.

CAP 6: No CMF response was required and no DCHCS response was included in the documents received.

CAP 7:  The CMF response included a local operating procedure for Keyhea renewal, and an audit of Keyhea renewals since the suicide, as attachments.

CAP 8:  No CMF response was required.  The PPEC suicide case review determined that the PPEC concurred with the physician reviewer findings of practice deficiencies and had summarily suspended the privileges of the specific doctor identified as the provider responsible for those deficiencies in the inmate's chronic care.  An ongoing peer review investigation involving the specific doctor, including a formal hearing process, was anticipated to come to a close within the next 60 to 90 days from the date of the review which was 1/30/07.

**Findings:**  This inmate's death appeared to have been foreseeable and preventable.  Although the inmate did not report SI or intent, his changes in behavior and mental status decompensation, including very astute referral from unit custody staff to the B-1 clinic because of the inmate giving away his property, were all clear warning signs of the increased risk of suicide.  The CDCR suicide reviewer identified, quite appropriately, a number of problems in the care, treatment, and overall management of this inmate, particularly after his transfer from one unit to another and a new treatment team taking over his mental health management.  The assertions of "discussions" regarding a referral to a higher level of care were not supported in the medical record, and there was no evidence that such a referral was generated.  The failure of clinicians to appropriately utilize the SRA process and take into account past history, as well as the clear deterioration of this inmate, were inexcusable.  There were also failures in the emergency response that appeared to have been documentation failures which were corrected as part of the CAP.  The medication management for this inmate began to unravel when there was no assessment of his need for renewal of his Keyhea in December 2005, and the laboratory testing of his blood during the emergency response indicated that there were no measurable or detectable levels of psychotropic medications in his system at the time of his death.  This was a gross failure of the medication management process for an inmate on an EOP unit whose condition was clearly deteriorating and who should have been placed at a higher level of care.

## 24. Inmate X

Brief History:  This inmate was a 45-year-old Caucasian male who committed suicide by hanging on 6/29/06 in the administration segregation unit number two (stand-alone administrative segregation unit) at KVSP.  The inmate was the sole occupant of his cell at the time of his death and was not on the MHSDS caseload.  The inmate entered the CDCR via the RJD RC on 3/2/93, having been convicted of murder in the second degree with a firearm enhancement, with a 20-year to life sentence.  His minimum eligible parole date was 1/25/09.

The inmate was discovered on 6/29/06 at approximately 10:45 p.m. by a correctional officer conducting a security check in the administrative segregation unit number two.  The inmate was hanging by a state-issued sheet attached to the air vent, and with the other end attached to his neck.  The officer shined his flashlight into the cell, did not observe the inmate in his bed, and discovered the inmate hanging above the toilet area.

The officer activated his personal alarm and notified central control via institution radio with a Code One medical emergency and requested the ERV. Staff arrived, the cell door was opened, and two officers entered the cell and used the cut-down scissors to cut the noose from around the inmate's neck. The inmate was placed on the floor where CPR was begun with assistance of an RN. The inmate was then placed on a gurney, taken to the ERV and transported to the correctional treatment center. CPR continued until the staff was relieved by the Delano Ambulance Service EMT crew. The EMT crew contacted a doctor at Delano Regional Medical Center emergency room who pronounced the inmate dead at 11:22 p.m. A CDCR physician arrived at the CTC and "clinically pronounced" the inmate dead at 12:40 a.m. An autopsy report was provided by the Sheriff-Coroner of the Kern County Coroner's facility. The report stated that the autopsy was performed on 7/3/06 and that the cause of death was hanging and the manner of death was suicide. The toxicology analysis indicated there were no drugs of abuse or alcohol found in the inmate's blood sample. The inmate left two suicide notes, one of which read, "I love you mom," and a second which read, "Mom the inmate who made this statement lied (captain) said I would probably get a SHU term. Can't do this anymore. Sorry mom I love you. (Inmate's first name)."

The suicide report contained the inmate's criminal history. It noted that the inmate had no known juvenile criminal history, but that he had a number of arrests and convictions as an adult beginning in May 1980 through June 1991. These included disturbing the peace, assault and battery, assault with a deadly weapon, malicious mischief, vehicle code violations, and possession of a knife, all for which he received either probation or short jail sentences. The commitment offense occurred in December 1991 when, during a traffic dispute, the inmate fired a loaded shotgun into a vehicle in the next lane, striking a 19-year-old victim and killing him. The inmate escaped from the scene but was subsequently arrested after disposing of the shotgun. He initially entered RJD on 3/2/93 and subsequently was transferred to several institutions including CTF, Folsom, the CSP/Corcoran SHU in December 1993 through February 1995, then back to Folsom, then CAL in 1999, CSP/LAC in 2003, PVSP in 2005, and ultimately to KVSP on 1/23/06. He remained in general population at KVSP until he was transferred to administrative segregation on 6/28/06, where he remained until his death on 6/29/06.

As part of his pre-trial commitment, his attorney requested a pre-sentencing psychological report. Two psychologists provided a report that included review of an MRI and opined that the inmate was brain damaged and was a "depressed, schizoid man" who also had learning disabilities.

The inmate was evaluated by a psychologist at RJD in March 1993, based on the above-referenced report and statements that the inmate had received antidepressant medication prior to his incarceration in the CDCR. At RJD he was diagnosed with Polysubstance Abuse/Dependent NOS and Personality Disorder NOS with Antisocial Features and was cleared for general population. The inmate was next seen on November 6, 1995 by a social worker at Folsom who determined a diagnosis of Psychotic Disorder NOS. He was then placed in the 3CMS level of care. At that time he saw a psychiatrist and signed consent to take Elavil up to 300 mgs per day. The inmate subsequently reported that he

did not believe he needed antidepressants any longer and requested that they be discontinued, which they were on 4/12/96. It appeared from the records that he did not receive additional treatment until seen in September 1996 by a psychiatrist who reported that the inmate came to the appointment with hostile and oppositional behavior and was to be scheduled for another appointment the following week. He was, however, not seen again until 12/30/96 after he had had an altercation with a correctional officer. At that time, he was seen by a clinical social worker who had seen him in November 1995 and a chrono indicated that the inmate should be placed at the 3CMS level of care. He was continued in the program, seeing the social worker as his case manager and having periodic psychiatric evaluations until July 1998, when he was removed from the MHSDS with statements that he had been in remission, was not taking medications and did not have any Axis I diagnosis. The record was confusing. The suicide report clarified this was a "clean up" chrono to remove him from the MHSDS, but he had been clinically discharged from the MHSDS in December 1996. The inmate was seen between January 1999 and July 2000 by four mental health professionals, in conjunction with custody referrals and/or placement in administrative segregation, was found to be without mental illness, and was cleared for administrative segregation and/or SHU housing.

The inmate's medical history was positive for his having had several episodes of closed head trauma, including several auto accidents and football injuries which at times resulted in a loss of consciousness. He was also noted to have had a history of alcohol abuse, marijuana abuse, and experimentation with other illegal drugs including PCP, LSD, cocaine, and mushrooms. He was also reported to have had a history of severe headaches and associated numbness in his hands during his adolescence. As noted above, he continued to have a number of RVRs because of fights with other inmates after his incarceration in the CDCR. He also had a history of back pain and Herpes Simplex, and had several complaints regarding visual problems for which he was seen on numerous occasions by optometry and ophthalmology.

In August 2002, the inmate sent an inmate services request form to mental health requesting a single cell because he had had conflicts with his cellies over the years. A psychiatrist diagnosed Organic Personality, Depressive Disorder NOS, a history of Alcohol Abuse and Borderline Intellectual Functioning, and did indeed write a chrono advising single-cell placement. The psychiatrist recommended antidepressant medication, but the inmate did not want to take medication. Although the psychiatrist continued to follow him through February 2003, he was not placed in the MHSDS.

A memorandum dated 10/22/03 was sent from an administrative segregation sergeant at CAL to mental health services reporting the inmate's distress at being placed in the stand-alone administrative segregation unit on 10/22/03. The sergeant attached a copy of a letter the inmate wrote to his mother describing the conditions and his difficulty in being placed in the stand-alone administrative segregation unit.

On 10/23/03, the inmate was seen by a psychologist in response to a self-referral stating that he was having panic attacks. After completing a mental health evaluation, he was diagnosed with Adjustment Disorder and Personality Disorder NOS, and was placed in

the 3CMS level of care. The inmate at that time was originally housed in the stand-alone administrative segregation unit and was moved to a different administrative segregation unit where mental health inmates were placed. The suicide report referred to the inmate having written at that time a letter to his mother, describing his placement in the new administrative segregation unit, and his being returned to the 3CMS level of care in October 2003 related to his having been housed in the stand-alone administrative segregation unit. The inmate was also anticipating he would be transferred to another facility, and reported he was very anxious about enemy concerns, staff conflicts, and specifically not wanting to be transferred back to CSP/LAC.

On 12/3/03 the inmate was transferred from CAL to CSP/LAC. The initial health screening of 12/3/03 indicated that the inmate reported anxiety as a current mental health problem. However, no referral to mental health was recorded on the screening form. The inmate was seen by a psychiatrist two days later because of his complaints of anxiety and depression. The psychiatrist removed him from the MHSDS. The suicide report referred to there being no documentation as to why this action was taken. There was no documentation in the records reviewed that explained this decision; however, a note by the psychiatrist on 12/5/03 identified the inmate as being evaluated in administrative segregation as a new admission and an MH-4 was updated. The psychiatrist initially indicated the plan to continue 3CMS, scratched out those words, and replaced them with "dc'd 3CMS" without further explanation. The GAF was estimated at 60. The inmate saw two psychologists within a week of this psychiatric evaluation. The second psychologist who saw the inmate during an ICC wrote that the inmate was depressed and recommended that he be returned to the 3CMS level of care. However, it appeared that this did not happen. The inmate sent additional inmate services request forms to mental health and periodically saw mental health staff requesting a single cell because of "brain damage." The inmate was described consistently in these contacts as hostile, oppositional, unkempt, argumentative, and demanding, and reported that he was depressed and had trouble with cellmates. The inmate continued to have daily psych tech rounds in administrative segregation. However, his appointments with DMH staff were based on his self-requests. This continued until 5/25/05 when he was seen by the IDTT and an MH-2 treatment plan was completed solely for the purpose of assessing whether or not he should be placed on single-cell status. The Axis I diagnosis was deferred and the inmate was not placed in a single cell. The inmate was seen again by mental health staff in June and July because of requests for single-cell status; these requests were consistently denied.

The inmate was transferred to KVSP on 1/23/06. On 1/27/06, a mental health screening was provided by a licensed psych tech. The psych tech opined that the inmate was depressed and referred him for further mental health evaluation which was performed on 1/31/06 by a psychiatrist. The psychiatrist noted that the inmate stated he "does not want any psych meds" and "I just wanted to be 3CMS." The psychiatrist noted his mental status was essentially clear, and the inmate denied any mood swings, depression or SI. The psychiatrist assessed the inmate as having a Mood Disorder NOS by history in remission, determined that no psychiatric treatment was indicated, and the inmate was not placed in the MHSDS. His next contact with mental health staff was on 4/26/06, based

125

on a staff referral by a correctional officer who described the inmate as appearing "sad, depressed, lost." In response to this referral, the inmate was seen by a psychologist. Once again, the inmate reported his symptoms were because of his being double-celled and because of his father's poor health. He was described as mildly depressed but denied SI. His ADLs were essentially normal such that the psychologist opined that he was stable and not in need of a single cell or placement in the MHSDS. The plan was for the inmate to notify custody if he felt he needed a single-cell placement.

The mental health screening on 6/29/06 by the psych tech indicated that the inmate had been in the 3CMS in 2000 and 1996 and had been prescribed antidepressants, but denied past suicide attempt and answered "not at all" in response to thinking of killing himself. The screening also indicated that the inmate's adaptive functioning assessment was poor and his mental health needs were continuing, concluding that the inmate met criteria for experiencing a major depression. This was the inmate's last mental health contact, on the day after he had been placed in the administrative segregation stand-alone unit. He was scheduled for a routine mental health follow-up which must occur within five days. The inmate denied suicidal thoughts or intent and therefore was not scheduled for an emergency follow-up; however, the psych tech did tell the inmate that he (the psych tech) would see this inmate on the following day. The inmate was discovered hanging late that day at approximately 10:45 p.m.

The inmate had received a number of RVRs during his incarceration, the first of which occurred in December 1993 for assault on a peace officer resulting in a 12-month SHU term. While in the SHU, he was involved in several other assaults and batteries on prisoners, including cell fights, until he was transferred from CSP/Corcoran to a series of other prisons. He continued to have conflicts with other inmates resulting in RVRs for mutual combat and/or battery, disrespect of officers, and non-compliance with inmate grooming standards. In September 2002 he was actually recommended by a psychiatrist for single-cell status, which was also recommended by an ICC in December 2003 because of his "medical condition and history of in cell violence." When the inmate was transferred to CSP/LAC, he was placed on an SNY, but was approved for double-cell housing, refused to double-cell in SNY. He had several bed moves for threats against other inmates and ultimately received an RVR for mutual combat resulting in serious injury in August 2004. He continued to be involved with mutual combat both as a perpetrator and victim with other inmates over the next two years through June 2005. He was moved to the SNY at KVSP in January 2006, again with double-cell housing. The suicide report referred to the inmate threatening his cellmate with physical harm on 6/28/06. The inmate was deemed a threat to institutional safety and placed in the stand-alone administrative segregation unit because of these threats. The threat was determined to be an offense that could potentially result in a SHU term. The inmate was informed of this by a captain at approximately 12:10 p.m. on 6/29/06, approximately 10 and a half hours prior to his being discovered hanging in his cell.

The CDCR suicide reviewer referred in the suicide report to the inmate having a "primary point of stress" in not having a single cell, and his ongoing attempts to obtain such a cell. The inmate was seen by the psych tech approximately two hours before he was informed

by the captain that he might be placed in a SHU following his placement in the stand-alone administrative segregation unit. The reviewer continued with the opinion "it seems that he became overwhelmed after learning the possibility of a SHU term and rather than alerting staff of his increased depression and hopelessness, he decided to take his own life."

The suicide report identified one problem, with recommendation, as follows:

> Problem: Concerns regarding the Code for the emergency response included unacceptable delay of nine to 13 minutes in calling 911 and lack of detail such as whether intubation was attempted and cardiac medications administered.
> Recommendation: Refer to nursing for PPEC review at the departmental level.

Plaintiffs' counsel sent a letter dated 11/9/06 to the CDCR and the Special Master regarding this inmate's death. They stated in their letter that serious clinical inadequacies were identified in the suicide report, but the report's only recommendation addressed the inadequacy of the emergency response provided to the inmate after he was discovered hanging in his administrative segregation cell. Counsel reiterated their request that CDCR implement in the stand-alone administrative segregation unit the same exclusionary screening process utilized in the PBSP SHU because of a "rash of suicides that already occurred within them." They also re-emphasized their request that CDCR track prior suicide attempts and mental health history on non-MHSDS inmates, and emphasized this inmate's history of mental health decompensation when he was housed in the stand-alone administrative segregation unit at CAL in 2003. Plaintiffs' counsel also quoted from the suicide report the inmate's describing his experience in the stand-alone administrative segregation unit in October 2003, including "this is the worse nightmare situation I've been in yet!" and his description of the cells and outdoor yard as "cages." They also referred to evidence in the suicide report that the inmate had decompensated in the stand-alone administrative segregation unit in 2003 because of the severe conditions, and stated that he probably would have been readmitted to the MHSDS and removed from this stand-alone administrative segregation unit, but the suicide report "contains no recommendation regarding the need to screen and/or exclude inmates with a history" such as this inmate. Plaintiffs' counsel demanded CDCR "immediately implement a pre-screening assessment for inmate's placed in the stand-alone ASUs that includes a UHR and central file review for suicide attempt history, prior mental health history, and/or history of decompensation when placed in the SHU or stand-alone ASU and excludes those inmates with such a history." They also stated that none of the serious clinical failures identified in the suicide report resulted in recommendations. These included the removal of the inmate from the MHSDS at CSP/LAC, the failure to return the inmate to the MHSDS caseload after a recommendation by a psychologist who participated in the ICC, and subsequent failures by psychiatrists after a referral by a psych tech who described the inmate as depressed, and by a psychologist who saw him in April 2006 after a correctional officer referral. In addition to the above statements and recommendations, plaintiffs' counsel proposed that staff training be conducted at CSP/LAC on the requirements for removal of inmates from the MHSDS, and that the

"threshold standards at CSP/LAC for returning former caseload inmates" to the MHSDS be evaluated.

On 2/5/07, the Directors of the DCHCS and DAI issued a report on the implementation of a quality improvement plan for suicide of Inmate X. That report included a nurse consultant program review as part of the death review committee submission, with findings that stated, (1) no cardiac monitor paddles on the crash cart defibrillator which have now been replaced, (2) leads were not available for the EKG which have been ordered, (3) the AED was unable to be located in the ERV; however, one has been placed in the ERV emergency response bag, (4) the inmate was moved without a cervical collar, and (5) EMTs did not administer medications and did not intubate the inmate. In addition, problems were identified including a (1) nine to13-minute delay in calling 911, (2) the Code initially being called by the correctional officer as a Code 1, (3) the 17-minute ambulance response time, and (4) the DON stating that headquarters had been informed in June that the Regional CHSA II had all the defibrillator paddles and leads removed from the EKG machines because they were BLAS, not ACLS. The corrective actions proposed were to have the DON to provide the ERRC minutes for this case, to ensure that all personnel who respond to medical emergencies receive training regarding use of C-spine collars, to work with regional DON to resolve the issues of equipment supplies for the TTA and emergency bags, to develop a process for ordering TTA supplies and repairing/replacing TTA equipment, to submit a written description of the process to the regional DON, to train appropriate staff, and finally to meet with the TTA RN and discuss the reason for the delay in calling 911 and provide a written summary of the meeting to the regional DON. Three of these corrective actions were to be completed within seven days, one within 14 days, and the last within 30 days of the review dated 12/6/06. There was no additional documentation provided regarding the completion of these corrective actions.

**Findings:** This inmate's death does not appear to have been foreseeable as he was not reporting SI or intent; however, it may very well have been preventable had he been appropriately included in the MHSDS caseload. This was not done because of failures by clinicians at several points, as identified in the suicide report and records reviewed. It appeared that his disruptive, aggressive, hostile and combative behavior was the focus of clinicians who deferred to a custody response, rather than conduct in-depth and continuing evaluations of his mental health pathology which may very well have included some organic brain damage and/or organic personality disorder secondary to head trauma. Further, the inmate had identified the stress that he experienced and his responses to that stress when placed in double-celling. However, despite there being some recommendations for single-cell status, these were not agreed upon by custody and therefore did not occur. Lastly, his placement in the stand-alone administrative segregation unit and his previous experience were not known to the psych tech who saw him on the day of his death. However, he did report his depression and his history of being at the 3CMS level of care. This should have prompted a review of his record, which would very likely have resulted in a more timely referral for further mental health services on transfer from this administrative segregation unit. The management of this

inmate within the CDCR clearly required a collaborative and coordinated effort by clinical and custody staff.  The descriptions of his behavior, including his aggressiveness and depression, could have been managed more effectively.  Had they been, it may very well have resulted in his not being placed in a stand-alone administrative segregation unit which for him was a high risk area.


## 25.  Inmate Y

Brief History:  This inmate was a 35-year-old Caucasian male who committed suicide by hanging on 7/1/06 in the administrative segregation unit at CTF.  The inmate was the sole occupant of his cell at the time of his death and was not in the MHSDS.  The inmate entered the CDCR via the DVI RC on 2/5/02 after he pled guilty to kidnapping and assault with a firearm, for which he received a sentence of 11 years in prison.  His earliest parole date was 8/20/10.

The inmate was discovered on 7/1/06 at approximately 9:10 a.m. by a correctional officer who was walking by his cell on his way to get an inmate for a visit when he looked into the inmate's cell and discovered him hanging.  The inmate was hanging from the bars to the right of the cell door and was facing the inside of the cell.  The officer yelled man down and the central medical department was notified by telephone and advised of the emergency.  A sergeant requested assistance via the institutional radio.  Two officers entered the cell and lifted the inmate's body while a third officer cut the noose that was made from a bed sheet and tied to the cell bars.  The officers placed the inmate on the floor on top of a mattress as a third officer checked his vital signs and, finding none, began CPR with the assistance of another officer.  At 9:15 a.m. an RN responded to the wing and third tier.  The inmate was moved to the second tier and the AED was applied.  CPR continued, and at approximately 9:37 a.m. the ambulance service with the EMT/paramedics arrived on the scene and prepared the inmate for transport to the Salinas Valley Memorial Hospital.  The ambulance left the grounds at about 10:00 a.m.  After arriving at the hospital, a physician pronounced the inmate dead at 10:29 a.m.  The suicide report stated that a correctional officer who responded to the emergency wrote a memorandum to the warden complaining about the emergency response by medical personnel.  Specifically, the officer reported that the first medical staff to respond was an RN who stated "he's dead" without checking any vital signs, and the RN then stated "someone" needed to call 911.  The correctional officer told the RN she needed to do something and the RN subsequently connected the AED but requested that staff move the inmate to the second tier where there was more room.  The inmate was placed on a Stokes litter and carried to the second tier where the RN turned on the AED but then stopped when correctional staff told her she might electrocute everyone.  The officer further wrote that the medical staff did not give correctional staff any direction on how to proceed.  The officers continued CPR without intervention by the medical staff until a second RN relieved the officer from doing CPR, but conducted only five or six compressions and stated that she needed to be relieved.  The officer also wrote that on the EMTs' arrival, they took control of the situation and provided guidance to the officers.  An autopsy report was provided by the Monterey County Sheriff-Coroner's Office and stated that the autopsy was performed on 7/3/06 and determined the cause of death to be

asphyxia due to hanging. The manner of death was determined to be suicide. A toxicology screen determined that there were no common acidic, neutral or basic drugs and no blood ethanol alcohol detected in the inmate's blood sample.

The suicide report contained the inmate's criminal justice history. It described an arrest record beginning at age 18 with multiple arrests, many of which were related to his chronic methamphetamine addiction. His arrests included grand theft, burglary, possession of a controlled substance, receiving known stolen property, battery, inflicting corporal injury on a spouse/cohabitant, possession/manufacturing/selling a dangerous weapon, carrying a loaded firearm, possession of hypodermic needles, murder, kidnapping, assault with a deadly weapon, and buying a handgun without proper identification. However, he served only one jail term in excess of thirty days with regard to these offenses. His committing offense involved his having forced his girlfriend into his truck after he had gone to her home to collect money that she owed him. He was arrested as he and the girlfriend were walking towards his truck. He ultimately pled guilty to kidnapping and assault with a firearm. He was sentenced to 11 years in prison and ordered to pay restitution fees of nearly $60,000.

The inmate entered the CDCR on 2/5/02. He had a confidential transfer of medical information form from the California Forensic Medical Group stating that the inmate had a history of using crack and amphetamines, and had had suicidal thoughts in the past. The initial health screening on 2/5/02 also indicated "no" answers to all mental health questions, including whether he had ever had any SI or suicide attempts. The mental health screening conducted on 2/6/02 indicated that he was cleared for general population and had no mental health needs. Similarly, initial health screening when he was transferred from DVI to CTF on 2/27/02 indicated "no" answers to all mental health-related questions. The inmate had no contact with mental health services until 6/22/06, when a brief screening report indicated that the inmate had no indications of suffering from any mental illness and that referral to a mental health professional was not indicated. There were no notations that the inmate had any serious medical conditions or problems while he was incarcerated.

The 6/22/06 brief mental health screening was conducted after the inmate was charged with battery on an inmate without serious injury, alleged to have occurred on 6/21/06 in the CTF North dormitory. He was transferred to the CTF-Central O-Wing administrative segregation unit after receiving an RVR. On 6/29/06, the ICC reviewed his case; a summary stated that he would remain in administrative segregation with a possible DA referral. The inmate's functioning in administrative segregation was reviewed by the CDCR suicide reviewer with administrative segregation staff. The reviewer reported that the staff was not able to provide much information regarding the inmate's functioning for the 11 days that he was in the administrative segregation unit. The administrative segregation 114-A log could not be located.

The suicide report identified two problems, with recommendations, as follows:

130

Problem 1:  Staff was unable to locate missing CDC 114-A Inmate Segregation Records for the periods of 6/21/06 though 7/1/06 (the date of the suicide).
Recommendation:  CTF to produce the missing documentation.  If unable to produce, provide an explanation and review policy to ensure that such documentation is always available.

Problem 2:  An officer who responded to the suicide has made allegations that the response by medical personnel was inadequate.
Recommendation:  Health care manager or designee to conduct a review of their staff's response to this medical emergency.

A death review/suicide was conducted by a physician regarding this inmate's death.  He opined that, while overall there seemed to be no significant health or health treatment issues related to the inmate's suicide, there were serious problems with the "code" that needed further review.  Problems included the nurse's statement and the lack of direction for medical staff in assisting custody to run the "code."  There were also confusing time-related entries in the sequence as to whether the paramedics arrived at 9:25 or 9:37 a.m., and concerning the stopping of CPR to transport the inmate to the gurney and the emergency response vehicle (ERV).  On 2/27/07, the Directors of the DCHCS and DAI provided a report on the implementation of quality improvement plan for suicide of Inmate Y.  The report included a memorandum dated 12/6/06 from CTF and indicated that, with regard to Problem 1, CTF cited numerous staff shortages in the records department as the reason why these documents could not be located.  It also stated that to ensure that these files were available in the future for review, the procedure for handling these documents had been modified, and that in all cases of a death in the administrative segregation unit, the original 114-As would be hand-carried to the classification and parole representative (C&PR) and a photocopy of the record should be included in the incident package.

With regard to Problem 2, the circumstances of the emergency medical response were reviewed by the DON and a report was submitted on 9/11/06.  The conclusion of the DON was that, although training issues were identified regarding how an AED unit worked, appropriate medical care was given by both custody and medical staff who responded to the emergency.  However, the warden and health care manager determined that after reviewing this report, the officers' report and the allegations, the matter was referred to the Central Intake Unit, and a request for an internal affairs investigation was prepared and forwarded.  There was no additional information with regard to the outcome of any investigation.

**Findings:**  This inmate's suicide did not appear to have been foreseeable, as the inmate was not receiving nor requesting mental health services and did not indicate to clinical or custody staff any SI or intent.  However, his death may have been preventable had appropriate emergency procedures been followed.  Although it appeared that custody staff responded appropriately by providing CPR, the behavior of the first arriving nurse in not taking vital signs and not appropriately using the AED was inexcusable.  Given the officer's report and allegations, the response of the director of nursing (DON) in

determining that the medical response was appropriate was also inexplicable. The decision of the health care manager and the warden to forward this matter to internal affairs for review was appropriate, and the outcome of their investigation should be provided to the Special Master.

### 26. Inmate Z

Brief History: This inmate was a 25-year-old Hispanic male who committed suicide by hanging on 7/8/06 at approximately 6:37 p.m. in the stand-alone administrative segregation unit at CSP/Sac. He was the sole occupant of his cell at the time of his death. The inmate was not a participant in the MHSDS. He entered the CDCR on 2/9/04 via the NKSP RC after having been convicted of first degree murder with a handgun, for a sentence of 50 years to life. His minimum eligible parole date was October 31, 2052.

The inmate was discovered on 7/8/06 at approximately 6:37 p.m. by a correctional officer who had gone to the inmate's cell to talk with him. The officer approached the cell and it was dark; when the officer called the inmate's name, he did not respond. The officer shined his flashlight into the cell and saw the inmate hanging from a sheet attached to the cell air vent just above the toilet. The officer activated his personal alarm and told the control booth officer he had an "inmate hanging." The cut-down tool was passed down to responding staff in the housing unit, and when additional staff arrived, the officer instructed the control booth officer to open the cell door. Staff entered the cell, turned on the cell light, and saw that the inmate's eyes were open and non-responsive to light. The sheet was cut with the cut-down tool, the inmate's body was placed on a Stokes litter, and the noose was removed from the inmate's neck to establish an airway. The officer checked for a pulse. As the inmate was being rolled on a gurney toward the rotunda, a second officer started CPR, which continued until the inmate was placed in the emergency response vehicle (ERV) and transported to A Facility ER. At approximately 6:40 p.m., the inmate was removed from the van, and the AED was placed on him as CPR continued. Several officers continued CPR until approximately 7:06 p.m. when Folsom Fire Department paramedics arrived at the facility, assessed the inmate's condition, and ordered CPR stopped. A paramedic pronounced the inmate dead at approximately 7:09 p.m. The suicide report indicated that there was some delay in the control booth officer's locating the ambu bag. An autopsy report was received from the Sacramento County Coroner. It stated the autopsy was performed on 7/10/06, with hanging as the cause of death, and suicide as the manner of death. The toxicology report indicated that no alcohol or illicit drugs were found in the blood specimen.

A review of the inmate's death by a Coleman team expert during the subsequent Coleman monitoring visit indicated that CPR chest compressions were begun while the inmate was en route to the rotunda. The ambu bag was not passed down from the control booth until after the A Facility ERV had arrived. A micro-shield was not utilized while the delay of the ambu bag continued. The Coleman expert indicated in his report that CPR was not immediately initiated after the inmate was cut down, custody staff were unable to locate and utilize the ambu bag in a timely manner, micro-shields were not utilized as indicated, and that chest compressions were suspended during the transport of the inmate to the

132

clinic.  The <u>Coleman</u> expert also indicated that the recorded time from when the inmate was found hanging in his cell to the time he arrived in the ER was approximately three minutes, and that this timeline was questionable.

The suicide report contained the inmate's criminal justice history.  It reported that the inmate was arrested as a juvenile for vandalism, but the disposition was unclear.  The inmate had one previous misdemeanor conviction for driving with a suspended license as an adult.  His commitment offense involved his having shot and killed the victim at a bus stop.  The inmate had stopped in a van near the bus stop and approached the victim, whom he believed had been involved in a gang-related shooting in the inmate's home which had injured his mother.  The inmate shot the victim, fled the scene and, after his van crashed into another car, was apprehended and convicted.

The inmate was received at NKSP RC on 2/9/04.  No mental health history or mental health issues were identified at the initial health screening.  He received a mental health screening on 2/11/04, and once again, no history or current mental health issues were identified and he was cleared for general population.  The inmate was transferred to Folsom on 4/29/04, to the Folsom administrative segregation unit on 11/9/04, then to the CSP/Corcoran SHU on 7/13/05, and was returned to the Folsom administrative segregation unit on 8/24/05.  On each of these occasions, he received mental health screenings, and no mental health issues were identified to prevent his placement in administrative segregation or the SHU.  The suicide report referred to an interview with the psych tech, and to a review of the log books at the administrative segregation unit and the SHU.  It stated that there was no indication from the interview or the log books that this inmate had reported or was identified to have had any mental health concerns during his stays in administrative segregation or SHU.

The inmate received an RVR on 11/9/04 because of an assault on another inmate on the yard.  Both inmates were apparently members of the Southern Hispanic Prison Gang.  The subject inmate stabbed the other inmate with a metal shank multiple times in the head, face, neck, and torso.  A referral was made to the DA.  The inmate was placed in administrative segregation, and while there he received three additional RVR for refusing to accept a cellmate.  The inmate was also issued an additional RVR for obstructing a peace officer's duty/cell extraction when he participated in a disturbance with approximately 75 inmates in the stand-alone administrative segregation unit by withholding their food trays, resulting in mass cell extractions.  Based on these offenses, the inmate was transferred to the CSP/Corcoran SHU on 7/13/05; his DA referral was still pending.  The inmate's SHU term was suspended on 12/1/05, and he was returned to the mainline from the administrative segregation unit at Folsom.  He was then returned to the administrative segregation unit, initially for refusing to return to the mainline after an attorney visit on 1/19/06, but subsequently he was held there for safety/enemy concerns.  The inmate had requested an SNY, but was found unsuitable due to lack of cooperation with the investigator and his history of gang activity.  On 6/28/06 he was endorsed to CSATF.

The suicide report identified four problems, with recommendations, as follows:

133

Problem 1:  During the emergency response, the control booth officer was unable to locate the ambu bag.
Recommendation:  CSP/Sac has already made a change to procedure to ensure that the bags are readily available.

Problem 2:  During the emergency response, the electric ambulance assigned to the stand-alone administrative segregation unit was unavailable.  CPR should have continued during transport.
Recommendation:  CSP/Sac indicated this problem has been "fixed" and that the ambulance will now be available as per policy.

Problem 3:  No medical staff responded to the unit during the emergency.
Recommendation:  The health care associate warden at CSP/Sac told the reviewer that an investigation had been initiated.

Problem 4:  There was a five-minute delay in calling 911, which should be called right away.
Recommendation:  Ensure that all staff is aware of the requirement to call 911 immediately in a medical emergency.

A death review was conducted by a physician.   It indicated that there were key events that occurred, including (1) the inmate was found with his hands and feet bound, hanging in the cell; (2) CPR was stopped for approximately three to four minutes during transport to the TTA; (3) overall, there seemed to be no health or health treatment issues related to the inmate's suicide; (4) conduct of the CPR and running of the Code were not appropriate, with several concerns including the five-minute delay in calling 911, the excessive slowness of staff in starting an IV, the non-continuation of CPR during transport, the slow response time for the paramedics, i.e. 26 minutes; and (5) the lack of attempt by the correctional officer, who observed the inmate's light out at 6:25 p.m., to see or question the inmate, which the reviewer found to be "a significant error in judgment."

On 2/27/07, the Directors of the DCHCS and DAI provided a report on implementation of quality improvement plan for suicide of Inmate Z.  Their report included the memorandum from CSP/Sac regarding the corrective actions in connection with the suicide report recommendations.  With regard to Problem 1, the response indicated that CSP/Sac standardized the packaging and location of the ambu bag in each control booth, as part of the cut-down kit.  With regard to Problem 2, the electric ambulance had been reassigned to another facility, but since this suicide, it was reassigned back to the stand-alone administrative segregation unit.  Two additional electric ambulances had been purchased and CSP/Sac was awaiting delivery.  With regard to Problem 3, although CSP/Sac had indicated that a personnel investigation had been initiated, it had not been. The medical staff assigned to administrative segregation was also assigned to the minimum support facility (MSF), and the five-minute time lapse between the time of the inmate discovery and transport to the A facility was inadequate time for the medical staff

to respond. Instead, the problem was addressed through staffing review and a re-evaluation of the scheduling of MTAs. With regard to Problem 4, CSP/Sac responded that "a one to five minute time frame seemed reasonable considering that medical staff evaluated" this inmate and initiated use of the AED, and relayed the request for emergency personnel within that period. No additional information was received regarding the corrective actions or the DCHCS response to CSP/Sac's statements.

**Findings:** This inmate's death did not appear to have been foreseeable in that he did not report, nor did he appear to indicate in any way, that he was contemplating ending his life. This death may, however, have been preventable had the emergency response not been flawed, that is had there not been the time delays in initiating full CPR including ventilation, discontinuation of CPR, the failure of medical staff to respond to the scene, and the delay in calling 911. DCHCS appears to have accepted these conclusions by SCP/Sac.

**27. Inmate AA**

Brief History: This inmate was a 39-year-old Caucasian male who committed suicide by hanging on 7/10/06 in the EOP at SVSP. The inmate was placed at the EOP level of care in the MHSDS and was the sole occupant of his cell at the time of his death. The inmate entered the CDCR on 3/8/01 via the HDSP RC after pleading guilty to murder and voluntary manslaughter with a sentence of 62 years to life with the possibility of parole.

The inmate was discovered on 7/10/06 at approximately 1:49 p.m. after an inmate notified the control booth officer to have staff check this inmate's cell because it appeared that the inmate was hanging in his cell. The inmate who reported this to officers then locked himself in the shower. The control booth officer asked the officer who was conducting security rounds to check this inmate's cell. At approximately 1:50 p.m. the officer discovered this inmate hanging in his cell from the upper bunk. The officer then activated his personal alarm and retrieved the cut-down tool from the control booth officer. He then cut the noose from the upper bunk, and he and another officer lowered the inmate to the floor and pulled him outside of the cell. Another officer cut the noose from the inmate's neck. When medical personnel arrived, they started CPR. The ERV was summoned, arrived on the scene, and transported the inmate to the correctional treatment center (CTC). The incident report stated that medical staff continued CPR and other life-saving procedures, including application of the AED. However, the inmate did not respond and a physician in the CTC pronounced the inmate dead at 1:57 p.m. There were approximately three minutes between the inmate's discovery and the beginning of CPR by an LPN and officer. The inmate appeared to have left a very short suicide note addressed to his sister, stating his love for her and "I couldn't take this any longer." In a seven-line note, he stated that he would cherish is sister and their memories together , and advised her to take care of herself. The note was signed with the inmate's name.

An autopsy report from the Monterey County Coroner's Office stated that the autopsy was done on 7/12/06, determined that the cause of death was asphyxia (minutes) due to hanging (minutes), and that the manner of death was suicide. The toxicology report

135

stated that there were no common acidic, neutral, or basic drugs detected, and no blood ethanol alcohol detected.

The suicide report contained the inmate's criminal justice history. It included a significant juvenile history, including the juvenile court's placement of the inmate in alternative placements, based on his allegations of battery, auto theft and difficulties in past placements. This resulted in the inmate being placed in his father's home, only to find that the inmate had a knife and was subsequently placed in juvenile hall. His history included a number of charges including burglaries, trespassing, vandalism and assaults. He had had at least three auto accidents in which he was the at-fault party. The suicide report contained a reference to his conviction involving use of force likely to cause great bodily injury, for which received a six-year term. However, more information on this conviction was not available. The inmate reported that he had had a history of being diagnosed with Bipolar Disorder and Schizophrenia, that he had been taking Prozac and Zyprexa for two months prior to the commitment offense, and that he was involved in a county MHP. The inmate's commitment offense began on 9/8/00 when he got into an argument with two men with whom he had agreed to give a ride. This ultimately ended in his stabbing each of them with a knife, killing both of them. The inmate subsequently pled guilty to murder and voluntary manslaughter, and was sentenced to 62 years to life with the possibility of parole.

After the inmate entered the CDCR via HDSP, he was transferred to CSP/LAC on 1/8/02, to CSP/Sac in April 2004, and to KVSP on 11/22/05. He then transferred back to CSP/LAC on 11/30/05 and ultimately to SVSP on 2/22/06 where he remained until his death. The CSP/Sac OHU observation record indicated suicide precautions were to be done every two hours and were documented as being conducted every two hours rather than Q 15 minutes which is the standard within the CDCR. These suicide precautions were instituted after the inmate was admitted to the MHCB for suicide ideation and stated "I'm suicidal and depressed." The inmate was placed in a ZZ cell while awaiting transfer to the MHCB.

The inmate had a history of mental illness prior to his imprisonment. He was screened at HDSP as having positive indicators of mental illness that begin at approximately age 13. The past history included his having auditory hallucinations telling him he was "no good" as well as a suicide attempt at age 13 by overdosing on pills. The inmate was diagnosed as having Schizophrenia and placed at the EOP level of care on his arrival at CDCR at HDSP.

On 1/8/02 while at CSP/LAC, a mental health assessment completed by the psychiatrist indicated that the inmate had a history of mental health treatment. He was diagnosed with Schizophrenia, Paranoid Type and prescribed antipsychotic medication.

The inmate was transferred to CSP/Sac in April 2004 and continued at the EOP level of care. He was transferred from CSP/LAC to the PSU at Folsom on 4/15/04. He remained in the PSU until August 2004 when he was transferred to general population and then ultimately transferred to the OHU in March 2005. He was housed in a psychiatric

housing unit (PHU) with a diagnosis of Schizoaffective Disorder. On 4/22/04 a psychologist opined that he was a risk of harm to self and to others and noted past suicidal thoughts of hanging himself and cutting his wrists. His diagnosis was changed to Schizophrenia, Paranoid Type and he continued on at the PHU.

He remained at Folsom until he was transferred to KVSP on 11/22/05. On 11/30/05 he was transferred to an MHCB at CSP/LAC after he had taken an overdose of medications which he reportedly had hoarded and purchased on the yard. He was diagnosed with Major Depressive Disorder with possible psychosis which was subsequently changed to Schizoaffective Disorder. The record indicated the inmate reported a number of different mental illness symptoms, including hearing voices, having thoughts of hurting himself and of suicide, and had had multiple suicide attempts beginning at age 18. It was also noted he reported to staff that if he did get access to enough medication, he would kill himself. The inmate had trials of various medications including Seroquel, Abilify, Prozac, Paxil, Trazodone, Zydis, Effexor, Buspar, Haldol and Thorazine. It appeared from the record that the precipitant for his taking the overdose on 11/30/05 may have been related to an RVR on 11/25/05 involving allegations that he was involved in inciting a riot. The inmate was discharged from the MHCB and admitted to the EOP at CSP/LAC. On 1/23/06 the inmate reported that he had taken approximately 60 pills he had gotten from other inmates, and he was transferred to a CSP/LAC MHCB. The inmate reported that he had family problems including his sister's refusal to talk with him any further. On a mental status, he reported that he had heard voices directing him to kill himself. During his stay in the MHCB from 1/28/06 until 2/7/06, he attempted to make a noose from a paper shirt. It was unclear from the record whether or not he actually did take an overdose of medication, as there were no blood or urine studies noted in the record. The inmate was prescribed Geodon, Prozac, and Trazodone during his stay, but he refused to attend IDTT meetings. He was discharged from the MHCB on 2/7/06. A suicide risk evaluation on 4/13/06 identified suicide ideations/threats in the past with no dates and did not reference any previous suicide attempts. The sources of information were identified as correctional officer or staff interview, inmate interview and the UHR; however, the clearly documented past history of suicide attempts were not noted. There were no dynamic risk factors (short-term risk factors) identified. Group activities were identified as the only protective factors. The inmate's level of risk was estimated as low.

After being released from the MHCB, the inmate remained at the EOP level of care with the same medications as prescribed for him. The records indicated that on 6/22/06 the inmate signed a refusal slip for his medications, although the MARs indicated that the inmate had been refusing morning and HS medications for several weeks, and had refused the morning medications for one and a half months without there being any documented evidence of referral to the psychiatrist or follow-up regarding his medication non-compliance. The MAR for the month of May indicated at least 21 medication refusals. The MAR for June 2006 indicated at least 22 medication refusals. Finally on 6/27/06 the psychiatrist evaluated the inmate who reported that he wanted to take his previous medications, and the psychiatrist discontinued Prozac, Geodon and Trazodone, and prescribed Luvox, Seroquel and Topamax. He is described as alert and oriented with euthymic mood, with the plan to revise his current psych med regimen. There was no

reference in this note to the inmate's non-compliance with medications in April, May and June 2006. Because of an institutional lockdown on 6/27/06, this inmate did not participate in EOP programs. A progress note dated 6/30/06 by a psychologist stated that the inmate had good sleep, appetite and energy levels, with no homicidal ideation or disciplinary problems, and that he was taking his medications without problems. The inmate was noted to have denied distress but had a complaint about a group which was unclear from the note. His mental status was described as essentially clear with an absence of SI, with a plan to continue to address treatment goals with case management sessions and group therapy.

On 7/3/06 the inmate's cellmate reported that this inmate had been performing sex acts on him against his will. The cellmate was placed in the administrative segregation unit pending an investigation and the inmate was kept in the cell on close-custody status. The inmate's case manager saw the inmate for the last mental health contact on 7/6/06 when the inmate reported that the allegations against him weren't true, and that he did not want to participate further in the MHP. He was noted to have denied SI during a cell-front interview. The inmate committed suicide on 7/10/06 while on close-custody and single-cell status. Inmate AA was cleared by an MTA for placement in administrative segregation; however, he was not placed in administrative segregation because of a lack of beds. The record did not indicate that a 31-question screening was performed on this inmate after his medical clearance for placement in administrative segregation.

The suicide report did not identify any problems with this inmate's care, treatment and management, and no recommendations were made. There was a notation that the Suicide Case Review Focused Improvement Team considered whether the inmate should have been referred to a higher level of care and determined that "given the chronic nature of his presentation, and general ability to function at an acceptable level within the Enhanced Outpatient Program, this did not appear to be indicated."

A death/suicide review was performed by a physician regarding this inmate's death. It stated that he was taking Luvox, Seroquel and Topamax. The physician reviewer also stated that oxygen should have been given during the emergency response, but "for some reason," it was not available. The physician reviewer also stated the inmate had no significant health problems but mental health issues predominated. There were multiple items in the UHR that indicated the inmate continued to be a suicide risk. These included his chronic SI, his not wanting to have a cellmate for fear of hurting him, and his statements that his sister was his only support in the community and had stopped communicating with him. The physician concluded that, other than placing the inmate on constant watch, there was "little more that could have been done to prevent a suicide," but further review of the emergency code should be conducted.

**Findings:** This inmate's suicide does not appear to have been foreseeable as he was not reporting current SI or intent and did not demonstrate behavioral change suggesting intent to harm himself. He did, however, have behavioral changes based on his having received a very recent allegation by his cellmate, resulting in his being placed on close-custody status in administrative segregation-like conditions within his EOP cell. His cellmate had

been removed from the cell because of these allegations and placed in the administrative segregation unit; however, the inmate was not transferred because there was no room in the administrative segregation unit. There was no indication after the determination that he be placed on close custody status that he received a full mental health evaluation, although he was medically cleared by the MTA for administrative segregation. The last case manager contact occurred at cell front. There were no notations regarding at least three months of variable to poor compliance with medication management. His medications were changed by the psychiatrist; however, the change was based on the inmate's request to be placed on previous medications and the issue of non-compliance does not appear to have been addressed. This inmate's suicide may have been preventable as his judgment was inadequate and he should have been considered by the treatment team for referral to a higher level of care.

### 28. Inmate BB

Brief History: This inmate was a 35-year-old Caucasian male who committed suicide by hanging on 7/13/06 in the general population unit at Folsom. He was not a part of the MHSDS at the time of his death. He was the sole occupant of his cell. The inmate entered the CDCR on 3/17/06 after having been convicted of possession of a controlled substance with a 16-month sentence. His earliest possible release dated was 10/8/06.

The inmate was discovered on 7/13/06 at approximately 6:52 a.m. by a correctional officer who heard several inmates yelling on a tier and pointing at this inmate's cell. The officer approached the cell, discovered the inmate hanging by the neck by a bed sheet tied around a portion of an electrical conduit from the cell's ceiling. The officer activated his personal alarm device and a second officer responded. The two officers entered the cell. While one officer lifted the inmate in an attempt to relieve pressure from the neck, the other officer went to the first tier, retrieved the cut-down tool and returned. While this officer was obtaining the cut-down tool, the first officer utilized his institutional radio to request medical assistance. The second officer returned with a cut-down tool and cut through the sheet, releasing the noose from the inmate's neck. The inmate was lowered to the floor and placed outside of the cell, and an MTA arrived. Although the MTA and an officer prepared to perform CPR, the senior MTA arrived and ordered the inmate to be transferred to the clinic. The inmate was placed on a Stokes liter and transported to the TTA where he arrived at 6:56 a.m. Once in the TTA staff began to perform CPR. However, the inmate did not respond, and at approximately 7:15 a.m., a physician ordered CPR to be stopped. A Folsom Fire Department paramedic pronounced the inmate dead. An autopsy report was provided by the Department of the Coroner for the County of Sacramento, and stated that the autopsy was performed on 7/14/06 and determined the cause of death was hanging. A toxicology report indicated that there was no ethanol or drugs of abuse in blood samples. The toxicology studies did confirm that caffeine, Benadryl, Amitriptyline, and Nortriptyline were found in the blood samples; however, the actual amounts of these substances were not reported. A suicide note was discovered in the inmate's cell that was address to "mom" and stated that the "hardest thing I will ever have to write" and stated his love for his mom and that he is in a much better place. The second letter to "Linda" stated that he could not believe he would make such a decision at the age of 35, and that he couldn't believe "what that surgery has

done." The letter goes on to make reference to removing "fat pads" and the "attractive features from my face" as being a life changing experience as well as stating "the pain is just to much." The letter goes on to describe the inmate believed he was "literally sitting on death row," and the results of the surgery were permanent. The letter concludes with his describing his suffering and "torture," ends with an incomplete sentence, and is unsigned.

The suicide report contained the inmate's criminal history and reported that there was no juvenile history on record, but as an adult he had numerous arrests and convictions beginning at age 20, the great majority of which were related to his "severe drug dependency." These included possession of a controlled substance, public intoxication, possession of a dangerous weapon, battery, driving under the influence with alcohol or drugs in the vehicle, reckless driving, possession of a narcotic controlled substance, and transporting and selling a narcotic controlled substance, with dispositions including probation, jail time and treatment programs. It was noted that he generally did well on probation and completed a number of recovery programs. However, he was convicted in February 2003 of willful discharge of a firearm in a negligent manner. The results were a 16-month prison system sentence with probation, conditions for drug testing, and a recovery program. However, the inmate violated his probation approximately two weeks prior to its expiration, resulting in his arrest and revocation of his probation. The 16-month state prison system sentence was imposed and he entered the CDCR on 3/17/06, as stated above.

The inmate entered the CDCR via the NKSP RC. His initial health screening was positive for a history of mental illness, treatment for Hepatitis C, and a referral to mental health was generated. The inmate also was noted to have signed a refusal of medication for Seroquel. A Refusal Examination and/or Treatment Form dated 3/17/06 indicated that the inmate refused treatment for "psych problem" with a notation "denies." He was seen on 3/20/06 by a psychologist who indicated that the inmate had been treated in the past with Seroquel, and had a history of depression. The psychologist's evaluation on 3/20/06 indicated that the inmate reported that he had auditory hallucinations "sometimes," was not sleeping, his appetite was "not good," and that he endorsed having mood swings, racing thoughts and being depressed with some paranoia. He denied SI and homicidal ideation. The impression was Axis I "296.80" which in the DSM-IV indicates Bipolar Disorder NOS and the inmate was referred to a psychiatrist and case manager. The inmate had a brief mental health screening on 3/21/06 which stated that he had no indications of mental illness. He was cleared for general population. An RC mental health evaluation was completed on 3/28/06 where the inmate was noted to admit that he had taken Seroquel in the county jail, but denied any past history of psychiatric hospitalization or SI or behaviors. The inmate reported that he had been treated for substance abuse in rehabilitation programs but was not in need of any mental health services at the time of the evaluation. The clinician stated that the inmate was distressed because of being in prison for the first time. He was cleared for population with a recommendation that he did not require inclusion in the MHSDS. An SRAC was completed; however it was not signed or dated. The SRAC endorsed that the inmate had a history of substance abuse and no recommendations were made. The psychiatrist saw

the inmate on 4/2/06 and indicated that the inmate stated, "I do not need any meds in IM wants to cleared from 3CMS." The psychiatrist opined that the inmate is "doing alright" and does not need any medication.

The inmate was transferred to Folsom on 2/6/06 having not received any mental health treatment since his admission at NKSP. There was a reference in the suicide report to the inmate's father having arranged for the inmate to see a psychologist that he had previously seen in the community. However, there was no documentation in the record to indicate this occurred prior to the inmate's transfer to Folsom.

An initial health screening on 2/6/06 from Folsom to the Folsom Transitional Treatment Facility indicated no answers to all questions.

After the inmate's transfer to Folsom, he was not referred for mental health treatment. However, he was seen by a medical physician with complaints of back pain and that he had been unable to sleep. There was a reference that the inmate was "focused on his appearance." The inmate reported that he had had plastic surgery on the street, didn't look anything like he used to, and the physician assessed the inmate as having anxiety and back pain. He was prescribed Motrin and Elavil for pain relief, and Benadryl for seasonal allergies. However, he was not referred to mental health. Mental health was consulted by medical staff when the inmate appeared in the emergency care area in the Folsom Transitional Treatment Facility Clinic, stating that he was in a "panic" and was described as "restless, moving his hands, walking about the clinic," and an assessment said that he was restless related to a panic disorder. A psychiatrist was called and an order for Ativan was given, and the inmate was advised to seek help if he needed it. The inmate was taken to Folsom for further evaluation. The following day, a psych tech wrote an urgent referral on 7/9/06 describing the inmate as having "extreme panic attacks," and noted that Ativan was not helping him and that MD orders at [CSP/Sac] "did not follow him here."

The following day, the inmate was brought to a psychiatrist by custody staff because of the inmate's anxiety and safety concerns. The psychiatrist's note indicated that the inmate was fearful for his safety, fidgety, and that he agreed to a trial of Seroquel which had been helpful to him in the past. The Seroquel was prescribed, and he was to have follow-up in seven days. The orders were written on the following day, 7/11/06. A condensed mental health assessment was completed on 7/11/06 and described the inmate as having been referred by various custody staff for "bizarre behaviors," including extreme psychomotor agitation and complaints of anxiety. The inmate was requesting protective custody and claimed that he had a history of dual diagnoses. The assessment also indicated the inmate had been psychiatrically hospitalized in the past and had received outpatient treatment, and had a history of alcohol and cocaine abuse. The impression was Adjustment Disorder with Anxiety, Acute and Polysubstance Dependence, and he was to be placed at the 3CMS level of care.

The suicide report referred to a mental health treatment plan that was completed on 7/11/06. However, this was not found by the Suicide Reviewer nor was it included in the

documents provided for review.  An SRAC was completed on 7/11/06 and indicated that the sources of information were the inmate and the UHR; however, correctional officer or staff interview was not checked.  Although a history of anxiety, "bipolar?," poor impulse control, poor coping skills and current, "anxious," "fearful," and "insomnia" were all endorsed, with the only protective factor being spousal support, the evaluation of risk was "no current intent or plan," and the box checked was "no apparent significant risk."  No referral was made by the social worker completing the SRAC.

The following day, 7/12/06, the inmate was referred by custody staff to mental health "asap" after the inmate had been seen the previous day by a lieutenant for consideration of protective custody.  The inmate was not placed in protective custody.  On interview, the inmate stated that he wanted to be transferred to a different institution and that he felt "jumpy."  The inmate was noted to have stated that he had no suicidal or homicidal ideation, suicidal or homicidal plan, that he denied hearing or seeing things other people don't, and that his psych meds "were working."  The inmate was noted to have a blunted affect but psychomotor agitation with erratic eye contact and anxious mood.  He was noted as future oriented and goal directed, and the impression was Adjustment Disorder with Anxiety, Acute, with recommended placement in the MHSDS.  The plan was for psych follow-up as needed or 90 days.  On that same date, Seroquel 200 mgs BID was ordered for 90 days as the Seroquel order of 7/11/06 was for Seroquel 200 mgs one time.  There was no progress note corresponding to the 7/12/06 90-day order for Seroquel.  The evaluation by the senior supervising psychologist from 7/12/06 noted above after the inmate was referred by custody was the last mental health contact with this inmate.  The next medical notation was on 7/13/06 at 7:29 a.m. in which the physician indicated that he was called to the TTA after the inmate had been discovered hanging in his cell.  This note was timed after the response to the call to the TTA and describes the emergency response including the institution of CPR in the TTA.

The CDCR Suicide Reviewer referred to the inmate's apparent preoccupation with his physical appearance that was referenced in various notes in the medical record, and by other documents, including the suicide letter to "Linda," as well as communications with the inmate's parents regarding the inmate's concerns about his physical appearance after having cosmetic surgery.  It appears to have been a very important factor in the inmate's anxiety.  However, it is unclear whether or not this had any relevance to his safety concerns.  The suicide report also referred to the inmate having been seen at the TTA at approximately 7:20 a.m. on 7/12/06 because "he appeared to be paranoid."  It was noted that the on-call psychiatrist was notified, but the inmate did not receive medications or crisis bed referral as he did not indicate he was a danger to himself.  The MOD was notified; he reported that he could not prescribe anti-anxiety medications and only a psychiatrist could do that.  The inmate received two Benadryl tablets and was returned to custody according to the suicide report.  The suicide report referred to property found in the inmate's cell after his death, including letters to friends and family and internet printouts regarding Body Dysmorphic Disorder.

The suicide report identified four problems, with recommendations, as follows:

Problem 1:  Cardiopulmonary resuscitation was not started at cell front due to lack of space and proximity of the clinic.  The institution addressed this problem in its Comprehensive Morbidity and Mortality Review (CMMR) and concluded that the proper action was taken under the circumstances.  However, the DCHCS Medical Reviewer noted that although the running of the code was mostly appropriate, there were some concerns including:  four-minute delay in calling 911; failure of first ambu bag; monitor leads not attached correctly; and unacceptable delay of 13 minutes to get the automatic external defibrillator on.
Recommendation:  Folsom nursing staff should conduct practice drills on running codes, and this should be included in local policy.  Ensure that equipment is always working properly.  Staff should be reminded to call 911 immediately when there is a life threatening emergency.

Problem 2:  Vital signs taken at the Triage and Treatment Area (TTA) on 7/8/06, indicated pulse 138, respirations 20, and blood pressure 152/97.  The inmate was given Ativan and it was not clear whether the physician was informed of these abnormal vitals.  Vital signs taken at the TTA on 7/12/06, indicated pulse 140, respirations 20, and blood pressure 145/91, yet the inmate was not seen by a physician.
Recommendation:  Nursing Director referred the case to Nursing Professional Practice Review Committee for recommendations.

Problem 3:  A referral chrono marked urgent was not received by mental health for two days.  (Once received it was acted upon the same day).
Recommendation:  Folsom needs to develop a process for triaging all referrals, whether medical or mental health, within 24 hours even on weekends; and a process by which referrals to mental health are delivered in a timely manner.  This may require a Quality Improvement Team.

Problem 4:  Psychiatrist at Folsom did not consistently write progress notes corresponding with orders, making it difficult to track the sequencing of events.
Recommendation:  Provide on the job training for the psychiatrist regarding the importance of clear documentation particularly with complex cases.

A death review/suicide review dated 8/25/06 was provided by a physician regarding this inmate's death.  The area for comment and concern included his assessment that overall the inmate did not have significant health problems, but that the mental health issues predominated; e.g., anxiety, paranoia, and panic.  The physician continued on that the inmate was seen four times during the month of July by various staff who described his status as one of high anxiety, being afraid for his life, with restlessness and panic.  Three of those encounters occurred in the TTA and resulted in medication additions or changes by the psychiatrist.  On two of those visits, the inmate's vital signs were quite abnormal.  The symptoms seemed to worsen, and yet, on the day before he died, he was not deemed a suicide risk.  Indeed, two days before he died, one note stated that he did not need a mental health referral while the next day's note stated that he needed a mental health referral.  This physician reported, "this confuses me."  The physician also reported that

143

the conduct of the CPR and code was mostly appropriate, but identified the concerns that were noted in the suicide report recommendations and the paramedic response time as being too slow at 18 minutes when it was needed within eight to ten minutes. He recommended that the code sequence needed to be reviewed and investigated further by nursing, and that facility and ambulance staff needed to develop a much faster response time.

On 9/15/06, the Directors of the DCHCS, Death Review Committee and NPPEC reviewed the nursing management of this inmate and found deviations from nursing standards of care, non-compliance with CDCR policies for nursing assessment, nursing documentation and urgent/emergent response. They reported that the inmate experienced panic attacks and was seen in the TTA on 7/8/06, and was seen on 7/9 and 7/12/06, but it was not clear whether he was seen in the TTA or the yard clinic. The nursing assessment for 7/8/06 was inadequate, and nursing assessments were not done on 7/9 and 7/12/06. Also the nursing management of the emergency response on 7/13/06 did not meet standards of practice. Further, the senior MTA's decision to delay CPR was not appropriate nor was the delay in calling 911. A CAP was generated and included four actions as follows: (1) DON to provide individual instruction to the TTA RN on 7/8/06 and on 7/9 and 7/12/06 to the RNs who failed to perform adequate nursing assessments and provide clinical competency evaluations; (2) DON to ensure that the senior MTA is counseled about his actions and receives individual instruction regarding the requirements of the emergency response policy; (3) DON to ensure that the local operating procedure includes who has the authority and responsibility to call 911/ambulance during a medical emergency; and (4) DON to provide the ERRC minutes. All of these were to be done within seven or 14 days, respectively.

On 2/27/07, the Directors of the DCHCS and DAI provided a report on implementation of quality improvement plan for suicide of Inmate BB. In their report, a memorandum from Folsom staff dated 12/15/06 was included and provided the following responses to the suicide report recommendations. Regarding Problem 1, a copy of operational procedure number 99 – emergency medical response, updated April 2006 and the completion of medical emergency response drills and training was provided, as was the "inmate medical services program policies and procedures" in Chapter 12, including urgent/emergent response with modifications to have emergency response drills quarterly rather than semi-annually. The addendum to operational procedure number 11 with requirements to conduct monthly emergency response drills in the administrative segregation unit was also included. There was no documentation of any emergency response drills being performed in 2006 prior to the month of October; however, formal classroom training was conducted in July for RNs on physical assessment and urgent/emergent protocols plus training on local procedures, which was provided in the documentation. Also included were documentation regarding the policy for providing immediate life support, and training records for custody and medical staff having completed mandatory CPR certification.

With regard to Item Two of the facility response, "provide documentation that equipment utilized in emergency response is routinely tested and maintained," the master service

contract for all medical equipment except electrocardiogram/pulmonary equipment had expired on 12/31/05, and was in the process of being re-bid. Repairs were to be handled on an emergency as-needed basis. Daily inventories and inspections are conducted on the crash cart equipment in the TTA with copies of the crash cart procedure and training records provided. Also, the emergency response bag in the TTA is inspected daily to verify that the seal had not been compromised, with an attached memorandum to medical staff regarding expectations for accountability of the TTA emergency response bag.

With regard to Item Three of the facility response, a requirement was issued to provide all staff with on-the-job training to remind them of the requirement to call 911 as soon as the life threatening emergency is identified. It was reiterated that this information is provided in the CPR course criteria mandated for all custody and medical staff, as part of the annual block training.

With regard to Item Four of the facility response, the nursing PPRC recommendations listed above were referenced. However, no follow-up documentation had been requested by the nursing PPRC at the time of this memorandum.

With regard to Item Five of the facility response, a QIT met and recognized the need for additional clarification regarding treatment of "urgent" mental health referrals, and modification of the policy pertaining to triaging emergency referrals to categorize all urgent referrals as "emergencies." The QIT minutes and revised policy were included in the documents.

With regard to Item Six of the facility response, a requirement was issued to provide evidence of written instruction and acknowledgement by the psychiatrist reiterating the expectations for consistently writing progress notes corresponding with orders issued. A copy of the memorandum addressing these issues and documenting the training record was also attached in the documents provided.

**Findings:** This inmate's suicide does not appear to have been foreseeable as he was not reporting SI or intent to clinical or custody staff. However, the inmate did display intense panic attacks including alterations of his vital signs with inadequate responses by medical and psychiatric staff. Because of these inadequate responses and the failure to properly assess the inmate, as well as an SRAC that indicated no risk despite the inmate's history, current impulsivity, and increasing distress, this inmate's death may very well have been preventable. The inmate, while having an unusual disorder i.e., very likely Body Dysmorphic Disorder, clearly had escalating anxiety including panic attacks and physiological changes, yet he was not seen by the POD or MOD on the evening before his death, despite yet another referral by custody staff who were observing his escalating behavior and clearly fulfilled their responsibilities of attempting to have this inmate evaluated by medical and/or mental health staff. The order of Seroquel on a one-time basis on 7/11/06 after the inmate was seen on 7/10/06 was clearly inadequate, as was the order by a psychiatrist for Seroquel for 90 days on 7/12/06 without having seen the inmate or assessed any need for referral to a higher level of care.

**29. Inmate CC**

Brief History:  This inmate was a 24-year-old African-American male who committed suicide by hanging on 7/18/06 in the administrative segregation unit at CSP/Sac.  The inmate was the sole occupant of his cell at the time of his death and was in the MHSDS caseload at the 3CMS level of care.  The inmate entered the CDCR via the NKSP RC on 3/8/02 after having been convicted of sexual battery, sexual penetration with force, burglary, and assault with a deadly weapon not a firearm, and was sentenced to 20 years and four months in state prison.

The inmate was discovered on 7/18/06 at approximately 1:32 p.m. by a correctional officer who observed the inmate hanging by an inmate-manufactured noose attached to his neck and the upper bunk in his cell.  The officer activated his personal alarm device and a radio transmission was made notifying correctional staff of an inmate hanging in the cell block.  At approximately 1:33 p.m., a sergeant and additional staff arrived and the sergeant ordered the cell door to be opened.  The sergeant utilized a cut-down tool, and he and officers guided the inmate to the floor where an officer placed the inmate in handcuffs and a second officer placed the inmate in leg irons.  The inmate was removed from the cell and placed on a Stokes litter and an additional sergeant utilized the ambu bag to begin rescue breathing as an officer began chest compressions.  The Stokes litter was lifted by responding staff, carried down the stairs and placed on a rolling gurney in the dayroom.   CPR continued as the inmate was transported to the A facility emergency room.  Medical staff took over lifesaving measures at approximately 1:35 p.m., and at 1:45 p.m. found no femoral pulse and started IV medications.  At approximately 1:50 p.m., the AED displayed "no pulse – shock advised" and the AED was utilized.  The inmate however did not recover and at 1:53 p.m., a physician pronounced the inmate deceased.  The physician listed the cause as "death by asphyxiation."  There is a discrepancy in the incident report and the suicide report with regard to the AED.  The incident report states the AED displayed "no pulse – shock advised" while the suicide report indicates the AED displayed "no pulse – no shock."  An autopsy report was provided by the Coroner for Sacramento County and stated the autopsy was performed on 7/19/06 and determined the cause of death to be hanging, and the manner of death suicide.  A toxicology report indicated no acidic, basic or common drugs of abuse were found in a blood sample.  Lidocaine was found in the blood sample.  No ethanol was found in the blood sample.

The suicide report contained the inmate's criminal justice history, which included a juvenile criminal history that stated the inmate was first arrested at age 13 for vandalism.  This juvenile criminal history continued at age 16 with arrests for car theft, possession of narcotics, assault with a deadly weapon not a firearm, and at age 17 for use of false identification and robbery.  The inmate was convicted of several offenses and sentenced to juvenile hall, county jail, probation, and eventually to a term at the California Youth Authority (CYA).  This term began in May 1989 and he was paroled from the CYA directly to the CDCR on 2/8/91 following a conviction for assault on a peace officer.  For this offense he received 16 months in prison and paroled from the SCC in February 1992.  His parole was revoked after he was arrested for possession of narcotics on 5/19/92, and

finished his term at PBSP with parole in November 1992.  During this same time period from age 13-19, the inmate was also a member of the Pomona Bloods street gang and had arrests for possession of narcotics and was a documented user of PCP.  After his release from PBSP the inmate appears to have pursued gainful employment and left the Pomona Bloods.

The inmate, however, was convicted of two counts of misdemeanor sexual battery in June 1998 and received three years probation.  He was re-arrested for incidents that occurred in October and December 2001 which are his commitment offenses as described above.  These convictions resulted in his last incarceration beginning on 3/8/02.

The inmate does not appear to have had any history of mental illness or treatment for mental illness prior to his re-entry into the CDCR in March 2002.  In fact, he did not come to the attention of mental health staff until August 2002, based on a referral by a custody staff after he reportedly made homicidal comments directed at his cellmate.  The records provided do not include documentation of a clinician seeing the inmate on 8/16/02; however, the suicide report refers to the inmate having been seen by a clinician and subsequently placed in the OHU on a custody hold by the warden.  On 8/19/02, the record references a psychiatrist writing that the inmate had been placed in the OHU by the warden for observation because of threats to harm his cellmate.  He was not placed in the MHSDS based on this OHU admission and was cleared for general population, including double-celling, despite his alleged threats against his cellmate.  The suicide report refers to the inmate having been seen for several appointments by mental health staff for approximately six months after his release from the OHU in August 2002, even though he was not a participant in the MHSDS.  These contacts include his seeing a psychiatrist on 8/26/02, 10/7/02, 11/25/02 and 12/31/02, and although there is no diagnosis documented in the record, the inmate was prescribed Vistaril for sleep each evening during this time period.  The suicide report makes a vague reference to the inmate having reported "strange dreams, in which his cell door opened and men came in, and he then ran from yard to yard to evade his assailant."  During the course of these contacts a psychiatrist noted in February 2003 that the problem with the dreams had resolved.

The inmate was placed in the administrative segregation unit at Calipatria on 10/30/03 after he refused to be handcuffed and verbally threatened an officer, which ultimately resulted in a four-month SHU term.  On 10/31/03 he underwent an administrative segregation screening conducted by a psych tech and reported as negative.

On 11/3/03 the inmate was seen by a psychologist who reported that the inmate stated, "people take your words and twist them against you, you get in trouble if you say something, and you get in trouble if you don't…I don't see the difference (between life and death)…I am not suicidal."  This contact was based on a referral from custody and nursing in administrative segregation, as the inmate was not responding to staff inquiries.  His affect was described as "constricted flat and, lifeless.  Mood appears depressed."

The inmate had an SRAC on 11/3/03 and, despite there being a number of risk factors and no protective factors documented, there was no evaluation of risk documented and the inmate was referred to psychiatry by the psychologist completing the SRAC.

The records do not indicate that the psychiatric evaluation took place. He was seen by the IDTT on 11/10/03, reported visual hallucinations and concerns about loss of control, and was placed in the MHSDS at the 3CMS level of care with the diagnoses of Adjustment Disorder with Depressed Mood and Personality Disorder Mixed with Borderline and Antisocial Features.

The inmate was seen by a psychiatrist on 11/20/03 who prescribed Olanzapine and Benadryl with a follow-up for three weeks from that date. The psychiatrist did see him on 12/1/03 and opined that the inmate was suffering from paranoid and hostile ideation and poor sleep. The inmate also provided the psychiatrist with a handwritten note with Bible verses. The psychiatrist increased the inmate's medication and scheduled a follow-up. The inmate was transferred to CSP/LAC on 12/10/03 prior to the follow-up appointment.

Upon his arrival at CSP/LAC, the inmate attacked his cellmate, was re-housed in a single cell, and was charged with battery on an inmate. His medications were changed two days later to Geodon and, although the suicide report refers to a mental health evaluation, this evaluation was not provided in the records reviewed. Despite these reported symptoms of visual hallucinations and his behavior upon arrival at CSP/LAC, the inmate remained single-celled in administrative segregation until 6/2/04, completing two SHU terms for threats against the officer at Calipatria and assault on a cellmate in CSP/LAC. He remained at the 3CMS level of care, and his medications were changed from Geodon to Thorazine. His diagnosis remained Adjustment Disorder with Depressed Mood.

Finally, after the inmate was transferred to CSP/Sac on 6/10/04, his diagnosis was changed to Psychosis NOS and his medication was changed from Thorazine to Olanzapine. The inmate refused medications in July 2004, and they were discontinued at his request by a psychiatrist. A psychologist's note on 10/15/04 stated the inmate was seen on one-to-one and reported that he did not go to the yard for the past two months because he "likes to keep to himself – avoids personality conflicts." The psychologist also noted that he had an associate degree in liberal arts and was interested in Spanish and Chinese. Further the inmate denied SI but "says violent tendencies." The psychologist also wrote that the inmate "had intense dreams (night terrors)" and diagnosed him with Psychotic Disorder NOS by History.

The inmate continued to meet with his case manager approximately every 90 days, met with the IDTT on 6/1/05, and remained at the 3CMS level of care. The inmate was seen for case management and psychiatric contacts in June and August 2005, respectively, continued off medications, and appeared to be stable, based on the clinician's notes in the UHR. He denied SI and any psychotic or major depressive symptoms. He was placed in administrative segregation in December 2005 because of "safety" concerns. During a treatment team meeting on 12/13/05, he reported that he was having "homicidal visions."

The inmate remained single-celled and continued in the 3CMS program. Despite his report of homicidal ideation, he did not request nor was he prescribed any medications. He later changed his mind when he agreed to take Seroquel and Trileptal.

While the inmate was in administrative segregation, a psych tech note for the week of 3/13-20/06 recorded the inmate stating, "messing up on my meds," and he was described as agitated, anxious, worries about his medication, and having hallucinations of "tigers in my cell." The psych tech commented, "appears to not be stable on current medication." The plan was for education/evaluation regarding medication management.

On 3/15/06 the psychologist's note stated that the inmate "openly admitted to the committee that he had fabricated allegations that he preyed upon former cellies/sodomizing them in order to try and get a single cell" when the inmate was seen in the ICC. A progress note dated 3/30/06 indicates an IDTT was held in absentia for the inmate and the IDTT diagnosed the inmate with "PCP Induced Psychosis 292.12," Paranoid Personality Disorder, and Antisocial Personality Disorder.

He remained in the administrative segregation until the end of March 2006. A psychiatrist wrote that he had trouble back in general population around other inmates such that he was placed on an SNY. This appears to have been because of the inmate's concerns about his safety, and may very well have been related to his commitment offenses. The inmate remained without a cellmate, continued to see his case manager, and even participated in a transition group for inmates coming to a SNY until the end of June 2006. The inmate stopped coming to this group. His case manager opined that the inmate was struggling with difficulties in accepting that he belonged on an SNY. The inmate was seen at his cell side on 6/19/06 and was noted to have no SI or intent. In April 2006, the inmate began refusing his medications, as recorded on the MARs. An entry in the UHR is dated 7/11/06 by a psychiatrist who stated the inmate "approached me in 8 block foyer and asked me to discontinue his Seroquel and Trileptal since he says `I haven't taken them anyway,' and he asked if he (could) be removed from heat list." The psychiatrist also wrote "He has no S/H idea." The psychiatrist assessed the inmate as having Psychosis NOS (probably PCP induced) and discontinued the inmate's Seroquel and Trileptal at the inmate's request. This was the last contact the inmate had with mental health staff before his completed suicide on 7/18/06.

During this incarceration, the inmate received approximately ten RVRs, beginning in June 2003 for indecent exposure, and continuing with refusing to be handcuffed and threatening an officer, battery of a cellmate, obstructing a peace officer (three times) and other refusals to comply with correctional rules. He also was noted to have five enemies, but it was unclear whether or not these were related to his previous gang affiliation, his commitment offenses, or other conflicts with inmates. He did pursue single-cell status by direct request, reporting thoughts of sodomizing or violently attacking cellmates, and reporting safety concerns.

In March 2006, the inmate was released from administrative segregation to the CSP/Sac SNY awaiting transfer to a SNY at either SVSP or MCSP. He was, however, returned to

administrative segregation on 7/16/06 based on the inmate's cellmate's reporting that this inmate had assaulted him within ten days of being placed as a cell-mate. The inmate committed suicide two days later on 7/18/06.

The suicide report stated all policies and procedures were followed and there were no recommendations related to this inmate's suicide.

**Findings:** This inmate's suicide does not appear to have been foreseeable. Although he did have a history of difficult adjustment to the CDCR and treatment at the 3CMS level of care, he did not report nor display any signs or symptoms to indicate that he was contemplating taking his life prior to his suicide. His suicide may have been preventable had he been transferred to a higher level of care and involuntary medication administration pursued because he had been non-adherent since April 2006, and was clearly decompensating. Referral to a higher level of care does not appear to have been considered despite his decompensation. Despite these failures, the suicide report states all policies and procedures were followed.

The inmate's UHR also included what appear to be his own writings of a particular statement written to the Director of Psychology and Director of Psychiatry regarding himself when he was housed in the administrative segregation unit. In this submission, he stated he was "going to speak to your mind. I will not compromise. The enemy rises at first dawn. We attack prior to." He goes on to make statements that he attacks his cellies/enemies with the element of surprise and "overwhelm them in their sleep, strangling them into submission with a strong rope of branded strands or plastic bag." The inmate writes "cursed! Be your blastfulness alchemy" and makes reference to his threats to harm other inmates including "I am not beyond the use of sodomy as a means to submission." He states further "I am a violent sexual predator," but also writes, "I do not consider myself to be a homosexual." He includes "I have sodomized three out of six of my last cellies."

## 30. Inmate DD

Brief History: This inmate was a 19-year-old Hispanic male who committed suicide by hanging on 7/31/06 in general population at the SCC. The inmate was double-celled at the time of his death and was a participant in the MHSDS at the 3CMS level of care. The inmate entered the CDCR on 10/14/05 via the WSP RC. This was the inmate's first admission to the CDCR where he was serving a two-year eight-month sentence for possession of a controlled substance. His earliest possible release date was 2/21/08. He also had an INS hold such that he would be deported upon his release.

On 7/31/06 at approximately 11:27 a.m., an officer approached the inmate's cell after another inmate had informed him that there was a man down in this inmate's cell. This officer and a second officer approached the cell and observed through the cell door window that the inmate was hanging between the beds and the sink/toilet area by a sheet that was tied to shoelaces that were threaded through the small holes in the cell air vent. One officer went to retrieve the cut-down tool and the second officer called for assistance