on the institutional radio.  The officer who went to get the cut-down tool returned and the two officers opened the cell door at approximately 11:29 a.m., the officers entered the cell, and cut the sheet from which the inmate was hanging.  By this time, a sergeant had arrived and the sergeant and one officer placed the inmate on the tier "so medical could perform CPR."  Two MTAs, an RN and physician arrived and started CPR which continued for approximately 20 minutes without the re-establishment of a pulse or respiration.  The physician then ordered CPR to be discontinued and pronounced the inmate dead at approximately 11:50 a.m.  An outside ambulance was called but cancelled at 11:50 a.m. Notifications to administrative staff and the DA's Office proceeded from that point.  The incident report referred to the inmate having an assigned cellmate who was placed in administrative segregation.  However the incident report did not refer to where the cellmate was during the course of this emergency response.  The incident report does, however, refer to investigative services unit (ISU) officers arriving at approximately 11:33 a.m. and that they "assumed control of the crime scene."  The incident report states that evidence of narcotics use, including an empty hypodermic syringe and one loaded hypodermic syringe containing a liquid substance, was discovered in the cell during an ISU search. The incident report also refers to a third inmate who was identified as an acquaintance of this inmate (who committed suicide) requesting protective custody during the emergency phase of this incident, reporting that he had drug debts and usage.  This third inmate was placed in administrative segregation.  The suicide report says that an officer radioed the watch office at approximately 11:31 a.m. to call for an outside ambulance.  The suicide report also states that the physician who directed the emergency response stated that CPR was established within one minute, but it does not clarify whether this was from the time of the inmate's discovery or the time that the medical staff arrived.  The suicide report also states that the AED was attached but registering "do not shock," so that it was not used; however, the ambu bag was used with oxygen.  No cardiac drugs were available or administered, as per the suicide report.  Finally the suicide report says that there was a discrepancy from the incident report, based on an interview of ISU officers who told the suicide reviewer there was only one empty syringe found in the cell at the time of the suicide.  The suicide report clarifies that the inmate's cellmate was at work in a Prison Industry Authority (PIA) shop during the emergency response.  An autopsy report provided by the Tuolumne County Sheriff-Coroner's Office indicated that the autopsy was performed on 8/1/06 and determined the cause of death as asphyxia (minutes) due to hanging (minutes).  A toxicology screening report was provided and indicated that there was no ethanol alcohol and no common, acidic, neutral or basic drugs detected in a peripheral blood sample.

The suicide report contained the inmate's criminal justice history and indicated that prior to his commitment offense, he had crimes of record including child annoyance, child molestation, battery, robbery and health and safety violations.  The inmate was an illegal immigrant and had reported entering this country at age ten, leaving his family and living on the streets at that same age, and abusing multiple drugs including marijuana and methamphetamine, and sniffing paint thinner.  Although there was no documented evidence of past mental health treatment in the records reviewed, the inmate reported that he had possibly taken medications in jail, occasionally having auditory hallucinations, and two suicide attempts prior to entering prison, including an attempted hanging and

hitting himself in the head with a rock. The inmate was placed at the 3CMS level of care when he entered the CDCR based on a mental health assessment. However, he did not receive any medications until after he was transferred to SCC on 1/12/06.

Based on the mental health screening of 10/19/05 in which the inmate endorsed having taken medications, being depressed, and having attempted suicide, he was seen for an RC mental health assessment on 10/25/05 and placed at the 3CMS level of care. The assessment also included his reporting his history of severe substance abuse in which the inmate endorsed using "everything." There were indications of a language barrier with the inmate, based on the assessment and references in the suicide report to his having pretended not to be able to speak any English during encounters with the police prior to his incarceration. He did have a developmental disability placement evaluation which stated that he was not in need of any staff assistance based on cognitive or developmental disability. His diagnosis from the mental health assessment was Psychotic Disorder NOS and he was referred to a psychiatrist whom he saw on 11/1/05. Contrary to the mental health assessment performed on 10/25/05, the psychiatrist described his mental status as essentially clear and without need for any psychiatric interventions. No medication was requested by the inmate and none was prescribed by the psychiatrist. The diagnosis was changed to Depressive Disorder NOS. The inmate saw his case manager on 12/16/05 and 1/9/06 while still at WSP. During the first appointment, he reported to her that he continued to hear voices and wanted to have medication; however, during the second appointment when he was seen at his request, he denied voices and stated he did not want to have any medication.

The inmate was transferred to SCC on 1/12/06 and was to be seen by a case manager approximately one week after his arrival. He was not seen because a translator was not available. He was seen by the IDTT on 1/24/06 and a mental health assessment was also completed at that time. The mental health assessment indicated the inmate reported hearing voices beginning at approximately age 17, consisting of people telling him to hurt himself and of others wanting to hurt him. This assessment referenced the inmate's report that he started using illegal drugs at age 13, and attempting suicide by hanging approximately one year prior to the interview. He was assessed as having limited intellectual functioning, poor insight and judgment, and perceptual distortions related to his reported hearing voices. The assessment indicated that he did not currently have SI or intent, and that the diagnoses were Psychotic Disorder NOS and Polysubstance Abuse.

There appear to be some discrepancies in the records reviewed with regard to the inmate's medication management. While the assessment indicated the inmate was to be treated with Seroquel, there was no doctor's order until after he was seen on 2/3/06 by a psychiatrist who prescribed Prozac and Olanzapine for "120 days." However, when the psychiatrist saw the inmate again on 2/17/06, he had not yet begun taking his medications. The psychiatrist's impression was that this was because of a "language confusion." When he was seen again on 3/3/06, the inmate told the psychiatrist that he was compliant with his medications. The MARs for February had multiple blanks and circles without explanation. MARs for March and April are appropriate, but May and June have multiple blanks. The MAR for July is appropriate. The inmate was described

as stable when seen on 4/10/06 by a case manager, and reported appropriate ADLs, including school and compliance with his medications.

The inmate acquired his second RVR on 5/4/06 because of mutual combat with another inmate. He received a 90-day loss of credit; however, his overall points went up and he was transferred to a level three yard where he continued until the time of his death. His first RVR occurred on 1/24/06 for the same charge for which he received 61 days' loss of credit. After his transfer to the level three yard, the inmate was assigned a new case manager whom he met with on 5/22/06. He continued to report that he was hearing voices that were telling him something was going to happen, that someone was going to kill him, and that he had not been receiving his medications after his transfer to this new yard. Very curiously, the case manager documented what appear to be conflicting statements indicating that the inmate "admits to suicidal ideation with plan to hang self with sheet" "five months ago," and conversely, "clearly denies suicidal ideation, however reports continuing auditory hallucinations." The case manager did not administer a SRAC but did refer the inmate to the psychiatrist for medication review. The MAR for May 2006 had blanks from May 17 through May 23 (the day after seeing his case manager) without explanation for why he did not receive his medication or why it was not documented.

The inmate was seen again by a psychiatrist on 6/9/06, reporting that he was receiving his medications. The psychiatrist noted, "good English now," and renewed his medications for another 120 days. The inmate was last seen by a mental health clinician when his case manager saw him approximately two months after his arrival on the level three yard, on 7/27/06. The case manager reported that the inmate denied SI and hallucinations, but was concerned about what would happen when he got out of prison and the likelihood of his being deported to Mexico. He reported that his family did not visit or write to him, but he was sure that they continued to love each other. The case manager described him as having no future orientation and "severely limited insight," with an ongoing plan to continue him at the 3CMS level of care with quarterly case management visits. The inmate hanged himself on 7/31/06, four days after his last case management contact.

There is a reference in the record to the inmate having been seen by medical on 3/29/06, after he reportedly took four or five capsules of an unknown medication given to him by another inmate. It was reported that he did not know what the capsules were, and there was no explanation as to why he took them, including whether or not he may have been attempting to harm himself. The inmate was prescribed Rifampin at the time of his death. He had previously been on Isoniazid because he tested positive for tuberculosis.

The suicide report identified four problems, with recommendations, as follows:

> Problem 1: Medication orders were written for 120 days. Department policy does not allow psychotropic medications to be ordered at greater than a 90-day interval.

Recommendation:  The Reviewer while on site alerted the health care manager to this problem, and he indicated he would follow up with the psychiatrist regarding the policy.

Problem 2:  The inmate's medications did not follow him when he was transferred to a different yard.
Recommendation:  Audit medication continuity upon yard transfer within the institution.

Problem 3:  The Medication Administration Record did not indicate that any effort was made to follow up when the inmate had not appeared for medications for five days, and no referral was made.  An institution audit of Medication Administration Records in July 2006 revealed an unacceptable number of blanks.
Recommendation:  Provide immediate remedial training for nursing staff regarding proper documentation on the Medication Administration Record, and on initiating proper follow-up for missed medications.

Problem 4:  There was an inconsistency between the incident report stating that a loaded syringe was found in the inmate's cell along with an empty one, and Investigative Services staff verbal assertion that only an empty syringe was found. It would be important to know what the loaded syringe contained and what became of it.
Recommendation:  Conduct an inquiry to reconcile the discrepancy and provide documentation of the true facts.

On 3/21/07 the Director of the MHP for DCHCS and the Director of the DAI provided a report on the implementation of the quality improvement plan for the suicide of Inmate DD.  In their report, the Directors stated that the quality improvement plan response that was received on 1/18/07 from SCC was incomplete.  They stated the submission for Problems 1, 2, and 4 were acceptable; however, the submission of Problem Three was not.  The response for Problem 3 was identified as problematic because the response from SCC by the Supervising Registering Nurse II was that inmates who miss medications will be referred after five days rather than three, as per Departmental Medication Policy; the issue of blanks on the MARs was not addressed; and no training rosters were submitted.

SCC submitted a memorandum dated 1/9/07 which included the following:  Regarding Problem 1, staff was notified that prescriptions are to be written for a maximum of 90 days.  A memorandum from the Chief of Mental Health dated 11/10/06 was included. Regarding Problem 2, audits were submitted for the months of August and September 2006 for consistency of inmates' medications upon transfers to other yards.  A compliance rate of ninety seven percent was found for inmates' receipt of medication within 24 hours. Regarding Problem 4, an ISU crime/incident report supplement dated 11/20/06 was provided.  It stated that "the 837A was prepared on verbal information related to the emergency," and that if ISU discovered only one empty syringe with residue, then the 837A was incorrect.  A second memo dated 8/18/06 stated that one syringe was discovered, that no drugs were discovered in the syringe based on a narcotics

identification system test, and that no fingerprints were discovered on the outside of the syringe.

On 6/18/07, a report of completion of quality improvement plan for suicide of Inmate DD was provided by the Director of the MHP, Director of DCHCS, and the Director of DAI. This second memorandum was in response to the 3/21/07 memorandum from the Directors to the Chief Psychologist for the Northern Region, Regional Administrator–North, and the Associate Director for the DAI which required that the institution submit the required proof-of-practice documentation regarding Problem 3 "immediately upon receipt of this memorandum. The 6/18/07 report includes a 4/11/07 memorandum from SCC regarding the "completed corrective action plan requested." In the report, a memorandum provided from the senior registered nurse (SRN) II states five items to "assure full compliance with state regulations." The SRN II states that the procedures must be followed and details these procedures regarding MARs, "carry" medications, "duplicate medication boxes in the cart," "narcotic administration," and "transferring (borrowing) medications." Regarding the quality improvement plan, the memorandum states that inmates who are 3CMS will be reported to the Mental Health Department by completing an informational chrono when three consecutive no-shows occur. This was the only item identified in the suicide report to be addressed regarding this inmate's completed suicide, and the Directors in their report stated "this quality improvement plan is now complete."

**Findings:** This inmate's suicide does not appear to have been foreseeable as the most recent documentation in the UHR does not indicate the inmate was reporting current SI or intent, nor was there any information provided to suggest that his behavior or statements indicated he was intending to take his life in the near future. This inmate's death may very well have been preventable, however, had the issues of his medication non-compliance been appropriately addressed. This inmate had identified SIs with a plan to a case manager on 5/22/06; however, there was no SRAC performed at that time. He also reportedly ingested five capsules of an unknown medication and became nauseated such that a medication assessment was conducted, but he was not referred for mental health review for having taken these medications. The suicide report does not make refer to either one of these events. (The second one was on 3/29/06). This inmate had variable compliance during the months of February, May, and June 2006, and clearly was not offered his medications when he transferred from one yard to another. The suicide report appropriately identifies as problematic these areas as well as the writing of psychotropic medication prescriptions for 120 days rather than 90 days as per CDCR policy. Lastly, CPR was not initiated by the first responding sergeant or correctional officer.

### 31. Inmate EE

Brief History: This inmate was a 33-year-old Hispanic male who committed suicide by hanging on 8/5/06 in the administrative segregation unit at PVSP. The inmate was the sole occupant of his cell at the time of his death. He was a participant in the MHSDS at the 3CMS level of care. The inmate entered the CDCR on 1/3/00 via the SQ RC, after he received a sentence of 23 years for crimes of rape (victim incapable of consent), oral

copulation by force, sexual penetration by foreign object, assault with a deadly weapon (not a firearm), and great bodily injury likely. The inmate's earliest possible release date was 3/22/19.

The inmate was discovered on 8/5/06 at approximately 11:15 p.m. by an officer performing security checks. He was observed to be lying face down unresponsive on the cell floor. The officer utilized the institutional radio to summon additional staff. Staff arrived, the emergency cell entry was performed, and the inmate was determined to be not breathing and had no pulse. The inmate had an inmate-manufactured rope made from a state-issued sheet tied tightly around his neck. The incident report did not identify what the other end of the rope was attached to. Facility staff removed the rope and an MTA began CPR. The inmate was placed on a Stokes litter, and was transported to the ERV and subsequently to the correctional treatment center (CTC). Resuscitation efforts continued but weren't successful, and the inmate was pronounced dead by a physician via telephone at 11:55 p.m. The inmate left an 11-page suicide note addressed to his family. The note began with his asking how they are and hoping that "we meet someday in the future." There are multiple references by the inmate to his life in prison. He stated "it's like a bad spirit came upon me in these last days." He makes reference to something disastrous happening to him, and to his having been a bad kid "in some aspects." He made further reference to his not wanting to "debrief" and that "they did their mind powers on me." He made vague references to "the matrix" and some obscure relevance to him. He further made reference to trying to get back to God and to get his spirit back, as well as to "voices." He also referred to his problems with not being compatible with a cellmate and to his being placed in administrative segregation because of that. The last line of his letter stated, "it's like I died at High Desert." An autopsy report was provided by the Office of the Fresno County Coroner. It stated that the autopsy was performed on 8/7/06 and determined that the cause of death was hanging and the manner of death was suicide. A toxicology report indicated that a drug screen was negative as was the blood screen for alcohol. A stomach content analysis revealed 0.04 percent miscellaneous alcohol.

The suicide report contained the inmate's criminal justice history. It indicated that while he did have some difficulties as a juvenile and reportedly was described as "defying authority" resulting in his having to go to continuation school after having been suspended indefinitely from regular high school, he did not appear to have had any juvenile arrests. Just prior to his 18th birthday, the inmate was arrested for taking a vehicle without the owner's consent. Over the next several years through December 1999, he had arrests for battery, driving with a suspended license, assault with a deadly weapon (not firearm), great bodily injury likely, oral copulation by force, resisting a peace officer, rape, and sexual penetration by a foreign object.

The inmate received a mental health screening at SQ and was referred for further evaluation. He was seen by a clinical psychologist who placed him in the 3CMS level of care on 1/31/00. He remained at that level of care, was transferred to SVSP in August 2000, and had an evaluation by a psychiatrist because he had stopped taking the medications that had been prescribed for him at SQ based on his complaint of auditory hallucinations. His medications were re-instituted; however, they were discontinued

again in March 2001 because the inmate complained of side effects which he described as "flashbacks." After his discontinuation of medication by his request, he was seen by an IDTT in April 2001 and was removed from the MHSDS on 4/21/01.

The records provided did not include information as to when the inmate was returned to the MHSDS, but this appears to have occurred after February 2002 when he was seen by a mental health clinician after referral by custody because he was giving away his property and reportedly stated "I'm going home." He was removed from the mental health caseload for a second time in May 2002 because he was reportedly symptom-free since November 2000. The inmate was transferred from SVSP with a one-day stop at NKSP, ultimately arriving at HDSP on 9/10/02. Nearly two years later, in August 2004, he was again placed on the mental health caseload, and was subsequently removed on 10/29/05, one day after he had been placed in administrative segregation. The actual reason for his placement in administrative segregation at HDSP in October 2005 is not clear from the records reviewed, but there are numerous references to his having received RVRs for fighting with other inmates beginning in SQ, and continuing at HDSP, with three administrative segregation placements on 2/5/06 (refusing to obey staff orders), on 3/14/06 for breaking a sprinkler head and flooding his cell, and on 3/19/06 for unclear reasons. The suicide report refers to his having had mental health evaluations in the adjudication of the RVRs, with mental illness was not found to be a factor in any of these cases.

After his removal from the MHSDS on 10/28/05 the inmate next came to the attention of mental health staff when he submitted an inmate health request form. He was seen by a psychologist on 1/10/06 and was once again placed on the caseload at the 3CMS level of care however this time as medical necessity. On 12/10/05 the inmate was seen in medical and reported, "I'm feeling suicide" and elaborated "I'm depressed" and observed with his head down with no eye contact. No SRA was documented at that time.

The suicide report refers to the inmate having three inpatient admissions at HDSP "all for disorganized suicidal ideation" which occurred from 3/7-13, 3/13-16, and 3/19-20. The suicide report states that staff beliefs that the inmate was exaggerating symptoms to avoid being placed in administrative segregation and because of his having gang dropout concerns.

During his inpatient admissions, the inmate was diagnosed with Malingering, Psychotic Disorder NOS, Major Depressive Disorder, Antisocial Personality Disorder, Polysubstance Abuse, Adjustment Disorder, and PTSD, and he continued at the 3CMS level of care. He also received five-day follow-ups for crisis bed discharges, some of which must have been ongoing when he was readmitted. Prior to his last MHCB admission on 3/19/06, a mental health assessment on 3/18/06 stated that a correctional officer found the inmate with a makeshift noose around his neck, but the inmate had "taken no measures to actualize this" and stated, "I'm fine." It is noted that he denied intent to harm or kill himself and "he is already on suicide watch in ASU." This assessment concluded that the inmate was diagnosed with Cocaine Dependence, Malingering and Antisocial Personality Disorder, and notes the diagnosis "represents the

157

consensus of the team." An SRAC was done on 3/15/06 that identified the source of information as a correctional officer or staff interview and an inmate interview, and identified no risk factors and no protective factors, with an evaluation of imminent risk as "negligible risk." Additional comments included, "I have interviewed this man many times including 24 hours ago – tonight he banged his head – as he saw another inmate do." The clinician continued that he will place the inmate in five-point restraints and will send him back to his cell. This SRAC was conducted after the inmate had been at the MHCB from 3/7 to 3/13/06, and during his five-day follow-up following that discharge.

A SRAC was completed on 3/20/06 with the source of information being the inmate, UHR C-File and correctional officer or staff interview, which identified a number of risk factors including sex offender, history of violence, history of substance abuse, SI, threats, history of mental illness, long sentence, recent suicidal threats, assaultiveness, and no protective factors, but determined the evaluation of imminent risk as "negligible risk." The plan was to refer the inmate to the case manager and discharge to 3CMS. Comments were that the inmate was attempting to get mental health services to challenge custody and housing issues, and he was referred to the ICC. His gang-related concerns appeared to have resulted in his being endorsed to a SNY, and it is reported that the inmate did not agree with this decision.

After his transfer to PVSP on 3/23/06, the inmate was continued in the 3CMS program. His initial health screening on the date of transfer from HDSP to PVSP indicated a positive answer to the inmate having been treated for mental illness at the 3CMS level of care, and that he was currently under a doctor's care for mental health reasons. The inmate had had a number of varying diagnoses historically, and at PVSP he was diagnosed with Adjustment Disorder with Depressed Mood. He was seen by a treatment team on 4/7/06 and 6/6/06 with determinations to continue him at the 3CMS level of care, and no documented evidence that there was any consideration of referring him to a higher level of care such as the EOP or DMH. After his transfer to administrative segregation on 6/12/06, a note by a case manager dated 7/19/06 stated that the inmate "continued to experience difficulty in being able to tell the difference between real and fantasy" and the inmate had delusional beliefs involving "the matrix story." The note also indicated that Inmate EE had "no overt signs of MI" and "the inmate was not appear[ing] to be psychotic." The case manager concluded on 7/19/06 "a questionable provisional Psychotic DO NOS." A note by the case manager on 7/25/06 indicated that the inmate was at the EOP level of care and that his mental status was remarkable for psychotic symptoms as well as disorganized and illogical thinking. The inmate was not at the EOP level of care at that time and there was no indication that the case manager referred him for a higher level of care based on his clinical presentation on 7/25/06. The suicide report makes reference to the inmate having told clinicians in the past that he was at the EOP level of care, which may have "contributed to his confusion." However, it is clear from the record review that the case manager did not adequately review the records to determine the inmate's level of care or his past history. Although the inmate was seen on daily rounds by an psych tech who noted that the inmate's mood and thought content were within normal limits and he denied SI, the requirements for him to be seen weekly by his case manager were not documented in the records reviewed.

While the suicide report refers to the inmate having reported flashbacks of murders he committed when indeed he had not committed any murders, and that he was "going home" although he had an extensive sentence, being in the EOP, and attempting to give away his property, these statements were not further clarified by clinical staff to determine whether they were part of a psychotic or other mental health problem versus lies or misstatements by the inmate.

The suicide report also refers to the inmate having been found with a noose around his neck tied to the air vent in his administrative segregation cell at HDSP and telling a physician that he wanted to kill himself, as well as to his having a noose around his neck at PVSP three months prior to his actual suicide. The records do not indicate that an adequate SRAC was conducted in response to either of these events. Although this inmate had a myriad of different diagnoses and had been prescribed anti-depressants and anti-psychotics during the course of his mental health care in the CDCR, his last diagnoses recorded on an MH-2 was Adjustment Disorder with Depressed Mood, Improving, and Polysubstance Dependence. The suicide report refers to the inmate's 11-page suicide note and describes this note as being "rambling, disorganized, and psychotic," and this reviewer agrees with that assessment. The CDCR suicide reviewer concluded with the opinion that "regardless of these mitigating factors, Inmate (EE) met criteria for referral and transfer to a higher level of care, and at minimum, the process of referral should have been initiated."

The suicide report identified one problem, with recommendation, as follows:

> Problem: Inmate (EE) appeared to be appropriate for a higher level of care, such as DMH intermediate care or EOP, based upon his admissions to crisis beds and ongoing psychosis. However, he was never referred. His last case manager recognized the seriousness of his mental illness; however, she erroneously believed that the inmate was already at the EOP level of care.
> Recommendation: (a) Supervisor to provide focused remedial training to the clinician on how to identify an inmate's current level of mental health care. Have the clinician audit enough charts to demonstrate competence at this. (b) Clinician will be referred to the PPEC for a pattern of practice review.

On 1/31/07, a memorandum was provided by the Chair of the PPEC regarding this inmate's suicide, and his last case manager. The Chair wrote that on 11/15/06, the PPEC voted to refer the clinician for a pattern of practice review. However, before the pattern of practice review could be completed, PVSP administrators terminated the clinician who had been serving as a contract provider in the MHSDS. The determination was stated as being unrelated to the suicide death of this inmate. Despite that determination, the PPEC issued a credentialing alert to be placed in the clinician's file.

On 2/27/07, the Directors of the DCHCS and DAI provided a report on the implementation of quality improvement plan for suicide of Inmate EE. The response included memoranda dated 1/31/07, 12/15/06, and 12/7/06 all indicating that the clinician

had been terminated prior to the implementation of the proposed pattern of practice review.

**Findings:** This inmate's suicide does not appear to have been foreseeable because he did not report nor did his behavior indicate that he was considering taking his life in the foreseeable future. It should be noted, however, that despite his having reported SI and a suicide attempt, he didn't have adequate SRAs conducted in conjunction with these identified suicidal statements and/or behaviors. The suicidal statements and behaviors included his stating his intent to kill himself as well as his being found with a noose around his neck, and his statements to staff that he was "going home" and attempting to give away his property. The SRACs that were conducted minimized or underestimated his risk based on incomplete or inadequate review and assessment of the data. His decompensating mental status was, however, well known to mental health staff both in HDSP and PVSP. The inmates' placements and removals to the MHSDS are not clear from the records and the suicide report does not identify this as a problem to be addressed by any of the institutions. At HDSP, he had very short stays in the MHCB. While it is stated in the suicide report that he had five-day follow-up, he returned to MHCBs on two occasions within the five-day follow-up periods. Despite this and varying diagnoses, there is no indication in the record that he was ever considered for referral to a higher level of care. The suicide report correctly identifies that the last case manager treating him believed that he was at the EOP level of care. Despite her error in believing that he was at the EOP level of care, his clinical condition at HDSP and continuing deterioration at PVSP indicated clearly that he should have been referred to a mental health crises bed or DMH program by the IDTT and clinicians who treated him, and not just by the last case manager. Because of these factors, this inmate's suicide was very likely preventable had he been properly evaluated and referred to a higher level of care as indicated.


**32. Inmate FF**
Brief History: This inmate was a 31-year-old Hispanic male who committed suicide by hanging on 8/13/06 in the administrative segregation unit at CIM. The inmate was the sole occupant of his cell at the time of his death and was not a participant in the MHSDS. The inmate was returned to the CDCR on 7/28/06 via the DVI as a parole violator for "a new term" that began on 6/29/01. He was paroled and deported to Mexico on 12/16/05, re-arrested in Texas on 7/16/06, and extradited to California on 7/27/06, first to Sacramento County and the following day to the CDCR.

On 8/13/06 at approximately 12:47 a.m., while conducting security checks, two officers observed the inmate hanging by a state-issued sheet that was fashioned into a noose and attached to the cell light fixture with the other end attached to the inmate's neck. The officers left the tier, notified a correctional sergeant of the situation. He instructed one of the officers to retrieve a cut-down tool, and the second officer to notify medical staff of a medical emergency via telephone. At approximately 12:49 a.m., the cell door was opened and the sergeant and an officer entered and cut the inmate down. The sergeant and officer attempted to begin CPR with the officer beginning chest compressions. However, the sergeant was unable to insert the state-issued micro-shield barrier into the

inmate's mouth because of "rigidness/stiffness" in the inmate's jaw. The inmate was then placed on a Stokes litter, taken down to the first tier, and placed on a gurney where CPR was attempted by an MTA. At approximately 12:56 a.m., an officer accompanied medical staff, transporting the inmate via ambulance Code three to the CIM-MSF hospital. The inmate arrived at the CIM-MSF hospital emergency room at approximately 1:03 a.m. where emergency medical treatment continued but the inmate did not respond. At approximately 1:14 a.m., a physician pronounced the inmate dead. The suicide report refers to the emergency room documentation which includes the doctor not performing defibrillation because of a systole and to the prevention of intubation by neck rigidity (rigor mortis). An autopsy report was provided by the Sheriff-Coroner Division of San Bernardino County. It stated that the autopsy was performed on 8/15/06, and that the cause of death was determined as hanging, unknown, and the manner of death "undetermined." The autopsy report included the following comments the lower extremity lividity findings are completely inconsistent with the history of the circumstances. From the history of the circumstances, rigor mortis is seen as the body arrives in the emergency room, meaning the body must have been hanging for four to six hours or so generally speaking. The comments continue "however, the lividity findings of the legs are completely inconsistent with the body hanging up for hours." The comments conclude, "therefore the mode is undetermined." The Coroner's Report also makes reference to there being "a previous suicide attempt where he had stabbed himself in his eye," and noted a left eye lid scar. A toxicology report indicates that there were no alcohol or common drugs of abuse found in blood specimens.

The suicide report contained the inmate's criminal justice history, which began as a juvenile with a strong-arm robbery resulting in placements at several CYA facilities and eventually his walking away from one of those facilities in 1993. His exact age at the time of his first arrest is unclear, as he has three different birth years reported in the records. He had multiple arrests as an adult including robbery, false imprisonment, carrying a concealed weapon, felony possession of a firearm, assault with a firearm, carrying a loaded firearm in a public place, participation in criminal street gang activity, possession of a controlled substance, failure to appear and false imprisonment. His first admission to the CDCR was from 11/19/94 on a six-year sentence for second degree robbery, false imprisonment, and assault with a deadly weapon. He paroled in May 2000 to the INS. He returned to CDCR for a second term on 6/29/01 as a parole violator with a new term, and he once again paroled to INS on 12/16/05 with deportation to Mexico. The inmate's last admission to the CDCR was on 7/28/06 after he had been arrested in Texas on 7/16/06 for possession of a weapon and ammunition. The Parole Board was still reviewing his case at the time of his death; however, he had been transferred from DVI to CIM on 8/3/06 with subsequent placement in the administrative segregation unit on 8/4/06, approximately nine days before his death.

The inmate had been placed in administrative segregation as he was a documented Delhi gang member who associated with southern Hispanics. He was considered, however, a dropout and had a long list of documented enemies. During his first two incarcerations in the CDCR, the inmate had acquired 17 RVRs, ten of which included battery or mutual

combat with another inmate.  He also had been placed in administrative segregation and SHU for various periods of time during his incarcerations.

The inmate was never a participant in the MHSDS or its predecessors.  During his first incarceration, he was cleared for general population in 1996 and received subsequent evaluations when he was returned to CDCR that were related to his transfers from one institution to another.  His last mental health screening was on 8/5/06, the day after he arrived at CIM with placement in the administrative segregation unit.  He was seen in an ICC hearing on 8/9/06, with a clinician in attendance, and there was no indication that he had any mental health issues that would prevent his remaining in administrative segregation.  Of significant note is the inmate having a self-inflicted eye injury on 7/26/06 while in a detention center in Texas.  Despite this self-inflicted injury and his having been air transported to a hospital for treatment, he was extradited to California on 7/28/06 and admitted at DVI.  The suicide report referred to the inmate having receiving daily psych tech rounds after he was placed in administrative segregation on 8/5/06.  However, notes of these rounds were not included in the records provided.

A file received from the Cooke County Detention Center in Texas included an incident report that stated the inmate had stabbed himself in the eye with a pen on 7/26/06, and a subsequent cell search found bed sheets torn into strips approximately two inches wide.  There were no records provided with regard to any mental health evaluation or treatment.  The inmate was extradited from Texas to the Sacramento County Jail on 7/27/06.  The Sacramento County Jail provided a transfer sheet that indicated the inmate "needs immediate attention" and made reference to the self-inflicted wound of his left eye.  He was cleared for transfer to the CDCR.

At DVI, an initial health screening done by an RN also stated the inmate had stabbed himself in the eye three days prior to his admission, and recommended follow-up by a physician within 72 hours.  The initial health screening indicates the inmate answered "no" to questions regarding mental health problems and treatment as well as to threats of harming himself and suicide attempts.  There is no indication that the 72 hour follow-up by a physician was done.  The inmate remained at DVI for six days and there was no referral for mental health screening to be performed at DVI prior to his transfer to CIM on 8/3/06.  The initial health screening on transfer from DVI to CIM on 8/3/06 was not provided in the records reviewed.  The inmate's record contains a mental health screening chrono that was completed by a psych tech and dated 8/5/06, one day after he was placed in the administrative segregation unit.  However, there was no actual mental health screening form in the record and the suicide report refers to the screening being done at cell-front and not in a confidential area.  The inmate's last mental health contact was by a clinician who sat on the ICC hearing of 8/9/06 and reported that the inmate was stable and could remain in the administrative segregation unit.

The suicide report also refers to there being incident reports in the documents received from the Cooke County Detention Center indicating that the inmate assaulted his cellmate in that detention center on two occasions, without any explanation during the time he was incarcerated in Texas.

162

The suicide report identified five problems, with recommendations, as follows:

> Problem 1:  According to the San Bernardino Coroner's Office, inmate (FF) had been dead for about four hours before he was discovered.  There were two counts at 2130 and 2330 during that period.
> Recommendation:  An investigation by the Office of Internal Affairs has been initiated.

> Problem 2:  The initial health screening form at DVI noted a self-inflicted eye wound yet did not make a referral to mental health.
> Recommendation:  The Division of Correctional Health Care Services will develop a policy such that any inmate with a self-inflicted injury necessitating medical care who is not currently in the MHSDS will be referred by medical for a mental health evaluation and entered into the MHSDS if clinically appropriate.

> Problem 3:  The initial health screening that DVI indicated that a referral is made to the "MD" but there is no record of follow-up.
> Recommendation:  DVI shall determine the reason for the lack of follow-up, and ensure that a process for timely follow-up to medical referrals is in place.

> Problem 4:  The initial health screening (bus) form for the inmate's arrival at CIM was not seen in the unit health record.
> Recommendation:  CIM shall locate the document, or determine the reason why the screening was not completed.  If the screening was not completed, conduct an audit to determine the scope of this problem and implement a process to correct it.

> Problem 5:  The mental health screening at CIM was performed at cell front and not in a confidential area.
> Recommendation:  A memo from CIM warden [name withheld] and [name withheld] dated 8/18/06 states, "mental health screenings must be completed within a confidential setting and can no longer be completed at cell front."  Conduct an audit of location of mental health screenings in the Palm Hall administrative segregation unit for one month.

On 8/16/07, a memorandum from the Directors of the MHP, DCHCS and DAI was sent to the warden, Chief Medical Officer, DON, and Chief of Mental Health at CIM with a subject "overdue quality improvement plan for suicide of Inmate (FF)."  In the memorandum the Directors stated that the suicide report dated 11/24/06 required submission of a quality improvement plan report by 2/24/07, and that this report had not been received.  The Directors provided copies of the memorandum dated 10/22/01 titled "New Suicide Report and Review Policy" and a Coleman v. Schwarzenegger Court Order dated 6/13/02 mandating that a copy of the report on implementation be provided to the Special Master's Expert within 180 days from the completed suicide.  There was no additional information provided in the documents received.

**Findings:**  This inmate's suicide may have been foreseeable as he had a self-inflicted stabbing to his left eye on 7/26/06, approximately 17 days prior to his death.  Although this information was clearly stated in documents received from other institutions upon his arrival in the CDCR on 7/28/06, there was no documentation in the record that he was ever evaluated for risk of suicide or self-harm or the provision of a SRAC.  This suicide appears very likely to have been preventable had the inmate received the appropriate evaluations beginning at DVI when he was not referred to mental health, and at CIM when the bus screening questions should have been done.  Despite his having a known self-inflicted wound to his eye less than three days prior to his admittance to the CDCR, and a reported cell-front mental health screening which was not provided in the records reviewed, none of the clinicians who saw him conducted an appropriate evaluation or SRAC, or referred the inmate for such evaluations.  Lastly, the Coroner's Report states that rigor mortis and lividity had set in and the inmate had been dead for several hours prior to his discovery, which is stated in the suicide report, implying failures by correctional officers in conducting institutional counts at 2130 and 2330 hours on 8/12/06.  The Office of Internal Affairs investigation results were not provided at the time of the completion of this report.


## 33.  Inmate GG

Brief History:  This inmate was a 38-year-old Hispanic male who committed suicide by hanging on 8/19/06 at CIM.  The inmate was the sole occupant of his RC cell at the time of his death.  He was not a participant in the MHSDS.  The inmate re-entered the CDCR on 7/26/06 via the DVI RC, having been returned as a parole violator following his serving a sentence from 10/1/05 through 7/26/06 for assault in Colorado.  At the time of his death, his earliest possible release date had not been re-calculated.

The incident reports state that at approximately 9:38 p.m., a radio transmission from Colusa was broadcast-requesting a Code One response, and at 9:40 p.m. a sergeant and other responders arrived to the RC East Facility.  Upon their arrival, an officer indicated that this inmate was hanging from the bunk inside of his cell and a second officer was standing in front of the cell observing the inmate.  The staff observed that the inmate was hanging from the upper bunk from what appeared to be a white sheet, and that his hands were tied in front of him and his feet were also tied together.  The arriving sergeant instructed an officer to retrieve the institutional cut-down tool.  At approximately 9:42 p.m., CPR was begun after the inmate was ordered to stand but did not respond.  Prior to the MTAs arrival, a sergeant attempted to locate a carotid pulse and could not.  The MTA upon arrival also was unable to find a pulse; chest compressions and rescue breathing were begun.  The sergeant instructed staff to radio for a Code Three ambulance.  CPR continued until approximately 9:45 p.m. when the institutional medical transport vehicle arrived on the scene and the inmate was removed from the cell and placed on a gurney.  CPR was stopped briefly when the inmate was moved, but restarted when he was placed on the gurney.  The inmate was transported from the unit at approximately 9:48 p.m. to the MSF hospital emergency room where he arrived at 10:04 p.m.  Advance cardiopulmonary life support was provided and an IV line was started by medical staff, with attempts to intubate the inmate twice.  Both attempts failed.  The suicide report

164

indicates that paramedics arrived at 10:00 p.m., took over life support measures and successfully intubated the inmate.  The paramedics administered medications and the ambulance departed the facility at 10:35 p.m., arriving at Chino Valley Medical Center at 10:45 p.m. where CPR and other life savings efforts continued.  The inmate did not recover and was pronounced dead at 11:00 p.m.  The discrepancy in time between the inmate's arrival at the MSF hospital emergency room at 10:04 p.m. and paramedics taking over life support measures at 10:00 p.m. was not explained in the suicide report.  An autopsy report was provided by the San Bernardino County Sheriff's Department, Coroner Division.  It stated that the autopsy was performed on 8/22/06 and determined the cause of death as "hanging, unknown interval" and manner of death suicide.  A toxicology report stated there were no drugs of abuse or alcohol (ethanol) detected in the blood specimen.  The inmate appears to have left three suicide notes.  The first was addressed to his son stating his love for his son and asking for his forgiveness and apologizing for the hurt and shame he had caused him.  He also professed his love apparently for his grandchildren and included "I never messed with _____."  The second note was addressed to his daughter, also stating his love for her and asking for her forgiveness and his advice to keep in touch with her other brothers and sisters as they all need each other.  The third note appeared to be addressed to "Jessica" and requested her forgiveness, and stated, "the only way to be rid of the thing that has taken control of me is to kill the vessel," that he did not remember lots of the things he did when he was on drugs, and ended with "I'm sorry."

The suicide report contained the inmate's criminal justice history and stated the inmate was an associate of the Eastside 14th Street Gang (southern Hispanics).  There are no references to any juvenile history.  However, the inmate was reported to have been first arrested at age 18 for being under the influence of a controlled substance.  He had additional arrests or convictions for use, transfer/sale, or possession of controlled substances, carrying a concealed weapon, resisting arrest, terrorists threats, disregard for safety, and false imprisonment.  He had served time in local jails and one prison term in the CDCR from January 1990 through December 1994 prior to his commitment offense which occurred on 1/13/00.  In that offense, the inmate attempted to strangle his wife from whom he was separated, and he was subsequently convicted of assault with a deadly weapon with great bodily injury likely and received a sentence of five years and eight months.  The inmate entered the CDCR on 1/27/00 to begin a second term and paroled on 5/4/03.  He was re-arrested for carrying a concealed "Dirk" or dagger on 3/27/04, receiving a two-year sentence with his return to the CDCR.  He again paroled on 5/3/05 and was arrested in Colorado for absconding and assault on 10/1/05.  He remained incarcerated in Colorado from 10/1/05 through 7/26/06 when he was extradited to California and readmitted to the CDCR via DVI.  He was subsequently transferred to CIM on 8/1/06, where he remained until his death.  His earliest possible release date had not been calculated at the time of his death.

The inmate was not currently involved in the MHSDS at the time of his death and had not received mental health services, except for a relatively brief period of time from 10/2/01 through 11/15/01.  The inmate had been referred by medical on 9/28/01 for a psychiatric consultation because of complaints of difficulty sleeping.  He was prescribed Zyprexa on

10/2/01 and Trazodone on 10/10/01. The Trazodone was subsequently changed to Benadryl, and the inmate continued to take these medications through the end of October 2001, but began refusing them in early November such that they were discontinued by 11/6/01. On 11/6/01 a psychiatrist discontinued his medications and noted in a progress note that the inmate "meets criteria for removal from MHSDS." On 11/15/01 an IDTT removed the inmate from the MHSDS. These actions occurred at SCC. The inmate had been placed at the 3CMS level of care after he reported to mental health staff that a correctional lieutenant had given his social security number and other personal information to a number of inmates, and he feared that his "confidential information" might be used by other inmates, causing him to be stressed and having difficulty sleeping. He was seen by a psychologist on 10/10/01 after he had been placed in administrative segregation (on 9/30/01) for safety reasons. On 10/10/01 the inmate also had an MH-4 condensed mental health assessment and an MH-2 treatment plan, all of which stated that he had a diagnosis of Adjustment Disorder with Anxious Features and was placed in the 3CMS level of care as medical necessity.

On 1/31/02, the inmate was seen by a psychologist who repeated this information, but stated that the inmate's symptoms had improved "with the pills," and that he was no longer a candidate for inclusion in the MHSDS. The inmate had been transferred to ISP on 1/25/02 and was seen on 1/28/02 by a psychiatrist who referred the inmate for further mental health evaluation. He was subsequently seen by the psychologist on 1/31/02.

After the inmate's parole in May 2003, return to custody and subsequent parole in May 2005, he appears to have received no further mental health services with the exception of initial health screenings upon his return to custody. When he was transferred from the jail in Colorado to DVI on 7/26/06 all questions were answered "no" with the exception of the inmate having some difficulty in understanding the questions. When transferred from DVI to RCC on 8/1/06, all questions on the initial health screening were answered "no." These screenings were consistent with initial health screenings he received in 2000, 2002, and 2004, when he had transferred between institutions and/or was returned to custody. He received no additional mental health services and was prescribed no psychotropic medications after November 2001.

The inmate had a history of inguinal hernia and complaints regarding treatment for his apparently recurring hernia which appears to have been successful during prior incarcerations.

The suicide report refers to the inmate having been charged with absconding from parole and assault in Colorado resulting in his return to CDCR custody. However, he was also charged with lewd/pervious acts with children under 14 years old, oral copulation with a minor and a non-consenting adult, penetration by foreign object, and assault. His placement in administrative segregation was for safety concerns. These incidents were alleged to have occurred between June and July 2005, and the suicide report refers to the inmate having told the lieutenant in the CIM RC of his safety concerns should other inmates find out about his charges. Although the inmate was not placed on single-cell

status, he was placed alone in a cell on 8/18/06 and committed suicide the following day on 8/19/06.

Based on interviews, the CDCR suicide reviewer suggested that the alleged victim in the sexual assault charges appeared to have been his daughter. He was served with these charges on 8/18/06, the day before his suicide. These were new charges from Colorado, served by a Decentralized Revocation Unit Notice Agent.

The suicide report stated, "all policies and procedures in effect at the time of this death appeared to be followed, and there are no recommendations in this case."

A death review/suicide report was prepared by a physician and dated 10/12/06. The physician stated the inmate was discovered at 2140, CPR was begun at 2142 the ERV arrived at the cell at 2151, the inmate arrived at the TTA at 2204 with continuation of CPR. Paramedics arrived at 2222 with the inmate ultimately being successfully intubated, transported to the CVMC at 2234 and pronounced dead at 2300. The physician opines that overall there were no significant health problems and his mental health issues seemed to subside during 2002 with no further need for treatment. The physician also opines that although the ambulance response time (15 minutes) was to slow the Code was run reasonable well by all personnel involved, with the recommendation to close the case.

**Findings:** This inmate's suicide does not appear to have been foreseeable or preventable. Although the inmate did receive mental health services in 2001 and was placed in the MHSDS as medical necessity, he subsequently paroled, returned to custody, paroled and returned to custody again, and during all of the screening and intake procedures, he did not identify any mental health needs. Further, he did report his safety concerns and was placed in administrative segregation and, although not on single-cell status, he was housed alone. The inmate received "bad news" of his having new charges in Colorado that may have been related to child sexual abuse, possibly of his daughter, as reflected in the suicide notes. The suicide report identified no problems or recommendations except noting that all policies were followed; however, it appears that the inmate was removed from the MHSDS after approximately less than two months of mental health treatment, and well short of the usual timeframe of being medication-free and stable. Although this does not appear to have contributed to his death, it does appear to be a deviation from policy. Further, the suicide report does not identify the discrepancies in the timeline of the emergency response. More specifically, the incident report indicates that a radio call was placed at 9:38 p.m. However, other documents indicate that the inmate was discovered at 9:40 p.m. CPR was begun at approximately 9:42 p.m., just a four-minute timeframe from the time of the radio announcement. Also, officers had not entered the cell and cut the inmate down. The incident reports and summaries also stated that the paramedics arrived approximately four minutes before (10:00 p.m.) the inmate was reported to have arrived at the TTA (10:04 p.m.), and that the paramedics "took over" lifesaving efforts from CDCR medical personnel who were already performing such efforts. There is also no explanation for the failure by CDCR medical personnel to successfully intubate the inmate. The Physician Reviewer did correct the time of arrival

for the paramedics to 10:22 p.m., but there was no reference to this in the actual suicide report.

## 34. Inmate HH

Brief History:  This inmate was a 29-year-old Hispanic male who committed suicide by hanging on 8/29/06 in the administrative segregation unit at CSP/LAC.  The inmate was the sole occupant of his assigned cell in the administrative segregation unit, and was not a participant in the MHSDS at the time of his death.  The inmate was returned to the CDCR via the RJD RC as a parole violator with a new term.  The inmate had pleaded guilty to unlawful taking and driving of a vehicle, and was sentenced to three years in state prison. His earliest possible release date was 1/10/08.

On 8/29/06 at approximately 9:13 p.m., a correctional officer was conducting the 9:30 p.m. count, approached the cell occupied solely by this inmate, and observed that the cell window was covered with paper.  The officer ordered the inmate to remove the paper with negative results, and the officer then asked the inmate if he was okay and received no response.  The officer notified a second officer that the inmate was non-responsive to orders and both officers responded to the cell with a plastic protective shield.  They again attempted to obtain a verbal response from the inmate, and receiving none, one officer placed the plastic shield up against the food port and opened the food port.  The officer used his flashlight to look inside the cell and saw the inmate hanging by a sheet tied around his neck and suspended from the air vent.  The officer activated his personal alarm, ordered the control booth officer to open the cell, and he and the second officer entered the cell.  One officer utilized the cut-down tool to cut the noose from the air vent and the inmate was placed on the floor.  Two MTAs arrived; they evaluated the inmate's vital signs and began to administer CPR.  The inmate was placed on a gurney and taken by the institutional medical transport vehicle to the TTA.  Medical staff in the TTA continued lifesaving measures.  The inmate did not respond and was pronounced dead by a physician at 9:34 p.m.  The incident report also referenced nursing staff calling 911 at approximately 9:21 p.m.  At 9:24 p.m., a pulse was discovered by medical staff, and the inmate was given medication beginning at 9:27 p.m., but he did not respond further.  At 9:34 p.m., the inmate was pronounced dead.  Paramedics from Los Angeles County arrived at 9:38 p.m. but immediately departed because the inmate had already been pronounced death.  The CDCR suicide reviewer referred to staff finding an undated long "inmate request for interview" written in Spanish on stationery paper, and the reviewer noted "delusional content."  An autopsy report was provided by the Department of the Coroner for Los Angeles California, stated that the autopsy was conducted on 9/1/06, described the death as due to asphyxia due to hanging, and gave the opinion that this death was "a suicidal death by hanging."  The autopsy report also noted there were multiple wounds that were superficial and consistent with self-mutilation.  These wounds included lacerations on the inner area of both arms that had been stapled at some point in the past, a three inch laceration to his neck, multiple one-half to one inch lacerations on the upper torso, and a small puncture at the base of the skull.

The suicide report contained the inmate's criminal justice history. There are no references to any juvenile history; however, as an adult, he had been arrested for burglary, grand theft auto, possession of a weapon, receiving stolen property, and forged identification, resulting in probation or county jail time. The inmate first entered the CDCR on 7/3/03 after having pled guilty to possession of a forged driver's license and grand theft auto, resulting in two 16-month sentences. He was transferred from RJD to the California Correctional Facility – Cornel, a private prison, and subsequently in November 2003 to CIM. He was paroled in February 2004 to the U.S. INS and was deported. At some time he returned to the United States.

The records reviewed indicate that this inmate did not have any known history of mental illness or treatment for any mental health problems and when he entered the CDCR via RJD. On 7/3/03, the health screening stated that he did not identify any current mental health problems. The following month, he had a developmental disability screening and was rated as normal cognitive functioning (NCF), indicating that he did not have any developmental disabilities and was not in need of any assistance. The inmate received no mental health services during that prison term and paroled in February 2004. He was returned in March 2005 again to RJD, and he again screened negative for any mental health history or current mental health needs. During this final incarceration, in 2005, the inmate was transferred from RJD to Desert View Minimum Community Correctional Facility, and ultimately to administrative segregation at CSP/LAC on 5/5/06. While the inmate was housed in the Desert View Minimum Community Correctional Facility, he received several RVRs for disobeying orders or disrespect, with a more serious RVR on 4/25/06 for possession of a deadly weapon which appeared to have been made from a white plastic object being sharpened to a point. He was subsequently transferred to the administrative segregation unit at CSP/LAC on 5/5/06.

The inmate's language issues were once again identified. He needed a Spanish-speaking clinician and/or interpreter to complete a mental health screening; however, there is no documentation in the record that such a screening was completed at CSP/LAC until 7/15/06 when a psychologist completed the screening and once again documented that there was no evidence of current mental illness. It was unclear from the record whether this was a Spanish-speaking psychologist or whether an interpreter was used.

The records indicate the inmate was seen by a psych tech on daily rounds while he was in the administrative segregation unit. Approximately one week after he was seen by the psychologist, a psych tech saw him on 7/23/06, and with the help of a Spanish-speaking officer, was able to obtain information that the inmate was frightened and had safety concerns for his life because he believed officers had told other inmates that he was in protective custody. He also reported vegetative symptoms of inability to sleep and poor appetite. He displayed his hands which had blood at the fingertips from his having bitten his nails. The officer who served as interpreter told the inmate that he would be able to speak with the lieutenant and have a possible cell move. The psych tech noted in his or her note that a mental health referral would be made. At this time the inmate was double-celled. The following day, an officer responded to the noise of someone kicking the cell door of this inmate's cell and discovered that the cellmate was kicking the door to alert

officers that this inmate had large cuts on the inside of his left arm, and blood on the front of his shirt and down his arm. Both inmates were removed from the cell. When interviewed, this inmate stated that staff had beaten him and had allowed a prison gang, the Surenos, to cut him. In contrast, the cellmate reported that he woke up, heard this inmate yelling, and then saw the blood. This inmate was transferred to the TTA and reportedly told an MTA that he had used a razorblade that "got flushed down the toilet." The inmate received medical treatment including 30 staples and an antibiotic while in the TTA, but he was returned to custody and re-housed in administrative segregation in a different cell. The suicide report references a "California State Prison – Los Angeles County/Lancaster, California/ Notice of Unusual Occurrence/Incident Administrative Contact Report," which described this incident and stated that an RVR was issued to the inmate for a "self-mutilation for staff manipulation." The suicide report also states, however, that no RVR report was located in the inmate's C-file. There was also no referral made to mental health for this serious self-inflicted injury, and no SRAC was done.

Four days later, on 7/28/06, the inmate was discovered to have a laceration on his neck and was taken from administrative segregation to the TTA. The medical report of injury or unusual occurrence report of 7/28/06 said the inmate reported in broken English that "the south side came in his cell and fuck him up." (*sic*) The wound was cleaned, sutures were used to close it, and the inmate was prescribed an antibiotic and analgesic. There were also superficial lacerations on the inmate's right forearm and his forehead which were treated. On 7/28/06 an RN in the TTA wrote "I/M paranoid with three inch laceration to throat and a five inch laceration to right forearm, multiple superficial cuts to forehead. Twenty-two staples intact and left FA wounds. Inmate appears scared."

After admission to the MHCB, a psychiatric note on 7/28/06 states that the inmate had been seen on 7/23/06 for "bilateral self-inflicted lacerations to the forearms," and stated that the inmate had reported that someone else had cut him and had "not taken responsibility for the wounds himself." The inmate reportedly stated that someone else had actually cut his throat, even though he was in a single cell at the time. The psychiatrist opined that the inmate was delusional, fearful of violence against him from others, and had bitten his fingernails down to the nail beds. Although the inmate stated that he was not mentally ill, the psychiatrist diagnosed a Delusional Disorder with Persecutory Delusions and assessed his GAF at 55. The psychiatrist prescribed Risperdal IM stat and completed a SRAC, noting that the inmate was anxious, fearful for his safety, had recently attempted suicide or self-injury, was housed in administrative segregation, and had a past suicide attempt several days earlier. The psychiatrist estimated the risk of suicide as moderate. The inmate was seen the next day by another psychiatrist who diagnosed "Delusional Disorder versus Malingering," noted the inmate was fearful and wanted to be in a safe environment, and that the inmate had stated that officers were allowing other inmates into his cell to cut him. On 7/31/06 the inmate was again evaluated by a psychologist who reported that he could not return to administrative segregation because the "Surenos" (southern Hispanic prison gang) wanted to kill him. The inmate apparently had changed his story regarding other inmates threatening or attacking him during the course of his incarceration, and at one point, mental health staff

wrote that he had been attacked while taking a shower by other inmates, which caused the laceration to his forearm. The CDCR suicide reviewer stated that this information was not true.

During the course of his MHCB admission, the notes indicate that the staff did not believe he was mentally ill and that his language ability with English was better than he represented, resulting ultimately in a diagnosis by the psychologist who evaluated him on 7/31/06 and 8/1/06 of Malingering. In the 8/1/06 note, the psychologist indicated that the inmate "admits he lied to this writer yesterday," and continued that the inmate reported his self-inflicted acts were to obtain his transfer out of administrative segregation. The psychologist added Polysubstance Abuse by History and Antisocial Personality Disorder to the current diagnosis of Malingering, and noted that the inmate wanted transfer because of gang-related drug debts. A SRAC performed by a psychologist on 8/1/06 did not provide an evaluation of risk based on the risk and protective factors, but added in the comment section, "psych malinger to get self out of administrative segregation. Has no SI history," despite having checked as a dynamic risk factor "recent suicide attempt or self-injury" and circling "self-injury."

The IDTT meeting conducted on 8/1/06 included a completion of a MH-2 treatment plan and stated that the inmate's mental status was essentially within normal limits, with the exception of his insight and judgment which were evaluated as "fair to poor." His diagnosis was Malingering, Polysubstance Abuse by History ("coke," "mj," "etoh") and ASPD, and his GAF was estimated at 75. This IDTT was held three days after the inmate was admitted to the MHCB with a diagnosis of Delusional Disorder with Persecutory Delusions. On that same date, the psychologist wrote a progress note re-emphasizing the diagnoses with a plan to discharge the inmate to administrative segregation single-cell status, to have custody will intervene with inmate regarding this safety concerns, and to "encourage I/M to not lie about his historical information."

The following day, on 8/2/06, the inmate was discharged from the MHCB. His diagnosis had been changed to No Diagnosis and a GAF of 70, with a return to the administrative segregation unit and five-day follow-up. Despite the mental health staff's determination that the inmate had no diagnosis and admitted to "feigning suicide," he was referred for custody to take the appropriate interventions, and for mental health to conduct a five-day follow-up. The five-day follow-up should have been from 8/3-8/7; however, notes from only 8/3, 8/4, and 8/6 were documented.

Prior to his discharge, there was a note by a psych tech indicating that the inmate was tearful and fearful but denied SI. The psych tech noted that the inmate stated that he had enemies, did not feel that he would be safe, had attempted to give the psych tech his parents' names, and stated that he wanted to call his mother. The psych tech asked the sergeant if they could move him to a different building where he could be more closely monitored for safety concerns. On 8/3/06, the day after his discharge, a different psych tech noted that the inmate appeared fearful and depressed and stated that the mental health screening should be completed using a Spanish interpreter. A psychiatrist saw him

171

on 8/4/06, diagnosed Adjustment Disorder, and gave a GAF of 30-35, in striking contrast to the GAF of 75
given prior to discharge from the MHCB.

The inmate continued to be seen by mental health staff after his incomplete five-day follow-up while housed in administrative segregation, with staff noting that he appeared to be stable, was refusing medication,  and had covered his cell window on 8/23/06.  On 8/26/06, when a correctional officer discovered four weapons made of copper wire inside of the cable box in the cell which the inmate occupied, he received an RVR for possession of inmate-manufactured weapons.  These weapons were found within a torn piece of sheet that had been rolled up and placed in the cable box, according to the suicide report.  The inmate was evaluated by an RN who discovered superficial lacerations on the inmate's abdomen.  The inmate reported that he had cut himself because he wanted to get out of the administrative segregation unit and "I want a shot."  The inmate was seen by a psychiatrist and told him that he wanted to get out of administrative segregation.  The psychiatrist wrote that the inmate was "well known for his para suicidal threats.  If you don't give me what I want I will scratch myself."  Although the psychiatrist opined that the inmate had no symptoms of mental illness and did not have any "real" suicide attempts, he prescribed an injection of Benadryl and returned the inmate to custody.  This was the last contact the inmate had with mental health staff prior to his suicide three days later on 8/29/06.

The suicide report refers to the one and a half page-long "Inmate Request for Interview" found in the inmate's cell after his suicide.  The CDCR reviewer noted that this was hard to follow; however, "this writing reveals the inmate's paranoid, delusional thought process."  He wrote that several officers were providing information about him to other prisoners, and that these prisoners made fun of him when the social worker walked past their cells."  The CDCR reviewer also noted that interviews with administrative segregation officers indicated that the inmate frequently refused to come out for showers and did not come out for yard exercise.  The CDCR reviewer interviewed inmates and stated in the suicide report that one inmate reported that on the night of this inmate's suicide, he was yelling and banging on the cell door, yelling "help somebody, help," but no staff responded.  The CDCR reviewer further opined that the inmate's state appeared to have been increasingly decompensated and that "his fears, whether real or imaginary, increased and lead to severe anxiety, paranoia, and delusional thinking, and then to extreme fear and escalated anxiety, and finally, suicide."  The reviewer opined that the inmate's placement in administrative segregation appeared to be a significant stressor, precipitated his mental illness, and appeared to have exacerbated his condition, and finally that "the most salient risk factor for suicide was his deteriorating mental condition that was not recognized or adequately treated by the mental health staff."

The suicide report identified five problems, with recommendations, as follows:

> Problem 1:  It appeared that mental health staff failed to recognize this inmate's deteriorating mental condition.  For example, his nonsensical story that staff from second watch had beaten him and let the "Surenos" into his cell to cut him, was

not seen as an illustration of confusion or psychotic thinking (except by the admitting psychiatrist). Instead, the inmate was labeled as Malingering. His serious self-injuries on 7/24/06 and 7/28/06 and evidence of anxiety and emotional distress, were seemingly not taken into account. Furthermore, staff did not always use interpreters, and in some instances noted that his poor English speaking ability was evidence of manipulative behavior, as they believed he could speak better English and was faking.

Recommendation: The three psychiatrists and one psychologist involved in the evaluation of this inmate while he was in the MHCB will be referred to the DCHCS PPEC. All clinical staff at the institution shall be reminded that a diagnosis of Malingering requires a complete psycho-diagnostic evaluation utilizing standardized testing materials which the institution shall ensure are available.

Problem 2: Following discharge from the MHCB, the inmate continued to exhibit distress but was not referred back to mental health for an evaluation for being returned to the crises bed.

- On 8/1/06, mental health staff discharged the inmate from the mental health crises bed. That same day, a psych tech noted that the inmate was tearful and fearful, but the psych tech did not refer the inmate back for a mental health evaluation.
- On 8/3/06 another psych tech also noted that the inmate was in distress, but did not refer him back to mental health.

Recommendation: The local Director of Nursing shall provide direction for identifying any barriers to referrals by psych techs, and provide training as indicated.

Problem 3: On 8/26/06, three days before the suicide, staff found four manufactured weapons in his cell. A nurse evaluated the inmate and noticed small scratches on his abdomen. The psychiatrist evaluated the inmate and wrote, "inmate is well known for his para-suicidal threats," indicated he had no mental illness or "real" suicide attempts, ordered Benadryl 100 mgs intramuscularly stat, and released him to custody.

Recommendation: A DCHCS PPEC Emergency Action was taken on this psychiatrist on 9/28/06. Final action is pending. (This is one of the psychiatrists also referenced in Recommendation One.)

Problem 4: There is no indication that mental health screening was completed within 72 hours of being placed in administrative segregation on 5/5/06. The notation on 114A: "needs Spanish-speaking to complete MHS." Apparently this was not followed up.

Recommendation: Conduct audit of the mental health screenings in administrative segregation to ensure 100 percent compliance with screenings offered within 72 hours.

Problem 5: One inmate reported to this writer that on the night of the suicide, he heard inmate (HH) yelling and banging on the cell door. The inmate stated that inmate (HH) did not speak good English, but was yelling "help, somebody help." The inmate stated no staff responded to his yelling. [Further allegations reported by other inmates via the plaintiffs' attorneys in Coleman included that inmate (HH) attempted suicide earlier in the day and twice approached mental health staff claiming to be suicidal but was ignored, all on the day of his death. Reports also alleged that custody does not make regular checks and that the inmate was dead for five hours when discovered.]

Recommendation: The Institution's Investigative Services Unit is conducting fact-finding into these allegations.

On 9/20/06, counsel for the plaintiffs in Coleman v. Schwarzenegger sent an e-mail to counsel for the defendants, stating that they had received a number of letters over the past week from inmates housed in the administrative segregation unit at CSP/LAC, that the content of the letters was quite disturbing. They asked the defendants to investigate these allegations as part of the Suicide Review process. Counsel for the plaintiffs continued on that the letters alleged the following: (1) As a result of a suicide attempt or SI in the administrative segregation unit approximately two weeks before this inmate's successful suicide, he was placed in a cell in a paper jumpsuit without a mattress or bedding and was kept in those conditions for two days. (2) Prior to the inmate's suicide, inmates overheard the inmate telling a psych tech in the housing unit that he was feeling suicidal but was not referred for mental health evaluation or need for MHCB placement. (3) Inmates reportedly told a specific correctional officer that the inmate was suicidal, but the officer did not summon mental health or respond in any fashion.

On 5/8/07, the Directors of Mental Health for the DCHCS and DAI issued a report on implementation of the quality improvement plan for suicide of Inmate HH in response to this suicide report dated 11/24/06. The Directors' memorandum included the memorandum from CSP/LAC staff dated 2/13/07 with other memoranda associated with each CAP Item. The CSP/LAC response stated the following: (1) With regard to Problem 1, a copy of a memorandum given in September 2007 to clinical staff and all clinical case managers stated that two psycho-diagnostic tests had been ordered, including the Structured Inventory of Malingered Symptomatology (SIMS) and Paulhus Deception Scale (PDS), that would be available for all clinical staff. The response continued that training for Malingering would be conducted at a later date once the testing material was received, and that DCHCS will be advised on completion of training. (2) With regard to Problem 2, CSP/LAC staff provided a memorandum dated August 2007 from an SRN II, stating that the barriers noted were related to a lack of scheduled follow-up after discharge from a MHCB and a lack of follow-up after an emergency MH referral was initiated, with recommendations to review policies and procedures, develop a tracking system, to change policies and procedures to require automatic mental health follow-up within two to three days after discharge from an MHCB, and to review policies and procedures related to identifying language barriers and providing translators.

174

(3) In response to Problem 3, a review by the DCHCS PPEC was initiated in September 2006 and continued with two additional meetings in October 2006 and March 2007. The memorandum dated 3/29/07 from the Chair of the PPEC stated that the Suicide Case Review Committee found practice deficiencies on the part of three providers who cared for this inmate. These specific practitioners who were referred to the PPEC were designated as "Dr. X," "Dr. Y," and "Dr. Z." In the meetings of the PPEC in September and October 2006, the committee determined that Doctor Z's clinical privileges were to be restricted pending a peer review investigation, that he be required to complete a training on SRAC and receive counseling regarding counter-transference issues, and that he undergo a chart review that focused on his care for suicidal patients. The committee determined that Dr. Z completed these requirements with satisfactory results, and in October 2006, the committee lifted the restriction on his clinical privileges. With regard to Drs. X and Y, the committee concurred with the Suicide Case Review Committee's findings that Drs. X and Y deviated from the standard of care in failing to collect the necessary data to support a diagnosis of Malingering and failing to adequately consider the inmate's previous self-injuries and documented anxiety. The PPEC requested a pattern of practice review for Drs. X and Y, with particular focus on the practitioners' approach to MHCB patients and their assessment of patient's motives with regard to self-harm. The PPEC indicated that they would review the findings and take action as appropriate, once the pattern of practice reviews had been completed.

(4) With regard to Problem 4, an audit of mental health screenings for the months of September 2006 thru December 2006 was completed by a senior psych tech. While the comments provided regarding the audits for September, October, November, and December stated that less than 50 percent of the mental health screenings were completed after 72 hours, in September, five of 30 were not completed within 72 hours, in October ten of 30 were not completed within 72 hours, in November two of 30 were not completed within 72 hours, and in December all 30 were completed within 72 hours. The audit also reviewed psych tech weekly summaries and stated that for September, eleven of 20 were not completed, in October seven of 20 were not completed, in November two of 20 were not completed, and in December all 20 were completed.

(5) With regard to CAP Item Five, a memorandum dated 1/29/07 from a correctional sergeant of the Investigative Services Unit stated that a specific inmate was interviewed and a fact-finding was initiated, based on a letter submitted by the inmate on 8/30/06 to the Office of Internal Affairs Headquarters that alleged acts of staff misconduct on the part of correctional staff employed at CSP/LAC. The allegations of staff misconduct included the inmate's statements that a specific officer was advised that this inmate was suicidal and did nothing to help the inmate, that correctional officers did not conduct hourly security checks as required, that the correctional sergeant did not conduct his rounds in the building, and that a psych tech rarely saw anyone when they come into the building. Based on "fact finding," the investigator stated that the allegations that medical including psych techs were not doing rounds was not substantiated; the allegation that this inmate did not receive proper medical care was not substantiated; and "that the event of witnesses being requested and the rescinding of the witnesses can not be determined with the present documentation or evidence that is available" and the "allegation is thus

unsubstantiated." The memorandum states, "it appears that no department or institutional policy was violated," and "the allegations of staff misconduct raised by (this inmate) does not warrant a formal investigation based on the supporting documents and interviews conducted."

There was no additional documentation provided regarding the response by DCHCS or DAI to the CAP, submitted by CSP/LAC, DCHCS PPEC, or the Institution's Investigative Services Unit.

**Findings:** This inmate's suicide appears to have been both foreseeable and preventable. The CDCR suicide reviewer identifies substantial problems with the care, treatment and custodial management of this inmate. The five problems identified were absolutely appropriate for further investigation, and this reviewer's review of the records and information available concurs with the CDCR reviewer's identification of problems and failures in the clinical care for this inmate. This reviewer would add an additional problem of failure to conduct five-day follow-up for 8/3/06 to 8/7/06.

The responses to the suicide report recommendations appear to be inadequate. This inmate gave very clear indications of his deteriorating condition, including self-inflicted wounds which were not appropriately assessed by clinical staff, nor were appropriate interventions by clinical and custody staff initiated. The apparent perspective of clinical staff that this inmate was either "Malingering" (manipulative) or "mentally ill" implies that the two conditions or circumstances are mutually exclusive and/or do not require appropriate collaborative responses by clinical and custody staff. They certainly are not mutually exclusive. This inmate may very well have had gang-related drug debt and safety issues which would not exclude him from having serious mental illness that is very likely best described as a Delusional Disorder or other psychotic disorder in which he was making blatantly psychotic statements and engaging in self-injurious behaviors that were attributed by mental health staff as evidence of "manipulation." There is no indication in any of the records that the inmate was considered for referral to a higher level of care. Those individuals in the MHCB appeared to simply write off his behavior as malingering, manipulative, and not related to mental illness, despite the seriousness of his self-inflicted wounds and of his increasing psychotic decompensation. The responses to the suicide review identified problems via the CAP items from CSP/LAC, DCHCS, and the Institution's Investigative Services Unit are inadequate, while there is no further investigation or response at a higher level to further explore, challenge, or clarify these responses.

### 35. Inmate II

Brief History: This inmate was a 25-year-old Hispanic female who committed suicide by hanging on 10/1/06 in a dormitory in CCWF. The inmate was not a participant in the MHSDS at the time of her death. The inmate entered the CDCR for her first and only adult conviction via the CCWF RC on 4/11/01, after having been convicted of first degree murder and assault with force likely to cause great bodily injury, for which she received a sentence of 29 years to life. Her minimum eligible parole date was 9/19/26.

The inmate was discovered on 10/1/06 at approximately 12:57 p.m. when another inmate ran into the dayroom at CCWF screaming, "she hung herself." Two correctional officers responded to Room Nine, an eight-bed dormitory that also has a toilet and shower room. One officer immediately activated his personal alarm device when the other inmate ran into the dayroom screaming, and then exited the officer's station and ran to Room Nine. A second officer ran to the officer's station, obtained the cut-down tool, proceeded to Room Nine, and gave it to the first officer responding to the scene. The incident report describes approximately 50 inmates in the front of Room Nine looking into the window. The first officer had to make his way through the crowd where he observed another large group of inmates in the dorm room, two of whom were administering CPR to this inmate. The officer observed these two inmates appearing to appropriately administer CPR and left the room briefly to get the cut-down tool from the second officer who was on his way. This inmate was observed lying on the floor of the bathroom in the doorway with her feet near the toilet and her head out of the doorway in a supine position. Two inmates continued performing CPR, and it appeared they had removed the piece of fabric this inmate had used to connect her neck to the mounted hook on the wall of the bathroom stall. A lieutenant and an additional officer arrived and ordered the inmates in the area to leave the area, and subsequently pulled this inmate completely out of the bathroom. The lieutenant and officer found no pulse and no respiration and they then took over CPR from the two inmates. At approximately 1:00 p.m., an MTA arrived as did an LVN who took over chest compressions. The MTA connected the AED to the inmate; however, the AED advised no shock. At approximately 1:03 p.m., two additional MTAs arrived at the building with the ETV and placed the inmate on a gurney. An MTA radioed the TTA of the Paris Lamb Treatment Center and notified them that they would be bringing the inmate in a full code. CPR continued during transport. At 1:08 p.m. an RN called the watch commander to see if he had called for an ambulance; he had not done so, having assumed that other staff had already called. At 1:10 p.m. the inmate arrived at the TTA, where CPR continued and other medical services were begun. At that time, an RN called the Pistoresi Ambulance Service for a Code Three transport. At 1:15 p.m. the TTA staff attempted to start an IV but were unsuccessful, and at 1:24 p.m. shock was initiated via the AED. An IV was started. Beginning at 1:28 p.m., IV medications were administered, and between 1:31 p.m. and 1:36 p.m., second and third shocks were delivered from the AED. At 1:35 p.m. paramedics arrived and at 1:39 p.m., the inmate was intubated by paramedics. At 1:43 p.m.. the inmate was pronounced dead by a paramedic while still at the facility. The autopsy report was issued by the Sheriff-Coroner for the County of Madera and stated that the autopsy was conducted on 10/2/06. The cause of death was determined to be hanging; however, there was no manner of death specified by the Coroner's Office. A toxicology analysis was completed and determined that there were no common acidic, neutral or basic drugs, and that no ethanol alcohol was detected in a blood sample.

The suicide report contained the inmate's criminal justice history. This was her first and only offense, according to the records available. She did not have a juvenile history. The instant offense was committed approximately two weeks prior to her 18th birthday. The offense involved her having a fight with a girl in the neighborhood in front of the girl's

177

home.  When the girl's mother came out of the front door, the inmate started slashing with a buck knife, resulting in the mother being stabbed four times and subsequently dying from the injuries.  The inmate was intoxicated with alcohol at the time, and had subsequently described herself as an alcohol and methamphetamine addict who also used cocaine and marijuana.  When the inmate arrived at CCWF, the initial health screening (bus screening) was positive for her having reported being diagnosed with a mental illness in 1998 as well as a suicide attempt in 1998.  Additional information in the suicide report states that the probation officer's report indicated that the inmate had reported hearing voices approximately six to seven months prior to her arrest, being diagnosed with Paranoid Schizophrenia after her arrest, and being treated with antipsychotic and antidepressant medication.  She had also reported that she had a positive family history for Schizophrenia, including her mother, uncle, grandfather and other family members.  After arriving at CCWF, she received a mental health screening which indicated that she was experiencing a major depression and received an RC mental health evaluation that noted physical and sexual abuse, past mental health treatment including psychotropic medications, a suicide attempt in 1998, auditory hallucinations by history, and substance abuse by history.  In contrast to the history, the clinician also reported that the inmate's mental status at the time of the mental health screening was within normal limits, that she was not reporting any symptoms currently, and that she had not been on medications for approximately seven months.  The inmate was cleared for general population having not met the criteria for inclusion in the MHSDS, although she was diagnosed with Schizoaffective Disorder in Full Remission and Alcohol Dependence in Institutional Remission.  She also received a Developmental Disability Screening on 4/19/01 and scored NCF, indicating that she had no cognitive problems and no need for staff assistance.

The inmate did not receive nor request any mental health services after her entry into the CDCR until she was referred on 1/10/03 to mental health by a CC1, after she had been informed that her uncle had died.  She was not placed in the MHSDS; however, she was noted to have been participating in groups available to non-MHSDS inmates, including AA and anger management since mid-2002.  On 3/10/03 she was seen by an unlicensed psychologist who indicated that any treatment provided by the unlicensed psychologist would be supervised by a supervising psychologist.  There were no further notes as to why this appointment was held or any subsequent visits.  The suicide report also refers to her having participated in a childhood abuse survivors group between March and May of 2004, with good participation in these groups.  She continued her participation in groups that were not offered as part of the MHSDS and apparently was on a waiting list for an unspecified group based on a discussion she had with a social worker in September 2005 which was her last contact with any mental health staff.  She was never a participant in the MHSDS while incarcerated, despite the reported history prior to her incarceration.  Also, the inmate gave no history of significant medical problems prior to incarceration.  She reported suffering a motor vehicle accident in 2001 and subsequently complained of cervical and lumbar back pain for which she received analgesics, muscle relaxants and a lower bunk chrono.  She did have inmate health services request forms for minor injuries that appear to be work-related, one of which resulted in a lower bunk chrono.  Her only

consistent medical complaint was obesity, having gained a significant amount of weight while incarcerated, with her weight ranging from approximately 140 to 240 pounds.

The suicide report refers to a possible precipitating event with this inmate having arguments with her "girlfriend," and what is described as an accidental physical interaction in which this inmate tripped and fell on top of her girlfriend, resulting in their being placed in separate dormitories. These events occurred on the day before the inmate's suicide and continued into the day of her suicide, when she was described as having not gone out to yard with other inmates, placing a towel over the opening of the top of the door to the toilet and shower room, and then hanging herself in the toilet area. She was discovered by another inmate who was returning from church. When she looked into the toilet, she observed the inmate hanging. The suicide report refers to the inmate not having left a suicide note but having written several letters, two of which were from her and four of which were from her "girlfriend" although written in the same handwriting and believed to have all been authored by this inmate. It is noted that none of these letters indicated the inmate's intent to harm herself, but were focused on the inmate's concern for her grandmother and complaints to a prison advocacy group regarding assistance with her back and shoulder pain issues that she felt were not being adequately addressed. The suicide report also refers to the inmate's grandmother's failing health, and in July of 2006 the grandmother not visiting for the first time since the inmate was incarcerated in the CDCR.

The suicide report identified no problems, and there were no recommendations made regarding the inmate's death.

A death/suicide review dated 10/23/06 was conducted by a physician and provided a summary of the emergency response. The physician commented that overall, the inmate had no significant health problems and that her mental health issues were more historic than current, requiring no treatment. He also commented the ambulance response time of 27 minutes was too slow, and that the code sequencing had a number of flaws including a ten-minute delay in calling 911, a 15 to 25-minute delay in calling the MOD, Narcan not given, blood sugar not being checked, and it taking over 90 minutes for the physician to appear in the TTA after being called. The physician recommended that the noted delayed response times in the code sequence should be reviewed with nursing staff as well as with the physician on call. There was no additional information that any of these recommendations were provided to the staff at CCWF, nor there was any follow up regarding the recommendations.

**Findings:** This inmate's suicide does not appear to have been foreseeable or preventable. The physician reviewer does refer to a number of issues having to do with the time sequence of the emergency response which should have been identified as problems in the suicide report requiring corrective action responses. It is unclear whether these problems, as identified, may have been such that they may have prevented this inmate's death; however, the CCWF staff should be required to respond to these problems with corrective actions to facilitate a more timely emergency response for any future inmates in need.

179

### 36. Inmate JJ

Brief History:  This inmate was a 51-year-old Caucasian male who committed suicide by hanging on 10/15/06 in his general population cell at the WSP RC.  The inmate was double-celled at the time of his death and was not a participant in the MHSDS.  The inmate entered the CDCR via the WSP RC on 10/12/06, having been convicted of first degree murder with use of a firearm, and two counts of child endangerment with enhancements for being armed with a firearm.  He received a sentence of 50 years to life and his minimum eligible parole date was 9/1/55.  The inmate committed suicide three days after his arrival at the CDCR.

The inmate was discovered on 10/15/06 at approximately 5:07 p.m. when he was discovered hanging by a state sheet used as a rope in his RC cell.  The inmate was discovered by a correctional officer who was conducting an institutional count, hanging by the sheet tied to the ceiling light fixture.  The inmate's wrists were bound to his upper thighs with a cloth.  The inmate's cellmate was lying on the lower bunk.  The officer contacted the control booth officer, told him to radio for a Code One alarm ,and asked for the bar box key to release the lower tier section.  The officer also activated his personal alarm.  Staff responded to the location, opened the cell door, ordered the cellmate out of the cell, and then handcuffed him and removed him from the area.  Another officer retrieved the cut-down tool from the control booth.  The inmate was cut down, carried out of the cell, and placed on a dayroom floor.  An MTA initiated CPR but then stopped as the inmate showed "obvious signs of death" (rigor).  The inmate was placed on a gurney and transported to the TTA.  After examination by a physician who was unable to detect any vital signs, noted the state of rigor mortis and pronounced the inmate dead at 5:33 p.m.  An autopsy report was provided by the Kern County Coroner's office.  It stated that the autopsy was conducted on 10/16/06, and concluded that the cause of death was asphyxia due to hanging with neck compression, and that the type of death was suicide.  A toxicology report stated that there were no drugs of abuse or alcohol found in blood samples; however, Trazodone at 0.02 mg/L was found in the blood sample.

The suicide report contained the inmate's criminal justice history.  This was the inmate's first arrest and conviction; he had no prior criminal record as an adult or juvenile.  The circumstances of the commitment offense involved the inmate shooting and killing his wife after discovering that she had been having an affair.  This occurred while the couple's two children were asleep in their respective bedrooms in the family home.  The suicide report refers to a "subsequent investigation" that revealed that the inmate intended to kill his wife's lover and that he was considered suicidal at the time of the crime.

On the initial health screening at WSP-RC on 10/12/06, when the inmate was transferred from the county to WSP, he indicated that he had a history of "thyroid" disorder and "depression" and that he had been treated for a mental illness and a current mental health problem, but denied that he had ever attempted suicide, resulting in a "psych referral."  The doctor's orders dated 10/12/06 state that the inmate should be placed in a heat

180

sensitive building, with psychiatric evaluation in 24 to 36 hours, and that his Buspar, Remeron and Trazodone were re-ordered.  He did not see a psychiatrist on 10/12/06.

Review of the record indicated that the inmate received his medications on the evening that he arrived at WSP, and received Buspar the following morning.  However, the MAR has blanks for administration of these medications on the evening of 10/13/06 and indicates that he refused his p.m. medications on 10/14/06.  The inmate appears to have received his Buspar on each morning, as prescribed.

The suicide report refers to the Chief of Mental Health being contacted by a treating psychologist from the LA County Jail on 10/13/06 to provide information about the inmate's mental health treatment and suicidal behavior while in the jail.  The psychologist reported the inmate having attempted suicide by overdosing on Seroquel approximately 11 months before entering prison, with hospitalization for one week at that time.  The inmate was kept on suicide precautions from that time until he was transferred to WSP.

Based on this information, the inmate was seen by a psychologist on 10/13/06.  A note dated 10/13/06 at 12:45 by a psychologist stated that the "psych from LA county jail called regarding this inmate and his history of OD attempt eight months ago, and staff supervision because of the inmate ruminating about suicide."  The note went on to indicate that the inmate attempted to overdose on Seroquel, but indicates that the mental status examination was essentially normal, that the inmate was stable with appropriate affect, and the he denied SI or homicidal ideation, with good insight and good judgment. The plan indicated a statement as "I/M DOA 10/12/06.  Currently on psych meds – see attached."  The note went on to state that the inmate's occupation was  stock broker executive and that he attended college, and that he had a conviction – murdered wife and child endangerment.  It is also noted follow-up "prn."

The CDCR suicide reviewer refers in the suicide report to having talked with the psychologist who stated that he viewed this as a routine referral to assess how the inmate was doing, saw the inmate at the cell door to keep the interview "low key," and told the inmate that he was "making rounds."  The psychologist told the reviewer that the inmate did not need more privacy.  In response to the inmate's questions about his medication, the psychologist told him other professionals would see him the following week. According to the psychologist, the mental status examination was essentially normal and the inmate's affect was euthymic.  According to the reviewer, the psychologist did not ask the inmate about mental health problems in the county jail or tell him the reason that he was seeing the psychologist on that day because he did not want to give the inmate "cause for alarm," and told him that his visit was to "see how he was doing."  According to the records, the psychologist diagnosed Mood Disorder NOS and Personality Traits with a GAF of 60.  The psychologist recommended follow-up as needed and the inmate was not placed in the MHSDS at that time.  This was the last mental health contact with this inmate prior to his death two days later.

The suicide report identified one problem, and recommendation, as follows:

<u>Problem</u>:  The psychologist who evaluated the inmate in response to the call from the jail psychologist did not complete a comprehensive mental health assessment or SRA, and did not see the inmate in a confidential setting.  (The fact that the jail psychologist took the time to call and express these concerns should have indicated to prison staff that this required more than a casual, cursory "check-in" with the inmate.)

<u>Recommendation</u>:  (a) The Institution should present this case at a mental health staff meeting and discuss the appropriate response to such a situation.  (b) The Psychologist shall be referred by the Division of Correctional Health Care Services (DSHCS) to the Professional Practice Review Committee (PPRC) for a Pattern of Practice Review (PPR).

On 3/9/07, in response to the suicide report dated 12/14/06, the Directors of DCHCS and the Director of the DAI issued a report of implementation of the quality improvement plan for the suicide of Inmate JJ.  In their report, the Directors include a memorandum from WSP dated 1/29/07 stating that the minutes of the MHP staff meeting held on 1/23/07 were included in fulfillment of the required quality improvement plan, and two pages of on-the-job training sign-in sheets documenting clinical staff attendance at the meeting.  The minutes indicated that the case was presented with additional information, including information from the LA County jail psychologist that the inmate had attempted suicide by overdose some months before,  was "later found with a noose in his cell made of plastic bags," and that "the psychologist viewed him as a high risk for suicide and requested follow-up by the WSP-RC clinical staff."  A discussion with staff took place regarding a number of points, including insisting that the inmate come out of the cell, ensuring that a SRAC was completed, discussing information received from the jail documenting the information on a MH-3, and having the inmate sign a "no suicide contract" to develop rapport with him. It was reported by the chief psychologist that these points were summarized in the minutes and would be copied and distributed to all WSP-RC MHP staff.

On 3/7/07 the PPEC suicide case review regarding this inmate was conducted, and a memo was presented by the chair.  The PPEC concurred with the Suicide Prevention and Response Focus Improvement Team (SPR-FIT) with respect to the psychologist's care and voted to refer the psychologist for a Pattern of Practice Review.  A summary suspension of the clinical privileges of this psychologist was issued by the Chief Psychiatrist and Chief Psychologist of DCHCS until the psychologist completed an eight hour training on SRAC.  The memorandum continues that the psychologist had completed the SRAC training and his privileges had been restored.  A Pattern of Practice Review was completed and would be reviewed by the PPEC at a meeting in March 2007.  It was anticipated the committee would assess the Pattern of Practice Review results and review the care provided to this inmate and take further action to address practice deficiencies and protect patient safety as necessary.  There was no further information reported since this memorandum from the Directors dated 3/9/07.

**Findings:** This inmate's death was foreseeable and preventable. The staff at WSP was put on notice by the LA County jail staff psychologist that this inmate had attempted suicide while in the jail, and had been found with instruments for suicide in his cell. Further, the jail personnel had provided constant supervision for this inmate prior to his transfer to WSP. It is not uncommon for jail facilities to fail to communicate important information regarding inmates when they are transferred to prison, but in this case the jail psychologist took the extra step of calling the chief of mental health at WSP and informing the Chief of their concerns regarding this inmate as a potential high risk for suicide. Despite this, there appears to have been a breakdown in communication between the chief of mental health at WSP and the psychologist assigned to conduct a full assessment, including a SRAC, for an inmate about whom they had clear information was considered a high risk by the immediately preceding mental health treatment staff. This information appears to not have been taken seriously and/or not communicated effectively, such that a "rounds" approach was taken with this inmate regarding an evaluation. The suicide report is silent on the inmate having had his psychotropic medications renewed without having been seen by a psychiatrist. Although this may not be inappropriate for "bridge orders" to continue an inmate on medications until he or she is seen by a psychiatrist, the doctor's orders indicated that the inmate should be seen by a psychiatrist within 48 to 72 hours, and he was not. This was clearly a case in which the information was effectively communicated by the jail personnel to the prison mental health clinicians and simply was not acted upon in a reasonably professional manner. Lastly, the suicide report is silent regarding the emergency response and the fact that an MTA stopped CPR because of obvious signs of "rigor," which is beyond the scope of clinical authority for the MTA.

## 37. Inmate KK

Brief History: This inmate was a 48-year-old Caucasian male who committed suicide by hanging on 11/5/06 in the stand-alone administrative segregation unit at SVSP. The inmate was the sole occupant of his cell at the time of his death, and was not a participant in the MHSDS at that time. The inmate entered the CDCR via the RJD RC on 12/17/96 as a first-termer after he was convicted of assault, rape by force and fear, assault with a deadly weapon other than firearm, sexual battery, sexual penetration with foreign object by force, and false imprisonment with a sentence of 12 years. He was subsequently charged with aggravated battery on a peace officer in August 2003; disposition of that charge is not stated in the records reviewed. At the time of his death, his earliest possible release date was 6/25/08.

Inmate KK was discovered on 11/5/06 at approximately 2:17 p.m. by a correctional officer who was conducting security checks in the administrative segregation unit. When the correctional officer approached this inmate's cell, she noticed the inmate hanging by the state-issued sheet around his neck and secured to the air vent. The officer activated her personal alarm device and staff responded to her location. A sergeant ordered the cell opened, and at approximately 2:19 p.m. the noose was removed from the inmate's neck. The inmate was then placed on the floor, and medical staff arrived at approximately 2:20 p.m. The first nurse who arrived noted that the inmate was lying face down with his arms at his sides, with fixed and dilated pupils, and no pulse. The second nurse attached a

defibrillator which registered a flat line. When the inmate was lifted to attach the defibrillator pads, the nurses noted there was dependent lividity on the inmate's abdomen. An on-call physician was paged. The physician decided, based on this report, not to initiate CPR. At 2:27 p.m. an RN pronounced the inmate as "flat lined." The suicide report refers to the physician noting on the CDC-7229A inmate death report a return of the nurse's page at 2:30 p.m. and a request that staff attach an ECG to confirm the lack of pulse. The suicide report states that the physician said that he "did not order to initiate life support as it has been 30 minutes since the inmate was found in cardiopulmonary arrest and the 12-lead EKG reading." The on-call physician arrived at the institution at 4:40 p.m., assessed the inmate, and pronounced him dead at 5:05 p.m. The inmate's body was never removed from the cell until the coroner arrived at 5:06 p.m. and removed the inmate from the institution. An autopsy report provided by the Monterey County Sheriff-Coroner's Office, Office of the Coroner stated the autopsy was performed on 11/26/06, and determined the cause of death to be asphyxia due to hanging (minutes) and the manner of death as suicide. The toxicology report was included. It determined that there no common acidic, neutral or basic drugs were detected, and no blood ethanol alcohol was detected in femoral blood samples.

The suicide report contained the inmate's criminal justice history. It stated that he had a juvenile criminal offense history beginning in 1994, based on a robbery with a six-month camp placement. His adult criminal history spanned 22 years and included grand theft auto, burglary, robbery, disturbing the peace, sale and transportation of marijuana/hash, battery, vandalism and assault with a deadly weapon, resulting in probation and county jail placements until his conviction in November 1996, as referenced above.

While there is no record of any mental health history before this inmate was arrested on the commitment offenses, he had an extensive mental health history while in jail and prison, with his first having been seen by CDCR mental health staff on 12/17/96 when he arrived at the RDJ RC. He had received treatment in the county jail and reported a history of PTSD related to recurring dreams of auto accidents, as well as substance abuse including alcohol, marijuana and cocaine. He had been treated in the jail with an antipsychotic and antidepressants as well as anxiolytic. The inmate began receiving mental health services in 1996 after his admission but prior to the establishment of the MHSDS.

Despite his being transferred from the jail to the CDCR and prescribed the above medications, his course through the CDCR was remarkable for a number of changing diagnoses. At the time of his death, he was diagnosed with Polysubstance Dependence and Antisocial Personality Disorder. During his CDCR stay, he had a number of characteristics of personality disorder including his hostile and resistant behaviors and an uncooperative attitude toward taking medications and being treated. He also complained of not being given appropriate support by mental health clinicians. His Schizoaffective Disorder was a prominent Axis I diagnosis, despite the suicide report statement that his diagnosis at the time of his death that he had no serious Axis I mental illness diagnosis. The inmate received multiple RVRs during his incarceration, and because of his

commitment offense, he had an "R" suffix. He was housed in administrative segregation and in the SHU in multiple institutions.

The inmate was placed in the PSU at CSP/Sac from June 2001 through April 2003. During that time period he was on a Keyhea Order that expired on 3/31/03. He was noted to have had six MHCB admissions for SI, and two admissions to the APP at CMF from 1/16/02 through 3/3/02 and 12/21/03 through 1/16/04. The inmate was treated with antipsychotics and antidepressants during these time periods; however, his more recent medications in 2005 and 2006 were antidepressants and anti-anxiety medications, despite his repeated requests for antipsychotic medications. Ultimately, he was placed in the EOP at CSP/LAC when he was discharged from the APP at CMF in January 2004.

From 1/16/04 through 3/29/05, he was in the EOP at CSP/LAC, although during this time period, the suicide report refers to his having gone out to court 23 times for the aggravated battery on a peace office charge. The suicide report states he "committed battery on a peace officer on 8/11/03." There is no indication in the report as to the actual disposition of this charge. Although his diagnosis during this time was Psychotic Disorder NOS and as noted above, he had multiple MHCB and CMF APP admissions, he was treated with Paxil for depression. He was transferred from CSP/LAC to SVSP at the EOP level of care on 3/29/05. According to a mental health assessment done on 4/5/05, a psychologist stated that the inmate denied history of SI or attempt, but also reported that when he first entered prison, he attempted to hang himself but rescued himself. Descriptions by the psychologist included the inmate being evasive and argumentative; however, he was diagnosed with Psychotic Disorder NOS, rule out Delusional Disorder and Antisocial Personality Disorder. His Paxil prescription was continued, and the record indicates that he was refusing medications on some occasions.

He was housed in the SVSP administrative segregation unit from the time of his transfer until 11/22/05, when he was returned to general population. His level of care also changed on 5/12/05 from EOP to 3CMS, based on an IDTT meeting. It was noted that the inmate had refused to participate in the EOP and was refusing his psychotropic medications. The IDTT changed his diagnoses to Adjustment Disorder with Disturbance of Conduct, Antisocial Personality Disorder, and rated his GAF at 60. It stated, "it is strongly recommended that this inmate be transferred to a lower level of care due to his refusal to participate in this treatment program." After he was placed at the 3CMS level of care, his medication was changed by a psychiatrist on 7/22/05from Paxil to Trazodone.

The inmate was seen by an IDTT on 9/14/05 to review his care. The team said that he was exhibiting some psychotic process and may have been in need of antipsychotic medication. In the IDTT meeting, the possibility of a psychosis was offered, and need for antipsychotic medication resulted in a referral to a psychiatrist. However, he was not seen by a psychiatrist "due to the shortage of psychiatrists," and therefore antipsychotic medications were not prescribed. Two months later, he was released from administrative segregation to general population, as noted above. Another IDTT meeting took place on 12/20/05, and this time, the IDTT noted that the inmate was requesting antidepressant medication. However, members of the treatment team also noted that he was not taking

his Trazodone and that his diagnosis needed to be clarified.  There was no comment at
this IDTT meeting regarding the issue of his not being seen by a psychiatrist after his
referral in September 2005.

The inmate was seen on 3/13/06 for his 90-day case manager contact.  He was noted to be
angry, and requesting an antipsychotic medication, Haldol, as it "helps me not feel my
feelings."  He was seen by a psychiatrist on 3/25/06.  Remarkably, from the
documentation, the psychiatrist appeared to be unaware of the inmate's request for
antipsychotic medication and his past history including having been on a Keyhea Order.
He prescribed Vistaril at 75 mgs per day which continued until the medication order
expired in October 2006 without renewal.

On 5/17/06 the inmate was seen at the TTA because he reported that he would kill his
cellmate if returned to his cell.  He was therefore held overnight in the TTA, treated with
an anti-anxiety medication, and returned to housing in the administrative segregation unit
because of threats against the other inmate.  The inmate was again seen by an IDTT on
5/24/06 while he was in administrative segregation, and continued at the 3CMS level of
care as medical necessity.  He received case manager contacts on a weekly basis, and
continued to request antipsychotic medication.  However, he was noted by his case
manager to be stable, with no problems or symptoms of mental illness.  By 6/29/06, the
inmate was noted to have told his case manager that he wanted to be removed from the
mental health caseload because the psychiatrist would not prescribe Seroquel for him,
and therefore he must not be mentally ill.  His behavior from that point on was described
once again as hostile and refusing mental health contacts, but he "appeared to be stable."
The case manager notes reflect he was not on medications, despite his having a
continuing prescription for Vistaril.

The inmate was returned to general population from administrative segregation on
8/31/06, and again requested removal from the MHP on 9/7/06.  He was retained in the
MHP "due to his mental health history."  The inmate received an RVR for mutual
combat/battery on an inmate on 9/15/06 and was returned to administrative segregation.
It was also referenced in the record that he had a weapon; however, he did not appear to
have been charged with possession of a weapon.  The IDTT met on 9/29/06, and although
the inmate was at the 3CMS level of care as medically necessity, he denied being in the
MHP.  He was noted as stable, but was once again referred for a medication evaluation.
His GAF at this time was graded at 70.

On 10/11/06, the inmate's Vistaril prescription expired.  He was also seen by a
psychiatrist on that date and once again requested removal from the MHP.  The
psychiatrist reported that the inmate had symptoms consistent with his history of
substance abuse, and he did not re-order the Vistaril.  An IDTT met on that same date,
and the inmate again requested to be removed from the MHP and said that he did not
want medications.  The inmate was seen appropriately one week later on 10/17/06 by the
same psychiatrist who described the inmate as cooperative, dysphoric, and ambivalent
about remaining in the MHP and taking medications.  The psychiatrist diagnosed him
with an Adjustment Disorder with Anxiety and Depressed Mood, and prescribed Effexor,

an antidepressant, with follow-up, to be seen within 30 days or sooner. Curiously, according to the MARs on the following day, 10/18/06, the medication was discontinued, but there was no doctor's order in the chart for this medication to be discontinued. On that same day, 10/18/06, the IDTT removed the inmate from the MHSDS, as per his request. This was one day after he had a change in diagnosis and a prescription for an antidepressant. The suicide report identifies the inmate's final diagnoses as of 10/11/06 as Polysubstance Dependence and Antisocial Personality Disorder with a GAF of 75. The suicide report does not refer to the change in diagnosis to Adjustment Disorder with Anxiety and Depressed Mood nor to the prescription of an antidepressant with its abrupt discontinuation the following day without a progress note or order to explain this change.

The inmate was discontinued from the MHSDS on 10/18/06, and on 10/26/06 he was moved to the stand-alone administrative segregation unit where he refused a cellmate and was on walk-alone status. The records do not indicate that he had any further contact with mental health staff after 10/18/06, including any mental health screening for placement in the stand-alone administrative segregation unit on 10/26/06, or contacts with mental health staff between 10/26/06 and 11/5/06, approximately ten days later, when he committed suicide.

The suicide report refers to a grievance (form CDC-602) that was found in the inmate's cell and dated 11/6/06, the day after his suicide, in which he wrote, "every prison I've been in for the past 8 ½ years has had me in ASU longer than I was on the mainline including this one. Therefore I can prove my own records, conspiracy, racism, torture and record fraud. The EOP is a restricted program designed for three month stays which the court will deem restrictive and torturous. I will be suing the state for this travesty of justice and I will win. True too is that I'm a first termer that must be housed in a level three prison or below. This is an emergency 602." The suicide report also states that on 10/26/06, the inmate was housed in a stand-alone administrative segregation unit where mental health patients may not be housed, after being removed from the MHP on 10/18/06.

Doctor's orders on 4/4/03 were for Paxil 40 mgs and Seroquel 200 mgs bid, when the inmate was discharged from the MHCB with a diagnosis of Mood Disorder and a GAF of 45. He was on involuntary medications as per a Keyhea Order at that time. The suicide report says that he was never on Seroquel, but he was at CSP/LAC. The inmate had been admitted to the CTC on 3/26/03 with a diagnosis of rule out Depressive Disorder NOS, rule out Mood Disorder NOS, History of Psychotic Disorder NOS with suicide precautions in a stripped cell. His diagnosis during that MHCB admission was Schizoaffective Disorder.

The inmate had been admitted from 10/21/02 through 12/6/02 as well as 1/16/02 through 4/23/02 to the DMH program at CMF APP as being suicidal, and although the inmate was noted to have been hostile and angry during his treatment, he was also noted to have denied auditory hallucinations and suicidal thinking after he was admitted.

His admission to the MHCB on 6/2/04 indicated a diagnosis of Psychosis NOS (Provisional) and he was placed on suicide watch with a stripped cell and safety mattress at CSP/LAC.

A SRAC of 6/7/04 at CSP/LAC indicated that the inmate had a "history of Keyhea," and "no insight denies suicidal." The comments by the clinician stated "puzzling inability to connect (!?) non-compliant with meds." There are other SRACs that indicate that the inmate had a history of multiple admissions for SI, paranoia, history of delusions of persecution, prior Keyhea procedure, and longstanding treatment non-compliance.

With regard to the inmate having been seen by a psychiatrist on 10/17/06, diagnosed with Adjustment Disorder, and prescribed an antidepressant for a 90-day period, only for the inmate to be seen by the IDTT on 10/18/06, the following day, and removed from the MHSDS, and for his medication prescription being discontinued on the MAR without a psychiatrist's note or order, the CDCR suicide reviewer commented, "the concurrence of a new prescription written one day and being removed from the program on next, epitomized this inmate's ambivalence along with staff difficulty in dealing with it." Clearly the psychiatrist expected the inmate to be treated with the antidepressant for a 90-day period, and followed-up in 30 days, which certainly strongly suggests that he was also to have remained in the MHP.

The suicide report identified two problems, with recommendations, as follows:

> Problem 1: In the emergency response, it was not clear whether the nurse's failure to initiate CPR was appropriate in that she apparently did not speak to the physician until ten minutes after arriving at cell front. (There were indications that this nurse declined to perform lifesaving measures for personal reasons.) No heart stimulant or other resuscitation efforts were attempted, the inmate was not transported to the correctional treatment center, and paramedics were not called. Recommendation: The emergency response should be reviewed by a Division of Correctional Health Care Services mental health quality improvement assistance team nurse consultant, who shall determine whether further review is necessary by the Division of Correctional Health Care Services NPPEC.

> Problem 2: It was not clear whether the inmate was appropriately removed from the MHSDS. The IDTT evidently decided to remove the inmate on 10/11/06, and a removal chrono was written on 10/18/06. Meanwhile, however, the team psychiatrist re-evaluated the inmate on 10/17/06 and re-ordered medication. The medication stopped the next day. Recommendation: Salinas Valley State Prison (SVSP) is to look into this matter and determine exactly what did happen and what should have happened. Ensure that a workable process is in place to prevent this type of mix-up from occurring.

Plaintiffs' counsel submitted an e-mail on 8/20/07 with the subject "Report on Implementation of QIP for Suicide of Inmate (KK)." Among other things, the plaintiffs state that one of the problems identified in this inmate's suicide report was the officer's

failure to initiate CPR after they cut him down and placed him on the floor, and the responding RN's failing to initiate CPR because she described "dependent lividity."

On 8/2/07 and 9/17/07, respectively, the Directors of Mental Health for the DCHCS and DAI provided their report on implementation of the quality improvement plan for suicide of Inmate KK, and the final report on implementation of the quality improvement plan for suicide of Inmate KK.  In their memorandum of 8/2/07, the Directors included the response dated 5/11/07 from the SVSP health care manager and warden.  With regard to Problem One, SVSP stated that the DON had addressed this problem, and that nursing staff were re-trained on CPR protocols and the assessment of patients discovered without a pulse.  Staff was retrained in calling 911 and the watch commander when situations warranted an outside ambulance, and in transporting inmates to the yard while resuscitation was underway.  An additional four SRN II's were hired and increased monitoring and teaching of nursing staff in the ER area.  There was also included a report dated 4/17/07 by the facility DON.  In her review, the DON stated that the first ER nurse responded with the ERV, saw the patient face down, and noted that the custody officers had not started CPR.  This nurse found no pulse or breathing.  The second ER nurse arrived "within 2-3 minutes with the AED," and when staff lifted the inmate in order to place the AED leads on him, the first nurse saw what she described as "dependent lividity," and was of the opinion that the patient had been dead for some time and that any attempts of resuscitation would be useless.  The DON also states that the "parenthetical expression stating the nurse possibly declined to perform lifesaving measures for personal reasons has been completely denied by the nurse," and if that is someone's subjective opinion, it should be discounted. The DON reported a quality improvement plan that stated: (1) a local protocol that states that CPR would be initiated immediately in all situations of suspected cardiac arrest, with few exceptions, and applies to both medical and custody, and that all RNs have been trained and re-trained on this and taught not to rely on the presence or absence of "dependent lividity;"(2) all staff has been instructed to call 911 and request an outside ambulance as soon as they need one to enable paramedics to arrive in a more expeditious manner; they will then call the watch commander to notify him; (3) inmates waiting for an ambulance or receiving CPR will be transferred to the ER even with CPR in process; and (4) since that time, a full-time SRN II for the ER area had been hired.

Regarding Problem Two, the SVSP staff reported that this was addressed by the Psychology Peer Review Committee and forwarded to the Mental Health Subcommittee (MHS).  They reported that the mental health staff had adopted a specific process for removal of inmates from the MHSDS, which includes primary clinician review of the entire mental health history of the inmate, consultation with psychiatry for their input regarding removal, and reconciliation of differences regarding treatment indications, if any, prior to the inmate being brought to IDTT for removal from MHSDS.  A report detailing the operational process for removing an inmate from MHSDS at his request was also provided.

With regard to Problem 1, a nurse consultant to CDCR Nursing reviewed this case for the NPPEC on 4/26/07.  The case was summarized as was the timeline of the emergency

response.  The nurse consultant issued the following findings:  (1) Daily mental health rounds were not conducted on 11/5/06; (2) SVSP emergency response coordinator reviewed the case and interviewed staff, which raised questions about RN-1's clinical decisions and personal beliefs that may have prohibited her from initiating CPR.  She further stated that the DON determined that whatever was overheard was misinterpreted, and that the RNs actions were appropriate.  Further, the emergency response coordinator was an RN and was no longer at the institution; (3) The patient remained face-down on the floor when the AED was activated.  Custody reported that RN-1 would not let them turn the patient over on to his side or back, but that RN-1 did not remember whether the patient was still face-down on the floor when she left the cell around 1430; (4) RN-1's basic life support (BLS) certification was current, and (5) RN-1 did not remember whether the noose had been removed from the patient's neck by custody, nor whether she told the correctional officers that they should not turn him over.  RN-1 did not look at the neck to see if there were ligature marks, swelling or bruising, nor did RN-1 place a C-spine collar on the patient.  However, the patient was not moved.

The nurse consultant identified a number of other problems including the following:  (1) The psych tech assigned to the unit failed to come to work that day as scheduled and did not call anyone, therefore rounds were not conducted; (2) RN-1 did not document the incident until the following morning and did not remember some of the important details when interviewed on 11/13, such that the documentation of the event was incomplete; (3) custody officers did not initiate CPR while waiting for the TTA RN to arrive.  The statewide DON provided training to all nursing staff re-imposing the policy that CPR shall be initiated and other emergency measures implemented when pulse and respirations are absent.  Custody officers were also informed of this change in policy and that they shall not delay CPR until medical staff arrive.

The Nursing Consultant referred to the actions by the DON as stated above and reported the following CAP:  (1) DON to document her findings that contradict those of the emergency response coordinator and have them available for review by the regional DON, within seven days, (2) DON to assure that monthly audits and the sign-in log books are readily available on site for review by the regional DON, within seven days, (3) DON to collaborate with the regional DON to determine appropriate disciplinary actions, if any, for individual nursing staff identified as deviating from the nursing standards of practice, within seven days, (4) DON to document the supervisory conference with the psych tech and place a signed copy in the employee's personnel file, within seven days, and (5) DON to conduct an individual supervisory consult with RN-1 discussing specific areas of concern, identify where improvement will occur, develop a plan of training, if indicated, document this conference, and place a signed copy in the employee's supervisory file within 14-days.

On 8/2/07 the Directors of Mental Health, DCHCS and DAI issued a memorandum to the Chief of Mental Health for the Central Region and the Regional Administrator for DCHCS as well as the Associate Director of DAI, stating that the institution's report on its implementation of the quality improvement plan previously received for the second recommendation of the QIP was incomplete.  The Directors noted that while the

institution did propose a process, there was no documentation of any case analysis to support the proposal. They required that the case analysis be submitted "immediately" and show how that analysis supported the proposed "operational process for removing an inmate from MHSDS." They also reminded staff that the QIP was then overdue.

In their final report on implementation of quality improvement plan dated 9/17/07 for the suicide of Inmate KK, the Directors provided the SVSP peer review committee analysis dated 8/24/07. The committee reviewed the inmate's UHR, noted several discrepancies in the process of removing the inmate from the MHSDS, the lack of communication between the primary care clinician and the visiting psychiatrist, that the early volumes of the UHR "which are not routinely available to clinical staff" reflected treatment of the inmate for significant mental health symptoms that were not evidenced in more recent records, and repeated requests by the inmate for removal from the MHSDS which had been refused on the grounds of the inmate's prominent personality characteristics and long history of mental health treatment. The committee decided that peer consultation offered benefits of in-depth perspective and preliminary review of recent functioning, that discussion should be had with clinicians who provided care within the past year or the time at SVSP (whichever is lesser), that "parallel processes by which psychiatry and psychology see inmates and make clinical decisions" prompted the determination that increasing communications across disciplines would be beneficial, and that the peer review committee elected to utilize the staff referral system already in place. The committee also determined that the existing IDTT process was the appropriate venue for presenting the agreed-upon plan for an inmate regarding ongoing treatment.

**Findings:** This inmate's suicide does not appear to have been foreseeable as he did not report his intent to harm himself in the foreseeable future, although his deterioration and behaviors were clearly noted. His death, however, does appear to have been clearly preventable for several reasons. The inmate's overall care and treatment was inadequate. His mental health history, including multiple admissions to MHCB beds as well as the APP in DMH, and his having been on a Keyhea Order for involuntary medication administration, were apparently unknown or unrecognized by the clinical staff at SVSP. Further, there were a number of questionable decisions in determining the inmate's level of care when it was reduced from EOP to 3CMS, and when it was ultimately decided that he should be removed from the 3CMS program one day after a psychiatrist diagnosed him with an Adjustment Disorder and prescribed a 90-day course of an antidepressant and 30-day follow-up. The staff at SVSP appear to have made extensive efforts to document that the inmate had "Axis II" or characterological pathology, including his being hostile and difficult to work with and not participating in programmatic activities, but they simply ignored or did not recognize his serious mental illness which was well documented in earlier records. In addition, the inmate had reported being involved in a motor vehicle accident in 1987, in which his foot was partially severed and reattached, and his subsequently having recurring dreams of the auto accident and a history of PTSD. This diagnosis does not appear among the diagnoses given to the inmate at SVSP.

The declaration and support of petition for renewal of judicial determination regarding involuntary medication dated 4/11/02 from CMF indicated that the inmate had a

diagnosis of Paranoid Schizophrenia and required treatment with psychotropic medications, as he was a threat to the health of the respondent (himself) and "there are no less invasive medically available alternatives to his treatment." Finally the petition states "without medication, (Inmate KK) suffers from a mental illness that renders him a danger to others and to himself, and states that involuntary medications were initiated on 7/6/01. There is no explanation in the record as to why there was no further attempt at extending his Keyhea order in 2003.

It appears that not only were the staff at SVSP unaware of the inmate's significant mental health history, but that the CDCR suicide reviewer states incorrectly that the inmate was never on Seroquel, that there was no documentation the inmate was ever on Seroquel, and that his risk of danger to self had not been properly documented in past records.

The suicide report does not refer to theses failures; it refers to the appropriateness of the IDTT decision to remove this inmate from the MHSDS the day following his being prescribed an antidepressant with plans for follow-up treatment by a psychiatrist as "not clear." Although the suicide report states that this inmate would not have been an appropriate placement in a stand-alone administrative segregation unit had he been on the MHSDS caseload, DCHCS does not attribute the failure to properly follow policy and procedure regarding removal of this inmate from the MHSDS and/or, at a minimum, the acknowledgement by the IDTT that the inmate was continuing in treatment at the time of his removal as a serious deficiency having substantial impact on this inmate being placed in a stand-alone administrative segregation unit. It is noted that the inmate had been in administrative segregation housing at the 3CMS level of care and, since it was necessary for him to remain in administrative segregation, he certainly could have remained in the administrative segregation unit where he would have received ongoing mental health care. However, this did not occur. It is quite clear that, but for the removal of this inmate from the MHSDS inappropriately, he would have been ineligible for placement in a stand-alone administrative segregation unit. There is also inadequate reference to the inmate's antidepressant medication being discontinued one day after the inmate was placed on this medication, without adequate explanation. Finally, the emergency response was seriously flawed in that custody staff did not initiate CPR. For an RN to arrive on the scene and also not initiate CPR was a gross deficiency in nursing practice. The corrective actions reported by DCHCS did not appear to adequately address these deficiencies.

### 38.  Inmate LL

Brief History: This inmate was a 37-year-old Caucasian male who committed suicide by hanging on 11/30/06 in general population at CIM. The inmate was housed alone and was not a participant in the MHSDS. The inmate entered the CDCR via CIM on 11/22/06 after being committed for a 90-day period of observation and diagnosis pursuant to Section 1203.03 of the Penal Code. This was after he violated probation related to a guilty plea on computer related crimes which included "knowingly accesses and without permission adds, alters, damages, deletes, or destroys any data, computer software, or computer programs which reside or exist internal or external to computer, computer

system, or a computer network." He had been incarcerated for eight days in the CDCR when he committed suicide.

The inmate was discovered on 11/30/06 at approximately 5:05 p.m. by two officers delivering dinner in Birch Hall on the second tier. One of the officers called the inmate and did not get a response. When he looked into Inmate LL's cell, he discovered the inmate hanging by a sheet tied to the metal bar on the bottom of the top bunk with the other end tied around his neck. The suicide report included information from an incident report that states that part of the cell bars were covered by a sheet. An officer activated his personal alarm as another officer alerted the RC central control that they had a Code One emergency and needed medical staff. An additional officer and sergeant arrived at the location and the arriving officer supplied one burst of Oleoresin Capsicum spray to the inmate's face. When the inmate did not respond, staff entered the cell to initiate lifesaving measures. The officer who sprayed the inmate entered the cell with a cut-down tool and cut the inmate down. Medical staff arrived and found the inmate face down with the noose around his neck, and the MTA found a pulse, although the inmate remained unconscious. The MTA pulled the inmate by his feet out of the cell, turned him over, and, with the assistance of correctional officers and another MTA, dragged the inmate into the custody area. The second MTA removed the noose from the inmate's neck by untying it and again a pulse was found. The sergeant and the two MTAs then began lifesaving efforts approximately two and a half minutes after the inmate was discovered hanging. These lifesaving efforts did not occur until after the inmate was removed from the cell, transported to the second tier officer's station, and placed on a Stokes litter. The suicide report refers to one of the MTAs inserting an oral airway and connecting that airway to oxygen via the ambu bag, and to another MTA who arrived from the hospital and placed the inmate on the AED. The AED advised no shock. An RN and EMS services personnel arrived. The inmate did not respond, and at approximately 5:38 p.m., the emergency medical personnel contacted a Chino Valley Emergency Room physician who pronounced the inmate dead. An autopsy report provided by the San Bernardino County Sheriff's Office, Coroner's Division, stated that the autopsy was performed on 12/1/06, determined the cause of death to be hanging, minutes, and that the manner of death was suicide. A toxicology report indicated that there were no drugs of abuse and no alcohol determined to be in the blood samples taken at the time of autopsy. The inmate apparently left a suicide note "addressed to the Chino and San Diego Prison System." The inmate stated that he hoped the addressees were "happy now" because they had put a Level One prisoner under 90-day observation and who is "a disabled psych patient (in)to a Level Four area." He detailed the 24-hour-a-day lock-down seven days a week as inhumane and cruel and unusual punishment, and said that he did not deserve to be placed in this area. He described as being placed in such an area for observation as "ridiculous bullshit?" He reported he was asking and then begging to get his medications which he did not receive, and to be housed in a more suitable area. The inmate stated that he was totally disabled and "a psych patient," and had no business being in this environment. The inmate stated he is "Bipolar," "Manic Depressive," and "Claustrophobic," and should not have been in this environment. The inmate went on to express his anger and rage against the system, stating, "this is not rehabilitation you fucking cold hearted pricks," and further "this place should be shut

down and labeled condemned by the health department." He stated "thanks for killing me!!! I hope that you are all happy now!!! Wake up!!!" He continued with a list of eight persons for emergency contacts.

The suicide report contains the inmate's criminal justice history which consists of the commitment offense in which he pled guilty to one count of a computer-related crime and was convicted of three computer-related crimes, as referenced above. He was ordered to serve a jail sentence with three years' formal probation, restitution, a penalty assessment, and court fees. There were also conditions of his probation including the requirement to participate in individual therapy, anger management, psychiatric treatment, to not contact his former employer or the employees of his former place of employment, as well as ten conditions imposed when the inmate was using computers.

The inmate violated his probation by e-mailing and telephoning his former girlfriend at the place of employment. In his e-mail to his former girlfriend, he alluded to suicide as well as the jail experience being the worst experience in his entire life and that he would rather die than go back to jail, according to the suicide report. The suicide report details the content of the e-mails which underscore his SI and intent, if he were to be returned to jail. The suicide report refers to these e-mails as beginning with warm comments and quickly turning into hostile and derogatory comments to the former girlfriend, as well as references to his suicidal intent. Included in the e-mails according to the suicide reviewer's statement, "see you at my funeral…then (sic) maybe you will be happy then (sic) little miss can't be wrong ever!!! My life and career are totally over now. I hope you are happy now." He signed this e-mail as her "harmless and brokenhearted ex-boy friend that has nothing to live for." The inmate was subsequently arrested for violating the conditions of his probation.

According to the suicide report, the probation officer issued a report that stated that the inmate was hired by a health care recruitment company in April 2005, but became increasingly disruptive at the workplace, including using foul and abusive language toward staff, such that in November 2005 the company asked the defendant to work at home. By January 2006, the inmate asked the company to purchase a new software database system. When the company refused, the inmate then threatened to sue the company. He subsequently disabled the company's e-mail service, deleted files and client information, and was terminated by the company. The inmate subsequently issued communications to company employees that were derogatory and threatening. including "get ready for World Ward II to start" and "get ready for a blood bath motherfuckers," according to the suicide report. The inmate was subsequently interviewed by the probation officer, who reported that the inmate stated he had been promised partnership in the company, that his database would be used, and that he felt betrayed by the company because they fired him, since he was the main person running the company. Co-workers reportedly expressed fear and concern about possible future violence from the inmate.

The inmate had prior convictions in Pennsylvania for receiving stolen property, forgery, theft, and misuse of credit cards as well as prior convictions in California for forgery,

194

grand theft and insufficient funds for which he received probation and/or jail time. The inmate had a history of Bipolar Disorder since 1994 and had been treated by a mental health counselor and had received various medications. The inmate reportedly had some marijuana and alcohol use in high school and alcohol use as an adult. Medically, the inmate reported that he was in a motor vehicle accident while on his motorcycle at age 22, which resulted in a ten-month hospitalization and multiple surgeries.

Because of the violations of probation and ongoing problems with his new employment, on 11/7/06 San Diego County committed the inmate to the CDCR for a 90-day period of observation and diagnosis pursuant to Section 1203.03 of the Penal Code. He was received at CIM on 11/22/06. This was eight days prior to his committing suicide.

On arrival at CIM, the initial health screening was completed by an RN who noted that the inmate answered "yes" to questions regarding having been treated for a mental illness and having a current mental health problem, reporting that he was "bipolar." He also answered "no" to questions regarding current or past suicidal behavior. His medication was renewed by telephone order as Seroquel 300 mgs per day under DOT. He was seen by a psychologist five days later on 11/27/06, and the recommendation was for further evaluation. The following day he was seen by a psychiatrist who diagnosed Mood Disorder NOS, increased his Seroquel to 400 mgs per day, and described the inmate as essentially stable on his current medications, with the exception of having insomnia and racing thoughts. The inmate began receiving his medication on 11/23/06 and, from the MAR review, appears to have taken his medications up to and until the morning of his death on 11/30/06. He had no further mental health contacts after the psychiatric evaluation on 11/28/06. The inmate was seen by mental health staff as noted above. He initiated an inmate health care services request form on 11/23/06, the day after his arrival, stating that he needed help because he had not gotten his medications, that he needed a housing change, and ended his request with "HELP ME! ASAP!" He was scheduled to see the psychiatrist on 11/29/06 and a physician on 11/30/06; however, he does not appear to have seen either before his death on 11/30/06.

The suicide report identified two problems, with recommendations, as follows:

> Problem 1: When inmate (LL) was discovered hanging, one of the responding officers administered state-issued Oleoresin Capsicum spray to inmate (LL)'s face, apparently to determine if he was conscious. The inmate did not respond, so the officer discontinued the use of force. The use-of-force incident review stated that the officer sprayed the inmate "due to inmate (LL)'s slumped, motionless posture and lack of response to staff summoning. The use of force in this incident enabled staff to assess that inmate (LL) was incapacitated, posing little danger to staff entering the cell to initiate lifesaving measure." Once staff determined that inmate (LL) was non-responsive, his cell was opened and the officer who sprayed the inmate entered the cell with a cut-down tool, while the sergeant and another housing officer provided cover for him. The officer then cut the hanging ligature, but did not remove the noose. Responding medical staff reported that they found

a pulse on the inmate.  The use of pepper spray may have compromised lifesaving efforts.
Recommendation:  A Departmental Use of Force Review is currently underway.

Problem 2:  There were a number of problems with the emergency response, including placing the inmate face-down after he was cut-down, dragging the inmate out of the tier area before removing the noose from his neck and starting CPR, and interrupting CPR once it was started.
Recommendation:  Refer to the DCHCS NPPEC for a complete review of the emergency response in this case.

On 1/5/07, a suicide/death review was conducted by a physician who reviewed the case and opined that there were no non-psychiatric medical issues identified prior to the suicide, but that the suicide response should be reviewed by NPPEC and possibly the Death Review Coordinator.  The physician noted that the correctional officers who radioed for a Code One ambulance should have radioed for a Code Three ambulance or 911, although EMS did arrive.  The use of pepper spray delayed the prompt institution of CPR and is being reviewed, and there was no Code Flow Sheet used to record medication and documentation of the code documentation was deficient.

On 6/11/07, the Director of the mental health program of the DCHCS and Director of the DAI provided their report on the implementation of quality improvement plan for suicide of Inmate LL.  In their report, they included the memorandum from the health care manager and warden of CIM dated 4/10/07 addressing Problems 1 and 2 in the suicide report.  With regard to Problem 1, the staff at CIM report that the use-of-force review was terminated pending investigation, with attached electronic confirmation that the Executive Review Committee deferred the case pending the warden's review for a category one or two investigation.

With regard to Problem 2, there was a referral to the DCHCS NPPEC for a complete review of the emergency response in this case.  A nurse consultant program review/death review summary was completed on 4/24/07 by a nursing consultant to the NPPEC.  The case was summarized and the problems identified were as follows:  (1) staff did not document dates that the 7362 dated 11/23 was picked up and reviewed, and therefore there could not be a determination whether policy was followed for urgent/emergent 7362s on holidays;  (2) the custody officer used pepper spray before entering the cell.  This was referred to custody for an investigation;  (3) a C-spine collar was not placed before moving the patient;  (4) the MTA moved the patient pulling him by his feet over the floor;  (5)  CPR was interrupted;  (6)  there was no documentation by the RN who responded to the scene; and (7) there was delay in calling 911.  The CAP included that the facility DON ensure that RNs and MTAs who responded to this emergency receive training with regard to the importance of documenting their evaluations and specific times of their activities, and calling 911 in a timely manner, within 14 days.  The DON was to discuss in a nursing staff meeting the importance of complying with the Access to Primary Care policy, including documenting dates and times that 7362s are picked up and reviewed which would be mandatory, and having the DON provide instruction to anyone

196

who could not attend, within 14 days.  Thirdly, the DON was to ensure that emergency response exercises are developed and implemented for hanging scenarios, targeting nurse response, assessment, treatment, referral and documentation,  and to consult with the regional DON to ensure that the exercises are meaningful to CIM's unique issues. Further, drills were to be held within 30 days, at least one per shift, with sample written exercises, evaluations and drills, with staff attendance/ participation documented and available at the institution for review.  There was no additional information provided regarding implementation of corrective actions.

**Findings:**  This inmate's suicide does not appear to have been foreseeable in that, despite the inmate having a history of Bipolar Disorder, he did not have a reported history of SI or intent, did not express any intent to harm himself and did not display behaviors suggesting that he was planning to harm himself.  This inmate's death, however, may have been preventable, given that he should have been seen for a follow-up appointment by a psychiatrist on 11/29/06, and that the emergency response was inadequate.  There was no documentation presented that the corrective actions were implemented by staff at CIM; however, the problems identified in the suicide report and by the Nurse Consultant to DCHCS were fully appropriate.  This inmate had a pulse during the course of the emergency response; the use of pepper spray by custody, the late start and interruption of CPR, and the manner of movement of the inmate do not appear to have been warranted, based on the inmate's presentation, and on policy and procedural requirements.  The results of the investigations noted in the corrective actions were not included in the documents received.

### 39.  Inmate MM

Brief History:  This inmate was a 46-year-old Caucasian male who committed suicide by hanging on 11/30/06 in East Block condemned at SQ.  The inmate was a participant in the MHSDS at the 3CMS level of care and was single-celled at the time of his death.  The inmate entered the CDCR on 10/13/92, after having been found guilty of first degree murder with special circumstances and sentenced to death on 10/9/92.

The inmate was discovered on 11/30/06 at approximately 11:25 p.m. by a correctional officer conducting a security check.  The officer observed the inmate hanging via a noose attached to the top bunk in his single cell, and activated his personal alarm.  At the same time the alarm was sounded, a Code Three ambulance was called.  Medical and custody staff arrived at the cell and an emergency cell extraction team entered the cell at approximately 11:32 p.m.  The inmate was unresponsive and the noose was cut with a cut-down tool.  The inmate was then moved to the tier outside the cell, vital signs were checked and medical staff began CPR.  The inmate was transported via Stokes litter to the TTA, where he arrived and CPR was restarted.  The incident reports have conflicting times as to the actual arrival time for the ambulance, but it appears it was either at 11:40 p.m. or 11:45 p.m., and paramedics began lifesaving measures in the TTA.  The AED was attached and indicated "no shock."  There were efforts to establish an airway, but a paramedic reported that rigor mortis prevented the establishment of the airway as well as the inmate had "pale/cold skin with lividity to all extremities.  Rigor mortis to jaw and

neck." The inmate was pronounced dead at 11:50 p.m. by a physician at a local hospital. An autopsy report was provided by the Office of the Coroner for Marin County which stated that the autopsy was performed on 12/4/06 and stated the cause of death was asphyxiation by hanging (minutes), due to or as a consequence of suicide. A toxicology report was provided and indicated Mirtazapine 720 mg/ml (effective level 5-90 mg/ml, potentially toxic greater than 300 mg/ml), Methadone 0.35 mg/L, and EDDP 0.08 mg/L (ranges 0.05-0.75 mg/L effective level, and greater than 0.75 mg/L potentially toxic for Methadone and EDDP effective level less than 0.10 mg/L, potentially toxic not known), as well as Venlafaxine 2.4 mg/L (effective level 0.07-0.20 mg/L, potentially toxic greater than 6.0 mg/L) were found in blood specimens. No common acidic, neutral or basic drugs, or ethyl alcohol were detected.

The suicide report contained the inmate's criminal justice history and stated that he was sentenced to approximately 20 months in the CYA at age 17 after he had been arrested for a violent assault involving his shooting the victim four times. It is unclear from the report as to how long he spent in the CYA. He was arrested in July 1982 as an adult and sentenced to a violence diversion program for domestic violence. He had additional arrests in 1982 for inflicting corporal injury on a spouse, and other arrests for theft in Arizona in 1984 and assault in California in 1986, as well as outstanding warrants in California in 1989. It appears he was not sentenced to any jail or prison time on any of these offenses. The inmate's commitment offense occurred in April 1990; he was arrested in July 1990 and charged with murder and rape of a female victim. He was found guilty of first degree murder with special circumstances in September 1992 and sentenced to death.

The inmate entered the CDCR prior to the implementation of the MHSDS; however, he did have examinations by psychologists and psychiatrists when he was admitted to SQ as a condemned inmate. He refused psychological testing, and it was determined that he did not have any psychiatric disorder. The inmate's next contact with mental health staff occurred in July 1994 after he had flooded his cell, but he did not receive any ongoing mental health treatments. According to the suicide report, in September 1994, the inmate attempted to hang himself and was admitted to the OHU. He was placed on suicide observation and subsequently released to his condemned housing unit after a four-day stay in the OHU. He was not seen again until January 1996 by mental health staff when he was admitted to the OHU after custody discovered a noose in his cell. The inmate tested positive for a metabolite of marijuana in his urine, and was returned to condemned housing after a two-day stay in the OHU. He was not prescribed any psychotropic medications at that time.

The suicide report refers to the inmate having been admitted again to the OHU for a two-day length of stay for "suicidalness" (*sic*), and he admitted to taking another inmate's medications at that time. This was also a two-day length of stay; however, he was placed in the MHSDS at the 3CMS level of care with a diagnosis of Depressive Disorder NOS. He remained in the MHSDS until August 1998 when he was discharged, requiring no further mental health treatment.

The inmate was returned to the MHSDS at the 3CMS level of care in March 1999, after he had been admitted to the OHU following his having shaved his head and being described by custody staff as being "paranoid." The inmate had reported a pre-incarceration history of marijuana, alcohol, and methamphetamine abuse, and had participated in alcoholics anonymous and narcotics anonymous when he was housed in the CYA. There were suspicions that he may have been under the influence of, or responding to, illegal drug ingestion during several of his admissions to the OHU; however, the records are inconclusive regarding illegal drug use. He was prescribed an antipsychotic and antidepressant medication in May 1999, and continued to receive mental health treatment through April 2001, when his diagnosis was changed from Psychosis NOS to Major Depressive Disorder. He continued on antipsychotic medications and antidepressants, and on 8/1/03 was taken to an outside hospital that determined that he had ingested opiates, as he had been found unconscious in his cell. He continued on psychotropic medications and regular case manager contacts throughout the course of his incarceration. The inmate was a condemned grade "B" inmate and was housed in East Block.

In addition to the inmate being prescribed Effexor and Remeron, both antidepressants, he was also prescribed Methadone for chronic low back pain. He also had been diagnosed with Hepatitis B and C. The inmate was diagnosed with Right-Sided Sciatica and Lumbar Radiculitis as well as Hypothyroidism; however it was not clear from the record whether or not he was treated for any thyroid disease.

The inmate had multiple disciplinary charges during his incarceration since October 1992, a majority of which were for suspicion of drug use, refusal to provide urines and possession of inmate-manufactured alcohol.

The inmate continued to receive mental health services at the 3CMS level of care until he was readmitted to the OHU on 10/30/06, after he had destroyed property in his cell and a sprinkler head. He remained in the OHU for two days with follow-up by his case manager. He was suspected of using illegal drugs. An SRAC on 11/1/06 rated the inmate's risk of suicide as low. It appears the inmate damaged his T.V. and other property when he destroyed the sprinkler head on 10/30/06. A case manager contact with the inmate approximately four weeks later on 11/27/06 was remarkable for the case manager's noting that custody staff reported that the inmate had thrown away some of his property.

A progress note on 11/27/06 by a psychologist stated that the inmate was being seen for an RVR mental health assessment because of a broken fire sprinkler on 10/21/06, and that the inmate had also cut his wrist. He had been placed in the OHU on psychiatric observation status because he had cut his wrist, but the inmate denied SI, stating that the cut to his wrist was accidental. The inmate was seen at cell front and agreed to participate in an RVR mental health assessment review, but he did not want to go to the office. His mood was described as low, his affect flat, and he appeared to be suspicious. The psychologist noted that he referred the inmate to his case manager, who saw him immediately after their meeting, and that the psychologist spoke with the tier captain who

discovered that the inmate had thrown away many of his personal items earlier that day. The inmate's judgment was described as fair to poor, insight fair to poor, and a GAF of 55. The finding of the assessment was that the inmate's Major Depressive Disorder contributed to his feelings of hopelessness, which may have influenced him to cut his wrist. A note by the case manager stated that the inmate was "very depressed wondering about the purpose of life, vehement denial that he's suicidal." The inmate also reported that he was hearing voices saying that "you should go…no you shouldn't go," and the inmate had thrown away some of his medications. The case manager noted that the inmate was having apparent auditory hallucinations as a new symptom, and he recommended re-housing in the OHU for psych observation and further evaluation. He noted that the inmate was not presently a danger to self or others. The inmate was also noted to have declined his past couple of yard opportunities, although the inmate "usually goes to all of them." Diagnoses offered were Major Depressive Episode, Severe, with Possible Psychotic Features, rule out Brief Psychotic Episode. There was no indication the inmate was considered for any higher level of care or referral to a MHCB at this time or while in the OHU.

The SRAC by a psychologist on 11/27/06 determined that the inmate was at low risk, but the plan was for OHU placement. Comments included that the inmate had increased depression, decreased energy, and new auditory hallucinations (illusion or misinterpretation) with decreased sleep and marked change in usual stability. The recommendation was for the inmate to be re-housed in the OHU and for further evaluation. On 11/28/06, another SRA was conducted by a different clinician who opined that the inmate was low risk and made no additional comments.

The inmate was placed in the OHU on 11/27/06 and released on 11/28/06. The inmate was scheduled for follow-up within 24 hours by his case manager but was not seen prior to his death.

On 11/30/06, approximately three and one-half hours prior to the inmate being discovered hanging, a custody officer reported that the inmate was talking to himself and acting strangely, but that he did not think it was anything serious. According to the suicide report, the custody officer did call the OHU requesting that a mental health clinician be paged. Also according to the same report, the mental health clinician reported that he had not received a page that evening, but was told by a nurse in the OHU as he was leaving for the day that she had paged him to have this inmate seen. Further, according to the same report, despite the clinician being informed of this information, the inmate was not seen by any mental health staff and was not transported to the OHU by custody staff. He was discovered hanging at approximately 11:25 p.m. that night.

The inmate's final diagnoses were Major Depressive Disorder, Severe, with Psychotic Features and Opioid Dependence as well as Personality Disorder NOS.

The suicide report identified three problems, with recommendations, as follows: