Problem 1:  Custody staff reported last seeing the inmate at 2100 hours.  The policy on the unit is reportedly for 60 minute security and/or welfare checks.  Since the inmate was discovered hanging at 2325 hours nearly two and a half hours later, the hourly checks were apparently not being done in a timely manner.
Recommendation:  Institution to conduct a fact-finding into whether the hourly checks were being conducted appropriately.

Problem 2a:  Seven minutes passed between the time the inmate was discovered at 2325 hours and the time the cell was entered at 2332 hours.  A delay of this length would make it unlikely for cardiopulmonary resuscitation efforts to be successful.
Problem 2b:  Cardiopulmonary resuscitation was interrupted while the inmate was being transported to the TTA.
Recommendation:  Institution Emergency Response Review Committee to conduct a review of both custody and nursing actions in the emergency response, and make recommendations for improvement.  These recommendations should then be implemented.

Problem 3:  On the evening of his death, an officer contacted the OHU and a clinician was apparently paged.  The clinician did not receive the page, but was told about it as he was leaving for the night.  The officer took no further action to have the patient seen by mental health.
Recommendation:  Conduct a fact finding into this event and determine whether corrective action is needed for failure to follow through with referral for mental health evaluation, and/or why the page was not answered.

On 7/27/07, the Directors of Mental Health for the DCHCS and DAI sent a memorandum to the warden, health care manager and chief of mental health at SQ stating that the overdue quality improvement plan for the suicide of Inmate MM had not been received, and reminded SQ staff of the 6/13/02 court order in Coleman v. Schwarzenegger and other CDCR policy requirements.  On 9/17/07 a report of implementation of Quality Improvement Plan for suicide of Inmate MM was issued by the Directors.  In their report, the Directors referred to a 7/11/07 memorandum from SQ staff to DCHCS stating:  (1) that the Office of Internal Affairs had opened an investigation into allegations made against the correctional officers on duty the evening when the inmate died;  (2) administrative staff at SQ initially requested an investigation into allegations made against the custody supervisors on duty during the suicide of this inmate; however, the Central Intake Unit determined that the information did not establish a reasonable belief that the supervisors should be subjects at that time; and (3) that two operational changes occurred subsequent to the inmate's suicide, emergency medical response drills were conducted, and a supplement was developed addressing emergency medical responses in all housing units.

With regard to Problem 2, the staff at SQ reported that the Emergency Response Review Committee (ERRC) met on 3/27/07 and found that the only problem from a medical standpoint was inappropriate chest compressions while the inmate was en route to the

TTA. Training was recommended as well as two procedural changes which included emergency response drills conducted on first watch for approximately 60 days, and a supplement to be developed addressing emergency medical responses in all housing units (as referenced above for Problem 1).

With regard to Problem 3, an attachment was included which stated that the clinician did not receive the page, but was told that the inmate wanted to see him as he was leaving for the night ("approximately 2200 hours.") The attachment went on to state that the clinician knew that the inmate had recently seen him and there was no indication there was a crisis ("he was not escorted to the TTA, he was not placed in a holding cell on the unit, and there was no indication from anyone that this was an emergent situation.") The attachment went on to state that the clinician planned to meet with the inmate the following day as a routine follow-up to a referral. Further random sampling of SQ clinicians indicated that there are some times when electronic pages are not received. SQ staff stated that, "corrective action is not needed as the clinician followed through based on the information available to him." The attachment refers to the two operational changes that are referenced elsewhere in their responses. There is also a memorandum from the clinician who stated, "in this case, as this inmate was not waiting for a crises evaluation, it appeared to be clear that this was not a crisis referral. Due to the apparent routine nature of the request and the lateness of the hour, I decided I would meet with Mr. (Inmate MM) the next day."

**Findings:** This inmate's suicide does not appear to have been foreseeable but likely was preventable. The CDCR suicide reviewer refers to a number of issues with regard to the emergency response once this inmate was discovered, including a delay in the response by custody in opening the cell as well as to interruption of CPR during transport. He also refers to custody apparently not making their hourly security and/or welfare checks. There is reference to the custody officer contacting the OHU and not doing anything further to assure that the inmate was seen. However, the suicide report does not identify any problem with the clinician being told by the OHU nurse that he had been paged, and whether or not the clinician received the page, the clinician decided to leave the institution without evaluating this inmate, contacting the nursing unit, or having the inmate brought to the TTA for evaluation. There is no explanation offered by the CDCR suicide reviewer regarding this omission other than for there to be a "fact finding" as to why the page was not received and why the officer didn't do more. The response by SQ staff to the problems and recommendations identified in the suicide report does not adequately address these issues. Lastly, the suicide report does not identify any issues or concerns regarding the failure of SQ staff to retain the inmate in the OHU for more than one day, or refer this inmate to a higher level of care, despite there being multiple OHU admissions and what is described in the records as a clearly deteriorating mental status identified as Major Depression, Severe, with Psychotic Features. Five-day follow-up was not ordered as per policy despite the inmate expressing possible SI prior to admission to the OHU. The inmate had been prescribed Zyprexa, Paxil, Celexa, Effexor, Remeron, Zydis, Prozac, and Seroquel during the course of his incarceration. The inmate was prescribed two antidepressants but no antipsychotic medications during the final months of his life.

**40.  Inmate NN**

Brief History:  This inmate was a 47-year-old Hispanic male who committed suicide by hanging on 12/4/06 in general population at HDSP.  The inmate was housed in a single cell at the time of this death, having been moved to that cell the previous night from the gymnasium, a dormitory setting.  He was not a participant in the MHSDS.  The inmate entered the CDCR via the DVI RC on 3/12/96, having been convicted of seven counts of lewd and lascivious acts with a child under the age of 14, as well as three additional counts including continued sex abuse with a child under the age of 14, employing child-obscene material, and sodomy with the victim under age 16/offender over age 21.  He was sentenced to 24 years in state prison; however, his sentence was reduced to 17 years and four months because of an error in the manner in which he was sentenced.  His minimum eligible release date was 1/21/07.

The inmate was discovered on 12/4/06 at approximately 2:30 p.m. when two officers entered the housing unit and approached the inmate's cell to escort him to a Facility A program.  The inmate was due to be re-housed in administrative segregation.  When the officers looked into the cell, they saw that the inmate was hanging by what appeared to be a sheet tied around his neck with the other end tied to the air ventilation grid.  One officer notified the A3 control booth.  The control booth officer announced a medical emergency using the institutional radio and activated his personal alarm.  An MTA responded to the cell and cut the sheet, and the inmate was lowered to the floor.  The MTA examined the inmate and determined that he was deceased and past the point of medical assistance, and therefore CPR was not done.  The inmate was pronounced deceased by a physician at 3:03 p.m. at the scene.  According to the suicide report, the MTA had determined that the body was in full rigor mortis, although this is not mentioned in the incident report.  A suicide death review performed by a physician on 1/5/07 indicated that the inmate was found hanging, and that the MTA examined the inmate and found "lividity," and therefore no CPR was performed.  An autopsy report was provided by the Lassen County Sheriff's Office.  A pathologist determined the cause of death was asphyxia due to hanging by ligature and the manner of death was suicide.  A toxicology report was also provided and determined that there were no drugs of abuse or ethanol in blood specimens examined.

The suicide report contained the inmate's criminal justice history.  It stated that he was first arrested at approximately age 28 or 29 for child molestation.  At that time, he was providing temporary foster care to young boys aged seven to 12, and it was one of the foster care boys who reported the inmate's offenses to authorities.  On this offense the inmate received probation and attended a sexual offender treatment group for approximately one year, but he dropped out after accusing his therapist of violating confidentiality.  The inmate was next arrested in March 1994, once again for molestation of a young boy which reportedly had occurred for approximately four years.  The sexual abuse was alleged to have begun in 1989 with the oldest son of a woman to whom this inmate was engaged.  The abuse subsequently shifted to the woman's younger son and another boy, which ultimately resulted in the older son reporting the sexual abuse to his

own therapist. The therapist subsequently reported the child molestation to authorities, resulting in the inmate's arrest in May 1993. The inmate then left that area of California and relocated to the San Diego area with a 15-year-old boy, and ultimately was arrested by police who discovered a videotape of this inmate and the 15-year-old boy engaging in sexual acts. He received the sentence noted above.

After the inmate entered the CDCR, he reported to other inmates that he was from Mexico, although he actually had been born and raised in California and affiliated with the Border Brothers Prison gang. The records reviewed refer to the inmate having been physically and sexually abused by his father between the ages six or seven through ten. The inmate received counseling in the early 90s for the childhood sexual abuse perpetrated upon him by his father, the above-noted group therapy for sexual deviants while he was on probation, and rehabilitation programs for alcohol and drug abuse, as he reported a history of alcohol dependence.

Although the inmate received a brief mental health screening, was seen by a psychologist and psychiatrist in March 1996, and had a noted history of childhood sexual abuse, alcohol dependence and depression, he was evaluated as not meeting criteria for inclusion in the MHP. He was prescribed Desyrel by the psychiatrist, and there were references to him having been prescribed antidepressants prior to his incarceration, but he was not included in the program. The inmate was transferred from DVI to HDSP in May 1996, and again the inmate's history, he was noted as having had two suicide attempts by cutting his wrists on one occasion and attempting to shoot himself with a shotgun on the other. At that time he was taking both Navane and Desyrel and reported that the medications were helpful, but he was having some excessive sedation. The inmate's Navane was continued, and Paxil was added to his regimen as his morning dose of Desyrel was discontinued.

The inmate left the CDCR to return to court for reconsideration of his sentencing on 6/6/96. He was placed in the MHP on 6/18/96, even though he was at that time not in the facility. The inmate remained out to court until 2/5/97 when he returned to the CDCR via the NKSP RC, and was ultimately transferred to HDSP on 2/25/97. The suicide report refers to the initial health screening (bus screening) and to a confidential transfer from the county sheriff's department to NKSP, indicating that the inmate was not receiving psychotropic medications and did not have any current mental health problems. The standardized bus screening of 2/25/97 when the inmate was transferred to HDSP RC also states that the inmate reported taking Trazodone and Perphenazine as well as having a history of treatment for "psychotic, manic depressive," and that he had attempted suicide ten years prior to that date. The inmate did not report, and the screening did not note, that while at DVI the inmate received a diagnosis of Major Depression with Psychotic Features and PTSD in March 1996. He was re-evaluated at HDSP in May 1996 with these two diagnoses continued and Pedophilia also added by a psychiatrist.

On 2/19/97, he received a mental health evaluation which repeated the history as noted above and added that he was reporting auditory hallucinations. The RC mental health evaluation was completed with diagnoses of rule out Schizoaffective Disorder, rule out

Bipolar Disorder, a GAF of 50, inclusion in the 3CMS level of care and referral to a psychiatrist. The inmate was prescribed Desyrel and Trilafon. He had not received any treatment at the EOP level of care prior to his transfer to the 3CMS level of care upon his return. Although the history was again recounted when the inmate was transferred to HDSP in February 1997 and he was prescribed Desyrel, he appeared not to have been seen by mental health staff between April 1997 and November 1997 and had not been receiving medications for six months. The inmate was re-evaluated on 5/18/98. An IDTT met that same month and determined he was symptom-free and, based on his request to be removed from the MHP, he was removed from the MHSDS in May 1998, as he had not been receiving medications and had been symptom-free for one year. Although the suicide report stated that the inmate did not seek mental health services after that time, the suicide/death review by a physician dated 1/5/07 stated that the inmate's last prescription for "psychiatric meds was back on 4/25/05."

On 4/25/05, the inmate was prescribed Abilify for 90 days. The doctor's order also indicated that previous Abilify would be discontinued, although there was no previous order for Abilify on the doctor's order sheets, nor was there any consent form for Abilify in the records reviewed.

The inmate received one RVR for possession of a razor that was discovered in his toilet during a cell search in September 1997, for which he received a 30-day loss of credit. He was also investigated for possible inappropriate activities with ancillary staff in December 2000; however, no charges were filed.

The inmate was approaching his parole date and committed suicide six weeks prior thereto. He was interviewed by a psychologist on 10/31/06 to determine whether or not he met the criteria for the Sexually Violent Predator Program at DMH, where, if he did not meet such criteria, he would be placed at ASH. The CDCR suicide reviewer indicated that this psychologist told the reviewer the inmate seemed to be more concerned about the possibility of being placed in the community, where the community would be notified of his sexual predator status, than about being placed at ASH. The psychologist also reported that the inmate was very concerned about other inmates finding out the nature of his crime, since he had been able to keep this information from other inmates throughout his incarceration. The records reviewed indicated that the inmate had a "notice of sex offender registration requirement – 290PC" with relevant information filled in. It is unclear whether or not the inmate actually received this notice.

According to the suicide report, just over a month later, on 12/3/06, the inmate approached a housing officer, stating that he had to be placed in secure housing because an inmate had "seen his paperwork." The inmate reported that he was concerned that an inmate had seen his paperwork and may have informed the Southern Hispanics prison gang of the nature of his crimes, and that Southerners were known for their zero tolerance of child molesters. Because of his safety concerns and because other inmates heard him making these statements to the officer, he was immediately moved to a holding cell. It was arranged for him to be re-housed in a single cell in one of the general population buildings on the yard because there was no space available in administrative segregation.

The suicide report states that on the day of the inmate's death, he was not seen after breakfast until the escort officer discovered him hanging in mid-afternoon because the facility was on a full lock-down. The inmate's administrative segregation paperwork had not been completed, and he was not on close custody status.

The suicide report identified two problems, with recommendations, as follows:

> Problem 1: It is noted that the inmate was not provided proper follow-up when he was in the mental health program in 1997.
> Recommendation: Given that these problems occurred almost ten years ago, there are no recommendations for this issue.

> Problem 2: Inmate was re-housed in a single cell as "adm seg pending" without actually being on administrative segregation status, and therefore not having the security and well-being checks that he would have been provided upon entering the administrative segregation unit.
> Recommendation: (a) Local Issue: This Reviewer was informed that the institution immediately stopped this practice, and that any inmate going to administrative segregation is placed immediately. (b) System Issue: Refer to Departmental Suicide Prevention and Response Focus Improvement Team (SPR-FIT) to review current statewide policy and training regarding provision of custody checks and mental health services at administrative segregation overflow situations, particularly "adm seg pending" status.

On 6/8/07, the Director of the MHP for DCHCS and the Director of DAI provided a report on implementation of the quality improvement plan for the suicide of Inmate NN. In their report, the Directors included a memorandum dated 3/30/07 from HDSP stating that the practice of housing inmates pending placement in the administrative segregation unit on the general population will cease. The memorandum also stated that every effort will be made to create housing in the administrative segregation unit; that when overflow housing is used it will be on specific units that are identified in the memo; and that the inmates placed in overflow will be subjected to all administrative segregation unit policies and procedures, including the security welfare checks, as required for new intakes into administrative segregation.

The minutes from the SPR-FIT meeting on 4/3/07 were also included in the report and stated that there was currently a policy in the Departmental Operating Manual for providing staffing and services in administrative segregation overflow situations, and that HDSP was in violation of that policy. The committee determined that this was a local institutional issue and did not require statewide policy to be modified.

**Findings:** This inmate's suicide does not appear to have been foreseeable, as he was not reporting any intent to harm himself, although his behavior was noted as significantly changed on 12/3/06. His suicide, however, may have been preventable had the staff at HDSP provided the welfare checks and other monitoring required for inmate's placement in administrative segregation status, and had the emergency response policies been

followed. He was not on administrative segregation status long enough to have received the required administrative segregation screening. However, welfare checks and other monitoring should have been conducted. The MTA who arrived on the scene determined that CPR would not be conducted because of "rigor mortis." However, the physician Suicide/Death Reviewer indicated that CPR was not provided because of the MTA reporting "lividity." The suicide report does not address these inconsistencies, nor was there any comment regarding the MTA's determination that CPR and was not performed. The suicide report also does not reference the discrepancy in the records indicating that Inmate NN was prescribed Abilify, an antipsychotic medication, in April 2005 without documentation as to why.

### 41. Inmate OO

Brief History: This inmate was a 44-year-old African-American male who committed suicide by hanging on 12/8/06 in the EOP at CMF. The inmate was double-celled at the time of his death and was a participant in the MHSDS at the EOP level of care. The inmate entered the CDCR on 2/26/98 via the WSP RC, having been found guilty of second degree murder and sentenced to 18 years to life in prison. The inmate's earliest possible release date was reported as 1/24/12.

The inmate was discovered on 12/8/06 at approximately 6:58 p.m. when a correctional officer was returning the inmate's cellmate to his cell after the evening meal. The cellmate and the officer observed this inmate on the bottom bunk, leaning forward with a leather belt around his neck, hanging at an approximate 45-degree angle. The officer ran to the front of the tier, notified two other officers that the inmate was hanging in his cell. One of these officers notified the CMF watch commander via institutional radio as the first officer activated his personal alarm device. That officer then retrieved the cut-down tool from the unit lock box. He and a third officer entered the cell, removed the belt from the top bed frame. Officers removed the inmate from his cell, placing him in the corridor. A lieutenant was attempting to check for vital signs when medical staff arrived and CPR was initiated by medical and custody staff. A nurse arrived with the AED which advised "no shock" and the inmate had no vital signs. CPR was continued as a physician arrived. The physician instructed the staff to take the inmate to the B1 emergency room where lifesaving measures continued until the physician pronounced the inmate dead at approximately 7:31 p.m. An autopsy report was provided by the Sheriff/Coroner of Solano County, stating that the autopsy was performed on 12/11/06. The cause of death was determined to be asphyxia (minutes) due to hanging (minutes). A toxicology report was also provided, stating that there were no common acidic, neutral or basic drugs, nor blood ethyl alcohol detected in a femoral blood sample.

The suicide report contained the inmate's criminal justice history which states that this was the inmate's only criminal offense. The commitment offense involved the death of his girlfriend who was found in his home on 6/21/96 by the inmate's mother. The inmate had left his mother a note turning over to her all of his assets as well as a check for the entire balance of his checking account. The suicide report states that what actually happened to the inmate's girlfriend is unclear; however, it was determined she did not die

of natural causes.  The inmate was found the following afternoon approximately two miles from his house, in a state that was described as "semi-conscious" with an elevated level of Tylenol in his blood.  He was subsequently found guilty of second degree murder and sentenced to 18 years to life, as noted above.

After the inmate entered the CDCR in February 1998 and received initial health screenings, he was cleared for general population and found not to be in need of mental health services.  He was seen by a clinician in October 1999, well over a year and a half after he first entered the CDCR, and was diagnosed with Adjustment Disorder with Depressed Mood but was not placed in the MHSDS.  He was next seen by mental health staff in March 2000, after custody referred the inmate because they observed him packing his belongings and telling officers that he was leaving the facility.  This statement was accompanied by the inmate gesturing with his hand as if it were a gun, placing his hand to the side of his head and "pulling the trigger" in mock fashion, as stated in the suicide report.  This occurred at PBSP where the inmate had been transferred from DVI in April 1998.  He was admitted to a mental health crises bed at PBSP and was housed there for five weeks.  He was diagnosed with a Psychotic Disorder, prescribed Olanzapine, and referred to the APP at CMF.  Prior to being transferred, he had improved.  The transfer was delayed for unclear reasons, and he was placed at the EOP level of care.  The inmate was prescribed antipsychotic and mood stabilizing medications.  However, he was not adherent to those medications.  He was transferred ultimately to CMF at the EOP level of care on 6/22/01.  Prior to his transfer, a Keyhea Order application had been initiated at PBSP.  The Keyhea Order actually went into effect on 6/1/01 and the inmate remained on a Keyhea Order throughout the remainder of his incarceration.  The last application for a Keyhea renewal was dated 6/24/06 and indicated that the inmate presented as a danger to self and others.

Review of the records indicated that the inmate had approximately five transfers from the EOP or administrative segregation to the APP between October 2001 and December 2002, including his admission to the APP from 10/11 through 11/20/01, 6/7 through 7/12/02, and 11/27 through 12/18/02.  When the inmate decompensated he was described as selectively mute, refusing to answer questions, very uncooperative, assaultive, and not adherent to medications.  The records indicated that many of his readmissions occurred after his deterioration, when his antipsychotic medication was either discontinued or when he was not taking it.  When the inmate was stable, he did participate in the EOP programming but had very limited interactions with his peers.  The records indicated that his condition would change when he was not adherent to medication, and that he would become more isolated and on several occasions was described as "mute" or "catatonic like."

The inmate was last admitted to the APP on 5/17/06 when his condition had again deteriorated in the EOP.  Although he denied delusions, hallucinations, and other signs of thought disorder, he was continuously resistant to medications including decanoates (injectable) long-acting medication.  An SRAC of 5/17/06 indicated a risk evaluation as "medium" and "high."  A DMH referral was instituted.  The inmate was re-evaluated during this stay in the APP, and it was noted that he refused to answer when asked if he

were suicidal.  The inmate was discharged from the APP on 6/5/06 and continued at the EOP level of care.  Quite remarkably, although he was reported as not having delusional thinking while in the APP, after his return to the EOP he continued to state that he was going to be released soon from prison, including identification of the  date 11/25/06 to his case manager.  The CMF treatment plan dated 10/17/06 stated that the inmate was stable on medications, not suicidal or homicidal, but that he slept most of the morning hours because of his "psych meds."  His diagnosis remained Schizophrenia Paranoid Type in Partial Remission.

A case manager note of 11/27/06 indicated that the inmate's problems with denial and coping skills appeared to be improving, and that his risk assessment for suicide, self-injury, and unpredictable and aggressive behavior were low.  It was also noted from the last treatment team meeting, the inmate did not meet the criteria for referral to a higher level of care, and that his Haldol injection was changed to every three weeks.  With regard to the inmate's stating that his minimum eligible parole date was 11/15/06, the case manager noted that this was probably a "coping mechanism."  Also, on 11/27/06, the inmate was more straightforward with regard to his crime, describing it as one of passion.  He reported that at times he could become discouraged.  He said that he did not recall the behavior that led to his Keyhea order and denied having any past psychiatric treatment.  Keyhea was instituted because he was overwhelmed by the gravity of his situation, which he believed was an isolated episode.  The inmate was described as cooperative with staff, with good ADLs, no custody log alerts, and appropriate affect and cognition.  He denied suicidality, self-harm, and aggressive impulse.  Psychotic features were not observed or self-reported.  The plan was to monitor the inmate for family support.  It was noted that a maternal uncle had visited a week earlier and that the inmate was expecting a visit from his father and sister at the end of December.

The suicide report refers to his family having been contacted and his C-file being reviewed, neither of which indicated any support for the inmate having an appeal pending or for there being any new information that he could be released in the very near future.  His inconsistent adherence to medication was reflected in frequent notes in the MARs that were in the records reviewed.  He had been placed on injectable Haldol, oral Prolixin, and Cogentin (both of which were to be crushed) to assist in adherence to medication.  His Keyhea order was renewed annually, based on grave disability and his withdrawal and deterioration when he was not adherent to his medications.  His last diagnosis was Schizophrenia, Paranoid Type with a GAF of 44, as well as Glaucoma and Hypertension.

The CDCR suicide reviewer reported that family members were contacted, and that the inmate's sister stated that since childhood the inmate had wide mood swings from depression to elation.  The circumstances of his commitment offense also implied that he had ongoing mental health problems as an adult.  It was unclear from the records if he had received mental health treatment prior to incarceration.

A progress note by a psychiatrist dated 12/7/06 (the day before his suicide) stated the inmate's current medications and continued the diagnosis of Schizophrenia, Paranoid

Type.  Comments from the psychiatrist were that the inmate reported "no complaints," and that his response to medications was "excellent."  The inmate denied paranoid thoughts and had no evidence of decompensation or suicidal thoughts.  Further, he was alert, oriented, and compliant with present meds, and did not express any homicidal thoughts.  The assessment was that the inmate was stable, and the plan was to continue his present medications.  This was the inmate's last contact with mental health staff.

The suicide report identified one problem, with recommendation, as follows:

> Problem:  Despite being on a Keyhea Order for involuntary medication continuously since June 1, 2001, the inmate decompensated several times after it was discovered that he was not taking his medication.  Direct observation therapy administration was evidently not routinely ordered despite the Keyhea.
> Recommendation:  CMF is to provide their procedure for ensuring that inmates on Keyhea Orders receive their medication.

On 8/18/07, the Directors of Mental Health for the DCHCS and DAI provided their report on implementation of the quality improvement plan for the suicide of Inmate OO.  The report included a memorandum from staff at CMF that stated that a copy of Plata Volume:  4-11 Medication Management, Pages 4, 9 and 11, were attached.  This outlined the required procedures for administration of restricted medications.  Staff reported that these were the procedures currently followed at CMF for medication administration.  The process described was for referral of an inmate who refused or was a "no show" for one dose of Keyhea-ordered medication or involuntary medication to the MOD or POD for follow-up medication counseling, for nursing staff to check the MARs for back-up medication, and to involve custody, if necessary.  There were also other memoranda attached, including memoranda from a senior psychiatrist giving MHSDS psychiatrists specific instructions regarding Keyhea medications, audits performed by a psych tech regarding the status of current Keyhea medication orders, and copies of nursing supervisory audits.  These audits covered 3/6 through 4/9/07, and the conclusions were that there were "no discrepancies noted on any of the seven supervisory audits."

**Findings:**  This inmate's suicide does not appear to have been foreseeable or preventable.  The suicide report identifies quite appropriately that the inmate had ongoing problems with adherence to medications, despite their being a Keyhea order in effect since 2001.  The inmate clearly did have periods of decompensation over the course of his incarceration and was referred to a higher level of care in those instances when a higher level of care was required.  Based on the records reviewed, it appears that the inmate was essentially stable except for his having a long-standing delusion that he was going to be released from prison much sooner than was apparently realistic.  The records indicated, however, that he was adherent to his medications up to the time of his death and that he did not give indications that he was anticipating "leaving" the institution other than through being granted parole.  Retrospectively, his failure to obtain his release less than two weeks prior to his suicide, as he had informed his case manager that he expected to achieve, may have been an indication that his risk for suicide had increased, but staff were vigilant in their efforts to treat and manage his illness.

210

### 42.  Inmate PP

Brief History:  This inmate was a 31-year-old Hispanic male who committed suicide by laceration on 12/21/06 in general population at CEN.  The inmate was double-celled at the time of his death and was not a participant in the MHSDS.  The inmate entered the CDCR via the CIM RC on 10/12/04.  The inmate had been convicted in August 2004 of forcible rape, sexual penetration with a foreign object, criminal threats, and child abuse.  He received a sentence of 21 years, four months.  His earliest possible release date was 6/2/22.

The inmate was discovered on 12/21/06 at approximately 10:05 p.m. by a floor officer who heard a pounding noise coming from the inmate's cell.  The floor officer responded to the cell and saw the inmate's cellmate standing at the door, yelling that something was wrong with his cellie.  The officer looked inside the cell, saw blood streaming down the southwest corner of the cell, and notified central control via radio that there was a medical emergency.  A control booth officer activated his personal alarm.  The officer retrieved the deadlock key from the control booth officer, unlocked the cell, and ordered the cellmate to get down.  Custody staff responded, and the cell door was opened.  An officer handcuffed the cellmate.  Several officers entered the cell and found this inmate lying face-up on the top bunk with his "throat sliced open."  The officer grabbed a towel, applied pressure to the inmate's throat, and attempted to stop the bleeding.  Other correctional staff reported to the building with a medical cart.  The inmate was placed on a Stokes litter as central control was contacted via radio to contact the outside ambulance service.  The outside ambulance service was advised they needed a Code Three.  Officers placed the inmate, along with his mattress, on the Stokes litter, and transported him downstairs and onto the medical cart.  An MTA responded to the scene and removed the towel that was covering the inmate's neck wound to assess the damage.  The MTA saw a very deep laceration on the inmate's neck with tracheal exposure.  The inmate was taken to the CTC, while the MTA continued to apply pressure to the inmate's neck with a towel but was unable to initiate CPR due to the depth of the laceration.  After arrival at the CTC, medical staff continued their efforts to treat the inmate, but he was unconscious and unresponsive.  A physician was contacted and advised of the situation.  The Gold Cross Ambulance staff arrived and contacted a physician at the El Centro Regional Medical.  Inmate PP was pronounced dead at 10:37 p.m.  The CDCR physician contacted by CTC arrived at the facility and pronounced the inmate dead at 11:10 p.m.  An autopsy report was provided by the Coroner's Office for the County of Imperial California.  The autopsy was conducted on 12/26/06 and the coroner concluded that the cause of death was multiple incised wounds of the neck (three separate incised wounds to anterior, lateral neck).  The toxicology report was also provided.  It stated that there were no illegal drugs detected from the coroner's panel (amphetamines, benzodiazepines, cannabinoids, cocaine and/or metabolite, opiates, phencyclidine, and alcohol).

The suicide report contained the inmate's criminal justice history.  The inmate stated that he had no prior criminal justice history, and none could be confirmed.  He had arrived in the United States in 2003, having been born in Mexico.  He drank alcohol socially but

denied using illegal drugs.  He also denied physical and psychiatric problems.  The circumstances of the inmate's commitment offense involved the inmate raping his paraplegic girlfriend in April 2004, after he became enraged that she had kissed and hugged his brother earlier that day at a family gathering.  The inmate was subsequently arrested and convicted of the offenses as stated above.

According to the suicide report, the probation officer's report stated that the inmate had denied any history of mental illness prior to his incarceration.  After his arrival at the CDCR on 10/12/04, an initial health screening was completed.  The inmate answered "no" to all questions having to do with treatment for mental illness or current mental health problems, including suicidality.  The inmate was given a Developmental Disability Screening on 10/13/04.  On review of this screen, the psychologist stated that this inmate "did not pass the cognitive test but did not need adaptive services."  However, the report was silent as to what should  be done to address his failure to pass the screening or what to do about his possible adaptive needs.  There was no documentation that follow-up testing was done.  He was also cleared for general population as having no mental illness.  The inmate received an RC screening.  He stated that his victim had two brothers who were serving time in the CDCR, and that he was fearful for his safety.  The correctional counselor referred the inmate for further psychological evaluation.  The inmate was subsequently evaluated by a psychiatrist and admitted to an MHCB unit on suicide precautions, with notations that he was very depressed about having received such a long sentence.  The inmate, however, stated that he was not suicidal and that he had never stated that he wanted to kill himself.  He was diagnosed with Adjustment Disorder NOS and was not placed in the MHSDS as the psychiatrist opined that he did not meet the criteria for placement.

The inmate was readmitted to the MHCB and placed at the EOP level of care on December 2004 for five days, after the psychiatrist had placed him on suicide precautions.  The treatment team met and determined that his diagnosis was Adjustment Disorder with Depression and Personality Disorder NO, and that his level of care was changed from EOP to 3CMS as medical necessity.  The inmate was subsequently seen by a psychiatrist to whom he reported that since he was given 21 years to live like a criminal, he should have been given the death penalty.  He also reported that he wanted to appeal his case.  The psychiatrist changed the diagnosis to Depressive Disorder NOS, and the inmate continued at the 3CMS level of care.  Throughout these admissions and evaluations, the inmate was not prescribed any psychotropic medications.  He was transferred from CIM to CAL at the end of January 2005, and received an initial health screening to which he answered "no" to all questions regarding mental health treatment or current mental health problems.  However, a psychologist reviewed the UHR, noted his two MHCB admissions in 2004, completed a mental health placement chrono placing the inmate at the EOP level of care, and referred him for further evaluation.  He was transferred to CSP/LAC two weeks later, and it appears that he had not received the evaluation prior to his transfer.

The initial health screening at CSP/LAC was conducted.  The inmate again responded "no" to questions regarding mental health history or current mental health problems,

including intent to harm himself. An IDTT met on 2/23/05 at CSP/LAC, determined that the inmate did not have any mental health issues, denied suicidal thoughts, and had no history of receiving psychotropic medication. Based on their review and assessment, the inmate was removed from the MHSDS, and the mental health placement removal chrono was completed on 3/14/05. It was unclear from the records whether or not the IDTT actually reviewed the UHR or the referral from the psychologist at CAL as part of their review process.

The inmate was transferred to CEN on 2/7/06. Again, he answered "no" to all questions having to do with mental health history or current mental health needs including suicidality, and was cleared for general population, even though it was noted by the screening nurse that he had had diagnoses in the past. This was the inmate's last contact with mental health staff or medical staff regarding mental health issues.

The CDCR suicide reviewer identified a number of risk factors for suicide for this inmate, including his "extremely vicious sexual crime, making him a potential target from other inmates," his prison term being his first, his long sentence, and the likelihood of his being deported upon release. The reviewer continued that although the inmate did not have any past mental health history prior to his incarceration, he did have two MHCB admissions shortly after his entry into prison, and it appeared that support systems were not sufficient.

The suicide report identified one problem, with a recommendation, as follows:

> Problem: A psychiatrist at the California Institution for Men wrote a chrono placing the inmate in EOP when admitting him to a crises bed.
> Recommendation: This appeared to be an individual error but did not impact the inmate's care, so there is no recommendation

There was also a death/suicide case review by a physician dated 2/8/07 that summarized the emergency response to the inmate's discovery. It recommended that the facility and local EMS need to look into improving response time for emergency medical transport.

Plaintiffs' counsel also submitted an e-mail dated 4/6/07 in which they raised, among other things, questions about the emergency response to this inmate's discovery stating that officers who discovered him did not call a Code Three so that an ambulance would be called to the CTC. Plaintiffs' counsel assert that the inmate was found with a deep laceration across his neck, but the ambulance was not called until eight minutes after he was found and five minutes after medical staff responded to the housing unit, and that this timeline was not identified as a problem in the suicide report.

**Findings:** This inmate's suicide does not appear to have been foreseeable or preventable. The inmate did appear to have some difficulties in adjusting to prison and had two MHCB admissions early in his incarceration. He appears to have been placed in the MHSDS at the EOP level of care, subsequently removed (in 3/05) and "cleared" at CEN in 2/06. While policies do not appear to have been followed, he neither sought nor

appeared to require mental health services after his initial period of confinement. The concerns identified by the CDCR suicide reviewer and plaintiffs' counsel do not appear to have impacted directly on his death, nor does the failure of custody staff to notify 911 for eight minutes, given the severity of the inmate's self-inflicted wounds.


### 43. Inmate QQ

Brief History:  This inmate was a 32-year-old Asian male who committed suicide on 12/26/06 by exsanguination in the EOP at CSP/LAC.  Even though the inmate was housed in the EOP, he was at the 3CMS level of care at the time of his death.  The inmate was the sole occupant of his cell at that time.  He entered the CDCR via the SQ RC on 6/10/97 after he was convicted of two counts of attempted murder, two counts of kidnapping, and firearm charges for which he was sentenced to four life sentences plus 46 years for firearm enhancements.  He was also convicted of carjacking, two counts of robbery and other firearm charges, receiving an additional sentence of 28 years.  His minimal eligible parole date was 2046.

The inmate was discovered on 12/26/06 at approximately 10:49 p.m. by an officer conducting security checks in the EOP at CSP/LAC.  The inmate was the sole occupant of his cell.  The officer noticed what appeared to be blood inside the cell.  When the officer looked closely, he saw that the inmate was lying on his back in a pool of blood on the lower bunk, and that there was blood on the cell floor and cell wall.  The inmate was observed "rolling from side to side and moaning."  The officer activated his personal alarm and awaited a response from staff.  A sergeant ordered the inmate be taken out of his cell and placed on a Stokes litter along with his mattress.  An MTA arrived and the inmate was transported to the TTA.  He was noticed to still have been breathing at that time.  The inmate was then placed in the institutional medical transport vehicle, and at that point, the inmate was no longer breathing and CPR was started.  The institutional medical transport vehicle arrived at the TTA at 11:05 p.m.  Staff were continuing CPR, and 911 was contacted along with the MOD.  The LA County Fire Department arrived and began treatment and at 11:33 p.m.  A fire department paramedic notified a physician at Holy Cross Hospital who pronounced the inmate dead.  The timeline was provided in the incident report and stated that the officer activated his personal alarm at 10:49 p.m. and that the MTA arrived on the scene seven minutes later, at 10:56 p.m.  CPR began at 11:00 p.m. and the inmate was subsequently placed on oxygen prior to his arrival at the TTA at 11:05 p.m.  911 was called at 11:06 p.m. and the AED was placed on the inmate at 11:07 p.m.  CPR continued.  The LA County Fire Department arrived at the TTA at 11:21 p.m. with CPR continuing until the physician at Holy Cross pronounced the inmate dead at 11:33 p.m.  The suicide report refers to the inmate having inflicted severe wounds to both antecubitals with a paperclip, causing excessive blood loss.  The paperclip was found after his death in his cell, with blood and flesh on it.  An autopsy report was provided by the Coroner for the County of Los Angeles.  It stated that the autopsy was performed on 12/28/06 and determined that the cause of death was exsanguination and the manner of death was suicide.  The toxicology report was provided and stated that there were no detected levels of ethanol, basic drugs or common drugs of abuse including barbiturates, cocaine, fentanyl, methamphetamine, codeine, morphine, or phencyclidine.

The note in the TTA dated 12/26/06 indicated that the inmate was received in the TTA with "blood noted all over body, open wound also noted on both antecubitals area approximately three centimeters times two centimeters on the left AC area and 3.5 x 2 centimeters on right AC area."

The suicide report contained the inmate's criminal justice history and stated that he was serving his first term in the CDCR. The inmate had attempted to enter a plea of not guilty by reason of insanity on the instant offenses. These were described as involving the inmate and an accomplice accosting two individuals in a store, subsequently placing them in the trunk of a car, and shooting them multiple times. Neither of the victims were critically injured and eventually were able to notify police. The inmate was charged with attempted murder (two counts) with enhancements, for use of a firearm; kidnapping (two counts) with enhancements, for use of a firearm; carjacking with enhancements, for use of a firearm, and second degree robbery. Although the inmate attempted to plead not guilty by reason of insanity, he also admitted to having been smoking crack and drinking, and ultimately was convicted of all of the charges. He and received an indeterminate sentence consisting of four life sentences plus 46 years for the firearm enhancements and 28 years on the carjacking, robbery and other firearm charges, in addition to restitution fees of over $40,000. The inmate is not known to have had any juvenile or previous adult criminal justice history.

After his entrance to the CDCR in June 1997 via the SQ RC, the inmate was transferred to CSP/LAC in August 1997, SVSP in July 2000, and back to CSP/LAC on 5/27/05, where he remained until his death.

In terms of his mental health history, the inmate was reported to have had no history of mental illness or treatment prior to the instant offenses. Despite the pre-trial evaluations regarding an insanity plea, was cleared for general population based on the initial health screening and mental health screenings at SQ in June 1997. The inmate did not come to the attention of mental health staff until April 2004 when he was at SVSP, based on a referral from custody staff. The inmate was admitted to an MHCB because he was described as overtly psychotic, with delusional thinking, hallucinations, and acting in a bizarre manner including his not eating or sleeping. He remained in the MHCB for four days, was given a diagnosis of Psychotic Disorder NOS, and placed in the MHSDS at the 3CMS level of care. The inmate cut both of his wrists, his neck, his forearm, and right eyebrow in May 2004, and was transferred to Salinas Valley Memorial Hospital for repair of these injuries. He returned to the MHCB at SVSP and remained for three days from 5/14 through 5/17/04 after these injuries. By 5/17/04, his GAF was assessed as 65 and he remained at the 3CMS level of care.

After his return from the outside hospital and placement in the MHCB, an SRAC was completed. It described his history of first incarceration, life sentence, cutting as past suicidal attempts, and SI. However, it did not give an evaluation of his risk, and he was returned to the 3CMS level of care. It does not appear from the records reviewed that the inmate received a five-day follow-up based on his self-harming/suicidal behaviors. A

215

note dated 5/24/04 stated that the inmate was seen for suicide follow-up and noted that he had cut his wrists and neck, but denied SI on that date. However, the note also stated that the inmate was psychotic, as he was hearing voices and was not on any medication. No medication was prescribed, and his level of care was not changed. The records reviewed indicated that he had reported five previous suicide attempts, but none of this information was clearly documented on the SRAC performed on 5/17/04, or reflected in the note of 5/24/04.

The inmate remained at the 3CMS level of care, and despite his past history including clearly psychotic symptoms as reported by the inmate and as the basis of referral by custody, the inmate was not seen by mental health staff as having a psychotic disorder. He was diagnosed by a psychiatrist with Depression NOS in December 2004. A treatment plan described the inmate as sad, dejected, and joyless, but did not indicate that he was prescribed medications for depression or psychosis.

There was no indication that the inmate was ever considered for a higher level of care until May 2005, when the 3CMS treatment team considered the inmate's request to be in the EOP after he had received an RVR for mutual combat. Despite that request, the inmate remained at the 3CMS level of care. He was subsequently transferred from SVSP to CSP/LAC and had finally been prescribed an antipsychotic, Geodon, prior to his transfer. Despite the antipsychotic medication, after his arrival at CSP/LAC, the inmate was described in early June 2005 as having psychotic symptoms including paranoid delusions, and disorganized thought processes. An IDTT mental health treatment plan described the inmate as "floridly psychotic." He was given a diagnosis of Psychotic Disorder NOS with a consideration of Schizophrenia Paranoid Type, and he was then finally placed at the EOP level of care.

Despite his being placed at the EOP level of care in June 2005, and prescribed antipsychotics, his condition did not improve substantially and by September 2005 he was described as having grandiose delusions, that he was a prophet, as well as auditory and visual hallucinations. Remarkably at a treatment team meeting on 9/22/05, despite this history and documented evidence of psychotic illness, the inmate's diagnosis was changed to Generalized Anxiety Disorder and his medications were Paxil and very minimal dose Haldol (1 mg per day).

In February 2006, Risperdal replaced the inmate's Haldol prescription. A psychiatrist noted that the patient wanted a lethal injection because "doesn't want to kill himself. Still quite psychotic." By March 2006, the inmate was reported to have stated that he would be willing to have his head opened and experimented on because he didn't want to spend the rest of his life in prison. He complained of continuing auditory hallucinations and was described as "very delusional." He denied SI. His diagnosis was updated to include Schizophrenia Paranoid Type. Once again, he did not appear to have been considered for referral to a higher level of care. His statements that he did not want to spend the rest of his life in prison and wanted to get rid of his auditory hallucinations did not appear to have inform treatment staff that he may have some increased risk of suicide. His medications were changed from the antipsychotic, Risperdal, to an antidepressant,

216

Trazodone, in April 2006. This occurred even though the inmate stated that he was not compliant with his medications because they were not helping him with his "voices." The inmate acknowledged to his case manager that he did think of hurting himself as a possible solution to his problems, but the case manager stated that the inmate was stable and denied SI.

By June 2006, the inmate's diagnosis changed again to Delusional Disorder, Grandiose Type. Although he continued to report voices and was described as having a thought disorder, as well as delusional thinking that he was a prophet, he was prescribed the antidepressant Trazodone. By the end of August 2006, Thorazine in very low dosage was added to his medication regimen. Despite the inmate's changing diagnoses and medication prescriptions, he was participating in the EOP with both groups and continuing to see his case manager.

A very curious change occurred on 10/10/06, when the case manager documented the inmate's request to be out of the EOP and in an "honor yard," and a psychiatrist documented that he wanted his medications discontinued because he did not believe he needed to have them. The psychiatrist stated, "no medications thus far have decreased auditory hallucinations." The psychiatrist opined that the inmate was stable, off antipsychotic medications, and was not actively psychotic, and in October 2006 the inmate's Trazodone was reduced with continuation until 11/1/06.

The suicide report references, and the records confirm, that the inmate was told by a case manager of his impending discharge from the EOP. The inmate was "reminded" of this on 11/14/06, with the psychologist documenting that the inmate stated that he was ready to leave the program, but subsequently stated that he did not want to be discharged from the EOP because of safety concerns if he were in general population. This meeting with the case manager was followed two days later by an IDTT meeting at which no psychiatrist was in attendance and the inmate refused to attend. However, the IDTT meeting was held in the inmate's absence. Although the inmate continued to have a diagnosis of Delusional Disorder, Grandiose Type, based on his belief that he was a prophet, the plan was to discharge him from the EOP and lower his level of care to 3CMS, as he had "reached maximum benefit of the EOP."

The CDCR suicide reviewer stated that this last treatment team meeting for this inmate was described by one of the clinicians who was present as not having agreement with custody, and with concern by psych tech about the inmate being discharged from the EOP because they thought the inmate was a "really crazy guy." However, the case manager wanted to discharge him. There was an undated note in the record by the case manager, stating that the inmate only sporadically attended groups and was delusional, but did not display delusional presentation with peers. The note continued that the inmate "appears to be focused on self-indulgence and is impatient and narcissistic." It also says that the inmate reported auditory hallucinations and delusions that he was a prophet. The case manager's opinion was that the inmate's reporting of auditory hallucinations did not match what was observed when the inmate was not "aware of being watched." Although the inmate was noted to have continuously denied suicidal

and homicidal ideation, and was "intrusive at times, manipulative and not very motivated to participate in the program," the case manager concluded that the inmate's statements "might suggest that inmate fabricated clinical picture in order to come/stay in safety of EOP."

The inmate had one last documented clinical contact on 12/7/06 with a case manager, in which the case manager documented the inmate stating, "doctor I can't go to the mainline again. I thought that was enough when I told you that I hear voices and I was the prophet." The inmate received one further contact on 12/14/06 from a psychiatrist who stated that the inmate was on Trazodone, which he had been refusing for two weeks, and did not want to take medication. The suicide report refers to a pharmacy printout indicating that the inmate's Trazodone had been discontinued on 12/1/06, despite the two-week period that the psychiatrist stated the inmate had been refusing medication. The psychiatrist wrote, "the patient admitted to safety issues and case manager believes patient embellished mental health symptoms to avoid enemies." This was the last documented contact with mental health staff in the UHR; however, the inmate requested to see his case manager on 12/26/06.

The CDCR suicide reviewer refers to his conversations with the case manager in which the latter stated that the inmate was interviewed on that date (date of his death) at a cell-front session "around 6 or 7 o'clock," but there was no documentation in the record of this interview having taken place. The suicide reviewer states that the case manager stated that the patient was "still trying to get through to me so I could hear him. He did not want to go to general population." The CDCR suicide reviewer continued on that it was his impression that the "case manager solely made the decision to discharge him from the EOP, in spite of the numerous pleas by the inmate to stay in the program." The CDCR reviewer describes the documentation in the record, and this reviewer's review of the record confirms, that this inmate was described as being demanding and narcissistic, needing to be heard, and that the case manager did not appear to recognize the inmate's serious mental illness. Further, based on this reviewer's review of the records, not only did the case manager fail to recognize the inmate's serious mental illness, but dismissed or minimized the inmate's psychotic disorder and the need for comprehensive treatment and participation by the full treatment team including psychiatry, and the appropriate prescription of antipsychotic medications. The inmate's non-adherence to medications was also never fully addressed, based on this reviewer's review of the records.

During the inmate's final days in the EOP, he was held in a cell in which the cell front was covered by Plexiglas and was described by staff, as referenced in the suicide report, as "fulfilling a Coleman mandate to keep the Enhanced Outpatient Program inmates separate from the Correctional Clinical Case Management System inmates." The suicide reviewer appropriately describes this placement as an isolated environment for an inmate who was clearly requesting to remain in the EOP, and the seriousness of his mental dysfunction as grossly underestimated by his case manager and by (extension or absentia) the treatment team.

The CDCR suicide reviewer referred to an Investigative Services Unit (ISU) report in which ISU staff reconstructed a torn-up letter with the inmate's name and number found in the inmate's cell. It read, "counselor, I was wondering if you could help me get out of the trouble I'm in. They're sending me back to the mainline but because of the mistakes I made before I was accepted into EOP I have safety concerns. I was supposed to go back to UCC or IDTT but I'm assuming people forgot to put me on the list. Thank you." The suicide reviewer refers to there being a lack of clarity with regard to the inmate's safety concerns, as expressed by other inmates and custody staff.

The suicide reviewer opined that the inmate "took his own life rather than face life as a Correctional Clinical Case Management System inmate in general population on a mainline yard with his alleged safety concerns."

The CDCR suicide reviewer also refers in the suicide report to the inmate having received ten RVRs between 1998 and 2005, most of which were for acts of violence, with in-cell violence and violence towards others. He had been in administrative segregation seven times, moved 19 times within a one-year period for safety reasons, and was listed as on single-cell status from the time of his housing at SVSP until the time of his death. His overall institutional functioning greatly improved after his transfer to CSP/LAC at the EOP level of care. There were no indications in the record of significant behavior problems or acts of violence after that transfer. The IDTT determination that the inmate had reached maximum benefit (and in concert with the CDCR suicide reviewer's opinions and this reviewer's review of the record) appears to have been based nearly exclusively on the clinical case manager's opinions regarding the inmate. He was removed from the EOP on 11/16/06 and housed subsequently in a secluded part of the building, behind Plexiglas, without EOP activities, for approximately five weeks while awaiting placement in a general population yard. He killed himself while in this isolated housing environment. The rationale given for separating this inmate "behind the glass" was to "separate Correctional Clinical Case Management System inmates from Enhanced Outpatient Program inmates per the Coleman mandate." Lastly, the suicide report refers to the suicide reviewer interviewing the case manager after this inmate's death. In that report, the reviewer describes the case manager as stating that he had met with the inmate several hours before the inmate committed suicide on the day of his death, and although the inmate again reported he did not want to go to general population during a cell-side interview, and was experiencing significant distress about the pending transfer, the case manager believed that this was a custody issue. There was no documentation in the UHR of this meeting having ever taken place.

The suicide report identified three problems, with recommendations, as follows:

> Problem 1: Inmates discharged from the EOP should have a detailed discharge plan that described how they will be assisted in transitioning to their 3CMS Program. The Program Guide requires a 3CMS IDTT within ten working days. In this case, it appears that inmate (QQ) was isolated in a Plexiglas-covered cell for over five weeks, with no programming offered from either EOP or 3CMS.

This was detrimental to his mental health status and completely inappropriate for an inmate who had not demonstrated any threat to other EOP inmates.
Recommendation: The senior psychologist will audit 100 percent of discharge plans from this EOP for a minimum of three months to ensure that they include a transition plan and indicate what programming will be offered to discharged inmates who are awaiting transfer to another yard.

Problem 2: The decision to discharge this inmate from the EOP also appeared to be inappropriate, based on the available documentation. The preponderance of the documentation indicated that this inmate had a severe mental illness including active psychosis, had clearly functioned much better behaviorally since being placed in EOP, and had been programming positively most of the time. There was no documentation of other team input into this decision, and it appeared to be solely the decision of the case manager, who failed to document anything about the inmate's treatment progress and related mental status. This inmate, who was not present at his final IDTT meeting, was thus expelled from the EOP, despite his pleas not to be moved and despite evidence of his continued clinical need. Note that non-compliance is not a valid reason to discharge an inmate from a treatment program. The reason for discharge should be that the inmate has met his treatment goals. The achievement of said goals should be reflected in the documentation over time, and not suddenly proclaimed when the inmate stops cooperating.
Recommendation: While auditing all discharge plans from the EOP as per Problem 1, the senior psychologist will also ensure that inmates are being discharged for the right reasons, i.e., they have met their treatment goals. Inmates who become resistant to programming, particularly if they had been doing well previously, should be offered interventions to overcome the resistance and return to positive programming. Inmates must be maintained at the levels of care that are clinically indicated. The case manager shall be referred to the Division of Correctional Health Care Services Interim PPRC.

Problem 3: Inmates often cite "safety concerns" as reasons to not be removed from EOP (or other places where they feel comfortable). However, with mentally ill inmates, especially those with poor insight or understanding of their illnesses, staff must look beyond the words. The inmate may have no better way to express his needs, so it is up to mental health professionals to interpret his true needs. Inmate (QQ) continued to report hallucinations and endorse this delusion, and other inmates also commented they were too ill to be moved out of EOP. Inmate (QQ) was asking to remain in the program, where his behavior and programming had been the best he ever had while incarcerated.
Recommendation: The institution should present this case at a mental health staff meeting and discuss how to interpret the needs of severely mentally ill inmates with limited ability for self-expression.

Plaintiffs' counsel submitted an e-mail on 4/6/07 regarding this inmate's suicide with the subject "recent suicide reviews of emergency failures." Plaintiffs' counsel stated, among

other things, that in their review of this inmate's suicide, no emergency response failure was identified in the corrective action despite facts which document clear failures.

A death/suicide review of this inmate was conducted by a physician whose comments were provided as an attachment to the suicide report. The physician re-stated the inmate's history as well as the timeline of the emergency response, and concluded that the "patient did not have any chronic or acute medical problems that would have caused him to commit suicide and the emergency response to the attempted suicide was appropriate."

On 8/13/07, the Director of Mental Health for the DCHCS and Director of DAI submitted a report on implementation of quality improvement plan for suicide of Inmate QQ. In their report, they reference several memoranda from CSP/LAC. An undated memorandum from a correctional psychiatrist at CSP/LAC and co-chair of the Suicide Prevention Committee stated that in May 2007 a senior psychologist began to review all the EOP discharges and discharge plans, and will continue the process for the next several months. Training for all EOP mainline case managers at a regular weekly staff meeting began on 6/13/07, and ongoing suicide prevention training will continue on a permanent basis. In addition, all EOP-discharged inmates will continue to receive "normal programming and treatment" pending transfer to another location. A memorandum continued that as of the 3/6/07 memorandum, all EOP-discharged inmates will receive full EOP programming and treatment until their dates of transfer to the 3CMS level of care.

With regard to Problem 2, training took place in May and June 2007 "to suggest to clinicians that when difficult inmates demand extra attention or services, (and) services or attentions are withheld, that the reasons or rationale for this be charted carefully." On 6/13/07, training continued to instruct that failure to participate in the program in EOP would not be an appropriate or reasonable ground for discharge from the program, and that failure to participate in programming will elicit further intervention and services rather than punishment, discharge from the program, or withholding of services or treatment.

With regard to Problem 3, the memorandum stated that the inmate's case was reviewed in detail by the Suicide Prevention Committee at large at a meeting on 5/9/07 attended by over ten mid-level managers in the MHP. The case was also reviewed at a regular staff meeting on 6/13/07 with all EOP clinical case managers. It also stated that there will be a continuation of suicide prevention training for all EOP clinical staff. The memorandum ended with a statement that the CSP/LAC staff were currently drafting a new policy and procedure document on suicide prevention, as per the new 2006 Coleman Program Guide, including a new section that would suggest that if a patient expresses substantial suicidality, the on-call clinician would be notified. Minutes from the 6/13/07 training on this inmate's suicide were attached, as were on-the-job training sign-in forms and a copy of the outline for the new suicide prevention procedure manual.

A memorandum dated 6/27/07 to the DCHCS Suicide Program Coordinator stated that there had been an audit of the discharge plans, but that only two patients had been discharged. The audit indicated that one patient had been discharged to a Developmental Disabilities Program (DDP and remained stable, and that the other had been discharged and was told that he could return to the EOP if they unable to function at a lower level of care.

**Findings:** This inmate's suicide appears to have been both foreseeable and preventable. He had a well known history of suicide attempts and was reporting his increasing anxiety with regard to the downgrading of his level of care from EOP to 3CMS before and while he was housed for several weeks "behind the glass" awaiting transfer to general population and receiving minimal mental health services. The inmate was downgraded from EOP to 3CMS based on the opinions of the clinical case manager, as evidenced in the both CDCR suicide reviewer's and this reviewer's review of the medical records. There was no psychiatrist in attendance at the inmate's final IDTT meeting, and the prescription of antipsychotic and antidepressant medications appears to miserably fallen short of the standards of care with regard to an inmate who is diagnosed with Delusional Disorder and clearly has ongoing psychotic symptomatology. The inmate's overall condition was deteriorating and his pleas for assistance and maintenance in the EOP, where he did report he felt safe and was participating in programming until several weeks before his death, were minimized by the treatment team. His medication management was not consistent with the CDCR Program Guide in that he was not prescribed the appropriate medications, and his non-adherence to medication was not promptly followed with appropriate corrective actions.

The CDCR suicide reviewer is right on point with the three problems identified and the recommendations, including the referral of the case manager, a psychologist, to a Peer Review Professional Practice Committee to review that case manager's work. However, the suicide reviewer does not clearly address the failure in the emergency response, nor does the Physician Death/Suicide reviewer in stating that the emergency response was appropriate. There were numerous failures in the timeline, including the response, the failure to call 911, and most important, the failure to "stop the bleeding" of an inmate who has lacerated his arms and was conscious and disoriented at the time of discovery. Simply stopping the bleeding and starting IV fluids at the greatest rate possible may have been enough to save this man's life. However, there was no comment from anyone within CDCR regarding the failure to implement these procedures. This suicide death occurred at the end of 2006, literally years after there had been several reviews of suicides in which there appeared to have been no consideration for referrals to higher levels of care of inmates who were not functioning well at their current levels of care. The minimizing or ignoring of this inmate's need for appropriate medications, while the UHR indicated that he was indeed attending EOP programming, plus the "vague" safety concerns despite the inmate having had multiple RVRs related to mutual combat and in-cell violence prior to being placed in the EOP, and the concerns by custody staff and psych techs about the inmate's removal from the EOP, was unconscionable.

It is unacceptable for the CDCR staff to state that an inmate was placed "behind the glass" while awaiting transfer from an EOP to a 3CMS program "to keep EOP and 3CMS inmates separate" as a justification for providing minimal mental health contact for an inmate who was being removed unjustifiably from the EOP level of care.  This case represents an absolute failure, at both the facility level and at the level of DCHCS and DAI, to have more appropriately provided and supervised the treatment of an inmate in need of mental health services, as well as with the corrective actions and responses from facility staff who significantly ignored or diminished the seriousness of this inmate's mental health needs.

The discharge summary from the case manager indicated that the inmate came to EOP on 6/14/05 from 3CMS, and that throughout his stay, he received different diagnoses including Psychotic Disorder NOS, rule out Schizophrenia Paranoid Type, Antisocial Personality Disorder, Generalized Anxiety Disorder, Polysubstance Dependence, Psychotic Disorder NOS, Schizophrenia Paranoid Type, and Delusional Disorder, Grandiose Type.  The case manager continued that the inmate sporadically attended groups and "presented as someone who is delusional but when observed/listen to with his peers no delusional presentation was noted."  The case manager further continued that the "inmate usually friendly and very needy (to be heard)."  The case manager stated that the inmate was admitted to the EOP due to his "delusions," but there was no documentation that points out the inmate's "fear" of being among general population due to needing to fight."  This clinician does not appear to have reviewed the inmate's UHR.