# EXHIBIT A

1                    UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF CALIFORNIA
2              AND THE NORTHERN DISTRICT OF CALIFORNIA
           UNITED STATES DISTRICT COURT COMPOSED OF THREE
3      PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE
4    RALPH COLEMAN, et al.,     )
                                )
5              Plaintiffs,      )
                                )
6          vs.                  )   NO. 2:90-cv-00520 LKK JFM P
                                )
7    ARNOLD SCHWARZENEGGER,      )
     et al.,                    )
8                               )
               Defendants.      )
9    _____)
     MARCIANO PLATA, et al.,    )
10                              )
               Plaintiffs,      )
11                              )
           vs.                  )
12                              )
13   ARNOLD SCHWARZENEGGER,      )
14   et al.,                    )
15                              )
16   _____Defendants.___)
17
18                         ---o0o---
19
20        DEPOSITION OF RONALD M. SHANSKY, M.D.
21             Monday, December 10, 2007
22                         ---O0O---
23
24
25        REPORTED BY:  KRISTIE L. HUBKA, CSR NO. 5974

1    changes to your answers?

2        A.    Yes.

3        Q.    You understand, however, that if you make a

4    substantive change that myself or somebody else may

5    comment on it at the time of trial?

6        A.    Yes.

7        Q.    This is an important one.  I think I ask the

8    greatest, most intelligible questions of all time, but

9    it's quite possible that I'll ask you something

10   unintelligible.  Let me know.

11       A.    Yes.

12       Q.    Because if you don't let me know, we're going

13   to hold you to your answer.  Do you understand that?

14       A.    Yes.

15       Q.    You're doing a great job, you answer audibly

16   and with affirmative or negative responses.  We won't

17   talk over each other, we should be okay.  Okay?

18       A.    Yes.

19       Q.    If you need to take a break at any time or the

20   court reporter, anybody needs to take a break, just let

21   me know and we'll break.  I would just ask that we not

22   break when a question is pending.

23       A.    Yes.

24       Q.    Dr. Shansky, could you list for me the

25   components of a constitutionally adequate healthcare

8

1   system in a correctional setting?

2       A.   You start with the simple ones.  The basic

3   components of a constitutionally adequate system include

4   adequate numbers of appropriately trained and

5   credentialed professional staff.  An adequate

6   environment within which to work including appropriate

7   equipment and conditions which ensure an environment

8   that's conducive to a professional assessment including

9   privacy.

10          Another component is a system of documenting

11  the healthcare interactions including assessments,

12  plans, orders, results of tests, et cetera.  A system of

13  tracking to ensure continuity with regard to all

14  elements of professionally created plans, including

15  medications, lab, x-ray, other ancillary services,

16  followup visits, specialty referrals, et cetera.  A

17  system that allows for the movement of patients to

18  appropriate levels of care based on the complexity of

19  their medical problems, including both inpatient and

20  outpatient.  A system of self-monitoring in order to

21  identify patterns of breakdowns in the system for which

22  improvements, strategies can then be implemented in

23  order to mitigate the breakdowns.  It includes the

24  ability to ensure access regardless of custody level or

25  housing situation, meaning sufficient officers to both

1    ensure access on site and ensure access to off site

2    services.  Requires sufficient resources in the

3    community which would not be available on site

4    necessarily but would be available either through off

5    site encounters or some sort of tele-medicine

6    arrangement so that specialized care can be provided

7    when ordered by the clinician.  A system of ensuring

8    that credentialing is done on entry based on standards

9    related to the type of practice the clinician is going

10    to be engaged in.  And that that credentialing process

11    mirrors what happens in the community at an HMO or a

12    hospital in terms of the processes used.  Those are the

13    basics that come to mind right now.

14        Q.   Thank you.  I understand the easy questions.

15    What is, in your opinion, constitutionally adequate

16    correctional medical care?

17        A.   In, I guess, the simplest form that would be a

18    system which ensures timely and appropriate responses to

19    serious medical problems.

20        Q.   You used the term "community standards" I

21    believe in your report.  Is that a term that you believe

22    you've used?

23        A.   I used it in one place.  There are community

24    standards certainly with regard to nationally developed

25    clinical guidelines.

1    correctional healthcare?

2        A.    Yes.

3        Q.    Do you consider yourself an expert in

4    custodial correctional issues?

5        A.    Can you explain what you mean by that?

6        Q.    Sure.  Have you ever held a position like a

7    warden position or anything like that?

8        A.    No.

9        Q.    Have you ever been charged with coming up with

10   staffing models for correctional officers?

11       A.    No.

12       Q.    Have you ever been charged with running a jail

13   or a prison facility systemwide beyond medical care?

14       A.    In D.C. I was responsible for medical and

15   mental healthcare and all who worked within those areas

16   but that was the limitations of my responsibility.

17       Q.    Earlier in response to my first question about

18   what are the components of a constitutionally adequate

19   healthcare system you listed quite a few.  Is it

20   possible to rank those in terms of priority?  Are some

21   more important than others?

22       A.    That would be very difficult.  That would be

23   very difficult.  Because if the fundamental concern is

24   being able to respond timely and appropriately to

25   serious medical problems, then many of those elements

1    are interrelated and it depends on the nature of the

2    problem which of those elements come in to play.

3        Q.   So all of those components that you had

4    identified before are important, correct?

5        A.   Yes.

6        Q.   And they're interrelated, correct?

7        A.   Yes.

8        Q.   I'm going to show you what we've pre-marked as

9    Exhibit 1, it's the notice of your deposition and a

10   request for production of documents.  Actually, I'm

11   going to have you look at the one that we've marked.

12       A.   Okay.

13       Q.   Take a second and review that document.

14       A.   Okay.

15       Q.   Have you seen this document before?

16       A.   Yes.

17       Q.   On page two and three of the document are

18   eight categories of documents that I asked you to

19   produce today.  Do you see those eight categories?

20       A.   Yes.

21       Q.   Did you produce all documents responsive to

22   category No. 1?

23       A.   I believe so.

24       Q.   And did you produce all documents in your

25   possession that you believe are responsive to the

1    next day?

2         A.    The next day?

3         Q.    Uh-huh.

4         A.    No.

5         Q.    How about within six months?

6         A.    Again, I'm demurring in part because I don't

7    know what the targeted number should be on a statewide

8    basis, I really have no clue.   And I've had no

9    discussions with plaintiffs' attorneys about any of

10   that.

11        Q.    Have you had discussions with anybody

12   regarding that subject?

13        A.    No.

14        Q.    If the only improvement that was made in the

15   next two years is the decrease in the population,

16   nothing else, everything else remained status quo, the

17   only change is in two years from now there are 40,000

18   less inmates, no other changes other than the current

19   status quo, would CDCR have a systemwide

20   constitutionally adequate medical care delivery system?

21        A.    Mr. Mello, your question kind of insults the

22   receiver.

23        Q.    I'm asking you a question.

24        A.    The answer is no.

25        Q.    I want you to now grab which I believe is the

1    next exhibit in order which is the Findings of Fact and

2    Conclusions of Law.  First of all, Dr. Shansky, have you

3    ever seen the Findings of fact and Conclusions of Law re

4    Appointment of Receiver?

5         A.   Yes, I believe so.

6         Q.   I'm going to direct you to page 43 of that

7    document.  And I'm looking specifically at lines 11

8    through 15 regarding leadership.

9         A.   Yes.

10        Q.   And it reads, "While blame for the deplorable

11   condition of prison medical care in the state can

12   properly be attributed to multiple causes, there is a

13   single root cause of this crisis:  An historical lack of

14   leadership, planning, and vision by the State's highest

15   officials during a period of exponential growth of the

16   prison population."  Do you see that?

17        A.   Yes.

18        Q.   Do you agree or disagree with the finding of

19   the Court?

20        A.   I am reluct- -- I'm hesitant to disagree with

21   the Court, of course.

22        Q.   Me, too.

23        A.   However, as I indicated before, I am reluctant

24   to single out a single factor.  Clearly that's a very

25   important factor.  I don't think you can analyze it in a

1    way that says that's the only factor.  So in that sense

2    I'm not comfortable with the statement.

3         Q.   You're not comfortable with those items listed

4    by the Court being the single root cause of the crisis?

5         A.   Well, but it turns out that those things are

6    more than one thing.

7         Q.   Right.

8         A.   I mean, so I don't know what -- I don't know

9    what to say.

10        Q.   Do you disagree that these are causes?

11        A.   These are unquestionably important causes,

12   absolutely.

13        Q.   Is any of them more important than the other,

14   in your mind?

15        A.   Again, I don't know how you separate

16   leadership from vision.  Can you have a vision in the

17   absence of leadership?  There's a metaphysical question.

18        Q.   This is why I love you, Dr. Shansky.

19        A.   Well.

20        Q.   So, again, maybe you can't answer the question

21   and that's fine, but do you believe any of these

22   multiple things that are part of the single root cause

23   are more important than the other?

24        A.   No.  I think they're all extremely important.

25        Q.   Dr. Shansky, have you heard of AB900?

64

1        A.    AB900?

2        Q.    Assembly bill 900.

3        A.    No.

4        Q.    Have you reviewed any documents relating to

5    the state's plan to build 53,000 new state and local

6    beds?

7        A.    No.

8        Q.    So it's true that you didn't consider AB900 in

9    reaching your opinion in this case?

10       A.    No.

11       Q.    That's true?

12       A.    That's true.

13       Q.    Have you -- and I know you have -- but have

14   you reviewed the receiver's November 15th, 2007, Plan

15   of Action?

16       A.    Yes.

17       Q.    And do you have a general opinion as to the

18   quality of that Plan of Action?

19            MS. HARDY:  Objection, it's 300 pages long.

20   Are there elements that you're interested in?

21            THE WITNESS:  I believe that there are some --

22   that many important -- many of the important issues are

23   addressed in it.  I'm not comfortable on the stand, you

24   know, appearing as a critic of it.  I do think it

25   addresses many of the important issues that are

1    potentially within the receiver's purview.

2        Q.    (By Mr. Mello) As you sit here now, are

3    you aware or of the opinion that several important

4    features are missing from that Plan of Action?

5        A.    I'm sure there may be some, other people have

6    told me.  But I was not -- I never reviewed the plan --

7    I had to review it pretty quickly in the context of this

8    appearance so I was looking at it not so much in terms

9    of the comprehensive nature of the approach but rather

10   to what extent it referenced, you know, issues related

11   to crowding.

12       Q.    Did the Plan of Action identify, based upon

13   your review -- strike that.

14             Based upon your review did the Plan of Action

15   identify crowding as a barrier to creating a

16   constitutionally adequate medical care delivery system?

17       A.    As I recall, yes, it identified that crowding

18   created problems with regard to the facility of

19   implementing improvements.

20       Q.    To your knowledge, did the Plan of Action

21   provide that overcrowding would prohibit the receiver

22   and CDCR from developing a constitutionally adequate

23   medical care delivery system?

24       A.    I don't believe it said that.

25       Q.    Dr. Shansky, are there any materials that you

1      Q.    Okay.  And you reviewed various post-tour

2   letters in preparation -- strike that.

3            Did you review PLO post-tour letters in

4   reaching your opinion in this matter?

5      A.    Yes.

6      Q.    Do you remember which ones?

7      A.    They were done within the previous twelve

8   months.

9      Q.    So is it your testimony that you believe that

10   the post-tour letters that you reviewed were all done

11   within the last year?

12      A.    There may have been an exception or two but

13   generally they were.

14      Q.    Do you know if those post-tour letters that

15   you reviewed are in the documents that you're providing

16   today?

17      A.    I believe they are.

18      Q.    Upon reviewing the post-tour letters in this

19   case did you find them to be credible?

20      A.    I found them quite credible because they

21   always documented improvements, positives, and in that

22   sense they reflected greater balance than you might

23   expect from an advocacy -- you know, an advocate's

24   organization.

25      Q.    Do you recall, as you sit here today, any of

1    the improvements that were identified in any of those

2    post-tour letters?

3         A.    Well, there were -- and I can't remember by

4    facility but there were improvements with regard to

5    responsiveness in appeals, there were improvements with

6    regard to timeliness of appointments in some instances,

7    there were improvements in some instances with regard to

8    staffing, you know, filling positions.  Those kinds of

9    things.

10        Q.    Do you recall any other as you sit here today?

11        A.    Not off the top of my head.

12        Q.    And Exhibit 2, the proposal to be the limited

13   temporary receiver.

14        A.    Yes.

15        Q.    On page 17, the third sentence of the summary

16   reads, I believe, "In relation to the RFP for a

17   temporary receiver, our perspective is that the

18   immediate task to be addressed is to reduce unnecessary

19   morbidity and mortality."  Do you see that?

20        A.    Yes.

21        Q.    That was your opinion at the time?

22        A.    Yes.

23        Q.    Do you still have the opinion that that's

24   important?

25        A.    Yes.

1      A.    Oh, no.

2      Q.    May I approach the witness?

3            MS. HARDY:  You may indeed.   Just don't give

4      me one, too.

5            THE WITNESS:  Just don't hit me with it.

6      Q    (By Mr. Mello) And I think the crux that

7      I'm going to ask you about, Doctor, I am going to

8      mark the whole thing including the appendices and so

9      we'll probably have several volumes of that because

10     it's such interesting reading.   But I think I'm just

11     going to ask you about these pages, Doctor.  And I'm

12     going to jump around because I have a short

13     attention span and that's just the way that I work.

14            I'm going to point you to page three of the

15     report or the Plan of Action.

16     A.    The problem is in this document there are so

17     many page threes.

18     Q.    Right.  And I am referring to page three of

19     the introduction.

20     A.    Okay.

21     Q.    Which is if you look at the top actually page

22     five on there.

23     A.    Okay.

24     Q.    In subsection C it says, "The overall goals of

25     a constitutionally-adequate prison medical care system

1    are to reduce unnecessary morbidity and mortality,

2    improve inmates' health status and functioning,

3    coordinate care with mental health and dental, and

4    protect public health."

5        A.    Wait, where are you reading?

6        Q.    I'm sorry.

7        A.    I see, okay.

8        Q.    Do you agree or disagree with that statement?

9        A.    Yes.

10       Q.    You agree with it?

11       A.    Uh-huh.

12       Q.    Yes?

13       A.    Uh-huh, yes.

14       Q.    Now I'm going to refer you to page -- it's 87

15    on the top of the document, you know I showed you there,

16    it might be easier to find it.

17       A.    Right.

18       Q.    Actually I'll get there and then I'll ask you

19    about it.  And this is the Clinical Quality Measurement

20    and Evaluation Initiative.

21       A.    Yes.

22       Q.    And the last sentence of the first paragraph

23    reads, "Without question, one of" -- I think -- the

24    causes that has created the unconstitutional shortfalls

25    in the CDCR's medical delivery system has been an

1    bureaucratic culture either within CDCR or within the

2    State of California, government in general.  But I just

3    don't know what details it refers to other than possibly

4    people utilizing personnel disciplinary processes.

5        Q.   I'm going to point you to the introduction of

6    the Plan of Action which you have in front of you at

7    page ten up at the top.  In the paragraph or the item

8    No. 4 and sort of the second half of the paragraph it

9    refers to the state's trained incompetence and CDCR's

10   destructive culture.  Do you see that?

11       A.   Yes.

12       Q.   Do you have any idea what that means?

13            Off the record for a second.

14       (Whereupon a discussion was held off the record.)

15            THE WITNESS:  I'm not sure specifically what

16   they're referring to there.

17       Q    (By Mr. Mello) On the same page in item

18   No. 5 a sentence reads, and I believe it's about the

19   third or fourth sentence, "And operating day-to-day

20   medical care requires far more than simply providing

21   oversight to clinical personnel.  It also requires

22   overhauling dysfunctional business and financial

23   systems."  Do you see that?

24       A.   Yes.

25       Q.   Do you agree or disagree with that statement?

1         A.    I would agree.

2         Q.    Just because I want you to search around and

3    scramble, I'm going to send you back to the Findings of

4    Fact and Conclusions of Law.   I'll send you to page 38

5    of that document.

6         A.    Okay.

7         Q.    The first lines one or two say, "The provision

8    of adequate medical care in this situation presents a

9    classic example of a polycentric problem."   Do you see

10   that?

11        A.    Yes.

12        Q.    Do you agree with the Court's finding that the

13   provision of adequate medical care in CDCR presents a

14   classic example of a 'polycentric' problem?

15        A.    Having not thought about this before --

16        Q.    Dr. Shansky, why don't you take a second and

17   read, you know, the first couple of paragraphs on this

18   page and then I'll ask the question again.

19        A.    Okay.

20        Q.    Do you agree with the Court's finding that

21   that the problem with the delivery of constitutionally

22   adequate medical care in CDCR facilities is a

23   polycentric problem?

24        A.    Yeah.

25             MR. MELLO:  Why don't we take a break.

1      Q.    So it's your understanding that the number of

2   board certified and board eligible clinicians has

3   increased dramatically?

4      A.    Yes.

5      Q.    Okay.  And do you believe that further

6   increases in the number of board certified and board

7   eligible physicians would improve the quality of medical

8   care delivered to CDCR inmates?

9      A.    Yes.

10      Q.    Are you aware of any measures that the office

11   of the receiver has taken to improve or increase the

12   number of board certified and board eligible physicians?

13      A.    Compensation unquestionably has been addressed

14   in a substantial way.  There may be some more forms of

15   benefits that I'm not completely filled in on.  But I

16   think clearly that has made a significant impact.

17      Q.    I hate to do this to you.  Back to page 29 of

18   your report.  On page 29 of your report you state that:

19   "The prisons report significant problems hiring and

20   retaining LVNs, across the state."  Do you see that in

21   paragraph 82?

22      A.    Yes.

23      Q.    Is it true that hiring and retention of LVNs

24   is a problem at every prison within CDCR?

25      A.    I haven't done an across the state look.  I do

1    believe it will not be reached?

2        A.    I have no basis for concluding one way or the

3    other.

4        Q.    So it could be reached?

5        A.    Possibly.

6        Q.    Page 15 of your report.  I'm going to ask you

7    about paragraph 38.

8        A.    Uh-huh.

9        Q.    On page 15 you write or it's written that

10   "Even with unlimited resources, however, there are

11   likely some physician vacancies that may never be filled

12   because they are located in remote prisons where

13   qualified individuals choose not to live."  Do you see

14   that?

15       A.    Yes.

16       Q.    Do you agree with that statement?

17       A.    The key would be sufficient numbers of

18   qualified.

19       Q.    Do you know which locations -- or strike that.

20             Do you have an opinion as to which locations

21   are so remote that it may not be able to sufficiently

22   staff them with qualified individuals?

23       A.    The ones I am familiar with are either a place

24   in the central valley like Avenal or High Desert or, you

25   know, a place like Pelican Bay, some of the desert

1      prisons.

2           Q.    And only because I'm trying to speed up and I

3      won't take you there unless I need to, but in the 2005

4      proposal for temporary receiver, on page three, so if

5      you want to go look at it -- you see, I said I wasn't

6      going to do it but then I did it, anyways.  On page

7      three of that report at the top of the page you wrote,

8      "A Receiver should work with custody and medical

9      leadership to adjust the classification system so that

10     persons with higher acuity medical conditions would be

11     classified into categories that compel them to be housed

12     in facilities where recruitment of better qualified

13     physicians is easier."  Do you see that?

14          A.    Yes.

15          Q.    Do you still hold the opinion that that is

16     appropriate?

17          A.    As long as there are difficulties bringing in

18     sufficient numbers of qualified professionals, there

19     isn't much of a choice.  You have to match the intensity

20     of the clinical resources with the intensity of the

21     pathology.

22          Q.    So it's true that an adjustment of the medical

23     classification system is a possible solution to the

24     staffing issues at some of these remote locations?

25          A.    Yes.

132

1        A.    It would -- that reduction in population would

2    reduce the existing resource/demand mismatch.  The

3    system will only work well when the rest of the

4    infrastructure, the scheduling, the tracking, medical

5    records, et cetera, is competently put in place.

6        Q.    So, again, it's your testimony that simply

7    reducing the prison population all by itself won't cure

8    the specialty medical issues, correct?

9        A.    Correct.

10       Q.    Do you have any idea -- this is a Phase II

11   issue, I'm not going to ask.  I want to.

12       A.    I'm on the bench.

13       Q.    I know but I'm kind of curious what you think.

14   Move to strike my own question and I just did.

15            I'm going to ask you to go back to the Plan of

16   Action, pages 17 to 21 of the Nursing Medication

17   Delivery Process Redesign objective which is pages -- at

18   the top again of the computer printout, it's I believe

19   pages 75 to 79.

20       A.    Okay.

21       Q.    Do you have an opinion as to -- back up.

22            Do you believe that this Nursing Medication

23   Delivery Process Redesign objective is an appropriate

24   objective?

25       A.    I can honestly say, even though I think I

134

1    Q.    And what is that opinion?

2    A.    It does remain a problem.

3    Q.    Do you have an idea as to whether it's a

4    lesser or greater problem than when you left in June of

5    2006?

6    A.    I think it's lesser in at least one

7    significant way.  I never understood why with large

8    prisons and so much activity going on at least two

9    shifts a day, medical records shut down after

10   3:00 o'clock or whatever it was, and the fact that I

11   don't know if it's all prisons but in many prisons they

12   have medical records is open for at least two shifts, I

13   think it's a major improvement so that documents can be

14   accessible for people working in the evening hours.

15   Q.    So it's your opinion that medical records can

16   be improved by having more shifts?

17   A.    Yes.

18   Q.    On page 37 of your report you note at the

19   bottom of the first paragraph "As the Receiver has

20   stated, 'an effective computer network is essential to

21   providing medical staff access to clinical

22   information.'"  Do you see that?

23   A.    Yes.

24   Q.    You quoted the receiver there.

25   A.    Yes.

```
 1        Q.   Do you agree with that statement?

 2        A.   Yes.

 3        Q.   In your opinion, will a reduction in the

 4   prisoner population result in the essential effective

 5   computer network that is essential to the system?

 6        A.   Will it result in is the question?

 7        Q.   Yes.

 8        A.   No.

 9        Q.   But an effective computer network system would

10   improve the quality of care, correct?

11        A.   Yes.

12        Q.   Would a reduction in the prisoner population

13   resolve the fact that unit health records for returning

14   prisoners are stored at a southern regional facility?

15             MS. HARDY:  Objection, that doesn't make

16   sense.

17        Q    (By Mr. Mello) On page 37 of your report

18   again you state that, and I believe you're referring

19   to returning prisoners, "The UHRs for these

20   prisoners, containing the medical records from

21   previous CDCR terms, are stored at a southern

22   regional facility," correct?

23        A.   Yes, that's correct.

24        Q.   You see that as a problem?

25        A.   Yes.
```

136

1      Q.    Why?

2      A.    Because the information is not accessible to

3    the people who are attempting to do a comprehensive

4    evaluation on intake.

5      Q.    Is it also your opinion, and I believe you

6    said it on page 41, essentially that the unit health

7    records are poorly organized?

8      A.    Yes.

9      Q.    Would a reduction in the prison population

10   resolve the fact that CDCR stores unit health records

11   for returning prisoners at a southern regional facility?

12     A.    No.

13     Q.    Would the simple reduction in the number of

14   inmates resolve the fact that CDCR's unit health records

15   are poorly organized?

16     A.    There could be a relationship in that, again,

17   the resource/demand to file documents and everything

18   else is reduced and then the resources available may be

19   adequate, so that may have that impact.

20     Q.    During your inspections, I believe at pages 39

21   and 40 of your report, you indicated that there's a

22   backlog of paper medical records to be filed.

23     A.    Yes.

24     Q.    Can that backlog be addressed with more

25   shifts, correct?

1    help with medical scheduling and tracking?

2        A.    When you say increase the load --

3        Q.    I don't know, I was trying to use your term

4    and I couldn't remember what you said.  I was trying to

5    BS my way through it, Doctor.  Let me back up.

6              Can I have his answer before I went on my --

7        (Whereupon the reporter read back as requested.)

8        Q    (By Mr. Mello) Again, I apologize.  You

9    mentioned maximum load in the previous response.

10   Can you tell me what that is, your understanding of

11   what that is.

12       A.    We have the blind leading the blind here.  But

13   my understanding is that it can only handle so much

14   inputting activity simultaneously and then the

15   connections begin to break down.

16       Q.    If that issue could be addressed so that a

17   number of people could input, is it your opinion that it

18   would improve medical scheduling and tracking at CDCR?

19       A.    If people enter conscientiously, yes.

20       Q.    So if you had enough good employees to input

21   the information and a system that could take it, it

22   would be an effective tool?

23       A.    Yes.

24       Q.    In your report on page 42 you note that some

25   prisons rely on a paper-based -- rely on paper based

1    processes for medical scheduling.  I'm trying to find it

2    myself.  Do you see that?

3        A.   Yes.

4        Q.   Is it your opinion that a prisoner reduction

5    will solve the problems caused by such paper-based

6    processes?

7        A.   The reduction in patients only impacts the

8    volume of use of a system whether it's electronic or

9    paper, that's the extent of the impact.

10       Q.   So, again, the problem could be dealt with,

11   one, by either decreasing the number of inmate/patients

12   or increasing the number of staff to handle the data

13   entry and the paper documents?

14       A.   Yes.

15       Q.   Does your review of the receiver's IT

16   initiatives, do you believe it addresses inadequacies in

17   scheduling and tracking ultimately?

18       A.   Well, it's too broadly described to be able to

19   answer that question.  In theory, if they're smart,

20   they'll look at the elements in the IMSATS and then try

21   and off the shelf or de novo develop a system that will

22   handle the load but continue to provide the same sort of

23   data output that IMSATS provides.

24       Q.   On page 39 of the Plan of Action and it's

25   actually page one of something but it's page 39 on the

1    improve care provided.

2         Q.   Like for TB?

3         A.   Yes.  Mersa.

4         Q.   Valley fever?

5         A.   (Witness nods head.)

6         Q.   Okay.  Some, though not me, have described

7    CDCR as having a dysfunctional culture.

8         A.   Yes.

9         Q.   What, if any, role has that dysfunctional

10   culture played in CDCR's failures or deficiencies in

11   providing medical care?

12        A.   That's very hard for me to say.  I do know

13   that I view the structural phenomenon of weak central

14   office versus strong as probably playing a bigger role

15   than the dysfunctional culture.  Because a strong

16   central office holds wardens and others accountable and

17   that tends to influence a culture.

18        Q.   One of the most important things in terms of

19   remedying CDCR's failed medical care delivery system is

20   changing the culture, correct?

21        A.   Yes.

22        Q.   And correct me if I'm wrong, but it's your

23   opinion that you can't change the culture unless you

24   have competent clinicians, adequate space, adequate

25   facilities, peer review, death review to name just a

1    few?

2        A.    Yes.

3        Q.    Based upon your review of the documents to

4    date, your experience with CDCR and your recent

5    inspections, do you believe that it's impossible for

6    CDCR and the receiver to provide constitutionally

7    adequate medical care to 172 plus thousand inmates?

8        A.    Ever?  Is the question ever?

9        Q.    Ever.

10       A.    No, I think one could provide constitutional

11   care.  But a major facilitator would be population

12   control and reduction.

13       Q.    It's your opinion that population control and

14   reduction would facilitate the delivery of

15   constitutional healthcare?

16       A.    Yes.

17       Q.    Is it your opinion that population control and

18   reduction is the only method by which to obtain

19   constitutionally adequate healthcare in CDCR's

20   institutions?

21       A.    Well, let me go back to something I tried to

22   articulate earlier.  The receiver has or will have

23   whatever tools are needed internally to create an

24   adequate system.  But population pressures over which

25   the receiver has no control will continue to sabotage to

1    things that are happening in the free world as

2    strategies to protect patients' safety or reduce errors

3    and healthcare programs across the country are

4    implementing things to reduce errors.  And then the -- I

5    guess the judge asked, "As you understand the California

6    system, can that happen under the present system?"  And

7    my response was, California has some system errors but

8    beyond that it lacks certain clinical talent given the

9    resource/demands and reducing system errors by things

10    like avoiding certain abbreviations or even electronic

11    ordering, automated ordering, if your clinicians don't

12    have a competence to see the level of pathology that

13    they're seeing, then that part is not effective.

14         MS. HARDY:  Thank you, Dr. Shansky, I don't

15    have anything further.

16

17              EXAMINATION BY MR. MELLO

18         Q    (By Mr. Mello) A couple of quick followups

19    because I've got to get the last word in.  Is

20    clinical quality the most important component to a

21    constitutionally adequate medical care delivery

22    system?

23         A.   It's very hard to single out a most.  Because

24    if you have excellent clinicians but they don't get the

25    medical records so they don't have the information, they

1   can't use their talents.  That's why I say it's very

2   difficult to say any one thing is most.

3        Q.   And that's the same reason why it's very

4   difficult to say that overcrowding is the most or

5   biggest factor, correct?

6        A.   The difference that I have -- the way I

7   perceive it is the reason why overcrowding is the

8   primary problem is because we're in a receivership and a

9   receivership has or will have the tools necessary to

10   mitigate things internal to the system, whether they're

11   structural or personnel or whatever.  But a receiver

12   can't address the external problem of population

13   control, that's outside of the receiver's purview.  And

14   that's why I view it as the primary problem.  Because a

15   receivership has no tool in its bag to directly address

16   that.  It can only keep building or expanding or trying

17   to hire and on and on and on.  That's all it can do with

18   the tools it has.

19        Q.   But it could address increased population

20   through all of those things that you mentioned, like

21   additional hirings, temporary space, permanent space,

22   electronic medical records, increased paper staff?

23        A.   Those are the tools available to it and those

24   are the ones I would expect it would use.

25        Q.   You've reviewed a lot of documents, I mean,

```
 1            STATE OF CALIFORNIA    )    ss.

 2            I, the undersigned, a Certified Shorthand

 3    Reporter of the State of California, hereby certify that

 4    the witness in the foregoing deposition was by me duly

 5    sworn to testify to the truth, the whole truth, and

 6    nothing but the truth in the within-entitled cause; the

 7    said deposition was taken at the time and place therein

 8    stated; that the testimony of said witness was reported

 9    by me, a Certified Shorthand Reporter and a

10    disinterested person, and was thereafter transcribed

11    under my direction into typewriting; that the foregoing

12    is a full, complete and true record of said testimony;

13    and that the witness was given an opportunity to read

14    and, if necessary, correct said deposition and to

15    subscribe the same.

16            I further certify that I am not of counsel or

17    attorney for either or any of the parties in the

18    foregoing deposition and caption named, nor in any way

19    interested in the outcome of the cause named in said

20    action.

21            IN WITNESS WHEREOF, I have hereunto set my

22    hand this _____ day of _____, 20__.

23

24            _____

25            CERTIFIED SHORTHAND REPORTER

26
```