EDMUND G. BROWN JR.
Attorney General of the State of California
DAVID S. CHANEY
Chief Assistant Attorney General
ROCHELLE C. EAST - 183792
Senior Assistant Attorney General
JONATHAN L. WOLFF - 193479
Supervising Deputy Attorney General
LISA A. TILLMAN - 126424
Deputy Attorney General
KYLE A. LEWIS - 201041
Deputy Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
Telephone: (415) 703-5677
Facsimile: (415) 703-5843
lisa.tillman@doj.ca.gov
kyle.lewis@doj.ca.gov

HANSON BRIDGETT LLP
JERROLD C. SCHAEFER - 39374
PAUL B. MELLO - 179755
S. ANNE JOHNSON - 197415
SAMANTHA TAMA - 240280
RENJU P. JACOB - 242388
425 Market Street, 26th Floor
San Francisco, CA 94105
Telephone: (415) 777-3200
Facsimile: (415) 541-9366
jschaefer@hansonbridgett.com
pmello@hansonbridgett.com
stama@hansonbridgett.com
rjacob@hansonbridgett.com

Attorneys for Defendants

# UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

## AND THE NORTHERN DISTRICT OF CALIFORNIA

## UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

## PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>ARNOLD SCHWARZENEGGER, et al.,<br><br>Defendants. | No. 2:90-cv-00520 LKK JFM P<br><br>**THREE-JUDGE COURT** |
| MARCIANO PLATA, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>ARNOLD SCHWARZENEGGER, et al.,<br><br>Defendants. | No. C01-1351 TEH<br><br>**THREE-JUDGE COURT**<br><br>**DEFENDANTS' SEPARATE STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF MOTIONS FOR DISMISSAL, OR, ALTERNATIVELY, SUMMARY JUDGMENT**<br><br>**To: Three-Judge Panel** |

| No. | Undisputed Material Facts | Supporting Evidence |
|---|---|---|
| **A.** | **Plaintiffs Did Not Comply with the PLRA's Exhaustion Requirement** | |
| 1. | Before filing the *Plata* lawsuit, on April 5, 2001, none of the named class representatives—Marciano Plata (aka Marcial Plata), Gilbert Aviles, Steve Bautista, Paul Decasas, Raymond Johns, Joseph Long, Clifford Myelle, Leslie Rhoades, Raymond Stoderd, and Otis Shaw)[1]—exhausted their administrative remedies for the issues raised in this three-judge panel proceeding. Specifically, they did not exhaust whether overcrowding is the primary cause of the alleged unconstitutional medical care or request the remedy of a prisoner release order. | Pls.' Compl. (Request for Judicial Notice (RJN)-2); Pls.' Am. Compl. (RJN-3); Decl. of N. Grannis Supp. Defs.' Mot. Dismiss, Alt., Summ J. ¶¶ 8-17 & 19. |
| 2. | Before filing the motion to convene the three-judge panel, the sole remaining incarcerated *Coleman* class representative, Ralph Coleman, failed to exhaust the issue of overcrowding as the primary cause of alleged unconstitutional mental health care or a prisoner release order. | Grannis Decl. ¶¶ 18-19. |
| **B.** | **The Three-Judge Panel Lacks Jurisdiction to Consider a Prisoner Release Order.** | |
| 3. | Since the filing of these lawsuits, Plaintiffs have never sought and no court has ever ordered any relief directed at overcrowding. | *See Plata* Court Docket (CD) and *Coleman* CD (Request for Judicial Notice ("RJN")-1.) |
| 4. | The *Plata* class consists of inmates with serious medical needs. | Stipulation and Order for Injunctive Relief, approved by the *Plata* Court on June 13, 2002, 1:22-23. |
| 5. | The *Coleman* class consists of inmates with serious mental disorders. | Stipulation and Order Amending Plaintiff Class and Application of Remedy in Coleman, approved by the *Coleman* Court on July 23, 1999, 2:24-27 |

---

[1] Plaintiffs Decasas, Long, and Shaw are no longer incarcerated.

- 2 -

DEFS.' SEPARATE STMT. OF UNDISPUTED FACTS
(CASE NO. 2:90-CV-00520 LKK JFM P/ C01-1351 TEH)

1604075.3

### C. Overcrowding Is Not the Primary Cause of, Nor Remedy for, the Alleged Constitutionally Inadequate Delivery of Medical Care.

| | | |
|---|---|---|
| 6. | According to the Receiver, the overall goals of a constitutionally adequate prison medical care system are to reduce unnecessary morbidity and mortality, improve inmates' health status and functioning, coordinate care with mental health and dental, and protect public health. | Former Receiver's Plan Of Action ("POA"), Intro, p. 3 (*see* RJN-4); accord Shansky Depo., 78:24-79:13 (Exhibit A to Declaration of Paul Mello ("Mello Decl."); Current Receiver's Turnaround Plan Of Action ("TPOA") (*see* RJN-5), p. 2: "Mission: "Reduce avoidable morbidity and mortality and protect public health by providing patient-inmates timely access to safe, effective and efficient medical care, and integrate the delivery of medical care with mental health, dental and disability programs." |
| 7. | California's average annual mortality rate of State prison inmates, per 100,000 inmates, from leading causes of illness deaths between 2001 and 2004 was 170. | Medical Causes of Death in State Prisons, 2001-2004 (Exhibit B to Mello Decl. Supp. Defs.' Mot. Dismiss, Alt., Mot. Summ J.). |
| 8. | The national average for annual mortality of State prison inmates during the same period was 223 and the West's average was 181. | *Id.* |

| | | |
|---|---|---|
| 9. | According to Plaintiffs' medical expert and the Receiver, there are multiple, interrelated components of a constitutionally adequate correctional healthcare system, including (i) adequate numbers of appropriately trained and credentialed professional staff; (ii) an adequate environment within which to work including appropriate equipment and conditions which ensure an environment that is conducive to a professional assessment including privacy; (iii) a system of documenting the healthcare interactions including assessments, plans, orders, results of tests, etc.; (iv) a system of tracking to ensure continuity with regard to all elements of professionally created plans, including medications, lab, x-ray, other ancillary services, follow up visits, specialty referrals, etc.; (v) a system that allows for the movement of patients to appropriate levels of care based on the complexity of their medical problems, including both inpatient and outpatient; (vi) a system of self-monitoring in order to identify patterns of breakdowns in the system for which improvement strategies can then be implemented in order to mitigate the breakdowns; (vii) the ability to ensure access regardless of custody level or housing situation, meaning sufficient officers to both ensure access onsite and ensure access to offsite services; (viii) sufficient resources in the community either through offsite encounters or some sort of tele-medicine arrangement so that specialized care can be provided when ordered by the clinician; and (ix) a system of ensuring that credentialing is done on entry-based standards related to the type of practice the clinician is going to be engaged in and that the credentialing process mirrors what happens in the community at an HMO or a hospital in terms of the processes used. | Shansky Depo., 7:24-9:13; accord TPOA, p.4, identifying six strategic goals: 1. Ensure Timely Access to Care, 2. Improve the Medical Program, 3. Strengthen the Health Care Workforce, 4. Implement Quality Assurance and Continuous Improvement, 5. Establish Medical Support Infrastructure, and 6. Provide Health Care and Health Care-Related Facilities. |
| 10. | It is very difficult to rank these interrelated components in terms of importance and very hard to single out a most important component. | Shansky Depo., 12:17-13:7, 160:19-161:2. |

| | | |
|---|---|---|
| 11. | The *Plata* Court itself acknowledged that the problem with the delivery of constitutionally adequate medical care in California Department of Corrections and Rehabilitation (CDCR) facilities is a polycentric problem, involving an historical lack of leadership, planning, and vision by the State's highest officials during a period of exponential growth of the prison population. | Findings of Fact Conclusions of Law Re Receiver, filed October 3, 2005 ("FOF"), 38:1-18, 43:11-15 (*see* RJN-6); accord Shansky Depo., 62:2-63:24; 88:2-24. |
| 12. | According to Plaintiffs' medical expert, one of the most important factors to remedy CDCR's failed medical care delivery system is changing the culture. | Shansky Depo., 143:18-21; accord TPOA, p. 13, 15, advocating "establishing a culture of organizational quality in a health care program" and asserting that development of a continuous quality improvement program requires "a fundamental culture change" and advocating the development of "a culture of accountability." |
| 13. | Operating a constitutionally adequate medical system in California also requires, among other things, providing oversight to clinical personnel as well as overhauling dysfunctional business and financial systems. | POA, Intro, p. 8; Shansky Depo., 87:17-88:1; accord TPOA, pp. 15-24, detailing key goals of implementing quality improvement programs and establishing medical support infrastructure |
| 14. | Plaintiffs' own expert testifies that simply reducing the prison population will not by itself cure the problems with specialty medical care. | Shansky Depo., 132:6-9. |
| 15. | A prisoner reduction will only impact the volume of the use of a paper-based medical scheduling system, not solve the problems caused by such a system | *Id.* at 139:24-140:9. |
| 16. | Likewise, a reduction in the prison population would not solve the problems caused by CDCR's storage of unit health records for returning prisoners at a southern regional facility. | *Id.* at 135:17-136:12. |
| 17. | A reduction in the prisoner population will not result in an effective computer network, which is essential to providing adequate medical care. | *Id.* at 134:18-135:8. |
| 18. | A decrease in the prisoner population of up to 40,000 inmates by itself would not result in a constitutionally adequate medical care delivery system. | *Id.* at 61:14-24. |

- 5 -

DEFS.' SEPARATE STMT. OF UNDISPUTED FACTS
(CASE NO. 2:90-CV-00520 LKK JFM P/ C01-1351 TEH)

1604075.3

| # | Fact | Citation |
|---|------|----------|
| 19. | There have been improvements in the delivery of medical care since the Receiver was appointed, including responsiveness to inmate appeals, timeliness of appointments, and staffing. | *Id.* at 70:18-71:9. |
| 20. | The number of board-certified and board-eligible physicians has increased dramatically in part due to improvements by the Receiver in compensation. | *Id.* at 108:1-16. |
| 21. | An adjustment of the medical classification system is a possible solution to the staffing issues at some of the remotely located prisons, such as California State Prison, Avenal or High Desert State Prison. | *Id.* at 112:20-113:25. |
| 22. | The Receiver's November 15, 2007 Plan of Action addressed many of the important issues impacting medical care in California's prisons that are potentially within the Receiver's purview. | *Id.* at 64:13-65:1. |
| 23. | Neither the Receiver's November 15, 2007 Plan of Action, nor the Receiver's June 2, 2008 Turnaround Plan of Action, state that overcrowding would prohibit the Receiver and CDCR from developing a constitutionally adequate medical care delivery system. | POA; Shansky Depo., 65:20-24; TPOA, pp. iii and iv of enclosure letter: "[T]he Receiver's job is to establish constitutionally adequate prison medical care as quickly as practicable and in a way which will be sustainable after the Receiver winds down operations and the responsibility for prison medical care reverts to the State" and "even if some of the early actions are not as comprehensively planned or executed as would be desirable if we had the luxury of more time, these early steps will undoubtedly improve CDCR's health care system." |
| 24. | According to Plaintiff's own medical expert, it is possible for the Receiver and CDCR to ultimately provide constitutionally adequate medical care to 172,000 plus inmates. | Shansky Depo., 144:3-12. |

- 6 -

**D. Overcrowding Is Not the Primary Cause of, Nor Remedy for, the Alleged Constitutionally Inadequate Delivery of Mental Health Care.**

25. Whether the delivery of mental health care to inmates is constitutionally adequate depends upon six basic components: (1) a systematic program for screening and evaluating inmates to identify those in need of mental health care; (2) a treatment program that involves more than segregation and close supervision of mentally ill inmates; (3) employment of a sufficient number of trained mental health professionals; (4) maintenance of accurate, complete and confidential mental health treatment records; (5) administration of psychotropic medication only with appropriate supervision and periodic evaluation; and (6) a basic program to identify, treat, and supervise inmates at risk for suicide.

    *Coleman v. Wilson*, 912 F. Supp. 1282, 1298 n.10 (E.D. Cal. 1995) (RJN-7.).

26. Since 1998, the Special Master has prepared twenty reports on the status of the delivery of mental health care to California's adult inmates.

    The *Coleman* Special Master's 20 monitoring reports submitted to the *Coleman* court between April 1998 and September 2008 (RJN-8.).

27. None of the Special Master's reports has identified overcrowding as the primary cause of the alleged constitutional inadequacies.

    *Id.*

28. None of the Special Master's reports has recommended or asked for any orders on population control.

    *Id.*

29. According to Special Master Keating, clinicians cannot be spread out evenly over the Mental Health Care Services Delivery System because staffing ratios are much more intensive in inpatient setting (intermediate care, acute care, and mental health crisis beds), as opposed to outpatient care (Enhanced Outpatient Program and Correctional Clinical Case Management System).

    Special Master's Response to Court's May 17, 2007 Request for Information, filed on May 31, 2007 (RJN-9), p. 15.

30. A reduction in the overall inmate population would not enable any increase in this specialized clinical staffing and licensed beds necessary to serve the needs of the mental health caseload.

    *Id.*

31. Even a release of 100,000 inmates would still not resolve the need to provide sufficient clinical staffing and licensed mental health beds to serve this population. — *Id.*

32. Defendants have submitted a detailed plan to provide such beds and have already engaged in implementing increased pay to recruit and retain the necessary staff to enable care in those beds. — Defs.' July 08 mental health bed plan (Exh. A to L. Tillman Supp. Defs.' Mot. Dismiss, Alt., Summ J ("Tillman Decl.")); Jan. 31, 2007 Special Master's Report on Pls.' Response to the Sixteenth Report on Compliance Seeking Salary Enhancements for Department of Mental Health Clinicians (Exh. B to Tillman Decl.); June 14, 2007 Department of Mental Health Pay Parity Plan (Exh. C to Tillman Decl.).

DATED: September 15, 2008

HANSON BRIDGETT LLP

By: /s/ Paul B. Mello
PAUL B. MELLO
Attorneys for Defendants Arnold Schwarzenegger, et al.

DATED: September 15, 2008

EDMUND G. BROWN JR.
Attorney General of the State of California

By: /s/ Rochelle C. East
ROCHELLE C. EAST
Senior Assistant Attorney General
Attorneys for Defendants