# EXHIBIT A

LEXSEE 912 F. SUPP. 1298

**RALPH COLEMAN, et al., Plaintiffs, v. PETE WILSON, et al., Defendants.**

**NO. CIV. S-90-0520 LKK JFM**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF CALIFORNIA**

**912 F. Supp. 1282; 1995 U.S. Dist. LEXIS 13634**

**September 13, 1995, Decided**
**September 13, 1995, FILED**

**PRIOR HISTORY:** [**1] Adopting Magistrate's Document of June 6, 1994, Reported at: 1994 U.S. Dist. LEXIS 20786.

**COUNSEL:** For RALPH COLEMAN, plaintiff: Donald Specter, Prison Law Office, San Quentin, CA. Alison Hardy, Prison Law Office, San Quentin, CA. Linda D Kilb, Disability Rights Education and Defense Fund, Berkeley, CA. Richard L Goff, Amelia A Craig, Ingrid S Leverett, Heller Ehrman White and McAuliffe, San Francisco, CA. Adela B Karliner, Michael W Bien, Rosen Bien and Asaro, San Francisco, CA. Warren E George, Jr, Sara Weinkauf Anderson, McCutchen Doyle Brown and Enersen, San Francisco, CA. Sidney Wolinsky, Disability Rights Advocates, Oakland, CA.

For WINIFRED WILLIAMS, DAVID HEROUX, DAVID MCKAY, ROY JOSEPH, plaintiffs: Donald Specter, Prison Law Office, San Quentin, CA. Amelia A Craig, Heller Ehrman White and McAuliffe, San Francisco, CA. Michael W Bien, Rosen Bien and Asaro, San Francisco, CA. Warren E George, Jr, McCutchen Doyle Brown and Enersen, San Francisco, CA. Sidney Wolinsky, Disability Rights Advocates, Oakland, CA.

For TROY CHRISTIAN DAVEY, intervenor: Ann M Hansen, Seltzer and Cody, Oakland, CA.

For JOHN S ZIL, MD, NADIM KHOURY, MD, JAMES GOMEZ, Director of CDC, JOSEPH SANDOVAL, Secretary of Youth and Corrections, defendants: Ismael A Castro, Attorney General's Office [**2] of the State of California, Sacramento, CA.

For CALIFORNIA MEDICAL ASSOCIATION, amicus: Catherine I. Hanson, Kimberly S Davenport, California Medical Association, San Francisco, CA.

**JUDGES:** LAWRENCE K. KARLTON, CHIEF JUDGE EMERITUS, UNITED STATES DISTRICT COURT

**OPINION BY:** LAWRENCE K. KARLTON

**OPINION**

[*1293] *ORDER*

Plaintiffs, state prisoners who suffer from serious mental disorders, brought suit under 42 U.S.C. § 1983 alleging that the mental health care provided at most institutions within the California Department of Corrections is so inadequate that their rights under the Eighth and Fourteenth Amendments to the United States Constitution are violated. Plaintiffs also raised a claim under the Rehabilitation Act, 29 U.S.C. § 794. Plaintiffs seek declaratory and prospective injunctive relief.

The named defendants are Pete Wilson, Governor of the State of California, Joseph Sandoval, Secretary of the Youth and Corrections Agency of the State of California, James Gomez, Director of the California Department of Corrections, Nadim Khoury M.D., Assistant Deputy Director for Health Care Services for the California Department of Corrections, and John S. Zil, M.D., Chief of Psychiatric Services for [**3] the California Department of Corrections. All named defendants are sued in their official capacity.

The matter was referred to Chief Magistrate Judge John F. Moulds pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 302(c)(17). On October 22, 1991, Judge Moulds recommended certification as a class action pursuant to Rules 23(b)(1)(A), 23(b)(1)(B), and 23(b)(2) of the Federal Rules of Civil Procedure. On November 14, 1991, those findings and recommendations were adopted by this court, and a class was certified consisting of "all

912 F. Supp. 1282, *; 1995 U.S. Dist. LEXIS 13634, **

inmates with serious mental disorders who are now or who will in the future be confined within the California Department of Corrections (except the San Quentin State Prison, the Northern Reception Center at Vacaville and the California Medical Facility-Main at Vacaville)." (Order filed November 14, 1991, at 4-5.)

On June 6, 1994, the magistrate judge issued findings and recommendations on plaintiffs' § 1983 claims. [1] On July 25, 1994, defendants filed objections to the findings and recommendations ("Objections"). [2] On September 13, 1994, plaintiffs filed a response to defendants' objections ("Plaintiffs' Response"). Plaintiffs' response was accompanied [**4] by declarations of Michael Bien (Bien Declaration) and Donald Specter (Specter Declaration) with appended declarations. On November 7, 1994, defendants filed a closing brief ("Defendants' Closing Brief"), raising various evidentiary issues.

> 1  Plaintiffs' claims regarding treatment of mentally retarded inmates have been dismissed by separate order.
>
> 2  A corrected text of the objections was filed on August 2, 1994. Reference to defendants' objections throughout this opinion is a reference to the corrected text filed August 2, 1994.

On March 25, 1995, this court remanded the matter to the magistrate judge because he had resolved the matter on constitutional grounds without first addressing the statutory claim. See Lyng v. Northwest Indian Cemetery Protective Association, et al., 485 U.S. 439, 445, 99 L. Ed. 2d 534, 108 S. Ct. 1319 (1988). Plaintiffs then moved to dismiss the Rehabilitation Act claim and the matter was returned to this court. Defendants were given an opportunity to comment on the terms [**5] and conditions of dismissal and plaintiffs were granted an opportunity to respond. Thereafter the Rehabilitation Act claim was dismissed and this court again turned to consideration of the merits.

Having concluded that the briefing on this matter exhausts the issues and thus resolution without oral argument is appropriate, see L.R.230(h), the court now disposes of the matter. The court turns first to the evidentiary issues raised by defendants. The court then considers their objections to the magistrate [*1294] judge's proposed findings and recommendations.

I.

*EVIDENTIARY ISSUES*

Defendants move to strike all of the exhibits appended to the Specter Declaration pursuant to Fed. R. Evid. 802 on the grounds that they are hearsay. Defendants also seek to strike exhibits B, H, I, J, and K pursu-

ant to Fed. R. Evid. 404(a) arguing that these exhibits constitute inadmissible character evidence. Finally, defendants contend that all of the exhibits are more prejudicial than probative and that they should therefore be stricken pursuant to Fed. R. Evid. 403.

Exhibits A, C, D, E, G, H, I, J, and K to the Specter declaration are documents filed in this court or the United States Court of Appeals [**6] for the Ninth Circuit in *Gates v. Deukmejian,* 1988 U.S. Dist. LEXIS 9111, CIV S-87-1636 LKK JFM P (E.D.Cal.). While the court can take judicial notice of court records, *see Escobar-Ramos v. Immigration and Naturalization Service,* 927 F.2d 482, 485 n.3 (9th Cir. 1991), three factors have led to the conclusion that the documents will be disregarded in resolving plaintiffs' § 1983 claims. First, the *Gates* litigation involves conditions of confinement at California Medical Facility, an institution not included in the class in the instant action. Second, the *Gates* case is governed by the consent decree entered into by the parties to that action in December 1989. Resolution of issues in that action is thus determined with reference to the standards set forth in that decree while resolution of the instant action turns on standards applicable to claims made under the Eighth Amendment. Finally, to the extent that the evidence from *Gates* is offered to support appointment of a special master it is unnecessary; for the reasons discussed in this order, the record in this action, standing alone, supports such appointment.

Exhibit B is a letter from defendant James Gomez to Allen Breed, the court-appointed [**7] mediator in *Gates.* The letter contains statements about the instant action; it is an admission by a party to this action and thus is not hearsay. Fed. R. Evid. 801(d)(2). Nor is exclusion of the letter pursuant to Fed. R. Evid. 403 or 404(a) warranted. Defendants' motion to strike will be denied as to Exhibit B to the Specter declaration.

Exhibit F is an excerpt of a transcript of proceedings from the 1993 trial in *Madrid v. Gomez,* 889 F. Supp. 1146 (N.D. Cal.). The court can take judicial notice of this transcript. *Escobar-Ramos,* 927 F.2d at 485 n.3. Plaintiffs contend that this transcript is admissible pursuant to Fed. R. Evid. 106 to augment a portion of the transcript from *Madrid* appended to defendants' objections. Defendants' exhibit is cumulative of evidence already in the record in this action. *(See* Reporter's Transcript of Proceedings (RT) at 28:44-48.) The court has not, therefore, considered the transcript tendered by plaintiffs in connection with the *de novo* review of this record. Accordingly, defendants' motion to strike will be granted as to Exhibit F.

Exhibit L is a letter from defendants' counsel to plaintiffs' counsel concerning possible stipulations [**8] to modify the time limits set forth in the magistrate

judge's findings and recommendations. Plaintiffs have offered this letter to support their argument that defendants' objection to those time limits is premature. The letter is of such limited relevance to the issues before the court that it will not be considered.

In their reply brief, defendants also move to strike the deposition excerpts of employees of the California Department of Corrections and of defendants' experts, Drs. Koson and Dvoskin. [3] The magistrate judge permitted plaintiffs to submit deposition excerpts of CDC employees, including consultants, as admissions of party opponents. (RT at 16:189.) The excerpts were admitted [*1295] subject to other applicable evidentiary objections. (Id.) The magistrate judge allowed defendants to file objections to the tendered deposition excerpts. (Id.) He also permitted defendants the option of augmenting the deposition excerpts or calling each deponent as a live witness at trial. (Id.) Defendants now renew their objection, overruled by the magistrate judge, that plaintiffs have not made a showing required by Fed. R. Civ. P. 32 sufficient to support admission of the excerpts and that admission [**9] of the excerpts is not authorized by any of the provisions of Fed. R. Civ. P. 32.

> 3 Raising an issue for the first time in a closing brief is improper, *Von Brimer v. Whirlpool Corp.,* 536 F.2d 838, 843 (9th Cir. 1976), and a court's refusal to consider such issues is wholly justified. Because the disposition of this motion arrived at in the text will have no adverse effect on this court's ability to assess the propriety of the magistrate judge's proposed findings and recommendations, the court will consider the motion.

Defendants proceed from the assumption that the admissibility of depositions is governed in the first instance by Fed. R. Civ. P. 32. As has been observed, however, "the Federal Rules of Evidence . . . provide the general rules regarding the use at trial of depositions . . . . Rule 32 defines some circumstances in which a deposition is admissible, leaving most issues of admissibility to the Federal Rules of Evidence." 8A Wright, Miller & Marcus, *Federal Practice and Procedure: Civil 2d* [**10] § 2141, 15 157, § 2142, at 158 (1994); *see United States v. International Business Machines Corp.,* 90 F.R.D. 377, 384 (S.D.N.Y. 1981) (Fed. R. Civ. P. 32 and Fed. R. Evid. 804 "are independent bases for the admission of a deposition."). [4]

> 4 Fed. R. Civ. P. 43(a), which generally requires that unless otherwise provided, the testimony of witnesses shall be taken orally in open court, requires no different analysis. That rule is the counterpart of Fed. R. Evid. 802, the hearsay rule. Thus if a written statement is admissible under

the evidence rules, it is not excludable on the grounds that the statement could also have been presented in the form of live oral testimony. *See In re Adair,* 965 F.2d 777, 779 (9th Cir. 1992).

As a general matter, admissibility of deposition testimony is resolved under the hearsay rule. *Angelo v. Armstrong World Industries, Inc.,* 11 F.3d 957, 962 (10th Cir. 1993). The deposition excerpts at issue here were offered as admissions of party-opponents pursuant to Fed. R. [**11] Evid. 801(d)(2)(C) and (D). Those subsections provide that "[a] statement [5] is not hearsay if . . . offered against a party and [it] is . . . (C) a statement by a person authorized by the party to make a statement concerning the subject, or (D) a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship." Fed. R. Evid. 801(d)(2)(C), (D). If in fact the excerpts fall within these subsections, they are not hearsay and Fed. R. Civ. P. 32 has no application to their admissibility.

> 5 "Statement" is defined as, *inter alia,* a "written assertion." Fed. R. Evid. 801(a).

Statements made by employees of the California Department of Corrections concerning matters within the scope of their employment are admissible under Fed. R. Evid. 801(d)(2)(D). *Hoptowit v. Ray,* 682 F.2d 1237, 1262 & n.10 (9th Cir. 1982). Defendants' request to strike will be denied as to all deposition excerpts of individual employees of the [**12] CDC who were so employed at the time of their deposition.

At the time of argument before the magistrate judge on this issue, defendants claimed that one deponent, Dr. Altmansberger, had ended his employment with the Department of Corrections the day before his deposition, that two other deponents, Dr. Maloof and Mr. Rollin Rose, were working for "Paroles" rather than "directly under the defendants in this case," that Scarlett Carp was a consultant, not an employee of the Department, and that defendants' experts were employed by the Attorney General's Office and not by defendants. (RT at 16:159,161.)

Plaintiffs argued that Dr. Altmansberger's deposition was originally noticed for a date during his employment, that it had been continued by stipulation of the parties, and that they were not informed that he would be quitting his job. (RT at 16:167.) Plaintiffs further argued that Dr. Maloof and Mr. Rose were still employees of the California Department of Corrections at the time of their deposition, even though they reported to another division

Case 2:90-cv-00520-KJM-SCR    Document 3039-1    Filed 09/15/08    Page 5 of 29

912 F. Supp. 1282, *; 1995 U.S. Dist. LEXIS 13634, **

within the Department. (Id.) Plaintiffs argued that Scarlett Carp and the two experts were employed by defendants as consultants and that statements [**13] about that [*1296] consultancy were admissions. (Id. at 16:168-69.)

One of the predicates for admission of an employee's statement under Fed. R. Evid. 801(d)(2)(D) is that the employee must have been employed by the party at the time the statement being offered was made. M. Graham, *Federal Practice and Procedure: Evidence* § 6723, at 509 (Interim Edition) (1992). Dr. Altmansberger was not employed by the Department of Corrections at the time of his deposition. Accordingly, the court has not considered that deposition excerpt. [6]

> 6 If plaintiffs' version of the deposition proceedings are credited, defendants' attorneys may have engaged in a form of sandbagging violative of their general ethical duties as officers of this court. If so, a proper sanction might well be receipt of the evidence. Because the evidence is not critical to disposition of the pending matters, I will tarry no further over the issue.

Dr. Maloof and Mr. Rose were still employed by the Department at the time of their depositions. Those deposition [**14] excerpts will remain in the record.

The admissibility of the deposition excerpts of Scarlett Carp, Dr. Koson, and Dr. Dvoskin present a different issue. To the extent the material is introduced for the truth, its admissibility turns on whether these individuals were "agents" of the defendants. *See Merrick v. Farmers Ins. Group,* 892 F.2d 1434, 1440 (9th Cir. 1990) (out-of-court statements by insurance agent inadmissible against insurance company where plaintiff had failed to demonstrate whether agent was "agent" or "independent contractor"). To the extent the material bears on the state of mind and knowledge of the defendants, however, it is not subject to hearsay objections at all. Fed. R. Evid. 801(c). Moreover, the court notes that defendants offered the declarations of both Dr. Kosin and Dr. Dvoskin; to the extent the deposition testimony is offered in rebuttal of that testimony it is properly received. Fed. R. Civ. P. 32(a)(1). To avoid a prolonged examination of the facts bearing on agency, the court will restrict its use of this material to the latter functions. [7]

> 7 Defendants offered as an exhibit the Final Report prepared by Scarlett Carp and Associates, Inc. Scarlett Carp's deposition is admissible to clarify or rebut any information contained in that report.

[**15] Having disposed of these preliminary evidentiary matters, the court turns to the substantive issues at bar.

II.

*Summary of Findings and Recommendations*

Undergirding the magistrate judge's recommendations were a series of legal conclusions. First he concluded that the Eighth Amendment requires the state to provide inmates with access to adequate mental health care. (Findings and Recommendations at 14.) Second, he concluded that there are six components required for a mental health care system to meet minimum constitutional requirements. (Id.). [8] Third, he determined that an Eighth Amendment claim based on inadequate medical care in prison is comprised of both an objective and a subjective component. (Id. at 15.) The objective component focuses on the degree of seriousness of the deprivation of medical care, while the subjective component focuses on whether defendants acted with "deliberate indifference" to serious medical needs. (Id.)

> 8 Those criteria are set out in n.10, *infra.*

The magistrate [**16] judge was also required to propose factual findings. Although there are a great many specific findings, there are eight essential ones.

First, Judge Moulds found that defendants do not have an adequate mechanism for screening inmates for mental illness, either at the time of reception or during incarceration. He further found that the CDC has lacked adequate screening since at least 1987. (Id. at 31.)

Second, he found that the CDC is seriously and chronically understaffed in the area of mental health care. Indeed he found that there was no dispute in this regard. (Id. at 36.)

Third, he found that defendants have no effective method for insuring the competence of their mental health staff and, therefore, [*1297] for insuring that inmates have access to competent care. (Id. at 42.)

Fourth, he found that "there are significant delays in, and sometimes complete denial of, access to necessary medical attention, multiple problems with use and management of medication, and inappropriate use of involuntary medications." (Id.)

Fifth, he found that "the mental health status of class members is adversely impacted by inappropriate use of punitive measures without regard to the impact [**17] of such measures on their medical condition." (Id.)

Case 2:90-cv-00520-KJM-SCR    Document 3039-1    Filed 09/15/08    Page 6 of 29

Page 5

912 F. Supp. 1282, *; 1995 U.S. Dist. LEXIS 13634, **

Sixth, the magistrate judge found that the medical records system maintained by defendants is "extremely deficient." *(Id.* at 61.)

Seventh, the magistrate judge found that defendants have designed an adequate suicide prevention program and have taken many of the steps necessary to implement that program. *(Id.* at 75.) He also found, however, that the program has not yet been fully implemented at least in part because of the severe understaffing in mental health care. (Id.)

Finally, the magistrate judge found substantial evidence of defendants' deliberate indifference to the deficiencies in their system. *(Id.* at 75-76.)

Having concluded that the system for delivery of mental health care to members of the class maintained by the defendants violates the Eighth Amendment, the magistrate judge recommended a series of steps designed to redress the perceived constitutional violations. The majority of these recommendations would require defendants to develop and implement a series of forms, protocols, and plans in consultation with court-appointed experts. *(Id.* at 78-82.) Judge Moulds also recommended appointment of a special [**18] master for a period of three years to (1) consult with the court concerning the appointment of experts; (2) monitor compliance with court-ordered injunctive relief; (3) report to the court in twelve months on the adequacy of suicide prevention; and (4) perform such additional tasks as the court may deem necessary. *(Id.* at 78.)

III.

*Standard of Review of the Findings and Recommendations*

The district court reviews *de novo* those portions of the proposed findings of fact to which objections have been made. 28 U.S.C. § 636(b)(1)(C); *McDonnell Douglas Corp. v. Commodore Business Machines*, 656 F.2d 1309, 1313 (9th 1981), *cert. denied*, 455 U.S. 920, 71 L. Ed. 2d 461, 102 S. Ct. 1277 (1982). The court may, however, assume the correctness of that portion of the proposed findings of fact to which no objection has been made, and decide the matter on the applicable law. *See United States v. Remsing*, 874 F.2d 614, 617 (9th Cir. 1989) (citing *Orand v. United States*, 602 F.2d 207, 208 (9th Cir. 1979)). The magistrate judge's conclusions of law are reviewed *de novo. Barilla v. Ervin*, 886 F.2d 1514, 1518 (9th Cir. 1989) *(citing Britt v. Simi Valley Unified Sch.* [**19] *Dist.*, 708 F.2d 452, 454 (9th Cir. 1983)).

The court is not bound to adopt the magistrate judge's findings and recommendations; on the contrary, the court must exercise "sound judicial discretion" in making its own determination on the record. *United States v. Raddatz*, 447 U.S. 667, 675-76, 65 L. Ed. 2d 424, 100 S. Ct. 2406 (1980). The court may accept, reject, or modify, in whole or in part, the magistrate judge's findings and recommendations. 28 U.S.C. § 636(b)(1)(C); *Remsing*, 874 F.2d at 617.

IV.

*Substantive Standards*

The Eighth Amendment to the United States Constitution imposes on the states an obligation to provide for the basic human needs of prison inmates. *Farmer v. Brennan*, 128 L. Ed. 2d 811, 114 S. Ct. 1970, 1976 (1994). [9] While "the Constitution 'does not mandate comfortable prisons,' . . . neither does it permit inhumane ones." *Id.* (citation omitted); *see also Helling v. McKinney*, 509 U.S. 25, [*1298] 125 L. Ed. 2d 22, 113 S. Ct. 2475, 2480 (1993). The obligation to provide for the basic human needs of prisoners includes a requirement to provide access to adequate mental health care. *Doty v. County of Lassen*, 37 F.3d 540, 546 (9th Cir. 1994); *Hoptowit*, [**20] 682 F.2d at 1253. If the state fails to meet this obligation, "it transgresses the substantive limits on state action set by the Eighth Amendment." *Helling*, 113 S. Ct. at 2480.

> 9   The Eighth Amendment provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. Amend. VIII.

Where the allegations are that there has been a failure to provide adequate medical care, plaintiffs, to prove a violation of the Eighth Amendment, must demonstrate that defendants acted with "'deliberate indifference'" to their "'serious medical needs.'" *Wilson v. Seiter*, 501 U.S. 294, 297, 115 L. Ed. 2d 271, 111 S. Ct. 2321 (1991) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106, 50 L. Ed. 2d 251, 97 S. Ct. 285 (1976)); *Doty*, 37 F.2d at 546. An Eighth Amendment violation is comprised of both an objective component and a subjective component. *See Wilson*, 501 U.S. at 298. The objective component turns on whether the deprivation of a particular medical [**21] need is "sufficiently serious." *Id.; see also McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992). "The 'routine discomfort' that results from incarceration and which is 'part of the penalty that criminal offenders pay for their offenses against society' does not constitute a 'serious medical need.'" *Doty*, 37 F.3d at 546 (quoting *McGuckin*, 974 F.2d at 1059). Rather, a medical need is said to be "serious" for Eighth Amendment purposes, "if the failure to treat a prisoner's condition could result in further sig-

Case 2:90-cv-00520-KJM-SCR     Document 3039-1     Filed 09/15/08     Page 7 of 29

Page 8

912 F. Supp. 1282, *; 1995 U.S. Dist. LEXIS 13634, **

nificant injury or the 'unnecessary and wanton infliction of pain.'" *McGuckin,* 974 F.2d at 1059 (citation omitted).

> The existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain are examples of indications that a prisoner has a 'serious' need for medical treatment.

*Id.* at 1059-60 (citations omitted).

The objective component of deliberate indifference is treated as a mixed question of law and fact in this circuit. *Doty,* 37 F.3d at 546. [**22] The etiology, symptoms, and diagnosis of medical conditions present questions of fact; whether a medical condition is a "serious medical need" for purposes of the Eighth Amendment is a legal conclusion to be drawn from established facts. *Id.*

In the context of this lawsuit, the objective component turns on whether the mental health care delivery system operated by defendants is so deficient that it deprives seriously mentally ill inmates of access to adequate mental health care. To analyze that question, the courts have focused on the presence or absence of six basic, essentially common sense, components of a minimally adequate prison mental health care delivery system. *Balla v. Idaho State Board of Corrections,* 595 F. Supp. 1558, 1577 (D. Idaho 1984) (citing *Ruiz v. Estelle,* 503 F. Supp. 1265, 1339 (S.D.Tex. 1980)). As explained in detail below, the magistrate judge correctly identified those components and made appropriate findings concerning them. [10] (Findings and Recommendations at 14.)

> 10   The six components are: (1) a systematic program for screening and evaluating inmates to identify those in need of mental health care; (2) a treatment program that involves more than segregation and close supervision of mentally ill inmates; (3) employment of a sufficient number of trained mental health professionals; (4) maintenance of accurate, complete and confidential mental health treatment records; (5) administration of psychotropic medication only with appropriate supervision and periodic evaluation; and (6) a basic program to identify, treat, and supervise inmates at risk for suicide. *Balla v. Idaho State Board of Corrections,* 595 F. Supp. 1558, 1577 (D. Idaho 1984).

[**23]

Under present doctrine, even when inmates with serious mental illnesses are deprived of access to adequate mental health care, an Eighth Amendment violation is not shown unless defendants have acted with "deliberate indifference" to their need for such care. *See Wilson,* 501 U.S. at 303. "[A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of [*1299] confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 114 S. Ct. at 1979. [11] As the Supreme Court recently explained, however, where the evidence before the district court proves the objective component of an Eighth Amendment violation, "the defendants could not plausibly persist in claiming lack of awareness, any more than prison officials who state during litigation that they will not take reasonable measures to abate an intolerable risk of which they are aware could claim to be subjectively blameless for purposes of the Eight Amendment . . . ." *Id.* at [**24] 1984 n.9.

> 11   The requirement of a subjective component is said to derive from the inherent meaning of the word "punishment," as connoting intentional conduct. *See Wilson v. Seiter,* 501 U.S. 294, 300, 115 L. Ed. 2d 271, 111 S. Ct. 2321 (1991) (quoting *Duckworth v. Franzen,* 780 F.2d 645, 652 (7th Cir. 1985) *cert. denied,* 479 U.S. 816, 93 L. Ed. 2d 28, 107 S. Ct. 71 (1986)). The assertion, while expressed by Judge Posner with great firmness, is, at best, dubious. *See* Webster's Third New International Dictionary, at 1843 ("punishment . . . 3. severe, rough or disastrous treatment"). Moreover, even if the assertion had better linguistic support, it would not mandate the reductive examination of each occurrence for proof of the perpetrator's mental state required under the cases. The precondition for an Eighth Amendment claim is a formal judgment that imprisonment is an appropriate punishment. Thus everything that happens to a post-conviction prisoner is the result of an intentional effort to punish, and the only question which remains is whether the punishment actually experienced is cruel and unusual within the meaning the Eighth Amendment. Having noted my disagreement with both the principle and its rationale, it goes without saying that this court is bound by those cases and thus must apply those determinations, however much I think them in error.

[**25] V.

Case 2:90-cv-00520-KJM-SCR    Document 3039-1    Filed 09/15/08    Page 8 of 29
Page 7

912 F. Supp. 1282, *; 1995 U.S. Dist. LEXIS 13634, **

*Defendants' Objections*

A. *Preliminary Observations:*

The law provides for commitment to prison as punishment for the commission of serious crimes. Hence prisons are "places of involuntary confinement of persons who have demonstrated a proclivity for antisocial criminal, and often violent, behavior." *Hudson v. Palmer,* 468 U.S. 517, 526, 82 L. Ed. 2d 393, 104 S. Ct. 3194 (1984). Administration of such institutions is no easy task. Moreover, in California that task has been complicated by the fact that prisons have also become the repository of an enormous number of the state's mentally ill. Thus in the matter at bar one of defendants' experts estimated that on any given day there are probably between 13,000 and 18,000 inmates in California's prisons in need of treatment because they suffer from serious mental disorders. *(See* Declaration of Joel A. Dvoskin (Dvoskin Declaration) at 6; Attachment to Letter from Karl S. Mayer, filed May 25, 1994.) As I noted above, under the Eighth Amendment such prisoners are entitled to adequate medical care. It is of course fundamental that neither the dimension of the task, nor its difficulty, excuses compliance with a constitutional [**26] mandate.

After a trial the magistrate judge found that the delivery of necessary care to the mentally ill inmates who comprise the plaintiff class was so deficient that it constituted a substantial violation of the federal Constitution. Defendants have interposed numerous objections to the magistrate judge's findings and recommendations. Their objections to Judge Moulds' findings and recommendations can be grouped into two categories. First, defendants contend that there are five "fundamental deficiencies" which pervade the findings and recommendations, herein characterized as "fundamental" objections. Second, defendants raise specific objections to the legal standard used by the magistrate judge to analyze defendants' state of mind and to several factual determinations that he made in the Findings and Recommendations. These are referred to as "specific" objections. [12]

[12] In their objections, defendants raise for the first time a contention that class members confined at California Men's Colony (CMC) are bound by *Dohner v. McCarthy,* 635 F. Supp. 408 (C.D.Cal. 1985), and the findings therein. Dohner was tried in 1985 and challenged various conditions of confinement; the class certified was "comprised of all inmates confined at CMC-East." *Id.* at 411.

Individuals who are not members of a class are not bound by the judgment in a class action. 18 Wright, Miller & Cooper, *Federal Practice*

*and Procedure: Jurisdiction* § 4455, at 473 (1981). The *Dohner* class did not include by its terms inmates who would in the future be housed at CMC-East, and there is no evidence that any inmates in the plaintiff class in this action were housed at CMC-East in 1985. Accordingly, there is no basis for concluding that members of the instant class are bound by the judgment in *Dohner.*

[**27] [*1300] B. *Fundamental Objections*

1. *Definition of Serious Mental Disorder*

Defendants object that the magistrate judge did not include a definition of "serious mental disorder" in the findings and recommendations. They suggest the absence of such a definition has two results, one evidentiary, the other substantive. As to the evidentiary issue they argue that without a more specific definition of "serious mental disorder," the connection between what a defendant knew and the defendant's response to that knowledge is "clouded." Defendants also contend that the absence of a specific definition of "serious mental disorder" precludes this court or anyone charged with implementing relief from determining who is a member of the class, and thus its extent or the requisites for relief. (Objections at 76.) [13]

[13] The defendants raised the same objection in connection with class certification. See Defendants' Opposition to Plaintiffs' Motion for Class Certification, filed August 15, 1991 (Opposition), at 15-17; *see also* Transcript of Proceedings on Plaintiffs' Motion for Class Certification, August 29, 1991, at, e.g., 2-4.). Defendants did not reraise those arguments in their objections to the magistrate judge's findings and recommendations on class certification filed with this court. *(See* Objection to Magistrate Judge's Findings and Recommendations for Class Certification, and Request for Reconsideration by the Magistrate Judge or the Court, filed October 31, 1991.) Since that time defendants have not seriously pressed the issue, tendering only one sentence in their trial brief regarding the absence of an elaborate definition of serious mental disorder. *(See* Defendants' Trial Brief filed February 22, 1993, at 2.)

Defendants' failure to object to the proposed class definition at the time of class certification arguably would, standing alone, suffice to support this court's conclusion that the objection is without merit. *See Gluth v. Kangas,* 951 F.2d 1504, 1509 (9th Cir. 1991) (failure to object to class certification order and failure to provide trial court with amended or alternative findings sufficient to support denial of appeal from class certification order).

912 F. Supp. 1282, *; 1995 U.S. Dist. LEXIS 13634, **

[**28] The record in this action demonstrates that this objection is simply disingenuous. The class certified in this case, far from representing some amorphous enigma to defendants, describes a group of inmates who have been studied by the CDC for over eight years. Two of the major studies offered as evidence in this action, the Stirling Report and the Scarlett Carp Report, were based on data concerning the prevalence of inmates suffering from "serious mental disorders." *(See e.g.,* Plaintiffs' Exhibit 1 at ii-3, ii-7; Defendants' Exhibit D1338 at i.) [14] These reports both concern themselves with the prevalence of, and the provision of mental health care services to, inmates who suffer from such disorders. [15]

14   These studies also used the term "severe" mental disorder. (See, *e.g.,* Plaintiff's Exhibit 1 at ii-7; Defendants' Exhibit D1338 at i.) The Stirling Report arose out of legislation which included a definition of "severe mental disorder." (Plaintiff's Exhibit 1 at ii-7.) It appears that the words "severe" and "serious" were used interchangeably. In any event, it is apparent that the phrase "serious mental disorder" is sufficiently specific to have concrete meaning in the contexts of both of these studies as well as among clinicians and officials in the CDC.

[**29]

15   The Stirling Report notes that "the disorders providing the clearest operational indication of SMD according to the definition [in Penal Code § 2960] were taken to be Organic Brain Syndrome - Severe, Schizophrenia, Major Depression and the Bipolar Disorders. It is recognized that some offenders with nonpsychotic disorders may well be sufficiently impaired to meet the [relevant] criteria. The SMD operationalization is, therefore, a conservative criterion . . . ." (Plaintiffs' Exhibit 1 at ii-7.)

Moreover, witnesses at trial had no trouble addressing the term. Thus, John O'Shaughnessy, Chief of Mental Health for the California Department of Corrections, testified that there is a clinical definition for the "seriously mentally disordered." (RT at 19:21.) In addition, one of defendants' experts, Dr. Koson, offered an opinion concerning the definition of serious mental disorder. (Declaration of Dennis F. Koson, M.D. (Koson Declaration) [*1301] at 3.) [16] Defendants' other expert, Dr. Joel Dvoskin, discussed treatment for inmates suffering from "serious mental disorders" without any apparent need [**30] for further definition (Dvoskin Declaration, *passim),* and testified that "the level of need in the California Department of Corrections for treatment of serious mental disorder on any given day would be approximately 11 to 15 percent of the population." (Dvoskin Declaration at 6.)

16   Dr. Koson opined that "a person in state prison would have a serious mental disorder such as to require that he be given access to the continuum of mental health care services if currently or within the last three years, he or she has had a significant disorder of thought or mood which substantially impairs or substantially impaired reality testing, judgment, or behavior. A person would also suffer from a serious mental disorder if she or he currently does not have the ability to meet the functional requirements of prison life without psychiatric intervention, including psychotropic medication." *(Id.* at 3-4.)

Defendants' contention also fails because it ignores the relevant law. As noted above, Eighth Amendment jurisprudence [**31] addresses medical needs in both the physical and mental contexts, *see McGuckin,* 974 F.2d at 1059 and *Doty,* 37 F.3d at 546, and thus provides a legal gloss to the term. It is, of course, true that the legal conclusion that a medical condition constitutes a serious medical need is intertwined with a factual determination inherently dependent on clinical findings. That hardly renders the concept uncertain, although it does suggest the means of resolution of questions in a specific context.

The court concludes that the phrase "serious mental disorder" has a readily available definition in a medical context, in a legal context, and, as a result of at least two major studies conducted by or for the CDC, in a penological context. Accordingly, the court finds that defendants' objection that the term "serious mental disorder" lacks sufficient meaning to enable them to ascertain what the problem is, or to do what the Constitution requires of them, is without merit.

2. *Specification of Applicable Constitutional Minima*

Defendants' second "fundamental" objection is that the magistrate judge failed to specify the minimum for each, or any, of the elements of a constitutionally adequate [**32] mental health care delivery system. Defendants do not object to the elements of a constitutionally adequate delivery system as described by the magistrate judge, see n.10 *supra.* Instead, defendants object to the magistrate judge's failure to quantify the specific level of services that the CDC must provide in order to satisfy the requirements of the federal Constitution. Defendants' argument, to the extent it reflects a serious legal position, as contrasted with mere obstructionism, does not convince.

The Constitution requires defendants to provide inmates in their custody with access to adequate mental health care. *Doty,* 37 F.3d at 546; *Hoptowit,* 682 F.2d at

1253. The basic components of a constitutionally adequate system have been described by the courts. *See e.g., Balla,* 595 F. Supp. at 1577 (quoting *Ruiz,* 503 F. Supp. at 1339). The Constitution does not, however, prescribe the precise mechanisms for satisfying its mandate to provide access to adequate mental health care. Moreover, in cases challenging conditions of prison confinement, courts must strike a careful balance between identification of constitutional deficiencies and deference to the exercise of [**33] the wide discretion enjoyed by prison administrators in the discharge of their duties. *See Toussaint v. McCarthy,* 801 F.2d 1080, 1086-87 (9th Cir. 1986) *cert. denied,* 481 U.S. 1069, 95 L. Ed. 2d 871, 107 S. Ct. 2462 (1987). [17] The need to strike that balance, common sense, and the clinical nature of the problem, all suggest that standards to insure compliance with the Eighth Amendment can only be developed contextually.

> [17]   As Chief Judge Henderson recently observed, federal judges are not prison administrators nor does the Eighth Amendment provide a general power to reform state prisons. On the other hand the protection of the rights guaranteed by the federal constitution is the special responsibility of the federal judiciary. *See Madrid v. Gomez,* 889 F. Supp. 1146, 1279 (N.D.Cal. 1995). It is within the parameters of both those truths that this, or any court resolving an Eighth Amendment case, must act.

[*1302]   The magistrate judge relied on the six elements described in *Balla,* 595 F. Supp. at 1577, [**34] as the basic framework for a constitutionally adequate mental health care system. (Findings and Recommendations at 14, 29.) He found deficiencies of a constitutional magnitude in most of the necessary areas. [18] He did not, however, specify the exact mechanisms for screening inmates, or the number of staff that must be hired, or the specific level of competence that must be possessed by staff, or the precise methods of medication management to be used, or the manner of maintaining medical records. Indeed, it would have been error to do so. *See Hoptowit,* 682 F.2d at 1253-54. Rather, properly allowing for deference to the penological expertise of defendants, while recognizing the essentially medical nature of the problem, the magistrate judge essentially proposed leaving the matter to the creation of protocols, standards, procedures and forms to be developed by defendants in consultation with court appointed medical experts. For the reasons explained above that resolution appears wholly appropriate. Defendants' second objection is without merit.

> [18]   Judge Moulds did not specifically find a deficiency in the second area, i.e., the requirement

of a treatment program involving more than segregation and close supervision.

[**35]   3. *Individual Consideration of Deliberate Indifference*

Defendants contend that the magistrate judge failed to consider whether there was evidence that each defendant had acted with deliberate indifference to the serious medical needs of class members. The contention that the magistrate judge failed to consider the liability of each defendant individually is not supported by the record. While Judge Moulds did not make individual findings as to each defendant, he found that the defendants have acted with deliberate indifference. Defendants' contentions that the record does not support a finding of deliberate indifference as to each, or any defendant, is discussed *infra.*

4. *Reliance on Expert Opinion*[19]

> [19]   As used in this opinion, "expert testimony" refers to the testimony of those individuals identified as expert witnesses in the Findings and Recommendations at pages 5-12 and the appendix thereto.

Defendants' fourth "fundamental" objection pertains to expert testimony. [20] It takes essentially [**36] two forms. One addresses the weight accorded the evidence, and the other focuses on the legal use made by the magistrate judge of that evidence. [21]

> [20]   Defendants raise specific objections to the use of several of the experts' declarations. Most of these repeat one or more of the objections described in the text and are rejected for the reasons set forth in the general discussion. Defendants' objection to reliance on the declaration of Dr. V. Meenakshi stems from her litigation with the department and an asserted lack of objectivity demonstrated in her declaration. (Objections at 79.) Of course all facts bearing on potential bias should be weighed by the trier of fact. Having done so, it is not at all "plain" to this court that Dr. Meenakshi "intended" to describe "only the very worst instances of mental health care."
> [21]   In their closing brief, defendants qualify their various objections. There, they contend that "the findings go too far when they give expert testimony conclusive weight without considering whether the testimony is supported by independent evidence in the record." (Defendants' Reply on Objections to Findings and Recommendations, filed November 7, 1994, at 25.) Defendants' assumption that the magistrate judge failed to con-

sider the evidence of record is simply unsupported.

Defendants also contend that "the findings go too far when they credit experts' opinions on the quality of care in individual cases without any clinical evaluation or other reliable diagnostic information." (Id.) Defendants do not, however, identify any instance in which this type of opinion was purportedly offered or relied on.

Finally, they contend that "the findings go too far when they accept experts' descriptions of the factual material that forms the bases for their opinions as proof that the underlying facts exist." (Id.) This objection is addressed in the text.

[**37] The evidentiary objections raise issues concerning the propriety of reliance on expert testimony in general, the reliability of the testimony in this case because of the sources of information used by the expert witnesses, and the propriety of the expert testimony addressing the prevalence of illness. The court turns to these issues seriatim.

Defendants contend that the expert declarations "are entitled to little weight in [*1303] determining whether a particular condition constitutes cruel and unusual punishment." (Objections at 82.) They appear to premise this argument on the lack of personal examination of inmates, (id. at 84), and suggest the declarations are unreliable insofar as they are based on medical files "preselected" by plaintiffs' counsel. On this basis defendants contend the declarations are not evidence of inmate suffering or of the prevalence of mental illness in the CDC. (Objections at 79.)

Defendants' contentions concerning the use of expert opinion will not lie. The law contemplates expert testimony in the form of opinion when "specialized knowledge will assist the trier of fact . . . ," See Fed. R. Evid. 702; see also Daubert v. Merrell Dow Pharmaceuticals, [**38] 509 U.S. 579, 125 L. Ed. 2d 469, 113 S. Ct. 2786, 2795 (1993) (assistance to trier is "a condition [going] primarily to relevance"); Jordan v. Gardner, 986 F.2d 1521, 1526 (9th Cir. 1993) (en banc) (expert opinion is competent evidence of harm likely to accrue to inmates as a result of particular conditions of confinement).

Defendants' deprecation of the sources relied on to formulate the opinion testimony offered in this case fares no better. Fed. R. Evid. 703 provides experts with "wide latitude to offer opinions, including those that are not based on first hand knowledge or observation." Daubert, 113 S. Ct. at 2796; see also Cabrales v. County of Los Angeles, 864 F.2d 1454, 1460 (9th Cir. 1988), vacated, 490 U.S. 1087 (1989), original decision reinstated, 886

F.2d 235 (9th Cir. 1989) cert. denied, 494 U.S. 1091 (1990). For the same reason their attack upon the files selected is without merit. [22] Daubert, 113 S. Ct. at 2796 (latitude permitted experts in reliance on nonadmissible sources is premised on the "assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline.") [23]

22    Plaintiffs argue that since this case is about adequacy of mental health care for mentally ill inmates, random selection of files from the general population would have been "nonsensical." Second, they contend that, at least for purposes of prison tours, plaintiffs' experts and defendants' experts used the same methods and worked in teams. (Plaintiffs' Response at 26-27.)

[**39]

23    Even if defendants' argument were better supported as a matter of the rules of evidence, they have pointed to nothing which suggests that a different but nonetheless sensible methodology for selecting files to review would have materially altered the evidence before this court.

The clinical testimony of plaintiffs' experts is precisely the type of testimony contemplated by the Federal Rules of Evidence: testimony offered by three psychiatrists and one clinical psychologist concerning the condition of mentally ill inmates based on statements by inmates, review of medical records, personal observation, and interviews with custodial and clinical staff. See Fed. R. Evid. 703 (advisory committee's notes). This evidence, together with the testimony of inmate witnesses called at trial, plainly demonstrates the suffering of mentally ill inmates incarcerated in the California Department of Corrections.

Defendants also attack the sufficiency of the testimony concerning the prevalence of severe mental illness within the inmate population. Expert testimony concerning this issue was offered by [**40] way of oral testimony, expert declaration (including the declaration of defendants' expert, Dr. Dvoskin), and documentary evidence. Defendants' only specific objection concerning reliance on expert testimony for prevalence data centers on the use of Dr. Grassian's declaration. (Objections at 80.) [24]

24    Defendants' objections to the magistrate judge's reliance on the Stirling Report and the Scarlett Carp report, both of which contained prevalence data, are of a different character and will be discussed infra.

Dr. Grassian averred that "estimates of the number of mentally ill inmates at Pelican Bay vary" and that he did not know the precise number of mentally ill inmates

Case 2:90-cv-00520-KJM-SCR    Document 3039-1    Filed 09/15/08    Page 12 of 29

912 F. Supp. 1282, *; 1995 U.S. Dist. LEXIS 13634, **

at that institution. (Id.; Declaration of Stuart Grassian, filed February 25, 1993, at 45 RT at 5-193.) Defendants do not dispute that there were mentally ill inmates housed at [*1304] Pelican Bay. The objection to the use of Dr. Grassian's declaration is without merit. [25]

> 25 Defendants also raise a vague objection that reliance on Dr. Grassian's declaration is erroneous because the parties stipulated at trial that references to depositions or documents in that declaration were for foundational purposes only, not for the truth of the matters contained in those depositions or documents. *(See* RT at 5:201-203.) Plaintiffs' counsel, however, also explained that those depositions or documents would be offered into evidence separately. (RT at 5:202.) Defendants do not point to any place in the findings and recommendations where the magistrate judge relied on Dr. Grassian's testimony in a manner inconsistent with this stipulation and representation.

[**41] The objection to the magistrate judge's use of the expert testimony appears to be of two types: first defendants contend that he used that testimony first to establish constitutional minima and second, as proof of deliberate indifference. The court examines each of these contentions in turn.

Defendants argue that Judge Moulds improperly relied on expert testimony to establish constitutional minima. [26] *See Rhodes v. Chapman,* 452 U.S. 337, 348 n.13, 69 L. Ed. 2d 59, 101 S. Ct. 2392 (1981) (expert opinions as to desirable prison conditions while potentially helpful and relevant, are insufficient to establish constitutional minima). The argument is inapposite.

> 26 This objection is not without irony given defendants' vigorous contentions that the findings and recommendations are defective for failing to establish constitutional minima.

The constitutional standards that apply to this case are well established, *see* § IV *supra.* The task before this court is to determine from the evidence whether defendants [**42] have violated these constitutional requirements. In his findings and recommendations the magistrate judge articulated the appropriate standards; there is nothing to support the contention that he used expert testimony to establish constitutional norms. [27]

> 27 The magistrate judge did take note of the congruence between the expert testimony before the court concerning the elements necessary to an adequate mental health care delivery system in prison and the components of a minimally adequate system described in *Balla.* (Findings and

Recommendations at 29.) That happy coincidence hardly undermines the mode of analysis adopted in the findings and recommendations.

Defendants also argue that "the Findings and Recommendations are replete with examples of use by the magistrate judge of opinions of experts to conclude that 'defendants' must be 'deliberately indifferent' because 'they' have not similarly embraced the opinions without question." (Objections at 8.) The attack is without justification. The magistrate [**43] judge did not conclude that defendants are deliberately indifferent simply because they have failed to embrace expert opinion, nor because they failed to adopt the recommendations of any of the major studies undertaken to assess the state of the delivery of mental health services within the CDC.

The court discusses in detail below the issue of deliberate indifference and the relationship between the evidence adduced at trial and the applicable standard for determining deliberate indifference. *See* § V(D). It suffices here to note that Judge Moulds concluded that defendants have known for years of the gross deficiencies in the provision of mental health care to inmates incarcerated in the CDC, and that they have failed to take reasonable steps to avert the obvious risk of harm to mentally ill inmates that flows from the failure to remedy those deficiencies. The evidence fully supports those conclusions.

### 5. *Standards for Compliance With Recommendations*

Defendants' last "fundamental" objection is to the purported absence of any standards in the findings and recommendations to guide defendants and court-appointed experts in the formulation of the remedial plans recommended by [**44] the magistrate judge. This objection is again without merit.

Having concluded that the delivery of health care to those suffering serious mental illness is constitutionally deficient, Judge Moulds recommended development of remedial plans to address that constitutional failure. Requiring development of remedial plans is the method most often employed by district courts faced with systemic constitutional deficiencies because it is an efficacious way to both "cure[] . . . constitutional deficiencies [*1305] and minimize[] intrusion into prison management." *Madrid v. Gomez,* 889 F. Supp. 1146, 1280 (N.D. Cal. 1995). That process seems to this court to represent both a sensible and legally appropriate way of proceeding if the findings are otherwise upheld.

### C. *Specific Objections*

Defendants have raised numerous objections to specific factual findings by the magistrate judge. The court has reviewed *de novo* all of the findings to which objec-

Case 2:90-cv-00520-KJM-SCR     Document 3039-1     Filed 09/15/08     Page 13 of 29

Page 12

912 F. Supp. 1282, *; 1995 U.S. Dist. LEXIS 13634, **

tions have been raised and now disposes of those objections. [28]

> 28  The court feels obliged to consider in detail each of the specific objections raised by the defendants. Such consideration, however, has a tendency to obscure the issues actually tendered by this litigation. What is at stake is the Magistrate Judge's ultimate conclusion of systemic deficiency in the delivery of medical treatment to members of the class. Focusing on the trees presents the danger of forgetting that what is being examined is the condition of the forest.

[**45] 1. Screening

The magistrate judge found that "in order to provide necessary mental health care to prisoners with serious mental disorders, there must be a system in place to identify those individuals, both at the time they are admitted to the Department of Corrections and during their incarceration." (Findings and Recommendations at 31.) He further found that "the CDC lacks an adequate mechanism for screening for mental illness, either at the time of reception or during incarceration, and has lacked adequate screening since at least 1987." (Id.) Judge Moulds concluded that "only those inmates who self-report or present with medical records demonstrating a prior psychiatric history, those who exhibit bizarre behavior, or those who ask to be seen by a psychiatrist will be identified as needing psychiatric care." (Id. at 35.)

Defendants object to the factual finding that the CDC does not have adequate procedures for screening for mental illness. (Objections at 33.) Defendants also object to the legal conclusion that the Constitution requires defendants to do more to screen for mental illness than they presently do. (Objections at 87.) Those objections must be rejected.

[**46]  The evidence cited by defendants depicts precisely the type of screening described by the magistrate judge. It is screening based on self-reporting, use of records of prior hospitalization and/or past or current use of psychotropic medications, exhibition of bizarre behavior, and requests for care. (See e.g., RT at 18:38; RT at 19:8-9; RT at 19:10-11; RT at 19:13; RT at 19:14-15.) Certainly each of those means of identifying ill inmates is appropriate. The question, however, is whether the Eighth Amendment requires more.

Under the Eighth Amendment the defendants are required to maintain a system in which inmates are able to make their need for mental health care known to staff competent to provide such care before inmates suffer unnecessary and wanton infliction of pain. Hoptowit, 682 F.2d at 1253. The evidence demonstrates that some in-

mates with serious mental disorders are, by virtue of their condition, incapable of making their needs for mental health care known to staff. (Declaration of Craig Haney, Ph.D., filed February 25, 1993 (Haney Declaration), at 18; RT at 1:115-16; RT at 3:8; RT at 10:101.) See also Madrid, 889 F. Supp. at 1217; Casey v. Lewis, 834 F. Supp. 1477, 1550 [**47] (D.Ariz. 1993). Delivery of adequate mental health care to such inmates requires their identification. For that reason it has been held that correctional systems are required by the Constitution to put in place a "systematic program for screening and evaluating inmates in order to identify those who require mental health treatment." Balla, 595 F. Supp. at 1577.

Defendants do not have a systematic program for screening and evaluating inmates for mental illness. (Defendants' Exhibit D1338 at 34 ("Screening and follow-up evaluations are not formalized and staffing for these functions is inconsistent among reception centers, . . . ."); Plaintiffs' Exhibit 440 at 4 ("There is a lack of comprehensive, standardized screening for mental illness and suicidality" in the CDC)). The mechanisms on which they rely are either used haphazardly, [*1306] or depend for efficacy on incomplete or non-existent medical records, self-reporting, or the observations of custodial staff inadequately trained in the signs and symptoms of mental illness. The evidence before the court plainly shows that thousands of inmates suffering from mental illness are either undetected, untreated, or both. [**48] (See e.g., Plaintiffs' Exhibit 1 at ii-9, ii-10; RT at 19:141 (testimony of John O'Shaughnessy); RT at 39:74-75 (testimony of James Gomez).) [29] The federal Constitution does not tolerate such a lack of medical care.

> 29  Defendants contend that the magistrate judge's reliance on the Stirling Report's finding that there were thousands of undetected inmates suffering from serious mental disorders within the CDC is based on a "gross misunderstanding" of the terminology used in the Stirling Report. (Objections at 93.) It is defendants, however, who misread the terminology of the Stirling Report.
>
> The Stirling Report was a study of, inter alia, the prevalence of serious mental disorders among inmates in the California Department of Corrections. The consultants divided inmates into two categories: the "'unidentified' general population group," defined as "those offenders who had not been assigned psychiatric categories in the CDC inmate classification system" and the "identified" group, "drawn from the approximately 2,966 prisoners (in July 1987) who currently had specific psychiatric classifications and/or were located in specific psychiatric facilities used by

Case 2:90-cv-00520-KJM-SCR    Document 3039-1    Filed 09/15/08    Page 14 of 29
Page 13

912 F. Supp. 1282, *; 1995 U.S. Dist. LEXIS 13634, **

CDC." (Plaintiffs' Exhibit 1 at ii-3.) (Emphasis in original.) *See also* RT at 11:43-47 (Testimony of Dr. Thomas Greenfield). The consultants specifically noted that "some of the 'Unidentified' sample had in fact received mental health treatment while incarcerated without their classification yet having been updated." Plaintiffs' Exhibit 1 at ii-3. The consultants found that "[a] large number of *unidentified* individuals in the general population, were they to be screened, would be diagnosable with the same serious disorders and exhibit related symptoms. Given the size of the unidentified population (over 57,000 at the time of the survey), even the small base-rate of 7% for the four serious disorders amounts to over 4,000 *undetected* SMD individuals." *(Id.* at ii-9.) (Emphasis in original.)

[**49] 2. *Staffing*

a. *Sufficiency of Staff*

In order to provide inmates with access to constitutionally adequate mental health care, defendants must employ mental health staff in "sufficient numbers to identify and treat in an individualized manner those treatable inmates suffering from serious mental disorders." *Balla,* 595 F. Supp. at 1577; *see also Madrid,* 889 F. Supp. at 1257 (citing cases).

The magistrate judge found that the California Department of Corrections is seriously and chronically understaffed in the area of mental health care. (Findings and Recommendations at 36.) A workload study undertaken by defendants almost a decade ago found that the need for psychiatric services far exceeded the available staffing resources, *(Id.* at 37), and the Stirling Report and the Scarlett Carp Report confirmed this finding. [30] (Id.)

> 30 The magistrate judge noted that the Scarlett Carp consultants determined that 732 mental health staff positions would be necessary to adequately staff mental health care for an inmate population of 119,000, that the budget for fiscal year 1992/93 contained only 376.6 authorized mental health care positions to serve a population of 113,000 inmates, and that the CDC had a twenty-five percent vacancy rate in authorized mental health care positions for fiscal year 1991/92 with no evidence that the vacancy rate had changed significantly at the time of trial. (Findings and Recommendations at 37.)

[**50] Defendants' objections to these findings consist of arguments that (1) they do have staff who provide inmates with mental health care services; (2) the magistrate judge failed to specify what level of staffing is required by the Constitution, [31]; and (3) the Scarlett Carp consultants "designed their plan to be well above constitutional minima." [32] (Objections at 94.)

> 31 This objection is rejected for the reasons set forth in section V(B)(2), *supra.*
> 32 Defendants also contend that they have not been deliberately indifferent to the staffing shortages. The question of deliberate indifference will be addressed in detail *infra.*

Defendants' first objection is inapposite. The fact that defendants have some staff providing mental health services is not evidence that they have sufficient staff.

Defendants' third objection is based on the declarations of defendants' experts, Dr. Dvoskin and Dr. Koson. *(See* Dvoskin Declaration at 6, Koson Declaration at 18.) As the court now explains, that criticism [**51] is unjustified. Moreover, as the court also explains, [*1307] the Scarlett Carp report hardly stands alone.

The Scarlett Carp study did find the system was substantially understaffed. (Defendants' Exhibit D1338 at 34.) The Scarlett Carp delivery system and staffing recommendations were based on a goal of providing care based on a community model described as providing mentally ill persons with "reasonable access to necessary care," (Defendants' Exhibit D1338 at 41), considering, however, "a reasonable assessment of what is feasible ...to meet constitutional obligations and the mental health needs of the inmate population, given budget constraints and public policy." (Id.) Elsewhere in the report, "reasonable access" is defined as "timely, responsible, and adequate care provided by qualified (and appropriately licensed) staff." (Defendants' Exhibit D1338 at xi.) These standards are not materially different from the constitutional requirement of ready access to competent medical staff. *Hoptowit,* 682 F.2d at 1253 ("The Eighth Amendment requires that prison officials provide a system of ready access to adequate medical care.").

The goals of the Scarlett Carp study and the design criteria [**52] incorporated to achieve those goals closely track the mandates of the federal Constitution. For that reason the assessment of staffing needs contained in the Scarlett Carp final report is significant evidence that the level of mental health care staffing is constitutionally inadequate. That evidence, however, does not stand alone.

Several major studies have been done regarding mental health care in the California Department of Corrections over the last decade. Each has concluded that the system is seriously understaffed. *(See e.g.,* Plaintiffs' Exhibit 456 at vi (1986 Workload Study concluded that "workload is clearly excessive with existing resources"); Plaintiffs' Exhibit 1 at ii-19, 20 (Stirling Report finding

that 20% of budgeted positions were unfilled, resulting in, *inter alia,* fewer patients being treated and/or patients received reduced care); plaintiffs' Exhibit 2 at iii (Stirling Report finding of need to "set adequate staffing standards for all mental health professionals and . . . determine why recruitment and retention of professional mental health staff is a problem."). [33]

33  The Stirling consultants focused primarily on the effect of vacancies in authorized positions on providing mental health care services. They pointed to recommendations of the 1986 work-load study and a 1979 psychiatric staffing study concerning staffing standards and recommended numbers of positions, but did not independently endeavor to validate or replicate those studies, or to assess the adequacy of the number of budgeted positions. (Plaintiffs' Exhibit 2 at III-7.)

[**53]  Plaintiffs' experts testified to significant understaffing within the system. *(See e.g.,* Declaration of Dr. Edward Kaufman (Kaufman Declaration), filed February 5, 1994, at 16 ("Every CDC institution I evaluated had a shortage of psychiatrists, psychologists, psychiatric social workers, psychiatric nurses, and occupational and recreational therapists. . . . Given the large numbers of seriously disturbed inmates in these institutions, many more mental health staff should be present. Staff were stretched dangerously thin in all institutions."); Declaration of Dr. Russell C. Petrella (Petrella declaration), filed February 5, 1993, at 39-40 ("The most obvious and pervasive sign of the lack of adequate mental health care resources in the CDC system are [sic] the unacceptably long delays in access to every level of care. Inmates suffer long waits at every stage of the process . . . . These delays, which I saw at every institution I looked at, are a critical sign of understaffing."). [34]

34  The court notes in passing that defendants' experts did not dispute this testimony. *(See* Dvoskin Declaration, *passim;* Dvoskin Deposition Excerpts, Volume II, at 303:14-17; Koson Declaration, *passim;* Koson Deposition Excerpts, Volume II, 274:21-275:3, 275:5-11.)

[**54]  The overwhelming weight of the evidence before this court demonstrates that the California Department of Corrections is significantly and chronically understaffed in the area of mental health care services. The Department does not have sufficient staff to treat large numbers of mentally ill inmates in its custody. This conclusion demonstrates that plaintiffs have satisfied the objective [*1308] component of a showing of a violation of the federal Constitution.

b. *Competence of Staff*

Defendants object to the finding that they have no effective method for ensuring either the competence of their staff or that inmates have access to competent care. They also object to the magistrate judge's finding that this violates the plaintiff class members' Eighth Amendment right of access to adequate mental health care. Finally, they object to the suggestion that a remedial order require the development of a quality assurance system.

Once again analysis commences with the observation that state prisoners have a constitutional right of access to adequate mental health care. Both as a matter of law and common sense, in order to meet that requirement of the federal Constitution, defendants must provide [**55] inmates with access to a competent medical staff. *Hoptowit,* 682 F.2d at 1253 ("The medical staff must be competent to examine prisoners and diagnose illnesses . . . [and] must be able to treat medical problems or refer prisoners to others who can."); *see also Ortiz v. City of Imperial,* 884 F.2d 1312, 1314 (9th Cir. 1989) (citing *Hoptowit,* 682 F.2d at 1253); *Cabrales,* 864 F.2d at 1461 (9th Cir. 1988) ("Access to medical staff is meaningless unless the staff is competent and can render competent care.").

Defendants' expert, Dr. Dvoskin, testified that in his opinion "a large system such as the California Department of Corrections could probably not provide adequate mental health care without some sort of management information system and some form of quality assurance." (Dvoskin Declaration at 9.) Plaintiffs' expert, Dr. Petrella, concurred in that assessment. (Petrella Declaration at 21.)

In sum, defendants are not providing adequate mental health care to inmates, and they do not have any form of quality assurance that reaches all institutions covered by this class action. [35] Defendants' expert has testified that defendants cannot provide adequate mental health [**56] care without some form of quality assurance. Requiring development of a quality assurance program is an appropriate remedy for constitutional deficiencies in the delivery of prison health care. *See Grubbs v. Bradley,* 821 F. Supp. 496, 500 (M.D.Tenn. 1993). Defendants' objections to this portion of the findings and recommendations is without merit.

35  Defendants apparently have some form of quality assurance program at three of the twenty-nine institutions in the class. They are, however, required to provide all inmates in the plaintiff class with access to adequate mental health care and they are failing to do so.

3. *Care of Mentally Ill Inmates*

a. *Delays in Access to Care*

The magistrate judge found that "there are significant and unacceptable delays" in inmate access to mental health care at each level of the mental health care delivery system as it exists in the CDC. (Findings and Recommendations at 43-44.) Defendants object to these findings insofar as they are based on the opinion testimony [**57] of experts and contradicted by "percipient witness caregivers." (Objections at 17, 52.) Defendants also argue that there was no finding by the magistrate judge that the delays caused harm to any individual inmate. (Objections at 99.) Finally, defendants argue that there was no finding by the magistrate judge as to whether the delays are a result of deliberate indifference by any defendant. (Objections at 101.)

The constitutional requirement that defendants provide inmates with "a system of ready access to adequate medical care," means simply either ready access to physicians at each prison or "reasonably speedy access" to outside physicians or facilities. *Hoptowit,* 682 F.2d at 1253. In addition, there must be an "adequate system for responding to emergencies." *Id.*

At the outset, the court notes that the previous findings with respect to the inadequacies in screening and staffing, standing alone, render inescapable the conclusion that mentally ill inmates' access to care within the CDC is unconstitutionally delayed. Additionally, the evidence before the court plainly demonstrates substantial delays in access to mental health care for inmates housed in the California Department [**58] of Corrections.

[*1309] The Scarlett Carp Final Report highlighted delays in access to necessary care as a deficiency in the present mental health care system. (Defendants' Exhibit D1338 at 34.) [36] It identified a "major problem" with access to acute inpatient hospitalization, and a "backlog of cases awaiting transfer to Enhanced Outpatient Program due to the limited number of beds available in designated institutions." *(Id.* at 34-35.)

> 36    "The current system seems to place a high degree of reliance on inpatient hospitalization and transfer to Enhanced Outpatient beds. . . . The vast majority of available mental health beds and services provided by CDC staff are at [three institutions] which are geographically distant from many institutions. Therefore, inmates must be transported long distances to receive needed treatment . . . . The current system of classifying mentally ill inmates further hinders timely transfer of inmates considered stable, or assessed as not mentally ill, out of mental health beds . . . which further renders an already strained system inefficient."

[**59] Beyond the 1993 report there was extensive testimony concerning delays in access to necessary care at every level. *(See e.g.,* RT at 3:13-18 (In February 1992, the waiting list to see a psychiatrist after initial screening was over 400 inmates at the reception center at Wasco State Prison; delays lasted up to three months and had "escalated to the point where inmates were cutting their wrists just to receive medication"); [37] RT at 22:3-6 (In 1991 and again in 1992, there were backlogs of 300-400 inmates awaiting transfer to enhanced outpatient psychiatric programs at California Men's Colony or California Medical Facility); [38] Defendants' Exhibit D880 (CDC memo to David Tristan stating that "the problem of the backlog of male inmates awaiting transfer to CMF and CMC for mental health services is approaching the crisis level for the Department"); Kaufman Declaration at 9 (delays of up to several months in transfers to Atascadero State Hospital for inpatient hospitalization).)

> 37    This backlog improved after the mental health staffing levels were improved. (RT at 3:19.)
> 38    These inmates were awaiting transfer to be evaluated for placement in the enhanced outpatient program; following transfer they still had to be screened before they were either placed in the program or returned to the transferring institution. (RT at 22:5-6.)

[**60] Defendants' objections to the magistrate judge's findings in this regard are without merit. Because the evidence demonstrates that there are delays everywhere within the system and that those delays result in exacerbation of illness and patient suffering, a violation of the objective facet of the test for violation of the Eighth Amendment has been demonstrated.

*b. Medication*

The magistrate judge found constitutional violations arising from the failure of the system to properly address questions arising as to the proper medication of class members. They may generally be classified as issues relating to medication management, and issues relating to involuntary medication. I address the questions in turn.

*1. Medication Management*

The magistrate judge found that defendants' current practices with respect to medication management violate the Constitution. (Findings and Recommendations at 50.) Specifically, the magistrate judge found that "defendants' supervision of the use of medication is completely inadequate; prescriptions are not timely refilled, there is no adequate system to prevent hoarding of medication, there is no adequate system to ensure continuity of medication, [**61] inmates on psychotropic medication are not ade-

Case 2:90-cv-00520-KJM-SCR    Document 3039-1    Filed 09/15/08    Page 17 of 29

Page 16

912 F. Supp. 1282, *; 1995 U.S. Dist. LEXIS 13634, **

quately monitored, and it appears that some very useful medications are not available because there is not enough staff to do necessary post-medication monitoring." (Findings and Recommendations at 50.)

In light of these findings Judge Moulds advanced a series of recommendations designed to remedy these deficiencies. (Id. at 79.) He also recommended that the preliminary injunction governing heat plans for management of inmates on psychotropic medication be made permanent for a period of two years. (Id. at 50-51.)

Defendants object to the factual findings and accompanying recommendations concerning medication management. Defendants also object to the recommendation that the preliminary injunction be made permanent.

[*1310] Defendants' objections to the factual findings concerning medication management are based on (1) evidence that they have a computer tracking system in place at each institution to identify inmates on medication; (2) some evidence in the record that at some institutions prescriptions are timely refilled and medication ingestion is monitored to one degree or another at some institutions, that various factors "may affect [**62] the way an inmate receives his psychotropic medication," and (3) that there is a "special procedure" by which a CDC physician can obtain permission to prescribe medication not in the CDC formulary. (Objections at 57-61.) [39]

[39] The court finds that some of defendants' arguments in this regard border on violation of Rule 11 of the Federal Rules of Civil Procedure. For example, defendants state that "the evidence shows that defendants employ reasonable medication tracking systems," citing to RT, April 13, 1993, at 21:52, 21:86-92, and 21:110-111. The cited pages are to the testimony of John O'Shaughnessy, Chief of Mental Health for the CDC. At the cited pages, Mr. O'Shaughnessy testified to a need for case management within the system. (RT at 21:52.) He testified that at present, correctional counselors at each institution are responsible for "case management." (Id.) He testified that those correctional counselors typically do not have access to an inmate's medical file, and that case managers do not in fact follow inmates throughout the system. (Id. at 21:90-91.) The only testimony in all of the cited pages concerning medication tracking is testimony that pharmacists at individual institutions keep information on a computer concerning inmates at the institution who are on psychotropic medication; Mr. O'Shaughnessy also testified that this information is not available except at the institution where it is generated. (Id. at 21:85-86.)

[**63] The computer tracking system is only available at individual institutions; it is not networked to any other institution. (See e.g., RT at 21:86.) Thus, it provides no solution to the significant problems that occur when inmates on psychotropic medication are transferred from one institution to another. [40] In addition, the fact that at some places within the CDC some inmates are getting timely medication and/or appropriate monitoring does not address the systemic failure resulting in gross deficiencies at institutions throughout the CDC.

[40] Plaintiffs argue that this computer system was only put in place in any event because of the heat plan preliminary injunction entered in this action. (Plaintiffs' Response at 183.)

Finally, the evidence of record demonstrates that some medications that are very effective in the treatment of serious mental disorders are not available. (See e.g., Defendants' Exhibit D1196.) In order to satisfy the Constitution, medical staff must have available to them the modalities [**64] to provide inmates with necessary care. See Ramos v. Lamm, 639 F.2d 559, 575 (10th Cir. 1980), cert. denied, 450 U.S. 1041, 68 L. Ed. 2d 239, 101 S. Ct. 1759 (1981).

The magistrate judge's factual findings concerning the constitutional deficiencies in medication management are fully supported by the record and will be adopted by the court. [41]

[41] Plaintiffs and defendants argue over the propriety of non-psychiatrist physicians prescribing psychotropic medications. The court need not resolve this debate. Defendants' constitutional obligation is to provide inmates with access to professionals who are competent to treat their serious mental disorders, and to provide for the administration of psychotropic medication only with appropriate supervision and periodic evaluation. Balla, 595 F. Supp. at 1577. As the magistrate judge noted, under California law, any licensed physician may prescribe medication. (Findings and Recommendations at 50 n.40 (citing California Business & Professions Code § 2051). To the extent that physicians in the Department may be performing duties for which they are not qualified, that problem appears likely to be addressed by development of a quality assurance program. See Grubbs v. Bradley, 821 F. Supp. 496, 500.)

[**65] Defendants object to the magistrate judge's recommendation that the preliminary injunction concerning heat plans for inmates on psychotropic medication be made permanent on the grounds that the findings made by the magistrate judge are insufficient to support imposition of a permanent injunction.

Case 2:90-cv-00520-KJM-SCR    Document 3039-1    Filed 09/15/08    Page 18 of 29
Page 17

912 F. Supp. 1282, *; 1995 U.S. Dist. LEXIS 13634, **

The magistrate judge found that "the principal obstacle . . . was motivating defendants to develop the heat management plans that are the subject of that injunction; now that the plans are developed and in use, defendants have little reason to abandon them and good reasons to keep them in place." (Findings and Recommendations at 51.) The court agrees with defendants that [*1311] the finding made by the magistrate judge does not support issuance of a permanent injunction. The court finds, however, that the record in this action does support such an injunction.

The standards for issuing a permanent injunction are substantially similar to those applied to requests for preliminary injunctive relief; however, in order to obtain a permanent injunction plaintiffs must actually succeed on the merits of their claims. *Sierra Club v. Penfold*, 857 F.2d 1307, 1318 (9th Cir. 1988) (citing *Amoco Production* [**66] *Co. v. Village of Gambell*, 480 U.S. 531, 541, 546 n.12, 94 L. Ed. 2d 542, 107 S. Ct. 1396 (1987)).

Plaintiffs originally sought a preliminary injunction in this action on August 1, 1991, following the heat and medication related deaths of three inmates on psychotropic medication. (Findings and Recommendations at 2.) That request for preliminary injunctive relief was denied on the basis of a memorandum submitted by defendants at the time of the hearing on the request for preliminary injunction and evidence of some steps being taken by defendants to address the problem. *(Id.* at 4.) Since the preliminary injunction was denied in the fall and trial was then set for early summer, the matter was not revisited until April 2, 1992, when plaintiffs renewed their motion for preliminary injunction. *(Id.* at 4.) In the interim, defendants had done almost nothing to have a permanent plan ready for the summer. *(Id.* (citing Declaration of Katherine Sher, filed April 2, 1992, at paragraph 17).) The matter was resolved on the eve of hearing by stipulated injunction, after settlement negotiations with the magistrate judge. *(Id.* at 4-5.)

Plaintiffs have succeeded on the merits of the [**67] claims raised before this court, including presenting ample proof that medication management practices within the CDC violate the Eighth Amendment. The history of defendants' response to this issue demonstrates a recalcitrant refusal to address the serious issues underlying the preliminary injunction until forced to do so under pressure of this litigation. Sadly, the response in that specific context echoes throughout the record. Defendants have been confronted repeatedly with plain evidence of real suffering caused by systemic deficiencies of a constitutional magnitude. Their responses have frequently occurred only under the pressure of this and other litigation. Given that history, the court not only has no confidence that defendants will continue to adequately monitor inmates on psychotropic medication for risks from

heat exposure, it regretfully concludes that without an order defendants are likely not to do so. The preliminary injunction presently in place will be made permanent for a period of three years.

## 2. *Involuntary Medications*

Plaintiffs raise several contentions with respect to administration of involuntary medications to class members. They contend that defendants [**68] do not have "consistent and appropriate practices for involuntarily medicating class members." (Plaintiffs' Trial Brief and Proposed Findings of Fact, filed February 22, 1993, at 16.) They contend that involuntary medication is not available at some institutions, and that it is underutilized at California Men's Colony. (Id.) They also contend that involuntary medication, when used, is sometimes administered in inappropriate settings. (Id.) In addition, plaintiffs contend that prison doctors order administration of involuntary medication over the telephone without examining the inmate to be medicated, and that custody staff are inappropriately involved in the decision to administer involuntary medication. *(Id.* at 17.)

The magistrate judge found on the one hand (1) that some institutions do not have protocols for use of involuntary medication and (2) that involuntary medication is underutilized, which causes harm to inmates decompensating as a result of mental illness, which in turn, results in the de facto denial of the procedural safeguards to which mentally inmates are entitled. On the other hand he also found that (1) involuntary medication can be and is administered without [**69] examination of the inmate by a physician; (2) that custody staff "can and does play a significant role in recommending the use of involuntary medication," and that custody staff can veto a medical decision concerning the use of involuntary medication; and (3) that inmates are "often involuntarily medicated in inappropriate [*1312] settings." (Findings and Recommendations at 58-60.)

The magistrate judge found these diverse deficiencies attributable in large measure to (1) the lack of an adequate screening program; (2) the lack of adequate training of custody staff in the signs and symptoms of mental illness; and (3) policies which permit custody staff to use involuntary medication "in the absence of consultation with, or against the considered advice of, medical and/or mental health professionals." (Findings and Recommendations at 61.)

Defendants' objection to this aspect of the findings and recommendations rests, essentially, on the fact that they are subject to the requirements of a permanent injunction issued in a state court case, *Keyhea v. Rushen*, Solano County Superior Court, No. 67432, and on the

Case 2:90-cv-00520-KJM-SCR    Document 3039-1    Filed 09/15/08    Page 19 of 29
Page 18

912 F. Supp. 1282, *; 1995 U.S. Dist. LEXIS 13634, **

presence of a state regulation governing administration of involuntary medication, [**70] 15 C.C.R. § 3364. [42]

> 42 Defendants assert that this regulation was issued pursuant to a consent decree filed in a federal class action, *Whitaker v. Rushen,* U.S.D.C. No. C-81-3284 SAW (N.D.Cal. March 25, 1985).

Both the injunction in *Keyhea* and the provisions of 15 C.C.R. § 3364 authorize administration of involuntary medication prior to any type of hearing. *Keyhea* governs procedures for "long-term" administration of involuntary medication; the injunction provides for procedures which apply when involuntary medication is necessary for more than 72 hours, for more than ten days, and for more than 24 days. *(See* Plaintiffs' Exhibit 103.) Section 3364 provides for "emergency" administration of involuntary medication and provides procedures that essentially track the *Keyhea* decree for administration of such medication for longer than seventy-two hours. Defendants contend that the procedures they currently follow pursuant to *Keyhea* and the state regulatory scheme exceed federal constitutional [**71] minima. [43] Defendants also contend that state law prohibits them from administering involuntary medication until inmates are gravely disabled and incompetent and, therefore, that they cannot be found deliberately indifferent because inmates who refuse medication deteriorate to a significant degree.

> 43 With respect to long-term use of involuntary medication, defendants' argument has persuasive force. *See Washington v. Harper,* 494 U.S. 210, 249-257, 108 L. Ed. 2d 178, 110 S. Ct. 1028 (1990) (Stevens, J., concurring and dissenting) (requirement that decision to involuntarily medicate an inmate be reviewed by an "impartial person or tribunal" provides greater protection to inmates than procedure approved by majority opinion).

The issues concerning the use of involuntary medication presented in this case raise difficult and troubling constitutional questions, implicating the potential conflict between the substantive and procedural rights protected by the due process provisions of the Fourteenth Amendment [**72] and the right to adequate medical care derived from the Eighth Amendment.

Plaintiffs' first set of contentions concerning the unavailability and underutilization of involuntary medication implicate the Eighth Amendment; these contentions are, in essence, that the defendants are not providing members of the plaintiff class with necessary medical treatment.

The evidence before the court suggests that in certain instances involuntary medication may be necessary

medical treatment for gravely mentally ill inmates. *(See e.g.,* Grassian Declaration at 23; Kaufman Declaration at 142.) There is also evidence before the court that such treatment is not being provided to those inmates. *(See e.g.,* Grassian Declaration at 23; Meenakshi Declaration at 28.) [44]

> 44 Defendants are correct that they must wait until an inmate is "gravely disabled" before administering involuntary medication; that is a federal constitutional requirement as well as a requirement of state law. *See Washington,* 494 U.S. 210, 225, 108 L. Ed. 2d 178, 110 S. Ct. 1028 (1990). That requirement does not address the evidence before the court that inmates who have deteriorated to that point are left to languish in that state for extended periods of time without any treatment. *(See, e.g.,* Meenakshi Declaration at 28; Grassian Declaration at 142.)

[**73] Plaintiffs' second set of contentions implicate the substantive and procedural protection derived from of the Due Process Clause of the Fourteenth Amendment. Prison [*1313] inmates have a substantive liberty interest in avoiding the unwanted administration of involuntary medication. *Washington v. Harper,* 494 U.S. 210, 221, 108 L. Ed. 2d 178, 110 S. Ct. 1028 (1990). That interest, however, may yield where a seriously mentally ill inmate "is dangerous to himself or others and the treatment is in the inmate's medical interest." *Id.* at 227. In those circumstances, the inmate's interest in freedom from involuntary medication is said to be outweighed by the state's obligations to, *inter alia,* (1) "provide prisoners with medical treatment consistent . . . with their . . . medical interests" and (2) take reasonable steps to ensure inmates' safety. *Id.* at 225.

Because of the inmate's liberty interest, the High Court has determined that the Fourteenth Amendment surrounds a determination to involuntarily medicate with protections containing both procedural and substantive components. Specifically, the decision to involuntarily medicate is a medical decision that must be made by medical [**74] staff and reviewed by independent medical decisionmakers. *Washington,* 494 U.S. at 232-233; *see also Bee v. Greaves,* 744 F.2d 1387, 1395-96 (10th Cir. 1984), *cert. denied,* 469 U.S. 1214, 84 L. Ed. 2d 334, 105 S. Ct. 1187 (1985) (even in an emergency, decision to administer involuntary medication is a medical decision). That review must take place at an administrative hearing prior to administration of the involuntary medication, and the inmate must be given notice of the hearing, the right to appear, and the right to present evidence and cross-examine witnesses. *Washington,* 494 U.S. at 235.

912 F. Supp. 1282, *; 1995 U.S. Dist. LEXIS 13634, **

Defendants do not have any procedures to govern the administration of involuntary medication for periods less than seventy-two hours, nor are procedural protections available prior to commencement of involuntary medication in the first instance, or at all unless the involuntary medication will continue for more than seventy-two hours.

There is evidence that in some instances involuntary medication has been ordered over the telephone without the inmate to be medicated first being examined by a physician. (Kaufman Declaration at 142.) The evidence also demonstrates that at certain [**75] institutions, custody staff plays an inappropriate role in decisions concerning involuntary medication. (Meenakshi Declaration at 29.) These practices violate the class members substantive and procedural rights. *See Washington v. Harper,* supra.

Addressing the constitutional violations which the magistrate judge quite properly found, while resolving the potential conflict between rights protected by the Fourteenth Amendment and the Eighth Amendment, and at the same time recognizing the appropriate deference accorded to defendants' responsibilities as prison administrators, requires a careful consideration of the circumstances when involuntary medication is to be administered and the rules concerning appropriate review. These difficulties, however, cannot justify a failure to remediate the violations.

### c. Mechanical Restraints

The magistrate judge found that "there was uncontradicted evidence that mechanical restraints are necessary in some instances for proper management of a mentally ill inmate, but that such restraints should only be used when physical assault, by the mentally ill inmate against others or against him or herself, is imminent or has just occurred, and that [**76] such restraints should only be used in accordance with strict guidelines." (Findings and Recommendations at 56.) He further found that the restraints should only be used on mentally ill inmates "when a psychological emergency has occurred," and, therefore, that "it is necessary to provide follow-up psychiatric care to the mentally ill inmate after restraints have been used." (Id.) Finally, he found that "procedures for use of these restraints vary from institution to institution within the class, and there is no systemwide review in place to ensure appropriate use of such restraints." *(Id.* at 57.) Judge Moulds recommended that defendants be required to develop and implement protocols to govern the use of mechanical restraints which, *inter alia,* specifically [*1314] address coordination between mental health staff and custody staff. *(Id.* at 81.)

Defendants object to the magistrate judge's recommendation on the grounds that there is a regulation governing use of these restraints. Section 3280 of Title 15 of the California Code of Regulations governs the use of mechanical restraints. The regulation addresses all of the areas of concern cited by the magistrate judge except the need [**77] for follow-up psychiatric care after the use of mechanical restraints.

The court finds several of the other remedial measures designed to address the constitutional deficiencies in staffing, access to necessary care including inpatient hospitalization, and maintenance of medical records sufficient to address the inadequacy of follow-up care after use of mechanical restraints. Accordingly, the court finds it unnecessary to order further specific relief with respect to the use of mechanical restraints.

### 4. Medical Records

The magistrate judge found that "the medical records system within the California Department of Corrections is extremely deficient." (Findings and Recommendations at 61.) Specifically, he found that

> at most of the prisons in the class there are serious deficiencies in medical recordkeeping, including disorganized, untimely and incomplete filing of medical records, insufficient charting, and incomplete or nonexistent treatment plans. To complicate the situation beyond all reason, inmates are typically transferred between prisons without even such medical records as might exist.

(Findings and Recommendations at 62.) The magistrate judge recommended [**78] that defendants be required to develop and implement a plan for use of transfer notes and transfer of inmate medical records within CDC institutions, to "develop a plan for obtaining medical records from county jails for inmates on their initial admission to the California Department of Corrections," and to develop protocols for the maintenance of adequate medical records. (Findings and Recommendations at 79-80, 82.)

Defendants' objections in this regard are limited. First, defendants point to some evidence that inmates sometimes arrive at some institutions with their medical records. The fragments of evidence cited by defendants to support this contention is outweighed by the significant evidence to the contrary described by the magistrate judge.

Defendants also contend that they are not responsible for the failure of county personnel to transfer medical records with inmates arriving at CDC reception centers from county jails. [45] That contention is inapposite.

912 F. Supp. 1282, *; 1995 U.S. Dist. LEXIS 13634, **

45    The problem with transfer of CDC medical records when inmates move from one CDC institution to another and when parolees return to custody is equally well-documented and is undisputed by defendants. (See, e.g., Defendants' Exhibit D1338 at 35; RT at 21:64-72; RT, May 17, 1993, at 87.)

[**79] Defendants have a constitutional obligation to provide inmates with adequate medical care. A necessary component of minimally adequate medical care is maintenance of complete and accurate medical records. Defendants have a constitutional obligation to take reasonable steps to obtain information necessary to the provision of adequate medical care. The evidence of record shows that some physicians on the CDC staff can and do take steps to obtain medical records from county jails when inmates arrive at the CDC without them. (See e.g., RT at 33:19.) Such steps are not standard practice, however. (See Petrella Declaration at 135.)

The harm that flows to class members from inadequate or absent medical records is manifest. (See e.g., Kaufman Declaration at 19-20.) Eighth Amendment liability in this regard is not predicated on the failure of counties to deliver medical records. It is predicated on the failure of defendants to take reasonable steps to implement policies that will aid in obtaining necessary medical information about class members when they are transferred from county jails to the CDC.

Defendants also take issue with the determination that they are deliberately [**80] indifferent to the need for adequate medical records. [*1315] The question of defendants' deliberate indifference will be addressed infra. [46]

46    Defendants also contend that "a treatment plan is not constitutionally mandated for every inmate who receives psychiatric care." (Objections at 22.) The magistrate judge did not find that it was, nor did he recommend that it be required.

The magistrate judge's findings and recommendations concerning the inadequacy of medical records will be adopted in full by the court.

5. Suicide Prevention

The magistrate judge found that "defendants have designed an adequate suicide prevention program and have taken many of the steps necessary to implement that program." (Findings and Recommendations at 75.) He further found that the program "has not yet been fully implemented, and that some of the failure to fully implement the program is due to the severe understaffing in

mental health care." (Id.) He therefore recommended that the special master be ordered to report to the court [**81] on the adequacy of suicide prevention in the CDC twelve months after the order of this court. (Id.) Defendants object to this recommendation on the grounds that "there is no basis for the court to oversee implementation of any plan in an area that is not constitutionally deficient." (Objections at 23.)

The weight of the evidence before the court shows that there are several institutions where the suicide watch component of the program has been inadequately implemented. As the magistrate judge found, this failure is due in large measure to the severe understaffing that exists throughout the CDC. The record before the court demonstrates that the purported constitutional violation at issue here is the chronic understaffing already described. That primary constitutional violation must be remedied; the remedy of that constitutional violation would redress its derivative effects, including inadequate implementation of the CDC's suicide watch program. No separate remedy directed specifically at the Department's suicide prevention program will be ordered at this time.

6. Summary

Plaintiffs consist of a group of inmates who have serious mental disorders. It is undisputed that failure [**82] to provide treatment for these disorders "could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" McGuckin, 974 F.2d at 1059 (citation omitted). As explained above, it is apparent that due to a systemic failure to provide adequate mental health care, thousands of class members suffer present injury and are threatened with great injury in the future. The court concludes that the record in this case demonstrates beyond reasonable debate the objective component of plaintiffs' Eighth Amendment claim.

D. Deliberate Indifference

The magistrate judge found that the defendants were deliberately indifferent within the meaning of Eighth Amendment jurisprudence. [47] Defendants challenge that finding.

47    He specifically found that the evidence bearing on the issue "was not seriously contested," and that "defendants have known [about and repeatedly acknowledged] the serious problem with understaffing at least since... 1985." He further found that "defendants have known that there were thousands of mentally ill inmates ... who were not even identified as needing care, let alone being provided necessary care, at least since... July, 1989." Moreover he found that "the inadequacies in the mental health care delivery system

912 F. Supp. 1282, *; 1995 U.S. Dist. LEXIS 13634, **

... remain today." In like manner he noted that "defendants repeatedly acknowledged that... their medical recordkeeping system... was woefully outdated and inadequate, and that they did not have a mechanism in place for screening and identifying mentally ill inmates." He concluded that "the fact that defendants have known about these deficiencies for over eight years without taking any significant steps to correct them is additional evidence of deliberate indifference."

(Findings and Recommendations at 75-76.)

[**83]  The court acknowledges the caution which both the law and propriety enjoin upon an inquiry as to whether high officials of state government are deliberately indifferent to the rights of persons within their charge. With due regard for the defendants and the difficult task that is theirs, but with equal regard for the duty that is the court's by virtue of its office, the court turns to that [*1316] task. In doing so, the court stresses that the issue is not whether as to some particular deficiency the defendants have exhibited deliberate indifference. Rather, given the overwhelming evidence of the systemic failure to deliver necessary care to mentally ill inmates, the issue is whether the defendants have demonstrated deliberate indifference to that condition.

In order to find that defendants have acted with deliberate indifference to the needs of the plaintiff class, the court must find (1) that defendants knew that inmates face a substantial risk of harm as a result of the systemic deficiencies noted above and (2) that defendants have disregarded that risk by "failing to take reasonable measures to abate it." *Farmer,* 114 S. Ct. at 1984.

Plaintiffs seek prospective injunctive relief. [**84] Under such circumstances, deliberate indifference is examined "in light of the prison authorities 'current attitudes and conduct,' *Helling,* 113 S. Ct. at 2477, i.e. the defendants attitudes and conduct "at the time suit is brought and persisting thereafter." *Farmer,* 114 S. Ct. at 1983. [48]

48  *Farmer* addressed suit by an inmate seeking "injunctive relief to prevent a substantial risk of serious injury from ripening into actual harm." *Farmer v. Brennan,* 128 L. Ed. 2d 811, 114 S. Ct. 1970, 1983 (1994). In the matter at bar members of the plaintiff class are not only facing substantial risks of serious injury, they are experiencing actual harm as a result of the systemic deficiencies identified in this order.

The question of whether a defendant charged with violating rights protected by the Eighth Amendment has the requisite knowledge is "a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence [citation omitted], and a factfinder may conclude [**85] that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.* at 1981. The inference of knowledge from an obvious risk has been described by the Supreme Court as a rebuttable presumption, and thus prison officials bear the burden of proving ignorance of an obvious risk. *Id.* at 1982. It is also established that defendants cannot escape liability by virtue of their having turned a blind eye to facts or inferences "strongly suspected to be true." *Id.* at 1982 n.8, and that "if . . . the evidence before the district court establishes that an inmate faces an objectively intolerable risk of serious injury, the defendants could not plausibly persist in claiming lack of awareness." *Id.* at 1984 n.9.

As the court concluded above, the evidence demonstrates that seriously mentally ill inmates in the California Department of Corrections daily face an objectively intolerable risk of harm as a result of the gross systemic deficiencies that obtain throughout the Department. The evidence also demonstrates that inmates have in fact suffered significant harm as a result of those deficiencies; seriously mentally ill inmates have languished for months, [**86] or even years, without access to necessary care. They suffer from severe hallucinations, they decompensate into catatonic states, and they suffer the other sequela to untreated mental disease.

Defendants' knowledge of the risk of harm to these inmates is evident throughout this record. *(See e.g.,* Defendants' Exhibit D880.) [49] It is equally apparent that defendants have known about these gross deficiencies in their system for years. The risk of harm from these deficiencies is obvious to plaintiffs' experts, to defendants' experts, to defendants' consultants, to individual employees of the Department of Corrections in the field, and to this court. The actual harm suffered by mentally ill inmates incarcerated [*1317] in the California Department of Corrections is also manifest in this record.

49  The exhibit, an internal Department of Corrections memorandum reads in pertinent part "the need to assess [inmates backlogged awaiting transfer for mental health services] is urgent. Seriously mentally ill inmates who do not receive needed treatment can worsen severely, losing most or all of their ability to function. Such inmates can also become suicidal or can pose significant risks to others or to the safety of the institution. In addition, the litigation facing the Department in this area, especially the Department-wide *Coleman* case, puts the Department at extreme liability risk if these inmates go untreated."

[**87] Defendants' objection to the finding of deliberate indifference rests on two arguments. On the one hand each asserts, for different reasons, that there is insufficient evidence of their personal indifference. The second objection rests on the notion that their response to the gross deficiencies in the delivery of mental health care to those seriously ill prisoners in their charge has been "reasonable." The court now turns to each issue.

Each defendant contends that there is insufficient evidence to support individual findings of deliberate indifference. These state officials, all sued in their official capacities, each have authority to make decisions that directly affect the rights of class members, and thus all are appropriate defendants in this action. *See Los Angeles County Bar Association v. Eu,* 979 F.2d 697, 704 (9th Cir. 1992) (quoting *Ex parte Young,* 209 U.S. 123, 157, 52 L. Ed. 714, 28 S. Ct. 441 (1908). Their claims as to lack of the requisite mental state are not well taken.

Defendants Khoury and Zil argue that they have no power or authority to change any aspect of the delivery of mental health care to inmates in the California Department of Corrections. The [**88] argument will not lie for two reasons. First, even if true, the lack of power does not necessarily contraindicate scienter. Second, the sole cite in support of the proposition is evidence that neither Dr. Khoury nor Dr. Zil had any independent authority to hire additional medical or mental health personnel or to "implement the Stirling Report." (RT, June 21, 1993, at 39:82-83.) That evidence does not speak to the many other areas within the scope of these defendants' authority that affect the delivery of constitutionally adequate care to class members.

Defendant Wilson argues that there is no evidence that he had knowledge of the systemic deficiencies that have obtained for years. Given his official responsibilities, the suggestion by his lawyers of the Governor's ignorance concerning information he was duty bound to be familiar with seems remarkable. Be that as it may, they have provided no evidence to support their assertion that he is unaware of the evidence received in this case, including the Stirling Report produced pursuant to a legislative mandate and the CDC commissioned Scarlett Carp Report. Moreover, after five years of litigating, the claimed lack of awareness is not plausible. [**89] *Farmer,* 114 S. Ct. at 1984 n.9.

Defendant Gomez argues that during his tenure as Director of the Department of Corrections he has made many improvements in the delivery of mental care services. As I explain below, however, the circumstances relied on do not refute the finding of deliberate indifference required by this record.

Defendant Sandoval argues generally that he was "hardly mentioned" during the trial and that the arguments made on behalf of defendants Wilson and Gomez apply equally to him. Those arguments are rejected for the reasons stated.

As I noted above each of these defendants is responsible to a greater or lesser degree for the tragic state of affairs revealed by this record. Each to a greater or lesser degree can make significant contributions to its solution. After vigorously litigating these issues for almost five years, defendants cannot plausibly claim that they lack knowledge of the gross deficiencies in the delivery of mental health care to class members. Furthermore, defendants continue to vigorously dispute any liability for these deficiencies even in the face of overwhelming evidence to the contrary. Each defendants claim to personal innocence cannot [**90] be credited. *See Jordan,* 986 F.2d at 1529.

Defendants' second claim, that their responses to the failure to provide adequate care to the mentally ill, has been reasonable must also be rejected. On examination, defendants' response has been to question the experts who provide information to them, to commission more studies, to make ineffective gestures toward the serious issues that pertain to the chronic problem of understaffing, and to initiate planning for a central administrative structure to manage a completely inadequate field delivery system. While defendants [*1318] do not contend, nor could they, that the risk of harm to these seriously ill inmates has been averted by the steps they have taken, they maintain that these responses absolve them from Eighth Amendment liability in this action. Each response is addressed in turn.

Defendants maintain that they are not required to accept uncritically the findings of experts hired to study the mental health care system and recommend remedial steps. The argument, while true, is unavailing. Defendants have offered no valid explanation for their rejection of the findings that have been repeatedly and consistently made over the last ten years. [**91] Defendant Gomez, for instance, testified that he had a "tremendous number of concerns" with the Stirling Report because "it didn't reconcile with what I felt was going on in the institutions," (RT, May 17, 1993 at 52) and because his staff "was not capable of providing [him] the kind of answers [he] felt [he] needed." *(Id.* at 53-54.) The director does not claim, however, to "have the capacity to make [] judgments on who's mentally ill and who's not," *(Id.* at 52) nor can he claim medical expertise. His articulated reasons for rejecting the information provided by experts with those capacities are thus without a sufficient basis. Given the essential consistency of the Sterling Report with subsequent studies and the evidence in this trial, continued refusal to accept the obvious is simple obduracy.

912 F. Supp. 1282, *; 1995 U.S. Dist. LEXIS 13634, **

Nor are repeated studies a reasonable response. Whatever variances exist between the various studies that have been made, they consistently find a woefully inadequate system of mental health care with all its tragic consequences.

Similarly, where, as here, the delivery of mental health services at the institutional level is constitutionally inadequate, planning to add administrators [**92] to central headquarters is an insufficient response. Despite acknowledgment that the provision of services at the institutional level is inadequate, defendants do not intend to spend any more resources in the field pending development and implementation of a central health care administration, (see RT, May 17, 1993, at 47-49), which will take will take three to four years. (See RT, May 17, 1993, at 47). Defendants are not free to disregard the constitutional rights of mentally ill inmates for three to four years.

Defendants devote several pages of their objections to arguments that they have taken steps to remedy the serious staffing shortages in the delivery of mental health care to class members, contending that these steps negate any possible finding of deliberate indifference. (Objections at 16, 43-50, 94-97.) I cannot agree.

First, none of the steps that defendants have taken have come close to addressing the understaffing problem. According to the data from the Scarlett Carp Final Report, the Department is understaffed in the range of some three hundred members deemed necessary to deliver adequate care to mentally ill inmates; this number is higher when the vacancy [**93] rate in authorized positions is considered. See infra at n.32. [50] Thus, the 1993/94 request for 21.25 new positions (RT at 14:67) is not reasonably designed to remedy the problem. [51]

> [50] The court is not finding a magic number that will render the staffing levels constitutional; the court is taking note of the evidence in this regard to illustrate the ineffectual nature of defendants' actions.
> [51] A systemwide request for 64.5 positions was made for fiscal year 1992-93; those positions were added the year before trial bringing the total number of authorized positions to the 376.6 level found by the magistrate judge. (RT at 14:96-97; Findings and Recommendations at 37.) The request for 21.25 positions was made for fiscal year 1993-94 and was turned down. (RT at 14:67-68.)

Defendant Khoury acknowledged serious problems with recruitment and retention of psychiatrists and psychologists at institutions within the CDC. (See e.g., RT at 14:141-143; 14-171.) He attributed this problem to non-competitive [**94] salaries, undesirable geographical locations and clientele, and inadequate incentives. (RT at 14:141-143; 14:171.) Even in the face of these clearly identified factors, defendants have failed to take any [*1319] meaningful steps to improve staffing levels. [52]

> [52] It appears from the record that several options are available to defendants to overcome the harm to inmates that flows from understaffing. Once again, the court emphasizes that specific management decisions rest with the defendants as prison administrators. It is only where, as here, defendants have abdicated their responsibilities to members of the plaintiff class that they must be required to make decisions that take seriously the constitutional rights of class members. See Jordan, 986 F.2d at 1529.

Defendants' objections may be read as obliquely relying on arguments premised on budgetary constraints to refute the finding of deliberate indifference. (See e.g., Defendants' Objections at 7.) Prior to trial, however, defendants acknowledged that they [**95] would not rely on the argument that fiscal constraints permit them to violate the Eighth Amendment. (RT, April 16, 1992.) Of course it is improper advocacy to raise issues in post trial argument specifically abjured before trial. Moreover defendants' pretrial position seems wholly appropriate. See Wilson, 501 U.S. at 301-302 ("It is hard to understand how [a 'cost' defense] could control the meaning of 'cruel and unusual punishment' in the Eighth Amendment. An intent requirement is either implicit in the word 'punishment' or is not; it cannot be alternately required and ignored as policy considerations might dictate."). [53]

> [53] The notion of budgetary constraints is, of course, highly protean. The administrators appear to have funds for those projects which appeal to them, such as the development of a central administration for mental health services. Whether or not a central administration is desirable, the point is that money is lavished on its development it is diverted from the identification and treatment of ill patients.

[**96] Given the nature and extent of the crisis and its duration, it is not possible to credit arguments that defendants entertain a good faith belief that such efforts were sufficient. "It is not enough to say that . . . prison authorities considered an issue carefully . . . . Prison authorities are also required to afford sufficient weight to the constitutional rights of individuals. The failure to treat constitutional provisions with appropriate respect constitutes deliberate indifference to the rights [at stake]." Jordan, 986 F.2d at 1529. Put another way, patently ineffective gestures purportedly directed towards remedying objectively unconstitutional conditions do not

Case 2:90-cv-00520-KJM-SCR   Document 3039-1   Filed 09/15/08   Page 25 of 29

Page 24

912 F. Supp. 1282, *; 1995 U.S. Dist. LEXIS 13634, **

prove a lack of deliberate indifference, they demonstrate it.

Yet other evidence supports the court's determination of deliberate indifference. After completing a *de novo* review of the record, this court has come to the reluctant conclusion that defendants are simply seeking to delay meeting their constitutional obligation to the mentally ill inmates who are their charges. The court has reviewed each objection, the evidence cited in support thereof, and the legal arguments tendered by defendants. Some of [**97] those objections are so seriously flawed that they raise questions of good faith. In certain instances the legal authority cited does not support the proposition for which it is tendered. In many instances the evidence cited by defendants not only does not support their contention, it supports the very finding of the magistrate judge to which the objection is being made.

Acting for the sole purpose of delay perpetuates the human suffering caused by the violations of the federal Constitution which the evidence in this case demonstrates. Deliberate indifference is nothing if it is not that.

The court repeats, the evidence of defendants' knowledge of the gross inadequacies in their system is overwhelming. The risk of harm from these deficiencies is obvious. The actual suffering experienced by mentally ill inmates is apparent. In the face of this reality, the court finds that defendants' conduct constitutes deliberate indifference to the serious medical needs of the plaintiff class.

E. *Use of Disciplinary/Behavior Control Measures Against Mentally Ill Inmates*

Plaintiffs also sue relative to an issue intimately related to the systemic failure to provide adequate medical care to [**98] mentally ill inmates, but nonetheless analytically distinct from it. They assert the inappropriate use of disciplinary and behavioral control measures [*1320] directed towards the members of plaintiff class.

1. *Insufficient Training*

Judge Moulds found that "mentally ill inmates who act out are typically treated with punitive measures without regard to their mental status." (Findings and Recommendations at 51.) He further found that such treatment was the result of inadequate training of the custodial staff so that they are frequently unable to differentiate between inmates whose conduct is the result of mental illness and inmates whose conduct is unaffected by disease. Defendants object to the finding that the custodial staff lacks sufficient training in the identification of signs and symptoms of mental illness.

New correctional officers in the California Department of Corrections receive a three hour course entitled "Unusual Inmate Behavior." (Declaration of Steve Cambra (Cambra Declaration) at 3.) In addition, custody staff may receive some additional in-service training at the institutional level. (*Id.* at 5.) The average length of the in-service classes is approximately one [**99] hour, although California Men's Colony offers a two hour in-service course called "The Skillful Observer," which covers psychiatric disorders. (RT at 17:130.) The question is whether, on the record made before the magistrate judge, this training suffices under the Constitution.

There is substantial evidence in the record of seriously mentally ill inmates being treated with punitive measures by the custody staff to control the inmates' behavior without regard to the cause of the behavior, the efficacy of such measures, or the impact of those measures on the inmates' mental illnesses. One explanation for these incidents is that defendants have a policy or custom of intentionally inflicting severe harm on mentally ill inmates. The magistrate judge found a less invidious reason, that the custody staff is inadequately trained in the signs and symptoms of serious mental illness. The magistrate judge's generous inference is well supported in the record. [54]

> 54  Plaintiffs' expert, Dr. Kaufman, testified in his declaration that "training of custodial staff on issues relating to mental health care was sorely lacking" at all the institutions he reviewed.

[**100]  2. *Administrative Segregation/Segregated Housing Units*

The magistrate judge found that "defendants' use of administrative segregation and segregated housing at Pelican Bay SHU and statewide to house mentally ill inmates violates the Eighth Amendment because mentally ill inmates are placed in administrative segregation and segregated housing without any evaluation of their mental status, because such placement will cause further decompensation, and because inmates are denied access to necessary mental health care while they are housed in administrative segregation and/or segregated housing." (Findings and Recommendations at 54.) Defendants' principle objections to these findings are based on a state regulation; their evidentiary objections are based on the use of the declaration of Dr. Stuart Grassian. Those objections are overruled. The magistrate judge's findings in this regard are fully supported by the evidence. [55]

> 55  Section 3342 of Title 15 of the California Code of Regulations provides for case review and psychological assessment of inmates assigned to segregated housing units. The case review is con-

Case 2:90-cv-00520-KJM-SCR    Document 3039-1    Filed 09/15/08    Page 26 of 29
Page 25

912 F. Supp. 1282, *; 1995 U.S. Dist. LEXIS 13634, **

ducted by correctional counselors. (RT at 17-78.) John O'Shaughnessy, the Chief of Mental Health for the CDC, testified at trial that correctional counselors "may well" have contact with a mental health clinician regarding an inmate's mental disorders, but that correctional counselors generally do not have access to an inmate's medical records. (RT at 21:90.) The evidence of acutely psychotic and otherwise seriously mentally ill inmates placed in administrative segregation and segregated housing units for significant periods of time demonstrates that the regulation has had little or no effect on practice.

[**101] The court must specifically address one objection raised by defendants. The magistrate judge found that "defendants and their employees recognize the danger to mentally ill inmates from housing in segregated housing units, particularly Pelican Bay SHU." (Findings and Recommendations at 53.) Defendants argue that some of the testimony cited by the magistrate judge "taken in context, . . . shows that defendants' agents took pains to evaluate the possible risks of Pelican Bay SHU, and ultimately [*1321] concluded that the potential danger never materialized." (Objections at 106 n. 10.)

Plaintiffs' expert, Dr. Grassian, a board certified psychiatrist, interviewed twenty-four inmates in the Pelican Bay SHU. (Grassian Declaration at 17.) [56] He found that

> of these, at least seven were actively psychotic and urgently in need of acute hospital treatment. Nine others suffered serious psychopathological reactions to SHU confinement, including in several cases a history of periods of psychotic disorganization. Of the remaining eight, five gave a history of psychiatric problems not clearly exacerbated by SHU, two others appeared free of psychiatric difficulties, and in one a language barrier [**102] prevented adequate evaluation.

(Id.) Dr. Grassian's findings concerning the seven actively psychotic inmates and the nine others suffering serious psychopathological reactions to SHU confinement, and the response of CDC staff to those conditions, *(see id.* at 18-43), fully support the magistrate judge's findings. The descriptions tendered by another of plaintiffs' experts, Dr. Craig Haney, are equally disturbing. (Haney Declaration at 45-47.) Given this testimony, defendants' assertion that the concerns about possible psychological harm from confinement in the Pelican Bay

SHU "never materialized" can only be viewed as evidence of defendants' deliberate indifference to the serious harm visited on class members.

> 56  As noted above, defendants raise several evidentiary objections to the use of Dr. Grassian's declaration. Those are overruled. In any event, Dr. Grassian's testimony concerning the condition of inmates confined in the SHU that he interviewed is plainly competent evidence. *See* Fed. R. Evid. 703.

[**103] For the reasons set forth by the magistrate judge, defendants' present policies and practices with respect to housing of class members in administrative segregation and in segregated housing units violate the Eighth Amendment rights of class members.

### 3. Use of Tasers and 37mm guns

Judge Moulds found that "inmates who act out are also subjected to the use of tasers and 37mm guns, without regard to whether their behavior was caused by a psychiatric condition and without regard to the impact of such measures on such a condition." (Findings and Recommendations at 54). Defendants raise two objections to this finding, one going to the applicable standard, the other to the evidence.

Defendants first argue that the use of tasers and 37mm guns against members of the plaintiff class must be analyzed under the standard applicable to excessive force claims under the Eighth Amendment, i.e. whether these weapons are used maliciously and sadistically for the purpose of causing harm, and not under the deliberate indifference standard. [57]

> 57  Defendants did not present this argument to the magistrate judge in either pre- or post-trial briefing.

[**104] Second, they point to an administrative bulletin issued September 29, 1992, setting guidelines for the use of tasers on inmates taking psychotropic medication as evidence that they are not deliberately indifferent to the serious medical needs of the plaintiff class.

### a. applicable standard

Defendants' first argument is focused on the subjective component of an Eighth Amendment claim under which the court is to assess whether the conduct at issue is "wanton." *Jordan,* 986 F.2d at 1527. """Wantonness' does not have a fixed meaning but must be determined with "due regard for the differences in the kind of conduct against which an Eighth Amendment objection is lodged.'" *Wilson,* 501 U.S. at 302 (quoting *Whitley v. Albers,* 475 U.S. 312, 320, 89 L. Ed. 2d 251, 106 S. Ct.

1078 (1986)." *Id.* The court turns to the question of what standard applies.

The "baseline" mental state for "wantonness" is "deliberate indifference." *Id.* As a general rule, the deliberate indifference standard applies where the claim is that conditions of confinement cause unnecessary suffering. *Id.* In contrast, the "malicious and sadistic" standard applies to claims [*1322] arising out of the use of [**105] force to maintain order. *See Id.* Whether conduct is """wanton"" in a particular context "'depends upon the constraints facing the official,'" not the effect of the conduct on the inmate. *LeMaire v. Maass,* 12 F.3d 1444, 1452 (9th Cir. 1993) (quoting *Wilson,* 501 U.S. at 303 (citations omitted.)).

The gravamen of plaintiffs' claim here is that they suffer from medical conditions which are exacerbated by use of the weapons at issue, and that defendants' policy permitting use of these measures against class members constitutes deliberate indifference to their serious mental disorders. The only policy in place regulating the use of these weapons covers the use of tasers on inmates who are taking psychotropic medication. [58] Otherwise, defendants' policy permits the custody staff to use tasers and 37mm guns on mentally ill inmates without regard to the impact on their mental condition. *(See e.g.,* RT at 17:158.)

> 58  Use of tasers on inmates on psychotropic medication causes physical harm. *(See* Kaufman Declaration at 159.) Thus, the policy prohibiting such use is apparently aimed at preventing physical harm. This policy suggests that the administration is drawing some unaccountable distinction between mental patients being subjected to physical as contrasted with psychological injury.

[**106] The policy regulating the use of tasers on inmates on psychotropic medication provides that tasers shall not be used until (1) custody staff notifies the chief medical officer (CMO) or designee that staff is considering using a taser on a particular inmate; (2) the name, CDC number, and location of the inmate are provided to medical staff; (3) the CMO or designee reviews the medical file to determine whether any medical conditions prohibit the use of the taser on the inmate; and (4) the CMO or designee notifies custody staff that there are no medical conditions which prohibit use of the taser on the particular inmate. (Id.) The medical conditions that trigger these requirements are defined as ". . . the inmate [having] received any psychotropic medication in the previous six weeks, is being treated for a cardiac arrhythmia, or if the inmate has a pacemaker." (Id.) The CMO or designee's findings are to be documented in the medical and psychiatric sections of the inmate's file, and administrative staff is to document compliance with the

policy on the "Crime/Incident Report" submitted to the Institutions Division.

This policy makes plain that the use of tasers is not restricted to [**107] "exigent circumstances" that preclude reflection on the propriety of their use in a particular instance; to the contrary, reflection, in the form of communication between custody and medical staff and review of a medical and psychiatric record by medical staff, is required prior to use of a taser on any inmate.

It is also plain from the undisputed evidence before the court that use of either tasers or 37mm guns on members of the plaintiff class can cause, and has caused, serious and substantial harm to mentally ill inmates, whether or not the inmate is on psychotropic medication. (Findings and Recommendations at 54-55.) This harm to the inmate can be both immediate and long lasting. [59] (Id.) Moreover, continuation of the present practices permitting these weapons to be used against inmates with serious mental disorders without regard to the impact on those disorders will cause serious harm to members of the plaintiff class so long as those practices remain in existence.

> 59  Defendants did not object to the magistrate judge's factual findings in this regard.

[**108] Given the fact that the policy permits, or rather requires, deliberation before use of tasers on a subclass of the plaintiff class, and given the lack of explicable distinction between the two groups, the court concludes that the deliberate indifference standard applies to plaintiffs' claim concerning use of tasers and 37mm guns against inmates with serious mental disorders. *See Jordan,* 986 F.2d at 1528 (challenge to policy authorizing cross-gender clothed body search analyzed under deliberate indifference standard because (1) claim did not involve "critique in hindsight [of] the exercise of judgment of a particular officer on a specific occasion but instead involved policy "developed over time, with ample opportunity for reflection"; and (2) policy did not inflict pain on a "one-time basis" but would "continue to inflict pain [*1323] upon the inmates indefinitely."); *cf. LeMaire,* 12 F.3d at 1452-53 (malicious and sadistic standard applied to claim involving "measured practices and sanctions either used in exigent circumstances or imposed with considerable due process.") [60]

> 60  The court wishes to be clear. Application of the deliberate indifference standard to this conditions of confinement case in no way precludes application of the malicious and sadistic standard in the context of suits brought by mentally ill inmates for physical or mental injuries sustained by virtue of the need to restore order in an emergency situation.

Case 2:90-cv-00520-KJM-SCR    Document 3039-1    Filed 09/15/08    Page 28 of 29

912 F. Supp. 1282, *; 1995 U.S. Dist. LEXIS 13634, **

[**109] *b. deliberate indifference*

Having determined that deliberate indifference is the appropriate standard, the court now turns to the question of whether defendants' policies and practices in this regard amount to deliberate indifference. The court does so again noting the serious nature of such an inquiry and the gravity of a finding that state officials are deliberately indifferent to the well being of those within their charge.

There is no dispute over the serious harm that can be, and has been, caused to inmates with serious mental disorders when the weapons in question are used against them. There is also no dispute that at present the only policy limiting use of these weapons prohibits use of tasers on inmates with specified heart conditions or who have received any psychotropic medication in the six weeks preceding use of the taser. Finally there is nothing of record suggesting a penological justification for the distinction between inflicting physical as contrasted with mental injury. Thus, there is no dispute that these weapons are used on inmates with serious mental disorders without regard to the impact of those weapons on their psychiatric condition, and without penological [**110] justification. The court can only conclude that these facts command a finding that the Eighth Amendment rights of members of the plaintiff class have been violated. *See Jordan,* 986 F.2d at 1529 (citing *Redman v. County of San Diego,* 942 F.2d 1435, 1443 (9th Cir. 1991) (en banc) *cert. denied,* 502 U.S. 1074, 117 L. Ed. 2d 137, 112 S. Ct. 972 (1992)).

VI

REMEDY

A. Forms, Protocols and Plans

The magistrate judge recommended a series of steps designed to address the constitutional violations he found. Defendants object to the proposed remedies on the grounds that the time constraints are too short. [61]

61  Of course defendants contend that remedial orders are inappropriate because they have not violated the constitution. For the reasons explained in the text those arguments cannot prevail.

The magistrate judge recommended development and implementation of a series of remedial plans within specified time constraints. Two of those were to be completed within thirty days: development and use of standardized [**111] screening forms and protocols, and development and implementation of medication protocols. One was to be completed within sixty days, and the remainder were to be completed within ninety days.

The court cannot accept defendants' argument concerning development and implementation of standardized screening forms and protocols. Requiring defendants to develop and implement standardized screening forms and protocols is narrowly tailored to address the constitutional violation at issue. Given that over a year ago defendant Gomez testified that development of standardized screening practices was necessary, (RT, May 17, 1993, at 49), it is to be expected that defendants have been working on the problem. Under the circumstances, the thirty day period does not seem unreasonable.

The court will also adopt the remainder of the recommendations insofar as they describe areas which must be addressed. This court recognizes the urgency of attending to the serious constitutional deficiencies identified in this order. Nonetheless, it will be important to consider the views of the special master and court-appointed experts concerning the amount of time that will be necessary to accomplish the tasks [**112] at hand. [*1324] Accordingly, the court will not establish specific time frames for completion of those tasks in this order. Instead, the court will refer the matter back to the magistrate judge for nomination of a special master. *See infra.* After the special master is appointed, the court will make further orders concerning appointment of experts and establishment of time lines. [62]

62  Defendants also object to the recommended remedial steps on the grounds that they are "void for vagueness." The court has already considered and rejected defendants' arguments that the court must specify in greater detail the steps that are required to satisfy the mandates of the federal constitution.

B. *Appointment of Special Master*

The magistrate judge recognized that the court may appoint a special master in a non-jury case where "'exceptional condition[s]'" require the appointment. (Findings and Recommendations at 77 (quoting Fed. R. Civ. P. 53(b)). Defendants object to the recommendation that the court appoint a special [**113] master to monitor compliance with court ordered injunctive relief on the grounds that the magistrate judge made no findings of "exceptional circumstances" to justify the appointment, and that there are no such "circumstances."

Defendants' contention that there are no exceptional conditions which warrant such appointment is unavailing. The constitutional violation which has been found is the product of systemwide deficiencies in the delivery of mental health care. Monitoring compliance with the injunctive relief ordered herein will be a formidable task. The court will adopt the findings and recommendation of the magistrate judge and appoint a special master to

Case 2:90-cv-00520-KJM-SCR    Document 3039-1    Filed 09/15/08    Page 29 of 29

Page 28

912 F. Supp. 1282, *; 1995 U.S. Dist. LEXIS 13634, **

monitor compliance with the court-ordered injunctive relief. *See Hoptowit,* 682 F.2d at 1263. [63]

> 63   The court reiterates that it is fully cognizant of the deference owed to the decision-making authority of prison administrators. The special master will not be appointed to make those decisions for the defendants, nor will he be appointed to "rush[] to impose notions of reform on the prisons." (Objections at 6.) The special master's responsibility will be twofold: to provide expert advice to the defendants to aid in ensuring that their decisions regarding the provision of mental health care to class members conform to the requirements of the federal constitution, and to advise the court concerning issues relevant to assessing defendants' compliance with their Constitutional obligations.

[**114] C. *Stay Pending Appeal* .

Defendants' request for a stay pending appeal is premature. It will be denied.

VII

ORDER

In accordance with the above, IT IS HEREBY ORDERED that:

1. Defendants' November 7, 1994 motion to strike is granted as to Exhibits A, C, D, E, F, G, H, I, J, K, and L to the Specter declaration and denied as to Exhibit B to the Specter declaration;

2. Except as modified by this order, the Findings and Recommendations filed June 6, 1994 are adopted in full, said recommendations to be implemented by subsequent order of the court;

3. Defendants' motion for judgment pursuant to Federal Rule of Civil Procedure 52(c), made at the close of plaintiffs' case in chief, is denied;

4. This matter is referred back to the magistrate judge for nomination of a special master. Said nomination shall be accomplished within a time period recognizing the urgency of the problems to be remedied and with such consultation with the parties as the magistrate judge deems appropriate; and

5. Defendants' request for a stay pending appeal is denied.

DATED: September 13, 1995.

LAWRENCE K. KARLTON

CHIEF JUDGE EMERITUS

UNITED STATES DISTRICT COURT