1 | FUTTERMAN & DUPREE LLP
MARTIN H. DODD (104363)
2 | 160 Sansome Street, 17th Floor
San Francisco, California 94104
3 | Telephone: (415) 399-3840
Facsimile: (415) 399-3838
4 | martin@dfdlaw.com

5 | *Attorneys for Receiver*
J. Clark Kelso

6

# UNITED STATES DISTRICT COURT

7

## FOR THE EASTERN DISTRICT OF CALIFORNIA

8

## AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

9

## UNITED STATE DISTRICT COURT COMPOSED OF THREE JUDGES

10

## PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

11

| | |
|---|---|
| RALPH COLEMAN, et al., | Case No. CIV S-90-0520 LKK JFM P |
| *Plaintiffs,* | **THREE JUDGE COURT** |
| v. | |
| ARNOLD SCHWARZENEGGER, et al., | |
| *Defendants.* | |
| CARLOS PEREZ, et al., | Case No. C 05-05241 JSW |
| *Plaintiffs,* | |
| v. | |
| JAMES TILTON, et al., | |
| *Defendants.* | |
| MARCIANO PLATA, et al., | Case No. C01-1351 TEH |
| *Plaintiffs,* | **THREE JUDGE COURT** |
| v. | **NOTICE OF FILING OF RECEIVER'S** |
| ARNOLD SCHWARZENEGGER, et al., | **NINTH QUARTERLY REPORT** |
| *Defendants.* | |

24 |    PLEASE TAKE NOTICE that the Receiver in *Plata v. Schwarzenegger*, Case No. C01-

25 | 1351 TEH, has filed herewith his Ninth Quarterly Report.

26 | Dated: September 16, 2008              FUTTERMAN & DUPREE LLP

27 |                              By:_____/s/ Martin H. Dodd_____
                                       Martin H. Dodd
28 |                                    Attorneys for Receiver J. Clark Kelso

# Achieving a
# Constitutional Level of Medical Care
# in
# California's Prisons

## Ninth Quarterly Report of the
## Federal Receiver's Turnaround Plan of Action

## September 15, 2008

# California Prison Health Care Receivership

## Vision:

As soon as practicable, provide constitutionally adequate medical care to patient-inmates of the California Department of Corrections and Rehabilitation (CDCR) within a delivery system the State can successfully manage and sustain.

## Mission:

Reduce avoidable morbidity and mortality and protect public health by providing patient-inmates timely access to safe, effective and efficient medical care, and integrate the delivery of medical care with mental health, dental and disability programs.

# Table of Contents

| | Page |
|---|---|
| 1. **Introduction and Executive Summary**.................................................. | 1 |
| 2. **The Receiver's Reporting Requirements**............................................ | 6 |
| 3. **Status and Progress Toward the Turnaround Plan Initiatives**................... | 8 |
| GOAL 1    Ensure Timely Access to Health Care Services............................. | 8 |
| *Objective 1.1*    Screening and Assessment Processes............................. | 8 |
| *Objective 1.2*    Access Staffing and Processes.................................... | 9 |
| *Objective 1.3*    Schedule and Patient-Inmate Tracking............................ | 11 |
| *Objective 1.4*    Standardized Utilization Management System..................... | 12 |
| GOAL 2    Establish a Prison Medical Program Addressing the Full Continuum of Health Care Services................................................ | 15 |
| *Objective 2.1*    Primary Care...................................................... | 15 |
| *Objective 2.2*    Chronic Care...................................................... | 16 |
| *Objective 2.3*    Emergency Response.............................................. | 18 |
| *Objective 2.4*    Specialty Care and Hospitalization............................... | 20 |
| GOAL 3    Recruit, Train and Retain a Professional Quality Medical Care Workforce................................................................... | 25 |
| *Objective 3.1*    Physicians and Nurses............................................ | 25 |
| *Objective 3.2*    Clinic Leadership and Management Structure...................... | 33 |
| *Objective 3.3*    Professional Training Program.................................... | 34 |
| GOAL 4    Implement a Quality Improvement Program.............................. | 36 |
| *Objective 4.1*    Clinical Quality Measurement and Evaluation Program............ | 36 |
| *Objective 4.2*    Quality Improvement Programs.................................... | 37 |
| *Objective 4.3*    Medical Peer Review and Discipline Process...................... | 40 |
| *Objective 4.4*    Medical Oversight Unit........................................... | 42 |
| *Objective 4.5*    Health Care Appeals Process..................................... | 44 |

*Objective 4.6*    Out-of-State, Community Correctional Facilities and Re-entry

Oversight.................................................................... 48

GOAL 5    Establish Medical Support Infrastructure................................... 51

*Objective 5.1*    Pharmacy.................................................................... 51

*Objective 5.2*    Medical Records........................................................... 57

*Objective 5.3*    Radiology and Laboratory................................................ 57

*Objective 5.4*    Clinical Information Systems............................................. 59

*Objective 5.5*    Telemedicine................................................................ 61

GOAL 6    Provide for Necessary Clinical, Administrative and Housing

Facilities..................................................................... 62

*Objective 6.1*    Upgrade Administrative and Clinical Facilities...................... 62

*Objective 6.2*    Expand Administrative, Clinical, and House Facilities............... 64

*Objective 6.3*    Finish Construction at San Quentin State Prison..................... 65

4.    **Additional Successes Achieved by the Receiver............................** 68

A.    Reducing Prisoner Deaths................................................... 68

B.    Establishing a CPHCS Project Management Office................................ 70

C.    *Turnaround Lifeline* Newsletter Published........................................ 70

**Particular Problems Faced by the Receiver, Including Any Specific Obstacles**

5.    **Presented By Institutions Or Individuals............................................** 72

A.    SPB Is Not Automating CPHCS Examinations Timely............................ 72

B.    CEA Requests Are Not Being Processed Timely.................................... 73

C.    Board Items Are Not Being Processed Timely..................................... 73

6.    **An Accounting of Expenditures for the Reporting Period........................** 75

7.    **Other Matters Deemed Appropriate for Judicial Review...........................** 76

A.    Coordination with Other Lawsuits.................................................. 76

B.    Master Contract Waiver Related Reporting......................................... 76

Other Steps Taken During the Reporting Period to Ensure a Fiscally

C.    Responsible Receivership…...………….……………………………………    77

8.    **Conclusion**……………...…………………………………………………………..    **80**

# Section 1
# Introduction and Executive Summary

During the June 15, 2008 through September 15, 2008 reporting period, significant progress continued toward attaining the Receiver's vision of providing "constitutionally adequate medical care to patient-inmates of the California Department of Corrections and Rehabilitation (CDCR) within a delivery system the State can successfully manage and sustain." Furthermore, the Receiver's programs were implemented in a cost effective manner. For example, the Maxor program projects a pharmacy cost avoidance savings to California taxpayers of approximately $33 million in 2008. More important than improvements in staffing, fiscal saving, organization, public health programs, infrastructure, and access to care, however, is the fact that the Receiver's efforts have reduced prisoner mortality rates. Simply stated, the Turnaround Plan of Action has begun to have an impact exactly where intended, improving medical care for those prisoners most at risk.

This is the first Quarterly Report that incorporates the metrics developed to measure Turnaround Plan of Action progress. Over time, the metrics provided in this report will improve in terms of both quantity and quality as new measurement systems are implemented and necessary information technology systems are established in California's prisons. To assist the reader, this report provides three forms of supporting data:

1. *Metrics*: Metrics that measure specific Turnaround Plan of Action objectives are set forth in this report with the narrative discussion of the objective. Note that some objectives (e.g., the reception center element of the access to care clinical initiative) are in a development stage, and therefore it is premature to implement metrics. However, other programs (e.g., the hiring of clinical personnel) can be measured by very specific metrics.

2. *Appendices*: In addition to providing metrics, the report also references a number of documents, which are provided to the reader in the attached Appendices filed concurrently with this report.

3. *Web Site References*: Concerning two large documents referenced in the report, the McKenzie Stephenson Report regarding Diagnostic Imaging and the Navigant Report regarding Laboratory Services, an executive summary only is provided as an appendix. The entire report, however, is available on the Receiver's website. Likewise, a third large document, the Corrections Corporation of America healthcare related Corrective Action Plan for its facility at Tallahatchie, Mississippi, is also available on the Receiver's website.

A chart summarizing the status of each of the six goals of the Turnaround Plan of Action is provided below. Objectives and actions' status shaded green are currently on schedule to be completed by the specified finish date. Objectives and actions' status shaded yellow are currently delayed slightly from the specified finish date. Objectives

1

and actions' status shaded red are currently delayed from the specified finish date. Discussion and explanations regarding delays are included in Section 3 under the respective objective and/or actions. Objectives and actions which have been accomplished are noted with a "check box."

September 15, 2008

| ID | Description |
|---|---|
| GOAL 1 | Ensure Timely Access to Care |
| Obj. 1.1 | Screening and Assessment Processes |
| Act 1.1.1 | Develop Standardize Screening and Assessment |
| Act 1.1.2 | Implement Screening and Assessment Process |
| Obj. 1.2 | Staffing and Processes for Health Access |
| Act 1.2.1 | Preliminary Assessment for Access Teams |
| Act 1.2.2 | Fully Implement Health Care Access Teams |
| Obj. 1.3 | Scheduling and Tracking System |
| Act 1.3.1 | Strategic Offender Management System |
| Obj. 1.4 | Standardized UM System |
| Act 1.4.1 | Long-Term Care Pilot |
| Act 1.4.2 | Implement Centralized UM System |
| GOAL 2 | Establish Medical Services Program |
| Obj. 2.1 | Access and Processes for Primary Care |
| Act 2.1.1 | Redesign sick call |
| Act 2.1.2 | Implement new sick call system statewide |
| Obj. 2.2 | Chronic Care |
| Act 2.2.1 | Chronic Care Initiative |
| Obj. 2.3 | Emergency Medical Response System |
| Act 2.3.1 | Emergency Medical Response Policy |
| Act 2.3.2 | Certification and Training |
| Act 2.3.3 | Standardize Emergency Equipment |
| Obj. 2.4 | Specialty Care and Hospitalization |
| Act 2.4.1 | Utilization and Care Management Policies |
| Act 2.4.2 | Statewide Specialty Care Contracts |
| Act 2.4.3 | Specialty Care Invoice Payments |

Timeline columns (Gantt chart): 2008 (2nd Q, 3rd Q, 4th Q), 2009 (1st–4th Q), 2010 (1st–4th Q), 2011 (1st–4th Q), 2012 (1st–4th Q), 2013 (1st Q, 2nd Q).

**September 15, 2008**

| | | 2008 | | | 2009 | | | | 2010 | | | | 2011 | | | | 2012 | | | | 2013 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 2nd Q | 3rd Q | 4th Q | 1st Q | 2nd Q | 3rd Q | 4th Q | 1st Q | 2nd Q | 3rd Q | 4th Q | 1st Q | 2nd Q | 3rd Q | 4th Q | 1st Q | 2nd Q | 3rd Q | 4th Q | 1st Q | 2nd Q |
| | **Physician and Nurse Recruitment** | | | | | | | | | | | | | | | | | | | | | |
| Act 3.1.1 | Nursing and Nursing Executive Positions | | | | | | | | | | | | | | | | | | | | | |
| Act 3.1.2 | Physician and Physician Executive Positions | | | | | | | | | | | | | | | | | | | | | |
| | **Management Structure** | | | | | | | | | | | | | | | | | | | | | |
| Act 3.2.1 | Establish and Staff Executive Leadership | | | | | | | | | | | | | | | | | | | | | |
| Act 3.2.2 | Establish and Staff Regional Leadership | | | | | | | | | | | | | | | | | | | | | |
| | **Professional Training for Clinicians** | | | | | | | | | | | | | | | | | | | | | |
| Act 3.2.1 | Orientation and Preceptor / Proctoring | | | | | | | | | | | | | | | | | | | | | |
| Act 3.2.2 | CME Accreditation | | | | | | | | | | | | | | | | | | | | | |
| | **Quality Measurement and Evaluation Program** | | | | | | | | | | | | | | | | | | | | | |
| Act 4.1.1 | Measurement, Eval. and Patient Safety Programs | | | | | | | | | | | | | | | | | | | | | |
| Act 4.2.2 | OIG Audit Program | | | | | | | | | | | | | | | | | | | | | |
| | **Quality Improvement Program** | | | | | | | | | | | | | | | | | | | | | |
| Act 4.2.1 | Train and Deploy QI Advisors to Develop Model | | | | | | | | | | | | | | | | | | | | | |
| Act 4.2.2 | Establish a Policy Unit | | | | | | | | | | | | | | | | | | | | | |
| Act 4.2.3 | Implement Improvement Programs | | | | | | | | | | | | | | | | | | | | | |
| | **Medical Peer Review Process** | | | | | | | | | | | | | | | | | | | | | |
| Act 4.3.1 | Establish Peer Review Process with SPB | | | | | | | | | | | | | | | | | | | | | |
| | **Medical Oversight Unit** | | | | | | | | | | | | | | | | | | | | | |
| Act 4.4.1 | Staff and Establish Medical Oversight Unit | | | | | | | | | | | | | | | | | | | | | |
| | **Health Care Appeals** | | | | | | | | | | | | | | | | | | | | | |
| Act 4.5.1 | Centralize Appeals, Correspondence & Habeas | | | | | | | | | | | | | | | | | | | | | |
| Act 4.5.2 | Health Care Appeals Task Force & Report | | | | | | | | | | | | | | | | | | | | | |
| | **Out-of-State & Other Facilities** | | | | | | | | | | | | | | | | | | | | | |
| Act 4.6.1 | Administrative Unit for Oversight | | | | | | | | | | | | | | | | | | | | | |

September 15, 2008

| | | 2008 | | | 2009 | | | | 2010 | | | | 2011 | | | | 2012 | | | | 2013 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 2nd Q | 3rd Q | 4th Q | 1st Q | 2nd Q | 3rd Q | 4th Q | 1st Q | 2nd Q | 3rd Q | 4th Q | 1st Q | 2nd Q | 3rd Q | 4th Q | 1st Q | 2nd Q | 3rd Q | 4th Q | 1st Q | 2nd Q |
| GOAL 5 | Medical Support Infrastructure | | | | | | | | | | | | | | | | | | | | | |
| Obj. 5.1 | Pharmacy Program | | | | | | | | | | | | | | | | | | | | | |
| Act 5.1.1 | Drug Formulary | | | | | | | | | | | | | | | | | | | | | |
| Act 5.2.2 | Pharmacy Policies and Practices | | | | | | | | | | | | | | | | | | | | | |
| Act 5.2.3 | Central-Fill Pharmacy | | | | | | | | | | | | | | | | | | | | | |
| Obj 5.2 | Health Records | | | | | | | | | | | | | | | | | | | | | |
| Act 5.2.1 | Roadmap for Standardized Health Records | | | | | | | | | | | | | | | | | | | | | |
| Obj. 5.3 | Radiology and Lab Services | | | | | | | | | | | | | | | | | | | | | |
| Act 5.3.1 | Determine strategy for HR, Lab and Radiology | | | | | | | | | | | | | | | | | | | | | |
| Obj 5.4 | Clinical Information Systems | | | | | | | | | | | | | | | | | | | | | |
| Act 5.4.1 | Establish Clinical Data Repository | | | | | | | | | | | | | | | | | | | | | |
| Obj. 5.5 | Telemedicine Program | | | | | | | | | | | | | | | | | | | | | |
| Act 5.5.1 | Secure Leadership for Upgrade | | | | | | | | | | | | | | | | | | | | | |
| GOAL 6 | | | | | | | | | | | | | | | | | | | | | | |
| Obj 6.1 | Upgrade Program | | | | | | | | | | | | | | | | | | | | | |
| Act 6.1.1 | Assessment & Planning at 33 Institutions | | | | | | | | | | | | | | | | | | | | | |
| Act 6.1.2 | Upgraded Administrative & Clinical Facilities | | | | | | | | | | | | | | | | | | | | | |
| Obj 6.2 | 10,000 Bed Expansion Program | | | | | | | | | | | | | | | | | | | | | |
| Act 6.2.1 | Pre-Planning on All Sites | | | | | | | | | | | | | | | | | | | | | |
| Act 6.2.2 | Construction at First Site | | | | | | | | | | | | | | | | | | | | | |
| Act 6.2.3 | Phased Construction Program | | | | | | | | | | | | | | | | | | | | | |
| Obj 6.3 | San Quentin Construction | | | | | | | | | | | | | | | | | | | | | |
| Act 6.3.1 | All Construction excluding Central Health Services | | | | | | | | | | | | | | | | | | | | | |
| Act 6.3.2 | Central Health Services | | | | | | | | | | | | | | | | | | | | | |

# Section 2
# The Receiver's Reporting Requirements

This is the Ninth Quarterly Report filed by the Receivership, and the third submitted by Receiver Clark Kelso.

The Order Appointing Receiver (Appointing Order) filed February 14, 2006 calls for the Receiver to file status reports with the *Plata* Court concerning the following issues:

    1. All tasks and metrics contained in the Plan and subsequent reports, with degree of completion and date of anticipated completion of each task and metric.

    2. Particular problems being faced by the Receiver, including any specific obstacles presented by institutions or individuals.

    3. Particular success achieved by the Receiver.

    4. An accounting of expenditures for the reporting period.

    5. Other matters deemed appropriate for judicial review.

(Appointing Order at p. 2-3.)

In support of the coordination efforts by the four Federal Courts responsible for the major health care class actions pending against the CDCR, the Receiver now files his Quarterly Reports in four different Federal Court class action cases. An overview of the Receiver's enhanced reporting responsibilities is included below.

*Plata, Coleman, Perez* and *Armstrong* Coordination Reporting Requirements

The Joint Order filed June 28, 2007 in *Coleman v. Schwarzenegger* (mental health care), *Perez v. Tilton* (dental care) and *Plata v. Schwarzenegger* (medical care) approved various coordination agreements made between the representatives of the three health care class actions. (Order Approving Coordination Agreements Attached to Joint May 29, 2007 Order, hereinafter "Joint Coordination Order.") These coordination agreements provide for the *Plata* Receiver to assume responsibility for the following: (1) direct oversight of contracting functions for medical, dental, and mental health care; (2) implementation of long-term information technology (IT) systems to include the medical, dental and mental health programs; and (3) oversight of pharmacy operations serving the medical, dental, and mental health programs. (Joint Coordination Order at 2.)

The Receiver's assumption of these responsibilities is coupled with reporting requirements which mandate that the Receiver file quarterly progress reports addressing the following: (a) all tasks and metrics necessary to the contracting functions, implementation of long-term IT, and pharmacy services for mental health care and dental care, with degree of completion and date of anticipated completion for each task and metric; (b) particular problems being faced by the Receiver in accomplishing remedial goals; and (c) particular successes achieved by the Receiver in accomplishing remedial goals. (Joint Coordination Order at 2-3.)

Additional reporting requirements were subsequently placed on the Receiver following his assumption of the management of certain coordinated functions involving the delivery of

Americans With Disability Act (ADA) related services in California prisons. [August 24, 2007 *Armstrong v. Schwarzenegger* Order Approving Coordination Statements (hereinafter "*Armstrong* Coordination Order.")]

On February 26, 2008, the *Plata, Coleman, Perez* and *Armstrong* Courts issued an additional joint order which provides for the Plata Receiver to manage two major prison health care construction projects: (1) upgrades to improve health care delivery at the existing 33 CDCR institutions, and (2) the construction, on existing prison sites, of health care facilities for up to 10,000 patient-inmates [Order filed February 26, 2008 (hereinafter "Order Approving Construction Agreement")]. As with the prior coordination orders, the Receiver was ordered to file quarterly reports in each case "concerning developments pertaining to matters that are the subject of the construction agreement." (Order Approving Construction Agreement at 3:1-3.)

Integration of Coordination Related Reporting in This Quarterly Report
Pursuant to the mandates of the various coordination orders referenced above, the Receiver's remedial umbrella now encompasses the following: the overhaul of the health care contract function; the implementation of long-term IT systems; the oversight of pharmacy operations for medical, mental health, dental and ADA patient-inmates; and the oversight of health care prison construction projects. As such, when this Quarterly Report describes progress and challenges facing reform of contracting functions, IT systems, pharmacy operations, and construction, all such references are referring to mental health, dental, ADA and medical care for patient-inmates. Specifically, the Receiver's Coordination-related reporting is set forth in the following sections of this Report: Credentialing and Privileging of Health Care Providers (Goal 4, Objective 4.2); Contracts (Goal 2, Objective 2.4); IT Update (Goal 1, Objective 1.3; Goal 5, Objective 5.4); Telemedicine Reform (Goal 5, Objective 5.5 ); Coordination with Other Lawsuits (Section 7.A.); and Construction (Goal 6).

Reporting Related to the Order Waiving State Contracting Statutes
On June 4, 2007, the Court approved the Receiver's Application for a more streamlined, substitute contracting process in lieu of State laws that normally govern State contracts. The substitute contracting process applies to specified project areas identified in the June 4, 2007 Order and, in addition, to those project areas identified in supplemental orders issued since that date. As ordered by the Court, the Receiver provides a summary of each contract the Receiver has awarded under the substitute contracting process during the reporting period. The Receiver's contract waiver-related report is provided in Section 7.B.

7

# Section 3
# Status of Turnaround Plan Initiatives

## Goal 1. Ensure Timely Access to Health Care Services

**Objective 1.1.**  Redesign and Standardize Screening and Assessment Processes at Reception/Receiving and Release

*Action 1.1.1. By January 2009, develop standardized reception screening processes and begin pilot implementation*

*The Reception Center Action in Context*:  When inmates first enter the correctional system, they receive an initial health screening at a reception center prior to endorsement to a mainline institution.  Under optimum conditions and processes, this initial health screening allows health care providers to stratify patients based upon health risk and refer patients to timely and appropriate clinical services.  Without effective screening at reception centers, the medical system fails to identify patients that may have immediate or chronic life-threatening medical conditions, disruptions in the continuity of care occur, such as failure to fill essential prescriptions, which can have life-threatening effects, and patients may be placed at institutions ill-equipped to accommodate patients' medical needs, among other negative outcomes.

A pilot program at San Quentin State Prison was initiated in 2006 to bring the existing reception screening process into alignment with national guidelines for health screening, provide screening on the same day as the inmate's arrival to prevent lapses in care, and integrate dental, mental health, and medical screening processes.  The integrated screening included laboratory testing and medication review and administration.  Implementation of the redesigned reception center process at San Quentin resulted in a reduction in sick call requests in all disciplines and a reduction in emergency care encounters and hospitalizations. The lessons learned at San Quentin are the basis for the development of standardized, measurable, and reliable screening processes which will be piloted, formally evaluated and revised, and then implemented statewide.  The San Quentin Reception Center Intake Screen and Health Assessment Update is provided as Appendix 1.

*Reception Center Progress During the Reporting Period*:  In July 2008, a Reception Center Core Team collaborated with staff at San Quentin State Prison to finalize a reception center redesign model that could be tested for reliability at another institution.  During this reporting period, the Reception Center Core Team and an on-site team of subject matter experts and executives from Richard J. Donovan Correctional Facility prepared for implementation of the redesign model at Richard J. Donovan Correctional Facility.  This redesign model is attached as Appendix 2.  Their collaboration included a facility assessment, baseline data collection, and arrangements for necessary physical space modifications.  The Richard J. Donovan Correctional Facility pilot commenced in August 2008 and is scheduled for completion in November 2008.  This is the final phase in the reception center process redesign, culminating in a statewide policy to be submitted to the Receiver in January 2009 for review and approval and then to the Court for

approval. This action item is moving forward consistent with the scheduled time frames set forth in the Turnaround Plan of Action.

> **Action 1.1.2. By January 2010, implement new processes at each of the major reception center prisons**

Following the anticipated approval of the new statewide policy in January 2009, the Reception Center Core Team will initiate implementation at all other reception centers statewide, scheduled for completion by January 2010. This action is on schedule to complete the projected statewide implementation by January 2010.

## Objective 1.2.    Establish Staffing and Processes for Ensuring Health Care Access at Each Institution

> **Action 1.2.1. By January 2009, the Receiver will have concluded preliminary assessments of custody operations and their influence on health care access at each of CDCR's institutions and will recommend additional staffing, along with recommended changes to already established custody posts, to ensure all patient-inmates have improved access to health care at each institution**

Preliminary Operational Assessments

This action is ahead of schedule. Preliminary Operational Assessments have been completed at 32 California Department of Corrections and Rehabilitation (CDCR) institutions. Specifically, in this reporting period, the final three Preliminary Operational Assessments were completed at Calipatria State Prison, California Correctional Institution, and Chuckwalla Valley State Prison. The final three assessments resulted in the recommendation of 207.26 correctional officer positions for use as clinic officers, escort officers and transportation officers. An additional 38.54 supervisory/management positions were also recommended to provide the appropriate level of supervision.

During this reporting period, the Special Master in *Madrid* completed oversight of Pelican Bay State Prison. Pursuant to a Court-approved stipulation by the parties in *Madrid*, Pelican Bay State Prison is now within the purview of the *Plata* litigation and under the authority of the Receivership. This change will necessitate an additional prison Preliminary Operational Assessment, which is scheduled for January 2009.

Operational Re-Assessments

As reported in past Quarterly Reports, the initial eight Preliminary Operational Assessments lacked the scope and depth of review that prisons have received at the later reviews. In order to ensure the same methodology and analysis is utilized in all the Preliminary Operational Assessments, it has been determined that additional assessments of the initial eight institutions, excluding Avenal State Prison and Correctional Training Facility, Soledad, will be conducted. During this reporting period, Sierra Conservation Center was re-assessed. By December 31, 2008, the following six re-assessments are to be completed: Wasco State Prison, Ironwood State

9

Prison, High Desert State Prison, California Conservation Center, California State Prison-Solano and Richard J. Donovan Correctional Facility.

To summarize, all Operational Assessments will be completed on schedule by January 2009.

> **Action 1.2.2 By July 2011, the Receiver will have fully implemented Health Care Access Units and developed health care access processes at all CDCR institutions**

The Health Care Access Units at the California Medical Facility and San Quentin State Prison continue to operate effectively and efficiently and are fully supported by the prisons administrative, clinical, and custody staff. Both San Quentin State Prison and the California Medical Facility continue to report a reduction in missed appointments and an increase in inmate access to health care. During July 2008, efforts were initiated to establish a Health Care Access Unit at the Correctional Training Facility, Soledad. Upon conclusion of the detailed analysis of custody health care operations inclusive of the planned construction of new clinical space, the recommendation is for 67 posts or 108.26 new positions. Of the positions, 48.72 positions or 50.42% are allocated for Hospital Guarding and 20.06 positions or 20.76% are allocated for Transportation. Activation of the Health Care Access Unit at Correctional Training Facility, Soledad is scheduled for completion by November 1, 2008.

As discussed in the last Quarterly Report the Receiver approved 134.2 new positions for the activation of the Health Care Access Unit at Avenal State Prison, scheduled to activate July 1, 2008. The Health Care Access Unit at Avenal State Prison was activated on August 11, 2008. Custody Support staff will continue to monitor the progress of the Avenal State Prison Health Care Access Unit and remedy issues as they arise.

This action items remains on schedule. Health Care Access Units will be established at California Institution for Men, California Rehabilitation Center, California Institution for Women, and Mule Creek State Prison by June 30, 2009. This action item is also on schedule to complete implementation of Access Units statewide by July 2011.

Monthly Health Care Access Quality Report - Data Collection Instrument
The purpose of the Access Team concept is to ensure prisoner access to medical, mental health, and dental care in a timely and cost-effective manner. To verify this result, an audit instrument was developed during the previous reporting period to formally measure access team performance. Pilot measurement programs to implement the instrument, the "Monthly Health Care Access Quality Report" were established at San Quentin State Prison, California Medical Facility, California State Prison-Corcoran and Avenal State Prison as of July 1, 2008. All prisons were to implement the instrument developed by the pilot as of October 1, 2008, following training that should have been provided on August 7, 2008. Because of the State budget crisis, however, travel for CDCR staff was suspended and the training did not take place. Training is now scheduled for September 24-25 2008, subject to passage of a State budget. The new implementation date is November 1, 2008. A draft version of the Monthly Health Care Access Quality Report is attached as Appendix 3.

**Objective 1.3.**  **Establish Health Care Scheduling and Patient-Inmate Tracking System**

*Action 1.3.1. Work with CDCR to accelerate the development of the Strategic Offender Management System with a scheduling and inmate tracking system as one of its first deliverables*

*Status of Work with CDCR Re Offender Management and Tracking*:  A system for the scheduling and tracking of medical appointments for patient-inmates is an essential element of providing timely access to care. Prisoner scheduling and movement control within the CDCR's 33 prisons will be handled by the Strategic Offender Management System (SOMS). SOMS will include four components that are critical to the success of the prison health care system: a unique identification number for each offender; real-time location information for each offender; demographic information on each offender; and a master offender schedule and scheduling prioritization system.

The SOMS project is in the vendor evaluation and selection stage of procurement. A Request for Proposals (RFP) has been issued to select a system integrator and a commercially available software product for the project. Proposals submitted in response to the RFP are currently being reviewed. A contract award is scheduled to be made by early 2009. The first phase of the SOMS implementation is scheduled for early 2010.

*Status of Development of an Adequate Health Care Scheduling System for Medical, Mental Health and Dental Needs*:  Commercial Off-The-Shelf offender health care management products that were reviewed by the Receiver's staff and by mental health and dental clinician/managers did not appear to be sufficiently robust to handle the more complex needs of a health care scheduling system necessary for 33 distinct institutions. Therefore the State employees who report to the Receiver in the California Prison Health Care Services Department (CPHCS), working with representatives of the mental health and dental disciplines, have initiated a project to identify health care scheduling needs, re-engineer processes to the extent necessary, and procure or develop software to manage health care scheduling (medical, mental health, dental, and disability related scheduling). It is essential that the proposed Health Care Scheduling System (HCSS) that will be implemented be able to integrate completely with SOMS on a near real-time basis. Consequently, CPHCS staff and consultants are closely involved in the SOMS RFP process as evaluators and subject matter experts.

The HCSS project is currently in the initial stages of procurement. CPHCS has recently executed, on a competitive basis, a contract with Gartner, Inc. to define the requirements and parameters, including interfaces with other information technology systems, for a system that will comprehensively encompass prison medical, dental, mental health, and other health care appointment scheduling. The new system must also accommodate all ancillary scheduling needs, such as custody officers, equipment, transportation, special care personnel, prison scheduling, offender location, and other constraints on patient-inmate movement. CPHCS will prepare, by the end of the year, an RFP for an HCSS product and implementer, including necessary modifications and enhancements.

11

Both the SOMS and HCSS projects are on schedule.

## Objective 1.4.  Establish A Standardized Utilization Management System

> *Action 1.4.1. By January 2009, open long-term care units at one facility as a pilot project to assist in developing plans for other long-term chronic care facilities*

This initiative was established in the Turnaround Plan of Action as a bridge to increase the available medical beds until the Receiver's first facility of the 10,000 medical bed project is completed in 2011. The additional beds will provide new treatment options and allow clinical staff to effectuate a number of clinical "sweeps" of Correctional Treatment Centers and other prison medical units and thereafter transfer those patients who appear the most at risk to a high level of care. The California Medical Facility was identified as the pilot site for this project and planning was initiated on May 20, 2008.

During the reporting period, a number of interdisciplinary meetings have occurred including California Medical Facility executives, CPHCS clinical leaders, the Receiver's Custody Support Team and Vanir Construction Management, Inc. As a result of these meetings, a final proposal was drafted and agreed to on August 19, 2008 by the Warden, Health Care Manager/Chief Medical Officer, Director of Nursing, Associate Warden of Health Care Services, CEO of Medical Services for the Receiver, Regional Administrator, Regional Director of Nursing, and Regional Medical Director.

The proposal entails the renovation of 31 existing Outpatient Housing Unit (OHU) beds on the first floor "H" Wing; the conversion of 100 General Population beds on both the second and third floors of "H" Wing to 39 OHU beds for each floor (78 new OHU beds total); and improvements to the physical plant in order to meet Fire Marshal and ADA requirements. This will result in a total of 109 OHU beds in "H" Wing at a projected cost of $3.3 million. The proposal will create appropriate nursing exam/treatment space, clean/soiled rooms, medication prep rooms, and other medical support spaces, replacement of 10 Administrative Segregation cell doors, a nurse call system, toilet/sink combo replacement, shower area conversions, and patch and painting of various walls, floors and ceilings.

Presently, this plan is pending approval by CDCR executive staff and the Receiver. Once approved, a construction plan will be finalized to open the beds as soon as possible due to the immediate need. It is estimated that the project will take between 8 and 11 months to complete once construction begins. However, because defendants failed to fund both the Receiver's 10,000 new bed project and the prison upgrade project, the money needed for this program is not available. Because of defendants' failure, this project is no longer on schedule and it will not be completed by January 2009. The Receiver has filed a motion to hold State officials in contempt concerning their failure to fund this element of the remedial plan, and a hearing is calendared for October 6, 2008.

*Action 1.4.2. By October 2010, establish a centralized Utilization Management System*

In July 2008, a Chief Medical Officer was hired to establish and administer a new Utilization Management (UM) Program. The vision for the new UM Program moves away from the current disorganized system that is focused on "gate keeping," lacks adequate clinical criteria, and fails to provide useful planning information and moves toward the use of criteria-driven approval processes, and at the same time incorporates care management systems to identify and manage the patient subpopulations that drive specialty care and acute care referrals.

Specialty Care Pilot
The UM CMO heads the Specialty, Infirmary, and Acute Care (SIAC) Core Team under the Access to Care Initiative, which includes staff with UM expertise in nursing, physician, correctional, information systems, and analytical disciplines. In July 2008, the SIAC Core Team prepared to establish a third specialty care pilot site. The third pilot site will build upon accomplishments at California State Prison, Los Angeles County (LAC) and California Correctional Institution (CCI) which have seen significant improvements in appointment access, cancellation rates, and overall specialty availability through their systems changes. These successful strategies include implementation of criteria-based referrals, pre-appointment confirmation forms, improved coordination with custody escort staff, and a shift in the UM/specialty care/chronic care nursing role towards local care coordination and a centralized case management model. This role redesign and cross-training among nursing staff in the Access to Care Initiative directly supports the Receiver's vision for a patient-centered health care delivery system. At a third pilot program at Folsom State Prison, the Core Team will develop a sustainable specialty care referral process that expedites patients' access to specialty services, incorporates InterQual criteria in decision-making, and minimizes appointment backlogs and cancellations.

Concurrent with the establishment of a pilot specialty care program at Folsom State Prison, the SIAC Core Team will train institutions in the use of InterQual. Training will begin in October 2008 and conclude in December 2008. Use of InterQual criteria will help to standardize the basis for specialty care referrals. InterQual also will compel providers to complete thorough patient evaluations and follow appropriate evidence-based alternatives prior to making a referral for specialty care. The InterQual evidence based clinical decision support criteria are endorsed by all Joint Commission (JCAHO) accredited hospitals. The criteria have served as the standard lexicon regarding decisions about appropriate referrals and quality of care and also contain an extensive library of clinical literature and citations available for organizational support and reference.

Bed Access Pilot
Over utilization of expensive acute care hospital beds often can be attributed to lack of inpatient beds in the overcrowded prisons that can accept discharged hospital patients. There are no utilization criteria such as InterQual for bed management in the correctional health care industry. The SIAC Core Team has completed the groundwork to establish a bed access pilot program focusing initially on institutional beds within the CDCR and is scheduled to commence in November 2008. This pilot is a short-term remedy to address inappropriate bed utilization in

13

the institution while the 10,000 bed project is still under construction. Using a multi-disciplinary team approach with staff from Headquarters and the field, this pilot program will test strategies to develop an efficient, appropriate, and standardized system to monitor in-patient bed utilization in the correctional setting. This system will refer patients to/from infirmary and acute care beds, integrate standardized definitions of medical necessity, and utilize InterQual criteria and possibly other screening and assessment tools from the long-term care industry.

The Specialty Care Pilot and Bed Access Pilot are on schedule.

## Goal 2. Establish A Prison Medical Program Addressing The Full Continuum of Health Care Services

**Objective 2.1.**   Redesign and Standardize Access and Medical Processes for Primary Care

*Action 2.1.1. By July 2009, complete the redesign of sick call processes, forms, and staffing models*

During this reporting period, Sick Call Core Team staff prepared for implementation of Phase I of a three-phased process to redesign the sick call program and staffing model.  Sick call program redesign is on track for completion by the target date of July 2009.

As noted in the Receiver's Turnaround Plan of Action, access to primary care services in California's prison system is generally accomplished through a "sick call" process.  Through sick call, patients submit requests for health care services, the requests are triaged, and the patient is scheduled to see a provider in accordance with timeframes specific to the acuity of the patient's medical complaint.  In his Turnaround Plan of Action, the Receiver found the current sick call process to be "plagued by inconsistent local processes involving too many forms, handoffs, and opportunities for error."   Additional problems included out-of-date nursing protocols, an inefficient system for diagnostic testing and follow-up, lack of access to patient records for providers evaluating patients, and insufficient scheduling and tracking mechanisms that lead to gaps in care and do not allow for effective program monitoring and evaluation.

To accomplish the Receiver's objectives pertaining to reform of the sick call process, Access to Care executives will implement a three-phased strategy.  In Phase I, the Sick Call Core Team will pilot a new sick call program and staffing model at one institution.  In Phase II, the Sick Call Core Team will refine the program based upon the findings and lessons learned from the pilot program and will expand the pilot to encompass two additional institutions.  At the conclusion of Phase II in July 2009, the Sick Call Core Team will submit a new sick call policy, forms, and a staffing model to the federal court for approval.  In Phase II, the Sick Call Core Team will implement the approved sick call program at all CDCR institutions by July 2010.

*Sick Call Redesign Progress During the Reporting Period*: During this reporting period Access to Care executives began Phase I, establishing a workgroup of staff with clinical, administrative, correctional, information systems, and project management expertise referred to as the Sick Call Core Team.   By the end of August 2008, Access to Care executives had selected a clinical manager, administrative team lead, correctional expert, nursing practice expert, and analysts to staff this new Sick Call Core Team.  Core Team members conducted site visits at Mule Creek State Prison, California Correctional Institution, Richard J. Donovan Correctional Facility, and California State Prison, Los Angeles County  to map out current sick call processes and staffing models; researched health care access programs at health care organizations such as Kaiser and the Department of Veterans' Affairs and correctional systems such as Federal Bureau of Prisons and the Texas correctional system; and began to develop pilot site criteria.  Members of the new Sick Call Core Team also received training in the rapid-cycle quality improvement processes that will be applied in the Sick Call Pilot.

15

During the remainder of Phase I, the Sick Call Core Team will establish new sick call processes and staffing models to be tested at pilot sites, as well as appropriate performance measures and program reports. The first pilot site is anticipated to launch in December 2008, which will allow for the completion of Phase I and II by July 2009.

### Action 2.1.2. By July 2010, implement the new system in all institutions

The redesigned sick call process action plan is on schedule for statewide implementation by the target date of July 2010.

## Objective 2.2.    Improve Chronic Care System to Support Proactive, Planned Care

### Action 2.2.1. By April 2009, complete a comprehensive, one-year Chronic Care Initiative to assess and remediate systemic weaknesses in how chronic care is delivered

As detailed in previous Quarterly Reports, one of many failures of the original *Plata* remedial plan involved attempts to implement complicated clinical programs in a simplistic, and subsequently ineffective, costly, and unsustainable manner. Concerning chronic care, for example, the original remedial program called for development of chronic care policies and procedures, which were then provided to staff (assuming that adequate staffing was available) with little or no training, and without a formalized *program model or system* to adequately manage chronic care. The Receiver's Chronic Care Initiative approaches chronic disease in an entirely different manner by establishing a cost effective continuum of care program via an integrated chronic care team (of different clinicians, e.g. primary care providers and nurses). Thus, this Action calls for *both* a new patient management system and the application of adequate policies and procedures.

The focus of the two-phased Chronic Care Initiative is to build the infrastructure for both an effective chronic care system and an ongoing quality improvement process at each CDCR institution using a learning collaborative model. Under this initiative, each institution will learn how to establish critical elements of an effective chronic care management model, including the identification of patient subpopulations, care management and coordination, use of evidence-based treatment protocols, and implementation of patient education programs. To commence the learning process, asthma patients were selected as the sample subpopulation. For Phase I, selected pilot prisons will engage in learning "collaboratives" (workgroups that meet periodically to share strategies, compare outcomes, and receive technical assistance and training).

*Chronic Care Initiative Progress During the Reporting Period*: Phase I of the Chronic Care Initiative commenced during the reporting period. It includes six pilot institutions to be enrolled in the chronic care learning collaboratives. The six pilot institutions, consisting of two institutions from each of the major geographical regions, are as follows: Folsom State Prison, Mule Creek State Prison, Central California Women's Facility, California Men's Colony, California Institution for Women, and Richard J. Donovan Correctional Facility. At the first learning session in July 2008, the six pilots received intensive training on rapid-cycle quality improvement, the chronic care model, and evidence-based treatment guidelines.

16

Following this first learning session, the six Phase I institutions began to experiment with new approaches to managing asthma patients, such as implementing group appointments for patient education and creating forms and questionnaires to help providers accurately diagnose patients' asthma severity. These experiments are referred to as "rapid-cycle improvement" – the changes tested by the Phase I institutions are implemented, studied, and modified as necessary over the course of a few days, in most circumstances. In July and August 2008, Phase I institutions completed 74 improvement cycles, or more than 12 program modifications per institution. By the end of July 2008, all six Phase I institutions had implemented at least one element of the chronic care model. At the close of August, all of the six institutions had implemented at least three elements, and four of the six institutions had implemented all six elements. This is significant because studies show a direct relationship between the number of chronic care model elements implemented and the quality of patient care; the more elements of this model that are implemented, the more likely providers are to provide high quality chronic care. The six Phase I institutions will convene in September 2008 for a second learning session to share strategies, identify best practices, and receive additional training in care management concepts and quality improvement techniques.

At the close of Phase I, from November 2008 to January 2009, Access to Care staff will finalize polices and forms to establish a statewide Chronic Disease Management Program. This program will be introduced to *all* CDCR institutions during Phase II, scheduled to begin in January 2009. In Phase II, the remaining 27 institutions in the state will begin implementation of the Chronic Disease Management Program by utilizing the approved polices and forms, which includes establishing a patient registry, redesigning clinical roles to put a care management system in place, and placing new emphasis on patient education and evidence-based treatment protocols. Each institution will also participate in a learning collaborative – one collaborative per region, with nine institutions in each collaborative – and each institution will begin monthly reporting of performance measures. While these 27 institutions initiate implementation of the chronic care model, the six pilot institutions from Phase I will expand the focus of their chronic care program beyond asthma patients into other disease states. By the close of Phase II in October 2009, all institutions will have developed a mature chronic care program, with the capacity to manage a variety of chronically-ill subpopulations.

*Modifications to the Chronic Care Initiative:* The initial strategy contemplated by the Receiver's staff concerning this Action involved launching one learning collaborative of six institutions, and a traditional roll-out of the chronic care model to the field by April 2009. It is now clear, however, based on the experience gained by the six Phase I institutions, that the clinical staff (both primary care providers and nurses) at the other 27 CDCR prisons will benefit significantly from participating in a learning collaborative. In other words, the remaining 27 institutions will have much better chances of establishing sustainable programs if provided with the intensive technical assistance and training, problem-solving, and peer support found in a learning collaborative. Indeed, the conclusion has been reached that to limit the collaborative process to six prisons will create an unacceptable risk of duplicating the level of unsustainability that characterized the pre-Receivership *Plata* chronic care remedial program. In order to provide necessary learning collaboratives for all 33 prisons, and not just for a pilot group, the projected completion date for this initiative has extended by eight months to December 2009.

17

**Objective 2.3.    Improve Emergency Response to Reduce Avoidable Morbidity and Mortality**

The original *Plata* emergency care remedial plan suffered from similar defects as described above concerning chronic care. Not only were the policies and procedures inadequate, there was simply no real emergency care "system." Here again, therefore, the Receiver's goal concerning necessary emergency related improvements calls for an entirely new multi-faceted model for emergency care: the Emergency Medical Response Initiative (EMRI).

A standardized Emergency Medical Response System (EMRS) will provide prisoners and staff within the California prison system with an adequate level and quality of emergency medical care. Once implemented, the EMRS will improve care and response times within the prison setting, improve clinical outcomes, and decrease preventable deaths. The initiative is broken into the following five phases:  Phase I - Establish emergency response policies and procedures; Phase II - Pilot the initiative at two institutions; Phase III – Modify policies and procedures based on feedback and lessons learned at the pilot institutions and from stakeholders; Phase IV – Train each institution on the new policies and procedures; and Phase V – Sustain the initiative through quarterly reviews of adherence to policy.

EMRS policies and procedures will be adopted across all institutions through a systematic rollout of the EMRI. The initiative will implement a standardized approach to emergencies at all prisons, including documentation, equipment, and certifications to ensure timely response to medical emergencies.

*Action 2.3.1. Immediately finalize, adopt and communicate an Emergency Medical Response System policy to all institutions*

Phases I, II and III of the EMRI were completed during the reporting period. An initial version of the policies and procedures was provided to the pilot institutions on June 12, 2008. The EMRS was then implemented at Chuckawalla Valley State Prison and Richard J. Donovan Correctional Facility on June 23, 2008, and July 27, 2008, respectively. Emergency policies and procedures were revised following the pilot to reflect input from the pilot institutions, stakeholder groups (including counsel, and representatives from the *Coleman, Perez,* and *Armstrong* class actions), and executive committees. The revised policies and procedures were approved by the Receiver on September 5, 2008 and are attached as Appendix 4.

To assure appropriate implementation, the revised policies will be rolled out to all prisons pursuant to a time-phased training and deployment program. The schedule for implementation is attached as Appendix 5. However, the preparation of policies, the roll out of policies, and training on policies is only the first of several necessary steps to ensure real life establishment of the Receiver's emergency care system. Two other critical elements involving certification and emergency equipment must also be implemented, as explained below.

18

*Action 2.3.2. By July 2009, develop and implement certification standards for all clinical staff and training programs for all clinical and custody staff*

To ensure that all clinical staff have the requisite skills to provide basic life support in the event of a medical emergency, all clinical providers working in or intermittently assigned to the Triage and Treatment Area (TTA) will be Advanced Cardiac Life Support (ACLS) trained, and all first responders to a medical emergency will receive Basic Life Support (BLS) training. During September 2008, a survey of all institutions will be conducted to determine the ACLS and BLS training needs. Following the survey, a training plan will be developed and a directive to the field will be distributed. The EMR Implementation team has also confirmed that custody staff will receive BLS training, as part of the standard block training required of all correctional officer staff. While this program is on schedule to be completed by July 2009, the scope of implementation is daunting, requiring a wide range tasks that must be completed to effectuate the process, including organizing the training effort both internally and with CDCR, negotiating with impacted bargaining units, scheduling, follow-up reviews, and so on.

*Action 2.3.3. By January 2009, inventory, assess and standardize equipment to support emergency medical response*

Inventorying, assessing, and standardizing emergency response equipment and supplies at 33 prisons, each of which, in the past, dealt with emergency planning in different ways, presents a complex challenge. The task has proven especially difficult because there are no health care property managers assigned to the prisons. Therefore, to move forward in a timely and cost effective manner with Action 2.3.3, three focus areas were designated concerning inventorying, assessing and standardizing the emergency response medical equipment and supplies.

### 1. Emergency medical response bags

Significant progress was made during the reporting period concerning Emergency Response Bags. Eight institutions were audited concerning inventory and need, and the new, standardized Emergency Response Bag was deployed on a pilot basis to four institutions. While this element of the emergency program is off to a good start, initial evaluations determined that if this program element continues at its present pace, the deployment of standardized Emergency Response Bags may not meet the January 2009 deadline. Therefore, this program is in a redesign process to ensure the fastest possible roll out of standardized bags -- consistent with appropriate training and fiscally responsible inventory control.

### 2. Defibrillators

Defibrillators and Automatic External Defibrillators (AED) are critical medical equipment components to the Receiver's emergency response initiative. A statewide audit of all defibrillators was completed during the reporting period, consistent with plans to replace the defibrillators with a standardized unit that meets appropriate standards. Preferred standardized equipment has been identified, and work has commenced with procurement to purchase this equipment. The initial estimated cost for statewide roll-out is $1.6 million.

While this program element is on schedule to meet a January 2009 date to *begin* procuring standardized Defibrillators and AED's for the institutions, far too many risk factors may impact this schedule. Furthermore, it should be possible to speed up the necessary statewide roll out of this equipment. Therefore, this element of the emergency system remedial plan is also under redesign at this time.

### 3. Other Emergency Response Equipment and Supplies

While the initial focus is appropriately on the equipment cited above, an effective emergency system will also require certain other equipment and supplies (e.g. emergency gurneys), and in some situations (given significant differences in institution age and design) specialized equipment for selected prisons. Assessing needs, conducting inventories, and establishing an adequate standardized list of additional supplies presents a wide range of challenges, including establishing prison specific liaisons with correctional officials, and conducting accurate inventories when needed property managers do not exist. Therefore, the decision was made to centralize this effort, and to establish an interdisciplinary team to approach this problem in a manner similar to the program cited in Goal 1 concerning the development of access to care correctional teams. A time-phased program and progress to date report concerning this enhanced element of the Receiver's emergency response system will be provided in the next Quarterly Report.

**Objective 2.4.** **Improve the Provision of Specialty Care and Hospitalization to Reduce Avoidable Morbidity and Mortality**

*Action 2.4.1. By June 2009, establish standard utilization management and care management processes and policies applicable to referrals to specialty care and hospitals*

Progress related to the establishment of a Utilization Management program is summarized under Goal 1, Objective 1.4, Action 1.4.2.

*Action 2.4.2. By July 2009, establish on a statewide basis approved contracts with specialty care providers and hospitals*

Overall Contract Processing System
Ten institutions have been rolled into the ProdAgio contracting system. An additional six institutional programs are scheduled to be implemented into ProdAgio during September and October 2008. The implementation of the remaining institutional programs is scheduled for completion by March 2009. Full implementation of the Prodagio contracting system was anticipated for February 2009, and this target date was reported in the previous Quarterly Report. A one month delay is due to longer time required for site assessments than planned, staffing shortage among the ProdAgio technical team, and time required to resolve technical limitations at the target institutions.

Contract Processing Timelines
*Restructuring the Contracts Branch.* In order to meet the expected timeframes for processing contracts, the Contracts Branch intends to restructure and transition to a best practices model as

called for by the April 21, 2008 Navigant contract study. This report was attached to the Eight Quarterly report as Exhibit 6. To summarize, the existing duty statements and job levels for contracts personnel is simply not adequate to ensure that the State is properly represented during contract negotiations with hospital, registry, and specialty providers, some of which carry multi-million dollar price tags. CPHCS will enter into a contract with CPS Human Resource Services within 45 days to identify more fiscally appropriate classifications, staffing levels, and business model.

*Streamlining the State Contract Boilerplate.* During this reporting period, Contracts Branch staff also worked to revise the health care contract language boilerplate. The revised language reflects changes to align it with the healthcare industry while at the same time protecting the interest of the State. Staff implemented a website which contains links to allow providers easy access to download standardized contract exhibits. This enhancement reduced the number of hard copy pages required in each contract by an estimated 45 pages. These changes should streamline the negotiation and approval process, by shortening the contract process and creating consistency with contract provisions.

Comparison data and timeframes will be provided in the next Quarterly Report, identifying the number of contracts fully executed under the new process.

Status of Chancellor Group Hospital and Associated Physicians Contract Negotiations
The Chancellor Consulting Group (retained by the Receiver to re-negotiate hospital and associated physician group contracts) has successfully negotiated and executed 21 hospital letters of agreement, and 6 letters of agreement with medical groups containing 892 physicians, and 152 individual physician letters of agreement. Significant fiscal savings will be generated through these new contracts, compared to the cost of the State contracts entered into prior to the Receivership. At present, Chancellor Consulting Group is on schedule to complete their planned negotiations by July 2009; however, the primacy of the focus of the Chancellor Group's efforts involve three considerations that are more important than meeting projected dates for this project: (1) establishing contracts using a Medicare-based percentage industry standard in contrast to the prior, more cumbersome and more costly State generated rate structure; (2) entering into contracts that achieve significantly lower overall rates for hospital care for patient-inmates; and (3) working to establish an interim statewide hospital network that makes fiscal sense (replacing an existing system that is both chaotic in structure and unnecessarily expensive).

*Action 2.4.3. By July 2009, ensure specialty care and hospital providers' invoices are processed in a timely manner*

Roll Out of the ProdAgio Invoicing System
Twelve institutions are currently in the centralized ProdAgio invoicing system. An additional six institutional programs scheduled to be implemented into ProdAgio during September and October 2008. The implementation of the remaining institutional programs is scheduled for completion by March 2009. Like the Prodagio contracting system, full implementation of the Prodagio invoicing system was anticipated for February 2009, and this target date was reported

in the previous Quarterly Report. The additional one month delay is due to longer time required for site assessments than planned, staffing shortage among the ProdAgio technical team, and time required to resolve technical limitations at the target institutions.

Progress Concerning Invoice Processing During the Reporting Period
Numerous factors influence the time necessary to process provider invoices: accuracy of submitted invoices, completeness of required information, submission to correct address, adherence to contract terms, etc. These factors in turn impact the overall average time required for processing invoices. Therefore, during the reporting period efforts continue on a variety of fronts including the following: educating providers concerning invoicing requirements; design and implementation of improvements to ProdAgio and the Contract Medical Database (CMD); increasing staff resources; and the further consolidation and centralization of invoice adjudication and processing operations.

*Current Status of Invoice Processing Time.* Nevertheless the time required for processing invoices statewide in both the ProdAgio and the non-ProdAgio payment systems increased during the reporting period. Specifically, the processing time for adjudication and data entry of invoices during this period increased from about 15 days to more than 22 days for the two systems. Refer to Table 1 below. Several factors contributed to this increase, including the following:

1.    Because field personnel (invoicing staff who work in the prisons) have been informed that the invoice function will transition to the ProdAgio computerized invoice process, and thereafter it will centralized in Sacramento, many current field invoice staff have, not surprisingly, moved to transition to new prison assignments. These employee moves created a higher percentage of vacant positions and, in some cases, required the transfer of work previously done in the field to the Central Office.

2.    Transition to ProdAgio and centralization has, at the same time, necessitated an extensive hiring program at the Central Office in Sacramento. Orientation and training new invoice clerks has created a temporary reduction in productivity. At the same time contract unit managers have taken steps to improve training and the knowledge base of all invoice processors. Indeed, recognition of the value and importance of training in improving the skills and efficiency of invoice processing staff has resulted in a number of initiatives. For example, all newly hired staff will receive initial invoice adjudication, processing, and data recording training in a comprehensive training program as a graduated workload is assumed. The branch is also closely collaborating with Plata Human Resources to develop a training regimen for all employees for purposes of staff and organizational development.

3.    The State fiscal year budget crisis has also had an adverse impact on invoice management and control, including an increased burden of work responding to payment related inquiries by specialty providers and hospitals.

22

4.      The instability and limitations of the pre-Receiver CMD document systems and the sporadic performance of ProdAgio (temporary in nature, driven by the system's roll out) has also created processing delays during the reporting period.

To some degree these conversion related issues were anticipated, and invoice managers remain confident that the conversion to ProdAgio and centralization will, over time, lead to faster and more accurate invoice processing. Furthermore, despite the dip in invoice payment time for this reporting period, invoice processing remains far more efficient and timely compared to the unacceptable conditions that existed at the start of the Receivership.

**Table 1.**



***Table 1 Results Explanation:*** *Data represents invoices processed for FY07/08; however, analyst(s) continue to process invoices received from contractors for prior fiscal years. Total number of Invoices for FY06/07 303,574, Prodagio 39,603, Non Prodagio 263,971. Total number of invoices for FY07/08 365,825, Prodagio 135,188, Non Prodagio 230,637.*

*Status of Contract Database System Upgrades.* Important (for utilization management and fiscal purposes) medical data and payment information is at present entered into the CMD, a pre-existing CDCR contract data and invoice payment database, in order to capture industry standard data for reporting and rate modeling purposes. Historically, the CMD was decentralized and was available to each institution; however, this created efficiency problems such as the inability to access real-time data centrally. To address this problem, the CMD is currently being upgraded

23

and centralized. The upgrade will speed-up data entry and reduces data entry errors by allowing multiple concurrent users. In addition, it will functionally consolidate 33 separate prison Access databases into a central SQL server for increased system reliability and storage capacity. (SQL is a database computer language for querying and modifying data and managing databases.) To support management decision making, the upgrade will provide real-time data and timely, on-demand data reporting. The upgrade project began in May 2008, is expected to be rolled out in November 2008, and is scheduled to be completed by December 2008.

The sporadic performance of ProdAgio has created the need for continuous monitoring and adjustments by the software consultants. Additionally, given the need to receive paper bills and then data enter the billing amounts, ProdAgio, standing alone, may not have the capacity to achieve the processing objective of an average of 45 days from when an invoice is received to the contractor having a check in hand. Therefore, the decision has been made to begin to explore utilizing the services of a third party adjudicator for processing some or all invoices, and transitioning the work of invoice processors to more of a review and audit function.

Despite the challenges reported above, the Invoice Processing Branch remains on schedule to achieve Action 2.4.3 by July 2009.

24

## Goal 3. Recruit, Train and Retain a Professional Quality Medical Care Workforce

**Objective 3.1.**    Recruit Physicians and Nurses to Fill Ninety Percent of Established Positions

### *Action 3.1.1. By January 2009, fill 90% of nursing positions*

Recruitment efforts continued to focus on physicians and nurses during the reporting period. The results have been very positive. As of July 30, 2008, approximately 88 percent of nursing positions are filled (this percentage is an average of all six State nursing classifications) which is within 2 percent of the statewide goal of having 90 percent of nursing positions filled.

Furthermore, the goal of filling 90 percent of the Registered Nurse (RN) positions has been achieved at 22 institutions (67 percent of all prisons), and 10 prisons have filled 95 percent or more of their RN positions. Ten more institutions (30 percent) have filled 80 to 89 percent of their RN positions. The goal of filling 90 percent of the Licensed Vocational Nurse (LVN) positions has been achieved at seventeen institutions (52 percent); nine of these institutions have filled 90 percent or more of their LVN positions. Seven institutions (21 percent) have filled 80 to 89 percent of their LVN positions. Ten institutions (30 percent) have achieved the goal of filling 90 percent of their Psychiatric Technician (Psych Tech) positions, and four of these ten institutions have 95 percent or more of their Psych Tech positions. Thirteen institutions have filled 80 to 89 percent of their Psych Tech positions.

The following hiring related initiatives continue during the reporting period: (1) focused recruitment continues statewide for LVNs and Psych Techs; (2) presentations at nursing schools statewide; (3) advertisements in local papers, professional trade magazines, and online; and (4) mass mailers target LVN classifications. A mailer is planned for Psych Techs during the next quarter. Additionally, there continues to be a push at all institutions with nursing vacancies to schedule interviews on a weekly basis and interview all interested applicants expeditiously.

Action 3.1.1 is on schedule to achieve the 90 percent fill rate for nursing positions by January 2009.

For additional details related to vacancies and retention, refer to the Plata Vacancy and Retention Report for June 2008. This report is attached as Appendix 6.

The following metrics are included: Table 2 summarizes nursing filled percentages by prison; Table 3 summarizes nursing turnover rates by prison (refer to Objective 3.3 for explanation); and Table 4 summarizes nursing filled percentages and turnover rates by prison.

**Table 2.**



**Table 3.**



**Table 4.**



*Action 3.1.2. By January 2009, fill 90% of physician positions*

Physician recruitment efforts focused on "hard-to-fill" institutions during the reporting period. This focus is appropriate because most urban institutions have now hired their full component of primary care providers. These focused efforts have proven successful. For example, Avenal State Prison, which historically has had difficulty staffing their physician positions, recently hired four physicians. Correctional Training Facility and Salinas Valley State Prison, both with a long-term history of serious hiring problems, have collectively hired ten physicians since the centralized hiring process began. Pelican Bay State Prison, which also experienced serious shortages of primary care providers until recently, is now fully staffed with physicians and mid-level providers.

As of July 30, 2008, approximately 85 percent of physician positions are filled (this percentage is an average of all three State physician classifications). This is within 5 percent of the statewide goal of having 90 percent of physician positions filled. One hundred percent of the Chief Medical Officer positions are filled; 85 percent of the Chief Physician and Surgeon positions are filled; and 82 percent of the Physician and Surgeon (P&S) positions are filled. Thirteen institutions (39 percent) have achieved the goal of filling 90 percent of their P&S positions and twelve of these institutions have filled at least 95 percent of their P&S positions. Seven institutions (21 percent) have filled 80 – 89 percent of their P&S positions. With the exception of San Quentin State Prison, all institutions still proving to be "hard-to-fill" are located in the Central Valley region.

Specialized recruitment efforts for physicians continue with advertisements placed in professional periodicals, newspapers, online, direct mailers, conferences, and visits to residency programs. In addition, efforts are underway to contract with a search firm that can assist in finding candidates for the hard-to-hire locations.

Action 3.1.2 is on schedule to achieve the 90 percent fill rate for physician positions by January 2009.

For additional details related to vacancies and retention, refer to the Plata Vacancy and Retention Report for June 2008. This report is attached as Appendix 6.

The following metrics are included: Table 5 summarizes physician filled percentages by prison; Table 6 summarizes physician turnover rates by prison (refer to Objective 3.3 for explanation); and Table 7 summarizes physician filled percentages and turnover rates by prison.

29

**Table 5.**



**Table 6.**



**Table 7.**



**Objective 3.2   Establish Clinical Leadership and Management Structure**

*Action 3.2.1. By January 2009, establish and staff new executive leadership positions*

*Action 3.2.2. By January 2009, establish and staff regional leadership structure*

Actions 3.2.1 and 3.2.2 are being addressed simultaneously; therefore, the response below refers to the progress of both.

CPS Human Resource Services has completed salary surveys for these positions, and the Department of Personnel Administration (DPA) has accepted the recommended salaries as well as the new concept of individual pay based on performance; education and experience; work assignment and location; and longevity. DPA will issue the official pay letter to formally establish the pay band in early September 2008 and establish a pay differential for the performance component by late September 2008. A fourth RCEA classification, Clinical Executive, will be responsible for all other licensed disciplines including rehabilitation, pharmacy, laboratory, radiology, optometry, podiatry, and dietary services. The classification specification for this RCEA position has been developed, sent to the SPB for approval, and was approved effective September 3, 2008. From the perspective of Receivership efforts and necessary analysis by DPA, this project was on schedule.

However, delays have arisen because of processing failures on the part of the State Personnel Board (SPB). Implementation of three new clinical executive classifications (Medical Executive, Nurse Executive, and Chief Executive Officer, Health Care) was scheduled at three pilot locations (San Quentin State Prison, Mule Creek State Prison, and California State Prison, Sacramento/Folsom State Prison) for September 1, 2008. However, significant delays implementing the automated examinations of the exams for these three RCEA classifications have taken place because of SPB's failure to handle the automation process in a timely manner. Because of SPB's delays, the "go live" date for this critical pilot continues to be delayed. Refer to Section 5 for a summary of how SPB continues to delay important Receivership programs.

Given SPB's problems and the Board's apparent inability to manage the automated exam process in a timely manner, it is difficult at this time to determine whether the RCEA positions will be fully staffed by January 2009, as this is dependent upon a number of factors including the ability of the control agencies to meet reasonable timeframes to complete necessary processes prior to hiring for vacant positions.

Meanwhile, however, the Receiver's efforts to prepare for RCEA recruitment have continued. For example, professional advertisements have been designed and a media plan has been developed and is ready to be implemented once the pay letter is issued and automation of the examinations are complete. Advertisements will run primarily in professional journals aimed at health care administrators and clinical and nursing leaders. Some online advertisements will also reach out to this audience. In addition, in order to determine whether the Executive leader model and the resultant organization structure are effective, a contract was executed between CPHCS

33

and CPS Human Resource Services to assess the organization of the new model. CPS Human Resource Services will provide briefings every 60 days on the status of the assessment.

**Objective 3.3.** **Establish Professional Training Programs for Clinicians**

> *Action 3.3.1. By January 2009, establish statewide organizational orientation for all new health care hires and institution-specific clinical orientation through a nursing preceptor or proctoring program*

Until recently, CDCR has not had a consistent orientation program or practice for its new health care employees, and none of the individual facilities had a formalized preceptor or proctoring program. These basic elements in establishing a culture of organizational quality in a health care program are underway.

Status of New Employee Orientation and Training
The Health Care New Employee Orientation (HCNEO) has evolved from a single pilot site to three regional HCNEO locations. Clinical staff from each institution travel to the nearest regional HCNEO site for training within the first week or so of their hire date. Effective September 2008, Education and Training Unit (within Human Resources' Workforce Development Branch) will assume responsibility for conducting the HCNEO. Previously, the Nursing Services Branch has been coordinating the training. This responsibility, in addition to conducting the training, will include ongoing curriculum development, training event coordination, registration, and tracking. Also, in collaboration with Human Resources' Education and Training Unit, the Education and Professional Development Unit will be expanding its focus to support other required clinical training such as BLS, ACLS, and other Continuing Medical Education (CME) programs.

A performance measure that has been closely monitored is the turnover rate of new hires who attend the HCNEO versus those who did not attend. One percent of clinical staff who attended regional HCNEO separated from State service within the first year of employment. Eleven percent of those new hires who did not attend regional HCNEO separated within the first year of employment. While these results will require constant monitoring, they represent a very significant improvement over pre-orientation turnover rates, reducing the turnover rate by ten percent. General data related to employee turnover is included in Tables 3 and 6.

Status of the Proctoring/Mentoring program
The proctoring/mentoring program for new health care clinicians has been developed, and implementation will begin in September 2008. This didactic and clinical program will provide new clinicians the opportunity to work under every day correctional work conditions, build rapport, and be mentored by experienced staff members. Following the four-day initial classroom orientation, each new employee will be assigned a preceptor/proctor who will be the new employee's contact and support during the clinical orientation. In each of the practice settings, a designated, experienced clinician will be assigned to orient/mentor the new employee to that area. Implementation of this program will be completed within all 33 institutions by December 2008.

34

Action 3.3.1 is on schedule to establish a statewide organizational orientation for all new health care hires and institution-specific clinical orientation through a nursing preceptor or proctoring program by January 2009.

> ***Action 3.3.2. By January 2009, win accreditation for CDCR as a CME provider recognized by the Institute of Medical Quality and the Accreditation Council for Continuing Medical Education***

In an effort to maintain and enhance the level of clinical competencies with educational programs, the Office of the Receiver has established a CME Committee. The CME Committee has been established and has met monthly since February 2008. The committee membership is representative of clinicians providing health care services within CPHCS from each licensed practitioner group, including physician, psychiatrist, nurse, nurse practitioner and psychologist. The primary objective of the CME Committee is to obtain accreditation for CPHCS as a CME provider, recognized by the Institute of Medical Quality (IMQ) and the Accreditation Council for Continuing Medical Education. The CME Committee will also oversee the planning of all CME activities.

The Interdisciplinary Professional Development (IPD) Unit within the Clinical Operations Support Branch, Professional Development and Review (PDR) Section, is providing administrative support for the CME Committee. The IPD Unit is currently preparing the application for accreditation, including a description of the history of the program, its purpose and mission, and detailed descriptions of how the CME program complies with standards for commercial support. Policies and procedures are also being drafted which must be available for IMQ to review during the on-site survey which is targeted to occur in early December 2008. The application will be submitted to IMQ no later than September 30, 2008. In addition to obtaining accreditation, the IPD Unit will be responsible for the operation and administration of the CME program once accreditation has been obtained.

One component of the accreditation application is to plan and present CME activities to establish a "track record." The purpose of this process is to demonstrate CPHCS's understanding of the CME requirements and readiness to become an accredited provider of CME activities. The IPD Unit submitted an application to IMQ entitled "Primary Care Introduction to Hepatitis C" which will be reviewed by the IMQ Committee at its September 9, 2008 meeting. Once the activity has been approved, CPHCS providers may receive one hour of CME credit for attending. CPHCS's second CME "track record" activity, "Primary Care Introduction to Chronic Pain Management," is under development and will be presented to providers in the institutions during September and early October 2008. The IDP Unit has completed a Service and Expense Order with IMQ for joint sponsorship and consulting services, including a physician liaison to CPHCS's CME Committee.

Action 3.3.2 is on schedule to establish a statewide organizational orientation for all new health care hires and institution-specific clinical orientation through a nursing preceptor or proctoring program by January 2009.

35