# Goal 4. Implement Quality Improvement Programs

**Objective 4.1.**  **Establish Clinical Quality Measurement and Evaluation Program**

> *Action 4.1.1. By July 2011, establish sustainable quality measurement, evaluation and patient safety programs*

During this reporting period, the Quality Improvement Section completed planning activities to ensure that the CPHCS is able to establish sustainable quality measurement, evaluation, and patient safety programs by July 2011. These planning activities involved securing a partnership with a major research organization, as part of the process for establishing performance and outcome measures. The awarding of the contract is expected to be accomplished during the next reporting period.

> *Action 4.1.2. By July 2009, work with the Office of Inspector General to establish an audit program focused on compliance with Plata requirements*

This action plan was divided into two phases. Phase I included program development and pilot implementation, and Phase II included statewide roll-out and implementation. This objective is on schedule with statewide Office of the Inspector General (OIG) implementation scheduled for September 2008.

As of the conclusion of the reporting period, the OIG completed Phase I of the Medical Inspection Program. During Phase I, the OIG developed the inspection instruments in a collaborative process with the CDCR, Prison Law Office (PLO) CPHCS staff and other stakeholders. The OIG conducted pilot medical inspections at five institutions, including Mule Creek State Prison, Calipatria State Prison, California State Prison at Corcoran, Centinela State Prison and California Institution for Men. The final pilot medical inspection was completed on June 12, 2008.

As a result of the lessons learned during the pilot phase, the OIG provided proposed revisions to the medical inspection instrument to all of the stakeholders in August 2008. The stakeholders subsequently provided comments to the OIG for modifications to the inspection instrument. On August 19, 2008, a stakeholders' meeting was held to discuss the proposed revisions to the medical inspection instrument. During the August 19, 2008 meeting, discussions took place regarding the loaning of CPHCS physicians to the inspection team as well as reporting and automation and the commencement of Phase II of the statewide inspections.

In September 2008, the OIG will initiate Phase II of the Medical Inspection Program. Phase II includes annual medical inspections at all 33 adult prisons with the potential of follow-up inspections at poor performing prisons. To support the implementation of the statewide Medical Inspection Program, the Receiver will provide clinical expertise to OIG inspection teams and will continue to collaborate closely with the OIG to provide input to refine the indicators used in medical inspections as CPHCS's policies and procedures are updated.

36

**Objective 4.2.** **Establish a Quality Improvement Program**

Quality improvement is a hallmark of a well-run health care system. Using information from measurement and evaluation systems, as well as self-assessment and other sources of ideas for improvement, the health care system works on a continuous basis to improve both its efficiency and its outcomes. Improvements in clinical processes will also require updating of clinical policies and procedures.

The Office of the Receiver established a quality-based program to administer the CPHCS healthcare credentialing and privileging function as part of the Quality Improvement Program. Status of this Unit will be discussed below and prior to the status of the three specific Quality Improvement Program actions specified in the Turnaround Plan of Action.

Credentialing and Privileging Unit

As a first step in establishing and implementing a Quality Improvement Program, the Office of the Receiver established the CPHCS health care credentialing and privileging function. The Credentialing and Privileging Unit is responsible for implementation of a credentialing software program to facilitate the initial credentialing, and ongoing tracking of required licenses, certification renewals and continuing education for all licensed independent practitioners practicing within the prison system.

The Credentialing and Privileging Unit has completed a review of the Unit's original August 2007 policies, and the policies have been updated to reflect the Unit's current practice, which conform to community health care standards. The revised policies are scheduled for review and approval at the September 2, 2008, Credentials Committee Meeting. The Unit has also completed a comprehensive policy that meets community standards (JCAHO) that is currently under review by legal counsel. Once the Credentialing and Privileging Unit's policies have been approved through the committee structure, they will be forwarded to the Office of the Receiver for final review and approval.

The Credentials Committee's policies have been reviewed by legal and were approved by the Credentials Committee on August 11, 2008 and the PPEC on August 20, 2008. These policies are scheduled for review and approval by the Medical Governing Body on September 8, 2008 and the Dental-Mental Health Governing Body on September 15, 2008.

On June 20, 2008, a credentialSmart training was conducted for the Credentialing and Privileging staff. Following this training session, staff began the data entry process of converting the existing paper credential files to the electronic profile. The data conversion implementation plan includes all current civil service CPHCS Physician and Surgeons, Psychiatrists, Dentists, Psychologists, and Social Workers. The conversion plan was then split into the following four phases based upon the institution's licensing status: Phase I: Conversion of Headquarters and Regional practitioners; Phase II: Conversion of all practitioners assigned to the Outpatient Housing Units; Phase III: Conversion of all practitioners assigned to the institutions that are licensed as a Skilled Nursing Facility or Correctional Treatment Center; and Phase IV: Conversion of the practitioners assigned to the General Acute Care Hospital. All phases are

37

expected to be completed by December 2008. As of this reporting period, Phases I and II are complete and Phase III is more than 90% complete. It is anticipated that Phase IV will begin by mid-October, and the December deadline for completion will be achieved.

In addition to the file conversion for the above practitioners, the Credentialing and Privileging Unit began the verification and profile establishment of the Nursing classifications. To date, there are 76 Nurses (RN and LVN) entered into the credentialSmart system. The Nursing component has been added to assist in the Emergency Medical Response Plan, as described under Goal 2, Objective 2.3. The implementation schedule for this aspect of the action is under development and will be outlined in the next reporting period.

### Action 4.2.1. By September 2009, train and deploy a cadre of quality improvement advisors to develop model quality improvement programs at selected institutions.

The Quality Improvement Section is on track to deploy a cadre of quality improvement advisors to develop model quality improvement programs at selected institutions in accordance with the Receiver's September 2009 timeframe. Satisfying this objective requires hiring and training nurse consultant quality advisors and establishing a working model for institution-level quality improvement.

In July 2008, a Chief Medical Officer for Quality Improvement was appointed and began staffing the Quality Improvement Section. Four nurse consultant quality advisors were hired. In addition, analytical and clerical staff were hired during this reporting period to support these advisors.

In July and August 2008, in collaboration with Health Management Associates (an independent national research and consulting firm specializing in complex health care program and policy issues), contractors that specialize in process improvement and care management, and Kent Imai, M.D., Medical Consultant with the Office of the Receiver, the Quality Improvement Section staff began to develop a curriculum for regional and statewide quality advisors that includes care model expertise, fundamental concepts in rapid cycle improvement, and activities that build mentoring and facilitation skills.

Quality advisers will receive initial training in this curriculum during the upcoming reporting period. Quality Improvement Section staff will revise and refine the curriculum further in 2009 as part of the ongoing statewide learning collaborative. (Refer to Goal 2, Objective 2.2). The Quality Improvement Section is also collaborating with the Clinical Support Unit, as an existing unit of regional-level technical assistance physician and mid-level providers, to implement process improvement interventions in the field. Also, in the upcoming reporting period, Quality Improvement Section staff will assess process improvement infrastructure and functioning at institutions statewide and will begin the process of designing quality management policies and procedures that define the new process improvement process.

*Action 4.2.2. By September 2009, establish a Policy Unit responsible for overseeing review, revision, posting and distribution of current policies and procedures.*

To accomplish this action item, an action plan was established and divided into two phases. Phase I includes the development of the organization structure and program concept, the recruitment and hiring of staff, and staff training. Phase II includes the development of policies and procedures and the procurement of a policy tracking system. This objective is currently on schedule.

As of the conclusion of this reporting period, CPHCS Management has completed the development of the program concept, identified the appropriate organizational structure and advertised the positions on the SPB website. Additionally, research has been conducted to procure a policy management system which will enable the Policy Unit to standardize policy format; accelerate the review and approval process; track and archive all policy revisions; and electronically notify employees of new policies and or revisions.

During the upcoming reporting period, the hiring and training process will be completed and the Policy Unit will begin work on Phase II. This objective is on schedule to be accomplished by September 2009.

*Action 4.2.3. By January 2010, implement process improvement programs at all institutions involving trained clinical champions and supported by regional and statewide quality advisors*

With regard to Action 4.2.3, the Quality Improvement Section continued to build infrastructure for process improvement programs through the design and implementation of four Access to Care Initiatives. For example, one of the initiatives, the Chronic Care Initiative, uses a learning collaborative model and assists institutional pilot sites in incorporating rapid-cycle improvement and performance measurement into day-to-day operations. Quality Improvement Section staff inform the development of all learning collaborative curricula and assist in the establishment of relevant performance indicators. Quality Improvement Section staff will continue to serve this advisory function for all Access to Care domains, ensuring that rapid-cycle improvement concepts, performance measurement, and program reporting are embedded in the implementation of all pilot programs. Through the collaboration between Quality Improvement Section and Access to Care staff, the Quality Improvement Section will simultaneously build statewide capacity for ongoing process improvement while the redesign of the health care service delivery system spreads in the field.

The Quality Improvement Section is on schedule to implement process improvement programs at all institutions by January 2010.

**Objective 4.3.** **Establish Medical Peer Review and Discipline Process to Ensure Quality of Care**

> *Action 4.3.1. By July 2008, working with the State Personnel Board and other departments that provide direct medical services, establish an effective Peer Review and Discipline Process to improve the quality of care*

This action item is completed in part, and delayed in part. The establishment of an effective Peer Review has been accomplished while the establishment of an effective Disciplinary process is still being addressed.

On July 9, 2008, the Court issued the "Order Approving, With Modifications, Proposed Policies Regarding Physician Clinical Competency." Delay with implementation has taken place, however, because SPB has been unable to develop and implement a program to effectuate PPEC due process hearings in a timely manner. As a result, the initial implementation of this program has defaulted to the Receiver. Implementation activities have now begun, including establishing new processes, modifying notifications to physicians subject to peer review investigation, providing training on policy implementation, and developing a contract with the Institute of Medical Quality for Judicial Review Committee. The implementation of the new process is more than 90% complete as of the end of the reporting period and is anticipated to begin within 30 days.

During this reporting period, the old version of PPEC met eight times and reviewed 38 allegations of clinical misconduct. To protect patient-inmate safety, the committee summarily suspended the clinical privileges of four providers, implemented or continued 12 monitoring plans and closed the cases of 12 investigations. The Governing Body issued Notices of Proposed Final Actions to revoke the privileges of three providers and a Final Action for a fourth provider. During this reporting period, three licensed independent practitioners separated from State service following a peer review investigation.

A graphical display of PPEC outcomes for the second calendar quarter of 2008 is presented in Tables 8 and 9.

**Table 8.**



**Table 9.**



**Objective 4.4.   Establish Medical Oversight Unit to Control and Monitor Medical Employee Investigations**

*Action 4.4.1. By January 2009, fully staff and complete the implementation of a Medical Oversight Unit to control and monitor medical employee investigations*

The Medical Oversight Program (MOP) is a collaborative pilot project to conduct clinical investigations consisting of staff from the CPHCS, CDCR Office of Internal Affairs (OIA), CDCR Employee Advocacy Prosecution Team (EAPT) and the OIG.  The MOP has been conducting multi-disciplinary clinical investigations since January 1, 2008, and based on the initial staffing allocations, the MOP is fully staffed.   During the reporting period, the MOP conducted reviews of six unexpected death cases and reviewed one case of possible medical harm that did not result in patient-inmate death.  These reviews resulted in four cases being opened for formal investigation.  Thirteen referrals were made to the Professional Practice Executive Committee (PPEC) and fourteen referrals were made to Nursing Practice Review (NPR) to address clinical practice concerns.  As of August 31, 2008, there were fourteen open investigations.  The MOP pilot is on schedule in developing and implementing an expedited process for conducting clinical employee investigations.

A graphical display of MOP outcomes for the second calendar quarter of 2008 is presented in Tables 10 and 11.

**Table 10.**



**MOP Quality Review 4/2008-6/2008**

Total Deaths - 35

|  | Unexpected Death Cases | Possible Medical Harm | Formal Investigations | PPEC Referrals | NPR Referrals | Open Investigations |
|---|---|---|---|---|---|---|
| Series1 | 7 | 2 | 7 | 8 | 16 | 7 |

**Table 11.**



The program goals of MOP have broadened to include identification of serious systemic issues, as well as clinical employee misconduct. The MOP is defining specific types of incidents that require the investigative resources of the program, versus those warranting a referral to institutional, regional, and statewide clinical leadership, and/or the PPEC and NPR. The new peer-review policies outlined in the recent court decision have been incorporated into the decision-making process for MOP case review. The MOP has begun immediately referring possibly "dangerous" clinicians to medical and nursing leadership. These referrals have resulted in prompt actions including the limiting suspending the clinicians' privileges. Detailed information on PPEC outcomes are detailed in Tables 8 and 9, within Objective 4.3.

To meet one of the key program objectives, the MOP is in its final phase of revising the Employee Disciplinary Matrix to make it more clinically-relevant. A draft of the revision was developed through a collaboration of the following program stakeholders: CPHCS, EAPT, OIA, the OIG, CDCR Custody, Mental Health, and Dental. This modification has taken longer than anticipated; however, given the issues involved and the concerns of a wide variety of stakeholders, the extended period of review and discussion are warranted.

The MOP continues to collaborate with the California Out-of-State Correctional Facility program (COCF) on systemic issues identified at an out-of-state private prison. (Refer to Objective 4.6 for additional information regarding this incident.) Subsequent to the on-site investigation in Mississippi, MOP has been instrumental in the development of a Corrective

Action Plan (CAP) to address issues identified. The MOP also provided ongoing clinical resources and expertise to assist COCF in the development and implementation of the CAP with the out-of-state facility.

**Objective 4.5. Establish a Health Care Appeals Process, Correspondence Control and Habeas Corpus Petitions Initiative**

*Action 4.5.1. By July 2008, centralize management over all health care patient-inmate appeals, correspondence and habeas corpus petitions*

This action plan was divided into two phases. Phase I included the consolidation of all correspondence and habeas corpus petition responses under the Controlled Correspondence and Litigation Support Unit (CCLSU). Phase II included the separation of health care appeals from CDCR institution appeals and the establishment of the Office of Third Level Appeals – Health Care. Previously, institution appeals were routed through CDCR institution appeals which the Receiver deemed inefficient and unnecessary. Additionally, the third level appeals were responded to by CDCR custody staff who lacked the medical knowledge to appropriately respond to patient-inmates' health care issues.

Phase I, the consolidation of correspondence and Habeas corpus was completed in October 2007. As a result of this consolidation the work load for the CCLSU has increased nearly 200%. See Table 12 below regarding the tracking of correspondence and habeas corpus cases handled by the CCLSU for the second calendar quarter of 2008. The CCLSU Executive Summary Report for June through August 2008 is attached as Appendix 7.

**Table 12.**



44

Phase II, the centralized management of health care appeals, was completed and the objective was met on August 1, 2008, when all inmate health care appeals were completely centralized and consolidated under the Litigation Management Unit within the Plata Field Support Division.

Institutional Health Care Appeals

During this reporting period, the CCLSU staff drafted new policies and procedures and developed new forms for institutional Health Care Appeals functions. The revisions were necessary in order to separate health care appeals from other institution appeals. On July 22, 2008, a joint memorandum (from CDCR Division of Adult Institutions and Plata Field Support Division) was distributed to all institution staff and patient-inmates advising them about the new health care appeals process. These memoranda are attached as Appendices 8 and 9. A statewide conference for health care appeals staff was held on July 23 through July 25, 2008, to provide training on the new policies and procedures and to answer any questions and concerns from institution staff. Additionally, CCLSU staff developed a brochure for the patient-inmate population describing the new health care appeals process and how it would affect them and distributed copies of the brochure to all institutions. The brochure is attached as Appendix 10.

Health Care Appeals – Office of Third Level Appeals

CCLSU management staff completed the hiring process for 15 of the 17 newly established positions for the Office of Third Level Appeals (OTLA). The new OTLA health care staff includes one Physician, 2 Nurse Consultant Program Reviews and twelve support staff. New OTLA staff attended the statewide conference for health care appeals and received additional training on the Health Care Appeals tracking system and drafting appropriate responses to third level appeals. On August 1, 2008, OTLA began receiving all third level appeals regarding health care issues. As of August 28, 2008, OTLA has received 544 third level appeals.

Tables 13 – 16 below display data related to Health Care Appeals for the second calendar quarter of 2008.

45

**Table 13.**



**Table 14.**



**Table 15.**



**Table 16.**



*Action 4.5.2. By August 2008, a task force of stakeholders will have concluded a system-wide analysis of the statewide appeals process and will recommend improvements to the Receiver*

To accomplish this action item, an action plan was created which included the coordination of the task force (including representatives from other class actions, other disciplines, and counsel); facilitating the task force meetings; identifying issues and recommendation; and forwarding the recommendations to the Receiver for review and approval. This action item is now complete.

47

During this reporting period, the task force of stakeholders concluded its system-wide analysis of the existing CDCR appeals process. Proposed improvements recommended to the Receiver included the following: (1) eliminating the informal level of appeals; (2) designating a Registered Nurse to triage each appeal for urgent or emergent health care issues; (3) establishing a Patient Advocate Liaison (PAL) position to precipitate face-to-face communication between patient-inmates and health care staff; and (4) establishing a correspondence program to resolve problematic patient-inmate health care issues that do not meet the appeal processing criteria, to address correspondence submitted form parties other than patient-inmates, and to informally resolve health care issues submitted by patient-inmates who do not have access to PAL (i.e. Administrative Segregation status, Out-to-Court status, etc.). It was also recommended that the proposed improvements be implemented on a pilot basis.

The recommendations and pilot program were approved by the Receiver's Chief of Staff on June 16, 2008 and is attached as Appendix 11. The pilot program will be implemented beginning November 1, 2008, at Central California Women's Facility, Mule Creek State Prison, Pelican Bay State Prison and California State Prison, San Quentin. New policies and procedures are in the process of completion, and will be submitted to representatives from the other class actions for review prior to submission to the Court.

### Objective 4.6. Establish Out-of-State, Community Correctional Facilities and Re-entry Facility Oversight Program

> *Action 4.6.1. By July 2008, establish administrative unit responsible for oversight of medical care given to patient-inmates housed in out-of-state, community correctional or re-entry facilities*

As previously reported, the COCF, Community Correctional Facilities (CCF) and Re-entry Program Oversight Unit (POU) has been in operation since November 2007. The Unit was originally staffed with one executive, 1 physician, 2 nurses and three support staff. As a result of the expanding COCF, CCF, and Re-Entry inmate population, the Unit has proposed a new organizational structure including additional staff resources which has been submitted to management for review and approval. Set forth below is a summary of specific actions accomplished during the reporting period.

Investigation at the Tallahatchie County Correctional Facility (TCCF) in Mississippi
As a result of the death of a California patient-inmate at the Tallahatchie County Correctional Facility (TCCF) in Mississippi, staff from the COCF Unit and the MOP conducted an on-site investigation. On June 3, 2008, after returning from TCCF in Mississippi operated by the Corrections Corporation of America (CCA), staff from the COCF and MOP briefed Receiver's staff regarding the preliminary findings of an investigation.

In June 2008, staff from the CDCR's COCF, MOP, and the Plata Field Support Division's POU, which has responsibility for the medical programs within the out-of-state facilities, met several times to develop a draft TCCF Remedial Plan. During the week of June 23, 2008, the aforementioned staff met with CCA representatives to finalize the Remedial Plan. As a result of

this meeting, a final TCCF Remedial Plan was presented to Receiver's staff. On July 1, 2008, the Office of the Receiver conducted an executive level meeting with all parties, including CCA, informing CCA and CDCR that a CAP was required to address the clinical and access to care findings of the on-site investigation.

During July and August 2008, the POU, CDCR, COCF, and MOP worked extensively with CCA to develop and finalize a CAP. The CCA CAP is available for viewing on the CPHCS website (www.cphcs.ca.gov). To summarize, CCA has agreed to implement the following remedial measures:

1. Implement the CAP in a timely manner at Tallahatchie.
2. Increase clinical staffing at Tallahatchie.
3. Seek approval by the Receiver's clinical team concerning all future physician hires that will treat California prisoners.
4. Establish a special CCA oversight organization to monitor and manage the health care provided to California prisoners at all CCA facilities which house California prisoners.
5. Over time, roll out the Tallahatchie remedial plan to all CCA facilities which house California prisoners, creating an internal CCA structure which will provide consistent medical care to California prisoners.

After some confusion during the initiation of the development of the CAP, CCA has worked diligently to address the concerns raised, and cooperation and coordination between the Receiver's staff, CDCR personnel, and CCA staff has been good. Furthermore, CCA has endeavored to commence implementation of the CAP in a timely fashion and has demonstrated a willingness to work closely with CDCR and Receiver's staff to address problems. Despite the timely development of CAP, however, five points require emphasis:

1. When the plan for out of state transfers was presented to the Receiver by CDCR and State officials, no one anticipated the level of monitoring of health care functions that would prove necessary.
2. The timely correction of problems at Tallahatchie has had a serious negative impact on the Office of the Receiver, drawing critical clinical personnel away form other important projects and delaying "in-state" remedial efforts. In essence, thousands of dollars of valuable clinical hours have been devoted to helping a private prison organization rework its medical delivery system (at the request of CDCR and State officials) in order to keep the out of state transfer process from collapsing. In fact, the in state remedial process has suffered as a result.
3. The Receiver's clinical executives have determined that medical screening standards for out-of-state transfers must be tightened, a program that will be implemented within 30 days.
4. The Receiver's clinical executives have also determined that certain "at risk" California prisoners in CCA facilities should be returned to California. The number of such patients appears to be small.
5. Given the need to oversee the implementation of the CCA CAP, the fact that CDCR does not have the clinical staff to evaluate CCA medical care, the number of prisoners the

49

State anticipates sending to CCA facilities, the geographical diversity of the locations of CCA facilities, and the need for enhanced levels of monitoring, the Receiver will be submitting, within 30 days, a request to the CDCR and State for very significant increases in clinical staff to effectuate the necessary clinical oversight of CCA facilities. Unless and until that staffing is provided, the Receiver's ability to approve out-of-state transfer and monitor out-of-state inmates will be limited.

Community Correctional Facilities
The POU staff, on a limited basis, continue to monitor the Community Correctional Facilities (CCF) and provide direction and oversight. Program staff is working with CDCR's CCF staff to modify the CCF Handbook, which is anticipated to be released during the upcoming reporting period. Additionally, staff has been working on developing a proposal to modify the current method of staffing the CCFs with health care professionals to ensure quality care is being provided to the patient-inmate population. It is anticipated that the proposal will be submitted to the Receiver during the next reporting period.

As explained above, however, the Receiver's ability to properly monitor CCFs has been limited due to the reallocation of resources required for the Tallahatchie remedial plan. The request for increased staffing described above will address this problem.

Re-entry Facilities Update
The CDCR continues performing pre-activation activity for the Northern California Re-Entry Facility, which is scheduled to open in approximately July 2009. Receiver's staff have worked collaboratively with CDCR in every step of the pre-activation efforts. Appendix 12 is the most recent letter from the Office of the Receiver regarding the approval of the planned physical plant and health care staffing for the NCRF.

## Goal 5. Establish Medical Support Infrastructure

**Objective 5.1.   Establish a Comprehensive, Safe and Efficient Pharmacy Program**

Implementation of the *Road Map to Excellence* continues to move forward in a deliberate and timely manner.  The collective efforts of the pharmacy improvement program guided by the *Road Map* give priority to achieving improved patient safety and health outcomes, developing an evidence-based pharmacy practice and increasing cost-efficiency.  Progress continues to be made in addressing each of these priorities.  During this reporting period, activities have been focused upon extending implementation of the GuardianRx® pharmacy operating system to additional facilities; moving forward to build, equip and bring into operation a central fill pharmacy; updating staffing assessments, addressing pharmacy staffing needs and continuing the development of improved staff competencies; actively working with the ongoing CDCR Pharmacy & Therapeutics (P&T) Committee processes to maintain positive momentum; and, maintaining an active and aggressive purchasing and contracting program.

*Action 5.1.1. Continue developing the drug formulary for the most commonly prescribed medications*

Development and improvement of the Formulary continues.  The P&T Committee has continued its monthly meetings to address formulary issues, discuss and approve Disease Medication Management Guidelines (DMMG), and review and approve pharmacy policies and procedures. The P&T Committee also realized an important milestone in June.  The CDCR (CPR Edition) Formulary reached its one year milestone.  The CDCR Formulary plays an important role in the Pharmacy *Road Map to Excellence* as adopted by the *Plata* Federal Court.  Primarily, it is a key health care management tool oriented to the specific needs of the CDCR patient-inmate population, and reflects the goals of standardization of a contemporary, evidence-based, efficient, safe and cost effective correctional healthcare system.

During this reporting period, a formal request for a representative from the Department of Mental Health (DMH) to serve on the P&T Committee was approved, with participation beginning in August 2008.   DMMGs for Schizophrenia, Major Depressive Disorder and Bipolar disease were prepared and reviewed. The Schizophrenia and Major Depressive Disorder DMMGs has been approved for implementation and the remaining one is pending final approval. Formulary additions were reviewed and approved for a number of additional medications.  A therapeutic interchange program to facilitate appropriate dosing of Abilify (a formulary antipsychotic medication included in the Schizophrenia DMMG) was also approved.

During this reporting period, the Clinical Pharmacy Specialists conducted multiple in-service training sessions for health care providers, nursing and pharmacy staff on pharmacy policies and procedures, formulary changes and the non-formulary process.

As noted in earlier reports, the establishment of a viable, active and engaged P&T Committee process, the implementation of a CDCR-specific formulary that is managed on an ongoing basis, and the development of treatment medication guidelines that are evidence-based and focused on

patient safety are critical components of achieving improved cost-effectiveness in the system. This integrated approach provides a firm foundation for more effective pharmaceutical contracting. These responsive contract strategies and management continue to provide opportunities for cost avoidance. As displayed in Table 17, in the first seven months of 2008, Maxor has documented cost avoidance of $8,466,155 from the use of targeted contracting strategies resulting from P&T Committee decisions.

**Table 17.**



*Table 17 Results Explanation: These categories represent specific P&T Committee initiatives targeting particular drugs or drug classes. Savings calculated by comparing purchases using the actual targeted contract rate to the pre-targeted contract rate.*

Contract, purchase, and inventory monitoring efforts also continue to yield results by avoiding unnecessary costs due to out-of-stock orders and ensuring that the correct contracted items are purchased. Targeted contracts, order management activities, and the implementation of a new wholesaler agreement tailored specifically to address the pharmaceutical needs of the CDCR health care system have contributed to cost avoidance. As displayed in Tables 18 and 19, total cost avoidance when compared to the prior purchase trend is more than $16.8 million.

Table 18.



***Table 18 Results Explanation***: *Cost savings/cost avoidance calculated based on comparing actual wholesaler purchases to prior historical trendline (also based on wholesaler purchases). Data pulled monthly from Wholesaler Purchase data. Maxor began managing pharmacy purchasing in April-May 2007.*

Table 19.



***Table 19 Results Explanation***: *Savings/Cost Avoidance is calculated by comparing actual wholesaler purchases to prior wholesaler purchase trend line. Maxor began managing pharmacy purchasing in April-May 2007.*

***Action 5.1.2. By June 2009,*** *improve pharmacy policies and practices at each institution and complete the rollout of the GuardianRx® system*

Pharmacy Policies and Practices

The CDCR P&T Committee has continued its work on a complete revision of the Pharmacy Policies and Procedures, reviewing and updating them to reflect improved practice standards, implement quality control measures and standardize pharmacy processes. The P&T Committee approved revisions to Chapter 7 (After Hours Pharmacy Services); Chapter 23 (Repackaging and Compounding of Non-Sterile Medications); Chapter 28 (Parole & Discharge); Chapter 29 (Impaired Pharmacy Personnel) and approved new procedures in Chapter 37 (Pharmacy Staff Scheduling and Position Appointments); Chapter 38 (Prescription turn-Around Time); and Chapter 16-Appendix I (Guidelines for Handling Pharmaceutical Waste). Additionally, Chapter 30 (Drug Regimen Review) was deleted and replaced with a new "Guidelines for Profile and Drug Regimen Review" including a chart abstraction form. Chapters 15 (Directly Observed Therapy and 31 (Pharmacy Terms) were deleted because the items were determined to be adequately addressed in other policies.

Maxor continues to provide support for policy implementation as well as monitoring for adherence to pharmacy policy and procedure. Clinical Pharmacy Specialists provide in-service and implementation support to facility staff as new procedures are released. A statewide Pharmacist-In-Charge (PIC) meeting was held on July 10, 2008 and was well attended. Training included Chapter 21 (Reporting theft or loss of medications); Chapter 16, (Handling of Pharmaceutical Waste); Diabetes Disease Medication Management Guideline (DMMG); and pharmaceutical contract compliance. Additionally, an update on the status of the *Road Map* goals and objectives was provided.

Also during this reporting period, a transition to a process of centralized hiring for Pharmacist I and Pharmacist II positions was implemented. This effort, initiated by the Office of the Receiver and involving both Maxor and CDCR, is intended to assist in filling critical vacancies for pharmacists and includes updated processes for credentialing, coordination of interviews and making final selections. Standardized duty statements for both Pharmacist positions have been developed and are currently under review. Reference check questionnaires and scored interview questionnaires have been developed. Interviewing for vacancies using the revised hiring process commenced in July 2008. Three candidates have been recommended for hire and offers are pending approval of standardized duty statements.

The pharmacy inspection process has been well established with documented movement towards compliance across the state. The number of pharmacies with an inspection rating score of pass/problem (not failed) has increased from 21 percent in March 2007 to 64 percent in July 2008. The Maxor team is also continuing its efforts to objectively validate the improvements for any facility moving from non-passing to passing status in their monthly inspection reports. To date, inspection status has been validated for 12 facilities (Chuckawalla Valley State Prison, Ironwood State Prison, Richard J. Donovan Correctional Facility, Calipatria State Prison, Centinela State Prison, California State Prison Los Angeles County, California Rehabilitation

Center, California Institution for Women, California Institution for Men, Wasco State Prison, North Kern State Prison, and California Correctional Institution). Pharmacy inspection status data is displayed in Table 20.

**Table 20.**



***Table 20 Results Explanation*** *Pharmacy areas are denoted in blue, and non-pharmacy locations (medication administration locations) are denoted in red: Independent Maxor Validation of Monthly Inspection Data began in Feb 2008.*

Rollout of the GuardianRx® System
The GuardianRx® pharmacy operating system has been successfully implemented in 14 sites (California Correctional Center, High Desert State Prison, Folsom State Prison, Mule Creek State Prison, California State Prison San Quentin, California State Prison Sacramento, California Men's Colony, Chuckawalla Valley State Prison, Ironwood State Prison, California State Prison Corcoran, Substance Abuse Treatment Facility, Central California Women's Facility, Valley State Prison for Women, and California Institution for Women). Group training for PICs on the GuardianRx® system and the implementation process has continued as scheduled.

During July 2008, a review of the GuardianRx® implementation schedule was initiated to assess progress following conversion of the first third of the state's facilities. A decision was jointly reached and approved by members of the steering committee to revise the GuardianRx® rollout schedule in order to allow time for more training, to improve efficient use of limited rollout team resources and to allow facilities with significant infrastructure issues additional time to address those challenges. A revised schedule is under review and will be issued upon approval by the Receiver's staff.

55

Additionally, as the initial GuardianRx® implementation and deployment proceeds, work has begun on the next phase of the project intended to extend automation efforts out from the pharmacies to the actual medication management process. Maxor leadership met with Receiver's staff in July 2008 to discuss aspects of this critical next step.

Maxor is on schedule to improve pharmacy policies and practices at each institution by June 2009. The roll out of the GuardianRx® system has been delayed, as described above, and is not on schedule to complete implementation statewide by June 2009. A revised schedule is under review and will be included in the next Quarterly Report.

### Action 5.1.3. By February 2009, establish a central-fill pharmacy

Work continues related to the establishment of a Central Fill Pharmacy Facility for the CDCR. The pre-centralization ambulatory model is being defined and implemented as processes are standardized and validated as part of the GuardianRx® implementation work plan.

During this reporting period, two key recommendations related to the Central Fill Pharmacy Facility were finalized: selection of a site location for the facility and selection of an automation vendor to design and equip the facility.

A site recommendation was prepared for consideration by the Office of the Receiver. A meeting to review the final recommendation was held on July 23, 208 and a final selection decision letter was approved on July 30, 2008. With the final recommendation approved, representatives of the Department of General Services, CDCR and Maxor are working to negotiate final lease and/or purchase terms with the property owner.

Concurrently, work was finalized on the related recommendation to address automation needs for the Central Fill Pharmacy facility. The RFP for automation needs was issued on May 8, 2008 with responses due June 20, 2008. A mandatory bidder's conference was held on June 3, 2008, with a number of potential bidders in attendance. Four detailed proposals were received in response to the RFP and were evaluated by an evaluation team including representatives of Maxor, CDCR and the Office of the Receiver. On July 9, 2008, two firms were selected to make oral presentations and to address follow-up questions. A finalized recommendation for selection of an automation vendor was prepared and presented to the Office of the Receiver on July 23, 2008. Additional internal coordination at the request of the Receiver's Chief of Staff was conducted and a final selection approved in mid-August. Negotiation of a final contract for the automation has been initiated and work on the Central Fill Facility is anticipated to begin immediately upon contract approval.

Establishment of the Central Fill Pharmacy is proceeding; however there was a delay in the site selection and site acquisition which has offset the overall completion timeframe. A revised schedule will be included in the next Quarterly Report.

Maxor's monthly reports for June and July 2008 are provided as Appendices 13 and 14 respectively.

**Objective 5.2.**  **Establish Standardized Health Records Practice**

> *Action 5.2.1. By February 2009, create a roadmap for achieving an effective management system that ensures standardized health records practice in all institutions*

To create a standardized health records practice that supports constitutionally-adequate healthcare system, we need to assess CDCR's current operations, create a roadmap for transformation of the system to support health records best practices, build a plan based on the road map, and implement the plan.  The Receivership is on schedule with its vision for remediation of health records management.

In the most recent reporting period, the Office of the Receiver selected Sourcecorp, Inc. from a bidder's pool that included 12 highly competitive proposals, to provide health information management (HIM) professional services.  Sourcecorp, Inc. initiated their work on September 1, 2008.  The contract goal is to transition the current paper-based HIM operation to one based on industry best practices and standards applicable to the correctional environment.  The major objectives of this initiative are to remediate health information management within CDCR to enable cost-effective, constitutionally adequate, cost-effective healthcare for all patient-inmates and to standardize records processes as a preparatory step for the eventual implementation of an electronic health record (EHR).  Specifically, Sourcecorp's scope of work includes establishment of effective leadership and management oversight over CDCR's health record services; preservation of the integrity and continuity of the health record; updated policy and procedures regarding the security and confidentiality of the health record; updated policies and procedures; development of the structure of the HIM organization at the local and Headquarters levels; evaluation and, as necessary, remediation of the physical infrastructure of, the 33 prison health record departments; evaluation of the HIM automation infrastructure of all prison medical record departments; and establishment of management controls over HIM processes.

The Sourcecorp engagement will be divided into two phases.  Phase I deliverables, due in January, include an overall assessment of CDCR's health records management and a road map for remediation.  Upon the Receiver's approval, Sourcecorp will proceed to Phase II, which includes implementation of the Phase I recommendations and creation of a management structure that can eventually be transitioned back to the State over the course of 19 months.  Sourcecorp has also been asked to help plan for a document imaging and scanning project, and to help with planning for construction of the Receiver's new healthcare prison facilities as it relates to HIM and health record issues.

**Objective 5.3.**  **Establish Effective Radiology and Laboratory Services**

> *Action 5.3.1. By August 2008, decide upon strategy to improve medical records, radiology and laboratory services after receiving recommendations from consultants*

Medical Records
A strategy for improving medical records has been achieved and is detailed above in Goal 5, Objective 5.2.

Radiology Services

A strategy for improving radiology services has been achieved.   In late July, the Receiver's radiology consultants, McKenzie-Stephenson, Inc. presented CPHCS with a comprehensive assessment of CDCR's medical imaging services and a road map for future improvement. Areas covered included operations, technology, professional services, physical infrastructure, and financial impact across the entire domain of imaging, including radiology, CT, MRI, and ultrasound. The cover sheet and Executive Summary of the McKenzie-Stephenson, Inc. report is included as Appendix 15, and the complete report is available for viewing on the on the CPHCS website (www.cphcs.ca.gov).

McKenzie-Stephenson, Inc.'s assessment found that "the diagnostic imaging care continuum...currently 'functions' in a state of disrepair throughout each operational, technical, and professional level of service...If urgent action is not taken to remediate numerous problematic areas, the current mixture of deficient work processes, lack of leadership, poor technology decisions, violations of regulatory mandates, nonsensical goods and services contracts, and a profound absence of industry standards may actively cause harm to inmate-patients and staff." As part of their assessment, McKenzie-Stephenson, Inc. created a medical imaging road map for planning and stabilization; building and integration of an imaging program; operational deployment and adoption; and monitoring and measurement.   Major recommendations included transition to a fully digital imaging system; expanding in-house services to include distributed radiology, CT, ultrasound, and mobile MRI; and creation of a core professional radiology reading environment.  McKenzie-Stephenson, Inc. presented evidence that implementation of their recommendations could result in annual savings to the state of $67 million after two years.

The Receiver has retained McKenzie-Stephenson, Inc. to provide strategic planning advice for the 10,000 bed construction project.  We are currently preparing an RFP for professional services for outsourced management of our Enterprise Imaging Program (similar to the Maxor model) to implement the McKenzie-Stephenson, Inc. recommendations.

Laboratory Services

Consultants from Navigant presented the Receiver with an assessment, road map, and recommendations for remediation of laboratory services in April 2008.  The cover sheet and Executive Summary of the Navigant report are included as Appendix 16, and the complete Navigant report is available for viewing on the CPHCS website (www.cphcs.ca.gov).     The Receiver adopted these recommendations, and thus has achieved the objective of forming a strategy for improving laboratory services.

Due to delays created by SPB concerning the establishment of certain clinical executive RCEA positions, the Receiver has been unable to secure administrative leadership for the laboratory program to implement the strategy. The Receivership currently has an open candidate search for the position of Chief Medical Officer, Laboratory Services.

**Objective 5.4.** **Establish Clinical Information Systems**

*Action 5.4.1. By July 2009, establish a clinical data repository available to all institutions as the foundation for all other health information technology systems*

In October 2007, the Receivership issued a RFP for a clinical data repository and portal solution. The goal of the project is to store key patient health information, such as current medications, allergies, lab results, encounters, problems, etc., in a standardized manner and make this information available to providers at the point-of-care to support clinical decision making. In the end, 20 vendors submitted proposals in response to the request. The proposals were reviewed over a three week span by a proposal review committee that consisted of members of the Receiver's IT team, a representative from the *Coleman* case, CDCR healthcare services staff, and a nationally-recognized expert in health information technology retained by the Receivership to assist it during the selection process.

The proposal review committee subsequently selected six proposals to evaluate further and invited the respective vendors to interview with the Receivership. The vendors selected were: 3M Health Information Solutions, Accenture, Allscripts Healthcare Solutions, Emergis, IBM, and Medicity. The Receivership conducted in-person interviews from December 12 through December 17, 2007 in the former San Jose office. The interviews involved meetings with three separate evaluation committees: a) executive committee consisting of senior management from both the Receivership and CDCR healthcare services, as well as representatives from the *Coleman* and *Perez* cases; b) clinical user committee consisting of CDCR clinical staff (e.g., physicians, dentists, nurses, psychiatrists, etc.) from a variety of institutions throughout the state; and c) technical committee consisting of members of the Receivership IT team, a representative from the *Coleman* case, CDCR healthcare services staff, and a nationally-recognized expert in health information technology retained by the Receivership.

After the interviews, each of the committees submitted their respective recommendations to the Receivership IT team. The solution stack proposed by both Accenture and IBM was the first choice of all three committees, followed by 3M and Allscripts. The team subsequently conducted due diligence activities in January and February 2008 -- meeting with vendor product teams, performing site visits, interviewing current and former product managers, etc. On February 28, 2008, the Receivership issued a notification of award to IBM, indicating that it had been selected to deliver the clinical data repository and portal solution, pending the successful completion of contract negotiations.

In June 2008, the Receivership successfully concluded contract negotiations with IBM, Initiate Systems, and Orion Health for a clinical data repository and portal solution and began formal implementation efforts in July 2008. During the week of July 7, 2008, IBM in conjunction with Receiver's staff conducted a week long work session to orient the subcontractors (Initiate, Oracle, and Orion Health) and initiate project planning efforts. Subsequently on July 15, 2008, the Receiver's staff held a project kick-off meeting in Sacramento to provide key stakeholders with an overview of the solution as well as key project information. Among those in attendance

were representatives from CDCR, the *Coleman* and *Perez* courts, DMH, OIG, as well as senior members of the Receiver's staff.

As previously reported, IBM is the lead system integrator on the project. The Receivership expects to pilot the initial release of the system at select institutions beginning in April 2009. Currently, IBM and its subcontractors (Initiate Systems, Oracle and Orion Health) are in the first of the six phases of the project. During this phase of the project ("Solution Outline"), the IBM project team is establishing an overall project management methodology, completing staffing of the project team, establishing the overall technical architecture of the solution, developing detailed system functional and non-functional requirements, creating design documentation, and building out the development environment. The project team has also initiated discussions with Maxor to plan for the exchange of medication-related patient-inmate information and similar discussions with Quest Diagnostics, Foundation Laboratory, and the microbial disease laboratory of the California Department of Public Health for the exchange of laboratory results.

On August 4 and August 5, 2008 the Receivership and the IBM project team conducted a two-day session to design the clinical portal through which CDCR clinical staff will be able to access patient-inmate health information as well as future clinical information systems. In order to ensure that the clinical portal solution would meet the needs of its target user audience, the Receivership convened a clinical user advisory group. The clinical user advisory group was composed of clinical staff from a variety of disciplines (dental, medical, mental health and nursing) and included representatives from institutions from throughout the state. It had been established initially in December 2007 to assist the Receivership in its selection efforts related to the clinical data repository. During the two-day session, led by the Receivership's Chief Medical Information Officer, the group assisted the IBM project team in developing specific requirements around the functionality scheduled to be rolled out as part of the initial release of the solution and provided valuable insight into current clinical workflows and processes. The group's feedback regarding the design session was very positive, as were their comments about the project as a whole. The Receivership will be subsequently utilizing the members of the group as project "champions" at their respective institutions to build further support.

The solution outline phase of the project is approximately two and a half months in duration and is scheduled to be completed by the end of September, 2008. At the conclusion of this phase, IBM will produce the first of the project's deliverables, which will include a finalized project plan, system requirements documentation, technical architecture specifications, and solution strategy documentation. Upon acceptance of these deliverables by the Receiver, the project will then move into the second phase ("Solution Design").

The Clinical Data Repository project is on schedule.

**Objective 5.5.**  **Expand and Improve Telemedicine Capabilities**

*Action 5.5.1. By September 2008, secure strong leadership for the telemedicine program to expand the use of telemedicine and upgrade CDCR's telemedicine technology infrastructure*

This action item is not on schedule due to delays created by SPB concerning the establishment of certain clinical executive RCEA positions. As a result of SPB's inaction, the Receiver has been unable to recruit an executive leader for the telemedicine program in a timely manner. Additionally, a majority of the recommendations contained in the University of Texas Medical Branch's (UTMB) assessment and telemedicine roadmap report still cannot be implemented until a new and robust Health Care Information Network has been rolled out to all 33 institutions.

In the interim, the Office of Telemedicine Services (OTS) continues to focus on issues which can be addressed at this time. For instance, in an effort to improve efficiency and increase services to the patient-inmate population, CPHCS management has completed an analysis of the current processes within the OTS and has implemented changes to improve the efficiency of staff. In June 2008, the OTS increased its number of patient encounters by 34.5 percent over the same period last year, and in July 2008, the number of encounters increased by 38 percent over the same period last. The OTS is also working collaboratively with the Supervising Psychiatrist and Mental Health staff to increase services to a number of institutions.

On June 2, 2008, the OTS met with the Contracts Branch and the Healthcare Invoice, Data and Provider Services Branch to discuss issues with current contact language and the development of additional contracts to increase the network of telemedicine providers. Additionally, a project manager has been brought on board and is currently working on developing and implementing a new process for on-boarding medical facilities and specialty providers to expand the off-site specialty provider network. The new process will include clear guidelines, processes and responsibilities, in addition to measurable outcomes, and will be tested through a series of pilots. On August 29, 2008, the project manager met with various stakeholders to discuss the development of the project charter and the next meeting is scheduled for September 2008.

# Goal 6. Provide for Necessary Clinical, Administrative and Housing Facilities

**Objective 6.1.**  Upgrade administrative and clinical facilities at each of CDCR's 33 prison locations to provide patient-inmates with appropriate access to care

> ***Action 6.1.1. By January 2010, complete assessment and planning for upgraded administrative and clinical facilities at each of CDCR's 33 institutions.***

The assessments and planning to renovate or build new clinical space at each of the 33 prisons continues.  The Facility Master Plans for the Correctional Training Facility, California Rehabilitation Center and Mule Creek State Prison (the second, third, and fourth prison respectively to undergo the planning process) have proceeded into implementation of the design and construction phase.  The Receiver filed and received in July 2008 Waivers of State Law from the Court.  Implementation subsequently began on August 8, 2008 for Mule Creek State Prison and will continue with a staggered kick-off of Correctional Training Facility and California Rehabilitation Center incrementally in three week intervals.

Facility Master Plans for California Institution for Women, California Institution for Men, Richard J. Donavon Correctional Facility and Folsom State Prison (the fifth, sixth, seventh, and eighth prisons respectively to undergo the planning process) have been completed and approved by the respective Warden; Associate Warden, Health Care Services; Chief Medical Officer; and Director of Nursing as well as a member of CDCR's Facility Management.  The Master Plans have been reviewed by an architectural consultant and are awaiting approval by the Receiver.  Additionally, the Planning for California State Prison, Sacramento; California Correctional Center; and High Desert State Prison have been completed with final reports prepared.  Similar to the previous assessments, an analysis of existing facility space was completed at these prisons and multiple coordination meetings (inclusive of court designated representatives from the *Coleman* and *Perez* litigation as well as the CDCR's Facilities Management) were held to review concepts and coordinate needs specific to each prison.

Final approval of these Master Plans has been suspended as a result of recent considerations to integrate mental health and possibly dental space needs into the Master Plans.  This effort is intended to specifically determine standards for the mental health space needs in light of the 5,000 new mental health beds being planned by the Receiver in new health care facilities. As these new beds come on-line over the next three to five years, mental health program space needs in the existing prisons will change.  Plans must take into account all these factors.

Consistent with the established master schedule, planning was initiated at Sierra Conservation Center on August 12, 2008 and two progress meetings were held.  This effort has also been suspended pending determination of impacts from the possible integration of future mental health space needs into the program scope.

At this time, efforts are underway to define a strategy for gathering mental health and dental program data and information and to allow the team to adjust the budget model to determine the

62

impacts to the program budget. In order to complete this effort, the progress of the planning teams has been suspended and the teams will be dispatched to some of the remaining 23 prisons that have not been visited for planning purposes and to gather baseline information that will allow the budget model to be accurately developed. Upon completion of the updated budget model in the next 30 to 45 days, it is anticipated that the Office of the Receiver together with CDCR will agree upon the planning scope to be included to meet the program budget. This exercise is anticipated to delay the Master Planning Schedule by possibly 60 to 90 days and could possibly result in a delay to the overall Implementation completion as well.

Looking ahead, the Master Schedule for planning and assessments of the remaining prisons will undergo further revision to adjust for the time needed to assess the impact of the expanded scope to include mental health and possibly dental programs, as well as the possible expansion of the approval process to facilitate these departments. Upon completion of the updating of the budget modeling and the impact analysis in the next 30 to 60 days, the Office of the Receiver will then be able to determine the final scope of the program components and make adjustments to the Master Schedule accordingly in order to determine the impact and possible delay in completing a Master Plan for each prison by January 2010.

The special planning project to address inadequate treatment space at the Salinas Valley Psychiatric Program (Intermediate Care Facility) has been completed and submitted to the Receiver for consideration and approval. It appears that neither the CDCR nor the DMH have funding for this project; therefore, how and when it will be implemented has yet to be determined.

### Action 6.1.2. By January 2012, complete construction of upgraded administrative and clinical facilities at each of CDCR's 33 institutions

Presently, San Quentin State Prison, Avenal State Prison and Mule Creek State Prison are the only prisons in the implementation phase of design *and* construction.

As a result of the Receiver's recent tour of the prison, additional projects were added to the Avenal State Prison Facility Master Plan. An Addendum was completed, agreed to by the Institution as well as CDCR Facilities Management and approved by the Receiver. The Addendum includes the following: (1) adds shade canopies to the central core mobile clinics location and at the pill distribution areas on each of the six facilities, (2) revises the Administrative Segregation clinic from an interior renovation to a new modular clinic building adjacent to the housing block, (3) provides additional space for the Custody Access Team within the modular Health Services Administration building, (4) expands the existing Medical Records building, and (5) adds an additional area to Building 390, the Central Health Services building, for inmate waiting. The Addendum increases the previously approved Master Plan budget of $27,500,000 to $33,429,830. The Vanir Master Plan Addendum for Avenal State Prison is included as Appendix 17, and Vanir's June and July monthly reports for Avenal State Prison are included as Appendices 18 and 19.

63

Despite the modifications to the design, the implementation phase of construction at Avenal State Prison has continued. Based on the recommendations of the County Department of Public Health, an occupational health and safety consultant was hired to assist with finalizing the Valley Fever mitigation plan. The report is in final stages and will be incorporated into the bid documents for construction as well as processes and training of staff. The design-build documents for the modular health services clinics, Administration, and Administrative Segregation buildings were completed and advertised. A pre-bid meeting is scheduled for early September with bids scheduled to be received at the end of September 2008. Bid documents for the medical supply warehouse are being finalized and the projects added as a result of the Addendum are being initiated in order that they may duly be issued for bids as well. All six additional mobile clinics as required in Project One have been delivered and are fully operational and in use by health care staff to see patients. The Infirmary and Pharmacy renovation is in progress and furnishings for the Pharmacy are in the process of being scheduled for bidding to allow installation in advance of Guardian Rx® implementation in October 2008. Upon completion of the Pharmacy (Building 395) the renovation of Building 390 will begin. The final construction completion date is on schedule as planned.

While upgrade planning is proceeding in a timely manner, even if somewhat behind, the actual upgrade construction program for all prisons is not on schedule because defendants have failed to fund the prison upgrade construction program. Thus, Action 6.1.2 is behind schedule. As a result, the Receiver has filed a motion re contempt as described in Section 5.

**Objective 6.2.** **Expand administrative, clinical and housing facilities to serve up to 10,000 patient-inmates with medical and/or mental health needs**

### Action 6.2.1. Complete pre-planning activities on all sites as quickly as possible

Site evaluations are continuing at eight existing CDCR locations. The Environmental Impact Report (EIR) process is being implemented in compliance with the California Environmental Quality Act (CEQA) at each site.

Community Outreach materials are being prepared to assist the communities in understanding why these facilities are being built, what will happen in these facilities, and what impact these facilities will have on the communities. These materials will help to communicate to the public more effectively and make getting information out more efficient.

### Action 6.2.2. By February 2009, begin construction at first site

Plans for the seven new facilities have been refined and described in documents published to serve as the basis for the detailed facilities design. The draft Facilities Program Statement, (FPS), a 900 page document, was completed July 22, 2008, describing initial thoughts and considerations concerning possible facility requirements. Initial programs have been developed for three facility types to serve as the basis for planning and design for construction. The initial programs will evolve significantly as planning and design phases continue.

An agreement was executed with each of the selected Integrated Project Delivery (IPD) teams on July 1, 2008 for participation in a six-month Co-Opetition phase of work. The firms selected are: Project Production Systems Laboratory; Lean Project Consulting; and Strategic Project Solutions, Inc. The IPD process has been adapted to the specific needs of the 10,000 bed program. This preliminary design and validation phase, calling for both collaboration and competition, is referred to as Co-Opetition. This Co-Opetition phase is a process in which the three IPD teams work collaboratively and competitively to develop two prototypical facility designs. At the completion of the Co-Opetition, each IPD team will submit separate and competing design-build proposals, which will serve as the basis for selecting the team to negotiate a contract to design and construct the "first fastest" facility.

It is anticipated that the first site will be located in Stockton. Engineering evaluation of infrastructure systems is underway. The administrative draft EIR (ADEIR) is scheduled to be released to agencies in September 2008 and released to the public in October 2008. The EIR is scheduled for certification in February 2009 which will enable the start of construction.

Meanwhile, however, defendants have failed to take the steps necessary to ensure funding for this project. As a result, the Receiver has filed a motion re contempt as described in Section 5.

### Action 6.2.3. By July 2013, complete execution of phased construction program

A project manager has been retained to track the activation projects, tasks and resources necessary to have the first building fully operational by the time it is scheduled to open in 2011. The project manager is building a master project schedule that will track all items. A transition team is in the process of being staffed, and will include representatives from medical, mental health, dental and custody, and inmate programs. This team will report on the progress and consult with the Office of the Receiver and URS Bovis Lend Lease (URS/BLL). Additionally, the Office of the Receiver has embedded staff at URS/BLL working as part of the Core Planning Team and Integrated Project Delivery Teams to identify and drill down on operational and space requirements.

The necessary planning and programming is taking place to ensure the implementation of a timely and fiscally responsible phased construction program by July 2013; however, until an adequate funding stream is established, this schedule is in jeopardy.

### Objective 6.3. Complete Construction at San Quentin State Prison

### Action 6.3.1. By December 2008, complete all construction except for the Central Health Services Facility

Four of the eight projects in Construction Package One are complete. The completed projects are: Project Two, Replacement Parking Spaces; Project Three, Relocate Exercise Yard; Project Five, the Triage and Treatment Area Renovation; and Project Eight, Addition of Re-locatable Office Space Trailer.

The following is an update on each of the four remaining projects in Construction Package One. Project One, the Personnel Offices, was authorized by the Office of the Receiver on March 24, 2008 and the builder's contract was subsequently signed. The builder was given a Notice to Proceed with construction on March 26, 2008. At the time of this report, construction is approximately 50 percent complete. Rough framing is complete. The roofing is complete; window and door frames installed, and installation of the exterior plaster and interior sheetrock are in progress. The soil contamination issue, where the soil was discovered to have nickel content that was slightly above hazardous level, is resolved as well as the issue of over saturated soil. Both events were encountered during the early earthwork activity and resulted in a combined delay of 23 calendar days. Since then, there have been no other owner caused delays. Overall, the contractor is approximately 20 days behind schedule but gradually recovering the lost time. The completion date is late October 2008.

Project Four, Medical Supply Warehouse, is currently in the design phase. Bids were received on March 31, 2008 and a Selection Panel chose W. E. Lyons as the design/build entity. A Notice to Proceed was issued on June 26, 2008; the project duration is 240 calendar days and the contract completion date is February 25, 2009. The contractor completed his onsite geotechnical investigation and is incorporating his findings into the construction documents. Onsite mobilization for demolition began in late August 2008. Construction of the foundation system will start in mid September 2008 after approval of the foundation plans.

Project Six, East and West Block Rotunda Clinics, commenced construction on March 17, 2008 and is currently running approximately 60 days behind schedule. The delay is due to the late procurement of the new electrical panels which must be installed prior to building the structures. The existing electrical transformers were relocated, which required two prison wide power shutdowns. The foundation piers are complete as is installation of the temporary construction barriers in each rotunda. Due to the electrical procurement delay, the project will not meet the original November 12, 2008 completion date. The contractor is finalizing revisions to the project schedule with assistance from the construction manager. Many sequencing scenarios were analyzed to recover as much lost time as possible, but the best realistic completion date at this time is mid-January 2009.

Project Seven, Clinic Heat Projects, consists of installing space heating in the Adjustment Center Clinic, North Segregation Clinic, TTA and installation of an electrical panel at the medical staff modular office for emergency power. The project was competitively bid to three general contactors and the Receiver's Office approved the award to Hitchcock Builders. A pre-construction kick-off meeting was held August 14, 2008. Construction began the week of August 25, 2008 with installation of the emergency power panel. Total construction duration is approximately 40 days.

In reference to Construction Package Two, two of the three projects are complete. The remaining project is the Upper Yard Medical Modular. Construction is essentially complete. Furniture equipment and telecommunications are installed. The State Fire Marshal has granted occupancy to the administration side. Last minute changes directed by the Fire Marshall have

delayed occupancy of the clinic side, but the changes are almost complete. San Quentin medical staff are now occupying the Upper Yard Medical Modular.

### *Action 6.3.2. By April 2010, complete construction of the Central Health Services Facility*

Construction Package Three, the Central Health Services Facility, is progressing well and is on schedule. Steel erection is complete. The current critical activity is placing concrete on the metal floor decks. Installation of the pre-cast exterior wall panels is scheduled to start September 15, 2008. The contractor is attempting to complete the pre-cast panels by mid-December and have the interior weatherized through the winter. This project remains on schedule to complete by April 2010.

Vanir's June and July monthly reports for San Quentin State Prison are included as Appendices 20 and 21 respectively.

# Section 4
# Additional Successes Achieved by the Receiver

## A.    Reducing Prisoner Deaths

In the October 3, 2005 Findings of Fact and Conclusions of Law re Appointment of Receiver (hereinafter "Findings"), the Court held that "the California prison medical system is broken beyond repair. The harm already done in this case to California's prison inmate population could not be more grave, and the threat of future injury and death is virtually guaranteed in the absence of drastic action." (Findings at 1:21-24). One finding supporting this conclusion involved the "...uncontested fact that, on average, an inmate in one of California's prisons needlessly dies every six or seven days due to unconstitutional deficiencies in the CDCR's medical delivery system. This statistic, awful as it is, barely provides a window into the waste of human life occurring behind California's prison walls due to the gross failures of the medical delivery system." (Findings at 1:26-2:2).

While many gross problems of the California prison medical delivery system continue, and more remedial work (including the dire need for adequate treatment space for chronically ill prisoners) is needed, there is, for the first time, indications that elements of the Turnaround Plan of Action, including the addition of clinical staff, is having a positive impact on prisoner deaths. The prisoner death rate in California's prisons has trended downward for the last 10 quarters. Table 21 below reflects the aggregate death rate, including homicides and suicides.

**Table 21.**



While future variations are expected, the downward slope of the dashed regression line is heartening. Displaying the same data in lines one year long in Table 22 demonstrates the seasonal variation pattern, correlating with circulation of winter viruses, that is usually seen in population-based mortality studies:

**Table 22.**



A number of factors contribute to this favorable trend. Most prominently, an influx of new physicians and nurses has bolstered the physicians and nurses already providing services. CPHCS hired 172 new physicians between August 1, 2007 and July 31, 2008; every one of them is board-certified in internal medicine or family medicine as required by the new credentialing criteria. This figure represents 47 percent of the 366 authorized positions in the physician pool. During this same period (August 1, 2007 through July 31, 2008), CPHCS added 488 Registered Nurses and 533 Licensed Vocational Nurse to the prison medical delivery system.

In addition, the death review and peer review processes have benefited from multiple revisions and new resources. The death reviews are intended to identify significant systemic lapses in care and to identify potentially unsafe practitioners. The peer review process has resulted in 65 physician practitioners separating from CPHCS employment from June 2005 through August 2008. Another 33 physician practitioners currently have some restriction of privileges, at least until completion of ongoing investigation.

No doubt the same California officials who allowed horrific prison conditions to fester to a degree that lead to the Receivership, and those California officials who continue to attempt to impose bureaucratic barriers to thwart the Receiver's efforts, will be among the first to cry out that an initial reduction of prisoner deaths warrants an end to the Receivership or significant modification of the Turnaround Plan of Action. Nothing could be further from the truth. This initial reduction in deaths, and the many positive reports of progress set forth above, demonstrate only that the Receivership is started its work and is achieving preliminary results, not that the work is complete. The Receiver's objectives and metrics for success are defined by the Turnaround Plan of Action - a three to five year project approved by the Court after extensive discussion with both the State and plaintiffs. A constitutionally adequate and sustainable prison medical system will not be established until the Turnaround Plan of Action is fully implemented, including the construction of new facilities for the thousands of California prisoners with long-

term, chronic illnesses. The Receivership cannot sustain its preliminary improvements unless facilities, working conditions and medical systems are improved.

Nevertheless, this news is very encouraging. A comprehensive analysis of all the year 2007 deaths will be forthcoming on November 1, 2008.

## B.    Establishing the CPHCS Project Management Office

Establishing a Program Management Office (PMO) is the first step to improving the project, program and portfolio management within the CPHCS. In April 2008 the Office of the Receiver retained a consultant to serve as the project manager for building and deploying the PMO. The responsibility of the consultant is to develop the PMO processes and library of templates, deploy an appropriate electronic Project and Portfolio Management (ePPM) system, and help identify project management needs throughout the organization and staff for those needs.

During this reporting period, CPHCS hired a Director of the PMO and is currently recruiting for a Deputy Director. Two existing program staff have been transferred into the PMO and a Administrative Assistant position will soon be filled. Additionally, a Request for Offer (RFO) has been issued for a contract Technical Architect to work with all projects sponsored by the Office of the Receiver. The PMO has also, during the reporting period, developed and deployed a library of PMO materials and templates (e.g. project plan templates, project charter templates and workflow diagrams) for all project managers to utilize. To date, a total of 16 master templates have been prepared; four other lower priority templates are still to be prepared. All of these templates are stored in a master repository available to all project managers.

Additionally, during this reporting period, the PMO has purchased and implemented an ePPM system, Clarity, produced and marketed by Computer Associates. The ePPM is currently being used by project managers to help deliver projects within scope, schedule and budget. The system will help the PMO to manage its procedures and controls for collecting information, performing data analysis, optimize decision making and strengthen controls. The system will also give the Office of the Receiver the ability to track and report on all projects and align them with the goals and objectives laid out in the strategic plan.

The PMO is working to hire needed project managers for all CPHCS projects. Currently the PMO employs 20 full time project managers and is working to add at least 11 more project managers by the end of September 2008. Additionally, the PMO, in cooperation with Plata Human Resources, has developed the duty statements for a new project management classification within the California State civil service. During the upcoming reporting period, PMO staff will conduct exams, create permanent civil service positions and recruit for those newly established positions.

## C.    *Turnaround LifeLine* Newsletter Published

Good communication is essential to changing the work culture of any organization. On August 5, 2007, the Receivership launched one of its prime tools for fostering communication, delivering timely information, and boosting morale among staff. The *Turnaround Lifeline*, is a

four-page monthly newsletter designed to inform the staff of the improvements in the delivery of health care in California's prisons. The *Lifeline* features profiles of successful staff members and best practices stories in a section entitled "Above and Beyond." It also includes a message penned directly from the Receiver called "The Receiver's Corner." The newsletter provides facts and short articles about workplace and career issues.

The Communications team requested a dedicated e-mail address to facilitate communication between the writers in the Communications Department and the readers. The first newsletter drew widespread compliments from the field staff.

> Cheryl Almquist, a Health Program Specialist, for example, wrote: "I am so pleased to read the Turnaround Lifeline Newsletter; I have been with CDCR for approximately two years and I am ecstatic to see Mr. Kelso's commitment to communication."

> Programmer Analyst Robert Cummings wrote: "This is a big milestone in CPHCS history! Congratulations! I've been here about eight months. About an hour before we were told of the appointment of a new receiver I told my team members during a team meeting that "If internal communications doesn't improve around here soon, I'm leaving!" I'm glad I stayed!"

E-mail replies from the field staff led to the two new "Above and Beyond" feature stories in the second edition which was published September 8, 2007.

In total, 15,000 copies of the newsletter are printed by the Reproduction Unit at CDCR Headquarters and mailed to the Plata Analysts at the 33 institutions for distribution to all Medical, Mental and Dental Health Employees. The Warden's offices also receive copies for the custody staff who are most involved with health-related issues. In an ongoing effort to save taxpayers money and contribute to a "greener" environment, the staff at the Sacramento Headquarters location receive copies electronically.

The goal is to foster two-way communication through the newsletter so that field staff will know that their efforts are appreciated, their concerns are taken into account, and that help is on the way. The August and September editions of the *Turnaround Lifeline* are attached as Appendices 22 and 23.

# Section 5
# Particular Problems Faced by the Receiver, Including Any Specific Obstacles Presented by Institutions or Individuals

The Receiver encountered two problems during the reporting period, both presenting significant obstacles to the timely and complete implementation of the Turnaround Plan of Action. The first, defendants' failure to fund an absolutely critical element of the plan - prison upgrade construction and the construction of new healthcare facilities is the very heart of the Plan. Without adequate treatment facilities, adequate care for most serious CDCR patients will be impossible to provide. Forced by months of State inaction, the Receiver has filed a motion re contempt to be heard on October 6, 2008. Because this motion is pending, further discussion will not be provided in this Quarterly Report. The pleadings filed are available for review on the Receivers website (www.cphcs.ca.gov).

The second serious problem encountered this reporting period involves a California agency which, throughout the Receivership, has repeatedly attempted to present obstacles to the timely and cost-effective implementation of remedial efforts: the State Personnel Board (SPB). This reporting period, however, the SPB's obstacles are not legal in nature; they have been created by the ineffective and wasteful operation of SPB itself. The three operational failures of SPB, each of which has had an adverse impact on remedial programs, are explained as follows:

## A.    SPB Is Not Automating CPHCS Examinations Timely

As explained in this and prior Quarterly Reports, the creation of the Receiver's Nurse Executive, Medical Executive, and Chief Executive Officer classifications and examinations is one of the Receiver's key staffing initiatives. This was discussed with the SPB Executive Officer and Assistant Executive Officer directly on September 6, 2007 and July 9, 2008. Examination material is created by CPHCS staff, but it is web-enabled by SPB staff. To process such exams in a timely manner, SPB requested and subsequently received two positions in fiscal year 2006/2007 to work on examinations related to CDCR lawsuits.

CPHCS provided SPB with adequate notice of the importance of web-enabling of the exams. For example, a phone call to the SPB Examination Services Manager in early June 2008 stressed the importance of these examinations and that the pilot program was scheduled to debut on July 1, 2008. SPB staff agreed that the three examinations could be completed by July 1, 2008 if the material for the first two examinations was submitted to SPB by June 6, 2008, and completion was guaranteed within two weeks of submission of material for the third examination. CPHCS staff provided the materials for the first two examinations on June 9 and June 10. SPB indicates that each examination takes approximately 40 hours to program for the web, dependent upon the condition of the examination materials and how much additional work SPB staff needs to perform to complete automation. The development of these examinations was managed by a CPHCS staff member who was formerly the Examination Services Manager of SPB, and the materials submitted were complete and in the proper format. The Nurse Executive examination

72

was not completed by July 1; indeed, *it was seven weeks late* and recently delivered in final form on August 25, 2008. The Medical Executive examination was delivered to CPHCS on September 8, 2008 but had serious discrepancies in the exam format and was returned on the same date for revisions. Nothing has been heard from SPB concerning the completion of this exam, despite repeated requests. The Chief Executive Officer exam materials were submitted to SPB on July 11, 2008; however, as of the date of this report nothing has been heard from SPB concerning when it will be completed. For example, no responses have been received to numerous e-mails and phone calls requesting status updates and commitments for final products. At the same time, despite instructions to the contrary, several other examinations that were not high priority have been completed. Absent formal legal action it is difficult to determine, given an ongoing failure to meet objectives, whether this SPB conduct represents only mismanagement or whether it is deliberate thwarting. Given the repeated failures to communicate, however, there are indications that at some level of the SPB operation, the delays encountered represent efforts to thwart a critical element of the Receiver's remedial program. The Receiver has discussed these problems directly with SPB's Executive Director, but problems at a staff level have persisted.

**B.      CEA Requests Are Not Being Processed Timely**

Procedural and staffing changes during this past year, coupled with SPB workload issues have created significant delays in establishing positions resulting in delays for CPHCS in appointing individuals to these positions. To make matters worse, CPHCS staff has been held accountable by SPB for new scheduling requirements that were discussed at task force meetings where we were not present, and that have not yet been publicized to State departments. In addition, lower level SPB staff have created self-imposed procedures that require that proposed CEAs be posted on the SPB agenda, and not acted upon until after each board meeting. This creates at least a month, and sometimes longer, delay from the submission of the proposal to its approval, which, in turn, delays the appointment of key executives.

**C.      Board Items Are Not Being Processed Timely**

To facilitate the process of establishing classifications, SPB issues a calendar of board meetings and due dates for submission of materials. Traditionally, items that are submitted by the date all materials are due to Secretariat are placed on the next board meeting agenda. In at least two instances, critical board items have not been calendared according to the published schedule, even though the board items were prepared by staff that have years of experience managing SPB's board item program, many more years preparing and reviewing board items, and are following a template for previously adopted board items (thus requiring minimal review). Again, SPB delays created delays in appointing key executives at CPHCS.

For example, on January 18, 2008, the class specification and board item for Receiver's Chief Executive Officer, Health Care (Safety) were submitted to SPB. According to the published schedule, this item could have been placed on the February 4, 2008 calendar; however, CPHCS staff agreed to its placement on the February 19, 2008 calendar. It was not calendared until March 4, 2008. On June 27, 2008, the class specification and board item for Receiver's Clinical

Executive (Safety) were submitted to SPB. According to the published schedule, this item could have been placed on the July 22, 2008 calendar or the August 8, 2008 calendar; however, it was not calendared until September 3, 2008. Even worse, on April 14, 2008 a class specification and board item for Receiver's Project Manager was submitted to SPB and DPA. Despite both organizations' agreement in concept to the item and repeated attempts by CPHCS staff, the control agencies did not review and schedule the item until September 3, 2008. With more than fifty key projects awaiting a Project Manager, this delay has been costly to the Receiver in terms of time and necessitated hiring contractors to manage the most pressing projects.

The Receiver is contemplating a range of options to correct these problems, including taking responsibility for the management of web-enabling, obtaining delegation for selected tasks, seeking waiver of State law given SPB's failure, and an Order to Show Cause re contempt. Prior to seeking Court involvement, however, the Receiver has delegated certain members of his staff to made one final attempt to resolve each of the problems above.

# Section 6
# An Accounting of Expenditure For the Reporting Period

<u>Expenses</u>
The total net operating and capital expenses of the Office of the Receiver for the year ended June 2008 were $22,921,817 and $28,732,703 respectively. A balance sheet and statement of activity and brief discussion and analysis is attached as Appendix 24.

For the two months ending August 31, 2008 the net operating and capital expenses were $4,641,376 and $7,185,333 respectively. A balance sheet and statement of activity and brief discussion and analysis is attached as Appendix 25.

<u>Revenues</u>
On June 30, 2008 and on July 7, 2008 the Receiver requested a transfer of $34,147,258 and $20,000,000 respectively from the state to the California Prison Health Care Receivership Corporation (CPR) to replenish the operating fund of the office of the receiver for the first quarter of the Fiscal Year 2008-2009. All funds were received in a timely manner.

75

# Section 7
# Other Matters Deemed Appropriate for Judicial Review

**A.    Coordination with Other Lawsuits**

During the reporting period, regular meetings between the Receiver and the monitors of the *Coleman*, *Perez*, and *Armstrong* (Coordination Group) class actions have continued. Coordination Group meetings were held on June 24, 2008 and August 12, 2008. Steady progress continued during the reporting period. For example, the coordination group has agreed that the Receiver in coordination with DCHCS and subject to the oversight of the monitors in the health care class action cases will assume responsibility for all non-institutional office space statewide for the medical, mental health and dental programs. As a result, a space planning coordination agreement was submitted to the Courts for approval.

Currently, coordination agreements are being prepared in the areas of health care appeals and the transition, activation, and management of the Receiver's 10,000 bed project. Once completed and approved by the coordination group, these agreements will be submitted to the Courts for approval.

**B.    Master Contract Waiver Reporting**

On June 4, 2007, the Court approved the Receiver's Application for a more streamlined, substitute contracting process in lieu of State laws that normally govern State contracts. The substitute contracting process applies to specified project areas identified in the June 4, 2007 Order and, in addition, to those project areas identified in supplemental orders issued since that date. The approved project areas, the substitute bidding procedures and the Receiver's corresponding reporting obligations are summarized in the Receiver's Seventh Quarterly Report and are fully articulated in the Court's orders, and therefore, the Receiver will not reiterate those details here.

As ordered by the Court, attached as Appendix 26 is a summary of each contract the Receiver has awarded during this reporting period, including the following: (1) a brief description of each contract, (2) which project the contract pertains to, and (3) the method the Receiver utilized to award the contract (*i.e.*, expedited formal bid, urgent informal bid, sole source.) Vendors were also engaged by the Receiver during this reporting period to assist in the operation of the Receiver's non-profit corporation, the California Prison Health Care Receivership Corporation. While such contracts are not governed by the Master Contract Waiver, a list of contracts is provided to the Court for its information.

76

C.    **Additional Steps Taken During the Reporting Period to Ensure A Fiscally Responsible Receivership**

As summarized above, a number elements of the Turnaround Plan of Action call for initiatives that will save taxpayer dollars. In some cases, as with Chancellor Group hospital negotiations, the saving will be millions of dollars. In other projects, such as contract and invoice processing, savings will result from more efficient and timely processing and more effective negotiations. The effective implementation of several clinical support projects (projects that are delayed because of SPB failures), should also result in the more fiscally responsible use of diagnostic imaging and laboratory functions. For example:

> *McKenzie-Stephenson, Inc. - Radiology*: As mentioned in the Status of Goal 5, Objective 5.3, Action 5.3.1, McKenzie-Stephenson, Inc., presented CPHCS with a comprehensive assessment of CDCR's medical imaging services and a road map for future improvement. Areas covered included operations, technology, professional services, physical infrastructure, and financial impact across the entire domain of imaging, including radiology, CT, MRI, and ultrasound. McKenzie-Stephenson, Inc. presented evidence that implementation of their recommendations *could result in annual annuity savings to the state of $67 million after two years.*

> *University of Texas Medical Branch - Telemedicine*: The consultants from the University of Texas Medical Branch estimate that an improved telemedicine program could avoid inmate transport costs *totaling nearly $60 million annually.*

> *Navigant – Lab Services*: Navigant guarantees its high-quality lab services will yield *five-year cumulative savings of approximately $5 million.* Navigant believes this model has the potential to additionally reduce operating costs by 10 to 15 percent over 5 years through reduction of waste, inefficiency, and unnecessary duplicated testing.

The major clinical support function which has been implemented, the Maxor pharmacy project, continues to provide California taxpayers with significant savings. For example, based on a review of the first 8 months of wholesaler pharmacy costs and assuming a continuation of current trends, Maxor, *projects a cost avoidance of approximately $33 million in 2008 compared to prior drug cost trends.* These cost avoidances are being achieved through more effective formulary management, implementation of disease medication management guidelines, targeted pharmaceutical contracting strategies and increased pharmacy services accountability and oversight.

During the reporting period, the Receiver initiated three additional fiscal responsibility projects which focus on the following: (a) establishing a unique and transparent construction oversight process, (b) initiating an independent audit concerning contract processing, and (c) providing accurate information about the true cost of correctional health care, specifically, what portion of correctional health care is clinically-driven, and what portion of expenses are generated because health care is provided in prisons which have been designed in a manner which precludes the efficient delivery of medical services.

The Construction Oversight and Advisory Board

The Receiver established and conveyed the first meeting of his Construction Oversight and Advisory Board (COAB) during the reporting period. The purpose of the COAB governing body is to provide advice, expert recommendations, and transparency regarding the construction of the 10,000 bed health care facilities. The eleven-member COAB includes representatives from public and private sectors with expertise in the fields of governmental accountability, facility planning, and construction in order to obtain the highest quality of advice and to be able to ensure optimum quality and accountability for project scope, schedule, and budgets, including a representative from the United States Justice Department's National Institute of Corrections, California's State Auditor, and California's Inspector General. Specific details regarding the Board members are attached as Appendix 27, and the draft Board Charter is attached as Appendix 28.

The COAB met for the first time on September 3, 2008, and was presented an overview of the following: Receivership and Organization, Court Orders, Board and Charter, Turnaround Plan of Action, Health Care Expansion Program, Health Care Improvement Program, and Management and Transition Plan. The next meeting is scheduled for November 2008.

Request for Contract Investigation and Audit by the Bureau of State Audits

On a regular basis, key executives who report to the Receiver make decisions concerning a wide range of contracts as to whether to utilize State processes, or to request a formal waiver of State Law and initiate an appeal under the authority of the Court's order of June 4, 2007. In mid-2007 the number of staff reporting to the Receiver was far less than today, and the informal controls and processes in use to effectuate this decision making process may no longer be adequate given the scope of the Turnaround Plan of Action and the number and pace of remedial projects. For example, perhaps a practice of verbal discussion between among a small group of project leaders should now, given the growth of projects, be better defined by written policy and procedures and more formal documentation requirements. Given the growth of the number of projects, and the execution of a contract which appears to have met neither State or Court protocols, the Receiver has asked the Bureau of State Audits (BSA) to conduct whatever investigations and/or audits it deems appropriate in order to provide the Receiver and his staff findings and advice to ensure, as the Turnaround Plan of Action progresses, that timely contract processing is effectuated consistent with the appropriate fiscal controls. Audit findings are, at this time, anticipated to be available in November 2008.

The Cost of Prison Health Care

As the Receivership begins implementation of the Turnaround Plan of Action (and the Receiver moves forward with plans to construct new healthcare facilities for 10,000 chronically ill patient-inmates), questions and concerns have been raised about the cost of health care in California's prisons. Some concerns are legitimate. For example, California's unconstitutional prison medical delivery system not only delivered poor care, but also, because it was so dysfunctional, at the same time wasted millions of dollars of taxpayer resources. As explained above, the Receiver and his staff continue to devote significant efforts to implement medical delivery

programs that will function in a far more cost effective manner that those in place when the Receivership began.

Putting aside for the moment the dysfunctional and wasteful nature of the system, it is necessary to emphasize that correctional health care is inherently expensive. Like it or not, California's prisons were designed to *prevent* the human movement, the communication, the transportation, and the timely observation of medical conditions that is necessary to provide adequate and cost effective health care. Because of this, caring for prisoners *inside* California's prisons cannot be compared to clinics in the free world, facilities which provide care to veterans, rest homes for the retired, or County hospitals. Like it or not, California's prisons are different.

Because all patients in the correctional environment are prisoners, men and women confined and subject to security restrictions entirely different to patients in the free world, correctional health care is ultimately far more expensive than healthcare services provided to the public – even when the level of actual *clinical* services is less than that provided through MediCare or MediCal or private insurance.

For example, approximately 19% of medical care budget involves custody related medical delivery functions, as explained below:

| | |
|---|---|
| Total Medical Budget for 2008-09: | $1,515,548,330 |
| Total Custody Budget for Medical 2008-09: | $285,921,589 |
| Total Custody Transportation Budget 08-09: | $73,818,000 |
| Overall Custody Budget 2008-09: | $359,739,589 |
| Total Medical/Custody Budget for 2008-09: | $1,875,287,919 |
| Total Percentage for Custody: | 19 percent |

The cost of the custody component, however, *is only the beginning.* Given prison structures, lock downs, and legitimate security related concerns, delivering clinical care in prison is inherently more expensive that providing similar levels of care in the free world. To explain this difference, and to provide real life illustrations of the staff intensive nature of correctional care, the Office of the Receiver has prepared a report entitled Understanding the Cost of Prison Health Care. This document is attached as Exhibit 29.

79

# Section 8
# Conclusion

As the Court forecast in its Order Appointing New Receiver, filed January 23, 2008, the Receivership has now decidedly entered "an implementation phase, during which the Receivership must translate the conceptualized reforms into reality" (Order Appointing New Receiver at p. 4). In order to understand and organize the complex reforms which are necessary, the Receiver worked with stakeholders and the Courts to produce the Turnaround Plan of Action which now guides all of our initiatives. With the Turnaround Plan of Action in place and a strong focus on project management, concrete, measurable progress is now plainly evident. We know where we need to go, and we are aggressively moving in that direction. The Receiver's message of planning, project management and progress is paying off.

The steady reduction in the prison population's death rate per 100,000 is one of the strongest indicators of our progress. We are confident that this reduction is largely attributable to the Receiver's efforts over the last 30 months. For the first time in many, many years, there is genuine reason for some hope that CDCR's health care system can be fixed, and that the Receiver is the right instrument for completing the fix in a reasonable period of time and at reasonable cost.

The most serious obstacle to continued progress is the State's failure to provide funding for the Receiver's facilities improvement and expansion program. The progress which has been made to date will be for naught unless we are able to make permanent improvements to CDCR's facilities. Right now, the facilities are simply inadequate, given CDCR's population, to sustain for the long-term the improvements we are seeing. The Turnaround Plan of Action recognized that a long-term solution requires improvements at each adult institution and construction of new facilities to care for CDCR's most seriously and chronically ill patient-inmates. The Receiver fervently hopes the State will, even at this late date in the budget process, recognize its federal constitutional obligations and provide the necessary funding for the Receiver to move forward with his construction program.