# APPENDIX 29

# Understanding the Cost of Prison Health Care

Introduction

As the Receivership begins implementation of the Turnaround Plan of Action (and the Receiver moves forward with plans to construct new healthcare facilities for 10,000 chronically ill prisoner/patients), questions and concerns have been raised about the cost of health care in California's prisons. Some concerns are legitimate. For example, California's unconstitutional prison medical delivery system not only delivered poor care, but also, because it was so dysfunctional, at the same time wasted millions of dollars of taxpayer resources. As explained in this Quarterly Report, and summarized below, the Receiver and his staff continue to devote significant efforts to implement medical delivery programs that will function in a far more cost effective manner that those in place when the Receivership began. However, putting aside for the moment the dysfunctional and wasteful nature of the system, it is necessary to emphasize that correctional health care is inherently expensive. Like it or not, California's prisons were designed to prevent the human movement, the communication, the transportation, and the timely observation of medical conditions that is necessary to provide adequate and cost effective health care. Undoubtedly, the numbers are huge – more than 170,000 prisoner/patients scattered among 33 separate institutions, all of which house many thousands of prisoners, many of which are now mega-institutions with populations ranging from more than 5,000 and up to 10,000 potential patients. For these reasons, caring for prisoners *inside* California's prisons cannot be compared to clinics in the free world, facilities which provide care to veterans, rest homes for the retired, or County hospitals. California's prisons are different.

Thus, providing basic healthcare services to 170,000 or more prisoners within California's 33 aged and remotely located prisons is a difficult, staff-intensive, time consuming and expensive task. Because all patients in the correctional environment are prisoners, men and women confined and subject to security restrictions entirely different to patients in the free world, correctional health care is ultimately far more expensive than healthcare services provided to the public – even when the level of actual *clinical* services is less than that provided through MediCare or MediCal or private insurance.

The primary reason is security. Security, protecting the public, protecting staff, and protecting prisoners from each other is perhaps the highest priority in a prison. Providing a constitutional level of healthcare for dangerous felons while, at the same time, maintaining a secure and safe prison, poses very significant challenges for both clinical managers and correctional administrators. California prisoners are classified into one of our security levels, depending on their safety risk - a Level 1 inmate poses the least risk and a Level IV inmate the most. Not surprising, as demonstrated below, providing healthcare services grows more complex and staff intensive as an inmate's risk level increases. "Routine and simple" free world medical procedures inside a prison often present major security and safety concerns, especially when clinical staff, medical instruments, specialty care related transportation outside the prison, and needles are involved.

1

It must also be noted that the "prison factor" in correctional healthcare cost is particularly high in California because of crowding, the use of unsuitable facilities to confine chronically ill prisoners, poorly maintained facilities, and the State's failure for the past 40 years to construct correctional facilities that are designed to provide medical services, mental health services, and services for aged and disabled prisoners. For instance, providing correctional support for medical and healthcare services at San Quentin State Prison costs approximately $18.8 million per year. That does not include *any actual medical or healthcare service* – it represents *only* the cost of guarding and escorting inmates.

The Role of Patients in the Prison Environment Compared to the Community Setting
In a community setting diabetic patients are encouraged to actively participate in the management of their wellness and have a great responsibility for the day-to-day treatment of their chronic illness. The community health care systems have developed care management guidelines that feature self management of chronic disease. The daily activities of checking blood sugars, determining insulin doses, dietary selections and meal preparations, are all activities the average patient manages with very little assistance. These patients can get to their appointments without help and are able to obtain their medications and supplies including mail order pharmaceutical services.

Therefore, Medical Care for Prisoner/Patients is Staff-Intensive
In the prison setting, patients with diabetes must rely on others to ensure adequate management of a chronic illness. Syringes and blood sugar testing equipment are considered to be a safety and security issue in a correctional setting. This requires licensed health care providers, usually LVN, to perform the blood sugar testing and monitor or administer the insulin. The patient in a Level II or III security setting may see an LVN two to four times a day for blood sugar checking and administration of insulin. In addition to LVNs, the patient will require interactions with at least three custody officers for each visit to a clinic. If the patient is on other medications, they will work with other LVNs to receive them.

Because of custody and security constraints, patient-inmates cannot take much responsibility for the management of there own illness in the existing CDCR treatment model. They are dependent upon the normal operations of the prison setting in order to receive meals and medications on a scheduled basis.

The Difficulties Inherent in Meeting Chronic Healthcare Needs in High Security Prisons
Patients with chronic health care needs, who are residing in high security prisons, like a Special Housing Unit (SHU) encounter additional barriers concerning their access to effective medical care. A patient in a SHU is more likely to have significant mental health issues, which is an important health issue when considering treatment for Hepatitis C and other chronic diseases. The SHU patient is more likely to have behavioral disturbances which make interactions with health care providers very difficult and make adherence to a treatment regime more unlikely. The poor adherence will drive additional patient and health care provider encounters, and results in higher costs.

2

By the Numbers

| | |
|---|---|
| Total Medical Budget for 2008-09: | $1,515,548,330 |
| Total Custody Budget for Medical 2008-09: | $285,921,589 |
| Total Custody Transportation Budget 08-09: | $73,818,000 |
| Overall Custody Budget 2008-09: | $359,739,589 |
| Total Medical/Custody Budget for 2008-09: | $1,875,287,919 |
| Total Percentage for Custody: | 19 percent |
| Total Inmate Population: | 172,000 |
| * Level IV Population: | 32,000+ |

Prison Healthcare Delivery Scenarios

The raw numbers above, however, do not provide an adequate picture of the difficulty providing healthcare in the correctional environment. To provide a more detailed explanation of the problem, three scenarios follow which illustrate the inter-connectivity of security concerns with clinical operations, factors which significantly increase the cost of care in California's prisons.

**Healthcare Scenario I: Diabetic Level III Inmate Requiring Daily Maintenance**

**Inmate, Custody Requirements:** Patient-Inmate Brown P33333 is a 45 year old level III inmate housed at the California Correctional Center on the Lassen Unit. Mr. Brown has been incarcerated at CCC for the past five years.

**Ailment:** Mr. Brown has been diabetic since he was 14 years old. Mr. Brown is insulin dependent and has to have shots of insulin twice a day, once in the morning and once at night.

**Medical Element:** Under normal circumstances, daily maintenance is relatively easy to access for Mr. Brown, because he is housed in a General Population unit. He is released from the housing unit before the morning meal to walk on his own to the facility clinic to check his blood sugar and give himself the insulin shot. Clinical staff gives Mr. Brown the items needed to check his blood sugar and give himself the shot. Normally this will consist of an alcohol wipe, the lancet, glucometer, insulin syringe and insulin vial. After Mr. Brown finishes his blood sugar check and his shot, the nurse then checks the needle to ensure nothing has been removed from the syringe and takes all of the items back. He is then released from the holding cell.

**Custody Element:** Even in General Population, however, numerous security related procedures must be implemented to effectuate the clinic visit described above. Prior to Mr. Brown being released from his housing unit to proceed to the clinic, the Control Booth Officer has to wait for notification from the facility Search and Escort Officer. This process can not start until the yard observation tower is on post and ready for inmate movement. Once Mr. Brown has been released from the building, he walks to the clinic where the assigned correctional officer stops him and conducts a clothed body search. He is then escorted to the clinic and placed into the clinic holding cell. The door is closed and locked. The officer conducts another clothed body search of Mr. Brown and he is released back to his housing unit until the morning meal release.

**Nutritional Element:** Mr. Brown is released with the rest of his housing unit in a normal meal release. However, when the meal is complete, he has to present to the officer at the Dining hall door a state-issued medical card stating that he is a diabetic and should be issued two lunch bags as opposed to the one standard issue. Mr. Brown repeats this process in the evening after the dinner meal with the exception of the extra lunch meal which is only given with the morning meal.

**"Outside World" Care:** For the typical diabetic living in the "free" world, daily monitoring and maintenance are self directed. If Mr. Brown were living on the outside, he would wake up, walk to his kitchen or bathroom and test his own blood sugar with easily stored supplies. He would manage his own meals. During a given day, he can carry his testing supplies with him and administer insulin if needed. His only interaction with medical personnel would be during routine check-ups and visits to a local pharmacy to acquire supplies.

## Healthcare Scenario II: Level IV Inmate with Hepatitis C

**Inmate, Custody Requirements:** Patient-Inmate Smith P22222 is a Level IV inmate housed on a 180 design, Level IV unit at California State Prison- Sacramento. Mr. Smith has Hepatitis C. Due to his custody level and his confinement in a "180" design facility, providing health care is staff-intensive.

**Medical Element:** Due to his Level IV status, Mr. Smith is not allowed to simply go see a doctor or nurse whenever he chooses. When Mr. Smith is having health complications related to his illness he must fill out a Request for Medical Services form, CDCR 7362, and wait for a ducat authorizing him to go to the clinic. When the CDCR 7362 is received, it is reviewed and a determination is made as to the priority level for being seen. The names of all inmates requesting medical services then goes to a scheduler who creates a list of inmates with name, number, housing assignment, location of appointment, which medical line the inmate is being scheduled for, and the time of the appointment. The ducat list is then hand-delivered to the Inmate Assignment Lieutenant, who will generate the ducat and forward it out to Mr. Smith's housing unit. The ducat is delivered to Mr. Smith the night before the appointment by the building officers, who require that he and all other inmates who receive priority ducats sign a form acknowledging receipt of the ducat.

**Custody Element:** Movement of a Level IV inmate within a correctional facility is severely restricted and requires significant contact with correctional officers. After the proper administrative process is complete, Mr. Smith can then proceed to his appointment. Prior to the appointment, he must present the ducat to the housing unit officer and the officer must sign the ducat and put the time that Mr. Smith was released from the building on the ducat. He is then released from the building and begins his walk to the program patio area. At the program gate Mr. Smith is stopped by a facility yard officer who stops him and conducts a clothed body search prior to allowing him on the patio. At the completion of the search the officer notifies the yard observation tower via the institutional radio that he has one inmate going from the yard to the patio for medical line. The tower officer checks the patio for any problems and then opens the patio gate and allows Mr. Smith to enter.

**At the Clinic:** Mr. Smith goes to the clinic window and hands the ducat and his I.D. through the med-pass window and is advised to go stand by the program wall until his name is called. The nurse who took his pass document's his time of arrival and places the ducat on the counter until it's Mr. Smiths' turn to see the doctor. Once Mr. Smith's name has been called he goes to the door and the clinic officer conducts a clothed body search and allows him to enter the clinic. Upon completion of the appointment the clinic officer must fill out the time slots on the ducat that documents what time he left the clinic and he is released. If Mr. Smith fails to report to the facility clinic for his scheduled appointment with the health care provider, the clinic officer is responsible for locating him. The clinic officer will call the housing unit and ask if Mr. Smith is still in the building. If he is, the clinic officer will request that the building officer ask Mr. Smith if he intends on keeping

his appointment with the health care provider. If he says 'yes,' the clinic officer will ask that he be released from the building and instructed to report to the clinic.

**Refusing an Appointment:** If Mr. Smith refuses his appointment, the clinic officer needs to ask the building officer to keep him in the building until the escort officer arrives. The clinic officer will contact an escort officer and explain that he refused to attend his scheduled appointment in the facility clinic. He will next be escorted to the facility clinic because, per policy, Mr. Smith must refuse to a medical staff member. The escort officer will therefore go to Mr. Smith's housing unit and escort him to the facility clinic. When he arrives at the clinic, the clinic nurse or primary care provider will attempt to educate Mr. Smith on the consequences of refusing medical treatment for his hepatitis C. They will also answer any questions Mr. Smith has regarding the disease that may encourage him to cooperate with the treatment plan. If he continues to refuse treatment the clinic nurse will ask him sign a CDCR 7225, Refusal of Examination and/or Treatment form. If Mr. Smith refuses to sign the form, the clinic nurse will document his comments and reason for refusing treatment. The clinic nurse and a second health care provider will both sign the CDCR 7225 noting that on this particular day Mr. Smith refused his scheduled appointment.

**Follow-up Care:** Mr. Smith needs to follow the process detailed above on a fairly routine schedule. Hepatitis C requires months of evaluation and thereafter, if appropriate, treatment with antiviral drugs. The treatment schedule is rigorous, with constant follow-up and consistent care being the key to enhancing a patient's health. The side effects of a treatment regime may include days of flu-like symptoms after the injection of antiviral drugs. Some side effects can be extremely serious, since treatment medications can cause severe depression or suicidal thoughts. Therefore, constant monitoring of the inmate/patient's well-being is vital, and for each face-to-face evaluation, the security procedures set forth above must be repeated.

**"Outside World" Care:** In the outside world, Mr. Smith would take on the effort to schedule, attend and maintain all appointments and follow-up treatment. Typically, a physician, nurse or health practitioner would educate Mr. Smith about his illness, encouraging proper diet and treatment to facilitate good health.

**Healthcare Scenario III: Max Custody Inmate Requires Specialist**

**Inmate, Custody Requirements:** Patient-Inmate Jones P11111 is a maximum custody inmate housed in the Security Housing Unit (SHU) at Pelican Bay State Prison. Due to his disciplinary history and propensity for violence towards staff, escort requirements dictate that an escort team comprised of two Correctional Officers and one Correctional Sergeant or Lieutenant are present every time his cell door is opened.

**Ailment:** For the past two days Mr. Jones has had a rash between his legs that itches and burns constantly.

**Initial Custody Element:** Due to his custody level, Mr. Jones must rely on custody staff to bring him a Request for Medical Services form, CDCR 7362. At about 6:45 a.m. during the morning breakfast program while the floor officers are going through the unit collecting breakfast trays after the meal, Mr. Jones requests a CDC 7362 from the tier officer. The officer advises Mr. Jones that he will bring the form during his next tour of the unit. He does so in a timely manner, Mr. Jones completes the form appropriately, and submits the form to medical staff. Upon review of the CDC 7362, nursing staff calls the custody staff in Mr. Jones' building and requests to see Mr. Jones in the Facility A Clinic as soon as possible. At 5:30 p.m., unit staff arrive at cell 205 to take Mr. Jones to the clinic. Once all staff are present, the escort officers conduct an unclothed body search of Mr. Jones through the cell door. Meanwhile, another officer searches the clothing that Mr. Jones will wear to the medical appointment. At the completion of the search, Mr. Jones is placed in handcuffs, the cell door opened and he is placed in leg restraints. He is then escorted from the cell, where an officer waits with a handheld metal detector. The officer uses the handheld metal detector to search Mr. Jones for any metal objects he may be attempting to conceal. Once this process is complete, the sergeant assisting with the escort contacts the yard observation tower and asks the tower to clear a path from Building Four to the clinic.

**Initial Medical Element:** Upon arrival at the clinic, the escort finds there are inmates in the clinic being seen by various providers. Due to Mr. Jones' SHU custody level he cannot be inside of the clinic with General Population inmates (GP). Therefore the escort stops Mr. Jones outside of the clinic, and all GP inmates are removed from the clinic no matter what stage of service they were being provided. Once all inmates are clear of the clinic one of the escorting officers steps through the door and verifies that the clinic is clear of inmates. The escort continues into the clinic where Mr. Jones can be seen by the facility nurse. The leg restraints are removed and Mr. Jones is placed in the holding cell. The cell door was closed and the handcuffs are removed. The nurse comes to the holding cell and asks Mr. Jones to remove his jumpsuit so she could see the rash he complained of. The nurse examines the rash through the bars of the cell door (if necessary the nurse will instruct the officers to take Mr. Jones into a clinic unit for further examination). She then instructs Mr. Jones to get dressed, and explains to him that the rash appears to be serious and he needs to be seen by a dermatologist. Pelican Bay does not have a dermatologist on staff; therefore, he will need to be transported off-grounds to be seen.

7

The nurse explains to Mr. Jones that she will notify the specialty clinic nurse to have an appointment scheduled. He will receive more information when the date approached.

**Back to the Cell:** The escort team again places Mr. Jones in restraints. The cell door is opened and Mr. Jones is backed out of the cell. Then, one of the escort officers places leg restraints on his ankles. The sergeant then notifies the yard observation tower to clear an escort path from the clinic to Building Four. The tower advised the sergeant the path is clear for the escort. The clinic door is open and one of the escort officers steps from the clinic verify the path is clear and the escort starts back to the unit. Once in the unit Mr. Jones is again scanned with a handheld metal detector, according to unit procedures, and is then taken to his cell. At the cell front the sergeant orders the cell door open and the control booth officer opens the door. The leg restraints are removed and Mr. Jones is placed in the cell. The sergeant then orders the cell door closed, escort officers remove the handcuffs from Mr. Jones' wrists, and the security port is closed.

**Making an Appointment:** Once the appointment has been scheduled the transportation team is notified. One of the transportation officers calls the inmate records department and requests that Mr. Jones' central file be pulled from the shelf for review. The transportation sergeant then reviews the central file as he fills out the custody portion of the Request for Off-Grounds Medical Services or CDC 7252. Once the CDC 7252 is completed, including the staffing recommendations, the sergeant then takes the file for the Chief Deputy Warden's approval. Once there, the sergeant explains the reason for the amount of custody staff recommended, and the Chief Deputy Warden approves the transport. The sergeant returns to the transportation office and writes the transport on the schedule board.

**Travel to Offsite Doctor and Preparing Inmate for Offsite Doctors Visit:** On the morning of the transport, staff reviews the CDC 7252 and collects all necessary equipment and paperwork for the transport. Once all of the paperwork is in place, one of the transportation team officers notifies Building Four and asked the unit officer to get Mr. Jones ready for transport.

Unit staff goes to cell 205 and advises Mr. Jones he is going out to medical and needs to get ready. For security reasons, Mr. Jones has not been provided with advance notice that this is the date and time that he will be escorted from the prison. Correctional staff then conducts an unclothed body search of Mr. Jones through the cell door. Upon completion, the clothing is handed back through the security port and the officers observe him as he dresses. Mr. Jones is then placed in handcuffs. Mr. Jones places his hands behind his back and through the security port where the officer places him in handcuffs. The sergeant orders the door open, and Mr. Jones is placed in leg restraints. Again he is removed from the cell where there is an officer waiting with a handheld metal detector. He is next escorted to a holding cell in the building rotunda where he is placed anticipating the arrival of transportation staff.

8

Upon arrival at the unit, transportation staff (two officers and one sergeant) present building staff with a copy of the paperwork authorizing the removal of Mr. Jones from the unit due to his pending medical appointment.

Transportation staff then conducts another unclothed body search as required by institution policy for removing an inmate from the SHU. Mr. Jones is then given a transport jumpsuit and shoes. Transportation staff next place Mr. Jones in the restraint equipment he will wear during the transport. The transportation sergeant notifies the yard observation tower to clear a path from Building Four to the pedestrian gate which exits the facility. After the path is clear, the observation officer notifies the sergeant that the path is clear for the escort. The building control officer then opens the building door and the escort begins. Mr. Jones is escorted to the van, where upon one of the transportation officers searches the van for contraband prior to the trip. Mr. Jones is placed into the van and the officer snaps the seat belt into place across Mr. Jones' chest, so the transport can begin. Once the sally port is clear, the transport vehicles pull in and all gates are closed. The sergeant and one officer enters the tower sub-armory and retrieves the weaponry dictated by operational procedures. While the weapons are being retrieved, the unarmed officer stays with Jones. Meanwhile, the sally port officers positively identified Jones with the paperwork and the current photo that the transport team has in possession. Once the sally port officer has satisfactorily identified Mr. Jones, they call central control and ask permission to release him from the institution. The sally port officers retain one copy of the GA 154 and log the transport in their log book. Once permission is received from the control sergeant to release the transport and the armed personnel are in their vehicles the tower officer opens the outside gate and allows the transport to leave the institution.

**At the Doctors Office:** When the transport arrives at the doctor's office one of the officers goes into the building and obtains any required paperwork that Mr. Jones needs to fill out. He brings these documents out to Mr. Jones. Once the paperwork is complete the officer will return the papers to the office personnel and wait for the room to become available for Mr. Jones. Only after the room is available is Mr. Jones removed from the security of the van. When the room is available, Mr. Jones is brought out of the van and escorted to the room that has been prepared for him. The trip from the van to the room includes the armed staff walking ahead of the escort and checking for any potential problems including a search of the room before Mr. Jones is allowed to enter. After the room is cleared, Mr. Jones is brought into the room by the unarmed officer, while the sergeant and the armed officer post up outside of the room observing locations of entrances and exits. When the doctor is finished examining Mr. Jones the officer collects the paperwork given by the doctor and speaks with the scheduling nurse about Mr. Jones' follow up visit, if necessary. After all business has been completed, the sergeant and the armed officer lead the escort out of the office using a rear exit and Mr. Jones is returned to the van where he was again secured in the van.

**Trip Back to Prison Grounds:** The sergeant advises the officer driving the van of an alternate route that the transport will take on the return trip, just in case someone is watching the transport or observing in order to plan an escape. When the transport is approximately two miles from the prison, the sergeant notifies the tower that operates the

9

vehicle sally port of their return so the tower can clear the designated area. As the transport approaches the sally port it is clear and the gate opens for their entry. Both vehicles pull into the sally port, all staff are positively identified by sally port officers and the armed officers are allowed into the sub-armory to check in their weapons. During the weapons check-in, sally port staff positively identify Mr. Jones and then search the vehicles. The transport continues through the sally port and goes to the Correctional Treatment Center (CTC) building for Mr. Jones to be cleared by an institution nurse. If medications were ordered by the specialist, the process to obtain those medications begins at this point. After arrival at the building the leg restraints are removed and Mr. Jones is again placed in a holding cell. The cell door is closed and the restraint equipment removed. Transportation staff gives the building officers a copy of the GA 154, officially returning Mr. Jones. Thereafter, they collect their restraint equipment.

**Back to the Cell:** Unit command staff then assemble the appropriate number of correctional officers to escort Mr. Jones from the CTC back to the SHU. Once all staff are present, the escort officers conducted an unclothed body search of Mr. Jones through the cell door, while another officer searches the clothing that Mr. Jones is issued. At the completion of the search Mr. Jones is placed in handcuffs, the cell door opened and he is placed in leg restraints. One of the unit officers utilizes a handheld metal detector to search for metal objects he may be attempting to conceal. Once this process is complete, Mr. Jones is escorted back to his cell and at the cell front the sergeant orders the cell door open and the control booth officer opens the door. The leg restraints are removed, and he is placed in the cell. The sergeant then orders the cell door closed and escort officers remove the handcuffs.

**Free World Treatment:** If Mr. Jones were living in the outside world, he would call or visit his primary care provider or nurse, and describe his rash. If appropriate, the primary care provider would then refer him to a dermatologist. Mr. Jones would set up an appointment with the specialist. On the established day and time, Mr. Jones would drive himself to his appointment. After being examined he would make a follow-up appointment. On the way home from his first appointment, he could stop by a local pharmacy to pick up a prescription.

Conclusion

It is clear that correctional health care is far different from any type of medical attention a person in the general public may receive. It is with that in mind that the Receiver is working toward the implementation of the 10,000 bed program. Construction of seven stand-alone health care facilities for California inmates will increase the efficiency and effectiveness of this model of care.

The facilities will eliminate barriers to care through cutting-edge custody methods, adequate and effective medical treatment and facilities specifically designed to properly contain these services -- and keep area residents, staff and inmate/patients safe. Transportation costs for outside care will be greatly reduced. Litigation expenses due to inadequate care will be nearly eliminated. Wasted staff time used for navigating a complex, cumbersome system will be reduced.

In addition, upgrades at California's existing 33 correctional institutions will bolster delivery of care and the overall health of inmates. That reduces long-term care costs, and once an inmate is released, reduces public health issues.

The bottom line is that providing a constitutional level of health care to inmates will save lives and save tens or hundreds of millions of dollars in taxpayer funds.