1   PRISON LAW OFFICE                          ROSEN BIEN & GALVAN, LLP
    DONALD SPECTER, Bar No. 83925              MICHAEL W. BIEN, Bar No. 96891
2   STEVEN FAMA, Bar No. 99461                 JANE E. KAHN, Bar No. 112239
    SARA NORMAN, Bar No. 189536                AMY WHELAN, Bar No. 215675
3   ALISON HARDY, Bar No. 135966               LISA ELLS, Bar No. 243657
    REBEKAH EVENSON, Bar No. 207825            MARIA V. MORRIS, Bar No. 223903
4   1917 Fifth Street                          315 Montgomery Street, 10th Floor
    Berkeley, CA 94710                         San Francisco, CA 94104
5   Telephone: (510) 280-2621                  Telephone: (415) 433-6830

6   K & L GATES LLP                            BINGHAM, McCUTCHEN, LLP
    JEFFREY L. BORNSTEIN, Bar No. 99358        WARREN E. GEORGE, Bar No. 53588
7   EDWARD P. SANGSTER, Bar No. 121041         Three Embarcadero Center
    RAYMOND E. LOUGHREY, Bar No. 194363        San Francisco, CA 94111
8   55 Second Street, Suite 1700               Telephone : (415) 393-2000
    San Francisco, CA 94105-3493
9   Telephone: (415) 882-8200

10  THE LEGAL AID SOCIETY -
    EMPLOYMENT LAW CENTER
11  CLAUDIA CENTER, Bar No. 158255
    600 Harrison Street, Suite 120
12  San Francisco, CA 94107
    Telephone: (415) 864-8848

13
    Attorneys for Plaintiffs

14
15              IN THE UNITED STATES DISTRICT COURTS

16          FOR THE EASTERN DISTRICT OF CALIFORNIA

            AND THE NORTHERN DISTRICT OF CALIFORNIA
17
        UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES
18
           PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

19  RALPH COLEMAN, et al.,              )    No. : Civ S 90-0520 LKK-JFM P
              Plaintiffs,               )
20                                      )    **THREE-JUDGE COURT**
        vs.                             )
21                                      )
    ARNOLD SCHWARZENEGGER, et al.,       )
22            Defendants                )
                                        )
23  ─────────────────────────────────  )    No. C01-1351 TEH
    MARCIANO PLATA, et al.,             )
24            Plaintiffs,               )    **THREE-JUDGE COURT**
                                        )
25      vs.                             )    **PLAINTIFFS' OPPOSITION TO
                                        )    DEFENDANTS' MOTION TO DISMISS
26  ARNOLD SCHWARZENEGGER, et al.,       )    AND/OR MOTION FOR SUMMARY
              Defendants                )    JUDGMENT/ADJUDICATION**
27  ─────────────────────────────────

28

                                       1

# TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

TABLE OF ABBREVIATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

PROCEDURAL HISTORY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    I.    Plata Procedural History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    II.    Coleman Procedural History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    III.    Three Judge Court Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    I.    The Overcrowding Crisis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    II.    Overcrowding Is the Primary Cause of Unconstitutional Medical and
        Mental Health Care . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        A.    The Receiver and Special Master  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        B.    Defendants and their experts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

        C.    Plaintiffs' experts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

        D.    California Inspector General  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

    I.  The Motion to Dismiss Lacks Merit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

        A.    The Doctrine of Exhaustion Does not Bar This Proceeding  . . . . . . . . . . . . . . . . 26

            1.    Defendants expressly waived any exhaustion argument as to
                Plata plaintiffs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

            2.    The Three Judge Court proceeding is not a new case, and no
                separate exhaustion is required prior to convening a three-judge
                panel. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

        B.    The Plata and Coleman Courts Correctly Granted the Motion to
            Convene a Three Judge Court . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

            1.    The Plata and Coleman Courts have issued orders for
                "less intrusive" relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

            2.    Plaintiffs seek relief only on behalf of the classes . . . . . . . . . . . . . . . . . 30

PLTFS' OPP. TO DEFS' MTN. TO DISMISS AND/OR MTN. FOR SJ, NO. CIV S 90-0520 LKK-JFM P , NO. C01-1351 TEH

1

II.    Defendants Have Failed to Meet Their Burden on Their Summary Judgment Motion  . 31

A.    Plata  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

1.    Dr. Shansky's testimony . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

2.    Other evidence demonstrates that overcrowding is the primary
cause and that no other relief will remedy the constitutional
violations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

B.    Coleman  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

1

## TABLE OF AUTHORITIES

2

### CASES

3

4 *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ........................................................ 31

5 *Booth v. Churner*, 532 U.S. 731 (2001) ............................................................................... 27

6 *Caruso v. Zenon*, No. 95-MK-1578-BNB, 2005 WL. 5957978
7    (D. Colo. July 25, 2005) .................................................................................................. 26

8 *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .................................................................. 31

9 *Clarkson v. Coughlin*, No. 91-CV-1792-RWS, 2006 WL. 587345
10    (S.D.N.Y. Mar. 10, 2006) ............................................................................................... 26

11 *Coleman v. Wilson*, 912 F. Supp. 1282 (E.D. Cal. 1995) .................................................... 4

12 *Columbus Board of Ed. v. Penick*, 443 U.S. 449 (1979) .................................................... 30

13 *Davis v. Board of School Comm'rs of Mobile Cty.*, 402 U.S. 33 (1971) ........................... 30

14 *Devereaux v. Abbey*, 263 F.3d 1070 (9th Cir. 2001) ......................................................... 36
15

16 *Eastman Kodak Co. v. Image Tech. Services, Inc.*, 504 U.S. 451 (1992) .......................... 31

17 *Gilligan v. Jamco Development Corp.*, 108 F.3d 246 (9th Cir. 1997) .............................. 28

18 *Handberry v. Thompson*, 446 F.3d 335 (2d Cir. 2006) ...................................................... 27

19 *Jones v. Bock*, 549 U.S. 199 (2007) ................................................................................... 27

20 *Jones v. Goord*, No. 95-CIV-8026-WHP, 2000 WL. 290290 (S.D.N.Y. Mar. 20, 2000) ................ 26
21

22 *Lewis v. Casey*, 518 U.S. 343 (1996) .................................................................................. 30

23 *Leybinsky v. Millich*, No. 98-CV-0387A, 2004 WL. 2202577 (W.D.N.Y., Sept. 29, 2004) ............. 27

24 *Ludy v. Sherman*, No. 06-74, 2007 WL. 320831 (W.D. Pa., Jan. 30, 2007) .................................. 27

25 *Maffei v. N. Insurance Co. of N.Y.*, 12 F.3d 892 (9th Cir. 1993) ................................. 32, 43

26 *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496 (1991) ....................................... 31, 34

27 *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ............................. 31
28

*Nissan Fire & Marine Ins. Co., Ltd. v. Hitachi Data System Corp.*,
  210 F.3d 1099 (9th Cir. 2000) ................................................................ 31

*Rahim v. Sheahan*, No. 99-C-0395, 2001 WL. 1263493 (N.D. Ill. Oct. 19, 2001) ......................... 27

*Safe Air v. Meyer*, 373 F.3d 1035 (9th Cir. 2004) ............................................................. 28

*Strong v. David*, 297 F.3d 646 (7th Cir. 2002) ................................................................. 27

*T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Association*, 809 F.2d 626 (9th Cir. 1987) ............ 31

*Thomas v. Bible*, 983 F.2d 152 (9th Cir. 1993) ................................................................. 29

*United States v. Alexander*, 106 F.3d 874 (9th Cir. 1997) .................................................... 29

## STATUTES

42 United States Code
  § 1997e(a) ........................................................................................... 26

18 United States Code
  § 3626(a)(3)(A) ...................................................................................... 29
  § 3626(g)(4) ......................................................................................... 29

## RULES

Federal Rules of Civil Procedure
  12(b) ................................................................................................ 28
  12(b)(1) ............................................................................................. 28
  12(b)(6) ......................................................................................... 28, 29
  56(c) ................................................................................................ 31

1

## TABLE OF ABBREVIATIONS/ACRONYMS

2

3    ASH          Atascadero State Hospital

4    BCP          Budget Change Proposal

5    CDCR         California Department of Corrections and Rehabilitation

6    CMF          California Medical Facility

7    DCHCS        Division of Correctional Health Care Services

8    DMH          Department of Mental health

9    EOP          Enhanced Outpatient Program

10   GP           General Population

11   ICF          Intermediate Care Facility

12   MHCB         Mental Health Crisis Bed

13   MHSDS        Mental Health Services Delivery System

14   OIG          California Office of the Inspector General

15   PLRA         Prison Litigation Reform Act

16   RJN          Request for Judicial Notice

17   SVPP         Salinas Valley Psychiatric Program

18

19

20

21

22

23

24

25

26

27

28

**<u>INTRODUCTION</u>**

The evidence demonstrates overwhelmingly that overcrowding is the primary cause of the constitutional violations in both *Plata* and *Coleman*. Defendants themselves admit the pervasive effects of the overcrowding and the impossibility of compliance under such conditions. Their own experts, the Receiver, the Special Master, and numerous independent state panels of notable experts agree. Defendants sought leave to bring a motion for summary judgment on the grounds that there were undisputed facts dispositive of the *Plata* action; they claimed that plaintiffs' medical expert conceded that overcrowding is not the primary cause of the constitutional violations. As demonstrated below, this contention is false, and defendants other arguments are equally meritless.

Defendants' claim that plaintiffs failed to exhaust their administrative remedies lacks merit. First, defendants have expressly and unequivocally waived any exhaustion defense in *Plata*. Moreover, the exhaustion doctrine does not apply where, as here, the plaintiffs have not filed a new action, but merely request further relief in actions that are already adjudicated.

The claim that the Three Judge Court lacks jurisdiction because plaintiffs never sought less intrusive relief is also spurious. As the *Plata* and *Coleman* Courts have previously found, all statutory requirements have been met, and plaintiffs have sought and obtained numerous court orders requiring less intrusive relief for the constitutional violations at issue.

Moreover, defendants' summary judgment arguments rest on fallacies. They contend that there are no triable issues about overcrowding as the primary cause of the ongoing constitutional violations in *Plata* because they argue that plaintiffs' expert Dr. Shansky gave deposition testimony that contradicted his report and admitted that overcrowding is not the primary cause of the violation. As demonstrated below, defendants are wrong; they fail to quote a *single* statement by Dr. Shansky to support their case, choosing instead to misleadingly paraphrase his testimony. In fact, Dr. Shansky's testimony is consistent with his report in declaring that overcrowding is the primary cause of the constitutional violations, and utterly inconsistent with defendants' strained misreading. Moreover, the contention that overcrowding *does not* cause the constitutional violations cannot hold, given that all the key players have made admissions that substantiate plaintiffs' theory of the case: the Governor, his top officials at

1    CDCR, CDCR-employed experts, and intervenor-employed experts have all made strong and

2    unequivocal statements providing evidence that overcrowding is the primary cause of the constitutional

3    violations.

4    The motion for summary judgment with respect to the *Coleman* case is an afterthought,

5    unsupported by even the illusory argument made in *Plata.* Defendants assert that there is no triable

6    issue of fact that crowding is the primary cause of the ongoing constitutional violations in *Coleman*

7    without even a reference to or discussion of the overwhelming evidence that plaintiffs have amassed to

8    the contrary. Defendants base their motion on the purported failure of the *Coleman* Special Master to

9    make findings and recommendations concerning the ultimate legal issue that this Three Judge Court has

10   undertaken to address, but as we demonstrate below, the Special Master has repeatedly identified

11   overcrowding as the primary barrier to the provision of constitutionally adequate mental health care.

12   Moreover, defendants simply ignore the reports and testimony of plaintiffs' eminently qualified expert

13   witnesses, the admissions of the Governor and other senior officials of the CDCR and DMH, the

14   numerous reports of the Special Master and the Receiver, and the opinions of defendants' only mental

15   health expert, Ira Packer. Dr. Packer agrees with plaintiffs that overcrowding is in fact the primary

16   cause of the ongoing constitutional violations in mental health care in critical parts of the prison system:

17   the reception centers, where medical and mental health screenings must occur, and the medical records

18   system, which is essential for the delivery of medical and mental health care.

19   Thus plaintiffs demonstrate below that far from conceding that overcrowding is not the primary

20   cause of the constitutional violations, plaintiffs can and will prove that overcrowding *is* the primary

21   cause of the constitutional violations based on defendants' own admissions and bolstered by expert

22   testimony from both sides.

23   <u>**STATEMENT OF ISSUES**</u>

24   1.    Have defendants waived the exhaustion requirement as to *Plata* plaintiffs?

25   2.    Are plaintiffs subject to a new exhaustion requirement during the course of a pending action

26         when they file a motion for a different type of relief, even if they have not filed a new action?

27   3.    Have defendants demonstrated that this Three Judge Court lacks jurisdiction because the

28

2

1    *Plata* and *Coleman* plaintiffs did not previously seek "less intrusive relief"?

2    4.    Does this Three Judge Court lack jurisdiction to consider granting relief that will remedy the

3    systemic constitutional violations suffered by the *Plata* and *Coleman* class members because

4    the theoretical relief might incidentally benefit non-class members?

5    5.    Have defendants demonstrated that there are no disputes about whether overcrowding is the

6    primary cause of the constitutional violations in *Plata* and *Coleman* and that no other relief

7    will remedy the constitutional violations?

8                                     **PROCEDURAL HISTORY**

9    *I. Plata Procedural History*

10    The *Plata* case was filed six years ago. Following the filing, the State admitted that the medical

11    care being provided was so inadequate that it violated the Eighth Amendment protections against cruel

12    and unusual punishment. *See* 6/13/02 Stipulation for Injunctive Relief at 2-3 (*Plata* Docket # 68). In

13    June 2002, the parties signed a stipulated injunction to improve the medical care system in the

14    California Department of Corrections and Rehabilitation (CDCR). *Id.*

15    Despite this order, the medical care system remained in a state of crisis. The *Plata* Court issued

16    more narrowly tailored directives, which covered areas such as physician evaluations, nursing

17    supervision, and central quality control. *See* 9/17/04 *Plata* Stipulated Order Re Quality of Patient Care

18    and Staffing (*Plata* Docket # 229). In addition, the *Plata* Court met monthly with the parties for over a

19    year to try and expedite the improvement of the medical care system. 10/3/05 Findings of Fact and

20    Conclusions of Law Re Appointment of Receiver ("Findings of Fact") at 38-39 (*Plata* Docket # 371).

21    During these meetings, the Court encouraged defendants to propose actions that would allow them to

22    solve the problems with medical care, including suggesting specific Court orders. *Id.*

23    These actions proved inadequate to improve the medical care system. On May 10, 2005, the

24    *Plata* Court issued an Order to Show Cause regarding why civil contempt should not issue and there

25    should not be an appointment of a temporary receiver. 5/10/05 Order to Show Cause Re Civil Contempt

26    and Appointment of Interim Receiver (*Plata* Docket # 294). The Order stated that the "prison medical

27    delivery system is in such a blatant state of crisis" and that "defendants have publicly conceded their

28

                                              3

1  inability to find and implement their own solutions that will meet constitutional standards." *Id.* at 1.

2       Commencing on May 31, 2005, the *Plata* Court held a five-day evidentiary hearing regarding the

3  status of medical care in CDCR.  On June 30, 2005, the Court ruled from the bench that the appointment

4  of a Receiver was necessary in order to raise medical care to a constitutionally adequate level.  The

5  Court issued a detailed written order stating that a Receiver would be appointed.  10/3/05 Findings of

6  Fact (*Plata* Docket # 371).

7       On February 14, 2006, the *Plata* Court appointed a Receiver in this case.  2/14/06 Order

8  Appointing Receiver at 2 (*Plata* Docket # 473).  The Receiver has issued several reports, and has stated

9  that it would be impossible to "raise access to, and quality of, medical care to constitutional levels with

10 overpopulation at its current levels."  *See* Request for Judicial Notice in Support of Plaintiffs'

11 Opposition to Defendants' Motion to Dismiss and/or Motion for Summary Adjudication ("RJN"), Exh.

12 A at 1 (7/24/06 Receiver Letter).

13      The *Plata* plaintiffs subsequently moved to convene a Three Judge Court to consider a prisoner

14 release order.  On July 23, 2007, the *Plata* Court issued an order granting the motion, finding, among

15 other things, that "[i]t is clear to the Court that the crowded conditions of California's prisons, which are

16 now packed well beyond their intended capacity, are having – and in the absence of any intervening

17 remedial action, will continue to have – a serious impact on the Receiver's ability to complete the job

18 for which he was appointed: namely, to eliminate the unconstitutional conditions surrounding delivery

19 of inmate medical health care."  7/23/07 *Plata* Order at 8 (*Plata* Docket # 780).

20 **II.  *Coleman* Procedural History**

21      Plaintiffs filed the *Coleman* case in 1990 in an effort to remedy the unconstitutional mental

22 healthcare system in the CDCR.  In 1995, after trial, the Court issued its decision finding that defendants

23 were violating the constitutional rights of the *Coleman* class, granting injunctive relief, appointing a

24 special master, and ordering defendants to develop and implement various remedial plans to remedy the

25 constitutional violations.  *Coleman v. Wilson*, 912 F. Supp. 1282 (E.D. Cal. 1995).  Since that time, the

26 Special Master and his team of nationally-recognized psychiatrists, psychologists, clinicians and other

27 staff have monitored the mental healthcare delivery system in an effort to bring it into constitutional

28

1  compliance.  Despite those efforts, the *Coleman* Court stated on April 26, 2006 that "we are still in a

2  place in which the defendants have been unable to bring the delivery of psychiatric care up to

3  constitutional standards. . .  Every defendant in this case is in violation of the law.  That is shocking.

4  That is shocking."  *See* Declaration Of Lisa Ells In Support Of Plaintiffs' Opposition to Defendants'

5  Motion to Dismiss And/Or Motion for Summary Judgment/Adjudication ("Ells Decl.") ¶ 2, Exh. A at

6  2:14-16, 3:9-11 (Transcript of 4/26/06 Evidentiary Hearing before Judge Karlton).

7      Between 1995 and 2006, the prison system became increasingly overcrowded causing the

8  remedial process to flounder and prompting the Governor to declare a state of emergency within the

9  prison system.  Plaintiffs subsequently filed a motion to convene a three-judge panel to address the

10  overcrowding crisis, which was preventing defendants from implementing and obeying the numerous

11  orders issued by the *Coleman* court to address the ongoing constitutional violations.  On the same day as

12  the *Plata* Court issued its order granting the Motion to Convene a Three Judge Panel, the *Coleman*

13  Court also issued an Order granting the *Coleman* plaintiffs' motion to convene a Three Judge Court,

14  holding that, "[t]he orders of this court issued from 1995 through the present have failed to remedy the

15  constitutionally inadequate delivery of mental health care to CDCR inmates.  That failure appears to be

16  directly attributable to overcrowding and the consequent inability to staff the caseload."  7/23/07

17  *Coleman* Order at 7-8 (*Coleman* Docket # 2320).

18  **III.  Three Judge Court Proceedings**

19      The Court has set a trial date of November 18, 2008.  On June 9, 2008, defendants requested

20  leave to file a summary judgment motion, contending that in the *Plata* case "a dispositive motion is both

21  appropriate and necessary because Plaintiffs' experts testified (1) that overcrowding is not the primary

22  cause of Defendants' inability to provide constitutionally adequate medical and mental health care to

23  Plaintiffs, and (2) that a prisoner release order is not the only means of providing constitutionally

24  adequate medical and mental health care to Plaintiffs."  6/9/08 Joint Status Conference Statement at 2

25  (*Plata* Docket # 1236).  After defendants represented in court that they could file a statement detailing

26  the expert testimony at issue, and that the testimony would dispose of the entire matter, the Court

27  ordered defendants to file with the Court "a list of the specific testimony by Plaintiffs' experts that

28

1    Defendants contend eliminates any issue of material disputed facts in these proceedings." 7/2/08 Order

2    Re Pretrial Preparation at 2 (*Plata* Docket # 1294); Ells Decl. ¶ 3, Exh. B at 20:4-10 (Transcript of

3    6/26/08 Case Management Conference before Three-Judge Court).

4         On July 10, 2008 defendants submitted a statement summarizing Dr. Shansky's testimony that

5    they believed supported their position. 7/10/08 Defendants' Statement (*Plata* Docket # 1311). On July

6    24, 2008, this Court issued an order setting a briefing schedule for the instant motion. 7/24/08 Order

7    (*Plata* Docket # 1334).

8                              **STATEMENT OF FACTS**

9    **I.    The Overcrowding Crisis**

10        On October 4, 2006, Governor Schwarzenegger proclaimed a State of Emergency due to the

11   severe overcrowding in California's prisons. Ells Decl. ¶ 4, Exh. C at 1 (10/4/06 Governor's

12   Proclamation). The Governor declared that "the current severe overcrowding in 29 CDCR prisons has

13   caused substantial risk to the health and safety of . . . the inmates housed in them." *Id.* Large numbers

14   of prisoners live in "increased, substantial risk for transmission of infectious illnesses." *Id.*

15   Overcrowding causes "extreme peril" because the prison population "exceeds the capabilities of the

16   services, personnel, equipment, and facilities."[1] *Id.* at 6.

17        As a result of overcrowding, the Governor estimated that more than 15,000 prisoners were

18   housed in "conditions that pose substantial safety risks, namely, prison areas never designed or intended

19   for inmate housing, including, but not limited to, common areas such as prison gymnasiums, dayrooms,

20   and program rooms." *Id.* at 1; *see also* Ells Decl. ¶ 5, Exh. D (CDCR photographs). Nonetheless, the

21   only concrete action the Governor took when declaring a state of emergency was to order the transfer of

22   prisoners to out-of-state placements. Ells Decl. ¶ 4, Ex. C at 6-7. As of August 20, 2008, only 4,697

23   prisoners were housed out-of-state. Ells Decl. ¶ 6, Exh. E at 91:4-20 (Kernan Deposition). The most

24   current population reports indicate that there are approximately 14,000 prisoners housed in "bad beds."

25   Ells Decl. ¶ 6, Exh. E at 126:12-17 (Kernan Deposition). The Governor admits that this level of

26   ───────────────────

27        1.    Photographs posted by the CDCR on its own website provide vivid and disturbing evidence
     of the Governor's statements, showing prisoners triple-bunked and packed into every available space.
28   Ells Decl. ¶ 5, Exh. D (CDCR photos).

overcrowding creates a "very dangerous situation" and is "unsafe for staff and inmates alike."  Ells

Decl. ¶ 7, Exh. F (6/26/06 Speech by Governor Schwarzenegger).  As the *Plata* Court has stated, "the

consequences of system expansion without reform have been shocking."  Findings of Fact (*Plata* Docket

# 371).

Despite their acknowledgment of the severe dangers of overcrowding, defendants are unable to

remedy the current overpopulation problem in the prisons because the state has failed to take any

meaningful remedial measures.  Although the Governor sought legislative action to address the problem

in 2006, the legislature failed to provide any relief.  Ells Decl. ¶ 8, Exh. G at 1 (6/26/06 Governor's

Proclamation).  In 2007, the Legislature and Governor announced that the passage of a massive prison

building bill, Assembly Bill 900 (AB 900), would solve the crisis.  But that law has been an abject

failure.  No new prison beds have been built, no ground has been broken, and it is unclear when, if ever,

construction will begin or how many beds might be built.  Ells Decl. ¶ 9, Exh. H at 31:15-21, 23:10-15

(Hysen Deposition).  Republican Senator Dave Cogdill, a defendant intervenor in this action,

acknowledged that further legislative action will be necessary: "We certainly recognize that we have a

prison crisis that we need to be dealing with, and we want to be sure that [the] solution is comprehensive

and fiscally responsible.  That's why we've been pushing so hard to get the fixes necessary to AB 900 . .

. [which would] help us alleviate the overcrowding situation which we *currently know is the crux of the*

*crisis that we face*."  Ells Decl. ¶ 10, Exh. I (Cogdill video).  The only way that AB 900 funds can be

released to allow actual construction is through "clean-up" legislation, which the Legislature, including

the defendant intervenor Republican legislators, has been unable to accomplish.  Ells Decl. ¶ 9, Exh. H

at 61:13-62:7 (Hysen Deposition).  As of the filing of this opposition, no such clean up legislation has

been passed.  Ells Decl. ¶ 11, Exh. J (9/17/08 Statement of CDCR Secretary Cate).

## II.    Overcrowding Is the Primary Cause of Unconstitutional Medical and Mental Health Care

In its order granting plaintiffs' motion to convene the Three Judge Court, the *Plata* Court found

that "[i]t is clear to the Court that the crowded conditions of California's prisons, which are now packed

well beyond their intended capacity, are having – and in the absence of any intervening remedial action,

will continue to have – a serious impact on the Receiver's ability to complete the job for which he was

7

1   appointed: namely, to eliminate the unconstitutional conditions surrounding delivery of inmate medical

2   health care." 7/23/07 *Plata* Order at 8 (*Plata* Docket # 780).  The parallel *Coleman* order similarly held

3   that "[t]he orders of this court issued from 1995 through the present have failed to remedy the

4   constitutionally inadequate delivery of mental health care to CDCR inmates.  That failure appears to be

5   directly attributable to overcrowding and the consequent inability to staff the caseload." 7/23/07

6   *Coleman* Order at 7-8 (*Coleman* Docket # 2320).

7           The causal connection between overcrowding and the unconstitutional conditions has been

8   acknowledged by the *Plata* Receiver and the *Coleman* Special Master as well as by defendants

9   themselves, defendants' experts, defendant intervenors and their experts, and the California Inspector

10  General, as well as by the plaintiffs' experts (including the current and former heads of five state

11  correctional systems).

12          **A. The Receiver and Special Master**

13          The *Plata* Receiver has announced his resolve to fix medical care in California's prisons, but has

14  also acknowledged that a solution is impossible without addressing the dire overcrowding.  In a letter to

15  the Governor, the Receiver stated that "[i]t will not be possible to raise access to, and quality of, medical

16  care to constitutional levels with overpopulation at its current levels." RJN Exh. A at 1 (7/24/06

17  Receiver letter); *see also* 7/5/06 Receiver's First Bi-Monthly Report at 3 (*Plata* Docket # 524).

18  Specifically, the Receiver stated "[m]ost California prisons operate at 200% of capacity, with no

19  effective relief in sight.  Unless and until the living conditions of some prisons and the overpopulation

20  experienced system-wide is effectively addressed, the Receiver will be impeded in applying systemic

21  and even some ad hoc remedies to the medical care system." *Id.*; *see also* Ells Decl. ¶ 12, Exh. K at 3

22  (10/8/06 Sillen Sacramento Bee Article) (stating overcrowding is "at the root" of health care problems

23  in CDCR).[2]

24  _____

25          2.  For example, after a CDCR prisoner died at a private out-of-state prison in Mississippi used
    by CDCR in an attempt to reduce in-state population, a review revealed problems with the quality of
26  care.  9/15/08 Receiver's Ninth Quarterly Report ("Ninth Report") at 48-49 (*Plata* Docket # 1472).
    Addressing the matter "had a serious negative impact on the Office of the Receiver, drawing clinical
27  personnel away f[ro]m other important projects and delaying 'in-state' remedial efforts.  In essence,
28  thousands of dollars of valuable clinical hours have been devoted to helping a private prison . . . rework

The *Coleman* Special Master has similarly acknowledged the catastrophic effects of overcrowding on the mental health care delivery system. *See, e.g.,* 4/12/07 Special Master Report at 8 (*Coleman* Docket # 2186) ("By late 2005, it was evident that the reduction in population growth and then in the population itself in the first few years of the decade were over, and the numbers were rising fast. Early in 2006, defendants were staring at a galloping growth rate that threatened to hit 200 percent of capacity shortly, and the scramble was on to deal with the flow. One victim of the turnaround was CDCR's mental health bed plan."); 5/31/07 Special Master's Response to Court's Request for Information ("Special Master Response") at 16-17 (*Coleman* Docket # 2253) ("Over the past 11-plus years, much has been achieved, and many of the achievements have succumbed to the inexorably rising tide of population, leaving behind growing frustration and despair.").

According to the Receiver, medical care cannot be improved without addressing the population size because overcrowding is "the root cause of many of the prison system's ills, including constitutionally inadequate medical care."[3/] 9/16/06 Receiver's Second Bi-Monthly Report at 2 (*Plata* Docket # 547); *see also* RJN Exh. B at 1 (10/27/06 Receiver Letter) (stating "it is clear that overcrowding is at the root of many of the difficulties that afflict medical care"), RJN Exh. A at 1 (7/24/06 Receiver Letter) (noting "the overcrowding and medical crises are integrally related"); Ells Decl. ¶ 12, Exh. K at 3 (10/8/06 Sillen Sacramento Bee Article).

Failures in two of the central components to health care systems – treatment space and staffing – demonstrate that overcrowding is the primary cause of the health care violations. There are simply too

---

its medical delivery system . . . in order to keep the out of state transfer process from collapsing. In fact, the in state remedial process has suffered as a result." *Id.* at 49.

3.  Defendants refer in their motion to a report by Christopher Mumola, which defendants say shows that California's prison death rate for illness-related deaths is relatively low. But Mumola admits that his study failed to account for age, race, gender, length of sentence, or relative death rates in the state, all of which have significant impacts on death rates. Ells Decl. ¶ 13, Exh. L at 62:14-64:10 (Mumola Deposition). Preeminent epidemiologist Dr. Arthur Reingold has analyzed the Mumola report, and concluded that due to the failure to account for these crucial factors, "it is impossible to draw any meaningful conclusions about the risk of death from inadequate health care in California prisons from Mr. Mumola's deposition testimony or the data to which he refers." Reingold Decl. ¶ 2, Exh. A at 6 (8/27/08 Reingold Report). Accordingly, the Mumola study of death rates tells us nothing about the provision of medical care in California prisons.

1    many prisoners for the current staff and space:  adequate medical care cannot be provided because

2    "California's prisons were constructed without adequate clinical or office space for the numbers of

3    inmates housed at the prison."  5/15/07 Receiver's Overcrowding Report at 28:12-17 (*Plata* Docket #

4    673).  More specifically, the Receiver states that:

5        The facilities available for providing health care services within CDCR are woefully
         inadequate...We are dealing not with deferred maintenance, but with some facilities that
6        are literally falling apart.  In addition, investments in health care facilities have
         significantly lagged behind growing inmate populations, so much so that available
7        clinical space is less than half of what is necessary for daily operations.

8    6/6/08 Receiver's Turnaround Plan of Action ("Turnaround Plan") at 25 (*Plata* Docket # 1229).  In short

9    "CDCR does not have adequate clinical, administrative and housing facilities to support constitutionally

10   adequate health care."  *Id.* at 27.

11       The deficiencies in space for the numbers of prisoners were in fact by design: The state's

12   "newest and most modern prisons" were "designed with clinic space which is only one-half that

13   necessary for the real-life capacity of the prisons."  5/15/07 Receiver's Overcrowding Report at 19

14   (*Plata* Docket # 673) (emphasis removed).  As the *Coleman* Special Master has clarified, the Receiver's

15   "one-half" estimate applies to medical care alone and does not take into account space needed for

16   mental health care: "as the need for much expanded mental health care and the space needed to provide

17   it emerged in the mid and late 1990s, medical and mental health practitioners in CDCR were left to

18   scramble for the clinical space originally designed to meet just half of anticipated medical needs alone."

19   Special Master Response at 5 (*Coleman* Docket # 2253) (citing 5/15/07 Receiver's Overcrowding

20   Report at 28:12-17 (*Plata* Docket # 673)).

21       According to the Receiver, additional health care space is necessary at CDCR prisons

22   "primarily" because of "overcrowding" and the fact that the prisons were built without adequate clinical

23   and medical support facilities given the numbers of prisoners they house.  5/15/07 Receiver's

24   Overcrowding Report at 27:10 - 28:1 (*Plata* Docket # 673).  However, inadequate medical care resulting

25   from inadequate health care space caused primarily by overcrowding will continue for years.  The

26   Receiver's planning and construction of the necessary upgraded or additional health care space at

27   existing prisons is being done on a phased and serial basis.  Turnaround Plan at 25-26 (*Plata* Docket #

28

1229). Construction upgrade planning for all prisons was scheduled to be completed by 2010, but that schedule is now "suspended" and the Receiver has indicated a "possible delay" with the scheduled completion date for this task. Ninth Report at 62 (*Plata* Docket # 1472). Construction (as opposed to planning) at all prisons had been scheduled for completion in 2012, but is "not on schedule;" construction has actually begun at only three prisons. *Id.* at 63. Similarly, the Receiver's project to construct facilities to house approximately 10,000 prisoners with particular medical and/or mental health needs will not provide relief for many years: the first building is not scheduled to be ready until 2011 and the entire project is not scheduled to be completed until at least July 2013, but even this schedule is "in jeopardy" because of a lack of funding. *Id.* at 65.

There is also no short-term solution to the grave lack of office and treatment space in the *Coleman* case. The Receiver has assumed some of the responsibility for the planning and construction of clinical and office space at existing prisons for mental health care (2/26/08 Three-Judge Court Order at 4 (*Coleman* Docket # 2696)), but as noted above, these projects are delayed. Ninth Report at 65 (*Plata* Docket # 1472). As a result, inadequate office and treatment space for the number of prisoners will continue to plague mental health clinicians throughout the CDCR for years. As the Special Master noted in his most recent monitoring report, while limited improvements can be made, "[m]ental health treatment space throughout the system, however, remained severely limited. Many institutions are still not capable of substantial remediation prior to the construction and implementation of the CHCFs [the Receiver's "California Health Care Facilities"]." 9/12/08 Special Master's 20th Monitoring Report ("20th Report") at 356 (*Coleman* Docket # 3029-9). The Special Master also explained the severe office and clinical space shortages in his May 2007 report:

> Excessive population, thus, results in a reduction of programming space now occupied by inmate bunks, greater competition for use of the diminishing available space; fewer escorting correctional officers to permit access to the diminishing space; and, ultimately, the increasing frustration and demoralization of clinicians trying to provide the treatment. The lack of programming space is a huge problem.

Special Master Response at 7 (*Coleman* Docket # 2253).[4/]

---

4. Throughout the CDCR, defendants have been forced to convert "over 3,100 Level III and Level IV male GP beds for EOP housing. . . [T]hese converted facilities currently do not provide sufficient treatment and program space to fully meet the requirements of the mental health programs,

1    In addition to the dire space deficits, health care staffing is inadequate; there are simply too

2    many prisoners for the numbers of medical, mental health, and custody staff available to provide

3    constitutional health care services.  As the Receiver concluded, "[m]any CDCR prisons are unable to

4    sustain the basic delivery of medical, mental health, and dental services because of limited staffing

5    (clinical and custody) and an overwhelming number of prisoner/patients who require care.  Every day,

6    many California prison wardens and health care managers make the difficult decision as to which of the

7    class actions, *Coleman*, *Perez*, *Armstrong*, or *Plata* they will fail to comply with because of staff

8    shortages and patient loads." 5/15/07 Receiver's Overcrowding Report at 30 (*Plata* Docket # 673).

9    According to the Receiver, not only did the CDCR's staffing situation significantly worsen during the

10   period from 2002 to 2007, but "the true scope of clinical staff shortfalls is actually *far worse* than the

11   numbers" set forth in his report because the system has additional staffing needs not yet factored into the

12   vacancy rates.  *Id.* at 11-12.

13   These deficits continue.  The Receiver reports that primary medical care provider (physician and

14   surgeon) vacancy rates are 18%.  Ninth Report at 29 (*Plata* Docket # 1472); Ninth Report, Appx. 6 at 1

15   (*Plata* Docket # 1473-2).  Taking into account providers who are on leave (reported by the Receiver as

16   "adjusted vacant positions"), the vacancy rate climbs to approximately 29%.  *Id.*  It is no answer to fill

17   the vacant slots with contract providers; this is a stop-gap measure and not an adequate long-term

18   solution because contract providers are short-term and have no investment in the development of a

19   competent system of care, and, because they tend to turn over quickly, require expensive and time-

20   consuming on-the-job training.  Declaration Of Ronald Shansky, M.D., In Support Of Plaintiffs'

21   Opposition to Defendants' Motion to Dismiss And/Or Motion for Summary Judgment/Adjudication

22   
23   and these conversions exacerbate the system-wide shortage of cells by reducing the available housing for GP inmates." Ells Decl. ¶ 14, Ex. M at 2 (CDCR BCP re: SAC EOP).  At CSP-Sacramento, defendants chose to activate 192 EOP beds in 2006 "[d]ue to CDCR's mental health inmate population

24   pressures." *Id.* at 3.  Defendants admitted that the temporary retrofits of space for those beds "do not provide an adequate therapeutic environment." *Id.*  They accordingly requested to convert a 17,000

25   square foot warehouse in order to provide appropriate treatment.  *Id.* at 5.  According to defendants' own schedules, however, construction will not be complete until January of 2012, or six years after the

26   beds were brought online.  *Id.* at 6.  This is but one example of the severely inadequate treatment space in the system, which is caused by overcrowding, and which defendants are incapable (or unwilling) to

27   remedy for at least another four years.

28

("Shansky Decl.") ¶ 3, Exh. A at 17-18, ¶ 45 (11/9/07 Shansky Report); *id.* ¶ 5, Exh. C at 19-20, ¶¶ 65-66 (9/10/08 Second Supplemental Shansky Report).

CDCR also incarcerates too many prisoners for the existing staff to provide constitutional mental health care. The Special Master reported in his 20th round monitoring report that as of January 31, 2008, there was a 51% vacancy rate for all psychiatrists, which was reduced to a functional vacancy rate of 28% by contract staff. 20th Report at 329 (*Coleman* Docket # 3029-8). There was also a vacancy rate of 27% for psychologists, with a functional vacancy rate of 17% with contract staff. *Id.* The overall vacancy rate for psychiatrists, psychologists, psychiatric social workers and psychiatric technicians was 28%, or a functional vacancy rate of 17%. *Id.* With respect to contract staff specifically, however, the Special Master previously explained that services provided by contractors is not equivalent to permanent staff: "For lots of reasons, including the length and duration of provided services and problems of selection, orientation, and supervision, contracted services are not the equivalent of services provided by full-time clinical employees." Special Master's Response at 12 (*Coleman* Docket # 2253).

Since the Special Master issued his 20th report, defendants have provided updated staffing data, including most recently for the month of July 2008. That data shows that of the 282 authorized psychiatrist positions, 152.7 are vacant, or 51.1%. Ells Decl. ¶ 15, Exh. N at 7 (CDCR Staffing Statistics). Of the 928.4 allocated psychologist positions, 362.4 are vacant, or 39.4%. Of the 1251.7 allocated "other MH clinical staff" positions, which include psychiatric technicians, vocational nurses, registered nurses, recreation therapists and other staff necessary to provide care, 404.91 positions are vacant, or 32.3%. *Id.* Finally, of the 534.4 "all other support staff" positions, including pharmacists, office technicians, office assistants, health record technicians, correctional staff and so on, 247 positions are vacant or 40.5%. *Id.*

These vacancies, already very serious, also dramatically underestimate the staffing necessary to implement the court-ordered Program Guide. As part of the its 2008/09 budget, CDCR prepared a Finance Letter requesting augmented mental health staffing based upon the results of the Mental Health Staffing Workload Study, which was completed in June 2007. Ells Decl. ¶ 16, Exh. O at DEFS014447 (CDCR Finance Letter). Defendants state that "[t]his Finance Letter addresses the necessary MHP

1  [mental health program] field staffing for compliance with the *Coleman* Court orders, and the staffing in

2  the institutions required to fully implement the MHSDS Revised Program Guide in conjunction with the

3  staffing levels as described in the Mental Health Staffing Workload Study." *Id.* at DEFS014449.  In

4  making this request, defendants noted that "DCHCS has determined that current resources are

5  insufficient to comply with the required levels of care for mentally ill inmates.  Partial implementation

6  of the MHSDS Revised Program Guide suggests a tolerance for insufficient treatment of mentally ill

7  inmates."  *Id.*  The Finance Letter requested 407.7 additional mental health positions, but noted that

8  statewide Mental Health Program vacancies are at 625, and "[i]n FY 2008/09, salary savings from

9  currently authorized vacant positions will be used to offset these costs" for the 407.7 additional

10  positions.  *Id.* at DEFS014451.

11      More recently, the Special Master notified defendants on July 12, 2008, of several serious

12  problems with the Mental Health Staffing Workload Study, including that it appeared predicated on

13  several incorrect assumptions (*e.g.*, assumption that 30% of outpatient mental health patients take

14  medications, rather than the 80% that actually do), that it failed to capture all tasks performed by mental

15  health staff, that it failed to validate the amounts of time estimated for those tasks, and that it failed to

16  consider tasks required in meeting recent Program Guide revisions and Court orders.  Ells Decl. ¶ 17,

17  Exh. P at 10, 12 (7/12/08 Lopes Letter).  Thus the 407.7 positions sought by defendants as necessary to

18  implement the Revised Program Guide–based upon their Mental Health Staffing Workload Study–is an

19  under-estimation of the actual mental health staffing augmentation required to implement the MHSDS

20  Revised Program Guide.  The evidence is overwhelming and undisputed that defendants' staffing is

21  grossly inadequate to appropriately treat the *Coleman* class.

22      CDCR similarly does not have enough custody officers to ensure adequate access to timely

23  health care services for the overcrowded population.  As the Receiver explained in his Turnaround Plan

24  only a few months ago,

25      [h]ealth care services are meaningful only if patient-inmates have timely access to those
         services.  In a correctional setting, issues of access are inextricably intertwined with
26      control and supervision of inmate movement by custody staff.  System-wide, CDCR
         lacks the custody staff and organizational structure and processes to ensure that
27      patient-inmates are reliably escorted and/or transported to medical appointments.  As a
         result, patient-inmates are often denied timely access to health care services, substantially

28

increasing the risk that patient-inmates' health will further deteriorate and increasing the overall costs of providing health care services.

Turnaround Plan at 5 (*Plata* Docket # 1229). The custody escort shortage is exacerbated by the lockdowns that frequently follow overcrowding-related disturbances in California prisons. 5/15/07 Receiver's Overcrowding Report at 29 (*Plata* Docket # 673). Normally prisoners leave their housing units for yard clinic appointments and medication lines, but "[u]nder lockdown conditions, clinical staff must go from cell to cell to see the prisoner/patient, or small groups or individual prisoners must be escorted by correctional officers to and from clinic areas." *Id.* at 29-30. Thus, "lockdowns inhibit the delivery of medical care and increase the staffing necessary for such care." *Id.* at 30. Relief in this area, as in so many others, is many years away: the Receiver's program to increase custody staff for health care escorts and access at the prisons will not be completed until July 2011, even if it remains on schedule. Ninth Report at 10 (*Plata* Docket # 1472). It is also contingent on newly established positions being filled. Turnaround Plan at 6 (*Plata* Docket # 1229).

Overcrowding also causes inadequate health care in other ways besides the paucity of treatment space and staff. For example, the number of prisoners outpaces the system's ability to provide timely specialty care. The Receiver has identified "[s]ystemic and pervasive prolonged delays in specialty referrals" as one of the "[s]ystemic lapses" found when reviewing prisoner deaths, RJN Exh. D at 6-8 (8/20/07 Receiver's Analysis of CDCR Death Reviews 2006), and reports that "an increasing number of prisoners in the more remote prisons has placed a heavy burden on the very limited number of hospitals and specialty providers . . . ." 5/15/07 Receiver's Overcrowding Report at 28:8-10 (*Plata* Docket # 673). Moreover, "overcrowding has increased the number and seriousness of infectious and communicable diseases, jeopardizing prisoners, staff, and the public." *Id.* at 30. Although a system-wide outbreak has thus far been avoided, "given the number of prisoners, conditions in gyms and hallways converted to housing units, the velocity of prisoner movement between institutions and in and out of the CDCR itself, the risk of such an outbreak cannot be underestimated." *Id.* Further, overcrowding significantly impacts the ability to deliver medications in California prisons. Receiver's Seventh Quarterly Report ("Seventh Report"), Exh. 6 at 29 (*Plata* Docket # 1137-6).

With respect to mental health care in particular, one of the most serious problems is defendants'

1  inability to provide higher levels of care to the ever-expanding *Coleman* class.  The Special Master

2  noted in May of 2007 that "[t]his Court has spent the last three years deeply immersed in the disconnect

3  between the number of beds needed by defendants to provide mental health treatment for CDCR's most

4  seriously mentally ill inmates and the beds available to provide such care."  Special Master Response at

5  8 (*Coleman* Docket # 2253).   Yet the current system still provides insufficient beds and, unless and

6  until the population is reduced, will continue to do so for years to come:

> Whatever the cause, defendants are facing a four to five-year gap in the availability of
> sufficient beds to meet the treatment needs of many inmate/patients, who in the meantime
> are left suffering.  This means that, nearly 12 years after the determination that mental
> health services in CDCR were egregiously unconstitutional, hundreds certainly, and
> possibly thousands, of CDCR inmates/patients, all members of the *Coleman* class
> certified in the early 1990s, are still looking for beds at the level of treatment their mental
> illness requires.

11

12  *Id.* at 9.  Defendants are therefore unable to provide essential, and sometimes life-saving access to

13  nearly every level of care, including acute beds, *see* 20th Report at 357 (*Coleman* Docket # 3029-9 at

14  357) ("[a]cceptances and transfers to acute level DMH care remained significantly limited"); Mental

15  Health Crisis Beds, *see* 20th Report at 351 (*Coleman* Docket # 3029-9) ("[t]here continued to be too few

16  MHCBs to accommodate CDCR's mental health population.  Inadequate capacity was exacerbated by

17  delayed access to DMH and EOP programs, as needed MHCBs were too often filled with

18  decompensated or fragile inmates waiting weeks or months to be transferred to the appropriate level of

19  care"); Intermediate Care Facility beds, *see* 20th Report at 357 (*Coleman* Docket # 3029-9) ("There was

20  greater access to intermediate care at ASH and CMF, although higher level custody access remained

21  severely limited"); and Enhanced Outpatient beds, *see* 20th Report at 358 (*Coleman* Docket # 3029-9)

22  ("EOP transfers were excessively delayed in all directions").

23          Defendants allege that they "have submitted a detailed plan to provide mental health beds and

24  have already engaged in implementing increased pay to recruit and retain necessary staff to enable care

25  in those beds."  Defs' Motion at 9.  In fact, the most significant part of defendants' plan to provide

26  mental health beds is the Receiver's 10,000 bed project: "The planning for the delivery of mental health

27  services for the CHCFs is based on the Receiver's current construction schedule and is the basis for the

28  current plan . . .  Once sites, facility bed configuration and construction schedules are known, a further

16

1    update and status report can be provided to the Special Master."  Ells Decl. ¶ 18, Exh. Q at 4 (7/16/08

2    CDCR Mental Health Bed Plan).  Defendants have refused to fund the Receiver's plan and have recently

3    filed pleadings and declarations attacking the Receiver's construction plan.  *See, e.g.,* Defendants'

4    Opposition to Receiver's Motion for Contempt (*Plata* Docket # 1483-1493, 1497).

5         In the meantime, the severe shortage of beds for the expanding *Coleman* class continues.  As of

6    August 8, 2008, there were 4,605 EOP patients in the system, with capacity for only 3,648 – nearly

7    1,000 more EOP patients than the system can handle.  Ells Decl. ¶ 19, Exh. R at R1-5.  The vast

8    majority of these 1,000 EOP patients were awaiting transfer to an available EOP be in a system without

9    sufficient EOP capacity.  *Id.*  Defendants' most recent data also shows a waiting list of 166 patients for

10   intermediate care facility beds at the Salinas Valley Psychiatric Program ("SVPP"), a DMH program at

11   the ICF level of care fun inside the walls of Salinas Valley State Prison.  Ells Decl. ¶ 20, Exh. S at 1-2.

12   These bed shortages have devastating consequences for the *Coleman* class: Thousands of patients are

13   being denied minimally adequate treatment for their severe mental illness.

14        **B.  Defendants and their experts**

15        Defendants themselves agree that overcrowding prevents the provision of adequate medical and

16   mental health care in California's prisons.  Then-Secretary of CDCR James Tilton concluded in 2006

17   that "the overcrowding and lack of treatment space to service the additional populations has been a

18   major contributor to court intervention regarding CDCR's health care services delivery."  Ells Decl. ¶

19   21, Exh. T at CDCR009404 (CDCR July 2006 Report "Inmate Population, Rehabilitation, and Housing

20   Management Plan").  He declared that although the CDCR is responsible for providing prisoners with

21   programs, including mental health care, "until I get overcrowding reduced – then I don't have the

22   opportunity to provide the program that I believe is my charge."  Ells Decl. ¶ 23, Exh. V at 3 (CDCR

23   "Prison Reform and Rehabilitation Media").  He has further testified that "the lack of space is not only a

24   housing issue, but it's impacting the other factors, like delivery of healthcare service, the lack of offices,

25   and clinical space."  Ells Decl. ¶ 22, Exh. U at 80:11-15 (Tilton Deposition).

26        During a March 3, 2007 press conference at an overcrowded prison facility, Governor

27   Schwarzenegger underscored the inability of CDCR to provide rehabilitation in overcrowded prisons.

28

1   Ells Decl. ¶ 24, Exh. W at 1 (3/3/07 Schwarzenegger Speech).  Then-Secretary Tilton stated that "in

2   addition to space for program, we need to have space for staff to provide medical services, and office

3   space for those.  So we're working with the receivers to develop a capital outlay plan to do that.  You

4   know, he's increased salaries.  That's not the only solution, to increase salaries to recruit that staff; we

5   need to provide appropriate facilities to provide those services too.  So we talk about overcrowding in

6   programs, and we talk about program, one of the issues we have here is to make sure we provide space

7   for our medical staff to work and provide those services in the prison.  If we can do that in the prisons,

8   we save money and are more efficient from the (Inaudible) standpoint, as well as not having those

9   inmates transferred to the community.  So it's cheaper, and a safer situation, so we're working with the

10  courts to provide that."  *See id.* at 4.

11      Current CDCR Secretary Matthew Cate has echoed that sentiment, stating that "I agree that

12  overcrowding makes everything more difficult in the institutions.  I mean, I think that's a common –

13  that's a common-sense, non-expert view; but when it comes to providing program, we need space to

14  provide program, and the same thing is true for provision of medical care.  You've got to transport

15  inmates and provide space for them and so forth.  And so crowding, if you're overcrowded, that's a

16  challenge that has to be overcome in order to do those things."  Ells Decl. ¶ 25, Exh. X at Vol. I, at

17  141:23-142:8 (Cate Deposition).  Mr. Cate agreed that currently, "[a]s the inmate population increases, .

18  . . delivering healthcare, managing overcrowding and controlling costs become more difficult."  *Id.* at

19  175:22-176:4.

20      Indeed, CDCR officials have long admitted that overcrowding interferes with their ability to

21  perform their mission as a whole.  In March 2007, CDCR undersecretary Kingston "Bud" Prunty stated,

22  "We just have a real major problem with overcrowding.  It's impacting everything we do."  Ells Decl. ¶

23  26, Exh. Y (3/16/07 Sacramento Bee Article).  CDCR's Chief Deputy Secretary of Facility Planning,

24  Construction and Management wrote in 2007 that "[c]urrently, there is simply not enough space in the

25  prisons to meet the basic medical, mental health and dental needs of prisoners, and spaces that were

26  designed for rehabilitation, and vocational purposes now house either temporary beds or, in some cases,

27  are actually abandoned because there is simply not enough staff, resources, or modernization funds

28

1    available to restore them to their intended purpose."  Ells Decl. ¶ 27, Exh. Z at E_PRIV_161333 ("From

2    Custody to Community: Building the Bridge for California's Prisoners Returning Home"); Ells Decl. ¶

3    9, Exh. H at 157:4-158:20 (Hysen Deposition).

4         Official CDCR reports and analyses draw similar conclusions.  In January 2007, CDCR admitted

5    that "[t]he severe overcrowding has significantly impacted existing infrastructure systems, most notably,

6    wastewater systems.  These systems are often required to operate at or above the maximum intended

7    capacity, resulting in an increased, substantial health and safety risk to CDCR staff, inmates, the public,

8    and the environment."  Ells Decl. ¶ 28, Exh. AA at 2 (CDCR Budget Change Proposal re: STWD Infill

9    Housing and Program Space).  CDCR acknowledged in a report of August 30, 2007 that overcrowding

10   "has risen to emergency levels over the past several years and its elimination is a critical component of

11   prison reform not only because of its threat to inmate, staff and public safety, but also because of the

12   inability to provide the requisite level of rehabilitation program services *and constitutionally required*

13   *care* to inmates."  Ells Decl. ¶ 29, Exh. BB at 2 ("Overview and Planning Guide for Northern California

14   Women's Facility Conversion to a Secure Reentry Program Facility") (emphasis added).  CDCR has

15   further admitted that "[p]rison overcrowding is obstructing CDCR's ability to ensure the safety of staff

16   and inmates.  Severe overcrowding conditions pose substantial risk to the health and safety of both staff

17   and inmates.  Prisons were intended to provide programming for education, vocation, and rehabilitative

18   skills, yet space for those programs has been converted into housing units, reducing access to medical

19   care and rehabilitative programming."  Ells Decl. ¶ 30, Exh. CC at 1.

20        Defendants' own Expert Panel on Adult Offender and Recidivism Reduction Programming

21   echoes these findings:  "Not only does overcrowding have a negative impact on [rehabilitative]

22   programming but, according to documents provided to the court by CDCR Chief Deputy Secretary Scott

23   Kernan (2007), 'housing inmates in non-traditional quarters presents serious safety concerns for both

24   inmates and correctional staff.  The overcrowding of CDCR facilities has led to increased numbers [of]

25   infectious disease outbreaks and riots and disturbances system-wide.'"  Ells Decl. ¶ 31, Exh. DD at 9

26   (Expert Panel Report) (second alteration in original).  This conclusion led to the Expert Panel's first

27   recommendation, which was to "reduce overcrowding in [CDCR's] prison facilities and parole offices."

28

*Id.* at 10.

Even one of the defendant intervenors' experts agrees that "reducing the number of prisoners is at least one of the first steps that needs to be taken while you're doing – while you're kind of working on the infrastructure of risk and needs and subsequent identification and referral and in the facility and out of the facility . . . . Basically you've got to bring the population down to a more manageable size so that you can implement those things."  Ells Decl. ¶ 31, Exh. EE at 76:22-77:8 (Bennett Deposition).  Dr. David Bennet, who was offered as an expert in corrections planning by defendant-intervenor Sonoma County, further stated "[a]s has been documented in the expert reports, with the level of overcrowding in the prison just logistically, it has proven to be very difficult, if not impossible, to provide that level of care that is required.  But it's not just the fact that there isn't the physical space to do that, that it is -- and/or that the number of prisoners prohibits that, but it's also having in place the structure, the structure to systematically provide the risk and needs assessment of the offenders, the structure in place to provide that subsequent identification and referral to treatment, that ability to provide services both within the facility and, just as importantly, out in the community."  *Id.* at 76:1-13.

Defendants' sole expert clinician for the *Coleman* case has also explicitly found that overcrowding is the primary cause of constitutional violations in two aspects of the mental health care delivery system: the inadequate care at reception centers and the unconstitutional medical records system.  Ells Decl. ¶ 33, Exh. FF at 23 (12/10/07 Packer Report).  More specifically, Dr. Packer wrote, "crowding is the primary cause of the particular difficulties providing services to the *Coleman* class at the reception centers."  *Id.* at 20.  With respect to reception centers, Dr. Packer then reiterated this belief eight months later in his August 15, 2008 report:

> As with my first visit, *it appears that the reception centers are overwhelmed by the large number of admissions of individuals who are experiencing mental illness. . . .* For the Coleman class in Reception, the RC EOP program is very helpful, but more crisis beds are needed and there are significant delays getting these individuals into other programs (such as EOP programs in mainline prisons, or intermediate care programs).

Ells Decl. ¶ 34, Exh. GG at 6 (8/15/08 Packer Report) (emphasis added).

Dr. Packer also appears to suggest that overcrowding is, in fact, the primary reason for defendants' inability to provide mental health care in *all* respects.  Dr. Packer wrote:

20

1   As I indicated in my previous report, *it is my opinion that the major obstacle facing CDCR in providing adequate mental health care to inmates is the lack of adequate beds and resources to serve inmates with intensive mental health needs.* The new proposed model, which includes these Consolidated Health Care facilities, should significantly address the problem by providing more beds, better facilities, more treatment space (including freeing up space in existing facilities), and increasing the likelihood that qualified staff can be recruited and retained."

5   *Id.* at 9 (emphasis added).

6   Defendants' contention – that it is "undisputed" that overcrowding is *not* the primary cause of the constitutional violations in this case – is thus contradicted by their own expert as well as their own admissions.

9   **C. Plaintiffs' experts**

10   Based on extensive evidentiary reviews and tremendous weight of experience, plaintiffs' experts have also repeatedly found, and stated, that overcrowding is the primary cause of the unconstitutional medical and mental health care systems. Ronald Shansky, M.D., has approximately 35 years experience in correctional medicine, including as a staff physician at the Metropolitan Correctional Center of Chicago, twelve years as Medical Director of the Illinois Department of Corrections, five years as a medical consultant to the California Department of Corrections, and involvement with over two dozen other correctional systems as either a court-appointed expert, monitor, or special master or as a consultant retained by the correctional system. Shansky Decl. ¶ 3, Exh. A at ¶ 2 (11/9/07 Shansky Report). Dr. Shansky has inspected over 200 prisons and jails worldwide, but primarily in the United States, and in 1995 was appointed by a federal district court as the Receiver for the Washington, D.C. jail health care programs (under a federal court-imposed population cap). *Id.* at ¶¶ 2, 3.

21   Dr. Shansky's experience makes him uniquely qualified to provide an opinion on the relevant issues in this case. In preparing his report, Dr. Shansky reviewed relevant documents and conducted site visits at nine CDCR prisons. *Id.* at 2-3, ¶¶ 6-7; Shansky Decl. ¶ 5, Exh. C at 1-2, ¶¶ 5-6 (9/10/08 Shansky Second Supplemental Report).

25   According to Dr. Shansky, overcrowding is the primary cause of the medical care constitutional violations. Shansky Decl. ¶ 3, Exh. A at ¶ 6 (11/9/07 Shansky Report); Shansky Decl. ¶ 4, Exh. B at 1 (12/6/07 Shansky Supplemental Report); Shansky Decl. ¶ 5, Exh. C at 3, ¶ 7 (9/10/08 Shansky Second

1   Supplemental Report); Ells Decl. ¶ 35, Exh. HH at 53:1-9 (Shansky Deposition) (stress on medical care

2   delivery system caused by size of prisoner population the primary ongoing problem that inhibits

3   bringing the system to a constitutional level); 161:6-18 (overcrowding the primary problem).  He

4   explains that "the CDCR's medical care delivery system cannot provide a constitutional level of care

5   because the prison system incarcerates far more prisoners than can be adequately treated with the

6   resources, staffing and facilities available in the CDCR."  Shansky Decl. ¶ 5, Exh. C at ¶ 7 (9/10/08

7   Shansky Second Supplemental Report).  Dr. Shansky further opines that it is not possible to achieve

8   constitutional care "in the foreseeable future, unless the prison population is significantly reduced"

9   because "[t]he limitations on the CDCR, including staffing, administrative resources and especially

10  treatment space, are so severe that the only avenue for building a constitutional health care delivery

11  system is to reduce the demand on the system by lowering the number of patients it serves."  *Id*. at ¶ 8.

12      Dr. Shansky supports his opinions in his expert reports with extensive evidence, including

13  analyses of CDCR's overcrowding-driven severe shortages of clinical and medical office space,

14  insufficient staffing (including custody staff), and inadequate specialty care and medication

15  management, as well as the increase in rate and seriousness of infectious disease transmission caused by

16  the excessive population.  Shansky Decl. ¶ 3, Exh. A at 3-50, ¶¶ 10-135 (11/9/07 Shansky Report);

17  Shansky Decl. ¶ 4, Exh. B at 1-2 (12/6/07 Shansky Supplemental Report); Shansky Decl. ¶ 5, Exh. C at

18  4-36, ¶¶ 12-118 (9/10/08 Shansky Second Supplemental Report).  Dr. Shansky's opinions echo and

19  amplify the Receiver's descriptions, cited above, of the magnitude of the medical care deficiencies and

20  the impossibility of addressing them in any reasonable time frame without reducing the prison

21  population.

22      Dr. Pablo Stewart, a psychiatrist with a specialty in clinical and forensic psychiatry, was a Court-

23  appointed medical and psychiatric expert from 1990-2000 under the Court Mediator monitoring the

24  *Gates v. Deukmejian* Consent Decree.  He made similar findings to Dr. Shansky's with regard to mental

25  health care.  Dr. Stewart has worked extensively in jail and prison systems in California and in other

26  states, including on overcrowding issues.  After touring several CDCR facilities, interviewing numerous

27  staff members and class members, reviewing medical files and conducting a through review of other

28

underlying documents and data in the *Coleman* and *Plata* cases, Dr. Stewart found:

> the range of Constitutional violations discussed above, including inadequate suicide monitoring and prevention, inability to timely access appropriate levels of care, inability to timely access mental health clinicians due to staffing shortages, and inadequate medication management practices are unusual in a system that has been under Court supervision for more than ten years. These serious, dangerous violations this late in the remedial process are typical indicators of a system plagued by severe overcrowding. In a non-overcrowded system, the Constitutional violations are more readily addressed by such interventions as increased staff and increased programming. However, in a system overwhelmed by crowding, these traditional remedies are woefully inadequate. This appears to be the case in the CDCR where remedial efforts have resulted in significant expansions of staffing and programming activities, yet the constitutional violations persist or even worsen.

Declaration Of Pablo Stewart, M.D., In Support Of Plaintiffs' Opposition to Defendants' Motion to Dismiss And/Or Motion for Summary Judgment/Adjudication ("Stewart Decl.") ¶ 4, Exh. C at ¶ 112 (Stewart Report). After detailing his findings and conclusions in two expert reports, Dr. Stewart concluded: "The extreme overcrowding in California's prison system permeates nearly every aspect of medical and mental health care and, if not remediated, will continue to result in preventable suffering and death. Unless and until the state reduces population, it will be unable to sustain meaningful reform." *Id.* at ¶ 146.

Craig Haney, a professor of psychology who has studied institutional environments, including prisons, for 35 years and who was also a testifying expert in both the *Gates v. Deukmejian* and the *Coleman* trials, has also extensively documented his opinion that overcrowding prevents defendants from providing constitutionally adequate medical and mental health care. Dr. Haney has evaluated and testified about the psychological effects of overcrowded conditions of confinement at the California Men's Colony, San Quentin, and Soledad prisons, as well as in other state prison systems. Under the auspices of the U.S. Department of Justice, he also evaluated conditions at Atascadero State Hospital, a DMH facility in California. With respect to the CDCR, he found:

> As detailed throughout this declaration, and based on my observations and review of documents, I have concluded that overcrowding is now interfering with the ability of the CDCR to meet timelines for transfers to treatment programs at every level of care in its mental health system; it has resulted in an insurmountable shortage of clinical and custody staff; it has overrun all available treatment, office, and programming space; and combined with the environmental effects of overcrowding itself, these delays, shortages, and inadequacies in mental health care are exacerbating existing mental illness, and creating negative psychological consequences for prisoners who, but for overcrowding, would likely not exhibit these problems and symptoms.

Declaration Of Craig Haney In Support Of Plaintiffs' Opposition to Defendants' Motion to Dismiss And/Or Motion for Summary Judgment/Adjudication ("Haney Decl.") ¶ 2, Exh. B at ¶ 37 (Haney Report). Dr. Haney also concurs with the Governor and various CDCR officials who have publicly stated that overcrowding permeates every aspect of prison life and not just the medical and mental health care systems:

> The relevant psychological and social scientific literature on prison overcrowding underscores its negative impact on virtually every aspect of prison life, from the pains of imprisonment suffered by prisoners, to the performance and well-being of correctional officers and other prison employees, to the way in which individual institutions and prison systems discharge their constitutionally mandated duties and functions. In my experience as a scholar and researcher who has studied prisons in the United States for more than 35 years, no other single aspect or condition of confinement has had a more significant impact on the prisons of this country or prisons in the State of California.

*Id.* at ¶ 16.

An impressive array of correctional experts, former heads of five state correctional systems, echo these conclusions. Jeanne Woodford, a former Secretary of CDCR, former warden, and former correctional officer, visited numerous prisons and analyzed key documents in the case and produced a report in November 2007 opining that "overcrowding is the primary cause of the [health care] constitutional violations, and nothing short of a reduction in the prison population will effectively address these issues." Declaration Of Jeanne Woodford In Support Of Plaintiffs' Opposition to Defendants' Motion to Dismiss And/Or Motion for Summary Judgment/Adjudication ("Woodford Decl.") ¶ 3, Exh. A at ¶¶ 1, 6 and Appx. A (11/6/07 Woodford Report). After visiting three more prisons and reviewing current data, Ms. Woodford issued a supplemental report in August 2008 opining that "CDCR remains severely overcrowded, that this overcrowding is the primary cause of the constitutional violations and that the prison population must be substantially reduced to alleviate the unconstitutional conditions." *Id.* ¶ 4, Exh. B at ¶ 3 (8/15/08 Woodford Supplemental Report). She further opined that "[o]vercrowding in CDCR is extreme, its effects are pervasive and it is preventing the Department from providing adequate mental and medical health care to prisoners." *Id.* at ¶ 31.

Wayne Scott, an expert on corrections management, served for more than 30 years with the Texas Department of Criminal Justice, including five years as Executive Director from 1996-2001. Declaration Of Doyle Wayne Scott In Support Of Plaintiffs' Opposition to Defendants' Motion to

1   Dismiss And/Or Motion for Summary Judgment/Adjudication ("Scott Decl.") ¶ 3, Exh. A at ¶ 1

2   (11/9/07 Scott Report).  He has since performed independent reviews and expert analyses on staffing

3   patterns, institutional response to violent disturbances, general operations, and security controls for the

4   National Institute for Corrections, the Oklahoma Department of Corrections through a contract issued by

5   the Oklahoma state legislature, the Florida Department of Corrections, the New Mexico Department of

6   Corrections, the Cook County Judicial Advisory Council, the Indiana Department of Corrections, the

7   Kentucky Department of Corrections, and the Puerto Rico prison system, the latter on behalf of the

8   federal district judge overseeing reforms due to constitutional violations.  *Id.*  He concurs that

9   overcrowding is the primary cause of California's unconstitutional health care conditions.  *Id.* at ¶ 80.

10  According to Mr. Scott, medical care is a "basic need" that "cannot be supplied under the current

11  [overcrowded] conditions."  Scott Decl. ¶ 4, Exh. B at ¶ 21 (8/15/08 Scott Supplemental Report).  He

12  found the level of overcrowding in California's prisons "unprecedented in scope and in the dangers and

13  deprivations of day-to-day life in the prisons," and opined that overcrowding "makes the state unable to

14  keep prisoners and staff safe and to provide for the health care needs of prisoners."  Scott Decl. ¶¶ 3-4,

15  Exh. B at ¶ 4, Exh. A at ¶ 3.

16      Similarly, Joseph Lehman, an expert with over 35 years of experience in corrections, parole and

17  probation, including fifteen years of experience running state correctional systems in Washington State,

18  Maine and Pennsylvania, and a member of CDCR's Expert Panel, stated that "[o]vercrowding affects

19  virtually every aspect of a prison's operation.  Severe overcrowding, like that affecting California's

20  prisons, results in a lack of treatment and office space, decreased access to health care services, and the

21  cancellation of such services during lockdowns."  Declaration Of Joseph Lehman In Support Of

22  Plaintiffs' Opposition to Defendants' Motion to Dismiss And/Or Motion for Summary

23  Judgment/Adjudication ("Lehman Decl.") ¶ 2, Exh. A at ¶¶ 1, 10 (8/15/08 Lehman Report).

24          **D.  California Inspector General**

25      An independent state agency has also linked overcrowding to the unconstitutional care.  The

26  Office of the Inspector General found that CDCR's efforts to provide adequate medical care and other

27  services are not effective because of the degree of prison overcrowding: "[I]t must be recognized that

28

1    efforts to address the problems . . . are severely hampered by inmate population pressures that have

2    prisons straining at nearly twice design capacity, spreading staff resources thin and leaving little facility

3    space available for programming and other purposes." RJN Exh. 3, at ES-1 (OIG Report). Sustainable

4    solutions for improving medical care and other services will require addressing the overcrowding in

5    CDCR. *Id.* The Inspector General at the time of that report was current CDCR Secretary Matthew Cate.

6                                          **ARGUMENT**

7    **I. The Motion to Dismiss Lacks Merit**

8        **A. The Doctrine of Exhaustion Does not Bar This Proceeding**

9            **1.    Defendants expressly waived any exhaustion argument as to *Plata* plaintiffs**

10       Defendants' argument that *Plata* plaintiffs have not met exhaustion requirements must fail

11   because defendants themselves have explicitly and irrevocably waived all exhaustion defenses in the

12   case. The California Attorney General's Office, on behalf of state prison officials, entered an agreement

13   on December 16, 1999 by which it "agree[d] to irrevocably waive, in any civil lawsuit brought by

14   plaintiffs' counsel [the Prison Law Office] on behalf of plaintiffs [prisoners who are or will be in state

15   prison custody and who are or will be in need of medical care] involving the claims covered by this

16   Agreement, any defense based on whether plaintiffs have exhausted administrative remedies." Specter

17   Decl. ¶ 2, Exh. A at ¶ 3(c) (12/16/99 Tolling Agreement).

18       The claims covered by the agreement, and as to which the exhaustion defense is waived, are

19   "any and all claims for injunctive relief that could be brought in a civil lawsuit alleging that the medical

20   care provided to prisoners within the CDC is inadequate." *Id.* at ¶ 3(a). Since the injunctive relief

21   plaintiffs currently seek before the Three Judge Court meets that definition, it is covered by the

22   agreement and defendants have waived the exhaustion defense that they now attempt to assert.

23            **2.    The Three Judge Court proceeding is not a new case, and no separate
                      exhaustion is required prior to convening a three-judge panel.**

24

25       No separate exhaustion is required in either *Plata* or *Coleman.* It is axiomatic that PLRA

26   exhaustion is required only when a new "action" is brought. The PLRA states that "[n]o *action* shall be

27   brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a

28   prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as

                                                26

are available are exhausted." 42 U.S.C. § 1997e(a) (emphasis added).[5/] Defendants attempt to shoehorn a new exhaustion requirement into the PLRA, arguing that exhaustion applies not just to new actions, but to motions filed before the Court. Defs' Motion at 13:22-23 ("when Plaintiffs filed their motion to convene the three-judge panel on November 13, 2006, they were subject to the mandatory exhaustion requirement of § 1997e(a).") Defendants fail to cite even one case holding that exhaustion is required when plaintiffs make a motion before the court for a new type of relief, relying instead on inapposite cases that have to do with *amended pleadings*. Defendants describe *Jones v. Goord,* No. 95-CIV-8026-WHP, 2000 WL 290290 (S.D.N.Y. Mar. 20, 2000) as having a "scenario like the instant case," but *Jones* analyzed the exhaustion doctrine with respect to an amended complaint to add a plaintiff class. Similarly *Caruso v. Zenon*, No. 95-MK-1578-BNB, 2005 WL 5957978 (D. Colo. July 25, 2005), held that a prisoner's amended complaint did not trigger PLRA exhaustion requirements. In fact, in the solitary case that plaintiffs' counsel could find that dealt with a similar argument, the court held "[t]he exhaustion requirement of the PLRA does not apply to motions that exclusively seek the enforcement of the terms of the Consent Decree." *Clarkson v. Coughlin*, No. 91-CV-1792-RWS, 2006 WL 587345, at * 3 (S.D.N.Y. Mar. 10, 2006).[6/]

---

5. The *Coleman* case was filed in 1990, six years before the PLRA was enacted. Defendants concede that the PLRA is not retroactive and argue only that the *Coleman* plaintiffs should have exhausted prior to filing the motion to convene a three-judge panel and not, as they argue in *Plata*, prior to filing suit. Defs' Motion at 13-15.

6. If defendants were correct (which they are not) that a new exhaustion requirement exists any time a plaintiff seeks a new type of relief, they have waived this argument. Defendants acknowledge (in a "but see" reference) that *Jones v. Bock*, 549 U.S. 199 (2007) holds that any "failure to exhaust" argument under the PLRA is an affirmative defense. But defendants did not previously assert any such defense; they failed to raise it when they opposed the motion to convene a three-judge panel, failed to raise it in their Ninth Circuit appeals from the orders granting referral to a three-judge panel in both cases, and failed to raise it in any other motion or paper before this Court during the nearly two year period since plaintiffs filed the original motions. Accordingly, any such defense has been waived. *See, e.g.*, *Handberry v. Thompson*, 446 F.3d 335, 342-43 (2d Cir. 2006) (defendant who disclaimed exhaustion at the pleading stage, then reasserted it later based only on information available at the pleading stage, had waived); *Ludy v. Sherman*, No. 06-74, 2007 WL 320831, at *7 (W.D. Pa., Jan. 30, 2007) (court "is compelled to address the merits" of a claim as to which defendants disavowed an exhaustion defense); *Leybinsky v. Millich*, No. 98-CV-0387A, 2004 WL 2202577, at *2 (W.D.N.Y., Sept. 29, 2004) (defense waived exhaustion defense where it was omitted from answer and not raised until after discovery closed and the case was trial ready); *Rahim v. Sheahan*, No. 99-C-0395, 2001 WL

Defendants' argument that the *Coleman* and *Plata* plaintiffs had to exhaust administrative remedies prior to filing the motion to convene a three-judge panel also implies, contrary to law, that prisoners are required to exhaust remedies rather than claims. Here, plaintiffs in both cases seek a prisoner release order as a *remedy* to the ongoing constitutional violations of plaintiffs' rights to adequate medical and mental healthcare. Thus, defendants' argument that "[p]laintiffs failed to exhaust their administrative remedies before filing suit, *because they failed to submit any administrative appeal for relief specifically directed to overcrowding*," (Defs' Motion at 3:5-7 (emphasis added)) should be summarily rejected by this Court. *See Booth v. Churner*, 532 U.S. 731, 739 (2001) ("It makes no sense to demand that someone exhaust 'such administrative [redress]' as is available; one 'exhausts' processes, not forms of relief . . ."); *Strong v. David*, 297 F.3d 646, 649-50 (7th Cir. 2002) ("no administrative system may demand that the prisoner specify each remedy later sought in litigation-for *Booth v. Churner*, 532 U.S. 731, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001), holds that § 1997a(e) requires each prisoner to exhaust a *process* and not a *remedy*") (emphasis in original).

## B. The *Plata* and *Coleman* Courts Correctly Granted the Motion to Convene a Three Judge Court

Defendants bring their motion regarding this court's alleged "lack of jurisdiction" under Federal Rule of Civil Procedure 12(b)(1), or alternatively 12(b)(6). We note initially that these Rules do not appear to apply, because they relate to failures of the *pleadings*, but defendants do not attack plaintiffs' pleadings; rather, they contend that the Three Judge Court was improperly convened and that it has no "jurisdiction" to order the relief sought. Those are matters that should have been raised in opposition to plaintiffs' motions to convene the Three Judge Court, or, at the very least, in a motion for reconsideration of the orders convening the Three Judge Court. In any event, defendants fail to meet the high standards for a Rule 12(b) motion to dismiss. Under Rule 12(b)(1), defendants must demonstrate that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction. *Safe Air v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). As we demonstrate below, defendants cannot

---

1263493, at *6-7 & n.3 (N.D. Ill. Oct. 19, 2001) (finding waiver where exhaustion defense had not been raised through four complaints, a motion to dismiss, and an appeal).

1    meet this burden.  And as for Rule 12(b)(6), the court "construes all allegations of material fact in the

2    light most favorable to the nonmoving party" and "[i]t is axiomatic that '[t]he motion to dismiss for

3    failure to state a claim is viewed with disfavor and is rarely granted.'" *Gilligan v. Jamco Development*

4    *Corp.*, 108 F.3d 246, 248, 249 (9th Cir. 1997) (citations omitted).

5           **1.  The *Plata* and *Coleman* Courts have issued orders for "less intrusive" relief**

6          Defendants are simply wrong when they claim that this Three Judge Court has no jurisdiction

7    because there have been no prior orders for "less intrusive relief," a requirement under the PLRA.  In

8    granting the motion to convene the Three Judge Court, the *Plata* Court correctly found that "the

9    stipulated orders from June 2002 and September 2004 are sufficient to satisfy the ["less intrusive relief"]

10   requirement for convening a three-judge court." 7/23/07 Order at 5 (*Plata* Docket # 780).  Appointment

11   of the Receiver was also less intrusive relief.  Similarly, in *Coleman,* the Court correctly found that:

12  
13  
14  
15  
16  
> Since February of 1996, this court has issued at least seventy-seven substantive orders to
> defendants in an effort to bring the CDCR's mental health care delivery system into
> compliance with the requirements of the Eighth Amendment.  Taken together, these
> orders have contained directives aimed at all of the aforementioned requirements for a
> constitutionally adequate mental health care delivery systems.  In addition, the Special
> Master and his staff have spent hundreds of thousands of hours working with the parties
> to develop program guidelines for a constitutionally adequate system and monitoring
> defendants' implementation of those guidelines.  During the same period of time, the
> Special Master has filed seventeen semi-annual monitoring reports and fifty-five other
> reports reflecting the results of these efforts.

17  
18   7/23/07 Order at 4 (*Coleman* Docket # 2320).[7/]  Accordingly, plaintiffs have satisfied the PLRA

19   requirement of orders for "less intrusive relief."

20         Defendants claim that, to meet the PLRA requirement, any prior order would have had to be

21   "directed at overcrowding."  This argument is contrary to the plain language of the law.  The PLRA

22   does not require a prior order be "directed at overcrowding;" all the PLRA requires is that the Court has

23   previously entered an order for lesser intrusive relief for the constitutional deprivation at issue.  18

24   U.S.C. § 3626(a)(3)(A) provides that "no court shall enter a prisoner release order unless - (i) a court has

25  

26          7.  Defendants make no contention that these findings were in error, and any attempt to re-argue
these issues is barred by the "law of the case" doctrine, which provides that "'a court is generally

27   precluded from reconsidering an issue that has already been decided by the same court, or a higher court
in the identical case.'"  *United States v. Alexander*, 106 F.3d 874, 876 (9th Cir. 1997) (quoting *Thomas*

28   *v. Bible,* 983 F.2d 152, 154 (9th Cir. 1993)).

1   previously entered an order for *less intrusive relief that has failed to remedy the deprivation of the*

2   *Federal right sought to be remedied through the prisoner release order*; and (ii) the defendant has had a

3   reasonable amount of time to comply with the previous court orders."  (emphasis added).  And it is

4   undisputed that both the *Plata* and *Coleman* courts have issued numerous orders aimed at providing

5   "less intrusive" relief for unconstitutional medical and mental health care at issue in this proceeding.

6          Moreover, defendants' argument makes no sense.  Any order  "directed at overcrowding" (as

7   opposed to aimed at remedying inadequate health care) would logically entail reducing the prison

8   population.  And any order aimed at reducing the prison population would be a "prisoner release order."

9   (As this Court has recognized, the PLRA "defines a prisoner release order very broadly.  The definition

10  includes 'any order . . . that has the *purpose* or *effect* of reducing or limiting the prison population . . . '

11  18 U.S.C. §3626(g)(4)."  11/9/07 Order at 3-4 (*Plata* Docket # 952) (emphasis added).)  Defendants'

12  contention that the court has to issue a prior prisoner release order before it can issue a prisoner release

13  order is absurd on its face.

14          **2.  Plaintiffs seek relief only on behalf of the classes**

15          Defendants also make the spurious claim that this Court lacks jurisdiction because plaintiffs are

16  seeking relief for individuals outside the classes.  Plaintiffs have made it plain in every filing in this

17  matter that they seek to remedy the unconstitutional provision of inadequate medical and mental health

18  care, and that they seek a "prisoner release order" under the PLRA because the Receiver and the experts

19  (and many defendants) agree that the only way to fix the prison medical and mental health care systems

20  is to reduce the prison population.

21          In any event, any argument about the appropriateness of relief that this Court might issue is

22  premature.  The evidence will show that there are many safe ways to reduce the population.  One option

23  would be to include only *Plata* and *Coleman* class members, but the Constitution also allows whatever

24  relief is necessary to cure the constitutional violation, and where as here the violation is caused by the

25  sheer number of prisoners (regardless of whether they have serious health care needs), a narrowly drawn

26  remedy could also include prisoners who don't have serious health care needs.

27          Defendants' argument to the contrary relies solely upon *Lewis v. Casey*, 518 U.S. 343 (1996),

28

PLTFS' OPP. TO DEFS' MTN. TO DISMISS AND/OR MTN. FOR SJ, NO. CIV S 90-0520 LKK-JFM P , NO. C01-1351 TEH

1   which is inapposite. *Lewis* addresses whether systemwide relief is appropriate where the plaintiffs

2   proved at trial only two instances of a constitutional violation (in that case, inadequate libraries). *Id.* at

3   359. The Court found two instances insufficient "for a conclusion of systemwide violation and

4   imposition of systemwide relief."[8] But the *Lewis* decision rests upon the presumption that systemwide

5   relief *would have been* appropriate had constitutional violations "pervaded the State's prison system."

6   *Id.* at 360 n.7. Once a plaintiff demonstrates a systemic constitutional violation, a court has the power to

7   issue an injunction that remedies that violation, even if the injunction incidentally impacts non-class

8   members. For example, in the desegregation cases, courts regularly ordered school districts to

9   implement systemwide reforms that impacted both white and black children. *See, e.g., Davis v. Bd. of*

10  *School Comm'rs of Mobile Cty.,* 402 U.S. 33, 37 (1971) (in formulating a desegregation plan, "[a]

11  district court may and should consider the use of all available techniques including restructuring of

12  attendance zones and both contiguous and noncontiguous attendance zones."); *Columbus Bd. of Ed. v.*

13  *Penick*, 443 U.S. 449 (1979) (where court finds unconstitutional school segregation, it may order a

14  district to undertake systemwide reforms). The injuries alleged in *Plata* and *Coleman* are systemwide,

15  and systemwide relief will be appropriate. Accordingly, defendants' argument that this Court lacks

16  jurisdiction over the relief sought should be rejected.

17  **II. Defendants Have Failed to Meet Their Burden on Their Summary Judgment Motion**

18      Summary judgment is appropriate only where "there is no genuine issue as to any material fact

19  and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The

20  moving party has the burden of demonstrating the absence of a genuine issue of material fact. See

21  *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242 (1986);

22  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574 (1986). Defendants have failed to meet

23  this burden.[9]

24  _____

25      8. *Lewis* involves a post-trial appeal, and does not address whether a claim for systemwide relief
26  deprives a court of jurisdiction, as defendants argue.

27      9. Defendants are wrong to assert that they are entitled to summary judgment unless "Plaintiffs
    can show that there is clear and convincing evidence that crowding is the primary cause of a violation of
28  their Federal rights and that no other relief [other than population reduction] will remedy that violation."

1    A party moving for summary judgment can meet its initial burden by either negating

2  (disproving) an essential element of the opposing party's case and/or showing absence of evidence on an

3  essential element of that case. *Nissan Fire & Marine Ins. Co., Ltd. v. Hitachi Data Sys. Corp.*, 210 F.3d

4  1099, 1102 (9th Cir. 2000).  Summary judgment must be denied if the nonmoving party "designate[s]

5  specific facts showing that there is a genuine issue for trial."  *Celotex*, 477 U.S. at 324 (citation and

6  internal quotation marks omitted); *see also* Fed. R. Civ. P. 56(e). When deciding a motion for summary

7  judgment, the court must view the facts in the light most favorable to the nonmoving party; "[t]he

8  evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."

9  *Anderson*, 477 U.S. at 255.  Where words may be interpreted in several ways, one supporting the motion

10  and one controverting it, summary judgment must be denied.  *Masson v. New Yorker Magazine, Inc*.,

11  501 U.S. 496 (1991).  In short, the nonmovant's version of any disputed issue of fact is presumed

12  correct.  *Eastman Kodak Co. v. Image Tech. Servs., Inc*., 504 U.S. 451, 456 (1992); *T.W. Elec. Serv.,*

13  *Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630-31 (9th Cir. 1987).  Further, expert opinion alone

14  may defeat a summary judgement motion.  *Maffei v. N. Ins. Co. of N.Y.*, 12 F.3d 892, 897-98 (9th Cir.

15  1993).

16    **A.  Plata**

17    Defendants make two main arguments in support of their motion for summary judgment in

18  *Plata*.  First, they assert that they have negated or disproved an essential element of plaintiffs' case.

19  Defs' Motion at 18:21-25.  Specifically, defendants assert that "[a]ccording to the deposition testimony

20  of Plaintiffs' own expert, Dr. Ronald Shansky, overcrowding is not 'the primary cause' of the

21  unconstitutional delivery of medical care in California's prisons."  *Id.*  Second, they assert more broadly

22  that "[t]here is no evidence that overcrowding is the primary cause of the alleged unconstitutional

23  provision of medical care" and that "other measures will remedy the alleged constitutional inadequacies

24  _____

25  Defs' Motion at 10:4-7.  While it is true that the Court must be guided by the substantive evidentiary
   standard applicable to the case, plaintiffs do not have to *prove* their case in opposition to summary

26  judgment.  *Anderson*, 477 U.S. at 254-55.  Rather, the question in the present motion is whether there is

27  a suffficient caliber or quantity of evidence to allow a rational trier of fact to find by clear and
   convincing evidence that overcrowding is the primary cause of the unconstitutional conditions and that

28  no relief other than population reduction will remedy the violation.  *See id.*

1   . . . but a prisoner release order will not." *Id.* at 20:6-7, 19:12-13.  Defendants are wrong on all counts.

2        As we demonstrate below, Dr. Shansky repeatedly testified that overcrowding is the primary

3   cause of the violations and that no other relief will remedy the violations, and defendants' arguments to

4   the contrary rely upon *inferences* that defendants draw from selected testimony that is taken out of

5   context, irrelevant to the issue, or subject to inferences consistent with overcrowding being the primary

6   cause of the violation.  In addition, there is overwhelming evidence besides the testimony and

7   statements of Dr. Shansky showing a genuine issue regarding primary cause and that no other relief will

8   remedy the violations.  The evidence – including evidence provided by the defendants themselves, the

9   Receiver, plaintiffs' other experts, and the intervenor-defendants' experts – along with that from Dr.

10  Shansky, shows that the questions of primary cause and "no other relief" are contested.

11                    **1.  Dr. Shansky's testimony**

12       Ronald Shansky, M.D., one of plaintiffs' experts, has decades of experience in correctional

13  medicine, including work for defendants and as a federal court-appointed Receiver.  Shansky Decl. ¶ 3,

14  Exh. A at 1, ¶¶ 2-3 (11/9/07 Shansky Report).  Dr. Shansky repeatedly and directly testified at

15  deposition that overcrowding is the primary cause of the unconstitutional delivery of medical care in

16  California prisons.  Ells Decl. ¶ 35, Exh. HH at 53:1-9 (Shansky Deposition) (stress on medical care

17  delivery system caused by size of prisoner population the primary ongoing problem that inhibits

18  bringing the system to a constitutional level); *id.* at 161:6-18 (overcrowding the primary problem).  He

19  also testified about matters from which it must be inferred that overcrowding is the primary cause of the

20  constitutional violation.  *Id.* at 144:10-12 (population control and reduction would be major facilitator to

21  providing constitutional medical care); *id.* at 144:24-145:3 (population pressures over which the

22  Receiver has no control will continue to sabotage ability to remedy medical care); *id.* at 149:16-19

23  (prison population is the biggest thing not addressable by Receiver and will likely cause his efficiency,

24  his ability to get in, fix it and get out to be slowed down dramatically).  Dr. Shansky also has directly

25  stated in the expert reports provided to defendants that overcrowding is the primary cause of the

26  constitutional violation.  Shansky Decl. ¶ 3, Exh. A at  2, ¶ 6 (11/9/07 Shansky Report); Shansky Decl. ¶

27  4, Exh. B at 1 (12/6/07 Shansky Supplemental Report); Shansky Decl. ¶ 5, Exh. C at 3, ¶ 7 (9/10/08

28

                                    33

1  Shansky Second Supplemental Report).

2      Defendants claim that "[a]ccording to" Dr. Shansky, overcrowding is not the primary cause of

3  the unconstitutional delivery of medical care in California's prisons.  They do not claim he states that

4  directly, but ask the Court to infer that he does, based on certain statements taken out of context,

5  irrelevant to the primary cause issue, or subject to inferences consistent with overcrowding being the

6  primary cause of the violation.  Defs' Motion at 18:23-20:5.

7      Defendants first assert that overcrowding is not the primary cause because Dr. Shansky agrees

8  there are multiple, interrelated components of a constitutionally adequate medical care system, that it is

9  very difficult to rank these interrelated components in terms of importance, and that the delivery of

10  adequate medical care is a polycentric problem.  *Id.* at 18:25-28.  However, that there are multiple

11  interrelated components to an adequate system is irrelevant to the issue of what is the primary cause for

12  the failure to establish such a system.

13      Further, that the problem of delivering adequate care is polycentric does not prove that

14  overcrowding is not the primary cause of the inadequate care.  The issue before this Court is not whether

15  inadequate medical care is a problem with many centers, or (obversely) whether overcrowding is the

16  sole cause of the problems; the question is whether overcrowding is the primary cause.  Thus, even if

17  Dr. Shansky's statement that delivering medical care is a polycentric problem referred to causes of the

18  failure to provide adequate care, it is not inconsistent with his opinion that overcrowding is the primary

19  cause.  As a matter of logic, a  problem with many centers can have a dominant cause, and in reviewing

20  this summary judgment motion the Court must infer that such is the import of Dr. Shansky's testimony.

21  *Masson,* 501 U.S. 496.

22      Defendants also argue that crowding is not the primary cause of inadequate medical care because

23  Dr. Shansky states that certain measures other than reducing population are either important factors in,

24  or required to, establish an adequate system.  Defs' Motion at 18:28-19:4.  However, that certain

25  measures in addition to reducing population are important or required does not prove that overcrowding

26  is not the primary cause of the problems.  When one matter or cause is "primary," the connotation is that

27  there are other matters or causes as well, ones which are lower in rank or subordinate.  That such other

28

causes exist, and are acknowledged by Dr. Shansky, does not mean that overcrowding is not the primary cause of inadequate care.  Again, the issue is not whether overcrowding is the sole cause, but the primary one.

Defendants also argue that crowding is not the primary cause of inadequate medical care because Dr. Shansky stated that a reduction in population alone, even of up to 40,000 prisoners, would not resolve, or resolve by itself, many of the deficiencies in care.  *Id.* at 19:5-11 and 20:2-5.  Here again, defendants' reasoning misses the mark.  As Dr. Shansky cogently explains:

> While I believe that reducing the population is necessary to achieve a constitutional level of medical care, population reduction alone will not, in a vacuum, produce a constitutionally adequate medical delivery system.  For example, if the population were reduced at a prison facility, but that prison lacked sufficient numbers of physicians, the care would still be unconstitutional.  Reducing overcrowding is not a panacea, but crowding is the primary cause of the ongoing inadequate medical care in the CDCR system.  Overcrowding is the one factor that negatively impacts almost every other matter that must be addressed to create a minimally adequate medical care delivery system for California's prisons.

Shansky Decl. ¶ 5, Exh. C at 3, ¶ 9 (9/10/08 Shansky Second Supplemental Report).  The relevant issue is not whether reducing population is  a panacea, or whether it is the sole cause of the failure to provide adequate care, but whether overcrowding is the primary cause of that failure.  Dr. Shansky's testimony is entirely consistent with his position that overcrowding is the primary cause of the violation.

A similar defect of reasoning infects defendants' arguments based on the improvements brought about by the Receiver's efforts, and their assertion that the Receivership should be dissolved if those efforts are not necessary.  Defs' Motion at 19:12-20:2.  That overcrowding is the primary cause of the problem does not mean that a Receivership is not necessary.  As Dr. Shansky explains:

> Reducing the population in the system to a manageable level is the only way to create an environment in which other reform efforts, including strengthening medical management, hiring additional medical and custody staffing, and improving medical records and tracking systems, can take root in the foreseeable future.  Continuing efforts to build a constitutional system under the current overcrowded conditions will guarantee that the unconstitutional conditions, and preventable suffering, will exist for a substantially longer period of time than would be the case if the population were reduced.

Shansky Decl. ¶ 5, Exh. C at 3-4, ¶ 10 (9/10/08 Shansky Second Supplemental Report). In addition:

> The Receiver has tools to fix the health care system, but has no tool within his purview, to deal with external pressures such as overcrowding.  The Receiver's mandate is to remove the Court's direct control of the CDCR health care delivery system as quickly as possible.  It is my opinion that, if the current overcrowding is not remedied, the Court's involvement in overseeing the health care system will certainly extend many years.

1   *Id.* at 4, ¶ 11.  In short, overcrowding is the primary cause, the population must be reduced, and the

2   Receivership remains necessary.  In addition, "[t]he limitations on the CDCR, including staffing,

3   administrative resources and especially treatment space, are so severe that the only avenue for building a

4   constitutional health care delivery system is to reduce the demand on the system by lowering the number

5   of patients it serves." *Id.* at ¶ 8.  Dr. Shansky, in sum, states that reducing overcrowding is the only way

6   to build an adequate medical delivery system.  This opinion is based on his experience as a Receiver

7   responsible for developing a minimally-adequate correctional health care system:

8       As a former Receiver tasked with building a constitutionally adequate medical care system in an
        unstable environment, I understand one must reduce on-going stresses in the system to stabilize
9       the health care delivery situation.  I was able to successfully implement a constitutionally
        adequate system in the District of Columbia jail in the required time frame because there was a
10      population cap on the facility.  In order to develop and implement a constitutionally adequate
        system in a reasonable time frame and avoid further unnecessary suffering and death, California
11      must reduce and stabilize the prison population.

12  Shansky Decl. ¶ 3, Exh. A at 51, ¶ 139 (11/9/07 Shansky Report).  Given this testimony alone, there is a

13  genuine issue to be decided as to whether overcrowding is the primary cause of the violation and

14  whether there is any other relief that will remedy that violation

15      Defendants also assert that overcrowding is not the primary cause because Dr. Shansky stated

16  that it is possible for the Receiver and CDCR to ultimately provide constitutional medical care to up to

17  172,000 prisoners.  Defs' Motion at 19:19-21.  This assertion selectively focuses on a portion of Dr.

18  Shansky's testimony that, taken in context, actually proves that overcrowding is the primary cause.  Dr.

19  Shansky's statement that it is possible for the Receiver and CDCR to ultimately provide adequate care to

20  172,000 prisoners was made in response to a question regarding whether it was "impossible" for those

21  entities to "*ever*" provide such care.  Ells Decl. ¶ 35, Exh. HH  at 144:3-9 (Shansky Deposition)

22  (emphasis added).  Dr. Shansky, responded, "No, I think one could provide constitutional care.  But a

23  major facilitator would be population control and reduction." *Id.* at 144:10-12.  Defendants' argument

24  ignores Dr. Shansky's testimony that population control is necessary.  It also ignores the "ever"

25  qualifier.  The reasonable inference from the doctor's answer is that overcrowding is the primary cause.

26      Dr. Shansky's testimony does not disprove the primary cause element of plaintiffs' case, or that

27  there is other relief that will remedy the problem.  There is a genuine issue regarding primary cause,

28

36

even if Dr. Shansky's testimony were the only evidence to consider. However, as we demonstrate herein, an abundance of other evidence supports plaintiffs' contentions.

### 2. Other evidence demonstrates that overcrowding is the primary cause and that no other relief will remedy the constitutional violations

Defendants broadly assert that "[t]here is no evidence that overcrowding is the primary cause of the alleged unconstitutional provision of medical care." Defs' Motion at 20:6-7. Defendants' "no evidence" argument neither discusses particular evidence, points to interrogatory answers or request for admissions, nor explains in any way whatsoever why they make the assertion. *Id.* The assertion is simply made.

Defendants' conclusory one-sentence argument that there is a lack of evidence regarding primary cause is insufficient to meet their burden on this motion. "It is not enough to move for summary judgment . . . with a conclusory assertion that the plaintiff has no evidence to prove his case." *Celotex*, 477 U.S. at 366. While the "no evidence" showing on summary judgment might be made by pointing out through argument the absence of evidence to support the claim (*Devereaux v. Abbey,* 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc)), defendants here provide no explication or argument to support the "no evidence" prong of their motion. As such, defendants motion must be denied.

Additionally, defendants' "no evidence" assertion is wrong. Plaintiffs' Statement of Facts points to clear and convincing evidence showing that crowding is the primary cause of the medical care constitutional violation and that nothing other than a population reduction order will remedy the violation. *See supra* at 7-26.

In addition to Dr. Shansky's statements that overcrowding is the primary cause of the constitutional violation and that no relief other than a prisoner relief order will remedy the problem (*see supra* at 33-37), additional experts, including Jeanne Woodford, Wayne Scott, and Joseph Lehman, former Directors of state prison systems who combined have almost 100 years of correctional experience, have concurred and provided further evidence that overcrowding is the primary cause of the violation. Jeanne Woodford, a former Secretary of CDCR, former warden, and former correctional officer, visited numerous prisons and analyzed key documents in the case and produced a report in November 2007 opining that "overcrowding is the primary cause of the [health care] constitutional

PLTFS' OPP. TO DEFS' MTN. TO DISMISS AND/OR MTN. FOR SJ, NO. CIV S 90-0520 LKK-JFM P , NO. C01-1351 TEH

violations, and nothing short of a reduction in the prison population will effectively address these issues." Woodford Decl. ¶ 3, Exh. A at 1, ¶ 1 and Appx. A (11/9/07 Woodford Report) (27 years correctional experience, including CDCR Director) and 2-3, ¶ 6 ("overcrowding is the primary cause of the [health care] constitutional violations, and nothing short of a reduction in the prison population will effectively address these issues"); Woodford Decl. ¶ 4, Exh. B at 1, ¶ 3 (8/15/08 Woodford Supplemental Report) ( "CDCR remains severely overcrowded, [] this overcrowding is the primary cause of the constitutional violations and [] the prison population must be substantially reduced to alleviate the unconstitutional conditions") and 14, ¶ 31 ("[o]vercrowding in CDCR is extreme, its effects are pervasive and it is preventing the Department from providing adequate mental and medical health care to prisoners"); Scott Decl. ¶ 3, Exh. A at 1, ¶ 1 (11/9/07 Scott Report) (30 plus years in corrections, including Director of Texas prisons) and 44, ¶ 80 (overcrowding is the primary cause of California's unconstitutional health care conditions); Scott Decl. ¶ 4, Exh. B at 1, ¶ 4 (8/15/08 Scott Supplemental Report) (overcrowding "makes the state unable to keep prisoners and staff safe and to provide for the health care needs of prisoners") and 10, ¶ 21 (medical care a "basic need" that "cannot be supplied under the current [overcrowded] conditions"); Lehman Decl. ¶ 2, Exh. A at 1, ¶ 1 (8/15/08 Lehman Report) (more than 35 years experience in corrections, parole, and probation, including 15 years experience running prison systems in three states) and 4, ¶ 10 ("[o]vercrowding affects virtually every aspect of a prison's operation. Severe overcrowding, like that affecting California's prisons, results in a lack of treatment and office space, decreased access to health care services, and the cancellation of such services during lockdowns").

The Court's Receivers have also have provided important evidence demonstrating the link between overcrowding and the constitutional violations – and the need to address overcrowding -- which is strong circumstantial evidence demonstrating that overcrowding is the primary cause of the violations and that no other relief will remedy the violations. RJN Exh. A at 1 (7/24/06 Receiver Letter) (noting that "the overcrowding and medical crises are integrally related" and "[i]t will not be possible to raise access to, and quality of, medical care to constitutional levels with overpopulation at its current levels"); Ells Decl. ¶ 12, Exh. K at 3 (10/8/06 Sillen Sacramento Bee Article) (stating overcrowding is "at the

38

1   root" of health care problems in CDCR); 7/5/06 Receiver's First Bi-Monthly Report at 3 (*Plata* Docket

2   # 524) (" Unless and until the living conditions of some prisons and the overpopulation experienced

3   system-wide is effectively addressed, the Receiver will be impeded in applying systemic and even some

4   ad hoc remedies to the medical care system"); 9/19/06 Receiver's Second Bi-Monthly Report at 2 (*Plata*

5   Docket # 547) (overcrowding is "the root cause of many of the prison system's ills, including

6   constitutionally inadequate medical care"); RJN Exh. B at 1 (10/27/06 Receiver Letter) ("[I]t is clear

7   that overcrowding is at the root of many of the difficulties that afflict medical care."); 5/15/07

8   Receiver's Overcrowding Report at 27:10-28:1 (*Plata* Docket # 673) (additional health care space is

9   necessary at CDCR prisons "primarily" because of "overcrowding" and the fact that the prisons were

10  built without adequate clinical and medical support facilities given the numbers of prisoners they

11  house); 6/11/07 Receiver's Supplemental Report Re Overcrowding at 1:25-4:7 (*Plata* Docket # 705)

12  (detailing how crowding interferes with and hampers the Receiver's efforts to bring the prison health

13  care system up to constitutional standards in a time manner) and 10:4-7 (CDCR custody-related

14  administrative and management actions, "aggravated by the limited alternatives imposed by

15  overcrowding, are now assuming a size, scope and frequency that will clearly extend the timeframes and

16  costs of the receivership and may render medical care impossible"); Turnaround Plan at 25 (*Plata*

17  Docket # 1229) (facilities available for providing health care services within CDCR "woefully

18  inadequate" and "available clinical space is less than half of what is necessary for daily operations") and

19  27 ("CDCR does not have adequate clinical, administrative and housing facilities to support

20  constitutionally adequate health care"); Ninth Report at 48-49 (*Plata* Docket # 1472) (need to address

21  matter involving medical care at out-of-state facility housing California prisoners has a "serious

22  negative impact" on Receiver's efforts and caused in-state remedial process to "suffer[]").

23          Moreover, defendants (including the Governor and Secretary of CDCR), the California Office of

24  the Inspector General (OIG), defendant-intervenors, and their experts have all made statements

25  providing strong circumstantial evidence from which the Court can infer primary cause and that

26  overcrowding must be solved before CDCR can provide adequate medical care.  The Governor

27  proclaimed overcrowding in California prisons a state of emergency, stating it causes "extreme peril"

28

1  because the number of prisoners "exceeds the capabilities of the services, personnel, equipment, and

2  facilities." Ells Decl. ¶ 4, Exh. C at 1, 6 (10/4/06 Governor Proclamation). Those who run the CDCR

3  also concur that overcrowding is a critical factor. Ells Decl. ¶ 25, Exh. X at 141:12-22, 175:23-176:7

4  (Cate Deposition) (overcrowding makes everything more difficult in the institutions, CDCR needs

5  spaces to provide services, including of medical care, and overcrowding a challenge that has to be

6  overcome in provide such services and that as prisoners population increases delivering healthcare and

7  managing the numbers becomes more difficult); Ells Decl. ¶ 21, Exh. T at CDCR009404 (CDCR July

8  2006 Report "Inmate Population, Rehabilitation, and Housing Management Plan") (citing overcrowding

9  as a "major contributor" to conditions that led to *Plata* receivership). At least one intervenor-defendant,

10  and one expert offered by an intervenor-defendant, echo these views. Ells Decl. ¶ 10, Exh. I

11  (intervenor-defedant Cogdill statement) ("overcrowding situation which we currently know is the crux

12  of the crisis that we face"); Ells Decl. ¶ 32, Exh. EE (intervenor-defendant expert Bennett Deposition) at

13  76:1-77:8 (overcrowding has made it difficult or impossible to provide required level of care, population

14  must be reduced to implement reforms). The independent OIG has also determined that efforts to

15  provide adequate medical care and other services are not effective because of the degree of

16  overcrowding in CDCR: "[I]t must be recognized that efforts to address the problems . . . are severely

17  hampered by inmate population pressures that have prison straining at nearly twice design capacity,

18  spreading staff resources thin and leaving little facility space available for programming and other

19  purposes." RJN Exh. 3 at ES-1 (OIG Report). There is much other similar evidence. *See* Statement of

20  Facts, *supra,* at 6-26.

21       In short, overwhelming evidence supports plaintiffs' contention that overcrowding is the primary

22  cause of the violations and that no other relief will remedy the violation. Defendants claim that there is

23  no genuine issue as to these elements of plaintiffs' case is meritless, and defendants' motion for

24  summary judgment should be denied.

25       **B. Coleman**

26       Defendants' motion for summary judgment in the *Coleman* case also rests on convoluted

27  arguments and defendants' feigned ignorance of the overwhelming evidence in this case. Defendants

28

1    assert that overcrowding cannot be the primary cause of constitutional violations because "[n]ever once

2    has the Special Master identified overcrowding as the primary cause of constitutional inadequacies in

3    the delivery of mental health care" and because the *Coleman* Court has not "issued any orders directed

4    at population controls." Defs' Motion at 20. Defendants then claim that there is no "nexus" between

5    meeting the treatment needs of the *Coleman* class and capping the overall population. *Id.* Finally,

6    defendants refer to a statement by the Special Master, taken out of context, to support their contention

7    that a "general population reduction will not satisfy the particularized needs of mentally ill inmates." *Id.*

8    at 21. Defendants then ignore the overwhelming evidence to the contrary and state, without any citation

9    to the record, that "[t]here is no evidence that overcrowding is the primary cause of alleged

10   unconstitutional mental health care." *Id.*

11        Each of defendants' arguments fails to satisfy their burden under a summary judgement standard.

12   As stated above, defendants cannot rely on a "conclusory allegation that (the opposing party) has no

13   evidence to prove his case." *Celotex*, 477 U.S. at 328. Yet conclusory statements are all that defendants

14   provide. Defendants fail to cite even one document, deposition, expert report, transcript, or discovery

15   response for their contention that there is "no evidence that overcrowding is the primary cause of alleged

16   unconstitutional mental health care." Nor do defendants acknowledge or address the overwhelming

17   amount of evidence in both *Plata* and *Coleman* that overcrowding is the primary cause of the

18   unconstitutional medical and mental health care systems. Plaintiffs will not restate those facts here,

19   since they appear earlier in this brief, but suffice it to say that nearly every person or entity that has been

20   asked to comment on the overcrowding crisis has found, either overtly or by inference, that the extreme

21   overcrowding in the CDCR is the root cause of the unconstitutional medical and mental health care

22   systems, including the Governor, who declared a State of Emergency due to the crisis, *see* Ells Decl. ¶ 4,

23   Exh. C (10/4/06 Governor Proclamation); then-Secretary of the CDCR Tilton, *see* Ells Decl. ¶ 21, Exh.

24   T at CDCR009404  (CDCR July 2006 Report "Inmate Population, Rehabilitation, and Housing

25   Management Plan") (noting "the overcrowding and lack of treatment space to service the additional

26   populations has been a major contributor to court intervention regarding CDCR's health care services

27   delivery"); other high-level CDCR staff, *see* Ells Decl. ¶ 26, Exh. Y at 1 (3/16/07 Sacramento Bee

28

41

1   Article (quoting Bud Prunty as saying, "We just have a real major problem with overcrowding. It's

2   impacting everything we do"); the *Plata* Receiver, *see* RJN Exh. A at 1 (7/24/06 Receiver Letter) ("It

3   will not be possible to raise access to, and quality of, medical care to constitutional levels with the

4   overpopulation at its current levels"); the *Coleman* Special Master, *see* Special Master Response at 16-

5   17 (*Coleman* Docket # 2253) ("Over the past 11-plus years, much has been achieved, and many of the

6   achievements have succumbed to the inexorably rising tide of population, leaving behind growing

7   frustration and despair"); defendant-intervenors in this action, *see* Ells Decl. ¶ 10, Exh. I (including

8   Cogdill statement "[t]hat's why we've been pushing so hard to get the fixes necessary to AB 900 . . .

9   [which would] help us alleviate the overcrowding situation which we *currently know is the crux of the*

10  *crisis that we face*") (emphasis added); defendants' expert, Dr. Ira Packer, *see* Ells Decl. ¶ 33, Exh. FF

11  at 20 (opining "crowding is the primary cause of the particular difficulties in providing services to the

12  *Coleman* class at the reception centers"); and plaintiffs' experts, *see* Stewart Decl. ¶ 4, Exh. C ¶ 146

13  ("The extreme overcrowding in California's prison system permeates nearly every aspect of medical and

14  mental health care and, if not remediated, will continue to result in preventable suffering and death.

15  Unless and until the state reduces population, it will be unable to sustain meaningful reform"), among

16  others. Plaintiffs will use this and other evidence to prove their case at trial, but for purposes of the

17  instant summary judgment motion, it is enough that the issues remain in dispute between the parties.

18         Defendants' statement that the *Coleman* Special Master has "never once . . . identified

19  overcrowding as the primary cause of the constitutional inadequacies in the delivery of mental health

20  care or recommended or requested population controls" is similarly incorrect. Defs' Motion at 20. The

21  Special Master has repeatedly identified overcrowding, or overcrowding-related issues (*e.g.,* too few

22  staff, inadequate office and treatment space and inadequate beds), as the primary reasons for defendants'

23  constitutional violations. *See, e.g.*, 4/12/07 Special Master's Report at 8 (*Coleman* Docket # 2186) ("By

24  late 2005, it was evident that the reduction in population growth and then in the population itself in the

25  first few years of the decade were over, and the numbers were rising fast. Early in 2006, defendants

26  were staring at a galloping growth rate that threatened to hit 200% of capacity shortly, and the scramble

27  was on to deal with the flow. One victim of the turnaround was CDCR's mental health bed plan.");

28

1   Special Master Response at 7 (*Coleman* Docket # 2253) ("Excessive population, thus, results in a

2   reduction of programming space now occupied by inmate bunks, greater competition for use of the

3   diminishing available space; fewer escorting correctional officers to permit access to the diminishing

4   space; and, ultimately, the increasing frustration and demoralization of clinicians trying to provide the

5   treatment.  The lack of programming space is a huge problem."); *id.* at 8 ("This Court has spent the last

6   three years deeply immersed in the disconnect between the number of beds needed by defendants to

7   provide mental health treatment for CDCR's most seriously mentally ill inmates and the beds available

8   to provide such care."); *id.* at 9 ("Whatever the cause, defendants are facing a four to five-year gap in

9   the availability of sufficient beds to meet the treatment needs of many inmate/patients, who in the

10  meantime are left suffering.  This means that, nearly 12 years after the determination that mental health

11  services in CDCR were egregiously unconstitutional, hundreds certainly, and possibly thousands, of

12  CDCR inmates/patients, all members of the *Coleman* class certified in the early 1990s, are still looking

13  for beds at the level of treatment their mental illness requires."); *id.* at 16-17 ("Over the past 11-plus

14  years, much has been achieved, and many of the achievements have succumbed to the inexorably rising

15  tide of population, leaving behind growing frustration and despair."); 20th Report at 356 (*Coleman*

16  Docket # 3029-9) ("Mental health treatment space throughout the system . . . remained severely limited.

17  Many institutions are still not capable of substantial remediation prior to the construction and

18  implementation of the CHCFs [the Receiver's "California Health Care Facilities"].") ; and *id.* at 329

19  (*Coleman* Docket # 3029-8) (detailing serious staffing shortages throughout the mental health care

20  delivery system).

21          In any event, whether the Special Master has recommended or requested population controls is

22  irrelevant to this case.  The *Coleman* Court has already determined that at least 77 prior orders were

23  issued in this case, to no avail.  7/23/07 *Coleman* Order at 4 (*Coleman* Docket # 2320) ("Since February

24  of 1996, this court has issued at least seventy-seven substantive orders to defendants in an effort to bring

25  the CDCR's mental health care delivery system into compliance with the requirements of the Eighth

26  Amendment").  And it is undisputed that plaintiffs' experts (along with multiple other witnesses)

27  identify overcrowding as the primary cause of the violations and state that no other relief will resolve

28

43

1  the constitutional violations.  On the basis of the expert testimony alone, defendants' motion should be

2  denied.  *See, e.g. Maffei v. N. Ins. Co. of N.Y.*, 12 F.3d 892, 897-98 (9th Cir. 1993) (expert opinion alone

3  may defeat summary judgment motion).

4      Finally, defendants argue that summary judgment should be granted because a general

5  population reduction will not remedy the constitutional violations in the *Coleman* case.  Defs' Motion at

6  21.  In sole support of this contention, defendants rely on the May 2007 Special Master report (a report

7  that formed a partial basis for the *Coleman* Court's order convening the Three-Judge Court).  As an

8  initial matter, this argument, which goes to the remedy in the case, is premature and inappropriate for

9  summary judgment.  This Court has not determined what, if any, remedy it will order–it could order

10  defendants to come up with a plan, it could order targeted releases, or it could order a generalized

11  release, as long as it makes appropriate findings in accordance with PLRA standards.

12      Moreover, defendants take the Special Master's comments out of the essential context in which

13  they were made.  The Special Master was ordered to answer the following, specific question by the

14  *Coleman* Court:  "[w]hether a reduction in total inmate population will affect the answer to question

15  number (3)[10/] and, if so, what level of total inmate population reduction would be required to allow the

16  provision of constitutionally adequate care to all members of the plaintiff class."  *Coleman* Docket #

17  2121 at 1-2.  The Special Master wrote approximately two full pages in response to this specific

18  question, yet defendants misleadingly paraphrase two sentences.  Defs' Motion at 21.  The sentences

19  that defendants intentionally omit show that the Special Master was simply pointing out that a general

20  population release may not be adequate to address the constitutional violations, and that targeted

21  releases of *Coleman* class members may also be necessary.  In fact, the Special Master acknowledged

22  that a general release would, in fact, address some constitutional violations:

23      From all of the foregoing, it is easy to conclude that defendants' ability to provide required
       mental health services would be enhanced considerably by a reduction of the overall census
24     of CDCR.  Determining the level of reduction needed to achieve equilibrium between the
       need for and an adequate supply of services, however, is no easier to calculate than the
25     precise extent of the existing disequilibrium.

26  _____

27  10.  Question number 3 from the *Coleman* Court was:  "[w]hat percentage of the plaintiff class is
    being provided with necessary mental health services with presently available resources, including but
28  not limited to staff, beds, and programming space . . ."  *Coleman* Docket # 2221 at 1.

Special Master Response at 14 (*Coleman* Docket # 2253). His point, therefore, is not that population reductions will not work, but rather that it is difficult for him to anticipate what specific reductions would lead to constitutionally adequate care. The Special Master also informed the Court that while a general release might help, "[o]nly a targeted release of seriously mentally ill inmates will serve quickly to reverse current deficiencies, especially of bed and program space. Still, the most seriously mentally ill inmate/patients in the CDCR are unlikely to be among those released pursuant to any of the provisions of defendants' Assembly Bill 900." *Id.* at 15. His conclusion is not that population reductions should not occur, but simply that he has "no clear answer to the inquiry about the level of overall population reduction [sic] will allow the provision of constitutionally adequate care to all members of the plaintiff class," *id.* at 16, and that defendants' AB 900 population control plans – together with the limited out of state transfers of prisoners *without* serious mental illness – will not be effective.

Far from creating any undisputed facts, therefore, the Special Master's report, upon which the *Coleman* Court relied to convene the Three Judge Court, simply provides the Special Master's opinions about possible forms of relief. Defendants have not shown that there is even one undisputed, material fact with respect to the *Coleman* case and their motion for summary judgment should therefore be denied.[11/]

## CONCLUSION

For the foregoing reasons, defendants' motion for dismissal or, alternatively, summary judgment or summary adjudication should be denied.

DATED: September 29, 2008                PRISON LAW OFFICE

                                         By:    */s/ Rebekah Evenson*
                                                Rebekah Evenson
                                                Attorneys for *Plata* Plaintiffs

---

11.  Plaintiffs' counsel requested in writing that defendants voluntarily dismiss this improper motion. We have received no response. Ells Decl. ¶ 36, Exh. II (9/16/08 letter from Michael Bien to Paul Mello and Rochelle East).

1    DATED: September 29, 2008               ROSEN BIEN & GALVAN

2                                            By:    /s/ Amy Whelan
                                                    Amy Whelan
3                                                   Attorneys for Coleman Plaintiffs

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLTFS' OPP. TO DEFS' MTN. TO DISMISS AND/OR MTN. FOR SJ, NO. CIV S 90-0520 LKK-JFM P , NO. C01-1351 TEH