PRISON LAW OFFICE
DONALD SPECTER, Bar No. 83925
STEVEN FAMA, Bar No. 99641
E. IVAN TRUJILLO, Bar No. 228790
SARA NORMAN, Bar No. 189536
ALISON HARDY, Bar No. 135966
REBEKAH EVENSON, Bar No. 207825
1917 Fifth Street
Berkeley, CA 94710
Telephone: (510) 280-2621

ROSEN, BIEN & GALVAN, LLP
MICHAEL W. BIEN, Bar No. 96891
JANE E. KAHN, Bar No. 112239
AMY WHELAN, Bar No. 215675
LISA ELLS, Bar No. 243657
MARIA V. MORRIS, Bar No. 223903
315 Montgomery Street, 10th Floor
San Francisco, California 94104
Telephone: (415) 433-6830

K&L GATES LLP
JEFFREY L. BORNSTEIN, Bar No. 99358
EDWARD P. SANGSTER, Bar No. 121041
RAYMOND E. LOUGHREY, Bar No. 194363
55 Second Street, Suite 1700
San Francisco, CA 94105-3493
Telephone: (415) 882-8200

BINGHAM, McCUTCHEN, LLP
WARREN E. GEORGE, Bar No. 53588
Three Embarcadero Center
San Francisco, California 94111
Telephone: (415) 393-2000

THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
CLAUDIA CENTER, Bar No. 158255
600 Harrison Street, Suite 120
San Francisco, CA 94107
Telephone: (415) 864-8848

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURTS

FOR THE EASTERN DISTRICT OF CALIFORNIA

AND THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

| | |
|---|---|
| RALPH COLEMAN, et al., <br><br> Plaintiffs, <br><br> vs. <br><br> ARNOLD SCHWARZENEGGER, et al., <br><br> Defendants | No.: Civ S 90-0520 LKK-JFM P <br><br> **THREE-JUDGE COURT** |
| MARCIANO PLATA ,et al., <br><br> Plaintiffs, <br><br> vs. <br><br> ARNOLD SCHWARZENEGGER, et al., <br><br> vs. <br><br> Defendants | No. C01-1351 TEH <br><br> **THREE-JUDGE COURT** <br><br> **REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AND/OR MOTION FOR SUMMARY JUDGMENT / ADJUDICATION** |

[242908-1]

Plaintiffs submit this Request for Judicial Notice in support of their Opposition to Defendants' Motion to Dismiss or Summary Judgment.  Pursuant to Federal Rule of Evidence 201, the Court may take judicial notice of facts that are capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.  Fed. R. Evid. 201(b)(2).  The Court may take judicial notice of a judicially noticeable fact "if requested by a party and supplied with the necessary information."  Fed. R. Evid. 201(d).

Courts routinely take judicial notice of government documents, particularly where they are posted on the government agency's official website.  *See, e.g.*, *Modesto Irrigation Dist. v. Pac. Gas & Elec. Co.*, 61 F. Supp. 2d 1058, 1066 (N.D. Cal. 1999) (taking judicial notice of document posted on agency's website and "readily accessible through the Internet"); *Paralyzed Veterans of Am. v. McPherson*, 2008 WL 4183981, * 5 (N.D. Cal. Sept. 9, 2008) (noting that "[i]t is not uncommon for courts to take judicial notice of factual information found on the world wide web.  This is particularly true of information on government agency websites, which have often been treated as proper subjects for judicial notice," and collecting cases (citation omitted)); *In re Agribiotech Secur. Litig.*, 2000 WL 35595963, *2 (D. Nev. Mar. 2, 2000) ("In this new technological age, official government or company documents may be judicially noticed insofar as they are available via the worldwide web."); *see also Lee v. City of L.A.*, 250 F.3d 668, 688 (9th Cir. 2001); *United States v. S. Cal. Edison Co.*, 300 F. Supp. 2d 964, 974 (E.D. Cal. 2004) (recognizing that court make take judicial notice of public documents).

Courts also regularly take judicial notice of information that appears on commercial or non-profit websites.  *See, e.g., Coalition for Icann Transparency Inc. v. Verisign, Inc.*, 464 F. Supp. 2d 948, 953 n.1 (N.D. Cal. 2006); *Caldwell v. Caldwell*, 420 F. Supp. 2d 1102, 1105 n.3 (N.D. Cal. 2006); *College of the Sequoias Farm v. White Gold Assoc., Inc.*, 2007 WL 2022040, *11 (E.D. Cal. 2007).

Accordingly, Plaintiffs request that this Court take judicial notice of the following documents:

1. A July 24, 2006 letter sent from the *Plata* Receiver to Governor Schwarzenegger. A true and correct copy of this document, which appears on the Reciever's official website at http://www.cphcs.ca.gov/docs/resources/ReceiverLetterSpecialSession _072406.PDF, is attached hereto as Exhibit A.

2. An October 27, 2006 letter from the *Plata* Receiver to various individuals, entitled "Letter from the Receiver, Vol. 1, Number 4." A true and correct copy of this document, which appears on the Receiver's official website at http://www.cphcs.ca.gov/docs/resources/LetterFromReceiver4_102706.pdf, is attached hereto as Exhibit B.

3. The Office of Inspector General's report entitled "Accountability Audit, Review of the Audits of the California Department of Corrections and Rehabilitation Adult Operations and Adult Programs, 2000-2004." A true and correct copy of this document, which appears on the Office of Inspector General's website at http://www.oig.ca.gov/reports/pdf/accountability_audit_corr_volume_I.pdf, is attached hereto as Exhibit C.

4. An August 20, 2007 public report by Kent Imai on behalf of the Receiver, entitled "Analysis of CDCR Death Reviews 2006." A true and correct copy of this document, which appears on the Receiver's official website at http://www.cphcs.ca.gov/docs/resources/AnalysisOfCDCRDeathReviews2006.p df, is attached hereto as Exhibit D.

5. The *Plata* Receiver's Reports, on file with the Court.

6. The *Coleman* Special Master's Reports, on file with the Court.

Dated:  September 29, 2008                     Respectfully submitted,


                                               */s/ Lisa Ells*
                                               Lisa Ells
                                               Rosen, Bien & Galvan
                                               Attorneys for *Coleman* Plaintiffs and on
                                               Behalf of *Plata* Plaintiffs

[242908-1]

# EXHIBIT

# A

*C*alifornia *P*rison Health Care *R*eceivership
*Office of the Receiver*

July 24, 2006

Governor Arnold Schwarzenegger
State of California
State Capitol Building
Sacramento, CA 95814

Assemblymember Fabian Nuñez
Speaker of the Assembly
State Capitol
P.O. Box 942849
Sacramento, CA 94249-0046

Senator Don Perata
Senate President pro Tem
State Capitol, Suite 205
Sacramento, CA 95814

Dear Governor Schwarzenegger, Assemblymember Nuñez and Senator Perata:

This is to provide some additional perspective for the upcoming Special Session of the Legislature called for by the Governor in recognition of the crisis in the California prison system.

As you are aware, Judge Henderson took the drastic action of placing the medical care system under a Federal Receivership after years of well-documented State neglect of the medical needs of its inmate population. The medical crisis, however, is, in part, a byproduct of the growing overpopulation problem in California's prisons. It cannot be fully resolved until appropriate corrective action is applied to both of these problems in a thoughtful, coordinated manner. In short, the overcrowding and medical crises are integrally related. I believe that the Special Session, if used effectively, presents an opportunity to make headway on both crises and maximizes the impact of the tremendous tax dollars involved. In this spirit, I offer the following points.

1. It will not be possible to raise access to, and quality of, medical care to constitutional levels with overpopulation at its current levels. Other key issues contributing to the medical crisis include staffing for healthcare and custody functions, instability in the leadership of CDCR down through, at least, the warden

level, and the decrepit physical condition of many of the California prisons. The extreme overcrowding of the system, however, makes the challenge of providing constitutionally adequate medical care dramatically more difficult.

2.  While I do not believe that the State can realistically "build its way" out of the chronic overcrowding crisis, new major construction must be a component of mitigating the current acute crisis. Maximizing taxpayer benefit from such projects, however, demands "smart" programming for any new construction. Conventional programming wherein conventional prisons are built (with traditional medical and mental health "components" allocated within each) has failed in the past and will certainly fail again, if pursued.

3.  Initial data indicates that the "smart" use of $1 billion ($2 billion including finance costs) would be to construct two multi-purpose medical/mental health facilities rather than two conventional prisons. By so doing, inmate/patients may be appropriately placed by disease category (e.g., acute care, long-term care/skilled nursing care, chronic care, care for the seriously mentally ill, crisis care for the mentally ill, hospice and palliative care, "home" care and assisted living care) and custody/security levels to create a system of care which is sadly missing today. The current waste of taxpayer money resulting from duplicative service locations in so many prisons across the State is enormous and is a significant barrier to providing cost effective, constitutional care. I can assure you that this is the approach the Receivership will have to take in any case in the very near future and would involve, most likely, taxpayer dollars similar to that being proposed for the Special Session. I would suggest that amount can be spent only once, rather than twice, in the described "smart" manner.

4.  The State would achieve the same benefit with respect to prison overcrowding under the aforementioned scenario (#3) as it would under the current proposal to construct two conventional prisons because moving ill inmates into the new medical facilities will free up the same number of inmate beds that would have been made available by building new conventional prisons. Thus, by engaging in "smart programming," the State can simultaneously accomplish its dual goals of reducing overcrowding and improving the delivery of medical, mental health and dental care – and make a tremendous stride forward toward the ultimate return of the medical care system to the State.

5.  Whatever construction is be accomplished, the location is critical. Any new facility should be situated in, or immediately adjacent to, major urban areas. The reality in California today is a tremendous shortage of qualified healthcare personnel (physicians, nurses, technologists, therapists, etc.) and severe competition for them. Locating new facilities in rural areas would only exacerbate the nearly impossible-to-solve (and quite expensive) dilemma of recruiting and retaining highly trained, competent, healthcare staff.

I am prepared to discuss these issues with you further should you so desire and to participate in any way that we see as mutually acceptable during the Special Session.

In time, a constitutionally adequate medical care system will be created by the Receivership. The Special Session is, potentially, a significant step toward a cooperative, collaborative relationship which will maximize the use of large sums of taxpayer dollars, mitigate some of the current waste and inefficiencies in the State prison system, and result in an approach which has a beneficial impact on both prison overcrowding as well as raising access to and quality of medical care to constitutional levels.

Sincerely,

Robert Sillen
Receiver

# EXHIBIT

# B



Robert Sillen
Receiver

Letter from the Receiver, Vol. 1, Number 4
27 October 2006

When the Receivership began in April, I promised that help was on the way. Though the problems with the prison medical system are complex and daunting, improvements have already started. Today I'd like to share with you some of the progress so far.

To start, my team and I are making headway on my commitment to visit all 33 adult prisons in the state. We've been to 11 to date -- meeting with inmate patients, medical and custody staff, wardens and physician leaders to get a feel for the realities they face every day. The working conditions are jaw dropping, and it is clear that overcrowding is at the root of many of the difficulties that afflict medical care. When on site, we meet some incredibly talented, motivated medical and custody staff who are doing their best under tough circumstances. These folks are eager to rise to the occasion presented by the Receivership to create a new, better medical care system.

At the end of each prison visit, we ask the staff to prepare a list of critically needed medical supplies and equipment, which is immediately reviewed. Essential items, such as cardiac monitors and gurneys, sphygmomanometers to read vital signs, sutures and gauze for the emergency room, are delivered as soon as possible. Even very basic materials such as training texts, eye and ear models, anatomical charts and office supplies such as dry-erase boards, folding tables and binders have been requested and delivered. It speaks volumes about the state of the clinical environment that these items had not been available until now. With them, staff's ability to provide adequate care to inmate patients is enhanced. I also have authorized a handful of new positions based on these visits. For instance, at CTF Soledad 16 Registered Nurses were trying to care for some 7,000 inmates. I immediately doubled the complement, creating 16 more RN positions for that overcrowded prison.

At San Quentin, our approach is more in-depth, with a special four-month project focused on improving medical care there. The lessons from San Quentin will be crucial to understanding systemic, bureaucratic and cultural barriers to adequate medical care, which apply to one degree or another at each prison. We started at San Quentin because of the enormous challenges that prison faces – including overcrowding, old and older facilities, a wide variety of inmate classifications, ages and illnesses, a reception center and California's death row. Our project is not intended to "fix" San Quentin, but there is much it can do. Most immediately, it is about upgrading the working conditions of staff and medical care delivered to patients. Though much remains to be done, that work already is bearing fruit.

The commitment and creativity of many members of the San Quentin staff -- including the Warden, Associate Warden for Health Care and Chief Medical Officer -- to this project has been outstanding. They have been integrally involved in defining problems,

developing solutions and carrying out improvements. Their extra hard work deserves recognition, and it will be vital to the achievement of meaningful change.

Highlights of progress at San Quentin include:
- Authorization of 29 new clinical and administrative staff positions.
- Improved access to specialty care, back log of 200 appointments reduced.
- Reorganization of nursing, the first step toward a model for better patient care.
- Plans to build a new medical facility for clinics, emergency and urgent care, X-Ray, lab, medical records and pharmacy.
- Reception center physicals moved to appropriate clinical space.
- Development of an inmate janitorial training program to clean medical areas.

Work such as this at the individual institutions is essential to improving patient care. Of equal importance are new approaches to the big picture. I am glad to report advances in that area as well.

As you know, the Receivership early on made good on long overdue payments to specialty physician and hospital contractors, paying out more than $58 million in bills, some of which were four years old. The next step in that process is to fix the contracting system going forward. Thanks to the diligence of CDCR and DGS contracting personnel, working together with my team, that project is well underway. We recently purchased a $5 million software system to replace the antiquated arrangements that had been used, allowing for timely processing, payment and tracking of contracts in the future.

Most prison medical staff statewide will soon see a long overdue salary adjustment. Judge Thelton E. Henderson's order last week granted my request to raise clinical salaries. The new salaries (covering medical, not mental health or dental staff) will be closer in line with those at University of California hospitals, in an attempt to reduce the staggering vacancy rates that currently plague the prison medical system. That move will cost $24 million in the first year, if all the positions are filled, compared to a $90 million price tag the state currently pays for temporary staff. It's going to take more than money to recruit and retain the people we need, but it is an important first step, without which all attempts at remedial action will be fruitless. We cannot achieve a constitutionally adequate medical care system without a sufficient number of permanent, qualified staff, dedicated to the mission.

And, we will soon need even more medical professionals to staff a significant increase in beds. After the August Special Session on the prison crisis failed to produce any policy decisions, I called a September 15th meeting with CDCR and state officials to start planning the building of 5,000 new prison medical beds and 5,000 new mental health beds. Those will become a reality in the next three to five years. Meanwhile, my staff is working to find 500 additional sub-acute medical beds for those inmate patients most in need today. Now, many sub-acute patients languish in community acute care hospitals due to the unavailability of beds to return to in the prisons where they came from. Typically, beds vacated when inmates go to outside hospitals are immediately filled with more sick inmates, leaving nowhere for discharged patients to return, so they remain out

at the hospital. Not only is this less than acceptable from a medical/nursing perspective but, as well, is an enormous waste of scarce taxpayer dollars.

Additional efficiencies will result when the prison pharmacy system undergoes a turnaround. An audit commissioned by the Receiver found that California's prison pharmacies cost taxpayers $46 to $80 million more than equivalent prison systems. We are currently in the process of negotiating with a firm to take over management of the 33 prison pharmacies in order to correct the practices of the currently dangerous, disorganized and wasteful enterprise.

We have taken significant steps in a short time, and there is much more work ahead. Please remember, all activities of the Receivership have one bottom line in mind: *To create a system where custody and health care staff together guarantee that access to care and quality of medical services in California prisons meet constitutional standards.*

I look forward to working with you to reach that goal.

Sincerely,

Robert Sillen
Receiver

Distribution:
Honorable Thelton E. Henderson
Honorable Governor, State of California
Honorable Members, California Legislature
All Cabinet Secretaries
All State Department Heads
All Employees, CDCR
All Bargaining Units
Inspector General
All State Constitutional Officers
Legislative Analyst's Office

# EXHIBIT

# C

*Matthew L. Cate, Inspector General*                                          *Office of the Inspector General*

April 18, 2006

Jeanne S. Woodford, Secretary (A)
California Department of Corrections and Rehabilitation
1515 S Street, Room 502 South
Sacramento, California 95814

Dear Secretary Woodford:

The enclosed report presents the results of the Office of the Inspector General's 2006 accountability audit of the California Department of Corrections and Rehabilitation's adult operations and programs. The audit assessed the department's progress in implementing recommendations resulting from 22 past audits conducted by the Office of the Inspector General between 2000 and 2004.

The accountability audit determined that individual institutions have taken numerous steps to improve operations and security, with wardens and staff at state prisons fully or substantially implementing 84 percent of past recommendations. The department itself, however, has fully or substantially implemented only 69 percent of recommendations directed to non-medical department administrators and only 48 percent of recommendations directed to department medical administrators. Overall, 75 percent of the 394 recommendations resulting from the 22 past audits have been fully or substantially implemented.

The Office of the Inspector General found that although the department has markedly improved its internal affairs operation, it has not addressed three of its most significant and long-standing problems: the need to overhaul its antiquated information technology; the need to provide inmates with adequate medical care in a fiscally sound manner, and the need to fulfill its broader public safety mission by better preparing inmates for release.

The report presents 91 new recommendations to address deficiencies identified in the course of the audit. The department's response appears as an attachment to the report.

Thank you for the courtesy and cooperation extended to my staff during the accountability audit.

Sincerely,

*Matthew L. Cate*

MATTHEW L. CATE
Inspector General

cc:  Bernard Warner, Undersecretary (A), California Department of Corrections and Rehabilitation
     Joe McGrath, Chief Deputy Secretary, Adult Operations, California Department of
     Corrections and Rehabilitation
     Del Sayles-Owen, Chief Deputy Secretary (A), Adult Programs, California Department of
     Corrections and Rehabilitation

Enclosures

*Arnold Schwarzenegger, Governor*

# OFFICE OF THE INSPECTOR GENERAL

## MATTHEW L. CATE, INSPECTOR GENERAL



## ACCOUNTABILITY AUDIT

## REVIEW OF AUDITS OF THE CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION ADULT OPERATIONS AND ADULT PROGRAMS

## 2000 – 2004

## VOLUME I

### APRIL 2006

### STATE OF CALIFORNIA

# CONTENTS

## VOLUME I

PAGE

EXECUTIVE SUMMARY ------------------------------------------------------------------------- ES-1

SUMMARY OF FINDINGS AND RECOMMENDATIONS ----------------------------- ES-9

INDEX TO FINDING SUMMARIES----------------------------------------------- ES-55

INTRODUCTION ----------------------------------------------------------------------------------1

BACKGROUND --------------------------------------------------------------------------1

OBJECTIVES, SCOPE, AND METHODOLOGY --------------------------------------2

FINDINGS AND RECOMMENDATIONS ------------------------------------------------------5

CALIFORNIA SUBSTANCE ABUSE TREATMENT FACILITY
AND STATE PRISON, CORCORAN -------------------------------------------7

PHARMACEUTICAL EXPENDITURES---------------------------------------------- 53

OFFICE OF INVESTIGATIVE SERVICES--------------------------------------------- 65

EMPLOYEE DISCIPLINARY PROCESS --------------------------------------------- 89

OFFICE OF COMPLIANCE, AUDIT FUNCTIONS------------------------------------ 99

MEDICAL CONTRACTING PROCESS-------------------------------------------------111

EDUCATION PROGRAMS AT LEVEL IV INSTITUTIONS --------------------------121

RICHARD A. MCGEE CORRECTIONAL TRAINING CENTER ----------------------133

CALIFORNIA STATE PRISON, SOLANO-----------------------------------------------143

CALIFORNIA STATE PRISON, SACRAMENTO-------------------------------------------165

# VOLUME II

**FINDINGS AND RECOMMENDATIONS, CONTINUED**

HIGH DESERT STATE PRISON--------------------------------------------------------------183

VALLEY STATE PRISON FOR WOMEN -----------------------------------------------209

SIERRA CONSERVATION CENTER ----------------------------------------------------237

LEO CHESNEY COMMUNITY CORRECTIONAL FACILITY --------------------------267

LOCAL ASSISTANCE PROGRAM-------------------------------------------------------293

INMATE APPEALS BRANCH------------------------------------------------------------301

SALINAS VALLEY STATE PRISON, INMATE APPEALS AND DISCIPLINARY PROCESSES ---305

CALIFORNIA REHABILITATION CENTER, INMATE APPEALS PROCESS --------------------315

DEUEL VOCATIONAL INSTITUTION, INMATE APPEALS PROCESS ----------------------------323

CORRECTIONAL FACILITY MAIL PROCESSING ------------------------------------------329

PRISON INDUSTRY AUTHORITY, OPTICAL PROGRAM AT RICHARD J. DONOVAN --------349

KONOCTI CONSERVATION CAMP NO. 27 --------------------------------------------------355

RESPONSE FROM THE CALIFORNIA DEPARTMENT OF CORRECTIONS
    AND REHABILITATION -------------------------------------------------------- ATTACHMENT

# EXECUTIVE SUMMARY

This report presents an assessment of the progress made by the California Department of Corrections and Rehabilitation in implementing past recommendations affecting the department's adult operations and programs. The recommendations resulted from 22 audits and reviews conducted by the Office of the Inspector General between 2000 and 2004. The report represents the third and final component of a comprehensive follow-up review — an accountability audit — of 33 previous reviews and audits of entities comprising the former Youth and Adult Correctional Agency (now the California Department of Corrections and Rehabilitation). In addition to the 22 audits and reviews conducted by the Office of the Inspector General between May 2000 and September 2004 represented here, the original audits in the accountability audit included nine audits and reviews of the former California Youth Authority (now the Division of Juvenile Justice) and two reviews of the Board of Prison Terms (now the Board of Parole Hearings). The two previous follow-up reviews in the accountability audit were released in January and July 2005, respectively.

The follow-up review of the California Department of Corrections and Rehabilitation's adult operations and programs determined that of 394 recommendations issued in the 22 previous audits and reviews, 241 (61 percent) have been fully implemented; 53 (14 percent) have been substantially implemented; 45 (11 percent) have been partially implemented; 39 (10 percent) have not been implemented; and 16 (4 percent) are no longer applicable. The Office of the Inspector General has issued 91 new recommendations, listed in the body of this report, to address remaining deficiencies.

The review revealed two broad findings. The first is that the staff and management of individual institutions have been highly responsive to recommendations resulting from past audits and reviews and have taken numerous steps to improve operations and security at the state's prisons. The second is that the department itself has been less responsive to past recommendations and, although it has markedly improved its internal affairs operation, has yet to address three of its other most troubling and long-standing problems — the need to overhaul its antiquated information technology system; the need to provide inmates with adequate medical care in a fiscally sound manner; and the need to fulfill its broader public safety mission by better preparing inmates for release. Achieving these goals is the responsibility of department administrators. At the same time, it must be recognized that efforts to address the problems in these areas are severely hampered by inmate population pressures that have prisons straining at nearly twice design capacity, spreading staff resources thin and leaving little facility space available for programming and other purposes. Developing sustainable solutions will require the department, state policymakers, and the public to collectively address the available options: increasing prison capacity; examining sentencing and parole policies; investing additional resources in reducing recidivism; or a combination of all three.

## IMPROVEMENTS BY THE INSTITUTIONS

Overall, the 2006 follow-up review determined that recommendations directed to prison wardens and chief medical officers at individual institutions were more often implemented than those directed toward department administrators, even though in some instances, the department has had as long as five years to take action. Of 175 recommendations directed to wardens, 84 percent (148) have been fully or substantially implemented. In contrast, only 69 percent (98) of the 143 recommendations directed to non-medical administrators in the department have been fully or substantially implemented. Worst of all, of the 31 recommendations directed to headquarters medical administrators, only 15 (48 percent) have been fully or substantially implemented. The table shown below illustrates these results.

| Responsible Entity | Totals | Fully Implemented | | Substantially Implemented | | Partially Implemented | | Not Implemented | | Not Applicable | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Number | Percent | Number | Percent | Number | Percent | Number | Percent | Number | Percent |
| Department Non-medical | 143 | 78 | 55% | 20 | 14% | 22 | 15% | 15 | 10% | 8 | 6% |
| Department Medical | 31 | 10 | 32% | 5 | 16% | 7 | 23% | 9 | 29% | | 0% |
| Warden | 175 | 128 | 73% | 20 | 11% | 10 | 6% | 9 | 5% | 8 | 5% |
| Chief Medical Officer | 43 | 23 | 53% | 8 | 19% | 6 | 14% | 6 | 14% | | 0% |
| Department of Forestry and Fire Protection | 2 | 2 | 100% | | 0% | | 0% | | 0% | | 0% |
| **Totals** | **394** | **241** | **61%** | **53** | **14%** | **45** | **11%** | **39** | **10%** | **16** | **4%** |

TABLE 1
IMPLEMENTATION STATISTICS
BY RESPONSIBLE ENTITY

Institutions have implemented improvements in a wide range of operations, including security requirements, employee disciplinary actions, staff training, and the inmate appeals process. For example:

- *Sierra Conservation Center.* A May 2001 audit of the Sierra Conservation Center resulted in 53 recommendations to address a range of deficiencies in safety and security, the inmate disciplinary process, staff training, employee grievances, equal employment opportunity complaints, adverse personnel actions, and the reporting of inmate deaths. The follow-up review determined that the institution has fully or substantially implemented 92 percent of the recommendations, making important improvements in its physical plant and operational procedures.

- *California State Prison, Solano.* A March 2003 audit of California State Prison, Solano, resulted in 24 recommendations relating to deficiencies in such areas as the tracking of inmates with tuberculosis; the awarding of sentence reduction credits for classes that

were not held; the reporting of inmate deaths; the retention of inmates in administrative segregation units for periods longer than justified; documentation of employee disciplinary proceedings; and prompt implementation of medical modification orders. The follow-up review determined that the institution has fully or substantially implemented 88 percent of the recommendations.

- ***Leo Chesney Community Correctional Facility.*** An audit of the Leo Chesney Community Correctional Facility, released in October 2001, found deficiencies related to the use of monies from inmate telephone revenues and the inmate welfare fund, as well as deficiencies in staff training, the inmate adult education program, and the processing of inmate appeals. The follow-up review determined that the facility has fully or substantially implemented 73 percent of the 22 recommendations resulting from the audit.

- ***California State Prison, Sacramento.*** A September 2000 audit of California State Prison, Sacramento resulted in 17 recommendations to address deficiencies related to financial management; internal control weaknesses in the handling of inmate trust funds; failure to process inmate appeal forms in a timely manner; the failure to comply with a mandate to remove underground storage tanks; inconsistent handling of inmate rules violation reports; and the failure to complete employee probation and performance reports on time. The follow-up review determined that the institution has fully or substantially implemented 82 percent of the recommendations.

## IMPROVEMENTS BY THE DEPARTMENT

The follow-up review determined that the most important improvements affecting the department have occurred in the internal affairs and employee disciplinary process as a result of earlier reviews and the *Madrid v. Woodford* litigation. Reviews by the Office of the Inspector General in October 2001 and March 2002 had found significant deficiencies that prevented internal affairs investigations from being completed within the statutory one-year time limit, which in turn prevented the department from disciplining peace officers found to have engaged in misconduct. The March 2002 review found, for example, that 43 percent of a sample of investigations completed during fiscal years 1999-2000 and 2000-01 in which misconduct allegations were sustained were not completed within one year and therefore did not result in disciplinary action. The department also has been criticized in the past for alleged failure to sufficiently investigate misconduct and to impose discipline in a fair and consistent manner. Under reforms developed through the Madrid Remedial Plan, however, a central intake panel made up of representatives from the Office of Internal Affairs, Office of Legal Affairs, and other department staff now reviews all requests for investigation and either accepts the request as an internal affairs investigation or sends it back to the hiring authority for disposition. The Office of the Inspector General's Bureau of Independent Review monitors the central intake and internal affairs process, and also monitors the investigations. A new electronic case management system tracks the entire employee discipline continuum from the request for investigation to the final hearing and disposition of action. Although deficiencies remain, such as the inability to use the system to identify trends and pervasive problems, the Office of the Inspector General found that as a result of these and other changes, only two percent of 94 investigations with sustained findings conducted by the Office of Internal Affairs for the period December 1, 2004 through May 31, 2005 exceeded the one-year statutory limit.

**CONTINUING DEPARTMENT FAILURES**

Where institutions have not fully or substantially implemented recommendations, often the reason has been the failure of the department to implement department-level solutions by establishing the necessary statewide policies and procedures or investing in needed resources. The department also has not effectively used its internal audit function and other tools to identify systemic problems. Again, the most significant deficiencies are seen in information technology, medical care, and inmate programming.

***Information technology.*** The department's outdated information technology, with its antiquated mainframes and stand-alone databases lacking integration with other system components, impedes processes at every level. The absence of efficient modern technology — to automate routine procedures, to organize records and make them readily available to designated staff — echoes through programs and institutions and causes inefficiency and waste. Worse, the deficiencies reduce critical procedures to the manual handling of paper documents and sometimes leaves the custody and medical staff at risk of making important decisions based on paper records in files that may not be up-to-date. These deficiencies have been fueled by a long history on the part of the department of poor information technology planning, poor project implementation, and failure to fund needed improvements. Only 42 percent of the Office of the Inspector General's past recommendations relating to information technology covered in this follow-up review, for example, have been fully or substantially implemented. To bring about solutions, the administration, policymakers, the courts, labor representatives, inmate advocates, and other corrections stakeholders should work together to invest in needed improvements and resolve these long-standing problems.

Examples of areas affected by the failures in information technology include the following:

- ***Pharmaceutical expenditures.*** The department continues to waste millions of dollars annually by not implementing recommendations that it replace its outdated, inefficient, 20-year-old pharmacy management system. A July 2003 survey by the Office of the Inspector General found the department's pharmaceutical expenditures were projected to increase 111 percent between 1999-2000 and 2002-03, even though the inmate population decreased two percent and the national consumer price index for pharmaceutical drugs increased only 22 percent during that time.[1] To remedy the problems, the Office of the Inspector General's survey and four comprehensive audits and studies by other entities identified the need for the department to replace the pharmacy management system with an automated health care management system capable of performing essential functions to control costs and prevent waste, fraud, and abuse. Following the July 2003 survey, the Office of the Inspector General estimated that by replacing the system and implementing other management controls, the department could reduce its annual pharmaceutical expenditures— which totaled $122.4 million in fiscal year 2002-03 — by as much as $26 million. In response to the 2006 follow-up review, the department reported that it has made progress toward launching a new automated health care management system, but that statewide implementation has not yet

---

[1] The actual increase in the department's pharmaceutical expenditures was later reported to have been 94 percent.

been accomplished. The department reported, however, that it nonetheless achieved "cost avoidance" between 2002-03 and 2003-04 because its pharmaceutical expenditures increased only 6 percent, compared to the 18 percent average annual increase over the three preceding fiscal years. Yet, Bureau of Labor Statistics data show that between July 2003 and June 2004, pharmacy prices nationwide increased only 3.3 percent. Meanwhile, the department's pharmaceutical expenditures in fiscal year 2003-04 rose to $129.7 million —an increase of $7.3 million over the previous year. Because of these problems, in March 2006, the U. S. District Court ordered a comprehensive financial and operational audit of the department's pharmaceutical services. That audit will be conducted by a private specialty firm with expertise in correctional pharmaceutical operations.

- *Inmate appeals.* The department's Inmate Appeals Branch still has not obtained the information technology needed to enable it to efficiently analyze information from all levels of the inmate appeals process in order to identify systemic problems in the department's operations and practices. The inmate appeals process provides inmates with a means of resolving grievances concerning a range of issues, including requests for reasonable accommodation under the Americans with Disabilities Act and the alleged failure to obtain medical services. The Office of the Inspector General found from a February 2001 review that the department had no automated process for analyzing the appeals to identify deficiencies in policies, procedures, or practices even though the department's operations manual identifies the inmate appeals process as a vehicle for that purpose. In a September 2004 follow-up review, the Inmate Appeals Branch reported that it had developed a new inmate appeals tracking system for use at the institutions and was in the planning stages to extend the reporting capability of the new system to include data that could be used as a tool for identifying systemic problems. In the 2006 follow-up review, however, the Inmate Appeals Branch reported that enhancements scheduled to take place in November 2004 had been delayed because of other department priorities. In December 2005, the Inmate Appeals Branch reported that it was working on a feasibility study for the enhancements, which was scheduled to be completed by December 21, 2005. But the department had not completed the study when the Office of the Inspector General's fieldwork on this issue ended in December 2005.

- *Local assistance.* The department's Local Assistance Program, which reimburses local jurisdictions for the costs of detaining state parolees in local facilities, lacks the information technology needed to efficiently verify information on the invoices submitted for those costs. The department reports that its parole revocation scheduling and tracking system cannot be programmed to allow continuous tracking of the movements of individual parolees. As a result, the parole staff cannot confirm that a parolee was detained in the local jurisdiction on an active parole hold during the period claimed. The department reports that it is using a tracking system developed only for Parole Region III, which encompasses Los Angeles County, but has not estimated when such a system might be available statewide. The 2005 state budget for local assistance payments totaled $81.5 million.

*Medical services for inmates.* Because of the department's long-standing failings in providing inmate medical services, a federal receiver appointed by the U. S. District Court will take over the department's health care operations on April 17, 2006 to create a sustainable health care

system capable of providing constitutionally adequate medical care to inmates. Under the terms of the court's action, the receiver will have broad powers to restructure day-to-day operations and to direct the department's medical administrative, personnel, financial, accounting, contractual, legal, and other operational functions. In working with the receiver, the department should endeavor to address the following long-term deficiencies:

- ***The California Substance Abuse Treatment Facility.*** The second-largest prison in the state system, the California Substance Abuse Treatment Facility and State Prison at Corcoran, reports that a critical shortage of staff physicians to treat its more than 7,300 inmates has prevented the institution from implementing many of the Office of the Inspector General's past recommendations affecting medical services. The institution continues to fail to ensure that inmates see physicians promptly after requesting medical services, and inmates with chronic medical conditions are not adequately monitored. Because of the physician shortage, inmate appeals concerning medical services at the institution are backlogged, creating a domino effect as new appeals are filed to complain that earlier appeals have not been answered. Repeated turnover in other key medical positions also contributes to the deficiencies. The institution reports that six different individuals filled its chief medical officer position between September 2002 and June 2005 when the present incumbent was hired and that since September 2002 its chief dental officer, chief psychologist, chief psychiatrist, director of nurses, and medical records supervisor have all resigned, retired, or transferred. The use of outside medical specialists at the institution also has not been brought under control. In fiscal year 2001-02, the institution exceeded its budget for contracted medical services by more than $5 million — an 81 percent overage. The Office of the Inspector General recommended in January 2003 that the institution establish a process to review all referrals to outside providers, and the institution reports that it did establish an authorization committee to review specialist referrals, but that the physician shortage has limited the review to a cursory examination by the chief medical officer.

- ***Contracting for outside medical services.*** An October 2002 special review by the Office of the Inspector General found the department lacked a comprehensive statewide policy for managing medical services contracts and, because of deficiencies in its medical contracting process, had paid for services not performed and for services with an outside physician that had not been authorized. In response to the Office of the Inspector General's review, the department established a health contract services unit to assist institutions with all medical services contracts. In addition, the department required institutions to solicit medical providers and to prepare market surveys before initiating a contract. Meanwhile, expenditures for medical contracts rose 58 percent between fiscal years 2000-01 and 2004-05 from $200 million to more than $315 million, largely because of medical staff vacancies requiring contracted personnel to fill the void.

In response to two subsequent audits issued by the California State Auditor in 2004, the Department of General Services tightened the procedures used by the department to contract with outside community hospitals, physicians, nurses, pharmacists and other medical professionals to provide needed services and fill temporary medical staff vacancies and required the department to obtain competitive bids on clinical contracts. According to a correctional expert appointed by the U. S. District Court, however, due in part to insufficient staffing and training necessary to properly implement the new

contracting procedures as well as to the complexity of the procedures, the department has fallen $58 million behind in paying provider claims. The new bidding process instituted to replace single-source contracting also has resulted in a shortage of specialty providers. Because of these developments, on March 30, 2006 the court ordered the department to pay all valid outstanding department-approved claims within 60 days and to establish new medical contracting procedures within 180 days.

***Preparing inmates for release.*** California's prison population grew by 8,245 inmates between 2000 and 2006, tracking almost exactly with the state's annual population growth rate. In February 2000, the total inmate population stood at 160,846 and by March 2006 it had increased to 169,091, making California's prison system among the largest in the world and filling the state's prisons to nearly double design capacity. The department's adult operations budget grew over the same period from $4.4 billion in fiscal year 2000-01 to $5.3 billion in 2003-04 and to a proposed $7.5 billion for fiscal year 2006-07. As the inmate population increases, the department's problems — controlling violence, offering education, delivering health care, managing overcrowding, and controlling costs — become more difficult. While numerous factors are driving the numbers, the department has done little to control recidivism.

Examples of the deficiencies in rehabilitation efforts:

- ***Substance abuse treatment.*** According to the department, 21 percent of the state's more than 169,000 inmates are presently serving prison terms for drug offenses and the one-year recidivism rate for drug offenders is 37 percent. Yet, the effectiveness of the department's largest substance abuse treatment program is still unproven. A September 2002 study by the University of California, Los Angeles of the California Substance Abuse Treatment Facility's 1,478-bed substance abuse treatment program — the largest custody-based substance abuse treatment program, not only in the state correctional system, but also in the United States — showed no difference in recidivism rates between program participants and a control group of inmates from another prison who did not receive treatment. No comprehensive effectiveness studies comparable to the September 2002 study have been conducted. A January 2003 audit by the Office of the Inspector General of the program found numerous problems that impaired the program's effectiveness. The program is administered by the department's Office of Substance Abuse Programs, which screens inmates for the program, and is run by two private contractors. From January 2002 through June 2006, the Office of Substance Abuse Programs contracted to pay each private contractor approximately $29 million for substance abuse program services, for a total of $58 million. Key among the deficiencies identified was the placement of large numbers of inmates into the program who were not suited to the treatment model, including sex offenders and inmates suffering from mental illness. Other deficiencies included a shortage of trained counselors to run the interactive therapeutic community — a proven treatment modality for substance abusers — and the fact that treatment group sizes exceeded contract limits. The department has made improvements since the January 2003 audit by reducing the number of sex offenders and mental health patients in the program, yet the problems of large group size and the shortage of counselors remain. The 2006 follow-up review found that more than 400 general population inmates had been moved into the substance abuse housing units in response to a department-wide bed shortage, causing the substance abuse treatment group

clusters to increase to up to 100 inmates —exceeding the professionally recommended standard for therapeutic communities of 50 to 75 participants per cluster. The follow-up review also found that program staffing was 19 percent short of contract requirements, with only 59 counselors, instead of the 73 entry-level and journey-level counselors provided for under the contracts. The deficiencies appear to result from the continuing failure of the department to adequately monitor program contractors or to include provisions in the contracts that would allow the state to impose sanctions for noncompliance.

- *Education.* To its credit, the department has taken steps to institute new education methods for inmates at Level IV institutions, where classroom education models have proven to be unworkable, but the effectiveness of the new programs has not yet been evaluated. A July 2003 survey by the Office of the Inspector General found that delivering academic and vocational classes through a classroom model was ineffective and expensive for Level IV maximum security inmates because frequent institution lockdowns caused classes to be cancelled more than 60 percent of the time. The Office of the Inspector General also found that even if the classes were held 100 percent of the time, they would be able to accommodate only a small percentage of inmates eligible for the programs, in part because of the small number of budgeted teaching positions at Level IV institutions. State law requires the department to make literacy programs available to at least 60 percent of eligible inmates with the goal of ensuring that inmates achieve a ninth-grade reading level by the time they parole, and a survey by the Department of Corrections in November 1996 found that 68 percent of the inmate population scored below the ninth grade level in reading. Yet, at the time of the Office of the Inspector General's July 2003 survey, only 21 percent of eligible inmates at the five Level IV institutions covered in the survey were assigned to education classes. Since the survey, the department reports that it has developed new program models incorporating self-paced independent study, distance education, and other education services to increase inmate participation. It is too early to assess the effectiveness of the new education programs, however, and the department has not developed an effective monitoring system to ensure that institutions are complying with its education policies and procedures. Prison reform advocates have also suggested that the new programs may be too shallow to be effective, but again, population pressures appear to make it difficult to provide more comprehensive educational opportunities, at least in a classroom setting.

*Failure to use internal auditing tools.* The Department of Corrections and Rehabilitation has failed to make effective use of its own internal auditing function to identify systemic deficiencies and effect needed changes in programs and institutions. An October 2002 audit by the Office of the Inspector General of the Office of Compliance, which is the entity responsible for the department's internal auditing activity, found numerous weaknesses. For example, the office did not target internal audits toward areas of the highest risk; did not monitor audit projects to make sure they were completed in a proper and timely manner; and used a rigid checklist auditing approach that had the potential to miss important issues. The Office of Compliance reports that it has taken preliminary steps toward correcting deficiencies. But, more than three years after the October 2002 audit, the Office of Compliance still has not addressed most of the audit findings and has still not appointed a chief of internal audits with the training and experience to manage an internal auditing unit.

## SUMMARY OF FINDINGS AND RECOMMENDATIONS

Following is a summary of the findings from each of the 22 follow-up reviews comprising this accountability audit of the California Department of Corrections and Rehabilitation's adult operations and programs. An index to the summaries is included following that section.

(blank page)

**CALIFORNIA SUBSTANCE ABUSE TREATMENT FACILITY AND STATE PRISON AT CORCORAN**

**The California Substance Abuse Treatment Facility and State Prison at Corcoran has developed needed improvements to policies and procedures affecting medical services, but the institution has not implemented numerous recommendations from a January 2003 audit, citing a shortage of medical personnel and turnovers in its management ranks as major impediments. In addition, the Office of Substance Abuse Programs has not significantly improved its processes for monitoring contracts with private providers of in-prison substance abuse treatment programs, and drug treatment providers continue to fail to provide the number of counselors required under the contracts. Independent evaluations of the effectiveness of the facility's in-prison substance abuse treatment program are inconclusive.**

| IMPLEMENTATION REPORT CARD |
| --- |
| **Previous recommendations: 72** |
| **Fully implemented: 38 (53%)** |
| **Substantially implemented: 11 (15%)** |
| **Partially implemented: 10 (14%)** |
| **Not implemented: 12 (17%)** |
| **Not applicable: 1 (1%)** |

The Office of the Inspector General issued a management review audit of the California Substance Abuse Treatment Facility and State Prison at Corcoran in January 2003. The audit identified numerous problems at the institution, including inadequate management of medical, dental, and pharmacy services; deficiencies in the substance abuse treatment program that prevented the institution from reducing recidivism by helping inmates overcome drug dependency; and the failure of a significant number of staff and managers to fulfill annual training requirements.

The January 2003 management review audit identified numerous problems that impaired the effectiveness of the institution's substance abuse treatment program. Key among these was the placement into the program of large numbers of inmates not suited to the treatment model, including sex offenders and inmates suffering from mental illness. Other deficiencies included a shortage of trained counselors to run the interactive therapeutic community — a proven treatment modality for modifying the behavior of substance abusers — and the fact that treatment group sizes for the therapeutic community exceeded contract limits.

A September 2002 study of the institution's substance abuse treatment program by the University of California, Los Angeles, showed no difference in recidivism rates between program participants and a control group of inmates at another prison who received no treatment. The study raised questions about the advisability of paying contractors millions of dollars for in-prison substance abuse programs not demonstrated to be effective.

As a result of the January 2003 management review audit, the Office of the Inspector General made 72 recommendations to the Department of Corrections, the Health Care Services Division, and the California Substance Abuse Training Facility and State Prison at Corcoran.

## BACKGROUND

The California Substance Abuse Treatment Facility and State Prison at Corcoran, which opened in August 1997, houses approximately 7,300 male inmates and has a staff of about 1,700 employees, making it one of the largest prisons in the western world. It is designed for inmates ranging from Level II (low medium security) through Level IV (maximum security), and also includes a small number of Level I (minimum security) inmates. The institution includes a correctional treatment center, which provides medical treatment and recovery, mental health assessment and care, and clinical services. Clinics affiliated with the correctional treatment center provide medical and dental services inside each of the prison's seven facilities. Pharmaceuticals are provided by a pharmacy located in the correctional treatment center. Medical services for the California Department of Corrections and Rehabilitation inmates are the responsibility of the department's Division of Correctional Health Care Services. The health care manager at the Substance Abuse Treatment Facility and State Prison at Corcoran acts as the on-site administrator of health care services for the institution and is responsible for overall management of the institution's medical, mental health, and dental programs.

In addition to its mission of providing custody for state prison inmates remanded to the custody of the Department of Corrections and Rehabilitation, the institution includes a 1,478-bed substance abuse treatment program — the largest custody-based substance abuse treatment facility in the United States. The Department of Corrections and Rehabilitation's Office of Substance Abuse Programs is responsible for administering the substance abuse program, which is run by two private contractors. The Office of Substance Abuse Programs has employees on site to monitor daily program operations and to screen inmates eligible for the substance abuse program to ensure that the program operates at full capacity. The office is also responsible for monitoring the private contractors for compliance with the terms of the contracts to provide treatment services. The institution staff provides custody, security, drug testing, classification reviews, and administrative support to the Office of Substance Abuse Programs and the contractors. From January 2002 through June 2006, the Office of Substance Abuse Programs contracted to pay each private contractor approximately $29 million for substance abuse program services.

## SUMMARY OF THE 2006 FOLLOW-UP RESULTS

In the 2006 follow-up review, the Office of the Inspector General found that although there have been some improvements, the California Substance Abuse Treatment Facility has made generally disappointing progress in implementing needed changes in the three years since the January 2003 management review audit. The institution has been successful in identifying and recruiting a higher proportion of program-eligible inmates into the program, while reducing the proportion of sex offenders and mental health patients. Of the 1,456 inmates assigned to the program on October 20, 2005, less than seven percent were mental health patients and less than one percent of those who were mental health patients were also sex offenders. In comparison, the January 2003 audit found the proportion of sex offenders and mental health patients in the program to be as high as 50 percent.

The Office of the Inspector General also found, however, that the Office of Substance Abuse Programs continues to fail at effectively monitoring its contracts with the private providers of substance abuse program services at the prison. In reviewing the on-site monitoring reports for each provider in the substance abuse program for the 11-month period from December 2004 to October 2005, the Office of the Inspector General found that the monitoring reports continued to lack detail, did not focus on the contractors' compliance with contractual expectations, and did not reflect evidence of substantive review of the providers' records and operations.

The Office of the Inspector General noted in addition that the program providers continue to supply an inadequate number of counselors. During an October 2005 site visit, the Office of the Inspector General found that program staffing was 14 counselors short of the 73 entry-level and journey-level counselors required under the state contracts — a 19 percent shortfall. Moreover, the Office of Substance Abuse Programs still has no language in its provider contracts permitting the state to withhold payment or to exercise other sanctions short of contract cancellation for instances of non-compliance.

The Office of the Inspector General also found that an influx of more than 400 general population inmates into the substance abuse housing units in response to a department-wide bed shortage caused the treatment group cluster sizes to increase from 62 inmates to up to 100 inmates —levels that exceed the professionally recommended standard of 50 to 75 participants for therapeutic community programs and further detract from program effectiveness.

Treatment also appears to be frequently interrupted. On two separate visits in October and November 2005, the Office of the Inspector General attempted without success to observe therapeutic community groups and evaluate group sizes at the institution. On the first visit, all counseling had been suspended for the programs' annual "Sports Week," and on the second visit nearly all group sessions had been suspended to accommodate population movements among the housing units. This inactivity, coupled with recent lockdowns reported by counselors, raises concerns about the continuity of therapeutic community treatment at the institution. It is noteworthy that, with the exception of the lockdowns, none of the monitoring reports by the Office of Substance Abuse Programs discussed the continuing problems found by the Office of the Inspector General during its six days of fieldwork.

The Office of the Inspector General reviewed three subsequent evaluations by the University of California, Los Angeles, of the institution's substance abuse treatment program conducted since the September 2002 evaluation. Although the more recent evaluations, which were issued in September 2003, September 2004, and January 2006, made positive assessments of the effectiveness of post-prison aftercare, none were bona-fide effectiveness studies like the 2002 evaluation because they did not compare the recidivism rates of in-prison program participants against those of inmates from another prison who had not received treatment. Without a comparison of the subject group to a control group, it is not possible to conclude that the institution's program is successful in lowering recidivism.

***Medical care.*** The Office of the Inspector General found that although the institution has made efforts to implement recommendations affecting the institution's medical services and operations, many of the problems identified in the January 2003 management review audit have

not been adequately addressed. The remaining deficiencies include a continuing backlog of inmate medical appeals; lack of an effective means of ensuring that physicians work a full 40-hour-a-week schedule; failure to ensure that inmates see a physician in a timely manner; lack of review of the need for inmate treatment by specialists; and inadequate monitoring of chronic care patients. The institution points to repeated turnover in the chief medical officer position as one cause of the continuing deficiencies. Six different individuals served in the position between September 2002 and June 2005, when the present incumbent was hired. The institution also reports that since September 2002 its chief dental officer, chief psychologist, chief psychiatrist, director of nurses, and medical records supervisor have all resigned, retired, or transferred. The institution further cites a critical shortage of physicians and other medical staff as a barrier to full implementation of the Office of the Inspector General's recommendations. For example:

- The institution reports that it has established an expectation that physicians complete all administrative duties, including notifying the chief medical officer of medical appeals approaching delinquent status, but maintains that the physician shortage precludes aggressive focus on appeals.

- The institution reports it established a medical authorization review committee to review the medical necessity for procedures referred to outside medical providers, but that the committee process has fallen victim to the physician shortage and reviews are limited to a cursory examination by the chief medical officer.

- While physicians' hours and workloads have been adjusted to permit doctors to see more patients, the requirement that inmates see doctors within 14 days after a request for contact as mandated by the *Plata v. Schwarzenegger* court decision is not being met because the institution does not have enough physicians to meet that workload.

In addition, the Office of the Inspector General found that despite establishing a system of accountability for medical personnel, the institution's medical management team has been lax in enforcing a directive that medical personnel log in and out of the correctional treatment center each day by signing the log and recording the actual times of arrival and departure. Instead of recording the time of day, physicians simply sign the log and indicate a status of "in" or "out."

***Pharmacy operations.*** The Office of the Inspector General noted significant improvements in the institution's pharmacy operations. The institution developed improved policies and procedures for control of medications and quality control over prescriptions, as well as for intra-facility transfers of inmate medications. Spending for pharmaceuticals also decreased. As the Office of the Inspector General reported in the January 2003 management review audit, the institution spent $5.4 million in fiscal year 2001-02 for drugs and pharmaceutical supplies, but in fiscal year 2004-05, the institution's reported spending decreased to $3.7 million — a 31 percent reduction. The Department of Corrections and Rehabilitation, however, has still has not made a significant effort to develop an automated pharmaceuticals inventory system for the institutions.

The Office of the Inspector General also found that the Substance Abuse Treatment Facility has made significant progress in staffing its pharmacy with permanent state employees. At the time of the Office of the Inspector General's January 2003 audit, the institution's pharmacy was

staffed entirely by contract employees, but now the pharmacy employs only two contract employees among its full-time staff of nine. The positions currently filled by the two contract employees have been advertised as state civil service job openings since October 30, 2002, and the institution says the current state salary for pharmacists is lower than that offered in the industry, making recruitment difficult.

**FOLLOW-UP RECOMMENDATIONS**

**As a result of the 2006 follow-up review, the Office of the Inspector General is providing 23 recommendations to the Office of Substance Abuse Programs. The main recommendations are listed below, and the remainder are presented in the full report.**

- **Conduct systematic, in-depth monitoring of treatment providers for compliance with contract terms. Monitoring reports should reflect all substantive details of the provider's records and operations. The reports should also include the Office of Substance Abuse Programs' analysis and evaluation of the provider's operations.**

- **When drafting contracts for substance abuse treatment services, include provisions for fiscal sanctions to address instances of non-compliance with contract terms, including failure to provide the required number of counselors.**

- **Whether performed by UCLA or by another contractor, ensure that future studies of the effectiveness of the substance abuse program at the institution include a comparison of the treatment group to a control group of similar inmates who did not receive treatment.**

- **Return to using smaller clusters of inmates to conform to the Office of National Drug Control Policy's recommendation that therapeutic community program clusters consist of no more than 50 to 75 inmates.**

**The Office of the Inspector General recommends that the Substance Abuse Treatment Facility and State Prison at Corcoran continue to work with the Division of Correctional Health Care Services' department-wide efforts to address the shortage of physicians and other medical staff.**

## PHARMACEUTICAL EXPENDITURES

**The Office of the Inspector General found that the Department of Corrections and Rehabilitation has made some progress in reducing its pharmaceutical expenditures. The department, however, has accomplished only the preliminary steps required to replace its outdated management information system.**

In July 2003, the Office of the Inspector General conducted a survey to examine the Department of Corrections pharmaceutical expenditure trends over the four preceding fiscal years and to evaluate the department's efforts to implement changes recommended by previous audits and studies. The survey revealed that the department's pharmaceutical expenditures increased 94 percent, from $63 million in fiscal year 1999-2000 to $122.4 million in 2002-03 despite a slight decrease in inmate population and in stark contrast to a 22 percent increase in the national consumer price index for pharmaceutical drugs during the same period. The department's per-inmate pharmaceutical expenditures also increased, more than quadrupling from $142 in 1997 to $642 in 2002. The survey further identified four comprehensive audits and studies that had previously identified problems in the department's pharmacy program and included specific recommendations to remedy the deficiencies. Particularly critical was the indicated need for the department to replace its Pharmacy Prescription Tracking System, a badly outdated 20-year-old information system that lacked essential functions to control costs and prevent pharmaceutical waste, fraud, and abuse. In its July 2003 survey, the Office of the Inspector General recommended that the department act promptly to implement the recommendations of previous audits and studies of its pharmacy program, noting the department could reduce its annual pharmaceutical expenditures by up to $26 million by doing so. The Office of the Inspector General also recommended that if it appeared that the department would be unable to carry out the implementation on its own, that it consider contracting with a private vendor to institute the necessary improvements.

### SUMMARY OF THE 2006 FOLLOW-UP RESULTS

In the 2006 follow-up review, the Office of the Inspector General found that the department has failed to fully implement the recommendations from the 2003 survey. Until it implements past recommendations in this area, the department continues to waste millions of dollars annually in pharmaceutical expenditures.

The department reported it has developed a strategic plan incorporating recommendations from private consulting, regulatory, and oversight agencies. It also reported that it has revised its statewide procedures for medication administration and distribution; trained personnel on formulary rules; and organized management workgroups. The department rejected recommendations to contract with a private firm to manage pharmacy operations and to centralize its pharmacy distribution system.

---

**IMPLEMENTATION REPORT CARD**

Previous recommendations: 7

Fully implemented: 0 (0%)

Substantially implemented: 1 (14%)

Partially implemented: 2 (29%)

Not implemented: 3 (43%)

Not applicable: 1 (14%)

---

Although the department reported it has made progress in launching a project to replace its outdated and inefficient pharmacy management system with an automated health care management system, statewide implementation of that system has not been accomplished. The department reported, however, that it achieved a "cost avoidance" of $14.3 million between *projected* pharmaceutical expenditures for fiscal year 2003-04 ($144 million) and *actual* expenditures for that period. The department's actual pharmaceutical expenditures for fiscal year 2003-04 were $129.7 million — a $7.3 million (6 percent) increase over the previous year, compared to an 18 percent average increase experienced in the three preceding fiscal years. Yet, Bureau of Labor Statistics data show that between July 2003 and June 2004, pharmaceutical prices nationwide increased only 3.3 percent.

Because of these problems, in March 2006, the U. S. District Court ordered a comprehensive financial and operational audit of the department's pharmaceutical services, to be conducted by a private specialty firm with expertise in correctional pharmaceutical operations. In addition, the U. S. District Court-appointed receiver scheduled to take over all aspects of the department's health care system on April 17, 2006, will have authority to acquire and modernize information technology.

**FOLLOW-UP RECOMMENDATIONS**

**As a result of its 2006 follow-up review, the Office of the Inspector General recommends that the Department of Corrections and Rehabilitation take the following actions:**

- **Continue the project to replace the outdated and inefficient Pharmacy Prescription Tracking System with the automated Health Care Management System and implement the new system statewide as soon as practicable.**

- **In light of the flexible options likely to be available under the February 2006 federal court order appointing a receiver over the department's medical health care delivery system, reconsider the option of contracting with a private pharmacy services management firm to implement the recommendations submitted in the reports and studies conducted since 2000.**

## OFFICE OF INVESTIGATIVE SERVICES

**The Department of Corrections and Rehabilitation has reorganized and significantly improved its internal affairs operation since an October 2001 special review. The Office of Investigative Services—renamed the Office of Internal Affairs[1]—is now responsible for all of the department's internal affairs investigative functions. Many of the Office of the Inspector General's previous recommendations were implemented in the course of the reorganization and as a result of a federal court-ordered remedial plan. Other recommendations are no longer applicable in the wake of these changes. Yet, several**

| IMPLEMENTATION REPORT CARD |
|---|
| Previous recommendations: 37 |
| Fully implemented: 19 (52%) |
| Substantially implemented: 2 (5%) |
| Partially implemented: 8 (22%) |
| Not implemented: 6 (16%) |
| Not applicable: 2 (5%) |

**deficiencies identified in the Office of the Inspector General's 2001 review remain, including the lack of a system for prioritizing investigations; inadequacies in completing employee background investigation; and failure to use the department's internal audits function to help identify pervasive problems.**

In October 2001 the Office of the Inspector General issued a special review of the management practices and administrative operations of the Office of Investigative Services, which is responsible for all of the department's internal affairs investigative functions. The special review centered on the Office of Investigative Services' effectiveness, its compliance with required procedures, and the quality of its operational practices, identifying numerous deficiencies that impaired the ability of the office to meet its responsibilities. In particular, the review found that a rapidly expanding caseload, coupled with deficient management practices, prevented the Office of Investigative Services from completing investigations within required time limits. That deficiency limited the ability of the department to take appropriate administrative action against employees when misconduct allegations were sustained. The Office of the Inspector General presented 37 recommendations to remedy the deficiencies identified in the October 2001 special review.

### SUMMARY OF THE 2006 FOLLOW-UP RESULTS

The Office of the Inspector General's 2006 follow-up review found that the Office of Internal Affairs has significantly improved its investigative process through creation of a central intake panel that brings consistency to the process of determining whether to accept or reject cases for investigation. In another improvement, the investigative classification system has been streamlined, allowing cases involving minor supervisory issues requiring no additional investigation to be addressed directly by the hiring authorities, while those requiring investigation are conducted or closely supervised by the Office of Internal Affairs. In addition, the former case management information system has been replaced by a new system providing not only for tracking and monitoring active cases, but also for tracking the entire employee discipline continuum from the initial request for investigation to its final disposition. The system

---

[1] Depending on the context and time-frame discussed, both names — Office of Investigative Services and Office of Internal Affairs — are used in this report.

is being installed at California Department of Corrections and Rehabilitation investigative offices, legal offices, and hiring authorities throughout the state.

Many of the Office of the Inspector General's recommendations from the October 2001 special review were implemented in the course of reorganizing the entities now under the Department of Corrections and Rehabilitation, and also as a result of a federal court-ordered remedial plan. Other recommendations are no longer applicable in the wake of these changes. However, several deficiencies identified in the Office of the Inspector General's 2001 review remain. These include a lack of a system for prioritizing investigations; inadequate management of overtime use; inadequacies in completing background investigations of employees and borrowed investigators; inadequate control over access to the case management information system; deficiencies in evidence handling; and failure to use the department's internal audits function to help identify pervasive problems.

**FOLLOW-UP RECOMMENDATIONS**

**The Office of the Inspector General's 2006 follow-up review makes ten additional recommendations to the Office of Internal Affairs, including the following:**

- **Develop policies and procedures for prioritizing investigative cases.**

- **Assign each region a monthly allocation of budgeted overtime and prepare a monthly log for each regional office that begins with monthly allotted hours and is adjusted for each usage. When overtime is granted, the supervisor should immediately e-mail the agent and the overtime timekeeper for the purpose of adjusting monthly balances and providing evidence of previous overtime approval. In order to provide regional supervisors flexibility in managing cases, the Office of Internal Affairs should consider rolling over unused office balances from one month to the next.**

- **Refrain from using investigative services unit investigators until their supplemental background investigations are complete.**

- **Formalize the process for verifying that case management information system access is limited to only authorized users. The process should define the frequency of reviews, require a reconciliation of beginning and ending authorized users for the period, and specify the date when users are added or deleted. Included in this process should be a requirement that an exit document be prepared by the departing staff's supervisor that instructs the information technology staff to remove the user's access.**

- **Prepare a supervisory quality control review sheet that ensures that the investigative package is complete, the investigative plan was followed, all key witnesses were interviewed, required notices were performed, and the final report represents a clear, fair, and unbiased representation of the facts.**

- **Use the Department of Corrections and Rehabilitation internal audit staff to perform field audits to identify trends in complaints against staff so that resources can be focused on the most pervasive problems.**

**EMPLOYEE DISCIPLINARY PROCESS**

**The Office of the Inspector General found that the Department of Corrections and Rehabilitation has improved its employee disciplinary process and has fully or substantially implemented all previous recommendations.**

> **IMPLEMENTATION REPORT CARD**
>
> **Previous recommendations: 9**
>
> **Fully implemented: 6 (67 %)**
>
> **Substantially implemented: 3 (33%)**
>
> **Partially implemented: 0 (0%)**
>
> **Not implemented: 0 (0%)**
>
> **Not applicable: 0 (0%)**

In March 2002, the Office of the Inspector General conducted a review of the Department of Corrections employee disciplinary process. The purpose of the review was to identify any administrative or procedural weaknesses in the disciplinary process that might affect the department's ability to take appropriate adverse action against employees found to have engaged in misconduct.

The review found that needless complexity sometimes delayed or even impaired disciplinary actions against employees. In addition, there were no clear guidelines defining the one-year period for investigating misconduct and imposing disciplinary action against peace officers. The review found that 43 percent of a sample of investigations completed during fiscal years 1999-00 and 2000-01 in which misconduct allegations were sustained were not completed within one year and therefore did not result in disciplinary action. Further, employee relations officers at institutions were not adequately trained, departmental legal staff were often uninvolved in disciplinary actions, and the department lacked policies and procedures governing settlements with employees. The Office of the Inspector General made nine recommendations to the department to address these findings. Subsequent to the March 2002 review, a special master appointed by the U. S. District Court, Northern District of California has been monitoring efforts to reform the disciplinary process through what is known as the Madrid Remedial Plan. Many of the plan's provisions are consistent with the Office of the Inspector General's March 2002 recommendations.

**SUMMARY OF THE 2006 FOLLOW-UP RESULTS**

In its 2006 follow-up review, the Office of the Inspector General found that the Department of Corrections and Rehabilitation has significantly improved its administration of the employee disciplinary process. The department has developed a case management system to monitor and track disciplinary cases from start to finish to ensure that cases meet statutory deadlines. It has also implemented a new central intake process that provides for representatives from the Office of Internal Affairs, office of Legal Affairs, and other department staff to review requests for investigations and determine appropriate action. The Office of the Inspector General's Bureau of Independent Review monitors the central intake and internal affairs process and also monitors the investigations. The department has also updated its policies and procedures for employee discipline and has provided formal training to its employee relations officers statewide. As a result of these and other changes, only two percent of 94 investigations with sustained findings conducted by the Office of Internal Affairs for the period December 1, 2004 through May 31, 2005 exceeded the one-year statutory limit. No follow-up recommendations are made.

**OFFICE OF COMPLIANCE, AUDIT FUNCTIONS**

**The Office of the Inspector General found that the Department of Corrections and Rehabilitation has consolidated its audit functions into a single unit and elevated the chief of the unit to report directly to the undersecretary. Yet, more than three years after an October 2002 review by the Office of the Inspector General, the department still has not corrected most of the deficiencies identified in that review.**

> **IMPLEMENTATION REPORT CARD**
>
> **Previous recommendations: 4**
>
> **Fully implemented: 2 (50 %)**
>
> **Substantially implemented: 0 (0%)**
>
> **Partially implemented: 2 (50%)**
>
> **Not implemented: 0 (0%)**
>
> **Not applicable: 0 (0%)**

In October 2002, the Office of the Inspector General issued a report resulting from a review of the audit functions of the Department of Corrections Office of Compliance. The Office of the Inspector General found that the Office of Compliance did not adhere to appropriate professional standards in performing its internal audit work. The Office of the Inspector General identified several specific weaknesses in the department's management of the Office of Compliance, all of which resulted from the failure of the office to comply with internal auditing standards. The deficiencies included poor communication with executive staff and unresponsiveness to executive requests for audits. As a result of the deficiencies, the Office of the Inspector General questioned the ability of the Office of Compliance to accomplish its objectives and meet its assigned responsibilities. As a result of the October 2002 review, the Office of the Inspector General recommended that the Department of Corrections consolidate all of its auditing activities into a professional internal auditing unit consistent with standards prescribed in *Standards for the Professional Practice of Internal Auditing*. The Office of the Inspector General recommendations specified that the chief of internal audits should possess the training, knowledge, and experience necessary to manage an internal auditing unit and should report to the chief deputy director for Support Services.

**SUMMARY OF THE 2006 FOLLOW-UP RESULTS**

In its 2006 follow-up review, the Office of the Inspector General found that more than three years after the initial audit in October 2002, the department has not addressed most of the audit findings. The department has consolidated its internal audit activities into the Office of Audits and Compliance, which reports directly to the department's undersecretary. That change should allow the department to better coordinate its varied audit activities and provide the appropriate level of organizational independence, as prescribed by the Institute of Internal Auditors. According to the department, once the Office of Audits and Compliance is fully operational, it will address most of the remaining issues raised in the October 2002 review.

Because the Office of Audits and Compliance is not yet fully operational, however, the department has not yet addressed several issues and recommendations raised in the review including:

- The department stated that it has not yet begun to adhere to *Standards for the Professional Practice of Internal Auditing*.

- The department reported that it has not yet developed a quality assurance and improvement program for its internal auditing activity.

- The department stated that it is currently not using a risk-based plan to determine the priorities of its internal audit activity.

- The department acknowledged that the two units that perform audits of internal operations are still not receiving substantive input from senior management in developing their audit plans.

- The department has not yet appointed a permanent assistant secretary as the chief of internal audits who possesses the training, knowledge, and experience to manage an internal auditing unit.

Not only appropriate auditing standards, but also sound business principles require the department to incorporate the features described above into its audit operations. By not adequately addressing the findings of the Office of the Inspector General's October 2002 report, the department has limited the value of its internal audit unit as a tool for identifying department operations needing improvement.

**FOLLOW-UP RECOMMENDATIONS**

**As a result of its 2006 follow-up review, the Office of the Inspector General makes six recommendations, including:**

- **The department should continue its efforts to recruit a permanent assistant secretary for the Office of Audits and Compliance, ensuring that the person selected possesses the training, knowledge, and experience to manage an internal auditing unit.**

- **The department should ensure that the Office of Audits and Compliance continues to develop operating policies and procedures that will ensure that its audit activity is consistent with the standards prescribed in the *Standards for the Professional Practice of Internal Auditing.***

- **The policies and procedures should include a process for effective communication with the department's executive staff in planning annual audit activities and reporting audit performance, and a process by which to develop a risk-based comprehensive annual plan for identifying the priorities of the internal audit activity.**

## MEDICAL CONTRACTING PROCESS

**The Office of the Inspector General found that the Department of Corrections and Rehabilitation has implemented several of the recommendations resulting from an October 2002 special review, but because of continuing problems with its medical contracting procedures, is under court order to develop new procedures within 180 days.**

| IMPLEMENTATION REPORT CARD |
|---|
| Previous recommendations: 7 |
| Fully implemented: 5 (72 %) |
| Substantially implemented: 1 (14%) |
| Partially implemented: 1 (14%) |
| Not implemented: 0 (0%) |
| Not applicable: 0 (0%) |

In October 2002, the Office of the Inspector General conducted a special review of the processes and controls used by the department's Health Care Services Division to procure and pay for contract medical services to inmates. In order to provide adequate medical services to the growing inmate population, the department contracts with outside community hospitals, physicians, nurses, pharmacists, and other medical professionals to obtain specialized services its staff and facilities cannot provide. In some instances, the department also contracts with medical professionals to fill temporary staff vacancies in medical classifications where recruitment is difficult. The review determined that the division did not effectively manage its medical services to inmates and that it should adopt statewide policies and procedures to ensure cost-effective contracts, quality case management, and continuity of care.

The October 2002 review found the department lacked a comprehensive statewide policy for managing medical services contracts and had paid for services not performed and for services with an outside physician that had not been authorized because of deficiencies in its medical contracting process. The review found that the process was vulnerable to potentially serious conflicts of interest because the person selecting the contractor was also authorized to approve invoices and payments under the contract, and that these deficiencies in the process may have led to problems in the quality and continuity of inmate medical care.

### SUMMARY OF THE 2006 FOLLOW-UP RESULTS

In its 2006 follow-up review, the Office of the Inspector General found that the Department of Corrections and Rehabilitation has made a number of changes to its medical contracting process. In response to the Office of the Inspector General's review, the department established a health contract services unit to assist institutions with all medical services contracts. In addition, the department required institutions to solicit medical providers and to prepare market surveys before initiating a contract. Meanwhile, expenditures for medical contracts rose 58 percent between fiscal years 2000-01 and 2004-05 from $200 million to more than $315 million, largely because of medical staff vacancies requiring contracted personnel to fill the void.

In response to two subsequent audits issued by the California State Auditor in 2004, the Department of General Services tightened the procedures used by the department to contract with outside community hospitals, physicians, nurses, pharmacists and other medical professionals to provide needed services and fill temporary medical staff vacancies and required

the department to obtain competitive bids on clinical contracts. According to a correctional expert appointed by the U. S. District Court, however, due in part to insufficient staffing and training necessary to properly implement the new contracting procedures as well as to the complexity of the procedures, the department has fallen $58 million behind in paying provider claims. The new bidding process instituted to replace single-source contracting also has resulted in a shortage of specialty providers. Because of these developments, on March 30, 2006 the court ordered the department to pay all valid outstanding department-approved claims within 60 days and to establish new medical contracting procedures within 180 days.

**FOLLOW-UP RECOMMENDATION**

**As a result of its 2006 follow-up review, the Office of the Inspector General recommends that the Department of Corrections and Rehabilitation develop a more effective and efficient system for processing and monitoring medical service invoices, including validation that contractors have performed all services invoiced prior to issuing payment.**

## EDUCATION PROGRAMS AT LEVEL IV INSTITUTIONS

**The Office of the Inspector General found that the Department of Corrections and Rehabilitation has made progress in developing alternative education programs for Level IV inmates, but the effectiveness of the new programs has not yet been evaluated.**

<div style="border:1px solid black">

### IMPLEMENTATION REPORT CARD

**Previous recommendations: 6**

**Fully implemented: 1 (17%)**

**Substantially implemented: 2 (33%)**

**Partially implemented: 3 (50%)**

**Not implemented: 0 (0%)**

**Not applicable: 0 (0%)**

</div>

In July 2003, the Office of the Inspector General conducted a survey of education programs at the Department of Corrections Level IV institutions. The survey was prompted by management review audits conducted by the Office of the Inspector General showing that inmates in state correctional institutions received only limited classroom instruction because classrooms were closed for significant periods of time due to lockdowns, teacher vacancies, and other program disruptions.

The survey revealed the classroom education model to be an inefficient and expensive means of delivering education to Level IV inmates because frequent lockdowns cause academic and vocational classes to be closed down more than 60 percent of the time. At the five Level IV institutions locked down for the largest percentages of time, education programs operated an average of only 25 percent of the time. And even with the classes closed for long periods, the survey found that inmates continued to receive day-for-day sentence reduction credits as though they had attended class, and teachers continued to be paid as though they had provided instruction. Meanwhile, the survey also found that institutions had no systematic means of accounting for teachers' activities during lockdown periods or of temporarily assigning them to other duties, and labor agreements hampered the redirection of teachers to other functions during those periods. When lockdowns and other program disruptions were taken into account, the annual per-inmate cost of the education programs at Level IV institutions greatly exceeded the annual per-inmate cost budgeted.

The Office of the Inspector General also found despite the statutory requirement that the Department of Corrections and Rehabilitation make literacy programs available to at least 60 percent of eligible inmates — and even though a statewide survey conducted by the Department of Corrections in November 1996 found that 68 percent of the inmate population scored below the ninth grade level in reading — only 20.8 percent of eligible inmates at the level IV institutions surveyed were assigned to education classes at the time of the survey. Lastly, the Office of the Inspector General found that even if the classes were held 100 percent of the time, they would have been able to accommodate only a small percentage of inmates eligible for the programs, in part because of the small number of budgeted teaching positions at Level IV institutions. The Office of the Inspector General recommended that the Department of Corrections re-evaluate education programs at Level IV institutions to determine whether they warrant continued operation and investigate other methods of delivering academic and vocational instruction. Among the options considered should be eliminating formal classroom instruction and retaining a small educational staff to coordinate in-cell study courses for inmates.

## SUMMARY OF THE 2006 FOLLOW-UP RESULTS

In its 2006 follow-up review, the Office of the Inspector General found that the Department of Corrections and Rehabilitation has made some progress in developing alternative education programs for its Level IV inmates. In response to a $34.8 million reduction to its education budget, the department evaluated its existing programs and prioritized them to determine those that warranted continued operation. Upon completion of the evaluation, the department eliminated 129 education positions, including many of the Level IV vocational programs, due to their ineffectiveness. The department has since developed alternative education program models designed to increase overall inmate participation through non-traditional methods. The new programs include more self-paced independent study, such as the new Bridging Education Program recently implemented in the reception centers and general population facilities. This new program allows inmates to begin participating in self-paced education programs when they arrive at a reception center. Other programs include short-term vocational certification classes, half-day assignments with a homework component, delivery of educational services via distance education methodologies, and delivery of educational services in the living units. The department recently implemented the majority of the new alternative delivery education models. Therefore, only minimal data is available at this time to evaluate the effectiveness of these programs. Prison reform advocates have suggested that the new programs may be ineffective, but inmate population pressures appear to make it difficult to provide more comprehensive educational opportunities, at least in a classroom setting.

Although the department has made progress in developing new education programs, it still has not developed an effective monitoring system to ensure that institutions are complying with its education policies and procedures.

## FOLLOW-UP RECOMMENDATIONS

**As a result of its 2006 follow-up review, the Office of the Inspector General recommended that the Department of Corrections and Rehabilitation take the following actions:**

- **Systematically evaluate the effectiveness of the new alternative education delivery models. The evaluation should include inmate participation rates, progress in achieving educational goals, and the impact of the programs on recidivism.**

- **The new Office of Correctional Education should dedicate staff to perform periodic on-site reviews to ensure compliance with department policies and procedures. The on-site reviews should include, but not be limited to, verification of educational representatives participating in classification committees, verification of class closures for teacher vacancies beyond 30 days, and the verification of the accuracy of timekeeping for inmate program participation.**

## RICHARD A. MCGEE CORRECTIONAL TRAINING CENTER

**The Office of the Inspector General found that the Richard A. McGee Correctional Training Center has significantly improved its cadet training program. The academy instituted guidelines for course development that include instructor input, cadet feedback, and Commission on Correctional Peace Officer Standards and Training program approval. Lesson plans for the now-expanded academy are complete and were approved by the commission. Cadet testing protocols are also complete, as are operational procedures governing test results retention.**

| IMPLEMENTATION REPORT CARD |
| --- |
| **Previous recommendations: 12** |
| **Fully implemented: 11 (92%)** |
| **Substantially implemented: 0 (0%)** |
| **Partially implemented: 0 (0%)** |
| **Not implemented: 1 (8%)** |
| **Not applicable: 0 (0%)** |

In April 2000 the Office of the Inspector General conducted an unannounced special review audit of the Richard A. McGee Correctional Training Center (now known as the Richard A. McGee Academy), which conducts the basic correctional officer academy program for all correctional officers training in California. The review was prompted by numerous serious allegations that were reported to the Office of the Inspector General in late March 2000. The allegations called into question the integrity of test results for recent graduates of the basic correctional officer academy located at the center and the overall preparedness of correctional officers graduating from the academy.

As a result of the May 2000 review, the Office of the Inspector General made eight specific findings, including:

- Cadets being trained under the expanded ten-week curriculum even though a significant number of the lesson plans had not been completed.

- Many of the 46 lesson plans, including those for highly essential courses, had not received provisional approval from the Commission on Correctional Peace Officer Standards and Training.

- The department's Staff Development Center and the training center staff failed to coordinate efforts in developing the lesson plans.

- The training center did not maintain the instructor-to-cadet ratios specified in the lesson plans approved by the Commission on Correctional Peace Officer Standards and Training.

### SUMMARY OF THE 2006 FOLLOW-UP RESULTS

In its 2006 follow-up review, the Office of the Inspector General found that the Richard A. McGee Correctional Training Center has significantly improved its cadet training program. The academy implemented guidelines for course development that include instructor input, cadet feedback, and Commission on Correctional Peace Officer Standards and Training approval. Lesson plans for the now-expanded academy are complete and have been approved by the

Commission on Correctional Peace Officer Standards and Training (now the Corrections Standards Authority). Cadet testing protocols and test retention policy also have been completed. The Office of the Inspector General makes no follow-up recommendations.

## CALIFORNIA STATE PRISON, SOLANO

**The Office of the Inspector General found that the California State Prison, Solano has improved certain of its operations since a March 2003 management review audit. The facility more closely monitors inmates' tuberculosis status, better manages sentence reduction credits granted to inmates, and has improved its management of both inmates placed in administrative segregation and those taking psychotropic medications. Although it has made significant progress, the facility has only partially implemented recommendations to properly house inmates taking anticonvulsant medications and has not taken steps to monitor its pharmacy inventory.**

---

**IMPLEMENTATION REPORT CARD**

**Previous recommendations: 24**

**Fully implemented: 19 (79%)**

**Substantially implemented: 2 (9%)**

**Partially implemented: 2 (8%)**

**Not implemented: 1 (4%)**

**Not applicable: 0 (0%)**

---

In March 2003, the Office of the Inspector General conducted a management review audit of California State Prison, Solano to assess the essential functions of the facility. As a result of the review, the Office of the Inspector General found that California State Prison, Solano was not adequately tracking inmates with tuberculosis, creating the potential of exposing inmates throughout the state to the disease and presenting a risk to the correctional staff and the general public. In addition, the institution allowed inmates to earn sentence reduction credit through education and training classes even when classes were not actually held, and maintained inadequate pharmacy record keeping and physical controls over prescription medications stored in the infirmary and clinics to prevent unauthorized access and theft. The Office of the Inspector General also found that a significant number of inmates taking psychotropic medications were inappropriately housed in buildings lacking air conditioning and some inmates who were taking anticonvulsant medications were not assigned to lower bunks to lessen the possibility of injury in the event of a seizure, and makeshift partitions in the institution's administrative segregation unit buildings created blind spots that limited the view of the control booth officers, compromising the safety and security of correctional staff and inmates. Furthermore, when inmate deaths occurred, the institution did not examine the cause and circumstances surrounding the deaths in a timely manner and the people the institution assigned to conduct the reviews may have had a direct interest in the results. The Office of the Inspector General presented 24 recommendations in its March 2003 report to remedy the findings.

## SUMMARY OF THE 2006 FOLLOW-UP RESULTS

In its 2006 follow-up review, the Office of the Inspector General found that the California State Prison, Solano has made significant progress in implementing the recommendations made in the March 2003 report. Specifically, the Office of the Inspector General made the following findings:

- The facility has improved its monitoring of inmates who have tested positive for tuberculosis by adding staff and increasing follow-up assessments of those inmates.

---

- In closing classes with no assigned instructors, the facility has reduced the rate at which it grants sentence-reduction credits to inmates who otherwise did not attend classes.

- The facility installed mirrors that improved visibility in its administrative segregation units.

- The facility has implemented procedures to ensure that inmates taking psychotropic medications—which increase inmates' susceptibility to heat-related illnesses—are appropriately housed and monitored when temperatures are higher than 90 degrees. The facility should, however, improve its monitoring of inmates taking anti-seizure medications to ensure that those inmates are assigned to lower bunks to protect their safety.

- The department implemented new procedures in December 2005 relative to reporting inmate deaths and submitting specific documents related to each death to headquarters for analysis.

- The pharmacy at California State Prison, Solano has improved its security over non-narcotic medications, but still does not have a method to monitor their inventory.

- The department obtained additional resources to improve statewide dental care.

**FOLLOW-UP RECOMMENDATIONS**

**As a result of its 2006 follow-up review, the Office of the Inspector General recommends that the California State Prison, Solano take the following actions:**

- **Conduct periodic evaluations of the housing assignments of inmates who have been prescribed seizure medications to ensure that those inmates are housed appropriately.**

- **Develop a method to reconcile the types and quantities of pharmaceuticals shipped from its pharmacy to its clinics and the correctional treatment center with the types and quantities of medications prescribed to inmates.**

**In addition, the Office of the Inspector General recommends that the California Department of Corrections and Rehabilitation assess whether additional dental staffing and equipment have improved the availability of dental examinations to inmates across all institutions.**

## CALIFORNIA STATE PRISON, SACRAMENTO

**The Office of the Inspector General found that California State Prison, Sacramento has corrected various deficiencies identified in a September 2000 management review audit. Financial management has improved, in that actual expenditures are closer to budget allotments; underground storage tanks have been removed, thus avoiding fines and penalties; and internal control weaknesses in the handling of inmate trust funds have been corrected.**

In September 2000, the Office of the Inspector General issued a management review audit report of California State Prison, Sacramento focusing on personnel, training, communications, inmate programming, security, and finances. The audit found deficiencies in financial management and internal control weaknesses in the handling of inmate trust funds. Other areas found to be deficient included the institution's electronic security clearance system designed to track the arrival and departure of employees and visitors, inmate dental examinations, the failure to process inmate appeal forms in a timely manner, failure to comply with a mandate to remove underground storage tanks in a timely manner, inconsistent handling of inmate rules violation reports, and the failure to complete employee probation and performance reports on time. The Office of the Inspector General presented 17 recommendations to remedy the deficiencies identified in the September 2000 review.

### SUMMARY OF THE 2006 FOLLOW-UP RESULTS

In its 2006 follow-up review, the Office of the Inspector General found that the California State Prison, Sacramento has substantially improved its financial management, keeping expenditures aligned with budget allotments and resolving internal control weaknesses relative to inmate trust funds. The institution has also implemented processes improving monitoring of the following: inmate and parolee appeals, the correctional peace officer apprenticeship program, equal employment opportunity case files, and inmate rules violation reports. The institution still needs improvement in tracking institution staff and visitors, providing timely inmate dental examinations, and completing staff performance evaluations.

### FOLLOW-UP RECOMMENDATIONS

**As a result of its 2006 follow-up review, the Office of the Inspector General makes five recommendations to the department and California State Prison, Sacramento, including:**

- **Explore options for a cost-effective electronic system that effectively tracks the entry and departure of staff and visitors at the institution.**

- **Barring a change in Title 15, California Code of Regulations, comply with the requirement to provide dental examinations to inmates within 14 days of their arrival at the institution.**

> **IMPLEMENTATION REPORT CARD**
>
> **Previous recommendations: 17**
>
> **Fully implemented: 12 (70%)**
>
> **Substantially implemented: 2 (12%)**
>
> **Partially implemented: 1 (6%)**
>
> **Not implemented: 2 (12%)**
>
> **Not applicable: 0 (0%)**

- **Ensure that employee performance and probationary reports are completed in a timely manner.**

## HIGH DESERT STATE PRISON

**The Office of the Inspector General found that High Desert State Prison has addressed most of the recommendations from a November 2001 audit that were under its control, but the Department of Corrections and Rehabilitation has not implemented several recommendations to provide the institution with needed resources or to take other actions affecting both High Desert State Prison and other institutions.**

```
┌─────────────────────────────────────────┐
│        IMPLEMENTATION REPORT CARD        │
│                                          │
│  Previous recommendations: 31            │
│                                          │
│  Fully implemented: 18 (58%)             │
│                                          │
│  Substantially implemented: 4 (13%)      │
│                                          │
│  Partially implemented: 3 (10%)          │
│                                          │
│  Not implemented: 5 (16%)                │
│                                          │
│  Not applicable: 1 (3%)                  │
└─────────────────────────────────────────┘
```

In November 2001, the Office of the Inspector General conducted a management review audit of High Desert State Prison. The audit determined that the institution was generally well run, but identified a number of deficiencies affecting safety and security, the inmate appeals process, the inmate disciplinary system, employee performance reports, and inmate medical and dental care. The audit also identified issues affecting safety and security and inmate dental care that required action from the Department of Corrections.

Specifically, the Office of the Inspector General noted a number of health care deficiencies, including poor documentation of chronically ill inmates, inmates taking psychotropic medications not being properly managed for heat risks, a risk that inmate medications could be tampered with before administration and were not adequately documented in the medical files, that inmates were not receiving required dental services, and poor controls over prescription drugs. Additionally, problems were found in institutional programs, such as the inmate appeals process, administrative segregation housing units, and inmate discipline process. As a result of the November 2001 audit, the Office of the Inspector General made 31 recommendations to the management of High Desert State Prison and to the Department of Corrections.

### SUMMARY OF THE 2006 FOLLOW-UP RESULTS

The Office of the Inspector General found in its follow-up audit that High Desert State Prison has made significant progress in implementing recommendations affecting areas under the warden's control, but a number of issues requiring additional funding and policy direction from the Department of Corrections and Rehabilitation central office have not been addressed. The institution has addressed the timeliness of the inmate appeals process, monitoring of inmate modification orders, and ensuring that inmates comply with administrative segregation policies. The institution has also made improvements in the inmate disciplinary process, in documenting services provided during lockdowns, in completing staff performance reports, and in completing mandated training requirements. In contrast, the Department of Corrections and Rehabilitation has made minimal progress in performing security modifications, including installing security cameras on the main yards, and in pursuing additional release allowance funding for inmates paroling from rural areas.

A number of the recommendations affecting the health care program, which is under the direction of the health care manager, have also been addressed. In particular, the institution has

made progress in documenting inmate medical histories before issuing medications; in providing additional escorts for dental services; and in implementing policies and procedures to improve distribution and tracking of inmate medications. But the institution's medical department still has not developed a system to ensure that inmates on psychotropic medications are included in the mental health care delivery system. Also, the department has not eliminated inconsistencies in regulations concerning minimum dental service requirements and has not developed an automated system to schedule and track dental services.

**FOLLOW-UP RECOMMENDATIONS**

**As a result of its 2006 follow-up review, the Office of the Inspector General made six recommendations, including the following:**

- **The High Desert State Prison medical department develop a system to ensure that inmates requiring psychotropic medications are included in the mental health delivery system before they receive the medications.**

- **The Department of Corrections and Rehabilitation eliminate inconsistencies between California Code of Regulations, Title 15 and the *Department of Corrections and Rehabilitation Operations Manual* concerning inmate dental care.**

- **The Department of Corrections and Rehabilitation implement an automated inventory system to track and monitor prescription drugs.**

**VALLEY STATE PRISON FOR WOMEN**

**The Office of the Inspector General found that Valley State Prison for Women has improved employee morale and the timeliness and completion of important administrative processes, such as Category I investigations, inmate appeals, and rules violation reports. The institution remains deficient in areas involving employee performance and probation reports, weapons qualification for armed staff, drug disposal, and drug interdiction training.**

| IMPLEMENTATION REPORT CARD |
| --- |
| **Previous recommendations: 35** |
| **Fully implemented: 24 (68%)** |
| **Substantially implemented: 2 (6%)** |
| **Partially implemented: 5 (14%)** |
| **Not implemented: 1 (3%)** |
| **Not applicable: 3 (9%)** |

The Office of the Inspector General conducted a January 2001 management review audit of Valley State Prison for Women focused on institutional processes relating to communications, personnel, investigations, training, security, and financial matters. As a result of the review, the Office of the Inspector General found that poor morale among the institution staff was pervasive. The Office of the Inspector General also found a number of administrative deficiencies, such as incomplete and untimely investigations of employee misconduct and rules violation reports involving inmate conduct, untimely completion of inmate appeals and employee performance and probation reports, and inadequate control over drug disposal.

**SUMMARY OF THE 2006 FOLLOW-UP RESULTS**

The Office of the Inspector General's 2006 follow-up review found that Valley State Prison for Women has taken measures to improve employee morale and various important administrative procedures, including investigations of employee misconduct, rules violation reports, inmate appeals, adverse personnel actions, and equal employment opportunity complaints. The institution has improved its tracking systems for these administrative processes and has established bi-monthly employee advisory council meetings. However, the institution remains deficient in preparing timely employee performance and probation reports; ensuring that staff assigned to armed posts meet quarterly weapons qualification requirements; providing drug interdiction training; and complying with Department of Corrections and Rehabilitation drug disposal guidelines.

**FOLLOW-UP RECOMMENDATIONS**

**As a result of its 2006 follow-up review, the Office of the Inspector General makes seven additional recommendations to Valley State Prison for Women, including:**

- **Hold staff members with responsibility for preparing performance and probation reports accountable for completing and submitting the reports on the required date and use progressive discipline to ensure compliance.**

- **Follow the updated evidence control procedure for the destruction of drugs.**

- **Conduct a quarterly audit of staff members assigned to armed posts to ensure compliance with the quarterly range qualifications.**

## SIERRA CONSERVATION CENTER

**The Office of the Inspector General found that the Sierra Conservation Center has successfully addressed nearly all of the deficiencies identified in a May 2001 management review audit. The institution has enhanced the safety and security of its physical plant and has improved procedures relating to inmate appeals, the inmate disciplinary process, staff training, adverse personnel actions, employee grievances, equal employment opportunity complaints, and the reporting of inmate deaths.**

> ### IMPLEMENTATION REPORT CARD
>
> **Previous recommendations: 53**
>
> **Fully implemented: 38 (71%)**
>
> **Substantially implemented: 11 (21%)**
>
> **Partially implemented: 1 (2%)**
>
> **Not implemented: 1 (2%)**
>
> **Not applicable: 2 (4%)**

The Office of the Inspector General issued a May 2001 management review audit report of Sierra Conservation Center, which is situated on 420 acres near Jamestown, California, and one of only two institutions in the state responsible for the training and placement of inmates into the conservation camp program. While the institution's principal mission is to provide housing, programs, and services for minimum and medium custody inmates, it also administers 22 conservation camps — 19 camps for male inmates and three camps for female inmates — located in rural and wilderness areas. The audit identified safety and security deficiencies focused on physical conditions of the institution such as the use of privacy curtains by inmates in their living areas, gun coverage on a recreational yard, physical deterioration of prison dormitories, the need for an additional strip search facility, and the need to secure utility closets in the administrative segregation unit. The audit also found deficiencies related to the institution's inmate appeals process, inmate disciplinary system, employee grievance process, equal employment opportunity complaints, inmate death reporting, staff training, and the tracking of adverse personnel actions. As a result of its May 2001 management review audit, the Office of the Inspector General made 53 recommendations to the management of the Sierra Conservation Center.

### SUMMARY OF THE 2006 FOLLOW-UP RESULTS

The Office of the Inspector General's 2006 follow-up review found that the Sierra Conservation Center made improvements in its physical plant and operational procedures, thereby limiting the use of privacy curtains in inmate living areas, enhancing gun coverage of the recreational yard, constructing a strip search area, securing utility closets in the administrative segregation unit; and making needed repairs to inmate dormitories. The institution has also developed monitoring tools to ensure that inmate appeals and inmate disciplinary actions are processed in a timely fashion, taken steps to ensure that staff training requirements are fulfilled, improved monitoring and tracking of adverse personnel actions and employee grievances, improved organization of equal employment opportunity complaints, and improved reporting of inmate deaths.

### FOLLOW-UP RECOMMENDATIONS

**The Office of the Inspector General's 2006 follow-up review makes five recommendations to the Sierra Conservation Center, including:**

- **Continue to enforce the order that the staff remove all sheets and makeshift privacy curtains in housing units that would obstruct the view of officers.**

- **Hold managers and supervisors accountable for failure to follow through with their responsibilities.**

- **Ensure that letters of instruction are issued when merited.**

- **Maintain a tracking log with complete and up-to-date information on the disposition of letters of instruction.**

# LEO CHESNEY COMMUNITY CORRECTIONAL FACILITY

**The Office of the Inspector General found that most of the recommendations from a 2001 audit of the Leo Chesney Community Correctional Facility have been fully implemented, but that the Department of Corrections and Rehabilitation has not addressed deficiencies identified in the audit relating to the need for written policies governing investigations into alleged misconduct at community correctional facilities by non-department employees.**

| IMPLEMENTATION REPORT CARD |
|---|
| Previous recommendations: 22 |
| Fully implemented: 15 (68%) |
| Substantially implemented: 1 (5%) |
| Partially implemented: 2 (9%) |
| Not implemented: 1 (5%) |
| Not applicable: 3 (13%) |

In October 2001, the Office of the Inspector General issued an audit report of the Leo Chesney Community Correctional Facility, operated by Cornell Corrections of California, Inc. under a contract with the Department of Corrections and Rehabilitation. The California Penal Code authorizes the California Department of Corrections and Rehabilitation to establish, operate, and contract for "community correctional centers" for the housing, supervision, and counseling of inmates. The Leo Chesney Community Correctional Facility, the only facility for female inmates in the community correctional facility program, is located in the community of Live Oak, approximately 50 miles north of Sacramento.

The audit identified problems with the facility's operations and with the department's management of the facility, the most significant of which included an absence of formal policies and procedures for investigating inmate and staff misconduct; failure by the department's Office of Investigative Services to adequately respond to allegations of sexual misconduct; and a lack of clear guidelines governing the use of revenues generated from inmate telephone calls.

## SUMMARY OF THE 2006 FOLLOW-UP RESULTS

The Office of the Inspector General's 2006 follow-up review found that Cornell Corrections has improved the investigative process by developing procedures for investigating allegations of inmate or employee misconduct. These improved procedures provide for investigations of inmate misconduct to be conducted jointly by Cornell Corrections and the Department of Corrections and Rehabilitation's Office of Internal Affairs. But the department still does not have clear policies to guide the investigative process in cases of misconduct involving the contractor's employees.

The Office of the Inspector General's follow-up review also found that the Community Correctional Facility Administration provided for better approval and control of inmate telephone revenues earned by the contractor by negotiating an amendment to its contract. The amendment addresses how revenues may be spent, but does not address the ownership of any unspent balance that may remain at the end of the contract period. The department reported that this important issue will be addressed in an arrangement that will cover all future contracts. Under that arrangement, inmate telephone services will be provided through a statewide contract that will result in the state general fund being paid the telephone revenues generated under the contracts.

**FOLLOW-UP RECOMMENDATIONS**

**As a result of its 2006 follow-up review, the Office of the Inspector General makes three recommendations to the Department of Corrections and Rehabilitation which include the following:**

- **Develop and implement clear policies to guide the investigative process for investigations of misconduct at community correctional facilities by individuals who are not department employees.**

- **Continue to use the new statewide Inmate Telephone System agreement to provide inmate telephone services for all future community correctional facility contracts.**

LOCAL ASSISTANCE PROGRAM

**The Office of the Inspector General found that the Parole and Community Services Division has made significant improvements in its oversight of the Local Assistance Program, but still lacks the information technology needed to efficiently verify information on invoices submitted to reimburse local jurisdictions for services provided to state parolees.**

In January 2002, the Office of the Inspector General conducted a special review of the Parole and Community Services Division's Local Assistance Program, which reimburses local jurisdictions for the costs of detaining state parolees in local facilities. The review determined that the program had overpaid local jurisdictions $8.2 million in the previous two fiscal years by reimbursing for services at rates exceeding the maximum daily rate allowed under the State Budget Act. The review also found that the program did not adequately monitor non-routine medical services provided to state parolees in Los Angeles County and that the department's procedures for processing invoices from local jurisdictions were deficient. The Office of the Inspector General made six recommendations to the Department of Corrections to address these findings.

> **IMPLEMENTATION REPORT CARD**
>
> **Previous recommendations: 6**
>
> **Fully implemented: 4 (66 %)**
>
> **Substantially implemented: 0 (0%)**
>
> **Partially implemented: 0 (0%)**
>
> **Not implemented: 1 (17%)**
>
> **Not applicable: 1 (17%)**

SUMMARY OF THE 2006 FOLLOW-UP RESULTS

The Office of the Inspector General's 2006 follow-up review found that the Parole and Community Services Division has improved its monitoring of the Local Assistance Program. The Department of Corrections cooperated with the Department of Finance and the California Sheriffs' Association to revise the method for calculating the daily jail rate and to amend the state budget act language for reimbursement to local jurisdictions. The resulting agreement excludes non-routine medical costs from the daily jail rate calculation, while the amended budget language resolves previous confusion over interpretation of California Penal Code requirements for calculating reimbursements to local jurisdictions. The Parole and Community Services Division has also improved its procedures and monitoring efforts to reduce associated non-routine medical costs. The Parole and Community Services Division's information system, however, needs further improvement to efficiently verify and process invoices from local jurisdictions. The State Budget Act of 2005 provides for expenditures of up to $81.5 million in payments for local assistance. The department reports that its parole revocation scheduling and tracking system cannot be programmed to allow continuous tracking of the movements of individual parolees.  As a result, the parole staff cannot confirm that a parolee was detained in the local jurisdiction on an active parole hold during the period claimed.  The department reports that it is using a tracking system developed only for Parole Region III, which encompasses Los Angeles County, but has not estimated when such a system might be available statewide.

**FOLLOW-UP RECOMMENDATION**

**As a result of its 2006 follow-up review, the Office of the Inspector General recommends that the Department of Corrections and Rehabilitation continue to pursue development of an information system to improve the Local Assistance Program's invoice verification process.**

## INMATE APPEALS BRANCH

**The Office of the Inspector General found that the Department of Corrections and Rehabilitation Inmate Appeals Branch has made efforts to enhance its inmate appeals tracking system to integrate appeals at the third-level review but other department priorities have hampered its efforts.**

> **IMPLEMENTATION REPORT CARD**
>
> **Previous recommendations: 1**
>
> **Fully implemented: 0 (0 %)**
>
> **Substantially implemented: 0 (0%)**
>
> **Partially implemented: 0 (0%)**
>
> **Not implemented: 1 (100%)**
>
> **Not applicable: 0 (0%)**

A special review of the Department of Corrections Inmate Appeals Branch, issued by the Office of the Inspector General in February 2001, identified serious deficiencies in the third-level inmate appeals process. The problems had caused unacceptable delays in the processing of inmate appeals and had created a significant and growing backlog of appeals that had not been completed within the 60-day time frame required by California Code of Regulations, Title 15, which provides inmates with a system and process for filing complaints.

The process usually begins with an informal attempt to resolve the issue but can escalate to a three-step formal appeal process beginning with the institution's appeals office, which logs appeals into a database before assigning the appeal to a staff member for action. Second level appeals are typically decided by the warden or chief medical officer and third level appeals are decided by the Inmate Appeals Branch in Sacramento. In addition, the inmate appeals process is intended to serve as a vehicle for improving department policies and procedures. *The California Department of Corrections and Rehabilitation Operations Manual* specifies that the appeals process is designed to audit the internal practices and operation of the Department of Corrections and Rehabilitation to "identify, modify, or eliminate practices which may not be necessary or may impede the accomplishment of correctional goals."

In September 2004, the Office of the Inspector General conducted a follow-up review that determined the Inmate Appeals Branch had made significant progress in addressing the deficiencies identified in the February 2001 review. In particular, the follow-up review found that the Inmate Appeals Branch was meeting required deadlines in responding to third-level appeals; had virtually eliminated its former backlog of overdue appeals; and had developed a formal training manual and written guidelines for new appeals examiners. The Inmate Appeals Branch also had developed a system for tracking inmate appeals for use at all institutions, but at the time of the follow-up review, online interconnectivity between the prisons and the Inmate Appeals Branch was still in the planning stage. After its 2004 review, the Office of the Inspector General recommended that the Inmate Appeals Branch continue to work with the Information Systems Division to develop and enhance the new inmate appeals tracking system to include third-level appeals and statewide reporting of first- and second-level appeals. These enhancements are also needed to provide for a review of institution appeals and elevation of granted and partially granted appeals as a vehicle for identifying department policies and procedures needing revision.

**SUMMARY OF THE 2006 FOLLOW-UP RESULTS**

The Office of the Inspector General completed a follow-up review in 2006 and found that the Inmate Appeals Branch has made continuous efforts to enhance its inmate appeals tracking system. As recently as December 2005, the Inmate Appeals Branch reported that it was working on a feasibility study for the enhancements, which was scheduled to be completed by December 21, 2005.  But the department had not completed the study when the Office of the Inspector General's fieldwork ended in December 2005.  Notwithstanding the passage of six years, the Information Systems Division continues to assign a low priority to this project.

**FOLLOW-UP RECOMMENDATION**

**As a result of its 2006 follow-up review, the Office of the Inspector General recommends that the Department of Corrections and Rehabilitation require the Information Systems Division to either integrate the inmate appeals tracking system with the third-level appeals or contract with a private firm to do so.**

SALINAS VALLEY STATE PRISON, INMATE APPEALS AND
DISCIPLINARY PROCESSES

**The Office of the Inspector General found that the number
of overdue inmate appeals at Salinas Valley State Prison
has increased since a September 2003 review, primarily
because of a significantly higher volume of appeals from
inmates. In addition, although the institution has improved
its inmate disciplinary process, it has not developed a
corrective action plan to address deficiencies in the process
identified in the September 2003 review.**

| IMPLEMENTATION REPORT CARD |
| --- |
| **Previous recommendations: 7** |
| **Fully implemented: 3 (44%)** |
| **Substantially implemented: 1 (14%)** |
| **Partially implemented: 1 (14%)** |
| **Not implemented: 1 (14%)** |
| **Not applicable: 1 (14%)** |

In September 2003, the Office of the Inspector General
conducted a follow-up review of the inmate appeals and disciplinary processes at Salinas Valley
State Prison. Since its opening, the institution has had problems with staff turnover and inmate
unrest. Problems with inmates have led to a significant number of total or partial lockdowns,
impairing the institution's ability to provide academic and vocational programs. In response to
the problems, the Office of the Inspector General conducted an audit of the inmate appeals and
inmate disciplinary processes at the institution in March 2000. The audit found significant
deficiencies in both processes and made recommendations to correct the problems. In response to
an inmate's complaint, the Office of the Inspector General returned to Salinas Valley State
Prison during January 2003 to initiate an investigation of certain aspects of the inmate
disciplinary process. As a result of that investigation, the Office of the Inspector General found
that the prison had violated the rights of more than 80 inmates in administering the inmate
disciplinary process following an inmate work stoppage in October 2002. The Office of the
Inspector General subsequently conducted a follow-up review of the March 2000 audit to assess
the institution's progress in addressing the earlier findings. The results of the follow-up review
were published in September 2003.

The September 2003 review found that the institution had significantly improved the inmate
appeals process since the earlier audit, but that problems remained in the inmate disciplinary
process. Specifically, the Office of the Inspector General found that the inmate appeals process
had significantly improved but the Salinas Valley State Prison had made little progress in
improving its inmate disciplinary process.  The Office of the Inspector General made seven
recommendations to the management of Salinas Valley State Prison for improving the inmate
disciplinary process.

SUMMARY OF THE 2006 FOLLOW-UP RESULTS

In its 2006 follow-up review, the Office of the Inspector General found that Salinas Valley State
Prison has improved its inmate disciplinary process by requiring chief disciplinary officers to
maintain independent registry logs and to regularly audit the logs for compliance. However, the
institution has not developed a corrective action plan to address the deficiencies in the
disciplinary process identified in the September 2003 follow-up review, and the disciplinary
system procedures developed by the institution still fail to hold staff members accountable for
the quality of their work. Moreover, the Office of the Inspector General found that the number of

overdue appeals has increased since the March 2000 follow-up review. The rise in the number of overdue appeals is attributable to a significantly higher volume of appeals from inmates, the process of logging informal appeals, and a lack of staffing to handle the increase in appeals.

**FOLLOW-UP RECOMMENDATIONS**

**As a result if the 2006 follow-up review, the Office of the Inspector General recommended that Salinas Valley State Prison take the following actions:**

- **Develop an alternative method of tracking informal inmate appeals instead of logging each informal appeal in the appeals tracking system.**

- **Provide for staff accountability in the inmate disciplinary system procedures.**

- **Prepare and execute a corrective action plan to address deficiencies in the inmate disciplinary process.**

## CALIFORNIA REHABILITATION CENTER, INMATE APPEALS PROCESS

**The Office of the Inspector General found that the California Rehabilitation Center has improved its process for handling inmate appeals by maintaining adequate staffing in the inmate appeals office, providing orientation on the appeals process to new inmates, and having management monitor inmate complaints against staff. The institution continues to experience problems with transferring inmate property.**

---

**IMPLEMENTATION REPORT CARD**

**Previous recommendations: 5**

**Fully implemented: 4 (80 %)**

**Substantially implemented: 0 (0%)**

**Partially implemented: 1 (20%)**

**Not implemented: 0 (0%)**

**Not applicable: 0 (0%)**

---

In August 2000, the Office of the Inspector General completed its review of the inmate appeals process at the California Rehabilitation Center. The inmate appeals process is prescribed under Title 15 of the California Code of Regulations to provide inmates with a system and process for filing complaints. The process usually begins with an informal attempt to resolve the issue but can escalate to a three-step formal appeal process beginning with the institution's appeals office, which logs appeals into a database before assigning the appeal to a staff member for action. Second level appeals are typically decided by the warden or chief medical officer and third level appeals are decided by the Inmate Appeals Branch in Sacramento.

As a result of the August 2000 review, which was prompted by a letter from an inmate reporting a backlog in the inmate appeals process, the Office of the Inspector General found that the institution had taken action to significantly reduce the number of overdue appeals and that the backlog was manageable. The review also found that a high percentage of inmate appeals at the institution concerned the forwarding of inmate property and trust funds to other institutions. The Office of the Inspector General made five recommendations to the California Rehabilitation Center, including that it review and analyze a representative sample of appeals categorized as complaints against staff to determine the cause of their frequency and implement corrective action. In addition, the Office of the Inspector General recommended that the institution discontinue its practice of waiting for an inmate appeal from a transferred inmate before sending property to the new institution.

### SUMMARY OF THE 2006 FOLLOW-UP RESULTS

In its February 2006 follow-up review, the Office of the Inspector General found that the California Rehabilitation Center has fully implemented the recommendations to adequately staff the inmate appeals office, incorporate inmate appeals information in its orientation process, investigate increased staffing for the inmate trust fund office, and review and analyze staff complaints to identify systemic problems. The Office of the Inspector General found, however, that the California Rehabilitation Center has not adequately addressed the timely transfer of inmate property when an inmate is transferred to another institution.

**FOLLOW-UP RECOMMENDATION**

**As a result of its 2006 follow-up review, the Office of the Inspector General recommends that the California Rehabilitation Center consider initiating procedures to transfer inmate property at the time of the inmate's relocation rather than waiting for the inmate to return a form once he or she is permanently housed at another institution.**

**DEUEL VOCATIONAL INSTITUTION, INMATE APPEALS PROCESS**

**The Office of the Inspector General found that Deuel Vocational Institution has improved its inmate appeals process by implementing both of the Office of the Inspector General's recommendations from a September 2000 review. Specifically, the institution upgraded the software used for the inmate appeals tracking system and began including informal level inmate appeals in the tracking system.**

| IMPLEMENTATION REPORT CARD |
|---|
| Previous recommendations: 2 |
| Fully implemented: 2 (100 %) |
| Substantially implemented:0 (0%) |
| Partially implemented:0 (0%) |
| Not implemented: 0 (0%) |
| Not applicable: 0 (0%) |

The September 2000 review of the inmate appeals process at Deuel Vocational Institution by the Office of the Inspector General determined that the process was generally efficient and well-run, but that the computer system in the inmate appeals office needed to be upgraded with the most recent version of the inmate appeals tracking system software. The Office of the Inspector General also noted that the institution was not tracking informal inmate appeals. The inmate appeals process is prescribed under Title 15 of the California Code of Regulations to provide inmates with a system and process for filing complaints. The process usually begins with an informal attempt to resolve the issue but can escalate to a three-step formal appeal process beginning with the institution's appeals office, which logs appeals into a database before assigning the appeal to a staff member for action. Second level appeals are typically decided by the warden or chief medical officer and third level appeals are decided by the Inmate Appeals Branch in Sacramento.

The Office of the Inspector General made the following two recommendations as a result of the September 2000 findings:

- The California Department of Corrections should consider upgrading the computer system used by the institution's inmate appeals office with the most recent version of the inmate appeals tracking system software. The inmate appeals office staff also should be provided with training and manuals for the new version of the software.

- Although the institution had strong management controls that mitigated the need for a tracking system for informal appeals, the inmate appeals staff and the warden should continue to diligently monitor all informal appeals to ensure that the informal process works as designed and that a tracking system remains unnecessary.

**SUMMARY OF THE 2006 FOLLOW-UP RESULTS**

The Office of the Inspector General's 2006 follow-up review found that both recommendations issued by the Office of the Inspector General in September 2000 concerning the Deuel Vocational Institution's inmate appeals process have been fully implemented, with the institution upgrading the inmate appeals tracking system software to the current version, and instituting tracking of informal inmate appeals. Accordingly, the Office of the Inspector General makes no follow-up recommendations.

## CORRECTIONAL FACILITY MAIL PROCESSING

**The Office of the Inspector General found that the California Department of Corrections and Rehabilitation has reported making significant progress in implementing the recommendations from the July 2002 review of correctional facility mail processing. Eighty-eight percent of the recommendations have been reported as either fully or substantially implemented.**

| IMPLEMENTATION REPORT CARD |
|---|
| **Previous recommendations: 27** |
| **Fully implemented: 14 (51%)** |
| **Substantially implemented: 10 (37%)** |
| **Partially implemented: 1 (4%)** |
| **Not implemented: 1 (4%)** |
| **Not applicable: 1 (4%)** |

In July 2002, the Office of the Inspector General conducted a review to determine whether mail handling procedures and processes could be changed to improve efficiency and reduce costs while maintaining mandated service levels and institution security. Department of Corrections and Rehabilitation inmates and staff send and receive millions of pieces of mail through the U.S. Postal Service each year. Inmates consider mail a vital link to family, friends, and the outside world, as well as a vehicle for communicating with legal advisers, government officials, and clergy.

The Office of the Inspector General reviewed the California Code of Regulations, Title 15 and the correctional facility plans of operations for mail handling for nine institutions, and conducted in-depth site visits to the California State Prison, Solano; the California Institution for Men; and the California Institution for Women. As a result of its July 2002 review, the Office of the Inspector General found a number of problems, including that institutions were not taking advantage of services provided by U.S. Postal Service, some prisons were inefficient in searching incoming mail, and standard mail was often delayed by mail requiring special processing. The Office of the Inspector General estimated that implementing the recommendations at all of the department's institutions could generate $1.3 million in operational savings and provide timelier mail delivery.

### SUMMARY OF THE 2006 FOLLOW-UP RESULTS

In January 2006, the Office of the Inspector General completed a follow-up audit of the 27 recommendations issued in July 2002. The Office of the Inspector General found that implementation of the recommendations had been delayed because the previous departmental administration neglected to provide direction to the institutions on implementing the needed improvements. It was only after the Office of the Inspector General's follow-up audit that instructions and guidelines were issued to the institutions.

### FOLLOW-UP RECOMMENDATIONS

**As a result of its 2006 follow-up review, the Office of the Inspector General makes eight recommendations, including the following:**

- **The Department of Corrections and Rehabilitation ensure that California State Prison, Sacramento use automatic letter openers and that the California Institution for Men**

**and Salinas Valley State Prison develop a list of acceptable publications that can be immediately placed in housing unit mailbags.**

**PRISON INDUSTRY AUTHORITY OPTICAL PROGRAM AT THE RICHARD J. DONOVAN CORRECTIONAL FACILITY**

**The Office of the Inspector General found that the optical program laboratory at the Richard J. Donovan Correctional Facility resumed operations during August 2000. The Prison Industry Authority also implemented a process to confirm that inmates applying for jobs in the optical laboratory meet the eligibility requirements set forth in Penal Code section 5071.**

```
┌────────────────────────────────────────┐
│      IMPLEMENTATION REPORT CARD         │
│                                         │
│  Previous recommendations: 2            │
│                                         │
│  Fully implemented: 2 (100 %)           │
│                                         │
│  Substantially implemented:  0 (0%)     │
│                                         │
│  Partially implemented: 0 (0%)          │
│                                         │
│  Not implemented: 0 (0%)                │
│                                         │
│  Not applicable: 0 (0%)                 │
└────────────────────────────────────────┘
```

The Office of the Inspector General's May 2000 audit of the Prison Industry Authority optical program at the Richard J. Donovan Correctional Facility found that in May 1999, the California Department of Corrections closed the optical laboratory operation at the Richard J. Donovan Correctional Facility because inmate workers had gained access to the personal information of Medi-Cal beneficiaries. The department also closed the remaining optical laboratories until corrective action was taken and then authorized the re-opening of each optical laboratory, except the Richard J. Donovan optical laboratory, soon after the Prison Industry Authority developed new policies and procedures to prevent inmate access to sensitive information. The Office of the Inspector General evaluated the corrective action taken by the Prison Industry Authority and found that it developed new policies and procedures that could effectively prevent inmate access to Medi-Cal beneficiary information in all areas of the optical program. The Office of the Inspector General recommended that the optical laboratory at the Richard J. Donovan Correctional Facility resume full operations and that inmate workers should be screened to ensure they meet eligibility requirements.

**SUMMARY OF THE 2006 FOLLOW-UP RESULTS**

The Office of the Inspector General's 2006 follow-up review found that both of the recommendations made in May 2000 have been fully implemented and that the optical laboratory program at the Richard J. Donovan Correctional Facility re-opened during August 2000. No follow-up recommendations are made.

## KONOCTI CONSERVATION CAMP NUMBER 27

**The Office of the Inspector General found that the Department of Corrections and Rehabilitation has clarified rules and procedures governing the use of inmate labor for conservation camp work projects; has improved accountability over reimbursements for work projects; and has instituted limits on reimbursement amounts.**

In April 2001, the Office of the Inspector General conducted a special review into allegations of misappropriation of state funds and inappropriate use of inmates on work projects and in the vocational auto body program at the Konocti Conservation Camp, which was operated by the former Department of Corrections. The department jointly operates 31 fire-fighting conservation camps with the California Department of Forestry and Fire Protection. Sixteen of the camps, including Konocti, are under the direct supervision of the California Correctional Center in Susanville, which receives, houses, and trains minimum-custody inmates for placement into one of the Northern California conservation camps. As a result of the 2001 review, the Office of the Inspector General found that some of the work projects conducted by the Konocti Conservation Camp violated state laws, regulations, and department policy and that the camp had received inappropriate reimbursements for those projects. The review also determined that the management of the Konocti Conservation Camp circumvented fiscal controls, failed to maintain proper accounting for reimbursements obtained through inmate labor, and failed to observe requirements governing the vocational auto body program. The Office of the Inspector General made eight recommendations to the Department of Corrections and the Department of Forestry and Fire Protection.

| IMPLEMENTATION REPORT CARD |
| --- |
| Previous recommendations: 8 |
| Fully implemented: 5 (63%) |
| Substantially implemented: 0 (0%) |
| Partially implemented: 2 (25%) |
| Not implemented: 0 (0%) |
| Not applicable: 1 (12%) |

### SUMMARY OF THE 2006 FOLLOW-UP RESULTS

In its 2006 follow-up review, the Office of the Inspector General found that the Department of Corrections and Rehabilitation has clarified rules and procedures governing the use of inmate labor for conservation camp work projects; has improved accountability over reimbursements for work projects; and has instituted limits on reimbursement amounts. No follow-up recommendations are made.

## INDEX TO FINDING SUMMARIES

California Rehabilitation Center, Inmate Appeals Process ----------------------------------ES-48

California State Prison, Sacramento ----------------------------------------------------------ES-32

California State Prison, Solano --------------------------------------------------------------ES-30

California Substance Abuse Treatment Facility and State Prison, Corcoran-------------ES-11

Correctional Facility Mail Processing -------------------------------------------------------ES-51

Deuel Vocational Institution, Inmate Appeals Process ------------------------------------ES-50

Education Programs at Level IV Institutions------------------------------------------------ES-26

Employee Disciplinary Process --------------------------------------------------------------ES-21

High Desert State Prison ---------------------------------------------------------------------ES-34

Inmate Appeals Branch -----------------------------------------------------------------------ES-44

Konocti Conservation Camp Number 27 ----------------------------------------------------ES-54

Leo Chesney Community Correctional Facility ---------------------------------------------ES-40

Local Assistance Program --------------------------------------------------------------------ES-42

Medical Contracting Process -----------------------------------------------------------------ES-24

Office of Compliance, Audit Functions------------------------------------------------------ES-22

Office of Investigative Services--------------------------------------------------------------ES-18

Pharmaceutical Expenditures-----------------------------------------------------------------ES-16

Prison Industry Authority Optical Program at the Richard J. Donovan

    Correctional Facility ------------------------------------------------------------------ES-53

Richard A. McGee Correctional Training Center-------------------------------------------ES-28

Salinas Valley State Prison, Inmate Appeals and Disciplinary Process -----------------ES-46

Sierra Conservation Center ------------------------------------------------------------------ES-38

Valley State Prison for Women --------------------------------------------------------------ES-36

# EXHIBIT

# D

CALIFORNIA
PRISON HEALTH CARE
RECEIVERSHIP CORP.

Robert Sillen
Receiver

# Analysis of CDCR Death Reviews 2006
*Public Version*

August 20, 2007

Kent Imai, MD

Consultant, California Prison Health Care Receivership

## BACKGROUND

The CDCR Death Review Committee (DRC) is a multidisciplinary committee chaired by the Statewide Medical Director and consisting of MDs, RNs, healthcare administrators, and correctional officers. The DRC meets 2-4 times monthly to discuss and analyze each death that occurs in the CDCR. Prior to the multidisciplinary reviews, an MD prepares a written report on each death. A subcommittee with representation from mental health, nursing, and custody reviews deaths from suicide. The main DRC reviews all other deaths.

The majority of the year 2006 death review reports were prepared by CDCR QMAT physicians. A minority of the reports were prepared by the Statewide Medical Director, by the Regional CMOs, or by the UCSD contract review physicians.

Each death review report was based on a reading of the patient's available medical record. The reviewer attempted to assess the patient's entire experience with medical care during his/her period of incarceration. The reports focused specifically on the cause of death and the quality of care provided to the patient. Upon identifying significant departures from the community standard of care and potentially problematic providers, the DRC referred cases to the Professional Practice Executive Committee (PPEC) for further evaluation of the provider's fitness for continued service in CDCR. The PPEC interpretation of community standard considers what a reasonable, similarly credentialed provider would do, given the situation in which the care in question was rendered.

The death reviews were valuable in identifying potentially unsafe practitioners. As one step in its practitioner assessments, PPEC conducted pattern of practice reviews for these individuals. Typically, the reviewer assessed a large sample of patient care interactions (usually 40-60 patient charts, including the index death case and any other deaths involving the clinician) for adherence to a community standard of care. After considering evidence from multiple sources, PPEC took one of several actions:

1. Temporary restriction from practice in the CDCR, pending a complete review of the clinician's pattern of practice.
2. A program of remediation, e.g., taking a course in an area of deficiency, followed by close monitoring
3. Suspension of privileges
4. No adverse action.

Sixty-two CDCR practitioners (56 MDs and DOs and 6 Nurse Practitioners) have had adverse action taken by the PPEC, from June 2005 to July 2007.  Of these, 41 were initiated by the death reviews.

## PURPOSE

Until now, the Death Review Committee and PPEC have been focused on identifying and sanctioning individual practitioners.  There has been little or no emphasis on identifying systemic deficiencies of care and acting on them.

The purpose of this analysis is to categorize each of the 2006 deaths as non-preventable, preventable, or possibly preventable, to summarize the major lapses in care (both individual and systemic) contributing to the patient deaths, and to make recommendations for quality improvement.

## LIMITATIONS

There were significant limitations in the ability of the reviewers to conduct meaningful death reviews.

A major limitation was the absence of a well-organized, easily navigated medical record. This same limitation plagues the CDCR providers themselves during care provision.  The physician portion of the CDCR medical records includes hand-written progress notes suffering from brevity, poorly documented reasoning, and illegible handwriting. The medical records available to reviewers were often incomplete, making it difficult to determine an accurate chronology of events or to "tease out" critical pieces of clinical information.  An important laboratory or x-ray result might be misfiled, or the record might be missing recommendations of consultants or records of emergency room visits and hospitalizations.

There was variation in the quality of the death review reports, in part because of the difficulties in the medical record, and in part because there was no template or form for guiding systematic death review. Some reports were quite brief and superficial.  Others went into great detail and reflected great effort at reconstructing events and determining clinical reasoning.  There was a spectrum of fault finding.  Some reports concentrated only on proximate causes of death and did not address the possibility of an early opportunity to make a diagnosis that might have affected a patient's prognosis.  Some

reviewers focused entirely on individual culpability and did not address possible systemic issues of care.

In early 2007 the DRC created a form for reports, leading to greater uniformity. The form prompts reviewers to address nursing issues, systemic issues of care, and preventability of death, in addition to individual practitioner lapses. Only the last 20 of the year 2006 reports used this template.

The majority of deaths did not trigger autopsies. This is usual in the non-CDCR world as well, but it makes complete clinical closure elusive, especially in the cases of sudden cardiac arrest.

There are also inherent limitations in conducting a retrospective, case-based analysis such as this one. There are no established criteria for attribution of "preventability." Research in this area is primarily epidemiological, comparing actual versus expected deaths in large populations over time. A search of the medical literature revealed no case-based studies for preventable deaths in adult primary care. Such studies would be difficult precisely because creating rigorous criteria for preventability would be difficult. Another limitation of this analysis is that it depends wholly on the judgment of a single reviewer. For example, several of the sudden cardiac arrests were judged to be possibly preventable because of a failure of clinicians to evaluate symptoms of syncope or chest pain in the weeks or months prior to the patient's death. Another reviewer might have judged these deaths to have been non-preventable, because there is no assurance that a proper evaluation of these red flag symptoms would in fact have prevented the patients' deaths. Many patients who have complete cardiovascular evaluations, who receive appropriate medications and who have appropriate interventional procedures nevertheless succumb to their disease. And without an autopsy, there is less assurance that the patient had a preventable cardiovascular death. In short, there is no easy methodology that can reliably quantify preventable deaths.

Despite the limitations in the death review process, it has proven useful in identifying many egregious examples of individual errors in judgment and failures to perform commensurate with community standards. This analysis consolidates findings for the year 2006 deaths.


## DEFINITIONS

**Non-preventable**:  The health care system and individual providers probably would not have been able to prevent the patient's death.  (Homicides and drug overdoses fall here.)

**Preventable**:  Better medical management or a better system of care would have prevented death.

**Possibly preventable**:  Better medical management or a better system of care might have prevented death.

# FINDINGS

| | |
|---|---|
| **Total year 2006 CDCR deaths** | **426** |
| Suicides (not included in this analysis) | 43 |
| Execution (not included) | 1 |
| Death Reviews unavailable for this report | 1 |
| **Death reviews in this analysis** | **381** |
| Non-preventable deaths | 315 |
| Preventable deaths | 18 |
| Possibly preventable deaths | 48 |

## A.  Non-Preventable Deaths

### 1.  *Causes of non-preventable death*

| | |
|---|---|
| 105 | Cancer |
| 53 | End-stage liver disease |
| 28 | Sudden cardiac arrest |
| 17 | AIDS |
| 17 | Drug overdose |
| 16 | Congestive heart failure |
| 16 | Homicide |
| 14 | Coronary artery disease (likely higher, because over 2/3 of cases of sudden cardiac arrest are attributable in autopsy studies to CAD) |
| 11 | COPD |
| 10 | End-stage renal disease |
| 7 | Stroke |
| 6 | Pneumonia |
| 5 | Upper GI hemorrhage |
| 5 | Cocciodioidomycosis |
| 3 | Sepsis |
| 2 | Pulmonary embolism |
| 4 | 1 each of diabetic ketoacidosis, neuroleptic malignant syndrome, encephalitis, and subarachnoid hemorrhage |
| **319** | **Total**   (Of the 315 cases, several had more than one major cause of death) |

**2.** *Lapses in care in cases of non preventable death*

Lapses were noted in over half of the cases of non-preventable death. In many cases, these lapses in care may have contributed to an earlier death or more suffering in patients who had fatal diagnoses such as cancer or end stage liver, heart, or kidney disease.

| Cases | Lapses |
|---|---|
| 66 | Poor primary clinician management – includes instances of clinical inertia in response to abnormal labs or x-rays, not treating to established guidelines and targets (blood pressure, blood sugar, etc), cursory evaluation of signs and symptoms (weight loss, new dementia, syncope, "can't walk", new ascites, chest pain, abdominal pain), delayed referral to a higher level of care, illegible handwriting, poor documentation, and fragmented care |
| 15 | Poor management of terminal event, including failure to administer narcan |
| 13 | System delays - medical records, delayed access to care, delayed response to 602 appeals, delays in obtaining tests, etc |
| 13 | Delays in diagnosis |
| 9 | Patient "refusal" of care/evaluation |
| 9 | Delays in obtaining specialty referral |
| 6 | Poor "handoffs" between clinicians, including coordination between inpatient and ambulatory, or at time of inmate transfers |
| 5 | Poor palliative care |

## B. Preventable Deaths

**1.** *Causes of preventable deaths*

| | |
|---|---|
| 6 | Asthma |
| 3 | Sudden cardiac arrest |
| 2 | Congestive heart failure |
| 1 | Acute myocardial infarction |
| 1 | Duodenal ulcer, perforated |
| 1 | Hyperthermia [redacted] |
| 1 | Incarcerated hernia |
| 1 | Acute pancreatitis |
| 1 | Stroke (probable) |
| 1 | Testicular cancer |
| **18** | **Total** |

**2.** *Lapses in care in cases of preventable death*

*Asthma* –failure of clinicians to follow published guidelines and standards of care in the evaluation and management of asthma, failure of RNs to appropriately triage sick asthmatics to an MD, failure to ensure timely follow-up after treatment of an acute exacerbation, failure to recognize the volatility of symptoms , failure to refer refractory asthma to a pulmonologist, and a botched handoff in which a steroid dependent asthmatic did not receive steroids for two days following transfer from a county prison to a CDCR facility.

*Sudden death* –failure by MDs and midlevels to adequately evaluate "red flag" symptoms such as exertional chest pain, chest pain associated with dizziness, and recurrent syncope occurring weeks to months prior to death in patients with cardiac risk factors.

*Acute myocardial infarction* – failure by MD to come in while on call to evaluate a pt with hypotension and tachycardia, failure to correctly interpret new edema and shortness of breath, and an 8 hour delay in access to MD evaluation while experiencing "constant and extreme" chest pain on the day of death.

*Congestive heart failure* – midlevel practicing beyond scope of practice  in unsupervised or poorly supervised situations, botched handoff from acute hospital to CDCR facility, multiple failed appointments because of dialysis, and MD failure to entertain diagnosis of CHF in a patient with new orthopnea, exertional dyspnea and edema.

*Perforated duodenal ulcer* – failure by MDs and RNs to adequately respond to patient complaint about severe abdominal pain on multiple occasions over five days, resulting in prolonged delay in diagnosis and treatment.

*Hyperthermia* – unsafe transfer of [redacted] patient from one CDCR facility to another [redacted] resulting in death from hyperthermia.

*Incarcerated hernia* – five week delay in referral to specialist for a patient with recurrent severe abdominal pain, vomiting and known bilateral inguinal hernias.

*Acute pancreatitis* – failure of RNs and MDs to properly triage, evaluate and manage a patient who presented nine times over three days with severe "10/10" abdominal pain, resulting in prolonged delay in recognition and treatment.

*Stroke* – midlevel practicing beyond scope in poorly supervised setting who failed to evaluate a pt who had symptoms of weakness, inability to walk [redacted] and who was repeatedly known to be "down" for more than 48 hours.

*Testicular cancer* – two year delay in diagnosis of testicular cancer in [redacted] patient with chronic testicular pain, metastatic at time of  eventual diagnosis, botched transfer with inadequate information passed from

facility to facility (lost urology consult), failure of MDs to work up for cancer in a young man with 17 months of testicular pain.

## C. Possibly Preventable Deaths

### 1. Causes of possibly preventable deaths

| | |
|---|---|
| 5 | Sudden cardiac arrest |
| 4 | Coccidioidomycosis |
| 4 | AIDS |
| 3 | Acute myocardial infarction |
| 3 | Bowel perforation |
| 3 | Sepsis |
| 2 | Coronary artery disease |
| 2 | Congestive heart failure |
| 2 | Drug overdose |
| 2 | Gastrointestinal hemorrhage |
| 2 | Subdural hematoma |
| 2 | Colorectal cancer |
| 2 | Opiate toxicity |
| 12 | 1 each of COPD, gastric cancer, cholecystitis in end-stage liver disease, acute renal failure from rhabdomyolysis following trauma, cervical cancer, lung cancer,  pneumonia, aortic dissection, drug induced hepatitis, diabetic ketoacidosis, carcinoma of thymus, seizure disorder |
| 48 | **Total** |

### 2. Lapses in care in cases of possibly preventable death -

| Cases | Lapses |
|---|---|
| 30 | Errors by individual physicians, nursing and midlevel staff – includes failure to adequately evaluate clinical "red flag" signs and symptoms, (chest pain, abdominal pain , weight loss, seizures, altered mental status, fever and tachycardia, poorly resolving pneumonia, joint effusion, history of significant trauma),  failure to adequately pursue abnormal test results (leucopenia, abnormal blood sugars, abnormal radiology studies), failure to transfer patients to appropriate higher levels of care, inadequate clinical surveillance of known conditions (cervical cancer, immune compromised patients) |
| 11 | Delayed referrals for specialty care or special tests – (cardiology, gastroenterology, vascular surgery, stress tests, etc.) |
| 9 | Delays in access (delayed response to patient requests for care – "7362s") |
| 7 | Poor provider communication, including failure to act on specialist |

|   | recommendations and lost medical information when patients undergo interfacility transfers |
|---|---|
| 6 | Missed abnormal test results (chest x-rays, CT scan, blood sugars, positive stress tests) |
| 5 | Fragmentation of care, multiple providers with no individual ownership of a patient's complaint or abnormal finding |
| 3 | Poor response to emergency or "man down" situations |
| 2 | Surgical or procedural complications (colonoscopy and herniorhaphy resulting in perforated bowel) |

## DISCUSSION

## A.  Lapses in Care

Significant lapses in care were noted in more than half of the death reviews. These can be divided into individual practitioner lapses, systemic lapses, and "no-fault" lapses

### *1.  Individual practitioner errors in judgment or attitude*

- Failure to appreciate potentially serious signs and symptoms (exertional chest pain, new onset shortness of breath and dizziness, unexplained tachycardia as harbingers of cardiac events, severe abdominal pain and abdominal distention as signs of acute abdominal catastrophe, increased use of inhalers as prelude to status asthmaticus),

- Failure to tailor the pace of evaluation to the clinical situation (rectal bleeding, testicular pain,  indicating rapid workup to detect potentially curable cancers ),

- Failure to perform the basic history and physical examination,

- Failure to follow well established guidelines for care (asthma,  diabetes mellitus, hypertension, coccidioidomycosis)

- Failure to apply critical thinking or to enlist help in  difficult cases

- Superficial or no documentation to indicate thought processes.

- Failure to take individual responsibility for patient outcomes

### *2.  Systemic lapses*

- A system that allows delays in triaging and processing patient requests for care resulting in patients with red flag symptoms not being evaluated in a timely manner.

- A system that allows fragmentation of care and clinical inertia, leading to lack of individual practitioner responsibility and accountability for each patient.

- Systemic and pervasive prolonged delays in specialty referrals

- No system for flagging abnormal test results,

- Incomplete medical records

- Poorly managed transfers of care – when patients move from one facility to another, there is increased risk of medical error.

- Practices which place mid level providers in vulnerable clinical situations, poorly supported or unsupported, with little or no mentoring.

- Practice environments (noisy, unkempt, crowded, lacking privacy) and patient characteristics (high rate of dual diagnosis, chronic pain, and manipulation for secondary gain) and other cultural factors which promote practice isolation and discourage collegiality and professionalism.

### 3. "No-fault" lapses

- Patient "non-adherence" to suggested treatment

- Patient "refusal" of care or evaluation (sometimes masking frustration with the system of care or reflecting poor provider – patient communication)

## B. Trends in Preventable Deaths Over Time

There was no clear trend indicating an increase or decrease in the number of preventable deaths over time.  Unlike the situation in hospitals, in which quality improvements can lead to aggregate decreases in mortality within the space of a year, improvements in primary care may take longer before yielding mortality decreases.

| Month | Deaths | Preventable | Possibly preventable | All preventable and possibly preventable deaths |
|-------|--------|-------------|----------------------|--------------------------------------------------|
| January | 42 | 0 | 3 | 3 |
| February | 35 | 3 | 4 | 7 |
| March | 46 | 1 | 4 | 5 |
| April | 31 | 1 | 8 | 9 |
| May | 36 | 1 | 4 | 5 |
| June | 39 | 0 | 6 | 6 |
| July | 40 | 2 | 3 | 5 |
| August | 36 | 2 | 1 | 3 |
| September | 25 | 1 | 3 | 4 |
| October | 32 | 3 | 6 | 9 |
| November | 32 | 0 | 3 | 3 |
| December | 29 | 4 | 3 | 7 |

## C.  Comment on CDCR Environment of Care

CDCR medical staff has been working in an environment of care characterized by crowded and poorly equipped clinical areas.  The medical record systems are outdated and medical information is difficult to retrieve.  The dispensing of prescribed drugs is often delayed, and there is an unreliable system for refilling medications for the treatment of chronic medical diseases such as diabetes, hypertension, asthma and coronary heart disease.  The drug profile information is unreliable.  Practices in many of the prisons focus on episodic care rather than continuity of care and preventive medicine.  The environment does not guarantee patient confidentiality, and the culture does not promote patient advocacy.

The patient population has a number of unfavorable characteristics, such as a high incidence of dual diagnosis (serious mental illness coexisting with physical illness), chronic hepatitis, HIV infection, drug and alcohol addiction, and skillful manipulation for secondary gain.

Despite these barriers, it is noteworthy that 167 of the death reports contained no serious lapses in medical care.  This is a reassuring indication that there are many conscientious providers and RNs who are doing a good job despite the environment in which they find themselves.

## RECOMMENDATIONS

The CDCR must create a culture of patient safety, in which clinicians readily identify mistakes and system vulnerabilities and in which all staff share in the responsibility for optimal patient outcomes. Systems should be reviewed or redesigned to support this end.

To that end, the Death Review Committee should continue in on-going fashion the analyses piloted in this analysis, identifying not only individual performance issues but also the most common systemic lapses in care.  The Committee should begin to standardize a list of the lapses and vulnerabilities that contribute to preventable deaths.  The Joint Commission provides examples of how to proceed in this area, e.g., in categorizing the causes of sentinel events or specifically the causes of delays in treatment (see the Sentinel Event Alert of June 17, 2002).  The Committee should continue its efforts to standardize its methodology for classifying preventable deaths.

These overall recommendations and most of the specific recommendations which follow are contained in Goals B, C, and D of the California Receiver's Plan of Action of May 2007 (POA).  Where applicable, relevant POA goals and objectives follow each numbered recommendation below.

1. Continue PPEC evaluation of individual practitioners referred by the Death Review Committee.

2. Develop and circulate a Clinical Newsletter in order to improve communication, educate CDCR providers about important findings of the Death Reviews and to make meaningful clinical suggestions for improving care. (C.8.1, A.8.5.2)

3. Develop a system wide quality initiative focusing on the management of asthma. (B.2.5, B.2.6.1)

4. Develop system-wide quality initiatives on the recognition and management of "red flag" clinical signs, and other subjects, using death review cases as indicators. (C.1.1, C.1.2, C.6.1)

5. Pilot practitioner "daily reports" at each prison for purposes of peer collaboration and discussion of problem cases, mistakes, "near misses," cases of patient non-adherence or refusal of care, local system process redesign, development of collegiality, and shared responsibility for patient care. (C.5, C.6, C.8)

6. Redesign CDCR processes for mid-level credentialing, privileging, supervision and mentoring. (A.8.5)

7. Redesign CDCR systems of care (including scheduling) to promote individual and shared responsibility for patient care outcomes, and to reduce fragmentation of care wherever possible. (B.3)

8. Redesign process of RN triaging of form 7362s to eliminate delays in care. (B.7.1, C)

9. Develop systems for tracking and following up abnormal laboratory and other test results. (B.12.1, B.12.2)

10. Create new templates for managing requests for specialty services in order to meet minimum standards for emergency (24 hour) urgent (7-14 day) and routine (60 day) priorities, and to ensure that consultation results are seen by ordering clinicians within one week of service. (B.3.1.8)

11. Review process for response to emergencies. (B.1)

12. Design and implement system-wide integrated health information systems. (goal D)

13. Redesign the environment of care to promote efficiency, teamwork, professionalism, and respect for patients, creating an ethically-based system of care. (B.3, B.10)

14. Wherever applicable, develop the standard quality metrics to support the foregoing recommendations. (POA, page 47)