PRISON LAW OFFICE
DONALD SPECTER, Bar No. 83925
STEVEN FAMA, Bar No. 99641
E. IVAN TRUJILLO, Bar No. 228790
SARA NORMAN, Bar No. 189536
ALISON HARDY, Bar No. 135966
REBEKAH EVENSON, Bar No. 207825
1917 Fifth Street
Berkeley, CA 94710
Telephone: (510) 280-2621

ROSEN, BIEN & GALVAN, LLP
MICHAEL W. BIEN, Bar No. 96891
JANE E. KAHN, Bar No. 112239
AMY WHELAN, Bar No. 215675
LISA ELLS, Bar No. 243657
MARIA V. MORRIS, Bar No. 223903
315 Montgomery Street, 10th Floor
San Francisco, California 94104
Telephone: (415) 433-6830

KIRKPATRICK & LOCKHART PRESTON
GATES ELLIS LLP
JEFFREY L. BORNSTEIN, Bar No. 99358
EDWARD P. SANGSTER, Bar No. 121041
RAYMOND E. LOUGHREY, Bar No. 194363
55 Second Street, Suite 1700
San Francisco, CA 94105-3493
Telephone: (415) 882-8200

BINGHAM, McCUTCHEN, LLP
WARREN E. GEORGE, Bar No. 53588
Three Embarcadero Center
San Francisco, California 94111
Telephone: (415) 393-2000

THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
CLAUDIA CENTER, Bar No. 158255
600 Harrison Street, Suite 120
San Francisco, CA 94107
Telephone: (415) 864-8848

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURTS

FOR THE EASTERN DISTRICT OF CALIFORNIA

AND THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

| | |
|---|---|
| RALPH COLEMAN, et al., <br><br> Plaintiffs, <br><br> vs. <br><br> ARNOLD SCHWARZENEGGER, et al., <br><br> Defendants | No.: Civ S 90-0520 LKK-JFM P <br><br> **THREE-JUDGE COURT** |
| MARCIANO PLATA ,et al., <br><br> Plaintiffs, <br><br> vs. <br><br> ARNOLD SCHWARZENEGGER, et al., <br><br> vs. <br><br> Defendants | No. C01-1351 TEH <br><br> **THREE-JUDGE COURT** <br><br> **DECLARATION OF JEANNE WOODFORD IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AND/OR MOTION FOR SUMMARY JUDGMENT / ADJUDICATION** |

[241784-1]

1        I, Jeanne Woodford, declare as follows:

2        1.      I make this declaration in support of "Plaintiffs' Opposition to Defendants'

3    Motions for Dismissal or, Alternatively, for Summary Judgment or Summary Adjudication." I

4    have personal knowledge of the matters set forth herein and if called as a witness, I could and

5    would competently so testify.

6        2.      I have been retained by Plaintiffs to testify as an expert witness in this matter. I

7    have prepared two expert reports which, pursuant to the court orders governing this

8    proceeding, are my direct testimony at trial.

9        3.      On November 6, 2007, I prepared my first report. Attached as **Exhibit A** is a

10   true and correct copy of my November 6, 2007 report.

11       4.      On August 15, 2008, I prepared a supplemental report. Attached as **Exhibit B** is

12   a true and correct copy of my August 15, 2008 supplemental report.

13       5.      I am informed and believe that copies of my reports were served on all parties to

14   the Three-Judge Court matter on November 6, 2007 and August 15, 2008, respectively.

15       I declare under penalty of perjury that the foregoing is true and correct, and that this

16   declaration was executed this 25th day of September, 2008, in Benicia , California.

17

18

19                                                        Jeanne Woodford

20

21

22

23

24

25

26

27

28

-1-

# EXHIBIT

# A

# REPORT OF JEANNE WOODFORD

COLEMAN v. SCHWARZENEGGER et. al.,
No. CIV S-90-0520 LKK JFM P

PLATA v. SCHWARZENEGGER et. al.,
No. C01-1351 THE

THREE-JUDGE COURT

NOVEMBER 9, 2007

# TABLE OF CONTENTS

A.  Background and Introduction...................................................1

B.  Causes and Effects of Overcrowding.........................................3

C.  The State's Inadequate Response to Overcrowding: AB 00..............10

D.  Communications with the Governor and His Staff on
    Overcrowding..............................................................13

E.  Conclusion.................................................................15

*Plata v. Schwarzenegger; Coleman v. Schwarzenegger*
**REPORT OF JEANNE WOODFORD**

## A. Background and Introduction

1. I received my B.A. from Sonoma State University in 1978. I became a correctional officer at San Quentin in 1978. I worked for the California Department of Corrections and Rehabilitation (CDCR) for the next 27 years in various custodial and management positions. While at San Quentin, I rose through the ranks, eventually becoming the Warden from 1999 to 2004. In 2004 Governor Schwarzenegger appointed me as the Director of what was then the Department of Corrections. In 2005 he appointed me to be the Undersecretary for the CDCR and then the acting Secretary of the Department. I retired from the CDCR in July of last year. Since November 1, 2006, I have been the Chief Probation Officer for the City and County of San Francisco. A complete description of my educational and employment background is set forth in my resume, which is attached as Appendix A.

2. All of my positions with the CDCR have included health care related tasks. While a correctional officer, one of my responsibilities was to escort prisoners to their medical or mental health appointments. As a supervisor in housing units, I was responsible for ensuring that correctional officers did the same. As a correctional counselor, I advocated for prisoners to be examined by physicians. As a manager at San Quentin and the CDCR I worked with health care staff, and court appointed personnel on the improvement of the health care delivery system both at San Quentin and in the Department generally through both *Coleman* and *Plata*.

1

3. I have been asked by attorneys for the Plaintiffs in both of these cases to describe my observations of the effects of overcrowding on the delivery of medical and mental health care to prisoners and whether in my opinion overcrowding is the primary cause of the constitutional violations, and, if so, whether other orders would effectively address the severe problems that plague the CDCR. I agreed to describe my observations and express my opinions, but I will not accept any compensation for doing so.

4. In preparation for this report I have reviewed the following documents: Governor Schwarzenegger, *Prison Overcrowding State of Emergency Proclamation* (October 2006); Office of Inspector General, *Special Review into the California Department of Corrections and Rehabilitation's Release of Inmate Scott Thomas* (October 2007); Little Hoover Commission, *Solving California's Corrections Crisis: Time is Running Out* (January 2007); Assembly Bill 900; *Toussaint v. McCarthy*, 597 F. Supp. 1388 (N.D. Cal. 1984); CDCR, *Fall Adult Population Projections* (October 2007); Office of the Inspector General, *Special Review into In-Prison Substance Abuse Programs Managed by the California Department of Corrections and Rehabilitation* (February 2007); Expert Panel, *A Roadmap for Effective Offender Programming in California* (June 2007).

5. In the last four years I have testified as an expert witness in a trial involving death row in Ohio.

6. My observations are set forth below. My opinion is that overcrowding is the primary cause of the constitutional violations, and nothing short of a reduction in the

2

prison population will effectively address these issues.

### B. Causes and Effects of Overcrowding

7.  When I began employment as a correctional officer there were fewer than 30,000 prisoners in 12 state prisons.  In the early 1980s, the prison population began to grow, and as a result the then existing prisons, including San Quentin, began to increase the use of double celling, to house prisoners.  I saw first hand the effects of overcrowding on prisoners, staff and the prison's infrastructure.

8.  The increase in the prison population created problems in virtually all areas. Overcrowding caused the prison to be more dangerous for both prisoners and staff.  The environmental conditions deteriorated to the point where they posed health and safety risks to everyone living and working in some housing units.  Violence increased among prisoners, putting prisoners and staff at a greater risk of harm.  Crowding also put a tremendous strain on the prison's ability to deliver adequate services, particularly medical and mental health care to prisoners.

9.  It was not long before lawsuits were filed, challenging these terrible conditions. Two cases, *Wilson v. Deukmejian* and *Toussaint v. McCarthy*, resulted in orders not to double cell prisoners.  Another case, *Marin v. Rushen*, was settled with an agreement to provide enhanced medical and mental health services to prisoners.  In the *Toussaint* case, the Court found that overcrowding "strains all environmental systems within the institution, and makes it difficult to provide decent conditions of confinement to lockup inmates." *Toussaint v. McCarthy*, 597 F. Supp. at 1405.  I agree, although I believe the

3

Court understated the challenges posed by severe overcrowding, perhaps because the lockup units at that time were only 140% overcrowded.

10.  Overcrowding of the magnitude currently existing in the CDCR is unprecedented in my experience.  I do not know of another state prison system that approaches this level of crowding.  In my opinion, it is all but impossible to safely and humanely incarcerate this many prisoners within the existing facilities.

11.  **Management.**  The CDCR lacks an effective management structure, it has insufficient management information systems to provide accurate data to managers, and it lacks sufficient number of personnel who have the necessary skill and training to manage such a large and complex organization.

12.  Overcrowding exacerbates the weaknesses in the organizational structure of the CDCR.  There are simply too many issues that arise from such a large number of prisoners and staff.  One result of this is that management spends virtually all of its time fighting fires instead of engaging in thoughtful decision-making and planning.  This results in short-sighted decisions that create even more crises.  Under these circumstances, it is virtually impossible for the organization to develop, much less implement, a plan to provide prisoners with adequate care.

13.  **Transfers/Classification.**  Overcrowding limits the CDCR's ability to get prisoners to the right prison for treatment.  The health care needs of prisoners do not take place in a vacuum.  The CDCR employs an objective classification system that assigns prisoners points based on the length of their sentence, their disciplinary history and other

objective factors. Based on the number of points, prisoners are classified into one of four levels. The level of classification determines which prisons prisoners can be transferred to. In addition, many prisoners have other special needs, such as for protective custody, gang association or dual diagnosis. All of these factors limit the places that prisoners can be housed. Since crowding fills any available space, there is insufficient flexibility in moving prisoners so that their health care and other needs can be met. For example, crowding causes delays in moving reception center prisoners to other prisons for treatment. Instead, many parole violators end up serving their entire sentence in reception centers, which are not designed for, nor capable of, providing the appropriate treatment.

14. To manage the movement of prisoners appropriately, five percent of housing should be vacant. Without the flexibility that this vacancy rate provides, it is very difficult to ensure that prisoners are housed appropriately for their medical and mental health needs.

15. **Staffing.** A prison cannot function without adequate custodial staff. Custodial staff are essential to providing health care to prisoners because they supervise prisoner movement to and from medical appointments, they escort prisoners to services within an institution and they provide supervision when prisoners are taken out of the prison to medical appointments, hospitals or they are transferred to another institution. In California there is not enough correctional staff to provide prisoners with timely access to care and still perform other essential functions.

5

16. Despite relatively high salaries, it is difficult to recruit enough correctional officers. While I was in the central office, we tried to step up recruitment efforts but we could not get enough applicants that passed the security and background checks and then made it through the academy to fill all our authorized positions. At San Quentin, for example, even when new recruits were added the effect was often temporary because after a short time correctional officers transferred to other prisons in more desirable, less expensive locations. In addition, the least experienced staff would often have to work the most difficult positions because union rules permitted personnel to bid on 70% of the open positions. When I visited the Correctional Training Facility at Soledad, for example, I found a lone correctional officer in a housing unit who told me that he could not search cells (a basic safety requirement) while prisoners were in the housing unit. When I asked what his supervising sergeant thought about this, he responded that there was no sergeant because it was the least desirable of the units at CTF.

17. The number of authorized positions is grossly inadequate to provide sufficient staff to meet all of the prisoners' basic needs. For example, there are often only two officers to supervise 200 prisoners in a gym or a dorm. This is extremely dangerous for both the prisoners and the staff because line of sight supervision is impossible under these circumstances and it does not permit the staff the time to recognize that prisoners are in trouble from any number of causes, including medical or mental illnesses.

18. Inadequate staff has created dangerous conditions for both the staff and prisoners. To be effective, correctional officers must interact with prisoners. This

6

communication reduces tension and violence in the unit, and it often allows the staff to know when a prisoner has a medical or mental health issue. Generally, there is not enough prisoner-staff interaction in the CDCR because of the staffing shortages and the insufficient number of staff positions in many of the housing units.

19. The danger to prisoners is enhanced because the correctional staff frequently is forced to work mandatory overtime. Some staff work back-to-back double shifts and would sleep in their cars in the prison parking lot instead of making the long commute home. Officers who are tired and suffer from low morale are often less productive and do not fulfill all their responsibilities to provide for the basic needs of prisoners. Such officers will be less responsive to prisoners who need escorts to medical or mental health services and will be less likely to recognize signs and symptoms of mental illness or manifestations of suicidal ideation.

20. At Corcoran and SATF two tragic cases illustrated the problem. One prisoner literally starved to death and another bled to death. Many officers were in the unit at the time these events occurred. It is inconceivable to me that officers who were properly supervising the prisoners in their care would not notice such obvious events.

21. The tragic effects of overcrowding reach into the community. The case of Scott Thomas exemplifies the unreasonable demands placed on staff when the prisons are so overcrowded. Scott Thomas was mistakenly released on parole on May 18, 2007 and allegedly entered a San Francisco bakery and stabbed a 15 year-old girl and a man who came to her aid.

7

22. San Quentin staff made three fundamental errors when processing this case. First, they confused Scott Thomas with another prisoner, Steve Thomas, who was a different race, 16 years younger and 40 pounds lighter. Second, in 2002 the CDCR designated Thomas as "high control", which requires the Department to take additional precautions, such as close supervision, when releasing such prisoners on parole. No such precautions were taken despite prominent documents to that effect in his prison file. Third, staff violated clear CDCR policy that required the release of a prisoner serving a term in the security housing unit directly to a parole agent.

23. Although it is clear that individuals did not comply with CDCR policy, the inappropriate release of Thomas is really a system failure because the people doing the work have an impossible mission. Having been a correctional counselor with similar responsibilities, I know from first hand experience that there is not enough time for the Correctional Counselor III to review 150 to 200 cases per week and do their job properly. Nor is there sufficient trained records staff to complete adequate review of cases for parole or other legal releases.

24. **Lockdowns.** Lockdowns exacerbate the overcrowding crisis because they are staff intensive and inhibit the delivery of services to prisoners. When I became the Director I was shocked by the number and durations of lockdowns. A recent state-sponsored study of lockdowns recognized the direct relationship between overcrowding and lockdowns: the "other side of the overcrowding coin is that when wardens implement security lockdowns, they usually shut down all programming in the affected areas. Not

8

only is this disruptive to programming but, the Panel believes the number and duration of lockdowns in California prisons is excessive." Expert Panel, *A Roadmap for Effective Offender Programming in California*, at viii.

25. Lockdowns make the delivery of medical and mental health particularly difficult because staff must escort prisoners to every service or bring the service to them. The CDCR prisons are not staffed for that. In my experience, mental health services were at times cancelled because of lockdowns or other emergencies, and officers would only escort prisoners with urgent medical conditions.

26. Lockdowns increase the risk that a prisoner will not get treatment in an emergency because prisoners are dependent on the correctional officer to properly convey the medical problem to medical staff and then be able get an escort to the clinic. Conversely, there is an extra burden on medical staff because they may be required to travel to the housing unit.

27. Lockdowns also adversely affect some prisoners' mental health. I have observed many prisoners who have been locked in their cells for long periods of time deteriorate right before my eyes. Their skin becomes ashen, their ability to communicate is reduced and sometimes they are not oriented to time and place.

28. **Clinical Space**. California's prisons were not built with sufficient space for medical and mental health services. Space for mental health facilities is a particular concern because of all the activities that are required by the *Coleman* program guides. To meet the demands for space the CDCR was constantly trying to shoehorn mental health

facilities into areas that were not designed for such activities. Not only did this make an imperfect fit for the space, but it also resulted in the loss of space for other programs.

29. **Old and Deteriorating Prisons**. Many of the existing facilities are too old and decrepit to provide humane housing. Among those include parts of the Correctional Training Facility, Deuel Vocational Institution, San Quentin, the California Mens Colony, Folsom, the California Rehabilitation Center and the Correctional Conservation Center.

30. When I visited prisons during my tenure as Director at times the noise levels were so bad that it was enough to drive a sane person crazy. In some units, like Palm Hall for example, staff found it unbearable to remain inside the unit for more than a few minutes.

**C.  The State's Inadequate Response to Overcrowding: AB 900**.

31. Assembly Bill 900 is not the right solution for the overcrowding crisis. AB 900 essentially is a prison expansion measure which increases the number of prison cells without addressing the fundamental structural issues that have caused the crisis and that have created unconstitutional conditions within the prisons. It is not consistent with the recommendations of the report of the Expert Panel on Corrections Reform as well as other similar reports. See Expert Panel Report at 77 (summarizing recommendations of previous reports).

32. AB 900 does nothing to limit the growth of the prison population. According to the CDCR's latest projections, the population will increase by another 10,000 prisoners

by 2010. This confirms my belief that California cannot build its way out of this crisis.

33.   AB 900 relies heavily on the assumption that there will be a reduction in recidivism through rehabilitative programs in the planned reentry facilities. That assumption is wrong. CDCR paroles 10,000 prisoners per month. Sixty percent of those parolees serve an average of 4.5 months, and 69% of first time parolees serve less than a year. Not only is this precious little time to promote effective rehabilitation, but I agree with the Little Hoover Commission that these "short prison stints" have no effect on public safety. "[T]hey . . . disrupt families and communities where these offenders come from and return to, and diminish the potential for offenders to get and keep jobs, maintain housing and become law-abiding citizens." Little Hoover Commission, *Solving California's Corrections Crisis*, at 27.

34.   Effective rehabilitation assumes that the Legislature and Governor will appropriate enough money for effective programs. This fiscal year the legislature enhanced the budget for programs by only approximately $50 million. By any measure, this paltry figure demonstrates a lack of commitment to rehabilitation in a system this large with an annual budget of almost $10 billion. In my experience, in tight fiscal times the first thing to go in corrections is money for rehabilitative programs.

35.   I witnessed the destruction of most rehabilitation programs during the early 1990s, from which the department has never recovered. With a California budget deficit expected to reach over $8 billion next year, I do not believe that the state legislature's monetary commitment will be any greater and probably much less.

11

36. AB 900 relies heavily on the construction of 32 reentry facilities located in urban areas to provide rehabilitation. Since many, if not most, of the prisoners will spend only a short time in these facilities, I doubt it will be very effective in reducing recidivism. In addition, it is extremely unlikely that the CDCR will be able to site 32 of these facilities in local communities, especially in urban centers.

37. In the unlikely event that these facilities are built, I question whether they will ever be adequately staffed or managed. Since the CDCR cannot effectively manage or staff its existing 33 prisons, doubling the number of prisons will only aggravate the problems.

38. The Inspector General recently audited the substance abuse treatment provided by the CDCR. He concluded that the effort was a "$1 billion failure—failure to provide an environment that would allow the programs to work; failure to provide an effective treatment model; failure to ensure that the best contractors are chosen to do the job at the lowest possible price; failure to oversee the contractors to make sure they provide the services they agree to provide; failure to exert the fiscal controls necessary to protect public funds; failure to learn from and correct mistakes—and most tragically, failure to help California inmates change their lives and, in so doing, make our streets safer." Office of the Inspector General, *Special Review into In-Prison Substance Abuse Programs Managed by the California Department of Corrections and Rehabilitation*, at 5. Nothing that I now know suggests that the CDCR is any more capable of reducing recidivism through these or any other programs. In fact my experience with the

12

leadership of the CDCR suggests the opposite. When I was the Acting Secretary of the CDCR, I adopted a goal of reducing the recidivism rate by 10% by 2010. When I stepped down from this position that goal was rescinded. The Secretary informed me that he had rescinded that goal because he believed it was risky to set such a goal. Throughout my career I have found the leadership unwilling to be accountable for the outcome of prisoner programs.

39. The so-called "in-fill" beds will cause more problems than they will solve. Many of California's prisons are so big that they are effectively unmanageable. Wardens and other administrators spend much of their time responding to crises, rather than fulfilling their responsibilities to provide adequate medical and mental health care. Unless these in-fill beds stand alone with their own administrative and support facilities, adding thousands of additional prisoners to already overburdened facilities will only compound the burdens imposed on prison administrators and line staff.

### D. Communications with the Governor and His Staff on Overcrowding

40. When the Governor offered to appoint me as acting Secretary of the CDCR, I asked him whether we could meet to discuss the direction that I wanted to pursue for the Department. He agreed to meet the next week, but despite several attempts, I never met with him again until the day I resigned.

41. I wanted to meet with the Governor to make sure that I would have his support for the initiatives I believed were necessary. I particularly wanted to talk to him about sentencing reform because I believed that the population pressures were going to

13

continue and that the state could not build its way out of this problem.

42. I did subsequently meet with Ms. Kennedy, the Governor's Chief of Staff, and Fred Aguiar, the Governor's Cabinet Secretary, and informed them that I could not accept the position as Secretary until I had an opportunity to discuss my plans with the Governor. I told them about the population pressures and my position on sentencing reform. Ms. Kennedy said that she wanted to give the issue some thought, but never discussed this issue with me again until the day I resigned.

43. I finally met with the Governor in his smoking tent after I told Mr. Aguiar that I planned to resign. I told the Governor that the state did not have a plan to address the population pressures. In a prior meeting with the Governor as the Undersecretary of the CDCR the Governor asked me if I thought we needed more prison beds. I replied no, unless it is to replace existing capacity. I explained that California has more prisoners than Texas, yet Texas has over one hundred prisons and California has only 33. I informed the Governor that California had built very large prisons that were designed to warehouse inmates. These large prisons are very difficult to manage and do not provide enough space for programs and services.

44. During my meeting with him on the day I stepped down as acting Secretary of the CDCR I explained that we could not build our way out of the overcrowding problem and that we needed sentencing reform. I also explained to him that we parole about 70,000 parole violators per year who serve twelve months or less and that this revolving door created population pressures. I also told him that dangerous offenders were being

released without any treatment or program, and that this crisis was jeopardizing public safety. In addition, I explained that low level offenders could receive programs in the community that would cost less and be more effective than the prison programs. Governor Schwarzenegger said that this all sounded reasonable, but Ms. Kennedy reminded him that it was an election year and the meeting ended shortly thereafter.

45. It was obvious to me at that time that in order to run an organization this large with such complex, high profile problems, the CDCR Secretary must have meaningful access to and the support of the Chief Executive. He is the only one who can make the tough, politically sensitive decisions that are necessary to alleviate the crisis. Since it was obvious that I was not going to have this necessary access and it was evident to me the Governor was not going to address the issues in a way I thought would address the prison overcrowding problem, I resigned my position as acting Secretary.

### E. Conclusion

46. The Governor's October 4, 2006 emergency proclamation recognized that California's prisons are severely overcrowded, creating "extreme peril" to the health and safety of prisoners and that "the magnitude of the circumstances exceeds the capabilities of the services, personnel, equipment, and facilities. . . ." I agree. Until the population is reduced substantially there is no realistic hope that the unconstitutional conditions will be eliminated.

Dated: November 9, 2007

Jeanne Woodford

15

# APPENDIX A

# *Jeanne S. Woodford*

*Work: (415) 553-1688*

OBJECTIVE:

*To utilize education and career experience to benefit the Department of Corrections and Rehabilitation.*

EDUCATION:

*1974 - Associate of Arts Degree*
*Santa Rosa Junior College*
*Santa Rosa, California*
*Liberal Arts*

*1978 - Bachelor of Arts Degree*
*Sonoma State University*
*Rohnert Park, California*
*Criminal Justice, emphasis on Psychology and Sociology*

CAREER EXPERIENCE:

*11/01 /06*
*Department*

*Chief Adult Probation Officer, San Francisco Adult Probation*

*Direct responsibilities include the proper administration of the Adult Probation Department; formulates policies and plans and develops methods and procedures for the rehabilitation of adult probationers; manages the budgetary and fiscal activities and services of the entire organization, making continuing high-level contacts with the welfare of adult probationers; directs the preparation, approval, review and maintenance of important records and reports affecting all operations of the department; cooperates with various social agencies, law enforcement bodies and interested persons and groups in programs of crime and delinquency prevention.*

*07/05/05*

*Appointed by Governor Arnold Schwarzenegger as Undersecretary of the California Department of Corrections and Rehabilitation (CDCR).*

*Key responsibilities include advising the Secretary on major policy, program and organization issues; during the Secretary's absence acting for and representing the Secretary in a variety of areas with the Legislature, Governor's Office, Department of Finance, other state and federal agencies, local government, and constituent groups; representing the CDCR on all policy and program matters in response to inquiries from the press, the State Legislature, and the public; reviewing and approving proposed administrative regulations of the CDCR; advising the Secretary on decisions of the state and federal courts affecting the CDCR; and providing administrative direction, and supervision to all CDCR staff. For significant periods of time, appointed as Acting Secretary.*

*02/23/04*                    ***Appointed Director, Department of Corrections***

*Responsible for the administration of 32 State prisons, 38 conservation camps, more than 185 parole units, and contracts with 50 public or private community-based facilities or centers. Also, responsible for managing and operating budget of $5.3 billion (fiscal year 2003-2004). In this capacity, also serve as the Chair, Prison Industry Board, am an acting member of the Board of Corrections, which oversees local juvenile halls and county jails; and serve as a member of the California Council on Criminal Justice.*

*06/22/00*                    ***Appointed Warden, San Quentin State Prison***

*02/99 to 6/00*              ***Warden (a)***
                                   ***San Quentin State Prison***

*Directly responsible for the overall operation of San Quentin State Prison. San Quentin has three primary missions: Reception Center, condemned housing, and a level II general population. San Quentin has a budget of 110,000,000. San Quentin houses 5,800 inmates and has a work force of 1,500 staff.*

**RESUME**
**JEANNE S. WOODFORD**
**Page 2**

*08/97 to 02/99*            ***Chief Deputy Warden***
                                   ***San Quentin State Prison***
                                   ***San Quentin, CA 94964***

*Directly responsible for the day to day operation of San Quentin, including 1,500 staff and an inmate population of 6,000. Responsible for managing a one hundred ten million ($110,000,000.) budget.*

*04/96 to 8/97*             ***Associate Warden***
                                   ***Correctional Facility***
                                   ***San Quentin State Prison***
                                   ***San Quentin, California 94964***

***Directly responsible for managing San Quentin's Central Services Division. Primary responsibility for perimeter security, yards, gates, wall posts, dining hall, Receiving and Release and visiting and mail programs. Direct supervision of Central Services Captain. Indirect supervision of 345 custody staff. Additional responsibilities include the position of San Quentin's Equal Employment Opportunity (EEO) Coordinator.***

*04/95 to 04/96*           ***Facility Captain***
                                   ***Correctional Facility***
                                   ***San Quentin State Prison***
                                   ***San Quentin, California 94964***

***Directly responsible for managing San Quentin's Reception Center, consisting of 3,000 inmates, including a 150-man HIV positive unit. Direct supervision of Correctional***

*Counselors II and Correctional Counselors I, as well as Reception Center custody staff.*

*02/93 to 04/95*  **Program Administrator**
       **Correctional Facility**
       **San Quentin State Prison**
       **San Quentin, California 94964**

**Directly responsible for managing San Quentin's Reception Center, consisting of 3,000 inmates and a Reception Center records office; a 150-man HIV positive unit and San Quentin's main records office.**

*07/91 to 02/93*  **Program Administrator**
       **Correctional Facility**
       **San Quentin State Prison**
       **San Quentin, California 94964**

*Directly responsible for managing North Block, an orientation/general population housing unit with a bed capacity of 826 inmates; responsible for 32 uniform/non-uniform staff; chair initial and routine classification committees; established inmate programs; monitoring and enforcing appropriate security measures; establishing staff development; ensuring due process compliance for both staff and inmates.*

*12/90 to 07/91*  **Program Administrator**
       **Institutions Services Unit**
       **California Department of Corrections - Headquarters**
       **Sacramento, California 94283**

**Directly responsible for monitoring and managing the litigation filed against the California Department of Corrections. In addition, I was responsible for projects aimed at preventing litigation such as the CIW health care study. Also, I was responsible for development of the Litigation Management Plan for the Department.**

*06/90 to 12/90*  **Correctional Counselor III**
       **Correctional Facility**
       **San Quentin State Prison**
       **San Quentin, California 94964**

**Directly responsible for the operation of the Reception Center Records Office. Monitor activities of Parole Revocation Unit relative to timeliness of revocation hearings. Act as liaison with other agencies and other institutions to coordinate transfers for out to court, medical and psychiatric cases. Monitor of overall production and quality control of cases from reception to transfer. Direct supervision of four Correctional Counselors II and One Case Records Manager. Indirect supervision of 21 Correctional Counselors I, two Case Records Supervisors and other clerical personnel. Provide on the job training and formalized training for Records, counseling and other staff.**

*04/87 to 06/90*  **Correctional Counselor II**
       **Legal Affairs Coordinator**
       **San Quentin State Prison**
       **San Quentin, California 94964**

**Coordinate and investigate compliance services with custodial and ancillary staff. Act**

*as primary liaison and resource person for the Institution Operation Divisions with respect to court compliance. Coordinate the on-site compliance audits and production of all submissions to the courts or other agencies. Respond to special compliance/legal affairs projects as necessary and perform special duties as directed by the Warden and Chief Deputy Warden. Answer questions and prepare responses to Monitors, Special Masters, Inspector General staff, departmental counsel, Attorney General and Court Management Services Branch on behalf of the institution. Assist in preparation of institutional budget proposals affected by court cases. Schedule and track condemned inmates with execution dates. Prepare reports for the Governor for inmates with execution dates.*

09/86 to 04/87          **Correctional Counselor II**
                        **Work Incentive Coordinator**
                        **San Quentin State Prison**
                        **San Quentin, California 94964**

**RESUME**
**JEANNE S. WOODFORD**
**Page 3**

*Coordinate San Quentin's Work Incentive Program. Auditing of Work Incentive records. Training staff on the proper implementation of the Work Incentive Program.*

03/86 to 09/86          **Correctional Counselor II**
                        **Security Housing Units I and IV**
                        **San Quentin State Prison**
                        **San Quentin, California 94964**

*Supervision of Correctional Counselors I. Schedule and participate in institutional classification actions. Chair unit classification; act as Program Administrator in the absence of the Program Administrator. Work closely with San Quentin's Criminal Activity Coordinator relative to gang activity. Ensure compliance with court decisions; i.e., Toussaint Decision, Thompson Decision, Wilson Decision. Write and update Institutional Procedures.*

05/83 to 03/86          **Correctional Counselor I**
                        **San Quentin State Prison**
                        **San Quentin, California 94964**

*Perform the casework functions for San Quentin's 102-man, Maximum A custody, staff assaulter unit. These duties include normal casework functions as well as a very broad knowledge of gang members and gang activities. Work closely with San Quentin's Criminal Activity Coordinator relative to gang activity. Ensure compliance with court decisions. Perform casework functions for San Quentin's H-Unit; duties include classification actions, board reports and appropriate programming recommendations.*

1978 to 1983            **Correctional Officer**
                        **San Quentin State Prison**
                        **San Quentin, California 94964**

*Supervision of inmates.*

*APPOINTMENTS:*

*Human Relations Committee, San Quentin*
*Conflict Resolution Team*
*Trauma Team*
*Equal Employment Opportunity/Affirmative Action Counselor*
*Department Equal Employment Opportunity Investigator*
*San Quentin Drug Program Coordinator*
*San Quentin Equal Opportunity Coordinator*
*San Quentin Treatment of People Committee Mentor*
*Leadership Institute*
*Class A Trustee with the General Services Board for Alcoholic Anonymous*
*John Jay College of Criminal Justice Advisory Committee*
*Technology Services Board for the Department of technology Services (Member)*
*Council on Mentally Ill Offenders (Chair)*
*Correctional Standards Authority (Chair)*
*Friends Outside Sacramento Chapter (Honorary Chair)*

*PANEL MEMBER/HEARINGS:*

*National Institute of Corrections (June 6-7, 2005) hearing on Faith-based Approach to*
*Corrections Issues*

# EXHIBIT

# B

# SUPPLEMENTAL REPORT OF JEANNE WOODFORD

*Coleman v. Schwarzenegger et al.,*

No. Civ. S-90-0520 LKK

*Plata v. Schwarzenegger et al.,*

No. C01-1351 T.E.H.

AUGUST 2008

## SUPPLEMENTAL REPORT OF JEANNE WOODFORD

A. Introduction

1. On November 9, 2007, I submitted a report on the effects of overcrowding in California's prisons. At that time I concluded that overcrowding is the primary cause of the constitutional violations in these two cases, that a prison construction program will not alleviate the unconstitutional conditions and that the prison population must be substantially reduced for there to be any realistic hope that the unconstitutional conditions will be eliminated.

2. Since that time the population of the prison system has remained essentially unchanged, with the exception of a few thousand prisoners that have been transferred to private out-of-state prisons. In November 2007, there were 163,834 prisoners in institutions and camps, which is 199% of design capacity. As of July 30, 2008, there were 159,326 offenders in institutions and camps which is 191% of design capacity. Compare Weekly Reports of Population for July 30, 2008 and November 7, 2007, Data Analysis Unit, California Department of Corrections and Rehabilitation. Almost the entire difference is attributable to the 4,606 prisoners in out-of-state facilities.

3. After considering this information and inspecting three California prisons in the last month, it is still my opinion that the CDCR remains severely overcrowded, that this overcrowding is the primary cause of the constitutional violations and that the prison population must be substantially reduced to alleviate the unconstitutional conditions. In my opinion, the state can and should safely

reduce the prison population to an appropriate level that allows prisoners to receive, and staff to provide, the health care to which they are entitled and the programming that will keep all of us safe. I have read that the strike team appointed by the Governor to implement AB 900 has concluded that CDCR should not exceed 130% of design bed capacity in the long term, and should establish measures to ensure that this crowding level is not exceeded in the future. Joint Pls Trial Ex. 74 at 6 (Validation of In-Fill Bed Plan, AB 900 Strike Team Issue Memo No. 1, August 13, 2007). I agree with this position, with the caveat that different (and particularly older) facilities might require slightly lower population limitations, based on the quality of infrastructure and availability of treatment space, for example.

4. I inspected the Correctional Training Facility at Soledad (CTF) on July 23, 2008, the California State Prison at Corcoran (Corcoran) on July 24, 2008, and the California State Prison – Los Angeles at Lancaster (Lancaster) on August 7, 2008. I was accompanied on the tour by prison officials, a representative of the Receiver's office and a Deputy Attorney General. I was provided with access to all areas of the prison and any documents or prisoner files that I requested. Both custody and health care staff answered all of my questions.

5. All three of the prisons that I inspected are severely overcrowded by any measure. CTF was 197% overcrowded on July 23, 2008, housing 6,500 prisoners in a facility designed for 3,312. Weekly Report of Population for July 23, 2008, Data Analysis Unit, California Department of Corrections and Rehabilitation.

Corcoran was designed for 3,116 prisoners, but was housing 5734 on July 23, 2008, 184% of design capacity. *Id.* Lancaster housed nearly 5,000 prisoners on July 23, 2008, in a prison designed for 2,300, an overcrowding rate of an astounding 216%. The three prisons I visited confirmed my opinion that overcrowding negatively affects the entire operation of a prison. Although this is manifested in different ways, it is obvious that the overcrowding itself is very dangerous and is preventing the state from providing the necessary services to prisoners.

6. Even the remedies the state uses to alleviate crowding cause problems for an already overburdened staff. For example, at CTF the medical department was swamped with work because they had been ordered to review 1,500 medical files to determine which prisoners were eligible for transfer to out-of-state prisons.

B. Housing Units

7. All three prisons were housing prisoners in areas not designed for that purpose. At Lancaster, all three of the gymnasiums were filled with triple bunks and each housed between 150 and 200 prisoners. Other housing units had 40 double bunks on the dayroom floor. CTF is using three units as dormitories filled with 200 prisoners in double-bunks. And at Corcoran a gym was converted into a triple bunked dormitory, and inmates in a housing unit in the sensitive needs yard were overflowing on to the dayroom floor.

8. These overcrowded housing units are neither safe nor secure. The custodial staffing in each of these units is not sufficient to provide adequate

supervision, especially because the bunks obstruct lines of sight and there are not

enough officers to patrol the units. At Lancaster, for example, a gym housing

reception center was filled with inmates that according to the Correctional Officer

had not been classified by security level. This allowed prisoners with different

potential for violence to be mixed in a housing unit where there was scant ability

to provide supervision. This practice violates the most basic correctional practices

designed to ensure that prisoners are safe from harm by other prisoners and that

correctional officers are able to provide assistance if the prisoner has a health

issue.

9. Adding to the risk of harm is the fact that these units are very hot, with

the outside temperature between 95-102 degrees. Further, the prisoners had

virtually nothing to do for months and sometimes years on end. The staff in these

units confirmed that with the exception of the "E" Dorm at South at CTF there

was little program or activity for these prisoners except exercise, and that was

often cancelled because of the lack of officers or security lockdowns. At CTF

North, for example, the size of the housing units, coupled with the lack of

recreational space, has resulted in a yard program that divides the yard between

three housing units on one yard and two on the other yard. Limiting the number of

inmates on the yard has reduced the potential for violence on the yard but has

dramatically reduced the number of hours general population inmates are out of

their cell. I was told over 50% of the inmates did not have education or work

assignments. For these inmates the amount of out of cell time was slightly more

than an inmate in administrative segregation or a security housing unit. As a former correctional officer and Warden, I have observed that prolonged periods of idleness under cramped conditions breeds anger and frustration. I also observed a growing number of elderly inmates at CTF central utilizing assistive devices such as a cane climbing grated stairs to get to their cell. These inmates were having some difficulty. This appeared dangerous under normal conditions. It is hard to imagine how they would accomplish this task in an emergency evacuation. There appears to be an insufficient number of first floor cells to meet the needs of the growing number of elder inmates. Inmates are often left with the choice of staying at a prison that has mobility challenges but offers some programs, such as CTF Central, or transferring to a prison that can meet their physical needs but has no or limited program availability. I agree with Governor Schwarzenegger that this level of overcrowding constitutes an emergency because it increases the risk of violence, riot and the transmission of infectious disease.

    C.  <u>Reception Centers</u>

    10.  It is also apparent that the sheer numbers of prisoners are straining the prison operations beyond the breaking point. This is especially apparent in reception centers. Several managers, including the Warden at Lancaster, remarked on the difficulty that they had keeping up with the flow of 1,000 newly arriving prisoners each month, each of whom must undergo a medical, dental and mental health examination. The reception center was also taxed by the need to keep inmates moving through the reception center until transferring to other prisons to

complete their sentence.  It was also clear from touring this facility that staff had difficulty keeping up with sanitation and cleanliness.  Much of the prison, including medical examining rooms, was unbelievable dirty, lacking appropriate sanitation practices.

11.  Another manifestation of crowding is the length of time it takes to transfer prisoners from the reception center to other prisons.  Prisoners should be processed through a reception center in 60 days.  At Lancaster, the Warden initially told us that the average length of stay was 113 days.  During the tour, I was told by correctional staff that the average reception stay was about 120 days. I was later informed by the associate warden that the average length of stay was about 61 days, a figure which appears suspect.

12.  The Warden acknowledged that some reception prisoners stayed at Lancaster for up to two years because there was no other place to put them.  I spoke with one such prisoner in the most restrictive and harsh unit at the prison, the new free-standing administrative segregation unit.  He had been in ASU for two years because there was no room for him at the security housing unit, and in the year since his disciplinary term had expired seven proposed transfers had failed.  Since I only talked with a few randomly-selected prisoners in this unit, I am confident that a full examination of the 175 prisoners in that unit would have revealed similar cases.  The situation was similar at CTF with at least one prisoner spending two years in administrative segregation because there was no place else to put him.

13. The Health Care Manager and Director of Nursing at Lancaster both remarked that prisoners coming into the prison from the county jails were sicker and had more medical and mental health problems than general population prisoners. The chief medical records officer stated that the prison was two months behind in filing certain medical documents because files had not arrived from the *Plata* central medical records storage facility. This was particularly serious because virtually none of the prisoners from the Los Angeles county jails arrived with any health related information.

14. Although CTF is not a reception center, the mental health staff there stated that at times they felt like it was one. Not only were the absolute number (900) of outpatient (CCCMS) prisoners stretching their resources beyond their capability, but many CCCMS prisoners were present at the prison for only a short time, thus requiring staff to use their resources on the time intensive intake process. Mental health staff reported that they have had up to 200 new arrivals in a week, preventing them from completing the initial evaluations within the timelines, even with staff working overtime.

D. Segregation Units

15. The Warden of Lancaster remarked that the reception center Enhanced Outpatient Program (EOP) prisoners were "really hurting us." Sixty percent of the EOP prisoners at Lancaster were from the reception center. Many of those were housed in an EOP administrative segregation unit. The unit was supposed to house only 54 prisoners, but had housed up to 90. The unit was noisy, filthy, and

there were cages all over the dayroom floor that were used as holding cells or for "group treatment". The Health Care Manager candidly acknowledged what was obvious – there was not enough room in the unit to provide medical and mental health treatment to all these mentally ill prisoners. I talked with several who were clearly very distressed. The prison had converted some custodial office space to treatment space, but those rooms did not even have an examination table for medical staff.

16. Prisoners in this EOP unit were not receiving the required ten hours per week of exercise. I examined CDCR forms 114-A, which covered the period of August 3 through 7, 2008. These forms are kept to record the services provided to prisoners in a segregation unit. In all of the thirty-nine 114-A's that I examined only one indicated that the prisoner had received exercise on one occasion. The others either indicated that the prisoner had refused or there was no indication that the prisoner was given the opportunity to exercise. I was quite surprised by the number of refusals since generally prisoners exercise when given the opportunity. The high number of refusals is a symptom of a problem that was not understood or being addressed by staff.

17. According to the Coleman requirements, a psychiatric technician is supposed to make rounds in the unit every day to identify prisoners at risk of decompensation or suicide. The 114s that I reviewed showed that the psych tech was making rounds only once every other day.

18. The sheer number of reception center prisoners caused prisoners to be housed in places that were completely inappropriate. In the recently built free-standing administrative segregation unit at Lancaster, I talked to two minimum security prisoners who were in that unit only because there was no space anywhere else in the facility. The rules of the unit require all prisoners housed there to be treated the same. As a consequence, they remained in the cells for all but 10 hours a week, during which they could exercise in a small cage outside. Another prisoner was housed in this unit only because he had a relative who worked at the prison. When I brought these cases to the attention of staff, they told me arrangements had been made to have the minimum custody inmates moved out of the unit and they would explore the possibility of moving the inmate who had a relative working at the facility to another reception center. These examples are significant because it shows that this degree of overcrowding causes staff to make housing decisions solely on the basis of available beds and not according to the prisoners' or the prison's needs.

19. While inspecting the administrative segregation unit at Corcoran, I saw a notice posted outside the cell that said that this prisoner had not received any property because he refused a cell mate. The light was off in the middle of the day and the prisoner was lying on his back on the floor motionless with a towel or cloth of some type partially covering his face. This atypical behavior strongly suggests that the prisoner is mentally or emotionally at risk. However, his condition apparently went unnoticed. A review of the 114-Ds for this prisoner

revealed that psych tech rounds were done daily, yet no one had referred this man for a psychiatric evaluation despite the behavior and lack of program participation noted on the CDC 114A until I pointed out his condition to the chief psychologist who accompanied me during the tour.

20. I interviewed an older prisoner housed in the Security Housing Unit (CDCR's most restrictive setting) at Corcoran who uses a wheelchair and was wearing a neck brace. After a few minutes, this man started talking about the electrodes that were emanating from his feet and that correctional officers were trying to kill him. It was obvious to me that this man was out of touch with reality, and the Chief Psychologist who interviewed him shortly after me confirmed that he was severely psychotic. The Chief Psychologist said he was recently in a crisis bed for eight days, and had been in the SHU for the last thirty days. The Chief Psychologist said that he would be referred for a mental health evaluation, but that since he was refusing medication there was little they would do for him until he becomes a danger to himself or others by attempting suicide or assaulting another person. This was not an isolated incident. The Chief Psychologist noted that there were a lot of others like him in the SHU at Corcoran.

21. At Lancaster, I spoke with several of the prisoners in an EOP unit who appeared to be losing touch with reality. They had difficulty expressing their thought and appeared somewhat disorientated to time and space.

E. Lockdowns

22. Lockdowns continue to be common and were present at each of the prisons I visited. At CTF, the North facility had been on lockdown for about a month prior to the visit. Officers from other facilities had to leave their assigned posts and help with cell searches at North, leaving only one officer responsible for three tiers and hundreds of prisoners in each of the other units.

23. At Corcoran, one of the yards was locked down because of problems with one of the gangs. These lockdowns directly interfered with treatment because mental health staff were required to conduct interviews at the cell front, where there is no privacy.

24. At Lancaster, although the Warden said the prison had few lockdowns, it appeared much of the prison was on some form of lockdown when we visited. There were few prisoners on the yards, and many prisoners and staff reported that prisoners had gone weeks or months without access to the exercise yard.

F. Custodial Staffing

25. In prisons custody staff is essential to providing prisoners access to health care services, especially in cases where prisoners need urgent or emergency treatment. Not only do they provide escorts at certain times, but they are responsible for alerting health care staff when prisoners complain of an immediate serious problem and also are supposed to observe prisoners periodically to identify actual or potential problems. It is essential to the well-being of prisoners that correctional officers perform these functions at all times. There is not enough custodial staff to keep prisoners safe from harm in California prisons today.

"System-wide, CDCR lacks the custody staff and organizational structure and processes to ensure that patient-inmates are reliably escorted and/or transported to medical appointments. As a result, patient-inmates are often denied timely access to health care services, substantially increasing the risk that patient-inmates' health will further deteriorate and increasing the overall costs of providing health care services." Exhibit 1 to Joint Pls Trial Ex. 56 (Federal Receiver's Turnaround Plan of Action, attached as Exhibit 1 to Receiver's Eighth Report) at 5.

26. As noted above, in some facilities at CTF there was only one officer responsible for all prisoners in a housing unit. At Lancaster, correctional staff informed us that the day before we arrived, there were no officers on the floor in some units. That left only two officers in the control booth to observe the entire unit, making in-cell observation and interaction all but impossible.

G. Space

27. I agree with the Receiver that space represents a serious obstacle to the delivery of health care. Joint Pls Trial Ex. 56 (Receiver's Eighth Report) at 5. The staff at all three prisons I toured complained about inadequate space. At CTF, the medical staff stated that the Receiver has accepted their proposal for the construction of more space, which they believed was "critical" to their ability to provide care, but the completion of that project is at least two years away. The lack of space is having an immediate impact since they have identified a physician who could provide services, but they don't have space for him. In the South facility at CTF the clinic is by any measure too small and crowded with staff who

hardly can find a place to sit. The infirmary at CTF had 16 beds, six or seven of which were occupied by prisoners who needed long term care. Staff said that they need double that amount.

28. At Lancaster, prison officials cannibalized general population libraries to make room for clinics. But, that resulted in law libraries being moved to the dayroom floor in some of the units, making that space unavailable for recreation and treatment. The medical records office does not have room for all the files; instead, only the current volume of the medical record was readily available. The records office staff were crowded into an extremely small space, and in a small hallway at the rear of the office, boxes filled with records were stacked against the wall, and other vacant boxes were stacked about 10 feet high.

29. The Receiving and Release area at Lancaster was not designed for that purpose. Consequently, prisoners were stuffed into large holding cages where they spent up to ten hours with some sitting on the floor, waiting to be processed. The area used for psychiatric screening did not provide any visual or audio privacy. Prisoners and clinicians were sitting right next to each other in cubicles where the walls were about three feet tall. The Health Care Manager recognized the critical need for space, but was told it would be many years before the problems are alleviated.

30. As the Receiver noted recently, "The facilities available for providing health care services within CDCR are woefully inadequate. Through years of neglect, the facilities have long since passed the time when modest investments

could remedy the problem. We are dealing not with deferred maintenance, but with some facilities that are literally falling apart. In addition, investments in health care facilities have significantly lagged behind growing inmate populations, so much so that available clinical space is less than half of what is necessary for daily operations." Exhibit 1 to Joint Pls Trial Ex. 56 (Federal Receiver's Turnaround Plan of Action, attached as Exhibit 1 to Receiver's Eighth Report) at 25. "Simply stated, before constitutionally adequate health care can be delivered in California's prisons, there needs to be *constitutionally adequate treatment facilities to provide such care*.   Unless and until the facilities are constructed, . . . prisoners will continue to die unnecessarily." Joint Pls Trial Ex. 56 (Receiver's Eighth Report) at 46 (emphasis in original).

H. Conclusion

31.  Overcrowding in the CDCR is extreme, its effects are pervasive and it is preventing the Department from providing adequate mental and medical health care to prisoners.

32.  The prison population can be reduced safely. As the former Chief Probation Officer of San Francisco, Warden of San Quentin and acting Secretary of the CDCR, it has been my experience that California incarcerates many more prisoners than is necessary for the safety of the public. This is not to say that offenders should not be held accountable for their actions. Sanctions other than incarceration are effective in punishing many prisoners and at the same time reducing the risk of recidivism. If California used these sanctions it would have

not only a prison system that is capable of providing essential services, but safer communities.

August 15, 2008

_____

JEANNE WOODFORD

15

## APPENDIX A to REPORT OF JEANNE WOODFORD

The following are the documents I reviewed in preparation for this Supplemental Report.

1. Weekly Reports of Population for July 30, 2008 and November 7, 2008, Data Analysis Unit, California Department of Corrections and Rehabilitation .

2. Receiver's Seventh Quarterly Report.

3. Receiver's Eighth Quarterly Report.

4. Receiver's Eighth Quarterly Report, Exhibit 1 (Federal Receiver's Turn-Around Plan of Action).

5. 114-A's Lancaster Ad/Seg EOP for August 3-7, 2008.

6. California Independent Review Panel, Reforming California's Youth and Adult Correctional System, pp. 122-127.

7. Validation of In-Fill Bed Plan, AB 900 Strike team Issue Memo No. 1, August 13, 2007.