1  PRISON LAW OFFICE
   DONALD SPECTER, Bar No. 83925
2  STEVEN FAMA, Bar No. 99641
   E. IVAN TRUJILLO, Bar No. 228790
3  SARA NORMAN, Bar No. 189536
   ALISON HARDY, Bar No. 135966
4  REBEKAH EVENSON, Bar No. 207825
   1917 Fifth Street
5  Berkeley, CA  94710
   Telephone:  (510) 280-2621

6  KIRKPATRICK & LOCKHART PRESTON
   GATES ELLIS LLP
7  JEFFREY L. BORNSTEIN, Bar No. 99358
   EDWARD P. SANGSTER, Bar No. 121041
8  RAYMOND E. LOUGHREY, Bar No. 194363
   55 Second Street, Suite 1700
9  San Francisco, CA  94105-3493
   Telephone:  (415) 882-8200

10 THE LEGAL AID SOCIETY –
   EMPLOYMENT LAW CENTER
11 CLAUDIA CENTER, Bar No. 158255
   600 Harrison Street, Suite 120
12 San Francisco, CA  94107
   Telephone:  (415) 864-8848

13 Attorneys for Plaintiffs

14            ROSEN, BIEN & GALVAN, LLP
             MICHAEL W. BIEN, Bar No. 96891
             JANE E. KAHN, Bar No. 112239
             AMY WHELAN, Bar No. 215675
             LISA ELLS, Bar No. 243657
             MARIA V. MORRIS, Bar No. 223903
             315 Montgomery Street, 10th Floor
             San Francisco, California  94104
             Telephone: (415) 433-6830

             BINGHAM, McCUTCHEN, LLP
             WARREN E. GEORGE, Bar No. 53588
             Three Embarcadero Center
             San Francisco, California  94111
             Telephone: (415) 393-2000

IN THE UNITED STATES DISTRICT COURTS

FOR THE EASTERN DISTRICT OF CALIFORNIA

AND THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

| | |
|---|---|
| RALPH COLEMAN, et al., | No.: Civ S 90-0520 LKK-JFM P |
| Plaintiffs, | **THREE-JUDGE COURT** |
| vs. | |
| ARNOLD SCHWARZENEGGER, et al., | |
| Defendants | |
| MARCIANO PLATA ,et al., | No. C01-1351 TEH |
| Plaintiffs, | **THREE-JUDGE COURT** |
| vs. | **DECLARATION OF RONALD SHANKSY,** |
| ARNOLD SCHWARZENEGGER, et al., | **M.D. IN SUPPORT OF PLAINTIFFS'** |
| vs. | **OPPOSITION TO DEFENDANTS' MOTION** |
| Defendants | **TO DISMISS AND/OR MOTION FOR** |
| | **SUMMARY JUDGMENT / ADJUDICATION** |

[241769-1]

I, Dr. Ronald Shanksy, declare as follows:

1.    I make this declaration in support of "Plaintiffs' Opposition to Defendants' Motions for Dismissal or, Alternatively, for Summary Judgment or Summary Adjudication." I have personal knowledge of the matters set forth herein and if called as a witness, I could and would competently so testify.

2.    I have been retained by Plaintiffs to testify as an expert witness in this matter. As of this date, I have submitted three expert reports which, pursuant to the court orders governing this proceeding, will be my direct testimony at trial.

3.    Attached hereto as **Exhibit A** is a true and correct copy of my November 9, 2007 first report. I directed the preparation of this report, including identifying to plaintiffs' counsel the key areas of problems in which I felt overcrowding was an issue based on prison visits and review of documents, then reviewing and directing the revision of drafts of the report. Upon completion, I signed the report. All matters in this report are my views, opinions, and the reasons therefore.

4.    Attached hereto as **Exhibit B** is a true and correct copy of my December 6, 2007 supplemental report. I directed the preparation of this report, including identifying to plaintiffs' counsel the key areas of problems in which I felt overcrowding was an issue based on prison visits and review of documents, then reviewing and directing the revision of drafts of the report. Upon completion, I signed the report. All matters in this report are my views, opinions, and the reasons therefore.

5.    Attached hereto as **Exhibit C** is a true and correct copy of my September 10, 2008 second supplemental report. I directed the preparation of this report, including identifying to plaintiffs' counsel the key areas of problems in which I felt overcrowding was an issue based on prison visits and review of documents, then reviewing and directing the revision of drafts of the report. Upon completion, I signed the report. All matters in this report are my views, opinions, and the reasons therefore.

[241769-1]

1    6.    I am informed and believe that copies of my reports were served on all parties to

2    the Three-Judge Court matter on November 9, 2007, December 6, 2007, and September 10,

3    2008, respectively.

4    I declare under penalty of perjury that the foregoing is true and correct, and that this

5    declaration was executed this September __26__, 2008, in Chicago, Illinois.

6

7

8    _____
     Ronald Shansky, M.D.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-2-

[241469-1]

Report of Ronald Shansky, M.D.

November 9, 2007

## TABLE OF CONTENTS

I.    EXPERT QUALIFICATIONS................................................................1

II.   BASES FOR EXPERT OPINIONS.....................................................2

III.  THE PRISON HEALTH CARE FACILITIES ARE INADEQUATE
      FOR THE NUMBER OF PRISONERS WHO REQUIRE MEDICAL
      CARE..................................................................................3

     A.    Reception Center Clinical Areas Are Inadequate for the High
           Volume of Medical Contacts.......................................................4

     B.    There is a Severe Shortage of Health Care Clinical and Office
           Spaces in Mainline Prisons ...................................................5

     C.    Older Prisons Lack Clinical Space and the Space that Is
           Allocated to Health Care Is Inappropriate......................................7

          1.    San Quentin ......................................................................7

          2.    CIM.............................................................................10

     D.    Space Shortages Impair Health Care Delivery Statewide......................11

IV.  THE NUMBER OF CLINICIANS IS INSUFFICIENT FOR THE
      NUMBER OF PRISONERS WHO REQUIRE MEDICAL CARE ...............13

     A.    CDCR Has Been Unable to Fill Vacancies at Some Prisons....................15

     B.    Some Prisons Allocated too few Primary Care Providers......................16

     C.    Use of Registry Providers Cannot Resolve Staffing Shortfalls ................17

     D.    Staff Shortages Result in Delayed Care.........................................18

     E.    Prisons Too Short-Staffed to Implement Required Programs....................19

V.   CDCR HAS BEEN UNABLE TO CONTRACT WITH A SUFFICIENT
      NUMBER OF SPECIALTY PROVIDERS TO MEET THE NEEDS
      OF STATE PRISONERS ON A TIMELY BASIS ...............................21

     A.    Delays in Access to Care Harmful and Even Fatal ...........................21

     B.    Some Prisons Have Long-Standing Delays in Specialty Care
           Access...........................................................................22

1.  Avenal Inspection ...........................................................22

2.  HDSP.................. .......................................................24

3.  Plaintiffs Counsel's Findings ...........................................24

VI.  THE CDCR HAS INADEQUATE STAFF AND RESOURCES TO
ENSURE THE TIMELY AND APPROPRIATE DISTRIBUTION OF
MEDICATIONS............................................................................28

A.  Some Prisons Unable to Fill LVN Positions ...................................29

B.  The Shortage of LVNs is Causing Medication Delays and Inadequate
Recordkeeping ...........................................................................31

C.  The *Coleman* Special Master Uncovered Pervasive Problems with
Medication Delivery ...................................................................33

VII.  THE OVERCROWDING CRISIS OVERWHELMS CDCR'S ABILITY TO
ADEQUATELY MANAGE AND MAINTAIN MEDICAL RECORDS AND
PATIENT SCHEDULING NFORMATION...........................................35

A.  Medical Records Staff Are Incapable of Maintaining Orderly
Medical Files Due to the Sheer Numbers of Prisoners ......................35

1.  The Quality of Medical Records at Many Prisons is
Poor .............................................................................37

B.  CDCR's Medical Scheduling and Tracking System Is
Inadequate ...............................................................................41

VIII.  THERE ARE NOT ENOUGH CUSTODY OFFICERS TO ENSURE
ADEQUATE ACCESS TO MEDICAL APPOINTMENTS AND
CLINICAL CONTACTS ..................................................................45

IX.  THERE ARE MORE PRISONERS REQUIRING SPECIALIZED
PLACEMENT FOR MEDICAL REASONS THAN CDCR CAN
ACCOMMODATE.........................................................................46

X.  OVERCROWDING INCREASES THE RATE AND SERIOUSNESS
OF INFECTIOUS DISEASE TRANSMISSION .....................................48

XI.  CONCLUSIONS...........................................................................50

# EXPERT REPORT OF
# RONALD M. SHANSKY, M.D.

## I.  EXPERT QUALIFICATIONS

1.  I am a Physician Consultant specializing in correctional medicine and continuous quality improvement, and a voluntary attending physician for the Cook County Hospital, Department of Medicine, in Chicago, Illinois.  I received my Medical Degree from the Medical College of Wisconsin in 1971, and did my Internship and Residency at Cook County Hospital between 1971 and 1974.  I received my Masters Degree in Public Health from the University of Illinois School of Public Health in 1975.  My CV is attached.

2.  In my 36 years as a physician, I have focused almost exclusively on correctional health care issues.  My correctional health care experience includes seven years work as a staff physician at the Metropolitan Correctional Center of Chicago, twelve years as Medical Director of the Illinois Department of Corrections five years as a medical consultant to the California Department of Corrections, and involvement with over two dozen other correctional systems as either a court-appointed expert/monitor/special master or as a consultant retained by the correctional system.  During the course of my career, I have inspected over 200 prisons and jails worldwide, but primarily in the United States.

3.  In 1995, U.S. District Court Judge William Bryant appointed me Receiver of the District of Columbia Jail Medical and Mental Health Programs, a position I held for five years.  The jail that I was responsible for was under a federal court-ordered population cap.

4.  I am the associate editor of *The Clinical Practice in Correctional Medicine*, Second edition, 2006.  I have listed all of my publications on my attached C.V.

1

5. I am billing the plaintiffs $250 an hour, my usual billing rate. During the last four years, the only case in which I have testified under oath is *Plata v. Schwarzenegger*, on June 8, 2005.

## II.    BASES FOR EXPERT OPINIONS

6. I have been retained by plaintiffs counsel in the *Plata* and *Coleman* cases as an expert in prison medical care and health care administration, and the impact of overcrowding on prisoners' medical care, including how prison overcrowding detrimentally affects prisoners' access to health care and interferes with the ability of prison officials to meet the existing and increased medical needs of the prisoners in an overcrowded system. I have also been asked to render my opinion with respect to whether overcrowding with California Department of Corrections and Rehabilitation (CDCR) is the primary cause of the current unconstitutional conditions experienced by members of the *Coleman* and *Plata* classes. My opinions are based upon the evidence that I have reviewed to date documenting current conditions within the CDCR, on my recent inspections of California Institution for Men (CIM), Avenal State Prison (ASP), Valley State Prison for Women (VSPW), San Quentin State Prison (SQ) and High Desert State Prison (HDSP) and on my professional experiences working in similarly overcrowded correctional settings.

7. A list of the documents provided to me by plaintiffs counsel is attached. Included on that list are reports that plaintiffs counsel drafted during the last year based on prison tours they performed throughout the state, in the presence of CDCR counsel. I understand that these reports were generally drafted within one month of the visit, and that, with one exception, [1] no objections have been raised to these reports, or to the

---

[1] I am aware that the Receiver's office did object to an earlier report submitted regarding San Quentin

plaintiffs' reports submitted in the preceding years.

8.  Having toured five of the state's prisons very recently, and having acted as a consultant to the CDCR until mid-2006, I find that these reports accurately describe the kind of problems I observed while touring prisons and was aware of while consulting with the Department.

9.  To meet the community standard of care, a medical care system must be able to provide timely service that is clinically appropriate, and must have reliable processes to ensure continuity of care.  Having toured five state prisons in October and November 2007, and reviewed documents provided by plaintiffs counsel, including the Receiver's Reports, I believe that, despite improvements including greater numbers of primary care providers at some prisons and improved specialty contracting, the CDCR's medical delivery system continues to operate in a state of crisis that harms prisoners with serious medical concerns and places them at substantial risk of harm because the number of prisoners far outstrips the capacity of the system to provide care.

## III.    THE PRISON HEALTH CARE FACILITIES ARE INADEQUATE FOR THE NUMBER OF PRISONERS WHO REQUIRE MEDICAL CARE

10.  As the Receiver's Consultant, Dr. Kent Imai, recently noted, the "CDCR medical staff has been working in an environment of care characterized by crowded and poorly equipped clinical areas." Joint Pls' Trial Ex. 34, at 9. (Receiver's Death Report).  I agree.  The CDCR does not have enough facilities to adequately accommodate the number of medical encounters necessary to provide adequate care.   In the newer prisons, the clinic space allocated for medical and mental health exams and professional offices is insufficient for the number of staff and patients, and in the older prisons, what little space

State Prison (SQ).

there is for health care functions is often inadequate.  Given the current prison population, the prison system lacks sufficient space to provide timely medical care, with appropriate confidentiality safeguards.

### A.    Reception Center Clinical Areas Are Inadequate for the High Volume of Medical Contacts

11.  Reception Centers present a particular problem: all prisoners entering the massive system must be processed through one of these specialized locations, but "none of the CDCR's designated reception centers were designed or constructed with adequate clinical space.  To make matters worse, as the original prisons designated for reception became overwhelmed by the influx of parole violators, the CDCR was forced to 'convert' general population prisons into reception centers," but did so without providing "adequate additions to clinical staff or clinical space."  Joint Pls' Trial Ex. 26, at 19 (Receiver's May 15, 2007 Overcrowding Report.)   With too many prisoners flowing through limited space and inadequate screening staff, the screening process itself breaks down.

12.  This problem is illustrated at CIM's Reception Center, where most of the new arrivals receive the required history and physical examinations in a building that the prison refers to as "the hub."  Because the RC must process a certain number of prisoners each day, and this number exceeds the number of patients that can be adequately treated, the prison squeezes too many prisoners and too many providers into the available treatment area.  The screening exams are conducted by primary care providers (PCPs) in two adjacent rooms with an open door between the two rooms.  Each of the rooms has two areas for PCPs to conduct exams.  As such, four history and physical exams can be, and often are, conducted simultaneously.  The two exam areas in each room are separated by only a thin white fabric folding screen that is approximately five to six feet tall.

Conversations between a PCP and prisoner patient on one side of the screen can be heard by those on the other side, as can conversations between the two adjacent rooms. With the number of prisoners being processed through this area simultaneously, the prison's screening process is compromised. Given the current, overcrowded conditions in the CIM reception screening area, the clinicians cannot obtain reliable patient histories because, without confidentiality safeguards, some prisoners will withhold vital health care information.

### B.    There is a Severe Shortage of Health Care Clinical and Office Spaces in Mainline Prisons

13. The prisons to which prisoners are assigned after being processed through a reception center also do not have adequate space for medical encounters. The state's "newest and most modern prisons" were "designed with clinic space which is only one-half that necessary for the real-life capacity of the prisons." Joint Pls' Trial Ex. 26, at 19. (May 15, 2007 Receiver's Overcrowding Report.) Emblematic of this problem is Kern Valley State Prison, the state's newest institution, which "was planned, designed, and subsequently constructed knowing full well that the medical, mental health, and dental space and staffing would be entirely insufficient for the prison's actual population." *Id.* at 22. "CDCR has a long-standing policy and practice of constructing new prisons with design capacity limitations on clinical space and thereafter operating those facilities at 200 percent design capacity." *Id.* at 27:19-23. Even simply expanding telemedicine at the prisons, necessary for adequate patient care, often faces the "insurmountable barrier" of being unable to find a room adequate for the telemedicine purposes "because California's prisons were constructed without adequate clinical or office space for the numbers of inmates housed at the prison." *Id.* at 28:12-17.

5

14. The Receiver indicates that all California prisons require facilities upgrades to provide safe, appropriate space for medical staff and patients, including clinic, office, and medical support services (e.g., medical records). *Id.* at 27:10 - 28:1 and Joint Pls' Trial Ex. 32, at 79:24-28. (Receiver's Sixth Report.) The additional space is necessary "primarily" because of overcrowding and the fact that the prisons were built without adequate clinical and medical support facilities. Joint Pls' Trial Ex. 26 at 27:10 - 28:1. (Receiver's Overcrowding Report.)

15. The amount of needed clinical and related support space has not been determined. Joint Pls' Trial Ex. 26, at 27:19-23. (Receiver's Overcrowding Report.) The Receiver states a master schedule for these upgrades, even with a "very aggressive" timetable – and assuming that funding is available – calls for completion of construction by the end of 2011, four years from now. Joint Pls' Trial Ex. 32, at 80:27 - 81.2. (Receiver's Sixth Report.) No completion date has been publicly established by the Receiver for the statewide project to establish 5,000 beds (with associated clinic and office space) for housing and treating medical patients (along with 5,000 beds for mental health patients). Id. at 77:9 - 79:22.

16. I observed a critical shortage of space at VSPW, where a gymnasium was recently converted into a living facility to accommodate an influx of 400 additional female prisoners into the prison. The prison had set up a small exam room off the gymnasium from which medications are distributed and where the RN can do face-to-face triage appointments. The room is accessible only by walking through the prisoners' bathroom and shower area. I waited 10-15 minutes for a female custody officer to clear the bathroom of women before I could enter the exam room to interview the female RN. The location of this exam area is unprofessional and degrading for the women prisoners and for

6

the clinicians required to work there. Moreover, the fact that the exam area is restricted to females raises concerns about how the male supervising nurse will be able to adequately oversee this clinic. VSPW staff advised me, however, that they had to open the clinic space in the gymnasium, despite its shortcomings, because the additional gym prisoners had placed too great a strain on the existing clinics. Forcing professionals to work under such conditions will likely create hiring and retention problems.

17. At ASP, each clinic has but two rooms available for medical examinations, a very small medication distribution room, and the clinic scheduler must work in an open area immediately adjacent to where patients wait and vital signs are taken, making it difficult to run double PCP lines in the yard clinics. As described below, ASP should be running double PCP lines whenever possible, because there are backlogs of hundreds of prisoners awaiting medical appointments on each yard. The backlogs cannot be cleared, however, so long as there is no place for the appointments to occur.

### C.    Older Prisons Lack Clinical Space and the Space that Is Allocated to Health Care Is Inappropriate.

#### 1.    San Quentin

18. With overcrowding at 200% of capacity for Reception Center prisoners, and 187% for the 1700+ Level II prisoners, the dearth of appropriate clinical space at California's oldest prison, San Quentin, is particularly acute. As a result, the prison has resorted to using ill-equipped, wholly unprofessional and possibly dangerous designated clinic areas in a desperate, but unsuccessful, attempt to provide adequate and timely care to prisoners.

19. The clinic serving the 1200 Reception Center prisoners housed in the West Block Housing Unit (approximately 900+ prisoners) and the gymnasium, which was

converted into housing for 350+ prisoners, illustrates the problems that overcrowding has caused. San Quentin has created a make-shift medical "clinic" in what used to be a shower/bathroom area. This clinic area typically serves the gym prisoners on one day each week, and prisoners from West Block on the other four days. It consists of a room balkanized into approximately a half dozen very small treatment areas, demarcated with shoulder-height partitions creating semi-private exam areas for the RNs and primary care providers, and areas for LVNs to take vital signs and do dressing changes. A smaller adjoining room still has a toilet in it (that apparently is not used), but the rest of the hardware has been removed to accommodate a cramped, narrow exam room. On the day I visited, the two-room clinic area was staffed with two RNs, two physicians and one mid-level provider, in addition to several LVNs, and was very crowded with very limited confidentiality.

20. These crowded working conditions impede the ability of conscientious clinicians to provide adequate care, will likely create significant hiring retention problems and may be unsafe for the clinicians. Two of the young women physicians working in this clinic described the conditions as isolating, very noisy and wholly unprofessional, and making it difficult for them to work efficiently. They raised concerns that they may not be safe, because the custody officers do not stay in the clinics, and because the windows to the crowded gym are covered. While window covering facilitates privacy for the patients, it raises security concerns for the clinicians working there. Although they may carry personal alarms, the physicians pointed out that there are only a handful of custody officers in the gym overseeing 350+ prisoners, and that they are generally congregated at their work area at the far end of the gymnasium. Additionally, the five or six clinicians assigned to the clinic share just two telephones, making it very difficult for physicians in

8

particular to make calls to the pharmacy, laboratory, x-ray department and specialty consultants for information necessary to treat their patients. They reported the clinic has lacked a working fax machine for weeks, further stymieing communications with other providers. Even the best doctors cannot work effectively under these conditions, and one of the doctors acknowledged that she is often unable to see all of the patients assigned to her on a given day.

21.  In a mainline tiered housing unit for hundreds of prisoners, SQ has also converted three small offices, formerly occupied by custody officers, into "clinic" areas in an effort to accommodate the growing number of SQ prisoners in that housing unit. These rooms are not appropriate for health care delivery because they are very noisy and also may not be secure for the clinicians who work in them. Several of the SQ doctors described their dilemma in deciding whether to increase their personal security by leaving the clinic door open while seeing patients, or closing it to lessen the considerable din from the prisoners in the housing unit making effective communication, and even coherent thought, challenging.

22.  In another of the small exam areas in that same tiered housing unit, the RN performs face-to-face triage in a small, cramped area from which medications for hundreds of inmates are also administered, twice daily. The room lacks an exam table. Without appropriate clinic space for the number of patients that must be seen, SQ is forced to create substandard exam areas throughout the prison.

23.  The dramatic overcrowding in San Quentin has pushed the prison administration to designate work areas that, because they are so substandard, will make retaining competent clinicians difficult. In order to build a competent, committed and professional team of clinicians to develop a constitutionally adequate medical care

9

delivery system, the CDCR must provide a professional environment in which to practice medicine. The clinical space allocated at San Quentin is so substandard and creates such a stressful environment that, while the prison has been able to attract some highly trained young physicians in the short term (two state physicians I spoke to had worked at San Quentin for six weeks or less), I believe the prison's capacity to retain physicians is seriously jeopardized by both the physicians' perception of personal safety issues and the unprofessional conditions. The treatment delays at SQ will only worsen if the prison is not capable of retaining qualified physicians.

### 2.    CIM

24. Housing prisoners at 167% of capacity, CIM's mainline facilities are, like the Reception Center facilities, so over-taxed that fundamental medical confidentiality rights are routinely ignored. In the West facility clinic at CIM, two PCPs share one room and simultaneously see patients for sick call and other encounters. A thin fabric folding screen separates the area in which the doctors see patients from a single exam table which the PCPs must share, as the room is not large enough to accommodate a second table. In the same clinic, the registered nurse conducts face-to-face triage appointments with patients in a large room that is shared by another nurse (who may be seeing patients) and an office technician. These arrangements cannot provide for minimally adequate patient-provider privacy. Moreover, the medical treatment area is so small that there is no medically appropriate waiting area, so sick patients must wait for appointments on a small bleacher outside the clinic, exposed to the elements.

25. The prison has been unable to afford the nursing staff adequate clinical space in other clinics as well. In the East clinic at CIM, some nursing encounters are conducted in a large open area that does not provide for minimally adequate patient-provider privacy.

In the Elm Hall clinic, the PCP and registered nurse must use the same relatively small space for medical patient encounters, and that same space is also used by nursing staff to distribute medication and document that activity.   There is also a shortage of office space at CIM for medical supervisors and staff.   These conditions will exacerbate overcrowding problems – clinicians will be unable to obtain essential information from their patients, and they are more likely to resign over frustration with the working conditions, further worsening the clinician shortage.  (See section IV, below.)

### D.    Space Shortages Impair Health Care Delivery Statewide

26.  Plaintiffs' on-site inspections have found that, consistent with the Receiver's finding, the space allocated for medical care at the prisons is insufficient for the number of prisoners who must be treated in the clinics.  These overcrowded conditions around the state have resulted in treatment delays, a failure to implement required medical programs, and substandard working conditions.

27.  Given the overcrowding, prison managers must be vigilant in responding to outbreaks of disease.  In prisons that must respond to these public health issues, the space shortage is felt even more acutely.  For example, San Quentin's West Block housing unit was under a lockdown and quarantine during the month of July.  Nurses reported that, for a period of about two weeks, very few West Block prisoners were escorted to the Gymnasium/West Block clinic for nurse triage.  The nurses said that they did go to West Block and tried to do triage at the sergeant's desk, but this was not effective, as there was no available exam space.  Plata Pls' Trial Ex. 27, at 5.  (Letter, September 7, 2007.) Without alternative clinic facilities, the RN triage system essentially broke down for the duration of the disease outbreak.

28.  Even without the stress of quarantine, most of the prisons lack sufficient space

11

to fulfill their medical duties under the Policies and Procedures.  At Pleasant Valley State

Prison (PVSP), staff report that space is a problem even though there are three rooms in

each yard clinic dedicated to medical encounters; staff also state that in addition to more

medical exam rooms more space is needed for medication distribution and work by

phlebotomists.  Plata Pls' Trial Ex. 23, at 7.  (Letter, July 24, 2007.)  At that prison, clinics

for patients with Hepatitis C cannot be regularly held because of space constraints.  *Id*. at

12.

29.  At the Substance Abuse Treatment Facility at Corcoran (SATF), managers state

that even if the prison were fully staffed with primary care providers (PCPs), timely and

adequate PCP appointments could not be provided because of a lack of space.  Plata Pls'

Trial Ex. 32, at 3.  (Letter, October 19, 2007.)

30.  California Correctional Center (CCC) medical managers and staff state that

they lack the space necessary to provide medical care to the number of prisoners in their

custody.  Plata Pls' Trial Ex. 31, at 2.  (Letter, October 18, 2007.)  Among the more

serious of the space-related problems, as described by CCC staff, are: (1) a Main Clinic

waiting area that routinely has 60 to 70 patients although the rated fire marshal capacity is

46 (there is no alternative space available, and having patients wait outside, aside from

security/custody concerns, is not practical, particularly during the winter months); (2)

inadequate numbers of medical exam rooms in the Main Clinic area given the number of

primary care providers (PCPs) and patients to be seen; (3) an OHU that is not large enough

to house all patients who need that level of care on any given day; (4) a Triage &

Treatment Area (TTA) too small for patients and workers who must use it, particularly

since space in the TTA must be regularly used by a PCP because of the lack of adequate

space in the Main Clinic; (5) "temporary space" for FTF triage for registered nurses (and

their patients) on two prison yards, described as "small closets" without sinks or toilet facilities; (6) an extremely crowded medical records space; and (7) no dedicated space for a telemedicine clinic, meaning that such services must be provided in an existing medical exam room (which of course results in that room being unavailable for an on-site PCP or RN).

31.  At Mule Creek State Prison there also is insufficient clinical space.  Clinical staff pack the small clinics.  The space allocation to the pharmacy, which functions out of two separate rooms, is a long-standing issue.  The physical therapist does not have adequate or permanent space.  Plata Pls' Trial Ex. 30, at 5.  (Letter, October 9, 2007, at 5.)

32.  At ASP, the current medical clinic and other medical-related spaces are inadequate to treat the approximately 7500 prisoners at that facility.  There is not enough space for on-site specialty providers, or for medical records.  The building that used to house administrative segregation prisoners (Facility 1, Building 140) has no medical room or adequate alternative area for exams or assessments.  Plata Pls' Trial Ex. 17, at 1. (Letter, May 30, 2007.)

33.  At California Men's Colony (CMC), the area allotted to the nurse responsible for doing the initial medical interview for incoming prisoners is a small office that serves as a "pass-through" area and appeared to be shared with a custody officer; the prison's warden reported that it was not an appropriate space for these interviews.  Plata Pls' Trial Ex. 25, at 7. (Letter, August 3, 2007.)

## IV.   THE NUMBER OF CLINICIANS IS INSUFFICIENT FOR THE NUMBER OF PRISONERS WHO REQUIRE MEDICAL CARE

34.  Overcrowding creates pressures on the system that make hiring and retaining sufficient numbers of clinicians and other medical workers exceedingly difficult.

California's overcrowding crisis has created a situation where the prisons, and particularly the more remote prisons, are unable to hire and retain enough health care staff to address the medical needs of the prisoner-patient population.

35. As the Receiver concluded, "Many CDCR prisons are unable to sustain the basic delivery of medical, mental health, and dental services because of limited staffing (clinical and custody) and an overwhelming number of prisoner/patients who require care. Every day, many California prison wardens and health care managers make the difficult decision as to which of the class actions, *Coleman*, *Perez*, *Armstrong*, or *Plata* they will fail to comply with because of staff shortages and patient loads." Joint Pls' Trial Ex. 26, at 30. (Receiver's Overcrowding Report.)  And, according to the Receiver, not only did the CDCR's staffing situation significantly worsen during the period from 2002 to 2007, but "the true scope of clinical staff shortfalls is actually *far worse* than the numbers" set forth in the Receiver's report because the system has additional staffing needs not yet factored into the vacancy rates. *Id.* at 11-12.  I agree.

36. Based on its review of four years of correctional system audits, the Office of the Inspector General also acknowledges that insufficient clinical staffing for the growing population makes the medical care delivery problem intractable.  "[I]t must be recognized that efforts to address problems in these areas [including inadequate medical care] have been severely hampered by inmate population pressures that have prisons straining at nearly twice design capacity, spreading staff resources thin and leaving little facility space available for programming and other purposes." Joint Pls' Trial Ex. 46, at ES-1.  (Office of the Inspector General, Accountability Audit, Review of the Audits of the California Department of Corrections and Rehabilitation Adult Operations and Adult Programs, 2000-2004, April 2006, vol. 1.)  I agree with the Receiver and the Inspector General that

14

the CDCR has been seriously understaffed, both in terms of clinical vacancies and an overall lack of sufficient allocated positions.

### A.    CDCR Has Been Unable to Fill Vacancies at Some Prisons

37.  Despite substantial pay increases in the last eighteen months, the CDCR health care staff remains riddled with vacancies.  The statewide September 2007 staffing figures for CDCR shows a total of 355.63 staff PCP positions at all prisons (PCPs includes physician and surgeons, nurse practitioners, and physician assistants), with only 220.75 state employee civil servants in those positions.  Plata Pls' Trial Ex. 33, at 1.  (Mark IV Vacancy Report Requested for the Following Positions.)   This shortfall of approximately 135 PCPs computes to a vacancy rate for state physicians of approximately 38 percent.

38.  The Receivership reports that it will address the physician shortage by raising salaries as high as necessary to staff the prisons.   Joint Pls' Trial Ex. 26, at 24-26. (Receiver's Overcrowding Report.)  As the Receiver frankly acknowledges, this will likely be enormously expensive.  Indeed, he points out that hiring the necessary clinicians and implementing a constitutionally adequate system "may all but bankrupt the State of California." *Id.* at 41.  Even with unlimited resources, however, there are likely some physician vacancies that may never be filled because they are located in remote prisons where qualified individuals choose not to live.  As noted in the Receiver's May 15, 2007 Overcrowding Report, CDCR's recruitment challenges are intensified by the system's practice of locating "mega-prisons" in remote locations "far from the urban centers where it may be possible to recruit adequate numbers of competent clinicians." *Id.* at 14. Overcrowding inhibits the CDCR from limiting the number and type of patients sent to these remote facilities, because all the other prisons are filled beyond their capacity.

39.  Some of the toughest vacancies to fill in the CDCR are at the prisons with the

greatest overcrowding.  Now at well over 200% capacity, VSPW is the most overcrowded of the women's prisons.  Located in the central valley town of Chowchilla, the prison has had a physician vacancy for years, and earlier converted two other physician positions to mid-level positions because they considered the physician positions unfillable.  The prison recently received authorization to hire an additional five physicians and two mid-level providers.  Dr. Virk, VSPW's Chief Medical Officer, frankly admitted that given his inability to fill the existing single physician position, he was unlikely to be able to fill the additional positions allocated.   In the two months since the extra positions had been allocated, he had received little interest, and he had just two candidate interviews scheduled.  He acknowledged that he did not know whether either candidate had the necessary credentials (*i.e.*, board eligibility or certification).

40.  At 256% capacity, ASP is the most crowded prison in the state.  At ASP, I learned that of the 10.5 PCP positions, only three were state employees and none of the five physician positions were filled by a state employee.

## B.    Some Prisons Allocated too few Primary Care Providers

41.  The prisons lack sufficient numbers of clinicians to treat the current level of need, not only because of clinician vacancies, but also because the prisons are often allocated too few medical care workers.  So, even if the prisons were able to fill all of their vacant health care positions, which they have not been able to do to date, despite the above-mentioned pay raises, the prisons would still be unable to handle the level of need given the current overcrowding.

42.  The Chief Physician and Surgeon at HDSP, for example, stated that at least two additional PCP positions were needed at the prison given the number of PCP-patient medical encounters that are needed to comply with the policies.  The Chief also pointed

16

out that the ratio of PCPs to prisoner-patients at HDSP was 1-to-660, which he reported was the highest among the prisons in the CDCR northern region. At ASP, the Chief Physician and Surgeon told me that the prison needed up to six additional PCP positions if encounters required by policy were to be timely provided.

43. CDCR staff members have also raised these issues during plaintiffs counsel's tours. Dr. Dudley Lee, Health Care Manager at Salinas Valley State Prison, explained that he believed the "need is greater than the capacity" with respect to the number of PCPs allocated SVSP relative to the needs of its population, which is getting sicker, older, and has increasingly acute concerns. Explaining this phenomenon, Dr. Lee pointed to the fact that SVSP receives medically-vulnerable prisoners, including those who cannot go to institutions with a risk of Valley Fever and those who require better oxygen (SVSP is at sea-level). Additionally, Dr. Lee pointed to the fact that SVSP shares grounds with the Department of Mental Health (DMH), whose patients often have more acute health issues. Plata Pls' Trial Ex. 29, at 2-3. (Letter, October 4, 2007.)

44. A physician at Calfornia State Prison at Sacramento (SAC) reported that the prisoners at that prison, which has a heavy mental health load, have a higher medical acuity than is found at many other prisons. He stated that CDCR's current method for calculating physician staffing is strictly population-based, and thus fails to account for the greater medical needs of the sicker populations at prisons like SAC. Plata Pls' Trial Ex. 12, at 2. (Letter, March 8, 2007.)

## C.    Use of Registry Providers Cannot Resolve Staffing Shortfalls

45. Unable to fill existing vacancies, some prisons, including VSPW and ASP, have been forced to use registry providers to fill in for their chronically vacant positions, in an attempt to mitigate the effects of the lack of state employees. While use of registry

providers can be useful in the short term to ensure that individual patients are seen in a timely manner, it is at most a stop-gap measure that is inadequate as a long-term solution. As VSPW's Dr. Virk explained to me, the registry providers have no investment in the development of a competent system of care because they have only a short-term commitment to the prison, and will leave for other employment when a higher registry rate is offered elsewhere.

### D.    Staff Shortages Result in Delayed Care

46.    In any system, inadequate medical staffing, whether due to unfillable vacancies or insufficient allocation of positions, will result in delayed care. In a dramatically overcrowded system like the CDCR's the treatment delays become more acute. Consistent with my expectations, I found significant appointment delays at the prisons I toured, as have plaintiffs' counsel over the course of the last year.

47.    At ASP, I learned that there are large numbers of pending PCP appointments, with all but one of the six yard clinics having over 400 such appointments pending with two of the yard clinics (4 and 5) having more than 700 and 600 pending, respectively. A single PCP is assigned to each yard clinic, and sees between 20 and 25 patients per day. Each day, a number of patients must be added to each clinic's PCP appointment list who did not otherwise have a pending appointment, based on an urgent referral from a nurse or other policy requirements. Given the numbers, there is no question that ASP is not in compliance with policy requirements regarding the timeliness of PCP appointments. Plaintiffs' counsel in May 2007 reported that routine appointments were taking four to six weeks in most yard clinics (see Plata Pls' Trial Ex. 17, at 3), and such delays are consistent with my observations.

48.    At CIM, the prison staff is unable to ensure that required intake history and

physical exams are conducted within the 14-day period mandated by policy.  I reviewed a three-page list provided on the tour that, among other things, showed that approximately 30 percent of those receiving their H&P exam on the day of our inspection were in violation of policy as they received the exam more than 14 days after arrival.

49.  At HDSP, the Chief Physician and Surgeon told me that there were backlogs for patients to see a PCP in all of the clinics.

50.  Plaintiffs' counsel also uncovered significant delays for routine and urgent primary care appointments at prisons throughout the state prison system.  The staff at Corcoran State Prison reported four week delays for their primary care provider lines. Plata Pls' Trial Ex. 24, at 3-4.  (Letter, July 25, 2007.)  Several of the clinics at PVSP reported three to four week delays for the PCP lines.  Plata Pls' Trial Ex. 23, at 6.  (Letter, July 24, 2007.)  Richard J. Donovan Prison (RJD) reported delays of up to a month for its PCP lines.  Plata Pls' Trial Ex. 22, at 6.  (Letter, July 18, 2007.)   Centinela State Prison had delays of up to three months.  Plata Pls' Trial Ex. 9, at 1.  (Letter, February 8, 2007.) .

E.    **Prisons Too Short-Staffed to Implement Required Programs**

51.  The Policies and Procedures adopted in *Plata* pursuant to the settlement require the prisons to implement certain programs, including a chronic care program, which requires identification of all patients with chronic conditions, a comprehensive documented initial intake exam by a PCP, and follow-up exams with a PCP that typically occur every three months but which can been more or less frequent depending on the PCP's assessment of the patient's acuity and the degree of control of the chronic condition(s).  The policies also require development of a preventive care program that tracks preventive services provided to qualified prisoners.

52.  With too few primary care providers to meet the most immediate needs of the

19

current population, some prisons are unable to develop required medical programs. For example, ASP has not yet implemented the required chronic care program. Large numbers of additional PCP encounters/appointments will be necessary at ASP once the chronic care program is implemented, particularly given certain characteristics of the inmate population. The Correctional Health Services Administrator stated during my visit that ASP housed approximately 1,200 prisoners over 50 years of age. The elderly tend to have chronic medical conditions. Further, two of ASP's yards are CDCR-designated for housing mobility impaired inmates, many who use wheelchairs. Prisoners with mobility impairments also tend to have more chronic conditions than those who are not disabled. As such, the need for required medical encounters will rise substantially as ASP further implements the required policies.

53. At VSPW, Dr. Virk reported to me that his prison has not been able to develop the required preventive health care program due to a lack of primary care providers.

54. The Policies and Procedures also require specific appointments be scheduled in relation to specialty care consultations. Not surprisingly, plaintiffs' counsel found that, with insufficient primary care provider staffing, the prisons are regularly failing to schedule or conduct these appointments. California State Prison at Solano (SOL), for example, fails to schedule these post-consultation appointments consistently, and getting reports after specialty appointments has been a problem in some specialties. Plata Pls' Trial Ex. 21, at 8. (Letter, July 10, 2007.)

55. The CDCR Policies and Procedures require that patients referred to a specialist on a routine basis see their PCP each 30 days pending the specialty appointment to review whether the consult is necessary, and whether it should be expedited. Prisoners awaiting an urgent referral must be seen every seven days pending the appointment, for the same

reason. The 30-day interim appointments are not scheduled at SOL. Plata Pls' Trial Ex. 21, at 8-9.) (Letter, July 10, 2007.) The seven-day interim appointments are not scheduled at California Medical Facility (CMF). Plata Pls' Trial Ex. 16, at 8-9. (Letter, May 7, 2007.)

## V.   CDCR HAS BEEN UNABLE TO CONTRACT WITH A SUFFICIENT NUMBER OF SPECIALTY PROVIDERS TO MEET THE NEEDS OF STATE PRISONERS ON A TIMELY BASIS

56. The CDCR cannot provide specialty services, including in urgent (high priority) cases, in accord with policy requirements for all prisoners who need such services because, as result of overcrowding, the number of prisoners who need such services exceeds the capacity of the providers available to CDCR, and/or is so great that CDCR cannot adequately track and schedule such cases.

### A.   Delays in Access to Care Harmful and Even Fatal

57. When the need for specialty care exceeds the capacity of the available providers, patients are at risk of serious harm, including preventable death. Due to CDCR overcrowding, members of the plaintiff class are suffering serious harm, and some have died, because they had no access, or delayed access, to specialty care.

58. The Receiver's review of calendar year 2006 deaths identified a preventable death in which there was a five-week delay in availability of an appointment for a specialist and, in 11 cases among the possible preventable deaths, there were delayed referrals (excessive time before appointment is available). The Receiver also identified "[s]ystemic and pervasive prolonged delays in specialty referrals" as one of the "systemic lapses" found when reviewing all deaths. Joint Pls' Trial Ex. 34, at 6-8.) (Receiver's Death Report.) The Receiver reports that "an increasing number of prisoners in the more remote prisons has placed a heavy burden on the very limited number of hospitals and

21

specialty providers . . . ."  Joint Pls' Trial Ex. 26 at 28:8-10.  (Receiver's Overcrowding Report.)

**B.    Some Prisons Have Long-Standing Delays in Specialty Care Access**

**1.    Avenal Inspection**

59.  Consistent with what the Court's Receiver has reported, I identified serious specialty care delays at certain of the prisons I visited, driven by the prisons' inability to arrange for timely consultations for the numbers of prisoners who needed them.  I found some of the worst delays at ASP.

60.  One of the largest and most over-crowded prisons, ASP is located in the Central Valley, a substantial drive from the urban areas where hospitals and specialty care providers are concentrated, yet relatively close to a half-dozen prisons that also compete for specialty services.  At ASP, managers and administrators told me there were delays with specialty services for inmates and that the basic problem was unavailability of specialty providers compared to the number of prisoners who need such services, particularly for cardiology and orthopedics.  They further stated that they must use the same providers used by a number of other prisons who also need specialty appointments for their patients.

61.  The delays identified were amply documented by ASP's scheduling records.  I reviewed two aging reports printed the day of my visit.  These reports, respectively, list 316 pending high priority (a.k.a. urgent) and 977 pending routine specialty referrals.  For each referral, the list sets forth, among other things, the number of days that have elapsed between the date of the request for the specialty service and the appointment date (if one has been scheduled).  Approximately 105 of the pending high priority referrals were listed as having an appointment date.  Of these, only two were going to take place within the 14

22

day period required by CDCR policy for such appointments. Of the high priority cases with appointment dates, approximately 50 were scheduled to occur more than three months after the high priority referral was approved, with many taking several months. Another approximately two dozen of these cases were scheduled to have appointments between two and three months of the urgent referral. The list also included another approximately 210 cases ordered as high priority for which no appointment date was listed. All except 14 of these unscheduled high priority cases were listed as pending for more than 14 days, with the vast majority shown as pending for more than a month (with some considerably longer). These delays in urgently ordered specialty care services create an extreme risk for the prisoners who need the care. Joint Pls' Trial Ex 34, at 4 and 8. (Receiver's Death Report.)

62. Moreover, the aging report for routine specialty referrals showed approximately 285 cases with a scheduled appointment date. Of these, about 150 were scheduled to occur more than three months after the specialty referral was made, and thus exceeded the policy time-frame requirements for such appointments. Approximately three dozen of these appointments, according to the report, would take place six months or more after the referral. The list also contained approximately 700 other routine specialty appointments that had yet to be scheduled, with at least 175 of them shown to have been already pending for more than three months (and thus already in excess of policy requirements). Again, the delays in specialty care create a risk for the prisoners who need care.

63. ASP managers and staff stated when providing me the aging reports that they were not confident that the reports were entirely accurate. Specifically, they indicated that some referrals listed as pending may have actually already taken place, but were still on

23

the list because after being completed had not been "closed" in the IMSATS program by a previous worker who was replaced a few weeks ago. To address the matter, ASP was going to have a staff person review the Unit Health Records for all the prisoners on the two lists totaling 1,300 pending specialty appointments, to determine which, if any, could be deleted based on the service having been already provided.

64. The specialty service delays at ASP may not be as broad, in terms of the numbers of prisoners impacted, as indicated in the aging reports. But to the extent that the aging report data is incorrect, then it reflects that the prison has more patient data than it is capable of processing, leaving ASP unable to determine who actually needs the services, with the distinct possibility of prisoners being double-scheduled (and thus delaying specialty services for other prisoners still actually in need of an appointment). The proposed investigation of 1300 files could take weeks to complete, and the diversion of a staff person on this task will likely slow records processing in other areas. It is apparent that ASP's population exceeds its capacity for scheduling and tracking. This chaos is as dangerous to prisoners as the extreme delays discussed above.

## 2.    HDSP

65. At HDSP on November 1st, I was also provided an aging report showing pending both off-site high priority and routine specialty appointments. The high priority section of the report listed 47 pending cases. Under policy requirements, these appointments are to take place within 14 days of the order. More than one-half of the 47 high priority referrals on the list are shown has having been pending for a period longer than that permitted by policy, or having taken place outside the policy's time limits.

## 3.    Plaintiffs Counsel's Findings

66. The reports of plaintiffs' counsel over the last year, consistent with findings of

the Receiver and my observations, also show specialty services delays, rooted in an insufficient number of providers for the number of patients requiring care.

67. At SATF, it was reported in May and September 2007 that off-site specialty services were in crisis, with managers and staff making clear that the number of prisoner-patients who need specialty services, including those who need such services urgently, far exceeded the number of timely appointments that the prison was able to obtain from specialty service providers. Plata Pls' Trial Ex. 32, at 2-3. (Letter, October 19, 2007.) Urgent appointments, including for cardiology and oncology, were identified that had been pending for roughly three, four, or six months. *Id.* These delays occur despite a well organized utilization review and specialty scheduling unit at the prison, and despite the prison making repeated requests to providers in individual cases. *Id.* Most high priority off-site consults were not yet scheduled to take place, or would likely take place (i.e., in those cases in which the prison had not yet received an appointment date for an approved high priority consult even though, for example, 30 days had passed), until two or three months after the consult was ordered. There are also, per the "aging report" provided by the schedulers, and by report of the schedulers and managers themselves, dozens of routine referrals that had not or would not occur within the 90 day period required by policy. SATF schedulers and managers state that these delays were caused by too many patients needing specialty services compared to the number of appointments SATF is able to obtain. *Id.*

68. At PVSP, there were 165 pending high priority off-site specialty appointments. Of these, 82 had not been scheduled. Some of the unscheduled appointments had been waiting for consults for almost a year; some of these appointments appeared to be diagnostics for Valley Fever or its associated diseases. There was a wait of three to five

months for some urgently requested lumbar punctures. Plata Pls' Trial Ex. 23, at 1-3.)
(Letter, July 24, 2007.)

69. There were also 949 pending routine off-site appointments at PVSP. Some specialties showed concerning delays in scheduling routine appointments, including: abdominal ultrasounds; bone scans; GI referrals; colonoscopies; ENT referrals; liver biopsies; nephrology; orthopedic surgery; pain management; sleep study; and urology consults. (Of 21 referrals for abdominal ultrasounds, five were unscheduled for between 4-13 months; of seven referrals for bone scans, all were unscheduled, and four had been pending between 3-8 months; of 62 colonoscopy referrals, more than half had been waiting more than 90 days, and 11 unscheduled appointments had been pending between four months - one year; of 24 ENT referrals, four had been unscheduled seven months - 15 months; 47 pending liver biopsy referrals, 12 unscheduled for over four months; five pending nephrology appointments, all scheduled between 5-8 months out; 12 pending orthopedic surgery appointments, none scheduled, eight 4 months or more out; eight pain management appointments, four unscheduled for 6 or more months, 4 scheduled 5 months or more out; 12 pending sleep study appointments, none scheduled, 11 pending for 4-17 months; eight urology consult appointments, seven unscheduled and pending 6-13 months.) *Id.* at 1-3.

70. At SOL, there was a backlog of specialty services cases, including some routine referrals that been pending for more than six months and a few for more than a year. Plata Pls' Trial Ex. 21, at 8. (Letter, July 10, 2007.) At California Rehabilitation Center (CRC), roughly one-third of routine specialty appointment (83 of 293) were pending past 90 days and two-thirds of urgent appointments (21 of 32) were pending past 14 days. Plata Pls' Trial Ex. 18, at 4-5. (Letter, June 6, 2007.)

26

71. At SAC, there was a backlog of orthopedic referrals. Plata Pls' Trial Ex. 12, at 7. (Letter, March 8, 2007.) At Chuckawalla Valley State Prison (CVSP), some urgent specialty referrals were taking over two months to occur. Plata Pls' Trial Ex. 20, at 9. (Letter, July 2, 2007.)

72. At California Institution for Women (CIW), off-site specialty scheduling was in disarray. There was no accurate tracking method and no one knew how many appointments were pending. Urgent referrals were frequently taking several months. Plata Pls' Trial Ex. 15, at 4-5. (Letter, May 7, 2007.)

73. At Kern Valley State Prison (KVSP), documentation regarding several unscheduled urgent appointments were observed in mid-July that had been pending since February and March, 2007. Staff provided documentation that showed other urgent specialty referrals that had been pending for six months to a year. Plata Pls' Trial Ex. 26, at 9. (Letter, August 15, 2007.)

74. Telemedicine specialty services at PVSP also had a high number of unscheduled appointments, including dozens of patients with Hepatitis C who could not be scheduled to see the infectious disease specialist because the ordered liver biopsy had not been performed because of an extreme (six to twelve month) backlog for the off-site provider who performed the biopsies. Plata Pls' Trial Ex. 23, at 12. (Letter, July 24, 2007.)

75. At COR, on-site specialty services were reported to be not all scheduled timely, due to the volume of the requests, as well as limitations by providers. Plata Pls' Trial Ex. 24, at 7. (Letter, July 25, 2007.)

76. At CEN, there were approximately 20-30 routine off-site pending appointments over the policy required time-frames. Plata Pls' Trial Ex. 9, , at 5. (Letter, February 8,

27

2007.)

77. Even prisons that are more successful at scheduling routine appointments may have problems scheduling timely urgent appointments. At CMF, plaintiffs found the prison had been unable to meet the 14-day timeline in the overwhelming majority of high priority (urgent) specialty cases. Of 38 high priority appointments that had been scheduled as of April 25, 2007, just one was scheduled within 14 days of the referral. Some of these high priority referrals were scheduled several months after the referral was ordered. Plata Pls' Trial Ex. 16, at 8. (Letter, May 7, 2007.)

78. All of this data demonstrates a specialty care system that is overwhelmed by the sheer number of prisoner-patients. It is questionable whether there are enough specialty services in the state, and certainly in some regions of the state, to meet the needs of the prison population.

## VI.    THE CDCR HAS INADEQUATE STAFF AND RESOURCES TO ENSURE THE TIMELY AND APPROPRIATE DISTRIBUTION OF MEDICATIONS

79. A system to ensure the timely delivery of the correct medication to the correct patient, with accurate documentation of what has been administered, is essential to an adequate health care delivery system.

80. Defendants' medication delivery systems are inadequate for the size of the population they serve, and are plagued by short-staffing at a number of prisons. Too many prisoners, with too few staff and insufficient resources, leads inevitably to medication delays and inadequate treatment documentation. The result is that prisoners receive their medications late or not at all, and suffer as a result. As Dr. Imai reports, "[t]he dispensing of prescribed drugs is often delayed, and there is an unreliable system for refilling medications for the treatment of chronic medical disease such as diabetes, hypertension,

28

asthma and coronary heart disease." Joint Pls' Trial Ex. 34, at 9. (Receiver's Death Report.)

81. The shortcomings in the medication delivery system are rooted in overcrowding – quite simply, there are more patients requiring medications than the prison has the resources or staffing to address. Most critically, the system lacks the necessary nursing staff to ensure the adequate distribution of medications. Licensed Vocational Nurses (LVNs) are now an essential component in the CDCR's medication distribution system.[2] The Receiver reports that, despite substantial recruitment efforts, the LVN positions have been difficult to fill at some prisons. Joint Pls' Trial Ex. 31, at 24. (Receiver's Fifth Report.) As of June, 2007, there were more than 300 LVN positions vacant statewide (out of approximately 925). *Id.* Medication delivery issues are further compounded at some prisons where the pharmacies have had insufficient staffing.

### A.   Some Prisons Unable to Fill LVN Positions

82. CDCR's need for qualified LVNs simply exceeds the supply of LVNs willing to work in the prison system. The prisons report significant problems hiring and retaining LVNs, across the state.

83. VSPW has been unable to fill all of its LVN vacancies. At that prison, there were four vacant LVN positions as of the end of October 2007, and the Director of Nursing reported retention problems with the LVNs that they hired. She recalled that seven LVNs had quit since June. She pointed out that the demands of running a pill line in prison are significantly higher than the demands of most LVN positions in the community, and that this made it difficult for the prison to keep these employees. At

---

[2] Until recently, this function was fulfilled by Medical Technical Assistants (MTAs).) As of May 31, 2007, the Receiver converted all positions for Medical Technical Assistants into License Vocational Nurse (LVN) positions. Receiver's Fifth Report, at 23.

HDSP, the prison had six vacant LVN positions of 25 allocated.

84. The medical managers at a number of prisons have reported to plaintiffs' counsel that they have been unable to hire and/or retain LVNs. At CMC, plaintiffs' counsel learned in July 2007 that almost three quarters of the LVN positions were vacant. Plata Pls' Trial Ex. 25, at 3. (Letter, August 3, 2007.) Medical managers at SVSP reported in January 2007 that they had received few applications for the LVN positions and were unlikely to find candidates to fill them. Plata Pls' Trial Ex. 7, at 2. (Letter, January 29, 2007.) In May, 2007, staff at CVSP reported a 25% vacancy rate for LVNs and retention problems. Plata Pls' Trial Ex. 20, at 2-3. (Letter, July 2, 2007.) In May 2007, RJD had 25.94 vacancies for 43.94 LVN positions. Plata Pls' Trial Ex. 22, at 1. (Letter, July 18, 2007.) To cover the vacant LVN positions, RJD was using "forced overtime" with the remaining LVNs to cover many posts and the staff reported that, on one June weekend, the shortage was so acute that even the Supervising Registered Nurses (SRNs) had to fill LVN posts. *Id.* at 1. In June 2007, Corcoran reported a 40% vacancy rate for their 50 LVN positions, and they anticipated receiving 18 additional LVN positions that they likely cannot fill. Plata Pls' Trial Ex. 24, at 2. (Letter, July 25, 2007.) In June 2007, fewer than half of the LVN positions at PVSP were filled with state employees. Plata Pls' Trial Ex. 23, at 6. (Letter, July 24, 2007.)

85. Prisons with LVN shortages scramble to work with the limited resources they have. The CMC medical managers reported that, in order to build in some continuity with the limited LVN staff available, most of the LVNs were being trained to work in only one area. While this promotes stability in certain work areas, the supervisors acknowledged that this policy creates other strains on the system. Most significantly, the prison has no staffing depth, and is very challenged when an LVN is sick or on vacation. Plata Pls' Trial

Ex. 25, at 3.  (Letter, August 3, 2007.)

## B.    The Shortage of LVNs is Causing Medication Delays and Inadequate Recordkeeping

86.  The fact that the CDCR has too few LVNs, given the size of the prison population, has a critical impact on medication delivery in both mainline and lockdown units, in terms of ensuring that the right patient gets the right medications in a timely manner, and in terms of maintaining necessary documentation and a complete medical history.

87.  At VSPW, the prison assigned a wide variety of responsibilities to the LVNs, possibly more than is reasonable given the overcrowded conditions at that prison.  The LVNs stationed in the yard clinics were responsible for, *inter alia*, medication distribution and record-keeping (including insulin administration), following up with the pharmacy on medication inquiries, doing blood pressure checks, changing dressings and responding to emergency alarms in their yards.  Emergency alarms sound for a number of reasons, including inmate assaults on inmates or staff, medical emergencies and false alarms.  Once the alarm goes off, medication distribution (as well as all movement on the affected yard) is suspended while the LVNs respond to the call with emergency equipment.  Following the emergency, the LVNs would resume the medications line.

88.  The LVNs' duties have become more complex because the emergency alarms at VSPW have apparently increased in the last year, as I would expect given the rapid increase in population.  CDCR's population data shows that the number of inmates at VSPW has increased by 400 during the last six months, from approximately 3850 to 4250, apparently due to the closure of the women's facility at the California Rehabilitation Center (CRC).  At 3,850, VSPW was at 195% capacity, and the addition of 400 prisoners

was not accompanied by any additional construction, so the extra prisoners have been housed in converted day rooms and in the converted gymnasium. VSPW's Director of Nursing reported that the number of alarms had increased significantly during this period.

89. The VSPW LVNs were not able to demonstrate compliance with their assigned duties. They are supposed to maintain medication administration records and treatment logs. I reviewed these documents on two of the four prison yards at VSPW and determined that the records were incomplete, lacking vital information. For example, the treatment log for blood pressure checks on one yard was supposed to track the blood pressures for patients for whom PCPs had ordered them. I found that the patient records often lacked the date of the order, the duration of the checks, the name of the ordering PCP and, in many cases, any indication that blood pressure checks had been performed. The LVNs confirmed that they do not track whether prisoners show up for their PCP-ordered blood pressure checks. Blood sugar checks for insulin dependent diabetics lacked critical information about dosage and the time of treatment. Based upon my conversations with the LVNs in the clinic and their supervisors, I believe these treatment lapses occur because there are too few LVNs for the number of VSPW prisoners.

90. Plaintiffs' report documents that CMC likewise has a high reported LVN vacancy rate and has also had care deficiencies based on having too few personnel to document medication distribution. Plaintiffs' counsel documented that at that prison, the medications for mainline prisoners are dispensed from a central office on each of the housing yards. The medications are not pre-packaged for each patient. Instead, they are stacked on shelves around the room, and the LVNs must review the Medication Administration Record (MAR) of each patient who arrives at the window, gather the prescribed medications and distribute them, patient by patient. This is a very time-

32

consuming process, and Dr. Greenman stated that, following the transition from MTAs to LVNs, medication lines lengthened. Plata Pls' Trial Ex. 25, at 8. (Letter, August 3, 2007.)

91. CMC's method for distributing medications makes it virtually impossible to track on a daily basis when patients fail to show up for their medications. Under the P&Ps, a prisoner who misses three consecutive days of a nurse-administered or DOT medication, or fails to pick up a "carry" medication (i.e., a medication that is provided to the patient for self-administration) for three days, must be referred to the scheduler for an urgent appointment with his PCP for medication follow-up counseling, and the referral must be initiated on the third consecutive day of the no-show or refusals. Policies & Procedures, 4-11-6. CMC staff readily admitted that they cannot review all of the hundreds of MARS on each yard each day to comply with this requirement, which is unsurprising given their level of staffing. (Plata Pls' Trial Ex. 25, at 2 and 8.) (Letter, August 3, 2007.)

### C.    The *Coleman* Special Master Uncovered Pervasive Problems with Medication Delivery

92. A medical delivery system that is insufficiently staffed for the existing treatment needs will result in significant medication errors. As I would expect in light of the staffing shortages, the Coleman Special Master has documented extensive medication delivery problems throughout the state prison system. See Joint Pls' Trial Ex. 36 (*Coleman* Special Master's 18th Report, filed July 30, 2007) at 47 (MCSP: "[m]edication expiration gaps were reportedly common"); 161, 292 (California Training Facility (CTF) and Central California Women's Facility (CCWF), respectively: "Medication continuity was problematic"); 210 (California State Prison, Los Angeles County (LAC): "medication management remained problematic"); 223, 285 (California Correctional Institution (CCI)

33

and CIW, respectively:  "Medication continuity remained problematic").

93.  There are breakdowns in continuity of medication in numerous areas, including: inter and intra-institutional transfers, renewals upon expiration, and initiation upon arrival.  See, *id.* at 26 (staff at Pelican Bay State Prison (PBSP) "reported interruptions in medication continuity, particularly when renewals were due"); 50 (MCSP: "Medication continuity was not sustained for new arrivals.  Staff audits found that 41 percent of new arrivals with current orders received medication within 24 hours of arrival, down from 82 percent during the previous quarter"); 89 (SQ "continuity of medication upon arrival and intra-institutional relocations was problematic."); 96 (Deuel Vocational Institution:  "Timely medication for newly arriving inmates remained problematic. . . . Medication continuity on intra-institutional transfers occurred timely in only 40 percent of cases."); 148 (SVSP "Medication continuity remained problematic when inmates were relocated between yards…or arrived from other prisons."); 190 (KVSP medication audits "revealed problems with continuity of medication upon inmates' arrival at the institution, their movements within the institution, and the renewal of medication orders.")

94.  In addition, the Special Master found disruptions to continuity of medication when patients transferred to administrative segregation, transferred from the CTC, and experienced institutional lockdowns.  See *id.* at 9 (SAC: "Staff audits found continuing problems with medication continuity when medication orders needed to be renewed and when inmates were discharged from the correctional treatment center (CTC)"); 17 (Folsom State Prison "medications sometimes expired in administrative segregation, according to psych techs."); 148 (SVSP "Medication continuity remained problematic when inmates . . .were released from the MHCB")

95.  In a functioning institutional health care system, a patient's non-compliance

34

with critical medications should trigger follow-up with the prescribing provider. This is not happening reliably or on time, in at least some prisons. See *id.* at 79 (SOL: "non-compliance with medication did not reliably trigger referrals to prescribers."); 108 (COR: "Response to medication non-compliance remained inconsistent."); 121 (SATF: "[O]nly 53 to 63 percent of documented cases of medication non-compliance were referred to mental health"); and, 122 SATF: "inmates throughout the institution were frequently found to have non-therapeutic levels of medication in their blood."; 137 (ASP: "Inmates referred for [medication] non-compliance were seen within five days in only 48 percent of cases, according to data in records"); 161 (CTF: "Referrals for non-compliance and hoarding were not made consistently"); 199 (North Kern State Prison (NKSP): "timely referral and follow up [to medication non-compliance] occurred in less than 20 percent of cases.")

96. Based on my prison inspections, review of the documents and experience as a clinician and medical administrator, I believe these significant, ongoing breakdowns in the medication delivery processes are caused by having more prisoner-patients than can be adequately treated by the staff that CDCR can hire.

## VII.   THE OVERCROWDING CRISIS OVERWHELMS CDCR'S ABILITY TO ADEQUATELY MANAGE AND MAINTAIN MEDICAL RECORDS AND PATIENT SCHEDULING INFORMATION

97. Clinical care is not the only requirement for the constitutional delivery of health care services. Unless medical records and scheduling information are managed, organized, and maintained effectively, appropriate health care services cannot be provided. Overcrowding makes it impossible for CDCR to perform these essential functions.

### A. Medical Records Staff Are Incapable of Maintaining Orderly Medical Files Due to the Sheer Numbers of Prisoners

98.  An organized, current medical record, whether maintained electronically or on paper, is essential to the provision of adequate medical care and must provide the PCP comprehensive information about the patient to enable the PCP to determine the patient's history and future treatment.  Indeed, an accurate medical record is particularly critical in a system like the CDCR, where prisoners are unlikely to have a single consistent primary care provider, due to staffing shortages, use of physician registry and inter and intra-prison transfers, and where the primary care provider may not have access to a fax machine, computer or even a telephone, to request current lab results, consultation reports, x-ray reports, and the like.  All CDCR prisons currently use paper medical records (except PBSP), with each prisoner's health care documents required to be organized in a file referred to as the "Unit Health Record" (UHR).  As I describe below, overcrowding makes it impossible for CDCR to adequately and appropriately maintain UHRs.

99.  The lack of adequate records is a long-standing issue that significantly impedes the delivery of health care and can have fatal consequences.  In 2005, the Court found that medical records at most prisons were either in a shambles or non-existent.  Plata Pls' Trial Ex. 1, at 20:18-19. (Findings of Fact and Conclusions of Law, October 3, 2005.) "Incomplete medical records" was identified in the review of calendar year 2006 deaths as one of the significant systemic lapses of care identified in the review.  Joint Pls' Trial Ex.34, at 7-8.  (Receiver's Death Report.)  That review also identified "lost medical information" as one of the kinds of poor provider communication in seven possibly preventable deaths.  *Id*. at 7.

100.  The CDCR health care data system is remarkable for its lack of computers

with connections to one other, both within and between prisons. The CDCR's network, such as it exists, has very limited capacity to store and transfer data and suffers multiple outages and failures daily. Joint Pls' Trial Ex.32, at 53:17-25. (Receiver's Sixth Report.) For these reasons, it cannot be used to house, access, or store data. *Id.* at 53:19-20. As the Receiver has stated, "an effective computer network is essential to providing medical staff access to clinical information." *Id.* at 53:23-25.

### 1.  The Quality of Medical Records at Many Prisons is Poor

101.  Consistent with the findings of the Court's Receiver and his staff, I found that medical records at certain prisons are dangerously incomplete. On October 29, 2007, I visited CIM. That prison houses 3,500 plus reception center prisoners, receiving each week about 500 new arrivals (and transferring out each week approximately the same number). It also houses approximately 2,650 minimum custody inmates. Based on what I observed and was told by prison staff when inspecting CIM on October 29, 2007, the medical records for the reception center prisoners, as explained below, are fragmented and often incomplete, meaning that nurses, doctors, and others do not have an adequate basis to assess and evaluate medical concerns.

102.  For the more than 3,500 reception center prisoners typically housed at CIM, the medical records are maintained in up to three and sometimes even four separate files. There are several reasons for this fragmentation. First, a large percentage of prisoners received at CIM are parole violators and/or persons who have served a previous term in prison. The UHRs for these prisoners, containing the medical records from previous CDCR term(s), are stored at a southern regional facility. It typically takes about two or

37

three weeks to receive these prisoners' UHRs from the regional office. As such, these UHRs, which hold all previous medical records, are not available to the PCP who conducts the new arrival history and physical exam, which is supposed to take place within two weeks of reception, or to other PCPs who see the patient in the yard clinics for "sick call." Further, if a new arrival prisoner's UHR is not in fact forwarded by the regional office, CIM must then contact the regional office and request it. This is not an unusual occurrence; the time it takes to receive such requested UHRs varies but it can take months. A log I reviewed on October 30th indicated that the UHRs of four prisoners who arrived at CIM on July 2, 2007 had not yet been received.

103. During the time when prisoners' UHRs are not available, CIM medical records staff file health care documents generated in the yard clinics and elsewhere (e.g., results of tests ordered by a PCP) in plain manila folders, referred to as flimsies, that are marked with each prisoner's name and number. Sometimes, if a prisoner is seen at a CIM clinic, and a UHR or flimsy is not provided or cannot be located, the clinic medical staff will make their own flimsy for a prisoner. This sometimes means that a prisoner will have two flimsy files containing medical records, plus the formal UHR.

104. In addition, every newly received reception center prisoner at CIM, whether or not a UHR and/or flimsy or flimsies are available and being used, has critical medical records placed in yet another file, known as the "yellow jacket." The CIM yellow jacket files hold all health care documentation related to the required new arrival screening and assessments, including the initial nursing evaluation, tuberculosis testing, and the initial history and physical exam by a primary care provider. These yellow jacket files, and the

38

medical records in them, are not provided to the yard medical clinics when a patient is seen there, but instead are kept in a central processing area or provided only to medical staff conducting the required new arrival health care history and physical exam. The medical documents in the yellow jackets are placed in the patients' UHR or flimsy – and thus at least in theory are available to other medical staff – only after all required reception center health care functions are completed, which can take two or more weeks. Adequate care is not possible with fragmented medical records.

105. CIM reception center medical records are also often incomplete, in addition to being fragmented. I observed in the CIM Reception Center Central medical records office approximately five linear feet of "loose filing"(documents waiting to be placed in prisoner-patient's unit health records (UHRs), including documents in yellow jackets waiting to be incorporated into UHRs. There were also two cardboard boxes full of unsorted health care documents waiting to be added to the loose filing. This amount of filing existed despite the record office being open 12 hours a day. I was told, and a spot check of some of the documents in the loose filing indicated, that the unfiled medical documents ranged in date back as long as one month. Adequate care is not possible, and serious harm to patients is risked, when medical records are incomplete.

106. At ASP on October 30, 2007, I was told that the medical records office constantly has approximately four feet of loose filing, despite the fact that the medical records department runs two shifts on weekdays and is also staffed on weekends. Moreover, I found loose filing that had not yet reached the medical records department. I observed a large plastic milk crate in the Yard Five medical clinic that was full

(overflowing, actually) with unorganized health care records, dating back at least two weeks and including PCP progress notes (on which the results of individual examinations are documented). This crate also included a large (approximately four inches thick) pile of medication distribution stickers, each of which documented that a particular prisoner had received a particular medication. I was told that each of the stickers needed to be placed on an individual piece of paper, and then placed in each prisoner's UHR, so that there would be a record of what medications were given to what prisoner. It was obvious that the amount of documents generated had simply overwhelmed the staff's capacity to timely and properly place documents in prisoners' UHRs.

107. At HDSP on November 1, 2007, I was informed that medical records staff pull 1400-1500 UHRs per week for various health care providers, and that approximately three feet of loose filing is generated each week. The medical records department has been short-staffed (unable to fill all allocated positions) for months, but uses overtime to increase the amount of work done. Despite using overtime, the amount of accumulated loose filing over the last two months has remained at 107 inches; these documents waiting to be filed are two to three weeks old. This means that the UHR received by a nurse or PCP may not include the most recent documentation. In addition, medical records staff no longer fastens documents in the UHR, as required by policy and good practice, but instead is "drop-filing," meaning that papers are simply placed into UHRs. This practice greatly increases the chance of documents being lost or misplaced.

108. My findings regarding inadequate medical records are consistent with those reported by plaintiffs' counsel over the last year. At LAC, plaintiffs' counsel reviewed

40

approximately 25 UHRs, finding that progress notes were rarely in chronological order, and in several files progress notes from different years were mixed up. Additionally, in most of the files records were misplaced within the folder. Several clinicians asked about the issue all agreed that the poor organization of the UHRs was a significant problem. Plata Pls' Trial Ex. 14, at 10. (Letter, April 18, 2007.)

109. Very recently, staff at CCC reported to plaintiffs' counsel that they had a large amount of loose filing in medical records, with records supervisors stating that some of the documents were as old as six months. This loose filing backlog exists despite efforts such as utilizing overtime and additional staff from the prison next door. Plata Pls' Trial Ex. 31, at 2. (Letter, October 18, 2007.)

## B. CDCR's Medical Scheduling and Tracking System Is Inadequate

110. Patients cannot receive adequate care if they cannot get timely appointments with clinicians. Timely appointments cannot be made without an effective scheduling and tracking system. CDCR has proven itself incapable of developing such systems due in large part to the sheer numbers of patients and their vast and growing need for coordinated appointments.

111. The CDCR medical services tracking system is, to use the Receiver's terms, "primitive" and "increasingly unreliable." Joint Pls' Trial Ex 29, at 42:13-16. (Second Receiver's Report.) The CDCR's "Access" based Inmate Medical Scheduling and Tracking System (IMSATS), first implemented in 2003-2004, was never intended to last more than a year or two, given its data load limitations. In addition, the system requires some level of experience with it to operate it correctly; for example, medical encounters

41

must be "closed out" in order for the system to work properly. Inconsistent data entry, as one physician manager indicated, regularly corrupts the information and schedules that are subsequently generated. This makes scheduling and coordinating patient appointments difficult or impossible.

112. The Receiver has determined that the CDCR's "primitive computerized tracking system . . . because of either programming errors or inappropriate input process continues to 'lose' patients with chronic diseases." Joint Pls' Trial Ex. 29, at 36:11-15. (Second Receiver's Report.) I agree. Moreover, because the scheduling systems for medical, mental health and dental care are all separate and independent, there is no way to avoid scheduling conflicting appointments. Further, some prisons do not have IMSATS, and rely on paper-based processes for medical scheduling and tracking that do not permit adequate tracking of appointments and patient needs.

113. At some of the prisons I visited, I observed or was informed of matters related to medical scheduling and tracking that were consistent with the findings of the Court's Receiver regarding the inadequacies of medical scheduling and tracking. At ASP, for example, I was provided two IMSATS computer generated "aging" reports listing all pending off-site specialty referrals. One listed 316 pending high priority (urgent) specialty referrals, while the other report listed 977 pending routine referrals. ASP managers and staff were convinced that the data was not entirely accurate, and that some of the referrals listed as pending had actually taken place or were otherwise not necessary. As noted above, the prison had determined it would have to review the UHRs for all 1,300 listed referrals in order obtain accurate scheduling information, an extremely time-consuming

and labor intensive task. If the aging reports are accurate, then patients are unable to see specialists within the required timelines. If they are not, then the prison's scheduling system is incapable of ensuring that patients are scheduled and seen timely.

114. My opinion and findings regarding inadequate medical scheduling and tracking are consistent with the reports by plaintiffs' counsel over the last year. Specifically, counsel reported that at SOL there were inadequate numbers of staff to enter data into the computer based scheduling system, and staff reported problems with the program in that appointments even when completed stay listed as pending. Thus, data entered can be incomplete or incorrect. Plata Pls' Trial Ex. 21, at 17. (Letter, July 10, 2007.)

115. At CRC, a manual paper-based system was being used to track specialty consult requests and appointments, and as such managers could not easily determine the extent of delays. Plata Pls' Trial Ex. 18, at 6. (Letter, June 6, 2007.) The prison also had no method to track those prisoner-patients who needed to be offered required preventive care tests (fecal occult blood tests). *Id.* at 11.

116. At CMF, the prison had implemented the IMSATS program, but was not producing key indicator reports because the prison did not have confidence in the data produced. Plata Pls' Trial Ex. 16, at 10. (Letter, May 7, 2007.)

117. CCWF was experiencing significant computer problems. Some of the computers were extremely slow, taking up to thirty seconds for the computer to open a screen that generally opens instantly. Obviously, this greatly limits the Office Technicians' (OTs) productivity. CCWF staff also reported that IMSATS itself also has

43

problems. For example, appointments that have been closed are reportedly still reopening for no reason. Plata Pls' Trial Ex. 8, at 2-3. (Letter, February 7, 2007.)

118. At CIW, patients were not all being timely scheduled for medical appointments, and there was no doubt that part of the scheduling difficulties result from problems with the IMSATS program. Further, some of the computers at CIW were very slow. CIW' staff members stated they had raised this issue, but did not know how to fix it. Plata Pls' Trial Ex. 15, at 4-5. (Letter, May 7, 2007.)

119. At CCC, managers and staff identified medical scheduling and tracking as an extreme challenge. The IMSATS computer program is not being provided to CCC, and so the prison must make do with what is essentially a hand-kept, paper-only process. As prison managers stated, this is a very labor intensive approach. The amount of scheduling and tracking is expected to increase as CCC more consistently schedules patients for follow-up and other appointments (e.g., chronic care), as required by the policies. CCC staff stated that this effort will require additional dedicated clerical staff and additional space, imposed on currently inadequate space. Plata Pls' Trial Ex. 31, at 2. (Letter, October 18, 2007.)

120. Calipatria State Prison (CAL) reported that it would not receive the IMSATS computer tracking program. The current system for tracking sick call requests was to write them in a log book. However, on C facility this logbook had a large gap where it did not indicate any 7362s were received. This gap was from 4/17/07 to 5/4/07. Plata Pls' Trial Ex. 19, at 6. (Letter, June 25, 2007.)

121. SATF's computers are not networked. The challenges this creates for medical

scheduling and tracking are obvious, particularly given the spread-out nature of the prison and its large population. In addition, most clinics only have a single old and very slow computer. Plata Pls' Trial Ex. 32, at 6. (Letter, October 19, 2007.)

## VIII. THERE ARE NOT ENOUGH CUSTODY OFFICERS TO ENSURE ADEQUATE ACCESS TO MEDICAL APPOINTMENTS AND CLINICAL CONTACTS.

122. In prisons, custody officers are integral to the medical care delivery system because they facilitate patients' access to their primary care providers and tertiary care. Custody escorts for medical care are particularly critical in California's overcrowded facilities, where overcrowding-related disturbances are frequently followed by prisoner "lockdowns." Joint Pls' Trial Ex. 26, at 29. (Receiver's Overcrowding Report.) "Lockdowns call for a radically different form of medical delivery than the services provided under normal general population conditions." *Id.* at 29. Whereas general population prisoners usually leave their housing units for yard clinic appointments, medication lines, etc., "[u]nder lockdown conditions, clinical staff must go from cell to cell to see the prisoner/patient, or small groups or individual prisoners must be escorted by correctional officers to and from clinic areas." *Id.* at 29-30. Whether the clinicians go to the patients, or the patients are escorted to the clinicians, "lockdowns inhibit the delivery of medical care and increase the staffing necessary for such care." *Id.* at 30.

123. The CDCR has a shortage of custody officers, based on high vacancy rates and a failure to allocate a sufficient number of custody positions. In April 2002, there were 1,179 correctional officer vacancies. By January 2007, that number had risen to 1,915. *Id.* at 12. The CDCR estimates that, when unbudgeted positions are included (*i.e.*, custody assignments to posts to guard at community hospitals and to monitor at nontraditional beds), the actual custody officer shortage is between 2,400 and 2,700. *Id.* at

45

12.

124. The Receiver's conclusions are corroborated by plaintiffs' counsels' findings. At SVSP in June 2007, Warden Evans discussed that SVSP's serious custody staff shortages (at 26%) have impacted methods of care delivery. Because of these shortages, facilities are shut down on a rotational basis and there is not enough staff to do medication passes on the yards. Medication therefore must be delivered cell-to-cell. Plata Pls' Trial Ex. 29, at 2. (Letter, October 4, 2007.)

125. At San Quentin, nurses complained to plaintiffs counsel that custody officers were not available to escort prisoners with urgent or emergency medical symptoms to the clinic for a same-day appointment. Plata Pls' Trial Ex. 27, at 5. (Letter, September 7, 2007.) This problem was vividly illustrated in the case of one prisoner whose 7362 was picked upon July 30, and was scheduled for nurse triage on August 2. This prisoner's listed symptoms included coughing blood, chest pains and high blood pressure. When asked why the patient was not brought to the clinic immediately, the nurse indicated that he should have been, but that she believed it would have been futile to ask the custody officers to bring him down, based on her experience. *Id.* at 5.

## IX. THERE ARE MORE PRISONERS REQUIRING SPECIALIZED PLACEMENT FOR MEDICAL REASONS THAN CDCR CAN ACCOMMODATE

126. Recognizing that "the CDCR has neither planned for nor provided adequate medical beds for disabled prisoners, aged inmates and prisoners who need some form of sheltered living due to their medical or mental health conditions," the Receiver has proposed the addition of approximately 5,000 medical beds. Joint Pls' Trial Ex. 26, at 27. (Receiver's Overcrowding Report.) Based on my review of documents and my site visits,

46

I agree that the CDCR is currently unable to accommodate the housing needs of medical patients requiring specialized placement.

127. At HDSP, for example, plaintiffs' counsel found in October 2006 that the number of Long Term Care (LTC) patients in the prison's Correctional Treatment Center had swelled to 20 patients. Many of these patients were of a higher acuity than previously housed in the CTC (some were transfers from CTCs at prisons in the Valley Fever epidemic region). The staff reported that these patients greatly impacted the PCP workload in the CTC, and there were no medical records showing that these patients were seen by a primary care provider every three days, as required. Moreover, the prison did not have the CTC equipment necessary to provide adequate treatment to the increased number of LTC patients, including for lifting and bathing patients. Plata Pls' Trial Ex. 10, at 2. (Letter, February 9, 2007.)

128. Some prisoners with medical disabilities require housing accommodations that may be provided in a general population setting. For example, prisoners with seizure disorders may require placement on a lower bunk, and those with orthopedic injuries may require housing on a lower tier of multi-floored cell block. Some prisons, including San Quentin, have consistently failed to ensure that these medical needs are adequately accommodated. In August 2006 and again in June 2007, plaintiffs counsel identified numerous cases in which prisoners complained that the physician orders for housing on the ground floor and/or a lower bunk were ignored. Plata Pls' Trial Exs. 3 and 4, at 8-9 and 5-7. (SQ *Armstrong* Report, June 20, 2007 and SQ *Armstrong* Report, August 30, 2006.)

129. In an especially egregious example of improper housing, San Quentin inmate Cole, whose knees buckle frequently and whose feet are often swollen and numb or painful, reports that he was forced to spend months on an upper bunk in violation of

47

medical staff's order that he be housed in a lower bunk, even after repeatedly bringing the violation to the attention of building staff. Joint Pls' Trial Ex. 12, at ¶¶ 2-8. (Declaration of Peter Cole.)  In 2006, Mr. Cole states he fell from his upper bunk while trying to climb down using his cane, crashed into the lockers below and punctured and broke his jaw and tore his left rotator cuff. He needed ten stitches in his cheek and had his jaw wired shut. *Id*. at ¶¶ 9-10. Mr. Cole remained in the Correctional Treatment Center for two months, where he vomited his liquid diet and tore the wire in his jaw. *Id*. at ¶¶ 11-13.

130.  Transfers for prisoners needing special accommodations because they have mobility impairments (*e.g.* wheelchair users) are delayed, presumably because of a shortage of appropriate housing. For the period of February to May, 2007, plaintiffs counsel determined that out of 79 prisoners with disabilities requiring placement accommodations based on their physical or medical condition, more than one-third were not transferred to an appropriate placement within seven days, as required by court order in *Armstrong v. Schwarzenegger*. Plata Pls' Trial Ex. 3, at 15-16. (June 20, 2007 SQ *Armstrong* Report.)

## X.    OVERCROWDING INCREASES THE RATE AND SERIOUSNESS OF INFECTIOUS DISEASE TRANSMISSION

131.  The Governor states that overcrowding puts "[l]arge numbers of inmates" at an "increased, substantial risk for transmission of infectious diseases." Joint Pls' Trial Ex. 1, at 1. (Governor's Proclamation.) The Receiver has also concluded that "overcrowding has increased the number and seriousness of infectious and communicable diseases, jeopardizing prisoners, staff, and the public." Joint Pls' Trial Ex. 26, (Receiver's Overcrowding Report.) Although a system-wide outbreak has thus far been avoided, "given the number of prisoners, conditions in gyms and hallways converted to housing units, the velocity of prisoner movement between institutions and in and out of the CDCR

48

itself, the risk of such an outbreak cannot be underestimated." *Id.* I agree that the CDCR's current overcrowded conditions make the system ripe for an infectious disease outbreak.

132. Some prisons have been hard-hit by infectious diseases. In the Fourth Report, the Receiver recounts an instance in which an outbreak of potentially deadly tuberculosis was narrowly averted in 2006, with significant costs to the system:

> A twenty-year-old man spent three months in three San Diego County jails prior to his November 2, 2006 transfer to the R.J. Donovan Reception Center. As a result of routine testing, RJ Donovan showed that he had florid, highly infectious tuberculosis. Almost immediately thereafter Donovan was closed to inmate movement, creating enormous stress on the already overcrowded prison and jail systems. Because so many inmates were exposed during his San Diego jail stay, and because many of those inmates had transferred to prisons throughout the state, the contact investigation effort was massive and required months of follow-up of potentially infected inmates and staff.

Joint Pls' Trial Ex. 30, at 71. (Receiver's Fourth Bi-Monthly Report.)

133. In the same report, the Receiver documents that the rate of gastroenteritis outbreaks was dramatically higher in the 2006/2007 norovirus season. Outbreaks at SOL and Chuckawalla Valley State Prison caused managers to shut down inmate movement for extended periods in November, 2006. *Id.* PVSP had an outbreak in its triple-bunked gymnasium. *Id.* at 72. An outbreak at San Quentin in December and January affected approximately 900 prisoners and 50 staff members, causing the prison to stop accepting prisoners for a period. *Id.*

134. The California Division of Occupational Safety and Health recently fined CDCR for its failure to investigate eight bacterial infections and for not reporting two staph infections between June 2006 and May 2007. Joint Pls' Trial Ex. 44. (Sacramento

49

Bee, November 1, 2007.)

135. The housing conditions I observed and, in particular, the converted gymnasiums at ASP, VSPW and San Quentin, create textbook breeding grounds for infectious diseases. Indeed, one of the physicians I spoke to in the gymnasium clinic reported concerns regarding the recent incidence of virally-related skin conditions that could be the beginning of an outbreak. Until CDCR reduces its population, it will remain highly vulnerable to outbreaks of communicable diseases, including staph infections, tuberculosis and influenza, a risk that is exacerbated by the fact that prisoners move frequently, both within and between institutions.

## XI.    CONCLUSIONS

136. Based on all that I have set forth above, I believe that overcrowding is the primary cause of the current state of medical crisis in the CDCR. The Receiver and the CDCR will be unable to address and resolve the critical medical care deficiencies until the need for services within the system is significantly reduced. Moreover, I believe that the hiring gains for clinicians made in the past year will be lost if these systemic issues are not addressed, because many newly-hired clinicians will be unwilling to risk their professional credentials and reputations by practicing in an environment where their patients are at risk of harm because among other things adequate clinical space is scarce, appointments are not scheduled, complete medical records are unavailable, and medications are not delivered.

137. As the Receiver has already informed the Governor, "It will not be possible to raise access to, and quality of, medical care to constitutional levels with overpopulation at its current levels." Joint Pls' Trial Ex. 55, at 1. (July 24, 2006 Letter, Receiver to Governor Schwarzenegger.) I agree. Creating a constitutionally adequate medical system

with the current population level is practically impossible. Creating such a system while the population continues to grow steadily, adding thousands of prisoners each year, is inconceivable.

138. The CDCR lacks the necessary infrastructure, staffing and systems to deliver adequate medical care to the current population. As the Receiver notes, "The consequences of severe overcrowding in the prisons, including specifically the CDCR's disorganized response to overcrowding, have continued to divert the Receiver's resources from his primary task of building a constitutionally adequate health care system." Joint Pls' Trial Ex. 27, at 4. (Supplemental Overcrowding Report.) The CDCR, in concert with the Receiver, cannot simultaneously develop a competent medical care delivery system in facilities that lack necessary space and staffing, and address the growing needs of an ever-increasing number of patients. Until the existing overcrowding situation is addressed, CDCR is locked into a "crisis-response" approach where it can focus only on putting out "fires" rather than system-building.

139. As a former Receiver tasked with building a constitutionally adequate medical care system in an unstable environment, I understand one must reduce on-going stresses in the system to stabilize the health care delivery situation. I was able to successfully implement a constitutionally adequate system in the District of Columbia jail in the required time frame because there was a population cap on the facility. In order to develop and implement a constitutionally adequate system in a reasonable time frame and avoid further unnecessary suffering and death, California must reduce and stabilize the prison population.

Date: November 9, 2007                    ___/s/ Ronald M. Shansky____
                                          RONALD M. SHANSKY, MD


51

# APPENDIX A

# RONALD MARK SHANSKY, M.D.

## CURRICULUM VITAE

### *ACADEMIC TRAINING*

Bachelor of Science, University of Wisconsin, 1967
Doctor of Medicine, Medical College of Wisconsin, 1971
Master of Public Health, University of Illinois School of Public Health, 1975

### *PROFESSIONAL LICENSE*

Licensed Physician (Illinois) No. 36-46042

### *INTERNSHIP AND RESIDENCY TRAINING*

Internship – Cook County Hospital, July 1971-1972
Residency – Internal Medicine, Cook County Hospital, July 1972-1974

### *BOARD CERTIFICATION AND FELLOWSHIPS*

Diplomate of the American Board of Internal Medicine – September 1978
Diplomate of the American Board of Quality Assurance and Utilization Review Physicians – 1992
Elected Fellow of the Society of Correctional Physicians – 1999

### *EMPLOYMENT*

Medical Director, Center for Correctional Health & Policy Studies, Washington, D.C. Jail – 2004 to 2006
Consultant, Corrections Medicine and Continuous Quality Improvement – 1993 to present on a full-time basis; and throughout career while holding other positions
Medical Director, Illinois Department of Corrections – 1982-1993, 1998-1999
Attending Physician, Department of Medicine, Cook County Hospital – 1978 to Present
Surveyor (part-time), Joint Commission on Accreditation of Healthcare Organizations – 1993-1997
Staff Physician, Metropolitan Correctional Center of Chicago – 1975-1982

## CONSULTATIONS

Condition of Confinement Reviews for PricewaterhouseCoopers,
   reviewing detention facilities housing federal detainees; 2000–Present
Essex County Jail, Newark, N.J.
Michigan Department of Corrections
Montana Department of Corrections
New Mexico Department of Corrections
Polk Correctional Center, Raleigh, N.C.
South Dakota Department of Corrections

## APPOINTMENTS

Member of Medical Oversight Team reviewing the Ohio prison system – 2005 to present
Court Monitor, De Kalb County Jail, Decatur, Georgia – 2002-2005
Consultant, California Department of Corrections – 2000
Court Monitor, Milwaukee County Jail – 1998 to present
Court Monitor, Essex County Jail, Newark, NJ – 1995 to present
Medical Expert, State of Michigan – 1995
Consultant to Special Master, *Madrid v. Gomez*, Pelican Bay Prison, California Department of
   Corrections – 1995
Medical Expert, State of New Mexico – 1994
Consultant, Connecticut Department of Corrections – 1994
National Advisory Board of the National Center for Health Care Studies – 1991
Illinois AIDS Interdisciplinary Advisory Council – November 1985
Illinois AIDS Caretaker Group – November 1985
Task Force to Rewrite American Public Health Association Standards for Medical Services in
   Correctional Facilities – 1983
Corrections Subcommittee, Medical Care Section, APHA – 1983
Preceptor, then Clinical Associate Professor, Department of Preventive Medicine and Community Health,
   Abraham Lincoln School of Medicine, University of Illinois, Chicago, Illinois – 1972-1979
Clinical Associate Professor, Department of Medicine, Ravenswood Medical Center, Chicago,
   Illinois – 1979-1981
Director, Phase 1 and 2 Program at Cook County Hospital for the Abraham Lincoln School of
   Medicine – 1976-1978
Medical Director, Uptown People's Health Center – September 1978
Director, General Medicine Clinic, Department of Medicine, Cook County Hospital – 1975
Director, Clinical Services, Department of Internal Medicine, Cook County Hospital – 1975
Associate Attending Physician, Department of Internal Medicine, Cook County Hospital – 1974-1975
Instructor, Illinois College of Optometry, Chicago, Illinois – 1972-1974

## COMMITTEE MEMBERSHIPS

Chairman, State of Illinois AIDS Caretakers Committee – 1985
Chairman, Corrections Subcommittee, Medical Care Section – 1983
Chairman, Medical Records Committee, Cook County Hospital – 1981
Member, Executive Medical Staff, Cook County Hospital – 1979
Member, Task Force to Rewrite the *Standards for Health Services in Correctional Institutions* –
   published 1986

## PROFESSIONAL ORGANIZATIONS

Society of Correctional Physicians – President, 1993-1995
American Public Health Association – 1974 to present
American Correctional Health Services Association – 1988
American Correctional Association – 1982
Federation of American Scientists – 1974-1981

## CIVIC

Mutually agreed upon expert, Milwaukee County Jail – 2001
Mutually agreed upon expert, *Inmates v. Essex County Jail*, 1995 to present
Appointed Receiver by Judge William Bryant, Medical and Mental Health Programs, District of
    Columbia Jail, *Campbell v. McGruder* – 1995
Mutually agreed upon neutral expert, State of Montana, *Langford v. Racicot* – 1995
Mutually agreed upon neutral expert, State of Vermont, *Goldsmith v. Dean* – 1996
Executive Committee Overseeing Health Care, Puerto Rico Administration of Corrections – 1993
Appointed by Judge Gerald Jenks, District Court for the Central District of Utah, as Impartial Expert
    in the matter of *Henry v. Deland* – 1993
Appointed by Magistrate Claude Hicks Jr., U.S. District Court in Macon, Georgia as Medical Expert
    in the matter of *Cason v. Seckinger* – 1993
Appointed by Judge Owen M. Panner, District of Oregon, as Special Master in *Van Patten v. Pearce*
    involving medical services at Eastern Oregon Correctional Institution – December 1991
Appointed by Allan Breed, Special Master, *Gates* case, as Medical Consultant regarding California
    Medical Facility in Vacaville
Appointed by Judge M. H. Patel, Special Master, case involving San Quentin Prison – 1989 to 1995
Selected as part of delegation to inspect the medical services provided to Palestinian detainees in the
    Occupied Territories and Israel by Physicians for Human Rights – 1989
Appointed by U.S. District Judge Williams as member of medical panel monitoring medical services in
    Hawaii Prison System – 1985
Appointed by U.S. District Judge Black to evaluate medical services in the Florida Prison System –1983
Appointed by U.S. District Judge Kanne as monitor to the Lake County, Indiana Jail in the litigation of
    the *Jensen* case (H74-230) – 1982
Appointed by U.S. District Judge J. Moran as Special Master of the Lake County, Illinois Jail in the
    litigation of *Kissane v. Brown* – 1981
Board Member, Health and Medicine Policy Research Group, Chicago, Illinois – 1980
Appointed to Advisory Committee, State of Alabama, Department of Mental Health – 1980
Appointed as consultant to the State of Alabama, Department of Mental Health – 1979
Consultant, U.S. Department of Justice Civil Rights Division, Special Litigation Section – 1977
Appointed by U.S. District Judge J. Foreman to a three-member panel of medical experts to advise on
    health conditions at Menard Correctional Center, Menard, Illinois – 1976

## AWARDS

Armond Start Award for Excellence in Correctional Medicine, Society of Correctional Physicians – 1999

American Correctional Health Services Association Distinguished Service Award – 1992

## PUBLICATIONS

Michael Puisis, editor, Ronald Shansky, associate editor, *The Clinical Practice in Correctional Medicine, second edition,* 2006.

Schiff, G., Shansky, R., chapter: "The Challenges of Improving Quality in the Correctional Health Care Setting," in *The Clinical Practice in Correctional Medicine, second edition*, 2006.

Schiff, G.; Shansky, R.; Kim, S., chapter: "Using Performance Improvement Measurement to Improve Chronic Disease Management in Prisons," in *The Clinical Practice in Correctional Medicine, second edition*, 2006.

Anno, B.J., Graham, C., Lawrence, J., and Shansky, R. *Correctional Health Care – Addressing the Needs of the Elderly, Chronically Ill, and Terminally Ill Inmates.* National Institute of Corrections, 2004.

Schiff, G., Shansky, R., chapter: "Quality Improvement in the Correctional Setting," in *The Clinical Practice in Correctional Medicine*, 1998.

How-To Manual, *Quality Improvement in a Correctional System*, State of Georgia, Department of Corrections, 1995.

*Journal of Prison and Jail Health*, Editorial Board; 1988 – present.

Shansky, R., "Advances in HIV Treatment: Administrative, Professional and Fiscal Challenges in a Correctional Setting," *Journal of Prison and Jail Health*, Volume 9, Number 1.

B. Jaye Anno, Ph.D., *Prison Health Care: Guidelines for the Management of an Adequate Delivery System*, 1991; Member of Editorial Advisory Board.
Coe, J., Kwasnik, P., Shansky, R., chapter: "Health Promotion and Disease Prevention" in B. Jaye Anno, Ph.D., *Prison Health Care: Guidelines for the Management of an Adequate Delivery System*, 1991.

Hoffman, A.; Yough, W.; Bright-Asare, P.; Abcariam, H.; Shansky, R.; Fitzpatrick, J.; Lidlow, E.; Farber, M.; Summerville, J.; Petani, C.; Orsay, C.; Zal, D., "Early Detection of Bowel Cancer at an Urban Public Hospital: Demonstration Project," *Ca – A Cancer Journal for Clinicians*, American Cancer Society, Nov/Dec 1983, Vol. 33, No. 6.

Mehta, P.; Mamdani, B.; Shansky, R.; and Dunea, G., "Double Blind Study of Minoxidil and Hydralazine." Sixth International Conference of Nephrology, Florence, Italy – June 1975.

## PRISONS INSPECTED

State of Alabama Prisons at Kilby, Holman, Fountain, Tutweiller, Staton, and Draper
Parchman State Prison, Mississippi Jefferson County and Birmingham City Jails, Alabama
Arizona State Prison, Florence, Arizona
Washington County Jail, Fayetteville, Arkansas
California Medical Facility, Vacaville
California State Penitentiary, San Quentin
Colorado State Penitentiaries, Centennial, Fremont, Territorial
District of Columbia Jail at Occoquan
Florida Prison System
Florida County Jails, including Monroe County, Pasco County and Polk County
Krome Detention Facility (INS), Miami, Florida
Department of Juvenile Justice, State of Georgia
Georgia Diagnostic Center, Jackson, Georgia
Hawaii Prison System
Menard Correctional Center, Illinois
Rock Island County Jail, Rock Island, Illinois
Indiana State Penitentiary, Michigan City, Indiana
Indiana Reformatory, Pendleton, Indiana
Lake County Indiana Jail, Crown Point, Indiana
Maine State Prison, Thomaston, Maine
State Prison of Southern Michigan
New Hampshire State Penitentiary, Concord
New York City Jails
Sing Sing Penitentiary, New York
Ohio Women's Prison
State of Vermont Prison System
Walla Walla State Penitentiary, Washington
Wisconsin State Penitentiaries at Waupan, Fox Lake, Taycheedah and Dodge

## SURVEYED MEDICAL PROGRAMS

Federal Bureau of Prisons, approximately 20 facilities

## INTERNATIONAL INSPECTION

Israeli Prisons and Jails Housing Palestinian Detainees

# APPENDIX B

**Documents Reviewed by Ronald M. Shansky, M.D.**

Governor Schwarzenegger's Proclamation of a State of Emergency regarding prison overcrowding

Findings of Fact and Conclusion of Law re Appointment of Receiver, entered October 3, 2005

Dr. Peter Farber-Szekrenyi's Letter to Robert Sillen and J. Michael Keating, Jr., dated September 1, 2006

Statement of CDCR Acting Secretary James Tilton on the Legislature's Failure to Act on Critical Prison Reform Legislation, issued September 1, 2006

Office of the Inspector General, "Accountability Audit, Review of the Audits of California Department of Corrections and Rehabilitation Adult Operations and Adult Programs, 2000-2004," April 2006, Exec. Summary

California Department of Corrections (CDCR) Spring 2007 Adult Population Projections

Analysis of CDCR Death Reviews 2006, by Kent Imai, Receiver's Office August 20, 2007

Recommendations for Coccidioidomycosis Mitigation in Prisons Hyperendemic Areas of California, submitted by Dr. Winslow June 2007

Memorandum by Dr. Winslow to Sillen, Prevention and Treatment of Coccidioidomycosis at Pleasant Valley State Prison, May 21, 2007

Memorandum from Dr. Harold Tate to Martin Teel re Physician Staffing at CCI, July 23, 2007

Memorandum from Jenny Klein to Mariana Teel re Status of MDE and RN appointments by yard

Receiver's Motion For Waiver of State Law re Receiver Career Executive Assignment Positions; Exhibits

Receiver's Supplemental Report re Overcrowding

10.29.07 List of CIM Overdue Physicals

11.01.07 Sac Bee Article "Folsom Prison Staph Infections Bring Fines; Health Agency Levies $21,000 for Failure to Probe, Report Cases."

Monthly Report of Population, June 30, 1995

Weekly Report of Population October 24, 2007

Weekly Report of Population June 1, 2005

07.24.06 Letter from Receiver to Governor Schwarzenegger, Assemblymember Nunez and Senator Perata

Declaration of Peter Cole in Support of Motions for Enforcement and Further Remedial Orders and for a Three Judge Panel (From Armstrong)

18th Report of the Special Master on the Defendant's Compliance with Provisionally Approved Plans, Policies and Protocols; Exhibits A-W

Specialty Aging Reports from ASP and HDSP

CDCR's Mark IV Vacancy Report (October 2006 through September 2007)

Letter from Receiver to Schwarzenegger, et al. Regarding Additional Perspective for the Upcoming Special Session of the Legislature (July 24, 2006)

**Receiver's Overcrowding Report and Selected Exhibits**

Overcrowding Report

CDCR Inmate Population Table 6/30/1997 - 4/40/2007. (Exhibit 2)

January 2007 Little Hoover Commission Report, "Solving California's Corrections Crisis: Time is Running Out". (Exhibit 4)

CDCR Facilities Master Plan 1993-1998 - August 12, 1994. (Exhibit 5)

CDCR Facilities Master Plan 1995-2000 - August 24, 1995. (Exhibit 6)

CDCR Facilities Master Plan 1998-2003 - February 23, 1998. (Exhibit 7)

Comparison of Health Care Staff Vacancies Between January 2002 and January 2007. (Exhibit 8)

CDCR Inmate Movement Table February 1, 2007 - February 28, 2007. (Exhibit 11)

CDCR Inmate Movement Table March 1, 2007 - March 31, 2007. (Exhibit 12)

Bed Conversions Occurring from Fiscal Year 2/03 to 6/07. (Exhibit 13)

CDCR Prototypical Prison Policy Design Criteria. (Exhibit 17)

Kern Valley State Prison Base Staffing Profile (Exhibit 18)

National Commission on Correctional Health Care, 2003.  (Exhibit 22)

Clinical Space Table (Exhibit 23)

**Receiver's Periodic Reports:**

1st Bi-Monthly Report
2nd Bi-Monthly Report
3rd Bi-Monthly Report
4th Bi-Monthly Report
5th Quarterly Report
6th Quarterly Report

**PLAINTIFF'S REPORTS:**

Armstrong Reports:
San Quentin, August 29-30, 2006
San Quentin, March 27-28 and June 19-20, 2007

Plata Reports:
Substance Abuse Treatment Facility, October 19, 2007
California Correctional Center, October 18, 2007
Mule Creek State Prison, October 9, 2007
Salinas Valley State Prison, October 4, 2007
Deuel Vocational Institute, September 24, 2007
San Quentin State Prison, September 7, 2007
Kern Valley State Prison, August 15, 2007
California Men's Colony, August 3, 2007
Corcoran State Prison, July 25, 2007
Pleasant Valley State Prison, July 24, 2007
Richard J. Donovan Correctional Facility, July 18, 2007
California State Prison - Solano, July 10, 2007
Chuckawalla Valley State Prison, July 2, 2007
Calipatria State Prison, June 25, 2007
California Rehabilitation Center, June 6, 2007
Avenal State Prison, May 30, 2007
California Medical Facility, May 7, 2007
California Institution for Women, May 7, 2007
California State Prison - Los Angeles County, April 18, 2007
High Desert State Prison, March 30, 2007
California State Prison - Sacramento, March 8, 2007
Richard J. Donovan Correctional Facility, March 1, 2007
High Desert State Prison, February 9, 2007
Salinas Valley State Prison, January 29, 2007
Centinela State Prison, February 8, 2007
Central California Women's Facility, February 7, 2007
Centinela State Prison, October 24, 2006
Pleasant Valley State Prison, October 12, 2006

# EXHIBIT

# B

SUPPLEMENTAL REPORT OF RONALD SHANSKY, M.D.
DECEMBER 6, 2007

This report supplements my November 9, 2007 report.  Since that date, I have

reviewed the Receiver's November 15, 2007 Plan of Action (POA), the CDCR Weekly

Reports of Population dated November 28, 2007 and May 25, 2005, and the CDCR Fall

2007 Adult Population Projections: 2008-2013.

The POA reinforces my opinion that overcrowding is the primary cause of the

inability to provide adequate medical care and that the Receiver and CDCR will be unable

to address and resolve timely the critical medical care deficiencies unless the number of

prisoners is reduced and stabilized.   The POA recognizes that overcrowding will prevent

timely implementation of relief.   The POA repeats the Receiver's previous determination

that extreme overcrowding makes the challenge of providing constitutionally adequate

medical care dramatically more difficult.  POA, Docket Number 930, page 2.  The POA

further points out that the task of constructing sufficient new clinical spaces within

existing overcrowded prisons presents serious challenges, and that the plan to do so will

not work  if the prisons become more overcrowded .  *Id*. at 23.  The POA also states that

continued correctional officer vacancies – a problem related to overcrowding – "is a

serious threat" to the remedial plan.  *Id*. at 37.  It also states that space limitations will

make it difficult to secure adequate space at each prison for medical administrative

functions. *Id*. at 68.  The POA also states that the "volume and velocity of inmate

movement" within the prison system makes the problem with inadequate medical records

1

even more crucial.  *Id*. at 75-76.  The POA states that flaws in electrical infrastructure and physical plants – caused in part by overcrowding – will deliver additional obstacles to efforts to implement a modern technology system.  *Id*. at 91.  The process of remedying the pharmacy problem is also stated to have been protracted based on, among other things, inmate overcrowding and physical plant challenges.  *Id*. at 99.  Overcrowding is also cited by the POA as aggravating the failure to provide adequate specialty care, and a barrier to fixing those deficiencies.  *Id*. at 110 and 122.

Given the current overcrowding and the projections of further population increases that will only exacerbate the existing crisis, successful and timely implementation of the POA is not likely.[1]  However, if CDCR population is reduced and stabilized, the chances of the POA accomplishing its goals within its stated timelines would be greatly increased, and preventable morbidity and mortality would be reduced.

/s/

Ronald Shansky, M.D.

---

[1].  The CDCR inmate population has increased more than 9,000 in the two years since the Court's hearing on whether to appoint a Receiver.  Compare Weekly Report of Population, May 25, 2005, and Weekly Report of Population, November 28, 2007 (showing total institution population increase from 163,074 to 172,132).  Over the next five years, CDCR projects that its total adult prison population will increase by three or four thousand inmates per year, such that by 2013 there will be 191,886 prisoners statewide.  CDCR Fall 2007 Adult Population Projections, 2008-2013, at 6.

# EXHIBIT

# C

# SECOND SUPPLEMENTAL EXPERT REPORT OF
# RONALD M. SHANSKY, M.D.

## SEPTEMBER 10, 2008

**TABLE OF CONTENTS**

I      EXPERT QUALIFICATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.    BASES FOR EXPERT OPINIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . II. 1

III.   EACH OF THE PRISONS I INSPECTED IN AUGUST, 2008 IS
       DRAMATICALLY OVERCROWDED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

IV.    THE PRISON HEALTH CARE FACILITIES STILL ARE
       INADEQUATE FOR THE NUMBER OF PRISONERS WHO REQUIRE
       MEDICAL CARE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

       A.     Reception Center Clinical Areas Continue to be Inadequate for
              the High Volume of Medical Contacts . . . . . . . . . . . . . . . . . . . . . . . . . . 7

       B.     The Severe Shortage of Clinical and Office Space Described in
              My First Report Has Not Changed in the Last Six Months . . . . . . . . . . . 9

              1.     NKSP's Clinical Space is Inadequate . . . . . . . . . . . . . . . . . . . . . 10

              2.     SATF's Clinical Space is Inadequate . . . . . . . . . . . . . . . . . . . . . 12

              3.     PVSP's Clinical Space is Inadequate . . . . . . . . . . . . . . . . . . . . . 13

              4.     CSP-Solano's Clinical Space is Inadequate . . . . . . . . . . . . . . . . 13

              5.     Receiver's Assessment of Other Prisons' Medical Space . . . . . . 14

                     a.   California Rehabilitation Center (CRC) . . . . . . . . . . . . . . . 14

                     b.   California Training Facility – Soledad (CTF) . . . . . . . . . . . 14

                     c.   Mule Creek State Prison (MCSP) . . . . . . . . . . . . . . . . . . . . 15

V.     THE NUMBER OF CLINICIANS CONTINUES TO BE INSUFFICIENT
       FOR THE NUMBER OF PRISONERS WHO REQUIRE MEDICAL
       CARE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

       A.     CDCR Still Cannot Fill Some Vacancies . . . . . . . . . . . . . . . . . . . . . . . 17

              1.     NKSP . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

2.     SATF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

3.     PVSP . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

4.     HDSP . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

B.     Some Prisons Are Still Allocated Too Few Providers . . . . . . . . . . . . . 19

C.     Use of Registry Still Cannot Resolve Staffing Shortfalls . . . . . . . . . . . 19

D.     Clinical Staff Shortages Continue to Result in Delayed and
       Inadequate Care . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

1.     NKSP . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

2.     SATF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

3.     PVSP . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

4.     Solano . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

5.     HDSP . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

E.     Inspected Prisons Still too Shortstaffed to Implement Required
       Programs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

1.     NKSP . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

2.     SATF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

3.     PVSP . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

4.     SOL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

5.     HDSP . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

VI.    PLAINTIFFS ARE STILL NOT RECEIVING TIMELY SPECIALTY
       CARE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

A.     PVSP . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

B.     SOL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

C.     HDSP . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

D.     NKSP . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

ii

VII.    MEDICATION MANAGEMENT PROBLEMS . . . . . . . . . . . . . . . . . . . . . . . . 28

VIII.   OVERCROWDING FUELS DYSFUNCTION IN MEDICAL RECORDS . . . . 29

      A.    Quality of Medical Records Continues to be Poor at Inspected
            Prisons . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

      B.    CDCR Continues to Rely on Inadequate Tracking Systems . . . . . . . . 31

IX.     THERE ARE STILL NOT ENOUGH CUSTODY OFFICERS TO ENSURE
      ADEQUATE ACCESS TO MEDICAL APPOINTMENTS AND CLINICAL
      CONTACTS AT SOME PRISONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

      A.    PVSP . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

      B.    HDSP . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

X.      THERE ARE MORE PRISONERS REQUIRING SPECIALIZED
      PLACEMENT FOR MEDICAL REASONS THAN CDCR CAN
      ACCOMMODATE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

XI.     IT WILL TAKE YEARS FOR THE RECEIVER'S TURNAROUND PLAN TO
      REMEDY THE UNCONSTITUTIONAL MEDICAL CONDITIONS . . . . . . . . 35

XII.    OVERCROWDING INCREASES THE RATE AND SERIOUSNESS OF
      INFECTIOUS DISEASE TRANSMISSION . . . . . . . . . . . . . . . . . . . . . . . . . . 35

XIII.   CONCLUSIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

# SECOND SUPPLEMENTAL EXPERT REPORT OF
# RONALD M. SHANSKY, M.D.

## I.     EXPERT QUALIFICATIONS

1.     I am a Physician Consultant specializing in correctional medicine and continuous quality improvement, and a voluntary attending physician for the Cook County Hospital, Department of Medicine, in Chicago, Illinois.  My C.V. is attached.

2.     I have provided two prior reports in this matter, on November 9, 2007 and on December 6, 2007.  My November report sets forth my complete academic and professional career.

3.     I have listed all of my publications on my attached C.V.  I have not published additional publications since my November 2007 report.

4.     I am billing the plaintiffs $250 an hour, my usual billing rate.  For testimony, my rate is $350 an hour.  I have not testified in any cases since November 9, 2007.

## II.    BASES FOR EXPERT OPINIONS

5.     I have been retained by plaintiffs' counsel in the *Plata* and *Coleman* cases as an expert in prison medical care and health care administration, and the impact of overcrowding on prisoners' medical care, including how prison overcrowding detrimentally affects prisoners' access to health care and interferes with the ability of prison officials to meet the existing and increased medical needs of the prisoners in an overcrowded system.  I have also been asked to render my opinion with respect to whether overcrowding in the California Department of

Corrections and Rehabilitation (CDCR) is the primary cause of the current unconstitutional conditions experienced by members of the *Coleman* and *Plata* classes. My opinions are based upon the evidence that I have reviewed to date documenting current conditions within the CDCR, on my earlier inspections of California Institution for Men (CIM), Avenal State Prison (ASP), Valley State Prison for Women (VSPW), San Quentin State Prison (SQ) and High Desert State Prison (HDSP), on my more recent inspections of North Kern State Prison (NSKP), the Substance Abuse and Treatment Facility at Corcoran (SATF), Pleasant Valley State Prison (PVSP), California State Prison at Solano (SOL), and a second inspection of HDSP, and on my professional experiences working in similarly overcrowded correctional settings. A list of the documents I have reviewed is attached.

6.      During my inspections, I spoke to medical staff throughout the facilities, including the Health Care Managers, Chief Medical Officers, physicians, nurses and schedulers. The staff members at each prison were consistently cooperative, provided me with the files, logbooks, documents, records and data I requested, and ensured my full access to the facilities I wished to inspect.

7.      In my first report, I concluded that the CDCR's medical delivery system was operating in a state of crisis that harmed prisoners with serious medical concerns and placed them at substantial risk of harm because the number of prisoners in the system far outstripped the capacity of the system to provide care. Having completed the five recent prison inspections and reviewed recent documents, including the Receiver's Seventh and Eighth Reports and his Turnaround Plan of Action, my opinion is unchanged: the CDCR's medical care

delivery system cannot provide a constitutional level of care because the prison system incarcerates far more prisoners than can be adequately treated with the resources, staffing and facilities available in the CDCR. In short, it is my opinion that overcrowding is the primary cause of the constitutional violations in the CDCR for *Plata* class members.

8.    I also concluded in my first report that it will not be possible to achieve a constitutional level of health care in the CDCR in the foreseeable future, unless the prison population is significantly reduced. My opinion has not changed. The limitations on the CDCR, including staffing, administrative resources and especially treatment space, are so severe that the only avenue for building a constitutional health care delivery system is to reduce the demand on the system by lowering the number of patients it serves.

9.    While I believe that reducing the population is necessary to achieve a constitutional level of medical care, population reduction alone will not, in a vacuum, produce a constitutionally adequate medical delivery system. For example, if the population were reduced at a prison facility, but that prison lacked sufficient numbers of physicians, the care would still be unconstitutional. Reducing overcrowding is not a panacea, but crowding is the primary cause of the ongoing inadequate medical care in the CDCR system. Overcrowding is the one factor that negatively impacts almost every other matter that must be addressed to create a minimally adequate medical care delivery system for California's prisons.

10.    Reducing the population in the system to a manageable level is the only way to create an environment in which other reform efforts, including strengthening medical management, hiring additional medical and custody

3

staffing, and improving medical records and tracking systems, can take root in the foreseeable future. Continuing efforts to build a constitutional system under the current overcrowded conditions will guarantee that the unconstitutional conditions, and preventable suffering, will exist for a substantially longer period of time than would be the case if the population were reduced.

11. The Receiver has tools to fix the health care system, but has no tool within his purview, to deal with external pressures such as overcrowding. The Receiver's mandate is to remove the Court's direct control of the CDCR health care delivery system as quickly as possible. It is my opinion that, if the current overcrowding is not remedied, the Court's involvement in overseeing the health care system will certainly extend many years.

## III.    EACH OF THE PRISONS I INSPECTED IN AUGUST, 2008 IS DRAMATICALLY OVERCROWDED.

12. According to the CDCR's August 20, 2008 population statistics, there were 159,823 prisoners housed in CDCR prisons and camps, which is 191% over the prison system's design capacity. Jt. Pls' Trial Ex. 98. The five prisons that I inspected are all, like the system itself, significantly overcrowded, and at some prisons, the higher security classification prisoners are the most significantly overcrowded. All five of the prisons currently house prisoners in "non-traditional" beds, including bunks in gyms and day rooms that were not designed for housing.

13. North Kern State Prison was built for 2,694 prisoners. *Id.* As of August 20, 2008, the prison was at 204% capacity, housing 5,496 prisoners. *Id.* Most NKSP prisoners, over 4,600, are housed in the Reception Center. *Id.* The remainder of the population is made up of 297 Level I prisoners and 581 Level III prisoners. *Id.* NKSP also serves as a health care "hub" for an additional 2,000

prisoners housed in community corrections facilities who receive health care at the prison.

14.    The Substance Abuse Treatment Facility and Prison at Corcoran was designed to hold 3,424 prisoners, but the total population as of August 20 was 7,121, *i.e.*, 208% of design capacity. *Id.*

15.    Pleasant Valley State Prison, built for 2,308 prisoners, now houses 5,199, making it among the state's most overcrowded prisons at 225% of design capacity. *Id.* That prison houses primarily Level III and IV prisoners (over 4,900), and has a small minimum security facility (MSF) housing fewer than 300 Level I and II prisoners. *Id.* While the MSF is less crowded than most other facilities, at 131% of design capacity, the Level III/IV facilities are currently at 234% of design capacity. *Id.* The prison staff also provides care to prisoners at a community care facility with approximately 400-500 patients.

16.    California State Prison, Solano, with 5,607 Level II and Level III prisoners in space designed for 2,610, is at 214% capacity. *Id.* The Level III prisoners are slightly more crowded than the Level II prisoners, with rates of 225% and 206% respectively. *Id.*

17.    High Desert State Prison has 4,472 prisoners in a prison built for 2,324. *Id.* With fewer than 1,000 Level I, II and III prisoners, the majority of the prisoners are either Level IV (approximately 2,850) or in the Reception Center (approximately 640). *Id.* Both of these populations are very overcrowded: the Level IV prisoners are housed at 253% of design capacity, and the Reception Center prisoners are housed at 319% of design capacity. *Id.*

IV.    THE PRISON HEALTH CARE FACILITIES STILL ARE
       INADEQUATE FOR THE NUMBER OF PRISONERS WHO
       REQUIRE MEDICAL CARE.

18.    The Receiver recognized the critical shortage of health care facilities

in his Turnaround Plan of Action,

>           The facilities available for providing health care services within
>           CDCR are woefully inadequate. . . .  We are dealing not with
>           deferred maintenance, but with some facilities that are literally
>           falling apart.  In addition, investments in health care facilities have
>           significantly lagged behind growing inmate populations, so much
>       so that available clinical space is less than half of what is necessary
>       for daily operations.

Jt. Pls' Trial Ex. 56 (Receiver's Eighth Quarterly Report, Exh. 1 – Receiver's

Turnaround Plan of Action) at 25.  Based on my site inspections and review of

documents, I believe the Receiver accurately describes the critical shortage of

adequate clinical space for the existing prison population.   These conditions,

which are also described in my first report, create insurmountable barriers to

providing timely medical care with appropriate confidentiality safeguards.

Additionally, I believe that the lack of clinical and medical office space creates an

unprofessional working atmosphere that likely impedes CDCR's recruitment and

retention efforts.

19.    The Receiver's Turnaround Plan includes plans to build and upgrade

clinical spaces around the state.  I understand, however, that the Receiver has yet

to obtain funding for this construction plan, and has recently had to move to hold

the Governor in contempt for failing to provide financial support for the plan.

Except at two prisons, *actual construction of clinical space has yet to begin.*  Jt.

Pls' Trial Ex. 56 (Receiver's Eighth Quarterly Report) at 39-44.

20.    Even if the Receiver were able to obtain immediate funding for his

construction project, his target date for completion of the clinical upgrade program

is not until 2012, more than three years from now. Jt. Pls' Trial Ex. 56 (Receiver's Eighth Quarterly Report, Exh. 1 – Receiver's Turnaround Plan of Action) at 25-26.

### A.    Reception Center Clinical Areas Continue to be Inadequate for the High Volume of Medical Contacts.

21.    In my initial report, I documented the significant space limitations at the Reception Center located at the California Institution for Men in Chino. The space limitations that I observed at the North Kern State Prison for reception center processing were as bad as the conditions I found at CIM. NKSP, a prison with a population of approximately 5,500 prisoners, including approximately 4,800 RC prisoners, receives approximately 500 new RC prisoners each week.

22.    Under the *Plata* Inmate Medical Policies and Procedures, prisoners arriving at a Reception Center undergo a health screening on their day of arrival. Policies and Procedures, 4-2-1. "Licensed health care staff shall conduct interviews with inmate-patients in a manner that ensures the privacy of their health care information subject to the safety and security concerns of the institution." *Id.* Reception Center prisoners must be provided a "complete history and physical examination performed by a Nurse Practitioner, Physician Assistant, or a Physician and Surgeon" within 14 days of arrival. P&P's, 4-2-2. The medical facilities that I observed at NKSP were inadequate for this purpose.

23.    Arriving RC prisoners are delivered to the Receiving and Release area at NKSP. In this large open area, prisoners are interviewed, have their vital signs taken and receive a TB test, among other things, before proceeding to a housing unit. The initial health screening, which consists of an interview by an RN and administration of the TB test, takes place for most prisoners in a small

office just off the R&R area. Two nurses conduct interviews simultaneously, with prisoners sitting back to back, separated only by a shoulder-high divider. I was told that a third nurse sometimes conducts these medical interviews at a desk in the open receiving area, where prisoners and staff circulate. Neither of these situations affords the necessary confidentiality for these critical initial health care encounters.

24.    I questioned Dr. Emam, the facilities Chief Physician and Surgeon, about these conditions. He indicated that space is so limited, that there is no other space available in which these interviews may be performed. I believe that, given the lack of confidentiality for these encounters, prisoners are less likely to provide accurate information about sensitive medical and psychiatric conditions.

25.    According to Dr. Emam, prisoners at NKSP are seen by a physician or mid-level provider for their medical history and physical examination within two to three days. I inspected the area where these encounters take place. The area contains a series of very small rooms, each equipped with two chairs and a medical exam table. The exam table, however, functions as a desk for the medical provider, and the rooms are so small that it would be very difficult if not impossible to perform an actual physical examination in them. Dr. Emam acknowledged that the "exams" that take place are in fact simply medical interviews, primarily for the purpose of determining what type of housing is appropriate for the prisoner.

26.    Adequate physical examinations are not performed on NKSP prisoners, despite the P&P requirements, which are based on the basic principle that incoming prisoners must undergo a comprehensive exam upon arrival so that

an adequate treatment plan may be developed and implemented. A physical exam, as opposed to a medical interview, is necessary because some conditions can be identified and confirmed only through physical examination of the patient.

27.    Dr. Emam told me that the prison lacks the space to provide actual physical examinations for the high number of incoming Reception Center prisoners arriving daily at NKSP, and that, in any case, he lacks the physician staff to provide that service. The failure to provide a true physical examination creates the risk that certain medical conditions will not be timely identified and/or treated.

28.    The Receiver has piloted a Reception Center screening process at San Quentin State Prison that, according to the Receiver, "provides integrated medical, dental, and mental health screening on the day of arrival as well as laboratory testing, medication review and administration, and referrals to providers based on national guidelines." Jt. Pls' Trial Ex. 67 (Receiver's Seventh Quarterly Report) at 7. The Receiver states that he intends to implement standardized reception center screening processes at the major reception center prisons by January 2009. *Id.* However, the Receiver frankly acknowledges that "[t]he most formidable challenge to progress at all the sites will be inadequacies in physical space and environment." *Id.*

29.    Based on my review of the facilities available at NKSP, I do not believe that the Receiver's pilot Reception Center screening program can be implemented at that prison, without creating additional clinical examination facilities.

**B.    The Severe Shortage of Clinical and Office Space Described in My First Report Has Not Changed in the Last Six Months.**

30.    As noted above, the Receiver has concluded that the facilities

available for medical care delivery are "woefully inadequate." That is consistent with my findings during my November 2007 inspections, and is further supported by my observations during my most recent inspections.

### 1.     NKSP's Clinical Space is Inadequate

31.     At NKSP, the clinical spaces available for medical encounters following Reception Center processing and for the mainline prisoners are inadequate for the number of prisoners requiring medical attention.

32.     NKSP is divided into five prison yards, denominated A-E. Yards B, C and D house only Reception Center prisoners awaiting transfer to a permanent institution. Yard A houses both general population prisoners (*i.e.*, prisoners who have been classified and endorsed to stay at NKSP) as well as Reception Center prisoners, and Yard E, a minimum security facility, houses only mainline prisoners.

33.     Each of the yards A-D has medical clinic space consisting of one exam room, a very small office in which the LVN prepares medications for distribution, a very small medical supply room, a dental clinic and a dentists' office.

34.     Each yard is supposed to run at least two medical lines each day, one for the RN doing face-to-face triage, and one for the primary care provider (PCP) doing sick call. The yard medical clinics on A-D cannot accommodate simultaneous RN and PCP lines in the one available exam room. Accordingly, NKSP has created three exam spaces on B yard in an area that formerly housed custody offices, in which the RNs are now conducting face-to-face triage for yards B, C and D on Second and Third Watch (*i.e.*, 8 a.m. to 2 p.m., and approximately

3 p.m. to 9 p.m.).   The NKSP staff members refer to this area as the Reception
Center Medical Clinic (RCMC).

35.     While the clinical space allocated to the RNs in the RCMC is
objectively adequate for performing screenings, data provided to me by the
scheduler shows that prisoners are regularly not seen for their scheduled
appointments.  The fact that some prisoners going to the RCMC must be escorted
from other yards for their appointments may contribute to this problem.

36.     For example, I reviewed the nurse triage tracking data for the week
of August 18, 2008 for prisoners from D-yard.  Joint Pls' Trial Ex. 36.  During that
week, of the 119 appointments schedule, more thant 50% (61) did not take place.
While the tracking form states that five prisoners were not seen because of a yard
change, one paroled and one was at a different medical appointment, the primary
reason stated for the missed appointment was "lockdown," "out of time," or "short
nurses."  I strongly suspect that the location of the clinic on a different yard means
that the triage line runs slower, resulting in fewer patients being seen timely.

37.     I was told that patients who are not seen for their appointment are
given an appointment on the next available triage line, usually two days later.
However, I reviewed D-yard's August 18-22 nursing tracking data, and found that
of the 14 patients who were scheduled but not seen on August 18, just three
patients were rescheduled and seen that week, while ten were either rescheduled
but not seen, or not rescheduled within the week.  *Id.*  (One prisoner transferred or
paroled.)

38.     The A-yard prisoners do not go to the RCMC for nurse triage.
Because the PCP runs a sick call line in the only medical exam room, the RN does

face-to-face triage in the hallway, with the prisoner sitting in a chair, within several feet of the prisoners awaiting their appointments. The RN states that, if she decides she needs an exam table for these encounters, she must wait until the PCP is between patients, and then use that office. The triage encounters cannot be maintained confidential under these circumstances; thus, the RN's ability to obtain reliable information from their patients is critically impaired.

39.     Prisoners who are housed in the Administrative Segregation Units on A-yard and D-yard are seen for RN triage and for sick call encounters in a meeting room in the housing unit. It is not set up with any medical equipment. Without necessary medical equipment, including an exam table, the medical staff cannot provide adequate medical care.

### 2.     SATF's Clinical Space is Inadequate

40.     The Substance Abuse and Treatment Facility at Corcoran is one of the largest prisons in the system, with approximately 7,000 prisoners housed on seven yards, A-G. Each of the prison yards has its own clinic, with an exam room for the RN performing triage, and a second room for the PCP seeing patients for sick call.

41.     At SATF, the medical staff reported that there were 1,200 overdue primary care appointments. I was told that, in an effort to address the backlog, SATF had on the day of my visit three CDCR physicians from the Central Office, whose mission was to visit, at their cell front, prisoners who had submitted sick call slips to determine what medical care they required, if any. I was told that primary care providers will be performing cell front triages two days a week, every two weeks, for the foreseeable future.

42.    The SATF staff said that the physicians were seeing patients in the housing units at their cell fronts because SATF lacked exam space for them to use for these medical encounters. Such encounters, which take place with custody officers and fellow prisoners within earshot, are not an adequate substitute for clinical encounters in a private, medically equipped setting.

### 3.    PVSP's Clinical Space is Inadequate

43.    Dr. Igbinosa, the Chief Medical Officer at PVSP, reported that he is currently authorized to hire 14 primary care providers to care for the 5,200 prisoners at PVSP. If he were able to fill all primary care positions, he advised me that he would not have the space for them.

44.    Dr. Igbinosa further related that he would like to have more specialty providers from the outside community provide care to prisoners on-site at the prison. Although some specialists do currently see patients at the prison periodically, Dr. Igbinosa said that he cannot expand this program because he lacks the necessary clinical space to accommodate the providers.

### 4.    CSP-Solano's Clinical Space is Inadequate

45.    At SOL, the Annex Clinic, which serves the needs of the approximately 1,750 prisoners housed at the prison's Facility 4, is located in what had been an area used for education programs, and the space is still used for education programs as well as prison classification committee activities. The main patient encounter area is a small room in which patients are seen by one of three primary care providers who work in the room. The room is divided into three medical encounter areas by five foot tall wood and cloth partitions or screens. The

three patient encounter areas are immediately adjacent to one another, such that a conversation in one can be heard in the others. This space does not provide for adequate patient confidentiality. A PCP also sees patients in the Annex Clinic's main work room. There, a thin hospital bed style curtain separates the patient and PCP from the clinic's other business.

46.    All available space in SOL's medical clinics was being used. SOL does not have adequate space for its current complement of PCPs to work in, let alone additional PCPs should the prison hire such additional staff.

### 5.    Receiver's Assessment of Other Prisons' Medical Space

47.    I reviewed operational assessments prepared for the Receiver regarding several of the CDCR prison facilities.

### a.    California Rehabilitation Center (CRC)

48.    The January 2008 operational assessment regarding the CRC conducted by the Receiver's office concluded that all medical spaces are in urgent need of repair, and that, "[f]or the most part, none of the existing areas occupied by health care clinicians are clinically appropriate." Jt. Pls' Trial Ex. 100. (California Prisoner Health Care Receivership Corporation, Operational Assessment for Access to Care at the California Rehabilitation Center) at 15.

### b.    California Training Facility – Soledad (CTF)

49.    A review of CTF conducted by CDCR and Receiver staff in March 2007 determined that the prison's Central Facility clinic is so crowded and has such limited space that "[i]nmates that are ducatted for health care usually wait for hours to see the provider," the North Facility clinic is "very small based on the number of inmate-patients being served," and that the South Facility clinic area,

although the newest physical plant of the three facility clinics at the prison, was "built to support an inmate population of 510 inmates and not the current housing of more than 1000 inmates." Jt. Pls' Trial Exh. 99 (Operational Assessment, review conducted in March 2007) at 2-3.

### c. Mule Creek State Prison (MCSP)

50.    The December 2007 operational assessment report regarding MCSP conducted by the Receiver's office concluded, "[a]ll of the Facility Clinics are undersized for the quantity of inmate/patients seen on a daily basis and lack[] appropriate holding/waiting space for inmate/patients ducated to be seen by health care providers." Jt. Pls' Trial Ex. 101 (Operational Assessment for Access to Care at Mule Creek State Prison) at 7. The assessment also pointed out that although Mule Creek's "size and overall design . . . is likely one of the most manageable . . . anywhere within the State . . . ", it is "no exception" to the "system wide barrier" of "serious space deficiencies for clinical staff," which have existed at "[a]ll of the CDCR facilities the Review Team has visited . . . ." *Id.* at 28.

51.    The Receiver plans to address medical facility deficiencies at existing prisons by assessing those prisons' needs, developing plans and then upgrading or constructing necessary facilities. The Receiver's Plan provides that assessments, plans and will be done on a phased and serial basis. The assessments are scheduled to be completed by January 2010. The target date for completing all upgrades and construction is January 2012. Jt. Pls' Trial Ex. 56 (Receiver's Eighth Quarterly Report, Exh. 1 – Receiver's Turnaround Plan of Action) at 25-26.

52.    As of June 2008, Avenal and San Quentin were the only two existing

prisons at which medical facility construction upgrades had begun. Jt. Pls' Trial Ex. 56 (Receiver's Eighth Quarterly Report) at 39-44. Avenal was scheduled to have construction completed in July 2009. *Id.* at 40. San Quentin had some projects completed; most projects there were scheduled to be completed in February 2009 with the final project (the central health services building) scheduled to be done in April 2010. *Id.* at 42-44.

53.    NKSP, SATF and SOL, where, as discussed above, clinic space is inadequate, are in the final group of 13 prisons scheduled to be assessed and to have upgrades completed (by 2012) . Jt. Pls' Trial Ex. 56 (Receiver's Eighth Quarterly Report, Exh. 1 – Receiver's Turnaround Plan of Action) at 26**.** Thus, in the best case -- if the Receiver's timetable has no slippage at all – tens of thousands of prisoners will continue to be incarcerated in prisons with inadequate medical facilities for the next three plus years.

## V.    THE NUMBER OF CLINICIANS CONTINUES TO BE INSUFFICIENT FOR THE NUMBER OF PRISONERS WHO REQUIRE MEDICAL CARE.

54.    In my previous report, I stated that overcrowding creates pressures on the system that make hiring and retaining sufficient numbers of clinicians and other medical workers exceedingly difficult, and that California's overcrowding crisis has created a situation where the prisons, and particularly the more remote prisons, are unable to hire and retain enough health care staff to address the medical needs of the prisoner-patient population. Based on my most recent inspections and my review of the vacancy data from May 2008, my opinion remains unchanged.

### A.    CDCR Still Cannot Fill Some Vacancies

55.    Even after the Receiver substantially raised salaries for medical staff, the vacancy rates at some prisons remain high.  The May 2008 vacancy and registry report provided by the *Plata* health care support division shows on-going serious problems in hiring primary care providers (PCPs), and even with having adequate numbers of such providers on site.  Jt. Pls' Trial Ex. 35 (*Plata* Vacancy/Registry Report, May 2008) at 1.  The report shows that statewide there was a 25 percent vacancy rate in primary care provider positions; the vacancy rate adjusted to account for PCP employees on leave in May was 35 percent.  *Id.* Further, the report shows that in May the prisons statewide had a shortfall of 56 PCPs even after temporary, overtime, and contract/registry PCPs used to reduce vacancies were taken into account.  *Id.*  Consistent with this statewide vacancy report, four of the five prisons I inspected in August have had critical, on-going problems filling their primary care positions with state employees.[1]

### 1.    NKSP

56.    According to the *Plata* Vacancy/Registry Report for May 2008, NKSP had a total of 16 primary care provider positions, of which 6.6 were unfilled, for a vacancy rate of 41%.  *Id.* at 12.

57.    Dr. Emam, the acting Chief Physician and Surgeon at NKSP advised me that the prison had very recently succeeded in hiring some primary care providers, but that it has been extremely difficult to fill the vacant positions.  He reported that the prison continued to have two line physician vacancies and that

---

[1]  CSP-SOL, the fifth prison I visited, did not have an adequate allocation of PCP positions.  See Part V.B, below.  Further, as discussed above (see Part IV.B), the prisons, including CSP-SOL, do not have adequate clinic space for PCPs to see prisoner-patients.

that they had also been unable to fill the Chief Physician and Surgeon position that

he has been filling on a temporary basis.

### 2.    SATF

58.    The May 2008 Vacancy Report shows that SATF had 13 primary

care positions allocated, of which one was filled with a state physician, but that

person was on leave. *Id.* at 15.

59.    The Report shows that SATF hired 7.7 registry providers at that time

to deliver primary care. *Id.*

60.    When I inspected the prison, Dr. Enenmoh, the acting Chief

Medical Officer, advised me the prison still had just one state employee physician,

and that recruiting for the physician positions, and for the unfilled Chief Physician

and Surgeon position, had been very difficult.  He had eight contract physicians

and two contract mid-level providers.

### 3.    PVSP

61.    The May 2008 Vacancy Report shows that PVSP had 14.8 allocated

primary care positions.  At that time, PVSP had just one state employee primary

care provider.  The prison contracted with 5.1 registry primary care providers. *Id.*

at 13.

62.    According to Dr. Igbinosa, as of the date of my inspection, the

prison had the equivalent of eight full-time primary care practitioners.  He

explained that it is extremely difficult to recruit medical professionals to work at

the prison because it is so remote.  Most contract providers currently providing

care at the prison live in Los Angeles or San Francisco and commute to the prison

on an intermittent basis.  One physician commutes from Chicago twice a month,

for a week each time. Dr. Igbinosa said that none are willing to relocate to the Central Valley. He noted that, even when candidates at hiring fairs express interest in working at PVSP, they often retract their application when they realize that they can earn the same CDCR salary and live in or near an urban environment. As a consequence, PVSP has too few primary care providers to care for the number of patients at the prison.

### 4. HDSP

63.     The May 2008 Vacancy Report shows that HDSP had 8.0 allocated primary care positions, and that two were vacant in May. *Id.* at 10. However, on the date that I inspected High Desert in August 2008, Chief Medical Officer Dr. Swingle advised me that, although HDSP appeared to have four state physicians, all four were either on leave or stripped of their clinical privileges.

### B. Some Prisons Are Still Allocated Too Few Providers

64.     At SOL, the prison is authorized 9.0 staff primary care provider (PCP) positions. The health care manager stated that the prison was making a request to add two more staff PCP positions, so that there would be a total of eleven. The chief medical officer, however, said that the prison needs a total of 13 PCP staff positions, given the number of medical encounters.

### C. Use of Registry Still Cannot Resolve Staffing Shortfalls

65.     The heavy use of registry providers is, as I explained in my initial report, a stop-gap measure that mitigates harm to individual patients in the short-term, but is not an adequate long-term solution. Solano's Chief Medical Officer, Dr. Traquina, indicated that there is a rapid turnover in registry personnel, and it is difficult to build a medical care delivery program with staff who do not intend to

make a substantial time investment at the prison.

66.    Because registry physicians tend to turn over quickly, the prisons end up spending time doing extensive on-the-job training repeatedly, which is time-consuming and detracts from patient care delivery.

### D.    Clinical Staff Shortages Continue to Result in Delayed and Inadequate Care

67.    At each prison I inspected in August, there were delays in triaging patients' sick call slips, and in primary care visits, because the clinicians were unable to keep up with the heavy demand for medical care.

68.    At most of the prisons I inspected, the staff reported that, although there are backlogs of patients waiting to see their primary care providers, the staff does triage to ensure that the sicker patients are seen first on the primary care provider lines. The defendants have not, however, demonstrated a method for this triage or that they evaluate or track whether this triage is effective.

### 1.    NKSP

69.    At NKSP, I reviewed the tracking data for the D-yard primary care provider sick call line for the week before my inspection, August 18-22. Jt. Pls' Trial Ex. 37. I found that the clinic had scheduled 94 appointments, but that the primary care provider had not seen 27 (29%) of those patients. The most common reasons cited on the tracking instrument were that the clinician ran out of time, or did not have the patient's Unit Health Record.

### 2.    SATF

70.    At SATF, the prison's Health Care Manager, Gayle Martinez, reported that SATF had a backlog of 1,200 overdue primary care appointments. The prison has a far greater demand for services than the staff at SATF can

deliver.

71.    I interviewed the Office Technicians and reviewed sick call slips on four of the seven prison yards (A, C, E and G).  I found that, on each of the yards, it usually takes two to six days for prisoners to see a nurse for a triage appointment.  (These appointments are supposed to occur within one business day of receipt of the patient's sick call slip.)  For example, on E-yard, I reviewed the stack of sick call slips for the patients scheduled to see the RN on August 27.  The sick call slips were marked received on August 21-25.

72.    On each of the four prison yards I inspected, the Office Technicians reported, and the sick call slips demonstrated, that it takes roughly four weeks for primary care appointments, once the patient has been referred to the primary care line on a routine basis.

### 3.    PVSP

73.     I was told by PVSP staff that the wait for routine primary care provider appointments is two to four weeks.

### 4.    Solano

74.    At SOL, there are major delays for routine appointments with a primary care provider at each of the prison's three clinics (Primary, Sattelite, and Annex).  In the Primary clinic, it takes 16 weeks for such an appointment.  In the Satellite clinic, it takes six to eight weeks.  In the Annex clinic, the backlog is eight to ten weeks, even with primary care provider appointments taking place on Saturdays.   The Primary clinic also has a backlog of face-to-face appointments with registered nurses; such appointments take about ten days to occur, even though the clinic had run triple lines of such appointments on weekends.

### 5. HDSP

75.     At each of the four main medical clinics at HDSP there are significant delays for routine appointments with a primary care provider (PCP). In "A" facility clinic, routine appointments are scheduled six weeks after a nurse determined that patient should be seen by such a provider. In "B" facility clinic, such appointments are scheduled approximately 16 weeks after such determinations. In "C" facility clinic, such appointments are scheduled approximately eight weeks after such determinations. In "D" facility clinic, such appointments are scheduled approximately 4 weeks after such determinations.

76.     The "C" and "D" facility clinics also had backlogs for routine registered nurse face-to-face triage appointments; those appointments are scheduled two and four to five days, respectively, after the prisoner's written request for medical attention was received.

77.     The HDSP CMO was not surprised, during the file reviews, to find that documents are placed in UHRs without having the practitioners review them, and the follow-up with PCPs are not timely scheduled. These documents include CT scan, ultrasound, and consultation reports. She was also not surprised that the files demonstrated substantial treatment delays. She advised me that HDSP lacked the staff and resources to treat the number of prisoners at the facility.

### E. Inspected Prisons Still too Shortstaffed to Implement Required Programs.

78.     Because there are too few clinical staff members to provide adequate treatment to the number of prisoners incarcerated, some prisons have failed to fully implement certain essential medical programs.

### 1.  NKSP

79.    For example, as explained above, NKSP has a large reception center, and thus is tasked with processing arriving prisoners and classifying them for transfer to permanent prisons. Given the acute staffing shortage, coupled with the lack of clinical exam space, NKSP has been unable to provide incoming prisoners with the required comprehensive physical examination. Instead, these prisoners are simply undergoing a second medical interview, several days after their initial interview with an RN.

80.    Additionally, based on my review of a sample of unit health records (UHR), I believe required follow-up appointments with primary care providers are not being done for a substantial number of patients. I reviewed 13 UHRs for prisoners sent offsite approximately one month before my inspection (either for scheduled or unscheduled appointments) for whom documentation of the offsite visit and follow-up with the PCP should have been in the file for minimally adequate care. I found that nine of the 13 UHRs lacked documentation of a timely follow-up with a physician, and eight lacked required documentation of the service or hospital visit.

### 2.  SATF

81.    At SATF, I visited four prison yard clinics. In none of these clinics was the staff maintaining an "Urgent/Emergent Log Book." Each yard is supposed to have an Urgent/Emergent Log book, in which the staff records each encounter in which a prisoner reports an urgent or emergent condition. P&P, 4-12-1. These logs play an important role in continuity of care, because the primary care provider assigned to each yard clinic is required to review the log each work

day to determine whether any patients require further follow-up. P&P 4-12-3. Without this link, I believe some patients who do require urgent follow-up attention will fail to receive it.

82.    I reviewed 11 UHRs for prisoners who had transferred to SATF two weeks earlier and had significant medical conditions. Based on these records and the available documentation, I concluded that for ten of the eleven patients, medically necessary follow-up had not occurred. The problems I identified included missed medications and lapsed chronic care follow-up visits with a primary care provider.

83.    Additionally, the UHRs lacked documentation of required primary care follow-up appointments. I reviewed nine UHRs for prisoners sent offsite approximately one month before my inspection (either for scheduled or unscheduled appointments) for whom documentation of the offsite visit and follow-up with the PCP should have been in the file for minimally adequate care. I was unable to find documentation of a PCP follow-up in four records. For three of those four medical records, there was also no documentation from either the hospital or specialist regarding the encounter. Some patients who receive medical attention off-site but are not adequately followed up by their primary care providers upon return to prison will be at serious risk of harm because necessary treatment will either lapse, or not be ordered.

84.    The SATF medical staff advised me that they are unable to schedule timely follow-ups in many cases because they have too few medical providers for the number of prisoners requiring treatment.

### 3. PVSP

85.     I reviewed the UHRs for 23 prisoners sent offsite approximately one month before my inspection (either for scheduled or unscheduled appointments) for whom documentation of the offsite visit and follow-up with the PCP should have been in the file for minimally adequate care.   According to the UHRs, 12 of 23 prisoners did not receive timely follow-up appointments.  Eleven of the 23 UHRs were missing required documentation, including ER reports, consult reports, etc.

### 4. SOL

86.     At Solano, I reviewed 14 records of patients sent offsite approximately one month before my inspection (either for scheduled or unscheduled appointments) for whom documentation of the offsite visit and follow-up with the PCP should be in the file for minimally adequate care.  I found that just seven of the files contained documentation of timely follow-up, and in four UHRs, required documentation of the offsite medical encounter was missing.

### 5. HDSP

87.     At HDSP, I reviewed 15 records of patients sent offsite approximately one month before my inspection (either for scheduled or unscheduled appointments) for whom documentation of the offsite visit and follow-up with the PCP should have been in the file for minimally adequate care. In eleven cases, there was no documentation of a timely PCP  follow-up visit, and in nine cases, there was missing documentation.  My review uncovered other serious problems.  For example, one patient was ordered an urgent MRI of the brain on July 8, 2008.   There was no documentation that the MRI had occurred as

of August 29, 2008.

## VI.    PLAINTIFFS ARE STILL NOT RECEIVING TIMELY SPECIALTY CARE

88.    Although defendants have added contract specialty providers, the prisons I inspected still cannot schedule timely "high priority" visits in a large number of cases.  PCPs request offsite specialty appointments on a "high priority" basis when the patient has an urgent medical need, and these appointments are supposed to be scheduled within 14 days of the request for services.  P&P 4-8-1. The demand for care, particularly for the high priority cases, continues to overwhelm the resources available to the defendants.  Additionally, some facilities have proven unable to obtain timely reports from the specialty providers, resulting in unnecessary treatment delays.  (See paras. 80, 83, 85-87 above.)

### A.    PVSP

89.    At PVSP, the offsite aging specialty report included 55 high priority referrals as of August 27, 2008.  *Plata* Pls' Trial Ex. 38.  Of those, 11 had been pending for over 14 days, yet had no appointment scheduled, and of those scheduled, 19 were scheduled to take place more than 14 days after the referral. Thus, well over half of the PVSP patients are unable to receive timely high priority appointments.

### B.    SOL

90.    The situation at SOL was worse.  There, 63 high priority off-site specialty appointments were listed on the aging report for such appointments. *Plata* Pls' Trial Ex. 39.  None were scheduled for a date within 14 days of the primary care provider request.  Most of these urgent referrals – approximately 40 – did not yet even have an appointment date; four of these cases had been already

pending at least 20 weeks, four others at least 15 weeks, three others at least 10 weeks, and another approximately one dozen between four and eight weeks. Of the approximately two dozen high priority off-site specialty referrals that had appointment dates scheduled, about 12 were scheduled to take place more than approximately five weeks after approval, with a few of these being scheduled four to five months (or longer) after approval. Another approximately one dozen were scheduled to take place three or four weeks after the approval date.

### C.   HDSP

91.    At HDSP, 48 high priority off-site specialty referrals were listed on the aging report. *Plata* Pls' Trial Ex. 40. Only one was scheduled for a date within 14 days of the primary care provider request, as required for these urgent referrals by the court-approved policies. Three other referrals were scheduled to take place between 14 and 21 days after the approval date. Seven other high priority referrals had appointments scheduled, with dates ranging from four to eight weeks after the approval date. The vast majority of the urgent off-site specialty referrals – 37 of the cases – did not yet even have an appointment date with the requested specialty provider. Approximately 20 cases without an appointment date scheduled had been pending for at least six weeks; half of these had been pending for more than two months.

### D.   NKSP

92.    At NKSP, of the 70 listed high priority offsite specialty referrals, 22 (31%) had been pending for more than 14 days and had no appointment scheduled. *Plata* Pls' Trial Ex. 41. Twelve more were scheduled, but more than 14 days had elapsed between the referral and the appointment. Nearly half the appointments

currently listed as "high priority" NKSP will not take place within the required timeframe.

93.    When specialists see CDCR prisoners or when prisoners are seen for certain procedures, the service provider must provide the sending prison with a report of the encounter.  The CDCR primary care provider then uses that report to determine the prisoner's treatment plan.

94.    Based on my reviews of unit health records at NKSP and PVSP, I concluded both prisons have a serious problem obtaining these records.

## VII.    MEDICATION MANAGEMENT PROBLEMS

95.    In my initial report, I found that defendants' medication delivery systems were inadequate for the size of the population they serve, and were plagued by short-staffing at a number of prisons.  Based on my most recent inspections and my review of the report by Pablo Stewart, M.D., it is still my opinion that the defendants' medication delivery system is inadequate for the population it serves.  Because there are too many prisoners, coupled with too few staff and insufficient resources, the system suffers from medication delays and inadequate treatment documentation.  Some prisoners continue to receive their medication late, or not at all, and suffer as a result.

96.    The Receiver is rolling out a new medication delivery system under the auspices of Maxor.  At SATF, the Maxor system was initiated in April 2008. The staff reported that they continued to find "bugs" in the system, and that the biggest issue was that refills were not being provided timely.  The staff also reported that the system was considerably more labor-intensive than the previous system, requiring additional clerical work, and yet the prisons were not provided

additional clerical support positions.

97.    In its annual report to the Receiver for 2007, Maxor recognizes that overcrowding significantly impacts its ability to deliver medications:

> **Overcrowding:** The impact of overcrowding on the system's abilities to provide timely and effective delivery of necessary medications is significant. A clear example of this impact was noted at San Quentin. San Quentin receives 75-80 new prisoners each day and presumably transfers out or releases about the same number. Overcrowding however, forces a series of "compaction" moves resulting in as many as 300-400 separate prisoner moves each day in order to free up appropriate housing for the offenders. This constant "churn" of prisoners within the institution keeps the healthcare staff chasing prisoner movement to ensure medications can be delivered in a timely fashion. . . . This takes time, and in some cases, the medications are simply returned to the medical area to try to determine where the prisoner is housed. During this time, the prisoner patient is not getting his medications and may complain to staff – who in turn – reorders the medications, resulting in duplicate work.

Jt. Pls' Trial Ex. 67 (Receiver's Seventh Quarterly Report, Exh. 6) at 29.

## VIII.  OVERCROWDING FUELS DYSFUNCTION IN MEDICAL RECORDS

98.    As I explained in my first report, health care records are a critical component of any adequate medical delivery system. Unless medical records and scheduling information are managed, organized, and maintained effectively, appropriate health care services cannot be provided. Overcrowding continues to make it impossible for CDCR to perform these essential functions.

### A.    Quality of Medical Records Continues to be Poor at Inspected Prisons.

99.    Although the Receiver has long-term plans to develop an electronic medical record, those plans are unlikely to come to fruition for years. In the meantime, California relies on paper medical records (except at Pelican Bay State Prison). At each of the prisons I inspected, I found that the medical records were unwieldy, rarely organized chronologically and, in general, poorly maintained.

Retrieving useful information from the files invariably requires considerable time sifting through extraneous reports, misfiled documents and outdated materials. At the same time, certain documents that would be extremely useful, such as an updated "Problem List" for each file, which is required by the court-ordered *Plata* Policies and Procedures, are typically missing.

100.    There are dangerous widespread delays in filing medical documents at HDSP. After I had provided HDSP medical staff with a list of the names and CDCR numbers of the prisoners whose unit health records (UHRs) I wanted to review, someone from the prison went through medical records' loose filing (documentation not yet placed in individual patient UHRs) to find any documents for the patients whose charts I was going to review. These documents were then brought to the room where I reviewed the UHRs. The documentation retrieved from loose filing included documents more than a month old, including, for example, the result of a CT Scan received by the prison in July. More alarming, most of the documents in loose filing, some of which had been received a month before my site visit, had not yet been initialed as reviewed by a primary care provider.

101.    In addition, Dr. Swingle, the HDSP Chief Medical Officer, reported that the transcribing of dictated primary care provider notes was "several months" behind at the prison. This means that documentation of a PCP-patient encounter is missing in the UHR. This, combined with the backlog in loose filing described above, creates dangerous risks because medical staff members who provide care to the patient have no idea what assessments were made previously or, in some cases, what diagnostic test results were obtained.

### B.    CDCR Continues to Rely on Inadequate Tracking Systems

102.    CDCR's tracking and information systems cannot keep up with the overwhelming data requirements in the system's overcrowded prisons.  In support of his Seventh Quarterly Report, the Receiver submitted a February 6, 2008 report entitled "Patient Identification Assessment."  Jt. Pls' Trial Ex. 67 (Receiver's Seventh Quarterly Report, Exh. 1.]   There, the consultant concluded that "the information technology environment within the medical care side of the CDCR is not a 'system' . . . it is *an act of desperation.*"  *Id*. at 5, emphasis in the original. The report further explains that, because the defendants cannot identify and link previous diagnostic and treatment information across prison sites, they face risks including "the possibility of significant errors during patient treatment . . . [and the] inability to identify individuals with chronic and/or communicable conditions upon reincarceration. . . ."  *Id*.

103.    The Report explains that these problems are magnified in the CDCR due to several factors, including "overcrowding in the prisons (increasing the risk of communicable disease transmission) . . . ."  *Id*.   "Due to debilitating technology and record management practices, pulling together a cohesive picture of the inmate's health status is a significant challenge, and currently is near impossible.  This puts continuity of care at risk."  *Id*. at 6.

104.    I agree with this report that the information systems currently in place in the CDCR are inadequate, and place prisoners at risk of harm.

## IX.    THERE ARE STILL NOT ENOUGH CUSTODY OFFICERS TO ENSURE ADEQUATE ACCESS TO MEDICAL APPOINTMENTS AND CLINICAL CONTACTS AT SOME PRISONS.

105.    As the Receiver explained in his Turnaround Plan in June 2008,

> Health care services are meaningful only if patient-inmates have timely access to those services. In a correctional setting, issues of access are inextricably intertwined with control and supervision of inmate movement by custody staff. System-wide, CDCR lacks the custody staff and organizational structure and processes to ensure that patient-inmates are reliably escorted and/or transported to medical appointments. As a result, patient-inmates are often denied timely access to health care services, substantially increasing the risk that patient-inmates' health will further deteriorate and increasing the overall costs of providing health care services.

Jt. Pls' Trial Ex. 56, (Receiver's Eighth Quarterly Report, Exh. 1 -- Turnaround Plan of Action) at 5.

106.    The Receiver has added additional custody teams to facilitate timely medical appointments, but his overall plan does not call for the full implementation of these additional custody allocations until July 2011, "contingent upon recruiting and training sufficient numbers of correctional officers to fill the new health care access posts." *Id.* at 6.

107.    At some of the prisons I inspected, prisoners are unable to access medical care appointments based on custody shortages. When a prison yard is placed on "modified program" status, *i.e.,* either all prisoners or some racial subgroups must be escorted to the clinics, often in shackles, there are often significant delays in treatment. These delays arise because there are not enough custody officers to move the prisoners in and out of the clinics on a timely basis, so far fewer prisoners are seen in the clinics.

## A.    PVSP

108.    I was told by custody staff that the B-yard at PVSP has been locked down during the last two months. The appointment tracking data for PVSP for the month of August (through August 14) shows the dramatic drop off in completed patient appointments on B-yard. *Plata* Pls' Trial Ex. 42 (PVSP Physician

Appointment Statistics, August 2008). During the first two weeks of August, primary care providers on yards A, C and D saw 258, 193 and 215 prisoners, respectively. On B-yard, the primary providers saw 118 prisoners during the same period. Indeed, on August 7, two providers were scheduled to see 42 patients, but just ten patients were seen. *Id.* The reasons stated on the tracking list were "alarms, LD [presumably lockdown]; no escorts." *Id.*

109. The tracking statistics for the RN triage appointments likewise reflect a drop for completed patient triage appointments for B-yard patients. *Plata* Pls' Trial Ex. 43 (PVSP RN Appointment Statistics, August 2008). While A, C and D completed 215, 121 and 129 triage appointments, B-yard nurses completed just 98, or fewer than ten appointments per clinic day. *Id.* The reasons provided for the cancelled appointments included, "lockdown," "no escorts," and "alarms." *Id.*

110. Additionally, on B-yard, the staff advised me that it took one business day from the date of collection of sick call slips to the date of the face-to-face triage appointment. However, when I questioned the office technician further about the scheduling, he stated that because the yard was on lockdown, he had to schedule prisoners for their triage appointments by race/gang affiliation, with each subgroup having one day a week for appointments. Thus, he was able to schedule timely RN triage appointments in only a handful of cases.

## B.    HDSP

111. At HDSP, the prison routinely has what the Warden describes as rolling lockdowns, in which half of the prison's four main housing facilities are locked down at any one time because the prison does not have enough correctional

officers to operate all facilities without using overtime.  When there is such a

lockdown on the two HDSP facilities used to house maximum custody prisoners,

access to medical care is affected because such prisoners must be escorted to the

medical clinics.  When there is a lockdown in "D" facility, the primary care

provider will be able to see between 12 and 20 patients a day, instead of the 20

that can be seen if there is no lockdown.

## X.    THERE ARE MORE PRISONERS REQUIRING SPECIALIZED PLACEMENT FOR MEDICAL REASONS THAN CDCR CAN ACCOMMODATE

112.    In my first report, I agreed with the Receiver's opinion that the

CDCR is currently unable to accommodate the housing needs of medical patients

requiring specialized placement.  My opinion has not changed.

113.    In his Turnaround Plan of Action, the Receiver discusses his plan to

expand facilities to accommodate the 10,000 state prisoners "whose medical

and/or mental condition requires separate housing to facilitate appropriate, cost-

effective access to necessary health care services." Jt. Pls' Trial Ex. 56

(Receiver's Eighth Quarterly Report, Ex. 1 – Turnaround Plan of Action) at 27.

The Receiver explains these facilities must be built because "CDCR does not have

adequate clinical, administrative and housing facilities to support constitutionally

adequate health care." *Id.*

114.    As the Receiver explained in his Eighth Quarterly report, the current

lack of medically appropriate housing for medically fragile prisoners can have dire

consequences.  "Simply stated, before constitutionally adequate health care can be

delivered in California's prisons, there needs to be *constitutionally adequate*

*treatment facilities to provide such care.*  Unless and until these facilities are

constructed, the major health care class action cases will continue indefinitely. Likewise, prisoners will continue to die unnecessarily." Jt. Pls' Exh. 56 at 46. (Emphasis in the original.)

115.    I understand that defendants have failed to provide the Receiver with the necessary funding for the construction, and the Receiver recently moved for contempt against the Governor and the State Controller for their failure to provide the funding. To my knowledge, no construction has yet begun on this essential project.

## XI.  IT WILL TAKE YEARS FOR THE RECEIVER'S TURNAROUND PLAN TO REMEDY THE UNCONSTITUTIONAL MEDICAL CONDITIONS

116.    On June 6, 2008, the Receiver submitted to the Court a "Turnaround Plan of Action" designed to correct constitutional deficiencies in the California prison health care system. I have reviewed the Receiver's Turnaround Plan.

117.    In his August 5, 2008 newsletter, the Receiver wrote that the Turnaround Plan "consists of over two dozen complex projects, initiatives and programs. Any one of these major projects would be enough to challenge an ordinary department." Jt. Pls' Trial Ex. 102 (August 5, 2008 Newsletter from the Receiver.) I agree that the plan is enormously complex, and I believe that it will take years to remedy the current unconstitutional conditions. The timeframe to reach a constitutionally adequate medical delivery system will be delayed if crowding is not reduced.

## XII.  OVERCROWDING INCREASES THE RATE AND SERIOUSNESS OF INFECTIOUS DISEASE TRANSMISSION

118.    I have not changed my opinion that the overcrowded housing conditions, and in particular, the conditions in the non-traditional beds, including

the converted gyms, create potential breeding grounds for disease.

## XIII. CONCLUSIONS

119. Based on all that I have set forth above and in my previous reports, I continue to believe that overcrowding is the primary cause of the current state of medical crisis in the CDCR. I do not believe the Receiver and the CDCR will be able to address and resolve the critical medical care deficiencies until the need for services within the system is significantly reduced, and I still believe that some of the hiring gains for clinicians will be lost if these systemic issues are not addressed, because many newly-hired clinicians will be unwilling to risk their professional credentials and reputations by practicing in an environment where their patients are at risk of harm because, among other things, adequate clinical space is scarce, appointments are not scheduled, complete medical records are unavailable, and medications are not timely delivered.

Dated: _____9·9·08_____          _____
                                      Ronald Shansky, M.D.

# ATTACHMENT A

# RONALD MARK SHANSKY, M.D.

## CURRICULUM VITAE

### *ACADEMIC TRAINING*

Bachelor of Science, University of Wisconsin, 1967
Doctor of Medicine, Medical College of Wisconsin, 1971
Master of Public Health, University of Illinois School of Public Health, 1975

### *PROFESSIONAL LICENSE*

Licensed Physician (Illinois) No. 36-46042

### *INTERNSHIP AND RESIDENCY TRAINING*

Internship – Cook County Hospital, July 1971-1972
Residency – Internal Medicine, Cook County Hospital, July 1972-1974

### *BOARD CERTIFICATION AND FELLOWSHIPS*

Diplomate of the American Board of Internal Medicine – September 1978
Diplomate of the American Board of Quality Assurance and Utilization Review Physicians – 1992
Elected Fellow of the Society of Correctional Physicians – 1999

### *EMPLOYMENT*

Medical Director, Center for Correctional Health & Policy Studies, Washington, D.C. Jail –
    2004 to 2006
Consultant, Corrections Medicine and Continuous Quality Improvement – 1993 to present on a full-time
    basis; and throughout career while holding other positions
Medical Director, Illinois Department of Corrections – 1982-1993, 1998-1999
Attending Physician, Department of Medicine, Cook County Hospital – 1978 to Present
Surveyor (part-time), Joint Commission on Accreditation of Healthcare Organizations – 1993-1997
Staff Physician, Metropolitan Correctional Center of Chicago – 1975-1982

## CONSULTATIONS

Condition of Confinement Reviews for PricewaterhouseCoopers,
    reviewing detention facilities housing federal detainees; 2000–Present
Essex County Jail, Newark, N.J.
Michigan Department of Corrections
Montana Department of Corrections
New Mexico Department of Corrections
Polk Correctional Center, Raleigh, N.C.
South Dakota Department of Corrections

## APPOINTMENTS

Member of Medical Oversight Team reviewing the Ohio prison system – 2005 to present
Court Monitor, De Kalb County Jail, Decatur, Georgia – 2002-2005
Consultant, California Department of Corrections – 2000
Court Monitor, Milwaukee County Jail – 1998 to present
Court Monitor, Essex County Jail, Newark, NJ – 1995 to present
Medical Expert, State of Michigan – 1995
Consultant to Special Master, *Madrid v. Gomez*, Pelican Bay Prison, California Department of
    Corrections – 1995
Medical Expert, State of New Mexico – 1994
Consultant, Connecticut Department of Corrections – 1994
National Advisory Board of the National Center for Health Care Studies – 1991
Illinois AIDS Interdisciplinary Advisory Council – November 1985
Illinois AIDS Caretaker Group – November 1985
Task Force to Rewrite American Public Health Association Standards for Medical Services in
    Correctional Facilities – 1983
Corrections Subcommittee, Medical Care Section, APHA – 1983
Preceptor, then Clinical Associate Professor, Department of Preventive Medicine and Community Health,
    Abraham Lincoln School of Medicine, University of Illinois, Chicago, Illinois – 1972-1979
Clinical Associate Professor, Department of Medicine, Ravenswood Medical Center, Chicago,
    Illinois – 1979-1981
Director, Phase 1 and 2 Program at Cook County Hospital for the Abraham Lincoln School of
    Medicine – 1976-1978
Medical Director, Uptown People's Health Center – September 1978
Director, General Medicine Clinic, Department of Medicine, Cook County Hospital – 1975
Director, Clinical Services, Department of Internal Medicine, Cook County Hospital – 1975
Associate Attending Physician, Department of Internal Medicine, Cook County Hospital – 1974-1975
Instructor, Illinois College of Optometry, Chicago, Illinois – 1972-1974

## COMMITTEE MEMBERSHIPS

Chairman, State of Illinois AIDS Caretakers Committee – 1985
Chairman, Corrections Subcommittee, Medical Care Section – 1983
Chairman, Medical Records Committee, Cook County Hospital – 1981
Member, Executive Medical Staff, Cook County Hospital – 1979
Member, Task Force to Rewrite *Standards for Health Services in Correctional Institutions* –
    published 1986

## PROFESSIONAL ORGANIZATIONS

Society of Correctional Physicians – President, 1993-1995
American Public Health Association – 1974 to present
American Correctional Health Services Association – 1988
American Correctional Association – 1982
Federation of American Scientists – 1974-1981

## CIVIC

Mutually agreed upon expert, Milwaukee County Jail – 2001
Mutually agreed upon expert, *Inmates v. Essex County Jail*, 1995 to present
Appointed Receiver by Judge William Bryant, Medical and Mental Health Programs, District of
  Columbia Jail, *Campbell v. McGruder* – 1995
Mutually agreed upon neutral expert, State of Montana, *Langford v. Racicot* – 1995
Mutually agreed upon neutral expert, State of Vermont, *Goldsmith v. Dean* – 1996
Executive Committee Overseeing Health Care, Puerto Rico Administration of Corrections – 1993
Appointed by Judge Gerald Jenks, District Court for the Central District of Utah, as Impartial Expert
  in the matter of *Henry v. Deland* – 1993
Appointed by Magistrate Claude Hicks Jr., U.S. District Court in Macon, Georgia as Medical Expert
  in the matter of *Cason v. Seckinger* – 1993
Appointed by Judge Owen M. Panner, District of Oregon, as Special Master in *Van Patten v. Pearce*
  involving medical services at Eastern Oregon Correctional Institution – December 1991
Appointed by Allan Breed, Special Master, *Gates* case, as Medical Consultant regarding California
  Medical Facility in Vacaville
Appointed by Judge M. H. Patel, Special Master, case involving San Quentin Prison – 1989 to 1995
Selected as part of delegation to inspect the medical services provided to Palestinian detainees in the
  Occupied Territories and Israel by Physicians for Human Rights – 1989
Appointed by U.S. District Judge Williams as member of medical panel monitoring medical services in
  Hawaii Prison System – 1985
Appointed by U.S. District Judge Black to evaluate medical services in the Florida Prison System –1983
Appointed by U.S. District Judge Kanne as monitor to the Lake County, Indiana Jail in the litigation of
  the *Jensen* case (H74-230) – 1982
Appointed by U.S. District Judge J. Moran as Special Master of the Lake County, Illinois Jail in the
  litigation of *Kissane v. Brown* – 1981
Board Member, Health and Medicine Policy Research Group, Chicago, Illinois – 1980
Appointed to Advisory Committee, State of Alabama, Department of Mental Health – 1980
Appointed as consultant to the State of Alabama, Department of Mental Health – 1979
Consultant, U.S. Department of Justice Civil Rights Division, Special Litigation Section – 1977
Appointed by U.S. District Judge J. Foreman to a three-member panel of medical experts to advise on
  health conditions at Menard Correctional Center, Menard, Illinois – 1976

## *AWARDS*

Armond Start Award for Excellence in Correctional Medicine, Society of Correctional Physicians – 1999

American Correctional Health Services Association Distinguished Service Award – 1992

## *PUBLICATIONS*

Michael Puisis, editor, Ronald Shansky, associate editor, *The Clinical Practice in Correctional Medicine, second edition,* 2006.

Schiff, G., Shansky, R., chapter: "The Challenges of Improving Quality in the Correctional Health Care Setting," in *The Clinical Practice in Correctional Medicine, second edition*, 2006.

Schiff, G.; Shansky, R.; Kim, S., chapter: "Using Performance Improvement Measurement to Improve Chronic Disease Management in Prisons," in *The Clinical Practice in Correctional Medicine, second edition*, 2006.

Anno, B.J., Graham, C., Lawrence, J., and Shansky, R. *Correctional Health Care – Addressing the Needs of the Elderly, Chronically Ill, and Terminally Ill Inmates*. National Institute of Corrections, 2004.

Schiff, G., Shansky, R., chapter: "Quality Improvement in the Correctional Setting," in *The Clinical Practice in Correctional Medicine*, 1998.

How-To Manual, *Quality Improvement in a Correctional System*, State of Georgia, Department of Corrections, 1995.

*Journal of Prison and Jail Health*, Editorial Board; 1988 – present.

Shansky, R., "Advances in HIV Treatment: Administrative, Professional and Fiscal Challenges in a Correctional Setting," *Journal of Prison and Jail Health*, Volume 9, Number 1.

B. Jaye Anno, Ph.D., *Prison Health Care: Guidelines for the Management of an Adequate Delivery System*, 1991; Member of Editorial Advisory Board.

Coe, J., Kwasnik, P., Shansky, R., chapter: "Health Promotion and Disease Prevention" in B. Jaye Anno, Ph.D., *Prison Health Care: Guidelines for the Management of an Adequate Delivery System*, 1991.

Hoffman, A.; Yough, W.; Bright-Asare, P.; Abcariam, H.; Shansky, R.; Fitzpatrick, J.; Lidlow, E.; Farber, M.; Summerville, J.; Petani, C.; Orsay, C.; Zal, D., "Early Detection of Bowel Cancer at an Urban Public Hospital: Demonstration Project," *Ca – A Cancer Journal for Clinicians*, American Cancer Society, Nov/Dec 1983, Vol. 33, No. 6.

Mehta, P.; Mamdani, B.; Shansky, R.; and Dunea, G., "Double Blind Study of Minoxidil and Hydralazine." Sixth International Conference of Nephrology, Florence, Italy – June 1975.

## PRISONS INSPECTED

State of Alabama Prisons at Kilby, Holman, Fountain, Tutweiller, Staton, and Draper
Parchman State Prison, Mississippi Jefferson County and Birmingham City Jails, Alabama
Arizona State Prison, Florence, Arizona
Washington County Jail, Fayetteville, Arkansas
California Medical Facility, Vacaville
California State Penitentiary, San Quentin
Colorado State Penitentiaries, Centennial, Fremont, Territorial
District of Columbia Jail at Occoquan
Florida Prison System
Florida County Jails, including Monroe County, Pasco County and Polk County
Krome Detention Facility (INS), Miami, Florida
Department of Juvenile Justice, State of Georgia
Georgia Diagnostic Center, Jackson, Georgia
Hawaii Prison System
Menard Correctional Center, Illinois
Rock Island County Jail, Rock Island, Illinois
Indiana State Penitentiary, Michigan City, Indiana
Indiana Reformatory, Pendleton, Indiana
Lake County Indiana Jail, Crown Point, Indiana
Maine State Prison, Thomaston, Maine
State Prison of Southern Michigan
New Hampshire State Penitentiary, Concord
New York City Jails
Sing Sing Penitentiary, New York
Ohio Women's Prison
State of Vermont Prison System
Walla Walla State Penitentiary, Washington
Wisconsin State Penitentiaries at Waupan, Fox Lake, Taycheedah and Dodge

## SURVEYED MEDICAL PROGRAMS

Federal Bureau of Prisons, approximately 20 facilities

## INTERNATIONAL INSPECTION

Israeli Prisons and Jails Housing Palestinian Detainees

ATTACHMENT B

# DOCUMENTS REVIEWED BY DR. SHANSKY

CDCR Weekly Population Report, as of Midnight, August 20, 2008

Plata Vacancy/Registry Report, May 2008

California Prisoner Health Care Receivership Corporation, Operational Assessment for Access to Care at California Rehabilitation Center

California Prisoner Health Care Receivership Corporation, Operational Assessment for Access to Care at the California Training Facility

California Prisoner Health Care Receivership Corporation, Operational Assessment for Access to Care at Mule Creek State Prison

California Prisoner Health Care Receivership Corporation, Operational Assessment for Access to Care at Avenal State Prison

NKSP Tracking Forms for D-Yard RN Line, dated August 18-22, 2008

NKSP MD/PCP Line, 2nd Watch, dated August 18-22, 2008

PVSP Offsite Aging Report, dated August 27, 2008

SOL Offsite Aging Report, dated August 28, 2008

HDSP Offsite Aging Report, dated August 29, 2008

NKSP Offsite Aging Report, dated August 25, 2008

PVSP Physician Appointment Statistics, August 2008

PVSP RN Appointment Statistics, August 2008

August 5, 2008 Newsletter from the Receiver

Receiver's Seventh Quarterly Report and Exhibits

Receiver's Eighth Quarterly Report and Exhibits

Report of Pablo Stewart, M.D., August 15, 2008

Various Logbooks maintained at inspected facilities and reviewed on-site