1  PRISON LAW OFFICE                          ROSEN, BIEN & GALVAN, LLP
   DONALD SPECTER, Bar No. 83925             MICHAEL W. BIEN, Bar No. 96891
2  STEVEN FAMA, Bar No. 99641                JANE E. KAHN, Bar No. 112239
   E. IVAN TRUJILLO, Bar No. 228790          AMY WHELAN, Bar No. 215675
3  SARA NORMAN, Bar No. 189536               LISA ELLS, Bar No. 243657
   ALISON HARDY, Bar No. 135966              MARIA V. MORRIS, Bar No. 223903
4  REBEKAH EVENSON, Bar No. 207825           315 Montgomery Street, 10th Floor
   1917 Fifth Street                         San Francisco, California  94104
5  Berkeley, CA  94710                       Telephone: (415) 433-6830
   Telephone:  (510) 280-2621
6  KIRKPATRICK & LOCKHART PRESTON            BINGHAM, McCUTCHEN, LLP
   GATES ELLIS LLP                           WARREN E. GEORGE, Bar No. 53588
7  JEFFREY L. BORNSTEIN, Bar No. 99358       Three Embarcadero Center
   EDWARD P. SANGSTER, Bar No. 121041        San Francisco, California  94111
8  RAYMOND E. LOUGHREY, Bar No. 194363       Telephone: (415) 393-2000
   55 Second Street, Suite 1700
9  San Francisco, CA  94105-3493
   Telephone:  (415) 882-8200
10 THE LEGAL AID SOCIETY –
   EMPLOYMENT LAW CENTER
11 CLAUDIA CENTER, Bar No. 158255
   600 Harrison Street, Suite 120
12 San Francisco, CA  94107
   Telephone:  (415) 864-8848
13
   Attorneys for Plaintiffs
14
                   IN THE UNITED STATES DISTRICT COURTS
15
               FOR THE EASTERN DISTRICT OF CALIFORNIA
16
               AND THE NORTHERN DISTRICT OF CALIFORNIA
17
        UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES
18
           PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

| | |
|---|---|
| RALPH COLEMAN, et al., | No.: Civ S 90-0520 LKK-JFM P |
| Plaintiffs, | **THREE-JUDGE COURT** |
| vs. | |
| ARNOLD SCHWARZENEGGER, et al., | |
| Defendants | |
| MARCIANO PLATA, et al., | No. C01-1351 THE |
| Plaintiffs, | **THREE-JUDGE COURT** |
| vs. | **DECLARATION OF DOYLE WAYNE** |
| ARNOLD SCHWARZENEGGER, et al., | **SCOTT IN SUPPORT OF PLAINTIFFS'** |
| | **OPPOSITION TO DEFENDANTS' MOTION** |
| vs. | **TO DISMISS AND/OR MOTION FOR** |
| Defendants | **SUMMARY JUDGMENT / ADJUDICATION** |

DECLARATION OF DOYLE WAYNE SCOTT IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AND/OR
MOTION FOR SUMMARY JUDGMENT / ADJUDICATION, NOS.: CIV S 90-0520 LKK-JFM, C01-1351 TEH

[241785-1]

I, Doyle Wayne Scott, declare as follows:

1.    I make this declaration in support of "Plaintiffs' Opposition to Defendants' Motions for Dismissal or, Alternatively, for Summary Judgment or Summary Adjudication." I have personal knowledge of the matters set forth herein and if called as a witness, I could and would competently so testify.

2.    I have been retained by Plaintiffs to testify as an expert witness in this matter. I have prepared two expert reports which, pursuant to the court orders governing this proceeding, are my direct testimony at trial.

3.    On November 9, 2007, I prepared my first report. Attached as **Exhibit A** is a true and correct copy of my November 9, 2007 report.

4.    On August 15, 2008, I prepared a supplemental report. Attached as **Exhibit B** is a true and correct copy of my August 15, 2008 supplemental report.

5.    I am informed and believe that copies of my reports were served on all parties to the Three-Judge Court matter on November 9, 2007 and August 15, 2008, respectively.

I declare under penalty of perjury that the foregoing is true and correct, and that this declaration was executed this 26th day of September, 2008, in Huntsville, Texas.

Doyle Wayne Scott

# EXHIBIT

# A

Report of Doyle Wayne Scott

November 9, 2007

# TABLE OF CONTENTS

I.   California's severely overcrowded prison population far outstrips the ability of the system to safely or appropriately house its prisoners...................................2

   A. The Texas experience demonstrates the impossibility for systemic reform in these areas under current overcrowded conditions................................2

   B. California's prison population has expanded tremendously in the last 30 years without the infrastructure, staff, or management capabilities to support it..............................................................................................4

      1. "Ugly beds"...................................................................5

      2. Infrastructure..............................................................9

      3. Staffing....................................................................13

      4. Management capabilities.................................................14

      5. Violence...................................................................17

      6. The overcrowding is getting worse.....................................20

   C. By any definition, California's prison population exceeds its capacity to safely house prisoners and provide for their needs.................................22

II.  Overcrowding makes the custodial management necessary for medical and mental health care nearly impossible.......................................................28

   A. Staffing.........................................................................29

      1. Escorts....................................................................29

      2. Emergency response......................................................32

      3. Watchdogs and gatekeepers..............................................33

   B. Lockdowns.......................................................................35

C. Classification..................................................................37

D. Management systems..........................................................42

III.    Overcrowding is the primary cause of the constitutional violations...............44

Report of Doyle Wayne Scott

1.  I am an expert consultant on corrections management, staffing, and security.  I
served for more than 30 years with the Texas Department of Criminal Justice (TDCJ), the
agency that runs the state's prisons, and the Texas Board of Pardons and Paroles,
culminating in an appointment as the Executive Director of TDCJ from 1996-2001.  I
have performed independent reviews and expert analyses on staffing patterns,
institutional response to violent disturbances, general operations, and security controls for
the National Institute for Corrections, the Oklahoma Department of Corrections through a
contract issued by the Oklahoma state legislature, the Florida Department of Corrections,
the New Mexico Department of Corrections, the Cook County Judicial Advisory Council,
the Indiana Department of Corrections, the Kentucky Department of Corrections, and the
Puerto Rico prison system, the latter on behalf of the federal district judge overseeing
reforms due to constitutional violations.  I have served as the Vice-Chair of the American
Correctional Association's Standards Committee and the Chair of the Legislative and
Legal Issues Committee of the Association of State Correctional Administrators.

2.  I have not authored any publications in the last ten years.  I have not testified as an
expert witness in the last four years in court or by deposition.  My company, MGT of
America, is charging Plaintiffs $250.00 an hour for my work on this case.  My
Curriculum Vitae is attached as Appendix A.

1

I.    California's severely overcrowded prison population far outstrips the ability
      of the system to safely or appropriately house its prisoners

3.  The overcrowding crisis in California is, in my experience, unprecedented in scope

and in the dangers and deprivations of day-to-day life in the prisons.  My extensive

experience in running the Texas prison system and evaluating management, staffing, and

security needs in multiple state and local jail systems, as well as my review of numerous

reports regarding California's prisons from diverse and credible sources, and my tours of

four California prisons, lead me to the conclusion that without substantially reducing its

prisoner population, California will never be able to generate the custodial support

services necessary to provide prisoners with basic medical and mental health care.

A. The Texas experience demonstrates the impossibility for systemic reform
   in these areas under current overcrowded conditions

4.  Next to California, Texas is the largest penal system in the United States and one

of the largest in the world.  When I started as a correctional officer in 1972, the system

was severely overcrowded, reaching "over 200 percent of . . . original design capacity" by

1980, the year the overcrowding, health care, and many other aspects of the system were

declared unconstitutional.  *Ruiz v. Estelle*, 503 F. Supp. 1265, 1285 (S.D. Texas 1980).

As Judge Justice found 27 years ago, the Texas Department of Corrections

> has been, by the admissions of its own officials, severely overcrowded since at
> least March of 1977.  The problem has reached crisis proportions.  When Director
> Estelle testified in August 1979, he reported that approximately 1,000 of the
> system's 26,000 inmates were sleeping on the floors of TDC institutions.  These
> supernumerary inmates are housed in cells and dormitories already holding almost
> double the number of persons for which they were designed.

2

*Id.* at 1277. The judge described the situation as "intolerable" and, in particular, noted that "[t]he population density of inmates confined in dormitories is shocking," *id.* at 1278, with "sanitary and recreational facilities" that were "wholly inadequate…" *Id.* at 1279.

5.  Judge Justice issued population controls as part of the relief in *Ruiz. See, e.g., id.* at 1387. As a corrections manager and later the system's executive director, I firmly believe that population control was absolutely necessary in our decades-long efforts to correct the systemic violations. We were able to remedy the serious harms by reducing our offender population to reasonable capacity limits agreed to by the parties that allowed the Texas Department of Corrections to properly classify and manage its inmates and their attendant needs. These limits or "caps" were calculated at five percent less than the original design capacity of each institution. Those "caps" were later memorialized in legislation passed by the State of Texas that made those limitations permanent.

6.  California today is far more overcrowded than Texas ever was. It is the worst overcrowding I have ever seen, in my decades of work in the severely overcrowded Texas system and in subsequent expert consultant reviews of staffing, security, and management functions in prison systems in Oklahoma, Indiana, Florida, New Mexico, Kentucky, Cook County, and Puerto Rico. Based on my experience, I was prepared to see crowded conditions, fraying infrastructure, and management failures in California's prisons. As the head of a similarly huge and complex penal system, and as an employee of that system as it struggled with severe overcrowding, I know that it is impossible to run such an

3

operation properly under such circumstances.  However, I was shocked by what I saw in

the four California prisons I toured. These tours confirmed the profoundly disturbing

accounts that I have read from the Court, the Governor, California Department of

Corrections and Rehabilitation (CDCR) officials, the *Plata* Receiver, the Legislature, and

the Office of the Inspector General.[1]  Not only are California's prisons operating under a

state of emergency, it is clear to me that unless the population is reduced, the state will

remain in crisis verging on catastrophe and will remain utterly unable to provide adequate

medical and mental health care to the prisoners in its custody.

### B.  California's prison population has expanded tremendously in the last 30 years without the infrastructure, staff, or management capabilities to support it

7.  The last few decades have seen extraordinary growth in California's prison

population.  The population has grown more than 500 percent in less than 30 years, and

the number of prisons has nearly tripled. Plata Pls. Trial Ex. 1 at 4 (*Plata* Findings of

Fact and Conclusions of Law Re Appointment of Receiver).   Today, California houses

---

[1] I personally toured four of California's 33 state prisons in October 2007: Avenal
State Prison (Avenal), California Institution for Men (CIM), Valley State Prison for
Women (VSPW), and California State Prison at San Quentin (San Quentin).  These
prisons represent a range of the most important variations in the system: men's and
women's facilities; Reception Centers, general population units, specialized mental health
units, condemned housing, and administrative segregation housing; dormitory,
gymnasium, dayroom, hallway, and celled housing; high, medium, and low security; and
old and more recently built structures.  In addition, I have reviewed reports as noted in
Appendix B from a wide range of credible and impressive sources, describing and
analyzing individual prisons as well as systemic issues.  My review of these written
materials gives me confidence that my observations at the four prisons I toured are truly

171,285 prisoners; its prisons are at 203.7 percent of design capacity. Joint Pls' Trial Ex. 25 at 1 (Weekly Report of Population, October 31, 2007).

8. The state has proven itself unable to address the increasing health care needs of the expanding population. As the population has grown, the state's prison infrastructure, staff, and management have stretched beyond the breaking point, resulting in the current state of acute crisis.

### 1. "Ugly beds"

9. It is impossible to grasp the scope of California's crisis without understanding the plight of the thousands of prisoners confined to "ugly beds." Before I describe the specific strains on infrastructure, staffing, and management, I would like to paint a picture of some of the stark realities of life in today's California prisons.

10. As the prison population has grown, it has outstripped the available space for safely housing prisoners. As a result, California has started in recent years to house more and more prisoners in so-called "ugly beds." According to the Governor, as of October 2006, "the CDCR is required to house more than 15,000 inmates in conditions that pose substantial safety risks, namely, prison areas never designed or intended for inmate housing, including, but not limited to, common areas such as prison gymnasiums, dayrooms, and program rooms. . . ." Joint Pls' Trial Ex. 1 at 1 (Governor's Emergency Proclamation). Six months later, that number had risen to more than 16,000, which

representative of the systemic failures described in this report.

"means that about 10 percent of the prison population is currently housed in 'bad' beds."

Joint Pls' Trial Ex. 13 at 2 (Senate Budget and Fiscal Review Committee Subcommittee

No. 4, Agenda of April 12, 2007). "Ugly beds" are not merely uncomfortable, they are

actually dangerous: they make it harder for staff to prevent violence and breed anger and

frustration among prisoners by sharply curtailing the space available for anything but the

warehousing of bodies. *See, e.g., id.* at 2.

11. These "ugly beds" are truly appalling. I saw cages at the California Institution for

Men (CIM) where, as staff freely admitted, prisoners have sometimes had to spend the

night because there were no beds for them. In more than 35 years of prison work

experience, I have never seen anything like it. These cages are in wide hallways with

busy foot-traffic. They are only a few feet wide, and there is no room for a mattress, so

prisoners have to sleep sitting on a bench. There are no toilets, and staff shortages would

lead prisoners to wait lengthy periods to be escorted to bathrooms. It is difficult to

properly hydrate prisoners in such a setting. These cages are an inhumane and

unacceptable result of severe overcrowding.

12. At the same prison, I saw 54 prisoners in Sycamore Hall double-bunked and

stuffed into a dayroom intended for recreational purposes. They had only one toilet. Also

at CIM, I saw a shockingly overcrowded gymnasium at the East Facility. Such facilities

are supposed to be temporary housing, but staff told me that some prisoners are there up

to a year. It was a sea of people: 202 prisoners, with only seven showers and 11 working

6

toilets. These numbers violate contemporary correctional standards for safe and hygienic facilities, as discussed in Section I.B.2, below.

13. At the California State Prison at San Quentin (San Quentin), I saw a gymnasium converted to inmate housing with 328 double bunk beds. There were only nine working toilets to service this entire population. Similarly, Dorm 410 at Avenal State Prison (Avenal) was designed for 172 prisoners but has a current population of 344, some housed in triple bunks.

14. My observations are entirely consistent with the findings of the *Coleman* Special Master, who found shocking living conditions for many mentally ill prisoners. For example, Deuel Vocational Institution (DVI) "was old and overcrowded. . . . A large room around the perimeter housed 38 [mentally ill] inmates in a triple-bunk arrangement. They reported that the room had a single toilet, urinal, and shower. Inmates were observed dumping water into a drain from a 30-gallon garbage can which they used as a shower supplement. Many windows were broken. Inmates reported that they used blankets to cover windows but that custody officer removed the blankets without replacing them, leaving the area cold and the beds unblanketed. An area of the [administrative segregation] building housing caseload inmates was referred to as 'deep seg' or 'the dungeon.' Its four cells were designed for the apparent purpose of isolation. They had almost no outside light and were illuminated by a single light controlled by an outside switch and turned off at night. Cells were malodorous, in disrepair, and out of

7

officers' ready view. Inmates in these cells likely had no more contact with custody staff than inmates housed in [punitive segregation] or stand-along administrative segregation cells and were in much worse condition. Time out of the dorm was limited to approximately 20 minutes twice per day for meals." Joint Pls' Trial Ex. 36 at 101 (18th Special Master's Report).

15. The space inadequacies extend to treatment as well as living spaces. The *Coleman* Special Master has noted that "[e]xcessive population, thus, results in a reduction of programming space now occupied by inmate bunks[;] greater competition for use of the diminishing available space; fewer correctional officers to permit access to the diminishing space; and, ultimately, the increasing frustration and demoralization of clinicians trying to provide treatment." Joint Pls' Trial Ex. 35 at 7 (*Coleman* Special Master's Report Regarding Overcrowding, May 31, 2007). He has documented mental health treatment taking place in closets (Joint Pls' Trial Ex. 36 at 73 (California Medical Facility)), in the middle of dayrooms (*id.* at 42 (High Desert State Prison), 55 (Mule Creek State Prison)), and on outdoor benches (*id.* at 304 (Valley State)). At the California Correctional Institution, suicidal prisoners have been held in holding cells; some "remained in the most frequently used holding cells for as long as three days." *Id.* at 225.

16. As the *Coleman* Special Master has noted, the "ugly beds" harm prisoners. In California's severely overcrowded system, "[a]ll inmates must spend increasingly larger

8

chunks of their days in their cells, or much more dangerously, in one of the triple-bunked 'non-traditional' spaces. None of this is conducive to the health and well-being of any inmate, much less a seriously mentally disordered inmate/patient; it inevitably escalates the incidence of mental illness and exacerbates the condition of those already mentally fragile and vulnerable." Joint Pls' Trial Ex. 35 at 7-8.

### 2. Infrastructure

17. Overcrowding affects all prisoners, not just those who are triple-bunked in gymnasiums or forced to live in hallways and dayrooms. "[T]he overcrowding of the prison facilities has overburdened the basic infrastructure of the institutions resulting in sewage spills and shortages of safe drinking water." Joint Pls' Trial Ex. 13 at 2 (Senate Budget and Fiscal Review Committee Subcommittee No. 4, Agenda of April 12, 2007). "[C]ritical deficiencies in . . . existing infrastructure" are found at most prisons; 20 prisons have critical drinking water system deficiencies; 18 have critical deficiencies in waste water treatment, 20 in electrical systems, and 14 in other areas. *Id.* at 9.

18. My tours demonstrated the truth of these findings. In my opinion, CIM is an incredibly old, poorly maintained, unsanitary facility with inadequate staffing and overburdened, crumbling infrastructure that must be vacated and provided significant maintenance and renovations or else simply abandoned. In its current state, it is not fit for housing human beings. Similarly, San Quentin needs a substantial infrastructure overhaul before it should house people: I saw bars rusted almost completely through, filthy

9

conditions that staff say cannot be made clean, and what was described to me as permanent unidentified liquid dripping from upper tiers onto busy passageways. It might well cost less to build an entirely new facility than to rehabilitate San Quentin to an acceptable level, the infrastructure damage and deterioration are so severe.

19.  On my tours, I saw housing units with serious deficits of toilets, sinks, and urinals by contemporary correctional standards. The American Correctional Association states that toilets should be "provided at a minimum ratio of 1 for every 12 inmates in male facilities and 1 for every 8 inmates in female facilities." Joint Pls' Trial Ex. 51 at 38 (American Correctional Association, Standards for Adult Correctional Institutions, 4th Ed.). Further, one sink should be provided for every 12 prisoners, and one shower for every eight prisoners. *Id.* at 38-39.

20.  California far exceeds these minimum ratios. For example, at CIM, Sycamore Hall had 54 prisoners for one toilet and East Gym had 202 prisoners for seven showers and 11 working toilets. Avenal 410 had 344 prisoners with 14 toilets. As a correctional administrator, I find that such deprivations are not only inhumane, they breed violence, as I discuss in greater detail below, and serve as a dangerous vector for the spread of disease.

21.  My understanding is that the established standards for toilets and showers in correctional settings are based on infectious disease prevention requirements. Such precautions are necessary because disease spreads with dangerous speed in extremely

dense populations with limited sanitation facilities. According to the CDCR institutions

chief, "[t]he overcrowding of CDCR facilities has led to increased numbers of infectious

disease outbreaks. . . system-wide." Joint Pls' Trial Ex. 11 at ¶ 3 (Declaration of Scott

Kernan in Support of Defendants' Report in Response to the Court's February 15, 2007

Order, May 16, 2007). The *Plata* Receiver has documented similar serious

overcrowding-caused outbreaks, supporting his opinion that "[t]he serious levels of

crowding in CDCR prisons and the unconstitutional levels of medical services" make it

necessary to be alert to "the ever present danger of a serious infectious disease outbreak

in California's prisons, a problem that not only jeopardizes inmates and staff, but also has

an impact on public health in the community." Joint Pls' Trial Ex. 30 at 70-71

(Receiver's Fourth Bi-Monthly Report, March 19, 2007). As a correctional administrator,

I am extremely concerned that lockdowns and limited programming also reduce access to

exercise and fresh air, and increase idleness and frustration, with consequent negative

effects on physical and mental health.

   22.  One result of having too many people and too few sanitary facilities are that

toilets, lavatories, and showers will be used much more than originally contemplated and

wear out faster. Prisoners complained of lack of hot water for weeks at a time at Avenal

(on 5 Facility and Building 410, where prisoners complained that there had been no hot

water for months) and for days at a time in CIM's West Facility. At San Quentin, staff

noted that they could submit work order after work order to repair basic living unit

11

functions, but the repairs were simply not done. As a result, staff expressed hopelessness and cynicism. At all three of these facilities, maintenance was inadequate and work orders were not addressed in a timely manner.

23. I saw everywhere evidence of crumbling infrastructure. Ventilation appeared to be inadequate at CIM, where I saw filters and screens that had clearly not been cleaned in quite some time. In Elm Hall, a housing unit that houses many paraplegics and other prisoners who use wheelchairs, all windows had been broken and were covered with plastic sheeting. Prisoners also complained that the roofs leak. At Avenal, I saw large amounts of mold in almost every shower that I inspected, demonstrating inadequate sanitation practices over a significant length of time.

24. One of the most dangerous effects of overcrowding on infrastructure lies in safety deficits. I saw a frightening range of fire hazards in the housing areas, where the very high population density exacerbates the risk of deadly fires. I saw few efforts to minimize this risk, but instead saw hazards such as flammable blankets and cardboard on cell doors and other flammable material in the cells and living areas. At San Quentin, the risk of fire disaster is unacceptable – there is no automatic cell unlock system, so in a fire emergency, each one of hundreds of cells, spread over five tiers in many living units, would have to be unlocked individually. It is simply impossible. On my tour of West Block, I smelled at two separate cell locations something burning. Clearly, prisoners are able to light flammable material in their cells, and are doing so. If there were a fire in San

12

Quentin's cell blocks, many would die in their cells.

### 3. Staffing

25. Staffing as well as infrastructure is strained to the breaking point. At the same time as it experienced extraordinary inmate growth, the CDCR has substantially reduced the number of prison staff, eliminating more than 5,000 workforce positions in the last 15 years alone. Joint Pls' Trial Ex. 4 at 125 (Reforming Corrections: Report of the Corrections Independent Review Panel, June 30, 2004). And the system has not even been able to fill the positions that remain: "CDCR projects current officer vacancies, statewide, at approximately 4,130. . . . [I]t will take about 5 years to fill all of the vacancies under the current academy structure."[2] Joint Pls' Trial Ex. 43 at ¶ 14 (Declaration of Scott Kernan in Opposition to Writ of Mandate, *California Correctional Peace Officers' Organization v. Schwarzenegger*, No. 06CS01568 (Sacramento Superior Ct)., January 19, 2007).

26. CDCR staffing rates are already extremely low by national standards. According to Dr. Joan Petersilia, who has headed numerous CDCR reform research efforts, "[w]hile the nation's prisons average one correctional officer to every 4.5 inmates, the average California officer is responsible for 6.5 inmates. Although officer salaries are higher than average, their ranks are spread dangerously thin and there is a severe vacancy rate." Joint

---

[2]I saw no mention in Mr. Kernan's Declaration of how CDCR will account for the new vacancies that will come about if more prison beds are built as described in the declaration.

Pls' Trial Ex. 5 at 2 (Dr. Joan Petersilia, *Understanding California Corrections* (May

2006)). The Receiver has expressed similar concerns about staffing: overcrowding "is

accompanied by severe staffing shortfalls" in clinical, custodial, and managerial staff.

Joint Pls' Trial Ex. 26 at 11-13 (Receiver's Report Re Overcrowding). I agree with Dr.

Petersilia and Mr. Sillen that the paucity of correctional officers in California, due to the

low staffing rate and high number of vacancies, is dangerous.[3] It is particularly

dangerous for prisoners in need of medical care, as I discuss in Section II.A, below, not

just because staff are not available to escort prisoners or clinicians to appointments, but

because short-staffing can lead to forced overtime and burnout, such that staff make poor

decisions, particularly in health care emergencies.

### 4. Management capabilities

27. Defendants themselves admit that the "rapid growth of the correctional system

was not accompanied by organizational restructuring to meet increasing system demands

and that it requires fundamental reform in a variety of areas, including management

structure, information technology and health care services in order to function effectively

and in compliance with basic constitutional standards." Plata Pls' Trial Ex. 1 at 4 (*Plata*

Findings of Fact and Conclusions of Law Re Appointment of Receiver); *see also* Joint

---

[3] Several prisons I visited – notably CIM and Avenal – reported that they had no
vacancies, but the staffing patterns I observed were clearly inadequate to maintain
security within an acceptable risk level and to address the needs of the prisoner
population, especially in the housing units with "ugly beds." In fact, every institution I
toured had inadequate custodial staff on the ground to address the needs of the prisoner

Pls' Trial Ex. 4 at 1 (Deukmajian Report) ("the system's organizational structure has not

kept pace with the massive growth in inmate population or with the vast geographical

spread of the institutions.")  As the Court has found, "[d]ecades of neglecting medical

care while vastly expanding the size of the prison system has led to a state of institutional

paralysis. The prison system is unable to function effectively and suffers a lack of will

with respect to prisoner medical care."  Plata Pls' Trial Ex. 1 at 2 (*Plata* Findings of Fact

and Conclusions of Law Re Appointment of Receiver).  Indeed, "[i]n the area of health

care services, the consequences of system expansion without reform have been shocking."

*Id.* at 5.

   28.  Overcrowding has yielded crisis decision-making as well as training and

supervision deficits, which leads to poor decisions by line staff in the housing units, as

discussed in Sections I.B.3 and II.A.  Further, the CDCR has inadequate information-

gathering systems to properly run this enormous and complicated system, meaning that

CDCR cannot adequately plan for, create, and manage specialized medical and mental

health units and cannot perform the basic functions (such as background checks)

necessary to hire the staff to carry out health care treatment and support services. *See*

Joint Pls' Trial Ex. 26 at 12 (Receiver's Report Re Overcrowding).  As the Receiver has

noted, the computer network "that connects the 33 prisons, regional offices, and

headquarters is well over 15 years old.  It can currently support only email and very

---

population, including ensuring that health care services are provided.

limited data." Joint Pls' Trial Ex. 32 at 53 (Receiver's Sixth Quarterly Report).

Moreover, there are multiple outages and system failures on a daily basis "that prevent its use as a system to house, access, and share clinical data," and the computers are not linked locally or between multiple prisons, "preventing the sharing of prisoner/patient health care data such as basic laboratory, pharmacy or other information that is essential for patient safety." Sixth Report at 53.

29.  The management failures are found at the very highest levels of state government. As I related above, I was prepared to witness troubling conditions at the prisons I toured in California, but was unprepared for the sheer magnitude of the crisis. I was even more appalled when I learned that California corrections and other state officials have known for many years that the problem was approaching emergency proportions. I have relied on the Governor's own State of Emergency Proclamation as an extraordinary admission of serious risk of harm for prisoners, staff, and the public, but I continue to be astounded that he issued it more than one year ago, and conditions have not improved.

30.  It is indicative of the poor management that is apparent in this crisis that the Governor refused to see at least one of his corrections chiefs, Jeanne Woodford, when she attempted to meet with him regarding sentencing reform. Joint Pls' Trial Ex. 42 at 14:1-16 (Transcript of Proceedings, December 20, 2006, *Madrid v. Woodford*, No. C 90-3094 TEH). She was trying to see him because "our population pressures were just going to continue to become critical, and I felt that the only path to success had to include

sentencing reform. . . ." *Id.* at 11:10-15. In Texas, where we took prison population control very seriously, I had the governor's telephone number and met with him routinely every month. The personal contact with the highest level of management in state government was crucial to my ability to run a humane system.

### 5. Violence

31. One of the most pernicious effects of overcrowding is increasing levels of violence, and it is necessary to devote some discussion to the nature of these effects in order to better understand how overcrowding-driven violence and fear of violence interferes with medical and mental health care delivery. According to the CDCR, "overcrowding in CDCR prisons has. . . led to increased riots and disturbances." Joint Pls' Trial Ex. 11 at ¶ 3 (Declaration of Scott Kernan in Support of Defendants' Report in Response to the Court's February 15, 2007 Order, May 16, 2007).

32. Overcrowding breeds violence in a number of ways. First, people are simply bumping up against each other far more often, especially those housed in triple bunks and dayrooms and hallways. They are also competing for extremely limited toilet, shower, and sink facilities and generate far more noise and smell in close quarters. Decades of experience have demonstrated to me that close physical proximity, lack of adequate supervision, noise, and competition for scarce resources are a recipe for violence in high-pressure prison settings. The lack of adequate toilets and sinks can also lead to long lines and anger at not getting basic needs met, which in turn can lead to violence.

17

33. Second, California prisoners have seen drastic cut-backs in the programming available to them due to the fact that programming space is used for warehousing bodies and because of the lockdowns due to staff limitations or violent outbursts. Joint Pls' Trial Ex. 6 at 22 (California State Auditor Report); Sections II.B and II.C, below. I observed on my tours that prisoners have inadequate out-of-cell time (or time spent outside of overcrowded dorms, gyms, dayrooms, and hallways) to compensate for the density of the population, especially at CIM, where prisoners living under extremely overcrowded, triple-bunked conditions had only a few hours per week of recreation in an exercise yard and few opportunities to obtain scarce prison jobs. The idleness and hopelessness that accompany extremely limited programming in overcrowded living units breed frustration, anger, and violence. I agree with the Governor's blue-ribbon panel that "combined with the reductions in security and non-security staff, the crowded conditions and lack of programming have elevated security risks and increased the probability of violent confrontations." Joint Pls' Trial Ex. 4 at 125 (Deukmajian Report). I also agree with the *Coleman* Special Master that under overcrowded conditions, "[d]isturbances occur more frequently, with resulting increases in the number and duration of lockdowns." Joint Pls' Trial Ex. 35 at 7 (Coleman Special Master's Report Regarding Overcrowding, May 31, 2007).

34. Third, short-staffing and the use of "ugly beds" mean that staff has far less control over prisoners. It is far more difficult to supervise a gym densely populated with

18

triple-bunked minimum to maximum security prisoners, as at CIM East Facility, or a

housing unit with people sleeping in bunk-beds in a hallway or dayroom, as at CIM and

Valley State, than it is to supervise a unit where all prisoners are locked in cells. It is also

far more difficult to get to know the prisoners in your unit when there are twice as many

of them. These situations are very much a reality in CDCR. In CIM's West Facility, at

Cleveland Hall, I saw 198 prisoners with only two officers to keep order, one in an office,

with the other roving. Half of the dorm was in another building connected by the

shower/bathroom area, and one room in the back was completely out of sight. It is

impossible to provide any type of security or proper services under these circumstances.

The housing unit was a serious disturbance waiting to happen. If the prisoners wanted to

take over the dorm they could do so in a second and no one would know. In the East

Facility gymnasium at CIM that I toured, there were only two officers on duty at night

and three during daytime watches, plus a gunner, to supervise 202 prisoners.

35. Visibility in these units was poor and sometimes sightlines were non-existent.

The physical structure simply could not allow an acceptable level of security. Illicit

activities would go on unnoticed and correctional officers are very much at risk. Further,

these closed gyms and dormitories provide no opportunity for backup if radio

communication is not available in an emergency, and the CDCR lacks adequate

supervisory personnel and cameras that would augment the staffing. My review of the

written materials and conversations with staff on the tours gives me confidence that these

conditions are replicated around the system – indeed, in many places, they are the norm.

36.    With short-staffed and overworked officers, and angry, idle prisoners spilling out

into common areas, experience tells me that not only is increased violence more likely,[4]

but crisis decision-making based on the inadequate controls over the inmate population is

guaranteed.  The fear of violence and the potential for violence can have more immediate

effects than violence itself, as officers make poor decisions, nearly invariably disbelieving

prisoners and denying permission for movement, based on their concerns about

controlling a population they perceive to be barely contained.  Such decisions can have

the effect of denying essential medical and mental health care, particularly in

emergencies, as is discussed in more detail in Section II.A.2, below.

37.    Not only does overcrowding cause violence, but violence also leads to even more

overcrowding.  California punishes prisoners who are found to have committed acts of

violence in prisons with the removal of work-time credits, which results in longer terms,

or by referring them to the district attorney for prosecution.  *See* Cal. Code of Regs., tit.

15, §§ 1315, 1316, and 1323.  Either way, the result is likely to be extended lengths of

stay, which increases the population and ensures further deterioration of the system.

### 6.    The overcrowding is getting worse

---

[4] Increased violence may not be reflected in statistics or in self-reports by prisoners, since, as I mentioned above, many illicit activities will take place out of the sight and knowledge of staff.  It is impossible to measure fully the degree of violence, including sexual assaults, taking place among the prison population because there is inadequate staff supervision.

38. "The overcrowded conditions are projected to worsen over the next several years as the population continues to grow. Over the past 20 years, the state inmate population has grown at an average annual rate of 5 percent. If this trend continues, the LAO indicates that the state prison system will be deficient 152,900 beds by the year 2022." Joint Pls' Trial Ex. 13 at 2 (Senate Budget and Fiscal Review Committee Subcommittee No. 4, Agenda of April 12, 2007). CDCR itself projects steady population increases, to 175,418 by June 30, 2008; 179,105 by June 30, 2009; 183,171 by June 30, 2010; 186,137 by June 30, 2011; 189,226 by June 30, 2012, and 191,886 by June 30, 2013. Joint Pls' Trial Ex. 19 at 2, 6 (CDCR Fall 2007 Adult Population Projections).

39. No relief is in sight. The CDCR itself projects that even if its population reduction strategies are implemented successfully, California's prisons will still hold 162,674 male prisoners in 2009 (compared with 159,605 male prisoners today). Plata Pls' Trial Ex. 2 at 12 (*Plata* Defendants' Report in Response to the Court's February 15 Order, May 16, 2007); Joint Pls' Trial Ex. 25 at 1 (Weekly Report of Population, October 31, 2007). The state has no plans to lift the State of Emergency before 2009. Plata Pls' Trial Ex. 2 at 12. Under the recently passed prison-building law, Assembly Bill 900, not a single "in-fill" bed will be activated before 2009, assuming that defendants can meet their schedule. *Id.* at 9. There are already indications that they cannot, however.[5] AB

---

[5] According to legislative experts, "the department's timeline for constructing the infill beds depends on its core business services functioning in a timely manner. . . [and] the majority of these functions within the department are not operating in a timely

900 also fails to include any plans for staffing. Joint Pls' Trial Ex. 13 at 8. Given how short-staffed the CDCR currently is, they will simply have no ability to open new beds because there will not be adequate staff to run the new housing units.

40.  In summary, the overcrowding is pervasive and severe and, barring court intervention, conditions will continue to deteriorate.

### C. By any definition, California's prison population exceeds its capacity to safely house prisoners and provide for their needs

41.  Any discussion of overcrowding must be grounded in a common understanding of what constitutes prison population capacity. Many terms are used to define how many prisoners can be physically confined in an institution. In Texas, we measure capacity by accounting for a wide range of factors that determine how many people can be held safely and humanely, grounded in all relevant accepted national standards and consistent with acceptable risk levels regarding violence and the spread of disease. *See* Appendix C, Texas Gov't Code §§ 499.101- 110, 501.111-113. Specifically, an institution's capacity is meant to ensure that the system has enough space for safety, programming, and humane living conditions, as well as built-in extra space to allow routine maintenance shut-downs and the flexibility to transfer prisoners to specialized housing areas such as medical and

---

manner;" and "the remote location of many of the construction sites means that the department will likely have difficulty finding contractors willing to bid for the contract." Joint Pls' Trial Ex. 13 at 7.

mental health units. Capacity includes the ability to provide "medical, dental, and psychiatric care adequate to ensure" minimal delays in service delivery as well as access to specialist care, "a sufficient number of psychiatric inpatient beds," and "sufficient staff" to "meet health care needs. . ." Texas Gov't Code § 499.102(a)(7), (8)(A) - (E). This definition is memorialized by statute, and each institution has a legally mandated capacity. *Id.* at § 499.101(a). This system ensures that the facilities and service areas – such as plumbing, kitchen space, electricity, laundry, education, etc. -- are sized to the actual population, and not some anticipated or hoped-for number of prisoners. Our statutory system requires that the population may not exceed this statutory definition of capacity without the express permission of the Attorney General, and then only after rigorous "written findings that the population may be increased without limiting the ability of the division to transfer inmates between units and necessary for classification, medical, and security purposes" and approval of the governor. *Id.* at § 499.109.

42. Such a system is a distant dream in California, where by any measure, population vastly outstrips capacity. California's prisons are currently at 203.7 percent of "design" capacity, the determination by the prison architect as to how many prisoners an institution can hold, including how many toilets, lavatories, and showers are needed. Joint Pls' Trial Ex. 25 at 1 (Weekly Report of Population, October 31, 2007). In my experience, prison systems generally maintain their populations within design capacity. California's vast overflow, then, places it very far outside the range of accepted practice.

43.  The design of some prisons makes them even more susceptible to overcrowding. For example, dorms are easier to overcrowd than cells.  Avenal State Prison, which is nearly all dorm housing, was designed to hold 2920 prisoners.  Joint Pls' Trial Ex. 25 at 2 (Weekly Population Report, October 31, 2007).  At the time of my tour, staff informed me that it held approximately 7500, or 257 percent of design capacity.[6]

44.  Another way of looking at prison capacity addresses the number of prisoners that can be held consistent with basic safety and security principles.  California's population surpasses by 15,000 the "safe and reasonable" capacity, defined as "the maximum number of inmates who can safely and reasonably be housed in the prison system. . . . [The CDCR] has determined that the maximum safe and reasonable capacity of the state's male prisons is 137,764 -- 179 percent of design capacity."  Joint Pls' Trial Ex. 4 at 124 (Deukmajian Report).   CDCR currently holds 153,759 male prisoners in California prisons.  Joint Pls' Trial Ex. 25 at 2 (Weekly Report of Population, October 31, 2007).

45.  "Operable" capacity comes closer to the Texas statutory definition, and "takes into account space needed for effective programming in addition to safety and security."  Joint Pls' Trial Ex. 4 at 124 (Deukmajian Report).  According to a "group of experienced California prison wardens," CDCR's "operable" capacity "to support full inmate programming in a safe and secure environment is 111,309 inmates, or 145 percent of

---

[6] The impact on health care delivery of such overwhelming numbers is clear and damaging: prisoners in Building 550, a dorm that holds a large proportion of paraplegic and other disabled prisoners, reported that it takes six to eight weeks to see a doctor.

design capacity." *Id.* at 124). CDCR currently houses 171,285 prisoners in California,

exceeding "operable" capacity by nearly 60,000. Joint Pls' Trial Ex. 25 at 1 (Weekly

Report of Population, October 31, 2007).

46.  Those definitions, however, still fail to look at the capability of a system or

individual facility to adequately and legally care for the medical and mental health needs

of its population, considered an essential part of capacity in the Texas statutory scheme.

A certain amount of clinical space with appropriate fixtures (such as for hand-washing,

privacy, etc). as well as specific treatment beds for medical and mental health care needs

that require isolation from the general population must be included in the design structure.

California has chosen to design and build prisons with inadequate clinical space and

medical/mental health beds for the projected population. According to the Receiver, the

state's "newest and most modern prisons" were "designed with clinic space which is only

one-half that necessary for the real-life capacity of the prisons." Joint Pls' Trial Ex. 26 at

19 (Receiver's Report on Overcrowding, May 15, 2007) (emphasis omitted).

47.  For example, in building Kern Valley State Prison, the newest institution,

"absolutely no consideration was given to the real life impact on the prison's health care

program that would result by the CDCR's plans to immediately double cell the entire

prison." *Id.* at 21. The prison "was planned, designed, and subsequently constructed

knowing full well that the medical, mental health, and dental space and staffing would be

entirely insufficient for the prison's actual population." *Id.* at 22. Similarly, prisoners in

25

acute mental health crisis situations are frequently housed in punitive administrative segregation conditions and other inappropriate locations because of the shortage of mental health crisis beds (MHCBs), as the *Coleman* Special Master has documented. *See, e.g.,* Joint Pls' Trial Ex. 36 at 53 (18th Special Master's Report) ("[f]aced with a chronic shortage of MHCBs, [Mule Creek State Prison] . . . used five cells in administrative segregation to monitor inmates waiting for MHCBs"); 184 (at Wasco State Prison, "[h]olding cells in the CTC, in B Facility chapel, or in administrative segregation were often used for inmates awaiting MHCB admission"); 250 (at R.J. Donovan, "the monitor's expert continued to find decompensating inmates in administrative segregation"); and 220 ("[t]wo inmates seen by the monitor's expert [at California State Prison at Los Angeles County] were acutely mentally ill in administrative segregation for weeks rather than being sent to higher levels of care"). This limiting factor further reduces the CDCR's capacity to house prisoners legally.

48. The different types of capacities discussed above address physical capabilities for housing prisoners. Another definition of capacity involves available staff and services. For example, a fully equipped 1,000-bed prison cannot house 1,000 prisoners if only three staff members are available to run the institution. The prisoners cannot be fed or safely allowed out of their cells without adequate staff to supervise them, and cannot be provided appropriate medical and mental health care without clinical staff to care for them and custodial staff to escort them to and from appointments both inside the prison

and to specialists outside, as well as providing security during their appointments.

49. Over the last several decades, California has made deliberate choices regarding how to house its massively expanding population, building huge prison complexes mostly in isolated rural areas. It is harder to recruit staff to come to such locations, particularly clinical staff. Joint Pls' Trial Ex. 26 at 14 (Receiver's Report on Overcrowding, May 15, 2007). Custodial staff shortages have also plagued the CDCR for many years, as described above in Section I.B.3. As of October 31, 2007, 10 prisons exceeded what the CDCR determines to be their "staffed capacity": California Men's Colony, Corcoran, California State Prison- Los Angeles County, San Quentin, Correctional Training Facility, Deuel Vocational Institution, Folsom State Prison, Kern Valley State Prison, Sierra Conservation Center, and Wasco. Joint Pls' Trial Ex. 25 at 2 (Weekly Report of Population, October 31, 2007).

50. Thus, any measure of California's prison capacity that includes a reasonable expectation of providing constitutional levels of medical and mental health must account for the severely limiting building design and staffing needs. As the Receiver has reported, "overcrowding is ingrained in the CDCR style of constructing and managing prisons. Crowding related policies that do not provide adequate clinical and program space are now an accepted practice of CDCR prison planning, as is California's practice of offering inadequate salaries and failing to provide adequate hiring programs which have created crisis levels of shortages of clinical personnel and correctional officers."

27

Joint Pls' Trial Ex. 26 at 8 (Receiver's Report on Overcrowding, May 15, 2007).

51. The Governor's blue-ribbon panel declared more than three years ago that "California's prisons are presently filled to the breaking point, with populations exceeding both design capacity and 'safe and reasonable capacity,' and far exceeding operable capacity." Joint Pls' Trial Ex. 4 at 124 (Deukmajian Report). At that time, the population was 162,000. *Id.* at 1. Today, CDCR houses nearly 10,000 more. Joint Pls' Trial Ex. 25 at 1 (Weekly Report on Population, October 31, 2007). The situation looks even more dire when all of the factors that we in Texas consider essential components of capacity are considered, and California's severe deficits in building design and staffing capabilities are factored into the equation. I wholeheartedly agree with the statement the Governor made more than a year ago: California' prison population "exceeds the capabilities of the services, personnel, equipment, and facilities of any geographical area in this state," causing "extreme peril." Joint Pls' Trial Ex. 1 at 8 (Governor's Emergency Proclamation). The "extreme peril" in the potential for violence is easy to see. Less obvious is the "extreme peril" of teeming populations of prisoners, at risk for deadly disease outbreaks and overwhelming through sheer numbers any attempt to provide even the basics of humane medical and mental health care, as discussed in Section II.

II.   **Overcrowding makes the custodial management necessary for medical and mental health care nearly impossible**

52. Custodial staff and managers play an essential role in medical and mental health care. Although non-clinicians are not directly responsible for providing health care, in a

well-functioning system they establish and run the supporting structure that makes health care delivery possible. They provide escorts and security that allow medical appointments to occur. They staff and run specialized health care units. They transport offenders to specialty medical appointments off site. They are usually the first to respond in any medical and mental health emergency. They see the prisoners on a daily basis and often serve as the gatekeepers that allow them to access care providers. They classify and place prisoners in appropriate housing units for their medical and mental health needs. In California, the short-staffing, inadequate management and supervision, and crisis conditions caused by overcrowding have made it nearly impossible for custodial staff to carry out these essential medical support roles.

### A. Staffing

53. Custodial staff plays several essential roles in the delivery of medical and mental health care in California prisons. They serve as escorts for medical appointments; they respond in health care emergencies; and as the staff with most interactions with the prisoner population, they become de facto watchdogs and gatekeepers for health care delivery.

### 1. Escorts

54. Staff is needed to move prisoners around within the prisons for medical appointments and outside the prisons for tests, specialist consultations, and emergency treatment. They are also needed for security during examinations. In California's

29

overcrowded system, staff is often not available for transportation within and outside the prisons. CDCR's head of adult institutions admits as much: "These riots deflect prison resources so that while correctional officers now must respond to the increased security concerns and maintain watch over an increasingly dangerous prison population, they are not able to assist the Receiver's efforts in addressing the inmates' medical concerns by escorting inmates to medical appointments, for instance." Joint Pls' Trial Ex. 11 at ¶ 3 (Declaration of Scott Kernan in Support of Defendants' Report in Response to the Court's February 15, 2007 Order, May 16, 2007). As the Court has already found, "[c]orrectional officers often are not available to take prisoners to medical appointments or to enable the physicians to do examinations. . . ." Plata Pls' Trial Ex. 1 at 22 (*Plata* Findings of Fact and Conclusions of Law Re Appointment of Receiver) (citation omitted)

55. The *Coleman* Special Master has made extensive findings that the paucity of escorts has interfered with mental health treatment. *See, e.g.,* Joint Pls' Trial Ex. 36 at 72 (18th Special Master's Report) (in the California Medical Facility's administrative segregation, "[r]oughly three dozen [mentally ill] inmates did not have confidential meetings due to lack of space, escorts, and schedules"); 84 (at the California State Prison at Solano, "[m]odified programming and failure to honor priority ducats for mental health contacts stymied access to treatment on the level III yards, where modified programming was in force throughout 2006 save for a few weeks. No escorts were available for mental health appointments"); 103 (at Deuel Vocational Institution, "[a]n audit in October 2006

30

found that 68 percent of case manager contacts were cell-front due to lack of space and escorts"); 115 (at Corcoran, "[p]rovision of mental health treatment to [mentally ill] inmates in administrative segregation was fraught with difficulty. . . .Treatment space, escorts, and confidentiality were problematic"); 168 (at the Correctional Training Facility, "[o]bstacles to confidential out-of-cell [case manager] contacts included escorts and space"); 227 (at California Correctional Institution, "[t]ime, escort availability, and space constraints stymied meaningful clinical contacts with [mentally ill] inmates in high-security units"); and 254 (at R.J. Donovan Correctional Facility's administrative segregation unit, "[h]alf of all completed [clinical] contacts occurred at cell-front due to a combination of high caseloads, inadequate escort support, and an insufficient number of holding cells").

56.  In another example, the California Rehabilitation Center recently converted from a mixed population of men and women to all-male, necessitating a move of approximately 600 women to different institutions. *Id.* at 5. As a result, one of the receiving institutions was "overwhelmed with the influx of inmates and custody has closed down some of the off site transportation which is now causing a delay in care." *Id.* at 6 & Exh. 3. According to staff at the receiving prison, "they were at 200% of capacity and . . . there were inmates on the floors. She [the Health Care Manager] does not know how she is going to deliver care to these inmates." *Id.*

57.  At San Quentin four very diverse groups of offenders are housed in the Badger

31

cell housing area of the South Block. These four groups consist of reception offenders, gang members, protective custody offenders, and offenders doing life terms. Because these groups cannot mix with each other the custodial staff must handle services to each group at a distinctly separate time. Staff admits that they struggle daily and sometimes fail to meet the service demands of these four sub-populations that all reside in the same cell housing area.

### 2. Emergency response

58. Custodial staff also performs certain necessary functions within medical housing units, such as responding to "man down" or emergency calls. With chronic short-staffing, these functions sometimes are not performed, with consequent dangers to the prisoner population. For example, the Court has already found that "[i]n medical units that lack call buttons for prisoners to contact doctors, custody staff routinely fail to make rounds and check on patients." Plata Pls' Trial Ex. 1 at 22 (Findings of Fact and Conclusions of Law Re Appointment of Receiver).

59. Overcrowding has also interfered with the ability of staff in regular housing units to respond appropriately to urgent and emergent medical and mental health situations. I know from experience that overworked staff without adequate back-up are less able to respond to emergencies and more likely to downplay prisoners' concerns. In a housing unit such as San Quentin's H Unit Dorm 2 (one officer for 200 prisoners ) or CIM's West Facility Cleveland Hall (two officers for 198 prisoners) or East Facility gym (two officers

for 202 prisoners), staff in an emergency can only sound the alarm, make frantic telephone or radio calls, and hope for backup. An officer alone with several hundred inmates is unlikely, for example, to perform emergency first aid or CPR – it is simply unsafe to do so with no backup, when prisoners could easily simulate an emergency as a diversion. This inability to perform basic lifesaving functions could have potentially devastating consequences on the life and health of a prisoner undergoing a medical or mental health emergency. This situation presents an unacceptable risk of harm to prisoners.

### 3. Watchdogs and gatekeepers

60. Custodial staff in the housing units generally has more contacts with prisoners than any other staff. They release prisoners for appointments and meals and are generally responsible for overseeing the delivery of their basic needs. A housing unit officer does not provide mental health care, but if a prisoner is decompensating, that officer is in the best position to see what is happening, recognize the problem, bring in the clinicians to address the patient's mental health needs, and ensure that he does not harm himself or others. Similarly, a housing unit officer does not provide medical care, but if a prisoner does not emerge for multiple meals in a row, that officer is responsible for recognizing the potential danger and investigating to ensure that the prisoner is not sick, or incapable of meeting his own needs. Under overcrowded conditions, with short-staffed units, and line officers who are overwhelmed and even fearful, they are far less likely to recognize a

prisoner in need of services and perform this essential function. In addition, managers are overwhelmed, and line staffs often do not get the attention and direction needed to run a safe, humane operation.

61. Short-staffing places managers and line staff alike in unacceptable positions. As the Receiver has noted, "[m]any CDCR prisons are unable to sustain the basic delivery of medical, mental health, and dental services because of limited staffing (clinical and custody) and an overwhelming number of prisoner/patients who require care. Every day, many California prison wardens and health care managers make the difficult decision as to which of the class actions, *Coleman*, *Perez*, *Armstrong*, or *Plata* they will fail to comply with because of staff shortages and patient loads." Joint Pls' Trial Ex. 26 at 30 (Receiver's Report on Overcrowding). I agree, and I observed this phenomenon on my prison visits. For example, at San Quentin and CIM, two Reception Centers where prisoners must be escorted to meals, yard, laundry, and other basic functions, staff by their own report get "maxed out" and unable to fulfill the needs of prisoners and the legal requirements of their jobs. Medical and mental health care are included in this burn-out, and demoralized staff often make poor decisions.

62. In an atmosphere of crisis where all operations other than essential safety and security moves are shut down, medical and mental health care are lower and lower priorities. Prison staff is less likely to know the prisoners in their units and have the time, the ability, and the willingness to identify and respond appropriately to basic medical and

34

mental health needs.

### B. Lockdowns

63.  Overcrowding engenders a state of perpetual crisis that shuts down non-emergency prison functions.  I agree with the Governor's expert panel: "Staffing reductions, overcrowding, and attendant violence have eroded the ability of the prisons to operate effectively for any purpose other than security."  Joint Pls' Trial Ex. 4 at 125 (Deukmajian Report).  Riots and disturbances at Avenal, the California Correctional Center, Calipatria, and Wasco alone account for thousands of days on lockdown or modified programs.  Joint Pls' Trial Ex. 11 at ¶ 3 (Declaration of Scott Kernan in Support of Defendants' Report in Response to the Court's February 15, 2007 Order, May 16, 2007).  The Governor noted more than a year ago that overcrowding has "substantially limited or restricted inmate movement. . ."  Joint Pls' Trial Ex. 1 at 6 (Emergency Proclamation).

64.  Lockdowns impact health care delivery because they "call for a radically different form of medical delivery than the services provided under normal general population conditions"; when non-essential movement is shut down, "clinical staff must go from cell to cell to see the prisoner/patient, or small groups o[f] individual prisoners must be escorted by correctional officers to and from clinic areas," so that lockdowns "inhibit the delivery of medical care and increase the staffing necessary for such care."  Joint Pls' Trial Ex. 26 at 29-30 (Receiver's Report Re Overcrowding).  Lockdowns are also

35

isolating, keeping prisoners in their cells or bed areas and making it harder to get staff
attention during health care emergencies and harder for custodial staff to notice prisoners'
medical and/or mental deterioration.

65.  As a result of lockdowns, many prisoners spend extreme amounts of time in their
cells or crowded dorms or gyms, with drastically limited time in beneficial programs or
basic living needs.  The Coleman Special Master has documented extensively the ways in
which lockdowns and partial lockdowns ("modified programming") injure prisoners with
mental illness by denying them needed mental health care.  Joint Pls' Trial Ex. 36 (18th
Special Master's Report) at 40 ("[g]roup therapy was available on all four yards at [High
Desert State Prison], though institutional lockdowns and program restrictions caused
frequent cancellations and limited inmate participation"); 84-85 (at the California State
Prison at Solano, "[m]odified programming and failure to honor priority ducats for mental
health contacts stymied access to treatment on level III yards, where modified
programming was in force throughout 2006 save for a few weeks.  No escorts were
available for mental health appointments"; in addition, "rising caseloads, poor access to
treatment associated with prolonged modified programming in one yard, and ducat
problems forced clinicians to resort too often to quarterly visits that were little more than
a cursory check-in, many of which occurred at cell-front or in locations that compromised
visual or auditory privacy.  Under these conditions, a subset of sick inmates got sicker,
and clinicians sometimes missed, or failed to respond appropriately to, signs of mental

illness"); 208 (California State Prison-Los Angeles County's "administration reported that lockdowns in November 2006 and January 2007 disrupted [mental health] treatment."); and 288 (California Institution for Women's treatment unit for seriously mentally ill patients "continued to limp along. Although over ten hours of groups per inmate per week were scheduled, inmates received only two to three hours of treatment per week. Staff audits found that 46 percent of groups were cancelled. . . . Lockdowns and other forms of restricted inmate movement were the largest single cause of cancellations").

66. I agree with the Receiver that "[o]vercrowding has resulted in increasing numbers of prisoner disturbances and 'lockdowns' by prison authorities in response. Because of the heightened security measures associated with lockdowns, medical care to the inmates is delayed and made substantially more time-consuming and cumbersome." Joint Pls' Trial Ex. 27 at 3 (Receiver's Supplemental Report Re Overcrowding, June 11, 2007).

### C. Classification

67. Overcrowding has pernicious effects on classification, the central organizing principal that keeps modern prisons as safe as possible for prisoners and staff by separating more dangerous inmates from more vulnerable prisoners and concentrating those in need of intensive medical and mental health treatment in places where services are more readily available and custodial as well as treatment staff are better trained to meet their needs. In a proper classification system, prisoners are assigned an objective classification score based on a range of weighted factors intended to predict their

37

institutional risk and specialized needs. Overcrowding has wreaked havoc with CDCR's classification systems, intended to maintain safe conditions and ensure appropriate specialized health care placement.

68. Overcrowding leads to classification failures that impact medical and mental health care delivery in two ways. First, the overburdened system no longer houses prisoners according to their classification levels in an alarming percentage of cases, making it harder to provide for their medical and mental health care needs, and second, the overcrowded system does not have the flexibility needed to respond to inevitable crises.

69. In any well-functioning classification system, "overrides," or instances in which staff make a reasoned determination that a prisoner is more appropriately housed in a different location than his classification score would indicate, should be no more than 10%. In California's overcrowded prisons, an estimated 25% of prisoners are housed outside of their security levels, many in higher security housing. Joint Pls' Trial Ex. 5 at 14 (Dr. Joan Petersilia, *Understanding California Corrections*). The most common reason to override classification scores in California is called a "population override," which "occurs when no bed is available at the type of facility that would normally be used for an inmate with a given score. Under those circumstances, the classification staff representative has total discretion over prisoner placement. This override has become increasingly common as California prisons have filled up beyond their designed capacity

38

[], and this shuffling of inmates to areas that were not designed to hold them has adverse consequences for both the facilities and the individuals they house." *Id.* (footnote omitted). In fact, this is not an override at all – this is the rejection of any classification scheme at all for these estimated 25% of prisoners. In any event, it is two and an half times greater than the accepted norm for variations from the classification scheme, and presents an unacceptable risk of violence and harm. As Dr. Petersilia notes,

> There are significant implications of these frequent reassignments to more heavily fortified facilities, where inmate violence is higher,[citation omitted] the housing cost per-prisoner is higher, and a lower level of programming is available to inmates. In other words, the pressures of overcrowding frequently lead to housing assignments that are more expensive and dangerous than necessary and less likely to encourage rehabilitation. . . .
>
> [¶]. . . Prisoners in a maximum-security prison or unit spend a good part of the day in their cell, have strictly regulated movement, and are surrounded by a secure perimeter with extensive gun coverage. At the other extreme, in a minimum-security conservation camp, prisoners spend a large part of the day out of their dorm and have few restrictions on movement within an unfenced security or work area. [citation omitted] These variations in inmates' level of movement translate into tremendous differences in their ability to participate in rehabilitation programs."

*Id.*

70.  I saw these problems in practice at Avenal, where Building 510 houses 300 prisoners; the population overflow goes to segregation units intended for punitive purposes, where they are treated like segregation prisoners. Similarly, prisoners suffering acute mental health crises are often housed in punitive administrative segregation conditions because of the shortage of mental health crisis beds, as noted in Section I.C,

39

above.

71. The widespread rejection of CDCR's classification system has a significant impact on medical and mental health care: it is harder to get to health care appointments within the prison as well as out-of-prison specialty appointments, and more limited staff contact means that staff are less responsive to emergencies due to distrust, lack of understanding and compassion, and simple logistics: it is harder to get staff attention in a high-pressure, high-security unit. In addition, prisoners are subject to increased degrees of danger and potential for violence because they are placed with more dangerous and violent prisoners than their classification scores would warrant.

72. Mixing prisoners of different security levels and different needs is also extremely dangerous. At CIM, I saw prisoners of all security levels, minimum to maximum, in a Reception Center dorm setting, and at Valley State Prison for Women, I saw a dayroom which had double bunks for Reception Center prisoners. That kind of configuration is unacceptable for prisoners who have not been classified, about whom staff know little or nothing. At CIM, staff in West Facility admitted that maximum security (Level IV) prisoners are in the yards along with minimum security (Level I and II) prisoners. At San Quentin, on West Block and in the Badger Unit of South Block, I saw gang members on one tier, protective custody on another, general population on another, and prisoners serving life terms on yet another. Having all of these very different, often directly opposing needs in one housing unit makes it extremely difficult to meet all of their needs,

40

since gang and protective custody prisoners cannot come into contact with one another,
for example, necessitating separate yard and feeding periods. Health care appointments
are thus even more difficult to facilitate than would be the case in a short-staffed and
overcrowded housing unit that nonetheless housed prisoners with uniform classification
levels.

73. The second overcrowding-driven classification failure comes about because
classification systems need built-in flexibility to respond to unforeseen needs. That is
why, for example, in Texas we have defined "capacity" to include enough space to ensure
"proper inmate classification and housing within the unit that is consistent with the
classification system" as well as "housing flexibility to allow necessary repairs and
routine and preventive maintenance to be performed without compromising the
classification system. . . ." Texas Gov't Code § 499.102(a)(1)-(2) (Appendix C).

74. This level of flexibility is impossible with the current violence and state of crisis
in California's prisons. For example, in late 2006, Los Angeles County cancelled a long-
standing contract with CDCR for 1300 beds, requiring that the beds be vacated by
January 31, 2007. According to CDCR's Director of CDCR Division of Correctional
Health Care Services, this action would result in "thousands of inmate moves over a 13-
week period scheduled to begin in September 2006." Joint Pls' Trial Ex. 54 at 1 (Dr.
Peter Farber-Szekrenyi, letter to *Plata* Receiver Robert Sillen and *Coleman* Special
Master J. Michael Keating, Jr., September 1, 2006).

41

75. CDCR simply did not have the capacity to deal with this event in an appropriate way and instead was forced to resort to cutting legally required corners. The head of medical services admitted that during the resulting transfers, CDCR would be unable to comply with legal requirements such as transferring prisoners with a 30-day supply of prescribed medications, performing intake assessments and tuberculosis tests on new arrivals, and completing medical summary forms for transferring prisoners. *Id.* at 2-3. Other "necessary medical services" would suffer "increased delay": outside specialty service appointments would be cancelled for prisoners scheduled to transfer. *Id.* at 3. Further, in order to conduct "required [mental health] evaluations, the existing mental health staff w[ould] have to be redirected from their primary responsibility of direct patient care." *Id.* at 2.

### D. Management systems

76. Overcrowding has overburdened CDCR's inadequate management systems that underlie health care delivery. The excessive population leads to management failures in two ways. First, overcrowding engenders a state of perpetual crisis that causes management failures. Administrators spend their time doing damage control, rather than making sure the prison is operating properly and prisoners are getting the services that they need. I was the warden of a prison with 3,000 prisoners and that was almost unmanageable. A population of 7,000 or more, as is found in some California prisons, is not manageable at all. The sheer size and complexities of managing a prison that size

42

would be overwhelming for one manager especially with the limited resources in the areas of staffing and inadequate space for services to the offenders that I observed at all of the prisons I toured in California. One warden simply cannot know what he/she needs to know on a daily basis to make good informed management decisions.

77.  Second, overcrowding overwhelms management infrastructure. As I have read in numerous reports of the Receiver, the CDCR lacks the management information systems needed to adequately organize and track prisoner transfers for specialized medical and mental health care and public health related needs (for example, people with compromised immune systems not going to Valley Fever risk areas) in the severely overcrowded conditions. Joint Pls' Trial Ex. 32 at 53 (Receiver's Sixth Quarterly Report). *See* discussion at I.B.4, above. CDCR also fails to hire adequate numbers of custodial as well as medical staff. *See* Joint Pls' Trial Ex. 26 at 11-12 (Receiver's Report Re Overcrowding).

78.  CDCR also cannot track and transfer essential health care records, because the record system lacks the capacity to deliver records regarding this many prisoners. I was told at CIM that 98% of parole violators do not have their files when they arrive, which leads to security problems because staff are unable to properly classify prisoners. As I saw on my tours, staff is failing utterly in the essential task of maintaining health care records. Adequate record-keeping is a basic component of correctional systems management, but at Avenal, a prison I was told was built for 2900 prisoners with a

43

current population of 7500. I was told that there was four feet of loose filing waiting to be placed in prisoners' health records. At CIM, I saw 48 inches of unfiled documents, plus two additional cardboard boxes of unfiled medical records that had just arrived. Staff told me they had 54 inches several days earlier and has been much higher at other times. I am not surprised; given the extraordinary number of prisoners in these facilities, it is simply impossible to manually file so many records on a timely basis. In my experience, such extraordinary pressure on staff also leads to serious filing errors, which means that even records that have been filed might not be available to clinicians, and might be impossible ever to locate.

79. In sum, it is impossible under current conditions to provide adequate medical and mental health care to California prisoners.

III.    **Overcrowding is the primary cause of the constitutional violations**

80. Based on the above, my opinion is that overcrowding is the primary cause of the medical and mental health constitutional violations caused by deficiencies in the support role played by non-health care staff. In rendering this opinion, I agree with the Governor's blue-ribbon panel of experts that "[t]he key to reforming the system lies in reducing the numbers." Joint Pls' Trial Ex. 4 at 3 (Deukmajian Report). I also agree with the *Plata* Receiver, when he reports that "[m]ost California prisons operate at 200% of capacity, with no effective relief in sight. Unless and until the living conditions of some prisons and the overpopulation experienced system-wide is effectively addressed, the

44

Receiver will be impeded in applying systemic and even some ad hoc remedies to the medical care system." Joint Pls' Trial Ex. 53 at 3 (Receiver's First Bi-Monthly Report, July 5, 2006). I further agree with the California State Auditor that "[m]eeting the constitutional rights of inmates to receive minimum standards of treatment" is a problem that "emerge[s]" from overcrowding. Joint Pls' Trial Ex. 6 at 22-23 (California State Auditor's Report). I also agree with the Office of the Inspector General that efforts to solve the medical care failures "are severely hampered by inmate population pressures that have prisons straining at nearly twice design capacity, spreading staff resources thin and leaving little facility space available for programming and other purposes. Developing sustainable solutions will require the [CDCR], state policymakers, and the public to collectively address the available options" to reduce overcrowding. Joint Pls' Trial Ex. 46 at ES-1 (Office of the Inspector General, Accountability Audit, Review of the Audits of the California Department of Corrections and Rehabilitation Adult Operations and Adult Programs, 2000-2004, April 2006).

Date: November 9, 2007

Doyle Wayne Scott

45

PAGE 01/01                          MAILBOX1                      93629212372      18:28   11/09/2007

# APPENDIX A



# DOYLE WAYNE SCOTT

SENIOR ASSOCIATE

## RANGE OF EXPERIENCE

Mr. Scott served over 30 years with the Texas Department of Criminal Justice and the Texas Board of Pardons and Paroles. He began his career in corrections in 1972 as a correctional officer and progressed through the ranks to serve as Executive Director of the Texas Department of Criminal Justice (TDCJ). While serving as Executive Director with the TDCJ, Mr. Scott was responsible for the confinement and care of 151, 000 felony offenders, as well as for the supervision of 518,000 offenders on probation or parole; he led an agency of more than 40,000 employees and administered an annual budget of $2.3 billion. He initiated major reforms in the management of purchasing, construction, and contract operations and in the management of the agency's finances. Mr. Scott also instituted aggressive new policies to ensure equal employment opportunity, cultural diversity, and the elimination of sexual harassment in the workplace, and has created an Advisory Council on Ethics to increase staff awareness of ethical issues and to facilitate the practice of ethical behavior by all of the agency's employees.

During his tenure Mr. Scott actively pursued accreditation for the department's confinement facilities from the American Correctional Association. He introduced several innovative treatment programs, most notably the Inner Change Freedom Initiative, which was begun in 1996 as the first faith-based pre-release program in a penal institution in the United States. He also began a cooperative effort with a number of local communities statewide to build Habitat for Humanity homes with volunteer offender labor and to produce 2.5 million pounds of food grown on prison agricultural lands that was donated to local Texas food banks.

The State of Texas and the Texas Board of Criminal Justice honored Mr. Scott for his service to the state by dedicating and naming a Texas prison for him in February 2002.

## PROFESSIONAL AND BUSINESS HISTORY

MGT of America, Inc., Senior Associate, July 2004 - Present.

Correctional Consultant, May 2002 - June 2004.

Management & Training Corporation, Vice President, International Operations, 2001 - 2002.

Texas Board of Pardons & Paroles, Board Member, 2001.

Texas Dept. of Criminal Justice, Executive Director, 1996-2001; Institutional Division Director, 1994 - 1996; Deputy Director of Operations, 1989-1994; Regional Director, 1984 - 1989; Senior Warden-Ellis II, February - June 1984; Assistant Warden-Ellis I, January - February 1984; Major of Correctional Officers, 1983 - 1984; Captain of Correctional Officers, 1974 - 1983; Lieutenant of

**YEARS OF EXPERIENCE:**

30+

**EDUCATION:**

B. A., Business Administration-Finance, Sam Houston State University, Huntsville, Texas, 1973

A. A., Navarro Junior College, Corsicana, Texas, 1971

**AWARDS:**

Texas Corrections Association - President's Gavel Award

Texas Public Employees Association - State Agency Administrator of the Year

Sam Houston State University - Distinguished Alumni

Texas Corrections Association - Dr. George Beto Hall of Honor Award

Teague High School - Distinguished Alumni

*Additional Information Available on Request*

Correctional Officers, 1973 - 1974; Sergeant of Correctional Officers, 1972 - 1973; Correctional Officer, January 1972.

## PROFESSIONAL AND BUSINESS EXPERIENCE

Consultant on a team hired by the Oklahoma state legislature to examine all operational and procedural aspects of all areas of responsibility managed by the Oklahoma Department of Corrections. The project commenced in June 2007 and is scheduled for completion in December 2007.

Consultant on a two-man team hired by the National Institute for Corrections at the request of the Commissioner of the Indiana Department of Correction to provide an external, independent review of the investigation into the causes and response to a disturbance at the New Castle Correctional Facility in April 2007.

Consultant on an agency-wide operational analysis for the Florida Department of Corrections. MGT contracted with the Florida Department of Corrections to provide an agency-wide operational analysis with recommendations for retooling specific areas that might not have been operating effectively, efficiently, in compliance with procedures or within the bounds of the law. Areas reviewed included the Inspector General's Office, contracting processes, personnel issues, security and institutions, and community corrections. MGT was able to accommodate the department's aggressive sixty-day schedule for delivery of the final report by mobilizing staff from different offices that have extensive corrections experience.

## PROFESSIONAL AND BUSINESS EXPERIENCE *(cont'd)*

Consultant on an assessment of the New Mexico Department of Correction's policies, procedures, and practices as they relate to the deployment of its correctional staff. The review included an assessment of the application of roster management procedures at two representative institutions within the Department. The project objective focused on enhancing the efficiency and effectiveness of the deployment of security staff and to determine if the use of overtime could be reduced.

Consultant on a project for the Cook County Judicial Advisory Council to develop an approach to assessing security staffing needs at the Cook County (Chicago, Illinois) Jail. The jail houses over 10,000 offenders on a daily basis, employs 2,400 officers, and is the largest single-site jail facility in the United States. MGT met with key policymakers, reviewed the jail's physical plant, and assessed jail operating policies. MGT reviewed current officer deployment patterns as well as facility operating systems and procedures. The project team also assessed security issues associated with the facility's physical plant and operational practices. The project produced a detailed work plan for a definitive study of Cook County Jail staffing needs.

Consultant on a correctional staffing analysis for the Indiana Department of Corrections. The objective of the study was to identify the optimum number of staff required to operate two Indiana DOC facilities safely and efficiently and to complete on-site training to IDOC staff in the process utilized to determine the optimum staffing level of a correctional facility. With submission of the final report MGT delivered a staffing analysis for the two facilities, in addition to specific recommendations on how the IDOC could improve the processes utilized to determine the optimum staffing complement required to operate its correctional facilities.

Consultant on a staffing analysis for the Kentucky Department of Corrections, through a grant from the Training Resource Center of Eastern Kentucky University. The analysis targeted three selected institutions within the Department of Corrections in order to determine the optimum number of staff required to operate these facilities in a safe and efficient manner. MGT issued a final report on its findings and recommendations and projected the potential for additional savings if its findings were implemented department-wide.

Consultant on a comprehensive review of the Puerto Rico prison system focusing on security and staffing assessments. This study was conducted for a federal district judge who was overseeing the prison system because of constitutional violations of the rights of inmates. Since that study, MGT has been hired by the prison system to help implement the recommendations.

Directed a team of experts that examined the staffing at every Texas prison and established the base staffing requirements that is used by the agency today.

Served over 30 years with the Texas Department of Criminal Justice and the Texas Board of Pardons and Paroles.

Began his career in corrections in 1972 as a correctional officer and progressed through the ranks to serve as Director of the Texas Department of Criminal Justice until 1996.

## PROFESSIONAL MEMBERSHIP

American Correctional Association
*Vice Chair, Standards Committee*
*Member, Policies and Resolutions Committee*

Association of State Correctional Administrators
*Chairman, Legislative and Legal Issues Committee*
*Member, Standards Committee*
*Member, Substance Abuse Committee*
*Member, Controlling the Difficult to Manage Inmate Committee*

Southern States Correctional Association

Texas Corrections Association
*Chair, Training and Certification Committee*

Texas Public Employees Association

Law Enforcement and Corrections Technology Advisory Committee

## COMMUNITY ACTIVITIES

Texas Corrections Association - President's Gavel Award

Texas Public Employees Association - State Agency Administrator of the Year

Sam Houston State University - Distinguished Alumni

Texas Corrections Association - Dr. George Beto Hall of Honor Award

Teague High School - Distinguished Alumni

# APPENDIX B

List of documents reviewed by Doyle Wayne Scott

Governor Schwarzenegger's Proclamation Regarding Prison Overcrowding, State of Emergency (October 4, 2006)

Photographs from the CDCR website, www.cdcr.ca.gov

CDCR's Inmate Population, Rehabilitation, and Housing Management Plan.

Finding of Fact and Conclusions of Law re Appointment of Receiver, *Plata v. Schwarzenegger*, October 3, 2005

Corrections Independent Review Panel, "Reforming Corrections," June 2004, Chapter 7, Inmate/Parolee Population Management.

Memorandum written by John Dovey, entitled " Memorandum Re: Modification to Correctional Operations Due to Compelling Operational Need," dated October 25, 2006

Dr. Peter Farber-Szekrenyi's Letter to Robert Sillen and J. Michael Keating, Jr., dated September 1, 2006.

Statement of CDCR Acting Secretary James Tilton on the Legislature's Failure to Act on Critical Prison Reform Legislation, issued September 1, 2006

Office of the Inspector General, "Accountability Audit, Review of the Audits of the California Department of Corrections and Rehabilitation Adult Operations and Adult Programs, 2000-2004," April 2006.

California Department of Corrections (CDCR) Spring 2007 Adult Population Projections.

Senate Budget and Fiscal Review Committee Subcommittee No.4, Agenda of April 12, 2007.

Senate Budget and Fiscal Review Committee Subcommittee No.4, Agenda May 9, 2007.

Dr. Joan Petersilia, "Understanding California Corrections," printed on May 29, 2007. Petersillia, Joan, Understanding California Corrections, California Policy Research Center, University of California (May 2006) (http://www.ucop.edu/cprc/documents/understand_ca_corrections.pdf)

Declaration of Scott Kernan in Opposition to Writ of Mandate, California Correctional Peace Officers' Organization v. Schwarzenegger, No. 06CS0168 (Sacramento Superior

Ct.), filed January 19, 2007.

Plata Defendants' Report in Response to the Court's February 15, 2007 Order, May 16, 2007, with supporting Declaration of Scott Kernan.

California State Sheriffs' Association, "Do the Crime, Do the Time? Maybe Not, in California: Jail Cell Shortage is Upsetting the Balance," June 2006.

Transcript of Proceedings, December 20, 2006, *Madrid v. Woodford*, No. C 90-3094 THE

California Department of Corrections, Fall 2007 Adult Populations Projections: 2008-2013

Weekly Population Report as of midnight, October 31, 2007

18th Report of the *Coleman v. Schwarzenegger* Special Master on the Defendant's Compliance with Provisionally Approved Plans, Policies and Protocols (without exhibits)

Special Master's Response to Court's May 17, 2007 Request for Information, *Coleman v. Schwarzenegger*, May 31, 2007

California State Auditor, High Risk: The California State Auditor's Initial Assessment of High-Risk Issues the State and Select State Agencies Face, May 2007

Receiver's Report Re Overcrowding, May 15, 2007, and selected Exhibits:

    CDCR Inmate Population Table 6/30/1997 - 4/40/2007. (Exhibit 2)

    Independent Review Panel Report on Reforming Corrections, Section 7: "Inmate/Parolee Population Management. (Exhibit 3)

    January 2007 Little Hoover Commission Report, "Solving California's Corrections Crisis: Time is Running Out". (Exhibit 4)

    CDCR Facilities Master Plan 1993-1998 - August 12, 1994. (Exhibit 5)

    CDCR Facilities Master Plan 1995-2000 - August 24, 1995. (Exhibit 6)

    CDCR Facilities Master Plan 1998-2003 - February 23, 1998. (Exhibit 7)

    CDCR Inmate Movement Table January 1, 2007 - January 31, 2007. (Exhibit 10)

CDCR Inmate Movement Table February 1, 2007 - February 28, 2007. (Exhibit 11)

CDCR Inmate Movement Table March 1, 2007 - March 31, 2007. (Exhibit 12)

Bed Conversions Occurring from Fiscal Year 2/03 to 6/07. (Exhibit 13)

March 30, 2007 Memorandum Re Emergency Revision of the April 2007 Institution Activation Schedules and Issuance of May 2007 Institution Activation Schedule. (Exhibit 14)

March 30, 2007 Memorandum re Conversion of CSP-LAC Facility D to a Reception Center. (Exhibit 15)

March 30, 2007 Memorandum re Conversion of Centinela State Prison Level III to a Level IV. (Exhibit 16)

CDCR Prototypical Prison Policy Design Criteria. (Exhibit 17)

Assembly Bill 900 Table. (Exhibit 24)

Receiver's Supplemental Report Re Overcrowding, *Plata v. Schwarzenegger,* June 11, 2007

Receiver's Sixth Quarterly Report, *Plata v. Schwarzenegger*, September 25, 2007

# APPENDIX C

Westlaw.
Case 2:90-cv-00520-KJM-SCR    Document 3058    Filed 09/29/08    Page 62 of 84

Page 1

Vernon's Texas Statutes and Codes Annotated Currentness
  Government Code (Refs & Annos)
    Title 4. Executive Branch (Refs & Annos)
      Subtitle G. Corrections
        ⌐▤ Chapter 499. Population Management; Special Programs (Refs & Annos)
          ⌐▤ Subchapter E. Unit and System Capacity
            → § 499.101. Existing Units

(a) The maximum capacities for the units in the institutional division are as follows:

| Unit | Capacity |
|---|---|
| Beto I | 3,000 |
| Beto II | 888 |
| Boyd | 1,012 |
| Briscoe | 1,012 |
| Central | 720 |
| Clemens | 851 |
| Clements | 2,200 |
| Coffield | 3,000 |
| Daniel | 1,012 |
| Darrington | 1,610 |
| Diagnostic | 1,365 |
| Eastham | 2,050 |
| Ellis I | 1,900 |
| Ellis II | 2,260 |
| Ferguson | 2,100 |
| Gatesville | 1,571 |
| Goree | 1,058 |
| Hightower | 1,012 |
| Hilltop | 761 |
| Hobby | 1,012 |
| Hughes | 2,264 |
| Huntsville | 1,705 |
| Jester I | 323 |
| Jester II | 378 |
| Jester III | 908 |
| Lewis | 1,012 |
| McConnell | 2,264 |
| Michael | 2,264 |
| Mountain View | 718 |
| Pack I | 864 |
| Pack II | 1,088 |
| Panpa | 1,012 |
| Ramsey I | 1,400 |
| Ramsey II | 850 |
| Ramsey III | 1,000 |
| Retrieve | 770 |
| Roach | 1,012 |

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

| | |
|---|---|
| Robertson.................... | 2,264 |
| Smith.................... | 1,012 |
| Stiles.................... | 2,264 |
| Terrell.................... | 2,264 |
| Torres.................... | 1,012 |
| Wynne.................... | 2,300 |

(b) It is the intent of the legislature that as case law evolves and indicates that maximum capacities established under Subsection (a) may be increased, the staff of the institutional division shall use the procedures established by this subchapter to increase those capacities. There shall be no cause of action against the institutional division for failure to take action under this subsection.

### § 499.102. Staff Determinations and Recommendations

(a) The staff of the institutional division, on its own initiative or as directed by the governor or the board, may recommend to the administration of the institutional division that the maximum capacity established under Section 499.101 for a unit be increased if the staff determines through written findings that the division can increase the maximum capacity and provide:

(1) proper inmate classification and housing within the unit that is consistent with the classification system;

(2) housing flexibility to allow necessary repairs and routine and preventive maintenance to be performed without compromising the classification system;

(3) adequate space in dayrooms;

(4) all meals within a reasonable time, allowing each inmate a reasonable time within which to eat;

(5) operable hygiene facilities that ensure the availability of a sufficient number of fixtures to serve the inmate population;

(6) adequate laundry services;

(7) sufficient staff to:

(A) meet operational and security needs;

(B) meet health care needs, including the needs of inmates requiring psychiatric care, mentally retarded inmates, and physically handicapped inmates;

(C) provide a safe environment for inmates and staff; and

(D) provide adequate internal affairs investigation and review;

(8) medical, dental, and psychiatric care adequate to ensure:

(A) minimal delays in delivery of service from the time sick call requests are made until the service is performed;

(B) access to regional medical facilities;

(C) access to the institutional division hospital at Galveston or contract facilities performing the same services;

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(D) access to specialty clinics;  and

(E) a sufficient number of psychiatric inpatient beds and sheltered beds for mentally retarded inmates;

(9) a fair disciplinary system that ensures due process and is adequate to ensure safety and order in the unit;

(10) work, vocational, academic, and on-the-job training programs that afford all eligible inmates with an opportunity to learn job skills or work habits that can be applied on release, appropriately staffed and of sufficient quality;

(11) a sufficient number and quality of nonprogrammatic and recreational activities for all eligible inmates who choose to participate;

(12) adequate assistance from persons trained in the law or a law library with a collection containing necessary materials and space adequate for inmates to use the law library for study related to legal matters;

(13) adequate space and staffing to permit contact and noncontact visitation of all eligible inmates;

(14) adequate maintenance programs to repair and prevent breakdowns caused by increased use of facilities and fixtures;  and

(15) space and staff sufficient to provide all the services and facilities required by this section.

(b) The staff of the institutional division shall request of the Legislative Budget Board an estimate of the initial cost of implementing the increase in capacity and the increase in operating costs of the unit for the five years immediately following the increase in capacity.  The Legislative Budget Board shall provide the staff with the estimates, and the staff shall attach a copy of the estimates to the recommendations.

(c) The staff of the institutional division may not take more than 90 days from the date the process is initiated to make recommendations on an increase in the maximum capacity for a unit under this section.

## § 499.103. Notice to Inmates

(a) The director of the institutional division shall prominently display in areas accessible to inmates housed in a unit for which the staff has recommended an increase in capacity copies of the recommendation and findings accompanying the recommendation.

(b) The board shall establish a process by which inmates may comment on the recommendations and ensure that a written summary of inmate comments is available to each individual or entity that makes a determination under this subchapter.

## § 499.104. Officers' Review and Recommendation

The executive director of the department, the director of the institutional division, the deputy director for operations, the deputy director for finance, the deputy director for health services, and the assistant director for classification and treatment shall independently review staff recommendations for an increase in the maximum capacity of a unit and the written findings accompanying the recommendation.  Not later than the 30th day after the date of accepting the comments of the other officers, if the executive director agrees that the new maximum capacity for the unit is supported by the findings, the executive director shall forward the recommendation and findings to the board.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## § 499.105. Board Review and Recommendation

The board shall review the recommendation and findings forwarded to the board under Section 499.104. Not later than the 60th day after the date the board receives the recommendation and findings, the board shall reject the recommendation or accept or modify the recommendation and forward the recommendation or modified recommendation and findings to the governor. The board may not modify the recommendation by increasing the maximum capacity specified in the recommendation.

## § 499.106. Governor's Review and Recommendation

The governor shall review the recommendation and findings forwarded to the governor under Section 499.105. The governor shall determine whether population pressures otherwise making an increase in maximum capacity necessary may instead be ameliorated by other measures, including the use of community corrections programs. Not later than the 30th day after the date the governor receives the recommendation and findings, the governor shall reject the recommendation or accept the recommendation and forward the recommendation and findings to the attorney general.

## § 499.107. Attorney General Review; Board Decision

(a) The attorney general shall review the recommendation and findings forwarded to the attorney general under Section 499.106 to determine whether the institutional division may confine the number of inmates permitted under the recommended new maximum capacity and be in compliance with state and federal law. In conducting the review under this section, the attorney general may request additional information from the institutional division and conduct on-site inspections of the institutional division. Not later than the 30th day after the date the attorney general receives the recommendation and findings, the attorney general shall approve or disapprove the recommendations and findings. If the attorney general approves the recommendations and findings, the attorney general shall notify the board of the approval, and on receiving the approval the board may establish a new maximum capacity for the unit. The attorney general may make the approval conditional and subject to further monitoring by the attorney general. The maximum capacity of a unit may not be increased if the attorney general determines that the increase would violate state or federal law.

(b) The institutional division may request that the board increase or decrease the new maximum capacity of a unit, but the board may not increase the new maximum capacity without following all procedures required by Sections 499.102-499.106 and by Subsection (a), and except as provided by Subsection (c) may not decrease the new maximum capacity without following the procedures required by Sections 499.103-499.106.

(c) The board may decrease a new maximum capacity without following the procedures listed in Subsection (b) only for the purposes of allowing single-celling flexibility or to repair minor structural deficiencies, provided that the decrease does not continue in effect for longer than 60 days.

## § 499.108. Capacity for New Units

(a) Before construction begins on a unit of the institutional division for which construction was not approved before January 1, 1991, the board shall establish a maximum capacity for the unit.

(b) Maximum capacity for a unit must be established under this section in the same manner as maximum capacity for a unit is increased under Sections 499.102, 499.104, 499.105, 499.106, and 499.107, except that time limits on official actions imposed by those sections do not apply.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(c) This section does not apply to a 2,250-bed (Michael-type) unit or a 1,012-bed (Daniel-type) unit, approved on or after January 1, 1991, unless the design for the unit is significantly altered or space in the unit is reduced.

## § 499.109. System Capacity

(a) The inmate population of the institutional division may not exceed 100 percent of the combined capacities of each unit in the division, as determined by this subchapter.

(b) The attorney general may authorize the institutional division to increase the inmate population of the division above 100 percent, but only if:

(1) the staff determines through written findings that the population may be increased without limiting the ability of the division to transfer inmates between units as necessary for classification, medical, and security purposes; and

(2) the administration of the department, the board, and the governor approve of the increase, in the same manner as increases in capacity of individual units are approved under Sections 499.104, 499.105, and 499.106.

(c) If the attorney general authorizes the institutional division to increase the inmate population of the division above 100 percent, the institutional division shall distribute the additional admissions permitted by the increase among counties or groups of counties in the same manner as regular admissions are distributed under the allocation formula.

## § 499.110. Administrative Procedure Act

Subchapter B, Chapter 2001, [FN1] applies to all reviews, recommendations, and decisions made under Sections 499.102-499.109.

[FN1] V.T.C.A., Government Code § 2001.021 et seq.

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.
Case 2:90-cv-00520-KJM-SCR    Document 3058    Filed 09/29/08    Page 67 of 84

V.T.C.A., Government Code § 501.111                                                          Page 1

**Effective:[See Text Amendments]**

Vernon's Texas Statutes and Codes Annotated Currentness
  Government Code (Refs & Annos)
    Title 4. Executive Branch (Refs & Annos)
      Subtitle G. Corrections
        ⌕▣  Chapter 501. Inmate Welfare (Refs & Annos)
          ⌕▣  Subchapter D. Inmate Housing
            ➡ § 501.111. Temporary Housing

(a) Except as provided by Subsection (b) and Subsection (c), the institutional division may not house inmates in tents, cellblock runs, hallways, laundry distribution rooms, converted dayroom space, gymnasiums, or any other facilities not specifically built for housing.

(b) Temporary housing may be used to house roving inmate construction crews and inmates temporarily displaced only because of housing renovation, fire, natural disaster, riot or hostage situations, if the institutional division provides those inmates with reasonable sanitary hygiene facilities.

(c) The institutional division may house inmates in tents or tent-like structures unless prohibited by federal law or a specific court order.

CREDIT(S)

Added by Acts 1991, 72nd Leg., ch. 655, § 3, eff. June 16, 1991. Amended by Acts 1993, 73rd Leg., ch. 845, § 1, eff. June 19, 1993.

LIBRARY REFERENCES

2004 Main Volume

  Prisons ⌾⟾ 17(1).
  Westlaw Topic No. 310.
  C.J.S. Prisons and Rights of Prisoners §§ 55, 59, 63 to 66, 68 to 69, 71 to 72, 76 to 90, 124, 129.

V. T. C. A., Government Code § 501.111, TX GOVT § 501.111

Current through the end of the 2007 Regular Session of the 80th Legislature

(c) 2007 Thomson/West
END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

V.T.C.A., Government Code § 501.112                                                                    Page 1

C

**Effective:[See Text Amendments]**

Vernon's Texas Statutes and Codes Annotated Currentness
  Government Code (Refs & Annos)
    Title 4. Executive Branch (Refs & Annos)
      Subtitle G. Corrections
        Chapter 501. Inmate Welfare (Refs & Annos)
          Subchapter D. Inmate Housing
          → **§ 501.112. Mixing Classifications Prohibited**

(a) Except as provided by Subsection (b), the institutional division may not house inmates with different custody classifications in the same cellblock or dormitory unless the structure of the cellblock or dormitory allows the physical separation of the different classifications of inmates.

(b) If an appropriate justification is provided by the unit classification committee or the state classification committee, the board may permit the institutional division to house inmates with different custody classifications in the same cellblock or dormitory, but only until sufficient beds become available in the division to allow the division to house the inmates in the manner required by Subsection (a) and in no event for more than 30 days.

CREDIT(S)

Added by Acts 1991, 72nd Leg., ch. 655, § 3, eff. June 16, 1991.

LIBRARY REFERENCES

2004 Main Volume

  Prisons 13(5).
  Westlaw Topic No. 310.
  C.J.S. Prisons and Rights of Prisoners §§ 20 to 21, 25 to 27.

V. T. C. A., Government Code § 501.112, TX GOVT § 501.112

Current through the end of the 2007 Regular Session of the 80th Legislature

(c) 2007 Thomson/West
END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

C

**Effective:[See Text Amendments]**

Vernon's Texas Statutes and Codes Annotated Currentness
   Government Code (Refs & Annos)
      Title 4. Executive Branch (Refs & Annos)
         Subtitle G. Corrections
            Chapter 501. Inmate Welfare (Refs & Annos)
               Subchapter D. Inmate Housing
                  → § 501.113. Triple-Celling Prohibited; Single-Celling Required for Certain Inmates

(a) The institutional division may not house more than two inmates in a cell designed for occupancy by one inmate or two inmates.

(b) The institutional division shall house the following classes of inmates in single occupancy cells:

   (1) inmates confined in death row segregation;

   (2) inmates confined in administrative segregation;

   (3) inmates assessed as mentally retarded and whose habilitation plans recommend housing in a single occupancy cell;

   (4) inmates with a diagnosed psychiatric illness being treated on an inpatient or outpatient basis whose individual treatment plans recommend housing in single occupancy cells; and

   (5) inmates whose medical treatment plans recommend housing in a single occupancy cell.

CREDIT(S)

Added by Acts 1991, 72nd Leg., ch. 655, § 3, eff. June 16, 1991.

LIBRARY REFERENCES

2004 Main Volume

   Prisons ⟜ 13(5).
   Westlaw Topic No. 310.
   C.J.S. Prisons and Rights of Prisoners §§ 20 to 21, 25 to 27.

V. T. C. A., Government Code § 501.113, TX GOVT § 501.113

Current through the end of the 2007 Regular Session of the 80th Legislature

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(c) 2007 Thomson/West
END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT

# B

# SUPPLEMENTAL REPORT OF DOYLE WAYNE SCOTT

*Coleman v. Schwarzenegger et al.,*

No. Civ. S-90-0520 LKK

*Plata v. Schwarzenegger et al.,*

No. C01-1351 T.E.H.

AUGUST 2008

## Supplemental Report of Doyle Wayne Scott

1.      I submit the present report to supplement my report dated November 9, 2007. Since writing that report, I have not authored any publications. I have not testified as an expert witness in court, but I have testified in one deposition: my deposition taken in this case, on December 14, 2007.

2.      Neither my curriculum vitae nor the rate my company, MGT of America, is charging plaintiffs for my work on this case, has changed.

3.      Since completing my expert report for this case in November 2007, I have toured four more California prisons: Folsom State Prison (Folsom) and the California State Prison-Sacramento on June 3, 2008, and the California State Prison-Solano (Solano) and Deuel Vocational Institution (DVI) on June 4, 2008. On these tours, I was allowed open access to staff, prisoners, medical and custody records and information. I was not blocked from speaking to any staff or asking any question, and all of my questions were answered. I have also reviewed additional documents, listed in Appendix A to this Supplemental Report.

Overcrowded conditions continue to endanger health and safety of California's prisoners

4.      The additional tours and documents serve to confirm the conclusion in my original report: California's prisons remain drastically overcrowded, which makes the state unable to keep prisoners and staff safe and to provide for the health care needs of prisoners. I agree with former CDCR Secretary Jim Tilton, that the overcrowding – and

1

the use of dayrooms, gymnasiums, hallways, and other inappropriate places for housing prisoners – "has reduced the availability of program and recreation space that is essential for positive inmate programming. There is widespread agreement among correctional experts that chronic idleness produces negative psychological and behavioral effects in prison." Joint Pls' Trial Ex. 72 at 15 (CDCR Presentation to the Senate Select Committee on Prison Population Management and Capacity, August 15, 2006). I further agree with Mr. Tilton that

> [i]dleness-related frustration increases the probability of interpersonal conflict and assaults in prison. Overcrowding simultaneously reduces the opportunities for staff to effectively monitor inmate behavior and drastically limits the options to reduce animosities between inmates by separating them or sending them to different facilities. Thus, there is less for inmates to do, fewer outlets to release the resulting tension, a decreased staff capacity to identify inmate problems, and fewer options to solve them if and when they do.

*Ibid.* Moreover, my assessment of the present situation in California's prisons comports with Mr. Tilton's in 2006: "the risk of catastrophic failure in a system strained from severe overcrowding is a constant threat. . . . [I]t is my professional opinion this level of overcrowding is unsafe and we are operating on borrowed time." *Ibid.*

5.    Prisoners continue to be housed in unacceptable conditions that endanger their health and safety. Prisoners in Folsom (in Building Two) were double-celled in six-by-eight foot cells, with two bunks, a toilet and sink, and a desk crowded into the cells with the two prisoners. There was hardly any unencumbered space in those cells, and they were extremely narrow. Prisoners in these units spent very little time outside these

2

cells. There were no dayrooms in the units. Although there was a large yard, they spent

little time on it and what time they spent was in groups of several hundred with very few

staff. (I saw only one staff on the yard on my tour.) It is inhumane to warehouse

prisoners two to a cell under such conditions.

6.      Inadequate out-of-cell or out-of-gym time was a common complaint on

these recent tours, as on my first round of tours. Staff at Solano told me that

administrative segregation prisoners do not receive even the required 10 hours per week

of outdoor recreation, because there is simply not enough space available to provide them

access to safe exercise.

7.      Cells in Folsom's Building Five were seven by nine feet, double-celled, and

had solid metal doors. These doors make direct supervision extremely difficult – staff

cannot tell what is going on in the cells. Under these circumstances, staff are even less

likely to be able to respond appropriately to medical and mental health emergencies,

given their inability to see what is happening in the cells, which delays response (because

they will need appropriate security and staff to be able to open the doors) and increases

mistrust.

8.      These cells doors were also individually keyed on the first tiers, making

quick exit in an emergency extremely difficult and escorts far more time-consuming and

staff-intensive. The staffing on these units was inadequate, given the solid doors.

9.      Nontraditional or "ugly" beds are still very much a common practice in

3

California's prisons.  A converted gymnasium at Solano (H Building) contained 225 triple bunks – a wall of sound and bodies and noise.  As was often the case in areas with significant numbers of people housed where people were never intended to be housed, many of the over-used toilets and showers were broken.  Z Dorm at DVI was a similar mass of people.

10.    DVI, a reception center for the San Francisco Bay Area, is extraordinarily overcrowded.  The design capacity is 1700 and the count, the day I was there, was just short of 4000.  All but approximately 640 prisoners were there for reception processing.  The prison is so overcrowded that prisoners being released are carefully timed with new arrivals so that beds are immediately swapped.  Every available space was in use for offender housing: most dayrooms at DVI are used for offender housing.  I saw dayrooms with 40 inmates in double and triple bunks, using showers in the bottom tier of the associated cellblock.  There were beds along all the outer walls and in the central area, leaving just enough space to walk, but not enough to do anything else.  There was no recreation space at all.

11.    The Receiver has written extensively about how the physical structure of CDCR facilities poses a serious barrier to delivery of adequate care:

> The facilities available for providing health care services within CDCR are woefully inadequate. Through years of neglect, the facilities have long since passed the time when modest investments could remedy the problem. We are dealing not with deferred maintenance, but with some facilities that are literally falling apart. In addition, investments in health care facilities have significantly lagged behind growing inmate populations, so much so that available clinical space is less than half of what is necessary for daily

4

operations.

Joint Pls Trial Ex. 56, Exhibit 1, at 25 (Federal Receiver's Turn-Around Plan of Action,

June 6, 2008, attached as Exhibit 1 to Receiver's Eighth Quarterly Report.) The Receiver

has also documented serious problems resulting from the custody understaffing that I

discussed in my initial report, noting that "[s]ystem-wide, CDCR lacks the custody staff

and organizational structure and processes to ensure that patient-inmates are reliably

escorted and/or transported to medical appointments. As a result, patient-inmates are

often denied timely access to health care services, substantially increasing the risk that

patient-inmates' health will further deteriorate and increasing the overall costs of

providing health care services." *Id.* at 5. Several examples he provides are worth quoting

at length, because they demonstrate the serious harms to prisoners and staff that result

from the understaffing that follows from the current overcrowding crisis:

> Information obtained continues to underscore the serious repercussions of
> the deficient numbers of custody staff to supervise clinic operations and
> medication administration to patient-inmates. For example, at one level
> III/IV institution, a facility clinic was left unsupervised while the
> correctional officer escorted a patient-inmate back to the housing unit.
> While the officer was away several prisoners attacked and viciously stabbed
> a rival gang member 13 times while secured within the holding tank in the
> facility clinic. At another institution, investigators pursuing suspected
> criminal conduct in a facility clinic caught patient-inmates stealing syringes
> and other medical supplies via surveillance cameras. This facility clinic did
> not have correctional officer posts allocated for the supervision of patient-
> inmate movement inside the clinic areas.

Joint Pls Trial Ex. 67 at 12-13 (Receiver's Seventh Quarterly Report).

> At present, the CDCR does not have any housing units designed to
> adequately provide for the needs of developmentally disabled prisoners.

5

Patient C was a 36 year old prisoner with the functional IQ of a nine-year old, and documented seizure disorders. An adaptive evaluation dated July 14, 2005 required "close supervision" in order to remind Patient C to take his medications. However, instead of being placed in a medical sheltered living unit (no such facilities exist in CDCR), Patient C was confined to an overcrowded dormitory in one of California's most deteriorated prisons. In late 2007, Patient C began to encounter problems with medication management and his behavior. On November 9, 2007, as the result of an alleged battery, Patient C was transferred (without his medical records) to a nearby high security prison administrative segregation unit. Thereafter, between November 9, 2007 and January 4, 2008, Patient C "missed" four medical appointments (the exact causes for the "missed" appointments is currently under investigation). On January 17, 2008, Patient C returned to dormitory housing; however, there is no indication that the necessary close supervision to remind him to take his medications was provided. Indeed, given the age and structure of the dormitory, and the limited staffing at this facility, it does not appear reasonable to expect minimally adequate care for developmentally disabled prisoners to be delivered at the prison where he had been housed. On January 27, 2008 another prisoner in the dormitory reported to correctional officers that Patient C was having a seizure. Prisoner C died the same day.

Joint Pls Trial Ex. 56 at 48-49 (Receiver's Eighth Quarterly Report).

12.    By placing prisoners in such settings, and requiring staff to work under these conditions, California is placing itself at serious risk, as the Governor noted in his State of Emergency Proclamation, from increased violence from enforced idleness, deteriorating mental and physical health from inadequate access to exercise and the outdoors. Further, these overcrowded conditions breed fear, anonymity, and mistrust on the part of custody staff which lead to an increased risk of inappropriate responses by such staff to medical and mental health needs, especially in emergencies.

13.    I agree with the Receiver that "[c]ustody resources needed to facilitate

access to care and provide the security necessary to deliver health care safely in a prison setting are inadequate, lacking both the personnel and structure to ensure timely access to health care services." Joint Pls Trial Ex. 67 at 5 (Receiver's Seventh Quarterly Report).

California has no meaningful plan to fix its overcrowding problems

14.    The CDCR's "Integrated Strategy to Address Overcrowding in CDCR's Adult Institutions" (Integrated Strategy) is an inadequate plan to address this crisis for several reasons. Joint Pls Trial Ex. 73. First, even if CDCR were to build the "infill" and "secure reentry facilities" they note in the plan, these spaces will not be available for prisoners to move in for years. CDCR predicts building 4,800 infill beds and 3,000 reentry beds in Phase I, and "up to" 3,800 additional infill beds and 8,000 additional reentry beds to follow. *Id.* at 3. CDCR predicts that the first 1000 infill beds will not be ready for occupancy until FY 2010/11, with the next 3,800 not available until FY 2011/12. *See* Integrated Strategy at Chart 1A, Priority Projects, May Revision Pop. Only 500 reentry beds will be available in FY 2009/10, with 500 more the next year, and an additional thousand added for each of the next several years. *Id.* Some of the beds intended to provide relief for this emergency will not be available until 2013. *Id.* CDCR's building projects will provide prisoners with minimal relief from the emergency conditions for many years to come, an unacceptable state of affairs.

15.    Second, I have serious doubts as to whether CDCR is capable of accomplishing what they set out to do in this strategic plan. The plan itself admits that

"CDCR has yet to build any of the infill beds authorized by AB 900" at its passage in May 2007 because they have not been able to find sites and because of "unforeseen limitations of infrastructure, community concerns with prison expansion, staffing difficulties, and scope of construction." *Id.* at 2. These should not have been "unforeseen" problems – these are exactly the problems faced in siting and building prison facilities. CDCR's current facilities have been severely understaffed and have a severely decaying infrastructure, as I point out in my original report; local communities are always concerned with prison expansion. These problems are nothing new. This plan admits CDCR's planning shortcomings for the last several years but provides no assurances that CDCR now has the capacity to accomplish what it promises.

16.      Further, the plan states that "the projects have been on hold" because of recent population projections, a budget crisis, and "settlement deliberations" in this case. *Id.* at 2-3. If the state were serious about building new facilities, and were committed to this as a meaningful solution to the crisis, it would not make such excuses.

17.      Third, the infill bed numbers – 4,800 beds in Phase I, 3,800 more in Phase II — are based on *overcrowded* housing – denoted on these charts as "HOC," or "housing overcrowding capacity," instead of "DBC," or "design build capacity." Prisoners in the new facilities, then, might not initially be living in gymnasiums or hallways, as they are now, but they will still be overcrowded. California will be in the same position with the new beds as with the old, replicating the same conditions that led to inadequate staffing

8

and treatment space, inadequate out-of-cell time, and overworked and overstressed staff and violent, frustrated prisoners.

18.    The state's AB 900 Strike team concluded that housing should be at no more than 130% of design bed capacity in the long term, based on national standards. Joint Pls Trial Ex. 74 at 6 (Validation of In-Fill Bed Plan, AB 900 Strike team Issue Memo No. 1, August 13, 2007).  That is a realistic and appropriate place for CDCR to be, to ensure that its prisons are safe and provide legally required services.  I caution, however, that while this number might be appropriate for new construction, it should be used carefully in CDCR's old, decaying facilities, with their failing infrastructure. Crowding prisoners at 130% is an appropriate goal for CDCR, speaking broadly, but some facilities might only be able to support and provide appropriate health care for smaller numbers.

19.    Fourth, the Integrated Strategy is extremely vague on reform provisions. The document states that CDCR's strategy "relies upon a reform component" to "effectively reduce overcrowding consistent with CDCR's mission to reduce recidivism," but does not say what that reform component is.  Joint Pls Trial Ex. 73 at 5 (CDCR's Integrated Strategy).  In fact, CDCR has not even decided what this "reform component" will look like: "our integrated approach incorporates summary parole *or an alternative reform measure* that would safely reduce average daily population by approximately 8,000 inmates when fully implemented." *Ibid.* (emphasis added).  This aspiration is a far

9

Aug 13 08 08:46p    Wayne Scott             936-295-2388        p.1
Sent By: Prison Law Office;        415 457 9151;      Aug-13-08  4:10PM;     Page 2/2
Case 2:90-cv-00520-KJM-SCR    Document 3058    Filed 09/29/08   Page 82 of 84

cry from an actual strategic plan.

20.    Fifth, the plan says nothing about funding sources for any of the building or reform components. Although AB 900 does provide some funding, it is not clear to me that it would cover all of the building proposed in this plan and, in particular, the undefined reform components. California's current budget crisis shows that unfunded promises are very risky propositions.

21.    The bottom line was stated properly by Mr. Tilton, in a statement currently on the CDCR's website; I would simply add medical care to his list of mental health care, education, and other basic needs that cannot be supplied under current conditions: "[t]he Department of Corrections owns the responsibility to assist inmates who are willing to change their ways with basic tools, of education, life skills, drug treatment and mental health, so they can get better when they leave Corrections -- not worse. But until I get overcrowding reduced -- then I don't have the opportunity to provide the program that I believe is my charge." (Viewed on the CDCR website on August 6, 2008, at http://www.cdcr.ca.gov/News/ Background_Info.html.)

Date: August 13, 2008

Doyle Wayne Scott

10

**APPENDIX A**

## Documents reviewed for supplemental report of Doyle Wayne Scott

CDCR Data Analysis Unit, Weekly report of population as of midnight August 6, 2008.

CDCR Presentation to the Senate Select Committee on Prison Population Management and Capacity, August 15, 2006.

*Plata* Receiver's Seventh Quarterly Report.

*Plata* Receiver's Eighth Quarterly Report.

Validation of In-Fill Bed Plan, AB 900 Strike team Issue Memo No. 1, August 13, 2007.

CDCR, Integrated Strategy to Address Overcrowding in CDCR's Adult Institutions.

Senate Budget and Fiscal Review, Subcommittee No. 4 Agenda, Thursday, March 15, 2007.

James Austin and Jeff Beard, Assessment of the Impact of Prison Population Reductions on Counties and Public Safety (power point presentation).