1   PRISON LAW OFFICE
    DONALD SPECTER, Bar No. 83925
2   STEVEN FAMA, Bar No. 99641
    E. IVAN TRUJILLO, Bar No. 228790
3   SARA NORMAN, Bar No. 189536
    ALISON HARDY, Bar No. 135966
4   REBEKAH EVENSON, Bar No. 207825
    1917 Fifth Street
5   Berkeley, CA 94710
    Telephone: (510) 280-2621
6   KIRKPATRICK & LOCKHART PRESTON
    GATES ELLIS LLP
7   JEFFREY L. BORNSTEIN, Bar No. 99358
    EDWARD P. SANGSTER, Bar No. 121041
8   RAYMOND E. LOUGHREY, Bar No. 194363
    55 Second Street, Suite 1700
9   San Francisco, CA 94105-3493
    Telephone: (415) 882-8200
10  THE LEGAL AID SOCIETY –
    EMPLOYMENT LAW CENTER
11  CLAUDIA CENTER, Bar No. 158255
    600 Harrison Street, Suite 120
12  San Francisco, CA 94107
    Telephone: (415) 864-8848
13
    Attorneys for Plaintiffs
14

ROSEN, BIEN & GALVAN, LLP
MICHAEL W. BIEN, Bar No. 96891
JANE E. KAHN, Bar No. 112239
AMY WHELAN, Bar No. 215675
LISA ELLS, Bar No. 243657
MARIA V. MORRIS, Bar No. 223903
315 Montgomery Street, 10th Floor
San Francisco, California 94104
Telephone: (415) 433-6830

BINGHAM, McCUTCHEN, LLP
WARREN E. GEORGE, Bar No. 53588
Three Embarcadero Center
San Francisco, California 94111
Telephone: (415) 393-2000

IN THE UNITED STATES DISTRICT COURTS

FOR THE EASTERN DISTRICT OF CALIFORNIA

AND THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

| | |
|---|---|
| RALPH COLEMAN, et al., | No.: Civ S 90-0520 LKK-JFM P |
| Plaintiffs, | **THREE-JUDGE COURT** |
| vs. | |
| ARNOLD SCHWARZENEGGER, et al., | |
| Defendants | |
| MARCIANO PLATA ,et al., | No. C01-1351 TEH |
| Plaintiffs, | **THREE-JUDGE COURT** |
| vs. | **DECLARATION OF JOSEPH LEHMAN IN** |
| ARNOLD SCHWARZENEGGER, et al., | **SUPPORT OF PLAINTIFFS' OPPOSITION** |
| | **TO DEFENDANTS' MOTION TO DISMISS** |
| vs. | **AND/OR MOTION FOR SUMMARY** |
| Defendants | **JUDGMENT / ADJUDICATION** |

[241786-1]

I, Joseph Lehman, declare as follows:

1.    I make this declaration in support of "Plaintiffs' Opposition to Defendants' Motions for Dismissal or, Alternatively, for Summary Judgment or Summary Adjudication." I have personal knowledge of the matters set forth herein and if called as a witness, I could and would competently so testify.

2.    I have been retained by Plaintiffs to testify as an expert witness in this matter. I prepared an expert report on August 15, 2008, which, pursuant to the court orders governing this proceeding, is my direct testimony at trial. Attached as **Exhibit A** is a true and correct copy of my August 15, 2008 report.

3.    I am informed and believe that a copy of my report was served on all parties to the Three-Judge Court matter on August 15, 2008.

I declare under penalty of perjury that the foregoing is true and correct, and that this declaration was executed this 24 day of September, 2008, in _Lakewood, WA_.

_____
Joseph Lehman

-1-

[241786-1]

# EXHIBIT

# A

# REPORT OF JOSEPH LEHMAN

*Coleman v. Schwarzenegger et al.,*

No. Civ. S-90-0520 LKK

*Plata v. Schwarzenegger et al.,*

No. C01-1351 T.E.H.

AUGUST 2008

## REPORT OF JOSEPH LEHMAN

A. **Background**

1.  I have over 35 years of experience in corrections, parole and probation, including managing adult prison systems and adult probation programs. I have fifteen years of experience running three state correctional systems in Washington State (1997 to 2005), Maine (1995 to 1997) and Pennsylvania (1990 to 1995).

2.  In addition to correctional positions, I have been a Commissioner on the Pennsylvania Commission on Crime and Delinquency, a member of sentencing commission in two states (Pennsylvania ex-officio) and Washington. I have been President of the Association of State Correctional Administrators and co-chair of the Washington State Law and Justice Advisory Council. I have received the Michael Francke Award for Excellence from the Association of State Correctional Administrators and the E.R. Cass Award from the American Correctional Association, among others. I have a B.A. from Saint Martin's College and an M.A. with an emphasis in Criminal Justice from Pacific Lutheran University. A complete description of my background is contained in my resume, which is attached hereto as Exhibit A.

3.  In the last four years, I have not testified as an expert witness.

4.  In December 2006, I was appointed by the State of California as a member of the CDCR Expert Panel on Adult Offender and Recidivism Reduction Programming. That panel produced a report to the California Legislature in June

2007, entitled *A Roadmap for Effective Offender Programming in California*.

Joint Pls Tr. Ex. 2 (Expert Panel Report). To produce that report the panel,

including myself, toured California prisons, were provided numerous documents

and heard presentations from many officials within the CDCR.

     5. I have been asked by the attorneys for Plaintiffs in both of these cases to

express an opinion about whether the California prison system is overcrowded and

the effect that overcrowding generally has on the provision of medical and mental

health care. I also have been asked to express an opinion about whether a

meaningful reduction of the prison population can be accomplished without any

significant risk to public safety.

    B. **Overcrowding in California's Prisons**

    6. There is no question that California's prisons are overcrowded. As of

July 23, 2008, the institution population was 155,096 or 195.3% of design

capacity. (CDCR, Data Analysis Unit, Weekly Report of Population, July 23,

2008.) I agree with Governor Schwarzenegger and others that this is an

emergency situation; it calls for drastic and immediate action.

    7. I am familiar with the effects of prison overcrowding. During my tenure

as Secretary in Washington and Pennsylvania, the prisons in those jurisdictions

were overcrowded.

    8. The kind of severe overcrowding that is present in California's prisons

affects the entire operation of a prison and a prison system. First, it is very

dangerous for prisoners and staff. "'The overcrowding of CDCR facilities has led

to increased numbers [of] infectious disease outbreaks and riots and disturbances system-wide.'" (Expert Panel Report at 9.)  Second, overcrowding places intolerable burdens on the staff and the facilities, with significant negative impacts on the CDCR's ability to provide prisoners with all the necessary services, including health care.  Third, prison overcrowding in many respects makes the prison classification system meaningless.  The classification of inmates becomes no more than a drill to find an empty bed.  This results in a greater risk of violence and the inappropriate housing of prisoners who need health care services.  In terms of health care, the overcrowding creates a likely situation where only those prisoners who have the most obvious health care issues are classified appropriately.  In many respects, in an overcrowded system the classification process focuses only on the behavior of the prisoner, particularly whether he is gang related and presents a potential for violent behavior.  Certainly, in this environment the needs of the individual are secondary.

9.  The conclusion the Expert Panel reached with respect to rehabilitation is equally applicable to health care: "[The] incidences of violence and other negative consequences of overcrowding degrade the CDCR's ability to consistently operate rehabilitation programs in the prison environment.  While lockdowns and controlled movements allow the CDCR to increase the safety of its correctional officers and prisoners, when wardens enact these security measures, they cancel all programming in the affected prison areas." (Expert Panel Report at 9.)

10. Overcrowding affects virtually every aspect of a prison's operation. Severe overcrowding, like that affecting California's prisons, results in a lack of treatment and office space, decreased access to health care services, and the cancellation of such services during lockdowns. In lockdown situations staff often have to escort prisoners to their appointments or activity, which makes the strain on the staff even more acute. Because of the strain on the staff, they must then choose between conflicting needs of the prisoner. I found during my tours that significant portions of program space were being used to house prisoners. Overcrowding thus reduces the opportunity for prisoners to program, which causes the obvious idleness I observed in a large segment of the population. That in turn leads to frustration, tension and increased violence among the prison population.

C. **The California Prison Population Can Be Reduced Safely**

11. The first recommendation of the Expert Panel is to reduce overcrowding. (Expert Panel Report at viii.) The panel included as members James Gomez, former Director of the California Department of Corrections, Reginald Wilkinson, former head of the Ohio prison system, Steven Ickes, Deputy Director of the Arizona Department of Corrections, Jeffrey Beard, Secretary of the Pennsylvania Department of Corrections, Mark Carey, President of the American Probation and Parole Association, Joan Petersilia, Ph.D., an expert retained by Defendants, and Marisela Montes, then Chief Deputy Secretary for Adult Programs for the CDCR. (Expert Panel Report at ii.) As Chair of the Model Program Sub-Committee, I proposed that recommendation, and continue to

believe that a reduction in the population is a necessary condition for providing rehabilitation in the California prison system. The Expert Panel concurred in that recommendation. The same recommendation holds true for providing other services, especially medical and mental health care.

12. The Expert Panel, mainly through the work of Dr. Petersilia, reviewed fifteen reports that had been written since 1990 on the subject of the crisis in California's prison system. Dr. Petersilia found that all of the reports made the same ten recommendations, which we endorsed:

    a.  Stop sending non-violent, non-serious offenders to prison.
        This particularly pertains to technical parole violators, who
        could better be served in community based, intermediate
        facilities.

    b.  Once in prison, use a standardized risk and needs assessment
        tool to match resources with needs and determinate
        appropriate placements for evidence-based rehabilitation
        programs.

    c.  Develop and implement more and better work, education, and
        substance abuse treatment programs for prisoners and
        parolees.

    d.  Reform California's determinate sentencing system to reward
        prisoners for participating in rehabilitation programs and

allow the system to retain prisoners who represent a continued public safety risk.

e.    Move low risk prisoners to community based facilities toward the later part of their sentences to foster successful reintegration and save more expensive prison-based resources. Sub-populations, such as women, the elderly and the sick, are ideal candidates.

f.    Create a sentencing policy commission or some other administrative body that is authorized to design new sentencing statutes into a workable system that balances uniformity of sentencing with flexibility of individualization.

g.    Reform California's parole system so that non-serious parole violators are handled in community-based intermediate facilities and more violent parole violators are prosecuted for new crimes.

h.    Create viable partnerships between state and local corrections agencies that would expand sentencing options, enhance rehabilitation services, and strengthen local reentry systems. Suggestions have been made that include Community Corrections Acts (to get greater funding for local criminal justice initiatives) and a Community Corrections Division of the CDCR charged with developing alternatives.

    i.    Evaluate all programs and require that existing and newly

           funded programs are based on solid research evidence.

    j.    Promote public awareness so that taxpayers know what they

           are getting for their public safety investment and become

           smarter and more engaged about California's prison system.

(Expert Panel Report, Appendix A.)

13. The Expert Panel Report also recommended that the prison population be reduced through the more aggressive use of in-prison credits, the early discharge of some parolees and the selective use of parole for only certain offenders. (Expert Panel Report at 11-13, 41-43.) The panel found, and I concur, that if implemented properly these measures would reduce the prison population without any significant adverse affect on crime in the community. As the panel found, "it has been widely established by a number of studies, including those conducted by the US Department of Justice and the CDCR, there is no relationship between time served and recidivism (US Department of Justice, 2006). Therefore, releasing prisoners early as a result of earning program credits will not increase their recidivism rates." (Expert Panel Report at 92.)

14. Indeed, in Washington State parole was abolished in 1984 and the law was changed so that offenders could not be sent to prison for probation violations. From 1984 to 1986, the court made certain changes to the sentencing laws retroactive and increased the amount of credits that prisoners were entitled to, creating a situation that caused prisoners to be released "early" in a relatively short

period of time. This early release did not have any significant impact on the crime rate or the rate of recidivism.

15. While I was Secretary we were directed by the Legislature to institute a system for parolees that allocated parole resources based on risk that an offender would commit a new crime, as measured by a risk instrument. In this system, low risk parolees and probationers were not supervised at all. This allowed the Department of Corrections to concentrate its resources on those parolees most likely to commit serious crimes in the future. In my experience, only a handful of the low risk offenders who were not supervised were subsequently convicted of violent crimes, and those were for assaults without a major injury.

16. Washington State also had a number of laws that prevented parole violators and certain felons from clogging up the prisons. Technical parole violators were not sent back to prison at all, but were placed county facilities. In addition, another law diverted certain categories of low risk felons to the county by prohibiting the courts from sentencing them to prison. In my opinion, both of these measures controlled the prison population while not having any significant adverse effect on public safety.

17. Washington State has a legislatively created Institute for Public Policy, which conducts research on criminal justice issues, among many other things. In a report entitled *Evidence-based Public Policy Options to Reduce Future Prison Construction, Criminal Justice Costs, and Crime Rates* (October 2006), the Institute noted many programs that can be instituted in the community and in

prison that effectively reduce recidivism (some by as much as 18-20%), thereby lowering the prison population and the cost of the punishment. I believe that many of these programs could be instituted safely by California.

18. In Pennsylvania the state made changes to sentencing guidelines to allow for restorative and intermediate sanctions, such as fines, restitution, probation, residential treatment programs and house arrest. Part of the intent of these changes was to reduce the number of offenders who were sent to state prison. In my opinion and experience, these changes did not result in any increased harm to the public; in fact, in general they benefited both the community and the offender.

D. **Conclusions**

19. In my opinion, California must act quickly and decisively to reduce its prison population so that prisoners receive the health care services to which they are constitutionally entitled. I have no doubt that the overcrowding crisis in California's prisons can be resolved without having a significant adverse impact on public safety.

20. I have reviewed a memo authored by Deborah Hysen, the head of the CDCR's Facilities Strike Team, appointed by the Governor to implement the extensive AB 900 building plans. Joint Pls Trial Ex. 74 (Validation of In-Fill Bed Plan, AB 900 Strike Team Issue Memo No. 1, August 13, 2007). In that memo, Ms. Hysen states (on pages five through six) that AB 900 infill bed construction should not exceed 145% design capacity, and that in its Master Planning process,

the CDCR should ensure that prisoners not be housed at higher than 130% design capacity in the future, a number based on national standards. I agree with Ms. Hysen. In my opinion and in my experience, housing California prisoners at 130% design capacity will give prison officials and staff the ability to provide the necessary programs and services for California's prisoners.

21. I have reviewed the report submitted by James Austin, Ph.D, which discusses the effects of various prison population reducing measures on public safety. I agree with his conclusions that if such measures are properly implemented, the prison population can be reduced, and the community as well as the prison system will be safer. This does not mean that some offenders released from prison "early" will not commit crimes. That happens now with offenders streaming back into the community no better and often worse off than when they went to prison. There is no need to choose between dangerously overcrowded prisons, on the one hand, and less crowded prisons but more crime, on the other; the question instead is whether California can maintain or reduce crime levels and at the same time run a less crowded prison system. Experience and research in other states throughout the country says that it can.

Dated: August 15, 2008

JOSEPH D. LEHMAN

10

APPENDIX A

## JOSEPH D. LEHMAN

### PERSONAL

Birth Date: September 1, 1943
Marital Status: Married
Wife: Cheryl

### SUMMARY

Over 35 years of increasing responsibilities in corrections, including experience in managing adult and juvenile institutions and community programs.

### PROFESSIONAL EXPERIENCE

Pastoral Assistant for Administration, ST. FRANCES CABRINI CHURCH, Lakewood, Washington—August 1, 2005 to present.

Consultant CDCR EXPERT PANEL, Sacramento, California
December 2006 to present

WASHINGTON DEPARTMENT OF CORRECTIONS

Secretary, Olympia, Washington - March 10, 1997 to January 31, 2005

- Established the Department's goals, legislative agenda, budget proposals, policies, and organizational structure.
- Managed a prison population of 17,000+, including 1,000+, pre/work release population and a community corrections active caseload of 34,,000+, and 1,000+ youthful offenders.
- Authored legislation to make comprehensive changes in sentencing policy which led to significant changes in the mission and business practices of community corrections and prisons.
- Served on the Washington State Criminal Justice Training Commission, Sentencing Guidelines Commission and the State Risk Management Council.
- Co-chair the Washington State Law and Justice Advisory Council.

MAINE DEPARTMENT OF CORRECTIONS

Commissioner, February 28, 1995 to March 10, 1997

- Managed adult and juvenile facilities including a Youth Training School housing 200 juvenile offenders and several adult correctional facilities housing approximately 1400 inmates.
- Managed adult probation and juvenile community programs involving over 6,000 adult and 2,000 youthful offenders.
- Developed and oversaw implementation of Department budget and policy.

12

- *Developed departmental budget and legislative package.*
- *Chaired Children's Cabinet responsible for developing a collaborative agenda and strategies for those executive branch agencies serving children in the state.*

## PENNSYLVANIA DEPARTMENT OF CORRECTIONS

<u>Secretary</u>, *June 29, 1990 to January 17, 1995*
<u>Acting Secretary</u>, *April 18, 1990 to June 29, 1990*

- *Managed prison system of 22 institutions with an inmate population of over 28,000.*
- *Developed comprehensive inmate classification system and emergency response preparedness program.*
- *Directed capital building projects, which added 8,500 prison beds.*
- *Developed and managed an annual budget of $604 million.*
- *Developed and oversaw implementation of Department policy.*
- *Developed and worked to pass Department legislation.*

## WASHINGTON DEPARTMENT OF CORRECTIONS

<u>Deputy Secretary</u>, *Olympia, WA - January 1989 to April 1990*

- *Direct supervision of Correctional Industries Programs.*
- *Oversaw Department policy development and technical assistance to counties.*
- *Managed capital project for renovation of McNeil Island Corrections Center.*
- *Coordinated activities of the Classification and Case Management Project.*
- *Assisted in the development and work to pass Department legislation.*

<u>Director, Division of Prisons</u>, *Olympia, WA - October 1986 to January 1990*

- *Managed 13 prisons with capacity of 6,831 and 3,400 staff.*
- *Developed and managed biennial budget of $275 million*
- *Implemented a prison security audit system.*
- *Developed comprehensive custody staffing model.*
- *Developed division's legislative initiatives.*

<u>Command Manager, Division of Prisons</u>, *Monroe Command - July 1983 to October 1986*

- *Managed institution complex including five prison units ranging from maximum to minimum custody.*
- *Oversaw Division Mental Health Service Delivery System. Directed capital renovation project and brought new institution on line.*

<u>Assistant Director, Division of Prisons</u>, *Olympia, WA - June 1981 to July 1983*

- *Managed several institutions throughout the state, including the systems diagnostic center and five forestry camps.*
- *Developed and implemented Audit Management System for the division.*

- *Developed the division's operating budget and annual allotments.*
- *Served as a member of the Washington State Jail Commission overseeing construction of jails and enforcement of operating standards.*

*WASHINGTON STATE DEPARTMENT OF SOCIAL AND HEALTH SERVICES
ADULT CORRECTIONS DIVISION*

*Assistant Director, Community Services, Olympia, WA - January 1980 to June 1981*
- Managed Adult Probation and Parole, Intensive Supervision, and Work/Training Release Programs.

*Associate Superintendent of Classification and Treatment, Community Services, Olympia, WA - June 1979 to January 1980*
- *Managed Intensive Supervision Program.*
- *Developed Community Services Budget.*
- *Supervised Federal grants, planning, research, and training activities.*

*Community Residential Program Administrator, Olympia, WA - October 1978 to June 1979*
- *Managed community based residential programs in three regions of the state.*

*Project Director, Intensive Parole Supervision Project, Olympia, WA - March 1976 to October 1978*
- *Developed and managed statewide Institutions Diversion Program funded by Federal grant.*

*Assistant Regional Administrator, Adult Probation and Parole, Seattle, WA - May 1975 to March 1976*
- *Administered Adult Probation and Parole Services within three-county region of state.*

*Project Director, Community-Based Diagnostic and Evaluation Project, Seattle, WA - September 1973 to May 1975*
- *Directed federally-funded interdisciplinary diagnostic unit providing presentence reports to superior courts.*

*Probation and Parole Supervisor, Seattle, WA - June 1972 to September 1973*
- *Supervised several district offices.*

*Probation and Parole Officer, Seattle, WA - June 1969 to June 1972*
- *Supervised caseload of adult offenders on probation or parole.*

**RELATED EXPERIENCE**

- *Commissioner, Maine Criminal Justice Commission*
- *Commissioner, Pennsylvania Commission on Crime and Delinquency*
- *Pennsylvania Commission on Sentencing (ex-officio member)*
- *Member of Washington State Sentencing Guideline Commission*
- *Commissioner, Washington State Jail Commission*

- *Session trainer for National Institute of Corrections Executive Excellence Program 1998 to present*
- *Instructor (part-time), Criminal Justice Master's Degree Program, Pacific Lutheran University, Tacoma, WA, September 1973 to May 1982*
- *Instructor (part-time), Police Science Associate of Arts Degree Program, Everett Community College, Everett, WA, March 1973 to October 1976*
- *Teacher, W.B. Laughbon High School, Dupont, WA, December 1968 to June 1969*
- *Lay Volunteer, Catholic Mission, Dillingham, AK, August 1962 to June 1963*

## *EDUCATION*

- *M.A. in Criminal Justice, Pacific Lutheran University, 1972*
- *B.A. in Education and Political Science, Saint Martin's College, 1968*

## *PROFESSIONAL COURSES AND SEMINARS*

- *Program on Correctional Leadership & Innovation, the Future of Litigation on Prison Issues, The Wharton Center for Applied Research, Pennsylvania, 1989*
- *Strategic Leadership for State Executives, The Governors Center, Duke University, 1989*
- *Executive Management of Emergencies, National Academy of Corrections, 1989*
- *Prison Architectural Design, National Academy of Corrections, 1988*
- *Leadership Conference, University of Pennsylvania, 1987*
- *Prison Security, National Academy of Corrections, 1986*
- *Influencing the External Environment, National Academy of Corrections, 1986*
- *Consultant Training Session, Commission on Accreditation, 1986*
- *Executive Management Development Program, University of Washington, 1985*
- *Planning and Control, National Academy of Corrections, 1985*
- *Strategic Management, University of Pennsylvania, 1980*
- *Institute for Criminal Justice Executives, University of Southern California, 1975*
- *Community Resources Training Institute, Washington State Department of Institutions, 1969*

## *MEMBERSHIPS/PROFESSIONAL ORGANIZATIONS*

- *American Bar Association*
  *Prior Member of the Legal Status of Prisoners Task Force*
- *Association of State Correctional Administrators*
  *Past-President; and Current Member of the Past Presidents Committee*
- *Association of State Correctional Administrators*
  *Former Chair of the Performance Based Measurement System Committee; Former member of the Program and Training, Research, Victims Committees*
- *American Correctional Association*
  *Former Chair, Standards Committee and Restorative Justice Committee*
- *Washington State Law & Justice Advisory Council*
  *Former Co-Chair*

## AWARDS

- "Excellence in Government Award for Corrections" from the national publication City & State in 1993
- "Michael Francke Award for Excellence" from Association of State Correctional Administrators in 1994.
- "Maud Booth Correctional Services Award" from Volunteers of America in 1995.
- "Roscoe Pound Award" from the National Council on Crime and Delinquency in 2000.
- "E. R. Cass Award" from the American Correctional Association in 2001.
- "Distinguished Alumni Professional Achievement Award from St. Martins College in 2002.

APPENDIX B

The following list contains the documents I reviewed in preparation for this Report.

1. CDCR, Data Analysis Unit, Weekly Report of Population, July 23, 2008

2. CDCR Expert Panel on Adult Offender and Recidivism Reduction Programming, *A Roadmap for Effective Offender Programming in California* (June 2007).

3. California Independent Review Panel, Reforming California's Youth and Adult Correctional System (2004), pp. 122-127.

4. Washington Institute for Public Policy, *Evidence-based Public Policy Options to Reduce Future Prison Construction, Criminal Justice Costs, and Crime Rates* (October 2006).

5. Validation of In-Fill Bed Plan, AB 900 Strike team Issue Memo No. 1, August 13, 2007.

6. James Austin, Expert Report, *Plata v. Schwarzenegger* and *Coleman v. Schwarzenegger* (August 2008).4