PRISON LAW OFFICE
DONALD SPECTER, Bar No. 83925
STEVEN FAMA, Bar No. 99641
E. IVAN TRUJILLO, Bar No. 228790
SARA NORMAN, Bar No. 189536
ALISON HARDY, Bar No. 135966
REBEKAH EVENSON, Bar No. 207825
1917 Fifth Street
Berkeley, CA 94710
Telephone: (510) 280-2621

ROSEN, BIEN & GALVAN, LLP
MICHAEL W. BIEN, Bar No. 96891
JANE E. KAHN, Bar No. 112239
AMY WHELAN, Bar No. 215675
LISA ELLS, Bar No. 243657
MARIA V. MORRIS, Bar No. 223903
315 Montgomery Street, 10th Floor
San Francisco, California 94104
Telephone: (415) 433-6830

KIRKPATRICK & LOCKHART PRESTON
GATES ELLIS LLP
JEFFREY L. BORNSTEIN, Bar No. 99358
EDWARD P. SANGSTER, Bar No. 121041
RAYMOND E. LOUGHREY, Bar No. 194363
55 Second Street, Suite 1700
San Francisco, CA 94105-3493
Telephone: (415) 882-8200

BINGHAM, McCUTCHEN, LLP
WARREN E. GEORGE, Bar No. 53588
Three Embarcadero Center
San Francisco, California 94111
Telephone: (415) 393-2000

THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
CLAUDIA CENTER, Bar No. 158255
600 Harrison Street, Suite 120
San Francisco, CA 94107
Telephone: (415) 864-8848

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURTS

FOR THE EASTERN DISTRICT OF CALIFORNIA

AND THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

| | |
|---|---|
| RALPH COLEMAN, et al., <br><br> Plaintiffs, <br><br> vs. <br><br> ARNOLD SCHWARZENEGGER, et al., <br><br> Defendants | No.: Civ S 90-0520 LKK-JFM P <br><br> **THREE-JUDGE COURT** |
| MARCIANO PLATA ,et al., <br><br> Plaintiffs, <br> vs. <br><br> ARNOLD SCHWARZENEGGER, et al., <br><br> vs. <br> Defendants | No. C01-1351 TEH <br><br> **THREE-JUDGE COURT** <br><br> **DECLARATION OF PABLO STEWART, M.D. IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AND/OR MOTION FOR SUMMARY JUDGMENT / ADJUDICATION** |

[242130-1]

1    I, Pablo Stewart, declare as follows:

2        1.    I make this declaration in support of "Plaintiffs' Opposition to Defendants'

3    Motions for Dismissal or, Alternatively, for Summary Judgment or Summary Adjudication." I

4    have personal knowledge of the matters set forth herein and if called as a witness, I could and

5    would competently so testify.

6        2.    I have been retained by Plaintiffs to testify as an expert witness in this matter.

7    On August 15, 2008, I prepared an expert report which, pursuant to the court orders governing

8    this proceeding, is my direct testimony at trial.

9        3.    On or about September 16, 2008, a letter setting forth some minor typographical

10   and exhibit reference changes to my August 15, 2008 report was sent to defense counsel.

11   Attached as **Exhibit A** is a true and correct copy of the September 16, 2008 letter from Amy

12   Whelan to Lisa Tillman.  A second letter setting forth one additional change to my August 15,

13   2008 report was sent to defense counsel on September 23, 2008.  Attached as **Exhibit B** is a

14   true and correct copy of the September 23, 2008 letter from Amy Whelan to Lisa Tillman.

15       4.    Attached hereto as **Exhibit C** is a true and correct copy of my August 15, 2008

16   report, with the changes specified in the September 16 and 23, 2008 letters.

17       5.    I am informed and believe that a copy of my original report was served on all

18   parties to the Three-Judge Court matter on August 15, 2008.  I am also informed and believe

19   that all parties received copies of the September 16th and 23rd letters regarding modifications

20   to that report.

21       I declare under penalty of perjury that the foregoing is true and correct, and that this

22   declaration was executed this 25th day of September, 2008, in San Francisco, California.

23

24                                   Pablo Stewart, M.D.

25

26

27

28

[242130-1]

**Exhibit A**

SANFORD JAY ROSEN[1]
MICHAEL W. BIEN
ERNEST GALVAN
GAY C. GRUNFELD

JANE KAHN[2]

# ROSEN, BIEN & GALVAN, LLP

ATTORNEYS AT LAW
315 MONTGOMERY STREET, TENTH FLOOR
SAN FRANCISCO, CALIFORNIA 94104
TELEPHONE: (415) 433-6830
FAX: (415) 433-7104
EMAIL: rbg@rbg-law.com
www.rbg-law.com

HOLLY BALDWIN
LISA ELLS
SHIRLEY HUEY[3]
MEGHAN LANG
ANNE MANIA
NURA MAZNAVI
MARIA MORRIS[4]
THOMAS NOLAN
LOREN STEWART
KENNETH WALCZAK[5]
AMY WHELAN
SARAH O. ZIMMERMAN[5]

September 16, 2008

**VIA U.S. MAIL AND EMAIL**

Lisa A. Tillman, Esq.
Deputy Attorney General
Office of the Attorney General
P.O. Box 944255
Sacramento, CA 94244-2550

Re:  *Coleman v. Schwarzenegger*; *Plata v. Schwarzenegger*
Our File No. 0489-3

Dear Ms. Tillman:

We have identified a few minor errors in Pablo Stewart's August 15, 2008 Expert report. Please be aware that plaintiffs intend to issue a corrected report with the following changes, the majority of which are typographical:

| Page / Paragraph | Change |
|---|---|
| p. 10, ¶25 | change "Coleman Pls' Trial Ex. 57" to "Joint Pls' Trial Ex. 57" |
| p. 24, ¶56 | change "Joint Pls' Trial Ex. 141" to "Coleman Pls' Trial Ex. 141" |
| p. 25, ¶58 | change "Joint Pls' Trial Ex. 142" to "Coleman Pls' Trial Ex. 142" |
| p. 27, ¶62 | change "Joint Pls' Trial Ex. 143" to "Coleman Pls' Trial Ex. 143" |
| p. 34, ¶82 | change "Coleman Pls' Trial Ex." to "Joint Pls' Trial Ex." |
| p. 37, ¶89(a) | change the second reference to "Coleman Pls' Trial Ex. 145" (after the words "between April 30 and June 6, 2008") to "Coleman Pls' Trial Ex. 141" |
| p. 43, subpart b | change "Coleman Pls' Trial Ex. 153" to "Coleman Pls' Trial Ex. 154" |
| p. 46, ¶94 | change "Coleman Pls' Trial Ex. 69" to "Joint Pls' Trial Ex. 69" |
| p. 51, ¶105 | change "remain in the building" to "be transferred to a mainline EOP unit" |

[1]MEMBER OF THE CONNECTICUT AND THE CALIFORNIA BAR
[2]OF COUNSEL
[3]MEMBER OF THE WASHINGTON, D.C. AND THE CALIFORNIA BAR
[4]MEMBER OF THE NEW YORK AND THE CALIFORNIA BAR
[5]MEMBER OF THE ILLINOIS AND THE CALIFORNIA BAR

Lisa A. Tillman, Esq.
September 16, 2008
Page 2

| Page / Paragraph | Change |
|---|---|
| p. 51; ¶105 | Delete "This account conflicts with" and replace with "In addition, the Special Master's 20th round report found that inmates…" |
| p. 55, ¶115 | change "Joint Pls' Trial Ex. 63" to "Coleman Pls' Trial Ex. 35 and Joint Pls' Trial Ex. 103" |
| p. 65, footnote 8 | change "Joint Pls' Trial Ex. 71 at p. E_PRIV_05782" to "Joint Pls' Trial Ex. 71 at p. E_PRIV_057802" |
| p. 69, ¶144 | change the reference to "Joint Pls' Trial Ex. 71" (after the words "cycle of mental[ly] ill inmates") to "Joint Pls' Trial Ex. 70" |

I have also enclosed an updated list of plaintiffs' trial exhibits. The previous lists were provided to all parties in conjunction with plaintiffs' expert reports.

Yours truly,

ROSEN, BIEN & GALVAN, LLP

*/s/ Amy Whelan*

By: Amy Whelan

AW:cg
Enclosure
cc:    Rochelle East (via email)
        Paul Mello (via email)
        Renju Jacob (via email)
        Samantha Tama (via email)
        Charles Antonen (via email)
        Counsel for Intervenors (via email)
        Co-counsel

[240261-1]

**Exhibit B**

SANFORD JAY ROSEN[1]
MICHAEL W. BIEN
ERNEST GALVAN
GAY C. GRUNFELD

JANE KAHN[2]

# ROSEN, BIEN & GALVAN, LLP

ATTORNEYS AT LAW
315 MONTGOMERY STREET, TENTH FLOOR
SAN FRANCISCO, CALIFORNIA 94104
TELEPHONE: (415) 433-6830
FAX: (415) 433-7104
EMAIL: rbg@rbg-law.com
www.rbg-law.com

HOLLY BALDWIN
LISA ELLS
SHIRLEY HUEY[3]
MEGHAN LANG
ANNE MANIA
NURA MAZNAVI
MARIA MORRIS[4]
THOMAS NOLAN
LOREN STEWART
KENNETH WALCZAK[5]
AMY WHELAN
SARAH O. ZIMMERMAN[5]

September 23, 2008

**VIA U.S. MAIL AND EMAIL**

Lisa A. Tillman, Esq.
Deputy Attorney General
Office of the Attorney General
P.O. Box 944255
Sacramento, CA 94244-2550

Re:     *Coleman v. Schwarzenegger*; *Plata v. Schwarzenegger*
        Our File No. 0489-3

Dear Ms. Tillman:

We have identified one other correction to Dr. Pablo Stewart's August 15, 2008 Expert report as follows:

| Page / Paragraph | Change |
| --- | --- |
| p. 52, ¶107 | change "The CDCR had at least 43 suicides in 2006 and I am informed by plaintiffs' counsel that there have been 35 suicides reported by defendants already this year" to "The CDCR had at least 43 suicides in 2006, reported 35 confirmed suicides in 2007, and, according to plaintiffs' counsel, has reported 24 suicides this year as of August 15, 2008." |

We will provide the corrected report next week.

Yours truly,

ROSEN, BIEN & GALVAN, LLP

*/s/ Amy Whelan*

By: Amy Whelan

AW:cg
Enclosure

[1]MEMBER OF THE CONNECTICUT AND THE CALIFORNIA BAR
[2]OF COUNSEL
[3]MEMBER OF THE WASHINGTON, D.C. AND THE CALIFORNIA BAR
[4]MEMBER OF THE NEW YORK AND THE CALIFORNIA BAR
[5]MEMBER OF THE ILLINOIS AND THE CALIFORNIA BAR

[241793-2]

Lisa A. Tillman, Esq.
September 23, 2008
Page 2


cc:    Rochelle East (via email)
       Paul Mello (via email)
       Renju Jacob (via email)
       Samantha Tama (via email)
       Charles Antonen (via email)
       Counsel for Intervenors (via email)
       Co-counsel

**Exhibit C**

PRISON LAW OFFICE
DONALD SPECTER, Bar No. 83925
STEVEN FAMA, Bar No. 99641
E. IVAN TRUJILLO, Bar No. 228790
SARA NORMAN, Bar No. 189536
ALISON HARDY, Bar No. 135966
REBEKAH EVENSON, Bar No. 207825
1917 Fifth Street
Berkeley, CA  94710
Telephone:  (510) 280-2621

KIRKPATRICK & LOCKHART PRESTON
GATES ELLIS LLP
JEFFREY L. BORNSTEIN, Bar No. 99358
EDWARD P. SANGSTER, Bar No. 121041
RAYMOND E. LOUGHREY, Bar No. 194363
55 Second Street, Suite 1700
San Francisco, CA  94105-3493
Telephone:  (415) 882-8200

THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
CLAUDIA CENTER, Bar No. 158255
600 Harrison Street, Suite 120
San Francisco, CA  94107
Telephone:  (415) 864-8848

ROSEN, BIEN & GALVAN, LLP
MICHAEL W. BIEN, Bar No. 96891
ERNEST GALVAN, Bar No. 196065
JANE E. KAHN, Bar No. 112239
AMY WHELAN, Bar No. 215675
LORI RIFKIN, Bar No. 244081
LISA ELLS, Bar No. 243657
MARIA V. MORRIS, Bar No. 223903
315 Montgomery Street, 10th Floor
San Francisco, California  94104
Telephone: (415) 433-6830

BINGHAM, McCUTCHEN, LLP
WARREN E. GEORGE, Bar No. 53588
Three Embarcadero Center
San Francisco, California  94111
Telephone: (415) 393-2000

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURTS

FOR THE EASTERN DISTRICT OF CALIFORNIA

AND THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>　　　　Plaintiffs,<br><br>　　vs.<br><br>ARNOLD SCHWARZENEGGER, et al.,<br><br>　　　　Defendants | No.: Civ S 90-0520 LKK-JFM P<br><br>**THREE-JUDGE COURT** |
| MARCIANO PLATA ,et al.,<br><br>　　　　Plaintiffs,<br>　　vs.<br><br>ARNOLD SCHWARZENEGGER, et al.,<br><br>　　vs.　　　　Defendants | No. C01-1351 THE<br><br>**THREE-JUDGE COURT**<br><br>**SUPPLEMENTAL EXPERT REPORT OF**<br>**PABLO STEWART, M.D.** |

# TABLE OF CONTENTS

**Page**

TABLE OF ABBREVIATIONS/ACRONYMS...............................................................................iv

I.    INTRODUCTION ............................................................................................................ 1

II.   SUMMARY OF MY OPINIONS IN THIS MATTER ..................................................... 4

III.  MY OPINIONS IN THIS MATTER ................................................................................ 6

      A.    Opinion 1:  Overcrowding Within The CDCR Is The Primary Cause Of
            The Constitutional Violations Currently Experienced By *Coleman* And
            *Plata* Class Members. .............................................................................................. 6

            1.    Evidence Concerning Overcrowding-Induced Constitutional
                  Violations from My Recent Prison Inspections ........................................... 7

                  (a)    Salinas Valley State Prison (SVSP) Tour ....................................... 7

                         SVSP Tour Overview ....................................................................... 7

                         Long Waiting List for Intermediate Care Facility Beds ................ 8

                         Waiting List for Acute Inpatient Beds ........................................... 9

                         Problems with Access to MHCB Care at SVSP ........................... 10

                         Staffing Shortages at SVSP .......................................................... 13

                         Impact of Excessive Lockdowns at SVSP .................................... 13

                         Lack of Adequate Treatment Space .............................................. 15

                         Deficient Medication Distribution Practices at SVSP ................. 15

                  (b)    California Medical Facility (CMF) Tour ....................................... 16

                         CMF Tour Overview ..................................................................... 16

                         Access to Higher Levels of Care .................................................. 17

                         Medication Management Problems ............................................... 20

                         Insufficient Office and Treatment Space ...................................... 21

                         The Use of Dorm Housing at CMF................................................ 22

                  (c)    Mule Creek State Prison (MCSP) Tour ........................................ 23

                         MCSP Tour Overview ................................................................... 23

[242136-1]

Lack of Access to Higher Levels of Care,
Including the Housing of Suicidal Inmates
in MHOHUs and Administrative
Segregation Units ................................................................ 23

The Significant Use of "Bad Beds" at MCSP ............................ 27

Medication Management Problems ............................................. 29

Problems with MCSP's EOP Program ......................................... 30

2.    Updated Information Regarding Overcrowding-Related
Violations at Institutions I Previously Toured ........................... 30

   (a)    Deuel Vocational Institute (DVI) Update ..................................... 31

   (b)    California State Prison - Solano Update ....................................... 33

3.    Evidence Concerning Systemic, Overcrowding-Induced
Constitutional Violations ............................................................. 34

   (a)    Systemic Problems with Seriously Delayed
          Access to Higher Levels of Care .................................................. 35

          MHCB and EOP Patients Who Require
          Inpatient Care .............................................................................. 37

          Intermediate Care Facility Patients Who
          Require Acute Care ....................................................................... 43

   (b)    Systemic Problems with the CDCR's Medication
          Management System ...................................................................... 45

   (c)    Systemic Problems with Medical Records ..................................... 50

   (d)    The Systemic Use of "Bad Beds" Throughout
          the CDCR System .......................................................................... 51

   (e)    The Impact of Overcrowding on Suicide Rates ............................ 52

4.    Overcrowding is the Primary Cause of the Constitutional
Violations in the CDCR ............................................................... 53

   (a)    The Persistence of the Constitutional Violations
          Present in the CDCR Demonstrates that They
          Are Caused by Overcrowding ....................................................... 54

   (b)    The *Coleman* Special Master Has Found That
          Overcrowding Has Undermined Progress
          That Was Being Made In Various Areas ....................................... 54

[242136-1]

(c)    The Percentage of Caseload Inmates in the CDCR is Increasing Faster than the Overall Population .......................................................................... 55

(d)    In Many Instances, the Overcrowded Conditions Themselves Are the Cause of the Unconstitutional Mental Health Care ................................. 56

B.    Opinion 2:  Other Remedial Efforts, Other than Population Reductions, Will Not Succeed In Remedying The Underlying Constitutional Violations. ................................................ 56

1.    Defendants' Current Plans to Fix the System Will Not Work ...................................................................... 56

2.    The State Must Make Substantial Reductions in the Prisoner Population ............................................. 60

C.    Opinion 3:  The State Can Include the *Coleman* Class in Population Reduction Plans without Adversely Affecting Public Safety and Should Do So.  Moreover, If the State Enhanced the Services Provided to Released Individuals, Public Safety Would Improve........................ 63

IV.    CONCLUSION .......................................................................... 70

[242136-1]

**TABLE OF ABBREVIATIONS/ACRONYMS**

| | |
|---|---|
| 3CMS: | Correctional Clinical Case Manager System |
| ACH: | Acute Care Hospital |
| ADD: | Attention Deficit Disorder |
| ADHD: | Attention Deficit Hyperactivity Disorder |
| ADL: | Activities of Daily Living |
| Ambu bag: | Ambulatory Bag Used for CPR |
| APP: | Acute Psychiatric Program at Vacaville |
| ASH: | Atascadero State Hospital |
| ASP: | Avenal State Prison |
| ASU: | Administrative Segregation Unit |
| BMU: | Behavioral Modification Unit |
| BPT: | Board of Prison Terms |
| C-file: | Central File |
| C&PR: | Classification and Parole Representative |
| CAL: | Calipatria State Prison |
| CAP: | Corrective Action Plan |
| CC: | Correctional Counselor |
| CCAT: | Coordinated Clinical Assessment Team |
| CCC: | California Correctional Center |
| CCI: | California Correctional Institution |
| CCM: | Clinical Case Manager |
| CCPOA: | California Correctional Peace Officers Association |

| | |
|---|---|
| CCWF: | Central California Women's Facility |
| CDC: | California Department of Corrections |
| CDCR: | California Department of Corrections and Rehabilitation |
| CEN: | Centinela State Prison |
| CHCFs: | California Health Care Facilities |
| CIM: | California Institute for Men |
| CIW: | California Institute for Women |
| CM: | Case Manager |
| CMC: | California Men's Colony |
| CMF: | California Medical Facility |
| CMO: | Chief Medical Officer |
| CO: | Correctional Officer |
| COR: | California State Prison/Corcoran |
| CPR: | Cardiopulmonary Resuscitation |
| CRC: | California Rehabilitation Center |
| CSATF: | California Substance Abuse Treatment Facility |
| CSH: | Coalinga State Hospital |
| CSP: | California State Prison |
| CSP/Corcoran: | California State Prison/Corcoran |
| CSP/LAC: | California State Prison/Los Angeles County |
| CSP/Sac: | California State Prison/Sacramento |
| CSP/Solano: | California State Prison/Solano |
| CTC: | Correctional Treatment Center |

[242136-1]

CTF:                California Training Facility/Soledad

CTQ:                Confined To Quarters

CVSP:               Chuckawalla Valley State Prison

DAI:                Division of Adult Institutions

DCHCS:              Division of Correctional Health Care Services

DDP:                Developmental Disabilities Program

DHS:                Department of Human Services

DMH:                Department of Mental Health

DNR:                Do Not Resuscitate

DOF:                Director of Finance

DON:                Director of Nursing

DOT:                Directly Observed Therapy

DRC:                Death Review Coordinator

DRMC:               Delano Regional Medical Center

DSM:                Diagnostic and Statistical Manual

DTP:                Day Treatment Program

DVI:                Deuel Vocational Institute

EOP:                Enhanced Outpatient Program

EPPD:               Earliest Possible Parole Date

EPRD:               Earliest Possible Release Date

ERDR:               Emergency Response and Death Review Committee

ERRC:               Emergency Response Review Committee

FIT:                Focus Improvement Team

[242136-1]

Folsom:             Folsom State Prison

FTE:                Full-Time Equivalent

GACH:               General Acute Care Hospital

GAF:                Global Assessment of Functioning

GP:                 General Population

HCCUP:              Health Care Cost and Utilization Program

HCM:                Health Care Manager

HCPU:               Health Care Placement Unit

HCQMC:              Health Care Quality Management Committee

HDSP:               High Desert State Prison

HQ:                 Headquarters

HS:                 *Hora Somni*/Hour of Sleep

ICC:                Institutional Classification Committee

ICF:                Intermediate Care Facility

ICU:                Intensive Care Unit

IDTT:               Interdisciplinary Treatment Team

IEX:                Indecent Exposure

IMHIS:              Inmate Mental Health Information System

INS:                Immigration and Naturalization Service

IP:                 Inmate Profile

I/P:                Inmate/Patient

ISP:                Ironwood State Prison

ISU:                Investigative Services Unit

[242136-1]

KVSP:               Kern Valley State Prison

LCSW:               Licensed Clinical Social Worker

LOC:                Level of Care

LOP:                Local Operating Procedure

LOU:                Locked Observation Unit

LPN:                Licensed Practical Nurse

LPT:                Licensed Psychiatric Technician

LSW:                Limited Suicide Watch

LVN:                Licensed Vocational Nurse

MAR:                Medication Administration Record

MCSP:               Mule Creek State Prison

MDD:                Major Depressive Disorder

MDO:                Mentally Disordered Offender

MH-4:               Mental Health Assessment

MHCB:               Mental Health Crisis Bed

MHOHU:              Mental Health Outpatient Housing Unit

MHSDS:              Mental Health Services Delivery System

MHTS:               Mental Health Tracking System

MOD:                Medical Officer of the Day

MOU:                Memorandum of Understanding

MSF:                Minimal Support Facility

MTA:                Medical Technical Assistant

NCF:                Normal Cognitive Functioning

[242136-1]

| | |
|---|---|
| NKSP: | North Kern State Prison |
| NOS: | Not Otherwise Specified |
| OHU: | Outpatient Housing Unit |
| OIA: | Office of Investigative Affairs |
| OP: | Operating Procedure |
| OT: | Office Tech |
| PBSP: | Pelican Bay State Prison |
| PC: | Primary Clinician |
| PHU: | Protective Housing Unit |
| PIA: | Prison Industry Authority |
| POC: | Parole Outpatient Clinic *or* Psychiatrist on Call |
| POD: | Psychiatrist on Duty *or* Psychiatrist of the Day |
| PSH: | Patton State Hospital |
| PSU: | Psychiatric Services Unit |
| PSW: | Psychiatric Social Worker |
| PT: | Psychiatric Technician |
| PTSD: | Post Traumatic Stress Disorder |
| PVSP: | Pleasant Valley State Prison |
| QIP: | Quality Improvement Plan |
| QIT: | Quality Improvement Team |
| QMAT: | Quality Management Assessment Team |
| QMT: | Quality Management Team |
| R&R: | Receiving & Release |

[242136-1]

| | |
|---|---|
| RC: | Reception Center |
| RJD: | Richard J. Donovan Correctional Facility |
| RN: | Registered Nurse |
| RT: | Recreation Therapist |
| RVR: | Rule Violation Report |
| SAC: | California State Prison/Sacramento |
| SCC: | Sierra Conservation Center |
| SHU: | Security Housing Unit |
| SI: | Suicidal Ideation |
| SMY: | Small Management Yard |
| SNF: | Skilled Nursing Facility |
| SNY: | Sensitive Needs Yard |
| SPC: | Suicide Prevention Committee |
| SPR-FIT: | Suicide Prevention and Response Focused Improvement Team |
| SPU: | Special Processing Unit |
| SQ: | California State Prison/San Quentin |
| SRA: | Suicide Risk Assessment |
| SRAC: | Suicide Risk Assessment Checklist |
| SRC: | Suicide Review Committee |
| SRN: | Senior Registered Nurse |
| SSI: | Supplemental Security Income |
| SVP: | Sexually Violent Predator |
| SVPP: | Salinas Valley Psychiatric Program |

[242136-1]

SVSP:               Salinas Valley State Prison

TCMP:               Transitional Case Management Program

THU:                Transitional Housing Unit

TLU:                Transitional Living Unit

TPU:                Transitional Program Unit *or* Temporary Protective Unit

TTA:                Triage and Treatment Area

UCC:                Unit Classification Committee

UCSF:               University of California at San Francisco

UHR:                Unit Health Records

UNA:                Unidentified Needs Assessment

VSPW:               Valley State Prison for Women

VPP:                Vacaville Psychiatric Program

WSP:                Wasco State Prison

[242136-1]

# SUPPLEMENTAL EXPERT REPORT OF PABLO STEWART, M.D.

## I. INTRODUCTION

1. I am a physician licensed to practice in California, with a specialty in clinical and forensic psychiatry. A true and correct copy of my current curriculum vitae is attached hereto as **Appendix A**.

2. I previously completed a report in this matter on November 9, 2007, which I will refer to here as my "11/9/07 Report." My previous report sets forth my full academic and professional career, including my extensive work as a consultant and expert for jail and prison facilities in California and in other states (including Michigan, Georgia, and New Mexico) as well as the various professional positions I have held. 11/9/07 Report at pp. 1-9.

3. My 11/9/07 Report also details my presentations before mental health professionals, prosecuting and defense attorneys, probation officers, and judges, and my publications in professional and peer-reviewed journals over the past several years. Since submitting my prior report, I have not authored any additional publications. I have testified as an expert in court or in a deposition in the following matters since November 9, 2007: *Coleman v. Schwarzenegger*; *Plata v. Schwarzenegger; People v. Mathew Cunningham* (Maricopa County, Arizona); *People v. Alfredo Prieto* (Fairfax County, Virginia); *People v. Edward Gutierrez* (Santa Clara County, California), and; *Fred Graves, et al. v. Joseph Arpaio, et al.* (Phoenix, Arizona).

4. I currently work as a private psychiatric consultant and as a Clinical Professor in the Department of Psychiatry at the University of California, San Francisco, School of Medicine. I am being compensated as an expert in this case as follows: $250 per hour for routine office work, writing, document review, and other similar tasks; $3,000 per day for tours and full day meetings or projects; $400 per hour for time testifying in depositions and at trial, with a 4 hour minimum for that work.

1

5.      I have been retained by plaintiffs' attorneys in the *Coleman* and *Plata* cases as an expert on prison medical care and prison psychiatry and the impact of overcrowding on prisoners' medical and mental health, including how prison overcrowding detrimentally affects prisoners' mental health and interferes with the ability of prison officials to meet the existing and increased medical and mental health needs of the prisoners in an overcrowded system.  As stated in my previous report, I have also been asked to render my opinion as to whether overcrowding within the California Department of Corrections and Rehabilitation (CDCR) is the primary cause of the current unconstitutional conditions experienced by members of the *Coleman* and *Plata* classes.  I have also been asked to address whether other relief – that does not address overcrowding – will remedy the ongoing constitutional violations in a timely and effective manner.  Finally, I have also been asked to offer an opinion concerning whether and to what extent public safety would be affected by a prisoner release order that included prisoners with mental illnesses.

6.      I submit this supplemental report in order to update and expand upon my opinions on these matters and to present my findings from three recent prison inspections.

7.      My opinions are based on my knowledge of the psychiatric and social science literature regarding the effects of overcrowded jail and prison conditions on the mental health of inmates and on my personal experiences assessing and treating individual inmates within the context of overcrowded correctional systems as set forth in my prior report and my curriculum vitae.

8.      When I submitted my previous report, the Receiver and the Special Master had already submitted several reports to the Courts regarding overcrowding and the Governor had declared a state of emergency in California due to the prison overcrowding crisis.  It remains my opinion that the serious problems described in those reports continue to plague the California medical and mental health systems.

9.      In the months since I completed my prior report for this case, the *Coleman* Special Master issued a final 19th monitoring report for tours conducted between March and

[242136-1]

early June of 2007 and a draft 20th round monitoring report for the monitoring period of September 2007 through February of 2008. The *Plata* Receiver also issued his 7th and 8th quarterly reports regarding the status of the healthcare system in the prisons, dated March 14, 2008 and June 17, 2008 respectively. I reviewed these documents, and others, in order to update my opinions in this matter. A complete list of the materials I have reviewed, including the updated materials I reviewed for this supplemental report, is attached hereto as **Appendix B**.

10.    My opinions are also based on the site inspections I completed back in October and November of 2007 and, more recently, in late July and early August of 2008. Specifically, I toured the following institutions on the following dates: Deuel Vocational Institute (DVI) (October 29, 2007); California State Prison-Solano (Solano) (October 31, 2007); Salinas Valley State Prison (SVSP) (November 1, 2007 and July 29, 2008); California Medical Facility (CMF) (July 30, 2008), and; Mule Creek State Prison (MCSP) (August 1, 2008).

11.    During each of the site inspections I conducted, staff provided me with excellent access to information, clinicians, housing areas, treatment spaces and to prisoners and their medical and mental health records. I also was accompanied by a photographer on some of my recent tours and was able to have photographs taken when I or the accompanying attorneys so requested. Custody and clinical staff, including both medical and mental health clinicians, made themselves available throughout the day and answered questions about existing conditions, problems, plans for the future and challenges. The institutions also provided requested documents for each tour, including information such as logs of patients transferred to (or awaiting transfer to) higher levels of care and printouts showing *Coleman* class members by housing unit. Various pictures from my tours are attached as follows:

| | |
|---|---|
| Appendix C | Mesh, holding cages in the Salinas Valley State Prison Correctional Treatment Center (CTC) |
| Appendix D | Mental Health Outpatient Housing Unit Cells at Mule Creek State Prison |
| Appendix E | Gym Dorm on B-Yard at Mule Creek State Prison |

[242136-1]

Appendix F          Gym Dorm on A-Yard at Mule Creek State Prison

## II.     SUMMARY OF MY OPINIONS IN THIS MATTER

12.     As set forth in detail below, it is my opinion that there has been no material change in the conditions of severe overcrowding in the California prison system in the past eight months since I issued my prior report.  In particular, it remains my opinion that overcrowding is the primary cause of the constitutional violations currently experienced by *Coleman* and *Plata* class members, that the State must reduce the population (including *Coleman* class members) if it has any hope of addressing those violations and that such reductions can be done safely.

13.     Although my report details several deficiencies in the medical and mental health care systems that I believe are the direct result of overcrowding, the following are the systemic problems that I find most disturbing and that, in my opinion, have the most detrimental effects on the *Coleman* and *Plata* classes:

•     The *Coleman* class, as a whole, is more acutely ill due to the extreme shortage of beds at every level of care.  This is particularly true for class members in need of acute hospitalization, but the shortages affect the entire Mental Health Services Delivery System (MHSDS).  By denying prompt access to inpatient care, the State is allowing patients to become more acutely ill than they otherwise would.  By the time those patients reach an inpatient bed, they will generally require more resources for a longer period of time to become well than they otherwise may have needed.  This further backlogs the system, thereby exacerbating the shortage of beds and making it difficult to assess the true demand for services.

•     The medication management system is overwhelmed and the State is therefore unable to adequately monitor both the efficacy and the side effects of prescribed medications.  I saw this problem time and again on my tours.  Because of staff shortages, frequent lock-downs, overwhelmed pharmacies and medical records offices, and the vast number of patients on medications, staff spend only a few seconds with each patient

4

when they distribute medications. Too many clinical contacts occur at cell front, in makeshift "offices" or in the open with no confidentiality, without access to medical records and by clinicians with little or no ongoing relationship with their patient. Problems such as side effects, refusals and unrelieved symptoms are regularly not identified, reported or followed up on with psychiatric appointments or blood testing. Continuity of care is hampered by staff turnover and major reliance on contract and registry clinicians. The ability to appropriately monitor both the efficacy and the effects of medication is a key component of basic psychiatric and medical care.

- <u>Until overcrowding is reduced, the State will be unable to hire and retain adequate, qualified and permanent staff.</u> As detailed below and as explained in the *Coleman* Special Master and the *Plata* Receiver's reports to the Courts, many medical and mental health staff face significant challenges in the current overcrowded system, including inadequate office and treatment space, insufficient inpatient beds, and large caseloads. These are difficult working conditions that, in my opinion, hamper the State's ability to hire and retain permanent and qualified staff.

- <u>The overcrowded conditions themselves significantly burden the medical and mental healthcare systems.</u> Because of population pressures, inmates are frequently housed in places that either exacerbate or, in some instances, might trigger mental health symptoms, including crowded dorms, administrative segregation units, holding cages, and small cells that were built for one person, but currently hold two. These conditions put added pressure on the already over-burdened medical and mental health systems.

- <u>The overburdened system results in a suicide rate that is nearly twice the national average.</u> The *Coleman* Special Master found in his analysis of 2006 suicides that more than 70 percent were "foreseeable and/or preventable." Joint Pls' Trial Ex. 58 at p. 2. In my opinion, the high suicide rate is a direct result of overcrowding in that the system lacks beds at every level of care, is plagued with poor medication management practices, and has severe shortages of adequate and permanent staff.

5

## III.     MY OPINIONS IN THIS MATTER

### A.     __Opinion 1__:  Overcrowding Within The CDCR Is The Primary Cause Of The Constitutional Violations Currently Experienced By *Coleman* And *Plata* Class Members.

14.     My previous report detailed the characteristics that are typically seen in overcrowded correctional settings, including shortages of medical, mental health and correctional staff, insufficient treatment space in which to provide therapeutic activities and contacts, dangerous and chaotic living conditions, increased idleness among prisoners due to decreased programming, increased population pressures on reception centers and locked areas such as administrative segregation units and delayed access to higher levels of care.  All of these characteristics, particularly when they are permitted to go on for long periods of time, significantly increase the burden placed on mental health and medical systems.[1]  I have personally witnessed these conditions in California's prisons and am also aware that they are well-documented by others with intimate knowledge of California's system, including the Governor, the federal Receiver who oversees the medical care system and the Special Master in the *Coleman* case.

15.     The facilities and conditions I have observed in the California Prison system represent the most overcrowded conditions I have seen.  In this report, I first set forth the findings from my late July and early August 2008 tours at SVSP, CMF and MCSP.  I have also provided updated information about facilities I did not return to during my recent round of inspections.  Finally, I discuss my overall opinions in this case based on my prior report, my

---

[1]  *See* P. Paulus, G. McCain, V. Cox, "The Relationship Between Illness Complaints and Degree of Crowding in a Prison Environment," *Environment and Behavior* 8 (1976) at 283, 288; P. Paulus, G. McCain, V. Cox, "Death Rates, Psychiatric Commitments, Blood Pressure, and Perceived Crowding as a Function of Institutional Crowding," *Environmental Psychology and Nonverbal Behavior* 3 (1978) at 107, 115; V. Cox, P. Paulus, G. McCain, "Prison Crowding Research," *American Psychologist* 39 (1984) at 1148, 1159; E. Sieh, "Prison Overcrowding: The Case of New Jersey," *Federal Probation* 53 (1989) at 41; B Walker and T. Gordon, "Health Risks and High Density Confinement in Jail and Prisons," *Federal Probation* 44 (1980) at 53. *See also* Joint Pls' Trial Ex. 27 (*Plata* Receiver's June 11, 2007 Supplemental Report on Overcrowding) at 3 (discussing increasing risk of "communicable disease outbreaks" in overcrowded CDCR units).

updated tours of these facilities and my review of additional materials and documents identified in Appendix B.

>    1.    **Evidence Concerning Overcrowding-Induced Constitutional Violations from My Recent Prison Inspections**

>        (a)    <u>**Salinas Valley State Prison (SVSP) Tour**</u>

>            <u>**SVSP Tour Overview**</u>

16.     I toured Salinas Valley State Prison (SVSP) on November 1, 2007 and again on July 29, 2008.  SVSP is a Level IV high security institution located south of the city of Salinas in the Salinas Valley.  According to the most recent CDCR weekly population report, as of midnight on August 6, 2008, SVSP had a population of 4,085 and a design capacity of 2,388, which means SVSP was operating at 171.1 percent of capacity.  Joint Pls' Trial Ex. 65 at p. 2.  My previous opinions and observations about SVSP were set forth on pages 51-63 of my November 9, 2007 Report.

17.     Similar to my last tour at SVSP, I observed significant overcrowding-related problems at SVSP, including serious problems with access to higher levels of care, poor medication distribution and compliance, staffing shortages, and inadequate treatment and office space.  11/9/07 Report at pp. 51-63.  According to the data provided by staff during the tour, there were 1,537 total *Coleman* class members housed at SVSP, with 1,152 at the 3CMS level of care and 232 at the EOP level of care as of July 28, 2008.  Coleman Pls' Trial Ex. 136.  This means that SVSP was operating at 115 percent capacity of its 3CMS program and 121 percent capacity of its EOP program.  Coleman Pls' Trial Ex. 57 at p. 3 (showing SVSP's capacities of 999 for 3CMS patients and 192 for its EOP program).  The data provided during the tour also showed that between April 29, 2008 and July 28, 2008, SVSP admitted 50 patients into mental health crisis beds and housed 79 patients in various "overflow" placements because crisis beds were unavailable.  Coleman Pls' Trial Ex. 136.

[242136-1]

18.     Because SVSP has mental health programs operated by both the CDCR and the Department of Mental Health (DMH), I was able to observe the movement of patients between those systems.  DMH runs the freestanding building, called the SVPP, which provides sixty four (64) Intermediate Care Facility (ICF) beds to *Coleman* class members.  DMH also runs units D-5 and D-6 which provide a combined 112 ICF beds for the *Coleman* class.  The CDCR operates the mental health crisis beds located in the Correctional Treatment Center and also oversees the units housing EOP and 3CMS class members.

<u>**Long Waiting List for Intermediate Care Facility Beds**</u>

19.     DMH staff reported during the tour of SVSP that the current waiting list for the level IV ICF beds was at 171 patients.  This waiting list is system-wide and has been a constant source of concern by the *Coleman* Special Master.

20.     The extremely long waiting list for ICF beds has a ripple effect throughout the system.[2]  Sterling Price, the Acting Executive Director of DMH who attended both my Salinas Valley State Prison and my California Medical Facility tours, acknowledged that some of the inmates on the SVPP waiting list for ICF beds have been on the list since 2005.  This is consistent with the reports from psychologists at both SVSP and CMF who said that it can take up to a year for a patient to come off of the waiting list.  Dr. Kittimongcolporn, the Clinical Director of the MHCB unit at SVSP, reported that it takes a year or longer to get her patients to an ICF bed and that she does not typically refer patients to those beds for that reason.  Dr. Burkhardt, a psychologist at SVSP who previously worked as the Clinical Director of the CTC, also reported a 9-12 month wait for ICF beds.  When I asked Dr. Burkhardt whether she continues to refer patients to that list, she said that she really only refers lifers who are at the EOP level of care since those patients will be around long enough to wait for a bed.  The *Coleman* Court also recognized the problem of under-referrals in its June 28, 2007 Order:

---

[2] SVSP staff reported that construction of another 64-bed ICF unit is on schedule for completion later this year.  These beds, while badly needed, will still fail to address the serious shortfall of beds.

"Indeed, from other sources the court has learned that at least some CDCR clinicians have stopped referring patients to DMH because of its refusal to accept referrals."  6/28/07 Order (Docket 2301) at 3, fn. 2.

21.    The impact of such a long waiting list for essential inpatient beds cannot be overstated.  When psychologists and psychiatrists face waiting lists of 9-12 months, they inevitably will stop referring patients to those beds, as Dr. Burkhardt and Dr. Kittimongcolporn confirmed.  This is because the referral becomes an exercise in futility for the already over-burdened mental health staff, particularly if the referrals involve patients who are paroling soon.  As a result, patients will parole without receiving the appropriate mental health care and are more likely to return to their home communities in less stable conditions.  This, in turn, will increase the demand on the limited parole and community mental health services and increase the likelihood that the patient may reoffend and be returned to the prison system.  Overcrowding is a tremendous obstacle to CDCR's ability to address the cycling of persons with serious mental illness from parole to prison.

22.    Data associated with the recent addition of 50 mental health crisis beds at CMF also suggests that clinicians have been under-referring patients for crisis care.  Whereas referrals to MHCBs ranged from 276 to 298 between March and May of 2008, they jumped to 355 in June, the month that the new beds opened.  Coleman Pls' Trial Ex. 137.  It is possible that this surge in referrals, which represents the highest number of referrals since at least November of 2006, resulted not from a greater rate of crisis incidents, but rather from the realization among clinicians that crisis beds were now available.  That is, clinicians previously identified the patients, but did not refer them to MHCB because the resource was simply not available.

**Waiting List for Acute Inpatient Beds**

23.    Sterling Price reported that the waiting list for the acute psychiatric hospital at CMF was 15 as of July 29, 2008 but that it was up to 45 patients as recently as July 1, 2008.  I heard reports from staff members at SVSP and CMF that it takes anywhere from about two to

[242136-1]

eight weeks to get a patient into an acute bed. SVSP also listed access to acute beds as a

problem in its *Coleman* 21st Round Corrective Action Plan, dated May 23, 2008: "We continue

to experience difficulty with the continual wait list for our referral to DMH acute for any referral

reason. Length of wait has also been longer for self injurious behaviors and suicidal ideation.

We had one inmate who was referred for grave disability reason at an acute level that we decided

to send [] back to EOP to wait for intermediate level of referral so that he at least could program

there while waiting." Coleman Pls' Ex. 138 at p. 7.

24.     This backlog is particularly significant in an overcrowded system like the

CDCR's. Dr. Kittimongcolporn, the Clinical Director of the CTC at SVSP, told me that if she

refers a patient to an acute bed from a mental health crisis bed (MHCB), that patient stays in the

MHCB until he is transferred. While it may be clinically appropriate (and even necessary) for a

patient to remain in an MHCB while he awaits transfer, it also means that that patient is

occupying a bed that is in high demand for other acutely ill and suicidal patients. This puts

clinicians in the dangerous position of having to triage the mental health acuity of their patients

because they simply do not have enough options for adequate treatment.

### Problems with Access to MHCB Care at SVSP

25.     The Special Master has documented system wide shortages of MHCBs

repeatedly, including in his 20th round report: "There continued to be too few MHCBs to

accommodate CDCR's mental health population. Inadequate capacity was exacerbated by

delayed access to DMH and EOP programs, as needed MHCBs were too often filled with

decompensated or fragile inmates waiting weeks and months to be transferred to an appropriate

level of care. The ongoing challenge to find beds for inmates with chronic, long-term medical

conditions regularly reduced MHCB capacity at CSP/LAC, HDSP, MCSP, and SVSP." Joint

Pls' Trial Ex. 57 at p. 351. As a result of these severe shortages, institutions are forced to house

acutely mentally ill patients in settings that are cruel and inappropriate for crisis care:

10

> As a result of the scarcity of MHCBs throughout the system, institutions continued to resort to the use of alternative beds to house inmates pending MHCB transfers. These alternative locations were uniformly inappropriate for acute care. Throughout the monitoring period, inmates were admitted to alternative areas for stays lasting longer than 72 hours. Many of them had multiple admissions. Inmates who might have been clinically considered for DMH levels of care if they had been admitted to MHCBs were not given that consideration. Complete and reliable data regarding the locations and uses of these alternative cells was rarely available.

Joint Pls' Trial Ex. 57 at p. 352.

26.     My prior report documented the serious problems I saw at SVSP with respect to suicidal inmates' impeded access to mental health crisis beds and consequent placements in wholly inadequate alternative settings. *See* 11/19/07 Report at pp. 58-60. These problems, including a shortage of sufficient mental health crisis beds and the use of make-shift cages to hold patients waiting for crisis beds, existed during my July 29, 2008 tour as well. Dr. Kittimongcolporn, the Clinical Director of the CTC at SVSP, reported that the MHCBs are almost always full. The Chief Psychiatrist, Dr. Wilson, explained that he has to "fight" to maintain the 6-8 MHCBs so that medical patients are not placed in those beds. While the MHCB unit at SVSP is theoretically open to other institutions, staff reported that only "very rarely" is anyone outside of SVSP admitted to the unit, although it did happen the week before the tour.

27.     During my tour on July 29, 2008, I observed again the dry holding cages that SVSP must use when there are no available mental health crisis beds. I described these cages and the wet cells used for overnight stays in the CTC in my prior report:

> Dr. Chase also indicated that the institution uses a variety of overflow holding cells due to the MHCB shortage. She indicated that three "dry cells," which are tiny freestanding upright cages with mesh wiring surrounding them (and no toilet) are routinely used during the day to house suicidal inmates. I observed these small holding cages on the tour of SVSP and they are extremely confined and are clinically inappropriate locations to assess suicidality and to have confidential psychiatric interviews with suicidal inmates. At night, these inmates are transferred into one of four holding cells outside the entrance to the CTC which are known as "wet cells" because they have toilets. SVSP also routinely uses "BPT cells" located on each yard for overflow suicide watch. This report was consistent with the findings of the Special Master in the most recent progress report. *See* Joint Pls' Trial Ex. 36 (18th Monitoring Report of the Special Master) at 153 (noting

11

[242136-1]

that holding cells "were in use daily and frequently housed inmates overnight. The holding cells in daily use were stand-up mesh cells. Holding cells used overnight were large group waiting rooms that had plumbing and that could be furnished with mattresses…Standard CTC procedures resulted in heavy use of both types of cells and many overnight stays in large holding cells."). The MHSDS system never intended to permit the use of holding cells, particularly one where a patient is required to sit in a wire mesh holding cell without access to minimum health and safety standards. The use of these non-authorized, unlicensed "treatment settings" results in an exacerbation of the underlying mental illness which led to the mental health crisis.

11/9/07 Report at pp. 59-60.

28.     During my tour on July 29, 2008, I spoke with *Coleman* Class Member SSS, an inmate who was waiting in one of the stand-up, mesh holding cages for admission to a crisis bed. Logs in the unit showed that *Coleman* Class Member SSS was admitted to the crisis bed unit the previous day, but was still waiting for placement. He was moved from the dry holding cage to a wet cell at 7:15 p.m. the night before and was back in the dry holding cage as of 8:15 a.m. the following morning. Staff reported that while *Coleman* Class Member SSS would be admitted within 24 hours, other inmates sometimes wait several days for admission, particularly on the weekends. A Psychologist on C-Facility, for instance, reported that patients often stay in the dry holding cells (with moves to the wet cells in the evenings) from Friday to Monday if they need crisis care on the weekends. This is consistent with the data SVSP provided to the Special Master for his 21st monitoring round showing that of the 80 referrals made to MHCBs between November of 2007 and April of 2008, 45 (56 percent) were admitted on the same day, 24 (30 percent) were admitted within 1 day, 5 (6 percent) were admitted within 2 days and 6 (8 percent) were admitted in 3 or more days. Coleman Pls' Trial Ex. 138 at p. 6.

29.     The stand-up, mesh holding cages are not clinically appropriate places to house patients who are having mental health crises. Pictures of the cages from my tour are attached to this report as **Appendix C**. Staff informed me during the tour that they cannot utilize wet holding cells for those patients during the day, however, because they have to use those cells to hold inmates awaiting medical appointments. This is another example of medical and mental health staff competing for very limited space in medical and mental health systems that simply

12

cannot accommodate the large volume of patients.  To treat a patient in crisis as if he was a dangerous animal, subjecting him to public degradation and humiliation, is, by definition, inappropriate mental health care.  The routine use of these cages throughout the system for mental health interventions is itself a tragic symptom of an overcrowded and dangerous system where mental health staff are taught to be fearful of their patients and inhumane practices are not only tolerated, but institutionalized within the medical and mental health systems.

### Staffing Shortages at SVSP

30.    During the morning meeting of my July 29, 2008 tour, Dr. Kahle, the Chief Psychologist, reported that SVSP has 12 vacant psychologist positions (of about 24) which it is able to fill with contract staff.  She reported that there is one vacant psychiatrist position and two positions filled by contract staff.  The Director of Nursing said that the nurse and psychiatric technician positions are almost full, but that there are not enough LVN positions allocated for the institution.  With respect to staffing in general, SVSP reported to the Special Master in May of 2008 that, "[h]iring of support staff remains a conflicting demand with no Recruitment and Retention to offer potential employees."  Coleman Pls' Trial Ex. 138 at p. 2.  SVSP also reported that "[s]taff turnover continues to be a problem" and that "Loss of Recruitment and Retention (R&R) pay differential causing continued difficulty in successful recruitment of state employees.  With the loss of R&R comes loss of incentive to live in a remote isolated, non-urban small-town environment."  *Id*.  CDCR chose to end the practice of paying extra bonuses to recruit clinicians to undesireable locations when the *Coleman* court raised salaries across the board.

### Impact of Excessive Lockdowns at SVSP

31.    My prior report also documented extensive lockdowns at SVSP that interfered with programming and mental health care.  11/9/07 Report at pp. 53-54.  Staff reported during the morning meeting on my July 29, 2008 tour that some of those lockdowns improved in recent months, particularly on the C1 side of C-Yard, which houses 3CMS class members.  On the day of tour, however, the entire yard was on modified program.  I understand that there are eight

13

housing units on C-Yard, which are split evenly between the C1 and C2 sides. Chief Deputy Warden Liotta and Associate Warden Trexler explained that the C1 side was programming fairly well until an incident occurred the week before the tour. They both confirmed that the C2 side of the yard, however, continued to struggle with modified program status (meaning that inmates cannot go to their jobs, school, the library, yard, etc.). This was also confirmed when I spoke with Dr. Burkhardt on C-Yard. She reported that C-yard's lockdowns interfere so much with programming that clinicians at SVSP are afraid to change classifications of class members from EOP to 3CMS. She explained that the programming would be so restrictive on the 3CMS C-Yard, that clinicians would opt to keep the patient at the EOP level so that he could at least continue to have some program.

32.    Dr. Burkhardt also talked generally about tensions she experienced with custody staff, including incidents whereby custody officers refused to escort patients out of their cells for her. The Special Master has also documented disturbing tensions between custody and mental health staff:

> A pervasive and disturbing pattern of custodial dysfunction was apparent at SVSP. Line officers and custodial supervisors assigned to 3CMS and EOP buildings reportedly taunted inmates about mental disabilities, enforced rules arbitrarily, restricted utilization of space set aside for mental health programs in an inexplicable manner, and failed to properly manage the priority ducat system. This dysfunction created tension and animosity between custody and mental health staffs and discouraged inmate participation in treatment, thereby thwarting access to mental health programs…The dysfunction reported in October 2007 had grown more widespread, pronounced, and destructive to SVSP's substantial and expanding mental health mission [by the June 2008 monitoring tour].

Joint Pls' Trial Ex. 57 at pp. 188-198. These problems are disturbing and, in my opinion, may be another symptom of the extremely stressful working conditions in the overcrowded system.

33.    My prior tour report also documented my conversation with Dr. Williams, a clinician on C-Yard who told me that it typically took 10 months or a year to complete an 8-meeting group due to the extensive lockdowns on the yard. 11/9/07 Report at p. 22. I asked Dr. Burkhardt if this was still the case and she said that it was. Dr. Burkhardt also reported that she

14

had recently gathered monthly data about mental health groups provided on C-Yard which showed that those groups were cancelled 2 out of every 4 weeks.

### Lack of Adequate Treatment Space

34.     SVSP continues to struggle with adequate treatment and office space for mental and medical health services.  Dr. Kahle explained during the tour that clinicians are forced to run 40-50 percent of all EOP therapy groups outside on the yard due to space shortages.  While the institution converted three rooms on the yard for group treatment, they are still not enough.  Because 40-50 percent of the groups are held on the yard, SVSP loses all of those groups when there are custodial lockdowns or modified programs.  Inclement weather is also presumably a factor.

35.     The D-5 and D-6 units also have significant space limitations.  These units are designated as intermediate care facility beds for Level IV prisoners and are operated by DMH.  They were always intended to be temporary, however, due to severe space shortages.  When I toured the D-5 unit, there was a therapy group happening on the dayroom floor while other custody and clinical staff worked at nearby tables.  This arrangement precludes privacy from both staff and other prisoners.  Staff in the D-5 unit also use a converted dining room for all IDTT meetings, case manager contacts and other clinical contacts, although staff reported that additional group and interview rooms are supposed to be completed by the end of the year.

36.     The Chief Deputy Warden told me during the morning meeting that the institution submitted a plan for additional treatment space on A, B and C yards two years ago, but has not heard anything back from headquarters' staff about that plan.

### Deficient Medication Distribution Practices at SVSP

37.      In my prior report, I documented significant problems with the medication management system at SVSP, as reported by two psychiatric technicians on C-Facility and by numerous inmate-patients who I interviewed.  *See* 11/9/07 Report at pp. 61-62.  I confirmed during my July 29, 2008 tour that the same medication practices are still in place, including the

"drive-by" distribution of medications in pill lines or cell-front.  The failure of staff to speak with patients about side effects or the efficacy of the medications is seriously deficient in that staff members are not providing essential feedback to treating physicians about medication compliance, whether medications are having the desired effects and whether the patients are having side effects.  This feedback is critical to basic psychiatric and medical care.

38.    In conclusion, SVSP displayed significant overcrowding-related problems that interfere with appropriate medical and mental health care, including significant problems with access to higher levels of care, staffing shortages, medication management and limited programming due to excessive lockdowns.

(b)    <u>California Medical Facility (CMF) Tour</u>

<u>CMF Tour Overview</u>

39.    I toured California Medical Facility (CMF) on July 30, 2008, although I also visited the prison many times between 1990 and 2000 when I was monitoring the *Gates* consent decree as a medical and psychiatric expert.  According to the most recent CDCR weekly population report, as of midnight on August 6, 2008, CMF had a population of 3,056 and a design capacity of 2,297, for a population at 133 percent of capacity.  Joint Pls' Trial Ex. 65 at p. 2.  CMF is the least overcrowded institution in the entire 33-prison system.  *Id.*

40.    CMF is the only prison that provides acute psychiatric hospitalization on its premises, although the acute units are operated by the Department of Mental Health (DMH).[3] CMF is also one of two prisons in the system (the other is Salinas Valley State Prison) that provides intermediate care facility (ICF) treatment (also through DMH) to prisoners housed in

---

[3] Atascadero State Hospital (ASH) also provides acute (and intermediate care facility) inpatient beds to CDCR prisoners, but has struggled to fill those beds due in large part to staffing shortages and custodial restrictions.  Although 256 inpatient beds (231 intermediate and 25 acute) are supposed to be available to the *Coleman* class, ASH treated only 176 patients for the entire month of June 2008.  Coleman Pls' Trial Ex. 139 at p. 1.  As of July 30, 2008, ASH had only 136 patients from CDCR.  Joint Pls' Trial Ex. 66 at pp. 5-6.

16

the CDCR. According to data provided to me during the morning meeting with staff, CMF

housed 671 3CMS and 551 EOP patients as of July 28, 2008. This data does not include patients

housed in DMH units and wings, however, and I did not receive DMH data on the tour. CMF

also recently opened a 50-bed mental health crisis unit which is being run by the CDCR (not

DMH). Staff reported that the unit opened on June 16, 2008 and there were 39 patients in the

unit as of July 30, 2008. Staff also explained that the 50 new mental health crisis beds are not

intended for use by CMF patients, but rather are available to other prisons throughout the system.

### Access to Higher Levels of Care

41.     The Special Master has repeatedly reported on the very limited access to DMH

inpatient beds, including most recently in the draft 20th report: "DMH acute care resources for

male inmates consisted of 130 beds at CMF and 25 beds at ASH, the latter of which re-opened to

admissions in July 2007. Slow access, coupled with a growing wait list and increasing numbers

of rescinded referrals, made it clear that these resources could not adequately accommodate

CDCR's expanding mental health population." Joint Pls' Trial Ex. 57 at p. 349. The Special

Master also collected data about referring institutions during the 20th round in order to detail the

delayed access to care:

> Of the 18 prisons that referred inmates to the acute programs at CMF and ASH,
> 13 reported delayed access. The most commonly cited cases, and the longest
> delays, were associated with referrals involving acutely psychotic inmates who
> were not suicidal. Such referrals, considered low priority, were routinely placed
> on a wait list and commonly rescinded by the institution. Other referrals,
> involving inmates within 30 days of parole and inmates without parole dates,
> were denied in accordance with DMH policy. Consequently, a large number of
> referrals failed to result in transfer, despite a low rejection rate. The percentage of
> acute care referrals that resulted in transfer was 40 percent for CSP/Sac, hovered
> around 50 percent for CMC and RJD, and barely exceeded 60 percent at DVI and
> WSP.

*Id.* at pp. 349-350. In my opinion, DMH's practice of designating acutely psychotic but non-

suicidal patients as "low priority" admissions to acute beds is a direct consequence of

17

overcrowding. Clinicians would not be forced to turn acutely psychotic patients away at the door in a system that had sufficient inpatient beds.

42. Sterling Price, the acting Director of DMH Programs at SVSP and CMF, reported that the ICF waitlist for level IV beds was up to 171 patients and that the acute waiting list was 15 as of July 30, 2008, but had been as high as 45 on July 1, 2008. I visited the S2 unit (among others) during the tour, which currently has 20 mental health crisis beds for use by CMF inmates and 10 acute beds that are available to the entire system. Mr. Price reported that the unit had 37 referrals in June of 2008, but had a high of 52 referrals back in December of 2007. When beds are not available in this, and presumably other units, Mr. Price reported that referred inmates either stay in their EOP units or go to observation cells. As I heard from staff at SVSP as well, referrals on the weekend are especially hard due to limited staffing during that time. This information is consistent with the Special Master's general findings that there is poor access to acute and intermediate care facility beds in this overcrowded system.

43. The insufficient access to higher levels of care has created a system which is overwhelmed by the acuity of its patients at every level of care. EOP units house many patients in need of inpatient care, MHCB's house patients in need of inpatient hospitalization, intermediate care facility units house many patients in need of acute hospital care and so on. When and if these patients finally reach the level of care they require, their mental health conditions may be far more serious, resulting in longer stays and more resources in order to stabilize and get well.[4]

44. My interview with *Coleman* Class Member TTT illustrates some of these problems. I interviewed Class Member TTT in the S1 unit at CMF, which houses men with

---

[4] It is also apparent from the chaos of the system that the inverse problems happens—patients sometimes stay in *higher* levels of care than they require due to the logjam in the system. The Monthly Bed Utilization Report for the DMH Hospitals and Psychiatric Programs for June 2008, for instance, lists eight patients who are currently housed in acute beds while they wait for an ICF (a lower level of care) bed to open. Coleman Pls' Trial Ex. 118, Patients 608, 658, 670, 673, 694, 696, 759, and 760.

acute mental illness. Although Class Member TTT had been housed in the acute unit for nearly six months at the time I saw him, he was floridly psychotic, with unintelligible thought processes. According to his file, he was prescribed a 300 mg. daily dose of Clozaril, which I refer to as the "atomic bomb" of antipsychotic medications because it is a medication of last resort that has the potential to effectively shut off a patient's bone marrow if it is not very closely monitored with weekly or bi-weekly blood draws. Class Member TTT demonstrates the very severe acuity of some *Coleman* class members in that he continues to display active psychosis even after 6 months of acute care, including treatment with very powerful anti-psychotic medication. It was also apparent to me that he will require an acute level of care for a long period of time, thereby consuming a very valuable resource within the CDCR's overcrowded system. According to the DMH Monthly Bed Utilization report, he also waited at MCSP for nearly a month (between 1/8/08 and 2/6/08) for an acute bed. Coleman Pls' Trial Ex. 118, Patient 127.

45.     I also interviewed another class member in an acute unit at CMF who, in my opinion, is also going to require a significant stay at that level of care. Class Member UUU was admitted into the acute unit on July 11, 2008 from administrative segregation, according to his medical file, although the file also showed another admission into the acute unit from administrative segregation on June 23, 2008. The file said he was diagnosed with Schizophrenia and Personality Disorder NOS, however his June 3, 2008 "Mental Health Treatment Plan" lists the following diagnoses: Schizophrenia, Paranoid Type; Major Depressive Disorder, Severe with Psychotic Features; and Schizotypal Personality Disorder. His medical file also showed a significant history of bizarre behavior, including pouring water over cell mates for "sacrificial purposes." His "Mental Health Treatment Plan" reflects a history of suicide attempts, cutting, violence and sexual victimization from childhood. Coleman Pls' Trial Ex. 140 at p. 1. The chart also notes that he has difficulty with female staff and that he has catatonic periods. *Id.* A clinician on the unit told me that Class Member UUU had a significant history of inpatient placements at DMH and Atascadero State Hospital. His file reflected that he was prescribed the

19

following medications:  Haldol Decanoate (150 mg. every 4 weeks); Abilify (30 mg. daily dose);
Prozac (60 mg. daily dose); Cogentin (2 mg. daily dose); Benadryl (50 mg. daily dose) and
Valproic Acid (2000 mg. daily dose).  In my opinion and based on Class Member UUU's clinical
presentation and mental health history, he was probably prematurely discharged back to
administrative segregation in late June to early July of 2008, which lead to his readmission into
the unit on July 11th.  It is also my opinion that he will require an acute level of care for a
significant amount of time in light of the severity of his mental illness.

46.    I also interviewed two class members in an ICF unit who, in my opinion, need
acute care (*see* pp. 43-44 of this report regarding Class Members DDDD and EEEE), a class
member who requires intermediate care, but has been housed in an EOP unit for more than six
months waiting for an open bed (*see* pp. 42-43 of this report regarding Class Member FFFF), and
a class member who was about to be prematurely discharged from an ICF bed back to EOP (*see*
p. 41 of this report regarding Class Member BBBB).

<u>**Medication Management Problems**</u>

47.    Every class member I spoke with about medications, including class members at
CMF, reported that medications were distributed very quickly by line staff who never asked
about either the efficacy of the medication or potential side effects.  The Special Master also
documented significant failures with CMF's ability to manage patient medications:

> CMF staff at all levels reported that medication management was a broken
> system.  Problems included continuity of medication when inmates were moved
> between housing units, handling medication non-compliance, medication errors,
> implementation of DOT orders and considerable variation in the quality of
> documentation on MARs.  Many inmates who were interviewed reported that they
> frequently received the wrong medication.  Some inmates reported that they had
> to choose whether to go to yard or stay inside in order to receive medication,
> while others had difficulty getting medication during scheduled work
> assignments.  Staff confirmed that medication errors included wrong medication,
> wrong recipient and wrong time of administration.

Joint Pls' Trial Ex. 57 at p.78.

48.    In my experience, these kinds of medication problems are common in overcrowded systems.  Line staff are overwhelmed by the volume of medications to distribute, psychiatrists carry large caseloads of patients, and staffing shortages mean that temporary or contract employees are distributing medications in facilities and to patients that they do not know.

## **Insufficient Office and Treatment Space**

49.    CMF also struggles with serious space issues.  It is an old-style prison that consists of a series of long, narrow units that run perpendicular to the main corridor.  The prison was constructed at a time when there was no inclusion of treatment space or even offices for staff.  As a result, treatment space is very limited and staff members frequently have to juggle their schedules and patients in order to complete groups, case manager contacts and other client contacts.  I observed these problems first-hand in several units at CMF.  In the S1 unit, for instance, staff explained that they use the same single room for treatment team IDTTs, case manager contacts, psychological testing, all patient groups and to conduct admissions into the unit.  As we moved throughout other DMH units, we learned that these severe space restrictions are common in nearly every unit off the main corridor, including in S2 (which has 30 MHCB and acute beds), Q2 (which has 30 acute beds), and the P-3 unit (which has 30 ICF beds).  When we visited the Q2 unit in particular, four staff members had to be kicked out of the room we used for confidential interviews with class members.  In the A2 unit, which houses the Day Treatment Program and also has only one room for all clinical and other contacts, I was struck by the number of men housed in their cells in the middle of the day.  When I asked Dr. Noorani, a psychiatrist in the unit, why so many men were in their cells in the middle of the day, he explained that they had to cancel a group so that I could use the one available room for interviews.

50.    The treatment and office space limitations are also severe for the CDCR mental health programs at CMF.  I spoke with a clinician who works in the M2 unit (an EOP unit), for

instance, who reported that there was no interview space available for staff and that the one available room must be shared with 4 or 5 other clinicians who frequently walk in and out of the room.  In fact, the defendants recently submitted a plan to the *Coleman* court admitting significant treatment and office space shortages in the L, M, and N-wings for EOP patients and proposing to build 16 group therapy rooms, 28 interview rooms, 4 recreational therapy rooms, 6 education classrooms and "appropriate support space for staff."  Coleman Pls' Trial Ex. 59 at p. 4.  CMF does not propose to start construction of these spaces until 2010, however, and does not anticipate completion until 2012 at the earliest.  *Id.*

51.    In my opinion, these space limitations are directly related to overcrowding.  While the infrastructure of CMF is antiquated and inadequate, there is no question that there are simply too many people housed at the prison.  The 20-person dorm spaces in units J1, J2 and J3, are a good example.  Those units used to be dining rooms, but were converted to dorm housing spaces because of overcrowding.  If the population were lower, spaces such as J1 could be used as programming areas, treatment spaces, or staff offices.  The impact of these conditions on mental healthcare is significant—mental health assessments, case manager contacts and psychiatrist meetings are frequently done in non-confidential settings where other staff members and even other inmates may be around.  Having one room available for all mental health contacts also necessarily means that groups and other contacts will be canceled when more intakes than usual are processed into a unit, when clinical sessions run overtime or when there are security or other incidents on the unit.  My visit, in fact, resulted in the cancellation of at least one group at CMF.

## The Use of Dorm Housing at CMF

52.    Although CMF is one of the least overcrowded institutions in the system (133 percent of capacity based on population data as of August 6, 2008), it still has overcrowded dorm housing units.  I toured the J1 unit, for instance, which has approximately 150 men split between 8, 12 and 20 person dorms.  Although I did not personally tour units J2 and J3, I was informed that they are identical to the J1 unit.  Although the J1 unit has smaller dorms than places like the

22

gym dorms at MCSP, these units are difficult places for people with or without mental illness to live because they do not afford any personal privacy. These settings also may exacerbate mental health conditions such as paranoia and create stressful environments for people who are otherwise vulnerable due to mental health issues, including cognitive impairments.

53.     Overall, CMF provides a good glimpse into systemic problems of accessing higher levels of care, medication management and crowded office and treatment space issues.

### (c)     Mule Creek State Prison (MCSP) Tour

### MCSP Tour Overview

54.     I toured Mule Creek State Prison (MCSP) on August 1, 2008. According to the most recent CDCR weekly population report, as of midnight on August 6, 2008, MCSP had a population of 3,687 and a design capacity of 1,700, for a population at 216.9 percent of capacity. Joint Pls' Trial Ex. 65 at p. 2. Mule Creek State Prison, unlike CMF and SVSP, does not have any DMH-run inpatient beds. It does have a large mental health population, however, including 526 EOP and 1,178 3CMS patients as of July 29, 2008. Coleman Pls' Trial Ex. 62. Because MCSP has capacities of 999 for its 3CMS and 510 for its EOP populations (Coleman Pls' Trial Ex. 57 at p. 2—showing 3CMS and EOP capacities) it was operating at 118 percent of its 3CMS capacity and 103 percent of its EOP capacity. MCSP also houses a significant number of its 3CMS inmates in overcrowded gyms as follows: 225 3CMS between 3 yards (73 in A-gym; 80 in B-gym and 72 in C-gym). Coleman Pls' Trial Ex. 62.

### Lack of Access to Higher Levels of Care, Including the Housing of Suicidal Inmates in MHOHUs and Administrative Segregation Units

55.     Because MCSP does not have ICF or acute beds, its biggest issue is providing adequate MHCB access to men who are suicidal or otherwise in crisis. During the morning meeting, both the Warden and the head registered nurse reported that the institution's MHCBs are almost always full and that while they are theoretically available to prisoners from other

[242136-1]

institutions, they did not know of even one admission from an outside prison. Staff also reported that the overflow units to the MHCBs are also almost always full, including the cells set aside as the Mental Health Outpatient Housing Unit (MHOHU) and five administrative segregation cells on C-yard.

56.    The Chief Psychiatrist, Dr. Fowler, candidly talked about problems getting men into crisis beds and inpatient beds run by DMH. He said that it takes a lot of paperwork to do a DMH referral and significant staff time, which he estimated as 5-7 hours. I asked him if these problems resulted in fewer referrals to DMH and he said that they do. He said that staff sometimes opt to initiate the Keyhea process (to involuntarily medicate patients) rather than refer them to an inpatient bed. Dr. Fowler also told me that he prefers to keep some men at MCSP rather than refer them to DMH beds for "continuity" of care purposes. He admitted that this means he sometimes uses the MHCB unit to provide acute care. The data provided by MCSP shows that the institution admitted 42 patients into crisis beds during the three month period between April 1 and June 30, 2008. Five of the admitted patients stayed a combined 13 extra days due to administrative reasons, which were described as "medical quarantine, institutional emergency, cell unavailability due to overcrowding or custody unavailable to complete transport." Coleman Pls. Trial Ex. 141 at p. 2. When Dr. Fowler does not have open beds in the MHCB unit, he uses six cells designated as the MHOHU and then 5 administrative segregation cells if the MHOHU cells are full.

57.    The Special Master has grave concerns about the systemic use of alternative placements due to shortages of mental health crisis beds. In his 20th monitoring report, he wrote:

> Fourteen institutions that did not have adequate access to licensed crisis beds resorted to using a variety of temporary monitoring arrangements, most of which were grossly inappropriate alternatives to acute care. Despite having 26 CTC beds and a 20-bed MHOHU, CSP/Sac referred inmates in holding cells for up to eight hours, held half of all MHOHU admissions for longer than 72 hours, and transferred 33 inmates to MHCB units in other prisons. MCSP used six MHOHU beds and five observation cells in administrative segregation to monitor inmates it was not able to admit to its eight-bed MHCB unit. CSP/LAC, KVSP, NKSP, SVSP, and WSP, all with licensed CTCs, routinely used holding cells and tanks to

24

> monitor inmates for whom MHCBs were not available. CCI, CIM, and DVI used
> alternative sites to monitor inmates for whom OHU beds were unavailable. OHU
> admissions at ASP, CRC, CTF, SCC, and SQ routinely exceeded 72 hours
> because inmates were not timely referred and/or transferred to MHCB units.

Joint Pls' Trial Ex. 57 at p. 352-353. The Program Guide specifies that patients should not be

housed in OHUs for longer than 72 hours except in limited circumstances. Joint Pls' Trial Ex. 9

at p. 12-5-28.

58.     The Mental Health Outpatient Housing Unit ("MHOHU") at MCSP is a

disturbing example of one of the overflow units to which the Special Master refers. The

MHOHU is in a fenced-off area within an administrative segregation unit at MCSP. Staff

reported during the morning meeting at MCSP that the MHOHU cells are usually full. Data

provided during the tour showed that there were 125 patients admitted to the MHOHU between

April 1st and June 30th of 2008, 33.6 percent of whom stayed in the MHOHU for longer than 72

hours. Coleman Pls' Trial Ex. 142 at p. 4. During my tour on August 1, 2008, four of the six

cells were occupied by men who had been housed there, according to notes on their doors, for

between one and eight days. The cells themselves are small, concrete rooms that are often

completely bare aside from a small toilet and sink. In fact, two of the men I saw in these cells

were wearing nothing but suicide smocks and had no mattress or blanket. They told me that they

do not get a mattress or a blanket even during the night while they are sleeping, forcing them to

sleep on the cold, concrete floor wearing only a suicide smock. The man who had been in the

MHOHU for 8 days was lucky enough to have a one inch plastic-coated mattress, but reported

that he slept on the bare concrete floor in a suicide smock and without a blanket for the first 7

days he was there.

59.     The MHOHU cells at MCSP do not constitute anything even approaching an

acute level of care. Attached to this report as **Appendix D** are pictures of a MHOHU cell that I

saw during my tour. To the contrary, the conditions found in the MHOHU are likely to

exacerbate many patients' clinical conditions and will ultimately dissuade people from

communicating candidly with their doctors about their mental health conditions. My interviews

[242136-1]

with two men who were currently in the MHCB unit, but who had spent time in the MHOHU support these opinions. One of those men (Class Member VVV) was wearing a suicide smock when I interviewed him and told me that he became so upset about being placed in the MHOHU without a mattress or a blanket that he smeared feces in his cell.[5] The paperwork in his file confirmed this account. Class Member WWW, the other patient I interviewed in the MHCB unit, told me that he did not like the MHOHU, primarily because he was forced to sleep on a concrete floor without a blanket or a mattress. *See* **Appendix D**.

     60.     While it is essential that staff be vigilant about suicide precaution measures, which may include removing items like underwear, non-safety blankets and other clothing items, the conditions in the MHOHU are so extraordinarily harsh that they risk inhibiting people from coming forward about their mental health conditions. This, in turn, hampers mental health staff's ability to fully evaluate and treat their patients. It is my experience that word travels quickly among inmates about deplorable conditions they experience. This results in prisoners not reporting the extent of their suicidality out of fear of being housed in places like the MHOHU.

     61.     Yet the MHOHU placements are not the only overflow beds for the MHCB unit at MCSP. Mule Creek also sets aside 5 administrative segregation cells in the same cordoned off area where the MHOHU cells are located. They are therefore overflow to overflow cells in that they house people who have been referred for mental health crisis care but who cannot be housed in either a MHCB or a MHOHU bed. The Special Master found the following problems with respect to the five administrative segregation cells: "The institution did not track the number or duration of placements in these cells. Inmates placed in the holding cells were reportedly monitored by custody staff on a one-to-one basis until they were either admitted to an MHCB or

---

[5] When persons with mental illness smear feces, it is most likely due to acute, untreated psychosis. It can also be associated with people who are psychotic because of a serious mood disorder such as Bipolar Disorder, Manic and Schizoaffective Disorder, Manic. This behavior is also seen in individuals who have severe cognitive impairments such as mental retardation and dementia due to medical conditions.

returned to their cell in administrative segregation.  Inmates placed in holding cells in administrative segregation reportedly received daily clinical contacts, most of which occurred cell-front.  Contacts routinely occurred without the inmate's UHR, as the medical records for inmates retained in the observation cells were stored in the TTA of the CTC."  Joint Pls' Trial Ex. 57 at p. 62.

62.    Again, these overflow units are a direct result of overcrowding and represent the system's desperate and inadequate attempt to deal with a significant deficiency of inpatient beds. In fact, MCSP notified the Director of Mental Health for the Division of Correctional Health Care Services back in October of 2006 that 8 crisis beds were wholly inadequate for the October 2006 census of 265 EOP patients and that increasing the EOP population would seriously impede the provision of mental healthcare:  "By doubling our EOP population without increasing acute care capacity the department would be taking an acute care program that is already too small for our current census and further overloading it…Failure to have adequate acute care capacity increases the risk of suicide and medical (mental health) negligence for our entire facility." Coleman Pls' Trial Ex. 143 at p. 1.  Despite these warnings, MCSP's EOP population as of July 29, 2008 was 526 patients (261 patients *more* than MCSP had when it issued the memorandum to headquarters staff warning that eight MHCBs were wholly inadequate).

### The Significant Use of "Bad Beds" at MCSP

63.    In addition to the disturbing MHOHU and administrative segregation placements of acutely ill class members, MCSP also generally houses many inmates in temporary "E-bed" placements in either converted gymnasiums or dayroom floors of housing buildings.  As of July 1, 2008, MCSP had 729 of these "non-traditional," bad beds.  Joint Pls' Trial Ex. 68 at p. 7.

64.    For instance, I toured the gyms on the A and B yards of the facility.  I understand that these buildings at one time acted as real gymnasiums, but that they have been used for housing in recent years due to overcrowding.  Staff members in the gym on B-yard informed me that they have a capacity of 160 men, and that the gym was full on the day of my tour.  The data

27

MCSP provided to us in the morning showed that 80 *Coleman* class members were housed in this gym as of July 29, 2008, all at the 3CMS level of care.  Coleman Pls' Trial Ex. 62.  The large room consists of multiple rows of triple bunks, although staff informed me that they had been able to empty out some of the middle bunks in recent weeks or months.  Pictures of the B-yard gym are attached to this report as **Appendix E**.  I spoke with a *Coleman* class member at the 3CMS level of care and asked him what it was like to live in the gym.  He said that conditions can be very stressful, which breeds anger among the men and tends to worsen one's mental health symptoms.

65.    I also toured the gym on A-yard during my visit to MCSP.  Pictures of the A-yard dorm are attached to this report at **Appendix F**.  The A-yard gym is the worst living space I have seen in any correctional system, including even the H-dorm at Solano.  There were nearly 200 men housed in rows of triple bunks, including on all of the middle bunks as far as I could tell.  According to the MCSP data, 73 *Coleman* class members were housed in the gym as of July 29, 2008, all of whom were at the 3CMS level of care.  Coleman Pls' Trial Ex. 62.  One row of beds was placed at an angle and there was virtually no visibility for staff or other inmates to see around corners or down the rows of beds.  I talked to several men in this gym who reported that they were often unable to sleep at all in the gym and that the living conditions are made even worse by the fact that they have no privacy at all.

66.    Placing inmates in overcrowded gym and dorm settings is often inappropriate for people with mental health issues and can either exacerbate existing symptoms or, in some cases, trigger symptoms in people who would not otherwise display them.  The Special Master also noted this as a problem in his 20th round report:  "Interviewed inmates reported, and many of the higher quality progress notes documented, the underlying stress, anxiety and frustration associated with inmate movement in and out of E Beds and triple-bunked dorms."  Joint Pls' Trial Ex. 57 at p. 68.  In my experience, crowded living spaces that afford no personal privacy breed anxiety, fear and sometimes violence.  For 3CMS inmates who are routinely triple-bunked in chaotic, overcrowded dorms, this means they may experience damaging levels of stress and

fear of predation, as well as sleep deprivation.  These conditions exacerbate mental illness and are serious barriers to the provision of minimally adequate mental health and medical care.

### Medication Management Problems

67.     The Special Master found the following with respect to MCSP's medication management system during the 20th round:  "[C]ontinuity [of medications] during intra-facility transfers worsened during the monitoring period, with audits yielding a compliance rate of 75 percent…recorded noncompliance prompted referral to mental health only 59 percent of the time and less than half of referrals submitted for noncompliance generated contact within seven calendar days."  Joint Pls' Trial Ex. 57 at p. 59.

68.     I also observed significant problems with MCSP's medication management practices during my tour on August 1, 2008.  The men I interviewed at the institution, for instance, all described the same "drive-by" distribution of medications by line staff.  They universally reported that medications are distributed within a matter of a few seconds by staff members who do not ask about either the efficacy of the medications or potential side effects the patients might be having.  The basic provision of adequate psychiatric care necessarily depends on information-sharing between line staff and doctors who prescribe the medications.  Dr. Fowler, the Chief Psychiatrist at MCSP, candidly told me during my tour that there are "no outcome measures at all" that permit psychiatrists to know whether intervention measures are having any effect.  The inability of overburdened line staff to adequately monitor medication management at MCSP is one example of the failure to monitor and assess outcome measures.

69.     I also learned from inmates waiting in a yard pill line at MCSP that they cannot receive Wellbutrin because staff fear they will abuse it.  If this is true, the removal of Wellbutrin from the formulary is, in my opinion, an admission that line staff are unable to appropriately monitor medication distribution and compliance.  If appropriate monitoring could be achieved, there would be no reason to worry about hording or abuse.  The resulting restriction on this

[242136-1]

medication, which is highly effective in treating a variety of mental health conditions, hampers psychiatrists' ability to appropriately provide care to their patients.

### Problems with MCSP's EOP Program

70.     The Special Master also documented significant problems with MCSP's EOP program during his 20th round of tours: "Internal audits yielded 60 percent compliance rates for bi-weekly case manager contacts during the second and third quarters of 2007. Noncompliance was attributed to the extra intake work for case managers associated with the program's rapid expansion, excessive case manager caseloads, inadequate clinical supervision and an overall lack of cooperation from custody officers. Case manager contacts continued to occur in cubicle spaces on the day room floor, which afforded inadequate auditory and visual privacy." Joint Pls' Trial Ex. 57 at p. 65. In my opinion, the expansion of MCSP's EOP program is directly related to overcrowding and the system-wide shortage of EOP beds.

### 2.     Updated Information Regarding Overcrowding-Related Violations at Institutions I Previously Toured

71.     There were also two institutions, DVI and Solano, that I previously toured in October and November of 2007, but that I did not return to during my recent round of site inspections. I did, however, review updated information about these institutions from various sources including the *Coleman* Special Master's monitoring reports, Defendant Cate's Responses to Second Set of Interrogatories from Plaintiff Coleman, and other documents. It is my opinion, based on this updated information, that there have been no material changes regarding the provision of inadequate medical and mental healthcare at either DVI or Solano and the effects of extreme overcrowding on these prisons.

72.     The overall level of overcrowding in the system remains at critical levels. As of August 6, 2008, CDCR's prison and camp population was at 160,334, with a design capacity of 84,066. The prison system is still operating at 190.7 percent of design capacity. Joint Pls' Trial Ex. 65 at p. 1. As of October 31, 2007, the time I made my initial tours of the prison for this

trial, CDCR institution population was 160,273 with a design capacity of 78,698. The prison system was then operating at 198.6 percent of design capacity. Joint Pls' Trial Ex. 25 at p. 1. There has been no more than a symbolic change in the level of overcrowding since my fall 2007 tours and almost all of the change can be attributed to an increase in the number of prisoners housed in private, out of state prisons. As of October 31, 2007, 1,673 prisoners were housed in Arizona, Mississippi and Tennessee. Joint Pls' Trial Ex. 25 at p. 1. By August 6, 2008, 4,614 prisoners were housed out of state and Oklahoma was added to the list. Joint Pls' Trial Ex. 65 at p. 1.

### (a)    Deuel Vocational Institute (DVI) Update

73.    I toured Deuel Vocational Institute (DVI) on October 29, 2007 and documented my findings in my November 9, 2007 report. 11/9/07 Report at pp. 29-45. As stated in my prior report, DVI's population as of midnight on October 24, 2007 was 3,855 with a capacity of 1,627, meaning that the population at that time was 236.9 percent of capacity. *Id.* at p. 29. As of midnight on August 6, 2008, DVI's population was 3,811 with a capacity of 1,681, meaning that the population is at 226.7 percent of capacity. The Reception Center at DVI is the most overcrowded part of the prison, housing 3,134 prisoners in space designed for 1,187, a shocking 264 percent of capacity. Joint Pls' Trial Ex. 65 at p. 3.

74.    As of June 20, 2008, the mental health caseload population at DVI was 857, with 765 CCCMS and 92 EOP. At the time of my tour, the mental health population was 933, but with only 54 EOP inmates. Although the mental health population has decreased slightly, the EOP population has almost doubled. Seventy of these EOP inmates were in the Reception Center as of June 20, 2008. Coleman Pls' Trial Ex. 57 at p. 2.

75.    Since my November 9, 2007 report, the Special Master issued a report from his 20th round tour at DVI, which took place on October 2-4, 2007. The issues identified by the Special Master confirmed many of the observations I made in my report.

76.     The Special Master found that there were substantial problems with access to higher levels of care at DVI, leading to use of overflow beds that were "isolated and poorly suited for acute psychiatric patients."  Joint Pls' Trial Ex. 57 at p. 115.  As I noted in my report, housing suicidal patients in harsh, dirty, and noisy overflow units is a very dangerous practice.  There were also delays in psychiatric responses to referrals.  Joint Pls' Trial Ex. 57 at p. 122-123.

77.     The Special Master also reported on the serious problems with medication management that I observed.

> Problems persisted in all areas of medication management, although methodologically flawed audits rendered it impossible, in most cases, to ascertain the magnitude of noncompliance or to identify the underlying causes.  Medication continuity upon arrivals and transfers within the institution remained poor, as did the institution's response to medication noncompliance.  The institution had not taken steps to remedy deficiencies noted during the preceding site visit relative to ordering DOT in response to medication cheeking, hoarding, and overdose.  An audit of distribution of parole medications was too small to produce meaningful results.

Joint Pls' Trial Ex. 57 at p.112-113.  The Special Master also reported that "protocols for monitoring blood levels of inmates prescribed mood-stabilizing medications were not working.  From July 20 to September 19, 2007, more than half, or 75 of 134 ordered labs were not drawn for unknown reasons.  In addition, UHRs reviewed by the monitor and chief psychiatrist during the site visit indicated that blood work was not always ordered when indicated.  None of the reviewed UHRs belonging to EOP inmates contained required lab reports for currently prescribed medications."  Joint Pls' Trial Ex. 57 at p. 113.

78.     I have reviewed Defendant Cate's Response to Second Set of Interrogatories from Plaintiff Coleman, dated August 8, 2008.  In response to questions about any improvements made in the ability of CDCR to house inmates at appropriate levels of mental health care, changes in the amount or quality of office space for mental health clinicians, and changes in the amount or quality of treatment space, the only change identified at DVI was a vague change to a "medical office."  It is my opinion that any change DVI makes to a medical office will not be

32

sufficient to materially alter that delivery of mental health care to the overcrowded population still housed at the prison.

**(b)      California State Prison - Solano Update**

79.      I toured Solano State Prison on October 31, 2007 and documented my findings in my November 9, 2007 report.  11/9/07 Report at pp. 45-50.  As stated in my prior report, Solano's population was then 6,051 with a design capacity of 2,610, for a population at 231.8 percent of capacity.  11/9/07 Report at 45.  As of midnight on August 6, 2008, Solano's population was listed as 5,658 with a capacity of 2,610, meaning that the population is at 216.8 percent of capacity.  Joint Pls' Trial Ex. 65 at p. 2.  The prison obviously remains dangerously overcrowded.

80.      As of June 20, 2008, the mental health caseload population at CSP-Solano was 1,552, with 1,541 CCCMS and 11 EOP.  Coleman Pls' Trial Ex. 57 at p. 3.  This is a similar population to that during my tour, which was 1,517 CCCMS and 10 EOP class members.

81.      The Special Master's report on this 20th round tour, which occurred on December 4-6, 2007, confirmed the observations I made during my tour.  There were serious problems with medication administration, symptomatic of severe overcrowding and understaffing.  The Special Master reported that, "[f]aced with chronic psychiatric vacancies, CSP/Solano continued to rely on contract psychiatrists.  Treatment continuity was poor in that many inmates rarely saw the same psychiatrist from one visit to the next.  The institution did not audit unexplained and unwarranted medication changes, the subject of a CAP item, and lacked the permanent staff to perform psychiatric peer review.  Consequently, it could not be determined if poor treatment continuity continued to be associated with unexplained, unjustified, and unwarranted changes in medications."  Coleman Pls' Trial Ex. 57 at p. 95.

82.      I have reviewed Defendant Cate's Response to Second Set of Interrogatories from Plaintiff Coleman, dated August 8, 2008.  Defendants did not identify any changes at CSP-Solano in response to questions about any improvements made in the ability of CDCR to house

33

inmates at appropriate levels of mental health care, changes in the amount or quality of office space for mental health clinicians, and changes in the amount or quality of treatment space. Joint Pls' Trial Ex. 66.

> ### 3. Evidence Concerning Systemic, Overcrowding-Induced Constitutional Violations

83. There is substantial evidence in recent reports issued by the *Plata* Receiver and the *Coleman* Special Master, and in other sources of evidence I reviewed in connection with my preparation of this report, that the overcrowding-induced problems I personally observed at SVSP, CMF, MCSP, DVI, and SOL are also affecting the delivery of medical and mental health care at prisons system-wide. These system-wide problems affect almost every one of the critical components of a constitutionally-adequate mental health care system that were identified by the *Coleman* court in its July 23, 2007 Order. *See* 7/23/07 Order at 4 (describing the key elements of a constitutional mental health system as identified in the *Coleman* Court's decision on the merits of this case in 1995 in *Coleman v. Wilson*, 912 F. Supp 1282, 1305 (E.D. Cal. 1995)).

84. It was my opinion previously and remains my opinion now, that the CDCR is a severely overcrowded system. According to its most recent monthly population report, there were 160,334 prisoners housed within the state's 33 prisons and camps as of midnight on August 6, 2008, with Avenal State Prison the most overcrowded (235.9 percent) and California Medical Facility the least overcrowded (133 percent). Joint Pls' Trial Ex. 65 at p. 1-2. The current overall population is operating at 190.7 percent of its design capacity (84,066). *Id.* at p. 1.

85. In his 7th Quarterly report, the Receiver documented ongoing and serious problems with the medical care systems. With respect to the system as a whole, he wrote:

> Accomplishing the mission [of the Receivership], however, is a huge challenge only because of the current chaotic state of CDCR's medical delivery system. Timely access is not assured. The number of medical personnel has been inadequate, and competence has not been assured. Accurate and complete patient records are often not available when needed. Adequate housing for the disabled and aged does not exist. The medical facilities, when they exist at all, are in an abysmal state of disrepair. Basic medical equipment is often not available or used.

> Medications and other treatment options are too often not available when needed. Custody resources needed to facilitate access to care and provide the security necessary to deliver health care safely in a prison setting are inadequate, lacking both the personnel and structure to ensure timely access to health care services. Thus the remedial actions necessary to fix these problems are far from simple. Indeed, it is a misnomer to call the existing chaos a "medical delivery system"—it is more an act of desperation than a system.

Joint Pls' Trial Ex. 67 at p. 5. The Receiver and the Special Master also documented numerous other systemic problems, including medication management issues, problems with medical records, serious delays in access to higher levels of care, staffing shortages, and lack of adequate office and treatment space.

### (a)    Systemic Problems with Seriously Delayed Access to Higher Levels of Care

86.    Perhaps the most disturbing and direct result of severe overcrowding is the terrible shortage of inpatient beds for *Coleman* class members. I am aware that the Special Master and the Receiver have been very concerned about this issue for some time. The Receiver documented the shortages in his 8th Quarterly Report, which was issued in June of 2008:

> At present, there exist serious shortages of mental health inpatient beds (including a waiting list of 162 for long-term intermediate care hospitalization). At present, CDCR simply does not have anything near adequate mental health treatment facilities for prisoners with serious mental health problems.

Joint Pls' Trial Ex. 56 at p. 48. The Receiver then discussed a recent death in a California prison that he attributed directly to this serious shortage of inpatient mental health beds:

> Patient B was a 36 year old male diagnosed with Hepatitis C antibody positive, paranoid schizophrenia, history of head trauma, borderline intellectual functioning, antisocial personality disorder, and history of substance abuse. Incarcerated continually since 1994, Patient B has been, in the past, admitted to both mental health crisis housing and administrative segregation housing. These placements were for safety concerns. Because of his mental health problem, Patient B was vulnerable to victimization when housed in "general population." He was last housed in general population, however, and also double-celled. On November 26, 2007, Patient B was found in his cell unresponsive with multiple wounds about the head, weak pulse, agonal breathing and fixed dilated pupils. He was transferred to a

[242136-1]

local hospital, determined to be brain dead, and care subsequently withdrawn. According to CDCR officials, Patient B had been beaten to death by his cellmate.

*Id.* at p. 48.

87.    The *Coleman* Special Master also documented serious problems with access to higher levels of care during his 19th and 20th round monitoring tours:

> Access to higher levels of mental health care at the DMH level remained slow.  In addition, the ongoing need for sufficient MHCBs continued to challenge the institutional capacity to provide crisis care.  Inmates' overly long stays in institutional OHUs and MHOHUs and their placements in holding areas reflect not only the continuing need for more MHCBs, but also the deferred access to inpatient levels of care needed by the more severely mentally inmates.  For several years the defendants have been struggling with assessing their mental health bed needs, particularly at the most intensive levels of care, and developing a responsive long-term plan.  Undoubtedly, the task has been challenging, for no less reason than the shifting nature of many conditions that affect CDCR and its mental health care.  These challenges have included unprecedented growth in the prison population and resulting changes to population projections; understaffing of personnel at CDCR's own headquarters to execute the many parts of the planning task; and coordination with the California Prison Receivership, which has become engaged in the redesign of medical care, and to some extent mental health care, within CDCR institutions.

Joint Pls' Trial Ex. 69 at p. 131-132.  In the draft 20th report, he noted, "Timely access to appropriate levels of care, essential to the efficacy of a mental health delivery service, continued to elude CDCR."  Joint Pls' Trial Ex. 57 at p. 349.

88.    The dire need for substantial additional inpatient, MHCB and EOP beds was apparent to me during my tours as I talked to and observed patients at every level of care.  It was clear that the severe shortage of mental health beds has created a system that houses a significant portion of *Coleman* class members at lower levels of care than the patients clinically require.  A significant number of class members who I interviewed at the EOP level of care, for instance, required, inpatient psychiatric hospitalization.  I base this statement on my clinical evaluation of those patients, on my review of their medical charts and on my knowledge of the MHSDS system during the time that I was monitoring the *Gates* consent decree.  I also interviewed several patients in DMH intermediate care facility placements that, in my opinion, required acute

psychiatric hospitalization.  I was struck by the very high acuity of the patients I encountered during my tours because they were much sicker, as a whole, than the *Coleman* class members I encountered between 1990 and 2000 while monitoring CMF as a medical and psychiatric expert for *Gates*.

### MHCB and EOP Patients Who Require Inpatient Care

89.     The following are examples of class members from my recent tours who I believe require a higher level of mental healthcare than was currently being provided:

a)      I interviewed *Coleman* Class Member VVV in the MHCB unit at MCSP on August 1, 2008.  He was designated at the EOP level of care.  The medical file reflected that Class Member VVV is diagnosed with Schizophrenia or Schizoaffective Disorder.  His "Inmate Profile" shows that he is also diagnosed with Dementia due to HIV disease or Cognitive Disorder NOS, although I did not see these diagnoses in his medical file. Coleman Pls' Trial Ex. 145.  He was prescribed the following medications:  Risperdal (37 ½ mg. shot every 2 weeks); Lexapro (20 mg. daily dose) and Trazodone (unknown daily dose).  The "Inmate Profile" sheet shows a significant suicide attempt history and also shows that while he was referred for acute inpatient care at DMH on February 20, 2008, he was not placed in an acute bed until June 6, 2008.  The MHCB 2nd Quarter Chart shows that he was housed in an MHCB for 37 days between April 30 and June 6, 2008.  Coleman Pls' Trial Ex. 141.  Class Member VVV reported that he was in the MHOHU previously, where he smeared feces in his cell because staff would not provide him with a mattress or blanket. Pictures of a MHOHU cell are attached to this report as **Appendix D**.  The "Patient Activity Report-Inhouse" log shows that he was admitted to the MHOHU three times between June 24 and July 22, 2008 (4/24-4/30; 7/4-

37

7/7 and 7/22 for one day).  Coleman Pls' Trial Ex. 146 at p. 13.  In my opinion and based on Class Member VVV's clinical presentation and his significant suicide history, he exceeds the EOP level of care and should be housed in an inpatient setting.

b)    I interviewed *Coleman* Class Member XXX at SVSP on July 29, 2008. Class Member XXX was floridly psychotic when I spoke with him, was also manic and was religiously preoccupied.  His file reflected that he was not taking medications despite documented assaults on staff due to untreated mental health issues.  He is also not listed on the Keyhea "active cases" log from SVSP dated July 20, 2008.  Coleman Pls' Trial Ex. 147 at p. 4.  Despite his condition, Class Member XXX was housed in an administrative segregation unit with active mental health issues that were not being treated.  He is designated at an EOP level of care, but in my opinion, requires inpatient psychiatric care.

c)    I interviewed *Coleman* Class Member YYY at SVSP on July 29, 2008. Class Member YYY was very paranoid, could not maintain eye contact, and was responding to internal stimuli.  He also had significant cognitive impairment.  The "inmate history" sheet provided by the institution shows that he has a diagnosis of Schizoaffective Disorder and is at the EOP level of care.  He was prescribed Zyprexa (daily dose of 10mg) and Cymbalta (daily dose of 60 mg).  Although Class Member YYY was being housed at the EOP level of care, I believe he requires inpatient care based on his clinical presentation and his active psychosis.  Clinicians at the institution agree that Class Member YYY needs an inpatient level of care as he has been waiting for an inpatient bed since his 11/8/07 referral (or for nearly 9

38

months as of the date I saw him).  Coleman Pls' Trial Ex. 118, Patient

622.

d)    I interviewed *Coleman* Class Member ZZZ at SVSP on July 29, 2008.

Class Member ZZZ reported, and his file confirmed, that he made a

serious suicide attempt more than a year before and had been waiting for

an intermediate care facility bed ever since that time.  The "Inmate

History" sheet provided by the institution shows that he has a diagnosis of

Bipolar I disorder, severe with psychotic features.  Coleman Pls' Trial Ex.

148 at p. 1.  He was psychotic and labile when we spoke and had low

frustration tolerance.  He was also on very high doses of medications as

follows:  Buspar (60 mg. daily dose); Zyprexa (30 mg. daily dose); Inderal

(60 mg. daily dose); Visteril (150 mg. daily dose, and; Lithium (900 mg.

daily dose).  While CDCR clinicians agreed that Class Member ZZZ needs

inpatient care, he has been housed at the EOP level for nearly a year

awaiting that placement.  The SVPP waiting list reflects that he has been

waiting for an inpatient bed since his September 6, 2007 referral (or nearly

a year as of the date I saw him).  Coleman Pls' Trial Ex. 118, Patient 607.

e)    I interviewed Class Member LL at SVSP on July 29, 2008.  Class Member

LL was floridly psychotic during our interview and had strange ideas of

reference.  He believed that the FBI was sending lasers into his cell

through wires and he also believed that his wife worked on the *Coleman*

lawsuit in San Francisco.  He had been admitted for mental health crisis

care five times in 2007 and once already in 2008 according to his "Inmate

History" print-out.  Coleman Pls' Trial Ex. 149 at p. 28.  His file reflected

that he was on Keyhea and that he was currently taking the following

39

medications:  Risperdal Consta (37 ½ mg. every 2 weeks) and Risperdal (2 mg. daily dose).  He was diagnosed with Schizoaffective Disorder.  It appears from a DMH log that clinicians referred Class Member LL to an ICF bed on September 27, 2007 and that he was "accepted" for the bed on January 22, 2008.  He then sat on the waiting list until May 4, 2008, when someone rescinded his referral.  Class Member LL needs a higher level of care than EOP as evidenced by his clinical presentation and his multiple mental health crisis bed placements since 2007.  Coleman Pls' Trial Ex. 117, Patient 570.  In my opinion, he should not have been removed from the ICF waitlist.

f)      I interviewed Class Member AAAA at SVSP on July 29, 2008.  Class Member AAAA was being treated at the EOP level of care and was diagnosed with Schizophrenia.  According to his file and my conversation with him, Class Member AAAA had a significant violent history, which included decapitating his father with a machete.  His "Inmate History" shows that he was on Keyhea since November 2, 2007 (order expires November 1, 2008).  Coleman Pls' Trial Ex. 150 at p. 38.  He was also on a very significant amount of medications, including the following:  Haldol Decanoate (100 mg. shot every two weeks); Cogentin (2 mg. daily dose); Zyprexa (20 mg. daily dose).  Despite being prescribed a significant amount of medication, including four times the normal dose of Haldol Decanoate, Class Member AAAA was still very ill and requires inpatient care.  In my opinion, he should have been promptly transferred to an inpatient psychiatric hospital.  According to the DMH referral log, clinicians referred Class Member AAAA to an inpatient bed on February 20, 2008, but he was sent back to the EOP unit to wait for that bed.

40

Coleman Pls' Trial Ex. 151 at pp. 1-2. It also appears that staff lost his referral package at one point, which required SVSP to send a replacement. His Inmate History also shows that Class Member AAAA saw seven different psychiatrists for psychotropic medications between June of 2007 and June of 2008.

g)    I interviewed Class Member BBBB at CMF on July 30, 2008. Although Class Member BBBB was in an intermediate care facility placement when I interviewed him, there was a July 29, 2008 physician note discharging him back to the EOP level of care. Class Member BBBB was diagnosed with Schizophrenia, Paranoid Type, Depressive Disorder, NOS, and Polysubstance Dependence and was prescribed the following medications: Abilify (30 mg. daily dose), and; Remeron (30 mg. daily dose). I saw paperwork for two different people in Class Member BBBB's file and when I asked him about it, he said that he was both men. I told him that the men were born five years apart based on the paperwork and he confirmed again that he is both men. In my opinion, Class Member BBBB was not appropriate for discharge to an EOP level of care and requires inpatient mental health treatment. Unless Class Member BBBB has an alias, it also appears that his medical file may contain documents about a different *Coleman* class member.

h)    I interviewed Class Member CCCC at MCSP on August 1, 2008. Class Member CCCC was housed in administrative segregation at the EOP level of care and appeared to have been there for a very long time. His file showed that he was diagnosed with "Psychosis NOS," but his "Inmate History" lists his diagnosis as Schizophrenia, Paranoid Type. Coleman

41

Pls' Trial Ex. 152 at p. 1.  His file showed that he was diabetic and that he was being treated for his mental health issues, as of July 25, 2008, with a 20 mg. daily dose of Abilify.  His "Inmate History," however, which is dated August 1, 2008, shows that all medications were stopped on January 27, 2008.  He reported that he was previously housed in inpatient beds at both CMF and SVSP.  At the time of our interview, Class Member CCCC was floridly psychotic and was responding to multiple internal stimuli. The "Patient Activity Summary" shows that he had three admissions to the MHOHU between April 19 and June 25, 2008 for a total of 27 days in the MHOHU.  Coleman Pls' Trial Ex. 146 at p. 15.  Based on the information in Class Member CCCC's file and his clinical presentation, he very clearly needs inpatient care and is not appropriately housed at the EOP level of care.

i)     I interviewed Class Member FFFF at CMF on July 30, 2008.  His case manager progress note, dated 7/25/08 shows that he has a diagnosis of Schizophrenia, Paranoid Type, and Polysubstance Dependence.  Coleman Pls' Trial Ex. 153 at p. 1.  His file showed that he was prescribed Risperdal Consta (50 mg. every 2 weeks); Risperdal (4 mg. daily dose) and Thorazine (200 mg. daily dose).  His "Case Manager Progress Note" shows that he is on a Keyhea as a "DTO" (Danger to Others).  According to the medical file, staff referred Class Member FFFF to an intermediate care placement on January 28, 2008, but he was waiting at the EOP level of care until a bed opened up for him.  I agree that Class Member FFFF requires inpatient care.  Because there are no beds, however, he has been forced to stay in a clinically inappropriate placement for nearly six months.  The severity of his mental illness is demonstrated by numerous

42

assaults on staff and other prisoners, his history of inpatient admissions and his suicidal history.

### **Intermediate Care Facility Patients Who Require Acute Care**

a)    I interviewed Class Member DDDD at SVSP on July 29, 2008.  Class Member DDDD was very psychotic and displayed prominent negative symptoms.  He was paranoid and had a history of staff assaults.  He was also prescribed significant medications, including two anti-psychotics and one mood stabilizer as follows:  Risperdal (8 mg. daily dose); Seroquel (400 mg. daily dose), and; Depakote (1000 mg. daily dose).  In my opinion, Class Member DDDD was inappropriate for ICF care due to his excessive psychosis and paranoia and his history of staff assaults.  He requires placement in a locked hospital setting that provides acute care.

b)    I interviewed Class Member EEEE at CMF on July 20, 2008.  He had been housed in an intermediate care facility bed since December 3, 2007 and had a significant violent history.  Class member EEEE was diagnosed with Schizoaffective Disorder (depressive type) with Polysubstance Dependence in remission.  His October 24, 2007 "Mental Health Treatment Plan," however, listed his diagnosis as Schizophrenia, Paranoid Type, and Polysubstance Dependence in remission.  Coleman Pls' Trial Ex. 154 at p. 3.  He was prescribed the following medications:  Depakote (1750 mg. daily dose); Prozac (40 mg. daily dose); Propranalol (20 mg. daily dose); Zyprexa (25 mg. daily dose), and; Benadryl (100 mg. daily dose).  Class Member EEEE is in my opinion too sick to be at an intermediate level of care and requires placement in an acute hospital setting.  He continued to display extensive thought blocking by competing

43

stimuli despite being housed at the ICF level of care for more than seven months and despite being prescribed large doses of anti-psychotic and mood stabilizing medications.

90.     These class members (and the two men I saw in the acute unit at CMF) were some of the most acutely ill people I have seen. When I said this to Dr. Gandhi, the Director of DMH units at CMF, she agreed that the acuity level of her patients is quite high and, as mentioned in the next section, attributed the high acuity in large part to medication problems.

91.     The reality of the current MHSDS system, as demonstrated by my interviews with these class members and the admitted shortage of EOP, MHCB and inpatient beds, is that too many people are housed in places that simply cannot provide them with the level of mental health care they require. This is a direct result of overcrowding—there are too many people in the system and too few resources to treat them. This in turn means that the acuity at every level of care is higher than it would be in a system that has sufficient inpatient beds. I saw this time and again during my tours—there were inadequate mental health crisis beds for people experiencing acute mental health episodes, which meant that many of those people are housed in inappropriate "overflow" placements such as MHOHUs or administrative segregation units. The significant 171 patient waitlist for intermediate care facility beds also means that patients who need inpatient care are instead waiting in EOP units, in valuable MHCBs or in the various "overflow" units. Once those people are admitted to inpatient beds, sometimes after many months of living in clinically inadequate placements, they are sicker and more acute than they would have been had they been promptly provided adequate care. As Dr. Gandhi, the Director of DMH units at CMF expressed, this means that the inpatient units as a whole are admitting extremely acutely ill patients. The waitlists for acute beds and mental health crisis beds only add to this crisis.

92.     There are serious clinical and systemic consequences of having too few beds at nearly every level of care. First are the individual consequences for patients. By not providing

adequate and timely care, people are decompensating and are ending up in mental health conditions far more acute than necessary.  This translates into longer stays in inpatient beds and the consumption of greater resources for longer periods of time than the person might otherwise have required.  Second are the systemic consequences of these backlogs.  It is taking longer to stabilize and treat the people coming into inpatient mental health beds, which means that those people consume valuable resources for longer periods of time.  In other words, the lack of sufficient inpatient beds creates a cycle of sicker people being admitted, with greater resources necessary to treat them, which then creates even further backlog in an already overwhelmed system.

        **(b)**    **Systemic Problems with the CDCR's Medication Management System**

93.      Another significant systemic problem that is closely tied to overcrowding is the flawed medication management system.  The Receiver's 7th Quarterly report included a report by the pharmacy management consulting firm that the Receiver has retained regarding the barriers it anticipates facing in the next year.  One of those barriers is overcrowding:

> The impact of the overcrowding on the system's abilities to provide timely and effective delivery of necessary medications is significant. A clear example of this impact was noted at San Quentin. San Quentin receives 75-80 new prisoners each day and presumably transfers out or releases about the same number. Overcrowding however, forces a series of "compaction" moves resulting in as many as 300-400 separate prisoner moves each day in order to free up appropriate housing for the offenders. This constant "churn" of prisoners within the institution keeps the healthcare staff chasing prisoner movement to ensure medications can be delivered in a timely fashion. Because the housing data used by the pharmacy is not up-to-date at all times, there is a duplication of workload for both pharmacy and nursing resulting from having to fill prescriptions for patients presumed to be in one housing area of the institution—but having been transferred as a result of the many compaction moves; the nursing staff must try to obtain the appropriate location and then transfer the medications to the new housing area. This takes time, and in some cases, the medications are simply returned to the medical area to try to determine where the prisoner is housed. During this time, the prisoner patient is not getting his medications and may complain to staff—who in turn—reorders the medication, resulting in duplicate work...

Joint Pls' Trial Ex. 67, Ex. 6 at p. 29.

94.    The Coleman Special Master also found major medication problems in both his 19th and his draft 20th reports.  He found, for instance, significant variance with institutions' abilities to fill medication orders:  "CSP/Corcoran complied with timelines for filling medication orders in 95 percent of cases.  NKSP, however, filled and delivered ordered medications within one day in only 50 percent of cases, and at CSP/LAC there were delays of up to one week before ordered medications reached carts."  Joint Pls' Trial Ex. 69 at pp. 121-122.  When it came to patient non-compliance with medications, the Special Master's audits showed significant problems:  "Predominantly, institutions did not meet timelines in responding to instances of medication noncompliance."  Joint Pls' Trial Ex. 69 at p. 122.  The Special Master also found that referrals to psychiatry for non-compliance issues were lacking, as was the documentation and follow-up regarding those referrals:

> At CSP/Sac, referrals to psychiatry for noncompliance fell below 80 percent, and staff failed to document cases of no-shows or medication refusals.  At KVSP, medication refusals were documented in MARs 89 percent of the time, but refusing inmates were seen within seven days in only 17 percent of cases.  The rate of documentation of medication noncompliance at CIM was high at 97 percent, but referrals for follow-up were documented in only 62 percent of cases.  Of those, follow up occurred within seven days in 51 percent of cases.  Follow-up on noncompliance was timely in only 48 percent of cases at ASP, which chartered a QIT although its audit was methodologically unsound. Documentation of noncompliance was deficient at CSP/LAC and at VSPW, which showed no improvement in this area during the monitoring period.  Compliance was probably hindered by inconsistency in psychiatric coverage which led to delays in follow-up contacts, with only half of referrals seen within one week.

Joint Pls' Trial Ex. 69 at pp. 122-123.

95.    At the end of 2007, I also observed significant flaws with the medication distribution system which I believe were direct consequences of overcrowding.  *See, e.g.*, 11/9/07 Report at pp. 36-37 (detailing problems with DVI's provision of medications during intra-institutional transfers, its medication renewals, its tracking of medication non-compliance, its lab testing and its problematic recordkeeping); pp. 48-50 (detailing problems SOL has

46

monitoring the efficacy of medications, the side effects of medications and patient compliance, among other things); pp. 61-62 (detailing deficient medication practices at SVSP).

96.    I observed similar problems during my recent round of tours at SVSP, CMF and MCSP.  First, due to the lack of adequate staff to distribute medications and the overwhelming number of inmates prescribed medications, staff members do not have sufficient time to adequately monitor whether inmates are taking medications properly.  A further contributing factor to the ability of staff to monitor adherence to medications are the frequent lockdowns in the institutions.  This results in distributions of medications through food ports or otherwise at cell doors, where it is difficult to monitor compliance with medication regimens.  Second, the clinical staff members who distribute medications are too understaffed to evaluate the efficacy and potential side effects of the prescribed medications.  Every patient I talked to about the medication distribution system described the same drive-by process—they received their medications in pill lines or at their cell doors from staff members who spent only a few seconds with them.  The staff members never ask the patients about the efficacy of the medications or whether they are causing side effects.  Third, psychiatrists are also overburdened and may consist largely of contract employees that are unable to maintain consistent relationships with their patients due to constant movements between units or even prisons.  One 3CMS patient I spoke to at SVSP saw seven different psychiatrists between January of 2007 and July of 2008.  Class Member AAAA, an EOP patient at SVSP, also saw seven different psychiatrists for psychotropic medications between June of 2007 and June of 2008.  *See supra* at p. 41.  The overburdened psychiatrists are further hampered by the largely absent information network from line staff about efficacy and or side effect problems.  This leaves the treating psychiatrists essentially operating in the dark.

97.    The Department of Mental Health (DMH) recently found very high medication non-compliance rates among its patients as a direct result of the medication problems described above.  According to a draft memorandum to all Chiefs of Mental Health, Health Care Managers, Chief Medical Officers, psychiatrists and directors of nursing, 222 out of 279 blood draw

47

samples of patients admitted to DMH during a recent audit "returned at the range of no level detected to at the minimum level of the laboratory reference for the psychotropic medication assayed." Coleman Pls' Trial Ex. 80 at p. 1.[6] This means that 79 percent of patients with serious mental illness who are being admitted for inpatient care had very little or no medication in their systems.

98.    During my tour at SVSP on July 29, 2008, Dr. Neill, the Program Director for DMH, talked about these serious medication non-compliance issues. In particular, she reported that most patients are not compliant with their medications when they are admitted to DMH units and also are not subject to Keyhea orders, which would permit involuntary medication. As a result, DMH must stabilize the patients on medications and also initiate Keyhea orders where necessary. Dr. Neill reported that 60 percent of the men housed in the SVPP, an intermediate care facility unit, are subject to Keyhea orders.

99.    Dr. Gandhi, the Director of DMH programs at CMF also talked about the serious medication compliance issues throughout the CDCR. As I mentioned, when I told Dr. Gandhi that two of the patients I interviewed in the DMH unit were some of the sickest people I have seen, she agreed that the acuity of patients is severe. She very candidly told me that the patients coming into DMH units are getting sicker and sicker in all of her programs, including the Day Treatment Unit. She said that "quite a lot" of the increased acuity levels has to do with poor medication compliance upon admission, which presents a "very big challenge." Dr. Gandhi also said that poor medication compliance means that it takes much longer to stabilize patients and get them to the point where they can productively participate in groups. This in turn means that

---

[6] The draft memorandum directs psychiatrists to order and monitor reference psychotropic blood levels immediately when patients show signs of decompensation and also specifies that "results are to be returned to the ordering psychiatrist within seven or less [sic] working days for review." Coleman Pls' Trial Ex. 80 at p. 1-2. It is unclear, however, whether the CDCR's overburdened medical and mental health care systems can even absorb the additional laboratory testing required to effectively monitor medication compliance. Several clinicians told me that they do not do this kind of lab testing, including the Director of the new 50-bed MHCB unit at CMF who had been in the unit for five weeks and had not ordered even one such test.

[242136-1]

patients must stay in DMH units longer than they otherwise might require, which further contributes to the backlog of significantly ill patients unable to access higher levels of care.

100.    These medication management problems are typical in overcrowded systems. The consequences are just as Dr. Gandhi described—patients are coming into DMH units with very acute mental health problems, are taking longer to stabilize on medications and are then returned to the same system that fails to adequately monitor medication compliance, thereby starting the cycle all over again.  A disturbing suicide that happened in the C-12 administrative segregation building at MCSP on January 22, 2008 illustrates this dangerous cycle, as well as the consequences of having too few crisis placements.  Class Member GGG had a history of inpatient placements due to the severity of his underlying psychotic process, and a history of suicidal ideation and medication non-compliance.  Coleman Pls' Trial Ex. 144 at p. 3-5.  On September 19, 2007, he was admitted into an acute bed at CMF, where staff were able to stabilize him and get him to take his medications.  *Id.* at p. 5.  He was discharged to the EOP level of care and arrived at MCSP on 11/2/07 with a recommendation that he continue to take his medications.  *Id.* at pp. 5-6.  Although a psychiatrist at MCSP continued the prescription initially, he discontinued the medication on 11/13/07.  *Id.* at p. 6.  Class Member GGG then apparently decompensated over a period of two months.  There were no progress notes in his medical file from a psychiatrist between November 13, 2007 (the day he was removed from medications) and January 22, 2008, the day he killed himself.  *Id.* at p. 7.  Meanwhile, his case manager realized that he was decompensating, particularly after receiving news that he received four additional years added to his sentence for pushing a food tray out of his cell back in June of 2007, which apparently hit a correctional officer.  *Id.* at p. 6.  On January 10, 2008, the case manager talked to the psychiatrist about initiating Keyhea, but apparently did not do so.  *Id.* at p. 7.  She noted the same plan on January 17th but an order still was not initiated.  On January 22nd, the case manager saw Class Member GGG for a crisis evaluation after he pushed his cell door into correctional officers when they were trying to close it.  *Id.* at p. 7.  Staff planned to admit him into the crisis unit at that point and initiate the Keyhea process.  *Id.*  After learning that the

49

restraint room was not available and that there were no crisis beds open, staff moved Class

Member GGG back to his administrative segregation cell without any prescribed observation.

*Id.* at p. 11. He hanged himself that night in his cell. This suicide is a disturbing example of an

institution's failure to maintain the clinical gains achieved at a higher level of care, its failure to

appropriately monitor and prescribe necessary psychotropic medications and its failure (in this

case fatal) to provide a mental health crisis bed to an acutely ill patient.

(c)      <u>**Systemic Problems with Medical Records**</u>

101.    The *Coleman* Special Master found significant problems with medical records

during his 20th round of tours. *See* Joint Pls' Trial Ex. 57 at p. 68 (MCSP's records sometimes

had "years of paperwork [] stuffed into heavy UHRs held together with duct tape); p. 120

(weekly summaries of psychiatric technician rounds "were not timely placed in UHRs due to

substantial filing backlogs in [DVI's] medical records"). The Receiver has also noted that the

"management and maintenance of health records continues to be an area of great concern." Joint

Pls' Trial Ex. 67 at p. 39.

102.    My personal experience with the CDCR's medical records is consistent with these

findings. I reviewed approximately 30 medical records during my first round of tours in

November of 2007 and approximately 30 more during my July and August 2008 tours. I

consistently found the records to be unwieldy, disorganized and bulky, with loose papers floating

around in the files. It was exceedingly difficult to follow the clinical course of treatment of the

patients because of the size and disorganization of the files. There were also a few instances

where I found other patients' records in the files I reviewed. In my experience, these problems

are typical in an overwhelmed and overcrowded system. Accurate and well organized medical

records are a critical element of medical and mental health care. They are even more essential in

a complex and overcrowded system such as CDCR which is characterized by frequent transfers

of patients, high turnover of clinical staff and overuse of contract clinicians who lack familiarity

with the patients and the system itself.

50

### (d)    The Systemic Use of "Bad Beds" Throughout the CDCR System

103.    Another direct result of overcrowding is the CDCR's activation of thousands of "bad beds" throughout the system.  According to recent data from the CDCR, there were 13,791 of these beds sprinkled throughout the CDCR as of July 1, 2008 date.  Joint Pls' Trial Ex. 68.

104.    Because of overcrowding, for instance, gymnasiums and dayroom floors have been converted into large dorms filled with hundreds of men.  In my opinion, these living spaces exacerbate existing mental health conditions and, in some cases, actually activate underlying mental illness in people who may not otherwise develop clinical symptoms.  I personally observed these effects during my recent tours at California Medical Facility and Mule Creek State Prison in particular.

105.    Another example of harsh living conditions are the administrative segregation units, which often act as overflow placements for *Coleman* class members who are unable to get into crisis beds, EOP units and even acute or intermediate facility placement beds.  The "Transitional Placement Unit" at Salinas Valley State Prison is an example of an overflow unit that was created because of population pressures in the system.  Although I did not tour the unit, staff explained that it was created as a transitional unit for men who require a "Sensitive Needs Yard" (SNY) placement, but for whom there are no SNY beds.  An Associate Warden explained that while *Coleman* class members at the 3CMS level of care can be housed in the TPU, EOP class members cannot.  The Associate Warden explained that if a person housed in the TPU becomes EOP, he would have to waive his SNY status to be transferred to a mainline EOP unit or, if he refused to waive that status, he would be housed in administrative segregation.  In addition, the Special Master's 20th round report found that inmates "identified as requiring EOP treatment typically waited two to three weeks *in the transitional program unit* for a bed to become available."  Joint Pls' Trial Ex. 57 at p. 183 (emphasis added).  Whether EOP prisoners remain in the TPU or are moved to administrative segregation units, however, these delays show inadequate access to the EOP level of care.

51

106.    While the TPU might be an appropriate unit to create in an overcrowded system, there is no question that this type of *ad hoc* unit would be unnecessary in a system that is operating at or near its capacity level.  Moreover, if the report from the Associate Warden is true, it is inappropriate to force a prisoner to choose between appropriate mental health care in an EOP program and his safety in a SNY program.  In my opinion, the extreme overcrowding in the system forces staff to create transitional housing units, overflow beds and other alternative placements that jeopardize the safety of prisoners and staff.

(e)    <u>The Impact of Overcrowding on Suicide Rates</u>

107.    I discussed the impact overcrowding has on suicide rates in my prior report. 11/9/07 Report at pp. 75-81.  In particular, I noted that the suicide rate in the CDCR has significantly exceeded the national average of 14 per 100,000 during both 2005 (21.9 per 100,000) and 2006 (at least 25 per 100,000 prisoners).  *Id.* at p. 76.  The CDCR had at least 43 suicides in 2006, reported 35 confirmed suicides in 2007, and, according to plaintiffs' counsel, has reported 24 suicides this year as of August 15, 2008.  The Special Master's draft report about 2006 suicides found that 72 percent of the completed suicides in 2006 "involved some measure of inadequate treatment or intervention and were, therefore, most probably foreseeable and/or preventable."  Joint Pls' Trial Ex. 58 at p. 8.

108.    My prior report explained:

> [O]vercrowding increases both the prevalence and the severity of mental illness. Put another way, overcrowding both creates new mental illness and makes existing mental illness worse.  Since many or most suicides are due to the presence of severe mental illness or the onset of a severe mental health crisis, it is clinically reasonable to anticipate a higher suicide rate in an overcrowded system. Another way to think about the correlation between overcrowding and suicide rates is to see overcrowding as a broad environmental factor increasing the risk of suicides by creating a larger class of at-risk individuals.

11/9/07 Report at p. 76.

52

[242136-1]

109.    The Special Master's finding that more than 70 percent of the 2006 suicides were preventable is extremely disturbing.  In my opinion, much of the suicide risk in the CDCR is related to overcrowding.  One recent suicide in particular illustrates the consequences of an overburdened system.  Class Member HHH hanged himself in an unlicensed infirmary at Correctional Training Facility (CTF) on March 18, 2008 and died two days later when he was removed from life support.  A few days prior to his admission into the infirmary, a staff member found Class Member HHH unresponsive in his administrative segregation cell due to a suspected drug overdose; he also had dried blood on his wrist.  He was transported to an outside hospital and then returned to the infirmary.  A March 16, 2008, clinical note shows that staff recommended placement in a mental health crisis bed, but did not pursue that placement.  A psychiatrist interviewed him on March 17, 2008 and noted that he was a "high suicide risk," but then reduced the observation to one hour rounding rather than the 15-minute watches.  The next day, Class Member HHH hanged himself with a noose that he made out of torn towel pieces.  Coleman Pls' Trial Ex. 155.  The report also reflects that staff were confused about the correct suicide precaution and watch standards that should have been followed.

110.    This suicide illustrates several aspects of the CDCR's overburdened system, including the danger of placing prisoners in alternative placements, the delayed access to higher levels of care (which in this case seems to have never been pursued), confusion among staff about suicide watch and observations procedures, and failure on the part of the attending psychiatrist to order clinically appropriate suicide precautions.

###    4.    Overcrowding is the Primary Cause of the Constitutional Violations in the CDCR

111.    These overcrowding-induced conditions that currently exist in the CDCR are extremely detrimental to the *Plata* and *Coleman* class members.  The conclusion that overcrowding is the primary cause of these violations is inescapable for several reasons.  I also stated these reasons in my November 9, 2007 Expert Report and have updated the following sections only as appropriate based on updated information.

[242136-1]

**(a)**    **The Persistence of the Constitutional Violations Present in the CDCR Demonstrates that They Are Caused by Overcrowding**

112.    First, taken together, the range of Constitutional violations discussed above, including inadequate suicide monitoring and prevention, inability to timely access appropriate levels of care, inability to timely access mental health clinicians due to staffing shortages, and inadequate medication management practices are unusual in a system that has been under Court supervision for more than ten years.  These serious, dangerous violations this late in the remedial process are typical indicators of a system plagued by severe overcrowding.  In a non-overcrowded system, the Constitutional violations are more readily addressed by such interventions as increased staff and increased programming.  However, in a system overwhelmed by crowding, these traditional remedies are woefully inadequate.  This appears to be the case in the CDCR where remedial efforts have resulted in significant expansions of staffing and programming activities, yet the constitutional violations persist or even worsen.

**(b)**    **The *Coleman* Special Master Has Found That Overcrowding Has Undermined Progress That Was Being Made In Various Areas**

113.    The *Coleman* Special Master has observed that, although there was a period of time when it seemed that defendants might be making progress in terms of their bed plan and the provision of treatment, the overcrowding crisis has overwhelmed this hope.  In his April 12, 2007 Report to the Court, he concluded:  "By late 2005, it was evident that the reduction in population growth and then in the population itself in the first few years of the decade were over, and the numbers were rising fast.  Early in 2006, defendants were staring at a galloping growth rate that threatened to hit 200 percent of capacity shortly, and the scramble was on to deal with the flow.  One victim of the turnaround was CDCR's mental health bed plan."  *See* 4/12/07 Special Master's Report on Defendants' Establishment of Interim Inpatient Intermediate DMH Beds at 8.

54

**(c)    The Percentage of Caseload Inmates in the CDCR is Increasing Faster than the Overall Population**

114.    Another factor that demonstrates that overcrowding is the primary cause of the constitutional violations is the fact that the percentage of persons with serious mental illness in the CDCR is increasing faster than the overall CDCR population.  Between January of 2003 and July of 2007, the population of the CDCR's prisons and camps grew from 152,396 to 165,932, an increase of 8.9 percent.  *Coleman* Pls' Trial Ex. 34 and 35 (Monthly population figures downloaded from the CDCR website for January 2003 and July 2007).  During the same period, the MHSDS caseload of EOP and CCCMS inmates grew from 24,599 to 32,039, an increase of 30.2 percent.  *Coleman* Pls' Trial Ex. 36 (CDCR MHSDS Prevalence Data for January 2003 and July 2007 from CDCR Monthly Reports).  Thus, during this period of roughly four and one-half years, the mental health caseload grew at four times the rate of increase for the overall population.

115.    Since my last report, the overall CDCR population has decreased while the MHSDS population continues to increase.  From July 2007 to June 2008, the overall population went from 165,932 to 160,169, a *decrease* of 5,763 inmates.  Coleman Pls' Trial Ex. 35 and Joint Pls' Trial Ex. 103.  At the same time, the MHSDS has increased from 32,039 to 34,035, or by 6.2 percent.

116.    This is typical of overcrowded systems because, as I have stated previously, overcrowding creates new mental health needs and exacerbates existing mental health needs.  I encountered numerous examples of this on my various prison tours in preparing this opinion.  As the data supports, the net result of overcrowding is a greater incidence of mental illness and at a more acute level.  Traditional remedial efforts such as increased staffing will be insufficient to remedy this problem and, in a system like the CDCR's where office and treatment space is severely limited, might actually create additional overcrowding problems.  Finally, as stated previously, overcrowding expands demand at the highest levels of care and creates static backlogs of patients that make it difficult to assess the true demand for services.

[242136-1]

> **(d)    In Many Instances, the Overcrowded Conditions Themselves Are the Cause of the Unconstitutional Mental Health Care**

117.    The causal link between overcrowding and unconstitutional mental health care is clear and direct in the many CDCR housing units where space shortages from overcrowding directly result in long-term living arrangements that are harmful to the mental health of *Coleman* class members.  For example, CCCMS inmates are routinely double or even triple-bunked in chaotic, overcrowded dorms where they experience damaging levels of stress and fear of predation.  It is clear that the mentally ill inmates I interviewed at Solano who also had staph infections would not have been as ill if they were not living in overcrowded conditions.  Similarly, mentally ill inmates are retained for extended periods in Reception Centers and in locked down general population units, where they are locked in their cells for most of the day and receive little or no programming or mental health services.  Such environments add to the instability of persons with mental illness.  Another context in which the link is clear is improper placements in administrative segregation, where caseload inmates are often unable to access care and experience decompensation.  Yet another context is suicide watches in holding cells, cages, tanks, administrative segregation units, and other unsafe, unlicensed, and improperly supervised environments.  These same harsh conditions, as discussed earlier, also increase the demand for mental health services in prisoners in the general population who, in a properly operating, not overcrowded system, would not need mental health services.  Isolation, seclusion, idleness, violence, fear and stress plague the prisoners in the CDCR as a direct result of overcrowding.  These conditions exacerbate mental illness and are serious barriers to the provision of minimally adequate mental health and medical care.

**B.    Opinion 2:  Other Remedial Efforts, Other than Population Reductions, Will Not Succeed In Remedying The Underlying Constitutional Violations.**

**1.    Defendants' Current Plans to Fix the System Will Not Work**

118.    In my opinion, no other relief will remedy the underlying constitutional violations except a remedy which results in a substantial reduction in the prison population.  I also stated

[242136-1]

this opinion in my November 9, 2007 Expert Report and have updated the following sections only as appropriate based on updated information.

119.    I am aware that the *Coleman* court has issued at least seventy-seven orders intended to induce the State to provide constitution levels of mental health treatment in the CDCR.  The *Coleman* court concluded in its July 23, 2007 Order referring consideration of a prisoner release order to the three-judge panel:  "Since February of 1996, this court has issued at least seventy-seven substantive orders to defendants in an effort to bring the CDCR's mental health care delivery system into compliance with the requirements of the Eight Amendment.  Taken together, these orders have contained directives aimed at all of the aforementioned requirements for a constitutionally adequate mental health care delivery system.  In addition, the Special Master and his staff have spent hundreds of thousands of hours working with the parties to develop program guidelines for a constitutionally adequate system and monitoring defendants' implementation of those guidelines.  During the same period of time, the Special Master has filed seventeen semi-annual monitoring reports and fifty-five other reports reflecting the results of these efforts."  7/23/07 Order at 4:13-21.  More orders and reports have issued since last summer.

120.    Having worked as a correctional expert and having worked on the *Gates* and *Madrid* cases, I am very familiar with the monitoring team working for the court on the *Coleman* case.  Moreover, having reviewed the recent monitoring reports and the other documents in this case, it is clear that very intensive remedial monitoring efforts have been going on in the *Coleman* case for many years.  In my opinion, the large team of national experts working as court-appointed experts in the *Coleman* case has a great deal of collective experience working with troubled correctional systems.  Nonetheless, after more than ten years of intensive monitoring and other remedial efforts, the CDCR remains plagued by serious constitutional deficiencies in its delivery of mental health care.  I agree with the *Coleman* Special Master that the reason for this sorry state of affairs is that whatever tentative progress was made early on in this case has been overwhelmed by the massive population expansion in recent years.

[242136-1]

121.    From reviewing the docket in the *Coleman* case, I am aware that these more than seventy-seven orders have attempted to address issues of staffing, space, quality of treatment, and bed availability, among others.  These include numerous orders concerning such critical issues as adequate MHCB capacity (see, e.g., 1/15/01, 12/20/01, 10/8/02 Orders); access to DMH beds (see, e.g., 5/22/98, 7/26/99, 8/28/00, 4/4/01, 6/27/01, 3/4/02, 5/7/02, 10/8/02, 1/19/04, 7/9/04, 6/30/07, 8/8/08 Orders); and staffing (see, e.g., 2/17/96, 6/17/98, 8/25/99, 1/19/99, 7/26/99, 1/13/00, 4/27/00, 8/28/00, 6/13/02, 10/8/02, 3/3/06 Orders).

122.    Persistent shortages of beds at every level, lack of adequate mental health and custodial staff, and inadequate treatment and programming space clearly reflect the overcrowding crisis.  In my opinion, more orders by the Court along the lines of those discussed above will not remedy the underlying Constitution violations at this time.  The system is simply too overwhelmed by the population for these orders to be effective.

123.    I am also aware that the State has proposed construction of new prisons and re-entry facilities as the bulk of its solution to the overcrowding crisis.  I have reviewed the Receiver's analysis in his Reports regarding overcrowding and the further demands for mental health and medical staffing, and treatment space that building these new prisons and re-entry facilities will create.  As the Receiver notes, building more prisons and re-entry facilities will require additional staff, and will spread existing overtaxed staff among more facilities.  See Joint Pls' Trial Ex. 26 (Receiver's 5/15/07 Report Re Overcrowding) at 40-41.  The building timeline for the beds contemplated by AB 900 does not anticipate any new beds until 2009, and most of the beds will be built much later.  *See Coleman* Pls' Trial Ex. 40 (January 2007 CDCR Estimated Construction Schedule for Infill Bed Plan, Ex. 20 to Receivers 5/15/07 Report).  Moreover, as the delays associated with the CDCR's plans to construct walk-alone yards demonstrate, construction projects involving government agencies are rarely finished by the anticipated dates.  In my opinion, any added capacity for mental health and medical treatment that this prison construction may create will take far too long to be sufficient to remedy the current constitutional violations, which are extremely urgent and life-threatening.  This plan also fails to address the

58

other persistent, intractable overcrowding-related problems that are present in the CDCR, such as clinical and custody shortages, inadequate medication management practices, and insufficient beds at the highest levels of care.

124.    Similarly, defendants' and the Receiver's plan to meet the needs of *Coleman* and *Plata* class members by building "Consolidated Healthcare Facilities" (CHCFs) is a long-term goal that is insufficient to address current Constitutional violations.  According to defendants' July 16, 2008 mental health bed plan, "[c]onstruction sites and schedules for the CHCFs are still in development, with anticipation of *the first 1500-bed facility targeted to begin construction* in January 2009, anticipating completion by January 2011.  There are eight sites being considered; land availability, infrastructure capability, environmental concerns, and political climate, among others, drive the ability to select, schedule and begin construction."  Coleman Pls' Trial Ex. 55 at p. 4.  It is also apparent from the Receiver's 8th Report that the entire project to build CHCFs is in jeopardy.  He discusses the need for 10,000 medical and mental health beds ("no one seriously disagrees with these projections") and explains that, "the scope of the existing shortfall in treatment facilities provides yet another example of the seriousness of the State's long-term failure to provide constitutionally adequate medical and mental health facilities for its prisoners." Joint Pls' Trial Ex. 56 at p. 46.  Despite the dire shortage of approximately 5,000 mental health beds and 5,000 medical beds, the State has thus far ignored the Receiver's efforts to get the CHCFs funded.  As he explains:

> The State's failure to make this necessary financial commitment puts the Receiver's entire remedial program at risk since the various pieces of the program are so intertwined and interconnected that failure to fund and implement on major element undermines all of the other elements.  Unfortunately, the State's failure to make the necessary financial commitment is not a result of inadvertent neglect or mere incompetence (trained or otherwise).  Instead, it is a result of conscious, deliberate obstruction by key decision-makers and decision-influencers resulting in a willful failure by the State to live up to its constitutional and court-ordered obligations.  This is not a charge that the Receiver makes lightly; he has spent the last fifteen years working within State government processes to improve government operations.  The State has now crossed that line and, in so doing, demonstrates a lack of remorse and an unwillingness to accept accountability for

59

> its own constitutional violations. The State's failure to express its unequivocal
> commitment to the Receiver's necessary construction program should be taken
> into account by this Court in subsequent proceedings, and by the *Coleman,
> Armstrong* and *Perez* Courts.

*Id.* at p. 56.

125. Even if the Receiver's construction plan had funding, however, the Receiver
anticipates building only one of the five hospitals by 2011 in the best case scenario. The fact that
the plan is currently unfunded means that the 2011 and all other deadlines are in jeopardy. It is
also significant that the Receiver's plan does not address all of the required shortfall of EOP,
MHCB and ICF beds. The CDCR, which has a very poor track record of completing
construction projects on time, is still tasked with a series of construction projects, including, for
example: the 64-bed ICF unit at SVSP; the 64-bed ICF unit at CMF; the 50 bed MHCB unit at
CMC; the 32 MHCB unit at San Quentin and; the 67 EOP unit at CMF. Coleman Pls' Trial Ex.
55 at p. 7. Meanwhile, the *Coleman* and *Plata* class members are daily suffering dangerous
denials of mental health care and medical care that place them, their fellow inmates, the officers
who supervise them, and the public at risk. The only way to timely correct the endemic denials
of appropriate mental health care that currently exist in the CDCR is to significantly reduce the
population. No other remedy will result in a constitutional medical and mental health care
system in the CDCR.

## 2. The State Must Make Substantial Reductions in the Prisoner Population

126. I conclude that the prison population must be substantially reduced in order to
provide adequate mental health care in a timely manner to the prisoners with mental illness who
are suffering every day in the California prisons. In 2004, the Corrections Independent Review
Panel appointed by Governor Schwarzenegger worked with experienced wardens to determine
the "Maximum Operable Capacity" (MOC) of the prisons system. The Panel defined MOC as
"the percentage of design capacity of the various housing units within the institutions wherein
the prison can be operated both safely and can provide programming for ever inmate, consistent

[242136-1]

with the inmate's ability."  Joint Pls' Trial Ex. 4 at p. 161.  The MOC incorporated educational, vocational, substance abuse, and other rehabilitation programming, but did not account for programming associated with mental health or medical treatment.  Coleman Pls' Trial Ex. 108 at p. 113:15-17.  The Panel concluded that the MOC for male prisons statewide was 145 percent of design capacity.[7]  Joint Pls' Trial Ex. 4 at p. 124.  The MOC made two assumptions:  first, all "bad beds" would be closed so that program space would be available, and second, there would be sufficient "staff with requisite experience" available to manage an effective program.  *Id.* at p. 161.

127.    When mental health treatment needs are taken into account, the maximum operable capacity will be lower.  The *Coleman* Special Master reported to the Court on May 31, 2007 that "[g]iven the inadequacies of programming space, program beds and mental health staffing…defendants cannot meet at least a substantial portion, amounting in some loose amalgam to about 33 percent, of acknowledged mental health needs…"  Joint Pls' Trial Ex. 35 at pp. 12-14.

128.    The operable capacity estimation by the California wardens also probably reflects a degree of institutionalized acceptance of overcrowding on the part of the wardens themselves that may have driven them to overestimate capacity.  The *Plata* Receiver has documented "CDCR's institutionalized acceptance of overcrowding and the lowering of correctional standards to accommodate overcrowding."  Joint Pls' Trial Ex. 26 at p. 10.  The Receiver found that decades of prison overcrowding in California resulted in the parallel evolution of "a correctional mindset that allows *overcrowding* rather than *sound correctional management* to drive crucial construction and prisoner management policy."  *Id.* (emphasis in original).  Moreover, the Receiver found that the CDCR Facility Master Plans spanning 1993-2003 similarly failed to account for medical, mental health, and dental care programming needs.

---

[7] Design capacity was determined to be 76,879 inmates at that time.  Joint Pls' Trial Ex. 4 at p. 123.  On January 25, 2007, the Little Hoover Commission issued a report updating the design capacity to 83,219.  Joint Pls' Trial Ex. 3 at p. 19.

Indeed, CDCR knowingly planned construction of even its newest prisons to provide at most fifty percent of all health care related space needs, "ignoring pre-existing plans to double-cell the prison up to 200 percent of capacity." *Id.* at p. 20. These facts suggest that the Maximum Operable Capacity is actually lower than the Corrections Independent Review Panel's conclusion of 145 percent.

129. At a minimum, it is clear that the prison population must be reduced to a level, whether 145 percent or lower, that allows the State to meet the assumptions that the Corrections Independent Review Panel laid out for maximum operable capacity. All bad beds must be eliminated, sufficient program space must be identified and made available, and the number of inmates must correlate with available appropriate clinician and custody staffing, in terms of both numbers and quality, to provide programming. It is not clear that the "serious staffing shortfalls" in CDCR prisons can accommodate 145 percent capacity (much less the near-double capacity they now face). Joint Pls' Trial Ex. 26 at p. 11 ("[O]vercrowding is accompanied by serious staffing shortfalls for both clinical providers and correctional officers.").

130. A maximum operable capacity that provides for the constitutional delivery of mental health care must expand the assumptions of the Panel to reflect the mental health treatment standards established by the *Coleman* Court. All "bad" mental health beds must be eliminated—for example, this means reducing the population to eliminate the use of alternative crisis beds, EOP "overflow" housing that does not have appropriate space for individual or group mental health contacts, and DMH units such as those currently run in SVSP D-5 and D-6, which are not set up to provide care consistent with inpatient standards. Adequate mental health programming space must be afforded. The operable capacity must also be related to the number of mental health and custody staff in the prison system providing mental health care, and the ability to provide these staff with adequate office and treatment space.

62

C.  **Opinion 3:  The State Can Include the *Coleman* Class in Population Reduction Plans without Adversely Affecting Public Safety and Should Do So.  Moreover, If the State Enhanced the Services Provided to Released Individuals, Public Safety Would Improve.**

131.    Any reduction of the prison population must include at least a proportionate reduction in the mental health caseload population in order to remedy the ongoing Constitutional violations in the delivery of mental health care.  The Special Master has already observed that the resources now in the system (beds, space, staff) are insufficient for at least one-third of the mental health caseload.  Joint Pls' Trial Ex. 35 at pp. 13-14.  It is both safe and appropriate to include individuals with mental illness in any program to decrease the length of stay or divert from prison designed to address overcrowding.  When considering the public safety impacts of such a program, and the increased use of sanctions other than prison for parole violators with mental illness, it is important to understand who these individuals are and what systems already exist in the community that are already available  to support them.

132.    Although many people talk in terms of "the mentally ill," there is a not a single monolithic "mentally ill" population.  In CDCR's Mental Health Services Delivery System, for example, there are individuals classified at the CCCMS level of care, individuals classified at the EOP level of care, and individuals classified at the inpatient level of care.  June 2008 data shows the total CDCR population of individuals identified with mental illness as 34,035, including 28,511 at the CCCMS level of care; 4,577 at the EOP level of care; at least 272 in Mental Health Crisis Beds; and 574 in Department of Mental Health inpatient beds.  Coleman Pls' Trial Ex. 57 at p. 4.  The total mental health population is approximately 21 percent of the total CDCR prison population (34,035 of 160,334).  Joint Pls' Trial Ex. 65 at p. 1 (showing population of prisons and camps).

133.    It is important to differentiate between these groups in terms of the levels of support and treatment required by these individuals upon parole or diversion to their home communities.  Under the Program Guide standards, CCCMS prisoners (84 percent of the mental health caseload and about 18 percent of the total prison population) can be safely housed and function in the general population of the prison, with a minimal level of mental health support.

[242136-1]

Currently, most receive only medication, and the Program Guide standards require that they receive a reevaluation regarding medication issues every 90 days. The Program Guide definitions of CCCMS patients recognize that there is a spectrum of needs within the CCCMS classification, including the largest group of patients for whom tracking and monitoring is sufficient to meet clinical needs, as well as those who may need a modest level of clinical and case management services. In the community, CCCMS individuals would need parallel levels of treatment, with many needing medication and follow-up, and some who would benefit from additional case management that would include assistance with accessing community mental health services, substance abuse treatment, housing, benefits, and employment. Just as in prison, the vast majority of parolees with mental illness will rarely require more intensive levels of mental health services such as crisis care, day treatment or hospitalization, in the community. Some mentally ill parolees, supported by friends and family, and away from the stress and tensions of the overcrowded prisons, will improve their level of functioning and their treatment needs may actually decrease.

134.    A far smaller group of mentally ill individuals, represented by the EOP population (13 percent of the mental health caseload and less than 3 percent of the total prison population), and the inpatient population (2 percent of the mental health caseload and less than .5 percent of the total population), need increased levels of community mental health services. Even in this smaller group of individuals at higher levels of care, there is still a range of appropriate treatment options. For example, there are some individuals at the EOP level of care who can succeed in the community with the same level of resources described above for the CCCMS population. Other individuals with a greater level of dysfunction as a result of their mental illness would be more likely to succeed in the community with day treatment programs. A smaller number would need housing in board and care or other residential facilities, and from time to time, access to crisis care and psychiatric hospitalization. It has been my experience that this broad range of services can be very effective for treating offenders with all levels of mental illness in the community. I also reviewed and agree with a memorandum from the Regional

Administrator for Parole Region IV (San Diego, Riverside, San Bernardino and Imperial Counties) in which he observed that the provision of adequate and timely intermediate levels of treatment to parolees such as day treatment could reduce the number of parolees who need hospitalization or who are returned to prison, thus "break[ing] the cycle of mentally ill parolees filling up expensive prison beds."  Joint Pls' Trial Ex. 70 at p. E_PRIV_051487 (Memorandum, Jeff Fagot, Parole Administrator, Region IV to Tom Hoffman, July 30, 2007.

135.    It has been my experience that there are already community mental health systems in place at the local level to provide treatment and other supportive services to this population.  These include a spectrum of services ranging from clinician and social worker appointments to day treatment to locked care facilities.  There are a variety of service providers including city and county hospitals and clinics, private contractors, parole office clinics, non-profits and the Veteran's Administration.  It is also my experience that community mental health and parole programs are currently underfunded and would benefit from a significant increase in their resources.  It is also true that various communities have different types of programs, some more successful than others and some better funded than others.  There is no question that California needs to do a much better job with community mental health programs and improvements in those programs would benefit society as a whole in many ways.

136.    It is my understanding that some public mental health treatment providers currently refuse to provide treatment to parolees because there remains confusion and disagreements about whether the county or the State is responsible for paying for mental health care for these persons.  This sometimes results in parole agents and the parole revocation process sending individuals back to prison when their primary need is actually mental health treatment.[8]  This ongoing dispute between the State and the Counties must be resolved.  It is dangerous for the patients, wasteful of public resources and decreases public safety in the community.  CDCR's

---

[8] For example, a memorandum from the Region III (Los Angeles) Parole Administrator notes that provision of increased clinical services to mentally ill parolees would provide needed treatment instead of punishing parolees for their illness by locking them up.  Joint Pls' Trial Ex. 71 at p. E_PRIV_057802.

Reception Centers are dangerously overcrowded and do not and cannot provide appropriate mental health care for anyone, let alone a short term parole violator with mental illness. This patient will be returned to the community after a few months, having suffered the effects of severe prison overcrowding but receiving little or no appropriate mental health care.

137.    Any generalized fear about "releasing the mentally ill" because they are all too dangerous or psychotic to be safely released to the community should be flatly rejected. Individuals at all levels of acuity are already released from prison to parole all the time. Most of these individuals do not present an increased danger to others because of their mental illness, and appropriate treatment can be extremely effective in treating mental illness. To the extent that there are individuals who are more dangerous because of their mental illness, California laws already authorize the involuntary commitment of individuals whose mental illness causes them to be so dangerous that they may not safely be released. These laws provide authority for involuntary commitment and legal protections for the individuals who may be involuntarily committed.

138.    The "Mentally Disordered Offender" (MDO) Law provides for individualized assessments of the dangerousness of inmates due to mental illness, and also authorizes involuntary commitment for the small number of individuals who are deemed either unsafe for release because of mental illness or who are in mental health crisis and pose an immediate threat to themselves or others. This means that to the extent there are individuals who should not be released to the community because of an inability to control serious criminal conduct due to mental illness, there is already a system in place to screen out those few individuals. The MDO Law provides the criteria for treatment as a mentally disordered offender. This designation would apply to an individual who has a "severe mental disorder that is not in remission or cannot be kept in remission without treatment" at the time of parole or upon termination of parole *and* the severe mental disorder was one of the causes of or was an aggravating factor in the commission of a crime that is one of the serious crimes listed by the statute. Conservatorships also provide another tool that may be used for a very small portion of acutely ill individuals.

66

139.    There are also already safety nets for individuals who decompensate in the community and require crisis care.  The "Lanterman-Petris-Short" (LPS) Act provides for an involuntary 72-hour treatment and evaluation at a facility designated by the county and approved by the State Department of Mental Health when "any person, as a result of mental disorder, is a danger to others, or to himself or herself, or gravely disabled."  The LPS Act also requires that certain evaluations then take place to determine whether further care and treatment is needed, and whether a conservator should be appointed if involuntary care is needed.

140.    It is my understanding that instead of following these laws, it has been the practice of the CDCR to return parolees with mental illness to custody in CDCR prisons when parole agents perceive that they may be dangers to themselves or others.  I reviewed an order the *Coleman* Court issued on August 8, 2008 directing parole agents to follow the LPS Act for parolees. These laws can be used to ensure that public safety considerations are met when releasing or diverting mentally ill offenders from prison.

141.    The improvements the State should make to its provision of care for mentally ill inmates released to parole are not insurmountable obstacles, and are well-known to clinicians in the field.  For example, the Regional Parole Administrator for Parole Region III wrote an August 2007 memorandum to the Director of the Division of Adult Parole Operations that an already-existing facility was assisting one of the parole districts with "housing EOP, CCCMS, and hard to place parolees…and has placement for approximately twenty parolees.  As the program already has a housing component, they can add components to accommodate at Day Treatment and Crisis Care Service."  Joint Pls' Trial Ex. 71 at p. E_PRIV_057801.  The components he specified were 1) integrate medical, psychiatric, psychological, and chemical dependency service delivery; 2) assign a POC social worker and therapist to the program in order to ensure continuum of care; 3) provide an array of services, via case management; 4) assign parole agent from each district to work as a liaison between the program and DAPO; and 5) monitoring parolee's behavior and arranging ongoing community support and treatment by coordination

between incarceration and gradual reintegration into the community. *Id.* at pp. E_PRIV_057801-057802.

142.    The Regional Administrator also recommended increasing clinical services for mentally ill parolees by providing access to:

> a community hospitalization component that would handle our psychiatric cases that will decompensate…Utilizing existing hospital facilities would be in alignment with community re-integration and would present a process that has patient's rights and redress already built in via the Lanterman-Petris-Short Act…Another aspect of this would be to engage in a contract with these facilities to set aside Forensic beds and to allow our POC Psychiatrists hospitalization privileges, to have the ability to hospitalize and treat our population…We can look at hospitals/clinics in the area that may be receptive to such a partnership. Our funding could allow for supplementing services provided by Medi-cal/SSI/Medicare. This process would allow parolees to remain in the community, and not be violated. Thereby, keeping their revocation rate down. The process would also allow for individuals who need more long term care to utilize existing Mental Health codes/statutes to pursue a 180-day certification or long-term treatment at State Hospitals. Thus, parolees would not be punished for their illness by being locked up.

*Id.* at p. E_PRIV_057802.

143.    Similarly, the Regional Administrator for Parole Region IV wrote a July 2007 memorandum to the Director of the Division of Adult Parole Operations that recommended "interagency agreements between CDCR and local government." He identified a "dire need for day treatment" and suggested that "[c]onsummation of joint formal agreements between county and state agencies would be most beneficial with cost reimbursement or offset by CDCR to include all parolees within those jurisdictions." Joint Pls' Trial Ex. 70 at p. E_PRIV_051492. He noted that the "mental health issue must be approached as a partnership with all the agencies involved having a say in the outcome." I agree with the Regional Administrator's conclusion that the State needs "to develop contractual locked and open psychiatric care facilities in the local communities." *Id.* at p. E_PRIV_051487.

144.    There are also some non-treatment steps CDCR could take that would improve the success of mentally ill individuals released to parole. For example, in the same

memorandum described above, the Administrator for Region III also recommended that "California should mandate a transportation policy independent of the $200.00 release funds. The policy should pay for the inmates' direct transportation from the prison to the assigned parole office. This will allow the release funds to assist the parolee with housing and living expenses upon his release. In addition, the direct transportation to the parole office will reduce the absconder rate for their initial release to parole, and parolees released from revocation…This would also greatly benefit the parolee in need of mental health treatment, get the parolee to the parole office expeditiously, and afford him or her the appropriate and immediate referral resources to maintain his stability in the community." Joint Pls' Trial Ex. 71 at p. E_PRIV_057797. The Administrator for Region IV noted that because mentally ill parolees "are not adept at handling stressors…we must alleviate as much of that stress as we can. They must be informed prior to their release what the plan is and how it will accommodate their needs. This must be initiated at the institution if we are to break the cycle of mental[ly] ill inmates." Joint Pls' Trial Ex. 70 at p. E_PRIV_051488.

145.    Based on the documents I have reviewed and my own experience, it is my opinion that a prisoner release order must include inmates with mental illness in order to address the unconstitutional delivery of mental health care in the prisons. It is also my opinion that a decrease in the length of stay or diversion of individuals with mental illness from prison can be done without adversely affecting public safety. Moreover, if the services provided to these individuals were enhanced as described above, public safety would be positively affected. Individuals with mental illness have varying needs that can be effectively addressed in the community when appropriate treatment is provided. There are already systems in communities that provide this range of treatment and services. These should be enhanced in connection with a prisoner release order to maximize the chances of success for those individuals who are paroled to the community or diverted from prison to help counties absorb these individuals.

## IV.    CONCLUSION

146.    The extreme overcrowding in California's prison system permeates nearly every aspect of medical and mental health care and, if not remediated, will continue to result in preventable suffering and death.  Unless and until the state reduces the population, it will be unable to sustain meaningful reform.

Dated:  August 15, 2008

PABLO STEWART, M.D.

70

**APPENDIX A**

## CURRICULUM VITAE

*PABLO STEWART, M.D.*

| | |
|---|---|
| **EDUCATION:** | University of California School of Medicine, San Francisco, California, M.D., 1982 |
| | United States Naval Academy Annapolis, MD, B.S. 1973, Major: Chemistry |
| **LICENSURE:** | California Medical License #GO50899<br>Hawai'i Medical License #MD11784<br>Federal Drug Enforcement Agency #BS0546981<br>Diplomat in Psychiatry, American Board of<br>Psychiatry and Neurology, Certificate #32564 |

## ACADEMIC APPOINTMENTS:

| | |
|---|---|
| September 2006-Present | Academic Appointment: Clinical Professor, Department of Psychiatry, University of California, San Francisco, School of Medicine. |
| July 1995 - Present | Academic Appointment:  Associate Clinical Professor, Department of Psychiatry, University of California, San Francisco, School of Medicine. |
| August 1989 - June 1995 | Academic Appointment:  Assistant Clinical Professor, Department of Psychiatry, University of California, San Francisco, School of Medicine. |
| August 1986 - July 1989 | Academic Appointment:  Clinical Instructor, Department of Psychiatry, University of California, San Francisco, School of Medicine. |

## EMPLOYMENT:

| | |
|---|---|
| December 1996-Present | Psychiatric Consultant<br>Provide consultation to governmental and private agencies on a variety of psychiatric, forensic, substance abuse and organizational issues. (Client list available upon request). |

| | |
|---|---|
| January 1997-<br>September 1998 | <u>Director of Clinical Services, San Francisco Target Cities</u><br><u>Project</u>.  Overall responsibility for ensuring the quality of the clinical services provided by the various departments of the project including the Central Intake Unit, the ACCESS Project and the San Francisco Drug Court   Also responsible for providing clinical in-service training's for the staff of the Project and community agencies that requested technical assistance. |
| February 1996 -<br>November 1996 | <u>Medical Director, Comprehensive Homeless Center,</u><br><u>Department of Veterans Affairs Medical Center, San Francisco.</u><br>Overall responsibility for the medical and psychiatric services at the Homeless Center. |
| March 1995 -<br>January 1996 | <u>Chief, Intensive Psychiatric Community Care Program,</u><br><u>(IPCC) Department of Veterans Affairs Medical Center, San</u><br><u>Francisco.</u>  Overall clinical/administrative responsibility for the IPCC, a community based case management program.  Duties also include medical/psychiatric consultation to Veteran Comprehensive Homeless Center.  This is a social work managed program that provides comprehensive social services to homeless veterans. |
| April 1991 -<br>February 1995 | <u>Chief, Substance Abuse Inpatient Unit, (SAIU), Department</u><br><u>of Veterans Affairs Medical Center, San Francisco.</u><br>Overall clinical/administrative responsibility for SAIU. |
| September 1990 -<br>March 1991 | <u>Psychiatrist, Substance Abuse Inpatient Unit, Veterans</u><br><u>Affairs Medical Center, San Francisco.</u>  Clinical responsibility for patients admitted to SAIU.  Provide consultation to the Medical/Surgical Units regarding patients with substance abuse issues. |
| August 1988 -<br>December 1989 | <u>Director, Forensic Psychiatric Services, City and County of</u><br><u>San Francisco.</u>  Administrative and clinical responsibility for psychiatric services provided to the inmate population of San Francisco.  Duties included direct clinical and administrative responsibility for the Jail Psychiatric Services and the Forensic Unit at San Francisco General Hospital. |
| July 1986 -<br>August 1990 | <u>Senior Attending Psychiatrist, Forensic Unit, University of</u><br><u>California, San Francisco General Hospital.</u>  Administrative and clinical responsibility for a 12-bed, maximum-security psychiatric ward.  Clinical supervision for psychiatric residents, postdoctoral psychology fellows and medical students assigned to the ward.  Liaison with Jail Psychiatric Services, City and County of San Francisco.  Advise San Francisco City Attorney on issues pertaining to forensic psychiatry. |

| | |
|---|---|
| July 1985<br>June 1986 | <u>Chief Resident, Department of Psychiatry, University of</u><br><u>California</u> <u>San Francisco General Hospital.</u>  Team leader of the Latino-focus inpatient treatment team (involving 10-12 patients with bicultural/bilingual issues); direct clinical supervision of 7 psychiatric residents and 3-6 medical students; organized weekly departmental Grand Rounds; administered and supervised departmental residents' call schedule; psychiatric consultant to hospital general medical clinic; assistant coordinator of medical student education; group seminar leader for introduction to clinical psychiatric course for UCSF second year medical students. |
| July 1984 -<br>March 1987 | <u>Physician Specialist, Westside Crisis Center, San Francisco,</u><br><u>CA.</u>  Responsibility for Crisis Center operations during assigned shifts; admitting privileges at Mount Zion Hospital.  Provided psychiatric consultation for the patients admitted to Mount Zion Hospital when requested. |
| April 1984 -<br>July 1985 | <u>Psychiatric Consultant, Marin Alternative Treatment, (ACT).</u><br>Provided medical and psychiatric evaluation and treatment of residential drug and alcohol clients; consultant to staff concerning medical/psychiatric issues. |
| August 1983 -<br>November 1984 | <u>Physician Specialist, Mission Mental Health Crisis Center,</u><br><u>San Francisco, CA.</u>  Clinical responsibility for Crisis Center clients; consultant to staff concerning medical/psychiatric issues. |
| July 1982-<br>July 1985 | <u>Psychiatric Resident, University of California, San Francisco.</u><br>Primary Therapist and Medical Consultant for the adult inpatient units at San Francisco General Hospital and San Francisco Veterans Affairs Medical Center; Medical Coordinator/Primary Therapist - Alcohol Inpatient Unit and Substance Abuse Clinic at San Francisco Veterans Affairs Medical Center; Outpatient Adult/Child Psychotherapist; Psychiatric Consultant - Adult Day Treatment Center - San Francisco Veterans Affairs Medical Center; Primary Therapist and Medial Consultant - San Francisco General Hospital Psychiatric Emergency Services; Psychiatric Consultant, Inpatient Medical/Surgical Units - San Francisco General Hospital. |
| June 1973 -<br>July 1978 | <u>Infantry Officer - United States Marine Corps.</u><br>Rifle Platoon Commander; Anti-tank Platoon Commander; 81mm Mortar Platoon Commander; Rifle Company Executive Officer; Rifle Company Commander; Assistant Battalion Operations Officer; Embarkation Officer; Recruitment Officer; Drug, Alcohol and Human Relations Counselor; Parachutist and Scuba Diver; Commander of a Vietnamese Refugee Camp.  Received an Honorable Discharge.  Highest rank attained was Captain. |

HONORS AND AWARDS:

| | |
|---|---|
| June 1995 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as the outstanding psychiatric faculty member for the academic year 1994/1995. |
| June 1993 | Selected by the class of 1996, University of California, San Francisco, School of Medicine as outstanding lecturer, academic year 1992/1993. |
| May 1993 | Elected to Membership of Medical Honor Society, AOA, by the AOA Member of the 1993 Graduating Class of the University of California, San Francisco, School of Medicine. |
| May 1991 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as the outstanding psychiatric faculty member for the academic year 1990-1991. |
| May 1990 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as the outstanding psychiatric faculty member for the academic year 1989-1990. |
| May 1989 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as the outstanding psychiatric faculty member for the academic year 1988-1989. |
| May 1987 | Selected by the faculty and students of the University of California, San Francisco, School of Medicine as the recipient of the Henry J. Kaiser Award For Excellence in Teaching. |
| May 1987 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as Outstanding Psychiatric Resident. The award covered the period of 1 July 1985 to 30 June 1986, during which time I served as Chief Psychiatric resident, San Francisco General Hospital. |
| May 1985 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as Outstanding Psychiatric Resident. |
| 1985 | Mead-Johnson American Psychiatric Association Fellowship. One of sixteen nation-wide psychiatric residents selected because of a demonstrated commitment to public sector psychiatry. Made presentation at Annual Hospital and Community Psychiatry Meeting in Montreal, Canada in October 1985, on the "Psychiatric Aspects of the Acquired Immunodeficiency Syndrome." |

## MEMBERSHIPS:

| | |
|---|---|
| June 2000-<br>Present | California Association of Drug Court Professionals. |
| July 1997-<br>June 1998 | President, Alumni-Faculty Association, University of California, San Francisco, School of Medicine. |
| July 1996 -<br>June 1997 | President-Elect, Alumni-Faculty Association, University of California, San Francisco, School of Medicine. |
| July 1995 -<br>June 1996 | Vice President, Northern California Area, Alumni-Faculty Association, University of California, San Francisco, School of Medicine. |
| April 1995 -<br>April 2002 | Associate Clinical Member, American Group Psychotherapy Association. |
| July 1992 -<br>June 1995 | Secretary-Treasurer, Alumni-Faculty Association, University of California, San Francisco, School of Medicine. |
| July 1990 -<br>June 1992 | Councilor-at-large, Alumni-Faculty Association, University of California, San Francisco, School of Medicine |

## PUBLIC SERVICE:

| | |
|---|---|
| June 1992 - | Examiner, American Board of Psychiatry and Neurology, Inc. |
| November 1992 -<br>January 1994 | California Tuberculosis Elimination Task Force, Institutional Control Subcommittee. |
| September 2000-<br>April 2005 | Editorial Advisory Board, *Juvenile Correctional Mental Health Report.* |
| May 2001-<br>Present | Psychiatric and Substance Abuse Consultant, San Francisco Police Officers' Association. |
| January 2002-<br>June 2003 | Psychiatric Consultant, San Francisco Sheriff's Department Peer Support Program. |
| February 2003-<br>April 2004 | Proposition "N" (Care Not Cash) Service Providers' Advisory Committee, Department of Human Services, City and County of San Francisco. |
| December 2003-<br>January 2004 | Member of San Francisco Mayor-Elect Gavin Newsom's Transition Team. |
| February 2004-<br>June 2004 | Mayor's Homeless Coalition, San Francisco, CA. |
| April 2004-<br>January 2006 | Member of Human Services Commission, City and County of San Francisco. |

| | |
|---|---|
| February 2006-<br>January 2007 | Vice President, Human Services Commission, City and County of San Francisco. |
| February 2007-<br>Present | President, Human Services Commission, City and County of San Francisco. |

UNIVERSITY SERVICE:

| | |
|---|---|
| July 1999-<br>July 2001 | Seminar Leader, National Youth Leadership Forum On Medicine. |
| October 1999-<br>October 2001 | Lecturer, University of California, San Francisco, School of Medicine Post Baccalaureate Reapplicant Program. |
| November 1998-<br>November 2001 | Lecturer, University of California, San Francisco, School of Nursing, Department of Family Health Care Nursing.  Lecture to the Advanced Practice Nurse Practitioner Students on Alcohol, Tobacco and Other Drug Dependencies. |
| January 1994 -<br>January 2001 | Preceptor/Lecturer, UCSF Homeless Clinic Project. |
| June 1990 -<br>November 1996 | Curriculum Advisor, University of California, San Francisco, School of Medicine. |
| June 1987 -<br>June 1992 | Facilitate weekly Support Groups for interns in the Department of Medicine.  Also, provide crisis intervention and psychiatric referral for Department of Medicine housestaff. |
| January 1987 –<br>June 1988 | Student Impairment Committee, University of California San Francisco, School of Medicine.<br>Advise the Dean of the School of Medicine on methods to identify, treat and prevent student impairment. |
| January 1986 –<br>June 1996 | Recruitment/Retention Subcommittee of the Admissions Committee, University of California, San Francisco, School of Medicine.<br>Advise the Dean of the School of Medicine on methods to attract and retain minority students and faculty. |
| October 1986 -<br>September 1987 | Member Steering Committee for the Hispanic Medical Education Resource Committee.<br>Plan and present educational programs to increase awareness of the special health needs of Hispanics in the United States. |
| September 1983 -<br>June 1989 | Admissions Committee, University of California, School of Medicine.   Duties included screening applications and interviewing candidates for medical school. |
| October 1978 -<br>December 1980 | Co-Founder and Director of the University of California, San Francisco Running Clinic.<br>Provided free instruction to the public on proper methods of exercise and preventative health measures. |

TEACHING RESPONSIBILITIES:

| | |
|---|---|
| July 2003-<br>Present | Facilitate weekly psychotherapy training group for residents in the Department of Psychiatry. |
| September 2001-<br>June 2003 | Supervisor, San Mateo County Psychiatric Residency Program. |
| January 2002-<br>January 2004 | Course Coordinator of Elective Course University of California, San Francisco, School of Medicine, "Prisoner Health." This is a 1-unit course, which covers the unique health needs of prisoners. |
| April 1999-<br>April 2001 | Lecturer, UCSF School of Pharmacy, Committee for Drug Awareness Community Outreach Project. |
| February 1998-<br>June 2000 | Lecturer, UCSF Student Enrichment Program. |
| January 1996 -<br>November 1996 | Supervisor, Psychiatry 110 students, Veterans Comprehensive Homeless Center. |
| March 1995-<br>Present | Supervisor, UCSF School of Medicine, Department of Psychiatry, Substance Abuse Fellowship Program. |
| September 1994 -<br>June 1999 | Course Coordinator of Elective Course, University of California, San Francisco, School of Medicine. Designed, planned and taught course, Psychiatry 170.02, "Drug and Alcohol Abuse." This is a 1-unit course, which covers the major aspects of drug and alcohol abuse. |
| August 1994 -<br>February 2006 | Supervisor, Psychiatric Continuity Clinic, Haight Ashbury Free Clinic, Drug Detoxification and Aftercare Project. Supervise 4th Year medical students in the care of dual diagnostic patients. |
| February 1994 -<br>February 2006 | Consultant, Napa State Hospital Chemical Dependency Program Monthly Conference. |
| July 1992 -<br>June 1994 | Facilitate weekly psychiatric intern seminar, "Psychiatric Aspects of Medicine," University of California, San Francisco, School of Medicine. |
| July 1991-<br>Present | Group and individual psychotherapy supervisor, Outpatient Clinic, Department of Psychiatry, University of California, San Francisco, School of Medicine. |
| January 1991 | Lecturer, University of California, San Francisco, School of Pharmacy course, "Addictionology and Substance Abuse Prevention." |
| September 1990 -<br>February 1995 | Clinical supervisor, substance abuse fellows, and psychiatric residents, Substance Abuse Inpatient Unit, San Francisco Veterans Affairs Medical Center. |

| | |
|---|---|
| September 1990 -<br>November 1996 | Off ward supervisor, PGY II psychiatric residents,<br>Psychiatric Inpatient Unit, San Francisco Veterans Affairs Medical<br>Center. |
| September 1990 -<br>June 1991 | Group therapy supervisor, Psychiatric Inpatient Unit, (PIU),<br>San Francisco Veterans Affairs Medical Center. |
| September 1990 -<br>June 1994 | Course coordinator, Psychiatry 110, San Francisco Veterans<br>Affairs Medical Center. |
| September 1989 -<br>November 1996 | Seminar leader/lecturer, Psychiatry 100 A/B. |
| July 1988 -<br>June 1992 | Clinical supervisor, PGY III psychiatric residents, Haight<br>Ashbury Free Clinic, Drug Detoxification and Aftercare Project. |
| September 1987 -<br>Present | Tavistock Organizational Consultant.<br>Extensive experience as a consultant in numerous Tavistock<br>conferences. |
| September 1987 -<br>December 1993 | Course Coordinator of Elective Course, University of<br>California, San Francisco, School of Medicine. Designed, planned<br>and taught course, Psychiatry 170.02, "Alcoholism". This is a 1-<br>unit course offered to medical students, which covers alcoholism<br>with special emphasis on the health professional. This course is<br>offered fall quarter each academic year. |
| July 1987-<br>June 1994 | Clinical supervisor/lecturer FCM 110, San Francisco<br>General Hospital and Veterans Affairs Medical Center. |
| July 1986 -<br>June 1996 | Seminar leader/lecturer Psychiatry 131 A/B. |
| July 1986 -<br>August 1990 | Clinical supervisor, Psychology interns/fellows,<br>San Francisco General Hospital. |
| July 1986 -<br>August 1990 | Clinical supervisor PGY I psychiatric residents,<br>San Francisco General Hospital |
| July 1986 -<br>August 1990 | Coordinator of Medical Student Education, University of<br>California, San Francisco General Hospital, Department of<br>Psychiatry. Teach seminars and supervise clerkships to medical<br>students including: Psychological Core of Medicine 100 A/B;<br>Introduction to Clinical Psychiatry 131 A/B; Core Psychiatric<br>Clerkship 110 and Advanced Clinical Clerkship in Psychiatry<br>141.01. |
| July 1985 -<br>August 1990 | Psychiatric Consultant to the General Medical Clinic,<br>University of California, San Francisco General Hospital. Teach<br>and supervise medical residents in interviewing and<br>communication skills. Provide instruction to the clinic on the<br>psychiatric aspects of ambulatory medical care. |

COMMUNITY SERVICE:

| | |
|---|---|
| February 2006-Present | Board of Directors, Physician Foundation at California Pacific Medical Center. |
| June 2004-Present | Psychiatric Consultant, Hawaii Drug Court. |
| November 2003-Present | Organizational/Psychiatric Consultant, State of Hawaii, Department of Human Services. |
| June 2003-December 2004 | Monitor of the psychiatric sections of the "Ayers Agreement," New Mexico Corrections Department (NMCD).   This is a settlement arrived at between plaintiffs and the NMCD regarding the provision of constitutionally mandated psychiatric services for inmates placed within the Department's "Supermax" unit. |
| October 2002-Present | Juvenile Mental Health and Medical Consultant, United States Department of Justice, Civil Rights Division, Special Litigation Section. |
| July 1998-June 2000 | Psychiatric Consultant to the Pacific Research and Training Alliance's Alcohol and Drug Disability Technical Assistance Project.   This Project provides assistance to programs and communities that will have long lasting impact and permanently improve the quality of alcohol and other drug services available to individuals with disabilities. |
| July 1998-February 2004 | Psychiatric Consultant to the National Council on Crime and Delinquency (NCCD) in its monitoring of the State of Georgia's secure juvenile detention and treatment facilities.  NCCD is acting as the monitor of the agreement between the United States and Georgia to improve the quality of the juvenile justice facilities, critical mental health, medical and educational services, and treatment programs.  NCCD ceased to be the monitoring agency for this project in June 1999.  At that time, the Institute of Crime, Justice and Corrections at the George Washington University became the monitoring agency.  The work remained unchanged. |
| July 1998-July 2001 | Psychiatric Consultant to the San Francisco Campaign Against Drug Abuse (SF CADA). |
| March 1997-Present | Technical Assistance Consultant, Center for Substance Abuse Treatment, Substance Abuse and Mental Health Services Administration, Department of Health and Human Services. |
| January 1996-June 2003 | Psychiatric Consultant to the San Francisco Drug Court. |
| November 1993-June 2001 | Executive Committee, Addiction Technology Transfer Center (ATTC), University of California, San Diego. |

| | |
|---|---|
| December 1992 -<br>December 1994 | Institutional Review Board, Haight Ashbury Free Clinics, Inc. Review all research protocols for the clinic per Department of Health and Human Services guidelines. |
| June 1991-<br>February 2006 | Chief of Psychiatric Services, Haight Ashbury Free Clinic. Overall responsibility for psychiatric services at the clinic. |
| December 1990 -<br>June 1991 | Medical Director, Haight Ashbury Free Clinic, Drug Detoxification and Aftercare Project.  Responsible for directing all medical and psychiatric care at the clinic. |
| October 1996-<br>July 1997 | Psychiatric Expert for the U. S. Federal Court in the case of Madrid v. Gomez.  Report directly to the Special Master regarding the implementation of constitutionally mandated psychiatric care to the inmates at Pelican Bay State Prison. |
| April 1990 -<br>January 2000 | Psychiatric Expert for the U.S. Federal Court in the case of Gates v. Deukmejian.   Report directly to the court regarding implementation and monitoring of the consent decree in this case. (This case involves the provision of adequate psychiatric care to the inmates at the California Medical Facility, Vacaville). |
| January 1984 -<br>December 1990 | Chief of Psychiatric Services, Haight Ashbury Free Clinic, Drug  Detoxification  and  Aftercare  Project.   Direct medical/psychiatric management of project clients; consultant to staff on substance abuse issues. Special emphasis on dual diagnostic patients. |
| July -<br>December 1981 | Medical/Psychiatric Consultant, Youth Services, Hospitality Hospitality House, San Francisco, CA.  Advised youth services staff on client management.  Provided training on various topics related to adolescents. Facilitated weekly client support groups. |

SERVICE TO ELEMENTARY AND SECONDARY EDUCATION:

| | |
|---|---|
| January 1996 -<br>Present | Baseball, Basketball and Volleyball Coach, Convent of the Sacred Heart Elementary School, San Francisco, CA. |
| September 1994 -<br>Present | Soccer Coach, Convent of the Sacred Heart Elementary School, San Francisco, CA. |
| June 1991-<br>June 1994 | Board of Directors, Pacific Primary School, San Francisco, CA. |
| April 1989 -<br>July 1996 | Umpire, Rincon Valley Little League, Santa Rosa, CA. |
| September 1988 -<br>May 1995 | Numerous presentations on Mental Health/Substance Abuse issues to the student body, Hidden Valley Elementary School and Santa Rosa Jr. High School, Santa Rosa, CA. |

PRESENTATIONS:

1.  San Francisco Treatment Research Unit, University of California, San Francisco, Colloquium #1. (10/12/1990). "The Use of Anti-Depressant Medications with Substance-Abusing Clients."

2.  Grand Rounds. Department of Psychiatry, University of California, San Francisco, School of Medicine. (12/5/1990). "Advances in the Field of Dual Diagnosis."

3.  Associates Council, American College of Physicians, Northern California Region, Program for Leadership Conference. (3/3/1991). "Planning a Satisfying Life in Medicine."

4.  24th Annual Medical Symposium on Renal Disease, sponsored by the Medical Advisory Board of the National Kidney Foundation of Northern California. (9/11/1991). "The Chronically Ill Substance Abuser."

5.  Mentoring Skills Conference, University of California, San Francisco, School of Medicine, Department of Pediatrics. (11/26/91). "Mentoring as an Art."

6.  Continuing Medical Education Conference, Sponsored by the Department of Psychiatry, University of California, San Francisco, School of Medicine. (4/25/1992). "Clinical & Research Advances in the Treatment of Alcoholism and Drug Abuse."

7.  First International Conference of Mental Health and Leisure. University of Utah. (7/9/1992). "The Use of Commonly Abused Street Drugs in the Treatment of Mental Illness."

8.  American Group Psychotherapy Association Annual Meeting. (2/20/1993). "Inpatient Groups in Initial-Stage Addiction Treatment."

9.  Grand Rounds. Department of Child Psychiatry, Stanford University School of Medicine. (3/17/93, 9/11/96). "Issues in Adolescent Substance Abuse."

10. University of California, Extension. Alcohol and Drug Abuse Studies Program. (5/14/93), (6/24/94), (9/22/95), (2/28/97). "Dual Diagnosis."

11. American Psychiatric Association Annual Meeting. (5/26/1993). "Issues in the Treatment of the Dual Diagnosis Patient."

12. Long Beach Regional Medical Education Center and Social Work Service, San Francisco Veterans Affairs Medical Center Conference on Dual Diagnosis. (6/23/1993). "Dual Diagnosis Treatment Issues."

13. Utah Medical Association Annual Meeting. (10/7/93). "Prescription Drug Abuse Helping your Patient, Protecting Yourself."

14. Saint Francis Memorial Hospital, San Francisco, Medical Staff Conference. (11/30/1993). "Management of Patients with Dual Diagnosis and Alcohol Withdrawal."

15. Haight Ashbury Free Clinic's 27th Anniversary Conference. (6/10/94). "Attention Deficit Disorder, Substance Abuse, Psychiatric Disorders and Related Issues."

16.     University of California, San Diego.  Addiction Technology Transfer Center Annual Summer Clinical Institute:  (8/30/94), (8/29/95), (8/5/96), (8/4/97), (8/3/98).  "Treating Multiple Disorders."

17.     National Resource Center on Homelessness and Mental Illness, A Training Institute for Psychiatrists.  (9/10/94).  "Psychiatry, Homelessness, and Serious Mental Illness."

18.     Value Behavioral Health/American Psychiatry Management Seminar.  (12/1/1994).  "Substance Abuse/Dual Diagnosis in the Work Setting."

19.     Grand Rounds.  Department of Oral and Maxillofacial Surgery, University of California, San Francisco, School of Dentistry.  (1/24/1995).  "Models of Addiction."

20.     San Francisco State University, School of Social Work, Title IV-E Child Welfare Training Project.  (1/25/95, 1/24/96, 1/13/97, 1/21/98, 1/13/99, 1/24/00, 1/12/01).  "Demystifying Dual Diagnosis."

21.     First Annual Conference on the Dually Disordered.  (3/10/1995).  "Assessment of Substance Abuse."  Sponsored by the Division of Mental Health and Substance Abuse Services and Target Cities Project, Department of Public Health, City and County of San Francisco.

22.     Delta Memorial Hospital, Antioch, California, Medical Staff Conference.  (3/28/1995).  "Dealing with the Alcohol and Drug Dependent Patient."  Sponsored by University of California, San Francisco, School of Medicine, Office of Continuing Medical Education.

23.     Centre Hospitalier Robert-Giffaard, Beoupont (Quebec), Canada.  (11/23/95).  "Reconfiguration of Psychiatric Services in Quebec Based on the San Francisco Experience."

24.     The Labor and Employment Section of the State Bar of California.  (1/19/96).  "Understanding Alcoholism and its Impact on the Legal Profession."  MCCE Conference, San Francisco, CA.

25.     American Group Psychotherapy Association, Annual Training Institute.  (2/13-2/14/96), National Instructor - Designate training group.

26.     American Group Psychotherapy Association, Annual Meeting.  (2/10/96).  "The Process Group at Work."

27.     Medical Staff Conference, Kaiser Foundation Hospital, Pleasanton, California, "The Management of Prescription Drug Addiction". (4/24/96)

28.     International European Drug Abuse Treatment Training Project, Ankaran, Slovenia, "The Management of the Dually Diagnosed Patient in Former Soviet Block Europe". (10/5-10/11/96)

29.     Contra Costa County Dual Diagnosis Conference, Pleasant Hill, California, "Two Philosophies, Two Approaches: One Client".  (11/14/96)

30.     Faith Initiative Conference, San Francisco, California, "Spirituality: The Forgotten Dimension of Recovery".  (11/22/96)

31.    Alameda County Dual Diagnosis Conference, Alameda, California, "Medical Management of the Dually Diagnosed Patient". (2/4/97, 3/4/97)

32.    Haight Ashbury Free Clinic's 30th Anniversary Conference, San Francisco, California, "Indicators for the Use of the New Antipsychotics". (6/4/97)

33.    DPH/Community Substance Abuse Services/San Francisco Target Cities Project sponsored conference, "Intake, Assessment and Service Linkages in the Substance Abuse System of Care", San Francisco, California. (7/31/97)

34.    The Institute of Addictions Studies and Lewis and Clark College sponsored conference, 1997 Northwest Regional Summer Institute, "Addictions Treatment: What We Know Today, How We'll Practice Tomorrow; Assessment and Treatment of the High-Risk Offender". Wilsonville, Oregon. (8/1/97)

35.    The California Council of Community Mental Health Agencies Winter Conference, Key Note Presentation, "Combining funding sources and integrating treatment for addiction problems for children, adolescents and adults, as well as coordination of addiction treatment for parents with mental health services to severely emotionally disturbed children." Newport Beach, California. (2/12/98)

36.    American Group Psychotherapy Association, Annual Training Institute, (2/16-2/28/1998), Intermediate Level Process Group Leader.

37.    "Multimodal Psychoanalytic Treatment of Psychotic Disorders: Learning from the Quebec Experience." The Haight Ashbury Free Clinics Inc., in conjunction sponsored this seminar with the San Francisco Society for Lacanian Studies and the Lacanian School of Psychoanalysis. San Francisco, California. (3/6-3/8/1998)

38.    "AIDS Update for Primary Care: Substance Use & HIV: Problem Solving at the Intersection." The East Bay AIDS Education & Training Center and the East Bay AIDS Center, Alta Bates Medical Center, Berkeley, California sponsored this conference. (6/4/1998)

39.    Haight Ashbury Free Clinic's 31st Anniversary Conference, San Francisco, California, "Commonly Encountered Psychiatric Problems in Women." (6/11/1998)

40.    Community Networking Breakfast sponsored by San Mateo County Alcohol & Drug Services and Youth Empowering Systems, Belmont, California, "Dual Diagnosis, Two Approaches, Two Philosophies, One Patient." (6/17/1998)

41.    Grand Rounds, Department of Medicine, Alameda County Medical Center-Highland Campus, Oakland, California, "Medical/Psychiatric Presentation of the Patient with both Psychiatric and Substance Abuse Problems." (6/19/1998)

42.    "Rehabilitation, Recovery, and Reality: Community Treatment of the Dually Diagnosed Consumer." The Occupational Therapy Association of California, Dominican College of San Rafael and the Psychiatric Occupational Therapy Action Coalition sponsored this conference. San Rafael, California. (6/20/1998)

43.    "Assessment, Diagnosis and Treatment of the Patient with a Dual Diagnosis", Los Angeles County Department of Mental Health sponsored conference, Los Angeles, CA. (6/29/98)

44.   Grand Rounds, Wai'anae Coast Comprehensive Health Center, Wai'anae, Hawaii, "Assessment and Treatment of the Patient who presents with concurrent Depression and Substance Abuse." (7/15/1998)

45.   "Dual Diagnostic Aspects of Methamphetamine Abuse", Hawaii Department of Health, Alcohol and Drug Abuse Division sponsored conference, Honolulu, Hawaii. (9/2/98)

46.   9th Annual Advanced Pain and Symptom Management, the Art of Pain Management Conference, sponsored by Visiting Nurses and Hospice of San Francisco. "Care Issues and Pain Management for Chemically Dependent Patients." San Francisco, CA. (9/10/98)

47.   Latino Behavioral Health Institute Annual Conference, "Margin to Mainstream III: Latino Health Care 2000." "Mental Illness and Substance Abuse Assessment: Diagnosis and Treatment Planning for the Dually Diagnosed", Los Angeles, CA. (9/18/98)

48.   Chemical Dependency Conference, Department of Mental Health, Napa State Hospital, "Substance Abuse and Major Depressive Disorder." Napa, CA. (9/23/98)

49.   "Assessment, Diagnosis and Treatment of the Patient with a Dual Diagnosis", San Mateo County Drug and Alcohol Services, Belmont, CA. (9/30/98)

50.   "Assessment, Diagnosis and Treatment of the Patient with a Dual Diagnosis", Sacramento County Department of Mental Health, Sacramento, CA. (10/13/98)

51.   California Department of Health, Office of AIDS, 1998 Annual AIDS Case Management Program/Medi-Cal Waiver Program (CMP/MCWP) Conference, "Triple Diagnosis: What's Really Happening with your Patient." Concord, CA. (10/15/98)

52.   California Mental Health Director's Association Meeting: Dual Diagnosis, Effective Models of Collaboration; "Multiple Problem Patients: Designing a System to Meet Their Unique Needs", San Francisco Park Plaza Hotel. (10/15/98)

53.   Northwest GTA Health Corporation, PEEL MEMORIAL HOSPITAL, Annual Mental Health Conference, "Recognition and Assessment of Substance Abuse in Mental Illness." Brampton, Ontario, Canada. (10/23/98)

54.   1998 California Drug Court Symposium, "Mental Health Issues and Drug Involved Offenders." Sacramento, CA. (12/11/98)

55.   "Assessment, Diagnosis and Treatment Planning for the Dually Diagnosed", Mono County Alcohol and Drug Programs, Mammoth Lakes, CA. (1/7/99)

56.   Medical Staff Conference, Kaiser Foundation Hospital, Walnut Creek, CA, "Substance Abuse and Major Depressive Disorder." (1/19/99)

57.   "Issues and Strategies in the Treatment of Substance Abusers", Alameda County Consolidated Drug Courts, Oakland, CA. (1/22 & 2/5/99)

58.   Compass Health Care's 12th Annual Winter Conference on Addiction, Tucson, AZ: "Dual Systems, Dual Philosophies, One Patient", "Substance Abuse and Developmental Disabilities" & "Assessment and Treatment of the High Risk Offender." (2/17/99)

59.   American Group Psychotherapy Association, Annual Training Institute, (2/22-2/24/1999). Entry Level Process Group Leader.

60.     "Exploring A New Framework: New Technologies For Addiction And Recovery", Maui County Department of Housing and Human Concerns, Malama Family Recovery Center, Maui, Hawaii.  (3/5 & 3/6/99)

61.     "Assessment, Diagnosis and Treatment of the Dual Diagnostic Patient", San Bernardino County Office of Alcohol & Drug Treatment Services, San Bernardino, CA.  (3/10/99)

62.     "Smoking Cessation in the Chronically Mentally Ill, Part 1", California Department of Mental Health, Napa State Hospital, Napa, CA.  (3/11/99)

63.     "Dual Diagnosis and Effective Methods of Collaboration", County of Tulare Health & Human Services Agency, Visalia, CA.  (3/17/99)

64.     Pfizer Pharmaceuticals sponsored lecture tour of Hawai'i.  Lectures included: Major Depressive Disorder and Substance Abuse, Treatment Strategies for Depression and Anxiety with the Substance Abusing Patient, Advances in the Field of Dual Diagnosis & Addressing the Needs of the Patient with Multiple Substance Dependencies.  Lecture sites included: Straub Hospital, Honolulu; Maui County Community Mental Health; Veterans Administration Hospital, Honolulu; Hawai'i (Big Island) County Community Mental Health; Mililani (Oahu) Physicians Center; Kahi Mohala (Oahu) Psychiatric Hospital; Hale ola Ka'u (Big Island) Residential Treatment Facility.  (4/2-4/9/99)

65.     "Assessment, Diagnosis and Treatment of the Patient with Multiple Disorders", Mendocino County Department of Public Health, Division of Alcohol & Other Drug Programs, Ukiah, CA.  (4/14/99)

66.     "Assessment of the Substance Abusing & Mentally Ill Female Patient in Early Recovery", Ujima Family Services Agency, Richmond, CA.  (4/21/99)

67.     California Institute for Mental Health, Adult System of Care Conference, "Partners in Excellence", Riverside, California.  (4/29/99)

68.     "Advances in the Field of Dual Diagnosis", University of Hawai'i School of Medicine, Department of Psychiatry Grand Rounds, Queens Hospital, Honolulu, Hawai'i.  (4/30/99)

69.     State of Hawai'i Department of Health, Mental Health Division, "Strategic Planning to Address the Concerns of the United States Department of Justice for the Alleged Civil Rights Abuses in the Kaneohe State Hospital."  Honolulu, Hawai'i.  (4/30/99)

70.     "Assessment, Diagnosis and Treatment Planning for the Patient with Dual/Triple Diagnosis", State of Hawai'i, Department of Health, Drug and Alcohol Abuse Division, Dole Cannery, Honolulu, Hawai'i.  (4/30/99)

71.     11th Annual Early Intervention Program Conference, State of California Department of Health Services, Office of Aids, "Addressing the Substance Abuse and Mental Health Needs of the HIV (+) Patient."  Concord, California.  (5/6/99)

72.     The HIV Challenge Medical Conference, Sponsored by the North County (San Diego) AIDS Coalition, "Addressing the Substance Abuse and Mental Health Needs of the HIV (+) Patient."  Escondido, California.  (5/7/99)

73.     "Assessment, Diagnosis and Treatment of the Patient with Multiple Disorders", Sonoma County Community Mental Health's Monthly Grand Rounds, Community Hospital, Santa Rosa, California.  (5/13/99)

74.     "Developing & Providing Effective Services for Dually Diagnosed or High Service Utilizing Consumers", Third annual conference presented by the Southern California Mental Health Directors Association. Anaheim, California. (5/21/99)

75.     15th Annual Idaho Conference on Alcohol and Drug Dependency, lectures included "Dual Diagnostic Issues", "Impulse Control Disorders" and "Major Depressive Disorder." Boise State University, Boise, Idaho. (5/25/99)

76.     "Smoking Cessation in the Chronically Mentally Ill, Part 2", California Department of Mental Health, Napa State Hospital, Napa, California. (6/3/99)

77.     "Alcohol and Drug Abuse: Systems of Care and Treatment in the United States", Ando Hospital, Kyoto, Japan. (6/14/99)

78.     "Alcoholism: Practical Approaches to Diagnosis and Treatment", National Institute On Alcoholism, Kurihama National Hospital, Yokosuka, Japan. (6/17/99)

79.     "Adolescent Drug and Alcohol Abuse", Kusatsu Kinrofukushi Center, Kusatsu, Japan. (6/22/99)

80.     "Assessment, Diagnosis and Treatment of the Patient with Multiple Diagnoses", Osaka Drug Addiction Rehabilitation Center Support Network, Kobe, Japan. (6/26/99)

81.     "Assessment, Diagnosis and Treatment of the Patient with Multiple Diagnoses", Santa Barbara County Department of Alcohol, Drug, & Mental Health Services, Buellton, California. (7/13/99)

82.     "Drug and Alcohol Issues in the Primary Care Setting", County of Tulare Health & Human Services Agency, Edison Ag Tac Center, Tulare, California. (7/15/99)

83.     "Working with the Substance Abuser in the Criminal Justice System", San Mateo County Alcohol and Drug Services and Adult Probation Department, Redwood City, California. (7/22/99)

84.     1999 Summer Clinical Institute In Addiction Studies, University of California, San Diego School of Medicine, Department of Psychiatry. Lectures included: "Triple Diagnosis: HIV, Substance Abuse and Mental Illness. What's Really Happening to your Patient?" "Psychiatric Assessment in the Criminal Justice Setting, Learning to Detect Malingering." La Jolla, California. (8/3/99)

85.     "Assessment, Diagnosis and Treatment Planning for the Patient with Dual and Triple Diagnoses", Maui County Department of Housing and Human Concerns, Maui Memorial Medical Center. Kahului, Maui. (8/23/99)

86.     "Proper Assessment of the Asian/Pacific Islander Dual Diagnostic Patient", Asian American Recovery Services, Inc., San Francisco, California. (9/13/99)

87.     "Assessment and Treatment of the Dual Diagnostic Patient in a Health Maintenance Organization", Alcohol and Drug Abuse Program, the Permanente Medical Group, Inc., Santa Rosa, California. (9/14/99)

88.     "Dual Diagnosis", Residential Care Providers of Adult Residential Facilities and Facilities for the Elderly, City and County of San Francisco, Department of Public Health, Public Health Division, San Francisco, California. (9/16/99)

89.   "Medical and Psychiatric Aspects of Methamphetamine Abuse", Fifth Annual Latino Behavioral Health Institute Conference, Universal City, California. (9/23/99)

90.   "Criminal Justice & Substance Abuse", University of California, San Diego & Arizona Department of Corrections, Phoenix, Arizona. (9/28/99)

91.   "Creating Balance in the Ohana: Assessment and Treatment Planning", Hale O Ka'u Center, Pahala, Hawai'i. (10/8-10/10/99)

92.   "Substance Abuse Issues of Runaway and Homeless Youth", Homeless Youth 101, Oakland Asian Cultural Center, Oakland, California. (10/12/99)

93.   "Mental Illness & Drug Abuse - Part II", Sonoma County Department of Mental Health Grand Rounds, Santa Rosa, California. (10/14/99)

94.   "Dual Diagnosis/Co-Existing Disorders Training", Yolo County Department of Alcohol, Drug and Mental Health Services, Davis, California. (10/21/99)

95.   "Mental Health/Substance Abuse Assessment Skills for the Frontline Staff", Los Angeles County Department of Mental Health, Los Angeles, California. (1/27/00)

96.   "Spirituality in Substance Abuse Treatment", Asian American Recovery Services, Inc., San Francisco, California. (3/6/00)

97.   "What Every Probation Officer Needs to Know about Alcohol Abuse", San Mateo County Probation Department, San Mateo, California. (3/16/00)

98.   "Empathy at its Finest", Plenary Presentation to the California Forensic Mental Health Association's Annual Conference, Asilomar, California. (3/17/00)

99.   "Model for Health Appraisal for Minors Entering Detention", Juvenile Justice Health Care Committee's Annual Conference, Asilomar, California. (4/3/00)

100.  "The Impact of Alcohol/Drug Abuse and Mental Disorders on Adolescent Development", Humboldt County Department of Mental Health and Substance Abuse Services, Eureka, California. (4/4-4/5/00)

101.  "The Dual Diagnosed Client", Imperial County Children's System of Care Spring Training, Holtville, California. (5/15/00)

102.  National Association of Drug Court Professionals 6th Annual Training Conference, San Francisco, California. "Managing People of Different Pathologies in Mental Health Courts", (5/31 & 6/1/00); "Assessment and Management of Co-Occurring Disorders" (6/2/00).

103.  "Culture, Age and Gender Specific Perspectives on Dual Diagnosis", University of California Berkeley Extension Course, San Francisco, California. (6/9/00)

104.  "The Impact of Alcohol/Drug Abuse and Mental Disorders on Adolescent Development", Thunderoad Adolescent Treatment Centers, Inc., Oakland, California. (6/29 & 7/27/00)

105.  "Assessing the Needs of the Entire Patient: Empathy at its Finest", NAMI California Annual Conference, Burlingame, California. (9/8/00)

106.    "The Effects of Drugs and Alcohol on the Brain and Behavior", The Second National Seminar on Mental Health and the Criminal Law, San Francisco, California. (9/9/00)

107.    Annual Conference of the Associated Treatment Providers of New Jersey, Atlantic City, New Jersey. "Advances in Psychopharmacological Treatment with the Chemically Dependent Person" & "Treatment of the Adolescent Substance Abuser" (10/25/00).

108.    "Psychiatric Crises In The Primary Care Setting", Doctor Marina Bermudez Issues In College Health, San Francisco State University Student Health Service. (11/1/00, 3/13/01)

109.    "Co-Occurring Disorders: Substance Abuse and Mental Health", California Continuing Judicial Studies Program, Center For Judicial Education and Research, Long Beach, California. (11/12-11/17/00)

110.    "Adolescent Substance Abuse Treatment", Alameda County Behavioral Health Care Services, Oakland, California. (12/5/00)

111.    "Wasn't One Problem Enough?" Mental Health and Substance Abuse Issues. 2001California Drug Court Symposium, "Taking Drug Courts into the New Millennium." Costa Mesa, California. (3/2/01)

112.    "The Impact of Alcohol/Drug Abuse and Mental Health Disorders on the Developmental Process." County of Sonoma Department of Health Services, Alcohol and Other Drug Services Division. Santa Rosa, California. (3/8 & 4/5/01)

113.    "Assessment of the Patient with Substance Abuse and Mental Health Issues." San Mateo County General Hospital Grand Rounds. San Mateo, California. (3/13/01)

114.    "Dual Diagnosis-Assessment and treatment Issues." Ventura County Behavioral Health Department Alcohol and Drug Programs Training Institute, Ventura, California. (5/8/01)

115.    Alameda County District Attorney's Office 4th Annual 3R Conference, "Strategies for Dealing with Teen Substance Abuse." Berkeley, California. (5/10/01)

116.    National Association of Drug Court Professionals 7th Annual Training Conference, "Changing the Face of Criminal Justice." I presented three separate lectures on the following topics: Marijuana, Opiates and Alcohol. New Orleans, LA. (6/1-6/2/01)

117.    Santa Clara County Drug Court Training Institute, "The Assessment, Diagnosis and Treatment of the Patient with Multiple Disorders." San Jose, California. (6/15/01)

118.    Washington Association of Prosecuting Attorneys Annual Conference, "Psychiatric Complications of the Methamphetamine Abuser." Olympia, Washington. (11/15/01)

119.    The California Association for Alcohol and Drug Educators 16th Annual Conference, "Assessment, Diagnosis and Treatment of Patients with Multiple Diagnoses." Burlingame, California. (4/25/02)

120.    Marin County Department of Health and Human Services, Dual Diagnosis and Cultural Competence Conference, "Cultural Considerations in Working with the Latino Patient." (5/21/02)

121. 3rd Annual Los Angeles County Law Enforcement and Mental Health Conference, "The Impact of Mental Illness and Substance Abuse on the Criminal Justice System." (6/5/02)

122. New Mexico Department of Corrections, "Group Psychotherapy Training." Santa Fe, New Mexico. (8/5/02)

123. Judicial Council of California, Administrative Office of the Courts, "Juvenile Delinquency and the Courts: 2002." Berkeley, California. (8/15/02)

124. California Department of Alcohol and Drug Programs, "Adolescent Development and Dual Diagnosis." Sacramento, California. (8/22/02)

125. San Francisco State University, School of Social Work, Title IV-E Child Welfare Training Project, "Adolescent Development and Dual Diagnosis." (1/14/02)

126. First Annual Bi-National Conference sponsored by the Imperial County Behavioral Health Services, "Models of Family Interventions in Border Areas." El Centro, California. (1/28/02)

127. Haight Ashbury Free Clinic's 36th Anniversary Conference, San Francisco, California, "Psychiatric Approaches to Treating the Multiple Diagnostic Patient." (6/6/03)

128. Motivational Speaker for Regional Co-Occurring Disorders Training sponsored by the California State Department of Alcohol and Drug Programs and Mental Health and the Substance Abuse Mental Health Services Administration-Center for Substance Abuse Treatment, Samuel Merritt College, Health Education Center, Oakland, California. (9/4/03)

129. "Recreational Drugs, Parts I and II", Doctor Marina Bermudez Issues In College Health, San Francisco State University Student Health Service. (10/1/03), (12/3/03)

130. "Detecting Substance Abuse in our Clients", California Attorneys for Criminal Justice Annual Conference, Berkeley, California. (10/18/03)

131. "Alcohol, Alcoholism and the Labor Relations Professional", 10th Annual Labor and Employment Public Sector Program, sponsored by the State Bar of California. Labor and Employment Section. Pasadena, California. (4/2/04)

132. Lecture tour of Japan (4/8-4/18/04). "Best Practices for Drug and Alcohol Treatment." Lectures were presented in Osaka, Tokyo and Kyoto for the Drug Abuse Rehabilitation Center of Japan.

133. San Francisco State University, School of Social Work, Title IV-E Child Welfare Training Project, "Adolescent Development and Dual Diagnosis." (9/9/04)

134. "Substance Abuse and the Labor Relations Professional", 11th Annual Labor and Employment Public Sector Program, sponsored by the State Bar of California. Labor and Employment Section. Sacramento, California. (4/8/05)

135. "Substance Abuse Treatment in the United States", Clinical Masters Japan Program, Alliant International University. San Francisco, California. (8/13/05)

136. Habeas Corpus Resource Center, Mental Health Update, "Understanding Substance Abuse." San Francisco, California. (10/24/05)

137.    Yolo County Department of Behavioral Health, "Psychiatric Aspects of Drug and Alcohol Abuse."  Woodland, California. (1/25/06), (6/23/06)

138.    "Methamphetamine-Induced Dual Diagnostic Issues", Medical Grand Rounds, Wilcox Memorial Hospital, Lihue, Kauai. (2/13/06)

139.    Lecture tour of Japan (4/13-4/23/06).  "Assessment and Treatment of the Patient with Substance Abuse and Mental Illness."  Lectures were presented in Hiroshima and Kyoto for the Drug Abuse Rehabilitation Center of Japan.

140.    "Co-Occurring Disorders: Isn't It Time We Finally Got It Right?" California Association of Drug Court Professionals, 2006 Annual Conference.  Sacramento, California. (4/25/06)

141.    "Proper Assessment of Drug Court Clients", Hawaii Drug Court, Honolulu. (6/29/06)

142.    "Understanding Normal Adolescent Development," California Association of Drug Court Professionals, 2007 Annual Conference.  Sacramento, California. (4/27/07)

143.    "Dual Diagnosis in the United States," Conference sponsored by the Genesis Substance Abuse Treatment Network.  Medford, Oregon.  (5/10/07)

144.    "Substance Abuse and Mental Illness: One Plus One Equals Trouble," National Association of Criminal Defense Lawyers 2007 Annual Meeting & Seminar.  San Francisco, California.  (8/2/07)

145.    "Capital Punishment," Human Writes 2007 Conference.  London, England.  (10/6/07)

146.    "Co-Occurring Disorders for the New Millennium," California Hispanic Commission on Alcohol and Drug Abuse, Montebello, California.  (10/30/07)

147.    "Methamphetamine-Induced Dual Diagnostic Issues for the Child Welfare Professional," Beyond the Bench Conference.  San Diego, California. (12/13/07)

148.    "Working with Mentally Ill Clients and Effectively Using Your Expert(s)," 2008 National Defender Investigator Association (NDIA), National Conference, Las Vegas, Nevada. (4/10/08)

149.    "Mental Health Aspects of Diminished Capacity and Competency," Washington Courts District/Municipal Court Judges' Spring Program.  Chelan, Washington.  (6/3/08)

150.    "Reflection on a Career in Substance Abuse Treatment, Progress not Perfection," California Department of Alcohol and Drug Programs 2008 Conference.  Burlingame, California.  (6/19/08)


PUBLICATIONS:

1)    Kanas, N., Stewart, P. and Haney, K. (1988). *Content and outcome in a short-term therapy group for schizophrenic outpatients*.  Hospital and Community Psychiatry, 39, 437-439.

2)    Kanas, N., Stewart, P. (1989*). Group process in short-term outpatient therapy groups for schizophrenics.*  Group, Volume 13, Number 2, Summer 1989.

3)    Zweben, J.E., Smith, D.E. and Stewart, P. (1991). *Psychotic Conditions and Substance Use: Prescribing Guidelines and Other Treatment Issues.* Journal of Psychoactive Drugs, Vol. 23(4) Oct-Dec 1991, 387395.

4)    Banys, P., Clark, W.H., Tusel, D.J., Sees, K., Stewart, P., Mongan, L., Delucchi, K., and Callaway, E. (1994). *An Open Trial of Low Dose Buprenorphine in Treating Methadone Withdrawal*. Journal of Substance Abuse Treatment, Vol 11(1), 9-15.

5)    Hall, S.M., Tunis, S., Triffleman, E., Banys, P., Clark, W.H., Tusel, D., Stewart, P., and Presti, D. (1994). *Continuity of Care and Desipramine in Primary Cocaine Abusers.* The Journal of Nervous and Mental Disease, Vol 182(10), 570-575.

6)    Galloway, G.P., Frederick, S.L., Thomas, S., Hayner, G., Staggers, F.E., Wiehl, W. O., Sajo, E., Amodia, D., and Stewart, P. (1996). *A Historically Controlled Trail Of Tyrosine for Cocaine Dependence.* Journal of Psychoactive Drugs, Vol. 28(3), July-September 1996

7)    Stewart, P. (1999). *Alcoholism: Practical Approaches To Diagnosis And Treatment.* Prevention, (Newsletter for the National Institute On Alcoholism, Kurihama Hospital, Yokosuka, Japan) No. 82, 1999

8)    Stewart, P. (1999). *New Approaches and Future Strategies Toward Understanding Substance Abuse.* Published by the Osaka DARC (Drug Abuse Rehabilitation Center) Support Center, Osaka, Japan, November 11, 1999.

9)    Stewart, P. (2002). *Treatment Is A Right, Not A Privilege.* Chapter in the book, *Understanding Addictions-From Illness to Recovery and Rebirth,* ed. By Hiroyuki Imamichi and Naoko Takiguchi, Academia Press (Akademia Syuppankai): Kyoto, Japan, 2002.

10)   Stewart, P., Inaba, D.S., and Cohen, W.E. (2004). *Mental Health & Drugs.* Chapter in the book, *Uppers, Downers, All Arounders, Fifth Edition*, CNS Publications, Inc., Ashland, Oregon.

11)   James Austin, Ph.D., Kenneth McGinnis, Karl K. Becker, Kathy Dennehy, Michael V. Fair, Patricia L. Hardyman, Ph.D. and Pablo Stewart, M.D. (2004) *Classification of High Risk and Special Management Prisoners, A National Assessment of Current Practices.* National Institute of Corrections, Accession Number 019468.

12)   Stanley L. Brodsky, Ph.D., Keith R. Curry, Ph.D., Karen Froming, Ph.D., Carl Fulwiler, M.D., Ph.D., Craig Haney, Ph.D., J.D., Pablo Stewart, M.D. and Hans Toch, Ph.D. (2005) *Brief of Professors and Practitioners of Psychology and Psychiatry as AMICUS CURIAE in Support of Respondent: Charles E. Austin, et al. (Respondents) v. Reginald S. Wilkinson, et al. (Petitioners), In The Supreme Court of the United States, No. 04-495.*

13)   Stewart, P., Inaba, D.S., and Cohen, W.E. (2007). *Mental Health & Drugs.* Chapter in the book, *Uppers, Downers, All Arounders, Sixth Edition*, CNS Publications, Inc., Ashland, Oregon

**APPENDIX B**

# APPENDIX B

| |
|---|
| Governor Schwarzenegger's Proclamation Regarding Prison Overcrowding, State of Emergency (October 4, 2006) |
| Expert Panel on Adult Offender and Recidivism Reduction Programming, Report to the State Legislature, *A Roadmap for Effective Offender Programming in California* (June 29, 2007) |
| Little Hoover Commission, *Solving California's Corrections Crisis: Time is Running Out* (January 2007) |
| Reforming Corrections:  Report of the Corrections Independent Review Panel, June 30, 2004 (Gov. Deukmejian, Chairman) |
| Mental Health Services Delivery System Program Guide (September 2006) |
| Memorandum from Jane Kahn Re: *Coleman* Revised Program Guide Basics (October 17, 2007) |
| Judge Karlton's 3/3/06 Order Regarding Defendants' Revised Program Guide (Coleman Docket 1773) |
| Mental Health Population Chart – Placement Per Institution, as of July 27, 2007 (September 25, 2007) |
| Mental Health Population Chart – Placement Per Institution, as of January 24, 2003 |
| Program Guide Overview, from Mental Health Services Delivery System Program Guide (September 2006) |
| Exhibit A to Defendants' Plan to Address Suicide Trends In Administrative Segregation Units (October 2, 2006) (Coleman Docket 1990) |
| Exhibit A in Support of Defendants' Submission of Plan for Reception Center/EOP Inmates (July 31, 2006) (Coleman Docket 1928) |
| Allocated Case Manager Positions and Vacancies for EOP Ad Seg Hub Institutions, as of July 2007 (September 25, 2007) |
| Memorandum from CDCR Re: Revised 30 Minute Welfare Check Process (December 12, 2006) |
| Judge Karlton's 9/14/07 Order Granting Defendants' Request for Extension of Time to File Plan for Small Management Yards in Administrative Segregation Units (Coleman Docket 2418) |
| Judge Karlton's 10/20/06 Order Approving Defendants' Plan for Provision of Acute and Intermediate Care and Mental Health Crisis Beds (Coleman Docket 1998) |
| Judge Karlton's 6/7/06 Order Requiring Defendants to Develop Plan to Address Suicide Trends in Administrative Segregation Units (Coleman Docket 1830) |
| Receiver's Report Regarding Overcrowding and Appendices to same (May 15, 2007) (Plata Docket 673 and 674) |
| Receiver's Supplemental Report Regarding Overcrowding (June 11, 2007) (Plata Docket 705) |
| *Coleman* Special Master's Report Regarding Overcrowding (May 31, 2007) (Coleman Docket 2253) |
| *Coleman* Special Master's 18th Monitoring Report (July 30, 2007) (Coleman Docket 2334 through 2334-11) |
| *Coleman* Special Master's 17th Monitoring Report, Part A (2/14/07) (Coleman Docket 2140 through 2140-3) |
| *Coleman* Special Master's 17th Monitoring Report, Part B (4/02/07) (Coleman Docket 2180 through 2180-5) |
| *Coleman* Special Master's 17th Monitoring Report, Part C (6/13/07) (Coleman Docket 2274 through 2274-7) |
| Office of the Inspector General (OIG), Special Review into the California Department of Corrections and Rehabilitation's Release of San Quentin Prisoner (October 2007) |
| Memorandum from CDCR Re: Standardization of Mental Health Crisis Bed Admission Procedures (July 21, 2005) |
| Report on Status of Funding for Acute, Intermediate and Mental Health Crisis Bed Plan, filed September 11, 2006 (Coleman Docket 1969) |
| Judge Karlton's 5/2/06 Order Regarding Defendants' Long Range Bed Plan (Coleman Docket 1800) |
| *Coleman* Special Master's 5/9/06 Report and Recommendations on Suicides in the California Department of Corrections in the Calendar Year 2004 (Coleman Docket 1806) |

[233150-1]

| |
|---|
| *Coleman* Special Master's 5/14/07 Supplemental Report and Recommendations on Defendants' Plan to Prevent Suicides in Administrative Segregation (Coleman Docket 2210) |
| *Coleman* Special Master's 7/2/07 Report and Recommendations on Defendants' Enhanced Outpatient Treatment Programs in Reception Centers (Coleman Docket 2302) |
| *Coleman* Special Master's 9/24/07 Report and Recommendations on Defendants' August 2007 Supplemental Bed Plan (Coleman Docket 2432 through 2432-3) |
| CDCR, 2004 Annual Suicide Report (September 26, 2005) |
| CDCR, 2005 Annual Suicide Report (September 8, 2006) |
| Collection of 43 Email Notifications from CDCR Regarding 2006 Suicides (Received between January and December 2006) |
| Collection of 29 Email Notifications from CDCR Regarding 2007 Suicides (Received between January and November 3, 2007) |
| CDCR Suicide Report for *Coleman* Class Member "P" |
| CDCR Suicide Report for *Coleman* Class Member "W" |
| CDCR Suicide Report for *Coleman* Class Member "H" |
| CDCR Suicide Report for *Coleman* Class Member "GG" |
| CDCR Suicide Report for *Coleman* Class Member "FF" |
| CDCR Suicide Report for *Coleman* Class Member "X" |
| Judge Henderson's 2/14/07 Order Continuing Hearing on Plaintiffs' Motion to Convene a Three-Judge Panel (Plata Docket 608) |
| Judges Karlton and Henderson's 7/23/07 Orders Granting Plaintiffs' Motion to Convene Three-Judge Panel (Coleman Docket 2320, Plata Docket 780) |
| Three Judge Panel Order Bifurcating Proceedings and Setting Deadlines for Phase I (October 10, 2007) (Coleman Docket 2456, Plata Docket 880) |
| Defendants' Supplemental Brief in Opposition to Plaintiffs' Motion to Convene a Three-Judge Panel and Exhibits, and Supporting Declarations of Joan Petersilia, Doug McKeever, Margaret McAloon, Scott Kernan, Kathryn P. Jett and Deborah Hysen (May 24, 2007) (Coleman Docket 2238) |
| Declaration of Scott Kernan in Support of Defendants' Response to Receiver's Supplemental Report Re: Overcrowding (June 18, 2007) (Coleman Docket 2287) |
| Defendants' Brief Re: Expert Panel's Report on Reentry and Recidivism and Its Relation to Pending Motion to Convene a Three Judge Panel and Declarations of Kathryn Jett and Joan Petersilia (July 11, 2007) (Coleman Docket 2310) |
| Sample Declarations of Pablo Stewart from *Morales* and *Prieto* Matters |
| Defendants' Report and Plan for Improvement of Enhanced Outpatient Programs in Administrative Segregation Units (July 11, 2007) (Coleman Docket 2311) |
| Defendants' Responses and Objections to Special Master Keating's Report on Defendants' Plan to Provide Enhanced Outpatient Program Care at Reception Centers (July 12, 2007) (Coleman Docket 2313) |
| Defendants' Statement in Response to Court Order Re: Compliance with Items to Reduce Suicides in Administrative Segregation Units and Declaration of Doug McKeever (July 30, 3007) (Coleman Docket 2335) |
| Defendants' Ex Parte Motion Re: Request for Extension of Time, Declaration of Misha Igra, and Proposed Order (July 30, 2007) (Coleman Docket 2336) |
| Defendants' Ex Parte Request for an Extension of Time Re: Small Management Yards, Declaration of Hysen, and Proposed Order (August 29, 2007) (Coleman Docket 2393) |

[233150-1]

Judge Karlton's 9/14/07 Order Granting Defendants' Ex Parte Request for an Extension of Time Re: Small Management Yards (Coleman Docket 2418)

Defendants' Response to Court Order Re: Small Management Yard (October 29, 2007) (Coleman Docket 2492)

Defendants' Supplemental Report Re: Television and Radio Accessibility in Administrative Segregation Units (August 21, 2007) (Coleman Docket 2382)

Defendants' Statement of Compliance Re: Television and Radio Accessibility in Administrative Segregation Units (August 13, 2007) (Coleman Docket 2363)

Memorandum from CSP-SAC, entitled "Report On Use of Alternate Sites for Crisis Bed Patients" (October 5, 2007) (20th Round SAC Tour Binder)

5/8 Day Follow Charts for Inmates that Were Removed from Observation Units in 2006

OHU-I and OHU Follow-Up/Wellness Check Charts for 3/1/07 to 9/28/07

Office of the Inspector General (OIG) Special Review Into the Death of Correctional Officer Manuel A. Gonzalez, Jr. on January 10, 2005 at the California Institution for Men (March 16, 2005)

"Repairs Needed After California Institution for Men Riot - Prison Officials Say Understaffing Left Guards in Jeopardy," Inland Valley Daily Bulletin (September 29, 2005)

"16-Year Veteran CDC Correctional Officer Dies From Inmate Stabbing Attack," CDCR Press Release (January 10, 2005)

"Major Prison Disturbance at the California Institution for Men in Chino," CDCR Press Release (December 30, 2006)

"Massive Riot at CIM," Officer.com Police Forums & Law Enforcement Forums, http://www.forums.officer.com/forums (December 31, 2006)

P. Paulus, G. McCain, & V. Cox, "The Relationship Between Illness Complaints and Degree of Crowding in a Prison Environment," Environment and Behavior 8 (1976) at 233, 288

P. Paulus, G. McCain, & V. Cox, "Death Rates, Psychiatric Commitments, Blood Pressure, and Perceived Crowding as a Function of Institutional Crowding," Environmental Psychology and Nonverbal Behavior 3 (1978) at 107, 115

V. Cox, P. Paulus, & G. McCain, "Prison Crowding Research," American Psychologist 39 (1984) at 1148, 1159

Judge Karlton's 6/1/07 Order Adopting Special Master's Report and Recommendations on Defendants' Plan to Prevent Suicides in Administrative Segregation (Coleman Docket 2255)

Selection of Documents from the DVI Coleman Tour Binder (October 2-4, 2007 Monitoring Tour)

Coleman Docket

Documents received during expert tour of Deuel Vocation Institution on October 29, 2007

Documents received during expert tour of CSP – Solano on October 31, 2007

Documents received during expert tour of Salinas Valley State Prison on November 1, 2007

CDCR Report Regarding Inmate Incidents in Institutions, Calendar Year 2006 (Published September 2007)

CDCR Weekly Population Report, October 24, 2007

CDCR Weekly Population Report, July 5, 2006

CDCR Weekly Population Report, January 10, 2007

Judge Karlton 6/28/07 Order Re: DMH Salary Increases and Atascadero State Hospital

Coleman Specials Masters Report on Defendants' Establishment of Interim Inpatient Intermediate DMH Beds and the Need for Approval of Some Components of Dec 2006 Bed Plan and Exhibit A (April 12, 2007) (Docket 2186)

| |
|---|
| Judge Karlton 10/18/07 Order Adopting Special Master's September 24, 2007 Report in Full (Coleman Docket 2461) |
| CDCR MHSDS Prevalence Data for January 2003 and July 2007 from CDCR Monthly Reports |
| Report of Doyle Wayne Scott and Appendices A-C (November 9, 2007) |
| Report of Ronald Shansky, M.D. (November 9, 2007) |
| Report of Jeanne Woodford (November 9, 2007) |
| Three-Judge Court's 4/25/08 Scheduling Order, *Plata* Docket 1179 |
| Three-Judge Court Order for Pretrial Preparation, *Plata* Docket 1294, (July 2, 2008) |
| Plaintiffs' Fourth Request for Inspection (July 2, 2008) |
| Plaintiffs' Amended Fourth Request for Inspection (July 18, 2008) |
| "Achieving a Constitutional Level of Medical Care in California's Prisons: The Federal Receiver's Draft Strategic Plan (2.0)" (April 21, 2008) |
| "Confidential Unredacted Special Review into the CDCR's Release" of San Quentin Prisoner, Office of the Inspector General Report (October 31, 2007) |
| CDCR's Notification of Changes to Inmate Medical Services Program, Policies and Procedures, re: New Emergency Response Policy (May 22, 2008) |
| *Plata* Receiver's Eighth Quarterly Report, *Plata* Docket 1248 (June 17, 2008) |
| *Coleman* Special Master's Final Report on Suicides Completed in 2005 (November 26, 2007) |
| Monthly Staffing and Staffing Vacancies Report for all DMH State Hospitals, Vacaville Psychiatric Program and Salinas Valley Psychiatric Program, through March 25, 2008 (April 4, 2008) |
| Monthly Report on the Licensure of Intermediate Care and Day Treatment Programs at the California Medical Facility, Vacaville and the Salinas Valley Psychiatric Program, Salinas Valley State Prison, for June 2008 |
| Monthly Report on the Licensure of Intermediate Care and Day Treatment Programs at the California Medical Facility, Vacaville and the Salinas Valley Psychiatric Program, Salinas Valley State Prison, for May 2008 |
| Monthly Report on the Licensure of Intermediate Care and Day Treatment Programs at the California Medical Facility, Vacaville and the Salinas Valley Psychiatric Program, Salinas Valley State Prison, for April 2008 |
| Monthly Report on the Licensure of Intermediate Care and Day Treatment Programs at the California Medical Facility, Vacaville and the Salinas Valley Psychiatric Program, Salinas Valley State Prison, for March 2008 |
| Mental Health Crisis Bed – Monthly Report, for December 2007 (April 11, 2008) |
| Mental Health Crisis Bed – Monthly Report, for January 2008 (April 11, 2008) |
| Monthly Bed Utilization Report for the Department of Mental Health Hospitals and Psychiatric Programs, for June 2008 (July 15, 2008) |
| Monthly Bed Utilization Report for the Department of Mental Health Hospitals and Psychiatric Programs, for May 2008 (June 12, 2008) |
| Monthly Bed Utilization Report for Department of Mental Health Hospitals and Psychiatric Programs, for March 2008 (April 14, 2008) |
| Navigant Consulting Mental Health Bed Need Study – Annual Report (July 2007) |
| Defendants' Response to Judge Karlton's 10/18/07 Order to Submit to the *Coleman* Special Master a development proposal for adequate mental health treatment and counseling space at the … California Medical Facility (March 28, 2008) |
| CDCR Mental Health Program Infrastructure Modification Projects as of February 2008 |

[233150-1]

| |
|---|
| CDCR Mental Health Program Infrastructure Modification Projects as of December 17, 2007 |
| *Plata* Receiver's Seventh Quarterly Report and Exhibits, *Plata* Docket 1136-1137 (March 14, 2008) |
| Operational Assessment: Mule Creek State Prison, Receiver Review (December 18-20, 2007) |
| CDCR's Notification of Changes to Inmate Medical Services Program, Policies and Procedures, re: New Emergency Response Policy (May 22, 2008) |
| Defendants' Response to Judge Karlton's 10/17/07 order to provide a development proposal for adequate mental health treatment and counseling space at Salinas Valley State Prison (February 14, 2008) |
| Central and Medical File for *Coleman* Class Member N, as of December 2007 |
| Transcript of Pablo Stewart's Deposition (December 11, 2007) |
| CDCR Weekly Population Report, August 8, 2006 |
| Mental Health Population Chart – Placement Per Institution, as of June 20, 2008 |
| Total MHCB Referrals, Transferred & Rescinded, Plaintiffs' Chart, (November 2006-June 2008) |
| CDCR Report, Summary of Inter-Institutional Mental Health Crisis Bed Referrals and Transfers for June 2008 (July 16, 2008) |
| Defendant Cate's Responses to Second Set of Interrogatories from Plaintiff Coleman, August 8, 2008 |
| CDCR Draft Memorandum, Directive: Medication Compliance Monitoring and Ordering Reference Psychotropic Blood Levels for Mental Health Services Delivery System (MHSDS) Inmate-Patients (Undated) |
| CDCR Memorandum, Lipon-McKeever, re Expansion of Level III EOP Program on B Yard and "Modified Program" (October 16, 2006) |
| CDCR Weekly Report of Population as of Midnight January 31, 2003 |
| CDCR Weekly Report of Population as of Midnight July 31, 2007 |
| January 2007 CDCR Estimated Construction Schedule for Infill Bed Plan, Exhibit 20 To Receiver's 5/15/07 Report Re: Overcrowding |
| CDCR's Mental Health Bed Plan (July 16, 2008) |
| CDCR Email from Jerome Marsh re AB 900 Region IV Analysis (July 31, 2007) |
| Nineteenth Monitoring Report of the Special Master on the Defendants' Compliance with Provisionally Approved Plans, Policies and Protocols, *Coleman* Docket 2895 (July 25, 2008) |
| Draft Twentieth Monitoring Report of the Special Master on the Defendants' Compliance with Provisionally Approved Plans, Policies and Protocols, Part A (2008) |
| Defendant Cate's Responses to Plaintiff Ralph Coleman's Interrogatories, Set One (July 25, 2008) |
| Judge Karlton's 8/8/08 Order Granting Plaintiffs Motion for Injunctive Relief Requiring Timely Access to Inpatient Psychiatric Hospitalization (*Coleman* Docket 2930) |
| All Documents produced by Salinas Valley State Prison on *Coleman* Expert tour including medical files and other logs, etc. reviewed on tour (July 29, 2008) |
| All Documents Produced by Mule Creek State Prison on *Coleman* Expert tour including medical files and other logs, etc. reviewed on tour (August 1, 2008) |
| All Documents Produced by California Medical Facility on *Coleman* Expert tour including medical files and other logs, etc. reviewed on tour (August 1, 2008) |
| Photos from the CDCR Website re: overcrowded conditions in 2006 |
| "2007 Prison Reform and Rehabilitation Initiative", Video from the CDCR website re: overcrowding conditions http://www.cce.csus.edu/CDCRVideos/Overcrowding/OPEC%20Package%20Prison%20Overcrowding.html |
| California Department of Corrections Salinas Valley State Prison Operational Procedure #14 Addendum, Title: Use of Force, Developed: March 2003, Revised: June 2005, CDCR023075-CDCR023077 |

APPENDIX B                                    5

| |
|---|
| MHSDS Hiring Activity Report for Mule Creek State Prison, As of Effective Date: July 31, 2007 |
| Notification of Suicide of *Coleman* Class Member "WWWW" Dated December 24, 2007 |
| Final Determination of Non-Suicide Death of *Coleman* Class Member "VVVV" Received 9/26/07 |
| Notification of Death of *Coleman* Class Member "UUUU" Dated November 21, 2007 |
| Memorandum regarding Suicide Watch in ASU from March 2006 to Present, Dated November 28, 2007, Mule Creek State Prison |
| CDCR Health Care Placement Unit Information Report, June 8, 2007 |
| CDCR Health Care Placement Unit Information Report, March 7, 2008 |
| CDCR Health Care Placement Unit Information Report, June 20, 2008 |
| Non-Traditional Beds by Institution as of October 17, 2007 |
| Division of Correctional Health Care Services, Mental Health Staffing Workload Study, June 2007 |
| Mental Health Crisis Bed – Monthly Report, for October 2007 (March 26, 2008) |
| CDCR Report, Summary of Inter-Institutional Mental Health Crisis Bed Referrals and Transfers for May 2008 (June 13, 2008) |
| *Coleman* Round XXI Corrective Action Plan for Salinas Valley State Prison (May 23, 2008) |
| CDCR Website Data Analysis Weekly Population Report as of Midnight August 6, 2008 |
| Letter, Dezember-Lopes, re Response to Judge Karlton's 10/18/07 order to provide a development proposal for adequate mental health treatment services and program space at California Medical Facility (March 28, 2008) |
| CDCR Executive Summary of Suicide Report for *Coleman* Class Member "GGGG" |
| CDCR Suicide Report for *Coleman* Class Member "HHHH" |
| Memoranda, Fagot-Hoffman re AB 900 Management Projects and re AB 900 Rehabilitative Projects, July 30, 2007 |
| Memorandum, Martinez-Hoffman re Region III Assembly Bill 900 Analysis and Suggestions, August 10, 2007 |
| Draft Special Master Report on the Suicides Completed in the California Department of Corrections and Rehabilitation in Calendar Year 2006 |
| DMH Summary Monthly Report of All CDC Patients in DMH Hospitals for Month Ending June 2008 |

[233150-1]