| | | |
|---|---|---|
| 1 | PRISON LAW OFFICE | ROSEN, BIEN & GALVAN, LLP |
| | DONALD SPECTER, Bar No. 83925 | MICHAEL W. BIEN, Bar No. 96891 |
| 2 | STEVEN FAMA, Bar No. 99641 | JANE E. KAHN, Bar No. 112239 |
| | E. IVAN TRUJILLO, Bar No. 228790 | AMY WHELAN, Bar No. 215675 |
| 3 | SARA NORMAN, Bar No. 189536 | LISA ELLS, Bar No. 243657 |
| | ALISON HARDY, Bar No. 135966 | MARIA V. MORRIS, Bar No. 223903 |
| 4 | REBEKAH EVENSON, Bar No. 207825 | 315 Montgomery Street, 10th Floor |
| | 1917 Fifth Street | San Francisco, California 94104 |
| 5 | Berkeley, CA 94710 | Telephone: (415) 433-6830 |
| | Telephone: (510) 280-2621 | |

K&L GATES LLP
JEFFREY L. BORNSTEIN, Bar No. 99358
EDWARD P. SANGSTER, Bar No. 121041
RAYMOND E. LOUGHREY, Bar No. 194363
55 Second Street, Suite 1700
San Francisco, CA 94105-3493
Telephone: (415) 882-8200

BINGHAM, McCUTCHEN, LLP
WARREN E. GEORGE, Bar No. 53588
Three Embarcadero Center
San Francisco, California 94111
Telephone: (415) 393-2000

THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
CLAUDIA CENTER, Bar No. 158255
600 Harrison Street, Suite 120
San Francisco, CA 94107
Telephone: (415) 864-8848

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURTS

FOR THE EASTERN DISTRICT OF CALIFORNIA

AND THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

| | |
|---|---|
| RALPH COLEMAN, et al., | No.: Civ S 90-0520 LKK-JFM P |
| Plaintiffs, | **THREE-JUDGE COURT** |
| vs. | |
| ARNOLD SCHWARZENEGGER, et al., | |
| Defendants | |
| MARCIANO PLATA ,et al., | No. C01-1351 TEH |
| Plaintiffs, | **THREE-JUDGE COURT** |
| vs. | |
| ARNOLD SCHWARZENEGGER, et al., | **DECLARATION OF LISA ELLS IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AND/OR MOTION FOR SUMMARY JUDGMENT / ADJUDICATION** |
| vs. | |
| Defendants | |

[241979-3]

DECLARATION OF LISA ELLS IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AND/OR MOTION
FOR SUMMARY JUDGMENT / ADJUDICATION, NOS.: CIV S 90-0520 LKK-JFM, C01-1351 TEH

I, Lisa Ells, declare:

1.       I am a member of the Bar of this Court and an associate in the law firm Rosen, Bien & Galvan, LLP, one of the counsel of record for the *Coleman* Plaintiff class in this case. I have personal knowledge of the matters set forth herein and if called as a witness I could competently so testify.  I make this declaration in support of Plaintiffs' Opposition to Defendants' Motions for Dismissal Or, Alternatively, For Summary Judgment or Summary Adjudication.

2.       Attached hereto as Exhibit A is a true and correct copy of relevant portions of the transcript of an April 26, 2006 evidentiary hearing before Judge Karlton in the *Coleman* case (*Coleman* Docket # 1813).  The excerpted pages are: 2-3.

3.       Attached hereto as Exhibit B is a true and correct copy of relevant portions of the transcript of a June 27, 2008 case management conference before the Three Judge Court (*Plata* Docket # 1314).  The excerpted page is: 20.

4.       Attached hereto as Exhibit C is a true and correct copy of Governor Schwarzenegger's October 4, 2006 emergency proclamation, entitled "Prison Overcrowding State of Emergency Proclamation," which a paralegal in my office, at my direction, printed from the Governor's website at http://gov.ca.gov/index.php?/proclamation/4278/ on September 28, 2008.

5.       Attached hereto as Exhibit D are true and correct color copies of images of CDCR prisons, which a paralegal in my office, at my direction, printed from the CDCR's website at http://www.cdcr.ca.gov/News/prisonovercrowding.html on September 28, 2008. According to information on the same website page, photos 1-3 of Exhibit D are of California Institute for Men on August 7, 2006; photos 4-5 are of California State Prison-Solano on August 7, 2006; photo 6 is of Mule Creek State Prison on July 19, 2006; photos 7-9 are of California Institute for Women on August 10, 2006; and photos 10-14 are of California State Prison-Los Angeles on August 8, 2006.

6.       Attached hereto as Exhibit E is a true and correct copy of excerpted portions of

1  the transcript of the deposition of Scott Kernan, taken on August 27, 2008.  The excerpted

2  pages are: 91, 126.

3     7.     Attached hereto as Exhibit F is a true and correct copy of the transcript of

4  Governor Schwarzenegger's June 26, 2006 remarks, entitled "Schwarzenegger Calls Special

5  Session to Address Prison Crowding, Recidivism," which a paralegal in my office, at my

6  direction, printed from the Governor's official website at http://gov.ca.gov/speech/1088/ on

7  September 28, 2008.

8     8.     Attached hereto as Exhibit G is a true and correct copy of Governor

9  Schwarzenegger's June 26, 2006 Proclamation and related press release, which a paralegal in

10  my office, at my direction, printed from the Governor's official website at

11  http://gov.ca.gov/index.php?/press-release/1076/ on September 28, 2008.

12     9.     Attached hereto as Exhibit H is a true and correct copy of relevant portions of the

13  transcript of the deposition of Deborah Hysen, taken on September 3, 2008.   The excerpted

14  pages are: 23, 31, 61-62, 157-158.

15     10.     Attached hereto as Exhibit I is a true and correct copy of a video of a June 26,

16  2008 speech given by Senator Dave Cogdill, which I located on Senator Cogdills' official

17  website at http://cssrc.us/web/14/multimedia.aspx under the linked title, "Senator Cogdill

18  Discusses the GOP's Solution to California's Prison Overcrowding."  On September 26, 2008,

19  at my direction, a paralegal in my office instructed a vendor we have engaged to capture

20  Senator Cogdill's speech on a CD.  I have confirmed that the video captured on this CD is the

21  same video as the one displayed on Senator Cogdill's website at the aforementioned location,

22  and has not been altered or tampered with in any way.  This CD, containing Exhibit I, will be

23  provided to each member of the Three-Judge Court as part of the courtesy copy of this filing,

24  and will also be provided to the parties under separate cover.

25     11.     Attached hereto as Exhibit J is a true and correct copy of a September 17, 2008

26  press release issued by the CDCR, entitled "Statement from CDCR Secretary Matthew Cate on

27  Lack of Public Safety Trailer Bill in Budget Package," which a paralegal in my office, at my

28

[241979-3]

1  direction, printed from the CDCR's official website at http://www.cdcr.ca.gov/News/

2  2008_Press_Releases/sept_17.html on September 26, 2008.

3      12.    Attached hereto as Exhibit K is a true and correct copy of an October 8, 2006

4  article written by the Receiver for the Sacramento Bee, entitled "Cruel and unusual prison

5  health care," which a paralegal in my office, at my direction, purchased from the Sacramento

6  Bee's online archives at http://www.sacbee.com/109/story/7178.html on September 28, 2008.

7      13.    Attached hereto as Exhibit L is a true and correct copy of excerpted portions of

8  the transcript of the deposition of Defendants' expert, Christopher Mumola, taken on August

9  25, 2008.  The excerpted pages are: 62-64.

10     14.    Attached hereto as Exhibit M is a true and correct copy of a Budget Year 2008-

11 2009 CDCR Budget Change Proposal for a project entitled "CSP-SAC Treatment and Office

12 Space to Accommodate 192 Enhanced Outpatient Program Inmate-Patients."  This document

13 was produced to Plaintiffs by Defendants in response to a request for production of documents

14 and is bates numbered DEFS012448- DEFS012453.

15     15.    Attached hereto as Exhibit N is a true and correct copy of an August 27, 2008

16 letter from Sharon Riegel to Special Master Lopes, received by Plaintiffs' counsel on August

17 29, 2008, as well as an enclosed letter from Dennis Beaty to Special Master Lopes on which

18 Plaintiffs' counsel was copied, and Enclosure 1, entitled "Mental Health Services Delivery

19 System Staffing Allocation and Vacancy History," containing a CDCR report showing data

20 through July 2008.  This report is an excerpt from the monthly documents produced by

21 Defendants to the *Coleman* Special Master and Plaintiffs pursuant to court orders in the

22 *Coleman* case.

23     16.    Attached hereto as Exhibit O is a Fiscal Year 2008-2009 CDCR finance letter,

24 entitled "Mental Health Staffing- Workload Study."  This document was produced to Plaintiffs

25 by Defendants in response to a request for production of documents and is bates numbered

26 DEFS014440- DEFS014451.  It was introduced as Exhibit 8 and authenticated during the

27 August 29, 2008 deposition of Shama Chaiken.

28

[241979-3]

17.    Attached hereto as Exhibit P is a true and correct copy of a July 12, 2008 email from *Coleman* Deputy Special Master Kerry Walsh to counsel for the *Coleman* parties attaching a July 12, 2008 letter from Special Master Lopes to Robin Dezember and Lisa Tillman concerning the Work Load Study.

18.    Attached hereto as Exhibit Q is a true and correct copy of a July 16, 2008 email from Lisa Tillman to Special Master Lopes entitled "Plan in Response to 10/07 Order", on which Plaintiffs' counsel was copied, and an attached CDCR report entitled "California Department of Corrections and Rehabilitation's Mental Health Bed Plan, July 16, 2008."

19.    Attached hereto as Exhibit R is a true and correct copy of a September 11, 2008 email from Sharon Riegel to Plaintiffs' counsel entitled "Coleman Monthly Package for July 2008 – Additional Documents", an attached August 28, 2008 letter from Dennis Beaty to Special Master Lopes, and an attached CDCR report based on August 8, 2008 data entitled "Combined Mental Health Population Per Institution."  This report is an excerpt from the monthly documents produced by Defendants to the *Coleman* Special Master and Plaintiffs pursuant to court orders in the *Coleman* case.  Although the report is labeled "Confidential," it is not subject to the protective orders in this case because it does not contain personal information such as inmate names or identification numbers, timetables of out of state transfers, architectural information, or any other type of information covered by the governing protective orders.

20.    Attached hereto as Exhibit S is a true and correct copy of a September 11, 2008 email from Lisa Tillman to Special Master Lopes entitled "DMH Staffing, Census", on which Plaintiffs' counsel was copied, an attached letter from Cynthia Radavsky to Special Master Lopes, and an attached DMH report run on August 31, 2008 entitled "Status of Implementation of Plan for Increasing Capacity of Intermediate Care Facility and Day Treatment Program Beds at the California Medical Facility."  This report is an excerpt from the monthly documents produced by Defendants to the *Coleman* Special Master and Plaintiffs pursuant to court orders in the *Coleman* case.

[241979-3]

21.     Attached hereto as Exhibit T is a true and correct copy of an excerpt of a July 2006 CDCR document, entitled "Inmate Population, Rehabilitation, and Housing Management Plan." This document was produced to Plaintiffs by Defendants in response to a request for production of documents and is bates numbered CDCR009402-CDCR009420.

22.     Attached hereto as Exhibit U is a true and correct copy of relevant portions of the transcript of the deposition of James Tilton, Former Secretary of CDCR, taken on September 3, 2008. The excerpted page is: 80.

23.     Attached hereto as Exhibit V is a true and correct copy of a webpage, entitled "Prison Reform and Rehabilitation Media," which a paralegal in my office, at my direction, printed from the CDCR's official website at http://www.cdcr.ca.gov/News/ ReformRehabMedia.html on September 25, 2008.

24.     Attached hereto as Exhibit W is a true and correct copy of the transcript of Governor Schwarzenegger's March 6, 2007 remarks, entitled "Gov. Schwarzenegger Tours Overcrowded State Prison in Norco," which a paralegal in my office, at my direction, printed from the Governor's official website at http://gov.ca.gov/speech/5568/ on September 29, 2008.

25.     Attached hereto as Exhibit X is a true and correct copy of excerpted portions of the rough transcript of the deposition of Matthew Cate, Secretary of CDCR, taken on August 29, 2008. The excerpted pages are: 141-142, 175-176.

26.     Attached hereto as Exhibit Y is a true and correct copy of a March 16, 2007 CDCR Daily Newspaper Clips containing a Sacramento Bee article entitled "Prison system failing, top corrections official says." This document was produced to Plaintiffs by Defendants in response to a request for production of documents and is bates numbered E_CDCR_016617-E_CDCR_016618.

27.     Attached hereto as Exhibit Z is a true and correct copy of an undated CDCR draft document by Deborah Hysen, entitled "From Custody to Community: Building the Bridge for California's Prisoners Returning Home." This document was produced to Plaintiffs by Defendants in response to a request for production of documents and is bates numbered

[241979-3]

1    E_Priv_161332- E_Priv_161334.  It was introduced as Exhibit 16 and authenticated during the

2    September 3, 2008 deposition of Deborah Hysen.

3          28.    Attached hereto as Exhibit AA is a true and correct copy of a Budget Year 2007-

4    2008 CDCR Budget Change Proposal for a project entitled "STWD Infill Housing and

5    Program Space."  This document was produced to Plaintiffs by Defendants in response to a

6    request for production of documents and is bates numbered CDCR020885-CDCR020895.  It

7    was introduced as Exhibit 2 and authenticated during the September 3, 2008 deposition of

8    Deborah Hysen.

9          29.    Attached hereto as Exhibit BB is a true and correct copy of an August 30, 2007

10   CDCR report, entitled "Overview and Planning Guide for Northern California Women's

11   Facility Conversion to a Secure Reentry Program Facility."  This document was produced to

12   Plaintiffs by Defendants in response to a request for production of documents and is bates

13   numbered E_CDCR_001606- E_CDCR_001622

14         30.    Attached hereto as Exhibit CC is a true and correct copy of a Fiscal Year 2007-

15   2008 CDCR Out of State Correctional Facilities document, entitled "Fall Population Proposal."

16   This document was produced to Plaintiffs by Defendants in response to a request for

17   production of documents and is bates numbered CDCR003746- CDCR003769.

18         31.    Attached hereto as Exhibit DD is a true and correct copy of excerpts of Part I of

19   the June 29, 2007 CDCR Expert Panel on Adult Offender and Recidivism Reduction

20   Programming Report to the California State Legislature, entitled "A Roadmap for Effective

21   Offender Programming in California."  This document was produced to Plaintiffs by

22   Defendants in response to a request for production of documents, and the excerpted portion is

23   bates numbered CDCR008342- CDCR008345, CDCR008372-CDCR008417.

24         32.    Attached hereto as Exhibit EE is a true and correct copy of relevant portions of

25   the transcript of the deposition of Intervenor Sonoma County's expert, Dr. David Bennett,

26   taken on September 9, 2008.  The excerpted pages are: 2, 76-77.

27         33.    Attached hereto as Exhibit FF is a true and correct copy of the December 10,

28

[241979-3]

2007 report of Defendants' expert, Ira Packer, which was served on Plaintiffs on December 10, 2007.

34.    Attached hereto as Exhibit GG is a true and correct copy of the August 15, 2008 report of Defendants' expert, Ira Packer, which was served on Plaintiffs on August 15, 2008.

35.    Attached hereto as Exhibit HH is a true and correct copy of relevant portions of the transcript of the deposition of Plaintiffs' expert, Dr. Ronald Shansky, taken on December 10, 2007.  The excerpted pages are:  53, 144-145, 149, 161.

36.    Attached hereto as Exhibit II is a true and correct copy of a September 17, 2008 letter sent by Michael Bien, a partner in my office, to Paul Mello, counsel for Defendants, asking Defendants to withdraw Defendants' Motions for Dismissal Or, Alternatively, For Summary Judgment or Summary Adjudication pursuant to Federal Rule of Civil Procedure 11. No response to this letter has been received by our office to date.

I declare under penalty of perjury under the laws of California and the United States that the foregoing is true and correct, and that this declaration is executed this 29th day of September 2008 in San Francisco, California.

_____ */s/Lisa Ells*_____
Lisa Ells

# EXHIBIT

# A

1                IN THE UNITED STATES DISTRICT COURT

2              FOR THE EASTERN DISTRICT OF CALIFORNIA

3                          ---oOo---

4       BEFORE THE HONORABLE LAWRENCE K. KARLTON, SENIOR JUDGE

5

6    RALPH COLEMAN, et al.,

7           Plaintiff,

8    Vs.                            CASE NO. CIV. S-90-0520 LKK

9    ARNOLD SCHWARZENEGGER,
     et al.,
10

11          Defendants.

12    _____/

13

14

15

16                          ---oOo---

17

18                   REPORTER'S TRANSCRIPT

19              WEDNESDAY, APRIL 26TH, 2006

20       RE:  EVIDENTIARY HEARING RE MOTION FOR COURT ORDER

21

22                          ---oOo---

23

24

25    Reported by:              CATHERINE E.F. BODENE,
                                CSR. No. 6926

2

1    those questions, discuss it with them so that they know what

2    it is we're going to be talking about, and then we'll put

3    them on the stand and try and get the answers that I think

4    are critical.

5         I want to start by making an observation that I am in

6    a sense quite -- Actually, you folks can sit down because I'm

7    about to make a speech.

8         MS. TILLMAN:  Thank you, Your Honor.

9         THE COURT:  I'm happy that the plaintiffs have

10   objected to some of the matters because it gives me an

11   opportunity to have a hearing that I've been thinking I

12   needed for some time.

13        It is not unimportant to the Court that the judgment

14   in this case was entered 11 years ago.  And we are still in a

15   place in which the defendants have been unable to bring the

16   delivery of psychiatric care up to constitutional standards.

17        I don't want to be misunderstood.  I very much

18   understand how much progress has been made, but in a sense --

19   and I don't mean this disrespectfully, though I suspect

20   that's how it's going to sound -- what we've managed to do is

21   crawl our way out of the snake pit.

22        Well, good for us, but that's hardly the standard

23   required by the Constitution.

24        I have profound trust in my Special Master.  I got so

25   lucky, I can hardly believe it.  Nonetheless, it is 11 years,

3

1    and we are not done.  And that is unacceptable.  It is just

2    plain unacceptable.

3         I promised myself I wouldn't lose my temper, and I'm

4    not going to.

5         In a sense, this hearing is to help me understand why

6    we are where we are, and what we can possibly do to bring the

7    State into conformance with the Constitution of the United

8    States.

9         That's what this case is about.  Every defendant in

10    this case is in violation of the law.  That is shocking.

11    That is shocking.

12         And that we go on and talk about building out to

13    19 -- to 2011, or God knows how much beyond that.  There's no

14    sense of urgency.  There's no sense that the defendants are

15    in violation of the law.

16         So that's one purpose in this hearing.

17         Another purpose is engendered by the fact that

18    Judge Henderson has ordered a receivership in Plata.  And we

19    are going to have a joint hearing, as I think you all know,

20    on June the 8th at ten o'clock here in Sacramento.  I offered

21    to go down to San Francisco, but I think Judge Henderson,

22    because we met down there twice, thought it was his turn to

23    come up.  And it's important for me to be in a position when

24    we talk on June the 8th to have some better sense of what's

25    possible.

# EXHIBIT

# B

PAGES 1 – 43

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES PURSUANT

TO SECTION 2284, TITLE 28 UNITED STATES CODE

```
RALPH COLEMAN, ET AL.,           )
                                 )
            PLAINTIFFS,          )
                                 )
  VS.                            ) NO. CIV LS-90-0520 LKK JFM P
                                 )
ARNOLD SCHWARZENEGGER, ET AL.    )
                                 ) THREE-JUDGE COURT
            DEFENDANTS.          )
                                 )
_____
                                 )
MARCIANO PLATA, ET AL.,          )
                                 )
            PLAINTIFFS,          )
                                 )
VS.                              ) NO. C 01-1351 TEH
                                 )
ARNOLD SCHWARZENEGGER, ET AL.    )
                                 )
            DEFENDANTS.          )
_____)
```

**TRANSCRIPT OF PROCEEDINGS**

SAN FRANCISCO, CALIFORNIA
FRIDAY, JUNE 26, 2008

(APPEARANCES ON FOLLOWING PAGES)

*REPORTED BY:*  JOAN MARIE COLUMBINI, CSR 5435, RPR
               OFFICIAL COURT REPORTER, U.S. DISTRICT COURT

1  ALL RIGHT.  YOU KNOW, IT'S REALLY IMPORTANT TO BE CANDID.  I

2  ACCEPT YOU'RE BEING CANDID.  ALL RIGHT.

3          **MS. EAST:**  YES, YOUR HONOR.

4          **JUDGE HENDERSON:**  AND LET ME JUST PURSUE IT A BIT

5  MORE.  AND WHAT YOU JUST SAID WILL HAPPEN, RATHER THAN THAT

6  AFTER WE'VE SEEN ALL THIS, WE WILL SORT OF SEE SOME WEAKNESSES

7  IN PLAINTIFFS' CASE AS WE GO TO TRIAL.  NOW, THERE'S A

8  DISTINCTION.  YOU'RE SAYING WE WILL SEE AT LEAST A VIABLE

9  ARGUMENT THAT WE SHOULDN'T HAVE A TRIAL.

10          **MS. EAST:**  YES.

11          **JUDGE HENDERSON:**  OKAY.

12          **MR. KAUFHOLD:**  YOUR HONORS, MAY I BE HEARD ON THIS

13  ISSUE AS WELL?

14          **JUDGE HENDERSON:**  OF COURSE.

15          **MR. KAUFHOLD:**  SETTING ASIDE THE ISSUE OF WHAT CAN

16  BE SHOWN WITHIN FIVE DAYS, WE, AS THE INTERVENORS WHO HAVE NOT

17  HAD AN OPPORTUNITY TO PARTICIPATE IN THE DISCOVERY, BELIEVE IT

18  WOULD BE INAPPROPRIATE TO DECIDE AT THIS POINT WHETHER SUMMARY

19  JUDGMENT IS APPROPRIATE OR WHETHER IT'S NOT.  AND THERE ARE TWO

20  REASONS.

21          ONE IS WE DON'T KNOW EXACTLY HOW ALL THE EVIDENCE

22  WILL COME IN ON THE PLAINTIFFS' SIDE.  WE THINK IT'S PREMATURE

23  TO MAKE THAT DECISION.  WE HAVE NO DESIRE AND WOULD NOT EVER

24  MAKE A FRIVOLOUS MOTION, BUT WE THINK IT'S PREMATURE FOR US TO

25  REPRESENT TO YOU NOW OR IN FIVE DAYS WHETHER THAT WILL BE THE

1

2

3                    **<u>CERTIFICATE OF REPORTER</u>**

4          I, JOAN MARIE COLUMBINI, OFFICIAL REPORTER FOR THE

5    UNITED STATES COURT, NORTHERN DISTRICT OF CALIFORNIA, HEREBY

6    CERTIFY THAT THE FOREGOING PROCEEDINGS IN LS-90-0520 LKK,

7    COLEMAN V. SCHWARZENEGGER, AND C 01-1351 TEH, PLATA V.

8    SCHWARZENEGGER, WERE REPORTED BY ME, A CERTIFIED SHORTHAND

9    REPORTER, AND WERE THEREAFTER TRANSCRIBED UNDER MY DIRECTION

10   INTO TYPEWRITING; THAT THE FOREGOING IS A FULL, COMPLETE AND

11   TRUE RECORD OF SAID PROCEEDINGS AS BOUND BY ME AT THE TIME OF

12   FILING.

13          THE VALIDITY OF THE REPORTER'S CERTIFICATION OF SAID

14   TRANSCRIPT MAY BE VOID UPON DISASSEMBLY AND/OR REMOVAL FROM THE

15   COURT FILE.

16

17                    /S/ JOAN MARIE COLUMBINI

18              JOAN MARIE COLUMBINI, CSR 5435, RPR

19                    FRIDAY, JULY 11, 2008

20

21

22

23

24

25

# EXHIBIT

# C

**Office of the Governor**

ARNOLD SCHWARZENEGGER
THE PEOPLE'S GOVERNOR

SEARCH

Home    About Arnold    About Maria    Newsroom    Multimedia    Issues    Blog    Interact    Appointments    Español

## Proclamation

RELATED CONTENT

10/04/2006    Print Version

### Prison Overcrowding State of Emergency Proclamation

### PROCLAMATION
by the
**Governor of the State of California**

**WHEREAS,** the California Department of Corrections and Rehabilitation (CDCR) is required by California law to house inmates committed to state prison; and

**WHEREAS,** various trends and factors, including population increases, parole policies, sentencing laws, and recidivism rates have created circumstances in which the CDCR is now required to house a record number of inmates in the CDCR prison system, making the CDCR prison system the largest state correctional system in the United States, with a total inmate population currently at an all-time high of more than 170,000 inmates; and

**WHEREAS,** due to the record number of inmates currently housed in prison in California, all 33 CDCR prisons are now at or above maximum operational capacity, and 29 of the prisons are so overcrowded that the CDCR is required to house more than 15,000 inmates in conditions that pose substantial safety risks, namely, prison areas never designed or intended for inmate housing, including, but not limited to, common areas such as prison gymnasiums, dayrooms, and program rooms, with approximately 1,500 inmates sleeping in triple-bunks; and

**WHEREAS,** the current severe overcrowding in 29 CDCR prisons has caused substantial risk to the health and safety of the men and women who work inside these prisons and the inmates housed in them, because:

With so many inmates housed in large common areas, there is an increased, substantial risk of violence, and greater difficulty controlling large inmate populations.

With large numbers of inmates housed together in triple-bunks, there is an increased, substantial risk for transmission of infectious illnesses.

The triple-bunks and tight quarters create line-of-sight problems for correctional officers by blocking views, creating an increased, substantial security risk.

**WHEREAS,** the current severe overcrowding in these 29 prisons has also overwhelmed the electrical systems and/or wastewater/sewer systems, because those systems are now often required to operate at or above the maximum intended capacity, resulting in an increased, substantial risk to the health and safety of CDCR staff, inmates, and the public, because:

Overloading the prison electrical systems has resulted in power failures and blackouts within the prisons, creating increased security threats. It has also damaged fuses and transformers.

Overloading the prison sewage and wastewater systems has resulted in the discharge of waste beyond treatment capacity, resulting in thousands of gallons of sewage spills and environmental contamination.

And when the prisons "overdischarge" waste, bacteria can contaminate the drinking water supply, putting the public's health at an increased, substantial risk.

**WHEREAS,** overloading the prison sewage and water systems has resulted in increased, substantial risk of damage to state and privately owned property and has resulted in multiple fines, penalties and/or notices of violations to the CDCR related to wastewater/sewer system overloading such as groundwater contamination and environmental pollution; and

**WHEREAS,** overcrowding causes harm to people and property, leads to inmate unrest and misconduct, reduces or eliminates programs, and increases recidivism as shown within this state and in others; and

**WHEREAS,** in addition to all of the above, in the 29 prisons with severe overcrowding, the following circumstances exist:

Avenal State Prison has an operational housing capacity of 5,768 inmates, but it currently houses 7,422 inmates, with 1,654 inmates housed in areas designed for other purposes. At the same time, in the last year, there were 64 incidents of assault/battery by inmates — 31 of them against CDCR staff — along with 15 riots/melees, and 27 weapon confiscations.

The California Correctional Center has an operational housing capacity of 5,724 inmates, but it currently houses 6,174 inmates, with 450 inmates housed in areas designed for other purposes. At the same time, in the last year, there were 128 incidents of assault/battery by inmates — 16 of them against CDCR staff — along with 34 riots/melees, and 21 weapon confiscations.

The California Correctional Institution has an operational housing capacity of 4,931, but it currently houses 5,702 inmates, with 771 inmates housed in areas designed for other purposes. At the same time, in the last year, there were 125 incidents of assault/battery by inmates — 79 of them against CDCR staff — along with 5 riots/melees, and 57 weapon confiscations.

Centinela State Prison has an operational housing capacity of 4,368, but it currently houses 4,956 inmates, with 588 inmates housed in areas designed for other purposes. At the same time, in the last year, there were 141 incidents of assault/battery by inmates — 30 of them against CDCR staff — along with 10 riots/melees, and 151 weapon confiscations.

The California Institution for Men has an operational housing capacity of 5,372, but it currently houses 6,615 inmates, with 1,243 inmates housed in areas designed for other purposes. At the same time, in the last year, there were 170 incidents of assault/battery by inmates — 57 of them against CDCR staff — along with 21 riots/melees, and 47 weapon confiscations.

The California Institution for Women has an operational housing capacity of 2,228, but it currently houses 2,624 inmates, with 396 inmates housed in areas designed for other purposes. At the same time, in the last year, there were 65 incidents of assault/battery by inmates — 26 of them against CDCR staff — and 6 weapon confiscations.

The California Men's Colony has an operational housing capacity of 6,294, but it currently houses 6,574 inmates, with 280 inmates housed in areas designed for other purposes. At the same time, in the last year, there were 151 incidents of assault/battery by inmates — 33 of them against CDCR staff — along with 11 riots/melees, and 29 weapon confiscations.

The California State Prison at Corcoran has an operational housing capacity of 4,954, but it currently houses 5,317 inmates, with 363 inmates housed in areas designed for other purposes. At the same time, in the last year, there were 147 incidents of assault/battery by inmates — 58 of them against CDCR staff — along with 5 riots/melees, and 111 weapon confiscations.

The California Rehabilitation Center has an operational housing capacity of 4,660, but it currently houses 4,856 inmates, with 196 inmates housed in areas designed for other purposes. At the same time, in the last year, there were 65 incidents of assault/battery by inmates — 28 of them against CDCR staff — 9 riots/melees, and 34 weapon confiscations.

The Correctional Training Facility has an operational housing capacity of 6,157, but it currently houses 7,027 inmates, with 870 inmates housed in areas designed for other purposes. At the same time, in the last year, there were 85 incidents of assault/battery by inmates — 26 of them against CDCR staff — along with 9 riots/melees, and 27 weapon confiscations.

Chuckawalla Valley State Prison has an operational housing capacity of 3,443, but it currently houses 4,292 inmates, with 849 inmates housed in areas designed for other purposes. At the same time, in the last year, there were 50 incidents of assault/battery by inmates — 11 of them against CDCR staff — along with 5 riots/melees, and 21 weapon confiscations.

Deuel Vocational Institution has an operational housing capacity of 3,115, but it currently houses 3,911 inmates, with 796 inmates housed in areas designed for other purposes. At the same time, in the last year, there were 114 incidents of assault/battery by inmates — 54 of them against CDCR staff — along with 7 riots/melees, and 37 weapon confiscations.

High Desert State Prison has an operational housing capacity of 4,346, but it currently houses 4,706 inmates, with 360 inmates housed in areas designed for other purposes. At the same time, in the last year, there were 351 incidents of assault/battery by inmates — 44 of them against CDCR staff — along with 6 riots/melees, and 289 weapon confiscations.

Ironwood State Prison has an operational housing capacity of 4,185, but it currently houses 4,665 inmates, with 480 inmates housed in areas designed for other purposes. At the same time, in the last year, there were 96 incidents of assault/battery by inmates — 19 of them against CDCR staff — along with 14 riots/melees, and 52 weapon confiscations.

Kern Valley State Prison has an operational housing capacity of 4,566, but it currently houses 4,686 inmates, with 120 inmates housed in areas designed for other purposes. At the same time, in the last year, there were 146 incidents of assault/battery by inmates — 60 of them against CDCR staff — along with 10 riots/melees, and 46 weapon confiscations.

TheCalifornia State Prison at Los Angeles has an operational housing capacity of 4,230, but it currently houses 4,698 inmates, with 468 inmates housed in areas designed for other purposes. At the same time, in the last year, there were 211 incidents of assault/battery by inmates — 123 of them against CDCR staff — along with 4 riots/melees, and 101 weapon confiscations.

Mule Creek State Prison has an operational housing capacity of 3,197, but it currently houses 3,929 inmates, with 732 inmates housed in areas designed for other purposes. At the same time, in the last year, there were 65 incidents of assault/battery by inmates — 35 of them against CDCR staff — along with 1 riot/melee, and 28 weapon confiscations.

North Kern State Prison has an operational housing capacity of 5,189, but it currently houses 5,365 inmates, with 176 inmates housed in areas designed for other purposes. At the same time, in the last year, there were 135 incidents of assault/battery by inmates — 43 of them against CDCR staff — along with 16 riots/melees, and 70 weapon confiscations.

Pelican Bay State Prison has an operational housing capacity of 3,444, but it currently houses 3,604 inmates, with 160 inmates housed in areas designed for other purposes. At the same time, in the last year, there were 256 incidents of assault/battery by inmates — 88 of them against CDCR staff — along with 9 riots/melees, and 106 weapon confiscations.

Pleasant Valley State Prison has an operational housing capacity of 4,368, but it currently houses 5,112 inmates, with 744 inmates housed in areas designed for other purposes. At the same time, in the last year, there were 205 incidents of assault/battery by inmates — 59 of them against CDCR staff — along with 12 riots/melees, and 26 weapon confiscations.

The Richard J. Donovan Correctional Facility has an operational housing capacity of 4,120, but it currently houses 4,720 inmates, with 600 inmates housed in areas designed for other purposes. At

the same time, in the last year, there were 244 incidents of assault/battery by inmates — 118 of them against CDCR staff — along with 11 riots/melees, and 96 weapon confiscations.

The California State Prison at Sacramento has an operational housing capacity of 2,973, but it currently houses 3,213 inmates, with 240 inmates housed in areas designed for other purposes. At the same time, in the last year, there were 264 incidents of assault/battery by inmates — 159 of them against CDCR staff — along with 5 riots/melees, and 118 weapon confiscations.

The California Substance Abuse Treatment Facility and State Prison at Corcoran has an operational housing capacity of 6,360, but it currently houses 7,593 inmates, with 1,233 inmates housed in areas designed for other purposes. At the same time, in the last year, there were 120 incidents of assault/battery by inmates — 53 of them against CDCR staff — along with 20 riots/melees, and 124 weapon confiscations.

The Sierra Conservation Center has an operational housing capacity of 5,657, but it currently houses 6,107 inmates, with 450 inmates housed in areas designed for other purposes. At the same time, in the last year, there were 61 incidents of assault/battery by inmates — 18 of them against CDCR staff — along with 19 riots/melees, and 50 weapon confiscations.

The California State Prison at Solano has an operational housing capacity of 5,070, but it currently houses 5,858 inmates, with 788 inmates housed in areas designed for other purposes. At the same time, in the last year, there were 60 incidents of assault/battery by inmates — 26 of them against CDCR staff — along with 4 riots/melees, and 114 weapon confiscations.

San Quentin State Prison has an operational housing capacity of 4,933, but it currently houses 5,183 inmates, with 287 inmates housed in areas designed for other purposes. At the same time, in the last year, there were 262 incidents of assault/battery by inmates — 123 of them against CDCR staff — along with 15 riots/melees, and 118 weapon confiscations.

Salinas Valley State Prison has an operational housing capacity of 4,200, but it currently houses 4,680 inmates, with 480 inmates housed in areas designed for other purposes. At the same time, in the last year, there were 181 incidents of assault/battery by inmates — 82 of them against CDCR staff — along with 7 riots/melees, and 91 weapon confiscations.

Valley State Prison for Women has an operational housing capacity of 3,902, but it currently houses 3,958 inmates, with 56 inmates housed in areas designed for other purposes. At the same time, in the last year, there were 125 incidents of assault/battery by inmates — 75 of them against CDCR staff — and 15 weapon confiscations.

Wasco State Prison has an operational housing capacity of 5,838, but it currently houses 6,098 inmates, with 260 inmates housed in areas designed for other purposes. At the same time, in the last year, there were 226 incidents of assault/battery by inmates — 97 of them against CDCR staff — along with 32 riots/melees, and 82 weapon confiscations.

**WHEREAS,** some of these 29 severely overcrowded prisons may even be housing more inmates, because the inmate population continually fluctuates among the CDCR prisons; and

**WHEREAS,** in addition to the 1,671 incidents of violence perpetrated in these 29 severely overcrowded prisons by inmates against CDCR staff last year, and the 2,642 incidents of violence perpetrated in these prisons on inmates by other inmates in the last year, the suicide rate in these 29 prisons is approaching an average of one per week; and

**WHEREAS,** the federal court in the *Coleman* case found mental-health care in CDCR prisons to be below federal constitutional standards due in part to the lack of appropriate beds and space; and

**WHEREAS,** the use of common areas for inmate housing has severely modified or eliminated certain inmate programs in the 29 prisons with severe overcrowding; and

**WHEREAS,** the severe overcrowding has also substantially limited or restricted inmate

movement, causing significantly reduced inmate attendance in academic, vocational, and rehabilitation programs; and

**WHEREAS,** overcrowded prisons in other states have experienced some of the deadliest prison riots in American history, including:

In 1971, the nation's deadliest prison riot occurred in Attica, New York, resulting in the death of 43 people.  On the day of this riot, the prison — which was built for 1600 — housed approximately 2,300 inmates.

In 1981, a riot occurred in the New Mexico State Penitentiary. More than 30 inmates were killed, more than 100 people were injured, and 12 officers were taken hostage, some of whom were beaten, sexually assaulted, and/or raped. On the day of this riot, the prison — which was built for 900 — housed approximately 1,136 inmates.

In 1993, a riot occurred in Lucasville, Ohio. One officer was murdered, four officers were seriously injured, and nine inmates were killed. On the day of this riot, the prison — which was built for 1600 — housed approximately 2,300 inmates.

**WHEREAS,** I believe immediate action is necessary to prevent death and harm caused by California's severe prison overcrowding; and

**WHEREAS,** because of the housing shortage in CDCR prisons, the CDCR has current contracts with four California counties to house 2,352 additional state inmates in local adult jails, but this creates the following overcrowding problem in the county jails:

According to a report by the California State Sheriffs' Association in June 2006, adult jails recently averaged a daily population of approximately 80,000 inmates. On a typical day, the county jails lacked space for more than 4,900 inmates across the state.

Based on the same report, 20 of California's 58 counties have court-imposed population caps resulting from litigation brought by or on behalf of inmates in crowded jails and another 12 counties have self-imposed caps.

Most of California's jail population consists of felony inmates, but when county jails are full, someone in custody must be released before a new inmate can be admitted.

The 2006 Sheriffs' Association report states that last year, 233,388 individuals statewide avoided incarceration or were released early into local communities because of the lack of jail space.

**WHEREAS,** overcrowding conditions are projected to get even worse in the coming year, to the point that the CDCR expects to run out of all common area space to house prisoners in mid-2007, and will be unable to receive any new inmates; and

**WHEREAS,** in January 2006, I proposed $6 billion in the Strategic Growth Plan to help manage inmate population at all levels of government by increasing the number of available local jail beds and providing for two new prisons and space for 83,000 prisoners to address California's current and future incarceration needs; and

**WHEREAS,** the California Legislature failed to act upon this proposal; and

**WHEREAS,** in March 2006, a proposal was submitted as part of my 2006-07 budget to enable the CDCR to contract for a total of 8,500 beds in community correctional facilities within the state; and

**WHEREAS,** the California Legislature denied this proposal; and

**WHEREAS,** on June 26, 2006, I issued a proclamation calling the Legislature into special session because I believed urgent action was needed to address this severe problem in California's prisons, and I wanted to give the Legislature a further opportunity to address this crisis; and

**WHEREAS,** the CDCR submitted detailed proposals to the Legislature to address the immediate and longer-term needs of the prison system in an effort resolve the overcrowding crisis; and

**WHEREAS,** the California Legislature failed to adopt the proposals submitted by the CDCR, and also failed to adopt any proposals of its own; and

**WHEREAS,** in response, my office directed the CDCR to conduct a survey of certain inmates in California's general population to determine how many might voluntarily transfer to out-of-state correctional facilities; and

**WHEREAS,** the CDCR reports that more than 19,000 inmates expressed interest in voluntarily transferring to a correctional facility outside of California; and

**WHEREAS,** the overcrowding crisis gets worse with each passing day, creating an emergency in the California prison system.

**NOW, THEREFORE, I, ARNOLD SCHWARZENEGGER,** Governor of the State of California, in light of the aforementioned, find that conditions of extreme peril to the safety of persons and property exist in the 29 CDCR prisons identified above, due to severe overcrowding, and that the magnitude of the circumstances exceeds the capabilities of the services, personnel, equipment, and facilities of any geographical area in this state. Additionally, the counties within the state are harmed by this situation, as the inability to appropriately house inmates directly impacts local jail capacity and the early release of felons. This crisis spans the eastern, western, northern, and southern parts of the state and compromises the public's safety, and I find that local authority is inadequate to cope with the emergency. Accordingly, under the authority of the California Emergency Services Act, set forth at Title 2, Division 1, Chapter 7 of the California Government Code, commencing with section 8550, I hereby proclaim that a State of Emergency exists within the State of California's prison system.

Pursuant to this proclamation:

    I.   The CDCR shall, consistent with state law and as deemed appropriate by the CDCR Secretary for the sole purpose of immediately mitigating the severe overcrowding in these 29 prisons and the resulting impacts within California, immediately contract for out-of-state correctional facilities to effectuate voluntary transfers of California prison inmates to facilities outside of this state for incarceration consisting of constitutionally adequate housing, care, and programming.

    II.  The CDCR Secretary shall, after exhausting all possibilities for voluntary transfers of inmates, and in compliance with the Interstate Corrections Compact and the Western Interstate Corrections Compact, and as he deems necessary and appropriate to mitigate this emergency, effectuate involuntary transfers of California prison inmates, based on criteria set forth below, to institutions in other states and those of the federal government for incarceration consisting of constitutionally adequate housing, care, and programming. In such instance, because strict compliance with California Penal Code sections 11191 and 2911 would prevent, hinder, or delay the mitigation of the severe overcrowding in these prisons, applicable provisions of these statutes are suspended to the extent necessary to enable the CDCR to transfer adult inmates, sentenced under California law, to institutions in other states and those of the federal government without consent. This suspension is limited to the scope and duration of this emergency.

A.    The CDCR Secretary shall prioritize for involuntary transfer the inmates who meet the following criteria:

1.   Inmates who: (a) have been previously deported by the federal government and are criminal aliens subject to immediate deportation; or (b) have committed an aggravated felony as defined by federal statute and are subject to deportation.

2.   Inmates who are paroling outside of California.

3.  Inmates who have limited or no family or supportive ties in California based on visitation records and/or other information deemed relevant and appropriate by the CDCR Secretary.

4.  Inmates who have family or supportive ties in a transfer state.

5.  Other inmates as deemed appropriate by the CDCR Secretary.

B.    No person under commitment to the Division of Juvenile Justice may be considered for such transfer.

III.   The CDCR Secretary shall, before selecting any inmate for transfer who has individual medical and/or mental-health needs, consult with the court-appointed Receiver of the CDCR medical system and/or the court-assigned Special Master in the *Coleman* mental-health case, depending on the healthcare needs of the inmate, to determine whether a transfer would be appropriate.

IV.   The CDCR Secretary shall, before effectuating any inmate transfer, carefully and thoroughly evaluate all appropriate factors, including, but not limited to, the cost-effectiveness of any such transfer and whether an inmate selected for transfer has any pending appeals or hearings that may be impacted by such transfer.

V.    The CDCR shall, as deemed appropriate by the CDCR Secretary, contract for facility space, inmate transportation, inmate screening, the services of qualified personnel, and/or for the supplies, materials, equipment, and other services needed to immediately mitigate the severe overcrowding and the resulting impacts within California. Because strict compliance with the provisions of the Government Code and the Public Contract Code applicable to state contracts would prevent, hinder, or delay the mitigation of the severe overcrowding in these prisons, applicable provisions of these statutes, including, but not limited to, advertising and competitive bidding requirements, are suspended to the extent necessary to enable the CDCR to enter into such contracts as expeditiously as possible. This suspension is limited to the scope and duration of this emergency.

**I FURTHER DIRECT** that as soon as hereafter possible, this proclamation be filed in the Office of the Secretary of State and that widespread publicity and notice be given of this proclamation.



**IN WITNESS WHEREOF** I have hereunto set my hand and caused the Great Seal of the State of California to be affixed this 4th day of October 2006.

ARNOLD SCHWARZENEGGER

Governor of California

**ATTEST:**

BRUCE McPHERSON

Secretary of State

Email the Governor | Email Alerts | Internship Program | Technical Contact |
RSS Feeds | Site Map | Privacy Policy | Conditions of Use

**CA State Homepage**

© 2008 State of California

# EXHIBIT

# D





























# EXHIBIT

# E

00001

1

2          UNITED STATES DISTRICT COURT

3      FOR THE EASTERN DISTRICT OF CALIFORNIA

4      AND THE NORTHERN DISTRICT OF CALIFORNIA

5              --oOo--

6 RALPH COLEMAN, et al.,          )

                        )

7        Plaintiffs,      )

                        )

8    vs.                ) No. CIV S 90-0520

                   )   LKK-JFM P

9 ARNOLD SCHWARZENEGGER, et al.,    )

                        )

10        Defendants.        )

                   )

11 _____)

12

13          DEPOSITION OF

14          SCOTT MICHAEL KERNAN

15      _____

16          August 27, 2008

17

18

19 REPORTED BY:  KAREN A. FRIEDMAN, CSR 5425   JOB # 412301

20

21

22

23

24

25

**Kernan, Scott 08/27/08**                    **Page  1**

00091

1 2008, 4,697 prisoners have been transferred out of

2 state.  Correct?

3    A.   Approximately, yes.

4    Q.   Let me have you take a look at Exhibit, what

5 we've marked as Exhibit 3, Mr. Kernan, the CDCR weekly

6 report of population as of midnight, August 20th.

7        The report is dated August 20th, 2008.

8    A.   Is this number 2?

9    Q.   Number 3.

10    A.   Number 3, I'm sorry.  Go ahead.

11    Q.   And taking a look at this report, does it state

12 the number of prisoners housed, as of that date, in

13 COCF?  That is, out-of-state facilities?

14    A.   Yes.

15    Q.   And it's 4,697?

16    A.   Yes.

17    Q.   And those are people who have been transferred

18 to facilities in other states, for which the CDCR has

19 contracted beds to house CDCR prisoners.  Right?

20    A.   Yes, sir.

21    Q.   How many different facilities are those

22 prisoners housed in, currently, out of state?

23    A.   I believe six.

24    Q.   And in how many different states?

25    A.   Tennessee, Mississippi, Oklahoma, and Arizona,

00126

1 serious safety concerns, right?

2     MR. MELLO:  It's vague.  You can answer.

3     THE WITNESS:  I disagree.  The out-of-states

4 have permitted us to take inmates that were arguably in

5 overcrowded conditions and place them in a

6 non-overcrowded situation in out-of-state facilities.

7 And it's reduced the overcrowding at existing prisons.

8 Letting me take down gyms and dayrooms and use those,

9 that space, for inmate recreation, for example, no

10 violent, increased safety at those prisons where I have

11 been able to deactivate bad beds.

12     Q.  Maybe I wasn't clear with the question.  The

13 out-of-state transfers haven't stopped the use of all

14 nontraditional beds, correct?

15     A.  That's true.

16     Q.  You still have approximately 14,000?

17     A.  Yes.

18     Q.  All right.  When will CDCR stop using

19 nontraditional beds to house inmates?

20     MR. MELLO:  Asked and answered.  I think he's

21 told us multiple times when they plan to --

22     MR. FAMA:  Are you instructing him not to

23 answer?

24     MR. MELLO:  Absolutely not.

25     MR. FAMA:  Thank you.

CERTIFICATE OF REPORTER

I, KAREN A. FRIEDMAN, a Certified Shorthand Reporter, hereby certify that the witness in the foregoing deposition was by me duly sworn to tell the truth, the whole truth, and nothing but the truth in the within-entitled cause;

That said deposition was taken down in shorthand by me, a disinterested person, at the time and place therein stated, and that the testimony of the said witness was thereafter reduced to typewriting, by computer, under my direction and supervision;

That before completion of the deposition, review of the transcript [X] was [ ] was not requested. If requested, any changes made by the deponent (and provided to the reporter) during the period allowed are appended hereto.

I further certify that I am not of counsel or attorney for either or any of the parties to the said deposition, nor in any way interested in the event of this cause, and that I am not related to any of the parties thereto.

DATED: September 2, 2008

Karen A. Fried

KAREN A. FRIEDMAN, CSR No. 5425

# EXHIBIT

# F

**Office of the Governor**

ARNOLD SCHWARZENEGGER
THE PEOPLE'S GOVERNOR

[SEARCH]

Home   About Arnold   About Maria   Newsroom   Multimedia   Issues   Blog   Interact   Appointments   Español

## Speeches

Monday, 06/26/2006   Print Version | Email / Share

### Schwarzenegger Calls Special Session to Address Prison Crowding, Recidivism



▶ PLAY VIDEO

Well, thank you very much. Thank you for this nice reception, and thank you, Jan for the wonderful introduction. I mean, this woman is incredible, I tell you, I just love her. We have had such a great working relationship. And this weekend she calls me. It was Saturday, it was just before I went to Disneyland to watch with my kids the pirate movie, the new one that's coming out. AndWell, thank you very much. Thank you for this nice reception, and thank you, Jan for the wonderful introduction. I mean, this woman is incredible, I tell you, I just love her. We have had such a great working relationship.

And this weekend she calls me. It was Saturday, it was just before I went to Disneyland to watch with my kids the pirate movie, the new one that's coming out. And she calls me and she says, "You know, besides your coming down there and speaking to us, there's one other thing I need." And I said, "What do you need now? There's always something when you call," I said, "It's never easy." So she says, "Well, we are doing an auction for a charity which is benefiting," what? For the criminal justice system, exactly. She said, "We are raising a lot of money for that. Can you give us an auction item? Because I imagine an item from you will sell for a lot of money." So I said, "Well, like what? Maybe to have lunch with you, or dinner, or maybe a workout with you, or maybe you can give us some of your governor's cigars or something. I mean, come on." So I said, "Okay, let me think about this for a second." I said, "Oh, you know what? How about this? I have an idea. How about—there are only five humidors that were made with the governor's seal on it, that I had made for special gifts. How about giving you one of those big humidors to auction off?" So she, of course, was very excited. (IA) come on out here with that thing. I want to—(Applause)

So in there is the humidor. I'm not going to unpack it now and show it, but in there is the humidor with the governor's seal engraved inside the top of the thing. So those that are into humidors, or those that are into smoking cigars, here is an item that you can buy. Don't even start below 5,000 dollars, okay? We want to make sure—(Applause)

That's the kind of relationship we all have here. This is really great. But it is great to be here today with so many of the dedicated public servants. And I think my father-in-law said it best when he said that being a public servant is the most noble profession, and this is exactly what it is.

But I have to admit that before I came here today I was a little bit nervous being with that many prosecutors in one room. This is a lot of prosecutors, especially when I started thinking a little bit about my earlier movies, like Hercules in New York or Red Sonja, or Jingle All the Way, and stuff like that. So I immediately had, of course, to check with my legal office in Sacramento, but they assured me that the statute of limitations for cruel and unusual punishment of movie fans has expired, so I felt a little bit safer here today. (IA) make a difference, you know, because those movies, if they are doing well, then they are a big asset. And if they don't, it can go the other way. I saw that with the election, our recall election. I don't know if you have heard that in San Diego. There were like 80 percent of the people in San Diego that voted for me, and the other 20 percent were really mad at my early movies, so they—eventually I'm going to win them over.

**RELATED CONTENT**

▶ Press Release

▶ Photo Essay

▶ Video

▶ Prison Reform Issue Page

**PHOTO ESSAY**

CLICK TO ENLARGE

 
 

**MORE RELATED SPEECHES**

03/6/08 - Transcript of Governor Arnold Schwarzenegger Speaking at Female Inmate Carpenter Graduation

09/26/07 - Governor Schwarzenegger Signs Legislation to Create First Secure Community Re-entry Facility

09/6/07 - Schwarzenegger Joins with Assembly Republicans, Law Enforcement Officials to Warn of Dangers if Felons are Released into Communities

But anyway, seriously, though, I love speaking to you today, and this is really great. I like giving speeches, of course. Like the other day, I gave a speech, I felt really good about myself, it was a great speech. My wife came running up to me, she said, "Oh, this was fantastic. You're becoming more and more Kennedyesque." So I said, "What does that mean, I talk like John F. Kennedy and like Robert Kennedy?" And she said, "No, you've gained weight like Teddy Kennedy." So anyway, these are the kinds of things that you hear. It's not easy.

But seriously, though, I'm very happy to share this time with all of you as officers of the court. And of course no one understands better than you the incredible trust that the public have in district attorneys, to keep the people and to keep the property safe. As governor, of course there is nothing that is more important—this is my No. 1 priority—is, of course, public safety and protecting the people, and that's why you and I have had such an incredible relationship and such a great partnership, and I'm very proud of that.

I mean, look at the things that we have together. I think that Jan has just touched on some of those things. I am very proud of the way we worked together to defeat Proposition 66, and that we were able to hold press conferences together and to raise that money that we needed, 5 million dollars, just shortly before the election. And the great thing about 66 was that the press said that they are going to win by two-thirds of the votes, and then within two weeks we turned it around and they lost their proposition by two-thirds of the vote, so that is really great. (Applause)

And like Jan said, you can count on me, that I will oppose any effort to weaken the three-strike law. It doesn't matter how many times they try to do it, because the three strike works, it makes sure to keep our most dangerous criminals where they belong, and that is behind bars. (Applause)

And I'm also very happy how we worked together to make sure that Proposition 69 passes, because to expand the DNA database was important, to make it easier to solve crimes using the DNA evidence.

And I've also signed a number of tough on crime bills that I'm very proud of, if it is Megan's Law, which is now much stronger, so that Californians have more internet information on the website about the sexual offenders, sex offenders.

Or we have also expanded the victims' rights, giving them a strong voice at parole hearings. And this week, of course, I'm appointing a Victim's Advocate in my office, which is very important, to safeguard victims' rights. So this is something that is going to be great, and so it is great also to see you here today.

And we have increased also restitution that inmates now pay to crime victims. They are paying now a record amount of 5.1 million dollars a month—just imagine, it's more than 100 million dollars total so far that they have paid, which is also, I think, a great, great accomplishment.

And of course as father of four children there is nothing that I care more deeply about than the safety and the welfare of our children. That's why I have been proud to sign bills that toughen our sexual predator laws. Because of legislation that I signed, child molesters are now prohibited from living within a half a mile from any public or private school. I also signed legislation that prohibits courts from granting child custody to a parent who lives with a registered sex offender.

And Jessica's Law, an initiative that I co-sponsored, is on the November ballot. It will give California some of the toughest sex offender laws in the nation.

And in May, I issued an executive order creating the High-Risk Sex Offender Task Force, to review all statutory and departmental policies on the release and placement of high-risk offenders. I've also called for recommendations by August 15th on specific steps that we can take to better protect the public from those offenders. I know that this bipartisan team, this bipartisan task force, is doing a great work right now, and I'm looking forward to hearing their proposals.

Now, in criminal justice, in the criminal justice arena, I know all of you realize that we have another very serious problem on our hands that needs to get swift and dramatic action and attention, and I'm talking about our prisons. We all know that we have a lack of prisons. We don't have enough prisons, and we have a recidivism rate of 70 percent. Our prisons are at a crisis point right now because the State of California has not planned adequately for its future. This is just another one of those infrastructure needs California has fallen way behind on. As of last Friday our prison population—I mean, think about this number here—was at 171,527, and this is at a prison system that was really built only for 100,000 inmates. And this is at an all-time high right now, and we are rapidly running out of space. California has authorized and built just one prison in the last 10 years—1 prison in the last 10 years. And with tougher sentencing and state population increasing to 37 million, our prisons are dangerously overcrowded right now.

Because of that, we are double and triple bunking inmates and housing them in parts of our prisons that were not meant to house any inmates. This is not only increasing tension, and makes our prisons unsafe for staff and inmates alike, but it also takes away space that we need for programs that can help rehabilitate and give our inmates the skills that they need to go to the outside. Right now, 16,300 inmates are housed in prison gyms and in day rooms. Any Correction experts will tell you that this is a recipe for disaster. Without the programs, we will are never going to lower our recidivism rate, which is now, like I said, at 70 percent, which is the highest in the nation.

If we don't address this very dangerous situation as quickly as possible, the courts may very well take over the entire prison system and will order us the early release of tens of thousands of prisoners. I know that you agree that this is something we cannot tolerate. We are working around the clock to make sure that this does not happen, and that we solve those problems as quickly as possible.

The bottom line is that California prisons were a mess when I took office, and we have worked on prison reform ever since Day 1. Last year I proposed and signed legislation that reorganizes our Correction system to increase efficiency and control at all of our institutions. But reform is an ongoing thing. Now we need bold and effective action on overcrowding and recidivism.

I inherited this problem, but I do not for a minute shy away from solving it. And that is why today I signed a proclamation for a special session of the legislature to deal with this issue. Now, I'm proposing four very specific prison proposals, that if the legislature passes them will give us significant relief on overcrowding and reducing recidivism. My administration has been working on those proposals for a month, and I'm very happy to say that now we are ready to move forward on those issues.

First, we desperately need more prisons—we need new prisons. And to provide that additional capacity, I'm proposing to use lease revenue bonds. Speaker Núñez has already introduced an Assembly Bill, 2902, to look at this approach, and we will work diligently with him and other members of the legislature to build additional prisons. This type of financing will allow us to build these prisons more quickly, which will give us the fast relief on overcrowding.

And No. 2, to make sure that we can move on this and other reforms as quickly as possible, I'm also asking the legislature to expedite purchasing, spending, and program implementations when it comes to prisons. Because these measures, we don't want to have them be slowed down because of red tape.

My third proposal transfers 4,500 low risk women inmates out of the state prisons into community correctional facilities. The Los Angeles Times wrote that this reform, if adopted, it would make California a leader among states, remaking their prison systems to reflect differences between the sexes. This reform would also allow these low-risk, nonviolent inmates, women who are about to be released anyway, to be closer to their families in their final month of custody. Experts agree that this is a key to reducing recidivism. And on top of that, this move alone will free up an entire prison, which is space that could be used for the male prisoners.

And my fourth proposal concerns community-based reentry facilities, another progressive idea to relieve overcrowding and reduce recidivism. In the 90 days before an inmate's release from state prison he will be sent to a secure re-entry facility where they will receive psychological counseling and other help, so they can re-enter society safely and productively. The day when they are released, inmates get, as you know, 200 bucks and a bus ticket, and that's the end of it. Our communities will be much safer if they come out better prepared. These facilities will also hold minor parole violators, who now are sent back to state prisons. This will free up prison space for more dangerous inmates and help with overcrowding.

Relieving prison overcrowding and reducing recidivism are monumental challenges, but they are challenges that we will not retreat from. Some people believe that they way to reduce prison overcrowding is by weakening the three strike. I can say, not on my watch. (Applause)

Some other people think that reducing prison overcrowding is to release thousands of criminals early, before they are serving their time. I say once again, not on my watch. (Applause)

And as you may know, in January when I introduced my infrastructure package, I included the construction of new prisons. I also had the transfer of women inmates to transitional facilities in my original budget proposal. At that time, of course, because of the compromise that we have reached, we were not able to get those things in as part of that package. At that time the legislature weren't ready to go along with those ideas. But now I believe they will join me in moving those ideas forward.

The four proposals that I have just laid out offer a comprehensive approach to prison overcrowding and recidivism, and a special session of the legislature devoted exclusively to those four tightly focused proposals allow us to truly dig in on a very, very tough and important subject. I look forward to working once again with both parties, with Democrats and Republicans, to enact meaningful reform that ensures the safety of our Corrections staff and inmates, and makes sure that more of our parolees stay out of prison after they are released.

As I have said at the start of my remarks, you all have been great partners, and I love working with you together. The kinds of things that we have accomplished this last two and a half years together, well, let's continue this way. Now as we get into the special session, I need your help once again. Let us work together the same way as we have done. Some of you will testify at the legislative hearings. Some of you will be talking to individual lawmakers about our proposal. I know from the many, many meetings that we have had together how much this issue means to all of you. And you know something? With your continued help, there is nothing that we cannot solve and we can also solve this big problem.

California is the greatest place in the world. With these reforms we can keep our prison system safe, and we can make sure that they are efficient, and that they are the model for the rest of the country. Our great state deserves and demands nothing but the best. This is the greatest place, like I said, in the world. Let's also fix this problem. Together we can do it.

Thank you very much for listening. Thank you. (Applause)

Text Version | Email the Governor | Email Alerts | Internship Program | Technical Contact | RSS Feeds | Site Map | Privacy Policy | Conditions of Use

**CA State Homepage**

© 2008 State of California

# EXHIBIT

# G

**Office of the Governor**    ARNOLD SCHWARZENEGGER
THE PEOPLE'S GOVERNOR

SEARCH

Home   About Arnold   About Maria   Newsroom   Multimedia   Issues   Blog   Interact   Appointments   Español

## Press Release

06/26/2006   GAAS:402:06   FOR IMMEDIATE RELEASE   Print Version | Email / Share

### Gov. Schwarzenegger Calls Special Session of the Legislature to Address Prison Crowding, Recidivism



Governor Schwarzenegger issued a proclamation today calling the Legislature into special session starting June 27 to address critical prison crowding and recidivism measures. The Governor has proposed several reforms to build new state prisons and local jail facilities, reduce crowding and move female inmates into community-based correctional facilities. Calling a special session enables the Governor to press for passage of these measures before the close of the Legislative session in August.

"Our prisons are at the crisis point because the State of California has not planned adequately for its future and has not faced up to the need to build new prisons as well as hire and train more officers.  I am calling on my partners in the Legislature to join me in taking action to face these challenges head on," said Gov. Schwarzenegger. "By building more prisons, managing the inmate population more effectively and implementing common-sense measures that target the most dangerous criminals, we can greatly improve our prison and rehabilitation system.

"We can enact meaningful reform that ensures the safety of our correctional staff and makes sure more of our parolees stay out of prison after they're released.  If we work together, I know we can do this and once again give California a model prison system."

California's prison population is at an all time high of more than 171,000 inmates.   The CDCR is double-bunking inmates and there are currently more than 16,000 inmates housed in prison gyms and day rooms throughout the various 33 correctional institutions.

The Governor outlined his legislative proposals in his official proclamation convening the special session including:

· Building more prisons - The Governor is proposing using lease-revenue bonds to build additional prisons, providing critically needed additional beds.   This type of financing will allow prisons to be built more quickly.

· Establishing local secure re-entry facilities- With a measure to relieve overcrowding and reduce the number of paroled inmates returning to prison, the Governor is proposing to create transitional local facilities where inmates about to be released would be detained. The facilities would be highly secured buildings that hold inmates and provide them with counseling services and other help to re-enter society safely and productively.  The facilities would also serve as centers to confine parole violators for technical violations that would normally result in a short return to prison.  Serious or high-risk parole violators would go back to prison, as they do now.

· Placing non-violent women in community correctional facilities - The Governor proposed a measure to move 4,500 non-violent women out of state prisons into community correctional facilities.   This reform would also allow low-risk, non-violent inmates, women who are near the time of their release, to be closer to their families in their final months of custody.   Experts have said that this type of program is effective in reducing recidivism.  Moving these women inmates out of prison, which consists of approximately 40 percent of the total female population, would make room for an entire prison worth of space that could be used for male prisoners.

**RELATED CONTENT**

▶ Speech
▶ Photo Essay
▶ Video
▶ Prison Reform Issue Page
▶ Secure Parole Re-Entry
▶ Prison Populations and Recidivism
▶ Prison Infrastructure
▶ Facilities for Women

**PHOTO ESSAY**
CLICK TO ENLARGE

 
 

**MORE RELATED PRESS RELEASES**

**06/4/08** - Gov. Schwarzenegger Issues Statement on Court Ruling Allowing Out-of-State Inmate Transfers to Continue

**03/6/08** - Gov. Schwarzenegger Attends Female Inmate Carpenter Graduation, Opens New Inmate Firefighter Training Center

**12/13/07** - Gov. Schwarzenegger Applauds Corrections Standards Authority Action to Prioritize Jail Funding for Re-Entry Facilities

· Expediting state contracting - The Governor is proposing legislation to expedite and streamline the state contracting process for implementing programs and construction of additional prisons and secure re-entry facilities.

Gov. Schwarzenegger has made prison reform a priority in his administration. Under his leadership in 2005, the Governor's historic reorganization proposal was passed by the Legislature with bipartisan support to improve the California Department of Corrections. The reorganization focuses on safer working environments, better service to crime victims, organizational effectiveness, a changed prison culture, use of enhanced agency-wide information technology, validation of rehabilitation and re-entry programs, development of offender re-entry programs and an increased role for rehabilitation. The California Department of Corrections added Rehabilitation to its title, a change that reflects a desire to move away from three decades that the concept of rehabilitation was not a priority. The change reflects a shift in attitude that has the potential to improve public safety, save money and make it more likely that those who have committed crimes will chose to turn their lives around.

The Governor's 2006-07 budget proposes $52.8 million for rehabilitation programs including vocational and job training and education.

Below is the text of the Governor's proclamation, and attached are fact sheets on each of the four legislative proposals.

## A PROCLAMATION

### BY THE GOVERNOR OF THE STATE OF CALIFORNIA

**WHEREAS**, an extraordinary occasion has arisen and now exists requiring that the Legislature of the State of California be convened in extraordinary session; now therefore,

**I, ARNOLD SCHWARZENEGGER**, Governor of the State of California, by virtue of the power and authority vested in me by Section 3(b) Article IV of the Constitution of the State of California, do hereby convene the Legislature of the State of California to meet in extraordinary session at Sacramento, California on the 27th day of June 2006, at a time to be determined, for the following purpose and to legislate upon the following subjects:

1. To consider and act upon legislation to transfer low-risk women inmates out of state prison and into community correctional facilities.

2. To consider and act upon legislation to appropriate funds, including appropriations for lease-revenue bonds, to build additional prisons.

3. To consider and act upon legislation to establish and fund secure re-entry facilities.

4. To consider and act upon legislation to expedite and streamline the state contracting process for implementing programs and construction of additional prisons and secure re-entry facilities.

IN WITNESS WHEREOF I have hereunto set my hand and caused the Great Seal of the State of California to be affixed this 26th day of June, 2006.

_____

ARNOLD SCHWARZENEGGER

Governor of California

ATTEST:

_____

BRUCE McPHERSON

Secretary of State

---

Text Version | Email the Governor | Email Alerts | Internship Program | Technical Contact |
RSS Feeds | Site Map | Privacy Policy | Conditions of Use

**CA State Homepage**

© 2008 State of California

# EXHIBIT

# H

00001

1

2          UNITED STATES DISTRICT COURT

3       FOR THE EASTERN DISTRICT OF CALIFORNIA

4       AND THE NORTHERN DISTRICT OF CALIFORNIA

5              --oOo--

6 RALPH COLEMAN, et al.,          )

                                  )

7         Plaintiffs,       )

                                  )

8      vs.                 ) No. CIV S 90-0520

                        )   LKK-JFM P

9 ARNOLD SCHWARZENEGGER, et al.,     )

                                  )

10         Defendants.        )

                                  )

11 _____)

12

13          DEPOSITION OF

14          DEBORAH HYSEN

15       _____

16          September 3, 2008

17

18

19 REPORTED BY:  KAREN A. FRIEDMAN, CSR 5425   JOB # 412304

20

21

22

23

24

25

00023

1  10,500, then I heard 500, then I heard 10,000 plus 1,000

2  for an inmate work crew in kind of a supporting role.

3  So I'm not sure where he is at the current time.

4      Q.  Is the Department currently moving ahead with

5  plans to build 8,000 medical beds as set forth in AB

6  900, or is that pending, depending on the receiver's

7  action?

8      A.  The Department is looking to the receiver, who

9  we believe is the authorized entity to build those beds.

10     Q.  So is it then fair to say that CDCR's current

11 plan for implementing AB 900 is to build fewer than

12 30,000 beds?

13     A.  It is, unfortunately, our plan to build less

14 than the authorized amount, and I would say less than

15 30,000 beds is an appropriate figure.

16     Q.  So let's start --

17     A.  And those are state beds, correct?

18     Q.  State beds, correct.  We're leaving to one side

19 the whole county jail funding for now.

20        Let's start with infill.  We'll talk more

21 specifically about CDCR's plans.  So the original intent

22 as of May 2007 was to build 12,000 infill beds to be

23 completed in 2009.  Is that correct?

24     A.  You know, I believe the first ones came online

25 in 2009.  I don't have all the dates in front of me.

00031

1 and advance the design pretty significantly when you go

2 from that point to the next.

3    Q.   And, I'm sorry.  Did you say that you have

4 reached the preliminary-plan stage already?

5    A.   We have reached it for the first four infill

6 sites.

7    Q.   And what are those four sites?

8    A.   The former El Paso Youth Correctional Facility,

9 the Northern Kern State Prison, Kern Valley State

10 Prison, and the Wasco State Prison, on infill and on

11 reentry NCRF.

12    Q.   And the reentry facility is the former women's

13 prison in Stockton?

14    A.   That's correct.

15    Q.   So the furthest advanced you are for infill or

16 reentry is the preliminary-plan stage; is that right?

17    A.   Just before the preliminary-plan stage.

18    Q.   "Just before."  So you've not yet reached the

19 preliminary-plan stage on any site?

20    A.   We are not permitted to advance to that stage,

21 yes.

22    Q.   Are you awaiting authorization to move into the

23 preliminary-plan stage on those five sites?

24    A.   Correct.

25    Q.   And from whom do you need the authorization?

**Hysen, Deborah 09/03/08**                                **Page 31**

00061

1    A.  No.  I think pulling this had to do with

2 advancing the wastewater treatment portion used with the

3 $300 million allocation.  If I saw some of the stuff

4 before I might be able to -- but the only project for

5 Salinas Valley we were looking at was that wastewater

6 treatment plant.

7    Q.  So, you spoke earlier about the fact that

8 California has not passed a budget this year.

9    A.  Did I?

10    Q.  There was a reference to it, I don't know,

11 maybe about going on minimum wage.

12    A.  Or not getting paid.

13    Q.  So has the failure to pass a budget for this

14 year delayed work in passing AB 900?

15    A.  For us, the budget carries with it the trailer

16 bill language, which allows us to advance our conceptual

17 plans because, based on the AG's opinion that they need

18 a clean bond opinion and can't authorize funding until

19 such time as that, or they are able to see the technical

20 changes and agree that these changes meet the

21 requirements for a clean bond opinion.

22        So that's what's holding us up.

23    Q.  So some of your work in implementing AB 900

24 does not hold because the budget hasn't passed yet.  Is

25 that a fair statement?

**Hysen, Deborah 09/03/08**                    **Page  61**

00062

1    A.   Yes, if it includes the trailer bill.

2    Q.   And the trailer bill can't pass until the

3 budget passes?

4    A.   It's part and parcel of the budget.

5    Q.   So you're waiting for the budget and the

6 trailer bill to go through, in order to proceed?

7    A.   Correct.

8        MS. NORMAN:  Why don't we take a break here.

9        (Off the record.)

10        MS. NORMAN:  Q.  Let's talk about

11 infrastructure problems again on the infill bed

12 building.  Have problems with infrastructure at CDCR

13 prisons made it difficult to build infill beds?

14    A.   I would say yes.

15    Q.   Take a look at Exhibit 2, which is at COBCP,

16 and I'm looking at page 2.  Look at the last full

17 paragraph, beginning with "Severe overcrowding."  Could

18 you read that paragraph just for the record, and make

19 sure to go a little slowly for the court reporter.

20    A.   "The severe overcrowding has significantly

21 impacted existing infrastructure systems, most notably

22 wastewater systems.  These systems are often required to

23 operate at or above the maximum intended capacity,

24 resulting in an increased, substantial health and safety

25 risk to CDCR staff, inmates, the public, and the

00157

1       MS. NORMAN:  Okay.  One last document.

2           (Whereupon, Deposition Exhibit No. 16

3            was marked for identification.)

4       MS. NORMAN:  Q.  Have you seen this document

5   before?

6       A.  Yeah.  I started to write it and didn't finish

7   it.

8       Q.  So it's something that you wrote?

9       A.  It's something I started to write.

10      Q.  Okay.  And when was it that you started it?

11      A.  Oh, man; I couldn't say with any certainty.

12      Q.  Do you remember if it was this year or last

13  year?

14      A.  I would say it was last year.

15      Q.  And I'm guessing it was probably after at least

16  you started on the strike team.  So before May?

17      A.  Given that I'm using that title, as Chief

18  Deputy Secretary.

19      Q.  So it would be not before June, at the least?

20      A.  Yeah.  I would assume so.

21      Q.  What did you start to write this document for?

22      A.  That's a good question.  You know, at some

23  point I wanted to create a, what's called a SharePoint

24  site, which is a technology tool that Microsoft uses to

25  have kind of a virtual space for collaboration.  And I

**Hysen, Deborah 09/03/08**                **Page  157**

00158

1 sort of envisioned this blogging, if you will, to engage

2 the stakeholders in the process; to communicate progress

3 to the community.  To educate, inform, engage,

4 collaborate.

5        And I think that this was my first attempt, and

6 clearly I stopped to kind of look at how I could

7 continue to communicate what we're doing and why it's so

8 important that there was more than just CDCR engaged in

9 this effort.

10    Q.  Could you read from the first page, second

11 paragraph.  Could you read starting with the word

12 "Currently" and going to the end of the paragraph.

13    A.  "Currently, there is simply not enough space in

14 the prisons to meet the basic medical, mental health,

15 and dental needs of prisoners, and spaces that were

16 designed for rehabilitation and vocational purposes now

17 house either temporary beds or, in some cases, are

18 actually abandoned because there is simply not enough

19 staff, resources, or modernization funds available to

20 restore them to their intended purpose."

21    Q.  Was that true at the time you wrote it?

22    A.  I think it was my understanding at the time

23 that the information that I started to write was

24 accurate.  I think partly the reason why I stopped is

25 clearly there were pretty important gaps here that I

**Hysen, Deborah 09/03/08          Page  158**

## CERTIFICATE OF REPORTER

I, KAREN A. FRIEDMAN, a Certified Shorthand Reporter, hereby certify that the witness in the foregoing deposition was by me duly sworn to tell the truth, the whole truth and nothing but the truth in the within-entitled cause;

That said deposition was taken down in shorthand by me, a disinterested person, at the time and place therein stated, and that the testimony of the said witness was thereafter reduced to typewriting, by computer, under my direction and supervision;

I further certify that I am not of counsel or attorney for either or any of the parties to the said deposition, nor in any way interested in the event of this cause, and that I am not related to any of the parties thereto.

DATED: _September 9_, 2008

_____
KAREN A. FRIEDMAN, CSR 5425

165

# EXHIBIT

# I



# EXHIBIT

# J



CALIFORNIA DEPARTMENT OF
**CORRECTIONS AND REHABILITATION**

**Office of Public & Employee Communications**

Home » News » 2008 Press Releases » **Sept 17**

For Immediate Release
Contact: Seth Unger / Gordon Hinkle
(916) 445-4950

September 17, 2008

## Statement from CDCR Secretary Matthew Cate on Lack of Public Safety Trailer Bill in Budget Package

**SACRAMENTO**– Matthew Cate, Secretary of the California Department of Corrections and Rehabilitation (CDCR), issued the following statement today on the budget package passed by the Legislature, which did not contain a public safety trailer bill containing needed clean-up language to AB 900:

"I am deeply disappointed that the Legislature chose not to pass the public safety trailer bill as part of their budget proposal. There will be very negative and long-lasting public safety repercussions if this bill is not passed. For 16 months the California Department of Corrections and Rehabilitation has worked with public safety and local stakeholders from across the state to implement the landmark corrections reforms contained in AB 900, which was passed on a bi-partisan basis. This clean up language would have provided funds to reduce overcrowding, and build much needed rehabilitation space in our prisons. It also would fund inmate reentry facilities designed to reduce recidivism.  Finally, it would have provided local communities with funding to build much needed jail expansion projects.  Without this trailer bill the state will be unable to pay for county jail, reentry, or infill bed construction projects, and will face a major setback in our strategy to reduce overcrowding. Local governments also lost important mentally ill offender crime reduction grants designed to provide treatment services for offenders. This administration will continue to work with the Legislature and local law enforcement to ensure that the initiatives authorized by AB 900 are funded, and that the prison reform movement continues."

# # # #

Conditions of Use | Privacy Policy | Compatibility Statement
Copyright © 2007 State of California

**NEWS**

» Communications Home Page
» Press Releases
» Press Office Contacts
» List of Public Information Officers
» Resources for Media
» Multi-Media
» Links Archive

» Recent RFI

# EXHIBIT

# K



*The Web Site of THE SACRAMENTO BEE*

Sacbee: News

### Cruel and unusual prison health care
### Outrage over neglect, suffering and needless deaths drives Robert Sillen's mission to bring medical care in California's prisons up to consititutional standards

October 8, 2006
Section: FORUM
Page: E1


By   Robert Sillen

Special to The Bee

--To reach one of San Quentin's medical clinics, you must walk past a row of 20 maximum-security cells with inmates confined behind fine crosshatched wire, barely visible. The floor is strewn with trash, puddles of water and worse from the runoff of inmate showers from the tiers above. Soap and hair drip off the guardrails of the walkways, leaving a slippery mess to dance around as you approach the clinic, which is shoehorned into a converted cell. A mildewed shower curtain hangs in front of the clinic's entrance to keep the water from spraying directly into the medical area.

I have run hospitals, clinics and public health facilities for the past 40 years, and medical care in California prisons is unlike anything I've ever seen. Inhumane is the nice term for the conditions. From a clinical standpoint, it is almost unrecognizable -- an exam room without a sink, a 53-bed medical unit with just one vital sign machine and an emergency room with broken defibrillators are just three glimpses at the bleak picture. The environment for patients, medical providers and custody staff is degrading, unsanitary and unsafe. The resulting patient health outcomes tell a gruesome story. Needless deaths occur weekly in our prisons, either from lack of access to care, or worse, from access to it.

Inmates are serving time and receiving court-appointed punishment for their deeds. But no one is sentenced by a judge to medical neglect or incompetence, or to die from unaddressed kidney disease or uncontrolled diabetes. No judge has mandated a pharmacy system out of control, creating danger to patients and wasting tens of millions of dollars of taxpayer money.

The stories of individuals suffering in California's prisons go on and on. Unfortunately, the outrage they generate has not been sufficient to move the state's leadership to clean up its prison health care system, so a federal court has been forced to intervene. As Receiver, I represent U.S. District Court Judge Thelton E. Henderson's commitment to rectify these atrocious conditions. The court has found that what California provides today violates the Eighth Amendment of the U.S. Constitution, which forbids **cruel** and unusual punishment. Spelling out the need for a Receivership a year ago, Henderson wrote:

The Court has given defendants (the State) every reasonable opportunity to bring its prison medical system up to constitutional standards, and it is beyond reasonable dispute that the State has failed. Indeed, it is an uncontested fact that, on average, an inmate in one of California's prisons needlessly dies every six to seven days due to constitutional deficiencies in the CDCR's medical delivery system. ... It is clear to the Court that this unconscionable degree of suffering and death is sure to continue if the system is not dramatically overhauled.

How do you begin to repair a system that is broken at every level? There are no easy answers or quick fixes, but the work can and will be done. It may take five to seven years to get the system up to constitutional muster, and an equal or greater amount of time until it can be reliably turned back over to the state, without fear of an immediate back slide. So far, the Receivership has embarked upon a two-track approach.

On one track, we have begun to deliver immediate relief in the clinical trenches where medical care is provided to nearly 175,000 California inmates. My team and I are visiting all 33 prisons in the state, meeting with inmate patients, medical and custody staff, wardens and physician leaders to get a feel for the realities they face every day. The working conditions are jaw dropping. In some places nurses work in closets. In others they have no keys to the hospital-bed cells, and must stand helplessly at the windows watching patients suffer while they wait for a correctional officer -- who may not arrive for hours due to chronic understaffing -- to bring the key. It is common to find medical areas filthy and ill-equipped, if equipped at all.

At the end of each visit, we ask the staff to prepare a list of critically needed medical supplies and equipment, which is immediately reviewed. Essential items, such as cardiac monitors and gurneys, sutures and gauze for the emergency room, are delivered as soon as possible. Our approach at San Quentin is more in-depth, with a special four-month project focused on improving medical care there. What we learn at San Quentin will be invaluable as we uncover systemic, bureaucratic and cultural barriers to adequate health care, which apply to one degree or another at each prison.

On track two, we are addressing systemic problems that have been ignored by the state for years and which must be solved to achieve meaningful change. For example, the way that prisons contract with local physician specialists to provide care to inmate patients in the areas of cardiology, oncology, optometry, podiatry, neurology, surgery and others was so dysfunctional that many of these physicians were not being paid for their work. In some cases, the bills -- totaling more than $58 million -- were four years overdue. Not surprisingly, many specialists had stopped accepting inmate patients. Under direction of the Receivership, supported by California Department of Corrections and Rehabilitation personnel, all of these providers have now been paid, and we are working on a new contracting system to avoid this type of mess in the future. What it boils down to is access to care for the sickest inmates, who suffer from advanced diabetes, heart disease, cancer, HIV/AIDS, Hepatitis C and other life-threatening conditions.

Uncompetitive salaries for clinical and support personnel is another instance of such neglect by the state that the Receivership is tackling.

Clearly, we cannot construct a constitutionally adequate medical care system without qualified, dedicated staff. Unfortunately, until now the state has paid prison clinical staff drastically depressed wages that are so far below market standards they have resulted in staggering vacancy rates, heavy reliance on costly temporary agencies and the hiring of many below-par clinicians willing to work for less. I have asked Judge Henderson to rectify this by waiving state law, in the absence of the state's willingness to act, to allow the Receiver to raise prison medical staff salaries, retroactive to Sept. 1 -- at a $24 million price tag in the first year. There is a lot of catching up to do. It's going to take more than money to recruit and retain the people we need, but it is an important first step, without which all attempts at remedial action will be fruitless.

Don't get me wrong. I have encountered many CDCR employees, medical providers and correctional personnel who desperately want to do a good job. There are many capable prison medical staff who have been toiling away in virtual anonymity and abject frustration, trying their best to care for their patients in impossible circumstances. They will be rewarded -- first with more appropriate compensation and, over time, better working conditions and a real clinical environment in which to practice medicine.

The obstacles run deep -- into the culture of prisons, which historically, and self-admittedly, have not seen themselves as places that deliver adequate health care. But that is already starting to change. Across the state, I have found wardens open to working toward fixing the problems. That improvement also translates into safer environments for correctional officers, clinical staff and surrounding communities in which these prisons are located.

The greater impediment, however, lies in state government itself. Remember, the CDCR does not set public policy, it carries out the decisions of the Legislature and the governor. As I reported to Judge Henderson in July, inmates aren't the only prisoners in the CDCR. The department's custody and medical staff are imprisoned by a state bureaucracy that is virtually paralyzed by its own rules, regulations, policies and procedures. Add to that the political component of pursuing prison reform, and you have the formula for the present crisis -- created and tolerated by both the executive and legislative branches. Every governor, every Legislature since Jerry Brown's administration is culpable.

Fortunately, the Receivership is not part of state government and, therefore, is not as grossly hampered by bureaucratic and political barriers. That is why, after state leaders failed to take action during the recent special session on the prison crisis, the Receivership is able to move forward with plans to build 5,000 new medical beds for inmates who require care. Those beds will become a reality in the next three to five years, at a necessary cost of hundreds of millions of dollars. These costs could have been substantially avoided had the state been doing its job. In the next six months, my team will find 500 medical beds to meet the most urgent needs dictated by patients' conditions as well as the dictates of prudent use of taxpayer money.

Today's political climate does not reward policy makers for doing the right thing for prison reform. Whoever got elected or re-elected on a platform of improving prison conditions? Yet, policies that swell our prison population are easily put into place -- resulting in a 73 percent increase since 1990. The revolving door of parole makes matters that much worse. In California, two-thirds of those released return to prison within three years. More than half of them are sent back for "technical" parole violations alone -- not the commission of a new crime -- a rate much higher than other large states. Multiple federal court interventions -- on medical care, mental health, dental, use of excessive force -- lay bare a system in crisis. But the state continues to do virtually nothing about it.

Prison overcrowding lurks at the root of many of these problems. Wardens and health care managers cannot operate safe, adequate programs when their institutions are filled to twice the intended capacity. At San Quentin, for instance, more than 5,200 inmates are crowded into an outdated prison built for fewer than 3,000.

There, my team is redesigning medical care, including building new facilities and staffing them appropriately. These centers will be designed to serve a maximum estimated number of patients. When that limit is reached, the institution will stop accepting inmates, rather than diminish the adequacy of care provided. Establishing capacity for patient care is essential, as we have seen the prison system continue to balloon beyond any reasonable expectations of what's manageable.

It is imperative that the Legislature and Gov. Arnold Schwarzenegger move quickly to confront the overcrowding problem and its destructive effect on every aspect of our prison system -- from internal security and public safety, to rehabilitation and medical care, to efficient and effective use of taxpayer resources.

Robert Sillen is the federal Receiver for the California prison medical care system. He was appointed by U.S. District Court Judge Thelton E. Henderson and started work as Receiver on April 17. As executive manager of the state's prison medical care system, his assignment is to direct and support change, clear impediments to needed improvements and provide leadership to bring the prison health care system up to constitutional standards.

Robert Sillen is the former Executive Director of the Santa Clara County Health and Hospital System, where he served in leadership positions for 27 years.

All content © The Sacramento Bee and may not be republished without permission.
Send comments or questions to NewsLibrary

News | Sports | Business | Politics | Opinion | Entertainment | Lifestyle | Cars | Homes | Jobs | Shopping

Contact Bee Customer Service | Contact sacbee.com | Advertise Online | Privacy Policy | Terms of Use | Help | Site Map

GUIDE TO THE BEE: | Subscribe | Manage Your Subscription | Contacts | Advertise | Bee Events | Community Involvement

Sacbee.com | SacTicket.com | Sacramento.com

Copyright © The Sacramento Bee, (916) 321-1000