# EXHIBIT

# L

00001

1        IN THE UNITED STATES DISTRICT COURTS

        FOR THE EASTERN DISTRICT OF CALIFORNIA

2        AND THE NORTHERN DISTRICT OF CALIFORNIA

 UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

3  PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

4 - - - - - - - - - - - - - -+

                            |

5 RALPH COLEMAN, et al,    |

                            |

6      Plaintiffs,    |

  vs.              |  No. S 90-0520 LKK-JFM P

7                |

 ARNOLD SCHWARZENEGGER,    |

8 et al,            |

                            |

9      Defendants.    |

                   |

10 - - - - - - - - - - - - - -+

                            |

11 MARCIANO PLATA, et al,    |  No. C 01-1351 TEH

                   |

12      Plaintiffs,    |

  vs.              |

13                |

 ARNOLD SCHWARZENEGGER,    |

14 et al,              |

                   |

15      Defendants.    |

 - - - - - - - - - - - - - - - - - - - - - -|

16

17      DEPOSITION OF CHRISTOPHER J. MUMOLA

         (by written questions)

18           Washington, D.C.

         Monday, August 25th, 2008

19           10:00 a.m. EST

20 Job No. 2-132568

21 Pages 1 - 123            **Mumola, Christopher 08/25/08**            **Page  1**

00062

1 deposition notice, the second page of Exhibit B is a

2 chart entitled "Attachment 1: Illness mortality rate

3 per 100,000 state prisoners by state, 2001 to 2005."

4 Correct?

5     A   Yes.

6     Q   That chart lists all 50 states, with the

7 illness mortality rates per 100,000 state prisoners

8 for each state for each of the years from 2001 to

9 2005, correct?

10     A   Yes.

11     Q   The chart also lists the average mortality

12 rate per 100,000 for the five-year period, correct?

13     A   Average annual illness mortality rate, yes.

14     Q   The yearly and five-year mortality rates on

15 this chart do not take into account the proportion of

16 state prisoners in different age cohorts in the

17 different state prisons, correct?

18          DEFENSE COUNSEL:  Objection.  The phrase "do

19     not take into account" is vague and ambiguous.

20          THE WITNESS:  Correct.  These illness

21     mortality rates are not adjusted to account for

22     variations in prisoner age across state systems.

00063

1 BY PLAINTIFFS' COUNSEL:

2    Q    The yearly and five-year mortality rates on

3 this chart do not take into account the proportion of

4 male to female prisoners in the different state

5 prisons, correct?

6        DEFENSE COUNSEL:  Objection.  The phrase "do

7    not take into account" is vague and ambiguous.

8        THE WITNESS:  Correct.  These illness

9    mortality rates are not adjusted to account for

10    variations in prisoner gender across state

11    systems.

12 BY PLAINTIFFS' COUNSEL:

13    Q    The yearly and five-year mortality rates on

14 this chart do not take into account the racial makeup

15 of the different state prisons, correct?

16        DEFENSE COUNSEL:  Objection.  The phrase "do

17    not take into account" is vague and ambiguous.

18        THE WITNESS:  Correct.  These illness

19    mortality rates are not adjusted to account for

20    variations in prisoner race or Hispanic origin

21    across state systems.

22

00064

1 BY PLAINTIFFS' COUNSEL:

2    Q    The yearly and five-year mortality rates on

3 this chart do not take into account the proportionate

4 prisoners serving different lengths of time in the

5 different state prisons, correct?

6         DEFENSE COUNSEL:  Objection.  The phrase "do

7    not take into account" is vague and ambiguous.

8         THE WITNESS:  Correct.  These illness

9    mortality rates are not adjusted to account for

10    variations in time served across state systems.

11 BY PLAINTIFFS' COUNSEL:

12    Q    Shifting back to Defendants' Exhibit A in

13 the Data Brief you wrote on page 3, "When compared to

14 mortality rates for U.S. residents in this age group,

15 i.e., 15 to 64, the overall mortality rate of state

16 prisoners was 19 percent lower during this period,

17 i.e., 2001 to 2004," correct?

18    A    Yes.

19    Q    You reported in the Data Brief at page 3

20 that for the period of 2001 to 2004, 99 percent of

21 state prisoners were between the ages of 15 and 64,

22 correct?

DEPOSITION OF CHRISTOPHER J. MUMOLA
CONDUCTED ON MONDAY, AUGUST 25, 2008

123

```
 1

 2

 3

 4    CERTIFICATE OF SHORTHAND REPORTER -- NOTARY PUBLIC

 5            I, Laurie Bangart-Smith, Registered
      Professional Reporter, the officer before whom
 6    the foregoing deposition was taken, do hereby
      certify that the foregoing transcript is a true
 7    and correct record of the testimony given; that
      said testimony was taken by me stenographically
 8    and thereafter reduced to typewriting under my
      supervision; and that I am neither counsel for,
 9    related to, nor employed by any of the parties to
      this case and have no interest, financial or
10    otherwise, in its outcome.
11            IN WITNESS WHEREOF, I have hereunto set my
      hand and affixed my notarial seal this 8th day of
12    September, 2008.
13    My commission expires:  March 14th, 2011

14

15    _Laurie Bangart-Smith_

16    _____

17    LAURIE BANGART-SMITH

      NOTARY PUBLIC IN AND FOR

18    THE DISTRICT OF COLUMBIA

19

20

21

22
```

# EXHIBIT

# M

| STATE OF CALIFORNIA<br>CAPITAL OUTLAY<br>BUDGET CHANGE PROPOSAL (COBCP)<br>COVER PAGE     (REV 02/07) | DEPARTMENT OF FINANCE<br>915 L Street<br>Sacramento, CA 95814<br>IMS Mail Code: A15 |
|---|---|
| **BUDGET YEAR 2008-09** | |

ORG CODE:  __5225__  COBCP NO. _____  PRIORITY: _____  PROJECT ID: __61.47.007__

DEPARTMENT:   California Department of Corrections and Rehabilitation (CDCR)

PROJECT TITLE:   CSP-SAC Treatment and Office Space to Accommodate 192 Enhanced
Outpatient Program Inmate-Patients

TOTAL REQUEST (DOLLARS IN THOUSANDS): $ __1,168__ MAJOR/MINOR: MA

PHASE(S) TO BE FUNDED: __P__ PROJ CAT: __ECP-E__ CCCI/EPI: 4877

**SUMMARY OF PROPOSAL:** The purpose of this proposal is to design and construct office and treatment space for the Enhanced Outpatient Program (EOP) at the California State Prison, Sacramento (CSP-SAC). This project will provide the necessary program, treatment and office space to serve the existing 192 Level IV EOP inmate-patients housed in Facility B at CSP-SAC, by converting existing, unused warehouse space. The project is consistent with the August 2007 Supplemental Mental Health Bed Plan, approved by the *Coleman* court in October 2007. The total estimated cost of this project is $15,051,000.

HAS A BUDGET PACKAGE BEEN COMPLETED FOR THIS PROJECT? (E/U/N/?): __U__

REQUIRES LEGISLATION (Y/N): __N__ IF YES, LIST CODE SECTIONS: _____

REQUIRES PROVISIONAL LANGUAGE (Y/N) __N__

IMPACT ON SUPPORT BUDGET: ONE-TIME COSTS (Y/N): __N__ FUTURE COSTS (Y/N): __N__
_____FUTURE SAVINGS (Y/N): __N__ REVENUE (Y/N): __N__

DOES THE PROPOSAL AFFECT ANOTHER DEPARTMENT (Y/N): __N__ IF YES, ATTACH

COMMENTS OF AFFECTED DEPARTMENT SIGNED BY ITS DIRECTOR OR DESIGNEE.

**SIGNATURE APPROVALS:**

Kim Garcia/SSMIII, DCHCS     1/24/08
PREPARED BY                                    DATE

Karen Wong, Deputy Director, DCHCS
DEPARTMENT DIRECTOR               DATE

*Dean Lee Borg* 3/12/08
Dean L. Borg, Director, FASS, FPCM
REVIEWED BY                                      DATE
                                                            3/24/08
Deborah Hysen, Chief Deputy Secretary, FPCM
AGENCY SECRETARY                         DATE

*************************************************************************

**DOF ANALYST USE**

DOF ISSUE #_____ PROGRAM CAT:___ PROJECT CAT:___ BUDG PACK STATUS:_____

ADDED REVIEW:_____ SUPPORT:____ OTROS:____ FSCU:____ OSAE:____ CALSTARS: ____

PPBA:_____ Original Signed By: Chris Lief                    Date: __APR 01 2008__

(DF)-151 Rev 02/07

DEFS012448

| STATE OF CALIFORNIA | DEPARTMENT OF FINANCE |
|---|---|
| CAPITAL OUTLAY | 915 L Street |
| BUDGET CHANGE PROPOSAL (COBCP) | Sacramento, CA 95814 |
| COVER PAGE    (REV 02/07) | IMS Mail Code:  A15 |
| **BUDGET YEAR 2008-09** | |

ORG CODE:___5225___ COBCP NO. _____ PRIORITY: _____ PROJECT ID:___61.47.007_

## A.  PURPOSE OF THE PROJECT:

Introduction:

This proposal is to renovate existing warehouse space (once used by Prison Industries Authority) in Facility B at the California State Prison, Sacramento (CSP-SAC) in order to meet the treatment needs of seriously mentally disordered inmate-patients housed at the Enhanced Outpatient Program (EOP) level of care at CSP-SAC.  This project will provide the necessary program, treatment and office space to serve the existing 192 Level IV EOP inmate-patients housed in Facility B.   The project is consistent with the August 2007 Supplemental Mental Health Bed Plan, approved by the *Coleman* court in October 2007.

Submission of a 2008/09 Finance Letter on this project is due to an immediate risk to public safety and health.  This project is mandated by the California Department of Corrections and Rehabilitation (CDCR) Mental Health Bed Plan that was approved by the Coleman court in October 2005.  Failure to proceed with these projects in the 2008/09 fiscal year will lead to delays of at least 12 months, and CDCR will be faced with potential contempt citations from the court.

Background

The male inmate population, which presents the greater demand for mental health care, currently is housed at more than 200% of the designed capacity of the prisons in which these inmates are housed, leading to challenges in identifying and dedicating the necessary space to provide required mental health treatment programs.

The population of inmates with serious mental disorders has increased faster than the overall population. The prevalence of serious mental disorders among the male prison population has grown from 7.9% in 1996, when the Mental Health Service Delivery System (MHSDS) was established, to nearly 20% today. This is partially due to the improved identification of inmate-patients requiring mental health services, and the continuing degenerative nature of serious mental disorders.  The CDCR treats and manages approximately 30,500 inmates with serious mental disorders.   The most serious cases may be treated and sometimes controlled but not cured, and thus the demand for care continues to increase.  Inmates are screened for mental health problems when they enter CDCR at reception centers, and are assigned to different levels of mental health care, as appropriate.

As the mental health population is identified, the need for celled mental health beds has increased.  The CDCR must continue to convert General Population (GP) cells throughout the prison system to provide appropriate housing for these inmate-patients.  To date, CDCR has converted over 3,100 Level III and Level IV male GP beds for EOP housing.  However, these converted facilities currently do not provide sufficient treatment and program space to fully meet the requirements of the mental health programs, and these conversions exacerbate the system-wide shortage of cells by reducing the available housing for GP inmates. The shortage of mental health beds is especially severe for inmate-patients who require maximum-security housing.

NARRATIVE, PAGE __2__ OF _6_

(DF)-151 Rev 02/07

DEFS012449

| STATE OF CALIFORNIA | DEPARTMENT OF FINANCE |
| CAPITAL OUTLAY | 915 L Street |
| BUDGET CHANGE PROPOSAL (COBCP) | Sacramento, CA 95814 |
| COVER PAGE    (REV 02/07) | IMS Mail Code:  A15 |
| BUDGET YEAR 2008-09 | |

ORG CODE:___5225___  COBCP NO._____  PRIORITY:_____  PROJECT ID:___61.47.007_

*Existing Operation*
Mental Health Service Delivery System (MHSDS):
The CDCR is mandated under the federal constitution to provide adequate medical and mental health care to all inmates who require such services.  "Deliberate indifference to medical needs", has long been held to be a violation of the Eighth Amendment's prohibition against cruel and unusual punishment.  Several precedent setting cases have demonstrated that "deliberate indifference" is determined when inmates do not have timely access to staff, facilities, equipment, and procedures to diagnose and treat their medical and mental health problems.

The CDCR, over the past decade, has implemented the MHSDS, which provides clinical services and therapeutic programs to seriously mentally disordered inmates through inpatient and outpatient services.  The MHSDS includes the following general components:

1) Reception center screening and evaluation;
2) Outpatient care programs: the Correctional Clinical Case Management System (CCCMS) for MHSDS inmates capable of living in the GP, the lowest level of care, and EOP for inmate-patients that require a structured living environment, the next level of care;
3) An inpatient care program: short term (10-day) crisis care in a Mental Health Crisis Bed (MHCB); and
4) Agreements with the Department of Mental Health (DMH) under section 2684 of the Penal Code for Intermediate Care Facility (ICF) and acute hospitalization for patients needing extended inpatient care, and day treatment for patients needing transitional outpatient care, the highest levels of care.  Access to long-term inpatient and day treatment mental health care provided by DMH is a critical component of the MHSDS continuum of mental health care.

Since 1995, the federal court in *Coleman v. Schwarzenegger,* upon issuing its finding that the CDCR violated the U.S. Constitution in its treatment of seriously mentally disordered inmates, has continued to oversee the development and operation of the CDCR MHSDS.

Problem Statement
 Due to CDCR's mental health inmate population pressures, CDCR activated 192 EOP beds at CSP-SAC in July 2006 (96 beds) and October 2006 (96 beds).  CSP-SAC accommodated this population in Facility B by relocating existing GP Level IV inmates throughout the system. To provide for the treatment needs of this EOP population, CSP-SAC completed temporary retrofits and space conversions for treatment and office space, pending approval of major capital outlay funding for permanent space conversion. However, these temporary retrofits do not provide an adequate therapeutic environment for the seriously mentally disordered inmate-patients.

The 2006 Budget Act authorized preliminary plan funding to design program and treatment space, as defined by the MHSDS, to support 384 EOP level of care inmate-patients at CSP-SAC; preliminary plans were completed in March 2007.  Subsequent to legislative

NARRATIVE, PAGE ___3___ OF _6__

(DF)-151 Rev 02/07

DEFS012450

| STATE OF CALIFORNIA<br>CAPITAL OUTLAY<br>BUDGET CHANGE PROPOSAL (COBCP)<br>COVER PAGE    (REV 02/07)<br>BUDGET YEAR 2008-09 | DEPARTMENT OF FINANCE<br>915 L Street<br>Sacramento, CA 95814<br>IMS Mail Code: A15 |
| --- | --- |

ORG CODE:___5225___ COBCP NO. _____ PRIORITY: _____ PROJECT ID:___61.47.007___

concerns regarding scope and cost, CDCR determined the project was erroneously "over scoped/programmed", by authorizing preliminary plan funds for a permanent space conversion for 384-EOP inmates. The scope should have been for the existing 192 EOP inmates at Facility B, as there is sufficient space in Facility A to accommodate the EOP population in that facility. Based on the August 2007 Supplemental Mental Health Bed Plan, CSP-SAC EOP population will remain at the current level of 384, with Facilities A & B each having 192 inmate-patients.

Department stakeholders, in coordination with the Department of Finance, agreed to cancel this over-scoped project and prepare a new budget package that: a) re-scopes the project to just the 192 EOP inmate-patients in Facility B; b) provides control agencies with a revised future cost of design and construction; c) standardizes treatment and office space for the general population EOP level of care; and, d) maintains compliance with the *Coleman v. Schwarzenegger* court approved August 2007 Supplemental Mental Health Bed Plan. Notice of the cancellation of the original project is pending notification to the Legislature and Public Work Board approval. This proposal is the result of the new budget package.

## B. RELATIONSHIP TO THE STRATEGIC PLAN
This project is consistent with the CDCR Strategic Plan, Goal Number 7, Health Care Delivery, "to ensure an organization design and accompanying system to provide efficient delivery of quality health care."

The CDCR is mandated to provide mental health care to all inmates requiring care. One critical test of the constitutionality of a health care program is timely access to appropriate care. Therefore, CDCR must assure sufficient availability of outpatient and inpatient care for all inmate-patients who are clinically determined to require that level of care. This project will assist in assuring the courts that CDCR is striving to provide sufficient mental health housing and treatment capacity for its mentally ill inmate-patients.

## C. ALTERNATIVES CONSIDERED:
<u>Alternative #1:</u> Renovate and expand existing space within Facility B at CSP-SAC to create treatment, therapy, and office space to support 192 EOP inmate-patients.

Project Advantages:
o   Will satisfy Coleman court requirement to provide mental health treatment and counseling space for EOP inmate-patients.
o   Is consistent with the August 2007 Supplemental Mental Health Bed Plan.

Project Disadvantages:
o   Requires Major Capital Outlay Funding

Estimated Project Cost: $15,051,000

<u>Alternative #2:</u>  Continue to operate the Mental Health Program on Facility B for the 192 EOP inmate-patients within existing space.

NARRATIVE, PAGE ___4___ OF _6__

(DF)-151 Rev 02/07

DEFS012451

| STATE OF CALIFORNIA CAPITAL OUTLAY BUDGET CHANGE PROPOSAL (COBCP) COVER PAGE    (REV 02/07) | DEPARTMENT OF FINANCE 915 L Street Sacramento, CA 95814 IMS Mail Code:  A15 |
|---|---|
| **BUDGET YEAR 2008-09** | |

ORG CODE:___5225___    COBCP NO._____    PRIORITY:_____    PROJECT ID:___61.47.007__

Project Advantages:
o    No capital outlay costs.

Project Disadvantages:
o    The temporary retrofits completed in 2006 do not provide an adequate therapeutic environment for the seriously mentally disordered inmate-patients.
o    Does not support the CDCR Supplemental Mental Health Bed Plan as approved by the *Coleman* court in October 2007; the Department would be subject to contempt of court.

**D.  RECOMMENDED SOLUTION:**
  1.  Which alternative and why.
      Alternative #1 is the recommended alternative, to renovate existing, unused PIA warehouse space at CSP-SAC in order to provide the necessary program, treatment and office space to serve the existing 192 Level IV EOP inmate-patients housed in Facility B at CSP-SAC. This alternative is consistent with the August 2007 Supplemental Mental Health Bed Plan approved by the *Coleman* court in October 2007.

  2.  Detail scope description
      The PIA warehouse is located between Facility A and Facility B. The portion of the warehouse space being converted is currently unused, and is located at the west end of the warehouse, adjacent to Facility B.  The proposed warehouse conversion will be single story with an area of approximately 17,000 square feet.  The scope includes the following:
      • Site preparation work for extension of existing utilities including water, sewer, electrical and communications to the proposed building site. The project requires providing concrete pad and 12-ft high perimeter fencing and gates at the Chiller yard.
      • Warehouse conversion: the building is a Type II-Fire Rated (FR) construction, B Occupancy. Maintenance will be performed to existing exterior walls, foundation, and roof system as required.  The non-bearing interior walls will be metal studs with a painted gypsum wallboard finish. Ceilings for the offices, working areas, record/file storage area, copy/supply room, and entrance lobby will be suspended acoustical tile. Ceilings in the restrooms and electrical equipment room will be suspended painted gypsum board. Vinyl composition tile flooring will be provided for the same areas receiving a suspended acoustical tile ceiling. The staff toilet rooms will have ceramic tile floors and wainscots. The electrical equipment room will have a sealed concrete floor and ceiling will be exposed to structure.
      • Fire-Life Safety: New fire sprinkler system and fire alarm system will be installed; personal alarm system will also be provided.
      • Roofing: New roofing over existing roof deck will be extended to 20' beyond the area of improvement in all directions. Roofing material will be single-ply mechanically attached geo-membrane, non-ballasted.
      • Structural support will be provided for any new mechanical/other units and ductwork in the ceiling. Any new wall openings will be reinforced with new steel and anchorage details.

NARRATIVE, PAGE ___5___ OF ___6___

(DF)-151 Rev 02/07

DEFS012452

| STATE OF CALIFORNIA | DEPARTMENT OF FINANCE |
|---|---|
| CAPITAL OUTLAY | 915 L Street |
| BUDGET CHANGE PROPOSAL (COBCP) | Sacramento, CA 95814 |
| COVER PAGE    (REV 02/07) | IMS Mail Code: A15 |
| **BUDGET YEAR 2008-09** | |

ORG CODE:___5225___ COBCP NO. _____ PRIORITY: _____ PROJECT ID:___61.47.007___

- New wall partitions consist of 6"x 20 gauge metal studs at 16" on center for office and treatment spaces while 8" masonry walls shall be used at holding area including the inmate toilet.
- Cooling:  The cooling methodology for the new mechanical system shall consist of a 60-ton air-cooled chiller located at the new outdoor chiller yard.
- Heating: The existing HVAC system consists of individual evaporative coolers which are beyond their useful economic life, and are not well suited for the new proposed use. Existing steam lines are available, and can be reused to provide heating for the new spaces. The steam shall be converted to hot water using a shell and tube heat exchanger. A five-horsepower pump with air separator and expansion tank will deliver water to rooftop air handling equipment and reheat coils within the building.
- Power Distribution: The improvements in the building will require (2) new pad mounted transformers.  No emergency power will be provided for this building.

3. Basis for cost information.
   Based on Budget Package prepared by Kitchen CEM.

4. Factors/benefits for recommending other than the least expensive alternative.
   Alternative #1 is in accordance with the Coleman court mandates and consistent with the court approved August 2007 Supplemental Mental Health Bed Plan.

5. Complete description of impact on support budget.
   None.  This project provides treatment and counseling space for staff already assigned to the existing EOP inmate-patient population at this facility.

6. Identify and explain any project risks.
   There are no identified risks associated with completion of this project.

7. List requested interdepartmental coordination and/or special project approval (including mandatory reviews and approvals, e.g. technology proposals).
   Review and approval will be required by the Office of the State Fire Marshal.

8. Proposed project schedule:
   Preliminary Plans    Start  08/2008    Complete  10/2009
   Working Drawings    Start  10/2009    Complete  05/2010
   Construction          Start  07/2010    Complete  01/2012

ATTACHMENTS:
   Attachment A:  3-Page Estimate dated 2/20/08.

NARRATIVE, PAGE ___6___ OF ___6___

(DF)-151 Rev 02/07

DEFS012453

# EXHIBIT

# N

STATE OF CALIFORNIA – DEPARTMENT OF CORRECTIONS AND REHABILITATION                    ARNOLD SCHWARZENEGGER, GOVERNOR

**DIVISION OF CORRECTIONAL HEALTH CARE SERVICES**
P.O. Box 942883
Sacramento, CA 94283-0001

**RECEIVED**

AUG 2 9 2008

Rosen, Bien & Galvan



August 27, 2008

Matthew A. Lopes, Jr., Esq.                    Via:    Lisa Tillman
Office of the Special Master                            Deputy Attorney General
Pannone Lopes & Devereaux LLC                          Department of Justice
317 Iron Horse Way, Suite 301                          1300 "I" Street, Suite 125
Providence, RI  02908                                   P. O. Box 944255
                                                        Sacramento, CA  94244-2550

RE:    **COLEMAN MONTHLY REPORT OF INFORMATION REQUESTED AND
       RESPONSE TO JANUARY 19, 1999, COURT ORDER REGARDING STAFF
       VACANCIES**

Dear Mr. Lopes:

Enclosed is the disk with the *Coleman* monthly report reflective of July 2008 data (or as
otherwise noted).

If you have any problems opening the disk, please contact me at (916) 928-5946.

Sincerely,

SHARON RIEGEL
Health Program Specialist II
Mental Health Program
Division of Correctional Health Care Services

Enclosures

STATE OF CALIFORNIA—DEPARTMENT OF CORRECTIONS AND REHABILITATION                    ARNOLD SCHWARZENEGGER, GOVERNOR

**DIVISION OF CORRECTIONAL HEALTH CARE SERVICES**
**MENTAL HEALTH PROGRAM**
P.O. Box 942883
Sacramento, CA 94283-0001



August 28, 2008

Matthew A. Lopes, Jr., Esq.                    Via:    Lisa Tillman
Office of the Special Master                            Deputy Attorney General
Pannone Lopes & Devereaux LLC                          Department of Justice
317 Iron Horse Way, Suite 301                          1300 "I" Street, Suite 125
Providence, RI  02908                                  P. O. Box 944255
                                                       Sacramento, CA  94244-2550

**RE:  COLEMAN MONTHLY REPORT OF INFORMATION REQUESTED AND**
**RESPONSE TO JANUARY 19, 1999, COURT ORDER REGARDING STAFF VACANCIES**

Dear Mr. Lopes:

Enclosed is the Coleman Monthly Report reflective of July 2008 data (or as otherwise noted).  The
following is the list of enclosures:

1.  Mental Health Services Delivery System (MHSDS) Staffing Allocation and Vacancy
    History.
2.  MHSDS Hiring Activity Report. (Included in Enclosure 1)
3.  Health Care Placement Oversight Program (HCPOP) Information Report, Summary and
    Administrative Segregation Greater than 60 Days.
4.  Mental Health Contract Services including Summary and Telemedicine Monthly Report for
    all disciplines. (Telemedicine Only)
5.  California Department of Corrections and Rehabilitation (CDCR) Reception Center (RC)
    Monthly Report.
6.  Monthly Summary of Mental Health Crisis Bed use by Institution Titles Inpatient
    Psychiatric Aging Report. (Not available)
7.  Referrals for Transfer to the Department of Mental Health (including admissions).
8.  Atascadero State Hospital (ASH) Discharges.
9.  Weekly Enhanced Outpatient Program (EOP)/Outpatient Psychiatric Program.
10. The DMH Monthly Report of CDCR Patients in DMH Hospitals--Summary and Penal
    Code 2684.
11. Suicide Report.
12. Statistics on Contracted Registered Nurse (RN).  (Not Available)
13. RC Processing for MHSDS Inmate Patients.
14. Medical Technical Assistant (MTA) Vacancy Report.
15. Allocated Case Manager Positions and Vacancies for the EOP Administrative Segregated
    Hub institutions. (Not Available)
16. EOP Inmates Waiting Transfer to a Psychiatric Services Unit (PSU).

Matthew A. Lopes, Jr., Esq.
Page 2

17. Audit reports on Psychiatric Technician Rounds in Administrative Segregation at California State Prison-San Quentin (SQ), California State Prison-Corcoran (COR), and Salinas Valley State Prison (SVSP).
18. Mental Health Crisis Beds Wait List.
19. Correctional Treatment Centers and CDCR General Acute Care Hospital Care Placement Issues. (No longer available)
20. Transferred and Rescinded Mental Health Crisis Bed Referrals by Institution and Level of Care.

If you have any questions, please contact me at (916) 928-4705.

Sincerely,

DENNIS BEATY
Deputy Director, Program Services
Mental Health Program
Division of Correctional Health Care Services

Enclosures

cc: Robin Dezember, Director, Division of Correctional Health Care Services (DCHCS)
    Karen Wong, Deputy Director (A), DCHCS
    Brenda Epperly-Ellis, Director, Statewide Mental Health Program, DCHCS
    Jeffrey L. Metzner, M.D., *Coleman* Expert
    Dennis F. Koson, M.D., *Coleman* Expert
    Kerry C. Hughes, M.D., *Coleman* Expert
    Melissa G. Warren, Ph.D., *Coleman* Expert
    Raymond F. Patterson, M.D, *Coleman* Expert
    Pal Nicoll, MPA, *Coleman* Monitor
    Ted Ruggles, Ph.D., *Coleman* Expert
    Mary Perrien, Ph.D., *Coleman* Expert
    Mary-Joy Spencer, Esq., *Coleman* Monitor
    Yong Joo Erwin, LCSW, *Coleman* Expert
    Kathryn A. Burns, M.D., MPH, *Coleman* Expert
    Henry A. Dlugacz, Esq., *Coleman* Expert
    Kerry F. Walsh, Esq., *Coleman* Monitor
    Angela Shannon, M.D., *Coleman* Expert
    Lisa Tillman, Esq., Office of the Attorney General
    Michael Stone, Esq., Office of Legal Affairs

Matthew A. Lopes, Jr., Esq.
Page 3


Michael Bien, Esq., Rosen, Bien and Galvan
Donald Specter, Esq., Prison Law Office
Mohamedu F., Jones, Esq., *Coleman* Deputy Special Master
Patricia Williams, Esq., *Coleman* Monitor
Linda Buffardi, Esq., *Coleman* Deputy Special Master
Haunani Henry, *Coleman* Monitor
J. Ronald Metz, *Coleman* Monitor
Andrew Swanson, M.D., Deputy Director, Psychiatry Services, DCHCS
Marion Chiurazzi, Psy.D., Deputy Director, Mental Health Clinical Services, DCHCS
Judy Burleson, Coleman Compliance Manager, DCHCS
Mary Neade, Correctional Counselor II, Division of Adult Institutions
Sharon Riegel, HPS II, DCHCS

# Enclosure 1

## Mental Health Services Delivery System Staffing Allocation and Vacancy History

Division of Correctional Health Care Services
Mental Health Program
Month to Month Vacancy Summary

| GENERAL CLASSIFICATION | 07/08 AUTH 7A POSITIONS | 08/09 AUTH 7A POSITIONS | February-08 | | March-08 | | April-08 | | May-08 | | June-08 | | July-08 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | VACANT | VACANCY RATE | VACANT | VACANCY RATE | VACANT | VACANCY RATE | VACANT | VACANCY RATE | VACANT | VACANCY RATE | VACANT | VACANCY RATE |
| PSYCHIATRIST[1] | 282.00 | 298.70 | 134.75 | 47.8% | 133.75 | 47.4% | 118.75 | 42.1% | 95.75 | 34.0% | 86.25 | 30.6% | 152.70 | 51.1% |
| PSYCHOLOGIST[2] | 928.40 | 920.40 | 247.60 | 26.7% | 225.80 | 24.3% | 206.80 | 22.3% | 208.05 | 22.4% | 220.55 | 23.8% | 362.40 | 39.4% |
| OTHER MH CLINICAL STAFF[3] | 1251.70 | 1253.30 | 290.46 | 23.2% | 274.46 | 21.9% | 249.46 | 19.9% | 254.71 | 20.3% | 235.71 | 18.8% | 404.91 | 32.3% |
| ALL OTHER SUPPORT STAFF[4] | 534.40 | 610.00 | 118.90 | 22.2% | 101.90 | 19.1% | 99.90 | 18.7% | 109.90 | 20.6% | 115.40 | 21.6% | 247.00 | 40.5% |
| TOTAL [5] | 2996.50 | 3082.40 | 791.71 | 26.4% | 735.91 | 24.6% | 674.91 | 22.5% | 668.41 | 22.3% | 657.91 | 22.0% | 1167.01 | 37.9% |

[5] State Controllers Office (SCO) data approximately 30-45 days in arrears, includes adjustments for blanket and pending hires, with no adjustments for Registry services

Per the July SCO data, 423.2 "Filled" positions were lost in July 2008 compared to the June 2008. The reason for the loss is unexplained at the time of report production but possibly due to abolishment of positions per Government Code Section 12439.

CSP-Sac data is absent in the July 2008 data run from SCO. CSP-Sac was in the process (and did not complete) the conversion of Reporting Units 320 and 314 to 220 and 214, respectively. (This will affect the number of SCO "Established" and "Filled" positions).



# EXHIBIT

# O

STATE OF CALIFORNIA
FINANCE LETTER - COVER SHEET
FOR FISCAL YEAR 2008/09
DF-46 (WORD Version)(REV 3/00)
*Use report dollars in thousands.*

Department of Finance
915 L Street
Sacramento, CA 95814
IMS Mail Code: A-15

| FINANCE LETTER # | PRIORITY NO. | ORG. CODE 5225 | DEPARTMENT California Department of Corrections and Rehabilitation |
|---|---|---|---|
| PROGRAM 50 | ELEMENT 30 | COMPONENT | |

TITLE OF PROPOSED CHANGE
Mental Health Staffing – Workload Study

SUMMARY OF PROPOSED CHANGES

This Finance Letter requests 407.7 positions in Fiscal Year 2008-09 and ongoing which will be funded by available salary savings. This is requested in order to comply with the *Coleman* court order dated March 2, 2006, and the 2006 MHSDS Revised Program Guide requirements, as recommended by the Mental Health Staffing Workload Study.

|  | FY 2007/08 | FY 2008/09 |
|---|---|---|
| POS | 0.0 | 407.7 |
| PYs | 0.0 | 387.3 |
| Funding (000's) | $0 | $0 |

| REQUIRES LEGISLATION | CODE SECTION(S) TO BE AMENDED/ADDED | BUDGET IMPACT—PROVIDE LIST AND MARK IF APPLICABLE |
|---|---|---|
| ☐ YES ☒ NO | | ☒ ONE-TIME COST     ☐ FUTURE SAVINGS ☐ FULL-YEAR COSTS   ☐ REVENUE ☐ FACILITIES/CAPITAL COSTS |

| PREPARED BY Jennifer Johnson | DATE 3/26/08 | REVIEWED BY Scott Carney, Deputy Director | DATE 4/1/08 |
|---|---|---|---|
| DEPARTMENT DIRECTOR Robin Dezember Division Director | DATE 3/26/08 | AGENCY SECRETARY Heidi Lackner, Director Division of Support Services | DATE 4/1/08 |

IF PROPOSAL AFFECTS ANOTHER DEPARTMENT, DOES OTHER DEPARTMENT CONCUR WITH PROPOSAL?

☐ YES     ☐ NO     ATTACH COMMENTS OF AFFECTED DEPARTMENT, SIGNED AND DATED BY THE DEPARTMENT DIRECTOR OR DESIGNEE.

FOR INFORMATION TECHNOLOGY REQUESTS, SPECIFY THE DATE SPECIAL PROJECT REPORT (SPR) OR FEASIBILITY STUDY REPORT (FSR) WAS APPROVED BY DOIT.

| DATE | PROJECT # | FSR ☐   OR   SPR ☐ |
|---|---|---|

DOF ANALYST USE
(ADDITIONAL REVIEW)

Orignal Signed BY:
Amy Jarvis

PAGE II-1

DEFS014440

STATE OF CALIFORNIA
BUDGET CHANGE PROPOSAL- FISCAL DETAIL
STATE OPERATIONS
~~ 46 (REV 07/06) Alternative
.se report dollars in thousands

PAGE #:  1
Printed:03/25/08time:08:11:27
Data source    :W:\TEMP\FL0325A.DBF
Report Location:W:\TEMP\FSCLDT~1.RP1
Report Form   :DF46-Plcy/FnLtr_Whl_v1.09

| BCP # B4460MH | | DATE  03/25/08 | TITLE MH WORKLOAD STUDY FL |
|---|---|---|---|

| PROGRAM    ( Consolidated ) | | ELEMENT | COMPONENT |
|---|---|---|---|

| PERSONNEL YEARS | PYs CY | PYs BY | PYs BY+1 | CY | BY | BY+1 |
|---|---|---|---|---|---|---|
| TOTALS S & W | | 407.7 | 407.7 | | | |
| SALARY SAVINGS | | -20.4 | -20.4 | | | |
| NET TOTAL S & W | 0.0 | 387.3 | 387.3 | | $0 | |
| STAFF BENEFITS | | -- | -- | | | |
| OASDI | | | | ( ) | ( ) | ( ) |
| HEALTH INSURANCE | | { whole } | | ( ) | ( ) | ( ) |
| RETIREMENT - Industrial | | { dollars } | | ( ) | ( ) | ( ) |
| RETIREMENT - Safety | | | | ( ) | ( ) | ( ) |
| RETIREMENT - Peace Officer | | | | ( ) | ( ) | ( ) |
| RETIREMENT - Other | | | | ( ) | ( ) | ( ) |
| WORKERS' COMPENSATION | | | | ( ) | ( ) | ( ) |
| IDL, NDI, UI (incl in W.C.) | | | | | | |
| TOTAL of STAFF BENEFIT DETAIL (whole $$) | | | | ( ) | ( ) | ( ) |

| TOTAL PERSONAL SVCS |
|---|

| OPERATING EXPENSES AND EQUIPMENT | | | | | | |
|---|---|---|---|---|---|---|
| GENERAL EXPENSE | | | | | 4 | 4 |
| PRINTING | | | | | | |
| COMMUNICATIONS | | | | | | |
| ~TAGE | | | | | | 0 |
| INSURANCE | | | | | | |
| TRAVEL - IN STATE | | | | | | |
| TRAVEL - OUT OF STATE | | | | | | |
| TRAINING | | | | | | |
| FACILITIES OPERATIONS | | | | | | |
| UTILITIES | | | | | | |
| CONSULTING & PROFESSIONAL:Interdepartmental | | | | | | |
| CONSULTING & PROFESSIONAL:External | | | | | | |
| CONSOLIDATED DATA CENTERS | | | | | | |
| Health and Welfare Data Center | | | | ( ) | ( ) | ( ) |
| Stephen P. Teale Data Center | | | | ( ) | ( ) | ( ) |
| DATA PROCESSING | | | | | | |
| EQUIPMENT | | | | | | |
| ERVICE | | | | | | |
| OTHER ITEMS OF EXPENSE (see Supplemental Info sheets) | | | | | | |
| TOTAL OPERATING EXPENSES and EQUIPMENT | | | | | 4 | 4 |

| SPECIAL ITEMS of EXPENSE |
|---|

| TOTAL STATE OPERATIONS EXPENDITURES | | | | $4 | $4 |
|---|---|---|---|---|---|

PAGE III-2a

DEFS014441

DEFS014441

CONTINUATION Sheet    ADULT CORR'L HEALTH CARE, PSYCHIATRIC    Printed:03/25/08  time:08:11:27
BCP# B4460MH  Page:2    DEPARTMENT:CORRECTIONS & REHABILITATION    FISCAL YEAR2008 - 2009

| SOURCE OF FUNDS | APPROPRIATION NO. | | | | CY | BY | | BY+1 |
|---|---|---|---|---|---|---|---|---|
| | ORG | REF | FUND | | | | | |
| GENERAL FUND | 5225 | 001 | 0001 | $ | $ | | $ | |
| SPECIAL FUNDS | 5225 | | | $ | $ | | $ | |
| HEALTH CARE FUND | 5225 | 002 | 0001 | $ | $ | 4 | $ | 4 |
| FEDERAL FUNDS | 5225 | 001 | 0890 | $ | $ | | $ | |
| OTHER FUNDS - Bond | 5225 | 001 | 0001 | $ | $ | | $ | |
| OTHER FUNDS - IWF | 5225 | 001 | 0917 | $ | $ | | $ | |
| OTHER - Spcl Deposit | 5225 | 001 | 0942 | $ | $ | | $ | |
| OTHER - | 5225 | 000 | 0000 | $ | $ | | $ | |
| OTHER - Lottery Educ | 5225 | 001 | 0831 | $ | $ | | $ | |
| REIMBURSEMENTS | 5225 | 501 | 0995 | $ | $ | | $ | |
| General Fund,Prop 98 | 5225 | 011 | 0001 | $ | $ | | $ | |
| Corr Trng Fund | 5225 | 001 | 0170 | $ | $ | | $ | |

| LOCAL ASSISTANCE SOURCE OF FUNDS | APPROPRIATION NO. | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | ORG | REF | FUND | | | | | |
| GENERAL FUND | 5225 | 101 | 0001 | $ | $ | | $ | |
| SPECIAL FUNDS | 5225 | | | $ | $ | | $ | |
| FEDERAL FUNDS | 5225 | | 0890 | $ | $ | | $ | |
| OTHER FUNDS | 5225 | | | $ | $ | | $ | |
| REIMBURSEMENTS | 5225 | 601 | 0995 | $ | $ | | $ | |

PAGE III-2b

////////////  E N D  of  CONSOLIDATED DISPLAY  ////////////

DEFS014442

DEFS014442

**CONTINUATION Sheet**    **ADULT CORR'L HEALTH CARE, PSYCHIATRIC**    Printed:03/25/08  time:08:11:27

BCP# B4460MH  Page:3    DEPARTMENT:*CORRECTIONS & REHABILITATION*    FISCAL YEAR2008 - 2009

| PROGRAM | *ADULT CORR'L HEALTH CARE, PSYCHIATR* | ELEMENT | | COMPONENT | | |
|---|---|---|---|---|---|---|
| PERSONNEL YEARS | CY | BY | BY + 1 | CY $$ | BY $$ | BY + 1 $$ |
| TOTAL S & W | | 407.7 | 407.7 | | | |
| SALARY SAVINGS | | -20.4 | -20.4 | | | |
| NET TOTAL S & W | 0.0 | 387.3 | 387.3 | $0 | $0 | |
| STAFF BENEFITS | -- | -- | -- | | | |
| OASDI | | { | } | ( | ) | ( | ) | ( | ) |
| HEALTH INSURANCE | | { whole } | ( | ) | ( | ) | ( | ) |
| RETIREMENT - Industrial | | { dollars } | ( | ) | ( | ) | ( | ) |
| RETIREMENT - Safety | | } | } | ( | ) | ( | ) | ( | ) |
| RETIREMENT - Peace Officer | | } | } | ( | ) | ( | ) | ( | ) |
| RETIREMENT - Other | | } | } | ( | ) | ( | ) | ( | ) |
| WORKERS' COMPENSATION | | { | } | ( | ) | ( | ) | ( | ) |
| IDL, NDI, UI (incl in W.C.) | | | | | | |

| TOTAL PERSONAL SVCS | | | | | | |
|---|---|---|---|---|---|---|

**OPERATING EXPENSES AND EQUIPMENT**

| | CY $$ | BY $$ | BY + 1 $$ |
|---|---|---|---|
| GENERAL EXPENSE | | 4 | 4 |
| PRINTING | | | |
| COMMUNICATIONS | | | |
| POSTAGE | | | |
| INSURANCE | | | |
| TRAVEL - IN STATE | | | |
| TRAVEL - OUT OF STATE | | | |
| TRAINING | | | |
| FACILITIES OPERATIONS | | | |
| UTILITIES | | | |
| CONSULTING & PROFESSIONAL:Interdepartmental | | | |
| CONSULTING & PROFESSIONAL:External | | | |
| CONSOLIDATED DATA CENTERS | | | |
| Health and Welfare Data Center | ( ) | ( ) | ( ) |
| Stephen P. Teale Data Center | ( ) | ( ) | ( ) |
| DATA PROCESSING | | | |
| EQUIPMENT | | | |
| DEBT SERVICE | | | |
| OTHER ITEMS OF EXPENSE (see Supplemental Info sheets) | | | |

| TOTAL OPERATING EXPENSES and EQUIPMENT | | 4 | 4 |
|---|---|---|---|

| SPECIAL ITEMS of EXPENSE | | | |
|---|---|---|---|

| TOTAL STATE OPERATIONS EXPENDITURES | \| $ | \| $    4 | \| $    4 |
|---|---|---|---|

PAGE III-2a

## 50  ADULT CORR'L HEALTH CARE, PSYCHIATRIC

| SOURCE OF FUNDS | APPROPRIATION NO. | | | CY | BY | BY + 1 |
|---|---|---|---|---|---|---|
| | ORG | REF | FUND | | | |
| GENERAL FUND | 5225 | 001 | 0001 | $ | $ | $ |
| SPECIAL FUNDS | 5225 | | | $ | $ | $ |
| HEALTH CARE FUND | 5225 | 002 | 0001 | $ | $  4 | $  4 |
| FEDERAL FUNDS | 5225 | 001 | 0890 | $ | $ | $ |
| OTHER FUNDS - Bond | 5225 | 001 | 0001 | $ | $ | $ |
| OTHER FUNDS - IWF | 5225 | 001 | 0917 | $ | $ | $ |
| OTHER - Spcl Deposit | 5225 | 001 | 0942 | $ | $ | $ |
| OTHER - | 5225 | 000 | 0000 | $ | $ | $ |
| OTHER Lottery-Educ | 5225 | 001 | 0831 | $ | $ | $ |
| REIMBURSEMENTS | 5225 | 501 | 0995 | $ | $ | $ |
| General Fund,Prop 98 | 5225 | 011 | 0001 | $ | $ | $ |
| Corr Trng Fund | 5225 | 001 | 0170 | $ | $ | $ |

| LOCAL ASSISTANCE SOURCE OF FUNDS | APPROPRIATION NO. | | | $( ) | $( ) | |
|---|---|---|---|---|---|---|
| | ORG | REF | FUND | | | |
| GENERAL FUND | 5225 | 101 | 0001 | $ | $ | $ |
| SPECIAL FUNDS | 5225 | | | $ | $ | $ |
| FEDERAL FUNDS | 5225 | | 0890 | $ | $ | $ |
| OTHER FUNDS | 5225 | | | $ | $ | $ |
| REIMBURSEMENTS | 5225 | 601 | 0995 | $ | $ | $ |

PAGE III-2b

DEFS014444
DEFS014444

*CONTINUATION Sheet*    *ADULT CORR'L HEALTH CARE, PSYCHIATRIC*    Printed:03/25/08  time:08:11:27
BCP# B4460MH   Page:5    DEPARTMENT:*CORRECTIONS & REHABILITATION*    FISCAL YEAR2008 - 2009

Fiscal Detail Continued
**DETAIL OF PERSONAL SERVICES**50   *ADULT CORR'L HEALTH CARE, PSYCHIATRIC*

| Workload Adjustments | POSITIONS | | | | AMOUNT | | |
|---|---|---|---|---|---|---|---|
| CLASSIFICATION | CY | BY | BY+1 | SALARY/RANGE | CY | BY | BY+1 |
| Registered Nurse,CF | | -55.6 | -55.6 | 7285- 9296 | | | |
| Psychologist-Clinical, CF | | -614.1 | -614.1 | 7116- 8930 | | | |
| Supvng Registered Nurse | | -15.0 | -15.0 | 5060- 6551 | | | |
| Occ Therapist | | -1.0 | -1.0 | 3241- 4450 | | | |
| Psychiatric Social Worker | | -211.5 | -211.5 | 3554- 4430 | | | |
| Psychometrist | | -0.8 | -0.8 | 3241- 4037 | | | |
| Med Transcriber | | -49.5 | -49.5 | 2751- 3354 | | | |
| Ofc Asst-Typing | | -71.7 | -71.7 | 2324- 2826 | | | |
| TOTAL SALARIES AND WAGES | | -1,019.2 | -1,019.2 | | | | |

PAGE III-3

\*
\*
\*

**SUPPLEMENTAL INFORMATION**
*Please report dollars in thousands.*Whole dollars
**IDENTIFY ALL PROPOSED ITEMS WHICH FIT INTO THE CATEGORIES LISTED BELOW.  SEE INSTRUCTIONS**

| | CURRENT YEAR | BUDGET YEAR | BY + 1 |
|---|---|---|---|
| ..P - | | | 0 |
| PS-In | | | 0 |
| PS-Ex | | | 0 |
| ONE-TIMES(One-Times inclds EQUIP & CONTRACTS) | | | 0 |
| FULL-YR | | | |
| FACILITIES/CAPITAL COSTS | | | |

PAGE III-4

DEFS014445
DEFS014445

CONTINUATION Sheet        ADULT CORR'L HEALTH CARE, PSYCHIATRIC                    Printed:03/25/08  time:08:11:27
BCP# B4460MH   Page:6      DEPARTMENT:CORRECTIONS & REHABILITATION               FISCAL YEAR2008 - 2009

Fiscal Detail Continued
DETAIL OF PERSONAL SERVICES50    ADULT CORR'L HEALTH CARE, PSYCHIATRIC

| Proposed New | POSITIONS | | | | AMOUNT | | |
|---|---|---|---|---|---|---|---|
| CLASSIFICATION | CY | BY | BY + 1 | SALARY/RANGE | CY | BY | BY + 1 |
| Sr Psychiatrist, CF-Spec | | 14.1 | 14.1 | 9845- 13170 | | | |
| Staff Psychiatrist,CF | | 36.5 | 36.5 | 11534-12863 | | | |
| Chief Psychologist | | 12.0 | 12.0 | 11391-11798 | | | |
| Sr Psychologist, CF-Spec | | 57.0 | 57.0 | 8416- 9376 | | | |
| Psychologist - Clinical (Safet | | 363.0 | 363.0 | 7116- 8930 | | | |
| Corr Counselor I | | 63.4 | 63.4 | 5033- 7772 | | | |
| Recr Therapist | | 122.4 | 122.4 | 5679- 6367 | | | |
| Assoc Govtl Prog Analyst | | 16.5 | 16.5 | 4400- 5348 | | | |
| Psych Techn (Safety) | | 279.7 | 279.7 | 4814- 5161 | | | |
| Psychiatric Social Worker | | 363.0 | 363.0 | 3554- 4430 | | | |
| Ofc Svcs Supvr II-Gen | | 37.2 | 37.2 | 2953- 3590 | | | |
| Ofc Techn-Typing | | 62.1 | 62.1 | 2686- 3264 | | | |
| TOTAL SALARIES AND WAGES | | 1,426.9 | 1,426.9 | | | | |

\*
\*                                                                                                                PAGE II + 90V
\*

SUPPLEMENTAL INFORMATION
Please report dollars in thousands.Whole dollars
IDENTIFY ALL PROPOSED ITEMS WHICH FIT INTO THE CATEGORIES LISTED BELOW.  SEE INSTRUCTIONS

| | CURRENT YEAR | BUDGET YEAR | BY + 1 |
|---|---|---|---|
| EQUIP - | | | 0. |
| C&PS-In | | | 0 |
| C&PS-Ex | | | 0 |
| ONE-TIMES(One-Times inclds EQUIP & CONTRACTS) | | | 0. |
| FULL-YR | | | |
| FACILITIES/CAPITAL COSTS | | | |

PAGE III-4

\\\\\\\\\\\\\\\\\\   E N D  of  PROGRAM:

DEFS014446

California Department of Corrections and Rehabilitation
Finance Letter
Fiscal Year 2008/09
Mental Health Staffing–Workload Study

**Division/Institution:** Division of Correctional Health Care Services – Mental Health Programs

**Title:** Mental Health Staffing - Workload Study

## A.    NATURE OF REQUEST

Pursuant to SB 1134, Chapter 511, the California Department of Corrections and Rehabilitation (CDCR) was required to complete a workload study to assess the total level of resources needed for the implementation of the Revised Program Guide for the Mental Health Services Delivery System (MHSDS). The Mental Health Staffing Workload Study was completed in June, 2007 and this funding request has been developed as a result of the recommendations identified in the study. The Department is requesting 407.7 permanent positions effective Fiscal Year (FY) 2008/09.

## B.    BACKGROUND/HISTORY

### 1991

On June 25, 1991, a class action complaint *Coleman vs Schwarzenegger, et al* (*Coleman*) was filed alleging that the Department "...under color of state law...acted with deliberate indifference depriving the plaintiff class of their rights to be free from cruel and unusual punishment as guaranteed by the Eighth and Fourteenth amendments to the United States Constitution."

The United States District Court for the Eastern District of California ultimately found that the state and prison officials had acted with deliberate indifference to the medical needs of inmates with serious mental disorders by ignoring the advice of their own experts regarding the deficiencies that had existed in the Correctional Health Care System for years. The Court found that the Department and the Health Care Services Division's MHSDS was a constitutionally inadequate system that lacked the necessary elements for delivery of adequate mental health care, such as screening and identification of mentally ill inmates; prompt access to mental health professionals for diagnosis and treatment; patient access to necessary and appropriate levels of care as determined by clinicians, including outpatient care; residential care, crisis care, and inpatient care; medical records and an information management system; and a quality assurance system. The Court concluded that California's system could not, and did not, meet the serious medical needs of mentally ill inmates. On June 6, 1994, it was recommended that the District Court order the appointment of a Special Master and that state and prison officials develop and implement forms, protocols, and plans necessary to remedy constitutional violations.

### 1995

In 1995, the *Coleman* decision found that the Department violated the Eighth and Fourteenth Amendments by being deliberately indifferent to the mental health needs of inmates. The CDCR, the Division of Correctional Health Care Services (DCHCS), the Mental Health Program (MHP), and the institutional MHSDS intends, through approval of this request, to provide full compliance with the *Coleman* orders.

DEFS014447

California Department of Corrections and Rehabilitation
Finance Letter
Fiscal Year 2008/09
Mental Health Staffing–Workload Study

The DCHCS mission is to protect the health and safety of the public and CDCR staff by providing proper health care service in a timely and cost-effective manner to mentally disordered inmates and parolees. Proper screening and treatment of mental illness is the most effective way to reduce inmate-patient potential for violence and its associated costs.

## 1997
In 1997, the Department established initial policies and procedures for providing mental health services at all institutions through the MHSDS Program Guide, which was approved by the *Coleman* Court. Revisions to the Program Guide have been an ongoing requirement of the *Coleman* case. As a result, each revision has resulted in amending memoranda to the field requiring additional workload, changing timelines, and/or new programs.

## 2006
The MHSDS Revised Program Guide includes all amendments and represents up-to-date policies and procedures for compliance with the *Coleman* Court orders, and to provide the necessary levels of mental health care statewide. Implementing the MHSDS Revised Program Guide is an integral part of the strategy to exit the *Coleman* case and to reduce costs related to this litigation.

During the summer of 2006, SB 518 was Chaptered, mandating that the CDCR execute and complete a workload study of the staffing requirements necessary to deliver the level of care outlined in the MHSDS Revised Program Guide, of which the findings and recommendations of this study were to be included in the FY 2007/08 budget.

## 2007
The Mental Health Staffing Workload Study was completed in June, 2007. Due to the complexities and significance of the Study, the DCHCS was unable to provide appropriate Executive level resources to analyze and approve the findings until December, 2007.

## C.    STATE LEVEL CONSIDERATIONS

The CDCR acknowledges, in its legislatively approved Strategic Plan, that it is morally and constitutionally obligated to provide health care services to incarcerated offenders. The plan notes that a fundamental level of health care is necessary for incarcerated individuals' successful return and integration into the community and concedes that radical changes are necessary in the Department's health care systems to ensure efficient delivery of quality, cost-effective health care services.

As noted in the *Coleman* Special Master's January 2006 report:

*"Coleman will not be ended until the defendants can demonstrate an ability to provide meaningful mental health care.... The defendants' recent history of*

DEFS014448

California Department of Corrections and Rehabilitation
Finance Letter
Fiscal Year 2008/09
Mental Health Staffing–Workload Study

*developing erratic plans or plans they are unable subsequently to implement suggests the present need for something more than just another requirement for the generation of yet more plans."*

Standardizing the delivery of mental health care is an essential, critical step to managing the inmate and parolee population and providing necessary mental health care in a safe, efficient, and cost effective manner. By providing the resources required to comply with the pending federal Court order and the mandated policies and procedures essential to providing constitutionally adequate mental health care, CDCR will take an important step toward self-directed management of the Mental Health Service Delivery System.

## D.    FACILITY/CAPITAL OUTLAY CONSIDERATIONS

A space study is currently underway to determine the space needs of the Mental Health, Dental, and Medical programs as well as other programs in the institutions. CDCR intends to continue to work closely with the Health Care Receiver's Office to ensure facility space planning for all facility health care needs are coordinated and therefore not duplicated. Therefore, a future space request is anticipated.

## E.    JUSTIFICATION

This Finance Letter addresses the necessary MHP field staffing for compliance with the *Coleman* Court orders, and the staffing in the institutions required to fully implement the MHSDS Revised Program Guide in conjunction with the staffing levels as described in the Mental Health Staffing Workload Study.

The CDCR is, therefore, requesting field positions to manage the increased workload relating to implementing and monitoring the MHSDS Revised Program Guide. The staffing levels requested in this Finance Letter will provide compliance with Court mandates and assist in extricating the state from federal judicial oversight.

After thirteen years of implementing the Court's orders and mandated services; the implementation of the MHSDS Revised Program Guide; and the development of and concurrence with, the Mental Health Staffing Workload Study; the DCHCS has determined that current resources are insufficient to comply with the required levels of care for mentally ill inmates. Partial implementation of the MHSDS Revised Program Guide suggests a tolerance for insufficient treatment of mentally ill inmates—undiscovered, undiagnosed, and untreated; while being subjected to conditions that aggravate conditions/illnesses. Due to limited resources, mentally-ill inmate patients, who are receiving treatment suffer needless extended and medically harmful delays accessing necessary psychiatric care.

To continue a MHSDS, which is understaffed, significantly overworked, and lacks a quality assurance program, places inmates and inmate-patients at a high risk, and the State, CDCR, and key decision-makers in danger of being found in contempt of court.

DEFS014449

California Department of Corrections and Rehabilitation
Finance Letter
Fiscal Year 2008/09
Mental Health Staffing–Workload Study

Standardizing the mental health care in accordance with generally accepted medical practice, the National Commission on Correctional Health Care, community standards, and the law is consistent with the CDCR's Strategic Plan and DCHCS's Goals and initiatives to manage the inmate and parolee population in a safe, efficient, and cost effective manner.

To date, the State of California has spent in excess of $30 million on monitoring and attorney fees in the *Coleman* case. To continue current operations without making adequate provisions for compliance with the Court's mandates and Mental Health professional standards, will leave the State in jeopardy of further litigation and expenses associated with Court imposed remedies that may be avoided by implementing the proposed improvements.

## F.    OUTCOMES AND ACCOUNTABILITY

The *Coleman* Court continues to monitor compliance with their requirements, and it is the Department's goal to demonstrate the ability to plan for and to provide meaningful mental health care, and to effect an exit from this case by implementation of the MHSDS Revised Program Guide, and activating the staffing levels detailed in the Mental Health Staffing Workload Study.

## G.    ANALYSIS OF ALL FEASIBLE ALTERNATIVES

**Alternative A:**  Fully implement the MHSDS Revised Program Guide with the addition of Field Operations staff designated in the Mental Health Staffing Workload Study.
- Establish 407.7 permanent field positions.
- The initial implementation of these positions will be funded using available salary savings .
- The DCHCS will monitor the activation of these positions, and will develop and present a request to the department's Budget Office for an augmentation to fund the ongoing costs associated with this request.

**Pros:**    This alternative would provide compliance with policies and procedures contained in the 2006 MHSDS Revised Program Guide, which were negotiated with all parties in the *Coleman* court case. This is the most likely alternative to lead to final exit of the *Coleman* case and reduction of legal costs associated with this case. This alternative is consistent with the mission of CDCR "to take responsibility and accountability for the rehabilitation of offenders" and to "provide training, counseling, and support" services.

**Cons:**    Alternative A will require a future augmentation to the department's budget when the temporary salary savings are exhausted.

**Alternative B:**  Do not implement the requirements of the revised MHSDS Program Guide.

DEFS014450

**California Department of Corrections and Rehabilitation**
**Finance Letter**
**Fiscal Year 2008/09**
**Mental Health Staffing–Workload Study**

**Pros:**    Requires no funding.

**Cons:**    Failure to provide constitutionally adequate mental health treatment may harm inmates and is a violation of inmate's rights under the Eighth and Fourteenth Amendments of the United States Constitution prohibiting cruel and unusual punishment. Failure to implement the MHSDS Revised Program Guide with necessary staffing and equipment allocations will lead to increased litigation costs. This alternative is not consistent with the CDCR's mission.

## H. RECOMMENDATION

The CDCR mission "to take responsibility and accountability for the rehabilitation of offenders" and to "provide training, counseling, and support" services is consistent with the revisions in the MHSDS Program Guide. The best strategy to exit the *Coleman* Court case is to fully implement the revised MHSDS Program Guide. It is therefore recommended that **Alternative A** be implemented beginning July 1, 2008.

The cost for the 407.7 positions is $30.5 million annually. In FY 2008/09, salary savings from currently authorized vacant positions will be used to offset these costs, resulting in no funding for these positions being required for Budget Year. By July, 2009, it is projected that all existing salary savings will be exhausted and a subsequent BCP will be submitted for FY 2009/10 costs of up to $30.5m.

The statewide Mental Health Programs vacancies are at 625. Recruitment activities are being conducted for these positions, and an expedited hiring process is in place for most classifications. Estimating that the Mental Health Programs will fill 10 percent (62 positions) of the vacancies each month will generate quantifiable cost savings through June, 2009.

The Mental Health Program will develop a comprehensive hiring plan based on the Mental Health Staffing Workload Study, vacancies and staffing complements by institutions, and submit to the Department and the Department of Finance.

## Attachments
1 - 3/2/06 *Coleman* Court order
2 - SB 1134
3 - Workload Staffing Analysis
4 – MHP Classification Vacancy Summary
Revised MHSDS Program Guide (on CD)
Mental Health Workload Study (on CD)

DEFS014451

# EXHIBIT

# P

## Sofia Millham

| | |
|---|---|
| **From:** | Sofia Millham |
| **Sent:** | Monday, July 14, 2008 5:28 PM |
| **To:** | Sofia Millham |
| **Subject:** | FW: Workload Study Letter |
| **Attachments:** | Workload Study Letter.pdf |

**From:** Walsh, Kerry F. [mailto:KWalsh@pld-law.com]
**Sent:** Saturday, July 12, 2008 11:31 AM
**To:** robin.dezember@cdcr.ca.gov; Lisa Tillman; michael.stone@cdcr.ca.gov; Michael W. Bien; Donald Specter; Jane E. Kahn; Amy Whelan; Ivan Trujillo; Brenda.Epperly-Ellis@cdcr.ca.gov; Riegel, Sharon
**Cc:** Matt Lopes; Jones, Mohamedu; Buffardi, Linda E.; jeffrey.metzner@ucdenver.edu; Ted Ruggles, PhD; Haunani Henry; Mary-Joy Spencer
**Subject:** Workload Study Letter

To all:

Attached please find a letter from Special Master Lopes regarding the Mental Health Staffing Workload Study.  Thank you.



*Kerry F. Walsh, Esq.*

**317 IRON HORSE WAY, SUITE 301**
**PROVIDENCE, RI 02908**

**T:** 401-824-5118  **F:** 401-824-5123
**www.PLDLAW.com**

This email is intended solely for the use of the individual to whom it is addressed and may contain information that is privileged, confidential or otherwise exempt from disclosure under applicable law.  If the reader of this email is not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited.  If you have received this communication in error, please immediately notify us by telephone and return the original message to us at the listed email address.

To insure compliance with Treasury Regulations (31 CFR Part 10, §10.35), we inform you that any tax advice contained in this correspondence was not intended or written by us to be used, and can not be used by you or anyone else, for the purpose of avoiding penalties imposed by the Internal Revenue Code. If you desire a formal opinion on a particular tax matter for the purpose of avoiding the imposition of any penalties, we will discuss the further Treasury requirements that must be met and whether it is possible to meet those requirements under the circumstances, as well as the anticipated time and additional fees involved.



PANNONE
LOPES &
DEVEREAUXⁱⁱᶜ

July 12, 2008

Robin Dezember
Chief Deputy Secretary
Division of Correctional Health
Care Services
501 J Street, Suite 530
Sacramento, CA 95814-0001

Lisa A. Tillman, Esquire
Deputy Attorney General
Office of the Attorney General
1300 I Street
P.O. Box 944255
Sacramento, CA 95814

RE:    Workload Study

Dear Robin and Lisa:

I have reviewed the workload-based staffing model for which the California
Department of Corrections and Rehabilitation (CDCR) is currently seeking legislative
approval. This letter is a summary of how the staffing model would be implemented. At
the outset, I would like to state that Business Advantage Consulting and Phase 2
Consulting (consultants) produced a thorough and detailed analysis of the mental health
staffing needs. However, given the dynamic nature of mental health care within CDCR
institutions and the resulting ongoing evolution of staffing needs, it is important to keep
in mind that, of necessity, a meaningful Workload Study must be a work in progress.
With that in mind, certain issues should be addressed in order to avoid any
underestimation of actual staffing needs. This letter details my concerns and
recommendations in that regard.

Background:

Beginning in 2002 and continuing for approximately the next four years, the
parties to the Coleman case were engaged in negotiating the content of an updated set of
standards for mental health care in CDCR institutions that were later collectively given
the more formal title of the Coleman Revised Program Guide.[1] It was within that context
in 2004 that the CDCR undertook a field study to determine the levels of staffing
necessary to implement the Program Guide revisions. In response to that study, the
CDCR submitted a Budget Change Proposal (BCP) that provided input on staffing needs
to the Department of Finance (DOF) in the May 2005 revise process for the fiscal year
(FY) 2005-06 budget. In it, CDCR sought $4.1 million for 51.25 mental health positions
to implement the revised Program Guide in the administrative segregation and secure

---

[1] The Coleman court entered an order dated March 2, 2006 approving the undisputed provisions of the
January 2006 Revised Program Guide and ordering defendants to implement them immediately.

housing units at California State Prison, Corcoran (CSP/Corcoran). In addition, the BCP provided for the allocation of 822.1 permanent mental health staff field positions and 21.2 limited term field positions to implement the revised Program Guide system-wide.

This 2005 BCP offered four strategies for the allocation of the recommended staffing. The first proposal called for the allocation of all the required positions in FY 2005-06 and the second proposal would spread the allocations over a two-year period. The third proposal would allocate just the staffing required to implement the revised Program Guide in the administrative segregation and segregated housing units at CSP/Corcoran. The fourth proposal would allocate no resources to implement the revised Program Guide.

The DOF approved only the staffing required to implement the revised Program Guide in the administrative segregation and segregated housing units at CSP/Corcoran which was specifically mandated by the Court. No explanation was offered as to why pending Program Guide revisions were not taken into consideration.

In the following year (FY 2006-07), the CDCR reduced by 40 percent its proposal for mental health staffing to implement the revised Program Guide. The CDCR justified this new request for staffing by highlighting areas already troubled by inadequate services and subject to the Court's scrutiny and remedial orders. The DOF allocated two percent of the staffing requested by the CDCR for administrative segregation and reduced by one-third CDCR's already reduced request for staffing to implement the revised Program Guide. The DOF promised to fund a workload study to corroborate and ensure appropriate staffing levels.

During a status conference held on May 19, 2006 to address the short list of unresolved issues with the revised Program Guide, the Court was informed that the DOF had rejected some portion of CDCR's request for mental health staffing necessary to implement the revised Program Guide. On May 25, 2006 the Court directed then Coleman Special Master J. Michael Keating to submit a report on the status and sufficiency of the defendants' budget requests for the staffing. On July 28, 2006, Special Master Keating filed his report, and on that same day the Court issued an amended order, paragraph two of which states:

> "Defendants shall prepare and present to the special session of the Legislature, scheduled to occur in August 2006, a budget proposal for the allocation of no less that 530.65 permanent and 21.2 limited term positions recommended by the Department of Finance's Unit Review in 2005, together with an allocation of sufficient funding to execute and complete a workload study in time to include its findings and recommendations in the FY 2007/08 budget. The 530.65 permanent positions should be in addition to the 208 permanent positions already allocated to implement the revised Program Guide."

In response to that order, Senate Bill 1134 was introduced to make appropriations for the 551.8 positions necessary to implement the revised Program Guide, and for $750,000 to conduct an extensive workload study to be incorporated into the budget process for the 2007-08 fiscal year. The legislation also mandated that the CDCR complete the workload study and submit it to the California State Legislature (Legislature) no later than April 1, 2007. Senate Bill 1134 was approved by the Governor on September 27, 2006 and Chaptered by the Secretary of State on September 27, 2006.

Workload Study Project:

CDCR engaged the consultants to conduct a statewide mental health staffing workload study. The project was completed in approximately six months. The project team held its first meeting in January 2007 and transmitted a request for information to headquarters. The information obtained by the project team was used to form "key assumptions" to develop the model. Some of this information included Program Guide requirements, the percentage of Mental Health Delivery Services System (MHSDS) inmates taking medication, staff assigned to particular tasks, the frequency of tasks, and the number of inmates per group.

The project team then sent data requests to identified mental health contacts at each institution requesting specific information or reports in the areas of:

- licensed clinician staffing patterns
- support personnel staffing patterns
- organizational/reporting structure
- duty statements
- local operating procedures
- budget financial statements
- management reports (e.g. dashboard or performance measurements)
- mental health activity volumes

After analyzing the data, the project team visited specific institutions designated as "calibration sites" to assess the structure and program deployment at those facilities. Four institutions were visited (Salinas Valley State Prison, California Medical Facility, California State Prison at Sacramento, and California Institution for Men) and the following programs were examined:

- reception center
- security levels I – IV
- DMH licensed inpatient psychiatric care
- 3CMS and EOP level of care in general population and administrative segregation
- mental health crisis beds (MHCB)
- psychiatric services unit (PSU)
- sensitive needs yard (SNY) designation

The project teams that visited these calibration sites were typically comprised of two licensed clinicians and up to five core project team members. The site visits lasted approximately four to five hours per institution and were all concluded during the week of January 22, 2007. The project team collected additional data from the institutions and Division of Correctional Health Care Services (DCHCS) headquarters throughout the month of February.

With this data, the project team began to develop the "activity grids" which provided the method for representing the actual clinical time required, by position, to perform the required services or "tasks" mandated by the revised Program Guide. The estimates of the time required for each task were not derived from actual observations or measurements, but were developed by the consultants and CDCR health care administrative staff prior to the site visits. These estimates were then refined through the site visits by interviewing field staff. By multiplying the number of minutes necessary to perform each task by the number of times the task is supposed to be performed over the course of a year using the Program Guide minimum requirements, the project team arrived at the total amount of time that each task required by position or classification.

The project team then visited twenty five institutions designated as validation sites during the time period of March 5, 2007 through March 27, 2007. These validation site visits lasted approximately three to four hours and involved the institution's participating staff. These visits were used to attempt to validate or correct assumptions about workload estimates, review the space and equipment issues, and refine the activity grids.

On April 2, 2007 the project team sent the reports generated from the collected data to the Chief of Mental Health or designee at each institution. Throughout the month of April and into May 2007, the project team continued to assess the collected data and catalogue the information. From April 3rd though April 12th, key DCHCS headquarters staff were interviewed. From those interviews twenty five persons were asked to participate in confidential discussions. By April 13, 2007 the mental health staffing model was completed in draft form. A "milestone meeting" with mental health leadership, Division of Adult Institutions (DAI) representatives, nursing, and health care licensing staff was held on April 13th and generated additional feedback. A working session was held in early May with mental health clinicians.

The Mental Health Staffing Workload Study (Workload Study or Study) was completed and presented to the CDCR in June of 2007. The DCHCS did not approve these findings until December 2007.

<u>2008-09 Budget</u>:

On April 1, 2008, Vincent Brown, Chief Deputy Director of the DOF, submitted a Finance Letter to the Senate Budget and Fiscal Review Committee. It contained a request for 407.7 new positions in FY 2008-09 that were recommended by the Workload Study and intended for compliance with the court order dated March 2, 2006. It is my understanding, based on representations made by representatives of the DCHCS, that this funding request has stalled in the Legislature. According to these DCHCS

representatives, the two concerns raised by both chambers of the Legislature are the validity of the Study and that 500 positions already authorized within the CDCR are still vacant and therefore more positions should not be approved. DCHCS staff has informed me that CDCR has stated to the Legislature that the Workload Study model should be approved this year for three reasons. First, CDCR may fill all of the vacant positions before the next budget cycle. Second, the Workload Study model provides better distinction for the classifications actually needed. Third, the CDCR wants to replace the current Prevalence Mix method of staffing because the Prevalence Mix method generates the number of necessary staff based only on the population numbers and this could cause the CDCR to lose positions.

DCHCS representatives have informed my staff that if the Workload Study model is approved, the CDCR would be required by the DOF to run the model twice every year, in the Spring and Fall, to account for any changes in programming or population changes. The new data would be entered into the model and an up to date staffing number would be generated and presented to the Legislature for the appropriate action. Although the consultants' report also addressed the staffing at DCHCS headquarters and custody staffing at all institutions, the experts' analysis of the Workload Study focused on clinical staffing positions.

Special Master's Review:

Copies of the Workload Study were provided to me in early February 2008. However, disk number 2 that was provided by CDCR was unable to be accessed and a new disk was provided. Although the Workload Study provided recommendations for headquarters and support staffing, my experts and monitors (experts) focused their evaluation solely on the mental health clinical staffing. The consultants reported that DAI was conducting a custody staffing study, and they recommended using the same methodology for custody as they had used for the mental health Workload Study to arrive at the custody staffing recommendations. While data concerning the functions of Correctional Counselor I positions appeared in the Workload Study matrix, the Study itself did not examine custody staffing, nor was custody staffing evaluated by my experts.

The voluminous information contained on the three compact disks was reviewed by the experts. The experts immediately began to question certain information within the Study. Although the Study was very comprehensive, it became clear to the experts that the answers they sought could not be found within the pages of the Study.

Meetings with Consultants:

Given the breadth of the information contained in the Study, the complexity of the methodology used by the consultants, and the unanswered questions, the experts determined that a face to face meeting with the consultants would be beneficial to a better understanding of the Workload Study.

The first meeting with my experts was held on April 24, 2008[2]. The consultants were represented by Todd Wilcox, M.D., Betsy Figueiro-Steinbrueck, and Tiffany Rolston. The consultants provided a general overview of how the staffing model was designed. The experts attended subsequent meetings on May 13th and May 23rd [3]. A final meeting was held on June 5th with Jennifer Johnson, CDCR Associate Health Program Advisor, Suzanne Streeter, CDCR Staff Services Manager and Sharon Riegel, CDCR Health Program Specialist I, who demonstrated to the experts how the new staffing spreadsheet worked.

Productive Minutes:

The productive minutes are intended to represent the actual amount of time necessary to perform a task required by the Program Guide (i.e. direct patient care or clinical process). During the course of the meetings it became clear to the experts that some of the data which was used to drive the staffing numbers was unreliable and not based on objective measures. It was determined that the minute values that were assigned to each task were estimates originally provided by DCHCS administrative staff or developed by the consultants and then refined during the site visits. The "validation" of these values was accomplished through interviews with institutional staff to determine whether the values made sense. There was no direct observation of any task or any actual measurement of a task used to arrive at a reasonable representation of the time required to perform each task. Comments by CDCR staff, located in the frequently asked questions section of the Workload Study, indicated that they also had doubts about the accuracy of the estimates for some of the tasks. The consultants openly acknowledged that the time frame imposed by CDCR for the completion of the Workload Study restricted their ability to conduct a more in depth approach.

The tables and comments below provide a sample of the issues and questions regarding the assigned values of productive minutes which have been raised by the experts:

Task: 3CMS Clinical Intake Assessment (case manager duties)

| Sub Task | Minutes Value Assigned |
|---|---|
| UHR Review | 15 minutes |
| Face-to-Face Evaluation | 25 minutes |
| Institutional Staff Interview | 6 minutes |
| Review Previous Mental Health Records | 2 minutes |

---

[2] In attendance at this meeting were Dr. Jeffrey Metzner, Dr. Ted Ruggles, Ms. Haunani Henry, and Mr. Kerry F. Walsh (via telephone). My attendance at that meeting was very brief as I also had to attend another meeting.
[3] In attendance at this meeting were Dr. Jeffrey Metzner, Dr. Ted Ruggles, Ms. Haunani Henry, Mr. Mohamedu F. Jones, and Mr. Kerry F. Walsh (via telephone).

| Multiaxial Diagnosis | 5 minutes |
|---|---|
| Progress Note | 5 minutes |

Commentary:

- It is not clear whether time is allotted for filling out the CDCR form which summarizes the evaluation.

- The time allotted for "Institutional Staff Interview" does not appear sufficient to determine adaptive functioning and no time is allocated for additional observation, cell side visits, etc.

- There is no time allocated for Central File Review (required by the Program Guide).

Task: 3CMS  Individual Therapy (90-day case management contact)

| Sub Task | Minutes Value Assigned |
|---|---|
| 90-Day Contact, Orientation and Supportive Counseling | 30.6 minutes/90-day cycle |
| Progress Note | 7.2 minutes/90-day cycle |

Commentary:

- There is no provision for case management contact at intervals of less than 90 days.

Task: 3CMS Medication Evaluation and Management

| Sub Task | Minutes Value Assigned |
|---|---|
| Psychiatrist Face-to-Face for Re-evaluation | 25.2 minutes/90-day cycle |
| Psychiatrist Responding to Medication Requests (probably self referrals regarding medication issues) | 6.3 minutes/patient per 90-day cycle |
| Psychiatrist's Progress Note | 6.3 minutes/90-day cycle |
| LPT Medication Preparation | 2.5 minutes/patient per day |

| LPT Medication Administration | 2.0 minutes/patient per day |

Commentary:

- There does not appear to be time allocated for the psychiatrist to review the UHR.

### Task: EOP Intake Assessment

| Sub Task | Minutes Value Assigned |
| --- | --- |
| UHR Review (by case manager) | 15 minutes |
| Face-to-Face Interview | 25 minutes |
| Interview with Institutional Staff | 6 minutes |
| Multiaxial diagnosis | 5 minutes |
| Progress Note | 10 minutes |

Commentary:

- The time allocated for an EOP intake assessment is the same as that allowed for 3CMS intake assessment. This appears unrealistic in view of the fact that prospective EOP inmates have much more complex presentations.

- There is no provision for Central File Review (required by the Program Guide).

- There is a severe restriction on the time allocated for collection of collateral information. This limitation, in combination with the absence of any provision for observation or cell side visits, limits the extent to which important adaptive information could be incorporated into the evaluation.

- It is not clear whether there is an allocation of time required to complete the Mental Health Intake evaluation form (which incorporates information regarding history, etc.).

The activity grids do not factor in visits by a case manager for any emergencies that might arise. Again, some required tasks were simply omitted (e.g. Central File Reviews). The frequency of a particular task was based on minimal Program Guide requirements. One illustration of this problem is found in the frequency of case manager visits for 3CMS inmates. The Program Guide requires that a 3CMS inmate have contact with a case manager at a *minimum* of every ninety days. The Program Guide itself assumes that visits will take place more frequently than once every ninety days if more frequent visits are clinically indicated. The Program Guide at p. 12-3-14 states "[f]ace to

face individual contacts between the CCM[4] and the 3CMS inmate-patients in a general population setting shall occur as often as clinical needs dictate but at least once every 90 days."

Indirect Time:

The "indirect time" factor was included to reflect time that could not be attributed to direct clinical time with inmates or requirements not specifically documented in the Program Guide, but that were necessarily part of the workday. This indirect time factor is reflected as a percentage and is added to the base total FTE hours (2,080) per year. The consultants arrived at this percentage based on interviews and observations at the prisons as well as discussions with DCHCS representatives. The Workload Study allocated an indirect time factor of 23 percent for licensed clinical positions. Other than the following lists of indirect time classifications, there does not appear to be any empirical evidence of how the allocation of 23 percent was calculated:

- vacation hours
- sick hours
- holidays
- bereavement
- in-service training time
- required meetings
- continuing education

 In addition to those factors listed above, indirect time factors may also include the following:

- administrative activities
- training
- quality and professional activities
- other court mandates (e.g. Vitek hearings, Clark evaluations, Keyhea activities)
- other reports (e.g. Board of Prison Term)
- forensic reports (e.g. Mentally Disordered Offenders, Board of Parole Hearing)

Program Guide and Court Ordered Plans:

The Workload Study is a point-in-time study which was based on Program Guide requirements as of January 2007. The Study did not take into account any additional workload requirements for mental health clinicians resulting from contemplated revisions to the Program Guide subsequent to January 2007. These unaccounted for tasks include, but are not limited to, the following:

---

[4] Clinical case manager

- mental health assessment for indecent exposure

- production of MHTS inmate profile which tracks suicide history

The Study also did not include any additional workload requirements for mental health clinicians resulting from portions of court-ordered plans that have been approved. These unaccounted for tasks include the following:

| Program Impacted | Requirement |
|---|---|
| Development of Administrative Segregation Unit (ASU) EOP | Institutions with an EOP HUB should charter a weekly QIT to ensure that out of cell and treatment within the ASU EOP programs is maintained. |
| Reception Center EOP | EOP inmates within Reception Centers are to be seen weekly by case managers. |
| Reception Center EOP | RC EOP inmates with release dates within 60 – 120 days will be identified and a treatment plan will be written to incorporate individualized re-entry needs. |
| Redevelopment of 3CMS RVR | Note that this project is currently a "pilot." If the pilot procedures are adopted for wider use, the workload impact should be evaluated. |

Key Assumptions:

Key assumptions represent data extracted from the Program Guide and on site interviews, or that are based on factors such as percentages of time allocated to clinical positions to perform tasks, percentage of inmates requiring activities of daily living (ADLs), weekly group hours and other assumptions for each level of care. The genesis of the key assumption values were reportedly provided through the mental health tracking system, interviews with administrative staff, and discussions with site clinicians.

One assumption that was immediately questioned by the experts regarded the percentage of 3CMS inmates who were taking medication. The value that was assigned for that assumption was 30 percent. This value was clearly incorrect. A survey of four institutions by the experts more accurately reflected the percentage of 3CMS inmates on medication was roughly 80 percent. At the demonstration of the staffing model provided by the CDCR on June 5th, the 30 percent value of 3CMS inmates on medication was replaced with a hypothetical value of 85 percent for one institution and this resulted in an increase by eleven staffing positions *for that institution alone*.

There are also instances of tasks being re-assigned to different positions based on assumptions that need to be more closely examined to ensure that the proper care is being provided despite the financial benefits of these re-assignments. While some of the re-

assignments may lead to an overestimate of necessary positions, this may also have the unintended effect of underestimating other positions.

There were other assumptions questioned by the experts for which answers were not provided. The following questions regarding these assumptions were submitted to the consultants by the experts. The questions were derived from information contained on the standard assumption chart provided by the consultants.

- Is it correct to assume that "discharge % to other CDCR programs" refers to the percentage of various populations that discharge to "other" CDCR programs? If this is correct, what are the other programs?

- Is it truly accurate that there is no difference between the percentage of EOP inmates and the percentage of 3CMS inmates who discharge to other CDCR programs?

- The chart indicates that one percent of 3CMS and one percent of EOP inmates discharge to DMH. Intuitively, the percentage for EOP inmates would seem to be higher. What is the basis for these percentages?

- The chart indicates that five percent of the total MHCB inmate stay is spent in restraints and that the average time spent in restraints is ten hours. What is the basis for these numbers, since both appear to be excessive?

- The chart indicates that 34 percent of MHCB inmates require psychometric testing. Based upon the experience of the experts, this appears to be a very high percentage, since psychometric testing seldom occurs in the MHCB programs or elsewhere. What is the basis for this percentage?

The answers to these questions have not been provided. It was indicated that further research needed to be completed in order to provide the answers.

In response to the experts' questions regarding the origin of certain key assumptions, the consultants reported that many of the values for these assumptions were established by a subcontractor in Salt Lake City, Utah who has gone out of business. And the individuals responsible for the establishment of these values are very difficult or impossible to contact.

Recommendations:

The Excel-based spreadsheet that comprises the staffing matrix produced by the Workload Study appears to be completely functional and adaptable to any changes within the MHSDS. This spreadsheet is a working model that can be expanded and adjusted for any changes in staffing, population, and programming within the MHSDS. The staffing matrix is data driven and any new data that is input into the spreadsheet produces immediate staffing changes. This Excel-based spreadsheet appears to function in a manner that allows the CDCR to arrive at accurate projections for staffing needs. However, the Workload Study simply did not go far enough and is incomplete for the reasons that I have stated above.

The following recommendations are offered to address the concerns regarding the ultimate implementation of the workload based staffing model:

- Given the errors which have been discovered and the uncertainty regarding the origin of many assigned values, the key assumptions should be thoroughly reviewed. If it is not possible to determine whether these values are objectively based, an effort should be made to verify their accuracy.

- CDCR should review the clinical activities that are performed by mental health staff and develop activity grids that include all tasks typically assigned to mental health staff and not just those tasks required by the Program Guide. Tasks required in meeting recent Program Guide revisions and court orders should also be included.

- CDCR should review all of the modules to insure that all identified subtasks (e.g. Central File Review) are consistent with Program Guide requirements.

- CDCR should validate the "minutes" values.

- The development of the Program Guide is an ongoing process which will demand that staffing needs be addressed and adjusted on a regular basis. CDCR should conduct reviews of the staffing needs twice a year utilizing the Excel-based spreadsheet, and <u>Coleman</u> experts should be involved in this process.

The completion of these measures will go a long way to ensure that the staffing recommendations generated by the Workload Study are based on data that has been both objectively determined and validated.

If you have any questions or concerns, please do not hesitate to contact me.

Sincerely,

Matthew A. Lopes, Jr.

cc:    Michael Stone, Esq.
       Michael Bien, Esq.
       Donald Specter, Esq.
       Jane Kahn, Esq.
       Amy Whelan, Esq.
       Ivan Trujillo, Esq.
       Brenda Epperly-Ellis
       Sharon Riegel

# EXHIBIT

# Q

## Sofia Millham

| | |
|---|---|
| **From:** | Lisa Tillman [Lisa.Tillman@doj.ca.gov] |
| **Sent:** | Wednesday, July 16, 2008 4:47 PM |
| **To:** | Matt Lopes |
| **Cc:** | Kerry Courtney Hughes, MD; Dennis F. Koson, MD; Patricia M. Williams; Haunani Henry; Mary Perrien; Melissa G. Warren, MD; hammujones@comcast.net; Henry D. Dlugacz; Raymond F. Patterson, MD; Kathryn Burns, MD, MPH; Angela P. Shannon; Ted Ruggles, PhD; Paul Nicoll; fdovale@pld-law.com; Kerry Walsh; LBuffardi@pld-law.com; Mary-Joy Spencer; Donald Specter; itrujillo@prisonlaw.com.; Amy Whelan; Jane E. Kahn; Lori E. Rifkin; Michael W. Bien; Sarah M. Laubach; Jeff Metzner; Yong Joo Erwin; Ron Metz |
| **Subject:** | Plan in Response to 10/07 Order |
| **Attachments:** | Final Response to Special Master - July 2008.pdf |

July 16, 2008

Re: *Coleman v. Schwarzenegger*

Dear Special Master Lopes:

In accord with the Coleman court's order of October 2007, please find attached Defendants' further plan to provide mental health care beds.

To the extent this plan amends the August 2007 bed plan, Defendants respectfully state their intention to seek the stipulation of Plaintiffs' counsel to that amendment by August 18, 2008.

Sincerely,

Lisa Tillman
Deputy Attorney General
Office of the Attorney General
Telephone: 916-327-7872
Facsimile: 916-324-5205

**CONFIDENTIALITY NOTICE:** This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

**FOR SUBMISSION TO THE *COLEMAN* SPECIAL MASTER**
*California Department of Corrections and Rehabilitation's*
*Mental Health Bed Plan*
**July 16, 2008**

## I.    Overview

### A.    Background

On December 19, 2006, the California Department of Corrections and Rehabilitation (CDCR) submitted to the *Coleman* Court the Mental Health Bed Plan – December 2006, which was a plan to meet through construction and reorganization, the treatment and office space, outpatient housing and inpatient bed needs for the projected mental health inmate-patient population.  In reply to the Special Master's response to that plan, in August 2007, CDCR submitted a supplemental bed plan that included more detail regarding the CDCR's plan to assume responsibility for treating inmate-patients in acute and intermediate care (inpatient) settings.  By order on October 17, 2007, the *Coleman* Court approved the Special Master's report and approved the August 2007 Supplemental Bed Plan with the requirement for further planning on the issues identified below.

Since the August 2007 Supplemental Bed Plan was approved, the CDCR, the Department of Mental Health (DMH), the *Coleman* Special Master and the *Plata* Medical Receiver (Receiver) have been working in partnership to implement the plan in conjunction with the Receiver's facility plan.  Intensive collaborative, programmatic and preliminary design planning efforts were commenced and are continuing.  Adjunctive to the collaboration effort, the CDCR has continued to pursue the planning processes, including the Capital Outlay funding process, to implement the "Consolidated Care Centers" as outlined in the Supplemental Bed Plan.

On February 26, 2008, the *Coleman, Plata, Perez* and *Armstrong* courts approved the "construction agreement" for collaborative "construction of approximately 5,000 additional CDCR medical beds and approximately 5,000 CDCR mental heath beds."  The construction agreement provides that the Receiver "will assume leadership responsibility for each of the…projects."  Additionally, the order states, "Given the significant need to coordinate the long-term treatment and care of mentally ill patients who also have serious medical problems, there exist both strong patient care and fiscal incentive to plan, design, and construct health care facilities that will effectuate coordinated medical and mental health treatment.  Therefore participation by *Coleman* representatives in this construction program is imperative."  The CDCR's Mental Health Program of the Division of Correctional Health Care Services, along with the DMH, participates regularly in the planning for these facilities.    This court mandated collaboration has required reconfiguration of the long term mental health bed plan approved by the *Coleman* court on October 17, 2007 in order to conform to the "construction agreement" order and the design and location requirements of these facilities.

Furthermore, in June 2008, CDCR and the DMH reached agreement that the DMH would continue to provide all inpatient acute and intermediate mental health services instead of transferring responsibilities to provide those services to the CDCR. The reconfiguration of the bed plan also incorporates this decision.

Two of the Receiver's new health care facilities will accommodate the DMH inpatient acute and intermediate mental health services. These mental health programs will be operated by the DMH in collaboration with the Receiver's medical, the CDCR mental health and the CDCR/Receiver custody programs. At each facility, these four discreet but interrelated programs are proposed to be under the overall management of a Health Care Chief Executive Officer who will be the controlling administrative authority for each facility's development and operations.

In addition, the projected number and types of beds identified in the December 2006 Mental Health Bed Plan and the August 2007 Supplemental Bed Plan are based on the June 2006 Mental Health Bed Need Study – 2006 Update ("Bed Need Forecast"). The current bed plan and this response identifies projected mental health bed need based on the "Mental Health Bed Need Study – Based on Spring 2008 Population Projections, June 2008," which updates the previous plan.

## B.    Purpose of Report

In addition to updating the long term mental health bed plan, this report responds to the October 17, 2007, *Coleman* Court order, requiring the CDCR to submit to the *Coleman* Special Master the following plans:

- A plan for identifying anticipated clinical and custody staffing needs and a program for providing the personnel required to recruit, vet, hire and retain adequate staffing;

- A plan for the recruitment and compensation of hospital administrators to develop and run California Department of Corrections and Rehabilitation's overall inpatient treatment program and the specific institutional inpatient programs in its consolidated care centers;

- Preparation of a memorandum of understanding (MOU) on California Department of Mental Health's mentoring and direct service obligations under the revised plan for integration in an inter-agency agreement; and

- An analysis justifying the reduction and/or elimination of mental health crisis beds (MHCB) (as recommended) in the revised August 2007 plan in the 29 California Department of Corrections and Rehabilitation institutions that are not scheduled to deliver consolidated care.

- A plan with time frames for meeting and procuring for all CDCR-operated inpatient programs applicable State Licensure and Joint Commission on Accreditation of Healthcare Organizations accreditation.

The numerous proposed modifications to the August 2007 Supplemental Bed Plan, based in a variety of issues, render some of the plans requested above irrelevant or significantly altered.  This document identifies the bases for the originally requested plans as well as the changes that have occurred that drive the revisions.

## C.    Context

There have been four elemental changes since the August 2007 Supplemental Bed Plan:  the construction collaboration order which made formal the coordination of the construction of mental health beds with the Receiver; the consolidation of the acute and intermediate care beds into fewer facilities; the agreement that the DMH continue to manage and provide inpatient acute and intermediate mental health services; and the incorporation of female mental health facilities into the collaboration agreement.  In addition, the coordination agreement provided for the inclusion within the Receiver's facility program, the mental health beds that were contained in the original bed plan (with few exceptions that are described later in this document) and the ability to consider the most appropriate use of beds within existing facilities.

Based on historical evidence of the existence of co-morbidity between mental illness and physical illness, there are strong patient care and fiscal incentives to plan, design and construct health care facilities that will coordinate medical and mental health treatment.  The construction collaboration agreement establishes a significant change to the substance of the mental health bed plan.  Instead of constructing "consolidated care centers" for mental health services only, the bed needs have now become integrated into a series of stand-alone health care facilities, California Health Care Facilities (CHCF), which will provide comprehensive medical and mental health services.  While this integration supports the essential and appropriate relationship of these major health care disciplines and provides substantial economies related to their joint construction and operation, it also requires significant coordination of these elements.

As the planning for mental health services has continued to evolve, strategies for the provision of the highest levels of mental health care, inpatient acute and intermediate have changed significantly from both the December 2006 and August 2007 Bed Plans.  Originally, the consolidated care centers would each have intermediate care as part of the continuum of mental health care provided in each facility.  The current plan is based on the decision that the DMH continue to provide inpatient intermediate and acute mental health services, and allocates space in two of the CHCFs, one in the northern part of the state and one in the south.  All inmate-patient intermediate and acute mental health services will occur in these two new facilities, thereby allowing *Coleman* court ordered state hospital beds to be returned to community use.  These DMH inpatient mental health programs will be operated by the DMH in collaboration with the Receiver's medical, the CDCR mental health and the CDCR/Receiver custody programs.  Furthermore, when both of these CHCFs are operational, there will be no provision of acute or intermediate levels of care outside the CHCFs.

During the evolutionary process, the female mental health bed need was incorporated into the planning of these facilities.  The women's facilities would be co-located with up

to two of the men's facilities, thereby allowing for some shared services and economies of scale. In these settings, the women's facility will share a secure perimeter with the men's facility. The interior of the facility will have gender-separating sight, sound and physical barriers formed from walls naturally occurring from building--housing and treatment--space that would normally be separate even in a single gender facility. It is the task of the architects to develop a design that does this effectively and efficiently.

Construction sites and schedules for the CHCFs are still in development, with anticipation of the first 1500-bed facility targeted to begin construction in January 2009, anticipating completion by January 2011. There are eight sites being considered; land availability, infrastructure capability, environmental concerns, and political climate, among others, drive the ability to select, schedule and begin construction.

The planning for the delivery of mental health services for the CHCFs is based on the Receiver's current construction schedule and is the basis for the current plan and the response to the five issues. Once sites, facility bed configuration and construction schedules are known, a further update and status report can be provided to the Special Master. It is recommended that these status reports key on specific elements that are necessary to provide a full response to the questions: (1) projected dates for completion of each of the CHCFs; (2) the configuration of both the CDCR and the DMH mental health beds that correspond with the final planning and design for these facilities; and (3) the operational plan for the facilities, which will include the governance, administrative and clinical structure and authority of the Receiver, the CDCR and the DMH. The operational plan for the CHCFs will address licensure, the medical staff function, the role of the DMH Governing Body, pharmacy licensing and medication issues, and the overall operating process and procedures. Finally, we expect to conform the entire bed plan documentation to these determinations when they are made, which will culminate in a motion to the court requesting the formal adoption of the changes made from the current approved plan.

## D.    Updates/Changes

In the bed planning process, all essential elements of the August 2007 Supplemental Bed Plan are being upheld using the same methodology for determining the number and type of beds. For their programs, the CDCR will continue to plan and provide for a continuum of care within the CDCR Mental Health Program Guidelines. The CDCR remains responsible for providing the appropriate number of beds, office and treatment space for the required levels of care. However, in collaborating with the *Plata* Receiver, several specifics have changed from the August 2007 bed plan. This section of this document reflects the changes that have occurred that drive these alterations to date. Areas with updates and changes are: facility planning and locations, division of construction activities, delivery of clinical services, and population projections.

| Facility Planning and Locations | | |
|---|---|---|
| **Date** | **Decision/Proposal** | **Impact** |
| August 2007 | Began informal collaboration with the Receiver regarding the design and construction of consolidated care centers. | Staff was dedicated to collaborating with the Receiver while continuing to pursue funding for the consolidated care centers should the collaboration not occur. |
| October 2007 | The original bed plan called for five new facilities of varying size. The Receiver proposed seven facilities with approximately 1500 beds each—750 Medical and 750 Mental Health. | Required a change from the August 2007 Supplemental Bed Plan and plan for a new distribution of beds across undetermined sites. (Compare Attachment A: August 2007 bed chart to Attachment B: June 2008 chart)

Created the need to continue on two planning tracks (the normal Capital Outlay –Budget Change Proposal process and the Receiver's planning track) in order to stay in process for either eventuality. |
| November 2007 | The five sites in the August bed plan were partially inconsistent with the Receiver's seven proposed sites. | Created a conflict with the August 2007 Supplemental Bed Plan which was crafted with specific sites on which to build consolidated care centers. The logic behind the original proposed creation of new beds at specific sites and the proposed decommissioning of mental health beds at other sites (returning them to the institution) was no longer as valid as long as different sites were proposed. |
| | The eight sites currently proposed for consideration are:<ul><li>Northern California Youth Center, Stockton</li><li>California State Prison (CSP) – Sacramento (SAC)</li><li>Deuel Vocational Institution, Tracy</li><li>Ventura Youth Facility</li><li>R. J. Donovan Correctional Facility (RJD)</li><li>California Institution for Men (CIM), Chino</li><li>Nellis/Whittier</li><li>California Medical Facility (CMF)/CSP-Solano</li></ul> | Required reconfiguration of supplemental bed plan beds and a change in the bed plan chart. (Compare Attachment A: August 2007 bed chart to Attachment B: June 2008 chart) |

| | | |
|---|---|---|
| Feb. 2008 | Courts approved the "construction agreement" for collaborative "construction of approximately 5,000 additional CDCR medical beds and approximately 5,000 CDCR mental heath beds." Order gave the Receiver the lead in the construction process. | Gave the Receiver the authority to lead the planning, design and construction projects for health care. Tied the CDCR construction schedules and locations to Receiver's plan. |
| January-June 2008 | Reduced number of sites planned to include Intermediate Care (ICF) beds from five identified in the August 2007 Supplemental Bed Plan to two facilities built by the Receiver's program.<br><br>This change is to provide for all ICF and acute bed need in new facilities to accommodate the DMH's continuing provision of these services. | Required multiple reconfigurations of supplemental bed plan beds and changes in the bed plan chart to reflect changing locations of ICF beds. (Compare Attachment A: August 2007 bed chart to Attachment B: June 2008 chart)<br><br>Creates the ability to provide ICF and acute care in both northern and southern locations. Allows state hospitals to redirect beds to community care and away from inmate care. Allows for institution beds to be returned to institutional use. |
| March 2008 | Included women's beds in Receiver's CHCF projects at two locations. Women's facilities are to be built with sight and sound barriers to share some services and create economies of scale. | A larger number of beds, and therefore larger facilities, are planned for two sites: one in the North and one in the South. Required reconfiguration of bed plan chart. (Compare Attachment A: August 2007 bed chart to Attachment B: June 2008 chart) |
| May 2008 | Redistributed 5 MHCB from Ironwood State Prison to: 1-Pleasant Valley State Prison (1 bed) and Substance Abuse Treatment Facility (4 beds) | Required reconfiguration of MHCB in bed plan chart(Compare Attachment A: August 2007 bed chart to Attachment B: June 2008 chart) |
| June 2008 | Planned decommissioning of existing Enhanced Outpatient Programs (EOP) and Administrative Segregation Units (ASU) at RJD, CSP-Los Angeles County (LAC) and SVSP. | Required reconfiguration of bed plan chart to accommodate changes. |

| | Increased by these numbers of beds the mental health program within the Receiver's CHCF project. | Requires additional transition planning for both staff and inmate-patients. |
|---|---|---|

| Division of Construction Activities | | |
|---|---|---|
| Date | Decision/Proposal | Impact |
| March 2008 | Maintained the following projects by CDCR:<br>• 64-bed ICF at Salinas Valley State Prison (SVSP)/Salinas Valley Psychiatric Program (SVPP)<br>• 64 bed ICF at CMF/Vacaville Psychiatric Program (VPP)<br>• 50 bed MHCB at California Men's Colony (CMC)<br>• 32 bed MHCB at San Quentin State Prison (SQ)<br>• 50 bed MHCB at CMF<br>• 67 EOP beds at CMF | Required update to original bed chart to delineate between Receiver's project and CDCR's projects. (Compare Attachment A: August 2007 bed chart to Attachment B: June 2008 chart) |
| June 2008 | To accommodate agreement whereby the DMH assumes responsibility for the inpatient acute and intermediate mental health services, the CDCR has moved the new and existing ICF beds from CDCR projects (SVSP/SVPP and CMF/VPP) into the CHCF construction projects.<br><br>Maintained the following projects to be constructed by CDCR:<br>• 50 bed MHCB at CMC<br>• 32 bed MHCB at SQ<br>• 67 EOP beds at CMF<br>• (50-bed MHCB at CMF is activated.) | Required update to chart and placement of all ICF bed need into CHCFs. (Compare Attachment A: August 2007 bed chart to Attachment B: June 2008 chart)<br><br>Treatment space must still be built to provide treatment until new facilities are built and activated. |
| June 2008 | Decision to move EOP programs from RJD, LAC, and SVSP into the CHCFs. | Placed more beds into the CHCFs. Allows for these beds to be returned to institutional use and eliminates the requirement for additional treatment and office space at LAC. |

| | | Requires update to bed plan. (Compare Attachment A: August 2007 bed chart to Attachment B: June 2008 chart) |
| --- | --- | --- |

| Delivery of Clinical Services | | |
| --- | --- | --- |
| Date | Decision/Proposal | Impact |
| November 2007 | Interpreted philosophy of behavior-based treatment and placement by replacing the Psychiatric Services Unit (PSU) and ASU with EOP-High and creating an ICF-High instead of using the current classification system | Discussion is ongoing about creating another system by which patients are placed in certain beds. This system will be clinically based and will depend on current behavior. This creates concern among custody staff that relies on the current classification system for placement. It may create the need to staff differently and create new policies and procedures. |
| April 2008 | The Courts ordered a coordination agreement regarding the Chief Executive Officer Pilot program. | This new governance structure is expected to be incorporated into the management structure of the operational plan for the joint facilities.<br><br>Requires modification of Supplemental Bed Plan regarding administrative/management structure. |
| June 2008 | The decision for the DMH to continue to provide inpatient acute and intermediate mental health services to CDCR inmate-patients in the newly constructed health care facilities. | Required modifications to the August 2007 Bed Plan. The modifications are as follows:<br>• Two new CHCFs will accommodate the DMH inpatient acute and intermediate mental health services. These mental health programs will be operated by DMH in collaboration with the Receiver's medical, the CDCR mental health and the CDCR/Receiver's custody programs.<br>• Inmates requiring inpatient acute and intermediate mental health services removed from the DMH *Coleman* court ordered state hospital, VPP and SVPP beds and placed in new facilities.<br>• Requires the addition of beds for inmates identified as PC1370 inmates.<br>• Eliminates mentoring aspect of the August 2007 Supplemental Bed Plan |

| | | |
|---|---|---|
| | | in that DMH will staff and run the inpatient program.<br>• The current inpatient ICF and Acute beds at CMF/VPP and SVSP/SVPP will be put to another use.<br>(Compare Attachment A: August 2007 bed chart to Attachment B: June 2008 chart)<br><br>Additionally an Interagency Agreement between DMH and CDCR is required to clarify and formalize the clinical services agreement. |
| June 2008 | Mental Health Staffing Workload Study Model approved. | The workload study model will provide the mechanism for appropriate clinical staffing of the Correctional Clinical Case Management System (CCCMS), EOP and MHCB levels of mental health care within CDCR. |
| June 2008 | Activated 50-bed MHCB at CMF. | Shown as operational. (See Attachment B: June 2008 Chart.) |

| Population Projections | | |
|---|---|---|
| **Date** | **Decision/Proposal** | **Impact** |
| June 2008 | Mental Health Bed Need Study – Based on Spring 2008 Population Projections was published. | Required creation of bed plans with bed need projections to 2017. Alters new bed need numbers; requires reallocation of beds in Receiver's building program. (Compare August 2007 to June 2008 chart.) |

**E.    Compilation of *Coleman* Court Orders related to the Long-term Mental Health Bed Plan**

The preceding table of changes variously addresses and impacts multiple orders from the *Coleman* Court regarding the creation of mental health beds, treatment space, and office space.  Attachment C of this document maps each *Coleman* court order related to creation of space by date and content; the actual and/or proposed entity with which the responsibility for providing that space lies; and the status of each of the projects emanating from the orders.

## II.    Specific Plans Required by the October 17, 2007 *Coleman* Order

### A.    Identifying Clinical and Custody Staffing Needs and a Program for Providing the Personnel to Recruit, Vet, Hire and Retain Adequate Staffing

**Identifying Staffing Needs**

Historically, the CDCR has had difficulty in obtaining adequate staffing and filling clinical vacancies within its mental health program.  Initially, staffing requirements for each level of care were outlined in the Mental Health Program Guide.  As long as the program guide's original assumptions remained static, the clinician to inmate-patient ratios identified were appropriate.  However, as the mental health program developed and grew, and as the inmate-patient population grew with the prison population, the original assumptions began to change and the appropriateness of staffing levels was thrown into question.

In Fiscal Year 2006-2007, in order to re-establish credible and viable staffing complements, a workload study was commissioned.  The completed study, called the Mental Health Staffing Workload Study – June 2007, identified actual workload and workload drivers and developed a comprehensive compendium of tasks required by level of clinical staff to fully achieve the objectives of the Mental Health Program Guide.  The workload study, which proposed revised program staffing levels, and a corresponding Budget Change Proposal (BCP) requesting additional positions to support the recommendations of the workload study were submitted to the Legislature on April 1, 2008.  In June 2008, the BCP was approved by the Joint Legislative Conference Committee on the Budget.

The Mental Health Staffing Workload Study – June 2007 also created a template from which future CCCMS, EOP and MHCB can be clinically staffed.  The CDCR is using this study and the incorporated staffing formula for planning purposes.  The level and size of treatment program, as well as the type of facility in which the program is housed, dictate the numbers and classifications of clinical and support staff required in order to be consistent with the mental health program guidelines and requirements.  Projected staffing patterns are being determined through the use of the workload study formulas for the EOP and MHCB levels of care.

Under the administrative oversight of the Chief Executive Officer of the CHCF, the DMH will be responsible for operating and providing inpatient acute and intermediate mental health services in collaboration with medical, CDCR mental health and CDCR/Receiver custody programs.  This requires that DMH be responsible for planning for and obtaining appropriate staffing (including Registered Nurses and Medical Technical Assistants – Psychiatric) for the respective levels of care.  It is anticipated that the staffing will be similar to those already established and used by the DMH at SVPP and VPP.

Under the direction of the Receiver's office, comprehensive operational planning for these facilities has begun but has not yet been completed. Upon completion of the Operational Plan, and the establishment of firm construction locations and dates, staffing plans will be produced which include recruitment, hiring and retention planning. Custody staffing patterns for mental health operations are also being determined through joint operational planning with the Receiver.

**Functional Staffing Areas**

The August 2007 Supplemental Bed Plan describes a CDCR headquarters management structure in which a Deputy Director reports to the Statewide Director of Mental Health. The plan further states that the Deputy Director position (which has been established) will administer two functions: 1) the statewide development and oversight of the mental health programs in the joint facilities and 2) the statewide support of these programs. Reporting to the Deputy Director will be mental health program managers of each facility and an Assistant Deputy Director who is responsible for the statewide support function.

As part of administrative and management planning, CDCR and the Receiver have collaborated on a proposed "shared governance" agreement, whereby a health care Chief Executive Officer is to be "responsible for health care delivery systems within one or more specified institutions as a means of ensuring coordinated multi-functional services and interdisciplinary interactions within a prison that are vital to a manage care delivery system." This governance structure is expected to be incorporated into the management structure of the operational plan for the CHCFs. It is anticipated that the "shared governance" agreement will significantly alter the headquarters management structure described in the August 2007 Supplemental Bed Plan. It has yet to be determined how the separate DMH inpatient mental health programs will be integrated into the governance, administrative and management planning of the two CHCFs where the DMH has programs.

Three functional areas of the CDCR mental health program staffing are in development: (1) the headquarters-based team tasked with conceptualizing, planning, designing, developing, and ultimately, providing state-level support for the programs; (2) an Activation Team that works within the operational plan and is charged with establishing the site-specific mental health programs, and becomes the initial program management staff for particular sites and transitions to the site as activation begins; and (3) mental health staff that provide clinical and support services will be recruited, hired and assigned consistent with the joint operational plan.

There is an agreement between the CDCR and the DMH for the DMH to operate the inpatient mental health programs within the CHCFs. The DMH will develop a plan to administer and manage the inpatient acute and intermediate mental health program using and building upon the expertise it has already demonstrated. Discussions that involve joint CDCR and DMH clinical hiring and privileging processes are being planned

and the training syllabi and lesson plans for all DMH staffing needs have been developed.

Both the CDCR and the DMH headquarters management and administrative support will be developed as needed consistent with the evolving plan.

**Clinical Recruitment and Retention**

A major aspect of recruitment and retention planning for the CDCR mental health facility staff is the design of the program and facility for the intended purpose of health care. Clinicians want to work in settings conducive to treatment, they want to have therapeutic contact with patients, and they want clinical interventions to be supported within the residential milieu. The ability to work within an intentionally therapeutic environment will be a valuable tool in assisting with the recruitment and retention of clinicians.

In selecting the sites for the new medical/mental health facilities, the clinical candidate pool in the surrounding geographical area of the facilities is, among other concerns, a primary consideration. A pilot project to incorporate Licensed Marriage and Family Therapists into the staffing complements is currently underway. Statewide implementation of that project would create a larger recruitment pool that will help alleviate mental health clinical staffing shortages.

The CDCR is also considering methods (e.g., hiring a recruitment consultant) to train departmental recruiters and improve recruitment methods within the department. Given therapeutic facilities and programming, sufficient remuneration, and community amenities and support, mental health clinical staff is recruited by using institution-based workshops, recruitment presences at schools, universities and professional conferences in and out of state, advertisements in professional journals and any other methods that can practicably be implemented. Additionally, student and pre-licensure clinical internships and forensic/correctional curricula are under development to create and employ a pool of candidates whose primary interest is in correctional mental health. An increased and accurate web presence along with user friendly application and credentialing processes will contribute to achieving clinical recruitment goals.

The DMH shall continue to recruit using recruitment presence at schools, universities, and professional workshops. Advertisements in professional journals and publications have also helped to increase the DMH recruitment efforts. Student practica, pre-licensed internships and post-doctoral fellowships have been a valuable tool for recruitment. At the VPP and SVPP student and pre-licensure internship programs are used for clinical advancement and as a recruitment method for certain classifications. The VPP has an Accredited American Psychological Association (APA) Internship Program. The VPP and SVPP utilize Nursing Rotation programs for Registered Nurses (RN), Licensed Vocational Nurses (LVN) and Psychiatric Technicians (PT). Both Programs also have internship programs for Social Workers and Rehabilitation Therapists.

**Custody Recruitment and Retention**

Facility planning to date is emphasizing a "direct supervision" philosophy as the primary and overarching custody approach within the CHCFs.  This approach combines line of sight architecture, a manageable and consistent inmate to officer ratio, leadership and communication competency training, and an understanding and embodiment of fairness and justice as fundamental tenets.  The direct supervision philosophy has been shown over time to be cost effective by minimizing construction costs and damage repair costs. It has also been shown to be safe because officers are in positions to be proactive and resolve tension before it escalates into violence.

Discussions are in progress regarding the provision of specialized training for custody staff who work in both the CDCR mental health programs and the DMH inpatient mental health programs.  With these principles at the forefront, custody staff can be recruited both from within CDCR and by using currently established successful recruitment efforts.  However it has yet to be determined how the custody operations will be integrated into the separate DMH Milieu.  More detail is expected to be developed through the joint operational plan.

**Administrative and Support Staff Recruitment and Retention**

The CDCR and the DMH headquarters and mental health administrative and support staff will be recruited from within state civil service and, wherever possible, from open examinations.  The CDCR mental health staff will be hired and credentialed through the currently established processes.  The DMH inpatient mental health services staff will be hired by DMH and credentialed and governed through mutually developed and agreed upon processes.

It is understood that all staff must be well trained to work in these types of facilities.  The August 2007 Supplemental Bed Plan described in some detail the training and mentoring that the DMH was to provide the CDCR staff hired to work at the intermediate and acute health care facilities.  The decision for the DMH, and not the CDCR, to manage and operate the intermediate and acute health care facilities, the training and mentoring of the CDCR staff by the DMH will no longer be required.


 **B.    Recruitment and Compensation of "Hospital Administrators"**
In his September 24, 2007 response to the August 2007 Supplemental Bed Plan, the Special Master identified concerns about the need to find, vet, hire and compensate qualified and experienced hospital administrators to obtain and retain licensing and accreditation for inpatient beds built and operated by the CDCR.  The court then ordered the CDCR to create a plan for the recruitment and compensation of hospital administrators to develop and run the CDCR's inpatient program.  As a result of the new agreement with the DMH there is now a need to create a plan for the recruitment and compensation of the DMH hospital administrators to develop and operate its inpatient mental health programs within the CHCFs.

The August 2007 Supplemental Bed Plan described a management structure with a Deputy Director, who reports to the Statewide Director of Mental Health. Each facility mental health program was proposed to have an Executive Director who would report to the headquarters Deputy Director. This management structure has changed significantly since the CDCR and the Receiver, as part of the administrative and management planning, collaborated on a proposed "shared governance" agreement. The current plan is to have a Chief Executive Officer responsible for the health care delivery in one or more specific institutions.

The Division of Correctional Health Care Services within the CDCR is in the process of creating the classification of Chief of Mental Health. The coordination of reporting responsibilities of this position in the entire context of the new facilities is being researched and is expected to be determined consistent with both the pending operational plan and the new governance structure.

Currently, the DMH employs a Career Executive Assignment (CEA) III as Executive Director and a CEA I as the Assistant Executive Director over both SVPP and VPP. Since the DMH inpatient program will be part of the CHCF facility, the DMH will need to create a plan for recruitment of Hospital Administrators to develop and mange the DMH's inpatient mental health program.

The August 2007 Supplemental Bed Plan required the inclusion of "executive personnel and staff from the CDCR…with expertise necessary to plan, direct, and manage large-scale and complex projects similar in nature to the new facilities." To that end, the CDCR has retained a consultant with decades of local, state and national expertise in the development and delivery of correctional mental health programs to lead the development, activation and delivery of the requirements of the supplemental bed plan.

The primary assumption within this plan is that the overarching concern of the court and the Special Master is that the CDCR have an adequate and appropriate management structure and expertise to successfully develop, implement and deliver mental health services within the approved bed plan concept. The August 2007 Supplemental Bed Plan stated that, "a portion of the (new facility) project team staff will be designated from existing resources, with remaining staff positions to be requested through the annual State budget process." Current efforts to create a division management team include the hiring of the consultant and the redirection of a special projects team, which includes a staff services manager and two analyst staff. This team has begun the fiscal and program planning that lays the ground work for the mental health programs in the new facilities.

**C.     Memorandum of Understanding for California Department of Mental Health's Mentoring and Direct Service Obligations under the Revised Plan for Integration in an Inter-agency Agreement**

Within the August 2007 Supplemental Bed Plan and in response to the concerns noted in the Special Master's report, CDCR included the following:

- The DMH would continue to operate the Acute, ICF and Day Treatment Program (DTP) programs at CMF and SVSP, inclusive of new intermediate care beds to be built at each of these prisons (until such time as the CDCR is determined to be able to provide a DMH standard of care);
- The DMH will, in collaboration with the CDCR, implement the intermediate care program at SAC;
- The DMH will initially operate the intermediate care program at SAC with the CDCR continuing in a training modality, with the understanding that the operation of that program would eventually transfer to the CDCR with the DMH monitoring and, eventually, advisory only;
- The DMH would assume an oversight role in the implementation of the intermediate care beds at the other consolidated care centers and California Institution for Women (CIW); however, at California Institution for Men (CIM), DMH would initially operate the acute beds with eventual transfer to CDCR; and
- The planned acute beds would be consolidated at CIM.

With the recent decision that the DMH provide all inpatient intermediate and acute care mental health services within the new facilities, the current acute, intermediate and day treatment mental health MOUs will no longer apply.  The CDCR and the DMH will develop an interagency agreement and MOUs for the ongoing coordination and collaboration for access of care to the DMH inpatient acute and intermediate programs.

**D.     Analysis Justifying the Reduction and/or Elimination of Mental Health Crisis Beds**

The December 2006 and the August 2007 Bed Plans anticipated the construction of a 50-bed MHCB at CMC and the 50-bed MHCB at CMF.  Spring 2008 population projections (including a reserve) anticipate the need for 410 MHCB statewide by 2017.  The new bed plan (see Attachment B -- June 2008 bed chart) anticipates satisfaction of that bed need in new construction within CHCFs, in maintaining MHCBs disbursed statewide, in the planned construction of the CMC 50-bed facility and in the activation in June 2008 of the CMF facility.

The 50-bed MHCB at CMC was court ordered only in the circumstance that CMC would not become a site for a consolidated care center.  In the August 2007 Supplemental Bed Plan, the current EOP was proposed to be eliminated because a new consolidated care center facility was proposed to be built there.  It now appears that CMC is not going to be a site for a new consolidated care center or CHCF thereby requiring the construction of the 50-bed crisis facility.  The new proposed bed plan anticipates leaving the current EOP at CMC as it stands.  The new 50-bed crisis facility will serve the crisis needs of that EOP population and will replace the 36 bed interim facility.

The reallocation of the MHCB, as outlined in the bed plans, was designed to locate the highest levels of CDCR mental health services in specific locations and is predicated on the construction of new crisis beds at CMF, CMC and in the new facilities. New EOP beds also are planned to be located in the new facilities and, because this level of care is a high user of MHCB, the preponderance of crisis beds will be co-located there. The EOP population is, by definition, less stable than the general population (GP) and is thus more prone to crisis. However, there is also an, albeit smaller, need for crisis beds in GP institutions. It is the intention of the CDCR to have crisis beds operational throughout the state. In some institutions, the crisis beds will eventually be at a reduced level, but only when it is determined that the overall statewide need has been met elsewhere.

There is no plan to reduce any mental health crisis beds currently operational until enough additional crisis beds are available to meet need and there is no waiting list for that level of care. Careful analysis of crisis bed use, wait lists and population trends over time will inform how, when and where crisis beds will be decommissioned. As new crisis beds are built and activated, this analysis will become more critical and detailed. If a downward trend in crisis bed use to numbers of beds available is validated, a schedule for reduction will be developed. Included in any deactivation schedule will be an additional detailed review of population trends, bed use and wait lists. The Correctional Treatment Centers will remain in place and active, with only the crisis bed use considered for deactivation.

## E.     Timeframes for Joint Commission Accreditation for CDCR Operated Inpatient Facilities

On October 18, 2007, the *Coleman* court issued an order that in a pertinent part stated: "Defendants shall submit to the Special Master a plan with timeframes for meeting and procuring for all California Department of Corrections and Rehabilitation operated inpatient programs applicable State licensure and accreditation by the Joint Commission on Accreditation of Healthcare Organizations."

The DMH has been the CDCR's longtime contractor of inpatient acute and intermediate mental health services for both male and female inmate-patients. The August 2007 Mental Health Bed Plan indicated CDCR would assume responsibility for operating the new inpatient acute and intermediate care beds.

In June 2008, a proposal was created whereby the DMH would be responsible for managing and operating the intermediate and acute inpatient clinical services instead of transferring the operation to the CDCR. These mental health programs will be operated by the DMH in collaboration with the Receiver's medical, the CDCR mental health and the CDCR/Receiver's custody program in two of the CHCFs.

The following page is a proposed timeframe for the DMH to achieve State licensure and Joint Commission (JC) accreditation for the proposed inpatient programs.

**TIMEFRAMES FOR STATE LICENSURE AND JOINT COMMISSION ACCREDITATION FOR THE DMH's PROPOSED ACUTE AND INTERMEDIATE INPATIENT TREATMENT PROGRAM.**

(Adapted from the April 2008 DMH facility project overview)

| Summary Task | Proposed Timeframe |
|---|---|
| Develop Operating Manuals, Staff Bi-laws, Governing Body, etc. in accordance with State and Joint Commission standards. | Approximately 2 years prior to estimated activation (Begin January 2009) |
| Verification of program manuals, staff orientation and training. | 2010 to 2011 |
| Completion of construction of facility and installation of equipment, supplies, furniture, staff, etc. Begin State licensing preparation. | 2010 to 2011 |
| Facility inspections, Department of Health Services' licensure. | December 2010 to January 2011 |
| Begin patient admissions. | February 2011 |
| Joint Commission Self Survey. | February 2011 to February 2012 |
| Self Survey Correction, Mock Joint Commission Survey, submission of Joint Commission Application. | February 2012 to November 2012 |
| First Joint Commission survey. | 2 years status post activation (approx. November 2013 to November 2014) |

<u>Initial survey</u>: Application for survey is valid for six months. Normally takes three-four months after receipt of application to conduct survey. Most organizations take one full year from the point of decision to be accredited until time of first survey.

## III.    Outline of Changes to Bed Plan Charts

**Attachment A:**
**Entitled:  Mental Health Bed Plan, December 2006 – Enclosure II (Amended)**

This chart was in the December 2006 Mental Health Bed Plan and was amended for the August 2007, Supplemental Bed Plan.  It uses bed need projections through 2011 based on the Mental Health Bed Need Study – 2006 Update.  The intent of this chart was to show the progression from scattered mental health programs into consolidated care centers, using current planning.  This chart forms the basis for the ensuing charts.

Incorporated into this chart are the following assumptions:
1)    Table #1 would become fully activated and operational by 2011.  This table includes several projects that were in various planning stages with funding ranging from none to through specific design stages.  Specifically the chart assumed that the following projects would be constructed and activated by June 2011:
- The 50 bed MHCB at CMC;
- The treatment and office space for 150 EOP beds at LAC;
- The 64 bed ICF at SVSP;
- The 64 bed ICF at CMF; and
- The 50 bed MHCB at CMF.

2)    Table #2 proposes the Consolidated Care Center locations at the following locations:
- SAC
- RJD
- CMC
- CIM
- LAC

3)    Table #2 proposes the decommissioning of the following beds:
- COR:         150 EOP; 54 ASU; 23 MHCB
- MCSP:       510 EOP; 36 ASU:  3 MHCB
- CMC:         580 EOP; 54 ASU and
- MHCBs at the following locations:
    - HDSP – 5
    - KVSP – 12
    - NKSP – 5
    - SATF – 11
    - SOL – 9
    - WSP – 1
    - CIM – 18
4)    The female chart assumed the construction of all new women's beds at California Institution for Women (CIW).

**Attachment B:**
**Entitled: California Health Care Facilities--Mental Health Program--June, 2008**

The "California Health Care Facilities--Mental Health Program--June, 2008" bed plan is the culmination of several iterations of bed planning. This final chart is intended to perform several functions:

1) To clearly delineate currently active mental health beds from bed creation projects that are not yet built or activated;

2) To clearly define the bed need projections in appropriate levels of care;

3) To identify project responsibility (i.e., which projects are proposed to be incorporated into the Receiver's "Joint Project" and which were to be maintained to be built by CDCR); and

4) To reflect current planning for level of care placement in CHCFs.

This chart incorporates several changes resulting in decisions made and studies finalized in June 2008:

1) The Mental Health Bed Need Study – Based on Spring 2008 Population Projections, June 2008 was finalized.
   - This study makes projections of the mental health population to 2017.
   - These projections, plus a "target reserve" calculated using the same method as in the August 2007 Supplemental Bed Plan, are used as the bed need.
   - This represents an increase in the bed need.

2) The decision for DMH to provide the inpatient acute and intermediate mental health services created several changes to the bed plan.
   - The entire Intermediate and Acute bed need will be provided in the new facilities. This means decommissioning SVSP/SVPP ICF beds and CMF/VPP Acute and ICF beds as well as the beds currently located in the DMH state hospitals.
   - Part of the decision was also to include ICF beds for inmates requiring DMH care under Penal Code 1370, individuals found by the court to be incompetent to stand trial.
   - This required major shifting of the program beds and the addition of additional beds to the Receiver's project.

3) In keeping with the court order to build the 50-bed MHCB at CMC, the EOP beds will remain active at CMC.
   - The EOPs at LAC, RJD, and SVSP will be decommissioned (as well as those at Mule Creek State Prison, and CSP – Corcoran, which were identified to be decommissioned in the August 2007 Supplemental Bed Plan).
   - This required major shifting of the program sites and a reconfiguration of the beds in the Receiver's project.

**Attachment B (continued)**

From left to right the "California Health Care Facilities--Mental Health Program--June, 2008" bed plan reads as follows:

1) Table #A reflects the actual beds in operation as of June, 2008.

2) Table #B reflects new beds proposed to be built.
   - Clearly separates Joint Project beds from CDCR beds:  yellow represents the Joint Project beds; black represents those retained by the CDCR.
   - Alters the original locations of CCCs to unnamed sites to be considered CHCFs.
   - Alters the plan from building ICF beds in all sites to building two sites with ICF and acute beds: one in the northern part of the state and one in the south.

3) Table #C reflects the proposed beds to be decommissioned.

4) Table #D reflects the total beds at each site after construction and activation of the supplemental bed plan beds.

5) The Female chart reflects the decision to incorporate the female mental health bed need into the Receiver's Joint Project, placing the female beds in two sites – one north and one south.

## IV.    Summary

This Bed Plan is subject to the receipt of funding by the *Plata* Receiver necessary for the design and construction of his planned 1500-bed Correctional Health Care Facilities.

The culmination of this evolving process and the coordination with the Receiver's office has resulted in a greatly improved bed plan for the provision of mental health services to inmate-patients.  It provides a very real opportunity to provide improved services to mental health treatment population that complies with the requirements of the program and the court.

**California Department of Corrections and Rehabilitation**
**Mental Health Bed Plan, December 2006 - Enclosure II (Amended[#])**

## MALES

**Introduction:** As a general rule, the following proposal uses existing beds at five (5) Consolidated Care Center (CCC) sites*(the CCC sites are SAC, RJD, CMC, CIM, and LAC), plus at SVSP and CMF, and proposes to build additional capacity to meet and exceed Navigant's projected mental health bed need for June 2011, (based upon Spring 2006 population projections).

**PROPOSAL -** Assumes that the CDCR will operate the Acute and ICF programs and that there is no bed capacity at DMH hospitals (i.e. no beds at ASH, CSH, Napa, or Metro).

### INITIAL
**Expected Permanent Bed Capacity, June 2011**
**NO NEW BEDS**
**(Status Quo)**

**Table #1:** Number of **permanent** mental health beds anticipated in June 2011** with **no** construction of additional beds, (except where noted).

| Institution | EOP | ASU | PSU | MHCB | Acute | ICF | ICF-High Custody | Total |
|---|---|---|---|---|---|---|---|---|
| SAC | 384 | 124 | 192 | 24 | | | | 724 |
| RJD | 330 | 63 | | 14 | | | | 407 |
| CMC[1] | 580 | 54 | | 50 | | | | 684 |
| CIM | | | | 18 | | | | 18 |
| LAC[2] | 450 | 54 | | 12 | | | | 516 |
| SVSP[3] | 192 | 45 | | 10 | | | 128 | 375 |
| CMF[4] | 600 | 58 | | 50 | 150 | 84 | 64 | 1,006 |
| PBSP[5] | 64 | | 128 | 10 | | | | 202 |
| Sub-Total: | 2,600 | 398 | 320 | 188 | 150 | 84 | 192 | 3,932 |
| COR | 150 | 54 | | 23 | | | | 227 |
| MCSP | 510 | 36 | | 8 | | | | 554 |
| SQ | | 36 | 32 | | | | | 68 |
| HDSP | | | | 10 | | | | 10 |
| ISP | | | | 5 | | | | 5 |
| KVSP | | | | 12 | | | | 12 |
| NKSP | | | | 10 | | | | 10 |
| PVSP | | | | 5 | | | | 5 |
| SATF | | | | 16 | | | | 16 |
| SOL[6] | | | | 9 | | | | 9 |
| WSP | | | | 6 | | | | 6 |
| Sub-Total: | 660 | 126 | 0 | 136 | | | | 922 |
| Grand Total: | 3,260 | 524 | 320 | 324 | 150 | 84 | 192 | 4,854 |

Navigant Bed Need, June 2011^ **6,306**

Beds Deficient **(Bed Need - Grand Total Table #1): 1,452**

* Note: will not use existing EOP, ASU, or MHCB at CMC and CIM .

** Data sources for number of beds: Health Care Placement Unit, Licensing Unit, and Office of Facilities Management.

1 Assumption: CMC - The 50 bed MHCB project proposed in the Interim ICF and MHCB Plan, June 2006 will be constructed.

2 Assumption: LAC - The 150 bed EOP project as proposed in the April 2006 plan will be constructed.

3 Assumptions: SVSP - 1. The 64 bed ICF project will be constructed.
2. All 128 ICF beds are counted as High Custody.

4 Assumptions: CMF - 1. ICF: The 64 bed ICF facility as proposed in the April 2006 plan will be constructed.
2. EOP: The 30 temporary ICF beds at P-3 will be returned to 67 EOP beds.
3. MHCB: The 50 bed MHCB unit is constructed.

5 PBSP: 4 of the 10 MHCBs are not covered under budgeted/staffed positions. Covered under registry or overtime.

6 SOL: CTC can treat only 9 MHCB patients because of physical plant issues.

### PROPOSAL
**New Beds to be Constructed**
**+ Reduction of Existing Beds**

**Table #2:** Estimated number of new **permanent** beds to be constructed by June 2011, and reduction of existing **permanent** beds to meet the bed deficiency in Table #1.

**NEW BEDS**

| Institution | EOP | ASU | PSU | MHCB | Acute | ICF | ICF-High Custody | Total |
|---|---|---|---|---|---|---|---|---|
| SAC | 336 | | | 26 | | 46 | 24 | 432 |
| RJD | 390 | 62 | 128 | 16 | 0 | 46 | 24 | 666 |
| CMC[7] | 720 | 125 | 128 | | 0 | 46 | 24 | 1,043 |
| CIM[8] | 720 | 125 | | 30 | 90 | 46 | 24 | 1,035 |
| LAC | 270 | 71 | | 38 | | 46 | 24 | 449 |
| SVSP[9] | 96 | 70 | | | | | | 166 |
| CMF | | | | | | | | 0 |
| PBSP | | | | | | | 0 | 0 |
| Sub-Total: | 2,532 | 453 | 256 | 110 | 90 | 230 | 120 | 3,791 |

**REDUCTION OF EXISTING BEDS**

| Institution | EOP | ASU | PSU | MHCB | Acute | ICF | ICF-High Custody | Total |
|---|---|---|---|---|---|---|---|---|
| COR | -150 | | | -23 | | | | -227 |
| MCSP | -510 | -36 | | -3 | | | | -549 |
| SQ | | -36 | | | | | | -36 |
| HDSP | | | | -5 | | | | -5 |
| ISP | | | | | | | | |
| KVSP | | | | -12 | | | | -12 |
| NKSP | | | | -5 | | | | -5 |
| PVSP | | | | | | | | |
| SATF | | | | -11 | | | | -11 |
| SOL | | | | -9 | | | | -9 |
| WSP | | | | -1 | | | | -1 |
| CMC | -580 | -54 | | | | | | -634 |
| CIM | | | | -18 | | | | -18 |
| SVSP[10] | | -45 | | | | | | -45 |
| Sub-Total : [11] | -1,240 | -225 | 0 | -87 | | | | -1,552 |
| Grand Total (net): | 1,292 | 228 | 256 | 23 | 90 | 230 | 120 | 2,239 |

| | |
|---|---|
| Bed Deficiency Table #1: | **1,452** |
| Adjustment - Add Reserve^^ from Table #3: | **787** |
| Bed Deficiency Adjusted for Reserve: | **2,239** |

7 Assumption: CMC not using existing EOP and ASU population facilities, and the 50 bed MHCB unit is constructed see Table #1, footnote #1.

8 Assumption: CIM not using the existing 18 GACH acute psych. beds as MHCBs. Total equals all new beds.

9 Assumptions: SVSP - The 128 bed ICF facility as proposed in the Statewide Mental Health Bed Plan April 2006 will be re-scoped to construct a 70 bed EOP-ASU, and will convert existing space at SVSP to accommodate an additional 96 EOP beds.

10 Assumption: SVSP - The current 45 ASU beds will be included in the proposed new 70 bed EOP-ASU construction project.

11 Note: does not include the return of temporary beds, (I.e., 36 MHCBs at CMC, 112 ICF Beds at SVSP, and 36 ICF beds at CMF P-2).

### FINAL
**Expected Permanent Bed Capacity**
**WITH CONSTRUCTION OF NEW BEDS**
Post Implementation of Mental Health Bed Plan, December 2006
**(Proposal)**

**Table #3:** Number of **permanent** mental health beds anticipated through construction of new beds.

| Institution | EOP | ASU | PSU | MHCB | Acute | ICF | ICF-High Custody | ICF Sub-Total | Total |
|---|---|---|---|---|---|---|---|---|---|
| SAC | 720 | 124 | 192 | 50 | | 46 | 24 | 70 | 1,156 |
| RJD | 720 | 125 | 128 | 30 | 0 | 46 | 24 | 70 | 1,073 |
| CMC | 720 | 125 | 128 | 50 | 0 | 46 | 24 | 70 | 1,093 |
| CIM | 720 | 125 | | 30 | 90 | 46 | 24 | 70 | 1,035 |
| LAC | 720 | 125 | | 50 | | 46 | 24 | 70 | 965 |
| SVSP | 288 | 70 | | 10 | | | 128 | 128 | 496 |
| CMF | 600 | 58 | | 50 | 150 | 84 | 64 | 148 | 1,006 |
| PBSP | 64 | | 128 | 10 | | | | | 202 |
| Sub-Total: | 4,552 | 752 | 576 | 280 | 240 | 314 | 312 | 626 | 7,026 |
| COR | | | | | | | | | 0 |
| MCSP | | | | 5 | | | | | 5 |
| SQ | | | 32 | | | | | | 32 |
| HDSP | | | | 5 | | | | | 5 |
| ISP | | | | 5 | | | | | 5 |
| KVSP | | | | | | | | | 0 |
| NKSP | | | | 5 | | | | | 5 |
| PVSP | | | | 5 | | | | | 5 |
| SATF | | | | 5 | | | | | 5 |
| SOL | | | | | | | | | 0 |
| WSP | | | | 5 | | | | | 5 |
| Sub-Total: | | | | 67 | | | | | 67 |
| Grand Total: | 4,552 | 752 | 576 | 347 | 240 | 314 | 312 | 626 | 7,093 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Navigant:^^^ | 4,175 | 675 | 401 | 268 | 224 | 299 | 264 | 563 | 6,306 |
| Reserve:^^ | 377 | 77 | 175 | 79 | 16 | 15 | 48 | 63 | 787 |
| % Reserve: | 9.0% | 11.4% | 43.6% | 29.5% | 7.1% | 5.0% | 18.2% | 11.2% | |

^ Source: Mental Health Bed Need Study - 2006 Update. Navigant Consulting. June 2006.

^^ Reserve is the number of beds above the forecasted mental health bed need in the Navigant study. The reserve is included in the Mental Health Bed Plan, December 2006, to allow additional program flexibility in an effort to ensure sufficient bed capacity once the facilities are constructed. See Table #4 below on Page 2 of 3 for further detail.

### SPRING 2007 FORECASTED BED NEED FOR FISCAL YEAR 2011/2012:

| | EOP | ASU | PSU | MHCB | Acute | ICF | ICF-HC | ICF-ST | Total |
|---|---|---|---|---|---|---|---|---|---|
| Navigant:^^^ | 3,684 | 639 | 409 | 330 | 222 | 304 | 307 | 611 | 5,895 |
| Reserve: | 868 | 113 | 167 | 17 | 18 | 10 | 5 | 15 | 1,198 |
| % Reserve: | 23.6% | 17.7% | 40.8% | 5.2% | 8.1% | 3.3% | 1.6% | 2.5% | |

HC = High Custody; ST = Sub-Total

^^^ Forecasted need - Planned Beds = Reserve.

Source: Mental Health Bed Need - Based upon Spring 2007 Population Projections. Navigant Consulting. July 2007. Note: Per this study the Acute projected need was taken from the Mental Health Bed Need Study - Based on Fall 2006 Population Projections. Navigant Consulting. March 2007.

KEY: Modified Text

# The Supplemental Bed Plan Report - August 2007 amends the December Bed Plan - 2006. Modifications to the original December Bed Plan - 2006 Enclosure II are underlined and shaded.

**MALES**

**Mental Health Bed Plan, December 2006 - Enclosure II (Amended)**

**Table #4: Actual vs. Target Reserve:** The reserve is the number of beds above the forecasted mental health bed need in the Navigant study. The reserve is included in the Mental Health Bed Plan, December 2006, to allow additional program flexibility in an effort to ensure sufficient bed capacity exists once the facilities are constructed.

Table 4.A: Indicates how the target reserve was calculated using the percent increase in projected populations for the years indicated in the Spring 2006 Navigant Study as minimums and maximums and calculating a target reserve based on the midpoint of the two.*

Table 4.B: Indicates actual reserve for the proposal along with the difference between the actual and the target reserve.*

| Table 4.A: | Minimum | | | Maximum | | | Midpoint | | | Table 4.B: | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Navigant Spring 2006: Projected Population By Year and Percent Increase | | | | | | | | | Actual Reserve for Proposal | | |
| | | | | | | | Target % Reserve | Target Reserve | | Actual % Reserve | Actual Reserve | Difference Between Actual and Target Reserve |
| | 2010 | 2011 | % | 2007 | 2011 | % | | | | | | |
| EOP | 4,123 | 4175 | 1% | 3,672 | 4175 | 14% | 7.5% | 312 | | 9.0% | 377 | 65 |
| ASU | 666 | 675 | 1% | 572 | 675 | 18% | 9.7% | 65 | | 11.4% | 77 | 12 |
| PSU | 390 | 401 | 3% | 332 | 401 | 21% | 11.8% | 47 | | 43.6% | 175 | 128 |
| MHCB | 266 | 268 | 1% | 252 | 268 | 6% | 3.6% | 10 | | 29.5% | 79 | 69 |
| Acute | 222 | 224 | 1% | 203 | 224 | 10% | 5.6% | 13 | | 7.1% | 16 | 3 |
| ICF | 294 | 299 | 2% | 267 | 299 | 12% | 6.8% | 20 | | 5.0% | 15 | -5 |
| ICF (High Custody) | 261 | 264 | 1% | 197 | 264 | 34% | 17.6% | 46 | | 18.2% | 48 | 2 |
| | | | | | | | | **Total:** | 513 | **Total:** | 787 | 274 |

* Differences in the reserve numbers in Table 4.A. and Table 4.B are due to rounding.

California Department of Corrections and Rehabilitation
**Mental Health Bed Plan, December 2006 - Enclosure II (Amended)**

## MALES

| LIST OF ACRONYMS (Arranged in Alphabetical Order) | |
|---|---|
| ASH | Atascadero State Hospital - DMH (Male) |
| ASU | Administrative Segregation Unit |
| CCC | Consolidated Care Center |
| CDCR | California Department of Corrections and Rehabilitation |
| CIM | California Institution for Men |
| CIW | California Institution for Women |
| CMC | California Men's Colony |
| CMF | California Medical Facility |
| COR | California State Prison - Corcoran |
| CSH | Coalinga State Hospital - DMH (Male) |
| CTC | Correctional Treatment Center |
| DHS | Department of Health Services |
| DMH | Department of Mental Health |
| DOF | Department of Finance |
| DPA | Department of Personnel Administration |
| DTP | Day Treatment Program |
| DVI | Deuel Vocational Institution |
| EOP | Enhanced Outpatient Program |
| GACH | General Acute Care Hospital Bed |
| HDSP | High Desert State Prison |
| ICF | Intermediate Care Facility |
| ISP | Ironwood State Prison |
| KVSP | Kern Valley State Prison |
| LAC | California State Prison - Los Angeles County |
| MCSP | Mule Creek State Prison |
| MHCB | Mental Health Crisis Bed |
| NKSP | North Kern State Prison |
| PBSP | Pelican Bay State Prison |
| PSH | Patton State Hospital - DMH (Female) |
| PSU | Psychiatric Services Unit |
| PVSP | Pleasant Valley State Prison |
| RJD | Richard J. Donovan Correctional Facility |
| SAC | California State Prison - Sacramento |
| SATF | Substance Abuse Treatment Facility at Corcoran |
| SOL | California State Prison - Solano |
| SQ | California State Prison San Quentin |
| SVSP | Salinas Valley State Prison |
| WSP | Wasco State Prison |

**California Department of Corrections and Rehabilitation**
**Mental Health Bed Plan, December 2006 Enclosure III (Corrected#)**

## FEMALES

**Introduction:** The following proposal uses existing beds at female institutions, and proposes to build additional capacity to meet and exceed the mental health bed need for June 2011 as projected by Navigant, (based upon Spring 2006 population projections).

**PROPOSAL** - Assumes that the CDCR will operate the Acute and ICF programs and that there will be no bed capacity at DMH hospitals, (i.e. no beds at PSH).

### INITIAL
**Expected Permanent Bed Capacity, June 2011**
**NO NEW BEDS**
**(Status Quo)**

**Table #1:** Number of **permanent** mental health beds anticipated in June 2011** with no construction of additional beds, (except where noted).

| Institution | EOP | ASU | PSU | MHCB | Acute/ICF | Total |
|---|---|---|---|---|---|---|
| | | | | | **Level of Care** | |
| CCWF | 54 | | | 12 | | 66 |
| CIW[1] | 75 | | 20 | 10 | 25 | 130 |
| VSPW | | 9 | | | | 9 |
| **Total:** | 129 | 9 | 20 | 22 | 25 | 205 |

| | |
|---|---|
| Navigant Bed Need, June 2011:^ | **345** |
| Beds Deficient (Bed Need - Total Beds Table #1): | **140** |
| Adjustment - PSU beds not projected and added back in: | **20** |
| Total Bed Deficiency with Adjustment, (20 PSU Beds + Beds Deficient): | **160** |

** Data sources for number of beds: Health Care Placement Unit, Licensing Unit, and Office of Facilities Management.

[1] Assumptions: CIW - 1. The 25 bed Acute/ICF facility proposed in the April 2006 plan will be constructed. Note if this proposal is approved, this project will require a scope change to include the MHCB and Acute/ICF beds in Table #2.
2. The 20 bed PSU project is completed.

### PROPOSAL
**New Beds to be Constructed**

**Table #2:** Estimated number of new **permanent** beds to be constructed by June 2011 to meet the bed deficiency in Table #1.

| Institution | EOP | ASU | PSU | MHCB | Acute/ICF | Total |
|---|---|---|---|---|---|---|
| | | | | | **Level of Care** | |
| CCWF | | | | | | 0 |
| CIW* | 168 | 15 | | 3 | 17 | 203 |
| VSPW | | | | | | 0 |
| **Total:** | 168 | 15 | 0 | 3 | 17 | 203 |

| | |
|---|---|
| Bed Deficiency Table #1: | **160** |
| Adjustment - Add Reserve ^^ from Table #3: | **43** |
| Bed Deficiency Adjusted for PSU beds and Reserve: | **203** |

* Assumptions: CIW - 1. EOP and ASU - New beds through conversion of existing space.
2. Acute/ICF and MHCB - 20 new beds will be added to the 25 bed Acute/ICF project proposed in the April 2006 plan.

### FINAL
**Expected Permanent Bed Capacity, June 2011**
**WITH CONSTRUCTION OF NEW BEDS**
**Post Implementation Mental Health Bed Plan, December 2006**
**(Proposal)**

**Table #3:** Number of **permanent** mental health beds anticipated through construction of new beds.

| Institution | EOP | ASU | PSU | MHCB | Acute/ICF | Total |
|---|---|---|---|---|---|---|
| | | | | | **Level of Care** | |
| CCWF | 54 | | | 12 | | 66 |
| CIW | 243 | 15 | **20** | 13 | 42 | **333** |
| VSPW | | 9 | | | | 9 |
| **Total:** | 297 | 24 | **20** | 25 | 42 | **408** |

| | EOP | ASU | PSU | MHCB | Acute/ICF | Total |
|---|---|---|---|---|---|---|
| **Navigant:^** | 262 | 22 | N/A | 22 | 39 | **345** |
| **Reserve:^^** | 35 | 2 | | 3 | 3 | **43** |
| **% Reserve:** | 13.4% | 9.1% | | 13.6% | 7.7% | |

^ Source: Mental Health Bed Need Study - 2006 Update. Navigant Consulting. June 2006.

^^ The reserve is the number of beds above the forecasted mental health bed need in the Navigant study. The reserve is included in the Mental Health Bed Plan, December 2006, to allow additional program flexibility in an effort to ensure sufficient bed capacity exists once the facilities are constructed. See Table #4 below on Page 2 of 3 for further detail.

| SPRING 2007 FORECASTED BED NEED FOR FISCAL YEAR 2011/2012: | | | | | | |
|---|---|---|---|---|---|---|
| | EOP | ASU | PSU | MHCB | Acute/ICF | Total |
| **Navigant:^^^** | 336 | 27 | N/A | 16 | 33 | **412** |
| **Reserve:** | -39 | -3 | | 9 | 9 | **-24** |
| **% Reserve:** | -11.6% | -11.1% | | 56.3% | 27.3% | |

^^^ Forecasted need - Planned Beds = Reserve. Source: Mental Health Bed Need Study - Based on Spring 2007 Population Projections. Navigant Consulting. July 2007.

# This document corrects a typographical error noted in the original Mental Health Bed Plan - December 2006 Enclosure III and provides an updated forecasted bed need. Corrections are limited to the PSU Table #3 with all changes underlined and shaded.    KEY: Modified Text

**California Department of Corrections and Rehabilitation**

**Mental Health Bed Plan, December 2006 Enclosure III (Corrected#)**

## FEMALES

**Table #4:  Actual vs. Target Reserve:** The reserve is the number of beds above the forecasted mental health bed need in the Navigant study. The reserve is included in the Mental Health Bed Plan, December 2006, to allow additional program flexibility in an effort to ensure sufficient bed capacity exists once the facilities are constructed.

Table 4.A:  Indicates how the target reserve was calculated using the percent increase in projected populations for the years indicated in the Spring 2006 Navigant Study as minimums and maximums and calculating a target reserve based on the midpoint of the two.*

Table 4.B:  Indicates actual reserve for the proposal along with the difference between the actual and the target reserve.*

| Table 4.A: | Minimum | | | Maximum | | | Midpoint | | Table 4.B: | Actual Reserve for Proposal | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Navigant Spring 2006: Projected Population By Year and Percent Increase | | | | | | Target % Reserve | Target Reserve | | Actual % Reserve | Actual Reserve | Difference Between Actual and Target Reserve |
| | 2010 | 2011 | % | 2007 | 2011 | % | | | | | | |
| EOP | 256 | 262 | 2% | 211 | 262 | 24% | 13.3% | 35 | | 13.4% | 35 | 0 |
| ASU | 21 | 22 | 5% | 19 | 22 | 16% | 10.3% | 2 | | 9.1% | 2 | 0 |
| MHCB | 22 | 22 | 0% | 17 | 22 | 29% | 14.7% | 3 | | 13.6% | 3 | 0 |
| Acute/ICF | 39 | 39 | 0% | 34 | 39 | 15% | 7.4% | 3 | | 7.7% | 3 | 0 |
| | | | | | | | Total: | 43 | | Total: | 43 | 0 |

* Differences in the reserve numbers in Table 4.A. and Table 4.B are due to rounding.

**California Department of Corrections and Rehabilitation**
**Mental Health Bed Plan, December 2006 Enclosure III (Corrected#)**

## FEMALES

| LIST OF ACRONYMS (Arranged in Alphabetical Order) | |
|---|---|
| ASH | Atascadero State Hospital - DMH (Male) |
| ASU | Administrative Segregation Unit |
| CCC | Consolidated Care Center |
| CCWF | Central California Women's Facility |
| CDCR | California Department of Corrections and Rehabilitation |
| CIM | California Institution for Men |
| CIW | California Institution for Women |
| CMC | California Men's Colony |
| CMF | California Medical Facility |
| COR | California State Prison - Corcoran |
| CSH | Coalinga State Hospital - DMH (Male) |
| CTC | Correctional Treatment Center |
| DHS | Department of Health Services |
| DMH | Department of Mental Health |
| DOF | Department of Finance |
| DPA | Department of Personnel Administration |
| DTP | Day Treatment Program |
| DVI | Deuel Vocational Institution |
| EOP | Enhanced Outpatient Program |
| GACH | General Acute Care Hospital Bed |
| HDSP | High Desert State Prison |
| ICF | Intermediate Care Facility |
| ISP | Ironwood State Prison |
| KVSP | Kern Valley State Prison |
| LAC | California State Prison - Los Angeles County |
| MCSP | Mule Creek State Prison |
| MHCB | Mental Health Crisis Bed |
| NKSP | North Kern State Prison |
| PBSP | Pelican Bay State Prison |
| PSH | Patton State Hospital - DMH (Female) |
| PSU | Psychiatric Services Unit |
| PVSP | Pleasant Valley State Prison |
| RJD | Richard J. Donovan Correctional Facility |
| SAC | California State Prison - Sacramento |
| SATF | Substance Abuse Treatment Facility at Corcoran |
| SOL | California State Prison - Solano |
| SQ | California State Prison San Quentin |
| SVSP | Salinas Valley State Prison |
| VSPW | Valley State Prison for Women |
| WSP | Wasco State Prison |

# MALES – CALIFORNIA HEALTH CARE FACILITIES - MENTAL HEALTH PROGRAM

**CONFIDENTIAL - Spring 2008 Projections through 2017**
INCLUDES: All new ICF/acute beds plus 50-1370 PC beds. Uses Spring 2008 population projections to 2017 with a target reserve.

| Level of Care: | Current Beds | + | New Beds | - | Returned Beds: | = | Net Number of Beds: | Bed Need to 2017*: | Bed need + target reserve** | reserve beds | | Level of Care: | New Beds | - | New Beds (Other Projects) | = | Joint Project Beds: |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| EOP | 3,045 | | 2,408 | | -1,578 | | 3,875 | 3,799 | 3,875 | 76 | | EOP | 2,408 | | 163 | | 2,245 |
| ASU | 474 | | 598 | | -288 | | 784 | 682 | 716 | 34 | | ASU | 598 | | 0 | | 598 |
| PSU | 384 | | 0 | | 0 | | 384 | 422 | 452 | 30 | | PSU | 0 | | 0 | | 0 |
| MHCB | 244 | | 300 | | -134 | | 410 | 366 | 410 | 44 | | MHCB | 300 | | 132 | | 168 |
| Acute | 150 | + | 244 | - | -150 | = | 244 | 230 | 244 | 14 | | Acute | 244 | - | 0 | = | 244 |
| ICF incl 50-1370 beds | 84 | | 297 | | -84 | | 297 | 297 | 297 | 0 | | ICF | 297 | | 0 | | 297 |
| ICF-High Custody | 241 | | 537 | | -241 | | 537 | 423 | 537 | 114 | | ICF-High Custody | 537 | | 0 | | 537 |
| Total: | 4,622 | | 4,384 | | -2,475 | | 6,531 | 6,219 | 6,531 | 312 | | Total: | 4,384 | | 295 | | 4,089 |

\* Bed Need Source: Mental Health Bed Need Study - Spring 2008 Population Projections, June 2008
\*\* Target reserve is a mathmatical equation.

**Table #A:** Number of mental health beds as of June 9, 2008.**

| Institution | EOP | ASU | PSU | MHCB | Acute | ICF | ICF-High Custody | Total |
|---|---|---|---|---|---|---|---|---|
| SAC | 384 | 74 | 256 | 24 | | | | 738 |
| RJD | 330 | 63 | | 14 | | | | 407 |
| CMC[1] | 580 | 54 | | 36 | | | | 670 |
| CIM | | | | 34 | | | | 34 |
| LAC | 300 | 54 | | 12 | | | | 366 |
| SVSP[3] | 192 | 45 | | 10 | | | 175 | 422 |
| CMF[4] | 533 | 58 | | | 150 | 84 | 66 | 891 |
| PBSP[5] | 66 | | 128 | 10 | | | | 204 |
| COR | 150 | 54 | | 23 | | | | 227 |
| MCSP | 510 | 36 | | 8 | | | | 554 |
| SQ | | 36 | | | | | | 36 |
| HDSP | | | | 10 | | | | 10 |
| ISP[6] | | | | | | | | 0 |
| KVSP | | | | 12 | | | | 12 |
| NKSP | | | | 10 | | | | 10 |
| PVSP | | | | 6 | | | | 6 |
| SATF | | | | 20 | | | | 20 |
| SOL[7] | | | | 9 | | | | 9 |
| WSP | | | | 6 | | | | 6 |
| **Total:** | **3,045** | **474** | **384** | **244** | **150** | **84** | **241** | **4,622** |

[1] CMC - The 36 MHCBs are interim and need to be replaced through permanent construction.

[2] CIM - The 34 MHCBs are interim and need to be replaced through permanent construction.

[3] SVSP - ICF High Custody beds are comprised of 64 permanent ICF beds plus 111 interim ICF beds in D-5 and D-6 housing units) that need to be replaced through permanent construction. The DMH operates the ICF beds.

[4] CMF - ICF beds are comprised of 44 DTP beds in the A-2 housing unit plus 40 ICF beds in the A-3 housing unit. ICF high custody beds are comprised of 36 interim ICF beds in the P-2 housing unit and 30 interim ICF beds in the P-3 housing unit that need to be replaced through permanent construction. DMH operates the Acute, ICF, and DTP beds.

[5] PBSP: 4 of the 10 MHCBs are not covered under budgeted/staffed positions. Covered under registry or overtime.

[6] ISP - The 5 MHCBs originally intended for ISP were redistributed as follows: 1 additional MHCB at PVSP and 4 additional MHCB at NKSP.

[7] SOL: CTC can treat only 9 MHCB patients because of physical plant issues.
** Data sources for material are: Health Care Placement Unit.

**Table #B:** ** Estimated number of new permanent beds to be constructed. **Joint Projects** are highlighted yellow, other projects outside the Joint Projects are highlighted Black.

| Institution | EOP | ASU* | PSU* | MHCB | Acute | ICF**** | ICF-High Custody | Total |
|---|---|---|---|---|---|---|---|---|
| SAC | | | | | | | | 0 |
| RJD | | | | | | | | 0 |
| CMC[8] | | | | 50 | | | | 50 |
| CIM | | | | | | | | 0 |
| LAC | | | | | | | | 0 |
| SVSP[9] | | | | | | | | 0 |
| CMF[8] | 67 | | | 50 | | | | 117 |
| PBSP | | | | | | | | 0 |
| COR | | | | | | | | 0 |
| MCSP | | | | | | | | 0 |
| SQ[10] | | | | | 32 | | | 32 |
| HDSP | | | | | | | | 0 |
| ISP | | | | | | | | 0 |
| KVSP | 96 | | | | | | | 96 |
| NKSP | | | | | | | | 0 |
| PVSP | | | | | | | | 0 |
| SATF | | | | | | | | 0 |
| SOL | | | | | | | | 0 |
| WSP | | | | | | | | 0 |
| **Sub-Total (Other Projects)** | **163** | **0** | **0** | **132** | **0** | **0** | **0** | **295** |

| Institution | EOP | EOP-High Custody | MHCB | Acute | ICF**** | ICF-High Custody | Total |
|---|---|---|---|---|---|---|---|
| Site 1 | 185 | 49 | 0 | 24 | 122 | 148 | 268 | 796 |
| Site 2 | 375 | 100 | 0 | 24 | 0 | 0 | 0 | 499 |
| Site 3 | 375 | 100 | 0 | 24 | 0 | 0 | 0 | 499 |
| Site 4 | 375 | 100 | 0 | 24 | | 0 | 0 | 499 |
| Site 5 | 185 | 49 | 0 | 24 | 122 | 149 | 269 | 798 |
| Site 6 | 375 | 100 | 0 | 24 | 0 | 0 | 0 | 499 |
| Site 7 | 375 | 100 | 0 | 24 | 0 | 0 | 0 | 499 |
| **Sub Total (Joint Projects)** | **2,245** | **598** | **0** | **168** | **244** | **297** | **537** | **4,089** |
| **Total (new permanent beds):** | **2,408** | **598** | **0** | **300** | **244** | **297** | **537** | **4,384** |

[8] CMC: The 50 bed MHCB unit is not built as a Joint Project.

[9] The new 64 bed ICF units at SVSP and CMF will be included in the Joint Projects.

[10] SQ - The 32 MHCBs are broken down as follows: 20 MHCBs in Building 22, and 12 MHCBs with the Condemned Inmate Complex project.

\*\*\*\*\*Rearranged the number of MHCB at several sites for a 6 bed minimum. Left 10 at SATF due to large Substance Abuse Treatment program and recently increasing MHCB number to 20.

\*\*\* ASU and PSU beds are combined in the Joint Projects plan as EOP-High
\*\*\*\* ICF bed numbers include 50 beds intended for 1370 PC use.

**Table #C:** Number of mental health beds returned to alternate use.

| Institution | EOP | ASU | PSU | MHCB*** | Acute | ICF | ICF-High Custody | Total |
|---|---|---|---|---|---|---|---|---|
| SAC | | | | | | | | 0 |
| RJD | -330 | -63 | | | | | | -393 |
| CMC | | | | -36 | | | | -36 |
| CIM | | | | -34 | | | | -34 |
| LAC | -300 | -54 | | | | | | -354 |
| SVSP | -192 | -45 | | | | | -175 | -412 |
| CMF | | | | | -150 | -84 | -66 | -300 |
| PBSP | | | | | | | | 0 |
| COR | -150 | -54 | | -23 | | | | -227 |
| MCSP | -510 | -36 | | -2 | | | | -548 |
| SQ | | -36 | | | | | | -36 |
| HDSP | | | | -4 | | | | -4 |
| ISP | | | | | | | | 0 |
| KVSP | -96 | | | -12 | | | | -108 |
| NKSP | | | | -4 | | | | -4 |
| PVSP | | | | | | | | 0 |
| SATF | | | | -10 | | | | -10 |
| SOL | | | | -9 | | | | -9 |
| WSP | | | | 0 | | | | 0 |
| **Total:** | **-1,578** | **-288** | **0** | **-134** | **-150** | **-84** | **-241** | **-2,475** |

**Table #D:** Net number of mental health beds.

| Institution | EOP | ASU** | PSU* | MHCB | Acute | ICF* | ICF-High Custody | Total |
|---|---|---|---|---|---|---|---|---|
| SAC | 384 | 74 | 256 | 24 | 0 | 0 | 0 | 738 |
| RJD | 0 | 0 | 0 | 14 | 0 | 0 | 0 | 14 |
| CMC | 580 | 54 | 0 | 50 | 0 | 0 | 0 | 684 |
| CIM | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| LAC | 0 | 0 | 0 | 12 | 0 | 0 | 0 | 12 |
| SVSP | 0 | 0 | 0 | 10 | 0 | 0 | 0 | 10 |
| CMF | 600 | 58 | 0 | 50 | 0 | 0 | 0 | 708 |
| PBSP | 66 | 0 | 128 | 10 | 0 | 0 | 0 | 204 |
| COR | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| MCSP | 0 | 0 | 0 | 6 | 0 | 0 | 0 | 6 |
| SQ | 0 | 0 | 0 | 32 | 0 | 0 | 0 | 32 |
| HDSP | 0 | 0 | 0 | 6 | 0 | 0 | 0 | 6 |
| ISP | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| KVSP | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| NKSP | 0 | 0 | 0 | 6 | 0 | 0 | 0 | 6 |
| PVSP | 0 | 0 | 0 | 6 | 0 | 0 | 0 | 6 |
| SATF | 0 | 0 | 0 | 10 | 0 | 0 | 0 | 10 |
| SOL | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| WSP | 0 | 0 | 0 | 6 | 0 | 0 | 0 | 6 |
| **Sub-Total (net beds/non Joint Project)** | **1,630** | **186** | **384** | **242** | **0** | **0** | **0** | **2,442** |

| Institution | EOP | EOP-High Custody | MHCB | Acute | ICF* ICF-High Custody | Total |
|---|---|---|---|---|---|---|
| Site 1 | 185 | 49 | 0 | 24 | 122 | 148 | 268 | 796 |
| Site 2 | 375 | 100 | 0 | 24 | 0 | 0 | 0 | 499 |
| Site 3 | 375 | 100 | 0 | 24 | 0 | 0 | 0 | 499 |
| Site 4 | 375 | 100 | 0 | 24 | 0 | 0 | 0 | 499 |
| Site 5 | 185 | 49 | 0 | 24 | 122 | 149 | 269 | 798 |
| Site 6 | 375 | 100 | 0 | 24 | 0 | 0 | 0 | 499 |
| Site 7 | 375 | 100 | 0 | 24 | 0 | 0 | 0 | 499 |
| **Sub-Total (Joint Projects)** | **2,245** | **598** | **0** | **168** | **244** | **297** | **537** | **4,089** |
| **Total - Net number of beds:** | **3,875** | **784** | **384** | **410** | **244** | **297** | **537** | **6,531** |

\*\*\* ASU and PSU beds are combined in the Joint Projects plan as EOP-High
\*\*\*\* ICF bed numbers include 50 beds intended for 1370 PC use.

| Department of Mental Health Hospital Beds: | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| ASH | | | | 25 | 231 | | | 256 |
| CSH | | | | | 50 | | | 50 |
| MSH | | | | | 5 | | | 5 |
| NSH | | | | | 5 | | | 5 |
| **Total:** | **0** | **0** | **0** | **25** | **291** | **0** | **316** |

| Department of Mental Health Hospital Beds: | | | | | | | |
|---|---|---|---|---|---|---|---|
| ASH | | | | | | | 0 |
| CSH | | | | | | | 0 |
| MSH | | | | | | | 0 |
| NSH | | | | | | | 0 |
| **Total:** | **0** | **0** | **0** | **0** | **0** | **0** | **0** |

| Department of Mental Health Hospital Beds: | | | | | | | |
|---|---|---|---|---|---|---|---|
| ASH | | | | -25 | -231 | | -256 |
| CSH | | | | | -50 | | -50 |
| MSH | | | | | -5 | | -5 |
| NSH | | | | | -5 | | -5 |
| **Total:** | **0** | **0** | **0** | **-25** | **-291** | **0** | **-316** |

| Department of Mental Health Hospital Beds: | | | | | | | |
|---|---|---|---|---|---|---|---|
| ASH | | | | | | | 0 |
| CSH | | | | | | | 0 |
| MSH | | | | | | | 0 |
| NSH | | | | | | | 0 |
| **Total:** | **0** | **0** | **0** | **0** | **0** | **0** | **0** |

## FEMALES - CALIFORNIA HEALTH CARE FACILITIES - MENTAL HEALTH PROGRAM

*CONFIDENTIAL - Spring 2008 Projections through 2017*

**INCLUDES: All female bed need less MHCB at two institutions. Uses Spring 2008 population projections to 2017 with a target reserve.**

| Level of Care: | Current Beds: | + Proposed New Joint Program Beds: | - Returned Beds: | = Net Number of Beds: | Bed Need to 2017*: | Bed need plus target reserve** | Reserve beds |
|---|---|---|---|---|---|---|---|
| EOP | 129 | 255 | 129 | 255 | 226 | 255 | 29 |
| ASU | 9 | 0 | 9 | 0 | 13 | 15 | 2 |
| PSU | 10 | 27 | 10 | 27 | 11 | 12 | 1 |
| MHCB | 22 | 10 | 10 | 22 | 18 | 20 | 2 |
| Acute/ICF | 0 | 29 | 0 | 29 | 26 | 29 | 3 |
| Total: | 170 | 321 | 158 | 333 | 294 | 331 | 37 |

\* Bed Need Source: Mental Health Bed Need Study - Based on Spring 2008 Population Projections, May 2008
\*\* Target reserve is a mathematical equation except for MHCB. This reflects current number of MHCB with none decommissioned.

**Table #A:** Number of mental health beds as of June 9, 2008.***

| Institution | Level of Care | | | | | |
|---|---|---|---|---|---|---|
| | EOP | ASU | PSU | MHCB | Acute/ICF | Total |
| CCWF | 54 | | | 12 | | 66 |
| CIW | 75 | | 10 | 10 | | 95 |
| VSPW | | 9 | | | | 9 |
| SOUTHERN**** | | | | | | |
| NORTHERN**** | | | | | | 0 |
| Total: | 129 | 9 | 10 | 22 | 0 | 170 |

**Department of Mental Health Hospital Beds:**

| | EOP | ASU | PSU | MHCB | Acute/ICF | Total |
|---|---|---|---|---|---|---|
| PSH | | | | | 30 | 30 |
| | | | | | | |
| Total: | 0 | 0 | 0 | 0 | 30 | 30 |

| | EOP | ASU | PSU | MHCB | Acute/ICF | Total |
|---|---|---|---|---|---|---|
| Grand Total: (DMH Hospital + CDCR) | 129 | 9 | 10 | 22 | 30 | 200 |

\*\*\* Data sources for number of beds: Health Care Placement Unit, Licensing Unit, and Office of Facilities Management.

\*\*\*\* Both southern and northern sites are proposed to be co-located (with sight and sound barriers) with both male and female inmates.

**Table #B:** Estimated number of new permanent beds proposed to be constructed by the Joint Program.

| Institution | Level of Care | | | | | |
|---|---|---|---|---|---|---|
| | EOP | ASU[3] | PSU[3] | MHCB[2] | Acute/ICF | Total |
| CCWF | | | | | | |
| CIW | | | | | | |
| VSPW | | | | | | |
| Site 5 (south)[1] | 170 | 18 | 0 | 6 | 19 | 213 |
| Site 1 (north)[1] | 85 | 9 | 0 | 4 | 10 | 108 |
| Total: | 255 | 27 | 0 | 10 | 29 | 321 |

**Department of Mental Health Hospital Beds:**

| | EOP | ASU | PSU | MHCB | Acute/ICF | Total |
|---|---|---|---|---|---|---|
| PSH | | | | | | 0 |
| | | | | | | |
| Total: | 0 | 0 | 0 | 0 | 0 | 0 |

| | EOP | ASU | PSU | MHCB | Acute/ICF | Total |
|---|---|---|---|---|---|---|
| Grand Total: (DMH Hospital + CDCR) | 255 | 27 | 0 | 10 | 29 | 321 |

[1] New EOP and ASU bed counts represent a 66/33 split for EOP, EOP-H and ICF/Acute beds between a southern and a northern location, based on County of commitment percentages and the practice of keeping inmates as close to family as possible.

[2] The Spring 2008 projections do not project an increase in MHCB need.

[3] ASU and PSU beds are combined in the Joint Projects plan

**Table #C:** Number of mental health beds returned to alternate use.

| Institution | Level of Care | | | | | |
|---|---|---|---|---|---|---|
| | EOP | ASU | PSU | MHCB | Acute/ICF | Total |
| CCWF | -54 | | | -6 | | -60 |
| CIW[4] | -75 | | -10 | -4 | | -89 |
| VSPW | | -9 | | | | |
| SOUTHERN | | | | | | |
| NORTHERN | | | | | | 0 |
| Total: | -129 | -9 | -10 | -10 | 0 | -158 |

**Department of Mental Health Hospital Beds:**

| | EOP | ASU | PSU | MHCB | Acute/ICF | Total |
|---|---|---|---|---|---|---|
| PSH | | | | | -30 | -30 |
| | | | | | | |
| Total: | 0 | 0 | 0 | 0 | -30 | -30 |

| | EOP | ASU | PSU | MHCB | Acute/ICF | Total |
|---|---|---|---|---|---|---|
| Grand Total: (DMH Hospital + CDCR) | -129 | -9 | -10 | -10 | -30 | -188 |

[4] Temporary PSU beds at CIW will be decommissioned and returned to alternative use.

**Table #D:** Net number of mental health beds.

| Institution | Level of Care | | | | | |
|---|---|---|---|---|---|---|
| | EOP | ASU[3] | PSU[3] | MHCB[5] | Acute/ICF | Total |
| CCWF | | | | 6 | | 6 |
| CIW | | | | 6 | | 6 |
| VSPW | | | | | | |
| Site 5 (south) | 170 | 18 | 0 | 6 | 19 | 213 |
| Site 1 (north) | 85 | 9 | 0 | 4 | 10 | 108 |
| Total: | 255 | 27 | 0 | 22 | 29 | 333 |

**Department of Mental Health Hospital Beds:**

| | EOP | ASU | PSU | MHCB | Acute/ICF | Total |
|---|---|---|---|---|---|---|
| PSH | | | | | | 0 |
| | | | | | | |
| Total: | 0 | 0 | 0 | 0 | 0 | 0 |

| | EOP | ASU | PSU | MHCB | Acute/ICF | Total |
|---|---|---|---|---|---|---|
| Grand Total: (DMH Hospital + CDCR) | 255 | 27 | 0 | 22 | 29 | 333 |

[5] Although only 20 MHCB are projected in the Spring population Projections, this proposes leaving all current MHCB operational.

[3] ASU and PSU beds are combined in the Joint Projects plan

CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
Mental Health Program
Coleman Court-ordered Construction
CONFIDENTIAL

Attachment C

| Date Court Ordered | Plan Name | Inst | Program | Status | Responsible Party | Comments |
|---|---|---|---|---|---|---|
| 2006-0502 | April 2006 - Long Term Bed Plan | CMC | 36 Crisis Beds - Building 7 LOU Conversion Modules (renovation of existing space) | Aug 07- June 08 | CDCR | Construction completed. Activation in process. |
| 2007-0201 | | CMF | Renovate 124 cells in Q1-3 and S2 Wings | April 08 - Aug 09 | CDCR | Project pending full activation of the MHCB per request of the Coleman Special Master. |
| 2007-0301 | | MCSP | Temporary EOP treatment space | Apr 08 - Oct 08 | CDCR | Activation anticipated October 2008.  On schedule. |
| 2007-0514 | | SW Renovation ASU | Intake cells (340 stand alone and 66 non stand alone) @ 33 prisons | Nov 07 - Sept 08 | CDCR | Completion targeted for September 2008.  On schedule. |
| 2007-1018 | August 2007 Supplemental Bed Plan | SVSP | Construction of 6 additional group rooms (renovation) for Temporary ICF in D5/D6 | FY 2010/11 | CDCR | Funding for Preliminary Plans and Working Drawings are included in the 2008-09 Governor's Budget. |
| 2007-1018 | August 2007 Supplemental Bed Plan | CIW | 20-Bed PSU | Pending | Receiver | This bed-need is proposed to be incorporated into the CDCR/Receiver CHCF project. |
| 2007-1018 | August 2007 Supplemental Bed Plan | CIW | 45 Bed Acute Care / ICF | Pending | Receiver | This bed-need is proposed to be incorporated into the CDCR/Receiver CHCF project. |
| 2007-1018 | August 2007 Supplemental Bed Plan | CMF | 64-Bed ICF (New stand alone) | Pending | Receiver | This bed-need is proposed to be incorporated into the CDCR/Receiver CHCF project. |
| 2007-1018 | August 2007 Supplemental Bed Plan | LAC | 150 EOP | Pending | Receiver | This bed-need is proposed to be incorporated into the CDCR/Receiver CHCF project. |
| 2007-1018 | August 2007 Supplemental Bed Plan | SVSP | 70-Bed EOP/ASU (New stand alone) | Pending | Receiver | This bed-need is proposed to be incorporated into the CDCR/Receiver CHCF project. |
| 2007-1018 | August 2007 Supplemental Bed Plan | SVSP | 96-bed EOP | Pending | Receiver | This bed-need is proposed to be incorporated into the CDCR/Receiver CHCF project. |
| 2007-1018 | August 2007 Supplemental Bed Plan | CMF | 600 EOP/58 ASU Office and Treatment space | To be determined | CDCR | A 30-day letter is being prepared to request AB 900 funding. |
| 2007-1018 | August 2007 Supplemental Bed Plan | CMF | 50 Mental Health Crisis Beds (New stand alone) | 5/06 - 4/08 | CDCR | This project is complete and is being activated. |
| 2007-1018 | August 2007 Supplemental Bed Plan | SAC | 192 EOP Treatment space (renovation office & treatment space) | FY 2010/11 | CDCR | July 2007 PWB submittal for approval of Preliminary Plans was reviewed by Control Agencies who raised concerns regarding scope and cost.  Upon further review, CDCR has determined project was over programmed (should have only been programmed for 192 in lieu of 384) and is developing a budget package to re-scope the project. Funding for preliminary plans is included in the 2008-09 Governors Budget. |
| 2007-1018 | August 2007 Supplemental Bed Plan | SVSP | 64-Bed mental Health ICF (New stand alone) | 4/07 - 11/08 | CDCR | Completion of construction is targeted for November 2008. |
| 2008-0226 | Coordination Order | SAC, CIM, LAC, RJD, CMC | Long-term new bed need | Pending | Receiver | This bed-need is proposed to be incorporated into the CDCR/Receiver CHCF project. |
| 2008-0226 | August 2007 Supplemental Bed Plan | CMC | 50 Mental Health Crisis Beds (New stand alone 50-bed) | To be determined | CDCR | 2007 Budget Act authorizes funding this project from AB 900 if the Department of Finance certifies that the Coleman court has resolved to construct this facility rather than the proposed larger Consolidated Care Center at this same prison. The current mental health program is now proposed to remain at CMC. |

Yellow area represents those projects proposed to be incorporated into the Receiver's CHCF Joint Project.

| LIST OF ACRONYMS (Arranged in Alphabetical Order) | |
|---|---|
| ASH | Atascadero State Hospital - DMH (Male) |
| ASU | Administrative Segregation Unit |
| CCC | Consolidated Care Center |
| CDCR | California Department of Corrections and Rehabilitation |
| CIM | California Institution for Men |
| CIW | California Institution for Women |
| CHCF | California Health Care Facility |
| CMC | California Men's Colony |
| CMF | California Medical Facility |
| COR | California State Prison - Corcoran |
| CSH | Coalinga State Hospital - DMH (Male) |
| CTC | Correctional Treatment Center |
| EOP | Enhanced Outpatient Program |
| DHS | Department of Health Services |
| DCHCS | Division of Correctional Health Care Services |
| DMH | Department of Mental Health |
| DOF | Department of Finance |
| DPA | Department of Personnel Administration |
| DTP | Day Treatment Program |
| DVI | Deuel Vocational Institution |
| EOP | Enhanced Outpatient Program |
| GACH | General Acute Care Hospital Bed |
| LOU | Locked Observation Unit |
| HDSP | High Desert State Prison |
| ICF | Intermediate Care Facility |
| ISP | Ironwood State Prison |
| IWL | Inmate/Ward Labor |
| KVSP | Kern Valley State Prison |
| LAC | California State Prison - Los Angeles County |
| MCSP | Mule Creek State Prison |
| MHCB | Mental Health Crisis Bed |
| MSH | Metro State Hospital |
| NKSP | North Kern State Prison |
| NSH | Napa State Hospital |
| PBSP | Pelican Bay State Prison |
| PSH | Patton State Hospital - DMH (Female) |
| PSU | Psychiatric Services Unit |
| PVSP | Pleasant Valley State Prison |
| PWB | Public Works Board |
| RJD | Richard J. Donovan Correctional Facility |
| SAC | California State Prison - Sacramento |
| SATF | Substance Abuse Treatment Facility at Corcoran |
| SOL | California State Prison - Solano |
| SQ | California State Prison San Quentin |
| SVSP | Salinas Valley State Prison |
| SW | Statewide |
| WSP | Wasco State Prison |