# EXHIBIT

T

# Inmate Population, Rehabilitation, and Housing Management Plan

July 2006

**California Department of Corrections and Rehabilitation**
**James E. Tilton, Secretary (A)**



**Governor Arnold Schwarzenegger**

CDCR009402
CDCR009402

# OVERVIEW

CDCR009403
CDCR009403

# OVERVIEW

*Based upon the current population and projected growth, the California Department of Corrections and Rehabilitation will run out of beds for its adult male population by July 2007.*

The CDCR population has reached a new all-time high of 171,527. Of particular importance, the CDCR has insufficient celled and dormitory housing to accommodate the current and projected male population. This trend has required the CDCR to activate non-traditional temporary housing utilizing existing program areas (gyms, dayrooms, and TV rooms) to provide housing for the expanding population. As of June 14, 2006, the adult male offender's population was 159,867. This situation has resulted in increased security concerns based upon severe overcrowding and the housing of inmates in less secure areas. This extensive overcrowding has also severely affected the CDCR's ability to achieve its goal of providing substantive work, vocational training, and educational programs for every inmate incarcerated. In addition, the overcrowding and lack of treatment space to service the additional populations has been a major contributor to court intervention regarding CDCR's health care services delivery. The CDCR is currently operating under stipulated court agreements for medical, mental health, and dental services, and is under receivership for medical services.

Additionally, the CDCR is currently experiencing custodial staff shortages that will be exacerbated by demands placed on staffing based upon the projected increases in population. By October 2006, CDCR projects this shortage in the officer classification to stand at 2,481 positions, 11 percent of all authorized positions. The vacancy rate is amplified by unbudgeted planned workload such as medical transportation and unplanned absences such as sick leave over budgeted levels. CDCR is seeking to mitigate the officer vacancy rate by streamlining existing testing requirements and expansion of our academies. However, inmate population increases, officer attrition, and more efficient use of academies will not alleviate the officer shortage for several years. The activation of 4,000 CCF's and 5,000 out-of-state beds for deportable foreign nationals represent the quickest response to the bed need without impacting the existing staff shortage.

The CDCR has developed a bed utilization plan that maximizes all existing and potential resources, and will promote the successful achievement of CDCR's mission. In developing this plan, the CDCR recognized that the use of non-traditional beds must be minimized while still providing bed and program capacity for future populations.

- **Based upon the Spring 2006 Population Projections, the CDCR will need to increase the adult male capacity by 51,069 beds with associated program space by 2021, in order to accommodate the expected population and eliminate non-traditional temporary housing.**

---

*California Department of Corrections and Rehabilitation*                    *Page 1*

CDCR009404
CDCR009404

- **CDCR has developed a number of strategies that will require simultaneous project development and funding as quickly as possible. These are re-entry facilities, male/female Community Correctional Facilities (CCF), infrastructure improvements, short and intermediate term housing construction, new prison construction, out-of-state placement, and other state facilities.**

CDCR's use of non-traditional beds stretches reasonable security correctional standards and the safety of staff, inmates, and the public. There are no additional alternatives to further overcrowding existing prison capacity without great risk to the public safety.

CDCR009405
CDCR009405



Double bunking in dayroom at CA Institution for Men



Housing overcrowding in hallway at CA Medical Facility

CDCR009406
CDCR009406

# BED CAPACITY GAP

CDCR009407
CDCR009407

# BED CAPACITY GAP

## Impending Adult Male Bed Capacity Gap

- By June 2007, the CDCR will have activated all remaining non-traditional beds and reach full capacity.
- The CDCR needs to increase capacity by approximately 9,000 beds by June 2009 in order to keep pace with the projected population.
- The CDCR needs to increase capacity by approximately 2,500 beds between July 2009 and June 2010 in order to keep pace with the projected population.
- The CDCR needs to increase capacity by approximately 2,000 beds between July 2010 and June 2011 in order to keep pace with the projected population.

## CDCR Proposes to Increase Capacity

- The CDCR proposes to increase capacity by approximately 19,500 beds by June 2009 which would allow for the deactivation of approximately 10,500 non-traditional temporary beds. These beds consists of 8,968 beds of new construction at existing prisons, 4,000 CCF beds, out of state placement of 5,000 foreign nationals with Immigration and Customs Enforcement (ICE) holds, and the conversion of 800 female beds to male at the California Rehabilitation Center (CRC). Reactivate 760 beds at Northern California Women's Facility (NCWF) to male.
- The CDCR proposes to increase capacity by approximately 5,700 beds by June 2010 which would allow for the deactivation of approximately 3,200 non-traditional temporary beds.
- The CDCR proposes to increase capacity by 14,000 beds by September 2012. This consists of 9,000 new construction and 5,000 Re-entry beds.
- This plan, if fully implemented will provide additional capacity of approximately 39,200 male beds, thus eliminating the use of all non-traditional beds by September 2011. Additionally, it will provide capacity for the anticipated growth in the male population into 2014.



*Male Inmate Population Bed Gap Capacity vs. Population*

CDCR009408
CDCR009408

## Impending Adult Female Bed Capacity Gap

- Activation of 4,500 Female Rehabilitative Community Correctional Center (FRCCC) beds will provide additional female capacity through April 2020.



*Female Inmate Population Bed Gap Capacity vs. Population*

* Approximately 800 female beds deactivated with implementation of 4,500 female CCF beds.
** Includes all contract beds: CCF, CCRC, DMH, DTF, and County Jails.
*** As 4,500 female CCF beds are activated CDCR will convert added capacity to male beds.

CDCR009409
CDCR009409

# INFRASTRUCTURE

CDCR009410
CDCR009410

# INFRASTRUCTURE ISSUES

CDCR's infrastructure includes multiple sophisticated systems such as power, water and wastewater, steam, energy conservation, telecommunications and fire suppression. The CDCR facilities are very much like cities, that, to function properly, must have an adequate utility infrastructure that provides for the safety and well being of all that enter, work, or live in the facility. These systems must also meet regulatory requirements and standards that periodically change and become more restrictive. At some facilities, water, wastewater, or power generation are provided on-site through CDCR-owned and operated plants. At other facilities, CDCR purchases these services from municipal sources or private providers.

In institutions where CDCR operates wastewater or water treatment plants, numerous violations have been cited, Cease and Desist Orders have been issued and fines levied due to the plants' inability to meet the requirements. Initial plant design allows for a minimal amount of growth, however, the population expansion has exceeded capacities and modifications are necessary.

This plan provides for the expansion of existing infrastructure systems to permit the construction of housing and program space on existing CDCR prison sites. The specific mitigations were developed through site surveys with the prisons. Site specific analysis will be required by technical staff to validate the recommendations and confirm cost estimates. In order to facilitate the necessary housing/space development the following strategies will be employed.

## Solutions

**Immediate** – Mitigations necessary to implement initial phase of the housing plan.

CDCR will implement water conservation measures to increase capacity at existing prisons.

- Reduces the amount of potable water consumed, allowing for additional capacity.
- Reduces the amount of wastewater created, allowing for additional capacity.

**Continuous** – Mitigations necessary to implement the remainder of the housing plan.

Conduct an extensive evaluation of infrastructure upgrades required to manage the addition of infrastructure demands.

- Expand existing plants (water and wastewater) for proposed additional infrastructure demands.
- Expand municipal agency plants; modify agreements for proposed additional infrastructure demands.
- Expand power capabilities.

CDCR009411
CDCR009411

# PROPOSED SOLUTIONS

CDCR009412
CDCR009412

# PROPOSED SOLUTIONS

The CDCR has developed a population, rehabilitation, and bed management plan that will allow the CDCR to take a multi-pronged approach to expanding bed capacity that will accommodate the projected population increases. It is imperative that the CDCR has the flexibility within the plan to procure capacity in the most timely and effective manner available. The following options represent a combination of alternatives that the CDCR will utilize to secure the necessary bed capacity to accommodate the projected increase in population and eliminate the use of non-traditional temporary housing.

CDCR recognizes that the actual mix of options and produced beds will vary based upon availability and funding. CDCR is proposing pursuing all options simultaneously and modifying the request as necessary to address the housing need. The current population deficit and uncertainty of option availability demand this approach. The following proposed solutions assume a total number of beds. Upon receiving authority to pursue the options a more detailed scheduled and refined cost estimate will be developed and reported to the legislature.

| Proposed Solutions | Security Provided by: | Number of Beds |
|---|---|---|
| Female Rehabilitative Community Correctional Centers | CDCR | 4,500 |
| Re-Entry Program Facilities | CDCR | 5,000 |
| Male Community Correctional Facilities | PRIVATE/PUBLIC | 4,000 |
| Housing Construction at Existing Facilities | CDCR | 14,678 |
| NCWF Activation to male beds | CDCR | 760 |
| Foreign Nationals with ICE Holds | PRIVATE/PUBLIC | 5,000 |
| CRC Conversion to male | CDCR | 800 |
| New Prisons | CDCR | 9,000 |
| **Total** | | **43,738** |

## Female Rehabilitative Community Correctional Centers

In July 2005, the former California Department of Corrections changed its name and mission to address the rehabilitative and re-entry needs of incarcerated females and males. As part of this re-organization, the CDCR established a new unit, Female Offender Program and Services to implement standards for the management, rehabilitation, and community reintegration of the over 11,600 females incarcerated within the CDCR.

There are currently four (4) State prisons housing 11,600 female offenders. Of those, only seven (7) percent (867) are housed in community-based beds. Nearly 5,900 (as of February 28, 2006) adult females who are also eligible for community based placement are incarcerated in the existing State prisons for non-serious, non-violent offenses and are classified as Level I and Level II. According

CDCR009413
CDCR009413

to the Spring 2006 Population Projections, the female felon and non-felon population will increase by an additional 1,550 by June 30, 2009. The existing community-based facilities that house the 867 women include the Leo Chesney CCF, a Restitution Center, Conservation Camps, Family Foundations Facilities, Community Prisoner-Mother Program Facilities and Drug Treatment Facilities.

To facilitate the female offender reform efforts, the CDCR created a strategic plan for improving outcomes for female offenders by implementing gender-appropriate operational practice, programming, medical, mental health and dental care, "wrap-around" treatment programs and services, in community-based facilities. CDCR's strategic plan for female offenders will move approximately 4,500 Level I and II female offenders from prison beds into an expansion of community-based beds with intensive wrap around services. This will allow the non-violent, non-serious offender to be placed in or near the county of commitment and begin a structured, individually tailored treatment, and rehabilitation/reintegration plan that begins at date of sentencing and sees the female offender through discharge from parole.

- All programming services will be provided by contract personnel, and CDCR will provide 24 hour/7 days per week security services.

Subject matter experts were hired to develop a Request for Proposal (RFP) for the 4,500 community beds. These are called Female Rehabilitative Community Correctional Centers. A contracted facility planning consulting firm has developed "Facility Guidelines" for the design of the female 75-bed, 100-bed, and 200-bed facilities that will be located throughout the State. The specific mix of facilities will not be determined until the RFP process is completed. The Facility Guidelines were developed around the program components, required staffing and the unique and differing security needs of the female offender.

The facilities will be demographically dispersed throughout the State consistent with the numbers of female offenders currently incarcerated for non-serious/violent offenses, the counties from which they were committed, and the counties to which they will return upon parole.

A Case Manager will be assigned to oversee the offender from commitment through discharge from parole. An initial and ongoing assessment(s) will provide a prescriptive program. Medical, mental health, and dental services will be handled in the community (providing the condition is not so serious that it would preclude participation in the facility program). There will be no traditional "hub" facility for these services, which will eliminate the need for continual "shuttling" between facilities which is both costly and interrupts any meaningful programming. Classification and disciplinary issues will be handled on-site. Those requiring higher level custody will be reviewed and appropriately removed from the program. These facilities will be staffed with 24-hour, seven days per week, CDCR custody staff to provide security. The on-site Correctional Counselor III will be the senior ranking CDCR position to ensure all Penal Code and departmental requirements are met, supervise the assigned custodial staff, and provide appropriate contractor training related to CDCR responsibilities and public safety.

CDCR009414
CDCR009414

Contract staff will provide for overall program and facility management. Programs and Services will include:

- Substance Abuse Treatment and Education
- 12-Step Meetings and Programming
- Group Counseling
- Individual Counseling
- Trauma Treatment
- Educational and Vocational Programming
- Community Linkages
- Skill Building
- Sober Living Skills
- Healthcare
- Wellness/Recreational Programs
- Religious Programs
- Family Counseling and Family Reunification Process



The 4,500 beds will be phased in over two (2) years; 2,500 beds in 2007/2008 and 2,000 in 2008/2009. It is estimated that the first facility could open in April 2008. Without yet having received the actual bids, it is difficult to project exact numbers and timeframes. A Request for Information (RFI) was released in May 2006 and the Department received 38 responses for possible housing and programming for the population. The activation of FRCCC beds will enable the CDCR to convert 800 female beds at CRC to male.

**In summary**, in January 2005, the CDCR established a Gender-Responsive Strategies Commission (GRSC) to develop an overall plan for improving outcomes for female offenders. The Committee was created in response to the significant growth of the female population, the existing high recidivism rate, and to address the differences that exist between female and male offenders in terms of management and rehabilitation. To guide its work, the GRSC developed a vision. This RFP, program elements, facility design, and multi-disciplined blend of staffing, is the first major step in actualizing that vision.

CDCR009415
CDCR009415

California
# Department of Corrections and Rehabilitation

## COMMUNITY CORRECTIONS

### COMMUNITY CORRECTIONAL CENTERS ADMINISTRATION

**PUBLIC COMMUNITY CORRECTIONAL FACILITIES (CCF)**
1. Lassen (LAS), Susanville
2. Chesnut Custody Center (CLN), Coalinga
3. Delano (DEL), Delano
4. Shafter (SFT), Shafter
5. Taft (TAF), Taft
6. Adelanto (ADL), Adelanto

**PRIVATE COMMUNITY CORRECTIONAL FACILITIES (CCF)**
1. Leo Chesney Center (LEO), Live Oak
2. McFarland (MCF), McFarland
3. Mesa Verde (MSV), Bakersfield
4. Baker (BKR), Baker

**PRIVATE MEDIUM COMMUNITY CORRECTIONAL FACILITIES (MCCF)**
1. Golden State (GOL), McFarland
2. Central Valley (CVA), McFarland
3. Desert View (DES), Adelanto

**FEMALE PRISONS**
CIW
CCWF
VSPW
CRCW

**FEMALE CAMPS - (290)**
MALIBU/RAINBOW/PUERTA LA CRUZ

**FEMALE CCF**
LEO CHESNEY (650) +40

**RESTITUTION CENTER**
LA (60)

**FAM. FOUNDATIONS - ALT. SENT**
SD      (135) +45 Children
SFS     (45) +45 Children
FRESNO  (0)

**CPMP**
OAKLAND     (24)
BAKERSFIELD (23)
POMONA      (24)

**DTF - OSAP**
SD          (40)
SANTA ANA   (42)
LONG BEACH  (32)
MONROVIA    (0)

**FOTEP - PAROLE**
SD          (54)
SD          (50)
EL MONTE    (59)
SFS         (29)
MONROVIA    (24)
SR          (32)
FRESNO      (45)

CDCR009416
CDCR009416

## Reentry Program Facilities

### Concept

Breaking California's entrenched cycle of parolee failure is the purpose of this new initiative. The desired outcome is to reduce post-release criminal behavior of high risk offenders returning to their county of last legal residence, and to scale back the failure rate of at-risk parolees revoked with no new prison term. This initiative envisions the creation of state and local government partnerships, new secure reentry facilities (5,000 beds), and enhanced services, as necessary for program success.

This CDCR proposal has at its core: risk and needs assessments; case management; wrap around services; a continuity of care between custody and parole; and collaborative partnerships between corrections, law enforcement and local community service providers. For California, the more salient features of our reentry partnership with local government will include:

**1. Improve inmate/parolee information.** Improve parole and local law enforcement information on parolees, and provide parole agents new and better risk and needs assessment tools for better placement decisions.

**2. Create new Police and Parole Agent Teams:** Additional parole agents will team with local law enforcement. Together these teams will increase the intensity and quality of supervision of parolees. They will target serious parole offenders for revocation and prosecution. Parolees at serious risk of re-offending will be targeted for placement in these Community-Based Parole Reentry Facilities.

**3. Improve the delivery and quality of inmate/parolee programs:** A mix of programs will be designed to meet the unique needs of inmates and parolees returning to a particular community. These programs will be evidence based, and tailored to the specific problems inmates/parolees must surmount.

**4. Secure community reentry beds for inmates/parolees in the selected target area:** To bolster reentry success, inmates and revoked parolees will spend the last few months of their term in close proximity to their home. Housing is anticipated to be cells with double occupancy. The facility will provide 24-hour supervision, and not allow in or out privileges. The building will contain a secure perimeter, and adequate space for mandatory programming. These facilities will be operated by the CDCR, and will be designed to be aesthetically complimentary to the surrounding area. Local political support will be needed for siting.

### Background

CDCR009417
CDCR009417

Proposed is a new Parole Reentry Project. This CDCR proposal will reflect the core attributes of efforts identified in research as "reentry partnership initiatives". Like those, our proposal will require a new style of state and local partnership. Reentry partnership initiatives were the subject of a 2002 National Institute of Justice, Office of Justice Program (OJP) study, entitled *Reentry Partnership Initiative: Moving from Prison Safety to Public Safety*. The report featured projects in the following communities: Baltimore, Maryland; Burlington, Vermont; Columbia, South Carolina; Kansas City, Missouri; Lake City, Florida; Las Vegas, Nevada; Lowell, Massachusetts; and Spokane, Washington). The three primary phases of a reentry partnership initiative include an *institutional phase*, a *structured reentry phase*, and a *community reintegration phase*. Figure 1 from the OJP report provides a good overview of these phases and support elements:

Figure 1

The above model is applicable to other reentry programs, and thus allowed staff to explore reentry options which may be better suited to California. In particular the efforts of the State of Illinois were seriously considered, as it is the only state that mirrors California by having both determinant sentencing and mandatory parole. In a September 2005 report by the U.C. Irvine, Center for Evidence-Based Corrections, Illinois was found to incarcerate only six (6) percent of their technical violators, compared to California re-incarcerating 39 percent. This and other favorable differences in Illinois are believed attributable to initiatives which include formation of a bipartisan statewide commission and working group to improve reentry success, the re-opening of a shuttered prison dedicated to a reentry purpose that directly links with two Community Support Advisory Councils in inner city Chicago. Parole agents in Illinois have access to a broad array of punitive and support services, affording the state options to re-incarceration. As one of the primary objectives of these Illinois efforts is to simultaneously reduce inner city street crime, these options are truly employed to bolster public safety. More research on Illinois is planned as this initiative develops.

---

CDCR009418
CDCR009418

A January 2, 2005 press release of Illinois governor heralded early results of their efforts, "On the one-year anniversary of the Sheridan National Model Drug Prison & Reentry program, Governor Rod Blagojevich today released results of an early evaluation of the program showing success in reducing crime and recidivism by as much as 66 percent."

For California, local support will be required to site and develop the requisite Parole Reentry Facilities. These facilities will be designed as 500-bed "mini-prisons" (considered small by California standards). Facility siting, in the inmate/parolee community of return, should enable CDCR to create an unprecedented continuity of care in the provision of needed support services. CDCR is recommending ten (10) facilities be built in cities, counties or regions willing to partner with CDCR, so as to achieve the purposes of this initiative.

Failure on parole is a significant contributing factor driving the over-crowding of our prisons. In the most recent Monthly Projection Status Report, - May 2006, parolees returned to custody accounted for 64 percent of all admissions between January 1 and May 31, 2006. During this period there were 20,284 new admissions of offenders not on parole, for 36 percent. CDCR received 8,690 parole violators returned to prison with new criminal convictions, representing 15 percent. A significant need for bed space was due to the 28,107 parolees who were violated with no new term, constituting 49 percent of all new admissions.

California inmates are woefully unprepared for their return to their county of last legal residence. This population is of great concern to local communities, and especially to local law enforcement. With the recent Sampson decision, the U.S. Supreme Court upheld the authority of local California law enforcement to conduct spot searches of parolees in much the same manner as our parole agents. Parolees who are ill prepared for reentry are most likely to engage in illicit behavior and thus warrant police attention. Thus, better preparing parolees for release is timely on many fronts.

There is an emerging consensus among researchers and policymakers nationwide that a focus on reentry is the critical area of need. An alternative is envisioned to California's existing pattern of adding prisons to meet a continual crisis of prison overcrowding, largely driven by failure on parole. That alternative would revolve around a new type of community based facility which would reflect all of the best thinking on how to dramatically improve parolee outcomes.

Possible effect on Recidivism: Staff has discussed the preliminary design of this initiative with Dr. Joan Petersilia, PhD, Executive Director of the U.C. Irvine Center of Evidence-Based Corrections, and nationally recognized expert on offender reentry. Dr. Petersilia informed staff that considerable research on the national level is available to assist CDCR in this new effort. When asked about the potential for success, she stated that for any such effort four critical ingredients must be in place. These ingredients include: program design, selection of the right target population, staff competency (which includes training and stability), and quality community

CDCR009419
CDCR009419

collaborations. If these ingredients are present and sustained over time, she expressed a general confidence that, like other such efforts, significant success rates are reasonable.

## Capital Costs

The conceptual design of these facilities, and therefore the estimated capital costs, are notably different from the traditional California prison construction project. Where most prison projects were constructed using prototype designs in rural locations, the department was able to achieve design economies of scale, use lower-cost building materials (steel, wood, and stucco, etc.) in non secure areas, and utilize two story low-rise housing units permissible due to the 100-300 plus acres of land on which each facility was sited.

The overarching principal in these proposed Reentry Facilities is to accomplish changes in parolee behavior by providing a robust array of evidence based programs for every inmate doing their short period of incarceration in this facility and upon parole in communities. Thus, these programs will require a significant amount of dedicated facility space. These Reentry Facilities are proposed to be sited within urban locations, where community and governmental services can be seamless and transition with the parolee upon release. Construction may require the purchase of more expensive urban property, demolition of existing structures, mitigation of urban environmental issues such as traffic, water, sewer, etc, and will involve more expensive mid-rise construction ensuring a high level of security for the entire building envelope (similar to some urban county jails).

## Programs

The Office of Research working with the Center of Evidence-Based Corrections at UC Irvine is identifying specific programs that have a proven record of reducing recidivism. A large body of research and evaluation, including Joplin et al. (2004) from the National Institute of Corrections, illustrates what treatment principles help inmates make the transition to a successful crime free life. Using this framework, a partnership that provides a comprehensive model of treatment and prevention services is indicated. The program goal is to reduce recidivism in the inmate/parolee population most likely to re-offend. Some important risk factors shown to be linked with recidivism include substance abuse, trauma and violence, gang affiliation, family dissolution and dysfunction, lack of employability and housing, and problems associated with mental and physical health disorders.

Steeped in evidence-based practices, the program model will move prisoners who are close to their parole date and parolees who are being revoked on technical violations, to the secure locked facility within their former neighborhood. Criteria for participation will be based on need and risk of re-offending.

A case management model will be implemented. This will start with an intake assessment of risk and needs and will finish with an exit interview to determine an inmate's needs for continued success. Various programs and services will be available based on risk and needs assessments. They range from drug and alcohol treatment and maintenance, cognitive behavior therapy,

CDCR009420
CDCR009420

# EXHIBIT

# U

00001

1          UNITED STATES DISTRICT COURT

2          EASTERN DISTRICT OF CALIFORNIA

3       AND THE NORTHERN DISTRICT OF CALIFORNIA

4   UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

5   PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

6

7 RALPH COLEMAN, et al.,

8        Plaintiffs,

9 vs.                    No. CIV S-90-0520 LKK JFM P

10 ARNOLD SCHWARZENEGGER, et al.

11        Defendants.

   _____/

12

   MARCIANO PLATA, et al.

13

        Plaintiffs,

14 vs.

15 ARNOLD SCHWARZENEGGER, et al.

16        Defendants.

   _____/

17

18        Deposition of JAMES EDWIN TILTON

19

20 DATE:        SEPTEMBER 3, 2008

21 TIME:        9:41 A.M.

22 LOCATION:        ROSEN, BIEN & GALVAN

              315 Montgomery Street, 10th Floor

23            San Francisco, California 94104

24 REPORTED BY:    Cari L. Waters-Drewry

           Certified Shorthand Reporter

25           License Number 12401

00080

1 healthcare services delivery.  The CDCR is currently          11:43:34

2 operating under stipulated court agreements for medical,          11:43:36

3 mental health, and dental services, and is under          11:43:36

4 receivership for medical services."          11:43:36

5          Can you explain how the overcrowding and lack          11:43:37

6 of treatment space had contributed to difficulties in          11:43:51

7 CDCR complying with the mandates of these cases?          11:43:56

8          MS. TILLMAN:  I'll object.  It misstates the          11:43:59

9 evidence in the document.          11:44:01

10          If you can answer, go ahead.          11:44:02

11          THE WITNESS:  Well, I think what we were          11:44:05

12 raising here is the issue that the lack of space is not          11:44:07

13 only a housing issue, but it's impacting the other          11:44:10

14 factors, like delivery healthcare service, the lack of          11:44:15

15 offices, and clinical space.          11:44:19

16          MR. BIEN:  Q.  Did you believe, in the summer          11:44:22

17 of 2006, that that was a contributing factor to CDCR's          11:44:24

18 difficulty in complying with, for example, the Coleman          11:44:31

19 Court inmates for treatment?          11:44:37

20          MS. TILLMAN:  Misstates the evidence.  Assumes          11:44:39

21 facts not in evidence.          11:44:42

22          You can answer.          11:44:43

23          THE WITNESS:  It was clear to me that the lack          11:44:44

24 of program space was not just education, vocational.  It          11:44:46

25 also is the ability to provide the mental health and...          11:44:48

**Golden Gate Reporting**

1                                                      September 10, 2008

2

3      James Edwin Tilton
       C/O Lisa A. Tillman

4      Office of the Attorney General
       1300 I Street, Suite 125

5      Sacramento, California 94244-2550

6      In Re:  Coleman vs. Schwarzenegger

7      Dear Mr. Tilton:

8           Please be advised that, pursuant to California Code
       of Civil Procedure Section 2025.520, the original

9      transcript of your deposition, in the above-referenced
       matter, has been completed and is now ready for your

10     reading, correcting, and signing, by appointment, in our
       San Rafael office.

11          The transcript will be available for thirty (30)
       days.  Any errata changes mus be signed by you within

12     the thirty (30)-day time period.
            The official transcript for the noticing counsel,

13     with exhibits, will be mailed in accordance with the
       California Code of Civil Procedure, depending on the

14     action of the deponent.
            Thank you very much for the opportunity to serve

15     you.  Please do not hesitate to call upon our office
       with any questions.

16

17

18                              Best regards,

19

20                              *Cari L. Waters-Drewry / vo*

21                              Cari L. Waters-Drewry, CSR

22

23     cc:  Original Transcript

24          All Counsel

25

                                                      Page 241