# EXHIBIT

# AA

| STATE OF CALIFORNIA | DEPARTMENT OF FINANCE |
|---|---|
| CAPITAL OUTLAY | 915 L Street |
| BUDGET CHANGE PROPOSAL (COBCP) | Sacramento, CA 95814 |
| COVER PAGE  (REV 11/99) | IMS Mail Code: A15 |

**BUDGET YEAR 2007-2008**

ORG CODE: <u>5225</u>    COBCP NO. _____    PRIORITY: _____    PROJECT ID: <u>61.01.851</u>

DEPARTMENT:    <u>California Department of Corrections and Rehabilitation</u>

PROJECT TITLE:    <u>STWD Infill Housing and Program Space</u>

TOTAL REQUEST (DOLLARS IN THOUSANDS): <u>$2,703,119</u>    MAJOR/MINOR: <u>MA</u>

PHASE(S) TO BE FUNDED: <u>PWC</u>    PROJ CAT: <u>ECP-N</u>    CCCI/EPI: <u>4606</u>

SUMMARY OF PROPOSAL:

The California Department of Corrections and Rehabilitation proposes to add bed capacity by constructing and/or renovating additional beds within existing prison facilities and reactivating closed facilities (16,238 beds) and improve and/or increase all infrastructure, program and support space associated with the increased capacity; and relocating the Northern California Training Academy (satellite) at Northern California Women's Facility (NCWF) to Southern California. The construction of additional housing will provide the additional bed space needed to continue receiving newly sentenced felons and reduce the use of nontraditional housing.

HAS A BUDGET PACKAGE BEEN COMPLETED FOR THIS PROJECT?  (E/U/N/?):  <u>E</u>

REQUIRES LEGISLATION (Y/N): <u>Y</u>    IF YES, LIST CODE SECTIONS:

REQUIRES PROVISIONAL LANGUAGE (Y/N) <u>N</u>

IMPACT ON SUPPORT BUDGET:   ONE-TIME COSTS (Y/N): <u>Y</u>
         FUTURE COSTS (Y/N): <u>Y</u>  FUTURE SAVINGS (Y/N): <u>N</u>  REVENUE (Y/N): <u>N</u>

DOES THE PROPOSAL AFFECT ANOTHER DEPARTMENT (Y/N): <u>N</u>    IF YES, ATTACH COMMENTS OF AFFECTED DEPARTMENT SIGNED BY ITS DIRECTOR OR DESIGNEE.

SIGNATURE APPROVALS:

<u>Donna Long    01/04/2007</u>                    <u>Debora Simpson                01/04/2007</u>
PREPARED BY                    DATE           REVIEWED BY                    DATE


_____    _____
DEPARTMENT DIRECTOR  DATE           AGENCY SECRETARY        DATE
*************************************************************************************

DOF ANALYST USE

DOF ISSUE #_____  PROGRAM CAT:___  PROJECT CAT:___  BUDG PACK STATUS:_____

ADDED REVIEW:    SUPPORT:____TIRU:____ FSCU:____ OSAE:___ CALSTARS: _____

*************************************************************************************

CDCR020885
CDCR020885

## A. PURPOSE OF THE PROJECT:

### Introduction

The California Department of Corrections and Rehabilitation (CDCR) currently houses a record number of inmates due to inmate population increases, parole policies, sentencing laws, and recidivism rates. As of December 27, 2006, population was at an all-time high of more than 172,500 inmates. To accommodate this population the Department is required to house approximately 18,000 inmates in prison areas not designed or intended for inmate housing (nontraditional beds), including prison gymnasiums, dayrooms, triple bunks, and program space. These conditions pose substantial health and safety risks to the men and women working inside these prisons and to the inmates in the custody of the State.

### Problem Statement

Based upon Fall 2006 Population Projections, the CDCR has insufficient housing to accommodate the current and projected population and will run out of beds for its adult male inmate during the 2007/08 fiscal year.

The overcrowding of inmates into large common areas increases the risk of violence and reduces the ability of correctional officers to maintain control over the inmate population. Security is jeopardized by tight quarters and triple bunks that create line-of-sight problems for correctional officers. Risk for transmission of infectious illness is substantially increased by housing large numbers of inmates in the triple bunk environment. Overcrowding leads to inmate unrest and misconduct, and endangers the safety of staff, inmates, and the public. CDCR's ability to achieve its mission to improve public safety through recidivism reduction strategies is seriously impacted as programming space is not always available for inmates housed in nontraditional locations.

The severe overcrowding has significantly impacted existing infrastructure systems, most notably, wastewater systems. These systems are often required to operate at or above the maximum intended capacity, resulting in an increased, substantial health and safety risk to CDCR staff, inmates, the public, and the environment. Pumps, bar screens, and motors were not intended to operate at these high rates and for extended hours each day. Additionally, overloading the prison sewage and wastewater systems has caused the discharge of waste beyond treatment capacity, resulting in sewage spills and environmental contamination. The "overdischarge" of waste can create bacteria which contaminates the public drinking water supply, puts the public's health at great risk, and causes damage to state and privately owned property. These wastewater and sewer system issues have resulted in multiple fines, penalties, and notices of violation to the CDCR from environmental control agencies.

Following is a partial list of violations and fines CDCR has incurred:

### California Men's Colony
- December 5, 2005 – Regional Water Quality Control Board (RWQCB)-Mandatory Penalty Order R3-2005-0122 of $24,000 from violations of effluent limitations for the period April 1, 2004 through June 30, 2005.
- May 8, 2005-RWQCB - Administrative Civil Liability Complaint No. R3-2005-0037 for Sewage Spills over 200,000 gallons. Fine $600,000.

2

CDCR020886
CDCR020886

Deuel Vocational Institution
- April 25, 2003 was issued a CEASE AND DESIST order #R5-2003-0065 by the RWQCB Central Valley Region. The Order gave specific directions directly related to discharge permits along with a schedule to ensure compliance with effluent limitations B.1, B.8, B.7, C.1 of order #R5-2003-0065

California Correctional Center (Shared with High Desert State Prison)
- March 3, 2005 - Received a NOTICE OF VIOLATION for exceeding the waste discharge requirements of Board order 6-95-23, Department of Corrections, California Correctional Center, High Desert State Prison Wastewater Treatment Facility, Lassen County, WDID No. 6A186000500
- June 6, 2005 - The California RWQCB-Lahontan Region issued a CEASE AND DESIST ORDER for exceeding the waste discharge requirements of Board Order 6-95-23. The current high sludge content and past sludge removal that is on site in the ponds was also noted. Department of Corrections, California Correctional Center, High Desert State Prison Wastewater Treatment Facility, Lassen County, WDID No. 6A186000500

Mule Creek State Prison
- September 5, 2006 – Received a NOITCE OF VIOLATION for exceeding flows and effluent spills on the spray disposal fields, Order No. 5-00-088. The Order gave specific directions with time lines, directly related to discharge requirements for monitoring and reporting, water balance report, tailwater containment report and a long term wastewater facilities upgrade and financing plan.
- December 15, 2006 – Issued a CEASE AND DESIST Order # R52006-0130 by the RWQCB, Central Valley Region. The Order contains specific dates for certain actions and to submit reports on the wastewater system, to include but not limited to a 25% reduction in wastewater flows, sprayfield improvements consisting of ground monitoring well installation, staffing analysis report, flow metering installation, operations and maintenance plan, and long term wastewater facilities upgrade and financing plan.

The overcrowded conditions in CDCR's prisons have also overloaded prison electrical systems, resulting in power failures and blackouts that have created increased security threats and damaged electrical equipment in the institutions.

Project Justification

The State's prisons are dangerously overcrowded. The sociological effect of overcrowding has created an environment of tension in CDCR facilities. Inmates are triple-bunked in dormitory housing and in areas not designed as living units. Nontraditional beds are used for inmate housing in all but three of the State's prisons.

Inmate violence against staff and other inmates occurs on a daily basis. The effect of prison gangs is insidious and segments the population, providing a disincentive to positive programming. Overcrowding eliminates many of the population management tools necessary to control this behavior. Population management as a response to gangs is difficult as segregated housing is at a premium due to CDCR's inability to effectively manage behavior in these overcrowded conditions. Educational and vocational programs are difficult to establish and maintain in an environment of violence. Inmates interested in positive programming are often drawn to gangs in an overcrowded environment that

3

CDCR020887
CDCR020887

emphasizes the protection afforded by numbers. Table I displays the overcrowding and use of nontraditional beds in CDCR facilities:

TABLE I

| Institution Code | (A) Design Bed Capacity[1] | (B) Overcrowding Bed Capacity[2] | (C) (A) + (B) = (C) Long-Term Capacity | (D) Nontraditional Bed Capacity[3] | (E) (C) + (D) = (E) Projected Capacity |
|---|---|---|---|---|---|
| ASP | 2,920 | 2,848 | 5,768 | 2,270 | 8,038 |
| CAL | 2,308 | 2,010 | 4,318 | N/A | 4,318 |
| CCC | 3,883 | 1,841 | 5,724 | 594 | 6,318 |
| CCI | 2,781 | 2,150 | 4,931 | 1,207 | 6,138 |
| CCWF | 2,004 | 1,883 | 3,887 | 416 | 4,303 |
| CEN | 2,308 | 2,060 | 4,368 | 1,104 | 5,472 |
| CIM | 3,261 | 2,111 | 5,372 | 1,525 | 6,897 |
| CIW | 1,406 | 822 | 2,228 | 396 | 2,624 |
| CMC | 3,840 | 2,454 | 6,294 | 688 | 6,982 |
| CMF | 2,357 | 959 | 3,316 | N/A | 3,316 |
| COR | 3,116 | 1,838 | 4,954 | 499 | 5,453 |
| CRC | 2,314 | 2,346 | 4,660 | 196 | 4,856 |
| CTF | 3,301 | 3,346 | 6,647 | 480 | 7,127 |
| CVSP | 1,738 | 1,705 | 3,443 | 849 | 4,292 |
| DVI | 1,787 | 1,328 | 3,115 | 796 | 3,911 |
| FSP | 2,105 | 2,014 | 4,119 | N/A | 4,119 |
| HDSP | 2,324 | 2,022 | 4,346 | 780 | 5,126 |
| ISP | 2,200 | 1,985 | 4,185 | 1,284 | 5,469 |
| KVSP | 2,448 | 2,118 | 4,566 | 600 | 5,166 |
| LAC | 2,300 | 1,930 | 4,230 | 558 | 4,788 |
| MCSP | 1,700 | 1,497 | 3,197 | 786 | 3,983 |
| NKSP | 2,692 | 2,497 | 5,189 | 284 | 5,473 |
| PBSP | 2,393 | 1,051 | 3,444 | 200 | 3,644 |
| PVSP | 2,308 | 2,060 | 4,368 | 1,104 | 5,472 |
| RJD | 2,600 | 1,520 | 4,120 | 960 | 5,080 |
| SAC | 1,808 | 1,165 | 2,973 | 240 | 3,213 |
| SATF | 3,424 | 2,936 | 6,360 | 1,233 | 7,593 |
| SCC | 3,736 | 1,921 | 5,657 | 594 | 6,251 |
| SOL | 2,610 | 2,460 | 5,070 | 1,485 | 6,555 |
| SQ | 3,334 | 810 | 4,144 | 287 | 4,431 |
| SVSP | 2,324 | 1,876 | 4,200 | 770 | 4,970 |
| VSPW | 1,980 | 1,922 | 3,902 | 416 | 4,318 |
| WSP | 2,984 | 2,854 | 5,838 | 368 | 6,206 |
| Totals | 84,594 | 64,339 | 148,933 | 22,969 | 171,902 |

The Department's rehabilitation efforts are central to the systemic changes necessary to improve the correctional environment. These changes, while hampered by overcrowding, can occur concurrent with a large scale and concerted effort to relieve population pressures, but cannot be realized if that effort is insufficient or prolonged. Ultimately, the pressure of overcrowding results in violence and racial tension, lack of programs, and shortages of staff. Coupled with an outdated physical plant, these elements have

---

[1] Facility originally designed to house one inmate per cell and single bunks in dormitories.

[2] Overcrowding based on double celling and double bunks in dormitories.

[3] Beds that are in gymnasiums, day rooms, and triple bunks and program space not intended as living space

4

CDCR020888
CDCR020888

proven to form the base cause of large-scale incidents, as illustrated by the following examples in other overcrowded State facilities:

- In September 1971, the nation's deadliest prison riot occurred in Attica, New York. Forty-three lives were lost in the siege. Causative factors included overcrowding, inadequate physical plant, and racial tension among inmates and staff.

- The New Mexico State Penitentiary riot occurred on February 2, 1980. Thirty-three inmates were killed; more than 100 were injured. Twelve officers were taken hostage, many subjected to serious beatings, sexual battery, and rape. Causative factors include overcrowding, lack of programs, and shortages of staff.

- On April 11, 1993, a prison riot occurred in Lucasville, Ohio. This incident resulted in four officers being seriously injured, one murdered, and nine inmate fatalities. Causative factors included overcrowding, lack of staff, insufficient training and inadequate prison management.

## B. RELATIONSHIP TO THE STRATEGIC PLAN:

It is the goal of CDCR to provide safe and adequate facilities to improve the Department's ability to protect the public from harm by inmates and parolees.

### Goal 2:

*Manage California's inmate and parolee populations in a safer, more efficient, and more cost-effective manner.*

To accomplish Goal 2, the CDCR will address the following strategic issues: prison capacity, infrastructure/organization, inmate/parolee programming, and management practices.

Objective 1
Reduce inmate and parolee idleness through work and education programs.

Objective 2
Ensure adequate bed space is available to house California's prison inmate population.

Strategy
(a) Acquire additional prison beds through funding for prison construction and other existing means such as reviewing and changing institution missions, expanding existing facilities, and reviewing privatization options.

Objective 3
Maintain facilities in safe and proper condition to provide standardized and humane living conditions for all inmates and to mitigate risks to the surrounding communities.

Strategy
(a) Provide preventive maintenance and capital investment on CDCR facilities.
(b) Identify health and safety violations.
(c) Ensure compliance with the legally required health and safety standards.

CDCR020889
CDCR020889

## C. ALTERNATIVES

### *Alternative #1:*

Implement the construction of CDCR Infill Housing and Program space.

Background/Discussion

To address the bed capacity deficit, CDCR proposes to add 16,238 additional male beds through construction and renovation at existing prisons and reactivation of closed facilities, and improve and/or increase all infrastructure, program and support space associated with the increased bed capacity. This proposal includes building a new training facility in Southern California to maintain training capacity and increase statewide recruitment efforts. This proposal would authorize CDCR to utilize design build construction delivery methods for portions of this proposal.

Advantages

- Provides capacity to allow for continued reception of newly sentenced felons

- Reduces use of nontraditional beds

- Reduces prisoner overcrowding and inmate violence

- Improve work environment and safety for the correctional work force

- Increases the availability of program and recreation space that is essential for positive inmate programming including self-help, religious, recreational and art, and vocational programs

- Reduces the risk of catastrophic failure in an infrastructure system strained from severe overcrowding

- A Southern Academy for Correctional Officers would maintain current capacity for Correctional Officer training and increase statewide recruitment efforts

Disadvantages

- High capital cost

Fiscal Impact:

- $2.7 billion (this is an estimate and does not reflect fully developed costs but has been established with general estimates based on assumptions).

### *Alternative #2:*

Suspend Inmate Intake

Background/Discussion

Penal Code Section 4016.5 provides that counties shall be reimbursed for the cost of housing prisoners sentenced to State prison if the Department is unable to accept delivery of the prisoner. Under the law, reimbursement shall be provided for "each day starting on the day following the fifth working day after the date of notification by the county, if the prisoner remains ready to be delivered and the department is unable to receive the prisoner."

Based upon Fall 2006 Population Projections, the Department has projected that it will run out of existing capacity needed to house prisoners during the 2007/08 fiscal year. As a result, the Department will notify counties that it will only be able to accept prisoners at a rate equal to prisoner releases.

6

CDCR020890
CDCR020890

Based upon Spring 2006 Population Projections, it is estimated that the total number of State felons requiring housing in county jails by fiscal year (FY) 2015/16, will be approximately 26,000 inmates. An additional 19,500 inmates will continue to be housed in nontraditional beds within CDCR facilities.

County jails will be further impacted by this alternative. Many county jails do not currently have enough existing capacity to house even pretrial and post-dispositional offenders within their system. Current information from the Corrections Standards Authority reports that in calendar year 2005, 83,979 pretrial and 138,715 post-dispositional offenders were released due to lack of capacity within the State's county jail system. In 2005, there were 20 counties operating under a court-imposed population cap. Another 12 counties were under self-imposed/early release population caps.

Advantages

- CDCR would compensate the Counties at a predetermined level "jail-rate" without additional support or capital costs.

Disadvantages

- This alternative would require the Department to notify counties that it will only be able to accept prisoners at a rate equal to prisoner releases.

- Based upon Spring 2006 Projections, an estimated 26,000 State felons will require housing at county jails by FY 2015/16.

- Many county jails are already under court-mandated caps. County jails would be required to accelerate the release of pretrial and post-dispositional offenders to make room for State felons.

- This alternative would have a significant impact on public safety, as offenders needing to be incarcerated will be released within communities throughout the State.

Fiscal Impact (through FY 2015/16)

- $4.2 billion (total payments to counties are estimated at the Summer 2006 daily rate of $71 per inmate, adjusted for inflation).

*Alternative #3:*

Use other State assets to address housing needs.

Background/Discussion

The Department researched the use of other state facilities that could potentially house inmates, including the Fred C. Nelles Youth Correctional Facility, the Coalinga State Hospital, and the Federal Bureau of Prisons in Mendota.

The Fred C. Nelles Facility, although currently closed and on the State's surplus property list, is not suitable for housing the higher security level of inmate population required by the CDCR, lending itself only to low level and/or re-entry type adult male inmates. Due to the existing condition of the security perimeter, personal alarm system, structural condition of the housing units, utility systems, and environmental hazardous materials, it is roughly estimated to cost anywhere from $54 to $127 million to renovate the facility.

CDCR020891
CDCR020891

CDCR's Infill Housing and Program Space includes the relocation of the Northern California Training Academy (satellite) at NCWF to Southern California. Another potential use of the Fred C. Nelles facility may be as a Southern California Training Academy. Additionally, the Receiver identified this facility as a potential location for construction of new medical beds for inmates.

Coalinga State Hospital, located next to CDCR's Pleasant Valley State Prison is designed to house 1,500 Sexually Violent Predators and is not fully occupied. This facility would also lend itself to CDCR's lower level security inmates (1,000 beds) with minimal internal modifications. However, anticipated population growth by Department of Mental Health (DMH) patients, due to the passage of Jessica's Law, will eliminate the current available capacity.

The Federal Bureau of Prisons is constructing a facility in Mendota, California, that has experienced construction funding obstacles. The facility might have been made available to the CDCR provided the Department completed construction. Further investigation determined that the Federal Bureau of Prisons anticipates they will acquire the funding necessary to complete the facility. In addition, the completion of the construction is two to three years out, which will not address the CDCR's immediate capacity needs.

Advantages

- Provides a limited number of beds for lower security level inmates
- Coalinga State Hospital is in close proximity to an existing CDCR prison

Disadvantages

- Capital funding will be required for any of the above three facilities
- The number of beds will be minimal, and only for lower security level inmates
- Some of the beds will be available only until State Hospital needs increase
- None of the above facilities will be available for expedited occupancy

Fiscal Impact:

- Depending on which facility is considered, costs vary from $15 million to potentially $127 million or more

## D. RECOMMENDED SOLUTION:

1. Which alternative and why?

*Alternative #1:*

**Implement the CDCR Infill Housing and Program Space.**

The plan recommends funding for construction to add bed capacity to CDCR's system by constructing and/or renovating additional beds within existing prison facilities and reactivating closed facilities, for an additional 16,238 beds, while improving and/or increasing all infrastructure, program and support space associated with the construction; relocating the Northern California Training Academy (satellite) at NCWF to a site in Southern California.

2. Detailed scope description:

This project proposes to add bed capacity to CDCR's system by constructing and/or renovating additional beds within existing prison facilities and reactivating closed facilities (16,238 beds); and relocating the Northern California Training Academy (satellite) at NCWF to Southern California. The creation of new facilities will provide the additional bed space needed to ease departmental

8

CDCR020892
CDCR020892

overcrowding and authorize CDCR to use the design build construction delivery method for some of these projects. Table II displays the estimated construction schedule to implement the CDCR Infill Housing and Program Space:

## TABLE II

| Institution Code | Housing Type | Number of Beds | Estimated Start Date | Estimated Design Time | Estimated Construction Start Date | Estimated Construction Time | Estimated Activation Date |
|---|---|---|---|---|---|---|---|
| PVSP | Dorm | 400 | Jul-07 | 6 mos | Jan-08 | 12 mos | Jan-09 |
| PBSP | Dorm | 400 | Jul-07 | 6 mos | Jan-08 | 12 mos | Jan-09 |
| LAC | Dorm | 400 | Jul-07 | 6 mos | Jan-08 | 12 mos | Jan-09 |
| CAL | Dorm | 400 | Jul-07 | 6 mos | Jan-08 | 12 mos | Jan-09 |
| CEN | Dorm | 400 | Jul-07 | 7 mos | Feb-08 | 12 mos | Feb-09 |
| SVSP | Dorm | 400 | Jul-07 | 8 mos | Mar-08 | 12 mos | Mar-09 |
| KVSP | Dorm | 400 | Jul-07 | 9 mos | Apr-08 | 12 mos | Apr-09 |
| CRC | Dorm | 200 | Jul-07 | 9 mos | Apr-08 | 12 mos | Apr-09 |
| WSP | Dorm | 400 | Jul-07 | 10 mos | May-08 | 12 mos | May-09 |
| NKSP | Dorm | 400 | Jul-07 | 11 mos | Jun-08 | 12 mos | Jun-09 |
| MCSP | Dorm | 400 | Jul-07 | 12 mos | Jul-08 | 12 mos | Jul-09 |
| Site TBD | 270 | 1140 | | | | | |
| CMF | Dorm | 440 | Aug-07 | 13 mos | Sep-08 | 12 mos | Sep-09 |
| CAL | ASU | 190 | Aug-07 | 13 mos | Sep-08 | 12 mos | Sep-09 |
| PBSP | ASU | 150 | Aug-07 | 13 mos | Sep-08 | 12 mos | Sep-09 |
| SATF | ASU | 150 | Aug-07 | 13 mos | Sep-08 | 12 mos | Sep-09 |
| CRC | Dorm | 400 | Sep-07 | 14 mos | Nov-08 | 12 mos | Nov-09 |
| PVSP | Dorm | 200 | Sep-07 | 14 mos | Nov-08 | 12 mos | Nov-09 |
| RJD | Dorm | 200 | Sep-07 | 14 mos | Nov-08 | 12 mos | Nov-09 |
| CRC | Dorm | 400 | Oct-08 | 15 mos | Jan-10 | 12 mos | Jan-11 |
| RJD | Dorm | 400 | Oct-08 | 15 mos | Jan-10 | 12 mos | Jan-11 |
| SAC | SATU | 264 | Nov-08 | 16 mos | Mar-10 | 12 mos | Mar-11 |
| LAC | SATU | 264 | Nov-08 | 16 mos | Mar-10 | 12 mos | Mar-11 |
| NKSP | Dorm | 400 | Dec-08 | 17 mos | May-10 | 12 mos | May-11 |
| CEN | ASU | 190 | Dec-08 | 17 mos | May-10 | 12 mos | May-11 |
| NKSP | Wing Nut | 570 | Jul-07 | 12 mos | Jul-08 | 18 mos | Jan-10 |
| NKSP | Wing Nut | 570 | Aug-07 | 12 mos | Aug-08 | 18 mos | Feb-10 |
| SCC | Dorm | 400 | Mar-08 | 20 mos | Nov-09 | 12 mos | Nov-10 |
| CIM | Dorm | 400 | Apr-08 | 21 mos | Jan-10 | 12 mos | Jan-11 |
| CCI | ASU | 475 | May-08 | 22 mos | Mar-10 | 12 mos | Mar-11 |
| CCI | Dorm | 400 | Jun-08 | 23 mos | May-10 | 12 mos | May-11 |
| WSP | Wing Nut | 570 | Jan-08 | 12 mos | Jan-09 | 24 mos | Jan-11 |
| WSP | Wing Nut | 380 | Feb-08 | 13 mos | Mar-09 | 24 mos | Mar-11 |
| ISP | 270 & ASU | 365 | Mar-08 | 21 mos | Dec-09 | 18 mos | Jun-11 |
| CCC | Dorm | 400 | Jan-08 | 18 mos | Jul-09 | 24 mos | Jul-11 |
| ASP | Dorm | 600 | Feb-08 | 19 mos | Sep-09 | 24 mos | Sep-11 |
| ASP | Dorm & ASU | 590 | Mar-08 | 19 mos | Oct-09 | 24 mos | Oct-11 |
| CVSP | Dorm | 400 | Jun-08 | 23 mos | May-10 | 18 mos | Nov-11 |
| CVSP | Dorm & ASU | 590 | Oct-08 | 15 mos | Jan-10 | 24 mos | Jan-12 |
| SOL | ASU | 190 | Dec-08 | 17 mos | May-10 | 24 mos | May-12 |
| HDSP | ASU | 350 | Dec-08 | 17 mos | May-10 | 24 mos | May-12 |
| Total Construction | | 16,238 | | | | | |

[a] Shaded area represents construction activities that will be design build.

9

CDCR020893
CDCR020893

3. Basis for cost information.

The total project cost was derived based on estimates in the <u>Inmate Population Management Plan</u>, and the Institutional Summary Data which was provided to the Legislature in Summer of 2006. The Plan contains Project Cost Summary Estimates for every proposed housing unit at each institution. These costs have been updated to reflect escalation and proposed funding in 2007.

4. Factors/benefits for recommending other than the least cost alternative.

Alternative #1 is the recommended solution because it meets the Department's Strategic Goals for addressing issues related to prison capacity, infrastructure/organization, inmate/parolee programming, and management practices.

5. Complete description of impact on support budget.

CDCR estimates significant construction support costs, which at this time are unknown.

6. Identify and explain project risks.

Risks associated with not implementing the CDCR Infill Housing and Program Space include:

- Lack of capacity for continued reception of newly sentenced felons
- Nontraditional beds will continue to be used
- Increased inmate violence, with potential for riots and increased staff assaults
- Poor work environment, and safety for the correctional work force
- Reduced availability of program and recreation space that is essential for positive inmate programming including:
  - ➢ Self help, religious, recreational and art, and vocational programs
- Increased risk of catastrophic failure in an infrastructure system strained from severe overcrowding
- Statewide Correctional Officer training and recruitment efforts will be negatively impacted

7. List requested interdepartmental coordination and/or special project approval.

CDCR will require Legislative approval for design build authority for construction and/or renovation of additional beds at existing facilities, and relocation of the Northern California Training Academy (satellite) to Southern California.

8. Agency retained items:

Guarding and telecommunications costs have been included in the total project cost and will be retained by the Department.

9. Proposed project schedule:

See Table II, page 9

CDCR020894
CDCR020894

APPROVALS

Major Capital Outlay Budget Change Proposal

STWD Infill Housing and Program Space

January 4, 2007

Prepared by:

Donna Long, Staff Services Analyst

Deanna Rogers, Associate Construction Analyst

Capital Budgeting Section

Office of Facilities Management

Reviewed By

Debora Simpson, Chief

Capital Planning

Office of Facilities Management

Reviewed By

Richard Powers, Branch Chief

Facility Planning & Finance Branch

Office of Facilities Management

Reviewed By

Dean Borg, Assistant Deputy Director

Project Financing and Administration

Office of Facilities Management

Approved By

George S. Sifuentes, Deputy Director

Office of Facilities Management

11

CDCR020895
CDCR020895

# EXHIBIT

# BB

# Overview and Planning Guide for Northern California Women's Facility Conversion to a Secure Reentry Program Facility

**Presented August 30, 2007**
**By the California Department of Corrections and**
**Rehabilitation (CDCR)**

1

E_CDCR_001606

# Part I
# Introduction to the Public Safety and Offender Rehabilitation Services Act (AB 900)

Overview

In May 2007, Governor Arnold Schwarzenegger signed into law the Public Safety and Offender Rehabilitation Services Act of 2007, also known as Assembly Bill 900 (i.e., AB 900). This new statute provides vital funding for constructing state and local facilities and establishes important goals and objectives for achieving comprehensive prison reform and rehabilitation. It is anticipated, for instance, that up to 53,000 state and local jail beds can be constructed to ease the overcrowded conditions in these institutions. This overcrowding has risen to emergency levels over the past several years and its elimination is a critical component of prison reform not only because of its threat to inmate, staff and public safety, but also because of the inability to provide the requisite level of rehabilitation program services and constitutionally required care to inmates.

The Act also introduces the Secure Reentry Program Facility (SRPF) concept, a model in which smaller facilities, generally located near urban areas provide strong rehabilitation programs, offer greater proximity to service providers, family networks and prospective employers, all with an emphasis on better preparing offenders for life outside prison and reducing recidivism rates among the parolee population. The importance of effective programming, and the impact that it has on inmate success upon parole was underscored in the *Expert Panel Report* [1] commissioned by the Legislature in the Budget Act of 2006.

Reentry Facilities and Jail Financing

Many jails are experiencing the same levels of overcrowding as state institutions and AB 900 proposes to mitigate this through available lease revenue financing. However, because of the emphasis on programming as a key element of reducing recidivism, and the support of the reentry facility concept as an essential component of that success, AB 900 has established an important link between local jails and reentry facilities. The State has offered to match 75% of jail financing costs for counties submitting requests for funding in exchange for among other things the City or County inviting the State to site a reentry in that jurisdiction and further, its support in siting a reentry facility.

## Collaborative Partners in Prison Reform

Overview

This Act establishes the importance of forging collaborative partnerships between counties, cities, and California Department of Corrections and Rehabilitation

---

[1] June 2007. Expert Panel on Audit Offender Recidivism Reduction Programming Report to the California State Legislature http://cdcr.ca.gov/Communications/doc/ExpertPanelRpt.pdf

2

(CDCR) to work together to devise programs that will assist parolees to succeed on parole, reduce recidivism, and enhance public safety

Collaboration between the State and local authorities depends first on a commitment by both levels of government to dedicate experienced staff to plan the policies, programs and operational practices necessary to support effective offender management transition into local communities.

This beginning commitment is demonstrated by an *Agreement to Cooperate*, a non-binding agreement between the parties (Attachment A). This document reflects recognition that collaboration will be necessary between the State and the County to improve the successful transition of adult offenders back to their county of origin in order to reduce recidivism and enhance public safety through improved parole success. The document declares that current resources being used to address adult offender needs and challenges are to be reviewed under a collaborative relationship, and that the gaps in programs and services necessary to improve adult offender success on parole are to be jointly identified with proposed plans to address the gaps. This document also reflects that the parties agree to work collaboratively to site a secure reentry program facility.

The County Board of Supervisors, or in the case of a city, the City Council, interested in siting a secure reentry program facility should pass a resolution of support of a secure reentry facility, and then submit a signed *Agreement to Cooperate* to the Secretary of the California Department of Corrections and Rehabilitation. The *Agreement to Cooperate* is a non-binding agreement between the parties and serves as a joint commitment to begin the extensive work necessary to effectively site, design and operate a reentry program.

Summary of Existing County Commitments
Of the 58 counties, 13 have submitted an *Agreement to Cooperate* or a Letter of Intent with several more in process. The Monterey County Board of Supervisors, one of the 13 participating counties, has recently passed a resolution to establish a Planning Committee to begin siting a Secure Community Reentry Facility with the CDCR. Three other examples among the 13 counties are San Diego County, Santa Barbara County and Shasta County, with each having previously established a reentry planning committee with these committees actively meeting over a course of several years to date. These counties can be of real assistance to San Joaquin County, showing them what has worked and not worked as they have diligently developed their community support and programming over the past several years. CDCR can facilitate linking San Joaquin County to these people.

Similarly, and to varying degrees of development and efforts, the other 10 counties are working with CDCR to develop planning teams with an emphasis on adult offender reentry transition planning.

3

CDCR executives are currently developing site criteria and program guidelines to be used in its acquisition and facility planning processes. Staff will be working with each county with an *Agreement to Cooperate* to identify opportunities for siting facilities, designing programs to meet the unique population demographics and needs of the returning inmates and executing formal agreements that set forth the roles, responsibilities and general parameters of the parties as the discussions progress.

Collaboration with San Joaquin County
The San Joaquin County Board of Supervisors and Stockton City Council has passed resolutions supporting conversion of the former Northern California Women's Facility to a male reentry facility. As with the other participating counties, an *Agreement to Cooperate* from the San Joaquin County Board of Supervisors will additionally provide the necessary statement of commitment to collaborate with the CDCR in the broader planning efforts that are essential to improving adult offender reentry and transition to a successful parole experience. Additionally, due to the unique originating legislation of the NCWF facility, legislation must be sponsored and adopted that allows the redesignation of this facility from an adult women's correctional institution to a male Secure Reentry Facility consistent with AB 900. It is presumed that the elected City and County representatives, as well as other local constituencies, will continue to provide support throughout the legislative process and through occupancy of the facility under its new designation.

San Joaquin County executives advise the CDCR that they are in the process of establishing a Transition Team for the purpose of working with CDCR on facility (NCWF) activation planning and for developing appropriate reentry programs and services for adult offenders returning to San Joaquin County. The opportunity to re-dedicate and activate the NCWF as a reentry facility needs the active support of San Joaquin County, including law enforcement, mental health and substance abuse treatment providers, and community-based organizations delivering an array of services necessary for reentry and parolee success. The major cities within the county and various stakeholders directly impacting adult offender transition to the community after a term of incarceration must also be included. It should be noted that if the facility is to be included under a tri-party agreement with other counties, those additional counties and cities must be included early in the planning discussions.

## Overcrowding in Local Jails

Financing Local Jails
As with state facilities, local jails are experiencing unprecedented levels of overcrowding, many under imposed population caps which, without expansion relief, will continue to threaten public safety. One unique aspect of AB 900 is the provision for the State to provide a significant financial match to meet the funding

4

needs of local governments dealing with overcrowded conditions in jails. The Corrections Standards Authority (CSA) has oversight and funding authority for regulations and financing of local jails among other things and is authorized to provide funds to applicants as outlined in AB 900. Over $1.2 billion has been allocated with an expectation that as many as 13,000 jail beds may be funded statewide with this allocation. The process for submitting a request for funds, and the eligibility requirements and governing documents related to that request, will be further iterated in a competitive application process outlined in a Request for Proposal (RFP) to be issued by the CSA on or about November 1, 2007.

Design and Development
Even before the RFP can be properly responded to, the County should have a fully developed Needs Assessment as required by Title 24, regardless of the funding source, outlining a number of key components of its proposed detention system. This often includes a limited amount of programming information and is necessary before the county can progress to architectural programming and schematic design. It is our understanding that San Joaquin County is currently working on a Needs Assessment and has not yet progressed to its architectural design phase.

When a county submits its proposal for jail construction funding, the Needs Assessment document is required as part of that submittal. A proposal submission requires that a specific dollar amount be requested, thus necessitating sufficient architectural programming to be completed so as to be able to define the facility's architectural components and the estimated costs for construction and related activities (completing the architectural design process, construction management, etc.). The actual architectural design process, beginning with schematic design drawings, is not required prior to the submittal of a proposal.

Legal Ownership
The CSA is currently working with the State Public Works Board (SPWB) to draft the legal documents necessary to effect the proposed transactions governing this financial arrangement. For instance, because of the lease revenue financing provided for in AB 900 and the involvement of the SPWB, the State will require ownership throughout the duration of the Lease Revenue Bonds and all matters of ownership will be governed by a set of documents developed by the SPWB. It is anticipated that the parties will enter into a ground lease which facilitates the state's financing, with title vesting with the County upon payment of all lease revenue bonds. The terms and conditions of the ground lease are established by the SPWB in statute and administered by the SPWB, and are generally not subject to negotiation. Additionally, the parties, including the CSA, will enter into a Project Delivery and Construction Agreement that sets forth the roles, responsibilities and performance expectations of the parties if and when the County is selected as a participant (via the competitive RFP process initiated by

5

CSA), and terminating upon the completion of construction of the facility (as defined).

Other documents required to affect the financing of local jails may include but are not limited to a Right of Entry, Facility Sublease, Construction Contract, Hold Harmless Agreements, Site Lease, Operations and Maintenance Agreement, Loan Application, and related bond documents. To the extent possible, the RFP will include draft copies of these documents and/or provide a general overview of the requirements contained therein.

Preference in Jail Funding
Inasmuch as it is anticipated that the need for funding is far greater than the available allocation, it is expected that the RFP process will be very competitive. The CSA is currently establishing the criteria for which applicants will compete. This process will be guided by existing CSA practices and procedures, the criteria outlined in AB 900, and regulations governing the CSA contained in Title 15 and Title 24, both current and proposed.

One significant factor in assessing the responses to the RFP will be a county's commitment to the tenets of prison reform outlined in AB 900, with significant focus on the county's assistance in both inviting a reentry facility into its jurisdiction and its assistance in siting the facility. With the reactivation of NCWF as a reentry facility, San Joaquin County will meet these requirements as provided for in AB 900. Proposed legislation (SB 943, Machado) which will provide for the reactivation of NCWF at a reentry facility will state that the requirements for preference under AB 900 will have been met (the proposed legislation will state that for purposes of this facility, "reactivation" shall have the same meaning and legal definition as "sited" as contained in AB 900).

Funding preference is also given to counties that provide a continuum of care, so that parolees with mental health and substance abuse needs can continue to receive services at the conclusion of their parole. To the extent that San Joaquin County can meet the requirements of this, additional preference may also be awarded by CSA.

## San Joaquin County's Offender Characteristics

Characteristics of San Joaquin County Parolees
The CalParole database, as of August 2007, indicates that San Joaquin County has approximately 2,500 active parolees and 550 parolees on revoked status.[2]

---

[2] (Note: If a tri-party, or Regional Reentry Consortium is established between San Joaquin, Amador and Calaveras County, these figures would be as follows: Calaveras County as of August 2007 has approximately 100 Active Parolees and 21 on Revoked Status. Amador County has approximately 100 Active Parolees and 10 on Revoked Status).

6

According to data from the Offender Information Services Branch (OBIS), during the calendar year of 2006, 2,036 male inmates were released to San Joaquin County. This number counts an inmate as being released only once during the year. In total, including the same parolee who may have been released more then once, (due to multiple parole violations) 3,185 male inmates were released to San Joaquin County during the calendar year 2006.

To date, over 700 Correctional Offender Management Profiling for Alternative Sanctions (COMPAS) assessments have been completed on parolees in San Joaquin County. The following is a chart that shows information collected from the COMPAS Assessments (See Figure 1). Please note that the assessments were completed on inmates prior to being released from CDCR institutions to San Joaquin County from a period of July 2006 to July 2007. The discrepancy in the number of assessments is a result of some offenders only completing portions of the COMPAS.

Figure 1

| Risk Assessment | Number of COMPAS assessments completed | % Highly Probably | % Probable | % Unlikely |
|---|---|---|---|---|
| Residential Instability | 763 | 28% | 15% | 57% |
| Risk of Recidivism | 626 | 28% | 27% | 45% |
| Risk of Violence | 838 | 35% | 25% | 40% |
| Substance Abuse | 764 | 47% | 28% | 25% |
| Vocational Ed. Need | 473 | 38% | 18% | 44% |

Based on current population forecasts, the average number of projected inmates to be released to parole statewide is expected to remain stable for 2007. Likewise, for the remainder of 2007, the number of active parolees should remain relatively stable, barring any unusual circumstances.

Addressing the Needs of the Offender Population
As San Joaquin County inmates return to their county through a reentry facility, or for those inmates who may be returned to a reentry facility through a parole violation, it is important that the criminogenic needs identified as unique to each inmate, are addressed through the rigorous program identified in the inmate's behavior management plan and offered at each SRPF, along with aftercare programs in the community that can be extended to the offender upon his release. It is anticipated that each county's offender demographics will present slightly different challenges that will require a unique program approach. While AB 900 describes the overall importance of rehabilitation in the reentry facilities, the Expert Panel Report previously mentioned provides greater detail on the significance of this important assessment. It also lists the basic six program areas to address criminogenic needs. Many, but perhaps not all of these, would be programmed into the San Joaquin facility.

7

1. Criminal Thinking, Behaviors, Skills, and Associations;
2. Aggression, Hostility, Anger and Violence;
3. Academic, Vocational and Financial;
4. Family, Marital and Relationships;
5. Substance Abuse; and
6. Sex Offending.

An effective and necessary strategy for ensuring the success of a state reentry facility and the readiness of the community to provide support to the facility is outlined in Part II of this Guide. It is recommended that the County and the State use this process as an effective planning and partnership tool as it embarks on this mutual endeavor.

8

## Part II
## Stockton Secure Reentry Program Facility (SRPF)
## Proposal Planning Guide

A proposal to convert the existing Northern California Women's Facility (NCWF) to a Secure Reentry Program Facility (SRPF) is being considered by both the state and San Joaquin County. This guide includes information on defining a SRPF, a brief description of the parolee/inmate population needs, and preliminary information on the proposed programming to be offered at NCWF.

## Eligible Inmates

The target populations for San Joaquin County SRPF will be adult offenders from San Joaquin County (and possibly Amador and Calaveras Counties) who will returned to San Joaquin County and who have varying needs that will be determined under a battery of assessments, interviews and a review of the inmate's official file. Assessments of the adult offenders' rehabilitation needs, transition planning needs, and risks-to-re-offend will be identified beginning with the use of comprehensive assessment tool(s). These factors are also identified in the *Expert Panel Report on Audit Offender Recidivism Reduction Programming Report* to the California State Legislature.

The target population could also include parolees from San Joaquin (and possibly Amador and Calaveras Counties) who are being returned to state prison on a parole violation.

The San Joaquin County SRPF will target offenders with moderate and high risks to re-offend. Per statute, most offenders are required to parole to their community of last legal residence. This comprises over 90 percent of inmates released to San Joaquin County. Research demonstrates that by providing offenders with intensive programming, focused on their criminogenic needs, near their local community, they are more likely to be successful on parole, with their return to prison significantly reduced. [3]

Inmates housed in the SRPFs will meet the following criteria as determined by CDCR staff responsible for offender classification and endorsement to particular facilities and program assignments:

- Would be within 12 months of release. Inmates with moderate to high risk to re-offend will receive priority placement in the facility.
- Persons who are parole violators or pending parole violation.
- Would benefit from the programs offered as determined through use of a risk and needs assessment.

---

[3] Strategic Reform: Implementing Evidence-Based Programs for California Offenders. Joan Petersilia, Ph.D. July 12, 2005. http://ucicorrections.seweb.uci.edu/pubs.shtml#reports

9

## Staffing and Service Levels

In order to support the delivery of intensive programs to the offenders housed in the San Joaquin County SRPF, there will be a variety of job classifications including state employees, county/city employees, contract service providers or a combination of the above. The San Joaquin County SRPF will be operated by the California Department of Corrections and Rehabilitation. In addition to custody staff, the facilities will employ personnel with specialties in education, vocation, health care, substance abuse counseling, the arts, recreation, character based education, civics, parenting, gang awareness and other essential program areas. San Joaquin County and other local cities may agree to provide certain programs or services and local government employees may participate as part of the overall program delivery plan. Examples of local government's involvement include drug and alcohol programs, mental health programs, and classes led by local law enforcement gang task forces. In addition, services provided by community-based organizations will be included. Contract staff will be employed to deliver specialty programs or services to the offenders.

The vocational programs that will be included at each SRPF will reflect the local employment needs and the availability and interest of local employers in providing employment opportunities for returning offenders. Employment data for San Joaquin County is included and will be utilized in conjunction with other relevant data and planning input to design an effective vocational program that provides meaningful employment opportunities for the inmate and the business community.

There are several providers from San Joaquin County that currently have an ongoing relationship in providing services to parolees. These include the Contra Costa Office of Education, Freedom First, Father Matters, Work Net, New Directions, Narrow Gate Counseling Center, Sentencing Concepts, Delta Health Care and Counseling Center, Women's Center, S.T.E.P.S. Life Skills, Victory Outreach, The Way to Happiness, Horton Ministries, and Reformers Unanimous Addiction Program. It is anticipated that many of these will provide their services in the San Joaquin County SRPF, along with other providers who have a history of assisting residents of San Joaquin County. Additional state funding may be made available pursuant to AB 900 to assist in these efforts, as AB 900 included an appropriation of $50 million for statewide funding to expand treatment services for prison inmates and parolees. The funds are to be used for the following: prison-to-employment programs, substance abuse programs, risk and needs assessments, day treatment services for mentally ill parolees, and educational/vocational programs.

10

## Architecture and Design

The State has begun an architectural programming effort to establish core design criteria and space standards for cost efficient and operationally superior reentry facilities using performance-based standards consistent with the American Correctional Association (ACA). Each county, including San Joaquin County and/or city officials, has an opportunity to participate in the review of the proposed layout and design to ensure it meets its fundamental population needs.

Commencing on or about September 1, 2007 and continuing through the remainder of 2007, the State will continue in its architectural programming efforts. The State will develop a San Joaquin Reentry Planning Team to work with the San Joaquin County Reentry Team in establishing design criteria unique to San Joaquin County and its inmate population.

The suitability of NCWF is dependent upon needed renovations necessary to enhance security, meet current fire/life/safety code requirements, and to add the programs, medical and administrative spaces necessary to operate a robust array of programs appropriate to San Joaquin County. A preliminary Site Assessment of the feasibility of reactivating NCWF has been completed and additional architectural and engineering design will be required to reopen the facility with the revised design intent currently being established.

## Programming and Rehabilitation Services

The San Joaquin SRPF will house and provide programming to San Joaquin County (and possibly Calaveras and Amador counties) inmates within 12 months of their parole release date, and will also house Parole Violators who will be completing their parole violation terms for a period of one to twelve months. Additionally, the facility will:

- Contain appropriate space to provide the delivery of evidence-based programs and services.
- Provide administrative support and office space for the various critical intervention needs of housed offenders.
- Comply with court-mandated standards for medical, dental, and psychiatric treatment.

The design and operating principles and policies for secure reentry facilities continue to be developed and refined. Consistent with the *Expert Panel Report*, the following eight evidence-based principles and practices are being incorporated into the architectural design and rehabilitation program efforts:

1. Target inmates with a moderate to high risk to re-offend.
2. Assess offender's needs.
3. Design responsivity into programming.

11

E_CDCR_00161616

4. Develop behavior management plans.
5. Deliver treatment programs using cognitive-based strategies.
6. Motivate and shape offender behaviors.
7. Engender community support in offender reentry and reintegration.
8. Identify outcomes and measuring progress.

Other principles and policies that are being developed for secure reentry facilities will include, but not be limited to, custody and population management, incentives and privileges, feeding and health care support, compliance with court mandates and PLATA Receiver directives, security and escort inside the facility and transportation to and from the facility, and other substantive areas.

It is anticipated that various professional providers, including local government agencies and private sector vendors will be involved in delivering many of these areas of programs and services. Community-based organizations, non-profit and faith-based organizations are also key ingredients to the success of reentry facilities. The ability to effectively mobilize local government agencies and other partners in this process will determine in large part the overall success of the SRPF.

## Mitigation Funding

Reactivation of NCWF as a reentry facility will qualify San Joaquin County for mitigation funding based on the design capacity of the population to be housed within the facility, as provided under Penal Code Section 7005. CDCR has budgeted $800 per bed to be distributed pursuant to Penal Code Section 7005.5 which provides that funding would be split between the local education agency and the impacted city or county. This funding is designed to mitigate the impact that the facility would have on county services including, but not limited to, schools, transportation, public works, and other county services.

In addition, the State would be required to provide mitigation funding as identified during the Environmental Impact Report process required under State law.

## San Joaquin County/City and Reentry Planning

County and City Readiness
San Joaquin County/City readiness to support a SRPF can be represented through a variety of factors. CDCR will work with San Joaquin County to examine the following components as necessary:

1) Reentry Planning Teams – San Joaquin County should have a dedicated county reentry planning team. As an example, the following county officials and members may be involved:

12

E_CDCR_00161617

| **San Joaquin Planning Team** | Alcohol and Drug Programs |
|---|---|
| Sheriff | Private Industry Employers |
| District Attorney | Courts |
| Jail Commander | Public Defender |
| Local Adult Probation Official | Office of Education/Career Colleges |
| Police Department | Housing Authority |
| Adult Institutions' Representative | Other Service Providers |
| Local Parole Representative | Victims group |
| Mental Health Services  and | Community and Faith-based |
| Public Health | Organizations |
| City Representatives | |

Currently, the Division of Adult Parole Operations (DAPO) contracts and/or works closely with several San Joaquin County Agencies and Community Organizations including: the Contra Costa Office of Education, Freedom First, Father Matters, Work Net, New Directions, Narrow Gate Counseling Center, Sentencing Concepts, Delta Health Care and Counseling Center, Women's Center, S.T.E.P.S. Life Skills, Victory Outreach, The Way to Happiness, Horton Ministries, and Reformers Unanimous Addiction Program.  It is anticipated that representatives from these and other organizations will also participate on the planning teams.  Other programs and functions are included on Attachment C.

2) Availability of Wrap-Around Services - Consideration will be given to counties and cities able to provide contact information and estimated service capacity of community-based organizations, faith-based organizations, and other profit and nonprofit organizations that assist in various services and programs supportive of the reintegration of previously incarcerated individuals.

3) Availability of Employment - Consideration will be given to communities with employers willing to hire parolees.  These employers may begin to hire, train and employ the inmate while housed in the SRPF and then, upon release, provide employment to the offender when paroled.

4) County's Mental Health, Public Health, Substance Abuse and Social Services Departments - The extent to which these local agencies collaborate to provide a supportive network of services for previously incarcerated individuals will be considered.

5) Assistance with Parolee Housing - CDCR will work with San Joaquin county representatives to identify organizations that assist in transitional housing for parolees.  A general plan for the expansion of private/public partnerships to

13

enhance the availability of transitional housing will be evaluated. The ability to obtain Conditional Use Permits for parolee housing programs will be considered.

6) <u>Public Transportation</u> – San Joaquin County and the cities of Stockton, Modesto, Tracy and Lodi and communities in Amador and Calaveras County will be requested to provide information on the public transportation system. Ideally, transportation will be available for the contracted providers and inmate families to go to the SRPF.

7) <u>Services and Programs Intended to Reduce Recidivism</u> - Consideration will be given to evidence-based programs and services intended to reduce criminal behaviors, reduce victimization, and reduce recidivism among previously incarcerated individuals.

8) <u>County Established Reentry Efforts</u> - Consideration will be given to the counties with a successful history of planning and developing reentry programs and coalitions.

## Public Entity Agreements

Public Entity Agreements (PEA) will be used between the State and San Joaquin County to define the programming provided in the SRPF. A planning agreement should be developed to address the programs within the facilities, and the populations to be served. An additional PEA should be used to establish the parameters for the ongoing working relationships between the parties.

E_CDCR_00161619

15

E_CDCR_0016201620

# ATTACHMENT B

## Amador, Calaveras, and San Joaquin Local Programs

The **Computerized Literacy Program (CLLC)** is a computer-assisted instructional program designed to increase the literacy skills of parolees, resulting in increased parolee employability and parolee success. The CLLC's goal is to raise the individual's level of skill a minimum of two grade levels and/or up to sixth grade level. The CLLC strives to provide 800 instructional hours to students per month, by way of ten computer stations. The CLLC is open to all parolees, with no defined exclusionary criteria. According to the California State University San Marcos Evaluation of the California Preventing Parolee Crime Program (PPCP), published in December 2003, CLLC students achieving two grade learning gain recidivate at a 28.2% lower rate than non-PPCP parolees, making it an effective tool at reducing recidivism.

The **SUBSTANCE ABUSE TREATMENT AND RECOVERY (STAR)** Program is an "evidence-based" cognitive behavioral education program designed to provide substance abuse and relapse prevention instruction to parolees. STAR instructors are California Certified Teachers with additional training in STAR curriculum instructional methodologies. STAR classes meet five days a week, six hours per day and are offered on an open/entry, open/exit basis. There are twenty seats available at the Stockton Parole office. There are no exclusionary criteria for admittance into the STAR Program. Parolee participation in the STAR program is a proven tool in reducing recidivism. This fact is supported by the evaluation of the California PPCP, released in December 2003 by the California State University, San Marcos (CSUSM). Specifically, the CSUSM evaluation indicated that of all STAR admissions studied; only 40.4 percent of the parolees that graduated from the program were returned to custody within twelve months of release to parole. This is compared to 54.7 percent of the Non-PPCP parolee population returned to custody within twelve months of release to parole.

The Stock **Residential Multi-Service Center (RMSC)** provides housing for forty-nine homeless and at risk parolees. The RMSC program offers a variety of services to male and female parolees, which includes drug counseling, literacy training, job preparation/placement, anger management classes, as well as individual and group counseling. The program offers a minimum of six months and in some cases up to one year of residence with participation in a 90-day aftercare program. Program services shall be structured throughout the duration of the participant's stay and will encompass a minimum of 40 hours per week for unemployed and 20-hours per week for employed parolee-participants in a 5-phase program. The Stockton RMSC is currently at 100% of capacity.

The **Female Residential Multi-Service Centers (FRMSC)** RFP is part of California Department of Corrections and Rehabilitation's strategic plan to reduce

16

E_CDCR_00162u1621

recidivism and to provide gender-responsive rehabilitation for female offenders. The centers would provide treatment and services to female parolees to increase their opportunities for successful reintegration into their communities by creating a therapeutic environment. The programming will address such gender specific issues as trauma treatment, substance abuse, domestic violence, life skills, parenting skills, and job readiness. A twenty-five bed Stockton contract is tentatively planned for January 1, 2008.

17

# EXHIBIT

CC

CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
OUT OF STATE
CORRECTIONAL FACILITIES
FISCAL YEAR 2007/08
FALL POPULATION PROPOSAL

A.    **NATURE OF REQUEST**

The California Department of Corrections and Rehabilitation (CDCR), California Out-of-State Correctional Facility (COCF) is requesting a General Fund augmentation of $xxxxx and xxxx positions in Fiscal Year (FY) 2008/09. This is to support the expansion of the COCF program from 5,060 TO 8,000 inmates. In addition, due to delayed activations, the projected number of inmates moved out of state did not materialize. In light of this, we are reducing FY 2007/08 funding by $XXXXX.
Please see **Attachment A** for a summary of these costs.

In addition to expanding the previously approved resources for the COCF program, this request seeks to:

1)  Augment funding for additional court-mandated costs to conduct mental health screening for increased contracted beds.
2)  Augment the CDCR's existing vendor contract by increasing the number of contract beds by 2,940.
3)  Augment COCF staffing to manage increased bed capacity as a result of involuntary inmate transfers.
4)  Augment existing leased office space for additional COCF staffing.
5)  Augment contract for legal consultation and travel expenditures.
6)  Augment funding for pre-transfer medical screening by a registered nurse.
7)  Augment funding and staff to provide video visiting program to inmates housed on of state.
8)  Augment funding to offset overtime costs associated with custody coverage for medical screenings and overtime costs associated with processing the inmates for out of state placement.
9)  Augment support staffing to assist COCF in the implementation of the program.

B.    **BACKGROUND/HISTORY**

Prison overcrowding is obstructing CDCR's ability to ensure the safety of staff and inmates. Severe overcrowding conditions pose substantial risk to the health and safety of both staff and inmates. Prisons were intended to provide programming for education, vocation, and rehabilitative skills, yet space for those programs has been converted into housing units, reducing access to medical care and rehabilitative programming. These conversions were economical in optimizing the available space within the confines of the prison walls, but it also increases the risk of violence and decreases the ability of staff to control, manage and supervise the inmate population. History has shown that overcrowding was a causal factor to some of the deadliest prison riots in America.

On October 4, 2006, the Governor issued an Emergency Proclamation citing severe overcrowding as a threat to health and safety in 29 of the State's 33 prisons. Additionally, the legislature responded by passing AB 900, which permits the CDCR to transfer 8,000 inmates to contract

CDCR003746
CDCR003746

facilities in other states. As a result of this order, the CDCR established the COCF to administer the transfer and placement of inmates. The CDCR has begun the involuntary transfers of CDCR inmates to contract facilities out of state. The state entered into contractual agreement **with two vendors** for **XXXXX** beds and the COCF has successfully activated three of the contract facilities with voluntary and involuntary inmates.

During the process, the CDCR faced many legal challenges and obstacles to implementation, slightly delaying the activation of the beds as identified in the May Revision BCP. Despite the slowed start, CDCR anticipates being able to fill **XXXXXX** beds in FY 07/08 and has entered into a contract for an additional 3,000 bed facility in Arizona with implementation for intake beginning in July 2008.

The COCF was activated in October 2006 and will expand as the COCF population increases, however, additional resources will be needed to expand the COCF program, fund contract beds, fund pre-endorsement process and to transport the inmates in and out of California. The implementation and activation of the program is extremely staff intensive, requiring significant out of state travel to address serious non-compliance issues, to facilitate training, to audit facilities and to ensure compliance with court orders and inmate due process rights.

## C.    STATE LEVEL CONSIDERATIONS

Prison overcrowding has the potential to impact the health and safety of all citizens of California. Overcrowding leads to inmate unrest and misconduct, reduces or eliminates rehabilitative programs, increases recidivism, impedes access to health care services, and places overloading on electrical, sewage and wastewater systems.

**Something about the 3 judge panel.**

Without action, the overcrowding in California prisons will eventually force CDCR to refuse intake from the county jails. This will have a domino effect back into the communities. The county jails already face their own overcrowding issues and if unable to relieve their population pressures by transferring inmates into the prison system, the counties will be forced to release felons into the communities.

According to the California State Sheriff's Association in June 2006, the average daily population in adult jails was 80,000. Important to note is that 20 of California's 58 counties have court-imposed population caps resulting from litigation brought by or on behalf of inmates in crowded jails and another 12 counties have self-imposed caps. Most of the jail populations consist of felony inmates, but when county jails are full, someone in custody must be released before a new inmate can be admitted.

Based upon these facts, the impact on California communities could be catastrophic if the prison system meets its capacity and cannot accept the average monthly intake of 10,000 felons into its reception centers. Without actions by the Governor and the Legislature, the CDCR currently projects this could occur as early as the middle of next year.

## D.    FACILITY/CAPITAL OUTLAY CONSIDERATIONS

This request includes the standard facility complement.

CDCR003747
CDCR003747

E.    **JUSTIFICATION**

1. **CALIFORNIA OUT OF STATE CORRECTIONAL FACILITY ADMINISTRATION**

The following additional resources are requested on the premise that staffing is required to support the COCF's plan to house a total of 8,000 California prisoners out of state. Ratio driven positions (i.e., Heath Records Technician I, Office Assistant, Personnel Specialist, Correctional Counselor I) are not displayed for these purposes and assumed to be allocated with the population. Positions to support the 8,000 beds are included on **Attachment XX** and total **XXX** positions, an increase of **XXX** non-ratio positions. Of this total, 68 were approved in the FY 2007/08 May Revision process. This request includes the workload justifications for the additional **XXXX** positions, as shown on **Attachment XXX through XXX.** In addition, the organizational chart is provided on **Attachment XX.**

**COCF HEADQUARTERS ADMINISTRATION**

An existing Administration was funded in the FY 2007/08 Fall Population BCP; however, based on the increase numbers of inmates transferring out-of-the state,

**Warden – 1.0 PY**

**Associate Warden – 1.0 PY**

**Office Technician (OT) – 2.0 PYs**

In the FY 2007/08 Fall Population BCP, COCF received funding for 1.0 position. Due to population increases and facility activations, from 5 to 10 facilities, the current staffing will be insufficient to meet the needs of the COCF. Therefore, the COCF is requesting 2.0 additional OT positions to provide clerical support to Correctional Administrators, Facility Captains, Litigation Coordinator, and Appeals Coordinator. Under the supervision of the Correctional Administrators, the OTs will develop and maintain tracking systems for assignments, correspondence control, staff time and attendance reporting, and paycheck distribution. The OTs will assist the Secretary and will provide backup and support for other office functions such as equipment inventory and supply orders, and maintain unit files, records, manuals and other reference materials.

*COCF Business Services Office*

The Business Services Office is responsible for the negotiation, review and execution of facility contracts, review of contract amendments, billing by vendors, personnel, budgets, purchasing, information technology servicing and maintenance, and other administrative related functions.

**Associate Governmental Program Analyst /AGPA – 1.5 PYs**

In the FY 2007/08 Fall Population BCP, the COCF received funding for 3.0 positions. The COCF is requesting 2.0 additional permanent, full-time positions; SSA/AGPA at 1.5 PY. Due to the increase in staffing, travel and related expenditure and the significant potential increase in contracts

CDCR003748
CDCR003748

necessary to secure out of state housing for an additional 2,800 inmates, the current staffing is insufficient. The AGPAs will perform duties related to business services management, accounting management, policy standardization and compliance, contract development, contract management, and administrative technical support.

### COCF Transportation Liaison and Training Office

**CSU positions to PFT**

In the implementation BCP for COCF, CDCR was authorized to augment the Classificaiton Services Unit, Headquarters Division, with a limited Term Correctional Counselor III and a limited term Correctional Counselor II to liaison with the COCF Transportation section to coordinate the statewide movement of the population and support regulatory changes. Based on the resource intensive needs to support the institutions in the complex pre-transfer processing, these positions were moved into the COCF unit and will be required on a permanent basis to assist the field in the coordination the movement, regulatory changes and training associated with those changes will be a marginal aspect of these position workloads. While no additional resources are being requested for the COCF Transportation Liaison Unit, CDCR is requesting to establish the previously authorized Correctional Counselor III and Correctional Counselor II associated with CSU to permanent, full time status.

The COCF Transportation Liaison Office will be required to perform the complex task of coordinating with: (1) the Classification Services Unit (CSU) on statewide endorsement of inmates for the program, (2) the Transportation Unit (TU) for the movement of inmates both to and from the out-of-state facilities, and (3) the COCF Case Records Office (CRO) to return inmates to California and request additional inmates from CSU to back fill those vacancies. The Transportation Liaison Office will also be responsible for seeking the most cost effective means to move inmates and their property in a secure manner.

This unit is also the permanently stationed unit responsible for daily interaction with the out of state facilities to ensure that required incoming information is received and disseminated to the COCF Field Operations and Support Office. Document must be provided daily from the contract facilities to ensure the appropriate oversight of the inmates housed out of state. As a result, the Transportation Liaison Office, as the non-travel security staff, is responsible to collect, review and disseminate documents such as Daily Movement Sheets, Daily Activity Reports, Daily Staffing Worksheets, Incident Reports, Inmate Court Sheets, Visiting Reports, Medical Transportation Reports and Inmate Disciplinary Reports.

### COCF Case Records Office

The CRO performs a variety of functions, such as (1) ensuring classification and sentencing documents are accurate and meet legal, regulatory and statutory requirements, (2) time computations meet regulatory requirements, (3) holds, warrants and detainers are reviewed and accurately documented, (4) notifications and registration documents are filed pursuant to legal requirements, and (5) a myriad of other functions which are primary to the overall functions of the facilities and the Department as a whole.

CDCR003749
CDCR003749

The tasks performed by the COCF CRO will be comparable to a 5,060 bed, Level II/III institution. In order to maintain the workload for approximately 5,060 inmates, the CRO's managerial, supervisory and ratio driven positions should remain the same as an institution as the obligations/requirements are similar.

The CRO staff are responsible for performing a variety of tasks related to inmate date calculations. Tasks include interpreting, researching, analyzing, and applying State laws, court decisions, and administrative policies. In addition, they review classification documents, inmate appeals, Attorney General decisions, etc., for the calculation of release dates. The support staff maintain the integrity of the central files, maintain file security, ensure filing of critical central file documents is current; and provides support to the classification, custodial and health care staff assigned to COCF, by pulling and refilling central files, making copies of documents, requesting archive files, arranging for file transfers to and from COCF hub facilities. In addition, staff are assigned to various specialty desks including Parole, Transfer, Automated Records Tracking System (ARDTS), Offender Based Information System (OBIS), California Law Enforcement Technology System (CLETS), Holds, Warrants and Detainers (HWD), Out to Court Classification, Mentally Disabled Offender/Sexual Violent Predator (MDO/SVP) support services, Administrative Segregation Unit tracking support, and Revocation. Analysts also complete all victim and law enforcement notifications of an inmate's impending release date, conduct intake and transfer audits; review detainers placed on inmates by law enforcement agencies and notify appropriate staff. The line staff are allotted as Office Assistants through the ratio process and are reclassed as needed to Case Records Analysts, Program Technicians and Office Services Supervisor Is.

## Case Records Supervisors – 2.0 PYs

In the FY 2007/08 Fall Population BCP, the COCF received funding for 3.0 Case Records Supervisors. Due to population increases, the COCF is requesting 2.0 additional permanent and full-time Case Records Supervisor positions. The Case Records Supervisors are the first line supervisors of Case Records Analysts and must have a working understanding of all functions within the records office. The Case Records Supervisor conducts random audits of previous intake and 60-day audits, and responds to 1st level inmate appeals (Haygood hearings). The Case Records Supervisors are also responsible for training, ensuring recent court decisions or changes in law are appropriately applied to inmate sentences, performance evaluation and corrective action of line staff as well as acts as a liaison with other law enforcement agencies and the Board of Parole Hearings. The Case Records Supervisor may also represent the CDCR as an expert witness in routine court appearances.

## Program Technician II – 1.0 PY

In the FY 2007/08 Fall Population BCP, the COCF received funding for 1.0 PY. Due to the change from voluntary transfer to involuntary and the increase in transfers to approximately 5,060 inmates, not including returns, there is a significant increase in workload relative to Case Records. As a result, the staffing previously requested is insufficient to meet the needs of the COCF. The COCF is requesting 1.0 additional permanent and full-time Program Technician II position. The Program Technician II is the lead Program Technician and is responsible for entering commitments, entering inmate movement history, input vesting information, and interpreting inmate committee action call sheets. The Program Technician II is also responsible to ensure quality control of work products, correct discrepant information in the Offender Based Information System (OBIS) and assist with

5

CDCR003750
CDCR003750

problems the Program Technician I may encounter. The Program Technician I positions are ratio driven.

**Office Technician – 1.0 PY**

In the FY 2007/08 Fall Population BCP, the COCF received funding for 1.0 PY. The COCF is requesting 1.0 additional permanent and full-time OT position to provide clerical support to the Records Office. This position does not perform case records computations, but rather tracks assignments, field incoming correspondences and telephone calls, sets meetings, files documents, and other similar duties as assigned. The incoming correspondences from inmates and their families concerning out of state placement requires a dedicated OT to track, assign, file and process. In addition, the OT is the liaison for Out-to-Court processes as well as Board of Parole Hearings and the revocation process.

### COCF Field Operations and Support Unit

In the FY 2007/08 Fall Population BCP, funding was secured for field operations and support positions for up to ten facilities to house California inmates. However, it appears much more likely with the 8,000 beds, COCF will be monitoring six or seven facilities. Therefore, economies of scale can be realized with the previously approved staffing. Therefore, to manage the additional 3,000 beds the COCF is limiting the request to one Facility Captain, six correctional sergeants, three Correctional Counselor II Specialists and three Office Technicians.

To facilitate monitoring, as well as the contractual obligation of training contract staff in the various out-of-state facilities, the COCF Administration has established a Field Operations and Support Unit. The unit will be comprised of field teams who will be assigned to oversee specific facilities. Each field team will be comprised of, at minimum, a Facility Captain, two Correctional Lieutenants, one correctional sergeant, a Correctional Counselor II Supervisor, a .50 PY Correctional Counselor II Specialist and Correctional Counselor Is. When it was originally believed that the field teams would monitor small facilitieis, it was felt that each team would be assigned two facilities to manage. However, CDCR has been able to negotiate contracts for larger facilities to maximize efficiencies and allow the field teams to concentrate on one facility.

Field Teams will be responsible for onsite operational and contract reviews, as well as ensuring compliance with inmate due process mandates related to classification, inmate disciplinary actions, administrative segregation placements, appeals requiring personal interview, review of incidents, use of force critiques and review of facility policies for compliance with CDCR mandates.

The team will monitor inmate appeals and compliance with all applicable court orders (i.e. Plata, Coleman, Clark, Armstrong, and Perez). These responsibilities will require document auditing, on-sight reviews and video/teleconferencing with inmates and contract facility staff. These responsibilities will require substantial out-of-state travel to the various contract facilities. Related travel costs are identified later in this document.

The Field Teams will be responsible for the activation of the facilities, which includes intensive and on-going training of contract staff on departmental policies and procedures, policy development

CDCR003751
CDCR003751

related to the specific facilities, and review of policies at each site for consistency and compliance with California's Code of Regulations and court mandates.

California regulations and court orders are exceedingly complex therefore, the COCF staff will be required to continue to perform portions of due process functions (i.e. classification hearings, disciplinary hearings, administrative segregation placements) until the CDCR is satisfied that the contract counseling staff have been trained and are proficient in the application of regulations and court mandates governing California inmates. It is unknown at this time how long that training process will take, but as contract facilities have been trained and demonstrate a command of California classification regulations, it is the intent to reduce travel needs; however, based on the current lack of formalized training modules or materials for contract classification staff, it is not anticipated this will occur until that issue is remedied. The Field Team positions will be required for on-going monitoring, auditing and training to ensure constitutionally adequate incarceration, compliance with contractual obligations, compliance with California regulation, compliance with governing court mandates and continual training as policies changes. **Attachment G** reflects the responsibilities of the Field Operations Staff.

Due to the distant location of the COCF facilities, higher security level inmates and lack of established programming and trained staff with new contracts in out-of-state facilities. The number of contracted facilities was not solely utilized in determining staffing levels; instead workload and travel time was utilized for the staffing justification.

With this Finance Letter and previous BCP, the intent is to reduce the number of ratio driven Correctional Counselors (CCI) associated with this program, as the contract facilities have case work staff that can perform many of the functions that a CCI would normally perform. CDCR is requesting CCIs at the ratio of 250:1, rather than the normal 150:1. Labor Negotiations are still pending. The actual ratio will ultimately be decided during those implementation contract negotiations.

### Facility Captain– 1.0 PY

In the FY 2007/08 May Revision BCP, the COCF received funding for 5.0 PY. The field teams are responsible monitoring, auditing and training staff in the out of state facilities located in multiple states. The existing budgeted positions for field teams for the original 5060 inmates will be insufficient to meet these needs. The COCF is requesting 1.0 additional permanent and full-time Field Captain (FC) position. The FC will be responsible for oversight and coordination of audit teams of Correctional Counselor II Supervisors, Correctional Lieutenants, and associated ratio driven Correctional Counselor Is. The FC will manage more than one facility and approximately 1,000 inmates. The intent of the five positions is for each Captain to manage one or two out-of-state facilities, depending on the facility population. This position will be needed to ensure inmate due process rights are adhered to and that appropriate and in-depth audits are conducted of the contract facilities. The FC will be assigned specific out of state facilities. The Captain will review adjudicated CDC-115s, conduct the managerial review on use of force, conduct critical incident reviews (i.e. escapes, riots, homicides, suicides, batteries, drug trafficking), and chair Initial and Annual Classification Committees. The FC will also ensure the adequate training of contract staff, review billing requests for their facility, and oversee and conduct audits – including security, program, visiting, law library, access to health care, privileges, IWL fund, restitution collection, etc.

CDCR003752
CDCR003752

The FC will receive information from the COCF Transportation Liaison and Training Office on all incoming daily information and will assign follow-up to staff. The FC is responsible for staff hiring, training, development, evaluations, corrective action and serves as Administrative Officer of the Day (AOD), to collect information and provide direction concerning major incidents during non-business hours.

## Correctional Lieutenant – 1.0

In the FY 2007/08 May Revision BCP, the COCF received funding for 12.0 Lieutenant pys to support the field teams. While this staffing is considered appropriate, an additional Lieutenant will be needed to focus on the video visiting program. The Video Visiting Lieutenant will be responsible for coordination in state and with the out of state facilities to approve inmate family visitors and schedule and monitor the video visiting program. The Lieutenant will work with the inmate families to complete the processing for their clearance to visit and coordinate with one of two CDCR facilities identified to host the inmate family visitors and the out of state facility housing the inmate to schedule the video visit. The Visit Lieutenant will ensure he appropriate filling of the visiting forms and answer all correspondences and grievances related to inmate visiting.

## Correctional Sergeants – 6.0 PYs

In the FY 2007/08 Fall Population BCP, the COCF received funding for 12.0 Lieutenant PYs. These positions were funded for the purpose of activation, monitoring and training for facilities housing approximately 5,060. Due to the increase in population, the current custody staffing is insufficient to meet the needs of the COCF. However, it is believed that Correctional Sergeants can perform several of the functions being performed by the Lieutenants and reduce the costs associated with additional lieutenant positions. Therefore, the COCF is requesting 6.0 permanent and full-time Sergeant positions. While additional facilities are being activated by teams which include Lieutenants, exiting facilities are being audited/monitored bi-weekly, thus stretching the existing resources beyond their limits. The intent of the six sergeants is for each Sergeant to be assigned one out-of-state facility. Sergeants will assist with the adjudication of inmate disciplinary reports, response to appeals, review of incident reports and use of force incidents and on-site training and auditing of the facilities during activation and on-going.

## Correctional Counselor II (CCII) – Supervisor – 1.0 PY

In the FY 2007/08 May Revision BCP, the COCF received funding for 5.0 PYs. COCF is requesting 1.0 additional permanent and full-time Correctional Counselor II – Supervisor position. The increase in population will increase the need for classification actions, additional supervision needs based upon the increase in ratio driven CC I positions, activations, training and monitoring. Existing resources will be insufficient to meet those needs. The intent of the six CCII Supervisors is for each to be assigned at least one out-of-state facilities and provide supervision to the associated Correctional Counselor Is assigned to those facilities. The CCII Supervisor is responsible for the classification actions by CDCR staff and contract personnel and must ensure that inmates receive appropriate due process related to Initial Committee, Annual Reviews, Administrative Segregation Unit (ASU) Placement Committees, and post disciplinary work group/privilege group changes. They are the first line supervisors for Correctional Counselor I staff, responsible for training, performance evaluations and corrective action, member of Field Training and auditing team for compliance with case records functions, classification, appeals and compliance with court mandates. There will be one CCII Supervisor assigned to every field team.

CDCR003753
CDCR003753

**Correctional Counselor II (CCII) – Specialist – 3.0 PY**

In the FY 2007/08 May Revision BCP, the COCF did not request funding for Correctional Counselor II Specialists for the Field teams. However, based on the experiences associated with the administrative segregation due processing for the inmates housed out of state, COCF required dedicated Correctional Counselor II Specialists to process the complicated classification actions associated with Administrative Segregation Unit (ASU) placement in the out of state facilities. The CDCR regulations associated with administrative segregation, Security Housing Unit (SHU) term assessments, validation of prison gang members, identification of enemy concerns and sensitive needs yard housing (SNY) require dedicated resources to assist the out of state facilities in ensuring inmate due process rights are adhered to.

Some language on incidents.


### COCF – Health Care Unit

This Health Care Unit (HCU) will (1) serve as the facilitator of all issues pertaining to the care and treatment of patients placed out-of-state, (2) serve as the focal point for out-of-state correctional health care program personnel on issues pertaining to the health and treatment of inmates placed out-of-state, and (3) be responsible for on-going consultation and management of inmate placed out-of-state, authorization of services, quality assurance and monitoring of out of state facilities, review and maintenance of inmate Unit Health Records (medical records) and approval of inter-state transfers. The FY 2007/08 Fall Population BCP provided sufficient staffing; however, the Coleman court mandated mental health screenings and Coleman court oversight for the mental health treatment of the COCF population dictate that a Senior Psychologist manage and oversee these processes.

**Senior Psychologist – 1.0 PY**

The CDCR is requesting 1.0 permanent and full time Senior Psychologist beginning July 01, 2007. The Chief/Senior Psychologist will lead and coordinate all required statewide mental health screening activities. This includes, among others, arranging screening dates and assuring the availability of qualified and trained clinicians to perform the work at each institution. The Chief/Senior Psychologist will develop methods for tracking the progress of the mental health screening of inmates identified for out-of-state transfer, and will maintain a database of planned and completed mental health screenings. This data will be shared with the COCF and the Division of Correctional Health Care Services on a regular basis to ensure adherence with the assessment processes. Additionally, the Chief/Senior Psychologist will respond to questions and requests from stakeholders concerning the methods and progress of COCF mental health screening by producing letters, reports, or datasets, as necessary. This will also include participation in communications with the Coleman Court Special Master and Coleman Plaintiffs' Attorneys.

The Chief/Senior Psychologist will be responsible for ensuring the qualified clinicians are trained and adequately prepared to undertake the assessments prior to sending them out to the institutions. To facilitate this activity, the Chief/Senior Psychologist will develop and update training materials for clinicians conducting mental health screening, and will develop methods and standards for

CDCR003754
CDCR003754

clinical case review and quality assurance of the mental health screening process. In addition, the Chief/Senior Psychologist will perform contract oversight for mental health screenings and serve as the vendor's primary point of contact in undertaking this workload.

## 2. MAJOR FUNDING NEEDS AND SUPPORTING DOCUMENTATION FOR COCF PROGRAM

Following is a cost summary for equipment, Travel, Contracts, and Overtime for the aforementioned work activities. Additional equipment requests are noted by each headquarter unit as well to undertake the workload associated with supporting the COCF program.
**Equipment and miscellaneous furniture**

The CDCR is requesting one-time funding of **$168,000** (Program 25 - $97,900 / Program 50 - $70,100) in FY 2007-08 for equipment associated with the expansion of the COCF program. Refer to Attachment H for a breakdown of costs associated with equipment and furniture.

- **Laptops-** One-time funding of **$10,850** ($7,750 Program 25 and $3,100 Program 50) is requested to purchase laptops with docking a station. Staff will be required to travel and will often be in the out-of-state facilities. A laptop computer in place of a standard desktop workstation allows staff the convenience and flexibility of transporting files on the laptop without the worry of copying files to disks, diskettes, or other downloadable drives and does not require the cost of both a desktop and laptop computer. Staff will typically maintain files (audits, templates and forms) to assist in managing and conducting day-to-day business while in the field or at an out of state facility. When auditing any facility, staff will have various audit instruments to record and collect information. A laptop ensures the integrity of the audit instrument with the security safe guards to limit access to only the user. It is feasible that on any week, there will be numerous staff members in the field, requiring numerous lap top computers. With an estimated ten facilities, the COCF program will need five additional lap top computers to be provided to a staff member at the level of Facility Captain, Correctional Lieutenant or Correctional Counselor, depending on facility assignments. Additionally, the Health Care Field Teams will also require laptops for field reviews. Those laptops would be assigned to two of the Registered Nurses previously authorized for the program.

- **Office Equipment -** One-time funding of **$39,900** is requested to purchase miscellaneous equipment, such as table, faxes, and copiers. The tentative site for the COCF program has a mixture of private offices and open floor areas. The COCF requests standard office furniture for private offices and modular furniture for open floor spaces and conference tables and chairs for meeting and consultation rooms. COCF staff are working with DGS staff to acquire used modular furniture in storage by Caltrans in Southern California.

- **Kardex Lektriever Filing System -** One-time funding of **$117,250** is requested to purchase central file retention systems for the maintenance and security of the inmates' central files. Upon the transfer of inmates to out-of-state facilities, the COCF unit will be responsible for the maintenance and physical storage of the inmate central record and medical record files, as prescribed by the Penal Code §2081.5. These record files provide staff/administrators with all historical information on an inmate while incarcerated, in addition to maintaining the inmate's medical chronology. The Lektriever filing system will ensure proper storage and management of the inmate records. Lektriever systems were authorized in the BCP and

CDCR003755
CDCR003755

were purchased for the first 2,260 inmates. However, there was insufficient funding for the additional 2,800 inmate central files. Therefore, it is necessary to purchase 4 Lektriever Systems, ($67,000) for Program 25 and 3 Lektriever Systems, ($50,250) for Program 50.

## Contracts

### Distributed Data Processing System

The COCF is requesting one-time funding of **$50,000** (Program 25) in FY 2007/08 for a consultant to develop interface program for the DDPS database system to incorporate the COCF program, one-time funding of **$112,500** (Program 25) in FY 2007/08 for computer equipment for DDPS and **$32,337** (Program 25) in FY 2007/08 and ongoing for licensing, support, and maintenance agreements on computer equipment (**Attachment I**). In order to effectively manage the inmates, track the population for statistical purposes and ensure timely classification actions and paroles, the COCF must have access to the same automated systems currently used in all CDC institutions. The Distributed Data Processing Systems (DDPS) electronically captures and stores custody related offender information. The data maintained are required to safely conduct various aspects of prison operations associated with inmates and to comply with statutory requirements.

While it was initially believed that the contract facility and an associated database could assist with inmate information systems, it has been determined that the DDPS is the most efficient and cost effective system for the following reports to avoid duplication of efforts. The following reports are critical for inmate population management and are all maintained in the DDPS system:

- ⇨ Automated Visiting Information System (AVIS)
- ⇨ Inmate Job Assignment System (IJAS)
- ⇨ Inmate Mental Health Identifier System
- ⇨ Inmate Roster Classification System (IRCS)
- ⇨ Inmate Roster Movement System (IRMS)
- ⇨ Inmate Time Collection Scanning System (ITCSS)

Money will be required for computer software, computer hardware and consultant funding to rewrite existing DDPS programming to incorporate the COCF Program. The consultant will be needed to build the interfaces and modify nightly collection jobs required to keep track of the out-of-state's inmates in the virtual DDPS environment, bed assignment, job assignment, restitution, account balance, and whatever DDPS is supposed to have in it that will not be available by virtue of the inmate not physically being taken care of by CDCR staff. The data having to come from other sources will require program changes, script changes, batch job changes.

## CONTRACT SUMMARY

Identified in this summary are the costs for the two vendor bed contracts with Corrections Corporation of America (CCA) and GEO. The McGeorge legal consulting is included to reflect any services required for future legal assistance. The Medical Unit Health Record photocopying contract will be an ongoing contract for services currently being utilized.

11

CDCR003756
CDCR003756

### Out of State Beds Contract

The CDCR, COCF is requesting total funding of $66,934,980 in FY 2007/08 and $116,354,700 in FY 2008/09 and ongoing for vendor contracts for out-of-state housing of 5,060 inmates. There are two existing vendors who have signed contract agreements with the CDCR. The vendor locations are: 1) the GEO Group (Indiana); and, 2) CCA (Oklahoma, Arizona, and Tennessee). These contracts have been reviewed by CDCR Legal staff and approved by the Department of General Services to ensure compliance with all state contract laws and regulations at $63.00 per day per inmate. The CDCR intends to enter into contract negotiations for an additional 2,800 beds in FY 2007/08. Transportation costs via the vendor are continually being negotiated per the contract and are not inclusive within the current contract provisions. Refer to **Attachment J-1** for a breakdown of out- of-state beds contract costs.

### Pre-transfer Contracts

Prior to the movement of inmates, several critical components are required that cannot be performed by CDCR staff due to staff vacancies or lack of qualified staff to perform the function. As a result, contracts have been required for four purposes: Legal consultation prior to endorsement out of state, photocopying of the unit health record to provide to the contract facility, medical screening, and mental health screening.

The CDCR is requesting the funding for the following contracts.

### Legal Consultation Contract

The CDCR, COCF is requesting one-time funding of $ 322,080 (Program 25) in FY 2007/08, and $66,792 in FY 2008/09 and on-going to provide contracted legal assistance to inmates prior to involuntarily transferring an inmate out of state. In addition, one-time funding of $107,500 (Program 25) in FY 2007/08 and $42,500 in FY 2008/09 and ongoing for travel associated with those services. Pursuant California Penal Code section 11194, inmates are entitled to legal consultation prior to volunteering for out of state placement. The CDCR has been instructed to provide legal consultation to involuntary inmates; therefore, the CDCR is requesting sufficient funds to provide that service. It is anticipated that nearly 100% of involuntary transfers will request legal consultation prior to the involuntary endorsement process. Currently the CDCR is contracted with McGeorge School of Law to provide the consultation at $60 per inmate and to pay any travel or per diem for the legal staff. Inmate consultations are clustered by institution to reduce travel costs and, on average, attorneys will require travel for 25 of the male institutions. Based on the activation schedule and parole rates, it is anticipated that attorneys will need to travel to those locations at least twice a year to provide legal consultation. CDCR will maximize resources by sending attorneys to centralized locations on the same trip. (Refer to **Attachment J-2** for travel costs).

### Medical Record Reproduction Contract

The CDCR, COCF is requesting one-time funding of $1,073,600 (Program 50) in FY 2007/08 and $222,640 in FY 2008/09 and ongoing for reproduction of medical records for the transferring population. Prior to being transported out of state, every inmate's Unit Health Record (UHR) must be photocopied for transfer to the receiving facility. Based on the fact that the inmates are traveling from numerous locations, the coordination of the photocopying is best ensured by a single point of

CDCR003757
CDCR003757

contact. As a result, the Health Care Unit requires a contract to provide that service. The original estimate for UHR photocopying was $300 per file. However, based on the average costs associated with the first 360 inmates transferred out of state, the estimate has been reduced to $200 per UHR.

The rational for the contract includes but is not limited to: (1) the lack of space at the hub institution and other institutions for additional OT staff and the copy machine, (2) the amount of UHRs that will have to be copied (up to 5,368) during FY 2007/08, (3) the size of the UHRs, some of them being hundreds of page long, (4) the legal and confidential aspect of copying UHRs, which the contractor has experience in, (5) difficulty in hiring Office Assistants (OAs) due to the low pay, (6) and the statewide movement of the population, which may not reach the hub facility more than a day prior to transfer out of state.

If after a year or two, the amount of copying is reduced, then the money allocated for this service would not be spent. The copying of UHR is also temporary based on CDCR's current paper system. In future years the medical information for CDCR inmates will be via electronic medical records and no "paper" copies of documents will be required upon transfer of an inmate to any location within CDCR or to a contracted facility. (Refer to **Attachment J-1**)

## Medical Screening Contract

The CDCR, COCF is requesting one-time funding of **$365,024** (Program 50) in FY 2007/08, and funding of **$75,698** in FY 2008/09 and ongoing to conduct medical screening for inmates transferring out of state. The CDCR's protocol requires that inmates be medically screened to determine eligibility for transfer. As a result of legal actions taken by the Prison Law Office on behalf of inmates from the Coleman versus Schwarzenegger class action law suit, on November 3, 2006, the Federal Court ordered that inmates be medically screened by Registered Nurses (RNs) prior to transfer and should specific medical factors exist, an additional pre-transfer mental health screening of inmates shall be conducted (refer to **Attachment J-1**). Clearly as evidenced by the requirement to have a Federal Receiver to provide oversight for access and delivery of medical services, this additional workload, without supplemental staffing, negatively impacts access to medical care. The impact to RN workload for the screenings completed has been problematic. Additionally, it is anticipated that CDCR facility RNs will be unable to conduct a portion of the required screening for those inmates backfilling inmates returned from contract facilities.

Due to the accelerated transfer of inmates and the need to medically screen inmates prior to transfer, CDCR is unable to absorb the workload associated with the pre-transfer screening process with existing medical staff. To date, approximately 400 inmates have been medically screened and transferred out of state. The CDCR expects to transfer 5,368 inmates out of state during FY 2007/08 and 1,113 inmates in FY 2008/09 as reflected in the Inmate Cost Summary (refer to **Attachment J-1**). To evaluate the resource need, it is estimated that one RN can medically screen one inmate and conduct a thorough unit health record review in one hour at a costing of $68.00 per hour. This cost is based upon a current CDCR statewide contract for RN Registry at $68.00 per hour.

CDCR003758
CDCR003758

### Mental Health Screening Contract

The CDCR, COCF is requesting one-time funding of **$268,400** (Program 50) in FY 2007/08 and funding of **$55,660** in FY 2008/09 and ongoing to conduct mental health screenings for inmates transferring out of state. When CDCR began the initial movement of the voluntary population, legal actions were taken by the Prison Law Office on behalf of inmates from the Coleman versus Schwarzenegger class action law suit. On November 3, 2006, as a result of concerns that CDCR might be transferring inmates out of state who require mental health treatment, the Federal Court ordered pre-transfer mental health screening of inmates with a prior mental health or suicidal history who are not currently in the Mental Health Services Delivery System (refer to **Attachment J-1**). In mid-December 2006, the Coleman Federal Court approved CDCR's mental health screening program, which requires intensive reviews of the identified inmate population.

Based on data analysis of the potential involuntary population, approximately 20% of the targeted inmates meet the criteria for mental health screening by a licensed clinician prior to being approved for transfer. CDCR is unable to absorb the workload with existing mental health staff and has initiated a contract for those services. The lowest bid, currently received for this service is $250 per assessment, including travel costs.

### INMATE MOVEMENT CONTRACTS

The CDCR, COCF is requesting funding of **$6,322,395** (Program 25) to enter into contracts to provide transportation to and from the out-of state facilities. This includes **$285,120** (Program 25) to move the associated inmate property in FY 2007/08. Funding of **$2,394,888** for transportation which includes **$100,188** for property contracts in FY 2008/09 and on-going is also requested. Refer to **Attachment J-1** for a breakdown of costs.

### Potential Inmate Turnover

Based on the current inmates slated for involuntary transfer, it is expected at 20% of the inmates will return to California during FY 2007/08 for parole. It is also anticipated that 2% will return for reasons other than parole (i.e. medical complication, mental health needs, and disciplinary issues). (Refer to **Attachment J-1**). Additionally, based on a statewide review of potentially eligible inmates that occurred in November 2006, only 2% of those inmates who were eligible for transfer to an out of state facility actually volunteered, which may result in greater inmate unrest in the out of state facility and increased number of inmates transported back to California for behavioral or mental health reasons.

Therefore, it is anticipated that in FY 2007/08, 968 inmates of the COCF population will returned to California and the state will be required to transfer approximately 5,368 inmates out of state. In FY 2008/09, it is estimated 1113 of the COCF population will return, requiring the movement of 2,226 inmates to fully utilize the bed capacity. All returned inmates require the transfer of the inmate back to California, which results in another inmate going through the transfer processing and being transported out of state to fill the vacant bed. (Please refer to **Attachment J-1**)

CDCR has previously received quotes to move large groups of inmates via air flight to activate facilities. That quote remains at $918.61 per inmate; however, moving individual or smaller groups of inmates is somewhat higher as the economies of scale are not realized.

CDCR003759
CDCR003759

As of this date, CDCR is still working with vendors to reduce the cost to return California inmates upon parole or due to medical concerns and to backfill the vacant bed. For individual transports, if the CDCR Transportation Unit is required to do an individual return via air flight for an inmate in mental health crisis, the average cost per transport is approximately $3,000. The lowest contract bid for the same service to air transport a single inmate is approximately $1,250, but is markedly higher if the inmate requires emergency transport back to CDCR due to mental health reasons and actually exceeds the costs of CDCR transportation.

Group transportation via ground may be more cost effective. Based on quotes received to date, it is estimated that it will cost approximately $1,041 per inmate to transport groups of 10-12 inmates from Tennessee to California, via flight or ground; however, additional inmate property transport costs will be required above the transport costs as the vendor will not transport inmate property with the inmates. (Refer to **Attachment J-1**).

Therefore, it appears most cost effective to utilize mass air flight transportation when moving large groups of inmates and using ground transportation when returning inmates to California for parole and backfilling the vacated beds with additional California inmates; however, there may be times when air flight for smaller groups is more secure or required for medical or mental health reasons, so the quoted average of ground and air transport for groups of 10-12 from Tennessee to California is utilized for the estimate.

## Inmate Air flight Transport Contract

The out–of–state transfer of inmates utilizes four means of transporting an inmate.

1) From the current CDCR institution they are located, to the hub institution at Wasco (WSP).
2) Transport from the hub located at WSP to the airport at which the inmate is to depart.
3) The means of transportation (generally a plane) the inmate would be transported to another state.
4) The transportation from the airport in the state the inmate is located to be housed to the contracted facility.

Currently, the existing vendor contracts do not include transportation costs, because costs vary with facility location, number of inmates, and fuel costs. It is estimated that the per inmate flight cost is $918.61 and that the new facilities will be housed in states that require air transport. A total of 4,400 inmates are anticipated to be transferred out of California via mass air flight to fill the newly contracted beds during FY 2007/08. (Refer to **Attachment J-1**)

Above the initial movement, an estimated 1936 additional inmates will be moved in FY 2007/08 due to paroles, crisis movement, and backfilling vacancies. For every inmate returned to California, an inmate will be transported to the out of state facility to fill the vacant bed. While some of the inmates returning for crisis medical or mental health treatment may require individual airline transportation, CDCR intends to utilize ground transportation when the cost of group air flight exceeds the cost of ground travel. The currently quoted average cost of $1,041 per inmate utilizing the most economical blend of air and ground transportation for groups of 10 inmates; however, CDCR continues to seek the most economical means to move this population that ensures the safety and the community and the inmates. (Please refer to **Attachment J-1**).

CDCR003760
CDCR003760

**Inmate Property Transportation Contract**

The CDCR, COCF is requesting one-time funding of **$285,120** (Program 25) in FY 2007/08 and **$100,188** in FY 2008/09 and on-going to enter into contracts to ship inmate property to and from the out-of state facilities. Refer to Attachment J-1 for a breakdown of costs. Inmates who are being transferred to another state are allowed six cubic feet plus one cubic foot of legal property. Property will be stored and drop shipped via ground transportation. It was initially believed that CDCR could ship the property at $30 per inmate. However, based on actual costs for the movement of the first 360 inmates, the average cost to ship the property is $50 per inmate. Regardless, CDCR is currently seeking other bids for the movement of property to further reduce the costs.

Property and transport costs may be adjusted as needed in the Pop BCP/May Revise process.

## INMATE PROCESSING OVERTIME COSTS

CDCR is requesting one-time Funding of **$129,100** (Program 25) in FY 2007/08 and **$26,772** (Program 25) in FY 2008/09 on-going to offset institutional overtime associated with the processing of the out of inmates. Based on information received during the initial movement of inmates out of state and the statewide review of potentially eligible inmates, the workload cannot fully be absorbed with existing resources. The institutions will be provided lists of thousands of inmates potentially eligible for out of state placement and must conduct central file reviews and classification on those inmates. For those inmates who are eligible, the institutions must conduct an Institutional Classification Committee, prepare the property for shipment, complete legal detainers on the inmates, create a field file copy of the central file for shipment to the out of state facility and package and ship the central file to COCF. As the inmates are being moved in mass from a centralized location under very rapid circumstances, the workload cannot be entirely absorbed by the institutions without overtime. Based on data gained for the previous transfer of inmates and statewide review process, the state incurred approximately $24 of overtime for each inmate reviewed and transferred. (Please refer to **Attachment J-1**.)

**Security Coverage for Medical Screenings**

CDCR is requesting, one-time funding of **$256,425** (Program 25) in FY 2007/08 to provide direct security coverage for the medical screening teams while reviewing large groups of inmates for involuntary movement. The Receiver has requested that the CDCR provide additional correctional officer coverage while mass medical screenings are being conducted for out of state movement. The pre-screening plan involves the clustering of medical reviews to two or three specific institutions each week. Therefore, it is anticipated that when activating 300 additional beds per month, that the screening teams will be in two prisons a week and when activating 400 beds a month, the screening teams will be in three institutions – an officer will be required to provide security coverage for each of the screening teams. Based on the constantly rotating movement of the screening teams between institutions, it is most effective to utilize overtime at the affected institution during that week. CDCR is hopeful to be able to absorb the workload in FY 2008/09 without further resources. (Please refer to **Attachment J-1**).

CDCR003761
CDCR003761

### VIDEO VISITING/VIDEO CONFERENCING PROGRAM

CDCR is requesting one-time funding of **$61,440** (Program 25) in FY 2007/08 and on-going funding of **$62,460** in FY 2008/09 for video conferencing usage fees for video classification and video visiting for the out of state inmates. (Refer to **Attachment K**).

Based on the remote location of the inmates and to ensure that friends or family members of the out of state inmates are able to visit with the inmates as an proven rehabilitative need, CDCR intends on establishing a video visiting program. The contract facilities are required to have the ability to video conference with California and ensure inmates are able to be seen and heard via the video conference systems. As a result, video visiting systems will be established at two CDCR prisons to allow for five day a week visiting. It is currently believed that Wasco State Prison and Folsom State Prison are the best geographic locations, but the actual CDCR institutions may change based on space and technology needs. Additionally, COCF requires the ability to conduct video conferencing for classification actions, disciplinary actions, training and Valdivia and Rutherford compliance related to CDCR inmates being housed out of state. The equipment is currently in the process of being purchased, but funds for installation and usage fees are needed as well as correctional officers in two centrally located facilities to arrange and monitor the video visiting program.

### COCF ADMINISTRATION TRAVEL

#### Pre-Contract Facility Inspection Teams

One-time funding of **$18,000** (Program 25) in FY 07/08 is requested for travel costs associated with the pre-contract inspection of any proposed new out of state facility. Penal Code Section 11194 mandates the pre-inspection of facilities prior to CDCR entering into contracts with such facilities. It is estimated that CDCR will require four of five additional facilities to house the proposed 5,060 inmates. As a result, it is estimated that ten additional out of state facilities will require a security review. It is planned that six staff members will be required to tour approximately ten facilities during the pre-inspection phase. (Refer to Attachment **L-1**)

#### Facility Activation Teams

One-time funding of **$79,500** (Program 25) in FY 2007/08 is requested for travel costs associated with a post-contract Facility Activation Team for an estimated five (5) additional facilities. Upon activation or occupancy of a new facility in another state, the COCF will deploy teams (consisting of Correctional Administrator, Facility Captain, and a Correctional Counselor II) to inspect, train, and indoctrinate staff at each new facility for a period of up to 30-45 days. These teams will be at the site prior to occupancy and/or travel with inmates as the need prevails and will rotate assignment providing support, training and monitoring during the activation period. This is a one-time cost for each new facility CDCR occupies. (Refer to **Attachment L-1**)

#### On-Going Inspection, Training and Monitoring

The COCF is requesting one-time funding of **$376,300** ($304,300 in Program 25 and $72,000 in Program 50) in FY 2007/08 and on-going funding of **$549,400** ($465,400 in Program 25 and $84,000 in program 50) in FY 2008/09 for travel costs associated with ongoing monitoring of contract facilities out of state. Utilizing the staff authorized in the FY 2007/08 Fall Population BCP and the additions requested in the Finance Letter, the COCF will establish five sub-units attached to

CDCR003762
CDCR003762

specific institutions and managed by a Facility Captain. As a portion of their workload, members of these units will travel to their assigned contracted facilities to audit/monitor the full range of facilities operations in accordance with contract requirements. These teams will be comprised of three persons, consisting of the following types of staff: Captain, Correctional Counselor II, Correctional Lieutenant or ad hoc member to evaluate various specialized areas of the facility operation (i.e. inmate trust, medical, canteen, etc.).

In addition to conducting contract compliance audits, these teams will provide on-going training to the contract staff regarding CDCR policies, regulations, and programs. It is expected that the teams or a portion of the team will conduct monthly site visits at the contract locations. The staff will be required in the facilities every two weeks due to the time constraint requirements associated with due process mandates so teams will be separated to ensure compliance (i.e. inmate rule violations, administrative segregation placement, inmate appeals). It is hopeful that all required reviews and training can be conducted during the monthly audit with an additional week per year for intensive auditing.

It is also expected that updated training will be required as policies and procedures will be developing and changing during the year or emergent issues will occur that require immediate response and training. These staff will be responsible to develop and maintain all necessary audit instruments that will assure that the contracted facilities are operating within the individual contracted scope of work and established agreements. They will also be responsible to develop, implement and track training for their respective facilities.

In agreement with the Health Care Services (HCS), Receiver, Health Care Services staff will be required to conduct bi-annual reviews of each facility to monitor the delivery of medical services at the contracted facilities. HCS will utilize a four person team to carry out this function.

The activation plan reflects contracts with eight (8) facilities. The facilities are estimated to be populated as identified in the Activation Schedule. The tentative travel schedule and costings can be found on **Attachment L-2.**

### SUPPORT FUNCTIONS

The following reflects the positions, travel, equipment and overtime needs associated with non-COCF positions need to activate this program.

### CDCR Transportation Unit Detail

The Transportation Unit (TU) is tasked with the safe and secure transport of inmates throughout the State and the interstate extradition of absconders and escapees from points throughout the United States and its territories to designated CDCR reception centers. TU will coordinate with institutions, Classification Services Unit, and COCF Administration for the transfer of inmates from each of the 30 male institutions to the designated hub facility at WSP.

From WSP, this group of inmates will normally be transported to Meadows Field in Bakersfield for transport by plane out of state. Transporting the inmates to WSP will involve one, two, and three day trips for multiple buses as CDCR institutions are located throughout the state. Additionally, it is projected that inmates will be returned to California 60 days prior to parole. These inmates

CDCR003763
CDCR003763

would be picked up at the airport and then temporarily housed at WSP or delivered by ground transportation to a centralized institution or released to the jurisdiction of the CDCR transportation unit at a designated transfer location. Inmates returned to California would then be moved from WSP to a General Population institution. At this time, CDCR assumes that the TU is involved in the clustered movement of all returning inmates, regardless of whether they are flown or driven back to California.

In order to facilitate this additional movement, TU will require resources as shown below. However, future BCPs will request positions and new vehicles due to the fact the existing fleet is dilapidated and the existing staff is already working significant overtime.

*Note – it is unknown at this time what the full impact will be. Adjustments upward or downward to the TU budget will be made via the Population BCP/May Revision process.*

### Fuel/Maintenance/Lease Costs (Attachment M)

Funding of $127,250 (Program 25) in FY 2007/08 and $35,204 in FY 2008/09 and ongoing would be required for transportation bus and van fuel, maintenance and vehicle lease costs associated with this program. This is based on projected FY 2006/07 expenditures for fuel, maintenance, and lease costs divided by projected FY 2006/07 moves of 195,000, multiplied by COCF moves in a given year.

### Overtime

Fund $1,358,246 (Program 25) for overtime in FY 2007/08 and $631,270 in FY 2008/09 and ongoing. The overtime cost is based on staff hours required multiplied by the overtime rate ($53.17 & $59.41) by classification. **Attachment M** provides a breakdown of staff hours and costs.

### Travel

Funding of $88,392 (Program 25) in FY 2007/08 and $23,194 in FY 2008/09 and ongoing for travel (per diem, rental car, etc.) for transportation staff would be required to move the COCF inmate population. These figures are based on In State/Out of State Travel/Per Diem for FY 2006/07 divided by 195,000 moves per year, multiplied by COCF moves in a given year.

### Classification Services Unit

The Classification Services Unit (CSU) provides departmental oversight for classification systems and population management statewide. Currently, the Population Management Section of CSU has been strained to meet the expanding inmate population, yet has received no additional resources to manage, move and track the population. The implementation of the COCF program requires resources in the CSU population management section to assist with the statewide tracking and movement of the population to ensure full utilization of the potential bed capacity.

While the previous BCP gave two staff to support the endorsement process and regulatory changes, the increase to 5,060 beds will strain CSUs population management section. Therefore, an Associate Governmental Program Analyst (AGPA) is needed to assist CSU in the movement of these additional inmates. The AGPA, as indicated below, will be responsible for complex tracking programs, as well as generating associated reports for Administrative and Legislative review such

CDCR003764
CDCR003764

as the number of voluntary vs. involuntary transfers, reasons for screening outs, inmates pending clearance of issues before transfer, and other factors in screening and transferring inmates. The documents from the institutions and COCF will be faxed into CSU for review and entering into the tracking program. The documents from the CSU will be scanned and emailed to various stakeholders, including contract staff in the out-of-state facilities.

In summary, the CSU needs the following staffing to support the COCF:

**Associate Government Program Analyst – 1.0 PY**

The Classification Services Unit is requesting 1.0 permanent and full-time Associate Governmental Program Analyst beginning FY 2007/08 for the Population Management Section to provide administrative support in the population management of California Out-of State Facility inmates. The Classification Services Unit (CSU) provides departmental oversight for classification systems and population management statewide. As the departmental subject matter experts (SME) in these areas, the CSU staff will be handling the pre-transfer functions associated with the out-of-state transfers. (CSU will handle the "in state" functions and the COCF will handle the "out of state" functions.)

This request is being submitted in response to the policy decision changing participation in this program from voluntary to involuntary and the activation of an additional 2,800 beds in the COCF program for a total of 5,060 beds. This increase represents a significant additional workload that cannot be absorbed by the current staffing, especially in light of the overwhelming Unit workload associated with the current overcrowding conditions within the prisons.

Under the supervision of the Facility Captain and Correctional Counselor III, Population Management Section, Classification Services Unit, the AGPA will collect, develop and interpret statistical data reports of the inmate population by institution and by program area as well as comparison with established criteria for specific out-of-state facilities in an effort to identify potential inmates for transfer, and will notify institutions of potential transfers. In addition, the incumbent will develop and maintain a tracking system which can identify and sort the inmates approved for transfer. The AGPA will also develop a tracking system to management the placement of inmates in out of state facilities to ensure the institutions are ethnically balanced. The AGPA will eventually transition the responsibility of ethnic balance to the COCF administration; however, will maintain responsibility for the tracking of each inmate endorsed for transfer to the COCF program. The AGPA will coordinate the movement of COCF inmates with the Transportation Unit. The incumbent will serve as a liaison to the Transportation Unit to review bus/airplane seats requested for COCF inmates being transported out of state and returning to California. The AGPA will reconcile the send and intake reports and convey changes to CSU and/or COCF staff. The AGPA will also maintain the transportation wait list for potential COCF inmates who have been approved but have not yet transferred out of state. The AGPA will assist in development of training and provide assistance with other research and analysis in identifying potential inmates for transfer through review of statistical data reports and comparison with established criteria for specific out of state facilities. The AGPA will also be responsible for preparing special population reports and/or studies on the COCF inmates to be submitted for executive review and action, and respond to correspondence and other inquiries from a variety of entities.

CDCR003765
CDCR003765

### Human Resources

The Office of Personnel Services (OPS)'s workload will increase with the additional staffing in this program. OPS must receive additional resources in order to assume the increase workload demands generated from added staff. It is believed the positions that were requested in the previous BCP had been approved but had been missed in the complicated process of adjusting the BCP as additional information became available.

The OPS is responsible for providing personnel support in recruiting, selecting and the appointing process. The OPS will need to review and approve duty statements, classification levels, and a variety of pay actions; provide consultation to managers and supervisors on personnel and payroll laws and rules; investigate and prepare written responses to grievances and merit issue complaints; provide comprehensive certification services for recruitment and selection; and process various personnel and payroll documents for compensation and benefits for each employee. The OPS would need 1.0 AGPA position and 1.0 PY for an OT position to provide the personnel services mandated by state government laws and rules and bargaining unit contracts.

### Associate Governmental Program Analyst – 1.0 PY

The analysts will be responsible for completion of research projects and compiling statistical statewide data for various assignments at the request of management. Provide specific Management Information Reporting Systems reports to departmental supervisors and managers as requested. Develop policy and procedure training for use by Human Resources staff statewide.

### Office Technician - Typing – 1.0 PY

The Office Technician will provide support services to the Personnel Office including typing correspondence, reports and spreadsheets. Answer and screen incoming call and forward to appropriate staff for response. Assist the public and departmental staff at the reception counter by responding to questions and providing requested documentation. Maintain filing systems and prepare and distribute bulletins and other personnel related information.

### Budget Management Branch – 0.5 PY

The Budget Management Branch (BMB) workload will increase with the additional budget for this program. BMB must receive additional resources in order to assume the increase workload demands generated from adding another program with a significant budget allocation

The BMB is responsible for providing support in preparing complex budget documents for fiscal accountability. The addition of the COCF program will require document production, quality assurance and budgeting, such as: Governor's Budget worksheets, the development of allotments, budget changes, monthly expenditure reports, fiscal reviews, 607 approval and special projects related to the COCF program. To meet the added workload, the OPS would need 0.5 Associate Budget Analyst to provide the fiscal services mandated by state government laws and rules and regulations.

CDCR003766
CDCR003766

**Associate Budget Analyst – 0.5 PY**

The analysts will be responsible for all aspects of fiscal management associated with the COCF program, including but not limited to: Schedule 8, Standard 33, 7A – Salary and Wages supplement, budget allotment, monthly budget plan, fiscal reviews, fiscal analysis for the Legislature, 607 documentation, requests for personnel action and other special projects and requests related to this program..

**F.    OUTCOMES AND ACCOUNTABILITY**

1.   What is the implementation plan for the proposal?

> The implementation of this proposal is structured so that staffing increases with the number of inmates sent out of state. The initial stages are well under way and two COCF facilities have been activated. Once approved to move forward, CDCR will activate between 300 and 400 additional beds a month out of state. It is anticipated the movement will resume by June 1, 2007.

> The inmate population to fill these beds has been being identified and contract providers have submitted proposals for consideration. Policies and procedures are being developed and implemented with the activation of each new facility. Administrative staff will monitor the contracts and expenditures of the program identifying any issues requiring corrective action or adjustment. Recruitment for the essential positions tied to the ongoing inmate transfers is currently underway.

> The COCF will continue to transfer up to a total of 5,060 inmates, and will ensure the ongoing monitoring of the program throughout its duration to ensure essential policies and procedures are effectively followed in relation to public safety, security, and fiscal accountability.

2.   What is the hiring plan for the positions, if any, being requested?

> Once approved, the CDCR, COCF Administrators will follow established hiring guideline for permanent, full-time employees activated. Descriptions for each functional area within the COCF, timeframes for implementation and staffing, and position descriptions being requested are displayed in Attachment E.

3.   What controls will be in place to ensure the appropriate use of the requested resources or authority?

> In order to ensure the contracted facilities with departmental policies and standards, the CDCR has included a compliance component to annually inspect and ensure facilities comply. The contracts and expenditures will be continuously monitored by the administrative staff of the COCF on a monthly basis. Discrepancies or issues of concern will be immediately addressed via corrective action plans. Progress and outcome reports regarding the status of the program, including program expenditures, population by facility, position vacancies, and annual audit results will be prepared and submitted as part of the Fall Population and May Revision BCP processes. In the event additional funding is required to maintain the existing COCF program or surplus funding is identified in the

CDCR003767
CDCR003767

program, substantiation will be included via the Fall Population and May Revision BCP processes for additional funding approval or to facilitate the return of excess funding identified. CDCR will also continue to monitor inmate population levels to ensure bed capacity within existing CDCR are maintained and do not exceed population crisis levels.

4. How will the requested resources be accounted for and monitored?

All positions associated with the program will be tracked to demonstrate vacancy periods and associated salary savings compared to authorized overtime or temporary help expenditures to identify true salary savings. Any salary savings would be identified are reported through the Fall Population and May Revision BCP processes. All expenses related to the program including purchasing and travel expenses will be monitored and audited by COCF staff to ensure only essential items and cost effective methods of travel are conducted. The services of the contracted out of state correctional facility providers will be continually monitored by COCF staff to ensure compliance and program compliance teams will annually audit out of state correctional facilities, require corrective action plans when required, and follow up on the implementation of any corrective action plans. These audit findings will be provided on an annual basis via the Fall Population or May Revision Budget Processes.

5. Will there be progress and/or outcome reports completed? If so, how often and to whom will they be distributed?

Progress reports will be completed on a quarterly basis for CDCR management review. Bi-annual progress and outcome reports will be included via the Fall Population and May Revision BCP processes. The format for these reports is currently under development.

## G.    ANALYSIS OF ALL FEASIBLE ALTERNATIVES

**Alternative 1: Continue With Current Overcrowding of Prisons** – Should the department continue to grow at its existing rate, with every bed and every livable space being used to house an inmate, the CDCR will have reached full capacity by August 2007. With this said, the Governor would have to turn its felon population onto the counties who are also experiencing overcrowding. Without some immediate relief to remedy this crisis, federal courts could intervene and cap the department's population and further exacerbate an already complex dilemma.

**Alternative 2: Expand Current Modified Community Correctional Facility Program** – During the 2006 Special Session of the Legislature, proposals by the CDCR to expand or modify existing prison facilities were rejected. Impact to the General Fund would have been approximately $1.6 Billion and would have taken 24-48 months to complete.

**Alternative 3: Build new prisons** – During the 2006 Special Session of the Legislature, proposals by the CDCR to expand, modify or build new prison facilities were rejected. This proposal sought to build three new prisons to increase capacity at a cost of $1.2 Billion with a construction time of 40-60 months until completion.

**Alternative 4: Transfer Inmates to Correctional Facilities Out-of-State** - This proposal while also addressed in the 2006 Special Session presents immediate results to reduce the population bed crisis. If these inmates are not housed out of state, they will be housed within the CDCR at the

CDCR003768
CDCR003768

average cost of incarceration, which is referred to as overcrowding cost. As such, the total of this request is offset by the cost of overcrowding. The net request is $9,578,000 in FY 2007-08 and $14,634,000 in FY 2008-09. Please see **Attachment N** for detail.

**H.    TIMETABLE**

1. See **Attachment E** for Proposed Staffing and **Attachment J-1** for estimated movement of inmate population

**I.    RECOMMENDATIONS**

Alternative #4, transferring inmates to correctional facilities out-of-state provides the most immediate reprieve to California's overcrowded prison system and at cost presumably to be lower than housing inmates within CDCR's existing facilities

24

CDCR003769
CDCR003769