# EXHIBIT

# DD

California Department of Corrections and Rehabilitation

# Expert Panel on Adult Offender Recidivism Reduction Programming

Report to the California State Legislature

**Arnold Schwarzenegger**
Governor



**James E. Tilton**
Secretary
California Department of Corrections and Rehabilitation

**K.W. Prunty**
Undersecretary, Operations
California Department of Corrections and Rehabilitation

**Marisela Montes**
Chief Deputy Secretary
California Department of Corrections and Rehabilitation

June 2007

CDCR008342
CDCR008342

# California Department of Corrections and Rehabilitation

## Expert Panel on Adult Offender and Recidivism Reduction Programming

## Report to the California State Legislature



A Roadmap for Effective Offender Programming in California



CDCR008343
CDCR008343

**California Department of Corrections and Rehabilitation Expert Panel on Adult Offender Reentry and Recidivism Reduction Programs**

Report to the California State Legislature: A Roadmap for Effective Offender Programming in California

Copyright © 2007
by California Department of Corrections and Rehabilitation

All rights reserved. Permission is granted to reproduce this report for non-commercial purposes.

This project was funded under Provision 18 of the California Budget Act for Fiscal Year 2006/2007. California State University, Long Beach, University College and Extension Services was contracted to provide project management, logistical support, and report compilation services for this project.

*Points of view, recommendations, or findings stated in this document represent the consensus of the entire Expert Panel and do not necessarily represent the views of individual Expert Panel Members, nor do they represent the official positions or policies of the California Department of Corrections and Rehabilitation.*

June 29, 2007
Sacramento, California

*Report design by Paul Edward.*

*Cover image: "Prison Corridor" Copyright © 2007 Paul Edward. All rights reserved.*

CDCR008344
C:DCR008344

# Contents

**Members of the Expert Panel-ii**

**Sub-Committees of the Expert Panel-iii**

**Expert Panel and Sub-Committee Meeting Dates and Locations-iii**

**Project Support Team-iv**

**Program Review Support-v**

**Executive Summary-vii**

**Introduction-1**

**Part I—The Roadmap-9**
Factors External to the Programming Environment         9
Clearing the Road for Rehabilitation 14
Factors Internal to the Programming Environment 19
Summary of Findings and Recommendations         50
Making it Work in California  51

**Part II—The Program Reviews-55**
Where California Now Stands         55
Identifying Recidivism Reduction Programs 57
Methodology for Surveying Inventory Programs    59
Evaluating Recidivism Reduction Programs 59
CPAP Assessments Details    64
CPAP Program Reviews Conclusion  71

**Part III—Next Steps and Conclusion-73**

**Appendix A—Reports Previously Published Reports on California's Correctional Crisis-77**

**Appendix B—Full-Sized California Logic Model-81**

**Appendix C—Recommendations for Incorporating Evidence-Based Practices in the CDCR-83**

**Appendix D—Resources for Implementing Recommendations in the CDCR-85**

**Appendix E—Estimating the Impacts of Our Recommendations-87**

**Appendix F—Expanded Space and Safety Recommendations-101**

**Appendix G—CDCR Female Offender Reform-105**

**Appendix H—Arizona Department of Corrections Fast Track Program-109**

**Appendix I—The Important Role of the Community in the Correctional Process-113**

**Appendix J—Implementation Requirements-117**

**Appendix K—Implementation Timeline-123**

**Appendix L—Detailed CDCR Adult Offender Profile Information and Tables-127**

**Appendix M—Detailed CDCR Adult Offender Programs and Activities Tables -147**

**Appendix N—Detailed CDCR Program Review Information-165**

**References-191**

CDCR008345
CDCR008345

# Part I—The Roadmap

*In this section of the report, we provide detailed explanations of our findings and recommend solutions to the problems that we have identified. We begin with the factors external to the programming environment that are contributing to California's programming problems and conclude with the internal factors.*

## Factors External to the Programming Environment

> *Finding—The state of overcrowding in CDCR prison facilities makes it difficult for offenders to access rehabilitation programs.*

The first aspect of programming that we examined was the physical context. Physical context includes such issues as program space (e.g., treatment beds, classroom seats, etc.) and institutional safety (of program providers, CDCR staff, and offender participants). CDCR facilities were built to hold 100,000 prisoners; however, at the time of this report, the CDCR was currently housing 172,385 prisoners in its prison institutions—California prisons are operating at 172% capacity.

According to the CDCR, 18,000 prisoners are being housed in spaces designed for programs (Hysen, 2007). This is consistent with what we observed when we visited California's prisons and what we were told by the administrators and staff members working at these facilities.

Not only does overcrowding have a negative impact on programming but, according to documents provided to the court by CDCR Chief Deputy Secretary Scott Kernan (2007), "housing inmates in non-traditional quarters presents serious safety concerns for both inmates and correctional staff. The overcrowding of CDCR facilities has led to increased numbers [of] infectious disease outbreaks and riots and disturbances system-wide."

These incidences of violence and other negative consequences of overcrowding degrade the CDCR's ability to consistently operate rehabilitation programs in the prison environment. While lockdowns and controlled movements allow the CDCR to increase the safety of its correctional officers and prisoners, when wardens enact these security measures, they cancel all programming in the affected prison areas. Table 2 provides a summary of the CDCR's adult prison lockdowns in 2006. We provide a detailed list of prison safety improvement recommendations in Appendix F.

9

CDCR008372
CDCR008372

*CDCR EXPERT PANEL ON ADULT OFFENDER REENTRY AND RECIDIVISM REDUCTION PROGRAMS*

*Table 2: CDCR Adult Institution Lockdown Summary, 2006*

| Mission-Based, Facility Type* | Number of Lockdowns-Controlled Movements | Average Days in Lockdown | Events over 60 Days |
|---|---|---|---|
| Calendar Year 2006 | | | |
| General Population Levels II & III | 169 | 12 | 6 |
| General Population Levels III & IV | 114 | 18 | 5 |
| High Security & Transition Housing | 134 | 7 | 17 |
| Female Institutions | 32 | 3 | 0 |
| | | | |
| Source: CDCR *Does not include Reception Centers | | | |

On the parole side, a legacy of budget and policy decisions has created a situation where parole agents have unmanageable case loads of parolees to supervise and community-based program providers have more offenders needing treatment than they can treat. As Petersilia (2005) has shown, fully two-thirds of more than 120,000 California parolees only see their parole agents once every six weeks. This infrequent visitation schedule causes us to wonder how effective this system is at reducing recidivism.

---

**Recommendation 1—Reduce overcrowding in its prison facilities and parole offices.**

---

We recommend that the CDCR reduce overcrowding in its prison facilities to make it easier for offenders to access rehabilitation programming. This will also create a safer environment for correctional officers, program providers, and prisoners. On the parole side, California needs to either reduce the numbers of parolees to which it provides services or increase the funding to the CDCR Parole Division and community-based program and service providers.

We do not believe the only answer to reducing overcrowding is to build more prisons. Experience from other states demonstrates that at some point those responsible for authorizing and funding adult institutions come to the conclusion that they can no longer afford to keep building more prisons. The expenditures become too costly and can force states to the margins of bankruptcy. With California already spending more than $10 billion a year on its correctional system, we believe that it is only a matter of time before this state is forced to consider alternatives besides prison building to solve its overcrowding problem. Solving the overcrowding problem is not the mission of this Panel. To that end, we direct the reader to Appendix A for specific recommendations provided by other groups as to how California may potentially reduce its correctional system overcrowding. Nonetheless, some of the evidence-based programming recommendations that we make will potentially reduce the numbers of prisoners in California prisons. We provide a detailed discussion in Appendix E.

CDCR008373
CDCR008373

> *Finding—The CDCR treats offenders who successfully complete rehabilitation programs and positively manage their behaviors in roughly the same manner as those who do not.*

One of the best ways to shape behavior is to provide positive rewards for people when they engage in positive activities. In the correctional context this means that if California wants its offenders to participate in rehabilitation programming, it must motivate them to complete rehabilitation programs and positively manage their behaviors.

We believe that the CDCR's current culture is focused primarily on control and punishment and secondarily on rehabilitation. While control and punishment are understandably very important in a correctional setting, correctional agencies need to balance the different aspects of their missions. They need to focus an appropriate amount of attention on the security and order of the prison, as well as rehabilitation.

In the case of the CDCR, we spoke to several wardens who were interested in providing more rehabilitation programs to their prisoners. However, because of California's tough on crime laws, including its Determinate Sentencing Act (DSL), California's adult offenders are minimally motivated to participate in and complete rehabilitation programs. In fact, some legislative features actually *discourage* prisoners from program participation. For example, California does not pay its prisoners who are enrolled in rehabilitation programs (e.g., substance abuse, education), but it does pay its prisoners who have work assignments. Prison hourly pay ranges from $0.08 (prison laborer) to $0.95 (Prison Industries lead worker). Several other states (e.g., Pennsylvania and Ohio) pay prisoners for participating in *either* rehabilitation programs *or* work assignments.

> **Recommendation 2—Enact legislation to expand its system of positive reinforcements for offenders who successfully complete their rehabilitation program requirements, comply with institutional rules in prison, and fulfill their parole obligations in the community.**

On May 2, 2007, California enacted AB 900, the Public Safety and Offender Rehabilitation Services Act of 2007. This legislation requires the CDCR to "determine and implement a system of incentives to increase inmate participation in, and completion of, academic and vocational education [programming]." We believe that with this legislation, California is moving in the right direction toward improving its state of correctional rehabilitation. Additionally, California enacted Senate Bill 1453 in 2006. This legislation allows the CDCR to discharge offenders after they successfully complete in-prison drug treatment followed by 150 days of residential drug treatment in the community. We recommend that California enact the necessary legislation to *expand* its correctional incentive system to include *all* of the rehabilitation programs that the CDCR offers to its offenders in prison and on parole.

In accordance with the directives of AB 900, we recommend that the CDCR implement those positive reinforcements that do not require additional legislation. For example, the CDCR could expand visitation privileges, locate prisoners in prisons closer to their homes, provide long distance phone calls, and issue vouchers for the prison canteens. Parole offices could offer similar reinforcements to parolees who successfully complete rehabilitation programming in the community. Positive reinforcements increase motivation levels, build morale, and improve behaviors. If the CDCR incorporates these kinds of reinforcements into its culture and programs, it will accelerate the integration of rehabilitation into its systems.

CDCR008374
CDCR008374

*CDCR EXPERT PANEL ON ADULT OFFENDER REENTRY AND RECIDIVISM REDUCTION PROGRAMS*

Research by Wright, Caspi, Moffitt, and Paternoster (2004) and Taxman, Soule, and Gelb (1999) determined that punishment, particularly severe punishment, does not deter behavior and that it might actually cause offenders to be more defiant. Defiant offenders do not willingly participate in the rehabilitation programming that they need. According to Andrews and Bonta (1998) to effectively influence behavior there must be a ratio of four rewards to one consequence, since rewards serve to "shape" responses to positive actions.

At the correctional system level, if correctional agencies do not motivate offenders to complete rehabilitation programs, fewer offenders will be willing to participate in those programs. At the program level, those programs that do not have positive reinforcement structures or capacities will not effectively shape offender behaviors.

*2a. Award earned credits to offenders who complete any rehabilitation program in prison and on parole.* While California currently provides earned credits to offenders: (a) who the CDCR assigns to conservation camps to fight fires and perform other public service tasks (the California Work Incentive Program or WIP) and (b) offenders who participate in the Bridging Educational Program, offenders who complete other rehabilitation programs do not receive earned credits. With the enactment of AB 900, we anticipate that the CDCR will soon award earned credits for offenders who complete academic and vocational education programs. We recommend, therefore, that California enact laws that would allow the CDCR to award earned credits to offenders who complete *any* rehabilitation program, such as substance abuse treatment or life skills development, in accordance with the terms of their behavior management plans. These earned credits would provide motivation for offenders to participate in and successfully complete their assigned rehabilitation programs to earn reduced sentences. Offenders who participate in quality evidence-based prison programming have lower recidivism rates. We believe that the public safety benefits of adopting this recommendation will be a vast improvement over California's current practice of releasing offenders who have not completed rehabilitation programming.

*2b. Replace Work Incentive Program (WIP) credits with statutorily-based good time incentive credits.* Most prisoners in the CDCR are serving sentences that were handed down under California's Determinate Sentencing Act (DSL). California's DSL allows offenders to earn, with some exceptions, as much as a day-for-day "good time" rate (50% reduction), *but only if they are able to receive WIP credits*. While most offenders (with the exception of those serving 3- and 2-Strike sentences, life sentences, and those convicted of violent crimes) are eligible to receive the day-for-day WIP credits, because of program capacity limits, they cannot *access* the WIP-specific programs. In most cases, offenders are assigned to WIP-specific programs on a first-come, first-served basis, which is contrary to the tenet of assigning the right offender to the right program. We recommend, therefore, that the Legislature pass a law that would allow the CDCR to grant good time credits to those offenders who comply with institutional rules in prison. These good time credits would provide motivation for prisoners to manage their behaviors in prison to earn reduced sentences.

CDCR008375
CDCR008375

*2c. Implement an earned discharge parole supervision strategy for all parolees released from prison after serving a period of incarceration for an offense other than those listed as serious and violent under CPC 1192.7(c) and 667.5(c) criteria.* We recommend that California enact the necessary laws that authorize the CDCR to award parolees earned discharge credits according to the following schedule and criteria:

- Low risk to reoffend, non-violent parolees could reduce six months off their periods of parole supervision if they actively engaged in community services, remained violation-free, and completed all payments of victim restitution.
- Moderate risk to reoffend, non-violent parolees could be discharged from supervision if, at the end of 12 months, they have achieved stability in housing and employment; successfully completed all treatment requirements addressing their criminogenic needs, have maintained continuous violation-free parole, and have completed all payments of victim restitution.
- Higher risk to reoffend, non-violent parolees who are complying with their treatment requirements and who remain arrest-free for the first year could earn one month off their total parole supervision periods for each arrest-free month they have in the second year.

An earned discharge parole system provides an incentive system that rewards desired behavior and encourages parolees to earn early discharges from parole. The earned discharge strategy is an evidence-based practice that reduces recidivism. Ultimately, agencies that implement earned discharge parole strategies motivate their parolees to participate in their own supervision successes. This strategy will help reduce prison overcrowding as fewer parolees return to prison for parole violations or new criminal convictions.

Please refer to Appendix E for our estimates of the costs and benefits associated with implementing these recommendations.

13

CDCR008376
CDCR008376

## Clearing the Road for Rehabilitation

Before addressing the internal factors, we provide preparatory steps that California must take to make it possible to improve rehabilitation programming in its adult offender correctional system.

### Take an Integrated "Systems" Approach

Changing the way corrections agencies do business is no easy task. Improving rehabilitation programs to reduce recidivism is not simply a matter of identifying those evidence-based programs that produce results. Rather, the greater challenge lies in changing existing *systems* to support the programs so that they can be effectively implemented.[j] This requires energetic leadership that is willing to place equal focus on:

- Evidence-based principles in program and service delivery,
- Organizational re-engineering, and
- Collaboration within and between organizations.

These three essential components are an integrated systems model for correctional agency reform. First, evidence-based principles form the basis for effectively managing and delivering quality rehabilitation programs and services. Next, political and correctional agency leaders must engage in several organizational re-engineering tasks to successfully move from traditional warehousing or custodial practices to evidence-based rehabilitation principles and practices. And finally, collaboration with stakeholders creates more comprehensive and continuous systems changes at both the state and community levels.[k]

We were pleased to see that the CDCR leadership team has already incorporated some elements of all three of these focus areas into its strategic plan. The CDCR has (a) made a commitment to use evidence-based measures and national standards in its programming, (b) begun re-organizing its departments and re-engineering its processes, and (c) made a commitment to seek out and expand its community partnerships. Our intention is to help the CDCR move to the next level of rehabilitation as it considers its missions and values; gains new knowledge and skills; adjusts its infrastructures to support the new ways of doing business; and transforms its staff and organizational culture.

### Consider Three Important Concepts

The person reading this report should keep these things in mind:

- Change in organizations takes time to effect (2-5 years).
- Correctional agencies are part of larger communities.
- Only qualified and appropriately trained staff members should deliver programs.

---

j    Taxman (1998); Sachwald & Tesluk (2205); Friedmann, Taxman, & Henderson (2007); Simpson & Flynn (in press); Simpson (2002).
k    Young, Taxman, & Byrne (2003); Byrne, Taxman, & Young (2003).

CDCR008377
CDCR008377

### Correctional Change Takes Time

Because correctional change involves often competing (or at least differing) stakeholders—citizens, administrators, offenders, corrections officers, parole officers, families, legislators, etc.—it often takes a long time, at least two to five years, for agencies to achieve consistent and sustainable results. Part of this is due to the amount of time needed to build consensus among all parties. But an even greater contributor to the extended time factor is that rehabilitation involves influencing human behavior. Because of this, correctional agencies need to be deliberate and careful when introducing new rehabilitation programs to their offender populations or when modifying existing programs.

Many correctional programs yield poor results not because of program design flaws or targeting mistakes, but because these programs were implemented without a concurrent commitment to measuring and maintaining the quality of these programs. It takes time to continuously measure and improve the quality and delivery of programs. But we believe this is time well-spent. Such an approach makes it easier for offenders to achieve the desired programming outcomes—reduced reoffending rates—and prevents correctional programming from deviating from the evidence-based principles that are effective.

### Correctional Agencies Are Part of the Community

Most people forget that (except for those serving life without parole or death penalty sentences) all offenders come from and will one day return to the community. One needs to view corrections through the lens of prisoner reentry to understand the importance of rehabilitation programming. As Jeremy Travis (2005) has reminded us, "they all come back." In 2006, the CDCR admitted nearly 142,000 persons to prison and released nearly the same number—134,000. The average prison sentence served in California is 25 months. The fact that the majority of prisoners go back to their communities relatively quickly means that public safety is the responsibility of all community members, not just the correctional agency. When correctional agencies deliver appropriate rehabilitation *treatment* programs in prison and then follow those programs up with aftercare programs and services in the community, they are more likely to reduce recidivism two to three times more than when delivering prison-based programs alone.[l] Other research shows that correctional agencies can enhance the effectiveness of their rehabilitation programming by actively collaborating with communities.[m] Additionally, research by Bloom, Owen, and Covington (2003) shows that female offenders need the assistance of their family members, friends, and community support agencies (e.g., substance abuse, mental health, housing, etc.) if they are to sustain the treatment gains they achieved through participating in rehabilitation programming in prison.

To become productive and contributing members of society, ex-offenders must stay sober, find work, and have safe places to live. An individual who is high, out of work, and living on the streets is not likely to succeed. California must make a financial commitment to help previously incarcerated persons obtain access to and pay for the services they need to be clean, sober, and employable. Without this investment in offenders' survival issues, investments in prison and parole programming alone will not produce the desired recidivism reduction outcomes.

---

l        Aos et. al. (2006); Simpson et. al. (1999a); (1999b); Taxman, Young, & Byrne (2004); Byrne & Taxman (2006).
m        Sampson & Laub (1993); Taxman et. al. (2004).

15

CDCR008378
CDCR008378

CDCR EXPERT PANEL ON ADULT OFFENDER REENTRY AND RECIDIVISM REDUCTION PROGRAMS

*Qualified Staff Matters*

Often the difference between success and failure in a program is determined by the staff. In correctional settings there are two general and sometimes overlapping types of staff: (a) security-supervision staff and (b) rehabilitation treatment-programming staff. ***Both staff types must come to respect the role the other plays in the delivery of effective rehabilitation interventions. And, both staff types must work together to ensure that both security-safety and rehabilitation programming objectives are accomplished in a manner that appears seamless to the offender.*** Most agencies need to train their staff members to accomplish these cross-objectives tasks, as they are not normally part of agency traditions or cultures. However, doing so will have a big impact on further aligning the organization's mission to its daily operational practices.

Another important issue is staff qualifications. To be an effective teacher, mental health counselor-clinician, vocational educator, or substance abuse counselor-clinician, the staff member must meet the minimum requirements of state certification for providing these vital services. Correctional agencies cannot allow any shortcuts in this area. Requiring staff members to obtain appropriate certifications helps agencies ensure that their staff members learn the techniques that will assist offenders in progressing through their rehabilitation programs. The CDCR must ensure that it hires high-caliber professionals, who are capable of delivering quality rehabilitation programs and services in the demanding environments of prisons and parole.

Agencies that are committed to rehabilitating offenders continuously develop the technical and organizational development skills of their staff members. We cannot emphasize enough the importance of continuous staff development as a best practice in the corrections industry. Staff members are the delivery agents of rehabilitation programs and services, and, therefore, are critical to programming success.

Develop Gender and Age Responsivity

Researchers recognize that "generic one size fits all" programming does not achieve uniform recidivism reduction results across special populations. Correctional agencies need to pay more attention to these populations, such as female and youthful offenders, to improve the rehabilitation *treatment* results of these groups.

Correctional agencies have paid minimal attention to female offenders in the areas of predicting their risks to reoffend or the criminogenic needs related to their criminal behaviors. With female offenders representing only 7% of the U.S. prison population, prevailing correctional policies tend to be based on assessment instruments and rehabilitation programs that are geared towards male offenders. For example, the risk assessment tools used by most corrections agencies are largely based on male theories of crime (e.g., social learning and control theories). Bloom et. al. (2003) found that these tools generally ignore the context of female criminality and disregard female-specific risks to reoffend and those factors related to female criminal behaviors.

The same is true for youthful offenders (18-25 year olds). Correctional agencies have geared their assessment instruments and rehabilitation programming offerings primarily toward males in their mid-30s. While less information is readily available on the youthful offender population, California will need to pay more attention to this group as it moves towards a model of reducing recidivism through effective rehabilitation programming.

16

CDCR008379
CDCR008379

*Gender-Responsive Programming*

Gender-responsive approaches are multidimensional and based on theoretical perspectives that acknowledge explicitly female offender pathways into the criminal justice system. These approaches address social and cultural factors, as well as therapeutic interventions and provide the foundation for gender-responsive policies and practices (Bloom et. al).

---

### Profile of California's Female Offenders

The average female offender in California is in her late thirties. She is likely to have been a victim of physical or sexual abuse early in life. She is addicted to drugs, often has mental health issues, and most likely was sent to prison for using drugs or stealing to support a drug habit. She also is likely to be a mother and frequently the primary caregiver of young children (Little Hoover Commission, 2004).

The following CDCR data provide an overview of female offenders in California:

- At year end (12/20/06), 11,492 adult females were incarcerated in CDCR facilities.
- The majority (65% or almost 7,000) of all offenders were convicted of non-violent offenses (property and drug violations). Another 35% percent were convicted of property crimes, with drug crimes representing 30% of the female population.
- Less than 15% of the female prison population are second or third strikers, indicating a shorter criminal career. As of December 2006, only 80 women were serving third strike sentences.
- While in custody, female prisoners continue to be non-violent, with the majority (68%) of all offenders classified in Level I-II designations. Another 41% percent are classified as Level I, with 27% classified as Level II.
- The median time served in prison by incarcerated women is 13 months.
- The recidivism rate for female felons within two years after release onto parole was 39% as compared with 52% for male felons.

---

The current generation of criminogenic needs assessment instruments that correctional agencies in California use does not adequately measure female offenders' needs. The emerging research on gender-responsive strategies for female offenders provides strong support for correctional agencies to develop assessment instruments that include gender-specific needs. Since female offenders' pathways differ from male offenders, female offenders have additional needs that correctional programming should address to provide female offenders with the means to become and remain productive citizens. These needs include: treatment for abuse, violence, trauma, family relationships, substance abuse, and co-occurring disorders. Our references to "criminogenic needs" in our programming improvement recommendations do not refer comprehensively to the specific needs of female offenders.

A great deal of work has been and is being done within the CDCR to bring its programming of female offenders in line with the new theoretical perspectives and research findings in this area. Appendix G highlights the significant efforts the CDCR is making to continuously improve the assessment and programming of female offenders under its jurisdiction.

For the most part, the recommendations in this report apply equally to male and female offender populations. However, in those cases where research indicates the need to treat female offenders differently, we propose separate recommendations.

CDCR008380
CDCR008380

## Age Responsive Programming

Young adults—18-25 years old—present certain challenges for any correctional system. Many of these youthful offenders have previously been in the juvenile justice system, and many of them do not have strong, pro-social support systems in the community. Developmentally, they are in the period of their lives where they have not fully matured psychologically, sociologically, or biologically. This immaturity negatively affects their decision-making, executive functioning, and responses to rehabilitation programming efforts. Because of their previous involvements in the juvenile and-or adult justice systems, they often have not been exposed to the resources in life that tend to guide individuals, such as strong familial relationships, education and-or work, and long-term goals.

Neither California, nor any other state in the nation has devoted much attention to this age group. The average age of offenders participating in rehabilitation programs nationally is 35, which criminologists have acknowledged is towards the end of an offender's active years of criminal behavior. Assessment instruments in existence are not sensitive to the characteristics of this age group, nor have many correctional agencies developed rehabilitation programming for them. To be effective in turning the tide and keeping these youthful offenders from returning to prison, California needs to examine, develop, and enhance its programming for the approximately 21,000 youthful offenders that are admitted to the CDCR every year.

CDCR008381
CDCR008381

## Factors Internal to the Programming Environment

In this section of the report, we provide several recommendations that address the internal causes of California's rehabilitation programming problems. We base our recommendations on eight key evidence-based principles and practices (Figure 4).  Our recommendations operationalize these principles and practices so that California can deliver a core set of effective rehabilitation programs to its adult offenders.

*Figure 4: Eight Evidence-Based Principles and Practices*

1. **Target Highest Risk Offenders.** Correctional agencies should provide rehabilitation treatment programming to their highest risk to reoffend prisoners and parolees first. Provide other types of programs to low risk to reoffend prisoners or parolees.
2. **Assess Offenders Needs.** Correctional agencies should assess the criminogenic needs (dynamic risk factors) of their offenders using research-based instruments. The goal of programming should be to diminish needs.
3. **Design Responsivity into Programming.** Programming should account for individual offender characteristics that interfere with or facilitate an offender's ability and motivation to learn.
4. **Develop Behavior Management Plans.** Individual programming should occur in the context of a larger behavior management plan developed for each offender, which will include the priority and sequence of treatment programs, the means for measuring treatment gains, and the goals for a crime-free lifestyle.
5. **Deliver Treatment Programs using Cognitive-Based Strategies.** Research has consistently determined that cognitive-behavioral treatments are more effective than any other form of correctional intervention because these treatment types address criminal thinking and behaviors in offenders. The therapeutic community treatment model, which uses cognitive-based treatment strategies, is a highly effective method for treating alcohol and other drug dependencies.
6. **Motivate and Shape Offender Behaviors.** Programming should include structure or capacity for rewarding positive behavior in addition to punishing negative behavior.
7. **Engender the Community as a Protective Factor Against Recidivism and Use the Community to Support Offender Reentry and Reintegration.** Programming should involve the offender's immediate family members and the social service agencies in the community to which the offender will be returning. The state should empower the community—families, neighborhoods, religious and cultural institutions, businesses—to reduce crime through deliberate efforts that assist offenders under correctional control and provide support to reduce criminal behavior.
8. **Identify Outcomes and Measure Progress.** All programs should have identified outcomes and integrated methods for measuring progress toward objectives. The system should use performance measures to evaluate progress and inform improvements.

*We reiterate that rehabilitation programming alone is not the solution to California's correctional crisis. California must adopt the rehabilitation programming improvement recommendations that we provide in conjunction with the other measures we have proposed, if it is to reduce recidivism and increase public safety.*

19

CDCR008382
CDCR008382

*CDCR EXPERT PANEL ON ADULT OFFENDER REENTRY AND RECIDIVISM REDUCTION PROGRAMS*

### The California Logic Model

Figure 5 is a visual representation of the eight evidence-based principles and practices, which we call our California Logic Model.[n] We refer to this model as we provide our remaining recommendations so that the reader can conceptualize where each recommendation fits in the overall process.

*Figure 5. California Logic Model*

California Logic Model



The California Logic Model is a detailed, sequential description of how California should apply the eight evidence-based principles and practices and what effective rehabilitation programming (including treatment) would look like if California were to implement our recommendations. We provide a full-sized version of the California Logic Model in Appendix B.

---

n        Special thanks to Heather Yates at the Pennsylvania Department of Corrections for working with the Expert Panel to create the California Logic Model.

20

CDCR008383
CDCR008383

> *Finding— The CDCR does not assign offenders to programs based on risk-needs assessments.*

Research shows that offenders with different levels of risk to reoffend respond differently to rehabilitation programming. Yet, the CDCR is not currently using a risk-based assessment tool to assign offenders to rehabilitation programming. We found that in many instances, the CDCR assigned offenders to programs on a first-come, first-served basis, regardless of risk level. The probability of the right offenders receiving the right programs using this approach is extremely low. Research also shows that programs that target appropriate offenders are more likely to reduce recidivism.[o]

**Recommendation 3—Select and utilize a risk assessment tool to assess offender risk to reoffend.**



We recommend that the CDCR select and utilize an objective tool to assess offenders' risk to reoffend levels, in both the prison and parole systems. Such an instrument would allow the CDCR to identify which offenders should be assigned to rehabilitation programming.

---

o       Lowenkamp & Latessa (2005); Lowenkamp, Latessa, & Hoslinger (2006).

CDCR008384
CDCR008384

*CDCR EXPERT PANEL ON ADULT OFFENDER REENTRY AND RECIDIVISM REDUCTION PROGRAMS*

*3a. Adopt a risk assessment instrument for the prison population.* In June 2007, the CDCR implemented a pilot of the Correctional Offender Management Profiling for Alternative Sanctions (COMPAS) instrument in 4 of its 12 Prison Reception Centers to assess the risk to reoffend levels of it incoming prisoners. The COMPAS is an objective risk and needs assessment instrument.[p] We commend the CDCR for taking this step to assess the risk to reoffend levels of its offenders, however, we recognize the difficulty of implementing a complex risk to reoffend assessment tool like the COMPAS in the prison population, especially considering the lack of networked computer resources in the CDCR's prison facilities. Therefore, we recommend that the CDCR also pilot a static risk factor instrument in four additional prisons. The CDCR could develop this instrument fairly quickly by using most of the data it is already collecting. We provide examples of several static risk assessment instruments in Appendix D.

*3b. Utilize the COMPAS or similar assessment tool for the parole population.* In 2005, the CDCR began to use the COMPAS assessment tool to determine the risk to reoffend among its parole population and is currently validating the results. We recommend that the CDCR adopt the COMPAS if it is valid and the CDCR staff find it useful.

> Drs. David Farabee, UCLA, and Sheldon Zhang, San Diego State University, were awarded a contract from the CDCR to help validate the COMPAS instrument and make it more user-friendly and better suited for use in the CDCR setting. The CDCR anticipates receiving the COMPAS validation study preliminary results in fall of 2007.

*3c. Develop a risk assessment tool normed for the female prisoner and parolee populations.* Research shows that when correctional agencies assess female offenders with instruments designed to assess the risk to reoffend levels for male offenders, they often receive invalid results. We recommend, therefore, that the CDCR adopt an instrument that it then norms and validates for female offenders to assess their risk to reoffend levels.

> Dr. Pat Van Voorhis has been working with the CDCR to develop a gender responsive trailer to the COMPAS and plans to provide it to the CDCR by mid-July 2007.

*3d. Develop a risk assessment tool normed for the young adult prisoner and parolee populations.* Currently the risks-needs assessments tools have not been normed or validated for youthful offenders (18-25 years old) that have unique characteristics. As with the female offender population, the CDCR needs to pay more attention to this population and develop a normed and valid instrument for these offenders.

*3e. Norm and validate all the selected risk assessment instruments for the CDCR's adult offender population and validate these tools at least once every five years.* To ensure that it is accurately predicting outcomes, we recommend that the CDCR validate and norm its risk to reoffend assessment tools on the California offender population at least once every five years using a standard research-based methodology that compares projected outcomes to actual results.

---

p       Details of COMPAS can be found at http://www.northpointeinc.com/.

CDCR008385
CDCR008385

*3f. When assigning rehabilitation treatment programming slots, give highest priority to those offenders with high and moderate risk to reoffend scores.* The first principle of evidence-based rehabilitation programming is: target the highest risk offenders. This is because research shows that **high and moderate risk to reoffend prisoners and parolees achieve the greatest gains in recidivism reduction**.[q] The explanation for this is that high and moderate risk to reoffend prisoners and parolees have greater deficits in pro-social skills and criminal thinking and achieve higher levels of improvement from rehabilitation *treatment* programs. Additionally high and moderate risk to reoffend prisoners and parolees have higher base rates of offending, so increasing their pro-social skills and reducing their criminal thinking produces greater returns, or "bang-for-the buck." Because rehabilitation *treatment* resources are often limited, we recommend that the CDCR allocate its rehabilitation *treatment* programming slots first to its high and moderate risk to reoffend prisoners and parolees.

*3g. Provide low risk offenders with rehabilitation programs that focus on work, life skills, and personal growth rather than rehabilitation treatment programs.* Low risk to reoffend prisoners and parolees have low base rates of offending behavior, fewer criminogenic needs, and generally stronger support systems (Andrews and Bonta, 1998), which means that their needs for more expensive rehabilitation *treatment* programs are minimal or nonexistent. In fact, the largest known test of the "target the highest risk" principle found that when corrections agencies provided intensive rehabilitation treatment programs to higher-risk offenders, those offenders experienced significant recidivism reductions, but when the agencies provided those same intensive rehabilitation treatment programs to low-risk offenders, those offenders experienced either a very minimal reduction or even an increase in recidivism (Lowenkamp et. al., 2006). Therefore, we recommend that the CDCR provide its low risk offenders, who have such needs, with rehabilitation programs that focus on work, life skills, and personal growth, such as vocational or educational programming, but not rehabilitation *treatment* programming.

*3h. Provide short-term prisoners with reentry services and reintegration skills training rather than rehabilitation treatment programs.* Most credible rehabilitation treatment programs require the offender to participate for at least 6 months to gain any measurable and sustainable benefit from the program. (Hubbard et al., 1989; Hser et al., 2001; Simpson, Joe, and Brown, 1997.) However, as Table 3 shows, there are nearly 70,000 "short-term" prisoners who spend only a few weeks or months in prison before the CDCR releases them. Regardless of risk to reoffend level, these prisoners simply do not have the time to participate in or benefit from rehabilitation *treatment* programs. This group of short-term prisoners needs a different kind of rehabilitation programming. We recommend that the CDCR offer this group of prisoners rehabilitation programs and services that develop their community reintegration and reentry skills. The CDCR can conduct most of these types of programs within a 30-60 day time frame, and the offenders can continue them, if appropriate, in their communities.[r] The CDCR may also want to consider a fast-track rehabilitation program such as the one used by the Arizona Department of Corrections (see Appendix H). This would be another way for the CDCR to match the right offender to the right rehabilitation program—based on the offender's length of stay.

---

q    Andrews & Bonta (1998); Latessa, Cullen, & Gendreau (2002); Taxman (2006).
r    In the treatment literature, researchers generally recognize that individuals could benefit from short periods of motivational readiness to prepare for treatment (NIDA, 1999; Knight, Hiller, Broom, & Simspon, 2000).

CDCR008386
CDCR008386

*CDCR EXPERT PANEL ON ADULT OFFENDER REENTRY AND RECIDIVISM REDUCTION PROGRAMS*

*Table 3: CDCR Admissions and Lengths of Stay by Admit Type*

| Admission Type | N | % | Current Average Length of Stay (ALOS) |
|---|---|---|---|
| Total Admissions | 141,881 | 100% | 11.4 mos |
| New Court Felony Conviction | 50,708 | 36% | 18.3 mos |
| No Probation Violation | 36,176 | 26% | 23.0 mos |
| Probation Violation | 14,532 | 10% | 8.6 mos |
| Parole Violators – Total | 91,173 | 64% | 8.7 mos |
| New Court –Felony Conviction | 21,936 | 16% | 19.5 mos |
| Technical Violators | 57,728 | 41% | 4.0 mos |
| Technical Violators Reinstated | 11,509 | 8% | 0.6 mos |
| Other Key Groups | 18,752 | 13% | |
| Two Strikes | 17,280 | 12% | 56 mos |
| Three Strikes | 334 | 0% | 240 mos |
| Life Sentences – No 2 or 3 Strikes | 1,138 | 1% | Life |

*Source: CDCR Admissions and Release Data, CY 2006, CDCR Office of Research*

**Short-Term Prisoners**

CDCR008387
CDCR008387

> *Finding— The CDCR does not assign offenders to programs based on risk-needs assessments.*

Objective, standardized instruments, rather than subjective judgments alone, are the most effective methods for determining the programming needs that should be targeted for each offender.[s] By using objective risks-needs assessment instruments, CDCR personnel can determine the strength or "level" of each need in an offender. The CDCR can use this information to match the right offender to the right rehabilitation program and also determine the offender's rehabilitation program sequence. Ideally, the CDCR should assign high to moderate risk to reoffend offenders to the programs that target their primary, or strongest, criminogenic need areas first. Effective programs target multiple, specific factors (Lowenkamp and Latessa, 2005). *The more criminogenic needs that a program targets in an offender, the greater the rate of recidivism reduction he or she experiences.*

**Recommendation 4—Determine offender rehabilitation treatment programming based on the results of assessment tools that identify and measure criminogenic and other needs.**



We recommend that the CDCR assess the criminogenic needs of high to moderate risk to reoffend prisoners and parolees and the life skills and personal development needs of low risk to reoffend offenders. (Figure 6 lists the seven criminogenic needs areas.) After identifying the risk to reoffend levels of its adult offender population, the CDCR should select and begin using a battery of criminogenic, self-administered needs assessment tools to

---

s        Grove & Meehl (1996); Andrews & Bonta (1998); Latessa et. al. (2002); Taxman, Crospey, Young, & Wexler (2007).

CDCR008388
CDCR008388

determine the criminogenic needs levels of high to moderate risk to reoffend prisoners and paroleees: (a) when they enter prison, (b) after they complete rehabilitation programming, (c) when they are assigned to parole supervision, and (d) periodically during their time in the correctional system. Measuring the criminogenic needs levels of offenders at these times will allow the CDCR to determine if the programs are effectively reducing those needs. The CDCR also needs to select non-criminogenic needs instruments to identify and measure the other needs of its low risk offenders. The CDCR should develop a risks-needs matrix to provide its staff with standard rehabilitation programming recommendations guidelines. We provide a list of recommended criminogenic needs assessment tools in Appendix D.

*Figure 6: Seven Criminogenic Needs Areas*

---

Research has demonstrated that varied combinations of these seven criminogenic needs (dynamic risk factors) drive criminal behavior in male offenders:

1.  Educational-vocational-financial deficits and achievement skills
2.  Anti-social attitudes and beliefs
3.  Anti-social and pro-criminal associates and isolation for pro-social others
4.  Temperament and impulsiveness (weak self-control) factors
5.  Familial-marital-dysfunctional relationship (lack of nurturance-caring and/or monitoring-supervision)
6.  Alcohol and other drug disorders
7.  Deviant sexual preferences and arousal patterns

The concept of criminogenic needs means that research shows that the offender population has a higher prevalence of these behaviors than does the general population. Therefore, the presence of these needs in a person may very well indicate a tendency toward criminal activity. The key to understanding the importance of these criminogenic needs is the fact that they represent a constellation of characteristics or circumstances. The mission, of course, is to divert the offender from adverse behaviors and to replace them with healthy alternatives.

---

*4a. Do not assess the criminogenic needs of low risk to reoffend offenders (identified using the tools in recommendation #3).* As mentioned in recommendation 3g, low risk to reoffend prisoners and paroleees are not likely to have criminogenic needs and are not positively affected. In fact, many are negatively affected by participation in rehabilitation *treatment* programs. We recommend that the CDCR not use its limited resources to assess the criminogenic needs of low risk offenders. Instead, these CDCR should select needs instruments that identify and measure the work, life skills, personal growth, and other programming needs of this population and assign them to rehabilitation programs based on those assessments.

*4b. Utilize additional evidence-based tools to supplement criminogenic needs assessments.* General risk assessment instruments (e.g., LSIR) don't make distinctions between kinds of behavior assessed. This becomes especially important when dealing with special populations—e.g., violent offenders and sex offenders. Therefore, we recommend that the CDCR investigate and then utilize additional evidence-based tools to supplement the criminogenic needs assessments given to its high and moderate risk to reoffend prisoners and paroleees. We provide examples of these additional tools in Appendix D.

CDCR008389
CDCR008389

> *Finding—The CDCR does not have automated behavior management (case) plans for each of its offenders.*

The behavior management planning process is an important evidence-based practice and is an integral step in matching the right offender to the right program *in the right order*. The behavior management plan links the assessment process to rehabilitation programming and ensures continuity of rehabilitation programs and services between the prison, parole system, and other community-based providers. At the heart of a behavior management plan is a behavioral contract, which is a dynamic tool that provides for continuous and seamless measurement of program and service delivery to prisoners and parolees. Risk-based assignments to rehabilitation programming require behavioral contracts to ensure that offenders and correctional agency staff agree to the desired offender outcomes.

> **Recommendation 5—Create and monitor a behavior management plan for each offender.**



We recommend that the CDCR create a behavior management (or case) plan for each of its adult offenders in prison and on parole. The CDCR should actively monitor these plans to keep track of the progress that offenders are making toward achieving their rehabilitation programming objectives. The CDCR should design these behavior management plans to identify and change the criminal behavior patterns of the offenders.

CDCR008390
CDCR008390

*CDCR EXPERT PANEL ON ADULT OFFENDER REENTRY AND RECIDIVISM REDUCTION PROGRAMS*

Behavior management planning includes these major tasks:

1. Administer the objective risk-needs assessment tools at the prison Reception Center to identify the programming needs of the prisoners while in prison or at the parole office to identify the programming needs of parolees being released to parole supervision.
2. Develop a behavior management plan based on the risks and needs levels identified in step 1.
3. For prisoners: Update the behavior management plan as the prisoner (a) completes assigned programming in prison, (b) fails to comply with the plan requirements, or (c) periodically completes a new risk-needs assessment.
4. As prisoner prepares to transition to the community (parole), update existing behavior management plan to include additional programming required for the offender's successful reentry into the community
5. For parolees: Update the behavior management plan as the parolee (a) completes assigned programming in the community, (b) fails to comply with the plan requirements, or (c) periodically completes a new risk-needs assessment

CDCR staff and program managers (in prison and in the community) who actively review the behavior management plans of their offenders, as well as pre- and post-program tests and risk-needs assessments, will be able to measure treatment gains and update or modify rehabilitation program requirements as needed. Behavior management plans provide the CDCR with the ability to keep track of prisoners and parolees as they complete their assigned rehabilitation programs, comply with institutional rules, and fulfill their parole obligations.

CDCR008391
CDCR008391

> *Finding—The CDCR does not offer a sufficient quantity of evidence-based rehabilitation programs designed to reduce recidivism to its adult offenders.*

The effectiveness of rehabilitation services depends on the quality, quantity, and content of the programs. Each program should have written manuals and curricula that outline each session. Studies have found that such programs are better managed and achieve better outcomes (NIDA, 2006). Focusing on a small set of programs allows correctional agencies to establish quality programs, put in place quality assurance procedures to measure program outcomes, and hire and train qualified staff to deliver the programs effectively. Research on a national and international basis concludes that programs focused on the six major offender programming areas, when implemented appropriately, do reduce recidivism. An example of that research is the Washington State study by Aos, et al. on page 31.[t]

**Recommendation 6—Select and deliver in prison and in the community a core set of programs that covers the six major offender programming areas— (a) Academic, Vocational, and Financial; (b) Alcohol and other Drugs; (c) Aggression, Hostility, Anger, and Violence; (d) Criminal Thinking, Behaviors, and Associations; (e) Family, Marital, and Relationships; and (f) Sex Offending.**



We recommend that the CDCR select and deliver a core set of evidence-based rehabilitation programs that covers the six major offender programming areas.

---

t    While we have identified those programs that work based on research, there are also "promising" programs that are showing evidence to be working, but have not yet accumulated a sufficient body of rigorous research.

CDCR008392
CDCR008392

*CDCR EXPERT PANEL ON ADULT OFFENDER REENTRY AND RECIDIVISM REDUCTION PROGRAMS*

These programs should:

1. Be directed at reducing the seven criminogenic factors listed in Figure 6 that were identified in high and moderate risk to reoffend prisoners and parolees during the criminogenic needs assessment process;
2. Be directed at addressing the other needs of low risk to reoffend, female, and short-term prisoners and parolees; and
3. Be cognitive behavioral-based,[u] where appropriate, including the use of the therapeutic community model for substance abuse rehabilitation programs.

Because the introduction of evidence-based programming is a complex objective, we recommend the following approach:

1. Initially put in place one core program from each of the six major offender programming areas (see Appendix D, for examples of programs being operated in other states).
2. Measure processes and outcomes and revise programs to achieve program fidelity.
3. Once fidelity has been achieved in one program from each of the six major offender programming areas, make adjustments to those programs to create at least two levels of programming based on responsivity factors, such as:
   a. Match offender to programming based on responsivity factors (e.g., assign lower cognitive level offender to behaviorally-driven group, rather than higher functioning, cognitive based group).
   b. Match offender to staff based on responsivity considerations (e.g., Spanish speaking, gender, cognitive level, interests, etc.).
   c. Match staff to programs that they are most suited to deliver (e.g., training, education, personality, interests, skills, strengths-weaknesses, etc.).
4. Measure processes and outcomes of programs with added responsivity levels and revise programs to achieve program fidelity.
5. Put in place additional programs from each of the six major offending programming areas.
6. Measure processes and outcomes of additional programs and revise programs to achieve program fidelity.

---

[u]    Based on the research (Andrews & Bonta, 1998; NIDA, 1999, 2006; Lipsey & Landenberger, 2006; Landenberg & Lipsey, 2005), corrections agencies should use cognitive-behavioral (CBT) strategies in most of their rehabilitation treatment programs. The well-respected Therapeutic Communities program model now adopts CBT within its therapeutic setting to help offenders learn new skills and behaviors.

30

CDCR008393
CDCR008393

## Washington State Case Study

The recent work done by the Washington State Institute for Public Policy, a research arm of the Washington State Legislature, reinforces the recommendations in this report. The Institute was asked to determine if there were evidence-based policy options to reduce future prison construction. The Institute reported that in the area of correctional programming, effective correctional programming reduces crime and saves money. Table 4 shows selected results.

*Table 4: Effects of Evidence-Based Programming on Criminal Recidivism and Net Costs*

| Adult Offender Programs | Effect on Recidivism Rate | Benefits Minus Costs (per participant) |
|---|---|---|
| Cognitive/behavioral skills training in prison or community. | -6.3% | $10,299 |
| Drug treatment in prison. | -5.7% | $7,835 |
| Drug treatment in the community. | -9.3% | $10,054 |
| Sex offender treatment in prison with aftercare. | -7.0% | -$3,258 |
| General education in prison (basic education or post secondary). | -7.0% | $10,669 |
| Vocational education in prison. | -9.0% | $13,738 |
| Employment and job training in the community. | -4.3% | $4,359 |
| Source: Aos et al. | | |

*Note: This table reflects average effects based on multiple studies in each program type. "Effect on recidivism rate" considers criminal measures such as arrests and convictions but does not include technical violations (personal communication with Steve Aos, May 25, 2007). The effect on recidivism rate may be higher if technical violations were included. The effect on recidivism is measured as the percent change in re-arrests and re-convictions for program participants in the experimental group relative to a comparison (control) group that did not receive the treatment. "Benefits Minus Costs" is calculated as the sum of the benefits to crime victims plus the benefits to taxpayers minus the marginal costs of the program compared to the cost of the alternative program. Benefits to crime victims account for between 48% and 69% of total benefits. See Exhibit 4 in Aos et al. for more details.*

As Table 4 shows, research demonstrates that effective programming reduced recidivism and saved money. The one exception, from a cost benefit perspective, is sex offender treatment in prison with aftercare. Because of the intensity of the treatment, sex offender programs cost more than other programs, which means that they cost more than they save. Policy makers have to ask themselves, is the 7% crime reduction worth the added cost to offer such programming? Washington State policy makers concluded that it was and continue to provide cognitive-based sex offender treatment to its offenders in prison and in the community. The positive reductions in recidivism rates shown in the Table 3 are not additive. Offenders who have completed several rehabilitative programs are not likely to have reduced rates that are the accumulation of each program's estimated reductions. More importantly the programs **must demonstrate fidelity to the evidence-based principles to achieve the desired outcomes**. Maintaining quality standards in the implementation and ongoing operations of these types of programs is key to achieving the desired outcomes.

Besides the studies conducted by the Washington State Institute for Public Policy, other evidence-based research and guidelines show that correctional institutions can achieve even stronger results when they INTEGRATE all of these core risk reduction programs AND (a) automate their behavior management plan systems, (b) use sound cognitive protocols, and (c) systemically reinforce planned outcomes through a system-wide offender earned incentive system (Taxman, Shepardson, and Byrne, 2004).

Because of the measurable results that correctional organizations are achieving when implementing these programs, correctional institutions in Arizona, Iowa, Illinois, Maine, Missouri, Oregon, Pennsylvania, Washington, and Wisconsin, to name just a few, are incorporating these active elements into their next generation of correctional programming.

31

CDCR008394
CDCR008394

## Overview: Cognitive Behavioral Therapy

Cognitive Behavioral Therapy (CBT) is a type of psychotherapy derived from behavioral and cognitive psychological models of human behavior:

- Behavior therapy is based on the clinical application of theories of behavior such as learning theory; people learn how to change behavior with such therapy.
- Cognitive therapy is based on the clinical application of the role of cognition, or the process of perceiving, interpreting and attributing meaning to events, in emotional disorders. Cognitive therapy focuses on thoughts, assumptions and beliefs.

CBT draws from both models and it is based on the idea that people's thoughts cause feelings, not external things, like people, situations and events. Its aim is to modify everyday thoughts and behaviors to positively influence emotions. CBT is considered an effective evidence-based treatment widely used to treat mental disorders. CBT has been demonstrated as effective in over 375 studies for the treatment of mental health issues such as: anxiety disorders, generalized anxiety, panic, phobias, obsessive-compulsive disorder, post traumatic stress disorder, bulimia, depression, and marital distress. It is also used to treat more severe and enduring conditions such as: psychosis, schizophrenia, anger control, pain, adjustment to physical health problems, insomnia, and organic syndromes such as early stage dementia. CBT is used with groups of people as well as individuals.

CBT's role in prison and parole populations is sometimes used as a component of substance abuse and mental health treatment programs although many other programs include substance abuse problems, sex offenses and unstable mental illness in the exclusion criteria. Wilson, Bouffard, and Mackenzie's (2005) review of quantitative empirical evidence regarding cognitive behavioral programs in correctional settings found cognitive behavioral programs to be effective at reducing recidivism. Landenberger and Lipsey (2006) provide details on the specific elements or combination of elements necessary for a successful cognitive behavioral program which includes programs that focus on high risk offenders, tend to have outside researchers involved in the work, and use a specific manual or approach. These programs fare well in reducing recidivism.

## Overview: Therapeutic Communities

The therapeutic community (TC) treatment model consists of a therapeutic milieu that addresses the criminal thinking and antisocial behavior of the offender through a combination of social structure (from the residential setting) and the therapy. The TC model provides a holistic approach to assisting offenders to learn new behaviors, values, and attitudes that affect their substance abuse and criminal conduct behaviors. The client-base for TCs is typically those offenders with drug abuse problems as well as social and psychological issues. The design of the TC, originally targeted to address drug addiction, is to treat the whole person through the peer community, and it has evolved to include a variety of additional services relating to family, education, vocational training, and medical and mental health. The residential setting provides a forum for the offender to learn, adopt, and practice pro-social values.

The TC perspective views the substance abuse disorder as a disorder of the whole person, and clients typically either have histories indicating problems with socialization, emotional and cognitive skills, and psychological development or have eroded such skills through drug-addicted lifestyles. Recovery is seen as a process of rehabilitation and relearning or re-establishing healthy functioning, skills, and values, as well as regaining physical and emotional health. For those who never had such skills, the TC offers "habilitation," or learning the skills and values necessary for productive, socialized living.

The TC model for prison environments operates much like those models in the outside community, but tends to be constrained by prison-specific rules and regulations. A dedicated TC unit is usually one in which participants are isolated from the rest of the prison population. Staff are often ex-offenders and frequently graduates of the program themselves. Typically, correctional TCs are comprised of prisoners with substance abuse problems as well as psychological disturbances, especially those demonstrating persistent anti-social behavior. Those with acute psychiatric illness are usually considered unsuitable, as a major tenet of TC is that members must take responsibility for their actions.

Evaluations of in-prison drug treatment TCs in the U.S. show that intensive treatment followed up by after-care is associated with reduced criminality and drug use. DeLeon, Kressel, and Melnick (1997) notes that, based on various experiences with correctional systems, programs, and correction-based drug treatment, a continuum of services is the best strategy for effective TC intervention. The three-tiered process involving TCs through incarceration, work release, and parole are most successful at reducing recidivism and drug use. However, limitations in many TC studies are self-selection and the lack of rigorous experimental designs.

32

CDCR008395
CDCR008395

*6a. Develop and offer rehabilitation treatment programs to those offenders with high and moderate risk-to-reoffend scores and lengths of stay (LOS) of six months or more.* As we explained before, high and moderate risk to reoffend offenders achieve the greatest gains in recidivism reduction, because these offenders have greater deficits to overcome in areas of pro-social skills, substance abuse, and criminal thinking. Additionally, as discussed in recommendation 3h, to benefit from rehabilitation *treatment* programming, these offenders would need to participate for at least six months in the program, (Hubbard, et al, 1989), although more ingrained criminal behaviors require at least twelve months of care (Simpson et. al., 1999a and DeLeon et. al., 1997). Therefore, we recommend that the CDCR develop and offer evidence-based, rehabilitation treatment programs only to high and moderate risk to reoffend prisoners and parolees who have lengths of stay of six months or more. Treatment for offenders serving life sentences needs to be assigned based on their release dates.

*6b. Develop and offer rehabilitation programs focused on work, life skills, and personal growth for all low risk to reoffend prisoners and parolees who have LOS of six months or more.* As we mentioned earlier, several studies show that assigning low risk offenders to rehabilitation treatment programs and services increases their recidivism rates. For this reason, we recommend that the CDCR develop and offer rehabilitation programs focused on work, life skills, and personal growth programming for its low risk to reoffend prisoners who have more than a six-month LOS.

*6c. Develop and offer reentry programming for all offenders who have LOS less than six months.* As in the case of the low risk to reoffend prisoners, there are a sizeable number of prisoners admitted to the CDCR through new court convictions who receive relatively short sentences and will spend a short period of time in the CDCR before being released. Typically, any prisoner with a sentence of 16 months or less, who enters prison with three to five months of jail credit, and is able to earn day-for-day work credits, will serve less than six months in prison. These offenders are unlikely to have sufficient time to enter and complete a six-month rehabilitation *treatment* program by the time they complete their reception processing and arrive at their assigned prison facilities. We recommend, therefore, that the CDCR develop and offer reentry programming for this offender population and prepare them for reintegrating into their families and communities. Reentry programming should include access to services that will assist offenders in maintaining sobriety, locating housing, and obtaining employment. As previously noted, the CDCR may want to consider a fast-track program such as used in the Arizona Department of Corrections for this population (see Appendix H).

*6d. Develop and offer "booster" programs before reentry and within the community to maintain treatment gains.* We recommend the CDCR develop and offer "booster" programs to maintain treatment gains. The CDCR should deliver these programs to its higher risk to reoffend prisoners before releasing them from prison. The CDCR should stack these programs on top of core programs (e.g., refreshers on skills acquired during formal phases of treatment) in each of the major offender programming areas. Booster programs should also focus on providing offenders with skills to prevent criminal behavior relapses—i.e., avoiding high risk situations, responding differently, identifying behavioral triggers, etc.

CDCR008396
CDCR008396

*CDCR EXPERT PANEL ON ADULT OFFENDER REENTRY AND RECIDIVISM REDUCTION PROGRAMS*

*6e. Assign offenders to programs based on responsivity factors relating to their motivation and readiness; personality and psychological factors; cognitive—intellectual levels; and demographics.* We recommend that the CDCR assign offenders to programs and program providers based on identified responsivity factors and match the offenders to appropriate treatment groups and program facilitators. Research demonstrates that effective rehabilitation programs identify and account for individual differences in motivational and readiness levels, personality and psychological traits, levels of cognitive and intellectual functioning, and demographic variables. Where needed, the CDCR should create and deliver front-end, pre-rehabilitation treatment programs to address motivation and readiness factors in its offender population. Researchers recognize that treatment readiness is a critical area of improving offender outcomes (Finney, Noyes, Coutts, and Moos, 1998; Moos, Finney, Quimett, and Suchansky, 1999; Sia, Dansereau, and Cruchry, 2000; Blakenship, Dansereau, and Simpson, 1999).

*6f. Develop and offer a core set of programs that is responsive to the specific needs of female offenders.* Research demonstrates that female offenders have different rehabilitation programming needs than their male counterparts. We recommend, therefore, that the CDCR develop rehabilitation programming for female offenders that responds to their particular needs.

*6g. Develop and offer a core set of programs that is responsive to the specific needs of youthful offenders.* As previously discussed, youthful offenders have different programming needs that their older counterparts. We recommend, therefore, that the CDCR develop rehabilitation programming for youthful offenders that responds to their particular needs.

In Table 5 we sort the 34 CDCR Nominated Recidivism Reductions Programs into the Six Major Programming Areas to show the progress the CDCR is making toward delivering a full menu of programs to its adult offenders.

CDCR008397
CDCR008397

*Table 5: CDCR Nominated Recidivism Reduction Programs and the Six Major Programming Areas*

| Six Major Offender Program Areas | CDCR Recidivism Reduction Program |
|---|---|
| **Academic, Vocational, and Financial** | Academic Courses |
| | Computerized Literacy Learning Centers (CLLC) |
| | Elementary Secondary Education Act (ESEA) |
| | Bridging Education Program (BEP) |
| | Re-Entry Education |
| | Community-Based Coalition (CBC) |
| | Community Re-Entry Partnerships (CRP) |
| | Employment Development Department (EDD) |
| | Incarcerated Youthful Offenders (IYO) |
| | Offender Employment Continuum (OEC) |
| | Parolee Employment Program (PEP) |
| | Vocational Education |
| | Inmate Employability Program (IEP) |
| | Employment Re-Entry Partnership (ERP) |
| | Carpentry Pre-Apprenticeship Program |
| **Alcohol and other Drugs** | Parolee Service Centers (PSC) |
| | Residential Multi-Service Center (RMSC) |
| | Drug Treatment Furlough (DTF) |
| | In-Custody Drug Treatment Program (ICDTP) |
| | Parolee Services Network (PSN) |
| | Parolee Substance Abuse Program (PSAP) |
| | Substance Abuse Program (SAP) |
| | Substance Abuse Service Coordinating Agency (SASCA) |
| | Substance Abuse Treatment and Recovery (STAR) |
| | Transitional Treatment Program (TTP) |
| | Transitional Case Management Program-HIV (TCMP-HIV) |
| | Transitional Case Management Program-Mental Health Services Continuum (TCMP-MHSCP) |
| **Aggression, Hostility, Anger, and Violence** | Conflict Anger Lifelong Management (CALM) |
| | STAND UP |
| **Criminal Thinking, Behaviors, and Associations** | Day Reporting Center (DRC) |
| | SB618 |
| **Family, Marital, and Relationships** | Community Prisoner Mother Program (CPMP) |
| | Family Foundations Program (FFP) |
| | Female Offender Treatment and Employment Program (FOTEP) |
| **Sex Offending** | *Currently the CDCR has no sex offender programs for prisoners. Parolees attend parole outpatient clinics. The CDCR has recently established the Sex Offender Management Board to review best practices and develop recommendations to improve management practices for sex offenders.* |

CDCR008398
CDCR008398

*CDCR EXPERT PANEL ON ADULT OFFENDER REENTRY AND RECIDIVISM REDUCTION PROGRAMS*

> *Finding—The CDCR does not always measure the quality or effectiveness of its adult offender programs.*

A commitment to evidence-based rehabilitation programming that works includes determining whether or not the programming being delivered is achieving its stated objectives. This requires correctional agencies to collect programming data from every program delivered and every offender assigned to programming in an automated, systematic, and consistent fashion (Rossi, Freeman, and Lipsey, 1999). This also means that every program that correctional agencies deliver to their adult offender populations (in prison and the community) must have clearly defined outcomes—in other words, each program provider and offender participant should know, before the program begins, what a successful outcome from participating in the program would look like and what they need to do to achieve it. The CDCR has recently reestablished its Research Division and is expanding its program evaluation capability.

**Recommendation 7—Develop systems and procedures to collect and utilize programming process and outcome measures.**



If California adopts our rehabilitation programming improvement recommendations, it will be able to offer evidence-based rehabilitation programming to those offenders who would most likely benefit from such programs. But that is just the beginning. To fully benefit from these recommendations, the CDCR will need to develop information systems and operations procedures to ensure that it collects rehabilitation programming outcome data from each program it offers and each offender it assigns to programming. Therefore, we recommend that the CDCR require rigorous outcome and process evaluations from all of its rehabilitation programs to determine (a) the effectiveness of the programs on participants, (b) why and how the programs are producing the results they are obtaining, and (c) how it might improve the programs.

CDCR008399
CDCR008399

*7a. The CDCR should develop a system to measure and improve quality in its adult offender programming.* We recommend that the CDCR use its programming process and outcome measures data to: (a) determine the effectiveness of its programming as it relates to reducing recidivism or any other stated objective, (b) modify programming that is not achieving desired outcomes; and (c) provide research data for future correctional research projects. This will allow the CDCR to develop a quality assurance system for its offender programming.

*7b. The CDCR should develop the capability to conduct internal research and evaluation that measures and makes recommendations to improve the quality of its programming.* We recommend that the CDCR continue to fund and expand its Office of Research to give it the internal capability of conducting research projects of varying complexity levels. This will give the CDCR the ability to internally measure and improve the quality of its rehabilitation programming by collecting and assessing benchmark data.

*7c. The Legislature should create an independent capability to assist with developing and monitoring the CDCR's quality assurance system.* We recommend that the California State Legislature permanently fund an independent research entity to assist the CDCR Office of Research in: (a) establishing performance measures and outcome objectives for all adult offender programs, (b) analyzing outcome data to measure the effectiveness of all adult offender programming, and (c) recommending cancellation, modification, or addition of programming based on outcome results and current research and best practices. We believe that this is one of the best ways to assure quality assurance in rehabilitation programming. *Such an entity currently exists with the Center for Evidence-Based Corrections at UC Irvine.*

> The independent Washington State Institute assisted the Washington State Legislature and Washington Department of Corrections in identifying and adopting sound correctional policies and programming based on evidence-based research. It recently published a report on which correctional policies and programs were likely to reduce Washington's prison population. See page 31 for more details.

CDCR008400
CDCR008400

---

> *Finding—The CDCR has begun to focus on offender reentry issues and initiatives, but it needs to expand those efforts.*

---

Public safety in our communities is the responsibility of all citizens. It is not just the responsibility of the correctional and other justice agencies. Research and experience in recent years helped us realize that the transition from prison to the community is difficult and filled with many obstacles.[v] And, continuity of care is necessary for reducing recidivism.[w] In particular we know that individuals are at higher risks to return to prison shortly after their releases. Offenders require the assistance of their family members, friends, local support systems, and broader communities to sustain the treatment gains they have achieved through their participation in correctional programming.[x] When correctional agencies partner with these support systems in the community, it greatly enhances the ability of offenders to maintain their positive behavioral changes. These partnerships are even more important in light of current research that indicates that ***when offenders participate in treatment in the community after treatment in prison, the results are likely to be two to three times greater than if the person participated only in prison-based programs.***[y]

---

**Recommendation 8—Continue to develop and strengthen its formal partnerships with community stakeholders.**

---



---

v      Petersilia (2003); Maruna (2001); Visher & Courtney (2006); Visher & Farrell (2005), Visher, Kachnowski, LaVaigne, & Travis (2004); Visher, LaVaigne, & Farrell (2003); Wilson & Davis (2006).

w      Taxman (1998); Taxman et. al. (2004); NIDA (2006); Butzin, Scarpitti, Nielsen, Martin, & Inciardi (1999); Martin, Butzin, Saum, & Inciardi (1999).

x      Sampson & Laub (2001); Taxman, Byrne, & Young (2002); Byrne & Taxman (2006).

y      Butzin, Scarpetti, Nielsen, Martin, & Inciardi (1999); Harrison & Martin (2001); Martin, Butzin, Saum, & Inciardi, (1999); Simpson et. al. (1999a), (1999b).

CDCR008401
CDCR008401

We recommend that the CDCR establish interagency steering committees at both the statewide and community levels to ensure the appropriate coordination of transition services for its adult offenders moving from prisons to their communities.

In addition to coordinating transition services, these steering committees should be responsible for:

1. Ensuring that prisoners returning to the community receive access to programs and services that will help them obtain meaningful employment, find suitable housing, support their families, and participate in needed counseling.
2. Creating formal mechanisms and procedures that will assist with and improve information exchange between agencies.
3. Developing formal protocols that will allow agencies to share programming outcomes and offender behavior management program progress amongst themselves.
4. Creating training curricula that will ensure that all program providers and CDCR parole staff are cross-trained.
5. Developing a strategy to educate the public and others (e.g., employers, service providers, and educational institutions) about the importance of being involved in the reentry process of offenders.

*8a. Develop formal reentry plans for those offenders with high and moderate risk-to-reoffend scores.* We recommend that the CDCR develop formal reentry plans (the Ohio Department of Rehabilitation and Correction refers to these documents as Reentry Accountability Plans, or "RAPs" that are administered by Reentry Management Teams or "RMTs"; Washington State's Department of Corrections refers to these documents as Offender Accountability Plans) for all of its high and moderate risk to reoffend prisoners. This reentry plan should addresses specific issues including housing, employment, and aftercare treatment related to their rehabilitation *treatment* programs in prison.[z]

*8b. Provide offenders who have high risks to reoffend with intensive transition services for at least their first 90 days on parole.* In addition to a formal reentry plan, we also recommend that the CDCR provide all of its high risk to reoffend offenders with intensive transition services for a minimum of 90 days after they are released from prison.

*8c. Ensure that transition and reentry programming includes family member participation and addresses family unit integration skills development.* Because healthy family relationships and dynamics are an important aspect of treatment programs designed to reduce reoffending, we recommend that CDCR transition and reentry programming include programs designed to provide offenders with the skills to successfully integrate with their families upon release from prison. These programs should include the participation of the offenders' family members whenever possible.

*8d. Ensure that parole programming and transition services respond to the specific needs of female offenders.* Female offenders face specific challenges as they reenter the community from prison. In addition to the female offender stigma, they may carry additional burdens such as single motherhood, decreased economic potential, lack of services and programs targeted for women, responsibilities to multiple agencies, and a general lack of community support. We recommend that the CDCR ensure that its own internal transition programming, as well as those programs and services delivered by community-based partners are responsive to the specific needs of female offenders.

---

[z]      Taxman, Byrne, & Young (2003).

CDCR008402
CDCR008402

*CDCR EXPERT PANEL ON ADULT OFFENDER REENTRY AND RECIDIVISM REDUCTION PROGRAMS*

---

*Finding—The CDCR has begun to focus on offender reentry issues and initiatives, but it needs to expand those efforts.*

---

It is important to note that as offenders transition from prison to their communities, reducing their risk to reoffend levels not only involves changing the characteristics and motivations of the offenders, but also involves making changes in the communities—reducing the opportunities for them to commit crimes (Byrne and Taxman, 2005). These scholars note:

> The recent development of offender reentry initiatives has renewed interest in initiatives that target both at-risk offenders and at-risk communities. It is becoming increasingly clear that only incremental, short-term changes in offender behavior should be expected from the full implementation of evidence-based practices in both adult and community corrections. In large part, this is because the treatment research highlighted in these evidence-based reviews focused on individual-level change strategies. If we are interested in long-term offender change, we need to focus our attention on the community context of offender behavior, focusing on such factors as community involvement in crime prevention (Pattavina, Byrne, and Garcia, 2006), collective efficacy (Sampson, Raudenbush, and Earls, 1997), community risk level (e.g., communities with higher proportions of first-generation immigrants, particularly Latinos, will have lower violence levels) and community culture. Our basic premise is supported by a review of the research we cite here: we must develop intervention strategies that recognize the importance of person-environment interactions in the desistance process and incorporate both individual and community change into the model. (Byrne and Taxman, 2005)

Therefore, offender programming in the community must include programs designed to continue to reduce offender risk to reoffend levels, as well as reduce offender opportunities for committing crimes. Parole supervision must include a focus on those opportunities to commit crimes that exist in communities where certain neighborhoods or places present unique risks to safety and access to specific victim pools.

CDCR008403
CDCR008403

> **Recommendation 9—Modify programs and services delivered in the community (parole supervision and community based programs and services) to ensure that those services: (a) target the criminogenic needs areas of high and moderate risk offenders; (b) assist all returning offenders maintain their sobriety, locate housing, and obtain employment; and (c) identify and reduce the risk factors within specific neighborhoods and communities.**



Currently in the CDCR, parole supervision is based on surveillance and monitoring. Community-based programs and services do not target the factors related to reoffending. We recommend, therefore, the CDCR require that all of its programs and services delivered in the community, including parole supervision, include those activities that will keep offenders from re-offending. These activities include: reducing offender criminogenic needs, helping offenders stay sober, assisting offenders with finding housing and jobs, and reducing the criminal toxicity of offender neighborhoods. Most importantly, the CDCR should focus its parole supervision reducing risk by incorporating behavioral management principles that target behaviors that contribute to criminal conduct (Taxman, Sheperdson, and Byrne, 2004).

*9a. Based on a normed and validated instrument assessing risk to reoffend, release low-risk, non-violent, non-sex registrants from prison without placing them on parole supervision.* We recommend that instead of placing low-risk to reoffend, non-violent, non-sex registrant offenders on parole supervision, the CDCR should develop a "stabilization track" for these offenders. This stabilization track would provide low-risk offenders the opportunity to receive voluntary services in relation to housing, job placement, and referrals to other needed social services. The offenders on this stabilization track would no longer be under the legal authority of the Parole Division, and as such would not be subject to having their parole revoked. California will have to consider how to fund this group, because they will need assistance to obtain the services they need to stay out of prison.

CDCR008404
CDCR008404

*CDCR EXPERT PANEL ON ADULT OFFENDER REENTRY AND RECIDIVISM REDUCTION PROGRAMS*

Several studies show that imposing supervision conditions on those who are not likely to reoffend actually increases their recidivism rates. Table 6 shows the results of several studies of the relative effects of parole supervision on offenders by risk level.

*Table 6: Summary Results of the Effects of Treatment
and Parole Supervision on Recidivism Rates by Risk Level*

| Study | Risk to Reoffend Level | Level of Treatment and Supervision | |
| --- | --- | --- | --- |
| | | Minimal | Intensive |
| O'Donnell et al (1971) | Low | 16% | 22% |
| | High | 78% | 56% |
| Baird et al (1979) | Low | 3% | 10% |
| | High | 37% | 18% |
| Andrews & Kiessling (1980) | Low | 12% | 17% |
| | High | 58% | 31% |
| Bonta et al (2000) | Low | 15% | 32% |
| | High | 51% | 32% |
| *Source: Andrews and Bonta (2003)* | | | |

As Table 6 shows, placing low risk offenders on parole supervision has the opposite of its intended effect—instead of recidivism rates decreasing, they increase.

Such an effort is not new to the CDCR. Back in the early 1990s, the then California Department of Corrections conducted an experiment to lower the rate of technical violations by providing incentives to the parole regions. It was highly successful. Within two years the revocation rate dropped from 58 per 100 parolees to 35.5 per 100 parolees. Further, the disparity in return rates between parole offices and parole regions was dramatically reduced by 48% and 67% respectively. A key component of this model was to redirect part of the avoided prison expenses to parolee support services (Holt, 1995).

*9b. Focus programs and services on the highest criminogenic needs.* Successful parole strategies must include specific steps directed at reducing the dynamic risk factors related to the criminal behaviors of offenders and those risk factors associated with public safety in the community. We, therefore, recommend that the CDCR targets its parole programming on the criminogenic needs of its high and moderate risk parolees, from highest needs to lowest, based on their objective risk assessments.

*9c. Ensure that community-based providers develop and deliver programming that addresses criminal thinking for male offenders.* Current experience shows that most community-based programs do not address the criminal thinking patterns of offenders. We recommend that the CDCR require all of its community-based service providers to develop and deliver cognitive-behavioral based programming to address these needs.

*9d. Train parole agents how to deal with unmotivated and resistant offenders.* Successful parole programming is enhanced by trained supervision agents. We recommend that the CDCR include courses on how to deal with unmotivated and resistant offenders in its training program for parole agents. This training should include motivational interviewing and engagement skills.

CDCR008405
CDCR008405

*9e. Train parole agents how to mitigate the community risk factors.* Routine activity theory research indicates that identifying and addressing factors related to the safety of places and access to victims are important considerations for reducing crime. Some geographic locations are criminogenic by virtue of (a) what activities are occurring there, (b) who is congregating there, and (c) what is not be doing there to make those places safe. Therefore, it is extremely important that parole agents become aware of how offenders might access victim pools related to their criminal behavior patterns. We recommend, therefore, that the CDCR train its parole agents in strategies that will help them to identify and mitigate the risk factors in the communities. A great deal of research has been done in this field; please see Appendix I for a summary.

---

### California Penal Code Section 3001 Compliance

California Penal Code (CPC) Section 3001 addresses the statutory requirements to consider prior to discharge from parole. Specifically, parolees initially released from prison after serving a period of incarceration for a non-violent offense, described as a conviction not noted in CPC Section 667.5 (c), (e.g., violent crimes) and who have been on parole continuously for one year since their release, shall be discharged the 30th day after their first year, unless the recommendation to retain them on parole has been made to, and approved by the Board of Parole Hearings (BPH).

Additionally, parolees initially released from prison after serving a period of incarceration for a violent offense, as defined by CPC Section 667.5, and who have been on parole continuously for two years since their release, shall be discharged the 30th day after their second year, unless the recommendation to retain them on parole has been made to, and approved by the BPH.

Continuous parole is defined as a parole period with no interruptions as a result of previous actions taken by the BPH. Previous actions taken by the BPH constitute an assessment of revocation time, credit for time served, suspension of parole with reinstatement with time loss, and retention on parole. Those offenders who are eligible for discharge will be allowed to discharge at the field unit level.

In May of 2007, the CDCR Division of Adult Parole Operations (DAPO) issued a statewide memorandum dictating that field units comply with this mandate and added administrative oversight at the field administrator level for review of all cases that were recommended to be retained for final review before forwarding to the BPH.

---

CDCR008406
CDCR008406

CDCR EXPERT PANEL ON ADULT OFFENDER REENTRY AND RECIDIVISM REDUCTION PROGRAMS

> *Finding—The CDCR has begun to focus on offender reentry issues and initiatives, but it needs to expand those efforts.*

States needs to strengthen their communities. Communities provide networks of informal social controls that can prevent offenders from repeating their criminal behaviors. Research emphasizes that informal social controls are more powerful in controlling behavior than formal social control agencies such as corrections, law enforcement, welfare, etc. Informal social controls include families, non-criminally involved peers-associates, communities, religious institutions, civic organizations, etc. (Laub, Sampson, and Allen, 2001).

The families, communities, and religious institutions that define neighborhoods are a critical, but often neglected part of the overall plan to reduce recidivism. The research clearly suggests that solid intervention strategies must recognize the importance of person-to-environment interactions to aid in stopping the cycle of recidivism and to incorporate both individual and community changes into the process (Byrne and Taxman, 2005).

> **Recommendation 10: Develop the community as a protective factor against continuing involvement in the criminal justice system for offenders reentering the community on parole and-or in other correctional statuses (e.g., probation, diversion, etc.).**



Most of the recommendations in this report are directed at assisting the correctional system to provide better rehabilitation programs and services that are directed at the individual offender level of change. However, our research over the last several decades reinforces the importance of the community and familial supports as sources of informal social controls. We recommend that California take the lead in developing a system of informal social controls in its communities that thwarts criminal values and activities, minimizes victimization, addresses the offenders' criminogenic needs, and ensures that offenders are engaged in services and controls appropriate to those needs (Burke, 2000).

CDCR008407
CDCR008407