---

**Open Drug Market Interventions**

For example, a new gang and drug marketing reduction effort that Professor David Kennedy has ongoing in six communities in the U.S. (High Point, Winston-Salem, Greensboro, and Raleigh, North Carolina; Newburgh, New York; and Providence, Rhode Island) illustrates the strengths in informal social controls. Dr. Kennedy installed a program where law enforcement partners with families of drug dealers and leaders in communities (e.g., religious leaders, civic, businesses, etc.) to address the problem of open drug markets in these communities. The law enforcement agencies and prosecutors assemble a dossier on the offenders' criminal behaviors, including issuing arrest warrants. At an arranged meeting with law enforcement personnel and the offenders' family members, the drug dealers are given a choice, which is reinforced by the families—to stop their criminal behavior or have the warrant served. The families provide support that the offender is a welcome member of the community. In several cities, they have noted the closing of long-standing drug markets because the community is behind the offenders efforts to engage in law-abiding activities. (Kennedy, 2007)

This pilot is one of many across the nation that illustrates the power in the community in reducing, controlling, and eradicating criminal behavior. This is the direction that California should take to strengthen the communities that offenders are most likely to return to. It will serve the general good to improve the social functioning in these communities, which should serve overall to reduce crime in California.

---

*10a. Develop a strategy for ensuring that the community is able to provide the necessary health and social services to prisoners and parolees after they are discharged from the criminal justice system.* By default, in most states, the correctional system has become the largest provider of health services for many communities. Offender populations have significantly higher incidences of substance abuse, mental health concerns, and other debilitating diseases than the general population.[aa] Yet, some of these services are not universally available to the offender when they are released. We recommend that California develop a strategy for providing released offenders with various services that address their health and social needs and reduce their risk of further involvement in criminal behavior.

Table 7 shows which services are available to the offender depending on his or her correctional status. Once the offender leaves the correctional system, then he or she must obtain these services in the community, if they exist. In the cases where the needed services do exist, released offenders often don't have the resources required to obtain them. This leads to the offender become physically or mentally destabilized and often results in him or her being returned to prison after being convicted of committing a new crime or violating one or more parole conditions. We believe that it would be in the best interest of California to ensure that released offenders have access to the medications they need to manage their mental health disorders and-or physical ailments, as well as access to housing and job assistance services.

---

aa   Substance Abuse and Mental Health Services Administration, Office of Applied Studies (2006a); James & Glaze (2006); Maruschak (2004); Hammett, Harmon, & Rhodes (2002); Hammett (2001); Hammett, Harmon, & Maruschak (1999); Beck & Maruschak (2004)

45

CDCR008408
CDCR008408

*Table 7: Services Available to Offenders, Based on Status*

| | In Prison | On Parole | After Parole Release |
|---|---|---|---|
| Medical Care for TB-HIV-AIDS | X | In the community, if available | In the community, if available |
| Medical Care for Asthma-STDs-Diabetes | X | In the community, if available | In the community, if available |
| Assessment for Mental Health Disorders | X | Referral or by CDCR | In the community, if available |
| Mental Health Counseling | X | In the community, if available | In the community, if available |
| Medications for Mental Health Disorders | X | In the community, if available | In the community, if available |
| Assessment for Substance Abuse Needs | X | Referral or by CDCR | In the community, if available |
| Substance Abuse Treatment | X | Referral or by CDCR | In the community, if available |
| Vocational Education Assessment | X | Referral or by CDCR | In the community, if available |
| Vocational Educational Training | X | Referral or by CDCR | In the community, if available |
| Assessment for Family Issues | In the community, if available | In the community, if available | In the community, if available |
| Family Assistance | In the community, if available | In the community, if available | In the community, if available |
| Housing Assistance | In the community, if available | In the community, if available | In the community, if available |
| Child Care | In the community, if available | In the community, if available | In the community, if available |

CDCR008409
CDCR008409

> *Finding—The CDCR does not have a graduated parole sanctions policy to provide community-based alternatives to incarceration for parolees who violate their parole conditions.*

The ultimate goal of parole supervision is successful completion of parole with no new crimes committed. Compliance with parole conditions is intended to produce reductions in crime by reducing the offender's risk to reoffend. However, there is no evidence to support that the current practice of locking up offenders for technical parole violations (not related to their criminal behavior patterns and/or criminogenic needs) reduces crime. Incarceration is a destabilizing factor for the offender, family, and community, and therefore even short-term interruptions contribute to more negative behaviors in the community,[ab] such as unplanned pregnancies and higher rates of sexually transmitted diseases. Anything that contributes to the removal of individuals from the community has a negative impact, some of which is not measurable. But, Maruna (2001) has shown how difficulties in reintegration are only exacerbated by repeated incarceration periods.

**Recommendation 11—Develop structured guidelines to respond to technical parole violations based on risk to reoffend level of the offender and the seriousness of the violation.**



---

[ab] Thomas & Torrone (2006); Rose & Clear (1998); Kubrin & Stewart (2006); Thomas & Sampson (2005); Clear, Rose, Waring, & Scully (2003)

CDCR008410
CDCR008410

*CDCR EXPERT PANEL ON ADULT OFFENDER REENTRY AND RECIDIVISM REDUCTION PROGRAMS*

Table 8: Summary of Graduated Responses Concepts, Relevant Research, and Sanctions

| Concept | Relevant Research Findings | Sanction Features |
|---|---|---|
| Certainty | Increased perceived certainty of punishment deters future deviance (Grasmack and Bryjak 1980; Paternoster 1989; Nochols and Ross 1990). | Defined Infractions Behavioral contract & Written Notification Structured Sanction Menu |
| Celerity | Reduction in violations by reducing the interval between violation and sanction (Rhine 1993). Delaying response increases perception that response is unfair or questionable. | Swift Process to Respond |
| Consistency | Similar decisions made for similar situations increases compliance due to positive experience (Paternoster et al. 1997). | Behavioral contract Structured Sanction Menu |
| Parsimony | No punishment should be imposed that is more intrusive or restrictive than necessary (Tonry 1996). | Structured Sanction Menu |
| Proportionality | Level of punishment should be commensurate with severity of the criminal behavior (von Hirsch 1993). | Structured Sanction Menu |
| Progressiveness | Continued violations result in increasing stringent responses (Altschuler and Armstrong 1994). | Structured Sanction Menu |
| Neutrality | Responses must be viewed as impartial and consistent with rules, ethics, and logic (Burke 1997). | Defined Infractions Behavioral Contract |

*11a. Restrict the use of total confinement for parole violations to only certain violations.*
We recommend that California enact legislation that restricts the use of total confinement (e.g., prison) for technical parole violations to only those violations that are: (a) new felony convictions or (b) technical parole violations that are directly related to the offender's criminal behavior patterns, specific dynamic risk factors, and that also threaten public safety. All other parole violations should result in intermediate, community-based sanctions other than prison.

The most recent data from the US Department of Justice shows that for most states, new prison admissions consists of 71% new felony court convictions and 29% parole violators.[ac] California's new prison admissions, however, consists of 36% new felony court convictions and 64% parole violators, which is nearly the exact opposite of most other states. As mentioned before, part of the disparity between California and other states has to do with the sentencing laws that have been passed in California. For example, in California when a parolee absconds from parole, although it is considered a technical parole violation, state law mandates that serious and violent parolees be referred to the state Board of Parole Hearings (Petersilia, 2006). In 2006, the CDCR admitted nearly 70,000 parole violators to prison. If California were to begin diverting some percentage of less serious (based on an empirical risk assessment) parolees to community-based sanctions instead of prison, it would have less need for prison beds.

---

[ac]   Bureau of Justice Statistics, National Prisoner Statistics Series, August 2, 2000.

CDCR008411
CDCR008411

Currently in California, sanctions for technical parole violations are determined by three entities: (a) California state law, (b) the California Board of Parole Hearings (BPH), and (c) the CDCR Division of Adult Parole Operations. All three of these entities base their parole violation sanctions on the seriousness of the violation, but not on the risk to reoffend level of the violator. We recommend that California develop and implement structured sanctions— based on seriousness of the violation and offender risk to reoffend—for technical parole violators. The sanctions should address the offenders' criminogenic needs and ensure that offenders are engaged in services and controls appropriate to those needs (Burke, 2000).

*11b. Develop a parole sanctions matrix that will provide parole agents with guidelines for determining sanctions for parole violations.* The CDCR Division of Adult Parole Operations (DAPO) determines sanctions for approximately 18,000 (24%) of the CDCR's 75,000 total parole violators. Nearly 16,500 of these are non-technical parole violators and the remaining 1,500 are technical parole violators. We recommend that the CDCR create a matrix that incorporates graduated responses in the parole supervision process that support supervision goals and facilitate successful reentry. Having agency guidelines for responding to parole violations serves multiple purposes. Establishing structured parole guidelines will:

- Allow responses to violations to be more fair and consistent throughout the agency, based on a common set of guidelines that provide a set of options appropriate to offender risk level and the seriousness of the violation. While each individual case must be assessed, responses to violations should be viewed as impartial and consistent with rules, ethics, and logic. Similar decisions made for similar situations increases compliance of parolees, whereas dramatically different responses from officer to officer undermine trust and legitimacy of the system.
- Provide parolees with clear supervision expectations and consequences for violations.
- Hold offenders accountable by responding swiftly and certainly to all violations.
- Support maintaining treatment in the community and pro-social activities when feasible.
- Structure efficient use of time, resources, and delegation of authority.
- Allow the delegation of authority and informed decision-making at all levels of the agency.
- Support the agency and staff working together toward a common purpose.
- Facilitate performance measurement and quality assurance.

The graduated responses approach emphasizes using incentives to shape behavior and is based on the concepts in Table 8.

> By law, Washington State law does not confine its parole (community custody) violators in prison. Consistent with the principle of just deserts, if parolees commit crimes while on supervision, the state prosecutes them. For non-criminal violations of parole supervision, the Washington DOC created a prescriptive sanctioning grid that specified what punishment was allowed for a range of violations. The grid allows parole officers to return to custody only those high and moderate risk offenders who have committed violations directly related to their criminogenic needs. The WA DOC, through a separate administrative hearing unit, imposes parole sanctions.

CDCR008412
CDCR008412

*CDCR EXPERT PANEL ON ADULT OFFENDER REENTRY AND RECIDIVISM REDUCTION PROGRAMS*

## Summary of Findings and Recommendations

| Finding | Recommendation |
|---|---|
| The state of overcrowding in CDCR prison facilities makes it difficult for offenders to access rehabilitation programs. | Recommendation 1—The CDCR must reduce overcrowding in its prison facilities to make it easier for offenders to access rehabilitation programming. |
| The CDCR treats offenders who successfully complete rehabilitation programs and positively manage their behaviors in the same manner as those who do not. | Recommendation 2—California must enact legislation that creates a system that motivates its offenders to successfully complete their rehabilitation program requirements, comply with institutional rules in prison, and fulfill their parole obligations in the community. |
| The CDCR does not assign offenders to programs based on risk-needs assessments. | Recommendation 3—Select and utilize a risk assessment tool to assess offender risk to reoffend. |
|  | Recommendation 4—Determine offender rehabilitation treatment programming based on the results of objective assessment tools that identify and measure criminogenic and other needs. |
| The CDCR does not have automated behavior management (case) plans for each of its offenders. | Recommendation 5—Create and monitor a behavior management plan for each offender. |
| The CDCR does not offer a sufficient quantity of evidence-based rehabilitation programs designed to reduce recidivism to its adult offenders. | Recommendation 6—Select and deliver in prison and in the community a core set of programs that covers the six major offender programming areas—(a) Academic, Vocational, and Financial; (b) Alcohol and other Drugs; (c) Aggression, Hostility, Anger, and Violence; (d) Criminal Thinking, Behaviors, and Associations; (e) Family, Marital, and Relationships; and (f) Sex Offending. |
| The CDCR does not always measure the quality or effectiveness of its adult offender programs. | Recommendation 7—Develop systems and procedures to collect and utilize programming process and outcome measures. |
| The CDCR has begun to focus on offender reentry issues and initiatives, but it needs to expand those efforts. | Recommendation 8—Continue to develop and strengthen its formal partnerships with community stakeholders. |
|  | Recommendation 9—Modify programs and services delivered in the community (parole supervision and community-based programs and services) to ensure that those services: (a) target the criminogenic needs areas of high and moderate risk offenders; (b) assist all returning offenders maintain their sobriety, locate housing, and obtain employment; and (c) identify and reduce the risk factors within specific neighborhoods and communities. |
|  | Recommendation 10: Develop the community as a protective factor against continuing involvement in the criminal justice system for offenders reentering the community on parole and-or in other correctional statuses (e.g., probation, diversion, etc.). |
| The CDCR does not have a graduated parole sanctions policy to provide community-based alternatives to incarceration for parolees who violate their parole conditions. | Recommendation 11—Develop structured guidelines to respond to technical parole violations based on risk to re-offend level of the offender and the seriousness of the violation. |

CDCR008413
CDCR008413

**Making it Work in California**

The road to correctional reform is littered with thousands of pages of reports written by well-meaning people with good intentions. These reports often present good information, solid support, and well-developed conclusions, but fall short in the area of implementation. We recognized this common pitfall and devoted a considerable amount of time to making sure that this report is different.

Identified Barriers

The first step that we took to make this report useful was to identify several barriers that we believe will either prevent or hinder our recommendations from being fully implemented in California. We provide a complete list of those barriers in Appendix J—Implementation Requirements, but provide a summary here.

Essentially, the barriers we identified can be classified into four categories: (a) legislative, (b) structural, (c) cultural, and (d) societal (or community).

Legislatively, California must change the laws that contribute to offenders' lack of access to and motivation for participating in rehabilitation programming. Unless California reduces overcrowding, offenders will not have the space or safe environment they need to participate in the rehabilitation programs. And, until California provides its offenders with motivation to become involved in and successfully complete rehabilitation programs, they will continue to "do their time," likely getting worse, but certainly not getting better.

Structurally, the CDCR must take the necessary steps to improve the alignment of its organizational infrastructure to its stated mission. It must redraw its organizational chart to centralize programming policy, while making it easier for unit-level leaders to make decisions. It must tear down the silos between departments and create cross-functional teams that work together to solve the organization's challenges. It must also enhance and build up its technology infrastructure to support offender information sharing, automated behavior plan (case) management, and computer-based programming delivery.

Culturally, the CDCR must develop its employees to ensure that they are qualified to deliver and support adult offender rehabilitation programming. The CDCR must also train them to identify and manage the prisoners and parolees based on the assessment of risk and needs, in the context of a behavior management plan. It must ensure that all staff, correctional and programming, are working together to provide rehabilitation programs and services to offenders so that those offenders, when released, are less likely to return.

From a societal perspective, the CDCR must continue to foster, nurture, and expand partnerships with local governments and community-based organizations to provide seamless delivery of programming and services between prison- and community-based providers. And communities must realize that they can be either part of the solution to California's correctional crisis or part of the problem.

CDCR008414
CDCR008414

*CDCR EXPERT PANEL ON ADULT OFFENDER REENTRY AND RECIDIVISM REDUCTION PROGRAMS*

Expected Positive Outcomes

*Is it possible to quantify the benefits of implementing our recommendations?*

The simple answer to that question is *it depends*.

As anyone familiar with estimating potential impacts will state, quantifying potential benefits (or costs) depends largely on the extent to which the interventions are fully implemented. We have proposed a comprehensive package of recommendations, some of which California can implement faster than others. On one side of the implementation spectrum are those recommendations that organizational development consultants refer to as "low-hanging fruit"—those policy and practice changes that the CDCR can implement relatively quickly. Included in this group are activities like: piloting a static risk assessment, continuing to develop internal and external research capability, and developing a parole sanctions matrix. On the other side of the spectrum are those recommendations that will take longer to implement—recommendations that require labor contract negotiations or the enactment of new laws. Included in this group are activities like adopting and validating a criminogenic needs assessment instrument, enacting legislation to expand the system of positive reinforcements for program participation, and measuring program outcomes to improve program fidelity. California will realize the benefits of implementing our recommendations in direct relationship to the speed in which it puts them into practice.

In addition to the implementation factor, another variable that will influence the impact of our recommendations is the public sentiment that we have alluded to throughout this report. Although research shows that the voting public now feels that the CDCR should be rehabilitating its offenders, recent California legislation, like AB 900, which provides for $7 billion dollars to be spent on constructing additional prisons over the next several years, belies that sentiment. History shows that public sentiment on crime policy changes with the prevailing winds. The unfortunate truth about correctional policy is that oftentimes it is driven more by newspaper headlines than rigorous research. One only has to consider how the Willie Horton story in 1986, torpedoed rehabilitation reform to understand the importance of public sentiment on correctional policy. Some of our recommendations propose diverting some prisoners who are now sent to prison to community sanctions and others propose no longer supervising some parolees who are now being monitored by parole agents. Correctional experts and criminologists say that these are the right measures to take. But the most important questions are: *Is the public ready for these offenders to return? Would California's political leaders have the collective resolve to continue reforming its correctional system should even one of these diverted parolees or no longer supervised "ex-parolees" commit a headline grabbing crime?* We cannot answer those questions.

CDCR008415
CDCR008415

However, having provided those caveats, we believe that if California were to implement all of our recommendations, it would reduce the number of prison beds that it needs, thereby reducing the amount of money it spends on corrections. Table 9 summarizes our estimates. We provide details of these estimates in Appendix E.

Table 9: Total Costs and Savings of Proposed Programming and Population Reduction Strategies

|  |  | Costs | Dollar Savings | Bed Savings |
|---|---|---|---|---|
| Costs | Cost of Prison Programs | $120,637,519 - $124,236,131 |  |  |
|  | Cost of Parole-Community Corrections | $450,000,000 - $468,750,000 |  |  |
|  | Total Costs | $570,637,519 - $592,986,131 |  |  |
|  | + 10% increased CA costs* | $57,063,752 - $59,298,613 |  |  |
|  | Net Costs | $627,701,271 - $652,284,744 |  |  |
| Bed Reduction Savings | Prison Bed Savings |  | $803,283,000 - $906,268,000 |  |
|  | Recidivism Savings |  | $45,181,579 - $90,379,636 |  |
|  | Total Bed Reduction Savings |  | $848,464,579 - $996,647,636 |  |
| Offsets | Current Budget Funding for Prison and Parole Programming |  | $340,000,000 |  |
|  | Total Current Spending |  | $340,000,000 |  |
|  | Total Savings |  | $1,188,464,579 - $1,336,647,636 |  |
|  | **Net Savings** |  | **$560,763,308 - $684,362,892** |  |
|  | Beds saved through population reduction |  |  | 38,000 - 44,000 |
|  | Beds saved through recidivism reduction |  |  | 2,200 - 4,400 |
|  | **Overall Bed Savings** |  |  | **41,200 - 48,400** |

*A preliminary estimate of the increased costs for funding correctional programs in California compared to the rest of the country. See Gordon et. al. (2007).

Overall, our recommended strategies would reduce the number of prison beds that California needs by 42,000 to 48,000 beds per year. The result would mean an annual savings of between $848 and $996 million. New investments in prison and community programming should cost between $628 and $652 million a year. A significant portion of these costs, or $340 million a year, which the CDCR now spends on programs, could ultimately be used to offset these new expenditures. In total, all these new strategies could save California between $561 and $684 million a year.

We also believe that if California implements our recommendations, it will establish an accountable and credible correctional system. It is no secret that the Federal judiciary is giving serious consideration to appointing a Federal Receiver to run California's correctional system, as it already has with the states' correctional healthcare system. By adopting and implementing our recommendations, California will demonstrate by its actions, not just its words, that it is capable of resolving its current correctional crisis on its own. We have provided solutions to California's correctional problems that are evidence- and experience-based. We have provided a roadmap that other states have used to (a) improve their correctional cultures; (b) reduce the overcrowding and violence in their prisons; and (c)

CDCR008416
CDCR008416

*CDCR EXPERT PANEL ON ADULT OFFENDER REENTRY AND RECIDIVISM REDUCTION PROGRAMS*

provide their offenders with viable rehabilitation programs and services. Consequently, as prisoners receive more and better rehabilitative and treatment services prison security also improves. When custody challenges are minimized the prison becomes a safer environment for all corrections personnel.

## Incremental Implementation

As we close the first part of this report, we believe that the keyword to keep in mind is incremental. We recognize the natural desire of people to want to fix things rapidly and we urge speed where speed is called for. But we also urge caution when venturing into uncharted territories for the organization. The CDCR is the nation's largest correctional agency. It has many internal parts and external stakeholders; its information systems are not networked in most cases, making the sharing of offender information problematic at best; and it has two large employee labor unions with several thousand members each, which adds complexity to changing work assignments or expanding existing roles. The CDCR has a great deal of work to do to explain to its staff throughout the organization why these reforms are needed. If staff members do not understand why it is important for them to do what is required and how doing so will make them more effective, the CDCR will not be able to implement most of these recommendations. In light of these considerations, pilots should be used whenever possible to work out the flaws and engender buy-in when launching new initiatives. Using pilots means going slower than we are sure some would like, but experience teaches us that when attempting to transform organizations, leaders really only get one time to get it right. It is worth taking the time to get it right.

In terms of risk assessment, while piloting the COMPAS in prison, the CDCR could also quickly develop and begin piloting a static risk factor instrument to determine the risk to reoffend levels of all of its prisoners using existing data, and supplementing it as needed. This would provide the CDCR with an alternative method of obtaining a much-needed risk assessment tool, while at the same time giving it more time to validate and customize the COMPAS tool for its future expanded use. In terms of needs assessment, in Appendix D, we identify a few possible instruments that the CDCR could initially adopt, for example the CSS-M to measure criminal thinking/associates, HIQ to determine anger management needs, the static 99 to evaluate sex offender needs, and the TCU or ASI for determining substance abuse needs.

In Appendix K—Implementation Timeline, we provide a rational timeline for implementing all of the Panel's Reform Recommendations over a two-year period of time. We provide here a summary of the major tasks from that timeline.

**Major Tasks:**

1. Adopt Expert Panel Plan and Recommendations
2. Craft and Pass Legislation and Change Policies to Create Access to and Incentives for Program Participation
3. Develop or Adopt and Implement Risk to Reoffend Assessment Instrument
4. Select and Implement Offender Needs Assessment Instrument
5. Begin Assigning Offenders to Appropriate Services Based on Risk and Needs
6. Pilot New Programs

CDCR008417
CDCR008417

# EXHIBIT

# EE

```
00000
  1           IN THE UNITED STATES DISTRICT COURTS
  2           FOR THE EASTERN DISTRICT OF CALIFORNIA
  3           AND THE NORTHERN DISTRICT OF CALIFORNIA
  4    UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES
  5    PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE
  6                  --o0o--
  7    RALPH COLEMAN, et al.,   No. Civ S 90-0520 LLK JFM P
  8
  9
 10
 11
 12
 13
 14
 15
 16
 17
 18
 19
 20
 21
 22
 23
 24
 25
```

```
00001
 1   9           Plaintiffs,  THREE-JUDGE COURT
     9   vs.
 2  10   ARNOLD SCHWARZENEGGER,
         et al.,
 3  11
 4           Defendants.
 5  12               /
 6       MARCIANO PLATA, et al.,  No. C01-1531 TEH
 7  13
 8           Plaintiffs,  THREE-JUDGE COURT
 9  14
10   vs.
11  15
12       ARNOLD SCHWARZENEGGER,
13  16   et al.,
14           Defendants.
15  17               /
16  18           Deposition of
17  19           DAVID BENNETT
18  20       Tuesday, September 9, 2008
19  21
20  22   Reported by:
21       THOMAS J. LANGE, CSR No. 4689
22  23   Registered Merit Reporter
23       Job No.:  20022LR
24  24
25  25
```

00076

1  A.     As has been documented in the expert reports,
2  with the level of overcrowding in the prison just
3  logistically, it has proven to be very difficult, if not
4  impossible, to provide that level of care that is
5  required.  But it's not just the fact that there isn't
6  the physical space to do that, that it is -- and/or that
7  the number of prisoners prohibits that, but it's also
8  having in place the structure, the structure to
9  systematically provide the risk and needs assessment of
10  the offenders, the structure in place to provide that
11  subsequent identification and referral to treatment,
12  that ability to provide services both within the
13  facility and, just as importantly, out in the community.
14  Q.     Would you agree that when a prison is -- has a
15  rated capacity, I don't know, 80,000 beds, and yet it is
16  housing 176,000 inmates or 156,000 inmates -- I don't
17  know the number right now -- that that increases the --
18  or exacerbates, I should say, the problem of providing
19  adequate medical and mental healthcare?
20         MS. KECK:  Same objection.  Outside the scope.
21         THE WITNESS:  Yes.
22  Q.     BY MR. BORNSTEIN:  And would you agree that
23  reducing the number of prisoners is at least one of the
24  first steps that needs to be taken while you're doing --
25  while you're kind of working on the infrastructure of

00077
1  risk and needs and subsequent identification and
2  referral and in the facility and out of the facility?
3  Basically you've got to bring the population down to a
4  more manageable size so that you can implement those
5  things.
6       MS. KECK:  Objection as to scope and vague and
7  ambiguous.
8       THE WITNESS:  Yes.
9  Q.    BY MR. BORNSTEIN:  In -- okay.  Let me take --
10 let me --
11      I want to go back to something that we talked
12 about earlier.  AB 900, in your opinion, is that a
13 solution to the overcrowding problem that will work?
14 A.    No.
15 Q.    Why not?
16      MS. KECK:  Objection.  Outside the scope.
17      Go ahead.
18      THE WITNESS:  As I previously discussed, the
19 idea of a secure reentry facility in my opinion is an
20 oxymoron, and that what is proposed is simply nothing
21 more, new or different than the construction of
22 satellite prisons within -- throughout the state.
23 Q.    BY MR. BORNSTEIN:  I think you mentioned in
24 your report that you can't -- if you build -- whatever
25 you build, they will come and live in it, or I don't

REPORTER'S CERTIFICATE

I certify that the foregoing proceedings in the within-entitled cause were reported at the time and place therein named; that said proceedings were reported by me, a duly Certified Shorthand Reporter of the State of California, and were thereafter transcribed into typewriting.

I further certify that I am not of counsel or attorney for either or any of the parties to said cause of action, nor in any way interested in the outcome of the cause named in said cause of action.

IN WITNESS WHEREOF, I have hereunto set my hand this 22nd day of September, 2008.

_____
THOMAS J. LANGE, Calif. CSR No. 4689
Registered Merit Reporter