**EXHIBIT A**

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

AND THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE

PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

| | |
|---|---|
| RALPH COLEMAN, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | ) NO. 2:90-cv-00520 LKK JFM P |
| | ) |
| ARNOLD SCHWARZENEGGER, et al., | ) |
| | ) |
| Defendants. | ) |
| | ) |
| MARCIANO PLATA, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | ) |
| | ) |
| ARNOLD SCHWARZENEGGER, et al., | ) |
| | ) |
| Defendants. | ) |

*Certified Copy*

---oOo---

DEPOSITION OF JEANNE S. WOODFORD

Tuesday, December 18, 2007

---OOo---

REPORTED BY:  KRISTIE L. HUBKA, CSR NO. 5974

PROFESSIONAL REPORTING SERVICES    (800) 261-4814

1    copy of your deposition transcript and it will have all

2    of your answers, all of the objections and all of the

3    questions.   Okay?

4         A.    Yes.

5         Q.    And you will have an opportunity to make

6    changes to that transcript if you see fit.  Do you

7    understand that?

8         A.    Yes.

9         Q.    If you make any substantive changes, myself or

10   any of the other attorneys can comment on it at the time

11   of trial.  Do you understand that?

12        A.    Yes.

13        Q.    And lastly you understand you're under oath,

14   the same oath as if you were in front of the three

15   judges in February or whenever the trial date will be.

16        A.    Yes.

17        Q.    What is your current position?

18        A.    I'm the chief of adult probation in the City

19   and County of San Francisco.

20        Q.    And is there an association for chief

21   probation officers in the State of California?

22        A.    Yes, there is.

23        Q.    And what is that association?

24        A.    CPOC, C-P-O-C.  I'm not sure what it stands

25   for, California Probation --

1          MR. SPECTER:   Chief Probation.

2          THE WITNESS:   Chief Probation Officers of

3    California.   Thank you.

4          MR. MELLO:   Mr. Specter, please raise your

5    right hand and I'll swear you in.

6      Q.   Are you a member of that association?

7      A.   Yes.

8      Q.   And do you know whether that association -- or

9    strike that.

10         Do you know whether any members of that

11   association have intervened in this matter?

12     A.   Yes.

13     Q.   Have you ever participated in any conference

14   calls with members of that association regarding this

15   litigation?

16     A.   I don't believe so.   I mean, it's been -- the

17   litigation has been mentioned but I don't believe that I

18   participated in an actual call on this topic.

19     Q.   Have you ever been a participant in any

20   conference calls where the law firm of Jones & Mayor,

21   counsel for the interveners was on the line?

22     A.   Not that I'm aware of, no.

23     Q.   Your B.A. is in criminal justice, correct?

24     A.   Yes, that's correct.

25     Q.   Do you hold any degrees with respect to

1    medical or mental healthcare?

2        A.    No, I do not.

3        Q.    Have you ever received any training beyond

4    basic first-aid in medical care?

5        A.    Well, I have received training as a result of

6    litigation against the department so I've received

7    training as it pertained to the Coleman lawsuit,

8    training as it pertained to the Marin lawsuit when that

9    was a case -- a medical case at San Quentin State

10   Prison.  I received training on Plata.  And other

11   lawsuits that I can't even remember the name of at this

12   point in time so, yes, in that way I have.

13       Q.    Do you hold any degrees with respect to

14   medical or mental healthcare?

15       A.    No, I do not.

16       Q.    Can you tell me generally speaking what type

17   of training you've received with respect to the Coleman

18   lawsuit?

19       A.    There was training that was put on by the

20   Department of Health Services that covered the various

21   aspects of the Coleman lawsuit and our responsibility as

22   it pertained to the Coleman lawsuit.

23       Q.    When you say various aspects of that lawsuit,

24   do you mean actually -- or what do you mean?  To the

25   extent you remember.

1      A.    There's provisions within the Coleman lawsuit

2  as to how much yard, time inmates are supposed to be in

3  treatment programs.  What else is included in that?

4  There's just -- many requirements that we were trained

5  on as to our responsibility.

6      Q.    You mentioned the Marin lawsuit.  Was that a

7  lawsuit relating to various issues at San Quentin

8  prison?

9      A.    Healthcare issues at San Quentin State Prison,

10  yes.

11     Q.    Did it relate to issues besides healthcare

12  issues?

13     A.    It also covered mental health.

14     Q.    And you were formerly the warden at

15  San Quentin, correct?

16     A.    Yes, I was the warden.

17     Q.    When were you the warden at San Quentin?

18     A.    I was the warden from 1999 until February of

19  2004.

20     Q.    Do you know what period of time -- or strike

21  that.

22           Do you know when the Marin lawsuit ended?

23     A.    I don't remember the year because I can't

24  remember if it ended when I was the chief deputy warden

25  or the warden.  But I would estimate it was 2003 or

DEPOSITION OF JEANNE S. WOODFORD                    11

1  2004, somewhere along there, but I'm not positive of

2  that.

3      Q.    And I used the term "ended."  Was that lawsuit

4  ultimately dismissed?

5          MR. SPECTER:  If you know.

6          THE WITNESS:  I don't know if that's the

7  proper term.

8      Q    (By Mr. Mello) Do you know -- it's your

9  testimony that the Marin lawsuit involved both

10  medical care and mental healthcare, correct?

11      A.    Yes.

12      Q.    You left the department when?

13      A.    July, 2006.

14      Q.    And at that point you were the acting director

15  of CDCR?

16      A.    No.  I was actually --

17      Q.    Pardon me.  I'm sorry.  Were you the acting

18  secretary in July of 2006?

19      A.    No, I was not.  I was the undersecretary of

20  the California Department of Corrections and

21  Rehabilitation.

22      Q.    And, to your knowledge, the Marin lawsuit was

23  no longer active at that point, correct?

24      A.    That is correct.

25      Q.    Do you have any experience providing medical

1   chief medical officers when you were the warden at

2   San Quentin prison.  Do you also believe that those

3   individuals were M.D.s?

4       A.   Yes.

5       Q.   So all of these folks had medical training,

6   correct?

7       A.   That is correct.

8       Q.   As you testified earlier, you were the

9   director of the Department of Corrections starting in

10   February of 2004, correct?

11       A.   That is correct.

12       Q.   I should know this but the Department of

13   Corrections was not the same as the Department of --

14   California Department of Corrections and Rehabilitation?

15   CDCR is different from the Department of Corrections,

16   correct?

17       A.   Yes, that's correct.

18       Q.   How so?

19       A.   Under the California Department of Corrections

20   the primary mission of corrections was punishment.  It

21   also had a different structure where the director was

22   very much in charge of the California Department of

23   Corrections on the adult side.  The reorganization

24   created the California Department of Corrections and

25   Rehabilitation making rehabilitation a primary mission

1  of the department and it's now organized under the

2  secretary of the California Department of Corrections

3  and Rehabilitation and has a different management

4  structure.

5      Q.   When you were the director -- strike that.

6           When you were the warden at San Quentin prison

7  there was a chief medical officer and a chief

8  psychiatrist, correct?

9      A.   That is correct.

10     Q.   Was there a similar title below you when you

11  were the director of the Department of Corrections?

12     A.   There were similar titles, yes.

13     Q.   Was there a statewide chief medical officer or

14  chief psychiatrist?

15     A.   There was a statewide chief medical officer,

16  yes.

17     Q.   Was there somebody in the medical structure

18  above the statewide chief medical officer when you were

19  the director of the Department of Corrections?

20     A.   No, there was not.

21     Q.   How many chief medical officers --

22     A.   Excuse me, I need to correct that.

23     Q.   Sure.

24     A.   At some point while I was the director, maybe

25  a couple of months before I promoted to undersecretary,

1  they did put someone in a position under the secretary

2  to oversee healthcare for the California Department of

3  Corrections. But I'm uncertain as to the month that

4  that occurred.

5      Q.    Within several months of you becoming

6  undersecretary?

7      A.    Yes, that would be correct.

8      Q.    Prior to that time how many statewide

9  medical -- chief medical officers were there when you

10 were director?

11     A.    I'm sorry, I don't know the answer to that.

12     Q.    Was it more than one?

13     A.    Yes.

14     Q.    Do you think it was more than three?

15     A.    Yes.

16     Q.    Was it more than five?

17     A.    Yes.

18     Q.    Oh, boy.  Do you think it was less than ten?

19     A.    No.  There is a position at each of the

20 prisons but I don't know that all of them were filled.

21     Q.    Okay.  Just so I understand, at the time until

22 those last few months, at the time that you were the

23 director of the Department of Corrections, the chief

24 medical officers were at each facility, correct?

25     A.    Yes.

1      Q.   And am I correct that there was not a medical

2   officer above those facility chief medical officers

3   until just a couple of months before you became

4   undersecretary?

5      A.   No.  There was a chief medical officer in

6   Sacramento or the head of healthcare services, I'm not

7   sure what the titles were as we've changed titles, so

8   it's very difficult for me to remember what we were

9   calling people at that point in time.

10      Q.   Let's for purposes of this discussion just

11   refer to him as head of healthcare services.

12      A.   That's correct.

13      Q.   Okay.  At the time that you were the director

14   of the Department of Corrections how many heads of

15   healthcare services were there?

16      A.   At what location?

17      Q.   In Sacramento.

18      A.   There was one.  Until the last few months and

19   then there was another position added at the secretary

20   level.

21      Q.   And who was that one person?

22      A.   The one before the position added?

23      Q.   Yes.

24      A.   That would be Dr. Rene Kanan.

25      Q.   And Dr. Kanan.  Did the chief medical officers

1    at the institutions report to Dr. Kanan?

2         A.    Yes, they did.

3         Q.    And who did Dr. Kanan report to?

4         A.    Dr. Kanan reported to the director of

5    corrections, that would be me during that time.  And

6    also because we were in transition she was reporting to

7    the secretary of the agency.

8         Q.    Did she report to anybody below the -- was she

9    a direct report to anybody below you during that time?

10        A.    She reported a direct report to the deputy

11   director of administration.

12        Q.    How many deputy directors did you have below

13   you at the time Dr. Kanan was reporting to the deputy

14   director of administration?

15        A.    Let me restate.  The title of that one was

16   chief deputy director and I had two.

17        Q.    What was the other chief deputy?

18        A.    Operations.

19        Q.    And who is the chief -- strike that.

20              How many chief deputy directors of

21   administration did Dr. Kanan report to, to your

22   knowledge?

23        A.    One.

24        Q.    Who was that?

25        A.    Ernie Van Sant.  But I do need to say that

1    recall.

2         Q.    Was she a physician?

3         A.    I don't think so.

4         Q.    When you were the director of the Department

5    of Corrections, what, if any, role did you have with

6    respect to the Plata lawsuit, generally speaking?

7         A.    Well, my role -- that's a very complicated

8    question.  My role was to make sure that we were in

9    compliance with the Plata lawsuit and to work with

10   healthcare services to achieve that goal and work with

11   other parts of the department if achieving that goal

12   required physical plant changes or construction.

13            It was also to make sure that the custody side

14   of the house was working well with healthcare at their

15   facilities and at headquarters to come into compliance

16   with the provisions of the Plata lawsuit.  And, I mean,

17   that's everything from soup to nuts, I mean, trying to

18   attract more doctors.  I was involved in discussions in

19   just about every aspect of compliance with that lawsuit

20   I would say.

21        Q.    Was your role with respect to the Coleman

22   lawsuit similar when you were the director of the

23   Department of Corrections?

24        A.    Yes.  With the Coleman lawsuit I also worked

25   with other state agencies to try to bring us into

DEPOSITION OF JEANNE S. WOODFORD                    29

1    compliance with the provisions of Coleman.

2        Q.    And, again, on your resume it appears that you

3    were subsequently appointed the undersecretary of the

4    CDCR, correct?

5        A.    That is correct.

6        Q.    And it was in about July of 2005?

7        A.    That is correct.

8        Q.    And at that time was there somebody below you

9    who oversaw the medical care system at CDCR?

10       A.    No, there wasn't anyone below me.

11       Q.    Was there somebody at the same level as you

12   who directly oversaw medical care?

13       A.    Yes.

14       Q.    Who?

15       A.    Peter S.

16       Q.    Dr. Szekrenyi.

17       A.    Yes, that is correct.

18       Q.    I like to say Dr. Peter.  So when Dr. Peter --

19   it drove me nuts.  So Dr. Szekrenyi, he was the head of

20   medical when you were the undersecretary?

21       A.    That is correct.

22       Q.    The entire time?

23       A.    Yes.  Let me say I believe it was the entire

24   time.  I can't remember exactly when he was appointed.

25       Q.    Okay.  Was Dr. Szekrenyi also the head of

1    mental healthcare at that time?

2        A.    Yes, he had responsibility for both medical

3    and mental healthcare.

4        Q.    And do you know whether Dr. Szekrenyi had

5    physicians or psychiatrists at a level right below him

6    who reported to him?  Let me reask that.

7            Do you know if there was a statewide medical

8    director when Dr. Szekrenyi was the director of

9    healthcare services division or something along those

10    lines?

11        A.    Yes.  I don't remember the exact title but

12    something along those lines, yes.

13        Q.    Was there a chief psychiatrist, a similar

14    position for psychiatrists, to your knowledge, when you

15    were undersecretary?

16        A.    I don't recall that.

17        Q.    Do you know whether the person who was below

18    Dr. Szekrenyi who was something akin to a statewide

19    medical director, whether that person was a physician?

20        A.    Yes.

21        Q.    Do you know who those persons were?

22        A.    Again, not sure of the title but the person

23    that I view as having that responsibility was again

24    Dr. Rene Kanan.

25        Q.    And Dr. Kanan is an M.D., correct?

1      A.    Yes.   I also need to say that there was also

2   another person assigned to the secretary and that was

3   Darce Keller (phonetic) and he also had a role in

4   healthcare but I don't exactly remember his exact title

5   either.

6      Q.    To your knowledge, both Dr. Szekrenyi and

7   Mr. Keller are no longer working for the department?

8      A.    That's my understanding.

9      Q.    And you left your position as undersecretary

10  in July of 2006?

11     A.    Yes, that's correct.

12     Q.    Why?   Probably not an easy question.

13     A.    No, it's really not an easy question.   It's a

14  pretty complicated answer.

15     Q.    Can you give it to me, anyways?

16     A.    I had actually been asked to be the secretary

17  of the Department of Corrections and Rehabilitation and

18  I acted in that position for about 45 or 50 days and I

19  determined that I could not find a path to be successful

20  given the conditions of the Department of Corrections

21  including our overcrowding and the unwillingness, or if

22  that's the right word, of the State of California to

23  look at what I thought were resolutions to the problem.

24         I felt that we could not build our way out of

25  the problem, that we really needed to take a very

1    realistic approach and I also felt that what we were

2    doing in the Department of Corrections was not enhancing

3    public safety.

4            In fact, our policies or the state's criminal

5    justice system was actually harming public safety and I

6    felt under the overcrowding conditions that we had that

7    we weren't providing a constitutional level of care for

8    inmates to include every aspect of living inside a

9    prison, getting healthcare and mental healthcare.

10   Q.    Can you tell me what the components are of a

11   constitutionally adequate medical care system?

12   A.    I'm not sure that I can answer that question.

13   Q.    Why not?

14   A.    I'm not sure what you mean by "components."

15   Q.    I believe you testified that you didn't

16   believe -- one of the reasons that you didn't accept the

17   secretary position and you left CDCR is because you did

18   not believe that the department and the state could

19   provide constitutionally adequate medical and mental

20   healthcare.  I believe that was your testimony; is that

21   accurate?

22   A.    That is accurate.

23   Q.    My question to you is what are the components

24   or necessary parts of a constitutionally adequate

25   medical or mental health system?

1      A.   Well, I don't know that I can answer that in

2    technical terms.  But I can tell you having been

3    involved with the Department of Corrections for 27 years

4    and the variety of litigation cases that I have been

5    involved in and the standards that have been set by the

6    courts as to number of hours inmates need to be out of

7    their cell or be in yards or be involved in mental

8    health treatment or receive recreational activity or

9    double celling, all of that litigation has led me to

10   have an understanding of what the courts believe is a

11   constitutional level of treatment of incarcerated

12   individuals.

13        And then becoming the director and going

14   around the state and seeing some of the prisons and the

15   conditions and the overcrowding and our inability to

16   meet the ten hours of yard time, for example, that's

17   involved under the Toussaint, T-o-u-s-s-a-i-n-t, case or

18   the fact that we weren't giving inmates who were in the

19   EOP level of care for Coleman or CCCMS level of care to

20   the number of hours of group therapy or group counseling

21   or whatever the requirements were.  We weren't meeting

22   those standards.

23        After seeing all of that, I knew that we were

24   in big, big trouble and it was just a matter of time

25   before we would be facing all those similar lawsuits all

1          Q.    Isn't it possible that the number of vacancies

2    can go up at the same time that the number of filled

3    positions can go up?

4          A.    Yes, that's possible.

5          Q.    And that's possible because more positions can

6    be established or authorized?

7          A.    That is correct.

8          Q.    So there could actually be a greater number of

9    correctional officers in the system today even if there

10   are greater vacancies, correct?

11         A.    That is correct.

12         Q.    And that would be the same with respect to

13   clinicians?

14         A.    .Yes, that's correct.

15         Q.    On page four of your report, paragraph eleven,

16   would you take a look at that paragraph.  I'm going to

17   ask you some questions about it.

18         A.    Page four?

19         Q.    Yes, paragraph eleven.

20         A.    Yes.

21         Q.    In that paragraph it states that CDCR, quote,

22   "lacks sufficient number of personnel who have the

23   necessary skill and training to manage such a large

24   complex organization," end quote.  Do you see that?

25         A.    Yes.

1      Q.    What personnel are you talking about in this

2    paragraph?

3      A.    I'm actually talking about personnel in all

4    categories, custody, support staff, healthcare, mental

5    healthcare.

6      Q.    But it's your testimony that you don't

7    actually know the number of persons in the various

8    positions in the prisons today, correct?

9      A.    That is my testimony.

10     Q.    I'm not trying to be argumentative, I'm

11   just -- please, I'm not trying to be argumentative, I'm

12   actually just trying to make the record clear, okay.

13           Do you know what the current physician to

14   inmate ratio is at CDCR?

15     A.    No, I do not.

16     Q.    Do you have an understanding -- strike that.

17           Have you ever heard what an appropriate

18   physician to inmate ratio is in a prison setting?

19     A.    Yes, I have.  I don't remember the number but

20   I'm familiar with what is considered an appropriate

21   ratio.  I know I've seen that number.

22     Q.    Okay.  But you can't remember that number,

23   correct?

24     A.    No, I don't.

25     Q.    And do you remember what the physician to

1                    STATE OF CALIFORNIA    )    ss.

2              I, the undersigned, a Certified Shorthand

3     Reporter of the State of California, hereby certify that

4     the witness in the foregoing deposition was by me duly

5     sworn to testify to the truth, the whole truth, and

6     nothing but the truth in the within-entitled cause; the

7     said deposition was taken at the time and place therein

8     stated; that the testimony of said witness was reported

9     by me, a Certified Shorthand Reporter and a

10    disinterested person, and was thereafter transcribed

11    under my direction into typewriting; that the foregoing

12    is a full, complete and true record of said testimony;

13    and that the witness was given an opportunity to read

14    and, if necessary, correct said deposition and to

15    subscribe the same.

16              I further certify that I am not of counsel or

17    attorney for either or any of the parties in the

18    foregoing deposition and caption named, nor in any way

19    interested in the outcome of the cause named in said

20    action.

21              IN WITNESS WHEREOF, I have hereunto set my

22    hand this _3rd_ day of _January_, 20_07_.

23

24                        _Kristie L Wubker_
                          CERTIFIED SHORTHAND REPORTER

25