**EXHIBIT B**

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

AND THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE

PURSUANT TO SECTION 2284, 28 UNITED STATES CODE

RALPH COLEMAN, et al.,          )
                                )
            Plaintiffs,          )
                                )
        vs.                      )  NO. 2:90-cv-00520 LKK JFM P
                                )
ARNOLD SCHWARZENEGGER, et        )
al.,                             )
                                )
            Defendants.          )
_____)
MARCIANO PLATA, et al.,          )
                                )
            Plaintiffs,          )
                                )
        vs.                      )
                                )
ARNOLD SCHWARZENEGGER, et        )
al.,                             )
                                )
            Defendants.          )
_____)

*Certified Copy*

---oOo---

DEPOSITION OF DOYLE W. SCOTT

Friday, December 14, 2007

---oOo---

REPORTED BY:  KRISTIE L. HUBKA, CSR NO. 5974

9

1       A.    Yes.

2       Q.    For how long?

3       A.    Three and a half hours.

4       Q.    Did you meet at their office?

5       A.    Yes.

6       Q.    And what, if anything, was discussed regarding

7   Dr. Shansky's deposition?

8             MS. NORMAN:   I'm going to object about content

9   of discussion.

10             MR. MELLO:   On what basis?

11             MS. NORMAN:   Because I don't think you're

12   entitled to the content of our discussion with

13   Mr. Scott.

14             MR. MELLO:   I think I absolutely am.   He's a

15   testifying expert and there's no privilege attached to

16   any communication.

17       Q.    Do you remember the question?   Let me just

18   reask it.

19       A.    Okay.

20       Q.    What, if anything, was discussed regarding

21   Dr. Shansky's deposition?

22       A.    Specifically the length of time that it took

23   because I had an urgent matter that I needed to get back

24   for so I was very concerned about that.   And in general

25   some of the questions that were asked.

10

1      Q.   Do you recall what questions were discussed

2   during that meeting?

3      A.   Let me think.  They were questions generally

4   surrounding overcrowding but I don't really recall the

5   specifics.

6      Q.   Was the subject of the drafting of his expert

7   report discussed?

8      A.   Only in the context that we would probably go

9   through my drafts and you would ask about the changes.

10     Q.   Mr. Scott, you're a college graduate, correct?

11     A.   I am.

12     Q.   What's your degree in?

13     A.   Business administration.

14     Q.   Where did you obtain that degree?

15     A.   Sam Houston State University.

16     Q.   Do you have any advanced degrees?

17     A.   No.  Not beyond my bachelors degree.

18     Q.   I'm sure you've received training in courses

19   since that time, correct?

20     A.   Yes.

21     Q.   Probably numerous.

22     A.   Yes.

23     Q.   Do you have any degrees in the medical field?

24     A.   No.

25     Q.   Do you have any degrees in the mental health

11

1    field?

2         A.    No.

3         Q.    Have you ever been a clinician who provided

4    either medical or mental healthcare?

5         A.    No.

6         Q.    You were the executive director for the

7    Department of Criminal Justice from 1996 through 2001,

8    correct?

9         A.    Not through 2001, until the middle of 2001.

10        Q.    Just so I'm clear, what period of time were

11   you the executive director of that department?

12        A.    I started in January of 1996 and I retired in

13   July of 2001.  And before that I was acting director

14   from October of '95 until I became permanent director.

15        Q.    So you were the director effectively from

16   October of '95 through your retirement in July 1, 2001,

17   correct?

18        A.    Yes, sir, that's correct.

19        Q.    And you were employed by that department prior

20   to that time, correct?

21        A.    Yes, sir.

22        Q.    When did you join that department?

23        A.    January of 1972.

24        Q.    And were you employed continuously by that

25   department through your retirement?

12

1      A.    No.

2      Q.    You were employed there from January of 72

3   until when?

4      A.    I think it was 1981.

5      Q.    So you were employed in 1981.  When you left

6   the department, what was your title?

7      A.    I was the major of correctional officers.

8      Q.    Can you explain to me what that means?

9      A.    It's the highest ranking uniform security

10  officer at an institution.

11     Q.    So the top correctional officer at an

12  institution?

13     A.    Uniformed correctional officer, correct.

14     Q.    And which institution were you at?

15     A.    The Retrieve unit.

16     Q.    And where is that?

17     A.    Angleton, Texas.

18     Q.    The Retrieve unit?

19     A.    (Witness nods head.)

20     Q.    Meaning what?

21     A.    It's actually a family name.  It was the

22  family's name that donated the property.

23     Q.    It wasn't like the guys go out and pick up the

24  folks who got away?

25     A.    No.

13

```
1          Q.   Sorry.

2          A.   Couldn't help yourself, could you?

3          Q.   I am childish.  Can you spell Retrieve?

4          A.   R-e-t-r-i-e-v-e.  It's now the Scott unit.

5          Q.   Is it really?

6          A.   Yes.

7          Q.   And who would that be named after?

8          A.   Myself.

9          Q.   Cool.  So when you left in 1981 where did you

10    go?

11         A.   I went to work in Houston as a petroleum land

12    man.

13         Q.   That was not in corrections, correct?

14         A.   No.

15         Q.   And when did you rejoin the department?

16         A.   Seven months after I left.

17         Q.   Didn't like being a petroleum land man?

18         A.   No.  I was invited to come back from the

19    director.

20         Q.   And I assume at some sort of new, higher level

21    position?

22         A.   No.  I started over as a correctional officer.

23         Q.   Okay.  And how long -- so you came back

24    sometime in 1981?

25         A.   Yes.
```

Case 2:90-cv-00520-KJM-SCR Correctional Services Document 3067-2

19

1          THE WITNESS:  Okay.

2          Q    (By Mr. Mello) During the period of time

3    that you were executive director what programs or

4    efforts did the department take to find clinicians

5    for those difficult to place institutions?

6          A.    First we outsourced our medical treatment to

7    our university teaching hospitals in the state and that

8    would be the University of Texas Tech Health Science

9    Center and the University of Texas Medical Branch.  UTMB

10   had about 70 percent of our inmate population to care

11   for medically, Texas Tech had about 30 percent of our

12   population to care for.

13          We redesignated some beds to facilities that

14   were close to major metropolitan areas so we would have

15   an available labor pool of classes of medical

16   professionals to work at our institutions.

17          Q.    And when did the relationships with Texas Tech

18   and UTMB start?

19          A.    I don't recall the exact year.

20          Q.    Do you know if it was before you became the

21   executive director?

22          A.    It was.  It was, yes.

23          Q.    Do you think if California were to enter into

24   agreements with its U.C. system that that might help

25   with some of the problems in California's prisons?

Professional Reporting Services

20

```
1              MS. NORMAN:  I'm going to object as to
2    speculation.
3              You can answer if you can speculate.
4         Q    (By Mr. Mello) Let me reask the question.
5    Based upon your experience in Texas -- strike that.
6              Was it a positive development when these two
7    institutions took over medical delivery?
8         A    That and the relocation of our medical beds to
9    major metropolitan areas.
10        Q    Based upon that experience and the success
11   that you had do you believe that CDCR entering into a
12   similar agreement with, for example, the University of
13   California system would help improve medical delivery in
14   CDCR institutions?
15        A    Possibly.  I think -- again, I think it's
16   going to take more than just that.
17        Q    Is it your opinion that such an arrangement
18   would negatively impact medical care in California's
19   prisons?
20        A    I wouldn't say that it would negatively impair
21   it, no.
22        Q    When you were the executive director who was
23   responsible for the medical branch?  Was there a medical
24   director?
25        A    Yes.
```

21

1      Q.    And who was that?

2      A.    The medical director that worked for the

3   Department of Corrections?

4      Q.    Yes.

5      A.    Yes, Lynette Linthicum.  Don't ask me how to

6   spell that, either one.

7      Q.    She was in charge of medical?

8      A.    Yes.

9      Q.    Was there a similar person in charge of mental

10  health?

11     A.    She was.  She oversaw all of the medical

12  services.

13     Q.    Do you know if she was a physician?

14     A.    She is, yes.

15     Q.    Do you know if she's still employed by the

16  department?

17     A.    She was as of last week.

18     Q.    Was she a direct report to you when you were

19  executive director?

20     A.    She reported to my deputy.

21     Q.    Just so I understand the structure of the

22  system, when you were executive director, I assume you

23  were top.

24     A.    Correct.

25     Q.    And I assume you reported to the executive

Professional Reporting Services, Inc.

27

1       Q.      Right.

2       A.      And Plata is the medical portion of it.

3       Q.      Do you believe you'll be providing expert

4   testimony with respect to mental healthcare in this

5   case?

6       A.      I think I will, yes.

7       Q.      On the same page of your report you indicate

8   that you have done independent reviews and expert

9   analyses on staffing patterns, institutional response to

10  violent disturbances, general operations, and security

11  controls.  Do you see that?

12      A.      Uh-huh.  Yes.

13      Q.      Any of those items that you've just discussed,

14  did they relate to either medical care or mental

15  healthcare?

16      A.      Staffing patterns impacted medical care in the

17  number of staff, correctional staff, that were used as

18  escorts to escort people to and from medical

19  appointments.  Also the number of staff that was

20  designated to transfer offenders off site for specialty

21  appointments.  The one on violent disturbances, the only

22  impact on healthcare there was the treatment of the

23  offenders that were injured and the staff that were

24  injured.

25      Q.      Were you asked to provide any analysis of the

28

```
 1    staffing patterns of medical or mental health

 2    clinicians?

 3         A.   Clinicians?

 4         Q.   Yes.

 5         A.   No.

 6         Q.   Do you have any experience analyzing staffing

 7    or staffing ratios as it relates to medical clinicians

 8    or mental health clinicians?

 9         A.   No, I've never done that.

10         Q.   And when you say correctional officers needed

11    for medical escorts and correctional officers needed to

12    transfer inmates off site, on what locations have you

13    done such analysis?

14         A.   Florida, Oklahoma, Kentucky, Indiana,

15    New Mexico, and Puerto Rico.

16         Q.   Have you ever heard Texas referred to as Baja,

17    Oklahoma?

18         A.   No.

19         Q.   Somebody used that term to me in the last six

20    months, somebody from Oklahoma obviously.

21         A.   Don't you think it should be the other way

22    around?

23         Q.   That was very funny.  It was before the

24    Texas/Oklahoma or whatever.  Maybe it was a year ago.

25    Time flies when you're having fun.
```

Professional Reporting Services, LLC

32

1   Plata case?

2       A.   No, I did not.

3       Q.   It's true, you didn't do that, correct?

4       A.   No, I did not, yes.

5       Q.   I know and your report indicates but can you,

6   for the record, tell me which institutions you visited

7   in California?

8       A.   In California?

9       Q.   Yes.

10      A.   Avenal, the CIM, Valley State, and

11  San Quentin.

12      Q.   Did you spend two days at Avenal?

13      A.   No.

14      Q.   Did you spend two days at CIM?

15      A.   No.

16      Q.   Did you spend two days at Valley State Prison

17  for Women?

18      A.   No, I did not.

19      Q.   Did you spend two days at San Quentin?

20      A.   No.

21      Q.   Approximately how many hours did you spend at

22  Avenal?

23      A.   Five.  Five to six.

24      Q.   Approximately how many hours did you spend at

25  CIM?

Professional Reporting Services, Inc.

33

1    A.    I spent a whole day there.

2    Q.    So approximately eight hours?

3    A.    Probably closer to seven.

4    Q.    How many hours at Valley State Prison for

5    Women?

6    A.    About four.

7    Q.    How many hours did you spend at San Quentin?

8    A.    About seven.

9    Q.    Have you ever done an analysis of the medical

10   care delivery system of any institution, jail or

11   correctional system?

12   A.    Only as it is impacted by the operations

13   division at each place that I've analyzed.  I think I

14   understand your question.  I've never analyzed staffing

15   ratios, as I said earlier, for clinicians or licensed

16   medical professionals.

17   Q.    Have you ever analyzed the quality of care

18   provided by medical clinicians?

19   A.    Provided by -- no, I have not.

20   Q.    Have you ever analyzed the quality of mental

21   healthcare provided by clinicians?

22   A.    No.

23   Q.    Do you feel qualified to opine on the quality

24   of medical care provided by medical clinicians?

25   A.    No.

Professional Reporting Services, Inc.

36

1  "Chief Medical Officer"?

2      A.   Yes.

3      Q.   And that's sort of the chief doctor at a

4  California institution.

5      A.   I would assume so, yes.

6      Q.   Did Texas have a similar position when you

7  were executive director?

8      A.   Yes.

9      Q.   What was that position called?

10     A.   It was called coordinating physician I believe

11  is what it was called.  And then we had a hospital

12  administrator at each site.

13     Q.   I'm going to assume nothing.  Was the hospital

14  administrator an administrative person as opposed to a

15  medical provider?

16     A.   Most of the time.  Some of them had some

17  medical background but mostly they were administrators.

18     Q.   Would the coordinating physician be both in

19  charge of medical care and mental healthcare?

20     A.   Yes.

21     Q.   Did you ever serve as a coordinating

22  physician?

23     A.   No.

24     Q.   Did you ever serve as the director of medical

25  services in the department?

Case 2:90-cv-00520-KJM-SCR   Professional Reporting Service Document

37

1    A.    Have I ever served in that capacity?

2    Q.    Right.

3    A.    No, I have not.

4    Q.    Clearly when you were the executive director

5    it all stopped with you and you were responsible for

6    everything, correct?

7    A.    Yes.

8    Q.    So in that respect you were in charge of

9    medical and mental healthcare, correct?

10   A.    I was.

11   Q.    And that's obvious.  I don't dispute that.  Is

12   it true to say that your experience is really in custody

13   as opposed to medical or mental health delivery?

14   A.    Mostly, yes.  Now, I will say that when I was

15   warden at the -- now the Estelle unit, half of my

16   facility was mental health, acute and intermediate beds.

17   Q.    How long did you hold that warden position at

18   that Estelle unit now?

19   A.    I started in June of -- it's in my -- let me

20   look.  Too much water under the bridge.  From February

21   of 1984 until June of 1984.

22   Q.    February of '94 to June of '94?

23   A.    No, '84.  I'm sorry, I misspoke.

24   Q.    February of '84, to June of '84?

25   A.    That's right.

Professional Reporting Service, Inc.

102

1    A.    Approximately five years.

2    Q.    How soon did it roll out the first beds, to

3    your knowledge?

4    A.    Oh, somewhere between 30 and 36 months

5    probably.

6    Q.    And just so I'm clear, how many beds, to the

7    best of your knowledge, did they add during the mid '90s

8    in Texas?

9    A.    50,000.

10    Q.    50,000?

11    A.    Right.

12    Q.    And when I say -- were they permanent beds?

13    A.    Yes.

14    Q.    During that same period of time did they add

15    any temporary beds?

16    A.    I'm not sure what you mean by "temporary."

17    Q.    Okay, let me ask it this way.  It sounds like

18    it took 30 to 36 months for Texas to roll out its first

19    wave of permanent beds.

20    A.    Correct.

21    Q.    In those 30 to 36 months before permanent beds

22    were rolled out did the state provide any temporary

23    housing for prisoners?

24    A.    No.

25    Q.    Do you know whether the Federal Bureau of

103

1    Prisons is operating at above its design capacity?

2         A.   I don't know.

3         Q.   Do you know whether Pennsylvania is operating

4    above its design capacity?

5         A.   I have no knowledge of that.

6         Q.   In fact, it's your testimony that you're not

7    aware of any systems, other than California and Puerto

8    Rico, that are operating above their design capacity,

9    correct?

10        A.   Those are the only ones I have personal

11   knowledge of.  And let me amend that to say Puerto Rico

12   now does not operate above their design capacity.

13        Q.   What is the design capacity in Puerto Rico, to

14   the best of your knowledge?

15        A.   It's about 15,000.  They've actually reduced

16   their population to somewhere around 14,000.

17        Q.   On page three of the Plan of Action, I think

18   it's in part one and I think it's actually page three.

19   It may be page three of the Executive Summary.  No, it's

20   not.  On page three, which is page five at the top of

21   the document, Conceptual Basis for the Receiver's

22   November 15, 2007, Iteration of his Plan of Action, that

23   first paragraph in the middle reads, "The overall goals

24   of a constitutionally-adequate prison medical care

25   system are to reduce unnecessary morbidity and

104

1    mortality, improve inmates' health status and

2    functioning, coordinate care with mental health and

3    dental, and protect public health."  Do you see that?

4         A.    Yes, I do.

5         Q.    Do you agree or disagree with this statement?

6         A.    I don't know that I'm actually qualified.

7    That really speaks to the quality of the care, the

8    delivery of the care by the clinicians.  That's really

9    not my focus.

10        Q.    Okay.  Have you ever heard of the Medical

11   Causes of Death in State Prisons, 2001 - 2004 that was

12   published by the U.S. Department of Justice, Bureau of

13   Justice Statistics, have you ever heard of that?

14        A.    No.

15        Q.    It's Exhibit No. 7 to this deposition.  I want

16   you to grab it.

17        A.    Sure.

18        Q.    According to this study, California's

19   mortality rate due to medical causes is 170 which is

20   below both the national and western region average and I

21   am going to show you that on -- that's actually found on

22   page nine of this document.  There's an appendix table

23   nine on page nine.

24        A.    I see it.

25        Q.    And it says U.S., all illnesses 223,

124

```
1              STATE OF CALIFORNIA   )   ss.

2          I, the undersigned, a Certified Shorthand

3    Reporter of the State of California, hereby certify that

4    the witness in the foregoing deposition was by me duly

5    sworn to testify to the truth, the whole truth, and

6    nothing but the truth in the within-entitled cause; the

7    said deposition was taken at the time and place therein

8    stated; that the testimony of said witness was reported

9    by me, a Certified Shorthand Reporter and a

10   disinterested person, and was thereafter transcribed

11   under my direction into typewriting; that the foregoing

12   is a full, complete and true record of said testimony;

13   and that the witness was given an opportunity to read

14   and, if necessary, correct said deposition and to

15   subscribe the same.

16          I further certify that I am not of counsel or

17   attorney for either or any of the parties in the

18   foregoing deposition and caption named, nor in any way

19   interested in the outcome of the cause named in said

20   action.

21          IN WITNESS WHEREOF, I have hereunto set my

22   hand this _____ day of _____, 20__.

23

24                    _____

24                    CERTIFIED SHORTHAND REPORTER

25
```

1          STATE OF CALIFORNIA    )    ss.

2          I, the undersigned, a Certified Shorthand

3    Reporter of the State of California, hereby certify that

4    the witness in the foregoing deposition was by me duly

5    sworn to testify to the truth, the whole truth, and

6    nothing but the truth in the within-entitled cause; the

7    said deposition was taken at the time and place therein

8    stated; that the testimony of said witness was reported

9    by me, a Certified Shorthand Reporter and a

10   disinterested person, and was thereafter transcribed

11   under my direction into typewriting; that the foregoing

12   is a full, complete and true record of said testimony;

13   and that the witness was given an opportunity to read

14   and, if necessary, correct said deposition and to

15   subscribe the same.

16         I further certify that I am not of counsel or

17   attorney for either or any of the parties in the

18   foregoing deposition and caption named, nor in any way

19   interested in the outcome of the cause named in said

20   action.

21         IN WITNESS WHEREOF, I have hereunto set my

22   hand this _18th_ day of _December_, 20_07_.

23

24                    _Kristie L Wubka_

25                    CERTIFIED SHORTHAND REPORTER

PROFESSIONAL REPORTING SERVICES   (800) 261-4814  124