**EXHIBIT C**

**Certified Copy**

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA
AND THE NORTHERN DISTRICT OF CALIFORNIA
UNITED STATES DISTRICT COURT COMPOSED OF THREE
PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

RALPH COLEMAN, et al.,

    Plaintiffs,

vs.                                                                    CASE NO. 2:90-cv-00520
                                                                       LKK JFM P
ARNOLD SCHWARZENEGGER, et al.,
        THREE-JUDGE COURT

    Defendants.
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
MARCIANO PLATA, et al.,

    Plaintiffs,

vs.                                                                    CASE NO. C01-1351 TEH

ARNOLD SCHWARZENEGGER, et al., THREE-JUDGE COURT

    Defendants.
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

DEPOSITION OF

JOSEPH DENNIS LEHMAN

SEPTEMBER 16, 2008
10:05 p.m.

425 Market Street, 26th Floor
San Francisco, California

Reported by Quyen N. Do, RPR, CSR No. 12447

**PAULSON**
REPORTING & LITIGATION SERVICES
www.paulsonreporting.com

Telephone: 415.591.3333
Facsimile: 415.591.3335

44 Montgomery Street
Suite 1100
San Francisco, CA 94104

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA
AND THE NORTHERN DISTRICT OF CALIFORNIA
UNITED STATES DISTRICT COURT COMPOSED OF THREE
PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

RALPH COLEMAN, et al.,

        Plaintiffs,

  vs.                  CASE NO. 2:90-cv-00520
                            LKK JFM P

ARNOLD SCHWARZENEGGER, et al.,
                        THREE-JUDGE COURT
        Defendants.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

MARCIANO PLATA, et al.,

        Plaintiffs,

  vs.                  CASE NO. C01-1351 TEH

ARNOLD SCHWARZENEGGER, et al.,  THREE-JUDGE COURT

        Defendants.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

DEPOSITION OF

JOSEPH DENNIS LEHMAN

SEPTEMBER 16, 2008
10:05 p.m.

425 Market Street, 26th Floor
San Francisco, California

Reported by Quyen N. Do, RPR, CSR No. 12447

10

1    A    Yes, they would.
2    Q    Okay. I actually don't see any -- and we've
3 actually premarked as Exhibit 2 your report.
4    A    Right.
5    Q    So, if you turn to the back, your résumé is
6 attached. I have a copy.
7         I only have two, though. I don't have a
8 fourth. So, do you have a copy of this report?
9         MS. SCOTT: I have it.
10        MS. WANG: We both have it.
11 BY MS. JOHNSON:
12   Q    Okay. At page 15 --
13   A    Mm-hm.
14   Q    -- I don't see any listed professional courses
15 and seminars listed after 1989.
16   A    After 1989.
17   Q    Yeah.
18   A    And -- and, frankly, because you don't see
19 anything in terms of -- the -- there's nothing noted
20 here in terms of the Association of State Correctional
21 Administrators training programs. It's just -- it's not
22 in that section. I didn't put it in there.
23   Q    So it's not on your résumé?
24   A    That's correct.
25   Q    Do you have any degrees in medical care?

1	A	No, I do not.
2	Q	Do you have any degrees in mental health care?
3	A	No, I do not.
4	Q	Do you have any type of training in medical
5	care?
6	A	No, I do not.
7	Q	Do you have any type of training in mental
8	health care?
9	A	No, I do not.
10	Q	Do you have any experience providing medical
11	care?
12		MR. SPECTER:  Objection.  Vague.
13		THE WITNESS:  Not as a -- in terms of
14	providing direct services, no.
15	BY MS. JOHNSON:
16	Q	And the same would be true for mental health
17	care?
18	A	Yes.
19	Q	So, I believe you worked as the secretary of
20	the Washington State Department of Corrections from 1997
21	to 2005; is that correct?
22	A	Yes.
23	Q	What departments or divisions were under you
24	as secretary?
25	A	It was a unified system.  It included

1  probation, parole, community residence programs,
2  treatment programs in prisons.
3      Q    With respect to prisons, was there someone
4  under you who was in charge of the medical care in the
5  prisons?
6      A    Yes, there was.
7      Q    Who was that?
8      A    I can't remember the name.  It was a doctor.
9      Q    Did that person --
10     A    That was -- he headed up the health
11 department.
12     Q    And was that true for all the years that you
13 were at the department -- Washington State Department of
14 Corrections?
15     A    There wasn't a physician when I got there.  I
16 hired him and created the unit after I got there.
17     Q    Did the health department include mental
18 health care, as well, or was that its own department?
19     A    It included mental health.
20     Q    Was this person who headed up the health
21 department there when you left in 2005?
22     A    Yes, he was.
23     Q    But you're having a hard time remembering his
24 name today?
25     A    Yes.  Yes.

1   Q    So, is the position of commissioner of the
2   Maine Department of Corrections the equivalent position
3   as secretary of the Washington State Department of
4   Corrections?
5   A    Yes, it is.
6   Q    They're just called -- the secretary is just
7   called the commissioner in Maine?
8   A    East Coast phenomenon.
9   Q    So you were commissioner of Maine Department
10  of Corrections for two years?
11  A    Yes.
12  Q    And what departments or divisions were under
13  you when you were commissioner of the Maine Department
14  of Corrections?
15  A    The Maine Department of Corrections had the
16  parole system and the prison system.
17  Q    Anything else?
18  A    No.
19  Q    With respect to the prison system, was there
20  someone who was in charge of the medical and/or mental
21  health care?
22  A    No.  Not at the headquarters level.
23  Q    Does that mean that -- well, what are the
24  levels below headquarters level?
25  A    There were health care staff at each of the

22

```
 1  prisons.
 2       Q    And who did those health care staff at the
 3  prisons report to?
 4       A    The -- the superintendents, the wardens.
 5       Q    And did the wardens report to someone under
 6  you?
 7       A    To a deputy commissioner.
 8       Q    And so it was you, a deputy commissioner, and
 9  then there was -- and then the wardens at the various
10  prisons?
11       A    That's correct.
12       Q    Did you have any role in connection with the
13  provision of medical or mental health care in the
14  prisons while you were commissioner of the Maine
15  Department of Corrections?
16       A    Creating and promulgating policy.
17       Q    You yourself did that?
18       A    No.  With staff's input.
19       Q    You received staff input for the health and
20  mental health care --
21       A    Actually --
22       Q    -- policies?
23       A    -- they would -- they would draft the
24  policies.  I would review and approve.
25       Q    So which staff would -- drafted the medical
```

23

```
 1  policies?
 2      A   The -- we had a staff that was -- individual
 3  staff person who was responsible for development of the
 4  policies.  That staff person would work with people in
 5  the institutions to create those policies.
 6      Q   Did that person have a title?
 7      A   I'm not sure what the title is, but it had to
 8  do with policies, to oversee the policies.
 9      Q   And was there one person who was in charge of
10  medical and mental health care, or were those functions
11  divided between different people?
12      A   They did not exist in the -- at the
13  departmental level.  At the institutional level, they
14  were divided.
15      Q   I'm talking about in terms of the staff person
16  who was drafting the policies.  Was there one staff
17  person who --
18      A   One person.
19      Q   -- drafted policies for both medical --
20      A   Yes.
21      Q   -- and mental health?
22      A   Yeah.
23      Q   I'm just going to ask you to remind you to --
24      A   I'm sorry.
25      Q   -- to let me finish my question before you
```

26

questioning, I'm not really going to distinguish between those two functions unless you believe that there is some type of important distinction between being the acting secretary and then the secretary.

A    The only distinction was a period of between my appointment and confirmation by the Senate.

Q    Okay. So, I'm just going to -- for purposes of the question, I'm just going to refer to it as the period when you were secretary of the Pennsylvania Department of Corrections just for ease. Is that acceptable?

A    That's fine.

Q    Okay. So, during the period of time that you were the secretary of the Pennsylvania Department of Corrections, what departments or divisions were under you?

A    The prisons themselves and some prerelease programs.

Q    With respect to the prisons, was there a division for medical and/or mental health care?

A    Not initially, but I created one.

Q    So you created one department or division for medical and mental health together?

A    For health department.

Q    And just to be clear, that health department

1  covered both the medical and mental health care?
2     A    That's correct.
3     Q    Do you remember the person who served as the
4  head of that health department in Pennsylvania when you
5  were the secretary?
6     A    I'm sorry. I can't remember. It was a lady.
7     Q    Was she also a physician?
8     A    No, she was not.
9     Q    And did she serve for -- strike that.
10        How many years was that health department in
11 existence while you were the secretary of the
12 Pennsylvania Department of Corrections?
13    A    I started to -- probably 3 1/2, 4 years.
14    Q    So, was this person, who was not a physician,
15 the head of the mental -- I'm sorry, the head of the
16 health department for the entirety of that 3 1/2 to 4
17 years?
18    A    Yes.
19    Q    Do you remember what particular background or
20 qualifications that head of the health department had?
21    A    She was the health care manager at one of our
22 major institutions.
23    Q    And, when you say "one of our major
24 institutions," you mean one of the prisons?
25    A    That's correct.

34

1  to a hundred percent design capacity, or were they still
2  operated over design capacity?
3      A    Not while I was there.  I do not believe they
4  were operating over design capacity.
5      Q    Have you personally had any direct
6  responsibility for the administration of medical care in
7  prisons?
8      A    I'm not sure what you mean by direct.
9      Q    Where it was your job to oversee the delivery
10 of the medical care in the prison system?
11         MR. SPECTER:  That's still vague.
12 BY MS. JOHNSON:
13     Q    Have you ever held a position such as a health
14 care manager at a prison?
15     A    No, I have not.
16     Q    Have you ever held a position such as head of
17 the health department for a prison system?
18     A    No, I have not.
19     Q    Would you consider yourself to have experience
20 in the administration of health care systems in prison?
21     A    At a policy level.
22     Q    What does your experience, at a policy level,
23 regarding the administration of medical and mental
24 health care in prisons consist of?
25     A    Ensuring that the policies and procedures

59

1  Q    So are you aware of any key deficiencies in
2  the provision of medical care in California's prisons?
3  A    Those that I mentioned, actually, in reviewing
4  the reports of the witnesses who are -- in fact, Shansky
5  and those who were familiar with the medical services,
6  there's adequate documentation relative to the
7  inadequacy of the services, limited staffing, limited
8  space.  The infrastructure is a broken system.
9  Q    When you say that you reviewed the report of
10 those who are familiar with the medical services in
11 California's prisons, does that mean that you're not
12 familiar with the medical services in California's
13 prisons?
14 A    I am not a medical -- I'm not a health care
15 provider or an expert in that field.  I have -- I have,
16 certainly, responsibilities and experience relative to
17 the provision of those services on a policy level.
18 Q    Do you have knowledge about the actual state
19 of the delivery of medical care in California's prisons
20 today, such as staffing vacancy ratios and how many days
21 it takes for someone to see a physician, how many people
22 aren't seeing specialty physicians, anything like that?
23 A    Primarily, the documentation that is provided
24 by the -- reviewed by other witnesses, and certainly,
25 they did document those difficulties.

160

# REPORTER'S CERTIFICATION

I, Quyen N. Do, Certified Shorthand Reporter, in and for the State of California, do hereby certify:

That the foregoing witness was by me duly sworn; that the deposition was then taken before me at the time and place herein set forth; that the testimony and proceedings were reported stenographically by me and later transcribed into typewriting under my direction; that the foregoing is a true record of the testimony and proceedings taken at that time.

IN WITNESS WHEREOF, I have subscribed my name this 23rd day of September 2008.

_____
Quyen N. Do, RPR, CSR No. 12447

160

REPORTER'S CERTIFICATION

1
2
3   I, Quyen N. Do, Certified Shorthand Reporter, in
4   and for the State of California, do hereby certify:
5
6   That the foregoing witness was by me duly sworn;
7   that the deposition was then taken before me at the time
8   and place herein set forth; that the testimony and
9   proceedings were reported stenographically by me and
10  later transcribed into typewriting under my direction;
11  that the foregoing is a true record of the testimony and
12  proceedings taken at that time.
13      IN WITNESS WHEREOF, I have subscribed my name
14  this 23rd day of September 2008.
15
16          /S/
17          _____
            Quyen N. Do, RPR, CSR No. 12447
18
19
20
21
22
23
24
25

PAULSON
REPORTING & LITIGATION SERVICES, LLC
www.paulsonreporting.com

Telephone: 415.591.3333
Facsimile: 415.591.3335

44 Montgomery Street
Suite 1100
San Francisco, CA 94104