EDMUND G. BROWN JR.
Attorney General of the State of California
DAVID S. CHANEY
Chief Assistant Attorney General
ROCHELLE C. EAST
Senior Assistant Attorney General
JONATHAN L. WOLFF
Senior Assistant Attorney General
LISA A. TILLMAN – State Bar No. 126424
Deputy Attorney General
KYLE A. LEWIS – State Bar No. 201041
Deputy Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
Telephone: (415) 703-5708
Facsimile: (415) 703-5843
lisa.tillman@doj.ca.gov
kyle.lewis@doj.ca.gov

HANSON BRIDGETT LLP
JERROLD C. SCHAEFER - 39374
PAUL B. MELLO – 179755
S. ANNE JOHNSON – 197415
SAMANTHA D. TAMA – 240280
RENJU P. JACOB - 242388
425 Market Street, 26th Floor
San Francisco, CA 94105
Telephone: (415) 777-3200
Facsimile: (415) 541-9366
jschaefer@hansonbridgett.com
pmello@hansonbridgett.com
ajohnson@hansonbridgett.com
stama@hansonbridgett.com
rjacob@hansonbridgett.com

Attorneys for Defendants

# UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

## AND THE NORTHERN DISTRICT OF CALIFORNIA

## UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

## PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>　　　　Plaintiffs,<br>　v.<br>ARNOLD SCHWARZENEGGER, et al.,<br>　　　　Defendants. | No. 2:90-cv-00520 LKK JFM P<br><br>**THREE-JUDGE COURT** |
| MARCIANO PLATA, et al.,<br><br>　　　　Plaintiffs,<br>　v.<br>ARNOLD SCHWARZENEGGER, et al.,<br>　　　　Defendants. | No. C01-1351 TEH<br><br>**THREE-JUDGE COURT**<br><br>**DECLARATION OF ROBERT CANNING IN SUPPORT OF DEFENDANTS' MOTION IN LIMINE NO. 10 RE: EXCLUDE EVIDENCE OF SUICIDE RATE**<br><br>To: Three-Judge Panel |

I, Robert D. Canning, declare:

1. I am presently employed in the position of Senior Psychologist, Specialist, within the Mental Health Program, Division of Correctional Health Care Services of the California Department of Corrections and Rehabilitation (CDCR). In this position, I am the Suicide Prevention and Response Coordinator for CDCR. Before becoming a Senior Psychologist, Specialist in September 2005, I served as Staff Psychologist providing psychological services to inmate-patients at the CDCR California Medical Facility, Vacaville from August 1, 2001 to September 23, 2005. My professional background includes employment with the University of California, Davis Medical Center as a staff psychologist from April 1, 1998 through June 30, 2001 in the Department of Psychiatry and Behavioral Sciences, and, since September 2004, as an Assistant Clinical Professor of Internal Medicine at the University of California, Davis School of Medicine. I graduated from the Pacific Graduate School of Psychology in 1993 with a degree in Clinical Psychology, and attained licensure from the California Board of Psychology in February, 1997.

2. I have completed a two-year National Institute of Mental Health post-doctoral fellowship in Psychiatric Epidemiology at the Western Psychiatric Institute and Clinic of the University of Pittsburgh Medical Center. I have published a number of articles in peer-reviewed publications and am a member of several professional organizations, including the American Association of Suicidology (AAS), where I am a member of the Research Section. I am an instructor for the AAS and teach two-day courses both in the United States and Canada on suicide risk assessment and treatment of suicidal patients. Through this work I am familiar with issues relating to suicide prevention in correctional settings in states other than California. For instance, in late 2007 I spent five days with correctional mental health staff from the New York State Office of Mental Health teaching and consulting on suicide risk assessment in correctional settings. As part of my responsibilities as CDCR's Suicide Prevention and Response Coordinator, I have designed and delivered the most recent suicide risk

assessment training for CDCR's mental health clinicians, and finally, I prepare and deliver a monthly suicide prevention videoconference for 300-350 CDCR clinical staff.

3. I have personal knowledge of the facts stated in this declaration and if called to testify upon those facts would do so competently.

4. As part of my work within the Division of Correctional Health Care Services, I have been responsible for preparing numerous reports, entitled "Suicide Report," on the suicides of individual inmates that have occurred within the confines of CDCR. In preparing these reports, I visit the facility where the suicide occurred, interview available witnesses (such as cellmates, co-workers, housing officers, work supervisors) and mental health care providers, conduct reviews of the inmate's central files and unit health record (including any and all mental health records), review the reports of other investigators (such as the investigating officers' incident report, any coroner's report, medical death review reports), review visiting and telephone records, view personnel effects, and sometimes interview family members. Each Suicide Report provides a summary of the possible distal and proximal causes of the suicide, the victim's apparent mental health status prior to their death, any mental health care provided to the victim, the emergency response measures undertaken, and, as appropriate, recommendations concerning any deficient practices by correctional or clinical staff that may have contributed to a suicide (in accord with the January 12, 2004 *Coleman* court order). The Suicide Report assists in the development of any quality improvement plan, which must be submitted within 180 days of any suicide in accord with the *Coleman* court order of June 13, 2002.

5. In compliance with the *Coleman* court's order of June 2002, these reports are provided to the *Coleman* Special Master and his team of court monitors for review within 90 days of a suicide. The Suicide Report assists in the development of any quality improvement plan, which must be submitted within 180 days of any suicide in accord with the *Coleman* court order of June 13, 2002. I communicate several times each year with court monitor Ray Patterson, M.D., about suicide cases, and supply him with

- 3 -

additional information, as requested, for his preparation of the Special Master's Annual Report on Suicides within CDCR.

6. In addition to preparing these Suicide Reports, I maintain summaries of the number, locations, and mechanism of suicides that have occurred within CDCR. My predecessor, Helen Steenman, Ph.D., also kept these summaries and instructed me on their maintenance.

7. I have obtained data concerning the overall CDCR census from 1998 to 2007 from the website of the Offender Information Services Branch of CDCR. I have obtained data concerning the frequency of suicide within CDCR since 1998 from records of the Mental Health Program, Division of Correctional Health Care Services.

8. Using this data accumulated on suicides within CDCR as well as data on the CDCR overall population, I created the attached chart entitled "CDCR Suicide Rate, 1988 to 2007, with Inmate Population." This chart illustrates two characteristics: the annual inmate population and the suicide rate per 100,000 inmates for the years 1988 through 2007. This chart shows the growth of inmate population during this time period. The chart also shows that the rates of suicide can vary widely from year to year. The chart also details, by use of a "trend line," the five-year moving average of the suicide rate. This average has varied over time, decreasing from its high point in the 1980's and then, over the past ten years, increasing. This chart does not show a causal relationship between historical inmate population and suicide rates.

9. In the course of my work, I reviewed the article entitled, "Review of Completed Suicides in the CDCR, 1999 to 2004, published in <u>Psychiatric Services</u> (June 2008) Volume 59, Number 6. This article was written by Kerry Hughes, M.D. and Raymond Patterson, M.D., two court-appointed *Coleman* monitors. The article reported that 73% of all suicides that occurred within CDCR facilities from 1999 to 2004 were completed in single cells – whether in general population housing, administrative segregation or secure housing units. Of the suicides within administrative segregation, the authors stated 53% of such suicides occurred within three weeks of placement.

10. My review of the suicides within CDCR likewise shows that the vast majority of suicides within CDCR have occurred in single-cell housing rather than dormitories, gym housing, or dayroom housing.

11. In light of the occurrence of suicides within administrative segregation settings, the *Coleman* Special Master recommended and the *Coleman* Court ordered Defendants develop a plan to reduce suicide trends in administrative segregation units. (See *Coleman* Order, 6/8/06.) I attended meetings with Plaintiffs' counsel and Plaintiffs' experts on suicide prevention in drafting the plan to reduce suicide trends. Once the draft was completed, it was submitted to the *Coleman* Special Master and to Plaintiffs' counsel for review and comment.

12. At no time in the discussions surrounding the development of the plan to reduce suicide trends did Plaintiffs or their experts identify overcrowding as a cause of suicide trends within any area of CDCR. Rather, the collaboration resulted in a jointly-developed plan to address suicide trends in administrative segregation units by requiring correctional officers to conduct 30-minute rounds, at staggered intervals, of new arrivals, specific mental health screening before placement into administrative segregation, better tracking of inmate's history of suicidal behavior, easing of property restrictions within administrative segregation (permitting television and other electronic appliances), and retrofitting cells for newly arrived administrative segregation inmates to ensure a minimum of physical features that may enable suicide attempts. The Special Master recommended approval of Defendants' plan to reduce suicide trends in administrative segregation units. (*See* Special Master's Report and Recommendations on the Defendants' Plan to Prevent Suicides in Administrative Segregation, filed 12/18/06.) The *Coleman* Court approved and directed Defendants to implement this plan on February 12, 2007.

13. Defendants have further acted to reduce suicides within administrative segregation units by increasing the number of small management yards in administrative segregation, with the final activation date of fiscal year end 2008/2009, and by obtaining

additional funding for correctional officers to staff third watch (evening) yards to increase inmates' out-of-cell time.

14. In addition, CDCR voluntarily placed a moratorium on the use of video-monitoring as the sole means of conducting suicide watches, as of April 10, 2006. Plaintiffs agreed to this moratorium and, by stipulation of the parties, the moratorium became an order of the *Coleman* court on August 8, 2006.

15. Because a timely emergency response can prevent death in a suicide attempt, CDCR has required correctional officers to initiate and continue cardiopulmonary resuscitation to inmates who are unresponsive due to their suicide attempts, unless the inmate demonstrates rigor mortis or other signs of obvious trauma rendering such response moot.

16. The positive effect of Defendants' actions to reduce suicide may not be evident in the short-term. As Drs. Patterson and Hughes stated, "Even with large samples, a minimum of five years of data are needed for meaningful analysis because of year-to-year variability and other factors affecting mental health resources." (Patterson & Hughes, "Review of Completed Suicides in the CDCR, 1999 to 2004," <u>Psychiatric Services</u> (June 2008) Vol. 59, No. 6, p. 678.)

17. As much as these court-approved plans address and aim to reduce the environmental features surrounding suicides, I believe the actual cause of suicide is due to multiple factors, many of which are unique to each patient. I agree with Dr. Patterson and Dr. Hughes' findings that inmates at risk for suicide often present with one or more of the following characteristics: a history of serious mental illness; history of suicide attempts; housing in a single cell, particularly in administrative segregation or a secure housing unit; expressions of safety concerns with associated anxiety and agitation; serious medical concerns, co-occurring severe personality disorders and coexisting mental illness; a legal status that has undergone a significant change (such as a recent conviction for a new crime); and Caucasian race (although the number of suicides among Hispanic prisoners increased rapidly during the six-year period). (Patterson &

Hughes, "Review of Completed Suicides in the CDCR, 1999 to 2004," <u>Psychiatric Services</u> (June 2008) Vol. 59, No. 6, p. 681.) There is no empirical or scientific basis to causally link these factors to the overall census of CDCR.

18. These same 'at risk' features have been discussed by the *Coleman* Special Master's reports to the *Coleman* Court on suicides within CDCR. I have reviewed the Special Master's Report on Suicides Completed in CDCR in Calendar Year 2005, filed November 26, 2007, and the Special Master's Report on Suicides Completed in CDCR in Calendar Year 2006, filed September 12, 2008. The Report on Suicides Completed in CDCR in Calendar Year 2006, like the report on those suicides completed within calendar year 2005, noted the predominance of risk factors among those inmates who committed suicide: male (91%), Caucasian (44%) or Hispanic (35%), within the Mental Health Services Delivery System (47%), and between the ages of 31 and 50 (70%). The Special Master found "significant indications of inadequate treatment" in 72.1% of the cases, and made recommendations to address those treatment issues. None of the recommendations in these reports concerned the impact of overcrowding, if any, on the occurrence of any of these suicides.

19. Based upon my review of the suicides committed within CDCR during my tenure as Senior Psychologist, Specialist, within the Mental Health Program of CDCR as well as my review of the Special Master's reports on suicides within CDCR generally and within its administrative segregation units specifically, it is my opinion that the evidence is inconclusive that there is any causal link between suicide rates and CDCR inmate census.

I declare under the penalty of perjury that the foregoing is true and correct. Executed on October 20, 2008 in Sacramento, California.

*Robert Canning*
Robert Canning