1   EDMUND G. BROWN JR.                          HANSON BRIDGETT LLP
    Attorney General of the State of California    JERROLD C. SCHAEFER - 39374
2   DAVID S. CHANEY                              PAUL B. MELLO – 179755
    Chief Assistant Attorney General              S. ANNE JOHNSON – 197415
3   ROCHELLE C. EAST                             SAMANTHA D. TAMA – 240280
    Senior Assistant Attorney General            RENJU P. JACOB - 242388
4   JONATHAN L. WOLFF                            425 Market Street, 26th Floor
    Senior Assistant Attorney General            San Francisco, CA  94105
5   LISA A. TILLMAN – State Bar No. 126424       Telephone: (415) 777-3200
    Deputy Attorney General                      Facsimile:  (415) 541-9366
6   KYLE A. LEWIS – State Bar No. 201041         jschaefer@hansonbridgett.com
    Deputy Attorney General                      pmello@hansonbridgett.com
7   455 Golden Gate Avenue, Suite 11000          ajohnson@hansonbridgett.com
    San Francisco, CA 94102-7004                 stama@hansonbridgett.com
8   Telephone: (415) 703-5708                    rjacob@hansonbridgett.com
    Facsimile:  (415) 703-5843
9   lisa.tillman@doj.ca.gov
    kyle.lewis@doj.ca.gov
10
    Attorneys for Defendants
11

12                     UNITED STATES DISTRICT COURT

13               FOR THE EASTERN DISTRICT OF CALIFORNIA

14              AND THE NORTHERN DISTRICT OF CALIFORNIA

15        UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

16          PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

17   RALPH COLEMAN, et al.,                    No.  2:90-cv-00520 LKK JFM P

18            Plaintiffs,                      **THREE-JUDGE COURT**

19        v.

20   ARNOLD SCHWARZENEGGER, et al.,

21            Defendants.

22
     MARCIANO PLATA, et al.,                   No. C01-1351 TEH
23
              Plaintiffs,                      **THREE-JUDGE COURT**
24
          v.                                   **DEFENDANTS' MOTION IN LIMINE
25   ARNOLD SCHWARZENEGGER, et al.,            NUMBER 8 TO EXCLUDE OPINION
                                               EVIDENCE BY NON-HEALTH CARE
26            Defendants                       WITNESSES WOODFORD, SCOTT,
                                               LEHMAN, AUSTIN, AND BEARD**
27
                                               **To: Three-Judge Panel**
28

DEFS.' MIL # 8 TO EXCLUDE OPINION EVIDENCE BY NON-HEALTH CARE WITNESSES          1647253.2
(CASE NOS. 90-00520; 01-1351)

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................... 1

II.   ARGUMENT ......................................................................................................... 3

    A.    Ms. Woodford Is Not an Expert in Correctional Medical or Mental Health Care .................................................................................................. 3

    B.    Ms. Woodford's Opinions Are Not Based on Sufficient Facts or Any Methodology ................................................................................................. 4

    C.    Mr. Scott Is Not an Expert in Correctional Medical or Mental Health Care ............................................................................................................... 8

    D.    Mr. Scott's Opinion Is Not Based on Sufficient Facts or a Reliable Method ........................................................................................................... 9

    E.    Mr. Lehman Is Not an Expert in Correctional Medical or Mental Health Care .................................................................................................. 10

    F.    Mr. Lehman's Opinion Is Not Based on Sufficient Facts or a Reliable Method ......................................................................................................... 11

    G.    Dr. Austin Is Not an Expert in Correctional Medical or Mental Health Care and His Opinion Is Not Based on Sufficient Facts or a Reliable Method ......................................................................................................... 13

    H.    Dr. Beard Is Not an Expert in Correctional Medical Care and his Opinion Is Not Based on Sufficient Facts or a Reliable Method ............... 15

    I.    The Testimony by Jeanne Woodford, Doyle Wayne Scott, Joseph Lehman, Dr. Austin, and Dr. Beard Regarding the Primary Cause of the Allegedly Unconstitutional Delivery of Medical or Mental Health Care Must Be Excluded Under Federal Rule of Evidence 403 as Needlessly Cumulative ................................................................................ 16

III.  CONCLUSION .................................................................................................... 17

1

## TABLE OF AUTHORITIES

2

<u>Page</u>

3

**CASES**

4

5

*Claar v. Burlington N.R.R.,*
  29 F.3d 499, 502 (9th Cir. 1994) ................................................................3

6

*Daubert v. Merrell Dow Pharm.,*
  43 F.3d 1311, 1317 (9th Cir. 1995) ..........................................................3

7

*GE v. Joiner,*
  522 U.S. 136, 146 (1997).................................................................3, 15

8

*Thomas J. Kline, Inc. v. Lorillard, Inc.,*
  878 F.2d 791, 799-800 (4th Cir. 1989) ....................................................3

9

10

*U.S. v. Kizeart,*
  102 F.3d 320, 325 (7th Cir. 1996). ........................................................17

**STATUTES**

11

Federal Rule of Evidence 403 ....................................................2, 16, 17, 18

12

Federal Rule of Evidence 702 ......................................................2, 3, 10, 13

13

Federal Rule of Evidence 703. .....................................................2, 8, 10, 13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1      TO PLAINTIFFS MARCIANO PLATA AND RALPH COLEMAN AND THEIR

2 ATTORNEYS OF RECORD:

3      PLEASE TAKE NOTICE that Defendants Arnold Schwarzenegger, et al., move

4 the Three-Judge Panel for an in limine order to exclude any and all opinion argument,

5 evidence, reference to evidence, or testimony by non-health care witnesses Jeanne

6 Woodford, Doyle Wayne Scott, Joseph Lehman, James Austin, and Jeffrey Beard.  This

7 motion is based on this notice, the points and authorities, the supporting declaration and

8 attached exhibits, the Court's file in this case, and any argument presented to the Three-

9 Judge Panel.

10 **MEMORANDUM OF POINTS AND AUTHORITIES**

11 **I.    INTRODUCTION**

12      A prisoner release order is an extreme remedy that should not issue unless it will

13 cure the constitutional violation in question and the violation cannot be fixed in any other

14 way.  Here, the alleged constitutional violations at issue are the delivery of medical and

15 mental health care in California's prisons, not overcrowding, housing, or other

16 environmental conditions affecting the general population.  Defendants are not

17 deliberately indifferent to the medical and mental health needs of *Plata* and *Coleman*

18 class-members, and overcrowding is not the "primary cause" of those alleged

19 constitutional violations.  Therefore, a prisoner release order is not the proper remedy.

20      Each of Plaintiffs' experts have attempted to opine on the ultimate issues in this

21 case, despite their lack of qualifications to do so.  Defendants therefore move in limine to

22 exclude Plaintiffs' designated experts Jeanne Woodford, Doyle Wayne Scott, and

23 Joseph Lehman, from providing testimony at trial on (1) whether overcrowding is the

24 primary cause of the alleged inadequate delivery of medical and mental health care in

25 California's prisons, and (2) whether relief other than a prisoner release order would

26 effectively address problems in the delivery of medical and mental health care.

27 Defendants further move in limine to exclude Plaintiffs' expert Dr. James Austin from

28 providing testimony at trial regarding whether overcrowding is the primary cause of the

- 1 -

1   alleged unconstitutional delivery of medical care.

2        Ms. Woodford, Mr. Scott, and Mr. Lehman all have experience with custody and

3   corrections only, and self-admittedly are not experts in correctional medical or mental

4   health care, nor do they possess any appropriate qualifications to testify on these

5   subjects.  Further, Dr. Austin's experience relates to the evaluation of criminal justice

6   practices including parole and probation guidelines and offender risk assessment and

7   classification systems, not correctional health care, and Dr. Austin similarly does not

8   possess any appropriate qualifications to testify as to correctional mental or medical

9   health care matters.  Accordingly, absent any foundation for such opinions, the reports

10  and testimony of Ms. Woodford, Mr. Scott, and Mr. Lehman should be excluded in their

11  entirety at trial under Federal Rule of Evidence 702.  The report and testimony of Dr.

12  Austin as it relates to the primary cause of the alleged unconstitutional delivery of

13  medical or mental health care should similarly be excluded at trial as Dr. Austin lacks

14  foundation for any such opinions.  Fed. R. Evid. 702.  Dr. Beard himself testified that he

15  does not consider himself an expert in medical care delivery in prisons.  Accordingly, the

16  report and testimony of Dr. Beard as it relates to the primary cause of the alleged

17  unconstitutional delivery of medical care should be excluded, as Dr. Beard is not a

18  qualified expert on that subject.

19        Additionally, Ms. Woodford, Mr. Scott, Mr. Lehman, Dr. Austin, and Dr. Beard do

20  not base their opinions on sufficient facts or a reliable method.  In short, as detailed

21  below, these witnesses lack the requisite expertise and factual and methodological

22  foundation to be admissible and should be excluded under Federal Rule of Evidence

23  703.

24        Defendants further move to exclude each of the above expert witnesses'

25  testimony as to the primary cause of the allegedly unconstitutional delivery of medical

26  care under Federal Rule of Evidence 403 on the basis that such testimony would

27  constitute a waste of time and would also cause the "needless presentation of

28  cumulative evidence."  Fed. R. Evid. 403.  This is so especially in light of the fact that

- 2 -

1    Plaintiffs have retained a correctional health care expert, Dr. Shansky, specifically to

2    opine on the primary cause of the allegedly unconstitutional delivery of medical care.

3                                    **II.    ARGUMENT**

4           Under Federal Rule of Evidence 702, a witness who is qualified as an expert "by

5    knowledge, skill, experience, training, or education" may provide his or her expert

6    opinion to "assist the trier of fact to understand the evidence or to determine a fact in

7    issue."  However, an expert's opinion may be excluded where the expert does not have

8    the requisite knowledge, skill, experience, training, or education to qualify him or her as

9    having "specialized knowledge" regarding the subject upon which he or she proposes to

10   testify.  *See, e.g., Thomas J. Kline, Inc. v. Lorillard, Inc.*, 878 F.2d 791, 799-800 (4th Cir.

11   1989).

12          Factors regarding reliability include: "whether the experts are proposing to testify

13   about matters growing naturally and directly out of research they have conducted

14   independent of the litigation, or whether they have developed their opinions expressly for

15   purposes of testifying" (*Daubert v. Merrell Dow Pharm.*, 43 F.3d 1311, 1317 (9th Cir.

16   1995) (on remand)); whether there is simply "too great an analytical gap between the

17   data and the opinion proffered" and the opinion "is connected to existing data only by the

18   *ipse dixit* of the expert" (*GE v. Joiner,* 522 U.S. 136, 146 (1997)); and whether the

19   conclusions are "mere subjective belief or unsupported conclusions" (*Claar v. Burlington*

20   *N.R.R.*, 29 F.3d 499, 502 (9th Cir. 1994)).

21          As explained below, Ms. Woodford, Mr. Scott, and Mr. Lehman's opinions do not

22   satisfy these requirements.  Additionally, Dr. Austin's opinions with respect to his

23   assessment of the primary cause of the allegedly constitutionally inadequate delivery of

24   medical and mental health care do not satisfy these requirements.

25   **A.    Ms. Woodford Is Not an Expert in Correctional Medical or Mental Health**
     **Care.**
26

27          Ms. Woodford has a bachelor's degree in criminal justice.  (Decl. Paul Mello

28   Supp. Defs.' Mots. in Limine (Decl. Mello), Ex. A (12/18/07 Dep. Jeanne Woodford) at

                                            - 3 -

1    8:23-24.)  She does not have any degrees in medical or mental health nor does she

2    have any experience in providing medical or mental health care, including in a

3    correctional setting.  (*Id.* at 8:25-9:2; 12:3-5.)  Ms. Woodford has only worked in "various

4    custodial and management positions."  (*Id.* at Ex. C (Report of Jeanne Woodford) at 1, ¶

5    1.)  When Ms. Woodford was Director of the Department of Corrections, there were

6    Chief Medical Officers at each of the prisons and a head of healthcare services in

7    Sacramento.  (*Id.* at Ex. A, 23:6-26:11.)  Similarly, when Ms. Woodford was

8    Undersecretary of the California Department of Corrections and Rehabilitation, Dr. Peter

9    Farber-Szekrenyi directly oversaw medical and mental health care at the Undersecretary

10   level.  (*Id.* at 27:12-22, 29:2-31:5.)

11         Ms. Woodford testified that she is "not a medical expert," and was not able to

12   identify the "components or necessary parts of a constitutionally adequate medical or

13   mental health system" in "technical terms."  (Decl. Mello, Ex. B (Suppl. Dep. Jeanne

14   Woodford), 33:8; Ex. A at 32:9-34:2.)  Ms. Woodford further testified that she did not

15   know an appropriate physician-to-inmate ratio in a prison setting.  (Decl. Mello, Ex. A at

16   71:12-19.)  While she has significant experience in custodial operations, Ms. Woodford is

17   *not* an expert in correctional medical or mental healthcare.  She has no experience in

18   directly overseeing correctional healthcare and was not able to identify the components

19   of a constitutionally adequate medical or mental health system or even an appropriate

20   physician to inmate ratio in a prison setting.  In sum, Ms. Woodford is not qualified to

21   opine on the causes of California's alleged failure to achieve the goals of an adequate

22   healthcare system.

23   **B.    Ms. Woodford's Opinions Are Not Based on Sufficient Facts or Any
24         Methodology.**

25         Ms. Woodford's opinions are not the reliable product of a professional,

26   "intellectually rigorous" inquiry into the causes of the alleged deficiencies in the delivery

27   of medical and mental health care in California's prisons.  Ms. Woodford's opinions were

28   drafted in the first instance by Plaintiffs' counsel, who provided the draft report to her

- 4 -

1    electronically.  (Decl. Mello, Ex. A at 45:1-17.)  The opinions are not based on any actual

2    data, but mere conclusions engineered toward the positions advanced by Plaintiffs'

3    counsel.

4         Ms. Woodford has not worked in the California Department of Corrections since

5    July 2006.  (*Id.*)  She had not reviewed any of the Receiver's reports or Plans of Action

6    or Plaintiffs' counsels' site tour letters at the time she allegedly drafted her first expert

7    report, nor before her first deposition.  (*Id.* at 54:19-24, 57:4-8, 55:24-56:16.)  Neither

8    had Ms. Woodford visited any prisons in California since she resigned from her position

9    as Undersecretary in July 2006 at the time of her initial deposition in December 2007

10   after allegedly drafting her first expert report.  (*Id.* at 56:17-25.)

11        At Ms. Woodford's deposition in December 2007, she did not know the current

12   status of the delivery of medical care in 32 of California's 33 prisons.  (*Id.* at 59:24-60:3.)

13   In forming her opinion, Ms. Woodford did not review any documents that listed the

14   amount of space or the number of physicians or the number of psychiatrists and

15   psychologists.  (*Id.* at 67:11-16.)  Ms. Woodford was not aware of whether there have

16   been any improvements in the delivery of medical care since she left the CDCR in the

17   middle of 2006.  (*Id.* at 61:17-20.)  Ms. Woodford did not know whether there are more or

18   fewer correctional officers or more clinicians providing medical and mental health care

19   since she left CDCR.  (*Id.* at 61:17-20, 64:8-11.)  And other than what she read in the

20   newspaper about San Quentin, Ms. Woodford did not know whether there has been

21   additional clinical space provided for medical and mental health care.  (*Id.* at 61:22-62:1,

22   64:16-21.)

23        Ms. Woodford opined in her report that CDCR "lacks sufficient number of

24   personnel who have the necessary skill and training to manage such a large complex

25   organization."  (Decl. Mello, Ex. C at 4, ¶ 11.)  Though she was referring to "personnel in

26   all categories, custody, support staff, healthcare, mental healthcare," Ms. Woodford

27   admitted that she did not actually know the number of persons in the various positions in

28   the prisons today, or what the vacancy rate is at any of CDCR's institutions with respect

- 5 -

1  to physicians, nurse practitioners, physicians' assistants, RNs, LVNs, psychiatrists or

2  psychologists.  (*Id.* at Ex. A, 70:10-25, 71:1-4, 72:14-23.)

3          In her report, Ms. Woodford stated that "crowding causes delays in moving

4  reception center prisoners to other prisons for treatment," but she admitted that she does

5  not know if that is true since she left the CDCR or how many prisoners have been denied

6  adequate medical or mental healthcare because of such delays in the past year, if any.

7  (*Id.* at 72:24-73:9-13.)  Ms. Woodford also stated in her initial report that "in California

8  there is not enough correctional staff to provide prisoners with timely access to care and

9  still perform other essential functions."  (Decl. Mello, Ex. C at 5, ¶ 15.)  Ms. Woodford did

10 not have "have specific knowledge of all 32 prisons but [she] generally believe[d] that's

11 true of all 32 prisons."  (Decl. Mello, Ex. A, 75:19-76:7.)  Ms. Woodford believed this to

12 be the case despite the fact that she admittedly did not know the specific number of

13 correctional officer vacancies at any specific prison in the last year.  (*Id.* at 76:25-77:9.)

14         In her report, Ms. Woodford stated that "some staff work back to back double

15 shifts and would sleep in their cars in the prison parking lot instead of making a long

16 commute home."  (Decl. Mello, Ex. C at 7, ¶ 19.)  But Ms. Woodford did not know

17 whether this is occurring today, and instead based her opinion on "[her] knowledge of

18 the Department of Corrections and talking to different wardens while [she] was the

19 director and in conversation with people since, you know, here and there."  (Decl. Mello,

20 Ex. A at 77:11-25.)

21         In her report, Ms. Woodford stated that "officers who are tired and suffer from low

22 morale are less productive and do not fulfill their responsibilities to provide the basic

23 needs of prisoners."  (Decl. Mello, Ex. C at 7, ¶ 19.)  Ms. Woodford did not know if this is

24 the case today, whether any inmate deaths resulted in 2006 as a consequence of

25 purported circumstance, or whether this purported circumstance led to unconstitutional

26 delivery of medical or mental health care in 2006 or 2007.  (Decl. Mello, Ex. A at 78:1-8,

27 15-19, 20-23.)

28         In her report, Ms. Woodford stated that "[l]ockdowns increase the risk that a

- 6 -

1    prisoner will not get treatment in an emergency because prisoners are dependent on the

2    correctional officer to properly convey the medical problem to medical staff and then be

3    able to get an escort to the clinic." (Decl. Mello, Ex. C at 9, ¶ 26.)  But Ms. Woodford did

4    not know if any unnecessary deaths were caused in 2006 due to lockdowns or if

5    lockdowns caused unconstitutional delivery of medical or mental health care in 2006 or

6    2007.  (Decl. Mello, Ex. A at 79:7-16.)

7         Though Ms. Woodford allegedly wrote in her supplemental expert report that she

8    agreed with an expert panel's recommendation of a 130 percent design capacity for

9    CDCR facilities, when asked at her deposition what studies or reports she based her

10   opinion on, Ms. Woodford replied "I base that on my correctional experience and, you

11   know, probably reading things over the years that I – that the names of which are not

12   coming to mind, but certainly studying the field of corrections."  (Decl. Mello, Ex. B at

13   47:15-18.)  When asked again whether she could recall with any specificity the names of

14   any studies or reports that she relied upon in reaching her conclusions, Ms. Woodford

15   stated "No, I cannot."  (*Id.* at 47:22.)

16        And while Ms. Woodford had not toured any prisons in the two years prior to her

17   initial deposition in this matter, as of the time of her supplemental deposition, Ms.

18   Woodford had seen only three of CDCR's 33 institutions.  (*Id.* at 69:10-13.)  As for

19   drawing conclusions as to the conditions at the other 30 institutions she had not

20   personally viewed in the previous two years, Ms. Woodford stated during her

21   supplemental deposition that she "read the reports of other people who have been in

22   there, so from those reports, I have an impression, but I have not personally viewed the

23   conditions."  (*Id.* at 69:22-25.)  Similarly, though Ms. Woodford stated in her report that

24   she believed that when inmates with a potential for violence are housed in units with

25   non-violent inmates, correctional officers are not able to provide assistance to inmates

26   with health issues.  (*Id.* at 80:4-8.)  When asked if she was aware of any specific

27   instances where this was the case, Ms. Woodford had to defer to other experts' reports.

28   (*Id.* at 81:9-83:22.)  Specifically, she stated "I don't have a specific example, but in

- 7 -

1    reading the reports, it was clear that it was prevalent at other prisons." (*Id.* at 81:18-20.)

2    She went on to clarify that her opinion was based on the contents of expert reports

3    drafted by Dr. Pablo Stewart and Dr. Ronald Shansky.  (*Id.* at 82:4, 11-12.)

4        Void of any factual basis or discernible methodology, and impermissibly reliant on

5    other experts' opinions and reports, Ms. Woodford's opinion is naked speculation and

6    self-serving rhetoric, crafted by Plaintiffs' counsel to support the position they advocate.

7    (*See* Defs.' Mot. in Limine No. 9.)  In the absence of any specific methodology, Ms.

8    Woodford's opinion lacks foundation and must be excluded under Federal Rule of

9    Evidence 703.

10   **C.    Mr. Scott Is Not an Expert in Correctional Medical or Mental Health Care.**

11       Mr. Scott has a bachelor's degree in business administration.  (Decl. Mello, Ex. E

12   (12/14/07 Dep. Doyle Wayne Scott) at 9:11-14.)  He does not have degrees in the

13   medical or mental health fields or any other advanced degree.  (*Id.* at 9:17-25.)  Mr.

14   Scott has never been a clinician that provided medical or mental health care.  (*Id.* at

15   10:1-6.)  Mr. Scott rose through the ranks as a correctional officer to become the

16   Executive Director of the Texas Department of Criminal Justice from 1996 to 2001.  (*Id.*

17   at 10:7-9, 10:23-13:6.)  While Mr. Scott was Executive Director in Texas, a physician

18   oversaw all of the medical and mental health services.  (*Id.* at 19:23-20:15.)  He has no

19   experience analyzing staffing ratios as it relates to medical or mental health clinicians or

20   the quality of care provided by medical or mental health clinicians.  (*Id.* at 27:7-10, 32:17-

21   22.)  Rather, Mr. Scott's experience is mostly related to custody, and not to the delivery

22   of medical or mental health care.  (*Id.* at 36:11-16.)   He is not an expert in the quality of

23   care provided by medical or mental health clinicians, and Mr. Scott even testified that he

24   is not qualified to opine on what are the overall goals of a constitutionally adequate

25   medical care system.  (*Id.* at 32:23-33:6; 102:17-103:9.)

26       As revealed by Mr. Scott's deposition testimony, correctional medical and mental

27   health care are distinct from custodial operations.  Mr. Scott is undoubtedly an expert in

28   custodial operations, but he is not an expert in correctional healthcare.  He was not even

- 8 -

1  able to opine on what the overall goals of a constitutionally adequate medical care

2  system are.  Similarly, Mr. Scott is not qualified to opine on the causes of California's

3  alleged failure to achieve the goals of an adequate healthcare system, which Mr. Scott

4  admits he is not qualified to define.

5  **D.    Mr. Scott's Opinion Is Not Based on Sufficient Facts or a Reliable Method.**

6  Mr. Scott did not undertake an objective review of current, relevant information

7  regarding the state of medical and mental health care in California's prisons to reach his

8  opinion.  Instead, Mr. Scott severely limited the factors he was willing to consider and

9  made no effort to obtain current, comprehensive information about even those factors or

10 to take account of the current plans to address the problems.

11 In his deposition, Mr. Scott testified that he believes "there all kinds of things that

12 are impacting the inability to deliver healthcare and mental healthcare" that are "beyond

13 the number of custodial staff," and that "the lack of an appropriate number of custodial

14 staff" is "only one of the factors involved" in constitutionally adequate medical or mental

15 health care.  (Decl. Mello, Ex. E at 65:21-66:12; 67:1-7.)  For example, the quality of

16 clinicians is a factor in the ability to provide constitutionally adequate medical or mental

17 health care.  (*Id.* at 107:25-108:4.)

18 But Mr. Scott's assignment from Plaintiffs' counsel was "to look at the operational

19 areas that impacted the delivery of healthcare and mental healthcare to California

20 Department of Corrections offenders."  (*Id.* at 41:8-13.)  "The only thing he looked at"

21 was "the operations portion."  (*Id.* at 64:14-23.)  Mr. Scott did not look at the healthcare

22 provided by clinicians "whatsoever," nor did he assess the quality of the clinicians.  (*Id.*

23 and at 107:21-24.)

24 In looking at the "operations portion," Mr. Scott did not analyze each prison with

25 respect to custodial staffing levels.  (*Id.* at 30:3-6.)  Instead, Mr. Scott visited just four

26 prisons—Avenal, CIM, Valley State, and San Quentin—at which he spent between four

27 to seven hours each before allegedly drafting his first expert report.  (*Id.* at 31:6-11,

28 31:21-32:8.)  And yet, when Mr. Scott performed an analysis of correctional officers

- 9 -

needed for medical escorts and to transfer inmates off site for the State of Florida, he visited eight institutions over four weeks, generally spending two days at each institution. (*Id.* at 27:11-16, 28:2-29:21, 30:7-17.)  Mr. Scott also did not review of any of the post-tour letters prepared by Plaintiffs' counsel in monitoring the prisons' compliance with the *Plata* policies and procedures.  (*Id.* at 89:18-21.)

Mr. Scott believes that being familiar with the current plan on fixing the delivery of medical care in California's prisons is important.  (*Id.* at 53:14-17.)  But he did not read either the Receiver's May 10, 2007 Plan of Action or the November 15, 2007 Plan of Action, even though reviewing such a plan could have affected his opinions.  (*Id.* at 53:3-54:2, 54:23-55:2.)

Mr. Scott's opinion does not have the requisite "intellectual rigor" to be an admissible expert opinion, but is instead a statement of mere subjective belief and unsupported conclusions, engineered to match the positions of Plaintiffs' counsel.  Mr. Scott's opinion must therefore be excluded under Federal Rules of Evidence 702 and 703.

**E.    Mr. Lehman Is Not an Expert in Correctional Medical or Mental Health Care.**

Mr. Lehman does not have any degrees or training in medical or mental health care or experience providing medical or mental health care.  (Decl. Mello, Ex. N (Dep. Joseph Lehman), p. 10:25-11:18.)  When he was Secretary of the Washington State Department of Corrections, he appointed a physician to head the health department, which included mental health.  (*Id.* at 11:19-12:22.)  When he was Commissioner of the Maine Department of Corrections, there was a staff person responsible for promulgating medical and mental health care policies.  (*Id.* at 21:9-23:22.)  And during his tenure as Secretary for the Pennsylvania Department of Corrections, he created a department for medical and mental health care which was headed by a former health care manager at one of Pennsylvania's major prisons.  (*Id.* at 26:13-27:25.)  Mr. Lehman has never held a position such as a health care manager at a prison or head of the health department for a prison system.  (*Id.* at 34:13-18.)  When asked if he was familiar with the medical

- 10 -

1  services in California's prisons, Mr. Lehman testified that he is not a healthcare provider

2  or an expert in that field.  (*Id.* at 59:9-17.)

3  **F.    Mr. Lehman's Opinion Is Not Based on Sufficient Facts or a Reliable**
       **Method.**

4

5      Mr. Lehman's opinion regarding whether overcrowding is the primary cause of the

6  alleged deficiencies in the provision of medical care in California prisons is based on his

7  experiences in corrections in other states, having never been employed as a corrections

8  official in California.  (Decl. Mello, Ex. N, 57:15-58:11.)  Mr. Lehman could not recall if he

9  has ever read any studies or reports or best practices manuals regarding prison medical

10  care.  (*Id.* at 58:12-14.)  Mr. Lehman's familiarity with California's prison medical care

11  system stems from his review of other experts' reports, including Plaintiffs' expert, Dr.

12  Shansky's report.  (*Id.* at 59:1-8.)  Mr. Lehman explained that he is "not a health care

13  provider or an expert in that field."  (*Id.* at 59:14-15.)  When asked if he had knowledge

14  about the current state of the delivery of medical care in California's prisons, Mr. Lehman

15  stated that his knowledge was based on other expert witnesses' reports.  (*Id.* at 59:18-

16  25.)

17      Mr. Lehman did not review any of the Receiver's reports before forming his

18  opinion regarding what the alleged current problems were with the delivery of medical

19  care in California's prisons.  (*Id.* at 62:24-63:13.)  Mr. Lehman was not even aware that

20  the Receiver had written any reports as of the time he allegedly drafted his expert report

21  in August of 2008.  (*Id.* at 64:4-8.)  Similarly, though Mr. Lehman felt qualified to opine

22  on the impact of overcrowding on the provision of mental health care in California's

23  prisons, he knew "very little" about the Special Master in the *Coleman* case, and was

24  unaware of any of the Special Master's reports, nor could he articulate any specific

25  information regarding the current state of mental health care in California's prisons.  (*Id.*

26  at 64:12-23.)

27      Mr. Lehman allegedly wrote in his report that overcrowding has led to increased

28  numbers of infectious disease outbreaks, but did not know how many additional

DEFS.' MIL # 8 TO EXCLUDE OPINION EVIDENCE BY NON-HEALTH CARE WITNESSES
(CASE NOS. 90-00520; 01-1351)                                          1647253.2

1  infectious disease outbreaks occurred because of overcrowding. (*Id.* at 65:5-14.) Nor

2  did Mr. Lehman have an opinion at what population level these additional infectious

3  disease outbreaks would not have occurred. (*Id.* at 65:21-24.)

4        Mr. Lehman stated that California's staffing ratio of correctional officers at prisons

5  is below the national average, yet did not know what the staffing ratio was, nor had he

6  read any report or study standing for the proposition that the national average was the

7  necessary average to maintain to meet quality of care standards. (*Id.* at 69:2-9.)

8        And though Mr. Lehman asserted that overcrowding has created an intolerable

9  burden on staff resulting in negative impacts on the ability to provide health care, he

10  admitted that no correctional officer had ever expressed to him that they experienced

11  any specific difficulties or burdens. (*Id.* at 70:21-71:16.) Nor was Mr. Lehman personally

12  aware of any particular instances where an inmate was unable to receive the health care

13  he or she needed because of the alleged limited ability of correctional staff to become

14  familiar with inmates. (*Id.* at 71:17-72:7.) Instead, Mr. Lehman had to rely on incidents

15  alleged by Plaintiffs' other experts, Dr. Shansky and Mr. Scott, to support his assertions.

16  (*Id.*) Similarly, aside from a reference in another expert witness report, Mr. Lehman was

17  not aware of any specific instance where the alleged failure to deliver appropriate mental

18  health care was attributable to the limited numbers of custodial staff. (*Id.* at 73:2-9.)

19        Mr. Lehman wrote in his report that due to overcrowding, inmates were being

20  improperly classified, and yet at his deposition, did not have an opinion as to what level

21  of population would be necessary for all inmates in California to be properly classified.

22  (*Id.* at 73:12-18, 76:14-17.) Mr. Lehman also wrote in his report that the improper

23  classification of inmates leads to the improper housing of inmates who need health care

24  services, but did not know how many inmates who need health care services are

25  improperly classified. (*Id.* at 76:18-77:12.)

26        Mr. Lehman's opinion is not based on *any* facts or reliable methods, and instead

27  is based on his corrections experiences years ago in Maine, Washington, and

28  Pennsylvania, and is also drawn from the conclusions of Plaintiffs' other experts. Mr.

- 12 -

1   Lehman even admitted that "the only documents I reviewed are the reports of the other

2   witnesses.  Those are the only documents I reviewed.  And the population.  And a report

3   on the population."  (*Id.* at 50:19-22.)  In the absence of any reliable basis for his

4   allegedly expert opinion, Mr. Lehman's testimony must be excluded under Federal Rule

5   of Evidence 703.

6   **G.    Dr. Austin Is Not an Expert in Correctional Medical or Mental Health Care**
        **and His Opinion Is Not Based on Sufficient Facts or a Reliable Method.**
7

8        Dr. Austin has never received any medical training, education, or experience.

9   (Decl. Mello, Ex. M (Suppl. Dep. James Austin) at 25:10-12.)  At his deposition, in

10  response to questioning about why he hired medical and mental health care experts to

11  monitor compliance with agreements regarding correctional systems of which he was

12  overseeing implementation, Dr. Austin stated "I'm not a doctor or a psychiatrist, so you

13  need to get people with expertise in these areas."  (*Id.* at 30:5-31:10.)  And yet, despite

14  his lack of any training or education in medical or mental health care and his admitted

15  need to hire medical and mental health care experts when overseeing correctional

16  systems with medical and mental health care issues, Dr. Austin nonetheless opined on

17  such matters in his expert report, stating that "[t]here are many negative effects on the

18  delivery of mental health, medical, and other critical services that are directly linked to

19  the current level of crowding and can only be addressed by reducing the CDCR

20  institutional population to a more acceptable capacity figure."  (Decl. Mello, Ex. L (Expert

21  Report James Austin) at 10 ¶ 26.)

22       Dr. Austin further went on in his report to opine on the ultimate legal issues in this

23  case, which are related to the provision of medical and mental health care, stating that

24  "overcrowding within the California Department of Corrections and Rehabilitation

25  (CDCR) is the primary cause of the current unconstitutional conditions experienced by

26  members of the *Coleman* and *Plata* classes."  (*Id.* at 21 ¶ 53.)  Such opinions and

27  conclusions are lacking in any relevant foundation and must therefore be excluded under

28  Federal Rule of Evidence 702.  When deposed, Dr. Austin testified that he could not

1    identify all of the deficiencies in medical care in California's prisons he considered when

2    attempting to determine whether overcrowding was the primary cause of the

3    constitutionally inadequate care overall.  (Decl. Mello, Ex. M at 100:13-19.)  Dr. Austin

4    further testified that in reaching the conclusion that overcrowding was the primary cause

5    of the unconstitutional conditions for the *Plata* class members, he did not "put weights

6    on" all of the factors, but "just listed the ones that I thought were the most important

7    ones."  (*Id.* at 100:20-101:11.)  When asked how he came to the conclusion that the

8    factors he picked were the most important ones, Dr. Austin testified:

9              Well, that's based on my opinion and my experience in
               working with other states and the work that I do.  People ask
10             me all the time, you know, 'What do you think are the most
               important things here?'  And that's what I do for a living.  You
11             know, people ask me to do that.  I do that.  That's what I did
               here.
12

13   (*Id.* at 101:13-21.)  In other words, Dr. Austin did not employ any methodology

14   whatsoever to determine which factors contributing to the alleged inadequacies in

15   medical care were the most important, he simply decided by fiat which were the most

16   important.

17          With respect to *Coleman*, Dr. Austin testified that he could not identify any specific

18   allegedly unconstitutional conditions experienced by the *Coleman* class members which

19   are caused by overcrowding.  (*Id.* at 88:19-89:2.)

20          When deposed, Dr. Austin could not identify which documents he actually

21   reviewed to form his opinion regarding primary cause.  (*Id.* at 92:17-93:3.)  Dr. Austin did

22   not do any statistical analysis himself to determine primary cause and he could not

23   identify any statistical analysis or individual study done regarding primary cause that he

24   relied upon.  (*Id.* at 102:12-103:8, 104:11-21, 105:5-107:1.)  Dr. Austin then testified that

25   the bases of his opinion regarding primary cause were contained in paragraphs 26 and

26   27 of his first (November 2007) report—the conclusion of the Expert Panel on Adult

27   Offender and Recidivism Reduction Programming that "prison crowding must first be

28   reduced before any meaningful programming can occur" and the purported 60-day wait

- 14 -

1   period at reception centers.  (*Id.* at 109:23-111:19.)  But the Expert Panel addressed

2   rehabilitative programming, not medical or mental health care.  Also, Dr. Austin could not

3   identify any specific instances or number of instances where lack of access to

4   meaningful medical treatment was due to delay at the reception center.  (*Id.* at 121:11-

5   122:6.)

6        Dr. Austin's related opinions were similarly unsupported. He stated in his first

7   (November 2007) report that dangerous prison environments are not conducive to

8   treatment, but testified that to determine which prisons in California were dangerous he

9   would "have to do a tour of all the prisons and do a comprehensive evaluation of each

10  one." (*Id.* at 122:9-123:5.)  Accordingly, Dr. Austin could not identify which prisons in

11  California, other than Lancaster (which he visited as a member of the Expert Panel), had

12  dangerous environments that were impairing access to treatment.  (*Id.* at 123:6-13.)

13  With respect to Lancaster, Dr. Austin was not aware of any specific instances of denial of

14  access to medical or mental health care caused by its purportedly dangerous

15  environment.  (*Id.* at 123:15-19.)

16       In short, Dr. Austin is not qualified to opine on the primary cause of inadequacies

17  in medical or mental health care in California's prisons and his opinions regarding

18  primary cause are not supported by actual data, studies or research but merely the "the

19  *ipse dixit* of the expert." *GE v. Joiner,* 522 U.S. at 146.  Dr. Austin's opinions on primary

20  cause are unreliable and inadmissible and should therefore be excluded.

21  **H.   Dr. Beard Is Not an Expert in Correctional Medical Care and his Opinion Is**
        **Not Based on Sufficient Facts or a Reliable Method.**
22

23       Jeffrey Beard, Ph.D, who Plaintiffs have identified as a non-retained expert,

24  himself testified: "I don't consider myself an expert [in medical care delivery in prisons],

25  but I'm certainly aware of what some of the components [of a constitutionally adequate

26  medical care system] are that you need.  Whether I know all the components, I can't tell

27  you.  I'm not a physician." (Decl. Mello, Ex. K (Dep. Jeff Beard) at 153:4-19; *see also*

28  172:13-18.)

1    Further, Dr. Beard does not have a sufficient foundation for an admissible expert

2    opinion on the primary cause of the alleged deficiencies in the delivery of medical and

3    mental health care in California's prisons or whether remedies other than a prisoner

4    release order may exist.  Dr. Beard testified that he had never evaluated whether the

5    delivery of medical and mental health care in California's prisons is adequate or what

6    deficiencies, if any, exist in the medical and mental health care systems in California's

7    prisons.  (*Id.* at 134:25-135:9.)  Dr. Beard also testified that he had never evaluated

8    whether California can provide adequate medical and mental health care in its prisons

9    without a reduction in its prison population or whether California must take steps to fix

10    the delivery of medical and  mental health care in its prisons by means other than

11    reducing population.  (*Id.* at 166:7-20.)  Dr. Beard's knowledge of and experience with

12    the California prison system is based on is participation in the Expert Panel on Adult

13    Offender and Recidivism Reduction Programming, which Dr. Beard acknowledges was

14    "looking at [overcrowding] from a programming perspective" and not from "the direction

15    of the mental health or medical."  (*Id.* at 81:4-82:11.)

16    Accordingly, Dr. Beard is not qualified to offer an opinion on whether

17    overcrowding is the primary cause of the alleged deficiencies in medical care or whether

18    remedies to the alleged deficiencies medical care, other than a prisoner release order,

19    exist.  Moreover, Dr. Beard lacks any factual foundation whatsoever to support an

20    opinion on whether overcrowding is the primary cause of the alleged deficiencies in the

21    delivery of medical and mental health care in California's prisons or whether remedies to

22    those alleged deficiencies, other than a prisoner release order, exist.

23    **I.    The Testimony by Jeanne Woodford, Doyle Wayne Scott, Joseph Lehman,**

24    **Dr. Austin, and Dr. Beard Regarding the Primary Cause of the Allegedly Unconstitutional Delivery of Medical or Mental Health Care Must Be**

25    **Excluded Under Federal Rule of Evidence 403 as Needlessly Cumulative.**

26    Relevant evidence may nonetheless be excluded under Federal Rule of Evidence

27    403 if its probative value is outweighed by waste of time or needless presentation of

28    cumulative evidence.  Fed. R. Evid. 403.  Evidence is cumulative when "it adds very little

- 16 -

1    to the probative force of the other evidence in the case, so that if it were admitted its

2    contribution to the determination of truth would be outweighed by its contribution to the

3    length of trial."  *U.S. v. Kizeart*, 102 F.3d 320, 325 (7th Cir. 1996).

4        Here, as demonstrated above, Plaintiffs seek to introduce into evidence at trial the

5    opinions of each of the *Plata* experts regarding whether crowding is the primary cause of

6    the alleged unconstitutional delivery of medical care.  Though Jeanne Woodford, Doyle

7    Wayne Scott, Joseph Lehman, Dr. Austin, and Dr. Beard are in no way qualified to opine

8    on matters related to the delivery of medical care, regardless, their testimony is entirely

9    cumulative of that of Dr. Ronald Shansky, another of Plaintiffs' experts designated to

10   testify regarding the primary cause of the alleged unconstitutional delivery of medical

11   care.  (*See* Decl. Mello, Ex. I (12/10/07 Dep. Ronald Shansky) at 53:17-20 ("Q: Are you

12   going to opine on whether overcrowding is the primary cause of the unconstitutional

13   delivery of healthcare?  A: Yes.").)  Similarly, Plaintiffs have designated at least one

14   other expert to testify regarding the primary cause of the alleged unconstitutional delivery

15   of mental health care, Dr. Craig Haney.  (*See* Decl. Mello, Ex. CC (8/15/08 Report of

16   Craig Haney) at 9.)  Undeniably the testimony of six experts on the exact same topic is

17   precisely the type of needless cumulative evidence that Federal Rule of Evidence 403

18   contemplates excluding.  Accordingly, Defendants move to exclude Jeanne Woodford,

19   Doyle Wayne Scott, Joseph Lehman, Dr. Austin, and Dr. Beard from testifying as to

20   whether overcrowding is the primary cause of the alleged unconstitutional delivery of

21   medical or mental health care under Federal Rule of Evidence 403.

22                              **III.    CONCLUSION**

23       Plaintiffs' experts, Ms. Woodford, Mr. Scott, Mr. Lehman, and Dr. Austin, do not

24   qualify as correctional medical or mental health care experts and must therefore be

25   excluded from testifying at trial as to any and all correctional medical or mental health

26   care matters.  Dr. Beard is not a correctional medical care expert and must be excluded

27   from testifying at trial as to any and all issues related to correctional medical care.

28   Further, the proffered expert reports and testimony of Ms. Woodford, Mr. Scott, Mr.

Lehman, Dr. Austin, and Dr. Beard on the causes of and remedies for the alleged

inadequacies in the delivery of medical and mental health care must be excluded at trial

due to an absence of the foundational "intellectual rigor" necessary to qualify as an

expert opinion.  Lastly, Jeanne Woodford, Doyle Wayne Scott, Joseph Lehman, Dr.

Austin, and Dr. Beard must all be excluded from testifying at trial as to the primary cause

of the alleged unconstitutional delivery of medical or mental health care as such

testimony would constitute a waste of time and the needless presentation of cumulative

evidence.  Fed. R. Evid. 403.

DATED:  October 20, 2008                    HANSON BRIDGETT LLP


                                            By: /s/ Paul B. Mello
                                            PAUL MELLO
                                            Attorneys for Defendants Arnold
                                            Schwarzenegger, et al.

DATED:  October 20, 2008                    EDMUND G. BROWN JR.
                                            Attorney General for the State of California


                                            By: /s/ Kyle A. Lewis
                                            KYLE LEWIS
                                            Deputy Attorney General
                                            Attorneys for Defendants Arnold
                                            Schwarzenegger, et al.

DEFS.' MIL # 8 TO EXCLUDE OPINION EVIDENCE BY NON-HEALTH CARE WITNESSES
(CASE NOS. 90-00520; 01-1351)                                                    1647253.2