1   EDMUND G. BROWN JR.                          HANSON BRIDGETT LLP
    Attorney General of the State of California    JERROLD C. SCHAEFER - 39374
2   DAVID S. CHANEY                             PAUL B. MELLO – 179755
    Chief Assistant Attorney General            S. ANNE JOHNSON – 197415
3   ROCHELLE C. EAST                            SAMANTHA D. TAMA – 240280
    Senior Assistant Attorney General           RENJU P. JACOB - 242388
4   JONATHAN L. WOLFF                           425 Market Street, 26th Floor
    Senior Assistant Attorney General           San Francisco, CA  94105
5   LISA A. TILLMAN – State Bar No. 126424      Telephone: (415) 777-3200
    Deputy Attorney General                     Facsimile:  (415) 541-9366
6   KYLE A. LEWIS – State Bar No. 201041        jschaefer@hansonbridgett.com
    Deputy Attorney General                     pmello@hansonbridgett.com
7   455 Golden Gate Avenue, Suite 11000         ajohnson@hansonbridgett.com
    San Francisco, CA 94102-7004                stama@hansonbridgett.com
8   Telephone: (415) 703-5708                   rjacob@hansonbridgett.com
    Facsimile:  (415) 703-5843
9   lisa.tillman@doj.ca.gov
    kyle.lewis@doj.ca.gov
10
    Attorneys for Defendants
11

12                  UNITED STATES DISTRICT COURT

13             FOR THE EASTERN DISTRICT OF CALIFORNIA

14             AND THE NORTHERN DISTRICT OF CALIFORNIA

15       UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

16         PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

17

| | |
|---|---|
| 18  RALPH COLEMAN, et al., | No. 2:90-cv-00520 LKK JFM P |
| 19           Plaintiffs, | **THREE-JUDGE COURT** |
|          v. | |
| 20 | |
| 21  ARNOLD SCHWARZENEGGER, et al., | |
|           Defendants. | |
| 22  MARCIANO PLATA, et al., | No. C01-1351 TEH |
| 23           Plaintiffs, | **THREE-JUDGE COURT** |
| 24           v. | **DEFENDANTS' MOTION IN LIMINE NO. 1 TO EXCLUDE EVIDENCE RE: HOUSING AND OTHER ENVIRONMENTAL CONDITIONS, SAFETY CONCERNS, AND PROGRAMMATIC CONCERNS** |
| 25  ARNOLD SCHWARZENEGGER, et al., | |
| 26           Defendants. | |
| 27 | **To:  Three-Judge Panel** |
| 28 | |

- 1 -

1    TO PLAINTIFFS MARCIANO PLATA AND RALPH COLEMAN AND THEIR

2  ATTORNEYS OF RECORD:

3    PLEASE TAKE NOTICE that Defendants Arnold Schwarzenegger, et al., move

4  the Three-Judge Panel for an in limine order to exclude any and all of Plaintiffs'

5  evidence, including references to, testimony regarding, and argument relating to housing

6  and other environmental conditions, safety concerns, and programmatic concerns.  This

7  motion is based on this notice, the points and authorities below, the supporting

8  declaration and attached exhibits, the Court's file in this case, and any further argument

9  presented to the Three-Judge Panel.

10    **MEMORANDUM OF POINTS AND AUTHORITIES**

11    **I.    INTRODUCTION**

12    A prisoner release order is an extreme remedy that should not issue unless it will

13  cure the constitutional violation in question and the violation cannot be fixed in any other

14  way.  Here, the alleged constitutional violations at issue are the delivery of medical and

15  mental health care in California's prisons, not overcrowding, housing, or other

16  environmental conditions affecting the general population.  Defendants are not

17  deliberately indifferent to the medical and mental health needs of *Plata* and *Coleman*

18  class-members, and overcrowding is not the "primary cause" of those alleged

19  constitutional violations.  Therefore, a prisoner release order is not the proper remedy.

20    Many of Plaintiffs' experts focus not on the delivery of medical or mental health

21  care but on irrelevant and sensational descriptions of housing and other environmental

22  conditions and custody and programming concerns.  Any and all of Plaintiffs' evidence,

23  testimony, and/or argument about these topics should be excluded because their only

24  purpose is to be inflammatory and to distract from the real issues and their introduction

25  would waste valuable time.

26    Accordingly, under Federal Rules of Evidence 402 and 403, Defendants move to

27  exclude all such evidence, testimony, and/or argument from the trial of this proceeding

28  and to strike all such statements from the expert reports, including, but not limited to

1  those of Doyle Wayne Scott, Jeanne Woodford, and Joseph Lehman, or trial affidavits

2  submitted by Plaintiffs.

3                              **II.    ARGUMENT**

4  **A.    Evidence Regarding Uncomfortable, Inadequate, or Inappropriate Housing
        or Other Environmental Conditions, Safety Risks, or Rehabilitative**

5  **Programming Is Irrelevant and Should be Excluded.**

6          Only relevant evidence is admissible.  Fed. R. Evid. 402.  And "[a]lthough

7  relevant, evidence may be excluded if its probative value is substantially outweighed by

8  the danger of unfair prejudice, confusion of the issues . . . or by considerations of undue

9  delay, waste of time, or needless presentation of cumulative evidence."  Fed. R. Evid.

10  403.

11          The fundamental questions in this proceeding are whether overcrowding is the

12  primary cause of the allegedly inadequate delivery of medical care and mental health

13  care in California's prisons and whether any measures other than a prisoner release

14  order can solve those alleged inadequacies.  *See* 18 U.S.C. § 3626.  Whether

15  overcrowding has resulted in uncomfortable, inadequate, or inappropriate housing or

16  other environmental conditions, safety risks, or rehabilitative programming is not relevant

17  to whether a prisoner release order should issue to resolve the alleged violations with

18  respect to medical and mental health care, and all of Plaintiffs' evidence on those points

19  should be excluded.

20  **B.    Plaintiffs' Expert, Doyle Wayne Scott, Focuses on Irrelevant and Sensational
        Descriptions of Environmental Conditions and Custody and Programming**

21  **Concerns and Not the Delivery of Medical or Mental Health Care.**

22          Plaintiffs' expert, Doyle Wayne Scott, prepared two reports—the first dated

23  November 9, 2007 and the second dated August 2008.  Both reports contain much

24  irrelevant and inadmissible material.

25          Indeed, as detailed below, the first section of Mr. Scott's first (November 2007)

26  report focuses on the general environmental and custodial conditions in California's

27  prisons and not the delivery of medical or mental health care.  The title of Section "I"

28  itself is: "California's severely overcrowded prison population far outstrips the ability of

                                        - 3 -

the system to safely or appropriately house its prisoners." (Decl. Paul Mello Supp. Defs'
Mots. in Limine (Decl. Mello), Ex. G (11/9/07 Expert Report of Doyle Wayne Scott) at 2.)
Mr. Scott goes on to say: "The overcrowding crisis in California is, in my experience,
unprecedented in scope and *in the dangers and deprivations of day-to-day life in
prisons*." (*Id.* at 2 ¶ 3 (emphasis added).)

Section I has an entire subsection on "ugly beds." (*Id.* at 5-9, ¶¶ 9-16.) But the
mere existence of "ugly beds" has no relationship to the quality of the medical care
delivery system. Mr. Scott makes such irrelevant observations as: "'Ugly beds' are not
merely uncomfortable, they are actually dangerous: they make it harder for staff to
prevent violence and breed anger and frustration among prisoners by sharply curtailing
the space available for anything but the warehousing of bodies." (*Id.* at 6, ¶ 10.) He
continues, "These 'ugly beds' are truly appalling. I saw cages at the California Institution
for Men (CIM) where, as staff freely admitted, prisoners have sometimes had to spend
the night because there were not beds for them." (*Id.* ¶ 11.) Mr. Scott's sensationalistic
and inflammatory focus on the "appalling" ugly beds says nothing about whether
overcrowding is the primary cause of the unconstitutional delivery of medical care or
mental health care or whether measures other than a prisoner release order could
improve the delivery of medical care or mental health care.

Mr. Scott also has an entire subsection on "infrastructure" that focuses on general
systems, such as drinking water, toilets, and showers, and not on clinical facilities.
Quoting a Senate Subcommittee document, Mr. Scott observes: "'[C]ritical deficiencies in
. . . existing infrastructure' are found at most prisons; 20 prisons have critical drinking
water system deficiencies; 18 have critical deficiencies in waste water treatment, 20 in
electrical systems, and 14 in other areas." (*Id.* at 9, ¶ 17.) Mr. Scott opines regarding
CIM, based on his tour in October 2007: "In its current state, it is not fit for housing
human beings." (*Id.* ¶ 18.) About San Quentin, Mr. Scott states: "I saw bars rusted
almost completely through, filthy conditions that staff say cannot be made clean, and
what was described to me as permanent unidentified liquid dripping from upper tiers into

busy passageways." (*Id.* at 9-10, ¶ 18.)  This case is not about unconstitutional housing or other environmental conditions.  It is about the purportedly unconstitutional delivery of medical care and mental health care.  Mr. Scott's descriptions of housing conditions serve no purpose other than to inflame and distract from the actual issues in this case.

Mr. Scott continues with such irrelevant observations as: "One result of having too many people and too few sanitary facilities are that toilets, lavatories, and showers will be used much more than originally contemplated and wear out faster." (*Id.* at 11, ¶ 22.) "I saw a frightening range of fire hazards in the housing areas, where the very high population density exacerbates the risk of deadly fires." (*Id.* at 12, ¶ 24.)  Again, this purposefully disturbing comment bears no relationship to medical or mental health care.

About programming, Mr. Scott states: "I observed on my tours that prisoners have inadequate out-of-cell time (or time spent outside of overcrowded dorms, gyms, dayrooms, and hallways) to compensate for the density of the population, especially at CIM, where prisoners living under extremely overcrowded, triple-bunked conditions had only a few hours per week of recreation in an exercise yard and few opportunities to obtain scarce prison jobs." (*Id.* at 18, ¶ 33.)

About staffing and violence, Mr. Scott comments about CIM's Cleveland Hall in West Facility: "The housing unit was a serious disturbance waiting to happen.  If the prisoners wanted to take over the dorm they could do so in a second and no one would know." (*Id.* at 19, ¶ 34.)  Mr. Scott's purpose is clearly to scare the triers of fact, not to inform them of the state of medical and mental health care in California's prisons today or their causes.  Virtually the entirety of Section I of Mr. Scott's report is irrelevant and should be excluded.

Mr. Scott's second (August 2008) report suffers from similar deficiencies.  Mr. Scott opines that the "the use of dayrooms, gymnasiums, hallways, and other inappropriate places for housing prisoners-'has reduced the availability of programming and recreation space that is essential for positive inmate programming.  There is widespread agreement among correctional experts that chronic idleness produces

1  negative psychological and behavioral effects in prison.'" (Decl. Mello, Ex. H (8/15/08

2  Supp. Expert Report of Doyle Wayne Scott) at 2, ¶ 4.)  Mr. Scott then spends several

3  pages describing the housing conditions at the prisons he most recently visited and

4  again commenting on the supposed negative impact on rehabilitative programming.

5  (*See id.* at 2-6.)  Not once does Mr. Scott describe the medical or mental health facilities

6  or services available to the inmates at the prisons he visited.  By reading his

7  supplemental report, one would think that Mr. Scott is in an entirely different lawsuit than

8  that brought by the *Plata* and *Coleman* class representatives to address alleged

9  deficiencies in the delivery of medical and mental health care.

10  **C.    Plaintiffs' Expert, Jeanne Woodford, Focuses on Irrelevant General**
11  **        Conditions, Relegating the Delivery of Medical or Mental Health Care to an**
        **        Afterthought.**

12          Plaintiffs' expert, Jeanne Woodford, has also submitted two reports—the first

13  dated November 9, 2007 and the second dated August 2008.  Similar to Mr. Scott's

14  reports, Ms. Woodford's reports focus on the general effects of overcrowding on

15  prisoners, staff, and the prison's infrastructure and devotes very little space to the state

16  of medical or mental health care.  For example, in her first report (November 2007) Ms.

17  Woodford states: "The increase in the prison population created problems in virtually all

18  areas.  Overcrowding caused the prison to be more dangerous for both prisoners and

19  staff. The environmental conditions deteriorated to the point where they posed health

20  and safety risks to everyone living and working in some housing units.  Violence

21  increased among prisoners, putting prisoners and staff at a greater risk of harm."  (Decl.

22  Mello, Ex. C at 3, ¶ 8.)  Only in the next sentence does Ms. Woodford address medical

23  or mental health care.  She states: "Crowding also put a tremendous strain on the

24  prison's ability to deliver adequate services, particularly medical and mental healthcare

25  to prisoners."  (*Id.*)  This relegation of the delivery of medical and mental health care to

26  the last point of many, a mere afterthought, is representative of Ms. Woodford's entire

27  report.

28          The broad, blank nature of these statements is also representative.  On the

DEFS.' MIL NO. 1 TO EXCLUDE EVIDENCE RE: PROGRAMMING,
HOUSING, LIVING CONDITIONS (CASE NOS. 90-00520 AND 01-1351)

1646608.1

1   specific topic of "Management," Ms. Woodford has the following to say: "Overcrowding

2   exacerbates the weaknesses in the organization structure of the CDCR.  There are

3   simply too many issues that arise from such a large number of prisoners and staff.  One

4   result of this is that management spends virtually all of its time fighting fires instead of

5   engaging in thoughtful decision-making and planning.  This results in short-sighted

6   decisions that create even more crises.  Under these circumstances, it is virtually

7   impossible for the organization to develop, much less implement, a plan to provide

8   prisoners with adequate care." (*Id.* at 4, ¶ 11.)  These are irrelevant platitudes, not

9   expert opinion on the cause of the inadequacies in the delivery of medical and mental

10  health.  And Ms. Woodford inexplicably disregards completely the fact that the CDCR is

11  no longer even in charge of making or implementing a plan to provide prisoners with

12  adequate medical care; instead, the Receiver is.

13         Ms. Woodford's comments on "Old and Deteriorating Prisons" also have no place

14  in this lawsuit.  She states: "Many of the existing facilities are too old and decrepit to

15  provide humane housing.  Among those include parts of the Correctional Training

16  Facility, Deuel Vocational Institution, San Quentin, the California Mens Colony, Folsom,

17  the California Rehabilitation Center and the Correctional Conservation Center.  When I

18  visited prisons during my tenure as Director at times the noise levels were so bad that it

19  was enough to drive a sane person crazy.  In some units, like Palm Hall for example,

20  staff found it unbearable to remain inside the unit for more than a few minutes." (*Id.* at

21  10, ¶¶ 29-30.)  Ms. Woodford does not even attempt to connect this cursory and

22  outdated description of housing conditions to the delivery of medical or mental health

23  care—putting aside her "enough to drive a sane person crazy" comment.  In deposition,

24  Ms. Woodford admitted that the provision of housing is different from the provision of

25  medical and mental health care: "one is about where inmates live and one is about

26  where and how you provide healthcare." (Decl. Mello, Ex. A at 89:12-18.)  Ms.

27  Woodford's opinions and observations are also impermissibly redundant and cumulative

28  of Mr. Scott's.

DEFS.' MIL NO. 1 TO EXCLUDE EVIDENCE RE: PROGRAMMING,
HOUSING, LIVING CONDITIONS (CASE NOS. 90-00520 AND 01-1351)

1646608.1

1    Ms. Woodford's second report (August 2008) suffers from similar problems.  Ms.

2    Woodford spends several pages discussing the housing units at the three prisons she

3    visited in July and August 2008.  (*See* Decl. Mello, Ex. D (8/15/08 Sup. Expert Report of

4    Jeanne Woodford) at 3-5 & 9, ¶ 18.)  With respect to the Reception Centers, Ms.

5    Woodford noted that with respect to two of the facilities she visited, at least one prisoner

6    had stayed at the facility for two years, but she did not tie this extended stay in any way

7    to the delivery of medical or mental health care.  (*Id.* at 6, ¶ 12.)

8    All of Ms. Woodford's irrelevant commentary on housing, environmental, and

9    programming conditions should be excluded.

10   **D.    Plaintiff's Expert, Joseph Lehman's, Irrelevant Comments About Riots, Violence, and Programming Should be Excluded.**

11

12   Plaintiff's expert, Joseph Lehman, submitted one report dated August 2008.  Like

13   Plaintiff's other experts, Mr. Lehman improperly invokes the specter of "riots and

14   disturbances system-wide" and "greater risk of violence" as a result of overcrowding.

15   (Decl. Mello, Ex. O at 3, ¶ 8.)  Mr. Lehman also improperly imports the conclusions of the

16   Expert Panel on Adult Offender and Recidivism Reduction Programming (the Expert

17   Panel) regarding effects of overcrowding on rehabilitative programming into his report.

18   (*Id.* at 3, ¶ 9.)

19   Mr. Lehman, who toured prisons when he served on the Expert Panel, notes, "I

20   found during my tours that significant portions of program space were being used to

21   house prisoners.  Overcrowding thus reduces the opportunity for prisoners to program,

22   which causes the obvious idleness I observed in a large segment of the population.

23   That in turn leads to frustration, tension and increased violence among the prison

24   population."  (*Id.* at 4, ¶ 10.)  Like Mr. Scott, Mr. Lehman does not once mention the

25   condition or quality of the medical or mental health facilities or services available to the

26   inmates.  This is not surprising in light of the fact that he toured the prisons as a member

27   of the Expert Panel on rehabilitative programming and not to address the delivery of

28   medical or mental health care.

1    The irrelevant portions of Mr. Lehman's opinions regarding violence, security,

2    inmate idleness, programming, and the like should be excluded.

3                        **III.    CONCLUSION**

4    The reports of Plaintiffs' experts, Doyle Wayne Scott, Jeanne Woodford, and

5    Joseph Lehman provide examples of the type of irrelevant and inflammatory "evidence"

6    Plaintiffs intend to present at trial.  Not only should the irrelevant statements of Plaintiffs'

7    experts be excluded, so should all such evidence or argument from any other source.

8    This is not a case about unconstitutional housing or environmental conditions, safety

9    risks, or rehabilitative programming.  A complaint regarding those conditions has not

10   been filed, a class of prisoners purportedly afflicted by such conditions has not been

11   certified, and Plaintiffs cannot seek a prisoner release order on those grounds.  The

12   questions for this Court are whether overcrowding is the primary cause of the alleged

13   inadequate delivery of medical care and mental health care in California's prisons and

14   whether any measures other than a prisoner release order can solve those alleged

15   / / /

16   / / /

17

18

19

20

21

22

23

24

25

26

27

28

- 9 -

1    inadequacies.  Any and all evidence, testimony, and argument not addressed to those

2    questions should be excluded.

3    DATED:  October 20, 2008                    HANSON BRIDGETT LLP

4

5                                                          By: /s/ Paul B. Mello

6                                                          PAUL B. MELLO
                                                            Attorneys for Defendants
7                                                          Arnold Schwarzenegger, et al.

8    DATED:  October 20, 2008                    EDMUND G. BROWN JR.
                                                            Attorney General of the State of California
9

10                                                        By: /s/ Kyle A. Lewis

11                                                        KYLE LEWIS
                                                            Deputy Attorney General
12                                                        Attorneys for Defendants
                                                            Arnold Schwarzenegger, et al.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 10 -