1 | PRISON LAW OFFICE
DONALD SPECTER, Bar No. 83925
2 | STEVEN FAMA, Bar No. 99641
E. IVAN TRUJILLO, Bar No. 228790
3 | SARA NORMAN, Bar No. 189536
ALISON HARDY, Bar No. 135966
4 | REBEKAH EVENSON, Bar No. 207825
1917 Fifth Street
5 | Berkeley, CA  94710
Telephone:  (510) 280-2621

ROSEN, BIEN & GALVAN, LLP
MICHAEL W. BIEN, Bar No. 96891
JANE E. KAHN, Bar No. 112239
AMY WHELAN, Bar No. 215675
LISA ELLS, Bar No. 243657
MARIA V. MORRIS, Bar No. 223903
315 Montgomery Street, 10th Floor
San Francisco, California  94104
Telephone:  (415) 433-6830

6 | K&L GATES LLP
JEFFREY L. BORNSTEIN, Bar No. 99358
7 | EDWARD P. SANGSTER, Bar No. 121041
RAYMOND E. LOUGHREY, Bar No. 194363
8 | 55 Second Street, Suite 1700
San Francisco, CA  94105-3493
9 | Telephone:  (415) 882-8200

BINGHAM, McCUTCHEN, LLP
WARREN E. GEORGE, Bar No. 53588
Three Embarcadero Center
San Francisco, California  94111
Telephone:  (415) 393-2000

10 | THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
11 | CLAUDIA CENTER, Bar No. 158255
600 Harrison Street, Suite 120
12 | San Francisco, CA  94107
Telephone:  (415) 864-8848

13 | Attorneys for Plaintiffs

14 | IN THE UNITED STATES DISTRICT COURTS

15 | FOR THE EASTERN DISTRICT OF CALIFORNIA

16 | AND THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

17 | PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

18 | RALPH COLEMAN, et al.,

19 | Plaintiffs,

20 | vs.

21 | ARNOLD SCHWARZENEGGER, et al.,

22 | Defendants

No. Civ S 90-0520 LKK-JFM P

**THREE-JUDGE COURT**

MARCIANO PLATA ,et al.,

23 | Plaintiffs,

24 | vs.

25 | ARNOLD SCHWARZENEGGER, et al.,

26 | vs.

27 | Defendants

No. C01-1351 TEH

**THREE-JUDGE COURT**

*COLEMAN* AND *PLATA* PLAINTIFFS'
MOTIONS IN LIMINE 1-5

28 |

[246551-1]

1

# TABLE OF CONTENTS

2

Page

3     I.     MOTION IN LIMINE NUMBER 1:  PLAINTIFFS MOVE TO EXCLUDE

4            NON-PARTY WITNESSES FROM THE COURTROOM. ........................................... 1

5     II.     MOTION IN LIMINE NUMBER 2:  PLAINTIFFS MOVE TO EXCLUDE
THE SEPTEMBER 22, 2008 MARQUART EXPERT REPORT BECAUSE

6            IT WAS PRODUCED AFTER THE DEADLINES SET FORTH IN THIS
COURT'S ORDERS AND, IF ADMITTED, WILL PREJUDICE

7            PLAINTIFFS........................................................................................................... 1

8                A.     This Court Should Exclude the September 22, 2008 Marquart Report

9                     as an Impermissible "Supplemental" Report ........................................... 2

10                B.     The Court Should Exclude Dr. Marquart's September 22, 2008 Report

11                     Pursuant to Fed. R. Civ. P. 37(c)(1). ...................................................... 3

12     III.     MOTION IN LIMINE NUMBER 3:  PLAINTIFFS MOVE TO EXCLUDE
THE OCTOBER 1, 2008 PACKER REPORT BECAUSE IT IS AN

13            IMPERMISSIBLE REBUTTAL REPORT THAT, IF ADMITTED, WILL
PREJUDICE PLAINTIFFS AND BECAUSE, IN ANY EVENT, IT IS

14            NEITHER HELPFUL TO THE TRIER OF FACT NOR RELEVANT TO

15            THIS LITIGATION. ................................................................................................... 5

16                A.     This Court Should Exclude the October 1, 2008 Packer Report as

17                     Either an Untimely Rebuttal Report or an Impermissible Supplemental
Report ....................................................................................................... 5

18                B.     In the Alternative, this Court Should Exclude Dr. Packer's October 1,

19                     2008 Report Because its Premise, that Community Mental Health

20                     Systems are "Not Fully Functional," Is Too Hedged and Equivocal to
be Useful to the Trier of Fact. ................................................................. 8

21

22                     1.     Plaintiffs Are Prejudiced by the Presentation of An Expert
Witness Who has Only Provided A Late Placeholder Opinion. ................ 9

23     IV.     MOTION IN LIMINE NUMBER 4:  PLAINTIFFS MOVE TO EXCLUDE
CERTAIN EXPERT OPINION TESTIMONY PROFFERED IN CHIEF

24            JERRY DYER'S REPORT AND MOVE TO PROHIBIT HIM FROM

25            TESTIFYING ABOUT SUCH MATTERS AT TRIAL. ............................................ 10

26            FACTUAL BACKGROUND .................................................................................. 10

27

28

[246551-1]

A.    The Court Must Exclude Certain Expert Opinion Testimony Proffered in Chief Dyer's Report, and Prohibit him from Testifying about Such Matters at Trial, Because the Witness is Not Qualified as an Expert for the Matters on which he Offers Opinions and /or his Methodology is Unreliable. ...................................................................................... 11

B.    The Court Must Exclude The Proffered Opinion Testimony Of Chief Dyer On The Impact Of A Prisoner Release Order on Fresno County Economic Matters, And Prohibit Such Testimony From Him At Trial.............. 12

C.    The Court Must Exclude The Proffered Testimony Of Chief Dyer On The Impact Of A Prisoner Release Order On Fresno County Superior Court Operations, And Prohibit Such Testimony From Him At Trial. .............. 14

D.    The Court Must Exclude The Proffered Opinion Testimony Of Chief Dyer On The Impact Of A Prisoner Release Order On Fresno County Jail Operations, And Prohibit Such Testimony From Him At Trial. .................. 15

E.    The Court Must Exclude The Proffered Opinion Testimony Of Chief Dyer On The Impact Of A Prisoner Release Order On Fresno County District Attorney Operations, And Prohibit Such Testimony From Him At Trial. ........................................................................................ 16

F.    The Court Must Exclude The Proffered Opinion Testimony Of Chief Dyer On The Impact Of A Prisoner Release Order on Other Central Valley Cities, And Prohibit Such Testimony From Him At Trial. ..................... 17

V.    MOTION IN LIMINE NUMBER 5:  PLAINTIFFS MOVE TO EXCLUDE CERTAIN EXPERT OPINION TESTIMONY PROFFERED IN THE AUGUST 15, 2008 REPORT OF GALE BATAILLE, MSW, AND THE AUGUST 27, 2008 REBUTTAL REPORT OF GALE BATAILLE, AND MOVE TO PROHIBIT HER FROM TESTIFYING ABOUT SUCH MATTERS AT TRIAL. ....................................................................... 18

A.    Ms. Bataille is Not Qualified to Provide Expert Testimony on Adverse Impacts of a Prisoner Release Order on Public Safety or the Operation of a Criminal Justice System.................................................... 19

B.    Ms. Bataille's Report Consists Largely of Unsupported Speculation About the Impact of a Prisoner Release Order That Will Not Assist the Trier of Fact.............................................................................. 20

C.    Ms. Bataille's Assertions Regarding Obstacles Created by Intergovernmental Squabbling Do Not Assist The Trier of Fact in Determining Any Matter Relevant to this Action and Should be Excluded...................................................................................... 22

-ii-

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

D.    The Court Should Issue an Order In Limine Excluding Any Expert Opinions from Ms. Bataille Regarding Any Adverse Impact On The Operation Of A Criminal Justice System Caused By The Relief. ...................... 24

CONCLUSION. ......................................................................................................... 25

1

# <u>TABLE OF AUTHORITIES</u>

2

**Page**

3

<u>Cases</u>

4

5

*Bourjaily v. United States*,
   483 U.S. 171 (1987) ........................................................................... 12

6

7

*Brown v. Coleman Co., Inc.*,
   No. 06-403, 2007 WL 4707072 (D.N.M. 2007) .................................... 3

8

*Clausen v. M/V New Carissa*,
   339 F.3d 1049 (9th Cir. 2003) ........................................................... 12

9

10

*Daubert v. Merrell Dow Pharm., Inc.*,
   509 U.S. 579 (1993) ..................................................................... 8, 22

11

12

*Daubert v. Merrell Dow Pharm., Inc.*,
   43 F.3d 1311 (9th Cir.1995) ............................................................. 20

13

14

*Diviero v. Uniroyal Goodrich Tire Co.*,
   919 F.Supp. 1353 (D.Ariz. 1996) ................................................ 12, 19

15

*Domingo ex rel. Domingo v. T.K.*,
   289 F.3d 600 (9th Cir. 2002) ............................................................ 20

16

17

*Fineberg v. United States*,
   393 F.2d 417 (9th Cir. 1968) ............................................................ 12

18

19

*General Elec. Co. et al., v. Joiner*,
   522 U.S. 136 (1997) ......................................................................... 20

20

21

*Kumho Tire Co., Ltd. v. Carmichael*,
   526 U.S. 137 (1998) ......................................................................... 12

22

*Lust By and Through Lust v. Merrell Dow Pharmaceuticals, Inc.*,
   89 F.3d 594 (9th Cir. 1996) .............................................................. 20

23

24

*Metro Ford Truck Sales, Inc. v. Ford Motor Co.*,
   145 F.3d 320 (5th Cir. 1998) ........................................................... 1, 3

25

26

*Paugh v. Ottman, et al.*,
   No. 07-39, 2008 WL 2704561 (D. Idaho 2008) ........................... 1, 3, 8

27

*Pipitone v. Biomatrix, Inc.*,
   288 F.3d 239 (5th Cir. 2002) .............................................................. 8

28

*Prohaska v. Sofamor, S.N.C.*,
   138 F. Supp. 2d 422 (W.D.N.Y. 2001) ................................................................ 12

*Quevedo v. Trans-Pac. Shipping, Inc.*,
   143 F.3d 1255 (9th Cir. 1998) ................................................................ 4, 7

*Ralston v. Smith & Nephew Richards, Inc.*,
   275 F.3d 965 (10th Cir. 2001) ................................................................ 12, 19

*Schweizer v. DEKALB Swine Breeders, Inc.*,
   954 F. Supp. 1495 (D. Kan. 1997) ................................................................ 3

*Silong v. United States of America*,
   No. 06-0474, 2007 WL 2712100 (E.D. Cal. Sept. 14, 2007) ................................ 7

*United States v. Chang*,
   207 F.3d 1169 (9th Cir. 2000) ................................................................ 11, 12, 25

*United States v. Hankey*,
   203 F.3d 1160 (9th Cir. 2000) ................................................................ 11

*Yeti by Molly LTD, et al. v. Deckers Outdoor Corp., et al.*,
   259 F.3d 1101 (9th Cir. 2001) ................................................................ 3, 4

**Statutes**

18 U.S.C § 3626(a)(1)(A) ................................................................ 18, 22

**Rules**

Fed. R. Civ. P. 1 ................................................................ 10

Fed. R. Civ. P. 26 ................................................................ 1, 3, 5, 7

Fed. R. Civ. P. 26(a) ................................................................ 3

Fed. R. Civ. P. 26 (a)(2)(B)(i) ................................................................ 6, 9

Fed. R. Civ. P. 26(e) ................................................................ 3

Fed. R. Civ. P. 37(c)(1) ................................................................ passim

Fed. R. Evid. 104(a) ................................................................ 12

Fed. R. Evid. 401 ................................................................ 22

Fed. R. Evid. 615 ................................................................ 1

1

Fed. R. Evid. 701 ................................................................................ 13, 15, 16

2

Fed. R. Evid. 702 ..................................................................................... passim

3

Fed. R. Evid. 802 ...................................................................................... 15, 17

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Pursuant to this Court's July 2, 2008 "Order for Pretrial Preparation," the *Coleman* and *Plata* plaintiffs jointly submit the following five motions in limine. *See* Plata Docket 1294 at 3. The *Coleman* and *Plata* plaintiffs concurrently file additional motions in limine under separate caption pages.

## I. MOTION IN LIMINE NUMBER 1: PLAINTIFFS MOVE TO EXCLUDE NON-PARTY WITNESSES FROM THE COURTROOM.

Plaintiffs request, pursuant to Fed. R. Evid. 615, to exclude all non-party witnesses from the courtroom during trial except when they provide testimony. *See* Fed. R. Evid. 615 ("At the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses…"). Plaintiffs also request an order barring defense and intervenor counsel from providing transcripts to witnesses who have not yet testified, and instructing witnesses not to discuss their testimony with other witnesses before the end of trial.

## II. MOTION IN LIMINE NUMBER 2: PLAINTIFFS MOVE TO EXCLUDE THE SEPTEMBER 22, 2008 MARQUART EXPERT REPORT BECAUSE IT WAS PRODUCED AFTER THE DEADLINES SET FORTH IN THIS COURT'S ORDERS AND, IF ADMITTED, WILL PREJUDICE PLAINTIFFS.

Pursuant to this Court's July 2, 2008 scheduling order, expert reports were due on August 15, 2008 and rebuttal expert reports were due on August 27, 2008. *Plata* Docket 1294 at p. 3. Despite this clear order, defendants produced a so-called "supplemental" report for James Marquart on September 22, 2008. Supplemental reports are proper as a means of "correcting inaccuracies, or filling in the interstices of an incomplete report based on information that was not available at the time of the initial disclosure." *Paugh v. Ottman, et al.*, No. 07-39, 2008 WL 2704561, at *2 (D. Idaho 2008); *Metro Ford Truck Sales, Inc. v. Ford Motor Co.*, 145 F.3d 320, 324 (5th Cir. 1998) (supplemental disclosures "are not intended to provide an extension of the expert designation and report production deadline"). Dr. Marquart's report was not a supplement in any sense of the word; it was a further rebuttal report, based on old information, that violates this Court's clear deadline. Pursuant to Fed. R. Civ. P. 37(c)(1), plaintiffs move to exclude the report based on defendants' failure to comply with Fed. R. Civ. P. 26 and this Court's scheduling order.

**A.    This Court Should Exclude the September 22, 2008 Marquart Report as an Impermissible "Supplemental" Report**

Dr. Marquart submitted an initial report on August 15, 2008 and a rebuttal report on August 27, 2008—both of which complied with this Court's scheduling order.  On September 22, 2008, however, and nearly a month after the deadline for rebuttal reports, Dr. Marquart issued another expert report to "supplement my initial report submitted on August 15, 2008." Declaration of Michael W. Bien in Support of the *Coleman* and *Plata* Plaintiffs' Motions in Limine (hereinafter "Bien Decl."), Ex. A at 1.  The contents of the September 22, 2008 report, however, make clear that it was not a "supplement" at all, but rather a second rebuttal report to expert reports submitted on August 15, 2008.  Indeed, every single topic that Dr. Marquart addresses in his September 22, 2008 report was clearly set forth in plaintiffs' experts' August 15, 2008 reports as follows:

| DR. MARQUART'S TOPIC | SOURCE OF TOPIC |
|---|---|
| "[T]here is no relationship between crime and imprisonment rates."  Bien Decl., Ex. A at ¶ 3(a). | This is an exact quotation from Jim Austin's August 15, 2008 report.  *See* Bien Decl., Ex. C at ¶ 19.  Moreover, Dr. Marquart addressed this very same topic in his August 27, 2008 rebuttal report.  Bien Decl., Ex. B at ¶ 3(c). |
| "Plaintiff's experts claim that releasing offenders (1) will not adversely impact public safety and (2) releasing inmates will not have any (or 'minimal' one at best) impact on the administration of justice in the counties." Bien Decl., Ex. A at ¶ 4. | These opinions were set forth in plaintiffs' experts' August 15, 2008 reports.  Dr. Marquart also addressed this same topic in his August 27, 2008 rebuttal report.  Bien Decl., Ex. B at ¶ 3(d). |
| "Plaintiffs' experts advocate tinkering with the pool of technical violators by reducing parole terms (to artificially reduce recidivism and hence CDCR return) and diverting violators from CDCR institutions, including those involved in further criminal behavior, so as to affect the prison population."  Bien Decl., Ex. A at ¶ 9(f). | Plaintiffs dispute Dr. Marquart's added comments regarding these issues, but note that the proposals to reduce parole terms and divert violators from CDCR institutions were included in plaintiffs' discovery responses served in April of 2008 and in plaintiffs' expert reports served on August 15, 2008.  Bien Decl., Ex. D at 9-10.  Dr. Austin also addressed these issues extensively in his August 15, 2008 report.  *See* Bien Decl., Ex. C at ¶¶ 43, 47-61, 77-80. |

Moreover, Dr. Marquart did not obtain any new evidence between August 27, 2008 and September 22, 2008 that would justify his September 22nd report as "supplemental" pursuant to

[246551-1]

1    Fed. R. Civ. P. 26(e).  Of the reviewed documents he lists in Paragraph 2 of his late report,

2    every single one, with the exception of one newspaper article and the other expert reports in

3    this case, predates by several months his August 15, 2008 report.  Bien Decl. at ¶ 2, Ex. A at ¶

4    2.  Supplemental reports are not permitted under these circumstances.  *See Schweizer v.*

5    *DEKALB Swine Breeders, Inc.*, 954 F. Supp. 1495, 1510 (D. Kan. 1997) (excluding expert

6    testimony when "there is no reason the opinions expressed in the affidavit could not have been

7    stated earlier, at a time in compliance with the revised scheduling order and Fed. R. Civ. P.

8    26"); *Brown v. Coleman Co., Inc.*, No. 06-403, 2007 WL 4707072, at *2  (D.N.M. 2007)

9    (excluding a report when "[t]here is no reason the opinions stated in the supplemental report

10   could not have been stated in the original report in compliance with Court established

11   deadlines and Rule 26.").

12
13   **B.    The Court Should Exclude Dr. Marquart's September 22, 2008 Report Pursuant to Fed. R. Civ. P. 37(c)(1).**

14   Fed. R. Civ. P. 26(e) requires supplemental disclosures if "a party learns that in some

15   material respect the disclosure or response is incomplete or incorrect…"  With respect to

16   expert reports in particular, Courts have clarified that supplemental reports are proper as a

17   means of "correcting inaccuracies, or filling in the interstices of an incomplete report based on

18   information that was not available at the time of the initial disclosure."  *Paugh v. Ottman, et*

19   *al.*, No. 07-39, 2008 WL 2704561, at *2 (D. Idaho 2008); *Metro Ford Truck Sales, Inc. v. Ford*

20   *Motor Co.*, 145 F.3d 320, 324 (5th Cir. 1998) (supplemental disclosures "are not intended to

21   provide an extension of the expert designation and report production deadline").  Pursuant to

22   Fed. R. Civ. P. 37(c)(1), "[i]f a party fails to provide information or identify a witness as

23   required by Rule 26(a) or (e), the party is not allowed to use that information or witness to

24   supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially

25   justified or is harmless."  This particular subsection of Rule 37, which was implemented in

26   1993, "is a recognized broadening of the sanctioning power [citation omitted]" in the prior

27   rule.  *Yeti by Molly LTD, et al. v. Deckers Outdoor Corp., et al.*, 259 F.3d 1101, 1106 (9th Cir.

28   2001).  Bad faith or willfulness is not required for expert testimony to be excluded pursuant to

-3-

1   Rule 37(c)(1). *Id.* Moreover, the Rule 37(c)(1) sanction is "self-executing" and "automatic,"

2   and the burden to prove substantial justification or harmlessness is on the party facing

3   sanctions. *Id.* at 1106-07.

4          This Court made clear in its July 2, 2008 Order that "[r]ebuttal expert disclosures *shall*

5   *be made, and rebuttal expert reports exchanged,* on or before August 27, 2008." *Plata* Docket

6   1294 at 3 (emphasis added). The only way to ensure fairness and consistency in a complicated,

7   multi-party case such as this one is to bind all of the parties to the exact same deadlines and

8   standards. Moreover, the deadlines with respect to expert reports are particularly significant in

9   this case where, "[d]irect testimony from expert witnesses will be presented through their

10  expert reports and no more than thirty minutes of live testimony, followed by cross-

11  examination." *Plata* Docket 1294 at 3-4. Defendants will have an unfair advantage at trial if

12  they can rely on Dr. Marquart's late September 22, 2008 report as part of his direct testimony,

13  while at the same time forcing plaintiffs' counsel to utilize some portion of their own experts'

14  direct testimony to address those issues. Plaintiffs abided by the deadlines set forth by this

15  Court and defendants should be made to do the same.

16         Here, defendants and Dr. Marquart attempt to circumvent this Court's clear deadlines by

17  labeling a report "supplemental" when it neither addresses new topics nor relies on information

18  unavailable at the time of his initial disclosure. Defendants' misnomer of the report as a

19  "supplement" does not change what is really is—an untimely and impermissible rebuttal report

20  that Dr. Marquart was required to serve by August 27, 2008 and that, in any event, relies on

21  information long available to Dr. Marquart. Under these circumstances, and to ensure fairness

22  among the parties, the report should be excluded from the record. *See, e.g., Quevedo v. Trans-*

23  *Pac. Shipping, Inc.,* 143 F.3d 1255, 1258 (9th Cir. 1998) (refusing to consider expert's report

24  because it was filed one-and-a-half months late and party could have asked for an extension of

25  time); *Yeti by Molly LTD*, 259 F.3d at 1106.

26

27

28

III.     **MOTION IN LIMINE NUMBER 3:  PLAINTIFFS MOVE TO EXCLUDE THE OCTOBER 1, 2008 PACKER REPORT BECAUSE IT IS AN IMPERMISSIBLE REBUTTAL REPORT THAT, IF ADMITTED, WILL PREJUDICE PLAINTIFFS AND BECAUSE, IN ANY EVENT, IT IS NEITHER HELPFUL TO THE TRIER OF FACT NOR RELEVANT TO THIS LITIGATION.**

Defendants produced a report by Dr. Ira Packer, called an "addendum," on October 1, 2008.  That report was neither an "addendum," nor a supplemental report, but rather an untimely rebuttal report that attempted to address new topics not previously disclosed, in violation of Fed. R. Civ. Proc. 26.  Plaintiffs therefore move for an order from this Court excluding Dr. Packer's October 1, 2008 report and precluding Dr. Packer from testifying about the topics discussed in that report at trial.  Plaintiffs also move to exclude Dr. Packer's October 1, 2008 report because it will not assist the trier of fact and is therefore not admissible under Rule 702 of the Federal Rules of Evidence.

A.     **This Court Should Exclude the October 1, 2008 Packer Report as Either an Untimely Rebuttal Report or an Impermissible Supplemental Report**

At 6:41 p.m. on October 1, 2008, defendants sent an email to all parties attaching a "courtesy copy of the Addendum to Dr. Packer's report."  Bien Decl. at ¶ 6 and Ex. E.  Dr. Packer had previously issued reports in this case on November 9, 2007, December 10, 2007 and August 15, 2008, but did not issue a rebuttal report by the August 27, 2008 deadline to do so.  Bien Decl. at ¶ 7.  The October 1st report was signed and sent to the parties more than a month after the deadline for rebuttal reports, only 40 hours before Dr. Packer's deposition and only six weeks before the first day of trial.  Bien Decl. at ¶ 6.  In the October 1, 2008 report itself, Dr. Packer wrote:

> This brief addendum is intended to address specifically the issue of potential impact of [sic] expedited release of Coleman class members. I have reviewed the following reports submitted in this case:
> 1. Report of James Gilligan, M.D., dated August 15, 2008
> 2. Report of Gail Bataille, MSW, dated August 15, 2008
> 3. Rebuttal Report of James Gilligan, M.D., dated August 27, 2008
> 4. Rebuttal Report of Gail Bataille, MSW dated August 27, 2008

[246551-1]

Bien Decl., Ex. F at 1.[1]  When plaintiffs' counsel asked Dr. Packer about the October 1, 2008 report during his deposition, he testified that defense counsel had not contacted him about writing that report until September 29, 2008, which was more than a month after the deadline for rebuttal reports.  Bien Decl., Ex. H at 20:15-24.[2]  Dr. Packer also testified at his deposition that he did not recall talking with anyone from the Attorney General's office between August 15, 2008, the date reports were due, and August 27, 2008, the date rebuttal reports were due.

> Q.  …There's a Court order, which was sent to you—actually, E-mail—which designated August 15th as a date for expert reports, and August 27th as a date for rebuttal reports.  Between August 15th and August 27th, did you have any discussions with the Attorney General's Office about preparation of a rebuttal report?
> A.  No, I did not.
> …
> Q.  And is it your testimony that no one had a discussion with you between August 15th and August 27th about whether or not you could rebut any of the opinions provided in Plaintiffs' expert reports of August 15, 2008?
> A.  Are you talking about these four reports that we're talking about?  You said "rebuttal"—of these specific reports?
> Q.  Any Plaintiffs' expert reports.
> A.  To the best of my knowledge, I don't believe I had any communication with anyone from either the Attorney General's Office or CDCR between August 15th and August 27th, to the best of my recollection.

Bien Decl., Ex. H at pp. 24:1-8; 25:3-16.  Though Dr. Packer characterized his report as an "addendum," the report addressed completely new topics not covered by his prior reports, in violation of Rule 26.  *See* Fed. R. Civ. P. 26 (a)(2)(B)(i) (mandating that an expert's disclosure set forth "a complete statement of all opinions the witness will express and the basis and

---

[1] To the extent Dr. Packer addresses the August 15, 2008 reports, it is an untimely rebuttal report that was due on August 27, 2008.  To the extent that it addresses the Bataille and Gilligan 8/27/08 reports, it is a second rebuttal report not permitted by the Court's July 2, 2008 Order.

[2] Plaintiffs' counsel was able to devote only a brief period of time to the substance of the late report at Dr. Packer's deposition.  This was particularly true because the report was produced only 40 hours before Dr. Packer's deposition was set to begin and because it raised new topics that Dr. Packer had never previously addressed.  Bien Decl. at ¶ 10.

1    reasons for them."). Whereas Dr. Packer's prior reports addressed whether overcrowding is

2    the primary cause of the deficiencies in mental health care in the prison system and whether

3    defendants' plans would fix the problems, the October 1, 2008 report discussed the "risk of

4    violence of mentally ill offenders," and the public safety consequences of a prisoner release

5    order. Bien Decl. at ¶ 10 and Ex. F. Dr. Packer's October Report, for the very first time,

6    discussed mental health services available to parolees in the local communities, concluding

7    that *Coleman* class members will decompensate in the communities and have high recidivism

8    rates. Bien Decl., Ex. F at 2-3. The October 1 Report also addresses and attempts to rebut

9    reports by plaintiffs' expert, James Gilligan. This is an impermissible second rebuttal report by

10   defendants to Dr. Gilligan—his report was rebutted by defendants' expert, Gale Bataille, on

11   August 27. To the extent that Dr. Packer opines about mental health services in the

12   communities, public safety and recidivism rates, these are new topics not previously disclosed

13   and therefore barred by Rule 26.

14         As discussed above, the only way to ensure fairness and consistency in a complicated,

15   multi-party case such as this one is to bind all of the parties to the exact same deadlines and

16   standards. Moreover, the deadlines with respect to expert reports are particularly significant in

17   this case where, "[d]irect testimony from expert witnesses will be presented through their

18   expert reports and no more than thirty minutes of live testimony, followed by cross-

19   examination." *Plata* Docket 1294 at 3-4. Defendants will have an unfair advantage at trial if

20   they can rely on Dr. Packer's late report as part of his direct testimony, while at the same time

21   forcing plaintiffs' counsel to use some portion of their own experts' direct testimony to address

22   those issues. Plaintiffs will also be prejudiced because Dr. Packer raised new topics that were

23   not previously identified as his areas of expertise. Under these circumstances, and to ensure

24   fairness among the parties, the reports should be excluded from the record pursuant to Fed. R.

25   Civ. P. 37(c)(1). *See, e.g., Quevedo v. Trans-Pac. Shipping, Inc.,* 143 F.3d 1255, 1258 (9th

26   Cir. 1998) (refusing to consider expert's report because it was filed one-and-a-half months late

27   and party could have asked for an extension of time); *Silong v. United States of America*, No.

28   06-0474, 2007 WL 2712100, at *5 (E.D. Cal. Sept. 14, 2007) (a party cannot "cure the

-7-

[246551-1]

1  violations of Rule 26 and this Court's order by belatedly producing an expert declaration,

2  which includes new opinions, facts, methodologies and analysis not contained in the initial

3  expert report."); *Paugh v. Ottman, et al.*, No. 07-39, 2008 WL 2704561, at *3 (D. Idaho 2008)

4  (rejecting a report as a supplement when it included "a new opinion not previously disclosed

5  prior to the Court's expert witness disclosure deadline").

**B.    This Court Should Exclude Dr. Packer's October 1, 2008 Report Because its Premise, that Community Mental Health Systems are "Not Fully Functional," Is Too Hedged and Equivocal to be Useful to the Trier of Fact.**

If the Court is unwilling to exclude Dr. Packer's report as set forth above, it should

exclude it because it will not assist the trier of fact and is thus irrelevant to this action. *See*

Fed. R. Evid. 401. Dr. Packer's 3-page October 1, 2008 opinion consists of four basic

statements: (1) He agrees with the conclusion of Plaintiffs' experts that the reliable research

"does not suggest that mentally ill offenders pose a higher risk of violence than their non-

mentally ill counterparts." (2) If, however, "mentally ill inmates are discharged without

adequate services in place for them in the community, then *in those situations* their risk would

be increased (both to themselves or others)." (3) Community services "are not fully

functioning with the current number of mentally ill offenders being discharged from CDCR."

(4) Therefore, "an expedited release of Coleman class prisoners, without significant increases

in resources for community treatment (including both inpatient and outpatient), monitoring,

and coordination, would likely result in increased risk of harm both to inmates themselves and

to others in the community." Bien Decl., Ex. F at 1-3.

The truism that services are "not fully functioning," is the linchpin of Dr. Packer's

opinion that increased releases of prisoners with mental illness are likely to have an adverse

impact on public safety. This truism, however, is so equivocal and hedged as to be useless to

the trier of fact in this case, given that no complex system is ever "fully functioning." *See*

*Pipitone v. Biomatrix, Inc.,* 288 F.3d 239, 245 (5th Cir. 2002) ("A perfectly equivocal opinion

does not make any fact more or less probable and is irrelevant under the Federal Rules of

Evidence."); *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 590-91 (1993) (the

[246551-1]

Rule 702 condition that expert testimony "assist the trier of fact to understand the evidence or to determine a fact" is primarily a question of relevance). In enacting the prisoner release order provisions of the Prison Litigation Reform Act, Congress cannot have intended to condition the issuance of a prisoner release order on any finding that resources in the community for released prisoners are "fully functioning." Because such systems are never fully functioning, such a condition would mean that prisoner release orders are flatly prohibited; yet the PLRA does not prohibit them.

That Dr. Packer could not say anything specific or useful about the level of functioning of community mental health services for parolees is not surprising, given the rushed manner in which this late report was prepared. Dr. Packer testified that he was only given two days to prepare his October 1, 2008 report, having been first contacted about it on September 29, 2008. Bien Decl., Ex. H at 20:16-24. The October 1, 2008 Report relies in part on the report of Plaintiffs' expert, Dr. James Gilligan. Dr. Packer, however, did not read Dr. Gilligan's report until after he was contacted on two days notice to write his October 1, 2008 Report. *Id.* at 21:12-22:1. Dr. Packer did not, and could not perform any independent evaluation of the actual state of community mental health in California in the short time he was allowed. *Id.* at 85:14-86:14; 307:7-309:4.

Dr. Packer testified at his deposition that he did not prepare an opinion regarding any particular magnitude or pace of a prisoner release. *Id.* at 310:3-311:14. Instead, in the very short time he had, he simply opined on the "increased risk" to an "individual" being released. *Id.* Dr. Packer testified that he had no comment regarding "how many would need to be released" for the increased risk to happen. *Id.* at 311:11-14. In the very short time he had to prepare the October 1, 2008 Report, Dr. Packer was only able to state a generic opinion about individual risk, and was not able to provide this Court with any assistance in assessing the magnitude or pace of any particular prisoner release order.

> **1.     Plaintiffs Are Prejudiced by the Presentation of An Expert Witness Who has Only Provided A Late Placeholder Opinion.**

Fed. R. Civ. P. 26(a)(2)(B)(i) requires timely disclosure of a "complete statement of all

opinions the witness will express and the basis and reasons for them."  When, as here, an expert belatedly submits a skeletal report, with a placeholder opinion, the prejudice to the opposing party is that the expert will then be able to expound on the topic at trial with details and explanation that were never explored in discovery.  Dr. Packer's placeholder statement that community mental health systems are "not fully functioning," is a classic example of a makeweight opinion designed to be expanded at a later date.  If this placeholder opinion had been presented on the initial expert report deadline of August 15, 2008, the prejudice would be far less, as Plaintiffs could have more adequately explored the subject in his deposition. Instead, Dr. Packer submitted this skeletal report on entirely new subject matters less than forty hours before his deposition and just six weeks before trial.  Bien Decl. at ¶ 10.  If the Court does not prohibit Dr. Packer from testifying on the subject of community mental health, plaintiffs will be hearing his full-blown opinions for the first time at trial.

At this late date, allowing a further deposition of Dr. Packer is not a remedy consistent with the "just, speedy and inexpensive" determination of this action.  Fed. R. Civ. P. 1. Defendants have already proffered an expert on community mental health, Gale Bataille, who presented a more detailed and timely report, to which Dr. Packer's late report is simply a "me too" placeholder.  There is no reason to put the parties to the work of an additional deposition, merely to allow Defendants to attempt to add weight to Ms. Bataille's opinion by piling on the cumulative similar opinions of Dr. Packer on this subject.

## IV.    MOTION IN LIMINE NUMBER 4:  PLAINTIFFS MOVE TO EXCLUDE CERTAIN EXPERT OPINION TESTIMONY PROFFERED IN CHIEF JERRY DYER'S REPORT AND MOVE TO PROHIBIT HIM FROM TESTIFYING ABOUT SUCH MATTERS AT TRIAL.

### *FACTUAL BACKGROUND*

Jerry Dyer is Chief of Police for the City of Fresno and served an expert report in this action.  Expert Witness Report of Jerry Dyer City of Fresno Chief of Police, September 15, 2008 (hereafter Dyer Report), copy attached as Exhibit I to the Bien Declaration filed herewith. Chief Dyer has held his present position for seven years.  Bien Decl., Ex. I at ¶ 1.  He has a Bachelor of Science degree in criminology, a Master's degree in management, and additional

education in law enforcement leadership. *Id.* at ¶ 5. His work experience has exclusively involved work as a police officer, supervisor, or manager in the Fresno Police Department. *Id.* at ¶¶ 1-12.

By his own admission, Chief Dyer is neither an economist nor an expert in economics or statistics. Bien Decl., Ex. J at 10:1-8 and 101:15-16. Nor is he a psychologist. *Id.* at 101:13-14.

As explained below, Chief Dyer's report offers certain opinion testimony that is far removed from his knowledge, skill, experience, training, or education. This testimony includes the impact of a prisoner release order on: (a) visits to shopping and entertainment venues, business activities and initiatives, sales tax revenues, and unemployment rates in Fresno County; (b) the operations and practices of the Fresno County Superior Court; (c) operations and practices of the Fresno County Jail; (d) the operations and practices of the Fresno County District Attorney's office; and (e) all these matters in other Central Valley cities. Bien Decl., Ex. I at 4-5 and 7-8.[3]

### A.    The Court Must Exclude Certain Expert Opinion Testimony Proffered in Chief Dyer's Report, and Prohibit him from Testifying about Such Matters at Trial, Because the Witness is Not Qualified as an Expert for the Matters on which he Offers Opinions and/or his Methodology is Unreliable.

To render an admissible opinion, an expert must possess knowledge, skill, experience, training, or education relevant to the subject of his testimony. *See* Fed. R. Evid. 702; *United States v. Hankey*, 203 F.3d 1160, 1168 (9th Cir. 2000); *United States v. Chang*, 207 F.3d 1169, 1172 (9th Cir. 2000). The admissibility of expert testimony is "a subject peculiarly within the sound discretion of the trial judge, who alone must decide the qualifications of the expert on a

---

[3]  Chief's Dyer's Report was not paginated and some of the paragraphs, except for the first thirteen, are not numbered. For ease of reference, plaintiffs have inserted page numbers on Chief Dyer's report. Plaintiffs also provide the location on the page of some paragraph references. Page numbers were determined by designating the Dyer Report's first page of text (i.e., the page that follows the cover or title page) as page 1, and then counting sequentially to the final (tenth) page of text. Paragraph location on a particular page was determined by counting the number of paragraphs from the top or bottom of the page, as applicable.

[246551-1]

given subject and the extent to which his opinions may be required." *Chang*, 207 F.3d at 1172

(citing *Fineberg v. United States*, 393 F.2d 417, 421 (9th Cir. 1968)). The trial courts must act

as gatekeepers to exclude unreliable expert testimony. *Kumho Tire Co., Ltd. v. Carmichael*,

526 U.S. 137, 141 (1999); *Clausen v. M/V NEW CARISSA*, 339 F.3d 1049, 1055-56 (9th Cir.

2003). Ultimately, the party proffering expert testimony has the burden to prove its

admissibility by a preponderance of the evidence. Fed. R. Evid. 104(a); *Bourjaily v. United

States*, 483 U.S. 171, 175-176 (1987).

A trial court must examine a proffered expert's qualifications to determine whether he

had studied or published, had personally worked, or had received training in the relevant

subject matter, and must exclude opinions by those who do not possess the required

qualifications. *See*, *e.g.*, *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 969-970

(10th Cir. 2001) (holding expert was not qualified because she had neither researched nor

published about the medical device at issue); *Diviero v. Uniroyal Goodrich Tire Co.*, 919

F.Supp. 1353, 1356-58 (D.Ariz. 1996), *aff'd*, 114 F.3d 851 (9th Cir. 1997) (holding engineer's

testimony regarding failure of steel belted radial tires properly excluded because expert's

extensive experience in the tire industry related solely to bias-belted, not steel belted, radial

tires); *Prohaska v. Sofamor, S.N.C.*, 138 F. Supp. 2d 422, 436-37 (W.D.N.Y. 2001) (holding

expert "not qualified as an expert by skill, experience, or training" even though expert was a

board-certified neurosurgeon with thirty-five years experience because he never had designed,

implanted, or explanted an internal fixation device).

**B.      The Court Must Exclude the Proffered Opinion Testimony of Chief Dyer on the Impact of a Prisoner Release Order on Fresno County Economic Matters, And Prohibit Such Testimony from Him at Trial.**

The Court must exclude the opinion testimony of Chief Dyer that:

> When people become fearful, the tendency is for them to stay in their homes and limit visits to shopping and entertainment venues to avoid being a crime victim. This will have a negative impact on sales tax revenues and businesses already struggling with the lagging economy. Additionally, new businesses will be hesitant to open in Fresno if crime increases. This will exacerbate the already high unemployment rates in our city.

Bien Decl., Ex. I at 7 (last paragraph on page). The Court must also exclude similar opinions

[246551-1]

1  related to economic matters proffered by the Chief that:

2  > The relationship between property crimes offenders, methamphetamine use, and unemployment cannot be overstated.

3  *Id*. at 8 (final paragraph on page), and that,

4  > [Fresno's] high unemployment rate severely reduces the chance of a released prisoner obtaining employment...

5  *Id*. at 6 (third paragraph from bottom of page).

6       These opinions must be excluded because Chief Dyer is not an expert on these matters,
7  as required by Fed. R. Evid. 702 for such opinion testimony.  Estimating impacts on shopping
8  and entertainment, tax revenues, business operations, and unemployment, and the relationship
9  between crime and unemployment, are complex matters reserved to the field of economists and
10  social scientists.  Chief Dyer is neither an economist nor social scientist.  He has no personal
11  work or other professional experience, education, or training regarding the impact of "fear" on
12  visits to shopping and entertainment venues and the consequent impact, if any, on sales tax
13  revenues, local businesses successes and start-ups, and unemployment rates.  His knowledge
14  regarding these matters is based on his review or memory of two reports regarding economics,
15  or, with regard to matters relating to impact on sales tax revenues, only a single report.  Bien
16  Decl., Ex. J at 104:6-105:4.  Chief Dyer is not qualified to assess the accuracy or reliability of
17  these reports, or to represent or apply the findings of those who did the reports.  A layperson
18  cannot shoehorn an expert's opinion into his or her own testimony.  Chief Dyer is a layperson
19  on these matters, attempting to offer the expert opinion of others.  Because Chief Dyer is not
20  an expert on the impact of crime on shopping and entertainment venue visits, sales tax
21  revenues, and unemployment, the Court under Fed. R. Evid. 702 must exclude the above-
22  quoted portion of the expert report and preclude any testimony by him regarding such matters.

23       The testimony quoted above is also not admissible under Fed. R. Evid. 701 as the
24  opinion of a lay witness.  Such testimony is limited, *inter alia*, to opinions which are
25  "rationally based on the perception of the witness" and "not based on scientific, technical, or
26  other specialized knowledge within the scope of Rule 702."  Fed. R. Evid. 701.  Here, the
27  opinions at issue are not based on Chief Dyer's own perception, but his reading of reports.

28

-13-

These are not admissible lay opinions, but exactly the kind of testimony that is admissible—if it is admissible at all (and it is not here)—only under Rule 702.

### C.    The Court Must Exclude the Proffered Testimony of Chief Dyer on the Impact of a Prisoner Release Order on Fresno County Superior Court Operations, And Prohibit Such Testimony from Him at Trial.

The Court must also exclude the opinion testimony of Chief Dyer, both in his report and at trial, regarding the impact of a prisoner release order on the Fresno County Superior Court, because he is not an expert in court administration and because his opinion relies on hearsay. Chief Dyer opines:

> The Fresno Superior Court will face challenges similar to those of the jail and the District Attorney's Office. Superior Court Judge Gary Hoff, who oversees the felony courts, said the release of 1,920 inmates would burden the courts because of the high recidivism rates of property offenders and that each case would require multiple appearances and court dates. The court services manager conservatively estimates that the workload would increase by 10% and put a drain on court services.

Bien Decl., Ex. I at 7 (second paragraph from bottom of page).

Chief Dyer attempts here to offer opinion testimony regarding impacts beyond the police department, his current employing agency, and his area of expertise. The impact on court operations and administration is not a subject within Chief Dyer's knowledge, experience, training, or education. He has no specialized knowledge regarding these matters. On its face, the proffered expert opinion is based entirely on statements purportedly made by others. *Id.* Chief Dyer admits that these statements were made not to him, but to a subordinate, and that neither he nor his subordinate made any effort to verify the factual basis of the statements. Bien Decl., Ex. J at 99:15-100:18. He also admits that he does not even know upon what facts the statements were based. *Id.* The Chief is not an expert on these subjects as required by Fed. R. Evid. 702. Even if he somehow were an expert in court administration, his methodology – relying on statements purportedly made to a subordinate for which no attempt was made to verify the accuracy and for which he does not even know the underlying factual basis – is entirely unreliable. And because the opinion is based not on his perception, but on double-hearsay, the Chief's opinion regarding the courts also is not

admissible under Fed. R. Evid. 701.[4]

**D.     The Court Must Exclude the Proffered Opinion Testimony of Chief Dyer on the Impact of a Prisoner Release Order on Fresno County Jail Operations, And Prohibit Such Testimony from Him at Trial.**

The Court must also exclude, and prohibit, opinion testimony proffered or which may be offered by Chief Dyer regarding the impact of a release order on the Fresno County Jail. Chief Dyer opines:

> [a]ny increased levels of arrests requiring booking would pose a severe challenge for the [Fresno County] jail, and property offenders would be the first to be released or refused in the face of overcrowding.

Bien Decl., Ex. I at 7 (third paragraph from bottom of page).

Chief Dyer runs a police department, not the county jail. *Id.* at ¶¶ 1-12 (detailing experience with police operations and management, with no mention made of work, knowledge, experience, skill, training, or education regarding the local jail). The Fresno County jail is run by the County Sheriff, not Chief Dyer. Bien Decl., Ex. J at 86:10-23 and 89:25-90:22. Chief Dyer admits that because someone else is the sheriff, he cannot say whether the sheriff has public safety as the top professional responsibility or whether she would do anything to adversely impact public safety. *Id.* at 86:10-87:5. Given these admissions, and the absence of specialized experience with jails, the Court must conclude that the Chief is not an expert on matters related to the county jail and therefore under Fed. R. Evid. 702 exclude and prohibit opinion testimony from him on that subject. This opinion testimony is also not admissible under Fed. R. Evid. 701, as it is not based on the perceptions of Chief Dyer, in that as stated above he admits he does not know whether the Sheriff would do anything to adversely impact public safety, or even whether the sheriff considers public safety the top professional responsibility.

---

[4]  Also, the statements purportedly made by Judge Hoff and an unnamed Fresno court services manager to a subordinate of Chief Dyer must be excluded as hearsay. Fed. R. Evid. 802.

-15-

**E.**    **The Court Must Exclude the Proffered Opinion Testimony of Chief Dyer on the Impact of a Prisoner Release Order on Fresno County District Attorney Operations, And Prohibit Such Testimony from Him at Trial.**

The Court must also exclude the opinion testimony proffered by Chief Dyer regarding the impact of a prisoner release order on the Fresno County District Attorney's Office, and preclude such testimony at trial.  Chief Dyer opines:

> The Fresno County District Attorney's Office faces serious resource challenges.  Their ability to process cases this year is reduced from last year and they are overwhelmed.  The District Attorney's Office would be unable to accept an increased work load and would be faced with the difficult task of prioritizing cases, with the knowledge they will not be able to pursue many serious cases.  Priority would be given to violent crimes, and those cases with the most sentencing exposure, thus, it is doubtful that the property crimes that we expect these released prisoners to commit, will receive aggressive prosecution.

Bien Decl., Ex. I at 7 (fourth paragraph from bottom of page).

These opinions must be excluded because Chief Dyer's knowledge, skill, experience, training, or education do not qualify him to provide these opinions.  How a District Attorney's office would respond to a purported increase in workload is a matter peculiarly within the realm of prosecutors, or those who study or have specific experience with such matters.  Chief Dyer is not a prosecutor, has never worked for the District Attorney's office, or done any studies of its workload.  Bien Decl., Ex. J at 77:14-24.  There is no logical nexus between his work as a police officer, supervisor, and manager and expertise regarding the workload management of a District Attorney's office and how prosecution priorities would be determined.  He thus does not qualify under Fed. R. Evid. 702 as an expert on such matters, and these opinions must therefore be excluded.

Chief Dyer's opinions regarding District Attorney operations and practices also are inadmissable even as lay opinion under Fed. R. Evid. 701.  That rule requires, *inter alia*, that the opinion be rationally based on the perception of the witness.  Here, the opinion is based not on the Chief's perceptions but in large part on what he was told by the District Attorney and

-16-

her staff.[5]  Bien Decl., Ex. J at 77:25-78:18.  Further, Chief Dyer points to no information at all

to support his proffered opinion regarding what crimes would or would not be prosecuted, or

more generally, the purported difficulties that the District Attorney's office would face; these

matters are but rank speculation.  With regard to these latter matters, the Court should exclude

the opinion of Chief Dyer, even if somehow it deems him an expert on District Attorney

operations and practices, since he has no basis whatsoever for these opinions.[6]

###### F.    The Court Must Exclude the Proffered Opinion Testimony of Chief Dyer on the Impact of a Prisoner Release Order on Other Central Valley Cities, And Prohibit Such Testimony from Him at Trial.

The Court must also exclude the opinion testimony proffered by Chief Dyer regarding

the impact of a prisoner release order on Central Valley cities other than Fresno, and preclude

such testimony at trial.  Chief Dyer opines:

> Based on my knowledge of cities within the central valley and their
> demographics, as well as conversations I have had with police chiefs from
> these cities, it is my belief that central valley cities such as Stockton, Modesto,
> Merced, Visalia, etc. will experience the same impact as Fresno in terms of
> crime should the premature release of inmates occur.

Bien Decl., Ex. I at 10 (paragraph above signature).

Chief Dyer, in short, attempts to export his opinions about impact to cities where he

neither lives nor works.  This must be excluded.  To the extent that Chief Dyer is not qualified

to offer expert opinion regarding the impact in his own city and county—as is the case with his

proffered opinions on visits to shopping and entertainment venues, business activities and

initiatives, sales tax revenues, and unemployment rates, and the operations and practices of the

---

[5]  The statements purportedly made to Chief Dyer by the district attorney and her staff must be excluded as hearsay.  Fed. R. Evid. 802.

[6]  Because the Court must exclude Chief Dyer's opinions regarding the impact of a prisoner release order on the Fresno County district attorney's office, jail, and superior court, it must also exclude his more general or over-arching opinion that, "*All parts* of the criminal justice system expect to be seriously challenged by the release of these prisoners."  Bien Decl., Ex. I at 7 (first paragraph at top of page) (italics added). With regard to the impact on the criminal justice system, Chief Dyer for the reasons explained above is qualified to offer expert opinion only with regard to the agency – the police department – that he manages, not "all parts."

Fresno County Superior Court, the Fresno County Jail, and the Fresno County District Attorney's office – he is also not qualified as an expert with respect to the impact on such matters in cities were he neither lives nor works.

**V.    MOTION IN LIMINE NUMBER 5:  PLAINTIFFS MOVE TO EXCLUDE CERTAIN EXPERT OPINION TESTIMONY PROFFERED IN THE AUGUST 15, 2008 REPORT OF GALE BATAILLE, MSW, AND THE AUGUST 27, 2008 REBUTTAL REPORT OF GALE BATAILLE, AND MOVE TO PROHIBIT HER FROM TESTIFYING ABOUT SUCH MATTERS AT TRIAL.**

Plaintiffs move for an order in limine to exclude testimony and opinions from defendants' witness Gale Bataille on the following subjects:

1)  Any testimony regarding the adverse impact of a prisoner release order on public safety.  Ms. Bataille is not qualified to opine on this issue.  Moreover, the opinions stated in Ms. Bataille's reports are not based on sound methodology, but rather on exaggerated and speculative predictions that take no account of the proportionate impact of a modest release of prisoners with mental illness into a community mental health system that services over 650,000 persons per year with funding of over $6 billion per year.

2)  Any testimony regarding intergovernmental disputes within the state of California regarding the funding of community mental health system.  The choices made by California state and local governments over how to fund and allocate responsibility for community mental health are far removed from the issues in this case.  Much of Ms Bataille's testimony appears directed at securing local governments' interests in greater funding.  While she may be prescribing sound policies regarding state-county relations, the state of these relations is not determinative of the issues in this case.  Ms. Bataille appears to urge the Court to refrain from addressing the overcrowding crisis because California's intergovernmental relations are too dysfunctional to respond appropriately to a prisoner release order.  The Prison Litigation Reform Act requires the Court "give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief."  (18 U.S.C. § 3626(a)(1)(A).)  The Court is required to "give substantial weight" to these factors.  It is not required to address inadequacies in the state system of funding public safety functions, or to

1  refrain from addressing constitutional violations due to the state's inability or unwillingness to

2  fund systems of community mental health.

3      3)  Any testimony regarding the adverse impact of a prisoner release order on the

4  operation of a criminal justice system.  Ms. Bataille has testified that she is not an expert on the

5  criminal justice system.

    **A.**   **Ms. Bataille is Not Qualified to Provide Expert Testimony on Adverse Impacts**
6
         **of a Prisoner Release Order on Public Safety or the Operation of a Criminal**
7
         **Justice System.**

8      Ms. Bataille offers far-ranging generalized opinions about the impact of a prisoner

9  release order on public safety which are beyond her qualifications and expertise.  Ms. Bataille

10  relies on her experience as a community mental health official in three Bay Area counties.  Ms

11  Bataille admits that her formal training leading to a Masters in Social Work degree did not

12  include training in criminology or in forensic mental health.  Bien Decl., Ex. K at 278:15-

13  279:11.  Ms. Bataille has never published in a peer-review journal on any subject, and has

14  never been qualified as an expert by any court.  *Id.* at 281:4-9.  Where, as here, the proffered

15  expert has not studied, published, personally worked, or received training in the relevant

16  subject matter, the court must exclude the expert's opinions.  *See*, *e.g*., *Ralston v. Smith &*

17  *Nephew Richards, Inc*., 275 F.3d 965, 969-970 (10th Cir. 2001) (holding expert was not

18  qualified because she had neither researched nor published about medical device at issue);

19  *Diviero v. Uniroyal Goodrich Tire Co.*, 919 F.Supp. 1353, 1356-58 (D.Ariz. 1996), *aff'd*, 114

20  F.3d 851 (9th Cir. 1997) (holding engineer's testimony regarding failure of steel belted radial

21  tires properly excluded because expert's extensive experience in the tire industry related solely

22  to bias-belted, not steel belted, radial tires).

23      Although Ms. Bataille states opinions about mentally ill parolees and their impact on

24  public safety, she admits that she has no expertise regarding parole supervision:  "I really don't

25  hold myself out as having any expertise in literally for, example, what probation would need to

26  be doing, or parole agents.  I mean, I'm not the criminal justice system expert."  Bien Decl., Ex.

27  K at 131:7-11.  Instead, she asserts that her expertise is in a narrow band that excludes the

28  parole system:  "I have a certain band of expertise about community-based mental health

1    services." *Id.* at 131:13-14.  Ms. Bataille's admitted lack of expertise on parole services is

2    particularly disturbing given her testimony that she and her fellow county mental health

3    directors have taken the position that treatment of mentally ill parolees is the responsibility of

4    the state parole authority, not of county mental health services.  *Id.* at 236:23-243:10; *see also,*

5    Bien Decl., Ex. L at 6-7 (August 15, 2008 Preliminary Expert Report).

6        Ms Bataille also admits that she has no expertise in technical parole violations, which

7    she acknowledges as an important factor in California's high recidivism rate.  Bien Decl., Ex.

8    K at 199:10-22; 200:22-201:13.

9

10   **B.    Ms. Bataille's Report Consists Largely of Unsupported Speculation About the Impact of a Prisoner Release Order That Will Not Assist the Trier of Fact.**

11       The trial court must examine proffered expert testimony for reliability, determining

12   whether there exists any "objective, verifiable evidence that the testimony is based on

13   'scientifically valid principles.'"  *Daubert v. Merrell Dow Pharm., Inc.,* 43 F.3d 1311, 1317-18

14   (9th Cir.1995) ("*Daubert II* ").  Expert opinion must make rational connections between the

15   expert's conclusions and the evidence.  "[N]othing in either *Daubert* or the Federal Rules of

16   Evidence requires a district court to admit opinion evidence that is connected to existing data

17   only by the *ipse dixit* of the expert.  A court may conclude that there is simply too great an

18   analytical gap between the data and the opinion proffered."  *General Elec. Co. et al., v. Joiner*,

19   522 U.S. 136, 146 (1997); *see also Domingo ex rel. Domingo v. T.K.*, 289 F.3d 600, 607 (9th

20   Cir. 2002).  While the *Daubert* test does not require that all expert testimony be developed

21   outside the litigation and subject to scientific peer review, where such indicia of reliability are

22   lacking, the expert must explain how he or he reached his conclusions based on a reliable

23   methodology.  *Lust By and Through Lust v. Merrell Dow Pharm., Inc.*, 89 F.3d 594, 597 (9th

24   Cir. 1996).

25       Here, the methodology used in Ms. Bataille's reports do not make analytically sound

26   links between the evidence she examines and the speculative conclusions that she draws.  Ms.

27   Bataille's two reports, her initial report of August 15, 2008, and her August 27, 2008 rebuttal

28   report, do not offer any specific assistance to the Court in measuring the impact of a prisoner

-20-

release order on public safety, because the reports lack quantitative support for their speculative predictions. Instead, the report largely consists of hyperbolic editorial predictions exemplified by the following passages in Ms. Bataille's two expert reports:

> An accelerated release of prisoners who meet Coleman class criteria can be anticipated to have adverse--and potentially serious consequences for the released prisoners; community mental health systems and the (non-offender status) mentally ill children, adults and older adults they serve; a potentially negative impact on community safety if adequate supervision, treatment services and programs are not in place at the time of the prisoner release; and potentially long-term negative consequences to the development of public mental health services in the future.

Bien Decl., Ex. L at 1 (August 15, 2008 Report).

> Even if we accept the general conclusion of Dr. Gilligan that there is no greater risk of violence in the seriously mentally ill parolee population than among other parolees, any episodes of violence committed by mentally ill parolees will be magnified by the press and can be expected to lead to disproportionate fear and discriminatory responses by the public.

Bien Decl., Ex. M at 2 (August 27, 2008 Report).

> The ripple effect of a blanket release order will severely strain county level mental health departments, county alcohol and drug treatment programs, housing, and foster additional competition for jobs in local communities, as well as strain local criminal justice, [sic] systems, especially county jails.

Bien Decl., Ex. M at 6 (August 27, 2008 Report). The acceptance of editorial statements like these would lead to absurd results, under which the Court could conclude that the release of even a small number of persons with mental illness would result in catastrophic denial of services to children and the elderly. Such alarmist statements do not assist the trier of fact. Ms. Bataille's opinion substitutes such editorializing for any examination of the facts regarding the size and capacity of California's community mental health system. Nowhere in her opinion does she acknowledge the official state statistics showing that California's community mental health system has an annual budget of approximately $6 billion and serves over 650,000 persons per year, over 40,000 of them with 24-hour services. Bien Decl., Ex. K at 171:23-173:5; *see also* Bien Decl. Ex. N at ¶ 24 (Rebuttal Report of Dr. James Gilligan).

Only by avoiding the actual numbers on the overall size of the community mental health system in comparison with the numbers of prisoners with mental illness likely to be released

could Ms. Bataille arrive at the speculative conclusions that characterize her report. This methodology of subordinating the data, and instead offering broad predictions of catastrophe should be rejected as unreliable, and Ms. Bataille's testimony should therefore be excluded.

### C. Ms. Bataille's Assertions Regarding Obstacles Created by Intergovernmental Squabbling Do Not Assist The Trier of Fact in Determining Any Matter Relevant to this Action and Should be Excluded.

Ms. Bataille's reports contend that the Court should assess impacts on public safety based in part on the choices that California state and county governments have made regarding the funding mechanisms for community mental health services. The PLRA requires that the Court "shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief." 18 U.S.C § 3626(a)(1)(A). The PLRA does not require the Court to conduct a trial within a trial regarding the intricacies of state and local systems of funding community services. Ms. Bataille's opinions regarding the proper allocation of funding responsibilities between state and county agencies therefore have no "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable," and are irrelevant to this action under Rule 401 of the Federal Rules of Evidence. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 587 (1993) (the Rule 702 condition that expert testimony "assist the trier of fact to understand the evidence or to determine a fact" is primarily a question of relevance).

The bulk of Ms. Bataille's opinions do not to concern the *Coleman/Plata* dispute at all, but rather appear to be directed at assisting the counties in gaining the upper hand in their on-going funding battles within the State of California. This comes across clearly in Ms. Bataille's deposition, where she briefly abandons her role as an expert retained by the state defendants, instead pleading the case of the counties:

> Q. What would a "reasonable guarantee" look like?
> A. I don't believe that's within my expertise. It would need to be something that locked it in with a rate of growth that matched a rate of growth, and that was not subject to the State saying, Oops, we don't have it this year, so we're not going to pay you like we said we would. And the State does that.
> Q. You were retained by the State in this matter; weren't you?
> A. Sorry. I'll be good. Not -- I'm not talking about this particular incident. I'm really talking about other funding streams to counties. But thank you for pointing that out.

-22-

[246551-1]

1    Bien Decl., Ex. K at 71:24-72:13.

2        Ms. Bataille wages this collateral fight with the state throughout her two reports,

3    expressing opinion after opinion on policy decisions made by the state government on how to

4    fund county services, or on which level of government should be responsible to pay for care of

5    mentally ill parolees, and the community mental health system in general.

6            Historically, CDCR staff have attempted to refer active parolees to county
             operated (or county contracted) outpatient, intensive outpatient and
7            institutional services  while counties have taken the position that services to
             this population is not a county mental health responsibility.
8
     Bien Decl., Ex. L at 6 (August 15, 2008 Report).
9
             [C]ounties maintain that provision of non-5150 related community mental
10           health services remain the responsibility of CDCR directly or via contract.
             Counties' position is that they have limited responsibility for parolee mental
11           health services is further supported by the restriction in 2004 Mental Health
             Services Act (Proposition 63) which prohibits use of MHSA funds for parolee
12           services or law enforcement/justice system functions.

13   Bien Decl., Ex. L at 7 (August 15, 2008 Report).

14       Ms. Bataille dedicates a considerable portion of her August 15, 2008 report to the

15   allocation of funding streams that resulted from a 1991 realignment of community mental

16   health services between state and county governments, and the manner in which the state

17   allegedly short-changed the counties in this complex arrangement.  Bien Decl., Ex. L at 9-10.

18   Ms. Bataille discusses a 20-year initiative to increase housing resources for the mentally ill.  *Id.*

19   at 11.  She discusses the need for the state and counties to initiate new training programs to

20   increase the availability of clinicians.  *Id.* at 13-14.  Ms. Bataille discusses her involvement

21   with the California State Association of Counties in opposing an early 2008 plan from the

22   Legislative Analysts' Office to realign the allocation of responsibilities between state parole

23   and county probation departments due, among other things, to "lack of adequate funding

24   guarantees."  *Id.* at 16, 19.  While these collateral matters may be of general interest, they are

25   far afield from what the PLRA requires in fashioning relief for constitutional violations.

26       Ms. Bataille's August 27, 2008 Rebuttal Report also refers at length to

27   intergovernmental disputes as somehow determining the limits of what can be done to address

28   public safety concerns.  At page 7 of her Rebuttal Report, Ms. Bataille criticizes plaintiffs'

-23-

[246551-1]

1    experts for pointing out the availability of various forms of civil commitment to address the

2    needs of prisoners who might present a danger to themselves or others.  Ms. Bataille's rebuttal

3    does not address whether or not such commitment procedures could address public safety

4    concerns, but instead, focuses on the incapacities created by intergovernmental squabbling

5    regarding which level of government should provide care for persons adjudicated as Mentally

6    Disordered Offenders, or civilly committed under the Lanterman Petris Short Act.  Bien Decl.,

7    Ex. M at 7-8.

8        Among Ms. Bataille's asserted qualifications are her experience as a county mental

9    health director, and her current role as a consultant to the California Mental Health Director's

10   Association (CMHDA).  *See* Bataille CV, attached as Exhibit A to Bien Decl, Ex. L.  As noted

11   above, many of Ms. Bataille's opinions appear more relevant to advancing the cause of the

12   counties in their funding disputes with the state than to this case.  Indeed, in preparing her

13   opinions in this case, Ms. Bataille consulted with the CMHDA to ensure that her opinions were

14   consistent with CMHDA's position in its disputes with the state regarding responsibility for the

15   care of mentally ill parolees.  Bien Decl., Ex. K at 236:11-238:6.

16       Ms. Bataille's defense of these county government positions on funding disputes with

17   the state does not assist the Court in determining relevant facts in this case, and therefore

18   should be excluded.

19
20       **D.    The Court Should Issue an Order in Limine Excluding Any Expert Opinions
             from Ms. Bataille Regarding Any Adverse Impact on the Operation of a
21           Criminal Justice System Caused by the Relief.**

22       Although Ms. Bataille's August 15, 2008 report makes several predictions regarding

23   burdens on police and county jails that might result from a prisoner release order, Ms. Bataille

24   disclaimed any expertise in the operation of the criminal justice system at her deposition:

25           I have some knowledge of a part of what it might look like, because I really
             don't hold myself out as having any expertise in literally for, example, what
26           probation would need to be doing, or parole agents.  *I mean, I'm not the
             criminal justice system expert.*   And any effective services have to have a
27           combination of treatment and supervision.  So, I have a certain band of
             expertise about community-based mental health services.

28   Bien Decl., Ex. K at 130:24-131:14 (emphasis added).  The Court may not permit an expert to

-24-

[246551-1]

1    provide testimony in an area where she possesses no expertise.  *See United States v. Chang,*

2    207 F.3d 1169, 1173 (9th Cir. 2000).

3                                **CONCLUSION**

4            For all of the reasons set forth above, plaintiffs respectfully request orders from this

5    Court (1) barring defense and intervenor witnesses from the courtroom until they testify,

6    prohibiting defense and intervenor counsel from providing transcripts to witnesses who have

7    not yet testified, and instructing witnesses not to discuss their testimony with other witnesses

8    prior to the close of trial; (2) excluding the September 22, 2008 James Marquart expert report;

9    (3) excluding the October 1, 2008 Dr. Ira Packer expert report and prohibiting Dr. Packer from

10   testifying regarding the topics set forth in that report at trial; (4) excluding certain expert

11   opinion testimony proffered in Jerry Dyer's expert report and prohibiting him from testifying

12   about those matters at trial, and; (5) excluding certain expert opinion testimony proffered in

13   Gale Bataille's August 15 and August 27, 2008 reports and prohibiting her from testifying

14   about those matters at trial.

15   Dated:  October 20, 2008                    Respectfully submitted,

16                                               ROSEN, BIEN & GALVAN, LLP

17

18                                               */s/ Amy Whelan*
                                                 Amy Whelan
19                                               Attorneys for *Coleman* Plaintiffs and on behalf
                                                 of the *Plata* Plaintiffs
20

21

22

23

24

25

26

27

28