# EXHIBIT A
# PART 1

**EXHIBIT A**

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

AND THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE

PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

| | |
|---|---|
| RALPH COLEMAN, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| vs. ) | NO. 2:90-cv-00520 LKK JFM P |
| ) | |
| ARNOLD SCHWARZENEGGER, et ) | |
| al., ) | |
| ) | |
| Defendants. ) | |
| _____) | |
| MARCIANO PLATA, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| vs. ) | |
| ) | |
| ARNOLD SCHWARZENEGGER, et ) | |
| al., ) | |
| ) | |
| Defendants. ) | |
| _____) | |

*Certified Copy*

---oOo---

DEPOSITION OF JEANNE S. WOODFORD

Tuesday, December 18, 2007

---oOo---

REPORTED BY:  KRISTIE L. HUBKA, CSR NO. 5974

PROFESSIONAL REPORTING SERVICES   (800) 261-4814

1    copy of your deposition transcript and it will have all

2    of your answers, all of the objections and all of the

3    questions.  Okay?

4        A.    Yes.

5        Q.    And you will have an opportunity to make

6    changes to that transcript if you see fit.  Do you

7    understand that?

8        A.    Yes.

9        Q.    If you make any substantive changes, myself or

10   any of the other attorneys can comment on it at the time

11   of trial.  Do you understand that?

12       A.    Yes.

13       Q.    And lastly you understand you're under oath,

14   the same oath as if you were in front of the three

15   judges in February or whenever the trial date will be.

16       A.    Yes.

17       Q.    What is your current position?

18       A.    I'm the chief of adult probation in the City

19   and County of San Francisco.

20       Q.    And is there an association for chief

21   probation officers in the State of California?

22       A.    Yes, there is.

23       Q.    And what is that association?

24       A.    CPOC, C-P-O-C.  I'm not sure what it stands

25   for, California Probation --

1          MR. SPECTER:  Chief Probation.

2          THE WITNESS:  Chief Probation Officers of

3    California.  Thank you.

4          MR. MELLO:  Mr. Specter, please raise your

5    right hand and I'll swear you in.

6      Q.    Are you a member of that association?

7      A.    Yes.

8      Q.    And do you know whether that association -- or

9    strike that.

10         Do you know whether any members of that

11   association have intervened in this matter?

12     A.    Yes.

13     Q.    Have you ever participated in any conference

14   calls with members of that association regarding this

15   litigation?

16     A.    I don't believe so.  I mean, it's been -- the

17   litigation has been mentioned but I don't believe that I

18   participated in an actual call on this topic.

19     Q.    Have you ever been a participant in any

20   conference calls where the law firm of Jones & Mayor,

21   counsel for the interveners was on the line?

22     A.    Not that I'm aware of, no.

23     Q.    Your B.A. is in criminal justice, correct?

24     A.    Yes, that's correct.

25     Q.    Do you hold any degrees with respect to

1    2004, somewhere along there, but I'm not positive of

2    that.

3        Q.    And I used the term "ended."  Was that lawsuit

4    ultimately dismissed?

5            MR. SPECTER:  If you know.

6            THE WITNESS:  I don't know if that's the

7    proper term.

8        Q    (By Mr. Mello) Do you know -- it's your

9    testimony that the Marin lawsuit involved both

10   medical care and mental healthcare, correct?

11       A.    Yes.

12       Q.    You left the department when?

13       A.    July, 2006.

14       Q.    And at that point you were the acting director

15   of CDCR?

16       A.    No.  I was actually --

17       Q.    Pardon me.  I'm sorry.  Were you the acting

18   secretary in July of 2006?

19       A.    No, I was not.  I was the undersecretary of

20   the California Department of Corrections and

21   Rehabilitation.

22       Q.    And, to your knowledge, the Marin lawsuit was

23   no longer active at that point, correct?

24       A.    That is correct.

25       Q.    Do you have any experience providing medical

1    chief medical officers when you were the warden at

2    San Quentin prison.  Do you also believe that those

3    individuals were M.D.s?

4        A.   Yes.

5        Q.   So all of these folks had medical training,

6    correct?

7        A.   That is correct.

8        Q.   As you testified earlier, you were the

9    director of the Department of Corrections starting in

10   February of 2004, correct?

11       A.   That is correct.

12       Q.   I should know this but the Department of

13   Corrections was not the same as the Department of --

14   California Department of Corrections and Rehabilitation?

15   CDCR is different from the Department of Corrections,

16   correct?

17       A.   Yes, that's correct.

18       Q.   How so?

19       A.   Under the California Department of Corrections

20   the primary mission of corrections was punishment.  It

21   also had a different structure where the director was

22   very much in charge of the California Department of

23   Corrections on the adult side.  The reorganization

24   created the California Department of Corrections and

25   Rehabilitation making rehabilitation a primary mission

1  of the department and it's now organized under the

2  secretary of the California Department of Corrections

3  and Rehabilitation and has a different management

4  structure.

5      Q.    When you were the director -- strike that.

6            When you were the warden at San Quentin prison

7  there was a chief medical officer and a chief

8  psychiatrist, correct?

9      A.    That is correct.

10     Q.    Was there a similar title below you when you

11  were the director of the Department of Corrections?

12     A.    There were similar titles, yes.

13     Q.    Was there a statewide chief medical officer or

14  chief psychiatrist?

15     A.    There was a statewide chief medical officer,

16  yes.

17     Q.    Was there somebody in the medical structure

18  above the statewide chief medical officer when you were

19  the director of the Department of Corrections?

20     A.    No, there was not.

21     Q.    How many chief medical officers --

22     A.    Excuse me, I need to correct that.

23     Q.    Sure.

24     A.    At some point while I was the director, maybe

25  a couple of months before I promoted to undersecretary,

1    they did put someone in a position under the secretary

2    to oversee healthcare for the California Department of

3    Corrections.  But I'm uncertain as to the month that

4    that occurred.

5        Q.    Within several months of you becoming

6    undersecretary?

7        A.    Yes, that would be correct.

8        Q.    Prior to that time how many statewide

9    medical -- chief medical officers were there when you

10   were director?

11       A.    I'm sorry, I don't know the answer to that.

12       Q.    Was it more than one?

13       A.    Yes.

14       Q.    Do you think it was more than three?

15       A.    Yes.

16       Q.    Was it more than five?

17       A.    Yes.

18       Q.    Oh, boy.  Do you think it was less than ten?

19       A.    No.  There is a position at each of the

20   prisons but I don't know that all of them were filled.

21       Q.    Okay.  Just so I understand, at the time until

22   those last few months, at the time that you were the

23   director of the Department of Corrections, the chief

24   medical officers were at each facility, correct?

25       A.    Yes.

1      Q.    And am I correct that there was not a medical

2   officer above those facility chief medical officers

3   until just a couple of months before you became

4   undersecretary?

5      A.    No.    There was a chief medical officer in

6   Sacramento or the head of healthcare services, I'm not

7   sure what the titles were as we've changed titles, so

8   it's very difficult for me to remember what we were

9   calling people at that point in time.

10     Q.    Let's for purposes of this discussion just

11  refer to him as head of healthcare services.

12     A.    That's correct.

13     Q.    Okay.    At the time that you were the director

14  of the Department of Corrections how many heads of

15  healthcare services were there?

16     A.    At what location?

17     Q.    In Sacramento.

18     A.    There was one.    Until the last few months and

19  then there was another position added at the secretary

20  level.

21     Q.    And who was that one person?

22     A.    The one before the position added?

23     Q.    Yes.

24     A.    That would be Dr. Rene Kanan.

25     Q.    And Dr. Kanan.    Did the chief medical officers

1    at the institutions report to Dr. Kanan?

2    A.    Yes, they did.

3    Q.    And who did Dr. Kanan report to?

4    A.    Dr. Kanan reported to the director of

5    corrections, that would be me during that time.  And

6    also because we were in transition she was reporting to

7    the secretary of the agency.

8    Q.    Did she report to anybody below the -- was she

9    a direct report to anybody below you during that time?

10    A.    She reported a direct report to the deputy

11    director of administration.

12    Q.    How many deputy directors did you have below

13    you at the time Dr. Kanan was reporting to the deputy

14    director of administration?

15    A.    Let me restate.  The title of that one was

16    chief deputy director and I had two.

17    Q.    What was the other chief deputy?

18    A.    Operations.

19    Q.    And who is the chief -- strike that.

20    How many chief deputy directors of

21    administration did Dr. Kanan report to, to your

22    knowledge?

23    A.    One.

24    Q.    Who was that?

25    A.    Ernie Van Sant.  But I do need to say that

1    recall.

2        Q.    Was she a physician?

3        A.    I don't think so.

4        Q.    When you were the director of the Department

5    of Corrections, what, if any, role did you have with

6    respect to the Plata lawsuit, generally speaking?

7        A.    Well, my role -- that's a very complicated

8    question.  My role was to make sure that we were in

9    compliance with the Plata lawsuit and to work with

10   healthcare services to achieve that goal and work with

11   other parts of the department if achieving that goal

12   required physical plant changes or construction.

13            It was also to make sure that the custody side

14   of the house was working well with healthcare at their

15   facilities and at headquarters to come into compliance

16   with the provisions of the Plata lawsuit.  And, I mean,

17   that's everything from soup to nuts, I mean, trying to

18   attract more doctors.  I was involved in discussions in

19   just about every aspect of compliance with that lawsuit

20   I would say.

21       Q.    Was your role with respect to the Coleman

22   lawsuit similar when you were the director of the

23   Department of Corrections?

24       A.    Yes.  With the Coleman lawsuit I also worked

25   with other state agencies to try to bring us into

1    A.    Yes.  I also need to say that there was also

2    another person assigned to the secretary and that was

3    Darce Keller (phonetic) and he also had a role in

4    healthcare but I don't exactly remember his exact title

5    either.

6    Q.    To your knowledge, both Dr. Szekrenyi and

7    Mr. Keller are no longer working for the department?

8    A.    That's my understanding.

9    Q.    And you left your position as undersecretary

10   in July of 2006?

11   A.    Yes, that's correct.

12   Q.    Why?  Probably not an easy question.

13   A.    No, it's really not an easy question.  It's a

14   pretty complicated answer.

15   Q.    Can you give it to me, anyways?

16   A.    I had actually been asked to be the secretary

17   of the Department of Corrections and Rehabilitation and

18   I acted in that position for about 45 or 50 days and I

19   determined that I could not find a path to be successful

20   given the conditions of the Department of Corrections

21   including our overcrowding and the unwillingness, or if

22   that's the right word, of the State of California to

23   look at what I thought were resolutions to the problem.

24        I felt that we could not build our way out of

25   the problem, that we really needed to take a very

1   realistic approach and I also felt that what we were

2   doing in the Department of Corrections was not enhancing

3   public safety.

4           In fact, our policies or the state's criminal

5   justice system was actually harming public safety and I

6   felt under the overcrowding conditions that we had that

7   we weren't providing a constitutional level of care for

8   inmates to include every aspect of living inside a

9   prison, getting healthcare and mental healthcare.

10      Q.   Can you tell me what the components are of a

11  constitutionally adequate medical care system?

12      A.   I'm not sure that I can answer that question.

13      Q.   Why not?

14      A.   I'm not sure what you mean by "components."

15      Q.   I believe you testified that you didn't

16  believe -- one of the reasons that you didn't accept the

17  secretary position and you left CDCR is because you did

18  not believe that the department and the state could

19  provide constitutionally adequate medical and mental

20  healthcare.   I believe that was your testimony; is that

21  accurate?

22      A.   That is accurate.

23      Q.   My question to you is what are the components

24  or necessary parts of a constitutionally adequate

25  medical or mental health system?

DEPOSITION OF JEANNE S. WOODFORD                    33

1      A.    Well, I don't know that I can answer that in

2    technical terms.  But I can tell you having been

3    involved with the Department of Corrections for 27 years

4    and the variety of litigation cases that I have been

5    involved in and the standards that have been set by the

6    courts as to number of hours inmates need to be out of

7    their cell or be in yards or be involved in mental

8    health treatment or receive recreational activity or

9    double celling, all of that litigation has led me to

10   have an understanding of what the courts believe is a

11   constitutional level of treatment of incarcerated

12   individuals.

13         And then becoming the director and going

14   around the state and seeing some of the prisons and the

15   conditions and the overcrowding and our inability to

16   meet the ten hours of yard time, for example, that's

17   involved under the Toussaint, T-o-u-s-s-a-i-n-t, case or

18   the fact that we weren't giving inmates who were in the

19   EOP level of care for Coleman or CCCMS level of care to

20   the number of hours of group therapy or group counseling

21   or whatever the requirements were.  We weren't meeting

22   those standards.

23         After seeing all of that, I knew that we were

24   in big, big trouble and it was just a matter of time

25   before we would be facing all those similar lawsuits all

1    could arrive at a reduced population in the Department

2    of Corrections.

3        Q.    In your opinion, how many inmates would need

4    to be released in order for -- strike that.

5             In your opinion, how much would the CDCR's

6    population have to be decreased in order to provide

7    constitutionally adequate healthcare and mental

8    healthcare?

9        A.    I don't know that I can state a number, it

10   really is identifying the -- a number that resources

11   allow you to accommodate and treat.

12       Q.    If the inmate population -- strike that.

13             Do you know the current population in CDCR's

14   adult institutions?

15       A.    The exact number I do not know.

16       Q.    Generally?

17       A.    I believe it's at about 173,000.

18       Q.    If the adult population in California

19   institutions was decreased by 40,000 inmates tomorrow

20   and nothing else was done do you believe that the CDCR

21   would be providing constitutionally adequate medical or

22   mental healthcare to its inmates?

23       A.    With your scenario, nothing else was done,

24   meaning you didn't hire doctors, you didn't do all of

25   those other things, no, I don't think you would get

1        Q.    The first time you saw the writing, the words,

2    which ultimately was your report was by way of the

3    internet?

4        A.    I accessed it using the internet, yes.

5        Q.    And just so I'm clear, you didn't actually

6    type up the first draft of your expert report, correct?

7        A.    No, I did not.

8        Q.    That's correct?

9        A.    That's correct.

10       Q.    And the first draft of your report was

11   available via the internet, correct?

12       A.    Via a program utilizing the internet.

13       Q.    And I believe -- did you provide any

14   handwritten notes or writings to the Prison Law Office

15   or to any of the plaintiffs' counsel prior to the

16   drafting of your first report?

17       A.    Oh, yes, actually I did provide some typed

18   notes, that's correct.  I recall that now.

19       Q.    Did you produce those typed notes that you

20   provided to the Prison Law Office today?

21       A.    Yes.

22            MR. MELLO:  I have in front of me five pages

23   of typed up notes and the title on the first page is

24   Conversations with the Governor.  I'm going to ask that

25   this portion of the documents that you produced today be

1    A.    Not that I plan to review.  I read constantly,

2  though.

3    Q.    How did you determine what documents to review

4  prior to developing your opinion or opinions in this

5  case?

6    A.    How did I determine that?  Well, some of the

7  facts that I used were known to me to be in documents

8  like the Blue Ribbon Commission.  What else did I do?

9  Things that I had read.  And others were shown to me by

10  Mr. Specter.

11    Q.    Okay.  Do you recall what documents were shown

12  to you by Mr. Specter?

13    A.    There is a list.

14        (Whereupon counsel confers with the witness.)

15        MR. MELLO:  Mr. Specter is badgering the

16  witness.

17        MR. SPECTER:  Let the record reflect

18  Mr. Specter is helping Mr. Mello.

19        THE WITNESS:  The Prison Overcrowding State of

20  Emergency Proclamation by the Governor.  I was aware of

21  it but he actually showed me the proclamation.  The

22  Inspector General's report.  I was aware of it but he

23  actually showed me the report.  The Little Hoover

24  Commission, I'm not sure if I had this one or not.  I

25  have most of the Little Hoover Commission reports so I

1    believe I had that one.  Toussaint came from

2    Mr. Specter.  The Fall Adult Population Projections came

3    from Mr. Specter.  The Special Review of In-Prison

4    Substance Abuse, I was aware of it but Mr. Specter gave

5    me a copy of it.  I already had and had read A Roadmap

6    for Effective Offender Programming in California.  He

7    may have also showed me a copy of that but I already had

8    that.

9        Q    (By Mr. Mello) Okay.  Other than those

10   items that you've just listed and/or which are

11   reflected in paragraph four of your report, did

12   Mr. Specter show you any other documents that you

13   based your opinion or opinions on in this case?

14       A.    There was one other document that I recall and

15   that was the Inspector General's review of the Scott

16   Thomas case.

17            MR. SPECTER:  No, that's this case.

18            THE WITNESS:  Oh, is it?  Okay.  No.

19       Q    (By Mr. Mello) So these items are all of

20   the items that Mr. Specter showed you?

21       A.    I believe so, yes.

22       Q..   In preparing your report did you read any of

23   the receiver's reports or his May 10, 2007, Plan of

24   Action?

25       A.    No, I did not.

1     Q.   Why not?

2     A.   I don't know.

3     Q.   Did you think that being familiar with the

4  current plan relating to the delivery of medical care in

5  California's prisons was important in forming your

6  opinions in this case?

7     A.   Not really.

8     Q.   Why not?

9     A.   I think just based on my years with the

10  Department of Corrections and the variety of plans that

11  I had seen over and over again and understanding the

12  population, the kinds of inmates we received, and for

13  how long we received them for, and the very complicated

14  criminal justice policies of the state have led me to

15  where I am in my beliefs and it -- from where I sit, the

16  overcrowding conditions and the --

17     MR. SPECTER:  He just asked you about -- oh,

18  I'm sorry.  I didn't want to interrupt your answer.

19  Just answer about why you didn't.

20     Q   (By Mr. Mello) Do you have anything else

21  to add before Mr. Specter interrupted you?

22     A.   Led me to where I -- to my position on this.

23     Q.   So you have no idea what the receiver's

24  reports say, correct?

25     A.   I followed some of the information in the

1   newspapers so I have some idea, I guess.

2       Q.   Based upon your experience with the Department

3   of Corrections and Rehabilitation and with the

4   Department of Corrections before that, were you aware

5   that the Prison Law Office would conduct tours of

6   institutions as part of the Plata remedial process?

7       A.   Yes.

8       Q.   And based upon your experience do you

9   understand that the Prison Law Office does reports or

10  what I call them post-tour letters after their

11  inspections of various institutions?

12      A.   Yes.

13      Q.   Did you review any of those post-tour letters

14  prior to developing your opinions on this case?

15      A.   Well, I've seen them when I was the director

16  but not in preparing my response to this, no.

17      Q.   Have you seen any post-tour letters since you

18  left the department in the middle of 2006?

19      A.   No, I have not.

20      Q.   Have you visited any CDCR facilities since the

21  middle of 2006?

22      A.   I don't believe so.  I went to San Quentin but

23  I believe that was right before I stepped down, I don't

24  think it was after.

25      Q.   So you did not visit any prisons recently in

DEPOSITION OF JEANNE S. WOODFORD                 57