# EXHIBIT A
# PART 2

```
 1        Q.   Okay.  I'll refer you again to your report to
 2   paragraph six on page two.  The second sentence of the
 3   paragraph six on pages two and three of the report says,
 4   "My opinion is that overcrowding is the primary cause of
 5   the constitutional violations, and nothing short of a
 6   reduction in the prison population will effectively
 7   address these issues."  Do you see that?
 8        A.   Yes.
 9        Q.   Did you draft that sentence?
10        A.   I know that I stated that but I didn't write
11   that sentence.
12        Q.   Did you state it in that exact form?
13        A.   I can't say that I stated it exactly as it is
14   written but it is my sentiment, yes.
15        Q.   When you use the term "primary cause," what do
16   you mean?
17        A.   I mean that in order to address any of the
18   other concerns about the incarceration of inmates we
19   have to address the overcrowding because it is the
20   single overriding issue that is preventing the
21   Department of Corrections in their ability to provide
22   appropriate healthcare, mental healthcare,
23   rehabilitative programs, appropriate exercise,
24   appropriate access to visitation.  I mean, just about
25   every aspect of incarceration is being impacted by the
```

1  single overriding issue of overcrowding, the inability
2  to hire sufficient staff. That's what I mean by it.
3      Q.  What constitutional violations are you
4  referring to in this sentence? If they're different
5  from what you've just described to me in the prior
6  answer.
7          MR. SPECTER:  Well --
8          MR. MELLO:  I can ask it separately.
9          MR. SPECTER:  Yeah.
10     Q   (By Mr. Mello) What are the constitutional
11  violations that you're referring to in that
12  sentence?
13     A.  I'm referring to healthcare, mental
14  healthcare, and conditions of confinement overall.
15     Q.  I may have asked this before differently but
16  unfortunately I get to be a child and ask it again.
17  What are the defining characteristics of constitutional
18  medical care, in your opinion?
19         MR. SPECTER:  You asked before what are the
20  components. Do you mean something different by that?
21         MR. MELLO:  No. So asked and answered is the
22  objection.
23     Q.  Do you have any ones to add other than the
24  ones you've already described?
25     A.  No, I do not.

61

1  Q.  Do you know what the status of the delivery of
2  medical care is today at each one of the 32 prisons that
3  are subject to the Plata stipulation for injunctive
4  relief?
5  A.  No, I don't have current information.
6  Q.  Do you know what the status is of the current
7  delivery of mental healthcare at the 32 institutions --
8  strike that.
9      Do you know the status of the delivery of
10 mental healthcare at the adult institutions subject to
11 the judgment in Coleman?
12     MR. SPECTER:  Objection, status is vague,
13 judgment is vague.
14 Q   (By Mr. Mello) Do you know the quality of
15 medical care that is being delivered to inmates
16 housed in CDCR adult institutions?
17     MR. SPECTER:  Same objection, quality is
18 vague.
19     MR. MELLO:  You can answer if you understand.
20     THE WITNESS:  I know that it's not in
21 compliance with the Plata -- provisions of Plata if
22 that's what you mean.
23 Q   (By Mr. Mello) Do you know what provisions
24 of Plata each one of the 32 institutions are not in
25 compliance with?

```
 1      A.   The specific -- could you ask the question
 2  again?  I'm not sure I understand it.
 3      Q.   I'm not sure I remember it.  Do you know which
 4  provisions of Plata that each of the 32 institutions are
 5  not complying with?
 6      A.   I don't know specific institutions.  I know
 7  generally there's still difficulty in hiring and
 8  retaining healthcare staff.  I know generally that
 9  there's still difficulty in having appropriate space to
10  provide healthcare or adequate space.  So I have that
11  general overview.
12      Q.   And that's not based upon your visiting any of
13  the 32 institutions in the last -- or since you left the
14  department, correct?
15      A.   That is correct.
16      Q.   And that's not based upon your review of any
17  of the receiver's reports, correct?
18      A.   That is correct.
19      Q.   Are you aware of whether there have been any
20  improvements in the delivery of medical care since you
21  left the department in the middle of 2006?
22      A.   No, I'm not aware.
23      Q.   Are you aware of any specific -- strike that.
24      A.   Can I add one thing to my last answer?
25      Q.   Sure.
```

```
 1  and mental healthcare at CDCR institutions?
 2       A.   Both of those questions can't be independent
 3  of each other.  Additional space, in and of itself,
 4  would not without healthcare staff, for example.
 5       Q.   If there were additional qualified clinical
 6  hiring and additional clinical space added, do you
 7  believe it would improve the delivery of medical and
 8  mental healthcare at CDCR?
 9       A.   It would improve it but there are still other
10  issues that would need to be solved.
11       Q.   And those other issues besides population are
12  what?
13       A.   The hiring of additional correctional staff,
14  the ability to find space available to build it.  The
15  retention of staff, both correctional staff and
16  healthcare and mental healthcare staff.  Having
17  appropriate recreational space for inmates.  Just about
18  every -- improving information technology systems in the
19  department so that information is where it needs to be.
20  Just about every aspect of the prison would have to be
21  improved to arrive at a point where you're able to
22  recruit, retain and have staff on site and the
23  facilities available to address the needs of inmates
24  within the prison facility.
25       Q.   Do you have any understanding whether there
```

1  tracking.

2  Q.  Did you believe at the time that you left the
3  department that CDCR's paper medical files -- do you
4  know whether those files were complete?

5  MR. SPECTER:  Objection.  In what sense do
6  you --

7  MR. MELLO:  It's not like TV, you have to
8  state an objection.  You can't just say objection and
9  then cut to commercial.  Let me reask the question, it
10 wasn't a very good question.

11 Q.  When you were warden at San Quentin the
12 medical records were in paper form, correct?

13 A.  Yes, they were.

14 Q.  Was there a computer tracking system for
15 scheduling when you were the warden at San Quentin?

16 A.  I don't believe there was.  I think that was a
17 paper system.

18 Q.  Based upon your experience as a warden at
19 San Quentin, do you believe that the delivery of medical
20 and mental healthcare could be improved with an
21 electronic tracking and scheduling system?

22 A.  Yes, it would be an improvement.

23 Q.  Do you believe, based upon your experience as
24 a warden at San Quentin and your experience as the
25 director and undersecretary of CDCR, that medical care

1  Q    (By Mr. Mello) Did you consider any other
2  measures like hiring additional physicians or
3  clinicians or increasing space or adding
4  correctional officers prior to developing your
5  opinion that nothing short of a reduction in the
6  prison population will effectively address these
7  issues?
8  A.   I actually did consider all of that. And,
9  again, knowing the state prisons as well as I do and
10 knowing how prisons operate and knowing the many issues,
11 you know, you simply can't add staff and make that
12 happen. All of the very complicated issues caused me to
13 arrive at my opinion.
14 Q.   But, again, you have no idea specifically
15 whether the number of correctional officers has
16 increased or decreased since you left the department,
17 correct?
18 A.   I don't know that specifically. I believe
19 that they actually have more vacancies. I don't know if
20 the number has increased.
21 Q.   Is it true that the term -- what do you
22 understand the term "vacancy" to mean as you've just
23 used it in your last answer?
24 A.   Vacancy is the number of positions that do not
25 have a staff member assigned to it.

1    Q.    Isn't it possible that the number of vacancies
2  can go up at the same time that the number of filled
3  positions can go up?
4    A.    Yes, that's possible.
5    Q.    And that's possible because more positions can
6  be established or authorized?
7    A.    That is correct.
8    Q.    So there could actually be a greater number of
9  correctional officers in the system today even if there
10 are greater vacancies, correct?
11   A.    That is correct.
12   Q.    And that would be the same with respect to
13 clinicians?
14   A.    Yes, that's correct.
15   Q.    On page four of your report, paragraph eleven,
16 would you take a look at that paragraph. I'm going to
17 ask you some questions about it.
18   A.    Page four?
19   Q.    Yes, paragraph eleven.
20   A.    Yes.
21   Q.    In that paragraph it states that CDCR, quote,
22 "lacks sufficient number of personnel who have the
23 necessary skill and training to manage such a large
24 complex organization," end quote. Do you see that?
25   A.    Yes.

```
 1        Q.   What personnel are you talking about in this
 2   paragraph?
 3        A.   I'm actually talking about personnel in all
 4   categories, custody, support staff, healthcare, mental
 5   healthcare.
 6        Q.   But it's your testimony that you don't
 7   actually know the number of persons in the various
 8   positions in the prisons today, correct?
 9        A.   That is my testimony.
10        Q.   I'm not trying to be argumentative, I'm
11   just -- please, I'm not trying to be argumentative, I'm
12   actually just trying to make the record clear, okay.
13             Do you know what the current physician to
14   inmate ratio is at CDCR?
15        A.   No, I do not.
16        Q.   Do you have an understanding -- strike that.
17             Have you ever heard what an appropriate
18   physician to inmate ratio is in a prison setting?
19        A.   Yes, I have.  I don't remember the number but
20   I'm familiar with what is considered an appropriate
21   ratio.  I know I've seen that number.
22        Q.   Okay.  But you can't remember that number,
23   correct?
24        A.   No, I don't.
25        Q.   And do you remember what the physician to
```

```
 1  inmate ratio was when you were the director or
 2  undersecretary?
 3       A.   No, I'm sorry, I don't.
 4       Q.   Do you know whether that ratio was different
 5  from what your understanding was with respect to what
 6  the ratio should be?
 7       A.   Yes, I recall that it was different.
 8       Q.   Was it lesser or greater?
 9       A.   We had less physicians than was per -- the
10  ratio was less physicians to inmates than was considered
11  acceptable.
12       Q.   Do you know where you saw or learned what an
13  acceptable ratio was?
14       A.   I don't know specifically.  I know that it was
15  a part of discussions over Plata and preparing budget
16  change proposals to seek the appropriate staffing that I
17  was provided that kind of information but I don't
18  remember what it was specifically.
19       Q.   Do you know -- and I have a sneaking suspicion
20  what your answer to these questions are, but I have to
21  make the record clear.  Do you know what the vacancy
22  rate is at each of the 32 institutions for RNs?
23       A.   Not today, no, I do not.
24       Q.   Do you know what the vacancy rate is at any of
25  the 32 institutions with respect to physicians, nurse
```

```
 1   the Department of Corrections and also managing a very
 2   large reception center as the warden of San Quentin and
 3   understanding the difficulty of housing inmates
 4   appropriately.
 5       Q.   Are you testifying that a prison system cannot
 6   provide appropriate medical care and mental healthcare
 7   if it exceeds 95 percent of design capacity?
 8       A.   Can you say that one more time?
 9       Q.   Sure.  Are you testifying that a prison system
10   cannot provide appropriate medical and mental healthcare
11   if it exceeds 95 percent of design capacity?
12       A.   I am testifying that it gets to be more
13   difficult when you have no vacancies and you're trying
14   to manage populations and putting the right inmate into
15   the right kind of healthcare or mental healthcare
16   program, you end up with delays and waiting lists for
17   appropriate housing of individuals when you have no
18   vacancy rates.
19       Q.   But, as you sit here today, you're not aware
20   of any of those conditions since you left the
21   department, correct?
22       A.   That's true, since I left the department.
23       Q.   And it's not your testimony that
24   constitutionally adequate medical and mental healthcare
25   cannot be provided if the population exceeds 95 percent
```

```
 1  of design capacity, is it?
 2          MR. SPECTER:  Do you understand the question?
 3          THE WITNESS:  I'm not sure that I do,
 4  actually.
 5      Q   (By Mr. Mello) I believe you testified
 6  that it makes it more difficult to exceed 95 percent
 7  of design capacity.  Is it your testimony that a
 8  prison system that is operating at more than
 9  95 percent of design capacity will be unable to
10  provide constitutionally adequate medical and mental
11  healthcare to its inmates?
12      A.  Well, I suppose that it's possible to provide
13  that if you had unlimited resources and put in place
14  whatever it took to make sure that happened.
15      Q.  What do you understand the term "design
16  capacity" to mean?
17      A.  Design capacity is a term that refers to what
18  a prison was built to house.  In the planning of it,
19  what did you plan to house at that prison.
20      Q.  And so if the planning said single bunks, then
21  that design capacity would be based upon one inmate per
22  cell?
23      A.  That's correct.
24      Q.  On page five again, paragraph 15 of your
25  report it reads that "In California there is not enough
```

DEPOSITION OF JEANNE S. WOODFORD                              76

```
 1   correctional staff to provide prisoners with timely
 2   access to care and still perform other essential
 3   functions."  Do you see that?
 4       A.   Yes.
 5       Q.   Are you referring to medical care or mental
 6   healthcare or both in this sentence?
 7       A.   I'm referring to both.
 8       Q.   Is it your testimony that this statement is
 9   true at all 32 prisons?
10       A.   I don't have specific knowledge of all 32
11   prisons but I generally believe that's true of all 32
12   prisons.
13       Q.   Are you aware of whether or not that is true
14   at any of the prisons, specific prisons?
15       A.   Are you referring to now?
16       Q.   Today.
17       A.   Today.  I know that it's true at many prisons
18   today but I cannot specifically tell you that.  I know
19   that it's true because of the number of correctional
20   officer vacancies.
21       Q.   Do you know what the number of correctional
22   officer vacancies is today?
23       A.   As of today, I do not.
24       Q.   Do you know what it was in the last six
25   months?
```

1    A.    Yes, I believe I do.

2    Q.    What's that number, to the best of your

3 understanding or recollection?

4    A.    I've heard numbers from 3,000 to 4,500.

5    Q.    Do you know the number of correctional officer

6 vacancies, a specific number, that there are at any

7 specific institution in the system today?

8    A.    No, I do not.

9    Q.    Do you know the number of -- the specific

10 number of correctional officer vacancies at any of the

11 institutions in the last six months?

12    A.    No, I do not.

13    Q.    In the last year?

14    A.    No, I do not.

15    Q.    On page seven of your report, paragraph 19, it

16 reads that "Some staff work back-to-back double shifts

17 and would sleep in their cars in the prison parking lot

18 instead of making a long commute home." Do you see

19 that?

20    A.    Yes.

21    Q.    Do you know how many correctional officers

22 have done this in the last year?

23    A.    No, I do not.

24    Q.    What do you base this opinion on or statement

25 on?

1   A.   My knowledge of the Department of Corrections
2   and talking to different wardens while I was the
3   director and in conversation with people since, you
4   know, here and there.
5   Q.   Do you know whether this is occurring today?
6   A.   No, I do not.
7   Q.   In paragraph 19, the same paragraph, you write
8   or it reads "Officers who are tired and suffer from low
9   morale are often less productive and do not fulfill all
10  their responsibilities to provide for the basic needs of
11  prisoners."  Do you see that?
12  A.   Yes.
13  Q.   Do you know if that is the case today?
14  A.   No, I do not know that today.
15  Q.   But you believe that was the case prior to you
16  leaving the department, correct?
17  A.   Yes.
18  Q.   And you base that upon your experience and in
19  talking to wardens among other things, correct?
20  A.   Talking to staff of all levels, yes.
21  Q.   Do you know whether that circumstance,
22  officers being tired and suffering from low morale and
23  being less productive, whether that led to any deaths in
24  2006?
25  A.   I do not know that.

DEPOSITION OF JEANNE S. WOODFORD                    79

```
 1  old and decrepit to provide humane housing.
 2      A.   Yes.
 3      Q.   What do you mean by "humane housing"?
 4      A.   What I mean by "humane housing" is the
 5  standard that the average person would find acceptable.
 6  In walking into some of these prisons, it was
 7  unbelievable what I saw.
 8      Q.   Can constitutionally adequate medical or
 9  mental healthcare be provided in crowded housing?
10  Strike that.
11           Can constitutionally adequate medical and
12  mental healthcare be provided to inmates who live in
13  crowded conditions?
14           MR. SPECTER:  Objection, crowded is vague.
15           MR. MELLO:  You can answer if you understand.
16           THE WITNESS:  Well, I would answer it this
17  way.  I think anything is possible if you have unlimited
18  resources and are willing to do whatever it takes to
19  make that happen.
20      Q    (By Mr. Mello) Can, in your opinion,
21  constitutionally adequate medical and mental
22  healthcare be provided to inmates who live in
23  non-humane housing conditions?
24           MR. SPECTER:  Objection, the non-humane
25  housing is vague.
```

```
                  STATE OF CALIFORNIA   )   ss.

          I, the undersigned, a Certified Shorthand
Reporter of the State of California, hereby certify that
the witness in the foregoing deposition was by me duly
sworn to testify to the truth, the whole truth, and
nothing but the truth in the within-entitled cause; the
said deposition was taken at the time and place therein
stated; that the testimony of said witness was reported
by me, a Certified Shorthand Reporter and a
disinterested person, and was thereafter transcribed
under my direction into typewriting; that the foregoing
is a full, complete and true record of said testimony;
and that the witness was given an opportunity to read
and, if necessary, correct said deposition and to
subscribe the same.

          I further certify that I am not of counsel or
attorney for either or any of the parties in the
foregoing deposition and caption named, nor in any way
interested in the outcome of the cause named in said
action.

          IN WITNESS WHEREOF, I have hereunto set my
hand this 3rd day of January, 2007.


                              _____
                                 CERTIFIED SHORTHAND REPORTER
```