**EXHIBIT B**

**Certified Copy**

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA
AND THE NORTHERN DISTRICT OF CALIFORNIA
UNITED STATES DISTRICT COURT COMPOSED OF THREE TO
PURSUANT SECTION 2284, TITLE 28 UNITED STATES CODE

RALPH COLEMAN, et al.,

      Plaintiffs,                    CASE NO. 2:90-cv-00520
                                      LKK JFM P
vs.                                     THREE-JUDGE COURT

ARNOLD SCHWARZENEGGER, et al.,

      Defendants.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

MARCIANO PLATA, et al.,

      Plaintiffs,                    CASE NO. C01-1351 TEH
vs.

ARNOLD SCHWARZENEGGER, et al.,     THREE-JUDGE COURT

      Defendants.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

DEPOSITION OF

JEANNE WOODFORD

SEPTEMBER 15, 2008
10:00 a.m.

425 Market Street, 25th Floor
San Francisco, California

Reported by Quyen N. Do, RPR, CSR No. 12447

**PAULSON**
REPORTING & LITIGATION SERVICES
www.paulsonreporting.com

Telephone: 415.591.3333
Facsimile: 415.591.3335

44 Montgomery Street
Suite 1100
San Francisco, CA 94104

26

1  listed, this Item No. 7?
2      A    I learned about it in discussions with
3  Mr. Specter.
4      Q    Do you recall what Mr. Specter told you with
5  respect to Item No. 7?
6      A    Specifically, no.
7      Q    Going back to Exhibit 1 quickly, you've
8  identified that you forwarded one e-mail to the Prison
9  Law Office with respect to drug programs, I believe, and
10 you sent a copy of your handwritten notes to the Prison
11 Law Office.
12          Did you provide the prison law office with any
13 other documents that you used or relied upon in arriving
14 at your opinions in this case?
15     A    I don't believe so.
16     Q    Okay.  So it's true that you did not provide
17 any copies of draft reports or handwritten reports to
18 the Prison Law Office other than your notes, correct?
19     A    That's correct, mm-hm.
20     Q    Can you tell me who prepared the first draft
21 of your supplemental report?
22     A    Well, I -- when you mean prepare, tell me what
23 you mean by that.
24     Q    Okay, did you write out a copy of the report
25 that's been marked as Exhibit 2?

PAULSON
REPORTING & LITIGATION SERVICES, LLC
www.paulsonreporting.com

Telephone: 415.591.3333
Facsimile: 415.591.3335

44 Montgomery Street
Suite 1100
San Francisco, CA 94104

27

1   A   No, I did not.

2   Q   Did you type out what has been marked as
3   Exhibit 2?

4   A   No, I did not.

5   Q   Did you dictate Exhibit 2 into a dictaphone or
6   some other machine?

7   A   No, I did not.

8   Q   Did you dictate Exhibit 2 to Mr. Specter?

9   A   Well, I don't know that I would use the word
10  dictate, but we certainly had lots of conversations
11  about what I would want to put into my supplemental
12  report based on my observations in touring the prisons
13  and based on what I had read.

14  Q   Did you dictate your supplemental report to
15  anybody else at the Prison Law Office, like Miss Norman
16  or somebody else?

17  A   I did not dictate it, but I had conversations
18  with Miss Norman about what I wanted to see in the
19  supplemental report.

20  Q   Okay. And can you tell me what you told
21  Miss Norman about what you wanted to see in the
22  supplemental report?

23  A   Well, I talked about what I had -- my
24  observations of the different prisons, what I saw in
25  terms of the overcrowded situations in each of the

PAULSON
REPORTING & LITIGATION SERVICES, LLC
www.paulsonreporting.com

Telephone: 415.591.3333
Facsimile: 415.591.3335

44 Montgomery Street
Suite 1100
San Francisco, CA 94104

                                    33

1            MR. SPECTER:  Objection.  It calls for a legal
2    conclusion.
3            MR. MELLO:  She's an expert.
4            MR. SPECTER:  Still calls for a legal -- she's
5    not a legal expert.
6    BY MR. MELLO:
7        Q   I think you can -- are you a medical expert?
8        A   No, I'm not a medical expert.
9        Q   Do you have any medical or mental health
10   training?
11       A   Yes.  I have some training as it pertains to
12   the lawsuits involved in this case.
13       Q   Do you have any undergraduate or graduate
14   training in medicine?
15       A   No, I do not.
16       Q   Do you have any undergraduate or graduate
17   school training in mental health?
18       A   No, I do not.
19       Q   Okay.  Have you read or been informed by
20   anybody what a constitutionally adequate medical care
21   system would look like?
22       A   I have read the Receiver's plan for providing
23   a constitutionally adequate health care system.
24       Q   Without medical training, can you evaluate
25   whether or not that plan is sufficient?

**PAULSON**
REPORTING & LITIGATION SERVICES, LLC
www.paulsonreporting.com

Telephone: 415.591.3333
Facsimile: 415.591.3335

44 Montgomery Street
Suite 1100
San Francisco, CA 94104

47

1  that 130 percent figure on?
2      A    I believe they -- I hope this was in this
3  particular report, but I believe they also looked at
4  what the Department of Corrections' review of each
5  prison had found, and they had come up with a
6  higher percent that they didn't agree with.  But I think
7  they probably utilized some of that information to make
8  their own decision, it sounded, from reading the report.
9      Q    Okay.  You wrote, at the end of that sentence,
10 that you agreed with that 130 percent design bed
11 capacity limit, correct?
12     A    Yes.
13     Q    Okay.  And what studies or reports, other than
14 the strike team report, do you base that opinion upon?
15     A    I base that on my correctional experience and,
16 you know, probably reading things over the years that
17 I -- that the names of which are not coming to mind, but
18 certainly studying the field of corrections.
19     Q    As you sit here today, can you recall with
20 specificity any of those studies or reports that you
21 relied upon in arriving at this opinion?
22     A    No, I cannot.
23     Q    Okay.  In your opinion, is 130 percent design
24 capacity necessary to achieve constitutionally adequate
25 medical and mental health care in California's

PAULSON
REPORTING & LITIGATION SERVICES, LLC
www.paulsonreporting.com

Telephone: 415.591.3333
Facsimile: 415.591.3335

44 Montgomery Street
Suite 1100
San Francisco, CA 94104

69

1  Other than these three prisons that you
2  visited in the last -- in July and August, have you been
3  inside a California adult institution in the last three
4  years?
5      A    Last three years?
6      Q    Uh-huh.
7      A    In the last three years, I have.  I think I've
8  only been gone from the department two -- a little over
9  two years.
10     Q    Okay, I'm losing my ears.  In the last two
11 years, have you been inside any other adult institutions
12 other than the three that you just spoke about?
13     A    No, I have not.
14     Q    Do you have any personal knowledge as to the
15 conditions in the other institutions that you haven't
16 viewed in the last two years?
17          MR. SPECTER:  Well, how could she have
18 personal knowledge if she hasn't been there?
19 BY MR. MELLO:
20     Q    You can answer, then.  So the answer would be
21 no.  Is the answer you have none?
22     A    Well, I mean, I've read the reports of other
23 people who have been in there, so from those reports, I
24 have an impression, but I have not personally viewed the
25 conditions.

Telephone: 415.591.3333
Facsimile: 415.591.3335

**PAULSON**
REPORTING & LITIGATION SERVICES, LLC
www.paulsonreporting.com

44 Montgomery Street
Suite 1100
San Francisco, CA 94104

                          80
1              provide supervision."
2              Right?
3       A      Yes.
4       Q      And you believe -- and this, you wrote,
5  basically means that correctional officers are not "able
6  to provide assistance if the prisoner has a health
7  issue."  Do you see that?  It's the last sentence.
8       A      Yes.
9       Q      Okay.  Can you identify any specific instances
10 that you are aware of where a correctional officer at
11 Lancaster failed to provide assistance to a prisoner
12 with a health issue due to mixing of potentially violent
13 prisoners?
14      A      No, I cannot provide a specific example of
15 that.
16      Q      Are you aware of any specific example anywhere
17 in the system where this mixing of potentially violent
18 prisoners resulted in a correctional officer failing to
19 provide assistance to a prisoner with a health issue?
20      A      Can you repeat the question again?  I'm sorry.
21      Q      Sure.  I asked you with respect to Lancaster.
22      A      Okay.
23      Q      My question is more broad.  Are you aware of
24 any specific instance where a correctional officer was
25 unable to provide an inmate with a -- to provide

Telephone: 415.591.3333
Facsimile: 415.591.3335

PAULSON
REPORTING & LITIGATION SERVICES, LLC

www.paulsonreporting.com

44 Montgomery Street
Suite 1100
San Francisco, CA 94104

                                  81

1    assistance to an inmate with a health issue due to
2    mixing of potentially violent prisoners at any CDCR
3    institution?
4               MR. SPECTER:  It's vague as to time.
5               THE WITNESS:  Yeah.
6               MR. SPECTER:  You mean any time ever?  Or just
7    when?  Sorry.
8               MR. MELLO:  In the last two years.
9               THE WITNESS:  I -- from reading some of the
10   other expert opinions, who -- from people who went in
11   and looked at prisons and saw the overcrowding, I think
12   that, while I don't use the term being housed with other
13   violent inmates, they do use the term inmates who are
14   more vulnerable were in crowded housing units, so --
15   and -- their circumstance caused their mental illness to
16   be worse and, in some cases, caused people to exhibit
17   signs of mental illness that would not otherwise have
18   done so.  So I don't know have a specific example, but
19   in reading the reports, it was clear that it was
20   prevalent at other prisons.
21   BY MR. MELLO:
22        Q    Which reports?
23        A    The one from -- oh, gosh.  Pablo --
24              MR. SPECTER:  Can I help her?
25   BY MR. MELLO:

Telephone: 415.591.3333
Facsimile: 415.591.3335

PAULSON
REPORTING & LITIGATION SERVICES, LLC

www.paulsonreporting.com

44 Montgomery Street
Suite 1100
San Francisco, CA 94104

                                82

1    Q    Stewart?
2    A    Okay.
3    Q    Stewart?
4    A    Yes, from Dr. Stewart.  I'm sorry.
5    Q    No, I want to help.
6         MR. SPECTER:  Okay.
7         THE WITNESS:  Thank you so much.
8    BY MR. MELLO:
9    Q    Anybody else?  Any other report that mentioned
10   specific examples?
11   A    I believe Dr. Shansky's report talked to it to
12   some degree.
13   Q    Anyone else?  Any other places where you
14   learned of specific incidences where correctional
15   officers failed to provide assistance to prisoners with
16   medical or mental health issues due to population?
17   A    Well, I -- I do think that Dr. Stewart's
18   report went into great detail to talk about the
19   increased percentage of inmates who are mentally ill,
20   and -- and I do think that that comes as a result of
21   inmates being overcrowded.
22   Q    And you base that --
23   A    And --
24   Q    I'm sorry.
25   A    I'm sorry.

PAULSON
REPORTING & LITIGATION SERVICES, LLC
www.paulsonreporting.com

Telephone: 415.591.3333
Facsimile: 415.591.3335

44 Montgomery Street
Suite 1100
San Francisco, CA 94104

Jeanne Woodford                                    September 15, 2008

83

1    Q    No, go ahead.
2    A    And I do think the reports -- Dr. Shansky's
3    report also discusses the impact of overcrowding on the
4    inmates' mental health and talks about staff's inability
5    to identify those signs and symptoms. And it really is
6    really common sense. When you have so many inmates
7    crowded in, it is -- it's just more difficult to know
8    who they are and know what their issues and problems
9    are, and you have an inability to really see the -- the
10   nuances in their changed behavior. You know, are they
11   eating? Are they not eating? Are they hearing voices?
12   Are they taking their medication?
13         All of those things get to be more difficult
14   to -- for the correctional officer to observe and bring
15   to the attention of medical staff, because it really is
16   the correctional officers that are with them 24/7,
17   and -- and the health care professionals are so
18   dependant on the observations of staff, and when you
19   have so many more inmates and so few staff, having been
20   a correctional officer myself, I can tell you how
21   difficult it is to be aware of the changes in their
22   behavior.
23   Q    Would CDCR be able to be more aware of their
24   behavior by hiring additional correctional officer
25   staff?

PAULSON
REPORTING & LITIGATION SERVICES, LLC
www.paulsonreporting.com

Telephone: 415.591.3333
Facsimile: 415.591.3335

44 Montgomery Street
Suite 1100
San Francisco, CA 94104

119

REPORTER'S CERTIFICATION

I, Quyen N. Do, Certified Shorthand Reporter, in and for the State of California, do hereby certify:

That the foregoing witness was by me duly sworn; that the deposition was then taken before me at the time and place herein set forth; that the testimony and proceedings were reported stenographically by me and later transcribed into typewriting under my direction; that the foregoing is a true record of the testimony and proceedings taken at that time.

    IN WITNESS WHEREOF, I have subscribed my name this 22nd day of September 2008.

/s/ *Quyen N. Do*

Quyen N. Do, RPR, CSR No. 12447

**PAULSON**
REPORTING & LITIGATION SERVICES, LLC
www.paulsonreporting.com

Telephone: 415.591.3333
Facsimile: 415.591.3335

44 Montgomery Street
Suite 1100
San Francisco, CA 94104