**EXHIBIT C**

# REPORT OF JEANNE WOODFORD

COLEMAN v. SCHWARZENEGGER et. al.,
No. CIV S-90-0520 LKK JFM P

PLATA v. SCHWARZENEGGER et. al.,
No. C01-1351 THE

THREE-JUDGE COURT

NOVEMBER 9, 2007

# TABLE OF CONTENTS

A.  Background and Introduction...................................................1

B.  Causes and Effects of Overcrowding........................................3

C.  The State's Inadequate Response to Overcrowding: AB 00.............10

D.  Communications with the Governor and His Staff on
    Overcrowding..............................................................13

E.  Conclusion..................................................................15

i

*Plata v. Schwarzenegger*; *Coleman v. Schwarzenegger*
**REPORT OF JEANNE WOODFORD**

**A. Background and Introduction**

1. I received my B.A. from Sonoma State University in 1978. I became a correctional officer at San Quentin in 1978. I worked for the California Department of Corrections and Rehabilitation (CDCR) for the next 27 years in various custodial and management positions. While at San Quentin, I rose through the ranks, eventually becoming the Warden from 1999 to 2004. In 2004 Governor Schwarzenegger appointed me as the Director of what was then the Department of Corrections. In 2005 he appointed me to be the Undersecretary for the CDCR and then the acting Secretary of the Department. I retired from the CDCR in July of last year. Since November 1, 2006, I have been the Chief Probation Officer for the City and County of San Francisco. A complete description of my educational and employment background is set forth in my resume, which is attached as Appendix A.

2. All of my positions with the CDCR have included health care related tasks. While a correctional officer, one of my responsibilities was to escort prisoners to their medical or mental health appointments. As a supervisor in housing units, I was responsible for ensuring that correctional officers did the same. As a correctional counselor, I advocated for prisoners to be examined by physicians. As a manager at San Quentin and the CDCR I worked with health care staff, and court appointed personnel on the improvement of the health care delivery system both at San Quentin and in the Department generally through both *Coleman* and *Plata*.

1

3. I have been asked by attorneys for the Plaintiffs in both of these cases to describe my observations of the effects of overcrowding on the delivery of medical and mental health care to prisoners and whether in my opinion overcrowding is the primary cause of the constitutional violations, and, if so, whether other orders would effectively address the severe problems that plague the CDCR. I agreed to describe my observations and express my opinions, but I will not accept any compensation for doing so.

4. In preparation for this report I have reviewed the following documents: Governor Schwarzenegger, *Prison Overcrowding State of Emergency Proclamation* (October 2006); Office of Inspector General, *Special Review into the California Department of Corrections and Rehabilitation's Release of Inmate Scott Thomas* (October 2007); Little Hoover Commission, *Solving California's Corrections Crisis: Time is Running Out* (January 2007); Assembly Bill 900; *Toussaint v. McCarthy*, 597 F. Supp. 1388 (N.D. Cal. 1984); CDCR, *Fall Adult Population Projections* (October 2007); Office of the Inspector General, *Special Review into In-Prison Substance Abuse Programs Managed by the California Department of Corrections and Rehabilitation* (February 2007); Expert Panel, *A Roadmap for Effective Offender Programming in California* (June 2007).

5. In the last four years I have testified as an expert witness in a trial involving death row in Ohio.

6. My observations are set forth below. My opinion is that overcrowding is the primary cause of the constitutional violations, and nothing short of a reduction in the

2

prison population will effectively address these issues.

### B. Causes and Effects of Overcrowding

7.  When I began employment as a correctional officer there were fewer than 30,000 prisoners in 12 state prisons. In the early 1980s, the prison population began to grow, and as a result the then existing prisons, including San Quentin, began to increase the use of double celling, to house prisoners. I saw first hand the effects of overcrowding on prisoners, staff and the prison's infrastructure.

8.  The increase in the prison population created problems in virtually all areas. Overcrowding caused the prison to be more dangerous for both prisoners and staff. The environmental conditions deteriorated to the point where they posed health and safety risks to everyone living and working in some housing units. Violence increased among prisoners, putting prisoners and staff at a greater risk of harm. Crowding also put a tremendous strain on the prison's ability to deliver adequate services, particularly medical and mental health care to prisoners.

9.  It was not long before lawsuits were filed, challenging these terrible conditions. Two cases, *Wilson v. Deukmejian* and *Toussaint v. McCarthy*, resulted in orders not to double cell prisoners. Another case, *Marin v. Rushen*, was settled with an agreement to provide enhanced medical and mental health services to prisoners. In the *Toussaint* case, the Court found that overcrowding "strains all environmental systems within the institution, and makes it difficult to provide decent conditions of confinement to lockup inmates." *Toussaint v. McCarthy*, 597 F. Supp. at 1405. I agree, although I believe the

3

Court understated the challenges posed by severe overcrowding, perhaps because the lockup units at that time were only 140% overcrowded.

10. Overcrowding of the magnitude currently existing in the CDCR is unprecedented in my experience. I do not know of another state prison system that approaches this level of crowding. In my opinion, it is all but impossible to safely and humanely incarcerate this many prisoners within the existing facilities.

11. **Management.** The CDCR lacks an effective management structure, it has insufficient management information systems to provide accurate data to managers, and it lacks sufficient number of personnel who have the necessary skill and training to manage such a large and complex organization.

12. Overcrowding exacerbates the weaknesses in the organizational structure of the CDCR. There are simply too many issues that arise from such a large number of prisoners and staff. One result of this is that management spends virtually all of its time fighting fires instead of engaging in thoughtful decision-making and planning. This results in short-sighted decisions that create even more crises. Under these circumstances, it is virtually impossible for the organization to develop, much less implement, a plan to provide prisoners with adequate care.

13. **Transfers/Classification.** Overcrowding limits the CDCR's ability to get prisoners to the right prison for treatment. The health care needs of prisoners do not take place in a vacuum. The CDCR employs an objective classification system that assigns prisoners points based on the length of their sentence, their disciplinary history and other

4

objective factors. Based on the number of points, prisoners are classified into one of four levels. The level of classification determines which prisons prisoners can be transferred to. In addition, many prisoners have other special needs, such as for protective custody, gang association or dual diagnosis. All of these factors limit the places that prisoners can be housed. Since crowding fills any available space, there is insufficient flexibility in moving prisoners so that their health care and other needs can be met. For example, crowding causes delays in moving reception center prisoners to other prisons for treatment. Instead, many parole violators end up serving their entire sentence in reception centers, which are not designed for, nor capable of, providing the appropriate treatment.

14. To manage the movement of prisoners appropriately, five percent of housing should be vacant. Without the flexibility that this vacancy rate provides, it is very difficult to ensure that prisoners are housed appropriately for their medical and mental health needs.

15. **Staffing.** A prison cannot function without adequate custodial staff. Custodial staff are essential to providing health care to prisoners because they supervise prisoner movement to and from medical appointments, they escort prisoners to services within an institution and they provide supervision when prisoners are taken out of the prison to medical appointments, hospitals or they are transferred to another institution. In California there is not enough correctional staff to provide prisoners with timely access to care and still perform other essential functions.

5

16. Despite relatively high salaries, it is difficult to recruit enough correctional officers. While I was in the central office, we tried to step up recruitment efforts but we could not get enough applicants that passed the security and background checks and then made it through the academy to fill all our authorized positions. At San Quentin, for example, even when new recruits were added the effect was often temporary because after a short time correctional officers transferred to other prisons in more desirable, less expensive locations. In addition, the least experienced staff would often have to work the most difficult positions because union rules permitted personnel to bid on 70% of the open positions. When I visited the Correctional Training Facility at Soledad, for example, I found a lone correctional officer in a housing unit who told me that he could not search cells (a basic safety requirement) while prisoners were in the housing unit. When I asked what his supervising sergeant thought about this, he responded that there was no sergeant because it was the least desirable of the units at CTF.

17. The number of authorized positions is grossly inadequate to provide sufficient staff to meet all of the prisoners' basic needs. For example, there are often only two officers to supervise 200 prisoners in a gym or a dorm. This is extremely dangerous for both the prisoners and the staff because line of sight supervision is impossible under these circumstances and it does not permit the staff the time to recognize that prisoners are in trouble from any number of causes, including medical or mental illnesses.

18. Inadequate staff has created dangerous conditions for both the staff and prisoners. To be effective, correctional officers must interact with prisoners. This

6

communication reduces tension and violence in the unit, and it often allows the staff to know when a prisoner has a medical or mental health issue. Generally, there is not enough prisoner-staff interaction in the CDCR because of the staffing shortages and the insufficient number of staff positions in many of the housing units.

19. The danger to prisoners is enhanced because the correctional staff frequently is forced to work mandatory overtime. Some staff work back-to-back double shifts and would sleep in their cars in the prison parking lot instead of making the long commute home. Officers who are tired and suffer from low morale are often less productive and do not fulfill all their responsibilities to provide for the basic needs of prisoners. Such officers will be less responsive to prisoners who need escorts to medical or mental health services and will be less likely to recognize signs and symptoms of mental illness or manifestations of suicidal ideation.

20. At Corcoran and SATF two tragic cases illustrated the problem. One prisoner literally starved to death and another bled to death. Many officers were in the unit at the time these events occurred. It is inconceivable to me that officers who were properly supervising the prisoners in their care would not notice such obvious events.

21. The tragic effects of overcrowding reach into the community. The case of Scott Thomas exemplifies the unreasonable demands placed on staff when the prisons are so overcrowded. Scott Thomas was mistakenly released on parole on May 18, 2007 and allegedly entered a San Francisco bakery and stabbed a 15 year-old girl and a man who came to her aid.

7

22.  San Quentin staff made three fundamental errors when processing this case. First, they confused Scott Thomas with another prisoner, Steve Thomas, who was a different race, 16 years younger and 40 pounds lighter.  Second, in 2002 the CDCR designated Thomas as "high control", which requires the Department to take additional precautions, such as close supervision, when releasing such prisoners on parole.  No such precautions were taken despite prominent documents to that effect in his prison file. Third, staff violated clear CDCR policy that required the release of a prisoner serving a term in the security housing unit directly to a parole agent.

23.  Although it is clear that individuals did not comply with CDCR policy, the inappropriate release of Thomas is really a system failure because the people doing the work have an impossible mission.  Having been a correctional counselor with similar responsibilities, I know from first hand experience that there is not enough time for the Correctional Counselor III to review 150 to 200 cases per week and do their job properly. Nor is there sufficient trained records staff to complete adequate review of cases for parole or other legal releases.

24.  **Lockdowns.**  Lockdowns exacerbate the overcrowding crisis because they are staff intensive and inhibit the delivery of services to prisoners.  When I became the Director I was shocked by the number and durations of lockdowns.  A recent state-sponsored study of lockdowns recognized the direct relationship between overcrowding and lockdowns: the "other side of the overcrowding coin is that when wardens implement security lockdowns, they usually shut down all programming in the affected areas.  Not

8

only is this disruptive to programming but, the Panel believes the number and duration of lockdowns in California prisons is excessive." Expert Panel, *A Roadmap for Effective Offender Programming in California*, at viii.

25. Lockdowns make the delivery of medical and mental health particularly difficult because staff must escort prisoners to every service or bring the service to them. The CDCR prisons are not staffed for that. In my experience, mental health services were at times cancelled because of lockdowns or other emergencies, and officers would only escort prisoners with urgent medical conditions.

26. Lockdowns increase the risk that a prisoner will not get treatment in an emergency because prisoners are dependent on the correctional officer to properly convey the medical problem to medical staff and then be able get an escort to the clinic. Conversely, there is an extra burden on medical staff because they may be required to travel to the housing unit.

27. Lockdowns also adversely affect some prisoners' mental health. I have observed many prisoners who have been locked in their cells for long periods of time deteriorate right before my eyes. Their skin becomes ashen, their ability to communicate is reduced and sometimes they are not oriented to time and place.

28. **Clinical Space.** California's prisons were not built with sufficient space for medical and mental health services. Space for mental health facilities is a particular concern because of all the activities that are required by the *Coleman* program guides. To meet the demands for space the CDCR was constantly trying to shoehorn mental health

9

facilities into areas that were not designed for such activities. Not only did this make an imperfect fit for the space, but it also resulted in the loss of space for other programs.

29. **Old and Deteriorating Prisons.** Many of the existing facilities are too old and decrepit to provide humane housing. Among those include parts of the Correctional Training Facility, Deuel Vocational Institution, San Quentin, the California Mens Colony, Folsom, the California Rehabilitation Center and the Correctional Conservation Center.

30. When I visited prisons during my tenure as Director at times the noise levels were so bad that it was enough to drive a sane person crazy. In some units, like Palm Hall for example, staff found it unbearable to remain inside the unit for more than a few minutes.

**C. The State's Inadequate Response to Overcrowding: AB 900.**

31. Assembly Bill 900 is not the right solution for the overcrowding crisis. AB 900 essentially is a prison expansion measure which increases the number of prison cells without addressing the fundamental structural issues that have caused the crisis and that have created unconstitutional conditions within the prisons. It is not consistent with the recommendations of the report of the Expert Panel on Corrections Reform as well as other similar reports. See Expert Panel Report at 77 (summarizing recommendations of previous reports).

32. AB 900 does nothing to limit the growth of the prison population. According to the CDCR's latest projections, the population will increase by another 10,000 prisoners

by 2010. This confirms my belief that California cannot build its way out of this crisis.

33. AB 900 relies heavily on the assumption that there will be a reduction in recidivism through rehabilitative programs in the planned reentry facilities. That assumption is wrong. CDCR paroles 10,000 prisoners per month. Sixty percent of those parolees serve an average of 4.5 months, and 69% of first time parolees serve less than a year. Not only is this precious little time to promote effective rehabilitation, but I agree with the Little Hoover Commission that these "short prison stints" have no effect on public safety. "[T]hey . . . disrupt families and communities where these offenders come from and return to, and diminish the potential for offenders to get and keep jobs, maintain housing and become law-abiding citizens." Little Hoover Commission, *Solving California's Corrections Crisis*, at 27.

34. Effective rehabilitation assumes that the Legislature and Governor will appropriate enough money for effective programs. This fiscal year the legislature enhanced the budget for programs by only approximately $50 million. By any measure, this paltry figure demonstrates a lack of commitment to rehabilitation in a system this large with an annual budget of almost $10 billion. In my experience, in tight fiscal times the first thing to go in corrections is money for rehabilitative programs.

35. I witnessed the destruction of most rehabilitation programs during the early 1990s, from which the department has never recovered. With a California budget deficit expected to reach over $8 billion next year, I do not believe that the state legislature's monetary commitment will be any greater and probably much less.

11

36. AB 900 relies heavily on the construction of 32 reentry facilities located in urban areas to provide rehabilitation. Since many, if not most, of the prisoners will spend only a short time in these facilities, I doubt it will be very effective in reducing recidivism. In addition, it is extremely unlikely that the CDCR will be able to site 32 of these facilities in local communities, especially in urban centers.

37. In the unlikely event that these facilities are built, I question whether they will ever be adequately staffed or managed. Since the CDCR cannot effectively manage or staff its existing 33 prisons, doubling the number of prisons will only aggravate the problems.

38. The Inspector General recently audited the substance abuse treatment provided by the CDCR. He concluded that the effort was a "$1 billion failure—failure to provide an environment that would allow the programs to work; failure to provide an effective treatment model; failure to ensure that the best contractors are chosen to do the job at the lowest possible price; failure to oversee the contractors to make sure they provide the services they agree to provide; failure to exert the fiscal controls necessary to protect public funds; failure to learn from and correct mistakes—and most tragically, failure to help California inmates change their lives and, in so doing, make our streets safer." Office of the Inspector General, *Special Review into In-Prison Substance Abuse Programs Managed by the California Department of Corrections and Rehabilitation*, at 5. Nothing that I now know suggests that the CDCR is any more capable of reducing recidivism through these or any other programs. In fact my experience with the

12

leadership of the CDCR suggests the opposite. When I was the Acting Secretary of the CDCR, I adopted a goal of reducing the recidivism rate by 10% by 2010. When I stepped down from this position that goal was rescinded. The Secretary informed me that he had rescinded that goal because he believed it was risky to set such a goal. Throughout my career I have found the leadership unwilling to be accountable for the outcome of prisoner programs.

39. The so-called "in-fill" beds will cause more problems than they will solve. Many of California's prisons are so big that they are effectively unmanageable. Wardens and other administrators spend much of their time responding to crises, rather than fulfilling their responsibilities to provide adequate medical and mental health care. Unless these in-fill beds stand alone with their own administrative and support facilities, adding thousands of additional prisoners to already overburdened facilities will only compound the burdens imposed on prison administrators and line staff.

**D. Communications with the Governor and His Staff on Overcrowding**

40. When the Governor offered to appoint me as acting Secretary of the CDCR, I asked him whether we could meet to discuss the direction that I wanted to pursue for the Department. He agreed to meet the next week, but despite several attempts, I never met with him again until the day I resigned.

41. I wanted to meet with the Governor to make sure that I would have his support for the initiatives I believed were necessary. I particularly wanted to talk to him about sentencing reform because I believed that the population pressures were going to

13

continue and that the state could not build its way out of this problem.

42. I did subsequently meet with Ms. Kennedy, the Governor's Chief of Staff, and Fred Aguiar, the Governor's Cabinet Secretary, and informed them that I could not accept the position as Secretary until I had an opportunity to discuss my plans with the Governor. I told them about the population pressures and my position on sentencing reform. Ms. Kennedy said that she wanted to give the issue some thought, but never discussed this issue with me again until the day I resigned.

43. I finally met with the Governor in his smoking tent after I told Mr. Aguiar that I planned to resign. I told the Governor that the state did not have a plan to address the population pressures. In a prior meeting with the Governor as the Undersecretary of the CDCR the Governor asked me if I thought we needed more prison beds. I replied no, unless it is to replace existing capacity. I explained that California has more prisoners than Texas, yet Texas has over one hundred prisons and California has only 33. I informed the Governor that California had built very large prisons that were designed to warehouse inmates. These large prisons are very difficult to manage and do not provide enough space for programs and services.

44. During my meeting with him on the day I stepped down as acting Secretary of the CDCR I explained that we could not build our way out of the overcrowding problem and that we needed sentencing reform. I also explained to him that we parole about 70,000 parole violators per year who serve twelve months or less and that this revolving door created population pressures. I also told him that dangerous offenders were being

14

released without any treatment or program, and that this crisis was jeopardizing public safety. In addition, I explained that low level offenders could receive programs in the community that would cost less and be more effective than the prison programs. Governor Schwarzenegger said that this all sounded reasonable, but Ms. Kennedy reminded him that it was an election year and the meeting ended shortly thereafter.

45. It was obvious to me at that time that in order to run an organization this large with such complex, high profile problems, the CDCR Secretary must have meaningful access to and the support of the Chief Executive. He is the only one who can make the tough, politically sensitive decisions that are necessary to alleviate the crisis. Since it was obvious that I was not going to have this necessary access and it was evident to me the Governor was not going to address the issues in a way I thought would address the prison overcrowding problem, I resigned my position as acting Secretary.

**E. Conclusion**

46. The Governor's October 4, 2006 emergency proclamation recognized that California's prisons are severely overcrowded, creating "extreme peril" to the health and safety of prisoners and that "the magnitude of the circumstances exceeds the capabilities of the services, personnel, equipment, and facilities. . . ." I agree. Until the population is reduced substantially there is no realistic hope that the unconstitutional conditions will be eliminated.

Dated: November 9, 2007

Jeanne Woodford
Jeanne Woodford

15

# APPENDIX A

## *Jeanne S. Woodford*
*Work: (415) 553-1688*

OBJECTIVE:

*To utilize education and career experience to benefit the Department of Corrections and Rehabilitation.*

EDUCATION:

*1974 - Associate of Arts Degree*
*Santa Rosa Junior College*
*Santa Rosa, California*
*Liberal Arts*

*1978 - Bachelor of Arts Degree*
*Sonoma State University*
*Rohnert Park, California*
*Criminal Justice, emphasis on Psychology and Sociology*

CAREER EXPERIENCE:

*11/01/06*          *Chief Adult Probation Officer, San Francisco Adult Probation*
*Department*

*Direct responsibilities include the proper administration of the Adult Probation Department; formulates policies and plans and develops methods and procedures for the rehabilitation of adult probationers; manages the budgetary and fiscal activities and services of the entire organization, making continuing high-level contacts with the welfare of adult probationers; directs the preparation, approval, review and maintenance of important records and reports affecting all operations of the department; cooperates with various social agencies, law enforcement bodies and interested persons and groups in programs of crime and delinquency prevention.*

*07/05/05*          *Appointed by Governor Arnold Schwarzenegger as Undersecretary of the California Department of Corrections and Rehabilitation (CDCR).*

*Key responsibilities include advising the Secretary on major policy, program and organization issues; during the Secretary's absence acting for and representing the Secretary in a variety of areas with the Legislature, Governor's Office, Department of Finance, other state and federal agencies, local government, and constituent groups; representing the CDCR on all policy and program matters in response to inquiries from the press, the State Legislature, and the public; reviewing and approving proposed administrative regulations of the CDCR; advising the Secretary on decisions of the state and federal courts affecting the CDCR; and providing administrative direction, and supervision to all CDCR staff. For significant periods of time, appointed as Acting Secretary.*

02/23/04          *Appointed Director, Department of Corrections*

*Responsible for the administration of 32 State prisons, 38 conservation camps, more than 185 parole units, and contracts with 50 public or private community-based facilities or centers. Also, responsible for managing and operating budget of $5.3 billion (fiscal year 2003-2004). In this capacity, also serve as the Chair, Prison Industry Board, am an acting member of the Board of Corrections, which oversees local juvenile halls and county jails; and serve as a member of the California Council on Criminal Justice.*

06/22/00          *Appointed Warden, San Quentin State Prison*

02/99 to 6/00     *Warden (a)*
                  *San Quentin State Prison*

*Directly responsible for the overall operation of San Quentin State Prison. San Quentin has three primary missions: Reception Center, condemned housing, and a level II general population. San Quentin has a budget of 110,000,000. San Quentin houses 5,800 inmates and has a work force of 1,500 staff.*

**RESUME
JEANNE S. WOODFORD
Page 2**

08/97 to 02/99    *Chief Deputy Warden*
                  *San Quentin State Prison*
                  *San Quentin, CA 94964*

*Directly responsible for the day to day operation of San Quentin, including 1,500 staff and an inmate population of 6,000. Responsible for managing a one hundred ten million ($110,000,000.) budget.*

04/96 to 8/97     *Associate Warden*
                  *Correctional Facility*
                  *San Quentin State Prison*
                  *San Quentin, California 94964*

*Directly responsible for managing San Quentin's Central Services Division. Primary responsibility for perimeter security, yards, gates, wall posts, dining hall, Receiving and Release and visiting and mail programs. Direct supervision of Central Services Captain. Indirect supervision of 345 custody staff. Additional responsibilities include the position of San Quentin's Equal Employment Opportunity (EEO) Coordinator.*

04/95 to 04/96    *Facility Captain*
                  *Correctional Facility*
                  *San Quentin State Prison*
                  *San Quentin, California 94964*

*Directly responsible for managing San Quentin's Reception Center, consisting of 3,000 inmates, including a 150-man HIV positive unit. Direct supervision of Correctional*

*Counselors II and Correctional Counselors I, as well as Reception Center custody staff.*

02/93 to 04/95          *Program Administrator*
                       *Correctional Facility*
                       *San Quentin State Prison*
                       *San Quentin, California  94964*

*Directly responsible for managing San Quentin's Reception Center, consisting of 3,000 inmates and a Reception Center records office; a 150-man HIV positive unit and San Quentin's main records office.*

07/91 to 02/93          *Program Administrator*
                       *Correctional Facility*
                       *San Quentin State Prison*
                       *San Quentin, California  94964*

*Directly responsible for managing North Block, an orientation/general population housing unit with a bed capacity of 826 inmates; responsible for 32 uniform/non-uniform staff; chair initial and routine classification committees; established inmate programs; monitoring and enforcing appropriate security measures; establishing staff development; ensuring due process compliance for both staff and inmates.*

12/90 to 07/91          *Program Administrator*
                       *Institutions Services Unit*
                       *California Department of Corrections - Headquarters*
                       *Sacramento, California  94283*

*Directly responsible for monitoring and managing the litigation filed against the California Department of Corrections.  In addition, I was responsible for projects aimed at preventing litigation such as the CIW health care study.  Also, I was responsible for development of the Litigation Management Plan for the Department.*

06/90 to 12/90          *Correctional Counselor III*
                       *Correctional Facility*
                       *San Quentin State Prison*
                       *San Quentin, California  94964*

*Directly responsible for the operation of the Reception Center Records Office.  Monitor activities of Parole Revocation Unit relative to timeliness of revocation hearings.  Act as liaison with other agencies and other institutions to coordinate transfers for out to court, medical and psychiatric cases.  Monitor of overall production and quality control of cases from reception to transfer.  Direct supervision of four Correctional Counselors II and One Case Records Manager.  Indirect supervision of 21 Correctional Counselors I, two Case Records Supervisors and other clerical personnel. Provide on the job training and formalized training for Records, counseling and other staff.*

04/87 to 06/90          *Correctional Counselor II*
                       *Legal Affairs Coordinator*
                       *San Quentin State Prison*
                       *San Quentin, California  94964*

*Coordinate and investigate compliance services with custodial and ancillary staff.  Act*

*as primary liaison and resource person for the Institution Operation Divisions with respect to court compliance. Coordinate the on-site compliance audits and production of all submissions to the courts or other agencies. Respond to special compliance/legal affairs projects as necessary and perform special duties as directed by the Warden and Chief Deputy Warden. Answer questions and prepare responses to Monitors, Special Masters, Inspector General staff, departmental counsel, Attorney General and Court Management Services Branch on behalf of the institution. Assist in preparation of institutional budget proposals affected by court cases. Schedule and track condemned inmates with execution dates. Prepare reports for the Governor for inmates with execution dates.*

| | |
|---|---|
| *09/86 to 04/87* | *Correctional Counselor II* |
| | *Work Incentive Coordinator* |
| | *San Quentin State Prison* |
| | *San Quentin, California  94964* |

*RESUME*
*JEANNE S. WOODFORD*
*Page 3*

*Coordinate San Quentin's Work Incentive Program. Auditing of Work Incentive records. Training staff on the proper implementation of the Work Incentive Program.*

| | |
|---|---|
| *03/86 to 09/86* | *Correctional Counselor II* |
| | *Security Housing Units I and IV* |
| | *San Quentin State Prison* |
| | *San Quentin, California  94964* |

*Supervision of Correctional Counselors I. Schedule and participate in institutional classification actions. Chair unit classification; act as Program Administrator in the absence of the Program Administrator. Work closely with San Quentin's Criminal Activity Coordinator relative to gang activity. Ensure compliance with court decisions; i.e., Toussaint Decision, Thompson Decision, Wilson Decision. Write and update Institutional Procedures.*

| | |
|---|---|
| *05/83 to 03/86* | *Correctional Counselor I* |
| | *San Quentin State Prison* |
| | *San Quentin, California  94964* |

*Perform the casework functions for San Quentin's 102-man, Maximum A custody, staff assaulter unit. These duties include normal casework functions as well as a very broad knowledge of gang members and gang activities. Work closely with San Quentin's Criminal Activity Coordinator relative to gang activity. Ensure compliance with court decisions. Perform casework functions for San Quentin's H-Unit; duties include classification actions, board reports and appropriate programming recommendations.*

| | |
|---|---|
| *1978 to 1983* | *Correctional Officer* |
| | *San Quentin State Prison* |
| | *San Quentin, California  94964* |

*Supervision of inmates.*

*APPOINTMENTS:*

*Human Relations Committee, San Quentin*
*Conflict Resolution Team*
*Trauma Team*
*Equal Employment Opportunity/Affirmative Action Counselor*
*Department Equal Employment Opportunity Investigator*
*San Quentin Drug Program Coordinator*
*San Quentin Equal Opportunity Coordinator*
*San Quentin Treatment of People Committee Mentor*
*Leadership Institute*
*Class A Trustee with the General Services Board for Alcoholic Anonymous*
*John Jay College of Criminal Justice Advisory Committee*
*Technology Services Board for the Department of technology Services (Member)*
*Council on Mentally Ill Offenders (Chair)*
*Correctional Standards Authority (Chair)*
*Friends Outside Sacramento Chapter (Honorary Chair)*

*PANEL MEMBER/HEARINGS:*

*National Institute of Corrections (June 6-7, 2005) hearing on Faith-based Approach to*
*Corrections Issues*