**EXHIBIT D**

# SUPPLEMENTAL REPORT OF JEANNE WOODFORD

*Coleman v. Schwarzenegger et al.*,

No. Civ. S-90-0520 LKK

*Plata v. Schwarzenegger et al.*,

No. C01-1351 T.E.H.

AUGUST 2008

# SUPPLEMENTAL REPORT OF JEANNE WOODFORD

A. <u>Introduction</u>

1. On November 9, 2007, I submitted a report on the effects of overcrowding in California's prisons. At that time I concluded that overcrowding is the primary cause of the constitutional violations in these two cases, that a prison construction program will not alleviate the unconstitutional conditions and that the prison population must be substantially reduced for there to be any realistic hope that the unconstitutional conditions will be eliminated.

2. Since that time the population of the prison system has remained essentially unchanged, with the exception of a few thousand prisoners that have been transferred to private out-of-state prisons. In November 2007, there were 163,834 prisoners in institutions and camps, which is 199% of design capacity. As of July 30, 2008, there were 159,326 offenders in institutions and camps which is 191% of design capacity. Compare Weekly Reports of Population for July 30, 2008 and November 7, 2007, Data Analysis Unit, California Department of Corrections and Rehabilitation. Almost the entire difference is attributable to the 4,606 prisoners in out-of-state facilities.

3. After considering this information and inspecting three California prisons in the last month, it is still my opinion that the CDCR remains severely overcrowded, that this overcrowding is the primary cause of the constitutional violations and that the prison population must be substantially reduced to alleviate the unconstitutional conditions. In my opinion, the state can and should safely

1

reduce the prison population to an appropriate level that allows prisoners to receive, and staff to provide, the health care to which they are entitled and the programming that will keep all of us safe. I have read that the strike team appointed by the Governor to implement AB 900 has concluded that CDCR should not exceed 130% of design bed capacity in the long term, and should establish measures to ensure that this crowding level is not exceeded in the future. Joint Pls Trial Ex. 74 at 6 (Validation of In-Fill Bed Plan, AB 900 Strike Team Issue Memo No. 1, August 13, 2007). I agree with this position, with the caveat that different (and particularly older) facilities might require slightly lower population limitations, based on the quality of infrastructure and availability of treatment space, for example.

4. I inspected the Correctional Training Facility at Soledad (CTF) on July 23, 2008, the California State Prison at Corcoran (Corcoran) on July 24, 2008, and the California State Prison – Los Angeles at Lancaster (Lancaster) on August 7, 2008. I was accompanied on the tour by prison officials, a representative of the Receiver's office and a Deputy Attorney General. I was provided with access to all areas of the prison and any documents or prisoner files that I requested. Both custody and health care staff answered all of my questions.

5. All three of the prisons that I inspected are severely overcrowded by any measure. CTF was 197% overcrowded on July 23, 2008, housing 6,500 prisoners in a facility designed for 3,312. Weekly Report of Population for July 23, 2008, Data Analysis Unit, California Department of Corrections and Rehabilitation.

Corcoran was designed for 3,116 prisoners, but was housing 5734 on July 23, 2008, 184% of design capacity. *Id.* Lancaster housed nearly 5,000 prisoners on July 23, 2008, in a prison designed for 2,300, an overcrowding rate of an astounding 216%. The three prisons I visited confirmed my opinion that overcrowding negatively affects the entire operation of a prison. Although this is manifested in different ways, it is obvious that the overcrowding itself is very dangerous and is preventing the state from providing the necessary services to prisoners.

6. Even the remedies the state uses to alleviate crowding cause problems for an already overburdened staff. For example, at CTF the medical department was swamped with work because they had been ordered to review 1,500 medical files to determine which prisoners were eligible for transfer to out-of-state prisons.

B. Housing Units

7. All three prisons were housing prisoners in areas not designed for that purpose. At Lancaster, all three of the gymnasiums were filled with triple bunks and each housed between 150 and 200 prisoners. Other housing units had 40 double bunks on the dayroom floor. CTF is using three units as dormitories filled with 200 prisoners in double-bunks. And at Corcoran a gym was converted into a triple bunked dormitory, and inmates in a housing unit in the sensitive needs yard were overflowing on to the dayroom floor.

8. These overcrowded housing units are neither safe nor secure. The custodial staffing in each of these units is not sufficient to provide adequate

3

supervision, especially because the bunks obstruct lines of sight and there are not enough officers to patrol the units. At Lancaster, for example, a gym housing reception center was filled with inmates that according to the Correctional Officer had not been classified by security level. This allowed prisoners with different potential for violence to be mixed in a housing unit where there was scant ability to provide supervision. This practice violates the most basic correctional practices designed to ensure that prisoners are safe from harm by other prisoners and that correctional officers are able to provide assistance if the prisoner has a health issue.

9. Adding to the risk of harm is the fact that these units are very hot, with the outside temperature between 95-102 degrees. Further, the prisoners had virtually nothing to do for months and sometimes years on end. The staff in these units confirmed that with the exception of the "E" Dorm at South at CTF there was little program or activity for these prisoners except exercise, and that was often cancelled because of the lack of officers or security lockdowns. At CTF North, for example, the size of the housing units, coupled with the lack of recreational space, has resulted in a yard program that divides the yard between three housing units on one yard and two on the other yard. Limiting the number of inmates on the yard has reduced the potential for violence on the yard but has dramatically reduced the number of hours general population inmates are out of their cell. I was told over 50% of the inmates did not have education or work assignments. For these inmates the amount of out of cell time was slightly more

4

than an inmate in administrative segregation or a security housing unit. As a former correctional officer and Warden, I have observed that prolonged periods of idleness under cramped conditions breeds anger and frustration. I also observed a growing number of elderly inmates at CTF central utilizing assistive devices such as a cane climbing grated stairs to get to their cell. These inmates were having some difficulty. This appeared dangerous under normal conditions. It is hard to imagine how they would accomplish this task in an emergency evacuation. There appears to be an insufficient number of first floor cells to meet the needs of the growing number of elder inmates. Inmates are often left with the choice of staying at a prison that has mobility challenges but offers some programs, such as CTF Central, or transferring to a prison that can meet their physical needs but has no or limited program availability. I agree with Governor Schwarzenegger that this level of overcrowding constitutes an emergency because it increases the risk of violence, riot and the transmission of infectious disease.

C. Reception Centers

10. It is also apparent that the sheer numbers of prisoners are straining the prison operations beyond the breaking point. This is especially apparent in reception centers. Several managers, including the Warden at Lancaster, remarked on the difficulty that they had keeping up with the flow of 1,000 newly arriving prisoners each month, each of whom must undergo a medical, dental and mental health examination. The reception center was also taxed by the need to keep inmates moving through the reception center until transferring to other prisons to

complete their sentence. It was also clear from touring this facility that staff had difficulty keeping up with sanitation and cleanliness. Much of the prison, including medical examining rooms, was unbelievable dirty, lacking appropriate sanitation practices.

11. Another manifestation of crowding is the length of time it takes to transfer prisoners from the reception center to other prisons. Prisoners should be processed through a reception center in 60 days. At Lancaster, the Warden initially told us that the average length of stay was 113 days. During the tour, I was told by correctional staff that the average reception stay was about 120 days. I was later informed by the associate warden that the average length of stay was about 61 days, a figure which appears suspect.

12. The Warden acknowledged that some reception prisoners stayed at Lancaster for up to two years because there was no other place to put them. I spoke with one such prisoner in the most restrictive and harsh unit at the prison, the new free-standing administrative segregation unit. He had been in ASU for two years because there was no room for him at the security housing unit, and in the year since his disciplinary term had expired seven proposed transfers had failed. Since I only talked with a few randomly-selected prisoners in this unit, I am confident that a full examination of the 175 prisoners in that unit would have revealed similar cases. The situation was similar at CTF with at least one prisoner spending two years in administrative segregation because there was no place else to put him.

13. The Health Care Manager and Director of Nursing at Lancaster both remarked that prisoners coming into the prison from the county jails were sicker and had more medical and mental health problems than general population prisoners. The chief medical records officer stated that the prison was two months behind in filing certain medical documents because files had not arrived from the *Plata* central medical records storage facility. This was particularly serious because virtually none of the prisoners from the Los Angeles county jails arrived with any health related information.

14. Although CTF is not a reception center, the mental health staff there stated that at times they felt like it was one. Not only were the absolute number (900) of outpatient (CCCMS) prisoners stretching their resources beyond their capability, but many CCCMS prisoners were present at the prison for only a short time, thus requiring staff to use their resources on the time intensive intake process. Mental health staff reported that they have had up to 200 new arrivals in a week, preventing them from completing the initial evaluations within the timelines, even with staff working overtime.

D. Segregation Units

15. The Warden of Lancaster remarked that the reception center Enhanced Outpatient Program (EOP) prisoners were "really hurting us." Sixty percent of the EOP prisoners at Lancaster were from the reception center. Many of those were housed in an EOP administrative segregation unit. The unit was supposed to house only 54 prisoners, but had housed up to 90. The unit was noisy, filthy, and

7

there were cages all over the dayroom floor that were used as holding cells or for "group treatment". The Health Care Manager candidly acknowledged what was obvious – there was not enough room in the unit to provide medical and mental health treatment to all these mentally ill prisoners. I talked with several who were clearly very distressed. The prison had converted some custodial office space to treatment space, but those rooms did not even have an examination table for medical staff.

16. Prisoners in this EOP unit were not receiving the required ten hours per week of exercise. I examined CDCR forms 114-A, which covered the period of August 3 through 7, 2008. These forms are kept to record the services provided to prisoners in a segregation unit. In all of the thirty-nine 114-A's that I examined only one indicated that the prisoner had received exercise on one occasion. The others either indicated that the prisoner had refused or there was no indication that the prisoner was given the opportunity to exercise. I was quite surprised by the number of refusals since generally prisoners exercise when given the opportunity. The high number of refusals is a symptom of a problem that was not understood or being addressed by staff.

17. According to the Coleman requirements, a psychiatric technician is supposed to make rounds in the unit every day to identify prisoners at risk of decompensation or suicide. The 114s that I reviewed showed that the psych tech was making rounds only once every other day.

8

18. The sheer number of reception center prisoners caused prisoners to be housed in places that were completely inappropriate. In the recently built free-standing administrative segregation unit at Lancaster, I talked to two minimum security prisoners who were in that unit only because there was no space anywhere else in the facility. The rules of the unit require all prisoners housed there to be treated the same. As a consequence, they remained in the cells for all but 10 hours a week, during which they could exercise in a small cage outside. Another prisoner was housed in this unit only because he had a relative who worked at the prison. When I brought these cases to the attention of staff, they told me arrangements had been made to have the minimum custody inmates moved out of the unit and they would explore the possibility of moving the inmate who had a relative working at the facility to another reception center. These examples are significant because it shows that this degree of overcrowding causes staff to make housing decisions solely on the basis of available beds and not according to the prisoners' or the prison's needs.

19. While inspecting the administrative segregation unit at Corcoran, I saw a notice posted outside the cell that said that this prisoner had not received any property because he refused a cell mate. The light was off in the middle of the day and the prisoner was lying on his back on the floor motionless with a towel or cloth of some type partially covering his face. This atypical behavior strongly suggests that the prisoner is mentally or emotionally at risk. However, his condition apparently went unnoticed. A review of the 114-Ds for this prisoner

9

revealed that psych tech rounds were done daily, yet no one had referred this man for a psychiatric evaluation despite the behavior and lack of program participation noted on the CDC 114A until I pointed out his condition to the chief psychologist who accompanied me during the tour.

20. I interviewed an older prisoner housed in the Security Housing Unit (CDCR's most restrictive setting) at Corcoran who uses a wheelchair and was wearing a neck brace. After a few minutes, this man started talking about the electrodes that were emanating from his feet and that correctional officers were trying to kill him. It was obvious to me that this man was out of touch with reality, and the Chief Psychologist who interviewed him shortly after me confirmed that he was severely psychotic. The Chief Psychologist said he was recently in a crisis bed for eight days, and had been in the SHU for the last thirty days. The Chief Psychologist said that he would be referred for a mental health evaluation, but that since he was refusing medication there was little they would do for him until he becomes a danger to himself or others by attempting suicide or assaulting another person. This was not an isolated incident. The Chief Psychologist noted that there were a lot of others like him in the SHU at Corcoran.

21. At Lancaster, I spoke with several of the prisoners in an EOP unit who appeared to be losing touch with reality. They had difficulty expressing their thought and appeared somewhat disorientated to time and space.

E. Lockdowns

22. Lockdowns continue to be common and were present at each of the prisons I visited. At CTF, the North facility had been on lockdown for about a month prior to the visit. Officers from other facilities had to leave their assigned posts and help with cell searches at North, leaving only one officer responsible for three tiers and hundreds of prisoners in each of the other units.

23. At Corcoran, one of the yards was locked down because of problems with one of the gangs. These lockdowns directly interfered with treatment because mental health staff were required to conduct interviews at the cell front, where there is no privacy.

24. At Lancaster, although the Warden said the prison had few lockdowns, it appeared much of the prison was on some form of lockdown when we visited. There were few prisoners on the yards, and many prisoners and staff reported that prisoners had gone weeks or months without access to the exercise yard.

F. Custodial Staffing

25. In prisons custody staff is essential to providing prisoners access to health care services, especially in cases where prisoners need urgent or emergency treatment. Not only do they provide escorts at certain times, but they are responsible for alerting health care staff when prisoners complain of an immediate serious problem and also are supposed to observe prisoners periodically to identify actual or potential problems. It is essential to the well-being of prisoners that correctional officers perform these functions at all times. There is not enough custodial staff to keep prisoners safe from harm in California prisons today.

11

"System-wide, CDCR lacks the custody staff and organizational structure and processes to ensure that patient-inmates are reliably escorted and/or transported to medical appointments. As a result, patient-inmates are often denied timely access to health care services, substantially increasing the risk that patient-inmates' health will further deteriorate and increasing the overall costs of providing health care services." Exhibit 1 to Joint Pls Trial Ex. 56 (Federal Receiver's Turnaround Plan of Action, attached as Exhibit 1 to Receiver's Eighth Report) at 5.

26. As noted above, in some facilities at CTF there was only one officer responsible for all prisoners in a housing unit. At Lancaster, correctional staff informed us that the day before we arrived, there were no officers on the floor in some units. That left only two officers in the control booth to observe the entire unit, making in-cell observation and interaction all but impossible.

G. Space

27. I agree with the Receiver that space represents a serious obstacle to the delivery of health care. Joint Pls Trial Ex. 56 (Receiver's Eighth Report) at 5. The staff at all three prisons I toured complained about inadequate space. At CTF, the medical staff stated that the Receiver has accepted their proposal for the construction of more space, which they believed was "critical" to their ability to provide care, but the completion of that project is at least two years away. The lack of space is having an immediate impact since they have identified a physician who could provide services, but they don't have space for him. In the South facility at CTF the clinic is by any measure too small and crowded with staff who

hardly can find a place to sit. The infirmary at CTF had 16 beds, six or seven of which were occupied by prisoners who needed long term care. Staff said that they need double that amount.

28. At Lancaster, prison officials cannibalized general population libraries to make room for clinics. But, that resulted in law libraries being moved to the dayroom floor in some of the units, making that space unavailable for recreation and treatment. The medical records office does not have room for all the files; instead, only the current volume of the medical record was readily available. The records office staff were crowded into an extremely small space, and in a small hallway at the rear of the office, boxes filled with records were stacked against the wall, and other vacant boxes were stacked about 10 feet high.

29. The Receiving and Release area at Lancaster was not designed for that purpose. Consequently, prisoners were stuffed into large holding cages where they spent up to ten hours with some sitting on the floor, waiting to be processed. The area used for psychiatric screening did not provide any visual or audio privacy. Prisoners and clinicians were sitting right next to each other in cubicles where the walls were about three feet tall. The Health Care Manager recognized the critical need for space, but was told it would be many years before the problems are alleviated.

30. As the Receiver noted recently, "The facilities available for providing health care services within CDCR are woefully inadequate. Through years of neglect, the facilities have long since passed the time when modest investments

13

could remedy the problem. We are dealing not with deferred maintenance, but with some facilities that are literally falling apart. In addition, investments in health care facilities have significantly lagged behind growing inmate populations, so much so that available clinical space is less than half of what is necessary for daily operations." Exhibit 1 to Joint Pls Trial Ex. 56 (Federal Receiver's Turnaround Plan of Action, attached as Exhibit 1 to Receiver's Eighth Report) at 25. "Simply stated, before constitutionally adequate health care can be delivered in California's prisons, there needs to be *constitutionally adequate treatment facilities to provide such care.* Unless and until the facilities are constructed, . . . prisoners will continue to die unnecessarily." Joint Pls Trial Ex. 56 (Receiver's Eighth Report) at 46 (emphasis in original).

H. Conclusion

31. Overcrowding in the CDCR is extreme, its effects are pervasive and it is preventing the Department from providing adequate mental and medical health care to prisoners.

32. The prison population can be reduced safely. As the former Chief Probation Officer of San Francisco, Warden of San Quentin and acting Secretary of the CDCR, it has been my experience that California incarcerates many more prisoners than is necessary for the safety of the public. This is not to say that offenders should not be held accountable for their actions. Sanctions other than incarceration are effective in punishing many prisoners and at the same time reducing the risk of recidivism. If California used these sanctions it would have

14

not only a prison system that is capable of providing essential services, but safer communities.

August 15, 2008

JEANNE WOODFORD

15

# APPENDIX A to REPORT OF JEANNE WOODFORD

The following are the documents I reviewed in preparation for this Supplemental Report.

1. Weekly Reports of Population for July 30, 2008 and November 7, 2008, Data Analysis Unit, California Department of Corrections and Rehabilitation.

2. Receiver's Seventh Quarterly Report.

3. Receiver's Eighth Quarterly Report.

4. Receiver's Eighth Quarterly Report, Exhibit 1 (Federal Receiver's Turn-Around Plan of Action).

5. 114-A's Lancaster Ad/Seg EOP for August 3-7, 2008.

6. California Independent Review Panel, Reforming California's Youth and Adult Correctional System, pp. 122-127.

7. Validation of In-Fill Bed Plan, AB 900 Strike team Issue Memo No. 1, August 13, 2007.