**EXHIBIT E
PART 1**

# EXHIBIT E

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

AND THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE

PURSUANT TO SECTION 2284, 28 UNITED STATES CODE

| | |
|---|---|
| RALPH COLEMAN, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| vs. ) | NO. 2:90-cv-00520 LKK JFM P |
| ) | |
| ARNOLD SCHWARZENEGGER, et ) | |
| al., ) | |
| ) | |
| Defendants. ) | |
| _____) | |
| MARCIANO PLATA, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| vs. ) | |
| ) | |
| ARNOLD SCHWARZENEGGER, et ) | |
| al., ) | *Certified Copy* |
| ) | |
| Defendants. ) | |
| _____| | |

---oOo---

DEPOSITION OF DOYLE W. SCOTT

Friday, December 14, 2007

---oOo---

REPORTED BY:  KRISTIE L. HUBKA, CSR NO. 5974

1    A.    Yes.

2    Q.    For how long?

3    A.    Three and a half hours.

4    Q.    Did you meet at their office?

5    A.    Yes.

6    Q.    And what, if anything, was discussed regarding

7  Dr. Shansky's deposition?

8          MS. NORMAN:    I'm going to object about content

9  of discussion.

10         MR. MELLO:    On what basis?

11         MS. NORMAN:    Because I don't think you're

12  entitled to the content of our discussion with

13  Mr. Scott.

14         MR. MELLO:    I think I absolutely am.    He's a

15  testifying expert and there's no privilege attached to

16  any communication.

17    Q.    Do you remember the question?    Let me just

18  reask it.

19    A.    Okay.

20    Q.    What, if anything, was discussed regarding

21  Dr. Shansky's deposition?

22    A.    Specifically the length of time that it took

23  because I had an urgent matter that I needed to get back

24  for so I was very concerned about that.    And in general

25  some of the questions that were asked.

1    Q.    Do you recall what questions were discussed

2    during that meeting?

3    A.    Let me think.  They were questions generally

4    surrounding overcrowding but I don't really recall the

5    specifics.

6    Q.    Was the subject of the drafting of his expert

7    report discussed?

8    A.    Only in the context that we would probably go

9    through my drafts and you would ask about the changes.

10    Q.    Mr. Scott, you're a college graduate, correct?

11    A.    I am.

12    Q.    What's your degree in?

13    A.    Business administration.

14    Q.    Where did you obtain that degree?

15    A.    Sam Houston State University.

16    Q.    Do you have any advanced degrees?

17    A.    No.  Not beyond my bachelors degree.

18    Q.    I'm sure you've received training in courses

19    since that time, correct?

20    A.    Yes.

21    Q.    Probably numerous.

22    A.    Yes.

23    Q.    Do you have any degrees in the medical field?

24    A.    No.

25    Q.    Do you have any degrees in the mental health

1    field?

2         A.    No.

3         Q.    Have you ever been a clinician who provided

4    either medical or mental healthcare?

5         A.    No.

6         Q.    You were the executive director for the

7    Department of Criminal Justice from 1996 through 2001,

8    correct?

9         A.    Not through 2001, until the middle of 2001.

10        Q.    Just so I'm clear, what period of time were

11   you the executive director of that department?

12        A.    I started in January of 1996 and I retired in

13   July of 2001.  And before that I was acting director

14   from October of '95 until I became permanent director.

15        Q.    So you were the director effectively from

16   October of '95 through your retirement in July 1, 2001,

17   correct?

18        A.    Yes, sir, that's correct.

19        Q.    And you were employed by that department prior

20   to that time, correct?

21        A.    Yes, sir.

22        Q.    When did you join that department?

23        A.    January of 1972.

24        Q.    And were you employed continuously by that

25   department through your retirement?

1      A.   No.

2      Q.   You were employed there from January of 72

3  until when?

4      A.   I think it was 1981.

5      Q.   So you were employed in 1981.  When you left

6  the department, what was your title?

7      A.   I was the major of correctional officers.

8      Q.   Can you explain to me what that means?

9      A.   It's the highest ranking uniform security

10  officer at an institution.

11      Q.   So the top correctional officer at an

12  institution?

13      A.   Uniformed correctional officer, correct.

14      Q.   And which institution were you at?

15      A.   The Retrieve unit.

16      Q.   And where is that?

17      A.   Angleton, Texas.

18      Q.   The Retrieve unit?

19      A.   (Witness nods head.)

20      Q.   Meaning what?

21      A.   It's actually a family name.  It was the

22  family's name that donated the property.

23      Q.   It wasn't like the guys go out and pick up the

24  folks who got away?

25      A.   No.

1     Q.   Sorry.

2     A.   Couldn't help yourself, could you?

3     Q.   I am childish.  Can you spell Retrieve?

4     A.   R-e-t-r-i-e-v-e.  It's now the Scott unit.

5     Q.   Is it really?

6     A.   Yes.

7     Q.   And who would that be named after?

8     A.   Myself.

9     Q.   Cool.  So when you left in 1981 where did you

10 go?

11    A.   I went to work in Houston as a petroleum land

12 man.

13    Q.   That was not in corrections, correct?

14    A.   No.

15    Q.   And when did you rejoin the department?

16    A.   Seven months after I left.

17    Q.   Didn't like being a petroleum land man?

18    A.   No.  I was invited to come back from the

19 director.

20    Q.   And I assume at some sort of new, higher level

21 position?

22    A.   No.  I started over as a correctional officer.

23    Q.   Okay.  And how long -- so you came back

24 sometime in 1981?

25    A.   Yes.

1          THE WITNESS:  Okay.

2      Q    (By Mr. Mello) During the period of time

3  that you were executive director what programs or

4  efforts did the department take to find clinicians

5  for those difficult to place institutions?

6      A.    First we outsourced our medical treatment to

7  our university teaching hospitals in the state and that

8  would be the University of Texas Tech Health Science

9  Center and the University of Texas Medical Branch.  UTMB

10  had about 70 percent of our inmate population to care

11  for medically, Texas Tech had about 30 percent of our

12  population to care for.

13          We redesignated some beds to facilities that

14  were close to major metropolitan areas so we would have

15  an available labor pool of classes of medical

16  professionals to work at our institutions.

17      Q.    And when did the relationships with Texas Tech

18  and UTMB start?

19      A.    I don't recall the exact year.

20      Q.    Do you know if it was before you became the

21  executive director?

22      A.    It was.  It was, yes.

23      Q.    Do you think if California were to enter into

24  agreements with its U.C. system that that might help

25  with some of the problems in California's prisons?

1           MS. NORMAN:  I'm going to object as to

2      speculation.

3           You can answer if you can speculate.

4      Q      (By Mr. Mello) Let me reask the question.

5      Based upon your experience in Texas -- strike that.

6           Was it a positive development when these two

7      institutions took over medical delivery?

8      A.     That and the relocation of our medical beds to

9      major metropolitan areas.

10      Q.     Based upon that experience and the success

11     that you had do you believe that CDCR entering into a

12     similar agreement with, for example, the University of

13     California system would help improve medical delivery in

14     CDCR institutions?

15      A.     Possibly.  I think -- again, I think it's

16     going to take more than just that.

17      Q.     Is it your opinion that such an arrangement

18     would negatively impact medical care in California's

19     prisons?

20      A.     I wouldn't say that it would negatively impair

21     it, no.

22      Q.     When you were the executive director who was

23     responsible for the medical branch?  Was there a medical

24     director?

25      A.     Yes.

1       Q.    Right.

2       A.    And Plata is the medical portion of it.

3       Q.    Do you believe you'll be providing expert

4   testimony with respect to mental healthcare in this

5   case?

6       A.    I think I will, yes.

7       Q.    On the same page of your report you indicate

8   that you have done independent reviews and expert

9   analyses on staffing patterns, institutional response to

10  violent disturbances, general operations, and security

11  controls.  Do you see that?

12      A.    Uh-huh.  Yes.

13      Q.    Any of those items that you've just discussed,

14  did they relate to either medical care or mental

15  healthcare?

16      A.    Staffing patterns impacted medical care in the

17  number of staff, correctional staff, that were used as

18  escorts to escort people to and from medical

19  appointments.  Also the number of staff that was

20  designated to transfer offenders off site for specialty

21  appointments.  The one on violent disturbances, the only

22  impact on healthcare there was the treatment of the

23  offenders that were injured and the staff that were

24  injured.

25      Q.    Were you asked to provide any analysis of the

1     staffing patterns of medical or mental health

2     clinicians?

3         A.    Clinicians?

4         Q.    Yes.

5         A.    No.

6         Q.    Do you have any experience analyzing staffing

7     or staffing ratios as it relates to medical clinicians

8     or mental health clinicians?

9         A.    No, I've never done that.

10        Q.    And when you say correctional officers needed

11    for medical escorts and correctional officers needed to

12    transfer inmates off site, on what locations have you

13    done such analysis?

14        A.    Florida, Oklahoma, Kentucky, Indiana,

15    New Mexico, and Puerto Rico.

16        Q.    Have you ever heard Texas referred to as Baja,

17    Oklahoma?

18        A.    No.

19        Q.    Somebody used that term to me in the last six

20    months, somebody from Oklahoma obviously.

21        A.    Don't you think it should be the other way

22    around?

23        Q.    That was very funny.  It was before the

24    Texas/Oklahoma or whatever.  Maybe it was a year ago.

25    Time flies when you're having fun.

1      A.    I never heard of that.

2      Q.    It obviously made an impression on me.  When

3  did you conduct such an analysis in Florida?

4      A.    I was there in the summer of 2006.

5      Q.    And who did you conduct that analysis for?

6      A.    The director of the department.

7      Q.    And what conclusions did you reach with

8  respect to this subject matter in Florida?

9      A.    That's a pretty broad question.

10     Q.    It is.  Did you write a report?

11     A.    I wrote my section of the report.

12     Q.    And do you recall what your conclusions were

13  in the section of the report that you wrote for the

14  director of the department of Florida?

15     A.    In regards to what in particular?

16     Q.    Staffing for correctional officers for escorts

17  and off site transfer.

18     A.    Right.  In some areas they were short and

19  needed to have additional staff in those areas.

20     Q.    And how did you go about determining whether

21  they were short staffed for Florida?

22     A.    For Florida?

23     Q.    Uh-huh.

24     A.    By observing on site for a number of hours at

25  the institutions that I was assigned to and by

1    interviewing staff, by interviewing offenders, looking

2    at how many medical appointments were missed, the

3    frequency of those misses, and then it's pretty easy to

4    extrapolate from there to determine the number of staff

5    needed.

6        Q.    Did you come up with hard numbers of

7    additional staff they needed at each institution?

8        A.    Correct.

9        Q.    Did you come up with ratios that were needed

10    at those institutions?

11        A.    In respect to what?

12        Q.    Inmate to correctional officers.

13        A.    Well, one ratio doesn't really apply because

14    each institution is designed and operated very

15    differently so you have to actually be on site and

16    observe the operation to determine the proper ratio of

17    officers to inmates.

18        Q.    And would that be the same with respect to the

19    institutions in California?

20        A.    Yes.

21        Q.    To do a proper analysis would you need to

22    spend time at each institution to come up with the

23    appropriate staffing levels?

24        MS. NORMAN:  Objection.  Clarification, to do

25    a proper analysis of?

1              MR. MELLO:  Let me restate the question.

2       Q.    Did you do an analysis of all 32 prisons,

3    adult institutions, in California with respect to

4    staffing levels?

5       A.    No, I did not.

6       Q.    When you did your analysis in Florida how many

7    institutions did you visit?

8       A.    Eight, I believe.

9       Q.    Over what period of time?  How long?  And let

10   me reask that question.

11             Over how many weeks or months did you visit

12   those eight institutions?

13      A.    Four weeks I believe.  I did two a week.

14      Q.    And how long did you spend at each of those

15   institutions?

16      A.    Generally two days.

17      Q.    And when you say two days, do you mean 8:00 to

18   5:00, 9:00 to 5:00, do you recall?

19      A.    It was pretty much a full day at each site.

20      Q.    So you spent approximately two days at each

21   institution?

22      A.    (Witness nods head.).  Yes.  I'm sorry.

23      Q.    I should have said that.  You caught yourself.

24   Okay.  Is it true that you did not do a similar analysis

25   at each one of the 32 institutions that are part of the

1    Plata case?

2        A.    No, I did not.

3        Q.    It's true, you didn't do that, correct?

4        A.    No, I did not, yes.

5        Q.    I know and your report indicates but can you,

6    for the record, tell me which institutions you visited

7    in California?

8        A.    In California?

9        Q.    Yes.

10       A.    Avenal, the CIM, Valley State, and

11   San Quentin.

12       Q.    Did you spend two days at Avenal?

13       A.    No.

14       Q.    Did you spend two days at CIM?

15       A.    No.

16       Q.    Did you spend two days at Valley State Prison

17   for Women?

18       A.    No, I did not.

19       Q.    Did you spend two days at San Quentin?

20       A.    No.

21       Q.    Approximately how many hours did you spend at

22   Avenal?

23       A.    Five.  Five to six.

24       Q.    Approximately how many hours did you spend at

25   CIM?

1          A.    I spent a whole day there.

2          Q.    So approximately eight hours?

3          A.    Probably closer to seven.

4          Q.    How many hours at Valley State Prison for

5     Women?

6          A.    About four.

7          Q.    How many hours did you spend at San Quentin?

8          A.    About seven.

9          Q.    Have you ever done an analysis of the medical

10    care delivery system of any institution, jail or

11    correctional system?

12         A.    Only as it is impacted by the operations

13    division at each place that I've analyzed.  I think I

14    understand your question.  I've never analyzed staffing

15    ratios, as I said earlier, for clinicians or licensed

16    medical professionals.

17         Q.    Have you ever analyzed the quality of care

18    provided by medical clinicians?

19         A.    Provided by -- no, I have not.

20         Q.    Have you ever analyzed the quality of mental

21    healthcare provided by clinicians?

22         A.    No.

23         Q.    Do you feel qualified to opine on the quality

24    of medical care provided by medical clinicians?

25         A.    No.

1    "Chief Medical Officer"?

2        A.    Yes.

3        Q.    And that's sort of the chief doctor at a

4    California institution.

5        A.    I would assume so, yes.

6        Q.    Did Texas have a similar position when you

7    were executive director?

8        A.    Yes.

9        Q.    What was that position called?

10       A.    It was called coordinating physician I believe

11   is what it was called.  And then we had a hospital

12   administrator at each site.

13       Q.    I'm going to assume nothing.  Was the hospital

14   administrator an administrative person as opposed to a

15   medical provider?

16       A.    Most of the time.  Some of them had some

17   medical background but mostly they were administrators.

18       Q.    Would the coordinating physician be both in

19   charge of medical care and mental healthcare?

20       A.    Yes.

21       Q.    Did you ever serve as a coordinating

22   physician?

23       A.    No.

24       Q.    Did you ever serve as the director of medical

25   services in the department?

1      Q.    And during either your first or second

2  conversation with Mr. Specter did he define what your

3  task would be in this matter or did that happen later?

4      A.    It happened later.

5      Q.    Did it happen in writing or verbally?

6      A.    Verbally.

7      Q.    And was it Mr. Specter who provided you that

8  task verbally?

9      A.    It was.

10      Q.    Do you know approximately how long after your

11  first conversation with Mr. Specter that he provided you

12  your verbal assignment?

13      A.    I don't recall specifically.  I'm sorry.

14      Q.    Do you recall what he told -- strike that.

15          Do you recall the assignment that Mr. Specter

16  asked you to complete?

17      A.    We had a conference call that had several

18  people involved and I can't tell you exactly who all was

19  on the line and we discussed then the particulars and

20  the travel schedule.

21      Q.    Were other individuals from your company on

22  that conference call?

23      A.    No.

24      Q.    Do you believe the others on that conference

25  call were attorneys from the Prison Law Office?

1   records that gave the history of the offenders.

2       Q.   Anything else you can think of that would be

3   needed?

4       A.   I probably will later on but those are the

5   things that come to mind immediately.

6       Q.   Okay.  Exhibit 1 is your report, correct?

7       A.   Yes.

8       Q.   When was the first time you saw the first

9   draft of this report?

10      A.   Just a few days before it was completed.

11      Q.   Did you type up the first draft of your

12  report?

13      A.   No.

14      Q.   Did you provide notes or handwritten notes to

15  the Prison Law Office to draft the first -- strike that.

16          Did you provide any handwritten notes to the

17  Prison Law Office in order to provide you with the first

18  draft of the report?

19      A.   They took notes from my observations.  They

20  interviewed me and took notes from my observations.

21      Q.   When did they interview you?

22      A.   Actually we interviewed in between facilities

23  while it was fresh on everybody's mind.  Don would sit

24  in the back seat of the car and take notes as I gave him

25  my observations.