# EXHIBIT E
# PART 2

1      Q.    It's true that you did not draft the first

2   report, correct?

3      A.    No, I did not prepare the document.

4      Q.    Did you prepare any of the draft reports?  And

5   I see that there are several here which I'll ask you

6   about.

7      A.    I edited every line of the re- -- from the

8   first draft on and added my own verbiage in a number of

9   places.

10      Q.    You've reviewed a lot of information so far in

11   this case, correct?

12      A.    I have.

13      Q.    Do you plan on reviewing any other materials

14   prior to your testimony at the Phase I trial?

15      A.    It's possible if there's new reports issued

16   between now and then I might.

17      Q.    As you sit here, can you think of anything

18   specifically you will review prior to your trial

19   testimony?

20      A.    Not unless there's some new information that

21   comes forward.

22      Q.    Do you plan to interview or speak to anybody

23   else about this matter prior to the Phase I trial which

24   is in February?

25      A.    Other than my attorneys?

1      Q.    Other than the Prison Law Office.

2      A.    No one that I can think of other than my

3  attorneys.

4      Q.    I'm not trying to be condescending so please

5  don't --

6      A.    No, I don't.  I didn't get that at all.

7      Q.    Okay.

8      A.    Any time I talk about lawyers, I'm fairly

9  condescending myself.

10      Q.    I'm not trying to be here.  Do you understand

11  that the Prison Law Office does not represent you in

12  this matter?

13      A.    Yes.  And I guess that I misspoke.

14      Q.    But you were referring to the Prison Law

15  Office when you said your attorneys?

16      A.    Yes, I did.

17      Q.    Okay.  Do you plan to supplement your report

18  in writing prior to the Phase I trial?

19      A.    I wouldn't think so, but if there's a new

20  development, possibly.

21      Q.    You read the receiver's report on overcrowding

22  issues on May 15th, 2007, correct?

23      A.    Yes.

24      Q.    And you read his supplemental report on

25  overcrowding issues on about June 11th, 2007, correct?

1      A.    Yes.

2      Q.    Did you review the receiver's I'll call it

3    interim Plan of Action which was issued on or about

4    May 10th, 2007?

5      A.    I would have to look.  I don't recall

6    specifically whether I looked at that or not.  I don't

7    see it on my list.

8      Q.    Why didn't you review that report?

9      A.    I don't -- it probably wasn't provided for me.

10   Or it may have been provided and I just -- if it's

11   included in one of these other reports, I can't

12   specifically recall it by name.

13     Q.    Do you think being familiar with the current

14   plan on fixing the delivery of medical care in

15   California's prisons is important?

16     A.    Yes.

17     Q.    Have you subsequently reviewed the receiver's

18   November 15, 2007, Plan of Action subsequent to the

19   filing of your report on November 9th?

20     A.    I don't think so.

21     Q.    Just for clarification, the receiver's Plan of

22   Action was filed in the court on November 15th, 2007,

23   after your report was submitted.

24     A.    And I don't think I've reviewed any documents.

25     Q.    Since then?

DEPOSITION OF DOYLE W. SCOTT                    54

1    A.    Since then.

2    Q.    Do you believe it's possible that if you

3  reviewed that Plan of Action from November 15th, 2007,

4  that it might affect your opinions in this case?

5         MS. NORMAN:  Objection as to speculation.

6         THE WITNESS:  Yeah, I don't know until I would

7  read it.

8    Q.    (By Mr. Mello) But you do agree that being

9  familiar with the current plan for fixing the

10 delivery of medical care in California's prisons is

11 important in forming your opinions in this case?

12        MS. NORMAN:  I'm going to object because I

13 believe counsel is making an assumption -- asking

14 Mr. Scott to make an assumption as to what is in the

15 contents of the receiver's Plan of Action and he's

16 already testified that he doesn't know.

17        MR. MELLO:  You can answer the question if you

18 understand it.

19        THE WITNESS:  Would you repeat it one more

20 time?

21        MR. MELLO:  Sure.

22   Q.    If there's a plan for fixing the delivery of

23 medical care in California's prisons do you believe that

24 that is something that might affect your opinions in

25 this case?

1    blame for the deplorable condition of California prison

2    medical care in the state can properly be attributed to

3    multiple causes, there is a single root cause of this

4    crisis:   An historical lack of leadership, planning, and

5    vision by the State's highest officials during a period

6    of exponential growth of the prison population."  Do you

7    see that?

8         A.   I do.

9         Q.   Do you agree or disagree with the statement in

10   the Findings of Fact and Conclusions of Law?

11        A.   Of that statement?

12        Q.   Yes.

13        A.   Only in the respect that it led to the

14   overcrowding situation that the California Department of

15   Corrections is now dealing with.

16        Q.   Do you believe that the Department of

17   Corrections itself in California, the CDCR, is

18   responsible for the number of inmates that it houses?

19        A.   Do I believe they are responsible?

20        Q.   Yes.

21        A.   No.

22        Q.   Who do you believe is responsible for the

23   number of inmates that are required to be housed by

24   CDCR?

25        A.   Well, it's a number of variables there.   The

1  changes to the Penal Code that impact how many people

2  that go in, it's the district attorneys, which cases are

3  they going to try and which ones they're not going to

4  try, it's patrol and probation revocations.  The

5  department probably does not have any control over who

6  comes in the front door or who goes out the back door,

7  they're just the custodians.

8      Q.   Is it your opinion that the deficiencies in

9  the support role played by non-healthcare staff are the

10 only cause of the medical care and mental healthcare

11 constitutional violations in this case?

12     A.   You're going to have to ask me that again.

13     Q.   Sure.  Is it your opinion that the

14 deficiencies in the support role played by

15 non-healthcare staff are the only causes of the medical

16 care and mental healthcare constitutional violations in

17 this case?

18     A.   Well, the only thing I looked at was the

19 operations portion of it so I can only render an opinion

20 on that.  But in terms of the healthcare provided by the

21 licensed clinicians themselves, I did not look at that

22 whatsoever.

23     Q.   Did you analyze the culture of CDCR in

24 arriving at your opinions in this case?

25     A.   I'm not sure I understand what you're saying.

1      Q.   Have you reviewed any documents that have

2  commented upon CDCR's culture?

3      A.   In respect to?

4      Q.   Housing offenders in California.  If you don't

5  understand the question, that's fine.

6      A.   I really don't.

7      Q.   Did you do an analysis of CDCR's leadership in

8  formulating your opinions in this matter?

9      A.   Only the leaders that I came into contact

10 with.

11     Q.   Did you do an analysis of the number of -- or

12 strike that.

13          Did you do an analysis of the quality of the

14 medical and mental health clinicians in arriving at your

15 opinion in this case?

16     A.   No, I did not do that.

17     Q.   Did you do an analysis of the computer systems

18 at CDCR in arriving at your opinion in this case?

19     A.   No, I didn't do that.

20     Q.   So it's possible that there are other

21 contributors beyond custodial staff to the

22 unconstitutional delivery of medical and mental

23 healthcare in this case, correct?

24     A.   I would expect there are all kinds of things

25 that are impacting the inability to deliver healthcare

1    and mental healthcare.

2         Q.    And they would be beyond the number of

3    custodial staff, correct?

4         A.    Yes.

5         Q.    And it would be beyond the number of custodial

6    staff to provide escorts, correct?

7         A.    Yes.

8         Q.    And it would be beyond the number of custodial

9    staff to take offenders or inmates to off site

10   appointments, correct?

11        A.    Yes.

12        Q.    And it would be beyond the clinical space

13   necessary to provide constitutionally adequate

14   healthcare, correct?

15        A.    I believe that, yes.

16        Q.    And it would be beyond any problems associated

17   with medical records, correct?

18        A.    Yes.

19        Q.    And it would be beyond the quality of the

20   clinicians who are providing medical and mental

21   healthcare, correct?

22        A.    In my opinion, yes.

23        Q.    Do you believe that the lack of having an

24   appropriate number of custodial -- strike that.

25             Do you believe that the lack of an appropriate

1    Q.    Did you ever use temporary space like modules

2   or trailers in Texas?

3    A.    For what purpose?

4    Q.    For clinical.

5    A.    Yes.

6    Q.    And was that -- did that help?

7    A.    It alleviated somewhat the problem until we

8   got permanent office space built.

9    Q.    Do you know whether or not the CDCR, the

10   receiver and/or the special master in Coleman is trying

11   to use such temporary space or develop such temporary

12   space to add clinical space?

13    A.    I do not.

14    Q.    Do you believe that similar to your experience

15   in Texas that the adding of temporary space would help

16   in California?

17    A.    Well, there's a critical difference.  We were

18   not overcrowded at the time.  We were still operating at

19   that facility within the design capacity and that's not

20   the case here.

21    Q.    The adding of temporary space at the four

22   institutions that you visited, do you think that would

23   impact one way or the other the delivery of medical or

24   mental healthcare at those institutions?

25    A.    It's possible.  But, again, I think you're --

DEPOSITION OF DOYLE W. SCOTT                    89

1      A.   Approximately five years.

2      Q.   How soon did it roll out the first beds, to

3  your knowledge?

4      A.   Oh, somewhere between 30 and 36 months

5  probably.

6      Q.   And just so I'm clear, how many beds, to the

7  best of your knowledge, did they add during the mid '90s

8  in Texas?

9      A.   50,000.

10     Q.   50,000?

11     A.   Right.

12     Q.   And when I say -- were they permanent beds?

13     A.   Yes.

14     Q.   During that same period of time did they add

15  any temporary beds?

16     A.   I'm not sure what you mean by "temporary."

17     Q.   Okay, let me ask it this way.  It sounds like

18  it took 30 to 36 months for Texas to roll out its first

19  wave of permanent beds.

20     A.   Correct.

21     Q.   In those 30 to 36 months before permanent beds

22  were rolled out did the state provide any temporary

23  housing for prisoners?

24     A.   No.

25     Q.   Do you know whether the Federal Bureau of

1  Prisons is operating at above its design capacity?

2      A.    I don't know.

3      Q.    Do you know whether Pennsylvania is operating

4  above its design capacity?

5      A.    I have no knowledge of that.

6      Q.    In fact, it's your testimony that you're not

7  aware of any systems, other than California and Puerto

8  Rico, that are operating above their design capacity,

9  correct?

10     A.    Those are the only ones I have personal

11 knowledge of.  And let me amend that to say Puerto Rico

12 now does not operate above their design capacity.

13     Q.    What is the design capacity in Puerto Rico, to

14 the best of your knowledge?

15     A.    It's about 15,000.  They've actually reduced

16 their population to somewhere around 14,000.

17     Q.    On page three of the Plan of Action, I think

18 it's in part one and I think it's actually page three.

19 It may be page three of the Executive Summary.  No, it's

20 not.  On page three, which is page five at the top of

21 the document, Conceptual Basis for the Receiver's

22 November 15, 2007, Iteration of his Plan of Action, that

23 first paragraph in the middle reads, "The overall goals

24 of a constitutionally-adequate prison medical care

25 system are to reduce unnecessary morbidity and

1       A.    Yes.

2       Q.    Did you base the statements that I just read

3    from paragraph 59 of your report on any data?

4       A.    I based it on my personal experience.

5       Q.    Are you aware that of the 18 preventable

6    deaths identified in 2006 by the receiver none was the

7    result of poor response to an emergency or a man down

8    situation?

9       A.    No, I'm not.

10      Q.    I'll ask you to look at the next exhibit which

11   I think is the last exhibit, Exhibit 8, and it's a

12   document by the office of the receiver entitled Analysis

13   of CDCR Death Reviews 2006.  It's the public version.

14   And I'm going to point you to page -- unnumbered but

15   it's the page that has preventable deaths and causes of

16   preventable deaths.

17      A.    I'm there.

18      Q.    Do you see that page?

19      A.    The one that says, "Preventable Deaths."

20      Q.    Causes of preventable deaths and it says 18

21   total.  Do you see that?

22      A.    I do.

23      Q.    Assuming for purposes of this question that

24   this report is accurate, does it surprise you that none

25   of the preventable deaths identified by the receiver in

1   2006 were the result of poor response to emergency or

2   man down situations?

3        A.    I really have no opinion on that.

4        Q.    Okay.  I'll bet that you're not going to have

5   an opinion on the next one, either.  I'm going to refer

6   you in the same document to page -- well, the one that

7   says, "C, Possibly Preventable Deaths."

8        A.    I'm there.

9        Q.    And there are 48 identified here.

10       A.    Correct.

11       Q.    You see that only three were only -- only

12  three were the result of poor response to emergency or

13  man down situations according to this report.  Do you

14  see that?

15       A.    No.  Where is that located?

16       Q.    I think it's actually on the next page.

17       A.    Okay.

18       Q.    Sorry.

19       A.    Oh, I do see that, I do.

20       Q.    Does that surprise you?

21       A.    I really have no opinion.

22       Q.    Okay.  Are your opinions in this matter based

23  at all on the quality of clinicians in CDCR?

24       A.    I did not look at the quality of the

25  clinicians in CDCR.

1        Q.    I'm going to now mark as I guess probably

2    separate exhibits additional documents that I received

3    from you.   The first one with a post-it number one on it

4    I believe is a draft of your expert report and we'll

5    mark that as ten.

6              (Marked Deposition Exhibit No. 10.)

7        Q    (By Mr. Mello) Will you take a look at

8    that, Mr. Scott, just tell me when you're ready to

9    answer questions about it.   You're ready?

10       A.    Sure.

11       Q.    Do you believe that's the first draft of the

12   report?

13       A.    I do.

14       Q.    And, again, you did not actually type in that

15   draft, correct?

16       A.    I did not prepare the document, no.

17       Q.    Is that a printout of the document -- strike

18   that.

19             Did you print that document with the post-it

20   note number one on it?

21       A.    No, I did not.

22       Q.    Do you believe counsel from the PLO printed

23   that out?

24       A.    I do.

25       Q.    Do you know if that document has a date or

1        STATE OF CALIFORNIA    )    ss.

2           I, the undersigned, a Certified Shorthand

3    Reporter of the State of California, hereby certify that

4    the witness in the foregoing deposition was by me duly

5    sworn to testify to the truth, the whole truth, and

6    nothing but the truth in the within-entitled cause; the

7    said deposition was taken at the time and place therein

8    stated; that the testimony of said witness was reported

9    by me, a Certified Shorthand Reporter and a

10   disinterested person, and was thereafter transcribed

11   under my direction into typewriting; that the foregoing

12   is a full, complete and true record of said testimony;

13   and that the witness was given an opportunity to read

14   and, if necessary, correct said deposition and to

15   subscribe the same.

16          I further certify that I am not of counsel or

17   attorney for either or any of the parties in the

18   foregoing deposition and caption named, nor in any way

19   interested in the outcome of the cause named in said

20   action.

21          IN WITNESS WHEREOF, I have hereunto set my

22   hand this _18th_ day of _December_, 20_07_.

23

24                        _Kristie L Wubka_
                          CERTIFIED SHORTHAND REPORTER

25