**EXHIBIT G
PART 1**

**EXHIBIT G**

Report of Doyle Wayne Scott

November 9, 2007

# TABLE OF CONTENTS

I. California's severely overcrowded prison population far outstrips the ability of the system to safely or appropriately house its prisoners..................................2

   A. The Texas experience demonstrates the impossibility for systemic reform in these areas under current overcrowded conditions..................................2

   B. California's prison population has expanded tremendously in the last 30 years without the infrastructure, staff, or management capabilities to support it..................................4

      1. "Ugly beds"..................................5

      2. Infrastructure..................................9

      3. Staffing..................................13

      4. Management capabilities..................................14

      5. Violence..................................17

      6. The overcrowding is getting worse..................................20

   C. By any definition, California's prison population exceeds its capacity to safely house prisoners and provide for their needs..................................22

II. Overcrowding makes the custodial management necessary for medical and mental health care nearly impossible..................................28

   A. Staffing..................................29

      1. Escorts..................................29

      2. Emergency response..................................32

      3. Watchdogs and gatekeepers..................................33

   B. Lockdowns..................................35

    C. Classification..................................................................................37

    D. Management systems.......................................................................42

III.   Overcrowding is the primary cause of the constitutional violations..................44

## Report of Doyle Wayne Scott

1. I am an expert consultant on corrections management, staffing, and security. I served for more than 30 years with the Texas Department of Criminal Justice (TDCJ), the agency that runs the state's prisons, and the Texas Board of Pardons and Paroles, culminating in an appointment as the Executive Director of TDCJ from 1996-2001. I have performed independent reviews and expert analyses on staffing patterns, institutional response to violent disturbances, general operations, and security controls for the National Institute for Corrections, the Oklahoma Department of Corrections through a contract issued by the Oklahoma state legislature, the Florida Department of Corrections, the New Mexico Department of Corrections, the Cook County Judicial Advisory Council, the Indiana Department of Corrections, the Kentucky Department of Corrections, and the Puerto Rico prison system, the latter on behalf of the federal district judge overseeing reforms due to constitutional violations. I have served as the Vice-Chair of the American Correctional Association's Standards Committee and the Chair of the Legislative and Legal Issues Committee of the Association of State Correctional Administrators.

2. I have not authored any publications in the last ten years. I have not testified as an expert witness in the last four years in court or by deposition. My company, MGT of America, is charging Plaintiffs $250.00 an hour for my work on this case. My Curriculum Vitae is attached as Appendix A.

1

I.   **California's severely overcrowded prison population far outstrips the ability of the system to safely or appropriately house its prisoners**

3. The overcrowding crisis in California is, in my experience, unprecedented in scope and in the dangers and deprivations of day-to-day life in the prisons. My extensive experience in running the Texas prison system and evaluating management, staffing, and security needs in multiple state and local jail systems, as well as my review of numerous reports regarding California's prisons from diverse and credible sources, and my tours of four California prisons, lead me to the conclusion that without substantially reducing its prisoner population, California will never be able to generate the custodial support services necessary to provide prisoners with basic medical and mental health care.

### A. The Texas experience demonstrates the impossibility for systemic reform in these areas under current overcrowded conditions

4. Next to California, Texas is the largest penal system in the United States and one of the largest in the world. When I started as a correctional officer in 1972, the system was severely overcrowded, reaching "over 200 percent of . . . original design capacity" by 1980, the year the overcrowding, health care, and many other aspects of the system were declared unconstitutional. *Ruiz v. Estelle*, 503 F. Supp. 1265, 1285 (S.D. Texas 1980). As Judge Justice found 27 years ago, the Texas Department of Corrections

> has been, by the admissions of its own officials, severely overcrowded since at least March of 1977. The problem has reached crisis proportions. When Director Estelle testified in August 1979, he reported that approximately 1,000 of the system's 26,000 inmates were sleeping on the floors of TDC institutions. These supernumerary inmates are housed in cells and dormitories already holding almost double the number of persons for which they were designed.

2

*Id.* at 1277. The judge described the situation as "intolerable" and, in particular, noted that "[t]he population density of inmates confined in dormitories is shocking," *id.* at 1278, with "sanitary and recreational facilities" that were "wholly inadequate..." *Id.* at 1279.

5. Judge Justice issued population controls as part of the relief in *Ruiz*. *See, e.g., id.* at 1387. As a corrections manager and later the system's executive director, I firmly believe that population control was absolutely necessary in our decades-long efforts to correct the systemic violations. We were able to remedy the serious harms by reducing our offender population to reasonable capacity limits agreed to by the parties that allowed the Texas Department of Corrections to properly classify and manage its inmates and their attendant needs. These limits or "caps" were calculated at five percent less than the original design capacity of each institution. Those "caps" were later memorialized in legislation passed by the State of Texas that made those limitations permanent.

6. California today is far more overcrowded than Texas ever was. It is the worst overcrowding I have ever seen, in my decades of work in the severely overcrowded Texas system and in subsequent expert consultant reviews of staffing, security, and management functions in prison systems in Oklahoma, Indiana, Florida, New Mexico, Kentucky, Cook County, and Puerto Rico. Based on my experience, I was prepared to see crowded conditions, fraying infrastructure, and management failures in California's prisons. As the head of a similarly huge and complex penal system, and as an employee of that system as it struggled with severe overcrowding, I know that it is impossible to run such an

3

operation properly under such circumstances. However, I was shocked by what I saw in the four California prisons I toured. These tours confirmed the profoundly disturbing accounts that I have read from the Court, the Governor, California Department of Corrections and Rehabilitation (CDCR) officials, the *Plata* Receiver, the Legislature, and the Office of the Inspector General.[1] Not only are California's prisons operating under a state of emergency, it is clear to me that unless the population is reduced, the state will remain in crisis verging on catastrophe and will remain utterly unable to provide adequate medical and mental health care to the prisoners in its custody.

### B. California's prison population has expanded tremendously in the last 30 years without the infrastructure, staff, or management capabilities to support it

7. The last few decades have seen extraordinary growth in California's prison population. The population has grown more than 500 percent in less than 30 years, and the number of prisons has nearly tripled. Plata Pls. Trial Ex. 1 at 4 (*Plata* Findings of Fact and Conclusions of Law Re Appointment of Receiver). Today, California houses

---

[1] I personally toured four of California's 33 state prisons in October 2007: Avenal State Prison (Avenal), California Institution for Men (CIM), Valley State Prison for Women (VSPW), and California State Prison at San Quentin (San Quentin). These prisons represent a range of the most important variations in the system: men's and women's facilities; Reception Centers, general population units, specialized mental health units, condemned housing, and administrative segregation housing; dormitory, gymnasium, dayroom, hallway, and celled housing; high, medium, and low security; and old and more recently built structures. In addition, I have reviewed reports as noted in Appendix B from a wide range of credible and impressive sources, describing and analyzing individual prisons as well as systemic issues. My review of these written materials gives me confidence that my observations at the four prisons I toured are truly

4

171,285 prisoners; its prisons are at 203.7 percent of design capacity. Joint Pls' Trial Ex. 25 at 1 (Weekly Report of Population, October 31, 2007).

8. The state has proven itself unable to address the increasing health care needs of the expanding population. As the population has grown, the state's prison infrastructure, staff, and management have stretched beyond the breaking point, resulting in the current state of acute crisis.

### 1. "Ugly beds"

9. It is impossible to grasp the scope of California's crisis without understanding the plight of the thousands of prisoners confined to "ugly beds." Before I describe the specific strains on infrastructure, staffing, and management, I would like to paint a picture of some of the stark realities of life in today's California prisons.

10. As the prison population has grown, it has outstripped the available space for safely housing prisoners. As a result, California has started in recent years to house more and more prisoners in so-called "ugly beds." According to the Governor, as of October 2006, "the CDCR is required to house more than 15,000 inmates in conditions that pose substantial safety risks, namely, prison areas never designed or intended for inmate housing, including, but not limited to, common areas such as prison gymnasiums, dayrooms, and program rooms. . . ." Joint Pls' Trial Ex. 1 at 1 (Governor's Emergency Proclamation). Six months later, that number had risen to more than 16,000, which

---

representative of the systemic failures described in this report.

"means that about 10 percent of the prison population is currently housed in 'bad' beds." Joint Pls' Trial Ex. 13 at 2 (Senate Budget and Fiscal Review Committee Subcommittee No. 4, Agenda of April 12, 2007). "Ugly beds" are not merely uncomfortable, they are actually dangerous: they make it harder for staff to prevent violence and breed anger and frustration among prisoners by sharply curtailing the space available for anything but the warehousing of bodies. *See, e.g., id.* at 2.

11. These "ugly beds" are truly appalling. I saw cages at the California Institution for Men (CIM) where, as staff freely admitted, prisoners have sometimes had to spend the night because there were no beds for them. In more than 35 years of prison work experience, I have never seen anything like it. These cages are in wide hallways with busy foot-traffic. They are only a few feet wide, and there is no room for a mattress, so prisoners have to sleep sitting on a bench. There are no toilets, and staff shortages would lead prisoners to wait lengthy periods to be escorted to bathrooms. It is difficult to properly hydrate prisoners in such a setting. These cages are an inhumane and unacceptable result of severe overcrowding.

12. At the same prison, I saw 54 prisoners in Sycamore Hall double-bunked and stuffed into a dayroom intended for recreational purposes. They had only one toilet. Also at CIM, I saw a shockingly overcrowded gymnasium at the East Facility. Such facilities are supposed to be temporary housing, but staff told me that some prisoners are there up to a year. It was a sea of people: 202 prisoners, with only seven showers and 11 working

6

toilets. These numbers violate contemporary correctional standards for safe and hygienic facilities, as discussed in Section I.B.2, below.

13. At the California State Prison at San Quentin (San Quentin), I saw a gymnasium converted to inmate housing with 328 double bunk beds. There were only nine working toilets to service this entire population. Similarly, Dorm 410 at Avenal State Prison (Avenal) was designed for 172 prisoners but has a current population of 344, some housed in triple bunks.

14. My observations are entirely consistent with the findings of the *Coleman* Special Master, who found shocking living conditions for many mentally ill prisoners. For example, Deuel Vocational Institution (DVI) "was old and overcrowded. . . . A large room around the perimeter housed 38 [mentally ill] inmates in a triple-bunk arrangement. They reported that the room had a single toilet, urinal, and shower. Inmates were observed dumping water into a drain from a 30-gallon garbage can which they used as a shower supplement. Many windows were broken. Inmates reported that they used blankets to cover windows but that custody officer removed the blankets without replacing them, leaving the area cold and the beds unblanketed. An area of the [administrative segregation] building housing caseload inmates was referred to as 'deep seg' or 'the dungeon.' Its four cells were designed for the apparent purpose of isolation. They had almost no outside light and were illuminated by a single light controlled by an outside switch and turned off at night. Cells were malodorous, in disrepair, and out of

7

officers' ready view. Inmates in these cells likely had no more contact with custody staff than inmates housed in [punitive segregation] or stand-along administrative segregation cells and were in much worse condition. Time out of the dorm was limited to approximately 20 minutes twice per day for meals." Joint Pls' Trial Ex. 36 at 101 (18th Special Master's Report).

15. The space inadequacies extend to treatment as well as living spaces. The *Coleman* Special Master has noted that "[e]xcessive population, thus, results in a reduction of programming space now occupied by inmate bunks[;] greater competition for use of the diminishing available space; fewer correctional officers to permit access to the diminishing space; and, ultimately, the increasing frustration and demoralization of clinicians trying to provide treatment." Joint Pls' Trial Ex. 35 at 7 (*Coleman* Special Master's Report Regarding Overcrowding, May 31, 2007). He has documented mental health treatment taking place in closets (Joint Pls' Trial Ex. 36 at 73 (California Medical Facility)), in the middle of dayrooms (*id.* at 42 (High Desert State Prison), 55 (Mule Creek State Prison)), and on outdoor benches (*id.* at 304 (Valley State)). At the California Correctional Institution, suicidal prisoners have been held in holding cells; some "remained in the most frequently used holding cells for as long as three days." *Id.* at 225.

16. As the *Coleman* Special Master has noted, the "ugly beds" harm prisoners. In California's severely overcrowded system, "[a]ll inmates must spend increasingly larger

8

chunks of their days in their cells, or much more dangerously, in one of the triple-bunked 'non-traditional' spaces. None of this is conducive to the health and well-being of any inmate, much less a seriously mentally disordered inmate/patient; it inevitably escalates the incidence of mental illness and exacerbates the condition of those already mentally fragile and vulnerable." Joint Pls' Trial Ex. 35 at 7-8.

### 2. Infrastructure

17. Overcrowding affects all prisoners, not just those who are triple-bunked in gymnasiums or forced to live in hallways and dayrooms. "[T]he overcrowding of the prison facilities has overburdened the basic infrastructure of the institutions resulting in sewage spills and shortages of safe drinking water." Joint Pls' Trial Ex. 13 at 2 (Senate Budget and Fiscal Review Committee Subcommittee No. 4, Agenda of April 12, 2007). "[C]ritical deficiencies in . . . existing infrastructure" are found at most prisons; 20 prisons have critical drinking water system deficiencies; 18 have critical deficiencies in waste water treatment, 20 in electrical systems, and 14 in other areas. *Id.* at 9.

18. My tours demonstrated the truth of these findings. In my opinion, CIM is an incredibly old, poorly maintained, unsanitary facility with inadequate staffing and overburdened, crumbling infrastructure that must be vacated and provided significant maintenance and renovations or else simply abandoned. In its current state, it is not fit for housing human beings. Similarly, San Quentin needs a substantial infrastructure overhaul before it should house people: I saw bars rusted almost completely through, filthy

9

conditions that staff say cannot be made clean, and what was described to me as permanent unidentified liquid dripping from upper tiers onto busy passageways. It might well cost less to build an entirely new facility than to rehabilitate San Quentin to an acceptable level, the infrastructure damage and deterioration are so severe.

19. On my tours, I saw housing units with serious deficits of toilets, sinks, and urinals by contemporary correctional standards. The American Correctional Association states that toilets should be "provided at a minimum ratio of 1 for every 12 inmates in male facilities and 1 for every 8 inmates in female facilities." Joint Pls' Trial Ex. 51 at 38 (American Correctional Association, Standards for Adult Correctional Institutions, 4th Ed.). Further, one sink should be provided for every 12 prisoners, and one shower for every eight prisoners. *Id.* at 38-39.

20. California far exceeds these minimum ratios. For example, at CIM, Sycamore Hall had 54 prisoners for one toilet and East Gym had 202 prisoners for seven showers and 11 working toilets. Avenal 410 had 344 prisoners with 14 toilets. As a correctional administrator, I find that such deprivations are not only inhumane, they breed violence, as I discuss in greater detail below, and serve as a dangerous vector for the spread of disease.

21. My understanding is that the established standards for toilets and showers in correctional settings are based on infectious disease prevention requirements. Such precautions are necessary because disease spreads with dangerous speed in extremely

10

dense populations with limited sanitation facilities. According to the CDCR institutions chief, "[t]he overcrowding of CDCR facilities has led to increased numbers of infectious disease outbreaks... system-wide." Joint Pls' Trial Ex. 11 at ¶ 3 (Declaration of Scott Kernan in Support of Defendants' Report in Response to the Court's February 15, 2007 Order, May 16, 2007). The *Plata* Receiver has documented similar serious overcrowding-caused outbreaks, supporting his opinion that "[t]he serious levels of crowding in CDCR prisons and the unconstitutional levels of medical services" make it necessary to be alert to "the ever present danger of a serious infectious disease outbreak in California's prisons, a problem that not only jeopardizes inmates and staff, but also has an impact on public health in the community." Joint Pls' Trial Ex. 30 at 70-71 (Receiver's Fourth Bi-Monthly Report, March 19, 2007). As a correctional administrator, I am extremely concerned that lockdowns and limited programming also reduce access to exercise and fresh air, and increase idleness and frustration, with consequent negative effects on physical and mental health.

22. One result of having too many people and too few sanitary facilities are that toilets, lavatories, and showers will be used much more than originally contemplated and wear out faster. Prisoners complained of lack of hot water for weeks at a time at Avenal (on 5 Facility and Building 410, where prisoners complained that there had been no hot water for months) and for days at a time in CIM's West Facility. At San Quentin, staff noted that they could submit work order after work order to repair basic living unit

11

functions, but the repairs were simply not done. As a result, staff expressed hopelessness and cynicism. At all three of these facilities, maintenance was inadequate and work orders were not addressed in a timely manner.

23. I saw everywhere evidence of crumbling infrastructure. Ventilation appeared to be inadequate at CIM, where I saw filters and screens that had clearly not been cleaned in quite some time. In Elm Hall, a housing unit that houses many paraplegics and other prisoners who use wheelchairs, all windows had been broken and were covered with plastic sheeting. Prisoners also complained that the roofs leak. At Avenal, I saw large amounts of mold in almost every shower that I inspected, demonstrating inadequate sanitation practices over a significant length of time.

24. One of the most dangerous effects of overcrowding on infrastructure lies in safety deficits. I saw a frightening range of fire hazards in the housing areas, where the very high population density exacerbates the risk of deadly fires. I saw few efforts to minimize this risk, but instead saw hazards such as flammable blankets and cardboard on cell doors and other flammable material in the cells and living areas. At San Quentin, the risk of fire disaster is unacceptable – there is no automatic cell unlock system, so in a fire emergency, each one of hundreds of cells, spread over five tiers in many living units, would have to be unlocked individually. It is simply impossible. On my tour of West Block, I smelled at two separate cell locations something burning. Clearly, prisoners are able to light flammable material in their cells, and are doing so. If there were a fire in San