**EXHIBIT G
PART 2**

Quentin's cell blocks, many would die in their cells.

### 3. Staffing

25.  Staffing as well as infrastructure is strained to the breaking point.  At the same time as it experienced extraordinary inmate growth, the CDCR has substantially reduced the number of prison staff, eliminating more than 5,000 workforce positions in the last 15 years alone.  Joint Pls' Trial Ex. 4 at 125 (Reforming Corrections:  Report of the Corrections Independent Review Panel, June 30, 2004).  And the system has not even been able to fill the positions that remain: "CDCR projects current officer vacancies, statewide, at approximately 4,130. . . . [I]t will take about 5 years to fill all of the vacancies under the current academy structure."[2] Joint Pls' Trial Ex. 43 at ¶ 14 (Declaration of Scott Kernan in Opposition to Writ of Mandate, *California Correctional Peace Officers' Organization v. Schwarzenegger*, No. 06CS01568 (Sacramento Superior Ct)., January 19, 2007).

26.  CDCR staffing rates are already extremely low by national standards.  According to Dr. Joan Petersilia, who has headed numerous CDCR reform research efforts, "[w]hile the nation's prisons average one correctional officer to every 4.5 inmates, the average California officer is responsible for 6.5 inmates. Although officer salaries are higher than average, their ranks are spread dangerously thin and there is a severe vacancy rate." Joint

---

[2] I saw no mention in Mr. Kernan's Declaration of how CDCR will account for the new vacancies that will come about if more prison beds are built as described in the declaration.

13

Pls' Trial Ex. 5 at 2 (Dr. Joan Petersilia, *Understanding California Corrections* (May 2006)). The Receiver has expressed similar concerns about staffing: overcrowding "is accompanied by severe staffing shortfalls" in clinical, custodial, and managerial staff. Joint Pls' Trial Ex. 26 at 11-13 (Receiver's Report Re Overcrowding). I agree with Dr. Petersilia and Mr. Sillen that the paucity of correctional officers in California, due to the low staffing rate and high number of vacancies, is dangerous.[3] It is particularly dangerous for prisoners in need of medical care, as I discuss in Section II.A, below, not just because staff are not available to escort prisoners or clinicians to appointments, but because short-staffing can lead to forced overtime and burnout, such that staff make poor decisions, particularly in health care emergencies.

### 4. Management capabilities

27. Defendants themselves admit that the "rapid growth of the correctional system was not accompanied by organizational restructuring to meet increasing system demands and that it requires fundamental reform in a variety of areas, including management structure, information technology and health care services in order to function effectively and in compliance with basic constitutional standards." Plata Pls' Trial Ex. 1 at 4 (*Plata Findings of Fact and Conclusions of Law Re Appointment of Receiver*); *see also* Joint

---

[3] Several prisons I visited – notably CIM and Avenal – reported that they had no vacancies, but the staffing patterns I observed were clearly inadequate to maintain security within an acceptable risk level and to address the needs of the prisoner population, especially in the housing units with "ugly beds." In fact, every institution I toured had inadequate custodial staff on the ground to address the needs of the prisoner

Pls' Trial Ex. 4 at 1 (Deukmajian Report) ("the system's organizational structure has not kept pace with the massive growth in inmate population or with the vast geographical spread of the institutions.")  As the Court has found, "[d]ecades of neglecting medical care while vastly expanding the size of the prison system has led to a state of institutional paralysis.  The prison system is unable to function effectively and suffers a lack of will with respect to prisoner medical care."  Plata Pls' Trial Ex. 1 at 2 (*Plata* Findings of Fact and Conclusions of Law Re Appointment of Receiver).  Indeed, "[i]n the area of health care services, the consequences of system expansion without reform have been shocking."  *Id.* at 5.

28.  Overcrowding has yielded crisis decision-making as well as training and supervision deficits, which leads to poor decisions by line staff in the housing units, as discussed in Sections I.B.3 and II.A.  Further, the CDCR has inadequate information-gathering systems to properly run this enormous and complicated system, meaning that CDCR cannot adequately plan for, create, and manage specialized medical and mental health units and cannot perform the basic functions (such as background checks) necessary to hire the staff to carry out health care treatment and support services.  *See* Joint Pls' Trial Ex. 26 at 12 (Receiver's Report Re Overcrowding).  As the Receiver has noted, the computer network "that connects the 33 prisons, regional offices, and headquarters is well over 15 years old.  It can currently support only email and very

---

population, including ensuring that health care services are provided.

limited data." Joint Pls' Trial Ex. 32 at 53 (Receiver's Sixth Quarterly Report).

Moreover, there are multiple outages and system failures on a daily basis "that prevent its

use as a system to house, access, and share clinical data," and the computers are not

linked locally or between multiple prisons, "preventing the sharing of prisoner/patient

health care data such as basic laboratory, pharmacy or other information that is essential

for patient safety." Sixth Report at 53.

29.  The management failures are found at the very highest levels of state government.

As I related above, I was prepared to witness troubling conditions at the prisons I toured

in California, but was unprepared for the sheer magnitude of the crisis. I was even more

appalled when I learned that California corrections and other state officials have known

for many years that the problem was approaching emergency proportions. I have relied

on the Governor's own State of Emergency Proclamation as an extraordinary admission

of serious risk of harm for prisoners, staff, and the public, but I continue to be astounded

that he issued it more than one year ago, and conditions have not improved.

30.  It is indicative of the poor management that is apparent in this crisis that the

Governor refused to see at least one of his corrections chiefs, Jeanne Woodford, when she

attempted to meet with him regarding sentencing reform. Joint Pls' Trial Ex. 42 at 14:1-

16 (Transcript of Proceedings, December 20, 2006, *Madrid v. Woodford*, No. C 90-3094

TEH).  She was trying to see him because "our population pressures were just going to

continue to become critical, and I felt that the only path to success had to include

16

sentencing reform. . . ." *Id.* at 11:10-15. In Texas, where we took prison population control very seriously, I had the governor's telephone number and met with him routinely every month. The personal contact with the highest level of management in state government was crucial to my ability to run a humane system.

### 5. Violence

31. One of the most pernicious effects of overcrowding is increasing levels of violence, and it is necessary to devote some discussion to the nature of these effects in order to better understand how overcrowding-driven violence and fear of violence interferes with medical and mental health care delivery. According to the CDCR, "overcrowding in CDCR prisons has. . . led to increased riots and disturbances." Joint Pls' Trial Ex. 11 at ¶ 3 (Declaration of Scott Kernan in Support of Defendants' Report in Response to the Court's February 15, 2007 Order, May 16, 2007).

32. Overcrowding breeds violence in a number of ways. First, people are simply bumping up against each other far more often, especially those housed in triple bunks and dayrooms and hallways. They are also competing for extremely limited toilet, shower, and sink facilities and generate far more noise and smell in close quarters. Decades of experience have demonstrated to me that close physical proximity, lack of adequate supervision, noise, and competition for scarce resources are a recipe for violence in high-pressure prison settings. The lack of adequate toilets and sinks can also lead to long lines and anger at not getting basic needs met, which in turn can lead to violence.

33.  Second, California prisoners have seen drastic cut-backs in the programming

available to them due to the fact that programming space is used for warehousing bodies

and because of the lockdowns due to staff limitations or violent outbursts.  Joint Pls' Trial

Ex. 6 at 22 (California State Auditor Report); Sections II.B and II.C, below.  I observed

on my tours that prisoners have inadequate out-of-cell time (or time spent outside of

overcrowded dorms, gyms, dayrooms, and hallways) to compensate for the density of the

population, especially at CIM, where prisoners living under extremely overcrowded,

triple-bunked conditions had only a few hours per week of recreation in an exercise yard

and few opportunities to obtain scarce prison jobs.  The idleness and hopelessness that

accompany extremely limited programming in overcrowded living units breed frustration,

anger, and violence.  I agree with the Governor's blue-ribbon panel that "combined with

the reductions in security and non-security staff, the crowded conditions and lack of

programming have elevated security risks and increased the probability of violent

confrontations."  Joint Pls' Trial Ex. 4 at 125 (Deukmajian Report).  I also agree with the

*Coleman* Special Master that under overcrowded conditions, "[d]isturbances occur more

frequently, with resulting increases in the number and duration of lockdowns."  Joint Pls'

Trial Ex. 35 at 7 (Coleman Special Master's Report Regarding Overcrowding, May 31,

2007).

34.  Third, short-staffing and the use of "ugly beds" mean that staff has far less

control over prisoners.  It is far more difficult to supervise a gym densely populated with

18

triple-bunked minimum to maximum security prisoners, as at CIM East Facility, or a

housing unit with people sleeping in bunk-beds in a hallway or dayroom, as at CIM and

Valley State, than it is to supervise a unit where all prisoners are locked in cells. It is also

far more difficult to get to know the prisoners in your unit when there are twice as many

of them. These situations are very much a reality in CDCR. In CIM's West Facility, at

Cleveland Hall, I saw 198 prisoners with only two officers to keep order, one in an office,

with the other roving. Half of the dorm was in another building connected by the

shower/bathroom area, and one room in the back was completely out of sight. It is

impossible to provide any type of security or proper services under these circumstances.

The housing unit was a serious disturbance waiting to happen. If the prisoners wanted to

take over the dorm they could do so in a second and no one would know. In the East

Facility gymnasium at CIM that I toured, there were only two officers on duty at night

and three during daytime watches, plus a gunner, to supervise 202 prisoners.

35. Visibility in these units was poor and sometimes sightlines were non-existent.

The physical structure simply could not allow an acceptable level of security. Illicit

activities would go on unnoticed and correctional officers are very much at risk. Further,

these closed gyms and dormitories provide no opportunity for backup if radio

communication is not available in an emergency, and the CDCR lacks adequate

supervisory personnel and cameras that would augment the staffing. My review of the

written materials and conversations with staff on the tours gives me confidence that these

conditions are replicated around the system – indeed, in many places, they are the norm.

36.   With short-staffed and overworked officers, and angry, idle prisoners spilling out into common areas, experience tells me that not only is increased violence more likely,[4] but crisis decision-making based on the inadequate controls over the inmate population is guaranteed.  The fear of violence and the potential for violence can have more immediate effects than violence itself, as officers make poor decisions, nearly invariably disbelieving prisoners and denying permission for movement, based on their concerns about controlling a population they perceive to be barely contained.  Such decisions can have the effect of denying essential medical and mental health care, particularly in emergencies, as is discussed in more detail in Section II.A.2, below.

37.   Not only does overcrowding cause violence, but violence also leads to even more overcrowding.  California punishes prisoners who are found to have committed acts of violence in prisons with the removal of work-time credits, which results in longer terms, or by referring them to the district attorney for prosecution.  *See* Cal. Code of Regs., tit. 15, §§ 1315, 1316, and 1323.  Either way, the result is likely to be extended lengths of stay, which increases the population and ensures further deterioration of the system.

### 6.  The overcrowding is getting worse

---

[4] Increased violence may not be reflected in statistics or in self-reports by prisoners, since, as I mentioned above, many illicit activities will take place out of the sight and knowledge of staff.  It is impossible to measure fully the degree of violence, including sexual assaults, taking place among the prison population because there is inadequate staff supervision.

38. "The overcrowded conditions are projected to worsen over the next several years as the population continues to grow. Over the past 20 years, the state inmate population has grown at an average annual rate of 5 percent. If this trend continues, the LAO indicates that the state prison system will be deficient 152,900 beds by the year 2022." Joint Pls' Trial Ex. 13 at 2 (Senate Budget and Fiscal Review Committee Subcommittee No. 4, Agenda of April 12, 2007). CDCR itself projects steady population increases, to 175,418 by June 30, 2008: 179,105 by June 30, 2009; 183,171 by June 30, 2010; 186,137 by June 30, 2011; 189,226 by June 30, 2012, and 191,886 by June 30, 2013. Joint Pls' Trial Ex. 19 at 2, 6 (CDCR Fall 2007 Adult Population Projections).

39. No relief is in sight. The CDCR itself projects that even if its population reduction strategies are implemented successfully, California's prisons will still hold 162,674 male prisoners in 2009 (compared with 159,605 male prisoners today). Plata Pls' Trial Ex. 2 at 12 (*Plata* Defendants' Report in Response to the Court's February 15 Order, May 16, 2007); Joint Pls' Trial Ex. 25 at 1 (Weekly Report of Population, October 31, 2007). The state has no plans to lift the State of Emergency before 2009. Plata Pls' Trial Ex. 2 at 12. Under the recently passed prison-building law, Assembly Bill 900, not a single "in-fill" bed will be activated before 2009, assuming that defendants can meet their schedule. *Id.* at 9. There are already indications that they cannot, however.[5] AB

---

[5]According to legislative experts, "the department's timeline for constructing the infill beds depends on its core business services functioning in a timely manner. . . [and] the majority of these functions within the department are not operating in a timely

21

900 also fails to include any plans for staffing. Joint Pls' Trial Ex. 13 at 8. Given how short-staffed the CDCR currently is, they will simply have no ability to open new beds because there will not be adequate staff to run the new housing units.

40. In summary, the overcrowding is pervasive and severe and, barring court intervention. conditions will continue to deteriorate.

### C. By any definition, California's prison population exceeds its capacity to safely house prisoners and provide for their needs

41. Any discussion of overcrowding must be grounded in a common understanding of what constitutes prison population capacity. Many terms are used to define how many prisoners can be physically confined in an institution. In Texas, we measure capacity by accounting for a wide range of factors that determine how many people can be held safely and humanely, grounded in all relevant accepted national standards and consistent with acceptable risk levels regarding violence and the spread of disease. *See* Appendix C, Texas Gov't Code §§ 499.101- 110, 501.111-113. Specifically, an institution's capacity is meant to ensure that the system has enough space for safety, programming, and humane living conditions, as well as built-in extra space to allow routine maintenance shut-downs and the flexibility to transfer prisoners to specialized housing areas such as medical and

---

manner;" and "the remote location of many of the construction sites means that the department will likely have difficulty finding contractors willing to bid for the contract." Joint Pls' Trial Ex. 13 at 7.

22

mental health units.  Capacity includes the ability to provide "medical, dental, and psychiatric care adequate to ensure" minimal delays in service delivery as well as access to specialist care, "a sufficient number of psychiatric inpatient beds," and "sufficient staff" to "meet health care needs. . ."  Texas Gov't Code § 499.102(a)(7), (8)(A) - (E). This definition is memorialized by statute, and each institution has a legally mandated capacity. *Id.* at § 499.101(a).  This system ensures that the facilities and service areas – such as plumbing, kitchen space, electricity, laundry, education, etc. -- are sized to the actual population, and not some anticipated or hoped-for number of prisoners.  Our statutory system requires that the population may not exceed this statutory definition of capacity without the express permission of the Attorney General, and then only after rigorous "written findings that the population may be increased without limiting the ability of the division to transfer inmates between units and necessary for classification, medical, and security purposes" and approval of the governor. *Id.* at § 499.109.

42.  Such a system is a distant dream in California, where by any measure, population vastly outstrips capacity.  California's prisons are currently at 203.7 percent of "design" capacity, the determination by the prison architect as to how many prisoners an institution can hold, including how many toilets, lavatories, and showers are needed.  Joint Pls' Trial Ex. 25 at 1 (Weekly Report of Population, October 31, 2007).  In my experience, prison systems generally maintain their populations within design capacity.  California's vast overflow, then, places it very far outside the range of accepted practice.

23

43. The design of some prisons makes them even more susceptible to overcrowding. For example, dorms are easier to overcrowd than cells. Avenal State Prison, which is nearly all dorm housing, was designed to hold 2920 prisoners. Joint Pls' Trial Ex. 25 at 2 (Weekly Population Report, October 31, 2007). At the time of my tour, staff informed me that it held approximately 7500, or 257 percent of design capacity.[6]

44. Another way of looking at prison capacity addresses the number of prisoners that can be held consistent with basic safety and security principles. California's population surpasses by 15,000 the "safe and reasonable" capacity, defined as "the maximum number of inmates who can safely and reasonably be housed in the prison system. . . . [The CDCR] has determined that the maximum safe and reasonable capacity of the state's male prisons is 137,764 -- 179 percent of design capacity." Joint Pls' Trial Ex. 4 at 124 (Deukmajian Report). CDCR currently holds 153,759 male prisoners in California prisons. Joint Pls' Trial Ex. 25 at 2 (Weekly Report of Population, October 31, 2007).

45. "Operable" capacity comes closer to the Texas statutory definition, and "takes into account space needed for effective programming in addition to safety and security." Joint Pls' Trial Ex. 4 at 124 (Deukmajian Report). According to a "group of experienced California prison wardens," CDCR's "operable" capacity "to support full inmate programming in a safe and secure environment is 111,309 inmates, or 145 percent of

---

[6] The impact on health care delivery of such overwhelming numbers is clear and damaging: prisoners in Building 550, a dorm that holds a large proportion of paraplegic and other disabled prisoners, reported that it takes six to eight weeks to see a doctor.

design capacity." *Id.* at 124). CDCR currently houses 171,285 prisoners in California,

exceeding "operable" capacity by nearly 60,000. Joint Pls' Trial Ex. 25 at 1 (Weekly

Report of Population, October 31, 2007).

46. Those definitions, however, still fail to look at the capability of a system or

individual facility to adequately and legally care for the medical and mental health needs

of its population, considered an essential part of capacity in the Texas statutory scheme.

A certain amount of clinical space with appropriate fixtures (such as for hand-washing,

privacy, etc). as well as specific treatment beds for medical and mental health care needs

that require isolation from the general population must be included in the design structure.

California has chosen to design and build prisons with inadequate clinical space and

medical/mental health beds for the projected population. According to the Receiver, the

state's "newest and most modern prisons" were "designed with clinic space which is only

one-half that necessary for the real-life capacity of the prisons." Joint Pls' Trial Ex. 26 at

19 (Receiver's Report on Overcrowding, May 15, 2007) (emphasis omitted).

47. For example, in building Kern Valley State Prison, the newest institution,

"absolutely no consideration was given to the real life impact on the prison's health care

program that would result by the CDCR's plans to immediately double cell the entire

prison." *Id.* at 21. The prison "was planned, designed, and subsequently constructed

knowing full well that the medical, mental health, and dental space and staffing would be

entirely insufficient for the prison's actual population." *Id.* at 22. Similarly, prisoners in

acute mental health crisis situations are frequently housed in punitive administrative segregation conditions and other inappropriate locations because of the shortage of mental health crisis beds (MHCBs), as the *Coleman* Special Master has documented. *See, e.g.,* Joint Pls' Trial Ex. 36 at 53 (18th Special Master's Report) ("[f]aced with a chronic shortage of MHCBs, [Mule Creek State Prison] . . . used five cells in administrative segregation to monitor inmates waiting for MHCBs"); 184 (at Wasco State Prison, "[h]olding cells in the CTC, in B Facility chapel, or in administrative segregation were often used for inmates awaiting MHCB admission"); 250 (at R.J. Donovan, "the monitor's expert continued to find decompensating inmates in administrative segregation"); and 220 ("[t]wo inmates seen by the monitor's expert [at California State Prison at Los Angeles County] were acutely mentally ill in administrative segregation for weeks rather than being sent to higher levels of care"). This limiting factor further reduces the CDCR's capacity to house prisoners legally.

48. The different types of capacities discussed above address physical capabilities for housing prisoners. Another definition of capacity involves available staff and services. For example, a fully equipped 1,000-bed prison cannot house 1,000 prisoners if only three staff members are available to run the institution. The prisoners cannot be fed or safely allowed out of their cells without adequate staff to supervise them, and cannot be provided appropriate medical and mental health care without clinical staff to care for them and custodial staff to escort them to and from appointments both inside the prison

26

and to specialists outside, as well as providing security during their appointments.

49. Over the last several decades, California has made deliberate choices regarding how to house its massively expanding population, building huge prison complexes mostly in isolated rural areas. It is harder to recruit staff to come to such locations, particularly clinical staff. Joint Pls' Trial Ex. 26 at 14 (Receiver's Report on Overcrowding, May 15, 2007). Custodial staff shortages have also plagued the CDCR for many years, as described above in Section I.B.3. As of October 31, 2007, 10 prisons exceeded what the CDCR determines to be their "staffed capacity": California Men's Colony, Corcoran, California State Prison- Los Angeles County, San Quentin, Correctional Training Facility, Deuel Vocational Institution, Folsom State Prison, Kern Valley State Prison, Sierra Conservation Center, and Wasco. Joint Pls' Trial Ex. 25 at 2 (Weekly Report of Population, October 31, 2007).

50. Thus, any measure of California's prison capacity that includes a reasonable expectation of providing constitutional levels of medical and mental health must account for the severely limiting building design and staffing needs. As the Receiver has reported, "overcrowding is ingrained in the CDCR style of constructing and managing prisons. Crowding related policies that do not provide adequate clinical and program space are now an accepted practice of CDCR prison planning, as is California's practice of offering inadequate salaries and failing to provide adequate hiring programs which have created crisis levels of shortages of clinical personnel and correctional officers."

27

Joint Pls' Trial Ex. 26 at 8 (Receiver's Report on Overcrowding, May 15, 2007).

51.  The Governor's blue-ribbon panel declared more than three years ago that "California's prisons are presently filled to the breaking point, with populations exceeding both design capacity and 'safe and reasonable capacity,' and far exceeding operable capacity." Joint Pls' Trial Ex. 4 at 124 (Deukmajian Report).  At that time, the population was 162,000.  *Id.* at 1.  Today, CDCR houses nearly 10,000 more.  Joint Pls' Trial Ex. 25 at 1 (Weekly Report on Population, October 31, 2007).  The situation looks even more dire when all of the factors that we in Texas consider essential components of capacity are considered, and California's severe deficits in building design and staffing capabilities are factored into the equation.  I wholeheartedly agree with the statement the Governor made more than a year ago: California' prison population "exceeds the capabilities of the services, personnel, equipment, and facilities of any geographical area in this state," causing "extreme peril." Joint Pls' Trial Ex. 1 at 8 (Governor's Emergency Proclamation).  The "extreme peril" in the potential for violence is easy to see.  Less obvious is the "extreme peril" of teeming populations of prisoners, at risk for deadly disease outbreaks and overwhelming through sheer numbers any attempt to provide even the basics of humane medical and mental health care, as discussed in Section II.

II.    **Overcrowding makes the custodial management necessary for medical and mental health care nearly impossible**

52.  Custodial staff and managers play an essential role in medical and mental health care.  Although non-clinicians are not directly responsible for providing health care, in a

well-functioning system they establish and run the supporting structure that makes health care delivery possible. They provide escorts and security that allow medical appointments to occur. They staff and run specialized health care units. They transport offenders to specialty medical appointments off site. They are usually the first to respond in any medical and mental health emergency. They see the prisoners on a daily basis and often serve as the gatekeepers that allow them to access care providers. They classify and place prisoners in appropriate housing units for their medical and mental health needs. In California, the short-staffing, inadequate management and supervision, and crisis conditions caused by overcrowding have made it nearly impossible for custodial staff to carry out these essential medical support roles.

### A. Staffing

53. Custodial staff plays several essential roles in the delivery of medical and mental health care in California prisons. They serve as escorts for medical appointments; they respond in health care emergencies; and as the staff with most interactions with the prisoner population, they become de facto watchdogs and gatekeepers for health care delivery.

### 1. Escorts

54. Staff is needed to move prisoners around within the prisons for medical appointments and outside the prisons for tests, specialist consultations, and emergency treatment. They are also needed for security during examinations. In California's

overcrowded system, staff is often not available for transportation within and outside the prisons. CDCR's head of adult institutions admits as much: "These riots deflect prison resources so that while correctional officers now must respond to the increased security concerns and maintain watch over an increasingly dangerous prison population, they are not able to assist the Receiver's efforts in addressing the inmates' medical concerns by escorting inmates to medical appointments, for instance." Joint Pls' Trial Ex. 11 at ¶ 3 (Declaration of Scott Kernan in Support of Defendants' Report in Response to the Court's February 15, 2007 Order, May 16, 2007). As the Court has already found, "[c]orrectional officers often are not available to take prisoners to medical appointments or to enable the physicians to do examinations. . . ." Plata Pls' Trial Ex. 1 at 22 (*Plata* Findings of Fact and Conclusions of Law Re Appointment of Receiver) (citation omitted)

55. The *Coleman* Special Master has made extensive findings that the paucity of escorts has interfered with mental health treatment. *See, e.g.,* Joint Pls' Trial Ex. 36 at 72 (18th Special Master's Report) (in the California Medical Facility's administrative segregation, "[r]oughly three dozen [mentally ill] inmates did not have confidential meetings due to lack of space, escorts, and schedules"); 84 (at the California State Prison at Solano, "[m]odified programming and failure to honor priority ducats for mental health contacts stymied access to treatment on the level III yards, where modified programming was in force throughout 2006 save for a few weeks. No escorts were available for mental health appointments"); 103 (at Deuel Vocational Institution, "[a]n audit in October 2006

30

found that 68 percent of case manager contacts were cell-front due to lack of space and escorts"); 115 (at Corcoran, "[p]rovision of mental health treatment to [mentally ill] inmates in administrative segregation was fraught with difficulty. . . .Treatment space, escorts, and confidentiality were problematic"); 168 (at the Correctional Training Facility, "[o]bstacles to confidential out-of-cell [case manager] contacts included escorts and space"); 227 (at California Correctional Institution, "[t]ime, escort availability, and space constraints stymied meaningful clinical contacts with [mentally ill] inmates in high-security units"); and 254 (at R.J. Donovan Correctional Facility's administrative segregation unit, "[h]alf of all completed [clinical] contacts occurred at cell-front due to a combination of high caseloads, inadequate escort support, and an insufficient number of holding cells").

56.  In another example, the California Rehabilitation Center recently converted from a mixed population of men and women to all-male, necessitating a move of approximately 600 women to different institutions. *Id.* at 5. As a result, one of the receiving institutions was "overwhelmed with the influx of inmates and custody has closed down some of the off site transportation which is now causing a delay in care." *Id.* at 6 & Exh. 3. According to staff at the receiving prison, "they were at 200% of capacity and . . . there were inmates on the floors. She [the Health Care Manager] does not know how she is going to deliver care to these inmates." *Id.*

57.  At San Quentin four very diverse groups of offenders are housed in the Badger

cell housing area of the South Block. These four groups consist of reception offenders, gang members, protective custody offenders, and offenders doing life terms. Because these groups cannot mix with each other the custodial staff must handle services to each group at a distinctly separate time. Staff admits that they struggle daily and sometimes fail to meet the service demands of these four sub-populations that all reside in the same cell housing area.

### 2. Emergency response

58. Custodial staff also performs certain necessary functions within medical housing units, such as responding to "man down" or emergency calls. With chronic short-staffing, these functions sometimes are not performed, with consequent dangers to the prisoner population. For example, the Court has already found that "[i]n medical units that lack call buttons for prisoners to contact doctors, custody staff routinely fail to make rounds and check on patients." Plata Pls' Trial Ex. 1 at 22 (Findings of Fact and Conclusions of Law Re Appointment of Receiver).

59. Overcrowding has also interfered with the ability of staff in regular housing units to respond appropriately to urgent and emergent medical and mental health situations. I know from experience that overworked staff without adequate back-up are less able to respond to emergencies and more likely to downplay prisoners' concerns. In a housing unit such as San Quentin's H Unit Dorm 2 (one officer for 200 prisoners ) or CIM's West Facility Cleveland Hall (two officers for 198 prisoners) or East Facility gym (two officers