# EXHIBIT D

PRISON LAW OFFICE
DONALD SPECTER, Bar No. 83925
STEVEN FAMA, Bar No. 99641
E. IVAN TRUJILLO, Bar No. 228790
General Delivery
San Quentin, California 94964
Telephone: (415) 457-9144

BINGHAM, McCUTCHEN, LLP
WARREN E. GEORGE, Bar No. 53588
Three Embarcadero Center
San Francisco, California 94111
Telephone: (415) 393-2000

ROSEN, BIEN & GALVAN, LLP
MICHAEL W. BIEN, Bar No. 96891
JANE E. KAHN, Bar No. 112239
AMY WHELAN, Bar No. 215675
LORI RIFKIN, Bar No. 244081
SARAH M. LAUBACH, Bar No. 240526
315 Montgomery Street, 10th Floor
San Francisco, California 94104
Telephone: (415) 433-6830

HELLER, EHRMAN, WHITE & McAULIFFE
RICHARD L. GOFF, Bar No. 36377
701 Fifth Avenue
Seattle, Washington 98104
Telephone: (206) 447-0900

THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
CLAUDIA CENTER, Bar No. 158255
600 Harrison Street, Suite 120
San Francisco, CA 94107
Telephone: (415) 864-8848

KIRKPATRICK & LOCKHART PRESTON
GATES ELLIS LLP
JEFFREY L. BORNSTEIN, Bar No. 99358
55 Second Street, Suite 1700
San Francisco, CA 94105-3493
Telephone: (415) 882-8200

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURTS

FOR THE EASTERN DISTRICT OF CALIFORNIA

AND THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

| | |
|---|---|
| RALPH COLEMAN, et al., <br><br> Plaintiffs, <br><br> vs. <br><br> ARNOLD SCHWARZENEGGER, et al., <br><br> Defendants | No.: Civ S 90-0520 LKK-JFM P <br><br> **THREE-JUDGE COURT** <br><br> *COLEMAN* **PLAINTIFFS' SUPPLEMENTAL RESPONSES TO DEFENDANT ARNOLD SCHWARZENEGER'S FIRST SET OF INTERROGATORIES** |
| MARCIANO PLATA ,et al., <br><br> Plaintiffs, <br> vs. <br><br> ARNOLD SCHWARZENEGGER, et al., <br><br> vs. <br> Defendants | No. C01-1351 TEH <br><br> **THREE-JUDGE COURT** |

*Coleman* Plaintiffs' Supplemental Responses To Defendant Arnold Schwarzenegger's First Set Of Interrogatories
NOS.: CIV S 90-0520 LKK-JFM, C01-1351 TEH

68209-4

1   PROPOUNDING PARTY:    DEFENDANTS SCHWARZENEGGER, et al.

2   RESPONDING PARTY:    PLAINTIFFS RALPH COLEMAN, ET AL.

3   SET:    ONE

4        Pursuant to Federal Rule of Civil Procedure 33 and the general rules governing discovery,

5   Plaintiff Ralph Coleman, on behalf of the *Coleman* class, hereby submits supplemental responses to

6   Defendants' First Set of Interrogatories to Plaintiff Ralph Coleman.

7   **PRELIMINARY STATEMENT AND GENERAL OBJECTIONS**

8       1.    The parties met and conferred about this first set of interrogatories and these

9   supplemental responses. Defendants requested supplemental responses to Interrogatories 3-14 and

10  clarified that this set of Interrogatories is directed to Ralph Coleman as a class representative and not

11  as an individual. Accordingly, the supplemental responses are submitted on behalf of the class as a

12  whole.

13      2.    Plaintiffs have not completed their investigation of the facts relating to this case, have

14  not completed their discovery in this action and have not completed their preparation for trial.

15  Therefore, these responses, while based on diligent factual exploration, reflect only Plaintiffs' current

16  state of knowledge, understanding, and belief with regard to the matters about which inquiry has been

17  made. Plaintiffs reserve the right to supplement these responses with subsequently obtained or

18  discovered information. With regard to each Interrogatory, Plaintiffs reserve the right, notwithstanding

19  these answers and responses, to employ at trial or in any pretrial proceeding herein information

20  subsequently obtained or discovered, information the materiality of which is not presently ascertained,

21  or information Plaintiffs do not regard as coming within the scope of the Interrogatories as Plaintiffs

22  understand them.

23      3.    These responses are made solely for the purpose of this action. Each answer is subject

24  to all objections as to competence, relevance, materiality, propriety, admissibility, privacy, privilege,

25  and any and all other objections that would require exclusion of any statement contained herein if any

26  such Interrogatories were asked of, or any statement contained herein were made by, a witness present

27

28

1

*Coleman* Plaintiffs' Supplemental Responses To Defendant Arnold Schwarzenegger's First Set Of Interrogatories
NOS.: CIV S 90-0520 LKK-JFM, C01-1351 TEH

68209-4

1    and testifying in court, all of which objections and grounds are reserved and may be interposed at the

2    time of trial.

3        4.      Except for explicit facts admitted herein, no incidental or implied admissions are

4    intended hereby. Plaintiffs' answers or objections to any Interrogatory are not an admission of any fact

5    set forth or assumed by that Interrogatory. In addition, each of Plaintiffs' answers to an Interrogatory

6    or part of any Interrogatory is not a waiver of part or all of any objection they might make to that form

7    of Interrogatory, or an admission that such answer or objection constitutes admissible evidence.

8    Plaintiffs assert these objections without waiving or intending to waive any objections as to

9    competency, relevancy, materiality or privilege.

10        5.      Plaintiffs object to each and every Interrogatory to the extent that Defendants are

11    requesting information that is privileged pursuant to the attorney-client privilege, the work product

12    doctrine, the right to privacy, or any other applicable privilege or doctrine. Plaintiffs object to the

13    Definition of "PLAINTIFFS" which specifically includes "attorneys" and therefore by definition seeks

14    information in violation of the attorney-client privilege and the work product doctrine. Plaintiffs

15    object to the Instructions provided by Defendants insofar as they specifically call for information

16    protected by the attorney-client privilege and work-product doctrine, such as requiring Plaintiffs to

17    "furnish all information available to you, including information in the possession of

18    your…attorneys…" and asking for information that is "obtained or developed by you or your counsel."

19        6.      Plaintiffs object to each and every Interrogatory to the extent that Defendants are

20    requesting information that is neither relevant to the subject matter of this action nor reasonably

21    calculated to lead to the discovery of admissible evidence.

22        7.      Plaintiffs object to the Interrogatories to the extent that they seek information available

23    to Defendants through public sources or records, and on the grounds that they subject Plaintiffs to

24    unreasonable and undue annoyance, oppression, burden and expense. Plaintiffs further object to the

25    Requests to the extent that such Requests are unduly burdensome because much or all of the

26    information requested in the Interrogatories is in the possession of Defendants, has been filed with

27    Court, or is otherwise equally or more available to Defendants than to Plaintiffs.

28

2

*Coleman* Plaintiffs' Supplemental Responses To Defendant Arnold Schwarzenegger's First Set Of Interrogatories
NOS.: CIV S 90-0520 LKK-JFM, C01-1351 TEH

68209-4

8.     Plaintiffs object to the Interrogatories to the extent that they are vague and ambiguous and do not include adequate definition, specificity, or limiting factors.

9.     Plaintiffs object generally to each Interrogatory to the extent that it seeks information prepared by expert consultants.  Plaintiffs submitted one round of expert reports on November 9, 2007, as required by the Three-Judge Court's October 10, 2007 Order Bifurcating Proceedings and Setting Deadlines for Phase I.  Plaintiffs will submit supplemental and/or new expert reports in accordance with the schedule that will be established by the Three-Judge Court.  Many of Defendants' Interrogatories request information that will be provided in whole or in part by expert testimony.

10.     Plaintiffs object generally to each Interrogatory that involves an opinion or contention that relates to fact or the application of law to fact upon the ground that such Interrogatories are premature and inappropriate until after discovery has been completed.  Plaintiffs moreover object to Interrogatories requesting "each and every" and/or "any and all" fact(s) or piece(s) of evidence on a particular topic, as such contention Interrogatories are unduly burdensome, oppressive, and inappropriate.

11.     Plaintiffs object to the Definitions provided by Defendants.  While the term "PRISONER RELEASE ORDER" is defined by reference to the statutory definition, it is vague, ambiguous, and overbroad as used in these Interrogatories.  The statute has rarely, if ever, been interpreted by the federal courts, and the question of whether a particular order is a "Prisoner Release Order" depends on a range of complex factual and legal elements, including deciding whether an order "has the purpose or effect" of "reducing or limiting population" or "directing the release from or nonadmission of prisoners."

Subject to and without waiving the foregoing objections, and incorporating them by reference into each of the responses provided below, Plaintiffs hereby provide the following supplemental responses.

///

///

///

3

## SUPPLEMENTAL RESPONSES TO INTERROGATORIES

**INTERROGATORY NO. 3:**

If the response to Interrogatory number 1 is affirmative, by what amount must the *Coleman* mental health caseload be reduced by the PRISONER RELEASE ORDER to remediate that failure?

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 3:**

In addition to the General Objections stated above, Plaintiffs object to this Interrogatory on the grounds that it is vague, ambiguous and overbroad and that it seeks information not relevant to this litigation nor reasonably calculated to lead to the discovery of admissible evidence. While the term "PRISONER RELEASE ORDER" is defined by reference to the statutory definition, it is vague, ambiguous, and overbroad as used in this Interrogatory. The statute has rarely, if ever, been interpreted by the federal courts, and the question of whether a particular order is a "Prisoner Release Order" depends on a range of complex factual and legal elements, including deciding whether an order "has the purpose or effect" of "reducing or limiting population" or "directing the release from or nonadmission of prisoners." Plaintiffs also object to the extent that it would require disclosure of information protected by the attorney-client privilege, work-product doctrine, and/or any other applicable privilege and improperly calls for a legal conclusion in violation of the work product doctrine. Plaintiffs further object on the basis that this Interrogatory calls for an expert opinion. Plaintiffs disclosed their experts and served initial reports of the experts on November 9, 2007, as required by the Three-Judge Court's October 10, 2007 Order Bifurcating Proceedings and Setting Deadlines for Phase I. Plaintiffs will submit additional expert reports in accordance with the deadlines set by the Three-Judge Court.

Subject to and without waiver of the above-stated objections, Plaintiffs respond as follows: As Judge Karlton found in his Order of July 23, 2007, "the orders of this court issued from 1995 through the present have failed to remedy the constitutionally inadequate delivery of mental health care to CDCR inmates." 7/23/07 Order at 7:22-23. Plaintiffs contend that crowding is the primary cause of the ongoing constitutional violations and that no other relief other than a prisoner release order will remedy the constitutional violations in a timely manner. A prisoner release order that excludes or

4

*Coleman* Plaintiffs' Supplemental Responses To Defendant Arnold Schwarzenegger's First Set Of Interrogatories
NOS.: CIV S 90-0520 LKK-JFM, C01-1351 TEH

68209-4

1  discriminates against the *Coleman* class, in Plaintiffs' opinion, will be unlikely to promptly and

2  effectively alleviate the ongoing constitutional violations.  Plaintiffs further contend that a prisoner

3  release order that is directed solely at the *Coleman* class and fails to address overcrowding in general is

4  also unlikely to promptly and effectively alleviate the constitutional violations.

5         Plaintiffs anticipate that the Court will order Defendants to develop a plan to accomplish the

6  population reductions, meaning that Defendants will be the ones charged with safely reducing the

7  population.  Defendants have numerous, evidence-based options available to them to safely effect the

8  population reductions, including those set forth in the following reports commissioned by or otherwise

9  available to Defendants:

10        Expert Panel on Adult Offender and Recidivism Reduction Programming, Report to the
          State Legislature, *A Roadmap for Effective Offender Programming in California* (June
11        29, 2007);

12        Little Hoover Commission, *Solving California's Corrections Crisis: Time is Running
          Out* (January 2007); *Reforming Corrections:  Report of the Corrections Independent
13        Review Panel*, June 30, 2004 (Former Gov. Deukmejian, Chairman);

14        Petersilia, Joan, *Understanding California Corrections,* California Policy Research
          Center, University of California (May 2006)
15        (http://www.ucop.edu/cprc/documents/understand_ca_corrections.pdf);

16        Final Report and Recommendations, Feb. 2008, Blue Ribbon Commission on Jail
          Overcrowding, County of Santa Barbara, hereinafter "Santa Barbara Report."
17        (http://www.sbsheriff.org/documents/FullFinalBRCReport.pdf);

18        Governor's Rehabilitation Strike Team Report, *Meeting the Challenges of Rehabilitation
          in California's Prison and Parole System*, December 2007
19        (http://www.cdcr.ca.gov/news/docs/GovRehabilitationStrikeTeamRpt_012308.pdf);

20        LAO 2008-09 Budget Analysis, Judicial and Criminal Justice
          (http://www.lao.ca.gov/analysis_2008/crim_justice/crimjust_anl08.pdf);
21
          "Accelerated Release:  A Literature Review, January 2008 (available at
22        http://www.nccd-crc.org) and all reports cited therein.

23        In terms of the numbers by which the *Coleman* and or general population must be reduced to

24  remediate the ongoing constitutional violations, it is impossible for Plaintiffs to determine at this time

25  the specific contours of the prisoner release order and, as stated above, Defendants will likely be the

26  ones ordered to develop a release plan.  The necessary population reductions also depend on issues

27  under Defendants' control, such as their ability to comply with required staffing ratios and court-

28
                                              5
*Coleman* Plaintiffs' Supplemental Responses To Defendant Arnold Schwarzenegger's First Set Of Interrogatories
NOS.:  CIV S 90-0520 LKK-JFM, C01-1351 TEH

68209-4

1  ordered mental health bed construction projects, which may change over time.  Any release order,

2  however, should include immediate reductions in the prison population over a limited period of time.

3  In Plaintiffs' view, the court may use various benchmarks for determining the population at which

4  defendants can meet constitutional standards for mental health treatment.  One method is design bed

5  capacity.  The institutions were built for roughly half of the current population.  The Deukmejian

6  Commission also suggested that the prison system had an operable capacity of 111,000 prisoners and a

7  maximum "safe and reasonable capacity of 138,000 prisoners."  Regardless of what plan Defendants

8  choose to establish, however, Plaintiffs will oppose any release plan that excludes *Coleman* class

9  members and will establish that many class members can be safely released to the community.

10 Moreover, Defendants' plan should include provisions specifically intended to both reduce the intake

11 and the recidivism rates of *Coleman* class members, including but not limited to improved pre-release

12 planning services for *Coleman* class members (including completion of benefits applications with the

13 Social Security and Veterans' Administrations), increased mental health services on parole to include

14 placement in appropriate treatment programs and housing, funding community-based alternatives to

15 returns to custody for parole violations that are related to mental illness, providing access to residential

16 mental health programs (including Department of Mental Health hospitals and programs), establishing

17 specialized mental health parole revocation units oriented to appropriate alternatives to incarceration of

18 persons with mental illness, and expanding mental health courts in the counties to reduce prison

19 commitments for offenders with mental illness.  Finally, the exact effect of population reduction

20 measures on the provision of constitutionally adequate mental health care may not be known until the

21 reductions actually begin to occur.  To this end, the population reduction measures may have to be

22 implemented in phases and/or may change over time.

23 **INTERROGATORY NO. 4:**

24      Do you contend that the PRISONER RELEASE ORDER must reduce the number of inmates in

25 the different categories of the *Coleman* mental health caseload (such as the Enhanced Outpatient

26 Program, coordinated clinical case management system, inpatient care patient) to achieve

27 constitutionally adequate mental health care?

28

*Coleman* Plaintiffs' Supplemental Responses To Defendant Arnold Schwarzenegger's First Set Of Interrogatories
NOS.: CIV S 90-0520 LKK-JFM, C01-1351 TEH

68209-4

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 4:**

In addition to the General Objections stated above, Plaintiffs object to this Interrogatory on the grounds that it is vague, ambiguous and overbroad and that it seeks information not relevant to this litigation nor reasonably calculated to lead to the discovery of admissible evidence. While the term "PRISONER RELEASE ORDER" is defined by reference to the statutory definition, it is vague, ambiguous, and overbroad as used in this Interrogatory. The statute has rarely, if ever, been interpreted by the federal courts, and the question of whether a particular order is a "Prisoner Release Order" depends on a range of complex factual and legal elements, including deciding whether an order "has the purpose or effect" of "reducing or limiting population" or "directing the release from or nonadmission of prisoners." Plaintiffs also object to the extent that it would require disclosure of information protected by the attorney-client privilege, work-product doctrine, and/or any other applicable privilege and improperly calls for a legal conclusion in violation of the work product doctrine. Plaintiffs further object on the basis that this Interrogatory calls for an expert opinion. Plaintiffs disclosed their experts and served initial reports of the experts on November 9, 2007, as required by the Three-Judge Court's October 10, 2007 Order Bifurcating Proceedings and Setting Deadlines for Phase I. Plaintiffs will submit additional expert reports in accordance with the deadlines set by the Three-Judge Court.

Subject to and without waiver of the above-stated objections, Plaintiffs respond as follows: Yes.

**INTERROGATORY NO. 5:**

If your response to the previous Interrogatory is affirmative, identify the reduction for each category of the *Coleman* mental health caseload and by level of custody to achieve constitutionally adequate mental health care.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 5:**

In addition to the General Objections stated above, Plaintiffs object to this Interrogatory on the grounds that it is vague, ambiguous and overbroad and that it seeks information not relevant to this litigation nor reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs also

7

*Coleman* Plaintiffs' Supplemental Responses To Defendant Arnold Schwarzenegger's First Set Of Interrogatories
NOS.: CIV S 90-0520 LKK-JFM, C01-1351 TEH

68209-4

1   object to the extent that it would require disclosure of information protected by the attorney-client

2   privilege, work-product doctrine, and/or any other applicable privilege and improperly calls for a legal

3   conclusion in violation of the work product doctrine.  Plaintiffs further object on the basis that this

4   Interrogatory calls for an expert opinion.  Plaintiffs disclosed their experts and served initial reports of

5   the experts on November 9, 2007, as required by the Three-Judge Court's October 10, 2007 Order

6   Bifurcating Proceedings and Setting Deadlines for Phase I.  Plaintiffs will submit additional expert

7   reports in accordance with the deadlines set by the Three-Judge Court.

8       Subject to and without waiver of the above-stated objections, Plaintiffs respond as follows:  See

9   Supplemental Response to Interrogatory No. 3.

10  **INTERROGATORY NO. 6:**

11      State each and every policy and procedure Defendants should adopt to achieve the amount of

12  the reduction in the *Coleman* mental health caseload necessary to remediate Defendants' failure to

13  provide constitutionally adequate mental health care according to the Revised Program Guide

14  standards.

15  **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 6:**

16      In addition to the General Objections stated above, Plaintiffs object to this Interrogatory on the

17  grounds that it is vague, ambiguous and overbroad and that it seeks information not relevant to this

18  litigation nor reasonably calculated to lead to the discovery of admissible evidence.  The request for

19  "each and every" conceivable policy and procedure is unduly burdensome and oppressive because it is

20  unlimited in time and scope and requests information not possibly within Plaintiffs' knowledge.

21  Plaintiffs also object to the extent that it would require disclosure of information protected by the

22  attorney-client privilege, work-product doctrine, and/or any other applicable privilege and improperly

23  calls for a legal conclusion in violation of the work product doctrine.  Plaintiffs further object on the

24  basis that this Interrogatory calls for an expert opinion.  Plaintiffs disclosed their experts and served

25  initial reports of the experts on November 9, 2007, as required by the Three-Judge Court's October 10,

26  2007 Order Bifurcating Proceedings and Setting Deadlines for Phase I.  Plaintiffs will submit

27  additional expert reports in accordance with the deadlines set by the Three-Judge Court.

28

*Coleman* Plaintiffs' Supplemental Responses To Defendant Arnold Schwarzenegger's First Set Of Interrogatories
NOS.:  CIV S 90-0520 LKK-JFM, C01-1351 TEH

68209-4

Subject to and without waiver of the above-stated objections, Plaintiffs respond as follows: Plaintiffs anticipate that the Court will order Defendants to develop a plan to accomplish the population reductions, meaning that Defendants will be the ones charged with safely reducing the population. Defendants have numerous, evidence-based options available to them to safely effect the population reductions, including, but not limited to, those set forth in the following reports commissioned by or otherwise available to Defendants:

Expert Panel on Adult Offender and Recidivism Reduction Programming, Report to the State Legislature, *A Roadmap for Effective Offender Programming in California* (June 29, 2007);

Little Hoover Commission, *Solving California's Corrections Crisis: Time is Running Out* (January 2007); *Reforming Corrections: Report of the Corrections Independent Review Panel*, June 30, 2004 (Former Gov. Deukmejian, Chairman);

Petersilia, Joan, *Understanding California Corrections,* California Policy Research Center, University of California (May 2006) (http://www.ucop.edu/cprc/documents/understand_ca_corrections.pdf);

Final Report and Recommendations, Feb. 2008, Blue Ribbon Commission on Jail Overcrowding, County of Santa Barbara, hereinafter "Santa Barbara Report." (http://www.sbsheriff.org/documents/FullFinalBRCReport.pdf);

Governor's Rehabilitation Strike Team Report, *Meeting the Challenges of Rehabilitation in California's Prison and Parole System*, December 2007 (http://www.cdcr.ca.gov/news/docs/GovRehabilitationStrikeTeamRpt_012308.pdf);

LAO 2008-09 Budget Analysis, Judicial and Criminal Justice (http://www.lao.ca.gov/analysis_2008/crim_justice/crimjust_anl08.pdf);

"Accelerated Release: A Literature Review, January 2008 (available at http://www.nccd-crc.org) and all reports cited therein.

As these and other reports make clear, Defendants have numerous, evidence-based population reduction options available to them that can be done safely and, in light of the dangerous overcrowding in the prison system right now, could actually improve public safety. Some of the population reduction measures available to Defendants include, but are not limited to the following:

1.     Fund Community Corrections Programs to Divert Prisoners with Sentences of Fewer than 24 Months.

2.     Provide Intensive Probation Supervision for 18-25 year old offenders.

9

*Coleman* Plaintiffs' Supplemental Responses To Defendant Arnold Schwarzenegger's First Set Of Interrogatories
NOS.: CIV S 90-0520 LKK-JFM, C01-1351 TEH

68209-4

3.      Replace Discretionary Day for Day Earned Time with Statutory Day for Day Credits, with Provisions That Only Disciplinary Conduct Can Result in Lost Days.  This would ensure that all prisoners receive day for day credits (including pretrial jail credits) that can only be removed for serious misconduct.  Washington, Indiana and Illinois have similar statutory schemes and this remedy was also recommended by the Expert Panel and Deukmejian Panel reports.

4.      Provide Supplemental Program Credits For Prisoners Complying With Case Management Plan And For Prisoners Who Complete Rehabilitative Programs.  *See* Expert Panel Report, pp. 92-93.

5.      Transfer Low Risk Prisoners with Fewer than 12 months to Serve to Parole.  This will require use of the risk assessment tool identified below and would place low risk offenders on a very short period of parole supervision while moving moderate to high risk offenders to community corrections centers (CCCs) or reentry facilities.

6.      Discharge Low Risk Offenders from Parole if Arrest-Free for 12 Months.

7.      Use a Validated Risk Assessment Procedure to Release Non-Violent, Non-Sex Offenders from Prison without Parole.  *See* Expert Panel, Exhibit E, p. 90.

8.      Develop A Parole Sanctions Matrix Based on the Risk to Re-Offend Level of the Offender And the Seriousness of the Violation.  Similar matrices are currently in use in other states, as reported by the National Institute of Corrections.  The matrix should preclude low risk parolees from being returned to prison for technical violations or misdemeanors.

9.      Implement a Validated Risk Assessment Instrument Throughout CDCR.  The prison system has ready access to such an instrument, which will ensure that high risk prisoners are not released from prison without proper supervision and that low-risk people are not over-supervised. CDCR *already* compiles the data necessary to use this risk assessment tool.

10

*Coleman* Plaintiffs' Supplemental Responses To Defendant Arnold Schwarzenegger's First Set Of Interrogatories
NOS.:  CIV S 90-0520 LKK-JFM, C01-1351 TEH

68209-4

10.    Immediately Hire Sufficient Staff to Calculate Credits and to Process Outgoing Prisoners.  The state found that 354 out of 679 prisoners subject to a recent audit were not released on time, resulting in $2.3 million in added housing costs for those prisoners.

11.    Greatly Expand the Availability of Alternative Sanctions As Recommended by the Parole Sanctions Matrix.  Some examples include residential multi-service centers, drug treatment programs, electronic in-home detention, mental health programs providing residential, day treatment and other necessary programs and services, and day reporting centers.

12.    Divert New Court Commitments with County Subsidy Grants.  One option is to provide funding to counties similar to Senate Bill 81 (requiring non-violent juvenile offenders to be retained in the community) for housing/treatment of non-violent adult offenders.  The state of Pennsylvania also has this type of diversion program.

13.    Automatically Restore Good-Time Credits for All Prisoners with Non-Serious Misconduct (Classes D, E, And F).  Under the current system, prisoners must request restoration of these credits, which are then inconsistently restored throughout the system.  This change would result in automatic restoration of credits in the absence of additional misconduct by the prisoner.

14.    Expand Pre-Release Planning Services for Mentally Ill, Developmentally Disabled, And Other Special Needs Inmates to Include Benefits Applications With the Social Security And Veteran's Administrations.  The CDCR will need to complete contract negotiations with each federal agency and hire social workers to implement this recommendation.

15.    Redirect Funds to Counties to Manage Parolees with Mental Illness, including, for example:

    a)    Increase and Fund Mental Health Services on Parole to Include Placement in Appropriate Housing (e.g. Board and Care, Inpatient, Outpatient Day Reporting) to Reduce Recidivism.

11

*Coleman* Plaintiffs' Supplemental Responses To Defendant Arnold Schwarzenegger's First Set Of Interrogatories
NOS.: CIV S 90-0520 LKK-JFM, C01-1351 TEH

68209-4

b)    Fund Community-Based Alternatives to Returns to Custody for Parole Violations that Are Related to Symptoms of Mental Illness.

c)    Expand Mental Health Courts in the Counties to Reduce Prison Commitments for Offenders with Mental Illness.

16.    Establish specialized mental health parole units to provide appropriate supervision, access to treatment, housing and reintegration with the community.

17.    Enact Legislation to Create a Sentencing Commission.  Unless the sentencing structure is reformed the prison population will continue to grow thereby perpetuating a system that will need court supervision to maintain limits on the prison population.

**INTERROGATORY NO. 7:**

State the time frame for the implementation of each and every policy that Defendants should adopt to achieve the reduction in the *Coleman* mental health caseload necessary to remediate Defendants' failure to provide constitutionally adequate mental health care according to the Revised Program Guide standards.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 7:**

In addition to the General Objections stated above, Plaintiffs object to this Interrogatory on the grounds that it is vague, ambiguous and overbroad and that it seeks information not relevant to this litigation nor reasonably calculated to lead to the discovery of admissible evidence.  Plaintiffs also object to the extent that it would require disclosure of information protected by the attorney-client privilege, work-product doctrine, and/or any other applicable privilege and improperly calls for a legal conclusion in violation of the work product doctrine.  Plaintiffs further object on the basis that this Interrogatory calls for an expert opinion.  Plaintiffs disclosed their experts and served initial reports of the experts on November 9, 2007, as required by the Three-Judge Court's October 10, 2007 Order Bifurcating Proceedings and Setting Deadlines for Phase I.  Plaintiffs will submit additional expert reports in accordance with the deadlines set by the Three-Judge Court.

12

*Coleman* Plaintiffs' Supplemental Responses To Defendant Arnold Schwarzenegger's First Set Of Interrogatories
NOS.: CIV S 90-0520 LKK-JFM, C01-1351 TEH

68209-4

1    Subject to and without waiver of the above-stated objections, Plaintiffs respond as follows: See

2   Supplemental Response to Interrogatory No. 3.  In addition, any plan defendants' develop or adopt

3   should mandate that population reductions occur within a three year period, with most of the

4   reductions occurring within the first two years.  There should also be an immediate reduction of

5   approximately 15,000 prisoners so that no prisoners are housed in what are commonly referred to as

6   "ugly" or "bad" beds, i.e., those in gymnasiums, dayrooms, triple-bunks, and other locations not

7   intended for housing.

8   **INTERROGATORY NO. 8:**

9    If those policies and procedures identified in response to Interrogatory number 7 are based

10  upon any prison or population models, please identify each and every model by its source, including

11  but not limited to entity, publication, and author.

12  **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 8:**

13   In addition to the General Objections stated above, Plaintiffs object to this Interrogatory on the

14  grounds that it is vague, ambiguous and overbroad and that it seeks information not relevant to this

15  litigation nor reasonably calculated to lead to the discovery of admissible evidence.  Plaintiffs also

16  object to the extent that it would require disclosure of information protected by the attorney-client

17  privilege, work-product doctrine, and/or any other applicable privilege and improperly calls for a legal

18  conclusion in violation of the work product doctrine.  Plaintiffs further object on the basis that this

19  Interrogatory calls for an expert opinion.  Plaintiffs disclosed their experts and served initial reports of

20  the experts on November 9, 2007, as required by the Three-Judge Court's October 10, 2007 Order

21  Bifurcating Proceedings and Setting Deadlines for Phase I.  Plaintiffs will submit additional expert

22  reports in accordance with the deadlines set by the Three-Judge Court.

23   Subject to and without waiver of the above-stated objections, Plaintiffs respond as follows: See

24  Supplemental Responses to Interrogatory No. 3 and Interrogatory No. 6.

25  ///

26  ///

27  ///

28

*Coleman* Plaintiffs' Supplemental Responses To Defendant Arnold Schwarzenegger's First Set Of Interrogatories
NOS.: CIV S 90-0520 LKK-JFM, C01-1351 TEH

68209-4

**INTERROGATORY NO. 9:**

Do Plaintiffs contend that a PRISONER RELEASE ORDER reducing only non-*Coleman* caseload population will enable Defendants to meet constitutionally adequate standards for mental health care according to the court-approved Revised Program Guide?

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 9:**

In addition to the General Objections stated above, Plaintiffs object to this Interrogatory on the grounds that it is vague, ambiguous and overbroad and that it seeks information not relevant to this litigation nor reasonably calculated to lead to the discovery of admissible evidence. While the term "PRISONER RELEASE ORDER" is defined by reference to the statutory definition, it is vague, ambiguous, and overbroad as used in this Interrogatory. The statute has rarely, if ever, been interpreted by the federal courts, and the question of whether a particular order is a "Prisoner Release Order" depends on a range of complex factual and legal elements, including deciding whether an order "has the purpose or effect" of "reducing or limiting population" or "directing the release from or nonadmission of prisoners." Plaintiffs also object to the extent that it would require disclosure of information protected by the attorney-client privilege, work-product doctrine, and/or any other applicable privilege and improperly calls for a legal conclusion in violation of the work product doctrine. Plaintiffs further object on the basis that this Interrogatory calls for an expert opinion. Plaintiffs disclosed their experts and served initial reports of the experts on November 9, 2007, as required by the Three-Judge Court's October 10, 2007 Order Bifurcating Proceedings and Setting Deadlines for Phase I. Plaintiffs will submit additional expert reports in accordance with the deadlines set by the Three-Judge Court.

Subject to and without waiver of the above-stated objections, Plaintiffs respond as follows: See Supplemental Response to Interrogatory No. 3.

**INTERROGATORY NO. 10:**

If your response to Interrogatory number 9 is in the affirmative, please state the amount of that population reduction.

*Coleman* Plaintiffs' Supplemental Responses To Defendant Arnold Schwarzenegger's First Set Of Interrogatories
NOS.: CIV S 90-0520 LKK-JFM, C01-1351 TEH

68209-4

1 | **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 10:**

2        In addition to the General Objections stated above, Plaintiffs object to this Interrogatory on the

3 grounds that it is vague, ambiguous and overbroad and that it seeks information not relevant to this

4 litigation nor reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs also

5 object to the extent that it would require disclosure of information protected by the attorney-client

6 privilege, work-product doctrine, and/or any other applicable privilege and improperly calls for a legal

7 conclusion in violation of the work product doctrine. Plaintiffs further object on the basis that this

8 Interrogatory calls for an expert opinion. Plaintiffs disclosed their experts and served initial reports of

9 the experts on November 9, 2007, as required by the Three-Judge Court's October 10, 2007 Order

10 Bifurcating Proceedings and Setting Deadlines for Phase I. Plaintiffs will submit additional expert

11 reports in accordance with the deadlines set by the Three-Judge Court.

12        Subject to and without waiver of the above-stated objections, Plaintiffs respond as follows: See

13 Supplemental Responses to Interrogatory No. 3 and Interrogatory No. 7.

14 | **INTERROGATORY NO. 11:**

15        For the population reduction stated in response to Interrogatory number 10, please identify the

16 numbers of inmates that you contend must be released by level of custody and gender.

17 | **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 11:**

18        In addition to the General Objections stated above, Plaintiffs object to this Interrogatory on the

19 grounds that it is vague, ambiguous and overbroad and that it seeks information not relevant to this

20 litigation nor reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs also

21 object to the extent that it would require disclosure of information protected by the attorney-client

22 privilege, work-product doctrine, and/or any other applicable privilege and improperly calls for a legal

23 conclusion in violation of the work product doctrine. Plaintiffs further object on the basis that this

24 Interrogatory calls for an expert opinion. Plaintiffs disclosed their experts and served initial reports of

25 the experts on November 9, 2007, as required by the Three-Judge Court's October 10, 2007 Order

26 Bifurcating Proceedings and Setting Deadlines for Phase I. Plaintiffs will submit additional expert

27 reports in accordance with the deadlines set by the Three-Judge Court.

28

68209-4

1     Subject to and without waiver of the above-stated objections, Plaintiffs respond as follows:  See

2  Supplemental Responses to Interrogatory No. 3 and Interrogatory No. 7.

3  **INTERROGATORY NO. 12:**

4     State each and every policy and procedure Defendants should adopt to achieve the reduction in

5  only *non-Coleman* caseload population stated in response to Interrogatory number 10.

6  **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 12:**

7     In addition to the General Objections stated above, Plaintiffs object to this Interrogatory on the

8  grounds that it is vague, ambiguous and overbroad and that it seeks information not relevant to this

9  litigation nor reasonably calculated to lead to the discovery of admissible evidence.  Plaintiffs also

10  object to the extent that it would require disclosure of information protected by the attorney-client

11  privilege, work-product doctrine, and/or any other applicable privilege and improperly calls for a legal

12  conclusion in violation of the work product doctrine.  Plaintiffs further object on the basis that this

13  Interrogatory calls for an expert opinion.  Plaintiffs disclosed their experts and served initial reports of

14  the experts on November 9, 2007, as required by the Three-Judge Court's October 10, 2007 Order

15  Bifurcating Proceedings and Setting Deadlines for Phase I.  Plaintiffs will submit additional expert

16  reports in accordance with the deadlines set by the Three-Judge Court.

17     Subject to and without waiver of the above-stated objections, Plaintiffs respond as follows:  See

18  Supplemental Response to Interrogatory No. 6.

19  **INTERROGATORY NO. 13:**

20     State the time frame for the implementation of each and every policy that Defendants should

21  adopt to achieve the reduction in only *non-Coleman* caseload population necessary to remediate

22  Defendants' failure to provide constitutionally adequate mental health care according to the Revised

23  Program Guide standards.

24  **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 13:**

25     In addition to the General Objections stated above, Plaintiffs object to this Interrogatory on the

26  grounds that it is vague, ambiguous and overbroad and that it seeks information not relevant to this

27  litigation nor reasonably calculated to lead to the discovery of admissible evidence.  Plaintiffs also

28

16

*Coleman* Plaintiffs' Supplemental Responses To Defendant Arnold Schwarzenegger's First Set Of Interrogatories
NOS.: CIV S 90-0520 LKK-JFM, C01-1351 TEH

68209-4

1  object to the extent that it would require disclosure of information protected by the attorney-client

2  privilege, work-product doctrine, and/or any other applicable privilege and improperly calls for a legal

3  conclusion in violation of the work product doctrine.  Plaintiffs further object on the basis that this

4  Interrogatory calls for an expert opinion.  Plaintiffs disclosed their experts and served initial reports of

5  the experts on November 9, 2007, as required by the Three-Judge Court's October 10, 2007 Order

6  Bifurcating Proceedings and Setting Deadlines for Phase I.  Plaintiffs will submit additional expert

7  reports in accordance with the deadlines set by the Three-Judge Court.

8       Subject to and without waiver of the above-stated objections, Plaintiffs respond as follows:  See

9  Supplemental Response to Interrogatory No. 7.

10  **INTERROGATORY NO. 14:**

11       If those policies and procedures identified in response to Interrogatory number 12 are based

12  upon any prison or population models, please identify each and every model by its source, including

13  but not limited to entity, publication, and author.

14  **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 14:**

15       In addition to the General Objections stated above, Plaintiffs object to this Interrogatory on the

16  grounds that it is vague, ambiguous and overbroad and that it seeks information not relevant to this

17  litigation nor reasonably calculated to lead to the discovery of admissible evidence.  Plaintiffs also

18  object to the extent that it would require disclosure of information protected by the attorney-client

19  privilege, work-product doctrine, and/or any other applicable privilege and improperly calls for a legal

20  conclusion in violation of the work product doctrine.  Plaintiffs further object on the basis that this

21  Interrogatory calls for an expert opinion.  Plaintiffs disclosed their experts and served initial reports of

22  the experts on November 9, 2007, as required by the Three-Judge Court's October 10, 2007 Order

23  Bifurcating Proceedings and Setting Deadlines for Phase I.  Plaintiffs will submit additional expert

24  reports in accordance with the deadlines set by the Three-Judge Court.

25  ///

26  ///

27  ///

28

*Coleman* Plaintiffs' Supplemental Responses To Defendant Arnold Schwarzenegger's First Set Of Interrogatories
NOS.: CIV S 90-0520 LKK-JFM, C01-1351 TEH

68209-4

Subject to and without waiver of the above-stated objections, Plaintiffs respond as follows:  See Supplemental Responses to Interrogatory No. 3 and Interrogatory No. 6.


Dated:  April 11, 2008                                            ROSEN, BIEN & GALVAN, LLP


                                                       By:  _____
                                                            Amy Whelan
                                                            Attorneys for Plaintiffs
                                                            RALPH COLEMAN, ET AL.

*Coleman* Plaintiffs' Supplemental Responses To Defendant Arnold Schwarzenegger's First Set Of Interrogatories
NOS.: CIV S 90-0520 LKK-JFM, C01-1351 TEH

68209-4

**VERIFICATION**

I, Ralph Coleman, certify and declare that I have read the foregoing "Coleman Plaintiffs' Supplemental Responses to Defendant Schwarzenegger's First Set of Interrogatories" and know the contents thereof.

I, Ralph Coleman, class representative in this action, am authorized to make this verification for and on behalf of Plaintiffs, and I make this verification for that reason. The responses are not all within my personal knowledge. I am informed and believe that there is no single person who has full personal knowledge of all of the matters set forth therein and that the responses were prepared with the advice and assistance of counsel. Subject to inadvertent or undiscovered errors and reserving the right to make changes to the responses if it appears that there were errors or omissions, I allege that the matters stated in the responses are true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct. Executed at Vacaville, California on April 10th, 2008.

_Ralph Coleman_
Ralph Coleman

*Coleman* Plaintiffs' Supplemental Responses To Defendant Arnold Schwarzenegger's First Set Of Interrogatories
NOS.: CIV S 90-0520 LKK-JFM, C01-1351 TEH

68209-4

**PROOF OF SERVICE**

I, Kathleen Johnson-Silk, declare that I am a resident of the State of California, am over the age of eighteen years and am not a party to the within action. I am employed with Rosen, Bien & Galvan LLP, whose address is 315 Montgomery Street, Tenth Floor, San Francisco, California 94104. On April 11, 2008, I served the following documents:

**PLAINTIFF RALPH COLEMAN'S SUPPLEMENTAL RESPONSE TO DEFENDANT GOVERNOR SCHWARZENEGGER'S FIRST SET OF INTERROGATORIES**

I served the documents on the persons listed below, as follows:

| | |
|---|---|
| [ ] | **By messenger service**. I served the documents by placing them in an envelope or package addressed to the persons listed below and providing them to a professional messenger service for service. (A declaration by the messenger is attached hereto as a separate document.) |
| [ X ] | **By United States mail**. I enclosed the documents in a sealed envelope or package addressed to the persons listed below and placed the envelope or package for collection and mailing in accordance with our ordinary business practices. I am readily familiar with my firm's practice for collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid. I am a resident or employed in the county where the mailing occurred. The envelope or package was placed in the mail at San Francisco, California. |
| [ ] | **By e-mail or electronic transmission**. Based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused the documents to be sent to the persons at the e-mail addressed listed below. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful. |

Lisa A. Tillman
Deputy Attorney General
P.O. Box 944255
Sacramento, CA 94244-2550

Lead Counsel for County Intervenors
Ann Miller Ravel
Theresa Fuentes
Office of the County Counsel
70 West Hedding, East Wing, 9th Floor
San Jose, CA 95110

Paul B. Mello, Esq.
Hanson & Bridgett LLP
425 Market Street, 26th Floor
San Francisco, CA 94105

Republican Assembly and Senate Intervenors
Steven S. Kaufhold
Akin, Gump Strauss Hauer & Feld, LLP
580 California Street, 15th Floor
San Francisco, CA 94104

*Coleman* Plaintiffs' Supplemental Responses To Defendant Arnold Schwarzenegger's First Set Of Interrogatories
NOS.: CIV S 90-0520 LKK-JFM, C01-1351 TEH

68209-4

California Correctional Peace Officers'
Association (CCPOA) Intervenors
Natalie Leonard
Gregg MacClean Adam
Carroll, Burdick & McDonough, LLP
44 Montgomery Street, Suite 400
San Francisco, CA 94104

County of Sonoma Intervenors
Anne L. Keck, Deputy County Counsel
Steven Woodside
575 Administration Drive, Room 105A
Santa Rosa, CA 95403

District Attorney Intervenors
William E. Mitchell
Assistant District Attorney
Riverside County District Attorney's
Office
4075 Main Street, First Floor
Riverside, CA 92501

California Sheriff, Probation, Police Chief
and Corrections Intervenors
Jones & Mayer LLP
Martin J. Mayer
Michael R. Capizzi
Kimberly Hall Barlow
Elizabeth R. Feffer
3777 North Harbor Boulevard
Fullerton, CA 92835

I declare under penalty of perjury under the laws of the United States and the State of

California that the foregoing is true and correct, and that this Proof of Service was executed on this

11th day of April, 2008, at San Francisco, California.

Kathleen Johnson-Silk

68209v4

21

68209-4

# EXHIBIT E

| From: | Charles Antonen [Charles.Antonen@doj.ca.gov] |
|---|---|
| Sent: | Wednesday, October 01, 2008 6:41 PM |
| To: | Chad Stegeman; Steven Kaufhold; Teresa Wang; Gregg Adam; Natalie Leonard; Theresa Fuentes; Carol Woodward; Ivy Tsai; Kimberly Hall Barlow; mjm@jones-mayer.com; Ed Sangster; Alison Hardy; Donald Specter; Rebekah Evenson; Steve Fama; Sara Norman; Amy Whelan; Lisa Ells; Michael W. Bien; William Mitchell; Anne Keck |
| Cc: | Jon Wolff; Kyle Lewis; Lisa Tillman; Rochelle East; Anne Johnson; Paul B. Mello; Renju Jacob; Samantha Tama |
| Subject: | 3-Judge Panel - Courtesy Copy of the Addendum to Dr. Packer's Report |
| Attachments: | Document.pdf |

Attached please find a courtesy copy of the Addendum to Dr. Packer's report. Thank you.

Sincerely,

Charles J. Antonen
California Department of Justice
Office of the Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, California 94102-7004
415.703.5443
415.703.5843 (Facsimile)
Charles.Antonen@doj.ca.gov

**CONFIDENTIALITY NOTICE:** This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

# EXHIBIT F

**IRA K. PACKER, Ph.D.**

**Forensic Consultation and Training**

Board Certified in Forensic Psychology, ABPP

P.O. Box 469
Sharon, MA 02067
781-864-2899
forensictraining@gmail.com

RECEIVED

OCT   3 2008

Rosen, Bien & Galvan

**Addendum to Expert Report re: Coleman et al. v. Schwarzenegger et al.**

Ira K. Packer, Ph.D., ABPP (Forensic)

October 1, 2008

This brief addendum is intended to address specifically the issue of potential impact of expedited release of Coleman class members. I have reviewed the following reports submitted in this case:

1. Report of James Gilligan, M.D., dated August 15, 2008
2. Report of Gail Bataille, MSW, dated August 15, 2008
3. Rebuttal Report of James Gilligan, M.D., dated August 27, 2008
4. Rebuttal Report of Gail Bataille, MSW dated August 27, 2008

I offer the following opinions:

I.   Risk of violence of mentally ill offenders

I agree that the research literature does not suggest that mentally ill offenders pose a higher risk of violence than their non-mentally ill counterparts. For example, in a study by Teplin and colleagues[1] using a jail (rather than prison study) concluded: "Our sample of jail detainees was highly recidivistic: Nearly one half were arrested for a violent crime during the six-year follow-up period. In this extremely recidivistic population, however, psychiatric disorder did not increase the probability of being arrested for violent crimes after release." Nevertheless, they did find that particular symptoms of psychosis may have been associated with increased arrests for violent crime. They wrote: "A history of both hallucinations and delusions increased the number of arrests for violent crimes after

---

[1] Teplin, Abram, and McClelland (1994). Does Psychiatric Disorder Predict Violent Crime Among Released Jail Detainees? A Six-Year Longitudinal Study, *American Psychologist, 49*, 335-342

Packer Addendum  October 1, 2008

release, but not significantly. This finding might have been stronger if we had had data on the recency of the psychotic symptoms. Nevertheless, this pattern corroborates prior studies [citations omitted here] and suggests that psychotic symptoms may be more powerful predictors of violent crime than diagnoses per se [citations omitted here]"(p. 340).

More generally, the literature on the relationship between mental illness and violence (which is too vast to be described in detail here), does suggest that although mentally ill individuals account for only a small percentage of crime in society, mental illness is a risk factor for violence, particularly if the individual also abuses substances and has acute psychotic symptoms.[2] This does not mean that mentally ill inmates should, by virtue of their mental illness, be considered higher risk than other inmates. However, it does suggest that if mentally ill inmates are discharged without adequate services in place for them in the community, then *in those situations* their risk would be increased (both to themselves and others).

II.    Discharge planning for mentally ill prisoners

I concur with Dr. Gilligan that an appropriate discharge process for mentally ill offenders would require pre-release planning, coordination with community providers, access to systems of care in the community, and availability of programs that target not only mentally ill individuals in the community, but particularly those with co-occurring substance abuse disorders. Based on the documents I have reviewed (detailed in my reports of December 10, 2007 and August 15, 2008) as well as information I obtained during my tours of the prisons, these elements are not fully functioning with the current number of mentally ill offenders being discharged from CDCR. Although efforts have been made to coordinate aftercare with providers and parole, there are still significant problems with parolees obtaining adequate services in the community. I am not familiar with the specifics of the community service delivery system in California, although Ms. Bataille's reports highlight some significant impediments which need to be addressed.

Given the difficulties faced at present, the problems would undoubtedly be exacerbated by a significant increase in mentally ill prisoners being released, absent significant investment in and restructuring of systems of care for mentally ill parolees (as well as those discharged outright from their sentences) in the community. Furthermore, and importantly, even with better community resources, discharge planning in prison cannot be successfully implemented hastily. Successful implementation requires coordination among a number of parties, including very centrally, the inmate. For example, in Massachusetts, mentally ill prisoners are identified 6 months to a year prior to discharge. During the interim period, coordination is required regarding identifying stable living situations, entitlements (such as Medicaid if appropriate), service providers for both mental health and substance abuse issues, and involving the inmate in the discharge planning in a meaningful way.

---

[2] For example: Link, B. G., Andrews, H., & Cullen, F. T. (1992). The violent and illegal behavior of mental patients reconsidered. *American Sociological Review, 57*, 275–292; Monahan et al. (2001). *Rethinking Risk Assessment: The MacArthur Study of Mental Disorder and Violence* . Oxford University Press

2

Packer Addendum  October 1, 2008

Without all the elements in place, expedited discharge of mentally ill inmates is likely to lead to decompensation (that is, return of psychiatric symptoms) for these individuals in the community. This decompensation would be expected to result in an increase in risk of harm both to themselves and others, as well as increased likelihood that they would return to prison. The high recidivism rate cited by experts for both the plaintiffs and defendants reinforces these points. Thus, if more mentally ill individuals were to be discharged, without adequate preparation and without adequate services in place, the recidivism rate would very likely increase, thus creating a revolving door and putting even more pressure on the Reception Centers.

I would add one more point about extrapolating from prison to the community. One cannot assume that the level of services that the individual is receiving in the prison (e.g., CCCMS versus EOP) is the level he or she will need in the community. As Dr. Gilligan notes, prisons are harsh and inhospitable environments and thus some inmates who require more support and service in prison may do better if they have a stable and supportive situation in the community. However, it is more common for some mentally ill individuals to function at a higher level in prison (from the standpoint of remission of acute psychiatric symptoms) because they are in a structured environment, are monitored, do not have the access to alcohol and other illicit drugs that they have in the community, and take medications. Ironically, despite the deficiencies in the system, many have more access to treatment while incarcerated than while in the community. As an example, during the period (2001-2007) that I worked at Bridgewater State Hospital, we were often in a situation in which we recommended that an inmate was sufficiently stable to be discharged from the hospital to general population in prison, but warned that if released to the community, the individual would require further hospitalization (due to unwillingness to take medications in the community and/or lack of access to services). Thus, the fact that many mentally inmates are classified as CCCMS, does not necessarily mean that they will need only this level of service in the community.

<u>Summary:</u>

It is my opinion that an expedited release of Coleman class prisoners, without significant increases in resources for community treatment (including both inpatient and outpatient), monitoring, and coordination, would likely result in increased risk of harm both to the inmates themselves and to others in the community.

_Ira K. Packer, R.D._

Ira K. Packer, Ph.D., ABPP (Forensic)

3

## DECLARATION OF SERVICE BY U.S. MAIL

Case Name: **Three-Judge Panel Proceeding Pursuant to 28 U.S.C. § 2284**
**Coleman, et al. v. Schwarzenegger, et al.**
**USDC, Eastern District of California, Case No. 2:90-cv-00520 LKK JFM**
**Plata, et al. v. Schwarzenegger, et al.**
**USDC, Northern District of California, Case No. C-01-1351 TEH**

No.:      **C 90-0520 LKK / C 01-01351 TEH**

I declare:

I am employed in the Office of the Attorney General, which is the office of a member of the California State Bar, at which member's direction this service is made. I am 18 years of age or older and not a party to this matter. I am familiar with the business practice at the Office of the Attorney General for collection and processing of correspondence for mailing with the United States Postal Service. In accordance with that practice, correspondence placed in the internal mail collection system at the Office of the Attorney General is deposited with the United States Postal Service that same day in the ordinary course of business.

On **October 2, 2008**, I served the attached **Ira K. Packer, Ph.D. Addendum to Expert Report re: Coleman et al. v. Schwarzenegger et al.** by placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid, in the internal mail collection system at the Office of the Attorney General at 455 Golden Gate Avenue, Suite 11000, San Francisco, CA 94102, addressed as follows:

Donald Specter
Prison Law Office
1917 Fifth Street
Berkeley, CA 94710

Michael W. Bien
Rosen, Bien & Galvan, LLP
315 Montgomery Street, 10th Floor
San Francisco, CA 94104

Jeffrey L. Bornstein
K & L Gates LLP
55 Second Street, Suite 1700
San Francisco, CA 94105-3493

Claudia Center
The Legal Aid Society -
Employment Law Center
600 Harrison Street, Suite 120
San Francisco, CA 94107

Warren E. George
Bingham, McCutchen, LLP
Three Embarcadero Center
San Francisco, CA 94111

Richard Goff
Heller, Ehrman, White & McAuliffe
701 Fifth Avenue
Seattle, WA 98104

1  Lead Counsel for County Intervenors
   Ann Miller Ravel
2  Theresa Fuentes
   Office of the County Counsel
3  70 West Hedding, East Wing, 9th Floor
   San Jose, CA 95110
4
   California Correctional Peace Officers'
5  Association (CCPOA) Intervenors
   Natalie Leonard
6  Gregg MacClean Adam
   Carroll, Burdick & McDonough, LLP
7  44 Montgomery Street, Suite 400
   San Francisco, CA 94104
8
   District Attorney Intervenors
9  William E. Mitchell
   Assistant District Attorney
10 Riverside County District Attorney's Office
   4075 Main Street, First Floor
11 Riverside, CA 92501

12 Paul B. Mello, Esq.
   Hanson & Bridgett LLP
13 425 Market Street, 26th Floor
   San Francisco, CA 94105

14

California Sheriff, Probation, Police Chief and
Corrections Intervenors
Jones & Mayer LLP
Martin J. Mayer
Michael R. Capizzi
Kimberly Hall Barlow
Elizabeth R. Feffer
3777 North Harbor Boulevard
Fullerton, CA 92835

Republican Assembly and Senate
Intervenors
Steven S. Kaufhold
Akin, Gump, Strauss, Hauer & Feld, LLP
580 California Street, 15th Floor
San Francisco, CA 94104

County of Sonoma Intervenors
Anne L. Keck, Deputy County Counsel
Steven Woodside
575 Administration Drive, Room 105A
Santa Rosa, CA 95403

15      I declare under penalty of perjury under the laws of the State of California the foregoing is

16 true and correct and that this declaration was executed on **October 2, 2008**, at Sacramento,

17 California.

18

19            J. Palomino
   _____
20            Declarant

21 20152377.wpd

22

23

24

25

26

27

28

Signature

# EXHIBIT G

# Addendum to Expert Report from

# Dr. Ira Packer, Ph.D, ABPP (Forensic)

# IRA K. PACKER, Ph.D.

**Forensic Consultation and Training**

Board Certified in Forensic Psychology, ABPP

P.O. Box 469

Sharon, MA 02067

781-864-2899

**Addendum to Report re: Coleman et al. v. Schwarzenegger et al.**

Ira K. Packer, Ph.D., ABPP (Forensic),

August 15, 2008

Introduction:

On December 10, 2007 I submitted an "Expert Report re: Coleman et al. v. Schwarzenegger et al." This addendum reflects additional information I have obtained since that time. From July 28, 2008 – August 1, 2008, I toured the following CDCR facilities, interviewing both staff and inmates.

- California Substance Abuse Treatment Facility (CSATF): July 28, 2008.
- CCI Tehachapi: July 29, 2008
- California Medical Facility – Vacaville (CMF): July 30, 2008
- North Kern State Prison: July 31, 2008
- Wasco State Prison: August 1, 2008

The tour of CMF was done in conjunction with a tour by plaintiff's expert, Pablo Stewart, M.D., as well as plaintiff's attorneys. The remaining tours were done in conjunction with tours by plaintiff's expert Craig Haney, PhD., as well as plaintiff's attorneys. In addition, an attorney from CDCR as well as attorneys from intervenor parties were present during the tours. I interviewed inmates who had been selected by the plaintiffs, in addition to two interviews of inmates whom I selected at random at North Kern State Prison. A plaintiff's attorney was present during all of my interviews with inmates.

1

In addition, I reviewed the Special Master's draft 20th monitoring report on the above facilities. I have also reviewed the following documents:

1. Court Order approving a Construction Agreement, which will include 5,000 medical beds and 5,000 mental health beds, dated 2/26/08.
2. Court Order approving Information Technology Coordination Agreement, dated 3/10/08.
3. Court Order approving Chief Executive Officer Pilot Program Coordination Agreement, dated 4/1/08.
4. California Department of Corrections and Rehabilitation's Mental Health Bed Plan submitted to the Special Master, dated July 16, 2008.
5. Transcript of deposition of Ralph Coleman, dated December 13, 2007.
6. Transcript of deposition of Doyle Scott, dated December 13, 2007.
7. Transcript of deposition of Robert G. Kennard, dated January 28, 2008.
8. Transcript of deposition of Ronald M. Shansky, M.D., dated December 10, 2007.
9. Transcript of deposition of George Sifuentes, dated December 14, 2007.
10. Transcript of deposition of Pablo Stewart, M.D., dated December 11, 2007.
11. Transcript of deposition of Jeanne S. Woodford,  dated December 18, 2007.
12. Navigant Mental Health Bed Need Study, Spring, 2008.
13. Declaration of William Proctor in support of the Receiver's motion for contempt, filed August 13, 2008.
14. URS Bovis Operational Guidelines Report for California Health Care Facility, dated July 8, 2008

I reserve the right to supplement this report as additional relevant information becomes available.

Significant changes since my last visit in November, 2007:

Crisis Beds:

The only facility which I toured on both visits was CMF-Vacaville. The most significant change since my last tour was the construction of a CTC, with 50 crisis beds. The facility had only been open for a few weeks, and was not yet up to capacity (39 of the 50 beds were filled on the day of

my visit), as the staff had asked for a phase in of admissions to allow for smooth operation. I was informed by staff that they were progressing ahead of schedule for full deployment. The facility was very impressive, with adequate space for treatment and for staff office space. This facility accepts inmates from other institutions who require licensed Mental Health Crisis Beds (MHCB). The added capacity for crisis beds will help ameliorate some of the backlog for this level of service. Clinical staff at CCI Tehachapi commented that they have already accessed these beds, and that this has helped them manage their inmates in crisis. In addition, this is a demonstration of how new construction, which incorporates the necessary space and is designed with treatment needs in mind, can be effective (similar to the intermediate care –ICF – free-standing facility which I observed during my first visit to Salinas Valley State Prison).

DMH Acute Psychiatric Program

Another significant advance noted in CMH-Vacaville was that the waiting list for inmates into the Acute Psychiatric Program (APP) run by DMH had been dramatically reduced. On the day of my visit, the waiting list was only 15 (I was informed that this was down from a waiting list of over 50).

Reception EOP Programs

Both North Kern and Wasco State prisons have functioning EOP programs for reception inmates (RC). Although this is not a change since my last visit, the RC EOP programs are relatively new (begun in 2007) and appear to be functioning well at this point in time. Both staff and inmates in the program described the program in positive terms and there were indications that the inmates were receiving the required elements of the program without significant difficulty. Officers were specifically assigned to transport EOP inmates to programming, and from all reports this is working well.

I note that at North Kern, two inmates who were classified as CCCMS complained to me during my interviews with the that they wanted to be re-classified as EOP, as they observed the enhanced services those inmates received. (Parenthetically, it did not appear to me that these two inmates had been inappropriately classified as CCCMS.) This sentiment reflects a positive valuation by inmates, as it is considered desirable by them to get admitted to the program.

3

I did have an opportunity to interview one inmate at North Kern, in Reception Status (that is, awaiting placement from the Reception Center to a mainline prison), who was classified as EOP and who had been placed in Administrative Segregation (Ad Seg) due to rules violations. He acknowledged that services he received while in the EOP general population were "alright" but complained that he was not receiving full services in Ad Seg. He had been endorsed to leave the Reception Center to go to an EOP program on a Special Needs Yard (as he was a gang drop-out, thus requiring a more protected environment), but this transfer was delayed. This inmate is an example of a group of inmates who are difficult to serve because of the difficulties inherent in dealing with inmates with complicated mental health and security needs. He was not only classified as EOP, but also Special Needs, as well as having security issues related to his rules infractions. I was informed that a Special Needs Yard for EOP inmates was about to come on line at Kern Valley.

Other observations:

Need for more EOP beds and more ICF (intermediate care provided by DMH)

Consistent with my initial report, during this visit I obtained similar information regarding the long waiting lists for EOP programs, as well as a very significant waiting list for Intermediate Care beds (I was informed that the waiting list for the ICF was 167, and that some inmates had been removed from the list as they were so low down as to be unlikely to obtain a bed in any reasonable time period). Inmates requiring these services are the most severely impaired by mental illness; as I indicated in my previous report, a general prisoner release is unlikely to significantly impact this problem. Additional resources for this population are needed and will continue to be needed even if the overall census in CDCR is reduced. In this context, I have reviewed the CDCR proposal for consolidated care facilities, which includes significant enhancement of EOP, ICF, and acute care beds (for a total of 5,000 mental health beds in these facilities). This plan appears reasonable in terms of meeting the needs for this population. It is

4

also my opinion that consolidating these beds in specific facilities is an excellent idea, as it will allow for ease of recruitment of staff as well as efficiency of service delivery.


Crisis beds:

I observed variability across facilities in terms of adequate number and management of crisis beds. CSATF appeared to be have few difficulties, reporting that they have rarely have "maxed out" their beds, and take inmates from other facilities. Clinicians at CCI Tehachapi reported that they had decreased their transfers to crisis beds over the past 6 months. One of their strategies was to have clinicians see inmates in OHU (Holding Unit cells) on a daily basis and discharge back to population those who did not really require a crisis bed. (There is a low threshold, appropriately, for placement in a holding cell; inmates who make suicidal statements are placed in such cells and observed closely. Many of these inmates are not genuinely suicidal and do not require hospital level of care as is provided in crisis beds; a period of observation to triage those genuinely requiring those beds is reasonable.)


North Kern had developed a capacity to use cells on another unit as observation cells, prior to those inmates being transferred to a crisis bed (MHCB), and this system appeared to be working reasonably well. On the day of my visit, they had no inmates in their holding cells. Although they had not received authorization from CDCR to staff these cells at a level required for an OHU, they were attempting to provide services to inmates in those cells comparable to an OHU. For instance, a psychologist from the MHCB visited the holding cell unit daily in order to provide continuity of care. Clinical staff informed me that 70% of inmates in the holding cells were discharged back to population within 3 days and the remaining 30% were admitted to a crisis bed.


Wasco State Prison appeared to have more difficulty accommodating the need for crisis beds. They too used another unit for holding cells, although on the day of my visit those cells were all full and these cells were on a unit which also had overflow beds on the floor. Of more concern in this facility, was a mentally ill inmate who had been admitted in Reception the night before and had to spend the night in a cell in the reception area (which had no bed, toilet, or sink). This

5

Addendum to Expert Report of Ira K. Packer, Ph.D., ABPP re: Coleman et al. v. Schwarzenegger et al.

Case 2:90-cv-00520-KJM-SCR   Document 3116-1   Filed 10/20/08   Page 39 of 86

inmate was watched continuously, but had spent almost 24 hours in the cell in the reception area, which was clearly not an appropriate place. Staff indicated that this was a rare occurrence, and stated that this should not have occurred (that is, mental health leadership should have been notified to find an appropriate bed). Nevertheless, this appears to be a situation which resulted directly from a lack of adequate capacity for crisis beds in that facility.

Reception

As with my first visit, it appears that the reception centers are overwhelmed by the large number of admissions of individuals who are experiencing mental illness. Although clinical staff manage to do a good job of mental health triage, it is still difficult to provide adequate services to this particular population. North Kern, for example, had creatively converted a cell in the Reception area for a psychiatrist and psychologist to use, and they were thus able to interview inmates referred by the nurse in a timely manner and triage these cases. For the Coleman class in Reception, the RC EOP program is very helpful, but more crisis beds are needed and there are still significant delays getting these individuals into other programs (such as EOP programs in mainline prisons, or intermediate care programs). As noted above, the problems are exacerbated when inmates have multiple problems or issues (such as requiring a Special Needs Yard or the highest levels of security).

Treatment and office space

As with my first visit, there were clearly identified issues of finding adequate space in a number of the facilities for office space for clinicians. In CCI Tehachapi, for instance, a psychologist was using a converted broom closet, which she shared with another clinician. In Wasco, there was very limited space available to both clinical and clerical staff. North Kern had been able to convert a former visiting area into office space for their clinicians. CSATF did have a centralized Mental Health office with space for clinicians.

There were also problems in a number of the facilities finding adequate treatment space. Administrative and clinical staff were creative about using chapels and other spaces, although there were both conflicting demands for these spaces as well as heat issues in some places (that is, some rooms could not be used during the hottest days).

6

Addendum to Expert Report of Ira K. Packer, Ph.D., ABPP re: Coleman et al. v. Schwarzenegger et al.

Case 2:90-cv-00520-KJM-SCR    Document 3116-1    Filed 10/20/08    Page 40 of 86

Overflow beds

Across my tour, I observed gyms that had been converted to housing space (double or triple bunked). EOP patients were to be excluded from these spaces and I was repeatedly informed that indeed EOP patients were either not placed there, or if they were, were quickly identified and moved out. CCCMS patients were found in these units. In addition, some of the units with cells had overflow beds on the floors (e.g., Wasco). Again, EOP inmates were not placed there, but CCCMS inmates were. On one of the units at Wasco, the sergeant informed me that the overflow beds were actually considered more desirable by the inmates than the cells, as they had more access to the TV and increased mobility.

I interviewed a number of CCCMS inmates who were housed in gyms. Their reactions to that space were mixed; some preferred it to being in a cell (as they were more restricted in the latter), while others found it too noisy and distracting. Correctional officers informed me that inmates were selected for these gyms based on lower security status and proximity to discharge. They also characterized these units as not having "a lot of drama," by which they meant not a lot of behavioral management issues. Clinical staff also reported that, in their experience, they did not find that CCCMS inmates in these units decompensated (that is, experienced serious exacerbations of their mental health symptoms, thus requiring a higher level of care, or becoming suicidal) due to the environment. Thus, despite other issues which make use of such space undesirable, I did not find that this was having a significant impact on the CCCMS inmates in terms of exacerbation of psychopathology. I was also informed that if clinical staff determine that a particular inmate is not able to cope with these units, that this information is shared with administration and the inmate will be moved.

I interviewed 3 randomly chosen CCCMS inmates in a reception dorm at North Kern. These inmates all complained about lack of therapeutic activities for them in the facility. However, they all seemed to be psychiatrically stable, and did not appear to meet criteria for EOP (based on a very limited, cursory interview). These types of inmates are more likely to be appropriate for

7

additional therapeutic services after they have been moved out of the reception centers to mainline prisons.

### Discharge planning

I found a mixed picture regarding discharge planning with parole for inmates with mental health issues. CCI Tehachapi has a designated pre-parole coordinator, and clinical staff reported that coordination was going well with parole, in terms of obtaining needed services for parolees. I also spoke with a social worker at North Kern who was assigned to work on pre-parole issues with EOP inmates. She indicated that the program had started about a year ago and appeared to be working well with most parole officers (although they did not have any outcome data, in terms of recidivism). By contrast, a psych tech at Wasco reported her experience of inconsistencies in working with the Transitional Case Management Program. I note that when I visited CIM last year, I was informed of significant problems coordinating with parole. I do not have data on whether the situation has improved in that facility. Based on the information from my current visit, it does appear that there are some successful models that are being implemented, but I cannot speak to the issue of how this is working system-wide.

### Adequate numbers of clinical staff

Consistent with my previous report, there were differences across facilities in terms of ability to attract and retain clinical staff. These issues tended to be a function of geography (i.e., more difficult to find permanent staff in more remote areas, away from large population centers). In some of these facilities (e.g., CCI Tehachapi), there was significant reliance on contractor staff. However, it appears that most contractor staff were not transient, but stayed for a significant period of time. Indeed, the Chief Psychiatrist at that facility is a contractor himself, has been there for a while, and explained that there is often no difference in quality or commitment between state employees and contract staff, but rather some psychiatrists prefer the contractor status because of financial considerations. This is likely to be an ongoing issue, regardless of the census in CDCR. However, the plan for Consolidated Care Centers is likely to be helpful in attracting and retaining permanent staff.

8

Summary

As noted, many of the issues identified in my previous report were confirmed during this current visit. However, there was also some significant evidence of improvement in some areas, particularly the new MHCB unit at CMF, progress at the RC EOP programs at North Kern and Wasco, and reduction in the waiting list for the Acute Psychiatric Program (APP ) at CMF. Also, significantly, there is now a proposal, with a timetable, for development of Consolidated Care Facilities, with 5,000 mental health beds included. As I indicated in my previous report, it is my opinion that the major obstacle facing CDCR in providing adequate mental health care to inmates is the lack of adequate beds and resources to serve inmates with intensive mental health needs. The new proposed model, which includes these Consolidated Health Care facilities, should significantly address the problem by providing more beds, better facilities, more treatment space (including freeing up space in existing facilities), and increasing the likelihood that qualified staff can be recruited and retained. These Health Care facilities are being constructed with a therapeutic goal in mind and thus are likely to be more effective than previous attempts at retro-fitting existing space designed for correctional purposes only. As indicated in the Operational Guidelines for these facilities, prepared by URS Bovis (p. 4), the new facilities "will be unlike any correctional facility currently found within the existing California Department of Corrections and Rehabilitation (CDCR)….There will be an emphasis on achieving a therapeutic environment that is conducive to appropriate levels of treatment and restorative care and programs for both medical and mental health patients."

Ira K. Packer, Ph.D.                     August 15, 2008

Ira K. Packer, Ph.D., ABPP (Forensic)          Date

Electronically signed. Original mailed 8/15/2008

9

# EXHIBIT H

Golden Gate Reporting

IN THE UNITED STATES DISTRICT COURTS
FOR THE EASTERN DISTRICT OF CALIFORNIA
AND THE NORTHERN DISTRICT OF CALIFORNIA
UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES
PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE


RALPH COLEMAN, et al.,

        Plaintiffs,
                 Case No. Civ S 90-0520 LKK-JFM P

vs.

ARNOLD SCHWARZENEGGER, et al.,

        Defendants.
_____/

MARCIANO PLATA, et al.,

                 Case No. C01-1351 TEH
        Plaintiffs,

vs.

ARNOLD SCHWARZENEGGER, et al.,

        Defendants.
_____/


DEPOSITION OF IRA K. PACKER, Ph.D.


DATE:        October 3, 2008

TIME:        9:37 a.m.

LOCATION:     ROSEN, BIEN & GALVAN, LLP
              315 Montgomery Street, Tenth Floor
              San Francisco, California  94104

REPORTED BY:  Katy Leonard
              Certified Shorthand Reporter
              License Number 11599

a6b07227-8718-4830-8dd5-d305f2a68a73

Page 20

1      Q.  Okay.

2          And do you recall getting some comments or

3  suggestions?

4      A.  Yes, I do.  And in that case, I do remember

5  the specifics.

6      Q.  What was that?

7      A.  They were actually very minor.  One of them

8  was that I apparently misspelled Wasco State Prison,

9  Waco State Prison, and I was asked to correct that typo.

10 And there was also a suggestion that I add a sentence

11 that says:

12              "I reserve the right to supplement this

13              report as additional relevant information

14              becomes available."

15      Q.  Okay.

16          And there's a fourth report that you just

17 prepared, or at least that was provided to us this

18 week -- an October 1 report?

19      A.  Right.

20      Q.  Okay.

21          And when were you first contacted in

22 connection with preparing an additional report?

23      A.  I believe it was just a few days earlier,

24 September 29th, 2008.

25      Q.  Okay.

a6b07227-8718-4830-8dd5-d305f2a68a73

Golden Gate Reporting

Page 21

1    And who contacted you about that?

2    A.  Ms. Tillman.

3    Q.  And what do you recall her talking to you

4    about?

5    A.  At that point, there was some discussion of

6    the fact that my report had focused solely on Phase I

7    issue and not on Phase II, meaning, that if there were a

8    prisoner release, how might it be implemented relative

9    to mentally ill individuals.  And that was -- she had

10   asked my opinion on that issue, and then asked if I

11   could write a brief report summarizing my opinion.

12   Q.  Did she also ask you to review and respond to

13   her report provided by Plaintiffs' expert, Dr. Gilligan?

14   A.  Well, just to be completely clear, I

15   already -- she already sent me the report by

16   Dr. Gilligan, and I had not yet read it.  In our

17   conversation of -- actually, let me correct that.  I

18   hadn't read it in detail.

19       I had skimmed through it and looked at that

20   report, as well as some other reports, because I thought

21   at that point that I was not being asked to specifically

22   address Phase II.

23       So, I looked at it briefly, offered some

24   comments about what I had seen, and then she asked if I

25   would review it in more depth and then put my thoughts

a6b07227-8718-4830-8dd5-d305f2a68a73

Page 22

1      in writing.

2           Q.  Okay.

3           Did Ms. Tillman explain that Defendants had

4      already designated an expert to address the issues that

5      you were addressing in the October 1 report?

6               MS. TILLMAN:  Objection.  Misstates the facts.

7               Go ahead and answer.

8               THE WITNESS:  I'm not sure I --

9               MR. BIEN:  Okay.

10              THE WITNESS:  I mean, if you mention a

11     specific name...  I'm not sure I know what you're

12     asking.

13              MR. BIEN:  Yes.

14     BY MR. BIEN:

15          Q.  You stated in your October 1 report that you

16     reviewed the report of Dr. Bataille.

17              Did Ms. Tillman explain to you who

18     Dr. Bataille was?

19              MS. TILLMAN:  It's Gale Bataille.  And I'm not

20     sure that she's a doctor.

21              MR. BIEN:  It says MSW.  You're right.

22              THE WITNESS:  Yeah.  I had already had a copy

23     of Ms. Bataille's reports.

24              MR. BIEN:  Okay.

25              THE WITNESS:  And yes, she did explain that

Golden Gate Reporting

Page 24

1          There's a Court order, which was sent to

2     you -- actually, an E-mail -- which designated August

3     15th as a date for expert reports, and August 27th as a

4     date for rebuttal reports.

5          Between August 15th and August 27th, did you

6     have any discussions with the Attorney General's Office

7     about preparation of a rebuttal report?

8          A.  No, I did not.

9          Q.  Were you asked to review Plaintiffs' expert

10    reports that were filed and served -- excuse me.  I'm

11    going to start over on that question.

12          Were you asked to review Plaintiffs' expert

13    reports that were served on August 15, 2008?

14          A.  At what point in time are you asking?

15          Q.  Soon after August 15th, 2008, were they

16    provided to you?

17          A.  Um, I would have to check on the computer to

18    see what date --

19          Q.  Okay.

20          A.  -- they were E-mailed to me, frankly.

21          Q.  Okay.

22          A.  But I don't have anything, other than an

23    E-mail saying, Here are some reports to review.

24          MS. TILLMAN:  I think we produced those

25    E-mails to you, Counsel.

a6b07227-8718-4830-8dd5-d305f2a68a73

Golden Gate Reporting

Page 25

1          MR. BIEN:  Right.

2    BY MR. BIEN:

3          Q.  And is it your testimony that no one had a

4    discussion with you between August 15th and August 27th

5    about whether or not you could rebut any of the opinions

6    provided in Plaintiffs' expert reports of August 15,

7    2008?

8          A.  Are you talking about these four reports that

9    we're talking about?

10          You said "rebuttal" -- of these specific

11    reports?

12          Q.  Any Plaintiffs' expert reports.

13          A.  To the best of my knowledge, I don't believe I

14    had any communication with anyone from either the

15    Attorney General's Office or CDCR between August 15th

16    and August 27th, to the best of my recollection.

17          Q.  Okay.

18          I have your invoice.  We can look at it later

19    on, if that refreshes your recollection.  I don't know,

20    as I'm sitting here, whether you did or not.

21          Did you, from time to time -- from time to

22    time, did you have communications by telephone with

23    persons, other than Lisa Tillman, acting on behalf of

24    the Attorney General's Office?

25          A.  Yes.

a6b07227-8718-4830-8dd5-d305f2a68a73

1  some of the other claims being made about the impact of

2  the prison system on the inmates, and most particularly

3  in terms of the claim that, "Well, it's the overcrowding

4  in the prison that's making these people mentally ill."

5      I think the data are much clearer that the

6  problem is not that people are coming in perfectly

7  normal and becoming acutely psychotic in prison -- there

8  are a few like that -- but mostly, it's people coming

9  into the prison system who are very acutely mentally ill

10 to start with.

11     Q.  And what evidence did you gather about mental

12 health care being provided to prisoners prior to their

13 arrival in the prison system?

14         In other words, did you do any study of

15 community mental health systems in California as part of

16 your work?

17     A.  No, I did not.

18         I relied to some extent on some of the

19 documents that were given to me.  I believe one of them

20 I remember is from Dr. Petersilia, I think, in

21 particular, but I know there were others as well where

22 they were talking about issues about services in the

23 community.

24         But it was also confirmed to me at all the

25 Reception sites that I went to, speaking to the

a6b07227-8718-4830-8dd5-d305f2a68a73

Page 86

1  clinicians who were working there.  And as you'll note

2  in my reports, I spent a significant amount of time

3  discussing with them issues about discharge planning and

4  what happens when they come back into the system.

5         In addition to which, I'm pretty sure, the

6  most recent documents from both Dr. Gilligan and Ms.

7  Bataille also addressed those issues.  Ms. Bataille in

8  particular, I think, has a very articulate description

9  on the issues in the community.

10        Q.  Okay.

11             So, is it correct that you didn't do any

12  independent evaluation of community mental health

13  services in California?

14        A.  That's correct.

15        Q.  Okay.

16        A.  I didn't do a study of community mental health

17  services here.

18        Q.  Okay.

19             You didn't visit a parole outpatient clinic?

20        A.  No, I did not.

21        Q.  Okay.

22             You didn't examine any data about whether the

23  level of mental health services for parolees has

24  increased or decreased in the recent years?

25        A.  Yeah.

Golden Gate Reporting

Page 307

1        Q.  How did you come to select this study,
2    Dr. Packer, to use in this report?
3        A.  This is a study that I've been familiar with
4    for sometime, and as I was writing this, to be frank,
5    very quickly, I started thinking, What did I know about
6    the research literature.  I didn't have time to do a lit
7    search, because, literally, this was, like, two days
8    ago.
9            And I remembered this article -- an article by
10   Teplin and colleagues that specifically addressed it,
11   because at one point, I had done some research on
12   jail -- mental illness in jails and houses of
13   correction.  So, I remembered an article by Teplin, et
14   al., and I just found it and referenced it.
15       Q.  If you look at page 340 of Exhibit 15, the
16   Teplin article -- I'm looking at the -- on the right
17   side of the page, the paragraph beginning with, "Because
18   our sample[...]"
19           Do you see that paragraph, Doctor?
20       A.  Right.
21       Q.  Okay.  The second sentence says, quote:
22           Nevertheless, our major finding -- that
23           psychiatric disorder was irrelevant to the
24           probability of arrest for violent crime after
25           release -- has important public policy

a6b07227-8718-4830-8dd5-d305f2a68a73

Golden Gate Reporting

Page 308

1          implications for traditional decision making.

2          Mental disorder alone is not a meaningful

3          variable when deciding who should be released

4          before trial or given probation.

5          Do you agree with that conclusion of this

6     article?

7          A.  Yes, I do.

8          Q.  Is it correct that you have no additional

9     information about the community mental health service

10    delivery system in California, other than what you

11    learned from Ms. Bataille's report?

12         A.  Say that again.

13              I don't have any --

14         Q.  In other words, your opinion is based on

15    Ms. Bataille's report?

16              You didn't do an independent --

17         A.  My opinion about what?

18         Q.  Community mental health services in

19    California.

20         A.  Well, it's mostly based on her report.  It's

21    also based on some of the information I gleaned from my

22    interviews at the prisons when people were telling me

23    about the issues in terms of providing discharge

24    planning and the difficulties they were facing.

25         Q.  Okay.

a6b07227-8718-4830-8dd5-d305f2a68a73

Page 309

1      But you didn't do any independent evaluation

2  of community mental health services or parole mental

3  health services?

4      A.  No, I did not.

5      Q.  Okay.

6      On page 3 of your report, the last page, the

7  paragraph above the summary, are you aware that

8  prisoners in California prisons have access to alcohol

9  and drugs?

10     A.  And that's why I very carefully wrote the

11 sentence the way I did, if you notice.  I believe I

12 actually spent a little bit of time thinking how to

13 phrase this.  I believe I said they do not have "the"

14 access to alcohol that they have in the community.  I

15 didn't say they don't have access, because I am aware.

16 I've worked in prisons.  But it's not quite as easy and

17 plentiful.

18     And I mean that very seriously, in that I do

19 understand that's a problem in the prisons, but it's not

20 quite the same.  In the community, they're able to get

21 large quantities, and they decompensate very quickly.

22     Q.  Okay.

23     Would you also agree that -- that there's a

24 certain portion of the mental health population that

25 might do better merely by being out of prison and in a

a6b07227-8718-4830-8dd5-d305f2a68a73

Golden Gate Reporting

Page 310

1    nonprison environment?

2         A.   Yes.

3         Q.   Okay.

4              In your summary -- well, let me ask you, what

5    were you assuming when you used the term, "expedited

6    release of Coleman class prisoners"?

7         A.   My understanding of that was simply some

8    process where, rather than serving their sentences,

9    their sentences were truncated at some point, and they

10   would be released to the community more rapidly than

11   they would have otherwise been released.

12        Q.   Okay.

13             Do you have in mind how -- how many Coleman

14   class prisoners and how rapidly they would be -- you

15   were contemplating?

16             Would it be one or --

17        A.   One what?

18        Q.   One prisoner released in one day, or 50 over a

19   month, or a hundred over two months?

20             I mean, what is the -- what did you mean by

21   "expedited"?

22        A.   No.

23             I meant expedited relevant to each individual.

24   What I mean over here is for any individual Coleman

25   class member.  If that person -- and it's just very

a6b07227-8718-4830-8dd5-d305f2a68a73

Golden Gate Reporting

Page 311

1    carefully worded here, so I want to be clear about that.

2           If a mentally ill prisoner were released

3    earlier than had been anticipated, and if that were done

4    without appropriate discharge planning and without the

5    services available in the community, then that

6    individual person would be an increased risk.  That's

7    all I meant.

8           I'm not saying each individual, that will

9    apply to.  And the more individuals that are released,

10   it's proportionate.

11          I'm not commenting here on how many would need

12   to be released for this to happen.  I'm talking about,

13   what is the risk for any individual, and then you

14   multiply that by the number released.

15        Q.  So, do you believe that the Coleman class

16   would benefit right now if they stopped releasing them

17   from prison on the schedule they're currently on?

18          MS. TILLMAN:  Objection.  Vague and ambiguous.

19   Calls for speculation.  Incomplete hypothetical.

20   BY MR. BIEN:

21        Q.  You understand, Doctor --

22        A.  I don't understand the question.

23        Q.  -- that every day, Coleman class members are

24   released from prison right now?

25        A.  Yes, I do.

1                   CERTIFICATION OF DEPOSITION OFFICER

2

3          I, KATY LEONARD, duly authorized to administer

4     oaths pursuant to Section 2093(b) of the California

5     Code of Civil Procedure, hereby certify that the

6     witness in the foregoing deposition was by me sworn to

7     testify to the truth, the whole truth and nothing but

8     the truth in the within-entitled cause; that said

9     deposition was taken at the time and place therein

10    stated; that the testimony of the said witness was

11    thereafter transcribed by means of computer-aided

12    transcription; that the foregoing is a full, complete

13    and true record of said testimony; and that the witness

14    was given an opportunity to read and correct said

15    deposition and to subscribe the same.

16          I further certify that I am not of counsel or

17    attorney for either or any of the parties in the

18    foregoing deposition and caption named, or in any way

19    interested in the outcome of this cause named in said

20    caption.

21

22

23

24    _____

25    KATY LEONARD, CSR 11599

Page 328

# EXHIBIT I

RECEIVED

SEP 1 8 2008

Rosen, Bien & Galvan

EXPERT WITNESS REPORT OF JERRY DYER
CITY OF FRESNO CHIEF OF POLICE

*Colemanv. Schwarzenegger, et al.,*

No. Civ. S-90-0520 LKK

*Plata v. Schwarzenegger, et al.*

No. C01-1351 T.E.H.

September 15, 2008

I.    QUALIFICATIONS

1.    I am the Chief of Police of the Fresno Police Department. I have served as the Chief for seven years, having been appointed Chief on August 1, 2001. The City of Fresno is the sixth largest municipality in California with nearly a half million residents. The Fresno Police department has 843 authorized sworn officer positions and 476 authorized civilian positions for a workforce of 1,319 people. The Fresno Police Department is a nationally accredited law enforcement agency. On July 30, 2005 the Fresno Police Department earned its accreditation from the Commission on Accreditation for Law Enforcement Agencies (CALEA), becoming the largest municipality in California to receive national accreditation. On July 30, 2008, the Fresno Police Department earned re-accreditation from CALEA. Fewer than four percent of law enforcement agencies nation wide have been able to earn accreditation.

2.    I currently serve as the President of the California Chiefs of Police Association, having been appointed to the position March 5, 2008. Prior to my position as President of the Association I served as First Vice-President, Second Vice-President and Third Vice-President. This position has caused me to become involved in a number of statewide concerns, including the issues of prison reform and the early release of prisoners.

3.    I currently serve as the Chair for the California Central Valley "High Intensity Drug Trafficking Area" Board. This position has given me broader insight into the workings of drug trafficking organizations operating in California and those that work for them to include illegal immigrants and former state prisoners.

4.    I currently serve as an Advisory Board member of Governor Schwarzenegger's California Gang Reduction Intervention Program. I also serve as a voting member of the Sacramento Regional Threat Assessment Center Governance Board.

5.      I have earned a Bachelor of Science Degree in Criminology from California State University Fresno; a Master's Degree in Management from California Polytechnic University at Pomona: and I am a graduate of the California Command College, a graduate level program for law enforcement leadership.

6.      In my nearly thirty years as a police officer I have worked a variety of assignments that have allowed me to much better understand the impact of parolees in a community. During my first five years as a police officer I worked the streets as a patrol officer. Much of that time was spent in the central part of Fresno where we have historically had a high concentration of parolees. I therefore had many contacts with parolees, generally on a daily basis. I had the opportunity to see some parolees succeed in their efforts to reintegrate themselves back into the community. Unfortunately however, I saw a great many more fail, especially if they were poorly supervised or did not have adequate community resources in place to help them turn away from their life of crime.

7.      During my eight years as a police sergeant I worked a variety of assignments, including supervising a patrol tactical team, supervising street level narcotics officers and then later major narcotics enforcement teams. This lead me to deal frequently with career criminals, many of whom were parolees or former state prisoners. I also served as a SWAT sergeant and often had to confront dangerous career criminals who had once again resumed their criminal lifestyle upon release from prison.

8.      During the next four years I served as police lieutenant. One of my duties included being an Area Commander in the Central Policing District where I had management control over teams working street crime issues. As mentioned previously this district has a high concentration of parolees.

9.    Later when I was promoted to police captain I was assigned as the Commander of the Southeast Policing District. It was at this time that I had an opportunity to extensively analyze crime trends and data for a large portion of the city. This research made it very clear that gang members and parolees, while a small percentage of the overall community, were responsible for a large percentage of crime occurring in Fresno.

10.    On March 13, 1999 I was promoted to Deputy Chief where I was in charge of the Field Operations Division, which includes our patrol officers. I was later promoted to Assistant Chief of Police.

11.    Upon being promoted to Chief of Police, knowing that parolees were involving themselves in a proportionally large percentage of crimes I put in place a Parolee Apprehension Team. This team was designed to locate and arrest parolees who were absconding from parole, knowing that getting them off the street sooner would help reduce crime in the community. This program has proven to be very successful. However it was also important to partner with various community based organizations and other government service providers to help gather the resources that a recently released prisoner would need to help mainstream them back into our community. These efforts have also proven successful and prevention and intervention are an integral part of our efforts in dealing with parolees.

12.    As Chief I also caused the development and implementation of "Crime View." "Crime View" was adopted as part of our agency's Smart Policing philosophy. The goal of Crime View is to rapidly identify and respond to criminal activity, using near real time data to allow us to quickly identify emerging crime trends, develop strategies and to deploy our resources more effectively and efficiently. Much of the data and intelligence gathered from this department wide crime view effort supports our conclusions about parolees being responsible for

3

a significant percentage of crime.

13.    As an intervener for the City of Fresno on this issue I have visited various state prisons, to include Wasco, Corcoran and San Quentin.  This has allowed me to take a close look at these facilities and some of the issues involved in our corrections system.  I was also one of the six individuals selected by Justice Elwood Lui to participate in a working group to develop alternatives to prisoner release as part of the attempted settlement agreement in this case.

It is difficult to predict the exact impact the release of forty thousand criminals released from prison would have on our communities; however, it is safe to say that in the City of Fresno, it would have an extremely detrimental effect on public safety. If the release of forty thousand prisoners occurs, it is estimated that 4.8% or 1,920 would be released to the County of Fresno with the vast majority to reside in the City of Fresno.

At this time, we do not know the specifics on the prisoners that are to be released; however, it can be expected that they will have similar criminal histories as those persons being released on parole. Currently, there are approximately six thousand parolees residing within the County of Fresno, with five thousand of those residing in the City of Fresno. Each month, approximately 120 prisoners are paroled to Fresno County, with 80% residing in the city of Fresno. Commitment offenses for parolees in the County of Fresno include:

| | | |
|---|---|---|
| 1. | 16.6% | Use and Possession of Narcotics |
| 2. | 12.5% | Auto Theft |
| 3. | 12.5% | Burglary |
| 4. | 12.5% | Receiving Stolen Property |
| 5. | 8.3% | Grand Theft |
| 6. | 8.3% | Spousal Abuse |
| 7. | 8.3 | Firearms Offenses |
| 8. | 5% | Sale of Narcotics |
| 9. | 5% | Petty Theft with Priors |
| 10. | 4% | Sex Offenses |
| 11. | 2.5% | Child Abuse |
| 12. | 4.5% | Financial Crimes (fraud, identity theft) |

According to Parole Agent, Daniel Renteria, the majority of these commitments are not the result of a first time conviction. Most of these offenders have multiple arrests preceding their commitment to prison. In most cases, the first two or three convictions result in diversion or probation commitments.

Those offenders who are convicted and sentenced to prison can clearly be described as career criminals. Conviction data alone does not describe the harm these offenders do in a community. They are responsible for committing scores of crimes, in addition to the one they are arrested for. Statistics bear out that 10% of these offenders commit over 80% of all crime. Studies indicate the average inmate has committed twelve crimes before being arrested for their commitment offense.

Of those released from prison, approximately 70% will reoffend within 3 years. However, those convicted of property crimes, to include auto theft, drug offenses, burglary and larcenies, have even higher rates of recidivism.

The two major obstacles to maintaining a crime-free life style for inmates being released from prison are drug addiction and unemployment. When inmates are released from prison, most do not receive adequate support in these areas and as a result, become

immersed in a continuing cycle of crime. Fresno is a uniquely poor environment for a released prisoner because of the high unemployment rate and the ready supply of methamphetamine.

Fresno has often been referred to as the "Meth Capital of the Nation" and because of vast agricultural lands, is one of the most active methamphetamine manufacturing regions in the United States. Despite continuous aggressive seizures of large super labs, methamphetamine continues to be plentiful and affordable in the Fresno area. As efforts increase at the borders to stem the flow of methamphetamine, we have experienced an increase in manufacturing in the San Joaquin Valley.

The majority of methamphetamine users support their habit by committing crime. Identity theft is one of the fastest growing crimes in America, and a favorite of methamphetamine addicts because of the ease with which it can be committed. There is little chance of detection or arrest, and if arrested, sentences are light when compared with that of robbery. Our detectives conservatively estimate that 65% of all identity theft cases involve suspects who are addicted to methamphetamine. These cases can easily involve tens of thousands of dollars in loss. Methamphetamine addicts are involved in approximately 90% of our auto thefts, and 15% of the suspects in domestic violence cases are addicted to methamphetamine.

Currently the availability of low or no-cost methamphetamine treatment is almost non-existent. There are approximately 530 beds for residential drug treatment in the Fresno metropolitan area to serve a population of over half a million. The majority of those receiving treatment at these facilities are there pursuant to a condition of probation. Most do not attend on their own volition.

Fresno has the greatest concentration of urban poverty in the nation. Unemployment is 2.5 times greater in Fresno than any other city of comparable size in California. Our current unemployment hovers around 10 percent. This high unemployment rate severely reduces the chance of a released prisoner obtaining employment, making it likely released prisoners will be involved in criminal activity to support their lifestyle.

Without employment and with continued drug addiction, released prisoners will quickly return to a life of crime. Property crimes, including auto theft, identity theft, burglary and larceny are the most likely crimes these released prisoners will be involved in.

It is expected that crimes rates in Fresno will increase dramatically if 1,920 prisoners are released into the community. When considering recidivism rates, numbers of crimes committed by offenders, and the fact that these prisoners represent the 10% of the offenders who are committing 80 % of the crime, the results are alarming. Within three years, we can expect that 1,344 released prisoners will commit a crime for which they will be arrested, and that each one of these offenders will have committed at least 12 crimes preceding their re-arrest. These 1,920 released prisoners can be expected to commit over 16,000 felony crimes, the majority of which they will never be held responsible.

All parts of the criminal justice system expect to be seriously challenged by the release of these prisoners.

Police officers will be hindered in their investigation of these crimes, especially as to those released prisoners who will not be on parole, and therefore not open to parole searches. In the majority of property crimes, there are no witnesses; therefore, the physical evidence yielded in parole searches often provides the vital evidence for prosecution. Losing the ability to conduct parole searches will be a serious impediment to investigating the crimes we expect these released prisoners to commit.

The Fresno County District Attorney's Office faces serious resource challenges. Their ability to process cases this year is reduced from last year and they are overwhelmed. The District Attorney's Office would be unable to accept an increased work load and would be faced with the difficult task of prioritizing cases, with the knowledge they will not be able to pursue many serious cases. Priority would be given to violent crimes, and those cases with the most sentencing exposure, thus, it is doubtful that the property crimes that we expect these released prisoners to commit, will receive aggressive prosecution.

The Fresno County Jail currently must comply with a federal court consent decree that limits the jail population. The jail's maximum population must not exceed 3,478 prisoners. Currently, the population hovers around 3,300 inmates. Due to budget cuts this fiscal year, the Sheriff has been forced to cut 32 correctional officer positions, which resulted in the closure of a 300 bed satellite jail facility. The closure of this facility has aggravated jail over crowding issues at the main jail. Pursuant to the consent decree, the Sheriff may release or refuse to take additional prisoners when they reach 90% capacity, and they must release and refuse prisoners when they reach 100% capacity. Any increased levels of arrests requiring booking would pose a severe challenge for the jail, and property offenders would be the first to be released or refused in the face of over-crowding.

The Fresno Superior Court will face challenges similar to those of the jail and the District Attorney's Office. Superior Court Judge Gary Hoff, who oversees the felony courts, said the release of 1,920 inmates would burden the courts because of the high recidivism rates of property offenders and that each case would require multiple appearances and court dates. The court services manager conservatively estimates that the workload would increase by 10% and put a drain on court services.

With little or no accountability, due to the over burdening of the criminal justice system, crime rates will increase. As crime rates increase, so does the fear in the community. When people become fearful, the tendency is for them to stay in their homes and limit visits to shopping and entertainment venues to avoid being a crime victim. This will have a negative impact on sales tax revenues and businesses already struggling with the lagging economy. Additionally, new businesses will be hesitant to open in Fresno if crime increases. This will exacerbate the already high unemployment rates in our city.

Currently, parolees in Fresno receive very little supervision. There is one parole agent assigned to one hundred parolees, with the exception of "third strikers" who are supervised at a ratio of one to 40 and sex offenders who are supervised at a ratio of one to 20. This is an overwhelming caseload, and as a result, a great deal of the crime committed in Fresno is committed by offenders on parole. It is not an understatement to say that everyday the Fresno Police Department arrests paroles for serious crimes. During 2007, the Fresno Police Department arrested 6,453 parolees. Several examples of the types of crimes these parolees are involved in are listed below.

Incident #1

On June 9, 2008, "Help Eliminate Auto Theft" task force officers located a stolen vehicle being driven by Mua Thao. Thao had been released on parole in September 2007 for PC 496, possession of stolen property, PC 459 burglary, and PC 12021 (a) felon in possession of a firearm. He was living in a motel room rented by a parolee by the name of Nina Her. Inside the room, officers located paper work in the name of Linda Fang, as well as methamphetamine paraphernalia. On June 18, 2007 "Help Eliminate Auto Theft" task force officers arrested Linda Fang in a stolen vehicle. Fang was on parole for PC 470, forgery, and was released on parole in October of 2007. Inside her motel room was another parolee, Nina Her. Her was on parole for PC 496, possession of stolen property, and HS 11377, possession of methamphetamine. Both parolees admitted to knowing the vehicle was stolen. Methamphetamine paraphernalia and multiple stolen checks and credit cards indicative of identity theft were found in the room. All three parolees, Her, Fang, and Thao are methamphetamine users.

Incident #2

On April 18, 2008, Martina Duarte was released on parole for auto theft. That same day she stole a purse from a victim who briefly walked away from her shopping cart while shopping. Over the next several weeks, Martina, her boyfriend, Daniel Maldonado, and her sister, Marcy Duarte, used the victim's credit cards and checks to defraud at least nine businesses in and around Fresno. Marcy Duarte was released on parole March 23, 2007, for PC 459, burglary, and PC 470 check forgery. Daniel Maldonado was discharged from parole on February 7, 2008. His commitment offence was PC 422, making terrorist threats. On May 6, 2008, Thomas Garcia committed a vehicle burglary in Merced County, stealing checks credit card and identification from the vehicle. Garcia was on parole for PC 459, burglary. These checks cards and identification were passed on to Martina Duarte, who along with her boyfriend, Daniel Maldonado and her sister Marcy Duarte, used them to defraud additional multiple business in Fresno and surrounding areas. During this investigation and subsequent search warrant, evidence was obtained to implicate these three suspects in numerous additional identity theft and fraud cases. Due to the complexity of the cases, and the potential of numerous unreported victims, this case is still under investigation. These three suspects have been arrested for multiple felony charges and likely face additional charges.

Incident #3

On January 20, 2006, Police officers observed Renard Brooks Jr. driving a vehicle that had been taken in an armed residential robbery. Brooks was not identified as being the suspect who committed the residential robbery, but it was learned that he had been driving the vehicle taken in the robbery for approximately one week. Brooks was arrested for driving the stolen vehicle and on March 29, 2006, Brooks was sentenced to 3 years in State Prison after being convicted of auto theft.

On October 23, 2006, Brooks was released on parole to the Fresno Parole Office. His scheduled discharge date from parole was October 23, 2009. On October 25, 2006, two days later, a home in northeast Fresno was burglarized. The property taken during this burglary included a .40 caliber semi-automatic handgun with two 10 round magazines, an AR-15 assault rifle with four 30 round magazines, and a .22 caliber pistol. The victim arrived home and observed an African-American male suspect walking out of her home with the above property. The next day, October 26, 2006, Brooks was observed by police officers walking in a neighborhood armed with a handgun. After his arrest, the handgun was determined to be the .22 caliber pistol taken in the residential burglary the previous day. Brooks was also in possession of a .40 caliber handgun magazine taken in the same burglary.

Brooks could not be identified as the burglary suspect who was seen walking out of the victim's residence with the property. As a result, he was charged with possession of stolen property, being a convicted felon in possession of a handgun, and violating his parole. On March, 20, 2007, Brooks was convicted of being a felon in possession of a firearm and sentenced to 3 years in state prison.

On June 18, 2008, Brooks was again paroled to the Fresno Parole Office. On June 20, 2008, two days after being released on parole, Brooks was detained by officers after he was observed knocking on several doors of residences. The officers believed he was in the process of looking for a residence to burglarize. During his detention, he provided a false name to officers and denied being on parole. Brooks was arrested for providing a false name to officers during a detention and violating his parole. Brooks was released by his parole agent on June 23, 2008.

July 1, 2008, Brooks forced his way into a car occupied by two elderly females in the parking lot at a shopping center. Brooks physically forced the females out of the vehicle then fled in their vehicle. Brooks was located by officers driving the vehicle and a vehicle pursuit ensued. During the pursuit, Brooks was involved in three separate traffic collisions. One of the collisions resulted in the driver being injured. Brooks fled from the vehicle on foot and shortly thereafter, he was taken into custody. Brooks was found to be in possession of property belonging to the victims.

In summarizing the impact the premature release of these prisoners will have in the City of Fresno, it is safe to say, the impact will be extremely detrimental to public safety. The relationship between, property crimes offenders, methamphetamine use, and unemployment can not be overstated. These inmates will certainly continue to pose a

hazard to the public safety unless they are able to kick their drug addiction and find employment.

Based on my knowledge of cities within the central valley and their demographics, as well as conversations I have had with police chiefs from these cities, it is my belief that central valley cities such as Stockton, Modesto, Merced, Visalia, etc. will experience the same impact as Fresno in terms of crime should the premature release of inmates occur. These cities have officer to population ratios that are very similar to that of the Fresno Police department, similar unemployment rates to that of the city of Fresno, and a population ratio of methamphetamine addicts that is also similar to ours.

Date: September 15, 2008

Jerry Dyer

**PROOF OF SERVICE**
**(§ 1013a, 2015.5 C.C.P.)**

**STATE OF CALIFORNIA, COUNTY OF ORANGE**

I am employed in the aforesaid county; I am over the age of eighteen years and not a party to the within entitled action; my business address is: 3777 N. Harbor Boulevard, Fullerton, California 92835.

On **September 15, 2008**, I served the within **EXPERT REPORT OF JERRY DYER**, on the interested parties in said action by placing [X] a true and correct copy or [ ] the delivered by one or more of the means set forth below:

**SEE ATTACHED SERVICE LIST**

[x ]    [*Via Mail*]   By depositing said envelope with postage thereon fully prepaid in the United States mail at La Habra, California. I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice, it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid at Fullerton, California, in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit of mailing in affidavit.

[ ]    [*Personal Delivery*]   I cause the above referenced document(s) to be delivered to the addressee set forth above.

[ ]    [*Overnight Courier*]   I caused the above referenced document(s) to be delivered to an overnight delivery service, for delivery to the addressee(s) on the attached service list.

[ ]    [*Via Facsimile Transmission*]   I caused the above referenced document(s) to be transmitted to the named person(s) to the fax number(s) set forth on the attached Service List.

[x]    [*Federal*]   I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on **September 15, 2008**, at Fullerton, California.

Marilyn L. Tallet

**SERVICE LIST**

| | |
|---|---|
| Prison Law Office<br>Donald Specter<br>Steven Fama<br>E. Ivan Trujillo<br>Sara Norman<br>Alison Hardy<br>Rebekah Evenson<br>1917 Fifth Street<br>Berkeley, CA 94710 | K&L Gates LLP<br>Jeffrey L. Bornstein<br>Edward P. Sangster<br>Raymond E. Loughrey<br>55 Second Street, Suite 1700<br>San Francisco, CA 94105-3493 |
| The Legal Aid Society–<br>Employment Law Center<br>Claudia Center<br>600 Harrison Street, Suite 120<br>San Francisco, CA 94107 | Rosen, Bien & Galvan, LLP<br>Michael W. Bien<br>Jane E. Kahn<br>Amy Whelan<br>Lori Rifkin<br>Lisa Ells<br>315 Montgomery Street, 10th Floor<br>San Francisco, CA 94104 |
| Bingham, McCutchen, LLP<br>Warren E. George<br>Three Embarcadero Center<br>San Francisco, CA 94111 | Natalie Leonard<br>Gregg MacClean Adam<br>Carroll, Burdick & McDonough, LLP<br>44 Montgomery Street, Suite 400<br>San Francisco, CA 94104 |
| Lisa A. Tillman<br>Deputy Attorney General<br>P. O. Box 944255<br>Sacramento, CA 94244-2550 | Paul B. Mello, Esq.<br>Hanson Bridgett LLP<br>425 Market Street, 26th Floor<br>San Francisco, CA 94105 |
| Steven S. Kaufhold<br>Teresa Wang<br>Akin Gump Strauss Hauer & Feld, LLP<br>580 California, Suite 1500<br>San Francisco, CA 94104-1036 | William E. Mitchell<br>Assistant District Attorney<br>Riverside County District Attorney's Office<br>4075 Main Street, First Floor<br>Riverside, CA 92501 |
| Anne L. Keck, Deputy County Counsel<br>Steven Woodside<br>575 Administration Drive, Room 105A<br>Santa Rosa, CA 95403-2815 | Rochelle East<br>Office of Attorney General<br>455 Golden Gate, Suite 11000<br>San Francisco, CA 94102-7004 |
| Ann Miller Ravel<br>Theresa Fuentes<br>Office of the County Counsel<br>County of Santa Clara<br>70 West Hedding, East Wing, 9th Floor<br>San Jose, CA 95110 | |

# EXHIBIT J

Page 1

IN THE UNITED STATES DISTRICT COURTS
FOR THE EASTERN DISTRICT OF CALIFORNIA
AND THE NORTHERN DISTRICT OF CALIFORNIA
UNITED STATES DISTRICT COURT COMPOSED
OF THREE JUDGES
PURSUANT TO SECTION 2284, TITLE 28
UNITED STATES CODE


RALPH COLEMAN,
        Plaintiff,


        vs.                         CASE NO. Civ S 90-0520
                                    LKK-JFM P
ARNOLD SCHWARZENEGGER,              THREE-JUDGE PANEL
et al.,

        Defendant.

~~~~~~~~~~~~~~~~~~~~~~~~
MARCIANO PLATA, et al.,
        Plaintiff,

        vs.

ARNOLD SCHWARZENEGGER,
et al.,

        Defendant.
~~~~~~~~~~~~~~~~~~~~~~~~
                DEPOSITION OF
                JERRY DYER



            OCTOBER 6, 2008

            11:44 A.M.



        2323 MARIPOSA MALL

        FRESNO, CALIFORNIA



    Reported by Celeste J. Silva, CSR No. 10179

Jerry Dyer                                    October 6, 2008

Page 10

1      Q      Okay.  So in terms of your background,

2  I'm assuming that you don't consider -- you don't

3  consider yourself an expert in economics, for

4  example?

5      A      No, I do not.

6      Q      And do you have any expertise in

7  statistics?

8      A      No.

9      Q      And in terms of when you -- your work,

10  does the report that you wrote accurately describe

11  the general points of your police background?

12      A      Yes.

13      Q      Okay.  And in terms of that report, you

14  understand that this report is being submitted as

15  part of the litigation in the case of Ralph

16  Coleman versus Schwarzenegger?

17      A      Yes.

18      Q      And you're familiar with that case,

19  correct?

20      A      Very familiar.

21      Q      Too familiar?  And you understand that

22  that report may be relied on by the court in

23  rendering its decision.  Do you understand that?

24      A      Yes.

25      Q      So when you sign this report, you

 1    legislatures had come back with an alternative

 2    which was no parole for many of the people

 3    released.  So the purpose of that was to talk

 4    about the impact that that would have should we

 5    eliminate parole.

 6        Q    So in other words, from your perspective

 7    parole serves as essentially an easy way for you

 8    to arrest people?

 9        A    It's a tool that we utilize to allow us

10    to keep them on the straight and narrow, yes.

11             MR. SPECTER:  Off the record.

12             (The proceedings went off the record.)

13    BY MR. SPECTER:

14        Q    The next paragraph is about the Fresno

15    County District Attorney's Office.  And was that

16    information compiled by your Chief Deputy for

17    you?

18        A    Yes.

19        Q    So you had never worked in the district

20    attorney's office, right?

21        A    No.

22        Q    You never done any work load studies of

23    the district attorney's office?

24        A    Correct.

25        Q    You don't -- you don't -- you're relying

Jerry Dyer                                    October 6, 2008

Page 78

1    on information provided by somebody in the

2    district attorney's office to your staff,

3    correct?

4         A    Actually I had a meeting directly with

5    the district attorney on this.

6         Q    I see.

7         A    And her top staff.

8         Q    I see.  And what did the district

9    attorney say?

10        A    Well, not only what she has said to me

11   but what she has said publicly at the board of

12   supervisors meeting the fact that they are

13   resource challenged, they are overwhelmed with

14   cases.  It's not uncommon for them to plead cases

15   down because of their staffing shortages.  And it

16   is also, unfortunately, causing them to not be

17   able to get to cases or file charges on cases

18   because of the staffing shortages.

19        Q    Right.  And the district attorney gets

20   her money from the county, right?

21        A    Board of supervisors.

22        Q    If the county board of supervisors wanted

23   to enable the district attorney to prosecute more

24   cases, they could fund her office more, correct?

25             MS. BARLOW:  Assumes facts not in

Jerry Dyer                                October 6, 2008

Page 86

1      that the sheriff was going to release more

2      prisoners from the jail because of budget cuts,

3      correct?

4           A     And has.

5           Q     And has.  How many has she released?

6           A     Seventy-two.

7           Q     And she wanted to release eight hundred,

8      correct?

9           A     Yes.

10          Q     Now, the sheriff is kind of one of your

11     public safety counterparts in the county, isn't

12     she?

13          A     Yes.

14          Q     He, she?

15          A     She.

16          Q     Her name is?

17          A     Margaret Mims.

18          Q     Margaret Mims.  And in your experience,

19     do you believe Ms. Mims has public safety at the

20     top of her professional responsibility?

21               MS. BARLOW:  Calls for speculation.

22               THE WITNESS:  Yeah, I don't have the

23     ability to answer that.  She's the sheriff.

24     BY MR. SPECTER:

25          Q     She's the sheriff.  She's the sheriff.

Jerry Dyer                                    October 6, 2008

Page 87

1    Well, have you had -- do you believe that she
2    would do anything that she believes would
3    seriously adversely affect the public safety of
4    Fresno?
5         A    I can't answer that.  I would hope not.
6         Q    Right.  Well, has she acted or said
7    anything that would lead you to that conclusion?
8         A    Well, the fact that seventy-two inmates
9    were released early has the potential to
10   jeopardize the safety of citizens in our
11   community.
12        Q    You're aware that she released them
13   pursuant to a certain criteria, are you not?
14        A    Yes.
15        Q    And that goes from the lowest level
16   misdemeanors first and -- right?
17        A    Yes.
18        Q    And to your knowledge, has she or the
19   prior sheriff ever released violent criminals
20   pursuant to this -- person in charge of violent
21   felonies?
22        A    If domestic violence is classified as a
23   violent felony, yes.
24        Q    Turn to the last page of Exhibit 4.
25        A    The very last page?

Jerry Dyer                          October 6, 2008

Page 89

1      A    Yes.

2      Q    Do you have any problems with the manner

3   in which they structure their release?

4           MS. BARLOW:  Wait.  Wait a second.  I

5   don't know if he has the most current one.

6           THE WITNESS:  This one here?

7           MS. BRINKMAN:  Did you have a chance to

8   review that?

9           THE WITNESS:  Is this the most current?

10          MR. SPECTER:  That's what I was told by

11  Ms. Barlow.  Is that the right one?

12          MS. BARLOW:  Yeah, dated August 18th.

13          THE WITNESS:  Okay.  Yeah, I've read this

14  one.

15  BY MR. SPECTER:

16     Q    Right.  And doesn't that data seem like a

17  reasonable way to determine how you should release

18  prisoners if you're forced to that choice?

19     A    Yes.

20     Q    I didn't notice that they did a risk

21  assessment before they released prisoners, was I

22  wrong about that?

23     A    I'm not aware of a risk assessment tool

24  that they used.

25     Q    The sheriff wanted to close two floors

Jerry Dyer                                    October 6, 2008

Page 90

1    and -- so to reduce her population by eight

2    hundred inmates; is that correct?

3         A    Yes.

4         Q    And is that because she doesn't have the

5    money to run the two floors?

6              MS. BARLOW:  Calls for speculation.

7    BY MR. SPECTER:

8         Q    If you know.

9         A    It's my understanding that the sheriff's

10   budget is not sufficient in the sheriff's eyes to

11   maintain jail operations.  And in order for her to

12   demonstrate to the board of supervisors that

13   point, she told them that she would close two

14   floors of the jail and release eight hundred

15   inmates and began that process of releasing

16   seventy-two of those inmates towards the eight

17   hundred and stopped releasing inmates early when

18   the board acquiesced and ultimately gave her some

19   funding.  And it's my understanding that they're

20   going to revisit this in November and if they

21   don't give her 3.2 million dollars more she's

22   going to once again begin releasing inmates.

23        Q    Do you understand that the prisons are

24   close to two hundred percent capacity?

25        A    Yes.

Jerry Dyer                                    October 6, 2008

Page 99

1       Q     The next paragraph -- and during this
2  time, that '04-'05 time period, you didn't go to
3  the Department of Corrections and say I need more
4  resources for more parolees?
5            MS. BARLOW:  Again, assumes facts not in
6  evidence.  The police department doesn't serve
7  parolees, they only arrest them.
8            MR. SPECTER:  Good point.
9       Q     (BY MR. SPECTER)  You didn't urge the
10  board of supervisors to request more resources
11  from the state to deal with this early release
12  program, did you even know it existed?
13      A     I did not know it existed so no, I would
14  not have gone to the state.
15      Q     The next paragraph in your report says
16  that Judge Hoff --
17      A     Yes.
18      Q     -- who oversees the felony courts said
19  that the release of 1,920 inmates were burdening
20  the courts because of higher recidivism rates in
21  property offenders and that each case would
22  require multiple appearances, court dates.  Did he
23  tell that to you?
24      A     No, he told that to Deputy Chief
25  Schaeffer.

Jerry Dyer                                    October 6, 2008

Page 100

1        Q     So, again, this is basically -- and the
2   same thing court services manager --
3        A     Correct.
4        Q     -- has provided information to your
5   deputy --
6        A     Yes.
7        Q     -- that would increase the court's work
8   load by ten percent, correct?
9        A     Yes.
10       Q     But you or your deputy, to your
11  knowledge, didn't verify the figures that they
12  told you?
13       A     That's correct.
14       Q     You don't know what they're based on?
15       A     No.  For clarification, my direction to
16  her was check with the courts and see what kind of
17  impact, if any, there would be.  And that was
18  information she provided back to me.
19       Q     Right.  Just so you understand where I'm
20  going.  I can understand you're talking about the
21  work load of your department, you had, but when
22  you start using hearsay when you talk about the
23  work load of other people who you haven't
24  checked -- you don't have to answer anything.
25            So the next sentence says, "With little

Jerry Dyer                                    October 6, 2008

Page 101

1    or no accountability due to the overburdening of

2    the criminal justice system crime rates will

3    increase," right?

4         A     Yes.

5         Q     And you still maintain that position even

6    though in the last -- you know, since '03 the

7    parolee population has risen by about half that

8    much and the crime rates have decreased?

9         A     I have no doubt that crime rates would

10   increase should individuals be released from

11   prison early, especially if there's no treatment

12   available for them.

13        Q     Now, are you a psychologist?

14        A     No.

15        Q     You're not an economist?

16        A     No.

17        Q     Do you take surveys of how fearful people

18   are in your community?

19        A     Yes.

20        Q     You do?  Is that a statistical survey, or

21   is that, you know, just talking to the many

22   friends in the community?

23        A     No, we do a survey based on citizen fear

24   and crime.

25        Q     I see.  And did you rely on that survey

9dc6d204-6666-4105-b640-b423eca2b652

Jerry Dyer                                    October 6, 2008

Page 104

1      Q    So now the next part seems to me you
2    start veering into dangerous territory.
3         MS. BARLOW:  I'm going to move to strike
4    that as completely irrelevant to the question.
5    BY MR. SPECTER:
6         Q    Right here's the question.  You know,
7    according to this statement, you can -- there's a
8    correlation between sales tax revenue and the
9    amount of fear in a community.
10        A    Yes.
11        Q    The first question is have you done any
12   studies to determine whether that's -- if it's
13   true, it's true in Fresno?
14        A    Yeah, the study was done for us out of
15   the University of Pacific of Stockton.  I can get
16   you the research on that.  And the purpose was to
17   demonstrate the impact crime could have on a
18   community in terms of financial impact.  And the
19   other study dealt with the economics was this
20   Sensible Sentencing Trust but not given the sales
21   tax revenue.  But there is a study that deals with
22   that.
23        Q    Okay.  And you asked him to provide it to
24   me?
25             MS. BARLOW:  Of course, we'd be happy to

Jerry Dyer                                    October 6, 2008

Page 105

1    provide that.

2              THE WITNESS:  It's a University of

3    Pacific, they did it this past year as we were

4    looking at a sales tax.

5    BY MR. SPECTER:

6         Q    You say on the next page that parolees in

7    Fresno receive very little supervision.

8         A    Correct.

9         Q    If they receive more -- did we go over

10   this morning if they receive more supervision

11   would the community be safer, correct?

12        A    Yes.

13        Q    You know, there's a study by the Urban

14   Institute which looked at parole in state -- well,

15   looked at states which had different parole

16   policies, some of which didn't have parole

17   comparative with crime rates in the various

18   states, it came out and found that parole

19   supervision really didn't make a difference in

20   recidivism.  Were you aware of that by the Urban

21   Institute?  Do you remember that study?

22        A    I remember those discussions when we were

23   doing the -- in our meetings, I remember that.

24        Q    And does that have any effect on your

25   opinion that parole supervision would reduce the

```
 1                    REPORTER'S CERTIFICATION

 2

 3          I, Celeste J. Silva, Certified Shorthand Reporter in

 4   and for the State of California, do here by certify:

 5

 6          That the foregoing witness was by me duly sworn; that

 7   the deposition was then taken before me at the time and

 8   place herein set forth; that the testimony and proceedings

 9   were reported stenographically by me and later transcribed

10   into typewriting under my direction; that the foregoing is a

11   true record of the testimony and proceedings taken at that

12   time.

13

14          IN WITNESS WHEREOF, I have subscribed my name this

15   ___6th___ date of ___October___, 2008.

16

17

18

19

20          _____

21          Celeste J. Silva, CSR 10179

22

23

24

25
```