# EXHIBIT K

Page 1

IN THE UNITED STATES DISTRICT COURTS
FOR THE EASTERN DISTRICT OF CALIFORNIA
AND THE NORTHERN DISTRICT OF CALIFORNIA
UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES
PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE


RALPH COLEMAN, et al.,

                Plaintiffs,
                            Case No. Civ S 90-0520 LKK-JFM P
vs.

ARNOLD SCHWARZENEGGER, et al.,

                Defendants.
_____/

MARCIANO PLATA, et al.,
                                Case No. C01-1351 TEH
                Plaintiffs,

vs.

ARNOLD SCHWARZENEGGER, et al.,

                Defendants.
_____/



            DEPOSITION OF GALE BATAILLE


DATE:        September 16, 2008

TIME:        9:36 a.m.

LOCATION:    ROSEN, BIEN & GALVAN, LLP
             315 Montgomery Street, Tenth Floor
             San Francisco, California  94104

REPORTED BY: Katy Leonard
             Certified Shorthand Reporter
             License Number 11599

Golden Gate Reporting

Page 71

1    that one or not.

2          Q.   Do you support that particular recommendation?

3          A.   I believe that this recommendation has to be

4    taken in context, and the context is and has been

5    consistently from the perspective of CSAC.  And I was

6    involved in earlier work with CSAC on principles related

7    to AB 900.

8              Um, the context for CSAC is that there needs

9    to be sufficient resources provided in communities, both

10   the correctional end of the community resources and the

11   treatment and community support continuum, in order to

12   better serve people, and that under the conditions of,

13   if the State made the investment in communities being

14   able to prepare, that they could indeed do some of these

15   things.

16             But it's all premised on the fact that

17   counties are severely underfunded, that the State has

18   failed to keep its end of the bargain in terms of many,

19   many, many programs over the years.  And so, this is all

20   predicated on adequate funding and some kind of -- I

21   think it's in here -- some kind of reasonable guarantee

22   of continued adequate funding in the future, not just

23   one-time funding.

24          Q.   What would a "reasonable guarantee" look like?

25          A.   I don't believe that's within my expertise.

Golden Gate Reporting

Page 72

1   It would need to be something that locked it in with a
2   rate of growth that matched a rate of growth, and that
3   was not subject to the State saying, Oops, we don't have
4   it this year, so we're not going to pay you like we said
5   we would.
6           And the State does that.
7       Q.  You were retained by the State in this matter;
8   weren't you?
9       A.  Sorry.  I'll be good.
10          Not -- I'm not talking about this particular
11  incident.  I'm really talking about other funding
12  streams to counties.  But thank you for pointing that
13  out.
14          MR. GALVAN:  I'd like to mark an Exhibit 5,
15  which I'll give to the Court Reporter.
16          (Whereupon Plaintiffs' Exhibit 5
17           was marked for identification.)
18  BY MR. GALVAN:
19      Q.  Exhibit 5 is a copy of your August 15th
20  report.
21      A.  Yes.
22      Q.  I'd like to turn to page 20.
23          And there is a -- there's a bold heading in
24  the middle of the page that says:
25              "I will conclude this report with a brief

e33848fb-cff6-4598-90ab-df74c1066cb0

Golden Gate Reporting

Page 130

1    it's -- there's a limited capacity.

2         Q.  And is the problem you're describing either

3    one of these two problems?

4            I'll give you a choice.

5            A --

6    A.  What if I say Door C?

7    Q.  Then that's a fair answer.

8    A.  Okay.

9    Q.  A, we know what to do, but we need time and

10   money and will to do it.  That's A.  Or B, we don't know

11   what to do.

12           MR. ANTONEN:  Objection.

13           MS. FUENTES:  Or something else.

14   BY MR. GALVAN:

15       Q   Or C?

16           And if so, what?

17           MR. ANTONEN:  Again, objection.  We're

18   straying a little bit far from the testimony the witness

19   was designated to provide.  Calls for speculation on a

20   topic we didn't designate her for.

21           But to the extent you're comfortable...

22           MR. GALVAN:  Let me reframe the question.

23   BY MR. GALVAN:

24       Q.  When you said that "adequate plans and

25   services are not in place," is part of your basis for

e33848fb-cff6-4598-90ab-df74c1066cb0

Page 131

1  saying that, based on your experience and the materials

2  you reviewed --

3      A.  Mm-hm.

4      Q.  -- you have some knowledge as to what adequate

5  plans and services would look like?

6      A.  I have some knowledge of a part of what it

7  might look like, because I really don't hold myself out

8  as having any expertise in literally for, example, what

9  probation would need to be doing, or parole agents.

10         I mean, I'm not the criminal justice system

11  expert.  And any effective services have to have a

12  combination of treatment and supervision.

13         So, I have a certain band of expertise about

14  community-based mental health services.

15      Q.  And is the problem in community-based mental

16  health services that you don't know what works, or you

17  know what works but you need more resources to do it?

18      A.  I think I've been saying consistently -- well,

19  let me just answer.

20         I think we have learned a great deal in the

21  last 20 years about what works better.  So, our

22  knowledge base is improving.  We don't have the

23  resources to do it.

24         Many staff in our systems have been around for

25  a while, and don't necessarily have all the latest

e33848fb-cff6-4598-90ab-df74c1066cb0

Page 171

1        A.  Um, I haven't seen this particular -- I
2   actually saw it referenced in one of your expert witness
3   reports.  And I tried to look it up on the Web and
4   couldn't find it.
5        Q.  Okay.
6            If you turn to the -- and let's see.
7            MR. GALVAN:  Is yours numbered?
8            MR. ANTONEN:  No.
9            MR. GALVAN:  Mine is not numbered, but if you
10  turn to the fourth slide.
11           THE WITNESS:  "Origin"?
12           MR. GALVAN:  No.  Pie chart.  If you go back
13  one.
14           MR. ANTONEN:  Is it "Major Sources"?
15           THE WITNESS:  Okay.  Yeah.  (Indicating)
16           MR. GALVAN:  Oh, that's terrible.
17           Maybe you should look at mine.
18           THE WITNESS:  Well, I can -- it is pretty
19  terrible.
20           MR. GALVAN:  I'll take yours.
21  BY MR. GALVAN:
22       Q.  Okay.
23           You were just testifying about the various
24  sources of funding for county mental health.
25       A.  Mm-hm.

e33848fb-cff6-4598-90ab-df74c1066cb0

Golden Gate Reporting

Page 172

1    Q.  So, I wanted to ask you if this exhibit, which

2    purports to just be the 2008-2009 May revise -- so, of

3    course, I will represent for the record that we don't

4    know if that became the budget, but --

5    A.  That's true.

6    Q.  -- roughly by orders of magnitude, does that

7    total $6.3 billion?

8    It seemed like it's commensurate with your

9    understanding of what the general total pie is for

10   mental health services.

11   A.  That sounds probably about right.

12   Q.  Okay.

13   And is it about right -- moving, you know,

14   clockwise around that pie -- MHSCA is about 1.5 billion?

15   A.  You know, all -- I don't know off the top of

16   my head.

17   Q.  Okay.

18   A.  But the source, I would trust on this.

19   Q.  Okay.

20   A.  So, I would assume that's correct, but...

21   Q.  And then realignment would be about 1.2

22   billion?

23   A.  Again, let me just state that I don't have in

24   my head any separate source of figures, but this is --

25   this is Department of Mental Health and the Mental

Page 173

1    Health Directors Association.  I'm sure there's pretty

2    close agreement.

3        Q.  So, overall, you would agree it's about a

4    $6.3 billion system?

5        A.  Sounds right.

6        Q.  Okay.

7            That's all I wanted to ask about that, I

8    think.

9            Actually, there is one other -- while we still

10   have Exhibit 12 -- one other slide I did want to ask you

11   about.

12           MS. FUENTES:  Which slide?

13           MR. GALVAN:  Oh.  Slide --

14           THE WITNESS:  It's almost at the back.  Five

15   or six in.

16           MR. GALVAN:  It's the slide with the title,

17   "Changing Services, Changing Lives."  "Collaboration" --

18   examples.  Right.

19   BY MR. GALVAN:

20       Q.  And the third bullet point down there

21   describes a program called "Pathways."

22           Is that your program?

23       A.  Yes.

24       Q.  Okay.

25           So, that's the program you were testifying

Golden Gate Reporting

Page 199

1          Could you please be more precise?

2    BY MR. GALVAN:

3          Q.  Do you know what a "technical parole

4    violation" is?

5          A.  I don't have the state-of-the-art definition.

6    No.

7          Could you provide it?

8          Q.  In --

9          A.  I mean, I assume it encompasses a range of --

10         Q.  In preparing your report, did you make any

11   assumptions about what technical parole violations are?

12         A.  I don't think that I specifically addressed

13   technical parole violations in my report.  I think what

14   I addressed was data identified by the UCLA study about

15   recidivism rates.

16              I am aware that there is -- you know, that

17   there is discussion in the literature about California

18   and other states, you know, to the extent -- let me get

19   this sentence straight -- that discusses whether

20   California does more technical violations than other

21   states.  I'm aware that that literature is out there.

22   That is not my field of expertise.

23         Q.  When you reviewed that literature --

24         A.  I didn't review the literature.

25         Q.  I'm sorry.

Golden Gate Reporting

Page 200

1    A.  I said I've seen references in literature.  I

2  did not go out and review the literature on what

3  constitutes or what California's track record is.  I saw

4  reference to it.

5    Q.  When you saw the references to it, was it your

6  testimony you became aware that California returns more

7  people to prison on parole violations than other states?

8    A.  My memory is that there were statements that

9  California was one of the states that had a high return

10 rate for technical violations.  I don't know the

11 comparison to other states.

12    Q.  Okay.

13    But is it your testimony that that fact did

14 not -- it was not something you considered in your

15 report?

16    You didn't consider, in forming your opinions

17 in this case, the impact one way or the other of

18 California's rate of return for technical parole

19 violations?

20    A.  I did not separate out technical violations

21 from -- what I looked at was recidivism rates.

22    Q.  Okay.

23    As you sit here today, would you agree that if

24 you're assessing the impact on public safety -- that a

25 serious or violent crime should count more than a return

e33848fb-cff6-4598-90ab-df74c1066cb0

Golden Gate Reporting

Page 201

1    to custody for failing to follow instructions from a

2    parole agent?

3        A.  I'm -- I'm really feeling -- let me -- not

4    feeling.

5            You're asking me to have an opinion that's not

6    something that I consider myself an expert on.  In my

7    opinion, when you are working with a population that has

8    serious mental illness and is likely to be using

9    substances and has risk of exacerbation in those

10   circumstances -- and I would want to look at the history

11   of what -- you know, of what got people into prison, and

12   I don't have all of that information -- um, you know,

13   there can be an increased risk to public safety.

14           And what was quite telling to me was in the

15   UCLA report, I believe, and in the March, 2008, I think,

16   it was cited as well -- individuals who had more

17   frequent, more intensive contact with the Parole

18   Outpatient Clinic, which I then took as, you know,

19   contact with some kind of treatment and supervision, had

20   much lower rates.

21           This rate you cited here is the average.

22   People who did not get access or who failed to follow

23   through, their recidivism rates were, I believe, 69 or

24   70 percent.  They were significantly higher.

25           So, what I was looking at in this study was

Page 236

1        Q.  Um, perfect transition, because I was just
2    going to ask you about CDCR talking with counties.
3            MR. GALVAN:  So, I'd like to mark a document.
4    Exhibit 18.
5                (Whereupon Plaintiffs' Exhibit 18
6                 was marked for identification.)
7            MR. GALVAN:  You're the witness, so you get
8    the privileged copy with the sticker.  I mean,
9    privileged not in the legal sense.
10   BY MR. GALVAN:
11       Q.  So, Exhibit 18, I marked, has Bates Nos. 551
12   to 552.  And it's an E-mail about a conference call.
13           And I believe you put a footnote in your
14   August 27th report saying that this conference call on
15   August 25th is part of what you relied on in your
16   report; is that right?
17       A.  Yeah.
18           Let me just think back on what happened when.
19           Um, yes.
20       Q.  Okay.
21       A.  I believe this had to do with the Valdivia
22   paper.
23       Q.  And as you look at page 2, there's some text
24   there that's says, "Hi, Pat and Don."
25       A.  Mm-hm.

Page 237

1          I never capitalize.

2     Q.   It says:

3          "As I get deeper into assertions related

4     to Coleman suit...I anticipate increased

5     pressures and questions about the role and

6     responsibility of county public mental health

7     systems to serve parolees...I have to do

8     responses..."

9     A.   Mm-hm.

10    Q.   Skipping a few words.

11    A.   Mm-hm.

12    Q.   (Reading)

13          "...would like a chance to discuss some of

14    these issues with you, especially our position

15    that county mental health is not responsible

16    for treatment of individuals who are on active

17    parole status, aside from prohibition under

18    MHSCA.  I think I will be challenged on this

19    and will need to identify code citations,

20    history, et cetera...and this is in light of

21    continued, although perhaps weakening

22    assertions from CDCR about our responsibility

23    to treat all of our residents..."

24    A.   Mm-hm.

25    Q.   So, the first question about this, when you

e33848fb-cff6-4598-90ab-df74c1066cb0

Golden Gate Reporting

Page 238

1   say "especially our position" -- and you're here today

2   as CDCR's expert -- do you mean "our" to be CDCR's

3   position?

4          A.  I meant, CMHDA.

5          Q.  Oh, you meant CMHDA?

6          A.  Mm-hm.

7          Q.  And how would you describe the -- well, how

8   does CMHDA's position differ from CDCR's position on

9   whether the County Mental Health is responsible for the

10  treatment of individuals who are on active parole

11  status?

12         MR. ANTONEN:  Objection to the extent the

13  witness knows CDCR's position on this.

14         THE WITNESS:  I can only --

15         MR. ANTONEN:  Please don't speculate, but to

16  the extent you know CDCR's position, go ahead.

17  BY MR. GALVAN:

18         Q.  You are CDCR's expert today; right?

19         MR. ANTONEN:  Well, she's Defendants' expert.

20         THE WITNESS:  I would never claim to be CDCR's

21  expert, no.

22         MR. GALVAN:  Okay.

23  BY MR. GALVAN:

24         Q.  You're the expert for the Coleman Defendants

25  and Plata Defendants, Schwarzenegger, and all those CDCR

e33848fb-cff6-4598-90ab-df74c1066cb0

Page 239

1    officials?

2            A.  In a specific area.

3            Q.  Okay.

4            A.  Which has to do with community mental health

5    impacts.

6            Q.  Okay.

7                And does that area include the impact of

8    parolees on community mental health, specifically a big

9    increase -- a possible increase in the number of

10   parolees?

11           A.  I believe my written testimony has gone in

12   that direction, yes.

13           Q.  So, when you wrote here, "our position," what

14   position -- what's the position you were describing?

15           A.  I was describing -- the practice has been, and

16   the discussion has been -- and actually, the citation I

17   would give you is that April or March kind of report

18   that says -- that we had earlier that says, you know,

19   county --

20           Q.  You can take it out, if it will help you.

21           A.  Oh.  I have it.  Right.

22           Q.  I have it too, but it's buried.

23               And that's the March 28th "Division of Adult

24   Parole Operations, Mentally Ill Parole Population"?

25           A.  Yes.

Golden Gate Reporting

Page 240

1        So, this report basically focuses largely on

2   the requirement under 5150 for an evaluation and

3   extended -- but I have been in various meetings with

4   State -- State CDCR folks, particularly up until about a

5   year ago, where statements were made to the effect of,

6   These are all of our residents.  County mental health

7   should be available to treat these folks.  We should be

8   able to refer them over.

9        And I think in here there is a statement that

10  if -- if parolees need a higher level of care than is

11  provided by parole outpatient, that they should try to

12  link them to county services.

13       History and practice in California has been

14  that I am unaware of any county that by policy says, We

15  are funded, and you're responsible for treating people

16  that are on active parole status.

17       So, that's the CDCR kind of assertion with

18  trying to get more -- you know, and I don't fault them.

19  It was trying to get access to more services than

20  they've been able to provide in the community.

21       Q.  So, did you actually have this conference call

22  on the 25th?

23       A.  Yes.

24       Q.  So, who attended?

25       A.  Um, I believe it was Nancy -- and it was

Golden Gate Reporting

Page 241

1    maybe -- I don't remember how long the call was -- maybe

2    half an hour.  But it was Nancy, Pat Ryan, Don Kingdon,

3    and maybe -- and I don't remember for sure -- maybe

4    Karen Baylor.  No.  I don't even think she was on this

5    call, if she was on the call, but I don't have a

6    specific memory of her being on the call.

7         Q.  And did you take up this --

8         A.  Here it is.  (Indicating)

9         Q.  -- topic of "our position" that the county

10   mental health is not responsible; do you recall?

11        A.  Yes.  We talked about that.

12             Specifically, it was essentially trying to

13   kind of sort the implications of the Valdivia -- the

14   August Valdivia findings and what that meant in terms of

15   the responsibility of counties to provide access to 5150

16   evaluations and treatment, and what the responsibility

17   of State DMH is for assuring that provision and for

18   payment, because State DMH doesn't pay counties for that

19   service.

20             I mean, there's a whole kind of mechanism of

21   funding, but it's not like a parolee goes to a crisis

22   service and gets hospitalized and the State pays us.

23   That doesn't happen.  I don't want to say "us," because

24   I'm not a county person anymore, but -- so, it is an

25   attempt to try to kind of touch base about, you know,

e33848fb-cff6-4598-90ab-df74c1066cb0

Golden Gate Reporting

Page 242

1    what -- what's everybody's opinion about what
2    practices -- and does Valdivia have any other
3    implications.
4          Q.  And what did you determine in the call?
5          A.  Um, what we came to, to the best of my
6    recollection --
7              MR. ANTONEN:  "We" is CMHDA?
8              THE WITNESS:  CMHDA.  Not CDCR.
9              CDCR had nothing to do with this.
10             MR. GALVAN:  I'm sure that I'll hear about it
11   eventually.
12             THE WITNESS:  Well, nor did state DMH have
13   anything to do with this call.
14             And what we came to is that, you know, yes, we
15   know we have a 5150, you know, LPS responsibility for
16   whoever it is, but that we believe that -- and this is
17   not worked out -- we believe that the payment
18   responsibility really does fall on State DMH.
19   BY MR. GALVAN:
20         Q    You say "this is not worked out."
21         A.  This is very -- you know, this is a very new
22   finding, and so, it's not worked out.  I don't think --
23   you know, I don't think there's conclusions yet.
24             There's a great deal of concern, you know,
25   that there will be expectations, particularly around the

Page 243

1  issue of restoration of confidence, because if someone

2  is brought in losing confidence -- and I am not a legal

3  expert in this, so I want to preclude my statement with

4  that -- but if they're brought in with restoration of

5  confidence issues and they have to be hospitalized,

6  who's going to provide -- and they are a danger to

7  themselves or others, first of all, is there -- are

8  there institutions out there that will take them.  Who's

9  responsible for providing not just the treatment, but

10  literally in some cases the custodial supervision.

11          That's a big issue in hospitals.  And some of

12  them refuse to take people that require that level.

13          Q.  When you -- when you were meeting with -- I

14  know you had one meeting with Robert Storms -- I'm

15  taking you to another meeting that's related to this

16  meeting --

17          A.  Okay.

18          Q.  -- about the AB 900 300 parolee services, the

19  crisis care services and the things they were calling

20  "day treatment" that they should call "Full-Service

21  Partnerships" --

22          A.  Mm-hm.

23          Q.  -- did you learn anything about -- did anyone

24  tell you anything about the CDCR's -- about a CDCR

25  intention to contract with the counties to provide the

e33848fb-cff6-4598-90ab-df74c1066cb0

Page 278

1          But I have never seen the kind of energy that

2   I see coming out of -- and I haven't been paid to make

3   this statement -- I have never seen the kind of energy

4   and the kind of initiative that I see coming out of CDCR

5   in my career.

6          And, you know, including things like the

7   expert panels and the planning that's going on, and the

8   very proactive thinking about how to train people to do

9   better work.  Um, it doesn't mean there isn't more

10  that's needed, but it's a sea change in terms of what

11  I've seen in my career.

12       Q.  Looking at your C.V., which is at the back of

13  your report...

14       A.  Mm-hm.

15       Q.  Um, so, your degree is an MSW; is that

16  correct?

17       A.  Yes, it is.

18       Q.  You don't have a Ph.D.; do you?

19       A.  No.

20       Q.  Do you have any particular training in

21  criminology?

22       A.  In criminology per se, no.

23       Q.  Do you have any particular training in

24  forensic mental health?

25       A.  I am not a forensic mental health

Page 279

1    practitioner.

2        I do have particular experience based on -- I

3    don't know -- 27 years of working in community mental

4    health, and experience supervising and working with a

5    number of criminal-justice-related programs, including

6    supervising the conditional release program and

7    supervising jail mental health services, developing and

8    supervising MIOCR grant programs.

9        So, I've had a lot of experience, you know,

10   done a lot of learning over the years, but, no, I didn't

11   go to a program -- a school.

12       Q.  Have you ever worked in a Parole Outpatient

13   Clinic?

14       A.  No, I have not.

15       Q.  Have you ever been to a Parole Outpatient

16   Clinic?

17       A.  Yes, I have.

18       Q.  Have you ever been in a California State

19   prison?

20       A.  I have been in San Quentin, briefly, at the

21   receiving -- and it was years ago.

22       Q.  Okay.

23       A.  So, as I stated, I am not an expert on the

24   internal operation for the prisons.

25       Q.  So, you don't intend to offer any opinion

e33848fb-cff6-4598-90ab-df74c1066cb0

Page 281

1  opinion about related to that would be measures in the

2  community that might impact the flow to the prisons or

3  impact recidivism.

4       Q.  Okay.

5          Have you ever been qualified as an expert by a

6  court?

7       A.  Um, I don't believe I have.

8       Q.  Have you ever published a peer-review work?

9       A.  In a peer-review journal, no.

10      Q.  Have you ever done any work -- any studies

11  that were -- involved statistical analysis of social

12  science data, psychological data?

13      A.  Um, I have, yes, but not published studies.

14  You know, I've worked with grant evaluations -- that

15  kind of thing.

16      Q.  Do you have any expertise in -- oh, sorry.

17          For this work, for this expert opinion, did

18  you perform any statistical analysis?

19      A.  No.

20      Q.  Do you have any specific expertise in violence

21  prevention?

22      A.  It depends on your definition of "expertise."

23          As a County Mental Health Director, there's a

24  lot of work that we do that involves training staff in

25  violence prevention, de-escalating.

e33848fb-cff6-4598-90ab-df74c1066cb0

1           CERTIFICATION OF DEPOSITION OFFICER

2

3       I, KATY LEONARD, duly authorized to administer

4  oaths pursuant to Section 2093(b) of the California

5  Code of Civil Procedure, hereby certify that the

6  witness in the foregoing deposition was by me sworn to

7  testify to the truth, the whole truth and nothing but

8  the truth in the within-entitled cause; that said

9  deposition was taken at the time and place therein

10  stated; that the testimony of the said witness was

11  thereafter transcribed by means of computer-aided

12  transcription; that the foregoing is a full, complete

13  and true record of said testimony; and that the witness

14  was given an opportunity to read and correct said

15  deposition and to subscribe the same.

16       I further certify that I am not of counsel or

17  attorney for either or any of the parties in the

18  foregoing deposition and caption named, or in any way

19  interested in the outcome of this cause named in said

20  caption.

21

22

23

24                                            

25                                  KATY LEONARD, CSR 11599

Page 298

# EXHIBIT L

# Preliminary Expert Report from

# Gale Bataille, MSW

Expert Opinion of Gale Bataille, M.S.W. Regarding the Probable Impact of a Coleman Class Prison Release Order Submitted on August 15, 2008

## (I) Statement of all opinions the witness will express and the basis and reasons for them

As an expert witness, my opinion will address the probable impact on California's county-based community mental health system and the seriously mentally ill individuals it serves if the California Department of Corrections and Rehabilitation (CDCR) is court ordered to implement a correctional facility population reduction through a prisoner release order.

Based upon my background as a County Mental Health Director in California for over 17 years including active statewide leadership in the development of community mental health policy, financing and program design since 1975, it is my expert opinion that adequate plans and services are not in place—nor can these plans and services be put in place without a funding increase and adequate program planning and implementation lead time, to respond to a release of even 15,000 offenders including all classes of mentally ill (Coleman class) prisoners. In fact-even if counties were given up to a year for mental health program planning and implementation, it will not be possible to adequately staff needed augmented program services because of the current professional mental health workforce shortage in California—and nationally. In addition, the imposition of a population cap on state prisons (whether through a court order or a legal settlement agreement) will have an immediate and significant impact on county law enforcement, jails, probation departments and the local health, human services and mental health services as these agencies will be required to serve offenders who would previously been sent to state prisons, in the community or in jails and local institutional settings. The concerns and objections expressed by the California State Association of Counties (CSAC) in its Corrections Policy: Principles and Guidelines (adopted as revised 5/22/08) and the California Mental Health Directors Association (CMHDA) as well as CSAC in separate policy responses to the Legislative Analyst Offices 2008-09 budget proposal for "parole realignment" are equally germane to the likely adverse consequences of a prisoner release plan.

An accelerated release of prisoners who meet Coleman class criteria can be anticipated to have adverse— and potentially serious consequences for the released prisoners; community mental health systems and the (non-offender status) mentally ill children, adults and older adults they serve; a potentially negative impact on community safety if adequate supervision, treatment services and programs are not in place at the time of the prisoner release; and potentially long-term negative consequences to the development of public mental health services in the future.

I will provide testimony that addresses how the above issues could reasonably be expected to be affected by release criteria and proposals described in Coleman Plaintiff's April 17, 2008 Supplemental Responses to Defendant Arnold Schwarzegger's First Set of Interrogatories.

I will address the following specific issues that inform and constitute the basis for my expert opinion as follows:

**1. Population definition/characteristics and implications for community based care service needs;**

**2. Mental health service requirements and capacity of CDCR Parole Outpatient Clinics and public mental health departments to meet service requirements--including outpatient as community support services as well access to psychiatric treatment in institutional/secure settings;**

**3. Effectiveness of currently available outpatient mental health services to mentally ill offenders— the need for new and evidence-based approaches;**

**4. Potential adverse impact of Coleman population release on public safety, the future growth/development of community mental health systems, and community acceptance of individuals with mental illness.**

**1. Population definition/characteristics and implications for care**—What is a reasonable estimate of the increased population of mentally ill prisoners that would be released to community parole status?  What are the characteristics/needs of this population?

**(a) Estimate of population likely to be released**

On the basis of Special Master Keating's Special Master's Response to the Court's May 17,2007 Request for Information it is reasonable to assume that "the percentage of the caseload census in the overall population is a predictable 19-20 percent. (pg. 14)  Therefore, if 15,000 prisoners are released on parole status, 19-20 percent of prisoners-or up to 3000 of these newly released parolees will have serious mental illness as assessed by CDCR.  The various proposals for prisoner release focus on the release of "low risk" offenders but it should be assumed that a substantial portion of these individuals who have received psychiatric treatment while incarcerated have a significant risk of exacerbation of their psychiatric symptoms when released to community settings.  In addition, Plaintiff's April 17,2008 supplemental response to Interrogatory No. 4 states subject to a number of objections that prisoner release order would need reduce the prison population in all of the different categories of Coleman class including 3-CMS, EOP and inpatient level of care to achieve constitutionally adequate mental health care in the state prison

2

system.

## (b) Anticipated characteristics of population likely to be released

There is little discussion in any of these proposals of how mentally ill offender psychiatric symptoms, characteristics and needs are likely to appear different in the community in contrast to the contained environment of prison facilities and to what extent members of the mentally ill released parolee population might be at greater risk for recidivism—especially if they do not access and receive prompt and adequate services. Of greatest concern is the lack of specific acknowledgement and planning for a population that has co-occurring psychiatric and substance abuse disorders. Approximately 50% of individuals who are served in the community based mental health system have co-occurring substance abuse/use disorders—with a higher prevalence (75-80%) reported among homeless, psychiatric emergency, hospitalized and incarcerated populations. There is a higher prevalence of substance abuse disorders in the population of mentally ill prisoners. Co-occurring mental health and substance use disorders are the assumption-not the exception among individuals who have contact with the criminal justice system. Client assessments (and services) must focus on integrated models of care. Of the 19-20 percent of prisoners who have diagnosed psychiatric disorders, 80-90 percent can be projected to have a history of co-occurring substance abuse. There is a significant and growing body of research and practice literature and public mental health system experience that finds that integrated mental health/substance abuse treatment must be provided to address the needs (and likelihood of relapse) of individuals with serious mental illness with co-occurring substance use disorders.

## (c) Eligibility of released inmates as "target population" for county/public mental health services

It should not be assumed that all inmates assessed by CDCR staff to meet criteria for serious mental illness in the prison setting will meet public mental health services eligibility criteria (including Federal Medicaid) as seriously mentally ill with a functional impairment that qualifies them for Medicaid or mental health indigent care services. It is not uncommon for correctional systems to include within the classification of mentally ill prisoners individuals with developmental disabilities and/or cognitive disorders that are not the result of mental illness, and are not within the target/treatment responsibility of the public mental health system. It is the experience of County Mental Health systems that it is particularly difficult (if not sometimes impossible) to access community based or institutional/inpatient services for individuals with developmental disabilities and traumatic brain injuries/cognitive disorders.

Potentially divergent assumptions about the criteria used to define mentally ill target populations can lead to faulty program design and even conflict among well-intended partners in criminal justice reform. This may

3

lead to unrealistic expectations that public mental health systems have the resource capacity and can effectively and safely treat a population with developmental disabilities, cognitive disorders, character disorders and high "criminogenic" risks. To the extent that a prisoner release plan anticipates access to counties' public mental health services, the following issues related to the target population to be treated must be considered. (This opinion will address separately the extent to which resource capacity exists or can be brought on-line in a timely manner.)

- Mental health/criminal justice program initiatives must be explicit about the target population to be served—including whether this is an expanded population that requires new funding resources and services that are beyond the current scope of the public mental health system. Understanding and effectively responding to released prisoner needs will require assessment and service development that addresses gender and culture specific impacts including trauma and victimization.
- Not all psychiatric disorders are amenable to treatment modalities offered in the public sector and individuals with certain personality and social disorders that are accompanied by criminal behaviors do present supervision and public safety concerns. Local mental health systems that develop or contract to serve these higher risk populations must distinguish specialty criminal justice services from the broader public mental health system and be clear about inherent risks and responsibilities in serving a new population.
- It is critical that there be agreed upon and broadly applied "risk assessment" tools and procedures for criminal justice involved populations. Risk and needs assessments should follow the individual's progress through local and State institutions and services.

## (d) Recommendation regarding Coleman class target population to be considered for community parole

Given the concerns and challenges described above regarding the population of mentally ill prisoners that could be subject to release, I strongly recommend that only those mentally ill individuals assessed as having the greatest level of psychiatric stability and the greatest potential to "voluntarily" follow-up on outpatient care be considered for early release. There should be no requirement of CDCR that a release plan include prisoners who qualify for all of the CDCR levels of care: 3-CMS, EOP or Crisis/inpatient services. The most seriously mentally ill prisoners (EOP) should be considered for early release-if and only if there are intensive supervision and treatment services available to serve the released prisoner immediately upon release and if there are provisions for inpatient care negotiated as part of the service agreement.

4

While professionals have limited capacity to accurately predict the behavior or the course of mental illness of parolees regardless of the care given to a pre-release risk assessment, release of high need prisoners without adequate services in place could set back future program development by CDCR or counties. In addition, the mandated release of seriously mentally ill prisoners at the predicted prevalence 19-20% prevalence level in the prison population would have extremely limited positive impact mental health services in the prison system. Special Master Keating states: "even the release of 100,000 inmates would likely leave the defendant with a largely unmitigated need to provide intensive mental health services to program populations that would remain undiminished by a reduction of some 19,000 3CMS (case management level mentally ill inmates in the general prison population.) …Only a targeted release of seriously mentally ill inmates will serve quickly to reverse current deficiencies, especially of bed and program space. Still, the most seriously mentally ill inmate/patients in CDCR are unlikely to be among those released pursuant to any of the provision of defendants' Assembly Bill 900." (pg 15)

## 2. Mental health services needs, requirements and capacity for services provision—

The May 2008 report to the Three Judge Panel by Court appointed Settlement Referee, Elwood Lui and Settlement Consultant, Peter Siggins, submitted as part of a proposed settlement agreement, a potential program for "Local Diversionary Alternatives for Low-Risk Individuals" (A. 1.-pg 7ff). In addition, in the April 17th Supplemental Responses to Defendants Interrogatories, the Coleman Plaintiff's articulated proposals that Defendants could consider as prison overcrowding reduction measures "available to them that can be done safely and, in light of the dangerous overcrowding in the prison system right now, could actually improve public safety." (April 17th Supplemental Interrogatories, No. 6, pg. 9-11) It is my opinion that both of these proposals/reports fail to take into account the capacity of either the CDCR Parole Outpatient Clinics or California's county mental health departments to provide the level of community mental health care and community support services or the psychiatric institutional care that will be necessary if there is a rapid release of seriously mentally ill prisoners. In addition, neither of these reports acknowledges or proposes a reasonable time frame for planning and implementing the array of services/programs that are considered. It should also be understood that even a prisoner release that does not include Coleman class seriously mentally ill prisoners will have a impact on community mental health resources and services.

The following issues must be addressed in order to accomplish a safe, humane and effective release of seriously mentally ill prisoners:

- Who is responsible for the provision of mental health outpatient and inpatient care to mentally ill parolees?

5

- What is the capacity of CDCR Mental Health Parole Outpatient Clinics (CDCR-POC) to serve additional mentally ill parolees?

- What is the capacity of county-based public mental health systems to meet additional service demands and how would public/community mental health programs be impacted by an increase in mentally ill parolees requiring services—including the impact if a Settlement Agreement is adopted whereby counties are responsible for provision of "local diversionary alternatives to incarceration for low-risk individuals"?

- What is required to implement additional services/programs for mentally ill offenders?  What are the structure, scope and responsibility and capacity of California's county-based community mental health system to provide State and Federally mandated mental health services?

## (a)  What agency/system is responsible for funding and providing mental health and inpatient care to parolees?

A clear agreement must be developed between CDCR and counties regarding responsibility and accountability for mental health treatment responsibility for parolees, particularly as the Courts and/or the State moves toward reducing the prison population.  Historically, CDCR staff have attempted to refer active parolees to county operated (or county contracted) outpatient, intensive outpatient and institutional services while counties have taken the position that services to this population is not a county mental health responsibility.  Clarification of responsibility for the funding and provision of outpatient, intensive outpatient and acute inpatient care  has been the subject of multiple discussions between representatives of the California Mental Health Directors Association on behalf of county mental health departments and CDCR staff.  A March 28, 2008 report released by the CDCR Division of Adult Parole Operations regarding the mentally ill parole population states:

"Consistent with the terms of the *Valdivia v Schwarzenegger* federal court injunction, effective January 8, 2007, the California Department of Corrections and Rehabilitation (CDCR) no longer incarcerates parolees solely for psychiatric treatment (psych-return).  Therefore, when a parolee requires mental health treatment above the level of care available from the Parole Outpatient Clinics (POC), CDCR relies on the counties, and other community-based providers, to obtain necessary mental health services.  Specifically, parolees are brought to the county mental health facilities for a California Welfare and Institutions Code (WIC) §5150 evaluation.  Oftentimes, a parolee resident does not meet the criteria for continued county services via the WIC §5150 process, but will still require a structured level of care in order to prevent negative outcomes in the community.  With the

6

end of the psych-return process, this level of care must now be provided by community-based mental health facilities." (pg. 2 of cited report).

To the best of my knowledge, counties are fulfilling their responsibility to provide WIC 5150 assessments and acute treatment pursuant to the Valdivia court decision, however, counties maintain that provision of non-5150 related community mental health services remain the responsibility of CDCR directly or via contract. Counties' position that they have limited responsibility for parolee mental health services is further supported by the restriction in 2004 Mental Health Services Act (Proposition 63) which prohibits use of MHSA funds for parolee services or law enforcement/justice system functions. (See **SECTION 7**. Section 5813.5 is added to Part 3 of Division 5 of the Welfare and Institutions

Code, to read: "...Funds shall not be used to pay for persons incarcerated in state prison or parolees from state prisons."This prohibition was included in the act because of the concern of the drafters of the ballot proposition that all new resources to meet the critical unmet needs of mentally ill individuals in our communities would be subsumed by the unmet needs in the state corrections system.

Clarification of funding and service provision responsibility for parolees is of particular concern to public mental health systems in light of their inability to meet current community demand for state and federally mandated services.   There have been indicators of progress as CDCR has begun to negotiate contracts with several counties to provide intensive and wrap around services to parolees either directly or via contracted agency providers. However, a "phase one" release of 15,000 prisoners with a projected 3,000 requiring POC services—a 13% increase in the parole outpatient clinic will create additional pressures on all services with potentially negative parolee impacts if this issue is not resolved.

## (b) What is the capacity of CDCR Mental Health Parole Outpatient Clinics (CDCR-POC) to serve additional mentally ill parolees?

I would defer to CDCR staff regarding services capacity of the CDCR POC but on the basis of my prior experience as a County Mental Health Director in both San Mateo and Solano Counties and as Deputy Director in Contra Costa County, it is my opinion that the Parole Outpatient Clinic System historically and currently is unable to meet the needs of the mentally ill parolee population.   This service capacity gap can only be expected to increase if there is a rapid release of POC eligible parolees.  CDCR reported a total of 22, 219 parolees eligible for POC services in February 2008.  Four thousand and eight (4008) of this population was designated as EOP and in need of higher level mental health services.  The release of 15,000 inmates represents a projected 13% increase in the eligible mental health population based on previously discussed estimating methodology.  I believe that this conclusion is supported by the actual

7

current numbers of authorized direct service positions to serve the POC client population and a June 2006 FINAL REPORT ON THE MENTAL HEALTH SERVICES CONTINUUM PROGRAM (MHSCP) OF THE CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION—PAROLE DIVISION that was conducted under contract by the *Integrated Substance Abuse Programs (ISAP) at the University of California, Los Angeles to conduct a process and outcome evaluation of the Mental Health Services Continuum Program (MHSCP).*

The MHSCP evaluation found that parolees with the highest level of mental health need (EOP) had a higher recidivism and prison return rate than the CCCMS population: 60.9% of EOP parolees were returned to prison within 12 months, relative to 53.4% of CCCMS parolees; (pg. 18) In addition the evaluation finds a "a strong relationship between the number of POC sessions attended and recidivism risk for all seriously mentally ill parolees. Specifically, "the greater number of POC contacts a CCCMS/EOP parolee has, the less likely he or she is to be returned to prison. Interestingly, the greatest decline in recidivism risk occurs for parolees who have attended a POC more than four times." (pg. 26) Even without a finding related to the mode/type of services provided by POC which would reflect current evidence on best practice, it is clear that increased frequency and numbers of contacts with a direct service provider reduced recidivism for the POC population.

The previously cited March 28, 2008 Adult Parole Division report provides staff: client caseload ratios for direct service POC staff as follows:

| Statewide Parole Outpatient Clinic Classifications--February 2008 | |
|---|---|
| **Parolee** to **Clinician Ratio** | |
| Staff Psychiatrist **41** | **542:1** |
| Clinical Psychologist **47** | **473:1** |
| Clinical Social Worker **128** | **174:1** |
| Total authorized positions equal 239 including 23 non case carrying supervisory positions. | |

In my experience, these client: clinician ratios dramatically exceed generally accepted community standards for effective services and it is further my understanding that these ratios are significantly higher than standards for care in the State's correctional facilities. In community mental health settings, outpatient case management caseloads of 50:1 are considered too high to provide effective services other than referral and brokerage. Although there is no consistent psychiatrist caseload standard in county mental health departments, it is my opinion and experience that the POC psychiatrist caseloads of 542:1 are at least a third higher and more typically close to double the full time equivalent caseloads of community

8

psychiatrists.

Any prisoner release program that does not insure adequate capacity for even the most basic outpatient services can be expected to fail as measured by parolee recidivism—and if there is a population cap that affects returns to prison, it can be anticipated that these individuals will put new demands on the county programs and local jails.

**(c) What is the capacity of county-based public mental health systems to meet additional service demands and how would public/community mental health programs be impacted by an increase in mentally ill parolees requiring services**—including the impact if a Settlement Agreement is adopted whereby counties are responsible for provision of "local diversionary alternatives to incarceration for low-risk individuals"?

California's county-based public mental health system does not currently have the financial, resource or workforce capacity to dramatically increase the availability of services to seriously mentally ill parolees within a short period of time such as the next several years.

**Financial resources are inadequate and not keeping up with current costs**--California's public community mental health system is operated by 56 counties and two cities with function as the local Medi-Cal mental health plan for Medicaid beneficiaries and indigent care and other related services. (The remaining two of the 58 counties having opted to have services provided through neighboring county mental health plans.) Several key legislative and administration initiatives in the early 1990's: Realignment and Medi-Cal (managed care) Consolidation crafted a State and County relationship in which the State Department of Mental Health directly operated the state hospital system and retained regulatory and quality assurance functions while counties became responsible for the design and provision of community mental health services (and purchased state hospital and acute psychiatric beds) at the local level. County mental health services have been primarily funded through a combination of State Sales Tax and Vehicle License Fees-VLF (Realignment known as the Bronzan-McCorquodale Act, (Chapter 89, Statutes of 1991) and Federal Medicaid funds. Since 2000, it has been necessary for counties to allocate an increasing share of counties' sales tax and VLF revenues to providing a 50% required match to drawn down federal Medicaid funding for Medicaid beneficiaries that require mental health services. This has reduced the level of funding available for services to indigent individuals who do not qualify for federal Medicaid or SSI-linked Medicaid benefits. Indigent services (other than 5150 related services) are provided for seriously mentally individuals only to the extent that resources are available. In addition, the distribution formula for Realignment funds established in 1991 did not undo historical inequities in resource allocation—through growth formula distributions did provide additional funds to under-resourced counties.

9

In 2004, voters approved the Mental Health Services Act (MHSA or Proposition 63) in order to increase the availability and quality of community mental health services to seriously mentally ill and emotionally disturbed children, youth, adults and older adults. It has been widely recognized that California's public mental health system was and still remains unable to meet the needs of the State's seriously mentally ill population with tragic consequences including the "criminalization of mentally ill individuals" and increased homelessness. Target distributions (subject to the submission of successful applications/MHSA plans) were based on a formula that took into account unmet service needs and populations in poverty as well as the historical resource base of each county. Although it is difficult to quantify unmet need, DMH Annual Planning Estimates issued in June 2005 provide documentation of the very real—and unevenly distributed gaps Californian's face in the availability of public sector mental health services.
(http://www.dmh.ca.gov/DMHDocs/docs/letters05/05-02_Encl-1.pdf)

Although the Mental Health Services Act has generated additional resources for the development of new and expanded services, sales tax, VLF and Medicaid funds that support core county mental health services have either decreased or not kept pace with the cost of doing business. At this time there are several California counties that may not have sufficient funds to provide federally mandated Medicaid services and have notified the State-or are considering notifying the State, that they intend to "opt out" and return the program to the State to administer. With the economic slow down of the last several years, many counties have been forced to cut services equivalent to the level of any new services added through the MHSA. These key findings are documented in a March 2006 Report from the California Mental Health Directors Association on History and Funding Sources of California's Public Mental Health System. The gap between funding and need has only gotten worse as the State and local economies continue in a down-turn thus public mental health systems do not have the financial resources to serve a new population of seriously mentally ill parolees and meet their current state and federal obligations to serve other seriously mentally ill residents.

## (d) There is an overall lack of sufficient outpatient and inpatient program capacity including inpatient psychiatric and sub-acute locked institutional/secure settings

The gap in availability of outpatient community services is most directly related to availability of professional and trained professional staffing that is discussed below under "the workforce crisis) –although counties are also struggling with having adequate facilities for service provision of clinic based services. As will be further discussed in my comments on effective/evidence based practices for a seriously mentally ill parole and/or probation population, public mental health systems have learned that case management/coordination and clinical services **are not sufficient in and of themselves** to support the

10