community stabilization and rehabilitation of seriously mentally ill individuals. Findings of the President's New Freedom Commission on Mental Health (2003) and the preponderance of literature on community mental health supports the importance of a range of community support services including supported housing, educational and vocational services, substance abuse treatment, integrated treatment for individuals with co-occurring substance abuse and psychiatric disorders, family education and support and health services. Access to these community supports and services is routinely cited as essential to the successful re-entry for mentally ill prisoners in national studies such as the Report on Re-entry of the Council of State Governments and the reports cited by the Plaintiffs as the basis for the development of safe and effective prison population reduction plans. (April 17, 2008 Supplemental Interrogatory Responses, pg. 9) It is my opinion based on my experience as a County Mental Health Director and my current work as a corrections-focused policy consultant to the California Mental Health Directors Association, that community support services—particularly supported employment opportunities and supervised or supported housing are inadequate to meet the needs of current public mental health clients. These critical community support services—especially residential and supported housing facilities, cannot be brought on-line quickly, or in the next few years. The crisis California faces in the lack of adequate, stable and supported housing for persons with mental illness has been highlighted in the Mental Health Services Act of 2004 and in the Governor's 20-year plan to end homelessness, but it is recognized that it is a long term proposition—estimated to require 20 years to fund and develop the necessary special needs housing.

However, there is an even more immanent crisis that communities are confronting related to the lack—and growing shortage of inpatient psychiatric beds. This gap in bed access and capacity varies significantly by state geographic region. For example, inpatient costs and profits relative to other medical specialties and the need for hospitals to upgrade to meet OSHPD earthquake safety standards, has led to a dramatic decline in the number and availability of inpatient psychiatric beds in the San Francisco Bay Area over the past 5-10 years. In northern and more rural California, counties are forced to transport long distances for inpatient care—particularly with the closure of Shasta County's inpatient psychiatric health facility.

If there is a prisoner release (assumed to be 15,000-40,000 CDCR prisoners for the purposes of this report) over the next several years, and a projected 19-20% or 3,000-7,600 of those parolees are classified as seriously mentally ill, I would expect significant additional demand for crisis and inpatient psychiatric care that the current public (and private) mental health system cannot safely meet. Even if a prisoner release does not include Coleman class seriously mentally ill individuals, it is reasonable to expect an increase in demand for outpatient, but particularly for psychiatric emergency/crisis and psychiatric inpatient care. The Coleman class of prisoners only includes individuals who meet criteria for serious mental illness but the general population subject to release will have mental health problems that particularly if there is increased

substance use in the community, will result in depression, "suicidality" and psychotic symptoms (including psychosis NOS) that require assessment and treatment. These individuals will typically not have SSI-linked Medi-Cal and will become the indigent care responsibility of the counties.

In addition the *Valdivia v Schwarzenegger* federal court injunction of 2007 (previously cited) prohibits CDCR from returning parolees to state correctional facilities for psychiatric treatment—a practice that was used prior to the injunction. There is currently a lack of clarity and agreement between the State Department of Mental Health, county mental health departments and CDCR about agency responsibility and requirements for insuring parolee access to 5150 evaluation and treatment. This is by no means just a financial responsibility question but also a question of how timely assessment and treatment is assured to the parolee once he/she is taken to a 5150 facility as an "inmate". Are 5150 facilities—including private psychiatric hospitals obligated to admit? If an extended evaluation or hold is necessary who is responsible for providing the treatment services and security services? Who is responsible for payment? Under what circumstances would the individual be admitted to a DMH inpatient facility and with what priority? Is the court clear about the differences in the obligation of counties who are responsible for LPS services and which often contract with private hospital facilities for LPS services, and DMH which directly operates only state hospital and prison mental health facilities. These concerns and issues about access to crisis evaluation and inpatient care will be intensified if there is a Coleman class prisoner release. It is critical that the Courts ensure that a plan and capacity is in place to provide crisis evaluation, psychiatric inpatient care and locked sub-acute (locked Imp's) for mentally ill parolees. Failure to identify, quantify and plan capacity to meet this need will almost inevitably result in parolees experiencing community psychiatric crises that cannot be adequately and safely addressed. Currently it is estimated that 7-10% of local law enforcement patrol officer encounters involve individuals with psychiatric disorders—with a significantly higher percentage involving substance use. (Munitz, Griffin)

(e) **The workforce crisis**

Funding short-falls are not the only challenge to counties as they work to provide core community mental health services. The mental health/behavioral health workforce is not adequate to meet current needs—let alone the expanded and focused needs of a justice involved mental health population. Special Master Keating's 5/17/07 report discusses critical vacancy rates of mental health staff at CDCR facilities—and the uneven geographic distribution of vacancies: "...defendants cannot meet at least a substantial portion, amounting in some loose amalgam, to about 33% of acknowledged mental health needs with current staffing resources." (Special Masters Report, PG 14) Just as vacancies are distributed unevenly across State Correctional facilities, critical vacancies in community mental health staffing impact counties disproportionately. Additional challenges include:

12

- Availability/capacity of management, administrative and technical staff to plan, design, implement and supervise new/expanded programs (whether county-operated or contracted with community agency providers); and

- Critical workforce shortages that have resulted in a lack of professionals (and trained paraprofessionals) required providing treatment and rehabilitation programs in community mental health programs and as has been well documented--in correctional facilities.

In addition, the impact of wage competition that was driven by CDCR prison and state hospital health care needs has been well documented and in a number of instances has resulted in high county mental health department vacancy rates in critical professional classes including psychiatrists and licensed clinicians. The shift of currently incarcerated populations to community care will only increase California's behavioral health workforce crisis—especially for skilled professionals. Public mental health systems also confront workforce skill and training gaps. Our workforce is not fully trained in providing therapeutic service interventions identified as best practices for the justice involved mental health population. The focus of state and local agencies on corrections reform and rehabilitation and county mental health MHSA workforce education and training initiatives may provide new opportunities and resources for designing career pathways and collaborative training ventures but these ventures will take time to roll-out and a conscious investment in creating the workforce of the future. Even with the best case scenario and rapid attention to workforce development and training initiatives it will take several years to increase the availability of personnel to provide enhanced correctional mental health services. Failure to take on the challenge of workforce development and failure to provide lead time to educate, recruit and train mental health direct service providers will result in lack of access to needed and appropriate levels and intensity of services—which will only exacerbate the current CDCR POC dilemma with high recidivism and the potential of community backlash and negative consequences including death and suicide for a disturbed and sometime disturbing justice involved mental health population.

In order to create expanded workforce capacity, the State and counties should consider cooperative investments in initiatives such as:
- Specialized masters, post-graduate and continuing education programs in forensic assessment and treatment strategies. For example, the City University of New York's John Jay College of Criminal Justice has recently established a partnership with Arizona State University develop cross-county criminology programs enhance research efforts and strengthen ties between academia and practitioners" (John Jay College Press Announcement 6/18/08) California should be at the forefront of creating such academic training partnerships.
- Community college based initiatives for case management and other paraprofessional staff;

13

- Regional and distance learning best practices training for clinicians and other providers.
- Best practices learning partnerships such as the MIOCR grantees' learning collaborative facilitated by California Institute of Mental Health.

**(f) Additional comments on specific proposals put forth in Supplemental Response to Interrogatory No. 6.**

Although I have discussed problems that would impact implementation of many of the prisoner release options identified by the Plaintiffs, I will comment directly on several of the options identified in Supplemental Response to Interrogatory No. 6. "The Plaintiff's state (pg. 9): "Defendants have numerous, evidence-based population reductions available to them that can be done safel and, in light of the dangerous overcrowding in the prison system right now, could actually improve public safety." While I agree that some of the proposed options have merit, I do not believe that any of the options—if applied to a seriously mentally ill and/or a mentally ill population with co-occurring substance abuse history, can be rapidly, effectively and safely be implemented in the community. My discussion above documents the extreme difficulty local mental health departments and related community service providers face in meeting current, let alone expanded demands. A rapid release of mentally ill prisoner, without adequate and immediately accessible services and resources may reduce overcrowding conditions in the state prison system but it would do so at the cost of increasing risk for many of these prisoners and our communities.

- 2.-*"Provide intensive probation supervision for 18-25 year old offenders."* This option appears to propose a shift of released prisoner supervision from parole to local probation departments under a program of intensive probation supervision. An investment in this younger population, including those transition age youth/young adults with mental illness and a very high rate of co-occurring psychiatric and substance use/abuse disorders could help to interrupt the cycle of relapse/recidivism and incarceration for this population. The caution and concern here—like with many of the other options is that intensive probation supervision must be accompanied by treatment and community integration supports and services. Effective treatment for transition age young adults (TAY) is rarely clinic based and requires the development of staff and resource intensive flexible wraparound services. In general, a seriously emotionally disturbed transition age young adult—including justice system involved TAY's should receive services based on a 1:10 or maximum 1:15 provider to client ratio. The community planning guidelines for the development of transition age youth "full service partnerships" developed by the State Department of Mental Health (posted on DMH-MHSA website) are useful in designing programs. In the San Francisco Bay Area, these programs cost up to $40,000 per year for participant—still a cost savings compared to

14

incarceration.

- 9. *"Implement a Validated Risk Assessment Instrument throughout CDCR..."* The availability and CDCR progress re: implementing a the COMPASS risk assessment tool is a positive step in preparing prisoners and agencies that serve prisoner for community release. However, to my knowledge the COMPASS is not universally completed for all prisoners assessed as "low-risk" and comprehensive data on the individual and aggregate COMPASS assessments has not been provided to the county agencies that should have this information to design effective re-entry plans in collaboration with CDCR. As the CSAC response to the 2008 LAO Parole Realignment Proposal, risk assessment must also focus on more than the most recent violation and incarceration since prisoner whose current offense is low-risk may have committed very serious prior offenses that must be acknowledged in designing community services.

- 11.-*"Expand Alternative Sanctions...to include drug treatment programs, mental health programs providing residential, day treatment ..."* There is not current capacity to provide cited residential treatment and care in either County Alcohol and Other Drug (AOD) systems on Mental Health Departments. Some counties do not have mental health residential treatment facilities and via personal communication, I am aware that there are already concerns that AOD residential treatment beds are being "bought up" by CDCR resulting in diminished access to these critical programs for non-parole populations. The vast majority of counties no longer provide adult day treatment programs but rather have moved to supported and more integrated community support services including supported employment, consumer self-help centers, and supported education.

- 12. *"Divert new court commitments with county subsidy grants similar to SB 81 for housing/treatment of non-violent offenders.."* See previous comment (No. 11) regarding lack of residential facilities. While it would be possible to develop these residential treatment facilities— generally operated by community provider agencies, it would be a multi-year process at best to site (including community use permits), build/rehabilitate facilities. As is well known, community "nimbyism" is also a major barrier to the development of these facilities—and particularly for facilities that serve justice system involved individuals.

- 14. *"Expand Pre-Release Planning services for mentally ill, developmentally disabled, ad other special needs inmates..."* This is a critical step for any release plan to work. Although it is beyond my scope in this expert witness report, I also believe that it is critical to insure that there are adequate plans and provisions for the eventual discharge of individuals with developmental disabilities. There is an even more serious gap in availability of appropriate community-based

15

services for the DD population and as a result, these individuals inappropriately end up in psychiatric institutions and jails.

- 15. *"Redirect funds to counties to manage parolees with mental illness...including (cites, housing and treatment facility placements...and expansion of mental health courts)"* CSAC and its affiliates (See CSAC position on LAO 2008 Parole Realignment Proposal) have stated that a well planned and appropriate realignment of low-risk parolees may ultimately make sense and that many of the best practices in supervision, treatment and rehabilitation would equally address the needs of both parolees and county probationers, however, CSAC opposed this proposal due to lack of clarity and risk-assessment of the population to be "re-aligned", lack of adequate funding guarantees and lack of fully thought out plan that could be expected to succeed. In addition, CSAC and other statewide organizations such as CMHDA were, and remain convinced that any initiative that focuses solely on the back-end of the system through a prison population cap without a equal and parallel development of community based prevention and early interventions services will ultimately fail. And, the consequences of failure to implement prevention and early intervention programs—will be felt in our already over-crowded jail and in our communities.

- 16. *"Establish specialized mental health parole units to provide appropriate supervision, access to treatment, housing and reintegration with the community."* My concerns about access to services and supports have been stated previously. I believe that it would be a positive step to establish specialized mental health parole units with significantly lower caseloads—and that would gain expertise in serving seriously mentally ill parolees. A successful precedent for this type of special population based unit can be found in some of the successful Mentally Ill Offender Crime Reduction grants from the Corrections Standards Authority. (Note: this successful program no longer has funding.)

## 3. Increasing the availability of effective and evidence-based services to mentally ill parolees

Both Referee's (unadopted-draft) Settlement Proposal and Coleman Plaintiff's Supplemental Responses to Defendants' Interrogatories assert that effective and evidence-based re-entry programs that should be put in place to address the populations needs—which Coleman Plaintiffs assert should include all CDCR classifications of CDCR prisoners including the most seriously psychiatrically disturbed. I have reviewed and am familiar with the majority of the cited reports as well as additional nationally recognized reports including but not limited to the Criminal Justice/Mental Health Consensus Project Report and the Re-Entry Report or the Council of State Government, the National GAINS Center for People with Co-Occurring

16

Disorders in the Justice System including the APIC Model: A Best Practice Approach to Community Re-entry from Jails for Inmates with Co-occurring Disorders (Osher, Steadman, and Barr). California's 2007 AB 900 "Rehabilitation Strike Force" report Meeting the Challenges of Rehabilitation in California's Prison and Parole System reviews current research on effective offender treatment. I have also been involved in the design and implementation of effective programs for mentally ill offenders including two MIOCR grants, a mental health court, and the CONREP program for conditional release of mentally ill offenders from the state hospital system and have personal experience with the importance—and the difficulty of implementing best practices in "real world" community environments.

There is a consensus, both nationally and in California, regarding the importance of providing targeted, effective and evidence-based clinical and community support services to parolees and other justice system involved seriously mentally ill individuals in order to prevent recidivism and re-incarceration. And there is agreement that a continuum of services should be available that can be tailored to the specific needs of the mentally ill individual—in order to avoid either over or under-treatment. This growing expert consensus stresses the importance of establishing a coordinated continuum of prevention, early intervention, treatment and rehabilitation that provides/insures access to behavioral health services that are coordinated with justice system intervention and/or sanction and supervision.

**In my opinion however, there is a chasm between this growing expert consensus regarding effective treatment and practices and the knowledge/practice base in the field—both among CDCR POC clinicians and within county mental health and AOD service providers.** The following are several examples of the gap between evidence-based treatment knowledge and practice in the field.

- The 2007 California Expert Panel on Adult Offender and Recidivism Reduction Programming offers a clear opinion that "the CDCR does not offer a sufficient quanitity of evidence-based rehabilitation programs" and includes specific recommendations related to the effectiveness of cognitive/behavioral skills training and therapy (CBT), however, there is no evidence that most POC and public mental health department clinicians are trained and/or competent in CBT.
- Integrated Services for Individuals with serious mental illness and co-occurring mental health disorders—I have addressed the prevalence of co-occurring substance use disorders among seriously mentally ill prisoners—generally understood to be over 75%. In addition, there is clear evidence and a growing consensus that these individuals can only be treated effectively through integrated mental health/substance abuse services. However, there are very few community mental health or substance programs that provide this integrated approach. Any serious effort to promote community release of prisoners—and reduce their 70% recidivism rate, must develop explicit plans for specialized co-occurring disorder treatment. This cannot be achieved without an

17

investment of funding and time to put programs on the ground.

- <u>Community integration supports:</u> Effective mental health/criminal justice services require, state-of-the-art treatment resources, but also health care services, income support, housing, education, jobs and access to social and leisure activities. This means that mental health/criminal justice initiatives must fundamentally rely on other community agencies and institutions and foster social inclusion. Effective parole re-entry initiatives should include specific plans for community integration supports that are specific to each county that would receive paroled offenders.
- <u>Gender, sexual orientation, and culture/race and ethnicity impact access and design of effective mental health treatment interventions and services.</u> One size does not fit all in program design. This understanding of the importance of culturally specific mental health services is largely lacking in the national literature and research on effective practices for the criminal justice involved population. For example, services for women must be gender focused and take into account prevalent experiences of victimization, abuse, trauma and re-dramatization both in the community and in institutions. California has much to offer in developing and documenting services that are responsive to culture, gender and sexual orientation and these issues must be considered in offender release plans
- <u>Transition Age Youth-Young Adults in the Justice System</u>—There is a growing body of effective practice, both service design and specific therapeutic interventions that identify and address the needs of youth as they transition to young adulthood. However, the very structure of criminal justice system institutions create barriers to implementing transition age focused services and supports. For example, the most recent round of Mentally Ill Offender Crime Reduction Grants funded innovative programs for adolescent or adults but were precluded from funding programs that focused on bridging these systems.

## 4. Potential adverse impact of Coleman population release on community safety and risk, the development of community mental health systems, and community acceptance of individuals with mental illness

An accelerated release of prisoners who meet Coleman class criteria can be anticipated to have adverse—and potentially serious consequences for the released prisoners; community mental health systems and the (non-offender status) mentally ill children, adults and older adults they serve; a potentially negative impact on community safety if adequate supervision, treatment services and programs are not in place at the time of the prisoner release; and potentially long-term negative consequences to community acceptance and the development of public mental health services in the future.

18

The focused discussions and conclusions of a special CSAC taskforce that was established to develop a response to the LAO's 2008-09 budget proposal to release up to 72,000 "low-risk" offenders (subsequently "refined" and reduced to a projected 50,000 offenders) and shift community supervision responsibility from parole to local probation departments, describes the concerns that county agencies and communities would have if there were a prisoner release order. In my opinion (and as a member of this CSAC representing CMHDA), these concerns would be magnified in the event of a release order that included all Coleman classes of seriously mentally ill prisoners. It is relevant to note that the legislature did not ultimately support the parole realignment proposal because of the concerns raised by CSAC, CMHDA and others. The CSAC taskforce report (which was accepted by the CSAC Board) had several key conclusions:

- The LAO Parole Realignment proposal focused on "the wrong end of the corrections system and targets the wrong population." The CSAC taskforce advocates a "front-end"/community focus on intercepting criminal justice at risk/involved persons through prevention, early intervention and diversion programs rather than "expecting counties to succeed with offenders who have been subject to severely overcrowded prison conditions,...exposed to harmful criminal influences, and received little in the way of services or preparation for reintegration."

- "Better outcomes cannot be assured..." especially in light of the lack of adequate local services to a substantially larger existing population at the local that is "presently receiving inadequate supervision and services because of a lack of funding."

- "Our existing system needs attention...a realignment of a significant new population will only place additional pressures on a strained and under-funded system.

Rather than a prisoner release plan that fails to take into account the need to prepare communities for prisoner reintegration, CSAC recommended the implementation of recommendations contained in the CDCR Expert Panel Report on Adult Offender and Recidivism Reduction (2007) including establishing community diversion programs to reduce the pressure for state incarceration, the development of community re-entry facilities for low risk offenders, reform of the parole system to expand community supervision for low-risk offenders, and strengthening state/local partnerships to develop the array of prevention, diversion and re-entry services strategies. It is my opinion that these strategies—including an extensive focus on creating and expanding both CDCR-POC and community mental health and substance abuse provider capacity are far more likely than a prison release program to result in a prison population reduction that can both be implemented and sustained over time.

I have just received and briefly reviewed several documents that describe Receiver Kelso's plans for providing additional mental health care for Coleman class prisoners. (Declaration of William Proctor in

19

Support of Motion of Receiver J. Clark Kelso for Order Adjudging Defendants in Contempt for Failure to Fund Receiver's Remedial Projects and/or for an Order Compelling Defendants to Fund Such Projects dated August 13, 2008 and the Operational Guidelines Report, California Health Care Facility, California Prison Health Care Receivership Corporation dated July 8, 2008.) In my opinion, the proposed construction and operation of improved mental health facilities and treatment through the construction and staffing of Consolidated Health Care Facilities (CHFC's)—to include 5000 beds and treatment facilities for seriously mentally ill inmates/patients, offers a more reasonable and considered resolution to the impact of overcrowding on Coleman class prisons than a potential prisoner release to communities that are unprepared to meet their needs. It is also my opinion and caution that this plan to operated CHFC's can only provide part of the long term solution. As was at least partially envisioned under the provisions of AB 900, there is also a continuing and urgent need for the State to insure the development of community capacity to provide prevention, early intervention and treatment services that will address and reduce the number of seriously mentally ill individuals who become involved in the criminal justice system. Addressing either approach to resolving this crisis in isolation will fail in the long run. I reserve the right to supplement and update my analysis of the information addressed above as time permits in the future.

**I will conclude this report with a brief summary of my opinion about the likely consequences of an inadequately planned, funded or implemented prisoner release program(s) for seriously mentally ill prisoners.**

Consequences for released prisoners—Our current fail-first system has already demonstrated that there is every reason to expect that prisoners with serious mental illness and a criminal history will fail to follow-up on mental health and substance abuse treatment, including taking psychiatric medications, in the absence of an effectively functioning system of low caseload parole/probation supervision and easily accessible evidence-based mental health treatment, including integrated mental healthsubstance abuse services. Seventy-five-eighty percent of these individuals have a prior history of substance use/abuse that dramatically exacerbates psychiatric symptoms and this is one of the key factors that is known to be predictive of increased violence/harm to self or others. There is a much higher risk of suicide in this population than the general public. It is likely that these individuals will continue to experience high recidivism rate that CDCR currently reports—and that they will use a disproportionate share of local criminal justice and mental health and other health and social services. Nationally recognized programs, including California's MIOCR and CONREP programs have demonstrated that mentally ill offenders can achieve a much higher level of psychiatric stability, rehabilitation and assume positive community roles if appropriate supervision, services and supports are in place.

Negative impact on community mental health systems—California's county-based community mental health systems are already over-burdened and unable to address the needs of their seriously mentally ill

populations. Even in the face of a continuing budget crisis, the passage of the Mental Health Services Act of 2004 brings hope that over time a better resourced and more effective public mental health system of care will be able to focus on prevention and early intervention services that can reduce or mitigate some of the consequences of serious mental illness to affected individuals, their families and communities. More effective and timely interventions and services have been demonstrated to reduce community, institutional and criminal justice system costs. However, public mental health systems must also function to help counties manage their population and community risk. An ill-planned and poorly resourced prisoner release order is likely to result in county mental health departments being forced to shift the balance of their resources to address community safety issues—with a higher percentage of community treatment resources being directed to high-end/high cost crisis and inpatient/institutional services to a justice involved/parolee population that is assessed to present a danger to themselves or others as a result of mental illness. This shifts the balance of resources to highest cost interventions at the expense of prevention and less costly community-based services. Ultimately, the lack of adequate prevention, early intervention treatment and diversion resources will perpetuate the cycle of the criminalization of individuals with mental illness who are then incarcerated in our jails and prisons.

Impact on law enforcement, the courts and county jails—Seven to ten percent of local police officer community incidents involve individuals who have (broadly defined) mental health issues. When mentally ill individuals commit crimes, even relatively low level crimes, they cycle through the local criminal justice system. They are among the most difficult and costly inmates in local jails—and serve sentences that are disproportionately long in relation to their offense. With few exceptions, county jails do not have facilities or the capacity to provide appropriate or effective mental health care—and do not have correctional facility based involuntary inpatient psychiatric treatment options. County correctional facilities are forced to house inmates who are incompetent to stand trial for felony offenses—not uncommonly for 6 months or longer because state hospitals have staffing shortages and will not admit. DA's and Public/Private Defenders find preparation, prosecution and defense of cases involving individuals with serious mental illness-among their most challenging and time-consuming. Superior Courts are establishing mental health and behavioral health courts at an increasing rate and though these courts have positive results, they are labor intensive for both the justice system and treatment providers. County Probation Departments have extremely high caseloads and typically "bank" cases that are assessed as lower level risk. Probation Departments rarely have the resources for the more intensive supervision demonstrated to be a contributor to lower recidivism in multiple MIOCR grant-funded programs to reduce recidivism and re-arrest. This is the local criminal justice system as it currently struggles to respond to individuals with mental illness and co-occurring psychiatric and substance abuse disorders. A prisoner release—and particularly a prisoner release that includes Coleman class seriously mentally ill prisoners will have a significant negative impact on an already over-burdened system. This could also have the effect of reducing or eliminating some of the very

programs that are proving effective for the justice involved mentally ill population—simply as a result of increased demand and pressures on the local criminal justice system.

<u>Potential impact and implications for community acceptance of individuals with mental illness</u>—The first <u>US Surgeon General's Report on Mental Health</u> (1999) and the subsequent <u>US Surgeon General's Report Supplement on Mental Health:Culture Race and Ethnicity</u> (2001) identified stigma and discrimination as the greatest barriers to mentally ill individuals accessing needed treatment. The general public's fear of individuals with mental illness and discriminatory practices related to this fear including a lack of understanding of mental illness have historically created barriers to the development of community mental health services and facilities—particularly, specialized treatment facilities and housing. Over the past decade, there has been progress in public awareness and acceptance of individuals with mental illness. There has even been an increase in awareness of the importance of addressing the unnecessary "criminalization" of seriously mentally ill individuals—and, in my opinion some small reduction in the automatic assumption on the part of the general public that individuals with mental illness are more violent than the general population. However, an inadequately planned and implemented Coleman class mentally ill prisoner release (or even a general prisoner release without adequate supervision and community service supports,) is likely to result in an increase in community incidents. Even a small number of these incidents has the potential of slowing or reversing the gains of mental health advocates and the mental health system over the past ten years. A strong and effective community mental health system—and one that mentally ill individuals are not afraid and ashamed to use, is one of the keys to reducing the criminalization of individuals with mental illness—and ultimately to reducing the State's prison population.

Mentally ill prisoners have a right to humane and effective services, but in my opinion, the key to effective care and the reduction of over-crowding in our institutions is to insure the availability of sufficient resources in our communities that prevent avoidable incarceration and to insure that an appropriate array of effective supervision, treatment and community support services are fully available and accessible to insure safe community integration and rehabilitation when individuals with mental illness do commit crimes.

I reserve the right to supplement this report as additional information becomes available.

## (II) the data or other information considered by the witness in forming opinion; Include list of reports and references reviewed

The following publications, reports and data were reviewed in preparation and as citations for this report.

1) A letter from the California State Association of Counties to Martin J. Mayer dated September 14, 2007 entitled "Potential County Impacts Resulting from a Prison Population Cap."

2) Plaintiff Coleman's Supplemental Responses to Defendants' Interrogatories, set one, served April 11, 2008.

3) The July 2, 2008 scheduling order issued by the Three-Judge Panel.

4) The Final Report on the Mental Health Services Continuum Program of the California Department of Corrections and Rehabilitation-Parole Division dated June 30, 2006.

5) Coleman Special Master Keating's Response to the Coleman Court's May 17, 2007 Request for Information.

6) The Coleman Special Master's report on suicides at CDCR for calendar year 2005.

7) R. Patterson and K. Hughes. 2008. "Review of Completed Suicides in the California Department of Corrections and rehabilitation, 1999-2004." *Psychiatric Services.* 59 (June): 676-682.

8) Status Report filed by Settlement Referee and Consultant dated June 2, 2008.

9) Supplemental Status Report filed by Settlement Referee and Consultant dated June 30, 2008.

10) Draft Settlement Proposal dated May 27, 2008.

11) California Prisoners & Parolees, 2006, Offender Information Services, Data Analysis Unit.

12) Mentally Ill Parolee Population, 3-28-2008, Report by the CDCR Division of Adult Parole Operations.

13) Ca Prevalence Rates for Serious Mental Illness:
http://www.dmh.ca.gov/Statistics_and_Data_Analysis/CNE/p5wsmi01_caindex1.htm

14) DMH—Mental Health Services Act; Annual Planning Estimates for the Three-Year Community Services and Supports Funding, 2005
http://www.dmh.ca.gov/DMHDocs/docs/letters05/05-02_Encl-1.pdf

15) DMH Mental Health Services Act Five-Year Workforce Education and Training Development Plan for the Period April 2008- April 2013, CA Dept. of Mental Health (2008)
http://www.dmh.ca.gov/Prop_63/MHSA/Workforce_Education_and_Training/docs/MHSA_FiveYear

23

Plan_5-06-08.pdf

16) Mental Health Services Act "Progress Report" July 2008, CA DMH
http://www.dmh.ca.gov/Prop_63/MHSA/Publications/docs/ProgressReports/MHSA_Progress_July2008.pdf

17) Corrections Reform: County Policy Principles and Guidelines, California State Association of
http://www.csac.counties.org/images/users/1/CSAC%20Corrections%20Policy%20Revision_%20adopted%20by%20BOD%2052208.pdf

18) Implementation of AB 900, CMHDA Testimony Provided Senate Budget and Fiscal Review Committee No. 4, Patricia Ryan, Executive Director, CMHDA, April 11, 2008,
http://www.cmhda.org/public_policy/documents/State%20Docs/State%20Advocacy_Legislative%20Letters/Assembly%20Bills/0804_AB%20900_CMHDA%20testimony%20to%20Sen%20Budget%20subcom4-4-08gbfinal.pdf

19) History and Funding Sources of California's Mental Health System, Patricia Ryan, Executive Director CMHDA, 2006, CMHDA Website Library http://www.cmhda.org/breaking_news/news.html

20) CDCR Report, Integrated Strategy to Address Overcrowding in CDCR's Adult Institutions, June 2008 http://www.cdcr.ca.gov/News/docs/2008_06_18_REDUCE_overcrowding_Docs.pdf

21) Report of the Re-Entry Policy Council: Charting the Safe and Successful Return of Prisoners to the Community. Council of State Governments. Reentry Policy Council. New York: Council of State Governments, 2005. http://www.reentrypolicy.org/report

22) New Freedom Commission on Mental Health Report to the President, 2003,
www.mentalhealthcommission.gov/index.html

23) Teplin, LA, Abram, KA, & McClelland, GM (1996) Prevalence of psychiatric disorders among incarcerated women: I. Pretrial jail detainees. *Archives of General Psychiatry*, 53, 505-512

24) Mark R. Muntz, MD & Patricia A. Griffin PhD.,"Use of the Sequential Intercept Model as An Approach to Decriminalization of People with Mental Illness," PSYCHIATRIC SERVICES ♦ ps.psychiatryonline.org ♦ April 2006   Vol. 57   No. 4

25) Criminal Justice Mental Health Consensus Project, Council of State Governments. Criminal Justice / Mental Health Consensus Project. New York: Council of State Governments. June 2002. Web citation:  Consensusproject.org

26) National GAINS Center, Co-Occurring Disorders and Justice Center, Center for Mental Health Services, Evidence Based Practice and Expert Panel Reports available on website
http://gainscenter.samhsa.gov/html/

27) US Surgeon General's Report on Mental Health (1999) and US Surgeon General's Report Supplement on Mental Health: Culture Race and Ethnicity (2001)

24

28) Declaration of William Proctor in Support of Motion of Receiver J. Clark Kelso for Order Adjudging Defendants in Contempt for Failure to Fund Receiver's Remedial Projects and/or for an Order Compelling Defendants to Fund Such Projects dated August 13, 2008

29) Operational Guidelines Report, California Health Care Facility, California Prison Health Care Receivership Corporation dated July 8, 2008

### (III) any exhibits that will be used to summarize or support them;

At this time there are no exhibits attached to support this report.

### (IV) the witness's qualifications, including a list of all publications authored in the previous 10 years;

See attached Resume. I have a Masters in Social Work from San Francisco State University and have worked as an upper level manager in three California' County Mental Health Systems from 1981-2008 including holding the position of Mental Health Director in two Bay Area counties for over 17 years. I have held active leadership roles in the California Mental Health Directors Association (CMHDA) including serving as President and on the Governing Board and most recently as Chair of the CMHDA Forensic Committee. Since retiring as a County Mental Health/Behavioral Health Director in January 2008, I have provided consultation services to CMHDA on corrections policy and community corrections issues including the development of CMHDA legislative testimony regarding AB 900 implementation issues and the LAO's Parole Realignment Proposal. I represent CMHDA on various task forces and committees related to mental health corrections issues and corrections reform including:

--CA Judicial Counsel: Judicial Task Force on Criminal Justice Collaboration on Mental Health Issues and serve on two sub-committee regarding Re-entry Services and Co-occurring Mental Health and Substance Abuse Disorders.

CA State Association of Counties (CSAC) Corrections Issues and Implementation Work Group as well as the CSAC Administration of Justice Parole Realignment Task Force that was formed to analyze and respond to the Legislative Analyst Office's 2008 budget proposal to release non-violent offenders and realign significant State Parole functions to County Probation Departments.

As Mental Health Director for San Mateo County (5/2001-1/2008) I served on local corrections related committees and task forces including: Superior Court of San Mateo's Mental Health Court Planning and Oversight Committee as well as the Board of Supervisors Criminal Justice Committee and its Re-entry Sub-committee.

Recent workshop and conference presentations:

25

- The Stanford Executive Sessions on Sentencing and Corrections, "California Corrections Reform: State/Local Partnerships, participant and speaker—6/2007

- From Words to Deeds IV: Changing the Paradigm for Criminal Justice and Mental Health, sponsored by the Council on Mentally Ill Offenders, workshop moderator— 2007

- California Mental Health Policy Forum; "Mental Health and Criminal Justice: Serving our Communities Together"-9/2007

- CSAC Annual Conference, Workshop on AB 900 Implementation, presenter—11/2007

- California Mental Health Directors Association All Directors Meeting; organized and panel presenter on "Community Corrections: Politics, Policy and Practice" -6/2008

**Publications:**

Abbott, Beverly, Gale Bataille, Sandra Goodwin, Co-Editors "Women and Mental Illness" The Journal of NAMI California, December 1999, Vol.10, No. 4., and authors of "Gender Matters", pg. 4-7.

Bataille, Gale, Ken Anderson and Susan Penner, "Solano County's Experience: A Public/Private Sector Venture in Managed Mental Health", Administration & Policy in Mental Health, Jan. 1995, Vol 22, No. 3.

Bataille, Gale, "Psychotherapy and Community Support: Community Mental Health Systems in Transition", New Directions in Mental Health Services, 1990, #48, Jossey-Bass, Inc.

Bataille, Gale and Crowell, Areta, "Why Not California? Dual Diagnosis and Fragmented Care", Journal of the California Alliance for the Mentally Ill, Winter 1991, Vol. 2, No. 2.

**(v) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition**

I have not served as an expert witness or testified at any trial during the previous 4 years.

**(VI) statement of the compensation to be paid for the study and testimony in the case.**

I have agreed to a compensation rate of $200.00 per hour for expert witness report preparation including research, review of documents and drafting the report. I have agreed to compensation rate of $250.00 per hour for expert witness depositions, testimony and related activities.

*Gale Bataille, MSW*

Gale Bataille, M.S.W.

August 15, 2008

26

# EXHIBIT A

(510) 224-0248
gale.bataille@mac.com

# Gale G. Bataille, M.S.W.

**Qualifications Summary:** Senior Executive with over thirty years of experience in planning, program development, administration and financial management of mental health and alcohol and drug abuse services and systems.

**Education:** Masters in Social Work, San Francisco State University, California, 1984, Specialization in Program Operations/Administration

B.A. with Honors in Psychology, Oberlin College, Ohio 1969

**Work History:**

### Independent Consultant, March 2008 – present

Consultation regarding mental health and behavioral health policy and systems development with particular focus on community mental health systems change processes and criminal justice policy as it impacts local systems of behavioral health care.

### San Mateo Mental Health Division, Health Services Department
### Director, Behavioral Health and Recovery Services, May 2001 – Jan. 2008

As County Mental Health Director, directed all service and administrative functions of County Mental Health Service and effective 6/2007 mental health and alcohol and other drug services with a $115 million budget, over 400 staff and multiple contracted community and institutional services. Active in statewide leadership functions related to community mental health policy and services provision. Retired 2008.

### Assistant Director, Mental Health Services, October 2000 – May 2001

Supervised managed care functions including coordination with State agencies; human resources, contract and budget development administration.

### Health and Social Services Department, Solano County, CA
### Mental Health Director, 1990 – 2000

Directed County Mental Health Division with a $31 million budget and over 225 staff and contracted community and institutional services. Developed and implemented California's first county-operated Mental Health Managed Care System; implemented services redesign in order to manage risk, insure access, quality and continuity of services; enhanced community support services to seriously mentally ill children and adults; promoted consumer self-help and peer support services; implemented cultural competence plan cited for excellence by WICHE.

### Deputy Director for Alcohol, Drug Abuse and Mental Health Services, Contra Costa County Health Services Department, 1984-2000

Supervised three Regional Mental Health Centers, Case Management,

Alcohol and Drug Programs with combined budgets of $25 million; directed program planning; developed contract monitoring system; designed policy and program(s) for substance abusing mentally ill persons including award of Federal demonstration grant (1987) for co-occurring disorders.

Chief of Planning and Evaluation 7/82 – 11/83

Continuing Care Director, 1/81 – 6/82

**Bay Area Community Services, Inc.**, Oakland, California

Director, Allso House 1974 – 1980

Developed and directed a 15 bed residential treatment facility for seriously mentally ill adults. President of California Association of Social Rehabilitation Agencies (CASRA) 1979 – 80

**American Friends Service Committee, Community Relations Division**, Philadelphia, PA 1972 –1973

Staff to National Woman's Project and consultant to women's self-help and consciousness raising groups.

**Health Information Project**, Philadelphia, PA, Founder & Staff, 1970 –1972

**Organizational And Professional Activities:**

**Workshops/Conferences:** Presenter and conference organizer for workshops regarding Community Corrections, Mental Health Managed Care, Co-Occurring Disorders, System Change, Consumer Empowerment and Self-Help, Wellness and Recovery, Children's System of Care, Women's Mental Health and Employment Services for Psychiatrically Disabled Adults.

**California Mental Health Directors Association**
Emeritus Mental Health Director member, January 2008- present
President 1995 – 1996;President Elect 1994 -1995; Sec/Tres 1993 –1994
Governing Board/Executive Committee, 1991 – 2000; 2006-2008
Chair, Forensic Committee 2006-2008
AB 3632 CMHDA Task Force-2003-present
Future of State Hospitals Committee, Co-Chair with California Department of Mental Health, 1993 – 1994
Chair, Greater Bay Area Mental Health Directors, 1991 – 1993
Chair, State Hospital Task Force/Long Term Care Committee, 1990 – 1993
Co-Chair, Employment Services Committee, 1989 – 1991

**California Institute for Mental Health Services**
President of Board, 1996 – 2000; Board of Directors, 1993 – 2006
Center for Multicultural Development Advisory Committee, May 2000 – present

**Mental Health Consumer Concerns, Inc.**, Board of Directors, May 2008 - present

**California Mental Health Planning Council**, 1996 – 2000
Appointed 1/96, Executive Committee, Chair, Policy and Planning Committee, 1/2000 – 12/2000

**Women's Mental Health Policy Council**, founding member, Steering Committee, 1998 – 2005

**American College of Mental Health Administration**, Fellow, 1997–present

**Governor's Committee for the Employment of Disabled Persons**, Appointed member, 10/93 – 3/96

State Department of Mental Health/State Department of Alcohol and Drug Programs Dual Diagnosis Task Force, member, 1994 – 1997

Solano County Children's Policy & Planning Committee, 1993 – 9/2000

Juvenile Justice Coordinating Council, Solano County, 1997 – 9/2000

Community Cancer Task Force, Coalition for Better Health, 1997

Robert Wood Johnson Foundation, Fighting Back Partnership, Vallejo, California, Steering Committee, 1991 – 1993

**Professional Publications:**

Abbott, Beverly, Gale Bataille, Sandra Goodwin, Co-Editors "Women and Mental Illness" The Journal of NAMI California, December 1999, Vol.10, No. 4., and authors of "Gender Matters", pg. 4-7.

Bataille, Gale, Ken Anderson and Susan Penner, "Solano County's Experience: A Public-Private Sector Venture in Managed Mental Health", Administration & Policy in Mental Health, January 1995, Vol 22, No. 3.

Bataille, Gale, "Psychotherapy and Community Support: Community Mental Health Systems in Transition", New Directions in Mental Health Services, 1990, #48, Jossey-Bass, Inc.

Bataille, Gale and Crowell, Areta, "Why Not California? Dual Diagnosis and Fragmented Care", Journal of the California Alliance for the Mentally Ill, Winter 1991, Vol. 2, No. 2.