# EXHIBIT M

# REBUTTAL REPORT

# OF GALE BATAILLE, MSW

## Gale Bataille—Rebuttal to Plaintiffs' Reports

August 27, 2008

### (i) Rebuttal and professional opinion regarding Plaintiffs' Expert Opinion reports as they pertain to:

1. Plaintiff's assumptions about the characteristics of the Coleman class population and the needs of these Coleman class prisoners for mental health and integrated mental health/substance use treatment if they are released to our communities on parole.

2 The potential impact of a prisoner release order on public safety given various potential prisoner release scenarios envisioned by the plaintiffs;

3. The capacity of California's mental health programs to meet the needs of Coleman class parolees as well as the needs of the general population of released prisoners who may experience mental health needs. I will discuss my opinion that Plaintiff's expert witnesses do not appear to have sufficient or current knowledge of the capacity—or more importantly, California's lack of resource capacity to meet the needs of released Coleman class prisoners in the following areas of mental health services: CDCR parole outpatient clinics; State Department of Mental Health programs; county and private psychiatric emergency services and acute psychiatric and chemical dependency inpatient hospitals, and county operated or contracted community mental health and mental health/substance abuse services;

4. Additional recommendations regarding potential strategies and services to more effectively and safely reduce the population in California's prisons including plans described by CDCR, CSAC, CMHDA and several legislative initiatives.

I have reviewed Plaintiffs expert witness reports by James Gilligan, M.D.; Joseph Lehman; James Austin PhD; and Pablo Steward M.D. In addition, I have reviewed the reports of County Interveners—San Mateo County and Santa Clara County and Defendants' expert witness, James Marquart, Ph.D. My comments and expanded opinions are based on references cited in my report submitted on August 15th as well as a June 25, 2008 updated report on psychiatric bed closures from the California Hospital Association's Center for Behavioral Health and telephonic communication with representatives of the California Mental Health Directors Association.

### 1. Plaintiff's assumptions about the characteristics of the Coleman class population, including violence potential and the needs of these prisoners for mental health and integrated mental health/substance use treatment if they are released to our communities.

Dr. James Gilligan provides extensive comment on the characteristics of mentally ill prisoners, what is known and generally accepted in the literature about the prevalence and predictors of violence among individuals with mental illness in comparison with the prevalence and predictors and of violence in the general population. Dr. Gilligan poses the question: (paragraphs 34 ff.) Are mentally ill offenders (MIO's) as a group more dangerous than non-MIO offenders? He cites a research study (unpublished manuscript) of California parolees (#36) that concludes mentally ill

1

offenders are no more likely than non-mentally ill offenders to commit violent crimes after release from prison. He further cites and discusses a meta-analysis (Bonta and Hanson, 1998,) that finds persons with severe mental illness were neither "more nor less likely than the non-mentally ill to re-offend" and that individuals with certain serious psychiatric disorders including schizophrenia and major depression are actually less likely to re-offend with only a modest increased risk of violence among paroled mentally ill offenders that is related to other risk factors including past violence.

In my career as a County Mental Health Director, I have had extensive experience in locating and implementing mental health services in community settings. I have often had to confront public fear and distortions regarding the violence potential of individuals with mental illness and I have made many of the same arguments and cited much of the same research that Dr. Gilligan references. However, there are certain characteristics and environmental factors that do correlate with increased violence potential of persons with mental illness as well as those with criminal justice involvement and the general public. As is acknowledged by Dr. Gilligan, **"Criminal history, antisocial personality, substance abuse**, and family dysfunction" were the most powerful predictors [of violence,] in mentally ill and non-mentally ill parolees. While, there are common predictors or correlates of future criminal behavior for mentally ill and non mentally ill populations, Dr. Gilligan and the other Plaintiff's experts generally fail to discuss and take into consideration **that there is an extremely high rate of co-occurring substance abuse within the mentally ill justice involved population—at least 75 % of mentally ill prisoners.** [Note: I provided an extensive discussion of this issue in my 8-15-08 Expert Opinion.] The use/abuse of alcohol and other drugs is often a trigger and antecedent to psychiatric de-compensation that may lead to (brief) psychotic episodes **and** as noted by Bonta and Hansen (pg. 139) "Hallucinations and delusions may trigger anti-social acts in the immediate situation and have high predictive validity in the short-term…however such symptoms may have little predictive validity in the long term." One of the few other predictors of future violence is a prior history of violence. It is reasonable to assume that mentally ill individuals who are incarcerated in the state's correctional facilities have a significantly higher rate of prior violence in their histories than individuals with mental illness who live in our communities.

My intention in raising these concerns is not to argue that mentally ill prisoners are violent and should not be released. Rather, I would argue that it is critical to develop a clear understanding of the risks and characteristics of the mentally ill prisoner and parole population and to responsibly plan to meet the supervision, treatment and rehabilitation needs of this population when they are released into the community. Even if we accept the general conclusion of Dr. Gilligan that there is no greater risk of violence in the seriously mentally ill parolee population than among other parolees, any episodes of violence committed by mentally ill parolees will be magnified by the press and can be expected to lead to disproportionate fear and discriminatory responses by the public. It is almost inevitable that there will be such community incidents in the future—just as it is inevitable that there will be violent acts committed by parolees who are not mentally ill. I am concerned that in his effort to combat over-blown stereotypes of violent mentally ill persons, Dr. Gilligan fails to adequately acknowledge the population risks that exist and fails to adequately advocate for effective plans or services to address the needs of seriously mentally ill parolees. The question that must be considered is whether the Courts, the State and local mental health systems will be able to say to the public when a mentally ill parolee commits an act of violence (as will inevitably occur)--that this incident must be understood as a rare exception, no more likely to happen than an incident of violence in the general public, because State and local mental health

2

systems have been put in place to insure needed supervision and treatment. In my opinion we are not in a position to make that assertion.

## 2. What elements should be included in prisoner release order that appropriately considers public safety in light of prisoner release scenarios envisioned by the Plaintiffs?

Plaintiff's expert witness reports generally concur that a prisoner release order including Coleman class prisoners can be safely implemented if there is a range/types of services in place to provide appropriate supervision, community support and mental health services to parolees. What is lacking in all of the Plaintiff's expert reports are specifics that either demonstrate that adequate services are in place or that there is an adequate plan to have these services in place **prior to a Coleman class prisoner release.**

**Gilligan Opinion**--Dr. Gilligan asks: "Would a prisoner release order that includes an incremental decrease in length of stay or diversion of mentally ill offenders adversely impact safety?" He concludes (16. b) that a responsible prisoner release program that provides the basic elements of treatment and support to mentally ill offenders—including pre-release planning, access to care in the community including services to individuals with co-occurring mental illness and addiction would not adversely impact public safety.  Dr. Gilligan argues that a responsible release plan would reduce the "churning" of mentally ill prisoners that results in short incarcerations with prisoners emerging "sicker than when they went in" and acknowledges that "without adequate plans for treatment services in the community this "churning" will continue. (# 25)  He comments positively on his experience with a 1997-2004 program for violence reduction conducted with San Francisco County's correctional facilities that resulted in a 100% reduction in institutional violence and 83% reduction in re-arrest for violent crimes.  However, good results for a pilot program in San Francisco County--which has an exemplary jail mental health service, has been a leader in supporting community based services and has greater access to resources than most California counties, don't translate to other California counties.

We must consider the impact if the numbers of seriously mentally ill parolees are increased under a Coleman release order. Dr. Gilligan states that large numbers of individuals are already recidivating--over 6000 per year.  This is a reflection of insufficient and inadequate treatment services for CCCMH and EOP parolees.

What Dr. Gilligan fails to provide in his expert opinion is any real data that proves that California has a plan, is prepared, or capable of providing supervision, community mental health/substance abuse treatment and support services that would constitute the "responsible prisoner release program" that he supports.

**Austin Opinion**--James Austin discusses the problems with California's "catch and release program" that results in a high rate of technical parole violations and high re-incarceration rates. Austin argues that imprisonment of parole violators "actually worsens public safety because it disrupts any effort to stabilize parolees and the communities in which they reside."  Austin discusses various methods for diversion and sentence reductions, and argues using data from

3

Amador, Fresno and Los Angeles counties, that there would be a minimal impact on local jails and corrections systems. In my experience working in three counties (Contra Costa, Solano and San Mateo) even the "minimal" effects that Austin describes would have serious consequences for California's counties overcrowded jails and high probation caseloads. Austin argues, "If a diversion program is implemented simultaneously with providing evidence-based programming, public safety might actually improve because research shows that technical parole violators and low-risk offenders have higher recidivism rates when incarcerated, and lower recidivism rates when provided appropriate evidence-based programming in the community." (#91-pg. 39)
In my opinion, Austin provides no evidence that such diversion programs are in place and he fails to address the impact on public safety if adequate diversion plans and resources are not in place prior to a prisoner release.

**Lehman Opinion**—Joseph Lehman offers his opinion that prison over-crowding can be reduced while maintaining public safety through implementing recommendations contained in CDCR's Expert Panel to Reduce Overcrowding where he served as Chair of the Model Program Sub-Committee. Included in the recommendations he cites is the importance of developing partnerships between state and local corrections agencies. I would add that these partnerships must be expanded to include partnerships with counties and their network of mental health, health and social services agencies that will be impacted and may be called upon to play key roles in serving released Coleman class prisoners. Lehman provides no opinion about the progress that the State has made in implementing these Model Program recommendations, nor does he identify which of these recommendations must be implemented in order to implement an effective prison population reduction plan that will maximize safety for released seriously mentally ill parolees or the public.

**Stewart Opinion**--Pablo Stewart, M.D. states that "the State can include the Coleman class in population reduction plans without adversely affecting public safety and should do so. Moreover, if the State enhanced the services provided to released individuals, public safety would improve." (Part 02, Opinion 3, pg. 3) He goes on to state: "When considering the public safety impacts of such a program,…**it is important to understand who these individuals are** and what systems already exist in the community." Dr. Stewart documents in extensive detail that poor mental health care in CDCR prisons actually means that accurate assessments—including diagnosis, level of care needs and risk assessments, are not available for prisoners who may be released to community parole status under a Coleman class release. According to Stewart:

- "The severe shortage of mental health beds has created a system that houses a significant portion of Coleman class members at lower levels of care than the patients clinically required. A significant number of class members who I interviewed at the EOP level of care, for instance, required inpatient psychiatric hospitalization. …I was struck by the very high acuity of the patients I encountered during my tours because they were much sicker, as a whole, than the Coleman class members I encountered between 1990 and 2000." (# 88, pg. 36-37) Dr. Stewart provides examples of cases of prisoner who are classified as Coleman class seriously mentally ill but "where medical files fail to note Dementia due to HIV disease and Cognitive Disorder NOS" (89 a./b.) as well as serious medication non-compliance issues (99) and problems with medical records. (102)

4

In my opinion, Stewart's assessment of conditions within CDCR prisons logically leads to the question of why the Court, counties or our communities should be in any way assured that we have adequate information about the needed level of community treatment supports for a Coleman prisoner release. According to Stewart, prison conditions of overcrowding, incomplete diagnoses, lack of access to treatment and placement at the appropriate levels of care, lack of appropriately prescribed and monitored medications has led to a population whose symptoms and severity is increasing and worsening.  These conditions in CDCR operated prisons, as disturbing as they are, raise very serious questions about who might be released in a prisoner release program and whether CDCR-POC or other contracted providers would be prepared to offer the necessary treatment and supervision need to insure both parolee safety and access to appropriate care—and potentially community safety.

Dr. Stewart discusses the various levels of care that are provided to Coleman class prisoners (CCCMS, EOP…) in the prisons and cites CDCR Program Guide Standards of Care that "recognize that there is a spectrum of needs within the CCCMH group **and that in the community CCCMH individuals would need parallel levels of treatment**, with many needing medication and follow-up, and some who would benefit from additional case management that would include assistance with accessing community mental health services, substance abuse treatment, housing, benefits and employment.…  Just as in prison, the vast majority of parolees will rarely require more intensive levels of mental health care such as crisis care, day treatment or hospitalization, in the community." (#133)  Dr. Stewart goes on to state that far smaller number of EOP parolees can be expected to require more intensive levels of care.  I do not understand how Dr. Stewart can make any assumption regarding the number and needs of EOP parolees given his previously cited critique of classification/diagnosis and care in the prisons.

I would concur with the general description of the range of services described by Dr. Stewart as necessary to treat and stabilize CCCMH and EOP parolee populations with several key exceptions:

--It cannot be assumed that the standards of care and clinician ratios in correctional facilities should appropriately be applied to community settings—and in fact as I documented in my 8-15 opinion, CDCS POC caseloads exceed those in California's prisons—not a standard to be emulated.

--Dr. Stewart cites day treatment as a service that should be provided, yet day treatment is not considered state of the art treatment in contrast to Assertive Community Treatment (ACT) or intensive rehabilitative and wrap around services-- which are.  In addition he does not provide adequate discussion of the need for integrated services for co-occurring mental health/substance abuse disorders when it is generally understood that individuals with serious mental illness and substance use/abuse usually fail—or are not accepted in traditional drug treatment programs. Based on prevalence data at least 75% of CCCMH and EOP parolees will have co-occurring substance use/abuse.

--Neither Dr. Stewart nor any of the other Plaintiffs' experts provide an adequate discussion/description of the critical need and lack of availability of integrated services for seriously mentally ill individuals with co-occurring substance abuse disorders.

-- Dr. Stewart appears to imply (or assume) that there are adequate and appropriate resources in the community for effective outpatient level of services to the CCCMS Coleman class of parolees.  However, I have demonstrated in my

5

8/15 opinion (Ref: pg. 8) that the POC does not have sufficient staffing to provide adequate outpatient and case management services to the current parole population.

Dr. Marquart, an expert witness retained by Coleman Defendants states: "However diversion, without the proper community support systems will simply lead to additional recidivism." (PG 14) And, "...prior to any release order, there must be the proper infrastructure established to handle the already burdensome workload in the parole division and in probation...The ripple effect of a blanket release order will severely strain county level mental health departments, county alcohol and drug treatment programs, housing, and foster additional competition for jobs in local communities, as well as strain local criminal justice, systems, especially county jails. (PG 15-16.)  Marquet discusses the Texas experience with prison caps and prisoner releases detailing the negative impacts on local jails, communities and community safety.  Does California want to emulate the failed Texas program?

My greatest concern with the opinions of Drs. Gilligan, Austin and Stewart is that simply asserting that seriously mentally ill prisoners can be safely released if there is a "responsible release program" (Gilligan) and basic agreement among experts that a spectrum of services is required (Gilligan, Austin, Stewart) provides no assurance that a plan is in place or that services exist to support a Coleman class prisoner release program.  Further, I have seen no documentation or quantification of the range and numbers of providers and programs that would be required. Dr. Stewart asserts that local systems are in place to provide the needed services to Coleman class released prisoners—though he does acknowledge that these programs are under-funded and would "benefit" from a significant increase in their resources. The fact that several Regional Parole Administrators has initiated efforts to reach agreements with providers in their regions (Stewart, 141-143) for parolee services is laudable—but woefully inadequate to address the true task at hand.

## 3.  California does not have accessible and adequate mental health programs to meet the needs of Coleman class parolees under an expedited prisoner release

California does not have the current capacity to meet the supervision, mental health or other community support needs if there were a prisoner release of 15,000-40,000 or more prisoners including Coleman class prisoners.  I have presented information in my 8-15 Expert Opinion regarding California's lack of adequate mental health care for our current populations of seriously mentally ill adults—both those who are under the care of counties and those who are treated through the Parole Outpatient system.  I will not reiterate this information but I will provide additional data to demonstrate the severity of this crisis in accessibility, availability and appropriateness of care.  However, my overriding concern is that Plaintiffs' expert witness reports provide inadequate support and guidance to support the Court's decision-making due to:

- Extremely limited (or outdated) knowledge of the structure and institutional responsibilities of the various partners in California's system of institutional and community mental health care

- And, demonstrate no knowledge or understanding of the capacity—or more importantly, California's lack of resource capacity to meet the needs of released Coleman class prisoners in the following areas of mental health services:  CDCR parole outpatient clinics; State Department of Mental Health programs; county and private psychiatric emergency services and acute psychiatric and chemical dependency inpatient hospitals, and county operated or contracted community mental health and mental health/substance abuse services.

### (a)  What systems/agencies are responsible for the provision of basic and intensive (including hospital) care to seriously mentally ill parolees?

I discussed this question at some length in my 8-15 opinion (Bataille Section 2.a. (pg 6)).  I am concerned that in particular, Dr. Stewart states:  "It is my understanding that some public mental health treatment providers currently refuse to provide treatment to parolees because there remains confusion and disagreements about whether the county or the State is responsible for paying for mental health care for these persons." (Stewart # 136)  Dr. Stewart then goes on to discuss the "Mentally Disordered Offender-MDO law" and LPS Conservatorships as avenues for care that would address issues regarding treatment responsibility for seriously mentally ill parolees.

- MDO programs are State Department of Mental Health operated (state hospitals) or contracted with either counties or community agencies for mentally ill offenders who are conditionally released from state hospitals-CONREP.  Counties are not required under statute to operate CONREP programs though some have chosen to do so under state contract.  Whether the State Department of Mental Health (DMH)  could be funded and legally expand the definition of the MDO population to include a broader class of Coleman class prisoners/parolees is a question that should be posed to DMH.

- With regard to the use of LPS conservatorships, it is my experience and understanding that counties/local jurisdictions are generally very reluctant to place individuals who remain on parole on LPS conservatorships.  Individuals may be held under LPS for a 5150 evaluation and initial treatment period in an inpatient setting as a danger to themselves/others or gravely disabled—but I believe it is extremely rare for parolees to have a concurrent parole status and an LPS conservatorship related to a "grave disability".  The filing of an LPS conservatorship and the resulting institution of a public or private guardianship process is really not appropriate or necessary in a circumstance where the custodial responsibility is established through the criminal courts and parole. County mental health systems and the LPS civil commitment door is the wrong "door number one" to knock on for services to seriously mentally ill parolees.

Community mental health services are structured and based on voluntary participation—even when individuals are participating in mental health services as probationers through the guidance of a mental health court.   County mental health systems are not bound by conditions of parole unless they are providing services to parolees under a contract with CDCR.  There are several counties that are negotiating with CDCR to provide parolee services—but these services are separate and distinct from core county mental health services in their eligibility criteria and would receive direct funding from CDCR (with the exception of insuring access to Medi-Cal revenues).

7

Dr. Stewart further cites (#140) the Coleman Court in its August 8th order and states that "these laws can be used to ensure that public safety considerations are met when releasing or diverting mentally ill offenders from prison." In my 8-15 opinion (pg. 12) I raise a number of concerns related to the implementation of the Valdivia order. Those questions remain but it is not simply a matter of whether CDCR POC and counties understand and comply with this guidance—it is equally a matter of whether it is actually even possible to provide timely access to 5150 acute psychiatric admissions of mentally ill parolees.

**(b) Access to acute psychiatric and chemical dependency inpatient care has dramatically declined from 1995 to 2006**

A June 25, 2008 updated report of the California Hospital Association's Center for Behavioral Health provides dramatic and disturbing data regarding the decline in psychiatric inpatient beds in California from 1995-2006 as follows:

- Inpatient psychiatric beds have dropped from 9353 to 6424: a 31.3% decrease and only 5515 of those beds serve adults.

- Inpatient chemical dependency beds have dropped from 1400 to 818 for a 41.6% decrease

- This drop in bed numbers is paralleled by a decrease in the actual number of facilities: psychiatric facilities have decreased from 181-142 or < 21.5% and chemical dependency inpatient facilities have decreased from 55 to 34 or < 38.2%

- The National average is 1 psyc. bed for every 2536 people: CA average is 1:5675 and according to CHA national experts estimate the need at 1 psyc. bed per 2000

- Chemical dependency beds compare at national average of 1bed:39,336 while CA has 1 CD bed:44,569

The availability of beds is also not distributed to insure geographic accessibility with 25 counties having not public or private inpatient beds. This data including charts regarding number and type of beds by county can be accessed at: http://www.calhealth.org/public/press/Article/107/CBH_PsycBedClosures.pdf.

**(c) Plaintiffs expert opinions on access and resources available for community mental health outpatient treatment of seriously mentally ill parolees**

In particular both Gilligan and Stewart appear to assume that community mental health services; integrated services for persons with co-occurring mental health and substance use disorders, and the range of community support services—particularly housing, either are available or could readily be increased if funding were provided. This is simply not accurate. I have previously addressed the gaps and serious resource challenges-including human and financial resources, that confront community mental health services in my 8-15 opinion.

**(d) I would add the following comments regarding county/community mental health services to my 8-15-08 report:**

- Santa Clara and San Mateo's reports as Intervener Counties clearly document both the crisis in the availability of resources to treat their existing populations of seriously mentally ill adults. Their reports make it clear that they cannot absorb new parolees—

particularly seriously mentally ill parolees without significant additional treatment and supervision/custodial resources. It should be understood that Santa Clara and San Mateo are widely recognized to be among the best funded and most comprehensive county mental health services in the State—both in their historical State and Federal funding base, and as a result of these counties allocating discretionary county funds to mental health and substance abuse services. Both counties also document their efforts to reduce structural deficits that include programs reductions or holding allocated positions vacant in mental health services.

- The majority of California's other counties face even more severe under-funding of mental health systems and do not have or have not chosen to provide discretionary local dollars to increase mental health services. As Medi-Cal providers, counties are obligated to provide assessments and medically necessary treatment to all Medi-Cal beneficiaries that meet diagnostic and functional impairment criteria. As indigent care providers, counties are responsible for providing services to seriously mentally ill adults—**to the extent resources are available.** I do not have data regarding the numbers or percentage of CCCMH and EOP parolees would be Medi-Call beneficiaries under a Coleman release but it is reasonable to assume that there would be a high percentage of these individuals who do not qualify for SSI-linked Medicaid. It cannot be assumed that county mental health systems have the capacity to assume a new responsibility for parolees—particularly indigent parolees. **In fact, there are currently three counties: Riverside, Shasta and Glenn, that have provided written notification to the State Department of Mental Health that they are considering returning the Medi-Cal program to the State due to the lack of sufficient local dollars to provide the required 50% match required to draw down federal Medicaid (Realignment sales tax and vehicle license fees).**

- In my opinion, a substantial Coleman class prisoner release would have a substantial negative impact on the conditions and treatment of these individuals when they re-offend and re-arrested. These parolees are likely to be held in local jails because of a State prison population cap system and lack of access to forensic state hospital beds. Almost half of California counties' correctional facilities are currently operating under their own jail population caps. If current conditions remain constant, additional numbers of seriously mentally ill parolees—even if they are eligible for admission to state hospitals will be held in inadequate conditions and receive inadequate care in local jails. DMH typically has a waiting list of over 300 local inmates who are pending state hospital forensic commitments/placements as has been reported to the CMHDA Forensic Committee by DMH administrators for at least the past three years. This is yet another way that a poorly planned and implemented Coleman prisoner release will simply transfer the problem of inadequate (and potentially unconstitutional) mental health care from the State level to the local level.

- In my opinion, Drs. Gilligan and Stewart under-estimate the numbers of current parolees as well as the increased numbers of parolees who would require intensive services under a Coleman release order. There is variation in cost across counties, but it is reasonable to assume that effective EOP level "assertive community treatment" (or as these programs are increasing called in California, "full service partnerships") can be estimated to cost an annual average of $15,000-$30,000 per individual. If one

9

estimates 506 new EOP parolees (per Gillian #54) with a 30,000 prisoner release, it will cost $8-16 million dollars in basic mental health treatment costs—excluding the cost of hospitalization or local incarceration should that become necessary. This estimate does not include intensive services to the current parole population—a population that is being significantly "under-treated" and that has a higher recidivism rate than the general parole population. This projection also does not take into account the extent to which prisoners who are assessed as CCCMH and are treated in the general prison population, will actually require more intensive follow-up due to greater access to drugs of abuse and failure to follow through on psychiatric medications, outpatient therapy and other conditions of parole. The UCLA Final Report on the Mental Health Services Continuum Program of the California Department of Corrections and Rehabilitation-Parole Division dated June 30, 2006 documents a significant rate of parolee failure to follow through on outpatient services and a correlation between decreased CDCR-POC contacts and recidivism and re-offense.

## 4. Additional recommendations to effectively and safely reduce the population in California's prisons including the plans described by CDCR, CSAC, CMHDA and several legislative initiatives.

In my opinion, it is possible and critically important to plan and implement a responsible program of community mental health treatment and support services that can effectively and safely meet the needs of seriously mentally ill prisoners as they are released from California's correctional facilities. However, I am concerned that the Plaintiff's expert witness reports either fail to understand or minimize the need for an investment prior to the size of prisoner release that would be required to reduce prison overcrowding in California.

I would urge the Courts and other parties to make a realistic assessment of what it would take to bring effective services and programs on-line—and then identify financing and a timeline to accomplish this task. I believe that significant progress has been made in settlement negotiations in this proceeding—even though final agreement was not reached. It is also important to give consideration to positive program developments including but not limited to:
- CDCR's AB 900 implementation plan(s);
- Legislative pilot programs such as SB 618 (Speier) that plan and implement a continuity of care and case management model that follows offenders through all levels of incarceration and community release; and
- Pending legislation such as SB 1851 (Steinberg) that defines a community system of care for seriously mentally ill parolees (based on the lessons of the Mental Health Services Act; Mentally Ill Offender Crime Reduction grant programs and the AB 2034 Integrated Services for Homeless Mentally Ill Persons) and AB 2541 (Bass) that promotes mental health/behavioral health courts.

It is also critically important that we understand and learn from past experience. California should not and cannot afford to dump mentally ill prisoners into our communities without adequate care and supervision. We've witnessed the consequences of the closure of state hospitals in the late

1960's through the 1970's when the promise was broken that dollars and services would follow these vulnerable individuals into the community. Any Court or State action to provide humane and constitutional mental health care in prisons, must include a commitment that appropriate care will also be provided to criminal justice involved individuals in our communities. The destructive cycle of criminalization of individuals with mental illness must be broken--and we must keep that promise.

## (II) the data or other information considered by the witness in forming opinion; Include list of reports and references reviewed

--California Hospital Association's Center for Behavioral Health, Updated Report on Psychiatric Bed Closures, June 25, 2008,

http://www.calhealth.org/public/press/Article/107/CBH_PsycBedClosures.pdf

--CMHDA, 8/25 conference call communication with Patricia Ryan, Executive Director-CMHDA, Don Kingdon, PhD, Assistant Director-CMHDA, Karen Baylor, PhD, San Luis Obisbo, Behavioral Health Director and Co-Chair, CMHDA Forensic Committee and Nancy Pena, PhD, President of CMHDA and Mental Health Director, Santa Clara County.

--CMHDA, 8/26 personal e mail communication from Pat Ryan, Executive Director of CMHDA regarding county notification to State Department of Mental Health that 3 counties are considering "opting out" of the mental health Medi-Cal program.

*Gale Bataille*

Gale Bataille

# EXHIBIT N

PRISON LAW OFFICE
DONALD SPECTER, Bar No. 83925
STEVEN FAMA, Bar No. 99641
E. IVAN TRUJILLO, Bar No. 228790
SARA NORMAN, Bar No. 189536
ALISON HARDY, Bar No. 135966
REBEKAH EVENSON, Bar No. 207825
1917 Fifth Street
Berkeley, CA  94710
Telephone:  (510) 280-2621

ROSEN, BIEN & GALVAN, LLP
MICHAEL W. BIEN, Bar No. 96891
JANE E. KAHN, Bar No. 112239
AMY WHELAN, Bar No. 215675
LORI RIFKIN, Bar No. 244081
LISA ELLS, Bar No. 243657
MARIA V. MORRIS, Bar No. 223903
315 Montgomery Street, 10th Floor
San Francisco, California  94104
Telephone: (415) 433-6830

KIRKPATRICK & LOCKHART PRESTON
GATES ELLIS LLP
JEFFREY L. BORNSTEIN, Bar No. 99358
EDWARD P. SANGSTER, Bar No. 121041
RAYMOND E. LOUGHREY, Bar No. 194363
55 Second Street, Suite 1700
San Francisco, CA  94105-3493
Telephone:  (415) 882-8200

BINGHAM, McCUTCHEN, LLP
WARREN E. GEORGE, Bar No. 53588
Three Embarcadero Center
San Francisco, California  94111
Telephone: (415) 393-2000

THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
CLAUDIA CENTER, Bar No. 158255
600 Harrison Street, Suite 120
San Francisco, CA  94107
Telephone:  (415) 864-8848

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURTS

FOR THE EASTERN DISTRICT OF CALIFORNIA

AND THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

| | | |
|---|---|---|
| RALPH COLEMAN, et al., | ) | No.:  Civ S 90-0520 LKK-JFM P |
| Plaintiffs, | ) | **THREE-JUDGE COURT** |
| vs. | ) | |
| ARNOLD SCHWARZENEGGER, et al., | ) | |
| Defendants | ) | |
| MARCIANO PLATA ,et al., | ) | No. C01-1351 TEH |
| Plaintiffs, | ) | **THREE-JUDGE COURT** |
| vs. | ) | |
| ARNOLD SCHWARZENEGGER, et al., | ) | **REBUTTAL EXPERT REPORT OF** |
| vs. | ) | **JAMES GILLIGAN, M.D.** |
| Defendants | ) | |

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF ABBREVIATIONS.................................................................................ii

OPINIONS IN THIS MATTER...............................................................................1

Opinion 1:    The recommendation that a prisoner release order must be limited
only to the lowest acuity individuals with mental illness is based on
false assumptions about the levels of care required by the
population currently on CDCR's mental health caseload, and on
unsupported speculative fears about the dangerousness of
individuals with mental illness.....................................................................1

A.    The population of individuals defined as "mentally ill" by CDCR
consists of a spectrum of severity and acuity of mental illness, and
their treatment needs vary accordingly .........................................................1

B.    The evidence does not support speculative fears about the increased
dangerousness of individuals with mental illness.........................................3

C.    The evidence does not support speculative fears about the increased
dangerousness of individuals with higher severity or acuity of
mental illness..................................................................................................6

D.    The assertion that individuals with mental illness cannot be safely
treated in the community should be rejected .................................................7

Opinion 2:    State and county governments' failure to adequately fund mental
health resources in the community does not justify criminalizing
individuals with mental illness and keeping them in prison.......................9

Opinion 3:    The effects of a prisoner release order on community mental health
resources will be limited, given the small proportion of mentally ill
offenders likely to be included in such an order relative to the
numbers of mentally ill offenders already being released to parole
under California's current system. .............................................................12

Opinion 4:    I agree with the Expert Panel's conclusion that reducing
overcrowding is an integral part of reforming California's
rehabilitation programs. .............................................................................15

EVIDENCE ON WHICH THE EXPERT OPINIONS ARE BASED.......................16

REBUTTAL EXPERT REPORT OF JAMES GILLIGAN, M.D., NOS.: CIV S 90-0520 LKK-JFM, C01-1351 TEH

## <u>TABLE OF ABBREVIATIONS/ACRONYMS</u>

CCCMS:          Correctional Clinical Case Manager System

CDCR:           California Department of Corrections and Rehabilitation

DMH:            Department of Mental Health

EOP:            Enhanced Outpatient Program

GAF:            Global Assessment of Functioning

MHCB:           Mental Health Crisis Bed

MHSA:           Mental Health Services Act

PMD:            Person With Mental Disorder

POC:            Parole Outpatient Clinic *or* Psychiatrist on Call

## REBUTTAL EXPERT REPORT OF JAMES GILLIGAN, M.D.

I have reviewed the expert reports submitted by defendants and intervenors concerning the effects of a prisoner release order on community mental health, including primarily the expert report of Gale Bataille, MSW.

## OPINIONS IN THIS MATTER

I offer the following opinions in response to these reports:

**Opinion 1:** The recommendation that a prisoner release order must be limited only to the lowest acuity individuals with mental illness is based on false assumptions about the levels of care required by the population currently on CDCR's mental health caseload, and on unsupported speculative fears about the dangerousness of individuals with mental illness.

**A.** The population of individuals defined as "mentally ill" by CDCR consists of a spectrum of severity and acuity of mental illness, and their treatment needs vary accordingly.

1. Ms. Bataille begins her report by describing the population likely to be released as part of a prisoner release order as consisting of 19-20% of individuals with "serious mental illness as assessed by CDCR" (p.2) and proceeds to make assumptions about the "mentally ill offender" population, their characteristics and service needs, and the effects of their release. Rather than starting from the premise of a single group of mentally ill offenders, it is crucial to recognize this "mentally ill" population in fact consists of a very broad spectrum of severity and acuteness of psychopathology, and wide variation with respect to the intensity of their treatment needs.  These can be divided into three broad categories, from least to most seriously psychiatrically impaired:  1) Parolees eligible for the Correctional Clinical Case Management System (CCCMS), who demonstrate stable functioning in the community and had a Global Assessment of Functioning Score (GAF) above 50;  2) Those requiring the Enhanced Outpatient Program (EOP), because they manifest acute onset or significant deterioration of psychotic symptoms, such as delusions or hallucinations; dysfunctional or disruptive social interaction (withdrawal, bizarre or disruptive behavior, or provocative behavior toward others

as a consequence of a serious mental disorder; and impairment of activities of daily living, such as eating, hygiene, and maintenance of their dwelling; 3) Those who need inpatient and/or acute care, including the subcategories of a) those who need a Mental Health Crisis Bed (MHCB), for inpatient treatment and stabilization, for up to 10 days (or longer, if deemed necessary by treating clinicians), until they demonstrate ability to function in a less restrictive environment, i.e., EOP or CCCMS; and b) those who require inpatient hospitalization on a longer-term basis, currently provided by the Department of Mental Health through its intermediate and acute care inpatient programs.

2.     As I documented in detail in my Expert Report of August 15, 2008, pp. 11-12, out of some 134,000 prisoners released to parole by CDCR in 2006, only 0.48%, or 642, could be classified in the third, most acute category (MHCB/DMH).  And only 1.82% required EOP services.  By far the largest group of parolees with one degree or another of psychiatric impairment, 17.65%, or 23,735, were classified as being at the CCCMS level of functioning, or to put it another way, at the minimal end of the spectrum of severity of mental illness.  To state, as Ms. Bataille does, that up to 20% of this population  would be suffering from "severe mental illness" fails to acknowledge that fully 17.65% are at the lowest level of severity, and only 0.48% at the level of severity that would require a temporary crisis bed or DMH inpatient treatment.  Furthermore, Ms. Bataille assumes that all individuals classified at the EOP level of care will need inpatient care if released to the community as part of a prisoner release order.[1] Not only is this assumption clinically inaccurate, in that being given an EOP classification does not signify that a prisoner is in "the most seriously mentally ill" group, nor does it mean that he or she needs in-patient treatment; but it also ignores the reality that CDCR currently paroles numerous individuals at the EOP and higher levels of care each year to the community and rarely if ever places them into inpatient care, or even into lesser day treatment programs.

---

[1] At page four of her report, Ms. Bataille states, "The most seriously mentally ill prisoners (EOP) should be considered for early release if and only if …there are provisions for inpatient care negotiated as part of the service agreement."

REBUTTAL EXPERT REPORT OF JAMES GILLIGAN, M.D., NOS.:  CIV S 90-0520 LKK-JFM, C01-1351 TEH

[236011-1]

3.      As I stated in my Report (pp. 28-29), if a prisoner release order required the diversion of 30,000 persons to parole and the community, it is reasonable to assume that they will be distributed in approximately the same proportions as those persons California paroled in 2006.  Assuming that that is the case, the number of persons needing the highest level of care (MHCB/DMH) would be 143, with only an additional 546 needing the EOP level of care, in a state with a population of over 36,000,000.  Even the larger group of stable, well-functioning persons with a minimal need for intensive mental health services would amount to approximately 5,296.  These individuals, consistent with State law and practice returning parolees to their home counties, would be distributed throughout the State, and over a period of time.  There is no basis for the assumption that the full incremental population would arrive all at once or overwhelm any one county's resources.

**B.**      The evidence does not support speculative fears about the increased dangerousness of individuals with mental illness.

4.      One of the suggestions pervasive throughout Ms. Bataille's report is that any additional release of mentally ill prisoners would disproportionately decrease public safety. For example, on page three, Ms. Bataille raises the question as "to what extent members of the mentally ill released parolee population might be at greater risk for recidivism" – presumably implying greater than the risk among non-mentally ill parolees. Raising the question in this way, without reviewing the evidence that would provide the answer suggests that, in fact, the mentally ill parolee population *is* at greater risk for recidivism.  Ms. Bataille also suggests that because California is currently understaffing its Parole Outpatient Clinic system, the POC system will not be effective for any additional parolees with mental illness who are released (pages 7-9), and concludes that one consequence of this failure is that these parolees will recidivate.  These suggestions about the increased recidivism rates for individuals with mental illness, without more analysis, also imply a corollary increase in risk to public safety. However, for this to be true, the rate of violent recidivism would have to be higher among mentally ill parolees than it is among those who are not mentally ill.  This is not the reality, as my review of substantial empirical data in my Report of August 15 illustrates.  As I explained,

mentally ill parolees and persons discharged from prison have been found in study after study (and with no major exceptions) to be either at lesser risk, or at no higher risk, of committing either a violent or a non-violent crime, than non-mentally ill prisoners are. (*See* my Expert Report of Aug. 15, 2008, paragraphs 34-49, pp. 18-26.)

5.    Moreover, cites to the general "recidivism" rates of mentally ill offenders in California are not reflective of actual dangerousness of these individuals and should not be used to promote speculative fears of mentally ill individuals as dangerous. Recidivism rates generally in California are not reliable indicators of violent crimes being committed; instead, the extremely high recidivism rates in California actually reflect the enactment of "tough on crime" legislation and policies resulting in the imprisonment of large numbers of individuals for technical or minor violations of parole that do not involve serious or violent crimes.[2] Joan Petersilia has stated that California's "blanket imposition of parole on all ex-prisoners, and California's unusual reliance on parole revocation as a quick-fix response to parolee problems" drives up recidivism rates in California.[3]

6.    Based on the materials I have reviewed, it is evident that California's parole revocation system not only results in extremely high recidivism rates generally, but also disproportionately affects individuals with mental illness. This is not because of their disproportionate dangerousness, but rather because the parole system encourages—in many cases, mandates—imprisonment as punishment for technical and minor infractions to which

---

[2] CDCR Expert Panel on Adult Offender Reentry and Recidivism Reduction Programs Report, Joint Pls.' Trial Ex. 2, at Appendix E, p.88. The Expert Panel recommended diversion from prison for the large group of parolees "who are now being returned to prison for non felony criminal behavior and technical violations." Appendix E, p.89.

[3] Joan Petersilia, "Understanding California Corrections," *California Policy Research Center, University of California* (May 2006), Joint Plaintiffs' Trial Ex. 5, at 71. It is also worth noting that Dr. Petersilia concludes that California's current parole system does not protect public safety and actually has "a profoundly harmful effect." *Id.* at 76. Similarly, the CDCR Expert Panel observed that previous studies have shown that imposing parole and probation supervision on those who are unlikely to recidivate serves to actually increase recidivism rates. Joint Pls.' Trial Ex. 2, Appendix E, p.90.

individuals with mental illness are more susceptible.[4]  This pattern is sometimes confused with a higher rate of criminal recidivism, or re-offending, whereas in fact it is primarily a symptom of their mental impairment and disorganization.  One study of California parolees concluded that "[t]hree interacting factors probably contribute to PMDs' disproportionate rate of return purely for technical violations.  First, parole agents may have lower thresholds for violating PMDs than non-disordered parolees…Second, PMDs have symptoms and functional impairments that may prevent them from adhering to some rules of parole…Third, PMDs often must adhere to more technical rules of parole than their non-disordered counterparts, including the special condition of treatment adherence."[5]  For example, California literally revokes mentally ill parolees—sends them back to prison—for failing to attend scheduled appointments with their clinicians at the Parole Outpatient Clinics, and this "violation" can result in a prison term of 12 months.[6]  While it is important to encourage psychiatric patients to understand their illness and take personal responsibility for treatment, it is appropriate to use case management services and education to achieve this function in a mental health system, not criminal sanctions and incarceration.

　　　　7.　　　Ms. Bataille herself recognizes the disconnect between the sentences individuals with mental illness serve and their actual dangerousness, observing that "[w]hen mentally ill individuals commit crimes, even relatively low level crimes, they cycle through the local criminal justice system," and they "serve sentences that are disproportionately long in relation

---

[4] Louden, J.E., Dickinger, E., & Skeem, J.L., "Parolees with Mental Disorder: Toward Evidence-Based Practice," *Center for Evidence-Based Corrections Bulletin* [unpublished manuscript] (2008), Joint Plaintiffs' Trial Ex. 76.  "Our finding that PMDs [parolees identified as having mental disorders] are disproportionately at risk for technical violations is consistent with past research."

[5] *Id.*

[6] *See* CDCR Department Operations Manual, Chapter 8, Jt. Pls.' Trial Ex. 95 at p.634, requiring a mandatory referral to the Board of Prison Terms for violation of a special condition of parole.  The requirement to attend Parole Outpatient Clinic is imposed as a special condition of parole.  The mandatory referral requirement means that if a parolee misses his or her Parole Outpatient Clinic appointment, the parole agent is required to refer this violation to the Board of Prison Terms for parole revocation.

to their offense" (p.21).  Once again, the far more accurate and valid measure of dangerousness is the commission of violent crimes, as I explained in my August 15 Report.

    **C.**    The evidence does not support speculative fears about the increased dangerousness of individuals with higher severity or acuity of mental illness

8.    The recommendation that individuals with only the very lowest levels of severity or acuity of mental illness be included in any kind of release order also implies that more severely or acutely ill individuals represent an increased danger to society.  This fear, based on public stigma and myth, must be rejected.  The evidence does not support such a conclusion; in fact, the evidence suggests the opposite.[7]  The important point here is that the presence and severity of mental illness, and the acuity level of such illness, are not valid predictors of dangerousness.[8]  To suggest that they are, without offering evidence of any kind, is to mobilize precisely  "[t]he general public's fear of individual with mental illness and discriminatory practices related to this fear" that Ms. Bataille describes at the end of her report (p.22).  For example, the most comprehensive meta-analysis of 58 studies involving 64 unique groups of comparisons between more severely and acutely mentally ill individuals with those who were less severely or acutely ill or did not meet the criteria for any diagnosis of mental illness found that people with the most severe illnesses (schizophrenia and other psychotic conditions) were less likely than those who were not mentally ill to commit violent crimes after returning to the community, while those with less severe psychiatric impairments, such as depressed mood, were as likely (but not more likely) than those with no mental illness to do so.[9]

---

[7]  See my August 15 Report at 18-26, describing the results of various research studies showing that even severe mental illness is not a valid predictor of violent recidivism.

[8]  *Id.* at 20-21.

[9]  Bonta J, Law M, Hanson K:  "The prediction of criminal and violent recidivism among mentally disordered offenders: a meta-analysis," *Psychological Bulletin* 123:123-142, 1998.

[236011-1]

9.      Other studies[10] [11] have found that an increase in the acuity or severity of the symptoms of schizophrenia (the most severe form of mental illness) is not a predictor of violence.  Rather, the most powerful predictors of violent behavior are the same for both the mentally ill and those who are not mentally ill, such as age, sex, substance abuse, socioeconomic status, and past criminal history.  These predictors differentiate between the violent and the non-violent in both the mentally ill and the non-mentally ill groups much more powerfully than the presence, absence, or severity and acuity of mental illness.

**D.**     The assertion that individuals with mental illness cannot be safely treated in the community should be rejected.

10.     On page two of her report, Ms. Bataille makes the unsupported assertion that if there were a prisoner release program on even the small scale of 15,000 prisoners, "it should be assumed that a substantial portion of these individuals who have received psychiatric treatment while incarcerated have a significant risk of exacerbation of their psychiatric symptoms when released to community settings."  Based upon my own experience in prisons, this statement is totally unsupportable, for it assumes that the social and physical environment of the prison is more salubrious, more conducive to mental health, than community settings are.  In saying that, I do not mean to imply that community settings are always supportive of mental health; on the contrary, they all too frequently are not.  Nor do I mean that all prisons are equally pathogenic, for prisons do vary in that regard among each other.  But in my opinion if one wanted to design an institutional setting that would be maximally pathogenic, or likely to provoke or exacerbate psychopathology of all kinds, one could hardly do better than to design

---

[10] Swanson, JW, et al., "A national study of violent behavior in persons with schizophrenia," *Archives of General Psychiatry* 63:490-499, 2006.

[11] Appelbaum, PS, Robinson PC, Monahan J, "Violence and delusions: data from the MacArthur Violence Risk Assessment Study," *American J. of Psychiatry*, 157:566-572, 2000.  This study found that the presence of psychotic delusions did not increase the prospective risk of violent behavior in a diagnostically heterogeneous sample of psychiatric patients, 17% of whom were schizophrenic, following discharge from hospitals, a finding that they attributed to the fact that delusions were so often associated with social withdrawal and decreased social interactions with other people, which actually rendered them less likely to be violent compared with less severely ill patients.

the typical modern prison as I have known it over the past 40 years.  To begin with, prisons stimulate paranoia more powerfully than any other type of institution in which I have ever worked, for prisons really are dangerous, which is presumably why the ratio of "police" (correction officers) to residents is higher than in any other residential setting in our society. Prisons are more dangerous than any other institution in our society not because most of the people in them are violent—an increasingly large proportion of the prison population over the past few decades has been made up of people who were sentenced to prison for non-violent offenses—but because among their residents is a small minority of individuals who really are among the most dangerous (i.e., violent) people in our society, and while they are there, they are indeed a threat and a danger to the less-violent or non-violent majority.  Thus, the less- or non-violent prisoners need to become effectively "paranoid" in order to survive.  Among the prisoners with whom I have worked over the years, a high level of distrust was almost universal.  Needless to say, this is not the kind of atmosphere in which to foster mental health. To say that we should leave mentally ill prisoners inside our prisons – for the sake of their mental health! -- rather than allow them to return to the community, since the community might be more likely to precipitate mental illness than prisons are, is not a conclusion in which I can place much credibility.

11.     On the contrary, if it is the mental health of our prisoners which we are concerned about, the best thing we could do for most of them is to get them out of the prisons and back into the community as soon as possible.  That there are exceptions to this generalization is of course true, depending on how disordered or pathogenic a particular community is relative to a particular prison.  However, the assumption that prisons on the whole are healthier psychological environments than peoples' home communities are—such that returning mentally ill prisoners to the community places them at higher risk for decompensating than leaving them in prison would—is highly dubious.  That mentally ill people need and can benefit from mental health treatment (provided it is competent treatment) is true, of course, whether or not they are or ever have been prisoners, and whether or not they are living in the community.  I would suggest, however, that mental health treatment in the

community is more likely to be successful and effective than similar treatment would be in the social environment of the prison.

12.     Given the unprecedented level of overcrowding in California prisons today and the uncontested findings of ongoing serious deficiencies in the delivery of mental health care in the prisons, the argument that individuals with mental illness may be "better off" in prison than in the community cannot be taken seriously.[12]   It is the ongoing violation of the minimum required level of mental health care in California's prisons today that drives our present consideration of a prisoner release order and the question of diversion of mentally ill prisoners to parole and the community.

**Opinion 2:**   State and county governments' failure to adequately fund mental health resources in the community does not justify criminalizing individuals with mental illness and keeping them in prison.

13.     From a public health standpoint, we must reject the implication that people should remain in prison because community mental health resources are too taxed.  To do otherwise, would be to accept the premise that the prison system, rather than the public mental health system, should have primary responsibility for the mental health care of mentally ill individuals who would otherwise be eligible for release or diversion from prison.  This "solution" of criminalizing rather than treating mental illness is a clinically and morally unacceptable conclusion.[13]  Similarly unacceptable is the proposition that prisons may be

---

[12] Similarly, Ms. Bataille's assertion that individuals with mental illness should be kept in prison and excluded from a prisoner release order because their inclusion will "slow[] or revers[e] the gains of mental health advocates and the mental health system over the past ten years" (p.22) is also incredible: it suggests that long-term gains for the mental health community may be best achieved by keeping people in prisons—undeniably non-therapeutic environments—to alleviate fears of the public which are exaggerated, unrealistic, and unsupported by the evidence concerning the relative dangerousness of mentally ill and non-mentally ill individuals.

[13] It is also far from easy, as evidenced by these continued proceedings in *Coleman v. Schwarzenegger*, a case decided in 1995.

[236011-1]

utilized as warehouses for holding individuals with mental illness until we have remedied the failures of the public mental health system.[14]

14.    Throughout her report, Ms. Bataille speculates as to the time it will take to bring the public mental health system into the condition in which it would need to be in order to provide treatment for mentally ill individuals released from prison.  However, the release of mentally ill individuals into the community is not something that will only happen in the future; rather, it already constantly happens.  A prisoner release order that includes the release and diversion of individuals with mental illness from prison would help close the "revolving door" through which mentally ill prisoners/parolees repeatedly cycle back and forth between the prisons and the community.  It is that process, more than the lack of capacity on the part of the public mental health system, that is making it impossible for these individuals to receive adequate and effective treatment.

15.    The State itself has estimated that more than 6,000 parolees are returned to prison each year for technical or minor parole violations resulting from unmet mental health needs.[15] This is not indicative of their dangerousness, but rather of the failure of the State to adequately fund its parole mental health services.  The State's failure in this regard does not provide justification for keeping high numbers of individuals with mental illness in prison, where the mental health system is also a failure.  The appropriate response to the lack of resources is to increase resources, not to give up and return people to prison.  In this respect, I agree with Ms. Bataille when she concludes that the "criminalization of the mentally ill individuals" is a "tragic consequence" of California's failure to adequately maintain its public mental health system.  (p.10).

---

[14] On page 11 of her report, Ms. Bataille writes there that "The crisis California faces in the lack of adequate, stable and supported housing for persons with mental illness has been highlighted in the Mental Health Services Act of 2004 and in the Governor's 20-year plan to end homelessness, but it is recognized that it is a long-term proposition – estimated to require 20 years…."  I fail to discern what implication that statement has other than to imply that for the next 20 years we should use prisons as our substitute for adequate public housing for the mentally ill.

[15] California Department of Corrections, Division of Adult Parole Operations, Mentally Ill Parole Population (July 2007), Jt. Pls.' Trial Ex. 77, at p. 5.

16.    Non-mentally ill parolees, by contrast, are more likely than those who are mentally ill to commit a new crime, both violent and non-violent.  The fact that mentally ill parolees oscillate more frequently between the prison and the community, spending relatively short times in each, makes it difficult if not impossible for them to receive any effective mental health treatment in either environment.  While it would be valuable to interrupt their constant cycling in and out of prison by providing adequate mental health care in both environments, they do not represent a greater danger to public safety than non-mentally ill parolees, and by most measures they represent a lesser danger.

17.    Ms. Bataille refers to the staffing shortages that exist within the public mental health system. (p.12).   Staffing shortages, however, in California's prison mental health system are severe, chronic and well-documented.  Based on my forty years of psychiatric experience as a clinician, an educator, an administrator and a policy planner in prison mental hospitals and mental health clinics, and in civil mental hospitals and community mental health centers, it is my firm and unambiguous opinion that it is much more difficult to recruit and hire qualified mental health professionals to work in prison settings than it is to recruit and hire them to work in civil hospital and clinic settings.  Thus, I fail to see how it can make sense to say that we should refuse to reduce the overcrowding in California's prisons because there are too few clinicians available in the civil mental health system – when the problem of staffing shortages in the prison mental health system is even greater and more difficult (if not impossible) to solve than it is in the civil mental health system.

18.    Ms. Bataille and the intervenor experts who opine about community mental health all acknowledge that California is at a funding impasse regarding what level of government (state or local) is responsible for paying for mental health care for parolees, and in what proportion.  I agree with Ms. Bataille when she concludes that clarification of funding and service provision responsibility would improve the provision of adequate mental health care to parolees and the public mental health system generally.  It is indeed tragic that California has allowed its public health system to deteriorate at the expense of the individuals who suffer from mental illness.  However, as the reports submitted by Ms. Bataille and the

intervenor experts illustrate, many experts in California have identified the evidence-based methods of improving this public health system, and the resources that, if funded, could be mobilized to support this system. In my opinion, the State's and counties' refusals to fund such a system[16] does not justify the continued criminalization of persons with mental illness. Indeed, the current overcrowding crisis makes evident that the State, both ethically and financially, can no longer afford to do so.

19.    Moreover, it is my experience mental health treatment in the community, even when it involves in-patient mental hospitalization, is much less expensive than incarceration in prison. Thus the implementation of the programs being proposed for California would be likely to result in cost-savings that could be passed on to the public mental health system. That is, the cost savings to the prison system from the changes being proposed would be more than adequate to pay for whatever additional resources the public mental health system would require.

**Opinion 3:**   The effects of a prisoner release order on community mental health resources will be limited, given the small proportion of mentally ill offenders likely to be included in such an order relative to the numbers of mentally ill offenders already being released to parole under California's current system.

20.    Ms. Bataille and the intervenor experts who opine on community mental health describe severe consequences for community mental health resources if a prisoner release order is entered. For example, Ms. Bataille predicts that an "accelerated release" of prisoners in the Coleman class will have "adverse—and potentially serious consequences for the released prisoners; community mental health systems and the (nonoffender status) mentally ill children, adults and older adults they serve," as well as "potentially long-term negative consequences to the development of public mental health services in the future." (p.1 & p.18). These types of

---

[16] For example, Expert Report of Nancy Pena, Ph.D. at 6 ("Santa Clara County revenue shortfalls have resulted in significant reductions in the MHD [Mental Health Department] budget. In the last three-year period, the MHD has lost close to $45 million in local mental health funding through reductions, and the ability to serve 4,000 clients."; Expert Report from Gale Bataille, MSW at 9 ("Financial resources are inadequate and not keeping up with current costs.").

dramatic and far-reaching statements overstate the potential effects of a prisoner release order because they do not accurately tie their conclusions to the actual numbers and populations being considered.

21.     Ms. Bataille's predictions of "adverse consequences" to the whole state mental health system are based on a projected figure of half that number, i.e., "a release of even 15,000 offenders including all classes of mentally ill (Coleman class) prisoners." (p.1).  In my opinion, based on the 2006 data discussed above, a more appropriate prediction, given the premise of releasing 15,000 individuals, is that 72 individuals statewide would require an inpatient or crisis level of care, 273 individuals statewide would require an EOP level of care, and 2,648 individuals statewide would require a CCCMS level of care.  The conclusions drawn that suggest the collapse of the current mental health system based on the transfer of this relatively small number of mentally ill persons out of the prison system and into the mental health system of the most populous state in the nation thus appear overstated.

22.     While I agree that the public mental health system in California is under appreciable pressure given the resources allocated to it and as a society, we would do well to increase the funding for these resources, I do not agree with Ms. Bataille's and the other experts' conclusions about the effects of the limited increase in population being considered.  As I discussed above, the assumptions made about the intensive levels of care this population would need are incorrect.  For example, Ms. Bataille assumes that all EOP individuals released to parole would need inpatient care, and the experts from Santa Clara County assume that half of all individuals with mental illness released to parole would need inpatient care.[17]  These assumptions are not supported by the evidence I have reviewed and appear to greatly overstate the level of mental health services that are likely to be required for this population.  Moreover, they ignore the realities of the numbers of individuals with mental illness currently being released to parole every year.  In 2006, 26,824 individuals with mental illness were released to parole, including 2,447 individuals at the EOP level of care.  None of these experts make the

---

[17] For example, Expert Report of Paul McIntosh at 5; Expert Report of Gary A. Graves at 5.

claim that the services they describe as so crucial to the public safety that without them, we dare not release mentally ill individuals, are now provided to these tens of thousands of individuals with mental illness now released to the communities. In fact, one of the experts from Santa Clara County estimates that in the "best case," "significantly less than 30% of those in need are able to access service."[18]

23.    Although the public health system in California is underfunded, it is important to recognize that there are public mental health systems in place and that large numbers of people are being served. For example, a report presented by the California Department of Mental Health, California Mental Health Directors Association, and Mental Health Services Oversight & Accountability Commission in July 2008 identify over $6 billion dollars funding public mental health in the state of California for fiscal year 2008-09.[19] Data from the California Department of Mental Health shows that 658,314 persons were served by county mental health programs in fiscal year 2005-06.[20] 43,435 persons received some type of 24-hour service, 69,063 received some type of day treatment service, and 633,884 received some type of outpatient service.

24.    The scale on which public mental health services are already being provided renders highly unlikely Ms. Bataille's prediction that the release or diversion of a relatively

---

[18] Expert Report of Nancy Peña, Ph.D. at 5.

[19] "Implementation of the Mental Health Services Act," California Department of Mental Health, California Mental Health Directors Association, Mental Health Services Oversight & Accountability Commission, July 2008, available at http://www.dmh.cahwnet.gov/Prop_63/MHSA/Publications/docs/MHSA_briefing_July2008.pdf, Jt. Pls.' Trial Ex. 96.

[20] Department of Mental Health Client and Service Information System, Statistics and Data Analysis, December 2007, available at http://www.dmh.cahwnet.gov/Statistics_and_Data_Analysis/docs/Statewide_Production_Rpt/CSI_annualreport_FY0506_FINAL_1.pdf, Jt. Pls.' Trial Ex. 97.

small number of mentally ill offenders[21] will result in the deprivation of care from mentally ill children and nonoffender adults.[22]

**Opinion 4:**  I agree with the Expert Panel's conclusion that reducing overcrowding is an integral part of reforming California's rehabilitation programs.

25.  Rather than endorsing a prisoner release order, Ms. Bataille suggests implementing the recommendations of the CDCR Expert Panel Report on Adult Offender and Recidivism Reduction (2007) "including establishing community diversion programs…, community re-entry facilities…, community supervision for low-risk offenders," etc. (p.19).  I agree completely with those recommendations, as far as they go.  But what Ms. Bataille fails to include in that reference to the Expert Panel Report is that its first and most central recommendation, to which it returned again and again, was that before it could hope to improve the effectiveness of any of its rehabilitation programs and practices, the CDCR must "Reduce overcrowding in its prison facilities and parole offices" (p. viii).  They also stated, as I quoted in my Report of August 15, 2008, that "The largest barrier that the Panel identified to delivering effective programming in CDCR prison facilities is its current state of overcrowding." (pp. viii, 9-10)  They continue, "Unless California reduces overcrowding, offenders will not have the space or safe environments they need to participate in the rehabilitation programs" (p. 51).  Therefore the highest and most urgent priority facing anyone who would like to decrease violent recidivism and increase public safety is to reduce prison overcrowding – first and foremost.

---

[21] In Ms. Bataille's example of a 15,000 person release, 72 individuals at an inpatient level of care, 273 individuals at EOP level of care, and 2,648 individuals at CCCMS level of care.

[22] The document cited in footnote 19, above, also estimates $1.5 billion dollars in revenue to fund Mental Health Services Act (MHSA) programs for fiscal year 2007-08, and another $1.5 billion dollars for fiscal year 2008-09.  It is my understanding that these MHSA programs specifically exclude the parolee population and provide services to the nonoffender status population Ms. Bataille claims will be harmed by an increase in mentally ill parolees.

# EVIDENCE ON WHICH THE EXPERT OPINIONS ARE BASED

26.    I have based my opinions on the three main sources of evidence:

a.    My own clinical and research experience over the past forty years of work with violent and/or mentally ill individuals in prisons, prison mental hospitals, jails and other correctional and clinical settings, including my therapeutic work as a clinician with individuals and groups; my administrative work as the medical director of the prison mental hospital and the prison mental health service for the Massachusetts Department of Correction, which included providing forensic psychiatric evaluations to the relevant courts as to both the psychiatric status and the potential dangerousness of patients in the prison mental hospital and of inmates in the prisons (as to whether they could be released into the community without endangering public safety, or were so dangerous to themselves or others by reason of mental illness as to require in-patient hospitalization in the prison mental hospital or elsewhere); and my empirical research as a social scientist measuring the variations in the incidence of in-house violence and violent recidivism in the community that occur under varying conditions of incarceration, mental health care, and rehabilitative programming.

b.    My knowledge of the professional and scientific literature on these subjects.

c.    My examination and analysis of much of the documentary evidence, research, judicial opinions and orders, specialized studies by commissions of experts, official correspondence and proclamations, reports by expert witnesses, and other materials introduced into this litigation, including but not limited to the materials listed in Appendix B to my August 15, 2008 Expert Report, and in Appendix A to this Rebuttal Report.

Dated: Aug. 27, 2008

_James Gilligan_
James Gilligan

# APPENDIX A

| DOCUMENT |
|---|
| CDCR Department Operations Manual, Chapter 8 |
| "Implementation of the Mental Health Services Act," California Department of Mental Health, California Mental Health Directors Association, Mental Health Services Oversight & Accountability Commission, July 2008, available at http://www.dmh.cahwnet.gov/Prop_63/MHSA/Publications/docs/MHSA_briefing_July2008.pdf |
| Department of Mental Health Client and Service Information System, Statistics and Data Analysis, December 2007, available at http://www.dmh.cahwnet.gov/Statistics_and_Data_Analysis/docs/Statewide_Production_Rpt/CSI_annualreport_FY0506_FINAL_1.pdf |
| Preliminary Expert Report from Gale Batille, MSW, August 15, 2008 |
| Intervenor San Mateo County's Disclosure of Non-Reatined Expert Witnesses for Trial, August 15, 2008 |
| Preliminary Expert Report from Dr. James Marquart, Ph.D, August 15, 2008 |
| Expert Report of David M. Bennett, August 15, 2008 |
| County of Santa Clara's Disclosure of Expert Witnesses, August 15, 2008 |
| Expert Report of Paul McIntosh, August 15, 2008 |
| Expert Report of Gary A. Graves, August 15, 2008 |
| Expert Report of Nancy Dane Peña, Ph.D, August 15, 2008 |
| Expert Report of Robert Garner, August 14, 2008 |
| Addendum to Expert Report from Dr. Ira Packer, Ph.D, ABPP (Forensic), August 15, 2008 |
| Department of Corrections and Rehabilitation, State of California, Senate Budget Hearing Briefing, James E. Tilton, Secretary, 2008 |
| California Department of Mental Health, "Mental Health Services Act Progress," July 2008, available at http://www.dmh.cahwnet.gov/Prop_63/MHSA/Publications/docs/ProgressReports/MHSA_Progress_July2008.pdf |
| Executive Summary Medi-Cal FY 1998-99 Through 2002-03, available at http://www.dmh.cahwnet.gov/Statistics_and_Data_Analysis/docs/Medi-Cal-TrendReport-FY98-FY03/EXECUTIVE%20SUMMARY%20MEDI-CAL%20TREND%20REPORT.pdf |

[235799-2]

1  PRISON LAW OFFICE                          ROSEN, BIEN & GALVAN, LLP
   DONALD SPECTER, Bar No. 83925              MICHAEL W. BIEN, Bar No. 96891
2  STEVEN FAMA, Bar No. 99641                 JANE E. KAHN, Bar No. 112239
   E. IVAN TRUJILLO, Bar No. 228790           AMY WHELAN, Bar No. 215675
3  SARA NORMAN, Bar No. 189536                LORI RIFKIN, Bar No. 244081
   ALISON HARDY, Bar No. 135966               LISA ELLS, Bar No. 243657
4  REBEKAH EVENSON, Bar No. 207825            MARIA V. MORRIS, Bar No. 223903
   1917 Fifth Street                          315 Montgomery Street, 10th Floor
5  Berkeley, CA  94710                        San Francisco, California  94104
   Telephone:  (510) 280-2621                 Telephone: (415) 433-6830

6  KIRKPATRICK & LOCKHART PRESTON             BINGHAM, McCUTCHEN, LLP
   GATES ELLIS LLP                            WARREN E. GEORGE, Bar No. 53588
7  JEFFREY L. BORNSTEIN, Bar No. 99358        Three Embarcadero Center
   EDWARD P. SANGSTER, Bar No. 121041         San Francisco, California  94111
8  RAYMOND E. LOUGHREY, Bar No. 194363        Telephone: (415) 393-2000
   55 Second Street, Suite 1700
9  San Francisco, CA  94105-3493
   Telephone:  (415) 882-8200

10 THE LEGAL AID SOCIETY –
   EMPLOYMENT LAW CENTER
11 CLAUDIA CENTER, Bar No. 158255
   600 Harrison Street, Suite 120
12 San Francisco, CA  94107
   Telephone:  (415) 864-8848

13 Attorneys for Plaintiffs

14              IN THE UNITED STATES DISTRICT COURTS

15            FOR THE EASTERN DISTRICT OF CALIFORNIA

16          AND THE NORTHERN DISTRICT OF CALIFORNIA

17    UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

      PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE
18
   RALPH COLEMAN, et al.,                )  No.:  Civ S 90-0520 LKK-JFM P
19                                        )
            Plaintiffs,                   )  **THREE-JUDGE COURT**
20                                        )
        vs.                               )
21                                        )
   ARNOLD SCHWARZENEGGER, et al.,         )
22                                        )
        Defendants                        )
23                                        )
   MARCIANO PLATA ,et al.,                )  No. C01-1351 TEH
24                                        )
            Plaintiffs,                   )  **THREE-JUDGE COURT**
25                                        )
        vs.                               )
26                                        )  **PROOF OF SERVICE**
   ARNOLD SCHWARZENEGGER, et al.,         )
27                                        )
        vs.       Defendants              )
28

# **PROOF OF SERVICE**

I, Kate M. Richardson, declare that I am a resident of the State of California, am over the age of eighteen years and am not a party to the within action. I am employed with Rosen, Bien & Galvan LLP, whose address is 315 Montgomery Street, Tenth Floor, San Francisco, California 94104. On August 27, 2008, I served the following documents:

**REBUTTAL EXPERT REPORT OF JAMES GILLIGAN, M.D.**

I served the documents on the persons listed below, as follows:

| [ X ] | **By United States mail.** I enclosed the documents in a sealed envelope or package addressed to the persons listed below and placed the envelope or package for collection and mailing in accordance with our ordinary business practices. I am readily familiar with my firm's practice for collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid. I am a resident or employed in the county where the mailing occurred. The envelope or package was placed in the mail at San Francisco, California. |
|---|---|

All documents were sent to the following persons:

Lisa A. Tillman
Deputy Attorney General
1300 I Street
Sacramento, CA 95814

Rochelle East
Office of the Attorney General
455 Golden Gate, Suite 11000
San Francisco, CA 94102-7004

Lead Counsel for County Intervenors
Ann Miller Ravel
Theresa Fuentes
Office of the County Counsel
70 West Hedding, East Wing, 9th Floor
San Jose, CA 95110

Paul B. Mello, Esq.
Hanson & Bridgett LLP
425 Market Street, 26th Floor
San Francisco, CA  94105

California Correctional Peace Officers'
Association (CCPOA) Intervenors
Natalie Leonard
Gregg MacClean Adam
Carroll, Burdick & McDonough, LLP
44 Montgomery Street, Suite 400
San Francisco, CA 94104

Republican Assembly and Senate Intervenors
Steven S. Kaufhold
Akin, Gump Strauss Hauer & Feld, LLP
580 California Street, 15th Floor
San Francisco, CA 94104

[232999-1]

1

District Attorney Intervenors
William E. Mitchell
Assistant District Attorney
Riverside County District Attorney's Office
4075 Main Street, First Floor
Riverside, CA 92501

County of Sonoma Intervenors
Anne L. Keck, Deputy County Counsel
Steven Woodside
575 Administration Drive, Room 105A
Santa Rosa, CA 95403

California Sheriff, Probation, Police Chief and Corrections Intervenors
Jones & Mayer LLP
Martin J. Mayer
Kimberly Hall Barlow
3777 North Harbor Boulevard
Fullerton, CA 92835

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct, and that this Proof of Service was executed on this 27th day of August, 2008, at San Francisco, California.

Kate M. Richardson

PROOF OF SERVICE

[232999-1]