1  EDMUND G. BROWN JR.
   Attorney General of the State of California
2  DAVID S. CHANEY
   Chief Assistant Attorney General
3  ROCHELLE C. EAST
   Senior Assistant Attorney General
4  JONATHAN L. WOLFF
   Senior Assistant Attorney General
5  LISA A. TILLMAN – State Bar No. 126424
   Deputy Attorney General
6  KYLE A. LEWIS – State Bar No. 201041
   Deputy Attorney General
7  455 Golden Gate Avenue, Suite 11000
   San Francisco, CA 94102-7004
8  Telephone: (415) 703-5708
   Facsimile: (415) 703-5843
9  lisa.tillman@doj.ca.gov
   kyle.lewis@doj.ca.gov
10
   Attorneys for Defendants
11

HANSON BRIDGETT LLP
JERROLD C. SCHAEFER - 39374
PAUL B. MELLO – 179755
S. ANNE JOHNSON – 197415
SAMANTHA D. TAMA – 240280
RENJU P. JACOB - 242388
425 Market Street, 26th Floor
San Francisco, CA  94105
Telephone: (415) 777-3200
Facsimile:  (415) 541-9366
jschaefer@hansonbridgett.com
pmello@hansonbridgett.com
ajohnson@hansonbridgett.com
stama@hansonbridgett.com
rjacob@hansonbridgett.com

12              UNITED STATES DISTRICT COURT

13          FOR THE EASTERN DISTRICT OF CALIFORNIA

14          AND THE NORTHERN DISTRICT OF CALIFORNIA

15    UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

16      PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

17  RALPH COLEMAN, et al.,

18          Plaintiffs,

19      v.

20  ARNOLD SCHWARZENEGGER, et al.,

21          Defendants.

No.  2:90-cv-00520 LKK JFM P

**THREE-JUDGE COURT**

22  MARCIANO PLATA, et al.,

23          Plaintiffs,

24      v.

25  ARNOLD SCHWARZENEGGER, et al.,

26          Defendants

27

No. C01-1351 TEH

**THREE-JUDGE COURT**

**EXHIBITS G, PART 3 TO EXHIBIT P TO
DECLARATION OF PAUL MELLO IN
SUPPORT OF DEFENDANTS' MOTIONS
IN LIMINE**

**To: Three-Judge Panel**

28

- 1 -

DECL. PAUL MELLO SUPP. DEFS.' MOT. IN LIMINE
(CASE NOS. 90-00520; 01-1351)

1648445.1

# EXHIBIT G
# PART 3

for 202 prisoners), staff in an emergency can only sound the alarm, make frantic telephone or radio calls. and hope for backup. An officer alone with several hundred inmates is unlikely, for example, to perform emergency first aid or CPR – it is simply unsafe to do so with no backup, when prisoners could easily simulate an emergency as a diversion. This inability to perform basic lifesaving functions could have potentially devastating consequences on the life and health of a prisoner undergoing a medical or mental health emergency. This situation presents an unacceptable risk of harm to prisoners.

### 3. Watchdogs and gatekeepers

60. Custodial staff in the housing units generally has more contacts with prisoners than any other staff. They release prisoners for appointments and meals and are generally responsible for overseeing the delivery of their basic needs. A housing unit officer does not provide mental health care, but if a prisoner is decompensating, that officer is in the best position to see what is happening, recognize the problem, bring in the clinicians to address the patient's mental health needs, and ensure that he does not harm himself or others. Similarly, a housing unit officer does not provide medical care, but if a prisoner does not emerge for multiple meals in a row, that officer is responsible for recognizing the potential danger and investigating to ensure that the prisoner is not sick, or incapable of meeting his own needs. Under overcrowded conditions, with short-staffed units, and line officers who are overwhelmed and even fearful, they are far less likely to recognize a

prisoner in need of services and perform this essential function. In addition, managers are overwhelmed, and line staffs often do not get the attention and direction needed to run a safe, humane operation.

61. Short-staffing places managers and line staff alike in unacceptable positions. As the Receiver has noted, "[m]any CDCR prisons are unable to sustain the basic delivery of medical, mental health, and dental services because of limited staffing (clinical and custody) and an overwhelming number of prisoner/patients who require care. Every day, many California prison wardens and health care managers make the difficult decision as to which of the class actions, *Coleman*, *Perez*, *Armstrong*, or *Plata* they will fail to comply with because of staff shortages and patient loads." Joint Pls' Trial Ex. 26 at 30 (Receiver's Report on Overcrowding). I agree, and I observed this phenomenon on my prison visits. For example, at San Quentin and CIM, two Reception Centers where prisoners must be escorted to meals, yard, laundry, and other basic functions, staff by their own report get "maxed out" and unable to fulfill the needs of prisoners and the legal requirements of their jobs. Medical and mental health care are included in this burn-out, and demoralized staff often make poor decisions.

62. In an atmosphere of crisis where all operations other than essential safety and security moves are shut down, medical and mental health care are lower and lower priorities. Prison staff is less likely to know the prisoners in their units and have the time, the ability, and the willingness to identify and respond appropriately to basic medical and

34

mental health needs.

**B. Lockdowns**

63. Overcrowding engenders a state of perpetual crisis that shuts down non-emergency prison functions. I agree with the Governor's expert panel: "Staffing reductions, overcrowding, and attendant violence have eroded the ability of the prisons to operate effectively for any purpose other than security." Joint Pls' Trial Ex. 4 at 125 (Deukmajian Report). Riots and disturbances at Avenal, the California Correctional Center, Calipatria, and Wasco alone account for thousands of days on lockdown or modified programs. Joint Pls' Trial Ex. 11 at ¶ 3 (Declaration of Scott Kernan in Support of Defendants' Report in Response to the Court's February 15, 2007 Order, May 16, 2007). The Governor noted more than a year ago that overcrowding has "substantially limited or restricted inmate movement. . ." Joint Pls' Trial Ex. 1 at 6 (Emergency Proclamation).

64. Lockdowns impact health care delivery because they "call for a radically different form of medical delivery than the services provided under normal general population conditions"; when non-essential movement is shut down, "clinical staff must go from cell to cell to see the prisoner/patient, or small groups o[f] individual prisoners must be escorted by correctional officers to and from clinic areas," so that lockdowns "inhibit the delivery of medical care and increase the staffing necessary for such care." Joint Pls' Trial Ex. 26 at 29-30 (Receiver's Report Re Overcrowding). Lockdowns are also

isolating, keeping prisoners in their cells or bed areas and making it harder to get staff
attention during health care emergencies and harder for custodial staff to notice prisoners'
medical and/or mental deterioration.

65.  As a result of lockdowns, many prisoners spend extreme amounts of time in their
cells or crowded dorms or gyms, with drastically limited time in beneficial programs or
basic living needs.  The Coleman Special Master has documented extensively the ways in
which lockdowns and partial lockdowns ("modified programming") injure prisoners with
mental illness by denying them needed mental health care.  Joint Pls' Trial Ex. 36 (18th
Special Master's Report) at 40 ("[g]roup therapy was available on all four yards at [High
Desert State Prison], though institutional lockdowns and program restrictions caused
frequent cancellations and limited inmate participation"); 84-85 (at the California State
Prison at Solano, "[m]odified programming and failure to honor priority ducats for mental
health contacts stymied access to treatment on level III yards, where modified
programming was in force throughout 2006 save for a few weeks.  No escorts were
available for mental health appointments"; in addition, "rising caseloads, poor access to
treatment associated with prolonged modified programming in one yard, and ducat
problems forced clinicians to resort too often to quarterly visits that were little more than
a cursory check-in, many of which occurred at cell-front or in locations that compromised
visual or auditory privacy.  Under these conditions, a subset of sick inmates got sicker,
and clinicians sometimes missed, or failed to respond appropriately to, signs of mental

36

illness"); 208 (California State Prison-Los Angeles County's "administration reported that lockdowns in November 2006 and January 2007 disrupted [mental health] treatment."); and 288 (California Institution for Women's treatment unit for seriously mentally ill patients "continued to limp along. Although over ten hours of groups per inmate per week were scheduled, inmates received only two to three hours of treatment per week. Staff audits found that 46 percent of groups were cancelled. . . . Lockdowns and other forms of restricted inmate movement were the largest single cause of cancellations").

66. I agree with the Receiver that "[o]vercrowding has resulted in increasing numbers of prisoner disturbances and 'lockdowns' by prison authorities in response. Because of the heightened security measures associated with lockdowns, medical care to the inmates is delayed and made substantially more time-consuming and cumbersome." Joint Pls' Trial Ex. 27 at 3 (Receiver's Supplemental Report Re Overcrowding, June 11, 2007).

### C. Classification

67. Overcrowding has pernicious effects on classification, the central organizing principal that keeps modern prisons as safe as possible for prisoners and staff by separating more dangerous inmates from more vulnerable prisoners and concentrating those in need of intensive medical and mental health treatment in places where services are more readily available and custodial as well as treatment staff are better trained to meet their needs. In a proper classification system, prisoners are assigned an objective classification score based on a range of weighted factors intended to predict their

37

institutional risk and specialized needs. Overcrowding has wreaked havoc with CDCR's classification systems, intended to maintain safe conditions and ensure appropriate specialized health care placement.

68. Overcrowding leads to classification failures that impact medical and mental health care delivery in two ways. First, the overburdened system no longer houses prisoners according to their classification levels in an alarming percentage of cases, making it harder to provide for their medical and mental health care needs, and second, the overcrowded system does not have the flexibility needed to respond to inevitable crises.

69. In any well-functioning classification system, "overrides," or instances in which staff make a reasoned determination that a prisoner is more appropriately housed in a different location than his classification score would indicate, should be no more than 10%. In California's overcrowded prisons, an estimated 25% of prisoners are housed outside of their security levels, many in higher security housing. Joint Pls' Trial Ex. 5 at 14 (Dr. Joan Petersilia, *Understanding California Corrections*). The most common reason to override classification scores in California is called a "population override," which "occurs when no bed is available at the type of facility that would normally be used for an inmate with a given score. Under those circumstances, the classification staff representative has total discretion over prisoner placement. This override has become increasingly common as California prisons have filled up beyond their designed capacity

38

[ ], and this shuffling of inmates to areas that were not designed to hold them has adverse

consequences for both the facilities and the individuals they house." *Id.* (footnote

omitted). In fact, this is not an override at all – this is the rejection of any classification

scheme at all for these estimated 25% of prisoners. In any event, it is two and an half

times greater than the accepted norm for variations from the classification scheme, and

presents an unacceptable risk of violence and harm. As Dr. Petersilia notes,

> There are significant implications of these frequent reassignments to
> more heavily fortified facilities, where inmate violence is
> higher,[citation omitted] the housing cost per-prisoner is higher, and a
> lower level of programming is available to inmates. In other words, the
> pressures of overcrowding frequently lead to housing assignments that
> are more expensive and dangerous than necessary and less likely to
> encourage rehabilitation. . . .
>
> [¶]. . . Prisoners in a maximum-security prison or unit spend a
> good part of the day in their cell, have strictly regulated movement,
> and are surrounded by a secure perimeter with extensive gun coverage.
> At the other extreme, in a minimum-security conservation camp,
> prisoners spend a large part of the day out of their dorm and have few
> restrictions on movement within an unfenced security or work area.
> [citation omitted] These variations in inmates' level of movement
> translate into tremendous differences in their ability to participate in
> rehabilitation programs."

*Id.*

70. I saw these problems in practice at Avenal, where Building 510 houses 300

prisoners; the population overflow goes to segregation units intended for punitive

purposes, where they are treated like segregation prisoners. Similarly, prisoners suffering

acute mental health crises are often housed in punitive administrative segregation

conditions because of the shortage of mental health crisis beds, as noted in Section I.C,

39

above.

71. The widespread rejection of CDCR's classification system has a significant impact on medical and mental health care: it is harder to get to health care appointments within the prison as well as out-of-prison specialty appointments, and more limited staff contact means that staff are less responsive to emergencies due to distrust, lack of understanding and compassion, and simple logistics: it is harder to get staff attention in a high-pressure, high-security unit. In addition, prisoners are subject to increased degrees of danger and potential for violence because they are placed with more dangerous and violent prisoners than their classification scores would warrant.

72. Mixing prisoners of different security levels and different needs is also extremely dangerous. At CIM, I saw prisoners of all security levels, minimum to maximum, in a Reception Center dorm setting, and at Valley State Prison for Women, I saw a dayroom which had double bunks for Reception Center prisoners. That kind of configuration is unacceptable for prisoners who have not been classified, about whom staff know little or nothing. At CIM, staff in West Facility admitted that maximum security (Level IV) prisoners are in the yards along with minimum security (Level I and II) prisoners. At San Quentin, on West Block and in the Badger Unit of South Block, I saw gang members on one tier, protective custody on another, general population on another, and prisoners serving life terms on yet another. Having all of these very different, often directly opposing needs in one housing unit makes it extremely difficult to meet all of their needs,

40

since gang and protective custody prisoners cannot come into contact with one another, for example, necessitating separate yard and feeding periods. Health care appointments are thus even more difficult to facilitate than would be the case in a short-staffed and overcrowded housing unit that nonetheless housed prisoners with uniform classification levels.

73. The second overcrowding-driven classification failure comes about because classification systems need built-in flexibility to respond to unforeseen needs. That is why, for example, in Texas we have defined "capacity" to include enough space to ensure "proper inmate classification and housing within the unit that is consistent with the classification system" as well as "housing flexibility to allow necessary repairs and routine and preventive maintenance to be performed without compromising the classification system. . . ." Texas Gov't Code § 499.102(a)(1)-(2) (Appendix C).

74. This level of flexibility is impossible with the current violence and state of crisis in California's prisons. For example, in late 2006, Los Angeles County cancelled a long-standing contract with CDCR for 1300 beds, requiring that the beds be vacated by January 31, 2007. According to CDCR's Director of CDCR Division of Correctional Health Care Services, this action would result in "thousands of inmate moves over a 13-week period scheduled to begin in September 2006." Joint Pls' Trial Ex. 54 at 1 (Dr. Peter Farber-Szekrenyi, letter to *Plata* Receiver Robert Sillen and *Coleman* Special Master J. Michael Keating, Jr., September 1, 2006).

41

75.  CDCR simply did not have the capacity to deal with this event in an appropriate way and instead was forced to resort to cutting legally required corners.  The head of medical services admitted that during the resulting transfers, CDCR would be unable to comply with legal requirements such as transferring prisoners with a 30-day supply of prescribed medications, performing intake assessments and tuberculosis tests on new arrivals, and completing medical summary forms for transferring prisoners.  *Id.* at 2-3. Other "necessary medical services" would suffer "increased delay": outside specialty service appointments would be cancelled for prisoners scheduled to transfer.  *Id.* at 3. Further, in order to conduct "required [mental health] evaluations, the existing mental health staff w[ould] have to be redirected from their primary responsibility of direct patient care."  *Id.* at 2.

### D. Management systems

76.  Overcrowding has overburdened CDCR's inadequate management systems that underlie health care delivery.  The excessive population leads to management failures in two ways.  First, overcrowding engenders a state of perpetual crisis that causes management failures.  Administrators spend their time doing damage control, rather than making sure the prison is operating properly and prisoners are getting the services that they need.  I was the warden of a prison with 3,000 prisoners and that was almost unmanageable.  A population of 7,000 or more, as is found in some California prisons, is not manageable at all.  The sheer size and complexities of managing a prison that size

.42

would be overwhelming for one manager especially with the limited resources in the areas of staffing and inadequate space for services to the offenders that I observed at all of the prisons I toured in California. One warden simply cannot know what he/she needs to know on a daily basis to make good informed management decisions.

77. Second, overcrowding overwhelms management infrastructure. As I have read in numerous reports of the Receiver, the CDCR lacks the management information systems needed to adequately organize and track prisoner transfers for specialized medical and mental health care and public health related needs (for example, people with compromised immune systems not going to Valley Fever risk areas) in the severely overcrowded conditions. Joint Pls' Trial Ex. 32 at 53 (Receiver's Sixth Quarterly Report). *See* discussion at I.B.4, above. CDCR also fails to hire adequate numbers of custodial as well as medical staff. *See* Joint Pls' Trial Ex. 26 at 11-12 (Receiver's Report Re Overcrowding).

78. CDCR also cannot track and transfer essential health care records, because the record system lacks the capacity to deliver records regarding this many prisoners. I was told at CIM that 98% of parole violators do not have their files when they arrive, which leads to security problems because staff are unable to properly classify prisoners. As I saw on my tours, staff is failing utterly in the essential task of maintaining health care records. Adequate record-keeping is a basic component of correctional systems management, but at Avenal, a prison I was told was built for 2900 prisoners with a

43

current population of 7500, I was told that there was four feet of loose filing waiting to be placed in prisoners' health records. At CIM, I saw 48 inches of unfiled documents, plus two additional cardboard boxes of unfiled medical records that had just arrived. Staff told me they had 54 inches several days earlier and has been much higher at other times. I am not surprised; given the extraordinary number of prisoners in these facilities, it is simply impossible to manually file so many records on a timely basis. In my experience, such extraordinary pressure on staff also leads to serious filing errors, which means that even records that have been filed might not be available to clinicians, and might be impossible ever to locate.

79. In sum, it is impossible under current conditions to provide adequate medical and mental health care to California prisoners.

## III.    Overcrowding is the primary cause of the constitutional violations

80. Based on the above, my opinion is that overcrowding is the primary cause of the medical and mental health constitutional violations caused by deficiencies in the support role played by non-health care staff. In rendering this opinion, I agree with the Governor's blue-ribbon panel of experts that "[t]he key to reforming the system lies in reducing the numbers." Joint Pls' Trial Ex. 4 at 3 (Deukmajian Report). I also agree with the *Plata* Receiver, when he reports that "[m]ost California prisons operate at 200% of capacity, with no effective relief in sight. Unless and until the living conditions of some prisons and the overpopulation experienced system-wide is effectively addressed, the

44

Receiver will be impeded in applying systemic and even some ad hoc remedies to the medical care system." Joint Pls' Trial Ex. 53 at 3 (Receiver's First Bi-Monthly Report, July 5, 2006). I further agree with the California State Auditor that "[m]eeting the constitutional rights of inmates to receive minimum standards of treatment" is a problem that "emerge[s]" from overcrowding. Joint Pls' Trial Ex. 6 at 22-23 (California State Auditor's Report). I also agree with the Office of the Inspector General that efforts to solve the medical care failures "are severely hampered by inmate population pressures that have prisons straining at nearly twice design capacity, spreading staff resources thin and leaving little facility space available for programming and other purposes. Developing sustainable solutions will require the [CDCR], state policymakers, and the public to collectively address the available options" to reduce overcrowding. Joint Pls' Trial Ex. 46 at ES-1 (Office of the Inspector General, Accountability Audit, Review of the Audits of the California Department of Corrections and Rehabilitation Adult Operations and Adult Programs, 2000-2004, April 2006).

Date: November 9, 2007

Doyle Wayne Scott

45

# APPENDIX A



# DOYLE WAYNE SCOTT

SENIOR ASSOCIATE

## RANGE OF EXPERIENCE

Mr. Scott served over 30 years with the Texas Department of Criminal Justice and the Texas Board of Pardons and Paroles. He began his career in corrections in 1972 as a correctional officer and progressed through the ranks to serve as Executive Director of the Texas Department of Criminal Justice (TDCJ). While serving as Executive Director with the TDCJ, Mr. Scott was responsible for the confinement and care of 151, 000 felony offenders, as well as for the supervision of 518,000 offenders on probation or parole; he led an agency of more than 40,000 employees and administered an annual budget of $2.3 billion. He initiated major reforms in the management of purchasing, construction, and contract operations and in the management of the agency's finances. Mr. Scott also instituted aggressive new policies to ensure equal employment opportunity, cultural diversity, and the elimination of sexual harassment in the workplace, and has created an Advisory Council on Ethics to increase staff awareness of ethical issues and to facilitate the practice of ethical behavior by all of the agency's employees.

During his tenure Mr. Scott actively pursued accreditation for the department's confinement facilities from the American Correctional Association. He introduced several innovative treatment programs, most notably the Inner Change Freedom Initiative, which was begun in 1996 as the first faith-based pre-release program in a penal institution in the United States. He also began a cooperative effort with a number of local communities statewide to build Habitat for Humanity homes with volunteer offender labor and to produce 2.5 million pounds of food grown on prison agricultural lands that was donated to local Texas food banks.

The State of Texas and the Texas Board of Criminal Justice honored Mr. Scott for his service to the state by dedicating and naming a Texas prison for him in February 2002.

## PROFESSIONAL AND BUSINESS HISTORY

MGT of America, Inc., Senior Associate, July 2004 - Present.

Correctional Consultant, May 2002 - June 2004.

Management & Training Corporation, Vice President, International Operations, 2001 - 2002.

Texas Board of Pardons & Paroles, Board Member, 2001.

Texas Dept. of Criminal Justice, Executive Director, 1996-2001; Institutional Division Director, 1994 - 1996; Deputy Director of Operations, 1989-1994; Regional Director, 1984 - 1989; Senior Warden-Ellis II, February - June 1984; Assistant Warden-Ellis I, January - February 1984; Major of Correctional Officers, 1983 - 1984; Captain of Correctional Officers, 1974 - 1983; Lieutenant of

YEARS OF EXPERIENCE:

30+

EDUCATION:

B. A., Business Administration-Finance, Sam Houston State University, Huntsville, Texas, 1973

A. A., Navarro Junior College, Corsicana, Texas, 1971

AWARDS:

Texas Corrections Association - President's Gavel Award

Texas Public Employees Association - State Agency Administrator of the Year

Sam Houston State University - Distinguished Alumni

Texas Corrections Association - Dr. George Beto Hall of Honor Award

Teague High School - Distinguished Alumni

Additional Information Available on Request



DOYLE WAYNE SCOTT
PAGE 2

Correctional Officers, 1973 - 1974; Sergeant of Correctional Officers, 1972 - 1973; Correctional Officer, January 1972.

## PROFESSIONAL AND BUSINESS EXPERIENCE

Consultant on a team hired by the Oklahoma state legislature to examine all operational and procedural aspects of all areas of responsibility managed by the Oklahoma Department of Corrections. The project commenced in June 2007 and is scheduled for completion in December 2007.

Consultant on a two-man team hired by the National Institute for Corrections at the request of the Commissioner of the Indiana Department of Correction to provide an external, independent review of the investigation into the causes and response to a disturbance at the New Castle Correctional Facility in April 2007.

Consultant on an agency-wide operational analysis for the Florida Department of Corrections. MGT contracted with the Florida Department of Corrections to provide an agency-wide operational analysis with recommendations for retooling specific areas that might not have been operating effectively, efficiently, in compliance with procedures or within the bounds of the law. Areas reviewed included the Inspector General's Office, contracting processes, personnel issues, security and institutions, and community corrections. MGT was able to accommodate the department's aggressive sixty-day schedule for delivery of the final report by mobilizing staff from different offices that have extensive corrections experience.



## PROFESSIONAL AND BUSINESS EXPERIENCE *(cont'd)*

Consultant on an assessment of the New Mexico Department of Correction's policies, procedures, and practices as they relate to the deployment of its correctional staff. The review included an assessment of the application of roster management procedures at two representative institutions within the Department. The project objective focused on enhancing the efficiency and effectiveness of the deployment of security staff and to determine if the use of overtime could be reduced.

Consultant on a project for the Cook County Judicial Advisory Council to develop an approach to assessing security staffing needs at the Cook County (Chicago, Illinois) Jail. The jail houses over 10,000 offenders on a daily basis, employs 2,400 officers, and is the largest single-site jail facility in the United States. MGT met with key policymakers, reviewed the jail's physical plant, and assessed jail operating policies. MGT reviewed current officer deployment patterns as well as facility operating systems and procedures. The project team also assessed security issues associated with the facility's physical plant and operational practices. The project produced a detailed work plan for a definitive study of Cook County Jail staffing needs.

Consultant on a correctional staffing analysis for the Indiana Department of Corrections. The objective of the study was to identify the optimum number of staff required to operate two Indiana DOC facilities safely and efficiently and to complete on-site training to IDOC staff in the process utilized to determine the optimum staffing level of a correctional facility. With submission of the final report MGT delivered a staffing analysis for the two facilities, in addition to specific recommendations on how the IDOC could improve the processes utilized to determine the optimum staffing complement required to operate its correctional facilities.

Consultant on a staffing analysis for the Kentucky Department of Corrections, through a grant from the Training Resource Center of Eastern Kentucky University. The analysis targeted three selected institutions within the Department of Corrections in order to determine the optimum number of staff required to operate these facilities in a safe and efficient manner. MGT issued a final report on its findings and recommendations and projected the potential for additional savings if its findings were implemented department-wide.

Consultant on a comprehensive review of the Puerto Rico prison system focusing on security and staffing assessments. This study was conducted for a federal district judge who was overseeing the prison system because of constitutional violations of the rights of inmates. Since that study, MGT has been hired by the prison system to help implement the recommendations.

Directed a team of experts that examined the staffing at every Texas prison and established the base staffing requirements that is used by the agency today.

Served over 30 years with the Texas Department of Criminal Justice and the Texas Board of Pardons and Paroles.

Began his career in corrections in 1972 as a correctional officer and progressed through the ranks to serve as Director of the Texas Department of Criminal Justice until 1996.

MGT
OF AMERICA, INC.

DOYLE WAYNE SCOTT
PAGE 4

## PROFESSIONAL MEMBERSHIP

American Correctional Association
  *Vice Chair, Standards Committee*
  *Member, Policies and Resolutions Committee*

Association of State Correctional Administrators
  *Chairman, Legislative and Legal Issues Committee*
  *Member, Standards Committee*
  *Member, Substance Abuse Committee*
  *Member, Controlling the Difficult to Manage Inmate Committee*

Southern States Correctional Association

Texas Corrections Association
  *Chair, Training and Certification Committee*

Texas Public Employees Association

Law Enforcement and Corrections Technology Advisory Committee

## COMMUNITY ACTIVITIES

Texas Corrections Association - President's Gavel Award

Texas Public Employees Association - State Agency Administrator of the Year

Sam Houston State University - Distinguished Alumni

Texas Corrections Association - Dr. George Beto Hall of Honor Award

Teague High School - Distinguished Alumni

# APPENDIX B

List of documents reviewed by Doyle Wayne Scott

Governor Schwarzenegger's Proclamation Regarding Prison Overcrowding, State of Emergency (October 4, 2006)

Photographs from the CDCR website, www.cdcr.ca.gov

CDCR's Inmate Population, Rehabilitation, and Housing Management Plan.

Finding of Fact and Conclusions of Law re Appointment of Receiver, *Plata v. Schwarzenegger*, October 3, 2005

Corrections Independent Review Panel, "Reforming Corrections," June 2004, Chapter 7, Inmate/Parolee Population Management.

Memorandum written by John Dovey, entitled " Memorandum Re: Modification to Correctional Operations Due to Compelling Operational Need," dated October 25, 2006

Dr. Peter Farber-Szekrenyi's Letter to Robert Sillen and J. Michael Keating, Jr., dated September 1, 2006.

Statement of CDCR Acting Secretary James Tilton on the Legislature's Failure to Act on Critical Prison Reform Legislation, issued September 1, 2006

Office of the Inspector General, "Accountability Audit, Review of the Audits of the California Department of Corrections and Rehabilitation Adult Operations and Adult Programs, 2000-2004," April 2006.

California Department of Corrections (CDCR) Spring 2007 Adult Population Projections.

Senate Budget and Fiscal Review Committee Subcommittee No.4, Agenda of April 12, 2007.

Senate Budget and Fiscal Review Committee Subcommittee No.4, Agenda May 9, 2007.

Dr. Joan Petersilia, "Understanding California Corrections," printed on May 29, 2007. Petersillia, Joan, Understanding California Corrections, California Policy Research Center, University of California (May 2006) (http://www.ucop.edu/cprc/documents/understand_ca_corrections.pdf)

Declaration of Scott Kernan in Opposition to Writ of Mandate, California Correctional Peace Officers' Organization v. Schwarzenegger, No. 06CS0168 (Sacramento Superior