# EXHIBIT K

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT

OF CALIFORNIA

* * * * * * * *

| | | |
|---|---|---|
| RALPH COLEMAN, | * | |
| et al., | * | |
| Plaintiffs | * | Case No. |
| vs. | * | Civ S90-0520- |
| ARNOLD | * | LKK-JFM-P |
| SCHWARZENEGGER, | * | |
| et al., | * | |
| Defendants | * | |

* * * * * * * *

DEPOSITION OF

JEFFREY BEARD, Ph.D.

September 26, 2008

Any reproduction of this transcript is prohibited without authorization by the certifying agency.

it's just so --- you know, it's so big. I mean, I think in 2006 they had almost 450 lockdowns, the average being about 12 days. Twenty-eight (28) of those lockdowns were for 60 days or more.

Here in Pennsylvania, except the four months that this institution was locked down after the Camp Hill riots in 1990, we haven't had any lockdown over two days. And I bet you we might have not even ten a year for our whole system. I mean, I just --- and so that makes it very difficult. And it shows that you have an unsafe system.

So not only is it overcrowded, there's no space to do programming. You're locking down all the time, so you don't have the time to consistently do the programs. But inmates who don't feel safe, how do you expect them to go to a program and then get something out of that program if they have to worry about

being assaulted on their way back to their housing unit? I mean, it's just not a very --- it's not a conducive atmosphere.

So even though if California didn't have all those problems, if they were ready to start today putting these programs in, it would take them probably at least three or four years to get where we are if they took some of the lessons that we've learned.

Q. Right.

A. But they're not ready to even begin that, you know, until they deal with the safety in their prisons. That's why the number one recommendation in the expert panel report was to reduce overcrowding.

Q. Right.

A. And we had a specific section in there, Section F, which dealt with safety and the crowding issue and tried to give some ideas of some things that they could do to try to

8ddb8e21-3ee4-42e6-aaa3-41b030845315

A. So I think --- you know, I would have preferred in AB-900 to see new prisons being built of between 2,000 and 3,000 inmates in size ---

Q. Right.

A. --- rather than this infill beds, because that is not going to deal with the safety problems and the severe overcrowding problems they have.

Q. It also has --- would you agree that it also has an effect, for example, on health care services because you still need ---?

A. Everything is affected when you have a --- when you overcrowd the infrastructure in a facility.

Q. Right.

A. Everything from feeding inmates, to being able to do programs with inmates, to being able to provide health care to inmates, to being able to identify and properly treat mentally ill inmates, all of those things are impacted if the

8ddb8e21-3ee4-42e6-aaa3-41b030845315

infrastructure of the institution is inadequate to handle ---

Q. Right.

A. --- the situation. So yes. I mean, obviously they would be affected along with everything else. I mean, one of the things I was surprised, when I go out to the one prison I visited, I see inmates carrying around bagged lunches. And I said, oh, you let them carry bagged lunches to the education program here? And he said, oh, no, they all get bagged lunches in the morning. I said, well, you don't feed them three meals a day? Well, we can't do that. We don't have the ability. We can only feed them twice and we have to give them bagged lunches. That's an example of the facility not having the infrastructure. They can't feed their inmates ---

Q. Right.

A. --- the way most prisons do. So you know, that's ---. So anyway,

8ddb8e21-3ee4-42e6-aaa3-41b030845315

Q. Right.
A. That, you know, it's something that --- you know, if they did that they could start getting on the road and probably between those two initiatives could lower their population over the course of three years or so between 15,000 and 20,000 inmates ---
Q. Right.
A. --- and reduce their receptions by close to 30,000.
Q. Right.
A. Now, that would get them well on the way to closing the gap that they need to close. I mean, you have to decide what level you want to bring the system down to.
Q. Right.
A. You know, I think I looked just recently on their web site and they're just under 200 percent.
Q. Right.
A. Well, it had been over 200 percent.

8ddb8e21-3ee4-42e6-aaa3-41b030845315

Q. Yes.
A. But they're now just under 200 percent of capacity.
Q. What level do you think is appropriate?
A. In my opinion, what I've seen over the years is once you start reaching about 150 percent ---
Q. Right.
A. --- of capacity you're getting to the point where you're going to start having problems. You're not going to be able to do the kinds of things that you want. So if I were recommending a first goal for them ---
Q. You mean a preliminary goal?
A. --- a preliminary goal, I would at least be shooting for something in that 150-percent range.
Q. Right.
A. I think one of their strike teams, I read somewhere, recommended even a lower number, of 130 percent.
Q. Right. What do you think

8ddb8e21-3ee4-42e6-aaa3-41b030845315

saw Jeannie Woodford's (phonetic). I saw Dr. Stuart's and Dr. Shansky's (phonetic) expert reports.

Q. And so knowing what you know about corrections and having been out in California with the expert panel and having reviewed those reports, is there any doubt that overcrowding is having an effect on the health care system?

A. I had no doubt --- and I know this lawsuit is about health care.

Q. Right.

A. And there's also the one about mental health care. I have no doubt that overcrowding is impacting on all of those things, just like it impacts on everything else. I came from it from a different perspective.

Q. Right.

A. Because I was looking at it from a programming perspective on the expert panel ---

Q. Right.

A. --- and became aware from a

8ddb8e21-3ee4-42e6-aaa3-41b030845315

number of factors of how significant that overcrowding was and how significant the impact of that overcrowding was on the system.

Q. Right.

A. I didn't come from it from the direction of the mental health or medical.

Q. Right.

A. Came from the program side.

Q. Right.

A. And you know, I, you know, saw --- I've talked to people from California. I reviewed statistics on their web sites, the assault rates.

Q. Right.

A. They probably have an assault rate of two and a half times the assault rate that we have here in Pennsylvania.

I looked at the number of suicides that they had there, which I think they were like double the national average almost in suicide rates, and you know, more than double

8ddb8e21-3ee4-42e6-aaa3-41b030845315

A. Uh-huh (yes).

Q. And that the only fix for the unconstitutional delivery of medical care and mental health care is a prisoner release order or cap. Has anybody explained that to you?

ATTORNEY SPECTER:

Well, that misstates the legal standard, Paul. That's not quite right.

ATTORNEY MELLO:

Okay.

BY ATTORNEY MELLO:

Q. Has anybody explained to you a standard along those lines?

A. I don't think I ever really discussed the specifics of what's being looked for here. I mean, my understanding is that the three-judge panel is looking at doing something to cap the prison population. How that --- the specifics of all of that, I don't know that I've ever really discussed with anybody.

Q. Fair enough. Have you ever

8ddb8e21-3ee4-42e6-aaa3-41b030845315

evaluated whether the delivery of medical and mental health care in California's prisons is adequate?

A. No.

Q. Have you ever evaluated what, if any, deficiencies exist in the medical and mental health care systems in California's prisons?

A. No.

Q. What type of data would you need to evaluate what, if any, deficiencies exist in the medical and mental health care systems in California's prisons?

A. Well, you know, one way is to look at reports done by experts, and of course, I did review two expert reports on that. Another way is to look at some of the statistics of the system.

Like, for instance, suicides is a good example. If your suicide rate is twice the national average you might conclude that there's some problem in the mental health care of

8ddb8e21-3ee4-42e6-aaa3-41b030845315

problem's getting worse and nobody seems to be moving to deal with the problem.

Q. Can you tell me the components of a constitutionally adequate medical care system?

ATTORNEY SPECTER:

It calls for a legal conclusion.

BY ATTORNEY MELLO:

Q. Well, let me back up. Do you consider yourself an expert in medical care delivery in prisons?

A. I don't consider myself an expert, but I'm certainly aware of what some of the components are that you need. Whether I know all the components, I can't tell you. I'm not a physician.

But obviously you need doctors. You need nurses. You need physicians' assistants. You need people to take care of it. You need a place for them to work. There should be suitable privacy in those

8ddb8e21-3ee4-42e6-aaa3-41b030845315

specific number is at each California institution you'd have to go there; correct?

A. Yes. That's correct. Or somebody who was an expert would have to go there.

Q. Right. Have you evaluated whether California can provide adequate medical and mental health care in its prisons without a reduction in its prison population?

A. I didn't specifically look at that, no.

Q. Have you ever evaluated whether California must take steps to fix the delivery of medical and mental health care in its prisons by means other than reducing population?

A. I haven't personally evaluated that, no.

Q. So you then you couldn't testify as to whether other steps other than reducing population would remedy the issue; correct?

ATTORNEY SPECTER:

8ddb8e21-3ee4-42e6-aaa3-41b030845315

system, but logically, if you improved pharmacy in California; correct?

A. Certainly. Anything that you improve ---.

Q. Any of those components ---?

A. Any of those components that you improve is going to improve the care. Now, whether or not it gets to the point where it's constitutional, that's --- somebody else has to make that decision.

Q. Because you're not a medical or mental health care expert; correct?

A. Well, I might consider myself a mental health expert, but not a medical expert.

Q. Okay.

A. But it's also a legal determination, I think, that courts really need to make rather than me.

Q. Right. I believe you testified earlier about steps that California might take to reduce its

COMMONWEALTH OF PENNSYLVANIA )
COUNTY OF DAUPHIN )

C E R T I F I C A T E

I, Jennifer T. Alves, a Notary Public in and for the Commonwealth of Pennsylvania, do hereby certify:

That the witness whose testimony appears in the foregoing deposition, was duly sworn by me on said date and that the transcribed deposition of said witness is a true record of the testimony given by said witness;

That the proceeding is herein recorded fully and accurately;

That I am neither attorney nor counsel for, nor related to any of the parties to the action in which these depositions were taken, and further that I am not a relative of any attorney or counsel employed by the parties hereto, or financially interested in this action.

NOTARIAL SEAL
JENNIFER T. ALVES, Notary Public
Harrisburg, Dauphin County, PA
My Commission Expires April 15, 2012

Jennifer T. Alves

Jennifer T. Alves, Reporter

· PITTSBURGH, PA · CLEARFIELD, PA · STATE COLLEGE, PA · HOLLIDAYSBURG, PA · ERIE, PA · OIL CITY, PA · HARRISBURG, PA
SARGENT'S COURT REPORTING SERVICE, INC.
210 Main Street
Johnstown, PA 15901
(814) 536-8908
· INDIANA, PA · GREENSBURG, PA · PHILADELPHIA, PA · SOMERSET, PA · WILKES-BARRE, PA · CHARLESTON, WV