# EXHIBIT L
# PART 1

# EXHIBIT L

1  PRISON LAW OFFICE
   DONALD SPECTER BAR NO.: 83925
2  STEVEN FAMA BAR NO.: 99641
   E. IVAN TRUJILLO BAR NO.: 228790
3  GENERAL DELIVERY
   SAN QUENTIN, CALIFORNIA 94964
4  TELEPHONE: (415) 457-9144

5  ROSEN, BIEN & GALVAN, LLP
   MICHAEL W. BIEN BAR NO.: 096891
   JANE E. KAHN BAR NO.: 112239
6  AMY WHELAN BAR NO.: 215675
   LORI RIFKIN BAR NO.: 244081
7  SARAH M. LAUBACH BAR NO.: 240526
   315 MONTGOMERY STREET, 10TH
8  FLOOR
   SAN FRANCISCO, CALIFORNIA 94104
9  TELEPHONE: (415) 433-6830

10 THE LEGAL AID SOCIETY –
   EMPLOYMENT LAW CENTER
11 CLAUDIA CENTER BAR NO.: 158255
   LEWIS BOSSING BAR NO.: 227402
12 600 HARRISON STREET, SUITE 120
   SAN FRANCISCO, CA 94107
   TELEPHONE: (415) 864-8848

13

14 Attorneys for Plaintiffs

15

BINGHAM, MCCUTCHEN, LLP
WARREN E. GEORGE BAR NO.: 53588
THREE EMBARCADERO CENTER
SAN FRANCISCO, CALIFORNIA 94111
TELEPHONE: (415) 393-2000

HELLER, EHRMAN, WHITE &
MCAULIFFE
RICHARD L. GOFF BAR NO.: 36377
701 FIFTH AVENUE
SEATTLE, WASHINGTON 98104
TELEPHONE: (206) 447-0900

IN THE UNITED STATES DISTRICT COURTS

16 FOR THE EASTERN DISTRICT OF CALIFORNIA

AND THE NORTHERN DISTRICT OF CALIFORNIA

17 UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

18

| | |
|---|---|
| 19 RALPH COLEMAN, et al., | No.: Civ S 90-0520 LKK-JFM |
| 20 Plaintiffs, | **THREE-JUDGE COURT** |
| 21 vs. | |
| 22 ARNOLD SCHWARZENEGGER, et al., | |
| 23 Defendants | |
| 24 MARCIANO PLATA, et al., | No. C01-1351 TEH |
| 25 Plaintiffs, | **THREE-JUDGE COURT** |
| 26 vs. | |
| 27 ARNOLD SCHWARZENEGGER, et al., | **EXPERT REPORT OF JAMES AUSTIN, PH.D.** |
| vs. | |
| Defendants | |

28

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ............................................................................................ 1

II.    MY EXPERT OPINIONS IN THIS ACTION ......................................................... 5

III.   HISTORY OF OVERCROWDING IN THE CALIFORNIA SYSTEM ............... 6

    A.     Causes and Effects of Severely Overcrowded Prison Systems ........................ 9

    B.     Overcrowding In the California Prison System ............................................. 10

        1.     Significant Delays in Processing and Classifying Prisoners.................... 10

        2.     Excessive Inter-Facility Transfers .......................................................... 12

        3.     Lack of Access to Meaningful Medical, Mental Health Treatment and Rehabilitative Programs ................................................................... 12

        4.     Mis-Housing of Inmates .......................................................................... 14

        5.     Serious Incidents and Safety .................................................................... 15

        6.     Inability to Conduct Valid Individual Needs / Risk Assessments ............ 16

        7.     The Failure of the Work Incentive Program ............................................ 18

IV.    DEFENDANTS' CURRENT EFFORTS TO ADDRESS OVERCROWDING WILL NOT BE EFFECTIVE ............................................. 19

    A.     Building New Prisons .................................................................................... 19

    B.     Out of State Transfers ................................................................................... 20

    C.     Administrative Discharge of Parolees .......................................................... 21

V.     CONCLUSIONS ............................................................................................. 21

EXPERT REPORT OF JAMES AUSTIN, PH.D., CASE NOS. 90-520 LKK (JFM), 01-1351 TEH

## EXPERT REPORT OF JAMES AUSTIN, Ph.D.

### I.    INTRODUCTION

1.    I received my Ph.D. in sociology from the University of California at Davis in 1980. I also hold a Master of Arts degree in sociology from De Paul University in Chicago, Illinois, which I obtained in 1975, and a Bachelor of Arts in sociology from Wheaton College in Wheaton, Illinois, which I obtained in 1970. I am currently the President of JFA Institute, a non-profit corrections consulting firm that works in partnership with federal, state and local government agencies to implement more effective criminal justice policies. My complete academic and professional experience is set forth more fully in my curricula vitae, which is attached as **Appendix A.**

2.    I have been involved in correctional planning and research for more than 30 years. From 1970 to 1974, I worked as a correctional sociologist in the Illinois Department of Corrections. From 1974 to 1982, I was a research associate at the National Council on Crime and Delinquency in San Francisco. Beginning in 1982, I became the Executive Vice President of the National Council on Crime and Delinquency and continued in that post until 1998. Between 1999 and 2003, I was a research Professor in the Department of Sociology at the George Washington University in Washington, D.C., where I was also the Director of the "Institute for Crime, Justice and Corrections." Since founding the JFA Institute in 2003, I have also acted as its President.

3.    In my current position, I and my staff evaluate criminal justice practices and design research-based policy solutions in a variety of areas including prison population simulation modeling and projections, offender risk assessment and classification systems, parole and probation guidelines, and special needs programs evaluation, including mental health programs. In 1991, I was named by the American Correctional Association as the recipient of the Peter P. Lejin's

1

Research Award for my research contributions to the field of corrections. In 1999, I received the Western Society of Criminology Paul Tappin award for outstanding contributions in the field of criminology. From 1999 to 2003, I served as Chair of the National Policy Committee for the American Society of Criminology.

4.    I am currently serving as the director for several large research and evaluation programs, including the Justice Reinvestment Initiative, funded by the Council of State Governments, and the Correctional Options Program, funded by the Bureau of Justice Assistance (BJA), a division of the U.S. Department of Justice.

5.    I have extensive experience working with correctional systems experiencing crowding and population-related challenges. I am currently working in the states of Maryland, Nevada, Texas, Rhode Island, Connecticut, Arizona, Pennsylvania, and Louisiana to safely reduce their prisons populations. In 1981 and 1986, I served on the National Academy of Sciences National Panels on Sentencing and Prison Overcrowding. I was appointed to the Governor's Task Force on Prison Crowding for Nevada in 1991.

6.    In the 1980s I conducted a major study funded by the US Department of Justice of the use of early release by Governor James Thompson's administration to control the level of crowding in the Illinois prison system. That study found that modest reductions in the length of imprisonment (60-120 days) would have significant impact on prison crowding without jeopardizing public safety.

7.    I have served as an expert or consultant to various federal courts and correctional systems. I was jointly appointed by the Department of Justice and the Georgia Department of Juvenile Justice and the Louisiana Department of Youth Services to monitor those states' compliance with a Memorandum of Agreement

concerning the conditions of confinement in Georgia's and Louisiana's youth facilities. I have also been a consultant for the National Institute of Corrections on jail and prison classification systems. In that capacity, I have assisted more than 25 states and numerous jail systems to develop and implement objective prisoner classification systems. Currently, I am working with parole boards to develop risk assessment systems for prisoners eligible for release in Texas, Pennsylvania, Maryland, Nevada, Rhode Island, and the US Parole Commission. In the recent past I have worked with the parole boards in Kentucky, West Virginia, and Oklahoma on these same issues.

8.    Between 1995 and 1997, I directed Congressionally-mandated evaluations of the Washington, D.C. Department of Corrections operations, classification system, staffing levels, and physical plant, and of the D.C. Department of Youth Services Agency operations, classification system, staffing levels, physical plant, mental health, information services and program services.

9.    I also have substantial experience specifically with the California adult and juvenile correctional systems. I conducted research on the CDC prison classification, evaluated the Los Angeles County Jail Boot Camp program, assessed the extent of over-representation of minorities in the California juvenile justice system, developed a risk assessment system for Alameda County, served on the Robert Presley Institute, conducted an evaluation of institutional violence at San Quentin, co-directed a study of the effects of AB2 on pretrial release, and assisted in the development of the California Alternatives to Incarceration report for the legislature. In 2003, I served on the Advisory Committee of the Little Hoover Commission, which produced a Report on the California Prison System titled "Back to the Community: Safe & Sound Parole Policies." As noted later on. I recently authored a proposal for a model re-entry program for Lancaster

prison that was requested by YACA Secretary Roderick Hickman and then CDC Director Jeanne Woodford.

10.    I was also recently invited to participate in the California Department of Corrections and Rehabilitation's "Expert Panel on Adult Offender Reentry and Recidivism Reduction" ("Expert Panel"). Joint Pls' Trial Ex. 2. The Expert Panel was created to complete two primary tasks: (1) review the current programs being offered by the CDCR to its adult offenders and comment on their effectiveness reducing recidivism and; (2) make recommendations as to how the CDCR could improve its program offerings, organizational culture, and environment to better reduce the adult offender recidivism rate. I was one of several nationally recognized experts in the field of corrections who studied these issues and produced a final report, which was published in June of 2007. I remain on the Expert Panel and am completing tasks associated with the implementation of the Panel's recommendations.

11.    As a member of the Expert Panel, I conducted a tour of the California Men's Colony (CMC) on April 6, 2007. Prior to that, I made two visits to the Lancaster prison in 2005 as part of the aforementioned re-entry proposal. My most recent visit to Lancaster was on November 2, 2007, as an expert for this case.

12.    The Expert Panel created two sub-committees to study recidivism and reentry issues, including the "Program Review Sub-Committee" which reviewed the current program offerings and the "Model Program Sub-Committee" which provided recommendations to improve the current program offerings and the underlying systems in which the programs operated. I was a member of the latter sub-committee.

EXPERT REPORT OF JAMES AUSTIN, PH.D., CASE NOS. 90-520 LKK (JFM), 01-1351 TEH

13.     One of the key conclusions that I and the Expert Panel as a whole reached was that the CDCR would have to address severe overcrowding before it had any hope of reducing recidivism rates or improving programming.

14.     I am billing the plaintiffs $150 an hour, my usual billing rate. I have not testified as an expert in either a deposition or a trial in the past four years. A list of the publications I authored in the past ten years is included in Appendix A.

## II.     MY EXPERT OPINIONS IN THIS ACTION

15.     I have been retained by plaintiffs' counsel in the *Plata* and *Coleman* cases as an expert in prison administration and the impact of overcrowding on prisoners' medical and mental healthcare. I have also been asked to render my opinion with respect to whether overcrowding within the California Department of Corrections and Rehabilitation (CDCR) is the primary cause of the current unconstitutional conditions experienced by members of the *Coleman* and *Plata* classes and whether the CDCR's current strategies to address overcrowding will be effective. In addition, I have been asked whether, in my opinion, other court-ordered relief that does not address overcrowding would be effective in addressing the underlying Constitutional violations in a timely manner.

16.     The opinions set forth in this declaration are based on my extensive experience studying and researching correctional systems, including my recent work on the Expert Panel, on my review of data and documents provided to me by plaintiffs' counsel and on my visits to California State prisons, including, most recently, my expert tour at CSP-Lancaster on November 2, 2007.

17.     In preparation for this report, I have reviewed the following documents (among others): Governor Schwarzenegger, *Prison Overcrowding State of Emergency Proclamation* (October 2006); Assembly Bill 900; CDCR, *Fall Adult Population Projections* (October 2007); Office of the Inspector General, *Special Review into In-Prison Substance Abuse Programs Managed by*

20.    As these legislative actions took hold, the CDCR prison population began to rise.  In about ten years, the prison population increased by nearly 100,000 inmates from 25,000 in 1980 to 120,000 in 1993.  In order to keep pace with this historic increase, the CDCR began a massive prison construction effort to keep pace with the growth.

21.    As shown in the following chart, the gap between the institutional population (excluding the camps and community correctional centers) and the design capacity of the CDCR institutions has been steadily widening ever since CDCR has been reporting its design bed capacity.  Specifically, there has been no progress by the state in reducing its over-crowding situation for approximately 20 years (or more).



Figure 1: Yearly Institutional Populations as Compared to Institutional Design Capacities

EXPERT REPORT OF JAMES AUSTIN, PH.D., CASE NOS. 90-520 LKK (JFM), 01-1351 TEH

22.    The current CDCR projection (Fall 2007) shows there is no immediate relief in sight. Joint Pls' Trial Ex. 19. The segment of the CDCR population that is most disconcerting is the institutional population where crowding is the greatest. The Fall Forecast as summarized below shows that the CDCR Institutional population will increase another 16,000 inmates over the next five years (see Joint Pls' Trial Ex. 19 at Table 1):

Population Projections Unit
Estimates and Statistical Analysis Section
Offender Information Services Branch

Department of Corrections and Rehabilitation
State of California
August 30, 2007

**Fall 2007 Adult Population Projections**
Table 1
Institution Population
June 30, 1998 through June 30, 2013

| As of June 30 | Total | Total Males | Male Felons | Male Addicts[1] | Male Others[2] | Total Females | Female Felons | Female Addicts[1] | Female Others[2] |
|---|---|---|---|---|---|---|---|---|---|
| Actual | | | | | | | | | |
| 1998 | 158,207 | 147,001 | 144,806 | 1,924 | 272 | 11,206 | 10,594 | 562 | 50 |
| 1999 | 162,064 | 150,981 | 148,621 | 1,703 | 257 | 11,483 | 10,949 | 495 | 39 |
| 2000 | 162,009 | 150,793 | 148,754 | 1,776 | 263 | 11,207 | 10,620 | 535 | 52 |
| 2001 | 161,497 | 150,785 | 148,863 | 1,668 | 264 | 10,712 | 10,261 | 403 | 48 |
| 2002 | 157,979 | 148,153 | 146,455 | 1,351 | 347 | 9,826 | 9,453 | 311 | 62 |
| | | | | | | | | | |
| 2003 | 160,931 | 150,851 | 149,449 | 1,104 | 298 | 10,080 | 9,752 | 270 | 58 |
| 2004 | 163,500 | 152,859 | 151,493 | 1,086 | 280 | 10,641 | 10,339 | 261 | 41 |
| 2005 | 164,179 | 153,323 | 152,016 | 966 | 341 | 10,856 | 10,528 | 283 | 45 |
| 2006 | 172,561 | 160,812 | 159,616 | 908 | 288 | 11,749 | 11,335 | 366 | 48 |
| 2007 | 173,312 | 161,424 | 160,325 | 800 | 399 | 11,888 | 11,571 | 281 | 36 |
| Projected | | | | | | | | | |
| 2008 | 175,418 | 163,242 | 162,213 | 734 | 295 | 12,176 | 11,889 | 253 | 34 |
| 2009 | 179,105 | 166,549 | 165,535 | 719 | 295 | 12,556 | 12,275 | 248 | 33 |
| 2010 | 183,171 | 170,163 | 169,154 | 714 | 295 | 13,008 | 12,729 | 247 | 32 |
| 2011 | 186,137 | 172,628 | 171,620 | 713 | 295 | 13,509 | 13,230 | 247 | 32 |
| 2012 | 189,226 | 175,373 | 174,365 | 713 | 295 | 13,853 | 13,575 | 247 | 31 |
| 2013 | 191,886 | 177,728 | 176,720 | 713 | 295 | 14,158 | 13,880 | 247 | 31 |

[1] Civil Narcotic Addict commitment.

[2] Others include county diagnostic cases, other state federal prisoners, county safekeepers and Juvenile Justice (JJ) wards.

23.    What is most interesting is that the prison population is projected to continue to grow despite little if any increases in new court commitments. There has been an accelerated increase in persons being admitted to parole which I believe may be a reflection of the greater use of the Bridging Program that serves to reduce the average length of stay. But despite lower than expected admissions and higher number of parole releases, the population will continue to increase in large part due to the two and three strike laws and the reluctance of the Board of

8

Prison Terms to release persons eligible for parole (these people consist largely of persons sentenced under an indeterminate sentence of life with the possibility of parole – there are an estimated 25,000 prisoners with such a sentence in the current CDCR population).

### A.    Causes and Effects of Severely Overcrowded Prison Systems

24.    Prison systems typically rely on two definitions of capacity. The first and most restrictive is the so called "design capacity." This definition reflects the original design of the facility based on the architectural design that was approved for construction and occupancy by the state consistent with existing standards. Design capacity reflects what the maximum population should be based on in light of the facility's infrastructure (plumbing, electrical, ventilation, heating and cooling systems, program and administrative space). The second definition is typically referred to as the "operational capacity" which allows for a higher capacity by 1) increasing the staffing pattern to accommodate a larger population, 2) converting the existing housing areas to accommodate more prisoners (by double or triple celling or placing temporary bunks in open areas), and 3) converting program space into housing units. By definition, operational capacity if it exceeds the design capacity for an extended period of time will place undue stress on the infrastructure and will not allow the facility to operate as designed.

25.    Finally, in planning new facilities and evaluating the capacity of the existing facilities, one must take into account the security levels of the inmate population and special needs populations (administrative segregation, protective custody, severe mental health, and severe medical restrictions) which cannot be housed in the general (or mainline) populations. Furthermore there are fluctuations in the daily population which are caused by surges in admissions and releases. For all of these reasons it is accepted practice to add a 10% peaking

9

factor that will ensure the facility is not crowded for an extended period of time. What this means is that the bed capacity needs to be increased by 10% to ensure the residual inmate population is housed according to their custody levels and special needs.

**B.    Overcrowding In the California Prison System**

26.    There are many negative effects on the delivery of mental health, medical and other critical services that are directly linked to the current level of crowding and can only be addressed by reducing the CDCR institutional population to a more acceptable capacity figure. The Expert Panel, of which I was a member, concluded that the level of prison crowding must first be reduced before any meaningful programming can occur. This was the very first recommendation that the Panel embraced due to the obvious burdens that overcrowding places on the California system. It was our considered opinion, based on facility tours and many presentations by the CDCR, that effective treatment programs could not be implemented until crowding and its associated consequences were addressed. This recommendation along with all of the others (with one exception) made by the Panel have been adopted by the CDCR. *See* Joint Pls' Trial Ex. 49. What follows is a summary of the effects crowding has on prison systems and on California's system, in particular.

**1.    Significant Delays in Processing and Classifying Prisoners**

27.    The CDCR reception centers have a mandate to process and transfer (to a mainline institution) new receptions from the counties within 60 days of admission to a reception center. It should be noted at the outset that this 60 day limit is excessive and does not meet typical correctional practices in other state correctional systems (Maryland, Georgia, Virginia, Arizona, Louisiana, Texas,

Illinois, and Michigan to name just a few I am familiar with). But even this overly generous 60 day limit is being violated on a routine basis by the CDCR.

28.    The major reasons for the delays, as observed at the Lancaster facility, all relate to overcrowding: 1) lack of sufficient legal analysts to compute critical sentence, good time and release dates, 2) significant delays obtaining medical and central files from storage for parole violators, 3) a cumbersome medical and mental health screening process to clear prisoners for transfer, and 4) a lack bed capacity at the other CDCR facilities.

29.    Additional problems also plagued the reception process at Lancaster, all of which relate to overcrowding and understaffing. I was informed by staff, for instance, that of the 13 staff budgeted to be legal analysts, only 10 positions were filled. Of those 10, two were on medical leave, one was on a restricted basis, and three were on probation, leaving only 7 full-time and fully trained staff. Even though Lancaster has been transformed to a reception center, which would greatly increase the volume of analysts' work, there was no adjustment of the analyst positions to be funded.[1] For these and other reasons, I was told by CDCR staff that there was a two month backload in the number of prisoners to be processed. I also learned that the medical screening process requires prisoners to remain in the initial housing unit for three days just to have the TB screening test confirmed. This 3 day waiting process is, to my knowledge, unique to the CDCR. Long delays were also reported in having the classification screening process completed simply because staff were waiting for the necessary clearances from medical and

---

[1]    The very fact that Lancaster became a reception center is likely a result of overcrowding. In overcrowded systems, the administrators must constantly adjust and readjust the missions of their prisons because there are simply not enough beds for all the varying populations that come in, whether it be differences based on security level, sensitive needs, medical needs, mental health needs or other factors.

mental health staff. The delays occur because there are not enough staff, the process is not automated (and will not be automated for several years) and because there are too many prisoners entering the system. Shortages of bed space, offices, custody officers and treatment spaces also contributed to the delays.

### 2.    Excessive Inter-Facility Transfers

30.    Crowding also results in large numbers of inter facility transfers to keep any facility from becoming too crowded. The basis for such transfers is based on bed availability rather than the prisoner service needs. In 2005 there were a total of 387,446 admissions to all of the CDCR facilities with 237,005 being intra-facility admissions. Joint Pls' Trial Ex. 52 at 3. With a prison population of approximately 168,000 in 2005, this means the overall length of stay averages out to be about 160 days. Clearly there is significant variation among the facilities and prisons, but these admissions and length of stay numbers are more reflective of a county jail system rather than a state prison system. This constant movement of the prisoner population and how it disrupts the delivery of meaningful medical and mental health services has been noted elsewhere by the Receiver in his overcrowding report. Joint Pls' Trial Ex. 26 at 15-17 and Exhibits 10-12 to same.

### 3.    Lack of Access to Meaningful Medical, Mental Health Treatment and Rehabilitative Programs

31.    The excessive delays at the reception centers also mean that newly admitted prisoners will not be able to participate in meaningful programs that can serve to reduce their recidivism rates. Furthermore, the large prison populations, that exceed both design and operating capacities, place undue stress on the infrastructure both at the reception centers and at the "mainline" facilities. This "undue stress" means that there are insufficient staff and program space to handle

12

EXPERT REPORT OF JAMES AUSTIN, PH.D., CASE NOS. 90-520 LKK (JFM), 01-1351 TEH

the number of prisoners who require such services. The Expert Panel found that only 21% of the current prisoner population was participating in proven recidivism reduction programs (education, vocational training, substance abuse, and prison industries). Joint Pls' Trial Ex. 2 at 148. And this figure does not show how many are completing these programs before being released or transferred to another facility.

32.    At the Lancaster facility, of the 3,222 prisoners in the reception center yards on November 2, 2007, there were zero inmates participating in such programs. 1,512 were assigned to the Bridging Program, which has not proven to have any positive impact on recidivism, and another 19 were assigned to support services -- another program that has little if any rehabilitative value. The facility could not produce numbers on how many prisoners have completed programs while assigned to Lancaster.

33.    Collectively, these factors result in large numbers of prisoners either not participating in educational, vocational, substance abuse, and mental health programs or having long delays in enrolling in such programs. If such meaningful participation is lacking, one cannot expect any significant reduction in the recidivism rates.

34.    Other programming is also significantly affected by overcrowding. At Lancaster, for instance, we learned that inmates housed in a converted gymnasium had not received yard all week long (our tour was on a Friday). The Sergeant on the yard explained that custody staff were not available to run the yard program because they were being diverted to other tasks, such as escorting inmates to the medical clinic. Ironically, he blamed the cancellation of yard for these inmates living in an extremely overcrowded Gym on "The Plata Receiver" who had apparently requested custody staff to provide necessary escorts and security to facilitate medical appointments. The Sergeant indicated that yard

13

EXPERT REPORT OF JAMES AUSTIN, PH.D., CASE NOS. 90-520 LKK (JFM), 01-1351 TEH

cancellation this happens quite frequently; a problem that relates to custody staffing shortages throughout the CDCR.

### 4.    Mis-Housing of Inmates

35.    In crowded facilities, there is a tendency to mix prisoners with differing custody levels in the same housing units. While there is always going to be some level of overlap in custody levels, the extent of mis-housing should not be pervasive. During my tour of Lancaster, I observed several practices that would suggest mis-housing. The facility has had a change in mission and has been converted to a major reception center for Southern California. On the date of the tour there were approximately 3,200 inmates in reception status. While they wait, they must be housed with other inmates who will eventually be classified at differing custody levels (Levels I –IV).

36.    Further, it was observed and confirmed by staff that in the reception housing areas and elsewhere, prisoners were told to "self-select" the cell mates rather than staff having and directing a well structured housing plan. In the areas that have "infill beds" (bunk beds which number approximately 900) there is no formal structured process for determining who is assigned to the bunk beds. Known as an internal classification system, such a plan would ensure that prisoners are housed according to their security and programs needs. These inmates were awaiting a custody designation to be completed by their Correctional Counselor. There is an extreme amount of delay in having prisoners so classified. Staff reported that inmates were routinely spending several months in the reception status.

37.    The Special Master also noted significant delays in reception for EOP class members, in particular. During the 18th Monitoring round of tours, the Special Master determined that ten of sixteen EOP inmates in the Lancaster

reception center during the review period were not transferred to an EOP mainline program within the mandated 60-day time period and two-thirds of expedited transfers for clinically more acute cases were not successful. Joint Pls' Trial Ex. 36 at 216.

### 5.    Serious Incidents and Safety

38.    With crowding one can expect increases in serious incidents, including assaults. This has already been acknowledged in the Governor's proclamation and the Kernan declaration citing the increased dangers for staff and inmates. Joint Pls' Trial Exs. 1 and 11 at 2-3. It goes without saying that a dangerous environment is not conducive to treatment.

39.    The CDCR reports that both the number and rate of serious incidents have been steadily increasing. In CY2006, there was a total of 14,490 officially reported such incidents of which the vast majority (approximately 9,000) were assaults with and without a weapon. Joint Pls' Trial Ex. 7 at 2-4. Given the number of staff per inmate and the high density of inmates in the housing units, these figures must be considered to be quite conservative as they do not take into account unreported assaults, robberies, thefts, and other serious crimes. The assault rate of approximately 5.6 per 100 (or 5,600 per 100,000 inmate population) is 20 times the aggravated assault rate reported by the FBI for the nation of 288 per 100,000 population. While the CDCR population is not comparable to the US resident population, the extremely high rate of assaults still indicates how dangerous the environment is and that it is worsening.

40.    The Expert Panel Report noted that lockdowns are frequently invoked at many CDCR facilities due to the large number of serous incidents occurring within the CDCR. Joint Pls' Trial Ex. 2 at 9 and Appendix F. The Expert Panel reported that there were nearly 450 such lockdowns in 2006. But

this is a conservative figure as it excludes the major reception centers. The Panel also noted that such lockdowns greatly restrict the implementation of effective treatment and rehabilitative programs. This is consistent with the Special Master's finding in the 18th Monitoring report that, "reported [] lockdowns in November 2006 and January 2007 [at LAC] disrupted EOP treatment." Joint Pls' Trial Ex. 36 at 208.

41.    While touring the Lancaster facility, I was struck by the use of security vests by all union staff (including correctional counselors), the constant presence of guns in the housing control units, the frequent use of lockdowns, and the more frequent tactic of having inmates fall to the ground in the yards when so ordered or risk being shot (the associate warden at Lancaster said these warnings occur 4-5 times a week). Correctional counselors stated they are afraid to conduct pre-parole interviews and classification screenings even in rooms within the housing units. Such interviews are often conducted on the open floor of the housing unit with the armed officer in the control prepared to shoot the inmate should he make any aggressive actions toward the correctional counselor. This process is done regardless of the prisoner's security level.

### 6.    Inability to Conduct Valid Individual Needs / Risk Assessments

42.    One of the key foundations of successful rehabilitative programs is the capacity to assess the criminogenic risk and associated program needs of the prisoner. The need for such services applies to both the EOP and CCCMS prisoners as well as other inmates. The non EOP and CCCMS inmates are important, as the CDCR believes that its extraordinary recidivism rates (the highest in the country at 70 percent) can be significantly reduced by assigning inmates to appropriate services that will lower recidivism rates and thus reduce crowding. It should be noted that the Expert Panel estimated that the current

16

CDCR population would be reduced by no more than 4,400 inmates by improving recidivism rates alone (compared to a bed savings of 38,000 to 44,000 through other population reduction strategies). Joint Pls' Trial Ex. 2, Appendix E at 98.

43.    Such a valid assessment process is not occurring within the CDCR as noted by the Expert Panel report and as observed by me as part of the tours at Lancaster and CMC. They are not occurring for two reasons. First, the CDCR has not implemented a risk and needs assessment tool at the reception centers. Second the environment for the Correctional Counselors is so chaotic, disorganized and inefficient that conducting a reliable and valid assessment is not feasible.

44.    At Lancaster, there are 32 Correctional Counselor I (CCI) positions, of which only 24 were filled as of the tour. This amounts to a caseload of more than 200 prisoners per counselor. Their work is to complete a security risk score (CDC 849, 840, or 841 forms) and then a recommended institutional placement plan. The office that the CCIs work out of is cluttered with a wide variety and number of miscellaneous office and computer equipment. There are no individual offices or office spaces. Staff have inadequate work space and equipment. The IT support is dysfunctional with staff having to share computers that have access to the OBIS and other important data bases. I have already noted that interviews are conducted in open settings within the overcrowded housing units. Even attempting to administer a well structured needs assessment instrument (which is not being used) in these conditions would not produce reliable or valid results.[2]

---

[2]    Space limitations (and/or staffing shortages) also affect EOP inmates. The Special Master noted during the 18th round of monitoring that "[a] staff audit [at LAC] found 50 to 87 percent of inmates in one general population EOP building were not offered the option of meeting their case managers in a setting that afforded confidentiality." Joint Pls' Trial Ex. 36 at 218.

17

7.    The Failure of the Work Incentive Program

45.    Crowding is also requiring the CDCR to exploit the original intentions of the Work Incentive Program (WIP) that serve to reduce the proper assignment of inmates to programs that meet their rehabilitative needs. Because the CDCR needs to expedite releases, it is using the WIP to place inmates in the first available program or work assignment regardless of their need for such a program or their expected release date. This practice is a result of overcrowding in that counselors do not have the time to assess inmates or the programming space (available substance abuse, vocational or educational slots) for the huge number of inmates in the California system. As the Expert Panel found, recidivism rates will remain high without targeted programs for those who need them most, thereby abolishing any hope that there will be a reduction in the number of readmissions to the CDCR due to released prisoners' parole violations and new crimes.

46.    In my opinion the number of prisoners with their associated mental health, medical, rehabilitative and security needs far exceeds the resources that can now be provided by the CDCR. Currently, the size of the CDCR institution population is overwhelming the CDCR's administrative, program service, housing and security infrastructure and support systems. Moreover this situation will remain at its current level until the institutional population is adjusted to meet the CDCR resources, including the CDCR's staffing capabilities, infrastructure capacity, and available housing and programming space. This opinion is consistent with the Expert Panel's report, which made reducing crowding its number one recommendation.

EXPERT REPORT OF JAMES AUSTIN, PH.D., CASE NOS. 90-520 LKK (JFM), 01-1351 TEH