**EXHIBIT P**

```
 1              IN THE UNITED STATES DISTRICT COURTS
 2           FOR THE EASTERN DISTRICT OF CALIFORNIA
 3           AND THE NORTHERN DISTRICT OF CALIFORNIA
 4      UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES
 5      PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE
 6                          -  -  -
 7   RALPH COLEMAN, et al.,            )
                                       )
 8                 Plaintiffs,         )
                                       )
 9        vs.                          ) No. CIV S90-0520
                                       ) LKK-JFM P
10   ARNOLD SCHWARZENEGGER, et al.,    ) THREE-JUDGE COURT
                                       )
11                 Defendants.         )
                                       )
     ----------------------------------)
12   MARCIANO PLATA, et al.,           )
                                       )
13                 Plaintiffs,         )
                                       )
14        vs.                          ) No. C01-1351 TEH
                                       ) THREE-JUDGE COURT
15   ARNOLD SCHWARZENEGGER, et al.,    )
                                       )
16                 Defendants.         )
     ----------------------------------)
17
18                       DEPOSITION OF
19                     JAMES GILLIGAN, MD
20                  SAN FRANCISCO, CALIFORNIA
21                    SEPTEMBER 19, 2008
22   ATKINSON-BAKER, INC.
     COURT REPORTERS
23   800.288.3376
24   REPORTED BY:   DAWN A. STARK, CSR NO. 7847
25   FILE NO. A207E46
```

1

```
 1              Feel free to take a look at it (indicating).
 2       A.    Uh-huh.
 3              (Witness reviewing document.)
 4              I'd say that's up to date, yes.
 5       Q.    Okay.  No more -- I'll strike that.
 6              Were there any publications of any articles
 7   written or authored by you since this curriculum vitae
 8   was provided to us in August 2008?
 9       A.    No.
10       Q.    I just want to kind of ask you a few questions
11   about your background.
12              First, I noticed, in your expert report, that
13   you indicated that you established a clinical director
14   position for Prison Health Services around that time; is
15   that correct?
16       A.    That's "Prison Mental Health Services".
17       Q.    "Prison Mental Health Services"?
18       A.    Yes.
19       Q.    In establishing that position, does that mean
20   that you actually served in that position?
21       A.    Yes.
22              I was the clinical director of the Prison
23   Mental Health Services for the Department of Correction
24   of the State of Massachusetts.
25       Q.    And at the time you established that position
```

```
 1   got added during the time I was running the program.
 2            We would have started with two prisons located
 3   at Bridgewater, Old Colony and Southeastern Corrections
 4   Center; MCI Norfolk; MCI Walpole; prisons in Shirley.
 5            It's been some years since I was running these
 6   programs.
 7            Well, also, there were -- I should add there
 8   were lower security facilities, prerelease centers and
 9   so-called prison farms, and so forth.
10            So, I'd say probably about half a dozen
11   full-scale prisons, and then a variety of -- a smaller
12   number of lower security prisons that you could think of
13   as, basically, prerelease centers.
14       Q.   I'm sorry.
15            How many prerelease centers?
16       A.   Oh, gosh.
17            There was one right next to Norfolk state
18   prison, the one in Plymouth -- three or four.
19            I don't remember exactly, but it's on that
20   scale.
21       Q.   And were there mental health clinics within
22   each of these -- we'll call them "prerelease centers"?
23       A.   No.
24            Those we would visit as needed, but we
25   didn't -- we didn't maintain an office within those.
```

1  Is this person dangerous? Should the person be
2  evaluated for competency to stand trial? Should the
3  person, you know, be evaluated as to whether they can be
4  held criminally responsible?
5  Q. Forensic evaluations?
6  A. Forensic evaluations, yes.
7  Q. Do you know if the system of providing mental
8  health care to parolees at these state department mental
9  health clinics is still viable in the State of
10 Massachusetts today?
11 A. You know, I probably shouldn't attempt to say,
12 because I've -- you know, I'm no longer working within
13 Massachusetts.
14 I've been in New York for the last several
15 years, so I probably shouldn't even try to answer that.
16 It's possible changes have occurred that I'm
17 just not aware of.
18 Q. The last time that you worked in that field of
19 providing mental health services to inmates, other than
20 the Massachusetts Department of Corrections, then, was
21 from 1982 to 1991?
22 A. Well, actually, I ran the Prison Mental Health
23 program -- sorry, I ran the Bridgewater state hospital,
24 as medical director, from 1977 to 1981.
25 Then I ran the Prison Mental Health Service

```
 1  a way somewhat similar to this report (indicating).
 2       Q.   Okay.
 3       A.   I mean, if you go on Amazon.com, it was listed
 4  as a book, but it was really more like a pamphlet.
 5       Q.   Was it subject to any peer review?
 6       A.   No.
 7       Q.   When you did this research to prepare this
 8  book, were you in contact with any employees of the
 9  California Department of Corrections and Rehabilitation
10  on this issue?
11       A.   Oh, yes.
12            I talked with many people, from the secretary
13  of the department on down --
14       Q.   Okay.
15       A.   -- as well as to many legislators, yes.
16       Q.   Did you undertake any tours of any CDCR
17  facilities in the preparation of this book?
18       A.   I'm trying to recall.
19            I don't believe I did that, that I can
20  recall --
21       Q.   Have you ever --
22       A.   -- in California.
23       Q.   I'm sorry.
24            Have you ever visited any California Department
25  of Corrections and Rehabilitation jail facility or prison
```

1  facility?

2     A.   No.

3          MR. GALVAN:  Objection.  Compound, jail or

4  prison.

5          THE WITNESS:  Jails, I've visited very

6  extensively; the San Francisco jails and also the

7  Los Angeles County jail.

8          I was called in as a consultant when they were

9  having one of their more serious riots.  I think it was a

10 couple of summers ago.

11         So, I've been in both San Francisco and

12 Los Angeles jails, including, at times, when they were in

13 the state of emergency crisis.

14 BY MS. TILLMAN:

15    Q.   Have you been in any state prisons?

16    A.   I don't believe I've been in any state prisons,

17 that I can recall.

18    Q.   Have you been in any of the state mental health

19 hospitals operated by the Department of Mental Health or

20 the State of California?

21    A.   No -- I'm trying to recall.

22         I know I've talked with people who have worked

23 in those settings about their work, but I haven't been

24 inside them.

25    Q.   Have you had any discussions with Jean Woodford

1    A.   I am not aware of any reason to question the
2  clinical judgment of the people who were categorizing
3  them.
4       I used the data that they used.
5    Q.   Okay.  When we speak of the immediate release
6  of 15,000 inmates, with possibly 21 percent of them from
7  the Coleman caseload, do you have any concerns about the
8  release of the mentally ill offender who is in an acute
9  care bed within a state hospital?
10   A.   Again, I'm not sure I'm understanding.
11       You're talking about people in the prison or
12 people in a DMH hospital?
13   Q.   In a DMH hospital, who would be subject to a
14 prisoner release order.
15   A.   Well, I want to say my concern would be that if
16 their legal status was changing from being a prisoner to
17 not being a prisoner, that, itself, wouldn't change their
18 mental status.
19       I would take it for granted that the Department
20 of Mental Health hospital would make an evaluation as to
21 whether the person was dangerous to him or herself or
22 another by reason of mental illness.
23       If they determined that that was the case, they
24 would petition the court to have the person committed to
25 the hospital, unless the person voluntarily agreed to --

```
 1        Q.    Is that what happens in New York?
 2        A.    That's what happens in Massachusetts.
 3        Q.    Are you familiar with the
 4   Lanterman-Petris-Short Act?
 5        A.    I am not, no.
 6        Q.    Are you familiar with whether or not the
 7   Department of Mental Health of the State of California
 8   has the ability to petition the court for an involuntary
 9   commitment of a state prisoner before they're subject to
10   parole?
11              MR. GALVAN:  Objection.  Calls for a legal
12   conclusion.
13              You can answer.
14              THE WITNESS:  I would say that's actually not
15   what I'm talking about.
16              I'm talking about what would happen after they
17   were no longer under the jurisdiction of the parole board
18   or the Department of Correction.
19   BY MS. TILLMAN:
20        Q.    If a prisoner release order from the
21   Three-Judge Panel issued, is it your belief that those
22   California Department of Correction prisoners who are
23   receiving mental health care at an acute level within the
24   Department of Mental Health hospital should not be
25   subject to immediate release?
```

```
 1  others in the community?
 2       A.    Sure, sure.
 3       Q.    Okay.
 4       A.    I'm just saying that would be responsible
 5  behavior, I think, on the part of correctional staff, as
 6  well as prison mental health staff.
 7       Q.    Are you familiar with the parole outpatient
 8  clinics within the State of California?
 9       A.    I have not visited them -- well, no.  Wait a
10  second.  Let me take it back.
11            I've read about them.
12            I actually have -- I'm quite familiar with the
13  parole outpatient clinics that the San Francisco jail
14  operates.
15            So, I can say I'm familiar with that part, but
16  with the state Department of Correction, I cannot say
17  that I am personally familiar; I've just read about
18  them.
19       Q.    Okay.  What have you read about them?
20       A.    Well, what I have read is that like many other
21  aspects of mental health treatment available to prisoners
22  and to people who are not prisoners but who are seeing
23  mental health clinicians, there are shortcomings in the
24  treatment available.
25            I mean, it would be -- that many people have
```

1  been calling for increased staffing or better staffing,
2  and have had some concerns that it's inadequate.
3           Again, that applies in both the prisons and
4  outside the prisons or the Department of Correction and
5  outside of it.
6      Q.   Have you formed any opinion as to whether the
7  present number of full outpatient clinics within the
8  State of California is sufficient to serve the needs of
9  the present parolee population with mental health
10 issues?
11     A.   Well, from what I have read -- and again, I
12 can't say this on the basis of my, personally, working in
13 those systems -- is that the people feel -- that people
14 have evaluated or observed those clinics, and I would
15 include mental health professionals among them.
16          They have felt that there were shortcomings,
17 and there were deficiencies.
18     Q.   Do you have any opinions as to what needs to be
19 done to address those shortcomings within the present
20 parole outpatient clinic within the State of
21 California?
22     A.   Well, my understanding is that people who are
23 familiar with it have called for increased staffing, that
24 they've been concerned about the fact that there are not
25 sufficient staff members.

1           I'd say that's the main problem that I've heard
2  described.
3       Q.   Do you have an opinion as to how many more
4  staff members are needed in order to serve the present
5  population of mentally ill parolees within the State of
6  California?
7       A.   I don't have an opinion about that. I don't --
8       Q.   Do you have any opinion as to the types of
9  staff, by profession, within the mental health
10 profession, that are needed to provide timely and
11 competent services to the present mental health
12 population of the parolees within the State of
13 California?
14      A.   Well, I certainly think that psychiatrists
15 would be a necessary profession to be involved there.
16           In general, psychiatrists alone, I think, can
17 be more productive and effective if they are part of a
18 mental health team that also includes psychologists and
19 social workers.
20      Q.   Do you know if psychiatrists are now staffing
21 any of the parole outpatient clinics within the State of
22 California?
23      A.   I cannot say. I do not know.
24      Q.   Do you know if any psychologists are presently
25 staffing any of the parole outpatient clinics within the

1  State of California?

2  A.  I don't know about that, either.

3  Q.  Do you know what type of personnel presently
4  staff the parole outpatient clinics within the State of
5  California?

6  A.  I can't give you a breakdown about the mental
7  health professions involved.

8  Q.  Now, your report also talks about the diversion
9  of mentally ill offenders.

10        What does that mean, "diversion"?

11 A.  What I would hope could happen is that when
12 people are identified as being mentally ill -- and I hope
13 they would be identified, if they are mentally ill --
14 that rather than them simply being funneled into the
15 criminal justice system that a psychiatric evaluation
16 would be made.

17        Also, in cooperation with the court, an
18 individual who needs treatment for a mental illness and
19 whose legal problems would appear to be an outcome of
20 their mental problems -- that this individual would be
21 diverted into the mental health system and away from the
22 correctional system.

23 Q.  When you say "diverted into the mental health
24 system," what mental health system are you referring
25 to?

1  not defendants should abandon the plan to create more
2  mental health beds at particular sites and simply go
3  full-speed ahead on providing the type of resources that
4  we saw in Massachusetts for the diversion and community
5  treatment of mental health offenders?
6     A.   If I'm understanding your question correctly,
7  and stop me if I'm not, I would strongly recommend that
8  the emphasis be on trying to treat the mentally ill
9  within the mental health system rather than diverting
10 them to the correctional system.
11      If the state were going to build mental health
12 treatment facilities or outpatient clinics, I would
13 strongly hope they would do that within the mental health
14 framework rather than a correctional framework.
15    Q.   Are you aware of any particular county in the
16 State of California that will receive a higher level of
17 parolees than any other county?
18    A.   I'm not specifically aware of numbers, but I
19 would say I wouldn't be surprised if there weren't
20 differences, based on the populations of different
21 counties, if they're different, but just as much the
22 different socioeconomic characteristics of the different
23 counties, to the extent those exist.
24      I can't break it down, though.  I don't know
25 California in that much detail.

```
 1        Q.   You also speak of the basic element of access
 2   to care in the community.
 3             Can you inform me what quantum of access of
 4   care in the community presently exists for parolees with
 5   mental health issues?
 6        A.   Well, I would -- I would assume there is --
 7   that there are mental hospitals in California.
 8             I assume that there are mental health clinics
 9   and mental health centers.
10        Q.   Do you know how many mental health hospitals
11   there are in California?
12        A.   I don't know the number.
13        Q.   Do you know the locations?
14        A.   I know the names of some of them and locations
15   spotted around the state.
16        Q.   Do you know their capacity?
17        A.   In terms of total numbers, their current
18   capacity, I don't know.
19             I do know that, certainly, they have a much
20   higher capacity because they have more people.
21             So, I would assume they have a higher
22   capacity --
23        Q.   Higher capacity --
24        A.   -- 50 years ago than they do today.
25             In other words, since the
```

193

REPORTER'S CERTIFICATION

I, DAWN A. STARK, CSR No. 7847, Certified Shorthand Reporter, certify:

That the foregoing proceedings were taken before me at the time and place therein set forth, at which time the witness was put under oath by me;

That the testimony of the witness, the questions propounded, and all objections and statements made at the time of the examination were recorded stenographically by me and were thereafter transcribed;

That the foregoing is a true and correct transcript of my shorthand notes so taken.

I further certify that I am not a relative or employee of any attorney of the parties, nor financially interested in the action.

I declare under penalty of perjury under the laws of California that the foregoing is true and correct.

DATED this 1st day of October, 2008.

_____
DAWN A. STARK, CSR No. 7847

REPORTER'S CERTIFICATION OF CERTIFIED COPY

I, DAWN A. STARK, CSR No. 7847, a Certified Shorthand Reporter in the State of California, certify that the foregoing pages 1 through 193 constitute a true and correct copy of the original deposition of JAMES GILLIGAN, MD, taken on September 19, 2008.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

DATED this 1st day of October, 2008.

DAWN A. STARK, CSR No. 7847