EDMUND G. BROWN JR.
Attorney General of the State of California
DAVID S. CHANEY
Chief Assistant Attorney General
ROCHELLE C. EAST
Senior Assistant Attorney General
JONATHAN L. WOLFF
Senior Assistant Attorney General
LISA A. TILLMAN – State Bar No. 126424
Deputy Attorney General
KYLE A. LEWIS – State Bar No. 201041
Deputy Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
Telephone: (415) 703-5708
Facsimile:  (415) 703-5843
lisa.tillman@doj.ca.gov
kyle.lewis@doj.ca.gov

HANSON BRIDGETT LLP
JERROLD C. SCHAEFER - 39374
PAUL B. MELLO – 179755
S. ANNE JOHNSON – 197415
SAMANTHA D. TAMA – 240280
RENJU P. JACOB - 242388
425 Market Street, 26th Floor
San Francisco, CA  94105
Telephone: (415) 777-3200
Facsimile:  (415) 541-9366
jschaefer@hansonbridgett.com
pmello@hansonbridgett.com
ajohnson@hansonbridgett.com
stama@hansonbridgett.com
rjacob@hansonbridgett.com

Attorneys for Defendants

# UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

## AND THE NORTHERN DISTRICT OF CALIFORNIA

## UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

## PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>ARNOLD SCHWARZENEGGER, et al.,<br><br>Defendants. | No.  2:90-cv-00520 LKK JFM P<br><br>**THREE-JUDGE COURT** |
| MARCIANO PLATA, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>ARNOLD SCHWARZENEGGER, et al.,<br><br>Defendants | No. C01-1351 TEH<br><br>**THREE-JUDGE COURT**<br><br>**EXHIBITS Q, PART 1 TO EXHIBIT V, PART 1 TO DECLARATION OF PAUL MELLO IN SUPPORT OF DEFENDANTS' MOTIONS IN LIMINE**<br><br>**To: Three-Judge Panel** |

- 1 -

# EXHIBIT Q
# PART 1

# EXHIBIT Q

1   PRISON LAW OFFICE
DONALD SPECTER, Bar No. 83925
2   STEVEN FAMA, Bar No. 99641
E. IVAN TRUJILLO, Bar No. 228790
3   SARA NORMAN, Bar No. 189536
ALISON HARDY, Bar No. 135966
4   REBEKAH EVENSON, Bar No. 207825
1917 Fifth Street
5   Berkeley, CA  94710
Telephone: (510) 280-2621
6

7   KIRKPATRICK & LOCKHART PRESTON
GATES ELLIS LLP
JEFFREY L. BORNSTEIN, Bar No. 99358
8   EDWARD P. SANGSTER, Bar No. 121041
RAYMOND E. LOUGHREY, Bar No. 194363
9   55 Second Street, Suite 1700
San Francisco, CA  94105-3493
10   Telephone: (415) 882-8200

11   THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
12   CLAUDIA CENTER, Bar No. 158255
600 Harrison Street, Suite 120
13   San Francisco, CA  94107
Telephone: (415) 864-8848
14

ROSEN, BIEN & GALVAN, LLP
MICHAEL W. BIEN, Bar No. 96891
ERNEST GALVAN, Bar No. 196065
JANE E. KAHN, Bar No. 112239
AMY WHELAN, Bar No. 215675
LORI RIFKIN, Bar No. 244081
LISA ELLS, Bar No. 243657
315 Montgomery Street, 10th Floor
San Francisco, California  94104
Telephone: (415) 433-6830

BINGHAM, McCUTCHEN, LLP
WARREN E. GEORGE, Bar No. 53588
Three Embarcadero Center
San Francisco, California  94111
Telephone: (415) 393-2000

Attorneys for Plaintiffs

15   IN THE UNITED STATES DISTRICT COURTS
16   FOR THE EASTERN DISTRICT OF CALIFORNIA
17   AND THE NORTHERN DISTRICT OF CALIFORNIA
18   UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES
PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE
19

| | |
|---|---|
| RALPH COLEMAN, et al., <br>     Plaintiffs, <br>     v. <br> ARNOLD SCHWARZENEGGER, et al., <br>     Defendants | No.: Civ S 90-0520 LKK-JFM P <br><br> **THREE-JUDGE COURT** |
| MARCIANO PLATA ,et al., <br>     Plaintiffs, <br>     v. <br> ARNOLD SCHWARZENEGGER, et al., <br><br>     Defendants | No. C01-1351 TEH <br><br> **THREE-JUDGE COURT** <br><br> **EXPERT REPORT OF JAMES GILLIGAN, M.D.** |

20
21
22
23
24
25
26
27
28

**TABLE OF CONTENTS**

TABLE OF ABBREVIATIONS/ACRONYMS ........................................................................ ii

I.    EXPERT QUALIFICATIONS ..................................................................................... 1

II.   BASIS FOR EXPERT OPINIONS ............................................................................. 6

      A.    QUESTIONS PRESENTED ............................................................................ 6

      B.    EVIDENCE ON WHICH THE EXPERT OPINIONS ARE BASED .................... 7

III.  SUMMARY OF OPINIONS ...................................................................................... 7

      A.    WOULD A PRISONER RELEASER ORDER THAT INCLUDES AN
            INCREMENTAL DECREASE IN THE LENGTH OF STAY AND/OR
            DIVERSION OF MENTALLY ILL OFFENDERS ADVERSELY
            IMPACT PUBLIC SAFETY? .......................................................................... 7

            1.    The Public Safety Baseline:  Overcrowding and Recidivism
                  Generally. ............................................................................................ 8

            2.    The Public Safety Baseline:  Releases of Mentally Ill Offenders
                  Are Already Happening. ...................................................................... 9

            3.    Improving on the Public Safety Baseline:  Are Mentally Ill
                  Offenders As a Group More Dangerous than Non-Mentally Ill
                  Offenders? ......................................................................................... 18

      B.    WHAT ARE THE ELEMENTS NEEDED TO IMPROVE PUBLIC
            SAFETY OUTCOMES REGARDING TREATMENT OF MENTALLY
            ILL OFFENDERS BY THE CALIFORNIA CORRECTIONAL AND
            PAROLE SYSTEM? ..................................................................................... 26

            1.    Pre-release planning. ......................................................................... 29

            2.    System of Access to Care. ................................................................. 31

            3.    Programs to Target Co-occurring Disorders/Dual Diagnosis. ............ 33

            4.    Coordination with Community Care Providers. .................................. 33

IV.   STATEMENT OF COMPENSATION ..................................................................... 36

V.    LIST OF ALL OTHER CASES IN WHICH I HAVE TESTIFIED AS AN
      EXPERT AT TRIAL OR BY DEPOSITION IN THE PREVIOUS FOUR
      YEARS. ................................................................................................................ 36

## TABLE OF ABBREVIATIONS/ACRONYMS

CCCMS:        Correctional Clinical Case Manager System

CDCR:         California Department of Corrections and Rehabilitation

C-ROB:        California Rehabilitation Oversight Board

DMH:          Department of Mental Health

GAF:          Global Assessment of Functioning

ICDTP:        In Custody Drug Treatment Program

PMD:          Person With Mental Disorder

POC:          Parole Outpatient Clinic *or* Psychiatrist on Call

SASCA:        Substance Abuse Services Coordinating Agency

TCMP:         Transitional Case Management Program

## EXPERT REPORT OF JAMES GILLIGAN, M.D.
### I.     EXPERT QUALIFICATIONS

1.     I am a psychiatrist with forty years of experience in the evaluation and treatment of homicidal, suicidal and/or mentally ill individuals in prisons, jails, prison mental hospitals, civil mental hospitals and court clinics, as a faculty member of the Harvard Medical School, the Institute of Criminology at Cambridge University (England), the University of Pennsylvania, and New York University. A true and correct copy of my curriculum vitae is appended hereto as **Appendix A**.

2.     I received my undergraduate education as a National Scholar at Harvard College, Class of 1957. After four years as a research assistant to Harvard professors including the sociologist David Riesman, the cardiologist and Nobel Prize winner Bernard Lown, and the psychiatrist Milton Greenblatt, I matriculated at the School of Medicine of Western Reserve University, Cleveland, from which I received my M.D. in 1965. I received my internship training in medicine at the University of Chicago Hospitals and Clinics, 1965-66, and returned to Harvard for my psychiatric training at the Massachusetts Mental Health Center, Boston, 1966-69.

3.     I am a Diplomate of the National Board of Medical Examiners, Certificate No. 89281, July 1, 1966; Registered as a Qualified Physician by the Board of Registration in Medicine, Commonwealth of Massachusetts, Certificate No. 31118, Nov. 13, 1968; Designated as a Qualified Physician (Forensic Psychiatry) Division of Legal Medicine, Department of Mental Health, Commonwealth of Massachusetts, 1977; and I am board-certified in Psychiatry by the American Board of Psychiatry and Neurology, Certificate No. 18274, November 1978.

4.     During my residency training, I received my first exposure to prison psychiatry under Dr. Gerald Adler, which included engaging in diagnostic and prognostic evaluations, individual, group, marital and family psychotherapy, and psychopharmacological treatment, with prisoners serving time for violent crimes at the Massachusetts state prison at Norfolk. Following completion of my residency training, my teaching activities as a junior faculty

member at the Harvard Medical School included training and supervising psychiatric residents in the evaluation and treatment of prison inmates.

5.    In 1977, in my role as Director of the Institute of Law and Psychiatry at McLean Hospital, one of the Harvard Medical School's major psychiatric teaching hospitals, I assumed responsibility for the newly constructed Bridgewater State Hospital. The new Bridgewater was the successor institution the notorious Massachusetts prison mental hospital for the "criminally insane" at Bridgewater. The old Bridgewater had been demolished as a result of a federal lawsuit challenging the practices of the Massachusetts Department of Corrections and Department of Mental Health regarding the care of persons involuntarily committed to prison custody for purposes of mental health treatment. The Department of Corrections entered into a contract with McLean under which McLean was responsible for providing psychiatric treatment and court-ordered forensic psychiatric evaluations at the new Bridgewater. As Director of the Institute of Law and Psychiatry at McLean, I became Medical Director of the new Bridgewater State Hospital.

6.    In 1982, I established the new position of Clinical Director of the Prison Mental Health Service for all of the prisons in Massachusetts. We established mental health centers or clinics in each of the state prisons, each of which was staffed with licensed psychiatrists, clinical psychologists and psychiatric social workers, and which also provided supervised training to psychiatric residents, clinical psychology interns, and social workers getting their "field placement" training.

7.    Among the challenges we addressed in the new Prison Mental Health service was bringing under control the epidemic of suicides and homicides that characterized the state's maximum security prisons, particularly Walpole. During the 1970s, Walpole, a 600-man prison, experienced an average of a murder a month and a suicide every six weeks, in addition to riots, hostage taking, etc.; while other prisons also experienced riots, fire-setting, suicides, and murders of correction officers, prisoners, and even visitors to the prison.

8.    During the first five years of the new Prison Mental Health Service, we brought the rate of homicides and suicides down to one or two a year throughout the entire prison

system, had two hostage-taking incidents during the whole five years (in both of which I participated in negotiations over the phone with the hostage-taker, and in both of which we were, fortunately, able to resolve the crisis without any deaths resulting), and no riots. By the second five years we were able, in some years, to go through an entire twelve months without a single violent death from either suicide or homicide throughout the entire state prison system, though there were also other years in which there was a single suicide or homicide. During those second five years, however, the epidemic of lethal violence was over, and we had no riots or hostage-takings throughout that time.

9.    During the 1990s, I published several works on violence reduction. In the spring of 1991, I was invited to give the Erikson Lectures at Harvard on "The Roots of Violence," which became a book on the psychological, biological and social causes of violence, entitled *Violence: Reflections on a National Epidemic* (1996). After returning to the Harvard Medical School in 1994 I also wrote *Preventing Violence: An Agenda for the Coming Century* (2001).

10.    In 1997, I founded and have remained President of the Center for the Study of Violence, a private non-profit research and consulting firm. From 1999 to 2001 I was President of the International Association for Forensic Psychotherapy, an organization of mental health professionals from around the world who are devoted to the treatment of violent offenders and the prevention of violent behavior. I have contributed chapters to many scholarly and scientific publications on the theme of understanding and preventing violence and the relationship between psychopathology and violence, including *Forensic Psychotherapy: Crime, Psychodynamics and the Offender Patient* (London, 1995, two volumes). From 1997 to 1999, I was a member of the Editorial Advisory Board of *Violence in America: An Encyclopedia* (three volumes), New York: Scribners, 1999, to which I contributed articles on "Psychological Violence" and "Structural Violence." Since 1998 I have been on the Editorial Board of the *Journal of Applied Psychoanalytic Studies*.

11.    Since joining the faculty of New York University in 2002, I have led seminars in the School of Arts and Science on terrorism and other forms of collective and political violence, and have served as a consultant to Bellevue Hospital's Forensic Psychiatry

Department, which provides in-patient care for inmates at the New York City Jail on Rikers Island, and other violent or potentially violent patients.

12.    From 2003 to 2006, I was also a Visiting Professor of Psychiatry and Social Policy at the University of Pennsylvania, where I taught graduate and undergraduate courses on the causes and prevention of violence in the Department of Criminology and the School of Social Policy and Practice, and gave lectures on psychopathology and violence to medical students and psychiatric residents at the School of Medicine.

13.    In 2004, the New York Academy of Sciences held a three-day symposium at Rockefeller University that was organized around my conceptualization of the primary, secondary and tertiary prevention of violence.  The proceedings of the symposium, which I co-edited and to which I contributed two chapters and an introduction, have been published as a volume in the *Annals* of the New York Academy, entitled *Youth Violence: Scientific Approaches to Prevention.*

14.    I have served as a consultant on violent crime and punishment, including war crimes, throughout the United States and around the world to many individuals and groups, including the following engagements:

    a.    Consulting with the Boston Police Department in 1992 on a multi-dimensional strategy that culminated in two years with no youth homicides, a phenomenon sometimes referred to as the "Boston Miracle."

    b.    Consulting with members of the British Parliament in 1993 on crime reduction strategies, and on the relationship between mental illness and crime.

    c.    Providing a briefing to prosecutorial staff of The World Court (the International Criminal Tribunal for the former Yugoslavia) in the Hague on the designation of systemic mass rape as a war crime.

    d.    Consulting with the World Health Organization's Department of Injuries and Violence Prevention since 2002 on the "Global Framework for Violence Prevention."

    e.    Serving as a speaker since 2003 at the World Economic Forum in Geneva on relationships between economic inequality, poverty, unemployment and violence, and as a

consultant in planning programs and selecting speakers for their annual meetings in Davos,

Switzerland, as well as serving on the organization's Global Agenda Council on Negotiation

and Conflict Resolution beginning this year.

      f.    Serving as Chair of the Committee on Violence Prevention of the

Academic Advisory Council of the National Campaign Against Youth Violence, to which I

was appointed by President Clinton in 2000.

      g.    Serving in 2002 on a committee organized by the Hudson Institute in

Washington, D.C., that drafted legislation to monitor, prosecute and prevent rapes in U.S.

prisons (the Prison Rape Elimination Act), which was unanimously approved by both Houses

of Congress and signed into law by President Bush in 2004. (I have subsequently been asked

to serve as a consultant to the National Prison Rape Elimination Commission that was

established by the Department of Justice to implement the provisions of the law.)

      h.    Serving in 1999 and 2000 as a consultant to California State Senator Tom

Hayden on violence prevention in California prisons, resulting in the publication of the book

*Violence in California Prisons: A Proposal for Research into Patterns and Cures* (Sacramento,

2000).

      i.    Serving as a consultant on violence prevention and rehabilitation in prison

systems in Poland, New Zealand, Singapore, Canada and Great Britain.

      j.    Serving since 2005 on the National Commission on Safety and Abuse in

American Prisons, culminating in a report to the U.S. Senate Judiciary Committee in 2006.

      k.    Serving as a consultant and adviser to the New York Correctional

Association, and a member of their board, with a special emphasis on treatment of mentally ill

and suicidal prisoners in the New York state prison system.

      l.    Participating in the preparation of a report on the global problem of

"Violence Against Children," which the Secretary General of the United Nations presented to

the General Assembly in 2005.

      m.    Serving, since this year, on a committee of the American Psychiatric

Association, to prepare a set of "best practices" guidelines for the psychiatric evaluation and

treatment of violent or potentially violent mental patients, as one in the series of evidence-based treatment guidelines they are publishing to summarize the most successful empirically validated approaches to each of a number of different psychiatrically relevant problems or syndromes.

15.     From 1997 to 2004, I evaluated the results of a violence-prevention experiment in the San Francisco jails that was based in part on my theories and research. By 2004 we were able to show that it had achieved a 100% reduction in in-house violence, and that graduates of the program were rearrested for violent crimes 83% less frequently than were the members of a control group of otherwise identical jail graduates who had been in ordinary jails.

## II.    BASIS FOR EXPERT OPINIONS

### A.    QUESTIONS PRESENTED

16.     I have been retained by plaintiffs' attorneys in the *Coleman* and *Plata* cases as an expert on prison psychiatry and the provision of mental health care in prisons, on causes and prevention of violence, and on the relationship between mental illness and violence. They have asked me to focus especially on the following questions:

a.     Would a prisoner releaser order that includes an incremental decrease in the length of stay and/or diversion of mentally ill offenders adversely impact public safety? My answer to this question is no, there would be no increase in crime if the state implemented the order responsibly. In fact, public safety outcomes can be significantly improved by release or diversion of mentally ill offenders in a manner that disrupts the current churning of such persons through short-term incarcerations from which they are released sicker than when they went in.

b.     What are the elements needed to improve public safety outcomes regarding treatment of mentally ill offenders by the California correctional and parole system? The basic elements are pre-release planning, access to care in the community, programs to target persons with co-occurring mental illness and drug addiction, and coordination between parole authorities and community care providers to address the needs of the very small

-6-

minority of mentally ill offenders who need occasional high-level care up to and including in-patient hospitalization. Based on my review of the evidence in this case, I conclude that California has a framework in place which can be used to improve public safety by diverting or releasing mentally ill offenders in a manner that ends the current harmful cycle of frequent short-term incarceration.

## B.    EVIDENCE ON WHICH THE EXPERT OPINIONS ARE BASED

17.    I have based my opinions on three main sources of evidence:

a.    My own clinical and research experience over the past forty years of work with violent and/or mentally ill individuals in prisons, prison mental hospitals, jails and other correctional and clinical settings, including both my therapeutic work as a clinician with individuals and groups, and my empirical research as a social scientist measuring the variations in the incidence of in-house violence and violent recidivism in the community that occur under varying conditions of incarceration, mental health care, and rehabilitative programming.

b.    My knowledge of the professional and scientific literature on these subjects.

c.    My examination and analysis of much of the documentary evidence, research, judicial opinions and orders, specialized studies by commissions of experts, official correspondence and proclamations, reports by expert witnesses, and other materials introduced into this litigation, including but not limited to the materials listed in **Appendix B** to this Report.

## III.    SUMMARY OF OPINIONS

## A.    WOULD A PRISONER RELEASER ORDER THAT INCLUDES AN INCREMENTAL DECREASE IN THE LENGTH OF STAY AND/OR DIVERSION OF MENTALLY ILL OFFENDERS ADVERSELY IMPACT PUBLIC SAFETY?

18.    A properly implemented prisoner release order that included an incremental decrease in length of stay and/or diversion of mentally ill offenders would not adversely impact public safety. In fact, it would improve public safety by ending current churning of such persons through short-term incarcerations from which they are released sicker than when they

went in. In the larger context, detailed studies of the relationship between incarceration levels and crime rates have shown that mass incarceration does not reduce rates of violent crime.[1] The same is true regarding incarceration of the mentally ill.

    **1.**    **The Public Safety Baseline: Overcrowding and Recidivism Generally.**

    19.    The status quo is characterized by frequent cycling of offenders through a prison system that is not equipped to provide the level of services and programming necessary to prevent future crimes and victimization. These points seem hardly to be in dispute. Even the primary defendant named in *Coleman*, Governor Schwarzenegger, not only agrees that the prisons are overcrowded, but that they are dangerously overcrowded, to such an inordinate degree that the overcrowding itself poses an acute and dangerous emergency not only to all those in the prisons but also to all those outside the prisons, *i.e.*, the community, the State, as a whole.[2] As is clear from reading his "Prison Overcrowding State of Emergency Proclamation," the prisons are overcrowded in terms not only of their "design capacity," *i.e.*,

---

[1] For the first three-quarters of the twentieth century, the rate at which Americans were incarcerated in our prisons and jails was remarkably constant, remaining roughly in the range of 100 plus or minus twenty per 100,000 of population. Beginning in the mid-1970s, for the first time in the past century, our incarceration rate underwent an abrupt and sustained increase, from rates of 100-120 to more than 700 per 100,000, a six- to seven-fold increase. This increase, however, has yielded no benefits in public safety. Homicide rates, for example, were 8.3 per 100,000 in 1970, before the incarceration boom, and exactly the same in 1996, after the incarceration rate had quadrupled. The homicide rate only started a downward trend not in step with the incarceration boom, but during the economic expansion of the late 1990s, when real income levels for poor families rose for the first time in 30 years. The National Academy of Sciences Panel on the Understanding and Control of Violent Behavior investigated the relationship between our incarceration rates and our violent crime rates, and concluded that there has been no substantial public safety benefit from the incarceration boom. Reiss, Albert J. and Roth, Jeffrey A., Eds. *Understanding and Preventing Violence,* Volume 1, Washington, D.C.: National Academy Press (1993) p. 6. See also Philip J. Cook, "Research in Criminal Deterrence: Laying The Groundwork For The Second Decade," in N. Morris and M. Tonry, eds., *Crime and Justice: An Annual Review of Research,* Vol. 2, Chicago: University of Chicago Press (1980).

[2] "Prison Overcrowding State of Emergency" Proclamation by the Governor of the State of California (October 4, 2006), Joint Plaintiffs' Trial Ex. 1.

the number of beds and the amount of programming capacity (medical and mental health offices, school rooms, workshops, gymnasia, etc.) they were originally designed for, but also of their "operational capacity," *i.e.*, the number of additional inmates they can accommodate by double- or triple-celling, transforming programming spaces into bed-spaces, etc. That this overcrowding is so severe as to create severe medical, psychiatric and security problems is stated clearly and repeatedly and with abundant supporting documentation and examples. There are confirmations of that conclusion in almost every other report I have cited above and in Appendix B.

20.    Rates of recidivism have increased substantially between 1977, following the passage of the DSL in 1976, followed by 80 additional laws whose cumulative effect was an explosive increase in incarceration rates (culminating in passage of the "three-strikes and you're out" law in 1994), and 2004, as measured by number of offenders returned to prison, with one-year recidivism rates increasing from 20% to 55%, two-year recidivism rates from 26% to 72%, and annual return rates from 10% to 60%.[3]

21.    The links between overcrowded prisons and recidivism are well established. David Farrington and his colleagues at the Institute of Criminology at Cambridge University found a strong relationship between overcrowding and increased rates of recidivism, a relationship that could not be explained away by other variables, leading them to recommend a reduction in prison overcrowding in order to improve the ability of prisons to reduce crime.[4]

   **2.    The Public Safety Baseline:  Releases of Mentally Ill Offenders Are Already Happening.**

22.    In order to answer the question of what impact the increased release of individuals, some with mental illness, will have on public safety, it is necessary to consider the

---

[3] "Roadmap for Effective Offender Programming in California," *Report to the California State Legislature by the CDCR's Expert Panel on Adult Offender and Recidivism Reduction Programming* (June 29, 2007), Joint Plaintiffs' Trial Ex. 2, p. 3.

effect of current release practice on public safety. The choice facing the California prison system is not between releasing or not releasing mentally ill offenders. Mentally ill offenders are released every day.

23.    Figure 1, below, is a chart derived from a summary of releases to parole in 2006 from the discovery documents in this case. The blue bars in the chart represent the numbers of persons released to parole based on identified mental health status. "No mental health code," is self-explanatory, and reflects no identification of mental illness. **CCCMS** stands for **Correctional Clinical Case Management System**, the lowest level of diagnosis in the California correctional system. According to the CDCR Mental Health Services Delivery System Program Guide, patients are to be designated for the CCCMS level of care based on stable functioning in the general population, exhibiting symptom control, or being in partial remission as a result of treatment, and with a Global Assessment of Functioning (GAF)[5] scores of 50 and above. EOP stands for **Enhanced Outpatient Program,** the California correctional designation for a higher and more intensive level of treatment, usually resulting in a GAF of less than 50. "Crisis Bed and DMH" signify persons at the two crisis levels of care provided by the program guide—the Mental Health Crisis Bed (MCHB) level of care for prisoners during the first 10 days of a major crisis, and the Department of Mental Health (DMH) level of care for the most acute cases.

24.    The distribution of persons by mental health status in Figure 1, below, is typically pyramidal, with a very broad base of persons with no diagnosis (80%) or with a very

---

[4] Farrington, D. and Nuttall, C., "Prison Size, Overcrowding, Prison Violence, and Recidivism, *Journal of Criminal Justice* 8:221-231 (1980), p. 230.

[5] The Global Assessment of Functioning (GAF) scale scores are clinical assessments of overall psychological, social and occupational functioning based on a 100-point scale. Higher scores reflect better overall functioning. A GAF score of 40 is indicative of major impairment in areas such as judgment, thinking, mood or social or work relations; a score of 50 is considered indicative of serious psychological symptoms or serious impairment in social or occupational functioning.

low acuity diagnosis (17.65% CCCMS), narrowing rapidly to population of higher-acuity individuals that is a full order of magnitude smaller (1.82% EOP), followed by a very small population of individuals with a history of needing crisis-level care (0.48% Crisis Bed and DMH).



Figure 1: Source: Attributes of 2006 Admissions, Standing and Release Cohorts of Felons and Civil Addicts (email from Bubpha Chen to Susan Turner, May 6, 2007 (Document Number E_UCI044669). Note that the source document includes the following qualification: "Data may be incomplete due to posting delay in DDPS, especially for new admissions." Also, reproduced at Appendix L to 2007 Expert Panel Report, page 145, available at http://www.cdcr.ca.gov/news/docs/Expert_Rpt/ExpertPanelRpt_AppendL.pdf, Joint Plaintiffs' Trial Ex. 2 at 145, Table L-5.

25.    What are the current public safety outcomes for California's released parolees, both mentally ill and non-mentally ill? Measured by California's recidivism rates, the outcomes are not good. California's recidivism rate has been measured variously. A recent estimate based on 1994 releases found 70% rearrested within three years of release. Counting only returns to prison, the rate was 66% within three years of release.[6] These high rates of recidivism make California an outlier in the United States, particularly in the numbers of

---

[6] Joan Petersilia, "Understanding California Corrections," *California Policy Research Center, University of California* (May 2006), Joint Plaintiffs' Trial Ex. 5, pp.71-72

people returned to prison not for new crimes but for technical parole parole violations. It is important to understand that part of this high recidivism rate is a group of offenders who continually cycle in and out of the prisons on parole violations. This has been referred to as California's "catch-and-release" policy.[7] California leads the nation in the practice of "churning" parolees into and out of prison for short-term parole violations that average about 4 months in prison.[8] As discussed in more detail below, while persons with mental illness do not have higher rates of violent recidivism, they do have higher rates of recidivism for technical parole violations, and thus are more likely to "churn" into and out of prison for short periods.[9] Individuals who "churn" through repeated short-term revocations are predictably released to parole without having received appropriate treatment or programming in the prison, and without adequate plans for treatment or supportive services in the community. Thus, the current public safety baseline is that large numbers of individuals are already recidivating, already being released to the community, coming back to prison, and being released again. For those individuals with mental illness, a California parole department management report from the discovery in this case estimated that thousands of individuals are being returned to prison for parole violations directly resulting from unmet mental health needs:

> Each year over 6,000 parolees suffering from serious mental illness
> are returned to prison for periods ranging from a few months up to

---

[7] *Id.* at p. 75

[8] *See* Blumstein, A. and Beck, A., "Reentry as a Transient State Between Liberty and Recommitment," *Prisoner Reentry and Crime in America* (2005) at pp. 69-74; Grattet, R, Petersilia, J. & Lin, J., *The Causes and Consequences of Parole Violations in California: A Multilevel and Policy-Focused Analysis*, Progress Report Submitted to the National Institute of Justice (July 2007) at p. 1; CDCR Spring 2008 Adult Population Projections, Joint Plaintiffs' Trial Ex. 75, at p. 15 (average time served in prison for male parole violators without a new term was 4.0 months) and p. 17 (average time served in prison for female parole violators was 3.8 months).

[9] Louden, J.E., Dickinger, E., & Skeem, J.L., "Parolees with Mental Disorder: Toward Evidence-Based Practice," *Center for Evidence-Based Corrections Bulletin* [unpublished manuscript] (2008), Joint Plaintiffs' Trial Ex. 76.

EXPERT REPORT OF JAMES GILLIGAN, M.D., NOS.: CIV S 90-0520 LKK-JFM, C01-1351 TEH

one full year or longer if they receive a new term. This is primarily
due to technical violations or other criminal behavior that can result
from their mental illness. Many of the problems exhibited by these
individuals when noncompliant with their parole conditions are
related to the disorganization produced by their mental illness.[10]

26.     The people now incarcerated in, and thus being released from, California's
prisons are largely of two types: those serving prison terms for new commitments and those
serving prison terms for violations of parole. In 2007, over half of the releases to parole—
approximately 68,295 releases—were "re-paroles" of parole violators who, on average, served
short terms of approximately 4 months in prison.[11] Even those who served the longest possible
term for a parole violation would only have served 12 months, the maximum term for a parole
violation.[12] The dramatic levels of prison overcrowding throughout the state mean that
individuals coming into prison are housed in "Reception Centers" for extended periods of time,
far longer than intended. Short-term parole violators—who account for half of the annual
releases to parole—are virtually certain to serve their entire revocation terms in these
Reception Centers.

27.     The evidence I reviewed establishes that the levels of mental health treatment
provided to individuals in Reception Centers are inadequate to meet the needs of persons with

---

[10]California Department of Corrections, Division of Adult Parole Operations, Mentally Ill
Parole Population (July 2007), Joint Plaintiffs' Trial Ex. 77, at p. 5.

[11]Movement of Prison Population, Calendar Year 2007,
http://www.cdcr.ca.gov/Reports_Research/Offender_Information_Services_Branch/Annual/M
ove5/Move5d2007.pdf, Joint Plaintiffs' Trial Ex. 78, at p. 1; CDCR Spring 2008 Adult
Population Projections, Joint Plaintiffs' Trial Ex. 75,  at p. 15 (average time served in prison
for male parole violators without a new term was 4.0 months) and p. 17 (average time served
in prison for female parole violators was 3.8 months).

[12] California Penal Code § 3057(a)

EXPERT REPORT OF JAMES GILLIGAN, M.D., NOS.: CIV S 90-0520 LKK-JFM, C01-1351 TEH

mental illness, especially those facing the stresses of reincarceration.[13] The *Coleman* Special Master has reported that transfers to housing at appropriate levels of care for the EOP and CCCMS populations in Reception Centers are extremely delayed.[14] Thus, for short-term parole violators the limited mental health treatment provided in the Reception Centers is all they are likely to receive before they are released to parole. Moreover, it is my understanding that identification of individuals with mental illness who would then be referred for this limited treatment may be significantly delayed upon their arrival at the Reception Centers because screening clinicians do not have timely access to prisoner files.

28.    Top CDCR administrators have admitted that programming in the Reception Centers is minimal or non-existent. During a hearing before the California State Senate Budget Subcommittee on Government Administration on March 12, 2008, in response to the question, "Can you talk about what the Department currently does to deal with the terms of parole violators in reception centers, whether or not there's any rehabilitative services being provided in the short stay that they have there?" Scott Kernan, CDCR Chief Deputy Secretary of Adult Operations, testified, "I would say as to your question are they getting services…in prisons, I would say no, sir. They're being sanctioned for their behavior and we are sitting them on bunks."[15] The California Rehabilitation Oversight Board found in its July 15, 2008 Biannual

---

[13] This evaluation of the state of care in the reception centers is based on many of the documents I have reviewed, particularly including the following: Supplemental Expert Report of Ira K. Packer, Ph.D. (Dec. 12, 2007); Special Master's Report and Recommendations on Defendants' Enhanced Outpatient Treatment Programs in Reception Centers (July 2, 2007), Coleman Plaintiffs' Trial Ex. 9.

[14] *See Coleman* Special Master's Draft 20th Monitoring Report, Joint Plaintiffs' Trial Ex. 57, at p. 353 (noting lengths of stay for CCCMS in Reception Centers), p. 357 (EOP transfers were excessively delayed in all directions; CCCMS transfers to mainline programs also generally exceeded timelines).

[15] Video clip of Senate Budget Subcommittee 4 March 12, 2008 Hearing, available at http://www.calchannel.com/MEDIA/0312A.asx, approximately 1:08, Joint Plaintiffs' Trial Ex. 84.

Report that "CDCR is still primarily in the planning stages of rehabilitation programming reform. The department needs to move more into the implementation phases to demonstrate true progress."[16] In this regard, I agree with the written statement of one of CDCR's top parole administrators in Southern California, who reported to the director of state parole that the state needs to "break the cycle of mentally ill parolees filling up expensive prison beds," as well as with the statement of a top Los Angeles parole administrator that under the current system parolees are "punished for their illness by being locked up."[17]

29.    Overcrowding the prisons and reception centers impairs California's ability to start to provide rehabilitative programming to anyone in the prisons. The CDCR Expert Panel on Adult Offender Reentry and Recidivism Reduction Programs issued a report on June 29, 2007 that concluded that California must reduce overcrowding in its correctional facilities in order to give its adult offenders the ability to access rehabilitation programming:[18]

> The largest barrier that the Panel identified to delivering effective
> programming in CDCR prison facilities is its current state of
> overcrowding. CDCR facilities were built to hold 100,000
> offenders; however, at the time of this report, the CDCR was
> currently housing 172,385 offenders in its prisons. Because of this
> overcrowding situation, there is simply not enough space to

---

[16] C-ROB, California Rehabilitation Oversight Board, Biannual Report (July 15, 2008), Joint Plaintiffs' Trial Ex. 79, at p. 2, *available at, http://www.oig.ca.gov/crob/pdf/2008/07-15-08_biannual_report.pdf.* The C-ROB report evaluated progress on the goals of providing short-terms inmates with re-entry services and low risk offenders with rehabilitation programs, finding such programs to still be mostly in the planning, not the implementation phases, pp. 7-8.

[17] Memorandum, Jeff Fagot, Regional Administrator, Region IV, to Thomas Hoffman (July 30, 2007), Joint Plaintiffs' Trial Ex. 70 at p. 5; Memorandum, Alfred Martinez, Regional Administrator, Region III, to Thomas Hoffman (Aug. 10, 2007), Joint Plaintiffs' Trial Ex. 71 at p. 9.

[18] Expert Panel Rpt (2007), see footnote 3, above, at pp. viii, 9-10 (finding that overcrowding prevents access to rehabilitation programs both because it eliminates the physical space available for programming and because it leads to violence and other negative consequences that cause wardens to cancel programming in affected areas).

conduct effective programming—this applies to both the male and
female offender populations. (p.101)

30.     The provision of mental health treatment, rehabilitation programming, and pre-
release and re-entry planning is also deficient for inmates who are incarcerated for long enough
periods that they are transferred to and housed in non-reception center housing prior to parole
(approximately 66,872 of the releases to parole in 2007[19]). The Court overseeing the *Coleman*
case regarding mental health treatment for inmates found on July 23, 2007 that the prison
system's "mental health care delivery system has not come into compliance with the Eighth
Amendment at any point since this action began."[20] The Court specifically referenced delays
in access to care at the highest level of need, inadequacies in the capture and collection of data,
inability of CDCR to engage in adequate long-range planning for the delivery of mental health
care, staffing vacancies, lack of programming space and shortages of beds for mentally ill
inmates. The Special Master in the *Coleman* case found that the treatment needs of at least
one-third of the inmates identified as mentally ill are not being met.[21]

31.     The observations that the California Rehabilitation Oversight Board made with
regard to the weaknesses of CDCR's rehabilitation programming are not restricted to reception
centers. The CDCR Expert Panel on Adult Offender Reentry and Recidivism Reduction
Programs issued a report on June 29, 2007[22] noting the serious deficiencies in rehabilitation
programming in CDCR prisons. The Expert Panel observed that the negative consequences of
overcrowding "degrade the CDCR's ability to consistently operate rehabilitation programs in
the prison environment" and noted that during the increased lockdowns and controlled
movements that result in overcrowded prisons, all programming in affected prison areas is

---

[19] *See* 2007 CDCR Movement Report, footnote 11, above.

[20] *Coleman* Order of July 23, 2007, *Coleman* Plaintiffs' Trial Ex. 46, at p. 6.

[21] *Coleman* Special Master's Response to Court's May 17, 2007 Request for Information, May
31, 2007, Joint Plaintiffs' Trial Ex. 35, at pp. 4-14.

[22] *See* footnote 3, above.