# EXHIBIT Q
# PART 2

canceled. (p.9). The Expert Panel concluded that because of the overcrowding in CDCR, "there is simply not enough space to conduct effective programming—this applies to both the male and female offender populations." (p.101)

32.     When overcrowding impairs the ability of a prison system to deliver treatment, rehabilitative programming, and pre-release planning, the already inherently harmful effects of "churning" are multiplied, and present clear and present risks to public safety: "By definition, churners' correctional histories are characterized by frequent short spells in prison interspersed with frequent short spells on parole."[23] Churning is particularly harmful for persons with mental illness, for whom frequent returns to prison interrupt their access to treatment, medication, and community ties needed to function productively in society. In my opinion, California's pattern of incarcerating mentally ill parolees is a tragically misguided decision which seriously harms public safety by increasing the criminogenic factors in the lives of such parolees, and cutting them off from the very sources of stable treatment and community connection that have been shown to prevent crime and victimization.

33.     Recent studies of the California parole system define parole revocation "churners" as persons who enter prison six or more times over a seven-year span.[24] The mechanisms by which such churning of the mentally ill adversely affects public safety are clear. An overcrowded prison medical system cannot reliably identify the treatment needs of such persons as their rapid arrivals and transfers overwhelm medical records systems. Thus, they are likely to go without adequate treatment at one of the most de-stabilizing times a person is likely to face. Churners tend to stay in for short-periods and are released back to the community not only without adequate treatment, but without adequate transition plans to ensure that they continue on medication regimes, and reconnect with housing, public benefits, and other stabilizing influences. Churning overwhelms the systems that parole departments

---

[23] Grattet et al. (2007), p. 6, see footnote 8, above.

[24] *Id.*; citing Blumstein & Beck (2005), footnote 8, above.

use to address the needs of the few high-need parolees in the system, including simple procedures such as identifying which releasees need to be met by a parole agent at the gate, and which can be sent into the community with less supervision. In my opinion and experience, the ability of prison mental health and administrative systems to perform such public-safety advancing functions properly is compromised when the volume of the inmate population being serviced overwhelms the staff and support infrastructure who are supposed to provide the services.

### 3. Improving on the Public Safety Baseline: Are Mentally Ill Offenders As a Group More Dangerous than Non-Mentally Ill Offenders?

34.     The scientific evidence is clear that the vast majority of mentally ill offenders are no more dangerous as a group than non-mentally ill offenders. Mental illness by itself is not a significant predictor of violent recidivism.

35.     We can translate this question into a form that permits empirical testing of all possible answers to it (*i.e.*, that they are more dangerous, less dangerous, or equal in dangerousness) by asking "Is the recidivism rate for violent crimes among those prisoners who have been diagnosed as mentally ill higher than, lower than, or equal to that observed among those who have not?"

36.     A recent study of California parolees confirms the results of national and international studies (discussed in more detail below) that mentally ill offenders as a group are no more likely to commit violent crimes after release than are non-mentally ill offenders. Among the discovery documents that I have reviewed in this case is a recent manuscript of a study by researchers Jennifer Eno Louden, Eric Dickinger, & Jennifer L. Skeem at the University of California at Irvine, Center for Evidence Based Corrections, titled "Parolees with Mental Disorder: Toward Evidence-Based Practice."[25] The researchers report their findings on

---

[25] Louden, J.E., Dickinger, E., & Skeem, J.L., "Parolees with Mental Disorder: Toward Evidence-Based Practice," *Center for Evidence-Based Corrections Bulletin* [unpublished manuscript] (2008), see footnote 9, above.

a cohort of 105,430 persons released to adult parole in California for one calendar year, 2004. The researchers sought to determine, among other things, whether there was an association between violent recidivism and mental illness in this cohort of releasees. The compared the parolees with an identified mental disorder (PMDs) with those without identified mental disorders. Their conclusion is in keeping with the general consensus of the scientific literature: "Our data indicate that PMDs were not significantly more likely to have a determination involving violence than their nondisordered counterparts. Relative to other characteristics that PMDs share with non-disordered parolees (e.g., past violence, antagonistic personality features, criminogenic peers), mental illness is a modest risk factor for both violence (Elbogen et al., 2007) and violent recidivism. (Bonta et al., 1998)." They note that this conclusion is contrary to common perceptions: "Members of the public grossly overestimate the relationship between mental illness and violence (Watson, Corrigan, & Angell, 2005)."

37.    The above-cited Center for Evidence Based Corrections study also examined the overall recidivism rate among the 2004 California cohort of persons released to adult parole, and confirmed the common perception that persons with mental illness tend to return to prison for parole violations at a higher rate. They went further, however, and "drilled down" into the reasons that persons with mental illness return to prison on parole violations. They found that the parolees with mental illness are far more likely to be returned to prison on technical violations and not for new crimes, as compared with the non-mentally ill population. "The results indicate that PMDs who recidivated are much less likely to be charged with a new offense than non-disordered parolees who are returned to custody (19.9% vs. 34.2%; $\chi2(1)$= 448.3, p< .001). PMDs, then, are much more likely than non-disordered parolees to return to custody for a technical violation of parole."

38.    This recent California research is consistent with the great body of scientific evidence that mental illness itself is not a useful predictor of violent recidivism. In my opinion, the most comprehensive source of evidence on this point is a meta-analysis of 58 research studies on 64 separate samples of subjects that compared violent (as well as non-violent) recidivism rates of mentally ill and non-mentally ill prisoners over a post-release

-19-

period that averaged 4.8 years.[26] The studies included all those that the authors were able to locate that met rigorous standards of scientific design and evaluation and had been published in edited journals or books, reported in academic theses, or recorded in the working papers of ongoing research projects, during the 37 calendar years 1959-1995.

39.    Their main finding (p. 136) was that "In studies that compared the recidivism of mentally disordered offenders with nondisordered offenders, the mentally disordered offenders were less likely to recidivate." These differences between the two groups were statistically significant ($p<0.001$). When they sub-divided the mentally ill ex-prisoners into different diagnostic groups, they found that "Severe mental disorders (e.g., psychosis and schizophrenia) were inversely related to [both] general and violent recidivism," *i.e.*, they were less likely than non-mentally ill offenders to reoffend with either violent or non-violent crimes. The mentally ill group diagnosed as suffering from "disorders of mood (e.g., depression) showed no relationship to recidivism" (p. 136), *i.e.*, they were neither more nor less likely than the non-mentally ill to reoffend. That was also the consensus in studies comparing individuals found "not guilty by reason of insanity" with those who were convicted of comparable offenses, *i.e.*, neither group was more or less likely than the other to reoffend after release back into the community (p. 134). They concluded that "those with mental illnesses are not as dangerous, at least as compared with nondisordered offenders, as the public perceives" (p. 139).

40.    Another major finding of this meta-analysis was that "The major predictors of general and violent recidivism appear comparable" for both mentally disordered and non-mentally disordered offenders. "Criminal history, antisocial personality, substance abuse, and family dysfunction" turned out to be the most powerful predictors or risk factors for both groups of offenders, and to be equally important for both. (p. 139). For example, mentally ill individuals who drink to excess or who have an established history of committing violent crimes are more likely to commit acts of violence after release from prison than are those who

---

[26] Bonta J., Law M., & Hanson K., "The prediction of criminal and violent recidivism among mentally disordered offenders: a meta-analysis," *Psychological Bulletin* 123:123-142 (1998).

do not; but the same is true for people who are not mentally ill. To sum up, "the results support the theoretical perspective that the major correlates of crime are the same, regardless of race, gender, class, and the presence or absence of a mental illness. Clinical or psychopathological variables," on the other hand, such as mental illness, "were either unrelated to recidivism or negatively related" (p. 139). And "In general, indicators of … psychological disturbance were among the least important predictors of general and violent recidivism. In contrast, the best predictors were those associated with an established pattern of prior criminal behavior" (p. 139), whether or not the individuals involved were mentally ill.

     41.    Those conclusions are completely consistent with my own clinical experience in evaluating and treating both mentally ill and non-mentally ill violent prisoners since 1967. In my published books and articles on the causes and prevention of violence, I have not found it useful to differentiate between the mentally ill (as major mental illness is defined by law and by psychiatry) and those who are not, since I had repeatedly observed in working with both populations that the same etiological and motivational factors appeared to be responsible for the violence committed by the members of both groups. I observed that one factor distinguished the mentally ill who committed serious acts of violence and were committed to the prison mental hospital from equally mentally ill but non-violent individuals whom I had diagnosed and treated in civil mental hospitals. That factor was that when the acute psychotic symptoms had resolved, there emerged in the violent mentally ill individuals a character or personality disorder that met the diagnostic criteria for antisocial personality disorder or such closely related, somewhat overlapping medical classifications as borderline or narcissistic personality disorder – exactly the types of personality disorders that are modal in the population of non-mentally ill prisoners. In the non-violent mentally ill patients I have treated, I have found no such pattern. Thus I have concluded that the main risk factor or etiological element in the violent mentally ill is not their mental illness as such, but rather, the same type of underlying personality disorder that is found in people without mental illness who commit violent crimes.

42.    The only exception to that that I would mention is the brief psychiatric emergency that can occur when mentally ill individuals become or threaten to become violent in response to paranoid delusions of persecution or command hallucinations (*e.g.*, hearing voices telling them to kill someone). In that situation, the most rapid and effective way to diminish the risk of violence is to treat the psychosis (by means of psychotherapy, psychopharmacology, and changing their social and physical environment, such as by having the individual moved to a different location, or placed temporarily in a more secure environment) so as to give them some relief from those symptoms. But that is no different in principle from what one does with non-mentally ill prisoners who are acutely emotionally disturbed, many of whom actually request to be moved to a different cell block or institution or to be placed in a locked cell until they feel in control of their own behavior again. Again, this is consistent with the meta-analysis on which I have been commenting, in which the authors observe that "Hallucinations and delusions may trigger antisocial acts in the immediate situation and have high predictive validity in the short term. However, as indicated by the present findings, such symptoms may have little predictive validity in the long term" (p. 139).

43.    A more detailed analysis of some of the 54 studies synthesized in the meta-analysis just referred to may make some of these issues clearer. One study[27] examined the behavior of 120 male prisoners divided between those with psychotic disorders and those with

---

[27] Villeneuve, D.B. & V.L. Quinsey, "Predictors of general and violent recidivism among mentally disordered inmates," *Criminal Justice and Behavior*, 22(4):397-410 (1995). This study was cited in a recent CDCR-commissioned-report: Farabee, D., "Final Report of the Mental Health Services Continuum Program of the California Department of Corrections and Rehabilitation Parole Division," *UCLA Integrated Substance Abuse Program Neuropsychiatric Institute* (June 30, 2006), Joint Plaintiffs' Trial Ex. 90. The CDCR report, however, mischaracterized the study's findings in a way that seriously exaggerates the risks of violent recidivism by both mentally ill and non-mentally ill offenders. The CDCR report misquoted the violent recidivism rate in the Villenueve and Quinsey as 70%. (Farabee (2006) at p. 6.) In fact, the 70% figure in the Villeneuve and Quinsey study is for "any rearrest" not violent recidivism. For violent recidivism, Villeneuve and Quinsey found that inmates classified as "psychotic" had a much lower rate of violent recidivism (below 30%) after three years than did non-psychotic inmates (45%). See Villeneuve and Quinsey (1995), p. 403.

non-psychotic (personality) disorders who had been released from incarceration in a maximum-security inpatient psychiatric unit of a federal penitentiary in Ontario into an "at risk" situation, *i.e.*, community, halfway house, or psychiatric institution other than maximum security, for an average of 92 months. Participants in the study had a mean of 24 prior criminal convictions including two for violent crimes, of which the average most serious conviction was for aggravated assault causing bodily harm. (p. 402). Their rearrest rates were measured at six, 12, 24, 36 and 92 months. The most relevant finding was that while there was no difference between the two groups in rearrest rates for non-violent crimes, the men who were diagnosed with major (psychotic) mental illnesses actually had *fewer* rearrests at all of the follow-up periods both for any violent crime, and for severe violent crimes (everything more serious than simple or common assault), than did the non-psychotic ex-prisoners.

44.    In another study from Ontario,[28] 96 men from a maximum security prison psychiatric hospital who had been found not guilty by reason of insanity and were diagnosed as schizophrenic were compared with a matched comparison group of 96 men who had undergone brief pretrial psychiatric assessments at the same hospital, found not to have schizophrenia or any other psychotic illness (19 received no diagnosis, 42 had personality disorders, 18 had a history of drug or alcohol abuse, and the remainder had a variety of non-psychotic diagnoses of insufficient severity to warrant further hospitalization) and transferred to prison. Following their release into "at risk" situations (the community or open, unlocked psychiatric hospitals) the men with schizophrenia had lower rates of recidivism both for any crime (35% vs. 53%) and for any violent crime (16% vs. 24%).[29] While only the former difference was large enough to be statistically significant (p< 0.02), when they examined the

---

[28] Rice, M.E. & Harris, G.T., "A comparison of criminal recidivism among schizophrenic and nonschizophrenic offenders," *Internat. J. of Law and Psychiatry*, 15:397-406 (1992).

[29] In order not to bias the results in favor of the mentally ill population, they defined recidivism broadly enough to include not only being charged with a crime but also any act that brought the offender back to a mental hospital, for which he could have been criminally charged.

seriousness of the offense, they found that the mentally ill population committed less severe offenses than the non-psychotic. Of their total of 15 violent charges, the most serious were three for assault causing bodily harm, as compared with 23 rearrests among the non-mentally ill group including one murder, one attempted murder, one wounding, six assaults with bodily harm, and four sexual assaults. (p. 403). This study, like many others, found that the best predictors of recidivism are the same for the mentally ill as for those who are not, and that among those is alcohol abuse. (p. 405). In this population, unlike those in some other studies, the mentally ill group had a lower overall rate of alcohol abuse than the non-mentally ill, and "when alcohol abuse was statistically controlled the two groups no longer exhibited statistically significant differences in recidivism" (p. 405). The more relevant point for this report, however, is precisely the fact that there was no significant difference in recidivism between the two groups; that is, they did not find the mentally ill group to be at greater risk of reoffending than the non-mentally ill, even when they examined only that minority among the mentally ill who also used alcohol to excess.

45.    In many other studies of recidivism, personality disorders (including antisocial, psychopathic, borderline and narcissistic disorders, which are the modal diagnoses among non-mentally ill prisoners)[30] have been found to be stronger predictors of reoffending than major mental illness is.[31]

46.    There is one "natural experiment" that bears on the question being asked here concerning the relative risk of danger to the public from suddenly releasing a large group of mentally ill offenders from prison. Exactly that event occurred in the state of New York following the decision of the U.S. Supreme Court on February 23, 1966 (*Baxstrom v. Herold*,

---

[30] Guze S., *Criminality and Psychiatric Disorders*, New York and London: Oxford University Press (1976) pp. 80 and 137.

[31] Quinsey, V.L., Preusse, M. & Fernley, R., "A follow-up of patients found not guilty by reason of insanity or unfit for trial," *Canadian Psychiatric Association Journal*, 20:461-467 (1975); Quinsey, V.L., Warneford, A., Preusse, M. & Link, N., "Released Oak Ridge patients: A follow-up of review board discharges," *British Journal of Criminology*, 15:264-270 (1975).

383 U.S. 107).[32]  As a result of that decision, New York State correctional authorities had to remove some 969 persons from its maximum-security prison mental hospitals for "insane criminals" in a very short period.  Published studies of these releases showed that predictions of violence and mayhem were unfounded, both during the phase in which the patients were transitioned to civil mental hospitals, and later in community releases.[33]

47.    My conclusion is that mentally ill prisoners as a group are either less likely, or at least no more likely, than non-mentally ill prisoners as a group to increase the risk of danger to the public upon release by committing violent crimes, and that before we can reject that conclusion we will need more evidence to the contrary than is currently available.

48.    However, it has been found that the mentally ill are far more likely to be victims of violent crime than perpetrators of it.[34]  That is, they are likelier to be injured by someone else than they are to injure someone else.  The research regarding mental illness and violence "does not support the stereotype that persons with severe mental illness are typically violent" toward others, but instead should raise more concerns regarding the vulnerability of the mentally ill to victimization.[35]

49.    The conclusion that should be drawn is that mental health status is not a useful, appropriate, or valid predictor of violence among people released from prison.  While social prejudices perpetuate the assumption that "mentally ill" prisoners are more dangerous when released into society than non-mentally ill prisoners are, the mental health status of ex-prisoners is not in fact correlated with increased dangerousness to others.  To the extent that

---

[32] Hunt, R.C. & Wiley, E.D., "Operation Baxstrom after one year," *Amer. J. Psychiat.* 124 (7):974-978 (1968).

[33] Steadman, H.J. & Keveles, G., "The Community Adjustment and Criminal Activity of the Baxstrom Patients:  1966-1970," *Amer. J. Psychiat.* 129 (3): 304-310 (1972).

[34] Choe, J., Teplin, L.A. & Abram, K.M., "Perpetration of Violence, Violent Victimization, and Severe Mental Illness," *Psychiatric Services*, 59(2):153-164 (2008).

[35] *Id.* at p. 161.

release of inmates is based on assessment of risk factors, these should be individualized and consider each particular individual's history of violence, substance abuse, etc., in order to assess each individual's dangerousness, or lack of it. This risk assessment should be no different for individuals who are mentally ill. To the extent that release of inmates is based on a generalized release that, for example, simply accelerates release dates for a group of inmates already scheduled for release, it would not be useful from a public safety perspective to differentiate between inmates in this group solely on the basis of mental illness.

## B.    WHAT ARE THE ELEMENTS NEEDED TO IMPROVE PUBLIC SAFETY OUTCOMES REGARDING TREATMENT OF MENTALLY ILL OFFENDERS BY THE CALIFORNIA CORRECTIONAL AND PAROLE SYSTEM?

50.    Despite the serious problems presented by the state's overcrowded prison system and the legacy of dysfunctional approaches to handling mentally ill offenders, California's correctional and parole authorities have a framework in place for providing services in the community to parolees with mental illness. It is my opinion that by building on this framework, California can break the cycle of short-term destabilizing incarcerations of mentally ill offenders, and improve their reintegration chances, and thus reduce crime and victimization.

51.    Based on my experience, a correctional agency should ensure that the basic elements of pre-release planning and a system of access to care in the community care are in place to reduce or eliminate both the constant cycling of mentally ill parolees through short-term re-incarceration, and the attendant harms to public safety when such cycling makes the affected parolees sicker and prevents their successful reintegration.[36]

52.    Building on this framework to accommodate a prisoner release order that includes the mentally ill does not require an unrealistic level of investment. In this regard it is critical to remember that not all mentally ill persons are the same. Most have modest needs for

---

[36] *See* Mello, J. & Greifinger, R., "The Evolving Standard of Decency: Postrelease Planning?, " *Journal of Correctional Health Care*, 14(1), at p. 21 (Jan. 2008).

treatment. Some have moderate needs. A very few have needs for the highest levels of treatment.

53.    In this area, it is important to differentiate between the large majority of mentally ill offenders who have modest reintegration needs (approximated by the CCCMS population in California, estimated at approximately 18,900 parolees as of June 2007[37]), the smaller group at the margins (the EOP population in California estimated at approximately 4,000 parolees as of June 2007[38]) who may have somewhat greater needs for services, and the even smaller minority who may need high levels of care up to and including inpatient hospitalization. As I stated above in Paragraph 24, above, in any population of mentally ill offenders, these levels of severity are arranged in a pyramidal distribution, with a broad base of low-acuity, low-need patients, and a very narrow tip of high-acuity, high need patients. For reference, I present the same chart again as Figure 2, showing the distribution of mental health status among persons released to parole in California in 2006, with 80% having no mental health diagnosis, 17.65% at the CCCMS level, 1.82% at the EOP level, and 0.48% at one of the "crisis" levels:

---

[37] California Department of Corrections and Rehabilitation, Division Of Adult Parole Operations, Mentally Ill Parolee Population (July 2007), Joint Plaintiffs' Trial Ex. 77, at p. 4.

[38] Id.





Figure 2: Source: Attributes of 2006 Admissions, Standing and Release Cohorts of Felons and Civil Addicts (email from Bubpha Chen to Susan Turner, May 6, 2007 (Document Number E_UCI044669.) Note that the source document includes the following qualification: "Data may be incomplete due to posting delay in DDPS, especially for new admissions," reproduced at Appendix L to 2007 Expert Panel Report, page 145, available at http://www.cdcr.ca.gov/news/docs/Expert_Rpt/ExpertPanelRpt_AppendL.pdf, Joint Plaintiffs' Trial Ex. 2 at 145, Table L-5.

54.    In implementing any prisoner release order, whether the order is targeted based on an assessment of risk and need, or whether it includes a wholesale short-term release or diversion, there is no public-safety based reason to exclude or disfavor the mentally ill as a group. Even examining the numbers based on the assumption of a wholesale short-term incremental increase in persons released and/or diverted, with no risk and needs assessment, the numbers show that local communities would not be overwhelmed with large numbers of high-need mentally ill offenders. Assume a prisoner release order that required the short-term removal of 30,000 people from the pool of convicted offenders held in (or to be sent back to) prison. Assume that this prisoner release order included no bias against the mentally ill, which is appropriate based on my findings that mental illness itself presents no greater risk to public safety, and that public safety would in fact be enhanced if California desisted from churning the mentally ill through the parole revocation process. Again, assuming no bias against the mentally ill, this group of 30,000 would be distributed in the same pyramidal manner described

-28-

above, with 80% having no diagnosis, 17.65% CCCMS, 1.84% EOP, and 0.48% "crisis level" care. Figure 3, below, shows the breakdown of 30,000 releases by mental health status. The significant fact here is that the numbers of persons at the high-acuity levels are very small—143 persons with a history of crisis care, and 546 persons at the EOP level of care to be released into state with a population of over 36,000,000.





Figure 3

### 1.    Pre-release planning.

55.    I have reviewed the *Coleman* Mental Health Services Delivery System Revised Program Guide, which provides for pre-release planning with the objective "to maximize the individual's potential for successful linkage and transition to the Parole Outpatient Clinic, or, if required, to inpatient services in the community or the Mentally Disordered Offender Program operated at the [Department of Mental Health] DMH facilities."[39] In my opinion, this correctly

---

[39] Mental Health Services Delivery System Program Guide, September 2006, Division of Correctional Health Care Services, Department of Corrections & Rehabilitation, Joint Plaintiffs' Trial Ex. 9, at p. 12-1-4, *see also*, pp. 12-2-8, 12-3-4, 12-3-9, 12-3-11, 12-3-13, 12-4-1, 12-4-2, 12-4-11, 12-4-13.

states the public safety enhancing obligations of the correctional mental health clinician to engage in pre-release planning that reduces the chances that the patient will suffer the harms of cycling back into prison.

56.     In my experience, a successful pre-release planning program for mentally ill offenders must include pre-release assessment of the prisoner's treatment and support needs, benefits eligibility screening and application for patients who may qualify for social security benefits, veteran's benefits, and/or Medicaid benefits, and continuity of treatment, including medication, while in the community. I have reviewed documents showing that CDCR has a framework in place to assist prisoners with public benefits applications to increase the chances that critical services such as medical and mental health care are accessible quickly upon release.[40]

57.     Pre-release and benefits planning must especially target the smaller group at the margins with the highest needs. The larger group of persons with modest needs can generally be managed with access to medications, and with the same types of reintegration programs such as education, access to employment, and reintegration with family that all parolees need, regardless of mental illness.

58.     I have reviewed documents regarding California's "Transitional Case Management Program—Mental Illness (TCMP-MI)," which is one of the pre-release planning elements required in the Mental Health Services Delivery System Revised Program Guide.[41] The 2003 and 2006 reports on TCMP-MI commissioned by the CDCR state that the program is designed to include the key components of pre-release assessment, benefits eligibility and

_____

[40] *See* Memorandum Of Understanding California Department Of Corrections And Rehabilitation And California Department Of Health Care Services, Preparole Process for Securing Medi-Cal Entitlements Agreement No. P07.0035 I, Joint Plaintiffs' Trial Ex. 80; Agreement Between The California Department Of Corrections & Rehabilitation (CDCR) And The Social Security Administration (SSA), Dated Jan. 11, 2008, Joint Plaintiffs' Trial Ex. 88.

[41] Mental Health Services Delivery System Program Guide at 12-4-11, *see* footnote 39, above.

application assistance, "expanded and enhanced post-release mental health treatment for mentally ill parolees"[42]

### 2.    System of Access to Care.

59.    I have reviewed documents concerning the operation of the Parole Outpatient Clinic (POC) component of the California parole system. The POC framework is set up to provide treatment consisting of medication management, group therapy and individual therapy in California parole offices throughout the state.[43] I reviewed the studies by David Farabee of the University of California at Los Angeles, Integrated Substance Abuse Program, that CDCR commissioned, on the efficacy of the POC program, in combination with pre-release planning, to reduce the chances that parolees with mental illness will return to criminal conduct after release.[44] Although it is my opinion that Mr. Farabee's report mischaracterizes some of the

---

[42] Farabee, D., Yip, R., Garcia, D., Sanchez, S., "First Annual Report on The Mental Health Services Continuum Program of The California Department Of Corrections Parole Division," *UCLA Integrated Substance Abuse Program Neuropsychiatric Institute* (Nov. 24, 2003), Joint Plaintiffs' Trial Ex. 93, at p. 1; Farabee, D., Yip, R., Garcia, D., Sanchez, S., "Final Report of the Mental Health Services Continuum Program of the California Department of Corrections and Rehabilitation—Parole Division," *UCLA Integrated Substance Abuse Program Neuropsychiatric Institute* (June 30, 2006), Joint Plaintiffs' Trial Ex. 90; Farabee, D., "An evaluation of California's Mental Health Services Continuum Program for Parolees," *Corrections Today*, December 2006, Joint Plaintiffs' Trial Ex. 93.

[43] California Department of Corrections and Rehabilitation, Division of Adult Parole Operations, Budget Change Proposal, Fiscal Year 2008/09, Community Based Treatment Programming and Crisis Care Services for Severely Mentally Ill Adult Parolees, Joint Plaintiffs' Trial Ex. 81, at p. 2.

[44] Farabee (2006 UCLA), Joint Plaintiffs' Trial Ex. 90.

literature regarding the overall public safety risks presented by mentally ill parolees,[45] Mr. Farabee's multi-year study of seven cohorts of releasees from July 2001 through June 2005, totaling 60,912 releasees, appears to result in scientifically sound conclusions regarding the efficacy of the POC program.[46] Mr. Farabee concluded that "parolees who attended POC following release from prison showed a 34% reduction in the odds of being returned to prison within 12 months, relative to parolees who did not attend a POC."[47]

60.    In addition to these elements, CDCR has a policy of enhanced supervision of persons with a history of mental health treatment care at higher-levels, the so-called "EOP" parolees. Such parolees are to be supervised at a ratio of 40:1, compare to the national average supervision ratio of 70:1.[48]

61.    It is my opinion that by continuing and expanding programs such as TCMP and reduced caseloads for EOP parolees, California can make progress toward breaking the cycle of re-incarceration of mentally ill offenders that now harm public safety. It is also my opinion that these programs can be effectively expanded to address any reasonable increase in the parole population that would result from a well-planned and implemented prisoner release order or population cap.

---

[45]Specifically, the Farabee study overstates some of the recidivism findings I have reviewed earlier in this Report. At page 6, the study cites Villeneuve & Quinsey, Predictors Of General And Violent Recidivism Among Mentally Disordered Inmates, *Criminal Justice and Behavior* (2005), for a finding that re-arrest rates for violent offenses are 70% after three years for both psychotic and non-psychotic releasees from a Canadian maximum security unit. The Villenueve & Quinsey study did not find a rate of violent re-arrests anywhere near 70% after three years. *See* footnote 27, above, and citing text.

[46] Farabee (2006 UCLA), Joint Plaintiffs' Trial Ex. 90, p. 10.

[47] Farabee (2006 UCLA), Joint Plaintiffs' Trial Ex. 90, p. 31.

[48] *See id.*; National Research Council, *Parole, Desistance from Crime and Community Integration* (National Academies Press 2008), at page 34.

### 3.    Programs to Target Co-occurring Disorders/Dual Diagnosis.

62.    As discussed above, mental illness is not a critical factor in predicting which released prisoners are at highest risk of violent crimes after release. Other factors, such as age at release, predominate. A factor that does affect new crime outcomes is untreated drug addiction. Drug addition hurts the chances of any released prisoner. For persons with both drug addiction and mental illness, specially targeted programs are useful and can improve public safety.[49] California has begun to put a framework in place to target parolees with co-occurring mental illness and drug addiction. First, the literature shows that California has a long experience with correctional drug addiction program based on the therapeutic community model.[50] Second, in recent years, California has begun to identify certain community-based drug treatment programs that specialize in serving persons with co-occurring mental illness and drug addiction.[51]

### 4.    Coordination with Community Care Providers.

63.    Successful post-release programs should be based on strong links to community resources. For releasees with mental illness this should include access to the local systems of mental health care. The safety of the parolee with mental illness and the public is enhanced by access to the community mental health system (which includes the additional services provided to parolees by the Parole Outpatient Clinics and parole programs such as Day Reporting

---

[49] *See* Farabee, D. & Shen, H., "Antipsychotic Medication Adherence, Cocaine Use, and Recidivism Among a Parolee Sample," *Behavioral Sciences and the Law* 22:467-476 (2004).

[50] Prendergrast, M. and Wexler. H., "Correctional Substance Abuse Treatment Programs in California: A Historical Perspective," *The Prison Journal* 84(1) 8 (March 2004).

[51] *See* Walden House Inc Region III Substance Abuse Services Coordinating Agency (SASCA) Community Based Services Subcontractor Agreement, Joint Plaintiffs' Trial Ex. 92; Specifications on Providing Augmented Services to the Dually Diagnosed ICDTP Participants, Joint Plaintiffs' Trial Ex. 91; SASCA Walden House Specifications on Providing Augmented Services to Dually Diagnosed ICDTP Participants and Treatment Provider Roster, Joint Plaintiffs' Trial Ex. 89.

Centers and Assertive Community Treatment programs.) Leaving a person with mental illness in need of treatment to fend for him or herself on the street and then returning him or her to an overcrowded and dangerous prison reception center environment for several months could be dangerous for the patient and public safety. Appropriate access to mental health treatment and pre-release planning is generally not available in these reception centers, especially for patients requiring higher levels of care to stabilize their mental illness. This cycle leads to further decompensation, and release of a patient who is as sick as or sicker than when he or she came into prison.

64.    A very small percentage of persons with mental illness will require access to higher levels of care, up to and including inpatient psychiatric hospitalization. As noted in Figure 2, above, releases at the highest levels of care in the California system numbered approximately 600 for all of 2006. If a prisoner release order resulting in the release or diversion of a total of 30,000 people immediately, this group would include only 143 persons with a history of crisis care, spread over an entire state. The size of this group that may need in-patient hospitalization in the community are likely to be even smaller. One proxy for this smaller group may be the group of persons who are returned by their parole agents due to mental illness alone. Documents that I have reviewed for this case estimate this need in the range of several hundred patients per year.[52] The historical strategy of California corrections has been to arrest such parolees solely because of their mental illness under a procedure known as "psych and return" or "return to custody for psychiatric treatment." In my opinion,

---

[52] These documents include a report from the Special Master in the *Valdivia v. Schwarzenegger* litigation regarding the procedures used in parole revocation cases in which the parolee was too impaired to participate in the hearing process. This report notes 180 such cases during 13 months. *Valdivia,* Fourth Report of the Special Master on the Status of Conditions of the Remedial Order (April 2008), Joint Plaintiffs' Trial Ex. 83. I have also reviewed an email from the discovery documents in this case in which a California parole official is asked to estimate the "historical volume of psych return parolees." The parole official responds that "from June 2006 through January 8, 2007 the Division of Health Care Services identified 79 inmates who were returned to prison solely for mental health stabilization and treatment." Email, Oct. 24, 2007, Joint Plaintiffs' Trial Ex. 86.

returning such person to a prison environment is harmful to public safety, as they are likely to return as sick as or sicker than when they went into prison, and with no progress having been made at reintegration into the community. Instead, prompt access to crisis care should include rapid and intensive treatment to address episodes of decompensation for this small minority of the population. For the small minority of prisoners who require continued access to higher levels of care, discharge planning to less restrictive (and less expensive) community placements such as board and care facilities, drug treatment programs, day treatment and other alternatives, should begin upon admission.

65.     Because the need for the highest levels of care exists at the margins of the continuum of mentally ill offenders, in my opinion it should not be an overwhelming or overly costly project to secure the necessary levels of community-based care in settings such as county mental health facilities or private board and care facilities.[53] The few hundred most serious cases that would need these levels of care will be scattered over a very large state, so that no one county would have to absorb an overly burdensome number of such high-need

---

[53] In my opinion it is part of the treating clinician's professional obligation to assist the patient in transitioning to continued care after an anticipated termination of the clinical relationship. *See* Mello, J. & Greifinger, R., "The Evolving Standard of Decency: Postrelease Planning?," *Journal of Correctional Health Care,* 14(1), at 21 (Jan. 2008); American Medical Association, "E- 10.01 Fundamental elements of the patient-physician relationship," retrieved on Aug. 11, 2008 at http://tinyurl.com/ay4ly (a page within http://www.ama-assn.org) ("The patient has the right to continuity of health care. The physician has an obligation to cooperate in the coordination of medically indicated care with other health care providers treating the patient. The physician may not discontinue treatment of a patient as long as further treatment is medically indicated, without giving the patient reasonable assistance and sufficient opportunity to make alternative arrangements for care.")

In the transition from prison to the community, this obligation can be met with a telephone call to the community mental health system to assist the patient in transitioning to community care. I have reviewed an email exchange from the discovery documents in this case in which California corrections clinicians are advised to make exactly this sort of contact to arrange continued care for their patients. Email, Feb. 21, 2007, Joint Plaintiffs' Trial Ex. 87.

mentally ill parolees.[54] In my opinion, providing for appropriate levels of care for this small group is better for public safety than is the currently implemented alternative of repeated returns to the community after short-term stints of re-incarceration without adequate treatment or pre-release planning.

66.    It is my opinion that by building on this framework, California could significantly improve public safety outcomes by breaking the dysfunctional cycle of churning mentally ill offenders through destabilizing short-term revocation stints.

## IV.    STATEMENT OF COMPENSATION

67.    The terms of my retention in this case are $2,500 a day for testimony and depositions, and $250 per hour for research, telephone conferences, writing and record review.

## V.    LIST OF ALL OTHER CASES IN WHICH I HAVE TESTIFIED AS AN EXPERT AT TRIAL OR BY DEPOSITION IN THE PREVIOUS FOUR YEARS.

68.    On April 29, 2004 I testified in New York City as an expert witness retained by the Fortune Society and the law firm Paul, Weiss, Rifkind, Wharton & Garrison LLP in the case of Calvin Florestal v.The Bureau Of Citizenship And Immigration Services of the United States Department Of Homeland Security For Withholding of Removal (to Haiti) under the Convention Against Torture.

//

//

//

---

[54] The *Valdivia v. Schwarzenegger* Special Master's review of such cases included the finding that 44 cases reviewed in 2005 were not concentrated in any particular parole unit or region. First Report of the Special Master on the Status of Conditions of the Remedial Order (Sept. 14, 2006), Joint Plaintiffs' Trial Ex. 82, p. 51.

69.    On Dec. 13, 2006, after having been retained as an expert witness by the law firm Cravath, Swaine and Moore, I testified in the State Court of Claims in White Plains, New York, in the case of Nakia Thompson v. The State of New York.

Dated: August 15, 2008

James Gilligan, M.D.

APPENDIX A

# CURRICULUM VITAE

James F. Gilligan, M. D

Collegiate Professor, New York University

Silver Center for Arts and Science, Room 908

100 Washington Square East, New York, NY 10003

Tel: 212-647-0963; Cell: 646-469-3931

**Place of Birth:** Nebraska City, Nebraska, U.S.A.

## EDUCATION AND PROFESSIONAL TRAINING:

### College

Class of 1957, Harvard College (National Scholar)

### Medical School

1961-1965, M.D., Western Reserve University School of Medicine

### Internship

1965-1966, Medicine, University of Chicago Hospitals and Clinics,

University of Chicago School of Medicine

### Psychiatric Residency Training

1966-1969, Massachusetts Mental Health Center, Harvard Medical School

## LICENSURE AND CERTIFICATION:

### Diplomate

National Board of Medical Examiners, Certificate No. 89281, July 1, 1966

### Registered as a Qualified Physician

Board of Registration in Medicine, Commonwealth of Massachusetts, Certificate No.

31118, Nov. 13, 1968

2

**Designated as a Qualified Physician (Forensic Psychiatry)**

Division of Legal Medicine, Department of Mental Health,

Commonwealth of Massachusetts, 1977

**Diplomate in Psychiatry**

American Board of Psychiary and Neurology, Certificate No. 18274,

November 1978

## PROFESSIONAL APPOINTMENTS:

**Academic Appointments:**

1966-69, Teaching Fellow, Department of Psychiatry, Harvard Medical School

1969-2000, Clinical Instructor and Lecturer, Department of Psychiatry, Harvard
Medical School

January 1993-August 1994, Visiting Fellow, Institute of Criminology and Clare Hall,
University of Cambridge, Cambridge, England

Fall 1997, Leibman Scholar in Residence, Loyola University, Chicago

2003 – 2006, Visiting Professor of Psychiatry and Social Policy, School of Arts and
Sciences (Department of Criminology) and School of Social Policy and Practice,
University of Pennsylvania

Sept. – Dec. 2005, Erikson Scholar, Erikson Institute for Education and Research,
Austen Riggs Center, Stockbridge, Mass.

2002 – 2007, Distinguished Visiting Scholar and Adjunct Professor, Faculty of
Arts and Sciences, New York University

2007 – present, Collegiate Professor, Faculty of Arts and Sciences, New York University

3

**Hospital Teaching Appointments:**

      1969-77, Supervising Psychiatrist, Psychiatric Residency Training Program,

Massachusetts Mental Health Center, Harvard Medical School

1977-89, Psychiatric Residency and Forensic Psychiatry Fellowship Training

Programs, Institute of Law and Psychiatry, McLean Hospital, Harvard Medical School

1989-1994, Forensic Psychiatry Fellowship Training Program, Program in

Psychiatry and the Law, Massachusetts Mental Health Center, Harvard Medical School

1994 -2000, Supervisor, Psychiatric Residency Training Program, The Cambridge

Hospital, Harvard Medical School

1998-1999, Supervisor, Psychiatric Residency Training Program, Massachusetts

General Hospital, Harvard Medical School

**Principal Clinical and Administrative Activities (Hospitals and Health-Care Systems):**

      1977 - 1980, Director, Institute of Law and Psychiatry, McLean Hospital, Harvard

Medical School

      January - October 1977, Deputy Medical Director; October 1977 - September 1980,

Medical Director, Bridgewater State Hospital (for the Criminally Insane), a treatment, teaching

and research affiliate of the Institute of Law and Psychiatry, McLean Hospital, Harvard Medical

School, and a maximum-security forensic psychiatric prison mental hospital administered by the

Department of Correction of the Commonwealth of Massachusetts

      August 1981 - April 1991, Clinical Director, Prison Mental Health Service, a treatment,

teaching and research affiliate of the Institute of Law and Psychiatry, McLean Hospital, Harvard

Medical School

4

December 1991 - December 1992,          Medical Director, Bridgewater State
Hospital and Center for the Study of Violence, a treatment, teaching and research affiliate of the
Program in Psychiatry and the Law, Massachusetts Mental Health Center, Harvard Medical
School

November 1999 – present, President, Center for the Study of Violence, Inc., a private
non-profit research and consulting corporation

**PROFESSIONAL SOCIETIES:**

April 1996 - present, Member of the Executive Board, International Association for
Forensic Psychotherapy

May 1999 – June 2001, President, International Association for Forensic Psychotherapy

November 1997 - present, Member, International Society for Traumatic Stress Studies

November 1999 – present, Member, American Public Health Association

**EDITORIAL BOARDS:**

March 1998 – present, Member, Editorial Board, *Journal of Applied Psychoanalytic
Studies*

1997-1999, Member, Editorial Advisory Board and Contributing Author, *Violence in
America: An Encyclopedia,* New York: Scribners, 1999

**PUBLIC SERVICE:**

January 2000 – December 2002, Member of the Academic Advisory Council and
Chairman of the Committee on Prevention, President Clinton's National Campaign Against
Youth Violence

May 2002 – present, Member, Advisory Board, New York Correctional Association

April 2005 – present, Member, National Commission on Safety and Abuse in America's
Prisons (Vera Institute of Justice; Nicholas deB. Katzenbach, Chairman)