# EXHIBIT R

1
2  PRISON LAW OFFICE
   DONALD SPECTER, Bar No. 83925
3  STEVEN FAMA, Bar No. 99641
   E. IVAN TRUJILLO, Bar No. 228790
4  SARA NORMAN, Bar No. 189536
   ALISON HARDY, Bar No. 135966
5  REBEKAH EVENSON, Bar No. 207825
   1917 Fifth Street
   Berkeley, CA 94710
6  Telephone: (510) 280-2621

7  KIRKPATRICK & LOCKHART PRESTON
   GATES ELLIS LLP
8  JEFFREY L. BORNSTEIN, Bar No. 99358
   EDWARD P. SANGSTER, Bar No. 121041
9  RAYMOND E. LOUGHREY, Bar No. 194363
   55 Second Street, Suite 1700
10 San Francisco, CA 94105-3493
   Telephone: (415) 882-8200

11 THE LEGAL AID SOCIETY –
   EMPLOYMENT LAW CENTER
12 CLAUDIA CENTER, Bar No. 158255
   600 Harrison Street, Suite 120
13 San Francisco, CA 94107
   Telephone: (415) 864-8848

ROSEN, BIEN & GALVAN, LLP
MICHAEL W. BIEN, Bar No. 96891
JANE E. KAHN, Bar No. 112239
AMY WHELAN, Bar No. 215675
LORI RIFKIN, Bar No. 244081
LISA ELLS, Bar No. 243657
MARIA V. MORRIS, Bar No. 223903
315 Montgomery Street, 10th Floor
San Francisco, California 94104
Telephone: (415) 433-6830

BINGHAM, McCUTCHEN, LLP
WARREN E. GEORGE, Bar No. 53588
Three Embarcadero Center
San Francisco, California 94111
Telephone: (415) 393-2000

14 Attorneys for Plaintiffs

15          IN THE UNITED STATES DISTRICT COURTS
16         FOR THE EASTERN DISTRICT OF CALIFORNIA
17          AND THE NORTHERN DISTRICT OF CALIFORNIA
   UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES
18       PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

19 RALPH COLEMAN, et al.,                    )   No.: Civ S 90-0520 LKK-JFM P
                                             )
20          Plaintiffs,                       )   **THREE-JUDGE COURT**
                                             )
21      vs.                                   )
                                             )
22 ARNOLD SCHWARZENEGGER, et al.,             )
                                             )
23          Defendants                        )
                                             )
24 MARCIANO PLATA ,et al.,                    )   No. C01-1351 TEH
                                             )
25          Plaintiffs,                       )   **THREE-JUDGE COURT**
        vs.                                   )
26                                            )
   ARNOLD SCHWARZENEGGER, et al.,             )   **REBUTTAL EXPERT REPORT OF**
27                                            )   **JAMES GILLIGAN, M.D.**
        vs.                                   )
28      Defendants                            )

# TABLE OF CONTENTS

Page

TABLE OF ABBREVIATIONS..................................................................................................ii

OPINIONS IN THIS MATTER...................................................................................................1

Opinion 1:   The recommendation that a prisoner release order must be limited only to the lowest acuity individuals with mental illness is based on false assumptions about the levels of care required by the population currently on CDCR's mental health caseload, and on unsupported speculative fears about the dangerousness of individuals with mental illness....................................................................1

A.   The population of individuals defined as "mentally ill" by CDCR consists of a spectrum of severity and acuity of mental illness, and their treatment needs vary accordingly.......................................................1

B.   The evidence does not support speculative fears about the increased dangerousness of individuals with mental illness.........................................3

C.   The evidence does not support speculative fears about the increased dangerousness of individuals with higher severity or acuity of mental illness..................................................................................................6

D.   The assertion that individuals with mental illness cannot be safely treated in the community should be rejected ..............................................7

Opinion 2:   State and county governments' failure to adequately fund mental health resources in the community does not justify criminalizing individuals with mental illness and keeping them in prison.........................9

Opinion 3:   The effects of a prisoner release order on community mental health resources will be limited, given the small proportion of mentally ill offenders likely to be included in such an order relative to the numbers of mentally ill offenders already being released to parole under California's current system.................................................................12

Opinion 4:   I agree with the Expert Panel's conclusion that reducing overcrowding is an integral part of reforming California's rehabilitation programs. ...............................................................................15

EVIDENCE ON WHICH THE EXPERT OPINIONS ARE BASED.......................................16

[236011-1]

## TABLE OF ABBREVIATIONS/ACRONYMS

| | |
|---|---|
| CCCMS: | Correctional Clinical Case Manager System |
| CDCR: | California Department of Corrections and Rehabilitation |
| DMH: | Department of Mental Health |
| EOP: | Enhanced Outpatient Program |
| GAF: | Global Assessment of Functioning |
| MHCB: | Mental Health Crisis Bed |
| MHSA: | Mental Health Services Act |
| PMD: | Person With Mental Disorder |
| POC: | Parole Outpatient Clinic *or* Psychiatrist on Call |

[236011-1]    REBUTTAL EXPERT REPORT OF JAMES GILLIGAN, M.D., NOS.: CIV S 90-0520 LKK-JFM, C01-1351 TEH

**REBUTTAL EXPERT REPORT OF JAMES GILLIGAN, M.D.**

I have reviewed the expert reports submitted by defendants and intervenors concerning the effects of a prisoner release order on community mental health, including primarily the expert report of Gale Bataille, MSW.

**OPINIONS IN THIS MATTER**

I offer the following opinions in response to these reports:

**Opinion 1:**  The recommendation that a prisoner release order must be limited only to the lowest acuity individuals with mental illness is based on false assumptions about the levels of care required by the population currently on CDCR's mental health caseload, and on unsupported speculative fears about the dangerousness of individuals with mental illness.

**A.**  The population of individuals defined as "mentally ill" by CDCR consists of a spectrum of severity and acuity of mental illness, and their treatment needs vary accordingly.

1.  Ms. Bataille begins her report by describing the population likely to be released as part of a prisoner release order as consisting of 19-20% of individuals with "serious mental illness as assessed by CDCR" (p.2) and proceeds to make assumptions about the "mentally ill offender" population, their characteristics and service needs, and the effects of their release. Rather than starting from the premise of a single group of mentally ill offenders, it is crucial to recognize this "mentally ill" population in fact consists of a very broad spectrum of severity and acuteness of psychopathology, and wide variation with respect to the intensity of their treatment needs. These can be divided into three broad categories, from least to most seriously psychiatrically impaired:  1) Parolees eligible for the Correctional Clinical Case Management System (CCCMS), who demonstrate stable functioning in the community and had a Global Assessment of Functioning Score (GAF) above 50;  2) Those requiring the Enhanced Outpatient Program (EOP), because they manifest acute onset or significant deterioration of psychotic symptoms, such as delusions or hallucinations; dysfunctional or disruptive social interaction (withdrawal, bizarre or disruptive behavior, or provocative behavior toward others

[236011-1]

as a consequence of a serious mental disorder; and impairment of activities of daily living, such as eating, hygiene, and maintenance of their dwelling; 3) Those who need inpatient and/or acute care, including the subcategories of a) those who need a Mental Health Crisis Bed (MHCB), for inpatient treatment and stabilization, for up to 10 days (or longer, if deemed necessary by treating clinicians), until they demonstrate ability to function in a less restrictive environment, i.e., EOP or CCCMS; and b) those who require inpatient hospitalization on a longer-term basis, currently provided by the Department of Mental Health through its intermediate and acute care inpatient programs.

2.    As I documented in detail in my Expert Report of August 15, 2008, pp. 11-12, out of some 134,000 prisoners released to parole by CDCR in 2006, only 0.48%, or 642, could be classified in the third, most acute category (MHCB/DMH). And only 1.82% required EOP services. By far the largest group of parolees with one degree or another of psychiatric impairment, 17.65%, or 23,735, were classified as being at the CCCMS level of functioning, or to put it another way, at the minimal end of the spectrum of severity of mental illness. To state, as Ms. Bataille does, that up to 20% of this population would be suffering from "severe mental illness" fails to acknowledge that fully 17.65% are at the lowest level of severity, and only 0.48% at the level of severity that would require a temporary crisis bed or DMH inpatient treatment. Furthermore, Ms. Bataille assumes that all individuals classified at the EOP level of care will need inpatient care if released to the community as part of a prisoner release order.[1] Not only is this assumption clinically inaccurate, in that being given an EOP classification does not signify that a prisoner is in "the most seriously mentally ill" group, nor does it mean that he or she needs in-patient treatment; but it also ignores the reality that CDCR currently paroles numerous individuals at the EOP and higher levels of care each year to the community and rarely if ever places them into inpatient care, or even into lesser day treatment programs.

---

[1] At page four of her report, Ms. Bataille states, "The most seriously mentally ill prisoners (EOP) should be considered for early release if and only if …there are provisions for inpatient care negotiated as part of the service agreement."

3.      As I stated in my Report (pp. 28-29), if a prisoner release order required the diversion of 30,000 persons to parole and the community, it is reasonable to assume that they will be distributed in approximately the same proportions as those persons California paroled in 2006. Assuming that that is the case, the number of persons needing the highest level of care (MHCB/DMH) would be 143, with only an additional 546 needing the EOP level of care, in a state with a population of over 36,000,000. Even the larger group of stable, well-functioning persons with a minimal need for intensive mental health services would amount to approximately 5,296. These individuals, consistent with State law and practice returning parolees to their home counties, would be distributed throughout the State, and over a period of time. There is no basis for the assumption that the full incremental population would arrive all at once or overwhelm any one county's resources.

**B.**     The evidence does not support speculative fears about the increased dangerousness of individuals with mental illness.

4.      One of the suggestions pervasive throughout Ms. Bataille's report is that any additional release of mentally ill prisoners would disproportionately decrease public safety. For example, on page three, Ms. Bataille raises the question as "to what extent members of the mentally ill released parolee population might be at greater risk for recidivism" – presumably implying greater than the risk among non-mentally ill parolees. Raising the question in this way, without reviewing the evidence that would provide the answer suggests that, in fact, the mentally ill parolee population *is* at greater risk for recidivism. Ms. Bataille also suggests that because California is currently understaffing its Parole Outpatient Clinic system, the POC system will not be effective for any additional parolees with mental illness who are released (pages 7-9), and concludes that one consequence of this failure is that these parolees will recidivate. These suggestions about the increased recidivism rates for individuals with mental illness, without more analysis, also imply a corollary increase in risk to public safety. However, for this to be true, the rate of violent recidivism would have to be higher among mentally ill parolees than it is among those who are not mentally ill. This is not the reality, as my review of substantial empirical data in my Report of August 15 illustrates. As I explained,

-3-

mentally ill parolees and persons discharged from prison have been found in study after study (and with no major exceptions) to be either at lesser risk, or at no higher risk, of committing either a violent or a non-violent crime, than non-mentally ill prisoners are. (*See* my Expert Report of Aug. 15, 2008, paragraphs 34-49, pp. 18-26.)

5.      Moreover, cites to the general "recidivism" rates of mentally ill offenders in California are not reflective of actual dangerousness of these individuals and should not be used to promote speculative fears of mentally ill individuals as dangerous. Recidivism rates generally in California are not reliable indicators of violent crimes being committed; instead, the extremely high recidivism rates in California actually reflect the enactment of "tough on crime" legislation and policies resulting in the imprisonment of large numbers of individuals for technical or minor violations of parole that do not involve serious or violent crimes.[2] Joan Petersilia has stated that California's "blanket imposition of parole on all ex-prisoners, and California's unusual reliance on parole revocation as a quick-fix response to parolee problems" drives up recidivism rates in California.[3]

6.      Based on the materials I have reviewed, it is evident that California's parole revocation system not only results in extremely high recidivism rates generally, but also disproportionately affects individuals with mental illness. This is not because of their disproportionate dangerousness, but rather because the parole system encourages—in many cases, mandates—imprisonment as punishment for technical and minor infractions to which

---

[2] CDCR Expert Panel on Adult Offender Reentry and Recidivism Reduction Programs Report, Joint Pls.' Trial Ex. 2, at Appendix E, p.88. The Expert Panel recommended diversion from prison for the large group of parolees "who are now being returned to prison for non felony criminal behavior and technical violations." Appendix E, p.89.

[3] Joan Petersilia, "Understanding California Corrections," *California Policy Research Center, University of California* (May 2006), Joint Plaintiffs' Trial Ex. 5, at 71. It is also worth noting that Dr. Petersilia concludes that California's current parole system does not protect public safety and actually has "a profoundly harmful effect." *Id.* at 76. Similarly, the CDCR Expert Panel observed that previous studies have shown that imposing parole and probation supervision on those who are unlikely to recidivate serves to actually increase recidivism rates. Joint Pls.' Trial Ex. 2, Appendix E, p.90.

individuals with mental illness are more susceptible.[4]  This pattern is sometimes confused with a higher rate of criminal recidivism, or re-offending, whereas in fact it is primarily a symptom of their mental impairment and disorganization.  One study of California parolees concluded that "[t]hree interacting factors probably contribute to PMDs' disproportionate rate of return purely for technical violations.  First, parole agents may have lower thresholds for violating PMDs than non-disordered parolees…Second, PMDs have symptoms and functional impairments that may prevent them from adhering to some rules of parole…Third, PMDs often must adhere to more technical rules of parole than their non-disordered counterparts, including the special condition of treatment adherence."[5]  For example, California literally revokes mentally ill parolees—sends them back to prison—for failing to attend scheduled appointments with their clinicians at the Parole Outpatient Clinics, and this "violation" can result in a prison term of 12 months.[6]  While it is important to encourage psychiatric patients to understand their illness and take personal responsibility for treatment, it is appropriate to use case management services and education to achieve this function in a mental health system, not criminal sanctions and incarceration.

7.    Ms. Bataille herself recognizes the disconnect between the sentences individuals with mental illness serve and their actual dangerousness, observing that "[w]hen mentally ill individuals commit crimes, even relatively low level crimes, they cycle through the local criminal justice system," and they "serve sentences that are disproportionately long in relation

---

[4] Louden, J.E., Dickinger, E., & Skeem, J.L., "Parolees with Mental Disorder: Toward Evidence-Based Practice," *Center for Evidence-Based Corrections Bulletin* [unpublished manuscript] (2008), Joint Plaintiffs' Trial Ex. 76.  "Our finding that PMDs [parolees identified as having mental disorders] are disproportionately at risk for technical violations is consistent with past research."

[5] *Id.*

[6] *See* CDCR Department Operations Manual, Chapter 8, Jt. Pls.' Trial Ex. 95 at p.634, requiring a mandatory referral to the Board of Prison Terms for violation of a special condition of parole.  The requirement to attend Parole Outpatient Clinic is imposed as a special condition of parole.  The mandatory referral requirement means that if a parolee misses his or her Parole Outpatient Clinic appointment, the parole agent is required to refer this violation to the Board of Prison Terms for parole revocation.

to their offense" (p.21).  Once again, the far more accurate and valid measure of dangerousness is the commission of violent crimes, as I explained in my August 15 Report.

    **C.**    The evidence does not support speculative fears about the increased dangerousness of individuals with higher severity or acuity of mental illness

    8.    The recommendation that individuals with only the very lowest levels of severity or acuity of mental illness be included in any kind of release order also implies that more severely or acutely ill individuals represent an increased danger to society.  This fear, based on public stigma and myth, must be rejected.  The evidence does not support such a conclusion; in fact, the evidence suggests the opposite.[7]  The important point here is that the presence and severity of mental illness, and the acuity level of such illness, are not valid predictors of dangerousness.[8]  To suggest that they are, without offering evidence of any kind, is to mobilize precisely "[t]he general public's fear of individual with mental illness and discriminatory practices related to this fear" that Ms. Bataille describes at the end of her report (p.22).  For example, the most comprehensive meta-analysis of 58 studies involving 64 unique groups of comparisons between more severely and acutely mentally ill individuals with those who were less severely or acutely ill or did not meet the criteria for any diagnosis of mental illness found that people with the most severe illnesses (schizophrenia and other psychotic conditions) were less likely than those who were not mentally ill to commit violent crimes after returning to the community, while those with less severe psychiatric impairments, such as depressed mood, were as likely (but not more likely) than those with no mental illness to do so.[9]

---

[7]  See my August 15 Report at 18-26, describing the results of various research studies showing that even severe mental illness is not a valid predictor of violent recidivism.

[8]  *Id.* at 20-21.

[9]  Bonta J, Law M, Hanson K:  "The prediction of criminal and violent recidivism among mentally disordered offenders: a meta-analysis," *Psychological Bulletin* 123:123-142, 1998.

9.      Other studies[10][11] have found that an increase in the acuity or severity of the symptoms of schizophrenia (the most severe form of mental illness) is not a predictor of violence. Rather, the most powerful predictors of violent behavior are the same for both the mentally ill and those who are not mentally ill, such as age, sex, substance abuse, socioeconomic status, and past criminal history. These predictors differentiate between the violent and the non-violent in both the mentally ill and the non-mentally ill groups much more powerfully than the presence, absence, or severity and acuity of mental illness.

**D.**    The assertion that individuals with mental illness cannot be safely treated in the community should be rejected.

10.     On page two of her report, Ms. Bataille makes the unsupported assertion that if there were a prisoner release program on even the small scale of 15,000 prisoners, "it should be assumed that a substantial portion of these individuals who have received psychiatric treatment while incarcerated have a significant risk of exacerbation of their psychiatric symptoms when released to community settings." Based upon my own experience in prisons, this statement is totally unsupportable, for it assumes that the social and physical environment of the prison is more salubrious, more conducive to mental health, than community settings are. In saying that, I do not mean to imply that community settings are always supportive of mental health; on the contrary, they all too frequently are not. Nor do I mean that all prisons are equally pathogenic, for prisons do vary in that regard among each other. But in my opinion if one wanted to design an institutional setting that would be maximally pathogenic, or likely to provoke or exacerbate psychopathology of all kinds, one could hardly do better than to design

---

[10] Swanson, JW, et al., "A national study of violent behavior in persons with schizophrenia," *Archives of General Psychiatry* 63:490-499, 2006.

[11] Appelbaum, PS, Robinson PC, Monahan J, "Violence and delusions: data from the MacArthur Violence Risk Assessment Study," *American J. of Psychiatry*, 157:566-572, 2000. This study found that the presence of psychotic delusions did not increase the prospective risk of violent behavior in a diagnostically heterogeneous sample of psychiatric patients, 17% of whom were schizophrenic, following discharge from hospitals, a finding that they attributed to the fact that delusions were so often associated with social withdrawal and decreased social interactions with other people, which actually rendered them less likely to be violent compared with less severely ill patients.

the typical modern prison as I have known it over the past 40 years. To begin with, prisons stimulate paranoia more powerfully than any other type of institution in which I have ever worked, for prisons really are dangerous, which is presumably why the ratio of "police" (correction officers) to residents is higher than in any other residential setting in our society. Prisons are more dangerous than any other institution in our society not because most of the people in them are violent—an increasingly large proportion of the prison population over the past few decades has been made up of people who were sentenced to prison for non-violent offenses—but because among their residents is a small minority of individuals who really are among the most dangerous (i.e., violent) people in our society, and while they are there, they are indeed a threat and a danger to the less-violent or non-violent majority. Thus, the less- or non-violent prisoners need to become effectively "paranoid" in order to survive. Among the prisoners with whom I have worked over the years, a high level of distrust was almost universal. Needless to say, this is not the kind of atmosphere in which to foster mental health. To say that we should leave mentally ill prisoners inside our prisons – for the sake of their mental health! -- rather than allow them to return to the community, since the community might be more likely to precipitate mental illness than prisons are, is not a conclusion in which I can place much credibility.

11.      On the contrary, if it is the mental health of our prisoners which we are concerned about, the best thing we could do for most of them is to get them out of the prisons and back into the community as soon as possible. That there are exceptions to this generalization is of course true, depending on how disordered or pathogenic a particular community is relative to a particular prison. However, the assumption that prisons on the whole are healthier psychological environments than peoples' home communities are—such that returning mentally ill prisoners to the community places them at higher risk for decompensating than leaving them in prison would—is highly dubious. That mentally ill people need and can benefit from mental health treatment (provided it is competent treatment) is true, of course, whether or not they are or ever have been prisoners, and whether or not they are living in the community. I would suggest, however, that mental health treatment in the

community is more likely to be successful and effective than similar treatment would be in the social environment of the prison.

12.    Given the unprecedented level of overcrowding in California prisons today and the uncontested findings of ongoing serious deficiencies in the delivery of mental health care in the prisons, the argument that individuals with mental illness may be "better off" in prison than in the community cannot be taken seriously. [12]    It is the ongoing violation of the minimum required level of mental health care in California's prisons today that drives our present consideration of a prisoner release order and the question of diversion of mentally ill prisoners to parole and the community.

**Opinion 2:**    State and county governments' failure to adequately fund mental health resources in the community does not justify criminalizing individuals with mental illness and keeping them in prison.

13.    From a public health standpoint, we must reject the implication that people should remain in prison because community mental health resources are too taxed.  To do otherwise, would be to accept the premise that the prison system, rather than the public mental health system, should have primary responsibility for the mental health care of mentally ill individuals who would otherwise be eligible for release or diversion from prison.  This "solution" of criminalizing rather than treating mental illness is a clinically and morally unacceptable conclusion.[13]  Similarly unacceptable is the proposition that prisons may be

---

[12] Similarly, Ms. Bataille's assertion that individuals with mental illness should be kept in prison and excluded from a prisoner release order because their inclusion will "slow[] or revers[e] the gains of mental health advocates and the mental health system over the past ten years" (p.22) is also incredible: it suggests that long-term gains for the mental health community may be best achieved by keeping people in prisons—undeniably non-therapeutic environments—to alleviate fears of the public which are exaggerated, unrealistic, and unsupported by the evidence concerning the relative dangerousness of mentally ill and non-mentally ill individuals.

[13] It is also far from easy, as evidenced by these continued proceedings in *Coleman v. Schwarzenegger*, a case decided in 1995.

utilized as warehouses for holding individuals with mental illness until we have remedied the failures of the public mental health system.[14]

14.    Throughout her report, Ms. Bataille speculates as to the time it will take to bring the public mental health system into the condition in which it would need to be in order to provide treatment for mentally ill individuals released from prison. However, the release of mentally ill individuals into the community is not something that will only happen in the future; rather, it already constantly happens. A prisoner release order that includes the release and diversion of individuals with mental illness from prison would help close the "revolving door" through which mentally ill prisoners/parolees repeatedly cycle back and forth between the prisons and the community. It is that process, more than the lack of capacity on the part of the public mental health system, that is making it impossible for these individuals to receive adequate and effective treatment.

15.    The State itself has estimated that more than 6,000 parolees are returned to prison each year for technical or minor parole violations resulting from unmet mental health needs.[15] This is not indicative of their dangerousness, but rather of the failure of the State to adequately fund its parole mental health services. The State's failure in this regard does not provide justification for keeping high numbers of individuals with mental illness in prison, where the mental health system is also a failure. The appropriate response to the lack of resources is to increase resources, not to give up and return people to prison. In this respect, I agree with Ms. Bataille when she concludes that the "criminalization of the mentally ill individuals" is a "tragic consequence" of California's failure to adequately maintain its public mental health system. (p.10).

---

[14] On page 11 of her report, Ms. Bataille writes there that "The crisis California faces in the lack of adequate, stable and supported housing for persons with mental illness has been highlighted in the Mental Health Services Act of 2004 and in the Governor's 20-year plan to end homelessness, but it is recognized that it is a long-term proposition – estimated to require 20 years...." I fail to discern what implication that statement has other than to imply that for the next 20 years we should use prisons as our substitute for adequate public housing for the mentally ill.

[15] California Department of Corrections, Division of Adult Parole Operations, Mentally Ill Parole Population (July 2007), Jt. Pls.' Trial Ex. 77, at p. 5.

16.    Non-mentally ill parolees, by contrast, are more likely than those who are mentally ill to commit a new crime, both violent and non-violent. The fact that mentally ill parolees oscillate more frequently between the prison and the community, spending relatively short times in each, makes it difficult if not impossible for them to receive any effective mental health treatment in either environment. While it would be valuable to interrupt their constant cycling in and out of prison by providing adequate mental health care in both environments, they do not represent a greater danger to public safety than non-mentally ill parolees, and by most measures they represent a lesser danger.

17.    Ms. Bataille refers to the staffing shortages that exist within the public mental health system. (p.12). Staffing shortages, however, in California's prison mental health system are severe, chronic and well-documented. Based on my forty years of psychiatric experience as a clinician, an educator, an administrator and a policy planner in prison mental hospitals and mental health clinics, and in civil mental hospitals and community mental health centers, it is my firm and unambiguous opinion that it is much more difficult to recruit and hire qualified mental health professionals to work in prison settings than it is to recruit and hire them to work in civil hospital and clinic settings. Thus, I fail to see how it can make sense to say that we should refuse to reduce the overcrowding in California's prisons because there are too few clinicians available in the civil mental health system – when the problem of staffing shortages in the prison mental health system is even greater and more difficult (if not impossible) to solve than it is in the civil mental health system.

18.    Ms. Bataille and the intervenor experts who opine about community mental health all acknowledge that California is at a funding impasse regarding what level of government (state or local) is responsible for paying for mental health care for parolees, and in what proportion. I agree with Ms. Bataille when she concludes that clarification of funding and service provision responsibility would improve the provision of adequate mental health care to parolees and the public mental health system generally. It is indeed tragic that California has allowed its public health system to deteriorate at the expense of the individuals who suffer from mental illness. However, as the reports submitted by Ms. Bataille and the

-11-

[236011-1]

intervenor experts illustrate, many experts in California have identified the evidence-based methods of improving this public health system, and the resources that, if funded, could be mobilized to support this system. In my opinion, the State's and counties' refusals to fund such a system[16] does not justify the continued criminalization of persons with mental illness. Indeed, the current overcrowding crisis makes evident that the State, both ethically and financially, can no longer afford to do so.

19.     Moreover, it is my experience mental health treatment in the community, even when it involves in-patient mental hospitalization, is much less expensive than incarceration in prison. Thus the implementation of the programs being proposed for California would be likely to result in cost-savings that could be passed on to the public mental health system. That is, the cost savings to the prison system from the changes being proposed would be more than adequate to pay for whatever additional resources the public mental health system would require.

**Opinion 3:**     The effects of a prisoner release order on community mental health resources will be limited, given the small proportion of mentally ill offenders likely to be included in such an order relative to the numbers of mentally ill offenders already being released to parole under California's current system.

20.     Ms. Bataille and the intervenor experts who opine on community mental health describe severe consequences for community mental health resources if a prisoner release order is entered. For example, Ms. Bataille predicts that an "accelerated release" of prisoners in the Coleman class will have "adverse—and potentially serious consequences for the released prisoners; community mental health systems and the (nonoffender status) mentally ill children, adults and older adults they serve," as well as "potentially long-term negative consequences to the development of public mental health services in the future." (p.1 & p.18). These types of

---

[16] For example, Expert Report of Nancy Pena, Ph.D. at 6 ("Santa Clara County revenue shortfalls have resulted in significant reductions in the MHD [Mental Health Department] budget. In the last three-year period, the MHD has lost close to $45 million in local mental health funding through reductions, and the ability to serve 4,000 clients."; Expert Report from Gale Bataille, MSW at 9 ("Financial resources are inadequate and not keeping up with current costs.").

dramatic and far-reaching statements overstate the potential effects of a prisoner release order because they do not accurately tie their conclusions to the actual numbers and populations being considered.

21.    Ms. Bataille's predictions of "adverse consequences" to the whole state mental health system are based on a projected figure of half that number, i.e., "a release of even 15,000 offenders including all classes of mentally ill (Coleman class) prisoners." (p.1). In my opinion, based on the 2006 data discussed above, a more appropriate prediction, given the premise of releasing 15,000 individuals, is that 72 individuals statewide would require an inpatient or crisis level of care, 273 individuals statewide would require an EOP level of care, and 2,648 individuals statewide would require a CCCMS level of care. The conclusions drawn that suggest the collapse of the current mental health system based on the transfer of this relatively small number of mentally ill persons out of the prison system and into the mental health system of the most populous state in the nation thus appear overstated.

22.    While I agree that the public mental health system in California is under appreciable pressure given the resources allocated to it and as a society, we would do well to increase the funding for these resources, I do not agree with Ms. Bataille's and the other experts' conclusions about the effects of the limited increase in population being considered. As I discussed above, the assumptions made about the intensive levels of care this population would need are incorrect. For example, Ms. Bataille assumes that all EOP individuals released to parole would need inpatient care, and the experts from Santa Clara County assume that half of all individuals with mental illness released to parole would need inpatient care.[17] These assumptions are not supported by the evidence I have reviewed and appear to greatly overstate the level of mental health services that are likely to be required for this population. Moreover, they ignore the realities of the numbers of individuals with mental illness currently being released to parole every year. In 2006, 26,824 individuals with mental illness were released to parole, including 2,447 individuals at the EOP level of care. None of these experts make the

---

[17] For example, Expert Report of Paul McIntosh at 5; Expert Report of Gary A. Graves at 5.

claim that the services they describe as so crucial to the public safety that without them, we dare not release mentally ill individuals, are now provided to these tens of thousands of individuals with mental illness now released to the communities. In fact, one of the experts from Santa Clara County estimates that in the "best case," "significantly less than 30% of those in need are able to access service."[18]

23.    Although the public health system in California is underfunded, it is important to recognize that there are public mental health systems in place and that large numbers of people are being served. For example, a report presented by the California Department of Mental Health, California Mental Health Directors Association, and Mental Health Services Oversight & Accountability Commission in July 2008 identify over $6 billion dollars funding public mental health in the state of California for fiscal year 2008-09.[19] Data from the California Department of Mental Health shows that 658,314 persons were served by county mental health programs in fiscal year 2005-06.[20] 43,435 persons received some type of 24-hour service, 69,063 received some type of day treatment service, and 633,884 received some type of outpatient service.

24.    The scale on which public mental health services are already being provided renders highly unlikely Ms. Bataille's prediction that the release or diversion of a relatively

---

[18] Expert Report of Nancy Peña, Ph.D. at 5.

[19] "Implementation of the Mental Health Services Act," California Department of Mental Health, California Mental Health Directors Association, Mental Health Services Oversight & Accountability Commission, July 2008, available at http://www.dmh.cahwnet.gov/Prop_63/MHSA/Publications/docs/MHSA_briefing_July2008.p df, Jt. Pls.' Trial Ex. 96.

[20] Department of Mental Health Client and Service Information System, Statistics and Data Analysis, December 2007, available at http://www.dmh.cahwnet.gov/Statistics_and_Data_Analysis/docs/Statewide_Production_ Rpt/CSI_annualreport_FY0506_FINAL_1.pdf, Jt. Pls.' Trial Ex. 97.

small number of mentally ill offenders[21] will result in the deprivation of care from mentally ill children and nonoffender adults.[22]

**Opinion 4:**   I agree with the Expert Panel's conclusion that reducing overcrowding is an integral part of reforming California's rehabilitation programs.

25.    Rather than endorsing a prisoner release order, Ms. Bataille suggests implementing the recommendations of the CDCR Expert Panel Report on Adult Offender and Recidivism Reduction (2007) "including establishing community diversion programs…, community re-entry facilities…, community supervision for low-risk offenders," etc. (p.19).  I agree completely with those recommendations, as far as they go.  But what Ms. Bataille fails to include in that reference to the Expert Panel Report is that its first and most central recommendation, to which it returned again and again, was that before it could hope to improve the effectiveness of any of its rehabilitation programs and practices, the CDCR must "Reduce overcrowding in its prison facilities and parole offices" (p. viii).  They also stated, as I quoted in my Report of August 15, 2008, that "The largest barrier that the Panel identified to delivering effective programming in CDCR prison facilities is its current state of overcrowding." (pp. viii, 9-10)  They continue, "Unless California reduces overcrowding, offenders will not have the space or safe environments they need to participate in the rehabilitation programs" (p. 51).  Therefore the highest and most urgent priority facing anyone who would like to decrease violent recidivism and increase public safety is to reduce prison overcrowding – first and foremost.

---

[21] In Ms. Bataille's example of a 15,000 person release, 72 individuals at an inpatient level of care, 273 individuals at EOP level of care, and 2,648 individuals at CCCMS level of care.

[22] The document cited in footnote 19, above, also estimates $1.5 billion dollars in revenue to fund Mental Health Services Act (MHSA) programs for fiscal year 2007-08, and another $1.5 billion dollars for fiscal year 2008-09.  It is my understanding that these MHSA programs specifically exclude the parolee population and provide services to the nonoffender status population Ms. Bataille claims will be harmed by an increase in mentally ill parolees.

# EVIDENCE ON WHICH THE EXPERT OPINIONS ARE BASED

26.    I have based my opinions on the three main sources of evidence:

a.    My own clinical and research experience over the past forty years of work with violent and/or mentally ill individuals in prisons, prison mental hospitals, jails and other correctional and clinical settings, including my therapeutic work as a clinician with individuals and groups; my administrative work as the medical director of the prison mental hospital and the prison mental health service for the Massachusetts Department of Correction, which included providing forensic psychiatric evaluations to the relevant courts as to both the psychiatric status and the potential dangerousness of patients in the prison mental hospital and of inmates in the prisons (as to whether they could be released into the community without endangering public safety, or were so dangerous to themselves or others by reason of mental illness as to require in-patient hospitalization in the prison mental hospital or elsewhere); and my empirical research as a social scientist measuring the variations in the incidence of in-house violence and violent recidivism in the community that occur under varying conditions of incarceration, mental health care, and rehabilitative programming.

b.    My knowledge of the professional and scientific literature on these subjects.

c.    My examination and analysis of much of the documentary evidence, research, judicial opinions and orders, specialized studies by commissions of experts, official correspondence and proclamations, reports by expert witnesses, and other materials introduced into this litigation, including but not limited to the materials listed in Appendix B to my August 15, 2008 Expert Report, and in Appendix A to this Rebuttal Report.

Dated:  _Aug. 29, 2008_                          _James Gilligan_
                                                James Gilligan

-16-

# APPENDIX A

| DOCUMENT |
|---|
| CDCR Department Operations Manual, Chapter 8 |
| "Implementation of the Mental Health Services Act," California Department of Mental Health, California Mental Health Directors Association, Mental Health Services Oversight & Accountability Commission, July 2008, available at http://www.dmh.cahwnet.gov/Prop_63/MHSA/Publications/docs/MHSA_briefing_July2008.pdf |
| Department of Mental Health Client and Service Information System, Statistics and Data Analysis, December 2007, available at http://www.dmh.cahwnet.gov/Statistics_and_Data_Analysis/docs/Statewide_Production_Rpt/CSI_annualreport_FY0506_FINAL_1.pdf |
| Preliminary Expert Report from Gale Batille, MSW, August 15, 2008 |
| Intervenor San Mateo County's Disclosure of Non-Reatined Expert Witnesses for Trial, August 15, 2008 |
| Preliminary Expert Report from Dr. James Marquart, Ph.D, August 15, 2008 |
| Expert Report of David M. Bennett, August 15, 2008 |
| County of Santa Clara's Disclosure of Expert Witnesses, August 15, 2008 |
| Expert Report of Paul McIntosh, August 15, 2008 |
| Expert Report of Gary A. Graves, August 15, 2008 |
| Expert Report of Nancy Dane Peña, Ph.D, August 15, 2008 |
| Expert Report of Robert Garner, August 14, 2008 |
| Addendum to Expert Report from Dr. Ira Packer, Ph.D, ABPP (Forensic), August 15, 2008 |
| Department of Corrections and Rehabilitation, State of California, Senate Budget Hearing Briefing, James E. Tilton, Secretary, 2008 |
| California Department of Mental Health, "Mental Health Services Act Progress," July 2008, available at http://www.dmh.cahwnet.gov/Prop_63/MHSA/Publications/docs/ProgressReports/MHSA_Progress_July2008.pdf |
| Executive Summary Medi-Cal FY 1998-99 Through 2002-03, available at http://www.dmh.cahwnet.gov/Statistics_and_Data_Analysis/docs/Medi-Cal-TrendReport-FY98-FY03/EXECUTIVE%20SUMMARY%20MEDI-CAL%20TREND%20REPORT.pdf |

1  PRISON LAW OFFICE                          ROSEN, BIEN & GALVAN, LLP
   DONALD SPECTER, Bar No. 83925              MICHAEL W. BIEN, Bar No. 96891
2  STEVEN FAMA, Bar No. 99641                 JANE E. KAHN, Bar No. 112239
   E. IVAN TRUJILLO, Bar No. 228790           AMY WHELAN, Bar No. 215675
3  SARA NORMAN, Bar No. 189536                LORI RIFKIN, Bar No. 244081
   ALISON HARDY, Bar No. 135966               LISA ELLS, Bar No. 243657
4  REBEKAH EVENSON, Bar No. 207825            MARIA V. MORRIS, Bar No. 223903
   1917 Fifth Street                          315 Montgomery Street, 10th Floor
5  Berkeley, CA  94710                        San Francisco, California  94104
   Telephone: (510) 280-2621                  Telephone: (415) 433-6830

6  KIRKPATRICK & LOCKHART PRESTON             BINGHAM, McCUTCHEN, LLP
   GATES ELLIS LLP                            WARREN E. GEORGE, Bar No. 53588
7  JEFFREY L. BORNSTEIN, Bar No. 99358        Three Embarcadero Center
   EDWARD P. SANGSTER, Bar No. 121041         San Francisco, California  94111
8  RAYMOND E. LOUGHREY, Bar No. 194363        Telephone: (415) 393-2000
   55 Second Street, Suite 1700
9  San Francisco, CA  94105-3493
   Telephone: (415) 882-8200

10 THE LEGAL AID SOCIETY –
   EMPLOYMENT LAW CENTER
11 CLAUDIA CENTER, Bar No. 158255
   600 Harrison Street, Suite 120
12 San Francisco, CA  94107
   Telephone: (415) 864-8848

13 Attorneys for Plaintiffs

14                    IN THE UNITED STATES DISTRICT COURTS

15                   FOR THE EASTERN DISTRICT OF CALIFORNIA

16                  AND THE NORTHERN DISTRICT OF CALIFORNIA

                UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES
17
                  PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE
18
   RALPH COLEMAN, et al.,                )    No.: Civ S 90-0520 LKK-JFM P
19                                        )
            Plaintiffs,                    )   **THREE-JUDGE COURT**
20                                        )
        vs.                               )
21                                        )
   ARNOLD SCHWARZENEGGER, et al.,         )
22                                        )
        Defendants                         )
23                                        )
   MARCIANO PLATA ,et al.,                )    No. C01-1351 TEH
24                                        )
            Plaintiffs,                    )   **THREE-JUDGE COURT**
25      vs.                               )
                                          )
26 ARNOLD SCHWARZENEGGER, et al.,         )    **PROOF OF SERVICE**
                                          )
27      vs.                               )
            Defendants                     )
28

[216897-1]            PROOF OF SERVICE, NOS.: CIV S 90-0520 LKK-JFM, C01-1351 TEH

## PROOF OF SERVICE

I, Kate M. Richardson, declare that I am a resident of the State of California, am over the age of eighteen years and am not a party to the within action. I am employed with Rosen, Bien & Galvan LLP, whose address is 315 Montgomery Street, Tenth Floor, San Francisco, California 94104. On August 27, 2008, I served the following documents:

**REBUTTAL EXPERT REPORT OF JAMES GILLIGAN, M.D.**

I served the documents on the persons listed below, as follows:

| | |
|---|---|
| [ X ] | **By United States mail.** I enclosed the documents in a sealed envelope or package addressed to the persons listed below and placed the envelope or package for collection and mailing in accordance with our ordinary business practices. I am readily familiar with my firm's practice for collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid. I am a resident or employed in the county where the mailing occurred. The envelope or package was placed in the mail at San Francisco, California. |

All documents were sent to the following persons:

Lisa A. Tillman
Deputy Attorney General
1300 I Street
Sacramento, CA 95814

Rochelle East
Office of the Attorney General
455 Golden Gate, Suite 11000
San Francisco, CA 94102-7004

Lead Counsel for County Intervenors
Ann Miller Ravel
Theresa Fuentes
Office of the County Counsel
70 West Hedding, East Wing, 9th Floor
San Jose, CA 95110

Paul B. Mello, Esq.
Hanson & Bridgett LLP
425 Market Street, 26th Floor
San Francisco, CA 94105

California Correctional Peace Officers'
Association (CCPOA) Intervenors
Natalie Leonard
Gregg MacClean Adam
Carroll, Burdick & McDonough, LLP
44 Montgomery Street, Suite 400
San Francisco, CA 94104

Republican Assembly and Senate Intervenors
Steven S. Kaufhold
Akin, Gump Strauss Hauer & Feld, LLP
580 California Street, 15th Floor
San Francisco, CA 94104

PROOF OF SERVICE

[232999-1]

1

2   District Attorney Intervenors                County of Sonoma Intervenors
    William E. Mitchell                          Anne L. Keck, Deputy County Counsel
    Assistant District Attorney                  Steven Woodside
3   Riverside County District Attorney's         575 Administration Drive, Room 105A
    Office                                       Santa Rosa, CA 95403
4   4075 Main Street, First Floor
    Riverside, CA 92501

5

6   California Sheriff, Probation, Police
    Chief and Corrections Intervenors
7   Jones & Mayer LLP
    Martin J. Mayer
8   Kimberly Hall Barlow
    3777 North Harbor Boulevard
9   Fullerton, CA 92835

10

11      I declare under penalty of perjury under the laws of the State of California that the

    foregoing is true and correct, and that this Proof of Service was executed on this 27th day of
12
    August, 2008, at San Francisco, California.
13

14                                              Kate M. Richardson

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PROOF OF SERVICE

[232999-1]