# EXHIBITS S AND T

# EXHIBIT S

Case 2:90-cv-00520-KJM-SCR    Document 3118-4    Filed 10/21/08    Page 2 of 18

IN THE UNITED STATES DISTRICT COURTS

FOR THE EASTERN DISTRICT OF CALIFORNIA

AND THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

RALPH COLEMAN, et al.,

    Plaintiffs,

vs.       CIV S 90-0520 LKK-JFM P

ARNOLD SCHWARZENEGGER, et al.,   THREE-JUDGE COURT

    Defendants.
_____/

MARCIANO PLATA, et al.,

    Plaintiffs,

vs.       No. C01-1351 TEH

ARNOLD SCHWARZENEGGER, et al.,   THREE-JUDGE COURT

    Defendants.
_____/

**CERTIFIED COPY**

Deposition of

PABLO STEWART, M.D.

Tuesday, December 11, 2007

Reported by:

SHARON CABELLO, RPR

CSR No. 3080

Job No. 58268

1  the Georgia correctional system and the California
2  correctional system?
3  A.      No.
4  Q.      Have you had any discussions with Dr. Shansky
5  in regards to your work in this matter?
6  A.      No.
7  Q.      And any discussions with Wayne Scott in
8  regards to your work in this matter?
9  A.      No.
10 Q.      Have you contacted any colleagues within your
11 profession about your work in this matter?
12 A.      How do you mean "contact"?
13 Q.      Sent out an email, picked up a telephone, sent
14 a letter, put out a question on a serve list to
15 colleagues who work in this area or work in other areas
16 that are pertinent to the issues in this case.
17 A.      No, I have not.
18 Q.      Your expert report sites various journal
19 articles.
20 A.      Yes.
21 Q.      Have you contacted any of the authors of those
22 journal articles in the course of preparing your
23 opinion in this case?
24 A.      I have not.
25 Q.      Did you have any assistance in preparing this

27

1  report?

2  A.      Yes.

3  Q.      Who helped you?

4  A.      Mr. Nolan.

5  Q.      Who did the first draft?

6  A.      Well, by that question you are implying that

7  there's a second draft or a third draft. There was one

8  working document that was created in a variety of ways,

9  by my dictating, by my discussion with Mr. -- dictating

10 to Mr. Nolan, by my discussion with Mr. Nolan. And

11 then Mr. Nolan prepared certain sections of it which I

12 reviewed.

13 Q.      Can you tell me which sections of the report

14 were prepared by Mr. Nolan and approved by you?

15 A.      Well, the entire report was approved by me.

16 The entire report was -- prepared is not right --

17 formatted, constructed in the computers at Mr. Nolan's

18 law firm.

19 Q.      Let me put it another way. Formatted to me

20 means putting in Roman Numerals and numbers next to

21 paragraphs, and making left or right justifications,

22 that kind of thing, all the things I am really bad at

23 doing with computers.

24         The actual substance, the actual wording of

25 the report, was that done by you? Did you create each

1  and every sentence in this report?
2  A.     In conjunction with Mr. Nolan.
3  Q.     Do you have within your computer or other hard
4  copy files or digital files any earlier working copies
5  of this document?
6  A.     No.
7  Q.     So as you were working on this document with
8  Mr. Nolan did you maintain any particular sections of
9  this document in a separate file on your computer?
10 A.     No.
11 Q.     So you continually updated this document as
12 you worked on it?
13 A.     Yes.
14 Q.     Did you keep any particular notes of your
15 work?
16 A.     No.
17 Q.     No handwritten notes?
18 A.     No handwritten notes.
19 Q.     When you took the tours of the facilities did
20 you take notes?
21 A.     I didn't take notes.
22 Q.     Did you make notes after you returned to your
23 hotel that night?
24 A.     After the tours is when Mr. Nolan had his
25 laptop and I was dictating to him about my observations

29

1   of the tours.
2   Q.      After you dictated, let's say that evening,
3   did you review what you dictated that evening?
4   A.      No.
5   Q.      Do you have your own laptop?
6   A.      I do have my own laptop.
7   Q.      Did you take it with you on the tours?
8   A.      No.
9   Q.      Did you leave it in your hotel room?
10  A.      I didn't use my laptop at all in the
11  preparation of this document -- well, except in the
12  larger sense where I was given emails of some of the
13  attachments we have already talked about. But my
14  laptop doesn't contain any drafts or sections of this
15  report.
16  Q.      Do you have any disk containing earlier drafts
17  of this report or any section of this report?
18  A.      No.
19  Q.      Aside from talking with Mr. Nolan, did you
20  talk with anyone else about this report as it was being
21  prepared?
22  A.      My work was limited to speaking with
23  Mr. Nolan.
24  Q.      Your report talks about overcrowding. Can you
25  tell me what is your definition of overcrowding?

30

REPORTER'S CERTIFICATE

I certify that the witness in the foregoing deposition was by me duly sworn to testify in the within-entitled cause; that said deposition was taken at the time and place therein named; that the testimony of said witness was reported by me, a duly Certified Shorthand Reporter of the State of California authorized to administer oaths and affirmations, and said testimony was thereafter transcribed into typewriting.

I further certify that I am not of counsel or attorney for either or any of the parties to said deposition, nor in any way interested in the outcome of the cause named in said deposition.

IN WITNESS WHEREOF, I have hereunto set my hand this 13th day of December, 2007.

_____
SHARON CABELLO
Certified Shorthand Reporter
State of California
Certificate No. 3080

127

**EXHIBIT T**

IN THE UNITED STATES DISTRICT COURTS

FOR THE EASTERN DISTRICT OF CALIFORNIA

AND THE NORTHERN DISTRICT OF CALIFORNIA

U.S. DISTRICT COURT COMPOSED OF THREE JUDGES

PURSUANT TO SECTION 2284 TITLE 28 U.S. CODE

RALPH COLEMAN, et al.,

      Plaintiffs,

vs.                                     No. CIV S 90-0520
                                            LKK-JFMP
ARNOLD SCHWARZENEGGER, et al.,

      Defendants.
_____/

MARCIANO PLATA, et al.,

      Plaintiff,

vs.

ARNOLD SCHWARZENEGGER, et al.,

      Defendants.
_____/

Deposition of

PABLO STEWART, M.D.

Volume 2, Pages 128 through 298

September 18, 2008

Reported by:
CARRIE PEDERSON
CSR No. 4373, RPR, RMR, CRR
Job No. 60864

Page 128

1  parolees?
2      A  Community mental health.
3      Q  And what does that consist of?
4      A  Community mental health consists of a
5  system of outpatient treatment, crisis
6  intervention, hospitalization, various levels of
7  care that are right below hospitalization but
8  greater than outpatient, case management systems,
9  day treatment systems. All these things are
10 currently in place.
11     Q  Do you have any opinion as to whether or
12 not the parole outpatient clinics are sufficient
13 in number and staffing to handle release order of
14 15,000 inmates with at least 20 percent of them
15 consisting of Coleman class members?
16     MS. WHELAN:  Objection. Lack of
17 foundation.
18     THE WITNESS:  I don't have that, an
19 opinion on that because I'm not that absolutely
20 familiar with what is currently available.
21 BY MS. TILLMAN:
22     Q  Do you have any opinion as to whether or
23 not the county mental health facilities presently
24 have sufficient clinical resources and bed
25 resources to respond to the mental health care

Page 238

Page 260

1   health caseload members as part of a prisoner
2   release order of, say, some 15,000, is your
3   opinion in any way changed when you acknowledge
4   that some of these class members may not be
5   appropriately classified for certain levels of
6   care?
7       A   It is not.
8       Q   Would you agree that an Axis I diagnosis
9   is generally the criteria used for admission of a
10  CDCR inmate into the mental health services
11  delivery system within CDCR?
12          MS. WHELAN:   Objection.  Lacks
13  foundation.
14          THE WITNESS:   Well, actually Axis I
15  diagnosis is one element of how people enter into
16  the mental health service delivery system.
17  Global assessment of functioning is also a
18  factor, and also, as I know you're aware of,
19  there is this medical necessity category that --
20  regardless of Axis I diagnosis, that people could
21  be brought into the system who need care.
22  BY MS. TILLMAN:
23      Q   Uh-huh.  The people who fit within the
24  criteria for care within the mental health
25  services delivery system, can you tell me what

Page 261

1    percentage of those people recover from their
2    mental illness and no longer need mental health
3    care at some point in their lives?
4           MS. WHELAN:  Objection.  Lacks
5    foundation.
6           THE WITNESS:  I do not know.
7    BY MS. TILLMAN:
8       Q  So when we speak to the reentry of these
9    mentally ill prisoners into the community, do you
10   have any opinion as to the duration of the
11   community services that must be provided to them
12   to enable their successful reintegration into the
13   community?
14          MS. WHELAN:  Objection.  Vague and
15   ambiguous.
16          THE WITNESS:  Can you help clarify that
17   for me, please?
18   BY MS. TILLMAN:
19      Q  Would you agree that there are some
20   mentally ill patients who will always need the
21   support of medication to help them remain stable
22   with their disease?
23      A  And this is the Coleman class members
24   that would potentially be released in a prisoner
25   release order?

Page 266

1  complete range of mental health services from
2  outpatient, inpatient, crisis care, medication
3  management, supportive housing, case management,
4  the full gamut of services.
5       Q   Any opinion as to whether or not the
6  Veterans Administration is underfunded like the
7  community mental health and parole programs
8  apparently are?
9           MS. WHELAN:  Objection.  Vague and
10 ambiguous as to which one or all of them.
11          THE WITNESS:  My experience with Veterans
12 Administration is in San Francisco, where I
13 worked at Veterans Administration for a number of
14 years running an inpatient drug and alcohol unit,
15 psychiatric unit as well as a case management
16 outpatient program, and we were relatively richly
17 supported compared to other services that I've
18 worked.
19 BY MS. TILLMAN:
20      Q   And when were you working for the V.A.?
21      A   I worked for the V.A. from
22 approximately -- well, not approximately -- the
23 summer of 1990 through 1996, but I'd also worked
24 for the V.A. during my training because the V.A.
25 Hospital's part of the University of California.

1      A  Competent psychiatrists, yes.

2      Q  Have you reviewed any of the plans

3  submitted in the Valdivia case to provide mental

4  health care to those parolees who are awaiting

5  their revocation hearings within CDCR?

6           MS. WHELAN:  Objection.  Lacks

7  foundation.

8           THE WITNESS:  I have not reviewed those

9  plans.

10 BY MS. TILLMAN:

11     Q  At paragraph 143 of your report, you

12 mention your agreement with the conclusion that

13 the state, quote, "needs to develop contractual

14 locked and open psychiatric care facilities in

15 local communities," end quote.  Are you aware of

16 any communities that have sought to house CDCR

17 parolees in their locked and/or open psychiatric

18 care facilities?

19     A  I do not.

20     Q  At paragraph 145, you indicate that the

21 diversion of individuals with mental illness from

22 prison can be done without adversely affecting

23 public safety.  What diversion programs do you

24 recommend for the mentally ill?

25          MS. WHELAN:  Objection.  Lacks

Page 274

1    foundation.
2         THE WITNESS:  Generally diversion
3    programs for the mentally ill that would increase
4    safety?
5    BY MS. TILLMAN:
6         Q   All that I'm saying is that you indicate
7    at paragraph 145 "if a diversion of individuals
8    with mental illness from prison can be done
9    without adversely affecting public safety."  What
10   diversion programs are you referencing in that
11   statement?
12        A   Programs that would order people into
13   treatment, programs that would include case
14   management services, supportive housing services,
15   medication management services, where the mental
16   health care would be supervised and not just left
17   up to the individual.  These sorts of supervised
18   mental health programs have been shown to ensure
19   that people remain compliant with the treatment
20   and stay out of trouble with the criminal justice
21   system.
22        Q   Have you toured such facilities?
23        A   No.
24        Q   Are you aware of the availability of such
25   diversion programs within any county of

1          MS. WHELAN:  Objection.  Misstates prior
2    testimony.
3          THE WITNESS:  Okay.  Now I sort of lost
4    the question in all that.
5    BY MR. STEGEMAN:
6       Q   I'm just trying to get at what staffing
7    ratios would be appropriate in the community
8    setting.  I don't know if you know what they are
9    now, but what do you think would be ideal?
10      A   I'm not familiar with staffing ratios in
11   the community.
12      Q   Okay.
13         MR. STEGEMAN:  And that's really all I've
14   got actually.
15         MS. WHELAN:  Okay.  Are we --
16         MS. TILLMAN:  Off the record for just a
17   moment.
18         (Discussion off the record.)
19         MS. TILLMAN:  First let's mark as
20   Exhibit 17 -- actually, the court reporter has
21   already done so -- a letter dated September 16,
22   2008 from Rosen, Bien & Galvan to my offices
23   regarding, as it says here, quote, "a few minor
24   errors in Pablo Stewart's August 15, 2000 expert
25   report," and there is a chart of corrections, so

REPORTER'S CERTIFICATE

1  
2        I certify that the witness in the
3  foregoing deposition,
4             PABLO STEWART, M.D.,
5  was by me duly sworn to testify in the
6  within-entitled cause; that said deposition was
7  taken at the time and place therein named; that
8  the testimony of said witness was reported by me,
9  a duly Certified Shorthand Reporter of the State
10 of California authorized to administer oaths and
11 affirmations, and said testimony was thereafter
12 transcribed into typewriting.
13       I further certify that I am not of
14 counsel or attorney for either or any of the
15 parties to said deposition nor in any way
16 interested in the outcome of the cause named in
17 said deposition.
18       IN WITNESS WHEREOF, I have hereunto set
19 my hand this 21st day of September, 2008.

                              _____
                              CARRIE PEDERSON
                              Certified Shorthand Reporter
                              State of California
                              Certificate No. 4373

298