# EXHIBIT U
# PART 1

# EXHIBIT U

1   PRISON LAW OFFICE
    DONALD SPECTER BAR NO.: 83925
2   STEVEN FAMA BAR NO.: 99641
    E. IVAN TRUJILLO BAR NO.: 228790
3   GENERAL DELIVERY
    SAN QUENTIN, CALIFORNIA  94964
4   TELEPHONE: (415) 457-9144

5   ROSEN, BIEN & GALVAN, LLP
    MICHAEL W. BIEN BAR NO.: 096891
6   JANE E. KAHN BAR NO.: 112239
    AMY WHELAN BAR NO.: 215675
7   LORI RIFKIN BAR NO.: 244081
    SARAH M. LAUBACH BAR NO.: 240526
8   315 MONTGOMERY STREET, 10TH FLOOR
    SAN FRANCISCO, CALIFORNIA  94104
9   TELEPHONE: (415) 433-6830

10  THE LEGAL AID SOCIETY –
    EMPLOYMENT LAW CENTER
11  CLAUDIA CENTER BAR NO.: 158255
    LEWIS BOSSING BAR NO.: 227402
12  600 HARRISON STREET, SUITE 120
    SAN FRANCISCO, CA  94107
    TELEPHONE:  (415) 864-8848

BINGHAM, MCCUTCHEN, LLP
WARREN E. GEORGE BAR NO.: 53588
THREE EMBARCADERO CENTER
SAN FRANCISCO, CALIFORNIA  94111
TELEPHONE: (415) 393-2000

HELLER, EHRMAN, WHITE & MCAULIFFE
RICHARD L. GOFF BAR NO.: 36377
701 FIFTH AVENUE
SEATTLE, WASHINGTON  98104
TELEPHONE: (206) 447-0900

13  Attorneys for Plaintiffs

14          IN THE UNITED STATES DISTRICT COURTS

15          FOR THE EASTERN DISTRICT OF CALIFORNIA

16          AND THE NORTHERN DISTRICT OF CALIFORNIA

            UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

17          PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

18  RALPH COLEMAN, et al.,                )   No.: Civ S 90-0520 LKK-JFM P
                                          )
19          Plaintiffs,                   )   **THREE-JUDGE COURT**
                                          )
20      vs.                               )
                                          )
21  ARNOLD SCHWARZENEGGER, et al.,        )
                                          )
22          Defendants                    )
                                          )
23  MARCIANO PLATA ,et al.,               )   No. C01-1351 THE
                                          )
24          Plaintiffs,                   )   **THREE-JUDGE COURT**
        vs.                               )
25  ARNOLD SCHWARZENEGGER, et al.,        )
                                          )
26      vs.                               )   **EXPERT REPORT OF PABLO STEWART,**
            Defendants                    )   **M.D.**

27

28

# TABLE OF CONTENTS

Page

I. INTRODUCTION ........................................................................................ 1

II. OPINIONS ................................................................................................ 9

   A. Opinion 1: Overcrowding Within The CDCR Is The Primary Cause Of The Constitutional Violations Currently Experienced By *Coleman* And Plata Class Members. ........................................................................ 9

     1. My Knowledge and Experience with Overcrowded Systems ........................... 9

     2. The Characteristics Typically Seen in Overcrowded Systems ...................... 11

     3. The CDCR is a Severely Overcrowded System ............................................ 14

       (a) Broad Reviews of the CDCR and Crowding ........................................... 14

          The Governor's Declaration of a State of Emergency ........................... 15

          The Receiver's 6/11/07 Supplemental Report on Overcrowding .......... 15

          Receiver's 5/15/07 Report on Overcrowding ....................................... 16

             The Receiver's overview of the current overcrowding crisis .......... 16

             Historical factors at work in creating the current crowding crisis ............................................................................................... 17

             Staffing problems associated with the current overcrowding crisis ............................................................................................... 17

             Intake and processing burdens associated with overcrowding ........ 18

             Impact of overcrowding on bed space for various categories of prisoners ...................................................................................... 19

             Impact of overcrowding on reception centers ................................. 20

             Problems with new construction projects ........................................ 21

             Overcrowding-related lockdowns .................................................... 21

             Overcrowding-related competition for space and resources between medical and mental health providers ................................. 22

             Overcrowding related CTC/MHCB bed shortages ........................... 23

             The Receiver's conclusions ........................................................... 23

          The *Coleman* Special Master's Report on Overcrowding ....................... 24

i

Delays in access to higher levels of care .......................................... 24

Delays in construction projects to remedy shortages at higher
levels of care. ...................................................................... 25

Access to Mental Health Crisis Beds (MHCBs).............................. 25

Inadequate staffing.......................................................................... 26

Adequate treatment and office space for clinicians. ..................... 27

Increasing demand for mental health services due to
overcrowding ..................................................................... 28

(b) Evidence Concerning Overcrowding-Induced Constitutional Violations at
the Individual Prisons I Visited............................................................ 29

(i) Deuel Vocational Institute (DVI) Tour........................................... 29

Inadequate Office and Treatment Space at DVI ...................... 31

DVI's Practice of Housing Suicidal Inmates in Administrative
Segregation Units............................................................... 33

Access to Higher Levels of Care at DVI ................................ 35

Medication Management Problems at DVI ............................. 35

Inadequate Medical Records at DVI....................................... 37

Medical Care Issues ............................................................... 38

The High Level of Acuity of Mentally Ill Inmates at DVI...................... 38

    (a)  Interview with DVI *Coleman* Class Member B ........................... 39

    (b)  Interview with DVI *Coleman* Class Member C ........................... 40

    (c)  Interview with DVI *Coleman* Class Member D........................... 40

    (d)  Interview with DVI *Coleman* Class Member E ........................... 41

    (e)  Interview with DVI *Coleman* Class Member F ........................... 41

    (f)  Interview with DVI *Coleman* Class Member G........................... 42

The March 2007 Suicide of *Coleman* Class Member H at DVI
Illustrates the Severe Consequences of Overcrowding-Related
Problems .......................................................................... 42

(ii) California State Prison Solano Tour ............................................ 45

Solano Tour Overview.......................................................... 45

ii

Overcrowding in the H-Dorm at Solano ................................................... 45

Staph Infections ...................................................................................... 46

The High Level of Acuity of Mentally Ill Inmates at Solano .................. 46

Solano's Significant Mental Health Population, Including in
Administrative Segregation ..................................................................... 47

Medication Problems .............................................................................. 48

(iii) Salinas Valley State Prison (SVSP) Tour ..................................................... 51

SVSP Tour Overview .............................................................................. 51

Custody Staff Vacancies Are Impacting Clinical Care at SVSP. ............. 52

Impact of Use of Contract or Registry Staff on Quality of Care at
SVSP ........................................................................................................ 52

Fragmented Care at SVSP Due to Over-Reliance on Contract Case
Managers .................................................................................................. 52

Impact of Excessive Lockdowns at SVSP ............................................... 53

CCCMS Care on C-Facility ..................................................................... 53

Suicide of SVSP CCCMS *Coleman* Class Member P Who Was
Classified As a Medical Necessity Case ................................................... 54

Interviews with C-Facility CCCMS patients ........................................... 57

EOP Care on D-Facility ........................................................................... 57

Access to ICF care at the SVSP DMH programs ..................................... 58

Problems With Access to MHCB Care and Other Higher Levels of
Care at SVSP ............................................................................................ 58

Deficient Medication Distribution Practices at SVSP ............................. 60

Impact of Gym Housing on SVSP CCCMS Inmate ................................. 62

Interviews with CCCMS Inmates at SVSP .............................................. 62

(1)    Interview with SVSP *Coleman* Class Member U ........................... 62

(2)    Interview with SVSP *Coleman* Class Member V ........................... 63

(c) Evidence of Overcrowding's System-Wide Impact in Various Areas of
Prison Administration and In the Delivery of Health Care ............................. 63

(1)   Timely Access to Appropriate Levels of Mental Health Care
-- Access to Programs/Sufficient Beds........................................... 64

Specific Areas Where Failure to Access Higher Levels of
Care is Most Dangerous.................................................................. 68

MHCB Access ............................................................................... 68

Access to DMH Care ..................................................................... 69

Movement of EOP and CCCMS Inmates Out of Reception
Centers .......................................................................................... 69

(2)   Access to Medication. ................................................................... 71

(3)   Improper "Overflow" Housing of Suicidal Inmates ...................... 71

The Suicide of *Coleman* Class Member W at CSP-
Sacramento in May of 2007 in an OHU Demonstrates the
Dangerousness of Using These Units to House Suicidal
Inmates .......................................................................................... 73

(4)   The Impact of Overcrowding on Suicide Rates ............................. 75

The Suicide of *Coleman* Class Member X illustrates various
overcrowding-related care issues as well as the dangers of
housing suicidal inmates in administrative segregation ................. 78

(5)   Staffing Shortages ........................................................................ 78

(6)   Adequate Treatment and Office Space for Clinicians to Use. ....... 79

4.   Overcrowding is the Primary Cause of the Constitutional Violations in
the CDCR ................................................................................................. 81

The Persistence of the Constitutional Violations Present in the
CDCR Demonstrates that They Are Caused by Overcrowding................ 81

The *Coleman* Special Master has Found that Overcrowding has
undermined progress that was being made in various areas..................... 82

The Percentage of Caseload Inmates in the CDCR is Increasing
Faster that the Overall Population............................................................ 82

In Many Instances, the Overcrowded Conditions Themselves Are
the Cause of the Unconstitutional Mental Health Care ............................ 83

B.   Opinion 2: Other Remedial Efforts Will Not Succeed In Remedying The
Underlying Constitutional Violations. ................................................................. 85

**EXPERT REPORT OF PABLO STEWART, M.D.**

I.    **INTRODUCTION**

1.    I am a physician licensed to practice in California, with a specialty in clinical and forensic psychiatry. A true and correct copy of my current curriculum vitae is attached hereto as **Exhibit A**.

2.    In 1973, I earned a Bachelor of Science Degree at the United States Naval Academy in Annapolis, Maryland, with a major in chemistry. In 1982, I received my Doctor of Medicine from the University of California, San Francisco, School of Medicine. In 1985, I received the Mead-Johnson American Psychiatric Association Fellowship for demonstrated commitment to public sector psychiatry and was selected as the Outstanding Psychiatric Resident by the graduating class of the University of California, San Francisco, School of Medicine. In 1985-1986, I served as the Chief Resident of the U.C. San Francisco Department of Psychiatry at San Francisco General Hospital and was responsible for direct clinical supervision of seven psychiatric residents and three to six medical students.

3.    Throughout my professional career, I have had extensive clinical, research, and academic experience in the diagnosis, treatment, and prevention of mental illnesses in correctional and other institutional contexts. In my work, I have specialized in community and correctional treatment programs for individuals with chronic and severe mental illnesses, as well as substance abuse and related disorders. I have also specialized in diagnosis, treatment, and care programs for persons with Major Depressive Disorder and Post Traumatic Stress Disorder (PTSD), in the management of patients with dual diagnoses and the application of psychotropic medication to such individuals, and in the history and use of psychotropic medications in institutionalized populations. I have designed and taught courses in correctional psychiatry at the University of California, San Francisco. I have also designed and taught courses on the protocols for identifying

1

and treating psychiatric patients with various disorders and have supervised psychiatric residents in teaching hospitals. I have worked closely with local, state and federal governmental bodies to design and present educational programs about psychiatry, substance abuse, and preventative medicine.

4.      I also have extensive experience managing, monitoring, and reforming correctional mental health systems. Between 1986 and 1990, I was the Senior Attending Psychiatrist for the Forensic Unit of the University of California, San Francisco, which was located at San Francisco General Hospital. In that capacity, I had administative and clinical responsibility for a 12-bed maximum security psychiatric ward and worked as the liason with the Jail Psychiatric Services of the City and County of San Francisco. My duties in that position included advising the San Francisco City Attorney on issues pertaining to forensic psychiatry.

5.      Between August 1988 and December 1989, I served as the Director of Forensic Psychiatric Services for the City and County of San Francisco. In that capacity, I had administrative and clinical oversight responsibility for the psychiatric care provided to the inmate population in San Francisco at both the county jails and in the 12-bed locked inpatient treatment unit at the San Francisco General Hospital. At the time, mental health care in the San Francisco's jails was subject to a consent decree in the case *Stone v. City and County of San Francisco*, 968 F.2d 850 (9th Cir. 1992). In the 1980s, San Francisco's jails were overcrowded, and the *Stone* consent decree included remedies designed to limit overcrowding. While I was working as the Director of Forensic Services in San Francisco, the plaintiffs in the *Stone* case brought contempt proceedings against the City because of ongoing overcrowding that they asserted violated the consent decree.

6.      I have also served as a psychiatric expert or consultant to various federal courts or other organizations implementing remedial decrees covering the provision of mental health care in correctional institutions. For ten years, between April 1990 and

2

February of 2000, I served as both a medical and a psychiatric expert for the United States District Court for the Eastern District of California in the consent decree case *Gates v. Deukmejian*, E.D. Cal. Case No. CIV S-87-1636. Among other things, that case involved the provision of adequate psychiatric care to mentally ill inmates at the California Medical Facility (CMF) in Vacaville, California. The *Gates* Consent Decree included various restrictions on overcrowding, and at times the parties in the case agreed to limitations on the size of the population of mentally ill inmates at CMF in order to prevent the mental health programs there from being overwhelmed and undermined by excessive transfers of mentally ill prisoners from other prisons. During my time monitoring CMF, California introduced its new state-wide Mental Health Services Delivery System (MHSDS) as part of the implementation of the remedy in the *Coleman* case. Given the requirements of the new MHSDS being implemented at CMF, the California Department of Corrections and Rehabilitation (CDCR) limited the number of inmates allowed to transfer to CMF in order to give the new MHSDS programs the ability to provide adequate psychiatric care.

7.    My experiences working on the *Gates* case also informed me about the difficulty of providing mental health services in locked, high security units. As part of the *Gates* case, CMF was forbidden from housing mentally ill inmates in its Willis Unit, a three-tier administrative segregation unit, because of the severity of conditions and the acknowledged difficulty of providng adequate mental health services in this type of setting.

8.    Between October 1996 and July 1997, I served as a psychiatric expert for the United States District Court for the Northern District of California in the case of *Madrid v. Gomez*, 889 F. Supp. 1146 (N.D. Ca. 1995), an omnibus case involving psychiatric care and other issues at Pelican Bay State Prison in Cresent City, California. In my work on that case, I gained first-hand knowledge concerning the severe impact of prolonged isolation in segregation units on mentally ill inmates, as well as a concrete

3

understanding of the need for constant monitoring of both non-mentally ill and mentally ill inmates in lock up units in order to prevent any further decompensation, since housing in these units by itself contributes to psychiatric instability.

9.     Between July of 1998 and February of 2004, I served as a psychiatric consultant to the National Council on Crime and Delinquency (NCCD) and subsequently for the Institute on Crime, Justice and Corrections at Washington University (when it took over monitoring responsibilities from NCCD) in their efforts to monitor juvenile detention and treatment facilities operated by the State of Georgia. In that case, I monitored an Agreement between the United States Department of Justice and the State of Georgia designed to improve the quality of care in its juvenile detention facilities. The Agreement encompassed mental health care, medical care, educational services, and treatment programs. Overcrowding was a major issue in the Georgia case. It was clear from the outset of the monitoring that overcrowding severely limited the ability of staff in the Georgia youth facilities to meet the medical and mental health needs of the youths in their charge. As part of the Agreement to address overcrowding, Georgia was required to limit the intake of youths from the counties into their state juvenile system in order to prevent the fragile mental health system from being overwhelmed. Also as part of the monitoring in that case, Georgia created significant new mental health treatment programs with dedicated staffing and capacity limitations, including most significantly a new inpatient treatment facility for boys and a second new inpatient treatment facility for girls. The Agreement also included a provision forbidding the prior practice of housing suicidal youths in administrative segregation units, and required "mainstream" housing and suicide watch monitoring of such youths. The youths would go to school and work during the day, and would continue their suicide watch in their housing units overnight. This provision was introduced because it had become clear under the prior practices that suicidal youths frequently would not come forward with their suicidal feelings because they did not want to be locked down in administrative segregation for suicide watch.

4

This demonstrated to me the dangerous and damaging nature of isolation in locked units for suicidal individuals. It also demonstrated to me the dangerous nature of punitive suicide watch conditions when they discourage suicidal individuals from coming forward and seeking treatment.

10.    Between June of 2003 and December of 2004, I was hired by the State of New Mexico as a defense expert for the implementation phase of the psychiatric sections of the "Ayer's Agreement" covering the New Mexico Corrections Department (NMCD). The Agreement was a settlement between attorneys representing New Mexico prisoners and the NMCD concerning the provision of adequate psychiatric care for inmates in New Mexico's highest security facility. The Ayers Agreement concerned a mental health treatment program in a disciplinary detention unit similar to the Security Housing Unit (SHU) at Pelican Bay State Prison. The treatment program implemented in the unit was based in part on the treatment standards for the Psychiatric Security Unit (PSU) mental health care programs in California. New Mexico implemented the new treatment program with an acknowledgement that they needed to maintain minimum clinical staff-to-inmate ratios given the severe nature of the housing conditions in the locked-down unit, and the potential for mental decompensation.

11.    I have also worked as an expert consultant for the United States Department of Justice (USDOJ) on inspections and remedial work in connection with youth facilities in California and Michigan. In August and September of 2003, I was retained as a medical and psychiatric expert for the USDOJ in connection with an inspection of the N.A. Chaderjian Youth Correction Facility in Stockton, California. In that inspection, we looked at overcrowding and whether the level of psychiatric care being provided met constitutional minimums, based on the number of wards and the limited number of staff. We concluded that the facility was badly overcrowded and understaffed. At the time, the facility consisted entirely of locked units, and the inspection found that the staff failed to provide minimally adequate medical and mental

5

health services, that the facility locked down its wards excessively, that medication delivery was faulty, that the level of ward access to yard and recreation was insufficient, and that the institution's suicide prevention efforts were underdeveloped, overwhelmed, and ineffective. All of these problems were, in my opinion, closely correlated with the extensive overcrowding that existed at that time at that institution. Moreover, these types of problems are typical in the overcrowded systems with which I have been involved in one capacity or another.

12.    Between March of 2003 and the summer of 2006, I worked as an expert for the USDOJ in connection with inspections to identify and remedy various problems at the Maxey Training School, a youth facility with large medical and mental health treatment programs in Whitmore Lake, Michigan. The case involved the adequacy of medical and mental health care provided at the facility. It did not involve overcrowding. The case did involve issues around excessive lock-downs of suicidal youths. One of the remedies implemented as a result of the proceedings was a requirement that the institution handle all cases of suicidal wards on an "outpatient basis" in the regular housing units, and that any suicidal behavior that could not be handled in this manner would result in a transfer to an outside psychiatric hospital. The case also involved general medical and psychiatric conditions.

13.    I have presented numerous papers before mental health professionals, prosecuting and defense attorneys, probation officers, and judges, and have published in professional and peer-reviewed journals on topics including prison mental health services, dual diagnosis, mental illness, alcohol and drug abuse, and the treatment of substance abuse. These presentations and publications include: "Classification of High Risk and Special Management Prisoners, A National Assessment of Current Practices" (2004); "Cultural Considerations in Working with the Latino Patient" (2002); "Psychiatric Complications of the Methamphetamine Abuser" (2001); "The Assessment, Diagnosis, and Treatment of the Patient with Multiple Disorders" (2001); "Managing

6

People of Different Pathologies in Mental Health Courts" (2000); "Model for Health Appraisal for Minors Entering Detention" (2000); "Co-Occurring Disorders: Substance Abuse and Mental Health" (2000); "The Dual-Diagnosed Client" (2000); "Psychiatric Assessment in the Criminal Justice Setting, Learning to Detect Malingering" (1999); "Working With the Substance Abuser in the Criminal Justice System" (1999); "Mental Illness and Drug Abuse" (1999); "Alcoholism: Practical Approaches to Diagnosis and Treatment" (1999); "Criminal Justice and Substance Abuse" (1999); "Impulse Control Disorders" (1999); "Major Depressive Disorder" (1999); "Substance Abuse and Major Depressive Disorder" (1999); "Mental Illness and Substance Abuse Assessment: Diagnosis and Treatment Planning for the Dually Diagnosed" (1998); "Assessment and Treatment of the High Risk Offender" (1999); "Assessment of Substance Abuse" (1995); "Attention Deficit Disorder, Substance Abuse, Psychiatric Disorders and Related Issues" (1994); and "Psychiatry, Homelessness, and Serious Mental Illness" (1994).

14.     I am currently a Diplomate of, and have served as an Examiner for, the American Board of Psychiatry and Neurology.

15.     Since 1986, I have held academic appointments as Clinical Instructor, Assistant Clinical Professor, Associate Clinical Professor, and Clinical Professor in the Department of Psychiatry, University of California, San Francisco, School of Medicine. I received the Henry J. Kaiser Award for Excellence in Teaching in 1987 and was selected by the graduating class of the University of California, San Francisco, School of Medicine as the outstanding psychiatric faculty member for the academic years 1988-1989, 1990-1991, and 1994-1995. I designed, planned, and taught "Drug and Alcohol Abuse" and "Alcoholism," one-unit courses covering major aspects of drug and alcohol abuse; supervised fourth year medical students in the care of dually diagnosed patients at the Psychiatric Continuity Clinic, Haight Ashbury Free Clinic; facilitated a weekly psychiatric intern seminar on "Psychiatric Aspects of Medicine," and lectured on addictionology and substance abuse to the School of Pharmacy, University of California,

San Francisco. I also coordinated a course on Prisoner Health at UC San Francisco School of Medicine between January 2002 and January 2004.

16. I have held numerous positions with responsibility for ensuring the quality of clinical services provided by inpatient and community-based programs. From 1997 to 1998, I was Director of Clinical Services for San Francisco Target Cities Project. I also served as (1) Medical Director of the Comprehensive Homeless Center, Department of Veterans Affairs Medical Center in San Francisco, where I had overall responsibility for the medical and psychiatric services at the Homeless Center; (2) Chief of the Intensive Psychiatric Community Care Program, Department of Veterans Affairs Medical Center in San Francisco, a community-based case management program; (3) Chief of the Substance Abuse Inpatient Unit, Department of Veterans Affairs Medical Center in San Francisco, where I had overall clinical and administrative responsibilities for the unit; and (4) Psychiatrist, Substance Abuse Inpatient Unit, where I provided consultation to the Medical/Surgical Units regarding patients with substance abuse problems.

17. I also served as a Physician Specialist to the Westside Crisis Center, San Francisco, from 1984 to 1987, and to the Mission Mental Health Crisis Center from 1983 to 1984. I was the Chief of Psychiatric Services at the Haight Ashbury Free Clinic from 1991 until February 2006. I also worked as a Technical Assistance Consultant to the Center for Substance Abuse Treatment, which is part of the Substance Abuse and Mental Health Services Administration of the United States Department of Health and Human Services.

18. I have also been employed as Psychiatric Consultant to the San Francisco Drug Court and to the Hawaii Drug Court.

19. I currently work as a private psychiatric consultant and as a Clinical Professor in the Department of Psychiatry at the University of California, San Francisco, School of Medicine.

8

20.    I have been retained by plaintiffs' attorneys in the *Coleman* and *Plata*

cases as an expert on prison medical care and prison psychiatry and the impact of

overcrowding on prisoners' medical and mental health, including how prison

overcrowding detrimentally affects prisoners' mental health and interferes with the ability

of prison officials to meet the existing and increased medical and mental health needs of

the prisoners in an overcrowded system. I have also been asked to render my opinion

with respect to whether overcrowding within the California Department of Corrections

and Rehabilitation (CDCR) is the primary cause of the current unconstitutional

conditions experienced by members of the *Coleman* and *Plata* class. Finally, I have been

asked to address whether other relief – that does not address overcrowding – will remedy

the ongoing constitutional violations in a timely and effective manner. My opinions,

based upon the evidence that I have reviewed to date documenting current conditions

within the CDCR, on my tours of Deuel Vocational Institute (DVI), California State

Prison/Solano (Solano), and Salinas Valley State Prison (SVSP), and on my professional

knowledge and my experiences working in similarly overcrowded correctional settings,

are set forth below.

21.    Prior to rendering any opinions, I reviewed a variety of reports,

documents and other materials relevant to the current condition of the CDCR. A

complete list of the materials I have reviewed is attached hereto as **Appendix B**.

## II.    OPINIONS

22.    My opinions and bases for them are as follows.

### A.    Opinion 1: Overcrowding Within The CDCR Is The Primary Cause Of The Constitutional Violations Currently Experienced By *Coleman* And *Plata* Class Members.

#### 1.    My Knowledge and Experience With Overcrowded Systems

23.    My opinion that overcrowding within the CDCR is the primary cause of

the ongoing constitutional violations is based on my experience with other overcrowded

correctional systems and mental health programs, on my knowledge of the psychiatric and social science literature regarding the effects of overcrowded jail and prison conditions on the mental health of inmates, on the documents I have reviewed as part of my preparation of my opinion in this case, on the prison tours conducted in this case, and on my personal experiences assessing and treating individual inmates within the context of overcrowded correctional systems. In particular, my opinion is based on my experiences managing psychiatric care in the San Francisco County jail system in the 1980s, when it was overcrowded. It is also based on my experiences with the overcrowded youth corrections system in Georgia. Overcrowding was also an important factor in the failure of the California Youth Authority to provide adequate medical and mental health care to its wards that was revealed in my inspection of the N.A. Chaderjian Youth Corrections Facility in 2003 for the USDOJ. In addition, while the psychiatric programs at the California Medical Facility were not typically overcrowded during the time that I served as an expert on the *Gates v. Deukmejian* case, there were times when the quality of care in the Outpatient Psychiatric Program (which became the Enhanced Outpatient Program (EOP) when the institution transitioned to *Coleman* programs) was undermined by a combination of insufficient staffing to meet the severity of the mental health problems presented in the EOP setting, along with insufficient treatment space, insufficient custodial staff, and a lack of back-up coverage when clinicians were out sick or on vacation. As discussed below, I encountered similar conditions on my recent prison tours of Deuel Vocational Institute, California State Prison Solano, and Salinas Valley State Prison.

24. In addition, I am familiar with the manner in which housing conditions that tend to worsen mental illness among chronic mentally ill patients become more common in an overcrowded system. For example, it is well established that prolonged isolation and lack of stimulus of the sort that is commonly experienced when inmates are housed in administrative segregation and other high security housing units for long

10

periods of time tend to exacerbate both the symptoms of mental illness and the underlying pathologies themselves. Indeed, these conditions are known to even cause symptoms of mental illness in individuals with no psychiatric history prior to being confined in this manner for long periods of time. Similarly, it is well established among psychiatrists that environmental and social stress of the type experienced in crowded dormitories tends to aggravate mental illness. In addition to finding these conditions at CDCR prisons with full mental health treatment programs, they are also common in reception centers that screen, assess, and process inmates when they first enter a prison system. Reception centers typically confine inmates to their cells for much of the day either for security reasons or because they do not have much out-of-cell programming available. In overcrowded systems such as the CDCR today, inmates tend to spend significantly longer periods of time in reception centers.

### 2.    The Characteristics Typically Seen in Overcrowded Systems

25.    In my professional opinion, overcrowded prison systems are characterized by several types of endemic correctional and care delivery problems which tend to reinforce and exacerbate each other. Two closely intertwined problems endemic to overcrowded systems are the shortages of staff and treatment space. In addition to the fact that there are simply more inmates for correctional officers to monitor, for mental health workers to treat, and for medical staff to treat, there is also frequently less treatment space in which to provide services to these inmates, and fewer correctional officers to provide escorts to medical and psychiatric appointments.

26.    A third endemic problem in overcrowded systems is that there are increased population pressures on administrative segregation and other locked units, and inmates tend to stay in these units for longer periods of time. In crowded systems, there are pressures to double-cell psychiatrically-impaired inmates in administrative segregation. In addition, overflow administrative segregation units are often created in

overcrowded systems, which stretches limited staffing resources and yard space and results in the institution being less able to provide inmates with access to basic privileges like yard, and showers. Because of this, the inmates in these units spend more and more time locked in their cells, and have fewer interactions with other individuals.

27.    A fourth endemic problem is that the number of inmates experiencing psychiatric crisis, medical problems, and/or psychiatric decompensation tends to soar,[1] causing overcrowding in mental health care units responsible for providing suicide watch and other forms of crisis psychiatric care. This often results in the creation of "overflow" crisis units, which are ill equipped to provide the level of psychiatric care required by this population.

28.    A fifth common problem is that access to inmate work, exercise, vocations, counseling, and education programs tends to be reduced and/or in many cases eliminated, leading to greater idleness on the part of inmates.

29.    A sixth endemic problem is the overcrowded, dangerous, and chaotic housing environments themselves. Given the shortage of space to house inmates, more vulnerable mentally ill inmates are housed in crowded gyms, dayrooms, and other make-shift environments where the stress of living in close quarters and the threat of violence exacerbate their mental illness. Due to their overwhelmingly overcrowded nature, these make-shift housing units threaten both the health of the inmates confined within them and the public health.

---

[1] *See* P. Paulus, G. McCain, V. Cox, "The Relationship Between Illness Complaints and Degree of Crowding in a Prison Environment," *Environment and Behavior* 8 (1976) at 283, 288; P. Paulus, G. McCain, V. Cox, "Death Rates, Psychiatric Commitments, Blood Pressure, and Perceived Crowding as a Function of Institutional Crowding," *Environmental Psychology and Nonverbal Behavior* 3 (1978) at 107, 115; V. Cox, P. Paulus, G. McCain, "Prison Crowding Research," *American Psychologist* 39 (1984) at 1148, 1159; E. Sieh, "Prison Overcrowding: The Case of New Jersey," *Federal Probation* 53 (1989) at 41; B Walker and T. Gordon, "Health Risks and High Density Confinement in Jail and Prisons," *Federal Probation* 44 (1980) at 53. *See also* Joint Pls' Trial Ex. 27 (*Plata* Receiver's June 11, 2007 Supplemental Report on Overcrowding) at 3 (discussing increasing risk of "communicable disease outbreaks" in overcrowded CDCR units).

30.    As discussed in greater detail below, all of these features appear to be present in the CDCR at this time.

31.    One striking feature of many of these characteristics of overcrowded systems is the manner in which they often operate in a feedback loop, with each problem reinforcing and heightening the impact of the other problems, making the problems much more severe much more quickly than would otherwise be expected. For example, it is well documented in psychiatric and social science literature concerning overcrowding that victimization and violence increase in overcrowded systems, due to less effective surveillance by understaffed correctional officers, the stressors of living in close quarters, and the stress on inmates caused by reduced access to programs and services.[2] As a result of this increase in victimization and violence, administrative segregation units tend to expand into overflow units. This produces several feedback effects. First, because administrative segregation units require additional staff to escort inmates to all of their appointments and to feed inmates in their cells, the expanded use of these units tends to exacerbate staffing shortages at the institution. Second, because overcrowded administrative segregation units provide less programming to inmates and take longer to process inmates out of the units, in my experience, more inmates in administrative segregation decompensate and require crisis care. Third, because overcrowded systems need to expand their administrative segregation units into "overflow areas," and because administrative segregation units often need to single cell a greater proportion of their population, the expansion of these units tends to exacerbate overcrowding in the rest of the prison. Similar effects take place in overcrowded reception center units, where

[2] *See* E. Mergargee, "The Association of Population Density, Reduced Space, and Uncomfortable Temperature with Misconduct in a Prison Community." The Governor also noted this overcrowding-related problem in his Declaration of a State of Emergency related to overcrowding. *See* Joint Pls' Trial Ex. 1 (Governor's 10/4/06 Proclamation Re: Overcrowding) at ¶ 2. The most recent annual CDCR report on incidents in 2006 also suggests that the increase in incidents may be due to the increased population pressure. *See* Joint Pls' Trial Ex. 7 (CDCR September 2007 Report, "Inmate Incidents in Institutions, Calendar Year 2006") at 2 (noting that "the rate of incidents per 100 average institution daily population increased from 8.7 in 2005 to 9.2 in 2006" and stating that "In 2006, the increase in the number of incidents could possibly be related to the increase in institutions and camps population.").

inmates are often locked for extended periods of time in conditions that resemble administrative segregation conditions.  As I saw first-hand when I toured SVSP, many general population units in the CDCR today are frequently on a "lockdown" or "modified program" due to custody issues relating to violence and understaffing.  Programs, activities, and mental health care are restricted, delayed, or cancelled when this happens.

32.    A similar feedback process takes place with respect to understaffing. Because overcrowded systems tend not to have enough staff and enough treatment space, inmates tend to have less access to needed medical and mental health care, ultimately creating a class of sicker prisoners who require more treatment staff than would otherwise be necessary.   However, once this process has started, it becomes more difficult to recruit new staff members, who typically do not want to work in a system where they do not have private office space or adequate spaces in which to provide treatment to their patients.  In addition, because inmates whose mental illness goes un-treated or under-treated are more likely to decompensate and incur disciplinary violations as a result, this problem also worsens the problem of expanding, staffing intensive administrative segregation units.  The resulting increase in need for crisis mental health care also creates overcrowded crisis units, which cannot provide adequate care to inmates who decompensate under the pressures of overcrowding.  This, in turn, leads to the placement of inmates who would ordinarily go to a crisis bed unit into "alternative" or "overflow" settings, such as administrative segregation units.

### 3.    The CDCR is a Severely Overcrowded System

33.    It is my opinion that the CDCR is a severely overcrowded system.  There is significant evidence of overcrowding in both broad system-wide reviews of the CDCR as a whole, and in specific reports concerning individual institutions and individual problems.

14