**EXHIBIT U
PART 2**

(a)    **Broad Reviews of the CDCR and Crowding**

34.    I have reviewed a variety of evidence documenting system-wide overcrowding in the CDCR, including (1) various statements by the Governor, and (2) the reports on Overcrowding by the Receiver and the Special Master, and (3) portions of several detailed overcrowding studies done by the January 2007 Little Hoover Commission Panel, the Deukmejian Review Panel's 2004 Report, and the June 27, 2007 Expert Panel Report and Recommendations on Overcrowding. In addition I have reviewed population data for CDCR, including the mental health populations at the prisons from January 2003 to July 2007. All of this evidence strongly supports the finding that the CDCR is severely overcrowded.

<u>The Governor's Declaration of a State of Emergency</u>

35.    The Governor's October 4, 2006 Proclamation of a State of Emergency contains several very frank admissions about the effects of overcrowding in the CDCR. The Proclamation declares that "conditions of extreme peril to the safety of persons and property exist in the 29 CDCR prisons identified [in the proclamation], due to severe overcrowding, and that the magnitude of the circumstances exceeds the capabilities of the services, personnel, equipment, and facilities of any geographical area in this state." Joint Pls' Trial Ex. 1 at ¶ 2. In his Proclamation, the Governor also correctly listed some of the commonly recognized effects of overcrowding, noting that "overcrowding causes harm to people and property, leads to inmate unrest and misconduct, reduces or eliminates programs, and increases recidivism as shown within this state." *Id.*

<u>The Receiver's 6/11/07 Supplemental Report on Overcrowding</u>

36.    In his June 11, 2007 Supplemental Report on Overcrowding, the *Plata* Receiver notes several characteristics of overcrowded systems are present currently in the CDCR. *See* Joint Pls' Trial Ex. 27 (6/11/07 Receiver's Supplemental Report on

Overcrowding). First, he notes the increased violence between prisoners:
"Overcrowding has resulted in increasing numbers of prisoner disturbances and
'lockdowns' by prison authorities in response. Because of the heightened security
measures associated with lockdowns, medical care to the inmates is delayed and made
substantially more time-consuming and cumbersome." Id. at 3. Second, he documents
the increased medical needs of inmates in the overcrowded CDCR: "The risk of
communicable disease outbreaks in the prisons, as well as their transference to local
communities is increased substantially by overcrowding and the attendant rapid
movement of prisoners between prisons." Id. Third, he notes the severe and detrimental
effects of the staffing shortages caused by overcrowding on medical and mental health
care: "The extent of overcrowding in the prisons means that the entire health care system
– medical, dental and mental health – is increasingly burdened. Because of staffing
shortages and the overwhelming number of prisoners needing care, prison staff often
must decide with which set of class action remedial orders they will comply at the
expense of others." Id. Fourth, he notes that overcrowding has led to shortages of space
and beds, which in turn causes "competition between the various providers over
resources, space, beds, and the like." Id. at 4. Fifth, the Receiver explains that the lack
of adequate space makes it more difficult to hire clinical staff, noting that "existing staff
shortages and inadequate clinical space" are among the factors that "make developing a
competent medical staff a daunting challenge." Id. at 2.

Receiver's 5/15/07 Report on Overcrowding

37.     Many of these findings echo and build upon the Receiver's First Report on
Overcrowding, which was filed with the Court on May 15, 2007, and which is discussed
below. See Joint Pls' Trial Ex. 26 (5/15/07 Receiver's Report Re: Overcrowding).

<u>The Receiver's overview of the current overcrowding crisis</u>

38.    The Receiver's First Report on Overcrowding begins with an overall
assessment of current overcrowding, explaining that "[T]he specifics of prison crowding
are far worse than previously explained by State officials."  Joint Pls' Trial Ex. 26
(5/15/07 Receiver's Report Re: Overcrowding) at 1.  The Receiver goes on to explain
that the institutional problems which led to his appointment in 2005 also contribute to the
severity of the overcrowding crisis: "The State's response to decades of overcrowding is
similar; despite various task forces, numerous studies and reports and Special Sessions,
California has not instituted any effective response to the worsening overcrowding
crisis." *Id.* at 2.  Moreover, the "degree of operational chaos within the CDCR, the
institutional paralysis in many State agencies, and trained incompetence are even worse
than indicated by the Court's findings [in connection with the appointment of the
Receiver in October 2005]." *Id.*

<u>Historical factors at work in creating the current crowding
crisis</u>

39.    Next, the Receiver looks at the history of the current crisis.  The Receiver
finds that the current crisis is an inevitable consequence of decades of CDCR policies and
decisions that tolerate overcrowding: "[O]vercrowding is ingrained in the CDCR style of
constructing and managing prisons.  Crowding-related policies that do not provide
adequate clinical and program space are now an accepted practice of CDCR prison
planning, as is California's practice of offering inadequate salaries and failing to provide
adequate hiring programs which have created crisis levels of shortages of clinical
personnel and correctional officers." *Id.* at 8.  In fact, "despite massive waves of
construction [over the last ten years], prison overcrowding has grown worse in
California." *Id.* at 9.  The Receiver also found that the CDCR has an "institutionalized
acceptance of overcrowding" and a consequent "lowering of correctional standards to

17

accommodate overcrowding," as seen in its facilities master plans, which call for up to nearly 200 percent crowding rates. *Id.* at 10.

### Staffing problems associated with the current overcrowding crisis

40.    The Receiver also found widespread staffing problems of the type that I witnessed first hand during my tours of DVI, Solano, and Salinas Valley State Prison. He notes that overcrowding "is accompanied by serious staffing shortfalls for both clinical providers and correctional officers." *Id.* at 11. The shortages impact almost every category of clinical, custodial, and managerial staff, and the staffing shortages are worse now than they were five years ago in every category except for registered nurses. *Id.* at 11-13. The Receiver also points out staffing and recruitment problems are exacerbated by the State's decision to house prisoners in "mega-prisons" in remote locations. *Id.* at 14. The Receiver also found that in some of the communities where prisons are located, "there may not be enough competent clinicians to both provide medical care for an unlimited number of State prisoners and for the public also," and that continuing to raise salaries for prison doctors in these areas might have "a resulting disruptive impact on the availability of clinicians for county and private health care programs." *Id.* at 46, 26.

41.    In my experience, it is extremely difficult to recruit and retain good clinical staff in a correctional environment in the best of times. In overcrowded systems, with the attended violence, high acuity, shortages of office space, these ordinary recruitment problems are compounded and become significantly more difficult to overcome.

42.    The custody side of these staffing problems was illustrated by comments from DVI staff during my tour there to the effect that even though DVI, which is centrally located in a relatively inexpensive area, can recruit as many staff members as they need, the CDCR intentionally maintains a custody vacancy rate of seven percent

18

(7%) at DVI to allow the CDCR to reduce custody vacancies at more remote, undesirable prisons.

### Intake and processing burdens associated with overcrowding

43.    The Receiver also found that the extraordinary number of prisoner intakes and transfers in the overcrowded system increases the stress of various parts of the CDCR's medical and mental health delivery systems. *Id.* at 14-18.    The "constant churning of parolees into and out of the CDCR (and between CDCR institutions) requires special clinical and correctional support staff at reception centers and in the 'receiving and release' units at each state prison." *Id.* at 13.    "[C]rowding driven movement," as prison officials search for open beds, "adversely impacts. . . health care delivery" by overburdening intake screening, out-going screening, records update and transfer, medication delivery, and special transport during the process, and by disrupting of patient-clinician relationships and clinical programs. *Id.* at 16.    "Movement into and out of the CDCR, as well as between CDCR prisons has now reached crisis proportions." *Id.* at 17.

44.    These movement-related problems were evident during my tour of DVI, where staff members told me that they process approximately 500 new arrivals a week in their Receiving and Release department, with roughly 25 percent of the new arrivals being identified as mentally ill.    Even after significant expansions of its Receiving and Release areas, there was not enough space at DVI at the time of my tour to allow for confidential psychiatric screenings, to permit confidential clinical contacts, or to allow same-day psychiatric screening of new arrivals.

### Impact of overcrowding on bed space for various categories of prisoners

45.    The Receiver found that overcrowding is also particularly felt "not only in the overall numbers, but also in the population pressures created by a lack of beds for

specific classifications of prisoners," such as maximum security beds. *Id.* at 17-18 (emphasis removed).

46.     Similarly, during my tour of the DVI reception center, it was clear that mentally ill prisoners with protective custody needs spent significantly longer periods in the reception center waiting for transfer to a more complete mental health program. Staff at SVSP also confirmed during my tour there that its similar population of protective custody inmates – known as "SNY" (for Special Needs Yard) inmates – who were also in need of EOP level of care would typically wait for extremely long periods in administrative segregation for a placement to open up at MCSP in the only EOP SNY program in the whole CDCR, unless they were willing to waive their SNY status.

### Impact of overcrowding on reception centers

47.     The Receiver also notes that one category particularly affected by overcrowding is reception centers. All prisoners entering the CDCR must be processed through a reception center, but "none of the CDCR's designated reception centers were designed or constructed with adequate clinical space. To make matters worse, as the original prisons designated for reception became overwhelmed by the influx of parole violators, the CDCR was forced to 'convert' general population prisons into reception centers," but did so without providing "adequate additions to clinical staff or clinical space." *Id.* at 19.

48.     These reception center space problems were evident in my tour of DVI, which was a general population prison until it was converted to a reception center a few years ago. Staff explained during my tour that DVI's extensive vocational programs (hence the name of the institution) were all shut down when DVI converted into a reception center institution. In addition, because it was not designed as a reception center, it has been difficult to find space for various reception center functions. For example, during the DVI tour I saw a small classroom where at any given time six

psychologists simultaneously conduct reception center mental health assessments for new arrivals. These assessments are mandated to be confidential by the *Coleman* Program Guide. *See* Joint Pls' Trial Ex. 9 (September 2006 *Coleman* Program Guide) at 12-2-4 and 12-2-5. In my experience, conducting screenings in non-confidential settings results in under-identification of mental illness.

Problems with new construction projects

49.     One of the most disturbing findings in the Receiver's report is that even the CDCR's "newest and most modern prisons" were "designed with clinic space which is only one half that necessary for the real life capacity of the prisons." Joint Plfs' Trial Ex. 26 (Receiver's Report Re: Overcrowding) at 19 (emphasis removed). Indeed, the Receiver found that CDCR building projects often go astray: "while millions of dollars have been allocated for prison health care space projects during the past five years, the great majority of the project[s] were never completed; indeed, some projects do not appear to exist." *Id.* at 20.

Overcrowding-related lockdowns

50.     The Receiver also reports that overcrowding causes lockdowns which "call for a radically different form of medical delivery than the services provided under normal general population conditions" because "clinical staff must go from cell to cell to see the prisoner/patient, or small groups o[f] individual prisoners must be escorted by correctional officers to and from clinic areas," so that lockdowns "inhibit the delivery of medical care and increase the staffing necessary for such care." *Id.* at 29-30.

51.     The difficulty of providing clinical treatment in an administrative segregation unit was clear to me in the administrative segregation unit known as "K-Wing" at DVI. The clinical leadership at DVI reported that although they have the necessary clinical staffing available, they are unable to hold any groups for their EOP inmates in the administrative segregation unit because of the absence of space. In

21

addition, I witnessed a case manager contact occurring in administrative segregation while touring the unit. The meeting took place in the front office of the unit, and there were two custody officers at the table with the inmate-patient. In addition, other custody staff members were going in and out of the room during the clinical interview. Such an environment affords zero privacy and is clinically inappropriate.

52.    The problem of delivering care in a locked down environment was also evident in the CCCMS program on C-Facility at Salinas Valley State Prison when I visited that institution on November 1, 2007. Staff and inmates alike reported during the tour that the Facility has been locked-down almost continually for the last two to three years. I spoke with a Dr. Williams on C-Facility who told me that due to the frequency of lock-downs on the yard, a group consisting of 8 sessions would typically take between ten months and a full year to complete. In addition, the level of acuity exhibited by the CCCMS inmates I interviewed on the yard was quite high, often exceeding the minimum requirements for EOP level of care. *See* Joint Pls' Trial Ex. 9 (September 2006 Program Guide) at 12-4-3 (EOP treatment criteria). In addition, I noted that the inmates were not psychiatrically stable and required more mental health treatment than they were receiving to control their illness.

Overcrowding-related competition for space and resources<br>between medical and mental health providers

53.    The Receiver also reports that "[m]any CDCR prisons are unable to sustain the basic delivery of medical, mental health, and dental services because of limited staffing (clinical and custody) and an overwhelming number of prisoner/patients who require care. Every day, many California prison wardens and health care managers make the difficult decision as to which of the class actions, *Coleman, Perez, Armstrong* or *Plata* they will fail to comply with because of staff shortages and patient loads." *Id* at 30.

22

54.     This problem was also evident on my tours.  For example, at DVI, staff reported that the 26 Outpatient Housing Unit (OHU) cells used to be divided equally between medical cases and mental health cases.  However, DVI staff reported that in the last year, generally only 4 of these OHU beds are available to mental health patients because the remaining beds in the unit are occupied by medical placements.  Similarly, at SVSP, the number of MHCB beds generally available to psychiatric cases has been reduced from 10 in the past to 8 and sometimes fewer due to the use of these CTC beds by medical patients.

Overcrowding related CTC/MHCB bed shortages

55.     The Receiver's report also documents the related problem of CTC bed shortages.  "[B]ecause of the failure, for more than fifteen years, to provide an adequate number of inpatient beds for prisoners with very serious mental illnesses, prison CTC beds confined many patients in a mental health 'crisis' creating shortages of CTC beds for medical needs which, at times, pits medical staff against mental health staff.  In similar fashion, the failure by the CDCR to plan for and construct beds for aged and disabled prisoners has lead to a practice of using the CTC beds for sheltered living housing, creating similar tensions."  *Id.* at 31.  As noted above, this problem was evident at DVI (in competition for OHU beds) and in the CTC units at SVSP.

The Receiver's conclusions

56.     The Receiver reaches a number of critical conclusions based on these findings.  First, he points out that "[o]vercrowding interferes with the Receiver's ability to successfully remedy the constitutional violations at issue..."  *Id.* at 24.  Second, he finds that overcrowding has created a "culture of cynicism, fear, and despair which makes hiring and retaining competent clinicians extremely difficult."  *Id.* at 25.  Third, he finds that overcrowding also makes it difficult to hire staff because of the sheer numbers required to support the population, the frequent movement of inmates and the remote

23

locations where California has placed its mega-prisons. *Id.* at 25-26. Fourth, he finds that the cost and duration of the Receiver's remedial efforts are adversely affected by overcrowding because it creates severe barriers to the recruitment and hiring of new clinical and support staff and competent health care managers and executives, leads to an extraordinarily high "velocity of prisoner movement in the CDCR," which necessitates the construction of thousands of medical beds and extensive clinical and support space, and places a heavy burden on contracts with outside providers for medical support services. *Id.* at 26-28. Fifth, he concludes that overcrowding "has increased the number and seriousness of infectious and communicable diseases, jeopardizing prisoners, staff, and the public"; the risk of an outbreak of infectious and communicable diseases "cannot be underestimated." *Id.* at 30.

57.     In short, because of overcrowding, the Receiver reports, many prisons simply cannot provide adequate medical, mental health, and dental services. *Id.* at 30.

The <em>Coleman</em> Special Master's Report on Overcrowding

58.     Special Master Keating filed a report on overcrowding on May 31, 2007. The report is consistent with the findings of the *Plata* Receiver in many respects, but it covers the problems with mental health care delivery associated with overcrowding in greater detail.

Delays in access to higher levels of care

59.     The Special Master's report is very stark in underscoring the impact of overcrowding on access to higher levels of care, particularly access to MHCB crisis units and DMH inpatient care units: "The inadequacy of beds appropriate to the treatment needs of inmates, particularly at the highest level of treatment needs, is compounded by severe overcrowding. The back-up of inmate/patients awaiting transfer to inpatient DMH programs fill MHCB units, which, in turn, cannot provide crisis intervention to other inmate/patients who need to be stabilized." Joint Pls' Trial Ex. 35 (Special Masters'

24

5/31/07 Report on Overcrowding) at 9.  The Special Master also explains that in the face

of these limitations on referrals, eventually, clinicians no longer even try to refer

appropriate cases to higher levels of care: "Not surprisingly, harassed clinicians often

choose not to undertake the frustrating struggle for a referral that will not bring

movement for weeks or months, and increasing numbers of truly psychotic

inmate/patients are trapped in EOPs that cannot meet their needs." *Id.* at 10.  Despite this

evidence of a widespread failure to refer all appropriate cases to higher levels of care,

during my visit to SVSP, Department of Mental Health staff reported that the waiting list

for their inpatient program has risen from 80 inmates six months ago to 110 inmates at

the time of my tour on November 1, 2007.

60.    This reported failure to refer to higher levels of care was confirmed in my

site visits.  In general, it was my experience that the level of acuity among mentally ill

inmates at the EOP level of care was extraordinarily high.  While at DVI, I met with a

number of EOP inmates that, due to the severity of their mental illness, required

stabilization in a crisis unit and/or inpatient psychiatric treatment in one of the

Department of Mental Health inpatient programs.  *See* Paragraphs 100 to 105, *infra.*

Delays in construction projects to remedy shortages at<br>higher levels of care.

61.    The Special Master also explains that additional mental health beds will

take a long time to construct: "Sadly, construction of the beds identified as needed to

meet defendants' projected needs for acute and intermediate inpatient care will not be

completed until FY2011/12." *Id.* at 9.  Since the Special Master wrote this report in May,

defendants have amended their beds expansion plans and further delayed many projects

for new inpatient and MHCB projects.  According to the new plans, if all goes according

to plan, defendants will finally have built sufficient beds to meet the needs of the

*Coleman* class by January 2014, at the earliest.  *See Coleman* Pls' Trial Ex. 12 (*Coleman*

25

Special Master's 9/24/07 Report and Recommendations on Defendants' August 2007

Supplemental Bed Plan) at 11.

<u>Access to Mental Health Crisis Beds (MHCBs)</u>

62.    The Special Master's Report explains that "[o]ver the past three years,

however, the number of inmate patients referred to a MHCB level of care has regularly

and significantly exceeded the number of MHCBs available in CDCR, resulting in the

placement of inmate patients in need of a MHCB level of care in a variety of temporary

housing alternatives, which often lacked the heightened monitoring and treatment

essential to the MHCB level of care." *Id.* at 3.   According to the Special Master, these

alternative placements have included Outpatient Housing Units (OHUs), which are

unlicensed infirmaries for temporary housing of inmates for up to 72 hours, mental health

outpatient housing units (MH-OHUs) and other temporary holding cells, including,

frequently, administrative segregation cells. *Id.*  "Between MHCBs, OHUs, MH OHUs

and other alternative placements, some 300 to 350 seriously mentally ill inmate/patients

are confined in one or another of these facilities on any given day." *Id.* at 4.

63.    This shortage of MHCB beds was confirmed in the oversubscribed MHCB

unit that I visited at SVSP during my tour on November 1, 2007, where psychiatrically

decompensating suicidal inmates are frequently housed in makeshift holding cells for

long periods of time.  Several of these "holding cells" are small upright cages that are

completely inadequate for inmates with serious mental health problems.  Similarly, at

DVI, staff reported during my October 29, 2007 tour that transfers to MHCB beds at

other institutions are virtually impossible, and that its own OHU, which essentially is

acting as an overflow MHCB unit, does not have enough space, resulting in the creation

of an overflow unit to the overflow unit.  Due to the lack of space in the OHU, DVI often

houses suicidal inmates in its administrative segregation unit.

Inadequate staffing

64.     The Special Master's Report attempts to quantify the impact of current staffing shortages, finding that the "CDCR ends up with sufficient staff to provide full mental health services to roughly two-thirds of its mental health caseload." *Id.* at 11. Next, the Special Master reviews current vacancy rates for psychiatrists, case managers, and psychiatric technicians, and calculates that for these three categories the combined vacancy rate is 43.94 percent. *Id.* Although the Special Master explains that some of these vacancies are covered by contract employees, he notes that even when such contract employees' coverage is included, the functional vacancy rate is still 19.68 percent. *Id.*

65.     In my experience, there are problems with heavy reliance on registry and contract staff. The heavy use of such staff members can create problems with diagnostic consistency, continuity of care, inappropriate use of psychotropic medication with resulting excessive medication changes, poor monitoring of acuity over time, and poor follow up care. In addition, such practitioners are often not familiar with procedures for referring patients to higher levels of care.

66.     Moreover, the Special Master notes that this discussion of vacancies and their impact, "does not even address the endemic shortages of escort correctional officers, nursing staff, clerical and records keeping personnel, pharmacy staff and lab technicians." *Id.* at 12.

Adequate treatment and office space for clinicians

67.     After discussing the finding by the Receiver that poor long-term planning and construction policies in the past have resulted in the medical department in the CDCR having only half the needed treatment space, Mr. Keating states that past planning decisions "may, indeed, have left the medical side of healthcare with just half a loaf of needed clinical space. The cost to future mental health programming space was even greater. . . . None of the 19 CDCR institutions planned and built in the boom of the 80s

27

and 90s gave any thought to space that might be needed for mental health purposes.
Instead . . . medical and mental health practitioners in CDCR were left to scramble for
clinical space originally designed to meet just half of anticipated medical needs alone."
*Id.* at 5.

68.    This lack of space has a particularly severe impact upon mental health
programming in restrictive locked units: "Each succeeding compliance report over the
past two years, for example, has documented the decline in the number of hours of
therapeutic activities offered in most institutions to Enhanced Outpatient Program
inmate/patients in administrative segregation units, repeatedly attributed to the acute
absence of adequate space." *Id.* at 6.

69.    But the impact of space shortages is felt more generally as well: "The
growing problems reflect the impact of overcrowding. The sheer number of inmates
needing all sorts of time out of their cells for all sorts of reasons puts incredible pressure
on available space. When gyms, dayrooms and all-purpose rooms are filled with bunks
and inmates, past accommodations for the use of these spaces for group activities for
mentally ill inmates evaporate." *Id.* at 7.

70.    The Master concludes his discussion on programming space shortages by
noting that "[e]xcessive population, thus, results in a reduction of programming space
now occupied by inmate bunks, greater competition for use of the diminishing available
space; fewer escorting correctional officers to permit access to the diminishing space;
and, ultimately, the increasing frustration and demoralization of clinicians trying to
provide treatment." *Id.* at 7.

<u>Increasing demand for mental health services due to
overcrowding</u>

71.    The Special Master also notes that "the inevitable result of severe
overcrowding is that everyone also spends more and more time in their cells. General
yards are more crowded, less well supervised and increasingly dangerous. . . . Work or

28

vocational opportunities shrink in the expanding population." *Id.* at 7.   The Master also

explains that these conditions lead to more conflict between inmates: "Disturbances

occur more frequently, with resulting increases in the number and duration of lock-

downs." *Id.*  This in turn means that "inmates must spend increasingly larger chunks of

their days in their cells, or much more dangerously, in one of those triple-bunked 'non-

traditional' spaces."   The Master concludes that such conditions "inevitably escalates the

incidence of mental illness and exacerbates the condition of those already mentally

fragile and vulnerable." *Id.* at 7-8.

> 72.     As discussed below, my site visits uncovered striking examples of most of

these overcrowding-induced problems discussed in the reports by the Receiver and the

Special Master.

<strong>(b)     Evidence Concerning Overcrowding-Induced<br>Constitutional Violations at the Individual Prisons I<br>Visited.</strong>

> (i)     **Deuel Vocational Institute (DVI) Tour:**

> 73.    I toured Deuel Vocational Institute (DVI) on October 29, 2007.  As part of

my tour, I spoke with a number of staff members and inmates at the institution.  At the

time of my visit, DVI was severely overcrowded – staff reported during the tour that DVI

has a design capacity of 1,861 and a current population of 3,748, meaning that the current

population is 201 percent of design capacity.  (However, these numbers do not comport

with the most recently CDCR population report posted on the CDCR website, dated

October 29, 2007, which states that DVI's population as of midnight on October 24, 2007

was 3,855 with a capacity of 1,627, meaning that the current population is actually 236.9

percent of capacity.  *See* Joint Pls' Trial Ex. 24 (October 24, 2007 CDCR Weekly

Population Report) at 2.

> 74.     Recently, the population of DVI's mental health programs has been

growing rapidly.  In a September 19, 2007 report provided to the *Coleman* monitors in

29

connection with an October 2, 2007 tour of the institution, DVI staff members report that while at the beginning of the year, 22 percent of DVI's population consisted of mentally ill individuals, by September the inclusion rate had risen by three percentage points to 25%. *Coleman* Pls' Trial Ex. 31 (DVI Institution Program Status from *Coleman* Tour Binder for 10/2/07 expert tour) at 1. The report also notes that "DVI remains a busy and at times chaotic reception center process receiving as much as 150 inmates daily." *Id.* One sign that overcrowding may be creating a more acutely ill population in need of greater mental health services is the fact that in places like DVI, the number of mentally ill prisoners is growing faster than the number of prisoners overall. Between January of 2007 and October 24, 2007, the overall population at DVI actually fell from 3,954 to 3,855. *See* Joint Plfs' Trial Ex. 22 and 24 (CDCR weekly population reports from January 10, 2007 and October 24, 2007).

75. During my tour of DVI on October 29, 2007, staff reported that as of the day of the tour, the mental health population at DVI was 933, or 25% of the overall population of 3,748. Staff also broke down the placements of mental health cases at DVI as follows: there were 879 CCCMS inmates (including 364 in reception center general population, 101 in administrative segregation, 425 in the reception center protective custody or SPU unit, and 11 in the infirmary); there were 54 EOP inmates (including 14 in reception center general population, 20 in administrative segregation, 17 in the reception center protective custody unit, and 3 in the infirmary).

76. During the tour of DVI, I interviewed 9 inmates in the visiting room of the institution. I also interviewed two EOP administrative segregation inmates during my tour of the K-wing administrative segregation unit. As discussed in greater detail below, my clinical impression of this group of inmates as a whole was that both the EOPs and the CCCMS patients that I met were more acutely ill than the EOP and CCCMS patients I encountered in the late 1990s while working at CMF. Clinical staff at DVI also indicated that they believe the clinical acuity of the patients they are treating at EOP level

30

of care frequently makes them appropriate for referrals to higher levels of care – MHCB and DMH inpatient programs – that are simply unavailable.

77.     In both my October 29, 2007 tour of DVI and in the documents I reviewed in preparing for the tour, there was substantial evidence of serious problems at the institution related to endemic overcrowding in the CDCR. These problems were the same problems highlighted in the system-wide reports of the *Coleman* Special Master and the Plata Receiver discussed above.

### Inadequate Office and Treatment Space at DVI

78.     The September 2007 report from DVI staff to the *Coleman* monitors notes that one "of DVI's biggest challenges in terms of the Mental Health Department remains treatment space access and utilization." *See Coleman* Pls' Trial Ex. 31 (DVI Institution Program Status from *Coleman* Tour Binder for 10/2/07 expert tour) at 2. The report also explains that despite a 65% increase in staffing, DVI has had very little increase in office and treatment space. *Id.* "Unfortunately, this has meant long wait times for inmates receiving treatment and overcrowded offices, as there are at times 8-10 doctors sharing offices in our ever increasing and growing mental health staff." *Id.* Moreover, "at the present time there is no group therapy occurring in Ad Seg for EOP inmates given space limitations." *Id.*

79.     My tour of DVI on October 29, 2007 confirmed that these shortages are interfering with the delivery of mental health care to the caseload population, as noted above. During my tour of the K-Wing administrative segregation unit, I saw that a case manager conference was taking place in the staff office at the front of the unit. There were two custody officers at the table while the inmate was having his individual counseling session, and there were people walking in and out of the room. This is not an appropriate, confidential setting for a case manager conference. Confidentiality is a critical component of meaningful mental health treatment.

80.    During the tour of the unit, the Chief Psychiatrist and Chief Psychologist also explained that due to space limitations, much of the treatment provided to caseload inmates in administrative segregation is provided at cell-front, through the cell door, which is both non-confidential and not conducive to meaningful clinical assessments or meaningful therapy.  They also confirmed that although DVI now has enough clinicians to hold groups for EOP inmates in its administrative segregation unit, no effort has been made to conduct such groups because there is no suitable treatment space available. *Coleman* Class Member A, one of the two mentally ill inmates I spoke with in the K-Wing administrative segregation unit, told me that he had been at DVI in administrative segregation as an EOP inmate since his arrival at DVI on August 17, 2007 (73 days as of the date of the tour) and that he had not received any group treatment and only sporadic cell-front case manager contacts.  The court-approved *Coleman* Program Guide requires the CDCR to transfer inmates to an EOP administrative segregation hub within 30 days of placement in an administrative segregation unit, and requires that all reception center EOP inmates be transferred to a mainline EOP program within 60 days. *See* Joint Pls' Trial Ex. 9 (September 2006 Program Guide) at 12-7-7 (EOP Ad Seg) and 12-1-13 (Timeline Chart).

81.    My tour of DVI also revealed that there is currently a severe office space shortage for clinical staff.  During the tour, I visited a clinician office on the L-2 area which houses the desks of 8 clinicians.  The clinicians I spoke with during the tour reported that even with 8 desks crammed into the office, they frequently have to share individual desks with other clinicians.  I also observed that 3-5 mental health staff members working in the OHU must share a small office in a converted cell.

82.    Lack of adequate and appropriate space for reception center psychological screening was also apparent at DVI.  While touring the areas where reception center processing takes place, we were shown a small classroom where 6-8 clinicians typically administer the 31-question psychological screening instrument given to all inmates

32

entering the CDCR. This is not an appropriate place to conduct a confidential mental health assessment, and, in my experience, could result in under-identification of mentally ill individuals.

83.     In addition, during the tour of DVI, the mental health leadership indicated that they had hoped to have space in the new Receiving and Release area to conduct these psychological assessments on the same day that inmates arrive, but that due to lack of sufficient space they are forced to screen inmates in a different part of the prison, which requires them to conduct the screening on the next day after arrival.

DVI's Practice of Housing Suicidal Inmates in its
Administrative Segregation Units

84.     A serious overcrowding-related problem acknowledged by DVI in the September 19, 2007 Institutional Summary report to the *Coleman* monitors has to do with the use of administrative segregation cells instead of the infirmary for suicide-watch patients. The report states that:

> Another significant problem at DVI has to do with the increased use of medical beds in the OHU [or "outpatient housing unit," a name given to unlicensed CDCR infirmaries], most likely driven by ongoing Plata requirements. While the number of inmates referred to the OHU for acute mental health treatment has not increased, the number of beds that the mental health inmates have access to continues to decrease. As a result, we are frequently forced to overflow inmates to areas other than the OHU given the paucity of treatment space in our OHU. This has resulted in a significant increase of inmates being housed in Administrative Segregation, specifically K-wing pending a bed opening up in the OHU.

*Coleman* Pls' Trial Ex. 31 (DVI Institution Program Status from *Coleman* Tour Binder for 10/2/07 expert tour) at 2.

85.     During my tour of DVI on October 29, 2007, staff confirmed this problem, reporting that although the 26-bed OHU used to be one-half designated for mental health cases, in recent months, only 4 of the 26 OHU beds are generally available to mental

33

health cases.  At the time of my tour, there were 3 mental health inmates in the holding

cells in the OHU, another 5 mental health patients in the OHU beds that are typically

occupied by medical cases, and one inmate on suicide watch in the L-Wing

administrative segregation unit.  Staff stated it was very unusual that so many beds were

available in the OHU for mental health patients.  DVI staff reported that they have 11

cells in the L-Wing unit for OHU-overflow/suicide watch and that these cells are

frequently used.  This is remarkable because, in effect, the OHU is itself an overflow unit

to the fully licensed MHCB units.  The administrative segregation overflow OHU is

essentially an overflow unit to an overflow unit.

86.    In my opinion, housing suicidal inmates in administrative segregation

units, particularly ones as harsh, dirty and noisy as K-Wing and L-Wing at DVI, is a very

dangerous practice, both because of its potential to exacerbate suicidal behavior, and

because of its potential to discourage inmates from reporting their true feelings for fear of

being housed in such a unit.  Indeed, the dangerousness of these units is evident from the

*Coleman* Court's Order that defendants undertake extensive modifications to their

administrative segregation programs to increase monitoring of all inmates in these units

to address the increased risks of suicide.  *See* 6/8/06 Order at ¶ 1 (noting "escalating

percentage of suicides occurring in administrative segregation units").  Although DVI is

now using L-Wing in lieu of K-Wing, and L-Wing does in fact represent a slight

improvement over the extremely harsh conditions of K-Wing, it is still an administrative

segregation unit.  Moreover, the cells in L-1 appeared to have been hastily retrofitted to

be suicide-proof.  They are also small and dirty, and the paint on the walls of the cells I

observed was peeling badly.

87.    In its *Coleman* Corrective Action Plan for the October 2, 2007 tour by the

*Coleman* Special Master's experts, DVI acknowledges some ancillary problems with

using administrative segregation in this manner (at the time of the report, only K-Wing

was being used in this manner).  *See Coleman* Pls' Trial Ex. 30 (DVI 10/2/07 CAP, item

34