# EXHIBIT U
# PART 3

14) at 26. "This overflow into K-wing, however, has caused other problems with regards to access to inmates given the low number of custody escort officers to both meet the needs of the OHU and their overflow inmates in K-wing, as well as the large number of mental health clinicians currently working in Ad Seg and their access to their CCC[MS] and EOP inmate's living in this housing unit. Although additional [escort] officers have been added to the mix, it is still inadequate to meet the ever increasing mental health need." *Id.* at 26-27.

### Access to Higher Levels of Care at DVI

88.    Another problem underscored by DVI mental health staff during my tour of the institution on October 29, 2007 is their inability to access licensed Mental Health Crisis Bed (MHCB) units at other prisons for DVI's suicidal inmates. During the tour, the Chief Psychiatrist, the Health Care Manager, and the Chief Psychologist all expressed to me that they are almost never able to transfer inmates needing higher levels of care to an MHCB unit or to one of the DMH inpatient programs.

89.    In their September 2007 Report to the *Coleman* experts, DVI staff likewise noted that although the institution has hired more treatment staff for its OHU units, "our effectiveness to actually move inmates to crisis facilities is limited as CTC's are not actively discharging inmates. As a result, additional beds for DVI mental health emergencies are never available." *Coleman* Pls' Trial Ex. 31 (DVI Institution Program Status from *Coleman* Tour Binder for 10/2/07) at 2. A more detailed review of the issue as part of DVI's Corrective Action Plan (CAP) item 10 noted that 97 percent of the cases transferred from DVI's OHU to an MHCB unit were not compliant with *Coleman* court-ordered time-frames for such transfers and noted that "DVI continues to experience significant problems with the transfer of inmates from the OHU to crisis beds or other higher levels of care." *Coleman* Pls' Trial Ex. 30 (DVI 10/3/07 Tour Documents, CAP item 10) at 15.

35

Medication Management Problems at DVI

90.    Another crowding-related problem discussed by DVI staff during my tour, and also documented in detail in the Special Master's Eighteenth Monitoring Report, is medication management.    During my tour of DVI, Dr. Coppola, the Chief Psychiatrist, acknowledged serious problems with medication continuity and medication practices generally and stated that medication is a "major area where we need to make changes" to improve the delivery of care.    During my tour, DVI staff also reported that due to large processing volumes of new inmates coming into the reception center, which typically number 100 new inmates a day, they are unable to check with counties when an inmate arrives reporting that he was on a medication that does not match documentation in the records from the sending county.

91.    According to the Special Master's most recent 18th monitoring report, DVI's medication practices suffer in the following respects:

- Medication on intra-institutional transfers was timely in only 40 percent of cases;

- Medication renewals were timely in 89 percent of the cases, but this was achieved through the use of 90-day bridging orders, and follow-up appointments were often delayed for periods of up to six weeks;

- Poor tracking of follow-up on medication non-compliance;

- Inaccurate recordings of MARs in 47 percent of cases;

- Timely follow-up appointments with psychiatrists in only 40 percent of cases;

- Problems with lab testing;

- Low medication compliance rates, at 40 to 57 percent for patients on anti-depressant medication, 37 to 40 percent for those on antipsychotic medication, and 73 percent for patients on Valproic acid.

36

*See* Joint Pls'. Trial Ex. 36 (Special Master's Eighteenth Monitoring Report) at 96-97.

92.     In my experience, these types of medication management problems are very typical in overcrowded systems. In overcrowded systems, medical staff becomes stretched thin and there is not enough time for clinical staff to consult closely with each inmate when administering medication to check for side effects, to ensure that the medication is being taken, and to ensure the efficacy of the particular medication prescribed. Of note, no effort is currently being made on the part of the medication dispensers to monitor to any degree the clinical efficacy of a given medication. This contributes to medication non-compliance and results in inadequate feedback to treating clinicians concerning instances of medication non-compliance and/or lack of medication efficacy.

### Inadequate Medical Records at DVI

93.     During my tour of DVI on October 31, 2007, I visited the medical records in the OHU unit. Staff showed me an area where un-filed medical records are kept. In my estimation, there were between four and five feet of un-filed medical records. This kind of backlog of medical records is dangerous and unacceptable. Both medical and mental health clinicians need to have up-to-date information in a patient's medical record in order to provide minimally adequate care.

94.     During the tour, DVI staff also estimated that about one-third of the time when they meet with patients, they do not have access to the inmate's medical record during the clinical encounter. This is a dangerous clinical situation because staff does not have access to the patient's entire medical and mental health history, including such critical information as drug allergies, prior diagnoses and treatment history. Also, when staff enters clinical information on loose sheets of paper, there is a risk that important clinical observations will never make it into the permanent file.

95.     The report to the *Coleman* experts by DVI staff in connection with the

10/2/07 *Coleman* experts' tour included a Corrective Action Plan (CAP) report on

medical records. *See Coleman* Pls' Trial Ex. 30 (CAP Item 23, page 46). The report

notes that as of September 7, 2007, there were 62 inches of loose medical records waiting

to be filed (more than five feet of un-filed records). *Id.*

Medical Care Issues at DVI

96.     During my tour of DVI, the institution's new Chief Medical Officer

candidly admitted that he believes that DVI is running 40% over capacity in terms of its

ability to deliver medical care.

The High Level of Acuity of Mentally Ill Inmates at DVI

97.     During my tour of DVI, I was surprised by the high level of acuity of

many of the EOP and CCCMS inmate-patients I met, both during the tour of the

institution and during the interview with class members at the end of the tour. DVI's

Chief Psychiatrist, Dr. Coppola, stated during the tour that he thinks that one effect of

overcrowding on his caseload population is that his patients are very sick, and that it is

difficult to move these sick patients to higher levels of care. He said that he sees an

increase in illness "in terms of both incidence and severity." I agree with Dr. Coppola

that the level of acuity among patients at DVI was very high. He also agreed with my

assertion that the current mental illness incidence rate of approximately 25% of the

institution's population is higher than that seen in other correctional settings.

98.     As noted above, in my work as a court-appointed expert in the *Gates* case

at CMF between 1990 and 2000, I was present for the implementation of the new

MHSDS system at CMF and I evaluated and worked with inmates who were classified as

CCCMS and EOP. In my view, the inmates who I met at DVI and Solano who were

CCCMS and EOP were much more acutely ill than the typical EOP or CCCMS inmates I

knew when working at CMF.

38

99.    This high level of acuity was confirmed by my interviews with EOP and CCMS inmates at DVI during the October 29, 2007 tour.

(a)    Interview with DVI *Coleman* Class
Member B:

100.    While at DVI on October 29, 2007, I interviewed *Coleman* Class Member B, an EOP inmate, and reviewed his Unit Health Records ("UHR"). According to his UHR, *Coleman* Class Member B has a "history of cutting and burning" himself and is diagnosed with Major Depressive Disorder. *Coleman* Class Member B is currently housed in the reception center EOP program for protective custody inmates. He had been in the reception center at DVI waiting for a transfer to an EOP program for more than six months, since April 17, 2007. He is taking very serious psychotropic medications including Seroquel, Depakote, Remeron and Effexor. *Coleman* Class Member B told me that medication has been a big problem for him at DVI. He indicated that DVI staff members "don't give it to you all the time" and that when medication has lapsed, it takes a long time to see a psychiatrist and get a renewal. *Coleman* Class Member B indicated that he is very frustrated because he was sexually assaulted as a child and would like to get treatment around this issue, but he has been unable to access individual therapy for this problem. He indicated that he goes to a one-hour group five days a week, but that it is mostly just a "check-in" group and that he does not believe he is receiving meaningful treatment from the group. Thus, he is getting five hours a week of the same group, rather than the 10 hours a week of EOP care mandated by the Program Guide. *See* Joint Pls' Trial Ex. 9 (September 2006 Program Guide) at 12-4-8 (10 hours of treatment per week requirement for EOP inmates). In addition, because he is in a reception center, he is confined to his cell most of the time. Once he is transferred to an EOP program at a mainline institution, *Coleman* Class Member B will hopefully receive much more out-of-cell time and be able to participate in significantly greater programming. *Coleman* Class Member B has a history of suicide attempts and self-mutilation. Although my interview

with *Coleman* Class Member B was time limited, in my opinion, a stay of more than six months in the reception center under these conditions is clinically deleterious to an inmate like *Coleman* Class Member B with serious, chronic mental illness and a history of suicidal ideation and self-mutilation.

        (b)     Interview with DVI *Coleman* Class Member C:

101.   *Coleman* Class Member C is a reception center CCCMS inmate who arrived at DVI on March 30, 2006, roughly 18 months ago. He reported to me that he is diagnosed as "paranoid and bipolar;" his medical record reflects a diagnosis of "Mood Disorder NOS." In general, an NOS diagnosis is an appropriate provisional diagnosis while a clinician is completing a thorough diagnostic workup. In my professional opinion, a diagnosis of Mood Disorder NOS is inappropriate when a patient has been in the same institution for 18 months. *Coleman* Class Member C is taking Seroquel, Neurontin, and Celexa. *Coleman* Class Member C was agitated when I interviewed him because he has recently been taken off of Wellbutrin, which he indicated was helping him. When I asked him how his long stay in reception center is affecting him, he stated "it's making me real mad ... and then when I get mad I start threatening them and I get written up." Apparently, he has received a number of 115s during his stay at DVI, which may be one reason for the delay in transferring him to a mainline institution. In my opinion, *Coleman* Class Member C is inappropriately diagnosed and is not receiving adequate treatment. His inadequate treatment is contributing to his agitation and disciplinary problems.

        (c)     Interview with DVI *Coleman* Class Member D:

102.   I also interviewed *Coleman* Class Member D during the tour of DVI. *Coleman* Class Member D is an EOP inmate currently housed in the K-Wing administrative segregation unit. He has been at DVI since March 14, 2006. He has been in administrative segregation since February of 2007. The *Coleman* Program Guide

40

requires that EOP inmates be moved from reception centers to a mainline EOP program within 60 days, or 30 days if clinically indicated. *See* Joint Pls' Trial Ex. 9 (September 2006 Program Guide) at 12-1-13. *Coleman* Class Member D stated that on September 2, 2007 he battered an officer after missing his morning medications. His medical record reflects a current diagnosis of Schizoaffective Disorder. He is on a variety of medications including Zyprexa, Seroquel, and Prozac. He indicated that he hears voices if he does not take his medications. In my opinion, *Coleman* Class Member D has a serious mental illness and is decompensating under the pressures of his prolonged stay in administrative segregation, where he getting very little treatment except for his medications.

(d)    Interview with DVI *Coleman* Class Member E:

103.    *Coleman* Class Member E is a reception center EOP inmate who has been housed in DVI's administrative segregation unit since his arrival at DVI on August 7, 2007. *Coleman* Class Member E is currently serving a term for a parole violation. He is on a number of serious psychotropic medications including Zyprexa, Depakote, and Risperdal. He is currently housed in the K-Wing administrative segregation unit on the second floor. He said he gets his medications every day, but he has not received any group therapy. According to his medical record, he is diagnosed with Schizoaffective Disorder. My clinical assessment of *Coleman* Class Member E is that he remains very psychotic and that he is decompensating in administrative segregation and requires access to a higher level of care. Some of his mental health clinicians appear to be concerned about the same symptoms I noticed in my interview with him. An October 2, 2007 psychiatric technician note in his medical record states: "look for symptoms of decompensation."

41

(e)    Interview with DVI *Coleman* Class Member F:

104.    *Coleman* Class Member F is a CCCMS administrative segregation inmate. He arrived at DVI on August 29, 2007 from the Sacramento County jail. According to his medical record, he is diagnosed with Schizophrenia, Paranoid Type. My clinical assessment of *Coleman* Class Member F is that he is severely psychotic and requires a higher level of care than he is currently receiving.

(f)    Interview with DVI *Coleman* Class Member G:

105.    *Coleman* Class Member G is a general population reception center EOP inmate who has been at DVI since August 14, 2007. The current diagnosis listed in his health record is "Psychotic Disorder, NOS." The Medication Administration Record (MAR) in his medical file shows that *Coleman* Class Member G refused to take his medications on 5 of the last 7 days. In my clinical opinion, *Coleman* Class Member G is very severely mentally ill. He is acutely psychotic. It is unclear whether his recent refusal of medication represents a worsening of his psychiatric disability or his informed decision to refuse medication. Regardless, he clearly needs close monitoring and supervision, which in my estimation based on the tour of DVI will be difficult for him to obtain in the overcrowded reception center.

The March 2007 Suicide of *Coleman* Class Member H at
DVI Illustrates the Severe Consequences of Overcrowding-
Related Problems:

106.    Several of DVI's overcrowding-related problems appear to have played a role in a successful suicide at DVI in the spring of 2007. In preparing this report, I reviewed the suicide report for *Coleman* Class Member H, who died on March 9, 2007. *See Coleman* Pls' Trial Ex. 26 (September 18, 2007 Suicide Report *Coleman* Class Member H and June 18, 2007 Executive Summary) at 5. *Coleman* Class Member H, a "severely mentally ill" schizophrenic, spent four days in CDCR custody prior to his death by hanging on Friday March 9, 2007 in the protective custody unit on West Hall. *Id.* at 2.

Although *Coleman* Class Member H reported to staff that he was taking psychiatric medications when he arrived at DVI on March 4, 2007, he was not seen for an initial assessment by psychiatric staff or referred for an urgent medication evaluation by a psychiatrist as required by the *Coleman* Program Guide. *Id.* at 3, 5. He reportedly asked nurses and other staff members for his medications and told officers on several occasions that he needed to leave his cell. *Id.* at Suicide Report at 11.

107.    The CDCR Suicide Report for *Coleman* Class Member H identified four serious failures that may have played a role in *Coleman* Class Member H's suicide. First, the Suicide Report notes that CPR was not initiated at the scene when custody staff discovered the inmate hanging in his cell. *Id.* at Executive Summary of Suicide Report at 5. In the course of the investigation into the death, it was revealed the Chief Medical Officer at DVI, who has since been suspended, personally countermanded CDCR policy by directing that custody officers should not conduct CPR at the scene when discovering a suicidal inmate, but should instead bring the individual to the institution's infirmary. *Id.* In my view, this serious problem is probably not related to overcrowding.

108.    Second, when he arrived at DVI, *Coleman* Class Member H reported to staff that he was taking psychiatric medications. The jail transfer sheet failed to document his medications. However, DVI staff did not make any effort to verify his medication claim with the sending jail, and *Coleman* Class Member H was not seen within 24-hours by a psychiatrist for a medication review as required by the *Coleman* Program Guide. *Id.* at 5. Indeed, he was never seen by a psychiatrist during the four days he spent at DVI prior to his death. *Id.*

109.    In my view, this second problem is related to overcrowding. During the tour of DVI, this issue was discussed with the mental health leadership and the screening nurse in R&R, who all indicated that given the huge volume of new arrivals each day and the limited space for processing staff, <u>DVI still does not have the resources to follow up on undocumented medication claims by calling county jails.</u> This is a serious problem.

43

The period immediately after an inmate arrives at jail or prison is a high risk period for inmate suicides, and this risk is exacerbated when inmates have gaps in medication.

110.    A third problem documented in the Suicide Report and Corrective Action Plan for *Coleman* Class Member H is that *Coleman* Class Member H's mental health screening by a DVI psychologist was conducted at cell-front in the presence of *Coleman* Class Member H's cell-mate. The Suicide Report notes: "The cellmate may have been pressuring *Coleman* Class Member H, and may have influenced his responses. Furthermore, it is extremely difficult to observe an inmate while talking through the side of a solid door. This does not allow for an adequate clinical assessment." *Id.* at Suicide Report at 12. The author of the suicide report attempted to find out why these screenings were not taking place in a confidential setting, and received two possible explanations. The first explanation was that "custody staff was not cooperative with facilitating out of cell interviews for protective custody inmates due to the presence of non-protective housing inmates in that area at times." *Id.* at 5-6. In my experience, this type of difficulty with housing multiple categories of prisoners with special needs in a single housing unit is more common in overcrowded systems. The second explanation for the failure to conduct out of cell screenings in the Suicide Report is that "[a]fter further inquiry, at the direction of the Chief Deputy, it became apparent that the mental health clinicians were not asking for inmates to be removed from their cells for interviews, in the interest of getting them done the day after their arrival to the institution (a local policy)." *Id.* at 6.

111.    In my opinion, this third problem is also overcrowding-related. DVI is a busy, chaotic reception center that must manage a number of different populations, including a large protective custody population, a large mental health caseload, a significant population of disabled inmates, and a significant population of inmates with severe medical conditions. During the tour of DVI, staff reported that they often screen 100 new inmate arrivals five days a week. As the Receiver found in his report, this

44

churning of the reception center population due to overcrowding creates severe pressures on DVI's staff to cut corners in order to process all of the inmates in a timely manner. It appears that confidential out-of-cell mental health screenings have been sacrificed at DVI under the pressures of overpopulation.

112.     The suicide report includes a fourth problem which does not appear to be overcrowding-related.

### (ii)     California State Prison - Solano Tour

#### Solano Tour Overview

113.     I toured California State Prison Solano ("Solano") on Wednesday October 31, 2007. According to the most recent CDCR population report dated October 24, 2007, as of midnight on October 24, 2007, Solano had a population of 6,051 and a design capacity of 2,610, for a population at 231.8 percent of capacity. Joint Pls' Trial Ex. 24 (CDCR Weekly Population Report, October 24, 2007).

#### Overcrowding in the H-Dorm at Solano

114.     The overcrowding in H-Dorm at Solano (on the Level III yard) was severe and extremely disturbing. The dorm is a converted gym that Solano has filled with triple bunks due to the burgeoning population. While I was there, the dorm (and the rest of the prison) was on lockdown status, meaning that the majority of the inmates were physically in the dorm during my visit. It was noisy and chaotic, with multiple televisions playing at a high volume. Staff informed us that the dorm has a capacity of 226 inmates; there were 220 housed there during my tour.

115.     The H-Dorm at Solano has been a source of great anxiety and stress for *Coleman* class members housed there. One CCCMS inmate who I interviewed during the tour (*Coleman* Class Member I) told me that he came "unwound" in the H-Dorm. He said he could not sleep, in part because of the dense population and in part because of the "constant, roaring engine of noise." His sleep deprivation became so severe that he

45

began to hear voices in the fans. Another class member, *Coleman* Class Member J, did
not become a *Coleman* class member until he was housed in the H-Dorm. *Coleman* Class
Member J also described severe sleep deprivation, which then caused him to become
depressed and paranoid. He described the desperation he felt living in a very
overcrowded dorm with no hope of moving out. Mental health staff recorded *Coleman*
Class Member J's problems as "adjustment disorder" secondary to his housing unit. The
housing conditions in places like the H-Dorm, where there is constant activity, sensory
overload, extreme sleep deprivation and loss of control, have been shown to cause or
exacerbate mental illness. "Intensive Care Unit" (ICU) psychosis, a well-established
clinical condition, for instance, is also caused by these conditions. As *Coleman* Class
Member I and *Coleman* Class Member J demonstrate, people become extremely agitated,
depressed, psychotic and potentially violent when living in these conditions.

Staph Infections:

116.    I interviewed eight *Coleman* class members during my tour of Solano. Of
the eight class members, two (*Coleman* Class Member K and *Coleman* Class Member L)
had serious staph infections that Solano was treating with heavy doses of antibiotics.
*Coleman* Class Member K, who was housed in the H-Dorm, told me that his staph
infection caused an abscess on his arm, which medical staff drained earlier in the day.
*Coleman* Class Member L was housed in Building 11. Another class member, *Coleman*
Class Member M, told me that his cellmate also had a staph infection. Staph infections
are a sign of poor hygiene, and they are a serious consequence of overcrowding that
could grow more serious over time if these dorms and cells continue to be crowded with
ill patients in the current manner. They can also become a threat to public health more
generally, as antibiotics used to control these infections select for more treatment-
resistant strains of the staph bacteria.

46

The High Level of Acuity of Mentally Ill Patients at
Solano:

117.    As in my tour at DVI, I was also surprised by the high level of acuity of
many of the EOP and CCCMS inmate-patients I met at Solano. I encountered several
CCCMS class members during the tour and in post-tour interviews that appeared to need
a higher level of care. For instance, *Coleman* Class Member L told me that although he
was currently CCCMS, he had previously been in the EOP program during a prior prison
term. Based on my familiarity with the MHSDS from my work at CMF and Pelican Bay
and my clinical experience, my opinion is that *Coleman* Class Member L requires an
EOP level of care. In systems that lack adequate higher acuity mental health beds, it is
not uncommon for patients to be kept at a lower level of care than their mental illness
truly warrants.

Solano's Significant Mental Health Population, Including
in Administrative Segregation:

118.    The Special Master was concerned about Solano's significant mental
health population during the 18th round of monitoring, noting that, "[t]he size of the
mental health caseload, 1,555, exceeded its capacity of 1,199 by 30 percent," and
recording that 111 out of 378 inmates in administrative segregation were on the mental
health caseload. Joint Pls' Trial Ex. 36 (18th Monitoring Report of the Special Master) at
76. The day that I visited Solano, the population was very similar. Staff reported that
there were 1,517 CCCMS and 10 EOP class members. They also reported that 105 of the
328 inmates housed in administrative segregation were on the mental health caseload (2
EOPs and 103 CCCMS). This means that while *Coleman* class members constitute
approximately 20% of the total CDCR population, they represent 32% of the population
in administrative segregation at Solano.

119.    In my opinion, housing inmates with serious mental health issues in
administrative segregation units is a very dangerous practice given the lack of stimulation

47

in those units and the nearly constant seclusion in cells. This is particularly true in light of the Special Master's observation in his 18th monitoring report that, "[i]n [Solano's] administrative segregation, mental health treatment and mandated outdoor recreation were stymied by inadequate space." Joint Pls' Trial Ex. 36 (18th Monitoring Report of the Special Master) at 85. During my tour of Building 10, which is an administrative segregation unit, I observed a psychiatric technician administering the 31-question mental health survey for new intakes into the unit. Although the Program Guide requires that these types of interviews occur in a confidential setting, the psychiatric technician was asking the questions at cell-front. *See* Joint Pls' Trial Ex. 9 (Program Guide) at 12-7-12 ("Interviews of inmates will be held in a private setting unless the security of the institution or the safety of staff will be compromised. Screening and evaluation interviews and treatment activities are accomplished in existing interview rooms and exercise areas within current ASU units."). In my opinion, this is a dangerous practice that relates to overcrowding; staff members do not have the office and treatment space that they need to administer clinically appropriate evaluations in a confidential setting (or there are insufficient custody staff to escort the patients to an appropriate setting).

### Medication Problems:

120.    I also observed several problems with the medication administration process at Solano. This is consistent with the Special Master's observations during the 18th round of monitoring: "During the monitoring period, medication management [at Solano] remained a collection of haphazard practices without oversight or standardized practices and procedures" and "non-compliance with medication did not reliably trigger referrals to prescribers." Joint Pls' Trial Ex. 36 (18th Monitoring Report of the Special Master) at 79. These problems were also apparent to me during my tour. In light of the infrequent appointments with psychiatrists and the very brief interactions between patients and staff in the pill lines, Solano cannot adequately monitor the efficacy of

medications, medication side effects, or patient compliance with medications as effectively as necessary. I discussed medication distribution with several staff members, including Dr. Kumar, the Chief Psychiatrist, Ms. Bibby, a Psychiatric Technician in the administrative segregation unit, Dr. Naku, the Pharmacist in Charge (PIC), Joel Williams, a supervising Registered Nurse and several class members. Mr. Williams explained that medical staff members at the pill windows are not in a position to monitor medications since they do not have patient records with them when they distribute the medications. He also explained that staff is supposed to report patient non-compliance only when a patient misses his medications for three days in a row. Even when medical staff does report non-compliance, however, Nurse Williams explained that the information only flows one way—the pill line staff never knows if anything is done in response to their reports.

121.    In addition, several class members I spoke with raised medication concerns that I found quite disturbing. An EOP class member housed in administrative segregation, for instance, told me that he is currently taking Zyprexa. When I asked him whether medical staff took his blood when he was first prescribed Zyprexa, he said that he did not think they had. He also could not remember any medical staff drawing his blood anytime since that initial prescription. Atypical antipsychotics such as Zyprexa carry with them certain metabolic risks that can only be addressed by regular monitoring of certain blood parameters. These metabolic risks include Type II diabetes, as well as significantly elevated cholesterol and triglyceride levels. Several other class members also confirmed problems with medications as noted by the Special Master. They complained, for instance, that the pill lines were very long and that they sometimes had to choose between taking their medications or going to the chow hall before it closed. If they chose to go to the chow hall, they were not allowed to go back to the pill line later and therefore were forced to skip doses. Other class members were taking medications too early in the day. *Coleman* Class Member N is currently taking 30 mg. of Remeron,

49

which he receives at 4:30 or 5:00 p.m. This is a very high dose of Remeron to be taking
so early in the day, which results in his becoming extremely sedated for several hours in
the late afternoon and evening, thus further disrupting his sleep/wake cycle. Still other
class members reported that their prescriptions sometimes lapsed, including *Coleman*
Class Member O and *Coleman* Class Member K. *Coleman* Class Member O is currently
taking Prozac (60 mg.), Remeron (15 mg.) and Risperdal (2 mg. twice per day). *Coleman*
Class Member O's medical file reflected that he was initially prescribed his medications
on July 6, 2007. When they expired on October 6, 2007, however, the clinicians at the
medication window renewed them without a doctor's order (*Coleman* Class Member O
did not see a doctor until 10/25/07). This is a very dangerous and illegal practice because
it precludes the patient from having adequate assessment of the efficacy and safety of his
medication. *Coleman* Class Member K, who has been prescribed Lexapro for Post
Traumatic Stress Disorder, did not receive his medications for several days when he was
transferred to administrative segregation.

     122.   In my opinion, the medication problems at Solano are clear symptoms of
overcrowding and understaffing. Effective mental health care depends on regular
monitoring of medications for their efficacy, the presence of side effects, and patients'
compliance. In order to do this, doctors and medication dispensers must have
manageable caseloads. Due to overcrowding and understaffing, Solano staff is not able
to administer and monitor medications in an effective way. This problem is clearly
documented in the Special Master's reports and was also apparent to me during the tour.
The Special Master wrote in his 18th Report: "[n]early six months after the mental health
caseload reached 1,550, 30 percent over its cap, access to treatment and the quality of
mental health treatment were inadequate. Caseloads typically numbered 140 to 160."
Joint Pls' Trial Ex. 36 at 83. Long pill lines, infrequent clinician contacts, and lapsed
prescriptions are dangerous conditions that seriously undermine both mental health and
medical care.

50

(iii)    **Salinas Valley State Prison (SVSP) Tour**

SVSP Tour Overview:

123.    I toured Salinas Valley State Prison (SVSP) on November 1, 2007. SVSP is a Level IV high security institution located south of the city of Salinas in the Salinas Valley. According to the most recent CDCR population report dated October 29, 2007, as of midnight on October 24, 2007, SVSP had a population of 4,112 and a design capacity of 2,372, for a population at 173.4 percent of capacity. Joint Pls' Trial Ex. 24 (CDCR Weekly Population Report, October 24, 2007) at 2. Thus, in many respects, SVSP is less overcrowded than DVI, which is at 236.9 percent of design capacity according to the same report, and Solano, which is listed at 231.8 percent of design capacity. *Id.*.

124.    Nevertheless, there were significant overcrowding-related problems present in our tour of SVSP. During an initial meeting with the SVSP Warden and SVSP's clinical leadership for medical and mental health at the beginning of the tour, staff reported a number of relevant facts. Staff indicated that roughly 38 percent of the population at SVSP is mentally ill. Staff also indicated that 80 percent of the cases of suicidal ideation admitted to "holding cells" at SVSP do not result in an admission to the MHCB unit.

Clinical and Custody Staff Vacancies Are Impacting Clinical Care at SVSP

125.    There was also significant information reported concerning staffing levels. During the morning meeting, Department of Mental Health (DMH) staff members present, including Victor Brewer, the director of the Salinas Valley Psychiatric Program, an inpatient treatment program at SVSP run by DMH, stated that DMH is still having staffing problems in some categories due to salary competition from the CDCR. SVSP staff reported that in the medical staff area, roughly 50 percent of the medical providers are full-time staff and the other 50 percent are contract employees. In the mental health

51

department, Dr. Kalie, the Chief Psychologist, reported that 14.5 of 29 psychologist positions are vacant and that there are no registry employees available to cover the vacancies.

126.    The Warden reported that although custody staffing levels have improved lately, at one point in the last year, SVSP was 200 custody officers short out of 840 total positions. The Warden reported a current custody staff vacancy rate of 97 out of 795 positions, or 12.5 percent. He also indicated that the biggest area where SVSP has problems recruiting custody staff is in recruiting and retaining Sergeants. He stated that SVSP currently has a vacancy rate for Sergeants of 27 percent. Clinical staff answered "yes" during the morning meeting when I asked if the high vacancy rate among custody staff has a negative impact on medical and mental health care.

### Impact of Use of Contract or Registry Staff on Quality of Care at SVSP

127.    Dr. Lee, the Chief Medical Officer and Health Care Manager at SVSP, acknowledged during the opening meeting that there are serious drawbacks associated with the use of contract and registry staff at SVSP. He indicated that reliance on such staff was not ideal because (a) such staff members come and go frequently, causing continuity problems, (b) such staff members do not have the same commitment to care as full-time correctional staff, and (c) such staff members have to be trained over and over again, draining the amount of time available for health care managers to take care of other business. He also indicated that he believes that the use of contractors "has had an impact on the delivery of care."

Fragmented Care at SVSP Due to Over-Reliance on
Contract Case Managers:

128.     I was able to personally discuss the impact of over-reliance on contract

clinicians with some of the inmates I interviewed while at SVSP. Several inmates I

spoke with during the tour complained about speaking with a different psychiatrist every

time they had an appointment with their psychiatrist. These inmates also complained

about the resulting frequent medication changes when they changed clinicians.

Impact of Excessive Lockdowns at SVSP:

129.     During the morning meeting, staff acknowledged that there have been

numerous and frequent lockdowns at SVSP during recent years. They indicated that at

the present time, all four Facilities at SVSP are locked down. During the tour, I was able

to observe the impact of excessive lock-downs in two areas, CCCMS treatment programs

on C-Facility, and EOP treatment programs on D-Facility.

CCCMS Care on C-Facility:

130.     During the morning meeting, staff reported that C-Facility, a Level IV

CCCMS yard, has been locked down almost continuously for the last two years. When I

visited C-Facility, I spoke with Dr. Williams, who indicated that there are three groups

for CCCMS inmates on C-Facility. I also personally reviewed the waiting list for these

groups. Each of the three groups had a long waiting list: The waiting list for the life

prisoner process group was 46 inmates, with the longest wait person on the waiting list

since 2/10/06; the waiting list for the anger management group was 27 inmates, with the

longest wait person on the waiting list since 9/11/06; and the waiting list for the coping

skills group was 33 inmates, with the longest wait person on the waiting list since

7/10/06.

131.     These delays are not surprising given the near constant lock-downs on the

yard. Dr. Williams stated that a typical 8-meeting group held on the yard would

53

generally take 10 months to a year to complete due to the frequent lockdowns. She also said that in some years the mental health staff only completes two or three groups in the entire year. In my opinion, disrupting group therapy for this long a time period would make the group ineffective. This is because there is a complete lack of continuity between the sessions and the group basically has to restart every time it meets.

132.    Dr. Williams also stated that in her estimation roughly five of every seven inmates she treats are in the CCCMS treatment program on the basis of "medical necessity." Under the Program Guide, "medical necessity" is a treatment category for inmates who do not have a qualifying serious mental illness, but who require treatment for short term mental health episodes involving less severe mental illness. *See* Joint Pls' Trial Ex. 9 (September 2006 Program Guide) at 12-3-5. In my opinion, this is an extraordinarily high percentage of cases to be medical necessity, and it either reflects under-diagnosis and treatment, or else a high level of acuity on the part of inmates who would not normally qualify for the MHSDS. Either explanation is bothersome and is likely a reflection of the impact of overcrowding on mental health care.

133.    Dr. Williams also provided me with a print-out listing the diagnosis and medications for these CCCMS inmates on her caseload. *See Coleman* Pls' Trial Ex. 32 (SVSP Current Mental Health Listing-Case Manager, from SVSP tour of C-Facility). A review of these CCCMS medical necessity patients revealed that they were being treated with multiple psychotropic medications including anti-psychotics and anti-depressants. Of note, their stated diagnoses did not "match" the severity of the psychotropic medications being given. When I mentioned this issue to Dr. Gregory, a new psychiatrist working on C-Facility, she expressed the same concerns about incorrect diagnoses, as well as about medication mismanagement issues among the patients she was seeing.