# EXHIBIT U
# PART 4

Suicide of SVSP CCCMS *Coleman* Class Member P Who
Was Classified As a Medical Necessity Case:

134.     In the preparation of this report, I reviewed an internal CDCR Suicide

Report and Corrective Action Plan, concerning the suicide of *Coleman* Class Member P

at SVSP on November 5, 2006. *Coleman* Pls' Trial Ex. 24 (2/20/07 Suicide Report and

Corrective Action Plan for Suicide of *Coleman* Class Member P). *Coleman* Class

Member P had an extensive history of mental health treatment while in prison. *Id.* at

Suicide Report at 2-7. According to the Suicide Report, *Coleman* Class Member P had at

various points been on a *Keyhea* order for involuntary medication, and had been treated

in the Psychiatric Services Unit at CSP-Sacramento for nearly two years between June

2001 and April 2003. *Id.* During this period, he had six crisis bed admissions for

suicidal ideation and was admitted on two occasions to the acute inpatient psychiatric

program operated by the state Department of Mental Health at the California Medical

Facility in Vacaville. *Id.* He arrived at SVSP in 2005 and was placed in the EOP

program there. *Id.* He appears to have been discharged from the EOP program at SVSP

because of his refusal to participate in treatment activities. *Id.* In May of 2005, his

diagnosis was changed from an Axis I diagnosis to a diagnosis of "predominant Axis II

characterological symptoms" and he was discharged to CCCMS and appears to have been

continued on the CCCMS caseload as a medical necessity case. *Id; see also* Joint Pls'

Trial Ex. 9 (September 2006 Program Guide) at 12-3-5 (CCCMS medical necessity

standard). After he was made CCCMS, he continued to refuse treatment, although a

clinician interviewed him on August 30, 2005 and concluded that he was exhibiting some

psychotic processes. *Id.* He was referred to a psychiatrist medication line several times

for possible initiation of antipsychotic medications, "but was never seen due to the

shortage of psychiatrists, and no antipsychotic medications were prescribed for the

inmate." *Id.* at 5. *Coleman* Class Member P finally saw a psychiatrist in late March of

2006 and he was prescribed an anti-anxiety medication. *Id.* at 6. In June of 2006, he was

continued in the CCCMS program on the basis of "medical necessity." *Id.* He repeatedly asked for Seroquel but was not given the medication. *Id.*

135.    In my opinion, *Coleman* Class Member P appears to have been extremely mentally ill for someone in the CCCMS program based on medical necessity receiving treatment, and there appear to have been severe problems with access to psychiatrists and appropriate medication in his case. In May and June of 2006, he was treated at the CCCMS level of care while in the CCCMS administrative segregation program. *Id.* at 6. He was continued on CCCMS status through October of 2006. *Id.* at 7. On October 11, 2006, he apparently requested that he be removed from the caseload; and he was removed from the CCCMS program in a treatment team meeting on October 18, 2006. *Id.* On October 17, 2006, however, *Coleman* Class Member P was prescribed Effexor, a drug commonly used to treat depression and anxiety, although it is unclear whether he ever received this medication and it appears that the medication order may have been cancelled when he was removed from the caseload on October 18, 2006. *Id.* Inmates on psychotropic medications cannot be removed from the caseload pursuant to the Program Guide. *See* Joint Pls' Trial Ex. 9 (September 2006 Program Guide) at 12-3-13 (standards for removal from CCCMS caseload requires inmates not be on psychiatric medication). Nevertheless, he was removed from CCCMS care and placed in the stand-alone administrative segregation unit at SVSP on October 26, 2006. *Coleman* Pls' Trial Exhibit 24 (Suicide Report of *Coleman* Class Member P) at Executive Summary at 5. A court order in the *Coleman* case forbids the housing of caseload inmates in the stand-alone administrative segregation units used in the CDCR because of the harsh conditions there. *See* 10/10/02 Order.

136.    In my opinion, this suicide reflects serious problems with the adequacy of diagnosis and treatment of chronically mentally ill inmates with serious mental health histories at SVSP. The case also reflects the serious consequences of some of the medication delivery problems I witnessed at SVSP, and the serious consequences of the

over-use of medical necessity diagnoses. If *Coleman* Class Member P had been maintained in the CCCMS program, he would have been seen more frequently and could not have been placed in the stand-alone administrative segregation unit. Other overcrowding-related problems that have played a role in this suicide include the severe shortage of psychiatrists at SVSP, the medication distribution problems at SVSP, and improper removals of patients from the MHSDS program.

### Interviews with C-Facility CCCMS patients:

137. I also interviewed and reviewed the medical records of several inmates on C-yard, the unit that staff stated had been on nearly continuous lockdown for the last two and a half years. The first two inmates I randomly selected appeared to be cases where inmates who might not normally be mentally ill were being treated as if they had serious mental illnesses. These cases reflect the impact of prolonged lockdowns on individuals whose mental illness would otherwise not require formal intervention. The third inmate I selected randomly off of Dr. Williams' caseload on C-Yard and interviewed was *Coleman* Class Member Q. *Coleman* Class Member Q's medical record reflects a diagnosis of "Schizoaffective Disorder." *Coleman* Class Member Q complained to me that his medications are changed every time he sees his psychiatrist. He also stated that he is very stressed out due to the fact that he never gets out of his cell due to a pending appeal. He indicated that he hears voices and that when he is not on his medications he can become violent, depressed and suicidal. He said that he is trying to hold it together, is having difficulty sleeping, and indicated that he feels like he might "fall out." In my view, *Coleman* Class Member Q is severely mentally ill and needs at least an EOP level of care. I believe he would have been classified as EOP when I worked as an expert at CMF and Pelican Bay in the late 1990s.

<u>EOP Care on D-Facility:</u>

138.    During the morning meeting at the outset of my tour of SVSP, clinical staff members stated that they believe the frequent lockdowns have the biggest impact on EOP programs on D-Facility, because a number of the groups offered to EOP inmates on D-yard take place across the yard, and when the yard is closed, inmates cannot access these treatment spaces.  I interviewed four inmates in the D-3 EOP program during my tour.  All four inmates indicated that D-Facility has been frequently locked down in recent months.  Based on these interviews, it appears that helpful groups are provided to these inmates when the yard is not locked down.  However, when the yard is locked down, these inmates all appear to struggle with the stress of confinement to their cells for extended periods of time and experience mental health difficulties.

<u>Access to ICF care at the SVSP DMH programs:</u>

139.    DMH staff reported during the morning meeting on the tour that the waiting list for access to DMH inpatient care programs at SVSP is currently 111 cases.  Staff reported that after the new DMH intermediate inpatient care programs opened last year in D-5 and D-6 at Salinas Valley and in P-2 and P-3 at CMF, the waiting list for SVPP intermediate inpatient care program dropped from about 120 down to 80.  However, now the waiting list has gone back up to over 110 inmates.

<u>Problems With Access to MHCB Care and Other Higher<br>Levels of Care at SVSP:</u>

140.    I observed serious problems with crisis care for suicidal inmates while touring SVSP.  It is clear that SVSP has a severe shortage of MHCB beds for its patients and that SVSP routinely employs a variety of make-shift "overflow" housing environments for such inmates.  Dr. Chase, the CTC psychologist in charge of the MHCB unit, stated that the MHCB beds are always full.  She indicated that inmates frequently stay in the MHCB unit for longer than the ten-day maximum mandated in the

58

*Coleman* Program Guide, especially if they are waiting for a placement in DMH. Joint

Pls' Trial Ex. 9 (September 2006 Program Guide) at 12-5-1 (mandating maximum

MHCB length of stay of 10 days). She also indicated that DMH can refuse referrals and

sometimes does refuse referrals. She stated that generally the census is 5-8 MHCB

patients and that in her experience working in the unit since May of 2007, up to 3 of the 8

MHCB beds are sometimes used by medical patients. She indicated that the unit refers

cases to an outside MHCB unit at least once a week.

      141.    Dr. Chase also indicated that the institution uses a variety of overflow

holding cells due to the MHCB shortage. She indicated that three "dry cells," which are

tiny freestanding upright cages with mesh wiring surrounding them (and no toilet) are

routinely used during the day to house suicidal inmates. I observed these small holding

cages on the tour of SVSP and they are extremely confined and are clinically

inappropriate locations to assess suicidality and to have confidential psychiatric

interviews with suicidal inmates. At night, these inmates are transferred into one of four

holding cells outside the entrance to the CTC which are known as "wet cells" because

they have toilets. SVSP also routinely uses "BPT cells" located on each yard for

overflow suicide watch. This report was consistent with the findings of the Special

Master in the most recent progress report. *See* Joint Pls' Trial Ex. 36 (18th Monitoring

Report of the Special Master) at 153 (noting that holding cells "were in use daily and

frequently housed inmates overnight. The holding cells in daily use were stand-up mesh

cells. Holding cells used overnight were large group waiting rooms that had plumbing

and that could be furnished with mattresses. . . . Standard CTC procedures resulted in

heavy use of both types of cells and many overnight stays in large holding cells."). The

MHSDS system never intended to permit the use of holding cells, particularly one where

a patient is required to sit in a wire mesh holding cell without access to minimum health

and safety standards. The use of these non-authorized, unlicensed "treatment settings"

results in an exacerbation of the underlying mental illness which led to the mental health crisis.

142.    While in the MHCB unit, I spoke with *Coleman* Class Member R, a seriously mentally ill patient who has been waiting for referral to the Department of Mental Health acute inpatient program since August 30, 2007. The Program Guide standard for transfer of an inmate to the acute DMH program at CMF is within 10 days of referral. *See* Joint Pls' Trial Ex. 9 (September 2006 Program Guide) at 12-1-13. Staff on the unit explained that *Coleman* Class Member R has chronic self-injurious behavior. He had been in a small safety cell near the front of the CTC unit since October 7, 2007, more than three weeks at the time of my November 1, 2007 tour, because he is too psychotic and paranoid to return to his cell – he believes that CDCR staff makes the floor vibrate in his MHCB cell and so he refuses to return to it. *Coleman* Class Member R is taking Depakote and Thorazine. He is alternately diagnosed as having Bipolar and Schizoaffective Disorders. His transfer has been delayed in part because he has 500 custody points, and must undergo a special review process before being sent to the acute DMH program at CMF. In my opinion, it is clinically inappropriate to keep this actively psychotic, paranoid inmate in a safety cell for such a long period of time. It is also inappropriate for him to remain in the MHCB unit for several months. He requires an expedited transfer to a higher level of care in DMH.

143.    The difficulty of accessing higher levels of care was evident from my conversation with Dr. Chase, who stated that at one point during the summer the MHCB unit had a very sick homicidal inmate waiting for more than 100 days for a transfer to a higher level of care. She also expressed that in her opinion the general acuity level of her MHCB patients is extremely high, in part because of the difficulty of transferring cases to DMH care.

Deficient Medication Distribution Practices at SVSP

144.    During my tour of SVSP, I spoke with staff members in various areas of the institution about medication management practices. The most significant interviews I conducted on this topic were with two psychiatric technicians on C-Facility who distribute medications. According to these individuals, because of the high security level on the yard, medication delivery is always done at cell-front through the open food port. These individuals stated that their interaction with each inmate includes giving the inmate the pill, doing a mouth check through the cell door, and moving on. In my opinion, this is, a seriously deficient medication distribution practice, because the individuals dispensing the medication are not taking the time to speak with patients about possible side effects they are having, and about whether or not their medication is working. Also, it is difficult to observe inmates taking their medications through food ports in cell doors. In a fully functional medication distribution system, these staff members would provide feedback to treating psychiatrists about medication compliance, whether the medications were having the desired clinical effect and about whether inmates are experiencing side effects. This kind of feedback is critical to basic psychiatric care.

145.    I encountered one medication problem that better medication practices at SVSP should have caught when interviewing inmates in the D-3 EOP program. At the end of the SVSP tour I interviewed inmate *Coleman* Class Member S. *Coleman* Class Member S recently had his dosage of his medications raised by his psychiatrist. During his interview, *Coleman* Class Member S told me that he thinks his medications are making him worse, and resulting in severe daytime sedation, and that he is experiencing other side effects. He went on to state that he was required to wait for his next regularly scheduled psychiatrist appointment to address the issues. An effective medication delivery system would provide timely information to clinicians about these kinds of side effects and would result in improved medication compliance at SVSP.

146.    In his most recent 18th Monitoring Report, Special Master Keating noted that SVSP has significant medication management issues. *See* Joint Pls' Trial Ex. 36 (18th Monitoring Report of the Special Master) at 148 (noting that "SVSP did not appear to have a functioning mechanism to manage medication . . . Medication continuity remained problematic when inmates were relocated between yards, were released from the MHCB, or arrived from other prisons."). In my experience, these medication management problems are closely associated with both staffing shortages and an oversubscribed system.

### Impact of Gym Housing on SVSP CCCMS Inmate:

147.    During my SVSP tour, I was told that although the institution had all four gyms filled and triple-bunked a month before my visit, these housing units had been emptied in the month before the tour. At the time of my tour, the only remaining gym in operation was on A-yard, and that gym was in the process of being emptied out. During the tour, I visited the A-gym and spoke to inmates about conditions there. Although it was no longer crowded, several inmates said living in the gym had been extremely stressful when the gym was full. I spoke with one inmate, *Coleman* Class Member T, who is CCCMS. He stated that he takes anti-psychotics and an anti-depressant and that he has found it extremely stressful to be housed in the gym. He stated that he was very stressed out and felt that he could "lose it" at any time. In my opinion, the stress of being housed in a gym is clinically harmful to this CCCMS inmate.

### Interviews with CCCMS Inmates at SVSP:

148.    I also interviewed two CCCMS inmates on A-Yard at SVSP.

### (1)    Interview with SVSP *Coleman* Class Member U:

149.    *Coleman* Class Member U is a CCCMS inmate serving a term of life without the possibility of parole living in A-yard protective custody housing. He was

recently taken off Wellbutrin and stated that he is becoming more depressed. He stays in his cell 24 hours a day, seven days a week, but comes out of his cell to take care of his hygiene and to eat. He was concerned about the loss of his television after being written up for refusing to work. He was very depressed, agitated, and stated that he sometimes has thoughts of suicide. In my clinical opinion, he is very depressed and needs more intensive treatment than the CCCMS system provides, including medication for his depression.

(2)     Interview with SVSP *Coleman* Class Member V:

150.     *Coleman* Class Member V is a CCMCS inmate who is refusing medications. He has a history of EOP treatment. He indicated that he used to take Wellbutrin, Neurontin, Paxil and Seroquel. He told me that he is able to communicate telepathically with his fiancé, who is out on the street. He appears to be very mentally ill. He may be appropriate for CCCMS treatment, but he needs to be watched closely for signs of decompensation, and he should be encouraged to take medication.

151.     In conclusion, my impression of the level of clinical acuity of the majority of the inmates I encountered at SVSP was that they exceeded the stated treatment criteria for the current MHSDS treatment program to which they were assigned. *See* Joint Pls' Trial Ex. 9 (September 2006 Program Guide). In addition, they were not receiving appropriate psychiatric care.

(c)     **Evidence of Overcrowding's System-Wide Impact in Various Areas of Prison Administration and in the Delivery of Health Care**

152.     There is substantial evidence in the *Coleman* Special Master's 18th Monitoring Report and in other sources of evidence I reviewed in connection with my preparation of this opinion that the overcrowding-induced problems I personally observed at DVI, Solano and SVSP are also affecting the delivery of mental health care at prisons system-wide. *See* Joint Pls' Trial Ex. 36 (18th Progress Report) and discussion of same

herein, *infra*. These system-wide problems affect almost every one of the critical components of a constitutionally-adequate mental health care system that were identified by the *Coleman* court in its July 23, 2007 Order. *See* 7/23/07 Order at 4 (describing the key elements of a constitutional mental health system as identified in the *Coleman* Court's decision on the merits of this case in 1995 in *Coleman v. Wilson*, 912 F. Supp 1282, 1305 (E.D. Cal. 1995)). In addition, there is ample evidence of another overcrowding-related problem that causes constitutional violations – overcrowded administrative segregation units that are unsafe for mentally ill inmates.

        (1)    Timely Access to Appropriate Levels of Mental
Health Care -- Access to Programs/Sufficient Beds.

     153.    Overcrowding is interfering with the ability of the CDCR to meet Court-mandated timelines for transfers to treatment programs at every different level of care in its mental health system. On March 3, 2006, the *Coleman* court ordered defendants to immediately implement the Revised Program Guide ("Program Guide"), which provides the protocols for the provision of mental health care in the CDCR. *See* 3/3/06 Order. I have reviewed the standards in the Program Guide relevant to this declaration. *See* Joint Pls' Trial Ex. 9 (September 2006 Program Guide). One of the key elements of the Program Guide is the transfer timeline chart that sets forth the required timeframes for transferring inmates to various levels of care. Joint Pls' Trial Ex. 9 (September 2006 Program Guide) at 12-1-13. The ability of a system to meet these timeframes is indispensable to the provision of adequate mental health care. In relevant part, these timeframes are set forth below:

     Reception Centers: EOP transfers should occur within 60 days, or 30 days if clinically indicated. CCCMS transfers should occur within 90 days, or 60 days if clinically indicated.

     MHCB: MCHB transfers should occur within 24 hours of referral.

DMH: Transfers to DMH acute placements should occur within 10 days of referral, if accepted to DMH. Referral must be completed within 2 working days of identification. Transfers to DMH intermediate care placements should occur within 30 days of referral, if accepted to DMH. Referral must be completed within 5-10 working days.

EOP: Transfers to general population ("GP") EOP programs should occur within 60 days, or 30 days if clinically indicated.

EOP Administrative Segregation Unit ("ASU") Hub: EOP inmates housed in the regular ASU should transfer to an EOP ASU Hub within 30 days of placement in the regular ASU or within 30 days of referral to EOP level of care.

PSU: EOP inmates housed in the ASU who are endorsed for the PSU must be transferred within 60 days of endorsement.

154.    Defendants do not appear to be meeting any of these transfer timeframes. There are extensive findings of fact in the Special Master's 18th Report concerning the lack of appropriate and timely access for *Coleman* class-members to these levels of care, and concerning the role of overcrowding limiting such access. The problem is most severe at the highest levels of care. In the most recent report, the *Coleman* Special Master found that system-wide, "access was limited for Mental Health Crisis Beds, acute inpatient care beds at DMH facilities, and care in Psychiatric Services Units for segregated inmates in Enhanced Outpatient Programs. The concomitant over-use of Outpatient Housing Units continued. Access to DMH acute inpatient care reached its nadir at the end of the monitoring period when Atascadero State Hospital imposed significant restrictions on admission of CDCR inmates." *See* Joint Pls' Trial Ex. 36 (Special Master's 18th Monitoring Report) at 2-3.

155.    One critical element of this failure to refer is that over time, discouraged clinicians routinely fail to refer all appropriate cases to higher levels of care. This, in turn, means that the inmates waiting for transfer become more gravely ill. In my experience, problems with failure to make appropriate referrals to higher levels of care are common in overcrowded systems. The Special Master's 18th Report finds numerous

examples of this problem. *See, e.g., id.* at 138 (at Avenal State Prison the monitors' review "of records for inmates with multiple OHU and or MHCB admissions revealed little evidence of consideration by the IDTT or assigned clinician of the need for higher levels of care."); at 233 (at CIM 33 percent of MHCB admissions were inmates who had three or more MHCB admissions in the prior six months, and the monitor's review of some of these cases "revealed that consideration of the need to refer these inmates to higher levels of care or to expedite their transfers into EOP had not been documented."); at 256 (at RJD the "monitor's expert also found decompensating inmates in administrative segregation, indicating that still more needed to be done to promote and implement an appropriate threshold for referring inmates to higher levels of care."). The *Coleman* Court recognized this pattern in CDCR in its June 28, 2007 Order: "Indeed, from other sources the court has learned that at least some CDCR clinicians have stopped referring patients to DMH because of its refusal to accept referrals." 6/28/07 Order (Docket 2301) at 3, fn. 2.

156.    Thus, sometimes even a downward trend of referrals does not necessarily reflect decreasing demand for higher levels of care. The effect of decreased referrals is to skew the data provided as to waiting lists and numbers of beds needed, and, based on my experience and observations, the data currently provided by CDCR likely under-represents the need for higher levels of mental health treatment.

157.    The State admits that it does not have enough beds at nearly every level of care right now (Fiscal Year 2007/2008), including a current shortage of the following mental health beds: 52 male acute beds; 49 male Level IV intermediate care facility beds; 370 male EOP beds; 42 male EOP-ASU beds; 42 male PSU beds; 138 female EOP beds, and; 15 female EOP-ASU beds. *See Coleman* Pls' Trial Ex. 12 (9/24/07 Special Master's Report and Recommendations at Exhibit A -- Defendants' Supplemental Bed Plan) at 82.

158.    In addition, the *Coleman* Special Master recently reported in his Report and Recommendations on Defendants' August 2007 Supplemental Bed Plan that "[f]inding available beds in either of these programs [MHCB and inpatient DMH] remains a daily challenge that still exceeds CDCR's capability...." *Id.* at 3. In June 2007, the Court found that "Defendants are providing to class members only twenty-six percent of the beds at ASH called for by their plan. That is unacceptable." 6/28/07 Court Order at 3:4-5. The Special Master also concluded that recent events, including the population crisis, implementation of the *Plata* Receivership, and defendants' newest bed plan, "have caused widespread confusion and uncertainty, which now threaten to stall the allocation of construction and operational funding critically needed to meet the increasingly desperate need for acute and intermediate inpatient and mental health crisis beds in CDCR." *Coleman* Pls' Trial Ex. 5 (4/12/07 Special Master's Report on Defendants' Establishment of Interim Inpatient Beds) at 9-10. In May 2006, the court described the effect of the shortage of intermediate care facility beds and mental health crisis beds in the CDCR: "It is undisputed that the shortage is leaving critically mentally ill inmates languishing in horrific conditions without access to immediately necessary mental health care." 5/02/06 Order at 2:16-18.

159.    The documents that I reviewed indicate that the defendants do not anticipate being able to meet the need for mental health beds at every level of care until 2014, at best. The *Coleman* Special Master concluded in his Report filed September 24, 2007 that full implementation of defendants' latest proposed bed plan "will stretch out" to January 2014. *See Coleman* Pls' Trial Ex. 12 at 11. Moreover, the Special Master also noted that "objections to defendants' present and preceding bed plans on the part of plaintiffs, experts, special master and the Court all reflect a decade of accumulated experience and frustration that justifies fully concerns about CDCR's ability to generate and implement this latest plan effectively." *Id.* at 12. The Special Master further

suggests that actual implementation of defendants' bed plan may be unlikely to occur within a decade. *Id.* at 13.

160. While the Department is building its new facilities over the course of the next seven years, it presumably intends to continue to operate provisional units that do not meet full licensing standards for inpatient programs at Salinas Valley State Prison and the California Medical Facility. The D-5 and D-6 DMH intermediate inpatient treatment program units at SVPP and the P-2 and P-3 units at CMF are operating as interim intermediate care programs, and the court waived the licensing requirements so that they could meet the emergency overflow need for inpatient care beds. *See* 5/02/06 Order.

161. These units do not have the appropriate treatment space for mental health patients at this acuity, nor do they have the resources to provide yard and out-of-cell time in the appropriate manner. For example, in the SVPP D-5 and D-6 units, all mental health treatment occurs on the dayroom floor. On October 18, 2007, the court ordered defendants to develop and submit proposals for developing "adequate mental health treatment and counseling space" at these SVPP and CMF units. 10/18/07 Order at 6:7-8.

### Specific Areas Where Failure to Access Higher Levels of Care is Most Dangerous:

162. There are three main areas where overcrowding in the CDCR appears to be causing extremely serious problems with access to higher levels of care, and non-compliance with the transfer guidelines set forth above from the Program Guide – (1) crisis bed access, (2) access to DMH inpatient care, and (3) transfers out of the reception centers to higher levels of care, such as EOP programs.

### MHCB Access:

163. The 18th Monitoring Report of the Special Master documents severe, endemic problems with access to MHCB beds and with the use of inadequate alternative sites for housing suicidal inmates who need MHCB care but are unable to access it. *See*

*generally*, Joint Pls' Trial Ex. 36 (18th Monitoring Report of the Special Master). The Eighteenth Report confirmed what I saw at DVI, reporting that "DVI had difficulty transferring inmates to MHCB beds at other prisons." *Id.* at 98. At Mule Creek, the institution was forced to open a 5-bed overflow wing to its MHCB unit in its administrative segregation unit. *Id.* at 53. At San Quentin State Prison, the Special Master's monitors noted that "there were 78 to 101" mental health placements in its unlicensed OHU each month, some of whom were so severely mentally ill that waiting for placement in the DMH acute inpatient unit. *Id.* at 92. At Wasco State Prison, overflow cases from the MHCB unit were frequently housed in "[h]olding cells in the CTC, the B Facility chapel, or in administrative segregation..." *Id.* at 184. Although I did not see any specific cases of failure to refer to the MHCB unit during my tour of Solano, the 18th Report of the Special Master documents "[t]wo cases in which referrals to the MHCB unit should have been made but were not, indicated that more improvement was needed (see Exhibit E, Case Reviews 3, 11)." *Id.* at 82.

<u>Access to DMH Care:</u>

164.    The Eighteenth Report also documents the severe problems CDCR institutions are having with accessing DMH care at every level, noting that "approximately one third of DMH referrals did not result in transfers" and noting that poor access to DMH "was attributed principally to lack of bed availability." *Id.* at 321. After years of plans to address this lack of sufficient MHCB and DMH beds, defendants' latest August 2007 plan to address these bed shortages will not be completed until 2014 at the earliest. *See Coleman* Pls' Trial Ex. 12 (*Coleman* Special Master's Report and Recommendations on Defendants' August Bed Plan) at 11.

165.    In my opinion, capacity problems at the highest levels of care are typical of overcrowded systems. The effects of overcrowding include both creating new mental health needs and exacerbating existing mental health needs. As a result, overcrowding

creates additional demands at every level of care, with the most significant capacity problems at the highest level of care.

### Movement of EOP and CCCMS Inmates Out of Reception Centers:

166.    This is an area where I witnessed first hand the impact of delays in reception center treatment programs when I toured DVI. My clinical impression of the inmates I encountered at DVI in the administrative segregation program and in the EOP and CCCMS program is that they exceed the stated treatment for the MHSDS programs to which they were assigned. *See* Joint Pls' Trial Ex. 9 (Program Guide). This impression was confirmed by the clinical leadership at DVI, who candidly stated that they are routinely treating inmates in their EOP program that should be treated at a higher level of care that is not accessible to them because of bed shortages. The Special Master also highlighted the severity of this problem in the recommendations section at the end of the 18th Monitoring report, his most recent:

> Over time, insufficient mental health staffing has exacted a particularly high toll on the care of the growing EOP population entering CDCR institutions. It has led to ever longer waiting periods for EOP inmates in reception. Inmates languished there without care, leading to an increase in cases of decompensation.

Joint Pls' Trial Ex. 36 (18th Monitoring Report of the Special Master) at 330. The Special Master goes on to explain that, despite the May 1, 2006 Court Order requiring limited treatment for EOP inmates in reception centers, "EOP inmates continued to wait for transfers in reception center for excessively longer periods of time." *Id.* at 331. Mr. Keating also noted the need for "vigilance" in monitoring the adequacy of care during these long waits. *Id.* There are numerous system-wide examples of this failure to refer inmates in a timely fashion out of reception centers in the Special Master's Eighteenth Monitoring Report. *Id.* In my opinion, this type of back-up in the reception center caseload is typical of overcrowded systems.

70

167.    The reception center EOP program appears to be a "stopgap" response to the overwhelming population pressures in CDCR.  The guideline for the RC EOP Program approved by the Court is not equal to the care mandated by the Program Guide for EOP patients. *Compare* Joint Pls' Trial Ex. 9 (Program Guide, Chapter 4 at 12-4-8, setting forth standard of 10 hours per week), *with Coleman* Pls' Trial Ex. 9 (Special Master's 7/2/07 Report on Reception Center EOP Programs, discussing lower standard of care). Yet, in July 2007, the *Coleman* Special Master reported to the Court that this is the care that will be provided to a significant number of inmates requiring an EOP level of care: "Apart from EOP inmates in administrative segregation, mental health crisis beds, or alternative housing pending admission to mental health crisis beds, on May 25, 2007, there were 463 EOP inmates in the seven reception centers surveyed in this report, representing over ten percent of all EOP inmates in CDCR institutions." *Coleman* Pls' Trial Ex. 9 (7/02/07 Special Master's Report and Recommendations on Defendants' EOP Treatment Program in Reception Centers) at 28.

(2)     Access to Medication.

168.    The many problems with medication distribution that I observed on my tours are also problems which appear to be widespread.  In the summary section of the Eighteenth Progress Report, the Special Master explains that in the area of medication distribution and continuity "fewer than half of institutions were compliant with medication continuity on intra-institutional transfers," and that "[r]esponsiveness to medication non-compliance was another area in which most institutions failed to comply with guidelines." Joint Pls' Trial Ex. 36 (18th Monitoring Report of the Special Master) at 315-16.  In my opinion, medication issues of this type are typical in overcrowded systems.

71

(3)    Improper "Overflow" Housing of Suicidal Inmates

169.    The problems with alternative, overflow housing arrangements for suicidal
inmates was one of the most severe problems among many severe problems that I
encountered in my tours. These problems also appear to be widespread, according to the
most recent report of the Special Master. *See* id. at 326-27. The Special Master explains
that this problem is an outgrowth of the MHCB shortage: "Inmates turned away from
MHCBs are housed in alternative accommodations such as OHUs, MHOHUs and so-
called holding cells, but these accommodations often do not afford the heightened level
of treatment and observation that suicidal persons require. Worse yet, many inmates in
these MHCB-alternative sites are never moved to actual MHCBs." *Id.* at 332-333. This
was a serious problem at DVI, where suicidal inmates are routinely held in an overflow
unit to the OHU unit (which is itself an MHCB overflow). Moreover, at DVI, this
overflow was in its administrative segregation unit. The 18th Monitoring Report of the
Special Master also notes that suicidal inmates were being placed in administrative
segregation units at Mule Creek State Prison. *See id.* at 53 (MCSP using five cells in
administrative segregation for inmates waiting for access to its MHCB beds).

170.    The dangers associated with this type of alternative housing for suicidal
inmates are clear. First, such arrangements discourage suicidal inmates from coming
forward and seeking treatment. Second, such shortages discourage clinicians from
making appropriate referrals to higher levels of care. There was nowhere for DVI staff
members to send their acutely suicidal or psychiatrically decompensating inmates in
administrative segregation and on suicide watch. As a result, DVI is forced to provide
treatment at levels of care it is not staffed or licensed to provide – crisis level treatment to
inmates in its EOP program, and longer term inpatient treatment to its OHU crisis bed
patients. The Special Master's 18th Report included examples from various prisons
around the state of inmates who were decompensating and not being referred to a higher
level of care. *See, e.g.,* Joint Pls' Trial Ex. 36 (18th Monitoring Report of the Special

72

Master) at 220 (LAC: "Two inmates seen by the monitor's expert were acutely mentally ill in administrative segregation for weeks rather than being sent to higher levels of care (see Exhibit R, Case Reviews 2, 3)").

171.    Documentation provided by defendants on a recent October 29, 2007 *Coleman* expert tour at CSP-Sacramento shows that even after that institution constructed a new, expanded unlicensed OHU, known as a mental health OHU (MH-OHU), the institution continued to rely on various ad-hoc "overflow" holding cells to house suicidal individuals experiencing a mental health crisis. *See Coleman* Pls' Trial Ex. 17 (October 5, 2007 Memo from CSP-Sacramento on Use of Alternative Sites for Crisis Bed Patients, produced to plaintiffs on October 29, 2007 *Coleman* tour). According to this report, between May 29, 2007 and September 28, 2007, CSP-Sacramento used so called "ZZ beds" on 62 occasions, and used so-called "contraband cells" on three occasions when the institution's MHCB beds and two OHU units were at capacity. *Id.*

> The Suicide of *Coleman* Class Member W at CSP-Sacramento in May of 2007 in an OHU Demonstrates the Dangerousness of Using These Units to House Suicidal Inmates:

172.    The dangerousness of the use of alternative unlicensed OHU placements rather than MHCB beds is illustrated by the suicide in May of 2007 of *Coleman* Class Member W at CSP-Sacramento. The suicide also highlights several other serious care problems relating to overcrowding. *Coleman* Class Member W committed suicide on May 28, 2007 in an Outpatient Housing unit at CSP-Sacramento. *See Coleman* Pls' Trial Ex. 25 (August 2007 Suicide Report for *Coleman* Class Member W) at Executive Summary of Suicide Report at 1. He was 31 years old at the time of his death. *Id.* *Coleman* Class Member W had taken psychotropic medication in the community for five years and came into the CDCR with a diagnosis of Bipolar Disorder. *Id.* at 2. He had been hospitalized in the community a half-dozen times and had a significant history of suicide attempts, including jumping off a bridge. *Id.* He was noted to be on suicide

73

watch in the county jail at the time of his sentencing. *Id.* He entered the CDCR at the North Kern State Prison (NKSP) reception center on May 19, 2006 and was continued on Depakote and Seroquel, which he had been prescribed in jail. *Id.* He was initially placed at the CCCMS level of care. *Id.* at 3. A few months later, he was made EOP for a short period of time after having had six admissions to the MHCB unit at NKSP for suicidality, but his EOP designation got "lost" and he was continued as a CCCMS inmate. *Id.* During his crisis bed admissions he was described as "extremely manic and psychotic with grave disability, including symptoms of confusion, disorganization, lability, flight of ideas, pressured speech, paranoia, irrational behavior, restlessness, confabulation and suicidal ideation." *Id.*

173. *Coleman* Class Member W was transferred to Folsom State Prison as a CCCMS inmate on January 23, 2007, after more than six months in the reception center at NKSP. *Id.* at 3. When he was transferred to Folsom, he was on Depakote, Seroquel, and Risperdal. *Id.* After some medication changes in February and March of 2007, his compliance with his medications dropped off dramatically. *Id.* On April 29, 2007, he was seen by a psychologist and counseled about the importance of medication compliance. *Id.* at 4. *Coleman* Class Member W was seen again on May 8, 2007 and his medications were changed. *Id.* He was seen again by a psychiatrist on May 21, 2004, was nervous and shaking, and complained about side-effects from his medication. *Id.* He was seen again by a psychiatrist on May 24, 2007, and reported that he had been feeling suicidal for one week and wanted to throw himself off the tier. *Id.* A suicide risk assessment was completed and his risk was noted to be high. *Id.* He was referred and transferred to a crisis bed at CSP-Sacramento. *Id.* However, after he arrived at CSP-Sacramento, he did not go to the MHCB. *Id.* Instead, he was housed in the Mental Health OHU and placed on suicide precautions. *Id.* The next day, May 25, 2007, a treatment team recommended that he be admitted to the MHCB unit. *Id.* However, he was never so admitted. *Id.* at 5. After several days on a suicide precaution protocol that