# EXHIBIT U
# PART 5

only called for hourly checks, which violates CDCR policy, staff was preparing to discharge him when he was found hanging in his cell, on May 28, 2007. *Id.*

174. The Suicide Review for *Coleman* Class Member W concluded that "unwise" medication changes contributed to his problems. *Id.* It also concluded that once he was transferred to CSP-Sacramento, "[t]he standard of care was not adequate, as he was only given hourly checks and orders for more frequent checks were apparently disregarded. State policy requires checks at least every 15 minutes at staggered intervals. Had such frequent checks been done, the likelihood that he could have successfully completed an act of suicide would have been substantially decreased." *Id.* The Suicide Review also raised several other serious questions about his care, noting that he should have been referred to DMH for inpatient care from NKSP following his six crisis bed admissions. *Id.* at 6 (problem 2). The review also questioned his removal from EOP level of care, apparently through mistake. *Id.* at 3.

175. In my opinion, another serious question raised by the suicide is the decision to place an inmate with a very high risk of suicide and a history of serious suicide attempts into an unlicensed outpatient housing unit rather than admitting him to an MHCB unit. This inmate's level of dysfunction and his mental health history were such that staff should have recognized his need for crisis stabilization using medication changes and closely monitoring both his suicidality and his response to medication. This suicide also appears to raise serious questions about medication management and the response to the inmates' medication side-effects.

(4) The Impact of Overcrowding on Suicide Rates:

176. Another potential indicator of the impact of overcrowding on the mental health of CDCR inmates is the current high rate of suicides in the CDCR. At least one

75

reputable study has linked overcrowding to increased rates of suicide.[3]

177. The suicide rate in the CDCR has been very high in recent years. The CDCR's own internal analysis of the suicide rate in 2005 found that the rate was 21.9 per 100,000, significantly above the national average for prisons of 14 per 100,000, as calculated by the Bureau of Justice Statistics. *See Coleman* Pls' Trial Ex. 16 (Defendants' 2005 Annual Report of Suicides) at 3. However, I am informed and believe that this rate does not include a number of additional deaths which plaintiffs contend were suicides. In any event, the suicide rate is significantly higher than the national average. In 2006, the CDCR reported a total of 43 suicides to plaintiffs counsel in e-mail notifications. *See Coleman* Pls' Trial Ex. 18 (Defendants' 2006 e-mail suicide notifications of suicides). According to CDCR population reports, the population of the CDCR in mid-2006 was 171,960. *See Coleman* Pls' Trial Ex. 37 (July 5, 2006 Weekly Population Report) at 1. Given that population, the 43 suicides in 2006 yields a suicide rate of 25 per 100,000 inmates – nearly double the national average of 14 per 100,000. While suicide rates vary from year to year, the rates of suicide for 2005 and 2006 are very high, and a cause for concern.

178. As noted above, overcrowding increases both the prevalence and the severity of mental illness. Put another way, overcrowding both creates new mental illness and makes existing mental illness worse. Since many or most suicides are due to the presence of severe mental illness or the onset of a severe mental health crisis, it is clinically reasonable to anticipate a higher suicide rate in an overcrowded system. Another way to think about the correlation between overcrowding and suicide rates is to see overcrowding as a broad environmental factor increasing the risk of suicides by creating a larger class of at-risk individuals.

---

See Meredith Huey and Thomas McNulty, "Institutional Conditions and Prison Suicide: Conditional Effects of Deprivation and Overcrowding" in The Prison Journal (December 2005) at 490.

179. In my experience as a physician, suicidality is clearly correlated with the acuity level of a person's mental health condition. In a system where clinicians are forced to keep and treat inmates at lower levels of care than what is clinically appropriate due to the absence of adequate beds at higher levels of care, one would expect to see an increase in suicide rates. The Mental Health Service Delivery System that was developed to provide the full spectrum of mental health care to CDCR inmates was not designed to treat severely psychotic or seriously suicidal inmates in its lower levels of care.

180. Moreover, overcrowding creates surveillance and treatment failures among the population of potential suicides. Other problems present in the overcrowded CDCR today that a clinician would anticipate would create a greater risk of suicides are (1) inadequate clinical and custodial staffing, (2) inadequate medication practices, (3) the use of overflow cells and cages for suicidal inmates, and (4) over reliance on registry or contract mental health clinicians.

181. Another factor that may be responsible for the high rate of suicides in the CDCR is the high rate at which mentally ill individuals in the CDCR are confined to administrative segregation and other high-security units. Data provided by the defendants in this case demonstrates that somewhere between 29.3 percent and 46.6 percent of the inmates in administrative segregation units are mentally ill. *See Coleman* Pls' Trial Ex. 38 (June 8, 2007 CDCR Health Care Placement Unit Chart, showing that 46.68 percent of all inmates in administrative segregation are mentally ill; however, the figures in the chart for administrative segregation capacity are not added up correctly – the actual total capacity using the figures given for individual institutions should be 8,782, which yields a prevalence rate for mentally ill in CDCR administrative segregation units of 29.3 percent). The rate of mentally ill inmates in the higher custody Security Housing Units (SHUs) is even higher. The same chart shows that 40 percent of all inmates in SHU units are mentally ill. *Id.* (this portion of the chart appears to be added

77

correctly). As noted above, administrative segregation and SHU units are dangerous for mentally ill inmates because such individuals tend to decompensate when they are isolated and locked in their cells for long periods of time and do not have adequate access to programs and exercise. In addition, the staff intensive nature of housing inmates in administrative segregation makes it extremely difficult to deliver treatment in these environments. Finally, it can be difficult to identify decompensation in these units because there are so few programming opportunities through which staff can observe the inmate's level of functioning.

182. The *Coleman* court and Special Master have recognized the dangerous nature of administrative segregation units for mentally ill individuals. On June 1, 2007, the *Coleman* court ordered defendants to develop further plans to reduce the risks of suicide in its administrative segregation and other high security units. *See* 6/1/07 Order at ¶¶ 4, 5. One issue included in defendants' plans to reduce the risks of suicide in these units is the development of 753 necessary walk-alone exercise yards in order to permit mentally ill inmates to have access to yard. *See Coleman* Pls' Trial Ex. 39 (Defendants' 10/29/07 Small Management Yard Plan). Defendants' new plan called for the construction of 476 walk-alone yards for administrative segregation inmates by January of 2010, even though the court ordered defendants to complete all of the necessary yards by "the end of fiscal year 2008/2009." 6/1/07 Order at ¶ 4 and 10/29/07 Small Yard Management Plan at 3.

183. The reasons given by defendants' for the delay in implementing this relatively straightforward project provides evidence as to the reason that defendants cannot address the underlying constitutional violations in this case without a remedy that addresses overpopulation. In their plan, defendants give the following reasons why they cannot meet the *Coleman* court's 24-month time frame: (1) there is no funding for the projects in this years budget, (2) the Government Code requires approval from the Department of Finance and the State Public Works Board for the projects, (3) a 45-day

notice period to the Joint Legislative Budget Committee is required, (4) the Public Contracting Code requires competitive bidding for the projects, which is time-consuming, (5) the procurement process for the projects takes 23 weeks for some parts of the project and 33 weeks for some other parts of the project. *Id.* Defendants also noted that in the interim, they are unable to maximize the use of existing yards because of custody shortages. *Id.* at 3.

### The Suicide of *Coleman* Class Member X illustrates Various Overcrowding-Related Care Issues as Well as the Dangers of Housing Suicidal Inmates in Administrative Segregation.

184. *Coleman* Class Member X committed suicide on January 18, 2006 in an administrative segregation unit at the Richard J. Donovan State Prison (RJD). *Coleman* Pls' Trial Ex. 27 (April 6, 2006 Suicide Report for *Coleman* Class Member X) at Executive Summary of Suicide Report at 1. Class Member X had never received mental health treatment in the community, but he received treatment previously while in jail and in the CDCR. *Id.* at 2. He arrived at RJD on October 3, 2005 with a diagnosis of Psychosis NOS and Mood Disorder NOS. *Id.* He had been treated at the jail with Seroquel. *Id.* When he was seen initially by a CDCR psychiatrist, he was prescribed a tapered dose of Seroquel for two weeks, and then taken off of medication. *Id.* On October 18, 2005, he suffered an apparent psychotic episode including delusions, auditory hallucinations, and paranoia. *Id.* One psychiatrist ordered a prescription of Seroquel for him by telephone. *Id.* Later that morning *Coleman* Class Member X told another psychiatrist who evaluated him that he was hearing voices telling him they were going to kill him. *Id.* He was then placed into administrative segregation, apparently for safety concerns stemming from his statements that someone was going to kill him. *Id.* On October 19, 2005, he was evaluated by a psychologist and reported increased auditory hallucinations. *Id.* He also asked for a medication change. *Id.* On November 3, 2005, he was seen by yet another psychiatrist who continued him on the same medication,

Seroquel. *Id.* On December 6, 2005, he was seen by a third psychiatrist to whom he reported paranoid thoughts "such as thinking cellmate is poisoning food." *Id.* at 3. The psychiatrist diagnosed him with Psychosis NOS and increased his Seroquel dosage from 600 mg to 800 mg, however his medication administration record (MAR) for the month of December shows that he only received his medication on one or two days. *Id.* Apparently he was not placed on the mental health caseload during this entire period.

185. Despite his medication non-compliance, he does not appear to have been seen again by mental health staff until January 10, 2006, when he was given a mental health screening and placed in the CCCMS program for the first time. *Id.* There were numerous discrepancies in the inmate's medication records, but he appears to have been prescribed Quetiapine starting January 3, 2006. *Id.* Coleman Class Member X made multiple lacerations to his wrists on January 17, 2006. *Id.* He reported gambling debts. *Id.* No suicide risk assessment was conducted. *Id.* He was referred to custody staff who decided to re-house him into the administrative segregation unit pending an investigation into his claims concerning his gambling debts. *Id.* Mental health staff members in the administrative segregation unit were not aware of his self-injurious behavior. *Id.* The next day, reportedly after being told by custody staff that he could be double celled, he was found hanging in his cell. *Id.*

186. The internal CDCR suicide review for this case found several serious problems with the manner in which his care was handled. *Id.* at 4-5. First, *Coleman* Class Member X's self-injurious behavior on January 17, 2006 was apparently not reported to mental health staff in the administrative segregation unit. *Id.* Second, the mental health clinician who evaluated *Coleman* Class Member X after he cut his wrists did not conduct a suicide risk assessment. *Id.* Third, he was never given an initial mental health screening when he arrived at RJD. *Id.* There was no documentation of the mental health evaluation he was allegedly given three months later on January 10, 2006. *Id.* Fourth, there were serious problems with medication administration records, and serious

discrepancies between the pharmacy medication records, Medication Administration Records, and medication orders in the inmate's medical record. *Id.*

187. Another serious issue noted in the Suicide Report is that the psychologist who evaluated *Coleman* Class Member X on January 17, 2006 and failed to conduct a suicide risk assessment did not have the inmate's health record available at the time of the interview. *Id.* at Suicide Report at 8.

188. In my opinion, this case illustrates a number of the problems and risks that a mentally ill patient faces in the CDCR today. First, the inmate was not properly screened for mental illness. Second, when he exhibited signs of psychiatric distress and suicidality, he was not appropriately responded to, was not given a suicide risk assessment, and in fact was placed into an administrative segregation unit, a dangerous place for suicidal inmates. Third, when he complained about medication side effects, and when, according to his MAR, he stopped taking his medication for a month, he was not referred to a psychiatrist for an assessment. Fourth, his suicidal gestures were discounted, and his behavior was not reported to mental health staff members in administrative segregation who should have monitored him. Fifth, he was not appropriately assessed for placement in the mental health treatment program. These are the types of problems that take place in an overburdened, overcrowded system when staff does not have enough time with each patient and systems break down.

### (5) Staffing Shortages

189. It is also clear that staffing shortages are currently endemic in the CDCR's mental health system. In the 18th Monitoring Report, the Special Master found that "high vacancy rates in mental health staffing continued throughout CDCR institutions," and that vacancy rates were a "significant obstacle to compliance with the *Coleman* Program Guide." Joint Pls' Trial Ex. 36 (18th Monitoring Report of the Special Master) at 330. He also found the staffing problem to be particularly damaging to EOP inmates entering reception centers. *Id.*

81

(6) <u>Adequate Treatment and Office Space for Clinicians to Use.</u>

190. It is also clear that the problem of adequate office and treatment space is endemic in the CDCR. The 18th Report explains that during the review period, "[c]ompetition for mental health treatment and clinical office space sharpened with growth in the overall healthcare infrastructure against the backdrop of already overcrowded prisons." Joint Pls' Trial Ex. 36 (18th Monitoring Report of the Special Master) at 2.

191. The Special Master's Report contains numerous concrete examples of individual institutions that are unable to provide adequate care because of space shortages. In many institutions and housing units, including Mule Creek State Prison, Solano, and Sierra Conservation Camp, group therapy is impossible because of lack of space. *See* Joint Pls' Trial Ex. 36 (Special Master's 18th Monitoring Report) at 55-56 (in MCSP's EOP Administrative Segregation program "eight holding cells used for group treatment were unable to accommodate the unit's census of 40 to 60 inmates" and group sessions and case manager contacts took place on the dayroom floor); 55 (MCSP Level IV EOP program had "insufficient group treatment space"); 61 (at SCC, treatment space in administrative segregation "remained insufficient"); 84 (at Solano four CCCMS groups were formed "but did not meet for lack of suitable space."); 85 (Solano: "In administrative segregation, mental health treatment and mandated outdoor recreation were stymied by inadequate space."); 178 (at CMC: "Lack of sufficient clinical staff caused [group treatment] options to be limited. Lack of space exacerbated CMC's difficulties with meeting Program Guide group requirements."); 204 (at NKSP: space limitations caused cancellation of groups administrative segregation).

192. In a number of other institutions, the lack of space means that case manager contacts and even therapy contracts take place in public setting that affords no confidentiality. *See* Joint Pls' Trial Ex. 36 (Special Master's 18th Monitoring Report) at

82

42 (at HDSP "[m]ental health assessments and case manager contacts in reception center routinely occurred in non-confidential settings. Assessments were conducted at dayroom tables that afforded limited privacy."); 55 (at MCSP "case manager contacts occurred in cubicles on the dayroom floor, which afforded inadequate visual and auditory privacy"); 64 (at CMF clinical interviews with suicidal inmates done in the middle of busy B-1 clinic which lacks a confidential interview area – "conversation was difficult at times. Confidentiality was not expected."); 72 (CMF: "Roughly three dozen 3CMS inmates [in administrative segregation] did not have confidential meetings due to lack of space, escorts, and schedules."); 83 (Solano: "Lack of space was problematic throughout the institution, making the greatest impact on group treatment and on confidential contacts in administrative segregation."); 133 (PVSP: "Treatment space was inadequate for all aspects of mental health services, and all areas were affected adversely."); 168 (CTF: "Obstacles to confidential out of cell [case manager] contracts included escorts and space.").

193.   At many institutions, the lack of space means that clinicians share offices. Since the offices are used for confidential therapy sessions with clients this interferes with that ability of existing staff members to provide treatment, and also makes it more difficult to attract and retain clinicians. *See* Joint Pls' Trial Ex. 36 (Special Master's 18th Monitoring Report) at 221 (CCI: "Mental health staff calculated that 6,000 more feet of treatment and office space were needed to meet treatment requirements."); 304 (VSPW: "In the general population EOP program, a shortage of office and program space and average caseloads of 125 inmates presented daily challenges. Three or more clinicians typically shared an office."); 127 (SATF: "lack of adequate office and programming space in four of seven of CSATF's yards hindered the delivery of mental health treatment. Case managers and psychiatrists often competed for limited office space, which routinely disrupted scheduled appointments."); 177 (CMC EOP administrative segregation: "Office space was available for only two clinicians and was unlikely to be

83

remediate pending completion of a long-term reconstruction plan. Treatment space was also insufficient. Reportedly, these working conditions hampered the institution's ability to attract and retain staff in the administrative segregation EOP program.").

194. At the California Medical Facility, space limitations mean that sometimes therapy is conducted in a small closet holding a microwave oven, and other sessions are held in what appears to be a bathroom. *See* Joint Pls' Trial Ex. 36 (Special Master's 18th Monitoring Report) at 73 (CMF: "The quality of [CCCMS] treatment was compromised by lack of suitable treatment space for individual contacts and by scheduling difficulties. Staff reported that . . . clinical meetings in some housing units were held in a closet that contained a microwave oven used by staff. Other treatment sessions were held in a small room equipped with a toilet.").

195. Finally, at VSPW, the lack of space means that treatment often takes place outside on the yard on benches. *Id.* at 304 ("Clinicians routinely interviewed inmates in non-confidential public areas, including on outdoor benches.").

### 4. Overcrowding is the Primary Cause of the Constitutional Violations in the CDCR

196. These overcrowding-induced conditions that currently exist in the CDCR violate the rights of inmates to constitutionally adequate medical and mental health care. The conclusion that overcrowding is the primary cause of these violations is inescapable for several reasons.

<u>The Persistence of the Constitutional Violations Present in the CDCR Demonstrates that They Are Caused by Overcrowding:</u>

197. First, taken together, the range of Constitutional violations discussed above, including inadequate suicide monitoring and prevention, inability to timely access appropriate levels of care, inability to timely access mental health clinicians due to

84

staffing shortages, and inadequate medication management practices are unusual in a system that has been under Court supervision for ten years. These serious, dangerous violations this late in the remedial process are typical indicators of a system plagued by severe overcrowding. In a non-overcrowded system, the Constitutional violations are more readily addressed by such interventions as increased staff and increased programming. However, in a system overwhelmed by crowding, these traditional remedies are woefully inadequate. This appears to be the case in the CDCR where remedial efforts have resulted in significant expansions of staffing and programming activities, yet the constitutional violations persist or even worsen.

### The *Coleman* Special Master has found that overcrowding has undermined progress that was being made in various areas

198. The *Coleman* Special Master has observed that, although there was a period of time when it seemed that defendants might be making progress in terms of their bed plan and the provision of treatment, the overcrowding crisis has overwhelmed this hope. In his April 12, 2007 Report to the Court, he concluded: "By late 2005, it was evident that the reduction in population growth and then in the population itself in the first few years of the decade were over, and the numbers were rising fast. Early in 2006, defendants were staring at a galloping growth rate that threatened to hit 200 percent of capacity shortly, and the scramble was on to deal with the flow. One victim of the turnaround was CDCR's mental health plan." *See* 4/12/07 Special Master's Report on Defendants' Establishment of Interim Inpatient Intermediate DMH Beds at 8.

### The Percentage of Caseload Inmates in the CDCR is Increasing Faster that the Overall Population:

199. Another factor that demonstrates that overcrowding is the primary cause of the constitutional violations is the fact that the percentage of caseload inmates in the CDCR is increasing faster than the overall CDCR population. Between January of 2003

and July of 2007, the population of the CDCR grew from 159,743 to 172,897, an increase of 8.2 percent. *Coleman* Pls' Trial Ex. 34 and 35 (Monthly population figures downloaded from the CDCR website for January 2003 and July 2007). During the same period, the MHSDS caseload of EOP and CCCMS inmates grew from 24,599 to 32,039, an increase of 30.2 percent. *Coleman* Pls' Trial Ex. 36 (CDCR MHSDS Prevalence Data for January 2003 and July 2007 from CDCR Monthly Reports). Thus, during this period of roughly four and one-half years, the mental health caseload grew at four times the rate of increase for the overall population.

200.   This is typical of systems where overcrowding is the primary cause of the constitutional violations because, as I have stated previously, overcrowding creates new mental health needs and exacerbates existing mental health needs. I encountered numerous examples of this on my various prison tours in preparing this opinion. As the data supports, the net result of overcrowding is a greater incidence of mental illness. In addition, this greater prevalence of mental illness presents at a more acute level. Traditional remedial efforts such as increased staffing will be insufficient to remedy this problem. Finally, as stated previously, overcrowding expands demand at the highest levels of care and creates static backlogs of patients that make it difficult to assess the true demand for services.

### In Many Instances, the Overcrowded Conditions Themselves Are the Cause of the Unconstitutional Mental Health Care:

201.   The causal link between overcrowding and unconstitutional mental health care is clear and direct in the many CDCR housing units where space shortages from overcrowding directly result in long-term living arrangements that are harmful to the mental health of *Coleman* class members. For example, CCCMS inmates are routinely triple-bunked in chaotic, overcrowded dorms where they experience damaging levels of stress and fear of predation. It is clear that the mentally ill inmates I interviewed at

Solano who also had staph infections would not have been as ill if they were not living in overcrowded conditions. Similarly, mentally ill inmates are retained for extended periods in Reception Centers and in locked down general population units, where they are locked in their cells for most of the day and receive little or no programming or mental health services. Such environments add to the instability of mentally ill individuals. Another context in which the link is clear is improper placements in administrative segregation, where caseload inmates are often unable to access care and experience decompensation. Yet another context where this link between overcrowded conditions and constitutional deprivations is very direct is suicide watches in holding cells, cages, tanks, administrative segregation units, and other unsafe, unlicensed, and improperly supervised environments. These same harsh conditions, as discussed earlier, also increase the demand for mental health services in prisoners in the general population who, in a properly operating, not overcrowded system, would not need mental health services. Isolation, seclusion, idleness, violence, fear and stress plague the prisoners in the CDCR as a direct result of overcrowding. These conditions exacerbate mental illness and are serious barriers to the provision of minimally adequate mental health and medical care.

    202.    There are a number of examples in the Special Master's Eighteenth Monitoring Report of overcrowding-related conditions directly interfering with access to constitutional mental health care. *See* Joint Pls' Trial Ex. 36 (Special Master's 18th Report) at 12 (Noting that at CSP-Sacramento, "[a]s predicted by staff, the expansion of EOP and PSU beds challenged the institution's ability to sustain previous levels of compliance. The amount of treatment provided to each EOP inmate was reduced, and more contacts were made at cell-front."); 84 (Solano: "rising caseloads, poor access to treatment associated with prolonged modified programming [lock-downs] in one yard, and ducat problems forced clinicians to resort too often to quarterly visits that were little more than a cursory check-in, many of which occurred at cell-front or in locations that compromised visual or auditory privacy. Under these conditions, a subset of sick inmates

got sicker, and clinicians sometimes missed, or failed to respond appropriately to, signs of mental illness."); 113 (Corcoran: "A high turnover rate among caseload inmates in concert with shortages of staff psychiatrists and lack of suitable treatment space continued to impede the delivery of mental health treatment and prevent CSP/Corcoran from meeting Program Guide requirements."); 126 (CSATF: "Large caseloads, turnover, and long-term leaves combined to reduce compliance with Program Guide requirements. . . . Mental health staff response to referrals was often slow."); 127 (CSATF Administrative Segregation: "Case managers assigned to administrative segregation reportedly barely had time to complete weekly contacts."); 155-156 (SVSP CCCMS administrative segregation: describing "structural impediments" to delivering adequate care including inadequate staffing and space constraints.); 237 (CIM: In the administrative segregation units, a "work group to improve strained relationships between custody and mental health found that the problem was related largely to increased administrative segregation population and physical plant.").

### B.  Opinion 2: Other Remedial Efforts Will Not Succeed In Remedying The Underlying Constitutional Violations.

203.    In my opinion, no other relief will remedy the underlying constitutional violations except a remedy which results in a substantial reduction in the prison population.

204.    I am aware that the *Coleman* court has issued at least seventy-seven orders intended to induce the State to provide constitution levels of mental health treatment in the CDCR. The *Coleman* court concluded in its July 23, 2007 Order referring consideration of a prisoner release order to the three-judge panel: "Since February of 1996, this court has issued at least seventy-seven substantive orders to defendants in an effort to bring the CDCR's mental health care delivery system into compliance with the requirements of the Eight Amendment. Taken together, these orders

have contained directives aimed at all of the aforementioned requirements for a constitutionally adequate mental health care delivery system. In addition, the Special Master and his staff have spent hundreds of thousands of hours working with the parties to develop program guidelines for a constitutionally adequate system and monitoring defendants' implementation of those guidelines. During the same period of time, the Special Master has filed seventeen semi-annual monitoring reports and fifty-five other reports reflecting the results of these efforts." 7/23/07 Order at 4:13-21.

205. Having worked as a correctional expert and having worked on the *Gates* and *Madrid* cases, I am very familiar with the monitoring team working for the court on the *Coleman* case. Moreover, having reviewed the recent monitoring reports and the other documents in this case, it is clear that very intensive remedial monitoring efforts have been going on in the *Coleman* case for many years. In my opinion, the large team of national experts working as court-appointed experts in the *Coleman* case has a great deal of collective experience working with troubled correctional systems. Nonetheless, after ten years of intensive monitoring and other remedial efforts, the CDCR remains plagued by serious constitutional deficiencies in its delivery of mental health care. I agree with the *Coleman* Special Master that the reason for this sorry state of affairs is that whatever tentative progress was made early on in this case has been overwhelmed by the massive population expansion in recent years.

206. From reviewing the docket in the *Coleman* case, I am aware that these more than seventy-seven orders have attempted to address issues of staffing, space, quality of treatment, and bed availability, among others. These include numerous orders concerning such critical issues as adequate MHCB capacity (see, e.g., 1/15/01, 12/20/01, 10/8/02 Orders); access to DMH beds (see, e.g., 5/22/98, 7/26/99, 8/28/00, 4/4/01, 6/27/01, 3/4/02, 5/7/02, 10/8/02, 1/19/04, 7/9/04, 6/30/07 Orders); and staffing (see, e.g., 2/17/96, 6/17/98, 8/25/99, 1/19/99, 7/26/99, 1/13/00, 4/27/00, 8/28/00, 6/13/02, 10/8/02, 3/3/06 Orders).

207. Persistent shortages of beds at every level, lack of adequate mental health and custodial staff, and inadequate treatment and programming space clearly reflect the overcrowding crisis. In my opinion, more orders by the Court along these lines of those discussed above will not remedy the underlying Constitution violations at this time. The system is simply too overwhelmed by the population for these orders to be effective as long as the population continues to remain at current levels.

208. I am also aware that the State has proposed construction of new prisons and re-entry facilities as the bulk of its solution to the overcrowding crisis. I have reviewed the Receiver's analysis in his Reports regarding overcrowding and the further demands for mental health and medical staffing, and treatment space that building these new prisons and re-entry facilities will create. As the Receiver notes, building more prisons and re-entry facilities will require additional staff, and will spread existing overtaxed staff among more facilities. See Joint Pls' Trial Ex. 26 (Receiver's 5/15/07 Report Re Overcrowding) at 40-41. The building timeline for the beds contemplated by AB 900 does not anticipate any new beds until 2009, and most of the beds will be built much later. *See Coleman* Pls' Trial Ex. 40 (January 2007 CDCR Estimated Construction Schedule for Infill Bed Plan, Ex. 20 to Receivers 5/15/07 Report). Moreover, as the delays associated with the CDCR's plans to construct walk-alone yards demonstrate, construction projects involving government agencies are rarely finished by the anticipated dates. In my opinion, any added capacity for mental health and medical treatment that this prison construction may create will take far too long to be sufficient as a remedy to the current constitutional violations, which are extremely urgent and life-threatening. This plan also fails to address the other persistent, intractable overcrowding-related problems that are present in the CDCR, such as clinical and custody shortages, adequate medication management practices, and sufficient beds at the highest levels of care.

209. Similarly, the alternative remedy proposed by defendants for beds at the MHCB and inpatient level will not be finished until 2014 – seven years from now -- at the earliest, even assuming there are no bureaucratic delays or construction delays. *See Coleman* Plfs. Trial Ex. 12 (9/24/07 Special Master's Report on Defendants' August 2007 Bed Plan). That plan is unacceptable. Mentally ill *Coleman* class members are daily suffering dangerous denials of mental health care and medical care that place them, their fellow inmates, the officers who supervise them, and the public at risk. In the interim, the only way to correct the endemic denials of appropriate mental health care that currently exist in the CDCR is to significantly reduce the population. No other remedy will result in a constitutional mental health care system in the CDCR.

Dated: 11/9/07

_____
PABLO STEWART, M.D.