1  EDMUND G. BROWN JR.
   Attorney General of the State of California
2  DAVID S. CHANEY
   Chief Assistant Attorney General
3  ROCHELLE C. EAST
   Senior Assistant Attorney General
4  JONATHAN L. WOLFF
   Senior Assistant Attorney General
5  LISA A. TILLMAN – State Bar No. 126424
   Deputy Attorney General
6  KYLE A. LEWIS – State Bar No. 201041
   Deputy Attorney General
7  455 Golden Gate Avenue, Suite 11000
   San Francisco, CA 94102-7004
8  Telephone: (415) 703-5708
   Facsimile:  (415) 703-5843
9  lisa.tillman@doj.ca.gov
   kyle.lewis@doj.ca.gov
10
   Attorneys for Defendants
11

HANSON BRIDGETT LLP
JERROLD C. SCHAEFER - 39374
PAUL B. MELLO – 179755
S. ANNE JOHNSON – 197415
SAMANTHA D. TAMA – 240280
RENJU P. JACOB - 242388
425 Market Street, 26th Floor
San Francisco, CA  94105
Telephone: (415) 777-3200
Facsimile:  (415) 541-9366
jschaefer@hansonbridgett.com
pmello@hansonbridgett.com
ajohnson@hansonbridgett.com
stama@hansonbridgett.com
rjacob@hansonbridgett.com

12            UNITED STATES DISTRICT COURT

13        FOR THE EASTERN DISTRICT OF CALIFORNIA

14       AND THE NORTHERN DISTRICT OF CALIFORNIA

15  UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

16    PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

17  RALPH COLEMAN, et al.,                No.  2:90-cv-00520 LKK JFM P

18            Plaintiffs,                 **THREE-JUDGE COURT**

19        v.

20  ARNOLD SCHWARZENEGGER, et al.,

21            Defendants.

22  MARCIANO PLATA, et al.,               No. C01-1351 TEH

23            Plaintiffs,                 **THREE-JUDGE COURT**

24        v.                              **EXHIBITS V, PART 2 TO EXHIBIT CC,
                                          PART 2 TO DECLARATION OF PAUL**
25  ARNOLD SCHWARZENEGGER, et al.,        **MELLO IN SUPPORT OF DEFENDANTS'
                                          MOTIONS IN LIMINE**
26            Defendants

27                                        **To: Three-Judge Panel**

28                          - 1 -

DECL. PAUL MELLO SUPP. DEFS.' MOT. IN LIMINE                          1648445.1
(CASE NOS. 90-00520; 01-1351)

# EXHIBIT V
# PART 2

18.    Because SVSP has mental health programs operated by both the CDCR and the

Department of Mental Health (DMH), I was able to observe the movement of patients between

those systems. DMH runs the freestanding building, called the SVPP, which provides sixty four

(64) Intermediate Care Facility (ICF) beds to *Coleman* class members. DMH also runs units D-5

and D-6 which provide a combined 112 ICF beds for the *Coleman* class. The CDCR operates

the mental health crisis beds located in the Correctional Treatment Center and also oversees the

units housing EOP and 3CMS class members.

### Long Waiting List for Intermediate Care Facility Beds

19.    DMH staff reported during the tour of SVSP that the current waiting list for the

level IV ICF beds was at 171 patients. This waiting list is system-wide and has been a constant

source of concern by the *Coleman* Special Master.

20.    The extremely long waiting list for ICF beds has a ripple effect throughout the

system.[2] Sterling Price, the Acting Executive Director of DMH who attended both my Salinas

Valley State Prison and my California Medical Facility tours, acknowledged that some of the

inmates on the SVPP waiting list for ICF beds have been on the list since 2005. This is

consistent with the reports from psychologists at both SVSP and CMF who said that it can take

up to a year for a patient to come off of the waiting list. Dr. Kittimongcolporn, the Clinical

Director of the MHCB unit at SVSP, reported that it takes a year or longer to get her patients to

an ICF bed and that she does not typically refer patients to those beds for that reason. Dr.

Burkhardt, a psychologist at SVSP who previously worked as the Clinical Director of the CTC,

also reported a 9-12 month wait for ICF beds. When I asked Dr. Burkhardt whether she

continues to refer patients to that list, she said that she really only refers lifers who are at the

EOP level of care since those patients will be around long enough to wait for a bed. The

*Coleman* Court also recognized the problem of under-referrals in its June 28, 2007 Order:

---

[2] SVSP staff reported that construction of another 64-bed ICF unit is on schedule for completion
later this year. These beds, while badly needed, will still fail to address the serious shortfall of
beds.

"Indeed, from other sources the court has learned that at least some CDCR clinicians have stopped referring patients to DMH because of its refusal to accept referrals." 6/28/07 Order (Docket 2301) at 3, fn. 2.

21.    The impact of such a long waiting list for essential inpatient beds cannot be overstated. When psychologists and psychiatrists face waiting lists of 9-12 months, they inevitably will stop referring patients to those beds, as Dr. Burkhardt and Dr. Kittimongcolporn confirmed. This is because the referral becomes an exercise in futility for the already over-burdened mental health staff, particularly if the referrals involve patients who are paroling soon. As a result, patients will parole without receiving the appropriate mental health care and are more likely to return to their home communities in less stable conditions. This, in turn, will increase the demand on the limited parole and community mental health services and increase the likelihood that the patient may reoffend and be returned to the prison system. Overcrowding is a tremendous obstacle to CDCR's ability to address the cycling of persons with serious mental illness from parole to prison.

22.    Data associated with the recent addition of 50 mental health crisis beds at CMF also suggests that clinicians have been under-referring patients for crisis care. Whereas referrals to MHCBs ranged from 276 to 298 between March and May of 2008, they jumped to 355 in June, the month that the new beds opened. Coleman Pls' Trial Ex. 137. It is possible that this surge in referrals, which represents the highest number of referrals since at least November of 2006, resulted not from a greater rate of crisis incidents, but rather from the realization among clinicians that crisis beds were now available. That is, clinicians previously identified the patients, but did not refer them to MHCB because the resource was simply not available.

### Waiting List for Acute Inpatient Beds

23.    Sterling Price reported that the waiting list for the acute psychiatric hospital at CMF was 15 as of July 29, 2008 but that it was up to 45 patients as recently as July 1, 2008. I heard reports from staff members at SVSP and CMF that it takes anywhere from about two to

eight weeks to get a patient into an acute bed. SVSP also listed access to acute beds as a

problem in its *Coleman* 21st Round Corrective Action Plan, dated May 23, 2008: "We continue

to experience difficulty with the continual wait list for our referral to DMH acute for any referral

reason. Length of wait has also been longer for self injurious behaviors and suicidal ideation.

We had one inmate who was referred for grave disability reason at an acute level that we decided

to send [] back to EOP to wait for intermediate level of referral so that he at least could program

there while waiting." Coleman Pls' Ex. 138 at p. 7.

24.    This backlog is particularly significant in an overcrowded system like the

CDCR's. Dr. Kittimongcolporn, the Clinical Director of the CTC at SVSP, told me that if she

refers a patient to an acute bed from a mental health crisis bed (MHCB), that patient stays in the

MHCB until he is transferred. While it may be clinically appropriate (and even necessary) for a

patient to remain in an MHCB while he awaits transfer, it also means that that patient is

occupying a bed that is in high demand for other acutely ill and suicidal patients. This puts

clinicians in the dangerous position of having to triage the mental health acuity of their patients

because they simply do not have enough options for adequate treatment.

### Problems with Access to MHCB Care at SVSP

25.    The Special Master has documented system wide shortages of MHCBs

repeatedly, including in his 20th round report: "There continued to be too few MHCBs to

accommodate CDCR's mental health population. Inadequate capacity was exacerbated by

delayed access to DMH and EOP programs, as needed MHCBs were too often filled with

decompensated or fragile inmates waiting weeks and months to be transferred to an appropriate

level of care. The ongoing challenge to find beds for inmates with chronic, long-term medical

conditions regularly reduced MHCB capacity at CSP/LAC, HDSP, MCSP, and SVSP."

Coleman Pls' Trial Ex. 57 at p. 351. As a result of these severe shortages, institutions are forced

to house acutely mentally ill patients in settings that are cruel and inappropriate for crisis care:

> As a result of the scarcity of MHCBs throughout the system, institutions
> continued to resort to the use of alternative beds to house inmates pending MHCB
> transfers. These alternative locations were uniformly inappropriate for acute care.
> Throughout the monitoring period, inmates were admitted to alternative areas for
> stays lasting longer than 72 hours. Many of them had multiple admissions.
> Inmates who might have been clinically considered for DMH levels of care if they
> had been admitted to MHCBs were not given that consideration. Complete and
> reliable data regarding the locations and uses of these alternative cells was rarely
> available.

Joint Pls' Trial Ex. 57 at p. 352.

26.     My prior report documented the serious problems I saw at SVSP with respect to

suicidal inmates' impeded access to mental health crisis beds and consequent placements in

wholly inadequate alternative settings. *See* 11/19/07 Report at pp. 58-60. These problems,

including a shortage of sufficient mental health crisis beds and the use of make-shift cages to

hold patients waiting for crisis beds, existed during my July 29, 2008 tour as well. Dr.

Kittimongcolporn, the Clinical Director of the CTC at SVSP, reported that the MHCBs are

almost always full. The Chief Psychiatrist, Dr. Wilson, explained that he has to "fight" to

maintain the 6-8 MHCBs so that medical patients are not placed in those beds. While the MHCB

unit at SVSP is theoretically open to other institutions, staff reported that only "very rarely" is

anyone outside of SVSP admitted to the unit, although it did happen the week before the tour.

27.     During my tour on July 29, 2008, I observed again the dry holding cages that

SVSP must use when there are no available mental health crisis beds. I described these cages

and the wet cells used for overnight stays in the CTC in my prior report:

> Dr. Chase also indicated that the institution uses a variety of overflow holding cells due
> to the MHCB shortage. She indicated that three "dry cells," which are tiny freestanding
> upright cages with mesh wiring surrounding them (and no toilet) are routinely used
> during the day to house suicidal inmates. I observed these small holding cages on the
> tour of SVSP and they are extremely confined and are clinically inappropriate locations
> to assess suicidality and to have confidential psychiatric interviews with suicidal inmates.
> At night, these inmates are transferred into one of four holding cells outside the entrance
> to the CTC which are known as "wet cells" because they have toilets. SVSP also
> routinely uses "BPT cells" located on each yard for overflow suicide watch. This report
> was consistent with the findings of the Special Master in the most recent progress report.
> *See* Joint Pls' Trial Ex. 36 (18th Monitoring Report of the Special Master) at 153 (noting

11

that holding cells "were in use daily and frequently housed inmates overnight. The holding cells in daily use were stand-up mesh cells. Holding cells used overnight were large group waiting rooms that had plumbing and that could be furnished with mattresses...Standard CTC procedures resulted in heavy use of both types of cells and many overnight stays in large holding cells."). The MHSDS system never intended to permit the use of holding cells, particularly one where a patient is required to sit in a wire mesh holding cell without access to minimum health and safety standards. The use of these non-authorized, unlicensed "treatment settings" results in an exacerbation of the underlying mental illness which led to the mental health crisis.

11/9/07 Report at pp. 59-60.

28.     During my tour on July 29, 2008, I spoke with *Coleman* Class Member SSS, an inmate who was waiting in one of the stand-up, mesh holding cages for admission to a crisis bed. Logs in the unit showed that *Coleman* Class Member SSS was admitted to the crisis bed unit the previous day, but was still waiting for placement. He was moved from the dry holding cage to a wet cell at 7:15 p.m. the night before and was back in the dry holding cage as of 8:15 a.m. the following morning. Staff reported that while *Coleman* Class Member SSS would be admitted within 24 hours, other inmates sometimes wait several days for admission, particularly on the weekends. A Psychologist on C-Facility, for instance, reported that patients often stay in the dry holding cells (with moves to the wet cells in the evenings) from Friday to Monday if they need crisis care on the weekends. This is consistent with the data SVSP provided to the Special Master for his 21st monitoring round showing that of the 80 referrals made to MHCBs between November of 2007 and April of 2008, 45 (56 percent) were admitted on the same day, 24 (30 percent) were admitted within 1 day, 5 (6 percent) were admitted within 2 days and 6 (8 percent) were admitted in 3 or more days. *Coleman* Pls' Trial Ex. 138 at p. 6.

29.     The stand-up, mesh holding cages are not clinically appropriate places to house patients who are having mental health crises. Pictures of the cages from my tour are attached to this report as **Appendix C**. Staff informed me during the tour that they cannot utilize wet holding cells for those patients during the day, however, because they have to use those cells to hold inmates awaiting medical appointments. This is another example of medical and mental health staff competing for very limited space in medical and mental health systems that simply

12

cannot accommodate the large volume of patients. To treat a patient in crisis as if he was a dangerous animal, subjecting him to public degradation and humiliation, is, by definition, inappropriate mental health care. The routine use of these cages throughout the system for mental health interventions is itself a tragic symptom of an overcrowded and dangerous system where mental health staff are taught to be fearful of their patients and inhumane practices are not only tolerated, but institutionalized within the medical and mental health systems.

### Staffing Shortages at SVSP

30.    During the morning meeting of my July 29, 2008 tour, Dr. Kahle, the Chief Psychologist, reported that SVSP has 12 vacant psychologist positions (of about 24) which it is able to fill with contract staff. She reported that there is one vacant psychiatrist position and two positions filled by contract staff. The Director of Nursing said that the nurse and psychiatric technician positions are almost full, but that there are not enough LVN positions allocated for the institution. With respect to staffing in general, SVSP reported to the Special Master in May of 2008 that, "[h]iring of support staff remains a conflicting demand with no Recruitment and Retention to offer potential employees." Coleman Pls' Trial Ex. 138 at p. 2. SVSP also reported that "[s]taff turnover continues to be a problem" and that "Loss of Recruitment and Retention (R&R) pay differential causing continued difficulty in successful recruitment of state employees. With the loss of R&R comes loss of incentive to live in a remote isolated, non-urban small-town environment." *Id.* CDCR chose to end the practice of paying extra bonuses to recruit clinicians to undesireable locations when the *Coleman* court raised salaries across the board.

### Impact of Excessive Lockdowns at SVSP

31.    My prior report also documented extensive lockdowns at SVSP that interfered with programming and mental health care. 11/9/07 Report at pp. 53-54. Staff reported during the morning meeting on my July 29, 2008 tour that some of those lockdowns improved in recent months, particularly on the C1 side of C-Yard, which houses 3CMS class members. On the day of tour, however, the entire yard was on modified program. I understand that there are eight

13

housing units on C-Yard, which are split evenly between the C1 and C2 sides. Chief Deputy
Warden Liotta and Associate Warden Trexler explained that the C1 side was programming fairly
well until an incident occurred the week before the tour. They both confirmed that the C2 side of
the yard, however, continued to struggle with modified program status (meaning that inmates
cannot go to their jobs, school, the library, yard, etc.). This was also confirmed when I spoke
with Dr. Burkhardt on C-Yard. She reported that C-yard's lockdowns interfere so much with
programming that clinicians at SVSP are afraid to change classifications of class members from
EOP to 3CMS. She explained that the programming would be so restrictive on the 3CMS C-
Yard, that clinicians would opt to keep the patient at the EOP level so that he could at least
continue to have some program.

      32.    Dr. Burkhardt also talked generally about tensions she experienced with custody
staff, including incidents whereby custody officers refused to escort patients out of their cells for
her. The Special Master has also documented disturbing tensions between custody and mental
health staff:

> A pervasive and disturbing pattern of custodial dysfunction was apparent at
> SVSP. Line officers and custodial supervisors assigned to 3CMS and EOP
> buildings reportedly taunted inmates about mental disabilities, enforced rules
> arbitrarily, restricted utilization of space set aside for mental health programs in
> an inexplicable manner, and failed to properly manage the priority ducat system.
> This dysfunction created tension and animosity between custody and mental
> health staffs and discouraged inmate participation in treatment, thereby thwarting
> access to mental health programs…The dysfunction reported in October 2007 had
> grown more widespread, pronounced, and destructive to SVSP's substantial and
> expanding mental health mission [by the June 2008 monitoring tour].

Joint Pls' Trial Ex. 57 at pp. 188-198. These problems are disturbing and, in my opinion, may be
another symptom of the extremely stressful working conditions in the overcrowded system.

      33.    My prior tour report also documented my conversation with Dr. Williams, a
clinician on C-Yard who told me that it typically took 10 months or a year to complete an 8-
meeting group due to the extensive lockdowns on the yard. 11/9/07 Report at p. 22. I asked Dr.
Burkhardt if this was still the case and she said that it was. Dr. Burkhardt also reported that she

14

had recently gathered monthly data about mental health groups provided on C-Yard which showed that those groups were cancelled 2 out of every 4 weeks.

### Lack of Adequate Treatment Space

34.    SVSP continues to struggle with adequate treatment and office space for mental and medical health services. Dr. Kahle explained during the tour that clinicians are forced to run 40-50 percent of all EOP therapy groups outside on the yard due to space shortages. While the institution converted three rooms on the yard for group treatment, they are still not enough. Because 40-50 percent of the groups are held on the yard, SVSP loses all of those groups when there are custodial lockdowns or modified programs. Inclement weather is also presumably a factor.

35.    The D-5 and D-6 units also have significant space limitations. These units are designated as intermediate care facility beds for Level IV prisoners and are operated by DMH. They were always intended to be temporary, however, due to severe space shortages. When I toured the D-5 unit, there was a therapy group happening on the dayroom floor while other custody and clinical staff worked at nearby tables. This arrangement precludes privacy from both staff and other prisoners. Staff in the D-5 unit also use a converted dining room for all IDTT meetings, case manager contacts and other clinical contacts, although staff reported that additional group and interview rooms are supposed to be completed by the end of the year.

36.    The Chief Deputy Warden told me during the morning meeting that the institution submitted a plan for additional treatment space on A, B and C yards two years ago, but has not heard anything back from headquarters' staff about that plan.

### Deficient Medication Distribution Practices at SVSP

37.    In my prior report, I documented significant problems with the medication management system at SVSP, as reported by two psychiatric technicians on C-Facility and by numerous inmate-patients who I interviewed. *See* 11/9/07 Report at pp. 61-62. I confirmed during my July 29, 2008 tour that the same medication practices are still in place, including the

15

"drive-by" distribution of medications in pill lines or cell-front. The failure of staff to speak with patients about side effects or the efficacy of the medications is seriously deficient in that staff members are not providing essential feedback to treating physicians about medication compliance, whether medications are having the desired effects and whether the patients are having side effects. This feedback is critical to basic psychiatric and medical care.

38.     In conclusion, SVSP displayed significant overcrowding-related problems that interfere with appropriate medical and mental health care, including significant problems with access to higher levels of care, staffing shortages, medication management and limited programming due to excessive lockdowns.

(b)     **California Medical Facility (CMF) Tour**

**CMF Tour Overview**

39.     I toured California Medical Facility (CMF) on July 30, 2008, although I also visited the prison many times between 1990 and 2000 when I was monitoring the *Gates* consent decree as a medical and psychiatric expert. According to the most recent CDCR weekly population report, as of midnight on August 6, 2008, CMF had a population of 3,056 and a design capacity of 2,297, for a population at 133 percent of capacity. Joint Pls' Trial Ex. 65 at p. 2. CMF is the least overcrowded institution in the entire 33-prison system. *Id.*

40.     CMF is the only prison that provides acute psychiatric hospitalization on its premises, although the acute units are operated by the Department of Mental Health (DMH).[3] CMF is also one of two prisons in the system (the other is Salinas Valley State Prison) that provides intermediate care facility (ICF) treatment (also through DMH) to prisoners housed in

---

[3] Atascadero State Hospital (ASH) also provides acute (and intermediate care facility) inpatient beds to CDCR prisoners, but has struggled to fill those beds due in large part to staffing shortages and custodial restrictions. Although 256 inpatient beds (231 intermediate and 25 acute) are supposed to be available to the *Coleman* class, ASH treated only 176 patients for the entire month of June 2008. Coleman Pls' Trial Ex. 139 at p. 1. As of July 30, 2008, ASH had only 136 patients from CDCR. Joint Pls' Trial Ex. 66 at pp. 5-6.

16

the CDCR. According to data provided to me during the morning meeting with staff, CMF

housed 671 3CMS and 551 EOP patients as of July 28, 2008. This data does not include patients

housed in DMH units and wings, however, and I did not receive DMH data on the tour. CMF

also recently opened a 50-bed mental health crisis unit which is being run by the CDCR (not

DMH). Staff reported that the unit opened on June 16, 2008 and there were 39 patients in the

unit as of July 30, 2008. Staff also explained that the 50 new mental health crisis beds are not

intended for use by CMF patients, but rather are available to other prisons throughout the system.

### Access to Higher Levels of Care

41.    The Special Master has repeatedly reported on the very limited access to DMH

inpatient beds, including most recently in the draft 20th report: "DMH acute care resources for

male inmates consisted of 130 beds at CMF and 25 beds at ASH, the latter of which re-opened to

admissions in July 2007. Slow access, coupled with a growing wait list and increasing numbers

of rescinded referrals, made it clear that these resources could not adequately accommodate

CDCR's expanding mental health population." Joint Pls' Trial Ex. 57 at p. 349. The Special

Master also collected data about referring institutions during the 20th round in order to detail the

delayed access to care:

> Of the 18 prisons that referred inmates to the acute programs at CMF and ASH,
> 13 reported delayed access. The most commonly cited cases, and the longest
> delays, were associated with referrals involving acutely psychotic inmates who
> were not suicidal. Such referrals, considered low priority, were routinely placed
> on a wait list and commonly rescinded by the institution. Other referrals,
> involving inmates within 30 days of parole and inmates without parole dates,
> were denied in accordance with DMH policy. Consequently, a large number of
> referrals failed to result in transfer, despite a low rejection rate. The percentage of
> acute care referrals that resulted in transfer was 40 percent for CSP/Sac, hovered
> around 50 percent for CMC and RJD, and barely exceeded 60 percent at DVI and
> WSP.

Id. at pp. 349-350. In my opinion, DMH's practice of designating acutely psychotic but non-

suicidal patients as "low priority" admissions to acute beds is a direct consequence of

overcrowding. Clinicians would not be forced to turn acutely psychotic patients away at the door in a system that had sufficient inpatient beds.

42.      Sterling Price, the acting Director of DMH Programs at SVSP and CMF, reported that the ICF waitlist for level IV beds was up to 171 patients and that the acute waiting list was 15 as of July 30, 2008, but had been as high as 45 on July 1, 2008. I visited the S2 unit (among others) during the tour, which currently has 20 mental health crisis beds for use by CMF inmates and 10 acute beds that are available to the entire system. Mr. Price reported that the unit had 37 referrals in June of 2008, but had a high of 52 referrals back in December of 2007. When beds are not available in this, and presumably other units, Mr. Price reported that referred inmates either stay in their EOP units or go to observation cells. As I heard from staff at SVSP as well, referrals on the weekend are especially hard due to limited staffing during that time. This information is consistent with the Special Master's general findings that there is poor access to acute and intermediate care facility beds in this overcrowded system.

43.      The insufficient access to higher levels of care has created a system which is overwhelmed by the acuity of its patients at every level of care. EOP units house many patients in need of inpatient care, MHCB's house patients in need of inpatient hospitalization, intermediate care facility units house many patients in need of acute hospital care and so on. When and if these patients finally reach the level of care they require, their mental health conditions may be far more serious, resulting in longer stays and more resources in order to stabilize and get well.[4]

44.      My interview with *Coleman* Class Member TTT illustrates some of these problems. I interviewed Class Member TTT in the S1 unit at CMF, which houses men with

---

[4] It is also apparent from the chaos of the system that the inverse problems happens—patients sometimes stay in *higher* levels of care than they require due to the logjam in the system. The Monthly Bed Utilization Report for the DMH Hospitals and Psychiatric Programs for June 2008, for instance, lists eight patients who are currently housed in acute beds while they wait for an ICF (a lower level of care) bed to open. Coleman Pls' Trial Ex. 118, Patients 608, 658, 670, 673, 694, 696, 759, and 760.

[229848-1]

acute mental illness. Although Class Member TTT had been housed in the acute unit for nearly six months at the time I saw him, he was floridly psychotic, with unintelligible thought processes. According to his file, he was prescribed a 300 mg. daily dose of Clozaril, which I refer to as the "atomic bomb" of antipsychotic medications because it is a medication of last resort that has the potential to effectively shut off a patient's bone marrow if it is not very closely monitored with weekly or bi-weekly blood draws. Class Member TTT demonstrates the very severe acuity of some *Coleman* class members in that he continues to display active psychosis even after 6 months of acute care, including treatment with very powerful anti-psychotic medication. It was also apparent to me that he will require an acute level of care for a long period of time, thereby consuming a very valuable resource within the CDCR's overcrowded system. According to the DMH Monthly Bed Utilization report, he also waited at MCSP for nearly a month (between 1/8/08 and 2/6/08) for an acute bed. Coleman Pls' Trial Ex. 118, Patient 127.

45.    I also interviewed another class member in an acute unit at CMF who, in my opinion, is also going to require a significant stay at that level of care. Class Member UUU was admitted into the acute unit on July 11, 2008 from administrative segregation, according to his medical file, although the file also showed another admission into the acute unit from administrative segregation on June 23, 2008. The file said he was diagnosed with Schizophrenia and Personality Disorder NOS, however his June 3, 2008 "Mental Health Treatment Plan" lists the following diagnoses: Schizophrenia, Paranoid Type; Major Depressive Disorder, Severe with Psychotic Features; and Schizotypal Personality Disorder. His medical file also showed a significant history of bizarre behavior, including pouring water over cell mates for "sacrificial purposes." His "Mental Health Treatment Plan" reflects a history of suicide attempts, cutting, violence and sexual victimization from childhood. Coleman Pls' Trial Ex. 140 at p. 1. The chart also notes that he has difficulty with female staff and that he has catatonic periods. *Id.* A clinician on the unit told me that Class Member UUU had a significant history of inpatient placements at DMH and Atascadero State Hospital. His file reflected that he was prescribed the

19

following medications:  Haldol Decanoate (150 mg. every 4 weeks); Abilify (30 mg. daily dose); Prozac (60 mg. daily dose); Cogentin (2 mg. daily dose); Benadryl (50 mg. daily dose) and Valproic Acid (2000 mg. daily dose).  In my opinion and based on Class Member UUU's clinical presentation and mental health history, he was probably prematurely discharged back to administrative segregation in late June to early July of 2008, which lead to his readmission into the unit on July 11th.  It is also my opinion that he will require an acute level of care for a significant amount of time in light of the severity of his mental illness.

46.     I also interviewed two class members in an ICF unit who, in my opinion, need acute care (*see* pp. 43-44 of this report regarding Class Members DDDD and EEEE), a class member who requires intermediate care, but has been housed in an EOP unit for more than six months waiting for an open bed (*see* pp. 42-43 of this report regarding Class Member FFFF), and a class member who was about to be prematurely discharged from an ICF bed back to EOP (*see* p. 41 of this report regarding Class Member BBBB).

### Medication Management Problems

47.     Every class member I spoke with about medications, including class members at CMF, reported that medications were distributed very quickly by line staff who never asked about either the efficacy of the medication or potential side effects.  The Special Master also documented significant failures with CMF's ability to manage patient medications:

> CMF staff at all levels reported that medication management was a broken system.  Problems included continuity of medication when inmates were moved between housing units, handling medication non-compliance, medication errors, implementation of DOT orders and considerable variation in the quality of documentation on MARs.  Many inmates who were interviewed reported that they frequently received the wrong medication.  Some inmates reported that they had to choose whether to go to yard or stay inside in order to receive medication, while others had difficulty getting medication during scheduled work assignments.  Staff confirmed that medication errors included wrong medication, wrong recipient and wrong time of administration.

Joint Pls' Trial Ex. 57 at p.78.

48.    In my experience, these kinds of medication problems are common in overcrowded systems. Line staff are overwhelmed by the volume of medications to distribute, psychiatrists carry large caseloads of patients, and staffing shortages mean that temporary or contract employees are distributing medications in facilities and to patients that they do not know.

**Insufficient Office and Treatment Space**

49.    CMF also struggles with serious space issues. It is an old-style prison that consists of a series of long, narrow units that run perpendicular to the main corridor. The prison was constructed at a time when there was no inclusion of treatment space or even offices for staff. As a result, treatment space is very limited and staff members frequently have to juggle their schedules and patients in order to complete groups, case manager contacts and other client contacts. I observed these problems first-hand in several units at CMF. In the S1 unit, for instance, staff explained that they use the same single room for treatment team IDTTs, case manager contacts, psychological testing, all patient groups and to conduct admissions into the unit. As we moved throughout other DMH units, we learned that these severe space restrictions are common in nearly every unit off the main corridor, including in S2 (which has 30 MHCB and acute beds), Q2 (which has 30 acute beds), and the P-3 unit (which has 30 ICF beds). When we visited the Q2 unit in particular, four staff members had to be kicked out of the room we used for confidential interviews with class members. In the A2 unit, which houses the Day Treatment Program and also has only one room for all clinical and other contacts, I was struck by the number of men housed in their cells in the middle of the day. When I asked Dr. Noorani, a psychiatrist in the unit, why so many men were in their cells in the middle of the day, he explained that they had to cancel a group so that I could use the one available room for interviews.

50.    The treatment and office space limitations are also severe for the CDCR mental health programs at CMF. I spoke with a clinician who works in the M2 unit (an EOP unit), for

[229848-1]

instance, who reported that there was no interview space available for staff and that the one available room must be shared with 4 or 5 other clinicians who frequently walk in and out of the room. In fact, the defendants recently submitted a plan to the *Coleman* court admitting significant treatment and office space shortages in the L, M, and N-wings for EOP patients and proposing to build 16 group therapy rooms, 28 interview rooms, 4 recreational therapy rooms, 6 education classrooms and "appropriate support space for staff." Coleman Pls' Trial Ex. 59 at p. 4. CMF does not propose to start construction of these spaces until 2010, however, and does not anticipate completion until 2012 at the earliest. *Id.*

51. In my opinion, these space limitations are directly related to overcrowding. While the infrastructure of CMF is antiquated and inadequate, there is no question that there are simply too many people housed at the prison. The 20-person dorm spaces in units J1, J2 and J3, are a good example. Those units used to be dining rooms, but were converted to dorm housing spaces because of overcrowding. If the population were lower, spaces such as J1 could be used as programming areas, treatment spaces, or staff offices. The impact of these conditions on mental healthcare is significant—mental health assessments, case manager contacts and psychiatrist meetings are frequently done in non-confidential settings where other staff members and even other inmates may be around. Having one room available for all mental health contacts also necessarily means that groups and other contacts will be canceled when more intakes than usual are processed into a unit, when clinical sessions run overtime or when there are security or other incidents on the unit. My visit, in fact, resulted in the cancellation of at least one group at CMF.

### The Use of Dorm Housing at CMF

52. Although CMF is one of the least overcrowded institutions in the system (133 percent of capacity based on population data as of August 6, 2008), it still has overcrowded dorm housing units. I toured the J1 unit, for instance, which has approximately 150 men split between 8, 12 and 20 person dorms. Although I did not personally tour units J2 and J3, I was informed that they are identical to the J1 unit. Although the J1 unit has smaller dorms than places like the

22

gym dorms at MCSP, these units are difficult places for people with or without mental illness to live because they do not afford any personal privacy. These settings also may exacerbate mental health conditions such as paranoia and create stressful environments for people who are otherwise vulnerable due to mental health issues, including cognitive impairments.

53.    Overall, CMF provides a good glimpse into systemic problems of accessing higher levels of care, medication management and crowded office and treatment space issues.

### (c)    Mule Creek State Prison (MCSP) Tour

### MCSP Tour Overview

54.    I toured Mule Creek State Prison (MCSP) on August 1, 2008. According to the most recent CDCR weekly population report, as of midnight on August 6, 2008, MCSP had a population of 3,687 and a design capacity of 1,700, for a population at 216.9 percent of capacity. Joint Pls' Trial Ex. 65 at p. 2. Mule Creek State Prison, unlike CMF and SVSP, does not have any DMH-run inpatient beds. It does have a large mental health population, however, including 526 EOP and 1,178 3CMS patients as of July 29, 2008. Coleman Pls' Trial Ex. 62. Because MCSP has capacities of 999 for its 3CMS and 510 for its EOP populations (Coleman Pls' Trial Ex. 57 at p. 2—showing 3CMS and EOP capacities) it was operating at 118 percent of its 3CMS capacity and 103 percent of its EOP capacity. MCSP also houses a significant number of its 3CMS inmates in overcrowded gyms as follows: 225 3CMS between 3 yards (73 in A-gym; 80 in B-gym and 72 in C-gym). Coleman Pls' Trial Ex. 62.

### Lack of Access to Higher Levels of Care, Including the Housing of Suicidal Inmates in MHOHUs and Administrative Segregation Units

55.    Because MCSP does not have ICF or acute beds, its biggest issue is providing adequate MHCB access to men who are suicidal or otherwise in crisis. During the morning meeting, both the Warden and the head registered nurse reported that the institution's MHCBs are almost always full and that while they are theoretically available to prisoners from other

23

institutions, they did not know of even one admission from an outside prison. Staff also reported that the overflow units to the MHCBs are also almost always full, including the cells set aside as the Mental Health Outpatient Housing Unit (MHOHU) and five administrative segregation cells on C-yard.

56.    The Chief Psychiatrist, Dr. Fowler, candidly talked about problems getting men into crisis beds and inpatient beds run by DMH. He said that it takes a lot of paperwork to do a DMH referral and significant staff time, which he estimated as 5-7 hours. I asked him if these problems resulted in fewer referrals to DMH and he said that they do. He said that staff sometimes opt to initiate the Keyhea process (to involuntarily medicate patients) rather than refer them to an inpatient bed. Dr. Fowler also told me that he prefers to keep some men at MCSP rather than refer them to DMH beds for "continuity" of care purposes. He admitted that this means he sometimes uses the MHCB unit to provide acute care. The data provided by MCSP shows that the institution admitted 42 patients into crisis beds during the three month period between April 1 and June 30, 2008. Five of the admitted patients stayed a combined 13 extra days due to administrative reasons, which were described as "medical quarantine, institutional emergency, cell unavailability due to overcrowding or custody unavailable to complete transport." Joint Pls. Trial Ex. 141 at p. 2. When Dr. Fowler does not have open beds in the MHCB unit, he uses six cells designated as the MHOHU and then 5 administrative segregation cells if the MHOHU cells are full.

57.    The Special Master has grave concerns about the systemic use of alternative placements due to shortages of mental health crisis beds. In his 20th monitoring report, he wrote:

> Fourteen institutions that did not have adequate access to licensed crisis beds resorted to using a variety of temporary monitoring arrangements, most of which were grossly inappropriate alternatives to acute care. Despite having 26 CTC beds and a 20-bed MHOHU, CSP/Sac referred inmates in holding cells for up to eight hours, held half of all MHOHU admissions for longer than 72 hours, and transferred 33 inmates to MHCB units in other prisons. MCSP used six MHOHU beds and five observation cells in administrative segregation to monitor inmates it was not able to admit to its eight-bed MHCB unit. CSP/LAC, KVSP, NKSP, SVSP, and WSP, all with licensed CTCs, routinely used holding cells and tanks to

> monitor inmates for whom MHCBs were not available. CCI, CIM, and DVI used
> alternative sites to monitor inmates for whom OHU beds were unavailable. OHU
> admissions at ASP, CRC, CTF, SCC, and SQ routinely exceeded 72 hours
> because inmates were not timely referred and/or transferred to MHCB units.

Joint Pls' Trial Ex. 57 at p. 352-353. The Program Guide specifies that patients should not be

housed in OHUs for longer than 72 hours except in limited circumstances. Joint Pls' Trial Ex. 9

at p. 12-5-28.

58.    The Mental Health Outpatient Housing Unit ("MHOHU") at MCSP is a

disturbing example of one of the overflow units to which the Special Master refers. The

MHOHU is in a fenced-off area within an administrative segregation unit at MCSP. Staff

reported during the morning meeting at MCSP that the MHOHU cells are usually full. Data

provided during the tour showed that there were 125 patients admitted to the MHOHU between

April 1st and June 30th of 2008, 33.6 percent of whom stayed in the MHOHU for longer than 72

hours. Joint Pls' Trial Ex. 142 at p. 4. During my tour on August 1, 2008, four of the six cells

were occupied by men who had been housed there, according to notes on their doors, for

between one and eight days. The cells themselves are small, concrete rooms that are often

completely bare aside from a small toilet and sink. In fact, two of the men I saw in these cells

were wearing nothing but suicide smocks and had no mattress or blanket. They told me that they

do not get a mattress or a blanket even during the night while they are sleeping, forcing them to

sleep on the cold, concrete floor wearing only a suicide smock. The man who had been in the

MHOHU for 8 days was lucky enough to have a one inch plastic-coated mattress, but reported

that he slept on the bare concrete floor in a suicide smock and without a blanket for the first 7

days he was there.

59.    The MHOHU cells at MCSP do not constitute anything even approaching an

acute level of care. Attached to this report as **Appendix D** are pictures of a MHOHU cell that I

saw during my tour. To the contrary, the conditions found in the MHOHU are likely to

exacerbate many patients' clinical conditions and will ultimately dissuade people from

communicating candidly with their doctors about their mental health conditions. My interviews

with two men who were currently in the MHCB unit, but who had spent time in the MHOHU support these opinions. One of those men (Class Member VVV) was wearing a suicide smock when I interviewed him and told me that he became so upset about being placed in the MHOHU without a mattress or a blanket that he smeared feces in his cell.[5] The paperwork in his file confirmed this account. Class Member WWW, the other patient I interviewed in the MHCB unit, told me that he did not like the MHOHU, primarily because he was forced to sleep on a concrete floor without a blanket or a mattress. *See* **Appendix D**.

60.    While it is essential that staff be vigilant about suicide precaution measures, which may include removing items like underwear, non-safety blankets and other clothing items, the conditions in the MHOHU are so extraordinarily harsh that they risk inhibiting people from coming forward about their mental health conditions. This, in turn, hampers mental health staff's ability to fully evaluate and treat their patients. It is my experience that word travels quickly among inmates about deplorable conditions they experience. This results in prisoners not reporting the extent of their suicidality out of fear of being housed in places like the MHOHU.

61.    Yet the MHOHU placements are not the only overflow beds for the MHCB unit at MCSP. Mule Creek also sets aside 5 administrative segregation cells in the same cordoned off area where the MHOHU cells are located. They are therefore overflow to overflow cells in that they house people who have been referred for mental health crisis care but who cannot be housed in either a MHCB or a MHOHU bed. The Special Master found the following problems with respect to the five administrative segregation cells: "The institution did not track the number or duration of placements in these cells. Inmates placed in the holding cells were reportedly monitored by custody staff on a one-to-one basis until they were either admitted to an MHCB or

---

[5] When persons with mental illness smear feces, it is most likely due to acute, untreated psychosis. It can also be associated with people who are psychotic because of a serious mood disorder such as Bipolar Disorder, Manic and Schizoaffective Disorder, Manic. This behavior is also seen in individuals who have severe cognitive impairments such as mental retardation and dementia due to medical conditions.

26

[229848-1]

returned to their cell in administrative segregation. Inmates placed in holding cells in administrative segregation reportedly received daily clinical contacts, most of which occurred cell-front. Contacts routinely occurred without the inmate's UHR, as the medical records for inmates retained in the observation cells were stored in the TTA of the CTC." Joint Pls' Trial Ex. 57 at p. 62.

62.    Again, these overflow units are a direct result of overcrowding and represent the system's desperate and inadequate attempt to deal with a significant deficiency of inpatient beds. In fact, MCSP notified the Director of Mental Health for the Division of Correctional Health Care Services back in October of 2006 that 8 crisis beds were wholly inadequate for the October 2006 census of 265 EOP patients and that increasing the EOP population would seriously impede the provision of mental healthcare: "By doubling our EOP population without increasing acute care capacity the department would be taking an acute care program that is already too small for our current census and further overloading it...Failure to have adequate acute care capacity increases the risk of suicide and medical (mental health) negligence for our entire facility." Joint Pls' Trial Ex. 143 at p. 1. Despite these warnings, MCSP's EOP population as of July 29, 2008 was 526 patients (261 patients *more* than MCSP had when it issued the memorandum to headquarters staff warning that eight MHCBs were wholly inadequate).

### The Significant Use of "Bad Beds" at MCSP

63.    In addition to the disturbing MHOHU and administrative segregation placements of acutely ill class members, MCSP also generally houses many inmates in temporary "E-bed" placements in either converted gymnasiums or dayroom floors of housing buildings. As of July 1, 2008, MCSP had 729 of these "non-traditional," bad beds. Joint Pls' Trial Ex. 68 at p. 7.

64.    For instance, I toured the gyms on the A and B yards of the facility. I understand that these buildings at one time acted as real gymnasiums, but that they have been used for housing in recent years due to overcrowding. Staff members in the gym on B-yard informed me that they have a capacity of 160 men, and that the gym was full on the day of my tour. The data

27