# EXHIBIT V
# PART 3

MCSP provided to us in the morning showed that 80 *Coleman* class members were housed in this gym as of July 29, 2008, all at the 3CMS level of care. Coleman Pls' Trial Ex. 62. The large room consists of multiple rows of triple bunks, although staff informed me that they had been able to empty out some of the middle bunks in recent weeks or months. Pictures of the B-yard gym are attached to this report as **Appendix E**. I spoke with a *Coleman* class member at the 3CMS level of care and asked him what it was like to live in the gym. He said that conditions can be very stressful, which breeds anger among the men and tends to worsen one's mental health symptoms.

65.    I also toured the gym on A-yard during my visit to MCSP. Pictures of the A-yard dorm are attached to this report at **Appendix F**. The A-yard gym is the worst living space I have seen in any correctional system, including even the H-dorm at Solano. There were nearly 200 men housed in rows of triple bunks, including on all of the middle bunks as far as I could tell. According to the MCSP data, 73 *Coleman* class members were housed in the gym as of July 29, 2008, all of whom were at the 3CMS level of care. Coleman Pls' Trial Ex. 62. One row of beds was placed at an angle and there was virtually no visibility for staff or other inmates to see around corners or down the rows of beds. I talked to several men in this gym who reported that they were often unable to sleep at all in the gym and that the living conditions are made even worse by the fact that they have no privacy at all.

66.    Placing inmates in overcrowded gym and dorm settings is often inappropriate for people with mental health issues and can either exacerbate existing symptoms or, in some cases, trigger symptoms in people who would not otherwise display them. The Special Master also noted this as a problem in his 20th round report: "Interviewed inmates reported, and many of the higher quality progress notes documented, the underlying stress, anxiety and frustration associated with inmate movement in and out of E Beds and triple-bunked dorms." Joint Pls' Trial Ex. 57 at p. 68. In my experience, crowded living spaces that afford no personal privacy breed anxiety, fear and sometimes violence. For 3CMS inmates who are routinely triple-bunked in chaotic, overcrowded dorms, this means they may experience damaging levels of stress and

28

fear of predation, as well as sleep deprivation. These conditions exacerbate mental illness and are serious barriers to the provision of minimally adequate mental health and medical care.

### Medication Management Problems

67.     The Special Master found the following with respect to MCSP's medication management system during the 20th round: "[C]ontinuity [of medications] during intra-facility transfers worsened during the monitoring period, with audits yielding a compliance rate of 75 percent…recorded noncompliance prompted referral to mental health only 59 percent of the time and less than half of referrals submitted for noncompliance generated contact within seven calendar days." Joint Pls' Trial Ex. 57 at p. 59.

68.     I also observed significant problems with MCSP's medication management practices during my tour on August 1, 2008. The men I interviewed at the institution, for instance, all described the same "drive-by" distribution of medications by line staff. They universally reported that medications are distributed within a matter of a few seconds by staff members who do not ask about either the efficacy of the medications or potential side effects the patients might be having. The basic provision of adequate psychiatric care necessarily depends on information-sharing between line staff and doctors who prescribe the medications. Dr. Fowler, the Chief Psychiatrist at MCSP, candidly told me during my tour that there are "no outcome measures at all" that permit psychiatrists to know whether intervention measures are having any effect. The inability of overburdened line staff to adequately monitor medication management at MCSP is one example of the failure to monitor and assess outcome measures.

69.     I also learned from inmates waiting in a yard pill line at MCSP that they cannot receive Wellbutrin because staff fear they will abuse it. If this is true, the removal of Wellbutrin from the formulary is, in my opinion, an admission that line staff are unable to appropriately monitor medication distribution and compliance. If appropriate monitoring could be achieved, there would be no reason to worry about hording or abuse. The resulting restriction on this

29

medication, which is highly effective in treating a variety of mental health conditions, hampers psychiatrists' ability to appropriately provide care to their patients.

### Problems with MCSP's EOP Program

70.    The Special Master also documented significant problems with MCSP's EOP program during his 20th round of tours: "Internal audits yielded 60 percent compliance rates for bi-weekly case manager contacts during the second and third quarters of 2007. Noncompliance was attributed to the extra intake work for case managers associated with the program's rapid expansion, excessive case manager caseloads, inadequate clinical supervision and an overall lack of cooperation from custody officers. Case manager contacts continued to occur in cubicle spaces on the day room floor, which afforded inadequate auditory and visual privacy." Joint Pls' Trial Ex. 57 at p. 65. In my opinion, the expansion of MCSP's EOP program is directly related to overcrowding and the system-wide shortage of EOP beds.

### 2.    Updated Information Regarding Overcrowding-Related Violations at Institutions I Previously Toured

71.    There were also two institutions, DVI and Solano, that I previously toured in October and November of 2007, but that I did not return to during my recent round of site inspections. I did, however, review updated information about these institutions from various sources including the *Coleman* Special Master's monitoring reports, Defendant Cate's Responses to Second Set of Interrogatories from Plaintiff Coleman, and other documents. It is my opinion, based on this updated information, that there have been no material changes regarding the provision of inadequate medical and mental healthcare at either DVI or Solano and the effects of extreme overcrowding on these prisons.

72.    The overall level of overcrowding in the system remains at critical levels. As of August 6, 2008, CDCR's prison and camp population was at 160,334, with a design capacity of 84,066. The prison system is still operating at 190.7 percent of design capacity. Joint Pls' Trial Ex. 65 at p. 1. As of October 31, 2007, the time I made my initial tours of the prison for this

30

trial, CDCR institution population was 160,273 with a design capacity of 78,698. The prison

system was then operating at 198.6 percent of design capacity. Joint Pls' Trial Ex. 25 at p. 1.

There has been no more than a symbolic change in the level of overcrowding since my fall 2007

tours and almost all of the change can be attributed to an increase in the number of prisoners

housed in private, out of state prisons. As of October 31, 2007, 1,673 prisoners were housed in

Arizona, Mississippi and Tennessee. Joint Pls' Trial Ex. 25 at p. 1. By August 6, 2008, 4,614

prisoners were housed out of state and Oklahoma was added to the list. Joint Pls' Trial Ex. 65 at

p. 1.

### (a)    Deuel Vocational Institute (DVI) Update

73.     I toured Deuel Vocational Institute (DVI) on October 29, 2007 and documented

my findings in my November 9, 2007 report. 11/9/07 Report at pp. 29-45. As stated in my prior

report, DVI's population as of midnight on October 24, 2007 was 3,855 with a capacity of 1,627,

meaning that the population at that time was 236.9 percent of capacity. *Id.* at p. 29. As of

midnight on August 6, 2008, DVI's population was 3,811 with a capacity of 1,681, meaning that

the population is at 226.7 percent of capacity. The Reception Center at DVI is the most

overcrowded part of the prison, housing 3,134 prisoners in space designed for 1,187, a shocking

264 percent of capacity. Joint Pls' Trial Ex. 65 at p. 3.

74.     As of June 20, 2008, the mental health caseload population at DVI was 857, with

765 CCCMS and 92 EOP. At the time of my tour, the mental health population was 933, but

with only 54 EOP inmates. Although the mental health population has decreased slightly, the

EOP population has almost doubled. Seventy of these EOP inmates were in the Reception

Center as of June 20, 2008. Coleman Pls' Trial Ex. 57 at p. 2.

75.     Since my November 9, 2007 report, the Special Master issued a report from his

20th round tour at DVI, which took place on October 2-4, 2007. The issues identified by the

Special Master confirmed many of the observations I made in my report.

31

76.    The Special Master found that there were substantial problems with access to

higher levels of care at DVI, leading to use of overflow beds that were "isolated and poorly

suited for acute psychiatric patients." Joint Pls' Trial Ex. 57 at p. 115.  As I noted in my report,

housing suicidal patients in harsh, dirty, and noisy overflow units is a very dangerous practice.

There were also delays in psychiatric responses to referrals. Joint Pls' Trial Ex. 57 at p. 122-123.

77.    The Special Master also reported on the serious problems with medication

management that I observed.

> Problems persisted in all areas of medication management, although
> methodologically flawed audits rendered it impossible, in most cases, to ascertain
> the magnitude of noncompliance or to identify the underlying causes.  Medication
> continuity upon arrivals and transfers within the institution remained poor, as did
> the institution's response to medication noncompliance.  The institution had not
> taken steps to remedy deficiencies noted during the preceding site visit relative to
> ordering DOT in response to medication cheeking, hoarding, and overdose.  An
> audit of distribution of parole medications was too small to produce meaningful
> results.

Joint Pls' Trial Ex. 57 at p.112-113.  The Special Master also reported that "protocols for

monitoring blood levels of inmates prescribed mood-stabilizing medications were not working.

From July 20 to September 19, 2007, more than half, or 75 of 134 ordered labs were not drawn

for unknown reasons.  In addition, UHRs reviewed by the monitor and chief psychiatrist during

the site visit indicated that blood work was not always ordered when indicated.  None of the

reviewed UHRs belonging to EOP inmates contained required lab reports for currently

prescribed medications." Joint Pls' Trial Ex. 57 at p. 113.

78.    I have reviewed Defendant Cate's Response to Second Set of Interrogatories from

Plaintiff Coleman, dated August 8, 2008.  In response to questions about any improvements

made in the ability of CDCR to house inmates at appropriate levels of mental health care,

changes in the amount or quality of office space for mental health clinicians, and changes in the

amount or quality of treatment space, the only change identified at DVI was a vague change to a

"medical office."  It is my opinion that any change DVI makes to a medical office will not be

32

sufficient to materially alter that delivery of mental health care to the overcrowded population still housed at the prison.

**(b)** **California State Prison - Solano Update**

79.     I toured Solano State Prison on October 31, 2007 and documented my findings in my November 9, 2007 report. 11/9/07 Report at pp. 45-50. As stated in my prior report, Solano's population was then 6,051 with a design capacity of 2,610, for a population at 231.8 percent of capacity. 11/9/07 Report at 45. As of midnight on August 6, 2008, Solano's population was listed as 5,658 with a capacity of 2,610, meaning that the population is at 216.8 percent of capacity. Joint Pls' Trial Ex. 65 at p. 2. The prison obviously remains dangerously overcrowded.

80.     As of June 20, 2008, the mental health caseload population at CSP-Solano was 1,552, with 1,541 CCCMS and 11 EOP. Coleman Pls' Trial Ex. 57 at p. 3. This is a similar population to that during my tour, which was 1,517 CCCMS and 10 EOP class members.

81.     The Special Master's report on this 20th round tour, which occurred on December 4-6, 2007, confirmed the observations I made during my tour. There were serious problems with medication administration, symptomatic of severe overcrowding and understaffing. The Special Master reported that, "[f]aced with chronic psychiatric vacancies, CSP/Solano continued to rely on contract psychiatrists. Treatment continuity was poor in that many inmates rarely saw the same psychiatrist from one visit to the next. The institution did not audit unexplained and unwarranted medication changes, the subject of a CAP item, and lacked the permanent staff to perform psychiatric peer review. Consequently, it could not be determined if poor treatment continuity continued to be associated with unexplained, unjustified, and unwarranted changes in medications." Coleman Pls' Trial Ex. 57 at p. 95.

82.     I have reviewed Defendant Cate's Response to Second Set of Interrogatories from Plaintiff Coleman, dated August 8, 2008. Defendants did not identify any changes at CSP-Solano in response to questions about any improvements made in the ability of CDCR to house

33

inmates at appropriate levels of mental health care, changes in the amount or quality of office space for mental health clinicians, and changes in the amount or quality of treatment space. Coleman Pls' Trial Ex. 66.

### 3. Evidence Concerning Systemic, Overcrowding-Induced Constitutional Violations

83.    There is substantial evidence in recent reports issued by the *Plata* Receiver and the *Coleman* Special Master, and in other sources of evidence I reviewed in connection with my preparation of this report, that the overcrowding-induced problems I personally observed at SVSP, CMF, MCSP, DVI, and SOL are also affecting the delivery of medical and mental health care at prisons system-wide. These system-wide problems affect almost every one of the critical components of a constitutionally-adequate mental health care system that were identified by the *Coleman* court in its July 23, 2007 Order. *See* 7/23/07 Order at 4 (describing the key elements of a constitutional mental health system as identified in the *Coleman* Court's decision on the merits of this case in 1995 in *Coleman v. Wilson*, 912 F. Supp 1282, 1305 (E.D. Cal. 1995)).

84.    It was my opinion previously and remains my opinion now, that the CDCR is a severely overcrowded system. According to its most recent monthly population report, there were 160,334 prisoners housed within the state's 33 prisons and camps as of midnight on August 6, 2008, with Avenal State Prison the most overcrowded (235.9 percent) and California Medical Facility the least overcrowded (133 percent). Joint Pls' Trial Ex. 65 at p. 1-2. The current overall population is operating at 190.7 percent of its design capacity (84,066). *Id.* at p. 1.

85.    In his 7th Quarterly report, the Receiver documented ongoing and serious problems with the medical care systems. With respect to the system as a whole, he wrote:

> Accomplishing the mission [of the Receivership], however, is a huge challenge only because of the current chaotic state of CDCR's medical delivery system. Timely access is not assured. The number of medical personnel has been inadequate, and competence has not been assured. Accurate and complete patient records are often not available when needed. Adequate housing for the disabled and aged does not exist. The medical facilities, when they exist at all, are in an abysmal state of disrepair. Basic medical equipment is often not available or used.

34

> Medications and other treatment options are too often not available when needed. Custody resources needed to facilitate access to care and provide the security necessary to deliver health care safely in a prison setting are inadequate, lacking both the personnel and structure to ensure timely access to health care services. Thus the remedial actions necessary to fix these problems are far from simple. Indeed, it is a misnomer to call the existing chaos a "medical delivery system"—it is more an act of desperation than a system.

Joint Pls' Trial Ex. 67 at p. 5. The Receiver and the Special Master also documented numerous other systemic problems, including medication management issues, problems with medical records, serious delays in access to higher levels of care, staffing shortages, and lack of adequate office and treatment space.

> (a)    **Systemic Problems with Seriously Delayed Access to Higher Levels of Care**

86.    Perhaps the most disturbing and direct result of severe overcrowding is the terrible shortage of inpatient beds for *Coleman* class members. I am aware that the Special Master and the Receiver have been very concerned about this issue for some time. The Receiver documented the shortages in his 8th Quarterly Report, which was issued in June of 2008:

> At present, there exist serious shortages of mental health inpatient beds (including a waiting list of 162 for long-term intermediate care hospitalization). At present, CDCR simply does not have anything near adequate mental health treatment facilities for prisoners with serious mental health problems.

Joint Pls' Trial Ex. 56 at p. 48. The Receiver then discussed a recent death in a California prison that he attributed directly to this serious shortage of inpatient mental health beds:

> Patient B was a 36 year old male diagnosed with Hepatitis C antibody positive, paranoid schizophrenia, history of head trauma, borderline intellectual functioning, antisocial personality disorder, and history of substance abuse. Incarcerated continually since 1994, Patient B has been, in the past, admitted to both mental health crisis housing and administrative segregation housing. These placements were for safety concerns. Because of his mental health problem, Patient B was vulnerable to victimization when housed in "general population." He was last housed in general population, however, and also double-celled. On November 26, 2007, Patient B was found in his cell unresponsive with multiple wounds about the head, weak pulse, agonal breathing and fixed dilated pupils. He was transferred to a

35

local hospital, determined to be brain dead, and care subsequently withdrawn. According to CDCR officials, Patient B had been beaten to death by his cellmate.

*Id.* at p. 48.

87.    The *Coleman* Special Master also documented serious problems with access to higher levels of care during his 19th and 20th round monitoring tours:

> Access to higher levels of mental health care at the DMH level remained slow. In addition, the ongoing need for sufficient MHCBs continued to challenge the institutional capacity to provide crisis care. Inmates' overly long stays in institutional OHUs and MHOHUs and their placements in holding areas reflect not only the continuing need for more MHCBs, but also the deferred access to inpatient levels of care needed by the more severely mentally inmates. For several years the defendants have been struggling with assessing their mental health bed needs, particularly at the most intensive levels of care, and developing a responsive long-term plan. Undoubtedly, the task has been challenging, for no less reason than the shifting nature of many conditions that affect CDCR and its mental health care. These challenges have included unprecedented growth in the prison population and resulting changes to population projections; understaffing of personnel at CDCR's own headquarters to execute the many parts of the planning task; and coordination with the California Prison Receivership, which has become engaged in the redesign of medical care, and to some extent mental health care, within CDCR institutions.

Joint Pls' Trial Ex. 69 at p. 131-132. In the draft 20th report, he noted, "Timely access to appropriate levels of care, essential to the efficacy of a mental health delivery service, continued to elude CDCR." Joint Pls' Trial Ex. 57 at p. 349.

88.    The dire need for substantial additional inpatient, MHCB and EOP beds was apparent to me during my tours as I talked to and observed patients at every level of care. It was clear that the severe shortage of mental health beds has created a system that houses a significant portion of *Coleman* class members at lower levels of care than the patients clinically require. A significant number of class members who I interviewed at the EOP level of care, for instance, required, inpatient psychiatric hospitalization. I base this statement on my clinical evaluation of those patients, on my review of their medical charts and on my knowledge of the MHSDS system during the time that I was monitoring the *Gates* consent decree. I also interviewed several patients in DMH intermediate care facility placements that, in my opinion, required acute

36

psychiatric hospitalization. I was struck by the very high acuity of the patients I encountered during my tours because they were much sicker, as a whole, than the *Coleman* class members I encountered between 1990 and 2000 while monitoring CMF as a medical and psychiatric expert for *Gates*.

### MHCB and EOP Patients Who Require Inpatient Care

89.    The following are examples of class members from my recent tours who I believe require a higher level of mental healthcare than was currently being provided:

a)    I interviewed *Coleman* Class Member VVV in the MHCB unit at MCSP on August 1, 2008. He was designated at the EOP level of care. The medical file reflected that Class Member VVV is diagnosed with Schizophrenia or Schizoaffective Disorder. His "Inmate Profile" shows that he is also diagnosed with Dementia due to HIV disease or Cognitive Disorder NOS, although I did not see these diagnoses in his medical file. Coleman Pls' Trial Ex. 145. He was prescribed the following medications: Risperdal (37 ½ mg. shot every 2 weeks); Lexapro (20 mg. daily dose) and Trazodone (unknown daily dose). The "Inmate Profile" sheet shows a significant suicide attempt history and also shows that while he was referred for acute inpatient care at DMH on February 20, 2008, he was not placed in an acute bed until June 6, 2008. The MHCB 2nd Quarter Chart shows that he was housed in an MHCB for 37 days between April 30 and June 6, 2008. Coleman Pls' Trial Ex. 145. Class Member VVV reported that he was in the MHOHU previously, where he smeared feces in his cell because staff would not provide him with a mattress or blanket. Pictures of a MHOHU cell are attached to this report as **Appendix D.** The "Patient Activity Report-Inhouse" log shows that he was admitted to the MHOHU three times between June 24 and July 22, 2008 (4/24-4/30; 7/4-

7/7 and 7/22 for one day). Coleman Pls' Trial Ex. 146 at p. 13. In my
opinion and based on Class Member VVV's clinical presentation and his
significant suicide history, he exceeds the EOP level of care and should be
housed in an inpatient setting.

b)    I interviewed *Coleman* Class Member XXX at SVSP on July 29, 2008.
Class Member XXX was floridly psychotic when I spoke with him, was
also manic and was religiously preoccupied. His file reflected that he was
not taking medications despite documented assaults on staff due to
untreated mental health issues. He is also not listed on the Keyhea "active
cases" log from SVSP dated July 20, 2008. Coleman Pls' Trial Ex. 147 at
p. 4. Despite his condition, Class Member XXX was housed in an
administrative segregation unit with active mental health issues that were
not being treated. He is designated at an EOP level of care, but in my
opinion, requires inpatient psychiatric care.

c)    I interviewed *Coleman* Class Member YYY at SVSP on July 29, 2008.
Class Member YYY was very paranoid, could not maintain eye contact,
and was responding to internal stimuli. He also had significant cognitive
impairment. The "inmate history" sheet provided by the institution shows
that he has a diagnosis of Schizoaffective Disorder and is at the EOP level
of care. He was prescribed Zyprexa (daily dose of 10mg) and Cymbalta
(daily dose of 60 mg). Although Class Member YYY was being housed at
the EOP level of care, I believe he requires inpatient care based on his
clinical presentation and his active psychosis. Clinicians at the institution
agree that Class Member YYY needs an inpatient level of care as he has
been waiting for an inpatient bed since his 11/8/07 referral (or for nearly 9

38

months as of the date I saw him). Coleman Pls' Trial Ex. 118, Patient 622.

d)   I interviewed *Coleman* Class Member ZZZ at SVSP on July 29, 2008. Class Member ZZZ reported, and his file confirmed, that he made a serious suicide attempt more than a year before and had been waiting for an intermediate care facility bed ever since that time. The "Inmate History" sheet provided by the institution shows that he has a diagnosis of Bipolar I disorder, severe with psychotic features. Coleman Pls' Trial Ex. 148 at p. 1. He was psychotic and labile when we spoke and had low frustration tolerance. He was also on very high doses of medications as follows: Buspar (60 mg. daily dose); Zyprexa (30 mg. daily dose); Inderal (60 mg. daily dose); Visteril (150 mg. daily dose, and; Lithium (900 mg. daily dose). While CDCR clinicians agreed that Class Member ZZZ needs inpatient care, he has been housed at the EOP level for nearly a year awaiting that placement. The SVPP waiting list reflects that he has been waiting for an inpatient bed since his September 6, 2007 referral (or nearly a year as of the date I saw him). Coleman Pls' Trial Ex. 118, Patient 607.

e)   I interviewed Class Member LL at SVSP on July 29, 2008. Class Member LL was floridly psychotic during our interview and had strange ideas of reference. He believed that the FBI was sending lasers into his cell through wires and he also believed that his wife worked on the *Coleman* lawsuit in San Francisco. He had been admitted for mental health crisis care five times in 2007 and once already in 2008 according to his "Inmate History" print-out. Coleman Pls' Trial Ex. 149 at p. 28. His file reflected that he was on Keyhea and that he was currently taking the following

39

medications:  Risperdal Consta (37 ½ mg. every 2 weeks) and Risperdal (2 mg. daily dose).  He was diagnosed with Schizoaffective Disorder.  It appears from a DMH log that clinicians referred Class Member LL to an ICF bed on September 27, 2007 and that he was "accepted" for the bed on January 22, 2008.  He then sat on the waiting list until May 4, 2008, when someone rescinded his referral.  Class Member LL needs a higher level of care than EOP as evidenced by his clinical presentation and his multiple mental health crisis bed placements since 2007.  Coleman Pls' Trial Ex. 117, Patient 570.  In my opinion, he should not have been removed from the ICF waitlist.

f)    I interviewed Class Member AAAA at SVSP on July 29, 2008.  Class Member AAAA was being treated at the EOP level of care and was diagnosed with Schizophrenia.  According to his file and my conversation with him, Class Member AAAA had a significant violent history, which included decapitating his father with a machete.  His "Inmate History" shows that he was on Keyhea since November 2, 2007 (order expires November 1, 2008).  Coleman Pls' Trial Ex. 150 at p. 38.  He was also on a very significant amount of medications, including the following:  Haldol Decanoate (100 mg. shot every two weeks); Cogentin (2 mg. daily dose); Zyprexa (20 mg. daily dose).  Despite being prescribed a significant amount of medication, including four times the normal dose of Haldol Decanoate, Class Member AAAA was still very ill and requires inpatient care.  In my opinion, he should have been promptly transferred to an inpatient psychiatric hospital.  According to the DMH referral log, clinicians referred Class Member AAAA to an inpatient bed on February 20, 2008, but he was sent back to the EOP unit to wait for that bed.

40

Coleman Pls' Trial Ex. 151 at pp. 1-2. It also appears that staff lost his referral package at one point, which required SVSP to send a replacement. His Inmate History also shows that Class Member AAAA saw seven different psychiatrists for psychotropic medications between June of 2007 and June of 2008.

g)    I interviewed Class Member BBBB at CMF on July 30, 2008. Although Class Member BBBB was in an intermediate care facility placement when I interviewed him, there was a July 29, 2008 physician note discharging him back to the EOP level of care. Class Member BBBB was diagnosed with Schizophrenia, Paranoid Type, Depressive Disorder, NOS, and Polysubstance Dependence and was prescribed the following medications: Abilify (30 mg. daily dose), and; Remeron (30 mg. daily dose). I saw paperwork for two different people in Class Member BBBB's file and when I asked him about it, he said that he was both men. I told him that the men were born five years apart based on the paperwork and he confirmed again that he is both men. In my opinion, Class Member BBBB was not appropriate for discharge to an EOP level of care and requires inpatient mental health treatment. Unless Class Member BBBB has an alias, it also appears that his medical file may contain documents about a different *Coleman* class member.

h)    I interviewed Class Member CCCC at MCSP on August 1, 2008. Class Member CCCC was housed in administrative segregation at the EOP level of care and appeared to have been there for a very long time. His file showed that he was diagnosed with "Psychosis NOS," but his "Inmate History" lists his diagnosis as Schizophrenia, Paranoid Type. Coleman

41

Pls' Trial Ex. 152 at p. 1.  His file showed that he was diabetic and that he

was being treated for his mental health issues, as of July 25, 2008, with a

20 mg. daily dose of Abilify.  His "Inmate History," however, which is

dated August 1, 2008, shows that all medications were stopped on January

27, 2008.  He reported that he was previously housed in inpatient beds at

both CMF and SVSP.  At the time of our interview, Class Member CCCC

was floridly psychotic and was responding to multiple internal stimuli.

The "Patient Activity Summary" shows that he had three admissions to the

MHOHU between April 19 and June 25, 2008 for a total of 27 days in the

MHOHU.  Coleman Pls' Trial Ex. 146 at p. 15.  Based on the information

in Class Member CCCC's file and his clinical presentation, he very clearly

needs inpatient care and is not appropriately housed at the EOP level of

care.

i)    I interviewed Class Member FFFF at CMF on July 30, 2008.  His case

manager progress note, dated 7/25/08 shows that he has a diagnosis of

Schizophrenia, Paranoid Type, and Polysubstance Dependence.  Coleman

Pls' Trial Ex. 153 at p. 1.  His file showed that he was prescribed

Risperdal Consta (50 mg. every 2 weeks); Risperdal (4 mg. daily dose)

and Thorazine (200 mg. daily dose).  His "Case Manager Progress Note"

shows that he is on a Keyhea as a "DTO" (Danger to Others).  According

to the medical file, staff referred Class Member FFFF to an intermediate

care placement on January 28, 2008, but he was waiting at the EOP level

of care until a bed opened up for him.  I agree that Class Member FFFF

requires inpatient care.  Because there are no beds, however, he has been

forced to stay in a clinically inappropriate placement for nearly six

months.  The severity of his mental illness is demonstrated by numerous

assaults on staff and other prisoners, his history of inpatient admissions and his suicidal history.

### Intermediate Care Facility Patients Who Require Acute Care

a)    I interviewed Class Member DDDD at SVSP on July 29, 2008. Class Member DDDD was very psychotic and displayed prominent negative symptoms. He was paranoid and had a history of staff assaults. He was also prescribed significant medications, including two anti-psychotics and one mood stabilizer as follows: Risperdal (8 mg. daily dose); Seroquel (400 mg. daily dose), and; Depakote (1000 mg. daily dose). In my opinion, Class Member DDDD was inappropriate for ICF care due to his excessive psychosis and paranoia and his history of staff assaults. He requires placement in a locked hospital setting that provides acute care.

b)    I interviewed Class Member EEEE at CMF on July 20, 2008. He had been housed in an intermediate care facility bed since December 3, 2007 and had a significant violent history. Class member EEEE was diagnosed with Schizoaffective Disorder (depressive type) with Polysubstance Dependence in remission. His October 24, 2007 "Mental Health Treatment Plan," however, listed his diagnosis as Schizophrenia, Paranoid Type, and Polysubstance Dependence in remission. Coleman Pls' Trial Ex. 153 at p. 3. He was prescribed the following medications: Depakote (1750 mg. daily dose); Prozac (40 mg. daily dose); Propranolol (20 mg. daily dose); Zyprexa (25 mg. daily dose), and; Benadryl (100 mg. daily dose). Class Member EEEE is in my opinion too sick to be at an intermediate level of care and requires placement in an acute hospital setting. He continued to display extensive thought blocking by competing

43

[229848-1]

stimuli despite being housed at the ICF level of care for more than seven months and despite being prescribed large doses of anti-psychotic and mood stabilizing medications.

90.    These class members (and the two men I saw in the acute unit at CMF) were some of the most acutely ill people I have seen. When I said this to Dr. Gandhi, the Director of DMH units at CMF, she agreed that the acuity level of her patients is quite high and, as mentioned in the next section, attributed the high acuity in large part to medication problems.

91.    The reality of the current MHSDS system, as demonstrated by my interviews with these class members and the admitted shortage of EOP, MHCB and inpatient beds, is that too many people are housed in places that simply cannot provide them with the level of mental health care they require. This is a direct result of overcrowding—there are too many people in the system and too few resources to treat them. This in turn means that the acuity at every level of care is higher than it would be in a system that has sufficient inpatient beds. I saw this time and again during my tours—there were inadequate mental health crisis beds for people experiencing acute mental health episodes, which meant that many of those people are housed in inappropriate "overflow" placements such as MHOHUs or administrative segregation units. The significant 171 patient waitlist for intermediate care facility beds also means that patients who need inpatient care are instead waiting in EOP units, in valuable MHCBs or in the various "overflow" units. Once those people are admitted to inpatient beds, sometimes after many months of living in clinically inadequate placements, they are sicker and more acute than they would have been had they been promptly provided adequate care. As Dr. Gandhi, the Director of DMH units at CMF expressed, this means that the inpatient units as a whole are admitting extremely acutely ill patients. The waitlists for acute beds and mental health crisis beds only add to this crisis.

92.    There are serious clinical and systemic consequences of having too few beds at nearly every level of care. First are the individual consequences for patients. By not providing

44

adequate and timely care, people are decompensating and are ending up in mental health conditions far more acute than necessary. This translates into longer stays in inpatient beds and the consumption of greater resources for longer periods of time than the person might otherwise have required. Second are the systemic consequences of these backlogs. It is taking longer to stabilize and treat the people coming into inpatient mental health beds, which means that those people consume valuable resources for longer periods of time. In other words, the lack of sufficient inpatient beds creates a cycle of sicker people being admitted, with greater resources necessary to treat them, which then creates even further backlog in an already overwhelmed system.

      **(b)**    <u>**Systemic Problems with the CDCR's Medication Management System**</u>

93.    Another significant systemic problem that is closely tied to overcrowding is the flawed medication management system. The Receiver's 7th Quarterly report included a report by the pharmacy management consulting firm that the Receiver has retained regarding the barriers it anticipates facing in the next year. One of those barriers is overcrowding:

> The impact of the overcrowding on the system's abilities to provide timely and effective delivery of necessary medications is significant. A clear example of this impact was noted at San Quentin. San Quentin receives 75-80 new prisoners each day and presumably transfers out or releases about the same number. Overcrowding however, forces a series of "compaction" moves resulting in as many as 300-400 separate prisoner moves each day in order to free up appropriate housing for the offenders. This constant "churn" of prisoners within the institution keeps the healthcare staff chasing prisoner movement to ensure medications can be delivered in a timely fashion. Because the housing data used by the pharmacy is not up-to-date at all times, there is a duplication of workload for both pharmacy and nursing resulting from having to fill prescriptions for patients presumed to be in one housing area of the institution—but having been transferred as a result of the many compaction moves; the nursing staff must try to obtain the appropriate location and then transfer the medications to the new housing area. This takes time, and in some cases, the medications are simply returned to the medical area to try to determine where the prisoner is housed. During this time, the prisoner patient is not getting his medications and may complain to staff—who in turn—reorders the medication, resulting in duplicate work...

Joint Pls' Trial Ex. 67, Ex. 6 at p. 29.

94.     The Coleman Special Master also found major medication problems in both his

19th and his draft 20th reports. He found, for instance, significant variance with institutions'

abilities to fill medication orders: "CSP/Corcoran complied with timelines for filling medication

orders in 95 percent of cases. NKSP, however, filled and delivered ordered medications within

one day in only 50 percent of cases, and at CSP/LAC there were delays of up to one week before

ordered medications reached carts." Coleman Pls' Trial Ex. 69 at pp. 121-122. When it came to

patient non-compliance with medications, the Special Master's audits showed significant

problems: "Predominantly, institutions did not meet timelines in responding to instances of

medication noncompliance." Joint Pls' Trial Ex. 69 at p. 122. The Special Master also found

that referrals to psychiatry for non-compliance issues were lacking, as was the documentation

and follow-up regarding those referrals:

> At CSP/Sac, referrals to psychiatry for noncompliance fell below 80 percent, and
> staff failed to document cases of no-shows or medication refusals. At KVSP,
> medication refusals were documented in MARs 89 percent of the time, but
> refusing inmates were seen within seven days in only 17 percent of cases. The
> rate of documentation of medication noncompliance at CIM was high at 97
> percent, but referrals for follow-up were documented in only 62 percent of cases.
> Of those, follow up occurred within seven days in 51 percent of cases. Follow-up
> on noncompliance was timely in only 48 percent of cases at ASP, which chartered
> a QIT although its audit was methodologically unsound. Documentation of
> noncompliance was deficient at CSP/LAC and at VSPW, which showed no
> improvement in this area during the monitoring period. Compliance was probably
> hindered by inconsistency in psychiatric coverage which led to delays in follow-
> up contacts, with only half of referrals seen within one week.

Joint Pls' Trial Ex. 69 at pp. 122-123.

95.     At the end of 2007, I also observed significant flaws with the medication

distribution system which I believe were direct consequences of overcrowding. *See, e.g.*,

11/9/07 Report at pp. 36-37 (detailing problems with DVI's provision of medications during

intra-institutional transfers, its medication renewals, its tracking of medication non-compliance,

its lab testing and its problematic recordkeeping); pp. 48-50 (detailing problems SOL has

[229848-1]

monitoring the efficacy of medications, the side effects of medications and patient compliance, among other things); pp. 61-62 (detailing deficient medication practices at SVSP).

96.    I observed similar problems during my recent round of tours at SVSP, CMF and MCSP. First, due to the lack of adequate staff to distribute medications and the overwhelming number of inmates prescribed medications, staff members do not have sufficient time to adequately monitor whether inmates are taking medications properly. A further contributing factor to the ability of staff to monitor adherence to medications are the frequent lockdowns in the institutions. This results in distributions of medications through food ports or otherwise at cell doors, where it is difficult to monitor compliance with medication regimens. Second, the clinical staff members who distribute medications are too understaffed to evaluate the efficacy and potential side effects of the prescribed medications. Every patient I talked to about the medication distribution system described the same drive-by process—they received their medications in pill lines or at their cell doors from staff members who spent only a few seconds with them. The staff members never ask the patients about the efficacy of the medications or whether they are causing side effects. Third, psychiatrists are also overburdened and may consist largely of contract employees that are unable to maintain consistent relationships with their patients due to constant movements between units or even prisons. One 3CMS patient I spoke to at SVSP saw seven different psychiatrists between January of 2007 and July of 2008. Class Member AAAA, an EOP patient at SVSP, also saw seven different psychiatrists for psychotropic medications between June of 2007 and June of 2008. *See supra* at p. 41. The overburdened psychiatrists are further hampered by the largely absent information network from line staff about efficacy and or side effect problems. This leaves the treating psychiatrists essentially operating in the dark.

97.    The Department of Mental Health (DMH) recently found very high medication non-compliance rates among its patients as a direct result of the medication problems described above. According to a draft memorandum to all Chiefs of Mental Health, Health Care Managers, Chief Medical Officers, psychiatrists and directors of nursing, 222 out of 279 blood draw