# EXHIBIT V
# PART 4

samples of patients admitted to DMH during a recent audit "returned at the range of no level detected to at the minimum level of the laboratory reference for the psychotropic medication assayed." Coleman Pls' Trial Ex. 80 at p. 1.[6] This means that 79 percent of patients with serious mental illness who are being admitted for inpatient care had very little or no medication in their systems.

98.     During my tour at SVSP on July 29, 2008, Dr. Neill, the Program Director for DMH, talked about these serious medication non-compliance issues. In particular, she reported that most patients are not compliant with their medications when they are admitted to DMH units and also are not subject to Keyhea orders, which would permit involuntary medication. As a result, DMH must stabilize the patients on medications and also initiate Keyhea orders where necessary. Dr. Neill reported that 60 percent of the men housed in the SVPP, an intermediate care facility unit, are subject to Keyhea orders.

99.     Dr. Gandhi, the Director of DMH programs at CMF also talked about the serious medication compliance issues throughout the CDCR. As I mentioned, when I told Dr. Gandhi that two of the patients I interviewed in the DMH unit were some of the sickest people I have seen, she agreed that the acuity of patients is severe. She very candidly told me that the patients coming into DMH units are getting sicker and sicker in all of her programs, including the Day Treatment Unit. She said that "quite a lot" of the increased acuity levels has to do with poor medication compliance upon admission, which presents a "very big challenge." Dr. Gandhi also said that poor medication compliance means that it takes much longer to stabilize patients and get them to the point where they can productively participate in groups. This in turn means that

---

[6] The draft memorandum directs psychiatrists to order and monitor reference psychotropic blood levels immediately when patients show signs of decompensation and also specifies that "results are to be returned to the ordering psychiatrist within seven or less [sic] working days for review." Coleman Pls' Trial Ex. 80 at p. 1-2. It is unclear, however, whether the CDCR's overburdened medical and mental health care systems can even absorb the additional laboratory testing required to effectively monitor medication compliance. Several clinicians told me that they do not do this kind of lab testing, including the Director of the new 50-bed MHCB unit at CMF who had been in the unit for five weeks and had not ordered even one such test.

[229848-1]

patients must stay in DMH units longer than they otherwise might require, which further contributes to the backlog of significantly ill patients unable to access higher levels of care.

100.    These medication management problems are typical in overcrowded systems. The consequences are just as Dr. Gandhi described—patients are coming into DMH units with very acute mental health problems, are taking longer to stabilize on medications and are then returned to the same system that fails to adequately monitor medication compliance, thereby starting the cycle all over again.  A disturbing suicide that happened in the C-12 administrative segregation building at MCSP on January 22, 2008 illustrates this dangerous cycle, as well as the consequences of having too few crisis placements.  Class Member GGG had a history of inpatient placements due to the severity of his underlying psychotic process, and a history of suicidal ideation and medication non-compliance.  Coleman Pls' Trial Ex. 144 at p. 3-5.  On September 19, 2007, he was admitted into an acute bed at CMF, where staff were able to stabilize him and get him to take his medications.  *Id.* at p. 5.  He was discharged to the EOP level of care and arrived at MCSP on 11/2/07 with a recommendation that he continue to take his medications.  *Id.* at pp. 5-6.  Although a psychiatrist at MCSP continued the prescription initially, he discontinued the medication on 11/13/07.  *Id.* at p. 6.  Class Member GGG then apparently decompensated over a period of two months.  There were no progress notes in his medical file from a psychiatrist between November 13, 2007 (the day he was removed from medications) and January 22, 2008, the day he killed himself.  *Id.* at p. 7.  Meanwhile, his case manager realized that he was decompensating, particularly after receiving news that he received four additional years added to his sentence for pushing a food tray out of his cell back in June of 2007, which apparently hit a correctional officer.  *Id.* at p. 6.  On January 10, 2008, the case manager talked to the psychiatrist about initiating Keyhea, but apparently did not do so.  *Id.* at p. 7.  She noted the same plan on January 17th but an order still was not initiated.  On January 22nd, the case manager saw Class Member GGG for a crisis evaluation after he pushed his cell door into correctional officers when they were trying to close it.  *Id.* at p. 7.  Staff planned to admit him into the crisis unit at that point and initiate the Keyhea process.  *Id.*  After learning that the

49

restraint room was not available and that there were no crisis beds open, staff moved Class

Member GGG back to his administrative segregation cell without any prescribed observation.

*Id.* at p. 11. He hanged himself that night in his cell. This suicide is a disturbing example of an

institution's failure to maintain the clinical gains achieved at a higher level of care, its failure to

appropriately monitor and prescribe necessary psychotropic medications and its failure (in this

case fatal) to provide a mental health crisis bed to an acutely ill patient.

(c)    **Systemic Problems with Medical Records**

101.    The *Coleman* Special Master found significant problems with medical records

during his 20th round of tours. *See* Joint Pls' Trial Ex. 57 at p. 68 (MCSP's records sometimes

had "years of paperwork [] stuffed into heavy UHRs held together with duct tape); p. 120

(weekly summaries of psychiatric technician rounds "were not timely placed in UHRs due to

substantial filing backlogs in [DVI's] medical records"). The Receiver has also noted that the

"management and maintenance of health records continues to be an area of great concern." Joint

Pls' Trial Ex. 67 at p. 39.

102.    My personal experience with the CDCR's medical records is consistent with these

findings. I reviewed approximately 30 medical records during my first round of tours in

November of 2007 and approximately 30 more during my July and August 2008 tours. I

consistently found the records to be unwieldy, disorganized and bulky, with loose papers floating

around in the files. It was exceedingly difficult to follow the clinical course of treatment of the

patients because of the size and disorganization of the files. There were also a few instances

where I found other patients' records in the files I reviewed. In my experience, these problems

are typical in an overwhelmed and overcrowded system. Accurate and well organized medical

records are a critical element of medical and mental health care. They are even more essential in

a complex and overcrowded system such as CDCR which is characterized by frequent transfers

of patients, high turnover of clinical staff and overuse of contract clinicians who lack familiarity

with the patients and the system itself.

[229848-1]

**(d)    The Systemic Use of "Bad Beds" Throughout the CDCR System**

103.    Another direct result of overcrowding is the CDCR's activation of thousands of "bad beds" throughout the system.  According to recent data from the CDCR, there were 13,791 of these beds sprinkled throughout the CDCR as of July 1, 2008 date.  Joint Pls' Trial Ex. 68.

104.    Because of overcrowding, for instance, gymnasiums and dayroom floors have been converted into large dorms filled with hundreds of men.  In my opinion, these living spaces exacerbate existing mental health conditions and, in some cases, actually activate underlying mental illness in people who may not otherwise develop clinical symptoms.  I personally observed these effects during my recent tours at California Medical Facility and Mule Creek State Prison in particular.

105.    Another example of harsh living conditions are the administrative segregation units, which often act as overflow placements for *Coleman* class members who are unable to get into crisis beds, EOP units and even acute or intermediate facility placement beds.  The "Transitional Placement Unit" at Salinas Valley State Prison is an example of an overflow unit that was created because of population pressures in the system.  Although I did not tour the unit, staff explained that it was created as a transitional unit for men who require a "Sensitive Needs Yard" (SNY) placement, but for whom there are no SNY beds.  An Associate Warden explained that while *Coleman* class members at the 3CMS level of care can be housed in the TPU, EOP class members cannot.  The Associate Warden explained that if a person housed in the TPU becomes EOP, he would have to waive his SNY status to remain in the building or, if he refused to waive that status, he would be housed in administrative segregation.  This account conflicts with the Special Master's 20th round report which found that inmates "identified as requiring EOP treatment typically waited two to three weeks *in the transitional program unit* for a bed to become available."  Joint Pls' Trial Ex. 57 at p. 183 (emphasis added).  Whether EOP prisoners remain in the TPU or are moved to administrative segregation units, however, these delays show inadequate access to the EOP level of care.

106.    While the TPU might be an appropriate unit to create in an overcrowded system, there is no question that this type of *ad hoc* unit would be unnecessary in a system that is operating at or near its capacity level.  Moreover, if the report from the Associate Warden is true, it is inappropriate to force a prisoner to choose between appropriate mental health care in an EOP program and his safety in a SNY program.  In my opinion, the extreme overcrowding in the system forces staff to create transitional housing units, overflow beds and other alternative placements that jeopardize the safety of prisoners and staff.

### (e)    The Impact of Overcrowding on Suicide Rates

107.    I discussed the impact overcrowding has on suicide rates in my prior report. 11/9/07 Report at pp. 75-81.  In particular, I noted that the suicide rate in the CDCR has significantly exceeded the national average of 14 per 100,000 during both 2005 (21.9 per 100,000) and 2006 (at least 25 per 100,000 prisoners).  *Id.* at p. 76.  The CDCR had at least 43 suicides in 2006 and I am informed by plaintiffs' counsel that there have been 35 suicides reported by defendants already this year.  The Special Master's draft report about 2006 suicides found that 72 percent of the completed suicides in 2006 "involved some measure of inadequate treatment or intervention and were, therefore, most probably foreseeable and/or preventable." Joint Pls' Trial Ex. 58 at p. 8.

108.    My prior report explained:

> [O]vercrowding increases both the prevalence and the severity of mental illness. Put another way, overcrowding both creates new mental illness and makes existing mental illness worse.  Since many or most suicides are due to the presence of severe mental illness or the onset of a severe mental health crisis, it is clinically reasonable to anticipate a higher suicide rate in an overcrowded system. Another way to think about the correlation between overcrowding and suicide rates is to see overcrowding as a broad environmental factor increasing the risk of suicides by creating a larger class of at-risk individuals.

11/9/07 Report at p. 76.

[229848-1]

109.    The Special Master's finding that more than 70 percent of the 2006 suicides were preventable is extremely disturbing. In my opinion, much of the suicide risk in the CDCR is related to overcrowding. One recent suicide in particular illustrates the consequences of an overburdened system. Class Member HHH hanged himself in an unlicensed infirmary at Correctional Training Facility (CTF) on March 18, 2008 and died two days later when he was removed from life support. A few days prior to his admission into the infirmary, a staff member found Class Member HHH unresponsive in his administrative segregation cell due to a suspected drug overdose; he also had dried blood on his wrist. He was transported to an outside hospital and then returned to the infirmary. A March 16, 2008, clinical note shows that staff recommended placement in a mental health crisis bed, but did not pursue that placement. A psychiatrist interviewed him on March 17, 2008 and noted that he was a "high suicide risk," but then reduced the observation to one hour rounding rather than the 15-minute watches. The next day, Class Member HHH hanged himself with a noose that he made out of torn towel pieces. Coleman Pls' Trial Ex. 155. The report also reflects that staff were confused about the correct suicide precaution and watch standards that should have been followed.

110.    This suicide illustrates several aspects of the CDCR's overburdened system, including the danger of placing prisoners in alternative placements, the delayed access to higher levels of care (which in this case seems to have never been pursued), confusion among staff about suicide watch and observations procedures, and failure on the part of the attending psychiatrist to order clinically appropriate suicide precautions.

### 4.    Overcrowding is the Primary Cause of the Constitutional Violations in the CDCR

111.    These overcrowding-induced conditions that currently exist in the CDCR are extremely detrimental to the *Plata* and *Coleman* class members. The conclusion that overcrowding is the primary cause of these violations is inescapable for several reasons. I also stated these reasons in my November 9, 2007 Expert Report and have updated the following sections only as appropriate based on updated information.

[229848-1]

    (a)    **The Persistence of the Constitutional Violations Present in the CDCR Demonstrates that They Are Caused by Overcrowding**

112.    First, taken together, the range of Constitutional violations discussed above, including inadequate suicide monitoring and prevention, inability to timely access appropriate levels of care, inability to timely access mental health clinicians due to staffing shortages, and inadequate medication management practices are unusual in a system that has been under Court supervision for more than ten years. These serious, dangerous violations this late in the remedial process are typical indicators of a system plagued by severe overcrowding. In a non-overcrowded system, the Constitutional violations are more readily addressed by such interventions as increased staff and increased programming. However, in a system overwhelmed by crowding, these traditional remedies are woefully inadequate. This appears to be the case in the CDCR where remedial efforts have resulted in significant expansions of staffing and programming activities, yet the constitutional violations persist or even worsen.

    (b)    **The *Coleman* Special Master Has Found That Overcrowding Has Undermined Progress That Was Being Made In Various Areas**

113.    The *Coleman* Special Master has observed that, although there was a period of time when it seemed that defendants might be making progress in terms of their bed plan and the provision of treatment, the overcrowding crisis has overwhelmed this hope. In his April 12, 2007 Report to the Court, he concluded: "By late 2005, it was evident that the reduction in population growth and then in the population itself in the first few years of the decade were over, and the numbers were rising fast. Early in 2006, defendants were staring at a galloping growth rate that threatened to hit 200 percent of capacity shortly, and the scramble was on to deal with the flow. One victim of the turnaround was CDCR's mental health bed plan." *See* 4/12/07 Special Master's Report on Defendants' Establishment of Interim Inpatient Intermediate DMH Beds at 8.

[229848-1]

(c)    **The Percentage of Caseload Inmates in the CDCR is Increasing Faster than the Overall Population**

114.    Another factor that demonstrates that overcrowding is the primary cause of the constitutional violations is the fact that the percentage of persons with serious mental illness in the CDCR is increasing faster than the overall CDCR population. Between January of 2003 and July of 2007, the population of the CDCR's prisons and camps grew from 152,396 to 165,932, an increase of 8.9 percent. *Coleman* Pls' Trial Ex. 34 and 35 (Monthly population figures downloaded from the CDCR website for January 2003 and July 2007). During the same period, the MHSDS caseload of EOP and CCCMS inmates grew from 24,599 to 32,039, an increase of 30.2 percent. *Coleman* Pls' Trial Ex. 36 (CDCR MHSDS Prevalence Data for January 2003 and July 2007 from CDCR Monthly Reports). Thus, during this period of roughly four and one-half years, the mental health caseload grew at four times the rate of increase for the overall population.

115.    Since my last report, the overall CDCR population has decreased while the MHSDS population continues to increase. From July 2007 to June 2008, the overall population went from 165,932 to 160,169, a *decrease* of 5,763 inmates. Joint Pls' Trial Ex. 63. At the same time, the MHSDS has increased from 32,039 to 34,035, or by 6.2 percent.

116.    This is typical of overcrowded systems because, as I have stated previously, overcrowding creates new mental health needs and exacerbates existing mental health needs. I encountered numerous examples of this on my various prison tours in preparing this opinion. As the data supports, the net result of overcrowding is a greater incidence of mental illness and at a more acute level. Traditional remedial efforts such as increased staffing will be insufficient to remedy this problem and, in a system like the CDCR's where office and treatment space is severely limited, might actually create additional overcrowding problems. Finally, as stated previously, overcrowding expands demand at the highest levels of care and creates static backlogs of patients that make it difficult to assess the true demand for services.

55

(d)    **In Many Instances, the Overcrowded Conditions Themselves
Are the Cause of the Unconstitutional Mental Health Care**

117.    The causal link between overcrowding and unconstitutional mental health care is
clear and direct in the many CDCR housing units where space shortages from overcrowding
directly result in long-term living arrangements that are harmful to the mental health of *Coleman*
class members.  For example, CCCMS inmates are routinely double or even triple-bunked in
chaotic, overcrowded dorms where they experience damaging levels of stress and fear of
predation.  It is clear that the mentally ill inmates I interviewed at Solano who also had staph
infections would not have been as ill if they were not living in overcrowded conditions.
Similarly, mentally ill inmates are retained for extended periods in Reception Centers and in
locked down general population units, where they are locked in their cells for most of the day
and receive little or no programming or mental health services.  Such environments add to the
instability of persons with mental illness.  Another context in which the link is clear is improper
placements in administrative segregation, where caseload inmates are often unable to access care
and experience decompensation.  Yet another context is suicide watches in holding cells, cages,
tanks, administrative segregation units, and other unsafe, unlicensed, and improperly supervised
environments.  These same harsh conditions, as discussed earlier, also increase the demand for
mental health services in prisoners in the general population who, in a properly operating, not
overcrowded system, would not need mental health services.  Isolation, seclusion, idleness,
violence, fear and stress plague the prisoners in the CDCR as a direct result of overcrowding.
These conditions exacerbate mental illness and are serious barriers to the provision of minimally
adequate mental health and medical care.

B.    **Opinion 2:  Other Remedial Efforts, Other than Population Reductions, Will
Not Succeed In Remedying The Underlying Constitutional Violations.**

1.    **Defendants' Current Plans to Fix the System Will Not Work**

118.    In my opinion, no other relief will remedy the underlying constitutional violations
except a remedy which results in a substantial reduction in the prison population.  I also stated

this opinion in my November 9, 2007 Expert Report and have updated the following sections only as appropriate based on updated information.

119.    I am aware that the *Coleman* court has issued at least seventy-seven orders intended to induce the State to provide constitution levels of mental health treatment in the CDCR. The *Coleman* court concluded in its July 23, 2007 Order referring consideration of a prisoner release order to the three-judge panel: "Since February of 1996, this court has issued at least seventy-seven substantive orders to defendants in an effort to bring the CDCR's mental health care delivery system into compliance with the requirements of the Eight Amendment. Taken together, these orders have contained directives aimed at all of the aforementioned requirements for a constitutionally adequate mental health care delivery system. In addition, the Special Master and his staff have spent hundreds of thousands of hours working with the parties to develop program guidelines for a constitutionally adequate system and monitoring defendants' implementation of those guidelines. During the same period of time, the Special Master has filed seventeen semi-annual monitoring reports and fifty-five other reports reflecting the results of these efforts." 7/23/07 Order at 4:13-21. More orders and reports have issued since last summer.

120.    Having worked as a correctional expert and having worked on the *Gates* and *Madrid* cases, I am very familiar with the monitoring team working for the court on the *Coleman* case. Moreover, having reviewed the recent monitoring reports and the other documents in this case, it is clear that very intensive remedial monitoring efforts have been going on in the *Coleman* case for many years. In my opinion, the large team of national experts working as court-appointed experts in the *Coleman* case has a great deal of collective experience working with troubled correctional systems. Nonetheless, after more than ten years of intensive monitoring and other remedial efforts, the CDCR remains plagued by serious constitutional deficiencies in its delivery of mental health care. I agree with the *Coleman* Special Master that the reason for this sorry state of affairs is that whatever tentative progress was made early on in this case has been overwhelmed by the massive population expansion in recent years.

[229848-1]

121.   From reviewing the docket in the *Coleman* case, I am aware that these more than seventy-seven orders have attempted to address issues of staffing, space, quality of treatment, and bed availability, among others. These include numerous orders concerning such critical issues as adequate MHCB capacity (see, e.g., 1/15/01, 12/20/01, 10/8/02 Orders); access to DMH beds (see, e.g., 5/22/98, 7/26/99, 8/28/00, 4/4/01, 6/27/01, 3/4/02, 5/7/02, 10/8/02, 1/19/04, 7/9/04, 6/30/07, 8/8/08 Orders); and staffing (see, e.g., 2/17/96, 6/17/98, 8/25/99, 1/19/99, 7/26/99, 1/13/00, 4/27/00, 8/28/00, 6/13/02, 10/8/02, 3/3/06 Orders).

122.   Persistent shortages of beds at every level, lack of adequate mental health and custodial staff, and inadequate treatment and programming space clearly reflect the overcrowding crisis. In my opinion, more orders by the Court along the lines of those discussed above will not remedy the underlying Constitution violations at this time. The system is simply too overwhelmed by the population for these orders to be effective.

123.   I am also aware that the State has proposed construction of new prisons and re-entry facilities as the bulk of its solution to the overcrowding crisis. I have reviewed the Receiver's analysis in his Reports regarding overcrowding and the further demands for mental health and medical staffing, and treatment space that building these new prisons and re-entry facilities will create. As the Receiver notes, building more prisons and re-entry facilities will require additional staff, and will spread existing overtaxed staff among more facilities. See Joint Pls' Trial Ex. 26 (Receiver's 5/15/07 Report Re Overcrowding) at 40-41. The building timeline for the beds contemplated by AB 900 does not anticipate any new beds until 2009, and most of the beds will be built much later. *See Coleman* Pls' Trial Ex. 40 (January 2007 CDCR Estimated Construction Schedule for Infill Bed Plan, Ex. 20 to Receivers 5/15/07 Report). Moreover, as the delays associated with the CDCR's plans to construct walk-alone yards demonstrate, construction projects involving government agencies are rarely finished by the anticipated dates. In my opinion, any added capacity for mental health and medical treatment that this prison construction may create will take far too long to be sufficient to remedy the current constitutional violations, which are extremely urgent and life-threatening. This plan also fails to address the

58

other persistent, intractable overcrowding-related problems that are present in the CDCR, such as clinical and custody shortages, inadequate medication management practices, and insufficient beds at the highest levels of care.

124.    Similarly, defendants' and the Receiver's plan to meet the needs of *Coleman* and *Plata* class members by building "Consolidated Healthcare Facilities" (CHCFs) is a long-term goal that is insufficient to address current Constitutional violations. According to defendants' July 16, 2008 mental health bed plan, "[c]onstruction sites and schedules for the CHCFs are still in development, with anticipation of *the first 1500-bed facility targeted to begin construction* in January 2009, anticipating completion by January 2011. There are eight sites being considered; land availability, infrastructure capability, environmental concerns, and political climate, among others, drive the ability to select, schedule and begin construction." Coleman Pls' Trial Ex. 55 at p. 4. It is also apparent from the Receiver's 8th Report that the entire project to build CHCFs is in jeopardy. He discusses the need for 10,000 medical and mental health beds ("no one seriously disagrees with these projections") and explains that, "the scope of the existing shortfall in treatment facilities provides yet another example of the seriousness of the State's long-term failure to provide constitutionally adequate medical and mental health facilities for its prisoners." Joint Pls' Trial Ex. 56 at p. 46. Despite the dire shortage of approximately 5,000 mental health beds and 5,000 medical beds, the State has thus far ignored the Receiver's efforts to get the CHCFs funded. As he explains:

> The State's failure to make this necessary financial commitment puts the Receiver's entire remedial program at risk since the various pieces of the program are so intertwined and interconnected that failure to fund and implement on major element undermines all of the other elements. Unfortunately, the State's failure to make the necessary financial commitment is not a result of inadvertent neglect or mere incompetence (trained or otherwise). Instead, it is a result of conscious, deliberate obstruction by key decision-makers and decision-influencers resulting in a willful failure by the State to live up to its constitutional and court-ordered obligations. This is not a charge that the Receiver makes lightly; he has spent the last fifteen years working within State government processes to improve government operations. The State has now crossed that line and, in so doing, demonstrates a lack of remorse and an unwillingness to accept accountability for

[229848-1]

its own constitutional violations. The State's failure to express its unequivocal commitment to the Receiver's necessary construction program should be taken into account by this Court in subsequent proceedings, and by the *Coleman, Armstrong* and *Perez* Courts.

*Id.* at p. 56.

125.    Even if the Receiver's construction plan had funding, however, the Receiver anticipates building only one of the five hospitals by 2011 in the best case scenario. The fact that the plan is currently unfunded means that the 2011 and all other deadlines are in jeopardy. It is also significant that the Receiver's plan does not address all of the required shortfall of EOP, MHCB and ICF beds. The CDCR, which has a very poor track record of completing construction projects on time, is still tasked with a series of construction projects, including, for example: the 64-bed ICF unit at SVSP; the 64-bed ICF unit at CMF; the 50 bed MHCB unit at CMC; the 32 MHCB unit at San Quentin and; the 67 EOP unit at CMF. Coleman Pls' Trial Ex. 55 at p. 7. Meanwhile, the *Coleman* and *Plata* class members are daily suffering dangerous denials of mental health care and medical care that place them, their fellow inmates, the officers who supervise them, and the public at risk. The only way to timely correct the endemic denials of appropriate mental health care that currently exist in the CDCR is to significantly reduce the population. No other remedy will result in a constitutional medical and mental health care system in the CDCR.

## 2.    The State Must Make Substantial Reductions in the Prisoner Population

126.    I conclude that the prison population must be substantially reduced in order to provide adequate mental health care in a timely manner to the prisoners with mental illness who are suffering every day in the California prisons. In 2004, the Corrections Independent Review Panel appointed by Governor Schwarzenegger worked with experienced wardens to determine the "Maximum Operable Capacity" (MOC) of the prisons system. The Panel defined MOC as "the percentage of design capacity of the various housing units within the institutions wherein the prison can be operated both safely and can provide programming for ever inmate, consistent

60

with the inmate's ability." Joint Pls' Trial Ex. 4 at p. 161. The MOC incorporated educational, vocational, substance abuse, and other rehabilitation programming, but did not account for programming associated with mental health or medical treatment. Coleman Pls' Trial Ex. 108 at p. 113:15-17. The Panel concluded that the MOC for male prisons statewide was 145 percent of design capacity.[7] Joint Pls' Trial Ex. 4 at p. 124. The MOC made two assumptions: first, all "bad beds" would be closed so that program space would be available, and second, there would be sufficient "staff with requisite experience" available to manage an effective program. *Id.* at p. 161.

127.    When mental health treatment needs are taken into account, the maximum operable capacity will be lower. The *Coleman* Special Master reported to the Court on May 31, 2007 that "[g]iven the inadequacies of programming space, program beds and mental health staffing…defendants cannot meet at least a substantial portion, amounting in some loose amalgam to about 33 percent, of acknowledged mental health needs…" Joint Pls' Trial Ex. 35 at pp. 12-14.

128.    The operable capacity estimation by the California wardens also probably reflects a degree of institutionalized acceptance of overcrowding on the part of the wardens themselves that may have driven them to overestimate capacity. The *Plata* Receiver has documented "CDCR's institutionalized acceptance of overcrowding and the lowering of correctional standards to accommodate overcrowding." Joint Pls' Trial Ex. 26 at p. 10. The Receiver found that decades of prison overcrowding in California resulted in the parallel evolution of "a correctional mindset that allows *overcrowding* rather than *sound correctional management* to drive crucial construction and prisoner management policy." *Id.* (emphasis in original). Moreover, the Receiver found that the CDCR Facility Master Plans spanning 1993-2003 similarly failed to account for medical, mental health, and dental care programming needs.

---

[7] Design capacity was determined to be 76,879 inmates at that time. Joint Pls' Trial Ex. 4 at p. 123. On January 25, 2007, the Little Hoover Commission issued a report updating the design capacity to 83,219. Joint Pls' Trial Ex. 3 at p. 19.

Indeed, CDCR knowingly planned construction of even its newest prisons to provide at most fifty percent of all health care related space needs, "ignoring pre-existing plans to double-cell the prison up to 200 percent of capacity." *Id.* at p. 20. These facts suggest that the Maximum Operable Capacity is actually lower than the Corrections Independent Review Panel's conclusion of 145 percent.

129.    At a minimum, it is clear that the prison population must be reduced to a level, whether 145 percent or lower, that allows the State to meet the assumptions that the Corrections Independent Review Panel laid out for maximum operable capacity. All bad beds must be eliminated, sufficient program space must be identified and made available, and the number of inmates must correlate with available appropriate clinician and custody staffing, in terms of both numbers and quality, to provide programming. It is not clear that the "serious staffing shortfalls" in CDCR prisons can accommodate 145 percent capacity (much less the near-double capacity they now face). Joint Pls' Trial Ex. 26 at p. 11 ("[O]vercrowding is accompanied by serious staffing shortfalls for both clinical providers and correctional officers.").

130.    A maximum operable capacity that provides for the constitutional delivery of mental health care must expand the assumptions of the Panel to reflect the mental health treatment standards established by the *Coleman* Court. All "bad" mental health beds must be eliminated—for example, this means reducing the population to eliminate the use of alternative crisis beds, EOP "overflow" housing that does not have appropriate space for individual or group mental health contacts, and DMH units such as those currently run in SVSP D-5 and D-6, which are not set up to provide care consistent with inpatient standards. Adequate mental health programming space must be afforded. The operable capacity must also be related to the number of mental health and custody staff in the prison system providing mental health care, and the ability to provide these staff with adequate office and treatment space.

[229848-1]

**C.    Opinion 3:  The State Can Include the *Coleman* Class in Population Reduction Plans without Adversely Affecting Public Safety and Should Do So.  Moreover, If the State Enhanced the Services Provided to Released Individuals, Public Safety Would Improve.**

131.    Any reduction of the prison population must include at least a proportionate reduction in the mental health caseload population in order to remedy the ongoing Constitutional violations in the delivery of mental health care.  The Special Master has already observed that the resources now in the system (beds, space, staff) are insufficient for at least one-third of the mental health caseload.  Joint Pls' Trial Ex. 35 at pp. 13-14.  It is both safe and appropriate to include individuals with mental illness in any program to decrease the length of stay or divert from prison designed to address overcrowding.  When considering the public safety impacts of such a program, and the increased use of sanctions other than prison for parole violators with mental illness, it is important to understand who these individuals are and what systems already exist in the community that are already available to support them.

132.    Although many people talk in terms of "the mentally ill," there is a not a single monolithic "mentally ill" population.  In CDCR's Mental Health Services Delivery System, for example, there are individuals classified at the CCCMS level of care, individuals classified at the EOP level of care, and individuals classified at the inpatient level of care.  June 2008 data shows the total CDCR population of individuals identified with mental illness as 34,035, including 28,511 at the CCCMS level of care; 4,577 at the EOP level of care; at least 272 in Mental Health Crisis Beds; and 574 in Department of Mental Health inpatient beds.  Coleman Pls' Trial Ex. 57 at p. 4.  The total mental health population is approximately 21 percent of the total CDCR prison population (34,035 of 160,334).  Joint Pls' Trial Ex. 65 at p. 1 (showing population of prisons and camps).

133.    It is important to differentiate between these groups in terms of the levels of support and treatment required by these individuals upon parole or diversion to their home communities.  Under the Program Guide standards, CCCMS prisoners (84 percent of the mental health caseload and about 18 percent of the total prison population) can be safely housed and function in the general population of the prison, with a minimal level of mental health support.

63

Currently, most receive only medication, and the Program Guide standards require that they receive a reevaluation regarding medication issues every 90 days. The Program Guide definitions of CCCMS patients recognize that there is a spectrum of needs within the CCCMS classification, including the largest group of patients for whom tracking and monitoring is sufficient to meet clinical needs, as well as those who may need a modest level of clinical and case management services. In the community, CCCMS individuals would need parallel levels of treatment, with many needing medication and follow-up, and some who would benefit from additional case management that would include assistance with accessing community mental health services, substance abuse treatment, housing, benefits, and employment. Just as in prison, the vast majority of parolees with mental illness will rarely require more intensive levels of mental health services such as crisis care, day treatment or hospitalization, in the community. Some mentally ill parolees, supported by friends and family, and away from the stress and tensions of the overcrowded prisons, will improve their level of functioning and their treatment needs may actually decrease.

134.    A far smaller group of mentally ill individuals, represented by the EOP population (13 percent of the mental health caseload and less than 3 percent of the total prison population), and the inpatient population (2 percent of the mental health caseload and less than .5 percent of the total population), need increased levels of community mental health services. Even in this smaller group of individuals at higher levels of care, there is still a range of appropriate treatment options. For example, there are some individuals at the EOP level of care who can succeed in the community with the same level of resources described above for the CCCMS population. Other individuals with a greater level of dysfunction as a result of their mental illness would be more likely to succeed in the community with day treatment programs. A smaller number would need housing in board and care or other residential facilities, and from time to time, access to crisis care and psychiatric hospitalization. It has been my experience that this broad range of services can be very effective for treating offenders with all levels of mental illness in the community. I also reviewed and agree with a memorandum from the Regional

64

[229848-1]

Administrator for Parole Region IV (San Diego, Riverside, San Bernardino and Imperial Counties) in which he observed that the provision of adequate and timely intermediate levels of treatment to parolees such as day treatment could reduce the number of parolees who need hospitalization or who are returned to prison, thus "break[ing] the cycle of mentally ill parolees filling up expensive prison beds." Joint Pls' Trial Ex. 70 at p. E_PRIV_051487 (Memorandum, Jeff Fagot, Parole Administrator, Region IV to Tom Hoffman, July 30, 2007.

135.    It has been my experience that there are already community mental health systems in place at the local level to provide treatment and other supportive services to this population. These include a spectrum of services ranging from clinician and social worker appointments to day treatment to locked care facilities. There are a variety of service providers including city and county hospitals and clinics, private contractors, parole office clinics, non-profits and the Veteran's Administration. It is also my experience that community mental health and parole programs are currently underfunded and would benefit from a significant increase in their resources. It is also true that various communities have different types of programs, some more successful than others and some better funded than others. There is no question that California needs to do a much better job with community mental health programs and improvements in those programs would benefit society as a whole in many ways.

136.    It is my understanding that some public mental health treatment providers currently refuse to provide treatment to parolees because there remains confusion and disagreements about whether the county or the State is responsible for paying for mental health care for these persons. This sometimes results in parole agents and the parole revocation process sending individuals back to prison when their primary need is actually mental health treatment.[8] This ongoing dispute between the State and the Counties must be resolved. It is dangerous for the patients, wasteful of public resources and decreases public safety in the community. CDCR's

---

[8] For example, a memorandum from the Region III (Los Angeles) Parole Administrator notes that provision of increased clinical services to mentally ill parolees would provide needed treatment instead of punishing parolees for their illness by locking them up. Joint Pls' Trial Ex. 71 at p. E_PRIV_05782.

Reception Centers are dangerously overcrowded and do not and cannot provide appropriate mental health care for anyone, let alone a short term parole violator with mental illness. This patient will be returned to the community after a few months, having suffered the effects of severe prison overcrowding but receiving little or no appropriate mental health care.

137.    Any generalized fear about "releasing the mentally ill" because they are all too dangerous or psychotic to be safely released to the community should be flatly rejected. Individuals at all levels of acuity are already released from prison to parole all the time. Most of these individuals do not present an increased danger to others because of their mental illness, and appropriate treatment can be extremely effective in treating mental illness. To the extent that there are individuals who are more dangerous because of their mental illness, California laws already authorize the involuntary commitment of individuals whose mental illness causes them to be so dangerous that they may not safely be released. These laws provide authority for involuntary commitment and legal protections for the individuals who may be involuntarily committed.

138.    The "Mentally Disordered Offender" (MDO) Law provides for individualized assessments of the dangerousness of inmates due to mental illness, and also authorizes involuntary commitment for the small number of individuals who are deemed either unsafe for release because of mental illness or who are in mental health crisis and pose an immediate threat to themselves or others. This means that to the extent there are individuals who should not be released to the community because of an inability to control serious criminal conduct due to mental illness, there is already a system in place to screen out those few individuals. The MDO Law provides the criteria for treatment as a mentally disordered offender. This designation would apply to an individual who has a "severe mental disorder that is not in remission or cannot be kept in remission without treatment" at the time of parole or upon termination of parole *and* the severe mental disorder was one of the causes of or was an aggravating factor in the commission of a crime that is one of the serious crimes listed by the statute. Conservatorships also provide another tool that may be used for a very small portion of acutely ill individuals.

66

[229848-1]

139.    There are also already safety nets for individuals who decompensate in the community and require crisis care. The "Lanterman-Petris-Short" (LPS) Act provides for an involuntary 72-hour treatment and evaluation at a facility designated by the county and approved by the State Department of Mental Health when "any person, as a result of mental disorder, is a danger to others, or to himself or herself, or gravely disabled." The LPS Act also requires that certain evaluations then take place to determine whether further care and treatment is needed, and whether a conservator should be appointed if involuntary care is needed.

140.    It is my understanding that instead of following these laws, it has been the practice of the CDCR to return parolees with mental illness to custody in CDCR prisons when parole agents perceive that they may be dangers to themselves or others. I reviewed an order the *Coleman* Court issued on August 8, 2008 directing parole agents to follow the LPS Act for parolees. These laws can be used to ensure that public safety considerations are met when releasing or diverting mentally ill offenders from prison.

141.    The improvements the State should make to its provision of care for mentally ill inmates released to parole are not insurmountable obstacles, and are well-known to clinicians in the field. For example, the Regional Parole Administrator for Parole Region III wrote an August 2007 memorandum to the Director of the Division of Adult Parole Operations that an already-existing facility was assisting one of the parole districts with "housing EOP, CCCMS, and hard to place parolees...and has placement for approximately twenty parolees. As the program already has a housing component, they can add components to accommodate at Day Treatment and Crisis Care Service." Joint Pls' Trial Ex. 71 at p. E_PRIV_057801. The components he specified were 1) integrate medical, psychiatric, psychological, and chemical dependency service delivery; 2) assign a POC social worker and therapist to the program in order to ensure continuum of care; 3) provide an array of services, via case management; 4) assign parole agent from each district to work as a liaison between the program and DAPO; and 5) monitoring parolee's behavior and arranging ongoing community support and treatment by coordination

67