**EXHIBIT CC
PART 2**

others, as well as my knowledge of the depth and magnitude of the overcrowding problem in the CDCR—a problem that reached crisis-level proportions many years ago and has been allowed to continue to worsen. I also base this opinion on my knowledge of the history of prison overcrowding in California and the CDCR's decades-long record of failing to anticipate the magnitude of this problem, failing to recognize the urgency of the continuing overcrowding crisis it faced, and failing to fully appreciate the harm inflicted on prisoners, staff members, and California communities by levels of prison overcrowding it came to regard as "acceptable" or "tolerable." The gap between the urgency of the problem and the insufficiency of CDCR's response is evident in their projected "best case scenario" date for a solution—the year 2014—which underscores why a prisoner release order is necessary. Even the active involvement of the *Plata* Receiver in addressing the shortfall of mental health beds in the system will not appreciably advance this date. Thus, although it is my understanding Receiver does not intend to build all of the outstanding mental health beds that will be required by the CDCR, the construction of the new mental health/medical facilities that the Receiver does plan to build are projected to be completed in July 2013.[15] However, even the Receiver has acknowledged that there is uncertainty of this completion date. Thus, he has said "[t]he key to hitting our 2013 target date for completing this objective is the commencement of construction at the first site no later than February 2009, with construction completed at that site no later than February 2011."[16]

### 1.    Nature of the Continuing Constitutional Violations

19.    In its July 23, 2007 Order referring consideration of a prisoner release order to the three-judge panel, the *Coleman* Court concluded that CDCR's mental health care delivery system has not come into compliance with the Eighth Amendment, despite twelve years of

---

[15] Joint Pls.' Trial Ex. 56 at Exhibit 1 at 28; Coleman Pls.' Trial Ex. 55 at 7 showing the following mental health bed projects to be constructed by CDCR: 50 bed MHCB at CMC, 32-bed MHCB at SQ, and 67 EOP bed at CMF.

[16] *Id.*

[230642-1]

remedial work in this case.[17] The Court cited significant delays in access to care at the highest levels of need, alarming rates of staffing vacancies, and a severe lack of programming space, among other problems, as evidence that the current level of <u>unmet</u> mental health need in the CDCR—estimated by the *Coleman* Special Master to be one-third of the *Coleman* class—"is unconscionable."[18] The Court noted that although it has issued at least seventy-seven orders over more than eleven years directed at bringing California's prison mental health care system into constitutional compliance, "the system still falls woefully short of meeting the requirements of the Eighth Amendment."[19]

      20.    The *Coleman* Special Master, in a Report filed with the Court on May 31, 2007 regarding the effects of overcrowding on mental health treatment, concluded that a lack of treatment and programming space, beds, and staff was still pervasive throughout the CDCR system. He provided a number of examples, including a consistent <u>decline</u> over the past two years "in the number of hours of therapeutic activities offered in most institutions to Enhanced Outpatient Program prisoner/patients in administrative segregation units, repeatedly attributed to the acute absence of adequate space."[20] The Special Master also reported a functional vacancy rate among clinicians of 19.86 percent, and concluded that there was sufficient staff to provide full mental health services to roughly two-thirds of the mental health caseload.[21] He noted that this analysis "does not even address the endemic shortages of escort correctional officers, nursing staff, clerical and records keeping personnel, pharmacy staff and lab technicians."[22]

---

[17] Coleman Pls.' Trial Ex. 46 at 6:6-8.

[18] Coleman Pls.' Trial Ex. 46 at 6-7.

[19] Coleman Pls.' Trial Ex. 46 at 8:4-10.

[20] Joint Pls.' Trial Ex. 35 at 6.

[21] *Id.* at 11-12.

[22] Joint Pls.' Trial Ex. 35 at 12.

[230542-1]

21.    Some of the standards for measuring whether constitutional requirements are being met are set forth in the Revised Program Guide approved by the *Coleman* Court ("Program Guide"). On March 2, 2006, the *Coleman* Court ordered defendants to immediately implement the Program Guide, which provides the protocol for the provision of mental health care in the CDCR.[23] I have reviewed the standards in the Program Guide relevant to this declaration.

22.    One of the key elements of the Program Guide is the transfer timeline chart that sets forth the required timeframes for transferring prisoners to appropriate levels of care.[24] For obvious reasons, the ability of a mental health delivery system to meet these timeframes is indispensable to the provision of adequate mental health care. They are, in essence, the limits placed on the amount of time a prisoner/patient must wait before receiving the care that clinicians have determined he or she needs. In relevant part, these timeframes are:

Reception Centers:  EOP transfers should occur within 60 days, or 30 days if clinically indicated.  CCCMS transfers should occur within 90 days, or 60 days if clinically indicated.

MHCB:  MHCB transfers should occur within 24 hours of referral.

DMH:  Transfers to DMH acute placements should occur within 10 days of referral, if accepted to DMH.  Referral must be completed within 2 working days of identification.  Transfers to DMH intermediate care placements should occur within 30 days of referral, if accepted to DMH.  Referral must be completed within 5-10 working days.

---

[23] Coleman Pls.' Trial Ex. 47.

[24] Joint Pls.' Trial Ex. 9 at 12-1-13.

EXPERT REPORT OF PROFESSOR CRAIG HANEY, NOS.: CIV S 90-0520 LKK-JFM, C01-1351 TEH

[230542-1]

EOP:  Transfers to general population ("GP") EOP programs should occur within

60 days, or 30 days if clinically indicated.

EOP Administrative Segregation Unit ("ASU") Hub:  EOP prisoners housed in

the regular ASU should transfer to an EOP ASU Hub within 30 days of

placement in the regular ASU or within 30 days of referral to EOP level of care.

PSU:  EOP prisoners housed in the ASU who are endorsed for the PSU must be

transferred within 60 days of endorsement.

23.    In the Court's July 23, 2007 Order referring this matter to the three-judge panel,
the Court found, based upon information documented by the Special Master, that these transfer
timelines are not being met.[25]  The Special Master reported that "[d]elays in transfers,
especially to the most intensive treatment programs for prisoners at the highest custody levels
[have become] "endemic."[26]

24.    Housing at the appropriate level of care, the ability to transfer prisoner-patients
to appropriate levels of care, and the resources to provide treatment at each level of care are
key elements in the provision of mental health care.  The State does not have enough beds
at nearly every level of care right now (Fiscal Year 2007/2008).[27]

25.    Additionally, the *Coleman* Special Master recently reported in his Report and
Recommendations on Defendants' August 2007 Supplemental Bed Plan that "[f]inding
available beds in either of these programs [MHCB and inpatient DMH] remains a daily
challenge that still exceeds CDCR's capability..."[28]  In June 2007, the Court found that

---

[25]  Coleman Pls.' Trial Ex. 46 at 6.

[26] *Id.*

[27] *See, generally,* Coleman Pls.' Trial Ex. 12.

[28]  Coleman Pls.' Trial Ex. 12 at 3.

[230542-1]

"Defendants are providing to class members only twenty-six percent of the beds at ASH [DMH inpatient psychiatric program] called for by their plan. That is unacceptable."[29] The Special Master also concluded that recent events, including the population crisis, implementation of the *Plata* Receivership, and defendants' newest bed plan, "have caused widespread confusion and uncertainty, which now threaten to stall the allocation of construction and operational funding critically needed to meet the increasingly desperate need for acute and intermediate inpatient and mental health crisis beds in CDCR."[30]  In May 2006, the Court described the effect of the shortage of intermediate care facility beds and mental health crisis beds in the CDCR:  "It is undisputed that the shortage is leaving critically mentally ill prisoners languishing in horrific conditions without access to immediately necessary mental health care."[31]  Even in his 15th Report, the Special Master warned that the long waiting lists for the special MHCB, PSU, and DMH beds meant that "suicidal and other seriously mentally ill and violent inmates lack access to clinically necessary levels of monitoring and treatment."[32]  In a Report issued in the summer of 2008, the *Coleman* Special Master found that the shortage of MHCBs remained a barrier to clinically adequate care. Specifically: "[t]imely access to appropriate levels of care, essential to the efficacy of a mental health delivery service continued to elude CDCR."[33]  In addition, the Special Master documented the continued use of alternative sites for prisoners who required MHCB level of care, a practice that was a direct result of the MHCB shortages. Moreover, he described these sites as "uniformly inappropriate for acute care."[34]  In fact, as the Special Master noted, "[f]ourteen institutions that did not have adequate access to licensed crisis beds

---

[29] Coleman Pls.' Trial Ex. 8 at 3:4-5.

[30] Coleman Pls.' Trial Ex. 5 at 9-10.

[31] Coleman Pls.' Trial Ex. 3 at 2:16-18.

[32] Joint Pls.' Trial Ex. 40 at 421.

[33] Joint Pls.' Trial Ex. at 349.

[34] *Id.* at 352.

[200542-1]

resorted to using a variety of temporary monitoring arrangements, most of which were grossly inappropriate alternatives to acute care." [35]

26.    In the Special Master's most recent draft report on suicides within the CDCR, he found that "[c]ontinuing use of ZZ cells and other holding cells for inmates awaiting transfers to *bonafide* CTCs with MHCBs, and placements in OHUs that exceeded the 72-hour time limitations, were ongoing obstacles to the care of inmates in need of constant or close monitoring or timely transfer to higher levels of care.[36]

27.    The documents that I reviewed clearly indicate that, as I noted earlier, defendants do not anticipate being able to meet the need for mental health beds at every level of care until 2014, at best. For example, the *Coleman* Special Master concluded in his Report filed September 24, 2007 that full implementation of defendants' latest proposed bed plan "will stretch out" to January 2014.[37] He also noted that "objections to defendants' present and preceding bed plans on the part of plaintiffs, experts, special master and the Court all reflect a decade of accumulated experience and frustration that justifies fully concerns about CDCR's ability to generate and implement this latest plan effectively."[38] The Special Master further suggested that the actual implementation of the defendants' bed plan may be unlikely to occur within a decade.[39]

28.    Similarly, the Receiver has acknowledged the many serious obstacles he has faced in his efforts to construct adequate health care facilities, which will include mental health beds.[40] In his most recent quarterly report to the *Plata* Court, the Receiver stated: "before

---

[35] *Id.*

[36] Joint Pls.' Trial Ex. 58 at 11.

[37] Coleman Pls.' Trial Ex. 12 at 11.

[38] *Id.* at 12.

[39] *Id.* at 13.

[40] Joint Pls.' Trial Ex. 56 at 46-47.

EXPERT REPORT OF PROFESSOR CRAIG HANEY, NOS.: CIV S 90-0520 LKK-JFM, C01-1351 TEH

[230542-1]

constitutionally adequate health care can be delivered in California's prisons, there needs to be *constitutionally adequate treatment facilities to provide such care.* Unless and until these facilities are constructed, the major health care class action cases will continue indefinitely. Likewise, prisoners will continue to die unnecessarily."[41] Nevertheless, despite "avoidable prisoner deaths" that "illustrate the human cost of the State's failure to provide adequate funding for needed health care treatment facilities," the Receiver concluded that the "State's failure to make this necessary financial commitment puts the Receiver's entire remedial program at risk."[42] A significant part of the *Coleman* mental health bed plan may be folded into the Receiver's plan to construct medical and mental health treatment facilities for 10,000 prisoner-patients.[43]

29.    Meanwhile, some of the beds that CDCR is routinely operating at higher levels of care are, in fact, overflow "jury-rigged" or makeshift units that do not meet appropriate standards for mental health treatment, according to CDCR and DMH guidelines. One example of this is occurring in the Reception Center EOP Program. This program appears to be a "stopgap" response to the overwhelming population pressures in CDCR. EOP patients are not being transferred out of Reception Centers in a timely manner, and some serve their entire terms there. However, the guideline for the Reception Center EOP Program approved as an emergency stopgap by the Court is not equal to the care mandated by the Program Guide for EOP patients. For example, the Reception Center EOP program provides for only five hours of treatment per week, while EOPs housed in mainline EOP or EOP administrative segregation programs must be provided with a minimum of ten hours of treatment per week.[44] Furthermore, due to overcrowding within CDCR, Reception Center EOPs were not

---

[41] *Id.*

[42] *Id.* at 56.

[43] Coleman Pls.' Trial Ex. 55.

[44] Joint Pls.' Trial Ex. 9.

[230542-1]

congregated in designated housing units despite the fact that EOP program is "characterized by a separate housing unit ... for mentally ill inmate-patients who, because of their illness, experience adjustment difficulties in a General Population (GP) setting."[45] Yet, in July 2007, the *Coleman* Special Master reported to the Court that this is the level care that is and will be provided to a significant number of prisoners who require an EOP level of care: "Apart from EOP prisoners in administrative segregation, mental health crisis beds, or alternative housing pending admission to mental health crisis beds, on May 25, 2007, there were 463 EOP inmates in the seven reception centers surveyed in this report, representing over ten percent of all EOP inmates in CDCR institutions."[46] The number of such prisoners continues to grow. Thus, by June 2008, the number of EOP patients housed in the same seven reception centers had reached 707—all patients waiting transfer to a mainline EOP program.[47] An additional 79 EOP patients were housed in other reception centers around the CDCR.[48] In addition, however, as I learned in my most recent tours and will detail below, even these "reduced" level of care Reception Center EOP programs are makeshift programs operated out of makeshift spaces under circumstances and staffing levels that compromise the quality of care provided.

30.    Similarly, some of the units currently operating as intermediate care facilities at SVPP and CMF do not meet the criteria for DMH intermediate care facilities. The D-5 and D-6 units at SVPP and the P-2 and P-3 units at CMF are operating as "interim" intermediate care programs, and the Court waived the state licensing requirements for inpatient facilities so that defendants could meet this overflow need in the short term, given the current emergency the

---

[45] *Id.* at 12-4-1

[46] Coleman Pls.' Trial Ex. 9 at 28.

[47] Coleman Pls.' Trial Ex. 57:  CIM, 196, DVI 70, NKSP 69, RJD 96, LAC 113, SQ 45, WSP 118.

[48] *Id.*

[230642-1]

CDCR faces.[49] However, these units do not have the appropriate treatment space for mental health patients at this level of acuity, nor do they have the resources to provide yard and out-of-cell time in the appropriate manner. For example, in the SVPP D-5 and D-6 units, all mental health treatment occurs on the dayroom floor. On October 18, 2007, the Court ordered defendants to develop and submit proposals for developing "adequate mental health treatment and counseling space" at these SVSP and CMF units.[50] Defendants have created construction proposals for SVSP and CMF in response to the October 2007 Coleman order,[51] but these are long-term projects that, under the best case scenario, will take years to complete. Thus, the SVSP proposal includes treatment space for both the EOP and the DMH units, but has a projected completion date of January 2011 that is contingent on being funded by the Legislature.[52] The CMF treatment space proposal covers only the EOP program, but it projects a completion date of 2012, and only if funding is approved.[53] In the meantime—a period of several years at best—the existing mental health treatment programs will be forced to "make do" with the existing inadequate treatment space.

31.     The tours that I have completed, discussions I have had with numerous mental health and custody staff, and the extensive documents I have reviewed all confirm that institutions throughout the California prison system are using a variety of different types of "overflow" housing to scramble to meet their pressing need for MHCB beds. These include housing such as OHU beds, "Mental Health" OHU ("MOHU") beds, and "ZZ" cells. In his May 31, 2007 Report to the Court, the *Coleman* Special Master found that: "Over the past three years, however, the number of inmate/patients referred to a MHCB level of care has

---

[49] Coleman Pls.' Trial Ex. 3 at 4-5.

[50] Coleman Pls.' Trial Ex. 48 at 6.

[51] Coleman Pls.' Trial Exs. 58-59.

[52] *Id.*

[53] *Id.*

[230542.1]

regularly and significantly exceeded the number of MHCBs available in CDCR, resulting in the placement of inmate/patients in need of a MHCB level of care in a variety of temporary housing alternatives, which often lack the heightened monitoring and treatment essential to the MHCB level of care.... Most of these alternative placements lack suitable staffing and/or the physical configuration needed for the continuous monitoring or intensive treatment provided in a MHCB unit. While strict time limits on their use are prescribed in both department and local policies, they are not consistently observed."[54] The problem persists. Thus, the continued use of alternative sites to house prisoner requiring MHCB placement was documented overall by the Special Master in his draft 20[th] Report and by individual institutions during the 21[st] round monitoring tours.[55]

32.    The situation at the California Men's Colony (CMC) provides just one illustrative example of the chronic nature of this problem. In 2006, the *Coleman* Court ordered that a locked observation unit (LOU) at CMC be re-opened despite its failure to meet state law licensing requirements. The Court found that although "State licensing requirements serve an important function...It is essential to provide immediately mental health crisis beds to critically ill inmates in the CDCR...Under present circumstances, state licensing requirements must temporarily give way to measures necessary to remedy the Eighth Amendment violations that remain unresolved in this action."[56] The unlicensed facility at CMC provides crisis bed care at a prison that has a large mental health population, including more than 500 EOP patients.[57] On March 27, 2007, the Coleman court ordered defendants to complete and occupy a 50 bed

---

[54] Joint Pls.' Trial Ex. 35 at 3-4.

[55] Joint Pls.' Trial Ex. 57 at 352; and *see, e.g.* Coleman Pls.' Trial Exs. 60-61: CIM Memo May 7, 2008 re activation of TBH in March and April 2008; DVI SPR-FIT, 4/9/08, L-Wing overflow Unit population was 89; DVI SPR-FIT, 5/14/08, L-Wing overflow unit population was 84.

[56] Coleman Pls.' Trial Ex. 3 at 3-4.

[57] Coleman Pls.' Trial Ex. 57.

[230542-1]

MHCB at CMC "as soon as possible." However, this project remains stalled. On February 26, 2008, the *Coleman* court, in an order regarding the construction agreement in *Plata, Perez, Armstrong,* and *Coleman,* addressed plaintiffs' concerns about the 50-bed MHCB at CMC, stated that "[a]pproval of the construction agreement does not relieve defendants of their obligation to comply with this court's March 27, 2007 order."[58] The start of this critically needed MHCB project has nonetheless been delayed by at least a year. No patients will benefit from this yet unfunded project for many years.

33.    I have been informed that two years after construction began in May 2006, CDCR opened the new CMF 50-bed MHCB facility to its first patients.[59] It is unclear how much this overdue resource will affect the massive backlog of patients waiting for higher levels of care. In my opinion, due to the effects of overcrowding on the delivery of mental health care, any reduction in the waitlists for higher levels of care will be temporary due to the pent-up demands in the system. During my site inspection at Wasco Reception center on August 1, 2008, the clinical staff in the CTC reported that they experienced difficulty referring their overflow crisis bed patients to the new CMF unit because their reception center prisoners do not have the medical work-up that CMF is requiring prior to transfer.

34.    As problematic as the widespread use of these overflow beds is, CDCR is so overcrowded that it has not been able to create enough of them. Thus, there continue to be waiting lists to get prisoner/patients into these beds. For example, the State reported that as of November 1, 2007, there was a 108 person waiting list for beds at SVPP, even with the overflow D-5 and D-6 units operating.[60] The waitlist for the SVPP intermediate care DMH beds has continued to expand since November 1, 2007 with the most recent waiting list data

---

[58] Coleman Pls.' Trial Ex. 63.

[59] Coleman Pls.' Trial Ex. 64.

[60] Coleman Pls.' Trial Ex. 70.

[230542-1]

for July 31, 2008, listing 173 patients currently accepted and waiting for transfer to SVPP.[61] Recent documents from CSP-Sacramento show that ZZ beds, which are "contraband watch cells" were used as alternate sites for crisis beds patients <u>after</u> CTC beds, OHU beds, and MOHU beds were already full. These documents show that these cells are used regularly, with 62 admissions to ZZ cells and approximately 900 admissions to the MOHU in seven months.[62]

35.     Similarly, at CIM during the 19th round of monitoring, the Special Master found that "there were 106 admissions to the Del Norte overflow MHCBs."[63] By the 20th round of monitoring, the number of admissions to the overflow MHCBs had increased to 384 and the Special Master noted: "[t]here were no physical plant modifications, and cells in Del Norte were inadequate for potentially suicidal or agitated inmates. Large grate vents, unsafe bunk beds, and blind spots were not addressed." [64]

36.     It also appears that some prisons are operating EOP units that are explicitly intended to be "temporary" because they are not appropriate for provision of this level of care. However, it seems inevitable that these units will continue to operate for years to come because of the current, overcrowding-driven bed shortage. This, in turn, has led to more interim measures being implemented to attempt to make these supposedly-temporary beds workable over the long term. For example, there is a "temporary" EOP mental health program operating at MCSP, and in March 2007, the Court approved defendants' *ex parte* request that they be permitted "to install adequate temporary treatment and office space to accommodate the existing and newly-opened Enhanced Outpatient Program mental health programs until replacement programs have been completed and occupied elsewhere in CDCR."[65] However,

---

[61] Coleman Pls.' Trial Ex. 78.

[62] Coleman Pls.' Trial Ex. 17.

[63] Joint Pls.' Trial Ex. 69 at 95.

[64] Coleman Pls.' Trial Ex. 57 at 263.

[65] Coleman Pls.' Trial Ex. 4 at 1-2.

[230542.1]

even here, there have been delays in trying to make "temporary" space more adequate. Thus, to date, the temporary treatment space at Mule Creek State Prison has not yet been completed.[66]

37.    In summary, as the *Coleman* Court noted throughout its July 23, 2007 Order, although some progress had been made over the years in the provision of mental health care in California prisons, this trend has been dramatically reversed by the overcrowding crisis.[67] Prisoners throughout the CDCR are living in harsh and extreme conditions of confinement. As detailed throughout this declaration, and based on my observations and review of documents, I have concluded that overcrowding is now interfering with the ability of the CDCR to meet timelines for transfers to treatment programs at every level of care in its mental health system; it has resulted in an insurmountable shortage of clinical and custody staff; it has overrun all available treatment, office, and programming space; and combined with the environmental effects of overcrowding itself, these delays, shortages, and inadequacies in mental health care are exacerbating existing mental illness, and creating negative psychological consequences for prisoners who, but for overcrowding, would likely not exhibit these problems and symptoms.

**B.    The Effects of Overcrowding on Prisoners and Prison Systems**

38.    Overcrowding impacts every aspect of prison life. In addition to its direct, adverse effects on prisoners and correctional officers, chronic and severe overcrowding can precipitate reactions and adaptations that actually exacerbate its harm, leading to even more dramatic, even tragic consequences. That is, extreme and persistent levels of prison overcrowding force individuals and institutions to adapt in ways that are often counterproductive, and produce even more serious harm. Exposure to chronic and severe overcrowding has especially harmful effects on mentally ill and other vulnerable prisoners.

---

[66] Coleman Pls.' Trial Ex. 55.

[67] Coleman Pls.' Trial Ex. 46.

[230542-1]

### 1.   The Nature of Overcrowding

39.   It is important to note that "overcrowding" is measured or understood as a function of more than just the ratio of prisoners to the rated capacity of a particular facility; it also includes the extent to which a prison, or prison system, houses more prisoners than it has adequate resources and infrastructure to humanely accommodate. Indeed, when prison systems increase their rated capacity without commensurate increases in programming, medical, and mental health resources, they are still "overcrowded" even though, technically, they do not house greater numbers of prisoners than they are designed to hold. Thus, a correctional facility "could be operating at fewer prisoners than its rated capacity, yet be overcrowded."[68] California prisons are chronically and severely overcrowded both in the sense that they house far more people than they were designed to hold, and because they do not have remotely enough programming, medical, and mental health resources—staff, space, and other infrastructure—to humanely house the unprecedented numbers of prisoners who are confined in them.

40.   It is also important to note that the negative consequences of overcrowding go beyond the failure to provide essential services to prisoners. Overcrowded prisons are dangerous for staff and prisoners alike because they create a variety of security-related problems and risks. Of course, these security-related problems and risks, in turn, create enormous and often insurmountable obstacles to effective treatment and constitutionally mandated care for mentally ill prisoners.

41.   The risks and dangers of overcrowding have been well understood and acknowledged by corrections officials and experts for decades. Indeed, when I first began to study the psychology of imprisonment in the 1970s, it was widely understood among corrections officials that whenever their prisons were nearing 90-95% of their capacity, they were becoming dangerously overcrowded. This was because of the recognition that in order to safely maintain a closed environment like prison, where people are involuntarily housed, staff

---

[68] R. Ruddell & G. Mays, Rural Jails: Problematic Prisoners, Overcrowded Cells, and Case-Strapped Counties, 35 *Journal of Criminal Justice* 251-260 (2007), at 255.

and administrators must have sufficient options to readily move and separate prisoners, both for security and treatment-related classification reasons. As prisons become full, tensions mount and deprivations begin to multiply; administrators must have sufficient degrees of freedom to respond to the special needs and conflicts that inevitably result. As a prison closes in on having every one of its cells filled, those degrees of freedom are correspondingly reduced and serious problems begin to go unaddressed and eventually worsen.

### 2.    Devolving Standards of "Overcrowding" Inside the CDCR

42.    Of course, we have traveled a very, very long distance in California from that original concept of what constitutes an "overcrowded" prison. Prison officials have come to expect, make do, and manage in the face of levels of overcrowding that are unprecedented and have lasted for an astounding length of time. The quality of life inside CDCR facilities has profoundly deteriorated and the physical safety and the mental health of the people who live and work there have been jeopardized as a result.

43.    To provide a sense of exactly how far standards of acceptable overcrowding have deteriorated in California, consider that as recently as the late 1970s there was a widespread consensus among the state's correctional officials about the evils of "double-celling"—the practice of housing two prisoners in a single cell usually designed to hold one person. High level prison administrators in California (and virtually everywhere else in the country) understood that double-celling was problematic, dysfunctional, and potentially damaging, even if they were forced to resort to it from time to time. Thus, here is how 1979 correctional task force that included a number of high-ranking California prison officials explained the state's official policy:

> According to legislative and departmental policy, the Department of Corrections does not sanction double-celling prisoners. This task force agrees with the basic premise that <u>double-celling violates basic standards of decent housing, health, and institutional security</u>; however, at present, there is no viable alternative to double-celling prisoners as population projections are realized. Thus, while concurring that <u>double-celling is totally undesirable</u>, the task force must recommend this, and has attempted to propose gradual

-24-

population increments and associated staffing to lessen the impact of overpopulation.[69]

44.     I know of no conceptual development or theoretical breakthrough —in psychology or penology or any other discipline—over the last several decades that alters or challenges the fundamental validity of these observations. Yet, in the intervening decades, we have come to accept double-celling and much, much worse as a matter of course. Instead of sound penological or psychological theory, this new-found acceptance of unprecedented levels of overcrowding appears to derive purely from necessity. To be sure, nothing more than necessity could account not only for the CDCR's acceptance of double-celling (which is nearly universal, even in the state's least overcrowded prisons), but also its "creative" definitions and redefinitions of "tolerable overcrowding." Indeed, the "acceptable" percentage of prisoners housed at different kinds of facilities <u>beyond</u> those facilities' design capacity has continued to inexplicably but inexorably rise. As a result, increasingly intolerable levels of overcrowding can be "accommodated" and made to appear less drastic than they are.

45.     The court-appointed Receiver in *Plata v. Schwarzenegger* clearly documented these shifting standards in his May 15, 2007, Overcrowding Report.[70] As he noted, CDCR has repeatedly redefined "tolerable overcrowding" by continuing to increase the acceptable

---

[69] Housing Inventory & Population Impact Task Force, California Department of Corrections, *Prison Overcrowding: A Plan for Housing Felons Through FY 1986/87* (1979), at iv (emphasis added). The practice of double-celling was still controversial enough in 1983 to prompt a trio of California state senators to attempt to introduce a Senate Constitutional Amendment that read in part:

> This measure, if adopted by the voters, would provide that the practice of double-celling shall not be deemed to be, or constitute, the infliction of cruel and unusual punishment. The measure would also provide that Department of Corrections regulations providing for double-celling are not invalid on the basis that they provide for double-celling of prisoners.

Senate Constitutional Amendment No. 41, introduced by Senators Boatright, Davis, and Presley on August 30, 1983.

percentages above design capacity so that "crowding limits were steadily lowered."[71] To illustrate, below is a summary of some of the shifting limits from the relevant CDCR Master Plans, depicting changes in <u>allowable</u> prisoner populations <u>above</u> the design capacities of the different types of housing units:

| <u>Master Plan</u> | <u>Dormitory</u> | <u>Celled Housing</u> |
|---|---|---|
| 1995-1998 | 120% | 130% |
| 1995-2000 | [not available] | 170% (for Level IV) |
| 1998-2003 | 190% (including gym housing) | 190% |

I can think of no possible reason—other than necessity and expediency—why a maximum allowable capacity of 120% or 130% over design capacity set for the years 1995-1998 would be increased to 190% by 1998-2003.

46.    In addition, as the Receiver also noted: "During these same years various CDCR housing definitions were repeatedly modified, and new terms were instituted such as 'crisis' and 'nontraditional' (the CDCR's designation for prisoners housed in classrooms, hallways, etc.). Prison staff refer to such beds as 'ugly' beds."[72] Unfortunately, overcrowding cannot simply be defined away, especially in a prison setting. Definitional gymnastics notwithstanding, the basic concept of overcrowding—housing more people than space, resources, or infrastructure can humanely accommodate—remains valid. Moreover, in a legal context, there is a constitutional line that cannot be crossed.

---

[70] Joint Pls.' Trial Ex. 26.

[71] *Id.* at 11.

[72] *Id.*

[230542-1]

### 3.    The Psychological Effects of Overcrowding on Prisoners

47.    There are a number of basic facts of life in overcrowded prison settings that generate a wide range of unpleasant, harmful, and potentially very dangerous and damaging effects, especially when the overcrowding is chronic and severe. Crowding intensifies or amplifies the basic pains of imprisonment. Prisoners in overcrowded correctional settings are forced to interact with more unfamiliar people, under extremely close quarters that afford little or no privacy or respite, where their basic needs are less likely to be addressed or met. The frequency of interactions, the sheer numbers of violations of personal space that occur, the forced closeness of the contact, and the reduction or elimination of respite from one another all expose prisoners to greater levels of psychological stress. Prisoners in overcrowded prisons are more idle and on edge.

48.    Indeed, overcrowding operates at an individual level to worsen the experience of imprisonment by literally changing the nature of the context or situation to which prisoners must adapt on a day-to-day basis. The longer someone is exposed to overcrowded conditions, the greater the length of time during which problematic coping mechanisms can evolve in response.[73] Thus, all other things being equal, short-term overcrowding is less problematic than exposure to long-term or chronically crowded prison conditions. In addition to these direct, individual-level effects, which I will discuss in a subsequent section, overcrowding changes the way the prison itself functions.

49.    Not surprisingly, a large literature on overcrowding has documented a range of adverse effects that occur when prisons have been filled to capacity and beyond. In the 1980s, when prisons in different parts of the United States were beginning to receive unprecedented numbers of incoming prisoners, a group of prison researchers concluded that "crowding in prisons is a major source of administrative problems and adversely affects prisoner health,

---

[73] For example, see the discussion in J. Bonta, Prison Crowding: Searching for the Functional Correlates, 41 *American Psychologist* 99-101 (1986), and the references cited therein.

behavior, and morale."[74] Two other early commentators concluded their review of the literature

in much the same way, namely, that "[w]ith few exceptions, the empirical studies indicate that

prison overcrowding has a number of serious negative consequences."[75] Although other

variables may mediate or reduce the negative effects of crowding,[76] its psychological toll can

be substantial.

    50.    Thus, despite an occasional study that yields an inconclusive finding,[77] there is

little reason to doubt that crowding significantly worsens the quality of institutional life and

increases the destructive potential of imprisonment. Among other things, we know that prison

overcrowding increases negative affect among prisoners,[78] elevates their blood pressure,[79] and

---

[74] Vernon Cox, Paul Paulus, and Garvin McCain, Prison Crowding Research: The Relevance for Prison Housing Standards and a General Approach to Crowding Phenomena, 39 *American Psychologist* 1148 (1984); Gaes, G., The Effects of Overcrowding in Prison. In M. Tonry and N. Morris (eds.), *Crime and Justice: Annual Review* of Research (1985); Paul Paulus, *Prison Crowding: A Psychological Perspective* New York: Springer-Verlag (1988).

[75] Thornberry, T., and Call, J., Constitutional Challenges to Prison Overcrowding: The Scientific Evidence of Harmful Effect, 35 *Hastings Law Journal* 313, 351(1983). Overcrowding studies at women's prisons showed similar effects. See Barry Ruback & Timothy Carr, Crowding in a Woman's Prison: Attitudinal and Behavioral Effects, 14 *Journal of Applied Social Psychology* 57-68 (1984).

[76] For example, Ekland-Olson, S., Crowding, Social Control, and Prison Violence: Evidence From the Post-*Ruiz* Years in Texas, 20 *Law and Society Review* 389 (1986). However, one of the reasons that quantitative measures of the adverse effects of prison crowding sometimes yield inconsistent results has to do with this basic fact of prison life: The prison and the prison staff also react and adjust to the levels of overcrowding, setting in motion a chain of events that changes what is being measured and how. Thus, for example, the ability of staff to identify disciplinary infractions, and how they react to and punish those that are identified, may change in unpredictable ways as a prison becomes increasingly overcrowded.

[77] For example, see Jeff Bleich, The Politics of Prison Crowding, 77 *California Law Review* 1125-1180 (1989).

[78] E.g., Paul Paulus, Vernon Cox, Garvin McCain, & J. Chandler, Some Effects of Crowding in a Prison Environment, 5 *Journal of Applied Social Psychology* 86, 90 (1975): "The present study indicates that living under relatively crowded housing conditions in a prison produces both negative affect and a lower criterion of what constitutes overcrowding."

[79] E.g., D'Atri, D., Psychophysiological Responses to Crowding, 7 *Environment and Behavior*
(continued . . .)

[230542-1]

leads to greater numbers of prisoner illness complaints.[80] Not surprisingly, exposure to "long-term, intense, inescapable crowding" of the sort that now characterizes California prisons results in high levels of stress that "can lead to physical and psychological impairment."[81] In addition, a number of studies have found that overcrowding is associated with higher rates of disciplinary infractions, especially among younger prisoners.[82] For example, one study concluded that in prisons "where crowded conditions are chronic rather than temporary and where people prone to antisocial behavior are gathered together, there is a clear association

---

237, 247 (1975): "[T]he major hypothesis that there would be an association between degree of crowding and blood pressure, systolic and diastolic, was strongly supported."

[80] E.g., McCain, G., Cox, V. and Paulus, P., The Relationship Between Illness Complaints and Degree of Crowding in a Prison Environment, 8 *Environment and Behavior* 283, 288 (1976).

[81] Paulus, P., McCain, G., & Cox, V., Death Rates, Psychiatric Commitments, Blood Pressure, and Perceived Crowding as a Function of Institutional Crowding, 3 *Environmental Psychology and Nonverbal Behavior* 107,115 (1978). See, also, Ostfeld, Adrian, Dasl, Stanislav, D'Atri, David, & Fitzgerald, Edward, *Stress. Crowding. and Blood Pressure in Prison.* Hillsdale, NJ: Lawrence Erlbaum (1987).

[82] There are a number of studies that have documented the fact that overcrowding contributes significantly to various forms of prison aggression and infractions. For example, see: G. Gaes, & W. McGuire, Prison Violence: The Contribution of Crowding Versus Other Determinants of Prison Assault Rates, 22 *Journal of Research in Crime and Delinquency* 41-65 (1985); J. Wooldredge, T. Griffin, & T. Pratt, Considering Hierarchical Models for Research on Prisoner Behavior: Predicting Misconduct With Multilevel Data, 18 *Justice Quarterly* 203-231 (2001) (overcrowding predicted prisoner misconduct in the New York, Washington, and Vermont prison systems). This appears to especially true in prisons that house "younger" prisoners (e.g., where their median age is 27 years or less). For example, see: S. Ekland-Olson, D. Barrick, & L. Cohen, Prison Overcrowding and Disciplinary Problems: An Analysis of the Texas Prison System, 19 *Journal of Applied Behavioral Sciences* 163-176 (1983); and Nacci, J. Prather, & H. Teitelbaum, *The Effect of Prison Crowding on Prisoner Behavior.* Washington, DC: U.S. Bureau of Prisons (1977). Thus, a "meta analysis" (a statistical procedure that combines the results of a number of different studies) concluded that although overcrowding did not appear to have a significant effect on misconduct within the prison population as a whole, it did have "substantially larger effects among younger prisoners, consequently leading to higher levels of violent and nonviolent misconduct among younger prisoner populations." T. Franklin, C. Franklin, & T. Pratt, Examining the Empirical Relationship Between Prison Crowding and Prisoner Misconduct: A Meta-Analysis of Conflicting Research Results, 34 *Journal of Criminal Justice* 401-412 (2006).

[230542-1]