EDMUND G. BROWN JR.
Attorney General of the State of California
DAVID S. CHANEY
Chief Assistant Attorney General
ROCHELLE C. EAST
Senior Assistant Attorney General
JONATHAN L. WOLFF
Senior Assistant Attorney General
LISA A. TILLMAN – State Bar No. 126424
Deputy Attorney General
KYLE A. LEWIS – State Bar No. 201041
Deputy Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
Telephone: (415) 703-5708
Facsimile: (415) 703-5843
lisa.tillman@doj.ca.gov
kyle.lewis@doj.ca.gov

Attorneys for Defendants

HANSON BRIDGETT LLP
JERROLD C. SCHAEFER - 39374
PAUL B. MELLO – 179755
S. ANNE JOHNSON – 197415
SAMANTHA D. TAMA – 240280
RENJU P. JACOB - 242388
425 Market Street, 26th Floor
San Francisco, CA  94105
Telephone: (415) 777-3200
Facsimile:  (415) 541-9366
jschaefer@hansonbridgett.com
pmello@hansonbridgett.com
ajohnson@hansonbridgett.com
stama@hansonbridgett.com
rjacob@hansonbridgett.com

# UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

## AND THE NORTHERN DISTRICT OF CALIFORNIA

## UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

## PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>ARNOLD SCHWARZENEGGER, et al.,<br><br>Defendants. | No.  2:90-cv-00520 LKK JFM P<br><br>**THREE-JUDGE COURT** |
| MARCIANO PLATA, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>ARNOLD SCHWARZENEGGER, et al.,<br><br>Defendants. | No. C01-1351 TEH<br><br>**THREE-JUDGE COURT**<br><br>**EXHIBITS CC, PART 3 TO EXHIBIT CC, PART 13 TO DECLARATION OF PAUL MELLO IN SUPPORT OF DEFENDANTS' MOTIONS IN LIMINE**<br><br>**To: Three-Judge Panel** |

- 1 -

DECL. PAUL MELLO SUPP. DEFS.' MOT. IN LIMINE
(CASE NOS. 90-00520; 01-1351)

1648445.1

# EXHIBIT CC
# PART 3

between restrictions on personal space and the occurrence of disciplinary violations."[83] And there is also evidence to suggest that psychiatric patients are more likely to become aggressive in housing units that lack adequate bed space and are overcrowded.[84]

51.    Among other things, crowded prisons generally experience increased noise levels and temperatures that can be elevated to intolerable levels during summer months, which in turn increase irritability. In addition, effective surveillance becomes more difficult because of the sheer number of people who must be monitored. Overcrowded housing units are more difficult to keep clean, more likely to fall into disrepair and suffer breakdowns in plumbing and other basic services more frequently. Unintentional violations of personal space are not only more likely in overcrowded prisons but also, in turn, are more often perceived as provocations (and responded to accordingly). In fact, perhaps in part because the subjective experience of prison crowding is so stressful, it actually leads prisoners to perceive others in their surrounding environment as more hostile and intentionally malevolent, increasing their readiness to react to those others as threatening.[85]

52.    Prison overcrowding also affects prisoners' mental and physical health by increasing the level of uncertainty with which they regularly must cope. Thus, crowded conditions heighten the level of cognitive strain that persons experience by introducing social complexity, turnover, and interpersonal instability into already dangerous prison environments in which interpersonal mistakes or errors in social judgments can be fatal. Of course, overcrowding also raises collective frustration levels inside prisons by generally decreasing the

---

[83] Megargee, E. The Association of Population Density, Reduced Space, and Uncomfortable Temperature with Misconduct in a Prison Community, 5 *American Journal of Community Psychology* 289, 295 (1977).

[84] For example, see: B. Ng, S. Kumar, M. Ranclaud, & E. Robinson, Ward Crowding and Incidents of Violence on An Acute Psychiatric Inpatient Unit, 52 *Psychiatric Services* 521-525 (2001); and Palmstierna, et al., The Relationship of Crowding and Aggressive Behavior on a Psychiatric Intensive Care Unit, 42 *Hospital and Community Psychiatry* 1237-1240 (1991).

[85] For example, see: C. Lawrence & K. Andrews, The Influence of Perceived Prison Crowding on Male Prisoners' Perception of Aggressive Events, 30 *Aggressive Behavior* 273-283 (2004).

resources, programming, and other activities that are available to the prisoners confined in them. The sheer number of things prisoners can do or accomplish on a day-to-day basis is compromised by the increasingly scarce resources and the multiplicity of people in between them and their goals and destinations.[86]

53.    One widely cited literature review concluded that although prisons in general were not necessarily harmful to prisoners, overcrowded prisons certainly were. It included the following empirically documented observations:  that "physiological and psychological stress responses ... were very likely [to occur] under crowded prison conditions"[87]; that "a correlation [has been found] between population density and misconduct [when age is used as a moderator variable]"[88]; that there is "a significant relationship between crowding and post-release recidivism"[89]; and that "high prisoner turnover [in some prisons has been found to predict] prisoner disruptions."[90] These reviewers also acknowledged that "as sentence length or exposure to crowded situations increase so does the risk for misconduct"[91]; and that "[w]hen threats to health come from suicide and self-mutilation, then prisoners are clearly at risk."[92]

---

[86] For example, Vernon Cox, Paul Paulus, & Garvin McCain, Prison Crowding Research, 39 *American Psychologist* 1148,1159 (1984). See, also, Edward Sieh, Prison Overcrowding: The Case of New Jersey, 53 *Federal Probation* 41-51(1989) for a brief review. For a discussion of the health risks of prison and jail overcrowding, see Bailus Walker & Theodore Gordon, Health Risks and High Density Confinement in Jails and Prisons, 44 *Federal Probation* 53-58 (1980).

[87] James Bonta and Paul Gendreau, P., Reexamining the Cruel and Unusual Punishment of Prison Life, 14 *Law and Human Behavior* 347-372 (1990), at 353.

[88] *Ibid.*

[89] At 354.

[90] *Ibid.*

[91] *Ibid.*

[92] At 356.

54.    Prisoners confined to severely and chronically overcrowded prisons commonly live in more rapidly deteriorating and dilapidated housing units. Obviously, overcrowded prisons are dirtier and their infrastructure is in greater disrepair because of the overuse they receive. In extreme cases, prisoners may be herded into makeshift housing that clearly was intended for some other purpose and affords them even less privacy than the already minimal amounts they receive in standard prison environments. The degraded conditions under which prisoners live serve as constant reminders of their compromised and stigmatized social status and role. A diminished sense of self-worth and personal value may result from this. That is, like the rest of us, prisoners derive and internalize symbolic meaning from the way they are treated. When they are treated in harsh and humiliating ways, and are confined in abysmal housing units, many come to think of themselves as deserving no more than the degradation and stigma to which they are being subjected.[53] This degraded identity may be difficult or impossible to relinquish when they are released from prison.

55.    Of course, there are many prisoners who enter overcrowded prison systems with pre-existing psychological problems and psychiatric disorders. For obvious reasons, chronically and severely overcrowded prison systems are challenged to obtain and retain adequate numbers of clinical staff and to implement treatment programs that address the needs of this special population. In addition to the lack of adequate numbers of treatment staff proportionate to the sheer numbers of mentally ill prisoners, these prisoners are themselves especially sensitive to the harsh realities of overcrowded prisons. Mentally ill prisoners are more likely to be adversely affected by the forced intimate contact that overcrowded housing units require because, depending on the nature of their illness, they may be far less adept at

---

[53] These issues have been explored extensively in the past by sociologists. See, for example: Homant, R., Employment of Ex-Offenders: The Role of Prisonization and Self-Esteem, 8 *Journal of Offender Counseling, Services, & Rehabilitation* 5-23 (1984); Irwin, J., *The Felon.* Englewood Cliffs, NJ: Prentice-Hall (1970); McCorkle, L., & Korn, R., Resocialization Within Walls, 293 *The Annals* 88-98 (1954); Thomas, C., & Peterson, D., *supra* note 58; Title, C., Institutional Living and Self-Esteem, 20 *Social Problems* 65-77 (1972); and Wulbert, R., Prisoner Pride in Total Institutions, 71 *American Journal of Sociology* 1-9 (1965).

[230542-1]

reading social cues, controlling their impulses, or regulating their emotional states than the prisoners with whom they must so closely and constantly interact. The decreased opportunities for normal, non-pressured social interaction may undermine already impaired reality testing. And the sheer stress of severely overcrowded confinement may overwhelm their already fragile coping mechanisms, creating fear and anxiety in what these prisoners experience as an increasingly unpredictable world. Thus, mentally ill prisoners are more likely to decompensate from exposure to such pressurized, overcrowded environments, and they are vulnerable to victimization from the overcrowding-related conflicts that occur with increased frequency.

56.   Whether or not they enter prison with pre-existing psychiatric disorders, some prisoners find the severe conditions of confinement in badly overcrowded systems to be traumatic. Others are exposed to violence and other emotionally wrenching events that will have long-lasting psychological consequences. As a result, some develop "post-traumatic stress disorder" (PTSD)—a range of long-term trauma-related symptoms, including depression, emotional numbing, anxiety, isolation, hypervigilance, and related reactions—in response to prison trauma.[94] In this regard, psychiatrist Judith Herman and others have proposed that the diagnostic category of post-traumatic stress disorder be restructured to include what she has termed "complex PTSD," a disorder created by "prolonged, repeated trauma or the profound deformations of personality that occur in captivity."[95] Complex PTSD can result in protracted

---

[94] American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders.* 4th Edition. Washington, DC: American Psychiatric Association (1994), at 111. For more detailed discussions of the disorder, see C. Peter Erlinder, Paying the Price for Vietnam: Post-Traumatic Stress Disorder and Criminal Behavior, 25 *Boston College Law Review* 305 (1984); Helzer, J. E., Robins, L. N., & McEvoy, L., Post-Traumatic Stress Disorder in the General Population, 1317 *The New England Journal of Medicine* 1630-1634 (1987); Rowan, A. B., Foy, D. W., Rodriguez, N., & Ryan, S., Posttraumatic Stress Disorder in a Clinical Sample of Adults Sexually Abused as Children, 18 *Child Abuse and Neglect* 51-61 (1994); John P. Wilson and Beverly Raphael (Eds.), *International Handbook of Traumatic Stress Syndromes.* New York: Plenum (1993).

[95] Judith Herman, A New Diagnosis. In Judith Herman (Ed.), *Trauma and Recovery.* New York: Basic Books (1992), at 119. See, also, Herman, Judith Lewis. Complex PTSD: A Syndrome in Survivors of Prolonged and Repeated Trauma. In George S. Everly Jr., Jeffrey M.

(continued . . .)

[230542-1]

depression, apathy, and the development of a profound sense of hopelessness. For some prisoners, it represents the long-term psychological cost of adapting to oppressive forms of prison confinement.[96]

57.    In any event, many prisoners adapt to the pains of extreme forms of imprisonment in severely overcrowded prisons by developing overt psychological symptoms or experiencing an exacerbation of ones that already exist—including clinical depression, paranoia, and psychosis.[97]

### 4.    The Behavioral Effects of Overcrowding on Prisoners and Prisons

58.    Prison systems, administrators, and staff also respond to overcrowding in a variety of ways that, in turn, impact prisoner behavior. In an important sense, of course, overcrowding is a systemic problem, and prison systems "behave" differently in the face of it. Because overcrowding is such a pernicious problem, however, few if any of these adaptations have long-term positive consequences.

59.    For one, overcrowded prison systems often respond to the influx of unprecedented numbers of prisoners by reducing the amount of screening, monitoring, and managing that they perform. This typically includes compromises that are made in the assessment and treatment of vulnerable or special needs prisoners. As one group of clinicians acknowledged: "Unfortunately, the prospect of screening prisoners for mental disorder and treating those in need of mental health services has become a daunting and nearly impossible

Lating, (Eds.), *Psychotraumatology: Key Papers and Core Concepts in Post-Traumatic Stress* (pp. 87-100). New York: Plenum (1995).

[96] Judith Herman, Complex PTSD: A Syndrome in Survivors of Prolonged and Repeated Trauma, 5 *Journal of Traumatic Stress* 377-391 (1992).

[97] Cf. DeWolfe, R., and DeWolfe, A., Impact of Prison Conditions on the Mental Health of Prisoners, 1979 *Southern Illinois University Law Journal* 497 (1979); Hans Toch, *Men in Crisis : Human Breakdowns in Prison.* Chicago, IL: Aldine (1975); Hans Toch, *Living in Prison : The Ecology of Survival.* New York: Free Press (1977).

[230542-1]

task in the present explosion of prison growth."[98] Unidentified and untreated mentally ill prisoners in mainline prison populations not only are more likely to deteriorate themselves, but also to have a significant adverse effect on the prisoners with whom they must live and interact—sometimes incurring their wrath and mistreatment.

60.    Overcrowding also means that prison systems experience pressures to reallocate already limited programming and other resources to create bed space and maintain basic security. Thus, in addition to significant reductions in correctional services, activities, programming, and treatment for prisoners, of course, overcrowded prisons are correspondingly plagued by higher levels of idleness. The prison overcrowding crisis in the United States in general and California in particular coincided with the advent of a correctional philosophy that saw punishment rather than rehabilitation become the stated goal and primary purpose of imprisonment. Unprecedented amounts of unproductive inactivity have resulted from the confluence of these trends. Put simply, a severely and chronically overcrowded prison system like the one that now exists in California cannot keep the majority of its prisoners meaningfully or productively engaged in activities and programs.

61.    Moreover, chronic idleness produces more than mere boredom. There is widespread agreement among correctional experts that empty, idle time in prison produces negative psychological and behavioral effects. As far back as the 1980s, when the trends toward overcrowding and the lack of prison programming had just begun, the U.S. Government Accounting Office noted: "Corrections officials believe that extensive prisoner idleness can lead to destructive behavior and increase violence within institutions. Moreover, idleness does little to prepare prisoners for re-entry into society."[99]

---

[98] Frank DiCataldo, Alexander Greer, & Wesley Profit, Screening Prison Prisoners for Mental Disorder: An Examination of the Relationship Between Mental Disorder and Prison Adjustment, 23 *Bulletin of the American Academy of Psychiatry and Law* 573-585, 574 (1995).

[99] United States Government Accounting Office, *Report to the Attorney General: Improved Prison Work Programs Will Benefit Correctional Institutions and Prisoners* 2 (1982).

62.     Idleness-related frustration also increases the probability of interpersonal conflict and assaults in prison. Unfortunately, as I noted earlier, overcrowding simultaneously reduces the opportunities for staff to effectively monitor prisoner behavior and drastically limits their options to reduce animosities between prisoners by separating them or sending them to different facilities. Thus, there is greater stress and more opportunity for interpersonal conflict, less for prisoners to do, fewer positive or productive outlets to release the resulting tension, decreased staff capacity to identify prisoner problems, and fewer options to solve them once they do.

63.     Moreover, the kind of widespread idleness and lack of purposeful activity that pervades overcrowded prisons has been identified as a major cause of self-harm and suicide among prisoners.[100] Indeed, a 2005 nationwide study of prison suicides found that the "the probability of suicide increases dramatically as overcrowding increases..."[101] These researchers found that suicide rates were lower in minimum security facilities overall—presumably because of the greater levels of program participation—but that overcrowding actually produced the greatest effect on the suicide rate at these facilities. That is, at high levels of overcrowding, minimum security prisons were as likely to experience suicide as their medium and maximum security counterparts. In fact, some prison researchers have concluded that one of the best ways to decrease the rate (not just the absolute number) of prison suicides would be to reduce the total number of incarcerated persons.[102]

---

[100] For example, see: M. Leese, S. Thomas, & L. Snow, An Ecological Study of Factors Associated with Rates of Self-inflicted Death in Prisons in England and Wales, 29 *International Journal of Law and Psychiatry* 355-360 (2006).

[101] M. Huey & T. McNulty, Institutional Conditions and Prison Suicide: Conditional Effects of Deprivation and Overcrowding, 85 *Prison Journal* 490-514 (2005), at 506.

[102] For example, see: P. Marcus & P. Alcabes, Characteristics of Suicides by Prisoners in an Urban Jail, *44 Hospital and Community Psychiatry* 256-261 (1993); and D. MacDonald & N. Thomson, Australian Deaths in Custody, 1980-1989, 159 *Medical Journal of Australia* 581-585 (1993). Of course, no one would argue that a simple reduction in population is all that is needed to address suicidality among prisoners. Clearly, a corresponding concern for the needs
(continued . . .)

64.     Another negative behavioral effect of overcrowding that stems from the changes it produces at both individual and institutional levels is the increased risk of sexual victimization. For example, one prison researcher has noted that "[i]n less well-regulated institutions in which prisoners have little recourse to protection or in which there may be collusion between dominant prisoners and staff to maintain the peace, sexual violence tends to be greater."[103] Others have suggested that overcrowded conditions in which prisoners have much idle time may contribute to higher numbers of prison rapes.[104]

65.     Researchers also have documented greater amounts of illicit drug use among prisoners who are incarcerated in overcrowded prison settings, leading one of them to conclude that "reducing drug-related behaviors inside prison may require alleviating prison crowding…"[105] There are several plausible explanations for this relationship, including the fact that illicit drug use is more difficult to monitor and prevent in overcrowded prisons and the likelihood that prisoners will attempt to cope with the stress of overcrowded living conditions through increased drug use.

66.     As I noted earlier, overcrowding appears to have especially adverse effects on the institutional behavior of younger prisoners. Thus, one study of the Texas prison system found that:

---

of the prisoners who remain behind in prison, as well as those who are released or diverted to non-prison settings, is also needed. For example, see: S. Fruehwald, P. Frottier, K. Ritter, R. Eher, & K. Gutierrez, Impact of Overcrowding and Legislational Change on the Incidence of Suicide in Custody Experiences in Austria, 1967-1996. 25 *International Journal of Law and Psychiatry* 119-128 (2002), who argue that reductions in prisoner populations must be accompanied by suicide prevention training among custodial staff.

[103] King, M., Male Rape in Institutional Settings. In Mezey, G., & King, M. (Eds.), *Male Victims of Sexual Assault*. Oxford: Oxford University Press (1992), at 70.

[104] Gunby, P. Sexual Behavior in an Abnormal Situation, 245 *Medical News* 215-220 (1981).

[105] W. Gillespie, A Multilevel Model of Drug Abuse Inside Prison, 85 *Prison Journal* 223-246 (2005), at 21. Perhaps not surprisingly, Gillespie found that the overcrowding effect appeared to be particularly pronounced among prisoners with a prior history of street drug use.

> The greater the proportion of young prisoners housed in the institution, the greater the infraction and assault rates. There is some evidence for an interaction effect between age and prison size. Younger prisoners may be more susceptible to the problems and control structures in large prisons than older prisoners.[106]

67.    Another study obtained similar results, with overall correlations that revealed "a significant association between density and total assaults and assaults on prisoners" such that the greater the density the more frequent the assaults. But the relationship between crowding and violence was "strongest in the institutions housing young offenders."[107]

68.    These age-related crowding effects are not difficult to understand. Younger prisoners tend to be more volatile, sensitive to their surroundings and, in general, more likely to react aggressively to the tensions and conflicts that crowded conditions of confinement generate. However, prison officials and staff members often respond to these crowding-related infractions by punishing prisoners, frequently by placing them in disciplinary segregation units. The heightened reactivity of younger prisoners to the context of crowded living conditions means that greater numbers of them will be exposed to even harsher conditions in the segregated or isolated housing units where they will be confined.

69.    A number of adverse and presumably unintended long-term consequences are likely to follow from this scenario. Prison officials typically use a prisoner's disciplinary segregation status to bar him from participation in any form of educational or vocational programming. Moreover, time spent in segregation simultaneously places prisoners at risk of developing a host of adverse psychological reactions that are associated with long-term isolation (that I will discuss in a subsequent section of this report). The absence of even

---

[106] Ekland-Olson, S., Barrick, D., & Cohen, L. Prison Overcrowding and Disciplinary Problems: An Analysis of the Texas Prison System, 19 *Journal of Applied Behavioral Science* 163-176,174 (1983); Gilbert Gaes and William McGuire, Prison Violence: The Contribution of Crowding Versus Other Determinants of Prison Assault Rates, 22 *Journal of Research in Crime and Delinquency* 41-65 (1985).

[107] Nacci, P., Teitelbaum, H., & Prather, J. Population Density and Prisoner Misconduct Rates in the Federal Prison System, 41 *Federal Probation* 26, 29 (1977).

minimal forms of programming and exposure to potentially disabling solitary confinement jeopardize subsequent adjustment in the mainline prison population as well as in the freeworld. And, once these prisoners do return to prison, they may well find that their prior disciplinary status leads more readily (or even automatically) to their classification as a present security risk, making them prime candidates for assignment to a segregation unit once again.

70.     In light of the panoply of negative individual and institutional effects of prison overcrowding that I have summarized in the preceding paragraphs, it is perhaps not surprising that several studies have suggested that crowded prisons are associated with increased recidivism. For example, at the start of the 1980s, several British researchers found a strong relationship between overcrowding and prison ineffectiveness in England—prisoners released from overcrowded prisons were more likely to be recommitted for subsequent criminal infractions. The relationship could not be explained away by other variables, leading the researchers to recommend a reduction in prison overcrowding in order to improve the ability of prisons to reduce crime. By sending fewer people to prison or by reducing the effective lengths of prison sentences, they argued, the effectiveness of prison might be enhanced.[108]

71.     Similarly, several years after this English study, Canadian researchers concluded that placing low-risk offenders in often-overcrowded high security facilities resulted in high rates of re-incarceration.[109] The rates were significantly higher than those of comparable low-risk offenders who had been placed in halfway houses. The researchers concluded that the failure to properly divert low-risk offenders from high to low security facilities—something that overcrowded prison systems often lack the capacity to do—"may actually increase the risk of future recidivism."[110]

---

[108] Farrington, D. & Nuttall, C., Prison Size, Overcrowding, Prison Violence, and Recidivism, 8 *Journal of Criminal Justice* 221-231, 230 (1980).

[109] Bonta, J., and Motiuk, L., The Diversion of Incarcerated Offenders to Correctional Halfway Houses, 24 *Journal of Research in Crime & Delinquency* 302 (1987).

[110] *Id.* at 312.

[230542-1]

72.    Long-term "criminogenic" or crime-producing overcrowding effects can occur in other ways as well. Indeed, severely overcrowded prison systems can generate a wide variety of problems that may reverberate back into the community and eventually back into the prison system itself. For example, because prisoners lack sufficient programming and treatment in overcrowded systems, they are more likely to re-enter the free society no better— and often much worse—than they left. This is especially true for mentally ill prisoners whose psychiatric conditions are likely to worsen in the face of the harsh and punitive conditions they face in overcrowded prisons. If mentally ill prisoners do not receive proper, effective treatment in prison, they will return home with mental health needs that local communities with already limited treatment resources will be called upon to address. Mentally ill prisoners who worsen or decompensate in prison will need even higher levels of care and, in extreme cases, they may become chronically or even permanently disabled. Untreated or worsened mental health conditions also may render some prisoners more dangerous when they return from prison than when they left.

73.    In addition, prisoners who are traumatized by severely overcrowded prison conditions or exposure to the extreme forms of violence that can occur within them may leave prison with psychiatric disorders that they did not have or manifest as clearly at the outset of their prison sentences. That is, some number of prisoners will enter prison without a documented history of mental illness but, because of the severe deprivations, profound indignities, and dangerous conditions they confront, develop serious trauma-related disorders that may require mental health treatment both in prison and later in free society. In the absence of such treatment, these prisoners are prime candidates to re-offend.

74.    Thus, overcrowded prisons tend to beget overcrowded prisons. In fact, California is a perfect example of the way in which a chronically and severely overcrowded prison system sends prisoners back into the community ill-prepared to successfully reintegrate there. Increasing numbers of them re-offend or violate the conditions of their parole quickly and repeatedly, which in turn continues to generate greater numbers of prisoners and exacerbates the prison overcrowding problem.

5.    The Relationship Between Overcrowding and the Overuse of Segregation

75.    As I already have noted, an unprecedented influx of prisoners compromises the meaningful evaluation and classification of incoming prisoners. In a severely overcrowded prison system like California's, a prisoner's security level and available bed space largely determine housing assignments. This means that many fewer new prisoners pass through an intake process that includes a comprehensive diagnostic evaluation and what—in the days of rehabilitation—was referred to as a "needs assessment." Thus, even chronic deficits in educational or vocational skills are overlooked or ignored in initial classification and subsequent housing assignments. Indeed, a chronically and severely overcrowded prison system for the most part lacks the resources with which to address the broad range of prisoner needs and problems anyway.

76.    Among other things, this means that prison administrators have few incentives or positive rewards at their disposal with which to manage and control prisoner behavior. That is, overcrowded prisons lose their programming orientation and options. They are rarely in a position to offer well-behaved prisoners meaningful opportunities for personal growth or skill development, or participation in engaging activities or thriving organizations as "carrots" to reinforce and shape prisoner behavior. Lacking carrots, overcrowded prisons and prison systems rely increasingly on "sticks." Thus, overcrowding leads to increasingly negative forms of institutional control and, as population pressures mount, the use of harsh discipline and punishment tends to escalate.

77.    The use of harsher and more punitive policies and procedures to maintain order and control means that custody staff increasingly rely on security hardware and surveillance technology to control prisoner behavior. The extent of their dependence on the technology and implements of control has concerned some penologists, who worry about the "de-skilling" of correctional officers—the fact that interpersonal skills atrophy in prison systems where problems are solved and conflict defused increasingly by a reflexive tendency to lock up or lock down problematic or challenging prisoners (or the entire housing units in which they

-41-

reside). Indeed, overcrowded prisons may engage in the more frequent use of "lockdowns" and forms of disciplinary sanctions and segregation that further restrict prisoner movement and keep them separated from staff as well as one another. In California, as I will document in a subsequent section of this report, this includes the placement of troubled and troublesome prisoners—many of whom are mentally ill—in ASUs and SHUs.

78.    Presumably designed to limit and control violence by keeping prisoners isolated from one another, segregated housing confines prisoners in especially harsh and deprived conditions for very long periods of time. Especially for mentally ill prisoners, this kind of confinement comes with a significant risk of psychological harm. As a general matter, psychologists know from studies of behavior and adjustment in free society that social isolation is generally bad for people's psychological well being.[111] Its effects are no more positive in prison. Thus, there is substantial evidence of the negative psychological effects of isolated confinement that comes from a variety of sources, including personal accounts, descriptive studies, and systematic research on solitary and supermax-type units. The data that establish these harmful effects have been collected in studies conducted over a period of several decades, by researchers from several different continents who had diverse backgrounds and a wide range of professional expertise.[112]

---

[111] For example, see: Graham Thornicroft, Social Deprivation and Rates of Treated Mental Disorder: Developing Statistical Models to Predict Psychiatric Service Utilisation, 158 *British Journal of Psychiatry* 475-484 (1991). Cf. Margaret K. Cooke & Jeffrey H. Goldstein, Social Isolation and Violent Behavior, 2 *Forensic Reports* 287-294, 288 (1989):

> A socially isolated individual who has few, and/or superficial contacts with family, peers, and community cannot benefit from social comparison. Thus, these individuals have no mechanism to evaluate their own beliefs and actions in terms of reasonableness or acceptability within the broader community. They are apt to confuse reality with their idiosyncratic beliefs and fantasies and likely to act upon such fantasies, including violent ones.

[112] For example, see: Christopher Burney, *Solitary Confinement.* New York: St. Martin's Press (1961); Frank Rundle, The Roots of Violence at Soledad. In Erik Olin Wright, (Ed.), *The Politics of Punishment: A Critical Analysis of Prisons in America* (pp. 163-172). New York:

(continued . . .)

79.     For example, mental health and correctional staff who have worked in
disciplinary segregation and isolation units have reported observing a range of problematic
symptoms manifested by the prisoners confined in these places.[112] The authors of one of the
early studies of solitary confinement summarized their findings by concluding that
"[e]xcessive deprivation of liberty, here defined as near complete confinement to the cell,
results in deep emotional disturbances."[114] A decade later, Professor Hans Toch's large-scale
psychological study of prisoners "in crisis" in New York State correctional facilities included
important observations about the effects of isolation.[115] After hundreds of in-depth interviews
with such prisoners, he concluded that "isolation panic" was a serious problem among
prisoners in solitary confinement. Symptoms reported included rage, panic, loss of control and
breakdowns, psychological regression, a build-up of physiological and psychic tension that led
to incidents of self-mutilation.[116]

---

Harper (1973); Robert Slater, Psychiatric Intervention in an Atmosphere of Terror, 7(1)
*American Journal of Forensic Psychiatry* 5-12 (1986); Slater, R., Abuses of Psychiatry in a
Correctional Setting, *7(3) American Journal of Forensic Psychiatry* 41-47 (1986).

[113] For detailed reviews of all of these psychological issues, and references to the many
empirical studies that support these statements, see: Craig Haney & Mona Lynch, Regulating
Prisons of the Future: The Psychological Consequences of Supermax and Solitary
Confinement; and Craig Haney, Mental Health Issues in Long-Term Solitary and "Supermax"
Confinement, both *supra* note 7.

[114] Bruno M. Cormier & Paul J. Williams, Excessive Deprivation of Liberty, 11 *Canadian
Psychiatric Association Journal* 470-484 (1966), at p. 484. For other early studies of solitary
confinement, see: Gendreau, P., Freedman, N., Wilde, G., & Scott, G., Changes in EEG Alpha
Frequency and Evoked Response Latency During Solitary Confinement, 79 *Journal of
Abnormal Psychology* 54-59 (1972); George Scott & Paul Gendreau, Psychiatric Implications
of Sensory Deprivation in a Maximum Security Prison, 12 *Canadian Psychiatric Association
Journal* 337-341 (1969); Richard H. Walters, John E. Callagan & Albert F. Newman, Effect of
Solitary Confinement on Prisoners, 119 *American Journal of Psychiatry* 771-773 (1963).

[115] Hans Toch, *Men in Crisis: Human Breakdowns in Prisons.* Aldine Publishing Co.: Chicago
(1975).

[116] Toch noted that although isolation panic could occur under other conditions of confinement
it was "most sharply prevalent in segregation." *Ibid* at 54. Moreover, it marked an important
dichotomy for prisoners: the "distinction between imprisonment, which is tolerable, and
(continued . . .)

[230542.1]

80.    More recent studies have identified other symptoms that appear to be produced by these conditions. Those symptoms include: appetite and sleep disturbances, anxiety, panic, rage, loss of control, paranoia, hallucinations, and self-mutilations. Moreover, direct studies of prison isolation have documented an extremely broad range of harmful psychological reactions. These effects include increases in the following potentially damaging symptoms and problematic behaviors: negative attitudes and affect, anxiety, withdrawal, hypersensitivity, ruminations, cognitive dysfunction, hallucinations, loss of control, irritability, aggression, and rage, paranoia, hopelessness, a sense of impending emotional breakdown, self-mutilation, and suicidal ideation and behavior.[117]

---

isolation, which is not." *Ibid.*

[117] For example, see the numerous studies cited in the articles referenced *supra* at note 7. In addition to those direct studies, and the many studies summarized in the literature reviews to which I have referred, there is a significant international literature on the adverse effects of solitary confinement. For example, see: Henri N. Barte, L'Isolement Carceral, 28 *Perspectives Psychiatriques* 252 (1989). Barte analyzed what he called the "psychopathogenic" effects of solitary confinement in French prisons and concluded that prisoners placed there for extended periods of time could become schizophrenic instead of receptive to social rehabilitation. He argued that the practice was unjustifiable, counterproductive, and "a denial of the bonds that unite humankind." In addition, see: Reto Volkart, Einzelhaft: Eine Literaturubersicht (Solitary confinement: A literature survey), 42 *Psychologie - Schweizerische Zeitschrift fur Psychologie und ihre Anwendungen* 1-24 (1983) (reviewing the empirical and theoretical literature on the negative effects of solitary confinement); Reto Volkart, Adolf Dittrich, Thomas Rothenfluh, & Paul Werner, Eine Kontrollierte Untersuchung uber Psychopathologische Effekte der Einzelhaft (A controlled investigation on psychopathological effects of solitary confinement), 42 *Psychologie - Schweizerische Zeitschrift fur Psychologie und ihre Anwendungen* 25-46 (1983) (when prisoners in "normal" conditions of confinement were compared to those in solitary confinement, the latter were found to display considerably more psychopathological symptoms that included heightened feelings of anxiety, emotional hypersensitivity, ideas of persecution, and thought disorders); Reto Volkart, et al., Einzelhaft als Risikofaktor fur Psychiatrische Hospitalisierung (Solitary confinement as a risk for psychiatric hospitalization), 16 *Psychiatria Clinica*, 365-377 (1983) (finding that prisoners who had been kept in solitary confinement were overrepresented as compared to other prisoners who were hospitalized in a psychiatric clinic); Boguslaw Waligora, Funkcjonowanie Czlowieka W Warunkach Izolacji Wieziennej (How men function in conditions of penitentiary isolation), *Seria Psychologia I Pedagogika* NR 34, Poland (1974) (so-called "pejorative isolation" of the sort that occurs in prison strengthens "the asocial features in the criminal's personality thus becoming an essential cause of difficulties and failures in the process of his resocialization"). See, also, Ida Koch, Mental and Social Sequelae of Isolation: The Evidence of Deprivation Experiments and of

(continued . . .)

[230542-1]

81.    In addition, there are correlational studies of the relationship between housing

type and various kinds of incident reports in prison. They show that self-mutilation and suicide

are more prevalent in isolated, punitive housing units like ASUs and SHUs. So, too, are signs

of deteriorating mental and physical health (beyond self-injury), other-directed violence, such

as stabbings, attacks on staff, and property destruction, and collective violence.[118]  Indeed,

within CDCR, suicides are much more likely to occur inside the segregated housing units. [119]

---

Pretrial Detention in Denmark, in *The Expansion of European Prison Systems, Working
Papers in European Criminology No. 7* 119 (Bill Rolston & Mike Tomlinson eds. 1986) who
found evidence of "acute isolation syndrome" among detainees that occurred after only a few
days in isolation and included "problems of concentration, restlessness, failure of memory,
sleeping problems and impaired sense of time an ability to follow the rhythm of day and night"
(at 124). If the isolated confinement persisted—"a few weeks" or more—there was the
possibility that detainees would develop "chronic isolation syndrome," including intensified
difficulties with memory and concentration, "inexplicable fatigue," a "distinct emotional
lability" that can include "fits of rage," hallucinations, and the "extremely common" belief
among isolated prisoners that "they have gone or are going mad" (at 125). See, also: Michael
Bauer, Stefan Priebe, Bettina Haring & Kerstin Adamczak, Long-Term Mental Sequelae of
Political Imprisonment in East Germany, 181 *Journal of Nervous & Mental Disease* 257-262
(1993).

[118] For example, see: Howard Bidna, Effects of Increased Security on Prison Violence, 3
*Journal of Criminal Justice* 33-46 (1975); K. Anthony Edwards, Some Characteristics of
Prisoners Transferred from Prison to a State Mental Hospital, 6 *Behavioral Sciences and the
Law* 131-137 (1988); Lindsay M. Hayes, National Study of Jail Suicides: Seven Years Later.
Special Issue: Jail Suicide: A Comprehensive Approach to a Continuing National Problem, 60
*Psychiatric Quarterly* 7 (1989); Elmer H. Johnson, Felon Self-Mutilation: Correlate of Stress
in Prison. In Bruce L. Danto (Ed.) *Jail House Blues*. Michigan: Epic Publications (1973); Anne
Jones, Self-Mutilation in Prison: A Comparison of Mutilators and Nonmutilators, 13 *Criminal
Justice and Behavior* 286-296 (1986); Peter Kratcoski, The Implications of Research
Explaining Prison Violence and Disruption, 52 *Federal Probation* 27-32 (1988); Ernest Otto
Moore, A Prison Environment: Its Effect on Health Care Utilization, *Dissertation Abstracts*,
Ann Arbor, Michigan (1980); Frank Porporino, Managing Violent Individuals in Correctional
Settings, 1 *Journal of Interpersonal Violence* 213-237 (1986); and Pamela Steinke, Using
Situational Factors to Predict Types of Prison Violence, 17 *Journal of Offender Rehabilitation*
119-132 (1991).

[119] In 2004, 73 percent of the suicides within CDCR prisons occurred in segregated housing.
Docket 1806 at 7.  In 2005, 37 percent of the suicides occurred in segregated housing and in
2006, 44 percent of the suicides occurred in segregated housing. Given the actual prison
population that is housed in segregated units—less than 10,000 prisoners out of 165,000—the
high number of suicides occurring among this small number of prisoners is quite staggering.

(continued . . .)

-45-

[230542.1]

82.    The use of extreme forms of solitary confinement in so-called "brainwashing" and methods of torture also underscores its painful, damaging potential. In fact, many of the negative effects of solitary confinement are analogous to the acute reactions suffered by torture and trauma victims, including post-traumatic stress disorder ("PTSD") and the kind of psychiatric sequelae that plague victims of what are called "deprivation and constraint" torture.[120]

83.    The prevalence of psychological symptoms (that is, the extent to which prisoners who are placed in these units suffer from these and related symptoms) is very high. In my own study of a representative sample of prisoners in the Pelican Bay SHU, for example, every symptom of psychological distress that I measured but one (fainting spells) was suffered by more than half of the prisoners.[121] Many of the symptoms were reported by two-thirds or more of the prisoners in this isolated housing unit, and some were suffered by nearly everyone. Well over half of the SHU prisoners reported a constellation of symptoms—headaches, trembling, sweaty palms, and heart palpitations—that is commonly associated with hypertension. I also found that almost all of the prisoners evaluated reported ruminations or intrusive thoughts, an

---

In CDCR's own 2004 Suicide Report, they calculated the suicide rate for their administrative segregation population at **248 per 100,000**. Coleman Pls' Trial Ex. 164 at 15.

[120] Solitary confinement is among the most frequently used psychological torture techniques. In D. Foster, *Detention & Torture in South Africa: Psychological, Legal & Historical Studies*. Cape Town: David Philip (1987), Psychologist Foster listed solitary confinement among the most common "psychological procedures" used to torture South African detainees (at 69), and concluded that "[g]iven the full context of dependency, helplessness and social isolation common to conditions of South African security law detention, there can be little doubt that solitary confinement under these circumstances should in itself be regarded as a form of torture" (at 136). See, also: Matthew Lippman, The Development and Drafting of the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, 27 *Boston College International & Comparative Law Review* 275- (1994); Tim Shallice, Solitary Confinement—A Torture Revived? *New Scientist*, November 28, 1974; F.E. Somnier & I.K. Genefke, Psychotherapy for Victims of Torture, 149 *British Journal of Psychiatry* 323-329 (1986); and Shuan R. Whittaker, Counseling Torture Victims, 16 *The Counseling Psychologist* 272-278 (1988).

[121] Craig Haney, Mental Health Issues in Long-Term Solitary and "Supermax" Confinement, *supra* note 7.

[230542-1]

oversensitivity to external stimuli, irrational anger and irritability, difficulties with attention and often with memory, and a tendency to socially withdraw. Almost as many prisoners reported a constellation of symptoms indicative of mood or emotional disorders—concerns over emotional flatness or losing the ability to feel, swings in emotional responding, and feelings of depression or sadness that did not go away. Finally, sizable minorities of the prisoners reported symptoms that are typically only associated with more extreme forms of psychopathology— hallucinations, perceptual distortions, and thoughts of suicide.

84.    Unless a prison system steadfastly guards against it—and few overcrowded prison system are able to—certain categories of vulnerable prisoners are likely to be placed disproportionately in these units where, precisely because of their vulnerabilities, they are at greater risk of suffering serious harm. For example, one commentator has described the "vicious cycle" into which mentally ill and developmentally disabled[122] prisoners can fall when they commit disciplinary violations and are placed in segregated housing. A lack of appropriate treatment and care in general population may worsen their condition, "[c]ausing hostile and aggressive behavior to the point that they break prison rules and end up in segregation units as management problems." Because of highly stressful conditions in segregation and the fact that mental health care is usually sporadic and of uneven quality there, "this regression can go

---

[122] I have not focused specifically on developmentally disabled prisoners in this report. However, they, too, are especially vulnerable to the negative consequences of overcrowding, in part because of the deteriorating living conditions with which they must contend and the reduced number of options that they may have with which to adapt. For example, as one observer put it, "A prisoner with mental retardation whose circumstances have placed him or her among brighter peers without support may well learn to survive through aggression." Hall, J., Correctional Services for Prisoners with Mental Retardation: Challenge or Catastrophe? (pp. 167-190). In Conley, R., Luckasson, R., & Bouthilet, G. (Eds.), *The Criminal Justice System and Mental Retardation* (pp. 167-190). Baltimore, MD: Brooks (1992), at p. 172. Other studies have confirmed this. For example: "[R]esearch evidence has suggested that the mentally retarded are slower to adjust to the prison routine, have more difficulty learning rules and regulations, and as a result, accumulate more rule infractions than the average prisoner." Finn, M. (1993). Disciplinary "Careers" of Mentally Retarded Prisoners, 19 *Journal of Offender Rehabilitation* 57-73 (1993), at p. 60. Precisely because overcrowded prisons enforce more stringent and unyielding routines, increase prisoners' frustration, and generate more potential
(continued . . .)

-47-

[230542-1]

undetected for considerable periods of time before they again receive more closely monitored mental health care." Unfortunately, this is a cycle that "can, and often does, repeat."[123]

85.    Indeed, in my own research, I found a higher percentage of prisoners who suffer from serious forms of mental illness residing in isolated or segregated housing, as compared to their numbers in the general prison population. Other researchers have found the same kind of high prevalence rates. For example, a Canadian study estimated that approximately 29 percent of prisoners in special handling and long-term segregation units suffered from "severe mental disorders."[124] A more recent study conducted by a group of Washington state researchers also found that 29 percent of intensive management prisoners in the state's correctional system manifested at least one pre-defined indication of serious mental disorder (such as multiple admissions to an acute care mental care facility, or having been in one of the prison system's residential mental health units).[125] California's segregated housing units also contain a disproportionately high concentration of mentally prisoner/patients. Thus, in the CDCR, although mentally ill prisoners comprise less than 25 percent of the overall prison population, by August 2007, 46 percent of the prisoners housed in the administrative segregation units were on the mental health caseload.[126]

86.    Unfortunately, as I have already suggested, the overrepresentation of mentally ill prisoners in isolation units like ASUs and SHUs is potentially dangerous and damaging. All other things being equal, it also is a problem that is more likely to plague overcrowded prison systems than others. There are several reasons why this is so. For one, these systems typically

---

conflicts, developmentally disabled prisoners are more challenged to avoid rule infractions.

[123] Streeter, P., Incarceration of the Mentally Ill: Treatment or Warehousing? 77 *Michigan Bar Journal* 166 (1998), at p. 167.

[124] Hodgins, S., & Cote, G., The mental health of penitentiary prisoners in isolation, 33 *Canadian Journal of Criminology* 177-182 (1991).

[125] Lovell, D., Cloyes, K., Allen, D., & Rhodes, L., Who lives in super-maximum custody? A Washington State study, 64 *Federal Probation* 33-38 (2000).

lack adequate treatment resources and programs to effectively monitor and manage mentally ill prisoners in the general population. The mental health of those prisoners is likely to worsen in the absence of appropriate treatment, and their problems are likely to become more serious before they are detected and addressed. In addition, the severe conditions of confinement that accompany overcrowding place special stressors on mentally ill prisoners that may worsen their conditions and lead to decompensation. Moreover, overcrowded prison systems are more likely to resort to punitive forms of social control than others, so that if and when mentally ill prisoners do violate prison rules in an overcrowded prison, those violations are more likely to occur in prisons that are more prone to punishment.

87.     Yet, as I have suggested, the placement of mentally ill prisoners in ASUs and SHUs places them at risk. It represents one of the critically important ways in which mentally ill prisoners can be damaged and harmed by overcrowded conditions of confinement—not just by the overcrowding to which they are directly exposed, but by the practices and reactions that the larger prison system has developed in response to the overall pressure and dysfunction that overcrowding brings about. As I will discuss in greater detail below, during my site inspections of the administrative segregation units, staff reported and I observed inadequate treatment space, insufficient staffing resources, inadequate access to exercise and yard, lack of programming and poor access to higher levels of care when these prisoners decompensated in these harsh environments.

### 6.     Summary of Effects of Prison Overcrowding

88.     In summary, I know of no reputable prison expert who doubts that prison overcrowding—especially when it is chronic and severe—significantly impacts the broadest and most fundamental aspects of prison life in negative ways that have adverse consequences for prisoners. For all of the reasons I have outlined above, overcrowding certainly undermines

---

[126] Coleman Pls.' Trial Ex. 81.