# EXHIBIT CC
# PART 4

the quality of medical and mental health care in prison.[127] As a representative of the World Health Organization summarized it: "Overcrowding is an obvious cause or contributory factor to many of the health problems in prison, most notably communicable diseases and mental health, including the use of psychoactive substances."[128] Not surprisingly, correctional administrators and law enforcement officials also acknowledge the wide-ranging negative effects of overcrowding on incarcerated populations and penal institutions. For example, between 80-90% of a sample of county sheriffs in the United States perceived overcrowding to have resulted in increased acts of violence between prisoners, increased violence between prisoners and staff, and increased facility maintenance expenses, and nearly one half or more of the total surveyed reported that overcrowding increased medical and mental health problems among prisoners.[129]

## C.     The CDCR Is A Chronically And Severely Overcrowded Prison System

89.     As someone who has studied the California prison system for more than 30 years, I have been a witness to the growth of the prison population in the state to its current unprecedented and intolerable levels of overcrowding. I systematically evaluated prison conditions in the early 1980s, in what were then among the state's largest prisons, as a very sizable influx of new prisoners began to enter the Department of Corrections. The problems that I and other experts identified in those early years were ones that a number of courts attempted to address through court orders limiting crowding-related practices such as double-celling, and that other courts deferred intervening to solve because of assurances from the CDC

---

[127] For example, see Roy Walmsley, Prison Health Care and the Extent of Prison Overcrowding, 1 *International Journal of Prisoner Health* 9 (2005): "It is universally acknowledged that overcrowding in prisons has a negative impact on the provision of health care" (at 1).

[128] H. Nikogosian, Representative of WHO Regional Office for Europe and former Minister of Health for Armenia. In *Prison Healthcare News* No. 5, Summer, 2003. London: International Centre for Prison Studies, King's College, London.

[129] P. Kindade, M. Leone, & S. Semond, The Consequences of Jail Crowding, 41 *Crime & Delinquency* 150-161 (1995).

[230542-1]

that they were making progress in limiting population growth and ameliorating its adverse effects. But those levels of overcrowding and the problems they engendered—as serious, dangerous, and destructive as they were—pale in comparison to the depth and magnitude of the current crisis.

### 1.    Broad Reviews of the CDCR and Crowding

90.    Of course, I am not the only person who has examined the overcrowding crisis in the CDCR in recent years who has come to this same sobering conclusion. Indeed, virtually every expert and group of distinguished analysts with whom I am familiar has voiced a nearly identical opinion.

91.    Thus, the recent panel of distinguished experts convened by defendants, the CDCR's Expert Panel on Adult Offender and Recidivism Reduction Programming, concluded that the <u>first</u> action that the State must take to address the crisis in the prisons and provide for meaningful rehabilitation is to "[r]educe overcrowding in its prison facilities and parole offices."[130] The Expert Panel further noted that for almost two decades, various other respected experts and expert panels—many convened by the State itself—have provided thoughtful recommendations for population reduction strategies for California prisons.[131] I have reviewed many of these recommendations, including reports by the Little Hoover Commission, the Corrections Independent Review Panel, and the CDCR Expert Panel. They have all concluded that the population crisis is beyond urgent. For example, in a January 25, 2007 cover letter to the Governor and Legislature accompanying its report titled "Solving California's Corrections Crisis: Time Is Running Out," the Little Hoover Commission underscored this conclusion:

> "California's prisons are out of space and running out of time.... The problem does not need further study. The State knows what the answers are, thanks to nearly two decades of work.... The bare facts have earned California's Department of Corrections and

---

[130] Joint Pls.' Trial Ex. 2 at viii.

[131] Joint Pls.' Trial Ex. 2 at 77.

Rehabilitation an ignoble distinction for systemic failure. Inmates have swelled prisons far past capacity. With cells already full, new inmates camp out in hallways, gyms and classrooms.... The ranks of correctional officers have not kept pace with the rising prison population. The department has thousands of openings, resulting in huge overtime bills and mounting stress for correctional officers.... The status quo is not acceptable.... The choices are stark. The price of failure is unimaginable."[132]

92.     The recommendations made by these experts to address the overcrowding crisis have often been similar in nature, and have commonly emphasized policy reforms that are aimed directly at significant population reductions. They include the establishment of a sentencing commission, parole reform, and implementation of alternatives to incarceration for parole violators. The CDCR Expert Panel concluded, "We agree with the Little Hoover Commission (2007) in that California doesn't need another report outlining correctional reform measures. What California needs to do is implement some of the proposals that have already been presented to it. Since 1990, there have been more than a dozen reports published that deal with the crisis in California's adult prison system. The major recommendations made in all of these reports are entirely consistent with the recommendations contained in our report."[133]

93.     In addition, according to documents I have reviewed, in a *Madrid*-related hearing, the attorney representing the Governor personally stated that "it is [the Governor's] belief that overcrowding affects virtually all of the issues that the Court is concerned about... [It] affects prisoners throughout the State..."[134]

94.     Indeed, the Overcrowding Proclamation issued by the Governor on October 4, 2006 reflects many of these very same conclusions about the absolute centrality of prison overcrowding and its serious, pernicious consequences: "[C]onditions of extreme peril to the safety of persons and property exist in [the CDCR prisons], due to severe overcrowding,

---

[132] Joint Pls.' Trial Ex. 3.

[133] Joint Pls.' Trial Ex. 2 at 77 (emphasis added).

[134] Joint Pls.' Trial Ex. 41 at 33:23-34:2.

[230542-1]

and…the magnitude of the circumstances exceeds the capabilities of the services, personnel, equipment, and facilities of any geographical area in this state."[135]  The *Coleman* Special Master observed that "[o]ver the past 11-plus years, much has been achieved, and many of the achievements have succumbed to the inexorably rising tide of population, leaving behind growing frustration and despair."[136] .

95.    As I noted repeatedly above, prison overcrowding is a systemic problem that affects all aspects of prison life. Thus, although many of my comments have been directed primarily at the mental health care delivery system, and effects of overcrowding on the *Coleman* class members, there is every reason to believe that the severe and chronic conditions that plague CDCR negatively impact its medical care as well. In this regard, as the *Plata* Receiver's Report on Overcrowding noted: "[T]he size, scope, pervasiveness and specifics of

---

[135] Joint Pls. Trial Ex. 1 (emphasis added): Overcrowding imperils the safety and well-being of correctional staff as well as prisoners. This was tragically illustrated in a sequence of events that culminated in the death of Correctional Officer Manuel Gonzalez at the California Institution for Men (CIM) on January 10, 2005. After an extensive investigation, the Office of the Inspector General (OIG) reached a number of damning conclusions, many of which were directly connected to the very serious overcrowding-related problems that plagued CIM and the CDCR when this attack occurred. Joint Pls.' Trial Ex. 45. The OIG's findings included these facts: The prisoner who has been charged with this crime, was "inappropriately housed" (*Id.* at 4) in a general population unit instead of the administrative segregation unit that was warranted by his record, likely because of "the shortage of administrative segregation beds" at the reception center (*Id.* at 22); the prisoner remained at CIM for nearly 7 months, apparently because the CDCR lacked bed space at any appropriate facility to transfer him elsewhere; the prison system also failed for months to transfer the prisoner to a DMH facility that a psychologist who evaluated him at CIM recommended he go to, a recommendation based in part on the fact that the prisoner suffered from very serious mental health problems and, among other things, was acting "bizarre and confusing," and claimed that "staff were out to kill him" (*Id.* at 17); and that, despite his severe mental illness, the prisoner was retained in a general population unit that had been locked down for the five weeks leading up to the killing, where conditions included "cell feeding, no recreational yard, escorted inmate movement, and a requirement that Black inmates be escorted separately from White and Hispanic inmates" (*Id.* at 30) in a housing facility that was "in such disrepair and tool controls so lax that inmates are able to easily obtain and hide materials for making weapons"(*Id.* at 4) and correctional officers "consistently failed to conduct required cells searches." (*Id.* at 6).

[136] Joint Pls.' Trial Ex. 35 at 16-17.

[230542-1]

overcrowding in California's prisons have special negative consequences" to the provision of medical services. [137]  The Receiver also found that, beyond overcrowding itself, "CDCR's efforts to manage the overcrowding problem" have created more and more "ugly beds," and "exacerbate existing inadequacies in the health care delivery system, while threatening to cause still others."[138]

96.    Of course, these deficiencies in providing proper care and treatment for mentally ill and medically ill prisoners can interact with and compound one another's harmful consequences. Mentally ill prisoners who are receiving substandard care are likely to deteriorate psychologically and, as a result, be less likely to proactively pursue medical care and more likely to have their medical conditions worsen. They may require a higher level of medical care once their physical condition finally comes to the attention of medical staff. Mentally ill prisoners in a system that provides substandard medical care may find that their psychiatric conditions are aggravated by the anxiety and vulnerability they feel at having their physical health-related problems and concerns neglected. Medical prisoner/patients who receive poor quality care may find that their emotional health is placed in jeopardy by virtue of the same kinds of anxieties and sense of vulnerability—suffering a worsening medical condition and experiencing fear and frustration over their inability to receive proper treatment. They may seek (or, at least, be in increasing need of) mental health care as a result. Precisely because prison is run as a largely closed system, serious deficiencies in one part of the system can adversely affect many others.

97.    In any event, as these experts have concluded and I agree, the California prison system is in crisis and operating in a dysfunctional and dangerous manner. Whole institutions—including the mentally ill prisoners housed inside—are chronically locked down. Mentally ill prisoners are being housed in ASU and SHU cells virtually around the clock, and

---

[137] Joint Pls.' Trial Ex. 26 at 8.

[138] Joint Pls.' Trial Ex. 27 at 9-10.

[230542-1]

are subjected to harsh treatment and severe deprivations that place them at greater risk of harm. California is suffering what appear to be escalating suicide rates and rates of recidivism in the state—rates that in any event are among the worst in the entire United States.  State prison suicide rates dropped sharply nationwide from 34 per 100,000 in 1980 to 14 per 100,000 in 2002.[139]  However, despite specific orders of the *Coleman* court and the ongoing intervention of the *Coleman* Special Master, California's prison suicide rate has not seen a similar drop; in fact, in 2006, despite focused attention on suicide prevention, there were 43 suicides in California's prisons, a rate of 25.1 per 100,000.[140]  In 2007, defendants reported 35 "uncontested" suicides and 7 overdose deaths, resulting in a suicide rate (only using the 35 suicides) of 21.18.[141]  In 2008, there have already been 24 suicides reported by defendants between January 1, 2008 and August 5, 2008.[142]  Equally disturbing, the Special Master found that 72 percent of the completed suicides in 2006 "involved some measure of inadequate treatment or intervention and were, therefore, most probably foreseeable and/or preventable...."[143]  In addition, although most states do not report any prisoner homicides in a single year, CDCR is a clear exception.[144]  In 2006, for example, CDCR reported 14 homicides.[145]  Although CDCR has not yet provided 2007 data, defendants have provided the *Coleman* Special Master and plaintiffs' counsel with email notifications of at least 12

---

[139] Coleman Pls.' Trial Ex. 82.

[140] Joint Pls.' Trial Ex. 58.

[141] Coleman Pls' Trial Ex. 83 (The rate was figured by using the June 30, 2007 CDCR website population listed as 165,196 and the 35 suicides notices by CDCR through email notifications.)

[142] Coleman Pls.' Trial Ex. 85.

[143] Joint Pls.' Trial Ex. 58 at 8.

[144] Coleman Pls.' Trial Ex. 82.

[145] Coleman Pls.' Trial Ex. 86 at 2.

[23054211]

homicides of MHSDS prisoners that occurred in 2007.[146] However, even these disturbing numerical measures of systemic dysfunction are in some ways dwarfed by the day-to-day realities that exist inside CDCR facilities and the way in which they impact the lives and mental health of the *Coleman* class members. I turn to some of these issues in the paragraphs below.

### 2. Personal Tours of Eight Severely Overcrowded California Prisons

98.    As I mentioned at the outset of this report, in order to gain a firsthand understanding of some of the consequences of overcrowding in the CDCR, I conducted tours and interviews in numerous housing units located in eight prisons where *Coleman* class members reside. I spent a full day at each of the eight prisons, and visited a representative sample of mainline housing units. During my tours I had open access to medical, custody and mental health staff, prisoners, medical and custody records, staffing and construction information, logs of delayed access to care and any additional information that I requested. Custody and clinical staff responded openly and honestly to my questions and no one tried to block me from reviewing any files or documents or from speaking with anyone in the prison. The housing units I visited included ones most affected by the severe overcrowding in CDCR (*e.g.*, housing units that had been converted into makeshift dayroom and gymnasium dormitories), ones that contained specialized mental health and crisis beds, and segregated housing (including the SHUs at Valley State and CCI). I also spoke with prisoners in each of the housing units and interviewed a sample of prisoners at each facility selected from lists of CCCMS and EOP prisoners at the prison and from correspondence with Plaintiffs' counsel.

99.    I should say at the outset of this section of my report that virtually every one of the overcrowding-related harmful conditions, negative consequences, and dysfunctional adaptations that I described in general terms earlier in this report—at least the ones that could be seen in the course of a prison tour—was in evidence at the eight prisons I visited. The nexus

---

[146] Coleman Pls.' Trial Ex. 87.

[230542-1]

between severe and chronic overcrowding as the primary cause of the continuing constitutional violations was clearly apparent and disturbing. Specifically:

### a.    California Institution for Men (CIM)

100.    CIM is a large, sprawling, prison complex consisting of four separate facilities under the administration of one warden. CIM serves as a Reception Center for parolees returning to custody and new commitments to the CDCR. According to the CDCR population report as of midnight on October 31, 2007, CIM had a population of 6,315 and a design capacity of 3,033, for a population at 208 percent of capacity.[147]

101.    Administrative Segregation units ("Ad Seg" or "ASUs") are located in Palm Hall, Cypress and sections of Birch. The EOP Reception Center prisoners are housed in various locations, including RC Central, RC East, and Ad Seg units.

### (i)    CIM Overview

102.    On the day I toured CIM (October 29, 2007), Warden Poulous reported that the count was approximately 6,900 prisoners, well over 200 percent of its rated capacity of 3,160. I should note that the level of overcrowding has not significantly subsided since then. Thus, on July 30, 2008, CDCR's website listed CIM's population as 6,057 prisoners—still 203 percent of its rated capacity of 2,976.[148] Ninety percent (90%) of the prisoners housed in the reception center were parole violators. Prior to touring the facilities, Warden Poulous and some of his staff met with me and the other experts and attorneys on the tour. Dr. Norris, the Chief Psychologist, reported that the mental health count was approximately 1,400 CCCMS and 130 EOP patients, which is 25 percent of the population. Among those caseload prisoners, Dr. Norris indicated that nearly 100 CCCMS/EOP patients were currently housed in their ASUs. He noted that until quite recently, the census of EOP patients in the ASUs was even higher, but they had recently transferred 15 to 20 EOPs out of their ASU to R.J. Donovan prison.

---

[147] Joint Pls.' Trial Ex. 25 at 2.

[148] Joint Pls.' Trial Ex. 59 at 2.

103.   Because parole violators are "short timers," many of them spend their entire terms at CIM. The prison administrators with whom I spoke were very clear about the fact that the Department's transfer policy was driven almost entirely by "space availability and custody level"—in other words, all other things being equal, prisoners typically were sent to whatever facility at the appropriate security level that had the bed space to receive them.

104.   The prison continues to experience backlogs in the flow of pertinent information needed to classify and house incoming prisoners. Thus, for example, although prisoners typically receive mental health and medical screening within a week of arriving at the prison, this is done without access to medical records, which may not arrive for another several weeks. This is consistent with medical record problems identified in the Special Master's 18th Monitoring report, which noted a daily filing backlog of medical records of "three to four days' worth although staff reported higher figures."[149] During the 21st round monitoring tour on May 14-16, 2008, CIM staff reported that "[m]edical records continue to be a challenging area at CIM. As the Plata and Perez cases increase, the demand for services, requests for medical records and filing demands also increase. Along with these demands there has been little additional staffing, resources or space allocated for this critical area."[150] Although I was told that an initial mental health screening is done within one business day after arrival, and that the clinics were "pretty good at catching mental health problems," I was also told that a "data glitch" in the mental health tracking system makes it difficult for the mental health staff to get access to an incoming prisoner's records. The mental health tracking system, used to schedule and track treatment and follow up, was frequently dysfunctional and lost track of patients in reception each time they were transferred between the various Units at CIM during the Reception process. In fact, during the 21st round tour, staff reported, "[a] representative from

---

[149] Joint Pls.' Trial Ex. 36 at 237.

[150] Coleman Pls.' Trial Ex. 88 at 21.

the Plata information technology division visited the institution in January, reviewed the system and stated that it was dysfunctional and beyond repair."[151]

### (ii)    EOP Reception Center Program.

105.    During my tour of the EOP reception center program, the Supervising Clinical Social Worker, in charge of pre-release planning for the EOP reception center prisoners, reported that the majority of the EOP RC prisoners will serve their entire term in the reception center at CIM. This is consistent with problems the Special Master identified in his 18th Monitoring report, including that it was taking CIM an average of 86 days to transfer EOP prisoners out of the reception center and that "[t]ransfer impediments included transportation difficulties and bed unavailability and population caps at receiving institutions." [152] In both the 19th and the draft 20th Report, the Special Master noted CIM's continued difficulty transferring EOP prisoners out of the reception center to EOP treatment programs.[153] These problems are especially problematic in light of CIM's staffing shortages for the EOP RC program. During the 20th round of monitoring, for instance, CIM identified the need for additional administrative staffing in order to meet the increased workloads that come with the reception center EOP program. As noted by CIM, the EOP reception center program and other increased workload requirements have added "over 800 more tracking forms that must be entered weekly, additional reports and other duties for a staff that has increased by almost 25%. In addition, scheduling demands have increased along with the services. No additional clerical positions were added as part of the RC EOP expansion."[154] Although the Special Master found that some elements of the EOP RC program were implemented at CIM during the 20th round review, he noted a number of obstacles including staffing vacancies, information technology

---

[151] Coleman Plts' Trial Ex. 88 at Problem 13.

[152] Joint Pls.' Trial Ex. 36 at 233-234.

[153] Joint Pls.' Trial Ex. 69 at 94-95; Joint Pls.' Trial Ex. 57 at 264.

[154] Coleman Pls.' Trial Ex. 41 at 32.

[230542-1]

shortcomings and workspace deficits.[155]   Finally, lockdowns impacted programming throughout the reception center during the 20th round monitoring.[156]

**(iii)   Inadequate Space, Suicidal Transfer Delay and Lack of Medical Records.**

106.   At CIM-East, a staff psychiatrist who sees about 25-30 prisoners a day—all of whom are on psychotropic medications—told me that when the CIM MHCB, located in a different part of the prison, to which he typically admits patients is full, they are transferred to "temporary" and "overflow" housing. This happened as recently as ten days ago. He also told me that although he has the patient's records most of the time, "sometimes I don't," and when this happens he is forced to make treatment decisions without them. Moreover, he often experiences a delay in getting suicidal patients transferred—"either the custody staff is tied up or, now that we take them in an ambulance, the ambulance is otherwise occupied and they have to wait." While the patients wait for transfer to the CTC or the overflow unit, they are kept in five small holding tanks---cages---in a room in the administrative building. There were five single man "dry" cages (no toilet or sink) and two were occupied.   The psychiatrist told me that suicidal prisoners are placed there about four to five times a day and custody officers confirmed that the cages are used for suicidal patients.

**(iv)   Use of Dangerous Overflow Units for MHCBs.**

107.   Later in the day I visited the "temporary" and "overflow" beds in Del Norte that are used when the MHCB is full.   The 10-bed unit is called the TBH (Temporary Bed Housing).   The TBH unit that is regularly used in Del Norte was under construction and closed. I was shown another 5-bed unit on the other side of the dayroom, which I was told was identical to the old "temporary" overflow unit. These "temporary" beds for housing suicidal prisoners had bunk beds, stools under the sink and large, mesh ventilation screens, all of which

---

[155] Joint Pls.' Trial Ex. 57 at 265-66.

[156] *Id* at 267.

-60-

[230542-1]

*j*

could be easily used to attach a ligature for hanging. I asked staff if the construction on the older "temporary" overflow beds was going to include suicide-proofing the cells (removing the bunks, replacing the large mesh ventilation screens, removing the stools), but I was told "no."

108.    The Special Master has also identified serious problems with CIM's MHCB units, including overcrowding in the unit (the "average daily census [in the MHCB] increased from 31 to 34.6, or 16 above licensed capacity") and staffing shortages: "MHCB staffing was allocated for 18 beds, while the unit served 36 prisoners within several different areas, including overflow areas on East yard and Cypress, and sometimes an area of the CTC. The 18 unlicensed beds plus the overflow beds were covered by diverting other staff."[157] In the 19th Report, the Special Master noted that overflow MHCB areas were operational in two of the reception center units, in Del Norte and in Birch Hall, with 106 admissions to the Del Norte overflow MHCBs in March 2007 alone.[158] This overflow unit in Del Norte was "inadequate for potentially suicidal or agitated inmates ... The cells had large-grate vents, unsafe beds and blind spots." [159] Similar problems were noted in the Draft 20th Report; CIM clinicians admitted 384 patients to the two overflow MHCB areas during the monitoring period.[160] Despite the frequent use of this overflow unit, no physical plant modifications were made to the unsafe overflow cells located in the Del Norte MHCB overflow unit. [161]

### (v)    Lack of Office and Treatment Space.

109.    At the time I visited the facility, CIM had recently hired a number of new clinicians, and there had been a large influx of new psychologists. However, many of them now did not have offices. In addition, social workers also shared offices, and I was told that

---

[157] Joint Pls.' Trial Ex. 36 at 233-234.

[158] Joint Pls.' Trial Ex. 69 at 95.

[159] Id at 96.

[160] Joint Pls.' Trial Ex. 57 at 263.

[161] *Id.*

psych techs have no offices at all. The counseling or therapy groups were being held in "card rooms" adjacent to the day rooms. In fact, I was told that one of the key problems with the groups themselves was what one staff member termed "scheduling gymnastics"—the fact that "we don't have enough escorts to bring people to groups." The Special Master noted much the same thing. Thus, he observed that although mental health staffing had been increased due to caseload demands in administrative segregation, "[o]ffice space problems were exacerbated by the additional staff, and ten clinicians shared two small offices during the monitoring period."[162] During the May 2008 21st round monitoring tour, staff reported that "[t]his institution has been operating at or above 200% of capacity for some time. This is particularly evident in the limited mental health clinical space available. Most offices are shared and in some cases as many as four clinicians share a single small office. Increases in medical and dental staffs have created a situation where we often are competing for the same space."[163] The Receiver's Eight Quarterly Report, filed June 7, 2008, describes the master plan developed for CIM, which will include renovations and additions to existing buildings for more clinical space.[164] The Master Plan for CIM has not been implemented, and in fact, the Receiver states that the cost and timeframe for the Master Plan is not yet known, "but will be provided in the Receiver's next quarterly report to the Court."[165] The Receiver's next quarterly report should be provided to the court in mid September 2008, since his Eighth Report was filed on June 17, 2008.

**(vi)    Overcrowded Housing Units with Idle Prisoners.**

110.    Many of the housing units that have been devised at CIM to accommodate the severe overcrowding that plagues the facility are shocking to see. For example, the units I saw

---

[162] Id at 266.

[163] Coleman Pls.' Trial Ex. 88.

[164] Joint Pls.' Trial Ex. 56.

-62-

at CIM where bunks have been installed in the dayrooms are very troubling—in terms of the inadequate space afforded the prisoners, the degrading and degraded nature of a number of the housing units themselves, and the way that the prisoners are "enclosed" inside the dayrooms of some of them. In fact, the dayroom dormitories in the Colusa unit are unlike anything I have seen in any other prison system I have visited. The makeshift dayroom dormitory holds some 38 beds and houses CCCMS and EOP prisoners together. However, the dayroom itself is actually fenced in, giving the very distinct impression that the entire dormitory is in a large cage—a caged-in dormitory within a prison housing unit. During the tour, we were told that the unit was caged because of a riot that occurred several years ago at CIM that resulted in injuries to staff and prisoners. The unit, which is a general population unit within the reception center, felt very much like an administrative segregation unit.

111. The bunks are also arranged very close together, and there was a dank feel and odor to the unit. There were only four toilets for the 38 men in the dormitory, and they were largely out in the open, affording no privacy. The prisoners had draped a sheet around the sides of one of the toilets so that they could sit on it partially shielded from the others. Although there was a dispute about how much yard time the prisoners got—a correctional officer said about 10 hours a week, while a number of prisoners indicated that they only went to yard every four to five days for an hour or two —there was no question that these prisoners did not have jobs, and were not being afforded educational or vocational training of any kind. They got out of their caged dormitory for yard, showers, and chow, but nothing else on a regular basis. Indeed, at approximately 11 a.m., when I visited the dormitory, I counted nearly half the prisoners lying or sitting idly on their bunks, engaged in no meaningful activity at all.

112. CIM also houses prisoners inside two large, makeshift gym dormitories. I toured both of these units, each of which houses approximately 200 prisoners. The living conditions are degraded and degrading. All of the prisoners sleep on double bunk beds, arranged in tight

---

[165] *Id.*

[230542-1]

rows. None of the prisoners are provided with lockers, so they store all of their possessions in paper grocery bags. The prisoners housed in these dormitories have little or no privacy, and virtually nothing to do. Just as with the prisoners in the dayroom dormitories, they are confined in open areas that allow them to do little more than exist. In the gym dorms, obviously, there are many more men living this way. The officer in charge of one of the gym dorm housing units on the day I was there told me that that "program" in the dormitory consisted of "laundry exchange, chow, and showers; when I say 'open the dayroom,' I just mean 'turn on the TV.'"

113.    The housing units themselves are extraordinary, difficult to adequately capture in words. The bunks are laid out in an area that is cavernous —the size of a full gymnasium—so the double bunks are stretched out as far as the eye can see. I think it is fair to say that the safety and security of the prisoners in these units is entrusted in large part to the prisoners themselves. Because of the physical layout of the housing units, effective monitoring and surveillance by correctional officers is a virtual impossibility. There are three officers assigned to the unit, plus a gunner.

114.    One of the gym dorms I toured had ten toilets and seven showers, all arranged in the open, in full view of one another. Thus, here, too, there is no privacy afforded to prisoners. When a counselor or case manager comes to this particular gym dorm to see a prisoner, the meeting takes place inside an office with large glass windows that adjoins and looks out on the shower and toilet area, and also is in plain view of it. The gym dorm housed a small number of EOP prisoners and a significant number of CCCMS prisoners.

115.    The other gym dorm unit I visited also housed a small number of EOPs and a significantly larger number of CCCMS prisoners. It was in a state of significant disrepair. The officers indicated that they make an attempt to remove EOP prisoners when and if they discover that they have been placed in this unit. When we toured this particular dorm, all of the prisoners had been temporarily moved outside because an "incident" had occurred and the unit was being searched. The shower and toilet areas were filthy and slippery, with water collected on the floor, and broken pieces of tile. The walls were dirty, and the doors and windows were rusted in places.

116.    As I suggested above, both of the dormitories appeared to be extremely dangerous places in which to live and work. There were blind spots throughout, and even the dorm officer who sits or stands on a raised officer's station peering out over the bunks cannot see what is taking place just a few yards away, let alone at the far corner of the gymnasium. In the case of the second gym dorm I toured, the windows on the ceiling had been painted some time ago—a remnant of the days when the gym was once used to show movies. Now that it had been converted to a housing unit, however, no one had bothered to remove the paint, so there was barely any natural light coming into the gym from above. In addition, three of the ten overhead lights were out—the officer told me that they had been for some time—so the housing unit was very dimly lit.

### (vii)    Co-mingling of EOP Prisoners with Other Populations.

117.    Despite these cramped and claustrophobic conditions and severe restrictions, I was told that there are a number of EOP prisoners housed in these crowded units throughout CIM. The mixing of EOP prisoners with general population and CCCMS prisoners in the same housing units, either in dorms or cells, was of serious concern. As I pointed out in my earlier discussion of the general consequences of overcrowding, prison staff in prisons like CIM— operating at over 200% of capacity—have little wiggle-room in making decisions about where to house prisoners. Thus, custody staff at CIM are often forced to place vulnerable prisoners in settings that are dangerous and inappropriate. I was told that EOP prisoners were afforded the opportunity to attend "groups" that were held in the offices that were adjacent to the dormitories, in plain view of the other prisoners. This turned out to be a common problem in the CDCR—EOP and CCCMS prisoners being housed in units where their "treatment" was arranged in plain view of general population prisoners—although no one in CDCR seemed particularly concerned about it. In any event, on the day I visited CIM, the particular groups that were being run in the unit I saw were devoted to "leisure skill development"—the prisoners came out to play checkers and other board games for an hour.

### (viii)  Delays Transferring EOP Prisoners Out of Administrative Segregation.

118.    I have reviewed the monitoring documents provided to plaintiffs' counsel during the 20th Round Monitoring tour of CIM, which occurred on October 10-12, 2007, a few weeks before my visit. In the Corrective Action Plan prepared by the institution to address access to appropriate care in the administrative segregation units, the monitors and institution found: "The mental health population in ASU continues to be high with an average ASU population of 113, the same as reported the last audit period. In addition, the EOP population in ASU remains high with an average of 30 – up 10% from last site visit. Access to EOP hub beds continues to be the main reason for delay, driving up this census. During past site visits the monitors reviewed performance audits and determined that due to physical limitations unique to the facility, the optimal number of mentally ill prisoners that CIM could effectively house and treat was 62. The accuracy of this capacity estimate appears to be confirmed by this past monitoring period's statistics."[166] The total administrative segregation population for CIM, in June 2007, was 356.[167] In fact, during my tour of the prison, there were at least 100 mentally ill prisoners housed in the administrative segregation units at CIM. Furthermore, during the tour, staff reported that the prison continues to experience on-going delays in transferring EOP prisoners who are confined to Ad Seg units to EOP Hubs where they will receive EOP level of care within thirty (30) days, as mandated by the *Coleman* Program Guide.[168] In the monitoring documents that I have reviewed that were provided to plaintiffs' counsel during the 21st round monitoring tour of CIM, held on May 14-16, 2008, the prison staff reported that the "mental health population in ASU continues to be high with an average ASU population of 120, up

---

[166] Coleman Pls.' Trial Ex. 41 at 7.

[167] Coleman Pls.' Trial Ex. 38.

[168] Joint Pls.' Trial Ex. 9 at 12-1-13.

EXPERT REPORT OF PROFESSOR CRAIG HANEY, NOS.: CIV S 90-0520 LKK-JFM, C01-1351 TEH

[230542-1]

from the last audit period.  In addition, the EOP population in ASU remains high with an average of 35 also up from the last visit."[169]

### (ix)    Administrative Segregation Units.

119.    I also toured the administrative segregation unit in Palm Hall and Cypress Hall. There were approximately 100 prisoners on the mental health caseload housed in the administrative segregation units, both EOPs and CCCMS.  After touring these units, which are dark, noisy and include a section referred to as "deep seg"— three or four cells recessed into a dark space with another set of door coverings—I agree with the institution and the *Coleman* monitors that providing appropriate mental health care in these units to the large numbers of mentally ill prisoners currently housed in these units is impossible. In the draft 20th Report, the Special Master discussed some of the obstacles to care that were observed in the ASUs at CIM. They included office space deficits, non-compliance with suicide prevention policies, custody practices that resulted in non-confidential clinical contacts, excessive waiting times in holding cells prior to and after clinical contacts, and the failure to provide minimum Title 15 required outdoor yard time.[170]

120.    As part of the CDCR's Suicide Prevention plan filed with the court and required to be implemented system-wide, prisons are obligated to provide 30-minute welfare checks on all prisoners housed in their administrative segregation units during the first three weeks of their stay.[171]  In the 20th Monitoring Round documents provided to the *Coleman* monitors and plaintiffs' counsel, CIM custody staff acknowledged their inability to provide 30 minute welfare checks because of insufficient custody staffing resources.[172]  In fact, CIM acknowledges that "Walking time to complete Ad Seg and Ad Seg overflow wellness checks is

---

[169] Coleman Pls' Trial Ex. 88 at 5.

[170] Joint Pls.' Trial Ex. 57 at 266.

[171] Coleman Pls.' Trial Ex. 45.

[172] Coleman Pls.' Trial Ex. 43.

[230542-1]

54 minutes...Acknowledging this is inadequate time lines it must be stated it is the best we can do without additional resources...Additionally when the renovation begins late '07 in Cypress and the Ad Seg prisoners are moved to Birch Hall walking time will be increased by 15-20 minutes."[173]   This non-compliance was confirmed by the Special Master in the Draft 20[th] Report: "CIM was noncompliant with pre-placement screenings and the 30-minute welfare checks in administrative segregation."[174]

121.   One of the officers in the Ad Seg unit showed us additional walk-alone yards under construction outside the unit. The officer referred to these yards as "dog runs." He reported to us that currently the men in the Ad Seg units are provided with approximately 3 to 4 hours of yard per week, but that would be increased once the new yards were completed. The men that we spoke to on the tiers and in interviews told us that they currently receive much less yard time than the officer reported to us. One said that he understood that he did not get yard "because he was EOP." Another, Prisoner II said he was afraid to leave his cell for any reason. I reviewed portions of Prisoner II's unit health record. It indicated that he had originally been placed in administrative segregation for safety concerns and because "appropriate housing is currently unavailable at this facility."[175] He had several crisis bed admissions in 2007 because of psychotic symptoms, including an admission on November 7-13, 2007, after I saw him during my site visit. In fact, he never transferred to a mainline EOP program, but rather paroled out of CIM on January 25, 2008. Three days after paroling out, he was rearrested by the Upland Police Department because he reported feeling suicidal, and was placed in the Mental Health ward of the Arrowhead Regional Hospital on a Welfare and Institutions Code Section 5150 hold. His records indicate that he was released on February 5, 2008, but was admitted to the Royale Health Care Center psychiatric unit the next day for

---

[173]. Coleman Pls.' Trial Ex. 43.

[174] Joint Pls.' Trial Ex. 57.

[175] Coleman Pls.' Trial Ex. 89.

[230542-1]

additional mental health care, and was released again on February 7, 2008. His parole was
revoked a few days later for a technical violation (that was apparently related to his mental
illness) for "failing to report" and he was returned to CIM reception center on February 11,
2008, where he was admitted to the crisis unit for 10 days. On April 2, 2008 (the date of the
last record that I have reviewed) he was expressing concern for parole because "I don't want to
be left at the bus stop again."

122.    Mental health clinicians, who had recently begun implementation of the EOP
Reception Center groups in cages set up in Cypress, confirmed that there was a very high
refusal rate for the caged groups and that they would try to visit these men cell-front. In order
to enter the Ad Seg tier, however, everyone is required to wear not only a protective vest but
also a plastic face mask.

123.    Based upon my tour of the Ad Seg units, and discussions with clinical and
custody staff and prisoners housed in these units, it is my opinion that these housing units are
dangerous places to house prisoners with serious mental health concerns. I agree with Dr.
Jordan, the Senior Psychologist Supervisor, who attended a meeting of the Suicide Prevention
Committee at CIM on May 10, 2007 and reportedly: "expressed concerns about the possibility
of another suicide occurring in administrative segregation due to the number of inmates, their
acuity level, and the lack of clerical support, offices, and the limited escort availability."[176]
One suicide occurred in Palm Hall, one of the Ad Seg units in August 2006.[177] More recently,
a suicide occurred in the administrative segregation unit at CIM on March 30, 2008.[178]

124.    Of course, I am aware that approximately 9 months have passed since I toured
CIM and interviewed staff and prisoners there. One of the overall conclusions that I have
reached in the course of my analysis of the magnitude and centrality of the overcrowding

---

[176] Coleman Pls.' Trial Ex. 42.

[177] Coleman Pls.' Trial Ex. 18.

[178] Coleman Pls.' Trial Ex. 85.