# EXHIBIT CC
# PART 6

monitoring documents, SVSP staff listed a number of obstacles to the provision of mental health treatment to EOP patients: (1) insufficient group rooms to see all of the patients ducated for groups; (2) 40% of the structured therapeutic activities are run outside on the yard and when the yard is "down", the program is adversely affected; and (3) significant deficit in available office space for EOP clinical staff (as the EOP Mental Health Building was designed for 25 staff members and currently supports 51).[238]  It is noteworthy that SVSP staff reported planning continues for the development of additional treatment space, but "there has been no new construction."[239] Hence, there does not appear to be a solution in sight.

163.    In any event, I had an occasion to discuss the magnitude of the lockdown problem with a CDCR staff member later in my tour of another EOP unit.  This especially candid sergeant who worked in the EOP program told me that, even in the EOP housing units, the lockdowns had increased over time and were being implemented with the same frequency and based on the same rationale as for the general population of prisoners. She said, "we are locking down a lot more now—its like we aren't analyzing the real threat level—we just lock down." And she pointed to another overcrowding-related dynamic: "The doctors are less frequently in the building now than in the past, so we don't communicate with them enough." She also believed that the management style at the prison had changed (in a way that also could stem from the overcrowding problems that existed there). Specifically, as she said:

> Now there is an emphasis on security—we used to be aiming toward programs—it took a while but we did it. But now, over the last years, things have deteriorated.... We had dayrooms, doctors would come over here, they would have "community meetings" and organize activities, TV events, and the guys would really get into it. It stopped a year or so ago. Then the "cave dwellers" emerged—guys who just stay in their cells all the time.

---

[238] Coleman Pls's Trial Ex. 93 at 5.

[239] *Id.*

[230542-1]

### (v)   Impact of Lockdowns on Facility C

164.   The lockdowns at SVSP are psychologically costly and directly impact both the *Coleman* class members and the CDCR mental health delivery system itself. For example, I spoke to Prisoner KK, a prisoner housed on suicide watch in the CTC who told me that he was a former EOP prisoner who was sent to SVSP from CSP-Sacramento several months ago, and housed in C Facility. However, he told me he "couldn't handle the stress of lockdown" and tried to kill himself. He spent 8 days at an outside hospital and now was back in the CTC on suicide watch. He had been there for days, sitting in a barren room with only a few books to read, sleeping on a mattress on the floor of the cell. He was adamant about not returning to C Facility but fearful that he would end up there again. I subsequently reviewed portions of Prisoner KK's records which confirmed that he transferred to SVSP Facility C from CSP-Sacramento on May 2, 2007.[240]   Prior to his transfer from CSP-SAC, he had been placed on involuntary medications – through a Keyhea Order – because he was found to be psychotic and a danger to himself and others unless he was involuntarily medicated. In the petition in support of the Keyhea Order, his significant psychiatric history, including psychiatric hospitalizations, beginning at the age of 13, were noted, as well as previous suicide attempts. Despite the involuntary medication order and his significant mental health and suicide attempt history, he was not referred to a higher level of care level and transferred to SVSP Facility C as a CCCMS. His records indicate that he found the lockdown conditions at SVSP very difficult and, on July 16, 2007, he told his case manager that "I feel like I'm going to do something to myself."[241]   He asked to be transferred to the EOP in August because "I've been locked down since I've been here."[242] On October 22, 2007, he was brought to the crisis unit because of a suicide attempt.

---

[240] Coleman Pls.' Trial Ex. 94.

[241] Coleman Pls.' Trial Ex. 94.

[242] Coleman Pls.' Trial Ex. 94.

[230542.1]

165.    I saw Prisoner KK a few days after his suicide attempt.  His medical records show that when he was discharged on November 5, 2007, he was returned to Facility C.  By December 2007, he was again expressing problems coping with the lockdowns, and finally on February 13, 2008, his case manager recommended him for EOP level of care.  However, he was not transferred to the EOP GP unit, but was rather placed in the EOP ASU, where he remained from February 13, 2008 until April 3, 2008, because no bed was available.  During this wait for an EOP bed in the ASU, he was repeatedly reassured "he is not in trouble only waiting for bed space."[243]  He told his case manager on April 21, 2008, after transferring out of ASU, that "being on lockdown all the time made me go crazy."[244]

166.    In fact, this case clearly illustrates the interconnected and long-term consequences of prison overcrowding, especially for mentally ill prisoners. Overcrowding helps to precipitate lockdowns at the prison which, in turn, have negative consequences on mentally ill prisoners in particular, some of whom cannot handle the severe stress of locked-down confinement.  They may decompensate or become suicidal as a result.  The increased suffering of the prisoners notwithstanding, this is another way that overcrowding puts mentally ill prisoners at greater risk and requires the clinical staff to devote more time and scarce crisis beds to stabilize them.

167.    The frequent lockdowns at SVSP also interfere with programming and mental health groups.  As one psychiatric technician at SVSP told me, "I'll be running the groups for 2-3 weeks, then, bang, we are on lockdown."  Chronic idleness becomes a way of life in the housing units with frequent lockdowns.  One C Facility prisoner I interviewed on the tier told me: "My program is to read, watch TV, sit in my cell—I get shower every other day—we haven't even got our packages from our family."  Like a number of the C Facility prisoners I spoke to, he was frustrated by the lockdowns and felt that they were taking a toll on him: "I

---

[243] Coleman Pls.' Trial Ex. 94.

[244] Coleman Pls.' Trial Ex. 94.

EXPERT REPORT OF PROFESSOR CRAIG HANEY, NOS.: CIV S 90-0520 LKK-JFM, C01-1351 TEH

[230542-1]

can't handle the stress of being locked up all the time, it's getting to me. I was OK before, but not now." This prisoner, who was on the mental health caseload, had transferred to Facility C four months ago from CSP-Sacramento Facility B where he was programming. He had been locked down since he arrived at SVSP.

168.    During these extended lockdowns on Facility C, prisoners on the mental health caseload are not provided with increased mental health monitoring, which is required by the Program Guide standards for mental health and non-mental health prisoners in Ad Seg units. Yet the conditions and daily life of these locked down prisoners are no different than Ad Seg. There have been a number of suicides at SVSP by prisoners who were housed on Facility C on lockdown conditions. I have reviewed a number of these CDCR Suicide Reports, and some of them are summarized below.

**(vi)    Facility C-Lockdown Suicides**

169.    *Coleman* Class Member BB, committed suicide on January 20, 2006 at SVSP. He was housed on Facility C and was receiving mental health services at CCCMS level of care.[245] Mr. BB had a history of suicidal ideation and the Suicide Report noted that "[h]e seemed to find lock-down conditions difficult, as he tended to utilize mental health services primarily when he was in ASU, SHU and the modified program."[246] The Report also found that "SVSP-C Facility was under lock-down the entire time that Prisoner BB was there."[247] Mr. BB was seen once when he first arrived at the prison for an initial case manager contact, and once more a week later for his treatment team.[248] He was not seen again by any mental health staff nor does the existing Program Guide require increased monitoring of mental health prisoners during extended lockdowns. The Suicide Report made no recommendations.

---

[245] Coleman Pls.' Trial Ex. 22.

[246] *Id.* at 9.

[247] *Id.* at 8.

[248] *Id.* at 6.

170.    *Coleman* Class Member GG, committed suicide on August 6, 2005 at SVSP.[249]
Mr. GG was housed on Facility C and was not on the mental health caseload at the time of his
suicide. He was 20 years old. He arrived at SVSP on June 8, 2004, and was housed in Facility
C.[250] The Suicide Report noted that "[h]is facility was in frequent [*sic*] and prolonged
modified lockdowns during his time at SVSP, had been on hard lockdown since July 14, 2005,
and no telephone calls or visits were permitted to any prisoners during this time."[251] In fact,
the Report noted that: "During the fourteen months that Prisoner GG had been at SVSP,
Facility C had been on modified program (i.e., partial lockdown status) for the majority of
time. While the total lockdown time was not readily available by record, research did indicate
that during May 2005 and until July 14, 2005, there were only approximately four days (June
17-21) that Facility C was not on modified program."[252] Just prior to his suicide, Mr. GG
received bad news about his criminal appeals, and faced life without possibility of parole until
he was about 75 years of age. The Suicide Report noted that: "this lockdown situation was
difficult for Prisoner GG, who had a lot of family support and contact."[253]

171.    *Coleman* Class Member FF, committed suicide on January 3, 2005, at SVSP.[254]
Mr. FF was housed on Facility C and was on the mental health caseload at CCCMS level of
care. He had a history of crisis bed admission and significant mental health symptoms prior to
his transfer to SVSP on November 29, 2004.[255] Due to an absent case manager, Mr. FF was
not seen during the first month that he was housed on Facility C, which was on lockdown as

---

[249] Coleman Pls.' Trial Ex. 50.

[250] *Id.* at 6.

[251] *Id.* at 2.

[252] *Id.* at 6.

[253] *Id.* at 10.

[254] Coleman Pls.' Trial Ex. 49.

[255] *Id.* at 3-6.

[230542-1]

indicated in the Suicide Report of Mr. FF.[256] On December 27, 2004, Mr. FF set his cell on fire and he was taken to a clinic for a mental health evaluation, which he first refused, but later agreed to. The psychologist noted that he sounded paranoid and set the fire to keep out someone who was trying to kill him.[257] Mr. FF remained in a holding cell in a clinic on the yard for two days and was eventually moved to a bed in the Ad Seg unit.[258] He was moved back to C-Yard the next day and was seen for the first time by his case manager on December 31, 2004.[259] He committed suicide four days later.

172.    Unlike administrative segregation units, where prisoners are guaranteed out-of-cell time (although not necessarily provided all of it) by regulation and are provided with psych tech rounding and enhanced case manager contacts for mental health prisoners, those prisoners housed on facilities like Facility C endure months on end of locked down conditions. My interviews with staff, prisoners and my reviews of these suicide reports confirm that the excessive lockdowns at SVSP are produced by the extraordinary levels of overcrowding at the facility and limited degrees of freedom the staff believes it has in reducing conflict and managing the prisoner population in other less drastic ways. Obviously, these excessive lockdowns undermine the delivery of mental health services and adversely affect the mental health of all prisoners housed in those units.

### (vii)    Behavior Modification Unit

173.    I was taken aback generally at how little the custody staff in the various CDCR institutions I toured appeared to know about which prisoners in their units were on the mental health caseloads—something that would be extremely useful in helping them place the prisoners' behavior in context and watch for signs of decompensation. But this was especially

---

[256] *Id.* at 6.

[257] *Id.* at 6-7.

[258] *Id.* at 7.

[259] *Id.* at 7.

[230542-1]

troublesome in the Behavioral Modification Unit (BMU), a pilot program developed by CDCR at several prisons, including SVSP. The BMU at SVSP is located in a housing unit on Facility C-8. The Warden told us in the morning meeting that this unit was not locked down when the rest of the yard was on lockdown status. When we visited the BMU, the officers told us that the unit was created for managing disruptive prisoners and teaching them to program more productively through a step program. The officers said that the men in the program are not provided with any outside yard time until they have reached Step 3. The Special Master has monitored the BMU and found that "[t]he BMU was locked down, as was the yard on which it was located, which undermined the use of graduated privilege levels ... Inmates were cuffed during mental health sessions."[260] During our tour of the BMU, custody staff reported that it was currently on lockdown status and had been so for several weeks (apparently without the Warden's approval). The *Coleman* monitors who reviewed Central Files during the 18th round tour, "found no factors that distinguished inmates placed in the BMU from those who were not selected."[261] In the draft 20th Report, the Special Master noted that the BMU was not placed on lockdown or modified program status unless an incident occurred within the program.[262] Notably, all of the 3CMS prisoners in the program at the time of the Coleman monitors' site visit were at Step 1.[263]

174. The officers we spoke to in the BMU were unable to identify the prisoners who were receiving mental health services by looking at photos and lists of prisoners. I asked one of the officers to identify several prisoners who had been at Level I for the longest time in the BMU and he provided me with three names. I looked up these prisoner names on a list of SVSP prisoners on the mental health caseload provided to me by staff, and two of the prisoners

---

[260] Joint Pls.' Trial Ex. 36 at 144.

[261] Joint Pls.' Trial Ex. 36 at 144.

[262] Joint Pls.' Trial Ex. 57 at 184.

[263] *Id.*

EXPERT REPORT OF PROFESSOR CRAIG HANEY, NOS.: CIV S 90-0520 LKK-JFM, C01-1351 TEH

[230542.1]

were CCCMS; they had been Level I (without any outside yard and limited phone privileges) since the summer of 2007. Needless to say, any meaningful, effective, and humane prison behavior modification program depends on a prisoner being able to comprehend the contingencies that are being imposed on him and also assumes that the prisoner possess the capacity to control his behavior enough to meet them. It was unclear to me whether the BMU program that is being applied to some *Coleman* class members is one that they are able to function productively in.

### (viii)   Custody and Clinical Staffing Problems in ASUs

175.   One of the psychologists who accompanied us for part of my tour of SVSP told me that his ASU caseload was about 50—a figure that he characterized as "too many" because it made it impossible to see them all on schedule. [264] He also told me that "we want to hold CCCMS groups but we have no staff, no space, and no escorts." Prisoners in a caged "group therapy" session taking place in the D Yard ASU told me that they were given a choice each day whether they wanted to go to group or to yard, but not to both. They also complained about a lack of mental health training and responsiveness on the part of the custody staff: "Sometimes we feel depressed in our cells. We tell the officers, but they ignore us. They tell you they want to see blood, or they tell you, 'we'll give you the rope.'" Prison staff reported during the 21st round monitoring tour that only 50 to 60 percent of the prisoners in administrative segregation were provided with confidential out-of-cell case manager meetings.[265] The obstacles to providing these confidential out-of-cell clinical meetings included "limited space available for confidential out of cell interviews," staff coverage during vacations and absences, and tight scheduling in the Ad Seg units.[266]

---

[264] Coleman Pls' Trial Ex. 57 (On June 20, 2008, the MHSDS population (EOP and 3CMS) in the ASUs at SVSP was reported as 248).

[265] Coleman Pls.' Trial Ex. 93 at 92.

[266] *Id.* at 95.

176.    One of the rooms that I saw at SVSP that was set aside for the caged "group therapy" that takes place in the ASU was truly degrading. The room in which some 10 or so therapy cages were located appeared to be a laundry room, with huge trays of laundry in the background and large storage shelves—a large, dirty industrial or factory-like setting that the caged prisoners looked out on during their sessions. In addition, the cages themselves were filthy, with rusted metal and graffiti on the sides of the cages and the tops of the small tables inside. A prisoner who was being held in one of the cages, presumably waiting for the rest of his "group," told me: "I'm just in a cage back here [in ASU]—I've been kept here for several weeks but had no yard, no group, no nothing."   The Special Master noted the EOP high refusal rates for group therapy and described the group therapy rooms where "[i]n one of the two rooms...cells were arranged in a straight line...[i]n the other room, noise from nearby machinery was problematic."[267]

177.    In another similar unit, a custody staff member told me that he could not run the yards for prisoners on the appropriate schedule because he simply lacked the manpower with which to do it: "I don't have single escorts to run the psych, doctor, CTC escorts. I don't have the staff. I am short at least 2 officers." This unit also lacked appropriate treatment space for *Coleman* class members to receive their mandated clinical contacts.  They had only two holding cages near the entrance to the housing unit, and an individual office that contained another cage inside it.

178.    I visited D-8, an Ad Seg housing unit where the majority of prisoners are CCCMS.  I spoke with the Sergeant, who discussed some of the problems that he faces in the unit because of staffing shortages and the inadequate number of walk-alone yards for Ad Seg prisoners.  This Sergeant described how the majority of prisoners in his unit were on walk-alone status, but there were no walk-alone yards on his yard.  (The "walk-alone yards" are actually outdoor exercise cages.)  He explained that in order for the men on walk-alone status

---

[267] Joint Pls.' Trial Ex. 57 at 185.

[230542-1]

in his unit to receive outside exercise, they have to be placed in restraints and waist chains, escorted out of their cells and out of their housing unit, and taken by correctional officers all the way to another yard on Facility D, where they are put in individual cages and allowed to exercise. When their exercise time is over, they are chained up again and escorted back to their unit and into their cells. He stated that he needed additional correctional staff in order to run the yard, medical, mental health and the regular Ad Seg program.

179.    A disturbing suicide occurred in the Ad Seg unit, D2, on January 10, 2008, when a 3CMS prisoner hung himself from the top bunk of his cell.[268] This prisoner was housed for a long period of time in the harsh conditions of Ad Seg and had "become more isolative and withdrawn, refused out-of-cell contacts" as the months passed and his promised transfer from Ad Seg to SATF general population did not materialize. He refused to come out of his cell for treatment and other activities. Progress notes documenting the last two cellfront visits with his case manager were missing from his medical records. When he was discovered by custody officers, CPR was not initiated immediately and according to the records, when the watch commander requested medical assistance via radio from medical staff in Facility D, the records note: "Be advised, medical staff are refusing to respond." Other problems were identified in the Suicide Report, including the fact that this prisoner was transferred in error from Lancaster back to SVSP where he had been charged with attempted murder of an officer and remained there until his death. Overcrowding contributed to the problems identified in this tragic case: his transfer to his endorsed prison was delayed; classification mistakes were made when he was returned to SVSP; this decompensating prisoner was retained in Ad Seg with little intervention by clinical staff; and, custody and medical staff failed to appropriately and timely respond to the emergency.

---

[268] Coleman Pls.' Trial Ex. 95.

[230542-1]

### (ix)    Impact of MHCB/DMH Shortages

180.    I requested to interview approximately ten randomly selected mental health

prisoners housed at SVSP. Due to some difficulty scheduling the interviews around the prison-

wide lockdown and mealtimes, I was able to only interview one of the prisoners on my list,

Prisoner LL. It is my understanding that some of the prisoners on the list were interviewed by

plaintiffs' expert, Dr. Pablo Stewart. This EOP prisoner I interviewed was floridly psychotic

and appeared to be in a considerable amount of psychological pain. He had an elaborate

delusional system that he shared with a great sense of urgency. He appeared genuinely

convinced that his life was in danger at the prison, from both staff and other prisoners, and he

urged me to help save him. When I asked the Senior Psychologist in charge of the EOP

program about his status, however, he seemed relatively unconcerned. "He's on a DMH

referral list," he told me, "and he's stable, we're watching him, we will have gone through the

motions, we're covering ourselves, and we don't know what else anyone could do." He knew

of no treatment plan or course of therapy that was being implemented in the case, just "manage

symptoms, keep him safe, that's all we can do, he's fending for himself adequately." Based

upon the information provided in the morning from Dr. Brewer, Director of the DMH inpatient

program, SVPP, it is clear that this floridly psychotic EOP mainline patient will be required to

wait for many months to a year before he transfers to an appropriate in-patient level of care. I

also understand that Dr. Pablo Stewart recently interviewed Prisoner LL him during the site

inspection that he undertook on July 29, 2008. Dr. Stewart concluded that Mr. LL was floridly

psychotic and had strange ideas of reference. Dr. Stewart concluded that Mr. LL needs

inpatient level of care as evidenced by his clinical presentation and his multiple crisis bed

admissions since 2007. I have also reviewed the DMH Report on Monthly Bed Utilization for

June 16, 2008, which lists Prisoner LL on the report -- he was referred to SVPP on September

27, 2007, his referral was received on December 3, 2007, he was accepted and placed on the

[230542-1]

waitlist on January 22, 2008 and his referral was finally rescinded on May 4, 2008.[269]  Since

his acceptance in the DMH program, this EOP patient has requested that he alternatively not

transfer to DMH and to be placed on the mainline at 3CMS level of care. He was on a modified

EOP program receiving one group a week; but appears to have a full EOP group schedule in

the past two months. His long wait for an ICF bed -- more than six months before the prison

rescinded his referral -- was similar to the timeframe suggested by Vic Brewer, Director of

SVPP, when discussing the transfer delays for GP EOP patients accepted into the program.

The current waitlist of 173 patients for the existing 176 beds at SVPP makes it unlikely that a

floridly psychotic patient such as this EOP patient would ever transfer to the ICF program.

### d.    Mule Creek State Prison (MCSP)

#### (i)    MCSP Overview

181.    I toured Mule Creek State Prison on November 2, 2007. The facility was

operating at over 200% of capacity the day I was there, with some 3800 prisoners confined in a

prison built for 1700. Nonetheless, the warden was adamant the prison was not crippled by the

overcrowding—"it is what it is, and we do a great job at this prison," he said. When pressed to

explain when and how he would know if he had too many prisoners at his facility, he replied

that "I've never gotten a bus where I didn't have space somewhere and I had to leave them [the

prisoners] on the bus" and talked about being able to "sandwich them in" at the prison

somehow. The prison houses Level III and IV prisoners, close custody Sensitive Needs Yard

(SNY) prisoners all with special vulnerabilities of some kind, and a large number of EOP and

CCCMS prisoners. The Special Master reported that as of January 2007, MCSP's overall

census was 3,966, of whom 1,530, or 39 percent were part of the mental health caseload.[270]

Mule Creek's prisoner population also has not decreased appreciably since my tour of the

facility. On July 30, 2008, its population was 3,681 prisoners, still over 200 percent capacity of

---

[269] Coleman Pls.' Trial Ex. 117.

[270] Joint Pls.' Trial Ex. 36 at 48.

[230542-1]

its design capacity of 1,700 prisoners.[271]  The June 20, 2008 monthly data provided by defendants listed the MHSDS population at 1694 (1161 3CMS, 525 EOP and 8 MHCB).[272] Thus, although the prison census was reduced by several hundred prisoners between January and June, 2008, the MHSDS caseload grew by 164 prisoners.

### (ii)     Inappropriate Treatment Space

182.    Given the large numbers of prisoners on the EOP and CCCMS caseloads, the inadequate amount of appropriate treatment space at the facility was especially troubling. For example, the area that served as the A Facility OHU (which also serves the B Facility EOP population, which does not have an OHU of its own) was wholly inadequate, consisting of a row of cells behind a chain link fence on one of the cellblocks. The nurse on duty in the unit informed me that the OHU is often filled, although on the day I was there it held only two prisoners. The inside of the OHU cells was filthy, depressing, and bare—converted Level IV cells that were dimly lit, and afforded prisoners only a thin mattress on the floor.[273]

183.    One of the prisoners I interviewed, Prisoner MM, later told me what it was like to be housed in this facility: "I went on suicide watch to the OHU. They threw me in the cell, they strip you, put you in a blue gown, mattress on the floor. I stayed there for several days like that. Nobody was watching me or helping me… I was behind a cage, nobody was watching me—the room was cold, then they sent me to the CTC, and I didn't get anything but the cold

---

[271] Joint Pls.' Trial Ex. 59.

[272] Coleman Pls.' Trial Ex. 57.

[273] The *Coleman* Revised Program Guide distinguishes between an MHCB and an OHU.  Joint Pls.' Trial Ex. 9 at 12-5-1 to 28.  A prisoner may be placed in an OHU for observation and evaluation of behaviors that may be indicative of mental illness, and that prisoner must be evaluated within 24 hours of placement.  If a patient is determined to need inpatient care, transfer to an MHCB is supposed to be arranged within 24 hours. *Id.* at 12-5-28.  A patient is not to remain in an OHU more than 72 hours.  MHCBs, on the other hand, have a maximum length of stay of 10 days and are intended to provide services akin to an inpatient setting to ameliorate mental health symptoms. *Id.* at 12-5-1.  Although the two appear to be used comparably by defendants in these overcrowded conditions, the difference in level of care each is supposed to afford is stark.

[230542-1]

cell there either." I reviewed portions of Prisoner MM's records after I interviewed him on the tour. [274] He had transferred to MCSP on April 18, 2007 after treatment at DMH-Vacaville for a serious suicide attempt. He had several OHU and crisis bed admissions at MCSP, primarily related to forced double-celling at MCSP. During his first admission, he was placed in the OHU from June 19 until June 22, 2007, at which time he was transferred to the MHCB. [275] During the four days he was housed in the OHU, he was observed on suicide precautions, and after his transfer to the MHCB on June 26, 2007, he remained on precautions until he was discharged with a recommendation that he be provided with a 2 week temporary single cell chrono. [276] On July 3, 2007, nine days later, custody staff tried to force him to take a cellmate despite the chrono, and when he refused, he was placed in segregation. [277] Again, on July 18, 2007, he was issued a rules violation for refusing to double cell. [278] According to the report, "I/M said that he would just go back to Ad-Seg because he couldn't deal with all of this. I again ordered I/M to move and again he refused. At this time I placed I/M in mechanical restraints (handcuffs)." [279] There is a clinical summary for the Ad Seg classification committee that notes that "I/M's claim at single cell status is correct. There is a note in UHR dated 6/26/08 signed by Dr. Riley, "single status x 2 wks." [280] His clinician wrote several chronos on his behalf recommending single-cell status, yet custody staff was unwilling or unable to honor these chronos. On October 12, 2007, he filed an administrative appeal requesting single cell status and attached a chrono from an EOP clinician describing why he required single cell

---

[274] Coleman Pls.' Trial Ex. 97.

[275] Coleman Pls.' Trial Ex. 97.

[276] Coleman Pls.' Trial Ex. 97.

[277] Coleman Pls.' Trial Ex. 97.

[278] Coleman Pls.' Trial Ex. 97.

[279] Coleman Pls.' Trial Ex. 97.

[280] *Id.*

status, but his appeal was denied. On January 17, 2008, his case manager wrote: "Mood anxious, agitated, tearful affect; it seems in the best interest of patient and peers that he be placed in a single cell...He continues to consider requested Ad Seg placement in order to be alone as he does not want to harm others while struggling with overwhelming emotions and memories."[281] On January 31, 2008, he met with his case manager and told him that another prisoner had been moved into his cell the night before.[282] He was quite agitated and his case manager referred him for admission to the OHU."[283] He reported to clinical staff that he was not suicidal, but that "I need a single cell or I might hurt someone."[284] He was transferred from the OHU to the CTC where he remained for two weeks until he was transferred to CMF-Vacaville's acute program on February 16, 2007. Custody staff at Mule Creek repeatedly over-rode clinical recommendations that this fragile EOP patient have a single cell which was likely a contributing factor in his decompensation and resulting referral and transfer back to the DMH acute program, which has a waiting list for these scarce beds.

184.   The EOP treatment area in A Facility was short on space. Staff told me that they would hold more groups if they had the space to do so. I was told that the clinical staff shares offices and handle large caseloads. Even so, general population prisoners are not given opportunities to participate in groups. A prisoner in one the groups that I spoke with said "we are packed—people aren't getting the help they need. There's just not enough programs, and there are a lot of guys here who can't function but aren't getting any help." Another one told me that many CCCMS prisoners are concerned that, if they appear to function too well, they will be pushed out of the groups, because there are so few of them and the spaces are reserved for the least functioning prisoners.

---

[281] *Id.*

[282] *Id.*

[283] *Id.*

[284] *Id.*

185.    At the CTC staff told me that "we are always full here." When there are overflow prisoners, they are sent to the A Facility OHU that I described above. The staff indicated that there have been times when there were so many prisoners in crisis that they not only filled the OHU but had to look for additional alternative space to house them. The longest delays in transferring prisoners from the CTC occur for those who are awaiting DMH transfers (for which the wait has been as long as 45 days).

### (iii)    Staff Concerns Related to Overcrowding

186.    Everywhere I went in this prison the clinical staff voiced concerns about inadequate space. In the B Facility mental health program building, clinicians need to schedule shared rooms for individual interviews or treatment. The clinical staff shares offices—one standard size office is used by four different psychiatrists and is also where all of the medical records are stored. Another office houses 7 or 8 recreational therapists, and there were 6 nurses using another small office. A psychiatric technician candidly explained the shortage of treatment space impacted the prisoners on the mental health caseload: "Even though we don't have the dayrooms full of beds, these are mentally ill prisoners, many of whom are paranoid. They get frightened and withdrawn because of the overcrowding. There is nowhere for them to have privacy. There are people everywhere on the unit and the prisoners are suffering because of it." She went on to say that: "I can see it in the tension in the yard, the apprehension of the prisoners—there are men who are afraid to go out—they have other prisoners accompany them."

187.    In fact, the psychologist who accompanied me on the tour spoke candidly as we left this area. She told me that her clinical staff is very concerned about their ethical and legal and professional standards being compromised, "the staff is doing its best, but... as a clinician, this is a very, very serious situation—you know what I mean." When I asked her if she would elaborate, and tell me how overcrowding was affecting the staff's ability to "ethically, legally, and professionally" do their job, the assistant attorney general on the tour informed me that I was not allowed to ask such a question. "If you want her opinion on that, depose her," as she put it.

188.   It was obvious that one of the overriding concerns among the clinicians was the quality of treatment that they could provide under the conditions that prevailed at the prison, given the lack of usable and appropriate treatment and office space, staff vacancies, and the overwhelming numbers of prisoners. Many of the treatment areas I saw at Mule Creek lacked even a modicum of privacy and, even when there were cubicles and partitions, it was possible to overhear what was being said. For example, two groups were underway when I entered the B Annex and the prisoners were talking in hushed tones, presumably in an unsuccessful attempt to keep the content of the group confidential.

### (iv)   Overcrowding and Housing Units

189.   Prisoners on the MHSDS caseload are housed in the "non-traditional" beds, which include dayroom and gyms with <u>triple bunks</u>. The makeshift gymnasium dormitory on B Facility is similar to those at the other prisons I visited, except that there are triple bunks, and all levels are filled with prisoners. Staff reported that there are three gyms filled with these bunks at MCSP. The correctional officer on duty in the B Facility gym told me that they tried to insure that only about a third of the prisoners were in the dorm at any one time, except for count and when everyone returned to the dorm in the evening. Prisoners who feel they are unable to tolerate dormitory housing like this can request an exemption; however the correctional staff member and the clinician who accompanied me on the tour both agreed that it was rare that such an exemption would be granted, in part because there were too few alternative housing spaces to accommodate them.

190.   Just as with the other gymnasium dormitories, there were obvious security concerns and blind spots throughout the unit. Prisoners have clothing and towels draped down the sides of their bunks in an attempt to create minimal amounts of privacy, but this also means that it is impossible to see what is taking place almost anywhere in the unit. The correctional officer overseeing the dormitory from the raised guard station told me, "we can't see very well from up here. We have to rely on informants" to know what is going on in the unit. He also told me that there are too many people for correctional staff to monitor or be sensitive to: "we have to rely on other prisoners to tell us that their bunk mate is not handling it well."

191.    In another of the makeshift gymnasium dormitories, a female staff member told me that "the biggest problem is too many people and not enough space. There's a guy in here who has been in 23 years. He has lots of stuff, but where will he keep it? There are blind spots all over here. It is dangerous for staff and prisoners. Triple bunking has made a difference. You just can't see any place. When you go back there [pointing to the far corner of the gym] even the gunman can't see us. It gets really, really hot [in the summer] and the swamp coolers are ineffective."

192.    A number of the housing units had makeshift dayroom dormitories in them, with rows of triple bunks where several dozen "extra" prisoners were housed in the unit. Among the many indignities that this kind of housing imposes, prisoners complained that there was only one toilet for some 20 prisoners (located in cells that were set aside to serve as bathrooms for the prisoners on the dayroom bunks). They told me that the line after breakfast was especially long, and prisoners who have to urinate badly or have problems with bladder control have a difficult time managing the wait. Prisoners also explained that, although they are allowed to use the dayroom tables until 9 PM, they are not allowed to be on the dayroom floor after that. Essentially this means that they are confined to their beds from 9 PM until the morning. Not surprisingly, prisoners on the bottom and middle bunks had an especially difficult time with this.

193.    A prisoner in one of these makeshift dayroom dorm beds told me that he was a Level IV CCCMS prisoner who could not handle the stress of this kind of housing: "Because I can't take the pressure I have gone off on people—living in a gym or dayroom, having to deal with all these people—I told them that I was being placed at risk." After living in one of the gym dorms, he was attacked by another prisoner. He told prison officials that "if you put me back in the gym, I'm not going to handle it." In response, he was sent to a triple-bunked dayroom dormitory instead.

194.    One of the prisoners I interviewed spoke eloquently about the problems prisoners at Mule Creek confronted: "Since it's gotten crowded, you can't get the help you need. They tell you they don't have enough staff—so you get so frustrated, you don't think anybody cares,

[230542-1]

so you feel even more hopeless." He also told me that the groups that are being run there are predominately recreation time. "We get 4 hours of core group a week. The rest of the group is just recreation. You just go out to the yard with your group and shoot baskets."

### (v)    Extreme Adaptations to Overcrowding

195.    Building 13 was one of the most bizarre housing units I have ever seen in a maximum or medium security prison. A tall, chain link fence divides both floors of one section of the unit, ostensibly into Ad Seg cells on one side and reception cells on the other. However, the Ad Seg population in the unit continues to grow, so MCSP has had to "convert" some of the standard cells for Ad Seg use. As the Sergeant in charge of the unit explained: "We are really struggling here with the layout. We have people in Ad Seg cells that don't have food ports, we don't have grill gates on some of the showers, so these guys have to be escorted when we take them out of the unit… We have huge problems with suicide prevention because we don't have enough officers." The officer shortage is intensified because the Ad Seg prisoners in the cells without the food ports require an entirely separate and elaborate procedure in order to be fed, one that ties up at least two officers for a considerable period of time, simply because of the shortage of appropriate cells.

196.    The Receiver's staff observed problems in conjunction with the anomalous arrangement in Building 13, as described in its MCSP Operational Assessment, conducted after my tour of MCSP:

> In the ASU Overflow, LVN's distribute medication by <u>sliding pills under the door</u> because there is no designated custody officer to open the food/handcuff port…. The doors in Building 13 have not been retrofitted to prevent "fishing," which has allowed GP inmates who are housed in the building to introduce serious contraband by throwing razor blades over the chain link fence which are then "fished" into one of the cells. [285]

---

[285] Coleman Pls.' Trial Ex. 98.

[230542-1]

The Receiver's staff rightly noted that "[t]his practice places the nursing license at risk and creates a serious security concern because of the potential for hoarding controlled medication."[286]

197.    The configuration of Building 12 was almost as problematic, but for different reasons. Clinicians have "offices" that sit completely out in the open on the dayroom floor of the housing unit, and a semi-circle of treatment cages stands against the wall behind them. Even though there are cubicle panels that create what appear to be semi "private" offices, much of what goes on in the treatment area is completely visible to the prisoners in the unit, especially to the prisoners on the second tier of the unit. Indeed, the treatment cages actually face the cells. There is a large EOP and CCCMS population in the unit and it is very noisy, with prisoners yelling across the unit. The noise and shouting (and sometimes the taunts) of the other prisoners are pervasive and distracting. The psychologist who accompanied me acknowledged that the atmosphere is utterly incompatible with effective treatment, but stated that the staff was doing the best they could under the circumstances.

198.    Prisoners noted that there were a lot of lockdowns at the facility, and that they appeared to be increasing. Despite being a prison that houses predominately SNY prisoners, there were a total of five emergency alarms on the day I was there (either prison-wide alarms or alarms within the individual unit that I was touring). During these alarms, all prisoners are required to get down on the ground until the emergency is cleared. In addition, the interviews I had scheduled at the end of the day were interrupted by a medical emergency in which a prisoner had to be evacuated to a hospital by helicopter. When I asked a correctional officer involved what had happened, he said, "hanger—guy threw himself off a second floor tier."

199.    Here, too, the observations of another independent observer—in this instance, the *Plata* Receivership—are worth quoting at some length, in part because of the high level of corroboration his assessment provides about the many overcrowding-related problems I

---

[286] *Id.*

[230542-1]