# EXHIBIT CC
# PART 7

described above, and also because the observations and related concessions by institutional staff actually <u>post-date</u> my visit to the institution. Thus, the Receiver's MSCP Operational Assessment and Facility Master Plan Report,[287] conducted December 18-20, 2007, documented many of the same serious overcrowding-related problems that I identified when I toured the prison a few months earlier. Despite describing MCSP as "one of the most manageable institutions to be found anywhere within the State of California," and having a staff that "obviously [takes] great pride...in the institution," the Receiver identified a number of serious overcrowding-related "barriers to care" for the prisoner/patients housed there.[288] The facility was operating at well over 200% of capacity (designed for 1700, it housed 3644 at the time the Receiver inspected it). In addition to the overall level of overcrowding, the Receiver noted that Mule Creek was tasked to "provide mental health services for an ever increasing caseload of seriously ill inmate/patients," in programs that had "expanded exponentially over the last year to include 560 EOP level of care inmate/patients, and 1093 inmate/patients at the Correctional Clinical Case Management Services (CCCMS) level of care."[289] A 6-page portion of the Receiver's report (pages 10-15) was devoted to the mental health program at Mule Creek and it documented numerous, continuing overcrowding-related problems.

200.    The initial portion of the Receiver's assessment of mental health treatment needs was based on observations provided to the team by the Chief of Mental Health Services, who told them that there was "an immediate need to expand services" to EOP inmate/patients at Mule Creek "in order to provide 10 hours of therapeutic services as required under the *Coleman* Program Guides." He noted several instances in which custody staff shortages prevented needed mental health services from being delivered, including the lack of escorts to bring prisoners to the new group therapy modules that were being opened and the need to

---

[287] Coleman Pls.' Trial Ex. 98.

[288] Coleman Pls.' Trial Ex. 98.

[289] *Id.*

[230542-1]

expand the mental health services offered to *Coleman* class members (to bring them up to the Program Guide-mandated amounts). Indeed, he emphasized that "the only barrier to initiating these programs was the lack of custody coverage."[290]

201.    The Receiver expressed a number of overcrowding-related concerns with respect to the Ad Seg (ASU) at Mule Creek, concluding that "[t]he ASU at MCSP, like health care access points in many institutions, has not been resourced sufficiently with custody escort personnel to meet operational requirements,"[291] and recommended additional officers be assigned as "Health Care Access Escort Officers." These were not the only personnel-related shortages. For example, the Receiver also noted that "[t]here were similar custody shortages noted in the ASU Overflow."

202.    The Receiver also noted that the "high volume of inmate/patient health care access contacts" in the Central Health Building at Mule Creek was not supported by sufficient correctional officer staffing and supervision, and the Review team "was surprised to discover that there is currently no dedicated custody staff assigned to provide supervision and escort of inmate/patients to and from the housing units."[292]

203.    The Receiver's conclusions and recommendations about access to the proper levels of care addressed several overcrowding-related problems, including what were described as "serious space deficiencies for clinical staff,"[293] and the insufficient correctional staffing levels in the mental health program at the prison. Thus, despite having a mental health program that was "extremely well established," it was compromised by staff shortages—so severe that they necessitated the use of so-called "inmate aides" (prisoners who were given the responsibility of providing "prompting and support for inmate/patients" by determining if they

---

[290] *Id.*

[291] *Id.* at 15.

[292] *Id.* at 16.

[293] *Id.* at 28.

[230542-1]

are present in their cells and want to attend scheduled EOP clinical services). As the Receiver
concluded, "the current system appears to create significant barriers to care."[294]

204.    The January 25, 2008 Facility Master Plan Report developed in response to the
assessment repeated many of these overcrowding-related themes. The Report recommended
that, "[i]n order to adequately service the needs of the inmate populations at the yard clinics
and reduce the overcrowded conditions that currently exist… Facility Clinics in Yards A, B,
and C need to be enlarged."[295] The Administrative Segregation Unit received special attention.
It noted that "[h]ealth services staff are currently operating out of a small kitchen space," and
that "[t]here are no designated medical exam or mental health treatment rooms," so that
"custody staff must escort restrained Ad Seg. Inmates out of the Ad Seg housing unit" through
the C Yard to the general population clinic where, because "[i]t is necessary to isolate the Ad
Seg Inmate during the entire exam process, in essence closing down both the access path and
the Clinic" while the Ad Seg Prisoner receives treatment, "in order to avoid any possibility for
an altercation to occur."[296] A timeline was provided in the MCSP Facility Assessment and Plan for
the overall project, which included Legal Approval for the project by May 3, 2008. If this had occurred
by May 3rd and all of the component projects are completed on schedule, overall completion of the
Plan upgrades is projected by March 2009.[297] However, in the Receiver's Eighth Quarterly Report, on
July 17, 2008, he noted that there is a motion pending regarding the upgrade proposal for Mule Creek
State Prison.[298] Thus, it appears that the timeframe for this project has been delayed.

205.    Mule Creek's own "Space Needs Survey," compiled by prison staff and signed
by the Warden more than two years ago, on March 22, 2006, acknowledged that

---

[294] *Id.* at 29.

[295] *Id.* at 30.

[296] *Id.* at 39.

[297] *Id.* at 53.

[298] Joint Pls.' Trial Ex. 56 at 37.

[230542-1]

"[d]etermining space and staffing needs is very difficult to speculate as our inmate Mental Health population is constantly changing, creating immediate staffing and space deficiencies."[299] The Warden expressed two additional, interrelated overcrowding concerns: that the "[c]urrent overcrowding packages provide temporary relief" that may evaporate "due to population fluctuations," and the fact that, given continuing operation at over 200 percent of capacity, "our existing infrastructure is unable to support proposed growth projections." Apparently, the concerns with respect to adequate water, waste, and electricity were identified years earlier in previous proposals from the prison "but have not been funded or scheduled."[300]

### e.    California Substance Abuse Treatment Facility (SATF)

### (i)    SATF Overview

206.    I toured SATF on July 28, 2008.  SATF is located in the Central Valley of California, south of Fresno.  During the morning meeting, staff reported the prison census for July 28, 2008 at 7,193 prisoners, which was well over 200% capacity for this prison built for 3,424.[301]  The population on the CDCR website for the week was listed at 7,156, or 209% of capacity.[302]  SATF is a large, sprawling prison.  In fact, we were told that it is physically the largest prison in the world, with buildings that stretch out some 1.5 miles long—and that it is the world's most populous.  It also may have the dubious distinction of holding the greatest number of prisoners beyond its design capacity; on the day we visited it, SATF housed some 3700 more prisoners than it was built for.

207.    SATF is comprised of seven separate facilities, a Correctional Treatment Center with 16 licensed mental health crisis beds, and two administrative segregation units, including a stand-alone Ad Seg, where mentally ill prisoners cannot be housed.  The prison houses

---

[299] Coleman Pls.' Trial Ex. 99 at 1.

[300] Coleman Pls.' Trial Ex. 99 at 2-3.

[301] Joint Pls.' Trial Ex. 59.

[302] Joint Pls.' Trial Ex. 60.

[230542-1]

several different custody levels and its housing types range from cells to large dormitories. On the day of our tour, prison staff also provided us with a packet of documents that included: an MHSDS census by yard and level of care, treatment space schedule by day of week and yard, MHCB admission/discharge report for April 1 to July 25, 2008, MHCB log for July 28, 2008 and a list of EOPs at SATF, including their length of stay, endorsement status and comment field. I have reviewed these documents. Prison staff reported to us during our tour that there were a total of 157 prisoners housed in the stand-alone Administrative Segregation unit and 136 prisoners housed in the regular Ad Seg unit, which is located in E1 (the vast majority of which were on the mental health caseload). SATF does not have an EOP program, which means it is not staffed for EOP patients and does not have treatment space allocated for EOP programming. Prior to the day of the tour, the prison staff provided us with MHSDS data reporting that approximately 1380 3CMS and 35 EOP prisoners were housed at SATF on July 21, 2008.[303] On July 28, 2008, eight of the 35 EOPs at SATF had been waiting at least 100 days to transfer to an EOP program. Almost half of the EOPs had been waiting more than 60 days, including a significant number of EOPs housed in Ad Seg (who should have been transferred to an EOP HUB within 30 days). According to SATF's own EOP List, the reason for these delays in transfers was the lack of EOP beds system-wide.[304]

208. In the draft 20th Report, the Special Master noted that the EOP population at SATF had rapidly expanded at SATF by October 2007 "[t]he number of EOP inmates awaiting transfer continued to increase, growing from eight in September 2006 to 16 in April 2007 and then reaching 23 by the end of October 2007." [305] During the 20th round of monitoring, SATF also experienced difficulty transferring EOPs within transfer requirements and "[t]ransfer delays were attributed by staff to the system-wide shortage of Level III and Level IV EOP

[303] Coleman Pls.' Trial Ex. 100.

[304] Coleman Pls.' Trial Ex. 100.

[305] Joint Pls.' Trial Ex. 57 at 141.

[230542-1]

beds, and in particular the lack of SNY beds at MCSP and EOP hub beds at CSP/Corcoran."[306] According to the Special Master (and confirmed by SATF staff on the day I toured), SATF follows a practice of dispersing EOPs throughout the immense prison. (We were driven in golf carts from unit to unit at SATF during the tour.) As the Special Master noted, this negatively impacts the ability of mental health clinicians to provide EOPs with a weekly case manager contact. [307] Yet the practice persists.

**(ii)     Shortages of Space for Offices and Treatment**

209.    During our orientation meeting, SATF administrators reported that their mental health program was fully staffed, although they still made some use of clinicians from the registry (several psychologists and 3.5 psychiatrist positions). However, the increase in staffing has created corresponding shortages in space; we were told "we don't have enough space for all the new folks we've hired." In the staffing data for June 2008 provided by Division of Correctional Health Care Services, SATF reported 6 clinical vacancies, with only 2 of their vacancies covered by registry clinicians.[308]

210.    We were also told at the orientation that there were treatment spaces in all of the various interconnected facilities that comprise the SATF complex. In addition, however, the institution submitted plans about a year ago that would have authorized fairly significant additional mental health treatment space to be constructed on each of the yards and in the Ad Seg. Unit located in E-1.[309] The acting chief psychologist acknowledged that they have not heard a word back about the fate of the proposal since it was submitted. Obviously, there has been no additional construction. He told us that "we need to be doing more groups, and the proposed treatment modules would allow us to do this." In fact, despite its enormous size, the

---

[306] Joint Pls.' Trial Ex. 57 at 149.

[307] Joint Pls.' Trial Ex. 57 at 149.

[308] Coleman Pls.' Trial Ex. 91.

institution is pressed for space. Chief Deputy Warden Allison said that they were "looking at our two vacant gyms"—not for use as gyms but rather as "interim treatment spaces to be converted." In fact, SATF already utilizes chapel areas and some space designed for hobby craft in the prison for mental health treatment.

211.   Acting Chief Psychologist Coffin told me that "because we are making use of spaces not originally designed for treatment, we are limited even more in the summer months." That is in part because some of the areas that they have converted for use as treatment spaces are too hot in the summer, and also because they cannot effectively utilize the yard areas for everyone because a number of prisoner/patients are on heat sensitive medications.

212.   The space limitations have resulted in a dispersal of clinical offices and treatment spaces to less than ideal areas of the prison. Thus, rather than intelligently and efficiently planning the creation of appropriate clinical offices and treatment spaces, the staff has been forced to utilize wherever space it can convert for clinical use. Among other things, for example, I was told that the Ad Seg clinicians have their offices in A Yard, at another part of the prison, even though they are supposed to service prisoners in the Ad Seg unit. Obviously, this limits their access to prisoner/patients in their housing units.

213.   Dr. Jesus Juarez, the CTC supervising psychiatrist, told me that the prison actually does have staff shortages, and needs more personnel in order to function properly. Some of the staff shortages impact little things. For example, he mentioned that he had recently been provided with a computer to use at SATF but there were no technical staff available to connect it. Other staff shortages pose more serious problems. Dr. Juarez told me that "we are short of psychiatrists. We need more. The six we have are not enough." Dr. Juarez went on to explain that his staff is always very busy in the CTC. He said that the MHCBs at SATF are always full. If they aren't filled with SATF prisoners, "then Sacramento sends us people to fill up." They need more clinical staff to meet these needs.

---

[309] Coleman Pls.' Trial Ex. 101.

[230542-1]

214.    Dr. Juarez was also emphatic that office and treatment space are "at a premium here. I am sharing an office with three other doctors, plus I have to see patients there. I have to do dictation when the other doctors are working there. If I get another psychiatrist I'll have to put him in there too. And we run a group in there. We don't have enough space here..." In addition, he told me, the same room "multi-purpose" room—is used for IDTT in the CTC.

215.    The issues of appropriate space and available staffing came up again and again. The Triage and Treatment Area ("TTA") is outside of the CTC.  I was told that prisoners who appear to be in a mental health crisis are first brought to the TTA, where they are put in a treatment cage—referred to here as a "safety cell"—that sits in the corner of the room. The prisoner stays in the cage until a psychiatrist can assess his condition. However, the TTA nurse told me that, when there is no psychiatrist on site, a suicidal prisoner could stay in the cage overnight, with a custody staff member sitting in front of the cage, observing the prisoner throughout.

### (iii)    Lack of Beds at Appropriate Level of Care
### (a)    EOP Beds

216.    At the SATF orientation we heard about a chronic problem that continues to plague CDCR facilities—EOPs who have been endorsed for transfer to more appropriate programs and levels of care but cannot be moved because of the shortage of bed space. Thus, we were told: "the hubs are always full. We call every week—CMF, Corcoran, Salinas Valley—they are all full. We try to get them out, but there is no room anywhere and it takes months sometime." The Acting Chief Psychologist told us that their program for the EOPs is to have them seen once a week by a case manager, once a month by a psychiatrist, and daily by the psych techs, if they are in Ad Seg. However, they are unable to provide their EOPs with group therapy or other enhanced services during their prolonged stays at the prison.  The prison staff acknowledged to us in the morning meeting and during the tour of the prison, that they made no effort to house the EOP prisoners in a single building on a yard in order to enhance the monitoring, safety or clinical care provided to these patients.  In face, we observed EOP prisoners scattered in many yards throughout the prison. As a result of the extended stays at

-117-

SATF and the limited mental health treatment provided to these EOPs while they waited for transfer, many of them were being admitted to the MHCBs for stabilization, often more than once.[310] In fact, 15 of the 35 EOPs who were at the prison when we toured, had been admitted to the MHCB at least once, and 9 had multiple admissions.[311]

### (b)    MHCB and DMH Access

217.    SATF has a CTC that is licensed for 14 mental health crisis beds that they have expanded to 18, although four of the beds still require retrofitting to ensure that they are safe for suicidal patients. The Chief Psychiatrist noted that all of the beds in the CTC are "flex" beds that can be converted to an MHCB. The staff reported that during a shortage of MHCBs, they are able to send medical patients out to nearby hospitals to open up bed space for mentally ill patients when they are determined to be in crisis. As I noted above, the CTC is "always full." In fact, on the day of our tour, the majority of the MHCBs were filled with patients from other prisons, including prisoners from DVI (4), Centinela (2), and CSP-Sacramento (3). Once again, the staff acknowledged that "DMH beds are very, very scarce," and suggested that the wait to transfer typically lasts a minimum of 30 days.

### (c)    3CMS Program

218.    In addition to the impacted space and treatment resources in the CTC, and the chronic problems with effectuating DMH transfers, SATF appeared to be running a very limited program for its 3CMS prisoners. The Special Master described SATF's inability to provide an adequate 3CMS program to be related to the prison's limited "success at recruiting and retaining clinical staff." [312] During the 20th round monitoring period, "[c]hronic staff

---

[310] Coleman Pls.' Trial Ex. 100.

[311] Id.

[312] Joint Pls.' Trial Ex. 57 at 152.

turnover clearly compromised 3CMS services."[313]  The Acting Chief Psychologist acknowledged to me problems with staff retention but stated that he hoped they would be more successful with the new staff hired.  Another staff person during the morning meeting reported that staff retention problems were related to their hiring of unlicensed psychologists who would leave after they completed their necessary hours for licensing.  When I asked whether new hires were licensed, I was informed that they were not.

219.    During our tour of Facility A, I visited the Chapel space that we were told was used for group therapy on this yard.  The schedule on the door indicated that the Chapel was available for mental health programming only four hours a week, on Tuesdays from 12:00 until 4 p.m.  Facility A houses approximately 188 3CMS prisoners.[314]  Perhaps not surprisingly, the Special Master found that although group therapy offerings increased on five of the seven yards, "inmate demand for groups outpaced CSATF's ability to provide them and wait lists for groups were lengthy."[315]

220.    I interviewed several prisoners in A Facility, which houses both EOP and 3CMS prisoners in dormitories as well as cells.  When we arrived on the yard and asked whether the EOP prisoners were placed in any one particular housing unit, the sergeant told us that they were not.  The stories told to me by several A Facility prisoners illustrated some of the ways in which overcrowding at SATF limits the staff's options in dealing with mentally ill prisoners and the level of care that is provided. The first prisoner that I interviewed, Prisoner NN had a significant history of DMH inpatient hospitalization that immediately pre-dated his arrival at SATF four weeks earlier. He had come from the DMH psychiatric Hospital at Coalinga, where he had been for 10 months and, before that, he spent some 8-9 months at DMH's Atascadero hospital. Before going to Atascadero, he was a 3CMS prisoner at SATF.  Yet Prisoner NN was

---

[313] *Id.*

[314] Coleman Pls.' Trial Ex. 105.

[315] Joint Pls.' Trial Ex. 57 at 153.

[230542-1]

returned to SATF at his former level of care – 3CMS – six weeks before he was scheduled for parole, apparently with no parole discharge planning provided. He told me he was diagnosed with PTSD (the result of extensive child abuse) and bi-polar disorder, and currently takes Thorazine, Effexor, and Depakote. He said that "there's a lot in my case file," but that for some reason "the psychs have overlooked it." Prisoner NN has been in and out of prison several times since 1996, most of the time returning because he said that he "self medicates" when he experiences mental health problems and psychological stress on the street. He told me that his psychological problems are greatly exacerbated when he is forced to live in open dormitory settings. He feels vulnerable and crowded and his PTSD symptoms are aggravated. He elaborated that "I'm very sensitive to lights, noise, crowds—people make me anxious when they are all around, and it's so crowded here." When he feels crowded in this way, "I become paranoid, sure that other prisoners are against me, trying to harass me,[that] people are talking about me. So I tried to kill myself." Prisoner NN showed me long cuts on his arms from this suicide attempt, and said that he had received 110 stitches as a result of this. He also said that he is an active participant in programs when they are available and that, for example, the mental health program at Coalinga was a good one in which he had been actively involved. Indeed, he said his psychiatric condition began to noticeably improve when he was at Coalinga. However, it deteriorated when he was sent back to SATF. He told me: "I started getting suicidal again." He told staff that he was feeling suicidal and he was admitted to the CTC on July 3, 2008 for suicide precautions and was kept there for fourteen days.[316] He told me: "I preferred being naked on a bed in CTC to being in a dorm. But they moved me back to the dorm anyway." After this crisis bed admission, his level of care was raised to EOP.

221.    Prisoner NN was most upset about the unresponsiveness of custody and clinical staff to the difficult time he had coping with the overcrowded conditions in the dorm and the way those conditions exacerbated his mental health symptoms since he returned to prison from

---

[316] Coleman Pls.' Trial Ex. 100.

[230542-1]

the DMH hospital. He said that staff "feel its our own fault and don't do much for us, unless they are forced to." In fact, he said, "how we are housed, in the face of the overcrowding, isn't something that they bother with. They can't." He insisted that he had tried to talk with staff about the way that he was panicked by the dorm housing and the fact that it was adversely affecting his mental health, but to no avail: "Before I tried to kill myself, I told them what was happening," but "they said the dorm housing was not something they could change." Even after he told them, directly, "something is going to happen," they "shrugged and said, '[we] can't help you.'" Prisoner NN said that he was forced to live in the crowded dormitory even though he had a "cell-living only" chrono (that SATF refused to honor). He also said that, since coming back to SATF from the state mental hospital about a month ago, the only EOP program that was available in his unit was a once a week meeting with a psychologist. He has had no groups at all over this one month period. Remarkably, this prisoner is scheduled to parole from prison in about two weeks—on August 15, 2008.

222.    I interviewed a second prisoner from A Facility who also had a significant mental health history but was receiving very little treatment for it. Prisoner OO has had several prior CDCR prison terms and is now at SATF for a parole violation. He has been on the mental health caseload off and on, and has taken psychotropic medications for depression. The last time he entered prison, around April, 2008, he went through the Reception Center at the Duel Vocation Institution (DVI), where he sought mental health help and even requested placement in solitary confinement to try to ward off a deepening depression that he felt was brought about by a number of deaths that had recently occurred in his family. He told me that staff there said "everybody has deaths, learn to get over it." When he came to SATF about a month later, at the end of May, 2008, he felt his depression "just got worse, I was getting more desperate." Prisoner OO sent clinical staff here a chrono asking for help for the depression, but got no response. After a few days, he was frustrated and angry and received a CDCR 115 for his disruptive behavior. He was put in a holding cell and eventually taken to the CTC, where he spent 7 days. He said they "gave me meds, [put me] on a bare mattress, in a wrap around garment."

223.    After about 7 days in the CTC, Prisoner OO was placed on the mental health caseload as 3CMS and was sent to the gym. Since being released from the CTC, several months ago, he told me: "I've had no groups, seen my case manager only twice, and the psychiatrist who does meds review once—that's it." Prisoner OO said he doesn't' know if there are any groups he can participate in—"no one told me anything"—hasn't discussed a treatment plan with the IDTT, and says that his case manager "just asks me, 'how are you doing?' and doesn't seem concerned about providing me treatment."

224.    The third A Facility prisoner, Prisoner PP is a 37 year-old man who said although he had made several suicide attempts when he was younger, and had suffered extensive sexual and other kinds of abuse in his life, this was the first time he had been in any type of mental health program while in prison. When he came into the prison system, through the Reception Center at DVI, he could not sleep and was hearing voices. At DVI "I got to see the psychologist right away, they gave me meds to calm me down." But then he was sent to SATF. He was 3CMS when he got here but told me that his clinician felt he should be placed on EOP status because he was not coping well at the prison. In fact, he is listed on SATF's EOP Log as EOP since April 17, 2008.[317] He is taking Remeron, Vistaril, and Depakote. He told me that "A-2 is a hard place to live... [there is] constant movement, noise, fast paced, shadows." Prisoner PP said he had a much easier time handling cell housing than the dormitory unit he is in. He feels that he has been given very little mental health help to cope with his problems or the situation that he is facing. Thus, he said that despite being at SATF since May, 2007, he had been in no groups at all and had to ask for contact with his psychologist rather than being in a program where regular contact was provided as a matter of course.

225.    In fact, Prisoner PP said that he has no real program of any kind here. Because he already has his GED he is not eligible for educational classes and, because he is required to

---

[317] Coleman Pls.' Trial Ex. 93.

[230642.1]

*j*

complete fully 85% of his sentence, is not eligible for work assignments. Not only is it difficult to absorb the day-to-day idleness and lack of mental health treatment but, he told me, "we are locked down whenever our yard or B Yard has problems." He went on to explain that because the prison is short of custody staff, whenever one yard is locked down, the adjoining one is too because the correctional staff are called to that other yard. (This practice was later confirmed to me by custody staff.) Prisoner PP said that it was not uncommon for this to happen a couple of times a week, and that some of the lockdowns lasted as long as a week or two. He told me that he had been endorsed for transfer and is on the wait list for an EOP/SNY program. However, his clinician told him that "the only reason I'm not moving is that there aren't enough beds," and he had no idea whether or when he would go. Prisoner PP should have transferred to an EOP program by June 16, 2008, but his log entry states "no beds" as the reason for his delayed transfer."[318]

226.    Finally, I interviewed Prisoner QQ, who is a 35-year old man who explained that he first came into the prison system when he was in his 20s, and began receiving his first mental health care the last time he entered prison. He said that he began hearing voices and seeing things in the Orange County Jail and that he continues to do so. He is taking Resperidol and Zoloft now. Prisoner QQ was 3CMS until May 15, 2008, when he was placed on EOP status.[319] He told me that he had never learned to read or write, and also that he was developmentally disabled. Like the other prisoners I spoke with, he was very concerned because he is not getting enough mental health care while he waits for his transfer to an EOP program. He said he sees his case manager once a week, in the chapel, and the case manager just asks him about the voices. This brief contact and the medications he takes are the full extent of the treatment that he receives. "I am just waiting to be transferred to an EOP program. I heard it takes a long time." In the meantime, he is living in the dormitory in A Yard.

---

[318] Coleman Pls.' Trial Ex. 93.

[319] Coleman Pls.' Trial Ex. 93.

[230542-1]

He told me: "It's hard over in the dorm. I'm trying to learn how to live there. The noise in the dorm makes the voices louder." He, too, confirmed that the unit is plagued by numerous lockdowns that can go on for days at a time. Prisoner QQ is listed on SATF's EOP Chart with a notation that his transfer is delayed because of "no beds."[320]

### (d)    Ad Seg Issues

227.    I toured the stand alone Ad Seg unit at SATF, where we were told that there were no 3CMS or EOPs currently housed. There are offices in the Ad Seg unit with individual cages in them that the clinical staff uses for assessments and also one-to-one treatment. We were shown a holding cell where a suicidal prisoner could be placed pending evaluation and transfer to the CTC. It was totally barren with no bed, toilet or sink, although there was a grate in the floor. The Ad Seg program consists of 10 hours of yard per week, in outside yards that are monitored over television screens and a gunner. The prisoners in Ad Seg also get access to law library and recreational books, which are brought to their cells. They can choose to have a radio or a television but, if the get a 115 disciplinary write up (for example, for refusing to double cell with another prisoner), their television can be taken away. The Ad Seg is configured as a straight row of cells—the 180 degree design, only one tier high. The cells are totally barren inside. There is a television, in the cells that have them, sitting on a makeshift stand. There are no shelves in the cells. The cells themselves are all concrete, including the bunks. The "yards" are completely caged-in, about the size of the cells in dimension. As our correctional escort acknowledged as we toured the unit: "These units are not good for the mental health of inmates, there is nothing for them to do or see."

228.    I also toured the E-1 Ad Seg unit, which has a "capacity" of 200—if all of the prisoners are double-celled—but currently holds 136. The unit sergeant explained that the unit has a heavy concentration of *Coleman* class members. He estimated that there were as many as 100 3CMS and 6 EOPs in the unit that day. The EOP prisoners are mixed in with the others,

---

[320] Coleman Pls.' Trial Ex. 93.

EXPERT REPORT OF PROFESSOR CRAIG HANEY, NOS.: CIV S 90-0520 LKK-JFM, C01-1351 TEH

[230542-1]

and none of the prisoners on the mental health caseload are housed in a special area or concentrated in any particular part of the unit. The unit roster indicated that some of the EOP prisoners had been in the Ad Seg unit since December, 2007, and others since February, 2008. I looked into the case of one of them in particular, Prisoner RR, who had been in the unit since December, 2007. He was described as having many mental health issues, suicide attempts, and behavior problems. Prisoner RR appears on the EOP Log with EOP level of care as of July 25, 2008. However, the MHCB admission log noted that he was admitted to the MHCB on March 27, 2008 from Ad Seg and was EOP level of care.[321] During his four admissions to the MHCB listed on this log over the past few months, his level of care bounced back and forth between EOP and 3CMS, and during the seven months he has lived in the unit, he remained in this regular Ad Seg, rather than an EOP Hub where he would have received increased mental health care.[322] Yet, as the unit sergeant explained, "these EOPs have been endorsed for hubs and they are just sitting here waiting for a bed somewhere in the system." There were holding cages along the side of the unit floor that the sergeant told us were used for individual clinical appointments as well as for other purposes (that included disciplinary cases). The sergeant explained that there had been treatment cages recently placed on the dayroom floor but then removed; he did not know whether new cages would be placed there later. In fact, if treatment cages are placed on the dayroom floor of this housing unit for group therapy sessions, they would not provide adequate sound or visual privacy to the prisoners participating in group therapy.

### (e)    Overcrowding in Housing Units

229.    As I noted earlier, despite the enormous size of the institution, SATF is plagued by overcrowding. It has more prisoners than it can properly house and, among other things, has had to convert gyms into dormitories just to hold them. In the makeshift gym dorm that I

---

[321] Coleman Pls.' Trial Ex. 100.

[322] Joint Pls.' Trial Ex. 9.

toured in A Yard, I saw what has become an all too familiar scene inside California prisons—more than a hundred men sitting in or milling around their open bunks, with little or nothing to do. The floor officer in this makeshift gym dorm did not know how many prisoners in the unit were on the mental health caseload or who they might be. I noted that the unit was relatively clean and quieter than some other gym dorms I have seen. The officer explained that this is because the unit is reserved largely for short-termer prisoners who are about to parole. He said, "we don't want any problems, so [we tell them] keep your bed clean, do your classes or whatever, and don't make waves." A prisoner in the gym, Prisoner SS told me that he has been diagnosed with bi-polar disorder and is 3CMS. He has made three requests within the last month to have his medication changed, but nothing has happened. He said that he is feeling very depressed. Although he sees a psychologist once a month, he has not seen her yet this month. In any event, he said, that is the full extent of the treatment he receives.

230.    In another makeshift gym dorm that I saw at SATF—this one in B Facility—the prisoners are triple bunked. There are 140 men in this gym dorm, which is a little less clean and not as quiet as the previous one. The officer on the floor explained that this dorm, too, is intended for short-termers although "we sometimes end up with guys on long-term." One of the sergeants in the unit, told me: "I don't like the housing here, I don't like to keep people in the humidity. The environment is bad here. I'd like to see the day when we can use a gym as a gym. But I guess that's just me." He noted that, in addition to complicating the supervision of the unit, it strains the infrastructure (toilets, etc.) and, the increased number of people in the unit means that it gets much hotter during the summer months

231.    While in the B Facility gym dorm, I interviewed Prisoner TT who told me that he had had serious mental health problems on the street, where he took Seroquel, Prozac, and Elavil, and had been an EOP prisoner in his prior term of incarceration. He said that he was having mental health problems at SATF, but that the staff was unresponsive and unhelpful to his many requests: "I'm not getting any help. I'm a Level I, I have only 6 points—I need help before I get out next year. If I get out with these problems, I'm going to be in trouble." He reported to me that when he arrived at SATF he was placed in the Substance Abuse Program

on Facility F or G, but he was praying out loud and officers sent him to the mental health crisis unit. When he left the crisis unit, he was sent to the B Facility gym dorm. Prisoner TT became agitated during the interview and expressed concerns about custody procedures in the gym dorm, including the fact that he is placed in handcuffs when he sees his case manager during clinical appointments. He reported that he was refusing clinical care because of the way he was being mistreated. I spoke to the Acting Chief Psychologist about my concerns regarding this prisoner's level of care and his continued housing in the overcrowded gym dorm setting.

232. In addition to makeshift gym dorms, SATF has makeshift dayroom housing on a number of units. I toured housing unit E-4, which has 20 extra bunks arranged on each side of the unit dayroom. I was told the same arrangement exists in E 2, 3, and 5. Prisoners live out in the open, with little or no privacy, in cramped quarters that are in full view of the others in the unit. One of the floor officers told me "this is bad. I never thought I'd see the day. I've been in the system 16 years, and I never thought it could happen." The added number of prisoners in the unit made it more difficult to supervise, taxed the infrastructure (due to overuse of toilets and the like), and made the unit hotter in the summer months "with so many extra bodies in here." Although all of the prisoners who have been placed in the dayroom bunks are lower custody, The floor officer explained that "3CMS inmates are all over the place. Their mental health status is not part of the decision about whether to house them in the dayrooms."

233. I interviewed one of the prisoners housed in the unit, who has been endorsed for transfer to an EOP program since April 2008 but has been delayed due to "no beds", and will be released from prison in a few months – November 20, 2008.[323] Prisoner UU, who is currently at EOP level of care, has been in the CDCR for the last three years and has been waiting more than three months to transfer to an EOP program.[324] The reason provided by the

---

[323] Coleman Pls.' Trial Ex. 93.

[324] *Id.*

prison for his delayed transfer is "no beds."[325] He reported a history of suicide attempts, including a suicide attempt by hanging at Soledad, another where he attempted to cut his neck at Wasco, and one at SATF where he cut his arm. He was previously treated at the California Men's Colony at San Luis Obispo as an EOP and recalled that he got one-to-one counseling, groups, and participated in a much better program. But now, he said, "I'm getting nothing in here—a social worker who does nothing sees me once a week, I get no groups, no nothing." He indicated that he has been asking to go to Mule Creek, to take advantage of the programming there, but "they won't send me." He has been admitted to SATF's CTC for suicidal ideation three times since March 29, 2008.[326] He explained that his last crisis bed admission occurred when "they forced me into the triple bunked gym, no matter what. I had a 'no triple bunk' order which they ignored. I've also been forced into double-bunked dayroom housing, even though I'm an EOP. Each time I've been forced into these dorms, I start to lose it."

234.    I also toured C Facility at SATF, which had been on lockdown status since Friday (three days before the tour). Apparently, there was conflict on the yard and a large group of prisoners began fighting. The sergeant accompanying us indicated that this was regarded as a very serious incident and "we'll be down a while, much more than a week." He indicated that the 3CMS prisoners in this Facility "are all over the place, wherever there are beds." He also explained that, when a unit is in lockdown here, prisoners may be placed in restraints and taken to the clinic for the clinical contacts, assuming that there are enough custody staff to provide the needed escorts. Otherwise, there will be little or no movement anywhere. I toured several of the specific housing units that were on lockdown and, indeed, there was literally no movement occurring at all. As I passed through the units to observe the conditions, the prisoners who were locked down in their cells complained about the heat, the lights, and the inactivity.

---

[325] *Id.*

[326] Coleman Pls.' Trial Ex. 100.

235.   The severe overcrowding-related problems that plague the CDCR adversely

affect and undermine the quality of care that is afforded to *Coleman* class members in a variety

of ways and can accumulate to worsen a mentally ill prisoner's condition over time. This was

illustrated in the case of Prisoner VV whom I happened to interview at Mule Creek when I

toured there on November 2, 2007, and saw again at SATF during my tour of the CTC. I have

reviewed portions of Prisoner VV's central and medical records, including records that I

reviewed during the tour at SATF. At the time I saw him at Mule Creek, his level of care was

EOP and he had been identified with a development disability, hearing and vision

impairment.[327]   Prisoner VV had been transferred to Mule Creek from CMF-Vacaville's acute

DMH program on June 28, 2007. His DMH Discharge summary, dated the same day,

indicated that his level of care was EOP, he was hearing and vision impaired, and had a

developmental disability (DD2), as well as a diagnosis of Major Depression with psychotic

features.[328]   When he arrived at Mule Creek he was placed in Ad Seg and he remained there

for many months for safety concerns. I interviewed him in early November in the Ad Seg unit.

He continued to receive EOP level of care, and was evaluated by his treatment team on

November 20, 2007 and retained in EOP. However, by December 20, 2007, his level of care

had been reduced to 3CMS. Clinical notes after that period indicate that he appeared to have

some difficulty coping with this reduced level of care, especially because he had been told he

would be transferring to SATF, which was located far from his grandmother, who was a source

of emotional support to him. On March 27, 2008, he was issued a Rules Violation for mutual

combat, but during the report, he told the officer that he "wrote a suicide note stating that I was

going to create an incident on the yard that would cause the yard-gun C/O to shoot and kill

me."[329] He was evaluated for suicide risk and found to have a "high risk" and was admitted to

---

[327] Coleman Pls.' Trial Ex. 102.

[328] Coleman Pls.' Trial Ex. 102.

[329] Coleman Pls.' Trial Ex. 102.

[230542-1]