**EXHIBIT CC
PART 10**

there, Inmate III received no regular individual or group therapy while he was confined in the CTC. He said that he had never been taken out of his cell for mental health treatment of any kind; the staff "tell me that's not their job—just [do it] through the door." Because of his MHCB status, he also could not have social visits from outside the prison or receive canteen. A brief review of Inmate III's records in the CTC confirmed the basic facts that he relayed to me about his.

(v)    **Reception Center Problems**

317.    Wasco State Prison serves as one of the Reception Centers for intake into the CDCR for prisoners from a number of areas in Southern California. I toured the Receiving and Reception ("R & R") area of the prison, which is laid out virtually identically to the North Kern facility visited the day before. However, I was told that the Wasco R & R receives a larger percentage of parole violators compared to North Kern. I talked to a contract psychiatrist, Dr. Christina Golden, who was assigned to R & R at Wasco. She told me that she shared office space on the unit with a nurse, so typically tried to conduct more or less confidential psychiatric evaluations with prisoners by sitting outside the bars of the large holding cells where they were kept. She was very candid about the consequences of overcrowding and the lack of appropriate bed space at the prison, in particular at the CTC: "We do the best we can, but we put people in overflow all the time. We're desperate for beds."

318.    In her view, the situation certainly had not improved recently: "In the last two weeks, custody has been pulling its hair out because they do not have beds anywhere." Dr. Golden was equally candid about the challenges faced by clinicians who are doing screening in the R & R: "We don't really catch all the people who need 3CMS and EOP that come in—the psych screening is so brief. I don't really have records. [I] never have them before I see [a prisoner]. I've never seen a doctor's note or history on the courts' record—never—I just have a medication record—the rest is my clinical judgment."

319.    Dr. Golden also told me about a prisoner, Inmate JJJ, who entered the facility the day before, and whose case she thought illustrated some of these problems. Inmate JJJ had come in the day before acting strangely and was identified by custody staff as needing

-170-

immediate psychiatric attention. She interviewed him, without any paperwork that might have indicated his medication needs or prior mental health history. She immediately determined that he needed to be put on suicide watch in an appropriate MHCB. However, she also knew that this might be difficult to arrange. He was moved to a "dry cell," on the floor of the R &R unit, to await transfer to an MHCB. However, instead of being moved to an MHCB that day, where they could care for him, as he should have been, she said, Inmate JJJ remained in the holding cell in the R & R today. She told me, with much concern: "I just saw him. He shouldn't be here. A custody person has had to watch him." Then she added: "We are struggling here, trying to provide decent psychiatric care in a place like this, but it is really hard."

320.    When I went to look for Inmate JJJ, I found that he was being kept in a separate cell off the main rotunda area of R & R. There was blanket on the floor, but no bunk, mattress, toilet, or sink in the cell. Inmate JJJ was standing straight up in the middle of the cell, almost at attention, dressed in a suicide gown; he had urinated on the floor. A nurse's assistant, who was sitting outside his cell, holding suicide watch, confirmed that he had been like this for quite a while. Inmate JJJ had a fixed gaze and he would not make eye contact. He appeared to be completely unresponsive, virtually catatonic. The nurse told that he had been standing more or less motionless for hours and that, in fact, he had been in exactly this state when she had left him the day before: "his behavior hasn't changed." He clearly had not eaten—the food tray that sat on the bench behind him did not appear to have been touched. As I was trying (unsuccessfully) to talk with Inmate JJJ, and asking the nurse about his case, the mental health staff members who handle the CTC overflow showed up for the first time. When they arrived, Dr. Newton indicated to me that the "overflow staff should have been in to see him last night." The psychiatrist explained that, unfortunately, they currently had "no place to put him; we'll have to move someone" in order to make room for him.

321.    When I discussed Inmate JJJ's case with the Lieutenant, who oversees R & R, he acknowledged the serious challenges his staff regularly faces in R & R. For one, he told me, they do not often have much information about individual incoming prisoners when they come off the bus. "When parole violators come in, there is no information with them. [The

diagnosed as suffering from schizo-affective disorder, but was housed with another prisoner who was not on the mental health caseload. They did not get along and it precipitated the cell fight for which Prisoner MMM now faces new charges. He acknowledged that the EOP program had improved some since he had been placed on it many years ago, when there literally "was nothing." Nonetheless, this EOP prisoner has been delayed in his transfer to an EOP program well beyond the required 60 days.

327.   I attempted to interview another Ad Seg EOP prisoner, Prisoner NNN. Because he refused to be escorted out of his cell by officers, I tried to speak with him cell front. It was impossible to do so. Prisoner NNN is an older prisoner who was disheveled, unkempt, and very troubled on the day I tried to interview him. He spoke a constant stream of words, as he sat on the top bunk in his cell and, although it was extremely difficult to hear him through the Plexiglas covering on his cell door, he seemed very upset and totally incoherent. One of the floor officers on the unit told me that he does this all the time—that is, he sits atop his bunk and talks constantly but incoherently to anyone who comes by. The officer said Prisoner NNN never comes out of his cell, does not go to yard, and he was not sure whether he ever showered. I was told that Prisoner NNN had refused to sign the conditions of his parole when he was last released from prison, which resulted in his parole being immediately violated. This EOP prisoner arrived at the reception center on November 28, 2007, but no explanation was provided on the prison's EOP log for his transfer delay of more than seven months.[377]

328.   At the end of the day, I conducted interviews with three additional prisoners, outside of the Ad Seg unit. Prisoner OOO paroled out of Wasco Reception Center on June 24, 2008, while he was waiting to transfer to the DMH program at SVPP.[378] He returned to Wasco RC on July 3, 2008, as a parole violator, only 9 days later. He is currently an EOP who said he was taking Effexor and two other medications whose names he could not remember. Prisoner

---

[377] Coleman Pls.' Trial Ex. 163.

[378] Coleman Pls.' Trial Ex. 163.

[230542-1]

OOO seemed very well oriented and coherent at first, expressing his desire to be taken off the mental health caseload and to no longer be given medications. However, as our conversation proceeded, an elaborate set of delusional beliefs eventually emerged. He told me he had become suspicious and "paranoid of the COs in here, as well as the other inmates." As he continued, he described a set of personal concerns that involved underdeveloped genitals, other inmates and people on the streets who threatened and berated him because of this anatomical problem, and voices that told him to engage in homosexual acts and threatened him with gang rape. He said that when he tells the voices that they are not making any sense and that he wants them to stop, they simply get louder. Prisoner OOO was adamant that these experiences were objectively true, and was so frustrated by mental health staff member's suggestions that they might not be true, that he no longer wanted to see any clinicians. Prisoner OOO remains housed at Wasco State Prison without access to EOP or DMH level of care for which he was referred and accepted months ago.

329.    Prisoner PPP told me that he had come into CDCR in 1996 and subsequently had a number of short recommitments, due primarily to parole violations. He had been hospitalized in state mental hospitals in the past, including Atascadero for five months (during which time he was declared an MDO), and several others in Oregon, Washington, and California. He said that he was diagnosed with schizophrenia, and bi-polar, schizo-affective type. He takes Abilify and another medication for his anxiety. Prisoner PPP was placed on EOP status several years ago, and was an EOP prisoner when he returned to Wasco about 21 months ago. He was referred and accepted at DMH's program at SVPP on February 11, 2008, and is listed as #43 on the waiting list for a bed.[379] He has had many problems with his cellmates in the past, and gotten into fights with them. As a result, he has been on single cell status for approximately 14 months. However, he believes the social isolation is having an adverse effect on him: "I am finding it hard to talk to people—I feel like a vegetable."

---

[379] Coleman Pls.' Trial Ex. 163.

Although he tries to go to groups, he finds that he sometimes does not feel comfortable around others and has to return to his cell. Prisoner PPP said that he hears a single voice talking to him frequently; he acknowledged that it was talking to him in the course of our interview. He told me that he was referred to DMH about four months ago, but has continued to wait for his transfer to occur. He has been to the CTC here several times, for suicide attempts, and is eager to receive the treatment he hopes will be provided at a DMH facility. He said: "I got a lot out of Atascadero. I'm a program guy. I did a ton of programs there." But there are very few useful programs at Wasco. Prisoner PPP told me: "I've been here almost two years, getting stagnant. EOP 'program' here is only an hour and a half a day, at best. What do you do the rest of the time?" Although the groups here do serve the purpose of getting you out of your cell, he said, they mostly consist of watching movies. "I am just losing my mind here. I know I'm mentally ill, but I'm not getting better in here. I am becoming a vegetable in here." In Ad Seg, he noted, the situation was much worse. Despite being a "program guy," he had a hard time with the cages: "I couldn't handle the cages. I never got my head right in there."

330.    The next prisoner I interviewed at Wasco was Prisoner QQQ, a 24-year old man from Bakersfield who told me he had a 10th grade education. Prisoner QQQ said he was an EOP prisoner, diagnosed with schizophrenia, and hears voices that have been talking to him since he was about 11 years old. He was somewhat disoriented during our conversation and had difficulty remembering things (such as how long he was at his present institution, or the process he underwent when he first entered Wasco). The voices he hears bother him all night, so he cannot sleep. This means that he is often sleepy all day, too sleepy to go out to the yard. Prisoner QQQ has been to the CTC because he was going to hurt himself—something he told me he has done a number of times on the street, but he cannot remember when or how long he stayed there. He is waiting for a transfer to another prison—he thinks it might be Mule Creek, but is not sure of this. He appeared to be very psychotic and very depressed. Prisoner QQQ

{230542.1}

indicated that he will be released from prison in about a year. Prisoner QQQ was referred and accepted to SVPP on April 23, 2008, and is #107 on the waitlist.[380]

331.    Finally, I interviewed Prisoner RRR, who was very concerned about being placed in jeopardy for talking with me. He was convinced that some of the staff at Wasco were out to get him and that he was at risk. Prisoner RRR is a long-term prisoner in the California system, having done some 18 years in prison, and a total of about eight years in the SHU (at Tehachapi and New Folsom). He has been taking psychotropic medications for 25 years, and currently suffers from Hepatitis C, and is an SNY prisoner. He has heard voices in the past and, although he is classified as a 3CMS prisoner now (taking Zoloft and Zyprexa), has been on EOP status a number of times in the past, including being subjected to Keyhea orders. Prisoner RRR reported mental health problems because "I get no treatment in here—just meds—the psych tech doesn't even come by my door. They haven't offered me any groups... I get out in two months. They haven't helped me at all. I asked and was told that they don't have the resources here. But I've been in prison almost 15 years straight and I am going to have a hard time back on the streets." Prisoner RRR is due to be released from prison at the end of September.

### 3.    General Observations About the Impact of Overcrowding in These Facilities

332.    Below I summarize some of the numerous overcrowding-related problems that I encountered on these tours and interviews, ones that I either saw directly, heard staff members describe, or about which prisoners repeatedly and consistently complained.

### a.    Backlogs Due to Overcrowding

333.    There are troublesome and potentially dangerous backlogs at virtually every critical juncture in the mental health delivery system, whether they involve the flow of critical information (such as the forwarding of medical and mental health records), delays in the time it takes to make appropriate referrals and to transfer prisoners to their proper destinations (where

---

[380] Coleman Pls.' Trial Ex. 163.

[230542-1]

they would receive badly needed care and treatment), or the speed at which mentally ill prisoners are removed from inappropriate housing and units (whether they are Ad Seg, "bad beds," or holding cages). For example, a correctional counselor at CIM told me candidly that "the transfer process is not working as well as it should" and estimated that it was taking as many as 120 days for EOPs to move through the classification process and be sent to their proper destination. Other professional staff told me that they have "had EOPs in Ad Seg on my caseload for months. I know I'm not supposed to but I do." The same person later told me that "I've had EOP guys in Ad Seg for 6 months or more."

334.    These comments and my observations are representative of a system in overall crisis, one that cannot meet the court-mandated and agreed upon mental health transfer timelines. For example, in CDCR's monthly summary of mental health crisis bed referrals and transfers from the Chief of the Health Care Placement Oversight Program, Rick Johnson,[381] for June 2008, there were a total of 355 MHCB referrals of which only 52 were actually placed. A large number (303, or 85%) of referrals were "rescinded" by the referring clinician before Health Care Placement Oversight Program staff could locate an empty mental health crisis bed within CDCR. Approximately one-third of those rescinded were ultimately placed in a crisis bed at the prison where they were housed. However, over a third of the prisoners referred to an MHCB (114/303) waited an average of more than a week (8.46 days) before their referral was rescinded.[382] Those 52 prisoner/patients who were successfully transferred to an MHCB in another prison spent an average of nearly 10 days (9.33) awaiting transfer; with 40 days as the outer range for days waiting to transfer. Only 5 prisoners, less than 2% of those referred, were transferred to an MHCB within the required 24 hours.[383]

---

[381] Coleman Pls.' Trial Ex. 135.

[382] *Id.* at 8.

[383] *Id* at 2.

[230542-1]

### b.    Staff Shortages

335.    Every facility I visited suffered significant staff shortages of some kind—ranging from significant shortages of custody staff to a drastic shortage of psychologists, to the overuse of contract psychiatrists. In various ways, serious staffing shortages all translate into inadequacies in the mental health delivery system and, in some instances, an outright denial of needed and mandated mental health services. In many of the units this means that professional staff are doubling up on duties, performing more tasks than they should be called upon to handle, and managing far larger caseloads than is appropriate or effective. One psychologist at CIM told me "I can't keep up with everything. I've been doing too much. We hired new staff, but that hasn't helped." He also told me "in my opinion, we are doing about 50% of what we should be doing."

336.    The CDCR June 2008 system-wide staffing data corroborates what I saw and heard at the individual prisons I toured. With 440 mental health vacancies system-wide, representing 24% of the overall positions, more than 206 psychologist and 88 psychiatrist positions were vacant in June 2008.[384] A total of 80 of the psychologist and 38 of the psychiatrist vacancies were covered by registry, leaving significant missing staff in these critical positions.[385] Of perhaps greater concern is the revelation in the Special Master's review of the long-awaited workload study that CDCR's 2008-09 staffing requests (based on the workload study numbers) significantly underestimated the staffing needed to implement critical portions of the *Coleman* Program Guide requirements (for example, the EOP Ad Seg program, the RC EOP program, the RC EOP pre-release planning component and so on).[386] Furthermore, key tasks were omitted when determining staffing workloads, including central file reviews, frequency of case manager contacts, psychiatric review of the medical records and

---

[384] Coleman Pls.' Trial Ex. 91.

[385] *Id.*

[386] Coleman Pls.' Trial Ex. 64.

[230542-1]

so on. Finally, there were concerns expressed about key assumptions provided to the researchers upon which they based their calculations (including, for example, that only 30 percent of the 3CMS population were taking medication, although the actual percentage is approximately 80 percent.).[387] CDCR has now been tasked with revising the workload study calculations with the Special Master's critique in mind, to conduct reviews of the staffing needs twice a year, and to involve the *Coleman* experts in the process. Once the more accurate staffing needs have been calculated that provide for the implementation of the *Coleman* Program Guide, a more valid staffing augmentation can be determined for each prison, along with a calculation of the additional treatment and office space that will be needed to accommodate the much expanded clinical teams. In short, however, the actual clinical and custody staffing necessary to provide the mental health care required by the *Coleman* Program Guide is significantly greater than the existing budgeted levels; yet defendants have been unable to recruit and retain staff even to meet the budgeted levels. In my opinion, the serious deficiencies in office and treatment spaces I observed throughout the system are themselves an obstacle to ever achieving appropriate clinical staffing. The working conditions are terrible and there is no space, in any event, for more clinicians.

### c.    Space Shortages

337.    Although the specific kinds of staff shortages varied from place to place, and some facilities reported having nearly all of their budgeted positions filled (at least in one or another clinical category), shortages in space were widespread, generic, and severe. Each one of the facilities I toured was short of significant amounts of space needed to perform otherwise critical tasks and responsibilities. The shortages of offices were perhaps most obvious at (but certainly not restricted to) those facilities fortunate enough to have even near their allotted number of filled staff positions. And every prison had inadequate space in which to conduct treatment. In some units, prisoners had to be transported to other parts of the prison for

---

[387] *Id.*

[230542-1]

treatment—a time consuming and custody-staff intensive practice—because, as clinician after clinician told me, "we don't have any program space here at all." Even in facilities that had added new clinical staff to handle the mental health caseloads, space was at a premium. For example, the chief psychologist at VSPW told me that they expected their newly hired staff to increase the number of groups they could offer and reduce the long waiting lists but, "as far as space, we are literally crawling all over each other... We've been going through the prison inch by inch, looking at storage rooms, anything that is possible to use for mental health space." Indeed, clinicians and mental health clerical staff were literally operating out of converted visiting rooms, closets, and storage rooms. Storage spaces, benches sitting out in the middle of open dayroom floors, and chapels were being used as clinical "treatment" areas. Another clinician told me, "we don't have space to have the confidential contacts we need," and that fact was clearly and repeatedly evident in every facility I toured. These kinds of complaints were echoed again and again by staff members at every prison I visited.

338.   In many of the units I toured, the critical shortage of treatment space meant that prisoners were forced to draw unwanted, embarrassing, and potentially problematic attention to their mental health status, as they were taken out of their cells or from their housing units, sometimes to participate in group or individual counseling in full view of the rest of the prisoners on the unit. As one mental health staff member told me, many of the groups were being underutilized because "prisoners don't like the stigma."

### d.    Lack of Meaningful Activity and Treatment

339.   Idleness has increased at all of the prisons, presumably due to overcrowding and the fact that there are too few programming activities, jobs, escorts, and treatment opportunities for the number of prisoners at each prison. In some VSPW units, for example, women told me that they used to get out of their cells twice a day for programming, but that has now been cut to just once per day. Everywhere I went in the prisons I visited, most of the prisoners were in their cells during most of the day I was at the prison. The one exception to this was Mule Creek, where several of the large outdoor yards were being put to good use. But even there, prisoners complained widely about the lack of adequate programs (as opposed to recreation)

-181-

and the content of the programs they were provided. And, in any event, the prisoners at the other facilities did not fare nearly as well. In literally every prison I visited, large numbers of prisoners, many of whom were on the mental health caseload, were sitting or milling about, with no programs or activities in which to participate. This was most striking in the makeshift dorm or dayroom housing units—or the bizarre "caged-in" dayroom dorms at CIM—where a hundred men or women at a time were sitting atop or standing around their double or triple bunks. But it was true of the celled housing units as well, where there was typically little or no inmate movement or meaningful activity in progress.

340.    And the enforced idleness is even more profound—almost total—for the mentally ill prisoners who have been placed in the Ad Seg and SHU units. One CIM prisoner's comment was typical of what I saw and heard. He told me: "I just lay on my bunk all day long. That's all I do. I have group on Wednesday and Fridays—about how not to be depressed. Nobody else goes. You have to sit in a cage, with your handcuffs on. But I go for something to do. I am the only member of my 'group' sitting there in the cage." The numbers of such *Coleman* class members living under these severe conditions is substantial and periods of time that they spend there quite substantial. For example, the Health Care Placement Unit Information Report (dated June 20, 2008) shows that at SATF alone there are approximately 50 CCCMS prisoners who have been housed in Ad Seg for more than 200 days, several for over 1000 days.[388]

341.    In addition, the content of the therapy groups I observed or learned about in many of the units was frankly questionable. Many of the groups appeared to serve little more purpose than to get the prisoners out of their cells (not an insignificant goal, but hardly psychotherapy for seriously mentally ill prisoners). Thus, I watched two Ad Seg EOP prisoners at CIM stand side-by-side in their treatment cages for "group"—which consisted of watching the film "Mission Impossible." At another prison, *Coleman* class members told me they had

---

[388] Coleman Pls. Trial Ex. 57 at R10-14, R10-15.

recently watched "The Mummy" in one of the "group therapy" sessions. In fact, numerous prisoners told me that their groups consisted of little more than watching movies, and that they participated largely because this was one of the only ways that they could get out of their cells, however briefly and infrequently.

342.    Indeed, many of the prisoners I interviewed complained about the lack of real treatment at the prisons where they were housed. Although some said that they were getting contacts with the clinical staff (a number did not), they nonetheless felt that little was being done to truly help them with their mental health problems. In addition, however, a uniformly expressed complaint on the part of prisoners who were nearing release dates was that they had been given little or no preparation for their return to free society. One told me, "it's difficult to come into prison to begin with. But my mind has been off, and I haven't been thinking about reality, and still I got no real help here. So I'm trying to help myself, and I am proud of myself for doing that."

343.    Numerous prisoners complained about waiting to be transferred out of the reception center or waiting to go to another more appropriate program than they had been cleared for, and never being told why they were forced to continue to wait or when they would get the help they needed. And a very large number voiced complaints about their medication— for example; being abruptly taken off medication that they felt was effective, or being given heavy doses of medication that had such adverse effects that they stopped taking it.

e.    Use of Holding Cages

344.    The use of holding cages is rampant throughout the CDCR. Prisoners are kept in holding cages when they are awaiting transport or escorts, when they are waiting to see medical or mental health staff and, for some of them, when they are supposed to be receiving individual counseling (even in cages that sit inside a clinician's office) or participating in "group therapy" sessions (inside cages that are arranged in semi-circles). Some of the cages are small, many are in disrepair (with paint peeling in them), and most of them are dirty. Many of them lack seats, so that prisoners must engage in "group therapy" standing up, or a prisoner who may be in crisis and awaiting transport must manage to remain upright until his escort

-183-

arrives. In the hallway outside the infirmary at CIM an officer told me that they try to keep the prisoners who are waiting to see a nurse or doctor—and who, therefore, presumably have some sort of medical problem—"in the small cages no more than 4 hours." Inside the infirmary at CIM, a large group of about 10 Sensitive Need Yard prisoners or "SNY" (those who need to be separated from other prisoners because of special vulnerabilities or for other reasons) were sitting and standing together in a much larger cage—but still clearly a cage—waiting to receive medical help.

### f.    Overcrowded Housing Units

345.    As I mentioned earlier, many of the housing units in the prisons I visited almost defied description, and ranged from uncomfortable to uninhabitable. It should be noted that the so-called "bad beds" are pervasive in the CDCR; I myself literally saw many hundreds of them in my tours of just eight prisons. Even the prisoners who are housed in traditional cells have been double bunked in cells designed for one. One CIM prisoner told me that he has to lift his legs up whenever his cellmate uses the toilet in their small cell, because his legs otherwise hang over it. As inconvenient and uncomfortable as this arrangement is, this prisoner is more fortunate than most because he is in a cell.

346.    In discussing the dormitory housing units I saw on these tours, I have often referred to them as "makeshift" dormitories, to underscore the way in which they represent an exigent response to the prison overcrowding crisis. The dormitory housing units I saw were in spaces that were originally intended for other uses—first built as gymnasiums and dayrooms. They are not appropriate spaces for housing prisoners and, unlike other forms of dormitory housing in some other prison systems, they were not constructed with this purpose in mind. The converted spaces are highly problematic in a number of ways, including the sheer density of the housing; the impossibility of monitoring prisoner behavior (especially in the larger makeshift gymnasium dorms, but also on the dayroom floors where officer stations and sight lines that were designed for cellblocks are obstructed by the bunks); the inadequacy of the toilet and other hygiene-related facilities, ventilation, and heating and cooling systems (all of which entail converting and supplementing existing infrastructure in ways that cannot possibly

meet the extraordinary levels of use to which they are subjected); the lack of sufficient, dedicated recreational and programming space, accommodations for basic prisoner privacy needs, appropriate storage for prisoners' personal possessions, and so on.

347.    Despite the impermanent and makeshift "feel" of the units, large numbers of prisoners are spending many months and years housed inside the barely habitable spaces. Not only are many of these makeshift dormitories shocking to see—especially the huge "triple bunk" dormitories located inside gymnasiums—but such housing units are dangerous and degrading, and they are likely to take an especially severe toll on prisoners who have pre-existing mental health and medical problems.

g.    **Lockdowns**

348.    Lockdowns appear to me to be used in California prisons far more than I have seen (or heard of) being used in any other prison system in the country. They are particularly problematic when used on such a frequent or long-term basis. Prisoners in CDCR facilities are being confined to their cells, denied programming and recreational activity, and must eat all of their meals in their cells. Elsewhere in the country lockdowns are used as a last resort by prison systems that cannot control their prisoner populations any other way; in some California prisons (C Facility at SVSP, for example), they have become routine, a way of life. When lockdowns and similar modified programs are overused, as they are in California, in my opinion, they represent another clear indication that the prison system is in crisis. This is true in part because lockdowns usually prove to be highly counter-productive. That is, the increased frustration they generate often increases rather than decreases the very tensions and conflicts they are supposed to help alleviate, and they deepen antagonisms between groups (who blame one another for the especially harsh and deprived conditions under which they are forced to live). In the meantime, prisoners—especially those with pre-existing psychiatric conditions—suffer emotionally and psychologically.

349.    In fact, the former CDCR Chief Deputy Secretary of Adult Institutions, Scott Kernan, has attributed the extraordinary number of lockdowns and "modified programs"—as much as 1,435 days at one prison—directly to overcrowding. Crowded conditions lead to riots,

which produce long lockdowns that, in addition to subjecting prisoners to especially harsh conditions of confinement that raise tensions, also:

> ...deflect prison resources so that while correctional officers now must respond to the increased security concerns and maintain watch over an increasingly dangerous prison population, they are not able to assist [prison officials in] addressing the inmates' mental health concerns by escorting prisoners to appointments and providing access to yard.[389]

350.    I could not agree more. Yet I saw little evidence in the prisons I visited that this enlightened perspective had altered CDCR's overall sense of urgency about the magnitude of the overcrowding crisis it faces or decreased the willingness of individual wardens to continue to rely on lockdowns as an ill-advised strategy for managing prisoner conflict.

### h.    Impact of Overcrowding Effects on Quality of Mental Health Care and Suicide Prevention

351.    Because of the subjective nature of the experience of mental illness, it is sometimes difficult to precisely measure whether and how the quality of mental health care in a prison system has improved the overall mental health of prisoner/patients. This is one of the reasons that indirect but objective measures—staffing, program and contact hours, waiting times to receive appropriate levels of care, and so on—are typically relied on to estimate or monitor progress (or deterioration) in the quality of care provided. One obvious exception to this occurs when the subjective suffering associated with mental illness results in someone taking his or her life. Moreover, because of the extreme and tragic nature of suicide, it is regarded as a basic measure of whether and how well a mental health care delivery system is functioning. That is, whatever else such a system does, it should be reasonably effective at preventing its patients from taking their own lives. And, when it does not, it is possible to analyze the events that led up to the suicide, which may help to account for it having happened, and to learn what could have or should have been done to prevent it.

---

[389] Coleman Pls.' Trial Ex. 53 at 2 (Declaration of Scott Kernan).

352.    This is the logic by which the Special Master's annual "Report on Suicides" is
conducted. The information that it contains is revealing, and identifies some of the ways that
the overcrowding-related problems that plague the CDCR continue to severely undermine the
quality of mental health care provided. For example, the "Report on Suicides Completed in
California Department of Corrections and Rehabilitation in Calendar Year 2005"—the seventh
such annual report that has been written—was forwarded by the Coleman Special Master on
November 26, 2007.[390] The Special Master calculated the number of suicides in CDCR to be
43, 17 more than in calendar year 2004. Nearly three-quarters (72.1%) had a history of suicidal
behavior, fully 86% had a history of past mental health treatment. In addition, about a third
(32.6%) were housed in an ASU or SHU, and two-thirds (67.4%) were on the Mental Health
Services Delivery System caseload at the time of their death.[391]

353.    Indications of "inadequate treatment" (including "canceled appointments not
rescheduled, referrals not responded to, past medical records not reviewed, unsupported
diagnoses, non-compliance with treatment without reassessment, assignment to inappropriate
LOC, failure to provide five-day clinical follow-up, [and] failure to provide immediate CPR")
were present in three-quarters (74.4%) of the cases. Based on the longitudinal data provided in
the Report, it appears that the most recently calculated suicide rate—for 2005—is higher than
any previous year. Between 1998 and 2005, the suicide rate has varied somewhat, from a low
of 9.3 per 100,000 in 2000 to a high of 26.2 per 100,000 in 2005.[392]

354.    A number of the inadequacies in treatment that the Special Master identified
appear to be the direct result of the severe overcrowding-related problems from which the
CDCR continues to suffer. Thus, the failure to reschedule appointments, respond to referrals,
review medical records, reassess treatment compliance, employ appropriate levels of care, and

---

[390] Joint Pls.' Trial Ex. 61 at 1-2.

[391] *Id.* at 7-9.

[392] *Id.*

[230542-1]

conduct required five-day clinical follow-ups all represent the kind of poor quality of care that comes about in understaffed, overpopulated prison systems. In addition, the Special Master identified a host of other overcrowding-related problems that were likely to have directly impacted suicide rates. These included: the continuing failure of CDCR clinicians "to utilize information available in unit health records (UHRs) or central files (C-Files) or through custody referrals," which would have "alerted mental health staff... to inmates' relative potential for suicide;" "[f]ailure to screen inmates in confidential settings" which "limit[ed] the adequacy of information that clinicians were able to elicit when completing SRACs [Suicide Risk Assessment Checklist] and intake assessments of inmates on admissions or transfers to (particular) facilities; the "[u]ntimely administration and inadequate completion of SRACs...;" inadequate staff training "on procedures for the initiation and supervision of Keyhea orders and guardianships or conservatorships for inmates in need of such support;" and the failure of "clinicians to monitor suicidal inmates more closely and, where appropriate, aggressively refer decompensating suicidal inmates, especially those at Level III and IV custody levels, to DMH programs" and to provide "appropriate crisis-level care until such transfers to DMH programs can be achieved."[393]

355.    Finally, the Special Master identified another overcrowding-related problem that he concluded was directly implicated in a number of suicides in 2005. Specifically:

> The crisis in the availability of MHCBs [Mental Health Crisis Beds], which became evident in early 2005, led to the spreading use of "alternative" and supposedly "temporary" housing in Mental Health Outpatient Housing Units (MHOHUs), Outpatient Housing Units (OHUs), and a variety of other holding cells for suicidal inmates for whom no bed was available in an MHCB unit. Defendants' dependence on these alternative placements emerged as a factor in a number of suicides in 2005. In addition, an increasing failure by clinicians to refer inmates who were clearly decompensating and in need of treatment at more intensive LOCs contributed to several successful suicides in 2005.[394]

---

[393] *Id.* at 11-13.

[394] *Id.* at 11.

[230542-1]

*j*

356.    Although the Special Master's Suicide Report was based on data that were collected in 2005, I have reviewed the 2006 suicide report and more recent suicide data which indicate that the overall number of suicides in the CDCR has remained high. Moreover, and perhaps more importantly, many of the very problems to which the Special Master has pointed to in his Report as playing an instrumental role in these suicides in 2005 persist in 2008. In fact, the last one mentioned above—the crisis in available MHCBs—has become increasingly problematic, as I will discuss at greater length near the end of this report. In any event, the Special Master's analysis illustrates a clear nexus between overcrowding-related dysfunction, decreased quality of overall mental health care, and an extreme and tragic set of mental health outcomes.

### i.    Disproportionate Impact of Overcrowding on Vulnerable Parole Population

357.    Because they are among the most vulnerable *Coleman* class members, and are so significantly affected by the State's inability to manage the population, I would like to briefly but separately address the group of mentally ill prisoners who cycle back and forth from CDCR prisons to parole, serving short revocation terms for violations of parole. I am informed that these terms cannot exceed twelve months without a revocation extension, and generally average between three and four months. This means that this group of prisoners generally serves their entire revocation terms in reception centers. Documents drafted by the State that I reviewed estimate that more than 10,000 parolees with mental illness were returned to custody in 2005, and more than 6,000 of them are returned for minor or technical violations related to unmet mental health need.[395] The documents I reviewed also show that at any one time, out of the approximately 500 EOP prisoners backlogged in reception centers, some 200 of them are serving parole revocation terms likely related to their mental illness.[396]

---

[395] Coleman Pls.' Trial Ex. 51 at Exhibit A and B.

[396] Coleman Pls.' Trial Ex. 52 at Exhibit V.

[230542-1]

358.    Based on interviews I conducted with prisoners who were in precisely this situation at CIM and VSPW, and what I have learned about the parole system more generally in California, I understand that mentally ill parolees often do not receive meaningful mental health treatment when they are on parole. More specifically, these parolees often do not have access to appropriate psychiatric medications, or stop taking them as a result of lack of clinical supervision, and then often decompensate.

359.    Frequently as a result of their decompensation, many are returned to prison, often for technical or minor violations. Thus, many of the parole violations that return them to prison are directly related to their unmet mental health needs. When they return to prison, these vulnerable prisoners are then packed into overcrowded reception centers. There they find that their out-of-cell time is severely limited and, even with the beginning of the EOP RC program implementation, they receive little individual or group treatment. One of CDCR's senior clinicians stated in a declaration before the *Coleman* Court that: "In the overall inmate population, approximately 18% of inmates are in the mental health caseload. In the Reception Center population, an even higher percentage of inmates are in need of immediate mental health services at the time of arrival. Upon entry, inmates with mental health needs are often severely decompensated because they have not had access to mental health care resources, particularly medication management, in the community."[397]

360.    Based on my observations and my review of documents provided by Plaintiffs' counsel, I have concluded that mentally ill prisoners in reception centers are generally not receiving adequate mental health treatment. In addition, none of the prisoners I interviewed had received meaningful pre-release planning before they paroled. Especially for this group of vulnerable mentally-ill prisoners, the lack of meaningful pre-release planning virtually guarantees their return to prison. Indeed, it was typical for the prisoners in this population whom I interviewed to have multiple releases and revocations in a single year. Moreover, the

---

[397] Coleman Pls.' Trial Ex. 53 at 2:19-23.

[230542-1]

time that they actually spent on parole between release and revocation tended to be short, sometimes as brief as one day.

361.    In addition to being revoked for violations related to their unmet mental health needs, this group of prisoners also appear to receive extensions of their revocation terms for actions related to their mental illness, adding to the cycle of punishment without treatment for mentally ill prisoners in this overcrowded system. In these inter-related ways, they are doubly or triply affected by the overcrowding that plagues the CDCR and the adverse conditions and policies it generates.

362.    Indeed, these prisoners seem to be lost in a "population shuffle" or cycle of "catch and release" that is tremendously destabilizing and life-altering for them. Each time cycle through this dysfunctional system in this way, the probability is increased that they will become sicker, and that their illness will become harder to stabilize and manage.

### j.    Perniciousness of Overcrowding Effects

363.    Finally, as I have tried to show throughout this report, chronic overcrowding has such pernicious consequences in correctional settings in large part because it can impact so many levels and aspects of the prison environment. The closed nature of a prison environment means that its different parts are unusually interconnected, and problems that remain unsolved in part of the environment have a way of reverberating throughout the institution and even the larger prison system. Thus, even though my discussion of the eight institutions I visited focused on specific aspects of the overcrowding-related crises that each facility faced, I continued to be struck by how deficiencies in one part of the institution impacted the services that could be delivered in another area of the prison. The tours and interviews I conducted and the voluminous documents I reviewed all underscore the degree to which the chronic and severe problem of overcrowding in the CDCR is so widespread and its harmful consequences so interconnected that it does not translate to a piecemeal solution, despite the best efforts of the many individual custody and clinical staff members I encountered who were laboring mightily to overcome this insurmountable obstacle.

[230542-1]          EXPERT REPORT OF PROFESSOR CRAIG HANEY, NOS.: CIV S 90-0520 LKK-JFM, C01-1351 TEH