**EXHIBIT CC
PART 11**

**D.    The Only Remedy to the Continuing Constitutional Violations That Are Primarily Caused by Overcrowding is to Reduce the Population of the CDCR**

364.    In the *Plata* Receiver's recent report on overcrowding, he noted: "[O]vercrowding has been a way of life in the CDCR for twenty years."[398] I have been a direct witness to that fact. The overcrowding crisis that now consumes the CDCR and prevents it from discharging its constitutional responsibilities began decades ago. It was largely ignored by the Department of Corrections until a number of courts forced prison officials to at least acknowledge its presence. But the Department never fully addressed the magnitude of the problem or treated it with the urgency it deserved. CDCR continues to refuse to take decisive actions reasonably designed to bring about a solution or even "instituted any effective response to the worsening overcrowding crisis."[399] Instead, a culture of overcrowding has emerged in the system in which CDCR officials have gotten used to a certain level of "tolerable" overcrowding (that is, of course, intolerable to the prisoners and line staff who live within it). The CDCR has become accustomed to questionable practices (many of which I have detailed above) and to redefining the overcrowding problem in ways designed to normalize rather than solve it

365.    Now, however, the problem has reached truly crisis-level proportions. It has reached this point despite the Herculean efforts of courts and litigators and monitors and receivers and their associated staffs to require the CDCR to alleviate and resolve it. As the *Coleman* Court noted, although it has issued at least seventy-seven orders over more than eleven years directed at bringing California's prison mental health care system into constitutional compliance, "the system still falls woefully short of meeting the requirements of the Eighth Amendment."[400]

---

[398] Joint Pls.' Trial Ex. 26 at 8.

[399] *Id.* at 2.

[400] Coleman Pls. Trial Ex. 46 at 8.

[230542-1]

366.    Obviously, prison overcrowding is not a self-correcting problem. To the contrary, as I have tried to show, because of its wide ranging and profoundly negative effects, and the destructive dynamics they set in motion, overcrowding is a self-exacerbating problem that gets much worse if it is not aggressively made better.[401] All of the judicial tools and administrative techniques of which I am aware to effect institutional change have been tried and failed with this intransigent system save one—to force the direct solution of the problem by meeting it head on and in a comprehensive way. There are several reasons why no other solution, including ones proposed by the CDCR itself, are inadequate to the task of resolving this crisis.

367.    The first is the urgency of the problem itself, and the unacceptably time-consuming nature of alternative solutions.[402] The Defendants' own projection for providing adequate mental health care beds is 2013 without including the construction projects outside the responsibility of the Receiver. As I will point out below, even this seems unrealistic, given their inability to address the wide range of glaring inadequacies in this system over the last decade. In this context, however, it is fair to note that mentally ill prisoners in California have been subjected to inadequate or non-existent mental health care since long before the Court's order in *Coleman* and the attempts to remedy these problems began in 1995. It has been more than 10 years since these efforts began, and the CDCR is still not in compliance with constitutional standards. Now, under the best case scenario—one that does not necessarily have any better chance of succeeding than prior, similar projections—the class of mentally ill prisoners is being asked to wait many more years before the system can deliver the care to which they are constitutionally entitled. Institutional change in response to problems this

---

[401] A Federal District Court in Rhode Island understood this when it wrote: "[O]vercrowding must be confronted before it becomes uncontrollable. A delay under the present conditions can give rise to problems of staggering magnitude not the least of which could be serious riots and/or a medical epidemic." *Palmigiano v. Garrahy*, 639 F. Supp. 244, 258 (D.R.I. 1986).

[402] Coleman Plaintiffs' Trial Ex. 12.

massive and endemic cannot occur on such an incremental basis. In my opinion, this is not only an unreasonable response but also a dangerous one.

368.    The second reason that any remedy short of a prisoner release order is unlikely to succeed pertains to the track record and capacity of the CDCR to solve this problem through its preferred methods and in its preferred manner. The severe and chronic overcrowding that plagues the California prison system is so profound and systemic that it appears to have overwhelmed CDCR officials in charge of all administrative functions, undermining their ability to plan, initiate, and implement overcrowding-related program initiatives.  The CDCR and its institutions are so beset by the magnitude and multiplicity of the overcrowding-related challenges and crises that they confront on a daily basis that all they appear to be able to do is manage the prisoner population and respond to emergencies. Constitutional and professional standards and goals have fallen by the wayside, and so too has the capacity to anticipate the next round of overcrowding-related set of problems and plan to address it, let alone to effectively resolve the panoply of pre-existing overcrowding-related issues with which the Department is struggling.

369.    On October 29, 2007, for example, CDCR officials filed their final plan to address the serious shortfall of small management yards ("SMYs") that are necessary for defendants to be able to provide even the basic minimum of 10 hours a week of yard time for prisoners housed in administrative segregation units.[403] The plan was in response to a *Coleman* Court order to implement various measures, including the construction of these yards, in an effort to reduce the high rate of suicides in CDCR's administrative segregation units.[404]  The Court ordered that CDCR construct all of the necessary yards no later than the end of fiscal year 08/09.[405] However, CDCR's plan lists a series of reasons and excuses why they cannot

---

[403] Coleman Pls.' Trial Ex. 39.

[404] Coleman Pls.' Trial Ex. 45.

[405] *Id.*

[230542-1]

comply with the Court order and, thus, will not be able to provide prisoners in administrative segregation with even 10 hours a week of yard for several years.[406] In response to the Court's order to also maximize the existing SMYs while the shortfall is addressed, CDCR's plan stated that: "[t]he institutions do not currently have sufficient escort and security staff to expand the Administrative Segregation Unit Yard Program beyond the hours currently offered."[407]

370.    Moreover, I have reviewed documents indicating that, on the very day that the defendants filed their plan, they also submitted a request to the Legislature to reduce the scope of their small management yard (SMY) project to construct 80 (SMYs) for prisoners housed in administrative segregation units at Mule Creek, Solano State Prison, Wasco State Prison and RJ Donovan. The request informed the Legislature that the change in scope would postpone the construction of 20 SMYs at Solano State Prison and revert $395,000 dollars to the budget.[408] This kind of delay—here for construction of 20 small management yards—when the CDCR has been ordered to build a total of 1,162 additional such yards does not bode well for its ability to comply with the *Coleman* court's order to complete the construction by the end of Fiscal Year 2008/2009."[409]

371.    Finally, the CDCR's proposed solution of incrementally increasing the system's capacity by adding new facilities and additional staff, and doing very little else, not only is expected to take far more time than this urgent problem permits, with much uncertainty surrounding the CDCR's capacity to deliver on even its own distant projections, but the very

---

[406] Coleman Pls. Trial Ex. 39 at 3 (Defendants' Plan states that they cannot comply with the Court Order to complete construction of all 476 SMYs by June 30, 2009, for the following reasons that include: the absence of any viable mechanism for funding the project in the current budget year, the existence of various statutory code sections that will delay the funding, bidding and approval of plans, and long procurement periods for obtaining the necessary materials ranging from 23 weeks for fabricated enclosures to 33 weeks for steel toilets and locks).

[407] Coleman Pls. Trial Ex. 39 at 3.

[408] Coleman Pls. Trial Ex. 107.

[230542-1]

nature of approach is inadequately conceived. As jail and prison construction began in earnest in the late 1980s and early 1990s, most scholars understood that correctional systems could not build their way out of the overcrowding problems they faced. For example, as two well-known experts noted, "projections show that such construction will not alleviate crowding if past trends in incarcerative policies and crime rates continue."[410] They were right.

372.    Indeed, if the last two decades of experience in California have proven anything, it is that the overcrowding crisis cannot be remedied through prison construction programs. The *Plata* Receiver is correct when he argues that: "[D]espite spending billions of dollars on construction, the level of overcrowding in California's prison system has not decreased; despite waves of prison expansion overcrowding has now reached crisis levels... By 2007, 19 institutions were at or above 200 percent of [capacity]. To summarize, despite massive waves of construction, prison overcrowding has grown worse in California."[411]

373.    Perhaps even more pointedly, there is evidence that the worsening prison overcrowding crisis has had a corresponding effect on the quality of mental health care afforded *Coleman* class members. In his May 31, 2007 Report to the Court, the Coleman Special Master concluded that "nearly 12 years after the determination that mental health service in CDCR were egregiously unconstitutional, hundreds certainly, possibly thousands, of CDCR inmates/patients, all members of the Coleman class certified in the early 1990s, are still looking for beds at the level of treatment their mental health requires."[412]    More than a year

---

[409] *Coleman* Docket 2644 at ¶ 2 (Order re Small Management Yards).

[410] H. Pontell & W. Welsh, Incarceration as a Deviant Form of Social Control: Jail Overcrowding in California, 40 *Crime & Delinquency* 18-36 (1994), at 19. Further, as they also noted: "There also is a long time lag between current problems and the potential opening of new facilities. There is also no guarantee, nor any body of systematic scientific evidence, that shows that when such new facilities are opened they will solve the overcrowding problem" (at 32).

[411] Joint Pls.' Trial Ex. 26 at 9.

[412] Joint Pls.' Trial Ex. 35, at 9.

[230542-1]

later, that still appears to be the case. In fact, the situation appears to be worsening, not improving, in a number of respects.

374.    Several charts prepared at my request and under my supervision illustrate some of the important dimensions along which the treatment of *Coleman* class members has deteriorated in recent years. For example, as Chart 1 illustrates below, the average number of days that inmate/patients must wait before being transferred to a mental health crisis bed (MHCB) has actually increased, from 1.67 days waiting in November, 2006, to an average of 9.33 days waiting in June, 2008. The maximum number of days an inmate/patient spent waiting reflects a similar deterioration in the standard of care. Thus, the longest wait that an inmate/patient experienced in November, 2006 was 6 days; by June, 2008, that waiting time had increased to 40 days.



(Chart 1)[413]

---

[413] Compilation of data found in Coleman Pls.' Trial Ex. 119-135.

[230542-1]

375. Chart 2 illustrates a similar worsening pattern in the access to mental health care over time. Thus, the total number of persons referred to an outside MHCB has increased very significantly over time, from 85 inmate/patient referrals in November, 2006, to a total of 355 in June, 2008 (suggesting, among other things, a deterioration of the quality of care afforded to inmate/patients at a lower level of acuity). Nonetheless, despite this significant rise in the number of total referrals (from 85 to 355 over a less than 2-year period), there was no consistently corresponding or proportionate increase in the number of inmate/patients actually transferred. For example, in April, 2007, when "only" 101 inmate/patients were referred for MHCB placement, a total of 50 were actually transferred. In June, 2008, nearly the same number of transfers occurred (52), despite a much larger number of referrals—355.



**(Chart 2)[414]**

---

[414] Compilation of data found in Coleman Pls.' Trial Ex. 119-135.

[230542.1]

376.   Chart 3 illustrates, there has been no corresponding improvement in the number of prisoner/patients on the Acute Psychiatric Program waiting list. After a low of 14 inmate/patients on the waiting list for admission to the Acute Psychiatric Care Program, that number has risen to 52 inmate/prisoners—those who are presumably the most psychiatrically disturbed in the system—waiting for the appropriate level of care.



(Chart 3)[415]

---

[415] Compilation of data found in Coleman Pls.' Trial Ex. 109-118.

377.   Chart 4 illustrates the explosive growth in the waitlist for the DMH operated

Salinas Valley Psychiatric Program (SVPP) from September 2007 to July 31, 2008.  The

number of inpatient DMH beds available in SVPP is 176; the number of patients on the June

2008 waiting list now approaches this same number.



(Chart 4)[416]

378.   Thus, as I say, as the overcrowding problem in general has intensified in the

CDCR, the quality of mental health care afforded *Coleman* class members has been

corresponsingly and negatively affected. It appears to have worsened rather than improved.

## IV.   CONTINUING CONSTITUTIONAL VIOLATIONS THAT ARE PRIMARILY CAUSED BY OVERCROWDING SHOULD BE REMEDIED BY OVERALL POPULATION REDUCTIONS TO BETWEEN 100-145% OF CDCR'S DESIGN CAPACITY

379.   Because CDCR is an enormous and enormously complex system, there is no

simple formulaic method for determining the precise reductions in the size of its prisoner

population that will eliminate the continuing constitutional violations that are primarily caused

by overcrowding. Instead, I believe that a range of reasonable goals can be established, ones

---

[416] Compilation of data found in Coleman Pls.' Trial Ex. 65-78.

[230542-1]

based on the most intelligent and informed estimates, reliable data, and appropriate, meaningful parameters. These goals can and should be adjusted as the nature and magnitude of the constitutional violations are continually monitored and assessed.

380.  As a starting point for establishing the range of reasonable goals, let me begin with what was once understood to be collective correctional wisdom (rather than an expedient approach to a largely politics-driven problem). As I mentioned earlier in this report, until the massive overcrowding crises that befell correctional systems in the United States beginning in the mid-1970s, most correctional scholars, experts, and administrators viewed prisons as dangerously overcrowded when they began to approximate 100% of their design capacity. The wisdom in this view was based on several commonsense assumptions. The first was that prisons were virtually always designed sparsely, from very basic and minimalist perspectives and premises, so that a prison that was reaching 100% of its capacity really was pushing against the limits of the number of prisoners that it could safely and humanely hold. In a related way, prison design traditionally maximized housing capacities and minimized space allocated to programming needs, opportunities, and demands. Thus, when a prison began to operate at near its rated capacity, there was typically little or no space available to pursue all but the most basic programming options. A prison administration that wanted to preserve at least some of its programming possibilities knew that those options would be all but foreclosed as its institutions neared 100% of capacity. In addition, correctional administrators, especially, knew that they were likely to face a number of unexpected contingencies and challenges, and that they would need at least some flexibility—to move or separate prisoners in response to conflict or confrontation, to accommodate to the special needs of a changing inmate population, or to address any one of a number of other unforeseeable but inevitable demands— that had not been factored into an original design capacity.

381.  Aside from the way that the overcrowding crises of the last several decades has forced administrators to accept the unthinkable, nothing has changed to undermine that earlier view—namely, that a prison that is approximating 100% of its design capacity is beginning to place its staff and inmates at risk. With this in mind, I see no reason why a proposed range of

-201-

goal-based remedies for what are significant and chronic constitutional violations should not at least begin with what once was regarded as the outer limit of acceptability, albeit, in this instance, as a concession to exactly how dire a situation has been allowed to come about, set as its most ambitious goal.

382.    How then to set the <u>maximum</u> allowable population? Fortunately, there is an existing estimate that has been proffered by informed analysts that I believe provides a useful (albeit very conservative) outer limit. The Corrections Independent Review Panel that was appointed by Governor Schwarzenegger undertook an analysis of the various ways that an acceptable CDCR "capacity" could and should be defined and established. Entirely consistent with the observations that I have made throughout this report, the panel concluded in 2004 that the overall population of male prisons in the state "exceeds a safe maximum, and individual housing units in some prisons are so severely over-crowded as to be at a crisis stage."[417] As part of its work, the panel convened a group of experienced wardens to determine what they termed the "Maximum Operable Capacity" (MOC) of the prisons system—the percent of design capacity at which a "prison can be operated both safely and can provide programming for every inmate, consistent with the inmate's ability."[418] The "programming" that was contemplated in calculating the MOC included educational, vocational, substance abuse, and other rehabilitation programming. It explicitly did <u>not</u> take into account the kind of programming that would be required to provide constitutionally adequate mental health and medical treatment.[419]  Nonetheless, the Panel concluded that the statewide MOC for male prisons was 145% of design capacity.[420]

---

[417] Joint Pls' Trial Ex. 4 at 124.

[418] *Id.* at 161.

[419] Coleman Pls'. Trial Ex. 108 at 113, l. 15-17.

[420] Joint Pls' Trial Ex. 4 at 124. Design capacity was determined to be 76,879 inmates at that time. *Id.* On January 25, 2007, the Little Hoover Commission issued a report updating the design capacity to 83,219. Joint Plts. Trial Ex. 3 at 19.

EXPERT REPORT OF PROFESSOR CRAIG HANEY, NOS.: CIV S 90-0520 LKK-JFM, C01-1351 TEH

[230542-1]

*j*

383.   The Corrections Independent Review Panel's estimate assumed several other things. Thus, the use of all "bad beds" would have to be ended, so that adequate program space would be available. Of course, it also assumed that, in addition to available space, there would be "staff with requisite experience" provided to manage effective programming.[421] Indeed, the Panel noted that the CDCR estimates of appropriate staffing "packages" that were operative at that time needed to be updated "to reflect position reductions, redirections, accommodations for 'overcrowding,' court decisions and other mandates that have affected staffing allocations."[422] Moreover, as I noted above, the Panel's estimate of an MOC did <u>not</u> specifically contemplate, take into account, or attempt to calculate the <u>additional</u> space and staffing levels that would be required to provide constitutionally adequate mental health and medical care.

384.   In fact, of course, there is every reason to believe that the necessary space and staffing levels needed to provide constitutionally adequate mental and medical are truly substantial. That is certainly my own judgment; it is the very clear conclusion reached on the basis of the observations and analysis I have detailed in much of this report. It also reflects the judgment of numerous other independent experts who have evaluated, analyzed, and monitored the CDCR.[423] In fact, although I have not attempted to provide a quantitative estimate of the extent of the shortcomings—in space and personnel—that plagues the CDCR in this regard, the *Coleman* Special Master has done so. Specifically, he reported to the Court on May 31, 2007 that: "Given the inadequacies of programming space, program beds and mental health staffing, it is clear that a significant portion of the MHSDS caseload is not receiving the necessary mental health services...defendants cannot meet at least a substantial portion, amounting in

---

[421] Joint Pls' Trial Ex. 4 at 161.

[422] *Id* at 126-27.

[423] Those numerous experts include, as I noted earlier, in addition to the Corrections Independent Review Panel, members of the Little Hoover Commission and the CDCR Expert Panel.

[230542-1]

some loose amalgam to about 33 percent, of acknowledged mental health needs with current staffing resources. Insufficient intensive mental health treatment beds and a chronic lack of programming space for mental health treatment contribute further to defendants' inability to meet required mental health services."[424] This quantitative estimate of the current shortfall brought about by inadequacies in space, beds, and housing—fully a third of mental health needs unmet—suggests that the magnitude of the incremental needs ignored in the Panel's estimate of maximum operable capacity is substantial.

385.    When these crucial mental health and medical treatment needs are taken into account—as they must be in any calculation aimed at addressing the primary cause of these continuing constitutional violations—then the appropriate percentage for maximum operable capacity would certainly be lower than the Panel's and wardens' estimate of 145%. Thus, in this important sense, a limit of 145% of design capacity can only be regarded as a very conservative estimate of the MOC, and seems an appropriate figure to establish as the outer limit or maximum capacity in a range that is intended to eliminate the constitutional violations that are at issue here.

386.    There is another reason to regard the Independent Review Panel's estimate of a viable MOC as a very conservative outside limit. Specifically, it is based on the judgments of a group of experienced California wardens, many of whose own perspectives on "Maximum Operable Capacity" were likely forged in a system in which a certain amount of institutionalized acceptance of overcrowding has occurred. I note, for example, that the *Plata* Receiver described what he called "CDCR's institutionalized acceptance of overcrowding and the lowering of correctional standards to accommodate overcrowding."[425] In fact, the Receiver documented not only the decades of prison overcrowding in California but also the parallel

---

[424] Joint Pls' Trial Ex. 35 at 12-14.

[425] Joint Pls' Trial Ex. 26 at 10.

[230542-1]

evolution of "a correctional mindset that allows *overcrowding* rather than *sound correctional management* to drive crucial construction and prisoner management policy."[426]

387.   Moreover, the Receiver identified the same failure to take medical, mental health, and dental care programming needs into account in the CDCR's Facility Master Plans (spanning 1993-2003) as was reflected in the Corrections Independent Review Panel's report. As he put it: "All the plans focus on corrections, as if medical, mental health, and dental care have no place in prison design, prison construction, or prison management."[427] In fact, the Receiver found that the acceptance of overcrowding was institutionalized to such a degree in CDCR management that it knowingly planned construction of even its newest prisons to provide at most fifty percent of all health care related space needs, "ignoring pre-existing plans to double-cell the prison up to 200 percent of capacity."[428] These facts suggest that the Maximum Operable Capacity would actually have been quite a bit lower than 145% if the Corrections Independent Review Panel had taken these critically important needs into account.

388.   At a minimum, then, using the Panel's estimate of 145% as a very conservative outside limit, remedial steps should be taken to reduce CDCR's prison population to its viable, defensible maximum operable capacity. This would mean that all bad beds must be eliminated,[429] sufficient program space must be identified and made available, and the number of inmates not to exceed appropriate numbers of available, qualified staff to provide necessary programming. Necessary staffing must be calculated in such a way as to provide programming opportunities <u>and</u> sufficient custody/escort staff to enable that programming to occur. Indeed, it is not clear that, given the "serious staffing shortfalls" that continue to plague CDCR, its

---

[426] *Id.* at 10 (emphasis in original).

[427] *Id.* at 11. (emphasis in original).

[428] *Id.* at 20. Even the personnel, accounting, inmate records, procurement, receiving and release, and family visiting areas were built to accommodate only 130 percent overcrowding.

[429] This task, alone, will be difficult to accomplish. According to recent data, there are 13,791 "non-traditional" beds throughout the prison system. Joint Pls.' Trial Ex. 68.

prisons can possibly safely and humanely accommodate even 145% of capacity (much less the near-double capacity they now face).[430]

389.    Moreover, as I have suggested, a "maximum operable capacity" that provides for the constitutional delivery of mental health care must incorporate and take centrally into account the mental health treatment standards established by the *Coleman* Court. To parallel the Corrections Independent Review Panel's assumptions in this context, then, all "bad" mental health beds must be eliminated. For example, this includes reducing the population to eliminate the use of alternative crisis beds, EOP "overflow" housing that does not have appropriate space for individual or group mental health contacts, RC EOP housing for EOP stays greater than 60 days, and DMH units such as those currently run in SVSP D-5 and D-6 and CMF P-2 and P-3, which are not set up to provide care consistent with inpatient standards.

390.    Furthermore, the programming considerations of the Independent Review Panel must be expanded to reflect the requisite mental health "program" that is set forth in the *Coleman* remedy. Thus, adequate mental health programming space must be afforded under any defensible definition of the MOC. Moreover, whatever operable capacity is finally implemented must also be related to the number of mental health and custody staff in the prison system who are tasked with providing mental health care. For example, as I noted above, the Special Master found that current staffing cannot provide for roughly one-third of the prisoners with identified mental illness. Finally, the maximum operable capacity must also account for the intersection of space availability and staffing levels. This means, as the Receiver noted, California's long-standing policy of building "only to base staffing levels"—a policy that "has left the CDCR in crisis regarding the clinical space needed to provide constitutional levels of access to health care"—must be correspondingly changed.[431]

---

[430] "[O]vercrowding is accompanied by serious staffing shortfalls for both clinical providers and correctional officers." Joint Pls' Trial Ex. 26 at 11.

[431] *Id.* at 22.

[230642-1]

## V.    CONCLUSION

391.    Numerous previous court orders—most of which were issued a considerable period of time ago—and virtually every other approach to judicially-mandated institutional change of which I am aware have been tried and failed to solve this chronic (and in many ways, worsening) problem.  In my opinion, a carefully crafted prisoner release order is the only remedy that is capable of addressing this severe overcrowding crisis and beginning the process of finally solving the wide range of dangerous and debilitating problems it has brought about.

Dated:  August 15, 2008

*Craig Haney*

CRAIG HANEY

[230542-1]

APPENDIX A

*j*

## CURRICULUM VITAE

Craig William Haney
Professor of Psychology
Department of Psychology
University of California, Santa Cruz 95064

home address:      317 Ocean View Ave.
                   Santa Cruz, California 95062
phone:             (831) 459-2153
fax:               (831) 425-3664
email:             psylaw@ucsc.edu

## PREVIOUS EMPLOYMENT

| | |
|---|---|
| 1985-present | University of California, Santa Cruz, Professor of Psychology |
| 1981-85 | University of California, Santa Cruz, Associate Professor of Psychology |
| 1978-81 | University of California, Santa Cruz, Assistant Professor of Psychology |
| 1977-78 | University of California, Santa Cruz, Lecturer in Psychology |
| 1976-77 | Stanford University, Acting Assistant Professor of Psychology |

## EDUCATION

| | |
|---|---|
| 1978 | Stanford Law School, J.D. |
| 1978 | Stanford University, Ph.D. (Psychology) |
| 1972 | Stanford University, M.A. (Psychology) |
| 1970 | University of Pennsylvania, B.A. |

1

[232510-1]

*j*

## HONORS AWARDS GRANTS

2006    Herbert Jacobs Prize for Most Outstanding Book published on law and society in 2005 (from the Law & Society Association, for <u>Death by Design</u>).

Nominated for National Book Award (by American Psychological Association Books, for <u>Reforming Punishment</u>).

"Dream course" instructor in psychology and law, University of Oklahoma.

2005    Annual Distinguished Faculty Lecturer, University of California, Santa Cruz.

Arthur C. Helton Human Rights Award from the American Immigration Lawyers Association (co-recipient).

Scholar-in-Residence, Center for Social Justice, Boalt Hall School of Law (University of California, Berkeley).

2004    "Golden Apple Award" for Distinguished Teaching, awarded by the Social Sciences Division, University of California, Santa Cruz.

National Science Foundation Grant to Study Capital Jury Decisionmaking

2002    Santa Cruz Alumni Association Distinguished Teaching Award, University of California, Santa Cruz.

United States Department of Health & Human Services/Urban Institute, "Effects of Incarceration on Children, Families, and Low-Income Communities" Project.

American Association for the Advancement of Science/American Academy of Forensic Science Project: "Scientific Evidence Summit" Planning Committee.

Teacher of the Year (UC Santa Cruz Re-Entry Students' Award).

2000    Invited Participant White House Forum on the Uses of Science and Technology to Improve National Crime and Prison Policy.

[232510-1]

Excellence in Teaching Award (Academic Senate Committee on Teaching).

Joint American Association for the Advancement of Science-American Bar Association Science and Technology Section National Conference of Lawyers and Scientists.

| | |
|---|---|
| 1999 | American Psychology-Law Society Presidential Initiative Invitee ("Reviewing the Discipline: A Bridge to the Future") |
| | National Science Foundation Grant to Study Capital Jury Decisionmaking (renewal and extension). |
| 1997 | National Science Foundation Grant to Study Capital Jury Decisionmaking. |
| 1996 | Teacher of the Year (UC Santa Cruz Re-Entry Students' Award). |
| 1995 | Gordon Allport Intergroup Relations Prize (Honorable Mention) |
| | Excellence in Teaching Convocation, Social Sciences Division |
| 1994 | Outstanding Contributions to Preservation of Constitutional Rights, California Attorneys for Criminal Justice. |
| 1992 | Psychology Undergraduate Student Association Teaching Award |
| | SR 43 Grant for Policy-Oriented Research With Linguistically Diverse Minorities |
| 1991 | Alumni Association Teaching Award ("Favorite Professor") |
| 1990 | Prison Law Office Award for Contributions to Prison Litigation |
| 1989 | UC Mexus Award for Comparative Research on Mexican Prisons |
| 1976 | Hilmer Oehlmann Jr. Award for Excellence in Legal Writing at Stanford Law School |
| 1975-76 | Law and Psychology Fellow, Stanford Law School |
| 1974-76 | Russell Sage Foundation Residency in Law and Social Science |
| 1974 | Gordon Allport Intergroup Relations Prize, Honorable Mention |
| 1969-71 | University Fellow, Stanford University |

3

[232610-1]