# EXHIBIT   B

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

AND THE NORTHERN DISTRICT OF CALIFORNIA

--oOo--

| | | |
|---|---|---|
| RALPH COLEMAN, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | No. CIV S 90-0520 |
| | ) | LKK-JFM P |
| ARNOLD SCHWARZENEGGER, et al., | ) | |
| | ) | |
| Defendants. | ) | **CERTIFIED COPY** |
| | ) | |
| | ) | |

DEPOSITION OF

JAMES MARQUART, Ph.D.

October 3, 2008

REPORTED BY:  KAREN A. FRIEDMAN, CSR 5425    JOB # 413241

**MERRILL LEGAL SOLUTIONS**

135 Main Street, 4th Floor
San Francisco, CA 94105

(415) 357-4300 Tel

www.merrillcorp.com/law

1      Q.    What she's suggesting is, reserve parole for

2    high-risk offenders.  Is that something you agree with?

3      A.    Yes.  Because it is a scarce resource.

4      Q.    Let's go to your supplemental report.

5            So, you produced four graphs which compare the

6    rate of incarceration in California to the crime rate.

7    Right?

8      A.    Yes, sir.

9      Q.    And basically, you conclude that -- well, you

10   conclude, I don't know, it seems like you conclude that

11   you don't know whether the incarceration rate has an

12   effect on the crime rate.  Is that right?

13     A.    What I'm saying is, by showing those graphs,

14   one can easily conclude that, by golly, by locking up

15   all these people, we had a drastic reduction in the

16   crime rate.  One could tumble to that fact if we're not

17   careful.

18     Q.    Right.

19     A.    What I'm trying to say is that these charts

20   illustrate that something is going on that is related to

21   those two things, and they do intersect.  But I'm not

22   going to go to the wall and conclude that the observed

23   relationship is as simple as is depicted.  There could

24   be some other things that are going on that we're not

25   aware of.

1      Q.    Such as the age of the offender population;

2   correct?

3      A.    Right.   It could also be that the incarceration

4   of second strikers, third strikers, when you take those

5   people off the street, you're going to put a dent in the

6   crime rate.   Those are high-volume offenders.

7         So it could be that policies like that are

8   contributing to that decline.

9      Q.    But -- that started in the '90s, but the

10  incarceration rate was -- I mean three strikes -- was

11  somewhere in the '90s, I can't remember when.   And this

12  incarceration rate and the crime rate were on the same

13  path, all the way from 1980 something or other.

14     A.    Yes.   So something is going on within the data.

15     Q.    And as you saw, are you familiar with the

16  example of New York, that New York cut its number of

17  people in prison and its crime rate went down?   Are you

18  familiar with that?

19     A.    I read that in Mr. Austin's report.

20     Q.    Right.   What does that suggest to you?

21     A.    It's bizarre.

22     Q.    Did you also read in Mr. Austin's report --

23  well, do you have any reason to believe that that is not

24  correct?

25     A.    I think it's bizarre.   I mean, why would you

156

1    believe that any more than I would believe the

2    prosecutors are telling me the truth?

3        Q.    Well, because it's based on actual data.

4        A.    Like I said, it's, the finding is bizarre.

5    That's all I can say.  It's very, very --

6        Q.    And by "bizarre," you mean you don't believe

7    it?

8        A.    I have a hard time with that.  I would like to

9    check it out myself.  So what you're saying is --

10       Q.    It's not what I'm saying.

11       A.    What he said is, by reducing the prison

12   population you also reduced the crime rate.

13       Q.    No.  He said the population of the prisons went

14   down at the same time as the crime rate.

15       A.    I don't know how that could happen.

16       Q.    But if it did happen, what would it suggest to

17   you?

18       A.    I just don't know how that would happen.

19       Q.    You're an expert.  I'm allowed to ask you

20   hypothetical questions.  This is a hypothetical

21   question.  If you don't have the capacity to answer the

22   question, you can say that.

23            But the question is, assuming those facts are

24   true, what does that suggest to you in terms of your

25   opinions in this case?

157

1      A.    That something is going on.

2      Q.    But you don't know -- to paraphrase Buffalo

3    Springfield, you don't know what it is.

4      A.    I don't know about Buffalo Springfield, but the

5    idea of reducing the population and that it has a

6    subsequent, it lowers the crime rate, it doesn't even

7    make any sense.

8      Q.    Okay.  You've had his report for a couple of

9    months now, correct?

10     A.    Uh-huh.

11     Q.    You've had adequate time to go to the

12   Department of Justice website and the New York State

13   website and look at the data and figure out if the data

14   that he's talking about is true.  Right?

15     A.    I could have.

16     Q.    Okay.  You also saw in his report that when you

17   compare the incarceration rates and crime rates in

18   various states, you don't get a straight-line

19   correlation, either.  Do you remember that part of his

20   report?

21     A.    I believe so.

22     Q.    Do you think that's bizarre, too?

23     A.    I think it is.  It's strange.  How could you

24   have a declining population and a declining crime rate?

25     Q.    It might be because the incarceration rate

1   doesn't have that much of an effect on the crime rate.

2   Isn't that possible?

3       A.   It's a possibility.  We don't know.  The books

4   have not been closed on that.  The other thing is, if

5   you believe that, you might as well find that.

6       Q.   Pardon me?

7       A.   I said if you believe that to be the case,

8   that's in fact what you end up finding.

9       Q.   And you also know that Dr. Austin in his report

10  analyzed various counties and looked at the rate by

11  which they send, some of them send offenders to prison.

12  And then compared counties which have high prison rates

13  to the counties, to crime rate in counties which have

14  low prison rates?

15      A.   Yes.

16      Q.   They were all over the map.  In other words, it

17  didn't correlate; the counties that send the most people

18  to prison didn't have the lowest crime rate, did it?

19      A.   Yes, sir.

20      Q.   That also suggests the number of people you

21  incarcerate doesn't affect the crime rate, does it?

22      A.   Like I said, the research on it is not

23  concluded at this point.

24      Q.   But those facts do suggest that theory is true,

25  isn't that right?

159

1    A.    It suggests that particular theory; there is a

2    theory.  But as far as it being true, it's not, at this

3    point in time.  That's his opinion.

4    Q.    Well, it's also Dr. Petersilia's opinion, too.

5    She made the same point, didn't she?

6    A.    But if you look at the research at this point

7    in time, it remains inconclusive at this point.

8    Q.    And both of those people know a lot more about

9    California corrections than you do.  Isn't that true?

10    A.    She does, yes.

11    Q.    And Dr. Austin?

12    A.    He might, yes.

13    Q.    You say in your report, on page -- you can put

14    Dr. Petersilia's report away.  We're done with that.

15         Do you have your report in front of you?

16    A.    Yes, sir.

17    Q.    Okay.  On page 7, please.  You're on page 7?

18    A.    Yes, sir.

19    Q.    What a coincidence.  You say that "Parolees" --

20    this is at the bottom of paragraph 5.

21         "If parolees are not assisted in securing such

22    resources" -- and those are the resources we talked

23    about earlier this morning --

24    A.    Yes, sir.

25    Q.    -- "upon their release and while incarcerated,

160

1    their chances of success are dismal." Do you see that?

2        A.    Yes, sir.

3        Q.    We also talked about, this morning, the fact

4    that according to counties, they haven't been able to

5    obtain the financial resources they need to provide

6    these services to all the parolees, right?

7        A.    Correct.

8        Q.    Is the fact that the State isn't allocating

9    those resources basically a political judgment, that

10   they are willing to live with this level of criminal

11   activity?

12       MR. ANTONEN:  Objection.  Calls for speculation

13   on behalf of the expert, and it's also on a topic he's

14   not been designated to testify about.  To the extent

15   you're comfortable offering an opinion, go ahead.

16       THE WITNESS:  I'm not an expert on the

17   political climate of the state.

18       MR. SPECTER:  Q.  Right.  But if public safety

19   is -- I'll represent to you that I just deposed the,

20   someone from the Governor's office Wednesday.  He said

21   public safety was paramount in their mind.

22       A.    Uh-huh.

23       Q.    And if providing these services would enhance

24   public safety, which is what you believe -- correct?

25       A.    Yes, sir.

161

1    Q.    -- wouldn't you believe that an administration

2    that was concerned about public safety would fund these

3    programs?

4              MR. ANTONEN:    Objection, calls for speculation.

5              THE WITNESS:    I'm sure that public safety is on

6    the top of their plate.    And there's no denying that.

7    So I believe they're doing everything they can to

8    protect public safety.

9              But that's a political decision, as to who is

10   going to force them to unleash the resources.    What if

11   the resources are not there?

12   Q.    It's not a matter that they're not there.

13   They're just not allocated.    California has the

14   resources.    It's their choice to allocate them whichever

15   way they so choose?

16   A.    And that's a political decision.    That's up to

17   elected officials, to make that happen.

18   Q.    If they're not funding those programs, wouldn't

19   they be jeopardizing public safety, in your opinion?

20   A.    I'm not going to say that, no.

21   Q.    If they did fund the programs would they be

22   enhancing public safety?

23   A.    I would hope they would.    It's the same as this

24   chart over here.    Somebody could look at that chart and

25   say, "By golly, we need to lock up more people."    So I'm

162

1    sure they're trying to do the best they can in terms of

2    providing for public safety in the state.  But again,

3    it's a political decision.

4        And may I add that in our state, that -- which

5    is very similar to this case here -- the wolf was at the

6    door, just like this.

7        Q.    Who is the wolf?

8        A.    All of these issues: overcrowding, budget

9    issues, the whole nine yards.  It all came crashing

10   down.

11        But the legislators, all, everybody got

12   together and said "Enough is enough."  And that's what

13   it's going to have to take.  Who is going to push it

14   over the top?

15       Q.    So you mean after the court order came down,

16   everybody got together and developed a comprehensive

17   solution to the problem?

18       A.    They began working on it like that.

19       Q.    They didn't do it until there was a court

20   order, right?

21       A.    Not -- it took some fuel to get that done.  The

22   court order was part of it.  The public was tired of it.

23   All the rest of it played into it to build the proper

24   level of prison capacity in the state to lock up these

25   offenders.

1        Q.    And did they fund programs?

2        A.    I said they did, earlier today.  The budget of

3    the prison system doubled or tripled.

4        Q.    The programs, you mean?

5        A.    Right.  All the way across.

6        Q.    And what about parolees?

7        A.    Like I said this morning, they added projects

8    or programs to help these people reintegrate.  And one

9    of them is Project Rio, R-i-o, Reintegration of

10   Offenders, to help them find jobs in the community.

11       Q.    Okay.

12       A.    It doesn't happen overnight.  Like I said,

13   we're going to be in the grave before all this goes

14   down.  Okay?

15       Q.    So the way I see it is that -- the way I see

16   what you're saying is that prisoners shouldn't be

17   released, because there aren't enough reentry programs.

18   Right?

19       A.    I'm saying it would be good if we had those

20   programs online before they got out, yes.

21       Q.    Right.  But the, it's a political decision

22   whether to fund those programs, right?

23       A.    That's correct.

24       Q.    So if the State continues not to fund those

25   programs in a sufficient amount to deal with the parole,

164

1    to deal with the prisoners, should the prisoners stay in

2    prison?

3        A.    Well, that's what elections are for; vote them

4    out.  That's what this country is, it's a democracy.

5    Whether we like it or not; if you don't like it, vote

6    with your feet.  Go to the ballot box and vote these

7    people out of office.

8              Using the court as a back door or a

9    sledgehammer to get it done, it can be done.

10             But either way, like I say, we're going to be

11   dead before this all transpires.  And I know that

12   doesn't make you happy, but those are the facts.

13       Q.    What doesn't make me happy is the fact that

14   there are unconstitutional conditions, because of the

15   overcrowding.

16             MR. ANTONEN:  Objection.  The plaintiffs

17   haven't proved it as the primary cause.  Don, that's

18   being litigated before the three-judge panel.

19             MR. SPECTER:  Thanks, Charles.  I'm really glad

20   you told me that.

21             MR. ANTONEN:  You're welcome, Don, you're

22   welcome.

23             THE WITNESS:  I'm not trying to be a smart

24   aleck.  Believe me, I'm not.  I respect your position, I

25   respect what you're trying to do.  Believe me.  I have

1    utmost respect to your position.

2            MR. SPECTER:  Okay.  I appreciate that.

3            THE WITNESS:  And I'm not disrespecting you or

4    trying to be flippant or play with you.

5            MR. SPECTER:  I don't take it that way.

6            THE WITNESS:  I'm basing my opinions on what

7    transpired in a large state that parallels what happened

8    here.  Because the people in our state wanted to do

9    exactly what you're talking about here.

10           Could we fix this and do it within a reasonable

11   amount of time?  But we both know that legal

12   institutions and political institutions probably have a

13   different frame of reference, and they operate

14   differently.  And I'm not being condescending.

15           MR. SPECTER:  And I don't take it that way.

16           THE WITNESS:  I just wanted you to know that

17   I'm not jacking with you.

18           MR. SPECTER:  I appreciate that.

19   Q.    So in the best of all possible worlds, assuming

20   for the sake of argument that crowding is the cause of

21   constitutional violations, you wouldn't have any

22   objections to releasing the prisoners if the programs

23   were in place?

24   A.    I would not have any objections if the cell

25   space was -- more cell space was brought online -- that

Merrill Legal Solutions
(800) 869-9132

1   the programs were brought online.

2          That the programs were brought online, not only

3   in terms of the parole system, to supervise them

4   effectively.  Because at the end of the day, we don't

5   want them to return.  And that the programs were online

6   in these counties, that if somebody needed

7   substance-abuse help, or they needed help managing their

8   money, or they needed a house instead of living under a

9   bridge, that all that stuff was put online to help these

10  people.  Because we want to make a difference.

11         Right now, as the documents say, the recidivism

12  rate is 50 to 60 percent, without any programing.  So

13  why would we want to release these people without any

14  programing and 50 to 60 percent of them are going to

15  come back?  It doesn't make any sense.

16         So why don't we try to do something as we're

17  beginning the advance releases -- you have to do all

18  this at the same time.  I'm not saying we've got to wait

19  eight years for the programing to come online.  Maybe

20  there's something in the interim that we can do.

21     Q.   What?

22     A.   I don't know.  Get them going in programs

23  inside.  Change -- go back to the Legislature and change

24  the sentencing structure.

25     Q.   That would be good, too.

167

1      A.    Yeah.  And we did that in our state.

2      Q.    You did.  That would be good.  I think that's a

3  good possibility.

4            MR. ANTONEN:  One might say less intrusive

5  relief.

6            MR. SPECTER:  Actually, it would be more

7  intrusive if it was relief.

8      Q.    I'm going to ask you to assume a legal fact.

9  Which is that I'm not quite sure whether this is true or

10  not true, but for the moment we'll assume that the court

11  can't order programs, community programs -- let's say

12  the court decides, "Well, that's a political decision.

13  We're not going to intrude on that.  The Legislature can

14  do it if they want, they cannot do it if they want."

15            Let's also assume that the crowding is causing

16  the constitutional violations and we have to release,

17  say, 30-, 40,000 prisoners in order to get the

18  constitutional conditions.

19            What would be your plan?

20      A.    Again, my plan would be to work with everybody

21  at the table to mimic or parallel what's gone on in the

22  Johnson case.  And that is, we're going to go extremely

23  slow in any kind of a release order.

24      Q.    Okay.

25      A.    Again, my claim, or my opinion on this, is, I

168

1    have utmost respect for the public safety of the

2    citizens of California.  One crime, one victim, is

3    pretty hard to handle.

4        Q.    The problem with your position, as I see it, is

5    that right now, California is not doing anywhere near

6    all it could do to enhance public safety.  And so if you

7    release some more prisoners, it doesn't seem to me

8    necessarily that it will make it any worse.

9        A.    But why do you want to contribute to that?

10   That's the thing.

11       Q.    I want to make it --

12       A.    The recidivism rate is already 60 percent.  Why

13   would we want to release 30,000 -- just do the math.  If

14   we have 100,000 people we release -- let's use even

15   numbers -- if we release 100,000 of these beautiful

16   people every year, and we know that -- what do you want

17   to pick?  Fifty percent?

18       Q.    Whatever you want.

19       A.    Let's say 50 percent.  We'll be conservative.

20             We know that 50,000 of these beautiful people

21   are coming back, by doing nothing.  We know that.

22   They're coming back, they're contributing to it.  And we

23   know that some level of it have committed crimes out

24   here in the free community.  Whatever.

25             If we add 30,000 to that, we know, based on

Merrill Legal Solutions
(800) 869-9132

1    what we're doing now, by doing nothing, we know that

2    15,000 of those beautiful people are going to come back.

3    So we're adding 65,000 people more to the correctional

4    system.  Of which, they can't handle that now.

5         So why continue?  And I totally agree with

6    Dr. Petersilia on that.  The concept is churning.  Why

7    do we want to add more "churnees" to the pot?

8    Q.    Then you agree that you can make changes so

9    that more people got released, then the public would be

10   safer?

11   A.    It's possible.  But what I'm saying is you're

12   adding all of this to the mix.  And if we do nothing,

13   this 65,000, they're going to be released again next

14   year on top of all the other ones we're releasing

15   otherwise.  It's compound interest, and you're adding on

16   top of that.  ·

17   Q.    I think that's the fallacy.  That's a really

18   good analogy, and it illustrates what I think is the

19   flaw in your argument.  Which is that interest grows at

20   a fixed rate over time?

21   A.    Uh-huh.

22   Q.    Is it your opinion that parolees commit crimes

23   at a fixed rate once they're out of prison?

24   A.    No.  We don't know.  Half of all crime in our

25   society goes unreported.  We don't know.

170

1         My point is that by doing nothing -- this is
2    the crystal ball.  This is what we face if we do nothing
3    and we release these people back here.
4         Q.   I see.
5         A.   If we add programs, if we do things to slow
6    this down, of which Dr. Petersilia has based her entire
7    career on -- 25 years of research -- if we add programs
8    to slow that down, I believe that we've gained a
9    foothold and we're beginning to turn the corner on this.
10        Because if you look at what happened in Texas
11   -- and I hate to keep throwing that out all the time --
12   before all the implementation of all this stuff, the
13   recidivism rate in that state was about the same thing.
14   Was about 50 percent.  Like I've said, in the last two
15   decades, they've added programs, the recidivism rate is
16   like 39 percent.  It has made a difference.  We're never
17   going to go down to zero.  We both know that.
18        Q.   Right.
19        A.   But doing nothing, we're going to stay at 60
20   percent.  That's intolerable.
21        Q.   You read the expert reports and -- I'm sorry,
22   the expert panel report.  That's the Petersilia/Austin/
23   Krisberg CDC report.
24        A.   Yes, sir.
25        Q.   And they say in there that length of stay is

171

1    not related to recidivism.

2        A.    That is correct.

3        Q.    That's correct.  So if length of stay is not

4    related to recidivism, that means that if you reduce the

5    length of stay, the prisoner is not going to be

6    committing any more crimes than he would if he stayed

7    another year, or six months, whatever it is.  Right?

8        A.    Yes, sir.

9        Q.    So then if you reduce the length of stay for

10   certain offenders to reduce the population, you wouldn't

11   be adding to the recidivism rate.  Right?  Correct?

12       A.    Why wouldn't you?

13       Q.    You just said length of stay -- never mind.

14       A.    You're still getting into the idea that 60

15   percent of these people are going to come back.  It's

16   not a shell game.

17       Q.    I think I've beaten that horse --

18       A.    It's buried.

19            MR. ANTONEN:  How about we take a break?

20            MR. SPECTER:  Sure.

21            (Off the record.)

22            MR. SPECTER:  Q.  Dr. Marquart, do you have any

23   reservations -- you've read the expert reports from many

24   of plaintiffs' experts.  Correct?

25       A.    Yes, sir.

172

1    Q.   I notice there's a paragraph or two in your

2    reports, there's a method about unnamed individuals

3    coming up with their opinions. Do you have any

4    criticisms about their methodological approach?

5    A.   Can you refresh my memory on that?

6    Q.   I was hoping you would remember. Paragraph B

7    on page 2, "Plaintiffs' experts claims pertaining to the

8    pernicious effects of crowding on prisoners has not been

9    validated through a systematic empirical investigation

10   based on CDCR data."

11   A.   Right.

12   Q.   Were you referring to Dr. Austin's report when

13   you said that?

14   A.   I'm just saying that if we're going to examine

15   the effects of crowding on California prisoners, we need

16   to do an in-depth analysis of that. Because I know that

17   others had talked about their observations, and they've

18   seen this and they've seen that.

19        I agree if they saw it, that probably was the

20   case.

21        But again, let's take a look at it empirically.

22   Let's see what we have.

23   Q.   Let's go into that a little bit. You're

24   talking about, like, experts like Dr. Shansky and

25   Dr. Stewart? Or do you know who you're talking about

173

1  here?

2      A.    Whoever said that statement about the

3  pernicious effects about crowding.  Maybe Dr. Haney.  Is

4  that him?  Might have been him, or some others.

5          MR. ANTONEN:  Do you have the reports?

6          MR. SPECTER:  No.  Because it's his statement.

7  He's the one who made it.  I'm just asking him what he

8  meant.

9          THE WITNESS:  What I mean by that,

10  observational or anecdotal evidence would be one thing;

11  to put it under the microscope for analytical scrutiny.

12          MR. SPECTER:  Q.  But you understand that not

13  everything can be quantified?

14      A.    If that's the case, how can we say that

15  overcrowding leads to violence and other things, if we

16  can't attempt to quantify that?

17      Q.    You've said a lot of stuff and you don't have

18  the data.

19      A.    You're asking me.  This is a serious issue; the

20  relationship between overcrowding and violence and

21  other, a lot of other things.  We need more, above and

22  beyond observational and other evidence.

23      Q.    If they rely on the literature, the

24  sociological literature, would that be an appropriate

25  basis to draw some conclusions?

174

1     A.    It can be, correct.

2     Q.    Would experience studying correctional

3  institutions for 30 years be another basis?

4     A.    It counts.

5     Q.    And being an expert and testifying in many

6  cases concerning the effects of overcrowding, would that

7  be a basis?

8     A.    I think it's a basis, but it's not the end-all

9  and the be-all.  It's not conclusive evidence.  Again,

10  it's personal observation.

11     Q.    Well, those things are more than you've done

12  about this, right?

13     A.    I have been involved with it myself.  I said I

14  worked there.  It was an overcrowded institution.  I

15  have had personal experience with that.  It's a serious

16  issue.

17           Let's take a look at it empirically.  If you

18  combine it all together, then maybe we have an accurate

19  picture of this phenomenon.  That's all I'm trying to

20  say.

21           I'm not negating what they say.  I say let's

22  corroborate it.

23     Q.    Fair enough.  So back to your supplemental

24  report.

25     A.    That comment over there was also, I sent that

1   e-mail, or that -- we discussed that with Professor

2   Trulson.  So I did send it to him via e-mail, and we did

3   discuss it via telephone as well as via e-mail.

4       Q.   So it seems to me the person you're addressing

5   this comment to is Dr. Haney.

6       A.   Others.  Wayne Scott and others.

7       Q.   Do you know who Wayne Scott is?

8       A.   I know Wayne Scott.  I know him personally.

9       Q.   Who is he?  What has he done?

10      A.   He's a neighbor of mine.  He lives right down

11  the street from me.

12      Q.   I see.  Does he have any particular

13  qualifications to make these observations?

14      A.   He's very qualified.

15      Q.   What are his qualifications?

16      A.   He was a director of the prison system.  He

17  came through the ranks.

18      Q.   You worked there for two years.

19      A.   Yes.

20      Q.   Whose opinion should be valued more?

21      A.   I believe the opinions of both of us combined

22  together would be the best possible way to go.

23      Q.   You say, on page 9 of your supplemental report,

24  that "A prisoner release order, then, absent the

25  necessary resources and infrastructure to support

176

1    releases, will therefore produce no change regarding

2    sustained reduction of the prison population." Correct?

3        A.   Yes, sir.

4        Q.   But you're not saying that population reduction

5    measures can't be taken, to effect sustained reduction

6    of a prison population, without those resources and

7    infrastructure, are you?

8        A.   I'm saying what the statement says.

9        Q.   Well, I'm asking you another question.

10       A.   I believe the statement is clear. That's what

11   I believe.

12       Q.   I'm asking you to tell me whether you agree or

13   disagree with the question I just asked.

14       A.   Can you readdress the question, please.

15       Q.   Sure. Prisoner release orders -- let me go at

16   it this way.

17            "Prisoner release order," in your definition,

18   is an order that they release offenders, correct?

19       A.   Yes, sir.

20       Q.   There are other ways than releasing offenders?

21       A.   Yes.

22       Q.   You can stop people from coming in.

23       A.   Yes, sir.

24       Q.   You can change their sentence times?

25       A.   Yes, sir.

177

JAMES MARQUART, Ph.D.         October 3, 2008

1    Q.    You can give them good-time credits?

2    A.    Yes, sir.

3    Q.    All of those things can lead to a sustained

4    reduction of the prison population, right?

5    A.    Yes, sir.

6    Q.    And that would be without what you call the

7    necessary resources and infrastructure?

8    A.    It could happen, yes.

9    Q.    Paragraph 7 on page 11, the second sentence

10   says, "The substantial addition of parolees beyond

11   historical release trends will further undermine the

12   ability of parole officers to assist offenders

13   post-release."  That's your statement, right?

14   A.    Yes, sir.

15   Q.    That assumes that the number of parole officers

16   remains constant, correct?

17   A.    Correct.

18   Q.    And also assumes that the number of parolees

19   who they have to supervise remains constant, correct?

20   A.    Correct.

21   Q.    So if you would either decrease the number of

22   parolees they have to supervise or increase the number

23   of parole officers, you could eliminate that problem.

24   Right?

25   A.    What problem?

178

1    Q.    The problem you identified in that sentence;

2    "undermines the ability of parole officers to assist the

3    offenders post-release."

4    A.    Yeah, I guess if we eliminate them from parole

5    supervision, we don't have to worry about them.

6    Q.    I mean, if you reduce the number of people on

7    parole or supervise only the high-risk parolees, you

8    would not undermine the ability of the parole officers,

9    right?

10    A.    It's a possibility.  If they continue to

11    recidivate at historical trends, they're going to bounce

12    back, and those parole officers, three, four people down

13    the line, might see the same people down the line.

14    Q.    Your sentence says they're "assisting offenders

15    post-release."  How do you know they're assisting

16    offenders post-release?

17    A.    By what I have read in the documents.  That's

18    what I have read.

19    Q.    Can you point me to which documents say that?

20    A.    I thought some of the materials provided to me

21    in the expert-panel report.

22    Q.    And the expert-panel report is the document

23    you're relying on for that basis?

24    A.    I believe so.

25    Q.    And what type of assistance are parole agents

1    providing to those parolees?

2        A.    The way I understand it, trying to help them

3    find a job.  At least to help them not return back.

4        Q.    Have you read anything else that suggests that

5    parole officers spend the majority of their time

6    actually in law enforcement capacity rather than in an

7    assisting capacity?

8        A.    That's the other side of the coin.  Yes, sir;

9    it's primarily a surveillance issue.

10       Q.    So they're not spending very much of their time

11   assisting the parolee?

12       A.    No.

13       Q.    If you can turn the page, please.  Just before

14   it starts with paragraph 9, it says that, in the middle

15   of the paragraph, it says, "The fact is that a portion

16   of the release-order parolees will re-offend for new

17   crimes that will require placement in county jails until

18   returned to the CDCR institution."  Do you see that?

19       A.    Yes, sir.

20       Q.    And then you go on to talk about the fact that

21   that "will exacerbate the overcrowding problems at the

22   county levels."  Do you see that?

23       A.    Yes, sir.

24       Q.    Tell me to what extent it will exacerbate the

25   problems.

1      A.   Well, if you arrest -- you know, you have the

2  normal stuff that's going on.  And on top of that, if

3  you add others that come in contact with the criminal

4  justice system via arrest and incarceration in the jail,

5  you're adding more people to the mix; you're adding more

6  people to the county jail of which they have to

7  supervise.  And you're going to exacerbate the problems

8  of overcrowding, bed space, and all those things at the

9  county level.

10     Q.   Right.  I understand that.  But I want to know,

11  could you quantify that for me, please?

12     A.   It just depends on how many people are

13  released.

14     Q.   Let's say 10,000 people are released over the

15  period of a year.  What percent of crowding now would

16  the L.A. County Jail have to handle in that situation?

17     A.   Well, we know that based on current estimates,

18  we know that 50 percent of them are going to come back.

19  So that's 5,000 people.

20          So how many people out of the 5,000 are from

21  L.A. County?  A third?

22          So let's just round it off.  That's 2,000

23  additional people that are going to be in L.A. county.

24  And do they have space for them in L.A. county as we

25  speak.

181

1        Q.   How many people do they arrest in L.A. county

2   over the year?

3        A.   That come through the jail?  I would estimate

4   4-, 5,000 people.

5        Q.   It's a million, right?

6        A.   Yes.

7        Q.   So 5,000 out of a million; what's that?

8        A.   It's a very low percent.  What you're talking

9   about is the aggregate.  I'm talking about the

10   individual.  Again, it boils down to the fact that

11   you're adding, I don't care whether it's 10, 20, or 30,

12   you're adding more people to the mix of which they have

13   to figure out a space to house them, to feed them, to

14   take care of them, to provide recreation.  You're adding

15   an undue workload to them to take care of these people.

16        Plus you're adding to the fact that they've

17   committed some kind of a crime, to return to jail.  So

18   we're also dealing with crime victims in the local area.

19        Q.   Is it your contention that everybody who is

20   rearrested for a parole violation commits a new crime?

21        A.   No.

22        Q.   What percentage commits a new crime?

23        A.   It's based on one of my reports -- I had a

24   chart in there.  I'm looking at a table here --

25        Q.   What are you looking at?

                                                           182

1      A.    "Administrative violations versus new criminal

2   convictions of California parolees returned to prison

3   1980 to 2004."

4      Q.    Where is that table?

5            MR. ANTONEN:   In the supplemental report.

6            MR. SPECTER:   Page what?

7            THE WITNESS:   Nineteen.

8            MR. SPECTER:   Q.   Okay.   And so it's divided

9   into new criminal convictions and administrative

10  violations.

11     A.    Right.   So the vast majority of people are

12  either a new conviction or some kind of an

13  administrative decision with a criminal violation.

14     Q.    Right.   But you understand that the 80 percent,

15  what you call "administrative" criminal violations are

16  80 percent of technical violations?

17     A.    That is correct.

18     Q.    And so when they have -- did you understand

19  what, they haven't been convicted of anything in a

20  court, right?

21     A.    Right.

22     Q.    Instead they have gone to a parole revocation

23  hearing?

24     A.    Uh-huh.

25     Q.    Do you know what Morrissey v. Brewer is?

183

1        A.    It's an old parole case.

2        Q.    It is.  It defines the level of due process

3    that you're entitled to with a parole hearing.  Is that

4    greater, the same as, or less than the amount of time

5    you're allowed?

6        A.    It's probably a little less than.

7        Q.    Do you know what the procedures are?

8        A.    No, I don't.

9        Q.    You wouldn't have a degree of confidence in

10    determining whether in fact those procedures would

11    adequately determine whether a person is guilty or not

12    guilty of the charge or offense, would you?

13        A.    That's a possibility.  But the point is they

14    did something to cause the fact that they were going to

15    be reincarcerated again.  In other words, they didn't

16    pee in a bottle and it came up with a dirty urine

17    analysis.  They did something that the District Attorney

18    thought, "We need to get them off the street."

19        Q.    Actually, the District Attorney doesn't get

20    those people off the streets, does it?

21        A.    Maybe not.

22        Q.    It's the parole board.

23        A.    Yes.  So they did something that -- it's like a

24    preemptive strike.

25        Q.    And do you know how many of those, what you

184

1    call "criminal" violations are for drug-related

2    offenses?

3         A.   I do not.

4         Q.   For example, do you know how many of them are

5    just for using drugs?

6         A.   I do not.

7         Q.   Or for just possessing drugs?

8         A.   Well, the other thing is that they may have

9    been doing something, maybe they caught them doing

10   something, and yet they were in possession of drugs at

11   the same time.

12        Q.   So you don't know, do you?

13        A.   Nobody knows.

14        Q.   You don't know?

15        A.   I don't know.

16        Q.   Is it possible that other people know?

17        A.   It's possible.  It would be very interesting to

18   get into the exact specifics of those.

19        Q.   I think there are specifics that Petersilia

20   relies on, and how many of those involve drug usage and

21   possession.  Are you aware of those statistics?

22        A.   Right.  But she also framed the issue that they

23   had done something and they were returned to the

24   institution for something that was, quote, criminal.

25   But the problem is, and I agree, is that they need to

185

1    have some sort of conclusion of that criminal case.

2        Q.    So the fact that you have these administrative

3    violations doesn't in fact mean that a crime has

4    occurred, does it?

5        A.    That's true.

6        Q.    Do you know, do you have an opinion about

7    whether a person who has been charged with a misdemeanor

8    offense while on parole, do you know that the parole

9    system sends most of those back to prison as parole

10   violators?  Are you aware of that?

11       A.    I'm not.

12       Q.    Do you have an opinion about whether it's

13   appropriate to use the parole system to send -- well,

14   are you aware of the fact that district attorneys don't

15   prosecute offenses, and they let the parole board do it,

16   so it gets sent back for a certain period of time?

17       A.    Yes.   It's an administrative issue, so it keeps

18   them out of, in lieu of the criminal justice system.

19       Q.    Do you have an opinion whether that's an

20   appropriate use of the parole revocation process?

21       A.    Until I would read the exact case in a file, I

22   wouldn't render an opinion.   It may be appropriate for

23   certain kinds of offenders.

24       Q.    So anyway, getting back to the L.A. County Jail

25   -- well, let me see if I can speed this up a little bit.

1              You read Dr. Austin's report where he analyzes

2      data on three counties?

3         A.    Yes, sir.

4         Q.    Do you remember what those three counties are?

5         A.    Alameda --

6         Q.    No.  Amador.

7         A.    Amador, that's it.

8         Q.    What were the other two?

9         A.    Fresno and Los Angeles.

10        Q.    And he concludes, based on the data from the

11     Department of Corrections, that it will have less than 1

12     percent, a 1 percent effect on the arrest and bookings,

13     and the like.  Do you remember that conclusion?

14        A.    I do.

15        Q.    Do you have any reason to believe the data

16     doesn't say what Mr. Austin says it says?

17        A.    He can say whatever he wants to say.

18        Q.    Do you have any reason to believe that the data

19     doesn't support Dr. Austin's conclusions?

20        A.    Not at this time.  But again, what you're

21     dealing with is a percentage rather than the human

22     being.  And I'm not going to go there.

23              Okay; 1 percent in L.A.  To the person on the

24     street, if you say 1 percent, that sounds pretty good.

25     But you take that 1 percent, you talk to the rape victim

187

1    or the theft victim or the arson victim, it's a

2    different thing.

3           I'm not going to use those kinds of strategies

4    to minimize the impact on the individual.  He's coming

5    at it this way, and I'm coming at it from over here.

6       Q.   So in your way of looking at things, if you did

7    a prisoner release order and one additional property

8    crime was committed, that would be too much.  Is that

9    right?

10      A.   It would be very difficult to swallow if we had

11   to do that and it led to victimization, yes.

12      Q.   You wouldn't support anything that --

13      A.   I don't know about one.  But certainly one

14   violent crime would be hard to swallow for me.  All the

15   more reason, as I have suggested, that this be done in a

16   slow, methodical way, and not obfuscated by saying 1

17   percent, and 2 percent here.  Those 1 percent and 2

18   percents equal human bodies.

19      Q.   In any way that you reduce the prison

20   population, can you guarantee there wouldn't be one

21   additional crime that was committed?

22      A.   I can't guarantee it.  Nobody can.

23      Q.   So any criminal justice policy, any change in

24   the criminal justice policy, could result in one

25   additional property crime being committed, correct?

Merrill Legal Solutions
(800) 869-9132

JAMES MARQUART, Ph.D.          October 3, 2008

1    A.   It could.

2    Q.   In fact, in California, as we talked about this

3    morning with the bridging program, that let people out

4    of prison early --

5    A.   My thing is, why would you want to do that?

6    You want to take the risk.  I don't.  I don't want to

7    take that risk.  You want to assume the 1 percent.  One

8    percent out of 30,000 is what, 300 people?  That's 300

9    victims.  That's a lot of people.  I don't want to

10   assume that.

11   Q.   That's fair enough.  But you need to offer an

12   alternative which eliminates any risk.

13   A.   I think you've got to go through this in a very

14   -- like I said before.  You've got to do it slowly, with

15   all deliberate speed.  Take your time and get it right.

16   There's not some kind of a blanket release where you're

17   going to let them all go.  We can't do that.

18        Let's get the programs in place; let's try to

19   help these people make it on the street.  I'm for having

20   them make it.  Why can't we agree?

21        It's like in the insurance business.  That's

22   basically what we're talking about.  But I have respect

23   for the individual.  The 1 percent, the 2 percent,

24   obfuscates that fact.

25   Q.   You said, before, the fact that length of stay

189

JAMES MARQUART, Ph.D.        October 3, 2008

1    doesn't have any impact on the crime rate.  If that's

2    true, isn't the level of crime the same?  They're just

3    going to maybe commit them a few months earlier than

4    they would have.

5        A.    But why do we want that to happen?  Why would

6    we want that?

7        Q.    Okay.

8        A.    The goal is to put things in place so they

9    won't come back.

10        Q.    You understand, even if you provide all the

11    programs that we talked about this morning, it doesn't

12    have a 100 percent success rate; right?

13        A.    That's true.

14        Q.    In fact, the success rate is, what is it?

15    About 10, 20 percent rate?

16        A.    That's right.

17        Q.    That's high.  No matter what you do, even if

18    you had all those programs, people are not going to be

19    successful.  They're still going to come back.  Right?

20        A.    That's true.

21        Q.    So even under your scenario, you're still going

22    to have crime.

23        A.    That's right.

24        Q.    On page 19, paragraph 10, of your supplemental

25    report -- wait a minute.  Sorry.  No, I'm not getting

190

1    mixed up.

2           You say, "Little insight into the impact of a

3    massive prisoner release order is gained by sterile

4    statistical manipulations suggesting that the release of

5    some 40,000 prisoners will have, on the aggregate,

6    minimal or no impact on the communities and citizens of

7    California."

8           So it seems to me that's a direct attack on

9    Dr. Austin's analysis.

10       A.    That's true.

11       Q.    And you're saying here that these sterile

12    statistical manipulations don't provide any insight into

13    the impact of the prisoner release order.   Is that

14    right?

15       A.    That's right.

16       Q.    And the fact that he is able to quantify the

17    impact on particular counties and show that it's less

18    than 1 percent doesn't provide any insight.   It's not

19    helpful.

20       A.    It is helpful, but it's sterile.   All right?

21    It's sterile to the point that saying that it's going to

22    have no impact is ridiculous.   It's going to have an

23    impact.   All right?

24           And I just repeated this, I stated this before,

25    and I'll repeat it again.   We can say all day long about

191

1   1 percent, 2 percent, or whatever.  The fact of the

2   matter is, when you're dealing with tens of thousands of

3   people, potentially, who could be released, 1 percent

4   sounds like no big deal.

5           But at the end of the day, that 1 percent out

6   of 30,000 people, that's 300 victims.

7           So my point is, we can statistically play these

8   shell games and do all that, but at the end of the day

9   there's still going to be 300 victims in the State of

10  California.

11          I'm not ready to go down that line and say that

12  that's okay.  I don't want to say that that's just part

13  of doing business, okay?  Those are 300 people who have

14  a right to have some say along, in this.  That's a lot

15  of people.

16      Q.   And --

17      A.   And the 1 percent or the 2 percent obfuscates

18  all that.  It sounds appealing, and it sounds as if

19  that's an acceptable level that we can deal with.

20      Q.   What's an acceptable level to you?

21      A.   I don't know.

22      Q.   You used the word "shell game."

23      A.   Right.

24      Q.   You think Dr. Austin's analysis is a shell

25  game?  That implies fraud.

192

1    A.    Not necessarily fraud.  It's playing with the

2    numbers.  Again, Dr. Austin's perspective, and I have

3    respect for him in terms of all the things he's done in

4    his lifetime, but I think he's wrong here.  Again, we

5    can statistically manipulate this until the cows come

6    home.  The point is, we need to do everything we can to

7    not have victims.

8          Maybe that's naive on my part.  My thing is,

9    let's put the programs in place, let's do this stuff

10   first, before we unleash people on the rest of society.

11         I don't want them living next door to me.  The

12   issue is, do you want them living next door to you?

13   Q.    They already are.

14   A.    I don't want them around me.

15   Q.    You said, referring to your rebuttal report,

16   you were talking about doing a systemic, empirical

17   investigation.  Do you remember that?

18   A.    Where is that?

19   Q.    In your rebuttal report.

20   A.    That was about overcrowding.

21   Q.    So it's all right to do these sterile

22   statistical manipulations about overcrowding but not

23   about prisoner release?

24   A.    I think they're two different things.  One's

25   talking about releasing a large group of people on the

193

JAMES MARQUART, Ph.D.          October 3, 2008

1    general public.  Another one is dealing with people who

2    are already incarcerated.

3        Q.    And maybe subject to violence, maybe, over

4    conditions over which they have no control.  Why would

5    sterile manipulations be acceptable for them but not

6    acceptable for victims in the free community?

7        A.    It's the same thing.  We need to be awfully

8    careful about making such global statements, about

9    having global impact.  It's irresponsible.

10       Q.    If crowding led to violence in the prison, it

11   would not be acceptable.  Right?

12       A.    I wouldn't like it.

13       Q.    Would it be acceptable or not acceptable?

14       A.    I wouldn't like it.

15       Q.    In your opinion, the population in the prison

16   should be reduced to the amount in which crowding

17   doesn't create more violence.  Isn't that right?

18       A.    If we can find a link that says 100 percent,

19   crowding has led to this.

20       Q.    And we have to use sterile manipulation of

21   numbers.  Is that right?

22             MR. ANTONEN:  Objection, argumentative.  Go

23   ahead.

24             THE WITNESS:  A study like that would be a

25   statistical manipulation of the data, there's no doubt

194

1    about it.

2            MR. SPECTER:   Q.   And it would provide little

3    insight to you, though.

4        A.   It is some insight.

5        Q.   But is it little insight, because they're

6    prisoners and not prison people in the free community?

7        A.   I never said that, no.

8        Q.   Have you read Dr. Petersilia's National

9    Institute of Justice study in which she suggests that

10   diverting technical parole violators and less serious

11   property and drug crimes would reduce prison admissions

12   by 25 percent?

13       A.   Yes, sir.

14       Q.   Do you know whether those recommendations were

15   adopted in California?

16       A.   I don't.

17       Q.   I'll represent to you that they weren't

18   adopted.

19       A.   They were?

20       Q.   Were not.

21       A.   Were not.

22       Q.   She did that study in 1997, correct?

23       A.   I believe so.

24       Q.   Do you think that's a suggestion that has

25   merit?

195

JAMES MARQUART, Ph.D.        October 3, 2008

1      A.    Can you read it one more time for me.

2      Q.    "Diverting technical parole violators and less

3   serious property and drug crimes."

4      A.    That's a good idea.  That's what we did in

5   Texas.  What we created was a -- if you don't mind if I

6   digress for a minute.

7      Q.    Sure.

8      A.    What happened in that state complies exactly

9   with that statement, that recommendation.  We did that,

10   probably in the mid-1990s: created a whole separate

11   layer.  Maybe you would want to recommend this here.

12   They created something called the state jail system, and

13   that's a buffer between the community and the

14   penitentiary.

15          And state jails are places where people go for

16   up to two years, and they are, technically or legally

17   speaking, they're probationers.  And they go to these

18   state jails in lieu of going to the penitentiary, and in

19   the jails they get substance-abuse training and things

20   of that nature.

21          So what you're doing, you're creaming those

22   kinds of people out to provide programing for them to

23   stop them from coming into prison; to get out so they

24   don't head into the mix.

25          And you're also, what we both agree on, is

196

1    using the prison as the best, unfortunately, the best

2    resource for the most dangerous people.

3        Q.   Do you understand that -- we've gone over the

4    fact that the courts have found that the prison

5    conditions are unconstitutional.  And that they are, at

6    least because they aren't being able to provide, the

7    Department isn't providing adequate medical and mental

8    health care.  You understand that, right?

9        A.   Yes, sir.

10       Q.   And you understand that if you're not able to

11   provide medical and mental health care that people can

12   get, prisoners will be harmed by that.  Do you

13   understand that?

14       A.   What do you mean?

15       Q.   Because if you're sick and you don't get

16   adequate medical care, you get sicker, or you get a

17   serious injury, or you die.

18       A.   Right.  I just wanted to clarify that.

19       Q.   Right.

20       A.   That is correct.

21       Q.   So they would be victims of unconstitutional

22   conditions.  Right?

23       A.   Correct.

24       Q.   And so assume for the moment that we're able to

25   prove that crowding is the cause of unconstitutional

197

1   medical care.  Do you think, when you're balancing the

2   rights of the victims on the outside who might get hurt

3   if prisoners are released, you should take into account

4   prisoners who may be victims of unconstitutional care in

5   the prison system?

6       A.    Yeah.  I'm not here to say they should go

7   without.  I'm not trying to run some tyrannical

8   institution where we're going to be devoid of medical

9   care.

10          When I worked there, one of the first things I

11  saw that horrified me is that there weren't enough

12  doctors.  We would call inmates out at night if somebody

13  got hurt, and then an inmate would come in.  One guy got

14  in a fight one night and got his nose broken.  We didn't

15  call the doctor.  We called an inmate in and the inmate

16  set the guy's nose.

17          I've seen all that.  I've seen inmates holding

18  other inmates down while another one sutured him up with

19  12 to 15 stitches.  I don't like that any more than

20  anybody else does.

21          As a result of those things, in our state a lot

22  of those things have been rectified.  There's no sense

23  sending people in there to get worse.

24          Another friend of mine was also the unit

25  psychologist.  You had one psychologist for 3,200

198

1    inmates.  It's ridiculous.

2          So I've seen it firsthand.  And I'm not in any

3    way advocating short-changing those people as well.  I

4    think you've got to protect people inside as much as we

5    try to do that with people out here.

6          Q.    Your report relies on Jeremy Travis's testimony

7    to the Little Hoover Commission.  Do you recall that?

8          A.    Yes, sir.

9          Q.    In that testimony he made several

10   recommendations for reform.  Do you recall that?

11         A.    I believe so.

12         Q.    Do you believe those are appropriate

13   recommendations?

14         A.    I would have to read them again, but I did like

15   his testimony.

16         Q.    I can get it for you.  I don't have it right

17   here.  When we take our next break I can get it.

18         The expert panel, you reviewed their

19   recommendations, did you not?

20         A.    Yes, sir.

21         Q.    In your first report, going back there for a

22   little bit, on page 7, the last sentence in the middle

23   paragraph, do you see that?

24         A.    Can you read me the -- which sentence?

25         Q.    "More inmates reduce the staff's ability to

CERTIFICATE OF REPORTER

I, KAREN A. FRIEDMAN, a Certified Shorthand
Reporter, hereby certify that the witness in the
foregoing deposition was by me duly sworn to tell the
truth, the whole truth and nothing but the truth in the
within-entitled cause;

That said deposition was taken down in
shorthand by me, a disinterested person, at the time and
place therein stated, and that the testimony of the said
witness was thereafter reduced to typewriting, by
computer, under my direction and supervision;

I further certify that I am not of counsel or
attorney for either or any of the parties to the said
deposition, nor in any way interested in the event of
this cause, and that I am not related to any of the
parties thereto.


DATED: _October 9_____, 2008



_____
KAREN A. FRIEDMAN, CSR 5425

227