# EXHIBIT B

# REBUTTAL REPORT

# OF GALE BATAILLE, MSW

# Gale Bataille—Rebuttal to Plaintiffs' Reports
August 27, 2008

## (i) Rebuttal and professional opinion regarding Plaintiffs' Expert Opinion reports as they pertain to:

1. Plaintiff's assumptions about the characteristics of the Coleman class population and the needs of these Coleman class prisoners for mental health and integrated mental health/substance use treatment if they are released to our communities on parole.

2 The potential impact of a prisoner release order on public safety given various potential prisoner release scenarios envisioned by the plaintiffs;

3. The capacity of California's mental health programs to meet the needs of Coleman class parolees as well as the needs of the general population of released prisoners who may experience mental health needs. I will discuss my opinion that Plaintiff's expert witnesses do not appear to have sufficient or current knowledge of the capacity—or more importantly, California's <u>lack of resource capacity to meet the needs of released Coleman class prisoners</u> in the following areas of mental health services: CDCR parole outpatient clinics; State Department of Mental Health programs; county and private psychiatric emergency services and acute psychiatric and chemical dependency inpatient hospitals, and county operated or contracted community mental health and mental health/substance abuse services;

4. Additional recommendations regarding potential strategies and services to more effectively and safely reduce the population in California's prisons including plans described by CDCR, CSAC, CMHDA and several legislative initiatives.

I have reviewed Plaintiffs expert witness reports by James Gilligan, M.D.; Joseph Lehman; James Austin PhD; and Pablo Steward M.D. In addition, I have reviewed the reports of County Interveners—San Mateo County and Santa Clara County and Defendants' expert witness, James Marquart, Ph.D. My comments and expanded opinions are based on references cited in my report submitted on August 15th as well as a June 25, 2008 updated report on psychiatric bed closures from the California Hospital Association's Center for Behavioral Health and telephonic communication with representatives of the California Mental Health Directors Association.

## 1. Plaintiff's assumptions about the characteristics of the Coleman class population, including violence potential and the needs of these prisoners for mental health and integrated mental health/substance use treatment if they are released to our communities.

Dr. James Gilligan provides extensive comment on the characteristics of mentally ill prisoners, what is known and generally accepted in the literature about the prevalence and predictors of violence among individuals with mental illness in comparison with the prevalence and predictors and of violence in the general population. Dr. Gilligan poses the question: (paragraphs 34 ff.) Are mentally ill offenders (MIO's) as a group more dangerous than non-MIO offenders? He cites a research study (unpublished manuscript) of California parolees (#36) that concludes mentally ill

1

offenders are no more likely than non-mentally ill offenders to commit violent crimes after release from prison. He further cites and discusses a meta-analysis (Bonta and Hanson, 1998,) that finds persons with severe mental illness were neither "more nor less likely than the non-mentally ill to re-offend" and that individuals with certain serious psychiatric disorders including schizophrenia and major depression are actually less likely to re-offend with only a modest increased risk of violence among paroled mentally ill offenders that is related to other risk factors including past violence.

In my career as a County Mental Health Director, I have had extensive experience in locating and implementing mental health services in community settings. I have often had to confront public fear and distortions regarding the violence potential of individuals with mental illness and I have made many of the same arguments and cited much of the same research that Dr. Gilligan references. However, there are certain characteristics and environmental factors that do correlate with increased violence potential of persons with mental illness as well as those with criminal justice involvement and the general public. As is acknowledged by Dr. Gilligan, "**Criminal history, antisocial personality, substance abuse**, and family dysfunction" were the most powerful predictors [of violence,] in mentally ill and non-mentally ill parolees. While, there are common predictors or correlates of future criminal behavior for mentally ill and non mentally ill populations, Dr. Gilligan and the other Plaintiff's experts generally fail to discuss and take into consideration **that there is an extremely high rate of co-occurring substance abuse within the mentally ill justice involved population—at least 75 % of mentally ill prisoners.** [Note: I provided an extensive discussion of this issue in my 8-15-08 Expert Opinion.] The use/abuse of alcohol and other drugs is often a trigger and antecedent to psychiatric de-compensation that may lead to (brief) psychotic episodes and as noted by Bonta and Hansen (pg. 139) "Hallucinations and delusions may trigger anti-social acts in the immediate situation and have high predictive validity in the short-term…however such symptoms may have little predictive validity in the long term." One of the few other predictors of future violence is a prior history of violence. It is reasonable to assume that mentally ill individuals who are incarcerated in the state's correctional facilities have a significantly higher rate of prior violence in their histories than individuals with mental illness who live in our communities.

My intention in raising these concerns is not to argue that mentally ill prisoners are violent and should not be released. Rather, I would argue that it is critical to develop a clear understanding of the risks and characteristics of the mentally ill prisoner and parole population and to responsibly plan to meet the supervision, treatment and rehabilitation needs of this population when they are released into the community. Even if we accept the general conclusion of Dr. Gilligan that there is no greater risk of violence in the seriously mentally ill parolee population than among other parolees, any episodes of violence committed by mentally ill parolees will be magnified by the press and can be expected to lead to disproportionate fear and discriminatory responses by the public. It is almost inevitable that there will be such community incidents in the future—just as it is inevitable that there will be violent acts committed by parolees who are not mentally ill. I am concerned that in his effort to combat over-blown stereotypes of violent mentally ill persons, Dr. Gilligan fails to adequately acknowledge the population risks that exist and fails to adequately advocate for effective plans or services to address the needs of seriously mentally ill parolees. The question that must be considered is whether the Courts, the State and local mental health systems will be able to say to the public when a mentally ill parolee commits an act of violence (as will inevitably occur)--that this incident must be understood as a rare exception, no more likely to happen than an incident of violence in the general public, because State and local mental health

systems have been put in place to insure needed supervision and treatment. In my opinion we are not in a position to make that assertion.

## 2. What elements should be included in prisoner release order that appropriately considers public safety in light of prisoner release scenarios envisioned by the Plaintiffs?

Plaintiff's expert witness reports generally concur that a prisoner release order including Coleman class prisoners can be safely implemented if there is a range/types of services in place to provide appropriate supervision, community support and mental health services to parolees. What is lacking in all of the Plaintiff's expert reports are specifics that either demonstrate that adequate services are in place or that there is an adequate plan to have these services in place **prior to a Coleman class prisoner release.**

**Gilligan Opinion**--Dr. Gilligan asks: "Would a prisoner release order that includes an incremental decrease in length of stay or diversion of mentally ill offenders adversely impact safety?" He concludes (16. b) that a responsible prisoner release program that provides the basic elements of treatment and support to mentally ill offenders—including pre-release planning, access to care in the community including services to individuals with co-occurring mental illness and addiction would not adversely impact public safety. Dr. Gilligan argues that a responsible release plan would reduce the "churning" of mentally ill prisoners that results in short incarcerations with prisoners emerging "sicker than when they went in" and acknowledges that "without adequate plans for treatment services in the community this "churning" will continue. (# 25) He comments positively on his experience with a 1997-2004 program for violence reduction conducted with San Francisco County's correctional facilities that resulted in a 100% reduction in institutional violence and 83% reduction in re-arrest for violent crimes. However, good results for a pilot program in San Francisco County--which has an exemplary jail mental health service, has been a leader in supporting community based services and has greater access to resources than most California counties, don't translate to other California counties.

We must consider the impact if the numbers of seriously mentally ill parolees are increased under a Coleman release order. Dr. Gilligan states that large numbers of individuals are already recidivating--over 6000 per year. This is a reflection of insufficient and inadequate treatment services for CCCMH and EOP parolees.

What Dr. Gilligan fails to provide in his expert opinion is any real data that proves that California has a plan, is prepared, or capable of providing supervision, community mental health/substance abuse treatment and support services that would constitute the "responsible prisoner release program" that he supports.

**Austin Opinion**--James Austin discusses the problems with California's "catch and release program" that results in a high rate of technical parole violations and high re-incarceration rates. Austin argues that imprisonment of parole violators "actually worsens public safety because it disrupts any effort to stabilize parolees and the communities in which they reside." Austin discusses various methods for diversion and sentence reductions, and argues using data from

3

Amador, Fresno and Los Angeles counties, that there would be a minimal impact on local jails and corrections systems. In my experience working in three counties (Contra Costa, Solano and San Mateo) even the "minimal" effects that Austin describes would have serious consequences for California's counties overcrowded jails and high probation caseloads. Austin argues, "If a diversion program is implemented simultaneously with providing evidence-based programming, public safety might actually improve because research shows that technical parole violators and low-risk offenders have higher recidivism rates when incarcerated, and lower recidivism rates when provided appropriate evidence-based programming in the community." (#91-pg. 39) In my opinion, Austin provides no evidence that such diversion programs are in place and he fails to address the impact on public safety if adequate diversion plans and resources are not in place prior to a prisoner release.

**Lehman Opinion**—Joseph Lehman offers his opinion that prison over-crowding can be reduced while maintaining public safety through implementing recommendations contained in CDCR's Expert Panel to Reduce Overcrowding where he served as Chair of the Model Program Sub-Committee. Included in the recommendations he cites is the importance of developing partnerships between state and local corrections agencies. I would add that these partnerships must be expanded to include partnerships with counties and their network of mental health, health and social services agencies that will be impacted and may be called upon to play key roles in serving released Coleman class prisoners. Lehman provides no opinion about the progress that the State has made in implementing these Model Program recommendations, nor does he identify which of these recommendations must be implemented in order to implement an effective prison population reduction plan that will maximize safety for released seriously mentally ill parolees or the public.

**Stewart Opinion**--Pablo Stewart, M.D. states that "the State can include the Coleman class in population reduction plans without adversely affecting public safety and should do so. Moreover, if the State enhanced the services provided to released individuals, public safety would improve." (Part 02, Opinion 3, pg. 3) He goes on to state: "When considering the public safety impacts of such a program,…**it is important to understand who these individuals are** and what systems already exist in the community." Dr. Stewart documents in extensive detail that poor mental health care in CDCR prisons actually means that accurate assessments—including diagnosis, level of care needs and risk assessments, are not available for prisoners who may be released to community parole status under a Coleman class release. According to Stewart:

- "The severe shortage of mental health beds has created a system that houses a significant portion of Coleman class members at lower levels of care than the patients clinically required. A significant number of class members who I interviewed at the EOP level of care, for instance, required inpatient psychiatric hospitalization. …I was struck by the very high acuity of the patients I encountered during my tours because they were much sicker, as a whole, than the Coleman class members I encountered between 1990 and 2000." (# 88, pg. 36-37) Dr. Stewart provides examples of cases of prisoner who are classified as Coleman class seriously mentally ill but "where medical files fail to note Dementia due to HIV disease and Cognitive Disorder NOS" (89 a./b.) as well as serious medication non-compliance issues (99) and problems with medical records. (102)

4

In my opinion, Stewart's assessment of conditions within CDCR prisons logically leads to the question of why the Court, counties or our communities should be in any way assured that we have adequate information about the needed level of community treatment supports for a Coleman prisoner release. According to Stewart, prison conditions of overcrowding, incomplete diagnoses, lack of access to treatment and placement at the appropriate levels of care, lack of appropriately prescribed and monitored medications has led to a population whose symptoms and severity is increasing and worsening. These conditions in CDCR operated prisons, as disturbing as they are, raise very serious questions about who might be released in a prisoner release program and whether CDCR-POC or other contracted providers would be prepared to offer the necessary treatment and supervision need to insure both parolee safety and access to appropriate care—and potentially community safety.

Dr. Stewart discusses the various levels of care that are provided to Coleman class prisoners (CCCMS, EOP...) in the prisons and cites CDCR Program Guide Standards of Care that "recognize that there is a spectrum of needs within the CCCMH group **and that in the community CCCMH individuals would need parallel levels of treatment**, with many needing medication and follow-up, and some who would benefit from additional case management that would include assistance with accessing community mental health services, substance abuse treatment, housing, benefits and employment.... Just as in prison, the vast majority of parolees will rarely require more intensive levels of mental health care such as crisis care, day treatment or hospitalization, in the community." (#133) Dr. Stewart goes on to state that far smaller number of EOP parolees can be expected to require more intensive levels of care. I do not understand how Dr. Stewart can make any assumption regarding the number and needs of EOP parolees given his previously cited critique of classification/diagnosis and care in the prisons.

I would concur with the general description of the range of services described by Dr. Stewart as necessary to treat and stabilize CCCMH and EOP parolee populations with several key exceptions:
--It cannot be assumed that the standards of care and clinician ratios in correctional facilities should appropriately be applied to community settings—and in fact as I documented in my 8-15 opinion, CDCS POC caseloads exceed those in California's prisons—not a standard to be emulated.
--Dr. Stewart cites day treatment as a service that should be provided, yet day treatment is not considered state of the art treatment in contrast to Assertive Community Treatment (ACT) or intensive rehabilitative and wrap around services--which are. In addition he does not provide adequate discussion of the need for integrated services for co-occurring mental health/substance abuse disorders when it is generally understood that individuals with serious mental illness and substance use/abuse usually fail—or are not accepted in traditional drug treatment programs. Based on prevalence data at least 75% of CCCMH and EOP parolees will have co-occurring substance use/abuse.
--Neither Dr. Stewart nor any of the other Plaintiffs' experts provide an adequate discussion/description of the critical need and lack of availability of integrated services for seriously mentally ill individuals with co-occurring substance abuse disorders.
-- Dr. Stewart appears to imply (or assume) that there are adequate and appropriate resources in the community for effective outpatient level of services to the CCCMS Coleman class of parolees. However, I have demonstrated in my

5

8/15 opinion (Ref: pg. 8) that the POC does not have sufficient staffing to provide adequate outpatient and case management services to the current parole population.

Dr. Marquart, an expert witness retained by Coleman Defendants states: "However diversion, without the proper community support systems will simply lead to additional recidivism." (PG 14) And, "...prior to any release order, there must be the proper infrastructure established to handle the already burdensome workload in the parole division and in probation...The ripple effect of a blanket release order will severely strain county level mental health departments, county alcohol and drug treatment programs, housing, and foster additional competition for jobs in local communities, as well as strain local criminal justice, systems, especially county jails. (PG 15-16.) Marquet discusses the Texas experience with prison caps and prisoner releases detailing the negative impacts on local jails, communities and community safety. Does California want to emulate the failed Texas program?

My greatest concern with the opinions of Drs. Gilligan, Austin and Stewart is that simply asserting that seriously mentally ill prisoners can be safely released if there is a "responsible release program" (Gilligan) and basic agreement among experts that a spectrum of services is required (Gilligan, Austin, Stewart) provides no assurance that a plan is in place or that services exist to support a Coleman class prisoner release program. Further, I have seen no documentation or quantification of the range and numbers of providers and programs that would be required. Dr. Stewart asserts that local systems are in place to provide the needed services to Coleman class released prisoners—though he does acknowledge that these programs are under-funded and would "benefit" from a significant increase in their resources. The fact that several Regional Parole Administrators has initiated efforts to reach agreements with providers in their regions (Stewart, 141-143) for parolee services is laudable—but woefully inadequate to address the true task at hand.

## 3. California does not have accessible and adequate mental health programs to meet the needs of Coleman class parolees under an expedited prisoner release

California does not have the current capacity to meet the supervision, mental health or other community support needs if there were a prisoner release of 15,000-40,000 or more prisoners including Coleman class prisoners. I have presented information in my 8-15 Expert Opinion regarding California's lack of adequate mental health care for our current populations of seriously mentally ill adults—both those who are under the care of counties and those who are treated through the Parole Outpatient system. I will not reiterate this information but I will provide additional data to demonstrate the severity of this crisis in accessibility, availability and appropriateness of care. However, my overriding concern is that Plaintiffs' expert witness reports provide inadequate support and guidance to support the Court's decision-making due to:

- Extremely limited (or outdated) knowledge of the structure and institutional responsibilities of the various partners in California's system of institutional and community mental health care

- And, demonstrate no knowledge or understanding of the capacity—or more importantly, California's lack of resource capacity to meet the needs of released Coleman class prisoners in the following areas of mental health services: CDCR parole outpatient clinics; State Department of Mental Health programs; county and private psychiatric emergency services and acute psychiatric and chemical dependency inpatient hospitals, and county operated or contracted community mental health and mental health/substance abuse services.

### (a) What systems/agencies are responsible for the provision of basic and intensive (including hospital) care to seriously mentally ill parolees?

I discussed this question at some length in my 8-15 opinion (Bataille Section 2.a. (pg 6)). I am concerned that in particular, Dr. Stewart states: "It is my understanding that some public mental health treatment providers currently refuse to provide treatment to parolees because there remains confusion and disagreements about whether the county or the State is responsible for paying for mental health care for these persons." (Stewart # 136) Dr. Stewart then goes on to discuss the "Mentally Disordered Offender-MDO law" and LPS Conservatorships as avenues for care that would address issues regarding treatment responsibility for seriously mentally ill parolees.

- MDO programs are State Department of Mental Health operated (state hospitals) or contracted with either counties or community agencies for mentally ill offenders who are conditionally released from state hospitals-CONREP. Counties are not required under statute to operate CONREP programs though some have chosen to do so under state contract. Whether the State Department of Mental Health (DMH) could be funded and legally expand the definition of the MDO population to include a broader class of Coleman class prisoners/parolees is a question that should be posed to DMH.

- With regard to the use of LPS conservatorships, it is my experience and understanding that counties/local jurisdictions are generally very reluctant to place individuals who remain on parole on LPS conservatorships. Individuals may be held under LPS for a 5150 evaluation and initial treatment period in an inpatient setting as a danger to themselves/others or gravely disabled—but I believe it is extremely rare for parolees to have a concurrent parole status and an LPS conservatorship related to a "grave disability". The filing of an LPS conservatorship and the resulting institution of a public or private guardianship process is really not appropriate or necessary in a circumstance where the custodial responsibility is established through the criminal courts and parole. County mental health systems and the LPS civil commitment door is the wrong "door number one" to knock on for services to seriously mentally ill parolees.

Community mental health services are structured and based on voluntary participation—even when individuals are participating in mental health services as probationers through the guidance of a mental health court. County mental health systems are not bound by conditions of parole unless they are providing services to parolees under a contract with CDCR. There are several counties that are negotiating with CDCR to provide parolee services—but these services are separate and distinct from core county mental health services in their eligibility criteria and would receive direct funding from CDCR (with the exception of insuring access to Medi-Cal revenues).

7

Dr. Stewart further cites (#140) the Coleman Court in its August 8th order and states that "these laws can be used to ensure that public safety considerations are met when releasing or diverting mentally ill offenders from prison." In my 8-15 opinion (pg. 12) I raise a number of concerns related to the implementation of the Valdivia order. Those questions remain but it is not simply a matter of whether CDCR POC and counties understand and comply with this guidance—it is equally a matter of whether it is actually even possible to provide timely access to 5150 acute psychiatric admissions of mentally ill parolees.

**(b) Access to acute psychiatric and chemical dependency inpatient care has dramatically declined from 1995 to 2006**

A June 25, 2008 updated report of the California Hospital Association's Center for Behavioral Health provides dramatic and disturbing data regarding the decline in psychiatric inpatient beds in California from 1995-2006 as follows:

- Inpatient psychiatric beds have dropped from 9353 to 6424: a 31.3% decrease and only 5515 of those beds serve adults.
- Inpatient chemical dependency beds have dropped from 1400 to 818 for a 41.6% decrease
- This drop in bed numbers is paralleled by a decrease in the actual number of facilities: psychiatric facilities have decreased from 181-142 or < 21.5% and chemical dependency inpatient facilities have decreased from 55 to 34 or < 38.2%
- The National average is 1 psyc. bed for every 2536 people: CA average is 1:5675 and according to CHA national experts estimate the need at 1 psyc. bed per 2000
- Chemical dependency beds compare at national average of 1bed:39,336 while CA has 1 CD bed:44,569

The availability of beds is also not distributed to insure geographic accessibility with 25 counties having not public or private inpatient beds. This data including charts regarding number and type of beds by county can be accessed at:
http://www.calhealth.org/public/press/Article/107/CBH_PsycBedClosures.pdf.

**(c) Plaintiffs expert opinions on access and resources available for community mental health outpatient treatment of seriously mentally ill parolees**

In particular both Gilligan and Stewart appear to assume that community mental health services; integrated services for persons with co-occurring mental health and substance use disorders, and the range of community support services—particularly housing, either are available or could readily be increased if funding were provided. This is simply not accurate. I have previously addressed the gaps and serious resource challenges-including human and financial resources, that confront community mental health services in my 8-15 opinion.

**(d) I would add the following comments regarding county/community mental health services to my 8-15-08 report:**

- Santa Clara and San Mateo's reports as Intervener Counties clearly document both the crisis in the availability of resources to treat their existing populations of seriously mentally ill adults. Their reports make it clear that they cannot absorb new parolees—

8

particularly seriously mentally ill parolees without significant additional treatment and supervision/custodial resources. It should be understood that Santa Clara and San Mateo are widely recognized to be among the best funded and most comprehensive county mental health services in the State—both in their historical State and Federal funding base, and as a result of these counties allocating discretionary county funds to mental health and substance abuse services. Both counties also document their efforts to reduce structural deficits that include programs reductions or holding allocated positions vacant in mental health services.

- The majority of California's other counties face even more severe under-funding of mental health systems and do not have or have not chosen to provide discretionary local dollars to increase mental health services. As Medi-Cal providers, counties are obligated to provide assessments and medically necessary treatment to all Medi-Cal beneficiaries that meet diagnostic and functional impairment criteria. As indigent care providers, counties are responsible for providing services to seriously mentally ill adults—**to the extent resources are available.** I do not have data regarding the numbers or percentage of CCCMH and EOP parolees would be Medi-Call beneficiaries under a Coleman release but it is reasonable to assume that there would be a high percentage of these individuals who do not qualify for SSI-linked Medicaid. It cannot be assumed that county mental health systems have the capacity to assume a new responsibility for parolees—particularly indigent parolees. **In fact, there are currently three counties: Riverside, Shasta and Glenn, that have provided written notification to the State Department of Mental Health that they are considering returning the Medi-Cal program to the State due to the lack of sufficient local dollars to provide the required 50% match required to draw down federal Medicaid (Realignment sales tax and vehicle license fees).**

- In my opinion, a substantial Coleman class prisoner release would have a substantial negative impact on the conditions and treatment of these individuals when they re-offend and re-arrested. These parolees are likely to be held in local jails because of a State prison population cap system and lack of access to forensic state hospital beds. Almost half of California counties' correctional facilities are currently operating under their own jail population caps. If current conditions remain constant, additional numbers of seriously mentally ill parolees—even if they are eligible for admission to state hospitals will be held in inadequate conditions and receive inadequate care in local jails. DMH typically has a waiting list of over 300 local inmates who are pending state hospital forensic commitments/placements as has been reported to the CMHDA Forensic Committee by DMH administrators for at least the past three years. This is yet another way that a poorly planned and implemented Coleman prisoner release will simply transfer the problem of inadequate (and potentially unconstitutional) mental health care from the State level to the local level.

- In my opinion, Drs. Gilligan and Stewart under-estimate the numbers of current parolees as well as the increased numbers of parolees who would require intensive services under a Coleman release order. There is variation in cost across counties, but it is reasonable to assume that effective EOP level "assertive community treatment" (or as these programs are increasing called in California, "full service partnerships") can be estimated to cost an annual average of $15,000-$30,000 per individual. If one

9

estimates 506 new EOP parolees (per Gillian #54) with a 30,000 prisoner release, it will cost $8-16 million dollars in basic mental health treatment costs—excluding the cost of hospitalization or local incarceration should that become necessary. This estimate does not include intensive services to the current parole population—a population that is being significantly "under-treated" and that has a higher recidivism rate than the general parole population. This projection also does not take into account the extent to which prisoners who are assessed as CCCMH and are treated in the general prison population, will actually require more intensive follow-up due to greater access to drugs of abuse and failure to follow through on psychiatric medications, outpatient therapy and other conditions of parole. The UCLA <u>Final Report on the Mental Health Services Continuum Program of the California Department of Corrections and Rehabilitation-Parole Division</u> dated June 30, 2006 documents a significant rate of parolee failure to follow through on outpatient services and a correlation between decreased CDCR-POC contacts and recidivism and re-offense.

## 4. Additional recommendations to effectively and safely reduce the population in California's prisons including the plans described by CDCR, CSAC, CMHDA and several legislative initiatives.

In my opinion, it is possible and critically important to plan and implement a responsible program of community mental health treatment and support services that can effectively and safely meet the needs of seriously mentally ill prisoners as they are released from California's correctional facilities. However, I am concerned that the Plaintiff's expert witness reports either fail to understand or minimize the need for an investment prior to the size of prisoner release that would be required to reduce prison overcrowding in California.

I would urge the Courts and other parties to make a realistic assessment of what it would take to bring effective services and programs on-line—and then identify financing and a timeline to accomplish this task. I believe that significant progress has been made in settlement negotiations in this proceeding—even though final agreement was not reached. It is also important to give consideration to positive program developments including but not limited to:
- CDCR's AB 900 implementation plan(s);
- Legislative pilot programs such as SB 618 (Speier) that plan and implement a continuity of care and case management model that follows offenders through all levels of incarceration and community release; and
- Pending legislation such as SB 1851 (Steinberg) that defines a community system of care for seriously mentally ill parolees (based on the lessons of the Mental Health Services Act; Mentally Ill Offender Crime Reduction grant programs and the AB 2034 Integrated Services for Homeless Mentally Ill Persons) and AB 2541 (Bass) that promotes mental health/behavioral health courts.

It is also critically important that we understand and learn from past experience. California should not and cannot afford to dump mentally ill prisoners into our communities without adequate care and supervision. We've witnessed the consequences of the closure of state hospitals in the late

10

1960's through the 1970's when the promise was broken that dollars and services would follow these vulnerable individuals into the community. Any Court or State action to provide humane and constitutional mental health care in prisons, must include a commitment that appropriate care will also be provided to criminal justice involved individuals in our communities. The destructive cycle of criminalization of individuals with mental illness must be broken--and we must keep that promise.

**(II) the data or other information considered by the witness in forming opinion; Include list of reports and references reviewed**

--California Hospital Association's Center for Behavioral Health, Updated Report on Psychiatric Bed Closures, June 25, 2008,

http://www.calhealth.org/public/press/Article/107/CBH_PsycBedClosures.pdf

--CMHDA, 8/25 conference call communication with Patricia Ryan, Executive Director-CMHDA, Don Kingdon, PhD, Assistant Director-CMHDA, Karen Baylor, PhD, San Luis Obisbo, Behavioral Health Director and Co-Chair, CMHDA Forensic Committee and Nancy Pena, PhD, President of CMHDA and Mental Health Director, Santa Clara County.

--CMHDA, 8/26 personal e mail communication from Pat Ryan, Executive Director of CMHDA regarding county notification to State Department of Mental Health that 3 counties are considering "opting out" of the mental health Medi-Cal program.

*Gale Bataille*

Gale Bataille

11