# EXHIBIT C

# Preliminary Expert Report from

# Dr. James Marquart, Ph.D

## I.    Introduction

### 1.  Professional Background

I am currently a Professor of Criminology and serve as the Chair of the Criminology and Sociology Program at the University of Texas—Dallas. I have been Chair since 2005. Prior to this appointment, I was a Professor of Criminal Justice at Sam Houston State University from 1986-2005. I have taught graduate and undergraduate courses on research methods, crime and public policy, social problems, corrections, and criminal justice. I have published over forty refereed journal articles, written (and co-authored) seven books and engaged in over $1 million in funded research activity.

My interest in prisons stems from my employment as a security officer for the Texas prison system (1981-1983) at the Eastham Unit, a large facility for multiple recidivists, malcontents, and escape risks. I was employed at Eastham during a period of overcrowding wherein many offenders were triple-celled and additional space for 400 offenders was created through construction of a tent compound, an area that succumbed to a riot. I have witnessed crowding on a personal level.

In 1997-1998, I was awarded a Leverhulme Visiting Professorship, Queen Mary and Westfield College (University of London), Faculty of Laws, London, England, where I toured a number of British prisons, especially high security prisons that housed members of the Irish Republican Army, organized criminal groups, and major drug and weapons importers. Last year, 2007-2008, I was an Academic Fellow, Foundation for Defense of Democracies, and toured an Israeli prison that housed members of such terrorist organizations as Hamas and Hezbollah. In 2005, I was awarded the Bruce Smith Senior Award by the Academy of Criminal Justice Sciences. Most recently I was elected 2nd Vice president of the Academy of Criminal Justice Sciences, and will be President of this national-level organization in 2010.

1

I started my academic career in 1983, and have developed a research agenda around prison organizations. My research has examined the inmate culture, guard culture, prison violence, prison gangs, and the consequences of judicial intervention on prison systems. I am specifically interested in the aftermath or consequences of policy implementation on prison organizations and society. I have examined the consequences of the commutation of death row offenders resulting from the *Furman v. Georgia* case in 1972 as well the California death row offenders impacted by the *People v. Anderson* case.[1] I also tracked the behavior of former Texas death row prisoners in the post-1976 era.[2] I have testified in over 20 death penalty trials, and have rendered my expertise on future dangerousness in one federal death penalty trial. I have not testified in a death penalty trial in four years. I am at this time, though, assisting in one Texas capital proceeding. I have also examined the consequences of judicial reform on the Texas prison system as well as the desegregation of the Texas prison system. Papers, books, and published articles from my research are listed on my professional vita.

My current research (with several colleagues from Sam Houston State University, the University of North Texas, and the University of Texas-Arlington) agenda involves an analysis of sexual assaults in the Texas prison system based survey or questionnaire data from over 1000 male and female offenders. I am also conducting an analysis (with several colleagues from UTD) of foreign born offenders/prisoners in Texas prisons as well as those offenders slated for deportation.

I have relied upon my education, training, knowledge, and experience in the field of Criminology and Corrections in forming the basis for my opinions. I have attached my professional vita for your review. Moreover, I am working with Professor Chad Trulson (University of North Texas) and the California Department of Corrections and Rehabilitation (CDCR) as a consultant or expert in the *Johnson v. California*, a United States Supreme Court case involving in-cell integration. I and Professor Chad Trulson

---

[1] Furman v. Georgia, 408 U.S. 238 (1972), and People v Anderson, 493 P.2d 880, 6 Cal. 3d 628 (Cal. 1972).

[2] Marquart, James W., Sheldon Ekland-Olson, and Jonathan R. Sorensen. 1989. "Gazing into the Crystal Ball: Can Jurors Accurately Predict Dangerousness in Capital Cases?" *Law and Society Review.* 23 (3): 449-468.

2

assisted the CDCR with staff training involving the implementation of an automated inmate disciplinary form to track inmate-inmate and inmate-staff assaults, both intra and inter-racial. The form will enable researchers to examine inter and intra racial assaults over time as implementation of the in-cell integration plan proceeds. In the summer of 2006, I toured several California facilities (California Institution for Men, Wasco, North Kern, and San Quentin) to observe offender intake and classification procedures. I also personally talked to dozens of correctional officers and new prisoners at each facility to obtain their perspective on in-cell integration. My work in the California prison system is based on nearly two decades of similar analysis of in-cell racial integration in the Texas prison system.

The information relied upon and the methodology utilized in arriving at the enclosed opinions is generally accepted in my field and are the type that experts in the field would reasonably rely upon. Please refer to the case specific report attached hereto. I reserve the right to amend or supplement this disclosure and the opinions contained herein should additional information become available or with any testimony or statement I may provide, including by deposition.

## 2. Retained by Defendants

I was retained by the California Attorney General's Office to be an expert in these proceedings in July 2008 and have reviewed numerous documents, reports, and depositions pertaining to the *Coleman* and *Plata* proceedings. I have been asked to render opinions (1) relating to plaintiff's assertions that overcrowding leads to violence; (2) provide an opinion on whether defendant's current methods (such as construction plans, parole reform, out of state transfer) are "least intrusive" instead of a general prison release order; (3) examine any proposed prison release order by plaintiffs, and (4) examine whether a prison release order will have an adverse effect on public safety and the health and safety of released inmates. My fee is $200 per hour for activity and work related to these cases.

3

### 3. Expert Opinions

Based on my review of documents supplied to me to date, the California prison system is by far the largest and perhaps most complex penal organization in the United States. With an annual budget of nearly $10 billion, the California Department of Corrections and Rehabilitation (or CDCR) oversees or has the responsibility for 319,000 offenders, employs over 60,000 individuals; the annual cost per inmate is $35,587 and the annual cost per parolee is $4,338.[3] California correctional institutions confine roughly 170,000 offenders in roughly 35 institutions. Indeed, the size and scope of operations for this state agency is massive and few state agencies anywhere can "boast" about this complexity. Delivering services to so many offenders is a daunting task and takes a high degree of leadership and commitment from the staff. Indeed, the staff is to be commended for their efforts. The table below portrays the substantial growth of the CDCR between 1982 and 2006. Since 1982, the institutional population has increased five-fold, resulting in an incarceration rate of 461/100,000.[4]

---

[3] CDCR, Division and Boards, First Quarter 2008 Facts and Figures,
[4] California Prisoners & Parolees, 2006, Offender Information Services, Data Analysis Unit.

4

TABLE 6
INSTITUTION POPULATION
RATE PER 100,000 CALIFORNIA POPULATION
DECEMBER 31, 1982 THROUGH DECEMBER 31, 2006

| DECEMBER 31 | ESTIMATED CALIFORNIA POPULATION* | INSTITUTION POPULATION | RATE PER 100,000 CALIFORNIA POPULATION | ANNUAL CHANGE | |
|---|---|---|---|---|---|
| | | | | NUMBER | PERCENT |
| 1982 | 25,052,000 | 34,640 | 138.3 | 5,438 | 18.6 |
| 1983 | 25,555,000 | 39,373 | 154.1 | 4,733 | 13.7 |
| 1984 | 26,113,000 | 43,328 | 165.9 | 3,955 | 10.0 |
| 1985 | 26,742,000 | 50,111 | 187.4 | 6,783 | 15.7 |
| 1986 | 27,388,000 | 59,484 | 217.2 | 9,373 | 18.7 |
| 1987 | 28,061,000 | 66,975 | 238.7 | 7,491 | 12.6 |
| 1988 | 28,771,000 | 76,171 | 264.7 | 9,196 | 13.7 |
| 1989 | 29,558,000 | 87,297 | 295.3 | 11,126 | 14.6 |
| 1990 | 30,296,000 | 97,309 | 321.2 | 10,012 | 11.5 |
| 1991 | 30,812,000 | 101,808 | 330.4 | 4,499 | 4.6 |
| 1992 | 31,303,000 | 109,496 | 349.8 | 7,688 | 7.6 |
| 1993 | 31,661,000 | 119,951 | 378.9 | 10,455 | 9.5 |
| 1994 | 31,910,000 | 125,605 | 393.6 | 5,654 | 4.7 |
| 1995 | 32,223,000 | 135,133 | 419.4 | 9,528 | 7.6 |
| 1996 | 32,670,000 | 145,565 | 445.6 | 10,432 | 7.7 |
| 1997 | 33,226,000 | 155,276 | 467.3 | 9,711 | 6.7 |
| 1998 | 33,773,000 | 159,563 | 472.5 | 4,287 | 2.8 |
| 1999 | 34,336,000 | 160,687 | 468.0 | 1,124 | 0.7 |
| 2000 | 34,650,000 | 160,655 | 463.7 | -32 | 0.0 |
| 2001 | 35,230,000 | 157,142 | 446.0 | -3,513 | -2.2 |
| 2002 | 35,802,238 | 159,695 | 446.0 | 2,553 | 1.6 |
| 2003 | 36,363,502 | 161,785 | 444.9 | 2,090 | 1.3 |
| 2004 | 36,810,358 | 163,939 | 445.4 | 2,154 | 1.3 |
| 2005 | 36,854,224 | 168,035 | 455.9 | 4,096 | 2.4 |
| 2006 | 37,380,870 | 172,528 | 461.5 | 4,493 | 2.6 |

* The estimated California population is provided by the Department of Finance.

The obvious large increase in offenders over these twenty-four years has been driven by many variables, including increases in crime and convictions, and statutory changes. The reliance on incarceration has led to numerous "downstream" problems for the prison system, and perhaps the most important of which is overcrowding. The table below presents institutional data on population size, design bed capacity, and the rate of occupancy, and gives a context for which to understand the level of crowding in the

facilities.[5]  On the face of it, these data show that the prisons hold about twice as many prisoners as they were originally designed to hold.

| As of 6/30 | Institutional Population | Design Bed Capacity* | Rate of Occupancy** |
|---|---|---|---|
| | | | |
| 2000 | 154,014 | 79,873 | 192% |
| | | | |
| 2003 | 153,783 | 80,187 | 192% |
| | | | |
| 2006 | 166,547 | 83,370 | 199% |
| | | | |

* Design Bed Capacity= the number of inmates a facility was originally designed to house. (increases or decreases indicate beds lost/gained due to conversions, additions, or deactivations).
** Rate of Occupancy= population divided by number of design beds multiplied by 100, (166,547/83,370 x 100 = 199%).

## A. Crowding

Concern for crowded cellblocks was voiced within a few years after the inception of the American penitentiary in the 1800s and has been a repeated concern for correctional managers and policymakers until today.  Courts in all regions of the country have addressed the crowding issue and judges in these cases have confronted two general sets of issues.  One is empirical, the other is considerably more value laden.  Value issues arise when deciding whether population densities involve the wanton infliction of pain, without penalogical justification.  In all likelihood, some levels of crowding, when combined with other conditions, policies and practices, would be universally condemned.[6]  In less extreme instances, decisions about what criteria to use varies across time, region, and correctional personnel and what constitutes crowding may also vary across time and jurisdiction.

Whatever the standard of constitutional decency, the empirical issue is whether there is a demonstrable connection between levels of population densities and the

---

[5] California Prisoners & Parolees, 2006, Offender Information Services, Data Analysis Unit data taken from Table 3.
[6] *Holt v. Sarver.* 442 F2d 304 (8th Cir. 1971).

specified standards of decency. Researchers have been interested in the general effects of crowding for decades, and the starting point of such work can be traced to Calhoun's research with rodents.[7] Crowding research in prison settings has drawn a distinction between spatial and social density. Social density has been typically defined as the number of persons encountered over time and has been measured by the number of persons housed in a system, particular institutions within a system, or particular locations within institutions.[8] Spatial density has been measured by the ratio of persons to "design capacity" or to some specified square footage standard.[9]

In general, researchers have employed two theoretical models to examine the adverse effects of prison crowding. Cox and colleagues suggest a "social interaction-demand model", in which crowding operates through social interaction and thereby influences uncertainty, goal interference, and cognitive load, and these states in turn may lead to strain and fear, and these manifestations of stress may then linked to increased blood pressure, mood changes, illness complaints, and aggression (including homicide and non-fatal assaults).[10] Ellis suggests another model in which the perceptions of crowding need systematic analysis.[11] He suggests a "social control" and transiency model in which (1) transiency within the inmate population weakens the interpersonal attachments among staff and offenders, and (2) transiency undermines the sanctioning process by reducing the certainty of punishment, and (3) transiency undermines interpersonal trust. More inmates reduce the staffs' ability to control the inmates, which may lead to interpersonal violence to settle or solve disputes.

Findings from inquiry employing these models have been mixed and this issue remains at the time of this writing unsettled. In short, there is no clear evidence that

---

[7] See J. Calhoun. 1962. "Population Density and Social pathology." Scientific American 206: 139-148.

[8] See McCain, G., V. Cox, and P. Paulus. 1980. *The Effect of Prison Crowding on Inmate Behavior.* Washington D.C.: National Institute of Justice.

[9] See G. Gaes and W. Mcguire. 1985. "Prison Violence: Crowding versus Other Determinants of Prison Assault rates." *Journal of Research in Crime and* Delinquency.

[10] Cox, V., P. Paulus, and G. McCain. 1984. "Prison Crowding Research: The Relevance for Prison Housing Standards and A general Approach regarding Crowding Phenomena." *American Psychologist.* 39: 1148-1160.

[11] D. Ellis. 1984. "Crowding and Prison Violence: Integration of Research and Theory." *Criminal Justice* Review. 11: 277-308.

overcrowding by itself automatically leads to violence. The link between the variables (e.g., age composition of the population, race, institutional size, ratio of staff to inmates, etc) examined and crowding is extremely complex and indirect. In many cases, prison violence results from a myriad of personal and organizational factors. The complexity between crowding and violence is best illustrated in the tables below. The data are from California prisons.[12]

---

[12] California Prisoners & Parolees, 2006, Offender Information Services, Data Analysis Unit.

TABLE 23
ASSAULTS ON STAFF IN INSTITUTIONS AND CAMPS
RATE PER 100 AVERAGE DAILY POPULATION (ADP)
WITH AND WITHOUT USE OF WEAPON
CALENDAR YEAR 1982 THROUGH 2006

| | TOTAL | | | WITH WEAPON | | WITHOUT WEAPON | |
|---|---|---|---|---|---|---|---|
| CALENDAR YEAR | NUMBER OF STAFF ASSAULTED | NUMBER OF ASSAULT INCIDENTS * | RATE PER 100 ADP | NUMBER OF ASSAULT INCIDENTS * | RATE PER 100 ADP | NUMBER OF ASSAULT INCIDENTS * | RATE PER 100 ADP |
| 1982 | 548 | 450 | 1.5 | 60 | 0.2 | 390 | 1.3 |
| 1983 | 670 | 551 | 1.5 | 121 | 0.3 | 430 | 1.2 |
| 1984 | 824 | 695 | 1.7 | 135 | 0.3 | 560 | 1.4 |
| 1985 | 914 | 740 | 1.6 | 159 | 0.4 | 581 | 1.3 |
| 1986 | 986 | 765 | 1.4 | 114 | 0.2 | 651 | 1.2 |
| 1987 | 1,157 | 922 | 1.5 | 151 | 0.2 | 771 | 1.2 |
| 1988 | 961 | 846 | 1.2 | 125 | 0.2 | 721 | 1.0 |
| 1989 | 945 | 834 | 1.1 | 143 | 0.2 | 691 | 0.9 |
| 1990 | 1,002 | 858 | 1.0 | 201 | 0.2 | 657 | 0.7 |
| 1991 | 1,190 | 933 | 1.0 | 303 | 0.3 | 630 | 0.7 |
| 1992 | 1,470 | 1,191 | 1.2 | 456 | 0.5 | 735 | 0.7 |
| 1993 | 1,773 | 1,416 | 1.3 | 608 | 0.6 | 808 | 0.7 |
| 1994 | 2,010 | 1,603 | 1.4 | 710 | 0.6 | 893 | 0.8 |
| 1995 | 1,575 | 1,309 | 1.0 | 600 | 0.5 | 709 | 0.6 |
| 1996 | 1,790 | 1,469 | 1.1 | 721 | 0.5 | 748 | 0.6 |
| 1997 | 2,569 | 2,108 | 1.5 | 948 | 0.7 | 1,160 | 0.8 |
| 1998 | 2,870 | 2,312 | 1.6 | 1,106 | 0.7 | 1,206 | 0.8 |
| 1999 | 3,224 | 2,606 | 1.7 | 1,216 | 0.8 | 1,390 | 0.9 |
| 2000 | 3,388 | 2,813 | 1.9 | 1,283 | 0.8 | 1,530 | 1.0 |
| 2001 | 3,207 | 2,768 | 1.8 | 1,092 | 0.7 | 1,676 | 1.1 |
| 2002 | 3,215 | 2,795 | 1.9 | 1,008 | 0.7 | 1,787 | 1.2 |
| 2003 | 2,907 | 2,597 | 1.9 | 911 | 0.6 | 1,986 | 1.3 |
| 2004 | 2,886 | 2,669 | 1.8 | 644 | 0.5 | 2,025 | 1.3 |
| 2005 | 3,507 | 3,494 | 2.2 | 888 | 0.6 | 2,606 | 1.7 |
| 2006 | 3,891 | 3,873 | 2.4 | 938 | 0.6 | 2,935 | 1.8 |

* Inmate assaults on staff and assaults on both staff and inmates are only reported as a staff assault incident.

NOTE: Previously published numbers may vary due to recent modifications to the database. The increase in incidents from 1996 to 1997, according to Institution Services, is due to new reporting requirements.

9

TABLE 24
ASSAULT INCIDENTS ON INMATES IN INSTITUTIONS AND CAMPS
RATE PER 100 AVERAGE DAILY POPULATION (ADP)
WITH AND WITHOUT USE OF WEAPON
CALENDAR YEAR 1982 THROUGH 2006

| | TOTAL | | WITH WEAPON | | WITHOUT WEAPON | |
|---|---|---|---|---|---|---|
| CALENDAR YEAR | NUMBER OF ASSAULT INCIDENTS * | RATE PER 100 ADP | NUMBER OF ASSAULT INCIDENTS * | RATE PER 100 ADP | NUMBER OF ASSAULT INCIDENTS * | RATE PER 100 ADP |
| 1982 | 687 | 2.0 | 396 | 1.2 | 291 | 0.9 |
| 1983 | 817 | 2.2 | 455 | 1.2 | 362 | 1.0 |
| 1984 | 1,213 | 3.0 | 801 | 2.0 | 412 | 1.0 |
| 1985 | 1,067 | 2.4 | 755 | 1.7 | 312 | 0.7 |
| 1986 | 1,155 | 2.2 | 782 | 1.5 | 373 | 0.7 |
| 1987 | 1,268 | 2.0 | 856 | 1.3 | 412 | 0.6 |
| 1988 | 1,229 | 1.8 | 812 | 1.2 | 417 | 0.6 |
| 1989 | 1,806 | 2.3 | 809 | 1.0 | 997 | 1.3 |
| 1990 | 1,420 | 1.6 | 728 | 0.8 | 692 | 0.8 |
| 1991 | 1,476 | 1.6 | 733 | 0.8 | 743 | 0.8 |
| 1992 | 1,615 | 1.6 | 868 | 0.9 | 747 | 0.8 |
| 1993 | 2,127 | 2.0 | 1,157 | 1.1 | 970 | 0.9 |
| 1994 | 2,408 | 2.0 | 1,127 | 1.0 | 1,281 | 1.1 |
| 1995 | 2,685 | 2.1 | 959 | 0.8 | 1,726 | 1.4 |
| 1996 | 3,004 | 2.2 | 961 | 0.7 | 2,043 | 1.5 |
| 1997 | 4,091 | 2.8 | 1,172 | 0.8 | 2,919 | 2.0 |
| 1998 | 4,062 | 2.7 | 1,116 | 0.7 | 2,946 | 2.0 |
| 1999 | 4,160 | 2.7 | 1,099 | 0.7 | 3,061 | 2.0 |
| 2000 | 4,397 | 2.9 | 1,175 | 0.8 | 3,222 | 2.1 |
| 2001 | 4,091 | 2.7 | 888 | 0.6 | 3,203 | 2.1 |
| 2002 | 4,018 | 2.7 | 866 | 0.6 | 3,152 | 2.1 |
| 2003 | 4,245 | 2.8 | 928 | 0.6 | 3,317 | 2.2 |
| 2004 | 4,327 | 2.8 | 943 | 0.6 | 3,384 | 2.2 |
| 2005 | 4,720 | 3.0 | 935 | 0.6 | 3,785 | 2.4 |
| 2006 | 5,200 | 3.2 | 930 | 0.6 | 4,270 | 2.6 |

* Only inmate on inmate assault incidents are reported on this table.

NOTE: Previously published numbers may vary due to recent modifications to the database. The increase in incidents from 1996 to 1997, according to Institution Services, is due to new reporting requirements.

Inspection of "Tables 23 & 24" presents data on assaultive activity between 1982 and 2006. Table 23 illustrates inmate attacks or assaults on staff with and without a weapon, which are serious infractions on the institutional order. The total number of staff assaults increased dramatically over the years. However using rates to account or control for the rising population, an interesting picture emerges. Between 1982 and 2006, the rate of attacks on staff by inmates using weapons was nearly "static" and increased only slightly, from 0.2 to 0.6. The rate of inmate assaults on staff without weapons, increased from 1.3 in 1982 to 1.8 in 2006. I am not minimizing these attacks or using statistics to belie their importance. My goal here is to illustrate the confounding (and complex) nature of the interaction between crowding and violence. Indeed one would expect that between 1982 and 2006 when the prison population took off, that the rate of inmate- on-staff attacks of all kinds would (in line with the crowding produces tension and aggression model) escalate. In Table 24, the absolute number of inmate-on-inmate assaults increased over the time period. Yet, inmate assaults with a weapon actually decreased, while weaponless assaults increased from 0.9/per 100 inmates in 1982 to 2.6 in 2006.

What are we to make of these data? Much of the upsurge in the weaponless attacks between 1982 and 2006 is, in my opinion, traceable to: (1) the decreased effectiveness of the staff to know specific details about problems among inmates; (2) hesitancy on the part of the staff to head off problems, given inexperience and mandated changes in use of force standards and reporting procedures; and most important (3) increased reliance on self-protection among inmates, most apparent in the growth of gang membership and influence. Gangs, like traditional-style Sicilian-mafia groups, have adopted a feud-like system of justice to deal with inter- as well as intra-gang disputes. The link between crowding and other extreme forms of inmate behavior is also unclear as the suicide data in the table below reveal.[13]

---

[13] R. Patterson and K. Hughes. 2008. "Review of Completed Suicides in the California Department of Corrections and rehabilitation, 1999-2004." *Psychiatric Services*. 59 (June): 676-682.

Table 1

California Department of Corrections and Rehabilitation population, suicide rate, and housing and location of suicide

| Variable | Population (at end of year) | Total suicides (N=154) | Suicide rate per 100,000 | Single-cell housing | | Administrative segregation or secure housing unit | | Mental health crisis bed unit | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | N | % | N | % | N | % |
| Year | | | | | | | | | |
| 1999 | 160,970 | 25 | 15.5 | 20 | 80 | 9 | 36 | 2 | 8 |
| 2000 | 160,855 | 15 | 9.3 | 12 | 80 | 8 | 53 | 0 | — |
| 2001 | 155,365 | 30 | 19.3 | 25 | 83 | 12 | 40 | 6 | 20 |
| 2002 | 158,099 | 22 | 13.9 | 15 | 68 | 6 | 27 | 1 | 5 |
| 2003 | 160,722 | 36 | 23.1 | 22 | 61 | 20 | 56 | 3 | 8 |
| 2004 | 163,346 | 26 | 15.9 | 22 | 85 | 19 | 73 | 3 | 12 |
| Average | 159,893 | 26 | 16.2 | 19 | 73 | 12 | 46 | 3 | 12 |

The relationship between crowding and violence is complex, and though it makes "common sense" to suggest that "more inmates confined in a finite space leads to aggression or violence", such a commonsensical conclusion is not always readily apparent when available data are examined. Most studies to date share methodological inadequacies and in my opinion no positive linear relationship exists at this point between social density and violent infractions. Alternative explanations (i.e., age structure of the inmate population, gang membership, time and duration, training level of staff) may be more accurate in explaining prison violence than simply crowding.

## B. Prison Population Reduction Plan and Possible Effects on local Communities

It has been asserted by the Plaintiffs that the primary source of unconstitutional levels of prisoner health care and mental health services is overcrowding, and that one possible solution or remedy to this situation is the immediate reduction of the prisoner population thru the imposition of a cap set at the level of 158% of design capacity, or 132,500 inmates by 2012.[14] Currently, there are 155,812 offenders in CDCR prisons and 4,341 in camps for a total of 160,153 inmates. [15] We realize that these prison/camp population figures are fluid and change daily, but the bottom line is that roughly 30,000 offenders will have to be removed or discharged, released or "let go" to reach the

---

[14] See "Draft Settlement Referee Proposal, 5/27/2008"

[15] CDCR, Division and Boards, First Quarter 2008 Facts and Figures,

132,500 figure.[16] We also realize that the cap will phased in over time-period—not all will be released at one time. It should be noted that the possibility of releasing tens of thousands of California offenders (no matter what their risk scores are) will have many intended and unintended consequences for the state. Yet the major question is whether releasing thousands of offenders correct the health care issue in the end? In my opinion, releasing inmates without improving the institutional delivery system is no solution.

It must be understood that prison organizations are "downstream" agencies within the criminal justice system. Tinkering with the "mechanics" of the correctional sector will have numerous intended and unintended consequences "upstream" within the criminal justice system and beyond into counties and local communities. Establishing a "constitutional' level of health care for prisoners (and I support this goal) through a general prison release order will impact the State of California in countless ways. One only has to examine the complex consequences of the *Ruiz v. Estelle* litigation on Texas prisons to obtain an understanding of what is at stake in the CDCR situation.[17]

Implementation of the "Draft Settlement Referee Proposal, 5/27/2008" calls for the (1) identification of offenders who pose a "minimal risk" and then divert them to county administered programs; (2) use of a graduated system of community-level sanctions for "low level" parole violators—reduce the number of parole violators returned to prison for "technicals"; and (3) increase earned credits or good time for prisoners.

Who is eligible for "diversion? Who will make the determination of eligibility? Will the "right" offenders be released, particularly as related to the constitutional delivery

---

[16] I am unaware of any mass release of prisoners in the United States, and a "California Exodus" of some 30,000 prisoners must be regarded as unprecedented in scope and size.

[17] Ben M. Crouch and James W. Marquart. 1989. *An Appeal to Justice: Litigated Reform of Texas Prisons.* University of Texas Press: Austin, Texas. Indeed for Texas to comply with the court-ordered remedies in this case, the state, among other things, instituted population caps at each institution of less than 5% of the original design capacity (see also the deposition of D. W. Scott 11/9/2007), hired hundreds of new correctional officers (and there are shortages today), hired 100's of new staff persons to support the organizational growth, expanded community corrections/continuum of sanctions, built dozens of new prisons, and required additional financial resources from the state legislature. Once the remedies were set in motion they became memorialized and budget expansion became an annual necessity.

of medical and mental health services in the prison setting? Most important, how can manipulations of the offender population be accomplished while ensuring public safety? In my opinion, we need detailed answers to these four latter questions before any population cap is instituted. The Expert Panel on Adult Offender & Recidivism Reduction Programming has developed a "road map". This panel has identified two potential pools of eligible offenders. Table 3 from the Panel's report portrays CDCR admission and length of stay data.[18] These data show that first pool of "diverts" consists of 14,532 probation violators serving less than nine months. The second ready pool of "diverts" are the roughly 70,000 "short-term" prisoners/parolees defined as "technical violators/technical violators reinstated" with an average length of stay of less than six months. There is no question that "diverting" some percentage of these offenders from the intake process would reduce the prison population. However, diversion without the proper community support systems will simply lead to additional recidivism.

Table 3: CDCR Admissions and Lengths of Stay by Admit Type

| Admission Type | N | % | Current Average Length of Stay (ALOS) |
|---|---|---|---|
| Total Admissions | 141,881 | 100% | 11.4 mos |
| New Court Felony Conviction | 50,708 | 36% | 18.3 mos |
| No Probation Violation | 36,176 | 26% | 23.0 mos |
| Probation Violation | 14,532 | 10% | 8.6 mos |
| Parole Violators – Total | 91,173 | 64% | 8.7 mos |
| New Court –Felony Conviction | 21,936 | 16% | 19.5 mos |
| Technical Violators | 57,728 | 41% | 4.0 mos |
| Technical Violators Reinstated | 11,509 | 8% | 0.5 mos |
| Other Key Groups | 18,752 | 13% | |
| Two Strikes | 17,280 | 12% | 56 mos |
| Three Strikes | 334 | 0% | 240 mos |
| Life Sentences – No 2 or 3 Strikes | 1,138 | 1% | Life |
| Source: CDCR Admissions and Release Data CY 2006, CDCR Office of Research | | | |

Short-Term
Prisoners

---

[18] Expert Panel on Adult Offender & Recidivism Reduction Programming. *Report to the California State Legislature: A Roadmap for Effective Offender Programming in California,* 2007.

14

In my opinion, releasing these felons without proper supervision in the community will add to the cycle of recidivism. The chart below illustrates the historic trends in recidivism among California releases. The second chart illustrates recidivism data by offense.



*Figure 1: California Department of Corrections Historical Recidivism Rates, 1977-2004*

One, Two, Three Year Follow-up Recidivism Rates
For All Paroled Felons Released from Prison for the First Time in 2004[1]
Under the Supervision of the California Department of Corrections and Rehabilitation

| Principal Commitment Offense | Number Paroled[4] | Returned to Prison Within:[2] | | | | | |
|---|---|---|---|---|---|---|---|
| | | One Year | | Two Years[3] | | Three Years[4] | |
| | | Number[5] | Percent[6] | Number[5] | Percent[9] | Number | Percent[6] |
| Murder First (old law) | 5 | 0 | | 0 | | 0 | |
| Murder First (new law) | 11 | 0 | | 0 | | 0 | |
| Murder Second (old law) | 2 | 0 | | 0 | | 0 | |
| Murder Second (new law) | 47 | 1 | 2.13% | 2 | 4.26% | 3 | 6.36% |
| Manslaughter | 323 | 59 | 18.27% | 106 | 32.82% | 124 | 38.39% |
| Vehicular Manslaughter | 163 | 19 | 11.66% | 31 | 19.02% | 37 | 22.70% |
| Robbery | 2,659 | 942 | 35.43% | 1,421 | 53.44% | 1,630 | 61.30% |
| Assault/Deadly WP | 2,912 | 969 | 33.28% | 1,427 | 49.00% | 1,617 | 55.53% |
| Attempted Murder First | 7 | 0 | | 0 | | 1 | |
| Attempted Murder Second | 190 | 34 | 17.71% | 58 | 30.21% | 72 | 37.50% |
| Other Assault/Battery | 4,830 | 1,830 | 37.97% | 2,579 | 53.51% | 2,858 | 59.29% |
| Rape | 224 | 45 | 20.09% | 77 | 34.38% | 94 | 41.96% |
| Lewd Act With Child | 1,098 | 213 | 19.40% | 319 | 29.05% | 389 | 35.43% |
| Oral Copulation | 108 | 29 | 26.85% | 55 | 50.93% | 62 | 57.41% |
| Sodomy | 31 | 7 | 22.58% | 7 | 22.58% | 10 | 32.26% |
| Sexual Penetration with Object | 62 | 20 | 32.26% | 27 | 43.55% | 31 | 50.00% |
| Other Sex | 1,083 | 486 | 44.88% | 647 | 59.74% | 709 | 65.47% |
| Kidnapping | 124 | 27 | 21.77% | 45 | 36.29% | 51 | 41.13% |
| Burglary First | 1,928 | 751 | 38.95% | 1,079 | 55.96% | 1,174 | 60.89% |
| Burglary Second | 4,232 | 1,899 | 44.87% | 2,475 | 58.48% | 2,653 | 62.69% |
| Grand Theft | 2,055 | 757 | 36.84% | 1,038 | 50.51% | 1,114 | 54.21% |
| Petty Theft With Prior | 3,701 | 1,699 | 45.91% | 2,223 | 60.06% | 2,361 | 63.79% |
| Receiving Stolen Property | 2,675 | 1,300 | 48.60% | 1,677 | 62.69% | 1,756 | 65.64% |
| Vehicle Theft | 3,942 | 2,176 | 55.20% | 2,685 | 68.19% | 2,813 | 71.36% |
| Forgery/Fraud | 2,318 | 774 | 33.39% | 1,101 | 47.50% | 1,188 | 51.25% |
| Other Property | 546 | 225 | 41.21% | 313 | 57.33% | 331 | 60.62% |
| CS Possession | 9,223 | 4,061 | 44.03% | 5,543 | 60.10% | 5,953 | 64.60% |
| CS Possession for Sale | 6,113 | 1,697 | 27.76% | 2,515 | 41.14% | 2,776 | 45.41% |
| CS Sales | 1,709 | 482 | 28.20% | 683 | 39.96% | 759 | 44.41% |
| CS Manufacturing | 1,074 | 184 | 17.13% | 303 | 28.21% | 337 | 31.36% |
| CS Other | 402 | 164 | 40.80% | 216 | 53.73% | 234 | 58.21% |
| Hashish Possession | 26 | 13 | 50.00% | 15 | 57.69% | 16 | 61.54% |
| Marijuana Possession for Sale | 632 | 162 | 26.60% | 259 | 40.99% | 283 | 44.76% |
| Marijuana Sale | 252 | 83 | 32.94% | 108 | 42.86% | 118 | 46.83% |
| Marijuana Other | 107 | 30 | 28.04% | 46 | 42.99% | 49 | 45.79% |
| Escape | 90 | 43 | 47.78% | 55 | 61.11% | 58 | 64.44% |
| Driving Under Influence | 1,759 | 367 | 20.86% | 578 | 32.86% | 674 | 38.32% |
| Arson | 175 | 60 | 34.29% | 84 | 48.00% | 92 | 52.57% |
| Possession Weapon | 3,009 | 1,361 | 45.23% | 1,824 | 60.62% | 1,989 | 66.10% |
| Other Offenses | 2,170 | 776 | 35.76% | 1,072 | 49.40% | 1,194 | 55.02% |
| **TOTAL** | 62,009 | 23,765 | 38.33% | 32,696 | 52.73% | 35,615 | 57.44% |

* See back page for definitions and formula

[1] First releases to parole include those paroled for the first time from prison on a new admission to prison and paroled for the
first time following return to prison with a new court commitment. Returns to prison on new court commitments following
discharge on this parole are not included.

[2] Returns to prison on new court commitments following discharge on this parole are not included.

[3] Returns within two years include returns within one year.

[4] Returns within three years include returns within one and two years.

[5] Numbers may have changed from prior version of report based on updated data.

[6] Percentages not computed for less than 20 releases to parole.

16

While there are many ways to define and analyze the nuanced concept of recidivism, the main point here is that some percentage of those released will return to prison time and again, either for new felonies or another technical violation. In my opinion, prior to any prisoner release order, there must be the proper infrastructure established to handle the already burdensome workload in the parole division and in probation. Additional releases beget more parole officers and probation personnel. In fact, the California State Association of Counties[19] has stated:

> ... if a significant number of prison inmates are released into our communities—
> communities that are ill-equipped to deal with existing service demands—
> counties' program and services will be stretched beyond the breaking point.

The ripple effect of a blanket release order will severely strain county level mental health departments, county alcohol and drug treatment programs, housing, and foster additional competition for jobs in local communities, as well as strain local criminal justice systems, especially county jails.[20]

The Texas experience with caps and offender releases prompts review. In 1983 the Texas State Legislature enacted the Prison Management Act which specified that the state prison system not operate in excess of 95% of capacity. The prison system was required to shut its doors until enough prisoners were released to maintain the legally specified capacity—the "back door" was opened like a safety valve to relieve population pressures at the front door— and between 2/1987 and 9/1987 the prison system closed (or refused to accept new admissions) 21 times. This led to overcrowding in county jails. In California right now there are thirty-three county jails operating under population caps, and further recidivism/rearrests would stress these local facilities even more.[21] In other words, the criminal justice system infrastructure must be built up before caps or releases are instituted.

---

[19] See letter date 9/14/2007 by California State Association of Counties.
[20] Similar concerns were raised in the "Position Statement of the District Attorney Intervenors'" dated 5/27/2008.
[21] See "Position Statement of the District Attorney Intervenors'" dated 5/27/2008.

Administrative actions designed to comply with a population cap in Texas also resulted in the wholesale parole of prisoners.

> *In 1980, just over 7,000 Texas inmates were paroled; by 1985 the figure had grown to almost 9500. By 1990, over 45,000 were released from state prisons on parole. According to Jack Kyle, chairman of the Texas Board of Pardons and Paroles, "during this time period [mid-1980s] parole in Texas became an open door." By way of comparison, the national parole rate in 1983 was 135 parolees per 100,000 and increased to 248 in 1989. In Texas, the 1983 parole rate was 290 and in 1989 the figure leaped to 758.[22]*

In Texas, complying with a population cap taxed the resources of the state.[23] At the same time the state saw an upsurge in crime.[24]

> *From 1980 through 1984, the number of index crime known to the police nationwide dropped by 11.4%, but those in Texas rose by 5%. Then, from 1984 through 1989, although the nation as a whole was experiencing a 20% increase in the number of known index crimes, Texas experienced an increase of 47.3%.[25]*

While the exact cause of the upsurge in index crime (especially drug-related crime) is difficult is to assign, in my opinion some portion of this rise in crime can be attributed to the swelling ranks of parolees. Additionally this release situation also led to a disproportionate impact on some Texas counties—an issue that I will examine more fully as it relates to counties in California. It must also be noted that in Texas (and consequently in California) the additional arrests led to additional convictions and prison

---

[22] See Marquart, J. and colleagues. 1994. "A Limited Capacity to Treat: Examining the Effects of Prison Population Control Strategies on Prison Education Programs." *Crime and Delinquency.* 40 (4): 516-531.
[23] See Marquart, J. and colleagues. 1993. "Ceremonial Justice, Loose Coupling, and the War on Drugs in Texas, 1980-1989." *Crime and Delinquency.* 39 (4): 528-542.
[24] See Cuvelier, S., J. Marquart, S. Huang, and V. Burton. 1992. "Regulating Prison Admissions by Quota: A Descriptive Account of the Texas Allocation Formula." *The Prison Journal.* 72: 99-119.
[25] See Marquart, J. and colleagues. 1993. "Ceremonial Justice, Loose Coupling, and the War on Drugs in Texas, 1980-1989." *Crime and Delinquency.* 39 (4): 528-542.

commitments—all fueling the demand on prison bed space leading to a cycle of releases and returns.

Advancing or accelerating "good time" credits as a population control technique is also fraught with problems as undeserving and dangerous offenders may be hastily released. The classic example of this occurred in Texas, and the story of Kenneth McDuff bears repeating and serves as a warning. McDuff was sentenced to death in 1968 for murdering two young men, and the rape/murder of their young female friend. However, his death sentence was commuted to life imprisonment in the aftermath of the *Furman v. Georgia* decision in 1972 that abolished the death penalty in America. McDuff was returned to general prisoner population (his death sentence was commuted to "life imprisonment", yet he gained good time credits) where he became the classic "model prisoner". He was paroled in 1989, at a time when Texas county jails were filled with state prisoners. Good time credits were liberally awarded to convicts to free up space for state prisoners in numerous county jails and McDuff walked out of prison and shortly thereafter returned to his murderous ways:

*Two of his victims, Melissa Ann Northrup and Colleen Reed were killed a short time later. After a nationwide manhunt, McDuff was arrested in Kansas City in 1992.*

*It was for the abduction, rape and murder of Northrup that McDuff was executed. The body of the 22-year-old pregnant mother of two was found in a gravel pit weeks after her abduction from a convenience store. Her hands were tied behind her, and she had been strangled with a rope.*

*McDuff also had a second death sentence for the 1991 abduction and killing of Austin accountant Colleen Reed, 28, but a judge granted a stay in that case. Authorities say he may have killed as many as a dozen other people, primarily in central Texas between Austin and Waco.* [26]

---

[26] See the *Huntsville Item*, 11/7/1998. "Man blamed for 14 murders executed in Texas."

19

It should also be remembered that California suffered a similar situation in the aftermath of *People v. Anderson*, the case that temporarily abolished capital punishment in February 1972. There were 107 offenders on death row (including such notables as Sirhan Sirhan and Charles Manson) and *Anderson* resulted in these 107 offenders receiving commutations and then being "released" into the general prisoner population— a number were eventually paroled, and one *Anderson*-commutee went on to commit a murder while in the free community.[27] The point here being that the identification of "less risky" inmates for potential release is not an exact science (as murderers are the typically the "best risks" for release), or an academic exercise, but a decision fraught with enormous public safety concerns. The "Yours to Lose System" appears to be a well-intentioned plan, but must be evaluated further and be attentive to public safety concerns.

Who will say that one or two violent acts by a few are an "acceptable" part of the business in the move towards compliance with a prison population remedy? Furthermore, blindly adhering to timelines will no doubt create the organizational stress and tension that facilitates mistakes, "speed ups", and accidents.[28] Californians need look no further than the Texas fiasco when McDuff "slid under the radar screen" and was released in a period of acute organizational pressure/strain and murdered his way back to the execution chamber. Indeed the "accidental" or improper release of inmate Scott Thomas from San Quentin in 5/2007 (which resulted in the stabbing of two persons in a bakery) illustrates clearly that mistakes can occur in making the decision to release offenders.[29]

Ironically, the Texas experience of advancing good time credits to control the prisoner population also led to a decrease in time-served in prison—a situation that had a negative impact of prison treatment programs.

---

[27] See Marquart, James W., Jonathan R. Sorensen, and Madhava Bodapati. 1990. "A Research Note: Two Decades After *People v Anderson*." *Loyola of Los Angeles Law Review*, 24 (1): 45-55.
[28] The deposition of D. W. Scott noted the piles of inmate medical records and the difficulty staff had keeping pace with basic filing—a recipe for misfiling and accidents.
[29] See "Office of the Inspector General: Special Review into the CDCR's Release of Inmate Scott Thomas." 10/2007.

> *The move to comply with the population cap produced a situation whereby the average number of months in prison was less than the average number of months needed to advance one grade level or to attain vocational certification. Accordingly, the opportunity to benefit from educational programming escaped many inmates.*[30]

In short, the "exposure time" or "programming window of opportunity" for inmates to complete programming was dramatically reduced—inmates were released before they finished treatment programs, fueling re-arrests, re-convictions, and returns to prison. A similar situation could unfold in California with respect to inmates in the conservation camps. Currently there are over 4,000 offenders in these camps which train inmates in fire suppression and to render aid in other emergencies:

> *The average sentence for adult inmates selected for camp is less than two years and the average time they will spend in camp is eight months. After being selected for camp, inmates undergo a vigorous two-week physical fitness training program and are then schooled for another two weeks in fire safety and suppression techniques.*[31]

Camp inmates are "low risk" offenders and would be the kind/type slated for any release program—and their release could severely impact the services these inmates render to the state.

"Churning" of the offender population (e.g., new admissions, discharges, "early releases", returns for new felonies, etc.) has complex intended and unintended consequences for any prison organization including reducing the exposure of offenders to programming, "creaming" of the on-hand population which impacts institutional expertise (i.e., reduces the support service function of inmates—electricians, plumbers,

---

[30] See Marquart, J. and colleagues. 1994. "A Limited Capacity to Treat: Examining the Effects of Prison Population Control Strategies on Prison Education Programs." *Crime and Delinquency.* 40 (4): 516-531.
[31] See the CDCR's web site http://www.cdcr.ca.gov/Conservation_Camps/index.html

welders, truck drivers), adding additional offenders to the released population, over and above the "normal" release cohorts. Adding additional release cohorts simply fuels the recidivism rate.

### C. State Plan

In lieu of releasing prisoners, in my opinion, other less intrusive measures as offered by the defendants' are reasonable and are in my opinion the measured way to proceed:

    a.  Follow through on the "construction agreement" (2/26/2008)

    b.  Implement the provisions as set forth in AB 900

    c.  Continue to use out of state transfers

    d.  Increase parole infrastructure to support the re-entry process (AB 900)[32]

I also support the "Legislator Intervenors' Position Statement dated 6/2/2008" especially in regards to their authorization of a:

> *...comprehensive census of inmates to determine the current illegal alien population of the California prisons—currently estimated at approximately 30,000 inmates—and negotiation of full federal funding for the costs associated with housing these inmates.*

In 2003, the State of California was awarded as part of the State Criminal Alien Assistance Program (SCAAP), $66 million in payments for the housing of illegal aliens, and about $30 million was distributed to a number of California counties.[33] The

---

[32] The "road map" to an effective long term offender population management (in-keeping with AB 900) can be found in "C-ROB—Annual report 7/15/2008".

[33] See 2003 State Criminal Alien Assistance Program Report. www.oip.usdoj.gov/BJA/grant/03scaaparch.htm.

criminality of these offenders is extensive[34] and at $35,587 per year per offender the correctional costs to the state are immense.

The data in "Table 2" shown above represents parole data by region, and provides some deportation activity information. The four regions combined deported roughly 13,000 offenders.[35]

Data Analysis Unit
Estimates and Statistical Analysis Section
Offender Information Services Branch

Department of Corrections and Rehabilitation
State of California
August 5, 2008

Table 2: Parole Counts for Parole Statuses (Parolee, PAL, PRTC, PENDREV)
by HWB, & NF SATCU Programs, Deport & Pending Deport and All Other Parole Units
by Parole Region for July 31, 2008

| REGION 1<br>PAROLE UNITS | PAROLEE | PAL | PRTC | PENDREV | PRTC<br>AND<br>PENDREV | TOTAL<br>POP | PRTC &<br>PENDREV<br>AS A<br>PERCENT OF<br>TOTAL POP |
|---|---|---|---|---|---|---|---|
| REGION 1 | | | | | | | |
| DEPORTED | 1,592 | 19 | 0 | 0 | 0 | 1,611 | 0 |
| PENDING DEPORT | 587 | 263 | 3 | 2 | 5 | 855 | 0.6 |
| ALL OTHER UNITS | 25,121 | 2,531 | 4,541 | 1,243 | 5,784 | 33,436 | 17.3 |
| TOTAL REGION 1: | 27,300 | 2,813 | 4,544 | 1,245 | 5,789 | 35,902 | 16.1 |
| REGION 2 | | | | | | | |
| DEPORTED | 2,007 | 3 | 0 | 0 | 0 | 2,010 | 0 |
| PENDING DEPORT | 835 | 322 | 6 | 1 | 7 | 1,164 | 0.6 |
| ALL OTHER UNITS | 19,763 | 2,588 | 3,178 | 730 | 3,908 | 26,259 | 14.9 |
| TOTAL REGION 2: | 22,605 | 2,913 | 3,184 | 731 | 3,915 | 29,433 | 13.3 |
| REGION 3 | | | | | | | |
| HWB-ORION | 0 | 1 | 0 | 0 | 0 | 1 | 0 |
| HWB-WORKING ALT | 0 | 1 | 0 | 0 | 0 | 1 | 0 |
| DEPORTED | 5,913 | 11 | 0 | 0 | 0 | 5,924 | 0 |
| PENDING DEPORT | 2,121 | 919 | 3 | 2 | 5 | 3,045 | 0.2 |
| ALL OTHER UNITS | 30,588 | 5,791 | 2,916 | 196 | 3,112 | 39,491 | 7.9 |
| TOTAL REGION 3: | 38,622 | 6,723 | 2,919 | 198 | 3,117 | 48,462 | 6.4 |
| REGION 4 | | | | | | | |
| DEPORTED | 3,150 | 28 | 0 | 0 | 0 | 3,178 | 0 |
| PENDING DEPORT | 1,368 | 579 | 11 | 2 | 13 | 1,960 | 0.7 |
| ALL OTHER UNITS | 28,775 | 4,437 | 4,855 | 1,082 | 5,937 | 39,149 | 15.2 |
| TOTAL REGION 4: | 33,293 | 5,044 | 4,866 | 1,084 | 5,950 | 44,287 | 13.4 |
| GRAND TOTAL: | 121,820 | 17,493 | 15,513 | 3,258 | 18,771 | 158,084 | 11.9 |

Report Name: Parole. See also main.pgms(parole)

Deportation activity at the end of the system does not relieve "upstream" population pressures in the prisons, and efforts might be explored or taken to commence

---

[34] See the GAO Report, "Information on Criminal Aliens Incarcerated in federal and State Prisons and Local Jails, GAO-05-337R, (Washington DC, 4/2005.).
[35] CDCR, Division and Boards, Populations Reports, Parole Population, Monthly Report.

ICE processing and investigation of suspected illegal alien criminals at the initial stages of the criminal justice system (i.e., county jails, and at admission/intake in the state reception centers).[36]

## Conclusions

In conclusion, the CDCR faces enormous population pressures that have public safety implications. In my opinion, a prisoner release order will have untold public safety consequences (and will not alleviate the problems which ignited this litigation in the first place) and requires intense evaluation. The decision to release an offender is not an exact science. In my opinion, the defendant's plan (which has been endorsed by the Governor) is the way to proceed.[37]

Currently I (along with Professor Chad Trulson) am evaluating the long term consequences of the CDCR's in-cell integration plan.[38] CDCR's implementation of this plan provides a window into how a proposed population remedy might proceed. In short, the negotiated settlement did not specify timetables but left it up to the staff to develop and implement a strategy. A plan was developed within 18 months of the agreement, staff members were well-trained in the plan's details, the inmate population was prepared for this policy implementation, two facilities were selected for initial implementation, and the "go slow" methodology has delivered good results thus far. I recommend a similar strategy be followed, as proposed by the defendant's in Section C.

Finally, a critical element in the *Ruiz v Estelle* litigation in Texas involved remedying overcrowded institutions, including advancing good time credits and early

---

[36] The Texas prison system works in tandem with INS at the Goree Unit (where deportation hearings are held via teleconference arrangements) and at intake facilities to investigate the status of "foreign born" offenders.

[37] See the Governor's letter dated 6/17/2008; see also the CDCR's "Integrated Strategy to Address Overcrowding in CDCR's Adult Institutions.

[38] *Johnson v. California* (543 U.S. 499 (2005).

24

releases. Many inmates actually believed that they "had" to be released for the state to comply with a federal court order.[39] Expectations were unrealistically raised or elevated and led to disturbances—a lesson for all to remember.

JAMES W. MARQUART, Ph. D.    8/14/08

---

[39] Ben M. Crouch and James W. Marquart. 1989. *An Appeal to Justice: Litigated Reform of Texas Prisons.* University of Texas Press: Austin, Texas.

# EXHIBIT A

## CURRICULUM VITA

### James W. Marquart, Ph.D.

Professor
Criminology
University of Texas-Dallas
Richardson, TX 75083-0688
Work (972) 883-4948
Marquart @utdallas.edu

### EDUCATION

| | | | |
|---|---|---|---|
| Ph.D. | 1983 | Sociology | Texas A&M University |
| M.A. | 1978 | Sociology | Kansas State University |
| B.S. | 1976 | Law Enforcement Administration | Western Illinois University |

### PROFESSIONAL EMPLOYMENT

Professor and Director of Criminology Program, University of Texas-Dallas, August 2005 to present.

Director of Research for the College of Criminal Justice, September 2004 to 2005.

Director of the Crime Victims' Institute, September 2003-August 2004.

Director of the National Institute for Victim Studies, April 2000-August 2003.

Director of Research for the College of Criminal Justice, September 1999-May 2000.

Full Professor, College of Criminal Justice, Sam Houston State University. Responsibilities include teaching and research. Promoted June 1995.

Assistant to Associate Professor, College of Criminal Justice, Sam Houston State University. Tenured and promoted June 1989.

Assistant Professor, Department of Sociology, Mississippi State University. Responsibilities included: teaching, research, undergraduate advisor for Corrections Program, 1983-1986.

Sergeant, Eastham Unit. Texas Department of Corrections. Responsibilities included: assistant shift supervisor - responsible for 105 employees, training of new employees, and handling any inmate-inmate, inmate-employee, and employee-employee problems, 1982-1983.

Correctional Officer III, Eastham Unit, Texas Department of Corrections, 1981-1982.

Instructor for one Introduction to Sociology section. Responsibilities included: development of lectures, tests, and general classroom duties, 1980-1981.

Research Assistant, "Police and Energy Conservation," project funded by the Center for Energy and Mineral Resources, Department of Sociology, Texas A&M University. Responsibilities included: library research, collection of data through personal interviews, coding of data, 1979-1980.

Teaching Assistant, Department of Sociology, Texas A&M University. Responsibilities included: grading examinations, and occasional lecturing, 1978-1979.

Teaching Assistant, Department of Sociology, Kansas State University. Responsibilities included: development and grading of examinations and occasional lecturing, 1976-1978.

Correctional Officer I, Missouri State Penitentiary, Jefferson City, Missouri, Summer 1976.

## LEGISLATIVE ACTIVITY

Professor Marquart and Professor Janet Mullings worked with Texas State Senator Ken Armbrister and Texas State Representative Lois Kolkhorst to enact Senate Bill #1245, May 2003 that transferred the Crime Victims' Institute from the Texas State Attorney General's Office to Sam Houston State University.

## FUNDED RESEARCH ACTIVITY

Examining the Perceptions of Crime in a Gated Community. Contract funded by the Hackberry Creek Homeowner's Association, Irving, Texas, 2/07-8/07, $15,000.

Evaluation of *Johnson v. California*, "The Impact of Racial Desegregation in the California Prison System." Contract funded by the California Prison System, 5/05-12-07, $127,000.

Established (with Professor Janet Mullings) the Crime Victims' Institute at Sam Houston State University. Funds for this Institute originate from the Texas Crime Victims' Compensation Fund, Year 1 is $289,000 and Year 2 is $306,000.

Examining the Relationship Between Facility Size and Recidivism in the Texas Youth Council. Funded by the Texas Youth Council (Austin, Texas). Awarded December 1, 2002. Co-Principal Investigator (with Janet Mullings) ($55,000)

Continuation of the National Institute for Victim Studies. Funded by the Office of Juvenile Justice and Delinquency Prevention. Awarded September 1, 2001. ($498,000).

Establishment of the National Institute for Victim Studies. Funded by the Office of Juvenile Justice and Delinquency Prevention. Awarded September 1, 2000. ($1,000,000).

AIDS-risk Behavior of Mentally-Impaired Women Prisoners. Funded by the National Institute of Mental Health from January 1, 1998 to December 31, 1999. Co-Principal Investigator (with Victoria E. Brewer) ($97, 645).

Assessing Current Prisoner Classification Systems, Legal Environments, and Technological Developments. Funded by the National Institute of Justice (#2-7603-TX-IJ) from October 1992 to October 1994. Principal Investigator ($226,059).

Examining Criminal Justice Policy Initiatives in Harris County, Texas. Funded by the Harris County Court of Commissioners from September 1, 1990 to August 31, 1994. Co-Principal Investigator ($514,000).

An Examination of Prison Gang Structure and Activity in Texas. Funded by Sam Houston State University from June 1, 1990 to August 1990, Principal Investigator ($6,000).

The *Furman*-Commuted Prisoners in Texas. Funded by Sam Houston State University from June 1, 1988 to August 15, 1988, Principle Investigator, ($3,000).

OBTS Data Analysis (87-BJ-CX-K081). Funded by the U.S. Department of Justice from October 1, 1987 to December 31, 1988, Co-Investigator, ($44,029).

Organizational Change: The Impact of Court Ordered Reform in a Southern Penitentiary (SES 84-10925). Funded by the National Science Foundation from September 1, 1984 to December 31, 1984 ($13,955).

The Use of In-House Training Videos for Correctional Officers. Funded by Office of Graduate Studies and Research, Mississippi State University, from June 1, 1984 to August 30, 1984 ($4,500).

Developed the grant proposal funded by the Center for Energy and Mineral Resources, Texas A&M University, for the study of "Police and Energy Conservation," August, 1980 ($9,000).

## PUBLICATIONS: BOOKS

Paulette Everett-Norman, James W. Marquart, and Janet Mullings. 2007. *Deadly Betrayal: The Kidnapping and Murder of McKay Everett*. Texas Review Press (Texas A&M University Press Consortium).

Janet Mullings, James W. Marquart, Deborah Hartley. 2003. *The Victimization of Children*. The Haworth Press. Binghamton, NY.

Timothy J. Flanagan, Kenneth Adams, and James W. Marquart. 1998. *Issues in Corrections*. Oxford University Press. New York, NY.

James W. Marquart, and Jonathan R. Sorensen. 1996. *Correctional Contexts: Contemporary and Classic Readings*. Roxbury Press: Los Angeles, CA.

James W. Marquart, Sheldon Ekland-Olson, and Jonathan R. Sorensen. 1994. *The Rope, The Chair, and The Needle: Patterns of Capital Punishment in Texas, 1923-1990*. University of Texas Press: Austin, Texas.

Ben M. Crouch and James W. Marquart. 1989. *An Appeal to Justice: Litigated Reform of Texas Prisons*. University of Texas Press: Austin, Texas.

## PUBLICATIONS: Refereed Articles

James W. Marquart and Chad R. Trulson. 2006. "The First Available House: Desegregation in American Prisons and the Road to Johnson v. California." Corrections Compendium. 31 (5): 1-12.

Trulson, Chad, James W. Marquart, Janet Mullings, Tory Caeti. 2005. "In Between Adolescence and Adulthood." Youth Violence and Juvenile Justice 3: 355-387.

Marquart, James W. 2005. "Bringing Victims in, but How Far?" Criminology and Public Policy. 4.: 1501-1504.

Marquart, James W. 2005. "Understanding the Power of Social Contexts on Criminal Justice Institutions." Journal of Criminal Justice Education. 16: 217-225.

Davila, Mario, James Marquart and Janet Mullings. 2005. "Beyond Mother Nature: Contractor Fraud in the Wake of Natural Disasters." Deviant Behavior. forthcoming.

Mullings, Janet L., James W. Marquart, Hartley, Deborah J. and Tara Carr. 2004 "Knowledge Is Not Always Power: HIV Risk Behavior and the Perception of Risk among Women Prisoners." Journal of Correctional Health Care. Volume 11 (1): 59-78.

Janet Mullings, James W. Marquart, Deborah Hartley. 2004. "The Victimization of Children: Emerging Issues." Journal of Aggression, Maltreatment and Trauma. Part I (8): 1-203.

Janet Mullings, James W. Marquart, Deborah Hartley. 2004. "The Victimization of Children: Emerging Issues." Journal of Aggression, Maltreatment and Trauma. Part 2 (8): 204-310.

James W. Marquart. 2004. "Economic Development is in the Eye of the Beholder." Criminology and Public Policy. 3. July: 489-492.

Janet Mullings, James W. Marquart, Deborah Hartley. 2004. "Exploring the Relationship Between Alcohol Use, Child Maltreatment, and Treatment Needs of Female Women Prisoners." Substance Use and Abuse. 39: 279-307.

Janet Mullings, James W. Marquart, Deborah Hartley. 2003. "Exploring the Effects of Childhood Sexual Abuse and its Impact on HIV/AIDS Risk-taking Behavior Among Women Prisoners." The Prison Journal. 83: 442-463.

Worley, Robert, James Marquart and Janet Mullings. 2003. "Prison Guard Predators: An Analysis of Inmates Who Established Inappropriate Relationships With Prison Staff, 1995-1998." Deviant Behavior. 24 (2): 175-194.

Trulson, Chad and James W. Marquart. 2003. "Inmate Racial Integration: Achieving Racial integration in the Texas Prison System." The Prison Journal 82 (4): 498-525.

Trulson, Chad and James W. Marquart. 2002. "The Caged Melting Pot: Towards an Understanding of the Consequences of Desegregation in Prisons." Law and Society Review 36 (4): 743-782.

Trulson, Chad and James W. Marquart. 2002. "Racial Desegregation and Violence in the Texas Prison System." Criminal Justice Review. 27 (2): 233-255.

Marquart, James, Beth Barnhill, and Kathy Biddle-Balshaw. 2001. "Fatal Attraction: An Analysis of Employee Boundary Violations in a Southern Prison System, 1995-1998." Justice Quarterly 18: 877-910.

Mullings, Janet, James Marquart and Pamela Diamond. 2001. "Cumulative Continuity and Injection Drug Use Among Women: A Test of the Downward Spiral Framework." Deviant Behavior. 22: 211-238.

Marquart, James, Victoria Brewer, Patricia Simon, and Edward Morse. 2001. "Lifestyle Factors Among Female Prisoners With Histories of Psychiatric Treatment." Journal of Criminal Justice. 29: 319-328.

Cheeseman, Kelly, Janet Mullings, and James Marquart. 2001. "Assessing Inmate Perceptions of Correctional Staff Across Three Custody Levels. Corrections Management Quarterly. 5:

Mullings, Janet, James Marquart, and Victoria Brewer. 2000. "Assessing the Relationship Between Child Sexual Abuse and Marginal Living Conditions on HIV/AIDS Related Risk Behavior Among Women Prisoners." Child Abuse and Neglect: The International Journal. 24: 677-688.

Marquart, James, Dorothy Merianos, and Geri Doucet. 2000. "The Health Related Concerns of Older Prisoners: Implications for Policymakers." Ageing and Society. 20: 79-96.

Hemmens, Craig and James Marquart. 1999. "Straight Time: The Inmates' Perceptions of Violence and Victimization in Prison Environments." Journal of Offender Rehabilitation. 28: 1-22.

Brock, Deon, Jonathan Sorensen, and James Marquart. 1999. "Tinkering with the Machinery of Death." Journal of Criminal Justice. 5: 343-350.

Hemmens, Craig and James Marquart. 1999. "Friend or Foe?: Race, age, and inmate perceptions of inmate-staff relations." Journal of Criminal Justice. 4: 297-312.

Brock, Deon, Jonathan Sorensen, James Marquart. 1999. "Racial Disparities in Capital Punishment in Texas after Penry." The Justice Professional. 12: 159-172.

Fiftal, Leanne and James W. Marquart. 1999. "HIV/AIDS Knowledge and Risk Perception Of Incarcerated Adult Women in an Urban Jail." Journal of Correctional Health Care. 6: 97-127.

Sorensen, Jonathan, Deon Brock, James Marquart, and Victoria Brewer. 1999. "Capital Punishment and Deterrence: Examining Effect of Executions on Murder in Texas." Crime and Delinquency. 45: 481-493.

Marquart, James, Victoria Brewer, and David McIntyre. 1999. "Towards an Understanding of the Perception of HIV/AIDS-Related Risk Among Prison Officers." Journal of Criminal Justice. 27: 525-538.

Marquart, James, Janet Mullings, and Victoria Brewer. 1999. "Health Risk as an Emerging Field Within the New Penology." Journal of Criminal Justice. 27: 143-154.

Hemmens, Craig and James W. Marquart. 1999. "The Impact of Inmate Characteristics on Perceptions of Race Relations in Prison." International Journal of Offender Therapy and Comparative Criminology. 43: 230-247.

Mullings, Janet, Victoria Brewer, James W. Marquart, and Ben M. Crouch. 1999. "The Implications of Crime Control Policy on HIV/AIDS-related Risk Among Women Prisoners." Crime and Delinquency. 45:82-98.

Thompson, R. Alan and James W. Marquart. 1998. "Law Enforcement Responses to the HIV/AIDS Epidemic." Policing: An International Journal of Police Strategies and Management. 21: 648-665.

Hemmens, Craig and James W. Marquart. 1998. "Fear and Loathing in the Joint: The Impact of Race and Age on Inmate Support for AIDS Policies." The Prison Journal. 78: 133-151.

Brewer, Victoria, Janet Mullings, and James W. Marquart. 1998. "AIDS-Related Risk Behavior Among Women Prisoners with Histories of Mental Impairment." The Prison Journal. 78: 101-118.

Marquart, James W., Dorothy Merianos, Kelly Damphousse, and Jaimie L. Hebert. 1997. "From the Outside In: Using Public Health Data to Make Inferences About Older Inmates." Crime and Delinquency. 43: 298-313.

Marquart, James W., Dorothy Merianos, Jaimie L. Hebert, and Leo Carroll. 1997. "Health Condition and Prisoners: A Review of Research and Emerging Areas of Inquiry." The Prison Journal. 77: 184-208.

Marquart, James W., Dorothy Merianos, Steven J. Cuvelier, and Leo Carroll. 1996. "Thinking About the Relationship Between Health Dynamics in the Free Community and the Prison." Crime and Delinquency. 42: 331-360.

Fiftal, Leanne, James W. Marquart, Velmer S. Burton, Francis T. Cullen, and Steven J. Cuvelier. 1996. "Female Crime Roles in Serious Offenses: A Study of Adult Felons." Justice Quarterly. 13: 431-454.

Bodapati, Madhu and James W. Marquart. 1995. "The Sentencing Practices of Judges and Juries: A Comparative Analysis Using Texas Drug Offenders." Journal of Crime and Justice. 18: 181-203.

Brock, Deion, Jonathan Sorensen, and James W. Marquart. 1995. "Social Control in Twentieth Texas: The Influence of Ethnicity on Prison Terms for Murder." Rio Bravo. 4: 49-60.

Sorensen, Jonathan R., Velmer S. Burton, James W. Marquart, and Leanne Alarid. 1995. "Expectations and Institutional Support for Research in Criminal Justice Doctoral Programs." The Justice Professional 9: 31-43.

Adams, Ken, K. Bennett, T. Flanagan, James W, Marquart et. al. 1994. "A Large-Scale Multidimensional Test of the Effect of Prison Education Programs on Offenders' Behavior." The Prison Journal. 74: 433-449.

Marquart, James, W. et. al. 1994. "A Limited Capacity To Treat: Examining The Effects of Prison Population Control Strategies on Prison Education Programs." Crime and Delinquency. 40: 517-531.

Johnson, Wesley, Steve Cuvelier, Velmer Burton, Gregory Dunaway, and James W. Marquart. 1994. "The Goals of Community -Based Corrections: An Analysis of State Legal Codes." The American Journal of Criminal Justice 18: 79-91.

Gay, Bruce and James W. Marquart. 1994. "Jamaican Posses, A New Form of Organized Crime." Journal of Crime and Justice. 16 (2): 139-170.

Sorensen, Jonathan R., James W. Marquart, Deion E. Brock. 1993. "Factors Related to Killings of Felons by Police Officers: A Test of the Community Violence and Conflict Hypotheses." Justice Quarterly 10 (3): 417-440.

Hunter, Robert, Paige Ralph and James W. Marquart. 1993. "The Death Sentencing of Rapists in Pre-Furman Texas 1924-1971: The Racial Dimension." American Journal of Criminal Law. 3: 313-337.

Marquart, James W., Madhava Bodapati, Steven J. Cuvelier, and Leo Carroll. 1993. "Criminal Justice, Loose Coupling, and the War on Drugs in Texas, 1980-1989." Crime and Delinquency. 39 (4): 528-542.

Burton, Velmer, James Marquart, Steven Cuvelier, Leanne Alarid, and Robert Hunter. 1993. "A Study of Attitudinal Change Among Boot Camp Participants." Federal Probation 56 (3): 46-52.

Ethridge, Phil and James W. Marquart. 1993. "The New Penology for Profit: The Development of Private Prisons in Texas." Justice Quarterly 10 (1): 29-48.

Hunter, Robert, Velmer Burton, James W. Marquart, and Steven Cuvelier. 1992. "Assessing the Correctional Effectiveness of a Bootcamp Program for Young Felons." Journal of Contemporary Criminal Justice 8 (4): 283-298.

Cuvelier, Steven J., Shihlung Huang, James W. Marquart, and Velmer S. Burton. 1992. "Regulating Prison Admissions by Quota: A Descriptive Account of the Texas Allocation Formula." The Prison Journal 72 (1&2): 99-119.

Ralph, Paige, Jonathan Sorensen and James W. Marquart. 1992. "A Comparison of Death-Sentenced and Incarcerated Murderers in Pre-*Furman* Texas." Justice Quarterly 9 (2): 185-209.

Hunter, Robert J., James W. Marquart, and Steven J. Cuvelier. 1992. "The Attenuation of Drug War Efforts in Texas: Public Demand vs. State Policy." Journal of Crime and Justice 15: 137-155.

Beth Pelz, James W. Marquart, and Terry Pelz. 1991. "Right-Wing Extremism in Texas Prisons: the Rise and Fall of the Aryan Brotherhood." The Prison Journal 71 (2): 23-37.

Ralph, Paige H. and James W. Marquart. 1991. "Gang Violence in Texas Prisons" The Prison Journal 71 (2): 38-49.

Sorensen, Jonathan R. and James W. Marquart. 1990-1991. "Prosecutorial and Jury Decision-Making in Post-*Furman* Texas Capital Cases." New York University Review of Law and Social Change. 18 (3): 743-776.

Marquart, James W., Jonathan R. Sorensen, and Madhava Bodapati. 1990. "A Research Note: Two Decades After *People v Anderson*." Loyola of Los Angeles Law Review, 24 (1): 45-55.

   *Reprinted in The Death Penalty in America: Current Controversies. Edited by Hugo A. Bedau. 1997. Oxford University Press.*

Radelet, Michael and James W. Marquart. 1990. "Assessing Non-dangerousness During Penalty Phases of Capital Trials." Albany Law Review 54 (3/4): 845-861.

Crouch, Ben M. and James W. Marquart. 1990. "Resolving the Paradox of Prison Reform: Litigation, Inmate Violence, and Perceptions of Risk," Justice Quarterly. 7 (1): 103-122.

Marquart, James W., Sheldon Ekland-Olson, and Jonathan R. Sorensen. 1989. "Gazing into the Crystal Ball: Can Jurors Accurately Predict Dangerousness in Capital Cases?" Law and Society Review. 23 (3): 449-468.

   *Reprinted in A Capital Punishment Anthology. Edited by Victor L. Streib . 1993. Anderson Publishing Company.*

Marquart, James W. and Jonathan R. Sorensen. 1989. "From Death Row, To Prison, To Society: A National Study of the *Furman*-Commuted Inmates," Loyola of Los Angeles Law Review. (23) November (1): 5-28.

Tischler, Chloe A. and James W. Marquart. 1989. "Analysis of Disciplinary Infraction Rates Among Female and Male Inmates: Research Note." Journal of Criminal Justice. (17) 6: 507-513.

Marquart, James W. and Jonathan R. Sorensen. 1988. "Institutional and Post-Release Behavior of the Texas *Furman*-Commuted Inmates," Criminology 26 (4): 677-693.

> *Reprinted in Voice for the Defense - Journal of the Texas Criminal Defenders' Association_in December, 1988 issue.*

Marquart, James W. and Julian B. Roebuck. 1987. "Institutional Control and Christmas in a Maximum Security Penitentiary." Urban Life 15 (3 & 4): 449-473.

Marquart, James W. 1986. "The Use of Physical Force by Prison Guards: Individuals, Situations, and Organizations." Criminology 24 (2): 347-366.

Marquart, James W. 1986. "Doing Research in Prison: The Strengths and Weaknesses of Full Participation as a Prison Guard." Justice Quarterly 3 (1): 15-32.

> *Reprinted in The Language of Research in Criminal Justice. Edited by Frank Hagan and Pam Tontodonato. 1997. Allyn and Bacon Publishing Company*

Marquart, James W. and Ben M. Crouch. 1985. "Judicial Reform and Prisoner Control: The Impact of *Ruiz v. Estelle* on a Texas Penitentiary." Law and Society Review 19 (4):557-586.

> *Reprinted in Criminal Justice: Law and Politics. (1988) George F. Cole (editor) Publishing Co., Pacific Grove, CA.*

Marquart, James W. and Julian B. Roebuck. 1985. "Prison Guards and Snitches: Deviance Within a Total Institution." British Journal of Criminology 25 (3): 217-233.

> *Reprinted Correctional Controversies: A Book of Readings. Edited by K. Haas and G. Alpert. 1992. Waveland Press.*

Marquart, James W. and Ben M. Crouch. 1984. "Co-opting the Kept: Using Inmates for Social Control in a Southern Prison." Justice Quarterly 1 (4): 491-509.

Book Chapters:

Trulson, Chad, R., James W. Marquart, and Janet L. Mullings. 2007. "A failure to Integrate: Equal Protection and Race in American Prisons." In Craig Hemmens (Ed.). Current Legal Issues in Criminal Justice. Los Angeles, CA: Roxbury Publishing.

Blackburn, Ashley, James W. Marquart, and Janet L. Mullings. 2007. "Addressing the Rights of Victims in Capital Cases." In Craig Hemmens (Ed.). Current Legal Issues in Criminal Justice. Los Angeles, CA: Roxbury Publishing.

Janet L. Mullings, Victoria E. Brewer, and James W. Marquart. "Childhood Sexual Abuse as a Predictor of Substance Use and HIV/AIDS Risk Behavior among Women at Admission to Prison." In Eric Heinz (Ed.), Of Innocence and Autonomy. London: Queen Mary and Westfield College, University of London. Ashgate Publishing, London, England. September, 2000.

Crouch, Ben M., Geoffery Alpert, James W. Marquart, and Kenneth Haas. 1995. "The American Prison Crisis: Clashing Philosophies of Punishment and Crowded Cellblocks." in Kenneth Haas and Geoffery Alpert (editors). The Dilemmas of Corrections. Prospect Heights, IL: Waveland Press

Widmayer, Alan and James W. Marquart. 1991. "Capital Punishment and Discretion: Arbitrariness and Discrimination After Furman." in Clayton A. Hartjen and Edward E. Rhine (editors) Correctional Theory and Practice, Nelson-Hall.

Crouch, Ben M. and James W. Marquart. 1990. "Court Intervention and Emergent Prison Order in Texas," in John J. DiIulio, Jr. (editor) Courts, Corrections, and the Constitution, Oxford University Press.

Sorensen, Jonathan R. and James W. Marquart. 1989. "Working the Dead" in M. Radelet, Facing the Death Penalty: Essays on Cruel and Unusual Punishment, Temple University Press: Philadelphia, Pennsylvania.

Thomas, Jim and James W. Marquart. 1988. "Dirty Information and Clean Conscience: Communication Problems in Studying 'Bad Guys,'" in D. Maines and C. Couch (eds.) Communication and Social Structure, Charles C. Thomas Publishers, Springfield, Illinois.

Crouch, Ben M. and James W. Marquart. 1980. "On Becoming a Prison Guard." The Keepers: Prison Guards and Contemporary Corrections, edited by Ben M. Crouch, Charles Thomas Publishers.

Book Reviews:

Marquart, James W. 2002. Review of "Rebel and a Cause: Caryl Chessman and the Politics of the Death Penalty in Postwar California, 1948-1974." By Theodore Hamm, in American Historical Review.

Marquart, James W. 1989 Review of "Texas Prisons: The Walls Came Tumbling Down" by Steven J. Martin and Sheldon Ekland-Olson, in Criminal Justice Review 14 (1).

Marquart, James W. 1979. Review of "Police Work: Essays on the Social Organization of Policing" by Peter K. Manning, in Humanity and Society 3.

## PRESENTATIONS AT PROFESSIONAL MEETINGS

Stability and Delinquent Behavior. Chad Trulson, Janet L. Mullings and James W. Marquart. Paper presented at the American Society of Criminology Conference in Nashville, 2004.

An Analysis of Clients Who Received Services in a Southern Child Advocacy Center. Deborah J. Hartley, Janet L. Mullings and James W. Marquart. Paper presented at the Academy of Criminal Justice Sciences 41st Annual Meeting, Las Vegas, NV. March 2004.

Going to the Other Side: Towards a Life course Explanation of Desistance. James W. Marquart, Janet Mullings, and Melissa Meltzer. Paper presented at the American Society of Criminology Conference in Denver 2003.

Exposure to Violence. Janet Mullings, James W. Marquart, and Suzanne Godboldt. Paper presented at the American Society of Criminology Conference in Denver 2003.

When Disaster Strikes: Fraud in the Aftermath of Natural Disasters. Mario A. Davila, James W. Marquart, and Janet L. Mullings. Paper presented at the Southwest Association of Criminal Justice Educators. Houston, TX, September 2003.

The Caged Melting Pot: Towards and Understanding of the Consequences of Desegregation in Prisons. Chad Trulson and James W. Marquart. Paper presented at the American Sociological Association, Chicago, IL, August 2002.

Students Perceptions on School Violence and Implications for Social Control Measures to Reduce School-Related Victimization. Janet Mullings, Carrie Harter and James W. Marquart. Presented at the Academy of Criminal Justice Sciences conference in Anaheim, CA March 2002.

Patterns of Victimization and Special Needs Among Women Prisoners. Janet Mullings and James W. Marquart Presented at the 16th Annual San Diego Conference on Child and Family Maltreatment in San Diego, CA. January 2002.

Childhood Maltreatment, Alcohol Use, and Mental Health: Examining the effects of childhood maltreatment among newly incarcerated females. Janet Mullings, James W. Marquart and Ben M. Crouch. Presented at the American Society of Criminology Conference in Atlanta, GA. November 2001.

Racial Integration in the Texas Prison System. Chad Trulson and James W. Marquart. Paper presented at the Law and Society Association, Miami, FL, May 2000.

The Impact of Race/Ethnicity on Inmate Perceptions of the Future. Presented with Craig Hemmens, Janet Mullings, and James Marquart at the National Association of African-American and Hispanic/Latino Studies Conference in Houston, Texas. February 1999.

A Profile of High-Risk Lifestyles, Drug Use patterns and Criminal Offending Among Hispanic Women Entering Prison. Presented with Victoria Brewer, Janet Mullings, and James Marquart at the National Association of African-American and Hispanic/Latino Studies Conference in Houston, Texas. February 1999.

Relationship Between Child Sexual Abuse and Marginal Living Conditions on HIV/AIDS-Related Risk Behavior Among Women Prisoners. Janet Mullings, James W. Marquart, and Victoria Brewer. Paper presented at the American Society of Criminology, Washington, DC, November 1998.

Inmate Perceptions of the Risk of HIV/AIDS in a Prison Environment. Craig Hemmens and James W. Marquart. Paper presented at the American Society of Criminology, San Diego, California, November 1997.

Perceptions of Risk and HIV/AIDS Knowledge of Jail Offenders. Leanne F. Alarid and James W. Marquart. Paper presented at the Academy of Criminal Justice Sciences, Louisville, Kentucky, March 1997.

Examining HIV-Related Knowledge Among Prisoners. James W. Marquart, Kelly Damphousse, and Dorothy Merianos." Paper presented at the American Society of Criminology, Chicago, Illinois, November 1996.

The Relevance of Public Health Indicators for Criminal Justice Policy.   James W. Marquart, Steven J. Cuvelier, and Dorothy Merianos." Paper presented at the American Society of Criminology, Boston, Massachusetts, November 1995.

Current Issues in Prisoner Classification.   James W. Marquart, Barbara Belbot, and Steven J. Cuvelier. Paper presented at the Academy of Criminal Justice Sciences, Boston, Massachusetts, March 1995.

Towards a Methodology for the New Penology." Steven J. Cuvelier and James W. Marquart. Paper presented at the American Society of Criminology, Miami, Florida, November 1994.

The Influence of Race on Length of Prison Term in Texas, 1923-1972. Deion Brock, Jonathan Sorensen, and James W. Marquart. Paper presented at the American Society of Criminology, Miami, Florida, November 1994.

Prisoner Classification, Special Needs, and the Resolution of Place.   James W. Marquart, Barbara Belbot, and Steven J. Cuvelier. Paper presented at the Academy of Criminal Justice Sciences, Chicago, Illinois, March 1994.

In The Best Interests of the Child. Fran Reddington and James W. Marquart. Paper presented at the Academy of Criminal Justice Sciences, Chicago, Illinois, March 1994.

Gender and Time Served in Texas Prisons, 1980-1991. Janet Mullings, Steven Cuvelier and James W. Marquart. Paper presented at the Academy of Criminal Justice Sciences, Kansas City, Kansas, March 1993.

Determining Prison Usage. James W. Marquart, and Steven J. Cuvelier. Paper presented at the American Society of Criminology, New Orleans, Louisiana, November 1992.

Analyzing Parole Decision Making in Texas, 1980-1990.   Madhava Bodapati, James W. Marquart, and Steven J. Cuvelier. Paper presented at the American Society of Criminology, New Orleans, Louisiana, November 1992.

An Analysis of Job Satisfaction Among Correctional Officers in Taiwan. Albert Lin, James W. Marquart, and Frank Huang Paper presented at the American Society of Criminology, San Francisco, California, November 1991.

The Impact of Ruiz on Texas Criminal Justice System. Paper presented at the Northeast Criminal Justice Association, Newport, Rhode Island, June 3, 1991.

Prisoner Gangs in Texas. Paper presented at the National Symposium on Drugs and Gangs, San Antonio, Texas, January 18, 1991.

Scheduled Prisoner Admission Policies and The Effects on County Jails. with Steven J. Cuvelier. Paper presented at the American Society of Criminology, Baltimore, Maryland, November 1990.

Prisoner Gangs in Texas. with Paige Ralph and Ben Crouch. Paper presented at the American Society of Criminology, Baltimore, Maryland, November 1990.

The Effects of Legal and Extra-Legal Factors On Prosecutorial and Jury Decision Making in Post-*Furman* Texas Capital Cases. with Jonathan Sorensen.  Paper presented at the Academy of Criminal Justice Sciences, Denver, Colorado, March 1990.

The Effects of Legal and Extra-Legal Factors in Sentencing in Pre-*Furman* Texas. with Paige Ralph and Jonathan R. Sorensen.  Paper presented at the American Society of Criminology Meeting, Reno, Nevada, November 1989.

The Prediction of Dangerousness in Capital Cases.  Paper presented at the Death Penalty Legal Defense Fund Meetings at the South Texas School of Law, Houston, Texas, April, 1989.

Gazing Into the Crystal Ball:  Can Jurors and Psychiatrists Accurately Predict Future Dangerousness in Capital Cases? with Jonathan Sorensen and Sheldon Ekland-Olson.  Paper presented at the American Society of Criminology Meeting.  Chicago, Illinois, 1988.

A Comparison of Male and Female Prison Rule Violations. with Chloe Tischler.  Paper presented at the Academy of Criminal Justice Sciences, San Francisco, California, March,1988.

Prison Litigation and Inmate Safety.  Paper presented at the American Society of Criminology Meeting. Montreal, Canada, November, 1987.

"Social Control Structures, Prison Overcrowding, and Violence. with Bruce Thomas.  Paper presented at the Southwestern Social Science Association Meeting.  Dallas, Texas, March, 1987.

Analyzing Organizational Change In Prison. with Ben M. Crouch.  Paper presented at the American Society of Criminology.  Atlanta, Georgia, October, 1986.

Informal Justice in Prison. with Sheldon Ekland-Olson and Ben M. Crouch.  Paper presented at the American Society of Criminology Meeting.  San Diego, California, November, 1985.

"Judicial Reform and Prisoner Control in a Texas Prison:  Some Preliminary Findings in the Impact of Ruiz v. Estelle."  Paper presented at the Southern Sociological Society Meeting.  Charlotte, North Carolina, April, 1985.

The Use of Physical Force by Prison Guards:  Individuals, Situations, and Organizations. with Julian B. Roebuck.  Paper presented at the American Sociological Association Meeting.  San Antonio, Texas, August, 1984.

The Impact of Court-Ordered Reform in a Texas Penitentiary. with Julian B. Roebuck.  Paper presented at the Southern Sociological Society Meeting. Knoxville, Tennessee, April, 1984.

Participant Observation Behind Bars in the Role of a Prison Guard.  Paper presented at the Southern Sociological Society Meeting.  Knoxville, Tennessee, April, 1984.

Prison Guards and Snitches.  Paper presented at the Western Social Science Association Meeting.  San Diego, California, April, 1984.

The New Order in Texas Prisons.  Paper presented at the Academy of Criminal Justice Sciences.  San Antonio, Texas, March, 1983.

Co-optation of the Kept: Maintaining Control in a Southern Prison. Paper presented at the American Society of Criminology Meeting. Toronto, Canada, November, 1982.

A Model for Examining Entering the Guard Subculture. Paper presented at the Southwestern Social Science Association Meeting. Dallas, Texas, April, 1981.

Prisons, Inmates, and Women Guards. Paper presented at the Southwestern Social Science Association Meeting. Houston, Texas, March, 1980.

The Socialization of Prison Guards. with Ben M. Crouch. Paper presented at the Southwestern Social Science Association Meeting. Fort Worth, Texas, March, 1979.

## PROFESSIONAL ACTIVITIES AND AWARDS

Winner of the 2005 **Bruce Smith Senior Award**. Academy of Criminal Justice Sciences. To be presented with award on March 19, 2005 in Chicago, Illinois.

Awarded 1997-1998 **Leverhulme Visiting Professorship**, Queen Mary and Westfield College (University of London), Faculty of Laws, London, England.

Winner of the American Library Association, Association of College and Research Libraries, **OUTSTANDING BOOK for 1995** *"The Rope, the Chair, and the Needle: Capital Punishment in Texas, 1923-1990."*

Invited to National Institute of Justice to participate in "An Action Research Agenda and Strategy for Correctional Boot Camps. January 1995.

Appointed Deputy Editor of Justice Quarterly. November 1992-1995.

Invited to Law Day (organized by the Legal Studies Association), University of Houston-Clear Lake to deliver a paper on the evolution of capital punishment in Texas. April 13-14, 1993.

Invited to Woodrow Wilson School of Public And International Affairs (Princeton University) to participate on a panel session on Judicial Intervention in Prisons. The program was entitled "Public Leadership and Management Skills Program" specifically developed for the Federal Bureau of Prisons, July 21-27, 1991.

Winner of the Academy of Criminal Justice Sciences' 1991 **OUTSTANDING BOOK AWARD** for *"An Appeal to Justice: Litigated Reform of Texas Prisons."* Presented with award on March 8, 1991 in Nashville, Tennessee.

Invited to Albany Law School to present two papers "Assessing Nondangerousness During Penalty Phases of Capital Trials," with Michael Radelet. The second paper was entitled "Murder Over The Life Course," with Barbara Belbot. The meetings were entitled "The Death Penalty: Perspectives on the Past and Future in New York State sponsored by the Albany Law School, April 5-6, 1991.

Invited to New York University Law School, with Jonathan Sorensen, to present the paper "An Examination of Discretion and Discrimination in the Texas Capital Murder Cases: 1974-1988". The meetings were entitled "Challenging the Death Penalty: 1990 and Beyond. A Colloquium sponsored by the New York University Review of Law and Social Change, March 31- April 1, 1990.

Presented with the 1989 **Excellence in Research Award** at Sam Houston State University. (May, 1989).

Invited to Woodrow Wilson School of Public and International Affairs (Princeton University) for an authors' Conference, March 6, 1989. The conference sponsored by the Smith Richardson Foundation, reviewed chapters in the book Courts, Corrections, and the Constitution (Oxford University Press) by John J. DiIulio.

## MANUSCRIPT AND GRANT APPLICATION REVIEW ACTIVITY

Contemporary Ethnography
Contemporary Sociology
Criminology
Justice Quarterly
Journal of Contemporary Justice
Law and Society Review
National Science Foundation
National Institute of Justice
National Institute of Mental Health
Ohio State University Press

Oxford University Press
Prentice Hall
Sage Publications
Social Problems
Temple University Press
The Journal of Crime and Justice
The Social Science Journal
Wadsworth Publishing Company
West Publishing Company

## MEMBERSHIP IN PROFESSIONAL ORGANIZATIONS

Academy of Criminal Justice Sciences
American Sociological Association
American Society of Criminology

Service to Professional Organizations

Chair, Michael J. Hindelang Committee, American Society of Criminology, 1997.
Member, ASC Fellows Committee 1999-2000

Service to the Community

Vice President, Huntsville High School Football Booster Club 2001 to present.
Registrar, Huntsville Youth Soccer Association, November 1995-1997.

Member of the Board of Trustees of the Texas Prison Museum, Inc., Huntsville, Texas 77340 (September 1988-August 1993).

## COLLEGE AND UNIVERSITY SERVICE

Chair, Research Committee College of Criminal Justice: 2003-to present
Chair, Search Committee, College of Criminal Justice: 1998-1999.
Chair, Excellence in Teaching Committee, Sam Houston State University: 1995-1996, 1996-1997
Chair, Elected Faculty Chair of College of criminal Justice: 1994-1995
Chair, Graduate Curriculum Committee, College of Criminal Justice: 1992-1993.
Chair, Research Group, College of Criminal Justice, Comprehensive Program Review: 1991-1992.
Chair, Search Committee, College of Criminal Justice: 1991-1992.
Chair, Doctoral Committee, College of Criminal Justice: 1989-1990.

## TEACHING

Undergraduate
Introduction to Sociology
Social Problems
The Correctional System and Society
The Criminal Justice System
Research Methods

Graduate
Capital Punishment in America
Criminology and Corrections
Qualitative Methods
Seminar in Corrections
Seminar in Social Research
Seminar in Organized Crime
Social Policy

## REFERENCES

Geoffrey Alpert, Chair
Department of Criminal Justice
University of South Carolina
Columbia, SC 29208
(803) 777-6424

Sean McConville
Faculty of Laws
Queen Mary and Westfield College
Mile End Road
London E1 4NS
(0171) 975-5555

Janet Mullings, Assistant Dean
College of Criminal Justice
Sam Houston State University
Huntsville, TX 77341-2296
(936)-294-1646

Ben M. Crouch, Executive Associate Dean
College of Liberal Arts
Texas A&M University
College Station, TX 77843-1113
(979) 845-2141

Leo Carroll, Chair
Department of Sociology
University of Rhode Island
Kingston, RI 02881
(401) 792-2587