**EXHIBIT D**

# REBUTTAL REPORT

# OF JAMES MARQUART, PH.D

# Rebuttal Report of James W. Marquart, Ph.D.

August 27, 2008

1. I am submitting this report to supplement my initial report submitted on August 15, 2008. I have not been deposed in this case, nor have I testified in court as an expert witness in this case.

2. Since submission of my initial report I have reviewed various documents pertaining to these proceeding including

   a. Reports of J. Lehman, G. Bataille, D. W. Scott, J. Woodford, C. Haney, J. Gilligan, P. Stewart, and J. Austin;

   b. Reports prepared by experts retained by Santa Clara, San Mateo and Sonoma counties in California;

   c. The report "Development of the California Static Risk Assessment (CSRA), by Jesse Jannetta (UC Irvine 4/2/2008);

   d. The report "Do the Crime, Do the Time? Maybe Not, In California." Prepared by the California State Sheriff's Association, (6/2006);

   e. The report "Understanding California Corrections" by Dr. Joan Petersilia (5/2006).

3. Since completing my initial report and reviewing the latter reports as well as other data and information contained on the CDCR's website, my opinion in these proceedings is as follows,

   a. A direct causal link between overcrowding and violence and other forms of detrimental human behavior has not been confirmed in the research literature.

1

b.  Plaintiffs' experts' claims pertaining to the "pernicious effects" of crowding on prisoners in California prisons has not been validated through a systematic empirical investigation based on CDCR data. Their observational and/or anecdotal "evidence" obtained on tours should be but have not been corroborated via empirical investigation.

c.  Plaintiffs' experts' claim that a release order or population cap would not adversely impact public safety. Such statements are precarious. The chart below illustrates that even within groups identified as "low risk" recidivism can be expected to occur.[1]



In my opinion, it is best to err on the side of caution and commonsense prior to issuing any release order. I wish to add that lives and property are at stake, and no expert has the credentials to claim "no effect"—one extra act of violent behavior in the aftermath of an early release would undermine the public's trust and confidence in the

---

[1] Development of the California Static Risk Assessment (CSRA), by Jesse Jannetta (UC Irvine 4/2/2008)

2

criminal justice system. There are consequences to public safety that still remain to be seen with a substantial release of offenders (perhaps as high as 40,000). Plaintiffs' experts claim there is no relationship between crime rates and imprisonment. Indeed the relationship between incarceration and crime rates is complex and the issue has not been settled via systematic empirical analysis.[2]

There is to date only one irrefutable social fact regarding offenders released to the free community—some portion of them will re-offend.

    d.    Plaintiff's experts' conclusion that inmate releases are required to achieve "constitutional levels of medical and mental health care" has failed completely to take into consideration how such a release order would impact individual communities, facilities, and infrastructure across the state. In my opinion the sage advice of Gale Bataille (defendant's expert) underscores the consequences of a release order and its potential impact on local California communities. From a criminal justice perspective, Plaintiffs' experts' have failed to consider or weigh the fact that 33 California counties now have population caps in their detention facilities.

    e.    Plaintiffs' experts' opinion that a release order will not adversely impact public safety or unduly affect the California criminal justice system has not been supported by empirical data to date.

    f.    In my opinion, a prison release order will not necessarily "fix" the noted deficiencies in medical and mental health care. Even a targeted release of certain offenders (i.e., inmates with serious medical and mental health care needs) will simply shift the responsibility to already overburdened counties.

---

[2] For a recent review of this complex literature see T. Kovandzic and L. Vieraitis. 2006. "The Effect of County-level Prison Population growth on Crime Rates." *Criminology & Public Policy*. 5: 213-244.

3

g. In my opinion, based on my review of documents prepared by experts on both sides of this case, data from the California prison system, reports prepared by county sheriffs and district attorneys, and county governments leads me to the conclusion that managing the offender population within the CDCR is a complex and difficult task. The body of work prepared and submitted for review clearly illustrates that the California prison system is not an isolated institution. Tinkering with offender "inflow" and "outflow" without consideration of the systemic effects will negatively impact public safety, citizen trust of elected officials, and overburden an already stressed criminal justice system. The only long term "way out" is for elected state officials (in consultation with experienced CDCR prison managers) to provide the necessary resources for offender enrollment in treatment programs, and provide the necessary infrastructure and resources for offender treatment and supervision of offenders upon leaving the CDCR.

I reserve the right to amend or supplement this disclosure and the opinions contained herein should additional information become available or with any testimony or statement I may provide, including by deposition.

*[signature]* 9/27/08

JAMES W. MARQUART, Ph. D.

4