# EXHIBIT E

## Supplemental Report of James W. Marquart, Ph.D.

September 22, 2008

1.      I am submitting this report to supplement my initial report submitted on August 15, 2008.  I have not been deposed in this case, nor have I testified in court as an expert witness in this case.

2.      Since submission of my initial report I have reviewed various documents pertaining to these proceeding including:

a.      Reports of J. Austin and B. Krisberg;

b.      Reports prepared by experts retained by Santa Clara, San Mateo and Sonoma counties in California;

c.      The report "Development of the California Static Risk Assessment (CSRA), by Jesse Jannetta (UC Irvine 4/2/2008);

d.      "Judicial & Criminal Justice" 2007-2008.  California Legislative Analyst's Office.

e.      The report "Do the Crime, Do the Time?  Maybe Not, In California." Prepared by the California State Sheriff's Association, (6/2006);

f.      The report "Understanding California Corrections" by Dr. Joan Petersilia (5/2006).

g.      Research reports and statistics prepared by the California Department of Corrections & Rehabilitation (CDCR) found on their web site.

h.      Newspaper report (9/7/2008) written by A. Furillo "Jails fill up, inmates pour out in capitol region." Sacramento Bee.  Page A1.

i.      "Parole in California, 1980-2000: Implications for Reform." Prepared by Jeremy Travis, Public Hearing on Parole Reform, Little Hoover Commission, 2/27/2003.

j.      Uniform Crime Reports prepared by the Federal Bureau of Investigation.

    k.      "Review of the California Expert Panel on Adult Offender and Recidivism Reduction Programming, Summary of Findings from the Program Review Subcommittee, Testimony of Joan Petersilia Before the Senate Budget and Fiscal Review Subcommittee No. 4 on State Administration, General Government, Judicial and Transportation" August 27, 2007.

    3.      Since completing my initial report and reviewing the latter reports as well as other data and information contained on the CDCR's website, my opinion in these proceedings is as follows,

            a.    Plaintiff's expert asserts "… there is no relationship between crime and imprisonment rates." We offer four charts based on California crime data compiled by the Federal Bureau of Investigation.[1]

---

[1] Data and charts prepared by Erin Orrick, Research Assistant, Program in Criminology, University of Texas—Dallas.









Taken together, these charts illustrate that something is "going on" in California with respect to the relationship between incarceration rates and crime rates—the lines do in fact intersect. However, we are not so quick to conclude that the observed relationship is as simple as depicted on the charts. Indeed the relationship between crime rates and incarceration is extremely complex and remains an unresolved issue within the criminal justice community. Dr. William Spelman, who reviewed the refereed research literature on this topic, had this to say:

6

> *In a nutshell then, what the studies of the past ten years tell us is that crime*
> *responds to prison capacity and that continued expansion of prisons nationwide*
> *will reduce crime. What studies do not tell us is whether the reduction is large*
> *enough to warrant continued expansion.*[2]

The main point being, researchers have not closed the book on this critical policy issue, and it is certainly premature and unwise to advise policymakers that "no effect" is the standing order of the day.

4.      In my opinion, the main issue at hand is whether or not a release order will adversely impact public safety or unduly affect the California criminal justice system. Plaintiff's experts claim that releasing offenders (1) will not adversely impact public safety and (2) releasing inmates will not have any (or "minimal" one at best) impact on the administration of justice in the counties. These two conclusions are unwarranted.

5.      Should a release order be undertaken in California to reduce the correctional population, most of the released offenders would enter California communities under parole supervision for some period of time. From an offender's perspective, the re-entry process or "returning home" is not an easy transition, and staying out of prison is difficult. "Successful" re-entry is dependent upon, among other things, securing employment, obtaining proper medical and mental health care, securing housing, securing substance abuse programming, obtaining/maintaining family support, obtaining community support, and experiencing a positive period of parole supervision.[3] If parolees are not assisted in securing such resources upon their release (and while incarcerated) their chances of success are dismal. Indeed, of the 134,000 prisoners who exited California prisons in 2006, only 7% participated in substance abuse programs and

---

[2] See William Spelman. 2000. "What Recent Studies Do (And Don't) Tell us about Imprisonment and crime. Crime and Justice: An Annual Review of research. Chicago: University of Chicago Press. (419-494).

[3] See D. Baer and colleagues. 2006. "Understanding the Challenges of Prisoner Reentry: research findings from the Urban Institute's Prisoner Reentry Portfolio." *Urban Institute: Justice Policy Center*. This report examines a number of barrier parolees' face when re-entering the free community.

only 10% participated in vocational education while incarcerated. As Dr. Joan Petersilia noted, "fully 50% [of exiting CDCR prisoners in 2006] did not participate in any rehabilitation or work program, nor do they have a work assignment, during their entire prison term."[4] Specific to paroleees, 56% of California's 2005 parolees did not participate in any parole programming and only 10% participated in substance abuse programs. Importantly, "most prisoners and parolees leave CDCR with their literacy, substance abuse, and employment needs unmet. In other words, they are unprepared for success."[5] The point of this discussion is that a prison release order, without the necessary infrastructure to absorb and service more releases, will simply continue the cycle of recidivism and incarceration. In short, if nothing changes, nothing changes. The expectation that there will be no effect on the State parole system and local criminal justice systems, and that members of the prison release cohort will somehow perform differently in light of past trends and already absent services and that this will lead to no impact on public safety, seems misguided.

6.    An examination of CDCR data concerning parolees returned to custody in 2005 is instructive to the previous discussion (See Figure and Table below).[6] In 2005, 60,324 parolees were returned to the custody of CDCR. Of these, 49,422 or roughly 82% were returned to CDCR institutions versus re-released to parole supervision. More than 75% (or 37,532) of those returned to CDCR institutions came back as "Administrative Criminal Returns," meaning they were not convicted of a new crime but were involved in new criminal activity.[7] Examining the number of Administrative Criminal Returns in

---

[4] See, Review of the California Expert Panel on Adult Offender and Recidivism Reduction Programming, Summary of Findings from the Program Review Subcommittee, Testimony before the Senate Budget and Fiscal Review Subcommittee NO. 4 on State Administration, General Government, Judicial and Transportation, August 27, 2007; 3-4. Joan Petersilia, Ph.D.

[5] See, Review of the California Expert Panel on Adult Offender and Recidivism Reduction Programming, Summary of Findings from the Program Review Subcommittee, Testimony before the Senate Budget and Fiscal Review Subcommittee NO. 4 on State Administration, General Government, Judicial and Transportation, August 27, 2007, 4. Joan Petersilia, Ph.D.

[6] Parole Violators Released From Custody by Principal Charge Category, 2003-2005.

[7] In California, Administrative Criminal Returns are considered those who were involved in criminal activity and returned to CDCR, but for some reason were not convicted of this criminal activity. If convicted, the return to prison would be considered for a new crime. No information is available to determine why such returns were not prosecuted, and such returns appear unrelated to the seriousness of the crime. For example, in 2005, 114 Administrative Criminal Returns to CDCR institutions were for Homicide, 292 for Rape, and 347 for Robbery. For a discussion of this method of categorization in

2005 suggests that the addition of some 30-40,000 parolees above recent release trends, without first attending to their in-prison and re-entry needs, would not result in long-term prison population reductions nor would it have "no effect" on crime.    Moreover, shortening parole terms to artificially reduce the number of violators being returned to CDCR under parole jurisdiction, or to divert technical parole violators from prison (most "technical violators" of which were involved in further criminal behavior) into generally non-existent evidence-based programming is akin to ignoring the problem.    In short, a prison release order by itself ignores the gaps in programming and assistance needed to improve the success chances of parolees upon re-entry to the community.    As such, a prison release order will not accomplish long-term reductions in the prison population (which is expected to grow) and the supposed benefits of such reductions as any "slack" created will likely be quickly filled with returns to CDCR institutions.[8]    A prisoner release order then, absent the necessary resources and infrastructure to support releases, will therefore produce no change regarding a sustained reduction of the prison population.



**Figure 4**
**Long-Term Growth of Inmate Population: Three Scenarios**

[a] California Department of Corrections and Rehabilitation.

---

California, see, Travis, J. (2003). *Parole in California, 1980-2000: Implications for Reform.*  Washington, D.C.: Urban Institute.
[8] See Judicial & Criminal Justice" 2007-2008.  *California Legislative Analyst's Office.*  Figure 4.

|  | 2005 | | | | | |
|---|---|---|---|---|---|---|
|  | Female | | Male | | Total | |
|  | N | % | N | % | N | % |
| **FELON PAROLEES RETURNED TO CUSTODY** | 5,117 | 100 | 55,207 | 100 | **60,324** | **100** |
| Returned to Custody* | 4,238 | 82.82 | 45,184 | 81.84 | **49,422** | **81.93** |
| Continued on Parole** | 879 | 17.18 | 10,023 | 18.16 | 10,902 | 18.07 |
| **PAROLE VIOLATORS RETURNED TO CUSTODY** | 4,238 | 100 | 45,184 | 100 | **49,422** | **100** |
| Charge Info Not Available | 26 | 0.61 | 553 | 1.22 | 579 | 1.17 |
| Charge Info Available | 4,212 | 99.39 | 44,631 | 98.78 | 48,843 | 98.83 |
| PV-RTC WITH PRINCIPAL CHARGE INFORMATION | 4,212 | 100 | 44,631 | 100 | 48,843 | 100 |
| Violations of Parole Process | 887 | 21.06 | 9,877 | 22.13 | 10,764 | 22.04 |
| Crimes Against Persons | 359 | 8.52 | 6,618 | 14.83 | 6,977 | 14.28 |
| Property Offenses | 503 | 11.94 | 3,403 | 7.62 | 3,906 | 8 |
| Weapons Related Offenses | 135 | 3.21 | 2,255 | 5.05 | 2,390 | 4.89 |
| Drug Offenses | 1,123 | 26.66 | 10,074 | 22.57 | 11,197 | 22.92 |
| Other | 1,205 | 28.61 | 12,404 | 27.79 | 13,609 | 27.86 |
| **ADMINISTRATIVE CRIMINAL RETURNS** | 3,291 | 100 | 34,241 | 100 | **37,532** | **100** |
| TYPE I | 1,605 | 100 | 12,604 | 100 | 14,209 | 100 |
| H. Drug Offenses | 500 | 31.15 | 3,760 | 29.83 | 4,260 | 29.98 |
| Drug Use | 480 | 29.91 | 4,843 | 38.42 | 5,323 | 37.46 |
| Miscellaneous | 625 | 38.94 | 4,001 | 31.74 | 4,626 | 32.56 |
| TYPE II | 1,169 | 100 | 13,469 | 100 | 14,638 | 100 |
| Battery/Assault | 70 | 5.99 | 974 | 7.23 | 1,044 | 7.13 |
| Burglary | 35 | 2.99 | 555 | 4.12 | 590 | 4.03 |
| H. Drug Offenses | 80 | 6.84 | 759 | 5.64 | 839 | 5.73 |
| Driving Offenses | 95 | 8.13 | 1,503 | 11.16 | 1,598 | 10.92 |
| Miscellaneous | 392 | 33.53 | 5,231 | 38.84 | 5,623 | 38.41 |
| Sex Offenses | 32 | 2.74 | 1,552 | 11.52 | 1,584 | 10.82 |
| Theft/Forgery | 439 | 37.55 | 2,501 | 18.57 | 2,940 | 20.08 |
| Firearms/Weapons | 26 | 2.22 | 394 | 2.93 | 420 | 2.87 |
| TYPE III | 517 | 100 | 8,168 | 100 | 8,685 | 100 |
| Battery/Assault | 224 | 43.33 | 3,372 | 41.28 | 3,596 | 41.4 |
| Burglary | 29 | 5.61 | 347 | 4.25 | 376 | 4.33 |
| H. Drug Offenses | 63 | 12.19 | 712 | 8.72 | 775 | 8.92 |
| Driving Offenses | 22 | 4.26 | 408 | 5 | 430 | 4.95 |
| Homicide | 3 | 0.58 | 111 | 1.36 | 114 | 1.31 |
| Miscellaneous | 71 | 13.73 | 1,261 | 15.44 | 1,332 | 15.34 |
| Rape | 2 | 0.39 | 290 | 3.55 | 292 | 3.36 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Robbery | 28 | 5.42 | 319 | 3.91 | 347 | 4 |
| Firearms/Weapons | 75 | 14.51 | 1,348 | 16.5 | 1,423 | 16.38 |
| **ADMINISTRATIVE NON-CRIMINAL RETURNS** | 921 | 100 | 10,390 | 100 | **11,311** | **100** |
| I--Technical | 881 | 95.66 | 9,859 | 94.89 | 10,740 | 94.95 |
| II--Criminal | 34 | 3.69 | 513 | 4.94 | 547 | 4.84 |
| III--Serious | 6 | 0.65 | 18 | 0.17 | 24 | 0.21 |

7.     A prisoner release order will, however, have major ramifications for the State parole system. The substantial addition of parolees beyond historical release trends will further undermine the ability of parole officers to assist offenders post-release. The resulting growth would overwhelm existing services and programs and lead to even less access for parolees than is currently available. Such growth will likely also impact the ability of parole officers to properly monitor offenders and will reduce the ability of parole officers to help ensure public safety. Based on CDCR parolee populations from 1988-2007, a prisoner release order leading to the addition of 30-40,000 parolees beyond historical trends, without additional and appropriate resources, would represent a massive and detrimental increase to an already overburdened State parole system and will reverberate system-wide.[9]

8.     A prisoner release order will have significant ramifications for local criminal justice systems, in particular, county level jail facilities. California jails are already overcrowded well beyond their rated capacity. According to the California State Sheriffs' Association in 2006, the state was between 4,900-12,800 beds short comparing their rated capacity to their average daily population. "The consequence is that, in 2005 statewide, 9,148 offenders a month were given pretrial releases and an additional 9,323 inmates a month were released early from their jail sentence *due solely to lack of jail space.*" (italics added).[10] Assuming consistent incarceration trends at the county level and a 2005 rated capacity at 74,686 beds, the state would need to add an additional 8,159 beds by 2010. However, this estimate by the Sheriffs' Association is based on a number

---

[9] See the 2008 report, "California Prisoners and Parolees, 2007." Report by the California Department of Corrections and Rehabilitation, Offender Information Services Branch, Estimates and Statistical Services Branch, Data and Analysis, p. 61.
[10] "Do the Crime, Do the Time? Maybe not, in California." California State Sheriffs' Association, June 2006, p. v; 11.

of very restrictive assumptions: 1) no increase in the incarceration rate; 2) significant releases from jail will continue due to lack of space; 3) no significant increase in the number of unserved felony warrants; 4) no increase in the current crime rate; and most relevant to the current issue 5) *There will be no policy or legislative changes affecting the use of jail beds for new or additional populations* (like parolees, for example) (italics added).[11] The influx of parolees to the community under a prison release order, beyond historical trends, will be directly felt by the county jail system. The fact is that a portion of the release order parolees will re-offend for new crimes that will require placement in county jails until return to CDCR institutions. These failures will occupy a number of jail beds beyond that experienced under historical trends and such a situation will further exacerbate the overcrowding problems at the county level. Under this scenario, a prison release order will shift a significant burden to local criminal justice systems.

9.    Should a release order be affected, what might we expect to occur with California prisoners, as individuals, in the community?

      a.   Would the released offenders find **employment**? Research by Frank Williams and colleagues on a group of California parolees found that the overall employment experiences of offenders was not good, and in fact only 20% of the parolees supported themselves through employment in the first year after release.[12] Parolees or ex-offenders in general face a tall-order when reentering the free community in terms of securing gainful employment (i.e., simply checking the box on a job application about having a prior conviction is enough for disqualification), and many employers are reluctant to hire ex-offenders. Indeed, moving up or recalculating release dates, or changing the amount of time on or type of parole supervision are academic shell games devoid of the realities of individuals (not

---

[11] "Do the Crime, Do the Time? Maybe not, in California." California State Sheriffs' Association, June 2006, pp. 13-14.
[12] See F. Williams & colleagues. 2000. "Predicting Parole Absconders." *The Prison Journal.* 80: 24-38.

aggregates) finding jobs and keeping jobs in the face of intense competition from the very large pool of non-criminals.[13]   The plaintiff's experts have failed to consider the realities of parolees when it comes to finding legitimate employment or surviving "life on the streets at minimum wage".   In my opinion a released individual offender would face the "normal" obstacles faced by parolees everywhere.

b.  Would the released offenders be able to obtain proper medical and **mental health care**?  Research on correctional populations has shown that offender populations have "significantly higher incidences of substance abuse, mental health concerns, and other debilitating diseases than the general population.[14]   Services to help these afflicted offenders "on the streets" are not universally available to the offender when they are released.[15]

> *Once the offender leaves the correctional system, then he or she must obtain these services in the community, if they exist. In the cases where the needed services do exist, released offenders often don't have the resources required to obtain them.  This leads to the offender becoming physically or mentally destabilized and often results in him or her being returned to prison after being convicted of committing a new crime or violating one or more parole conditions. We believe that it would be in the best interest of California to ensure that released offenders have access to the medications they need to manage their mental health disorders and-or physical ailments, as well as access to housing and job assistance services.[16]*

---

[13] In the CDCR Expert Panel On Offender Reentry & Recidivism Reduction Program, Table M-1 shows that only 6% of prisoners participating in vocational education programs and only 4% working in prison industries.

[14] See James, D., & L. Glaze. 2006. Mental Health Problems of prison and jail inmates. (Publication No. NCJ-213600). Washington, DC: U.S. Department of Justice, *Bureau of Justice Statistics*.

[15] See the CDCR Expert Panel On Offender Reentry & Recidivism Reduction Program.

[16] See See the CDCR Expert Panel On Offender Reentry & Recidivism Reduction Program.

The plaintiff's experts have failed to consider the realities of parolees when it comes to finding and/or accessing mental health programming while in the free community.

c. Would the released offenders find **housing**?  The median home price in California in 2005 was $545,910 requiring an annual income of $127,950 to qualify for a loan—a job in the service sector at minimum wage would eliminate most released offenders from purchasing their own home.[17]  Like employment, securing adequate housing is another major hurdle for parolees and large numbers of California parolees end up homeless.[18]  The research by Williams and colleagues provides important information on the living arrangements of California parolees.[19]  They report that nearly half (44%) of the parolees that they examined lived with a family member, not in a half way house or group housing situation.  Moreover, data on the needs of California parolees shows that roughly 13% of these offenders have "2 or more prior family violence arrests or convictions".  In short, coupled with the difficulties of finding employment, parolees live fairly unstructured lives—situations that place them at a high risk for trouble in the home, re-arrest, and ultimately return to prison.  In my opinion, plaintiff's experts have failed to discuss the realities of parolees when it comes to housing.

d. Would the released offenders be able to obtain **substance abuse programming**?  COMPAS data (used to assess the needs of parolees) collected from 11,140 parolees shows that a sizeable percentage of parolees have a substance problem that led to a prison term.

---

[17] See J. Grossberg. 2005. "Area housing Prices in a Froth." *Daily Breeze*. (11/9/2005).
[18] See J. Petersilia. 2006. Understanding California Corrections.  See also the Little Hoover Commission. 2007. *"Solving California's Corrections Crisis."*
[19] See F. Williams & colleagues. 2000. "Predicting Parole Absconders." *The Prison Journal*. 80: 24-38.





15

Analysis of the COMPAS data also found that very few offenders in the prison population were in formal treatment programs for alcohol or drugs.[20] In my opinion, plaintiff's experts have failed to consider the realities of parolees finding and sustaining substance abuse programming while in the free community. Simply releasing offenders pursuant to a release order runs the risk of placing a number of offenders at risk for relapse—thereby furthering the churning of the prison population.

e.  Would the released offenders re-offend while in community-based programming? We agree that assigning offenders to these programs is a positive development; however, the data presented in the table below provides the THREE-JUDGE COURT some insight into post-prison programming, costs, and recidivism.[21] The point being that even after one year we must expect some percentage of offenders participating in programming to return to prison—the recidivism data are based on one year of post-program behavior, and will no doubt increase over time. Moreover, program access itself is no guarantee and more parolees will lead to less access to such programs. Additionally, even if program participation is secured, this is no guarantee of law abiding behavior. Program failures will end up in the system to be re-processed again and again. Continually diverting persistent failures from CDCR institutions or reducing parole terms to artificially reduce failures ignores the problem and does not offer solutions to the issue at hand. The plaintiff's experts have failed to consider the realities of parolees when it comes to post-prison programming and recidivism while in the free community.

---

[20] See the CDCR Expert Panel On Offender Reentry & Recidivism Reduction Program. Pages 137-140.
[21] Judicial & Criminal Justice" 2007-2008. *California Legislative Analyst's Office*. Figure 21.

16

## Figure 21
## LAO Cost and Benefit Comparison
## Of Employment Programs

| Programs | Estimated Cost Per Participant | Recidivism Reduction From Program After One Year | Net State Benefit (Positive Number Reflects Net Savings) |
|---|---|---|---|
| **Institution** | | | |
| Prison Industry Authority | $33,500[a] | 8%[b] | $9,300 |
| Vocational training | 4,700 | 13[b] | 7,300 |
| Academic education | 7,600 | 5[b] | 100 |
| **Pre-Release** | | | |
| Offender Employment Continuum | $500 | 16%[c] | $8,100 |
| Pre-release education | 800 | N/A | N/A |
| **Transitional** | | | |
| Parole Planning and Placement | $400 | N/A | N/A |
| Parole and Community Team | 200 | N/A | N/A |
| **Parole** | | | |
| Parolee Employment Program (formerly JobsPlus) | $400 | 15%[c] | $7,700 |
| Computerized Literacy Learning Center | 1,000 | 10[c] | 4,400 |
| Parolee Job Program | 300 | 5[b] | 2,400 |
| Residential Multi-Service Center | 12,800 | 12[c] | -6,300 |
| Female Offender Treatment and Employment Program | 14,700 | 12[d] | -8,200 |
| Parole Service Center | 5,400 | N/A | N/A |

[a] PIA costs are offset by revenues generated from the sale of its goods.

[b] Based on national literature for similar programs. California Department of Corrections and Rehabilitation programs not directly evaluated.

[c] Based on evaluation conducted by researchers from California State University, San Marcos.

[d] Based on evaluation conducted by researchers from the University of California, Los Angeles.

N/A–Data not available.

f.  Plaintiff's experts advocate tinkering with the pool of technical violators by reducing parole terms (to artificially reduce recidivism and hence CDCR return) and diverting violators from CDCR institutions, including those involved in further criminal behavior, so as to affect the prison population. Such a suggestion is irresponsible with further examination of the data.[22] The chart below illustrates that eighty percent of the technical violation pool consists of "administrative criminal violations". The plaintiff's experts have failed to consider that many so-called technical violators were returned to prison for criminal violations—individuals who under Plaintiff's experts assertions should be allowed to remain in the community or be discharged prematurely so they might avoid a CDCR term for their continued criminal involvement.

---

[22] See J. Petersilia. 2006. Understanding California Corrections. See also the Little Hoover Commission. 2007. *"Solving California's Corrections Crisis."*

FIGURE 34

**Administrative Violations vs. New Criminal Convictions of California Parolees Returned to Prison, 1980–2004**



Note: The data for analyzing the percent of administrative violations that are criminal versus noncriminal come from 2001, the last year California collected the data permitting such a calculation.

Source: Data provided by the Division of Adult Parole Operations, CDCR, various years.

10. In conclusion, the continuum of expected behaviors pursuant to a release order ranges from "no effect to a saturnalia of crime", and ordinary common sense tells us that the truth lies somewhere in the middle--there will be criminal activity and there will be victims, only the exact amount of such behavior remains unknown. All the more reason to enter this situation with the lives and families of "John/Jane Doe from Sacramento" at the forefront of our decision making; respect for the public's safety demands that we move slowly. Little insight into the impact of a massive prisoner release order is gained by sterile statistical manipulations suggesting that the release of some 40,000

prisoners will have, on the aggregate, "minimal" or "no impact" on the communities and citizens of the State of California. Such statements are naïve and if applied, dangerous, and disregard executive and legislative branch activity to address prison capacity, county jails, and programming.[23] Nor does this issue require a crystal ball. Rather, a conclusion in this case can be achieved based on the advice of Justice Stephen Breyer (in *Yarborough v. Alvarado*) when he opined "the law in this case asks judges to apply, not arcane or complex legal directives, but ordinary common sense."[24]

11. I reserve the right to amend or supplement this disclosure and the opinions contained herein should additional information become available or with any testimony or statement I may provide, including by deposition

_9/22/08_

JAMES W. MARQUART, Ph. D.

---

[23] Judicial & Criminal Justice" 2007-2008. California Legislative Analyst's Office. $65 million for projected changes in inmate, ward, and parole populations, $148 million to implement federal court orders and settlements, $50 million for a new adult probation grant program, $36 million to improve information technology systems, $65 million for projected changes in inmate, ward, and parole populations.
[24] *Yarborough v. Alvarado*. 541 U.S. 652 (2004) 316 F.3d 841.