# EXHIBIT F

# IRA K. PACKER, Ph.D.

**Forensic Consultation and Training**

Board Certified in Forensic Psychology, ABPP

P.O. Box 469

Sharon, MA 02067

781-864-2899

**Preliminary expert witness report re: Coleman et al. v. Schwartzenegger**

Ira K. Packer, Ph.D., ABPP (Forensic),

November 8, 2007

Referral issue:

I was retained by the State of California in reference to the plaintiff's request for a prisoner release based on the finding that the State has not remedied the deficiencies in delivery of constitutionally adequate services to mentally ill inmates. I have been asked to address the issues of whether: (1) crowding is the primary cause of the violation of the Federal right; and whether (2) no other relief will remedy the violation. In preparing this preliminary report, I have reviewed the documents listed below but have not yet had an opportunity to tour CDCR facilities and make direct observations. I am scheduled to tour several facilities at the end of November, 2007, during which time I will also obtain additional data and interview staff. Thus, this report represents my preliminary assessment; a supplementary and final report, which will incorporate information obtained from those visits, additional documents to be reviewed (including the Program Guide), as well as review of reports by other experts which will provided, will be prepared by December 20, 2007.

Documents reviewed:
- Declaration of Deborah Hysen, May 24, 2007
- Declaration of Margaret McAloon, Ph.D., May 24, 2007
- Declaration of Kathryn P. Jett, May 24, 2007

- Declaration of Doug McKeever, May 24, 2007
- Declaration of Joan Petersilia, Ph.D., May 24, 2007
- Declaration of Scott Kernan, May 24, 2007
- Memorandum re: Out-of-state correctional facility program, Phase III, February 2, 2007
- Memorandum re: 3001 Penal Code Compliance Policy Statement, May 15, 2007
- Summary Monthly Report of CDC patients in DMH hospitals, May – August, 2007
- Report on Suicides Completed in the California Department of Corrections and Rehabilitation in Calendar Year 2005, Raymond F. Patterson, M.D.
- Defendant's plan to address suicide trends in administrative segregation units, October 2, 2006
- Memo re: Administrative Segregation Unit 30 minute welfare check, August 6, 2007
- Court order to implement plan to reduce suicide in administrative segregation, February 9, 2007 (Judge Karlton)
- Special Master's Supplemental Report and Recommendations on defendant's plan to prevent suicide in administrative segregation, May 14, 2007
- Court order accepting Supplemental Bed Plan, October 17, 2007 (Judge Karlton)
- Special Master's Report on Plaintiff's Response re: Salary Enhancements, January 30, 2007
- Court order regarding pay parity, May 23, 2007 (Judge Karlton)
- Defendant's redacted response to court order of May 23, 2007 re: pay parity plan
- Court order regarding pay parity, June 28, 2007 (Judge Karlton)
- Court Order regarding proposed coordination agreements in the areas of information technology, credentialing, hiring, and pharmacy, May 29, 2007.
- Court Order approving coordination agreements, June 28, 2007
- Governor's Prison overcrowding state of emergency proclamation, October 4, 2006

- Special Master's Report on Enhanced Outpatient Treatment Programs in Reception centers, August 15, 2007
- Special Master's Response to Court's May 17, 2007 Request for Information, May 31, 2007
- Special Master's Report and Recommendations on Defendant's August 2007 Supplemental Bed Plan, September 24, 2007
- Defendant's Opposition to Plaintiffs' Motion to Convene a Three-Judge Panel to Limit the Prison Population, December 4, 2006
- Reporter's Transcript of hearing on December 11, 2006 re: Plaintiff's motion to convene a three judge panel
- Defendant's Supplemental Brief in Opposition to Plaintiffs' Motion for Referral to a Three-Judge Panel, May 24, 2007
- Court order to convene a 3 Judge Panel, July 23, 2007 (Judge Karlton)
- Supplemental Bed Plan Report, August, 2007
- Small management yard plan, October 25, 2007

Qualifications of expert:

I have attached my curriculum vita which provides information about my professional qualifications. In terms of specific expertise relevant to this assessment, I would highlight the following aspects of my experience:

I am a Board Certified Specialist in Forensic Psychology (from the American Board of Professional Psychology) with over 28 years experience in forensic and correctional psychology. I have worked in maximum security forensic hospitals whose populations included prison inmates. My first such experience was at the Center for Forensic Psychiatry in Michigan (1979 - 1985), a Department of Mental Health facility, which included units for transfers from the state prison. I also worked for 6 years (2001 - 2007) at Bridgewater State Hospital in Massachusetts, a Department of Correction facility, which provided evaluations and treatment for, among others, state prisoners. At that facility I served as the Director of Forensic Services as well as Chief of Psychology. I

was a member of the Hospital Executive Committee; this leadership committee developed and implemented policies and procedures, and was responsible for coordinating the successful attempt to obtain JCAHO accreditation for that facility (obtained for the first time in the facility's history in 2003) as well as re-accreditation (2006). A significant policy change which we implemented clarified admission and discharge criteria for prisoners, tightened the procedures for screening and triaging admissions, and improved communication between the hospital and the prisons.

I also was involved in program development, policy development, and operational implementation of provision of mental health services to the 18 Department of Correctional prison facilities. From 1998-2001, I served as Deputy Mental Health Program Director, during which time significant improvements were made in the delivery of mental health services to inmates in the Massachusetts prison system. From 2001-2007, as noted above, I served at Bridgewater State Hospital, but also maintained responsibility for oversight of the psychologists in the prison system (as Director of Psychology).

In addition to my experiences in the prison system, I also have extensive experience with county correctional facilities. From 1985-1993, I was program director for a community forensic program in Western Massachusetts, which included provision of services to the local courts as well as to three County Correctional facilities. In that capacity, I was responsible for development of a mental health program at the Hampden County Correctional Center, which has served as a model for other facilities in the Commonwealth. During that time, I also provided direct clinical services at the facility.

I also served, from 1993-1996 as Assistant Commissioner for Forensic Mental Health in the Massachusetts Department of Mental Health. In that position, I was responsible for oversight of services to over 70 courts, as well as 13 county correctional facilities. During my tenure, we developed standards for evaluation of quality of services at these facilities. In addition, we initiated a new program called the Forensic Transition Team (FTT). This service was developed in response to concerns that mentally ill inmates were being

discharged from the prisons and county correctional facilities without adequate community services in place. The FTT program involved Department of Mental Health clinicians working with inmates and the facilities prior to discharge to ensure a coordinated plan in the community. FTT clinicians then work with the newly released inmates for a period of several months until care can be transitioned to DMH case management and/or community providers. This program has been very successful and was recently significantly expanded.

### Preliminary opinion:

#### Scope of opinion:

It is my understanding that I am addressing specifically the impact of overcrowding on the *Coleman* class, which includes inmates with "serious mental disorders." My assessment incorporates the following determinations which have been presented in the various documents, and which I am not independently assessing:

1. The California Prison system is overcrowded, as there are currently approximately 173,000 inmates in CDCR facilities.
2. The Court has determined that CDCR's provision of mental health services is not in compliance with Constitutional requirements (8th amendment).

Thus, the question is whether the overcrowding is a primary cause of the lack of compliance and whether compliance can be achieved without a release of large numbers of prisoners.

Based on my review of the documents above, it is my professional opinion that the overcrowding in CDCR contributes to the difficulties in providing adequate mental health services, but is not the primary cause of the deficiencies. As noted in Special Master Keating's report (May 31, 2007), the issue of overcrowding affects 1) lack of adequate space to provide therapeutic services, 2) lack of adequate staffing to provide mental

health services to the *Coleman* class, and 3) lack of adequate intensive mental health treatment beds.

Impact of overcrowding on resources:

I will address these items individually:

1) Lack of adequate space: I have reviewed the Declaration of Deborah Hysen (May 24, 2007) regarding the Facilities Construction Strike Team's plans for increasing bed and programming space, the Small Management Yard Plan submitted by Ms. Hysen (October 25, 2007), as well as the Special Master's report noting the use of mobile trailers to increase programming space. It is my opinion that these strategies, if properly implemented, can reasonably be expected to ameliorate the problems posed by the current lack of adequate space. Furthermore, the Small Management Yard Plan would serve to improve conditions for mentally ill inmates in administrative segregation. However, as I have not yet had the opportunity to visit facilities, particularly those with trailers used for programming, I cannot at this point offer a more specific assessment. I expect to be able to do so following my visits.

2) Lack of adequate staffing: I have reviewed the State's pay parity plan to increase the salaries of mental health professionals. This plan appears reasonable and is likely to increase the number and quality of professional staff willing to work within the prison system. (I would also note that the plan was amended to increase pay for DMH staff, in anticipation that failure to do so would likely result in DMH staff transferring to CDCR. This speaks to the likelihood of the pay parity plan being successful in recruitment and retention). I have also reviewed the documentation regarding vacancies and the use of contracted employees. Although using contract employees, in general, is usually not as desirable as having permanent employees, there are ways to maintain quality even with

contracted employees. I reserve further judgment on this particular issue until I have had an opportunity to tour sites and interview staff.

3) Lack of adequate beds: I have reviewed the State's Supplemental Bed plan and the Special Master's report on that plan. It is my opinion that this plan demonstrates appropriate planning for the needs of the population and reasonably can be expected to improve the State's ability to provide mental health service to mentally disordered inmates, particularly those in need of the most intensive level of services. This plan, though, is a long range one and does not address the immediate needs. Thus, in the short term, what will be required is a more focused system of utilizing existing beds appropriately, including: moving patients out of the high intensity beds when they no longer require that level of service (thus freeing up the beds for other inmates); improving the system's ability to identify and prioritize those inmates who are most in need of the higher intensity services; overcoming some of the resistance of staff to refer patients for higher level services; work with the Department of Mental Health to balance concerns about security issues with clinical needs. The documents that I have reviewed suggest that the current leadership at CDCR is working towards these goals. However, I reserve judgment on whether these issues are being resolved until I have an opportunity to tour facilities and interview staff.

Impact of overcrowding on *Coleman* class:

Based upon my review of the documentation, there are 3 ways that overcrowding could impact the *Coleman* class: the stress of overcrowding causes inmates who were not in the class upon admission to become dysfunctional, thus entering the class; the stress of overcrowding causes mentally ill individuals who enter the prison system to deteriorate in their functioning thus requiring a higher level of care; the large numbers of mentally ill inmates (according to the Special Master's report, this class now numbers approximately 33,000) overwhelms CDCR's capacity to provide adequate resources.

1. Increase in *Coleman* class: although this is a "common-sense" assumption, this issue should be addressed by looking at empirical data. The data I have reviewed to date does not provide quantitative evidence of this process. In her declaration, Margaret McAloon, Ph.D. notes that the percentage of inmates who require mental health services upon admission to the prison system (Reception Centers) is higher than the percentage in the population (which she estimated at 18% and the Special Master estimated at 19%). This could be confirmed by looking at the actual numbers of inmates at all the Reception Centers who are included in the Mental Health Population and comparing this percentage to the percentage within the rest of the prison facilities. I have not yet had the opportunity to complete such an analysis, but a preliminary review of data provided regarding mental health population per institution suggests that the percentage of inmates requiring mental health services upon admission is <u>at least as high</u> as that of the general population. If this is substantiated after a more formal analysis, it would suggest that, although for certain individuals the stresses of overcrowding lead to need for mental health services, for the population as a whole, reduction of census would not make a significant impact on the *Coleman* class.

2. Decompensation within *Coleman* class: for this issue as well, I have not seen any empirical data yet to indicate how significant the impact of overcrowding is on causing deterioration among mentally ill inmates. It may be possible to obtain empirical data from the Reception Centers to address this issue, although it will be more difficult than the previous issue because this is more of a qualitative issue (degree of dysfunction or extent of symptoms) that is not as likely to be captured within existing data sources. Dr. McAloon's declaration that many inmates enter prison severely decompensated due to lack of services in the community, at least suggests that crowding is not the *primary* reason for severity of symptom presentation among mentally ill inmates. In addition, it is noted that the most seriously impaired inmates (in acute care, crisis beds, intermediate care, and EOP), are housed separately from the general population. Thus, they are not housed in settings in which inmates are crowded together (e.g., triple-bunked).

3. Impact of size of the *Coleman* class: CDCR's ability to provide adequate treatment to mentally ill inmates is impacted by the large number (about 33,000) of inmates in this class. However, a general reduction in the prison population is unlikely to have a significant impact on the size of the *Coleman* class and the adequacy of services provided to this class. As mentally ill inmates constitute approximately one-fifth of the population, a general reduction of census would, *at most*, result in reduction of one *Coleman* class inmate for each five inmates released. Even if there were to be a reduction of *Coleman* class inmates within each institution, this would not necessarily translate into a real ability to redeploy staff resources across institutions, due to issues of geography and patient needs. Thus, if there is decreased need for mental health staff in a particular institution (e.g., due to a smaller number of CCCM inmates), this does not necessarily mean that these staff can be deployed in other institutions which may be in a different part of the state, or that these staff are best suited for working with the more seriously impaired inmates in a higher intensity setting.

Furthermore, based upon the documentation I have reviewed to data (which will need to be augmented by my direct observations and interviews on site as well as review of additional data), it is my preliminary assessment that the most significant difficulties in providing adequate services to this population stem from lack of adequate treatment being provided to the most seriously ill inmates. Thus, inmates who cannot get in to the DMH beds, the intermediate care beds, or the EOP beds, end up either taking up crisis beds best used for other inmates, or remain in population, requiring more attention and services from mental health staff, thus reducing availability of these staff to other inmates. Reduction of the prison population in general is unlikely to have a significant impact on the number of more seriously mentally ill inmates or the CDCR's ability to provide constitutionally adequate services to this group.

This analysis suggests that improvement of services to the mentally ill population requires a focus on serving the needs of the most severely disturbed, so as to "unclog" the system. The issues affecting this class of individuals include the need to improve the quantity and quality of mental health staff, the need to improve training of staff, the need to change staff attitudes to increase the appropriate referral of inmates with mental illness to higher levels of care, the need to develop additional capacity for intensive treatment, the need to improve the information technology system, and the need to develop a better system for appropriate utilization of the most intensive resources (as discussed above). These changes are essential for improvement of care to the *Coleman* class and represent problems that are not primarily associated with the size of the prison population in general or the size of the *Coleman* class.

Suicides in the CDCR

Based on the data reviewed, it is my professional opinion that the increase in suicides in the California prison system is not primarily a function of census and overcrowding. Although reduction of overall population would result in some increased availability of mental health staff (that is, a higher staff/inmate ratio), this is not the primary factor identified in the increase in suicides. I reviewed Dr. Patterson's Report on Suicides (2005) as well as the CDCR plan for suicide reduction in administrative segregation and the Special Master's review of this plan. Based on these sources (and, this will be augmented by my review of selected cases), the problems noted were not primarily due to overcrowding issues. Rather, deficiencies were noted in room design (that is, failure to make the rooms more suicide-resistant, by removing grates, for example), failure to follow policy, and lack of follow through on the institutional level to previous recommendations. For instance, Dr. Patterson noted (p. 10) that "there continued to be significant substantive inconsistencies and inadequacies in the application of policies and procedures and in staff performance with regard to suicide prevention and management." These are issues that need to be addressed to reduce successful suicides in the prison, and are independent of the size of the prison and *Coleman* class population.

Transfer of prisoners out of State

The Governor's proclamation and AB900 address transfer of prisoners from California to out of state facilities. In terms of impact on the *Coleman* class, I would offer the following:

1. To the extent that this reduces overcrowding in general, this will have some ameliorative effect on the *Coleman* class, but will not be significant (using the same logic as above, in that overcrowding *per se* does not appear to be the primary cause of inadequate services to this class).

2. If members of the *Coleman* class (particularly CCCM inmates) are included in this transfer, this would reduce the size of this class. However, as noted above, increasing the staff to client ratio does not necessarily translate into a system that allows useful redeployment of the staff. The geographic obstacles as well as issues of staff who are specifically trained to work with the more seriously impaired inmates, limit the likely impact of out-of-state transfers on the system's ability to provide the necessary services to this class, particularly the more seriously impaired members.

**Summary:**

Emphasizing again that this is a preliminary assessment, based on review of the documents enumerated above, pending my visits to prison facilities, interviews with staff, and review of additional materials, the following is a summary of my assessment to this point:

1. Overcrowding (that is, the large number of prisoners in the custody of CDCR) is a contributory factor to the continued deficiencies in the delivery of mental health services to the *Coleman* population.

2. However, the overcrowding does not appear to be the *primary* cause of such deficiencies.

3. It appears that inadequate planning and projection of the size and needs of the mentally ill population has resulted in a mismatch between needs and types of services provided. There are also infrastructure issues (such as lack of an adequate information management system, need for more rooms that are suicide-resistant), staffing issues (including both issues of quantity and quality of staff, and adequate training of staff), and need for more appropriate space in which to provide mental health treatment services.

4. It also appears that there has not been adequate review and management of the appropriate utilization of existing resources (that is, improving management of the more intensive services to avoid "clogging up" other levels of service).

5. The declarations provided by Dr. McAloon, Ms. Hysen, Mr. Kernan, Ms. Jett, Dr. Petersilia, as well as the Supplemental Bed plan, the Small Management Yard plan, and the salary increases, all point to a concerted effort by the current administrators to respond to the needs of the *Coleman* class in a reasonable manner and to address the identified problems in planning and management of resources. I do not have a basis for explaining why previous efforts were unsuccessful, since I do not have information about this history, but it is my professional opinion that the current plans demonstrate a careful and thoughtful approach to ameliorating the deficiencies noted by the Special Master and acknowledged by the Court. These efforts have the potential to improve the quality of mental health care to the *Coleman* class and bring it up to the required Constitutional level. I cannot predict whether they will indeed be followed through and succeed, but they reflect a state-of-the-field approach.

Submitted on November 8, 2007

*Ira K. Packer, Ph.D.*