**EXHIBIT H**

# IRA K. PACKER, Ph.D.

**Forensic Consultation and Training**

Board Certified in Forensic Psychology, ABPP

P.O. Box 469

Sharon, MA 02067

781-864-2899

**Addendum to Report re: Coleman et al. v. Schwarzenegger et al.**

Ira K. Packer, Ph.D., ABPP (Forensic),

August 15, 2008

Introduction:

On December 10, 2007 I submitted an "Expert Report re: Coleman et al. v. Schwarzenegger et al." This addendum reflects additional information I have obtained since that time. From July 28, 2008 – August 1, 2008, I toured the following CDCR facilities, interviewing both staff and inmates.

- California Substance Abuse Treatment Facility (CSATF): July 28, 2008.
- CCI Tehachapi: July 29, 2008
- California Medical Facility – Vacaville (CMF): July 30, 2008
- North Kern State Prison: July 31, 2008
- Wasco State Prison: August 1, 2008

The tour of CMF was done in conjunction with a tour by plaintiff's expert, Pablo Stewart, M.D., as well as plaintiff's attorneys. The remaining tours were done in conjunction with tours by plaintiff's expert Craig Haney, PhD., as well as plaintiff's attorneys. In addition, an attorney from CDCR as well as attorneys from intervenor parties were present during the tours. I interviewed inmates who had been selected by the plaintiffs, in addition to two interviews of inmates whom I selected at random at North Kern State Prison. A plaintiff's attorney was present during all of my interviews with inmates.

1

In addition, I reviewed the Special Master's draft 20th monitoring report on the above facilities. I have also reviewed the following documents:

1. Court Order approving a Construction Agreement, which will include 5,000 medical beds and 5,000 mental health beds, dated 2/26/08.
2. Court Order approving Information Technology Coordination Agreement, dated 3/10/08.
3. Court Order approving Chief Executive Officer Pilot Program Coordination Agreement, dated 4/1/08.
4. California Department of Corrections and Rehabilitation's Mental Health Bed Plan submitted to the Special Master, dated July 16, 2008.
5. Transcript of deposition of Ralph Coleman, dated December 13, 2007.
6. Transcript of deposition of Doyle Scott, dated December 13, 2007.
7. Transcript of deposition of Robert G. Kennard, dated January 28, 2008.
8. Transcript of deposition of Ronald M. Shansky, M.D., dated December 10, 2007.
9. Transcript of deposition of George Sifuentes, dated December 14, 2007.
10. Transcript of deposition of Pablo Stewart, M.D., dated December 11, 2007.
11. Transcript of deposition of Jeanne S. Woodford, dated December 18, 2007.
12. Navigant Mental Health Bed Need Study, Spring, 2008.
13. Declaration of William Proctor in support of the Receiver's motion for contempt, filed August 13, 2008.
14. URS Bovis Operational Guidelines Report for California Health Care Facility, dated July 8, 2008

I reserve the right to supplement this report as additional relevant information becomes available.

Significant changes since my last visit in November, 2007:

Crisis Beds:

The only facility which I toured on both visits was CMF-Vacaville. The most significant change since my last tour was the construction of a CTC, with 50 crisis beds. The facility had only been open for a few weeks, and was not yet up to capacity (39 of the 50 beds were filled on the day of

my visit), as the staff had asked for a phase in of admissions to allow for smooth operation. I was informed by staff that they were progressing ahead of schedule for full deployment. The facility was very impressive, with adequate space for treatment and for staff office space. This facility accepts inmates from other institutions who require licensed Mental Health Crisis Beds (MHCB). The added capacity for crisis beds will help ameliorate some of the backlog for this level of service. Clinical staff at CCI Tehachapi commented that they have already accessed these beds, and that this has helped them manage their inmates in crisis. In addition, this is a demonstration of how new construction, which incorporates the necessary space and is designed with treatment needs in mind, can be effective (similar to the intermediate care –ICF – free-standing facility which I observed during my first visit to Salinas Valley State Prison).

DMH Acute Psychiatric Program

Another significant advance noted in CMH-Vacaville was that the waiting list for inmates into the Acute Psychiatric Program (APP) run by DMH had been dramatically reduced. On the day of my visit, the waiting list was only 15 (I was informed that this was down from a waiting list of over 50).

Reception EOP Programs

Both North Kern and Wasco State prisons have functioning EOP programs for reception inmates (RC). Although this is not a change since my last visit, the RC EOP programs are relatively new (begun in 2007) and appear to be functioning well at this point in time. Both staff and inmates in the program described the program in positive terms and there were indications that the inmates were receiving the required elements of the program without significant difficulty. Officers were specifically assigned to transport EOP inmates to programming, and from all reports this is working well.

I note that at North Kern, two inmates who were classified as CCCMS complained to me during my interviews with the that they wanted to be re-classified as EOP, as they observed the enhanced services those inmates received. (Parenthetically, it did not appear to me that these two inmates had been inappropriately classified as CCCMS.) This sentiment reflects a positive valuation by inmates, as it is considered desirable by them to get admitted to the program.

I did have an opportunity to interview one inmate at North Kern, in Reception Status (that is, awaiting placement from the Reception Center to a mainline prison), who was classified as EOP and who had been placed in Administrative Segregation (Ad Seg) due to rules violations. He acknowledged that services he received while in the EOP general population were "alright" but complained that he was not receiving full services in Ad Seg. He had been endorsed to leave the Reception Center to go to an EOP program on a Special Needs Yard (as he was a gang drop-out, thus requiring a more protected environment), but this transfer was delayed. This inmate is an example of a group of inmates who are difficult to serve because of the difficulties inherent in dealing with inmates with complicated mental health and security needs. He was not only classified as EOP, but also Special Needs, as well as having security issues related to his rules infractions. I was informed that a Special Needs Yard for EOP inmates was about to come on line at Kern Valley.

Other observations:

Need for more EOP beds and more ICF (intermediate care provided by DMH)

Consistent with my initial report, during this visit I obtained similar information regarding the long waiting lists for EOP programs, as well as a very significant waiting list for Intermediate Care beds (I was informed that the waiting list for the ICF was 167, and that some inmates had been removed from the list as they were so low down as to be unlikely to obtain a bed in any reasonable time period). Inmates requiring these services are the most severely impaired by mental illness; as I indicated in my previous report, a general prisoner release is unlikely to significantly impact this problem. Additional resources for this population are needed and will continue to be needed even if the overall census in CDCR is reduced. In this context, I have reviewed the CDCR proposal for consolidated care facilities, which includes significant enhancement of EOP, ICF, and acute care beds (for a total of 5,000 mental health beds in these facilities). This plan appears reasonable in terms of meeting the needs for this population. It is

4

also my opinion that consolidating these beds in specific facilities is an excellent idea, as it will allow for ease of recruitment of staff as well as efficiency of service delivery.

Crisis beds:

I observed variability across facilities in terms of adequate number and management of crisis beds. CSATF appeared to be have few difficulties, reporting that they have rarely have "maxed out" their beds, and take inmates from other facilities. Clinicians at CCI Tehachapi reported that they had decreased their transfers to crisis beds over the past 6 months. One of their strategies was to have clinicians see inmates in OHU (Holding Unit cells) on a daily basis and discharge back to population those who did not really require a crisis bed. (There is a low threshold, appropriately, for placement in a holding cell; inmates who make suicidal statements are placed in such cells and observed closely. Many of these inmates are not genuinely suicidal and do not require hospital level of care as is provided in crisis beds; a period of observation to triage those genuinely requiring those beds is reasonable.)

North Kern had developed a capacity to use cells on another unit as observation cells, prior to those inmates being transferred to a crisis bed (MHCB), and this system appeared to be working reasonably well. On the day of my visit, they had no inmates in their holding cells. Although they had not received authorization from CDCR to staff these cells at a level required for an OHU, they were attempting to provide services to inmates in those cells comparable to an OHU. For instance, a psychologist from the MHCB visited the holding cell unit daily in order to provide continuity of care. Clinical staff informed me that 70% of inmates in the holding cells were discharged back to population within 3 days and the remaining 30% were admitted to a crisis bed.

Wasco State Prison appeared to have more difficulty accommodating the need for crisis beds. They too used another unit for holding cells, although on the day of my visit those cells were all full and these cells were on a unit which also had overflow beds on the floor. Of more concern in this facility, was a mentally ill inmate who had been admitted in Reception the night before and had to spend the night in a cell in the reception area (which had no bed, toilet, or sink). This

inmate was watched continuously, but had spent almost 24 hours in the cell in the reception area, which was clearly not an appropriate place. Staff indicated that this was a rare occurrence, and stated that this should not have occurred (that is, mental health leadership should have been notified to find an appropriate bed). Nevertheless, this appears to be a situation which resulted directly from a lack of adequate capacity for crisis beds in that facility.

Reception

As with my first visit, it appears that the reception centers are overwhelmed by the large number of admissions of individuals who are experiencing mental illness. Although clinical staff manage to do a good job of mental health triage, it is still difficult to provide adequate services to this particular population. North Kern, for example, had creatively converted a cell in the Reception area for a psychiatrist and psychologist to use, and they were thus able to interview inmates referred by the nurse in a timely manner and triage these cases. For the Coleman class in Reception, the RC EOP program is very helpful, but more crisis beds are needed and there are still significant delays getting these individuals into other programs (such as EOP programs in mainline prisons, or intermediate care programs). As noted above, the problems are exacerbated when inmates have multiple problems or issues (such as requiring a Special Needs Yard or the highest levels of security).

Treatment and office space

As with my first visit, there were clearly identified issues of finding adequate space in a number of the facilities for office space for clinicians. In CCI Tehachapi, for instance, a psychologist was using a converted broom closet, which she shared with another clinician. In Wasco, there was very limited space available to both clinical and clerical staff. North Kern had been able to convert a former visiting area into office space for their clinicians. CSATF did have a centralized Mental Health office with space for clinicians.

There were also problems in a number of the facilities finding adequate treatment space. Administrative and clinical staff were creative about using chapels and other spaces, although there were both conflicting demands for these spaces as well as heat issues in some places (that is, some rooms could not be used during the hottest days).

Overflow beds

Across my tour, I observed gyms that had been converted to housing space (double or triple bunked). EOP patients were to be excluded from these spaces and I was repeatedly informed that indeed EOP patients were either not placed there, or if they were, were quickly identified and moved out. CCCMS patients were found in these units. In addition, some of the units with cells had overflow beds on the floors (e.g., Wasco). Again, EOP inmates were not placed there, but CCCMS inmates were. On one of the units at Wasco, the sergeant informed me that the overflow beds were actually considered more desirable by the inmates than the cells, as they had more access to the TV and increased mobility.

I interviewed a number of CCCMS inmates who were housed in gyms. Their reactions to that space were mixed; some preferred it to being in a cell (as they were more restricted in the latter), while others found it too noisy and distracting. Correctional officers informed me that inmates were selected for these gyms based on lower security status and proximity to discharge. They also characterized these units as not having "a lot of drama," by which they meant not a lot of behavioral management issues. Clinical staff also reported that, in their experience, they did not find that CCCMS inmates in these units decompensated (that is, experienced serious exacerbations of their mental health symptoms, thus requiring a higher level of care, or becoming suicidal) due to the environment. Thus, despite other issues which make use of such space undesirable, I did not find that this was having a significant impact on the CCCMS inmates in terms of exacerbation of psychopathology. I was also informed that if clinical staff determine that a particular inmate is not able to cope with these units, that this information is shared with administration and the inmate will be moved.

I interviewed 3 randomly chosen CCCMS inmates in a reception dorm at North Kern. These inmates all complained about lack of therapeutic activities for them in the facility. However, they all seemed to be psychiatrically stable, and did not appear to meet criteria for EOP (based on a very limited, cursory interview). These types of inmates are more likely to be appropriate for

additional therapeutic services after they have been moved out of the reception centers to mainline prisons.

Discharge planning

I found a mixed picture regarding discharge planning with parole for inmates with mental health issues. CCI Tehachapi has a designated pre-parole coordinator, and clinical staff reported that coordination was going well with parole, in terms of obtaining needed services for parolees. I also spoke with a social worker at North Kern who was assigned to work on pre-parole issues with EOP inmates. She indicated that the program had started about a year ago and appeared to be working well with most parole officers (although they did not have any outcome data, in terms of recidivism). By contrast, a psych tech at Wasco reported her experience of inconsistencies in working with the Transitional Case Management Program. I note that when I visited CIM last year, I was informed of significant problems coordinating with parole. I do not have data on whether the situation has improved in that facility. Based on the information from my current visit, it does appear that there are some successful models that are being implemented, but I cannot speak to the issue of how this is working system-wide.

Adequate numbers of clinical staff

Consistent with my previous report, there were differences across facilities in terms of ability to attract and retain clinical staff. These issues tended to be a function of geography (i.e., more difficult to find permanent staff in more remote areas, away from large population centers). In some of these facilities (e.g., CCI Tehachapi), there was significant reliance on contractor staff. However, it appears that most contractor staff were not transient, but stayed for a significant period of time. Indeed, the Chief Psychiatrist at that facility is a contractor himself, has been there for a while, and explained that there is often no difference in quality or commitment between state employees and contract staff, but rather some psychiatrists prefer the contractor status because of financial considerations. This is likely to be an ongoing issue, regardless of the census in CDCR. However, the plan for Consolidated Care Centers is likely to be helpful in attracting and retaining permanent staff.

8

## Summary

As noted, many of the issues identified in my previous report were confirmed during this current visit. However, there was also some significant evidence of improvement in some areas, particularly the new MHCB unit at CMF, progress at the RC EOP programs at North Kern and Wasco, and reduction in the waiting list for the Acute Psychiatric Program (APP) at CMF. Also, significantly, there is now a proposal, with a timetable, for development of Consolidated Care Facilities, with 5,000 mental health beds included. As I indicated in my previous report, it is my opinion that the major obstacle facing CDCR in providing adequate mental health care to inmates is the lack of adequate beds and resources to serve inmates with intensive mental health needs. The new proposed model, which includes these Consolidated Health Care facilities, should significantly address the problem by providing more beds, better facilities, more treatment space (including freeing up space in existing facilities), and increasing the likelihood that qualified staff can be recruited and retained. These Health Care facilities are being constructed with a therapeutic goal in mind and thus are likely to be more effective than previous attempts at retro-fitting existing space designed for correctional purposes only. As indicated in the Operational Guidelines for these facilities, prepared by URS Bovis (p. 4), the new facilities "will be unlike any correctional facility currently found within the existing California Department of Corrections and Rehabilitation (CDCR)….There will be an emphasis on achieving a therapeutic environment that is conducive to appropriate levels of treatment and restorative care and programs for both medical and mental health patients."


__Ira K. Packer, Ph.D.__                __August 15, 2008__

Ira K. Packer, Ph.D., ABPP (Forensic)         Date


Electronically signed. Original mailed 8/15/2008