# EXHIBIT J

## Report of David L. Thomas, MD JD

I.  **Name and Address of Expert**

David L. Thomas, M.D., J.D.
Professor and Chairman, Department of Surgery
Professor and Chairman, Division of Correctional Medicine
Nova Southeastern University
College of Osteopathic Medicine
3200 So. University Dr.
Ft. Lauderdale, FL  33328-2018

II.  **Qualifications of Expert**

1. I received my A.B. degree in Biology in 1966 from the University of
Florida, Miami, Florida. I received my medical degree from the University of
Miami School of Medicine, Miami, Florida in 1970. I interned at University of
Miami/Jackson Memorial Hospital in Miami, Florida and completed my
Ophthalmology residency at University of South Florida Affiliated Hospitals in
Tampa, Florida. I am board-certified in Ophthalmology by the American Board of
Ophthalmology.

2. From 1971 to 1973, I served in Viet Nam as Commanding Officer
of a 30-bed hospital unit, supervising three other physicians and a support staff of
fifty. From 1976 to 1994, I maintained a full-time practice of medicine,
specializing in ophthalmology, diseases and surgery of the eye. From 1994 to

1995, I was Medical Executive Director of Florida Department of Corrections

(FDOC), maintained a full-time practice of medicine with administrative and

clinical responsibility for a 208-bed inpatient facility, supervision of 13 physicians

and doctoral level providers, in addition to a staff of over 200 employees, was

responsible for Quality Management and AIDS treatment statewide, and

administered a budget that exceeded $7 million. In 1995, I was Regional Health

Services Director for FDOC, with responsibility for health care delivery in Region

IV of the FDOC. I supervised eighty doctoral level providers and administered a

budget of $50 million. From 1995 to 1998, I was Deputy Assistant Secretary for

Health Services and Chief of Health Services for FDOC, with oversight

responsibility for all clinical inmate services (physical health, mental health,

nursing, and pharmacy) throughout 55 major institutions housing 70,000 inmates

and administered a budget of $200 million. From 1998 to 2003, I was Assistant

Secretary for Heath Services and Director of Health Services for FDOC, with

responsibility for all health services to inmates in Florida's prison system,

administering a budget of $268 million. From 2000 to present, I am Professor and

Chairman of the Division of Correctional Medicine for Nova Southeastern

University, a part-time appointment. From 2003 to present, I am Professor and

Chairman of Department of Surgery for Nova Southeastern University, a full-time

faculty position. I am involved in training osteopathic physicians with additional oversight of post-graduate programs at college-affiliated sites.

3.  Among the focuses of my course preparation, clinical, research, and publication are: Infectious Diseases in Corrections including HIV, Hepatitis C and combined infections of Hepatitis C and HIV; Accreditation in Corrections; Aging inmates in Corrections; the interface of law and corrections; the appropriateness and levels of care for correctional populations; chronic illness clinics in corrections, conditions of confinement as they relate to health care delivery in corrections, and other topics.

4.  Additional qualifications include appointed service on the (Florida) Governor's Task Force on Juvenile Justice and others as are set forth in my curriculum vitae, attached hereto as Exhibit A.

III.  **Statement of Opinions and of the Bases and Reasons Therefore**

5.  I was asked to provide opinions regarding the medical treatment and health care delivery during conditions of confinement which may be termed "overcrowding" and specifically the treatment for inmates who have received an unconstitutional level of health care for decades and the impact of possible institutional and systemic overcrowding on bringing that healthcare to a Constitutional level. In connection with developing my opinions, I reviewed a

3

complete set of the Policies and Procedures for Health Services of the California

Department of Corrections and Rehabilitation; the California Department of

Corrections and Rehabilitation Plans of Action after various court orders from

2002 forward; Plan of Action of the Receiver, 5/10/07; CPR Plan of Action 05;

Receiver's third Bimonthly Report, 05/06; Receiver's First Bimonthly Report,

0/7/06; Appendix of Exhibits and exhibits to First Bimonthly Report; Receiver's

Second Bimonthly Report; Appendix to Exhibits and Exhibits of Second Bi

Monthly Report; Receiver's Third Bimonthly Report and all exhibits; Receiver's

Fourth Bimonthly Report and all 16 exhibits appended; Mr. Hagar's Supportive

Report; First Amended Complaint – 8/20/01; Stipulation and Order for Injunctive

Relief, 6/13/02; Stipulation and Order involving Quality of Patient Care and

Staffing, 9/17/04; Stipulation Order re Modification of Stipulation for Injunctive

Relief, 2/16/05; Order to Show Cause re Civil Contempt and Appointment of

Interim Receiver, 5/10/05; Findings of Fact and Conclusions of Law re

Appointment of Receiver, 10/03/05; Order Appointing Receiver, 2/14/06; Order

Bifurcating Proceedings, 10/10/07; Receiver's Fifth Quarterly Report; Receiver's

6th Quarterly Report, with exhibits; Receiver's Report on overcrowding with its

attachments; Receivers Supplemental Report on Overcrowding; the Needs

Assessment Document Pertaining to Chronic and Long Term Care in California

Prisons; Corrections Expert Report on the Death (Mortality) Reviews; Medical

Experts Report on San Quentin of 4/08/05; Letter to Judge Henderson re Corcoran

Site Visit of 3/14-17/05; Letter to Judge Henderson re Substance Abuse Treatment

Center Visit 5/16/05; Correctional Expert's Initial Report; Written Comments re

Court Expert's Draft Report of 11/14/05; Correctional Expert's Report re

monitoring of Court Order of 12/1/05 with its supporting exhibits; Corrections

Expert's Report re Status of State Contracts and Contract Payments; Reporter's

Transcript of Evidentiary Hearing of June 8, 2005; Bureau of Justice Statistics

Data Brief of Medical Causes of Death in State Prisons from 2001-2004; all of the

site reviews of individual prisons labeled 2003-2008(sic); and various other

pertinent documents.

I hold all of the opinions set forth below to a reasonable degree of medical

certainty.

6. It is my opinion that a Constitutional level of health care can be achieved

in severely overcrowded prisons. From my six year service on the Commission on

Accreditation for Corrections of the American Correctional Association, as

Chairman of that body for two years, and my service as a surveyor for the National

Commission of Correctional Health Care, I have personally witnessed health

5

services delivered in extremely overcrowded conditions that comports to all standards of constitutional correctional care. These overcrowded conditions existed both in individual prison sites as well as system wide. In spite of the overcrowded conditions quality, timely, appropriate, Constitutional medical services were provided.

7. It is further my opinion that the unconstitutional level of care provided to California's inmates is multifaceted and the Receiver and his team have identified many of the causes for that unacceptable delivery system. Removing a single issue, like overcrowding, will not effectuate Constitutional care delivery. It is clear the Receiver understands this. Reducing the prison population to half of its current size would clearly make the Receiver's job easier. So would a readily available, competent physician and nurse staff, a supply system that worked flawlessly, a pharmacy delivery system that could be dropped in place at every institution with a seamless transition, full cooperation from all aspects of the Government of California, inmates that were primarily healthy, and a myriad of other issues the Receiver has brought to the attention of the court. This is not, however, the situation of delivery of correctional health care in any state system.

As noted above, I have reviewed two of the documents the receiver has presented to the court concerning this issue as well as his statements in a variety of other documents he has authored. The issue of overcrowding is complex and involves far more facets than exceeding the design capacity of an institution. Correctional healthcare providers consider it a fact of life to have to provide a Constitutional level of healthcare in situations that are not comparable to the non-incarcerated environment and overcrowding is just one of those myriad of issues.

8. It is further my opinion that the very definition of overcrowding is predicated on the perspective of the person viewing the institution or system. For architects and designers, exceeding the design capacity is the definition of overcrowding. If an institution is designed and built for one thousand inmates and more than one thousand occupy the facility, then to architects and designers, the facility is overcrowded.

To correctional professionals that definition is totally inadequate and erroneous. The realities of corrections and practicing health care in a correctional setting do not permit such a narrow view. Many institutions in very fine systems use a concept known as "hot bunking." In those facilities, inmates have use of their bunks for a specified period of each day and then must relinquish them to another

prisoner. This is similar to the situation on many American naval vessels and most submarines.

Many institutions I have personally observed use single cell designs for two or three inmates by putting a second bed in the cell and using a "boat" on the floor. (A boat is a purpose designed portable fiberglass sleeping unit). These institutions also practiced a consistent, prideful, competent, Constitutional level of health care. Most correctional provider include in the definition of overcrowding those conditions of confinement that are so strained that programmatic functions of the prison or prison system deteriorate. It is clear that the fundamental reasons for programmatic dysfunction in the California Department of Corrections and Rehabilitation are related to a system wide prevalence of a unique culture, and not a single issue or multiple issues (see paragraph 11 below).

9.     It is further my opinion that although in his reports the Receiver makes much of the transport of inmates between and among facilities this is one of the realities of correctional health care. For most correctional health providers this constant movement of inmates is a daily fact of life. Inmates are moved regularly for a variety of sound correctional management reasons. Requiring a court appearance, attending a medical appointment; breaking up gang and other security threat issues, the protection of an individual inmate; reducing the burden of a

particular prison; change in classification of the inmate; change in mission of the institution; and a host of others necessitate inmate movement. During the seven years I was responsible for the health care delivery in the Florida Department of Corrections, approximately ten per cent of our population (around 70,000 then and 85,000 today) was in a transport status (roughly 7,000 one any one day).

Correctional health care providers understand the realities of a prison system and the burdens that places on the health services team. For each inmate there must be a health appraisal, a transfer summary, medications, sealed records, and the other items that the Receiver recognized. This is a regular and routine part of the delivery of correctional health care and as such is built into a competent health care delivery system.

10. It is further my opinion that although the Receiver commented on the inability of establishing an effective patient-provider relationship in light of both inmate moving and overcrowding, this is once again a typical reality of prison medical care delivery. This is one of the unfortunate realities of practicing medicine in a correctional environment. Unlike the civilian system, where the receiver and his medical expert team have vast experience, the very nature of corrections is such that long term interactions with patients are the exception rather than the rule. Because of the necessity for movement, as mentioned in paragraph

9

nine above, and the time limited nature of the period of incarceration (more than

85% of inmates are released from prison and return to their communities)

following the same patient and interacting with the same patient for years or over a

lifetime in an unusual occurrence.

Correctional systems address this effectively in a Constitutional permissible

way by performing some of the items the Receiver has already begun. Establishing

chronic illness clinics with defined times for regular reappointments, assigning

appropriate inmates to the appropriate chronic illness clinics; assuring that health

care is a high priority issue on the consciousness of all security personnel; having

an integrated pharmacy system; creating a systems of logs to assure follow-up

(whether they are paper or electronic) and a variety of other practices assure the

delivery of Constitutional care in spite of the realities of prison life.

11.    It is further my opinion that the delivery of Constitutional health care

in a correctional environment is dependent more on a culture that fosters the

delivery of health care more than any other single item. While overcrowding may

make an impact; lack of resources may make an impact; lack of quality staff may

make an impact; disorganized pharmaceutical distribution may make an impact; a

non-functioning supplies system may make an impact; a laboratory report system

that is fraught with delays may make an impact, the single most important item in

10

achieving a sound Constitutional level of care is a **culture** that fosters providing care at that level. In the extant case the court recognized this again and again in its comments. The court commented repeatedly on the "trained incapacitation" of the health care staff and their advocates.

Likewise the Receiver in most of his documents alludes to that culture and uses the same phraseology adopted by the court; "trained incapacitation." It is clear from the trend of the site visit reports that the culture of the California Department of Corrections and Rehabilitation is changing to one of appreciating the need and requirement for a Constitutional level of health care. This change in culture is fundamental to the provision of Constitutional care and the myriad of other issues are secondary and surmountable. Clearly, until the Receiver was appointed by the court, each individual warden- probably because of the Senate confirmation process- felt it was his or her sole responsibility to direct the individual institutions regardless of commitments made by their titular superiors, the Office of the Attorney general, or the Governor's office. This situation does not permit for the uniform provision of a Constitutional level of health care.

12.    It is further my opinion that the Receiver, through the power vested in the District Court, clearly has demonstrated that Constitutional Health care will be delivered in spite of any concepts of institutional autonomy. This is underscored in

11

two specific areas. The most obvious is the trends of the prison site reports. The later site report visits demonstrate a subtle, but real shift in priorities and on the institutional level for the first time show a shift in culture towards the necessity to provide Constitutional health care.

The second significant movement away from a dominantly security culture and the recognition that Constitutional Health Care providers are sometimes in conflict with security operations was the Receiver's insistence in removing the classification of "MTA." This classification of a health care provider being a security empowered officer was unique to California and underscored in a daily dramatic fashion that security had absolute control of all aspects of an inmate's life, including access to and delivery of medical care. All other systems in the country recognized the inherent dangers that such a dual role could play in creating barriers to access to care, barriers to receiving a professional medical opinion, and barriers to having that opinion carried out.

In removing these dual role positions, the Receiver declared openly that there was security and there was health care and they had to work together, but there would be no overt barrier to health care and security henceforth had a real role to perform in assisting a Constitutional health care delivery system, not obstructing one. This is a profound, dramatic, and needed cultural shift.

12

13. It is further my opinion that the issues surrounding delivering a Constitutional health care system in California are not fundamentally predicated upon the issues of overcrowding. While certainly a smaller population and wealthier resources would make the provision easier, it is not essential to reduce the prison population to effect a Constitutional level of care.

## IV. Data and Other Information Considered in Forming the Above Opinions

25. My opinions are based on my education, training, and experience as a physician, my administration of FDOC healthcare policies and procedures, my research and publications, my review of the materials noted in the previous section, and a review of other appropriate materials.

## V. Exhibits to be Used to Summarize or Support Opinions

26. I expect to testify concerning pertinent medical records, the applicable Clinical Updates, and to comment on exhibits used by other witnesses. Some demonstrative exhibits or charts may be used to summarize my opinions or their bases. These demonstrative exhibits or charts are not yet available and will be submitted at a later time, as agreed upon by the parties or ordered by the Court.

## VII. Compensation to be Paid to Expert for Case Review, Opinions, Testimony, and Other Work on the Case

27. I am compensated for my work in this case as follows:

13

Review of Records- $250.00/hour with a 4 hour minimum
Depositions – In or near my office or home- $500.00 per hour or any part of an hour
Depositions away from my location $1,200.00 per day or any part of a day
    With travel time being reimbursed at the same rate
Trial testimony- $3,500.00 per day or any part of a day
    With travel time being reimbursed at the same rate

## VIII. List of Cases in which Expert has Testified as an Expert, Either at Trial or by Deposition, within the Past Four Years

29. Although I keep no list of the Federal or State court cases in which I have been involved in the last few years I recall the following specific cases:

1. North Carolina     Testified by deposition and at trial for the Attorney General in both state and Federal court- Raleigh, North Carolina
2. North Carolina     Deposition and Review for the Defense- Federal Court- settled- Tyreze Odoms vs. Cleveland County
3. Louisiana     Appeared at trial and at deposition for the Plaintiff in a wrongful death and Deliberate indifference case (state & Federal) Avoyelles Parrish- Phillisa Jackson v. Sheriff Bill Belt
4. Maryland     Deposition for the Defense in a Deliberate indifference action- Baltimore
5. Texas     Served as expert witness and consultant in Federal class action case- Ruiz v Estelle
6. Arizona     Maricopa County- appearing for the defendant in an action against the Sheriff, Joe Arpayo- currently in progress
7. Georgia     Goforth v. Paris, et. al. appeared for the defendant in an action against the Medical Director of the Georgia Department of Corrections
8. Anderson v Dallas County Jail and Duvall v. Dallas County Jail- served as the plaintiff's expert in unconstitutional delivery of health services and mental health services in a county jail.
9. Maryland     Sipp, Barber vs,. County of Essex appeared for the defendant in two separate cases involving alleged delays in treatment

These are the cases that I recall in no particular order. I have never been turned down by any court as an expert witness in any field of expertise.

14

Dated this the 9th day of November, 2007.

David L. Thomas, MD, JD

EXHIBIT A

# DAVID L. THOMAS, MD JD

Office:
Nova Southeastern University
Department of Surgery
3200 So. University Drive
Ft. Lauderdale, FL 33328-2018
Telephone:    954-262-1554
Facsimile:    954-262-2250

Home:
1630 Meadowood St
Sarasota, Florida 34231
Telephone- (941) 925-0440
Facsimile- (941) 925-0586

---

## EDUCATION:

UNIVERSITY OF MIAMI SCHOOL OF MEDICINE, Miami, FL.
> M.D. 1970
>> Following graduation with M.D. degree several years of post-graduate residency work in General Surgery at the University of Miami were accomplished, and then completed a full residency post graduate program in Ophthalmology at the University of South Florida

UNIVERSITY OF MIAMI, Miami, Florida
> A.B. 1966

UNIVERSITY OF SOUTH FLORIDA COLLEGE OF MEDICINE
> From 1976 to 2000 I have been a Clinical Assistant, then Associate Professor of Ophthalmology (Part-Time)

STETSON UNIVERSITY COLLEGE OF LAW, St. Petersburg, Fl
> J.D. Dec. 1995

---

## EMPLOYMENT:

PROFESSOR & CHAIRMAN- DEPARTMENT OF SURGERY NOVA SOUTHEASTERN COLLEGE OF OSTEOPATHIC MEDICINE- This is a full time faculty position at the medical college of the eighth largest private non-profit University in the country. This position is responsible for one of the major Departments in a medical school. The Department of Surgery and its faculty are involved in all areas of the training of an osteopathic physician and attempts to create a stimulating environment which advances superb teaching, excellent research and

Abbreviated Resume
David L. Thomas, MD, JD
Page 2

outstanding patient care. The Department highlights the education of students in both the pre-clinical and clinical years. Students, during their clinical years, participate in a mandatory two month clerkship in surgery integrated through and overseen by the Department of Surgery. The Department of Surgery is also responsible for approved postgraduate programs at college affiliated sites. (2003 to present)

PROFESSOR & CHAIRMAN- DIVISION OF CORRECTIONAL MEDICINE- This position is a part-time appointment. The Division of Correctional Medicine was created to highlight the field of correctional medicine as a recognized subspecialty of medical practice, research into the unique aspects of correctional healthcare and introduce students and physicians-in-training to the healthcare as practiced for incarcerated persons. Collaboration with Federal Programs, including the Health Resources Financing Administration (HRSA) and the Centers for Disease Control (CDC) is essential. Several grants have come to the University because of this position (2000-present)

PROFESSOR OF PUBLIC HEALTH- This is a joint appointment with the aforementioned position and has responsibilities for teaching, service, and research with and through the Public Health Division of the College of Osteopathic Medicine. (2004- present)

---

ASSISTANT SECRETARY FOR HEALTH SERVICES AND DIRECTOR OF HEALTH SERVICES, Florida Department of Corrections -- This is a statutorily named appointment with the responsibility for all of Health Services to the inmates in Florida's prison system. It includes all clinical services and administrative functions. This includes all physical health, mental health, nursing, pharmacy, medical records, administrative functions, quality management, oversight, budgetary processes, legislative interaction, hospital and managed care operations within the system and the clinical oversight of the ten institutions which have for profit providers as well as the fifty institutions which have employee providers. There are approximately 550 doctorate level people and a budget of $268 million for which I have direct responsibility. I also have a direct in-patient care responsibility, although not a direct part of my duties, I feel all physicians in administrative positions should maintain their clinical skills. This included all patients with special emphasis on difficult to diagnose and treat HIV patients and their complications, TB patients and their complications, and Hepatitis patients and their complications. (1998-2003)

DEPUTY ASSISTANT SECRETARY FOR HEALTH SERVICES AND CHIEF OF HEALTH SERVICES, Florida Department of Corrections -- Total responsibility for all clinical inmate services including physical health care, mental health care, nursing operations, pharmacy operations, and medical records with Division Directors representing each of those areas reporting to me. This represents a 70,000 inmate population in 55 major institutions with a significant medical presence in each, a prison hospital of which I serve as the Chairman of the Board, a budget exceeding 200,000 million dollars per year and interfacing with a variety of private contractors providing some services as well as overseeing the state employees delivering health care services.

(Approx. 500 doctorate level personnel) I also have a direct in-patient care responsibility, although not a direct part of my duties, I feel all physicians in administrative positions should maintain their clinical skills. This included all patients with special emphasis on difficult to diagnose and treat HIV patients and their complications, TB patients and their complications, and Hepatitis patients and their complications. (1995-1998)

REGIONAL HEALTH SERVICES DIRECTOR, Florida Department of Corrections -- Total responsibility for the health care delivery in one of the five regions (Region IV) of the Florida Department of Corrections. There were approximately eighty doctorate level providers who reported to me and a combined budget of approximately 50 million dollars. There were both private and public providers in this region as well as some of the most medically challenged inmates including dialysis patients, females, a prison hospice, death row, and other challenges. I also have a direct in-patient care responsibility, although not a direct part of my duties, I feel all physicians in administrative positions should maintain their clinical skills. This included all patients with special emphasis on difficult to diagnose and treat HIV patients and their complications, TB patients and their complications, and Hepatitis patients and their complications. (1995)

MEDICAL EXECUTIVE DIRECTOR, Florida Department of Corrections, currently based at Zephyrhills Correctional Institution - Full time practice of medicine combined with the administrative and clinical responsibility for a 208 bed inpatient facility, supervising thirteen other physicians and doctoral level people, plus over two hundred total employees, and am responsible for a budget that exceeds 7 million dollars, as well as responsibilities on the statewide level for Quality Management and AIDS treatment. (1994-1995)

---

DAVID L. THOMAS, MD PA - Venice, FL. Full time private practice of medicine specializing in Ophthalmology, diseases and surgery of the eye. (1976-1994)

FLORIDA HOUSE OF REPRESENTATIVES - Member of the Florida House for a decade beginning in 1984. Have held the Leadership position of Republican Whip for over six years and have served on Rules and Calendar, Appropriations, Health Care, and the Judiciary Committees as well as a variety of others. Left the Florida House of Representatives in November, 1994 (1984-1994)

From 1956 (at age 11) until 1976 held a variety of full and part time jobs to finance undergraduate and medical education. The most notable of these included Seaman, Mate, and eventually Relief Captain of a 104 foot charter yacht that sailed from Miami to the Bahamas (1959-1965)

---

MILITARY:

Abbreviated Resume
David L. Thomas, MD, JD
Page 4

U.S. ARMY 1971-73 Served in Viet Nam as Commanding Officer of 30 bed hospital unit where responsibilities included medical and surgical patient care plus supervising three other physicians and a support staff of fifty. Awarded the BRONZE STAR, 1972. Rank: Captain

---

PERTINENT HIGHLIGHTS:

Part time and Voluntary Police Officer with the Florida Marine Patrol. Eventually achieved the rank of Major and supervised thirty officers. (1981-1992)

Had the opportunity to work a variety of serious felony cases as well as resource violations.

Have written two Published novels on drug smuggling in Florida, 1980 and 1981. Published by Norton Press.

Hold a Commercial Pilot's License as well as Ocean Operator's License for vessels to 100 gross tons and have some facility with aviation and marine laws and regulations.

Chairman of Florida Manatee Technical Advisory Committee - helped craft administrative rules to protect endangered species.

Chairman Committee on Accreditation in Corrections of the American Correctional Association-designed to accredit correctional and detention facilities at minimum standards to improve the quality of corrections as a whole

Born:    Philadelphia, PA
         October 13, 1945
         Moved to Miami, Florida in 1951

---

EDUCATION:

Attended various public schools in Miami and graduated from Miami Edison Senior High School in 1963

Attended the University of Miami from September 1963 and took an overload of credits each semester to graduate with an A.B. in June of 1966.

Attended the University of Miami College of Medicine from September 1966 until graduation in June of 1970 with the M.D. Degree

Completed a Straight Surgical Internship at the University of Miami Affiliated Hospitals in Miami,

Abbreviated Resume
David L. Thomas, MD, JD
Page 5

Florida from June 1970 until June 1971.

Began a Residency in General Surgery at the University of Miami Affiliated Hospitals immediately following Internship until drafted by the U.S. Army.

Upon completion of Military service (1971-1973) continued a General Surgery Residency Program at the University of Miami Affiliated Hospitals in Miami, Florida until beginning an Ophthalmology Residency at the University of South Florida College of Medicine.

University of South Florida College of Medicine Department of Ophthalmology, residency in ophthalmology from November 1973, until October 1976. This included a Basic Sciences Program at Stanford University at Palo Alto, California with their Department of Ophthalmology.

Subsequently I was a faculty member at the World Congress of Ophthalmology in San Francisco. I have taken multiple and varied courses to maintain a high level of competence in Medicine.

---

OTHER ACADEMIC:

Clinical Assistant Professor of Ophthalmology, then Clinical Associate Professor of Ophthalmology, University of South Florida College of Medicine, 1976 until present.

Clinical Professor and Chairman, Division of Correctional Medicine in the Department of Rural Medicine Nova Southeastern College of Osteopathic Medicine

---

Selected PUBLICATIONS from a more extensive listing:

Lead Author on a variety of publications in the Peer Reviewed Medical Literature including, but not limited to:
1. with Professor Abelardo Vargas at the University of Miami on Cardiac Emergencies in 1971
2. with Professors Jay Older & E. Torczynski on Ocular Dirofilaria in 1979
3. with Dr. Joeseph Giovinco on Intra-ocular Lens implants
4. with J. Morrissa Watson- Advanced Directives in the Correctional Setting 1999
5. with Jacqueline A. Thomas- Accreditation and You Why Correctional Systems Need Independent Accrediting Bodies to Evaluate Their Services- 2001
6. with Jacqueline A. Thomas- HIPPA- Do Correctional Facilities Need to Address Health Insurance Portability and Accountability Act? 2003
7. with Mary Scylla- Legal Aspects of Correctional Medical Care 2001
8. Update on Legal Aspects of Correctional Medical Care- 2002
9. Managing Tough Problems in HIV in a Correctional Setting-2001
10. Sending Students to Prison- Placing Medical Students in Correctional Settings- The Student's

Perspective, the School's Perspective and the Correctional Department's Perspective- T he Journal of Correctional Health Care, vol. 10, Issue 4 Winter, 2004

11. Assessment – Management Tool of the Future- Corrections Today, December 2004, pp 114 et. seq.

12. Spotlight- HCV- To Treat or Not to Treat, June 2004, IDCR (Infectious Diseases in Corrections Reporter)

13. The Future of Correctional Health Care- Correctional Health Care Reporter, July/August 2004, pp 58-63.

14. Research in Corrections- Infectious Disease in Corrections Report- September 2005- vol. 8 Issue 9

15. Letter to the Editor- IBID

Co-author position on a variety of others including, but not limited to:

1. with Margaret Fischl, et al. Direct Observed Therapy vs. Self Administered Therapy in the treatment of HIV Disease 2001

2. with Margaret Fischl- et al. Impact of Directly Observed Therapy on the Long term treatment of HIV Disease in Clinical Trials- in press- JAMA

3. with Anne DeGroot et. al.- Clinical Trials in Correctional Settings: Right or Retrogression?

4. with Abe Macher- Combination Therapy in Correctional Sites for the Treatment of HIV- Inappropriate Treatment Regimens- 2002

5. with Abe Macher- Combination Therapy in Correctional Sites for the treatment of HIV- More Inappropriate Combinations- 2002

6. with Abe Macher- The Use of Fusion Inhibitors in Correctional Settings- 2003

Books in Scientific Arena:
Chapter in HIV Treatment published by Florida AETC on HIV/AIDS in Corrections- 2000
Revised for the 2004 edition of this same book.

Chapter in Book: Correctional Management- "The Graying of Corrections- Managing Older Inmates" In Galley Proofs now

Currently in Preparation a Law Review article with Professor Manny Ramos on Medical Malpractice.

Co-authored with Dr. J. Morrissa Watson an article on Advanced Directives in the Prison System Psychology, Public Policy and the Law, 1998, vol. 4 no. 3, pp. 878-900

Co-author with Margaret Fischl and others - Direct Observed Therapy in the Treatment of HIV Disease (In press- JAMA)

Co-Principal Investigator with Margaret Fischl on CDC/HRSA/PHS grant concerning the follow-

up care of inmates released from prison. (Five year grant 5.5 million grant PHS 99099- begun in 2000)

---

## OTHER PUBLICATIONS:

Published Author of two novels by Tower/Leisure Books, a division of Norden Press; Gulf Coast Run in 1980 and Gulf Coast Goods in 1981. Both novels were of drug smuggling and violence in Florida.

---

## NON ACADEMIC AND VOCATIONAL:

Graduated in 1983 from the Florida Police Academy Training Program at Sarasota Vocational Technical Institute and am a Fully Certified Florida Law Enforcement Officer.

Certified as a Police Instructor

Served as a part-time and auxiliary police officer with the Florida Marine Patrol. During that service I had worked as a patrol officer, then a Sergeant (Investigator), a Lieutenant in charge of a shift, a Captain responsible for a Division, and as a Major responsible for a Region. I have worked misdemeanor, felony and major felony cases, and have worked in uniform as well as in plain clothes. (The Sergeant Investigator position in the Marine Patrol is a comparable position to a Detective Bureau. There is no Detective Bureau per se in the Marine Patrol.)

I have had advanced training through the Marine Patrol in a variety of areas and was a Certified Instructor. I also served as a pilot with that agency. I had several major felony cases including the undercover purchase of illegal materials under the direct authority of Major W. Harry Harper and one under the direct supervision of Lt. Col. Cliff Kidd.

Hold a U.S. Marine Captain's License - Specifically, Ocean Operator up to 100 Gross Tons.

Hold a U.S. Commercial Instrument Rated Pilot's License.

---

## WORK EXPERIENCE:

Began working as a kennel boy in a Veterinary Clinic at age 11 in about 1956. About 1959 began working on a 104 foot Motor Vessel as Seamen/Steward. Eventually, I became Relief Captain of this vessel, a charter yacht making trips between Miami and the Bahamas.

During my first year of Medical School I served as a Research Assistant in a clinical laboratory and a phlebotomist at the V.A. Hospital which I continued through my second year of Medical School. I did odd jobs my third and fourth years of medical school.

Private Practice of Ophthalmic Surgery in Venice, Fl and voluntary faculty responsibilities with the Department of Ophthalmology at the University of South Florida College of Medicine from 1976 until present.

Also served as an unpaid part-time police officer during 1981 until 1992.

## PUBLIC SERVICE:

Chairman of the Sarasota- Charlotte Bi-County Committee, 1983
Member, Florida House of Representatives, 1984 until 1994
Whip - 1988 until 1994
Chairman, Charlotte County Legislative Delegation 1986-1992
Chairman, Sarasota County Legislative Delegation 1988-1994
Chairman, Florida's Task Force on Indigent Health Care Funding, 1987-88
Chairman, Florida's Manatee Technical Advisory Council 1985- present. (Member since the inception of this group to protect and preserve Florida's endangered Manatee in 1981)
In the decade that I served in the Florida House of Representatives I handled a wide variety of legislation and served on a wide variety of committees. I served on a variety of House Joint Conference Committees and am one of the major authors of the 1988 Tort Reform and Malpractice Act. I have served on Appropriations, Rules and Calendar, Health Care, Natural Resources, Community Affairs, Commerce, Judiciary, Agriculture and a variety of others.

## MILITARY SERVICE:

Captain U.S. Army- served in Viet Nam 1971-1973 where I served as a General Medical Officer and General Surgeon. I ran a hospital facility in support of an infantry unit. I saw front line service during this period and served in multiple Medical-Civil Action Program. I served primarily throughout I Corps and especially in Chu Lai, Da Nang, Hue, Phu Bai and Quang Tri. My service was during a major Tet Offensive and the unit I was responsible for was pushed back almost to the

outskirts of Da Nang. We later retook much of that territory. After a one-year service in VietNam I was transferred to Ft. Jackson, South Carolina where I served as commanding officer of the outpatient troop clinics. During this period of time I also worked as a General Practitioner in the office of Dr. Robert Sawyer in Saluda, South Carolina. Dr. Sawyer had injured his back and the community was in need of medical coverage and I provided this for almost a year. This service was separate from, but approved by the Army Post. I received an Honorable Discharge from the U.S. Army in 1973.

---

AWARDS:

Bronze Star plus several other military medals and recognition's from my service in Viet Nam.
American Business Woman's Boss of the Year Award - 1982-1983
Florida Life Care Associations Better Life Award - 1985- (for Providing Indigent Medical Care)
Florida League of Conservation Voter's Environmental Honors List 1985-1986
Manatee Community College Friend of the Year Award - 1986
Manasota 88 Environmental Legislator of the Year Award- 1988
Florida Society of Ophthalmology Clowsen Award for Outstanding Service to the Profession and the Community - 1992
Drug Enforcement Administration Award for Public Service and contribution to the DEA - 1991

A variety of other awards and recognition's from various service and community and state groups.

PRESENTATIONS: There are too many presentations and conferences to count. I have given presentations in medicine, correctional medicine, HIV/AIDS, and while in the Legislature on many and varied other topics.

---

Current With or through NSU-COM
1. . Chairman of Faculty Council- an elected position by peers for the purpose of representing the faculty among other faculty bodies and to the administration of the College and the University (Member since 2003; Chairman since 2005- to present)
2. University Institutional Review Board -- Voting Member- protect patients enrolled in clinical trials and help assure appropriateness and safety of research studies by University Faculty or affiliates
3. Curriculum Committee- Academic committee assigned the responsibility to review and modify the current curriculum of the College, to make considered recommendations for modification to the Chief Academic Officer (Dean), and to make recommendations to the faculty council for those items of the curriculum which requires the input of the faculty as a whole. Currently NSU-COM is addressing the entire curriculum and possibly seeking other venues for curricular enhancement. Member 2003-present; Vice

Chair- 2004- present)

    a.  Sub-committee on Curricular Reform- this body was created by the curriculum committee with the advice and consent of the Dean to evaluate comprehensively the college curriculum, assess other medical school curriculums, and advise to the Curriculum Committee changes and improvements to our current curriculum. (Member 2004- present)

4. Council of Chairs- This is the body that assists the Chief Administrative Officer (Dean) of the College in determining academic and administrative policy and then once the direction is determined to implement those decisions. This body serves to improve both intra- and inter-departmental communications and to develop ideas and actions to improve and enhance the education of our students and post-graduates. Member 2003- present; Vice-Chair 2004- present)

5. Continuing Education and Faculty Development Committee- This is the body that is charged with determining the direction of the growth of the College in the area of continuing medical education for physicians who are both affiliated and not affiliated with the COM. The other charge of this committee is to determine what needs and areas faculty, both full time and adjunct, require for the improvement in their professional life. (Member 2003- present)

6. Faculty Promotions and Credentials Committee- This body is responsible for reviewing and assuring the accuracy of the credentials of current faculty and prospective faculty to recommend to the Dean the initial faculty rank and promotion in faculty rank. (Member 2005- present)

7. Patient Safety Committee- To advise the Chief Academic/Administrative Officer (Dean) of the College on the national and state policies concerning patient safety; to examine current curriculum and offer changes to improve our student and post-graduates education in the area of patient safety and the practice of safe medical care delivery. This committee is also responsible for evaluation of the safety of the patients of the University and to make recommendations concerning improvement of care. (Co-Chair- 2004- present)

8. Faculty Advisory Committee- This is a University wide Committee which enhances communication among all of the college and programs of the University, interacts with central University administration and review issues, questions, and concerns concerning the plans and initiatives of the Faculty in the overall direction and initiatives of the University and to serve as the Faculty voice to the University central administration. (Member- 2005- present- consistent with Chairmanship of Faculty Council)

9. Dean's Committee for the West Palm Beach Veteran's Administration Hospital- This committee interacts with the West Palm Beach VA and the VA system to enhance our educational opportunities and research opportunities at the VA and to share our resources and opportunities with the VA and VA system. (Member 2005- present)

10. Faculty position in the Center for Bioterrorism and Weapons of Mass Destruction Preparedness with responsibilities of direct teaching and assisting Drs. Levy and Howell in implementing state and federal grants concerning Bioterrorism and Weapons of Mass Destruction Preparedness (2004- present) As a part of this effort made various

presentations around Florida including the International Emergency Management- 26th Annual International Disaster Management Meeting in Orlando, Florida (February 2005)

## OTHER ACADEMIC ACTIVITIES-

1.  Co-Chief Editor of a peer reviewed medical journal in Infectious Diseases in Corrections (Infectious Diseases in Corrections Report (formerly HEPP) (Editorial staff 1995- present; Co-Chief Editor- 2005- present)

2.  Program Director of a Fellowship Training Program in Correctional Medicine established at NSU-COM for the training of physicians involved in correctional health care enable the Fellows to become certified by a Board of Correctional Medicine and receive a Master's in Public Health degree.

3.  Program Director and Content Expert for a yearly program entitled "Mini-Fellowship in HIV in Corrections" in combination with NSU-COM, the Florida Department of Corrections, and the Florida/ Caribbean Aids Education Teaching Centers (FIAETC) for the training of correctional physicians in the care and treatment of incarcerated persons with HIV

4.  Program Director and Content Expert in a yearly program in Updates for the clinical care of incarcerated persons put on in collaboration with the Florida Chapter of the American Correctional Health Services Association (FIACHSA) and the Florida/Caribbean AIDS Education Training Center (FIAETC)

5.  Member (former Chairman 2002-2004) since 1998 of the Commission on Accreditation in Corrections, a body designed to improve the conditions of incarceration by a system of accreditation. This is part of a public health initiative.

6.  Presentation to the Institutes of Medicine of the National Academy of Sciences in March 2005 concerning the ethics of clinical trials for their consideration and recommendation to the Secretary of Health and Human Services for revision of 45CFR46, the Federal statute concerning human subjects in research.

7.  Adjunct Faculty for the Master of Health Law Program- a combined College of Osteopathic Medicine/College of Law program leading to a Master's degree in Health Law for non-lawyers.

8.  Bioethics Council of Southwest Florida - a combined initiative of Nova Southeastern University's College of Medicine and College of Law and the University of Miami designed to serve as a forum for the exploration of ethical issues in law and medicine and to implement ethical approaches and structures in individual patient situations and patient care systems.

9.  Consultant to the Florida Department of Juvenile Justice for evaluation, assessment and recommendations concerning their delivery of health care to their students, detainees and inmates.

10. Consultant to various State and County Attorney General Offices (New Jersey, North Carolina, Maricopa County, Arizona, etc) in correctional health care in various issues concerning their delivery of health care to the incarcerated persons

Abbreviated Resume
David L. Thomas, MD, JD
Page 12

within their state.

11.   Consultant to several private correctional health care delivery companies to evaluate and assist them in the delivery of health care to the incarcerated population for which they are responsible.

12.   Consultant to the Department of Justice for evaluation, advocacy, interpretation and direction of correctional health care and how it is practiced throughout the nation and specifically the Bureau of Justice Statistics in evaluating the impact of certain specific disease entities and other conditions as they impact corrections and how to evaluate and measure that impact. More specifically was a medical measure of the impact of the recently enacted Prison Rape Elimination Act.

13.   Faculty member for international mission trips and national and state mission trips to areas of the world, nation or state underserved in medical care- (Peru- March 2005; Clewiston and Belle Glade, Florida- February 2005)

14.   Faculty Development Program leading to Master Teacher in Health Education (Master of Science in Health Education) (2003-2005)

Please note that I do not list any speaking engagements or conferences in which I have been asked to present, moderate, participate, or direct.

PERSONAL:
Married with five children - one of whom still lives at home and in college, one at Des Moines University COM and one recent graduate of NSU-COM; two twin grandchildren.