# EXHIBIT K

# Report of David L. Thomas, MD JD

I. **Name and Address of Expert**

David L. Thomas, M.D., J.D.
Professor and Chairman, Department of Surgery
Professor and Chairman, Division of Correctional Medicine
Nova Southeastern University
College of Osteopathic Medicine
3200 So. University Dr.
Ft. Lauderdale, FL 33328-2018

II. **Addendum to Statement of Opinions and of the Bases and Reasons Therefore**

1.  On December 6, 2007, I had the opportunity to fly to California to evaluate several California Department of Corrections and Rehabilitation facilities. These included San Quentin State Prison, the California Medical Facility and California Institution for Men. During this evaluation I had the opportunity to observe daily and weekend functions of the prison and medical facilities, talk to staff, inspect medical records, interact with physician providers, nursing staff and correctional officers. I was also able to witness pharmaceutical functioning, direct care delivery including triage, chronic illness clinics, acute care response, individual provider interactions and system functioning.

I was asked to evaluate these facilities a part of attorneys' work-product in a continuing effort to develop and refine my opinion of the California Prison system. I have had the opportunity to personally evaluate many prisons and prison systems in the course of my consultative practice. Indeed, in the Ruiz v Estelle matter there was significant hostility to the visits, however I was permitted unfettered access for evaluation.

In the current matter, I was shocked to find the opposing attorney present at all phases of this attorneys' work-product effort. Not only was Plaintiff's attorney present, but non-party attorneys accompanied me on this attorneys' work-product function.

This supplemental report is necessary because the objective findings of my first hand evaluation reinforces and expands upon my earlier opinion. Clearly, there have been huge changes in the medical delivery to the California Department of Corrections and Rehabilitation in the past year. Uniformly, one hundred per cent of the people I elicited comments from felt positive and empowered to do their jobs. Not one person claimed overcrowding impacted their functioning. Indeed, only one nurse discussed staff shortages as a problem, and compared to other systems with which I

have evaluated or participated in, her area was by objective criteria, not understaffed.

There were problems both witnessed and discussed, but one hundred per cent were of an administrative nature. None of them, not a single issue, was related to overcrowding.

Upon discussions with several physician level providers none complained of overcrowding in any way impacting on their services or care. Once again all of the physician providers complaints revolved around administrative and managerial issues. There were several comments concerning the inability to resolve issues pertaining to which medications patients were actually taking. This is directly related to the OT printouts not reflecting the pharmacy printouts. This is because their computers do not connect. This major frustration of physician providers is totally unrelated to patient population; rather they are directly related to management issues.

Other physician providers complained that as nurses were trained they would be moved to another area of the facility. This caused the physician to have to retrain a new set of nurses. While this provider complained of several other issues like this, none of them were related to prisoner population. They were all related to administrative and management issues.

Many nurses were asked their opinion concerning the medical care in the California Department of Corrections and Rehabilitation. They ranged from nurses who had been there for a year to nurses who had been employed for the majority of their career. No nursing provider pointed to overcrowding as an issue in the delivery of medical care. Indeed most of the comments were typified by one nurse who stated: "these inmates are very lucky. I don't get health care as good as they get." She then went on to describe some of her problems in accessing care and some of the advantages of the incarcerated population.

Another nurse stated that the care was "....good and getting better." She went on to claim that she had practiced in the Department for more than two decades and there had been significant problems, but she felt that in the last year it was clear that medical care had undergone significant changes and "...was moving in the right direction."

Once again, not one single staff person indicated overcrowding was an issue in the appropriate delivery of health care. Indeed, this personal inspection tour dramatically reinforces my previous opinion concerning the culture of the prison system being the primary reason for the previously unconstitutional level of care. The learned helplessness of healthcare staff is

4

now being replaced by a sense of empowerment that has come about directly because of the actions of the Receiver.

This visit underscored with clarity the fact that in the past security services dominated the prison system and program services existed only at the whim of security services. This unbalanced condition led to the "learned helplessness" of all program staff. Indeed another expert who ran the system commented that there was a lack of leadership and a lack of organization that came about because of the culture of the system. The Receiver has been able to cut through this learned helplessness and empower the health care staff outside the traditional correctional organization. This empowerment of staff is the crux of having a constitutional level of health care in the California Department of Corrections and Rehabilitation.

2. It is important to address the opinion of others who feel the problem will resolve by reducing the number of inmates in the system. It is intuitively obvious that if there are only one inmate per prison then the tasks of the staff are easier than if there are thousands. However, one must recall that program services, and medical services, had been denigrated for years by a distant subservience to security staff and the learned helplessness of repeated frustration. Given this unbalanced culture, no assurance can be

made that without a change in the culture there would be a constitutional level of care even in the absurd situation of one inmate per facility.

I have read the opinion of other correctional medical experts who have evaluated the California system. They have viewed population figures and then, predicated on their knowledge and examination a dysfunctional system, which cannot handle the extant population, cannot accommodate an increase in population. While this train of thought seems logical on the surface it is flawed by its failure to recognize the dysfunctional CULTURE of the California system.

What is not appreciated by the other experts is that the dysfunctionality has begun to be replaced by a sense of empowerment among the health care staff. Uniformly there is a new sense of pride and accomplishment by the health care staff. It is remarkable that the Receiver has turned this dysfunctional system into a prideful health services system with a sense of personal empowerment in about a year. Usually a cultural change is a long term event and it will be in the California system, however it is worth remarking upon much change has occurred in such a short period of time.

3. It is still my opinion that a Constitutional level of health care can be

achieved in overcrowded prisons. Nothing in my recent on-site evaluation of the California Department of Corrections and Rehabilitation prisons dissuades me from that opinion. Clearly, much work remains to be done and some individual institutions, because of their cultural tradition will be harder to change than others. San Quentin is a specific example where the culture of the institution is still quite driven by security. Even in this institution the healthcare staff feels empowered and able to perform a constitutional level of quality care. There are many facility modifications that are already underway and will make the delivery of care more efficient, more cost effective, and more convenient. The important thing about these demonstrable changes is that for the first time in the history of San Quentin there has been an empowerment of health services. In a security driven institution where officers yell as they move inmates, there has been a shift in the culture to dramatically underscore the necessity of achieving a constitutional level of health care. This is a phenomenal cultural shift and of course it will take time and reinforcement to bring it about.

From my six year service on the Commission on Accreditation for Corrections of the American Correctional Association, as Chairman of that body for two years, and my service as a surveyor for the National Commission of Correctional Health Care, I have personally witnessed health services delivered in extremely overcrowded conditions that comports to all standards of constitutional correctional care. These overcrowded conditions existed both in individual prison sites as well as system wide. In spite of the overcrowded conditions quality, timely, appropriate, Constitutional medical services were provided.

4. This personal on-site evaluation indicates that the Receiver and his team have identified that the issue of health care is multifaceted and the learned helplessness of the health care staff must be overcome. Pouring resources into the system and making demands for change in the culture and not permitting the reversion to "learned helplessness" that had plagued the delivery system in the past is accomplishing the goals. Addressing the cultural issues and recognizing that this is a multifaceted problem that cannot be "fixed" by removing one single problem is a winning strategy. Removing a single issue, like overcrowding, will not

effectuate Constitutional care delivery. It is clear the Receiver understands this. However, it is also clear that the job of he Receiver would be easier with fewer inmates in he system no matter what level of population that may take. As indicated above, one inmate per institution would not guarantee a Constitutional level of care, however it would make the Receiver's job easier.

5. During this tour I have personally witnessed the reception of the parole violator inmates who are in the system for approximately nine months at a time. While these persons place a burden on the system, and cause some of he most visible signs of overcrowding- "ugly beds" and gymnasiums with inmates, handling them is relatively simple. County jails receive inmates like this all of the time. It may be inappropriate to place them in a prison, however that is the California law and handling prisoners is the responsibility of corrections. The problems these people create are managerial and administrative in nature.

6. Although the Receiver commented on the inability of establishing an effective patient-provider relationship in light of both inmate movement and overcrowding, this was not borne out by the inspection of the site. All providers felt their interactions with inmates were as good or better than in

the community and with the recent increase in resources the follow-up by individual providers is better than in most correctional systems. The large number of resources and personnel the Receiver has added has permitted real continuity of care with individual providers, which is an unusual situation in most correctional systems.

7. Once again, this site visit reaffirmed that the delivery of Constitutional health care in a correctional environment is dependent on a culture that fosters the delivery of health care more than any other single item. While many other issues may make the task more difficult (e.g. overcrowding may make an impact; lack of resources may make an impact; lack of quality staff may make an impact; disorganized pharmaceutical distribution may make an impact; a non-functioning supplies system may make an impact; a laboratory report system that is fraught with delays may make an impact), the single most important item in achieving a sound Constitutional level of care is a **culture** that fosters providing care at that level. In the extant case the court recognized this again and again in its comments. The court commented repeatedly on the "trained incapacitation" of the health care staff and their advocates. Each and every health care staff I spoke to felt empowered and those who had been there

prior to the last year expressed great satisfaction in the recent changes that had been brought about and all felt that a quality level care was being achieved The site visit I made is in exact accord with the trend of the more recent site visits that report that the culture of the California Department of Corrections and Rehabilitation is changing to one of appreciating the need and requirement for a Constitutional level of health care. This change in culture is fundamental to the provision of Constitutional care and the myriad of other issues are secondary and surmountable.

8. It is clear that the Receiver has much work to do to continue to effectively bring about a change in culture. He wisely removed the designation of MTA, a sworn officer which constantly demonstrated the unbalance culture between security and healthcare. However, during this site visit it was clear that the inmates and staff are still faced with this designation in mental health care. It is important for the change in culture to be most successful to have consistency and to empower all health care staff. This is a fundamental issue that is related to the culture of the system and unrelated to the population numbers of the system. Having these providers in the system underscores the preeminent position of security and undermines the necessary partnership and balance between security

and health care. This anachronism in mental health care continues to underscore in a daily dramatic fashion that security had absolute control of all aspects of an inmate's life, including access to and delivery of medical care. All other systems in the country recognized the inherent dangers that such a dual role could play in creating barriers to access to care, barriers to receiving a professional medical opinion, and barriers to having that opinion carried out. In my opinion it is more important to expend resources to remove this classification of personnel to alter the culture of the system in a long term fashion than to expend resources in other areas. Certainly the removal of he MTA designation in mental health is far more important to achieving a Constitutional level of health care than reducing the sheer number of inmates.

9. Nothing I saw during my site visits indicated that issues of overcrowding are fundamental to a Constitutional level of health care in California, nor is reducing population necessary to achieve a constitutional level of health care.

David L. Thomas, MD, JD