# EXHIBIT L

## Report of David L. Thomas, MD, JD

I.    **Name and Address of Expert**

David L. Thomas, M.D., J.D.
Professor and Chairman, Department of Surgery
Professor and Chairman, Division of Correctional Medicine
Nova Southeastern University
College of Osteopathic Medicine
3200 So. University Dr.
Ft. Lauderdale, FL  33328-2018

## II.  Addendum II to Statement of Opinions and of the Bases and Reasons Therefore

1.    On September 1, 2008, I had the opportunity to fly to California to evaluate several California Department of Corrections and Rehabilitation facilities. These included North Kern State Prison, the Substance Abuse Treatment Facility, Pleasant Valley State Prison, California State Prison in Solano, and High Desert State Prison. During this evaluation I had the opportunity to observe daily functions of the prison and medical facilities, talk to staff, talk with inmates, inspect medical records, interact with physician providers, nursing staff and correctional officers. I was also able to witness pharmaceutical functioning, direct care delivery including triage, chronic illness clinics, acute care response, individual provider interactions and system functioning.

2.      Prior to traveling to California I had the opportunity to review the

material sent to me including the reports of Dr. Craig Haney, Pablo Stewart,

reports of the receiver to the court (Turnaround, 7th and 8th), several internet

web sites concerning individual prisons as well as the California Department

of Corrections and Rehabilitation and several other various items.

3.      This supplemental report is necessary because the objective findings

of this second first hand evaluation reinforces and expands upon my earlier

opinions. Clearly, there have been huge changes in the medical delivery to

the California Department of Corrections and Rehabilitation in the past year.

Uniformly, one hundred per cent of the people I elicited comments from felt

positive and empowered to do their jobs. This exceeded the feeling of pride

and empowerment elicited in the December 2007, visit.

4.      The number of vacant health care positions was remarkably small. At

each institution there were essentially no registered nurse vacancies. This is

an extremely unique situation for correctional healthcare systems throughout

the United States. There is a nationwide shortage of nurses and the fact that

the California prison system is not in a similar situation speaks positively

about both the resources and the commitment to healthcare. Likewise

physician positions were generally filled. Even when positions were filled

with registry providers, there was generally a long term institutional

2

commitment. Registry providers offered a long term continuity of care because they were present at the institutions for long periods of time. There was a commitment to an institution.

5.    Unlike the last evaluation, where no one noted overcrowding as impacting their functioning, this time there were some complaints of too many inmates in the system. Last year only one nurse discussed staff shortages as a problem. On this visit, one warden, several physicians, and some medical personnel reported that overcrowding was responsible for negatively impacting the accomplishment of their functions. Also, almost all personnel uniformly cited the need for more space and more staff. When asked specifically if they could deliver an adequate Constitutional level of health care with the existing population, all answered that they could. That is, one hundred per cent of all personnel felt there was adequate commitment adequate resources, and adequate ability to provide a Constitutional level of health care. It is important to view some of the background and the feeling of empowerment to understand why one year after the first site visit, there are concerns of overcrowding on the part of the staff.

6.    One of the major problems with health care delivery in the California system was the culture of the system itself. California was known as a custody dominated system and anything not directly and proximately related

to custody control was perceived as peripheral to institutional functioning and the incarceration mission. Indeed, on this inspection and the previous in December of 2007, I had several long term health care employees comment that even a few years ago they were told by the custody staff to "Sit over there in the corner and we'll let you know if we need you."

7.         At each of the institutions I toured on this site visit there was a clear reversal of that "custody first last and always" philosophy on all levels. At the executive level to the line level one could see dramatic shifts towards cooperative interactions between health care and custody. Several wardens broached the subject on their own initiative. Managerial and supervisory staff recognized the importance of health care to the inmates and both spoke of this and exhibited it in their daily actions. Line staff were all very knowledgeable about the importance of access to health care and cooperating with medical staff in their functioning. In the previous site visit, some line officer staff were unsure of the mechanism for inmates to receive routine access to health care and did not know the location of health care request forms. There was no such deficiency in this site visit. Each and every officer in all housing areas of every institution visited knew immediately where the requests were, how the inmates accessed them and where they were distributed. This shift in thinking is a profound change from just a few

4

years ago. One could see the culture beginning to shift in the site visit of one year ago, but it has progressed far more rapidly than one would have thought possible.

8.        Many of the institutions on this site visit had instituted cooperative substantive meetings between health care staff and custody staff to discuss both broad issues as well as individual inmates. There is still some variability within the institutions concerning the approach to individual medical treatment plans, but it is quite clear that the overriding effort is to have the inmate receive necessary health services. This is a huge and fundamental change in the philosophy of the California Department of Corrections and Rehabilitation. This shift in culture cannot be overemphasized in delivering a Constitutional level of health care. Without a systemic cultural change no amount of resources would alter the delivery system. It is remarkable that the California Department of Corrections and Rehabilitation could achieve such a dramatic change in such a relatively short time.

9.        It is important to ask why on this site visit health care staff indicated the population pressures were impacting their service delivery when this was not of concern previously. There are two specific reasons for this. First, the providers now are working in a culture that encourages and empowers health

care services, so they have come to take pride and ownership in their functions. This is a total change for health care services in California before the advent of the receivership. This feeling of pride, empowerment, and esprit-de-corps causes them to want to perform them to the best of their ability. Population pressures are now being viewed as limiting their ability to practice the kind of medical care they wish to practice.

10.    Secondly, and as important, is the naiveté of the health care staff concerning correctional health care outside of the State of California. On this site visit most all physicians I spoke to indicated they would like to spend about an hour with each inmate at each visit because of the complexity of medical conditions presented. Also, each provider felt their inmates were "sicker" than any other inmates in correctional systems. This directly speaks to the lack of knowledge concerning correctional health care outside of the State of California in general.

11.    When I was responsible for health care delivery in Florida (the fourth largest system in the country) a quality management study was undertaken at my behest. It indicated that more than sixty per cent of our inmates received their first significant health care services in an incarcerated setting. (A "Significant health care service" was defined as any surgical procedure or a

prescription that was filled (not necessarily taken)). California inmates are

no more ill than inmates throughout the country's prison system.

12.      Also, there were complaints from health care staff concerning staffing

levels. Once again, this was because of a lack of understanding concerning

correctional health care in general. Most physicians felt a staffing ratio

should be in the order of one physician for every five hundred inmates. This

far exceeds typical correctional staffing patterns throughout the country and

exceeds recommended staffing patterns by accrediting bodies. Indeed, once

again referencing the Florida system, one physician level provider was

generally available for every twelve to fifteen hundred inmates except in

specialized facilities.

13.      Third, there was a feeling that the institutions visited on this site visit

were at a distinct disadvantage in terms of the continuity of care and

longevity of the staff due to the remoteness of the facilities. Objectively this

was not the case. Although these were some of the most remote prisons in

California and "registry" services were used to staff the health care

positions, the "temporary" staff had a long term commitment to the

institution. There were economic incentives of the employees not to become

state personnel because of their "registry" contract permits the

reimbursement of housing and transportation expenses.

7

14.     The concerns of crowding are a positive because they reflect
empowered, proud practitioners wanting to accomplish the best they can for
their patients. This is a huge cultural change in California corrections and
bodes extremely well for Constitutional health care delivery in California.

15.     The cultural change has been so dramatic that inmates clearly feel
empowered about receiving their care. One provider indicated "...the
inmates run the system..." in reference to requesting specific medications
and complaining until they receive them. Certainly, there were some inmates
who complained bitterly about "...terrible medical care..." When an inquiry
was made, he was bitter about waiting for two hours to be seen. Almost all
other inmates indicated that the care was "...good and getting better..." In
an incarcerated setting, because of the manipulative and sociopathic nature
of some individuals, it is unwise to make significant opinions predicated on
inmate comments, however it is clear that inmates are being seen and feel
empowered to be seen.

16.     At no site visited was there a significant problem with access to health
care. Emergencies were handled by immediate referrals to outside hospitals.
At some institutions routine visits were delayed or backlogged, but the
longest was six weeks. Each institution had a plan to address these delays.
These plans included physicians and nurses seeing patients on weekends to

8

handle any backlogs; doubling up on providers at areas within the prison that were lagging; flexible staffing patterns to use limited space and other creative solutions. This sort of dedication to the medical mission was unheard of in California (except in very isolated areas) prior to three years ago.

17.     **It is important to note that on this site visit at no institution nor viewing the system as represented by the institutions evaluated was there an egregious systematic flaw in health care delivery.** There certainly were some individual issues of health care that one can see in any complex health care delivery in any large system, but these did not rise to the level of egregious systemic issues requiring Draconian actions to resolve.

18.     There were problems both witnessed and discussed, but one hundred per cent were of an administrative nature. None of them, not a single one, was directly related to overcrowding. Upon discussions with several physician level providers none complained of overcrowding in any way impacting on their services or care. Once again all of the physician providers' complaints revolved around administrative, managerial, and pharmaceutical issues. There were several comments concerning the inability to resolve issues pertaining to which medications patients were actually taking. This discomfort with providers not feeling patients

consistently receiving the medications they need is directly related to the OT printouts not reflecting the pharmacy printouts because their computers do not connect. This major frustration of physician providers is totally unrelated to patient population; rather they are directly related to management issues. The shift to Maxor is also creating a series of internal administrative issues. Pharmacies are having to fill more prescriptions than their private practice counterparts averaging about 400 prescriptions per day per pharmacist at each of the institutions visited on this site visit. This compares with about 300 prescriptions per day at commercial retail pharmacies.

19.     Other physician providers complained that as nurses were trained they would be moved to another area of the facility. This caused the physician to have to retrain a new set of nurses. While this provider complained of several other issues like this, none of them were related to prisoner population. They were all related to administrative and management issues. Some of the physician providers were concerned that the nursing staff was semi-autonomous and could not be directed by physicians. The feeling was that better use of the nurses could be made if the nurses reported to the medical director.

20.     Many nurses were asked their opinion concerning the medical care in the California Department of Corrections and Rehabilitation. They ranged

from nurses who had been there for a year to nurses who had been employed for the majority of their career. No nursing provider pointed to overcrowding as an issue in the delivery of medical care. Indeed most of the comments were typified by one nurse who stated: "these inmates are very lucky. I don't get are as good as they get." She then went on to describe some of her problems in accessing care and some of the advantages of the incarcerated population. Another stated that the care was "….good and getting better." She went on to claim that she had practiced in the Department for more than two decades and there had been significant problems, but she felt that in the last year it was clear that medical care had undergone significant changes and "…was moving in the right direction."

21.    Once again, not one single staff person indicated overcrowding was an issue in the appropriate delivery of health care, only in their desire to take longer with each patient and see fewer patients per day. Indeed, this personal inspection tour dramatically reinforces my previous opinion concerning the culture of the prison system being the primary reason for the previously unconstitutional level of care. The learned helplessness of healthcare staff is now being replaced by a sense of empowerment that has come about directly because of the actions of the Receiver.

22.    It is clear that in the past security services dominated the prison

system and program services existed only at the whim of security services.

This unbalanced condition led to the "learned helplessness" of all program

staff. Indeed another expert who ran the system commented that there was a

lack of leadership and a lack of organization that came about because of the

culture of the system. The Receiver has been able to cut through this learned

helplessness and empower the health care staff outside the traditional

correctional organization. This empowerment of staff is the crux of having a

constitutional level of health care in the California Department of

Corrections and Rehabilitation.

23.    It is important to address the opinion of others who feel the problem

will resolve by reducing the number of inmates in the system. It is intuitively

obvious that if there are only one inmate per prison then the tasks of the staff

are easier than if there are thousands. However one must recall that program

services, and medical services, had been denigrated for years by a distant

subservience to security staff and the learned helplessness of repeated

frustration. Given this unbalanced culture, no assurance can be made that

without a change in the culture there would be a constitutional level of care

even with one inmate per facility.

24.     I vehemently disagree with Dr. Shanksy's opinion expressed in

Paragraph 10 of his amended report that overcrowding is a primary

determinant of poor quality care delivered in the California prison system

and the only way to address it is the emergency release of inmates. Although

there were isolated incidents of less than optimal care, and some inmates not

being seen in follow-up in a timely fashion, this DID NOT rise to the level

of a systematic failure of acceptable care that requires a dangerous and

Draconian measure such as the release of dangerous felons into the

community.

25.     Other experts have opined that the system of incarceration

psychologically damaging to the inmates. From the previous writings of that

author one would suspect that the California system is no worse or better

than any other system of incarceration. Previous courts (Madrid v. Gomez)

in dicta have opined that an inmate's psychological condition may not

deteriorate while incarcerated. Although the thrust of the current case is not

psychological health, it appeared as though access to mental health care was

readily available throughout the course of this site visit as an incidental

observation and during chart reviews.

26.     Previously, others have opined, predicated on the operation of the

"learned helplessness" associated with the previously dysfunctional system

that such a dysfunctional system, which cannot handle the extant population, cannot accommodate an increase in population. What is not appreciated without a current visit is that the dysfunctionality has been replaced by a sense of empowerment, pride, and esprit-de-corps among the health care staff and a real change in the culture of the custody staff to facilitate inmates receiving medical services. Uniformly there is a sense of pride and accomplishment. It is remarkable that the Receiver has turned this dysfunctional system into a prideful health services system with a sense of personal empowerment in the relatively short time of the Court's actions. Cultural changes are generally thought of in generational time frames. To view this cultural reversal in the time span of the receivership is truly remarkable.

27.     It is still my opinion that a Constitutional level of health care can be achieved in overcrowded prisons. Nothing in my recent on-site evaluation of the California Department of Corrections and Rehabilitation prisons dissuades me from that opinion. Clearly, much work remains to be done and some individual institutions, however nothing rose to a serious systematic level which would warrant such a disproportionately severe remedy as the release of convicted felons onto society.

14

28.     The court is currently involved in other litigation concerning facility construction and there are many facility modifications that are already underway and will make the delivery of care more efficient, more cost effective, and more convenient. The ninth report of the receiver points out (page 69) deaths are down by 30%; The receiver goes on at his conclusion to plea for 8 billion dollars threatening that without those funds the health care will deteriorate. I must adamantly disagree with this position; indeed the Receiver's own progress indicates that this is a ludicrous position. In my experience in both Viet Nam and in Residency training at a powerful American university program space was as difficult and medical accommodations were as challenging as the California Department of Corrections and Rehabilitations, yet superb care was delivered. This superb care was delivered because of the reasons cited by the Receiver and by me throughout this opinion and have to do with the culture of empowerment and the desire of health care professionals to perform at excellent levels.

29.     Besides facility modifications attention must be given to the supply and distribution of medications. Once again a system and provider is already underway to assure the appropriate functions in this area. This transition will require a period of adjustment and will need some administrative oversight

and management input to keep from having a negative impact on patient care.

30.    From my six years of service on the Commission on Accreditation for Corrections of the American Correctional Association, as Chairman of that body for two years, and my service as a surveyor for the National Commission of Correctional Health Care, and my service on the Board of Governors of the American Correctional Association, I have personally witnessed health services delivered in extremely overcrowded conditions that comports to all standards of constitutional correctional care. These overcrowded conditions existed both in individual prison sites as well as system wide. In spite of the overcrowded conditions quality, timely, appropriate, Constitutional medical services were provided.

31.    This personal on-site evaluation indicates that the Receiver and his team have identified that the issue of health care is multifaceted the learned helplessness of the health care staff must be overcome. Pouring resources into the system and making demands for change in the culture and not permitting the reversion to "learned helplessness" that had plagued the delivery system in the past is accomplishing the goals.

32.    In addressing the cultural issues that dominated and pervaded the California Department of Corrections and Rehabilitation, the various

16

Receivers appointed by the court have recognized that medical care delivery in a correctional setting is a multifaceted problem that cannot be "fixed" by removing one single problem. Removing a single issue, like overcrowding, will not effectuate Constitutional care delivery. Indeed, most of the institutions evaluated on this site visit had plans in place and being implemented to stabilize staff, see inmates, provide care, and perform in a timely fashion. It is clear that this Receiver's team understands this.

33.     Note must be made of the space for medical facilities in the California Department of Corrections and Rehabilitation. Because of the aforementioned culture of custody dominance, even the newest of the California prisons have inadequate space for patient care. There simply was not much thought given to the needs of medical care for the inmates. It was not of great concern to this (formerly) custody driven system. Most of the facilities visited had created unique means of using existing space to accommodate their needs. Similar to my medical service in Viet Nam, flexible hours were used, weekend and rotating staff usage, hallway usage, and other managerial and administrative solutions were implemented. During my first residency (general and chest surgery) at Jackson Memorial Hospital/University of Miami School of Medicine in Miami, Florida, it was not unusual to see patients cared for in the hallways closets and other non-

17

traditional spaces. While not always a pleasant work environment, quality medical care was delivered because of the pride and empowerment of the health care staff. One is seeing that same sense of pride and accomplishment at every California facility visited on this site visit.

34.    However, it is also clear that the job of he Receiver would be easier with fewer inmates in he system no matter what level of population that may take. As indicated above, one inmate per institution would not guarantee a Constitutional level of care; however it would make the Receiver's job easier.

35.    During this site visit I have personally witnessed the reception of the parole violator inmates who are in the system for approximately nine months at a time. High Desert State Prison is one such reception center. The process there was orderly and efficient. No single staff member was overwhelmed by their responsibility and all performed admirably accomplishing the intake process with alacrity. While these relatively short term parole violators place a burden on the system, and cause some of he most visible signs of overcrowding- "ugly beds" and gymnasiums with inmates, handling them is relatively simple. County jails receive inmates like this all of the time. It may be inappropriate to place them in a prison, however that is the California law and handling prisoners is the responsibility of corrections.

18

The problems these people create are managerial and administrative in nature. Indeed, it is telling that two of the institutions visited on this site visit had converted some of their housing gymnasium units back into recreational gymnasiums. Clearly the burden of overcrowding is being met and the system has made administrative and managerial responses to deal with it. At no facility at any time evaluating the California Department of Corrections and Rehabilitation was there any "hot bunking." (Hot bunking is a system used by markedly overcrowded institutions which consists of inmates sharing the same bunk with differing hours permitted for use. Other facilities with marked overcrowding I have evaluated and I have reviewed in my capacity with the ACA have used this system and still provided acceptable medical care. (Until recently facilities in the Pennsylvania Department of Corrections were using hot bunking as a method to deal with their overcrowding issues). It is admirable that California has not resorted to this type of housing systems. It also speaks  their level of overcrowding. While 200% overcrowding at some facilities seems to call for a drastic response, when put into perspective of other prison systems, it becomes clear the fundamental reason for the previous poor care given to the inmates was the culture of the system.

19

36.     Although the Receiver and some providers have commented on the inability of establishing an effective patient-provider relationship in light of both inmate movement and overcrowding, this was not borne out by the inspection of the site. All providers felt their interactions with inmates were as good as or better than in the community. They did desire to spend more time with individual patients, but the time frames indicated were totally inconsistent with the non-correctional practice of medical care. Few general providers can routinely spend an hour with each patient.

37.     There are simple managerial and administrative remedies to improve provider efficiency. Although not the purpose of this evaluation some suggestions would be keeping the provider with the same subset of patients. Familiarity with the inmate's health care issues would require few extensive reviews of the record prior to seeing the patient. One institution had currently implemented this system (High Desert) at the initiative of the Chief Medical Officer and had noted some improvement in patient care flow. Once again it must be underscored that the recent increase in resources has caused the California system to leap ahead of other systems in terms of compensation of health care personnel and numbers of facility dedicated personnel. The large numbers of resources and personnel the Receivers and

their teams has added have permitted real continuity of care with individual providers, an unusual situation in most correctional systems.

38.    Once again, this site visit reaffirmed that the delivery of Constitutional health care in a correctional environment is dependent more on a culture that fosters the delivery of health care more than any other single item. While many other issues may make the task more difficult (e.g. overcrowding may make an impact; lack of resources may make an impact; lack of quality staff may make an impact; disorganized pharmaceutical distribution may make an impact; a non-functioning supplies system may make an impact; a laboratory report system that is fraught with delays may make an impact), the single most important item in achieving a sound Constitutional level of care is a **culture** that fosters providing care at that level. In the extant case the court recognized this again and again in its comments. The court commented repeatedly on the "trained incapacitation" of the health care staff and their advocates. Once again on this multiple site evaluation, each and every health care staff I spoke to felt empowered and those who had been there prior to the last few years expressed great satisfaction in the recent changes that had been brought about and all felt that a quality level care was being achieved. More importantly there was an obvious change in the culture of the custody staff and an understanding and

21

an internalization of the necessity to assure the proper access and assure that

the care ordered is carried out and not interfered with by a custody barrier.

39.    The site visit I made is in exact accord with the trend of the more

recent site visits that report that the culture of the California Department of

Corrections and Rehabilitation is changing to one of appreciating the need

and requirement for a Constitutional level of health care. This change in

culture is fundamental to the provision of Constitutional care and the myriad

of other issues are secondary and surmountable.

40.    It is clear that the Receiver has much work to do to continue the

effective change in culture which has already occurred. One fears that a

system like this could revert to a custody driven, custody dominated system

again were it not for the external pressures and oversight that have been

brought to bear and continuously bear on the culture of the system. One of

the initiatives of the Receiver previously opined upon was the absolute

necessity to remove the designation of MTA, a sworn officer with health

care responsibility including medication distribution, which constantly

demonstrated the unbalance culture between security and healthcare. In the

previous site visit this designation was still present in the area of mental

health. On this site evaluation no MTA personnel were seen distributing

psychotropic medications. When an inquiry was made at several institutions,

the responses were predicated upon an understanding of the inappropriateness of that system by upper level custody personnel. This is a dramatic indication of the pervasiveness of the change in culture that has already occurred in this system.

41.    It is important for the change in culture to be most successful to have consistency and to empower all health care staff and have custody staff internalize the necessity to facilitate health care to the inmates. This cultural issue is fundamental to health care delivery and is totally unrelated to the population numbers of the system.

42.    Nothing I saw on this site visit indicated that issues of overcrowding are fundamental to a Constitutional level of health care in California, nor is reducing population necessary to achieve a constitutional level of health care.

David L. Thomas, MD, JD

23

| | |
|---|---|
| EDMUND G. BROWN JR. | HANSON BRIDGETT LLP |
| Attorney General of the State of California | JERROLD C. SCHAEFER - 39374 |
| DAVID S. CHANEY | PAUL B. MELLO - 179755 |
| Chief Assistant Attorney General | S. ANNE JOHNSON - 197415 |
| FRANCES T. GRUNDER | SAMANTHA TAMA - 240280 |
| Senior Assistant Attorney General | RENJU P. JACOB - 242388 |
| ROCHELLE C. EAST | 425 Market Street, 26th Floor |
| Supervising Deputy Attorney General | San Francisco, CA 94105 |
| LISA A. TILLMAN – 126424 | Telephone: (415) 777-3200 |
| Deputy Attorney General | Facsimile: (415) 541-9366 |
| CHARLES ANTONEN – 221207 | jschaefer@hansonbridgett.com |
| Deputy Attorney General | pmello@hansonbridgett.com |
| 455 Golden Gate Avenue, Suite 11000 | ajohnson@hansonbridgett.com |
| San Francisco, CA 94102-7004 | stama@hansonbridgett.com |
| Telephone: (415) 703-5443 | rjacob@hansonbridgett.com |
| Facsimile: (415) 703-5843 | |
| rochelle.east@doj.ca.gov | |
| lisa.tillman@doj.ca.gov | |
| charles.antonen@doj.ca.gov | |

Attorneys for Defendants

## UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

## AND THE NORTHERN DISTRICT OF CALIFORNIA

## UNITED STATES DISTRICT COURT COMPOSED OF THREE

## PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

| | |
|---|---|
| RALPH COLEMAN, et al., | No. 2:90-CV-00520 LKK JFM P |
| Plaintiffs, | **THREE-JUDGE COURT** |
| v. | |
| ARNOLD SCHWARZENEGGER, et al., | **PROOF OF SERVICE** |
| Defendants. | |
| MARCIANO PLATA, et al., | No. C-01-1351 TEH |
| Plaintiffs, | **THREE-JUDGE COURT** |
| v. | |
| ARNOLD SCHWARZENEGGER, et al., | |
| Defendants. | |

- 1 -

PROOF OF SERVICE

1618648.1

1

## PROOF OF SERVICE BY MAIL

2

### Coleman v. Schwarzenegger - Case No 2:90- cv00520 LKK JFM P

3

### Plata v. Schwarzenegger - Case No. C01-1351 TEH

4       I, Hillary Plymate, declare that I am a resident of the State of California. I am over
the age of 18 years and not a party to the action entitled *Coleman v. Schwarzenegger/Plata v.*

5     *Schwarzenegger*; that my business address is 425 Market Street, 26th Floor, San Francisco,
California 94105. On September 17, 2008, I served a true and accurate copy of the document(s)

6     entitled:

7                    **REPORT OF DAVID L. THOMAS, MD, JD**

8     on the party(ies) in this action by placing said copy(ies) in a sealed envelope, each addressed to
the last address(es) given by the party(ies) as follows:

| | |
|---|---|
| KIMBERLY HALL BARLOW<br>Jones & Mayer<br>3777 North Harbor Boulevard<br>Fullerton, CA 92835 | STEVEN S. KAUFHOLD<br>CHAD A. STEGEMAN<br>TERESA WANG<br>Akin Gump Straus Hauer & Feld LLP<br>580 California Street, 15th Floor<br>San Francisco, CA 94102 |
| ANN MILLER RAVEL<br>THERESA FUENTES<br>Office of the County Counsel<br>County of Santa Clara<br>70 West Hedding, East Wing, 9th Floor<br>San Jose, CA 95110 | STEVEN WOODSIDE<br>ANNE L. KECK<br>Office of County Counsel<br>575 Administration Dr., Room 105A<br>Santa Rosa, CA 95403 |
| LORI RIFKIN<br>MICHAEL BIEN<br>Rosen Bien & Galvan, LLP<br>315 Montgomery St., 10th Fl.<br>San Francisco, CA 94104 | PRISON LAW OFFICE<br>DONALD SPECTER<br>1917 Fifth Street<br>Berkeley, CA 94710-1916 |
| MARTIN H. DODD<br>FUTTERMAN & DUPREE<br>160 Sansome Street, 17th Floor<br>San Francisco, CA 94109 | JOHN HAGAR<br>LAW OFFICE OF JOHN HAGAR<br>PMB 314<br>1819 Polk Street<br>San Francisco, CA 94109 |
| ROD PACHECO<br>WILLIAM MITCHELL<br>Office of the District Attorney<br>County of Riverside<br>4075 Main Street, First Floor<br>Riverside, CA 92501 | GREGG ADAM<br>NATALIE LEONARD<br>Carroll, Burdick & McDonough, LLP<br>44 Montgomery Street, Suite 400<br>San Francisco, CA 94104 |
| MICHAEL P. MURPHY<br>CAROL L. WOODWARD<br>Hall of Justice and Records<br>400 County Center, 6th Floor<br>Redwood City, CA 94063 | DENNIS BUNTING<br>ALAN COHEN<br>Office of County Counsel<br>County of Solano<br>675 Texas Street, Suite 6600<br>Fairfield, CA 94533 |

- 2 -

<table>
<tr><td>
1<br>
2<br>
3
</td><td>
DANIEL J. WALLACE<br>
KELLY DUNCAN SCOTT<br>
County of Santa Barbara<br>
105 E. Anapamu St., Suite 201<br>
Santa Barbara, CA 93101
</td><td>
ROCHELLE C. EAST<br>
Office of the Attorney General<br>
455 Golden Gate Avenue<br>
Suite 1100<br>
San Francisco, CA 94102
</td></tr>
</table>

4
5

LISA TILLMAN
Office of the Attorney General
1300 I Street, Suite 125
Sacramento, CA 94244

6

7
8
9
10
11

☒  (By First Class Mail pursuant to Code of Civil Procedure section 1013.) I am readily familiar with (firm name)'s practices for collecting and processing documents for mailing with United States Postal Service. Following these ordinary business practices, I placed the above referenced sealed envelope(s) for collection and mailing with the United States Postal Service on the date listed herein at 425 Market Street, 26th Floor, San Francisco, California 94105. The above referenced sealed envelope(s) will be deposited with the United States Postal Service on the date listed herein in the ordinary course of business.

12
13
14

☐  (By Express Mail pursuant to Code of Civil Procedure section 1013.) I deposited each sealed envelope, with the postage prepaid, to be delivered via _____ to the party(ies) so designated on the service list.

15
16
17
18
19
20

☐  (By Telecopy Fax pursuant to Code of Civil Procedure section 1013.) I am readily familiar with (firm name)'s practice for processing of documents via Telefax. Following these ordinary business practices, I directed that the above referenced documents(s) be placed in the Telefax machine, with all costs of Telefaxing prepaid, directed to each of the party(ies) listed on the attached service list using the last Telefax numbers(s) given by the party(ies), and processed through the Telefax equipment, until a report is provided by that equipment indicating that the Telefax operation was successful. A copy of the Telefax report indicating successful transmission is attached hereto.

21
22

I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

23

Hillary Plymate

24
25
26
27
28

- 3 -

PROOF OF SERVICE                                                    1618648.1