# EXHIBIT P

G. Bataille comments for CMHDA
Adult Parole Realignment—Mental Health Assessment

### 5) Mental Health and co-occurring AOD/MH

(a) Estimated impact on the Mental Health Department (including pharmacy) based on number of parole clients per LAO estimates.
Assume 10% of parolees for intensive treat. (FSP): (e.g., Cost per client @ $20K each);
Total_____
Assume 10% of parolees for outpatient treatment: (e.g., Cost per client @ $6K each);
Total_____
Pharmacy Cost estimate: Av. Cost/per client _____ Total _____

Total costs (Low to high range) $_____

(b) **What new/expanded service capacity is required to treat adult probation (paroles) w/mental illness? Use your county's Mental Health Services Act CSS program costs as basis: Full service partnership slots & outpatient slots.**

___% expansion in intensive services (FSP)
___% expansion in outpatient services

Pena/ 00961

# LAO's Parole Realignment Proposal
## Mental Health/Behavioral Health Issues/Concerns
### Talking Points

- SCC/counties have a vital interest in the outcome of the Legislative Analyst's (LAO) proposal to "realign" 71,000 adult offenders from State to local supervision.

- Not only is there risk related to adequacy of funding and resource capacity, but we need to understand the potential impact of managing the treatment of a new/expanded criminal justice population on services to other seriously mentally ill populations.

**Background**

- There is considerable legislative and county level activity re: the LAO proposal. CSAC, which has historically—in concept, held a policy position supportive of adult parole realignment, has convened a 20 (voting) member Parole Realignment Task Force.

- The goal of the group is to analyze parole realignment issues and options and to make recommendations to the CSAC Legislative Conference in late May.

- The LAO proposal was an alternative to the Governor's budget proposal re: early release and summary parole to reduce the prison population and is a starting point that will evolve in the 2008-09 budget process.

- The LAO proposal focuses on financing options and provides little specific detail regarding the population to be realigned, jurisdictional issues if parolees re-offend, supervision, or treatment/rehabilitation community support needs/costs.

**Parole Realignment—Issues and Concerns for SCC/counties**

**Financing**

- Given the State's fiscal crisis, the LAO proposes no new revenue for Realignment but recommends re-allocation of existing revenues including waste and water district property taxes, redirection of Prop. 172 (6%) currently allocated to cities, and reallocation of portion of State VLF administrative fees that currently support DMV.

- It provides $483 million—to "equal" current CDCR spending on the 71,000 parolees plus $12 million local start-up administration over 3 years for a total of $495 million.

- It is unclear whether there are other financing sources, new or existing.

- Local transfer of special district funds and Prop. 172 transfers from cities are <u>very problematic from CSAC & affiliate perspective.</u>

Pena/ 00962

- It is unclear whether $495 million is sufficient; or what funds would be needed vs. available for:
  - Jurisdictional/administrative needs
  - probation supervision
  - AOD and mental health treatment
  - community rehabilitation/re-integration (including housing, job training and placement)
  - healthcare costs relative to what CDCR spends for this same population

- It is unclear what the potential for growth in the population is.

- It is unclear how secure the sources of funding are or what the local risk is if funding is not adequate.

- The LAO is attempting to structure this realignment so that it is not subject to SB 90 county mandate claims.

- It is unclear what the distribution formula will be or how dollars will be allocated and distributed to counties, which was a huge, issue in Realignment I. Lessons learned from Realignment I need to be considered.

- There are questions about allocation guidelines relative to allocation to program components (supervision/rehabilitation, etc…) or full local discretion and consideration should be given to potential problems with priority for funding of various accounts and transfers among accounts.

- There needs to be clarity as to whether there would be an expectation that revenues other than Parole Realignment be used to fund care and services.

**Population to be realigned**

- The LAO proposes 71,000 "non-serious, non-violent" offenders with drug and property crimes. CSAC discussions with CDCR raise doubts.

- A high portion of these offenders may pose much higher risk including history of violence and sex offenses, even if latest offense was property or drug-related. The actual population that meets criteria for "low risk" may only be closer to 35,000.

- There needs to be a clear descriptive profile of the 71,000 parolees under consideration for transfer to communities.

- CDCR is completing the "COMPASS" risk/needs assessment for prisoners. CDCR must give priority to providing CSAC with risk/need analysis of this population by age, gender, ethnicity/language background, health status, and criminal history, which should latest offense/prior offenses/number of prior incarcerations, and community risk factors.

2

Pena/ 00963

- There should be specific estimates of the numbers/percentage of individuals with psychiatric history: by diagnosis and level of need; including the prevalence/history of substance abuse.

### Mental Health/behavioral health program requirements

- The LAO proposal does not provide any program detail on treatment and rehabilitation for the proposed realigned population.

- If this initiative moves forward, it is critical that program criteria are developed, outlining the requirements for the new/expanded services and estimate costs since a significant portion of the realigned population will require mental health treatment and rehabilitation services.

- CMHDA and CSAC provided input to the Urban County Caucus regarding a survey recently distributed to its member counties. UCC questionnaire assumed 20% of the population to be realigned would have psychiatric disorders and 70% would have substance abuse history. These are generally accepted prevalence rates in prison systems for serious psychiatric disorder, however county mental health directors believe we should assume that over 80% of inmates with psychiatric problems also have co-occurring substance use, which creates additional risk for recidivism.

- Projected costs of treatment and community support for mental health should include mental health-based treatment of co-occurring disorders, for this population.

- Program models, including levels of treatment and linked rehabilitation, should be based on proven effective program models.

- The current CA experience can inform program design and cost framework and includes
    - MHSA full service partnership(s)
    - AB 2034 - SB 1651 (Steinberg) provides current legislative framework for treatment/rehabilitation of hi-need/seriously mentally ill parolees;
    - CONREP program elements
    - Cost and experience should also be considered for intensive level of care;
    - Treatment courts
    - Gender-focused and culturally specific services.

- There should be clarity to what impact the shift to local Adult Probation supervision will have on existing CDCR Parole Outpatient Services, and whether any outpatient treatment will remain with CDCR or will treatment responsibility for realigned population shift entirely to county and county contract providers?

- A cost assessment by level of care should be conducted. Costs used for MHSA Community Services and Supports could be used as basis for this analysis for intensive services; and average outpatient adult services for lower levels of service.

3

- o Treatment costs based on level of care: (The LAO's website also provides estimates of number of parolees per county.)

- o Assume 10% (7,100) parolees require intensive treatment including pharmacy (FSP): e.g., number of parolees _100_ Cost per client @ $25,000 Total: $2,500,000

- o Assume 10% (7,100) parolees require outpatient treatment including pharmacy: e.g., number of parolees _100_ Cost per client @ $5,000 Total: $500,000

- The above does not include costs or responsibility for providing and paying for acute psychiatric hospitalization and subacute/skilled nursing level of care, or what access/priority will State DMH provide for state hospital care. (i.e, will there be an increased pressure on local jails/hospitals to treat high-risk seriously mentally ill parolees?)

- Will parolees be eligible for benefits including Medi-Cal and Medicare, Veterans benefits? There needs to be an estimate of what percent of parolees are anticipated to be eligible for various benefits There needs to be agreement that CDCR applies for reinstitution of benefits in timely manner.

- Regarding housing, job training and placement, it needs to be clear what systems will be responsible, i.e. Local housing agency/Probation? To what extent would mental health/behavioral health be directly involved and/or to what extent would MH provide "support" to maintain housing/employment?

**Supervision and jurisdictional issues**

- These concerns will be addressed by other criminal justice partners but it is critical to note that local courts, law enforcement and probation departments are already overloaded. Probation has large caseloads including "banked" cases. Probationers who have serious mental health, substance use and co-occurring disorders must be managed through smaller/intensive caseloads to provide adequate oversight.

- There is no clarity about who is responsible for re-offenses and where re-offenders will be re-incarcerated. If re-incarceration is in jails or re-entry facilities, local treatment as well as criminal justice system capacity will be impacted.

- County Probation Departments are already over capacity to supervise current adult probationers—often lower level cases are placed on caseloads of 300+ per probation officer and other cases are "banked." Much lower caseloads are critical, especially for probationers with serious psychiatric problems—50 cases is often used as intensive supervision standard. How will new realigned cases be managed?

4

Pena/ 00965