EDMUND G. BROWN JR.
Attorney General of the State of California
DAVID S. CHANEY
Chief Assistant Attorney General
ROCHELLE C. EAST
Senior Assistant Attorney General
JONATHAN L. WOLFF
Senior Assistant Attorney General
LISA A. TILLMAN
Deputy Attorney General
KYLE A. LEWIS – State Bar No. 201041
Deputy Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
Telephone: (415) 703-5708
Facsimile: (415) 703-5843
kyle.lewis@doj.ca.gov

HANSON BRIDGETT LLP
JERROLD C. SCHAEFER
PAUL B. MELLO
S. ANNE JOHNSON
SAMANTHA D. TAMA
RENJU P. JACOB
425 Market Street, 26th Floor
San Francisco, CA 94105
Telephone: (415) 777-3200
Facsimile: (415) 541-9366
jschaefer@hansonbridgett.com
pmello@hansonbridgett.com
ajohnson@hansonbridgett.com
stama@hansonbridgett.com
rjacob@hansonbridgett.com

Attorneys for Defendants

**UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

**AND THE NORTHERN DISTRICT OF CALIFORNIA**

**UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES**

**PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE**

| | |
|---|---|
| RALPH COLEMAN, et al.,<br>Plaintiffs,<br>v.<br>ARNOLD SCHWARZENEGGER, et al.,<br>Defendants. | No. 2:90-cv-00520 LKK JFM P<br>**THREE-JUDGE COURT** |
| MARCIANO PLATA, et al.,<br>Plaintiffs,<br>v.<br>ARNOLD SCHWARZENEGGER, et al.,<br>Defendants. | No. C01-1351 TEH<br>**THREE-JUDGE COURT**<br>**TRIAL AFFIDAVIT OF THOMAS G. HOFFMAN**<br>**To: Three-Judge Panel** |

I, Thomas G. Hoffman, declare:

1. I am the Director of the Division of Adult Parole Operations (DAPO) for the California Department of Corrections and Rehabilitation (CDCR). I have personal knowledge of the facts stated in this declaration and if called to testify about those facts could and would do so competently.

## I. Current Position and Background

2. I was appointed Director of the Division of Adult Parole Operations on August 14, 2006. As Director, I am responsible for the Division's primary mission to supervise the more than 125,000 CDCR parolees in the State of California. DAPO assists in the overall mission of CDCR by enhancing public safety through the effective supervision of parolees, enabling parole agents to be an active part of the community's public safety plans, and encouraging and assisting parolees in their effort to reintegrate into the community.

3. Before assuming the position of Director, I worked approximately 31 years in California municipal law enforcement. From 1994 to 2004, I was a member of the City of West Sacramento Police Department as the second-in-command of the Department, holding the titles of Captain and Deputy Chief. I served in that capacity at the Department until my retirement in April 2004. From 1975 to 1994, I served with the City of Inglewood Police Department. While at that Department, I held positions of increased authority and responsibility from Officer to Captain. I hold a Bachelor's Degree of Arts in Management from the University of Redlands, awarded in 1990.

4. I report to Chief Deputy Secretary for Adult Operations, Scott Kernan. Numerous personnel within DAPO report to me, including a Deputy Director, two Associate Directors, and four Regional Parole Administrators, among others. In its four parole regions, DAPO operates approximately 179 parole units and sub-units in 84 locations throughout the State. Altogether, there are approximately 4,400 personnel working in the Division of Adult Parole Operations, including 2,400 Parole Agents. I am readily familiar with the CDCR programs and policies concerning parole.

## II. Overview

5. In May 2007, the California Legislature enacted, and Governor Schwarzenegger signed into law, Assembly Bill 900 (AB900), comprehensive legislation which was intended to enact a variety of programs directed at reducing California's prison population. Recognizing the role that parole operations has in affecting the number of persons in California prisons, the Secretary of CDCR also took action within CDCR to address parole population issues. To that end, the Secretary has approved a number of parole reform measures intended to provide greater consistency in parole decisions and enhanced community based programs in lieu of incarceration that has and will have a positive impact on reducing prison population. As the Director of DAPO it is my responsibility to ensure these measures are effectively implemented.

6. According to the August 27, 2008 CDCR Weekly Parolee Population Report, the California parolee population under active supervision was 141,855. (See http://www.cdcr.ca.gov/Reports_Research/Offender_Information_Services_Branch/WeeklyWed/Weekly_Wednesday_Parole_Archive.asp). These parolees are located in every county of the State, and represent nearly every offense type and cultural, ethic, racial, or social group. (Defs.' Trial Ex. 1202, which is a true and correct copy of a document titled "2007 Parole Census Data as of June 30, 2008;" Defs.' Trial Ex. 1210, which is a true and correct copy of a document titled "County and Region of Parole Calendar Year 2007. These reports are made or updated on a regular basis by personnel in DAPO with knowledge of the matters contained therein, and are kept by CDCR in the course of regularly conducted activity, as a standard practice). As of June 30, 2008, there were approximately 62,393 parolees incarcerated at CDCR in-state prison facilities, including 43,111 Parole Violators Returned With a New Term, 15,689 Parole Violators Returned to Custody, and 3,593 Parolees Pending Revocation. (Defs.' Trial Ex. 1255, CDCR Prison Census Data Report). While some of these parolees are felons who chose to commit additional dangerous and wanton criminal acts while on parole and are subject to

additional or new terms of incarceration, there are parole violators who will serve relatively short terms. On average, a parole violator who is revoked and returned to prison is incarcerated for 4.2 months before release from prison. This short duration, combined with the sheer number of parolees returned to prison, leads to a recycling of offenders that is ineffective and prevents DAPO from achieving one of its primary goals to assist the parolee population with successful reintegration into the community. As reported by Dr. Joan Petersilia, of the University of California-Irvine, Center for Evidence Based Correction, this constant recycling of the California parolee population straps the limited resources of DAPO with case loads that are often unmanageable, further destabilizes the parolee population, and compromises the Division's capacity to effectively program and supervise parolees across the State.

7. The Division of Parole Operations has made recent improvements that will greatly enhance the efficiency and effectiveness of parole supervision within the State. Through DAPO's efforts, CDCR is implementing parole accountability efforts that are intended to provide more consistent revocation decisions, alternative sanction programs, diversion to parole programs based upon parolees' individual risk and needs factors, and more consistent decisions regarding parolee discharges. We believe that these improvements will result in more consistent parole violation decisions, diversion of parolees to resources and programs that can serve their needs, and altogether reduce the number of parolees returning to California prisons. Though these improvements will take time to implement and elicit quantifiable results, they demonstrate a significant effort by CDCR and DAPO to effectively supervise the California parolee population in order to ensure the public safety and properly return inmates to the community, while reducing the State's prison population. Collectively, evidence-based programming and remedial sanctions, supported by a risk and needs-based decision making model in the revocation process have proven to reduce prison population while maintaining public safety, and are discussed in detail below.

//

## III. Improvements in California Adult Parole Operations

### A. Implementation of the Parole Violation Decision Making Instrument

8. Parolees can experience difficulties under supervision due to a variety of conditions unique to each person, including substance abuse, mental health, physical health, job skills, education, prior criminal involvement, and lack of stability in housing and pro-social connections. Keeping in mind the goal of community safety and the need to develop a strategic approach to violations, in conjunction with numerous criminal justice experts and scholars, DAPO has developed a "Parole Violation Decision Making Instrument." (Defs.' Trial Ex. 1198, which is a true and correct copy of the Parole Violation Decision Making Instrument documents. I am readily familiar with the development and drafting of this instrument and the documents describing it. These documents were created by personnel in DAPO with knowledge of the subject matter after the instrument was finalized, and will generate records that will be kept and reported upon by CDCR during the course of regular activities, as a standard practice.) This is intended to provide a parole violations decision making tool that will enable parole staff to uniformly determine, recommend, and impose appropriate and consistent sanctions for parole violations. In doing so, this instrument will assist DAPO's mission to efficiently and effectively monitor the State's parolee population while ensuring continued public safely.

9. The Parole Violations Decision Making Instrument was formulated on the base assumption that responses to parole violations should be part of an overall strategy of reducing risk of recidivism, standardizing decision making, enhancing success on parole, and using parole resources wisely. This instrument is shaped by the principles of evidence-based practice and effective interventions with offenders. The tool takes into account a variety of factors, including the level of risk of the offender, his or her criminogenic needs related to that risk, as well as by the severity of the parole violation behavior. At its core, the violations instrument is intended to assure consistency, even-handedness, and effectiveness across DAPO while offering absolute transparency in the

parole violation process—offenders, DAPO staff, management, and the public should be able to understand the rationale for violation responses and see them as a part of the Division's public safety strategy.

10. In the context of these principles, the parole violation instrument seeks to establish an approach to responding to parole violations that will result in the more successful transition of offenders under parole supervision to the community. With these successful transitions, DAPO hopes to reduce future victimization, increase public safety, and enhance the ability of offenders to become more productive members of the community. Moreover, the tool will provide CDCR and the public with greater consistency in responses to parole violations that are based on severity and the level of risk the parolee poses to the community. These more focused responses will permit CDCR to efficiently target both its and the local communities' resources to effectively manage and help parolees while continuing to ensure public safety.

11. On the whole, DAPO's activation of the parole violations instrument is intended to emplace an orderly decision process that enables Parole Agents, Supervisors, and Parole Administrators to consider violation cases within a similar framework and provide specific guidance to staff about the factors to consider in developing a response to each violation of parole or the commission of a new crime by a parolee. Some of the key decision points and intended outcomes of the Parole Violations Decision Making Instrument include:

a. Allows for discretionary "override" of an indicated category of response level when, in the judgment of the Parole Agent and Supervisor—and according to definitions established by the policy—the "presumptive response" does not appropriately respond to the level of risk represented by the specific parolee or the seriousness of the instant violation;

b. Identifies the appropriate category of response for various combinations of assessed risk, violation severity, and significant stabilizing and destabilizing factors;

c. Targets revocation of parole toward the most serious and highest risk offenders; and

d. Directs programmatic sanctions short of revocation to parolees at high and mid-level risk according to their assessed criminogenic need. These programmatic sanctions include referrals to parole programs such as the Parole Service Centers, Community Based Coalition, Female Residential Multi-Service Centers, Residential Multi-Service Centers, and In-Custody Drug Treatment Programs, to name a few.

12. Instruction regarding the parole violations tool was conducted for parole agent supervisors in mid-October 2008. A pilot program using the tool will be implemented during the first week of November 2008 at four parole units spread throughout the State in response to all parole violations and/or commission of new crimes by the parolee population in those parole units. This pilot program is intended to assess functionality of the violation tool, characteristics of parolees, numbers and types of parole violations, availability of programs, and will also review the number of, and justification for, overrides at the parole unit level.

13. Activation and use of this tool is a significant milestone in parole operations that will permit CDCR to apply statistically validated data to parole decisions and will likely result in significant reduction in the historically high recidivism rate of the parole population and reduce the California prison population. Though CDCR cannot quantify the overall effect this tool will have on the number of parolees returned to California prison for violations at this time, I am confident that implementation of the Parole Violations Decision Making Instrument will result in greater use of diversionary sanctions and more consistent decision making by our staff. As this instrument is implemented on a statewide basis over a period of time, it could result in fewer parolees being returned to incarceration.

**B. <u>Use of Risk Assessments and Offender Management Databases</u>**

14. A key metric of the Parole Violations Decision Making Instrument is the risk

of re-offense a particular offender poses. The risk level of the offender in the violations instrument is determined by a tool known as the "California Static Risk Assessment." The sanctions imposed as a result of the tool will be based on the risk of the offender to recidivate (utilizing the California Static Risk Assessment), as well as the severity of the violation. This assessment tool was developed by the CDCR Office of Research in collaboration with the University of California-Irvine, Center for Evidence-Based Corrections and some of the country's leading experts on offender risk assessments. To develop the assessment tool, experts identified which factors are most predictive of recidivism by analyzing actual outcome data from over 103,000 discharges from parole in California in 2002-2003.

C. **Individual Levels of Risk**

15. As currently developed, the California Static Risk Assessment applies current data from the California Department of Justice regarding present parolees' personal information and criminal histories, including age, past violence, violence in prison, and crimes committed, to those predictive factors so that offenders can be categorized as low, moderate or high risk. For example, the assessment tool indicates whether a particular offender is at high risk to commit a property, drug, or violent offense. The assessment can then be used to determine the level of supervision a parolee should receive. This information is then automatically populated in a separate inmate database, the Correctional Offender Management and Profiling System, discussed in greater detail below.

D. **Needs Assessment as Inmates Parole**

16. Recognizing the need for a centralized database that will determine the needs of inmates as they parole, CDCR has implemented the Correctional Offender Management Profiling for Alternative Sanctions (COMPAS) instrument. (Defs.' Trial Ex. 1190, which is a true and correct copy of a COMPAS report generated in September 2008. This report is made or updated on a regular basis by personnel in DAPO with knowledge of the matters contained therein, and is kept by CDCR in the course of

regularly conducted activity, as a standard practice.) This is a research-based risk and needs assessment tool for criminal justice practitioners to assist them in placement, supervision, and case management of offenders while incarcerated and on parole. CDCR currently releases approximately 10,000 inmates to parole per month, with roughly 60% of them receiving an assessment utilizing COMPAS. To date, DAPO has completed over 90,000 pre-release assessments of inmates before placed on parole. Gathering data from inmates through personal interviews and examination of their individual records, CDCR evaluates a total of 22 categories of risks and needs associated with a parolee, including the risks of violence or recidivism, the potential need for vocational or educational training, and the need for substance abuse assistance, among others. These categories are then further subdivided into High/Medium/Low groups that further allow DAPO to target its resources to parolees needing greater assistance or supervision. COMPAS can also assist DAPO assess the risks and needs of the larger parolee population in geographic areas. (Defs.' Trial Ex. 1197, which is a true and correct copy of specified COMPAS Parolee/Offender Risks and Needs profiles for San Diego and Sacramento counties as of 8/1/2008. These reports are made or updated on a regular basis by personnel in the Parole Automation Unit of DAPO with knowledge of the matters contained therein, and are kept by CDCR in the course of regularly conducted activity, as a standard practice).

17. CDCR has established the infrastructure within the Department to expand these assessments for all pre-release offenders and further expand statistically validated risk and needs factors in placement decisions and ultimately diverting appropriate offenders to programs instead of incarceration. This tool is an important component of the overarching CDCR agenda regarding policy-driven responses to parole violations, commissions of new crime, and the use of remedial sanctions. This will have positive impacts on parole operations and will assist in DAPO's mission to effectively manage and transition the parolee population back to the community.

//

E. **Increased Availability of Alternative Sanctions Programs and Reintegration Resources**

18. Another important aspect of parole reform is the increased availability of alternative sanctions for parole violations. While there is no magic wand that can transform an offender's personal characteristics, CDCR may be able to address what is causing the violation, commonly referred to "criminogenic needs," and thereby reduce recidivism through the use of the Alternative Sanction Program. These consist of a variety of programs and resources available to DAPO that can be utilized based on a parolee's particular needs or proclivities.

19. The Alternative Sanction Program involves parolees who are charged with a parole violation who either: 1) receive a unit level decision to continue on parole with instructions to participate in/complete a community based alternative sanction program; or, 2) have received their due process hearing; and are identified as a person who may benefit from an intermediate custody setting or community based program in lieu of returning to prison. This program expansion directly relates to a reduction of offenders returning to state prisons for low-level violations and provides the offender evidence-based rehabilitative programming in lieu of incarceration.

20. For instance, CDCR now has access to 1,800 In-custody Drug Treatment Program beds statewide that provide alternative sanctions for parolees who violate their parole conditions due to a drug or alcohol dependency and/or who need treatment to control their substance abuse. This program allows parolees to receive rehabilitative treatment for drug addiction in either local community correctional environments or community-based residential treatment programs, rather than in state prison facilities, and in so doing allows for greater integration to local communities and eases parolees' return to local communities. Recognizing the value of this program, CDCR expanded the number of In-custody Drug Treatment Program beds from approximately 500 to 1800 during the 2007/08 fiscal year. (Defs.' Trial Ex. 1309, which is a true and correct copy of In-custody Drug Treatment Program providers. This report is made or updated on a

regular basis by personnel in CDCR with knowledge of the matters contained therein, and are kept by CDCR in the course of regular activity, as a standard practice.)

21. Parole violators can also be assigned to Day Reporting Centers as an alternative sanction. In this program, parolees receive an extensive needs assessment to determine criminogenic factors representing barriers to successful transition from prison to the community, from which a counseling/activity regime is developed to address them. Resources at these locations include employment services, substance abuse and anger management counseling, and educational programs to address criminogenic needs, to name a few. CDCR currently has 700 available spaces in Day Reporting Centers, an increase from 300 in 2006. These centers are currently located in urban centers including Los Angeles, Van Nuys, Riverside, Stockton, San Francisco, San Diego and Fresno, while negotiations for additional slots in Santa Barbara, Orange, Oakland, and Shasta are on-going.

22. In order to assist parolees with their transition back to the community, CDCR utilizes Residential Multi-Service Centers and Parolee Service Centers at locations across the state. Services provided at these centers include development of individualized treatment plans, substance abuse education, treatment and counseling, vocational services, life skills development, strengthening of family relationships, coordinated case management, referral to other agencies as needed, and discharge planning. Of note, CDCR has developed Female Residential Multi-Service Centers to provide specific needs for female parolees through a gender-responsive program model.

23. CDCR also uses an innovative parolee reentry service known as the Community-Based Coalition program, similar to the Day Reporting Center program described previously. In this program, parolees receive an extensive needs assessment to determine criminogenic factors representing barriers to successful transition from prison to the community, from which a counseling/activity regime is developed to address them. The program makes extensive use of community resources and organizations, and engages parolee family members to participate in family issues and

reunification programming. Two of the Community-Based Coalition programs are expected to serve a minimum of 360 parolees per year between them, and can accommodate 150 parolees at a time between the two programs. These two programs include a residential component to serve up to 10% of the participants. A third Community-Based Coalition program includes a residential component for all of the 300 participants/slots each month. These facilities are currently located in Los Angeles, East Palo Alto, and Sacramento.

24. DAPO also contracts for other rehabilitative parolee programs available to parolees, including:

a. The Computer Literacy Learning Centers provide a computer based curriculum which focuses on proficiency in reading, writing and computational skills. There are 21 literacy labs, of which each is tasked with providing 800 instructional hours to parolee-students per month.

b. The Substance Abuse Treatment & Recovery program is an evidence-based cognitive behavioral education program designed to provide substance abuse and relapse prevention instruction to parolees. There are 29 classrooms available to 115 parole units throughout the four parole regions.

c. The Parolee Employment Program provides workshops and employment services to parolees at six sites in three parole regions. Contracts for this program were suspended effective July 31, 2008 due to the State budget impasse, and it is hoped that the program will recommence with the newly enacted budget.

d. The Employment Development Department Parolee Job Program provides statewide job search preparation, pre-employment services, job placement and job retention assistance to parolees at 12 sites either on a full or half-time basis in three parole regions.

e. The Offender Employment Continuum program provides in-reach services to inmates up to 120 days prior to parole. The services consist of a 90-hour employability readiness workshop and transition into community-based employment assistance programs. The workshops are located at three male and two female CDCR prisons.

25. Recognizing its potential value, CDCR is working to expand the statewide scope and availability of Alternative Sanction Programs and other resources for use in managing violators and the parolee population as a whole. (Defs.' Trial Ex. 1306, which is a true and correct copy of the "Program Development Unit Program Matrix, Revised 8/13/08." This report is made or updated on a regular basis by personnel in CDCR with knowledge of the matters contained therein, and are kept by CDCR in the course of regularly conducted activity, as a standard practice.) CDCR is also monitoring the utilization of Alternative Sanction Programs and these resources and their resultant effects on the parolee population. If more fully implemented and analyzed, the Alternative Sanctions Program and other population resources could be a powerful tools assisting parolees in modifying their behavior or conditions that lead to recidivism.

## F. Consistent Parole Discharge Decisions

26. Pursuant to California Penal Code section 3001, parolees who are violation free are discharged from parole supervision at 13 months for non-violent/non-serious offenders and 25 months for serious/violent offenses. CDCR's prior operations practice allowed an individual Parole Agent to determine an offender's suitability for discharge and resulted in inconsistency among the various parole regions of the State. In May 2007, CDCR issued a memorandum elevating this decision to the District Administrator level in order to provide for increased consistency in discharge decisions. (Defs.' Trial Ex. 1191, which is a true and correct copy of Director Hoffman's May 15, 2007 Memorandum titled "Penal Code Section 3001 Compliance Policy Statement." This memorandum was issued at my direction, based on knowledge within my control, to personnel within CDCR, and is kept by CDCR in the course of regularly conducted

activity, as a standard practice.) In May 2007, DAPO estimated that 2,000 to 4,000 additional discharges would be realized. In actuality, CDCR saw an increase of 6,560 additional discharges from May 2007 through the end of April 2008, compared to the previous twelve month period. This increase has had a direct impact on reducing the prison population through fewer parolees being returned to prison for technical violations. While it is projected the discharge increase will level off, the inclusion of supervisory oversight of discharge decisions will provide for continued consistency and reduced prison population in the future.

**G. <u>Increased Attention to Parolee Mental Health Issues</u>**

27. There is a demonstrated need for the provision of mental health services to parolees released from the California prison system. CDCR statistics show that mentally ill parolees accounting for approximately 20% of the overall parolee population. (Defs.' Trial Ex. 1308, which is a true and correct copy of a report titled "Mentally Ill Parolee Population, March 28, 2008." This report was made or updated on a regular basis by personnel in CDCR with knowledge of the matters contained therein, and is kept by CDCR in the course of regularly conducted activity, as a standard practice.) If left untreated, many of these parolees with mental health issues will decompensate and pose a threat to themselves, the public, or the prison population or staff if they are reincarcerted. (Defs.' Trial Ex. 1205, which is a true and correct copy of the Annual Reports on the Mental Health Services Continuum Program of the California Department of Corrections and Rehabilitations—Parole Division. These reports were made and updated on a regular basis at the direction of CDCR by personnel with knowledge of the matters contained therein, and are kept by CDCR in the course of regularly conducted activity, as a standard practice.)

28. In 2000, CDCR implemented the Mental Health Services Continuum Program, which provides pre-release planning and post release treatment for mentally ill parolees. One component of the Continuum Program is the Transitional Case Management Program for the Mentally Ill, which provides pre-release assessments for

all inmates identified as part of the prison's Mental Health Services Delivery System. Information gathered from the assessments is provided to the second component of the Continuum Program, the Parole Outpatient Clinics. These clinics provide mental health treatment and medication management to *Coleman* class members upon release and throughout parole. Treatment can consist of medication management, group therapy, and individual therapy to parolees at high risk of criminal behavior due to their mental illness. Parole Outpatient Clinic staff conduct evaluations and provide services in CDCR parole offices located in each Parole Region of the State. During August and September 2008, over 14,000 mentally ill parolees had appointments with Parole Outpatient Clinic treatment staff. (Defs.' Trial Ex. 1199, which is a true and correct copy of a Count by County of Mentally Ill Parolees with POC Appointments During the Period of August 1, 2008 through September 30, 2008. This report is made or updated on a regular basis by personnel in CDCR with knowledge of the matters contained therein, and is kept by CDCR in the course of regularly conducted activity, as a standard practice.)

29. Recognizing the need to further develop its management of mentally ill parolees, DAPO reviewed its policies and made substantial systemic changes. Notably, in early 2007, DAPO ceased its practice of returning mentally ill parolees to CDCR solely on the basis of technical violations that arose from their mental illness. (Defs.' Trial Ex. 1195, which is a true and correct copy of former Secretary Tilton's January 12, 2007 Memorandum titled "Parolees Returned to Custody for Psychiatric Treatment." This memorandum was made by personnel in CDCR with knowledge of the matters contained therein, and was kept, maintained, and distributed by CDCR in the course of regularly conducted activity, as a standard practice.) Furthermore, DAPO developed a process to assist field units manage parolees who exhibit conduct indicating that the parolee's mental condition has deteriorated such that the parolee was likely to engage in future criminal behavior, and/or was unable to care for him or herself due to a perceived mental illness. (Defs.' Trial Ex. 1307, which is a true and correct copy of Director Hoffman's January 12, 2007 Memorandum titled "Process for Managing Mentally Ill

Parolees in Need of Enhanced Community-Based Mental Health Treatment." This memorandum was issued at my direction, based on knowledge within my control, to personnel within CDCR, and is kept by CDCR in the course of regularly conducted activity, as a standard practice.) This had the dual benefit of reducing the amount of parolees returned to prisons, thereby allowing populations to reduce, and allowing the parolees to receive necessary mental health treatment in their local communities.

30. If a mentally ill parolee violates parole, remedial sanctions are considered at each stage of the revocation process. Moreover, mentally ill parolees are not excluded from participation in remedial sanctions programs based solely on their mental illness. DAPO will be utilizing the Parole Violation Decision Making Instrument, discussed above, for guidance when determining whether a parolee may be placed in a remedial sanction program.

31. Furthermore, DAPO has developed specific plans to enhance the provision of mental health care to eligible parolees. During California Fiscal Year 2006-2007, DAPO established an additional 60 clinical positions for Parole Outpatient Clinic services. Of the 60 positions, 4 are supervisory, and 56 provide direct treatment to mentally ill parolees. In September 2008, CDCR instituted a policy to provide all parolees in CDCR custody the same access to mental health care provided to any other CDCR inmate. (Defs.' Trial Ex. 1222, which is a true and correct copy of a September 26, 2008 Memorandum titled "Referral of Parolees to Higher Levels of Mental Health Care Consistent with August 8, 2008 Court Order." This memorandum was made by personnel in CDCR with knowledge of the matters contained therein, and was kept, maintained, and distributed by CDCR in the course of regularly conducted activity, as a standard practice.) Furthermore, CDCR and the California Department of Mental Health have collaborated in the development of plans to ensure that mentally ill parolees receive adequate mental health care and timely parole revocation hearings. (Defs.' Trial Ex. 1193, which is a true and correct copy of the Revised 9/22/08 Plan regarding Due Process measures for revocation proceedings of mentally ill parolees.)

32. DAPO is also in the implementation stages of contracting for community-based mental health rehabilitative and crisis care services. The services are above and beyond what is available by way of the Parole Outpatient Clinics, and in most cases will include a housing component. In concert with CDCR's Division of Correctional Health Care Services and the California Department of Mental Health, DAPO is seeking to improve parole planning for mentally ill inmates to increase their success in the community and link them to the appropriate level of care as available. Additionally, DAPO is working to enhance Parolee Outpatient Clinics by the development of a standardized program guide and increased communication among the parole agents, clinicians and community providers for improved case management. As the mental health needs of parolees are met, their potential risk or recidivism could decrease, which may lead to a reduction of parolees returning to prison with beneficial effects on the overall prison population.

**H. Assisting Inmates Pending Release Obtain Benefits**

33. In addition to increased services for mentally ill parolees, CDCR has also taken steps assist inmate pending release to parole obtain benefits they may be entitled to when reentering the community. DAPO has contracted for social worker positions in the California prisons to represent inmates through the process of applying for Federal and State benefit programs, such as Social Security, Medi-Cal, and Veteran's Administration benefits, prior to an inmate's release to the community. These benefits are applied for when an inmate is potentially eligible due to a disability, medical or mental health condition. Currently, DAPO has contracted social workers for 19 of the 33 prisons, with a contract pending for the remaining 14 prisons.

**I. Working with Community Law Enforcement and Courts**

34. During my tenure as Director, I have traveled across the State and met with numerous local law enforcement personnel, including police, sheriffs, and district attorneys, for the purpose of informing them about developments in the parole operations field and fostering greater working relationships between State and local

officials in this area. I am readily familiar with two specific court programs in Santa Clara and Los Angeles counties where "dual jurisdiction" individuals are processed through the criminal justice system. These dual jurisdiction individuals are parolees who have committed new offenses in their local communities, but have not been returned to State custody. Instead, they are handled in the local courts and diverted to programs within their communities.

35. I have closely worked with Judge Steven Manley of the Santa Clara County Superior Court in the operation of "drug courts" that occasionally service the needs of mentally ill parolees, and have encouraged DAPO personnel to support this endeavor. DAPO has also worked with, and CDCR has provided a limited grant to, the Los Angeles County Superior Court on a program that facilitates the transition of female parolees back into the community along with programming, usually for drug and alcohol needs. While neither of these court programs is operated on a statewide basis, I believe they show promising collaboration among state and local officials and will benefit the parolee population.

## VIII. Summary

36. The effective and efficient management of CDCR's parolee population will have positive effects on the overall California prison population and the public safety. DAPO has instituted programmatic changes in its parole operations that will foster greater consistence in parole violation decisions, increase the Department's understanding of the risks and needs associated with each parolee, and push the necessary resources to parolees so that they can successfully return to the community after incarceration.

37. Though the use of the Parole Violation Decision Making Instrument, the offender management database, various Alternative Sanctions Programs, and community-based parolee service resources, DAPO is better positioned to understand the parolee population, provide for parolee needs, prevent recidivism and return to prison, and protect the public at large. CDCR now has a validated risk assessment

instrument in place that significantly improves the capacity to effectively manage the inmate and parolee population across the State. Given the necessary time to complete a thoughtful review of the inmate and parolee populations, CDCR will be able to evaluate the non violent/non-serious inmates and parolees via a science- and evidence-based risk assessment instrument that can lead to the identification of a specific population that could either be released from the institutions or discharged from parole supervision without compromising public safety. As these programs and resources are more fully implemented, CDCR's ability to supervise the parolee population will improve and could result in positive impacts on the overall population in California prisons.

I declare under penalty of perjury that the foregoing is true and correct. Executed in Sacramento, California on October 30, 2008.

THOMAS G. HOFFMAN