PRISON LAW OFFICE
DONALD SPECTER, Bar No. 83925
STEVEN FAMA, Bar No. 99461
SARA NORMAN, Bar No. 189536
ALISON HARDY, Bar No. 135966
REBEKAH EVENSON, Bar No. 207825
1917 Fifth Street
Berkeley, CA 94710
Telephone: (510) 280-2621

ROSEN BIEN & GALVAN, LLP
MICHAEL W. BIEN, Bar No. 96891
JANE E. KAHN, Bar No. 112239
AMY WHELAN, Bar No. 215675
LISA ELLS, Bar No. 243657
MARIA V. MORRIS, Bar No. 223903
315 Montgomery Street, 10th Floor
San Francisco, CA 94104
Telephone: (415) 433-6830

K & L GATES LLP
JEFFREY L. BORNSTEIN, Bar No. 99358
EDWARD P. SANGSTER, Bar No. 121041
RAYMOND E. LOUGHREY, Bar No. 194363
55 Second Street, Suite 1700
San Francisco, CA 94105-3493
Telephone: (415) 882-8200

BINGHAM, McCUTCHEN, LLP
WARREN E. GEORGE, Bar No. 53588
Three Embarcadero Center
San Francisco, CA 94111
Telephone: (415) 393-2000

THE LEGAL AID SOCIETY -
EMPLOYMENT LAW CENTER
CLAUDIA CENTER, Bar No. 158255
600 Harrison Street, Suite 120
San Francisco, CA 94107
Telephone: (415) 864-8848

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURTS

FOR THE EASTERN DISTRICT OF CALIFORNIA

AND THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

| | |
|---|---|
| RALPH COLEMAN, et al.,<br>Plaintiffs,<br><br>vs.<br><br>ARNOLD SCHWARZENEGGER, et al.,<br>Defendants | No. Civ S 90-0520 LKK-JFM P<br><br>**THREE-JUDGE COURT**<br><br>No. C01-1351 THE<br><br>**THREE-JUDGE COURT** |
| MARCIANO PLATA, et al.,<br>Plaintiffs,<br><br>vs.<br><br>ARNOLD SCHWARZENEGGER, et al.,<br>Defendants | **DECLARATION OF REBEKAH EVENSON IN SUPPORT OF PLAINTIFFS' OPPOSITION TO LAW ENFORCEMENT INTERVENORS' MIL NO. 1 (RE TESTIMONY OF DR. AUSTIN)** |

I, Rebekah Evenson, declare:

1.     I am a member of the Bar of this Court and an attorney at the Prison Law Office, one of the counsel of record for the Plaintiff classes in this case. I have personal knowledge of the matters set forth herein and if called as a witness I could competently so testify. I make this declaration in support of Plaintiffs' Opposition to Law Enforcement Intervenors' Motion in Limine No. 1 (re testimony of Dr. Austin).

2.     Attached hereto as Exhibit A is a true and correct copy of excerpts of the transcript of the October 15, 2008 deposition of Dr. James Austin.

3.     Dr. Austin was deposed in this matter on two separate days. First, he was deposed on September 19, 2008 from approximately 10:00 a.m. to 5:45 p.m. Next, he was deposed on October 15, 2008 from approximately 11:20 a.m. to 5:30 p.m.

4.     In advance of Dr. Austin's September 19, 2008 deposition, my office produced approximately two banker's boxes full of documents, amounting to thousands of pages of documents. Some of the documents produced were drafts of Dr. Austin's expert reports. Despite the fact that Law Enforcement Intervenors provided less than two weeks' notice of Dr. Austin's October 15, 2008 deposition, my office produced hundreds more pages of additional documents at Dr. Austin's October 15, 2008 deposition. Those documents are attached as Exhibit 9 to the transcript of Dr. Austin's October 15, 2008 deposition (see Exhibit A at 310, Index). Additionally, two documents were not available in hard copy, and plaintiffs' counsel informed Law Enforcement Intervenors counsel of that fact in advance, and provided information about how to obtain electronic copies. In all, plaintiffs have produced all documents that Dr. Austin relied upon, considered or referred to in his reports, and all communications between plaintiffs and Dr. Austin (with the exception of those communications relating to settlement negotiations, per agreement between the parties, which are noted on a privilege log that has not been challenged).

5.     Attached hereto as Exhibit B is Plaintiffs' Response to Law Enforcement Intervenors'

1  Amended Notice of Deposition of Dr. Austin and Request for Production of Documents.

2      6.      Attached hereto as Exhibit C is a true and correct copy of the first page of Exhibit 9 (Dr.

3  Austin's October 15, 2008 production of documents), which the Court Reporter's notation at the bottom

4  corner indicates is more than 500 pages.

5      7.      Attached hereto as Exhibit D is a true and correct copy of Exhibit 5 to the transcript of

6  Dr. Austin's September 19, 2008 deposition.

7      I declare under penalty of perjury under the laws of California and the United States that the

8  foregoing is true and correct, and that this declaration is executed this 30 day of October 2008 in

9  Berkeley, California.

10

11  */s/ Rebekah Evenson*

12  Rebekah Evenson

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT A

IN THE UNITED STATES DISTRICT COURTS

FOR THE EASTERN DISTRICT OF CALIFORNIA

AND THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

|  |  |
|---|---|
| RALPH COLEMAN, et al., | **ORIGINAL** |
| Plaintiffs, | |
| vs. | No. CIV S-90-0520 LKK-JFM P |
| ARNOLD SCHWARZENEGGER, et al., | THREE-JUDGE COURT |
| Defendants. | |
| MARCIANO PLATA, et al., | |
| Plaintiffs, | |
| vs. | |
| ARNOLD SCHWARZENEGGER, et al., | |
| Defendants. | |

VOLUME II

DEPOSITION OF JAMES AUSTIN, Ph.D.,

BURBANK, CALIFORNIA

WEDNESDAY, OCTOBER 15, 2008

Reported By:
JULIE MEEHAN
CSR NO. 12341

```
 1                    I N D E X

 2   EXAMINATION BY:                          PAGE

 3
            MS. BARLOW                    311, 503
 4
            MS. JOHNSON                         463
 5

 6

 7                  E X H I B I T S

 8
     INTERVENER'S                             PAGE
 9
       9   Documents Produced by James Austin, Ph.D.   315
10
      10   Supplemental Report of James Austin, Ph.D.  384
11
      11   Charts of Reimprisonment Rates              463
12
      12   Rough Draft Paper Written by Norman Holt    471
13

14

15

16

17

18

19

20

21
     INFORMATION TO BE SUPPLIED BY THE DEPONENT:
22        (None)

23
     QUESTIONS NOT ANSWERED ON ADVICE OF COUNSEL:
24        (None)

25
```

310

**HAHN & BOWERSOCK (800) 660-3187 FAX (714) 662-1398**
**151 KALMUS DRIVE, SUITE L1 COSTA MESA, CA 92626**

1      Q    Have you reviewed the deposition transcripts

2    of either Jerry Dyer or Jerry Powers?

3      A    No.

4      Q    Did you communicate with counsel for the

5    plaintiffs regarding the contents of those depositions?

6      A    No.

7      Q    Did you communicate with counsel any

8    statements that either Jerry Dyer or Jerry Powers made

9    regarding your opinions in this case?

10     A    No.

11     Q    Okay.  That was the follow up.  Thank you.

12          Let's talk briefly about these documents that

13   you brought here today.

14          MS. BARLOW:  Are these in any particular order,

15   counsel?

16          MS. EVENSON:  I think they should be in -- what

17   they are are the documents that were requested in

18   addition.  They're the e-mails between Dr. Austin and

19   myself and I think they should be in chronological

20   order.

21          MS. BARLOW:  Okay.

22          MS. EVENSON:  With the attachment attached to the

23   various e-mails pertaining.

24          MS. BARLOW:  We'll just label these as one exhibit,

25   if you don't mind, and then I'll have the doctor go

314

1    through the documents provided and tell us what they are

2    and how they related to his opinion if at all.

3        MS. EVENSON:  Sure.

4        MS. BARLOW:  So these will be collectively

5    Exhibit 1 or do you want to start where we left off on

6    the other deposition?

7        MS. EVENSON:  Do we know?

8        MS. JOHNSON:  I have the deposition.

9        MS. BARLOW:  Do you know what the last exhibit was?

10       MS. JOHNSON:  Sure.

11       MS. EVENSON:  It looks to me the last one was

12   Exhibit 8.

13       MS. BARLOW:  So we'll call this Exhibit 9.

14            (Intervener's Exhibit 9 was marked

15         for identification by the deposition

16         officer and is attached hereto.)

17       MS. EVENSON:  Right.

18       Q    BY MS. BARLOW:  Okay.  If you could just tell

19   us what each document is collectively marked as

20   Exhibit 9 and then we'll talk about them individually.

21       A    Okay.  The first document is a report that I

22   wrote with Ken McGinnis and it had to do with the

23   evaluation of the Texas Parole Board Guidelines.  And in

24   particular look at Table 10, which is a calculation of

25   the percent of crimes that were committed by parolees

315

1     Q    Did you review any of the documents that were

2   produced at Jerry Dyer's deposition?

3     A    No, all I have is Mr. Dyer's report.

4     Q    Are you familiar with studies that show that a

5   1990 prisoner self-report survey conducted in Wisconsin

6   showed that half the prisoners had committed 12 crimes

7   or more in the year prior to their incarceration

8   excluding drug crimes?

9     MS. EVENSON:  Objection.  Vague.

10    Q    BY MS. BARLOW:  Are you familiar with that?

11    A    Was that done by Mr. DiLulio, John DiLulio?

12  I'm aware of that report, but I haven't studied it.

13    Q    You haven't reviewed that report?

14    A    No.

15    Q    You're familiar with an earlier report from

16  Rand that indicated that it's up to 15 crimes per, on

17  average, year prior to arrest?

18    A    Right.  That's the one we just referenced.

19  But again, the National Academy of Sciences did a

20  reanalysis of the data and lowered that estimate.

21    Q    To what?

22    A    I don't know, but I can get it for you if you

23  want to read it.

24    MS. JOHNSON:  Do you know what year they did that

25  reanalysis?

399

1       THE DEPONENT:  It's going to be probably the late

2   '80s or early '90s.  The principal editor is

3   Alfred Bloomstein and it's called incapacitation.  There

4   is a whole volume on incapacitation.  And the woman that

5   did the reanalysis is Kristi Vishy at the University of

6   Delaware.

7       Q    BY MS. BARLOW:  On what basis did you opine in

8   your rebuttal report that Mr. Dyer was in error when he

9   assumed that some of the people rearrested that would be

10  released early on a prison release order would commit up

11  to 12 crimes before being arrested?

12      MS. EVENSON:  Objection.  Vague.

13      THE DEPONENT:  Well, his estimate was 16,000 new

14  felony crimes.

15      Q    BY MS. BARLOW:  Based upon?

16      A    And he said that 70 percent of those would

17  commit 12 crimes before they are arrested, okay?  So the

18  number one problem is he's not referencing where he's

19  getting his numbers, but I'm assuming he's getting them

20  from the Rand incapacitation numbers.  And if he is,

21  again, he has a problem that he's -- he's not

22  recognizing that most of the people in the Rand Study

23  were committing much smaller numbers and that's based on

24  their time coming into prison.  Rand did not look at

25  self-reported crimes of people coming out of prison.  So

400

1    he's looking at a completely different experience.

2            The Rand Study is people coming to prison.

3    Mr. Dyer is talking -- we're talking about people coming

4    out of prison and there are no estimates of how many

5    crimes exprisoners commit in one year once they're

6    released from prison.

7        Q    So it's your opinion -- strike that.

8            Are you aware of any studies that show that

9    people who have been released from prison commit fewer

10   crimes before they get reincarcerated than those who

11   were studied in the Rand Study or the Wisconsin study?

12       A    There's a great deal of information showing

13   that the number of arrests being produced by prisoners

14   one year before they come to prison is much higher than

15   the number of arrests when they get released.  So they

16   are clearly getting rearrested at a much lower rate than

17   when they came to prison.  So they're slowing down.

18       Q    You have offered in your written report the

19   opinion that 50 percent of parolees will be rearrested

20   in the first 12 months after their release --

21       A    That's right --

22       Q    -- first six months --

23       A    That's correct --

24       Q    -- after their released.

25       A    In California.

401

1    Q    What percentage of prisoners --

2    A    But you understand that I'm talking about the

3  rate the arrests.  So if you look at --

4    Q    I'm not asking about the rate of arrest.

5    A    I thought you were asking about --

6    Q    I was asking you about --

7    A    -- their behavior and after.

8    Q    I was asking you if you're aware of any

9  studies that quantifies for a prisoner after they are

10  released from prison how many crimes they commit before

11  they get rearrested?

12    A    Oh, there are no studies that have done that

13  based on the Rand methodology and what Mr. Dyer is

14  saying -- that's what I'm saying, he has no basis for

15  those statistics, they don't exist.

16    Q    So do you have any basis to say that the

17  number of crimes committed by post-release prisoners

18  before they are rearrested and reincarcerated is lower

19  than those committed by people as studied in the Rand

20  and Wisconsin studies?

21    MS. EVENSON:  Objection.  Vague.

22    THE DEPONENT:  Yeah, I don't understand that

23  question.

24    Q    BY MS. BARLOW:  Let me put it to you this way:

25  The Wisconsin study showed 12 crimes on average or more

HAHN & BOWERSOCK (800) 660-3187 FAX (714) 662-1398
151 KALMUS DRIVE, SUITE L1 COSTA MESA, CA 92626

1    excluding drug crimes --

2        A    The Wisconsin study is exactly the same

3    methodology as the Rand Study.

4        Q    I'm sorry, sir, you just told me you hadn't

5    read it so how do you know that?

6        A    I said I'm familiar with it, I'm familiar with

7    the study; but have I read it, no.  But DiIulio did a

8    number of studies, Wisconsin is one and I probably know

9    some other ones.  Then there came the Rand methodology

10   which is interviewing prisoners at the reception centers

11   and asking them how many crimes did you commit in the

12   12 months before you came to prison.  And they basically

13   all show the same kinds of patterns.

14        The average is somewhere between 10 and 15.

15   It's skewed dramatically toward a very small number of

16   people who are saying I committed 100 to 200 crimes per

17   year.  Most of the people are reporting zero to three

18   crimes per year.  That's what they all say.

19        Q    What I'm asking you is:  Are you aware of any

20   data which would show that the number of crimes they

21   commit per year after they leave prison is any lower

22   than the self-reported number of crimes they committed

23   before they got to prison in that study?

24        A    There's been no studies of that, but I --

25        Q    But you assume that they're lower and --

HAHN & BOWERSOCK (800) 660-3187 FAX (714) 662-1398
151 KALMUS DRIVE, SUITE L1 COSTA MESA, CA 92626

1      A    No, I didn't --

2      Q    -- I'm asking you on what basis you assume

3   that?

4      A    I'm not assuming that.  All I said was that I

5   was giving you an example which is important that their

6   arrest rate is significantly lower after prison than it

7   was than before they came to prison.

8      Q    Is it possible that that's because they're

9   better at it now since they have been to prison?

10      A    Well, that would be your theory, not mine.

11   It's an interesting theory.  And we also know, again,

12   most of the arrests are not being committed by people

13   released from prison.  We also know that maturation is a

14   huge factor.  Most criminals burn out and slow down with

15   age.  And in terms of the average arrestee population,

16   prisoners are a much older class of people.  It's pretty

17   well-known in criminology --

18      Q    I'm sorry, the average arrestee what?

19      A    The average age for a prisoner versus the

20   average arrestee of the arrest population, the prisoner

21   population is much older, like 35 or 36, that's the

22   average age of people coming out of the California

23   prison system.  Most of the people arrested in the

24   country are in the age groups of 15 to 25.  So the

25   prisoners are a much older group and they're longer

HAHN & BOWERSOCK (800) 660-3187 FAX (714) 662-1398
151 KALMUS DRIVE, SUITE L1 COSTA MESA, CA 92626

1  along in their career.  And that's why age is such a

2  strong predictor of future criminality.

3      Q    So 35 to 36 is the average age, and yet we

4  still have a 70 percent recidivism rate?

5      A    You're using percent rather than rate.  It's

6  rate of arrest versus percent.  Percent would be -- you

7  can have high percents, which you do have, 60 percent of

8  the people getting released get rearrested.  But if you

9  took all those arrests and gave me an average, average

10 per prisoner; and you took that average arrest rate

11 before they came, you're going to see about a 50 percent

12 drop.  Their rate of arrest has decreased significantly.

13 So if you look at arrests, they're not getting worse,

14 they're actually getting better, they're slowing down,

15 which is the maturation effect and also the effect of

16 punishment and deterrents and programs and all that

17 stuff that's going on.  I mean, you should know that

18 most prisoners don't come back to prison except in

19 California.

20     Q    Well, What I guess I'm trying to get at is you

21 state in your report of September 25, 2008, marked as

22 Exhibit 10, in Paragraph 1 to the section which is a

23 rebuttal to the September 15, 2008 report of

24 Jerry Dyer the following:

25              "Mr. Dyer's estimate of 16,000 new

405

1          serious crimes rests on two fundamental

2          errors, one, he is mistaken when he

3          assumes that there will be 1,920 new

4          releases; and two, he is mistaken when

5          he assumes that 70 percent of those or

6          1,344 will each commit 12 crimes before

7          they are arrested."

8      A     Correct.

9      Q     And I'm asking you to tell me on what basis do

10  you believe that he is mistaken about the number of

11  crimes they will commit before being rearrested?

12     A     He has not basis for it.

13     Q     Where is the study that you have that shows

14  he's wrong?

15     A     Well, if I wanted to use a study, I would use

16  the Rand Study.

17     Q     That said what?

18     A     That not 70 percent, but maybe about 10 or 20

19  percent of the people are those committing a high rate

20  of crime, most of the people are not committing.  And

21  that would be wrong to do that because that was based on

22  prison admissions, not prison releases.  So my

23  statements are that he's mistaken because there's

24  nothing to back up his statistics.

25     Q     So once they have been to prison, they're less

406

1    likely to reoffend; is that what you are saying?

2        A    As an aggregate group, yeah, an aggregate

3    group of prisoners, they are slowing down, no question

4    about that.  But I hope you understand my point that he

5    is putting these statistics out there and they're not

6    referenced and they're not cited.  So he's mistaken in

7    his -- there's nothing behind this.

8        Q    Well, I think that's your assumption, but I'm

9    not asking you to tell me what you think about

10   Mr. Dyer's report, what I'm asking you to tell me is

11   where is the data that tells you how many crimes would

12   be committed by the 1,920 people that would be released

13   if you assume the numbers that Jerry Dyer assumes?

14       A    I look at that as his burden.  If he's doing

15   statistics like this, he would have to cite, first of

16   all, the basis for his analysis.  That's the number one

17   thing that if you're going to put any kind of statistics

18   out there, you have to have a reference to this.  So

19   either he conducted a study himself where he followed

20   people who came into Fresno County and he interviewed

21   them and asked them after 12 months how many crimes did

22   you commit.  And if he found that 70 percent of these

23   people committed an average of 12 crimes, then he has

24   something that's factually correct.  Right now he's just

25   putting numbers out there that have no factual basis

                                              407

1    whatsoever, they're not referenced.  So this is like

2    basic research.  If you cite anything like this, you

3    have to cite the basis for it, some type of study.

4         Q    Can you cite to me any research that would

5    show you that Mr. Dyer's numbers are wrong?

6         A    That's not my burden, he's the one who is

7    putting out there --

8         Q    Sir, I didn't ask you what his burden was, I'm

9    asking you --

10        A    Well, that's --

11        Q    -- can you cite to me any research that would

12   show his figures are wrong?

13        A    I would go back to the Rand Study.  And just

14   based on that, you could say the Rand Study would

15   suggest he's wrong.

16        Q    Tell me what about the Rand Study would

17   suggest he's wrong.  Where is the average that shows

18   that prisoners released from prison do not commit some

19   crimes before they get rearrested?  Let's start with

20   that.

21        MS. EVENSON:  Objection.  Vague.  Mischaracterizes

22   the testimony.

23        THE DEPONENT:  Repeat the question.

24        Q    BY MS. BARLOW:  All right.  Let me ask you a

25   different way.  You said earlier that each time you

408

1    commit a crime, you have a 10 percent chance of being

2    arrested --

3        A    No, that's --

4        Q    -- so each arrest of a prisoner on parole, can

5    we assume from that 10 percent chance that that means

6    they committed more than one crime before they got

7    arrested?

8        MS. EVENSON:  Objection.  Mischaracterizes the

9    testimony.

10       THE DEPONENT:  Yeah, I just want to go back to -- I

11   didn't say what you just said.  I said that the number

12   of arrests to reported crimes, certain crimes, is about

13   ten to one.  That does not mean -- because you're doing

14   what is called an ecological fallacy.  You're ascribing

15   these overall rates to individual people.  So when we

16   talk about reported crimes and arrests, that's the whole

17   pool.  And that's mostly nonprisoners we're talking

18   about, nonrelease prisoners.  And that's my point here.

19   He's looking at, we're looking at, I'm looking at a very

20   small group of the arrest population, released

21   prisoners.  We demonstrated that.  Exprisoners

22   constitute a very small part of the arrest universe.

23       Q    BY MS. BARLOW:  Okay.  What I'm asking you,

24   Dr. Austen, is where is the study that shows how many

25   crimes were committed by those exprisoners before they

409

1    were arrested?

2        A    There are no studies.

3        Q    So what is the basis for your assumption that

4    Mr. Dyer is incorrect that prisoners released from

5    prison will commit more crimes than they actually get

6    arrested for?

7        MS. EVENSON:  Objection.  Asked and answered.

8        THE DEPONENT:  I believe I answered that.

9        Q    BY MS. BARLOW:  Well, you said there is no

10   study.

11       A    But he's giving statistics; so how could he be

12   accurate on something that has no scientific basis?

13       Q    I'm not asking about his numbers?  I'm asking

14   where your data comes from.  What data do you have to

15   support your position that he is incorrect?

16       A    He is mistaken --

17       MS. EVENSON:  Asked and answered.

18       Q    BY MS. BARLOW:  Just the Rand Study is all you

19   have?

20       A    No, we'll go into it some more, but, I mean,

21   the 1,920 new releases, that's factually incorrect.

22       Q    Okay.  Let's stick with the questions I'm

23   asking instead of the ones you want me to ask.  Right

24   now I'm asking you about the number of offenses that

25   would be committed by a releasee before they're

410

1  rearrested.

2      A    Okay.

3      Q    So other than the Rand Study, what data do you

4  have that you believe would show that Mr. Dyer's numbers

5  are incorrect?

6      MS. EVENSON:  Objection.  Asked and answered.

7      MS. BARLOW:  I have not heard anything but the

8  Rand Study.  If there's some other one, I would like to

9  hear about it.

10     MS. EVENSON:  We've talked about the National

11 Academy of Sciences study that looked at the Rand Study.

12 There have been several --

13     MS. BARLOW:  He didn't mention -- he hasn't

14 mentioned that with respect to this issue.

15     MS. EVENSON:  It's all the same issue.

16     MS. BARLOW:  No, it isn't the same issue.

17     THE DEPONENT:  Well, I guess I would just say again

18 that there's a great deal of scientific evidence that

19 since he is using that prisoners when they are released

20 from prison are not committing crime at the same rate as

21 when they are admitted to prison.  And he is using, I

22 think, the Rand Study to come up with the 12 crimes, and

23 the 12 crimes in the Rand Study actually said they

24 commit -- not before they are arrested, they're getting

25 arrested, but they're committing 12 crimes.  And the

411

1    Rand Study I don't think said about how many arrests are

2    part of that pool, but they came up with an average of

3    12 crimes per year.

4        Q    BY MS. BARLOW:  So the studies that you're

5    referring to, the scientific evidence that shows that

6    they're committing crimes at a lower rate after they're

7    released from prison than they were before they went

8    into prison, what rate are they committing crimes,

9    according to those studies, the people who recommit?

10       A    Well, it varies on the study.  You have to

11   look at the individual studies and you have to look at

12   the arrest rate before they came to prison and the

13   arrest rate after they left prison.

14       Q    I'm sorry, Dr. Austin, I'm not trying to make

15   this any harder than it needs to be --

16       A    Well, I'm not trying to be defensive either.

17       Q    I asked earlier if you were aware of any

18   studies that had studied the -- how many crimes were

19   committed by post-release prisoners before they were

20   rearrested and you said there were not any.

21       A    There are none.

22       Q    And now you're telling me there are some.

23       A    No, I said none -- no studies that look at the

24   number of crimes being committed by released prisoners.

25   There are no --

412

1    Q    Okay.  So what is the scientific --

2    A    Ma'am, can I finish what I --

3    Q    You can't have --

4    A    I haven't answered the question.  There are no

5    studies, but Mr. Dyer is somehow saying there are some

6    studies.

7    Q    That isn't the question I asked you.  You said

8    there were not any, but then you just testified that

9    there's a great deal of scientific evidence that shows

10   that when they are released from prison, they are not

11   committing crimes at the same rate.

12   A    I did not say that.  And if I said that, then

13   I was mistaken.  I said the arrest rate is lower when

14   they get released from prison than before they entered

15   prison.

16   Q    The arrest rate is lower, but you have no way

17   of knowing whether the number of crimes they commit

18   before they get rearrested is higher or lower than

19   before they were arrested the first time?

20   A    That's correct because there have been no such

21   studies.

22   Q    That's all I needed to hear.  Now, earlier you

23   wanted to talk about Mr. Dyer's assumption of his 1,920

24   new releases.  Can you tell me what you think is wrong

25   with that figure?

413

1        A    It's too high.

2        Q    Based on what?

3        A    I presented that math in my previous

4    deposition, but basically --

5        Q    Well, I'm sorry, but --

6        A    I know, but just for your benefit.  Basically

7    in Fresno County, he's looking at the number of people

8    that are going to come out in a year.  And he's assuming

9    there's going to be a whole doubling of that group

10   1,920.  If you look at our policy of reducing the length

11   of stay, it's only for a short period of time that you

12   have an increase in the releases, which I think is about

13   500 for the year, and then after that, after that is

14   accomplished, then the number of releases is exactly the

15   same as it is today.  So he's creating --

16   mathematically, he's incorrect.  There are not going to

17   be 1,920 new releases coming out of Fresno County.

18       Q    Well, he was basing that number on some

19   assumptions about the total numbers to be released,

20   correct?

21       A    Yeah, in my report on August 15, there's a

22   table that shows the estimate would be an additional 500

23   to 600.  And under the policy that I described, there's

24   no way that it could be mathematically 1,920 new

25   releases --

414

1    that have a high incarceration rate and a low crime

2    rate.  I can't name them, but you can find them.  But in

3    general, there's not that relationship.

4         Q    You can't name what those states are sitting

5    here?

6         A    No, I can't.

7         Q    And where would I go to find that out?

8         A    You go to the Bureau of Justice Statistics and

9    they will have a report called prisoners, whatever years

10   you want to pick.  And that will show the incarceration

11   rate for every state.  And then you can go to the

12   Uniform Crime Reports and they'll give you the crime

13   rates for every state.  And you do a comparison.  I did

14   a correlation coefficient, which I reported in my first

15   report, which showed there was no statistical

16   relationship.  But if you get those two lined up, you

17   will see variations in that.  And if you were to plot

18   the states' crime rates and incarceration rates, you

19   will see some states that are in this quadrant high

20   incarceration rate and low crime rate.  In other states

21   you will see the opposite, low incarceration -- but if

22   you look at the overall pattern, which is what the

23   correlation gives you, that's the conclusion I reached.

24        Q    With respect to Exhibit 10, it was on a -- the

25   draft of it was maintained on the web server?

483

1      A     Yes.

2      Q     That plaintiff's counsel maintains; is that

3   correct?

4      A     Yes.

5      Q     Did you input the first version of that draft

6   on that web server or --

7      A     Yes, I did.

8      Q     Okay.  So you wrote the first draft of this

9   report?

10     A     Yeah, there was probably -- yes, I wrote this,

11  yes, this is my writing.

12     Q     It talked about a Texas report you did -- you

13  did the Texas report in 1999; is that correct?

14     A     Yes.

15     Q     And you picked one month September in 1999

16  to extrapolate from that one month about how many

17  parolees -- strike that.

18           You took that one month September of 1999 to

19  extrapolate for the entire year of 1999 regarding what

20  percentage of arrests was accounted for by parolees?

21     A     Correct.

22     Q     Was that month representative of the other

23  months of the year?

24     A     Yes.

25     Q     How did you determine that?

484

```
 1                    DEPOSITION OFFICER'S CERTIFICATE

 2                      [C.C.P. 2025(q)(1),(r)]

 3

 4    STATE OF CALIFORNIA      )
                               ) ss
 5    COUNTY OF LOS ANGELES    )

 6            I, JULIE SEYMOUR, Certified Shorthand

 7    Reporter, Certificate No. 12341, State of California,

 8    hereby certify:

 9            I am the deposition officer that

10    stenographically recorded the testimony in the foregoing

11    deposition;

12            Prior to being examined, the deponent was by

13    me administered an oath in accordance to CCP 2094;

14            The foregoing transcript is a true record of

15    the testimony given;

16            The deposition officer was relieved of her

17    duty pursuant to the Code of Civil Procedure, Section

18    2025(q)(1); and therefore, any changes made by the

19    deponent or whether or not the deponent signed the

20    transcript are not herein set forth.

21

22    Dated:   OCT 1 5 2008             , Los Angeles, California.

23

24                        _____
                          JULIE SEYMOUR, CSR NO. 12341
25
```

EXHIBIT B

1   PRISON LAW OFFICE
    DONALD SPECTER, Bar No. 83925
2   STEVEN FAMA, Bar No. 99641
    E. IVAN TRUJILLO, Bar No. 228790
3   SARA NORMAN, Bar No. 189536
    ALISON HARDY, Bar No. 135966
4   REBEKAH EVENSON, Bar No. 207825
    1917 Fifth Street
5   Berkeley, CA  94710
    Telephone:  (510) 280-2621

6

7   KIRKPATRICK & LOCKHART PRESTON
    GATES ELLIS LLP
8   JEFFREY L. BORNSTEIN, Bar No. 99358
    EDWARD P. SANGSTER, Bar No. 121041
9   RAYMOND E. LOUGHREY, Bar No. 194363
    55 Second Street, Suite 1700
    San Francisco, CA  94105-3493
10  Telephone:  (415) 882-8200

11  THE LEGAL AID SOCIETY –
    EMPLOYMENT LAW CENTER
12  CLAUDIA CENTER, Bar No. 158255
    600 Harrison Street, Suite 120
13  San Francisco, CA  94107
    Telephone:  (415) 864-8848

ROSEN, BIEN & GALVAN, LLP
MICHAEL W. BIEN, Bar No. 96891
ERNEST GALVAN Bar No. 196065
JANE E. KAHN, Bar No. 112239
AMY WHELAN, Bar No. 215675
LORI RIFKIN, Bar No. 244081
LISA ELLS, Bar No. 243657
MARIA V. MORRIS, Bar No. 223903
315 Montgomery Street, 10th Floor
San Francisco, California  94104
Telephone: (415) 433-6830

BINGHAM, McCUTCHEN, LLP
WARREN E. GEORGE, Bar No. 53588
Three Embarcadero Center
San Francisco, California  94111
Telephone: (415) 393-2000

14  Attorneys for Plaintiffs

15  IN THE UNITED STATES DISTRICT COURTS

16  FOR THE EASTERN DISTRICT OF CALIFORNIA

    AND THE NORTHERN DISTRICT OF CALIFORNIA

17  UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

18  PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

19  RALPH COLEMAN, et al.,                      ) No.  Civ S 90-0520 LKK-JFM P
                                                )
20           Plaintiffs,                        ) **THREE-JUDGE COURT**
                                                )
21      vs.                                     )
                                                )
22  ARNOLD SCHWARZENEGGER, et al.,              )
                                                )
23           Defendants                         )
    _____ )
24  MARCIANO PLATA ,et al.,                     ) No. C01-1351 TEH
                                                )
25           Plaintiffs,                        ) **THREE-JUDGE COURT**
        vs.                                     )
26                                              ) **PLAINTIFFS' RESPONSE TO LAW**
    ARNOLD SCHWARZENEGGER, et al.,              ) **ENFORCEMENT INTERVENORS'**
                                                ) **AMENDED NOTICE OF DEPOSITION OF**
27                                              ) **DR. AUSTIN AND REQUEST FOR**
             Defendants                         ) **PRODUCTION OF DOCUMENTS**
    _____ )
28

1  PROPOUNDING PARTY: law enforcement intervenors

2  RESPONDING PARTY:    PLAINTIFFS on behalf of Plaintiffs' expert Dr. James Austin

3      Plaintiffs, on behalf of Plaintiffs' expert Dr. James Austin, hereby object to defendants'

4  notice of deposition because it fails to provide reasonable notice as required by F.R.C.P. 30

5  and provides insufficient time for production of documents as required by F.R.C.P 30 and 34.

6  ## RESPONSES TO REQUESTS FOR PRODUCTION

7  **REQUEST FOR PRODUCTION NO. 1:**

8      Any documents, records, or other materials reviewed in preparing Mr. Austin's rebuttal

9  report.

10  **RESPONSE TO REQUEST FOR PRODUCTION NO. 1:**

11      Plaintiffs object to this Request as vague and ambiguous, and overbroad.  Subject to and

12  without waiving the above objections, Plaintiffs will produce responsive, non-privileged, and

13  unobjectionable documents not previously produced.

14  **REQUEST FOR PRODUCTION NO. 2:**

15      Any documents, records, or other materials reviewed but not cited in preparing Mr.

16  Austin's rebuttal report.

17  **RESPONSE TO REQUEST FOR PRODUCTION NO. 2:**

18      Plaintiffs object to this Request as vague and ambiguous, and overbroad.  Subject to and

19  without waiving the above objections, Plaintiffs will produce responsive, non-privileged, and

20  unobjectionable documents not previously produced.

21  **REQUEST FOR PRODUCTION NO. 3:**

22      Any communications with counsel for Plaintiffs relating to Mr. Austin's rebuttal report.

23  **RESPONSE TO REQUEST FOR PRODUCTION NO. 3:**

24      Plaintiffs object to this Request as vague and ambiguous, and overbroad.  Subject to and

25  without waiving the above objections, Plaintiffs will produce responsive, non-privileged, and

26  unobjectionable documents not previously produced.

27

28

i219-4]

**REQUEST FOR PRODUCTION NO. 4:**

The entire file containing all of your work produced, prepared, and/or created in forming your opinions in this matter.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 4:**

Plaintiffs object to this Request as vague and ambiguous as to "this matter," and potentially overly broad and unduly burdensome. Plaintiffs further object to the extent that the request seeks documents subject to the mediation or settlement privileges. Plaintiffs will interpret this Request to include only responsive materials that are related to responding party's expert opinions in the Three-Judge Court proceedings in *Coleman v. Schwarzenegger* and *Plata v. Schwarzenegger*.

Subject to and without waiving the above objections, Plaintiffs will produce responsive, non-privileged, and unobjectionable documents not previously produced.

**REQUEST FOR PRODUCTION NO. 5:**

All reports, draft reports, and related documents in connection with your opinions in this case.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 5:**

Plaintiffs object to this Request as vague and ambiguous as to "this case," and potentially overly broad and unduly burdensome. Plaintiffs further object to the extent that the request seeks documents subject to the mediation or settlement privileges. Plaintiffs will interpret this Request to include only responsive materials that are related to responding party's expert opinions in the Three-Judge Court proceedings in *Coleman v. Schwarzenegger* and *Plata v. Schwarzenegger*.

Subject to and without waiving the above objections, Plaintiffs will produce responsive, non-privileged, and unobjectionable documents not previously produced.

**REQUEST FOR PRODUCTION NO. 6:**

All documents relating to any communication (i.e., letters, handwritten notes of conversation, faxes, emails, text messages, etc.) between you and counsel for the *Coleman*

362194]

1    Plaintiffs, agents of counsel for the *Coleman* Plaintiffs, the *Coleman* Plaintiffs' attorney and

2    their agents, or any other person related to this litigation.

3    **RESPONSE TO REQUEST FOR PRODUCTION NO. 6:**

4           Plaintiffs object to this Request as vague and ambiguous as to "this litigation," and

5    potentially overly broad and unduly burdensome. Plaintiffs further object to the extent that the

6    request seeks documents subject to the mediation or settlement privileges. Plaintiffs will

7    interpret this Request to include only responsive materials that are related to responding party's

8    expert opinions in the Three-Judge Court proceedings in *Coleman v. Schwarzenegger* and

9    *Plata v. Schwarzenegger*.

10          Subject to and without waiving the above objections, Plaintiffs have previously

11   produced all responsive, non-privileged, and unobjectionable documents.

12   **REQUEST FOR PRODUCTION NO. 7:**

13          All documents relating to any communication (i.e., letters, handwritten notes of

14   conversation, faxes, emails, text messages, etc.) between you and counsel for the *Plata*

15   Plaintiffs, agents of counsel for the *Plata* Plaintiffs, the *Plata* Plaintiffs' attorney and their

16   agents, or any other person related to this litigation.

17   **RESPONSE TO REQUEST FOR PRODUCTION NO. 7:**

18          Plaintiffs object to this Request as vague and ambiguous as to "this litigation," and

19   potentially overly broad and unduly burdensome. Plaintiffs further object to the extent that the

20   request seeks documents subject to the mediation or settlement privileges. Plaintiffs will

21   interpret this Request to include only responsive materials that are related to responding party's

22   expert opinions in the Three-Judge Court proceedings in *Coleman v. Schwarzenegger* and

23   *Plata v. Schwarzenegger*.

24          Subject to and without waiving the above objections, Plaintiffs will produce responsive,

25   non-privileged, and unobjectionable documents not previously produced.

26

27

28

5219-4]

**REQUEST FOR PRODUCTION NO. 8:**

Produce all documents, publications, reports, notes, or other items of evidence which were reviewed, examined, considered, used or relied upon by you in forming an expert opinion in this litigation.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 8:**

Plaintiffs object to this Request as vague and ambiguous as to "this litigation," and potentially overly broad and unduly burdensome. Plaintiffs further object to the extent that the request seeks documents subject to the mediation or settlement privileges. Plaintiffs will interpret this Request to include only responsive materials that are related to responding party's expert opinions in the Three-Judge Court proceedings in *Coleman v. Schwarzenegger* and *Plata v. Schwarzenegger*.

Plaintiffs further object to this Request to the extent that it calls for the production of documents that are equally available to Defendants or are already in Defendants' possession. The documents relied upon by the expert are listed in the expert's reports and Plaintiffs will produce only those documents that are not equally available to Defendants or are not already in Defendants' possession.

Subject to and without waiving the above objections, Plaintiffs will produce responsive, non-privileged, and unobjectionable documents not previously produced.

**REQUEST FOR PRODUCTION NO. 9:**

All documents or other items of evidence reviewed but not relied upon by you in forming any opinion in this litigation.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 9:**

Plaintiffs object to this Request as vague and ambiguous as to "this litigation," and potentially overly broad and unduly burdensome. Plaintiffs further object to the extent that the request seeks documents subject to the mediation or settlement privileges. Plaintiffs will interpret this Request to include only responsive materials that are related to responding party's

15219-4]

1   expert opinions in the Three-Judge Court proceedings in *Coleman v. Schwarzenegger* and

2   *Plata v. Schwarzenegger*.

3       Plaintiffs further object to this Request to the extent that it calls for the production of

4   documents that are equally available to Defendants or are already in Defendants' possession.

5   The documents relied upon by the expert are listed in the expert's report and Plaintiffs will

6   produce only those documents that are not equally available to Defendants or are not already in

7   Defendants' possession.

8       Subject to and without waiving the above objections, Plaintiffs will produce any

9   responsive, non-privileged, and unobjectionable documents not previously produced.

10  **REQUEST FOR PRODUCTION NO. 10:**

11      All documents or other items of evidence which demonstrate that a prisoner release

12  order will not cause any negative impacts to [sic] public safety in the State of California or in

13  any city or county thereof.

14  **RESPONSE TO REQUEST FOR PRODUCTION NO. 10:**

15      Plaintiffs object to this Request as overbroad and unduly burdensome in that it is not

16  limited to materials that are in Deponent's possession, custody, or control, or that are related to

17  this action, and calls for the production of materials that are outside the scope of the

18  Deponent's expert report and for materials that were not relied on or consulted in the forming

19  of his expert opinion.  Plaintiffs will reasonably interpret the Request as calling for only those

20  documents that are in Deponent's possession, custody, or control, and that are related to

21  responding party's expert opinions in the Three-Judge Court proceedings in *Coleman v.*

22  *Schwarzenegger* and *Plata v. Schwarzenegger*.

23      Subject to and without waiving the above objections, Plaintiffs will produce any

24  responsive, non-privileged, and unobjectionable documents not previously produced.

25

26

27

28

1

2   **REQUEST FOR PRODUCTION NO. 11:**

3       All documents or other items of evidence which demonstrate that no other remedy will

4   remedy Defendants' failure to provide constitutionally adequate mental health care.

5   **RESPONSE TO REQUEST FOR PRODUCTION NO. 11:**

6       Plaintiffs object to this Request as vague and ambiguous as to "other remedy" and is

7   overly broad and unduly burdensome as it is not narrowed to any particular timeframe, not

8   limited to materials related to this action, and not limited to materials that are in Deponent's

9   possession, custody, or control. Plaintiffs will reasonably interpret the Request as calling for

10   only those documents that are in Deponent's possession, custody, or control, and that are

11   related to responding party's expert opinions in the Three-Judge Court proceedings in *Coleman*

12   *v. Schwarzenegger* and *Plata v. Schwarzenegger.*

13       Subject to and without waiving the above objections, Plaintiffs have previously

14   produced all responsive, non-privileged, and unobjectionable documents.

15   **REQUEST FOR PRODUCTION NO. 12:**

16       Produce any and all charts, graphs, exhibits, documents or other items of evidence you

17   intend to use as demonstrative evidence in this matter.

18   **RESPONSE TO REQUEST FOR PRODUCTION NO. 12:**

19       Plaintiffs object to this Request to the extent that it seeks materials protected by the

20   work-product doctrine. Plaintiffs object to this Request as overbroad and unduly burdensome

21   because it requests materials beyond the scope of the materials Deponent relied on or

22   considered in forming his opinions on this matter.

23       Plaintiffs further object that this request prematurely seeks materials that have not yet

24   been developed; to the extent responsive materials are developed and need to be disclosed for

25   use at trial, plaintiffs will disclose them at an appropriate time pursuant to court order.

26       Subject to and without waiving the above objections, Plaintiffs respond that they have

27   produced all responsive material that exists as of the date of this response.

28

1   Dated: October 9, 2008               Respectfully submitted,

2                           PRISON LAW OFFICE

3

4                           By:_____/s/ *Rebekah Evenson*

5                           Rebekah Evenson
                               Prison Law Office

6                           Attorneys for Plaintiffs

EXHIBIT C

**Rebekah Evenson**

| | |
|---|---|
| From: | Asstin@aol.com |
| Sent: | Sunday, October 12, 2008 7:36 AM |
| To: | revenson@prisonlaw.com |
| Subject: | Fwd: MyFax Delivery from NA |

Attachments: NA_081012_123756192.pdf

Cover sheet for the Texas report

James Austin, Ph.D.
The JFA Institute
5 Walter Houp Court, NE
Washington, DC 20002

310-867-0569 cell/office
202-280-1157 fax

From: NoReply@MyFax.com
To: asstin@aol.com
Sent: 10/12/2008 9:37:51 A.M. Eastern Daylight Time
Subj: MyFax Delivery from NA

Fax Received at: 10/12/2008 09:34:23 GMT -4
Receiving Fax Number: (202) 280-1157
# of Pages: 4
Duration: 192
Sending Fax: NA
Caller Id: 5176417103

Please note that the image shown here is only the first page of the attached fax and is compressed to fit a 1024 X 768 screen. If you have
problems reading text on it, view the attached file.

Click here if you want to report this as a junk fax

EXHIBIT: ___9___
DATE: 10|15|08
WITNESS: Austn
PAGE: 1 OF 511

10/13/2008

EXHIBIT D

## Sofia Millham

| | |
|---|---|
| **From:** | Amy Whelan |
| **Sent:** | Sunday, November 04, 2007 5:07 PM |
| **To:** | Asstin@aol.com |
| **Cc:** | Coleman Team - RBG Only |
| **Subject:** | Coleman Case |
| **Importance:** | High |
| **Attachments:** | Topics for James Austin Report, 11-9-07, 489 ovr pleadings.doc |

Jim,
Here are some topics for you to consider.


Amy Whelan, Esq.
ROSEN, BIEN & GALVAN LLP
315 Montgomery Street, Tenth Floor
San Francisco, CA 94104
Telephone: 415/433-6830
Fax: 415/433-7104
awhelan@rbg-law.com

CONFIDENTIALITY NOTICE
The information contained in this e-mail message may be privileged, confidential and protected from disclosure. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited. If you think that you have received this e-mail message in error, please e-mail the sender at rbg@rbg-law.com <mailto:rbg@rbg-law.com>
IRS CIRCULAR 230 NOTICE:  As required by United States Treasury Regulations, you should be aware that this communication is not intended by the sender to be used, and it cannot be used, for the purpose of avoiding penalties under United States federal tax laws.

### JAMES AUSTIN

### <u>EXPERT QUALIFICATIONS</u>

1.      I received my Ph.D. in sociology from the University of California at Davis in 1980. I also hold a Master of Arts degree in sociology from De Paul University in Chicago, Illinois, which I obtained in 1975, and a Bachelor of Arts in sociology from Wheaton College in Wheaton, Illinois, which I obtained in 1970. I am currently the President of JFA Institute, a non-profit corrections consulting firm that works in partnership with federal, state and local government agencies to implement more effective criminal justice policies. My complete academic and professional experience is set forth more fully in my Curricula Vitae, which is attached as **Exhibit A.**

2.      I have been involved in correctional planning and research for more than 25 years. From 1970 to 1974, I worked as a correctional sociologist in the Illinois Department of Corrections. From 1974 to 1982, I was a research associate at the National Council on Crime and Delinquency in San Francisco. Beginning in 1982, I became the Executive Vice President of the National Council on Crime and Delinquency and continued in that post until 1998. Between 1999 and 2003, I was a research Professor in the Department of Sociology at the George Washington University in Washington, D.C., where I was also the Director of the "Institute for Crime, Justice and Corrections." Since founding the JFA Institute in 2003, I have also acted as its President.

3.      In my current position, I and my staff evaluate criminal justice practices and design research-based policy solutions in a variety of areas including prison population simulation modeling and projections, offender risk assessment and classification systems, parole and probation guidelines, and special needs programs evaluation, including mental health programs. In 1991, I was named by the American Correctional Association as the recipient of the Peter P. Lejin's Research Award for my work on [_____]. In 1999, I received the Western Society of Criminology Paul Tappin

award for outstanding contributions in the field of criminology. From 1999 to 2003, I served as Chair of the National Policy Committee for the American Society of Criminology.

4.      I am currently serving as the director for several large research and evaluation programs, including the Justice Reinvestment Initiative, funded by the Council of State Governments, and the Correctional Options Program, funded by the Bureau of Justice Assistance (BJA), a division of the U.S. Department of Justice.

5.      I have extensive experience working with correctional systems experiencing crowding and population-related challenges. I am currently working in the states of Maryland, Nevada, Texas, Rhode Island, Connecticut, Arizona, Pennsylvania, and Louisiana to safely reduce their prisons populations. In 1981 and 1986, I served on the National Academy of Sciences National Panels on Sentencing and Prison Overcrowding. I was appointed to the Governor's Task Force on Prison Crowding for Nevada in 1991. In 1996, I was retained by the Colorado Department of Corrections to evaluate the impact of crowding at the Colorado maximum security prison.

6.      I have served as an expert or consultant to various federal courts and correctional systems. I was jointly appointed by the Department of Justice and the Georgia Department of Juvenile Justice and the Louisiana Department of Youth Services to monitor those states' compliance with a Memorandum of Agreement concerning the conditions of confinement in Georgia's youth facilities. I have also been a consultant for the National Institute of Corrections on jail and prison classification systems. In that capacity, I have assisted more than 25 states and numerous jail systems to develop and implement objective prisoner classification systems. Currently, I am working with parole boards to develop risk assessment systems for prisoners eligible for release in Texas, Pennsylvania, Kentucky, Maryland, Nevada, Rhode Island, West Virginia and Oklahoma.

7.    Between 1995 and 1997, I directed Congressionally-mandated evaluations of the Washington, D.C. Department of Corrections operations, classification system, staffing levels, and physical plant, and of the D.C. Department of Youth Services Agency operations, classification system, staffing levels, physical plant, mental health, information services and program services.

8.    I also have substantial experience specifically with the California correctional system. [add more of your experience in CA]  In 2003, I served on the Advisory Committee of the Little Hoover Commission, which produced a Report on the California Prison System titled "Back to the Community:  Safe & Sound Parole Policies."

9.    I was also recently invited to participate in the California Department of Corrections and Rehabilitation's "Expert Panel on Adult Offender Reentry and Recidivism Reduction" ("Expert Panel").  The Expert Panel was created to complete two primary tasks:  (1) review the current programs being offered by the CDCR to its adult offenders and comment on their effectiveness reducing recidivism and; (2) make recommendations as to how the CDCR could improve its program offerings, organizational culture, and environment to better reduce the adult offender recidivism rate.  I was one of several nationally recognized experts in the field of corrections who studied these issues and produced a final report, which was published in June of 2007.

10.    The Expert Panel created two sub-committees to study recidivism and reentry issues, including the "Program Review Sub-Committee" which reviewed the current program offerings and the "Model Program Sub-Committee" which provided recommendations to improve the current program offerings and the underlying systems in which the programs operated.  I was a member of the latter sub-committee.

11.    One of the key conclusions that I and the Expert Panel as a whole reached was that the CDCR would have to address severe overcrowding before it had any hope of

reducing recidivism rates. The Panel also specifically concluded that building more prisons could not be the solution to overcrowding.

12.    I am billing the plaintiffs $____ an hour, my usual billing rate.

## MY EXPERT OPINIONS IN THIS ACTION

13.    I have been retained by plaintiffs' counsel in the *Plata* and *Coleman* cases as an expert in prison administration and the impact of overcrowding on prisoners' medical and mental healthcare. I have also been asked to render my opinion with respect to whether overcrowding with California Department of Corrections and Rehabilitation (CDCR) is the primary cause of the current unconstitutional conditions experienced by members of the *Coleman* and *Plata* classes and whether the CDCR's current strategies to address overcrowding will be effective.

14.    The opinions set forth in this declaration are based on my extensive experience studying and researching correctional systems, including my recent work on the Expert Panel, on my review of data and documents provided to me by plaintiffs' counsel and on my visits to California State prisons, including, most recently, my expert tour at CSP-Lancaster on November 2, 2007.

15.    In preparation for this report, I have reviewed the following documents (among others): Governor Schwarzenegger, *Prison Overcrowding State of Emergency Proclamation* (October 2006); Assembly Bill 900; CDCR, *Fall Adult Population Projections* (October 2007); Office of the Inspector General, *Special Review into In-Prison Substance Abuse Programs Managed by the California Department of Corrections and Rehabilitation* (February 2007); the SEIU report entitled *CDCR Reforms for Safer Communities* (March 2007); ….. A complete list of the documents provided to me by plaintiffs' counsel is attached as **Exhibit B**.

16.    This report is also based on documents and data that I received while working on the Expert Panel on Adult Offender Recidivism Reduction Programs, including _____.

## History of Overcrowding in the California System

17.    1980's vs. now; sentencing laws; 3 Strikes; building boom; information from new, Fall 2007 population projections.

## Causes and Effects of Severely Overcrowded Systems

18.    Define overcrowding

19.    Understaffing, tensions, violence, illness, lockdowns, lack of programs/yard, delays, focus only on pop management.

20.    Inability to focus on individual needs / risk assessments

## Indications of Overcrowding in the California System

21.    Summarize Expert Panel conclusions re overcrowding

22.    Constantly changing prison missions

23.    Lack of office and work space

24.    Lengthy delays for all types of care

25.    Crowding increases demand for all services and reduces the provision / availability of services

26.    This Includes Medical & Mental Health Treatment/Programs

27.    Over-burdened staff

28.    Lack of beds, including for mental health programs

## California Will Be Unable to Deliver Adequate Medical and Mental Healthcare Unless and Until it Addresses Prison Overcrowding

29.   Conclusions from Expert Panel

30.   *Coleman* Program Guide mandates the following timelines to transfer inmates out of a prison:

> Reception Centers:  EOP transfers should occur within 60 days, or 30 days if clinically indicated.  CCCMS transfers should occur within 90 days, or 60 days if clinically indicated.
>
> All Prisons:  MHCB transfers should occur within 24 hours of referral.
>
> Prisons without an EOP program:  EOP transfers should occur within 60 days, or 30 if clinically indicated.

31.   Program Guide requirements for EOP level of care:  (1) EOP inmates are housed in separate housing units and are provided with structured therapeutic activities. Program Guide at 12-4-1; (2) Each EOP patient shall be offered at least 10 hours per week of scheduled structured therapeutic activities.  Program Guide at 12-4-8.

32.   RC EOP Programs:  On October 20, 2006, defendants were ordered to implement a treatment program in 7 reception centers: CIM, DVI, SQ, NKSP, Wasco, LAC and RJD.  These programs are required to provide a minimum of 5 hours of structured therapeutic programming, including pre-release planning.  These requirements are not yet a part of the Revised Program Guide, but are reported on by the Special Master and his court monitors.

33.   Prior to that order, no EOP programming was provided at RCs at all.

## Defendants' Current Efforts to Address Overcrowding Will Not Be Effective

34.   **Building New Prisons.**

35.   **Out of State Transfers.**

36.   **Chronic and Severe Staffing Shortages.**

37.   **Parole Reform.**

38.     **The CDCR's Credit Earning System.**

39.     **Education Programs.**

40.     **Vocation and Job Programs.**

41.     Can expand on observations from your other declaration, including, for example: "I do not have confidence that the state will be able to stabilize the growth of the prison population or achieve any significant reductions in the prison population in the next few years." (Austin Decl. at 3:19-20)

42.     "In my opinion, the state's 'plan' to reduce overcrowding is not a plan, as that term is normally understood. It is deficient in that there are no detailed supporting documents, data analysis or timetables that show how the CDCR can meet the massive and unprecedented construction timelines Defendants have set forth in their pleadings in this case. As such, the State's proposal is not a plan but a series of goals that have no factual basis. The CDCR's goals for construction and implementation of new programs are not likely to be met." (Austin Decl. at 3:13-18)

43.     "There are many reasons besides the lack of detail to be skeptical that the state will be able to meet its goals. In general, the state proposes four major initiatives to reduce crowding: 16,000 re-entry beds, 8,000 transfers to out-of-state private facilities, 8,000 medical and mental health beds, and 16,000-18,000 infill beds. With the exception of the 8,000 transfers, none of these measures are designed to reduce the prison population. Instead, if implemented, they will solely increase the physical capacity of the prison system, and will require commensurate increases in staff, administration, and program space." (Austin Decl. at 3:23-4:2).

## Conclusions

44.     Is overcrowding the primary cause of constitutional violations?

45.     Will any remedies other than a release order address the violations?

7