1  EDMUND G. BROWN JR.
   Attorney General of the State of California
2  DAVID S. CHANEY
   Chief Assistant Attorney General
3  ROCHELLE C. EAST
   Senior Assistant Attorney General
4  JONATHAN L. WOLFF
   Senior Assistant Attorney General
5  LISA A. TILLMAN
   Deputy Attorney General
6  KYLE A. LEWIS – State Bar No. 201041
   Deputy Attorney General
7  455 Golden Gate Avenue, Suite 11000
   San Francisco, CA 94102-7004
8  Telephone: (415) 703-5708
   Facsimile:  (415) 703-5843
9  kyle.lewis@doj.ca.gov

   HANSON BRIDGETT LLP
   JERROLD C. SCHAEFER
   PAUL B. MELLO
   S. ANNE JOHNSON
   SAMANTHA D. TAMA
   RENJU P. JACOB
   425 Market Street, 26th Floor
   San Francisco, CA  94105
   Telephone: (415) 777-3200
   Facsimile:  (415) 541-9366
   jschaefer@hansonbridgett.com
   pmello@hansonbridgett.com
   ajohnson@hansonbridgett.com
   stama@hansonbridgett.com
   rjacob@hansonbridgett.com

10 Attorneys for Defendants

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

AND THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

| | |
|---|---|
| RALPH COLEMAN, et al.,<br>    Plaintiffs,<br>v.<br>ARNOLD SCHWARZENEGGER, et al.,<br>    Defendants. | No. 2:90-cv-00520 LKK JFM P<br><br>**THREE-JUDGE COURT** |
| MARCIANO PLATA, et al.,<br>    Plaintiffs,<br>v.<br>ARNOLD SCHWARZENEGGER, et al.,<br>    Defendants. | No. C01-1351 TEH<br><br>**THREE-JUDGE COURT**<br><br>**TRIAL AFFIDAVIT OF JAMES TILTON** |

- 1 -

TRIAL DECLARATION OF JAMES TILTON
*3-JUDGE PANEL* (2:90-CV-00520 LKK JFM P)(C01-1351 TEH)

I, JAMES TILTON, declare:

1. I served as Secretary of the California Department of Corrections and Rehabilitation (CDCR) from April 28, 2006 through May 16, 2008. I am currently retired from State service. I have personal knowledge of the facts stated in this declaration and if called to testify about those facts I could and would do so competently.

## I. Current Position and Background

2. I was the Secretary of CDCR from September 2006 through May 16, 2008. I also served as Acting Secretary from April 18, 2006 through September 2006. During my tenure as Secretary and Acting Secretary, I served on the Council on Mentally Ill Offenders, created to develop cost-effective approaches to meet the long-term mental health needs of those mentally ill persons in our communities who are at risk for offending or who have offended. This Council consists of representatives from the Department of Mental Health, the Secretary of the California Department of Corrections and Rehabilitation, and appointees of the Governor, Legislature, Office of the Attorney General, and California Supreme Court.

3. Before serving as the Acting Secretary of CDCR, I was employed with the Department of Finance (DOF) from 1998 to 2006. While at DOF, I served as a program budget manager from 2003 to 2006. I was responsible for the CDCR support budget. In the previous five years at DOF, I was responsible for the CDCR capital outlay program, where I assisted in the drafting of budgets regarding facility construction. Before 1998, I served as the Deputy Director of Administrative Services at CDCR.

## II. Overview

4. In the course of my work as Secretary, I was familiar with the overall census of the CDCR population as well as the delivery of health care to CDCR inmates. I participated in the out-of-state transfer of CDCR inmates to private correctional facilities to relieve the use of gymnasiums and dayrooms for housing inmates. I also participated in the development of various parole reform proposals to address the recidivism rate of CDCR inmates.

### III. The Out-of-State Transfer of Inmates

5. The out-of-state transfer of CDCR inmates was authorized by the Governor's Emergency Proclamation of October 2006, with specific findings that the triple-bunking of CDCR inmates in day rooms and gymnasiums would be relieved by the transfer of inmates to out-of-state facilities. Despite the Governor's Emergency Proclamation acknowledging the need to relieve the overcrowding of CDCR general population housing, the *Coleman* Plaintiffs filed a request with the *Coleman* court seeking a temporary restraining order to cease the first out-of-state transfer of inmates. I responded to the request for a temporary restraining order with a letter describing CDCR's use of extraordinary measures to appropriately screen those inmates who volunteered for transfer to an out-of-state facility and CDCR's continued desire to work with the Court to ensure the safe transfer of inmates in relieving the pressure on general population housing. (Defs.' Trial Ex. 1219, which is a true and correct copy of *Coleman* Defs.' Response to TRO, filed 11/3/06.) Judge Karlton denied Plaintiffs' request for the temporary restraining order and permitted CDCR to continue its program to house inmates by placing them in out-of-state facilities. The Court also approved CDCR's decision to not, at that time, transport *Coleman* caseload members to an out-of-state location far from the *Coleman* court's monitoring capabilities.

6. The out-of-state transfer program made a significant impact on the housing of general population inmates. Before the start of the out-of-state transfer program, CDCR was compelled to place triple bunks in gymnasiums and day rooms to house inmates (also called "non-traditional beds"). With the out-of-state transfer program, the use of such spaces for housing inmates significantly declined. There were 19,618 inmates housed in nontraditional beds in August 2007. (Defs.' Trial Ex. 1252, which is a true and correct copy of CDCR Chart of Non-traditional Beds.) That number had decreased to 15,518 by March 2008 due to the deactivation of nontraditional beds with out-of-state transfers during my tenure as Secretary. (*Id.*)

//

- 3 -

TRIAL AFFIDAVIT OF JAMES TILTON
(CASE NOS. 2:90-CV-00520 LKK JFM P AND C01-1351 TEH)

## IV. The Implementation of AB 900

7.  In the course of my work, I took action to reduce the recidivism rate of CDCR parolees. In January 2007, I ended the practice of returning mentally ill parolees to CDCR based upon nominal technical violations of their parole. (Defs.' Trial Ex. 1195, which is a true and correct copy of CDCR Memo re. Discontinue Return of Parolees for Psychiatric Services, dated January 12, 2007, see also Defs'. Trial Ex. 1307, which is a true and correct copy of CDCR Memo re. Process for Managing Mentally Ill Parolees in need of Enhanced Community-Based Mental Health Treatment.) A few months later, I worked to implement the historic bipartisan enactment of Assembly Bill 900 (AB 900) and its strategy to enable the proper care and rehabilitation of inmates. I reviewed the reports of the Governor's Strike Team on Facilities Management and the Governor's Strike Team on Rehabilitation. By January 2008, both the lead of the Facilities Management Strike Team, Deborah Hysen, and the Rehabilitation Strike Team, Kathy Jett, had joined CDCR as Chief Deputy of Facilities Management and Undersecretary, respectively, to further implement the AB 900 strategy.

8.  In the 2008 CDCR statement entitled "Prison Reforms: Achieving Results," I outlined the strategy used to implement the May 2007 enactment of AB 900, and to increase rehabilitation for inmates and thus reduce the population. (Defs.' Trial Ex. 1270, which is a true and correct copy of "Prison Reforms: Achieving Results.") That statement lists the AB 900 benchmarks, ranging from construction of beds to development of educational programming, with projected completion dates. Those benchmarks completed before my retirement include:

   a.  <u>Benchmark 5</u>: Prison institutional drug treatment slots average at least 75% participation over the previous six months. *Status*: Completed December 2007. There were 9,669 in-prison substance abuse treatment slots operating at almost 94% capacity and exceeding the benchmark as of December 2007.

   b.  <u>Benchmark 7</u>: CDCR develops an Inmate Treatment and Prison-to-

- 4 -

Employment Plan. *Status:* By April 2008, CDCR developed a new program for Prison-to-Employment called New Start which is modeled after a similar plan proven successful in Texas.

    c.    <u>Benchmark 10 a.</u>: CDCR develops and implements by January 15, 2008 a plan to address management deficiencies within the Department. *Status:* Completed as of January 15, 2008. CDCR submitted a management plan to the Legislature on January 15, 2008 which described management enhancements to optimize managerial success.

    d.    <u>Benchmark 10 b</u>: CDCR fills a minimum of 75% of managerial positions for at least six months. *Status*: Completed January 15, 2008. As of December 2007, CDCR had 110 career executive assignment or exempt positions, with only 25 remaining vacancies and of those 25 there were 11 pending appointment.

    e.    <u>Benchmark 12 a</u>: CDCR develops and implements a plan to obtain additional rehabilitation services pursuant to AB 900. *Status*: CDCR submitted a plan to the Legislature which detailed efforts to obtain additional rehabilitation services for inmates and parolees.

    f.    <u>Benchmark 13</u>: CDCR reviews existing parole procedures. *Status*: By February 2008, CDCR performed a review of existing parole procedures and presented multiple reorganization strategies designed to improve field level supervision, personnel accountability, and training of field agents.

## V.     Budget-Reduction Proposal

9. In January 2008 the State faced a budget shortfall of $3.3 billion in fiscal year 2007-2008 and an anticipated budget shortfall of $14.5 billion in fiscal year 2008-2009. Thus, and in preparation for the January 2008 initial budget package, the Governor directed every State department and agency to reduce its proposed budget by 10 percent. Because CDCR's budget is largely driven by its inmate population, in order to achieve a 10 percent reduction of the Department proposed budget, I prepared a

- 5 -

TRIAL AFFIDAVIT OF JAMES TILTON
(CASE NOS. 2:90-CV-00520 LKK JFM P AND C01-1351 TEH)

proposal to attempt to reduce the inmate population by screening certain inmates for early release. I would not have made this population reduction proposal if not for the directive to reduce the Department's proposed budget by 10 percent. I considered reducing programming, but determined that CDCR could not cut the necessary number of programs to reach the mandated 10 percent reduction figure. Furthermore, I did not believe we could reduce facility programs and still complete the CDCR mission.

10. The 10 percent population reduction proposal envisioned the early release of approximately 22,159 inmates. In arriving at that figure, my staff selected certain inmates for early release based upon their commitment offenses, criminal history, and behavior while incarcerated within CDCR, such as those inmates that had no history of violent or sex-based criminal behavior. The population reduction proposal was a budget exercise.

11. Upon submission, CDCR's reduction proposal was incorporated within the Governor's January 2008 proposed budget. Shortly after release of the proposed 2008 budget, I retired from CDCR. I understand that CDCR's 10 percent budget reduction proposal was withdrawn before finalization of the May Revise budget in May 2008.

## VI. Summary

12. I served as Secretary of CDCR during two historic efforts: the implementation of the out-of-state transfer process and during the initial implementation of AB 900. Both of these efforts provided thoughtful and deliberate means for addressing the overcrowding of CDCR prisons. Rather than the simple unqualified release of inmates, CDCR sought to abide by its mission to provide appropriate housing,

//
//
//
//

- 6 -

TRIAL AFFIDAVIT OF JAMES TILTON
(CASE NOS. 2:90-CV-00520 LKK JFM P AND C01-1351 TEH)

1 | programming, and services to inmates within its custody.

2 |     I declare under penalty of perjury that the foregoing is true and correct. Executed
3 | in Sacramento, California on October 30, 2008.

*[signature]*
JAMES TILTON

-7-

TRIAL AFFIDAVIT OF JAMES TILTON