1 | EDMUND G. BROWN JR.
Attorney General of the State of California
2 | DAVID S. CHANEY
Chief Assistant Attorney General
3 | ROCHELLE C. EAST
Senior Assistant Attorney General
4 | JONATHAN L. WOLFF
Senior Assistant Attorney General
5 | LISA A. TILLMAN – State Bar No. 126424
Deputy Attorney General
6 | KYLE A. LEWIS – State Bar No. 201041
Deputy Attorney General
7 | 455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
8 | Telephone: (415) 703-5708
Facsimile: (415) 703-5843
9 | lisa.tillman@doj.ca.gov
kyle.lewis@doj.ca.gov

HANSON BRIDGETT LLP
JERROLD C. SCHAEFER - 39374
PAUL B. MELLO – 179755
S. ANNE JOHNSON – 197415
SAMANTHA D. TAMA – 240280
RENJU P. JACOB - 242388
425 Market Street, 26th Floor
San Francisco, CA 94105
Telephone: (415) 777-3200
Facsimile: (415) 541-9366
jschaefer@hansonbridgett.com
pmello@hansonbridgett.com
ajohnson@hansonbridgett.com
stama@hansonbridgett.com
rjacob@hansonbridgett.com

10

Attorneys for Defendants

11

12 UNITED STATES DISTRICT COURT

13 FOR THE EASTERN DISTRICT OF CALIFORNIA

14 AND THE NORTHERN DISTRICT OF CALIFORNIA

15 UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

16 PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

17

| | |
|---|---|
| RALPH COLEMAN, et al., | No. 2:90-cv-00520 LKK JFM P |
| Plaintiffs, | **THREE-JUDGE COURT** |
| v. | |
| ARNOLD SCHWARZENEGGER, et al., | |
| Defendants. | |
| MARCIANO PLATA, et al., | No. C01-1351 THE |
| Plaintiffs, | **THREE-JUDGE COURT** |
| v. | **TRIAL AFFIDAVIT OF SCOTT KERNAN** |
| ARNOLD SCHWARZENEGGER, et al., | **To: Three-Judge Panel** |
| Defendants. | |

TRIAL AFFIDAVIT OF SCOTT KERNAN
(2:90-CV-00520 LKK JFM P) (C01-1351 TEH)

1659567.1

1  I, SCOTT KERNAN, declare:

2  1.   I am the Undersecretary of Operations of the California Department of

3  Corrections and Rehabilitation (CDCR).  I have personal knowledge of the matters set

4  forth in this trial affidavit and if called to testify would and could do so competently.

5  **I.   CURRENT POSITION AND BACKGROUND**

6  2.   As a 25 year employee of the CDCR, I have a deep understanding of the

7  state prison system operations.  As the Undersecretary of Operations, I am responsible

8  for oversight of both adult and juvenile institutions and parole operations, as well as the

9  Board of Parole Hearings, Office of Correctional Safety, Office of the Ombudsman, and

10  the Prison Industry Authority.   Before becoming the Undersecretary, I held the positions

11  of Chief Deputy Secretary, Adult Operations, and Deputy Director and Director of the

12  Division of Adult Institutions.  In these positions, I was responsible for all aspects of the

13  day-to-day operations of the adult prisons and parole.

14  3.   I started working at CDCR in 1983 as a Correctional Officer at San Quentin

15  State Prison.  In addition to the assignments above, I have held the following positions

16  within CDCR: Correctional Sergeant, Budget Analyst, Lieutenant, Facility Captain,

17  Associate Warden, Correctional Captain, Chief Deputy Warden, Warden, and Associate

18  Director.

19  **II.   OVERVIEW**

20  4.   CDCR has made significant progress in reducing overcrowding in its

21  prisons. First, the general trend has been a decrease in the prison population.  For

22  example, the prison population (excluding camps and contracted beds) was 162,792 in

23  October 2006 and by August 2008 it was 156,352.  Second, the number of non-

24  traditional beds, i.e., beds in areas not designed for inmate housing, has also decreased.

25  In August 2007, the number of non-traditional beds was 19,618 and by August 2008, the

26  number of non-traditional beds decreased to 14,359.

27  5.   CDCR is working to address overcrowding and to eliminate nontraditional

28  beds on two fronts—by increasing capacity and reducing the number of prisoners.

- 1 -

1   Assembly Bill 900 (AB 900) was directed at both fronts, providing for additional infill and

2   reentry beds and reducing the prison population through out-of-state transfers.  Infill

3   beds are housing units with full programming and medical, dental, and mental health

4   space, to handle that additional capacity on existing footprints.  Reentry beds are

5   housing units in secure community-based reentry centers, intended to house inmates for

6   their last 12 months in custody and prepare them for reentry into the community.

7       6.    In addition to implementing AB 900, CDCR plans to implement

8   rehabilitative programming intended to reduce recidivism and parole reform measures

9   intended to provide greater consistency in parole decisions and enhanced community-

10  based programs in lieu of incarceration.  Also, CDCR has efforts specifically directed at

11  female offenders, including an overall proposal for an additional 4,500 community-based

12  beds in Female Correctional Rehabilitation Centers, with 2,000 planned in Fiscal Year

13  2009/2010 and Fiscal Year 2010/2011.  CDCR has also improved custodial staffing and

14  recruitment efforts.

15      7.    The *Plata* Receiver has undertaken efforts to improve medical care.  For

16  instance, the Receiver has been able to staff more medical positions.

17      8.    CDCR has also addressed mental health care delivery issues.  For

18  example, the CDCR Division of Adult Institutions is involved in the delivery of mental

19  health care services.  Correctional officers have been encouraged by a series of

20  protocols to work with mental health clinicians in the overall care of mentally ill inmates,

21  including referring mentally ill inmates to higher levels of care.  Correctional officers also

22  receive significant training to assist in the delivery of care such as CPR training and the

23  monitoring of inmates at risk for suicide.  Further, CDCR has revised its classification of

24  inmates pertaining to security.  CDCR voluntarily removed the four point factor of mental

25  health illness from the classification scheme, which previously affected housing and

26  programming decisions.

27  ///

28  ///

- 2 -

### III.    MEASURES TO ADDRESS OVERCROWDING

9.    Overcrowding can mean different things to different people. Sometimes the term is used by others to mean a population that exceeds design bed capacity (i.e., putting two inmates in a cell when the cell was originally "designed" for one inmate). But when the infrastructure capacity can handle more inmates (such as when a cell can adequately accommodate two inmates even if it was originally intended for one), then exceeding design bed capacity is manageable. A problem arises where the level of population exceeds infrastructure capacity, results in long-term use of non-traditional beds, and there is not sufficient space to provide appropriate rehabilitative programming. Put another way, inmates can be safely and appropriately housed at a population that exceeds design capacity as long as the infrastructure, staffing, and programming space are available to serve the additional population.

### A.    AB 900, Parole Reform, and Population Trends

10.    AB 900 is one specific measure designed to reduce the level of overcrowding in CDCR prisons. On April 26, 2007, in response to California's prison overcrowding crisis, the California Legislature enacted AB 900, and Governor Schwarzenegger signed it into law on May 3, 2007. I have personal knowledge concerning AB 900 because my job duties involve the implementation of AB 900. Specifically, as Chief Deputy Secretary for Adult Operations, my responsibilities included temporarily transferring inmates out-of-state and also included parole reform efforts. I am also indirectly involved with the infill project and the rehabilitative programs.

11.    AB 900 has reduced and will reduce prison overcrowding through four measures: (1) through the temporary transfer of inmates to out-of-state facilities, (2) by construction of additional capacity at existing prisons (in-fill), (3) by establishing community re-entry beds, and (4) by creating more medical and mental health beds. Deborah Hysen, Chief Deputy Secretary of Facilities Planning, Construction and Management, addresses the status of new beds in her trial affidavit. AB 900 and parole reform measures, which I describe below, have had a significant impact on total

- 3 -

1  population.

2      12.    Overall, population has been decreasing. The Data Analysis Unit,

3  Estimates and Statistical Analysis Section, Offender Information Services Branch of

4  CDCR prepares Weekly and Monthly Reports of Population as part of its official duties.

5  The Weekly and Monthly Reports of Population list population totals for inmates within

6  California, inmates housed outside of California, and for parolees. These reports are

7  made or updated at or near the time of the events at issue, and they are made by a

8  person with knowledge of the matters addressed, or according to information provided

9  by a person with knowledge of those matters. These reports are made and kept in the

10  course of regularly conducted business activity, as a regular practice. True and correct

11  copies of Monthly Reports of Population for October 2003, October 2004, May 2005,

12  October 2005, April 2006, October 2006, May 2007, November 2007, January 2008 and

13  June 2008 are marked as Defendants' Trial Exhibit 1259 and submitted herewith. A true

14  and correct copy of the Weekly Report of Population as of August 27, 2008 is marked as

15  Defendants' Trial Exhibit 1203. A true and correct copy of the Weekly Report of

16  Population as of October 25, 2006 is marked as Defendants' Trial Exhibit 1149.

17      13.    From October 2006 to August 2008, there was a decrease in the absolute

18  number of inmates under CDCR's jurisdiction. At its peak in October 2006, the total

19  inmate population under CDCR's jurisdiction was 173,479, which declined to 172,057 as

20  of August 27, 2008. In addition, from October 2006 to August 2008, the number of

21  inmates housed in-state at all of CDCR's facilities (prisons, camps, and community

22  correctional facilities) declined—from 173,479 in October 2006 to 167,269 as of August

23  2008. Moreover, the prison population (excluding camps and contracted beds) declined

24  from 162,792 in October 2006, to 156,352 in August 2008. This information is derived

25  from the October 25, 2006 Weekly Report of Population and the August 27, 2008

26  Weekly Report of Population. Also, the August 2008 total inmate population was 6,179

27  less than the total inmate population projected for June 2008 in the Spring 2007

28  Population Projections. As part of its official duties, the Estimates and Statistical

- 4 -

TRIAL AFFIDAVIT OF SCOTT KERNAN
(2:90-CV-00520 LKK JFM P) (C01-1351 TEH)

1659567.1

1   Analysis Section of the Office of Research of CDCR publishes population projections

2   twice a year. These reports are made or updated at or near the time of the events at

3   issue, and they are made by a person with knowledge of the matters addressed, or

4   according to information provided by a person with knowledge of those matters. These

5   reports are made and kept in the course of regularly conducted business activity, as a

6   regular practice. A true and correct copy of the Spring 2007 Adult Population

7   Projections is marked as Defendants' Trial Exhibit 1204.

8       14.    As the in-state prison population has decreased, nontraditional beds have

9   reduced drastically in number. The CDCR has tracked and identified the non-traditional

10  beds since July 2003 for the male, female, and total inmate population, which is marked

11  as Defendants' Trial Exhibit No. 1252. This data is derived from Institution Activation

12  Schedules and Master Bed Rosters, true and correct copies of which are being

13  submitted as Defendants' Trial Exhibits 1303 and 1304. These reports are made or

14  updated at or near the time of the events at issue, and they are made by a person with

15  knowledge of the matters addressed, or according to information provided by a person

16  with knowledge of those matters. These reports are made and kept in the course of

17  regularly conducted business activity, as a regular practice. I have also assisted in the

18  preparation of a non-traditional bed chart in the regular course and scope of my official

19  duties, a true and correct copy of which is being submitted as Defendants' Trial Exhibit

20  1303. As of August 2008, there were 14,359 (13,467 male and 892 female) non-

21  traditional beds being utilized. This represents a total reduction of 5,259 non-traditional

22  beds throughout the system since the all-time high of 19,618 was reached in August

23  2007.

24      15.    I estimated in May 2007 that non-traditional beds would be reduced to

25  about 13,000. This estimate was delayed due to many unforeseen factors such as

26  delays in the activation of out-of-state beds and additional construction projects

27  temporarily reducing base capacity. CDCR's current Inmate Activation Schedule further

28  reduces non-traditional beds by an additional 5,422 (4,530 male and 892 female) by

- 5 -

1   June 2009. The current Inmate Activation Schedule is made or updated at or near the

2   time of the events at issue, and it is made by a person with knowledge of the matters

3   addressed, or according to information provided by a person with knowledge of those

4   matters. This report is made and kept in the course of regularly conducted business

5   activity, as a regular practice. A true and correct copy of the current Inmate Activation

6   Schedule is marked and submitted as Defendants' Trial Exhibits 1262.

7   **B.    Out of State Transfers**

8        16.    The acronym "COCF" means California Out of State Correctional Facilities.

9   The COCF does not include people transferred to other jurisdictions under interstate

10  agreements. Out-of-state transfers are one of the solutions to the overcrowding problem

11  because it reduces the number of non-traditional beds in California's in state correctional

12  facilities.

13       17.    As of August 29, 2008 approximately 4,852 inmates were housed in the six

14  (6) COCF institutions. I estimated in May 2007 that 5,060 would be housed in COCF by

15  June 2008. A minor delay in activations occurred due to temporary suspension of

16  transfers to the Mississippi Facility and operational delays within California, as such

17  CDCR did not reach the 5,000 mark until September 2008. However, CDCR anticipates

18  full activation of the currently contracted 8,000 COCF beds by June 2009. Additional

19  transfers could be performed under the Governor's Emergency Proclamation. A true

20  and correct copy of the daily COCF count as of August 29, 2008 is marked as

21  Defendants' Trial Exhibit No. 1150.

22       18.    The transfers reduce crowding in prisons, help enhance safety and security

23  for staff and inmates, and increase space for rehabilitation programs. Also, CDCR has

24  been able to reduce the number of non-traditional beds in gymnasiums and other places

25  that are not specifically intended for housing. CDCR is on schedule to house 8,000

26  inmates in out-of-state correctional facilities by next summer as authorized by AB 900,

27  and more transfers can occur under the Governor's Emergency Proclamation. A true

28  and correct copy of a press release CDCR issued concerning this development entitled,

- 6 -

TRIAL AFFIDAVIT OF SCOTT KERNAN
(2:90-CV-00520 LKK JFM P) (C01-1351 TEH)

1659567.1

1    "Out-of-State Transfers of Inmates Surpass 5,000; Allow CDCR to Reduce 'Bad Beds' by

2    27%" is marked as Defendants' Trial Exhibit No. 1211. The press release is a statement

3    of CDCR setting forth its activities.

4        19.    CDCR has contracted beds in the following COCF institutions: West

5    Tennessee Detention Facility – Capacity 80 – Pop 72; Florence Correctional Center,

6    Arizona  – Capacity 960 – Pop 1027; Tallahatchie County Correctional Facility

7    Mississippi – Capacity 2592 – Pop 1620; North Fork Correctional Facility, Oklahoma –

8    Capacity 1080 – Pop 1020; Red Rock Correctional Center, Arizona – Capacity 360 –

9    Pop 358; La Palmas Correctional Center, Arizona – Capacity 3060 – Pop 754. These

10    population numbers are accurate as of August 29, 2008. The Florence Correctional

11    Center is currently above capacity as it serves as the HUB for other COCF institutions.

12    The CDCR currently has a contract with the Corrections Corporation of America for

13    8,132 beds, which includes 132 beds for swing space during transports.

14        20.    CDCR has adhered to the Governor's Emergency Proclamation regarding

15    the transfer criteria for COCF inmates. CDCR began with volunteer and Immigration and

16    Customs Enforcement active and potential holds and progressed using the following

17    criteria: (1) Inmates who have not received any visits within the last 24 months and do

18    not have family ties within California; (2) Inmates who have not received a visit in last 12

19    months and do not have family ties within California; (3) Inmates who voluntarily choose

20    not to work or participate in an education or vocational program; (4) Inmates who are

21    involuntarily unassigned; (5) Inmates who are assigned to non-critical work assignments;

22    (6) Inmates who are not assigned to education/vocational assignments; and (7) Inmates

23    with the longest amount of time to serve. I am familiar with the proclamation as I

24    supplied the Governor's Office with the information regarding the statistics, and prison

25    information. Further, CDCR has complied with the *Coleman* and *Plata* courts' desire to

26    ensure the health of all inmates subject to transfer. Before any inmate is transferred, a

27    mental health and medical screening approved by the *Coleman* and *Plata* courts,

28    respectively, is conducted.

- 7 -

1        21.    On July 25, 2008, CDCR began processing inmates in criteria "5" stated

2 above - inmates who are assigned to non-critical work assignments. CDCR anticipates

3 a sufficient inmate pool to transfer 8,000 inmates to COCF institutions by June 2009.

4        22.    Based on the final resolution of litigation upholding the constitutionality of

5 CDCR's use of out-of-state beds under the Governor's Emergency Proclamation, the

6 CDCR has distributed a Request for Information to all public and private law

7 enforcement agencies. The Request for Information sought to identify existing or

8 proposed new construction that would allow CDCR to expand existing out-of-state bed

9 contracts above the current 8,000 level. The Request for Information responses are

10 currently in the review process. The additional capacity will allow CDCR to continue to

11 receive county intake of inmates without impacting population reduction strategies to

12 reduce overcrowding in-state.

13 **C.    Adult Parole Population Reform Measures**

14        23.    CDCR continues to implement parole accountability efforts intended to

15 provide: 1) more consistent revocation decisions, 2) alternative sanction programs, 3)

16 diversion to parole programs based upon the parolee's individual risk and needs factors,

17 and 4) more consistent decisions regarding parolee discharges. These efforts have

18 proven to reduce prison population while maintaining public safety. I am familiar with the

19 CDCR programs and policies concerning parole. Thomas Hoffman, Director of the

20 Division of Adult Parole Operations for CDCR, addresses parole reform in more detail in

21 his trial affidavit.

22        24.    CDCR has decided to implement the Parole Violation Decision Making

23 Instrument. The instrument will enable parole staff to uniformly determine, recommend,

24 and impose proportionate and consistent sanctions for parole violations. Another

25 important aspect of parole reform is the increased availability of alternative sanctions for

26 violations. It is CDCR's hope that it can treat what is causing the violation and thereby

27 reduce recidivism. The alternative-sanction program involves offenders who are

28 charged with a parole violation, have had their due process hearing, and are sent to

- 8 -

1    alternative sanctions in lieu of prison.  CDCR continues to monitor program utilization

2    through its COMPSTAT process.  *See* Defendants' Trial Exhibit No. 1300 for a true and

3    correct copy of COMPSTAT process documentation.  The COMPSTAT is a statement of

4    CDCR setting forth its activities.  Day reporting centers are facilities where offenders can

5    be assigned as an alternative sanction.  Their services can include assistance with

6    employment, substance abuse, education, anger management, and other offender

7    needs.  CDCR has implemented the Correctional Offender Management Profiling for

8    Alternative Sanctions instrument.  Correctional Offender Management Profiling for

9    Alternative Sanctions is a research-based risk and needs assessment tool for criminal

10   justice practitioners to assist them in placement, supervision, and case management of

11   offenders.

12   **D.    Overcrowding Measures Targeted at Female Population**

13          25.    CDCR has developed a number of programs designed to reduce the

14   female inmate population.  The Master Plan for Female Offenders provides a

15   comprehensive strategy to address inmate housing both within the prison setting and the

16   community, cultural changes to staff and inmates intended to improve outcomes,

17   targeted training of staff, case management planning for offenders, assessment tools,

18   and enhanced community-based service delivery.  The impact on the female population

19   includes: increased Drug Treatment Furlough beds, Community Prisoner Mother

20   Program, Family Foundation Program, Female Offender Treatment and Employment

21   Program, Female Residential Multi Service Center, Female Rehabilitative Community

22   Correctional Centers, as well as the recently opened Leo Chesney Community

23   Correctional Facility Trauma-informed Substance Abuse Treatment Program.  All of

24   these programs have the effect of reducing crowding within the female prison population.

25          26.    In May 2007, I advised that upon legislative approval and funding, CDCR

26   would begin occupying 4,500 beds in Female Rehabilitation Community Correctional

27   Centers.  I have responsibility over these Female Rehabilitative Community Correctional

28   Centers as it is a component of Adult Operations.  It was projected the activation of

- 9 -

TRIAL AFFIDAVIT OF SCOTT KERNAN
(2:90-CV-00520 LKK JFM P) (C01-1351 TEH)

1659567.1

1  these beds would not only eliminate the use of non-traditional housing in female

2  institutions, but significantly reduce the prison capacity need for this population.

3         27.    The CDCR has been unable to activate any of the Female Rehabilitative

4  Community Correctional Centers beds to date due to limited interest in partnerships for

5  these facilities and, therefore, has been unable to eliminate the non-traditional beds in

6  our female facilities.  The Request for Proposal for the Female Rehabilitative Community

7  Correctional Centers' was released in July 2006.  The process resulted in only one

8  successful bid for a 75 bed facility in Bakersfield, which is projected to open February

9  2009.  The bid process was unsuccessful primarily due to vendor perception that

10  standard building lease terms were too limited to be profitable.  CDCR has revised the

11  Request for Proposal, addressed the standard lease term limitation with control

12  agencies, and released a second Request for Proposal for Female Rehabilitative

13  Community Correctional Centers on August 1, 2008.  The CDCR expects to award the

14  contracts in March 2009.

15         28.    As of August 2008, there were 732 female non-traditional beds activated

16  and CDCR projects to reduce this number to 0 by the end of 2008/09 fiscal year, if all

17  beds are awarded.  When the Female Rehabilitative Community Correctional Centers

18  are activated CDCR will evaluate the conversion of traditional female beds to the male

19  population, thereby further reducing male nontraditional beds.  A true and correct copy of

20  the Request for Proposal concerning Female Rehabilitative Community Correctional

21  Centers will be submitted as Defendants' Trial Exhibit No. 1265.  The Request for

22  Proposal is a record of CDCR setting forth activities of this agency.

23         29.    CDCR has made significant strides in developing programmatic changes to

24  the female population.  The Female Offender Programs and Services was established in

25  the 2005 reorganization of the Department.  CDCR also established the Gender

26  Responsive Strategies Commission.  This commission is comprised of representatives of

27  various disciplines with CDCR, community partners, nationally recognized experts on

28  female offenders, previously incarcerated individuals, family members of female

- 10 -

1   offenders, and other external stakeholders, including labor, the Little Hoover

2   Commission, and legislative representatives.  With the assistance of the Gender

3   Responsive Strategies Commission, the CDCR has targeted policies and programs that

4   emphasize gender responsive strategies intended to increase rehabilitative services and

5   reduce inmate population.

6   **E.    Improved Staffing and Recruitment Efforts**

7       30.    CDCR has made great strides in reducing staffing vacancies.  In May

8   2007, I estimated that there were over 2,000 custody staff vacancies, not considering

9   overtime related to medical transportation and access to care within the prisons.  CDCR

10  targeted recruitment and background/hiring processes and greatly reduced the number

11  of vacancies.  Approximately 4,000 cadets graduated from the correctional officer

12  academy since May 2007.  These correctional officer academy cadets will fill staff

13  vacancies.  Today, CDCR has eliminated nearly all officer vacancies within the prisons.

14          **IV.    RECEIVER'S EFFORTS TO IMPROVE HEALTH CARE**

15  **A.    Receiver's 10,000 Bed Program**

16      31.    Clark Kelso, the court-appointed Receiver in the *Plata* case, has developed

17  plans for the construction of approximately 10,000 additional mental/medical health

18  beds.  The impact of these beds on CDCR population is unknown, but if constructed will

19  likely result in increasing available beds within the prisons by more than 10,000.  Some

20  of the inmates in mental health and medical beds are single celled as a result of their

21  condition.  Moving these inmates to the newly-constructed beds will permit CDCR to

22  double cell the vacated medical/mental health beds.  The Receiver has also developed

23  plans for the construction of treatment and office space at existing prisons.  These plans

24  will address space deficiencies at existing prisons and were developed with the

25  assumption that the added space will support the current level of population.  No

26  assumption of reduced population or prisoner release was factored into these space

27  augmentations proposed by the Receiver.

28  ///

                            - 11 -

**B.    Improvements in Medical Care Delivery**

32.    The CDCR is working with the Receiver's Office in projecting future officer needs and evaluating the establishment of an additional academy in Southern California. CDCR is also working with the Receiver's Office to improve access to care and necessary resources within the prisons.  In the Fiscal Year 2007/2008 Budget Year the Receiver's Office added approximately 664 custody positions to various prisons to improve access to care.  In the Fiscal Year 2008/2009 Budget Act the Receiver received 1834.74 correctional officer positions.   The Receiver has also purchased or is pending the procurement and delivery of over 200 transportation vehicles to improve timely transportation of inmates to medical services.    CDCR maintains records and produces reports of established, filled and contracted medical positions.  These records and reports are made or updated at or near the time of the events at issue, and they are made by a person with knowledge of the matters addressed, or according to information provided by a person with knowledge of those matters.  These records and reports are made and kept in the course of regularly conducted business activity, as a regular practice.  True and correct copies of CDCR's medical staffing reports are marked as Defendants' Trial Exhibits Nos. 1263 and 1264.  This data is accurately compiled in Defendants' Trial Exhibit No. 1235.

33.    As summarized in Defendants' Trial Exhibit No. 1235, the Receiver's Office has made great strides in hiring medical personnel.  For example, from October 2003 to June 2008, the number of positions increased in the following positions: Chief Physicians and Surgeons (10 to 26), nurse practitioners (7 to 47), pharmacist technicians (66.98 to 176.12), registered nurses (769.05 to 1,591.24) and LVNs (4 to 953.69).

**V.    MENTAL HEALTH CARE DELIVERY ISSUES**

**A.    Custodial Involvement in Mental Health**

34.    The CDCR Division of Adult Institutions is involved in the delivery of mental health care services.  CDCR recognizes that provision of adequate mental health

- 12 -

1  requires the engagement of both the Division of Adult Institutions and the Division of

2  Correctional Health Care Services. Interdisciplinary teams of correctional officers and

3  clinicians involved in developing and implementing mental health care initiatives are

4  evident at the institutional level at every prison where such inmates are housed.

5    35. Correctional officers are in a unique position to observe and respond to

6  mentally ill inmates. Correctional officers literally see the mentally ill inmates in their

7  assigned areas on a daily basis, viewing behaviors that range from appropriate to

8  sometimes disturbing, such as self-mutilation or other gestures indicative of suicidal

9  intent. Because of their familiarity with these inmates, correctional officers have, in

10  recent years, been encouraged by a series of protocols to work with mental health

11  clinicians in the overall care of mentally ill inmates. In contrast to the mental health care

12  system of 1994, correctional officers now participate in Interdisciplinary Treatment Team

13  meetings with inmates' assigned clinicians to discuss the inmates' observed issues and

14  needs. Correctional staff serving as hearing officers of disciplinary matters receive

15  mental health assessments of the mentally ill inmates' condition and its link to

16  inappropriate behavior before determining any alleged violation of prison rules.

17    36. At the headquarters level, I have personally ensured that custody staff are

18  assigned to compliance roles on the *Coleman* case. In other words, three custody staff

19  (including an associate warden) are responsible for participating in the development of

20  responses to *Coleman* court orders that require correctional staff input. These staff

21  members have collaborated with the Special Master's team in developing the now court-

22  approved plan to reduce suicide trends in administrative segregation units. That plan

23  engenders the use of correctional officers to conduct welfare checks on inmates within

24  administrative segregation and to place inmates new to administrative segregation into

25  intake cells with greater observation opportunities. Further, in the same plan correctional

26  staff provided for third watch (evening) staffing of administrative segregation yards to

27  enable increased outdoor access for inmates. As additional small management yards

28  have been built, correctional officers have provided staffing to enable more outdoor

- 13 -

1 | access by inmates. In addition, the administrative segregation inmate may now use
2 | television and other electronic appliances for diversion. Lastly, and most importantly, the
3 | Division of Adult Institutions has focused on the double-celling of inmates, where
4 | possible, in administrative segregation units to reduce the opportunity for suicide.

5 |       37.    On June 4, 2007, CDCR issued a directive to the field providing specific
6 | direction regarding the participation of inmates with Security Housing Unit terms in
7 | Department of Mental Health Intermediate Care Facilities. A true and correct copy of
8 | this directive will be submitted as Exhibit 1271. The directive is a statement of CDCR
9 | setting forth the activities of this agency. This action permitted institutions to transfer
10 | inmates requiring this level of care directly to the Intermediate Care Facilities with the
11 | Security Housing Unit term in place. The receiving institution's classification committee,
12 | with input from clinical staff, would then address the inmate's Security Housing Unit term
13 | based upon current behavior and mental health status and determine appropriate level
14 | of programming within the Intermediate Care Facilities. Better utilization of these
15 | important clinical beds has resulted from this action.

16 |       38.    The change in attitude toward the mentally ill is most obvious in the
17 | mandate that correctional officers perform cardiopulmonary resuscitation upon inmates
18 | who have attempted suicide. For many years, such resuscitative efforts were not
19 | required and were often not done for fear of assault and/or disease. The Division of
20 | Adult Institutions took strong steps to ensure not only that every correctional officer
21 | received the mandated CPR training and CPR equipment, but also that every officer
22 | understood that CPR was mandated. Whenever an emergency response effort involves
23 | an inmate who may have benefited from CPR, the involved officer must provide a written
24 | explanation if CPR was not provided. That report is reviewed at the local and
25 | headquarters level, with appropriate corrective action taken when necessary.

26 |       39.    Hand in hand with the mandate for cardiopulmonary resuscitation is the
27 | voluntary moratorium on the videomonitoring of inmates at risk for suicide. For many
28 | years, technology was seen as an appropriate substitute for the human interaction of

1    one-to-one monitoring of inmates. Experience taught us that the in-person contact

2    involved in one-on-monitoring by a correctional officer or other staff member not only

3    reduces the risk of inadvertently overlooking certain behaviors but also allows for the

4    very human contact that can decrease suicidal impulses and behavior. The Division of

5    Adult Institutions continues to work towards decreasing the incidence of suicides in

6    administrative segregation areas and throughout the CDCR system.

7    **B.    Elimination of the "Four Points" Program for Mental Health Inmates.**

8          40.    The classification of the security risks posed by inmates in general and

9    mentally ill inmates in particular has been the subject of lengthy discussions with the

10   *Coleman* Special Master and Plaintiffs. Each inmate is given a certain number of

11   classification points based on certain factors, including commitment offense and gang

12   activities. For many years, an inmate diagnosed at intake into CDCR with a serious

13   mental disorder was given four classification points for that diagnosis. There was a

14   concern some inmates given those four classification points were disadvantaged in their

15   housing and/or programming because of those four points. After much consideration,

16   CDCR voluntarily removed the factor of serious mental illness from the classification

17   system. Specifically, on September 5, 2008, staff were directed to discontinue the four

18   point assessment at the reception centers, as well as remove the previously assessed

19   four points. Now, no points are given because a person has been diagnosed as serious

20   mentally ill. The points are based upon the objective factor of the inmate-patient's

21   behavior in conformance with the correctional setting. The removal of the four points is

22   being accomplished at either the inmate's initial classification, annual classification or

23   upon referral for transfer to another facility, whichever comes first.

24   **C.    Enhanced Training for Custodial Staff**

25         41.    Directed training regarding the elements of the Mental Health Services

26   Delivery System is provided to all staff. This training includes Mental Health Overview,

27   Recognizing Signs and Symptoms of Mental Illness, Crisis Intervention and Suicide

28   Prevention, and the department's Heat Plan for inmates in the Mental Health Services

- 15 -

TRIAL AFFIDAVIT OF SCOTT KERNAN
(2:90-CV-00520 LKK JFM P) (C01-1351 TEH)

1659567.1

1   Delivery System. The training is provided in an eight (8) hour block at the pre-

2   employment correctional officer Academy and to new Parole Agents. Additionally,

3   custody and support staff receive 4-hour training in New Employee Orientation at their

4   assigned institution/facility that provides an overview of the aforementioned content and

5   addresses the local operating procedures. Refresher training is provided on these topics

6   during annual training.

7       42.    All peace officers within the institutions receive certified training on Cardio

8   Pulmonary Resuscitation both at the Academy and bi-annually in the field. Staff receive

9   safety glasses, rubber gloves, a glove holder and a micro shield as standard equipment.

10  This equipment supplements other life-saving equipment available to on-site staff.

11      43.    The Department has implemented additional strategies to reduce the risk

12  of inmate suicides in Administrative Segregation Units. Staff has been directed to place

13  a sign on the cell door denoting the inmate's "in-take" status for the first three (3) weeks

14  of the inmate's arrival to the unit. This permits all staff to be aware of the inmate's

15  welfare. Moreover, custody staff is required to make documented welfare checks of the

16  inmate every 30 minutes. This attention to an inmate's initial placement in Administrative

17  Segregation Units is intended to ensure all disciplines are closely monitoring the

18  inmate's mental health status with the intended goal of reducing inmate suicide.

19  Additional strategies including regular medical emergency response drills on all watches

20  and documented review of inmate cases for inmates housed in Administrative

21  Segregation Units longer than 30 days are also mandated.

22              **VI.    SUMMARY**

23      44.    CDCR's significant progress in reducing overcrowding in its institutions has

24  been a result of the several programs and policies developed by the State of California.

25  These programs and policies, namely (1) the implementation of AB 900, (2) improved

26  staffing and recruitment efforts, (3) the development of The Master Plan for Female

27  Offenders: A Blueprint for Gender-Responsive Rehabilitation, (4) the implementation of

28  out-of state transfers, and (5) revised parole programs demonstrate that the State is

- 16 -

TRIAL AFFIDAVIT OF SCOTT KERNAN
(2:90-CV-00520 LKK JFM P) (C01-1351 TEH)

1659567.1

1  making progress in reducing overcrowding. As these programs continue to be

2  implemented and improved, overcrowding will continue to decline.

3      45.    Further, the Receiver has undertaken numerous efforts to improve the

4  delivery of medical care, including significant medical staffing and recruitment efforts.

5      46.    In addition, CDCR has improved the delivery of mental health care through

6  the improved training program for its correctional officers and the elimination of the "four

7  points" program.

8      I declare under penalty of perjury that the foregoing is true and correct and that

9  this Affidavit was executed on October 30, 2008, at Sacramento, California.

10

11                                    SCOTT KERNAN

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                            - 17 -

TRIAL AFFIDAVIT OF SCOTT KERNAN
(2:90-CV-00520 LKK JFM P) (C01-1351 TEH)

1659567.1