# EXHIBIT A

```
 1              IN THE UNITED STATES DISTRICT COURTS
           FOR THE EASTERN DISTRICT OF CALIFORNIA
 2           AND THE NORTHERN DISTRICT OF CALIFORNIA
       UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES
 3      PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

 4

 5   RALPH COLEMAN, et al.,

 6              Plaintiffs,
                            Case No. Civ S 90-0520 LKK-JFM P
 7   vs.

 8   ARNOLD SCHWARZENEGGER, et al.,

 9              Defendants.
     _____/
10
     MARCIANO PLATA, et al.,
11                              Case No. C01-1351 TEH
                Plaintiffs,
12
     vs.
13
     ARNOLD SCHWARZENEGGER, et al.,
14
                Defendants.
15   _____/

16

17              DEPOSITION OF IRA K. PACKER, Ph.D.

18

19   DATE:         October 3, 2008

20   TIME:         9:37 a.m.

21   LOCATION:     ROSEN, BIEN & GALVAN, LLP
                   315 Montgomery Street, Tenth Floor
22                 San Francisco, California  94104

23   REPORTED BY:  Katy Leonard
                   Certified Shorthand Reporter
24                 License Number 11599

25
```

Page 1

1          I believe some of the documents did address

2     that, but I -- again, I think Ms. Bataille's perhaps, or

3     Dr. Gilligan's, but, no, I didn't personally go out

4     there and examine what's going on in the community

5     system.

6          Q.   Okay.

7               Are you aware that additional resources have

8     been provided by the State of California for mental

9     health services parolees in the last few years?

10         A.   In some of the documents that I read

11    recently -- I believe that might have even been since

12    the report -- I did have a chance to review documents

13    about both increasing the level of services, as well as

14    changing some of the procedures.

15              I actually just read some the other day about

16    issues about trying to get people into mental health --

17    get them hospitalized, I believe, rather than send them

18    back to the prison.

19         Q.   Okay.

20         A.   And issues about no longer having site

21    returns, so to speak -- returning someone to prison

22    simply because they need psychiatric care.

23              So, I have seen some of those documents.

24         Q.   Okay.

25              In your opinion, California could do a better

1    job on prerelease planning and coordination between

2    community mental health services and the prisons than

3    it's doing now; is that correct?

4         MS. TILLMAN:  I'm sorry.

5         What was that?

6    BY MR. BIEN:

7         Q.  Is it your opinion, Doctor, that California

8    could do a better job in, for example, prerelease

9    planning for prisoners being discharged from prison?

10        A.  Absolutely, yes.

11        Q.  And you saw areas -- I know you've commented

12   in your report where there was programs under way, but

13   is it your opinion that those programs could be

14   improved?

15        A.  Yes, it is.

16        Q.  Okay.

17        And is it also your opinion from --

18   whatever -- relying on these other reports -- Petersilia

19   and other ones that you reviewed -- that improvements

20   could also be made in community mental health services

21   in California that might reduce recidivism in, for

22   example, parole violators?

23        MS. TILLMAN:  I'm going to object to the

24   extent it possibly goes beyond this expert's opinion

25   regarding recidivism.  I don't think that was something

Page 88

1    he was designated on, but to the extent you can answer,

2    please respond to the question as best you can.

3            THE WITNESS:  I specifically was addressing

4    the impact on mentally ill individuals.

5            I know there's other documents that I was

6    asked to review, and some of them I reviewed more fully

7    than others about the general discussions about the

8    recidivism rate in the prisons.  I did not focus on

9    that, because my issue was simply the impact on the

10   Coleman class for mentally ill individuals.

11           And within that context, yes, from what I've

12   seen, the data support the contention that the level of

13   services that many of these individuals get when they

14   return to the community are not adequate, and, you know,

15   the proof is in the pudding.  They're coming back at

16   extraordinarily high rates, I think.

17           And at CIM, when I was there, they were

18   telling me that the rate of return is -- you know,

19   two-thirds to 80 percent of their admissions were

20   returnees, and many of them were mentally ill.

21           MR. BIEN:  Okay.

22   BY MR. BIEN:

23       Q.  So, it's your opinion that if there are

24   improvements made in the mental health services provided

25   to parolees, there may be an ability to reduce returns

Page 89

1    to prisons of mentally ill prisoners?

2        A.    That's correct.

3        Q.    Okay.

4            Would you also agree that to address that

5    problem -- have you ever heard the word "churning" used

6    in any of the --

7        A.    Yes.

8        Q.    Okay.

9            What do you understand that to mean?

10        A.    I believe they just meant they're sort of

11    just, like, churning, going around and around. These

12    people go back in the community; they get sent back to

13    prison; they get released again without adequate

14    services; they go back out, et cetera, et cetera.

15        Q.    Okay.

16            And is it also correct that you expressed an

17    opinion that, in your mind, overcrowding was the primary

18    cause of constitutional violations in the Reception

19    Centers in California?

20            MS. TILLMAN:    Objection.    Again, it calls for

21    a legal conclusion.    And I'm not sure what you mean by

22    "constitutional violations," so it's vague and

23    ambiguous.

24            THE WITNESS:    As you notice, I avoided, in my

25    opinions, any use of the term saying something was

Page 90

```
1            Well, sure, I mean, if one of the phenomenons
2    that's happening here is people are being released from
3    prison, go out to parole, are not getting adequate
4    treatment, and they come right back in again, well,
5    then, obviously, if you now return even more people to
6    the community with the same problems, and, in fact,
7    maybe enhanced problems -- because if you're pushing
8    people out, there's a good chance that there's less time
9    for them to get the full array of discharge planning --
10   this whole churning process just becomes exacerbated.
11           So, what I meant by that is, if you keep
12   sending people out, especially mentally ill individuals
13   who are not getting adequate services -- and the
14   recidivism rate that I'm reading here is extraordinary.
15   I believe Dr. Bataille mentioned 60-something percent.
16   I'm not sure if that's the exact number, but it was a
17   very high number. So, it would be at least that much,
18   probably even higher -- well, then they go back into the
19   system again.
20           And it's not clear how that has resolved
21   anything. You're back in again and back to where you
22   started form, and maybe even in worse shape.
23       Q.  What if the prisoner release order required a
24   diversion of prisoners from the system?
25           Wouldn't that assist --
```

Page 94

1      Q.   Acute patients, both at Vacaville and Salinas

2  Valley.   The ICF patients.

3      A.   I can't say that I recall that --

4      Q.   Okay.

5      A.   -- off the top of my head.

6      Q.   Okay.

7           At the bottom of page 21, you state that a

8  prisoner release would not remedy the problems in the

9  Reception Centers, and would likely exacerbate the

10 problems.

11          What is your basis for that, Doctor?

12     A.   Well, I think I explained it in the following

13 sentences, that -- again, what I was getting out with

14 the Reception Centers is that the acuity level of

15 individuals coming into that system was really high, and

16 a high percentage of people coming into that system had

17 serious mental health problems.

18          A lot of them were unstable, unmedicated

19 coming right in the door.   That made it difficult to

20 both provide adequate resources right off the bat in

21 terms of finding adequate -- an adequate number of

22 crisis beds, for example.   And also, it took a while to

23 stabilize them, often resulting in them being stabilized

24 just in time to be sent out, and then returning all over

25 again in the churning process.

Page 280

1          So, the concern would be that if you release

2     these individuals before they have a good opportunity to

3     have adequate discharge planning and good resources

4     available in the community, they're just going to return

5     at at least the high recidivism rate that we have right

6     now, and mostly likely even higher.

7          So, you haven't really accomplished much.

8     You're actually just creating more work and forcing more

9     of your resources to go into stabilizing these same

10    individuals over and over and over again.

11         And furthermore, any discharge of these

12    mentally ill individuals does require a significant

13    amount of time to work on adequate discharge planning.

14    So, that's what I meant by this whole issue of just

15    discharging people is not likely to solve the problem of

16    this churning at the Reception Centers.

17    Q.   The problem of churning at the Reception

18    Centers is going on right now; is that correct?

19    A.   That's correct.

20    Q.   Okay.

21         And every day, the system releases EOP

22    prisoners and triple C-MS prisoners in the manner you're

23    talking about -- without adequate discharge planning and

24    without community services.

25    A.   Without adequate community services, yes.

Page 281

1        Q.   Okay.

2             And one of the reasons that happens is that

3    overcrowding is impacting the Reception Centers; is that

4    correct?

5             MS. TILLMAN:  Objection.  Vague and ambiguous.

6             THE WITNESS:  Well, I -- actually, part of the

7    problem, by the way, is, as I said earlier this morning,

8    using the words "crowding, overcrowding," et cetera.

9    So, let me be more specific.

10            It's not overcrowding in the sense that there

11   are too many people in too small a space.  It's not

12   crowding in the sense that there are too many people for

13   the facility.

14            The problem is that there are both too many

15   mentally ill and their level of acuity is too high, and

16   they're being sent back into the Reception Centers.  And

17   in my opinion, that's the biggest part of the problem.

18   And releasing people will just increase that number and

19   just start this process all over again.

20            So, it's not the overcrowding in those

21   facilities in the real technical sense of the word.

22   It's the fact that the -- they're having to deal with

23   too many acute and too high acuity inmates being

24   returned to their system, because the community

25   resources are not adequate.  And this will just

Page 282

1    exacerbate the problem.

2    BY MR. BIEN:

3        Q    Let's assume --

4        A.    They're being released today, and that's not

5    working.  So, releasing more of them is not going to

6    make it work.

7        Q.    If you released a hundred people, who were

8    mentally ill from this population, and assume the same

9    recidivism rate, fewer than a hundred are going to come

10   back within the year; right?

11            MS. TILLMAN:    Objection.  Vague and ambiguous.

12   Calls for speculation.  Incomplete hypothetical.

13            THE WITNESS:    Well, first of all, looking at

14   the data -- and, again, from, I think, both Dr. Gilligan

15   and Ms. Bataille, I believe they were talking about

16   rates of recidivism for mentally ill people being in the

17   65, 70 -- it was a very high number.

18            So, you might be saving a little bit, but

19   you're not saving very much.  And in return for that,

20   you're having to process them back in again, and in some

21   ways, that's a much higher intensity and higher cost of

22   resources.

23            Every time they come back in the door, the

24   amount of effort and resource you have to put in to

25   working with them again is way more than it was when

                                            Page 283

```
 1   they stayed in for a little longer.

 2           And that's why I'm saying this process doesn't

 3   make sense to me.  They're sending these people out,

 4   bringing them right back, doing all this intense work on

 5   the front end, and they're sending them back out again.

 6   That's what I mean when I talk about the -- I think they

 7   used the word "crowding" or -- and I do think it's a

 8   problem, the use of these words.

 9           What I'm really talking about is that whole

10   process doesn't make any sense.  It really doesn't help

11   these inmates, because nothing -- in the long run, all

12   they're doing is cycling back and forth from lack of

13   resources in the community, to being in a prison for a

14   few months, and then back out again; and that my opinion

15   is that discharging more of these kinds of people is not

16   going to be helpful.

17           And my suggestion in all this was simply

18   saying, I think the effort should be put in to keeping

19   them out of prison in the first place, and any efforts

20   that can be put into that are much more desirable.  And

21   that's what I meant by this whole section on the

22   Reception Centers.

23           MR. BIEN:  Okay.

24   BY MR. BIEN:

25       Q.  So, you would agree that programs that would
```

Page 284

1    that it focused on both discharge planning, although I

2    do want to be specific here.  My issue is not simply

3    that people are doing the discharge planning.  I think

4    that's the easiest part of the problem to deal with, and

5    the part where I think they're doing better.

6            The problem is making sure that the resources

7    are available in the community to follow-up on what

8    these people really need.

9            And I'm talking particularly about the

10   parolees, although, you know, I think the same issue

11   would emerge for people being outright discharged, but

12   parolees is more of an issue, because they have an

13   ongoing responsibility to manage them.

14           MR. BIEN:  Let's see how far I can get on your

15   report No. 7 here, Exhibit 10.

16           Let me just mark this now.

17           (Whereupon Plaintiffs' Exhibit 14

18            was marked for identification.)

19           MR. BIEN:  I'd like to mark as the next

20   exhibit, 14, a report from the Division of Adult Parole

21   Operations on the "Mentally Ill Parolee Population,"

22   dated March 28th, 2008.

23           Just for the record, this was produced to us

24   yesterday in connection with Dr. Packer's October 1,

25   2008 report from the Attorney General's Office.

Page 301

```
 1    BY MR. BIEN:

 2        Q.  Dr. Packer, is this a -- Exhibit 14 a report

 3    that you reviewed in connection with preparing your

 4    October 1 report?

 5        A.  Um, well, when you say "in connection with," I

 6    believe I reviewed this after I wrote my October 1

 7    report.

 8        Q.  Okay.

 9            Did you understand that Gale Bataille referred

10    to this report in her report?

11        A.  Yes.

12            That's why the Attorney General's Office sent

13    this to me, because it was in her report.  But I didn't

14    have access to what she was referring to.

15        Q.  Okay.

16            So, when you wrote your report, you relied on

17    the four items that you have listed here on the first

18    page of Exhibit 10?

19        A.  That's correct.

20        Q.  Okay.

21            You've now been asked to express an opinion

22    about the risk of violence in mentally ill offenders; is

23    that correct?

24            MS. TILLMAN:  I'm going to object.  I think

25    you already saw the initial designation for this
```

Page 302

1   witness.  It didn't specifically say "risk of violence,"

2   so I'd just ask the record reflect that you've got the

3   designation for this witness that indicates what he was

4   testifying on.

5         Go ahead and answer the question, if you

6   understand it.

7         MR. BIEN:  Are you guys amending that or

8   trying to change it?

9         It doesn't say that.  I assume what you guys

10  are trying to do is add another category for him, and

11  I'm trying to ask about that.

12        MS. TILLMAN:  I think what we're saying is

13  that we've designated him on the issue of the impact of

14  a prisoner release order, and one impact might be risk

15  of violence.  And that's why you see this addendum

16  report.

17        MR. BIEN:  Okay.

18        We can fight about that later, if we need to.

19        THE WITNESS:  I want to be clear.  That's not

20  accurate.  I was not asked to give an opinion on the

21  risk of violence of mentally ill offenders.

22        I was asked to address specifically the issue

23  of the potential impact of an expedited release of

24  Coleman class members.

25        In doing that, I reviewed these four reports

Page 303

```
1    and offered opinions on two issues that underlie that

2    concept, and one is the risk of violence among mentally

3    ill offenders and the issue of discharge planning for

4    mentally ill offenders.

5              MR. BIEN:  Okay.

6    BY MR. BIEN:

7         Q.  So, you were asked to -- why don't you tell me

8    what you were asked to offer an opinion about.

9         A.  On the issue of the impact of potential -- the

10   potential impact of an expedited release of Coleman

11   class members.

12        Q.  Okay.

13             Impact on who and what?

14        A.  I believe, on risk to the community and to the

15   individuals.

16        Q.  Which individuals?

17        A.  The Coleman class members themselves, as well

18   as to members the community.

19        Q.  Okay.

20             And what work did you undertake to prepare

21   this additional opinion?

22        A.  Well, in addition to reviewing all the

23   previous information -- and this reformed some of my

24   thinking about this process from the beginning -- I

25   specifically reviewed these four documents:  The reports
```

Page 304

1    of Dr. Gilligan and Ms. Bataille.  And then each one of

2    them wrote a rebuttal report, so I read those as well.

3            So, those were the additional materials in

4    addition to all of the information that I had, and my

5    previous experience relative to this area.

6        Q.  Okay.

7            And why didn't you provide this information in

8    your August 15th report?

9        A.  My understanding, when I was first retained,

10   was that they were asking -- that the case had been

11   separated into a Phase I and Phase II, and I was

12   specifically asked to limit my reports to Phase I.  And

13   it was only very recently that I was asked to include

14   Phase II, since I was told that the two phases would be

15   combined into one trial.

16       Q.  Okay.

17           But you discussed in your reports that we've

18   been discussing all day, all sorts of things about

19   prisoner release.  And we've just been talking about

20   community mental health and parole services and all

21   sorts of things.

22           So, why didn't you include this opinion in

23   your reports?

24           MS. TILLMAN:  Objection.  Asked and answered.

25   Argumentative.

Golden Gate Reporting

```
 1              THE WITNESS:  My answer again is very simple.

 2    I was asked to specifically address Phase I and not

 3    necessarily to add on any information relevant to Phase

 4    II.

 5              MR. BIEN:  Okay.

 6    BY MR. BIEN:

 7         Q.  Your first point in the first part of your new

 8    report is -- has to do with risk of violence of mentally

 9    ill offenders.  And your first sentence is:

10              "I agree that the research literature does

11              not suggest that mentally ill offenders pose a

12              higher risk of violence than their nonmentally

13              ill counterparts."

14         Is that still your opinion today, which is a

15    whole two days later?

16         A.  Yes, it is.

17         Q.  Okay.

18         And you cite to the study by Teplin, Abram,

19    and McClelland, which is footnote 1.

20              MR. BIEN:  Can we mark that as Exhibit 15,

21    please?

22              (Whereupon Plaintiffs' Exhibit 15

23               was marked for identification.)

24              MR. BIEN:  Okay.

25    BY MR. BIEN:
```

Page 306

1          Q.   How did you come to select this study,

2    Dr. Packer, to use in this report?

3          A.   This is a study that I've been familiar with

4    for sometime, and as I was writing this, to be frank,

5    very quickly, I started thinking, What did I know about

6    the research literature.  I didn't have time to do a lit

7    search, because, literally, this was, like, two days

8    ago.

9               And I remembered this article -- an article by

10   Teplin and colleagues that specifically addressed it,

11   because at one point, I had done some research on

12   jail -- mental illness in jails and houses of

13   correction.  So, I remembered an article by Teplin, et

14   al., and I just found it and referenced it.

15         Q.   If you look at page 340 of Exhibit 15, the

16   Teplin article -- I'm looking at the -- on the right

17   side of the page, the paragraph beginning with, "Because

18   our sample[...]"

19              Do you see that paragraph, Doctor?

20         A.   Right.

21         Q.   Okay.  The second sentence says, quote:

22              Nevertheless, our major finding -- that

23              psychiatric disorder was irrelevant to the

24              probability of arrest for violent crime after

25              release -- has important public policy

Page 307

```
 1                implications for traditional decision making.

 2                Mental disorder alone is not a meaningful

 3                variable when deciding who should be released

 4                before trial or given probation.

 5                Do you agree with that conclusion of this

 6      article?

 7           A.   Yes, I do.

 8           Q.   Is it correct that you have no additional

 9      information about the community mental health service

10      delivery system in California, other than what you

11      learned from Ms. Bataille's report?

12           A.   Say that again.

13                I don't have any --

14           Q.   In other words, your opinion is based on

15      Ms. Bataille's report?

16                You didn't do an independent --

17           A.   My opinion about what?

18           Q.   Community mental health services in

19      California.

20           A.   Well, it's mostly based on her report.  It's

21      also based on some of the information I gleaned from my

22      interviews at the prisons when people were telling me

23      about the issues in terms of providing discharge

24      planning and the difficulties they were facing.

25           Q.   Okay.
```

Page 308

```
 1              But you didn't do any independent evaluation

 2    of community mental health services or parole mental

 3    health services?

 4         A.   No, I did not.

 5         Q.   Okay.

 6              On page 3 of your report, the last page, the

 7    paragraph above the summary, are you aware that

 8    prisoners in California prisons have access to alcohol

 9    and drugs?

10         A.   And that's why I very carefully wrote the

11    sentence the way I did, if you notice.  I believe I

12    actually spent a little bit of time thinking how to

13    phrase this.  I believe I said they do not have "the"

14    access to alcohol that they have in the community.  I

15    didn't say they don't have access, because I am aware.

16    I've worked in prisons.  But it's not quite as easy and

17    plentiful.

18              And I mean that very seriously, in that I do

19    understand that's a problem in the prisons, but it's not

20    quite the same.  In the community, they're able to get

21    large quantities, and they decompensate very quickly.

22         Q.   Okay.

23              Would you also agree that -- that there's a

24    certain portion of the mental health population that

25    might do better merely by being out of prison and in a
```

Page 309

1    nonprison environment?

2         A.   Yes.

3         Q.   Okay.

4              In your summary -- well, let me ask you, what

5    were you assuming when you used the term, "expedited

6    release of Coleman class prisoners"?

7         A.   My understanding of that was simply some

8    process where, rather than serving their sentences,

9    their sentences were truncated at some point, and they

10   would be released to the community more rapidly than

11   they would have otherwise been released.

12        Q.   Okay.

13             Do you have in mind how -- how many Coleman

14   class prisoners and how rapidly they would be -- you

15   were contemplating?

16             Would it be one or --

17        A.   One what?

18        Q.   One prisoner released in one day, or 50 over a

19   month, or a hundred over two months?

20             I mean, what is the -- what did you mean by

21   "expedited"?

22        A.   No.

23             I meant expedited relevant to each individual.

24   What I mean over here is for any individual Coleman

25   class member.  If that person -- and it's just very

Page 310

1    carefully worded here, so I want to be clear about that.

2            If a mentally ill prisoner were released

3    earlier than had been anticipated, and if that were done

4    without appropriate discharge planning and without the

5    services available in the community, then that

6    individual person would be an increased risk.  That's

7    all I meant.

8            I'm not saying each individual, that will

9    apply to.  And the more individuals that are released,

10    it's proportionate.

11            I'm not commenting here on how many would need

12    to be released for this to happen.  I'm talking about,

13    what is the risk for any individual, and then you

14    multiply that by the number released.

15        Q.  So, do you believe that the Coleman class

16    would benefit right now if they stopped releasing them

17    from prison on the schedule they're currently on?

18            MS. TILLMAN:  Objection.  Vague and ambiguous.

19    Calls for speculation.  Incomplete hypothetical.

20    BY MR. BIEN:

21        Q.  You understand, Doctor --

22        A.  I don't understand the question.

23        Q.  -- that every day, Coleman class members are

24    released from prison right now?

25        A.  Yes, I do.

Page 311

1            And according to the data I'm looking at,

2    70-something percent of them are coming right back in

3    the door.  I mean, the document that you just showed me

4    is -- I have seen this, and the recidivism rate is --

5    what?

6        Q.   Okay.

7             You're looking at --

8        A.   75, 77 percent.

9             MS. TILLMAN:  That's Exhibit 14?

10            MR. BIEN:  Page 4.

11            THE WITNESS:  Exhibit 14, page 4, from the

12   Division of Adult Parole Operations.  And what it's

13   showing me is that the recidivism rate -- I'm not quite

14   sure.  I don't understand quite the difference between

15   these columns.  So, it's anywhere between 69 and 75

16   percent for EOP, and 67 and 77 percent for triple Cs,

17   according to this.  I don't quite get these two columns,

18   but it's a very high number.

19            MR. BIEN:  Okay.

20            THE WITNESS:  So, yes, they're being released,

21   and they're coming right back in again.

22   BY MR. BIEN:

23       Q.   So, would it be preferable if we didn't

24   release any of them?

25       A.   What is "preferable"?

                                                  Page 312

1          I don't know what you mean by "preferable."

2      Q.   Would that reduce the risk to them and the

3  community under your hypothesis?

4      A.   Well, it's not preferable in the sense that if

5  their sentence is up and they're being paroled.   You

6  can't say to them, "You can't go out."  So, I can't see

7  any mechanism that would allow that.

8          I do say that the current system is not

9  working for them.   It's clearly not working for them.

10  I'm not saying don't do it, because legally, how can you

11  not do it, but this is clearly not working for them.

12     Q.   Let's just assume that one of the options

13  would be that you could extend someone's stay, for

14  example, with a civil commitment or something like that.

15          Do you think that would be preferable to

16  extend their stay in prison, rather than release them

17  into the community?

18          MS. TILLMAN:  Objection.  Calls for

19  speculation.  Incomplete hypothetical.  Assumes facts

20  not in evidence.  And possibly calls for a legal

21  conclusion.

22          If you understand the question...

23          THE WITNESS:  Well, the only thing I can give

24  you is an analogy to what happened in our system in

25  Massachusetts, which is, we do extend stays of prisoners

Page 313

1   when they complete their sentences, if they meet civil

2   commitment criteria.  If they don't, no, we don't.  And

3   I don't see any mechanism to suggest anything along

4   those lines.

5           If somebody, the day they're leaving prison,

6   is so acutely mentally ill where we think he or·she

7   poses a risk of harm, then indeed, we do civilly commit

8   them.  And I would recommend doing something similar

9   here.

10          I wouldn't recommend keeping them in prison.

11  I would recommend putting them in a hospital, if you

12  think they're that level.  If they're not, there's no

13  mechanism.

14          And I can't think of any method that would

15  allow you to keep them, even if it does mean, well,

16  they're just going to go back in the streets and come

17  back again.  That's just the nature of it.

18          MR. BIEN:  Okay.

19  BY MR. BIEN:

20      Q.  Are you aware that California does have -- I

21  assume you know -- some sort of civil commitment laws?

22      A.  Yes, I do.

23      Q.  Okay.

24          And so that one way that could be used to deal

25  with a prisoner who is paroling, who needs

Page 314

1    hospitalization or otherwise, would be to utilize those

2    laws?

3            MS. TILLMAN:  I'm going to object.  Incomplete

4    hypothetical.  Calls for a legal conclusion.  Kind of

5    vague.

6            THE WITNESS:  Let me just say, I can't fully

7    address that, but I will tell you that I did ask that

8    question at each of the sites.

9            I said, "Do you have some mechanism for doing

10   that?"  And I got a lot of, "No, we can't do that."

11   They had the mentally disordered offender, but

12   apparently, that covers very few of these people.  So,

13   that's one answer.

14           The second answer is, I don't think most of

15   these people likely require inpatient hospitalization

16   the day they're leaving the hospital.  That's why I gave

17   the analogy to our situation in Massachusetts.  They're

18   stable enough for the time being.

19           The problem is, they get out, stop taking

20   their medications, enter stressful situations, maybe

21   abuse substances, and they fall apart and come right

22   back in.

23           So, they're not committable the day they're

24   leaving, but once they engage in these behaviors, they

25   become high risk, both to themselves and others.  And

Page 315

1    that's what I'm getting at with this issue.

2           MR. BIEN:   Okay.

3    BY MR. BIEN:

4      Q.  And that's the current status; right?

5          That's the status quo?

6      A.  Yes.

7      Q.  Okay.

8          And one way to -- would you agree that it

9    would improve for both the community and for the Coleman

10   class in the prisons if something was done to interrupt

11   this churning -- interrupt the status quo?

12          MS. TILLMAN:   I'm going to object.   Incomplete

13   hypothetical.   Vague and ambiguous.   Calls for

14   speculation.

15          MR. BIEN:   I'm going to give him more detail.

16   I'm just asking for the first step.

17          THE WITNESS:   And just to be clear, I think

18   that's what I was trying to get at in my report.   Not

19   just this one, but in the previous report, when I

20   discussed the problem with the Reception Centers.

21          And I, again, may not have articulated it

22   clearly, but my opinion is absolutely that the greatest

23   bang for the buck regarding these kinds of people is to

24   focus on servicing them in the community so they don't

25   come back into the system.

                                              Page 316

1.         And that's where I think the efforts need to

2    be made.  And that's what I was getting at when I said,

3    Well, rather than a prisoner release, do this, and why I

4    was saying that the biggest problem in Reception Centers

5    was this whole issue of churning.

6         So, yes, I agree with that a hundred percent,

7    and, if appropriate, services are available in the

8    community, I think this would be a very effective

9    strategy.

10        MR. BIEN:  Okay.

11     Q.  Is it correct, Doctor, that Massachusetts is

12   doing significantly better with its mentally ill

13   parolees in terms of recidivism rate than California is

14   currently?

15     A.  I actually don't know the data.

16     Q.  Okay.

17        I don't really have time to dig it all out.  I

18   took it offline.

19        Would it surprise you that the recidivism rate

20   was lower than 75 percent for mentally ill parolees in

21   Massachusetts?

22     A.  No, it wouldn't surprise me.

23        I just -- I, frankly, don't have any

24   information about the data from Massachusetts.

25     Q.  Okay.

Page 317

```
 1            So, as far as you know, the programs in
 2   Massachusetts have not succeeded at all?
 3        A.   I'm just telling you, I don't have the data.
 4            MS. TILLMAN:  He's answered the question,
 5   Counsel.
 6            THE WITNESS:  I don't have the data.
 7            And the programs I described, by the way,
 8   don't necessarily focus on parolees, just to be clear.
 9   The program that I told you that I started that's been
10   going, did not focus on parolees per se.  It was all
11   mentally ill people being discharged from the prisons.
12   And as I said, I don't know the recidivism data for
13   those people.
14            MR. BIEN:  Okay.
15   BY MR. BIEN:
16        Q.   But it's your belief that programs could be
17   implemented in California that they can't guarantee
18   might have a positive effect on public safety and mental
19   health services for this population?
20            MS. TILLMAN:  Objection.  Vague and ambiguous.
21            THE WITNESS:  All I'm saying is, if
22   appropriate services are in place -- and this is
23   something that, I think, is agreed on by all the
24   experts -- reading Dr. Gilligan's report and
25   Ms. Bataille's report -- and I am agreeing with them.
```

Page 318

1   They have identified the elements that need to be in

2   place -- if such elements were in place, it's likely

3   that that would be effective.

4         I don't think any of us could point to

5   specifically, but if you extrapolate a bit from data we

6   know about the effects of treatment in the community,

7   and if you even look at the data from this document on

8   page 4, that, obviously, those parolees who are -- have

9   contact with the POCs, there's some improvement.

10        I mean, it's not dramatic, but it's pretty

11  decent.  At least something.  And that's the POCs, which

12  I understand are of limited value, based on input from

13  both inmates and clinicians.

14        But if you had more extensive services, I

15  think it's a reasonable expectation that it would reduce

16  the rate of recidivism and the rate of violence and the

17  rate of self-injurious behavior.

18        MR. BIEN:  Okay.

19  BY MR. BIEN:

20    Q.  Is it also correct that no matter what

21  services are in place, certain people are going to

22  commit crimes in society?

23    A.  Absolutely.

24    Q.  Okay.

25        And no matter what mental services are

Page 319

```
 1    provided for the Coleman class upon release, a certain

 2    number of them are going to recidivate?

 3              MS. TILLMAN:  Objection.  Vague and ambiguous.

 4              THE WITNESS:  When you say "a certain number,"

 5    I mean, I think that's sort of what the whole issue is

 6    here, as to whether or not that number can be reduced

 7    somehow.  Yes.

 8              I mean, it's not going to be zero.  No one is

 9    making those kind of ridiculous claims that it would be

10    zero.

11              The question is, if you put services in place,

12    would that reduce the recidivism rate, violence rate,

13    the self-injurious rate.  And I think the best answer to

14    that is that based on everything we know, that has a

15    reasonable chance of success.

16              MR. BIEN:  Okay.

17    BY MR. BIEN:

18        Q.  But there will still be a risk to public

19    safety from even one person getting out a day earlier;

20    is that your --

21              MS. TILLMAN:  Objection.  This is getting to

22    be the point where you've asked that and he's answered

23    it four times now.  It's also vague and overly

24    simplistic.  Incomplete hypothetical.

25              THE WITNESS:  Let me just sort of answer it
```

Page 320

**Golden Gate Reporting**

```
1    this way:  Risk is a continuum.  Nobody is zero risk;
2    nobody is a hundred percent risk.  We're all on some
3    risk continuum.
4            And all I'm saying is -- and I think this is,
5    frankly, not contested by any of the experts there --
6    that the more of these services you have in place, the
7    more of the elements of this kind of system you have in
8    place, the greater likelihood that you're going to
9    reduce the risk.  That's all I'm saying.
10           It's never going to be zero.  You're always
11   going to have to understand that there's a certain
12   amount of risk, and people leave prisons every day and
13   they leave hospitals every day and bad things happen,
14   but the only thing we really can impact is, can we
15   reduce the risk.
16           And I believe that Ms. Bataille, Dr. Gilligan,
17   and I are all saying the same thing -- that if you put
18   these elements in place, the risk can be reduced.
19   BY MR. BIEN:
20       Q.  You referred, in various of your reports, to
21   Dr. Petersilia's declaration as one of the things
22   that -- do you know who she is, and that she was Chair
23   of the Expert Panel?
24       A.  Yes, I do.
25       Q.  Okay.
```

Page 321

```
 1              And did you have a chance to review the Expert
 2    Panel Report?
 3         A.  I'm not sure which one that is.  It's listed
 4    on my -- it might have been called something else here,
 5    so, I don't know what it is.  But I did review something
 6    from Dr. Petersilia that I documented here.
 7              MS. TILLMAN:  I think it was a declaration.
 8              MR. BIEN:  I'm not sure if it was the Expert
 9    Panel Report or not.
10              THE WITNESS:  I'm not sure I see that here.
11              MS. TILLMAN:  I don't know that we did.
12              MR. BIEN:  Okay.
13              Don't worry about it.  I'll move on to
14    something else.  Just about wrapped.
15    BY MR. BIEN:
16         Q.  I noted, just in going over the documents that
17    you've used that you reviewed, Dr. Haney's book that he
18    published on -- one of his books; is that correct?
19         A.  Yes.  One of his books.
20         Q.  Okay.
21              And you actually sent the AG's office two
22    chapters.
23         A.  Two chapters, yes.
24         Q.  Okay.
25              Do you have an opinion about Dr. Haney's
```

Page 322

1    research that's reflected in his book and his

2    conclusions about overcrowding in the prisons?

3         A.   I just need to qualify this by saying, this is

4    my recollection, since I haven't read it in quite a few

5    months.

6             My recollection of what he was getting at was

7    a much more philosophical, conceptual understanding of

8    the impact of overcrowding per se of prisons.  It wasn't

9    talking about specific, and it wasn't talking about

10   these kinds of situations.

11            But he was looking at the -- looking at the

12   literature and the theories about the extent to which

13   prison overcrowding, not just in California, but across

14   the country, has resulted in a change in the mind-set of

15   correctional institutions, which he thinks has led to a

16   lot of the other problems that plague systems.

17            And then there was a specific section on how

18   it impacts the more fragile, vulnerable populations.

19            So, in some sense, it's very conceptual and

20   theoretical, and I think it's a reasonable approach to

21   looking at things.

22            I think it doesn't quite address what we're

23   talking about here, which is simply not, was it the, you

24   know, sort of bedrock back when, which changed the whole

25   way the prisons have adapted, as opposed to -- but right

Page 323

1    now, is this specific overcrowding impacting it, because

2    even in his model, some prisons that are currently not

3    overcrowded have really changed their whole model of

4    service based on sort of their reaction to the problems

5    caused by overcrowding.

6            So, that's what I can say at this point about

7    his book.

8        Q.  Have you ever conducted any empirical study of

9    the effects of overcrowding on a prisoner in jail?

10       A.  No, I have not.

11       Q.  Have you ever published any articles about

12   overcrowding?

13       A.  No, I have not.

14           MR. BIEN:  Let's call it over, unless you have

15   some questions.

16           MS. TILLMAN:  Just real a quick follow-up.

17

18

19           EXAMINATION BY COUNSEL FOR THE DEFENDANTS

20

21   BY MS. TILLMAN:

22       Q.  I'm looking at Exhibit 15, which is

23   the article, "Does Psychiatric Disorder Predict Violent

24   Crime Among Released Jail Detainees."

25           Do you have that in front of you?

1            CERTIFICATION OF DEPOSITION OFFICER

2

3            I, KATY LEONARD, duly authorized to administer

4    oaths pursuant to Section 2093(b) of the California

5    Code of Civil Procedure, hereby certify that the

6    witness in the foregoing deposition was by me sworn to

7    testify to the truth, the whole truth and nothing but

8    the truth in the within-entitled cause; that said

9    deposition was taken at the time and place therein

10   stated; that the testimony of the said witness was

11   thereafter transcribed by means of computer-aided

12   transcription; that the foregoing is a full, complete

13   and true record of said testimony; and that the witness

14   was given an opportunity to read and correct said

15   deposition and to subscribe the same.

16           I further certify that I am not of counsel or

17   attorney for either or any of the parties in the

18   foregoing deposition and caption named, or in any way

19   interested in the outcome of this cause named in said

20   caption.

21

22

23

24   _____

25           KATY LEONARD, CSR 11599

                                          Page 328