# EXHIBIT A

# IRA K. PACKER, Ph.D.

### Forensic Consultation and Training

Board Certified in Forensic Psychology, ABPP

P.O. Box 469

Sharon, MA 02067

781-864-2899

### Expert Report re: Coleman et al. v. Schwarzenegger et al.

Ira K. Packer, Ph.D., ABPP (Forensic),

December 10, 2007

Referral issue:

I was retained by the State of California in reference to the plaintiff's petition (in *Coleman et al. v. Schwarzenegger et al.)* for a prisoner release based on the finding that the State has not remedied the deficiencies in delivery of constitutionally adequate services to mentally ill inmates. I have been asked to address the issues of whether: (1) crowding is the primary cause of the violation of the Federal right; and whether (2) no other relief will remedy the violation. I submitted a preliminary report on November 8, 2007. This represents my final report, based on review of materials (as noted below) as well as my tour of prison facilities between November 26-30, 2007 (as documented below), which included interviews with inmates, mental health staff, as well as correctional staff.

Documents reviewed:

- Declaration of Deborah Hysen, May 24, 2007
- Declaration of Margaret McAloon, Ph.D., May 24, 2007
- Declaration of Kathryn P. Jett, May 24, 2007
- Declaration of Doug McKeever, May 24, 2007
- Declaration of Joan Petersilia, Ph.D., May 24, 2007
- Declaration of Scott Kernan, May 24, 2007
- Memorandum re: Out-of –state correctional facility program, Phase III, February 2, 2007

- Memorandum re: 3001 Penal Code Compliance Policy Statement, May 15, 2007
- Summary Monthly Report of CDC patients in DMH hospitals, May – August, 2007
- Report on Suicides Completed in the California Department of Corrections and Rehabilitation in Calendar Year 2005, Raymond F. Patterson, M.D.
- Defendant's plan to address suicide trends in administrative segregation units, October 2, 2006
- Memo re: Administrative Segregation Unit 30 minute welfare check, August 6, 2007
- Court order to implement plan to reduce suicide in administrative segregation, February 9, 2007 (Judge Karlton)
- Special Master's Supplemental Report and Recommendations on defendant's plan to prevent suicide in administrative segregation, May 14, 2007
- Court order accepting Supplemental Bed Plan, October 17, 2007 (Judge Karlton)
- Special Master's Report on Plaintiff's Response re: Salary Enhancements, January 30, 2007
- Court order regarding pay parity, May 23, 2007 (Judge Karlton)
- Defendant's redacted response to court order of May 23, 2007 re: pay parity plan
- Court order regarding pay parity, June 28, 2007 (Judge Karlton)
- Court Order regarding proposed coordination agreements in the areas of information technology, credentialing, hiring, and pharmacy, May 29, 2007.
- Court Order approving coordination agreements, June 28, 2007
- Governor's Prison overcrowding state of emergency proclamation, October 4, 2006
- Special Master's Report on Enhanced Outpatient Treatment Programs in Reception centers,  August 15, 2007
- Special Master's Response to Court's May 17, 2007 Request for Information, May 31, 2007
- Special Master's Report and Recommendations on Defendant's August 2007 Supplemental  Bed Plan, September 24, 2007

- Defendant's Opposition to Plaintiffs' Motion to Convene a Three-Judge Panel to Limit the Prison Population, December 4, 2006

- Reporter's Transcript of hearing on December 11, 2006 re: Plaintiff's motion to convene a three judge panel

- Defendant's Supplemental Brief in Opposition to Plaintiffs' Motion for Referral to  a Three-Judge Panel, May 24, 2007

- Court order to convene a 3 Judge Panel, July 23, 2007 (Judge Karlton)

- Supplemental Bed Plan Report, August, 2007

- Small management yard plan, October 25, 2007

- MHSDS Program Guide

- Receiver's Supplemental Report re: Overcrowding dated June 11, 2007

- The Summary sections of the Special Masters Monitoring reports –15th report (1/23/06) and  16th report (12/13/06)

- Receiver's Plan of Action, November, 2007 (with a focus on the Information technology section)

- Proposed Chapter XI of the Program Guide (referencing transfer of CCCMS inmates to out of state facilities) dated 10/23/07 (draft)

- Annual Suicide Report for 2006

- Corrective Action Plan (CAP) for California State Prison- Sacramento (SAC), October 29, 2007

- Staffing Pattern for SAC, October, 2007

- Appendix B (case reviews) to report of suicides in 2005

- CIM Coleman Site Visit Program Summary, October 10, 2007

- CIM Coleman CAP, October, 2007

- Transcript of a monitoring tour exit call from Richard J. Donovan Correctional Facility on November 20, 2006

- Revised Reception EOP Plan, December 3, 2007

- Defendant's Response re: Small Management Yards, December 4, 2007

- Declaration of Joseph Moss in Support of Defendant's Response to Notice of Non-Compliance Re: Small Management Yards, December 4, 2007

- Review of Plaintiff's expert reports by: Craig Haney, Ph.D., Pablo Stewart, M.D., and James Austin, Ph.D.

Prison facilities toured:

Between November 26-30, 2007, I toured the following prison facilities, which included interviews with health and mental health staff and administrators, correctional officers and administrators,  interview of inmates (at both the CCCMS and EOP level) who were chosen randomly, and review of randomly selected charts. During these tours I was accompanied by attorneys for the plaintiffs, attorneys for CDCR (and, for the last day, an attorney from the Attorney General's office), as well as representatives from CDCR headquarters.

- California Medical Facility (CMF) –Vacaville, November 26, 2007 (including DMH units)
- California State Prison – Sacramento, November 26, 2007
- Valley State Prison for Women (VSPW), November 27, 2007
- Central California Women's Facility (CCWF), November 27, 2007
- Salinas Valley State Prison (SVSP), November 28, 2007 (including DMH units)
- California Institution for Men (CIM), November 29, 2007
- R. J. Donovan Correctional Facility, November 30, 2007

Qualifications of expert:

I have attached my curriculum vitae which provides information about my professional qualifications. In terms of specific expertise relevant to this assessment, I would highlight the following aspects of my experience:

I am a Board Certified Specialist in Forensic Psychology (from the American Board of Professional Psychology) with over 28 years experience in forensic and correctional psychology. I have worked in maximum security forensic hospitals whose populations included prison inmates. My first such experience was at the Center for Forensic Psychiatry in Michigan (1979 - 1985), a Department of Mental Health facility, which included units for transfers from the state prison. I also worked for 6 years (2001 - 2007)

at Bridgewater State Hospital in Massachusetts, a Department of Correction facility, which provided evaluations and treatment for, among others, state prisoners. At that facility I served as the Director of Forensic Services as well as Chief of Psychology. I was a member of the Hospital Executive Committee; this leadership committee developed and implemented policies and procedures, and was responsible for coordinating the successful attempt to obtain JCAHO accreditation for that facility (obtained for the first time in the facility's history in 2003) as well as re-accreditation (2006). A significant policy change which we implemented clarified admission and discharge criteria for prisoners, tightened the procedures for screening and triaging admissions, and improved communication between the hospital and the prisons.

I also was involved in program development, policy development, and operational implementation of mental health services to the 18 Massachusetts Department of Correction prison facilities. From 1998-2001,  I served as Deputy Mental Health Program Director, during which time significant improvements were made in the delivery of mental health services to inmates in the Massachusetts prison system. From 2001-2007, as noted above, I served at Bridgewater State Hospital, but also maintained responsibility for oversight of the psychologists in the prison system (as Director of Psychology).

In addition to my experiences in the prison system, I also have extensive experience with county correctional facilities. From 1985-1993, I was program director for a community forensic program in Western Massachusetts, which included provision of services to the local courts as well as to three County Correctional facilities. In that capacity, I was responsible for development of a mental health program at the Hampden County Correctional Center, which has served as a model for other facilities in the Commonwealth. During that time, I also provided direct clinical services at the facility. During the later years of this period, we provided mental health services in an overcrowded facility, which was subject to court monitoring (unrelated to the mental health program), pending building of a new facility.

I also served, from 1993-1996 as Assistant Commissioner for Forensic Mental Health in the Massachusetts Department of Mental Health (DMH). In that position, I was responsible for oversight of forensic mental health services to over 70 courts, as well as to 13 county correctional facilities. During my tenure, we developed standards for evaluation of quality of services at these facilities. In addition, we initiated a new program called the Forensic Transition Team (FTT). This service was developed in response to concerns that mentally ill inmates were being discharged from the prisons and county correctional facilities without adequate community services in place. The FTT program involved Department of Mental Health clinicians working with inmates and the facilities prior to discharge to ensure a coordinated plan in the community. FTT clinicians work with the newly released inmates for a period of several months until care can be transitioned to DMH case management and/or community providers. This program has been very successful and was recently significantly expanded.

**Note on Methodology:**

This report is based on my review of the documents listed above, augmented by information obtained during my visits to the facilities. I interviewed approximately 20 inmates and also reviewed a number of charts. I utilized the information I obtained on-site to either corroborate or raise questions about data contained in the documents I reviewed, and/or to direct me to obtain additional information. I also attempted to corroborate, whenever possible, information obtained from inmates. In most instances, their reports were consistent with other sources of information (but not always so). To the extent that I utilize statements from staff and inmates in this report, this is done to illustrate a point, rather than as evidence of a particular practice. I believe this is an important caveat, since the aim of this assessment is to identify the primary cause of system deficiencies, which cannot be done on an anecdotal basis.

Also, to provide a context for this report, the high prevalence rates of mental illness in prisons is a national phenomenon, not limited to CDCR.[1] Many of these individuals enter prisons with a history of mental illness. Prisons were not designed with this population in mind, and prison environments, whether overcrowded or not, are not conducive to the treatment of mental illness. Furthermore, many of the mentally ill inmates in prisons present not only with psychiatric disorders but also with antisocial traits, making them particularly difficult to treat. Prisons have been required to develop mechanisms to provide treatment, without compromising security. For instance, CDCR and some other jurisdictions employ what are called "Treatment Modules" to provide group therapy to inmates requiring high levels of security (such as in ad-seg units). These modules are booths, which are designed to allow the inmates to see and hear each other and the group leader, but prevent any direct contact. Although a neutral observer may be taken aback when first seeing these modules, the alternative (as in Massachusetts, which does not employ them) is simply not to provide any group treatment to such inmates.  I point this out as an example of the need to evaluate the mental health services in CDCR within the context of appropriate treatment in a prison environment, as opposed to treatment in community settings. My opinions expressed here thus reflect my assessment of the problems preventing CDCR from providing adequate mental health services to the *Coleman* class within the context of a prison environment.

Although I interviewed a number of inmates/patients, I did not record their names (referring to them in my notes only by the first initial of their last name), in order to preserve confidentiality and privacy as much as possible. However, the plaintiffs' attorneys who accompanied me did record their names and prison i.d. numbers, so they have the opportunity to corroborate or disconfirm points made in my report based on those interviews.

---

[1] For example: James, D.J. & Glaze, L.E. (2006). Mental health problems of prison and jail inmates. *Bureau of Justice Statistics*, Special Report, Sept. 2006;  Pinta, E.M. (1999). Meta-analysis of prison mental health studies. *Correctional Mental Health Report,* p. 33.

**Scope of opinion:**

I am addressing the impact of overcrowding specifically on the *Coleman* class, which includes inmates with "serious mental disorders." My assessment incorporates the following determinations which have been presented in the various documents, and which I am not independently evaluating:

1.  The California Prison system is overcrowded, as there are currently approximately 173,000 inmates in CDCR facilities.
2.  The Court has determined that CDCR's provision of mental health services is not in compliance with Constitutional requirements (8th amendment).

Thus, the question is whether the overcrowding is the primary cause of the lack of compliance and whether compliance can be achieved by means other than an order for prisoner release.

Based on my review of the documents above, it is my professional opinion that the overcrowding in CDCR significantly contributes to the difficulties in providing adequate mental health services, but is not the *primary* cause of the deficiencies. In my professional opinion, the lack of adequate intensive mental health treatment beds (EOP, Mental Health Crisis Beds, Acute Psychiatric Hospital Beds, Intermediate Care beds) is the primary cause of the deficiencies in providing mental health care to mentally ill inmates in the CDCR. However, this is not primarily a function of the large population in the prisons (as the number of mentally ill patients is not simply a fixed percentage of prisoners, but is primarily impacted by factors that lead to the mentally ill being disproportionately incarcerated). Rather, the lack of sufficient beds and resources at the "high end" of the mental health system in the CDCR reflects both the unanticipated influx of mentally ill prisoners into the correctional system over the past 2-3 decades, and the delay in the state's response to this situation. Only more recently has the state undertaken a more comprehensive and planful approach to this issue (as evidenced by the

development of the strike teams, the new bed plan and other responses to recent court orders).

As noted above, the increasing numbers of mentally ill individuals becoming incarcerated is a national problem, likely attributable to a number of causes (including lack of adequate mental health care in the community, lack of access to such health care for many vulnerable individuals, and other factors unrelated to the prison system). These factors impact the California system, which is also plagued by a high number of parole violators (including many who are mentally ill) being returned to prison, discussed below on the section on Reception Centers. Focusing on a prisoner release is thus likely to provide only a modicum of relief to the problems in providing services to  mentally ill inmates; the main efforts need to be directed specifically towards programming and resources for this vulnerable population.

The sections that follow represent specific analyses of a number of the most significant issues impacting mental health care in the CDCR. For each issue, I present my opinion as to whether overcrowding is the primary cause of problems noted and, if so, if there are alternatives to a prisoner release that could remedy the situation.

Lack of beds and treatment space

My observations corroborated the documentation that indeed there are not enough beds available for mental health programming at the highest levels of intensity, including Mental Health Crisis Beds (MHCB), EOP program beds, and acute and intermediate care DMH beds. I have reviewed the Declaration of Deborah Hysen (May 24, 2007) regarding the Facilities Construction Strike Team's plans for increasing bed and programming space, the Supplemental Bed Plan developed by CDCR in August, 2007, as well as the Special Master's report noting the use of mobile trailers to increase programming space. It is my opinion that these strategies, if properly implemented, can reasonably be expected to ameliorate the problems posed by the current lack of an adequate number of beds at the higher levels of mental health care.

Expert Report of Ira K. Packer, Ph.D., ABPP re: Coleman et al. v. Schwarzenegger et al.    12/10/07

The completion of the construction projects, though, is several years away. In the interim, one of the strategies has been to convert existing space for use with these populations (retro-fitting). However, the effectiveness of this strategy is limited by the fact that existing space was not designed to serve the functions required for these units. A good example of this problem was noted at Salinas Valley (SVSP), where there is both a free-standing DMH building, as well as intermediate care DMH units in the D building of the prison. The differences in the units is quite striking, as the free-standing building has a therapeutic "feel" to it, appears designed to provide therapeutic services, and has reasonably adequate space to provide those services. By contrast, the unit in the D-building (which has been designated as temporary space) is standard prison unit, without adequate space for treatment, and difficulties in providing confidential 1:1 treatment environments. The problem is not with the census in the unit, but rather that the space is not appropriate for the purposes of providing intermediate care treatment to mentally ill inmates. Similarly, the EOP ad-seg unit which I visited at SVSP (for example) was also using retrofitted space, and had similar problems. Groups (using Treatment Modules) are run in the laundry room, which is a non-therapeutic milieu. The difficulties posed by using existing spaces in a manner not consistent with its original design are not limited to SVSP. The issue of overcrowding is not the cause of this problem, and a reduction in the number of inmates in the CDCR would not solve this problem. Rather, the most appropriate solution appears to be the one being pursued – construction of mental health units designed for that function. In some situations (such as SVSP), mental health staff and administrators reported that they have requested to move the existing unit to another building, with better space, which would provide better accommodations for both group and individual work. To the extent that such resources can be identified, this would represent an improvement over the current arrangement, pending the new construction.

EOP beds

In terms of other issues related to efficient use of existing resources, some of the earlier documents suggested difficulties in utilization management (that is, patients staying too long in higher level beds, such as DMH beds and crisis beds), thus creating lack of beds

for other patients who need them. I have been impressed that good progress has been made in this area. For instance, Vic Brewer, of DMH informed me that the length of stay (LOS) in the DMH intermediate care beds is now approximately 8 months, down from 16 months a couple of years ago (and right within the expected LOS of 7-9 months). Similarly, mental health staff provided me with reasonable explanations for some EOP inmates being maintained for long periods of time in that program, rather than being returned to GP. They explained that these are clinically driven decisions (in that some individuals are simply not capable of ever functioning well in GP, but do quite well in EOP, and do not require a higher level of care). For these individuals, prolonged stay in EOP programs is the clinically appropriate response and does not reflect a census problem or a systems failure. Indeed, one of the women I interviewed exemplified this point well, as she had a history of abuse and depression, was able to function reasonably well within the sequestered EOP program, but did not feel that she could tolerate the additional demands of a GP setting.

However, it is also clear that some inmate patients remain in EOP units pending transfer to DMH units. The system is "clogged" in the sense that the higher intensity beds are usually full, creating long waiting lists at other levels. As noted above, this is not an issue related to overcrowding in general (that is, not primarily a function of the total number of incarcerated inmates), but rather is primarily a function of the lack of adequate beds and programs for the most seriously mentally ill. Even if the total census of the prisons were to be reduced, there would still likely be a need for more EOP beds as well as other programming for mentally ill inmates (as discussed below).

Mental Health Crisis Beds

Another identified area which has a shortage of beds is the mental health crisis beds. These are being addressed in the supplemental bed plan. In the interim, the shortage of crisis beds is problematic as inmates requiring more intensive observation and/or treatment must remain in other settings, which are not clinically appropriate. This problem is more acute in some facilities than others. For instance, some of the facilities I visited did not have all the crisis beds filled, some (like R.J. Donovan) have an overflow

unit (which is not licensed), which they have used for those not considered acutely suicidal, but which has not been used often recently. However, in SAC, one inmate was being "housed" in a "ZZ" booth in a passageway, monitored by an officer. He had been there over the long Thanksgiving week-end. I was informed that this was not a common occurrence, but did occur at times when the other beds were filled. This is clearly not an acceptable standard of practice. However, given the alternatives which are available for observation of such individuals this is a problem which could be addressed by better management, including increasing the recognition that such an arrangement is never acceptable and requires immediate response, even on a holiday or week-end. In terms of alternatives, for instance, SAC has additional beds in an OHU and MHOHU, and there is a process for transferring to crisis beds in other facilities. Although all the beds in OHU and MHOHU are filled before the "ZZ" cells are employed, in such situations a triage process, either at a facility or central level, should be undertaken, to free up an appropriate observation cell for such an inmate.

In terms of the crisis bed issue – some facilities use their unlicensed OHU's as an alternative or precursor to the crisis bed. From my observations, this does not *necessarily* reflect a less desirable practice. I was repeatedly informed that many of the individuals so observed were deemed not to be in genuine mental health crisis and could be treated and managed appropriately without taking up a high intensity crisis bed. I have experience working in correctional facilities that indeed used such observation cells (for 1-2 days) as a means of determining whether the individual truly required a crisis or hospital bed. As long as this system is used based on clinical judgment, with an understanding that those deemed in imminent crisis (such as the system described to me at R.J. Donovan) must go directly to a licensed bed, this would be considered a reasonable practice.

<u>DMH beds</u>
Consistent with the documents reviewed, during my tour of the facilities staff confirmed that there is often a long waiting list for DMH beds, resulting in patients remaining either in crisis beds or in EOP level of care. Again, this is not a reflection of the general issue of crowding, but rather the need for more higher intensity beds, which will be addressed by

Expert Report of Ira K. Packer, Ph.D., ABPP  re: Coleman et al. v. Schwarzenegger  et al.   12/10/07

the bed plan. However, an additional issue relates to some difficulties between the
agencies (CDCR and DMH) in terms of determining when an inmate is appropriate for
DMH care. A number of staff reported that they had difficulty getting DMH to accept
some patients who were considered to be high security. Although I am not in a position to
judge the validity of DMH's concerns, the solution to this problem requires higher level
administrative intervention (at a level higher than either CDCR and DMH), and is not
primarily related to crowding.

In terms of space issues for DMH beds, it is clear that space designed specifically for the
purpose of providing licensed mental health care is much more effectively used than
retrofitting existing prison units. The latter is a necessary stop-gap measure, but is not a
long-term solution. Thus, even if more prison units were to be available for use as mental
health units as a result of a prisoner release, this would not be a good alternative to the
current plan to build newer facilities (which is underway, as I observed).

Access to yards

Another space issue identified by  the Special Monitor and acknowledged by CDCR
relates to design problems that limit the opportunities for inmates in ad-seg to go out to
yard.  I reviewed the Small Management Yard Plan submitted by Ms. Hysen (October 25,
2007), and in my opinion, this represents a reasonable approach to this problem and
would serve to improve conditions for mentally ill inmates in administrative segregation.
During my tours I viewed some of these yards and they do provide a means to increase
the out-of-cell time for these individuals, which is a significant issue in particular for
mentally ill inmates. The ability to utilize these yards maximally is limited by shortages
in custodial staffing (which is directly related to overcrowding). I understand that the
CDCR has proposals for increasing its recruitment of correctional officers. It is beyond
my expertise as a mental health professional to comment on whether these plans will
succeed in recruiting sufficient officers to address this problem.

Lack of adequate staffing:

I have reviewed the State's pay parity plan to increase the salaries of mental health professionals. This plan appears reasonable and is likely to increase the number and quality of professional staff willing to work within the prison system. (I would also note that the plan was amended to increase pay for DMH staff, in anticipation that failure to do so would likely result in DMH staff transferring to CDCR. This speaks to the likelihood of the pay parity plan being successful in recruitment and retention). During my tours I was informed by administrators (and this was confirmed in the documentation that I reviewed) the pay raises have helped significantly with recruitment of mental health staff. I also met a number of psychologists, for example, who had recently been hired as a result of the pay increases. The pattern with psychiatrists was more mixed, as some areas of the state have been more successful than others. I was also informed that parity raises for nurses has not yet been implemented, a strategy that would likely help improve that situation. Some of the facilities have filled their vacancies with contract staff, which is less desirable than permanent staff, due to turnover. To the extent that the state can develop longer term arrangements (that is for a longer minimum length of service) with contractors, this would be desirable. For example, in some facilities I was informed that some contractor staff have been there for many years and thus function, for all practical purpose, in the same capacity as permanent employees.

A general reduction in the prison population is unlikely to have a significant impact on the size of the *Coleman* class and the need for mental health professionals to provide services to this class. As mentally ill inmates constitute approximately one-fifth of the population, a general reduction of census would, *at most*, result in reduction of one *Coleman* class inmate for each five inmates released. Even if there were to be a reduction of *Coleman* class inmates within each institution, this would not necessarily translate into a real ability to redeploy staff resources across institutions, due to issues of geography and patient needs. Thus, if there is decreased need for mental health staff in a particular institution (e.g., due to a smaller number of CCCMS inmates), this does not necessarily mean that these staff can be deployed in other institutions which may be in a different part of the state, or that these staff are best suited for working in different settings.

The staff shortage issue is more prominent on the custodial side. In some parts of the state, there continue to be difficulties in hiring and maintaining adequate correctional staff, which is primarily a function of the census. Although this is a significant problem which impacts the prison system in general, it is not, in my opinion, a primary cause of problems in mental health service delivery for the most impaired inmates. The CDCR model of classifying mentally ill individuals by level of severity and providing, for the most part, separate services and housing for the EOP population, in many ways insulates these individuals from the consequences of this problem for the general population inmates. There is some impact in terms of access to yards being limited at times when correctional staff are stretched thin, but across all my tours (and review of documents),  it does not appear that programming for EOP inmates is detrimentally impacted.

The shortage of correctional officers does appear to have more of an impact on CCCMS inmates, who are housed in General Population and may experience difficulties in movement (to yard and to appointments, as well as to groups). In some facilities I visited (for example, CIM), mental health staff reported that it was difficult to run groups for CCCMS inmates due to other demands on officers. However, the staff did not report difficulties in providing individual services even in those facilities. Furthermore, the difficulties in providing treatment were not simply a function of lack of officers; for example, some of the gangs forbade their members to attend groups or to participate in treatment, an issue unrelated to staffing shortages or census issues.

Similarly, significant problems in delivering services to CCCMS patients were noted at SVSP, C-yard. This yard houses some of the most violent inmates, including many with gang involvement. This results in very frequent lockdowns on those units, which prevents groups from occurring. The frequent cancellations of such groups makes them almost useless for these CCCMS inmates.  However, the mental health staff I interviewed reported that they were not hampered in their ability to see their clients individually. They also did not report a pattern of a large number of their CCCMS clients decompensating and requiring higher levels of services.

I interviewed a Captain on the C-Yard and he insisted that even if there were fewer inmates in his facility, he believed the problems would persist because of the high violence level of this particular class of inmates. I cannot comment on whether the frequent lockdowns represent a strategy imposed by the lack of a sufficient number of officers (and too many inmates) or whether other strategies to control this yard would be more effective. This is an issue for a correctional professional, not a mental health professional. It is clear, though, that the current situation does impede mental health care in this and similar settings. Also, as noted above, the CDCR has plans for increasing the recruitment of correctional officers, an area that I do not have the expertise to comment upon.

Direct impact of overcrowding on *Coleman* class:

I will address several specific areas in which overcrowding may impact the *Coleman* class directly.

1. Does the stress of overcrowding causes inmates who were not in the *Coleman* class upon admission to become dysfunctional, thus entering the class? Although this may seem like a "common-sense" assumption, this issue should be addressed by looking at empirical data. The data I have reviewed to date does not provide quantitative evidence of this process. In her declaration, Margaret McAloon, Ph.D. notes that the percentage of inmates who require mental health services upon admission to the prison system (Reception Centers) is higher than the percentage in the population (which she estimated at 18% and the Special Master estimated at 19%). Her testimony is consistent with data provided by the CDCR on the percentage of mentally ill inmates in reception vs. those endorsed for placement. This is also consistent with my experiences in the reception facilities (which will be discussed in more detail below in the section on Reception Centers) that the inmates entering the prison system are likely to have a higher prevalence of acute mental illness. Furthermore, during my tour I questioned staff and interviewed inmates and did not find evidence that indeed the mental health

caseload has been significantly impacted by individuals who had no history of
mental illness prior to incarceration. There is a category called "medical
necessity" which refers to individuals who do not meet the diagnostic criteria for
CCCMS or EOP but who require mental health services. This includes individuals
who experience symptoms in response to the stressors in their environment (e.g.,
adjustment disorders). Over the course of all of my tours, I asked staff about this
issue and was repeatedly told that although there are some individuals in all the
caseloads who fit in this category (as would be expected in a prison environment),
this is a small percentage of the caseload. Thus, although for certain individuals
the stresses of overcrowding lead to need for mental health services, this is not the
primary factor impacting on the size of the *Coleman* class. Rather, factors outside
of the prison setting, including lack of adequate community services, contribute to
the increasing number of mentally ill individuals who become incarcerated.

2.  Are conditions of crowding causing decompensation among the *Coleman* class?
    One of strengths of the CDCR system is the classification of mentally ill inmates
    into categories reflecting severity of symptoms and level of function (CCCMS
    and EOP). The various court orders and the Program Guide provide for the more
    severely mentally ill inmates to be shielded from the most overcrowded settings.
    Thus, for example, EOP inmates are generally not housed in the "makeshift"
    dormitories (that is, gyms and day rooms which have been converted to housing
    units). These units are clear examples of overcrowding, as inmates are double
    and, in some cases, triple-bunked in spaces that are not designed for housing. The
    gym in CIM, for example, had peeling paint, was not clean, and was cramped.
    However, as noted there were no EOP patients housed there.

    There are CCCMS patients in these units. However, I did not find evidence that
    these environments resulted in significant decompensation among these inmates
    (based on my interviews with staff, augmented by interviews with inmates). One
    CCCMS inmate in the CIM gym highlighted a paradox of these settings. He
    described feeling stressed in the gym and asking his psychiatrist to recommend

moving him to a 2-man cell, two to three months prior to my visit. He reported that the psychiatrist encouraged him to remain in the gym. I then asked him if he would ask his psychiatrist again, after the additional period in the gym, to recommend that he be moved. His response was that with the holidays arriving, he thought that he would be more at risk of becoming depressed in a cell, than being around a lot of other people. I offer this example not to minimize the problems with housing people in such inappropriate settings, but to emphasize that the focus of the inquiry is on the extent to which particular conditions can be directly related to exacerbating mental health problems.

In this regard, I queried both mental health professionals and correctional officers about whether there was any screening or mental health input about placing specific CCCMS inmates in the dormitory settings. I received variable responses, with some describing a process involving input from mental health (e.g., VSPW) and others no such process (e.g., SAC). If there are instances in which a dormitory would be unsuitable to a mentally ill inmate, therefore, it appears that this could be addressed by developing mechanisms for mental health input in those institutions which currently do not have such a process.

3. Does the high census result in inmates/patients being misclassified in terms of level of mental health need? Although acknowledging the small sample size (20 individual inmates randomly chosen for interviews), it was my impression that the individuals that I met were appropriately classified. That is, the CCCMS inmates appeared psychiatrically stable, for the most part (with one exception in a Reception Center which will be discussed below), and the EOP patients were more acute, but did not appear to require a hospital bed. I understand that there are some EOP inmates who do require higher level of care who are awaiting placement, and this reflects, as noted above, the lack of sufficient higher intensity mental health beds in the system. However, for the most part, the clinical staff confirmed this impression about their ability to appropriately classify inmates in terms of mental health needs (that is, CCCMS vs. EOP).

There was one circumstance, described to me by mental health staff, at CCWF where demand for beds in the EOP program led to an expedited review of patients in that unit, resulting in a number being reclassified as CCCMS. I reviewed three charts of such inmates to assess whether the decisions were clinically appropriate. In one instance, it appears that the patient had been scheduled to move out a short time later and this was moved up by one or two weeks. Another patient was deliberately moved to CCCMS because she was not cooperative with treatment and the clinical staff believed that if she continued with that pattern in general population, it would allow them to get a Keyhea order, which they felt they could not make a case for in the more structured environment of the EOP unit.(I am not commenting on whether this is a reasonable strategy or not, but rather noting that this was not simply a decision based on needing to free up bed space.) The third chart was of an inmate who did not want to be in general population, but the clinical staff thought she could manage there – in this case I could not determine whether the decision was justified or not. These cases suggest that there should be a quality improvement process to verify that such decisions are clinically justified. If indeed patients' mental health classification is changed due to demands for mental health beds (and, aside from this situation, I did not come across this as a recurring pattern), this would reflect the lack of mental health beds and not a response to general conditions of crowding.

4.  Medical records problems: In several institutions there were difficulties in clinical staff obtaining charts in a timely manner (that is, the charts were not available when needed for a clinical assessment) as well as difficulty in updating the charts (that is, delays in notes being placed in the records). Staff referred to a category of "Flimsy" charts, meaning that they sometimes had limited information available when doing an assessment. The documentation I reviewed also described institutions in which there were significant numbers of charts unfiled. In my opinion, this is a direct effect of overcrowding, as the number of charts in the institutions is proportional to the population (noting that charts

include both medical and mental health information). This problem does impact directly on the ability to provide timely and appropriate care. In my opinion, the most reasonable solution to this problem should be focused on improving information technology, such as  an electronic medical record, or at the minimum, enhanced ability to track information in an accessible database. I understand that this is an issue being pursued by CDCR and the *Plata* receiver, and is the most reasonable solution to this problem, in my opinion.

5. Reception Centers:  In my opinion, crowding is the primary cause of the particular difficulties in providing services to the *Coleman* class at the reception centers. The percentage of inmates at the male reception centers I visited (CIM and R.J. Donovan) who were returned to prison for parole violations was extremely high (staff estimated between two-thirds to ninety percent of all admissions were parole violators). I was impressed with the ability of the mental health staff to complete their initial screenings and evaluations of these inmates in a timely manner. At CIM, for instance, staff reported that they completed these evaluations well in advance of the Program Guide requirements. However, difficulties were more apparent in terms of treatment and discharge planning. Mentally ill inmates are disproportionately represented among this group, often entering the prison system with a more acute mental health presentation, not having received adequate treatment in the community and/or having abused substances there. Furthermore, many of these inmates receive relatively short sentences, which means that they spend their entire sentence at the reception center. Thus, even when deemed appropriate for referral to an EOP program in another prison, by the time they are processed, they are too close to discharge to warrant such a transfer. In recognition of this issue, the Reception EOP's were developed. As these are relatively new, the problems are just beginning to be worked out (as noted in the Revised Reception EOP Plan, December 3, 2007).

Furthermore, the ability to develop appropriate community plans for these individuals is limited, thus creating a vicious cycle, as they decompensate in the

community and quickly return ("revolving door" phenomenon). Thus, for the
*Coleman* class inmates in the reception centers, it is my opinion that the
difficulties in providing adequate treatment are primarily attributable to the census
being too large.

One patient whom I interviewed at CIM exemplified this problem (which staff
confirmed was not unique to this individual).This individual, classified as an EOP
inmate (and placed in a 2-man cell rather than the day room which was being used
as a dormitory), had  a significant history of mental illness and  was serving a
short sentence (5 months) due to parole violation. It appears that he was stabilized
during his brief period of incarceration but was due to be released 2 days after my
visit. He reported that he would be homeless when released (confirmed by mental
health staff) and appeared to have regressed during the last few days of his
incarceration (he appeared depressed to me, and his psychologist confirmed that
he appeared less stable on that day than he had previously).Although he claimed
that he was not taking any medications, his psychologist (and the chart) confirmed
that he was still being prescribed medications and was to be given a 30 day supply
upon release. Nevertheless, it was clear that his community discharge plans were
not adequate to maintain stability in the community. The psychologist reported
that there are often difficulties working with parole in these cases, since the parole
officers do not necessarily want the prison clinicians to make specific mental
health referrals in the community that they do not agree to.

It is my opinion, though, that a prisoner release would not remedy this situation
relative to the Reception Centers. Indeed, it would likely exacerbate the problems.
As more inmates are released, even if recidivism rates remained steady (although
it is reasonable to believe that an increase in releases might increase recidivism
rates), this would likely result in an increase in admissions at the Reception
Centers. Thus, a more reasonable solution to this issue would be to focus on better
discharge planning and improved services to inmates (particularly mentally ill
inmates) who are paroled into the community. Several initiatives are underway or

Expert Report of Ira K. Packer, Ph.D., ABPP  re: Coleman et al. v. Schwarzenegger  et al.    12/10/07

are being planned in this regard. Dr. Petersilia's affidavit discusses this issue directly, describing the Rehabilitation Strike Team's efforts, as does Scott Kernan's affidavit regarding initiatives related to parole and re-entry. I am also aware of a contract with the V.A. to sign inmates up for entitlements (such as disability) prior to their release, to minimize the gap in ability to engage services in the community. Furthermore, it appears that there may be a need for better coordination between mental health clinicians in the prisons and parole in terms of recommendations for community placements (based on the report from CIM documented above). These strategies are more likely to be effective than a prisoner release.

6.  Suicides in the CDCR:  Based on the data reviewed, including the suicide reports from 2005 and 2006 (including the detailed case reviews of all 2005 suicides) and my interviews with staff, it is my professional opinion that the increase in suicides in the California prison system is not primarily a function of census and overcrowding. For those suicides which were considered to have been either foreseeable and/or avoidable, the problems noted were not identified as due to overcrowding issues. The data do not suggest that a higher staff/inmate ratio would significantly impact on the number of suicides. Rather, deficiencies were noted in room design (that is, failure to make the rooms more suicide-resistant, by removing grates, for example), failure to follow policy, and lack of follow-through on the institutional level to previous recommendations. For instance, Dr. Patterson noted (p. 10) that "there continued to be significant substantive inconsistencies and inadequacies in the application of policies and procedures and in staff performance with regard to suicide prevention and management." These are issues that need to be addressed to reduce successful suicides in the prison, and are independent of the size of the prison and *Coleman* class population.

Consistent with data from other jurisdictions, the analysis of suicides identified particular problems in ad-seg settings. These problems are not primarily a function of overcrowding (as confirmed by the Special Master's Report and

Recommendations on Defendant's Plan to Prevent Suicides in Administrative Segregation, filed December 18, 2006). From my review of the documents and interviews with staff, I concur with these assessments that crowding is not the primary cause of the suicides in the ad-seg (or in any of the other settings). Rather, changes in policies and practices, as identified in the Special Master's report, are required. One additional issue, which I observed and noted in the documents is that some inmates are placed in ad-seg not for rules violation, but for their own safety. This policy should be re-examined, or at the least, more focused mental health services should be assigned to these individuals.

**Summary and conclusions:**

Based upon my review of the documentation listed and my tours of the facilities, it is my opinion that the primary issue impacting service delivery to the *Coleman* class is the lack of sufficient resources at the higher intensity levels. This is not primarily attributable to the overcrowding in general, but is specific to the difficulties that have plagued the system in planning for and providing mental health services to individuals with severe mental illnesses who become incarcerated. The facilities were not designed to provide such services, and until recently, there was not adequate and comprehensive planning for the needs of this particular population. Appropriate services will require construction of units specifically designed to provide mental health treatment to inmates, as proposed in the Supplemental Bed Plan.

As noted in this report, for most of the problems noted, overcrowding is not, in my opinion, the primary reason for deficiencies in mental health care provision. I identified two areas, though, for which I thought that overcrowding was the primary factor: 1) medical records, and 2) reception centers. For the medical records problem, the most appropriate solution appears to be enhanced information technology (e.g., electronic databases, more computerized records). For the reception centers, improvements in policies and procedures for discharge planning and improved services to parolees are more likely to be effective in reducing the overcrowding at the Reception Center than

Expert Report of Ira K. Packer, Ph.D., ABPP   re: Coleman et al. v. Schwarzenegger  et al.    12/10/07

would a prisoner release (which may, paradoxically, increase the problems at the
Reception Centers).


_____                      _December 10, 2007_
Ira K. Packer, Ph.D., ABPP (Forensic)                      Date