# EXHIBIT C

# IRA K. PACKER, Ph.D.

### Forensic Consultation and Training

Board Certified in Forensic Psychology, ABPP

P.O. Box 469
Sharon, MA 02067
781-864-2899
forensictraining@gmail.com

### Addendum to Expert Report re: Coleman et al. v. Schwarzenegger et al.

Ira K. Packer, Ph.D., ABPP (Forensic)

October 1, 2008

This brief addendum is intended to address specifically the issue of potential impact of expedited release of Coleman class members. I have reviewed the following reports submitted in this case:

1. Report of James Gilligan, M.D., dated August 15, 2008
2. Report of Gail Bataille, MSW, dated August 15, 2008
3. Rebuttal Report of James Gilligan, M.D., dated August 27, 2008
4. Rebuttal Report of Gail Bataille, MSW dated August 27, 2008

I offer the following opinions:

I. Risk of violence of mentally ill offenders

I agree that the research literature does not suggest that mentally ill offenders pose a higher risk of violence than their non-mentally ill counterparts. For example, in a study by Teplin and colleagues[1] using a jail (rather than prison study) concluded: "Our sample of jail detainees was highly recidivistic: Nearly one half were arrested for a violent crime during the six-year follow-up period. In this extremely recidivistic population, however, psychiatric disorder did not increase the probability of being arrested for violent crimes after release." Nevertheless, they did find that particular symptoms of psychosis may have been associated with increased arrests for violent crime. They wrote: "A history of both hallucinations and delusions increased the number of arrests for violent crimes after

---

[1] Teplin, Abram, and McClelland (1994). Does Psychiatric Disorder Predict Violent Crime Among Released Jail Detainees? A Six-Year Longitudinal Study, *American Psychologist*, 49, 335-342

Packer Addendum October 1, 2008

release, but not significantly. This finding might have been stronger if we had had data on the recency of the psychotic symptoms. Nevertheless, this pattern corroborates prior studies [citations omitted here] and suggests that psychotic symptoms may be more powerful predictors of violent crime than diagnoses per se [citations omitted here]"(p. 340).

More generally, the literature on the relationship between mental illness and violence (which is too vast to be described in detail here), does suggest that although mentally ill individuals account for only a small percentage of crime in society, mental illness is a risk factor for violence, particularly if the individual also abuses substances and has acute psychotic symptoms.[2] This does not mean that mentally ill inmates should, by virtue of their mental illness, be considered higher risk than other inmates. However, it does suggest that if mentally ill inmates are discharged without adequate services in place for them in the community, then *in those situations* their risk would be increased (both to themselves and others).

II.     Discharge planning for mentally ill prisoners

I concur with Dr. Gilligan that an appropriate discharge process for mentally ill offenders would require pre-release planning, coordination with community providers, access to systems of care in the community, and availability of programs that target not only mentally ill individuals in the community, but particularly those with co-occurring substance abuse disorders. Based on the documents I have reviewed (detailed in my reports of December 10, 2007 and August 15, 2008) as well as information I obtained during my tours of the prisons, these elements are not fully functioning with the current number of mentally ill offenders being discharged from CDCR. Although efforts have been made to coordinate aftercare with providers and parole, there are still significant problems with parolees obtaining adequate services in the community. I am not familiar with the specifics of the community service delivery system in California, although Ms. Bataille's reports highlight some significant impediments which need to be addressed.

Given the difficulties faced at present, the problems would undoubtedly be exacerbated by a significant increase in mentally ill prisoners being released, absent significant investment in and restructuring of systems of care for mentally ill parolees (as well as those discharged outright from their sentences) in the community. Furthermore, and importantly, even with better community resources, discharge planning in prison cannot be successfully implemented hastily. Successful implementation requires coordination among a number of parties, including very centrally, the inmate. For example, in Massachusetts, mentally ill prisoners are identified 6 months to a year prior to discharge. During the interim period, coordination is required regarding identifying stable living situations, entitlements (such as Medicaid if appropriate), service providers for both mental health and substance abuse issues, and involving the inmate in the discharge planning in a meaningful way.

---

[2] For example: Link, B. G., Andrews, H., & Cullen, F. T. (1992). The violent and illegal behavior of mental patients reconsidered. *American Sociological Review, 57*, 275–292; Monahan et al. (2001). *Rethinking Risk Assessment: The MacArthur Study of Mental Disorder and Violence*. Oxford University Press

2

Packer Addendum October 1, 2008

Without all the elements in place, expedited discharge of mentally ill inmates is likely to lead to decompensation (that is, return of psychiatric symptoms) for these individuals in the community. This decompensation would be expected to result in an increase in risk of harm both to themselves and others, as well as increased likelihood that they would return to prison. The high recidivism rate cited by experts for both the plaintiffs and defendants reinforces these points. Thus, if more mentally ill individuals were to be discharged, without adequate preparation and without adequate services in place, the recidivism rate would very likely increase, thus creating a revolving door and putting even more pressure on the Reception Centers.

I would add one more point about extrapolating from prison to the community. One cannot assume that the level of services that the individual is receiving in the prison (e.g., CCCMS versus EOP) is the level he or she will need in the community. As Dr. Gilligan notes, prisons are harsh and inhospitable environments and thus some inmates who require more support and service in prison may do better if they have a stable and supportive situation in the community. However, it is more common for some mentally ill individuals to function at a higher level in prison (from the standpoint of remission of acute psychiatric symptoms) because they are in a structured environment, are monitored, do not have the access to alcohol and other illicit drugs that they have in the community, and take medications. Ironically, despite the deficiencies in the system, many have more access to treatment while incarcerated than while in the community. As an example, during the period (2001-2007) that I worked at Bridgewater State Hospital, we were often in a situation in which we recommended that an inmate was sufficiently stable to be discharged from the hospital to general population in prison, but warned that if released to the community, the individual would require further hospitalization (due to unwillingness to take medications in the community and/or lack of access to services). Thus, the fact that many mentally inmates are classified as CCCMS, does not necessarily mean that they will need only this level of service in the community.

Summary:

It is my opinion that an expedited release of Coleman class prisoners, without significant increases in resources for community treatment (including both inpatient and outpatient), monitoring, and coordination, would likely result in increased risk of harm both to the inmates themselves and to others in the community.

Ira K. Packer, Ph.D., ABPP (Forensic)