1  EDMUND G. BROWN JR.
   Attorney General of the State of California
2  DAVID S. CHANEY
   Chief Assistant Attorney General
3  ROCHELLE C. EAST
   Senior Assistant Attorney General
4  JONATHAN L. WOLFF
   Senior Assistant Attorney General
5  LISA A. TILLMAN – State Bar No. 126424
   Deputy Attorney General
6  KYLE A. LEWIS – State Bar No. 201041
   Deputy Attorney General
7  455 Golden Gate Avenue, Suite 11000
   San Francisco, CA 94102-7004
8  Telephone: (415) 703-5708
   Facsimile:  (415) 703-5843
9  lisa.tillman@doj.ca.gov
   kyle.lewis@doj.ca.gov
10

   HANSON BRIDGETT LLP
   JERROLD C. SCHAEFER - 39374
   PAUL B. MELLO – 179755
   S. ANNE JOHNSON – 197415
   SAMANTHA D. TAMA – 240280
   RENJU P. JACOB - 242388
   425 Market Street, 26th Floor
   San Francisco, CA  94105
   Telephone: (415) 777-3200
   Facsimile:  (415) 541-9366
   jschaefer@hansonbridgett.com
   pmello@hansonbridgett.com
   ajohnson@hansonbridgett.com
   stama@hansonbridgett.com
   rjacob@hansonbridgett.com

   Attorneys for Defendants

11

12                    **UNITED STATES DISTRICT COURT**

13            **FOR THE EASTERN DISTRICT OF CALIFORNIA**

14            **AND THE NORTHERN DISTRICT OF CALIFORNIA**

15    **UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES**

16       **PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE**

17

| | |
|---|---|
| 18  RALPH COLEMAN, et al., | No. 2:90-cv-00520 LKK JFM P |
| 19            Plaintiffs, | **THREE-JUDGE COURT** |
|      v. | |
| 20   ARNOLD SCHWARZENEGGER, et al., | |
| 21            Defendants. | |
| 22  MARCIANO PLATA, et al., | No. C01-1351 TEH |
| 23            Plaintiffs, | **THREE-JUDGE COURT** |
| 24        v. | **TRIAL AFFIDAVIT OF CYNTHIA RADAVSKY** |
| 25   ARNOLD SCHWARZENEGGER, et al., | |
| 26            Defendants. | **To:  Three-Judge Panel** |

27

28

TRIAL AFFIDAVIT OF CYNTHIA RADAVSKY
(CASE NOS. 2:90-CV-00520 LKK JFM P AND C01-1351 TEH)

I, Cynthia A. Radavsky, declare:

1.      I am the Deputy Director of Long-Term Care Services for the California Department of Mental Health (DMH).  I have personal knowledge of the facts stated in this declaration and if called to testify upon those facts would and could do so competently.

## I.      Current Position and Background

2.      I have been employed by DMH since October 1995.  From 1998 to 2006, I served as the Assistant Deputy Director of Long Term Care Services.  From 1995 to 1998, I served as the Program Director at Napa State Hospital.  I have a bachelor's of science in therapeutic recreation and a master's degree in adaptive physical education from the University of South Alabama.

3.      As the Deputy Director of Long-Term Care Services, I am familiar with the missions, policies, staffing, and operations of each of the state hospitals.  I am responsible for overseeing the inpatient care provided to CDCR inmate-patients at Atascadero State Hospital, Coalinga State Hospital, and Patton State Hospital.  I am also familiar with the missions, policies, staffing, and operations of DMH programs within California Department of Correction and Rehabilitation (CDCR) facilities, such as Vacaville Psychiatric Program at California Medical Facility and Salinas Valley Psychiatric Program at Salinas Valley State Prison.

4.      As the Deputy Director of Long-Term Care Services, I am responsible for ensuring DMH provides appropriate responses to and complies with those *Coleman* court orders applicable to DMH.  Those orders can be categorized in terms of some of the elements of a constitutionally compliant mental health system: beds, staff, policies and procedures for care.

5.      I have participated in responding to *Coleman* court orders requesting plans for the development of mental health care beds.  Those plans have ranged from renovating pre-existing space to creating entirely new space.  For instance, DMH examined the feasibility of converting space within Coalinga State Hospital, designed for

- 2 -

1   low-security sexually violent predators, into a unit able to manage high-security CDCR

2   inmate-patients. (See Defs.' Trial Ex. 1158, which is a true and correct copy of Coleman

3   Defs.' Am. Coalinga Feasibility Study, filed 12/4/06.) DMH participated in the

4   development and activation of a new 64-bed intermediate care unit at Salinas Valley

5   State Prison and new 36-bed intermediate care unit at California Medical Facility,

6   Vacaville. While CDCR built a new 50-bed mental health crisis bed unit at California

7   Medical Facility, Vacaville, DMH created some 20 mental health crisis beds from its

8   existing acute care unit at that site. To ensure sufficient mental health care beds in the

9   future, I worked with a multi-agency task force in preparing and developing Defendants'

10  August 2007 mental health bed plan and the July 2008 mental health bed plan. (Defs.'

11  Trial Ex. 1139, which is a true and correct copy of Coleman Defs.' Bed Plan 8/07; Defs.'

12  Trial Ex. 1175, which is a true and correct copy of Coleman Defs.' Bed Plan, 7/08.) In

13  conformance with the Coordinated Court's order, my office collaborated with the Plata

14  Receiver's office in preparing these bed plans. (Defs.' Trial Ex. 1299, which is a true and

15  correct copy of the Coordinated Courts' Order, 6/28/07.)

16       6.    I also participated in the development of plans to enhance the staffing

17  available to provide mental health care to CDCR inmates within DMH hospitals and

18  programs. In the wake of court-approved pay increases for CDCR clinicians in

19  December 2006, DMH suffered vacancies when some DMH clinicians obtained positions

20  with CDCR at a higher pay scale. (See Def. Trial Ex. 1305, which is a true and correct

21  copy of Coleman Special Master's Report on DMH Clinicians' Salary, filed 1/30/07.) By

22  June 2007, I had prepared and obtained court approval of similar pay increases for DMH

23  clinicians providing care to CDCR inmates. (Defs.' Trial Ex. 1286, which is a true and

24  correct copy of the Coleman Court Order, 6/28/07.) I also participated in developing

25  DMH's plan to enhance recruitment efforts to fill vacant clinical positions. (Id.)

26       7.    CDCR inmates are placed in these DMH-operated and staffed beds by

27  referrals made by CDCR clinicians. I oversee the preparation and implementation of the

28  operating interagency agreements and memoranda of understanding between DMH and

- 3 -

1  CDCR to provide acute and intermediate inpatient services to CDCR inmates.  The

2  memoranda of understanding incorporate the criteria stated in the court-approved

3  Revised Program Guide for the referral and care of CDCR inmates needing inpatient

4  mental health services.  Joint training between CDCR and DMH to streamline the referral

5  processes has occurred.

6      8.     DMH has expanded its role as a mental health service provider to include

7  CDCR inmates who are parolees awaiting revocation hearings, in compliance with the

8  *Valdivia/Coleman* August 8, 2008 order.  DMH has collaborated with CDCR in creating a

9  plan to provide mental health care services to those parolees awaiting revocation

10 hearings.

11     9.     As the Deputy Director of Long-Term Care Services, I am also responsible

12 for DMH's responses to other litigation matters, ranging from habeas petitions filed by

13 patients to the action brought by the United States Department of Justice against DMH

14 under the Civil Rights of Institutionalized Persons Act (known as the CRIPA case).

15 These other litigation matters reflect the DMH's statutory mission to serve not just the

16 CDCR population, but a multiplicity of populations, ranging from mentally disordered

17 offenders to those found not guilty be reason of insanity.

18                    II.    **Overview**

19     10.    DMH's role in this proceeding is limited to the services it provides to CDCR

20 inmates needing inpatient mental health care.  Because the inpatient population of DMH

21 is physically separated and housed apart from the CDCR general (non-patient)

22 population, DMH patients are not subject to the impact, if any, of the alleged

23 overcrowding of CDCR institutions.

24                 III.    **DMH's Relationship with CDCR**

25     11.    By statute, DMH has jurisdiction over the state hospitals.  Cal. Welf. & Inst.

26 Code § 4100.  DMH's jurisdiction over state hospitals, however, is subject to a statutory

27 process for the referral of CDCR inmates to DMH facilities for care.  Cal. Penal Code, §

28 2684.  This statutory referral process gives DMH discretionary authority to admit and

- 4 -

TRIAL AFFIDAVIT OF CYNTHIA RADAVSKY
(CASE NOS. 2:90-CV-00520 LKK JFM P AND C01-1351 TEH)

1    discharge CDCR inmates from state facilities. Cal. Penal Code § 2684. Likewise, Penal

2    Code section 2974 permits DMH to admit into a state hospital a CDCR inmate, upon a

3    finding of probable cause. In any circumstance, the responsibility for the care of

4    mentally ill CDCR inmates is limited, both in scope and time, by state law.

5         12.    Even before the entry of judgment in the *Coleman* case, CDCR and DMH

6    engaged in a cooperative relationship to meet the inpatient mental health care needs of

7    CDCR inmates. (Defs.' Trial Ex. 1273, which is a true and correct copy of *Coleman*

8    F&Rs, filed 6/6/94, at 43.) DMH provided such services, including 708 beds, at

9    Atascadero State Hospital and California Medical Facility, Vacaville. (*Id.*) With the start

10    of the compliance phase in the *Coleman* case in 1995, DMH continued its partnership

11    with CDCR to provide DMH inpatient intermediate and acute care to CDCR inmates.

12         13.    In 1994, the identified population of inmates requiring mental health care

13    was 7.9%. (Defs.' Trial Ex. 1273, which is a true and correct copy of *Coleman* F&Rs,

14    filed 6/6/94, at 21.) The mental health population as of May 2007 was 32,958 or 19% of

15    the overall CDCR population. (Defs' Trial Ex. 1292, which is a true and correct copy of

16    *Coleman* Special Master's Response to Court's May 17, 2007 Request for Information,

17    p. 2.) At any one time, approximately 449 inmate-patients receive inpatient intermediate

18    or inpatient acute care from DMH. (*Id.*)

19         14.    Inpatient intermediate and inpatient acute care is provided within DMH

20    hospitals (such as Coalinga, Patton, and Atascadero State Hospitals) and with DMH

21    facilities located on CDCR sites (Vacaville Psychiatric Program and Salinas Valley

22    Psychiatric Program). As part of Vacaville Psychiatric Program's 150 acute beds, 20

23    beds are set aside as mental health crisis beds specifically allocated for referral from

24    CDCR's California Medical Facility. These beds are consistently utilized at capacity as

25    DMH makes the necessary accommodations to ensure that there is not a wait list for

26    these beds. Salinas Valley Psychiatric Program operates 176 intermediate care beds for

27    CDCR patients, particularly those who present high security risks. Atascadero State

28    Hospital operates 231 intermediate care beds and 25 acute care beds made available

- 5 -

1  for CDCR inmate-patients.  These beds are consistently utilized at capacity due to

2  competing demands from *Coleman* class inmate-patients, civil commitments of those

3  found to be mentally incompetent to stand trial, not guilty by reason of insanity, or

4  mentally disordered offenders.  Coalinga State Hospital provides 50 intermediate care

5  beds to CDCR patients.  (See Def. Ex.  1296, a true and correct copy of the *Coleman*

6  Court Order dated May 2, 2006.)  Regardless of the location, inmate-patients receiving

7  DMH care are housed separately from the general population of CDCR inmates.   (See

8  Def. Ex. 1295, a true and correct map of DMH Institutions.)

9      15.    The CDCR-DMH relationship has been created by interagency agreements

10  outlining the clinical criteria, timelines, and procedures for the referral of mentally ill

11  inmates to DMH acute and intermediate beds.  With the *Coleman* court's finding that a

12  portion of DMH's beds were not being utilized, CDCR and DMH acted to streamline the

13  referral processes and conducted joint training programs on referrals.  To the extent

14  referrals were rejected, those rejected referrals have, since 2005, been the subject of a

15  twice-weekly Coordinated Clinical Assessment Team discussion involving CDCR and

16  DMH clinicians.  These joint agency discussions often result in a better understanding of

17  the referred inmate-patient's placement and results in a clinical determination of how the

18  inmate-patient's needs can be addressed.  Further, the discussions have resulted in a

19  shared understanding of the need for CDCR to use blood reference tests to ensure a

20  referred inmate-patient's symptomology is appropriately medicated with necessary

21  psychotropic medications.

22      16.    DMH and CDCR have enhanced the care available to mentally ill inmates

23  by deploying key resources to implement jointly-prepared bed plans.  Both agencies

24  engaged in the planning necessary for the now-completed construction of 64 additional

25  intermediate care beds within Salinas Valley Psychiatric Program, the placement of 50

26  CDCR inmates within Coalinga State Hospital, and the planned construction of 64

27  additional  intermediate care beds at California Medical Facility, Vacaville.  This level of

28  commitment to the care of mentally ill inmate-patients demonstrates the continued

- 6 -

engagement of DMH in the goal of providing mental health care to CDCR inmates.

### IV.    DMH Does Not Have Overcrowded Hospitals or Programs

17.    DMH's hospitals and programs are operated under strict state licensure regulations limiting the number of patients that may be served at any one time in any particular space.  Those licensure regulations require DMH programs providing inpatient care at CDCR sites to be self-contained units, with housing areas subject to particular space standards.  CDCR inmates receiving inpatient acute and/or intermediate care at Salinas Valley Psychiatric Program and at Vacaville Psychiatric Program are housed apart from other inmates of CDCR.  They are not housed with non-patient inmates in traditional or even non-traditional housing areas, such as dayrooms and gymnasiums.  CDCR inmates receiving inpatient acute and/or intermediate care at CDCR sites benefit from state licensure requirements setting minimum standards of occupancy in specific housing and treatment areas.  As a result, these CDCR inmates are not subject to any overcrowding in these DMH-run programs and are physically separate from alleged areas of overcrowding that may exist in these CDCR sites.

18.    The inpatient hospital care provided by DMH at Atascadero State Hospital and Patton State Hospital is licensed under state regulations and accredited by the national Joint Commission on the Accreditation of Healthcare Organizations.  Coalinga State Hospital is currently licensed and working toward Joint Commission accreditation.  Under these standards, the patients are provided either single rooms or two- or four-person dormitories, depending on their treatment needs and acuity level, in areas designed for patient housing.  No patients are triple-bunked in non-traditional housing areas, such as gymnasiums or dayrooms.  Given the geographic distance of DMH hospitals from CDCR facilities, those CDCR patients receiving inpatient care at a DMH hospital do not experience overcrowding.

19.    DMH is required, by a federal consent judgment, to provide a 'recovery model of care' at its hospitals.  (*See* Defs.' Trial Ex. 1169, which is a true and correct

- 7 -

1    copy of the CRIPA consent judgment, filed in *Coleman* Court, 5/4/06.)  This model of

2    care yields, as put by the *Coleman* Special Master, a therapeutic milieu for the treatment

3    of patients.  The model contains specific staffing ratios that dictate the ratio of clinicians

4    who must be available to provide a spectrum of services to inmate-patients. Simply put,

5    DMH can only accept the number of inmate-patients it has sufficient staff, under the

6    ratios of this recovery model of care, for providing care.   DMH cannot 'overcrowd' its

7    hospitals and programs with inmate-patients without falling afoul of the CRIPA consent

8    judgment.

9    **V.    The Need for More Inpatient Care Beds for High Custody Inmates**

10   **Is Being Addressed by CDCR and DMH**

11   20.    As discussed above, CDCR inmates requiring inpatient mental health care

12   may be referred to DMH for such care.  In making placement decisions, DMH must

13   consider the inmate-patient's treatment needs and, due to the design of DMH hospitals,

14   certain custody factors.

15   21.    DMH hospitals were simply not designed to house inmates that exhibit an

16   escape risk, predatory behavior against other patients, or assaultive behavior upon staff.

17   Two studies of the feasibility of housing high custody inmates at Coalinga State Hospital

18   indisputably established that the very walls of the cells could be easily smashed by the

19   naked fist of a patient.  The hospital walls, in accordance with hospital standards, do not

20   contain rebar.  Moreover, DMH's hospitals, unlike prisons, neither have secure

21   perimeters nor armed officers within its walls.  As a result, DMH can only accept into its

22   hospitals those patients requiring inpatient care who do not pose a security risk based

23   upon their past predatory, assaultive, or escape behaviors.

24   22.    Those CDCR inmates whose security levels preclude placement at a DMH

25   hospital are considered for placement in the high-security facilities of Salinas Valley

26   Psychiatric Program and Vacaville Psychiatric Program.  Because these DMH programs

27   within CDCR campuses have a limited number of beds, patients sometimes are placed

28   on a waiting list for their care within those beds. (See Defs.' Trial Ex. 1165, a true and

- 8 -

1   correct copy of the DMH Bed Utilization Report, dated August 15, 2008; Defs.' Trial Ex.

2   1166, a true and correct copy of DMH Report on SVPP and VPP Census, dated August

3   4, 2008.)

4          23.    The *Coleman* court ordered Defendants to submit a set of plans to address

5   the needs of two categories of inmate-patients: (1) those needing acute and intermediate

6   inpatient beds, and (2) those needing mental health crisis beds.  (Defs.' Trial Ex. 1043,

7   which is a true and correct copy of the *Coleman* Order, 3/3/06.)  The *Coleman* Court

8   further directed Defendants to submit additional bed plans for providing mental health

9   care to certain mentally ill inmates in reception centers, a plan for the interim provision of

10   intermediate inpatient and mental health crisis beds, and an amended long-term plan

11   based on current population projections.  (Defs.' Trial Ex. 1296, which is a true and

12   correct copy of the *Coleman* Order, 5/2/06.)  Further, Defendants were ordered to

13   coordinate their compliance efforts, particularly those involving bed planning, with the

14   Receiver appointed in April, 2006 in *Plata v. Schwarzenegger*, Case No. C01-1351 TEH

15   (N.D. Cal.).  (Defs.' Trial Ex. 1066, which is a true and correct copy of the *Coleman*

16   Order, 6/8/06.)  As *Coleman* Special Master Keating noted in his May 2007 and August

17   2007 reports to the *Coleman* Court, Defendants have submitted plans in compliance with

18   these orders and, indeed, await approval of the July 2008 plan to coordinate

19   construction of consolidated health care facilities with the *Plata* Receiver.

20          24.    These bed plans have consistently addressed the critical area of need

21   identified by the *Coleman* Special Master: the paucity of available inpatient beds for

22   high-custody patients.  I agree with former *Coleman* Special Master Keating that the

23   number of patients with high custody risk factors requiring inpatient care will increase in

24   the future.  Therefore, DMH and CDCR have been working to construct new hospital

25   facilities specifically designed for this subset of the *Coleman* class that cannot be safely,

26   timely, and appropriately treated within available DMH hospitals and facilities.

27          25.    The construction of the inpatient beds described in the August 2007 and

28   July 2008 bed plan are subject to coordination with the construction of medical beds by

-9-

1  the *Plata* Receiver. As stated in the July 2008 plan, DMH will draw upon its own

2  experienced clinical and administrative resources in providing the leadership in staffing

3  and delivering the mental health care services for the intermediate and acute care

4  mental health patients placed in these facilities. These inmate-patients will benefit from

5  the recovery-based model of care approved under the CRIPA consent judgment with the

6  United States Department of Justice, which was also approvingly termed a therapeutic

7  environment by the *Coleman* Special Master. (Defs.' Trial Ex. 1169, a true and correct

8  copy of the CRIPA consent judgment, filed 5/4/06; Defs.' Trial Ex. 1298, a true and

9  correct copy of the *Coleman* Special Master's Report on the August 2007 Bed Plan, filed

10  9/24/07, p. 10.)

11       26.    A corollary benefit of the construction of these additional inpatient beds is

12  that existing state hospital beds can be utilized to serve other growing mental health

13  populations: those found by state superior courts to be not guilty by reason of insanity, to

14  be mentally disordered offenders, to be incompetent to stand trial, and subject to

15  conservatorships. The competing demands placed upon DMH for the increasing mental

16  health population statewide can only be relieved by increasing the number of mental

17  health beds.

18       27.    In addition to planning an increase in mental health beds, DMH has taken

19  active measures to increase its mental health care staff. Like other public mental health

20  care providers, DMH has had difficulty attracting qualified mental health psychiatrists and

21  psychologists. The role of the professionals, of course, has been highlighted by the

22  CRIPA consent judgment mandate of a recovery model of care and its interdisciplinary

23  approach to mental health treatment.

24       28.    DMH and CDCR have often competed for mental health clinicians with

25  different pay packages. DMH experienced a severe loss in mental health professionals

26  when the *Coleman* court approved an across-the-board pay increase for CDCR

27  clinicians, with a waiver of certain Government Code sections. (*See* Defs.' Trial Ex.

28  1305, which is a true and correct copy of *Coleman* Special Master's Report on DMH

- 10 -

1    Clinicians' Salary, filed 1/30/07, p. 4-5.) That pay increase, along with other factors,

2    resulted in Atascadero State Hospital, and other hospitals, restricting admissions for a

3    short time. (*Id.*) With the use of contract clinicians, DMH was able to reinstate

4    Atascadero State Hospital's former admissions process. Fortunately, the *Coleman* court

5    approved an across-the-board pay increase for DMH clinicians in June 2007. (Defs.'

6    Trial Ex. 1286, a true and correct copy of the *Coleman* Order, dated 6/28/07.) At the

7    same time, DMH undertook and continues to implement recruitment strategies to obtain

8    and retain the qualified staff needed to provide the recovery model of care. (Defs.' Trial

9    Ex. 1143, a true and correct copy of the DMH Plan to Address Staffing, filed 5/16/07; *see

10   also* Defs.' Trial Ex. 1167, a true and correct copy of the DMH Monthly Report on

11   Staffing, dated August 4, 2008.) These recruitment strategies include the use of

12   internships with community colleges and the repayment of loans. Additionally, DMH has

13   relied upon contract clinicians who are willing to provide a long-term commitment to their

14   positions with DMH to fill other vacancies. Moreover, the consolidated health care

15   facilities planned in collaboration with CDCR and the *Plata* Receiver will hopefully attract

16   additional clinicians.

17                                    **VI.    Summary**

18          29.  The mental health care provided by DMH has consistently been upheld by

19   the *Coleman* Special Master as a "therapeutic milieu" that is appropriate and more than

20   constitutionally adequate. Indeed, this therapeutic milieu has developed under the

21   auspices of the federal Department of Justice's monitoring of a consent judgment with

22   DMH. Because DMH provides mental health care for CDCR inmates in settings

23   separate and apart from the housing of CDCR general population inmates, DMH care is

24   not impacted by the overall census of CDCR. The anticipated construction of additional

25   secure facilities for the care of high-custody inmates requiring inpatient care will

26   //

27   //

28   //

                                        - 11 -

1    //

2    //

3    remediate the present wait list for such care.

4        I declare under penalty of perjury that the foregoing is true and correct.  Executed

5    in Sacramento, California on October 29, 2008.

7    CYNTHIA A. RADAVSKY

- 12 -

TRIAL AFFIDAVIT OF CYNTHIA RADAVSKY
(CASE NOS. 2:90-CV-00520 LKK JFM P AND C01-1351 TEH)