ANN MILLER RAVEL, County Counsel (S.B. #62139)
THERESA J. FUENTES, Deputy County Counsel (S.B. #208588)
OFFICE OF THE COUNTY COUNSEL
70 West Hedding, East Wing, 9th Floor
San Jose, California 95110-1770
Telephone: (408) 299-5900
Facsimile: (408) 292-7240

Attorney for Intervenor
COUNTY OF SANTA CLARA

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

AND THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

| | |
|---|---|
| RALPH COLEMAN, et al., <br><br> Plaintiffs, <br><br> v. <br><br> ARNOLD SCHWARZENEGGER, et al., <br><br> Defendants. | No. CIV S-90-0520 LKK JFM P <br><br> <u>THREE-JUDGE COURT</u> <br><br> **TRIAL DECLARATION OF NANCY DANE PENA, Ph.D.** <br><br> Trial Date: November 18, 2008 <br> Time: 1:30 p.m. <br> Location: U.S.D.C. Ceremonial Courtroom |
| MARCIANO PLATA, et al., <br><br> Plaintiffs, <br><br> v. <br><br> ARNOLD SCHWARZENEGGER, et al., <br><br> Defendants. | No. C01-1351 TEH <br><br> <u>THREE-JUDGE COURT</u> |

I, Nancy Dane Pena, declare as follows:

1. I am currently employed as the Director of the Mental Health Department of the Santa Clara Valley Health and Hospital System (the "Mental Health Department") of Santa

1  Clara County (the "County") and have been so employed since 2000. Prior to becoming the
2  Director, I served in various roles at the Mental Health Department as Deputy Director from
3  1996-2000, Director of Family and Children's Services from 1992-1996, Director of Intensive
4  Children's Services from 1991-1992 and Director of Acute Services Social Services and
5  Children's Services from 1985-1991. Prior to my employment with the County, I worked as
6  Director of Mental Health Services for Gardner Community Health Center, Inc., in San Jose,
7  California.

8      2. I have been a licensed clinical psychologist since 1980 and I have worked in the field
9  of mental health public service delivery continuously for the past 30 years, and in the County
10 for the past 28 years in a variety of administrative and clinical leadership roles. I have planned
11 and administered a broad range of mental health programs for all ages, and all levels of
12 intensity, including services to youth and adults involved in the criminal justice system.

13     3. I have been actively involved in various state-level organizations and recently served
14 as President of the California Mental Health Directors Association ("CMHDA"). I also sit on
15 the Board of Directors of the California Institute for Mental Health and the California Mental
16 Health Advocates for Children and Youth. I was appointed to the State Performance Evaluation
17 Advisory Committee, a 20-member committee that has advised the State Department of Mental
18 Health on performance measures for the Mental Health Services Act ("MHSA"), which is a
19 voter approved tax initiative designed to expand county mental health systems. I also serve as
20 Co-Chair of the Statewide Children's System of Care Committee of Mental Health Directors.

21     4. As the Director of Mental Health, I am responsible for the overall administration of
22 the Mental Health Department, including responsibility for the overall budget and program
23 administration. In this capacity, every fiscal year (July 1 through June 30) I prepare a
24 recommended budget for the Mental Health Department within the fiscal parameters set by the
25 County and submit it to the County Executive's Office. The Mental Health Department
26 Recommended Budget then becomes a part of the larger County of Santa Clara Recommended
27 Budget. ("Recommended Budget" released by the Office of the County Executive in May
28 2008, Exhibit A to County's Trial Exhibits, at pp 475-484.) I am anticipating millions of

dollars in further budget cuts from the Recommended Budget due to budget cuts contained within the FY09 budget for the State of California.

5. In connection with preparing the budget and overseeing the programs and services provided by the Mental Health Department, my duties include considering and forming opinions regarding the impact of additional persons, including prisoners or parolees, needing mental health services in the County.

6. The Mental Health Department serves 17,000-19,000 clients each year through an extensive network of County operated and contracted providers. (Recommended Budget, at p. 472.) Approximately 25% of these clients are under 18 years of age, 65% are between 18 and 59 and 10% are 60 or older. (*Id.*) As of May 2008, the Mental Health Department Recommended Budget included more than $250 million of county, state and federal funds. (Recommended Budget, at p. 489.)

7. The majority of the County's mental health clients are covered by Medi-Cal, which is California's Medicaid program. Medicaid is a public health insurance program that provides necessary health care services for certain low-income individuals, including children, families with children, pregnant women, seniors, persons with certain disabilities and persons with certain diseases such as tuberculosis, breast cancer, or HIV/AIDS. Medi-Cal is partially funded by the State of California and the federal government, as indicated below.

8. The State of California contracts with the County to act as the Medi-Cal Mental Health Managed Care provider for Medi-Cal beneficiaries who are Santa Clara County residents. The County administers services to Medi-Cal eligible individuals through contracted and county-operated programs. Services are claimed and reimbursed through the State Department of Mental Health, who in turn bills the federal Medicaid program through the State Department of Health Services. Counties are reimbursed by federal medicaid pass through by the State at approximately 50% on the dollar. For children with Medi-Cal under the age of 22 years, counties receive federal and state reimbursement up to 95% on the dollar. As the Medi-Cal provider, the County is mandated to provide the required match of funds (*i.e.*, the difference between the cost of the services provided by the County and federal and state reimbursement)

from the County's Mental Health Realignment funds or local discretionary funds.

9. The County serves mentally ill adults and children that are uninsured, meaning they are not eligible for Medi-Cal and do not have private insurance or financial resources to cover the cost of mental health services. ("Unsponsored Clients"). Generally, the County is not required to provide mental health services to Unsponsored Clients beyond resources available through state and federal funds, and the required relatively small local match. Nonetheless, the County, as the safety net and health care provider of last resort, expends significant general funds dollars to provide services to this population. For example, the Recommended Budget shows approximately $72 million dollars in County general fund budgeted for mental health services, including the Medi-Cal required match. (Recommended Budget, p. 489.) In my duties as President of CMHDA and as the Mental Health Director for the County, I became aware that the County is one of only a few counties in the State of California that invests substantial general discretionary fund dollars to provide mental health care to Unsponsored Clients, and to Medi-Cal beneficiaries beyond available state and required local matching funds.

10. During the past five years, the Mental Health Department has sustained general fund budget cuts of nearly $45 million dollars. These budget cuts have resulted, among other things, in the loss of discretionary general fund dollars that are used to provide mental health services to Unsponsored Clients. I estimate that as a result of these budget cuts over the years, the County has lost the ability to serve at least 4,000 Unsponsored Clients. I fully expect there will be further reductions in services to this population due to the current fiscal state of affairs in the County and in the State of California.

11. Unfortunately, even with a $250 million dollar budget, the County does not have the resources to serve everybody who needs County mental health services. Most individuals needing services seek those services through the Mental Health Department's Call Center, which screens individuals for County mental health services. The Call Center accepts approximately 30% of these individuals. The rest are turned away or referred to other community resources. Generally, the only people who are able to receive mental health services from the County are Medi-Cal beneficiaries who have significant impairment in their

functioning, are unable to work, and have had recent psychiatric crisis, hospitalizations or suicide attempts. Unsponsored Clients usually only receive services if they are directly referred from an inpatient hospitalization or psychiatric emergency room. In fiscal year 2008, the Mental Health Department had a waiting list of nearly 500 Unsponsored Clients. I recently made the decision not to maintain a waiting list because it did not seem appropriate to offer people a spot on a list for services they will most likely never get.

12. The majority of adult mental health clients receive outpatient services, which consist of approximately one hour a month of case management services and individual, group and family therapy, and medication monitoring. It costs the Mental Health Department an average of $4,337 per year to provide outpatient services to an adult client. (County Exhibit G at p. 2.)

13. In my capacity as the President of CMHDA and the County Mental Health Director, I am aware that the County is one of few counties in California that has an inpatient psychiatric facility for emergency care. The County has seen a large spike in emergency services because when mentally ill people do not receive mental health services, they often have crises and require hospitalization. The Mental Health Department is currently $8 million over budget for inpatient hospitalization, and will likely need to fill this gap by further reducing services for Unsponsored Clients. I strongly believe that the higher need for inpatient beds is the direct result of individuals being unable to access basic mental health treatment from the County. It costs the County approximately $1200 a day for inpatient services if the services are rendered in the County facility, and approximately $900 a day if the County contracts for services in the private sector.

14. As the Mental Health Director, I am responsible for preparing and implementing the County's 3-year MHSA program and expenditure plan, which has been approved by the state of California (County Exhibit K.) The MHSA was passed by the voters in November 2004, and charges an additional 1% tax on certain taxable income. The funds are provided by the state to the counties based on each county's approved MHSA Plan and must be used to expand public mental health and services and programs, and to increase the number of residents served by those programs. MHSA funds are required to be used for community services and support,

capital and technology investment, workforce education and training, prevention and early intervention, and innovation. The MHSA Plan requires the County to use a majority of MHSA funds for Full Service Partnerships (FSP). (MHSA Plan, Exhibit K at p. 83.) The FSP model is a comprehensive multidisciplinary approach involving psychiatrists, clinicians and case management staff to address all aspects of a client's life and to provide treatment and support services such as permanent housing, 24 hour access to treatment, support and case management, and flexible funds that can be used for any purpose, including employment, benefits, or housing. The FSP model is designed for people who have multiple complex needs that cannot be served by an outpatient model of care. FSP candidates often have no support system in the community. They may have compliance issues in that they do not take their medications or have difficulty cooperating with their mental health treatment plan. Many are homeless or have problems maintaining housing. Many lack employment and education, and have repeated crises and use of emergency rooms; and many have substance abuse issues and have criminal histories. FSP services cost an average of $19,380 per year, per client. (County Exhibit G at p. 1.) FSP services are expensive and limited funds are available to provide FSP services to adult clients. Approximately 175 of 300-350 FSP slots are reserved for individuals who are part of the criminal justice system and are coming out of the County jail. I know there are many more individuals coming out of the County jail who need and would benefit from these services. The County is currently in the process of contracting with the State of California for the State to pay for a small number of FSP slots for parolees. In connection with these contract discussions, I became aware that there is a need for FSP services for state parolees.

15. Approximately 20 percent of inmates in our County jail are taking psychotropic medications and are receiving mental health services while in jail. (County Exhibit J at p. 2.) The general knowledge in the field, and based on my experience, is that 75% of these individuals have co-occurring substance abuse problems. Approximately 2000-2500 individuals leaving our County jail each year are in need of ongoing psychiatric service upon release, yet our mental health system is only able to serve an estimated 700 of them, or less than 30 percent. (County Exhibit J at p. 3.) Indeed, mentally ill offenders who are released into the

community from the court system with conditions of obtaining community mental health and substance abuse treatment are waiting 7 to 90 days because of the backlog of available treatment beds. (County Exhibit J at p. 4.) A new influx of prisoners competing for these same beds will widen the already extensive gap between need and resource, resulting in even more untreated individuals.

16. Based on my experience in the mental health field and my knowledge of the mental health needs of inmates coming out of our own County jail, individuals released from state prison are likely to have complex, high level service needs. For example, 75% of them are likely to have co-occurring substance abuse issues. They often receive mental health services (*e.g.*, medication, support therapy, counseling) in prison that they will not be able to receive in the community due to inadequate resources. These individuals are likely to be homeless and unemployed once released from prison. It is likely they are not self-sufficient and have no family and support network in the community. They have a criminal justice background which makes it more difficult to obtain housing and employment. Individuals with mental illness who are in prison or other institutions (regardless of the conditions in those institutions) are often provided with basic life needs such as shelter, food, clothing and medicine. If these individuals are released into a community setting with none of those basic supports in place, and no access to mental health treatment, they may quickly deteriorate in their psychiatric functioning. Psychiatric decompensation often results from this deterioration, leading to impaired judgment and thinking, paranoia, delusions, hallucinations, and loss of emotional and behavioral control. This leads to psychiatric hospitalization and rapid re-involvement with the criminal justice system.

17. According to the California Department of Corrections and Rehabilitation, Santa Clara County residents consist of approximately 3.6% of the state prison population. (County Exhibit D at p. 1.) I am not aware of the exact number of prisoners that would be released under a prisoner release order issued by this Court. However, I am aware that numbers ranging from 15,000 to 40,000 prisoners have been discussed. This would mean an additional 540 to 1440 prisoners would be released to Santa Clara County. In addition, the Santa Clara County

1  Department of Correction did a projected impact on the County jail of a court imposed cap
2  reducing the state population by 40,000, which indicated that 1,549 people would come back to
3  Santa Clara County in 2008, and the number increases to 1,943 as the state's projected
4  population increases. (County Exhibit D at p. 3.) Lastly, I am aware that the State's Legislative
5  Analyst's Office proposed to release 71,000 adult offenders from State to local prison, which
6  would result in approximately 3500 individuals coming to Santa Clara County. (County Exhibit
7  R at p. 132.)

8      18. Regardless of the number of individuals who are released under a prisoner release
9  order, whether it is 500 or 3500, twenty percent of them are likely to have mental illness. The
10 County simply cannot provide mental health services to an additional 100 to 700 individuals
11 when it currently denies services to 70% of adults who seek those services. The County does
12 not have the local resources to meet the needs that are pressing its system right now, resulting in
13 increased crises and psychiatric decompensation in the community, increased law enforcement
14 involvement, increased crimes and incarceration, and increased use of expensive emergency
15 services. There is no doubt in my mind that releasing additional prisoners into a community
16 without resources for treatment, as well as allotting sufficient time for planning, coordination
17 and workforce training for the services, will result in a negative impact on public safety because
18 these individuals will go untreated and will decompensate in the community. This will result
19 in a negative impact on public safety including increased psychiatric hospitalization and
20 emergency psychiatric crises, increased medical emergency room utilization, recidivism,
21 homelessness, unemployment, suicide, danger to others, substance abuse and increased
22 community safety concerns. The County would have no choice but to prioritize and provide
23 services to these newly released prisoners according to current system acuity, thereby stretching
24 an already thread-bare safety net and posing a severe risk to community safety. It is virtually
25 impossible to fathom anything other than a devastating outcome for many parolees as well as
26 for local mentally ill residents that rely on limited public resource, if the release of parolees
27 occurred without the accompanying resources to address their basic mental health needs. In
28 my opinion, you cannot take a very high need population and bring them into a system that has

no resources and is already stretched thin and assume there will not be major negative public safety outcomes.

19. The forgoing is based upon my personal knowledge and my expert opinion. If called to testify as a witness I could and would testify competently thereto. I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed this 28th day of October, 2008, at San Jose, California.

*Nancy Dane Pena, Ph.D*