1  PRISON LAW OFFICE
   DONALD SPECTER, Bar No. 83925
2  STEVEN FAMA, Bar No. 99641
   E. IVAN TRUJILLO, Bar No. 228790
3  SARA NORMAN, Bar No. 189536
   ALISON HARDY, Bar No. 135966
4  REBEKAH EVENSON, Bar No. 207825
   1917 Fifth Street
5  Berkeley, CA 94710
   Telephone: (510) 280-2621
6
   KIRKPATRICK & LOCKHART PRESTON
7  GATES ELLIS LLP
   JEFFREY L. BORNSTEIN, Bar No. 99358
8  EDWARD P. SANGSTER, Bar No. 121041
   RAYMOND E. LOUGHREY, Bar No. 194363
9  55 Second Street, Suite 1700
   San Francisco, CA 94105-3493
10 Telephone: (415) 882-8200

11 THE LEGAL AID SOCIETY –
   EMPLOYMENT LAW CENTER
12 CLAUDIA CENTER, Bar No. 158255
   600 Harrison Street, Suite 120
13 San Francisco, CA 94107
   Telephone: (415) 864-8848
14
   Attorneys for Plaintiffs

ROSEN, BIEN & GALVAN, LLP
MICHAEL W. BIEN, Bar No. 96891
ERNEST GALVAN, Bar No. 196065
JANE E. KAHN, Bar No. 112239
AMY WHELAN, Bar No. 215675
LORI RIFKIN, Bar No. 244081
LISA ELLS, Bar No. 243657
315 Montgomery Street, 10th Floor
San Francisco, California 94104
Telephone: (415) 433-6830

BINGHAM, McCUTCHEN, LLP
WARREN E. GEORGE, Bar No. 53588
Three Embarcadero Center
San Francisco, California 94111
Telephone: (415) 393-2000

15         IN THE UNITED STATES DISTRICT COURTS

16        FOR THE EASTERN DISTRICT OF CALIFORNIA

17        AND THE NORTHERN DISTRICT OF CALIFORNIA

18   UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

     PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE
19
20 RALPH COLEMAN, et al.,                ) No.: Civ S 90-0520 LKK-JFM P
                                         )
            Plaintiffs,                  )
21                                       ) **THREE-JUDGE COURT**
       v.                                )
22                                       )
   ARNOLD SCHWARZENEGGER, et al.,        )
                                         )
            Defendants                   )
23 _____  )
   MARCIANO PLATA ,et al.,               ) No. C01-1351 TEH
24                                       )
            Plaintiffs,                  )
25                                       ) **THREE-JUDGE COURT**
       v.                                )
                                         ) **EXPERT REPORT OF**
26 ARNOLD SCHWARZENEGGER, et al.,        ) **JAMES GILLIGAN, M.D.**
                                         )
27         Defendants                    )
   _____  )
28

**TABLE OF CONTENTS**

TABLE OF ABBREVIATIONS/ACRONYMS .......................................................... ii

I.    EXPERT QUALIFICATIONS ............................................................................1

II.   BASIS FOR EXPERT OPINIONS ......................................................................6

      A.    QUESTIONS PRESENTED ....................................................................6

      B.    EVIDENCE ON WHICH THE EXPERT OPINIONS ARE BASED...................7

III.  SUMMARY OF OPINIONS................................................................................7

      A.    WOULD A PRISONER RELEASER ORDER THAT INCLUDES AN
            INCREMENTAL DECREASE IN THE LENGTH OF STAY AND/OR
            DIVERSION OF MENTALLY ILL OFFENDERS ADVERSELY
            IMPACT PUBLIC SAFETY?....................................................................7

            1.    The Public Safety Baseline:  Overcrowding and Recidivism
                  Generally. ....................................................................................8

            2.    The Public Safety Baseline:  Releases of Mentally Ill Offenders
                  Are Already Happening. ...............................................................9

            3.    Improving on the Public Safety Baseline:  Are Mentally Ill
                  Offenders As a Group More Dangerous than Non-Mentally Ill
                  Offenders? ..................................................................................18

      B.    WHAT ARE THE ELEMENTS NEEDED TO IMPROVE PUBLIC
            SAFETY OUTCOMES REGARDING TREATMENT OF MENTALLY
            ILL OFFENDERS BY THE CALIFORNIA CORRECTIONAL AND
            PAROLE SYSTEM?...............................................................................26

            1.    Pre-release planning. ..................................................................29

            2.    System of Access to Care.............................................................31

            3.    Programs to Target Co-occurring Disorders/Dual Diagnosis. ...................33

            4.    Coordination with Community Care Providers...........................33

IV.   STATEMENT OF COMPENSATION................................................................36

V.    LIST OF ALL OTHER CASES IN WHICH I HAVE TESTIFIED AS AN
      EXPERT AT TRIAL OR BY DEPOSITION IN THE PREVIOUS FOUR
      YEARS. .........................................................................................................36

## TABLE OF ABBREVIATIONS/ACRONYMS

| | |
|---|---|
| CCCMS: | Correctional Clinical Case Manager System |
| CDCR: | California Department of Corrections and Rehabilitation |
| C-ROB: | California Rehabilitation Oversight Board |
| DMH: | Department of Mental Health |
| GAF: | Global Assessment of Functioning |
| ICDTP: | In Custody Drug Treatment Program |
| PMD: | Person With Mental Disorder |
| POC: | Parole Outpatient Clinic *or* Psychiatrist on Call |
| SASCA: | Substance Abuse Services Coordinating Agency |
| TCMP: | Transitional Case Management Program |

# EXPERT REPORT OF JAMES GILLIGAN, M.D.

## I.    EXPERT QUALIFICATIONS

1.    I am a psychiatrist with forty years of experience in the evaluation and treatment of homicidal, suicidal and/or mentally ill individuals in prisons, jails, prison mental hospitals, civil mental hospitals and court clinics, as a faculty member of the Harvard Medical School, the Institute of Criminology at Cambridge University (England), the University of Pennsylvania, and New York University. A true and correct copy of my curriculum vitae is appended hereto as **Appendix A**.

2.    I received my undergraduate education as a National Scholar at Harvard College, Class of 1957. After four years as a research assistant to Harvard professors including the sociologist David Riesman, the cardiologist and Nobel Prize winner Bernard Lown, and the psychiatrist Milton Greenblatt, I matriculated at the School of Medicine of Western Reserve University, Cleveland, from which I received my M.D. in 1965. I received my internship training in medicine at the University of Chicago Hospitals and Clinics, 1965-66, and returned to Harvard for my psychiatric training at the Massachusetts Mental Health Center, Boston, 1966-69.

3.    I am a Diplomate of the National Board of Medical Examiners, Certificate No. 89281, July 1, 1966; Registered as a Qualified Physician by the Board of Registration in Medicine, Commonwealth of Massachusetts, Certificate No. 31118, Nov. 13, 1968; Designated as a Qualified Physician (Forensic Psychiatry) Division of Legal Medicine, Department of Mental Health, Commonwealth of Massachusetts, 1977; and I am board-certified in Psychiatry by the American Board of Psychiatry and Neurology, Certificate No. 18274, November 1978.

4.    During my residency training, I received my first exposure to prison psychiatry under Dr. Gerald Adler, which included engaging in diagnostic and prognostic evaluations, individual, group, marital and family psychotherapy, and psychopharmacological treatment, with prisoners serving time for violent crimes at the Massachusetts state prison at Norfolk. Following completion of my residency training, my teaching activities as a junior faculty

member at the Harvard Medical School included training and supervising psychiatric residents in the evaluation and treatment of prison inmates.

5.    In 1977, in my role as Director of the Institute of Law and Psychiatry at McLean Hospital, one of the Harvard Medical School's major psychiatric teaching hospitals, I assumed responsibility for the newly constructed Bridgewater State Hospital. The new Bridgewater was the successor institution the notorious Massachusetts prison mental hospital for the "criminally insane" at Bridgewater. The old Bridgewater had been demolished as a result of a federal lawsuit challenging the practices of the Massachusetts Department of Corrections and Department of Mental Health regarding the care of persons involuntarily committed to prison custody for purposes of mental health treatment. The Department of Corrections entered into a contract with McLean under which McLean was responsible for providing psychiatric treatment and court-ordered forensic psychiatric evaluations at the new Bridgewater. As Director of the Institute of Law and Psychiatry at McLean, I became Medical Director of the new Bridgewater State Hospital.

6.    In 1982, I established the new position of Clinical Director of the Prison Mental Health Service for all of the prisons in Massachusetts. We established mental health centers or clinics in each of the state prisons, each of which was staffed with licensed psychiatrists, clinical psychologists and psychiatric social workers, and which also provided supervised training to psychiatric residents, clinical psychology interns, and social workers getting their "field placement" training.

7.    Among the challenges we addressed in the new Prison Mental Health service was bringing under control the epidemic of suicides and homicides that characterized the state's maximum security prisons, particularly Walpole. During the 1970s, Walpole, a 600-man prison, experienced an average of a murder a month and a suicide every six weeks, in addition to riots, hostage taking, etc.; while other prisons also experienced riots, fire-setting, suicides, and murders of correction officers, prisoners, and even visitors to the prison.

8.    During the first five years of the new Prison Mental Health Service, we brought the rate of homicides and suicides down to one or two a year throughout the entire prison

-2-

system, had two hostage-taking incidents during the whole five years (in both of which I participated in negotiations over the phone with the hostage-taker, and in both of which we were, fortunately, able to resolve the crisis without any deaths resulting), and no riots. By the second five years we were able, in some years, to go through an entire twelve months without a single violent death from either suicide or homicide throughout the entire state prison system, though there were also other years in which there was a single suicide or homicide. During those second five years, however, the epidemic of lethal violence was over, and we had no riots or hostage-takings throughout that time.

9.    During the 1990s, I published several works on violence reduction. In the spring of 1991, I was invited to give the Erikson Lectures at Harvard on "The Roots of Violence," which became a book on the psychological, biological and social causes of violence, entitled *Violence: Reflections on a National Epidemic* (1996). After returning to the Harvard Medical School in 1994 I also wrote *Preventing Violence: An Agenda for the Coming Century* (2001).

10.    In 1997, I founded and have remained President of the Center for the Study of Violence, a private non-profit research and consulting firm. From 1999 to 2001 I was President of the International Association for Forensic Psychotherapy, an organization of mental health professionals from around the world who are devoted to the treatment of violent offenders and the prevention of violent behavior. I have contributed chapters to many scholarly and scientific publications on the theme of understanding and preventing violence and the relationship between psychopathology and violence, including *Forensic Psychotherapy: Crime, Psychodynamics and the Offender Patient* (London, 1995, two volumes). From 1997 to 1999, I was a member of the Editorial Advisory Board of *Violence in America: An Encyclopedia* (three volumes), New York: Scribners, 1999, to which I contributed articles on "Psychological Violence" and "Structural Violence." Since 1998 I have been on the Editorial Board of the *Journal of Applied Psychoanalytic Studies*.

11.    Since joining the faculty of New York University in 2002, I have led seminars in the School of Arts and Science on terrorism and other forms of collective and political violence, and have served as a consultant to Bellevue Hospital's Forensic Psychiatry

Department, which provides in-patient care for inmates at the New York City Jail on Rikers Island, and other violent or potentially violent patients.

12.    From 2003 to 2006, I was also a Visiting Professor of Psychiatry and Social Policy at the University of Pennsylvania, where I taught graduate and undergraduate courses on the causes and prevention of violence in the Department of Criminology and the School of Social Policy and Practice, and gave lectures on psychopathology and violence to medical students and psychiatric residents at the School of Medicine.

13.    In 2004, the New York Academy of Sciences held a three-day symposium at Rockefeller University that was organized around my conceptualization of the primary, secondary and tertiary prevention of violence. The proceedings of the symposium, which I co-edited and to which I contributed two chapters and an introduction, have been published as a volume in the *Annals* of the New York Academy, entitled *Youth Violence: Scientific Approaches to Prevention.*

14.    I have served as a consultant on violent crime and punishment, including war crimes, throughout the United States and around the world to many individuals and groups, including the following engagements:

    a.    Consulting with the Boston Police Department in 1992 on a multi-dimensional strategy that culminated in two years with no youth homicides, a phenomenon sometimes referred to as the "Boston Miracle."

    b.    Consulting with members of the British Parliament in 1993 on crime reduction strategies, and on the relationship between mental illness and crime.

    c.    Providing a briefing to prosecutorial staff of The World Court (the International Criminal Tribunal for the former Yugoslavia) in the Hague on the designation of systemic mass rape as a war crime.

    d.    Consulting with the World Health Organization's Department of Injuries and Violence Prevention since 2002 on the "Global Framework for Violence Prevention."

    e.    Serving as a speaker since 2003 at the World Economic Forum in Geneva on relationships between economic inequality, poverty, unemployment and violence, and as a

consultant in planning programs and selecting speakers for their annual meetings in Davos, Switzerland, as well as serving on the organization's Global Agenda Council on Negotiation and Conflict Resolution beginning this year.

      f.     Serving as Chair of the Committee on Violence Prevention of the Academic Advisory Council of the National Campaign Against Youth Violence, to which I was appointed by President Clinton in 2000.

      g.     Serving in 2002 on a committee organized by the Hudson Institute in Washington, D.C., that drafted legislation to monitor, prosecute and prevent rapes in U.S. prisons (the Prison Rape Elimination Act), which was unanimously approved by both Houses of Congress and signed into law by President Bush in 2004. (I have subsequently been asked to serve as a consultant to the National Prison Rape Elimination Commission that was established by the Department of Justice to implement the provisions of the law.)

      h.     Serving in 1999 and 2000 as a consultant to California State Senator Tom Hayden on violence prevention in California prisons, resulting in the publication of the book *Violence in California Prisons: A Proposal for Research into Patterns and Cures* (Sacramento, 2000).

      i.     Serving as a consultant on violence prevention and rehabilitation in prison systems in Poland, New Zealand, Singapore, Canada and Great Britain.

      j.     Serving since 2005 on the National Commission on Safety and Abuse in American Prisons, culminating in a report to the U.S. Senate Judiciary Committee in 2006.

      k.     Serving as a consultant and adviser to the New York Correctional Association, and a member of their board, with a special emphasis on treatment of mentally ill and suicidal prisoners in the New York state prison system.

      l.     Participating in the preparation of a report on the global problem of "Violence Against Children," which the Secretary General of the United Nations presented to the General Assembly in 2005.

      m.     Serving, since this year, on a committee of the American Psychiatric Association, to prepare a set of "best practices" guidelines for the psychiatric evaluation and

treatment of violent or potentially violent mental patients, as one in the series of evidence-based treatment guidelines they are publishing to summarize the most successful empirically validated approaches to each of a number of different psychiatrically relevant problems or syndromes.

15.    From 1997 to 2004, I evaluated the results of a violence-prevention experiment in the San Francisco jails that was based in part on my theories and research. By 2004 we were able to show that it had achieved a 100% reduction in in-house violence, and that graduates of the program were rearrested for violent crimes 83% less frequently than were the members of a control group of otherwise identical jail graduates who had been in ordinary jails.

## II.    BASIS FOR EXPERT OPINIONS

### A.    QUESTIONS PRESENTED

16.    I have been retained by plaintiffs' attorneys in the *Coleman* and *Plata* cases as an expert on prison psychiatry and the provision of mental health care in prisons, on causes and prevention of violence, and on the relationship between mental illness and violence. They have asked me to focus especially on the following questions:

a.    Would a prisoner releaser order that includes an incremental decrease in the length of stay and/or diversion of mentally ill offenders adversely impact public safety? My answer to this question is no, there would be no increase in crime if the state implemented the order responsibly. In fact, public safety outcomes can be significantly improved by release or diversion of mentally ill offenders in a manner that disrupts the current churning of such persons through short-term incarcerations from which they are released sicker than when they went in.

b.    What are the elements needed to improve public safety outcomes regarding treatment of mentally ill offenders by the California correctional and parole system? The basic elements are pre-release planning, access to care in the community, programs to target persons with co-occurring mental illness and drug addiction, and coordination between parole authorities and community care providers to address the needs of the very small

-6-

minority of mentally ill offenders who need occasional high-level care up to and including in-patient hospitalization. Based on my review of the evidence in this case, I conclude that California has a framework in place which can be used to improve public safety by diverting or releasing mentally ill offenders in a manner that ends the current harmful cycle of frequent short-term incarceration.

**B.    EVIDENCE ON WHICH THE EXPERT OPINIONS ARE BASED**

17.    I have based my opinions on three main sources of evidence:

a.    My own clinical and research experience over the past forty years of work with violent and/or mentally ill individuals in prisons, prison mental hospitals, jails and other correctional and clinical settings, including both my therapeutic work as a clinician with individuals and groups, and my empirical research as a social scientist measuring the variations in the incidence of in-house violence and violent recidivism in the community that occur under varying conditions of incarceration, mental health care, and rehabilitative programming.

b.    My knowledge of the professional and scientific literature on these subjects.

c.    My examination and analysis of much of the documentary evidence, research, judicial opinions and orders, specialized studies by commissions of experts, official correspondence and proclamations, reports by expert witnesses, and other materials introduced into this litigation, including but not limited to the materials listed in **Appendix B** to this Report.

### III.    SUMMARY OF OPINIONS

**A.    WOULD A PRISONER RELEASER ORDER THAT INCLUDES AN INCREMENTAL DECREASE IN THE LENGTH OF STAY AND/OR DIVERSION OF MENTALLY ILL OFFENDERS ADVERSELY IMPACT PUBLIC SAFETY?**

18.    A properly implemented prisoner release order that included an incremental decrease in length of stay and/or diversion of mentally ill offenders would not adversely impact public safety. In fact, it would improve public safety by ending current churning of such persons through short-term incarcerations from which they are released sicker than when they

went in. In the larger context, detailed studies of the relationship between incarceration levels and crime rates have shown that mass incarceration does not reduce rates of violent crime.[1] The same is true regarding incarceration of the mentally ill.

### 1.    The Public Safety Baseline:  Overcrowding and Recidivism Generally.

19.    The status quo is characterized by frequent cycling of offenders through a prison system that is not equipped to provide the level of services and programming necessary to prevent future crimes and victimization.  These points seem hardly to be in dispute.  Even the primary defendant named in *Coleman*, Governor Schwarzenegger, not only agrees that the prisons are overcrowded, but that they are dangerously overcrowded, to such an inordinate degree that the overcrowding itself poses an acute and dangerous emergency not only to all those in the prisons but also to all those outside the prisons, *i.e.*, the community, the State, as a whole.[2]  As is clear from reading his "Prison Overcrowding State of Emergency Proclamation," the prisons are overcrowded in terms not only of their "design capacity," *i.e.*,

---

[1] For the first three-quarters of the twentieth century, the rate at which Americans were incarcerated in our prisons and jails was remarkably constant, remaining roughly in the range of 100 plus or minus twenty per 100,000 of population.  Beginning in the mid-1970s, for the first time in the past century, our incarceration rate underwent an abrupt and sustained increase, from rates of 100-120 to more than 700 per 100,000, a six- to seven-fold increase.  This increase, however, has yielded no benefits in public safety.  Homicide rates, for example, were 8.3 per 100,000 in 1970, before the incarceration boom, and exactly the same in 1996, after the incarceration rate had quadrupled.  The homicide rate only started a downward trend not in step with the incarceration boom, but during the economic expansion of the late 1990s, when real income levels for poor families rose for the first time in 30 years.   The National Academy of Sciences Panel on the Understanding and Control of Violent Behavior investigated the relationship between our incarceration rates and our violent crime rates, and concluded that there has been no substantial public safety benefit from the incarceration boom.  Reiss, Albert J. and Roth, Jeffrey A., Eds. *Understanding and Preventing Violence,* Volume 1, Washington, D.C.: National Academy Press (1993) p. 6.  See also Philip J. Cook, "Research in Criminal Deterrence: Laying The Groundwork For The Second Decade," in N. Morris and M. Tonry, eds., *Crime and Justice: An Annual Review of Research*, Vol. 2, Chicago: University of Chicago Press (1980).

[2] "Prison Overcrowding State of Emergency" Proclamation by the Governor of the State of California (October 4, 2006), Joint Plaintiffs' Trial Ex. 1.

the number of beds and the amount of programming capacity (medical and mental health offices, school rooms, workshops, gymnasia, etc.) they were originally designed for, but also of their "operational capacity," *i.e.*, the number of additional inmates they can accommodate by double- or triple-celling, transforming programming spaces into bed-spaces, etc. That this overcrowding is so severe as to create severe medical, psychiatric and security problems is stated clearly and repeatedly and with abundant supporting documentation and examples. There are confirmations of that conclusion in almost every other report I have cited above and in Appendix B.

20.    Rates of recidivism have increased substantially between 1977, following the passage of the DSL in 1976, followed by 80 additional laws whose cumulative effect was an explosive increase in incarceration rates (culminating in passage of the "three-strikes and you're out" law in 1994), and 2004, as measured by number of offenders returned to prison, with one-year recidivism rates increasing from 20% to 55%, two-year recidivism rates from 26% to 72%, and annual return rates from 10% to 60%.[3]

21.    The links between overcrowded prisons and recidivism are well established. David Farrington and his colleagues at the Institute of Criminology at Cambridge University found a strong relationship between overcrowding and increased rates of recidivism, a relationship that could not be explained away by other variables, leading them to recommend a reduction in prison overcrowding in order to improve the ability of prisons to reduce crime.[4]

### 2.    The Public Safety Baseline:  Releases of Mentally Ill Offenders Are Already Happening.

22.    In order to answer the question of what impact the increased release of individuals, some with mental illness, will have on public safety, it is necessary to consider the

---

[3] "Roadmap for Effective Offender Programming in California," *Report to the California State Legislature by the CDCR's Expert Panel on Adult Offender and Recidivism Reduction Programming* (June 29, 2007), Joint Plaintiffs' Trial Ex. 2, p. 3.

effect of current release practice on public safety. The choice facing the California prison system is not between releasing or not releasing mentally ill offenders. Mentally ill offenders are released every day.

23.    Figure 1, below, is a chart derived from a summary of releases to parole in 2006 from the discovery documents in this case. The blue bars in the chart represent the numbers of persons released to parole based on identified mental health status. "No mental health code," is self-explanatory, and reflects no identification of mental illness. **CCCMS** stands for **Correctional Clinical Case Management System**, the lowest level of diagnosis in the California correctional system. According to the CDCR Mental Health Services Delivery System Program Guide, patients are to be designated for the CCCMS level of care based on stable functioning in the general population, exhibiting symptom control, or being in partial remission as a result of treatment, and with a Global Assessment of Functioning (GAF)[5] scores of 50 and above. EOP stands for **Enhanced Outpatient Program,** the California correctional designation for a higher and more intensive level of treatment, usually resulting in a GAF of less than 50. "Crisis Bed and DMH" signify persons at the two crisis levels of care provided by the program guide—the Mental Health Crisis Bed (MCHB) level of care for prisoners during the first 10 days of a major crisis, and the Department of Mental Health (DMH) level of care for the most acute cases.

24.    The distribution of persons by mental health status in Figure 1, below, is typically pyramidal, with a very broad base of persons with no diagnosis (80%) or with a very

---

[4] Farrington, D. and Nuttall, C., "Prison Size, Overcrowding, Prison Violence, and Recidivism, *Journal of Criminal Justice* 8:221-231 (1980), p. 230.

[5] The Global Assessment of Functioning (GAF) scale scores are clinical assessments of overall psychological, social and occupational functioning based on a 100-point scale. Higher scores reflect better overall functioning. A GAF score of 40 is indicative of major impairment in areas such as judgment, thinking, mood or social or work relations; a score of 50 is considered indicative of serious psychological symptoms or serious impairment in social or occupational functioning.

low acuity diagnosis (17.65% CCCMS), narrowing rapidly to population of higher-acuity individuals that is a full order of magnitude smaller (1.82% EOP), followed by a very small population of individuals with a history of needing crisis-level care (0.48% Crisis Bed and DMH).



Releases to Parole in 2006

**Figure 1: Source: Attributes of 2006 Admissions, Standing and Release Cohorts of Felons and Civil Addicts (email from Bubpha Chen to Susan Turner, May 6, 2007 (Document Number E_UCI044669). Note that the source document includes the following qualification: "Data may be incomplete due to posting delay in DDPS, especially for new admissions." Also, reproduced at Appendix L to 2007 Expert Panel Report, page 145, available at http://www.cdcr.ca.gov/news/docs/Expert_Rpt/ExpertPanelRpt_AppendL.pdf, Joint Plaintiffs' Trial Ex. 2 at 145, Table L-5.**

25.      What are the current public safety outcomes for California's released parolees, both mentally ill and non-mentally ill?  Measured by California's recidivism rates, the outcomes are not good.  California's recidivism rate has been measured variously.  A recent estimate based on 1994 releases found 70% rearrested within three years of release.  Counting only returns to prison, the rate was 66% within three years of release.[6]  These high rates of recidivism make California an outlier in the United States, particularly in the numbers of

_____

[6] Joan Petersilia, "Understanding California Corrections," *California Policy Research Center, University of California* (May 2006), Joint Plaintiffs' Trial Ex. 5, pp.71-72

people returned to prison not for new crimes but for technical parole parole violations. It is important to understand that part of this high recidivism rate is a group of offenders who continually cycle in and out of the prisons on parole violations. This has been referred to as California's "catch-and-release" policy.[7] California leads the nation in the practice of "churning" parolees into and out of prison for short-term parole violations that average about 4 months in prison.[8] As discussed in more detail below, while persons with mental illness do not have higher rates of violent recidivism, they do have higher rates of recidivism for technical parole violations, and thus are more likely to "churn" into and out of prison for short periods.[9] Individuals who "churn" through repeated short-term revocations are predictably released to parole without having received appropriate treatment or programming in the prison, and without adequate plans for treatment or supportive services in the community. Thus, the current public safety baseline is that large numbers of individuals are already recidivating, already being released to the community, coming back to prison, and being released again. For those individuals with mental illness, a California parole department management report from the discovery in this case estimated that thousands of individuals are being returned to prison for parole violations directly resulting from unmet mental health needs:

> Each year over 6,000 parolees suffering from serious mental illness
> are returned to prison for periods ranging from a few months up to

---

[7] *Id.* at p. 75

[8] *See* Blumstein, A. and Beck, A., "Reentry as a Transient State Between Liberty and Recommitment," *Prisoner Reentry and Crime in America* (2005) at pp. 69-74; Grattet, R, Petersilia, J. & Lin, J., *The Causes and Consequences of Parole Violations in California: A Multilevel and Policy-Focused Analysis*, Progress Report Submitted to the National Institute of Justice (July 2007) at p. 1; CDCR Spring 2008 Adult Population Projections, Joint Plaintiffs' Trial Ex. 75, at p. 15 (average time served in prison for male parole violators without a new term was 4.0 months) and p. 17 (average time served in prison for female parole violators was 3.8 months).

[9] Louden, J.E., Dickinger, E., & Skeem, J.L., "Parolees with Mental Disorder: Toward Evidence-Based Practice," *Center for Evidence-Based Corrections Bulletin* [unpublished manuscript] (2008), Joint Plaintiffs' Trial Ex. 76.

one full year or longer if they receive a new term. This is primarily
due to technical violations or other criminal behavior that can result
from their mental illness. Many of the problems exhibited by these
individuals when noncompliant with their parole conditions are
related to the disorganization produced by their mental illness.[10]

26.    The people now incarcerated in, and thus being released from, California's
prisons are largely of two types:  those serving prison terms for new commitments and those
serving prison terms for violations of parole.  In 2007, over half of the releases to parole—
approximately 68,295 releases—were "re-paroles" of parole violators who, on average, served
short terms of approximately 4 months in prison.[11]  Even those who served the longest possible
term for a parole violation would only have served 12 months, the maximum term for a parole
violation.[12]  The dramatic levels of prison overcrowding throughout the state mean that
individuals coming into prison are housed in "Reception Centers" for extended periods of time,
far longer than intended.  Short-term parole violators—who account for half of the annual
releases to parole—are virtually certain to serve their entire revocation terms in these
Reception Centers.

27.    The evidence I reviewed establishes that the levels of mental health treatment
provided to individuals in Reception Centers are inadequate to meet the needs of persons with

---

[10]California Department of Corrections, Division of Adult Parole Operations, Mentally Ill
Parole Population (July 2007), Joint Plaintiffs' Trial Ex. 77, at p. 5.

[11]Movement of Prison Population, Calendar Year 2007,
http://www.cdcr.ca.gov/Reports_Research/Offender_Information_Services_Branch/Annual/M
ove5/Move5d2007.pdf, Joint Plaintiffs' Trial Ex. 78, at p. 1; CDCR Spring 2008 Adult
Population Projections, Joint Plaintiffs' Trial Ex. 75,  at p. 15 (average time served in prison
for male parole violators without a new term was 4.0 months) and p. 17 (average time served
in prison for female parole violators was 3.8 months).

[12] California Penal Code § 3057(a)

mental illness, especially those facing the stresses of reincarceration.[13]  The *Coleman* Special Master has reported that transfers to housing at appropriate levels of care for the EOP and CCCMS populations in Reception Centers are extremely delayed.[14]  Thus, for short-term parole violators the limited mental health treatment provided in the Reception Centers is all they are likely to receive before they are released to parole.  Moreover, it is my understanding that identification of individuals with mental illness who would then be referred for this limited treatment may be significantly delayed upon their arrival at the Reception Centers because screening clinicians do not have timely access to prisoner files.

28.    Top CDCR administrators have admitted that programming in the Reception Centers is minimal or non-existent. During a hearing before the California State Senate Budget Subcommittee on Government Administration on March 12, 2008, in response to the question, "Can you talk about what the Department currently does to deal with the terms of parole violators in reception centers, whether or not there's any rehabilitative services being provided in the short stay that they have there?" Scott Kernan, CDCR Chief Deputy Secretary of Adult Operations, testified, "I would say as to your question are they getting services…in prisons, I would say no, sir.  They're being sanctioned for their behavior and we are sitting them on bunks."[15]  The California Rehabilitation Oversight Board found in its July 15, 2008 Biannual

---

[13] This evaluation of the state of care in the reception centers is based on many of the documents I have reviewed, particularly including the following:  Supplemental Expert Report of Ira K. Packer, Ph.D. (Dec. 12, 2007); Special Master's Report and Recommendations on Defendants' Enhanced Outpatient Treatment Programs in Reception Centers (July 2, 2007), Coleman Plaintiffs' Trial Ex. 9.

[14] *See Coleman* Special Master's Draft 20th Monitoring Report, Joint Plaintiffs' Trial Ex. 57, at p. 353 (noting lengths of stay for CCCMS in Reception Centers), p. 357 (EOP transfers were excessively delayed in all directions; CCCMS transfers to mainline programs also generally exceeded timelines).

[15] Video clip of Senate Budget Subcommittee 4 March 12, 2008 Hearing, available at http://www.calchannel.com/MEDIA/0312A.asx, approximately 1:08, Joint Plaintiffs' Trial Ex. 84.

Report that "CDCR is still primarily in the planning stages of rehabilitation programming reform. The department needs to move more into the implementation phases to demonstrate true progress."[16]  In this regard, I agree with the written statement of one of CDCR's top parole administrators in Southern California, who reported to the director of state parole that the state needs to "break the cycle of mentally ill parolees filling up expensive prison beds," as well as with the statement of a top Los Angeles parole administrator that under the current system parolees are "punished for their illness by being locked up."[17]

29.    Overcrowding the prisons and reception centers impairs California's ability to start to provide rehabilitative programming to anyone in the prisons. The CDCR Expert Panel on Adult Offender Reentry and Recidivism Reduction Programs issued a report on June 29, 2007 that concluded that California must reduce overcrowding in its correctional facilities in order to give its adult offenders the ability to access rehabilitation programming:[18]

> The largest barrier that the Panel identified to delivering effective programming in CDCR prison facilities is its current state of overcrowding. CDCR facilities were built to hold 100,000 offenders; however, at the time of this report, the CDCR was currently housing 172,385 offenders in its prisons. Because of this overcrowding situation, there is simply not enough space to

---

[16] C-ROB, California Rehabilitation Oversight Board, Biannual Report (July 15, 2008), Joint Plaintiffs' Trial Ex. 79, at p. 2, *available at, http://www.oig.ca.gov/crob/pdf/2008/07-15-08_biannual_report.pdf*. The C-ROB report evaluated progress on the goals of providing short-terms inmates with re-entry services and low risk offenders with rehabilitation programs, finding such programs to still be mostly in the planning, not the implementation phases, pp. 7-8.

[17] Memorandum, Jeff Fagot, Regional Administrator, Region IV, to Thomas Hoffman (July 30, 2007), Joint Plaintiffs' Trial Ex. 70 at p. 5; Memorandum, Alfred Martinez, Regional Administrator, Region III, to Thomas Hoffman (Aug. 10, 2007), Joint Plaintiffs' Trial Ex. 71 at p. 9.

[18] Expert Panel Rpt (2007), see footnote 3, above, at pp. viii, 9-10 (finding that overcrowding prevents access to rehabilitation programs both because it eliminates the physical space available for programming and because it leads to violence and other negative consequences that cause wardens to cancel programming in affected areas).

conduct effective programming—this applies to both the male and
female offender populations. (p.101)

30.    The provision of mental health treatment, rehabilitation programming, and pre-
release and re-entry planning is also deficient for inmates who are incarcerated for long enough
periods that they are transferred to and housed in non-reception center housing prior to parole
(approximately 66,872 of the releases to parole in 2007[19]).  The Court overseeing the *Coleman*
case regarding mental health treatment for inmates found on July 23, 2007 that the prison
system's "mental health care delivery system has not come into compliance with the Eighth
Amendment at any point since this action began."[20]  The Court specifically referenced delays
in access to care at the highest level of need, inadequacies in the capture and collection of data,
inability of CDCR to engage in adequate long-range planning for the delivery of mental health
care, staffing vacancies, lack of programming space and shortages of beds for mentally ill
inmates.  The Special Master in the *Coleman* case found that the treatment needs of at least
one-third of the inmates identified as mentally ill are not being met.[21]

31.    The observations that the California Rehabilitation Oversight Board made with
regard to the weaknesses of CDCR's rehabilitation programming are not restricted to reception
centers.  The CDCR Expert Panel on Adult Offender Reentry and Recidivism Reduction
Programs issued a report on June 29, 2007[22] noting the serious deficiencies in rehabilitation
programming in CDCR prisons.  The Expert Panel observed that the negative consequences of
overcrowding "degrade the CDCR's ability to consistently operate rehabilitation programs in
the prison environment" and noted that during the increased lockdowns and controlled
movements that result in overcrowded prisons, all programming in affected prison areas is

---

[19] *See* 2007 CDCR Movement Report, footnote 11, above.

[20] *Coleman* Order of July 23, 2007, *Coleman* Plaintiffs' Trial Ex. 46, at p. 6.

[21] *Coleman* Special Master's Response to Court's May 17, 2007 Request for Information, May
31, 2007, Joint Plaintiffs' Trial Ex. 35, at pp. 4-14.

[22] *See* footnote 3, above.

canceled. (p.9). The Expert Panel concluded that because of the overcrowding in CDCR, "there is simply not enough space to conduct effective programming—this applies to both the male and female offender populations." (p.101)

32.    When overcrowding impairs the ability of a prison system to deliver treatment, rehabilitative programming, and pre-release planning, the already inherently harmful effects of "churning" are multiplied, and present clear and present risks to public safety: "By definition, churners' correctional histories are characterized by frequent short spells in prison interspersed with frequent short spells on parole."[23] Churning is particularly harmful for persons with mental illness, for whom frequent returns to prison interrupt their access to treatment, medication, and community ties needed to function productively in society. In my opinion, California's pattern of incarcerating mentally ill parolees is a tragically misguided decision which seriously harms public safety by increasing the criminogenic factors in the lives of such parolees, and cutting them off from the very sources of stable treatment and community connection that have been shown to prevent crime and victimization.

33.    Recent studies of the California parole system define parole revocation "churners" as persons who enter prison six or more times over a seven-year span.[24] The mechanisms by which such churning of the mentally ill adversely affects public safety are clear. An overcrowded prison medical system cannot reliably identify the treatment needs of such persons as their rapid arrivals and transfers overwhelm medical records systems. Thus, they are likely to go without adequate treatment at one of the most de-stabilizing times a person is likely to face. Churners tend to stay in for short-periods and are released back to the community not only without adequate treatment, but without adequate transition plans to ensure that they continue on medication regimes, and reconnect with housing, public benefits, and other stabilizing influences. Churning overwhelms the systems that parole departments

---

[23] Grattet et al. (2007), p. 6, see footnote 8, above.

[24] *Id.*; citing Blumstein & Beck (2005), footnote 8, above.

use to address the needs of the few high-need parolees in the system, including simple procedures such as identifying which releasees need to be met by a parole agent at the gate, and which can be sent into the community with less supervision. In my opinion and experience, the ability of prison mental health and administrative systems to perform such public-safety advancing functions properly is compromised when the volume of the inmate population being serviced overwhelms the staff and support infrastructure who are supposed to provide the services.

### 3. Improving on the Public Safety Baseline: Are Mentally Ill Offenders As a Group More Dangerous than Non-Mentally Ill Offenders?

34.    The scientific evidence is clear that the vast majority of mentally ill offenders are no more dangerous as a group than non-mentally ill offenders. Mental illness by itself is not a significant predictor of violent recidivism.

35.    We can translate this question into a form that permits empirical testing of all possible answers to it (*i.e.*, that they are more dangerous, less dangerous, or equal in dangerousness) by asking "Is the recidivism rate for violent crimes among those prisoners who have been diagnosed as mentally ill higher than, lower than, or equal to that observed among those who have not?"

36.    A recent study of California parolees confirms the results of national and international studies (discussed in more detail below) that mentally ill offenders as a group are no more likely to commit violent crimes after release than are non-mentally ill offenders. Among the discovery documents that I have reviewed in this case is a recent manuscript of a study by researchers Jennifer Eno Louden, Eric Dickinger, & Jennifer L. Skeem at the University of California at Irvine, Center for Evidence Based Corrections, titled "Parolees with Mental Disorder: Toward Evidence-Based Practice."[25] The researchers report their findings on

---

[25] Louden, J.E., Dickinger, E., & Skeem, J.L., "Parolees with Mental Disorder: Toward Evidence-Based Practice," *Center for Evidence-Based Corrections Bulletin* [unpublished manuscript] (2008), see footnote 9, above.

a cohort of 105,430 persons released to adult parole in California for one calendar year, 2004. The researchers sought to determine, among other things, whether there was an association between violent recidivism and mental illness in this cohort of releasees. The compared the parolees with an identified mental disorder (PMDs) with those without identified mental disorders. Their conclusion is in keeping with the general consensus of the scientific literature: "Our data indicate that PMDs were not significantly more likely to have a determination involving violence than their nondisordered counterparts. Relative to other characteristics that PMDs share with non-disordered parolees (e.g., past violence, antagonistic personality features, criminogenic peers), mental illness is a modest risk factor for both violence (Elbogen et al., 2007) and violent recidivism. (Bonta et al., 1998)." They note that this conclusion is contrary to common perceptions: "Members of the public grossly overestimate the relationship between mental illness and violence (Watson, Corrigan, & Angell, 2005)."

37.     The above-cited Center for Evidence Based Corrections study also examined the overall recidivism rate among the 2004 California cohort of persons released to adult parole, and confirmed the common perception that persons with mental illness tend to return to prison for parole violations at a higher rate. They went further, however, and "drilled down" into the reasons that persons with mental illness return to prison on parole violations. They found that the parolees with mental illness are far more likely to be returned to prison on technical violations and not for new crimes, as compared with the non-mentally ill population. "The results indicate that PMDs who recidivated are much less likely to be charged with a new offense than non-disordered parolees who are returned to custody (19.9% vs. 34.2%; $\chi2(1)=$ 448.3, p< .001). PMDs, then, are much more likely than non-disordered parolees to return to custody for a technical violation of parole."

38.     This recent California research is consistent with the great body of scientific evidence that mental illness itself is not a useful predictor of violent recidivism. In my opinion, the most comprehensive source of evidence on this point is a meta-analysis of 58 research studies on 64 separate samples of subjects that compared violent (as well as non-violent) recidivism rates of mentally ill and non-mentally ill prisoners over a post-release

-19-

period that averaged 4.8 years.[26]  The studies included all those that the authors were able to locate that met rigorous standards of scientific design and evaluation and had been published in edited journals or books, reported in academic theses, or recorded in the working papers of ongoing research projects, during the 37 calendar years 1959-1995.

39.     Their main finding (p. 136) was that "In studies that compared the recidivism of mentally disordered offenders with nondisordered offenders, the mentally disordered offenders were less likely to recidivate."  These differences between the two groups were statistically significant (p<0.001).  When they sub-divided the mentally ill ex-prisoners into different diagnostic groups, they found that "Severe mental disorders (e.g., psychosis and schizophrenia) were inversely related to [both] general and violent recidivism," *i.e.*, they were less likely than non-mentally ill offenders to reoffend with either violent or non-violent crimes.  The mentally ill group diagnosed as suffering from "disorders of mood (e.g., depression) showed no relationship to recidivism" (p. 136), *i.e.*, they were neither more nor less likely than the non-mentally ill to reoffend.  That was also the consensus in studies comparing individuals found "not guilty by reason of insanity" with those who were convicted of comparable offenses, *i.e.*, neither group was more or less likely than the other to reoffend after release back into the community (p. 134).  They concluded that "those with mental illnesses are not as dangerous, at least as compared with nondisordered offenders, as the public perceives" (p. 139).

40.     Another major finding of this meta-analysis was that "The major predictors of general and violent recidivism appear comparable" for both mentally disordered and non-mentally disordered offenders.  "Criminal history, antisocial personality, substance abuse, and family dysfunction" turned out to be the most powerful predictors or risk factors for both groups of offenders, and to be equally important for both.  (p. 139).  For example, mentally ill individuals who drink to excess or who have an established history of committing violent crimes are more likely to commit acts of violence after release from prison than are those who

---

[26] Bonta J., Law M., & Hanson K., "The prediction of criminal and violent recidivism among mentally disordered offenders: a meta-analysis," *Psychological Bulletin* 123:123-142 (1998).

do not; but the same is true for people who are not mentally ill. To sum up, "the results support the theoretical perspective that the major correlates of crime are the same, regardless of race, gender, class, and the presence or absence of a mental illness. Clinical or psychopathological variables," on the other hand, such as mental illness, "were either unrelated to recidivism or negatively related" (p. 139). And "In general, indicators of … psychological disturbance were among the least important predictors of general and violent recidivism. In contrast, the best predictors were those associated with an established pattern of prior criminal behavior" (p. 139), whether or not the individuals involved were mentally ill.

41.    Those conclusions are completely consistent with my own clinical experience in evaluating and treating both mentally ill and non-mentally ill violent prisoners since 1967. In my published books and articles on the causes and prevention of violence, I have not found it useful to differentiate between the mentally ill (as major mental illness is defined by law and by psychiatry) and those who are not, since I had repeatedly observed in working with both populations that the same etiological and motivational factors appeared to be responsible for the violence committed by the members of both groups. I observed that one factor distinguished the mentally ill who committed serious acts of violence and were committed to the prison mental hospital from equally mentally ill but non-violent individuals whom I had diagnosed and treated in civil mental hospitals. That factor was that when the acute psychotic symptoms had resolved, there emerged in the violent mentally ill individuals a character or personality disorder that met the diagnostic criteria for antisocial personality disorder or such closely related, somewhat overlapping medical classifications as borderline or narcissistic personality disorder – exactly the types of personality disorders that are modal in the population of non-mentally ill prisoners. In the non-violent mentally ill patients I have treated, I have found no such pattern. Thus I have concluded that the main risk factor or etiological element in the violent mentally ill is not their mental illness as such, but rather, the same type of underlying personality disorder that is found in people without mental illness who commit violent crimes.

42.    The only exception to that that I would mention is the brief psychiatric emergency that can occur when mentally ill individuals become or threaten to become violent in response to paranoid delusions of persecution or command hallucinations (*e.g.*, hearing voices telling them to kill someone). In that situation, the most rapid and effective way to diminish the risk of violence is to treat the psychosis (by means of psychotherapy, psychopharmacology, and changing their social and physical environment, such as by having the individual moved to a different location, or placed temporarily in a more secure environment) so as to give them some relief from those symptoms. But that is no different in principle from what one does with non-mentally ill prisoners who are acutely emotionally disturbed, many of whom actually request to be moved to a different cell block or institution or to be placed in a locked cell until they feel in control of their own behavior again. Again, this is consistent with the meta-analysis on which I have been commenting, in which the authors observe that "Hallucinations and delusions may trigger antisocial acts in the immediate situation and have high predictive validity in the short term. However, as indicated by the present findings, such symptoms may have little predictive validity in the long term" (p. 139).

43.    A more detailed analysis of some of the 54 studies synthesized in the meta-analysis just referred to may make some of these issues clearer. One study[27] examined the behavior of 120 male prisoners divided between those with psychotic disorders and those with

---

[27] Villeneuve, D.B. & V.L. Quinsey, "Predictors of general and violent recidivism among mentally disordered inmates," *Criminal Justice and Behavior*, 22(4):397-410 (1995). This study was cited in a recent CDCR-commissioned-report: Farabee, D., "Final Report of the Mental Health Services Continuum Program of the California Department of Corrections and Rehabilitation Parole Division," *UCLA Integrated Substance Abuse Program Neuropsychiatric Institute* (June 30, 2006), Joint Plaintiffs' Trial Ex. 90. The CDCR report, however, mischaracterized the study's findings in a way that seriously exaggerates the risks of violent recidivism by both mentally ill and non-mentally ill offenders. The CDCR report misquoted the violent recidivism rate in the Villenueve and Quinsey as 70%. (Farabee (2006) at p. 6.) In fact, the 70% figure in the Villeneuve and Quinsey study is for "any rearrest" not violent recidivism. For violent recidivism, Villeneuve and Quinsey found that inmates classified as "psychotic" had a much lower rate of violent recidivism (below 30%) after three years than did non-psychotic inmates (45%). See Villeneuve and Quinsey (1995), p. 403.

non-psychotic (personality) disorders who had been released from incarceration in a maximum-security inpatient psychiatric unit of a federal penitentiary in Ontario into an "at risk" situation, *i.e.*, community, halfway house, or psychiatric institution other than maximum security, for an average of 92 months. Participants in the study had a mean of 24 prior criminal convictions including two for violent crimes, of which the average most serious conviction was for aggravated assault causing bodily harm. (p. 402). Their rearrest rates were measured at six, 12, 24, 36 and 92 months. The most relevant finding was that while there was no difference between the two groups in rearrest rates for non-violent crimes, the men who were diagnosed with major (psychotic) mental illnesses actually had *fewer* rearrests at all of the follow-up periods both for any violent crime, and for severe violent crimes (everything more serious than simple or common assault), than did the non-psychotic ex-prisoners.

44. In another study from Ontario,[28] 96 men from a maximum security prison psychiatric hospital who had been found not guilty by reason of insanity and were diagnosed as schizophrenic were compared with a matched comparison group of 96 men who had undergone brief pretrial psychiatric assessments at the same hospital, found not to have schizophrenia or any other psychotic illness (19 received no diagnosis, 42 had personality disorders, 18 had a history of drug or alcohol abuse, and the remainder had a variety of non-psychotic diagnoses of insufficient severity to warrant further hospitalization) and transferred to prison. Following their release into "at risk" situations (the community or open, unlocked psychiatric hospitals) the men with schizophrenia had lower rates of recidivism both for any crime (35% vs. 53%) and for any violent crime (16% vs. 24%).[29] While only the former difference was large enough to be statistically significant (p< 0.02), when they examined the

---

[28] Rice, M.E. & Harris, G.T., "A comparison of criminal recidivism among schizophrenic and nonschizophrenic offenders," *Internat. J. of Law and Psychiatry*, 15:397-406 (1992).

[29] In order not to bias the results in favor of the mentally ill population, they defined recidivism broadly enough to include not only being charged with a crime but also any act that brought the offender back to a mental hospital, for which he could have been criminally charged.

seriousness of the offense, they found that the mentally ill population committed less severe offenses than the non-psychotic. Of their total of 15 violent charges, the most serious were three for assault causing bodily harm, as compared with 23 rearrests among the non-mentally ill group including one murder, one attempted murder, one wounding, six assaults with bodily harm, and four sexual assaults. (p. 403). This study, like many others, found that the best predictors of recidivism are the same for the mentally ill as for those who are not, and that among those is alcohol abuse. (p. 405). In this population, unlike those in some other studies, the mentally ill group had a lower overall rate of alcohol abuse than the non-mentally ill, and "when alcohol abuse was statistically controlled the two groups no longer exhibited statistically significant differences in recidivism" (p. 405). The more relevant point for this report, however, is precisely the fact that there was no significant difference in recidivism between the two groups; that is, they did not find the mentally ill group to be at greater risk of reoffending than the non-mentally ill, even when they examined only that minority among the mentally ill who also used alcohol to excess.

45.    In many other studies of recidivism, personality disorders (including antisocial, psychopathic, borderline and narcissistic disorders, which are the modal diagnoses among non-mentally ill prisoners)[30] have been found to be stronger predictors of reoffending than major mental illness is.[31]

46.    There is one "natural experiment" that bears on the question being asked here concerning the relative risk of danger to the public from suddenly releasing a large group of mentally ill offenders from prison. Exactly that event occurred in the state of New York following the decision of the U.S. Supreme Court on February 23, 1966 (*Baxstrom v. Herold*,

---

[30] Guze S., *Criminality and Psychiatric Disorders*, New York and London: Oxford University Press (1976) pp. 80 and 137.

[31] Quinsey, V.L., Preusse, M. & Fernley, R., "A follow-up of patients found not guilty by reason of insanity or unfit for trial," *Canadian Psychiatric Association Journal*, 20:461-467 (1975); Quinsey, V.L., Warneford, A., Preusse, M. & Link, N., "Released Oak Ridge patients: A follow-up of review board discharges," *British Journal of Criminology*, 15:264-270 (1975).

383 U.S. 107).[32] As a result of that decision, New York State correctional authorities had to remove some 969 persons from its maximum-security prison mental hospitals for "insane criminals" in a very short period. Published studies of these releases showed that predictions of violence and mayhem were unfounded, both during the phase in which the patients were transitioned to civil mental hospitals, and later in community releases.[33]

47.    My conclusion is that mentally ill prisoners as a group are either less likely, or at least no more likely, than non-mentally ill prisoners as a group to increase the risk of danger to the public upon release by committing violent crimes, and that before we can reject that conclusion we will need more evidence to the contrary than is currently available.

48.    However, it has been found that the mentally ill are far more likely to be victims of violent crime than perpetrators of it.[34] That is, they are likelier to be injured by someone else than they are to injure someone else. The research regarding mental illness and violence "does not support the stereotype that persons with severe mental illness are typically violent" toward others, but instead should raise more concerns regarding the vulnerability of the mentally ill to victimization.[35]

49.    The conclusion that should be drawn is that mental health status is not a useful, appropriate, or valid predictor of violence among people released from prison. While social prejudices perpetuate the assumption that "mentally ill" prisoners are more dangerous when released into society than non-mentally ill prisoners are, the mental health status of ex-prisoners is not in fact correlated with increased dangerousness to others. To the extent that

---

[32] Hunt, R.C. & Wiley, E.D., "Operation Baxstrom after one year," *Amer. J. Psychiat.* 124 (7):974-978 (1968).

[33] Steadman, H.J. & Keveles, G., "The Community Adjustment and Criminal Activity of the Baxstrom Patients: 1966-1970," *Amer. J. Psychiat.* 129 (3): 304-310 (1972).

[34] Choe, J., Teplin, L.A. & Abram, K.M., "Perpetration of Violence, Violent Victimization, and Severe Mental Illness," *Psychiatric Services*, 59(2):153-164 (2008).

[35] *Id.* at p. 161.

release of inmates is based on assessment of risk factors, these should be individualized and consider each particular individual's history of violence, substance abuse, etc., in order to assess each individual's dangerousness, or lack of it. This risk assessment should be no different for individuals who are mentally ill. To the extent that release of inmates is based on a generalized release that, for example, simply accelerates release dates for a group of inmates already scheduled for release, it would not be useful from a public safety perspective to differentiate between inmates in this group solely on the basis of mental illness.

**B.    WHAT ARE THE ELEMENTS NEEDED TO IMPROVE PUBLIC SAFETY OUTCOMES REGARDING TREATMENT OF MENTALLY ILL OFFENDERS BY THE CALIFORNIA CORRECTIONAL AND PAROLE SYSTEM?**

50.    Despite the serious problems presented by the state's overcrowded prison system and the legacy of dysfunctional approaches to handling mentally ill offenders, California's correctional and parole authorities have a framework in place for providing services in the community to parolees with mental illness. It is my opinion that by building on this framework, California can break the cycle of short-term destabilizing incarcerations of mentally ill offenders, and improve their reintegration chances, and thus reduce crime and victimization.

51.    Based on my experience, a correctional agency should ensure that the basic elements of pre-release planning and a system of access to care in the community care are in place to reduce or eliminate both the constant cycling of mentally ill parolees through short-term re-incarceration, and the attendant harms to public safety when such cycling makes the affected parolees sicker and prevents their successful reintegration.[36]

52.    Building on this framework to accommodate a prisoner release order that includes the mentally ill does not require an unrealistic level of investment. In this regard it is critical to remember that not all mentally ill persons are the same. Most have modest needs for

---

[36] *See* Mello, J. & Greifinger, R., "The Evolving Standard of Decency: Postrelease Planning?," *Journal of Correctional Health Care*, 14(1), at p. 21 (Jan. 2008).

treatment. Some have moderate needs. A very few have needs for the highest levels of treatment.

53.    In this area, it is important to differentiate between the large majority of mentally ill offenders who have modest reintegration needs (approximated by the CCCMS population in California, estimated at approximately 18,900 parolees as of June 2007[37]), the smaller group at the margins (the EOP population in California estimated at approximately 4,000 parolees as of June 2007[38]) who may have somewhat greater needs for services, and the even smaller minority who may need high levels of care up to and including inpatient hospitalization. As I stated above in Paragraph 24, above, in any population of mentally ill offenders, these levels of severity are arranged in a pyramidal distribution, with a broad base of low-acuity, low-need patients, and a very narrow tip of high-acuity, high need patients. For reference, I present the same chart again as Figure 2, showing the distribution of mental health status among persons released to parole in California in 2006, with 80% having no mental health diagnosis, 17.65% at the CCCMS level, 1.82% at the EOP level, and 0.48% at one of the "crisis" levels:

---

[37] California Department of Corrections and Rehabilitation, Division Of Adult Parole Operations, Mentally Ill Parolee Population (July 2007), Joint Plaintiffs' Trial Ex. 77, at p. 4.

[38] *Id.*



Figure 2: Source: Attributes of 2006 Admissions, Standing and Release Cohorts of Felons and Civil Addicts (email from Bubpha Chen to Susan Turner, May 6, 2007 (Document Number E_UCI044669.)  Note that the source document includes the following qualification:  "Data may be incomplete due to posting delay in DDPS, especially for new admissions," reproduced at Appendix L to 2007 Expert Panel Report, page 145, available at http://www.cdcr.ca.gov/news/docs/Expert_Rpt/ExpertPanelRpt_AppendL.pdf, Joint Plaintiffs' Trial Ex. 2 at 145, Table L-5.

54.    In implementing any prisoner release order, whether the order is targeted based on an assessment of risk and need, or whether it includes a wholesale short-term release or diversion, there is no public-safety based reason to exclude or disfavor the mentally ill as a group.  Even examining the numbers based on the assumption of a wholesale short-term incremental increase in persons released and/or diverted, with no risk and needs assessment, the numbers show that local communities would not be overwhelmed with large numbers of high-need mentally ill offenders.  Assume a prisoner release order that required the short-term removal of 30,000 people from the pool of convicted offenders held in (or to be sent back to) prison.  Assume that this prisoner release order included no bias against the mentally ill, which is appropriate based on my findings that mental illness itself presents no greater risk to public safety, and that public safety would in fact be enhanced if California desisted from churning the mentally ill through the parole revocation process.  Again, assuming no bias against the mentally ill, this group of 30,000 would be distributed in the same pyramidal manner described

-28-

above, with 80% having no diagnosis, 17.65% CCCMS, 1.84% EOP, and 0.48% "crisis level" care. Figure 3, below, shows the breakdown of 30,000 releases by mental health status. The significant fact here is that the numbers of persons at the high-acuity levels are very small—143 persons with a history of crisis care, and 546 persons at the EOP level of care to be released into state with a population of over 36,000,000.



Distribution of 30,000 Releases to Parole



Figure 3

### 1.    Pre-release planning.

55.    I have reviewed the *Coleman* Mental Health Services Delivery System Revised Program Guide, which provides for pre-release planning with the objective "to maximize the individual's potential for successful linkage and transition to the Parole Outpatient Clinic, or, if required, to inpatient services in the community or the Mentally Disordered Offender Program operated at the [Department of Mental Health] DMH facilities."[39]  In my opinion, this correctly

---

[39] Mental Health Services Delivery System Program Guide, September 2006, Division of Correctional Health Care Services, Department of Corrections & Rehabilitation, Joint Plaintiffs' Trial Ex. 9, at p. 12-1-4, *see also*, pp. 12-2-8, 12-3-4, 12-3-9, 12-3-11, 12-3-13, 12-4-1, 12-4-2, 12-4-11, 12-4-13.

states the public safety enhancing obligations of the correctional mental health clinician to engage in pre-release planning that reduces the chances that the patient will suffer the harms of cycling back into prison.

56.     In my experience, a successful pre-release planning program for mentally ill offenders must include pre-release assessment of the prisoner's treatment and support needs, benefits eligibility screening and application for patients who may qualify for social security benefits, veteran's benefits, and/or Medicaid benefits, and continuity of treatment, including medication, while in the community. I have reviewed documents showing that CDCR has a framework in place to assist prisoners with public benefits applications to increase the chances that critical services such as medical and mental health care are accessible quickly upon release.[40]

57.     Pre-release and benefits planning must especially target the smaller group at the margins with the highest needs. The larger group of persons with modest needs can generally be managed with access to medications, and with the same types of reintegration programs such as education, access to employment, and reintegration with family that all parolees need, regardless of mental illness.

58.     I have reviewed documents regarding California's "Transitional Case Management Program—Mental Illness (TCMP-MI)," which is one of the pre-release planning elements required in the Mental Health Services Delivery System Revised Program Guide.[41] The 2003 and 2006 reports on TCMP-MI commissioned by the CDCR state that the program is designed to include the key components of pre-release assessment, benefits eligibility and

_____

[40] *See* Memorandum Of Understanding California Department Of Corrections And Rehabilitation And California Department Of Health Care Services, Preparole Process for Securing Medi-Cal Entitlements Agreement No. P07.0035 I, Joint Plaintiffs' Trial Ex. 80; Agreement Between The California Department Of Corrections & Rehabilitation (CDCR) And The Social Security Administration (SSA), Dated Jan. 11, 2008, Joint Plaintiffs' Trial Ex. 88.

[41] Mental Health Services Delivery System Program Guide at 12-4-11, *see* footnote 39, above.

application assistance, "expanded and enhanced post-release mental health treatment for mentally ill parolees"[42]

### 2.    System of Access to Care.

59.    I have reviewed documents concerning the operation of the Parole Outpatient Clinic (POC) component of the California parole system. The POC framework is set up to provide treatment consisting of medication management, group therapy and individual therapy in California parole offices throughout the state.[43] I reviewed the studies by David Farabee of the University of California at Los Angeles, Integrated Substance Abuse Program, that CDCR commissioned, on the efficacy of the POC program, in combination with pre-release planning, to reduce the chances that parolees with mental illness will return to criminal conduct after release.[44] Although it is my opinion that Mr. Farabee's report mischaracterizes some of the

---

[42] Farabee, D., Yip, R., Garcia, D., Sanchez, S., "First Annual Report on The Mental Health Services Continuum Program of The California Department Of Corrections Parole Division," *UCLA Integrated Substance Abuse Program Neuropsychiatric Institute* (Nov. 24, 2003), Joint Plaintiffs' Trial Ex. 93, at p. 1; Farabee, D., Yip, R., Garcia, D., Sanchez, S., "Final Report of the Mental Health Services Continuum Program of the California Department of Corrections and Rehabilitation—Parole Division," *UCLA Integrated Substance Abuse Program Neuropsychiatric Institute* (June 30, 2006), Joint Plaintiffs' Trial Ex. 90; Farabee, D., "An evaluation of California's Mental Health Services Continuum Program for Parolees," *Corrections Today*, December 2006, Joint Plaintiffs' Trial Ex. 93.

[43] California Department of Corrections and Rehabilitation, Division of Adult Parole Operations, Budget Change Proposal, Fiscal Year 2008/09, Community Based Treatment Programming and Crisis Care Services for Severely Mentally Ill Adult Parolees, Joint Plaintiffs' Trial Ex. 81, at p. 2.

[44] Farabee (2006 UCLA), Joint Plaintiffs' Trial Ex. 90.

literature regarding the overall public safety risks presented by mentally ill parolees,[45] Mr. Farabee's multi-year study of seven cohorts of releasees from July 2001 through June 2005, totaling 60,912 releasees, appears to result in scientifically sound conclusions regarding the efficacy of the POC program.[46] Mr. Farabee concluded that "parolees who attended POC following release from prison showed a 34% reduction in the odds of being returned to prison within 12 months, relative to parolees who did not attend a POC."[47]

60.    In addition to these elements, CDCR has a policy of enhanced supervision of persons with a history of mental health treatment care at higher-levels, the so-called "EOP" parolees. Such parolees are to be supervised at a ratio of 40:1, compare to the national average supervision ratio of 70:1.[48]

61.    It is my opinion that by continuing and expanding programs such as TCMP and reduced caseloads for EOP parolees, California can make progress toward breaking the cycle of re-incarceration of mentally ill offenders that now harm public safety. It is also my opinion that these programs can be effectively expanded to address any reasonable increase in the parole population that would result from a well-planned and implemented prisoner release order or population cap.

---

[45]Specifically, the Farabee study overstates some of the recidivism findings I have reviewed earlier in this Report. At page 6, the study cites Villeneuve & Quinsey, Predictors Of General And Violent Recidivism Among Mentally Disordered Inmates, *Criminal Justice and Behavior* (2005), for a finding that re-arrest rates for violent offenses are 70% after three years for both psychotic and non-psychotic releasees from a Canadian maximum security unit. The Villenueve & Quinsey study did not find a rate of violent re-arrests anywhere near 70% after three years. *See* footnote 27, above, and citing text.

[46] Farabee (2006 UCLA), Joint Plaintiffs' Trial Ex. 90, p. 10.

[47] Farabee (2006 UCLA), Joint Plaintiffs' Trial Ex. 90, p. 31.

[48] *See id.*; National Research Council, *Parole, Desistance from Crime and Community Integration* (National Academies Press 2008), at page 34.

### 3.    Programs to Target Co-occurring Disorders/Dual Diagnosis.

62.    As discussed above, mental illness is not a critical factor in predicting which released prisoners are at highest risk of violent crimes after release. Other factors, such as age at release, predominate. A factor that does affect new crime outcomes is untreated drug addiction. Drug addition hurts the chances of any released prisoner. For persons with both drug addiction and mental illness, specially targeted programs are useful and can improve public safety.[49] California has begun to put a framework in place to target parolees with co-occurring mental illness and drug addiction. First, the literature shows that California has a long experience with correctional drug addiction program based on the therapeutic community model.[50] Second, in recent years, California has begun to identify certain community-based drug treatment programs that specialize in serving persons with co-occurring mental illness and drug addiction.[51]

### 4.    Coordination with Community Care Providers.

63.    Successful post-release programs should be based on strong links to community resources. For releasees with mental illness this should include access to the local systems of mental health care. The safety of the parolee with mental illness and the public is enhanced by access to the community mental health system (which includes the additional services provided to parolees by the Parole Outpatient Clinics and parole programs such as Day Reporting

---

[49] *See* Farabee, D. & Shen, H., "Antipsychotic Medication Adherence, Cocaine Use, and Recidivism Among a Parolee Sample," *Behavioral Sciences and the Law* 22:467-476 (2004).

[50] Prendergrast, M. and Wexler. H., "Correctional Substance Abuse Treatment Programs in California: A Historical Perspective," *The Prison Journal* 84(1) 8 (March 2004).

[51] *See* Walden House Inc Region III Substance Abuse Services Coordinating Agency (SASCA) Community Based Services Subcontractor Agreement, Joint Plaintiffs' Trial Ex. 92; Specifications on Providing Augmented Services to the Dually Diagnosed ICDTP Participants, Joint Plaintiffs' Trial Ex. 91; SASCA Walden House Specifications on Providing Augmented Services to Dually Diagnosed ICDTP Participants and Treatment Provider Roster, Joint Plaintiffs' Trial Ex. 89.

Centers and Assertive Community Treatment programs.) Leaving a person with mental illness in need of treatment to fend for him or herself on the street and then returning him or her to an overcrowded and dangerous prison reception center environment for several months could be dangerous for the patient and public safety. Appropriate access to mental health treatment and pre-release planning is generally not available in these reception centers, especially for patients requiring higher levels of care to stabilize their mental illness. This cycle leads to further decompensation, and release of a patient who is as sick as or sicker than when he or she came into prison.

64. A very small percentage of persons with mental illness will require access to higher levels of care, up to and including inpatient psychiatric hospitalization. As noted in Figure 2, above, releases at the highest levels of care in the California system numbered approximately 600 for all of 2006. If a prisoner release order resulting in the release or diversion of a total of 30,000 people immediately, this group would include only 143 persons with a history of crisis care, spread over an entire state. The size of this group that may need in-patient hospitalization in the community are likely to be even smaller. One proxy for this smaller group may be the group of persons who are returned by their parole agents due to mental illness alone. Documents that I have reviewed for this case estimate this need in the range of several hundred patients per year.[52] The historical strategy of California corrections has been to arrest such parolees solely because of their mental illness under a procedure known as "psych and return" or "return to custody for psychiatric treatment." In my opinion,

---

[52] These documents include a report from the Special Master in the *Valdivia v. Schwarzenegger* litigation regarding the procedures used in parole revocation cases in which the parolee was too impaired to participate in the hearing process. This report notes 180 such cases during 13 months. *Valdivia,* Fourth Report of the Special Master on the Status of Conditions of the Remedial Order (April 2008), Joint Plaintiffs' Trial Ex. 83. I have also reviewed an email from the discovery documents in this case in which a California parole official is asked to estimate the "historical volume of psych return parolees." The parole official responds that "from June 2006 through January 8, 2007 the Division of Health Care Services identified 79 inmates who were returned to prison solely for mental health stabilization and treatment." Email, Oct. 24, 2007, Joint Plaintiffs' Trial Ex. 86.

returning such person to a prison environment is harmful to public safety, as they are likely to return as sick as or sicker than when they went into prison, and with no progress having been made at reintegration into the community. Instead, prompt access to crisis care should include rapid and intensive treatment to address episodes of decompensation for this small minority of the population. For the small minority of prisoners who require continued access to higher levels of care, discharge planning to less restrictive (and less expensive) community placements such as board and care facilities, drug treatment programs, day treatment and other alternatives, should begin upon admission.

65.    Because the need for the highest levels of care exists at the margins of the continuum of mentally ill offenders, in my opinion it should not be an overwhelming or overly costly project to secure the necessary levels of community-based care in settings such as county mental health facilities or private board and care facilities.[53] The few hundred most serious cases that would need these levels of care will be scattered over a very large state, so that no one county would have to absorb an overly burdensome number of such high-need

---

[53] In my opinion it is part of the treating clinician's professional obligation to assist the patient in transitioning to continued care after an anticipated termination of the clinical relationship. *See* Mello, J. & Greifinger, R., "The Evolving Standard of Decency: Postrelease Planning?," *Journal of Correctional Health Care,* 14(1), at 21 (Jan. 2008); American Medical Association, "E- 10.01 Fundamental elements of the patient-physician relationship," retrieved on Aug. 11, 2008 at http://tinyurl.com/ay4ly (a page within http://www.ama-assn.org) ("The patient has the right to continuity of health care. The physician has an obligation to cooperate in the coordination of medically indicated care with other health care providers treating the patient. The physician may not discontinue treatment of a patient as long as further treatment is medically indicated, without giving the patient reasonable assistance and sufficient opportunity to make alternative arrangements for care.")

In the transition from prison to the community, this obligation can be met with a telephone call to the community mental health system to assist the patient in transitioning to community care. I have reviewed an email exchange from the discovery documents in this case in which California corrections clinicians are advised to make exactly this sort of contact to arrange continued care for their patients. Email, Feb. 21, 2007, Joint Plaintiffs' Trial Ex. 87.

mentally ill parolees.[54]  In my opinion, providing for appropriate levels of care for this small group is better for public safety than is the currently implemented alternative of repeated returns to the community after short-term stints of re-incarceration without adequate treatment or pre-release planning.

66.    It is my opinion that by building on this framework, California could significantly improve public safety outcomes by breaking the dysfunctional cycle of churning mentally ill offenders through destabilizing short-term revocation stints.


## IV.    STATEMENT OF COMPENSATION

67.    The terms of my retention in this case are $2,500 a day for testimony and depositions, and $250 per hour for research, telephone conferences, writing and record review.


## V.    LIST OF ALL OTHER CASES IN WHICH I HAVE TESTIFIED AS AN EXPERT AT TRIAL OR BY DEPOSITION IN THE PREVIOUS FOUR YEARS.

68.    On April 29, 2004 I testified in New York City as an expert witness retained by the Fortune Society and the law firm Paul, Weiss, Rifkind, Wharton & Garrison LLP in the case of Calvin Florestal v.The Bureau Of Citizenship And Immigration Services of the United States Department Of Homeland Security For Withholding of Removal (to Haiti) under the Convention Against Torture.

//

//

//

---

[54] The *Valdivia v. Schwarzenegger* Special Master's review of such cases included the finding that 44 cases reviewed in 2005 were not concentrated in any particular parole unit or region. First Report of the Special Master on the Status of Conditions of the Remedial Order (Sept. 14, 2006), Joint Plaintiffs' Trial Ex. 82, p. 51.

69.    On Dec. 13, 2006, after having been retained as an expert witness by the law firm Cravath, Swaine and Moore, I testified in the State Court of Claims in White Plains, New York, in the case of Nakia Thompson v. The State of New York.


Dated:  August 15, 2008

James Gilligan, M.D.

**APPENDIX A**

# CURRICULUM VITAE

James F. Gilligan, M. D

Collegiate Professor, New York University

Silver Center for Arts and Science, Room 908

100 Washington Square East, New York, NY 10003

Tel: 212-647-0963; Cell: 646-469-3931

**Place of Birth:** Nebraska City, Nebraska, U.S.A.

## EDUCATION AND PROFESSIONAL TRAINING:

### College

Class of 1957, Harvard College (National Scholar)

### Medical School

1961-1965, M.D., Western Reserve University School of Medicine

### Internship

1965-1966, Medicine, University of Chicago Hospitals and Clinics,

University of Chicago School of Medicine

### Psychiatric Residency Training

1966-1969, Massachusetts Mental Health Center, Harvard Medical School

## LICENSURE AND CERTIFICATION:

### Diplomate

National Board of Medical Examiners, Certificate No. 89281, July 1, 1966

### Registered as a Qualified Physician

Board of Registration in Medicine, Commonwealth of Massachusetts, Certificate No.

31118, Nov. 13, 1968

**Designated as a Qualified Physician (Forensic Psychiatry)**

Division of Legal Medicine, Department of Mental Health,

Commonwealth of Massachusetts, 1977

**Diplomate in Psychiatry**

American Board of Psychiary and Neurology, Certificate No. 18274,

November 1978

## PROFESSIONAL APPOINTMENTS:

### Academic Appointments:

1966-69, Teaching Fellow, Department of Psychiatry, Harvard Medical School

1969-2000, Clinical Instructor and Lecturer, Department of Psychiatry, Harvard
Medical School

January 1993-August 1994, Visiting Fellow, Institute of Criminology and Clare Hall,

University of Cambridge, Cambridge, England

Fall 1997, Leibman Scholar in Residence, Loyola University, Chicago

2003 – 2006, Visiting Professor of Psychiatry and Social Policy, School of Arts and

Sciences (Department of Criminology) and School of Social Policy and Practice,

University of Pennsylvania

Sept. – Dec. 2005, Erikson Scholar, Erikson Institute for Education and Research,

Austen Riggs Center, Stockbridge, Mass.

2002 – 2007, Distinguished Visiting Scholar and Adjunct Professor, Faculty of

Arts and Sciences, New York University

2007 – present, Collegiate Professor, Faculty of Arts and Sciences, New York University

**Hospital Teaching Appointments:**

> 1969-77, Supervising Psychiatrist, Psychiatric Residency Training Program,
>
> Massachusetts Mental Health Center, Harvard Medical School
>
> 1977-89, Psychiatric Residency and Forensic Psychiatry Fellowship Training
>
> Programs, Institute of Law and Psychiatry, McLean Hospital, Harvard Medical School
>
> 1989-1994, Forensic Psychiatry Fellowship Training Program, Program in
>
> Psychiatry and the Law, Massachusetts Mental Health Center, Harvard Medical School
>
> 1994 -2000, Supervisor, Psychiatric Residency Training Program, The Cambridge
>
> Hospital, Harvard Medical School
>
> 1998-1999, Supervisor, Psychiatric Residency Training Program, Massachusetts

General Hospital, Harvard Medical School

**Principal Clinical and Administrative Activities (Hospitals and Health-Care Systems):**

> 1977 - 1980, Director, Institute of Law and Psychiatry, McLean Hospital, Harvard

Medical School

> January - October 1977, Deputy Medical Director; October 1977 - September 1980,

Medical Director, Bridgewater State Hospital (for the Criminally Insane), a treatment, teaching

and research affiliate of the Institute of Law and Psychiatry, McLean Hospital, Harvard Medical

School, and a maximum-security forensic psychiatric prison mental hospital administered by the

Department of Correction of the Commonwealth of Massachusetts

> August 1981 - April 1991, Clinical Director, Prison Mental Health Service, a treatment,

teaching and research affiliate of the Institute of Law and Psychiatry, McLean Hospital, Harvard

Medical School

December 1991 - December 1992,          Medical Director, Bridgewater State Hospital and Center for the Study of Violence, a treatment, teaching and research affiliate of the Program in Psychiatry and the Law, Massachusetts Mental Health Center, Harvard Medical School

November 1999 – present, President, Center for the Study of Violence, Inc., a private non-profit research and consulting corporation

**PROFESSIONAL SOCIETIES:**

April 1996 - present, Member of the Executive Board, International Association for Forensic Psychotherapy

May 1999 – June 2001, President, International Association for Forensic Psychotherapy

November 1997 - present, Member, International Society for Traumatic Stress Studies

November 1999 – present, Member, American Public Health Association

**EDITORIAL BOARDS:**

March 1998 – present, Member, Editorial Board, *Journal of Applied Psychoanalytic Studies*

1997-1999, Member, Editorial Advisory Board and Contributing Author, *Violence in America: An Encyclopedia,* New York: Scribners, 1999

**PUBLIC SERVICE:**

January 2000 – December 2002, Member of the Academic Advisory Council and Chairman of the Committee on Prevention, President Clinton's National Campaign Against Youth Violence

May 2002 – present, Member, Advisory Board, New York Correctional Association

April 2005 – present, Member, National Commission on Safety and Abuse in America's Prisons (Vera Institute of Justice; Nicholas deB. Katzenbach, Chairman)

5

**CLINICAL PRACTICE:**

General Adult Psychiatry, private practice, 1969 -- present; and Clinical Forensic
Psychiatry, 1967 – present.

Time: Time divided between patient care, teaching, research, writing, public lectures,
and policy-planning consultations to officials in the legislative, judicial and executive branches
of municipal, county, state and national governments and international governmental and non-
governmental organizations.

Clinical program development: For fifteen years (1977-92) I administered and
supervised teams of mental health professionals from teaching hospitals of the Harvard Medical
School whose purpose was to ensure that the Commonwealth of Massachusetts complied with
orders of the U.S. District Court to bring the mental health services provided to patients at the
prison mental hospital and inmates of the prisons administered by the Department of Correction
into conformity with current community standards of psychiatric care. Since 1996 I have also
served as a psychiatric consultant designing and evaluating treatment and violence prevention
programs, and training and supervising mental health staff, in prisons, jails and prison mental
hospitals in Poland, New Zealand, Singapore, San Francisco, the states of Vermont, Ohio and
New York, and the province of Ontario, Canada.

**BIBLIOGRAPHY:**

**Books**

*Violence: Our Deadly Epidemic and Its Causes,* New York: Grosset/Putnam, 1996 (also
published in paperback as *Violence: Reflections on a National Epidemic* by Vintage Books, New
York, 1997; as *Violence: Reflections on Our Deadliest Epidemic*, London: Jessica Kingsley
Publishers, 2000; and in translation by Mondadori Editore, Milan, Italy; Bosch & Keuning, Ed

6

Baarn, the Netherlands; Wilhelm Heyne          Verlag, Munich, Germany;  Media Rodzina,

Poznan, Poland; and the China Times Publishing Co., Taipei, Taiwan)

   *Violence in California Prisons: A Proposal for Research into Patterns and Cures*,

Sacramento: Diane Publishing Co., 2000

   *Preventing Violence: An Agenda for the Coming Century*, London and New York:

Thames and Hudson, 2001

   *Youth Violence: Scientific Approaches to Prevention*, Volume 1036, *Annals of the New*

*York Academy of Sciences*, 2004, edited by John Devine, James Gilligan, Klaus A. Miczek,

Rashid Shaikh, and Donald Pfaff.

   **Articles and Chapters**

   "Chronic Schizophrenia: A Review of Recent Clinical Research," Chapter Two in *Drug*

*and Social Therapy in Chronic Schizophrenia*, edited by Milton Greenblatt, M.D., *et al.*,

Springfield, Ill.: Charles C. Thomas, 1965

   *Shame and Guilt in Schizophrenic and Paranoid Psychoses and the Psychotic*

*Depressions*, M.D. Thesis, Cleveland: Western Reserve University School of Medicine, 1965

"Beyond Morality: Psychoanalytic Reflections on Shame, Guilt and Love," Chapter Eight  in

*Moral Development and Behavior: Theory, Research and Social Issues*, edited by Thomas

Lickona, N.Y.: Holt, Rinehart and Winston, 1975, pp.144-158

   "Exploring Shame in Special Settings: A Psychotherapeutic Study," Chapter 28 in

*Forensic Psychotherapy: Crime, Psychodynamics and the Offender Patient*, Volume II, edited by

Christopher Cordess and Murray Cox, London: Jessica Kingsley, 1995, pp. 475-490

   "The Agenbite of Inwit: Or, The Varieties of Moral Experience," chapter in *Remorse and*

*Reparation*, edited by Murray Cox, London: Jessica Kingsley, 1998

7

"Pictures of Pain," chapter in *Behind          the Razor Wire: Portrait of a Contemporary American Prison System,* edited and with photographs by Michael Jacobson-Hardy (text by Angela Davis, John Edgar Wideman, Marc Mauer and James Gilligan), New York: New York University Press, 1998

"Reflections From a Life Behind Bars: Build Colleges, Not Prisons," *Chronicle of Higher Education*, October 16, 1998, pp. B7-B9

"Structural Violence," in *Violence in America: An Encyclopedia*,Vol. 3, pp. 229-233, Ronald Gottesman, Editor in Chief, New York: Charles Scribners Sons, 1999

"Psychological Violence," in *Violence in America: An Encyclopedia*, Vol 2, pp. 626-631, Ronald Gottesman, Editor in Chief, New York: Charles Scribners Sons, 1999

"Civilization and Its Malcontents: Rethinking the Relationship between Violence and Civilization As We Enter the Coming Millennium," in *At the Threshold of the Millennium*, edited by Maria Rosa Fort Brescia and Moises Lemlij, M.D., Lima, Peru: Seminario Interdisciplinario de Estudios Andinos, 1999, Volume 2, pp. 25-30

"Violence as a Problem in Public Health and Preventive Medicine," *Lancet* 355:1802-04, 2000

"Punishment and Violence: Is the Criminal Justice System Based on One Huge Mistake?," *Social Research 67(3):745-772,* 2000

"The Last Mental Hospital," *Psychiatric Quarterly* 72(1):45-61, 2001

"Shame, Guilt and Violence," *Social Research* 70 (4):1149-1180, 2003

"Beyond the Prison Paradigm: From Provoking Violence to Preventing It by Creating 'Anti-Prisons' (Residential Colleges and Therapeutic Communities)," James Gilligan and Bandy Lee, *Annals of the New York Academy of Sciences*, 1036:300-324, 2004

8

"The Psychopharmacologic                    Treatment of Violent Youth," James Gilligan and Bandy Lee, *Annals of the New York Academy of Sciences*, 1036:300-324, 2004

"The Resolve to Stop the Violence Project: Reducing Violence in the Community through a Jail-Based Initiative," James Gilligan and Bandy Lee, *J. Public Health*, 27(2):143-148, June 2005

"The Resolve to Stop the Violence Project: Transforming an In-House Culture of Violence Through a Jail-Based Programme," Bandy Lee and James Gilligan, *Journal of Public Health*, 27(2):149-155, June 2005

"Terrorism, Fundamentalism And Nihilism:  Analyzing The Dilemmas Of Modernity" in *The Future of Prejudice: Applications of Psychoanalytic Understanding toward its Prevention*, edited by Henri Parens and Stuart Twemlow, New York:  Rowman & Littlefield Publishers, Inc., 2006 (in press)

**HONORS AND AWARDS**

2003 Achievement Award, Physicians for Social Responsibility, Philadelphia, April 23, 2003

2004 "Innovations in Governance" Award of the Ash Foundation, Kennedy School of Government, Harvard University (awarded to the Sheriff's Department of the City and County of San Francisco for a violence prevention experiment conducted in the San Francisco jails based on Dr. Gilligan's conceptual model)

**LECTURES AT HARVARD MEDICAL SCHOOL, CONTINUING MEDICAL**

**EDUCATION COURSES, AND OTHER LOCAL TEACHING PRESENTATIONS:**

9

"Shame versus Guilt: An                    Interdisciplinary Theory of
Psychopathology and Violence," Academic Lecture, McLean Hospital, Oct. 20, 1978

"Psychopathology and Violence: The Bridgewater Experience," Lecture, Psychiatric Grand
Rounds, Beth Israel Hospital, Boston, Nov. 26, 1979

"`Murder by Cancer': Narcissistic Injury and `Negative Identity' as Precursors of
Homicide," Lecture, Harvard Faculty Seminar on Forensic Psychiatry, McLean Hospital, Jan. 16,
1980

"Family Patterns Associated with Violence," Lecture, Family Violence Seminar,
Children's Hospital Medical Center, Jan. 18, 1980

"Exploding the Myths about Psychopathology and Violence: Clinical and Legal
Perspectives," Lecture, CME Course on "The Violent Patient," Massachusetts Mental Health
Center, Boston, May 16, 1980

"Forensic Psychiatry," Three Lectures and Panel Discussions, Beth Israel Hospital
Psychiatry Grand Rounds, Boston, Dec. 1, 8 and 15, 1980

"Approaches to the Violent Patient," Lecture, CME Course on "The Violent Patient,"
Massachusetts Mental Health Center, Boston, Sept. 18, 1981

"The Psychodynamics of Violence," Lecture, Harvard Faculty Seminar on Forensic
Psychiatry, McLean Hospital, April 21, 1982

"Forensic Psychiatry," Lecture, Social Psychiatry Seminar, McLean Hospital, Sept. 23,
1982

"The Violent Patient in the General Hospital," Lecture, Medical Psychiatry Conference,
Beth Israel Hospital, April 23, 1983

"The Impaired Professional: Legal and Clinical Implications," Lecture, Harvard Faculty
Seminar on Forensic Psychiatry, McLean Hospital, Jan. 15, 1986

"Violence as a Public Health Problem: Psychosocial Determinants of Violent Behavior
(Part I)," Lecture, Harvard Faculty Seminar on Forensic Psychiatry, McLean Hospital, Nov. 16,
1988

"Violence as a Public Health Problem: Psychosocial Determinants of Violent Behavior
(Part II)," Lecture, Harvard Faculty Seminar on Forensic Psychiatry, McLean Hospital, Feb. 15,
1989

"Epidemiology of Violent Deaths: A Comparison of Male and Female Victimization
Rates," Lecture, Harvard Faculty Seminar on Forensic Psychiatry, Jan. 16, 1990

"Psychiatric Aspects of Violence:          Clinical and Forensic Perspectives," Lecture, Massachusetts General Hospital, April 18, 1990

"Men, Women and Violence," Lecture, Childrens Hospital Seminar on Family Violence, Boston, July 9, 1990

"The Psychodynamic Understanding of Violent Behavior," Lecture, Erich Lindemann Mental Health Center, Boston, Dec. 3, 1990

"A Comparison of Men and Women as Perpetrators and Victims of Violence," Lecture, Massachusetts General Hospital, Jan. 16, 1991

"The Roots of Violence," *The Erikson Lectures*, Harvard University, May 21 and 23, 1991

"Drugs and Violence," Lecture, Department of Psychiatry, Massachusetts General Hospital, June 13, 1996

"The Psychodynamics of Violence," Lecture, Pychiatric Grand Rounds, Cambridge Hospital, Nov. 6, 1996

"The Role of Shame and Guilt in the Psychodynamics of Violence," Lecture at the Boston Psychoanalytic Society and Institute, Oct. 28, 1996

"Violence: Fantasy versus Action," Lecture, Committee on Human Development, Graduate School of Education, Harvard University, Nov. 19, 1996

"Causes, Assessment and Prediction of Violence," Lecture, Department of Psychiatry, Massachussets General Hospital, Boston, Jan. 21, 1997

"The Epidemic of Violence Among American Youth," Lecture, Judge Baker Child Guidance Clinic, Boston, Febr. 12, 1997

"Truth Commissions as a Tool for Interrupting the Vicious Cycle of Violence," Lecture, Conference on "Collective Violence and Memory: Judgment, Reconciliation, Education," co-sponsored by the Harvard Graduate School of Education's "Facing History and Ourselves" Project, and the Graduate Program at Harvard Law School, Cambridge, MA, April 10, 1997

"A Bio-psycho-social Theory of Violent Behavior," Psychiatric Grand Rounds, McLean Hospital, Belmont, MA, May 16, 1997

"The Psychology of Love and the Dynamics of Shame and Guilt in Relations Between Men and Women," Eighth Annual Summer Seminar for Mental Health Professionals, a four-day course sponsored by the Massachusetts Mental Health Center and the Department of Continuing Education, Harvard Medical School, Nantucket, MA, Sept. 18-21, 1997

"Psychosocial and Political Contributions to Violence," Harvard Psychiatry Day, McLean Hospital, Belmont, MA, Nov. 5, 1997

"Violent Patients, Psychiatric Practice, and Risk Management," Conference on *Liability Prevention for Mental Health Clinicians: Strategies and Update, 1997*, sponsored by Massachusetts Mental Health Center and Harvard Risk Management Foundation, Boston, Nov. 21, 1997

"Understanding Violence," Lecture to Mental Health Professionals in Training, Heritage Hospital (Cambridge Hospital), Somerville, MA, Dec. 5, 1997

"Youth and Violence," Psychiatric Grand Rounds, Harvard University Health Service, Cambridge, MA, Dec. 11, 1997

"The Psychodynamics of Violence," Lecture, Conference on Adult Violence and Clinical Practice, Sponsored by the Department of Psychiatry, The Cambridge Hospital, Harvard Medical School, Boston, March 21, 1998

"Violence as a Problem in Public Health and Preventive Medicine," Psychiatry Grand Rounds Lecture Series sponsored by the Institute for Behavioral Science in Health Care and the Department of Psychiatry, Mount Auburn Hospital, Harvard Medical School, Cambridge, MA, March 24, 1998

"Why Are Men More Violent Than Women?," Lecture, Department of Psychiatry, Charlestown Health Care Center, Massachusetts General Hospital, Harvard Medical School, Charlestown, MA, April 2, 1998

"The Psychology of Love and the Dynamics of Shame and Guilt in Relations Between Men and Women," Ninth Annual Seminar for Mental Health Professionals, a four-day course sponsored by the Massachusetts Mental Health Center and the Department of Continuing Education, Harvard Medical School, Nantucket, MA, May 28-31, 1998

"The Clinical Prediction of Violent Behavior," Lecture at a C.M.E. course on Risk Management for Mental Health Professionals, sponsored by the Massachusetts Mental Health Center and the Department of Continuing Education, Harvard Medical School, Nov. 20, 1998

"Youth Violence," Lecture at Institute of Criminal Justice, Harvard Law School, Dec. 3, 1998

"Causes and Prevention of Violence," Grand Rounds Lecture, Beth Israel-Deaconess Medical Center, March 9, 1999

"Violent Offenders: What Went Wrong Developmentally?", Lecture at the First Annual C.M.E. Course on Violence in Children, Adolescents and Families: Strategies for Prevention and Clinical Intervention, sponsored by the Consolidated Department of Psychiatry, Harvard Medical School, March 19, 1999

"Violence and Trauma," Lecture at C.M.E. course on Psychological Trauma sponsored by the Department of Continuing Education at the Massachusetts Mental Health Center, Harvard Medical School, Boston, April 9, 1999

"Violence Among the Mentally Ill: Epidemiology and Treatment," Lecture at Massachusetts General Hospital, April 9, 1999

"Boys to Men: Questions of Violence," Panelist at Harvard Graduate School of Education Forum, April 15, 1999

"Violence and Aggression," Lecture at a C.M.E. course on Psychopharmacology sponsored by McLean Hospital and the Department of Continuing Education, Harvard Medical School, June 18, 1999

## EDUCATION OF  MEDICAL STUDENTS, PSYCHIATRIC RESIDENTS, FORENSIC PSYCHIATRY FELLOWS, CLINICAL PSYCHOLOGY INTERNS, AND GRADUATE STUDENTS OF SOCIAL WORK :

1969 - 2006:  I supervised an average of four psychiatric residents or fellows a year, one hour per week each, at the following Harvard teaching hospitals: Massachusetts Mental Health Center, 1969-77; McLean Hospital, 1977-89; Massachusetts Mental Health Center, 1989-94; Cambridge Hospital, 1994-2000; and Massachusetts General Hospital, 1998-99.  Throughout that time I lectured, led seminars, conducted clinical case conferences, and served as a clinical and forensic psychiatric consultant, at the teaching hospitals of the Harvard Medical School and of the University of Pennsylvania.  I have also supervised, and have given lectures and otherwise participated in the teaching activities of courses offered to, graduate students in clinical psychiatric social work at the Boston College Graduate School of Social Work, the Smith College School of Social Work, and the University of Pennsylvania's School of Social Work and School of Social Policy and Practice.

## REGIONAL, NATIONAL OR INTERNATIONAL CONTRIBUTIONS:

"Violence in the Family," Keynote Address, Symposium on "The Battering Family: Our Explosive Society," sponsored by the New Jersey Bar, Medical, and Public Health Associations, Trenton, N.J., Nov. 15, 1978

"Corrections, Psychiatry and the Violent Patient," and "Practical Problems in Forensic Psychiatry," Panel Discussions, Annual Meeting, American Psychiatric Association

"The Violent Individual in the Community Mental Health System," Lecture, Community Psychiatry Grand Rounds, Bay Cove Mental Health Center, Tufts Medical School, Dec. 3, 1979

"Anticipating and Managing Violence," Lecture, Massachusetts Medical Society Symposium on the Violent Patient, Pine Manor Junior College, Mar. 25, 1980

"Sex-Motivated Homicides," Lecture, Symposium on Forensic Investigation of Violent Death, Massachusetts Criminal Justice Training Council, June 9, 1980

13

Panel Discussion on "The Violent                    Patient," Hospital and Community
Psychiatry Association Annual Meeting, Boston, Sept. 18, 1980

"History and Present Application of the Insanity Defense," Lecture, Massachusetts
District Attorneys Association, Edgartown, Mass., Oct. 2, 1980

"Forensic Psychiatry," Lecture and Panel Discussion, National Legal Aid and Defenders
Association Annual Meeting, San Juan, Puerto Rico, Oct. 12, 1980

"Shame, Guilt and Violence," Lecture, LaBourre Mental Health Center, Dorchester,
Mass., Jan. 22, 1981

"The Psychodynamics of Violence," Lecture, Boston V.A. Hospital Academic
Conference, May 5, 1981

"The Role of Shame and Guilt in Violent Behavior," Lecture, Academic Conference,
Metropolitan State Hospital, Waltham, Mass., Sept. 30, 1981

"Understanding Violence," Lecture, Psychiatry Grand Rounds, Glenside Hospital, Oct.
28, 1981

"Psychiatry and the Law," Mock Trial and Panel Discussion, Massachusetts Psychiatric
Society Annual Meeting, Mar. 6, 1982

"Borderline and Narcissistic Personality Disorders," Discussant, Elvin Semrad Memorial
Lecture, Northeastern Society for Group Psychotherapy, Beth Israel Hospital, Boston, May 14,
1982

"The Violent Patient," Panel Discussion, American Psychiatric Association Annual
Meeting, Toronto, May 18, 1982

"The Psychology and Sociology of Violence," Lecture, Boston College School of Social
Work, April 11, 1984

"Psychopharmacology: Understanding the Relationship between Soma and Psyche in the
Etiology and Treatment of Violent Psychopathology," Lecture, Boston College School of Social
Work, Dec. 13, 1984

"Psychotherapy with Prison Inmates: Is It Possible?", Lecture, Massachusetts Medical
Society Conference on Health Care in Correctional Facilities, April 18, 1985

"Sociopathy: Impulse Disorders and the Prediction of Violence," Lecture, Emerson
Hospital, April 1, 1986

"Management of the Potentially Violent Patient in a General Hospital Setting," Lecture,
Lemuel Shattuck Hospital, July 25, 1986

14

"From Homicide to Genocide: The          Dynamics of Violence," Keynote Address, Group for the Advancement of Psychiatry Annual Meeting, April 20, 1989

"The Interpretation of Violence," Lecture, American Academy of Psychiatry and the Law Annual Meeting, Oct. 28, 1989

"The Etiology of Violence," Lecture, Kirby Forensic Psychiatry Center, New York, N.Y., Feb. 2, 1990

"The Interpretation of Violence: Homicide and Suicide," Lecture, Conference on the Study of Violence, Bridgewater State Hospital, March 29, 1990

"Understanding, Predicting, and Preventing Violence in the Prison," Lecture, Boston College School of Social Work, Dec. 6, 1990

"Countertransference in the Treatment of Prison Inmates," Lecture, Bridgewater State Hospital, Jan. 30, 1991

"The Prediction of Violence," Discussant, Symposium on Violence, Bridgewater State Hospital, April 5, 1991

"Violence in the Family," Lecture, Association of Family Therapy and Research, Newton, Mass., Nov. 2, 1991

"Violence as Symbolic Action: Ritualistic Aspects of Homicide," Lecture, Psychiatric Ground Rounds, Bridgewater State Hospital, Nov. 21, 1991

"Biological, Psychological and Sociological Determinants of Violent Behavior," Three Invited Lectures, Case Western Reserve University, School of Medicine, and Cleveland Court Clinic, Cleveland, Jan. 16, 17 and 23, 1992
"The Origins of Violence in Childhood and Society: Shame Versus Guilt," the Eighteenth Annual Esther Schour Zetland Lecture, Association of Child Psychotherapists and Institute for Psychoanalysis, Chicago, March 20, 1992

"Violence: A Problem in Criminal Justice or Public Health?", Keynote Address, Spring Meeting, New England Chapter, American Academy of Psychiatry and the Law, Cambridge, Mass., May 16, 1992

"Titicut Follies Revisited: Bridgewater State Hospital 25 Years Later," Lecture and Panel Discussion, Annual Meeting, American Academy of Psychiatry and the Law, Boston, Oct. 17, 1992

"The Violence of Tragedy and the Tragedy of Violence," Lecture in "The Scheherazade Series: A Forum on the Meeting of Theatre and Therapy," Toronto, Nov. 26, 1992

"Outlines of a General Theory of Violence," Lecture given at the Institute of Criminology, University of Cambridge, England, Feb. 10, 1993

"Shame and Guilt as Determinants        of Violent Behavior," Lecture given at Addenbrookes Hospital, School of Clinical Medicine, University of Cambridge, England, Mar. 18, 1993

"The Psychology of Violence," Two Lectures, Seminar on Domestic Violence, a Conference held at the Bridgewater State Hospital, Bridgewater, Mass., April 1 and 2, 1993

"Trauma, Shame and Guilt in the Childhood of the Perpetrator:  A Model for Understanding the Etiology of Violence," Lecture given at "Violence, Aggression and Psychic Trauma: Psychoanalytic Perspectives," a Symposium sponsored by the Western New England Psychoanalytic Society and the Yale Child Study Center, Yale University, New Haven, CT, April 17, 1993

"From Homicide to Genocide: The Etiology of Violence as a Problem in Public Health and Preventive Psychiatry," Lecture, Department of Psychiatry, School of Clinical Medicine, University of Cambridge, England, Oct. 14, 1993

"Why The American Penal System Does Not Work," Presentation to Labor Party Working Group on Crime (Tony Blair, M.P., Shadow Home Secretary, Chair), House of Commons, London, Jan. 11, 1994

"The Psychodynamics of Violence," Lecture, Portman Clinic, Tavistock Institute, Hampstead (London), Febr. 1, 1994

"How Morality Causes Violence,"  Lecture, Inter-Disciplinary Colloquium on Philosophy, Theology and Science, Peterhouse College, University of Cambridge, England, April 8, 1994

"Understanding the Violent Offender," Lecture and Discussion, Conference on Forensic Psychiatry and the Law, Convened by the Lord Chief Justice and the Senior Law Lords, House of Lords, held at Windsor Great Park, England, May 13-15, 1994

"Freedom Against One's Will, Coercion by Choice: Paradoxes of Psychotherapy in Prisons and Prison Hospitals," Lecture, International Association for Forensic Psychotherapy, University of Ulm, Germany, April 26, 1996

"Causes and Prevention of Violence," Lecture to Boston Police Department Senior Supervisors, Training Session on Violent Crime, sponsored by the Office of the Police Commissioner, Foxborough, MA, May 9, 1996

"Violence as a Problem in Public Health and Preventive Psychiatry," Lecture to Conference on "Forensic Issues in Violence and Trauma," Yale Child Study Center, Yale University School of Medicine, New Haven, CT, June 10, 1996

"Prison Psychiatry as a Means of Violence Prevention, Treatment, and Research," Lecture to Prison Mental Health Service, Massachusetts Department of Correction, Bridgewater, MA, June 1, 1996

"What the Study of Violence can          Teach Us about Men -- and Vice Versa," Lecture to Conference on New Psychologies, co-sponsored by the Universities of Cambridge, England and Edinburgh, Scotland, June 29, 1996

"Violence as Tragedy, Tragedy as the Exploration of Violence," Lecture, Conference on the Teaching of Shakespeare, sponsored by the National Endowment for the Humanities, Simons Rock College, Great Barrington, MA, July 25, 1996

"Prisons and Punishment: A Failed Experiment to Alter Criminal Behavior," Lecture, Symposium sponsored by the Pennsylvania Prison Society and the End Violence Project, Philadelphia, PA, Sept. 5, 1996

"Understanding Violence: An Overview of Interpersonal, Family and Community Violence," Plenary Lecture, "End the Violence: A National Conference on Partnerships, Prevention and Policies," sponsored by the Center for Social Policy and Community Development, Temple University, Philadelphia, PA, Sept. 5, 1996

"Understanding and Preventing Violence," Lecture, Massachusetts Psychiatric Society, Western Division, Northampton, MA, Sept. 18, 1996

"Violence as a Problem in Community and Preventive Psychiatry," Lecture, Psychiatric Grand Rounds, Berkshire Medical Center, Pittsfield, MA, Sept. 27, 1996

"Violence and Drug Addictions," Lecture, The Tenth Cape Cod Symposium on Addictive Disorders, sponsored by Brattleboro Retreat, Dartmouth Medical School, and the North River Foundation, Hyannis, MA, Oct. 3, 1996

"Violence, Tragedy, and Redemption," Lecture at 25th Annual Wellfleet Symposium, sponsored by the Center on Violence and Human Survival, John Jay College of Criminal Justice, City University of New York, Wellfleet, MA, Oct. 5, 1996

"Sex, Boundaries and Supervision: A Cross-Cultural Study," Lecture and Panel Discussion on Research in Progress, Annual Meeting, American Academy of Psychiatry and the Law, San Juan, Puerto Rico, Oct. 19, 1996

"Crime and Punishment: The Case Against Punishment," Lecture and Panel Discussion on "Crime and Punishment: How Should We Deal With Violent Offenders?," sponsored by the Commonwealth Club, San Francisco, CA, Nov. 15, 1996

"Art, Violence and Tragedy: Can the Visual Arts Deepen Our Response to the Tragedy of Violence?", Lecture, Art Museum, College of the Holy Cross, Worcester, MA, Nov. 20, 1996

"Violence and Drug Addiction," Lecture, Conference on "Addiction, Violence, Beliefs and Social Policy," sponsored by Codac Treatment Centers, University of Rhode Island, Providence, Dec. 7, 1996

"Understanding and Preventing          Violence and Sexual Abuse," Lecture at Conference on "Violence and Sexual Abuse" sponsored by the Sexual Abuse Prevention and Education Network, Philadelphia, PA, Dec. 13, 1996

"The Interdependence of Violent Crime and Socio-Economic Structure, Education, Employment, and Economic Growth," Lectures to the Legislative Issues Forum, Minnesota State Legislature (House and Senate), House Judicial Finance Committee, House and Senate Judiciary Committees, and the Family and Early Childhood Education Committee, sponsored by the Office of Drug Policy and Violence Prevention (Dept. of Children, Families and Learning), and by the Speaker of the House and the Majority and Minority Leaders, Minnesota State Legislature, St. Paul, MN, Feb. 18 and 19, 1997

"Perspective on Violence: Causes and Solutions," Lecture at a Community Meeting sponsored by: The Initiatives for Violence Free Families and Communities in Ramsey and Hennepin Counties; Alternatives to Violence Coalition; Minneapolis Health Department; Higher Education Center Against Violence and Abuse; the Minnesota Partnership for Nonviolent Communities; and the Council of Black Minnesotans, Minneapolis, MN, Feb. 19, 1997

"Perspective on Violence: Causes and Solutions," Lectures to the Duluth Family Court's Family Violence Council, and to a Community Meeting sponsored by Violence Free Duluth and Men as Peacemakers, Duluth, MN, Feb. 20, 1997

"Violence: Causes, Prevention and Treatment," Public Lecture sponsored by the Family Violence Research Project, University of Rhode Island, Kingston, RI, March 3, 1997

"Is Athletics a Microcosm of Society, thus Reflecting an Increased Level of Violence in Our Culture?," Panel Discussion at "Seminar and Town Meeting on Violence in Sport," sponsored by the University of Rhode Island, the Institute for International Sport, and the Center for the Study of Sport in Society, Kingston, RI, March 4, 1997

"Men, Women and War: A Psychological Framework," Lecture at Conference on "Men, Women and War," sponsored by INCORE (Initiative on Conflict Resolution and Ethnicity), the European Union, the United Nations University, and the University of Ulster, Derry, Northern Ireland, March 7, 1997

"Drugs, Mental Illness and the Law: Locating the Roots of Crime and Violence," Founder's Lecture, Sixth International Conference, International Association for Forensic Psychotherapy, London, England, April 25, 1997

"Responding to Violence as a Public Health Epidemic," Psychiatric Grand Rounds, Lutheran Hospital, Kansas City, MO, May 21, 1997

"Violence as a Problem in Public Health: Psychological and Social Issues," Lecture, and "The Relationship Between Gender and Violence," Workshop, 30th Anniversary Conference on "Caring for the Community: Moving Towards an Integrated Approach," Haight Ashbury Free Clinics, Inc., San Francisco, CA, June 6, 1997

"Violence and Drug Addictions,"                one-day course given at the Brattleboro Retreat (Dartmouth Medical School), Brattleboro, VT, Sept. 12, 1997

"Violence: Confronting the Epidemic in Our Communities," Keynote Address, and "Prison Violence," workshop, Albert Schweitzer Fellowship Program, Tufts University School of Medicine, Boston, MA, Oct. 14, 1997

"Violence and Tragedy," facilitator of panel discussion at a *Symposium on Substance Abuse, Crime and Values,* sponsored by the National Association of Social Workers, the Boston College and Simmons College Schools of Social Work, and the Sobriety Treatment, Education and Prevention Addiction Recovery Center, held at the Martin Institute at Stonehill College, Easton, MA, Oct. 23, 1997

"The Epidemic of Adolescent Violence," Plenary Address to the Juvenile Defender Leadership Summit, sponsored by the American Bar Association's Juvenile Justice Center, and the Office of Juvenile Justice and Delinquency Prevention of the United States Department of Justice, Chicago, IL, Oct. 26, 1997

"Shame: The Missing Link Between Poverty, Racism and Violence," and "How Punishment Stimulates Violence and Why We Keep Using It," lectures delivered as the Leibman Scholar in Residence, Loyola University, sponsored by the Center for Urban Research and Learning, the Child Law Center, and the Departments of Black World Studies, Criminal Justice, Peace Studies, Political Science, Psychology, and Sociology-Anthropology, Chicago, IL, Nov. 3 and 4, 1997

"Why Are Youth and Adolescents the Main Perpetrators and Victims of Violence?", Third Annual National Conference on the Adolescent, sponsored by New England Consultants, Park Plaza Hotel, Boston, Nov. 6, 1997

"Community Violence: A Challenge for Applied Psychoanalysis," and "The Interpretation of Violence: A Psychoanalytic Approach," lectures given at the annual meeting of the American Psychoanalytic Association, New York, Dec. 18 and 19, 1997

"How the University's Missions of Research, Teaching and Service Relate to the Solution of Social Problems," Plenary Address, University Colloquium on The University's Place in Society, University of Puerto Rico, Division of Medical Sciences, San Juan, Puerto Rico, March 20, 1998

"Children and Violence," a two-hour CBS Town Hall of the Air panel discussion hosted by Dan Rather, CBS television and radio, Phoenix, Arizona, April 14, 1998

"Civilization and Its Malcontents," Keynote Address, International Conference "At the Threshold of the Millennium: Culture, Environment, Gender, Violence," sponsored by UNESCO and the International Psychoanalytic Association, Lima, Peru, April 17, 1998

"What are the Mental Health Needs of Children and Youth in the Juvenile Justice System and How Can We Meet Them?" Keynote Address to "Community-Centered Response to Children and Youth in the Juvenile Justice System," an Annual Statewide Children's Mental

Health Conference and Community                    Dialogue sponsored by the Children's
Mental Health Division, Minnesota Department of Human Services, St. Cloud, MN, May 12,
1998

Moderator, Session on "Forensic Psychotherapy: Boundaries and Relationships Between
Therapists and Dangerous Patients," International Association for Forensic Psychotherapy,
Copenhagen, Denmark, May 16, 1998

"The Treatment of Violent Offenders, and the Prevention of Violent Behavior: What
Works and What Doesn't," Two Lectures sponsored by the Child Advocacy Commission of
Durham, Inc., at the Sanford Institute on Public Policy, Duke University, Durham, NC, May 21,
1998

"Does Revenge Heal Psychic Trauma?", Lecture at a Symposium on Communal
Responses to Traumatic Stress, American Psychiatric Association, Toronto, Canada, June 3,
1998

"Gender and Violence," 31st Anniversary Conference sponsored by the Haight Ashbury
Free Clinics, Inc., San Francisco, CA, June 10, 1998
        "Youth Violence," Lecture to the Department of Education, Durham, NC, Aug. 12, 1998

"Youth Violence," Lecture to the Minnesota Bar Association, Minneapolis, MN, Aug. 25,
1998

"The Interpretation of Violence," Lecture to the St. Louis Psychoanalytic Society, St.
Louis, Sept. 18, 1998

"Youth Violence," Lecture at Western Piedmont Community College, Morgantown, NC,
Nov. 2, 1998

"Structural Violence," Lecture at the annual meeting of the American Public Health
Association, Washington, DC, Nov. 18, 1998

"Violence and Trauma," Lecture to the annual meeting of the International Society for the
Study of Traumatic Stress, Washington, DC, Nov. 21, 1998

"School Violence," Lecture at a seminar sponsored by the Minnesota Bar Association and
the Minnesota Department of Education, Minneapolis, MN, Dec. 1, 1998
        "Character" and "The Prevention of Violence," Two Lectures and Panel Discussions at
the Renaissance Weekend, Hilton Head, SC, Dec. 30 and 31, 1998

"Understanding Violence," Lecture at Berkshire Community College Forum, Pittsfield,
MA, March 4, 1999

"Violence: Reflections on a National Epidemic," Lecture at the annual meeting of the
Forensic Mental Health Association of California, Pacific Grove, CA, March 12, 1999

"Violence and Language," Lecture          at the Tenth Annual Seminar on Violence, Kent State University, Kent, OH, March 15, 1999

"Causes and Prevention of Violence," Grand Rounds Lecture, Boston University Medical Center, Boston, March 18, 1999

"Paedophilia and Violence," Panel Discussion of the movie "M," sponsored by the Boston Institute for Psychotherapy, Cambridge, MA, March 19, 1999

"Preventing Violence," Grand Rounds Lecture, Berkshire Medical Center, Pittsfield, MA, March 26, 1999

"Violence: Legal Versus Medical Paradigms," Lecture at New York University Law School, New York, March 31, 1999

"Violence Prevention: An Agenda for the Coming Century," Keynote Address, Inaugural Conference on Building a Violence-Free Society, James Nayler Foundation, London, England, April 24, 1999
"Shame, Guilt, and the Pursuit of Violence: A Psychoanalytic Theory of Violence," Lecture at annual meeting of the International Association for Forensic Psychotherapy, Sheffield, England, May 8, 1999

"The Interpretation of Violence," Lecture at annual meeting of the American Academy of Psychoanalysis, Washington, DC, May 16, 1999

"Understanding and Preventing Violence," Lecture at a Conference on "How to Love a Child: New Insights of Contemporary Psychology," Conference sponsored by the Child Awareness Program for Poland, Warsaw, Poland, May 22, 1999

Member, "Safe From the Start: The National Summit on Children Exposed to Violence," Conference sponsored by Office of Juvenile Justice and Delinquency Prevention, United States Departments of Justice, and Department of Health and Human Services, Washington, DC, June 22-24, 1999

"Socio-Economic Inequality and Violence," Lecture, Consortium on Urban Violence, Center on Violence and Human Survival, John Jay College of Criminal Justice, City University of New York, June 25, 1999
"Therapy of Violent Offenders," Lecture, Massachusetts General Hospital, Boston, July 1, 1999

"Violence: Reflections on a National Epidemic," a Lecture Prepared for the Summer Lecture Series, Smith College School of Social Work, Northampton, MA, July 24, 1999

Panelist, Mental Health, Child Abuse and Neglect Panel, "Massachusetts Youth Violence Summit: A Community Dialogue on Safer Schools and Neighborhoods," sponsored by Senator Edward M. Kennedy, Boston, September 13, 1999

"The Psychology of Ethnic Hatred        and Violence," Panel Discussion, Symposium on "How Do We Stop the Killing? Genocide, Ethnic Cleansing, and U.S. Foreign Policy," Keene State College, Keene, NH, October 29, 1999

"Violence: Reflections on a National Epidemic," Lecture, American Public Health Association meeting, Chicago, November 10, 1999

"Violence and the American Dream: Why Are We Such a Violent Society, and What Can We Do About It:?," Lecture, Boston College, November 16, 1999

"Violent Youth: An American Crisis," Keynote Presentation, Seventh Annual Men's Day, Oakton Community College, Des Plaines, IL, November 21, 1999

"Mass Imprisonment: A New Method of Re-instituting White Supremacy," a Lecture Prepared for the University of Pennsylvania Law School, Philadelphia, PA, April 7, 2000

"What We Know About Violence and What We Still Need to Learn," Presidential Address, Annual Meeting of the International Association for Forensic Psychotherapy, Cambridge, MA, April 9, 2000

"Youth, Humiliation and Violence: How We Started Making this Deadly Cocktail, and How We Can Stop It," a Lecture Presented at a Conference on "Positive Outcomes: Towards a Safer Society," Organized by the Bryn Melyn Group Foundation, Manchester, England, July 12, 2000

"Youth Violence: Integrating Psychoanalytic Understanding With Biological and Social Determinants," Lecture Prepared for a Conference on Violence Sponsored by The Post-Doctoral Program in Psychotherapy and Psychoanalysis, New York University, New York City, October 28, 2000

"'Only Connect': Gender, Love and Violence," a Lecture Prepared for the Family Institute of Northwestern University, Chicago, IL, November 3, 2000

"Can Violence Be Prevented?: New Frontiers in the Criminal Justice System," the Fortunoff Lecture, School of Law, New York University, New York, NY, November 20, 2000

"Violence as Symbol, Symptom and Defense: A Psychoanalytic Theory of Violent Behavior," A Lecture Prepared for the Friday Night Lecture Series, The Erikson Institute of the Austen Riggs Center, Stockbridge, MA, February 9, 2001

"Soma, Psyche and Pneuma: Toward a New Theory of Personality," a Lecture Prepared for the Trialogue Conference on Literature, Religion and Psychotherapy, Bristol, England, February 17, 2001

"Does Capital Punishment Deter or Stimulate Violence?," a Lecture Prepared for a Conference Sponsored by the Center for Psychology and Social Change, Cambridge, MA, March 2, 2001

"The Psychology of Love and the                Dynamics of Shame and Guilt in Relations Between Men and Women," Twelfth Annual Seminar for Mental Health Professionals, a five-day course sponsored by the Massachusetts Mental Health Center and the Department of Continuing Education, Harvard Medical School, Sarasota, FL, March 5-9, 2001

"Shame, Democracy and Violence," a Lecture Prepared for a Conference on "Problems of Democracy," organized by the Institute for Human Sciences in Vienna and the Erasmus Chair at Warsaw University, Polish Academy of Sciences, Warsaw, Poland, May 18, 2001

"Does Capital Punishment Heal the Wounds of Murder or Deter Violence?:  A Look at the Empirical Research," a Lecture Prepared for a Conference on "Healing the Wounds of Murder," Boston College, Chestnut Hill, MA, June 12, 2001

"Preventing Violence: Lessons from the San Francisco Jail Program," a Lecture Presented at a Symposium on "Violence, Writing, and Restorative Justice in California Prisons," Annual Meeting of the American Psychological Association, San Francisco, CA, August 25, 2001

"Theories of Violence," a Lecture Prepared for the Boston Graduate School of Psychoanalysis, Brookline, MA, September 22, 2001

"Juvenile Violence: Causes and Cures," a Lecture Prepared for Massachusetts Continuing Legal Education, Boston, MA, October 19, 2001

"Structural Violence and the Socio-Economic Roots of Terrorism," a Lecture Prepared for the Conference "Seeds of Peace," New York, November 10, 2001

"Courts, Police and the Penal System as Sites for Intervention and Research," a Lecture Prepared for the Erik Erikson Institute of the Austen Riggs Center, Stockbridge, MA, November 20, 2001

"What It Means to Consider Violence as a Problem in Public Health and Preventive Medicine," Grand Rounds, Huron Hospital, Cleveland, OH, Feb. 25, 2002
"Violence: Biopsychosocial Determinants, and Primary, Secondary and Tertiary Prevention,"  Academic Lecture, Case Western Reserve University School of Medicine, Cleveland, OH, Feb. 25, 2002

"Fundamentalism and Terrorism as Responses to the Death of Good and Evil," Keynote Address, Ninth Annual Conference, Australasian Society for Traumatic Stress Studies, Auckland, New Zealand, March 8, 2002

"Towards a Theory of Violence," Panel on Preventing Violence, Ninth Annual Conference, Australasian Society for Traumatic Stress Studies, Auckland, New Zealand, March 8, 2002

"Preventing Adolescent Violence in Schools and Communities:  The Theoretical and Empirical Basis of The 'Manalive' International Approach," Lecture given at a Seminar on "*manalive*/International: A Systematic Approach to the Intervention, Management and

23

Prevention of Violence," sponsored by the          Regional Forensic Psychiatry Services, Auckland, New Zealand, March 11, 2002

"Causes and Prevention of Violence, Considered as a Problem in Public Health and Preventive Medicine," Royal College of Psychiatry of New Zealand, Auckland, New Zealand, March 12, 2002

"The Multi-Determined Biopsychosocial Aetiology and the Primary, Secondary and Tertiary Prevention of Violence," Keynote Address, First Meeting on Framework for Interpersonal Violence Prevention, Department of Injuries and Violence Prevention, World Health Organization, Brussels, Belgium, March 21, 2002

Chair and Discussant, Plenary Session I, "Trauma and Delinquency," 11th Annual Conference of the International Association for Forensic Psychotherapy, Stuttgart, Germany, April 5, 2002

"Understanding the Epidemic of Youth Violence," Keynote Address and Workshop, Peel District School Board, Mississauga, Ontario, Canada, April 18, 2002

"Violence, Education and Democracy," Keynote Address, Second International Roundtable of the Democracy Collaborative on the theme, "Globalization, Terror and Democracy: How 9/11 Changed the Debate in America and Abroad,"American Academy of Berlin, Berlin, Germany, June 2-4, 2002

"Violence Prevention: From Punishment to Public Health," Lecture given to the staff of the World Health Organization, Department of Injuries and Violence Prevention, Geneva, Switzerland, June 6, 2002

"Fundamentalism and Terrorism: Reflections on the Need for Certainty in the Modern World," Lecture given at the Annual Meeting of the Rapaport-Klein Study Group, the Austen Riggs Center, Stockbridge, MA, June 16, 2002

"Humiliation, Violence and Social Structure," Lecture, Conference on "Humiliation," sponsored by the Center for the Study of Developing Societies, New Delhi (Raniket), India, Sept. 9, 2002

Discussant, "Terrors, Traumas and the Tolerance of Uncertainty," 2002-2003 Colloquium Series, William Alanson White Psychoanalytic Society, New York, Sept. 11, 2002

"The Primary, Secondary and Tertiary Prevention of Violence," Lecture, annual meeting of the American Public Health Association, Philadelphia, Nov. 12, 2002

"Mass Incarceration and White Supremacy," Lecture, Pennsylvania Prison Society, Philadelphia, Nov. 15, 2002

"Terrorism, Nihilism and Modernity," Scholars Lecture Series, New York University, Nov. 21, 2002

Panelist, "Understanding the                    Psychology of Terror," January 23, 2003,
World Economic Forum, Davos, Switzerland, with Thomas L. Friedman, Columnist, Foreign
Affairs, The New York Times; Jessica E. Stern, Lecturer in Public Policy, John F. Kennedy
School of Government, Harvard University; Itamar Rabinovich, President, Tel Aviv University,
Israel Jamal S. Al-Suwaidi, Director, Emirates Center for Strategic Studies and Research, United
Arab Emirates; and Farhan A. Nizami, Director, Oxford Centre for Islamic Studies, United
Kingdom;

Panelist, "The Psychological Dimensions of Risk," World Economic Forum, Davos,
          Switzerland, January 24, 2003

Panelist, "Dealing with Violence," World Economic Forum, Davos, Switzerland, January 26,
          2003, with Amitai Etzioni, George Washington University; and
          Alvaro Uribe Velez, President of Colombia

"Risk, Its Management and Its Consequences," Lecture, World Economic Forum, Davos,
          Switzerland, January 27, 2003

"Violence as a Problem in Public Health and Preventive Psychiatry," Keynote Address, Annual
          Meeting, Physicians for Social Responsibility, Washington, D.C.,
          April 26, 2003

"Terrorism, Nihilism and Modernity," Lecture, World Congress of Criminology, University of
          Pennsylvania, Philadelphia, Aug. 10, 2005

"The Politics and Economics of Homicide," Lecture, World Congress of Criminology,
          University of Pennsylvania, Philadelphia, Aug. 10, 2005

"Chaos is Come Again:  Terrorism, Nihilism and Modernity," :Keynote Address, International
          Psychotherapy Institute, Salt Lake City, Dec. 2, 2005

**APPENDIX B**

# APPENDIX B

| DOCUMENT |
| --- |
| Three-Judge Court Order for Pretrial Preparation, July 2, 2008 (*Plata* Docket 1294) |
| Reforming Corrections: Report of the Corrections Independent Review Panel, June 30, 2004 (Gov. Deukmejian, Chairman) |
| Governor Schwarzenegger's Proclamation Regarding Prison Overcrowding, State of Emergency, October 4, 2006 |
| Little Hoover Commission, *Solving California's Corrections Crisis: Time is Running Out*, January 25, 2007 |
| Judge Karlton's 10/20/06 Order Approving Defendants' Plan for Provision of Acute and Intermediate Care and Mental Health Crisis Beds (*Coleman* Docket 1998) |
| Exhibit A in Support of Defendants' Submission of Plan for Reception Center/EOP Inmates, July 31, 2006 (*Coleman* Docket 1928) |
| Judge Karlton's October 3, 2007 Order Adopting *Coleman* Special Master's Report and Revisions to Defendants' Plan Regarding Enhanced Outpatient Programs in Reception Centers (*Coleman* Docket 2450) |
| *Coleman* Special Master's 7/2/07 Report and Recommendations on Defendants' Enhanced Outpatient Treatment Programs in Reception Centers (*Coleman* Docket 2302) |
| *Coleman* Special Master's 8/15/07 Supplemental Report and Recommendations on Defendants' Enhanced Outpatient Treatment Programs in Reception Centers (*Coleman* Docket 2369) |
| *Expert Panel on Corrections Reform Offers California a Roadmap for Reducing Recidivism and Overcrowding*, CDCR Press Release |
| CDCR Expert Panel on Adult Offender and Recidivism Reduction Programming, Report to the State Legislature, *A Roadmap for Effective Offender Programming in California*, June 29, 2007 |
| *Who Is In Our State Prisons?*, by George Runner, Spring 2008 |
| *Coleman v. Wilson*, 912 F. Supp 1282 (1995) |
| Plaintiffs' Memorandum in Support of Motion to Convene a Three Judge Panel to Limit the Prison Population, November 13, 2007 (*Coleman* Docket 2041) |
| Plaintiffs' Notice of Motion and Motion to Convene a Three Judge Panel to Limit the Prison Population, November 13, 2006 (*Coleman* Docket 2036) |
| Plaintiffs Supplemental Brief In Support of Motion to Convene a Three-Judge Panel to Limit the Prison Population, May 24, 2007 (*Coleman* Docket 2244) |
| *Coleman* Special Master's Report Regarding Overcrowding, May 31, 2007 (*Coleman* Docket 2253) |
| Receiver's Report Regarding Overcrowding, May 15, 2007 (*Plata* Docket 673 and 674) |
| Receiver's Supplemental Report Regarding Overcrowding, June 11, 2007 (*Plata* Docket 705) |
| Judges Karlton's 7/23/07 Orders Granting Plaintiffs' Motion to Convene Three-Judge Panel (*Coleman* Docket 2320) |
| Judge Henderson's 7/23/07 Order Granting Plaintiffs' Motion to Convene Three-Judge Panel (*Plata* Docket 780) |
| Mental Health Services Delivery System Program Guide, September 2006 |
| *Coleman* Special Master's 18th Monitoring Report, July 30, 2007 (*Coleman* Docket 2334 through 2334-11) |

[231332-1]

| DOCUMENT |
|---|
| Declaration of Michael W. Bien In Support of Plaintiffs' Motion to Convene a Three Judge Panel to Limit the Prison Population and Exhibits A-DD, November 13, 2006 (*Coleman* Docket 2038) |
| Email, Dubbs-Milne, re DAPO AB 900 Budget Change Proposal regarding services for parolees with mental illness, September 20, 2007 |
| FY 2007-08, Mental Health Services Continuum Program (Ex. A to Rifkin Decl. *Coleman* Docket No. 2240, 5/24/2007) |
| FY 2007/08 Budget Change Proposal Cover Sheet, Day Treatment Programming for Severely Mentally Ill Adult Parolees. (Exh. B to Rifkin Decl. *Coleman* Docket No. 2240, 5/24/2007) |
|  |
| Department of Adult Parole Operations, "AB 900—Talking Points Mentally Ill Parolees 7-31-07" |
| "First Annual Report on the Mental Health Services Continuum Program of the California Department of Corrections-Parole Division," *UCLA Integrated Substance Abusse Program Neuropsychiatric Institute*, November 24, 2003 |
| *An evaluation of California's Mental Health Services Continuum Program for Parolees*, David Farabee, Corrections Today, December 2006 |
| Email, McKeever-Norris, re Bus of homeless inmates at CIM, November 30, 2006 |
| *Coleman* Defendants Initial Disclosures, March 14, 2008 |
| Judge Mould's June 27, 2008 Order Granting Plaintiffs Request to Release Unredacted Office of the Inspector General's Report on the Release of Scott Thomas (*Coleman* Docket 2851) |
| Bordenkircher-Bien, Release of Unredacted Special Review of the California Department of Corrections and Rehabilitation's Release of Inmate Scott Thomas, May 27, 2008 |
| Office of the Inspector General Special Review of the California Departyment of Corrections and Rehabilitation's Release of Inmate Scott Thomas, October 2007 |
| "The [2003] Biennial Report of the Texas Correctional Office on Offenders with Medical and Mental Impairments" and Appendix I, Submitted to the Texas Board of Criminal Justice, January 28, 2005 |
| "The [2005] Biennial Report of the Texas Correctional Office on Offenders with Medical and Mental Impairments" and Appendix I, Submitted to the Texas Board of Criminal Justice, February 2007 |
| Expert Report of Professor Craig Haney, November 9, 2007 |
| Expert Report of Pablo Stewart, M.D., November 9, 2007 |
| Expert Report of James Austin, PhD, November 9, 2007 |
| Expert Report of Ira Packer, PhD, November 9, 2007 |
| Supplemental Expert Report of Ira Packer, PhD and Signature Page, December 10, 2007 |
| David Farabee, "Final Report on the Mental Health Services Continuum Program of the California Department of Corrections and Rehabilitation-Parole Division," *UCLA Integrated Substance Abuse Program Neuropsychiatric Institute*, June 30, 2006 |
| California Department of Additional Recovery Services (DARS) List of Walden House Los Angeles Dual Diagnosis Providers |
| DARS List of Dual Diagnosis Services Provided by Certain Programs |
| Sample Substance Abuse Services Coordinating Agency (SASCA) Contract With Provisions Regarding Co-occurring Disorders (Royal Palms Contract) |
| Memoranda, Fagot-Hoffman re AB 900 Management Projects and re AB 900 Rehabilitative Projects, July 30, 2007 |
| Memorandum, Martinez-Hoffman re Region III Assembly Bill 900 Analysis and Suggestions, August 10, 2007 |

[231332-1]

| DOCUMENT |
| --- |
| CDCR Division of Adult Parole Operations Budget Change Proposal Fiscal Year 2008/09 re Community Based Day Treatment Programming and Crisis Services for Severely Mentally Ill Adult Parolees |
| CDCR, Spring 2008 Adult Population Projections: 2008-2013 (http://www.cdcr.ca.gov) |
| Agreement Between California Department of Corrections and Rehabilitation and Social Security Administration, January 11, 2008 |
| Memorandum of Understanding, California Department of Corrections and Rehabilitation and California Department of Health Care Services, Preparole Process for Securing Medi-Cal Entitlements (CDCR030458) |
| SASCA Walden House Specifications on Providing Augmented Services to Dually Diagnosed ICDTP Participants and Treatment Provider Roster |
| Specifications on Providing Augmented Services to the Dually Diagnosed ICDTP Participants |
| Walden House Inc Region III Substance Abuse Services Coordinating Agency (SASCA) Community Based Services Subcontractor Agreement |
| Email, Dubbs-Howard re Initial Day Treatment Crisis Care BCP Questions, October 24, 2007 |
| *Valdivia v. Schwarzenegger*, Fourth Report of the Special Master on the Status of Conditions of the Remedial Order, March 26, 2008 |
| CDCR, Division of Adult Parole Operations, "Mentally Ill Parolee Population," July 2007 |
| *Valdivia v. Schwarzenegger*, First Report of the Special Master on the Status of Conditions of the Remedial Order, September 11, 2006 |
| Email, McAloon-Rolston re Placing mental health patients in the community, February 21, 2007 |
| "Parolees with Mental Disorder: Toward Evidence-Based Practice," Louden J.E., Dickinger, E. & Skeem, J.L., Center for Evidence-Based Corrections Bulletin (2008) (unpublished manuscript) |
| Movement of Prison Population, Calendar Year 2007, Department of Corrections and Rehabilitation Offender Information Services Branch, Estimates and Statistical Analysis Section, Data Analysis Unit, March 2008 |
| *Coleman* Special Master's Draft 20th Monitoring Report, 7/21/08 |
| California Rehabilitation Oversight Board Biannual Report, July 15, 2008 |
| Video clip of Senate Budget Subcommittee 4 March 12, 2008 Hearing, available at http://www.calchannel.com/MEDIA/0312A.asx |
| Email, Burke-Carter, Center for Effective Public Policy, July 27, 2007 |

[231332-1]