STEVEN S. KAUFHOLD (SBN 157195)  skaufhold@akingump.com
CHAD A. STEGEMAN (SBN 225745)  cstegeman@akingump.com
TERESA W. WANG (SBN 252961) twang@akingump.com
GALIT A. KNOTZ (SBN 252962) gknotz@akingump.com
Akin Gump Strauss Hauer & Feld LLP
580 California, 15th Floor
San Francisco, California 94104-1036
Telephone:     415-765-9500
Facsimile:     415-765-9501
Attorneys for Republican Assembly and Senate
Intervenors

IN THE UNITED STATES DISTRICT COURTS

FOR THE EASTERN DISTRICT OF CALIFORNIA

AND THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>    Plaintiffs,<br><br>  vs.<br><br>ARNOLD SCHWARZENEGGER, et al.,<br><br>    Defendants. | Case No.: CIV S-90-0520 LKK JFM P<br><br>**THREE-JUDGE COURT** |
| MARCIANO PLATA, et al.,<br><br>    Plaintiffs,<br><br>  vs.<br><br>ARNOLD SCHWARZENEGGER, et al.,<br><br>    Defendants. | Case No.:  C01-1351 TEH<br><br>**THREE-JUDGE COURT**<br><br>**TRIAL DECLARATION OF STATE ASSEMBLYMEMBER TODD SPITZER** |

1

**TRIAL DECLARATION OF STATE ASSEMBLYMEMBER TODD SPITZER**

I, Todd Spitzer, testify as follows:

1.    I am a State Assemblyman representing the 71st Assembly District, which comprises eastern Orange County and western Riverside County. I have served as a State Assemblyman for three consecutive terms, since 2002. I make this declaration based on my personal knowledge. If called to testify as to the contents of this declaration, I could and would competently do so.

2.    I testify in my capacity as an individual intervenor, and my testimony represents my own views and beliefs.

3.    Prior to my time in office as an assemblyman, I served as a Deputy District Attorney in Orange County from 1990 to 1996. During that time, I served a four-year term as an elected Trustee of the Brea-Olinda Unified School District. Also during that period, I graduated from the Los Angeles Police Academy and became a Reserve Police Officer. I served as a Reserve Police Officer in Los Angeles for ten years. In 1996, I was elected to the Orange County Board of Supervisors. I served on that Board until 2002.

4.    As an Assemblyman, I currently serve as the Chairman of the Select Committee on Prison Construction and Operation, and on the Health and Human Services, Revenue and Taxation and Joint Legislative Audit Committees.

5.    As one of 42 California state senators and assemblymembers intervening in this action (the "Legislator Intervenors"), I have been actively involved in all stages of the Legislator Intervenors' participation in these proceedings before the Three-Judge Court. I was an active participant in the settlement negotiations facilitated by settlement referees Justice Elwood Lui (ret.) and Justice Peter Siggins.

6.    As an Assemblyman, I have remained firmly committed to protecting public safety and the rights of crime victims.

7.    I have authored several bills addressing victims' rights that have been signed into law. For example, I authored AB 2928, which helps victims of crime continue to collect restitution after offenders are released from parole. AB 2928 was signed into law by Governor Schwarzenegger on October 2, 2008. I also co-authored, together with Assemblywoman Fiona Ma (D-San Francisco), AB 2043, a bill authorizing construction of a Crime Victims' Memorial in the Capitol Historic Region in

1   Sacramento, to honor California residents who are victims of crime. The Crime Victims' Memorial bill

2   was signed by Governor Schwarzenegger on September 29, 2008.

3       8.      I am the statewide chairman of Marsy's Law: Crime Victims' Bill of Rights of 2008,

4   which has been designated Proposition 9 on the November 2008 California ballot. Proposition 9

5   protects the often overlooked rights of crime victims by incorporating victims' rights into the

6   Constitution of the state of California. Proposition 9 requires that prosecutors actively involve victim

7   in their cases and gives victims the first claim on any restitution collected from offenders. Proposition

8   9 also restricts state and local officials' ability to release inmates early from prisons and jails.

9       9.      A prisoner release order that involves early release or a prison cap not only jeopardizes

10  public safety, it is premature and unnecessary, as less intrusive alternatives to a prisoner release order

11  are available.

12      10.     One alternative to a prisoner release order is the full and complete implementation of

13  Assembly Bill 900 ("AB 900"), which was signed into law on May 3, 2007. AB 900, a bipartisan bill,

14  authorized funding to build thousands of prison beds, strengthen inmate health care delivery, and

15  improve rehabilitation programs in state prisons and county jails. Before a prisoner release order is

16  considered, the Court should give the California Department of Corrections and Rehabilitation

17  ("CDCR") enough time to implement the construction and improvements authorized by AB 900.

18      11.     Attached hereto as Exhibit A is a true and correct copy of Assembly Bill 900 (AB 900),

19  signed into law on May 3, 2007.

20      12.     AB900 authorized funding to build thousands of prison beds to ease the overcrowding

21  crisis in our prisons. I witnessed the extent of this overcrowding crisis firsthand in March of 2007,

22  when I toured eight California state prisons, including one while in the presence of Governor Arnold

23  Schwarzenegger. The housing of inmates in gyms, dayrooms, and other spaces intended for

24  programming is completely unacceptable. Housing inmates in this manner precludes the CDCR from

25  fulfilling the crucial need to rehabilitate inmates. When fully implemented, AB 900 will remedy the

26  overcrowding crisis in California prisons by removing these "bad beds" in gyms and dayrooms that

27  take up valuable programming space. Freeing up this programming space will enable CDCR to

28

**TRIAL DECLARATION OF STATE ASSEMBLYMEMBER TODD SPITZER**

1  conduct the rehabilitative programming necessary that is essential to lower crime rates and to protect
2  the public's safety.

3      13.    AB 900 is a comprehensive plan, and in addition to funding bed construction, it also
4  authorizes funding for vocational and education programs, substance abuse treatment programs, and
5  other rehabilitative programming that will curb California's rampant recidivism rate. California has a
6  70% recidivism rate, which means that 70% of released offenders go on to commit new crimes.
7  Providing sufficient space and resources to conduct rehabilitative programming in state prisons and
8  county jails is essential to lower California's recidivism rate and ensure public safety.

9      14.    Another crucial aspect of AB900 is the construction of reentry facilities that will house
10  offenders in the last eighteen months of their incarceration. Reentry facilities will allow offenders
11  serving the last portion of their sentences to be housed closer to their communities to facilitate their
12  reintegration into society. These state-run facilities will provide county-based services to rehabilitate
13  offenders who are currently churning in and out of the prison system without undergoing any
14  rehabilitative programming. Equipped with these services and programs, released offenders will be
15  less likely to commit new crimes.

16      15.    AB 900 also allocated funding for construction that will provide thousands of medical,
17  mental, and dental health care, which will address the underlying constitutional concerns in the *Plata*
18  and *Coleman* actions.

19      16.    Thus, AB 900 is a less intrusive means to correct any violations of constitutionally
20  adequate medical and mental health care. AB 900 is in and of itself sufficient to alleviate
21  overcrowding, without resorting to an extreme remedy such as a prison cap or early release order. The
22  provisions of AB 900, and CDCR's implementation of AB 900, will eliminate bad beds in the prisons
23  and provide for reentry facilities; both of these measures will enhance rehabilitative programming
24  within the prisons and consequently, public safety. Finally, AB 900 provides funding for the
25  Receiver's construction plans, thereby strengthening medical and mental health care delivery.

26      17.    Together with my colleagues in the Senate and Assembly, I have repeatedly called for
27  the removal of all roadblocks that are precluding us from fully executing the provisions of AB 900.
28  Attached hereto as Exhibit B is a true and correct copy of an article entitled "A Look at AB 900 One

4
**TRIAL DECLARATION OF STATE ASSEMBLYMEMBER TODD SPITZER**

1   Year Later ... Nothing," that I authored with my colleague, Senator George Runner, which was

2   published in the online Flash Report on July 24, 2008.

3        18.    AB 900 was signed into law over a year ago. It is mind-boggling that not a single

4   prison bed authorized by AB 900 has been built. I remain hopeful that my colleagues in the

5   Legislature, who passed AB 900 with bipartisan support, and the Governor's Office, which signed it

6   into law, will take the steps necessary to fulfill their commitment to the people of this State to construct

7   the beds necessary to ease the overcrowding crisis. Alternatively, this Court should make whatever

8   order is lawful and necessary in order for AB 900 to be fully implemented prior to issuing any prisoner

9   release order.

10        19.    The provisions of Senate Bill 1705, authored and introduced earlier this year by Senator

11   George Runner, seek to cut through the red tape that has prevented the construction envisioned by AB

12   900. *See* Exh. B at 1. Whether through SB 1705 or other means, it is vital that the Senate and

13   Assembly, together with the Governor's Office act now to start constructing the beds authorized by AB

14   900.

15        20.    The overcrowding in California's prisons interferes with rehabilitation and, more

16   specifically, vocational, educational, and substance abuse programming. The effects of overcrowding

17   on rehabilitative programming must be distinguished from any effects of overcrowding on health care

18   delivery.

19        21.    Consistent with statements made by the Receiver appointed by Judge Henderson in

20   *Plata v. Schwarzenegger*, Clark Kelso, I believe that overcrowding is not the primary cause of any

21   constitutional inadequacies in the delivery of medical or mental health care. Rather, issues such as

22   funding and staffing are the primary hindrances to CDCR's provision of health care.

23        22.    A second less intrusive means of remedying any shortcomings in the provision of

24   constitutional medical and mental health care in the state prisons is permitting the Receiver to continue

25   and complete the work he is doing in improving the health care system in CDCR institutions.

26        23.    The Court's orders equipping the Receiver to upgrade CDCR's health care delivery

27   system have not yet failed. Indeed, Mr. Kelso only assumed the position of Receiver earlier this year,

28   on January 23, 2008. Accordingly, a prisoner release order is premature.

---

5

**TRIAL DECLARATION OF STATE ASSEMBLYMEMBER TODD SPITZER**

1    24.    Attached hereto as Exhibit C is a true and correct copy of a May 22, 2008 letter from

2    Judge Henderson to Senator Mike Machado.

3    25.    In the letter, Judge Henderson states that the Receiver's program "represents an

4    appropriate, cost-effective plan that will address the major treatment and housing concerns in all four

5    federal class actions," referring to the *Plata*, *Coleman*, *Perez*, and *Armstrong* actions. Exhibit C at 2.

6    It is the Receiver's efforts, rather than an early release order or prison cap, that are the most effective

7    way to address the underlying issue in these law suits—health care delivery in CDCR institutions.

8    26.    On August 13, 2008, I attended a press briefing at the Sacramento Press Club featuring

9    *Plata* Receiver Clark Kelso. Attached hereto as Exhibit D is a true and correct copy of a DVD of an

10    August 13, 2008 press briefing held by Clark Kelso at the Sacramento Press Club.

11    27.    Consistent with Mr. Kelso's statements during that briefing, CDCR's provision of health

12    care delivery does not primarily hinge on population level. Consequently, the size of the population is

13    not the primary factor in the CDCR's ability to ensure health care delivery.

14    28.    During that briefing, Mr. Kelso, stated, in response to a question regarding the effects of

15    overcrowding on health care provision, "I'm just not seeing difficulty in providing medical services no

16    matter what the population is." Exhibit D at 30:00 minutes. Thus, according to the Receiver, the

17    Receivership can provide constitutional healthcare in CDCR institutions, regardless of the size of the

18    inmate population. *Id.*. As Mr Kelso continued, "it's a question of how much you're willing to spend

19    for it." *Id.* Mr. Kelso also stated, "I think we've discovered that you actually can provide care and

20    certainly our plan and turnaround plan – we believe we can provide constitutional levels of care no

21    matter what the population is." *Id.* at 31:20 minutes.

22    29.    If adequate health care can be provided at any population level, then resorting to

23    extreme measures such as a population cap or prison release order is wholly inappropriate. Alternative

24    and less intrusive means, such as allowing the Receiver to continue his work, which includes

25    construction of beds and hiring more health care staff, are better suited to addressing the underlying

26    violations at issue in *Coleman* and *Plata*. In fact, the Receivership has been allocated approximately

27    $1.8 billion in the State's 2008-2009 budget, of a total of $2.3 billion allocated to prison health care, to

28    continue that progress.

6

**TRIAL DECLARATION OF STATE ASSEMBLYMEMBER TODD SPITZER**

1    30.    Not only would a prisoner release order be a premature response that does not remedy

2    the underlying issues in the *Plata* and *Coleman* actions, the public safety consequences of a prisoner

3    release order would be dire.

4    31.    Attached hereto as Exhibit E is a true and correct copy of an article by Jack Leonard et.

5    al. titled "Releasing Inmates Early Has a Costly Human Toll," published by the Los Angeles Times on

6    May 14, 2006 ("L.A. Times Early Release Study").

7    32.    The L.A. Times Early Release Study makes evident precisely how dangerous early

8    release is, even at the county jail level. Exhibit E. Nearly 16,000 inmates who were rearrested and

9    charged with new crimes when they were supposed to be serving jail time, and sixteen of those men

10   were charged with homicides. *Id.* Moreover, more than a fourth of those rearrested were charged with

11   violent or life-endangering crimes. These are the effects of a population cap in one county jail system.

12   County jails generally house lower level offenders than state prisons. Imposing a population cap

13   statewide, at the state prison level, would likely have far more drastic consequences.

14   33.    The inmates who would be released early have not had the opportunity to spend time in

15   reentry facilities or rehabilitative programming, because AB 900 has not been carried out as promised,

16   and because of overcrowding. Thus, there is a high likelihood that they will reenter their communities

17   and commit new crimes.

18   34.    Moreover, if serving prison time becomes "just another cost of doing business," as was

19   the result of Los Angeles County's jail caps, then incarceration will be stripped of its deterrent value.

20   Exhibit E at 2. As a result, not only will crime rates likely increase, the state may be faced with

21   another overcrowding crisis caused by a spike in crime.

22   I declare under penalty of perjury under the laws of the State of California and the United

23   States that the foregoing is true and correct and that this declaration was executed by me this 30th day

24   of October, 2008.

25   By: _____
         Todd Spitzer

26

27

28

7
**TRIAL DECLARATION OF STATE ASSEMBLYMEMBER TODD SPITZER**