# EXHIBIT A

**Assembly Bill No. 900**

CHAPTER 7

An act to add Chapter 3.2.1 (commencing with Section 15819.40), Chapter 3.2.2 (commencing with Section 15819.41), Chapter 3.11 (commencing with Section 15820.90), and Chapter 3.12 (commencing with Section 15820.91), to Part 10b of Division 3 of Title 2 of the Government Code, to amend Sections 7000, 7003, and 7003.5 of, to amend, repeal, and add Section 11191 of, to add Sections 2054.2, 2061, 2062, 2713.2, 3073, 6140, 6141, 7004.5, 7021, 10007, and 13602.1 to, to add Article 5 (commencing with Section 2694) to Chapter 4 of, and Article 2.5 (commencing with Section 3020) to Chapter 8 of, Title 1 of Part 3 of, to add Chapter 9 (commencing with Section 3105) to Title 1 of, and Chapter 9.8 (commencing with Section 6270) to Title 7 of, Part 3 of, and to repeal Section 7014 of, the Penal Code relating to prisons, making an appropriation therefor, and declaring the urgency thereof, to take effect immediately.

[Approved by Governor May 3, 2007. Filed with Secretary
of State May 3, 2007.]

LEGISLATIVE COUNSEL'S DIGEST

AB 900, Solorio. Prisons: construction.

Existing law authorizes the financing and construction of state prison facilities using lease-purchase financing arrangements by means of the issuance of state revenue bonds, as specified.

This bill, the Public Safety and Offender Rehabilitation Services Act of 2007 would authorize the Department of Corrections and Rehabilitation to design, construct, or renovate prison housing units, prison support buildings, and programming space in order to add up to 7,484 beds, to acquire land, design, construct, and renovate reentry program facilities, and to construct and establish new buildings at facilities under the jurisdiction of the department to provide medical, dental, and mental health treatment or housing for 6,000, as specified. This bill would also authorize the State Public Works Board to issue revenue bonds, negotiable notes, or negotiable bond anticipation notes pursuant to this part to finance the design, construction, and the costs of interim financing of these projects and would appropriate those funds for that purpose.

In addition, this bill would authorize the department to design, construct, or renovate prison housing units, prison support buildings, and programming space in order to add 4,000 beds at existing prison facilities, to design, construct, and establish new buildings at facilities under the jurisdiction of the department to provide medical, dental, and mental health treatment or housing for 2,000 inmates and to construct, establish, and operate reentry program facilities throughout the state that will house up to an additional

96

LEGIS001523

10,000 inmates. This bill would also authorize the State Public Works Board to issue revenue bonds, negotiable notes, or negotiable bond anticipation notes pursuant to this part to finance the design, construction, and the costs of interim financing of these projects and would appropriate those funds for that purpose, however, the board may not release these funds until a 3-member panel has certified that specified requirements have been met. This bill would provide that the authority provided by these provisions shall expire on January 1, 2014, and no project shall be commenced after that date, but projects already commenced may be completed.

This bill would authorize the Department of Corrections and Rehabilitation, a participating county, as defined, and the State Public Works Board to enter into a construction agreement in order to acquire, design, and construct a local jail facility approved by the Corrections Standards Authority, as specified. This bill would authorize the board to issue up to $750,000,000 in revenue bonds, notes, or bond anticipation notes to finance the acquisition, design, or construction of approved local jail facilities and would appropriate those funds for that purpose. This bill would provide that these provisions would become inoperative on June 30, 2017.

In addition, this bill would authorize the Department of Corrections and Rehabilitation, a participating county, as defined, and the State Public Works Board to enter into a construction agreement in order to acquire, design, and construct a local jail facility approved by the Corrections Standards Authority, as specified. This bill would authorize the board to issue up to $470,000,000 in revenue bonds, notes, or bond anticipation notes to finance the acquisition, design, or construction of approved local jail facilities and would appropriate those funds for that purpose. This bill would provide that the department and the Corrections Standards Authority may not award funds under these provisions unless a 3-member panel has certified that certain conditions have been met, as specified.

Existing law authorizes the Department of Corrections and Rehabilitation to establish pilot programs that provide training and counseling for parolees to assist in their successful reintegration into the community.

This bill would require the department to determine and implement a system of incentives to increase inmate participation in, and completion of, academic and vocational education, consistent with the inmate's educational needs, as specified.

This bill would require the department to develop and implement a plan to obtain additional rehabilitation and treatment services for prison inmates and parolees, as specified.

This bill would require the department to examine and report to the Legislature on whether the provisions of existing law related to payments to inmates released from prison are hindering the success of parolees and resulting in their rapid return to prison for parole violations, as specified.

This bill would require the department to expand substance abuse treatment services in prisons to accommodate at least 4,000 additional inmates who have histories of substance abuse, as specified.

LEGIS001524

This bill would require the department to conduct assessments of all inmates that include, but are not limited to, data regarding the inmate's history of substance abuse, medical and mental health, education, family background, criminal activity, and social functioning which shall be used to place inmates in programs that will aid in their reentry to society and that will most likely reduce the inmate's chances of reoffending.

This bill would authorize the department to obtain day treatment, and to contract for crisis care services, for parolees with mental health problems, as specified.

This bill would require the department to develop an Inmate Treatment and Prison-to-Employment Plan that should evaluate and recommend changes to the Governor and the Legislature regarding current inmate education, treatment, and rehabilitation programs to determine whether the programs provide sufficient skills to inmates that will likely result in their successful employment in the community, and reduce their chances of returning to prison after release to parole.

This bill would state various findings and declarations regarding improvements of a parolee's opportunity for successful reintegration into society due to continuity of services provided both before and after an inmate's release on parole. This bill would authorize the Department of Corrections and Rehabilitation to construct, establish, and operate reentry program facilities throughout the state that will house up to 6,000 inmates and facilities that will house up to an additional 10,000 inmates within one year of being released or rereleased from custody, as specified. This bill would require that reentry program facilities provide programming to inmates and parole violators tailored to the specific problems faced by this population when reintegrating into society. This bill would require the department to develop a collaborative partnership with the local government, local law enforcement, and community service providers in the communities where reentry program facilities are operated.

This bill would require the department to develop and implement, by January 15, 2008, a plan to address management deficiencies within the department, as specified.

This bill would create the California Rehabilitation Oversight Board (C-ROB) in the Office of the Inspector General to regularly examine and report to the Legislature and Governor on the various mental health, substance abuse, and educational and employment programs for inmates and parolees operated by the Department of Corrections and Rehabilitation. This bill would also provide that the board shall make recommendations with respect to modifications, additions, and eliminations of rehabilitation and treatment programs.

This bill would create a 3-member panel charged with verifying whether certain conditions have been met before the State Board of Public Works may release funds to the Department of Corrections and Rehabilitation for the construction of housing and other facilities, as specified.

Existing law provides that the Department of Corrections and Rehabilitation shall prepare plans for, and construct facilities and renovations

LEGIS001525

Ch. 7                          — 4 —

included within, its master plan for which funds have been appropriated by the Legislature.

This bill would expand provisions defining "master plan" to include the department's plans to activate or remove temporary beds in dayrooms, gyms, and other areas.

Existing law requires the department to submit a site plan and projected planning guide to the Joint Legislative Committee on Prison Construction and Operation for each facility included in the master plan.

This bill would instead require the board to submit various plans to the Joint Legislative Budget Committee, as specified, and to provide quarterly reports to the committee on the progress of funded projects.

This bill would require the department to meet with representatives of cities or counties whenever the Legislature authorizes the planning, design, or construction of new permanent housing units to describe the scope of the project and the project schedule, and to consider comments from the city or county representatives regarding the project's impact.

Existing law provides that the Joint Legislative Prison Committee shall be reimbursed, from funds appropriated to the Department of Corrections and Rehabilitation for support, for costs, as agreed to by the Department of Corrections and Rehabilitation, incurred by the committee in reviewing environmental assessment studies, as specified.

This bill would repeal those provisions.

This bill would also authorize the department to use portable or temporary buildings to provide rehabilitation, treatment, and educational services to inmates within its custody or to house inmates, as long a that housing does not jeopardize safety.

This bill would state various findings and declarations regarding staff vacancies at the Department of Corrections and Rehabilitation.

Existing law provides that any court or other agency or officer of this state having power to commit or transfer an inmate to any institution for confinement may commit or transfer that inmate to any institution outside this state if this state has entered into a contract or contracts for the confinement of inmates in that institution and the inmate, if he or she was sentenced under California law, has executed a written consent to the transfer.

This bill would, until a specified date, eliminate the consent requirement, except in certain circumstances.

This bill would authorize the department to establish a training academy for correctional officers in southern California.

This bill would appropriate the sum of $350,000,000 from the General Fund to the Department of Corrections and Rehabilitation for capital outlay to renovate, improve, or expand infrastructure capacity at existing prison facilities and to supplement funds for rehabilitation and treatment of prison inmates and parolees, as specified.

This bill would declare that it is to take effect immediately as an urgency statute.

Appropriation: yes.

96

LEGIS001526

*The people of the State of California do enact as follows:*

SECTION 1.  This act shall be known, and may be cited, as the Public Safety and Offender Rehabilitation Services Act of 2007.

SEC. 2.  Chapter 3.2.1 (commencing with Section 15819.40) is added to Part 10b of Division 3 of Title 2 of the Government Code, to read:

CHAPTER 3.2.1. REVENUE BOND FINANCING OF PRISON CONSTRUCTION — PHASE I

15819.40.  (a) (1)  (A)  The Department of Corrections and Rehabilitation shall design, construct, or renovate prison housing units, prison support buildings, and programming space in order to add up to 7,484 beds at the following prison facilities:

(i)  Pleasant Valley State Prison.
(ii)  Pelican Bay State Prison.
(iii)  California State Prison, Los Angeles County.
(iv)  Calipatria State Prison.
(v)  Centinela State Prison.
(vi)  Salinas Valley State Prison.
(vii)  Kern Valley State Prison.
(viii)  Wasco State Prison.
(ix)  North Kern State Prison.
(x)  Mule Creek State Prison.

(B)  After reporting to the Joint Legislative Budget Committee that site assessments are complete at other prison facilities, the department shall design, construct, or renovate prison housing units, prison support buildings, and programming space in order to add up to 4,516 beds. The reporting requirements set forth in Sections 7000 to 7003.5, inclusive, of the Penal Code shall apply to each project constructed or renovated pursuant to this section.

(2)  Any new beds constructed pursuant to this section shall be supported by rehabilitative programming for inmates, including, but not limited to, education, vocational programs, substance abuse treatment programs, employment programs, and prerelease planning.

(3)  The purpose of beds constructed pursuant to this section is to replace the temporary beds currently in use, and they are not intended to house additional inmates. For the purposes of this section, "temporary beds" shall be defined as those that are placed in gymnasiums, classrooms, hallways, or other public spaces that were not constructed for the purpose of housing inmates.

(b)  The Department of Corrections and Rehabilitation may acquire land, design, construct, and renovate reentry program facilities to provide housing for 6,000 inmates as authorized in Chapter 9.8 (commencing with Section 6271) of the Penal Code.

96

LEGIS001527

Ch. 7                    — 6 —

(c) The Department of Corrections and Rehabilitation is authorized to construct and establish new buildings at facilities under the jurisdiction of the department to provide medical, dental, and mental health treatment or housing for 6,000 inmates.

15819.401.  The scope and costs of the projects authorized by this chapter shall be subject to approval and administrative oversight by the State Public Works Board, including augmentations, pursuant to Sections 13332.11 and 13332.19.

15819.402.  For all projects approved for financing by the board pursuant to Section 15819.40, the board may borrow funds for project costs, including studies, preliminary plans and working drawings, construction, and construction-related costs from the Pooled Money Investment Account pursuant to Sections 16312 and 16313. Project funds expended prior to project approval by the board shall not be reimbursable from the proceeds of the bonds.

15819.403.  (a) The board may issue revenue bonds, negotiable notes, or negotiable bond anticipation notes pursuant to this part to finance the design, construction, and the costs of interim financing of the projects authorized in Section 15819.40. Authorized costs for design, construction, and construction-related costs for all projects approved for financing by the board shall not exceed one billion eight hundred million dollars ($1,800,000,000) for subdivision (a) of Section 15819.40, nine hundred seventy-five million dollars ($975,000,000) for subdivision (b) of Section 15819.40, and eight hundred fifty-seven million one hundred thousand dollars ($857,100,000) for subdivision (c) of Section 15819.40.

(b) Notwithstanding Section 13340, funds derived from interim financing, revenue bonds, negotiable notes, or negotiable bond anticipation notes issued pursuant to this chapter are hereby continuously appropriated to the board on behalf of the Department of Corrections and Rehabilitation for the purposes specified in Section 15819.40.

(c) For the purposes of this section, "construction-related costs" shall include mitigation costs of local government and school districts and shall be made available pursuant to subdivisions (c) and (d) of Section 7005.5 of the Penal Code. It is the intent of the Legislature that any payments made for mitigation shall be made in a timely manner.

15819.404.  Notwithstanding Section 15819.403, the amount of revenue bonds, negotiable notes, or negotiable bond anticipation notes to be sold shall equal the following:

(a) The cost of design, construction or construction management and supervision, and other costs related to the design and construction of the facilities, including augmentations.

(b) Sums necessary to pay interim financing.

(c) In addition to the amount authorized by Section 15819.403, any additional amount as may be authorized by the board to establish a reasonable construction reserve and to pay the costs of financing, including the payment of interest during acquisition or construction of the project, the cost of financing a debt-service reserve fund, and the cost of issuance of

96

LEGIS001528

permanent financing for the project. This additional amount may include interest payable on any interim loan for the facility from the General Fund or the Pooled Money Investment Account pursuant to Sections 16312 and 16313.

SEC. 3.   Chapter 3.2.2 (commencing with Section 15819.41) is added to Part 10b of Division 3 of Title 2 of the Government Code, to read:

### CHAPTER 3.2.2.  REVENUE BOND FINANCING OF PRISON CONSTRUCTION — PHASE II

15819.41.   (a) The Department of Corrections and Rehabilitation is authorized to design, construct, or renovate prison housing units, prison support buildings, and programming space in order to add 4,000 beds at existing prison facilities. This authorization is in addition to the authorization in subdivision (a) of Section 15819.40. Any new beds constructed shall be supported by rehabilitative programming for inmates, including, but not limited to, education, vocational programs, substance abuse treatment programs, employment programs, and prerelease planning.

(b) The Department of Corrections and Rehabilitation is authorized to design, construct, and establish new buildings at facilities under the jurisdiction of the department to provide medical, dental, and mental health treatment or housing for 2,000 inmates. This authorization is in addition to the authorization in subdivision (c) of Section 15819.40.

(c) The Department of Corrections and Rehabilitation is authorized to construct, establish, and operate reentry program facilities throughout the state that will house up to an additional 10,000 inmates pursuant to Section 6271.1 of the Penal Code.

15819.411.   The scope and costs of the projects authorized by this chapter shall be subject to approval and administrative oversight by the State Public Works Board, including augmentations, pursuant to Sections 13332.11 and 13332.19.

15819.412.   For all projects approved for financing by the board pursuant to Section 15819.41, the board may borrow funds for project costs, including studies, preliminary plans and working drawings, construction, and construction-related costs from the Pooled Money Investment Account pursuant to Sections 16312 and 16313. Project funds expended prior to project approval by the board shall not be reimbursable from the proceeds of the bonds.

15819.413.   (a) The board may issue revenue bonds, negotiable notes, or negotiable bond anticipation notes pursuant to this part to finance the design, construction, and the costs of interim financing of the projects authorized in Section 15819.41. Authorized costs for design, construction, and construction-related costs, for all projects approved for financing by the board shall not exceed six hundred million dollars ($600,000,000) for subdivision (a) of Section 15819.41, two hundred eighty-five million seven hundred thousand dollars ($285,700,000) for subdivision (b) of Section

LEGIS001529

Ch. 7                    — 8 —

15819.41, and one billion six hundred twenty-five million dollars ($1,625,000,000) for subdivision (c) of Section 15819.41.

(b) Notwithstanding Section 13340, funds derived from interim financing, revenue bonds, negotiable notes, or negotiable bond anticipation notes issued pursuant to this chapter are hereby continuously appropriated to the board on behalf of the Department of Corrections and Rehabilitation for the purposes specified in Section 15819.41.

(c) For the purposes of this section, "construction-related costs" shall include mitigation costs of local government and school districts and shall be made available pursuant to subdivisions (c) and (d) of Section 7005.5 of the Penal Code. It is the intent of the Legislature that any payments made for mitigation shall be made in a timely manner.

15819.414.  Notwithstanding Section 15819.413, the amount of revenue bonds, negotiable notes, or negotiable bond anticipation notes to be sold shall equal the following:

(a) The cost of design, construction or construction management and supervision, and other costs related to the design and construction of the facilities, including augmentations.

(b) Sums necessary to pay interim financing.

(c) In addition to the amount authorized by Section 15819.413, any additional amount as may be authorized by the board to establish a reasonable construction reserve and to pay the costs of financing, including the payment of interest during acquisition or construction of the project, the cost of financing a debt-service reserve fund, and the cost of issuance of permanent financing for the project. This additional amount may include interest payable on any interim loan for the facility from the General Fund or the Pooled Money Investment Account pursuant to Sections 16312 and 16313.

15819.417.  The State Public Works Board may not release any funds pursuant to this chapter until the panel created pursuant to Section 7021 of the Penal Code has certified that conditions listed in that section have been met. The authority provided by this chapter shall expire on January 1, 2014, and no project shall be commenced after that date, but projects already commenced may be completed.

SEC. 4.  Chapter 3.11 (commencing with Section 15820.90) is added to Part 10b of Division 3 of Title 2 of the Government Code, to read:

CHAPTER 3.11. FINANCING OF COUNTY JAIL FACILITIES

15820.90.  For the purposes of this chapter, "participating county" means any county, or regional consortium of counties, within the state that has been certified to the State Public Works Board (SPWB) by the Department of Corrections and Rehabilitation (CDCR) as having satisfied all of the requirements set forth in Section 15820.906 for financing a local jail facility pursuant to this chapter.

96

LEGIS001530

—9—                                    Ch. 7

15820.901. (a) The CDCR, a participating county, and the SPWB are authorized to acquire, design, and construct, a local jail facility approved by the Corrections Standards Authority (CSA) pursuant to Section 15820.906, or a site or sites owned by, or subject to a lease or option to purchase held by a participating county. The ownership interest of a participating county in the site or sites for a local jail facility must be determined by the SPWB to be adequate for purposes of its financing in order to be eligible under this chapter.

(b) Notwithstanding Section 15815 of the Government Code, a participating county may acquire, design, or construct the local jail facility in accordance with its local contracting authority. Notwithstanding Section 14951, the participating county may assign an inspector during the construction of the project.

(c) The CDCR, a participating county and the SPWB shall enter into a construction agreement for these projects that shall provide, at a minimum, performance expectations of the parties related to the acquisition, design, construction, or renovation of the local jail facility, guidelines and criteria for use and application of the proceeds of revenue bonds, notes, or bond anticipation notes issued by the SPWB to pay for the cost of the approved local jail facility project and ongoing maintenance and staffing responsibilities for the term of the financing.

(d) The construction agreement shall include a provision that the participating county agrees to indemnify, defend, and save harmless the State of California for any and all claims and losses arising out of the acquisition, design, and construction of the project. The construction agreement may also contain additional terms and conditions that facilitate the financing by the SPWB.

(e) The scope and cost of these approved local jail facility projects shall be subject to approval and administrative oversight by the SPWB.

(f) For purposes of compliance with the California Environmental Quality Act (Division 13 of the Public Resources Code (commencing with Section 210000)), neither the SPWB nor the CDCR shall be deemed a lead or responsible agency; the participating county is the lead agency.

15820.902. Upon a participating county's receipt of responsive construction bids, the SPWB and the CDCR may borrow funds for project costs after the project has been certified pursuant to Section 15820.90 from the Pooled Money Investment Account pursuant to Sections 16312 and 16313, or from any other appropriate source. In the event any of the revenue bonds, notes or bond anticipation notes authorized by this chapter are not sold, the CDCR shall commit a sufficient amount of its support appropriation to repay any loans made for an approved project.

15820.903. (a) The SPWB may issue up to seven hundred fifty million dollars ($750,000,000) in revenue bonds, notes, or bond anticipation notes, pursuant to Chapter 5 of Part 10b of Division 3 of Title 2 (commencing with Section 15830) to finance the acquisition, design, or construction, and a reasonable construction reserve, of approved local jail facilities described in Section 15820.901.

96

LEGIS001531

(b) Proceeds from the revenue bonds, notes, or bond anticipation notes may be utilized to reimburse a participating county for the costs of acquisition, preliminary plans, working drawings, and construction for approved projects.

(c) Notwithstanding Section 13340, funds derived pursuant to this section and Section 15820.902 are continuously appropriated for purposes of this chapter.

(d) This section shall become inoperative on June 30, 2017.

15820.905.  With the consent of the SPWB, the CDCR, and a participating county are authorized to enter into leases or subleases, as lessor or lessee, for any property or approved project and are further authorized to enter into contracts or other agreements for the use, maintenance, and operation of the local jail facility in order to facilitate the financing authorized by this chapter. In those leases, subleases, or other agreements, the participating county shall agree to indemnify, defend, and hold harmless the State of California for any and all claims and losses accruing and resulting from or arising out of the participating county's use and occupancy of the local jail facility.

15820.906.  (a) The CSA shall adhere to its duly adopted regulations for the approval or disapproval of local jail facilities. The CSA shall also consider cost-effectiveness in determining approval or disapproval. No state moneys shall be encumbered in contracts let by a participating county until final architectural plans and specifications have been approved by the CSA, and subsequent construction bids have been received. The review and approval of plans, specifications, or other documents by the CSA are for the purpose of ensuring proper administration of moneys and determination of whether the project specifications comply with law and regulation. The CSA may require changes in construction materials to enhance safety and security if materials proposed at the time of final plans and specifications are not essential and customary as used statewide for facilities of the same security level. Participating counties are responsible for the acquisition, design, construction, staffing, operation, repair, and maintenance of the project.

(b) The CSA shall establish minimum standards, funding schedules and procedures, which shall take into consideration, but not be limited to, the following:

(1) Certification by a participating county of project site control through either fee simple ownership of the site or comparable long-term possession of the site, and right of access to the projects sufficient to assure undisturbed use and possession.

(2) Documentation of need for the project.

(3) A written project proposal.

(4) Submittal of a staffing plan for the project, including operational cost projections and documentation that the local jail facility will be able to be safely staffed and operated within 90 days of completion.

(5) Submittal of architectural drawings, which shall be approved by the CSA for compliance with minimum adult detention facility standards and

LEGIS001532

which shall also be approved by the State Fire Marshal for compliance with fire safety and life safety requirements.

(6) Documentation evidencing the filing by a participating county of a final notice of determination on its environmental impact report.

(7) Provisions intended to maintain the tax-exempt status of the bonds, notes, or bond anticipation notes issued by the SPWB.

15820.907. (a) Participating county matching funds for projects funded under this chapter shall be a minimum of 25 percent of the total project costs. The CSA may reduce matching fund requirements for participating counties with a general population below 200,000 upon petition by a participating county to the CSA requesting a lower level of matching funds.

(b) The CDCR and CSA shall give funding preference to counties that assist the state in siting reentry facilities, pursuant to Section 6270.

(c) The CDCR and CSA shall give funding preference to counties that assist the state in siting mental health day treatment and crisis care, pursuant to Section 3073 of the Penal Code, and to counties who provide a continuum of care so that parolees with mental health and substance abuse needs can continue to receive services at the conclusion of their period of parole.

SEC. 5. Chapter 3.12 (commencing with Section 15820.91) is added to Part 10b of Division 3 of Title 2 of the Government Code, to read:

CHAPTER 3.12. FINANCING OF COUNTY JAIL FACILITIES

15820.91. For the purposes of this chapter, "participating county" means any county, or regional consortium of counties, within the state that has been certified to the State Public Works Board (SPWB) by the Department of Corrections and Rehabilitation (CDCR) as having satisfied all of the requirements set forth in Section 15820.916 for financing a local jail facility pursuant to this chapter.

15820.911. (a) The CDCR, a participating county, and the SPWB are authorized to acquire, design, and construct, a local jail facility approved by the Corrections Standards Authority (CSA) pursuant to Section 15820.906, or a site or sites owned by, or subject to a lease or option to purchase held by a participating county. The ownership interest of a participating county in the site or sites for a local jail facility must be determined by the SPWB to be adequate for purposes of its financing in order to be eligible under this chapter.

(b) Notwithstanding Section 15815, a participating county may acquire, design, or construct the local jail facility in accordance with its local contracting authority. Notwithstanding Section 14951, the participating county may assign an inspector during the construction of the project.

(c) The CDCR, a participating county and the SPWB shall enter into a construction agreement for these projects that shall provide, at a minimum, performance expectations of the parties related to the acquisition, design, construction, or renovation of the local jail facility, guidelines and criteria for use and application of the proceeds of revenue bonds, notes, or bond

96

LEGIS001533

Ch. 7 — 12 —

anticipation notes issued by the SPWB to pay for the cost of the approved local jail facility project and ongoing maintenance and staffing responsibilities for the term of the financing.

(d) The construction agreement shall include a provision that the participating county agrees to indemnify, defend, and save harmless the State of California for any and all claims and losses arising out of the acquisition, design, and construction of the project. The construction agreement may also contain additional terms and conditions that facilitate the financing by the SPWB.

(e) The scope and cost of these approved local jail facility projects shall be subject to approval and administrative oversight by the SPWB.

(f) For purposes of compliance with the California Environmental Quality Act (Division 13 of the Public Resources Code (commencing at Section 210000)), neither the SPWB nor the CDCR shall be deemed a lead or responsible agency; the participating county is the lead agency.

15820.912.   Upon a participating county's receipt of responsive construction bids, the SPWB and the CDCR may borrow funds for project costs after the project has been certified pursuant to Section 15820.91 from the Pooled Money Investment Account pursuant to Sections 16312 and 16313, or from any other appropriate source. In the event any of the revenue bonds, notes, or bond anticipation notes authorized by this chapter are not sold, the CDCR shall commit a sufficient amount of its support appropriation to repay any loans made for an approved project.

15820.913.   (a)  The SPWB may issue up to four hundred seventy million dollars ($470,000,000) in revenue bonds, notes, or bond anticipation notes, pursuant to Chapter 5 of Part 10b of Division 3 of Title 2 (commencing with Section 15830) to finance the acquisition, design, or construction, and a reasonable construction reserve, of approved local jail facilities described in Section 15820.911.

(b)  Proceeds from the revenue bonds, notes, or bond anticipation notes may be used to reimburse a participating county for the costs of acquisition, preliminary plans, working drawings, and construction for approved projects.

(c)  Notwithstanding Section 13340, funds derived pursuant to this section and Section 15820.902 are continuously appropriated for purposes of this chapter.

15820.915.   With the consent of the SPWB, the CDCR, and a participating county are authorized to enter into leases or subleases, as lessor or lessee, for any property or approved project and are further authorized to enter into contracts or other agreements for the use, maintenance, and operation of the local jail facility in order to facilitate the financing authorized by this chapter. In those leases, subleases, or other agreements, the participating county shall agree to indemnify, defend and hold harmless the State of California for any and all claims and losses accruing and resulting from or arising out of the participating county's use and occupancy of the local jail facility.

15820.916.   (a)  The CSA shall adhere to its duly adopted regulations for the approval or disapproval of local jail facilities. The CSA shall also

96

LEGIS001534

consider cost-effectiveness in determining approval or disapproval. No state moneys shall be encumbered in contracts let by a participating county until final architectural plans and specifications have been approved by the CSA, and subsequent construction bids have been received. The review and approval of plans, specifications, or other documents by the CSA are for the purpose of ensuring proper administration of moneys and determination of whether the project specifications comply with law and regulation. The CSA may require changes in construction materials to enhance safety and security if materials proposed at the time of final plans and specifications are not essential and customary as used statewide for facilities of the same security level. Participating counties are responsible for the acquisition, design, construction, staffing, operation, repair, and maintenance of the project.

(b)  The CSA shall establish minimum standards, funding schedules, and procedures, which shall take into consideration, but not be limited to, the following:

(1)  Certification by a participating county of project site control through either fee simple ownership of the site or comparable long-term possession of the site, and right of access to the projects sufficient to assure undisturbed use and possession.

(2)  Documentation of need for the project.

(3)  A written project proposal.

(4)  Submittal of a staffing plan for the project, including operational cost projections and documentation that the local jail facility will be able to be safety staffed and operated within 90 days of completion.

(5)  Submittal of architectural drawings, which shall be approved by the CSA for compliance with minimum adult detention facility standards and which shall also be approved by the State Fire Marshal for compliance with fire safety and life safety requirements.

(6)  Documentation evidencing the filing by a participating county of a final notice of determination on its environmental impact report.

(7)  Provisions intended to maintain the tax-exempt status of the bonds, notes, or bond anticipation notes issued by the SPWB.

15820.917.  (a)  Participating county matching funds for projects funded under this chapter shall be a minimum of 25 percent of the total project costs. The CSA may reduce matching fund requirements for participating counties with a general population below 200,000 upon petition by a participating county to the CSA requesting a lower level of matching funds.

(b)  The CDCR and CSA shall give funding preference to counties that assist the state in siting reentry facilities, pursuant to Section 6270.

(c)  The department shall give funding preference to counties that assist the state in siting mental health day treatment and crisis care, pursuant to Section 3073 of the Penal Code, and to counties who provide a continuum of care so that parolees with mental health and substance abuse needs can continue to receive services at the conclusion of their period of parole.

LEGIS001535

15820.918.  The CDCR and CSA may not award funds under this chapter until the panel created pursuant to Section 7021 of the Penal Code has certified that all of the following conditions have been met:

(a)  At least 4,000 of the local jail beds from Chapter 3.11 (commencing with Section 15820.90) are under construction or sited.

(b)  At least 2,000 of the original reentry beds are under construction or sited.

SEC. 6.  Section 2054.2 is added to the Penal Code, to read:

2054.2.  The Department of Corrections and Rehabilitation shall determine and implement a system of incentives to increase inmate participation in, and completion of, academic and vocational education, consistent with the inmate's educational needs as identified in the assessment performed pursuant to Section 3020, including, but not limited to, a literacy level specified in Section 2053.1, a high school diploma or equivalent, or a particular vocational job skill. These incentives may be consistent with other incentives provided to inmates who participate in work programs.

SEC. 7.  Section 2061 is added to the Penal Code, to read:

2061.  (a)  The Department of Corrections and Rehabilitation shall develop and implement, by January 15, 2008, a plan to address management deficiencies within the department. The plan should, at a minimum, address all of the following:

(1)  Filling vacancies in management positions within the department.

(2)  Improving lines of accountability within the department.

(3)  Standardizing processes to improve management.

(4)  Improving communication within headquarters, between headquarters, institutions and parole offices, and between institutions and parole offices.

(5)  Developing and implementing more comprehensive plans for management of the prison inmate and parole populations.

(b)  The department may contract with an outside entity that has expertise in management of complex public and law enforcement organizations to assist in identifying and addressing deficiencies.

SEC. 8.  Section 2062 is added to the Penal Code, to read:

2062.  (a)  The Department of Corrections and Rehabilitation shall develop and implement a plan to obtain additional rehabilitation and treatment services for prison inmates and parolees. The plan shall include, but is not limited to, all of the following:

(1)  Plans to fill vacant state staff positions that provide direct and indirect rehabilitation and treatment services to inmates and parolees.

(2)  Plans to fill vacant staff positions that provide custody and supervision services for inmates and parolees.

(3)  Plans to obtain from local governments and contractors services for parolees needing treatment while in the community and services that can be brought to inmates within prisons.

(4)  Plans to enter into agreements with community colleges to accelerate training and education of rehabilitation and treatment personnel, and modifications to the licensing and certification requirements of state licensing

96

LEGIS001536

— 15 —                                Ch. 7

agencies that can accelerate the availability and hiring of rehabilitation and treatment personnel.

(b) The department shall submit the plan and a schedule for implementation of its provisions to the Legislature by January 15, 2008.

SEC. 9. Section 2713.2 is added to the Penal Code, to read:

2713.2. The Department of Corrections and Rehabilitation shall examine and report to the Legislature on whether the provisions of existing law related to payments to inmates released from prison are hindering the success of parolees and resulting in their rapid return to prison for parole violations. The report shall specifically examine whether the costs of transportation of the inmate from prison to the parole location should be paid from the amounts specified in Section 2713.1 or whether it should be paid separately by the department. The department shall submit its findings and recommendations to the Legislature on or before January 15, 2008.

SEC. 10. Article 5 (commencing with Section 2694) is added to Chapter 4 of Title 1 of Part 3 of the Penal Code, to read:

Article 5. Substance Abuse Treatment

2694. The Department of Corrections and Rehabilitation shall expand substance abuse treatment services in prisons to accommodate at least 4,000 additional inmates who have histories of substance abuse. In determining the prisons in which these additional treatment services will be located, the department may consider efficiency and efficacy of treatment, availability of staff resources, availability of physical space, and availability of additional resources in surrounding communities to supplement the treatment. In addition, the department shall expand followup treatment services in the community in order to ensure that offenders who participate in substance abuse treatment while incarcerated in prison shall receive necessary followup treatment while on parole.

SEC. 11. Article 2.5 (commencing with Section 3020) is added to Chapter 8 of Title 1 of Part 3 of the Penal Code, to read:

Article 2.5. Interdisciplinary Assessment of Inmates

3020. The Department of Corrections and Rehabilitation shall conduct assessments of all inmates that include, but are not limited to, data regarding the inmate's history of substance abuse, medical and mental health, education, family background, criminal activity, and social functioning. The assessments shall be used to place inmates in programs that will aid in their reentry to society and that will most likely reduce the inmate's chances of reoffending.

SEC. 12. Section 3073 is added to the Penal Code, to read:

3073. The Department of Corrections and Rehabilitation is hereby authorized to obtain day treatment, and to contract for crisis care services, for parolees with mental health problems. Day treatment and crisis care

96

LEGIS001537

services should be designed to reduce parolee recidivism and the chances that a parolee will return to prison. The department shall work with counties to obtain day treatment and crisis care services for parolees with the goal of extending the services upon completion of the offender's period of parole, if needed.

SEC. 13.  Chapter 9 (commencing with Section 3105) is added to Title 1 of Part 3 of the Penal Code, to read:

### CHAPTER 9.  PRISON TO EMPLOYMENT

3105.  The Department of Corrections and Rehabilitation shall develop an Inmate Treatment and Prison-to-Employment Plan. The plan should evaluate and recommend changes to the Governor and the Legislature regarding current inmate education, treatment, and rehabilitation programs to determine whether the programs provide sufficient skills to inmates that will likely result in their successful employment in the community, and reduce their chances of returning to prison after release to parole. The department shall report the status of the development of the plan on or before October 1, 2007, again on or before January 15, 2008, and shall submit the final plan by April 1, 2008. The department may use resources of other state or local agencies, academic institutions, and other research organizations as necessary to develop the plan.

SEC. 14.  Section 6140 is added to the Penal Code, to read:

6140.  There is in the Office of the Inspector General the California Rehabilitation Oversight Board (C-ROB). The board shall consist of the 11 members as follows:

(a)  The Inspector General, who shall serve as chair.

(b)  The Secretary of the Department of Corrections and Rehabilitation.

(c)  The Superintendent of Public Instruction, or his or her designee.

(d)  The Chancellor of the California Community Colleges, or his or her designee.

(e)  The Director of the State Department of Alcohol and Drug Programs, or his or her designee.

(f)  The Director of Mental Health, or his or her designee.

(g)  A faculty member of the University of California who has expertise in rehabilitation of criminal offenders, appointed by the President of the University of California.

(h)  A faculty member of the California State University, who has expertise in rehabilitation of criminal offenders, appointed by the Chancellor of the California State University.

(i)  A county sheriff, appointed by the Governor.

(j)  A county chief probation officer, appointed by the Senate Committee on Rules.

(k)  A local government official who provides mental health, substance abuse, or educational services to criminal offenders, appointed by the Speaker of the Assembly.

LEGIS001538

SEC. 15. Section 6141 is added to the Penal Code, to read:

6141. The California Rehabilitation Oversight Board shall meet at least quarterly, and shall regularly examine the various mental health, substance abuse, educational, and employment programs for inmates and parolees operated by the Department of Corrections and Rehabilitation. The board shall report to the Governor and the Legislature biannually, on January 15 and July 15, and may submit other reports during the year if it finds they are necessary. The reports shall include, but are not limited to, findings on the effectiveness of treatment efforts, rehabilitation needs of offenders, gaps in rehabilitation services in the department, and levels of offender participation and success in the programs. The board shall also make recommendations to the Governor and Legislature with respect to modifications, additions, and eliminations of rehabilitation and treatment programs. In performing its duties, the board shall use the work products developed for the department as a result of the provisions of the 2006 Budget Act, including Provision 18 of Item 5225-001-0001.

SEC. 16. Chapter 9.8 (commencing with Section 6270) is added to Title 7 of Part 3 of the Penal Code, to read:

## CHAPTER 9.8. REENTRY PROGRAM FACILITIES

6270. The Legislature finds and declares the following:

(a) The continuity of services provided both before and after an inmate's release on parole will improve the parolee's opportunity for successful reintegration into society.

(b) Placing an inmate in a secure correctional facility within the community prior to parole into that community provides the opportunity for both parole officers and local law enforcement personnel to better coordinate supervision of that parolee.

6271. (a) The Department of Corrections and Rehabilitation is authorized to construct, establish, and operate reentry program facilities throughout the state that will house up to 6,000 inmates. These facilities shall be secure facilities of up to 500 beds each, house inmates within one year of being released or rereleased from custody, and, to the extent possible, be sited in urban locations.

(b) Reentry program facilities shall only be established in a city, county, or city and county that requests a reentry program facility, and the proposed location of the facility shall be identified by the city, county, or city and county.

6271.1. (a) The Department of Corrections and Rehabilitation is authorized to construct, establish, and operate reentry program facilities throughout the state that will house up to an additional 10,000 inmates, as provided for in subdivision (c) of Section 15819.41 of the Government Code. These facilities shall be secure facilities of up to 500 beds each, be for inmates within one year of being released or rereleased from custody,

LEGIS001539

and, to the extent possible, be located in urban locations. This authorization is in addition to the authorization in Section 6271.

(b) Sections 6272 and 6273 shall also apply to this authorization.

6272. Reentry program facilities shall provide programming to inmates and parole violators tailored to the specific problems faced by this population when reintegrating into society. Persons housed in these facilities shall receive risk and needs assessments, case management services, and wraparound services that provide a continuity of support services between custody and parole.

6273. In the locations where a reentry program facility is established, the Department of Corrections and Rehabilitation shall develop a collaborative partnership with local government, local law enforcement, and community service providers.

SEC. 17. Section 7000 of the Penal Code is amended to read:

7000. (a) The Department of Corrections and Rehabilitation shall prepare plans for, and construct facilities and renovations included within, its master plan for which funds have been appropriated by the Legislature.

(b) "Master plan" means the department's "Facility Requirements Plan," dated April 7, 1980, and any subsequent revisions. The plan shall include the department's plans to remove temporary beds in dayrooms, gyms, and other areas.

SEC. 18. Section 7003 of the Penal Code is amended to read:

7003. For each facility or project included within its master plan, at least 30 days prior to submission of preliminary plans to the State Public Works Board, the department shall submit to the Joint Legislative Budget Committee all of the following:

(a) A preliminary plan submittal package, as defined by the State Administrative Manual.

(b) An estimate of the annual operating costs of the facility.

(c) A staffing plan for the operation of the facility.

(d) A plan for providing medical, mental health, and dental care to inmates.

(e) A plan for inmate programming at the facility, including education, work, and substance abuse programming.

If the committee fails to take any action with respect to the submitted plans within 45 days after submittal, this inaction shall be deemed to be approval for purposes of this section.

SEC. 19. Section 7003.5 of the Penal Code is amended to read:

7003.5. (a) The department shall provide the Joint Legislative Budget Committee with quarterly reports on the progress of funded projects consistent with the requirements outlined in the State Administrative Manual. This report shall include new prisons, projects to construct inmate housing and other buildings at, or within, existing prison facilities, prison medical, mental health, and dental facilities, reentry facilities, and infrastructure projects at existing prison facilities.

(b) On January 10 of each year, the department shall provide a report to the Joint Legislative Budget Committee that includes the status of each

96

project that is part of the master plan, including projects planned, projects in preliminary planning, working, drawing and construction phases, and projects that have been completed. The report shall include new prisons; projects to construct inmate housing and other buildings at or within existing prison facilities; prison medical, mental health, and dental facilities; reentry facilities; and infrastructure projects at existing prison facilities.

(c) This section applies to regular prison facilities; projects to expand existing prison facilities; prison medical, mental health, and dental facilities; reentry facilities; and infrastructure projects at existing prison facilities, whether or not built or operated exclusively by the department.

SEC. 20. Section 7004.5 is added to the Penal Code, to read:

7004.5. The Department of Corrections and Rehabilitation shall meet with representatives of cities or, if the prison is located in an unincorporated location, counties, whenever the Legislature authorizes the planning, design, or construction of new permanent housing units. The meeting shall take place prior to the completion of the review required by Division 13 (commencing with Section 21000) of the Public Resources Code. The department shall describe the scope of the project and the project schedule, and shall consider comments from the city or county representatives regarding the project's impact.

SEC. 21. Section 7014 of the Penal Code is repealed.

SEC. 22. Section 7021 is added to the Penal Code, to read:

7021. (a) The State Public Works Board may not release any funds provided for projects in Section 15819.41 of the Government Code or Section 6271.1, until a three-member panel, composed of the State Auditor, the Inspector General, and an appointee of the Judicial Council of California, verifies that the conditions outlined in paragraphs (1) to (13), inclusive, have been met. The Legislative Analyst shall provide information and input to the three-member panel as it considers whether the conditions have been met.

(1) At least 4,000 beds authorized in subdivision (a) of Section 15819.40 of the Government Code are under construction.

(2) The first 4,000 beds authorized in subdivision (a) of Section 15819.40 of the Government Code include space and will provide opportunities for rehabilitation services for inmates.

(3) At least 2,000 of the beds authorized in subdivision (a) of Section 6271 are under construction or sited.

(4) At least 2,000 substance abuse treatment slots established in Section 2694 have been established, with aftercare in the community.

(5) Prison institutional drug treatment slots have averaged at least 75 percent participation over the previous six months.

(6) The Department of Corrections and Rehabilitation has implemented an inmate assessment at reception centers, pursuant to Section 3020, and has used the assessment to assign inmates to rehabilitation programs for at least six consecutive months.

96

LEGIS001541

(7) The Department of Corrections and Rehabilitation has completed the Inmate Treatment and Prison-to-Employment Plan, pursuant to Section 3105.

(8) At least 300 parolees are being served in day treatment or crisis care services, pursuant to Section 3073.

(9) The California Rehabilitation Oversight Board (C-ROB), created pursuant to Section 6140, has been in operation for at least one year, and is regularly reviewing the Department of Corrections and Rehabilitation's programs. This condition may be waived if the appointments to the C-ROB have not been made by the Legislature.

(10) The Department of Corrections and Rehabilitation has implemented a plan to address management deficiencies, pursuant to Section 2061, and at least 75 percent of management positions have been filled for at least six months.

(11) The Department of Corrections and Rehabilitation has increased full-time participation in inmate academic and vocation education programs by 10 percent from the levels of participation on April 1, 2007.

(12) The Department of Corrections and Rehabilitation has developed and implemented a plan to obtain additional rehabilitation services, pursuant to Section 2062, and the vacancy rate for positions dedicated to rehabilitation and treatment services in prisons and parole offices is no greater than the statewide average vacancy rate for all state positions.

(13) The Department of Corrections and Rehabilitation has reviewed existing parole procedures.

(b) The provisions of Section 15819.41 of the Government Code and Section 6271.1 shall not authorize construction of facilities until the three-member panel specified in subdivision (a) has certified that the requirements of that subdivision has not been meet. Those sections shall become inoperative on January 1, 2014. Any projects already underway may continue, and funding for those projects shall remain.

(c) The requirements set forth in Section 7021 are contingent upon the Legislature making funds available for the rehabilitation programs set forth in the Public Safety and Offender Rehabilitation Services Act of 2007.

SEC. 23.  Section 10007 is added to the Penal Code, to read:

10007.  The Department of Corrections and Rehabilitation may use portable or temporary buildings to provide rehabilitation, treatment, and educational services to inmates within its custody, or to house inmates, as long as that housing does not jeopardize inmate or staff safety.

SEC. 24.  The Legislature finds and declares all of the following:

(a) Between 16,000 and 17,000 inmates in California state prisons are sleeping in gymnasiums, dayrooms, classrooms, and hallways.

(b) These conditions create an unsafe environment for both staff and inmates.

(c) There are over 2,400 correctional staff vacancies at the Department of Corrections and Rehabilitation that result in significant overtime hours for correctional officers and costs to the state.

SEC. 25.  Section 11191 of the Penal Code is amended to read:

96

LEGIS001542

— 21 —                              Ch. 7

11191.  (a)  Any court or other agency or officer of this state having power to commit or transfer an inmate (as defined in Article II (d) of the Interstate Corrections Compact or of the Western Interstate Corrections Compact) to any institution for confinement may commit or transfer that inmate to any institution within or without this state if this state has entered into a contract or contracts for the confinement of inmates in that institution pursuant to Article III of the Interstate Corrections Compact or of the Western Interstate Corrections Compact. The inmate shall have the right to a private consultation with an attorney of his choice, or with a public defender if the inmate cannot afford counsel, concerning his rights and obligations under this section, and shall be informed of those rights prior to executing the written consent. At any time more than five years after the transfer, the inmate shall be entitled to revoke his consent and to transfer to an institution in this state. In which case, the transfer shall occur within the next 30 days.

(b)  Notwithstanding subdivision (a), no inmate with serious medical or mental health conditions, as determined by the Plata Receiver, or an inmate in the mental health delivery system at the Enhanced Outpatient Program level of care or higher may be committed or transferred to an institution outside of this state unless he has executed a written consent to the transfer.

(c)  This section shall remain in effect only until July 1, 2011, or until such time as the Department of Corrections and Rehabilitation has replaced "temporary beds," as defined in paragraph (3) of subdivision (a) of Section 15819.34 of the Government Code, whichever is sooner, and as of January 1, 2012, shall be repealed, unless a later enacted statute deletes or extends that date.

SEC. 26.  Section 11191 is added to the Penal Code, to read:

11191.  (a)  Any court or other agency or officer of this state having power to commit or transfer an inmate (as defined in Article II (d) of the Interstate Corrections Compact or of the Western Interstate Corrections Compact) to any institution for confinement may commit or transfer that inmate to any institution within or without this state if this state has entered into a contract or contracts for the confinement of inmates in that institution pursuant to Article III of the Interstate Corrections Compact or of the Western Interstate Corrections Compact, but no inmate sentenced under California law may be committed or transferred to an institution outside of this state, unless he or she has executed a written consent to the transfer. The inmate shall have the right to a private consultation with an attorney of his choice, or with a public defender if the inmate cannot afford counsel, concerning his rights and obligations under this section, and shall be informed of those rights prior to executing the written consent. At any time more than five years after the transfer, the inmate shall be entitled to revoke his consent and to transfer to an institution in this state. In such cases, the transfer shall occur within the next 30 days.

(b)  This section shall become operative on July 1, 2011, or at such time as the Department of Corrections and Rehabilitation has replaced "temporary

96

LEGIS001543

beds," as defined in paragraph (3) of subdivision (a) of Section 15819.34 of the Government Code, whichever is sooner.

SEC. 27.  Section 13602.1 is added to the Penal Code, to read:

13602.1.  The Department of Corrections and Rehabilitation may establish a training academy for correctional officers in southern California.

SEC. 28.  The sum of three hundred fifty million dollars ($350,000,000) is hereby appropriated from the General Fund to the Department of Corrections and Rehabilitation for the following purposes:

(a)  Three hundred million dollars ($300,000,000) for capital outlay to renovate, improve, or expand infrastructure capacity at existing prison facilities. The funds appropriated by this section may be used for land acquisition, environmental services, architectural programming, engineering assessments, schematic design, preliminary plans, working drawings, and construction.

(b)  Fifty million dollars ($50,000,000) to supplement funds for rehabilitation and treatment of prison inmates and parolees. These funds may be expended for staffing, contracts, and other services for rehabilitation and treatment services that include academic and vocational services, substance abuse treatment, and mental health treatment.

SEC. 29.  This act is an urgency statute necessary for the immediate preservation of the public peace, health, or safety within the meaning of Article IV of the Constitution and shall go into immediate effect. The facts constituting the necessity are:

As of April 2007, the prison inmate population totaled nearly 172,000. More than 16,000 inmates are being housed in buildings that were not designed as housing units, and all capacity in these nontraditional spaces will be exhausted during June 2007. In order to provide prison capacity beyond 2007, it is necessary that this act take effect immediately.

O

LEGIS001544

# EXHIBIT B



## Featured Column Library

« Return to Special Reports

### A LOOK AT AB 900 ONE YEAR LATER... NOTHING

*State Senator George Runner and Assemblyman Todd Spitzer*

July 24, 2008

*[Publisher's Note: As part of an ongoing effort to bring original, thoughtful commentary to you here at the FlashReport, I am pleased to present this column authored by two esteemed GOP legislators - Senator George Runner and Assemblyman Todd Spitzer - Flash]*

*If you are new to the FlashReport, please check out the main site and the acclaimed FlashReport Weblog on California politics.*

**With attention focused on California's budget challenges, the serious problems facing our state's prison system continue to go unaddressed by many Sacramento legislators.**



**Our prisons stand at the breaking point despite the fact that the Legislature came together to pass bipartisan prison reforms just last year. We now face the prospect of the federal courts ordering the early release of tens of thousands of dangerous criminals into our communities because the state has not been able to expedite new prison construction and improvements to inmate health care facilities. This would be our worst nightmare come true.**

**Republicans take our responsibility to protect the safety of all Californians seriously. We have fought hard throughout the process to stop the early release of these so-called non-violent inmates. We don't believe families should have to live in fear within their own homes because the state can't get its act together.**

**It makes no sense that more than a year after the Legislature passed bipartisan prison reforms in Assembly Bill 900, not one single new prison bed has been built leaving California's prisons still woefully overcrowded.**

**Democrats and Republicans came together last spring to pass AB 900 to provide the required funding to build the thousands of urgently needed new prison beds to eliminate**

LEGIS0000005

the concerns of three federal judges threatening to order early release. At the same time, we set aside funds to strengthen inmate health care and improve rehabilitation programs to reduce recidivism.

Unfortunately, AB 900 has been held up by unnecessary bureaucracy and red tape standing in the way of our urgent need to build more prison space. This is simply unacceptable.

Senate and the Assembly Republicans have proposed critical legislation to remove these road blocks and get these dollars out the door to build new prisons statewide.

Our legislation, Senate Bill 1705, will give state officials greater flexibility to expedite the design and construction of new prison beds and streamline the law to authorize the immediate issuance of $7.4 billion in bonds to begin construction now.

Republicans are also willing to consider parole reforms which balance safety with savings, including programs that would authorize GPS-monitored house arrest for parole violators.

The program would allow offenders with no history of violence or sex crimes to serve periods of parole revocation at home with certain provisions that ensure the public's safety.

Republicans are disappointed that they have been the only ones at the table urging immediate action to address obstacles to already approved prison construction. Doing whatever it takes to prevent early release has been an important priority for us. We have appeared in court before the three-judge panel, arguing that our bipartisan prison reforms in AB 900 would eliminate prison overcrowding problem and should be allowed to succeed.

At the same time, we have been the only voices fighting an attempt by the Department of Corrections and the liberal majority in the Legislature to implement a dangerous summary parole plan, which some foolishly claim is necessary to address our budget problems. Under summary parole, inmates serving time for dangerous crimes would simply be set free without having to check in with their parole officers. Our budget problems must not be used as an excuse to decimate public safety.

More recently, we have been very concerned about the attempts by the prison receiver in charge of improving inmate health care to seize $7 billion from the state treasury without accountability to taxpayers or the approval of the Legislature. We made a good faith effort last year by passing AB 900 to address our overcrowded prisons and will address the receiver's health care plan as we follow through with AB 900.

It's time that lawmakers work together to fully implement AB 900. Both parties must be engaged if we are going to stop early release. Republicans will continue to lead the way to craft a comprehensive solution to our prison overcrowding problems that also address inmate health care while fully-utilizing funds already authorized by the Legislature for prison improvement. Californians deserve no less.

---

*Senator George Runner, R-Antelope Valley, is the author of Jessica's Law and represents the 17th Senate District in the California Legislature.*
*Assemblyman Todd Spitzer, R-Orange, is Chairman of the Assembly Select Committee on Prison Construction and Operations.*

*E-Mail the authors, via the FR, here.*

ADD THIS

LEGIS0000006

# EXHIBIT C

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
450 GOLDEN GATE AVENUE
SAN FRANCISCO, CALIFORNIA 94102

THELTON E. HENDERSON
SENIOR UNITED STATES DISTRICT JUDGE

May 22, 2008

VIA ELECTRONIC MAIL AND U.S. MAIL

Senator Michael J. Machado
State Capitol, Room 5066
Sacramento, CA 95814

Re:    Senate Bill 1665

Dear Senator Machado:

Thank you for sponsoring Senate Bill 1665, which provides full funding for the construction program set forth in the *Plata* Receiver's strategic plan.

I understand that support for SB 1665 may be wavering with this week's news regarding a possible settlement of the proceedings before a three-judge court, of which I am a member, concerning prison overcrowding. Those proceedings concern whether overcrowding is the primary cause of the unconstitutional nature of medical and mental health care delivery to inmates. Although no settlement has yet been presented to the judges for their approval, and I therefore do not know the terms under consideration, resolving the overcrowding issue would only remove one barrier to achieving the delivery of constitutionally adequate health care to inmates. Without more, a reduction in prison overcrowding will not ensure that the delivery of medical health care to California's inmates will reach constitutional standards. Thus, without more, a settlement to reduce the prison population will not address the core issue in *Plata*, nor will it alleviate the reasons for the Receivership and my oversight over the prison's medical health care delivery system. Instead, a reduction in the prison population would simply resolve the plaintiffs' argument that overcrowding is the primary cause of the constitutional violations.

In addition, as you may know, three other federal district court judges and I are coordinating our efforts in four statewide prison class action lawsuits over which we individually preside. These cases concern medical health care (*Plata*), mental health care (*Coleman*), dental care (*Perez*), and disability access issues (*Armstrong*) in California's prisons. As the attached order demonstrates, the three other judges and I have approved an agreement for my Receiver to take the lead on prison construction projects, including the plan under consideration to construct new health care facilities that will serve the needs of up to 10,000 inmates. I have been briefed on

LEGIS0000056

Senator Michael J. Machado
Re: Senate Bill 1665

May 22, 2008
Page 2

numerous occasions concerning the proposed construction program, as set forth in SB 1665, and I believe strongly that the program – particularly in the phased fashion in which it will be undertaken – represents an appropriate, cost-effective plan that will address the major treatment and housing concerns in all four federal class actions.

I appreciate that SB 1665 asks for a significant amount of funds, but please rest assured that I am extremely concerned about spending funds from the public fisc in an efficient manner. To that end, I will not permit my Receiver to continue to undertake a construction program that becomes unnecessary due to changed circumstances, including any future reductions of the prison population in such a way that eliminates the need for additional medical facilities. My Receiver has made a similar commitment to me that he will carefully evaluate the need for additional facilities on a phase-by-phase basis.

In light of all of the above, I hope you will continue to communicate with your colleagues about the urgency of passing SB 1665. I have directed my Receiver to continue working with you and other members of the Legislature to ensure the bill's expedited passage.

Sincerely,

Thelton E. Henderson

Enclosure (February 26, 2008 Order Approving Construction Agreement)

cc:     (without enclosure and via electronic mail only)
        J. Clark Kelso, *Plata* Receiver
        Paul Mello, counsel for *Plata* Defendants
        Donald Specter, counsel for *Plata* Plaintiffs

why not

LEGIS0000057

# EXHIBIT D



# EXHIBIT E



**Los Angeles Times**

http://www.latimes.com/news/local/la-me-jail14may14,0,1011718.story?coll=la-home-headlines
*From the Los Angeles Times*

# Releasing Inmates Early Has a Costly Human Toll

A shortage of jail beds puts career criminals back on the streets, where they often commit new offenses.
By Jack Leonard, Megan Garvey and Doug Smith
Times Staff Writers

May 14, 2006

Mario Moreno should still have been behind bars the night he climbed into the passenger seat of a stolen car with two fellow gang members.

He was carrying a rifle, some cartridges and, in his jacket pocket, a bag of marijuana. "Let's go do this," the car's driver recalled Moreno saying as they headed into the turf of a rival black gang.

They drove by a liquor store at 89th Street and Central Avenue in South Los Angeles. Two older black men were standing outside.

Moreno, 18, aimed his weapon out the driver's-side window and fired. One bullet killed Darrell Dennard, 53, a grandfather who slept in an alley behind a nearby fish market and got by doing odo jobs. He had just bought a lottery ticket. It was about 9 p.m. on Oct. 11, 2004.

If not for a chronic shortage of jail beds in Los Angeles County, Dennard's killer would have been in jail four more months. Moreno had been convicted of possessing a sawed-off shotgun — a felony. A probation officer called him a "danger to the community," and a judge sentenced him to a year in jail, the county maximum. Six days later he was released into a work program. Since his arrest, he had served a total of 53 days.

Moreno joined more than 150,000 county inmates who have been released during the last four years after serving fractions of their sentences. Thousands, like Moreno, committed violent crimes when they would otherwise have been locked up, even with time off for good behavior.

The large-scale releases started in mid-2002, when Sheriff Lee Baca had to make major budget cuts. Unwilling to lay off patrol officers, he chose to close jails.

As a result, nearly everyone now sentenced to 90 days or less is let go immediately. Many others leave after serving no more than 10% of their time, making Los Angeles County Jail sentences among the weakest in the nation.

A Los Angeles Times investigation of early releases since Baca's jail closures began found:

• Nearly 16,000 inmates — more than 10% of those released early — were rearrested and charged with new crimes while they were supposed to be incarcerated.

• Nearly 2,000 of those rearrested were released early a second time, only to be arrested again while they should have been behind bars. Hundreds of those people cycled through jail three or more times. One example of the revolving door: A 55-year-old woman was released early in 2002 on an assault charge, only to be rearrested three days later on suspicion of another assault. Over the next three years, she was released early 15 times and rearrested 19 times when she was supposed to be locked up.

• Sixteen men, including Moreno, were charged with murders committed while they should have been in jail. Nine are awaiting trial; seven have been convicted in the homicides.

• More than a fourth of those rearrested were charged with violent or life-endangering crimes, including 518 robberies, 215 sex offenses, 641 weapons violations, 635 drunk-driving incidents, 1,443 assaults and 20 kidnappings.

Many of these inmates probably would have committed new offenses even if they had served full sentences. But the early releases have given career criminals more time on the streets to commit additional crimes, endangering the public.

Juvenal Valencia, 21, was convicted of assault with a deadly weapon, released early and then cycled in and out of jail twice more after early releases. Prosecutors have now charged him with first-degree murder in a drive-by shooting that

left one man dead and five others wounded. He has pleaded not guilty. At the time of the killing, Valencia had two months left to serve for a probation violation.

In recent years, sheriff's clerks have routinely disregarded sentences handed down by judges. In some cases, inmates are freed despite instructions from a judge that they must serve their full sentences.

"That puts us all in peril," said Los Angeles City Atty. Rocky Delgadillo. "I think criminals have learned from this that there is a way to beat the system.... For many, a few days in jail has become just a cost of doing business."

Los Angeles Police Chief William J. Bratton, who led the Boston and New York police departments before taking over in Los Angeles in late 2002, said the situation has frustrated officers on the street and made policing harder.

"It's an amazing system. I've never seen anything like it," he said. "The police, prosecutors and judges — sometimes even a jury — have made decisions, and you have the ability to arbitrarily undo all of that."

In recent interviews, Baca defended his decision to release inmates early as a "last resort," saying he had little choice but to shut down jail facilities when he had to cut millions of dollars from his budget.

At the time, Baca warned that crime would increase if he weren't given more money. "In a public safety fashion, the net will be cut and the floodgate will be open to more crime," Baca told county supervisors at a 2002 board meeting to which he had brought a thousand supporters.

Now, he says, the public is paying the consequences.

"I knew that there are people in our county jails that are so unstable that even if they're only in there for a minor crime, they're capable of committing a bigger crime," he said. "You just can't predict who that person is going to be, specifically."

A bond measure of up to $500 million to fund improvements to — and expansion of — the jail system is being considered for the November ballot.

But even if the extra millions come through, sheriff's officials say they won't be enough to fix long-neglected jails.

The sheriff has little control over who comes into his jails. In recent years, bookings have steadily increased, partly the result of a jump in arrests by Los Angeles police. And more than a thousand jail beds are regularly taken up by prisoners awaiting transfer to state facilities, a process that takes weeks.

Today, the county has about 19,000 jail beds in use. Baca says he would need at least 30,000 — and additional deputies — to end early release.

'A Truly Innocent Victim'

Darrell Dennard was always better at taking care of others than himself. When his grandmother was gravely ill, he stayed with her day and night, bathing and feeding her until she died. But he chose to make his home on the streets of South Los Angeles where he'd grown up, preferring his tidy bedroll to numerous offers of a warm bed.

A little over a week before Moreno killed him, Dennard's mother, Gladys Derrick, visited her son in the alley behind the fish market. She brought travel-size lotions and shampoos and a basket of "all kinds of things he didn't have to cook." He was "always good company," she said.

"It's not very often that you have a truly innocent victim," said LAPD Det. John Skaggs, who investigated the killing. "This of course is that case."

Half a dozen members of Dennard's family were in the Compton courthouse on March 27 to see Moreno sentenced to state prison for voluntary manslaughter, a plea prosecutors said they offered because witnesses wouldn't testify.

Dennard's sister wore a T-shirt printed with her brother's smiling image and the dates marking his life: 9/26/51-10/11/04.

Moreno, a member of one of the county's most notorious gangs, Florencia 13, smiled at his family when he entered the courtroom. A girlfriend powdered her nose. His mother, her hair tied back in two long braids, read a Bible.

Dennard's brother, Howard McZeal, addressed the court.

"I'd like to know why my brother isn't here," McZeal said, his voice cracking. "What did he do to you?"

Moreno stared straight ahead

Until speaking to a Times reporter shortly before the sentencing, Dennard's family had no idea that his killer had gotten out of jail with months still to serve.

"A gang member arrested with a sawed-off shotgun? That [jail time] was a camping trip to him, a business junket," McZeal said later.

"If that man had still been in jail, Darrell would still be alive."

A Crush of Inmates

A generation ago, no one in Los Angeles got out of jail early.

When beds were full, inmates were housed in hallways, common rooms, the pews of the jail's chapel and anywhere floor space was available. In the summer of 1983, with the building filled to twice its capacity, hundreds of inmates were given four blankets each and slept under the stars on the roof of Men's Central Jail.

By then a class-action lawsuit filed on behalf of inmates by the American Civil Liberties Union was making its way through the court system. A federal court found the overcrowding to be cruel and unusual punishment and ordered the county to stop overloading its jails. At the time, more than 22,000 inmates were being housed in space meant for half as many. County officials, under a federal consent decree, agreed to open new facilities.

In 1988, the judge allowed the county to institute what was to be a temporary solution to the overcrowding: early release.

The number of early releases ebbed and flowed, but by the late 1990s it had slowed to a trickle. Then, in mid-2002, Baca faced two years of budget shortfalls, forcing $167 million in cuts.

County supervisors said they had little choice but to rein in spending. During that time, state and county governments were reeling from losses in tax revenue caused by fallout from the dot-com bust. Other county departments were also hit hard.

"We did what we could to maintain" the sheriff's funding, said Supervisor Yvonne Brathwaite Burke.

Baca was already dealing with a jail system that had lost 5,000 beds in a decade, mostly from earthquake damage. In little more than a year, he closed three more jails and shut down parts of four others, reducing the number of inmates by another 5,000.

The cuts saved more than $50 million. But they also guaranteed a new wave of early releases.

Baca's critics point to "nonessential" pet projects, like rehabilitation programs in the jail, that could have been cut to keep inmates in jail longer.

"That's nice, but that's not our job. Our job is custody," said Los Angeles County Sheriff's Sgt. Paul Jernigan, who works in Men's Central and is one of four candidates running against Baca in the June 6 election.

But the sheriff said these programs amounted to a fraction of the money he needed to save. With cuts down to the bone, he said he faced laying off deputies or closing the jails.

"If you were to ask the community, 'I'll take away five police cars in your neighborhoods or I'll do early release,' " they'll say, 'Don't take away the five radio cars. Now manage your jail the best way you can.' So I did," he said.

In the last two years, Baca's department has benefited from an increase in county revenue from property taxes, fueled by a surging real estate market. More than half the beds closed since 2002 have been reopened. The department has the funds, but not the staff, to reopen the remaining 2,500 beds.

And there is still the problem of aging and outdated facilities at a time of growing pressure to reduce violence among inmates and relieve overcrowding that has continued despite the large-scale early releases.

In Men's Central, cells designed for three inmates are filled with six. Last week, U.S. District Judge Dean D. Pregerson described the practice as "simply not consistent with basic values," noting that inmates did not even have the space to stand up and take a step or two. Pregerson, who oversees the still-open civil rights case on jail conditions, said the situation "should not be permitted to exist in the future."

A Balancing Act

Last year, 32 of California's 58 counties — including Orange, San Diego, San Bernardino and Riverside — released inmates before they had completed their jail sentences.

Los Angeles County, with the largest jail system in the nation, has led the way. In the 3 1/2 years before Baca closed jails, about 10,000 inmates were let out prematurely. In the 3 1/2 that followed, almost 150,000 were released three or more days early.

With fewer beds, the sheriff has also had to loosen standards on who qualifies for early release.

"By lowering that criteria, you're qualifying more hardened criminals," said Sheriff's Capt. Bill Bengtson.

Until The Times asked for data, sheriff's officials had not tracked how often inmates were rearrested when they would otherwise have been behind bars. In February, the officials hastily conducted an analysis of rearrests before giving the newspaper data on more than 2 million bookings into the jail since 1999.

The Sheriff's Department analysis, which looked at the seven years of data as a whole, concluded that inmates released early were no more likely to re-offend than those who were not.

But The Times found distinct differences when it compared the years before the jail closures with those after. As fewer served full terms, rearrests within 90 days of release increased for all inmates. Those released early after the policy change were more likely to be rearrested within 90 days than inmates who served their full jail time.

The Times analysis also showed that although the number of inmates released early increased 15-fold after mid-2002, arrests of people with time left on their sentences rose about 60-fold, from 266 to 15,775. Rearrests for violent and life-threatening crimes soared from 74 before the jail closures to more than 4,000 since.

Among the perpetrators: Hector Aguilar, who left jail Sept. 1, 2004, with three months left on his sentence for domestic violence. Four days later, he opened fire with an AK-47 assault rifle on a sheriff's patrol car, missing two deputies inside. He pleaded guilty to assault with a deadly weapon and was sentenced to 43 years in state prison.

In deciding which inmates deserve the most time, sheriff's officials try to balance overcrowding against the need to keep dangerous criminals locked up.

The inmate pool for early release is limited to about 10% of the jail population — convicts sentenced by judges to less than a year. The remaining inmates are awaiting trial or transfer to state prison for longer sentences, or are incarcerated for parole violations under a contract with the state.

Since late 2004, a small number of beds — now about 75 — has been reserved for inmates sentenced to jail who have been identified by the LAPD as chronic, dangerous offenders. They do their full time. Occasionally, inmates arrested for specific crimes in specific areas are also kept longer. In recent months, for example, sheriff's deputies have cracked down on prostitution in parts of South Los Angeles and Compton. Current guidelines say prostitutes arrested there "shall serve 100% of their sentence, and shall NOT be released [early]."

Guidelines issued by the sheriff spell out which inmates in the 10% pool qualify for early release: Those in jail for manslaughter, sex offenses and child abuse, along with violators of gang injunctions, do all of their time. For nearly all other convictions, inmates serve a fraction of their sentences. Women, who are housed in separate, less crowded facilities, usually do no more than 25%. Men serve no more than 10%.

If jailers had the room, a typical inmate given a year in jail would spend about 243 days behind bars after discounts for good behavior and work. As it is now, an inmate eligible for a 10% release would serve just 24 days.

"That's a disaster," said Los Angeles County Dist. Atty. Steve Cooley. "Obviously, if they aren't in, they can be out committing crimes."

'Get Them Out'

Most of the time, the decision to free an inmate comes down to a simple mathematical calculation. A first-time offender is treated the same as a career criminal. There is no penalty for prisoners who have been rearrested while on early release. Prior convictions for violent crimes are not taken into consideration.

Each day the decision of who goes home early is made in cramped cubicles at the county's Inmate Reception Center. Sheriff's clerks work eight-hour shifts, reviewing inmate files to identify those who meet the sheriff's criteria for early release.

On a recent morning, Pamela Broom's desk was stacked with a dozen or so manila envelopes, filled with paperwork on candidates for early release.

Broom pulled the envelope of Rosa Louise Degraw. A blond, plump face glared from a booking photo. The jail's computer showed that Degraw was serving a 180-day jail sentence for battery and vandalism. With time off for good behavior, she was supposed to serve about four months.

Degraw's sentencing documents contained an explicit directive from the judge: "No early release."

Instead, 33 days after she was booked, Degraw was eligible to go.

"The sheriff says, 'It doesn't mean anything. I've got to get them out of my jails,'" said Broom's supervisor, Greg Sivard.

Degraw had landed in jail after repeatedly violating her probation requirements following a conviction for battery and vandalism. Among her battery victims: her mother.

Broom said she has little time to reflect on whom she is releasing.

"I'd be in a mental ward," said Broom, who finds anywhere from two to 40 inmates each day to release early. "You follow the criteria. You get paid to do your job, not have opinions."

In red ink on the envelope, she marked Degraw free to go.

Two and half hours later, Degraw, 23, pushed her way through a metal jail door onto Bauchet Street in downtown Los Angeles.

She was angry she'd served as much time as she had. Dressed in the same white tank top and blue jeans she had come to jail in, Degraw said she believed she'd serve only 10% of her sentence. Still, she said, the extra time made her want to avoid coming back.

"The longer you make them stay in there and think about it, the chances are less that they'll get out and do something else," she said.

Degraw said she planned to reunite with her 4-year-old son and try again to earn her high school equivalency degree. For the immediate future, she had other plans: "I'm going to drink me a bottle of Southern Comfort today."

**Freed Without a Review**

In 2003, Baca tried to reassure the public about his early-release program.

"It should be clear to those who are listening that we are going to put them in programs and ankle bracelet monitoring," Baca said, appearing on KCET-TV Channel 28's "Life and Times" in April 2003. "They're not just walking out the door with no obligations."

For a few months in 2003, jailers reviewed criminal histories before approving early release. Then they abandoned the effort, saying it was too time-consuming. Since then, inmates have been freed without anyone looking at their full criminal past. Many had long arrest records.

More than 4,400 released early after the jail cuts had been prosecuted for assaults with deadly weapons or seriously injuring people. Today, the department has far fewer inmates on electronic monitoring and other types of supervision than it did in 2001.

Elsewhere, jail officials do more to determine which inmates are likely to endanger public safety. In Portland, Ore., the Multnomah County Sheriff's Department examines the criminal records of inmates so convicts with violent pasts do more time regardless of their most recent offenses.

After questions from The Times, Los Angeles County Sheriff's Chief Marc Klugman said the department would consider once again looking at criminal histories and other factors to determine whether an early release was appropriate.

Baca said judges and prosecutors also bear some responsibility. He said they are well aware that he is releasing inmates early, yet continue to agree to plea bargains that send dangerous offenders to jail instead of prison.

**Creative Sentencing**

In 2002, Vincent Jeffery led sheriff's deputies on a chase through the streets of South L.A., hitting speeds of more than 80 mph, running eight red lights and crashing into a motorist. A deputy said Jeffery, who had a 20-year record and 10 aliases, pulled a gun on him when he tried to make a routine traffic stop.

On Sept. 30, 2002, Los Angeles County Superior Court Judge James R. Brandlin sentenced Jeffery, 36, to two years in County Jail. Eight months later, he was back on the street.

Brandlin, who had called Jeffery a "tremendous risk to public safety," demanded answers in a letter to Baca.

The sheriff had his aides look into the case. Jeffery, Baca wrote back to the judge, had been released properly by sheriff's officials struggling to keep the jail population down.

"While this may not meet with your approval," Baca said, "I sincerely hope that it allays any concerns you have that Mr. Jeffery was incorrectly released." Brandlin declined to comment for this story.

As more and more inmates realized that there was little risk of serving full sentences, fewer accepted deals to serve their time under house arrest or through community service. And as alternative sentences dwindled, more pressure was put on the jails.

"You tell a guy now, 'Hey, 30 days Caltrans,' " Cooley said. "He says ... 'You know what, I don't need all that jazz. Give me my time.' "

Cooley said frustrated prosecutors and judges seek creative ways to "beat the sheriff's sentencing system."

Here's how prosecutors and one judge made sure that a defendant served his time.

In September, sheriff's deputies caught Steven Torres strolling through his Compton neighborhood carrying a large glass bong and a small pipe containing drug residue. He was on probation for previously carrying a concealed weapon. A search of his home turned up another handgun — a serious violation.

His probation officer wrote that Torres should "spend a suitable amount of time in local custody" to show him that "criminal behavior will not be tolerated."

At a November hearing, where Torres pleaded no contest, Superior Court Judge Xenophon F. Lang Jr. told him he would "serve 90 actual days in the County Jail" and ordered him to surrender to the jail in January to await sentencing.

In March, at Torres' sentencing hearing, Lang smiled at the bulky defendant before him in handcuffs. The judge reminded Torres of the 90-day sentence he had proposed earlier.

"It appears he has done that," Lang said with a chuckle, ordering Torres released on probation.

**Fatal Consequences**

On Oct. 30, 2003, Jose Rafael Garcia stopped his motorcycle at a red light in East Los Angeles. It was about 9:30 p.m. The 31-year-old father of two had finished a day of construction work and was idling at 3rd Street and Arizona Avenue.

Randy Morones, 33, had been rousted from a jail bed about 2 a.m. It was his 11th day in jail on a drug conviction. He had been sentenced to six months.

In 1999 and again in 2000, he had been convicted of beating a girlfriend and sent to state prison. His latest offense marked his seventh stay in County Jail in four years. Since 1989, he had been convicted of drunk driving four times.

None of this mattered when Morones again came up for early release. Because he had served 10% of his jail time, he was free to go.

Morones left the downtown jail complex about 8:30 a.m. By evening, he was drinking beer at a friend's house. Then he climbed behind the wheel of his 18-foot motor home and headed to his parents' Pico Rivera home, speeding along 3rd Street.

Witnesses said he didn't even hit the brakes as he approached the red light at Arizona. He slammed into Garcia, throwing him more than 130 feet and killing him. Morones ran from the crash site, but witnesses caught and held him until deputies arrived.

In September 2004, a jury found Morones guilty of second-degree murder and gross vehicular manslaughter while drunk. At his sentencing, Morones apologized to Garcia's family: "I wish the Lord took my life instead of an innocent man."

He was sentenced to 20 years to life in state prison.

Galdino Garcia wept when he spoke recently of the crash and his memories of his brother.

A Mexican immigrant, Jose played guitar in Latin rock bands. He spent time riding his motorcycle in the San Gabriel Mountains, telling his family that the rides made him feel like he was "caressed by God."

Galdino Garcia said he blames the justice system as well as Morones.

"I believe in the law, but that was one of my questions: Why did they let him out early?" Galdino said. "They never answered me that question."

*Times researcher Maloy Moore and staff writers Robin Fields and Stuart Pfeifer contributed to this report. Data analysis by Doug Smith and Sandra Poindexter.*

(INFOBOX BELOW)

Recidivism

After early releases mushroomed in mid-2002, all county inmates were more likely to be rearrested within 90 days after being released. But the rearrest rate almost tripled for those let out early.

|  | Before jail closures | After jail closures |
|---|---|---|
| Full term | 13.1% | 18.5% |
| Early release | 7.7% | 20.6% |

Does not include inmates released after Sept. 30, 2005

Source: Los Angeles County Sheriff's Department. Data analysis by Sandra Poindexter

(INFOBOX BELOW)

Free to re-offend

From July 2002 to December 2005, the number of inmates who should have been in jail who were:

| | |
|---|---|
| Released early | 148,229 |
| Rearrested | 15,775 |
| Charged with assault | 1,443 |
| Charged with robbery | 518 |
| Charged with a sex offense | 215 |
| Charged with murder | 16 |

Sources: L.A. County Sheriff's Department; L.A. Superior Court

If you want other stories on this topic, search the Archives at latimes.com/archives.

**TMSReprints**
Article licensing and reprint options

Copyright 2008 Los Angeles Times | Privacy Policy | Terms of Service
Home Delivery | Advertise | Archives | Contact | Site Map | Help

partners: