1  ANN MILLER RAVEL, County Counsel (S.B. #62139)
   THERESA J. FUENTES, Deputy County Counsel (S.B. #208588)
2  OFFICE OF THE COUNTY COUNSEL
   70 West Hedding, East Wing, 9th Floor
3  San Jose, California 95110-1770
   Telephone: (408) 299-5900
4  Facsimile: (408) 292-7240

5  Attorneys for Intervenor
   COUNTY OF SANTA CLARA
6

7

8              UNITED STATES DISTRICT COURT

9         FOR THE EASTERN DISTRICT OF CALIFORNIA

10        AND THE NORTHERN DISTRICT OF CALIFORNIA

11     UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

12     PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

13

14  RALPH COLEMAN, et al.,                )  No. CIV S-90-0520 LKK JFM P
                                          )
15          Plaintiffs,                   )  THREE-JUDGE COURT
                                          )
16  v.                                    )
                                          )
17  ARNOLD SCHWARZENEGGER, et al.,        )
                                          )
18          Defendants.                   )
    _____)
19                                        )  No. C01-1351 TEH
    MARCIANO PLATA, et al.,               )
20                                        )  THREE-JUDGE COURT
            Plaintiffs,                   )
21                                        )  **INTERVENOR COUNTY OF SANTA**
    v.                                    )  **CLARA'S EXPERT REPORT OF PAUL**
22                                        )  **McINTOSH**
    ARNOLD SCHWARZENEGGER, et al.,        )
23                                        )  Trial Date: November 18, 2008
            Defendants.                   )  Time:      1:30 p.m.
24  _____)  Location:  U.S.D.C. Ceremonial Courtroom

25

26  //

27  //

28  //

ANN MILLER RAVEL
County Counsel
County of Santa Clara
San Jose, California

Intervenor County of Santa Clara's
Expert Report of Paul McIntosh                    CIV S-90-0520 LKK JFM P / C01-1351 TEH

California State Association of Counties



1100 K Street
Suite 101
Sacramento
California
95814
Telephone
916.327.7500
Facsimile
916.441.5507

### Expert Report of Paul McIntosh
*Coleman et al. v. Schwarzenegger* (No. CIV-S-90-0520-LKK-JFM-P (E.D. Cal)
*Plata et al. v. Schwarzenegger* (No. C01-1351-THE (N.D. Cal)
**August 13, 2008**

Since July 2007, I have served as the Executive Director of the California State Association of Counties (CSAC), a nonprofit corporation that promotes and represents the interests of California's 58 counties at the state and federal level. As the CSAC Executive Director, I have overarching responsibility over our association's efforts to identify, advance, and advocate for county budget and policy priorities.

I have more than 25 years of local government experience, 19 of those as a chief executive. Immediately prior to joining CSAC, I served as the Chief Administrative Officer of Butte County, California for five years. Prior to my tenure in Butte County, I served as the Chief Administrative Officer of El Dorado County, California; the Deputy County Administrator for Solano County, California; the County Administrator for Hernando County, Florida; and the County Manager of Mohave County, Arizona.

In the capacity of county manager/chief administrative officer, I have served as the senior executive responsible for the overall conduct and operation of all county functions and activities, reporting to the Board of Supervisors or County Commissioners ("board"), depending on the jurisdiction. The position carries overall responsibility for policy development, program planning, fiscal management, administration and operation of all county functions under the board and all county programs and activities. A county manager/chief administrative officer serves as an advisor to the board and provides policy guidance and coordination of the activities of constitutional officers to accomplish board goals and objectives. As county manager/executive, I was vested with full responsibility over the operations and administration of county services and functions, including those in the criminal justice system (sheriff, probation, district attorney, and public defender) as well as the health and human services systems (child welfare system, indigent health, mental health, alcohol and drug treatment, among others). My office was charged with — and I had ultimate authority over — fiscal management of all county departments and functions, including supervising and directing the preparation of the annual county budget. In the performance of budget responsibilities, it was my responsibility to review, evaluate, and provide recommendations to the board regarding all departmental requests and all items in the proposed budget including expenditures, revenues, and reserves.

During my tenure in Solano County, I was responsible for the County's Capital Projects Improvement Program. Among the projects for which I had primary responsibility were the construction of the Solano County Justice Center ($45

CSAC/ 00001

million), the county's central detention facility; a restoration of the Solano County Historic Courthouse ($1.2 million); and a remodel of the Solano County Hall of Justice. Each of these projects required significant research into and examination of the local criminal justice system, interaction among county justice partners, assessment of criminal justice systems and processes contributing to the county's jail population, and consideration of detention and release policies and practices.

The County of Santa Clara has requested my expert opinion, on behalf of the statewide association of counties, regarding the likely impacts of the court's potential actions in the *Coleman* and *Plata* matters. I am not being compensated by Santa Clara County or any other party for preparing this report and testimony. Further, I have not testified in any trials or participated in depositions in the past four years.

CSAC has been monitoring the *Coleman* and *Plata* court proceedings over the last year and participated financially in the initial phases of the efforts by the intervening local law enforcement coalition, represented by Martin J. Mayer. Subsequently, individual counties have intervened in the matters; CSAC, as an association, has no independent standing as an intervener. Over the last 18 months, particularly following the passage of AB 900 (Chapter 7, Statutes of 2008), the Public Safety and Offender Rehabilitation Services Act, my two staff who cover justice issues — Elizabeth Howard and Rosemary Lamb — have been actively engaged in policy discussions and implementation efforts with state and local officials. Through the course of these efforts, my staff and I have had an opportunity to discuss directly with county officials the general aspects of local and state correctional systems, as well as the significance and potential local impacts of the two state prison overcrowding cases before the three-judge court.

Specifically, my staff conducts bi-weekly conference calls on corrections matters that involve the participation of county officials — elected supervisors as well as staff from a range of county departments (probation, mental/behavioral health, and others). The issue of the *Coleman* and *Plata* matters is a regular agenda item, and counties have weighed in with general descriptions of anticipated impacts of an early release or population cap. Further, my staff significantly interacted with county officials as part of a series of 10 regional workshops last year on AB 900. Additionally, CSAC hosted a corrections reform workshop at our annual statewide conference in December 2007, which included participation from state officials, community-based agencies and county representatives. Lastly, my staff participates in a bi-weekly corrections discussion with the California Mental Health Directors Association, and we keep in regular contact on corrections matters with our public safety affiliates as well as with the California Department of Corrections and Rehabilitation (CDCR).

2

CSAC/ 00002

In preparation for rendering the opinions outlined below, I am drawing on the following specific references and research, in addition to my own expertise as a long-time county administrator:

- Interview with Elizabeth Howard, Legislative Representative in the area of Administration of Justice, CSAC;
- Interview with Rosemary Lamb, Legislative Analyst in the area of Administration of Justice, CSAC;
- Memo of September 14, 2007 memo to Martin J. Mayer, *Potential County Impacts Resulting from a Prison Population Cap*, prepared by Ms. Howard and Ms. Lamb;
- *Who's in Prison? The Changing Demographics of Incarceration* (2006) by the Public Policy Institute;
- *Do the Crime, Do the Time? Maybe not in California* (2006) by the California State Sheriffs Association;
- *Drug Treatment in the Criminal Justice System: The Current State of Knowledge* (2003) by Mears et al from the Urban Institute Justice Policy Center;
- *Stretched Thin 2008: State Budget Cuts Undermine County Human Services Programs*, California Budget Project. (2008);
- *Division of Adult Operations, Mentally Ill Parolee Population* (2008) California Department of Corrections and Rehabilitation;
- Mental Health and Substance Abuse Treatment Costs from Santa Clara County; and
- Urban Counties Caucus Parole Realignment Survey Results (County Aggregates), May 1, 2008.

The September 2007 memo referenced above was prepared for Martin J. Mayer in an effort to articulate the broad county impacts — outside of those expected to be experienced in the public safety community — expected if the court were to carry out either a prison population cap and/or an early release of state prison inmates. The Urban Counties Caucus (UCC) survey was an effort undertaken to identify the likely impacts of a budget proposal to realign responsibility to counties for certain lower-level parolees. That survey solicited cost estimates from the 11 most populous counties that comprise the UCC. The figures offered by counties reflect estimates — both a high and low range — that can be reasonably relied upon for purposes of considering likely impacts of a prison population release or population cap. The UCC survey is based on counties assuming responsibility for 71,000 parolees, as outlined in the Legislative Analyst's Office 2008 parole realignment proposal. It should be noted that the UCC is a county advocacy organization legally separate from CSAC, with its own staff. While my staff reviewed a draft of the survey instrument, CSAC was not involved in the parole realignment data collection or analysis.

This statement offers my expert testimony, based on my direct experience as a county administrator and as a representative of the statewide association of

3

California's 58 counties, regarding the likely impacts of either a state prison population cap or an early release of prisoners. We will be working in the short-term to supplement these opinions by surveying individual counties regarding their opinions, estimates, and experience with parolees that could augment our statements regarding expected impacts.

For purposes of this statement, I am assuming that the action of the court could include the release of a significant number of prison inmates (10,000 to 40,000), followed by a population cap to allow the state to maintain a designated level of inmates. I have focused primarily on the broad county impacts in the social services area, given that we anticipate the local law enforcement coalition of interveners will adequately address public safety issues.

### Opinion #1: Counties presently have very limited ability to address the needs of its population.

Counties bear responsibility for sheriffs' operations, including detention, jail medical services, and general law enforcement duties in the unincorporated areas; prosecution and defense functions; probation supervision and programming for juvenile and adult offenders; and the broad range of health and human services that contribute toward the treatment and diversion of the offender population.

Currently, however, demand for these county services far outstrips capacity. There are waiting lists for mental health and substance abuse treatment services — services that many state prison inmates will require when they to return to our communities. It is well documented that 70% of inmates suffer from some degree of alcohol and/or drug addiction and that 20% suffer from a mental illness.[1, 2] Probation officers, district attorneys and public defenders are overburdened with enormous caseloads that threaten their ability to adequately complete the duties required of them. Counties are struggling to operate their criminal justice systems. Additionally, counties are currently facing great challenges in our efforts to serve our residents; any increase in service demands will negatively affect counties.

Further, the fiscal health of counties is declining. In a time of reduced revenue — driven by declining property, sales and corporate taxes — and the persistent economic decline of the last two years, county service demands are on the increase. Counties rely on the state for funding for many programs that we carry out on behalf of the state. However, funding is not keeping pace with the growing need. Since 2001, for example, the state has withheld cost-of-living increases in a number of county-administered health and human services programs. Counties

---

[1] California Department of Corrections and Rehabilitation. (2008). *Division of Adult Parole Operations, Mentally Ill Parolee Population.*
[2] Mears, Daniel P. et all. (2003) *Drug Treatment in the Criminal Justice System: The Current State of Knowledge.*

CSAC/ 00004

have been required to absorb cost increases to cover necessities (e.g., employee salary and benefits, gas, rent) — the state estimates that for the current year counties have been shorted over $600 million in state General Fund and $400 million in accompanying federal funds, totaling over $1 billion statewide[3]. This fact is significant, given that counties have very little discretionary money, and redirected funds to cover costs are taken at the expense of other programs and services at the local level, further exacerbating already difficult financial situations locally.

**Opinion #2: Early release of state prisoners will have a significantly negative impact on county mental health systems.**

County mental health departments are the providers of last resort for those in need of mental health treatment and/or for those on Medi-Cal. The mental health system throughout California has been seriously underfunded given demand for at least the past decade. As a result, county mental health departments are stretched beyond their means to meet the needs of their residents with mental illness. Often times there is a significant amount of time between an individual's initial contact with a mental health department for an assessment and their first counseling and/or psychiatric appointment. Unless an individual is in crisis and is deemed to be a threat to him/her self or others, no immediate referral can be made, given that most counties have existing waiting lists for services.

Furthermore, the State of California's local parole departments are currently unable to meet the needs of their existing parolee populations. For example, some counties have no parolee services provided by the state within their jurisdictions. Therefore, parolees in their jurisdiction go without services, travel great distances for services, or attempt to access services provided by the already strained county system. It is only natural to assume that if a number of inmates were ordered to be released early by the three-judge panel, the state would not be able to provide the needed mental health services to these individuals and the burden will be transferred to counties. Counties are not equipped to take on additional responsibilities. The quality of care will be jeopardized if caseloads increase any further.

For example, assuming that the federal court were to release 40,000 inmates early and, using current data, regarding prevalence rates and cost for mental health treatment (provided by Santa Clara County), approximately 10% (4,000) of these individuals released early will require inpatient mental health treatment and another 10% (4,000) will require outpatient mental health treatment. At an annual cost of $19,380 per individual, it would cost $77.5 million annually to provide inpatient mental health treatment to those individuals in need of such treatment and $19.4 million annually to treat those released who are in need of outpatient mental health treatment (using $4,839 as an annual cost per individual). The

---

[3] California Budget Project. (2008). Stretched Thin 2008: *State Budget Cuts Undermine County Human Services Programs.*

5

CSAC/ 00005

inpatient and outpatient components collectively yield a total annual cost for mental health treatment to $96.4 million. If the goal is to truly reduce overcrowding over the long term and decrease the likelihood that these individuals will not return to the criminal justice system at any level, the state would need to invest a substantial amount of resources either into their state parole system or into local treatment programs administered by counties and community-based agencies in order for these systems to treat these offenders upon their return to the communities. It should be noted, as well, that these are not one-time costs but, rather, ongoing operational costs that would need to be funded annually for the foreseeable future.

### Opinion #3: An early release of prisoners would have a significant negative impact on county alcohol and drug treatment systems.

As stated earlier, approximately 70% of inmates suffer from some form of addiction. County alcohol and drug treatment programs face many of the same dilemmas as county mental health departments. They have existing waiting lists for services, decreasing budgets, and fewer resources.[4] Add to this the fact that the state parole department does not have adequate resources to provide the substance abuse treatment needed by many parolees; therefore, the state — if it assumes a surge in the parolee population associated with an early release — will experience the same crisis counties will. An early release of prisoners will likely impact county alcohol and drug treatment programs given that almost 3 out of 4 parolees are in need of some level of substance abuse treatment.

With decreasing budgets and resources counties will be unable to meet these soon-to-be parolees' needs. Counties are currently experiencing severe budget deficits and will be confronted with a difficult decision regarding which population to serve: the non-criminal offenders already awaiting services or prisoners/parolees who will otherwise face a lapse in treatment if counties are unable to provide services when they show up at their door?

Similar to mental health needs, if substance abuse needs go unaddressed, overcrowding and recidivism will not be reduced. Releasing inmates early without adequate resources at the local level may reduce the state prison population, but it will have negative effects locally. Without readily available treatment, these individuals will likely revert back to old habits and resume destructive, addictive behaviors. At an annual cost of $4,369 to treat an offender, using the current prevalence rate of 70%, it will cost $122.3 million to treat 28,000 (70% of 40,000) offenders in the community. Again, these would be annual costs that would require ongoing funding each year for the foreseeable future.

---

[4] As an example, counties will receive $25 million less in funding in 2007-08 for delivering treatment service required by Proposition 36 initiative. In 2006-07, counties received $145 million; the 2007-08 budget provides only $120 million for this purpose. Full funding to address current need rises to $209.3 million, according to county estimates.

6

***Opinion #4: An early release of prisoners would have a significant negative impact on the county health departments.***

Any discussion regarding the early release of prisoners should not be undertaken without discussing the possibility of releasing elderly and sick inmates who require greater costs to incarcerate and who, presumably, pose a lower public safety risk. If any number of these inmates were released early, it would likely be to the benefit of the state to be relieved of caring for these inmates. The cost of housing, transporting, and caring for elderly inmates is estimated to be two or three times higher than for other inmates.[5] The cost of these inmates' care will quickly shift from the state to the county that absorbs the population. Given that these new parolees will likely have no insurance or be on Medi-Cal (which can take anywhere from nine months to a year from application to confirmation of coverage) counties will surely take on more responsibilities for their care – especially if the ill parolee has no family support system.

Under California Welfare and Institutions Code Section 17000 counties are responsible for health care for low income uninsured residents who have no other sources of care, mostly "medically indigent adults," ages 21 to 64, without children. The county obligation under Section 17000 states:

*"Every county… shall relieve and support all incompetent, poor, indigent persons and those incapacitated by age, disease, or accident, lawfully resident therein, when such persons are not supported by their relatives or friends, by their own means or by state hospitals or other state or private institutions."*

Of equal importance is the rate of disease in California's prisons that will likely result in most, if not all, inmates requiring some form of medical care. And, if they do not receive that medical care, greater costs will be incurred by counties and private health providers due to the spread of infection because of parolees' untreated medical conditions. According to the 2005 report done by the Public Policy Institute of California (PPIC), 16% of prisoners self report that they have tuberculosis. HIV infection rates vary from 1% to 4% of the prison population. HIV rates are higher for female inmates than male inmates. Lastly, 33% of California's inmates have hepatitis C. County health departments will face further economic hardship when they treat these illnesses for an unspecified number of parolees without adequate resources; however, the real danger lies in the costs to the county and to human life when these parolees do not seek any care at all.

***Opinion #5: An early release program would, given parolees difficulties in securing employment, have a significant negative impact on counties.***

The PPIC reports that 44% of California's inmates do not have a high school diploma compared to 21% of the rest of Californians. The State Employment

---

[5] Bailey, Amanda and Hayes, Joseph M. Hayes. (2006) *Who's in Prison? The Changing Demographics of Incarceration.* Public Policy Institute of California.

CSAC/ 00007

Development Department is not adequately staffed to receive an influx of individuals requiring job location assistance nor are these soon to be paroled inmates qualified to fill most positions without having obtained a high school diploma. Past research has suggested a correlation between poverty and crime.[6] If these parolees are unable to sustain themselves – they will be unable to maintain housing and unable to contribute to their family's livelihood.

The result of these parolees being unable to lead self-sustaining lives will affect counties in a number of ways. Some of these parolees will seek aid from county programs such as the General Relief Program, which is funded completely out of a county's general fund. General Relief provides short-term financial assistance and social services to indigent residents. Additionally, since these parolees are not employed, they will seek training from local job training programs, but until they obtain employment they will not be able to contribute to a county's tax base – only taking from the county in the form of services. These additional demands will substantially threaten counties' financial health.

*Opinion #6: A prison population cap would have a significant negative effect on the local criminal justice system.*

A prison population cap would negatively affect the local criminal justice system in a number of ways. According to the 2006 California State Sheriffs Association Report on jails, there are 20 county jails that are under a court imposed population cap and 12 that are under a self-imposed population cap[7]. These caps resulted in approximately 111,000 inmates being released from county jails early and approximately 109,000 pretrial releases in 2005. Counties do not believe that population caps are the answer to resolving our state's overcrowding problems as the existing population caps on jails have not proven to be successful strategies at the local level. A cap at the state level will only further aggravate the problem at the local level and merely shift the state's problem to counties.

Currently, there are a number of new and vacant judgeships that continue to go unfilled. This creates a backlog of cases in the courts and results in civil cases taking years to come to trial as they are prioritized second to criminal cases. Caseloads for county district attorneys and public defenders are growing and would only continue to do so if more offenders remain locally. Growing caseloads make it difficult for attorneys to perform their job to the best of their ability and threaten both victims and the accused from receiving the best representation possible. A population cap will only exacerbate this growing problem in California's counties.

---

[6] Bailey, Amanda and Hayes, Joseph M. Hayes. (2006). *Who's in Prison? The Changing Demographics of Incarceration.* Public Policy Institute of California.
[7] California State Sheriffs Association. (2006). *Do the Crime, Do the Time? Maybe not in California.*

CSAC/ 00008

Mental health and substance abuse treatment services will be severely affected by the imposition of a population cap. Some county jails are structured in such a way that the county mental health department funds and provides mental health services to inmates in county jails. Any population cap will presumably impose a freeze on the transfer of county inmates to state prison, requiring county mental health departments to provide care to a growing number of inmates who are awaiting transfer to state prisons as well as their routine county jail patient population.

Ultimately, no matter if the court implements a population cap, releases prisoners early or implements some other measure(s) to reduce overcrowding, it is imperative that any solution be coupled with a substantial investment in programs and services to address the needs of the influx of offenders in local communities. Presently, counties cannot provide all the resources needed by their residents despite their best efforts. It will not benefit any level of government or any resident of California – with or without a criminal history -- if the gap in resources is not addressed. As with the health and mental health costs noted before, there would need to be an ongoing commitment of funding, growing each year with demand and business costs.  It is my firm belief and that of my peers working in the counties, that until there are adequate resources at the local level to treat those with mental health and substance abuse issues, our state and the local governments within it, we will never resolve the systemic correctional crisis.

Any significant, one-time release of prisoners back into the community will completely overwhelm an already fragile and strained county service delivery system. At a time when county budgets already are suffering from the impact of a current economic downturn and decreasing revenues, we also are anticipating dramatic cuts to local mental health and substance abuse programs as a result of state budget actions now pending. Our counties simply will not be able to accommodate the demands of this population, and we are certain that our systems will fail under the overwhelming pressure.

The fabric of the county safety net system is already severely stretched. Ultimately, counties simply do not have the resources to absorb the significant costs associated with serving prisoners in the community.

My qualifications are outlined in my curriculum vitae, which is attached.

Sincerely,

Paul McIntosh

Paul McIntosh

9

# PAUL M<sup>c</sup>INTOSH

### 4514 Sierra Del Sol
### Paradise, California 95969
### (530) 872-0877 (Home) * (916) 327-7500, x506 (Office & Messages)
### pmcintosh@counties.org

## SUMMARY OF QUALIFICATIONS

- International City/County Management Association – Credentialed Manager Since 2002 (ICMA-CM)
- 26 Years Experience with Public Sector Agencies
- 19 Years as a Senior Executive
- Commitment to Excellence
- Proven Record of Success in Program Management, Financial Planning & Management, Strategic Planning, Facilities Planning, Organizational Development, Organizational Effectiveness, Labor Relations & Negotiations & Information Systems Management, Energy Management
- Visionary Leader and Consensus Builder; Highly Ethical, Principled and Self-Disciplined
- Well-Versed in Evolving Information and Communication Technologies
- Seasoned Public Spokesperson/Media Representative
- Issuer Representative on 15 Separate Bond Transactions
- Proven Success in Construction Management Including $45 M Justice Center
- Experienced Executive Recruiter
- Demonstrated Success in Motivating Staff & Team Building through Systemic Change Reform

## EDUCATION

MASTERS DEGREE IN PUBLIC MANAGEMENT/FINANCE
   Indiana University, School of Public & Environmental Affairs * 1980

BACHELORS DEGREE IN PUBLIC ADMINISTRATION
   Indiana University, School of Public & Environmental Affairs * 1978

## PROFESSIONAL EXPERIENCE

### EXECUTIVE POSITIONS HELD

CALIFORNIA STATE ASSOCIATION OF COUNTIES
*Executive Director*
**July 2007 to Present**

10

**BUTTE COUNTY, CA**
*Chief Administrative Officer*
April 2002 to June 2007

**HERNANDO COUNTY, FLORIDA**
*County Administrator*
March 2000 to April 2002

**MOHAVE COUNTY, ARIZONA**
*County Manager*
December 1997 to March 2000

**EL DORADO COUNTY, CA**
*Chief Administrative Officer*
September 1988 to March 1995

Each position is a senior executive position responsible for the overall conduct and operation of all county functions and activities, reporting to and working at the will of an elected Board of Supervisors or Board of County Commissioners. The position has overall responsibility for policy development, program planning, fiscal management, administration and operation of all County functions under the Board, programs and activities, serves as an advisor to the Board on all matters before them, and provides policy guidance and coordination of the activities of constitutional officers to accomplish Board goals and objectives.

**California State Association of Counties (CSAC)**
CSAC was established in 1894 and is the only statewide association representing all 58 of California's counties. It is governed by elected county supervisors from throughout the state and has 36 employees. Significant accomplishments include:

- Created the CSAC Institute for Excellence in County Government, a certified continuing education program.
- Played a lead role in the defeat of Proposition 98, a statewide measure harmful to counties, and the passage of Proposition 99, a measure supported by CSAC.
- Furthered CSAC's position as the authority on local government issues within the State Capitol.
- Enhanced partnerships with other key local government associations at the local, state and federal levels.
- Implemented new ways to communicate with CSAC members around the state, utilizing state-of-the-art technology

**Butte County, California**
Butte County has a population of 214,000, and budget exceeding $350 million, and 2,300 employees. Butte County is the largest single employer north of Sacramento and is the largest county in Northern California. Significant accomplishments included:

- Stabilized County budget and introduced long-range financial planning – enabled Butte County to weather loss of $10 million in revenues during 2003-04 state shift.
- Developed the first Advanced Funding of Worker's Compensation

11

CSAC/ 00011

Program to provide a bridge in transitioning from a pooled insurance plan to a self-insured plan (CSAC Challenge Award 2004);

- Directed County team in intervention in the license renewal for the Poe and Lake Oroville Hydroelectric Projects – prepared and submitted numerous reports and responses including a comprehensive analysis of the operational impacts of Lake Oroville on Butte County;
- Installed a 1.18 Megawatt photovoltaic solar power system to provide 1/3 of power consumed on Oroville Campus (CSAC Challenge Award 2005) (US EPA/DOE Greenpower Leadership Award 2006) (Case Study for Transforming Local Government Conference 2007);
- Completed and successfully negotiated and implemented a comprehensive classification and compensation study;
- Issued $52 million in Pension Obligation Bonds to advance-fund liability;
- Completed comprehensive review of fire services in Butte County and became point contact for CSAC on CDF contract matters;
- Participated in initial planning session and design of the Berkeley Executive Seminar;
- Chairman of the County Administrative Officers Association of California (CAOAC) Professional Development Committee; and,
- Appointed by ICMA to Commission of Fire Accreditation and then to Board of directors, Center for Public Safety Excellence

### Hernando County, Florida

In 2002, Hernando County had 137,000 full-time residents and considerable vacationers, an annual budget exceeding $205 million, and 1,100 employees. Significant accomplishments during my tenure included:

- Negotiation of an amendment to existing leases for hospital facilities that resulted in the construction of a new acute-care hospital, to be deeded to the County at completion, in addition to annual tax revenue increases in excess of $1.5 million;
- Renegotiation of a management contract for the County detention facility, increasing County share of federal fees;
- Management of a study, through the University of Florida, to provide a blue-print for economic development efforts featuring specific, measurable performance criteria to ensure accountability;
- Preparation of a county-wide facilities master plan;
- Design and construction of a new Animal Shelter (completed under budget);
- Design of a new Public Works and Fleet facility;
- Construction of additional courtrooms in the County court facility and renovation of spaces within the Government Center to accommodate growth in county staff;
- Directed the phased installation of a new telephone system incorporating TCP/IP technology, Consolidated fire districts into a county-wide district and incorporated emergency medical services; and,

12

CSAC/ 00012

- Introduced performance-based budgeting and performance measurement criteria as a management tool to enable the county to operate from a five-year financial plan without any increases in the General Fund ad valorem tax rate.

## Mohave County, Arizona

In 2000, Mohave County had 147,000 full-time residents and considerable vacationers, an annual budget exceeding $135 million, and 1,100 employees. Significant accomplishments during my tenure include:

- A comprehensive transformation/re-engineering of county government in Mohave County;
- Stabilized to a chronically problematic budget and installed a financial planning system to contain costs;
- Restructured information systems and developed a county-wide approach to data processing;
- Led the Board through the process of analyzing critical aspects of the County's operational and capital budgets and provided recommendations on addressing $125 million in identified capital improvements. As a result of those recommendations, the Board adopted a 3 cent sales tax to fund the improvements, with no public opposition.
- Led the development of a multi-jurisdictional agreement to provide waste water treatment to the Fort Mojave Indian Tribe, City of Needles, California and Mohave County.
- Key County representative in negotiations to locate a 650 MW combined-cycle power plant in Mohave County, and in negotiations for the siting of a 2,500 bed private correctional institution.
- Improved bond rating from B+ to Aaa and saved County nearly $1 million in interest costs through refunding of outstanding debt.

## El Dorado County, California

In 1995, El Dorado County had 145,500 residents, an annual budget exceeding $130 million, and 1,553 employees. Significant accomplishments during my tenure include:

- Participated in the California State Association of Counties Budget Task Force for six (6) state budgets;
- Served on original State/Local Program Realignment Task Force during the 1991-92 budget cycle;
- Chaired the County Administrator's Task Force whose mission was to recommend changes to the legislation to clean up discrepancies and inconsistencies in Program Realignment;
- Responsible for the ongoing application before the California State Water Resources Control Board for the consumptive rights to 17,000 acre feet of water from the American River system and negotiations with the Federal Bureau of Reclamation for the consumptive rights to 15,000 acre feet of

13

CSAC/ 00013

water from the Central Valley Project; and,
* Recruited and recommended the appointment of seventeen department heads.

**OWNER/SENIOR CONSULTANT**                    **March 1995 to December 1997**
**M&I CONSULTING (CONCURRENTLY)**
**SHANNON, DAVIS & ASSOCIATES (NOW CPS)**
Owner and principal of public sector consulting firm specializing in organizational effectiveness, human resources, finance, organizational development and general management consulting. Clients include the County of Contra Costa, County of Riverside, Miller & Schroeder Financial, Inc. and Shannon, Davis & Associates.

First under contract, then a full-time employee of Shannon, Davis & Associates, a Management Consulting firm serving local government throughout the Western United States, specializing in executive recruitment, organizational development and general management consulting. I was responsible for numerous consulting engagements while with Shannon, Davis & Associates, including recruitment of senior executives.

**DEPUTY COUNTY ADMINISTRATOR**              **August 1985 to September 1988**
**SOLANO COUNTY, CALIFORNIA**
A senior management position in the County Administrator's Office. As a Deputy County Administrator, I was responsible for the Board/Legislative section of the Administrator's Office. My duties included direction and supervision of five professional and three clerical staff, preparation of the weekly agenda of the Board of Supervisors, managing and directing topical analyses and reports related to management of the County's business, and directing major studies.

In addition to my duties as Deputy County Administrator, I was responsible for the County's Capital Projects Improvement Program where I supervised and coordinated the financing, design, acquisition, renovation and construction of a number of facilities for Solano County. Projects I was responsible for included the Solano County Justice Center ($45 million), Solano County Co-Generation Plant ($4.5 million), Solano County Courthouse Historic Restoration ($1.2 million) and Solano County Hall of Justice Remodel ($2 million).

**ADMINISTRATIVE ANALYST II TO**                    **May 1982 to July 1985**
**SENIOR ADMINISTRATIVE ANALYST**
**SOLANO COUNTY, CALIFORNIA**
A middle management position in the County Administrator's Office responsible to the Assistant County Administrator - Finance. During a majority of this time I was responsible for all financial and administrative matters involving county criminal justice and data processing activities.

CSAC/ 00014

**ASSOCIATE**                                    July 1981 to May 1982
**HUGHES, HEISS AND ASSOCIATES**
Hughes/Heiss and Associates was a San Mateo-based management consulting firm to State, County and City governments. Working under the direction of a principal partner, I gathered and analyzed data, prepared reports, and assisted in public presentations of report findings.

**STAFF/FISCAL MANAGEMENT ANALYST**    January 1980 to June 1981
**LEGISLATIVE SERVICES AGENCY, STATE OF INDIANA**
The department was responsible for performance evaluations of state agencies subject to Indiana's comprehensive "sunset" code. Working under the direction of the Director, Management Section, staff reported directly to the Sunset Evaluation Committee; a standing committee of the legislature appointed by both houses. Typical tasks included cost/benefit analysis of state programs, exploration of alternative funding methods, statistical analysis, determining the fiscal impact of proposed legislation, and special topical analyses requested by the legislature.

## PROFESSIONAL ACTIVITIES/DISTINCTIONS

### Current
- International City/County Management Association Representative, Board of Directors, Center for Public Safety Excellence, since 2006
- Member, National Association of Counties, Financial Services Corporation Advisory Board, since 2001
- Member, National Association of Counties, Environment, Energy and Land Use Steering Committee and Land Use and Growth Management Subcommittee, Since 2000
- Member, National Association of Counties, Green Government Initiative Advisory Board, since 2007

### Former
- International City/County Management Association Representative, Commission on Fire Accreditation International (2003-2006)
- President, County Administrative Officers Association of California and Advisor, California State Association of Counties Executive Board (1993-1994)
- Member, Budget Task Force, County Administrative Officers Association of California (1990-1995)
- Member, CAO/City Manager Task Force, County Administrative Officers Association of California (1993-1994)
- Vice President, County Administrative Officers Association of California (1992)
- Secretary/Treasurer, County Administrative Officers Association of California (1991)
- Chairman, Realignment Task Force, County Administrative Officers Association of California (1991-1993

15

CSAC/ 00015

- Member, Judicial Council Task Force on Trial Court Funding (1990)
- Federal Summer Internship Outstanding Performance Award, Department of HEW (1979)
- Elected to Pi Alpha Alpha, National Honor Society for Public Administration (1978)

**_PUBLICATIONS_**

None

16

CSAC/ 00016

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

AND THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

## PROOF OF SERVICE BY MAIL

*Plata, et al. v. Schwarzenegger, et al.*          Nos.  C01-1351 THE (Northern District)
                                                         CIV S-90-0520 LKK JFM P (Eastern District)

I, Linda Ramos, say:

I am now and at all times herein mentioned have been over the age of eighteen years, employed in Santa Clara County, California, and not a party to the within action or cause; that my business address is 70 West Hedding, East Wing, 9th Floor, San Jose, California 95110-1770.  I am readily familiar with the County's business practice for collection and processing of correspondence for mailing with the United States Postal Service. I served a copy of **EXPERT REPORT OF PAUL McINTOSH** by placing said copy in an envelope addressed to:

### SEE ATTACHED SERVICE LIST

which envelope was then sealed, with postage fully prepaid thereon, on **August 15, 2008,** and placed for collection and mailing at my place of business following ordinary business practices. Said correspondence will be deposited with the United States Postal Service at San Jose, California, on the above-referenced date in the ordinary course of business; there is delivery Service by United States mail at the place so addressed.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct, and that this declaration was executed on **August 15, 2008**, at San Jose, California.

Linda Ramos

CSAC/ 00017

1    Donald Specter
Prison Law Office
2    General Delivery
San Quentin, CA 94964
3    E-Mail: dspecter@prisonlaw.com

4

5    Claudia B Center, Legal Aid Society
Employment Law Center
600 Harrison Street, Suite 120
6    San Francisco, CA 94107
E-Mail: ccenter@las-elc.org

7

8    Warren E. George
Bingham McCutchen
9    3 Embarcadero Center, Fl. 24
San Francisco, CA 94104
10    E-Mail: warren.george@bingham.com

11

12    Ronald Yank
Natalie Leonard
13    Gregg MacClean Adam
Carroll, Burdick & McDonough, LLP
14    44 Montgomery Street, Suite 400
San Francisco, CA 94104
15    E-Mail: gadam@cbmlaw.com
E-Mail: nleonard@cbmlaw.com
16

17    Richard Goff
Heller, Ehrman White & McAuliffe
18    701 Fifth Avenue
Seattle, WA 98104
19    E-Mail: Not Available

20

21    Steven S. Kaufhold
Terese Wang
Akin Gump Straus Hauer & Feld LLP
22    580 California Street, 15th Floor
San Francisco, CA 94102
23    E-Mail: skaufhold@akingump.com

24    Rod Pacheco
Chuck Huges
25    Office of the District Attorney
County of Riverside
26    4075 Main Street, First Floor
Riverside, CA 92501
27    E-Mail: rodpacheco@co.riverside.ca.us

28

K & L Gates LLP
Jeffrey L. Bornstein
Edward P. Sangster
Raymond E. Loughrey
55 Second Street, Suite 1700
San Francisco, CA 94105-3493

Michael Bien
Rose, Bien and Galvan
315 Montgomery Street, 10th Floor
San Francisco, CA 94104
E-Mail: mbien@rbg-law.com

Martin J. Mayer
Kimberly Hall Barlow
Jones & Mayer
3777 North Harbor Boulevard
Fullerton, CA 92835
E-Mail: mjm@jones-mayer.com
E-Mail: khb@jones-mayer.com

Paul Mello
Hanson Bridget
425 Market Street, 26th Floor
San Francisco, CA 94105
E-Mail: Pmello@hansonbridgett.com

Edmund G. Brown Jr., Attorney General
Lisa Tillman, Deputy Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102
E-Mail: Lisa.Tillman@doj.ca.gov

Rochelle East, DAG
455 Golden Gate Avenue, Suite 1100
San Francisco, CA 94102
E-Mail: rochelle.east@doj.ca.gov

Michael P. Murphy, County Counsel
Carol L. Woodward, Deputy County Counsel
Office of the County Counsel
Hall of Justice and Records
400 County Center, 6th Floor
Redwood City, CA 94063
E-Mail: mmurphy@co.sanmateo.ca.us
E-Mail: cwoodward@co.sanmateo.ca.us

ANN MILLER RAVEL
County Counsel
County of Santa Clara
San Jose, California

Proof of Service by Mail and E-Mail      2

CSAC/ 00018

Dennis Bunting, County Counsel
Alan Cohen, Deputy County Counsel
Office of the County Counsel
675 Texas Street, Suite 6600
Fairfield, California 94533
E-Mail: dwbunting@solanocounty.com
E-Mail: amcohen@solanocounty.com

Steven M. Woodside, County Counsel
Anne L. Keck, Deputy County Counsel
County of Sonoma
575 Administration Drive, Room 105A
Santa Rosa, California 95403-2815
E-Mail: swoodside@sonoma-county.org
E-Mail: akeck@sonoma-county.org

Stephen Shane Stark, County Counsel
Kelly Duncan Scott, Deputy County Counsel
OFFICE OF THE COUNTY COUNSEL
105 East Anapamu Street, Room 201
Santa Barbara, California 93101
E-Mail: sstark@co.santa-barbara.ca.us
E-Mail: kscott@co.santa-barbara.ca.us

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

ANN MILLER RAVEL
County Counsel
County of Santa Clara
San Jose, California

CSAC/ 00019

# EXHIBIT A

# TO EXPERT REPORT OF PAUL McINTOSH

California State Association of Counties



1100 K Street
Suite 101
Sacramento
California
95814

*Telephone*
916.327.7500

*Facsimile*
916.441.5507

September 14, 2007

To:     Martin J. Mayer, Esq.
        Jones & Mayer

From: Elizabeth Howard, Legislative Representative
      Rosemary Lamb, Legislative Analyst

**Re:   Potential County Impacts Resulting from a Prison Population Cap**

The California State Association of Counties (CSAC) represents county governments
before the California Legislature, administrative agencies and the federal government.
Our overarching objective is to improve the fiscal health of all California counties so they
can adequately meet the local demand for vital public programs and services. Our 58
member counties deliver services to some of our state's most vulnerable populations
who, without county programs, would go without needed services.

As you are aware, CSAC joined the coalition of local government associations in filing a
motion to intervene in the federal court with jurisdiction over the two class action lawsuits
(*Plata* and *Coleman*) challenging California's prison overcrowding. While CSAC as an
organization is not granted standing in the proceedings before the three-judge panel, our
joining the coalition gives CSAC the opportunity to provide you with the needed
documentation to express the myriad of concerns and potential setbacks to service
delivery that will affect counties and their residents if a population cap were to be
ordered by the panel. It is our hope that the information that follows will provide you with
the necessary insight to clearly articulate to the panel the ramifications of a population
cap on the broader set of services provided by counties. Given the current overcrowding
circumstances in prison, inmates clearly may not have ready access to the needed level
and scope of services. However, if a significant number of prison inmates are released
into our communities — communities that are ill-equipped to deal with existing service
demands — counties' programs and services will be stretched beyond the breaking
point.

While we do not disagree that the State's corrections system is in need of serious
reform, counties do believe there are other measures that can be adopted that can
effectively address the dire situation that our state is facing. Counties realize that for any
reform to our corrections system to be successful we must be an active partner;
however, if a prison population cap is issued it would negatively affect counties' ability to
further partner with the state. With a significant influx of inmates to counties, more
resources would be diverted to accommodating these former inmates into our
communities and safety nets — rather than committing resources at the front end of
corrections reform in prevention oriented services.

Counties throughout California provide numerous basic services to many county
residents. Currently, however, demand for county services far outstrips treatment
capacity. There are waiting lists for mental health and substance abuse treatment
services — services that many state prison inmates will require were they to return to

CSAC Memo Regarding County Impacts from a Prison Population Cap
Page 2 of 5

our communities. It is well documented that 80% of inmates suffer from some degree of alcohol and/or drug addition and that 16% suffer from a mental illness. [1,2]

Lunder County Mental Health Departments

County mental health departments are the providers of last resort for those in need of mental health treatment and/or for those on Medi-Cal. As a result, county mental health departments are stretched beyond their means to meet the needs of their residents. Often times there is a significant amount of time between an individual's initial contact with a mental health department for an assessment and their first counseling and/or psychiatric appointment. Unless an individual is in crisis and is deemed to be a threat to him/herself or others, then, generally speaking, no immediate referral can be made as most counties have existing waiting lists for services.

Furthermore, the State of California's local parole departments are currently unable to meet the needs of their existing parolee populations. For example, some counties have no parolee services provided by the state within their jurisdictions – so their parolees either go without services or attempt to access county services. It is only natural to assume that if a prison population cap were ordered by the three-judge panel, the state would not be able to provide the needed mental health services to these individuals.

So, how many potential parolees (assuming all inmates released early would be placed on some level of parole supervision) do we suspect might require mental health treatment? Using the most cited data, which states that 16% of inmates suffer from some form of mental illness – ranging from having a diagnosis of a severe mental illness to mild depression – and that approximately 40,000 inmates could potentially be released early, one can argue that at a minimum 6,400 of these inmates will require some form of mental health treatment services. These numbers would completely overwhelm our system.

An analysis done by a policy and financial analyst from the Solano County Health and Social Services Department provides some indication of the impact to one county. Solano County could expect – using 2005 release data from the California Department of Corrections and Rehabilitation – to receive just under 2% of inmates who are released early, or 660 parolees. The potential costs to the county for providing mental health treatment to these parolees would be $1,338,960 annually. To be fair, not all of these parolees would seek treatment; however, those parolees who did not seek treatment from either the county mental health department or parole department would absorb county resources in other forms as a result of their behavior due to their untreated mental illness.

Furthermore, some county jails are structured in such a way that the county mental health department funds and provides mental health services to inmates in county jails. Any population cap will presumably impose a freeze on the transfer of county inmates to state prison, requiring county mental health departments to provide care to a growing number of inmates who are awaiting transfer to state prisons as well as their routine county jail patient population.

---

[1] *Substance Abuse and Treatment of State and Federal Prisoners.* 1997. United States Bureau of Justice
[2] *Mental Health Treatment in State Prisons, 2000.* Bureau of Justice Statistics Special Report

CSAC/ 00021

One last point that should not be overlooked is the importance of providing a continuum of care to individuals in need of mental health treatment. A prison population cap would create an obstacle to providing that continuum by having an influx of residents in need of services into a county system already desperately trying to meet the needs of its residents. Some, if not all, of these parolees would have a lapse in treatment.

## County Alcohol and Drug Treatment Programs

As stated earlier approximately 80% of inmates suffer from some form of addiction. County alcohol and drug treatment programs face many of the same dilemmas as county mental health departments. They have existing waiting lists for services, decreasing budgets, and fewer resources.[3] Add to this the fact that the state parole department does not have adequate resources to provide the substance abuse treatment needed by many parolees — the state will have the same crisis as counties. A prison population cap will likely impact county alcohol and drug treatment programs given that almost 3 out of 4 parolees are in need of some level of substance abuse treatment.

With decreasing budgets and resources, how can county departments meet these soon-to-be parolees' needs? Counties will surely face budgetary problems and confront a difficult decision regarding which population to serve: those residents who were awaiting services prior to the early release or recently released parolees who will otherwise face a lapse in treatment if counties do not provide services to them when they show up at their door.

Solano County Health and Human Services estimates that of those 660 parolees returning to the county, treatment costs to the county for those who will require substance abuse treatment will be $2,054,000 annually. Where will this funding come from and will other county programs and priorities suffer to meet the increased demands? If counties turn these individuals away, what will happen? If they treat these individuals and forcing other county residents to wait longer, what happens to the quality of life for that individual who is struggling to maintain stability? What other county supports will they need to access if they do not receive treatment? Will they lose their job? Housing? Get arrested as a result of their addiction? Act out on those around them and lose their children to the child welfare system? The possible scenarios are endless. No matter what action a county chooses, the lack of sufficient services will ultimately result in impacts on county departments.

## Health Departments

Any discussion regarding a population cap will not be undertaken without discussing the possibility of releasing elderly and sick inmates who require greater costs to incarcerate and who, presumably, pose a lower public safety risk. If any number of these inmates were released early, it would likely be to the benefit of the state to be relieved of caring for these inmates. The cost of housing, transporting, and caring for elderly inmates is estimated to be two or three times higher than for other inmates.[4] The cost of these

---

[3] As an example, counties will receive in 2007-08 $25 million less in funding for delivering treatment service required by Proposition 36 initiative. In 2006-07, counties received $145 million; the 2007-08 budget provides only $120 million for this purpose. Full funding to address current need rises to $209.3, according to county estimates.
[4] Bailey, Amanda and Hayes, Joseph M. Hayes. *Who's in Prison? The Changing Demographics of Incarceration.* Public Policy Institute of California. August 2006.

CSAC/ 00022

CSAC Memo Regarding County Impacts from a Prison Population Cap
Page 4 of 5

inmates' care will quickly shift from the state to the county that absorbs the population. Given that these new parolees will likely have no insurance or be on Medi-Cal (which can take anywhere from 9 months to a year from application to confirmation of coverage) counties will surely take on more responsibilities for their care – especially if the ill parolee has no family support system.

Under California Welfare and Institutions Code Section 17000 counties are responsible for health care for low income uninsured residents who have no other sources of care, mostly "medically indigent adults," ages 21 to 64, without children. The county obligation under Section 17000 states:

*"Every county… shall relieve and support all incompetent, poor, indigent persons and those incapacitated by age, disease, or accident, lawfully resident therein, when such persons are not supported by their relatives or friends, by their own means or by state hospitals or other state or private institutions."*

Of equal importance is the rate of disease in California's prisons that will result in all inmates requiring some form of medical care. And, if they do not receive that medical care, greater costs while be incurred by counties and private health insurance due to the spread of infection because of their untreated medical conditions. According to the 2005 report done by the Public Policy Institute of California (PPIC), 16% of prisoners self report that they have tuberculosis. HIV infection rates vary from 1% to 4% of the prison population. HIV rates are higher for female inmates than male inmates. Lastly, 33% of California's inmates have hepatitis C. County health departments will face further economic hardship when they treat these illnesses for an unspecified number of parolees without adequate resources; however, the real danger lies in the costs to the county and to human life when these parolees do not seek any care at all.

Employment
The PPIC reports that 44% of California's inmates do not have a high school diploma compared to 21% of the rest of Californians. The State Employment Development Department is not adequately staffed to receive an influx of individuals requiring job location assistance nor are these soon to be paroled inmates qualified to fill most positions without having obtained a high school diploma. Past research has suggested a correlation between poverty and crime.[5] If these parolees are unable to sustain themselves – they will be unable to maintain housing and unable to contribute to their family's livelihood.

The result of these parolees being unable to lead self-sustaining lives will affect counties in a number of ways. Some of these parolees will seek aid from county programs such as the General Relief Program, which is funded completely out of a county's general fund. General Relief provides short-term financial assistance and social services to indigent residents. Additionally, since these parolees are not employed they will seek training from local job training programs, but until they obtain employment they will not be able to contribute to a county's tax base – only taking from the county in the form of services.

---

[5] Bailey, Amanda and Hayes, Joseph M. Hayes. *Who's in Prison? The Changing Demographics of Incarceration.* Public Policy Institute of California. August 2006.

CSAC/ 00023

CSAC Memo Regarding County Impacts from a Prison Population Cap
Page 5 of 5

Other Important Items to Consider

Other likely impacted county programs would be child welfare departments as they could see a rise in the number of calls regarding abuse due to family instability. This could be caused by any combination of factors mentioned above including untreated mental illness — due to county and state lack of resources or parolee refusal to receive treatment — as well as substance abuse. While this paints a picture of the worst cases, we know that not all parolees will engage in abusive behavior. The reality is, however, that counties are not prepared to adequately provide the services that will be needed and this influx will have a ripple effect upon county service delivery systems.

We hope this memo paints a picture of the looming implications to the broader array of county services that would result from the imposition of a prison population cap. Again, counties stand at the ready to partner in developing and implementing front-end reforms that will have positive long-term results in decreasing the state's prison population; however a prison population cap would severely impede counties' ability to provide services to its current residents as well as to the parolees unable to be serviced by the State. In the end, turning tens of thousands of inmates free into our communities — without providing sufficient resources to the service systems that will be expected to spring into action — will be disastrous and is likely to guarantee very negative outcomes for the individual inmates, the county systems, and the other non-criminal residents of the communities who rely on the county safety net.

Staff Contact. Please direct any questions or inquiries regarding this memo to Elizabeth Howard at (ehoward@counties.org or (916) 327-7500 x537) or Rosemary Lamb at (rlamb@counties.org or (916) 327-7500 x503).

# EXHIBIT B

# TO EXPERT REPORT OF PAUL McINTOSH

Public Policy Institute *of* California

# California Counts

## POPULATION TRENDS AND PROFILES

*Hans P. Johnson, editor*                               Volume 8  Number 1 • August 2006

# Who's in Prison?

## *The Changing Demographics of Incarceration*

*By Amanda Bailey and Joseph M. Hayes*

*ummary* For issues of crime and punishment, California has experienced a dynamic period over the past 15 years. Voters and legislators have chosen to impose harsher criminal penalties but also to experiment with alternatives to incarceration. The federal courts have taken management of the entire prison health care system away from the state itself; they have also ruled that California's racial segregation policy in prisons is unconstitutional. And as a larger number of Californians are confined to prison, concern has mounted about the effects of incarceration policies on all Californians, in particular on the families and communities that prisoners leave behind and to whom many eventually return.

The state prison population has grown three times faster than the general adult population since 1990 and at year-end 2005 stood at 167,698. African Americans have the highest incarceration rates of any group (5,125 per 100,000 adults in the population for men and 346 per 100,000 for women, compared to 1,159 and 62, respectively, for all adults), although Latinos now constitute the largest ethnic group in the prison system, at 38 percent of the total.

The prison population is aging, with adults under age 25 representing a steadily declining share while the number of prisoners in older age groups continues to grow. Currently, the share of prisoners age 50 and older is 11 percent, up from 4 percent in 1990, whereas the share of prisoners under age 25 has declined from 20 percent to 14 percent. This trend bears on the health care problem, as the cost of housing, transporting, and caring for elderly inmates is estimated to be two or three times higher than for other inmates (Brown and Jolivette, 2005).

The San Joaquin Valley and the Inland Empire contribute somewhat disproportionately to the prison population, and the highest incarceration rates are found in rural Central Valley counties. Women constitute 7 percent of prisoners, and they differ significantly from men by

Public Policy Institute *of* California

## *California Counts*

**The state prison population has grown three times faster than the general adult population since 1990 and at year-end 2005 stood at 167,698.**

a few important measures, most notably racial/ethnic representation and offense type.

Prisoners serving time for violent crimes are a majority (just over 50%) of the prison population, and their share is growing. More serious sentencing laws have increased the penalties for this group, contributing to its growth as well as to the aging of the overall prison population.

By contrast, drug offenders now represent a diminished share of the prison population, having fallen from 28 to 21 percent in the past 15 years; admissions for drug crimes have also declined in recent years, following the introduction of alternatives to prison for some offenders. Together, these trends contribute to a population composed of older prisoners serving longer terms for serious or violent offenses.

*Amanda Bailey and Joseph M. Hayes are research associates at the Public Policy Institute of California. Views expressed here do not necessarily reflect those of PPIC. The authors acknowledge the helpful comments of Richard Greene, Hans P. Johnson, Greg Jolivette, Deborah Reed, Lorien Rice, Darren Urada, and Franklin Zimring. They would also like to extend their thanks to those who provided data: Christopher Shores and Lori Asuncion at the California Department of Corrections and Rehabilitation (CDCR), Offender Information Services Branch; Allen Beck and Timothy Hughes at the U.S. Department of Justice, Bureau of Justice Statistics; and Tom Zelenock at the Interuniversity Consortium for Political and Social Research.*

**2**

CSAC/ 00026

Public Policy Institute *of* California

## Introduction

On February 23, 2005, the U.S. Supreme Court ruled that California's policy of segregating new prison arrivals according to race was unconstitutional. The state had argued that the practice was necessary to prevent interracial violence. On June 30, 2005, U.S. District Judge Thelton Henderson ordered that a federal receiver take control of California's $1.1 billion-per-year prison health care system, citing deplorable conditions and preventable deaths. In 2004, voters elected not to restrict the application of the ten-year-old Three Strikes and You're Out law.

Who are the people at the center of these recent policy interventions? To what extent does the prison population resemble the wider state population, and in what ways does it differ? What is its racial and ethnic profile? What health problems prevail in the prison system, and how might the population's changing age structure affect health care costs? How do changes in sentencing policy alter the composition of the prison population?

In this issue of *California Counts*, we begin by providing a demographic profile of the state prison population as of December 31, 2005. We compare California's prison population to the general population by several demographic measures and then examine some

incarceration-specific characteristics, including offense and sentence type.

Next, we explore how these characteristics have changed over the past 15 years, paying particular attention to the substantial growth of the prison population and the sizable yearly flows of prisoners into and out of the system. Finally, we examine some of the likely reasons for these changes.

In particular, we document changes in California's prison population subsequent to three contemporary policy interventions that have affected its size and composition: the passage of the Three Strikes and You're Out law (in Assembly Bill 971 in March 1994 and Proposition 184 in November 1994), California's adoption and enactment of Truth in Sentencing (September 1994), and the passage of the Substance Abuse and Crime Prevention Act (Proposition 36 in 2000).

## Who Are California's Prisoners?

At year-end 2005, California housed 167,698 men and women in 33 prisons, 40 camps, and 12 community correctional centers throughout the state,[1] giving it the largest state prison population in the United States (see the textbox, "Focus and Data

> **California incarcerates 616 prisoners per 100,000 adults in the population, 17th of the 50 states.**

Sources").[2] California incarcerates 616 prisoners per 100,000 adults in the population, 17th of the 50 states.[3] Most prisoners are men (93%) but women represent a growing share.

The prison population includes a few teenagers, many adults in midlife, and a small number of elderly inmates (Figure 1). Imprisoned men are slightly younger than imprisoned women. The average age at year-end 2004 was 36 for men and 37 for women (California Department of Corrections and Rehabilitation, 2005). Fifteen percent of men and 11 percent of women were younger than age 25 at the end of 2005. Three-quarters of adult prisoners were between ages 25 and 49 at year-end 2005. Eleven percent of the prison population is age 50 or older.

As Figure 1 illustrates, people ages 25 to 44 are overrepresented

**3**

CSAC/ 00027

Public Policy Institute *of* California

**Adult African American men are seven times as likely as white men and 4.5 times as likely as Latino men to be incarcerated.**

among prisoners compared to their share in the general adult population; older people are under-represented among prisoners. Criminological research tells us that young people are the most likely group to commit crimes (Blumstein, Farrington, and Moitra, 1985; Gottfredson and Hirschi, 1990). As people age, they tend to commit fewer crimes. The age distribution among prisoners at year-end 2005 is consistent with this pattern—younger prisoners represent a high share of the prison population.

Three of every four men in prison are nonwhite (38% are Latino, 29% are African American, and 6% are of another race or ethnicity[4]—see Figure 2), although just over one-half of the general adult male population is nonwhite.

White men constitute 27 percent of the prison population but 44 percent of the general adult male population. Among women prisoners, 28 percent are Latina, 29 percent are African American, 39 percent are white, and 5 percent report some other race or ethnicity. Compared to their numbers in the general population, however, African Americans are disproportionately represented in prisons.

Race-specific incarceration rates (i.e., the number of prisoners per 100,000 adults in the population) illustrate the disproportionate number of African Americans in prison. We calculate these incarceration rates separately for adult men and women (Figure 2). African American men and women have a dramatically higher probability than other groups of being imprisoned. Adult African American men are seven times as likely as white men and 4.5 times as likely as Latino men to be incarcerated. Among adult men, 5,125 per 100,000 African Americans were imprisoned in 2005, compared to 770 per 100,000 whites, 1,141 per 100,000 Latinos, and 474 per 100,000 for those classified as "other." One out of every 12 African American men ages 25 to 29 in California is currently in state prison.[5]

Furthermore, although adult women overall have much lower incarceration rates than men, African American women have a higher incarceration rate than



**Figure 1. Percentage Distribution of Prisoners and Adults, by Age and Gender, 2005**

Source: Authors' calculations of 2005 CDCR data and 2005 California Department of Finance (DOF) data.

Notes: The 18–24 age category includes a small number of prisoners under age 18 who are held in adult CDCR state facilities. The number of prisoners under age 18 ranges from 1 to 156, depending on the year, with only one or two prisoners under age 18 in the most recent years.

4

CSAC/ 00028

Public Policy Institute *of* California

## California Counts

Who's in Prison?



**Figure 2. Percentage Distribution of Prisoners, by Race and Ethnicity, and Race-Gender-Specific Incarceration Rates, 2005**

Source: Authors' calculations of 2005 CDCR data and 2005 DOF data.
Note: Race-specific incarceration rates have been age-standardized (using DOF population data, 2005) to control for the age differences by race and ethnicity that occur in the general adult population.

other women. African American women are four times as likely to be imprisoned as whites and Latinas. Among African American women, 346 per 100,000 in the population are incarcerated, whereas fewer than 80 women per 100,000 are incarcerated among whites, Latinas, and other groups.

Prior research shows that higher arrest rates for African Americans, particularly for crimes that result

in imprisonment, partially explain the black-white differentials in incarceration rates (Blumstein, 1982, 1993). In California in 2004, African Americans were about three times as likely as whites to be arrested for any offense and four times as likely to be arrested for a felony offense.[6] Contextual factors such as unemployment, poverty, and lower educational attainment are associated with

crime and arrests. African Americans have the highest poverty rate (17%) of any native-born racial or ethnic group in California (Reed, 2006) and among the lowest high school completion rates (77% for African Americans compared to 89% for whites) (Reed, 2005). Even when controlling for education and birth cohort (and thus, business cycles), Pettit and Western (2004) show that among high

**5**

CSAC/ 00029

Public Policy Institute *of* California

## *California Counts*

**Incarceration rates are much lower for foreign-born adults (297 per 100,000) than for U.S.-born adults (813 per 100,000).**

school dropouts, African American men are seven times as likely as white men to be imprisoned. Finally, some research suggests that the American history of slavery (Wacquant, 2002) and racial bias in various stages of the criminal justice system, including policing, prosecution, and sentencing (Free, 2002; Beckett, Nyrop, and Pfingst, 2006; Taxman, Byrne, and Pattavina, 2005; Alpert, MacDonald, and Dunham, 2005), also partially explain higher rates of incarceration for African Americans.

Reflecting California's diverse population, a sizable share of prisoners was born outside the United States.[7] Approximately 17 percent of all prisoners (28,279) were born abroad, with a higher share of men (17%) than women (8%) born in another country.[8] Sixty percent of all foreign-born prisoners were

born in Mexico, 4 percent were born in El Salvador, and 3 percent were born in Vietnam.[9] Incarceration rates are much lower for foreign-born adults (297 per 100,000) than for U.S.-born adults (813 per 100,000).

Highly populated regions of the state send more people to prison than do less populated areas. Approximately three of every five prisoners (62%) at year-end 2005 were sentenced and committed to prison from Southern California. Los Angeles County is home to 32 percent of the adult population and commits about that share of prisoners (33%). The share of prisoners committed from the San Joaquin Valley and the Inland Empire[10] is higher than those regions' representation in the general adult population. The Bay Area and South Coast regions send fewer people than are represented by their general adult population.

Figure 3 shows incarceration rates at the county level (controlling for county population size) and gives a more detailed view of variation in prison commitments across California. Shasta, Tehama, Yuba, and Lake Counties, relatively small northern inland counties with majority white adult populations, have the highest incarceration rates. Incarceration rates are elevated for all racial and ethnic groups living in these areas. Incarceration rates for white men are especially noteworthy, at

2.5 times higher in these counties than in the state overall. Latino men in Yuba and Lake Counties also have twice the incarceration rate of Latino men in California overall. Men who have been categorized as an "other" race also have noticeably higher rates of incarceration in these counties, ranging from 1.8 times higher in Yuba County to 6.7 times higher in Lake County than in the state overall. Kern and Kings Counties in the Central Valley, with roughly equal shares of white and Latino residents (47% and 39%, respectively, in Kern, and 42% each in Kings), also have high incarceration rates. Both white and Latino men in these Central Valley counties have incarceration rates that are nearly double the state rates.

Each of these six counties incarcerates more than 1,000 people per 100,000 adults; the state rate is 616 per 100,000. These rates may result from either genuinely higher crime rates in these counties, or tougher enforcement and prosecution, or both. The oft-observed link between poverty and incarceration is reflected here, as the highest incarceration counties all have higher poverty rates than the state as a whole. At the other end of the spectrum, the Bay Area and the South Coast counties, relatively wealthy areas, have the lowest incarceration rates in the state (fewer than 400 per 100,000 adults).

CSAC/ 00030

Public Policy Institute *of* California

## *California Counts*    **Who's in Prison?**



**Figure 3. California Incarceration Rates per 100,000 Adults, by County, 2005**

Legend:
- □ < 400
- ■ 400–699
- ■ 700–999
- ■ 1,000+

Source: Authors' calculations of 2005 CDCR data and 2005 DOF data.
Note: Incarceration rates by county are not age-adjusted.

**Forty-four percent of California prisoners do not have a high school diploma or GED.**

Research shows that completing a general equivalency diploma (GED) or postsecondary degree or participating in vocational classes while in prison reduces recidivism (Nuttall, Hollmen, and Staley, 2003; Vacca, 2004) and provides prisoners with basic skills that may lead to postrelease employment. Educational investments in prison are particularly important because most prisoners in California have completed little formal education (Figure 4). Forty-four percent of California prisoners do not have a high school diploma or GED; the comparable number for the general California adult population is 21 percent.[11] Educational attainment differs by race and ethnicity. Nearly two-thirds of Latinos (63%) in prison have not completed high school. Prisoners of all racial and ethnic groups, including Latinos, have earned a GED in prison in roughly equal shares (14% to 17%).

The effects of incarceration extend far beyond prison walls to touch the lives of thousands of children and family members of prisoners. Two-thirds of women in California's prisons are mothers of children under age 18; more than half of these mothers were living with their children at the

7

CSAC/ 00031

Public Policy Institute *of* California

**More than half of women in California prisons (58%) have an immediate family member (e.g., mother, father, brother, spouse, or child) who has also been imprisoned.**

time of their arrest.[12] About half of men in prison are fathers of minor children and 42 percent of fathers lived with their children at the time of their arrest.[13] Prior research suggests that children of incarcerated parents are more likely to serve time in prison themselves (Petersilia, 2000; Greene, Haney, and Hurtado, 2000). Our findings seem to corroborate this connection—more than half of women in California prisons (58%) have an immediate family member (e.g., mother, father, brother, spouse, or child) who has also been imprisoned. Forty-two percent of male prisoners report that an immediate family member has been imprisoned. This varies greatly by race and ethnicity. Two-thirds each of Afri-

can American, Latina, and "other" women have an immediate family member who has been incarcerated, compared to 44 percent of white women. Half of African American men in California prisons said they had an immediate family member who had been imprisoned, with a lower share of white, Latino, and "other" men reporting this connection.

## What Crimes Did Prisoners Commit?

One-half of all prisoners at year-end 2005 were serving time for violent crimes (including homicide, robbery, assault and battery, sex offenses, and kidnapping); approximately 20 percent were serving time for property crimes (such as burglary, theft, vehicle theft, or forgery/fraud), 20 percent for drug offenses, and 10 percent were locked up for other types of crimes (such as escape from custody, felony driving under the influence, arson, or possession of a weapon). Men and women differ sharply in the types of crimes for which they are incarcerated (Figure 5). A majority of men are imprisoned for violence (52%) whereas women most often serve time for property crimes (36%) and drugs (30%).

Type of offense varies by other characteristics as well. Only 14 percent of those under age 25 were imprisoned for drug crimes, whereas



**Figure 4. Percentage Distribution of California Prisoners, by Education, 1997**

Legend:
- ■ Bachelor's degree or more
- ⧄ Some college
- ⧅ GED in prison
- ⧅ High school diploma
- ■ < High school

Categories: Latino, African American, White, Other

Source: Authors' calculations of 1997 Survey of Inmates in State and Federal Correctional Facilities data.

CSAC/ 00032

Public Policy Institute *of* California

## *California Counts*                                    **Who's in Prison?**



**Figure 5. Percentage Distribution of Types of Offense, by Gender, 2005**

Men

Women

Source: Authors' calculations of 2005 CDCR data.

**Twenty-six percent of prisoners were sentenced under the Three Strikes and You're Out law, which enhances the sentences of felons with one or more prior serious or violent felonies.**

52 percent were sentenced for violent crimes and 25 percent for property crimes. A lower share of white prisoners was committed for violent offenses (44%), compared to other groups (52% for Hispanics and African Americans, and 63% for "other"). A higher share of foreign-born prisoners than of U.S.-born prisoners was serving time for violence (60% compared to 50% for men and 38% compared to 28% for women).

## Sentencing and Overcrowding

Six of every ten prisoners are serving a determinate sentence (a sentence of a specified length) and could be paroled before serving the specified time. By contrast, 14 percent of state prisoners are serving sentences that make them potentially permanent residents of the system (Figure 6). Most of these long-term prisoners are serving an indeterminate life sentence (20,487 "lifers" constitute 12% of the prison population) and will be released only on parole board approval. Another 2 percent (3,300) are serving a life sentence without the possibility of parole. Fourteen women and 638 men are on death row.

Twenty-six percent of prisoners were sentenced under the Three Strikes and You're Out law (see Greenwood et al., 1996; Schichor and Sechrest, 1996; Austin et al., 1999; Zimring, Hawkins, and Kamin, 2001), which enhances

the sentences of felons with one or more prior serious or violent felonies. Second-strikers serve double the normal sentence following their second conviction and constitute 21 percent (35,412) of those currently imprisoned. Third-strikers serve 25 years to life and make up 5 percent (7,815) of the prison population.[14]

At year-end 2005, California penal institutions were operating at nearly double their design capacity. That meant they were 186 percent occupied, judging by the maximum number of beds a facility was designed to contain. (CDCR *Monthly Report of Population,* December 31, 2005). Crowding beyond design capacity varies by security level. Higher security prisons, where inmates live in cells, are less crowded (but demand

9

Public Policy Institute *of* California

**California state prisons held 96,794 people in 1990; by year-end 2005, the California prison population had increased by 73 percent, to 167,698.**

more staff) than lower security, dormitory-style prisons and camps; reception centers are particularly overcrowded, averaging 245 percent of design capacity. Although design capacity can be an imprecise measure of overcrowded conditions, the nearly double-capacity figure does suggest that CDCR is struggling to effectively house all prisoners. CDCR reports that the overall maximum capacity for the institutional population (i.e., the "real" maximum or use of all possible space) is 176,500[15] and that, as of May 31, 2006, there were 170,713 prisoners in CDCR custody.[16] Crowded conditions can adversely affect rehabilitative services. Using classrooms and day-rooms as dormitories reduces the possibility that rehabilitative and

vocational programs and services, which are keys to reducing recidivism, will be available or effective (Marquart et al., 1994).

## How Is California's Prison Population Changing?

California has seen substantial growth and dramatic compositional change in its prison population over the past 15 years. California state prisons held 96,794 people in 1990; by year-end 2005, the California prison population had increased by 73 percent, to 167,698.[17] During the same period, Latinos became the largest ethnic group in the prison population (while whites became the largest racial group among women prisoners), and the age structure shifted toward older prisoners. From 1990 to 2005, the prison population expanded three times faster than the general population—73 percent compared to 25 percent (Figure 7).

Incarceration rates, the number of persons in prison per 100,000 in the general adult population, demonstrate imprisonment trends independent of population change (Figure 8). Incarceration rates have increased over the past 15 years in California, jumping from 443 in 1990, peaking at 673 in 1998, and declining in recent years to 616. Compared to the rest of the



**Figure 6. Percentage Distribution of Sentence Type**

Life without parole 2%
Death row 0.4%
Life
Third-striker 5%
Second-striker
Determinate sentence 59%

Source: Authors' calculations of 2005 CDCR data.
Note: Percentages do not sum to 100 because of rounding.

CSAC/ 00034

Public Policy Institute *of* California

## California Counts

**Who's in Prison?**



**Figure 7. Changes in Prison and Adult Population, 1990–2005**

Source: Authors' calculations of 2005 CDCR data and 2005 DOF data.
Note: Population changes have been indexed to 100 for the 1990 population.

**Since 1998, California incarceration rates have declined while rates in the rest of the United States have continued to increase slightly.**



**Figure 8. Incarceration Rates per 100,000 Adults, 1990–2005**

Sources: Authors' calculations of data from Harrison and Beck (2005) (for rest of U.S. rates) and CDCR data (for California rates); U.S. Census Bureau population estimates; and California DOF population data.
Notes: To maintain consistency with rates reported elsewhere in this study, we show California incarceration rates based on CDCR data. California's incarceration rates using BJS data are nearly identical to our results using CDCR data in all available years (e.g., 615 compared to 609 in 2004).

United States, California had especially high incarceration rates in the mid to late 1990s. Since 1998, however, California incarceration rates have declined while rates in the rest of the United States have continued to increase slightly. California rates have leveled off at 616 while rates in the rest of the United States stand at 573. California ranks 17th among all states for incarceration rates.

The dropoff in the late 1990s coincides with an economic boom and lower poverty in California. Criminological research suggests a correlation between poverty and crime (Blau and Blau, 1982). As poverty declined in the late 1990s (Reed, 2006), there could have been a genuine decrease in the amount of crime and, thus, fewer

**11**

Public Policy Institute *of* California

**The vast majority of admissions every year consists of prisoners being returned from parole, either for a new crime or for a technical violation of their parole terms.**

prisoners entering the system. The peak of admissions in 1998 (Figure 9) and subsequent decline is consistent with this explanation. Additionally, California enacted treatment instead of incarceration for some drug offenders in 2001, which slowed prison growth.

The California prison population is far more dynamic than is commonly understood. This population constantly changes, with new admissions arriving in the system, prisoners being released from custody on parole or outright, other prisoners returning for parole violations or new offenses, and inmates dying while in custody.

At year-end 1990, the system held 96,794 prisoners in custody. During the next year, 97,769 pris-

oners were admitted to the system, either arriving on new sentences or having had their parole revoked (Figure 9). Meanwhile, 93,354 prisoners left the system, resulting in a net population gain of 4,415 prisoners from the previous year, pushing the prison population to over 101,200.

Through most of the 1990s, admissions slightly outpaced releases; the prison population grew between 4.5 percent and 9.5 percent each year until 1998. Admissions peaked in 1998 at 135,812, but releases kept growing, peaking in 2000 at 131,832. By that time, releases outnumbered admissions by almost 4,000 and the prison population began to decline slightly, a pattern that continued until 2002, when it reversed again.[18]

The vast majority of admissions every year consists of prisoners being returned from parole, either for a new crime or for a technical violation of their parole terms. In 2004, only 33 percent of admissions were new admissions; in 1990, 41 percent were new admissions.[19] These numbers are consistent with the 70 percent recidivism rate found by Fischer (2005). But as Fischer notes, California has a unique parole process—nearly every prisoner is released to parole and placed under supervision for a period of time. This practice inevitably boosts the number of technical violators and perhaps explains why California



**Figure 9. Admissions, Releases, and Net Change in Prison Population, 1990–2002**

Source: Authors' calculations of National Corrections Reporting Program (NCRP) data, 1990–2002.

CSAC/ 00036

Public Policy Institute *of* California

## California Counts

has such a high rate of recidivism compared to other states.

### Demographic Changes

Women constitute 7 percent of the overall state prison population, and their numbers have been increasing slightly faster than those of men. Since 1990, the number of women in state prison in California has expanded 77 percent (from 6,440 to 11,418); the comparable number for men is 73 percent. Because women are typically imprisoned for property and drug offenses, the "war on drugs" of the 1980s and 1990s may have increased arrest and imprisonment among women (Simpson, 1991). Thirteen percent of women prisoners were serving time for drug offenses in 1980 but by 1990, that share had increased to 40 percent, peaked at 44 percent in 1999, and stood at 30 percent in 2005. The declining share in the last few years at least partly reflects the drug treatment alternatives created by Proposition 36.

Thirty percent of male prisoners were Latino in 1990; by 2005, Latinos constituted the largest ethnic group, at 37 percent. The share of African American and white men in prison decreased during this time period, from 36 to 29 percent and from 29 to 27 percent, respectively. A slightly different pattern emerges among women prisoners. Both Latina and white women increased their shares in prison between 1990 and

2005, Latinas growing from 23 to 28 percent and the white share from 35 to 39 percent. African American women experienced a pattern identical to that of African American men, decreasing from 36 to 29 percent of the prison population.

### Regional Representation

Between 1990 and 2002, Los Angeles County's share of prison admissions dropped from 39 percent to 26 percent. The difference was made up chiefly by the San Joaquin Valley and the Inland Empire, whose shares of admissions during the same time rose from 11 to 14 percent and 8 to 15 percent, respectively. In absolute terms, these regions' contribution to prison admissions is considerable. The San Joaquin Valley moved from 10,806 admissions in 1990 to 17,145 in 2002, whereas the Inland Empire's admissions increased from 7,459 in 1990 to 17,897 in 2002.

The cumulative effect of this growth in admissions is echoed in the disproportionate numbers of prisoners committed from these regions. The San Joaquin Valley and the Inland Empire both experienced significant adult population growth between 1990 and 2005, but the growth in the number of prisoners from these regions was far greater. The population of prisoners from the San Joaquin Valley grew twice as fast as the region's general adult population

> **The San Joaquin Valley and the Inland Empire both experienced significant adult population growth between 1990 and 2005, but the growth in the number of prisoners from these regions was far greater.**

(87% compared to 39%); for the Inland Empire, the prison population grew four times as fast as the adult population (221% compared to 48%).

### Age Structure

The prison population is becoming older for at least three reasons: The state's overall population is aging, prisoners are aging in place because they are serving longer sentences, and older adults are increasingly likely to be admitted into prison. Table 1 shows that young adults represent a declining share of the prison population and older prisoners a greater share. In 1990, 20 percent of prisoners were younger than age 25; in 2005, only 14 percent of prisoners were under age 25. Across this same time period, the share of prison-

CSAC/ 00037

Public Policy Institute *of* California

### Table 1. Changing Age Distribution of the Prison Population and Admissions, 1990–2005

| Year | Stock Population, % | | Admissions, % | | Incarceration Rates per 100,000 Adults | |
|---|---|---|---|---|---|---|
| | 18–24 | 50+ | 18–24 | 50+ | 18–24 | 50+ |
| 1990 | 20 | 4 | 19 | 3 | 550 | 59 |
| 1991 | 20 | 4 | 18 | 3 | 582 | 62 |
| 1992 | 20 | 4 | 19 | 3 | 649 | 67 |
| 1993 | 20 | 4 | 19 | 3 | 706 | 73 |
| 1994 | 19 | 4 | 17 | 3 | 708 | 80 |
| 1995 | 17 | 5 | 16 | 4 | 722 | 89 |
| 1996 | 17 | 5 | 15 | 4 | 763 | 102 |
| 1997 | 16 | 6 | 15 | 4 | 772 | 118 |
| 1998 | 16 | 6 | 14 | 5 | 767 | 130 |
| 1999 | 15 | 7 | 14 | 5 | 733 | 140 |
| 2000 | 15 | 8 | 15 | 6 | 708 | 147 |
| 2001 | 15 | 8 | 15 | 6 | 680 | 149 |
| 2002 | 15 | 9 | 16 | 7 | 681 | 155 |
| 2003 | 15 | 9 | — | — | 677 | 163 |
| 2004 | 15 | 10 | — | — | 655 | 177 |
| 2005 | 14 | 11 | — | — | 646 | 185 |

Source: Authors' calculations of CDCR, NCRP, and California DOF data, 1990–2005.
Note: Incarceration rates are age-specific per 100,000 under age 25 and ages 50+.

ers age 50 and older has nearly tripled—from 4 percent in 1990 to 11 percent in 2005. Admissions records echo this trend.

Age-specific incarceration rates are included in Table 1 to account for age trends in the general population. Rates for the youngest group rose swiftly during the first part of the decade, peaking at 772, then fell back to 646 per 100,000. But for those age 50 and older, incarceration rates more than tripled during the period, from 59 to 185 per 100,000.

Changes in the age structure of admissions help to illustrate this aging trend. Between 1990 and 2002, the median age of

prison admissions rose from age 31 to 34. Figure 10 displays age-specific admissions rates, to separate these trends from the overall aging of the state's population. The rates for each age group under age 40 show moderate overall fluctuation throughout the decade, whereas the rates for each age group age 40 and over increase dramatically. Particularly notable is the rate for the 40–49 age group, nearly doubling from 304 per 100,000 in the population in 1990 to 576 in 2002, and in the process surpassing the admissions rate for the under age 25 group.

The aging of the prison population could exacerbate the health

care problem as the population in need expands (see the textbox "Prisoner Health"). Responsibility for the California prison health care system has already been wrested from state authorities by the federal courts and given to a receiver because of the state's failure to provide adequate health care to prisoners. Furthermore, some researchers question the cost-effectiveness of incarcerating older people who are beyond their prime offending years (Schmertmann, Amankwaa, and Long, 1998; Brown and Jolivette, 2005).

## Why Is the California Prison Populaton Changing?

**M**any factors contributed to the demographic changes highlighted in the last section, including state-level economic and demographic trends and criminal justice strategies concerning law enforcement, prosecution, and sentencing. We do not attempt to account for all these factors or to draw a direct causal link to the outcomes we observe, but we do pay particular attention to the policy interventions implemented from 1990 to 2005 with an eye toward identifying their likely effects.

Three recent policy interventions merit particular consider-

CSAC/ 00038

Public Policy Institute *of* California

## California Counts

**Who's in Prison?**



**Figure 10. Age-Specific Admissions Rates, 1990–2002**

Source: Authors' calculations of NCRP data, 1990–2002.

**California is unique among states with three strikes laws in that the triggering felony need not be serious or violent—any felony conviction can be the second or third strike.**

ation. First, the Three Strikes and You're Out law, as discussed above, enhances the sentences of offenders with one or more prior serious or violent felonies. Second, Truth in Sentencing, a federal program initiated in 1994, provided financial incentives to states requiring that violent offenders serve at least 85 percent of their sentences without the possibility of earlier parole (Sabol et al., 2002). California met the Truth in Sentencing criteria in 1994. Third, Proposition 36, known formally as the Substance Abuse and Crime Prevention Act of 2000, diverts nonviolent drug offenders from prison to probation and community-based treatment centers.

Tougher sentencing policies (including three strikes and truth in sentencing legislation) explain much—although by no means all—of the demographic change that we see in the general prison population over the 15-year period. Most clearly, the three strikes law established a new sentencing dimension in California, creating a determinate sentence category for second-strikers (with double the penalty) and an indeterminate sentence category (25 years to life) for third-strikers. California is unique among states with three strikes laws in that the triggering felony need not be serious or violent—any felony conviction can be the second or third strike. Beyond sentencing, three strikes legislation also affects the actual time served by strikers. Prisoners sentenced under three strikes can reduce their sentences by only one-fifth, rather than one-half, as nonstriker prisoners can, through credits for good behavior. The innovative drug treatment policy (Proposition 36) partially explains the more recent slow-down in prison population growth and the shift to a higher share of prisoners serving time for violent crimes.

### New Sentencing Structure

In 1990, 90 percent of California state prison inmates were serving a sentence of determinate length, and 10 percent were serving either a term of life (8.4%), life without parole (0.9%), or death (0.3%). Beginning in 1994, with the passage of the three strikes legislation, new felony admissions who had

**15**

Public Policy Institute of California

## California Counts

**Who's in Prison?**

**Three strikes legislation has affected African Americans disproportionately. Thirty-eight percent of strikers are African American, compared to 29 percent in the overall prison population.**

previously been convicted of serious or violent felonies began to be classified as second-strikers or third-strikers.

Figure 11 shows the changes in composition of inmates by sentence type that resulted. At year-end 1995, after the first full year of implementation of three strikes, 11.4 percent of prisoners were serving sentences handed down by the courts under this law, and 10.6 percent were serving a term of life or more. The striker group continued to grow throughout the 1990s in both absolute and percentage terms. In recent years, the number of second-strikers has begun to stabilize around the year-end 2005 level of 35,412, whereas the number of third-strikers has continued to climb,

reaching 7,815 by that time. Collectively, strikers account for 26 percent of the prison population, and those serving life or more constitute 15 percent.

In addition, an undetermined number of second-strikers currently live in the broader community and if arrested and convicted of a felony—even a nonserious, nonviolent felony—can be imprisoned for 25 years to life.[20] The longer sentences imposed on both second- and third-strikers under this law will likely continue to increase the prison population (Greenwood et al., 1996; Sorensen and Stemen, 2002).

Three strikes legislation has affected African Americans disproportionately. Thirty-eight percent of strikers are African



Figure 11. Distribution of Sentence Type, 1990–2005

Source: Authors' calculations of CDCR data, 1990–2005.

CSAC/ 00040

Public Policy Institute *of* California

American, compared to 29 percent in the overall prison population. White and Latino shares of strikers (26% and 33%, respectively) are similar to their representation in the overall prison population. Although the striker population tripled in size between 1995 and 2005, its racial/ethnic representation remained exactly the same.

## The Nexus of Tougher Sentencing and Aging

As noted above, the prison population is aging. Age-specific incarceration rates for people ages 50 and older (Table 1), which control for population size and growth, have tripled from 59 per 100,000 population in 1990 to 185 in 2005. This growth, in rate as well as in share, shows that the aging phenomenon is not driven entirely by demographic changes, but it is at least partly the consequence of the enactment of three strikes and truth in sentencing legislation in 1994. At the end of 1995, the year after three strikes went into effect, California prisons held 15,308 second- and third-strikers. Of these, most (61%) were younger than age 35 (Figure 12). The largest group was between ages 30 and 34 (26%) and the next largest, between ages 25 and 29 (22%).

Ten years later, the picture of strikers had changed substantially. At year-end 2005, the total number had almost tripled (to 43,227) and the age distribution had shifted considerably—the largest

group of strikers was those ages 40 to 44, and a clear majority (65%) was age 35 or older. This aging of the striker population is consistent with other research on longer sentencing and the resulting older prison population (Brown and Jolivette, 2005; Aday, 2003; Schmertmann, Amankwaa, and Long, 1998).

Very similar patterns emerge in the age distribution of prisoners serving sentences of life, life without parole, or death. This category comprises nearly 25,000 inmates and is aging rapidly. Between 1995 and 2005, the median age rose from 34 to 39, and the proportion of prisoners age 50 and over grew from 10 percent to 20 percent.

## Drug Treatment in Lieu of Incarceration

The enactment of Proposition 36 in 2001 has dramatically diminished the number of prisoners serving time for drug offenses—the period from 2000 to 2005 saw a decrease of more than 10,000 prisoners. This was to be expected, as the law's intent was to provide rehabilitative alternatives for drug addicts outside the prison system. The decrease in prisoners with drug convictions meant an increase in the share of prisoners serving time for all other types of offenses.

Prisoners serving time for violent crimes constituted the largest offense type throughout the time interval, and as of year-end 2005, that group represents a majority of

> **... incarceration rates for people ages 50 and older, which control for population size and growth, tripled from 59 per 100,000 population in 1990 to 185 in 2005.**

the population, at just over 50 percent (Figure 13). (This category of prisoners has also grown steadily in absolute terms throughout this interval, from 40,000 in 1990 to over 83,000 in 2005.) During the 1990s, property crimes and drug-related crimes alternated as the second- and third-most-common offense types. Between 1995 and 2000, drug crimes outpaced property crimes, peaking at 28 percent in 1999. But following the implementation of Proposition 36, the share (and absolute number) of prisoners serving time for drug crimes declined, slowly at first, then more rapidly, and recently settling around 21 percent of the total.

17

Public Policy Institute *of* California

**The enactment of Proposition 36 in 2001 has dramatically diminished the number of prisoners serving time for drug offenses—the period from 2000 to 2005 saw a decrease of more than 10,000 prisoners.**



Figure 12. Age Distribution of Strikers, 1995, 2000, and 2005

Source: Authors' calculations of CDCR data, 1995–2005.

As noted above. the offenses for which men and women are committed to prison differ. Drug charges drove the largest movements of women into and out of the prison system over the past decade, peaking in 1999 with over 50 percent of women admitted to the system for this type of crime (Figure 14). Drug crime admissions dropped (in share and in absolute numbers) after 1999. The pattern for releases (not shown) is very similar but with a delayed decline in releases for drug crimes. Drug charges figure in most prominently among releases, peaking in 2001, when more than half of women released from prison had been serving time on drug charges; releases from prison for property crimes remain at about 33 percent of the total.

For men, drug crime admissions show a very similar pattern (Figure 15), peaking in 2000 at



Figure 13. Change in Composition of Prisoners, by Offense Type, 1990–2005

Source: Authors' calculations of CDCR data, 1990–2005.

CSAC/ 00042

Public Policy Institute *of* California

## *California Counts*



**Figure 14. Change in Composition of Admissions of Women, by Offense Type, 1990–2002**

Source: Authors' calculations of NCRP data, 1990–2002.



**Figure 15. Change in Composition of Admissions of Men, by Offense Type, 1990–2002**

Source: Authors' calculations of NCRP data, 1990–2002.

35 percent of the total and declining thereafter, whereas violent and property crimes remain at around 26 and 30 percent, respectively. As of 2002, drug crimes were still the most common type of admission among men, but the emerging trend was toward nearly equal proportions of violent, property, and drug crimes.

These patterns show that Proposition 36 has reduced admissions to California state prisons. However, drug crimes remain an important source of admissions. The only offenders who would be serving prison time for drug charges after Proposition 36 are those with offenses for sale or manufacturing of drugs or those who were ineligible because of a history of violent or serious crimes, a concurrent non-drug offense, or repeated violations following Proposition 36–mandated treatment. The remaining drug offenders would be getting treatment in lieu of incarceration. This diversion into treatment rather than incarceration means that a higher share of prisoners will be serving time for violent and other offenses.

## Conclusion

All Californians have a stake in the state's prison system. Per capita spending on adult corrections has increased by 78 percent in the past 16 years, from $109 in 1990 to $194 (inflation-

CSAC/ 00043

Public Policy Institute *of* California

## California Counts

**Who's in Prison?**

> **Large numbers of prisoners flow into and out of the system each year. Many of these prisoners are parents, and thus the effects of incarceration reach far beyond the prisons themselves.**

adjusted) in 2006. The governor's 2006–2007 budget proposes to spend more than $7.2 billion on adult corrections. The California Department of Corrections and Rehabilitation consumes 6 percent of the overall budget and is the fourth-largest general fund expenditure. Moreover, serious problems have been identified in the state's prison system, with the federal government placing prison health care in the hands of a receiver and the U.S. Supreme Court requiring that the state desegregate its prisons. Large numbers of prisoners flow into and out of the system

each year. Many of these prisoners are parents, and thus the effects of incarceration reach far beyond the prisons themselves.

The current size of the California state prison system, whose growth since 1990 has outpaced that of the state's overall adult population by three times, presents the obvious problems of overcrowded prison facilities and increased health care costs. A detailed examination of this population's recent changes in composition puts a finer point on these emerging concerns and suggests some results of recent policy interventions in the corrections system.

Because crime and the potential responses to it continue to rank high among public policy concerns, it may be instructive to observe the effects of recent legislation on the prison population. The three strikes and truth in sentencing laws have produced longer sentences and increased time served, respectively. Together with Proposition 36, they are helping to transform the prison population into one composed of more serious or violent offenders, although drug

crimes still constitute a major cause of imprisonment. Most clearly, the population is getting older.

The aging of the prison population, accelerated by the passage of stricter sentencing laws in the previous decade, presages greater health care needs and costs for the near future, especially given already high rates of infectious disease among prisoners. Because of high turnover in the system every year, these health issues could have a significant effect on the entire California population, especially on the communities from which these prisoners come and to which many eventually return. It remains to be seen whether the management of state prison health services by a receiver accountable to a federal court will bring any relief.

The impetus behind the three strikes and truth in sentencing legislation was to reduce crime, not to change the prison population. However, given the continued growth and shifting composition we have identified in this population, it will be important to consider such effects when formulating any future policy interventions. ◆

CSAC/ 00044

Public Policy Institute *of* California

## California Counts

---

### Text Box 1. Focus and Data Sources

**Focus on prisoners**

In this *California Counts*, we describe California prisoners housed in state-run adult facilities. We do not address the approximately 15 federal prisons in California, which held 18,154 prisoners as of February 2006, nor do we consider those persons held in local or county jails throughout the state.

Readers should note that imprisonment represents one of the end stages of the criminal justice system. Many processes, institutional actors, and practices precede incarceration. We are not accounting for the differences, demographic and otherwise, that may exist in the commission of crimes, policing activities, arrests, prosecution, legal counsel, or sentencing. Likewise, we are not explicitly examining prisoner reentry, recidivism, substance abuse, poverty, or employment—all factors that may influence imprisonment. Our goal is to describe California prisoners today and how this population has changed over the past 15 years.

**California Department of Corrections and Rehabilitation data**

We obtained annual data on state prisoners from the California Department of Corrections and Rehabilitation, Offender Information Services Branch, for 1980 and 1990 through 2005. Specifically, CDCR provided us with tabulated data for county of commitment, offense category, admission and return status, sentence status, and commitment type. We received each of these substantive pieces of information by age (categorical), race and ethnicity, sex, and nativity. In this report, we focus only on adult prisoners who are incarcerated in the state-run adult facilities, including institutions, camps, community correctional centers, and mental health hospitals. Our numbers may differ from published CDCR reports because of differing dates for population counts or different base populations (e.g., we do not have information on temporary releases, interstate cooperatives, or interstate parole units).

**Survey of Inmates in State and Federal Correctional Facilities data**

The Interuniversity Consortium for Political and Social Research provided us with the California state sample (confidential data) from the 1997 Survey of Inmates in State and Federal Correctional Facilities (SISFCF). The survey provides nationally representative data on state prison inmates and, because of the large California subsample, is representative of the California state prison population (n = 151,496). The data collectors used personal interviews to get information about prisoners' current offense and sentence, criminal history, family background, prior drug and alcohol use and treatment programs, and much more. The survey was conducted by the Bureau of the Census for the Bureau of Justice Statistics and Bureau of Prisons in five- to six-year intervals from 1974 to 1997 and has not been administered since that time.

21

Public Policy Institute *of* California

## California Counts

### Text Box 1. continued

**National Corrections Reporting Program data**

The National Corrections Reporting Program, a project of the Bureau of Justice Statistics, collects yearly comprehensive data on convicted persons' entrance into and departure from correctional custody and supervision. California has reported every year since 1983, providing a full set of records for each year through 2002.

Beginning in 1983, the NCRP included inmates with sentences of a year or less—prisoners sentenced to state prison but admitted to or released from a local jail, for instance, were included in the accounting. Multiple admissions or releases during the year, including those entering parole or having had their parole revoked, were recorded as separate records. For these reasons, a simple tallying of admissions less releases does not give the net growth in the prison population as measured by CDCR data.

Since our interests lay solely with those persons in physical custody, we used the information on admissions to and releases from California state institutions and ignored the portion concerned with release from parole. Data collected include race, gender, and age of inmates; type of offense; type of admission and release; prior time served; maximum and minimum sentence length; and, for persons being released, time served on the current conviction. Unfortunately, we found the race/ethnicity data to be fraught with missing values and suspiciously low numbers for Latino prisoners for selected years, so we were not able to use these data for determining the racial/ethnic composition of the yearly flow of prisoners into and out of the system.

CSAC/ 00046

Public Policy Institute of California

## California Counts

Who's in Prison?

---

### Text Box 2. Prisoner Health

We have shown that California's prison population is aging and now has a sizable share of people older than age 50 (11%). As this population ages and as current policies incarcerate people for longer periods of time, greater demands will be placed on the prison health care system. Currently, that system is in crisis and in federal receivership, and conditions may worsen as older prisoners require more health care. Additionally, the lack of adequate health care for prisoners may heighten the prevalence and spread of infectious diseases in prisons.

As with any institutionalized group, prisoners are at high risk for contraction and spread of tuberculosis (TB). Many prisoners, especially those with a history of IV drug use, are also considered high risk for HIV and hepatitis B and C. The prevalence of these diseases among prisoners varies according to the specific year and data source, but prisoners generally have a higher infection rate than the general population. According to self-reports, 16 percent of prisoners in California have TB.[21] Tuberculosis infection varies by race and ethnicity. One of every four prisoners classified as "other" race (including Asians and Pacific Islanders) report a positive TB test. Twenty-two percent of Latinos are positive for TB whereas a lower share of African Americans and whites report TB infection (15% and 8%, respectively).

HIV infection rate estimates vary by data source (from 1% to 4% of the prison population), but all sources confirm that rates differ by race and ethnicity. Three percent of African American prisoners and 1 percent of white prisoners self-report HIV positive status.[22] Other groups' rates are significantly lower. A cross-sectional study of new admissions to California prisons in 1999 found that 1.4 percent tested positive for HIV, 3.5 percent had current/chronic hepatitis B, and 33 percent had current hepatitis C (Ruiz et al., 2001). HIV rates were higher for women prisoners than for men. African American women and men, however, had the highest rates of HIV infection, with 2.8 and 2.3 percent positive, respectively. Hepatitis C, common among IV drug users, was prevalent in the prison population, with an astonishing one in three men and one in four women testing positive in the 1999 new admissions study.

In addition to physical problems, many prisoners experience mental and emotional difficulties. Nearly one-third of women prisoners in California report taking medication for emotional or mental problems; 18 percent of men say that they have taken prescription medicine for emotional and mental health reasons.[23] Emotional problems may be related to other traumas in prisoners' backgrounds and their current situation. Forty-five percent of women prisoners in California report physical abuse in their pasts; 39 percent report sexual abuse. These shares are much lower for imprisoned men.

23

CSAC/ 00047

Public Policy Institute *of* California

## *California Counts*

**Who's in Prison?**

# Notes

[1] According to the CDCR website, the 33 prisons range from minimum to maximum custody and are located in 19 counties. Several cities within these counties house at least two prison facilities (http://www.cya.ca.gov/ReportsResearch/OffenderInfoServices/OffenderInformation.html).

[2] On May 31, 2006, the total CDCR population was 310,949—170,713 in institutions, 116,530 on parole, and 23,706 classified as "non-CDCR jurisdiction," which includes people under other state or federal jurisdiction, out of state parole, inmates out to court, escapees, and so forth.

[3] The U.S. incarceration rate was 578 per 100,000 adults in 2004 (authors' calculations using the U.S. Bureau of Justice Statistics (BJS) data). The national ranking reported here is based on year-end 2004 data from BJS.

[4] The other race group reported here comprises Asian, Pacific Islander, Native Hawaiian, American Indian, Alaska Native, and a catch-all "other race" category.

[5] California is not unique in the high share of young African American men behind bars. Harrison and Beck (2005) report that 8.4 percent of African American males between ages 25 and 29 in the nation were in state or federal prison at year-end 2004. For further discussion of race, imprisonment, and inequality see Pettit and Western (2004).

[6] Authors' calculations using arrest data from California Department of Justice (2004, Table 30) and population data from the California Department of Finance.

[7] Authors' calculations using the 2005 *Current Population Survey* show that 35 percent of California's adult population is foreign-born.

[8] A foreign-born person who is convicted of a crime in a California court and receives a prison sentence will serve that sentence in a California state prison, regardless of immigration status. After serving the sentence, immigrants with U.S. Immigration and Customs Enforcement (USICE) "holds" will be paroled to the federal immigration authorities for deportation. Approximately three-quarters of current foreign-born prisoners in state custody have a USICE hold (54%) or potential hold (22%) (Authors' calculations of CDCR data, March 2006.) Further, the Legislative Analyst's Office shows that California budgeted approximately $700 million in 2005–2006 to incarcerate illegal immigrants who committed crimes in California. The state anticipated about $78.5 million from the federal government to partially offset this cost.

[9] Data on the place of birth for foreign-born residents are from CDCR and are current as of March 31, 2006. The share of foreign-born as of this date was the same as our share at year-end 2005 (17%).

[10] We define the San Joaquin Valley as Fresno, Kern, Kings, Madera, Merced, San Joaquin, Stanislaus, and Tulare Counties. The Inland Empire consists of Riverside and San Bernardino Counties. Alameda, Contra Costa, Marin, Napa, San Francisco, San Mateo, Santa Clara, and Solano Counties form the Bay Area. We define the South Coast as Orange and Ventura Counties.

[11] Information about prisoners' educational attainment comes from the authors' calculations of data from the 1997 Survey of Inmates in State and Federal Correctional Facilities (SISFCF), except where otherwise noted. Unfortunately, more recent data are not available. For comparison, the educational attainment of the general California adult population is based on 1997 *Current Population Survey* data.

[12] Information about parental status and living arrangements before incarceration is based on the California sample of the 1997 SISFCF data.

[13] For more information on the effects of incarceration on children, see Powell and Nolan (2003).

[14] Third-strikers who receive a life sentence are not part of the group we refer to as "lifers"—those serving a life sentence with or without the possibility of parole. These sentence types are mutually exclusive categories.

[15] http://www.corr.ca.gov/DivisionsBoards/AOAP/FactsFigures.html.

[16] http://www.cdcr.ca.gov/ReportsResearch/OffenderInfoServices/Monthly/TPOP1A/TPOP1Ad0605.pdf.

[17] Moreover, this 15-year period itself followed a decade of unprecedented—and since unmatched—growth in the prison population, attributed in large part to increased arrests and sentencing for violation of new drug laws, as well as to the use of determinate sentencing, which California adopted in 1977. Between 1980 and 1990, the California prison population quadrupled, from 24,165 to 96,794.

[18] Data for admissions and releases from the NCRP are currently available only through 2002.

[19] Authors' calculations using admissions data from California Department of Corrections and Rehabilitation (2005).

[20] The Legislative Analyst's Office estimates that, as of December 31, 2004, about 80,000 second-strikers have been sent to state prison since 1994 and approximately half of these have served their time and have been released. District attorneys have discretion to use three strikes sentence enhancements.

[21] Authors' calculations using 1997 SISFCF data.

[22] Authors' calculations using 1997 SISFCF data.

[23] Authors' calculations using 1997 SISFCF data.

24

CSAC/ 00048

Public Policy Institute *of* California

## *California Counts*                                                **Who's in Prison?**

# References

Aday, Ronald H., *Aging Prisoners: Crisis in American Corrections*, Praeger, Westport, Connecticut, 2003.

Alpert, G. P., J. M. MacDonald, and R. G. Dunham, "Police Suspicion and Discretionary Decision Making During Citizen Stops," *Criminology*, Vol. 43, No. 2, May 2005, pp. 407–434.

Austin, James, John Clark, Patricia Hardyman, and D. Alan Henry, "The Impact of 'Three Strikes and You're Out,'" *Punishment & Society*, Vol. 1, No. 2, October 1999, pp. 131–162.

Beckett, K., K. Nyrop, and L. Pfingst, "Race, Drugs, and Policing: Understanding Disparities in Drug Delivery Arrests," *Criminology*, Vol. 44, No. 1, February 2006, pp. 105–137.

Blau, Judith, and Peter Blau, "The Cost of Inequality: Metropolitan Structure and Violent Crime," *American Sociological Review*, Vol. 47, No. 1, February 1982.

Blumstein, Alfred, "On the Racial Disproportionality of United States' Prison Populations," *Journal of Criminal Law and Criminology*, Vol. 73, No. 3, Autumn 1982, pp. 1259–1281.

Blumstein, Alfred, "Racial Disproportionality of U.S. Prison Populations Revisited," *University of Colorado Law Review*, Vol. 64, 1993.

Blumstein, Alfred, Jacqueline Cohen, and David P. Farrington, "Criminal Career Research: Its Value for Criminology," *Criminology*, Vol. 26, 1988, pp. 1–35.

Blumstein, Alfred, Jacqueline Cohen, Jeffrey Roth, and Christy Visher, eds., *Criminal Careers and Career Criminals*, National Academy Press, Washington, D.C., 1986.

Blumstein, A., D. P. Farrington, and S. Moitra, "Delinquency Careers: Innocents, Desisters, and Persisters," *Crime and Justice*, Vol. 6, 1985, pp. 187–219.

Brown, Brian, and Greg Jolivette, *A Primer: Three Strikes—The Impact After More Than a Decade*, Legislative Analyst's Office, Sacramento, California, October 2005.

California Department of Corrections and Rehabilitation, Data Analysis Unit, Estimates and Statistical Analysis Section, Offender Information Services Branch, *Monthly Report of Population*, Sacramento, California, December 31, 2005.

California Department of Corrections and Rehabilitation, Offender Information Services, Estimates and Statistical Analysis Section, Data Analysis Unit, *California Prisoners and Parolees 2004*, Sacramento, California, 2005.

California Department of Justice et al., *Crime in California 2004*, 2004, available at http://ag.ca.gov/cjsc/publications/candd/cd04/cdintro.htm.

Federal Bureau of Investigation, "Age-Specific Arrest Rates and Race-Specific Arrest Rates for Selected Offenses, 1993–2001," Uniform Crime Reporting Program, Washington, D.C., 2003.

Fischer, Ryan, "Are California's Recidivism Rates Really the Highest in the Nation?" *UC Irvine Center for Evidence-Based Corrections Bulletin*, Vol. 1, No. 1, September 2005.

Free, Marvin D., "Race and Presentencing Decisions in the United States: A Summary and Critique of the Research," *Criminal Justice Review*, Vol. 27, No. 2, 2002.

Gottfredson, Michael R., and Travis Hirschi, *A General Theory of Crime*, Stanford University Press, Palo Alto, California, 1990.

Governor's Budget, 2006–2007, available at http://www.ebudget.ca.gov/BudgetSummary/ImagePages/SUM-06.html.

Greene, Susan, Craig Haney, and Aida Hurtado, "Cycles of Pain: Risk Factors in the Lives of Incarcerated Mothers and Their Children," *The Prison Journal*, Vol. 80, No. 1, March 2000, pp. 3–23.

Greenwood, P. W., et al., "Estimating Benefits and Costs of Calculating New Mandatory-Minimum-Sentencing Law," in David Schichor and Dale K. Sechrest, eds., *Three Strikes and You're Out: Vengeance as Public Policy*, Sage, Thousand Oaks, California, 1996.

Harrison, Paige, and Allen Beck, "Prisoners in 2004," *Bureau of Justice Statistics Bulletin*, October 2005.

Longshore, Douglas, Angela Hawken, Darren Urada, and M. Douglas Anglin, *SACPA Cost Analysis Report (First and Second Years)*, prepared by UCLA Integrated Substance Abuse Programs, Los Angeles, California, March 2006.

Marquart, James W., et al., "A Limited Capacity to Treat: Examining the Effects of Prison Population Control Strategies on Prison Education Programs," *Crime & Delinquency*, Vol. 40, No. 4, October 1994, pp. 516–531.

Marvell, Thomas B., and Carlisle E. Moody, "The Lethal Effects of Three-Strikes Laws," *The Journal of Legal Studies*, Vol. 30, No. 1, January 2001, pp. 89–106.

Nuttall, John, Linda Hollmen, and E. Michele Staley, "The Effect of Earning a GED on Recidivism Rates," *The Journal of Correctional Education*, Vol. 54, No. 3, September 2003, pp. 90–94.

Petersilia, Joan, "Challenges of Prisoner Reentry and Parole in California," *California Policy Research Center Brief*, Vol. 12, No. 3, June 2000.

Pettit, Becky, and Bruce Western, "Mass Imprisonment and the Life Course: Race and Class Inequality in U.S. Incarceration," *American Sociological Review*, Vol. 69, April 2004, pp. 151–169.

Powell, Anne, and Clare Nolan, *California State Prisoners with Children: Findings from the 1997 Survey of Inmates in State and Federal Correctional Facilities*, California Research Bureau, Sacramento, California, November 2003.

Reed, Deborah, "Educational Resources and Outcomes in California, by Race and Ethnicity," *California Counts*, Vol. 6, No. 3, February 2005.

Reed, Deborah, "Poverty in California: Moving Beyond the Federal Measure," *California Counts*, Vol. 7, No. 4, May 2006.

25

CSAC/ 00049

Public Policy Institute *of* California

*California Counts*                                                   **Who's in Prison?**

Ruiz, Juan D., et al., "Prevalence of HIV Infection, Sexually Transmitted Diseases, Hepatitis, and Risk Behaviors Among Inmates Entering Prison at the California Department of Corrections, 1999," California Department of Health Services, Prevention Services, Office of AIDS, HIV/AIDS Epidemiology Branch, Sacramento, California, 2001.

Sabol, William J., Katherine Rosich, Kamala Mallik Kane, David P. Kirk, and Glenn Dubin, *The Influences of Truth-in-Sentencing Reforms on Changes in States' Sentencing Practices and Prison Populations*, Report to the National Institute of Justice, Urban Institute, Justice Policy Center, Research Report, Washington, D.C., April 2002.

Schichor, David, and Dale K. Sechrest, eds., *Three Strikes and You're Out: Vengeance as Public Policy*, Sage, Thousand Oaks, California, 1996.

Schmertmann, Carl P., Adansi A. Amankwaa, and Robert D. Long, "Three Strikes and You're Out: Demographic Analysis of Mandatory Prison Sentencing," *Demography*, Vol. 35, No. 4, November 1998, pp. 445–463.

Simpson, S. S., "Caste, Class, and Violent Crime—Explaining Difference in Female Offending," *Criminology*, Vol. 29, No. 1, February 1991, pp. 115–135.

Sorensen, Jon, and Don Stemen, "The Effect of State Sentencing Policies on Incarceration Rates," *Crime & Delinquency*, Vol. 48, No. 3, July 2002, pp. 456–475.

Taxman, F., J. M. Byrne, and A. Pattavina, "Racial Disparity and the Legitimacy of the Criminal Justice System: Exploring Consequences for Deterrence," *Journal of Health Care for the Poor and Underserved*, Vol. 16, No. 4, Suppl. B, November 2005, pp. 57–77.

Vacca, James, "Educated Prisoners Are Less Likely to Return to Prison," *The Journal of Correctional Education*, Vol. 55, No. 4, December 2004, pp. 297–305.

Wacquant, Loïc, "From Slavery to Mass Incarceration," *New Left Review*, Vol. 13, January–February 2002.

Zimring, Franklin, Gordon Hawkins, and Sam Kamin, *Punishment and Democracy: Three Strikes and You're Out in California*, Oxford University Press, New York, New York, 2001.

CSAC/ 00050

Public Policy Institute of California

## California Counts

Who's in Prison?

### Board of Directors

*Thomas C. Sutton, Chair*
Chairman and Chief Executive Officer
Pacific Life Insurance Company

*Linda Griego*
President and Chief Executive Officer
Griego Enterprises, Inc.

*Edward K. Hamilton*
Chairman
Hamilton, Rabinovitz & Alschuler, Inc.

*Gary K. Hart*
Founder
Institute for Education Reform
California State University, Sacramento

*Walter B. Hewlett*
Director
Center for Computer Assisted
Research in the Humanities

*David W. Lyon*
President and Chief Executive Officer
Public Policy Institute of California

*Cheryl White Mason*
Vice-President Litigation
Legal Department
Hospital Corporation of America

*Ki Suh Park*
Design and Managing Partner
Gruen Associates

*Constance L. Rice*
Co-Director
The Advancement Project

*Raymond L. Watson*
Vice Chairman of the Board Emeritus
The Irvine Company

*Carol Whiteside*
President
Great Valley Center

ISSN #1554-401X

The Public Policy Institute of California is a private, nonprofit research organization established in 1994 with an endowment from William R. Hewlett. The Institute conducts independent, objective, nonpartisan research on the economic, social, and political issues affecting Californians. The Institute's goal is to raise public awareness of these issues and give elected representatives and other public officials in California a more informed basis for developing policies and programs. PPIC does not take or support positions on any ballot measure or on any local, state, or federal legislation, nor does it endorse, support, or oppose any political parties or candidates for public office.

PUBLIC POLICY INSTITUTE OF CALIFORNIA
500 Washington Street, Suite 800 • San Francisco, California 94111
Telephone: (415) 291-4400 • Fax: (415) 291-4401 • www.ppic.org

27

CSAC/ 00051

Public Policy Institute *of* California

## California Counts

**Who's in Prison?**

Recent issues of

# *California Counts*

## POPULATION TRENDS AND PROFILES

Poverty in California: Moving Beyond the Federal Measure

Time to Work: Commuting Times and Modes of Transportation of California Workers

California's Inland Empire: The Leading Edge of Southern California Growth

California's Newest Homeowners: Affording the Unaffordable

Second-Generation Immigrants in California

Educational Resources and Outcomes in California, by Race and Ethnicity

Women, Work, and Family in California

## are available free of charge on PPIC's website
## www.ppic.org

PUBLIC POLICY INSTITUTE OF CALIFORNIA
500 Washington Street, Suite 800
San Francisco, California 94111



NON-PROFIT ORG.
U.S. POSTAGE
**PAID**
BRISBANE, CA
PERMIT #83

**In This Issue**

**California's
Changing Prison
Population**

CSAC/ 00052

# EXHIBIT C

# TO EXPERT REPORT OF PAUL McINTOSH

# *DO THE CRIME,*
# *DO THE TIME?*

# *MAYBE NOT,*
# *IN CALIFORNIA*



### *JAIL CELL SHORTAGE IS*
### *UPSETTING THE BALANCE*

*CALIFORNIA STATE SHERIFFS' ASSOCIATION*
*JUNE 2006*

CSAC/ 00053

# CALIFORNIA STATE SHERIFFS' ASSOCIATION
### Board of Directors
### 2006-2007
### OFFICERS

| | |
|---|---|
| **PRESIDENT** | **Sheriff Gary Penrod**<br>San Bernardino County |
| **1st VICE PRESIDENT** | **Sheriff Laurie Smith**<br>Santa Clara County |
| **2nd VICE PRESIDENT** | **Sheriff Ed Bonner**<br>Placer County |
| **SECRETARY** | **Sheriff Clay Parker**<br>Tehama County |
| **TREASURER** | **Sheriff Curtis Hill**<br>San Benito County |
| **SERGEANT-AT-ARMS** | **Sheriff Mark Pazin**<br>Merced County |
| **SERGEANT-AT-ARMS, EMERITUS** | **Al Cooper** |
| **IMMEDIATE PAST PRESIDENT** | **Sheriff Bill Kolender**<br>San Diego County |

### DIRECTORS

| | |
|---|---|
| Sheriff Lou Blanas | Sacramento County |
| Sheriff Bob Brooks | Ventura County |
| Sheriff Mike Carona | Orange County |
| Sheriff Jim Denney | Sutter County |
| Sheriff Bob Doyle | Riverside County |
| Sheriff Don Horsley | San Mateo County |
| Sheriff Mike Kanalakis | Monterey County |
| Sheriff Dan Paranick | Mono County |
| Sheriff Mike Prizmich | Amador County |
| Sheriff Gary Simpson | Napa County |

### PRESIDENTS' COUNSEL

| | |
|---|---|
| Sheriff Robert Doyle<br><small>Past President</small> | Marin County |
| Sheriff Bruce Mix<br><small>Past President</small> | Modoc County |
| Sheriff Charles Plummer<br><small>Past President</small> | Alameda County |
| Sheriff Warren Rupf<br><small>Past President</small> | Contra Costa County |

### CSSA Detention Facility Ad Hoc Committee Members
Chair, Sheriff Jim Anderson – Santa Barbara County
Members
Sheriff Ed Bonner – Placer County
Sheriff Mike Carona – Orange County
Sheriff Mark Pazin – Merced County
Sheriff Mike Prizmich – Amador County
Sheriff Mack Wimbish – Kern County

CSAC/ 00054

# *ACKNOWLEDGEMENTS*

*The California State Sheriffs Association deeply appreciates the efforts of those who have developed and reviewed this document. Having conceptualized the need to explain California's crisis in jail capacity, CSSA sought out knowledgeable resources to help bring the concept to life.*

*The research and writing of this document were the work of Suzie Cohen & Associates. CSSA thanks principal consultant / author Suzie Cohen and research director John W. Kohls, Ph.D., for producing a comprehensive, accurate and readable description of the state of California's local detention systems.*

*I also wish to thank the Correctional Standards Authority (CSA) for providing data and statistical information as well as reviewing the draft document for accuracy.*

*Also, a special thank you to Cathy Coyne, CSSA's legislative analyst, who invested innumerable hours reviewing and editing this report.*


*Steven C. Szalay*
*Executive Director*
*June 2006*

CSAC/ 00055

# *TABLE OF CONTENTS*

|  | Page |
|---|---|
| *Executive Summary* | v |
| *Introduction* | 1 |
| *Background* | 2 |
| *Legislators and Judges Determine Who Gets Locked Up* | |
| *Who Is In Local Detention* | 4 |
| *Jails* | |
| *Juvenile Facilities* | |
| *Mentally Ill Offenders* | |
| *State and Federal Inmates* | |
| *Capacity vs. Need* | 11 |
| *Jails* | |
| *Population Growth Drives Need for Expansion* | |
| *Additional Factors Affecting Capacity* | |
| *No Room for Sentenced Inmates* | |
| *Population Caps* | |
| *Alternatives To Incarceration* | |
| *Juvenile Facilities* | |
| *Facility Design as a Function of Efficiency* | 22 |
| *Existing Facilities Need Updating* | |
| *Program Space* | |
| *Multiple Populations* | |
| *Special Needs* | |
| *Age of Existing Facilities vs. Functional Life Expectancy* | |
| *Costs* | 26 |
| *Construction costs* | |
| *Tentative Cost Projections For Jail Construction* | |
| *Operating Costs* | |
| *Jails* | |
| *Juvenile Facilities* | |
| *Where Will, Can or Should the Money Come From* | |
| *What Has Been Done to Address Capacity Deficits* | 30 |
| *Jail Construction and Renovation* | |

iii

*Juvenile Facility Construction and Renovation*

*Next Steps* ........................................................................................    *32*

*Appendix I Local Detention Population Overview -- Adult and Juvenile*

*Appendix II Counties with Court Imposed Population Caps*

iv

CSAC/ 00057

# *EXECUTIVE SUMMARY*

*"If you can't do the time, don't do the crime"* is no longer in effect in California. Our public safety system is increasingly unable to effectively meet its mandate to hold criminals accountable for their actions.

Local detention facilities - adult jails and juvenile halls and camps - are the crucial front end of California's correctional system. They're a vital part of every community's effort to protect itself. Without them, community safety disappears. There is no detention of the accused. There is no local programming of the convicted. Law enforcement, probation and parole lose a key consequence to impose for illegal behavior. That's just unacceptable!

In California's local adult system, jail facilities are bursting at the seams. Twelve percent of our jails are more than 60 years old, and nearly half are 30 years old or older. Dangerous crowding is a daily fact of life in many of the state's 460 jails. Simply put, California does not have enough local detention capacity or adequate program space to meet public safety demands.

The consequence is that, in 2005 statewide, *9,148 offenders a month* were given pretrial releases and an additional *9,323 inmates a month* were released early from their jail sentences due solely to lack of jail space.

## The Facts

There are state and federal standards, rules and regulations determining how many people can be housed in each jail and/or cell. When those standards aren't met, inmates sue. In 20 California counties, those suits have resulted in court-ordered population caps. An additional dozen counties have imposed population caps on themselves to avoid the costly litigation that results from crowding. These population caps mean that, when a jail is full, for every new inmate being admitted, someone already in custody has to be released.

In 2005, statewide bookings per month reached a ten-year high -- 106,941 per month (up from 97,589 in 1995).

There are 74,686 rated capacity (RC) jail beds in the state and, in 2005, the average daily population (ADP) of jails was 79,639 inmates -- the highest yearly ADP in history! It would take an additional 4,953 beds to house all the inmates in today's ADP.

The highest one-day jail population count statewide, in 2005, was 87,500 inmates. This means that, with current capacity, during times of peak demand for jail space, the state is short at least 12,800 jail beds.

v

CSAC/ 00058

In 2005, 233,388 individuals *avoided incarceration or were released early from jail sentences due solely to lack of jail space.* It would take 18,471 additional beds to eliminate these pre-trial and early releases.

There are over 285,000 unserved felony warrants and over 2,391,000 unserved misdemeanor warrants in California annually. If only 10% of the felony warrants resulted in someone being incarcerated, another 28,522 beds would be needed to house these felons.

Jails are required to separate the many classifications comprising their populations.    Pre-adjudicated offenders have to be separated from sentenced, juveniles from adults, civil commitments from criminals, females from males, gang members from members of rival gangs, and violent offenders from those they might prey upon. Additionally, those who are physically or mentally ill must be provided appropriate housing.    Jails are supposed to maintain a "vacancy factor" to allow for these classification separations.    At the current ADP, to maintain a 5% vacancy factor for management and classification purposes jails would require 4,000 additional beds.

This is the current state of our jails.  These deficits exist today.  California is short 66,385 jail beds statewide right now to meet current public safety demands.

Looking to the future, California's inexorable population growth will require 40,943 *new* beds by 2050 to address population growth alone.

These beds would not eliminate early releases or unserved warrants or allow for a vacancy factor. To deal with those existing deficits and achieve a fully functioning jail system by the year 2050, the state would need to add 217,300 jail beds.

In its local juvenile detention system, on any given day California's 125 juvenile halls and camps house between 10,000 and 11,000 youth -- 10,920 per day in 2005. Most of these youth (58.6%) are confined on a court-ordered commitment; the rest are going through the court process.

By the end of 2005, there were a total of 13,575 beds in California's local juvenile facilities.    Of these, 8,182 beds were in juvenile halls and 5,393 were in local commitment facilities (camps).

While local juvenile facility capacity is in better shape than it had been (in 1999 the ADP exceeded rated capacity by 400 juveniles), it is still true that, especially in juvenile halls, juvenile capacity is *merely* adequate.  On peak population days in the final quarter of 2005, the number of juvenile hall rated capacity beds statewide (8,181) exceeded incarcerated populations (7,560) by only 621 beds.

Like adult detention facilities, juvenile halls require at least a 5% vacancy factor to appropriately manage their populations. On peak days it would take only 243 additional juvenile detainees statewide to drive bed need up to the level of optimum capacity.

CSAC/ 00059

In other words, a small increase in the rate of juvenile offending or the number of juveniles in the at-risk population, or both, will produce a deficit in juvenile hall beds.

Juvenile correctional reforms under discussion in the Legislature could make significant new demands on local capacity. Whether or not those changes come to fruition, it is quite certain that, at the conclusion of the current juvenile facility construction program, there will still be counties that need to replace old, outmoded facilities and others that will continue to face chronic crowding problems in their juvenile facilities.

The Chief Probation Officers of California (CPOC) predict a need for approximately 6,800 additional local juvenile detention and commitment beds by 2015. An upward trend in the juvenile crime rate, changes in correctional policy or new legislative initiatives could greatly expand that number.

## Alternatives to Incarceration

Not only do local corrections agencies need more facility capacity, they also need additional ways to ensure communities' public safety. While existing alternatives to incarceration help relieve some of the pressure of crowding, they are not appropriate for everyone. Moreover they are often circumvented by inmates because those programs would be longer -- as well as harder -- to complete than jail time.

Research and best practices show significant success with correctional day reporting centers (DRCs). DRCs provide all or partial day custody along with intensive treatment, counseling, life skills, vocational readiness and educational remediation services that effectively reduce recidivism and link offenders to positive support in their communities. Sheriffs and chief probation officers across California are investigating these proven alternatives to incarceration because day reporting centers allow them to actively supervise lower-risk, non-violent offenders while freeing up jail space for the high risk offenders who should be housed and programmed in the more secure jail environment.

## What Does All This Mean?

One obvious conclusion is that jails must have added space to house pre-adjudicated inmates and the most dangerous sentenced offenders for the full term of their court-ordered sentences.

Jails also have to be able to provide the behavioral and educational programs, counseling and other treatments that will interrupt jail inmates' criminal careers and help correct their offending behavior.

In addition jails need still more beds to address the growing demand for specialized housing for medically or mentally ill offenders and other special populations.

The Legislature and taxpayers statewide must keep the already tenuous condition of California's jails from becoming much worse. We have to keep the already dramatic bed-and-program-space deficit from becoming a public safety disaster.

CSAC/ 00060

In order to do that, California:

- must construct a large number of additional jail beds,

- must be prepared to add juvenile facility capacity,

- must renovate and retrofit existing jails and older juvenile facilities to continue their useful lives,

- must have space in all local detention facilities in which to provide the behavioral and educational programs, counseling and other treatments that interrupt offenders' criminal careers and help correct their offending behavior,

- must have space in which to address the growing demand for specialized housing for medically or mentally ill offenders and other special populations, and

- must develop additional, viable, proven alternatives to incarceration as well as alternative kinds of facilities to most safely and cost effectively manage offender populations.

This study's best estimate is that it will cost nearly five billion dollars ($4,913,160,000) between now and 2050 to construct just the new jail space needed to stay abreast of California's projected population growth. Significantly more dollars will be required to deal with early releases and unserved warrants, renovate and upgrade existing facilities, address juvenile facility needs, and create viable alternative interventions.

We won't be able to do all this work -- and won't need all this money -- at once. What we do need is a plan, the will to put the plan into action, and a consistent funding stream aligned with the steady growth in the demand for detention capacity.

We need to switch to a proactive 'continuous growth' model for jail and juvenile facility construction and abandon the 'periodic crisis' model that produces the kinds of deficits in which we now find ourselves.

No sheriff, no jail commander, no chief probation officer wants to release people from custody before their time is served or before they appear in court. Doing so means offenders are not held accountable and public safety is compromised.

We must restore the balance between 'doing the crime' and 'doing the time.' That balance is vital to holding offenders accountable for their criminal behavior.

We can't afford to ignore this problem. Jails and juvenile halls are critical components of the state's justice system. We Californians must ensure they have adequate capacity to do their jobs. Our safety and quality of life depend on it.

CSAC/ 00061

# *INTRODUCTION*

Infrastructure is the underpinning of life in California. The quality of life in every community is built on the physical environment in concert with the community's health, education and safety.

Land use; clean air; clean water; dams, dikes and levies; roads, streets and transit; parks and libraries; schools and hospitals; courts and correctional facilities -- all critical -- and all interrelated. The idyllic community doesn't stay idyllic if asbestos is poisoning its children. The high priced neighborhood doesn't hold its property values if crime runs rampant in and around it.

Public safety is in everybody's interest. Public safety is everybody's business. Public safety comes from public and private interaction and takes a complex mix of planning, precaution, vigilance, caring, compassion, enforcement and accountability for a community to be and to stay safe.

There is no one way to guarantee a community's safety, but there are plenty of ways to undermine it. Not planning, not preparing, not taking care of the infrastructure of the community are sure to undercut safety and quality of life.

Why should you care about jails? What do they have to do with you?

- Jails are paid for by taxpayer dollars. Every taxpayer is a part-owner in local detention facilities.
- Jails and juvenile facilities reflect the community's interest in being safe by getting dangerous law breakers off the streets.
- Every person in jail or juvenile hall before or during trial and found not guilty comes home to the community reflecting his/her experience in jail.
- Every person sentenced to a jail or local juvenile facility comes back to the community within a year.

Public safety is everyone's business. Supporting improvements for jails is not some kind of 'gift' to inmates in the jails. It is a benefit for law-abiding citizens. Holding people accountable for their actions as well as providing resources to ready them for their eventual release back to the community is in our best interest. We should all be local corrections advocates.

The California State Sheriff's Association is committed to taking the lead in advocating for enough properly designed, efficiently operated jails and local juvenile facilities to correct the existing deficit and keep up with California's population growth of 5 to 10 million people every decade. We want every Californian to be safe to enjoy the best of life in the Golden State.

In this report, we show that support for local corrections facilities is in all of our interest.

1

CSAC/ 00062

# *BACKGROUND*

Some facts to consider:

- Cities and counties operate 335 booking and short term holding jails (they can detain offenders for no longer than 96 hours).
- Over 327,000 people are booked into these jails annually.[1]
- Sheriffs run 125 jails that house arrestees awaiting and going through the court process and serving court-ordered jail time. -- Type II, III and IV jails.
- These jails booked over 1,283,290 adults (an average of 106,941 per month) in 2005.[2]
- County probation departments operate 125 local juvenile halls and commitment facilities.
- In 2005, 108,560 juveniles were booked into these juvenile halls (an average of 9,046 per month).[3]
- During 2005, local detention facilities delivered detention and correctional services to an average daily population of 79,639 pre-adjudicated and sentenced adult offenders and 10,923 pre-adjudicated and committed juvenile offenders.[4]

While adult and juvenile offenders found guilty of committing the most egregious offenses and those with the most entrenched criminal histories are generally remanded to state-level adult and juvenile correctional facilities (prisons), each of these offenders spends time in a local detention facility before being transferred to the California Department of Corrections and Rehabilitation (CDCR).

Public safety demands that California's jails and local juvenile facilities be able to safely and securely house and program every kind of detainee, from the first-time arrestee through the most violent repeat criminal.

### *Legislators and Judges Determine Who Gets Locked Up*

Local detention facilities do not determine their own populations. The administrators of these facilities have nothing to say about which offenders or how many come to them. Legislators pass the laws that say who should be locked up. Judges sentence people convicted of breaking those laws. Jails and juvenile facilities take those who are sent their way and seek to manage these offenders as safely and effectively as possible.

Every time the Legislature passes a bill creating a new crime or a sentence enhancement, it affects local corrections.

---

[1] Corrections Standards Authority/Board of Corrections, 2004 Legislative Report, *Local Corrections in California*, pg. 8
[2] Corrections Standards Authority Jail Profile Survey  Fourth Quarter 2005
[3] Corrections Standards Authority Juvenile Detention Profile Survey, Fourth Quarter 2005
[4] Corrections Standards Authority Jail Profile and Juvenile Detention Profile Surveys 2005

CSAC/ 00063

Every time a Board of Supervisors or City Council enacts an ordinance requiring a curfew or a ban on particular behaviors, it is affecting local corrections.

Often these policy and legislative decisions are made without the slightest consideration for their correctional implications. And, just as often, the desired public safety benefit of the law or ordinance or policy is thwarted because there is no more room in the local jail or juvenile facility for those who break these new rules.

One only has to note that there are more than 2.67 million unserved arrest warrants extant in California today to understand the dilemma. Jails don't have enough room for the offenders they have and can't simply manufacture the space to house more.

Here is an example of the effect a legislative action can have on local correctional populations. In 1997, the Legislature began providing counties with a fiscal incentive to treat criminally delinquent minors locally versus incurring a "sliding scale fee" for committing those offenders to the California Youth Authority. Since then, local juvenile facilities' populations have increased dramatically, not only in response to the "sliding scale," but also because some courts have increased their use of "juvenile halls as commitment facilities for certain minors deemed to need secure care, as well as education, treatment and program opportunities that can best be provided locally with the participation of family members."[5]

Ongoing legislative consideration of the possibility of transferring responsibility for state parolees (adults and/or juveniles) to the local level is driving counties to explore strategies for expanding their correctional capacity, as well as their service delivery networks and partnerships. With just a stroke of the pen, the Legislature and Governor would have a profound and enormous impact on local jails and juvenile facilities.

---

[5] Corrections Standards Authority/Board of Corrections, 2004 Legislative Report, pgs. 22-23

CSAC/ 00064

# WHO IS IN LOCAL DETENTION?

### Jails

There are *79,630 people in county jails every day*. Eighty-seven (87) percent are male and most are adults. Although a large number of offenders are sentenced to county jails, space limitations have forced counties to put many of these sentenced offenders in alternatives to confinement or simply to release them before the end of their sentences. As a result, the majority of people in jail (67 percent) are pre-sentenced, i.e., arrestees and those going through the court process.

It has become harder to keep sentenced offenders in jail as sheriffs have had to devote more and more of their severely limited jail capacity to pre-adjudicated offenders. Communities need their jails to be able to carry out the sentences of the court, not release offenders before their sentences are over.

In 2005, more than three-quarters (78 percent) of jail prisoners were in custody for felony offenses. More than 24,760 of these inmates (30 percent) required maximum security housing. Eleven (11) percent of jail inmates were illegal/criminal aliens.

People who come to jail have a variety of medical and mental health issues. Many are indigent or homeless, without access to medical care. Many use and abuse drugs. Jails do their best to address these issues through the current stock of 1,002 medical treatment beds and 3,095 mental health treatment beds, as well as through in-house programming and treatment services and in liaison with community providers. But again, much more is needed.

Nearly every jail in the state needs more treatment and program space and professional support to appropriately work with the people in custody.

### Juvenile Facilities

On any given day, between 10,000 and 11,000 of California's youth are in custody in local juveniles halls and camps around the state -- 10,920 a day in 2005. Most (58.6 percent) are confined on a court-ordered commitment; the rest are going through the court process.

Among the young people in custody, the typical detainee is male (85 percent) between 15 and 17 years old (77 percent). Two out of three are in custody for felony charges and an average of one out of every twelve youth booked each month (8.7 percent) has been arrested on a weapons-related charge.

Assessments of juvenile detainees generally reveal a picture of troubled youth with multiple problems, including substance abuse (77 percent) and serious mental health

CSAC/ 00065

issues (42 percent).[6]   Among the juveniles in local custody in 2005, 3,400 were receiving treatment for open mental health cases and 1,219 required and were receiving psychotropic medications.[7]

### Mentally Ill Offenders

Jails and juvenile detention facilities across the nation have seen dramatic increases in the number detainees who are mentally ill. Many of these offenders also have drug and alcohol-related diagnoses that exacerbate their mental illness.

Studies repeatedly confirm that a growing number of jail inmates suffer from severe mental illness and that schizophrenia, major depression, bipolar disorder and other mental illnesses often result in impaired judgment and criminal behavior.

Nationally it is estimated that at least 16 percent of jail inmates are mentally ill. This translates into more than 12,000 seriously mentally ill inmates in California's jails.

According to the Pacific Research Institute, California's annual jail and probation costs for mentally ill offenders exceed $300 million a year.[8]

Mental illness impacts not only the affected individuals and their families, but also local corrections and society as a whole. In a costly cycle of incarceration, release and re-incarceration, mentally ill people come to jails and local juvenile facilities time and time again for crimes that grow out of their mental illness.

At the urging of the California State Sheriff's Association, in 1998 the Legislature established the Mentally Ill Offender Crime Reduction Grant (MIOCRG) program in response to the concern that jails are among the primary (or only) treatment facilities for an increasing number of mentally ill adults. The MIOCRG program, which ran from 1998/99 through 2003/04, tested, determined and documented 'what works' in reducing recidivism among mentally ill offenders.

Thirty projects in 26 counties, involving more than 8,000 adult offenders, produced a wealth of evidence about what works. All of the following were shown to have a positive effect, reducing re-arrests and returns to custody.

- Enhanced assessment and more comprehensive understanding of therapeutic needs in jail;
- The provision of quick and reliable services designed to ameliorate the effects of mental illness while in custody;

---

[6] CPOC Needs Assessment reference to 2003 National Council on Crime and Delinquency (NCCD) survey of mental health needs of youth in local detention
[7] See Appendix 1 for tables providing an overview of the size and characteristics of the local jail and juvenile facility populations and comparing current populations with those in local detention in the year 2000.
[8] California Board of Corrections, Mentally Ill Offender Crime Reduction Grant Program report to the Legislature, December 2004, page 2

5

CSAC/ 00066

- More complete after-jail systems of care designed to ensure adequate treatment and support; and
- After-release monitoring to ensure that additional illegal behavior, mental deterioration, and other areas of concern were quickly addressed.

MIOCRG participants were booked less often, were convicted less often and were convicted of less serious offenses when they were convicted than were those not in the program. Fewer participants than offenders in the comparison group served time in jail and, when they did serve time, they were in jail for fewer days than non-program inmates.

Program participants learned to comply with medication regimens, stay sober, return to school, find jobs, manage their money, and in some cases live independently and/or reunite with their families.

The MIOCRG Program reduced many participants' involvement in the criminal justice and acute-care hospitalization systems and provided the opportunity -- for some, the first ever - to maintain crime-and-drug-free lives in the community.[9]

That's the good news -- very good news indeed. Jails, mental health agencies and communities learned what worked. They came together and made a real difference in the quality of life and public safety in their communities.

> [In Santa Clara County's Mental Health Court] all are mentally ill, some so severely that they bring their "voices" to court. Many have been bouncing for years from court to jail to treatment and then, back to jail.
> The goal here is to break the cycle by stabilizing their lives.
>
> Sacramento Bee
> May 15, 2006

The not so good part is two-fold. First, when the MIOCRG Program grants ended, counties were forced to discontinue key program elements for lack of ongoing funding. Some of the Mental Health Courts and after-jail support could not be sustained with existing resources. Increasing jail crowding meant jails were hard pressed to continue housing mentally ill inmates in separate treatment units, and budget problems meant mental health agencies had to pull back the grant-funded intensive counseling they had been providing in jails. Having learned what worked made it all the more disheartening not to be able to sustain the hard won victories. However, as this report goes to press, CSSA and other organizations have convinced the Governor and legislature to appropriate $45 million for a MIOCRG II Program for FY 2006-07.

The second downside is that, despite a groundswell of evidence that it was and still is needed, there has been no comparable effort to test or implement strategies related to mentally ill *juvenile* offenders. Although a 2003 NCCD survey of mental health care in California's local juvenile justice system showed that at least 42 percent of youth in detention had "serious mental health issues" and 30 of the 45 counties surveyed reported they did not have an appropriate selection of services available for youth with

---

[9] op. cit., pages 15 - 56

6

CSAC/ 00067

mental health issues,[10] the state has not yet initiated a juvenile mentally ill offenders crime reduction effort.

Mirroring the NCCD survey, a preliminary juvenile justice gap analysis report, provided to the Legislature on December 1, 2005, found that

> ...mental health issues (including treatment, facilities, staff and appropriate jurisdiction) comprised the single most critical gap in juvenile justice services. It was clear from the frequency with which they were identified, and the priority ranking accorded them that gaps in mental health services are a primary concern. Without exception, every county -- large, medium or small, from Imperial to Del Norte and including large Los Angeles County, small Trinity County, and every other county in between -- described mental health service capacity related to either at risk youth, juvenile offenders or most frequently both, as a significant, if not their most significant, gap.[11]

That gap analysis and CPOC's juvenile facility needs assessment found that the most common unmet need was locked facilities for seriously mentally ill youth.

Counties may have no options but to build and operate the needed secure detention/ treatment facilities themselves. In a 2006 Needs Assessment study, the Chief Probation Officers of California (CPOC) estimate that county probation departments will require 6,800 juvenile detention and commitment beds by 2015 and 3,400 of those should be targeted for mental health and drug abuse treatment.[12] They will need the state's help to get that done.

### State and Federal Inmates

County and city jails in California work with the state and federal governments to house prisoners under certain circumstances.

The state and/or federal prison systems sometimes ask local jails to house certain of their inmates for a period of time for 'protective custody' or while the prisoner is going through a court or parole violator proceeding. There are also more formal, contract arrangements by which local jails provide housing to state and/or federal sentenced inmates to help relieve pressure on the state / federal system and/or to address other public safety demands.

In calendar 2005, the California Department of Corrections and Rehabilitation (CDCR) contracted with 15 counties and two cities (Oakland and Santa Ana) for a total of 29,435

---

[10] Hartney, C., McKinney, T., Eidlitz, L. and Craine, J. NCCD Focus: A Survey of Mental Health Care Delivery to Youth in the California Juvenile Justice System: Summary of Findings, September 2003
[11] CDCR, Division of Juvenile Justice, Juvenile Justice Reform Second Quarterly Report to the Legislature, December 2005, page 2
[12] Chief Probation Officers of California, Facilities Needs Survey, February 2006 (47 counties reporting representing 89% of the state population)

CSAC/ 00068

jail bed days, approximately 2,453 jail bed days per month or 80 jail beds per day statewide.[13] The local jails housing state inmates were:

| State Contract Inmate Days in 2005 | | | | |
|---|---|---|---|---|
| Jurisdiction | Inmate Days | | Jurisdiction | Inmate Days |
| Alameda | 6,469 | | Sacramento | 4,955 |
| Del Norte | 116 | | San Benito | 31 |
| Fresno | 729 | | San Diego (Wk. Furl.) | 424 |
| Imperial | 344 | | San Mateo | 443 |
| Kern | 244 | | Santa Ana P.D. | 95 |
| Los Angeles | 14,934 | | Tulare | 211 |
| Madera | 160 | | Yolo | 149 |
| Napa | 28 | | Yuba | 72 |
| Oakland P.D. | 26 | | | |
| Total State Contract Days | | | | 29,430 |

Obviously, the great majority of contracted beds were in the Los Angeles, Alameda and Sacramento County jail systems. Note that, of the counties contracting to hold state prisoners, only three -- Fresno, Kern and Los Angeles -- are operating under court imposed population caps.

In the 2004/05 federal fiscal year (from October 2004 through September 2005), California jails in 18 counties and two cities (Oakland and Santa Ana) held federal prisoners for a total of 43,297 jail bed days, approximately 3,608 jail bed days per month or 118 jail beds per day statewide.[14]

As indicated by the table on the following page, the majority of bed days used by the federal government were located, in descending order, in Los Angeles, San Bernardino, Sacramento, the Santa Ana (City) Police Department jail, Fresno, Alameda, Imperial, Kern, Yuba and San Diego Counties' jail systems. Immigration and Naturalization System (INS) use of local jail beds to detain illegal immigrants may account for the large number of bed days in such jurisdictions as Fresno, Imperial, Kern, Santa Ana, and San

---

[13] Corrections Standards Authority / Board of Corrections Jail Profile Survey, State Contracted Inmates 2004-2005
[14] Corrections Standards Authority / Board of Corrections Jail Profile Survey, Federal Beds 2004 - 05

CSAC/ 00069

Bernardino.  The presence of federal courthouses in Los Angeles, Alameda and Sacramento may explain the very high bed usage in those jurisdictions as well.

Note that, of the counties contracting to house federal inmates, five -- Fresno, Kern Los Angeles, San Bernardino and Yolo Counties -- are operating under court imposed population caps.

| Federal Contract Inmate Days in 2004-2005 | | | | |
|---|---|---|---|---|
| Jurisdiction | Inmate Days | | Jurisdiction | Inmate Days |
| Alameda | 3,846 | | Oakland P.D. | 408 |
| Fresno | 4,030 | | Sacramento | 5,195 |
| Humboldt | 2 | | San Bernardino | 6,781 |
| Imperial | 3,001 | | San Diego Wk. Furl. | 1,600 |
| Inyo | 192 | | San Mateo | 87 |
| Kern | 2,630 | | Santa Ana P.D. | 4,151 |
| Los Angeles | 8,680 | | Sutter | 8 |
| Madera | 9 | | Tulare | 347 |
| Marin | 186 | | Yolo | 154 |
| Napa | 0 | | Yuba | 2,180 |
| | | | Total Federal Contract Days | 43,487 |

The contracts by which local jails house state prisoners generate reimbursement in accordance with what is called the Daily Jail Rate (DJR).  The DJR is based on each jurisdiction's actual costs, does not include booking fees and is subject to specific guidelines.  The DJR had been $59/per day until recently; however, as part of the 2005 Budget Act, the daily rate has become $68.22 per inmate per day.  It is capped at 95 percent of the state's average cost for housing inmates in state facilities, excluding the cost of non-routine medical care.

While the DJR does not cover the full cost of supporting an inmate in local detention and although the state is often slow to make the contracted payments, contract arrangements have produced benefits to local detention facilities.  In some instances, contracts have enabled jails to make use of beds they could not otherwise afford to operate.  The contracts have provided the dollars necessary to pay for staff and programming for which county dollars were not available.  This inter-system cooperation has been a win/win with both the state and local jurisdictions benefiting.

9

CSAC/ 00070

However, this mutually beneficial relationship may be difficult to sustain. The relentless increases in the numbers of local offenders in jail -- and the resulting jail overcrowding -- may force counties to eliminate existing contracts, leaving the state and federal systems without needed beds and the counties without the vital revenue that has helped maintain jails and related services.

CSAC/ 00071

# CAPACITY VS. NEED

### Jails

California lacks sufficient local detention capacity and adequate program space to meet even the current, let alone future, public safety demands.   It has been 20 years since the last comprehensive jail construction bond program.

That effort was very successful, adding 42,000 much needed local jail beds.  However, since those beds were built in the 1980s, the state's population has ballooned.  Jail capacity has not kept pace.  In 1999, the State Board of Corrections projected a need for more than 55,000 additional jail beds. To date, only 6,150 new beds have been added since 1999.

Jails are bursting at the seams. Dangerous crowding is a daily fact of life in almost all of California's jails.  There are 74,686 rated capacity (RC) jail beds in the state.[15]  In 2005, jails' average daily population (ADP) was 79,639 inmates -- the highest yearly ADP in history!

> Jail officials say the average daily population at the [Sonoma County] jail has increased three times faster than the general population since 1990, chiefly because inmates are spending more time incarcerated and because many are repeat visitors.
>
> Sonoma County Press Democrat
> January 25, 2006

What the difference between rated capacity and average daily population means is that on the typical day, jails lacked space for more than 4,900 inmates.

Having 4,900 more inmates than available beds is a serious jail-capacity problem, but it is only the tip of the iceberg in terms of the overall capacity deficit.

The highest one-day population count statewide, in 2005, was right around 87,500 inmates.  This means that, under current conditions, during times of peak demand for jail space, the state is short at least 12,800 jail beds.

### Population Growth Drives Need for Expansion

Growth in the jail population is related directly to the growth in the general population. California's general population is projected to grow at a steady rate for at least the next half century.  It becomes very clear that we have a problem.  If we're going to maintain a statewide local detention system of adequate capacity and appropriate efficiency, we must pay attention to the growth in the general population and, with it, the at-risk population.

---

[15]   CSA data, current to April 2006

CSAC/ 00072

Look for example at tiny Calaveras County. Development already underway in its town of Copperopolis is slated to add 3,000 homes in the next three years and more than 40,000 in the next 30 years. The entire county's population was 45,939 in 2004; it is expected to be at least twice that 2030.[16]

The Calaveras County jail is one of the smallest in California. A court order limits the jail to holding 65 people each night - 56 men and nine women. The Sheriff says the County needs 100 beds now and 200 by 2020. [17] By 2050, Calaveras will need many more.

> *CROWDED HOUSE -- Lack of space at Calaveras County Jail results in hundreds of prisoners a year being released. Sometimes even violent felons are released.*
>
> *The Record*
> *November 13, 2005*

The State Department of Finance population projections, illustrated by the following graphic, results in about the straightest, most consistently upward-sloped line one will find in any social research. This steady and reliable growth in the general population makes it overwhelmingly clear that our current jail capacity shortfall can only get worse -- a lot worse -- and that is likely to happen very soon.



Coupling population growth projections with historical data regarding incarceration rates provides a striking picture of the inexorable increase in needed jail beds up to the year 2050.

CSA data indicates that, between the years 2000 and 2005, the incarceration rate has varied relatively little -- from 2,111 per 1,000,000 people in the general population to 2,224 per 1,000,000.

---

[16] "In Calaveras, development out leaps jumping frogs," Sacramento Bee, May 1, 2006
[17] "Crowded House: Lack of Space at Calaveras County Jail results in hundreds of prisoners a year being released," The Record, November 13, 2005

CSAC/ 00073

| Incarceration Rates: 2000 through 2005 | | | |
|------|------|------|------|
| Year | General Population | ADP | Incarceration Rate |
| 2000 | 33,871,648 | 75,340 | 0.002224 |
| 2001 | 34,441,561 | 73,824 | 0.002143 |
| 2002 | 35,088,671 | 75,156 | 0.002142 |
| 2003 | 35,691,442 | 75,340 | 0.002111 |
| 2004 | 36,271,091 | 76,939 | 0.002121 |
| 2005 | 36,810,358 | 79,639 | 0.002163 |

The most conservative estimate of future bed needs, (i.e., one that will most probably be on the low side) would make use of the lowest recent incarceration rate -- the .002111 that occurred in 2003. As shown in the table below, using this assumption, California will need 82,845 jail beds by the year 2010. By 2020, 92,565 beds will be needed, and by 2050, we will need 115,629 beds.[18]

| Projected Data: 2010 through 2050 | | | |
|------|------|------|------|
| Year | Projected General Population | Estimated Incarceration Rate | Projected ADP |
| 2010 | 39,246,767 | 0.002111 | 82,845 |
| 2020 | 43,851,741 | 0.002111 | 92,565 |
| 2030 | 48,110,671 | 0.002111 | 101,555 |
| 2040 | 51,538,596 | 0.002111 | 108,791 |
| 2050 | 54,777,700 | 0.002111 | 115,629 |

In other words, 40,943 new beds will be needed by 2050 (i.e., projected bed need of 115,629 minus the 2005 rated capacity of 74,686 = 40,943 beds), under the most conservative circumstances.

These projections are based on the following, *very conservative*, assumptions.

- There will be no increase in the incarceration rate.

---

[18] Based on California Department of Finance (DOF) population projections

13

CSAC/ 00074

- The projections relate to the ADP and not peak demand which in 2005 was 10% higher than the ADP.
- There *will continue to be significant releases due to lack of space.*
- There will be *no significant reduction in the number of unserved felony warrants.*
- There will be no increase in the current crime rate; and
- There will be no policy or legislative changes affecting the use of jail beds for new or additional populations (like parolees, for example).

Remember - California needs over 4,900 additional beds to eliminate *current* jail crowding (on a typical day) and 12,814 additional beds to accommodate *current* peak population days.

In other words, our jails are already thousands of beds short of being able to fully address their public safety functions and the shortfall will get worse as the population continues to grow.


### Additional Factors Affect Capacity

There are very good reasons for labeling the estimate of 40,943 beds by 2050 "very conservative." The estimate could easily be increased by 250 percent!

Why? Because there are other realities besides, and in addition to, population growth that greatly exacerbate the problem. Consider the following:

- Currently, *over 18,000 individuals a month in California are not incarcerated or are released early from jail sentences due solely to lack of jail space -- 9,148 are given pretrial release and 9,323 are released early from their sentences;*

- There are *over 285,000 unserved felony warrants* and over 2,391,000 unserved misdemeanor warrants in California annually.

- If, by some means, all of the felony warrants were served over a one-year period, and 10 percent of the warrants resulted in someone being incarcerated, the jail ADP would increase by 28,522 inmates.

- *Bookings per month reached a ten-year high in 2005 --* 106,941 per month (up from 97,589 in 1995).

- It is a key principle of good jail management to maintain some flexibility in inmate housing assignments by keeping a certain small number of beds vacant (e.g., for administrative segregation, conflict management, inmate safety and other purposes). Some experts suggest facilities should maintain a 10 percent vacancy rate. Even using a more conservative 5 percent vacancy factor,

14

CSAC/ 00075

California needs to build about 4,000 additional beds just to have adequate space to appropriately manage the existing ADP of nearly 80,000 inmates. [19]

- Adding the vacancy factor after early releases were eliminated and 10% of the felony warrants were served would require an additional 6,718 beds.

| Number of Beds Required to Fulfill Current Need Given the Current RC of 74,686 Beds | | |
|---|---|---|
| Source of Need | Additional Bed | Beds Needed |
| ADP, 2005 | 4,953 | 79,639 |
| Capacity for Peak Demands | 7,992 | 87,631 |
| No Early Releases | 18,471 | 106,102 |
| 10% of Felony Warrants Served | 28,251 | 134,353 |
| 5 % Vacancy Factor | 6,718 | 141,071 |
| Beds Needed to Fulfill Current Need Minus Current RC of 74,686 beds | | 66,385 |

As the above table demonstrates, one could easily argue that the *current* jail system bed capacity is 66,385 beds short of the *current* need.

This makes it clear that the estimate of 40,943 beds needed by 2050 would allow jails to address only increases in the population. That number of beds would not substantially improve the bare bones functioning of the current jail system. It would not allow for correcting the glaring problems of vacancy factors, unserved warrants and early releases.

On the other hand, if the goal were a *fully functioning system* by 2050, one could estimate the 2050 bed need using the following formula:

- If the current bed need is equal to the current ADP plus the additional 66,385 beds in the above table, the total would be 146,024 beds (or 0.3967% of the general population of California).

- Extrapolating that percentage to the projected 2050 general population yields a predicted need for bed space in 2050 of 217,299 beds.

While the formula and percentages and extrapolation may be complicated, the conclusion is not. If California wants to achieve a fully functioning jail system by the year 2050, it needs to develop capacity to house 217,299 inmates.

---

[19] These conclusions are based on the CSA 2005 Jail Profile Survey 4th Quarter 2005 report

15

CSAC/ 00076

## No Room for Sentenced Inmates

The percentage of inmates who are pre-sentenced has been rising steadily over the past 20 years and is currently at its highest rate in history -- 67 percent. As the number of pre-sentenced people rises while the number of jails beds doesn't, there is less and less space for sentenced inmates. In fact, in 2005 the ADP of sentenced inmates was 2,300 lower than it had been in 1995, even though the overall ADP is over 8,000 inmates higher today than it was in 1995.

We say, "If you can't do the time, don't do the crime" -- but crooks know better. In fact, they're electing to have monetary fines transferred into jail time since they know they'll have to serve only a fraction of their sentences.

> *The Orange County jail system has become the most crowded in the state and the third-most crowded in the country, with about 1,500 inmates released early this year because there were no beds for them.*
> *Orange County Register*
> *October 21, 2005*

Statewide in 2005, *9,323 sentenced inmates per month were released from jail before they completed their sentences.* Or they were put on alternative programs in lieu of custody. In tiny Calaveras County alone, 45 years of sentenced jail time went unserved in 2005 due to early releases.

Inmates may have turned the expression around to, "We won't do the time, so we might as well do the crime."


## Population Caps

No sheriff, no jail commander, no chief probation officer wants to release people from custody before their time is served or before they appear in court. Doing so means offenders are not held accountable and public safety is compromised.

Why then are inmates being released early? Why don't sheriffs keep every sentenced inmate who is sent to jail *in jail* for their whole sentences? Why are some pre-trial people being released too?

Here's why.

- California lacks sufficient jail beds.
- There are state and federal standards, rules and regulations determining how many people can be housed in each jail and/or cell.
- When those standards aren't met, inmates sue.
- In 20 California counties, those suits have resulted in court - ordered population caps.

> *"We're on the verge of a meltdown," Acting Shasta County Sheriff Larry Schaller said. We need additional space to "help correct a system in which only the most serious felons are held in the main jail, while others are assigned to work-release programs and sent home at night."*
> *Redding Searchlight*
> *January 27, 2006*

CSAC/ 00077

- An additional dozen counties have imposed population caps on themselves in order to avoid the inevitable, costly litigation that crowding can and does bring.

The 20 counties with court-ordered population caps account for 64 percent of the statewide average daily population.

What a cap means is that, when the jail is full, for every new inmate being admitted, someone already in custody has to be released.

Of course, jailers make every effort to release only those whose return to the community poses the least risk to public safety. The 'least risk' is not the same as 'no risk,' but jailers are, to the greatest extent possible, using classification and other criteria to determine which offenders to release.

Calaveras County says it "releases people guilty of misdemeanor drug offenses, traffic violations and so on first. But some nights there's only room for people accused of murder, rape and assault. When the crowding is most severe, even violent criminals get released before their sentences are completely served." [20]

To ease jail overcrowding, San Bernardino County has adopted a temporary policy to stop jailing suspects accused of drug offenses, theft, burglary and other nonviolent offenses if they promise to appear in court. Some sex offenders who fail to register with police, a violation of state law, also are booked, cited and released from custody if they promise to show up for their scheduled court hearings. "The sheriff's up against it here," sheriff's spokeswoman Cindy Beavers said. "The sheriff is concerned about the safety of the citizens of this county. At the same time he risks court action if he doesn't address the overcrowding that has left some inmates sleeping on [jail] floors." [21]

Since 2002, Los Angeles County has had to grant early releases to more than 150,000 inmates, most of whom, according to the LA Times, had served only 10 percent of their sentences. [22]

"Guidelines issued by the sheriff spell out which inmates qualify for early release.

> *RELEASING INMATES EARLY HAS A COSTLY HUMAN TOLL*
> *A shortage of beds puts career criminals back on the street, where they often commit new offenses*
> *Mario Moreno should still have been behind bars the night he climbed into the passenger seat of a stolen car with two fellow gang members....Moreno, 18, shot and killed Darrell Dennard, a grandfather who...had just bought a lottery ticket. If not for a chronic shortage of jail beds in LA County, Dennard's killer would have been in jail four more moths....*
> *Moreno joined more than 150,000 county inmates who have been released during the last four years after serving fractions of their sentences. Thousands, like Moreno, committed violent crimes when they would otherwise have been locked up....*
>
> *Los Angeles Times*
> *May 14, 2006*

[20] The Record, November 13, 2005
[21] Los Angeles Times, October 27, 2005
[22] "Revamp of Lockups is a Budget Priority," Los Angeles Times, April 18, 2006

17

CSAC/ 00078

Those in jail for manslaughter, sex offenses and child abuse, along with violators of gang injunctions, do all their time. For nearly all other convictions, inmates serve a fraction of their sentence. Women usually do no more than 25%. Men serve no more than 10%."[23]

Sheriff Lee Baca asked the County Board of Supervisors for "... $128 million in the 2006-07 budget year -- on top of $150 million the year before -- for a systemwide modernization that would control the violence and end the controversial practice of releasing inmates early to ease overcrowding." [24] "Today, the county has about 19,000 jail beds in use. Baca says he'd need at least 30,000 -- and additional deputies -- to end early releases."[25]

Statewide in 2005, 138,498 sentenced inmates had to be released early due to lack of space. An additional 94,890 pretrial inmates had to be released early for the same reason.

This is a total of 233,388 arrested and/or convicted people who avoided incarceration or were released early because there was insufficient space in jails to legally keep them.

Ninety-eight percent of the releases (all but about 3,300) occurred in counties with population caps.[26]

### Alternatives to Incarceration

It's important to understand that many of the people released early from jail are not just set free. They're still under the constructive custody of the sheriff and, to the extent possible, they're put in alternative programs, such as work release, electronic monitoring, drug court intensive supervision and Proposition 36 drug treatment.

> With Napa County's jail often filled to capacity and beyond ... Supervisors ... approved an expansion of the county's home detention program ... [that] allows qualified inmates to remain at home wearing a transmitter which is monitored by corrections officials 24 hours a day, seven days a week. Individuals must get approval to leave for counseling, work or educational programs ....Participants are required to be inside their homes for at least 100 of the 168 hours in a week.
>
> *Napa Valley Register*

While existing alternatives to incarceration help relieve some of the pressure of crowding, they are not appropriate for everyone. Moreover, they are often circumvented by inmates, because those programs would be longer -- as well as harder to complete -- than jail time.

---

[23] "Releasing Inmates Early Has a Costly Human Toll," Los Angeles Times, May 14, 2006
[24] "Revamp of Lockups Is a Budget Priority," Los Angeles Times, April 18, 2006
[25] "Releasing Inmates Early Has a Costly Human Toll," Los Angeles Times, May 14, 2006
[26] CSA data on early releases in counties with population caps

CSAC/ 00079

One obvious conclusion is that jails must have added space to house pre-adjudicated inmates and the most dangerous sentenced offenders for the full term of their court-ordered sentences.

Jails also have to be able to provide the behavioral and educational programs, counseling and other treatments that will interrupt jail inmates' criminal careers and help correct their offending behavior.

In addition jails need still more beds to address the growing demand for specialized housing for medically or mentally ill offenders, and other special populations.

> *The issue of overcrowding at the San Joaquin County Jail isn't something new.... As a way to reduce overcrowding, those convicted of certain nonviolent crimes are given options in place of jail time. There is the alternative work program, in which people are contracted to work at places like the Tracy Airport; home electronic monitoring; and work furlough.*
> *But the frequent guests at the jail know better ... Instead of serving their 30-day sentence in alternative programs -- where they have to serve the entire month -- they opt for the over-crowded jail in a gamble to serve only a fraction of that time before being sent home.*
>
> *Inside Bay Area*
> *January 23, 2006*

It is also increasingly clear that alternative kinds of facilities and/or programs must be put in place. For example, research and best practices implemented in other parts of the country show significant success with day reporting centers that provide all or partial day custody along with intensive treatment, counseling, life skills, vocational readiness and educational remediation services that effectively reduce recidivism and link offenders to positive support in their communities.

Day reporting centers enable a progressive array of sanctions that not only hold offenders accountable but also help to maximize jail capacity. Because day reporting centers actively supervise lower-risk, non-violent offenders, they free up jail space for the high risk offenders who should be housed and programmed in the more secure jail environment.

Several California counties including Orange, Sacramento San Diego and Solano, are operating day reporting centers for juvenile offenders and Placer County has recently opened a day reporting center for convicted adults. The California Department of Corrections and Rehabilitation (CDCR) has entered into a contract with a widely respected, well researched organization -- Behavioral Interventions (BI) -- to pilot a day reporting center for California's parolees. BI is also implementing this proven model at the local level in Franklin County, Pennsylvania and Sedgwick County, Kansas and could help California's local sheriffs' and probation departments develop these effective alternatives to incarceration for appropriately screened offenders who would otherwise be crowding local jails and juvenile facilities.

The Legislature and taxpayers statewide must support alternatives to incarceration, like day reporting centers, to keep the already tenuous condition of the state's jails from

CSAC/ 00080

becoming much worse. We have to keep the already dramatic bed-and-program-space deficit from becoming a public safety disaster.


### Juvenile Facilities

Juvenile halls and local commitment facilities -- camps and ranches -- administered by county probation departments serve dual purposes. First and foremost, they protect the public from juveniles who are considered too dangerous because of their criminal behavior to remain in the community. And second, within the confined setting, detainees are provided education, rehabilitation and treatment services that offer these youth an opportunity to get their lives back on track.

By the end of 2005, there were a total of 13,575 beds in California's local juvenile facilities. Of these, 8,182 beds were in juvenile halls and 5,393 were in local commitment facilities (camps).

The average daily population of juveniles in local custody in 2005 was 10,923 juveniles. The ADP of juvenile halls was 6,826 while camps held an average of 4,097 committed juveniles per day. (There were another 2,355 juveniles who were considered to be legally detained who were serving their time on home detention; and there were 250 juveniles assigned to alternative confinement programs).

> **Officials Push for Expansion of Cramped Juvenile Hall**
> *For the last 17 years, [Sacramento] county's juvenile hall has housed more young people than its official capacity allows. Earlier this year, some 356 juveniles were inside a facility approved for 261 beds.....Probation staff outlined $44 million to $50 million in new programs and new beds needed within 15 years ... By 2015, the county will need 150 more beds at the juvenile hall and 81 more beds at longer term commitment facilities [as well as] a 30-bed treatment unit for offenders with mental health issues, a long-term girls only facility and a 60-bed expansion of the Boys Ranch.*
>
> Sacramento Bee
> April 19, 2006

The last decade's decline in the juvenile crime rate coupled with counties' successes with prevention and early intervention,[27] as well as completed construction projects coming on line enabled juvenile hall capacity to exceed halls' average daily populations by 1,356 beds, and camp capacity to exceed camp ADP by 1,296 beds.

Doing the math shows that local juvenile facility capacity is in better shape than jail capacity. But it may be too soon to start celebrating. Crowding is still a problem in many counties. Ten counties -- accounting for almost 60 percent of the entire local juvenile detained population -- reported crowded conditions[28] for six months or more in at least one of their detention facilities in 2004.[29]

---

[27] Many counties programs are funded through the Juvenile Justice Crime Prevention Act (JJCPA)
[28] *Crowding* as defined by title 15, Section 1343, California Code of Regulations, occurs when a facility exceeds the CSA rated capacity (RC) for fifteen or more days during a month.
[29] Chief Probation Officers of California, Needs Survey, February 2006

CSAC/ 00081

While local juvenile facility capacity is in better shape than it had been (in 1999 the ADP exceeded rated capacity by 400 juveniles), it is still true that, especially for juvenile halls, juvenile capacity is <u>merely</u> adequate. For example, on peak population days in the final quarter of 2005, the number of juvenile hall rated capacity beds statewide (8,181) exceeded incarcerated populations (7,560) by only 621 beds.

Like adult detention facilities, juvenile halls require at least a 5 percent vacancy factor to appropriately manage their populations. Thus, on peak days it would take only 243 additional juvenile detainees statewide to drive bed need up to the level of optimum capacity.

In other words, a small increase in the rate of juvenile offending and/or the general population and related number of juveniles in the at-risk population will produce a deficit in juvenile hall beds.

In fact, the Chief Probation Officers of California (CPOC) have conducted preliminary assessments of counties' projected bed needs and are estimating that California will need in excess of 6,800 additional local juvenile beds by the year 2015. [30]

---

[30] ibid

CSAC/ 00082

# *FACILITY DESIGN AS A FUNCTION OF EFFICIENCY*

Having adequate and efficient jail capacity is critical for the state as a whole. Jails and local juvenile facilities have to be able to play their role in the continuum of correctional responses to ensure community safety. They can't do that in inefficient, outdated buildings.

### *Existing Facilities Need Updating*

In addition to adding capacity by building new beds, California must also commit to renovating and retrofitting currently existing jails and juvenile facilities.

Why? Because many of the state's older jails and juvenile facilities are linear designs and don't work for today's populations.

Not only are linear facilities staff-intensive and thus more expensive to operate than new generation, podular designs, they also are woefully inadequate for housing mentally ill offenders, inmates with drug and alcohol addictions and/or inmates with major health problems -- a great percentage of today's correctional populations.

### *Program Space*

Linear facilities, as a rule, have no programming space. It has been proven to be vitally important to provide programs and interventions to positively impact offenders' behavior (as well as to efficiently run jails). California's older, linear jails don't have room for the counseling, education, vocational training or other programming and reentry activities that should be offered.

### *Multiple Populations*

Not every jail is the same; not all juvenile correctional facilities look or function alike. Facilities' designs have to reflect the particular jurisdiction, the types of offenders to be housed, the correctional goals to be addressed and the kinds of interventions to be provided.

Nonetheless, all facilities are alike in that they must have enough beds to house the many classifications comprising their populations.

- Pre-adjudicated offenders have to be separated from sentenced.
- Those under 18 must be housed separately from those over 18.
- Civil commitments must be separated from criminals.
- Females must be separated from males.
- Gang members must be separated from members of rival gangs.
- Violent offenders can't be housed with those they might prey upon.

CSAC/ 00083

- Offenders who are physically or mentally ill must be provided appropriate housing, often separate from the general population.

And there should be enough beds to meet peak demand within each separate classification and for the facility as a whole.

Remember that, while the jail ADP was 79,639 in 2005, the highest one-day count was 87,531 inmates. That means jails had to fit over 87,500 inmates into the 74,686 beds that comprise California's jail bed capacity -- a trick that would confound even Houdini.

### Special Needs

Further exacerbating the 'form vs. function' strains on local correctional facilities is the fact that, in both adult and juvenile facilities, the need for specialized beds is growing. Mental health capacity, appropriate space for female populations and secure segregation are three of the areas of specialized housing that challenge local jurisdictions.

> *Sheriff Keith Royal said changing numbers at the jail in recent years have left the county open for lawsuits. The jail averages 200 to 220 inmates per day, but the state considers 80 percent to be full, he said, which is 200 prisoners.*
> *The jail was built to house 13 females, but there is now an average of 35 per day, Royal said. Jailers are also having a difficult time meeting state requirements to keep misdemeanor and felony inmates separate.*
> *The Union, Nevada County*
> *February 1, 2006*

While the number of medical beds in adult jails statewide has remained fairly stable over the last seven years (the average number was 1,002 in 2005), the number of occupied beds used for inmates receiving mental health services has increased steadily over the past decade, from 1,329 in 1996 to more than 3,100 in 2005.

In 2003, an estimated 26 percent of the juvenile detention population was identified as having an open mental health services case file; by the fourth quarter of 2005, that number rose to slightly over 31 percent. Additionally, the percentage of juveniles receiving psychotropic medication, and thus potentially in need of specialized housing, rose slightly from 10 percent in 1999 and 10.4 percent in 2003 to 11.2 percent by the end of 2005.

The proportion of female offenders continues to increase. In adult facilities, female offenders grew from 11.6 percent of the population to 13 percent from 1996 through 2003 and to 14 percent by the end of 2005. From 2000 to 2003, the female juvenile population increased from 14 percent to 15 percent, bringing an additional 109 juvenile girls into detention facilities during a one-year period. In the fourth quarter of 2005, girls comprised 17.1 percent of juvenile hall detainees and 10.5 percent of those housed in local juvenile commitment facilities.

CSAC/ 00084

Jails and juvenile facilities have to have not only the ability to separate females from males, but also the space and design capacity to provide gender responsive programming in an appropriate environment.   Research has long shown that correctional facilities have to do more than paint their living and program areas pink to have the most correctional effect with females in custody.

An additional stressor on local detention facilities is that both juvenile and adult facility managers report increasing demands on their limited ability to provide secure segregation for inmates and minors who cannot be mixed with the general population in their facilities.

### Age of Existing Facilities vs. Functional Life Expectancy

Under the best circumstances, the life expectancy of a detention facility is approximately 30 years.  Many of California's jails and some of the not-yet-updated juvenile facilities are approaching the end of their functional lives.

Over 12 percent of our jails are more than 60 years old, and nearly half (47.9 percent) are 30 years old or older.

By way of example, San Francisco's County Jail #3 was constructed in 1934. San Joaquin County's Honor Farm was opened in 1949.   Los Angeles County's Pitchess East Facility was built in 1954 (and Pitchess North in

> *The Yolo County Jail was built in 1987 and three years ago reached capacity of about 455 inmates.  "In the past nine to 10 months we have processed 7,000 inmates, Sheriff Prieto said.  And most of our inmates are felons due to drugs....If we could have 1,000 (jail) beds that would be wonderful."*
>
> *Davis Enterprise*
> *November 18, 2005*

1975).  Calaveras County's jail was originally opened in 1963.   Monterey County's Rehabilitation Center came on line in 1971 and the Monterey County Jail was opened in 1976.

Of the state's Type II jails:

- 7 (6 percent) were built in the 1930s and '40s;
- 8 (6.9 percent) were built in the 1950s;
- 21 (18 percent) were built in the 1960s;
- 20 (17 percent) were built in the 1970s;
- 31 (26.7 percent) were built in the 1980s;
- 29 (25 percent) were built in the 1990s;
                    and
- only 2 have been added since 1999.

Local detention facilities are in constant use.  People are walking their halls and flushing their toilets and slamming their doors 24 / 7 / 365.  Jails and juvenile detention facilities

24

CSAC/ 00085

are often crowded and deteriorate more rapidly as a result of this extensive use. Years of crowded conditions place severe stresses on their infrastructure, physical plants and fixtures.

Facility obsolescence is also hastened by changes in correctional populations and by emerging best practices. Jails built without program space, for example, find themselves unable to accomplish currently understood best practices in terms of occupying inmates' time with constructive activities and modeling productive behaviors. Juvenile facilities built for low-level young offenders are ill-equipped to securely confine, program and separate violent, gang bangers from one another and from other youth in custody. Facilities built for male offenders may not be able to appropriately house and program the increasing number of women and girls coming into local custody.

As correctional populations change and the validity of evidence-based practices is documented, correctional policy can be adapted to changing circumstances. Correctional facilities, however, are quite literally cast in concrete. They do not -- because they cannot -- change easily, quickly or cheaply.

25

CSAC/ 00086

# *COSTS*

*Construction Costs*

Even though construction represents less than 10 percent of the total cost of a detention facility over its life span, it is undeniably costly to build new detention capacity.

According to construction managers who have been involved in recent jail and juvenile facility construction, jail construction today costs about $400 per square foot and $120,000 to $150,000 per cell. Santa Barbara is being told it will cost $250,000 per cell to build that county's much needed additional jail beds.

Juvenile halls construction costs are about 25 percent higher than those for jails because of the additional education and program space required for juveniles. The roughly $500 per square foot construction cost for juvenile halls equates to a per cell cost of $180,000 to $200,000, including the necessary classroom and program space required by CSA standards.

Construction of commitment space (camp beds), traditionally somewhat less secure than juvenile halls, costs about $80,000 - $90,000 per bed. By way of example, Sacramento County spent $9,009,700 to add 90 new secure beds to its juvenile hall and $4,914,381 to add two new 30-bed housing units to the Warren E. Thornton Youth Center, one of the county's two juvenile commitment facilities.

The prices of crude oil, lumber and other construction material have been skyrocketing and are not expected to stabilize any time soon. The cost of materials has increased 30 - 40 percent in the last two years, creating multi-million dollar differences between initial bids and ultimate construction costs.

*Tentative Cost Projections for Jail Construction*

To get a ballpark estimate of the costs of keeping the adult system functioning at about its current level of capacity, we need to multiply the number of beds projected to be needed by an estimated cost per bed.

The number of beds being talked about here relates only to those it would take to stay abreast of California's projected population growth.

CSAC/ 00087

| Conservative Estimate of Costs for Needed Beds* | | | | |
|---|---|---|---|---|
| Need by Year | ADP Beds | Additional Beds | Cost Per Bed | Cost for Additional Beds |
| Current | 79,639 | 4,953 | $120,000 | $594,360,000 |
| 2010 | 82,845 | 3,206 | $120,000 | $384,720,000 |
| 2020 | 92,565 | 9,721 | $120,000 | $1,166,400,000 |
| 2030 | 101,555 | 8,990 | $120,000 | $1,078,800,000 |
| 2040 | 108,791 | 7,236 | $120,000 | $868,320,000 |
| 2050 | 115,629 | 6,837 | $120,000 | $820,560,000 |
| Total Expense to 2050* for 40,943 Beds | | | | $4,913,160,000 |

*Does not include capacity for: 1) peak times, 2) preventing releases due to lack of space, or 3) reduction in the number of unserved felony warrants.

Caution should be exercised in using these cost estimates for the following reasons:

- First of all, they are purposefully conservative.
- Second, they are only as good as the assumptions upon which they are based.
- Third, we don't have a current solid and reliable cost-per-bed estimate.
- Fourth, inflation and the ever increasing cost of construction materials will result in the cost per bed rising steadily over the next half century.
- Fifth, the cost per bed does not include all the infrastructure investment that will be required for new jail construction.

Nevertheless, this analysis makes clear that maintaining the effectiveness of the local jail system will involve continual, substantial costs.

Remember that this nearly five billion dollar amount ($4,957,033,504) does not take into account *current* needs for renovation and upgrading existing facilities to meet existing demands.

In terms of new construction, this figure is *the least* the state can realistically expect to pay over the next 45 years to achieve adequate jail capacity. The actual amount will be affected by inflation, construction costs, changes in the crime and incarceration rates and changes in policy, such as those proposing to house state parole violators at the local level, and others.

27

CSAC/ 00088

*Operating Costs*

Staffing and operating costs account for 90 percent or more of the lifetime costs of local detention facilities. These costs are borne by local governments.

*Jail Operating Costs*

County jail operational costs (excluding debt service) more than tripled between 1984/85 and 2001/02, increasing from $446 million in 1984/85 (when there were about 40,000 beds on line) to $1.7 billion in 2001/2002 (by which time there were approximately 73,000 beds on line).

Per capita operational bed costs increased from $11,000 to over $23,000 from 1984/85 to 2001/02, more than a 100 percent increase over 17 years.[31]

The 2003 statewide average cost per inmate per day (ADC) in county jails was $71.27. The highest reported ADC was $138.33 in the Nevada County Jail. The lowest was $26.69 in Del Norte County Jail.[32]

An indicator that the cost of jail operations is increasing is the fact that the California Department of Corrections and Rehabilitation (CDCR) and the Department of Finance (DOF) concurred, in the 2005 budget, to raising the amount the state reimburses county jails for holding state parolees.[33] The Daily Jail Rate (DJR) had been $59 per day. Since approval of the 2005 Budget Act, the new DJR is $68.22 per inmate per day and is capped at 95 percent of the state's average cost for housing inmates in state facilities, excluding the cost of non-routine medical care.

*Juvenile Facility Operating Costs*

Because specific staffing ratios are prescribed for local juvenile facilities, as are intensive programming and state-mandated education, the operational costs for county juvenile facilities are almost twice that of county jails.

CSA reports that operational costs (excluding debt service) for local juvenile facilities "increased from $196 million in 1984/85 (when there were about 9,000 beds on line) to over $620 million in 2001/02 (with 12,000 beds on-line). If only those beds in the CSA Rated Capacity were counted, per capita operational per bed costs rose from $21,000

---

[31] Corrections Standards Authority/Board of Corrections, 2004 Legislative Report, *Local Corrections in California*, pg. 10
[32] op. cit., page 11
[33] Parolees are held in county jails pursuant to PC Section 4016.5

CSAC/ 00089

to nearly $51,000 from 1984/85 to 2001/02, an increase of over 100 percent over 17 years (not adjusted for inflation)."[34]

### Where Will, Can or Should the Money Come From?

Like the state, local governments have experienced severe budget problems since the economic recession that began in the early 1990s. Add to this the further handicap laid on counties by the state property tax shift that began in 1992 and it will be crystal clear why counties have not been able to afford costly jail and juvenile facility construction.

To make improvements in their local detention capacity, counties have had to rely on funding from state and federal grants. A very successful bond program in the 1980s raised and expended more than $2.1 billion in state bond revenue and local matching funds for the construction of jails. Current federal and state grants will have increased local juvenile facility capacity 27 percent by 2006/07 when construction will be completed.

In all of these instances, counties have been required to match grant funds and that, in and of itself, has been challenging.

For much of the recent past, neither counties nor the state have been able to afford costly construction projects. There has been no stable funding stream to pay debt service on the bonds needed to finance the renovation of existing jails or the construction of much needed expanded capacity. Counties have been hard pressed to generate dollars to operate new or expanded jails and, in some instances, were unable to immediately open beds that grant funding had allowed them to build.

Proposition 1A, which was approved by the voters in November of 2004, will stabilize local revenue and prohibit unfunded state mandates, but it does not generate any new revenue. It may ensure that whatever is constructed can be operated, but it will not provide dollars to expand the supply of local jail and juvenile facility beds needed to meet the demand created by population growth, crime trends and best practices in public safety.

---

[34] Corrections Standards Authority/Board of Corrections, 2004 Legislative Report, *Local Corrections in California*, pg. 11

29

# *WHAT HAS BEEN DONE TO ADDRESS CAPACITY DEFICITS*

Almost all of the jail and local juvenile facility construction that has occurred in California in recent decades has been state or federal grant funded under the auspices of the Corrections Standards Authority (CSA), formerly the Board of Corrections.

Since 1997, the Board/CSA administered 107 state and federally funded construction grant projects in 48 counties. Totaling more than $491 million, these grants resulted, or will result, in the addition of 1,755 adult jail beds and 5,389 juvenile facility beds, plus the replacement of 2,221 outmoded juvenile beds, for a net gain of 3,168 beds statewide by 2007.

### *Jail Construction and Renovation*

Some California jails have completed or are in the process of completing renovations and expansions via the current state and federal Construction Grant Program, concluding in 2007. Some jurisdictions are funding jail renovation and construction through local bonds and/or other funding mechanisms.

Nevertheless, the number of beds being added will not make even a dent in California's jail capacity deficits.

As facilities continue to age, cities and counties must repair and remedy older facilities to maintain functional use and existing capacity and create program space wherever possible.

They also have to build new facilities, to accommodate population growth and to provide the program and special needs space increasingly required to protect inmates/ detainees and staff, and to maintain public safety.

### *Juvenile Facility Construction and Renovation*

The current Construction Grant Program -- the first major infusion of construction funds for local juvenile correctional facilities in several decades -- will help increase local juvenile facility capacity and significantly improve conditions of confinement in the counties with funded projects.

At the conclusion of the program in 2007, however, there will be several counties -- Los Angeles among them -- that will still require additional juvenile beds. There will also be a need to retrofit and provide treatment space in older juvenile halls.

The Chief Probation Officers of California are anticipating a need for approximately 6,800 new beds by 2015. An upward motion in juvenile crime trends, changes in

CSAC/ 00091

correctional policy and/or new legislative initiatives could greatly expand that expectation.

Regardless of what the Legislature might do in terms of juvenile correctional reforms that will impact local capacity needs, it is quite certain that, at the conclusion of the current construction program, there will still be counties that need to replace old, outmoded facilities and others counties that will continue to face chronic crowding problems.

31

CSAC/ 00092

# *NEXT STEPS*

Planners are often asked, "How many local jail and juvenile facility beds will we need in the year 2010?" The answer is simple -- we will need *all of them*. This is not a joke. California will need every bed it currently has and more.

As of now, there has been minimal planning and there aren't sufficient resources available, to remedy the jail bed deficit. It is vitally important that we do something now to stop what is already a serious problem from becoming much worse.

It makes little sense to allow the adult system to become even more inadequate and overwhelmed as California's population continues to grow.

While the juvenile system is in better shape than the adult system, it would be a mistake to think the work in that arena is done. Failing to plan for the ongoing needs of local juvenile facilities would continue the cycle of building followed by neglect that has placed local juvenile corrections in deficit mode for much of its history.

Thoughtful planning and preparation are critical to keep both the adult and juvenile correctional systems functioning efficiently. It is essential to prepare for the population increases and policy changes that are coming, and also to address the populations and challenges jails and juvenile facilities have now.

California would be well advised to abandon the 'periodic crisis' model that produces the kinds of deficit situations in which we now find ourselves and undertake a 'continuous growth' model, a proactive strategy. We must develop a plan and consistent funding streams aligned with the steady growth in the demand for detention capacity.

We recommend that a panel of subject matter experts be convened to:

1) review the issues,
2) consider the assumptions that should be included in the planning model,
3) develop detailed and reliable estimates of construction costs,
4) establish a projection model,
5) use the model to plan future jail and local juvenile facility construction,
6) develop multiple local and statewide financing strategies and
7) establish statewide implementation goals.

It is possible that California may never catch up in terms of producing and maintaining an ideal local detention and/or corrections system. On the other hand, with careful planning, and the generation of adequate resources, we can hope to keep pace with the ever-increasing demand for additional local detention capacity.

We must address this issue. The chief law enforcement officers in each county, California's sheriffs, take their responsibility to keep the public safe very seriously. But

32

CSAC/ 00093

sheriffs can't do it alone. All of us must recognize that local corrections is an important and integral part of each of our communities. We need a strong correctional component to our local infrastructure, just like we need good schools and roads and hospitals and libraries. We must all become advocates for local corrections because corrections infrastructure ensures our community safety.

The California State Sheriffs Association is committed to advocating for a jail and local juvenile facility construction / reconstruction program similar to the very successful jail bond program in the 1980s. That program raised more than $2.1 billion in state bond revenue and local matching funds. Five state bond measures were approved by the Legislature and voters to finance the construction and renovation projects. A similar strategy could and would be successful again.

California's sheriffs will be aggressively advocating for a plan that will provide sufficient funding to begin eliminating overcrowding and early releases at the local level.

We will be encouraging our local public safety partners, our corporate partners and our over 42,000 Associate Members to work with us to convince state Legislators that improving and expanding local detention facilities is a top priority -- important to the quality of life and safety in California and worthy of inclusion in the state's infrastructure package and subsequent bond and legislative measures.

We urge you to join us in the vital endeavor. We ask you to help hold offenders accountable by restoring the balance between doing the crime and doing the time.

CSAC/ 00094

# APPENDIX I

## LOCAL DETENTION POPULATION OVERVIEW - ADULT AND JUVENILE

CSAC/ 00095

## SUMMARY OF FINDING FROM THE
## 2005 CSA JAIL PROFILE SURVEY REPORT

| SURVEY MEASURES | 2000 | 2005 |
|---|---|---|
| Average Daily Population for the calendar year | 74,937 | 79,639 |
| Current beds meeting the CSA standards | 71,093 | 74,686 |
| Highest one day count for the calendar year | 79,418 | 87,531 |
| Number of bookings for the year | 1,177,205 | 1,283,292 |
| Percentage of males | 87% | 87% |
| Percentage of non-sentenced inmates | 60% | 67% |
| ADP of Sentenced Inmates | 29,929 | 26,454 |
| Percentage of felony inmates | 70% | 79% |
| Percentage of inmates in maximum security housing | 46% | 31% |
| Estimated percentage of inmates who are illegal/criminal aliens | 12% | 11% |
| Number of pretrial inmates released due to lack of space | 52,597 | 99,192 |
| Number of sentenced inmates released early due to lack of space | 128,784 | 155,052 |
| Unserved felony warrants as of the last quarter | 253,361 | 285,216 |
| Unserved misdemeanor warrants as of the last quarter | 1,995,439 | 2,391,801 |
| ADP of inmates housed on contract to the Federal Government | 3,577 | 3,584 |
| ADP of inmates housed on contract to other jurisdiction in CA | 14 | 147 |
| ADP of inmates housed on contract to CDCR | 2,590 | 2,665 |
| ADP of inmates awaiting transport to CDCR | 1,058 | 2,390 |

CSAC/ 00096

## SUMMARY OF FINDINGS FROM THE
## CSA JUVENILE DETENTION SURVEY, 2000 and 2005

| SURVEY MEASURES | 2000 | 2005 |
|---|---|---|
| Average Daily Population for juvenile halls for the calendar year | 7,108 | 6,826 |
| Juvenile hall beds meeting the CSA standards | 6,769 | 8,182 |
| Highest one-day population for juvenile halls | 7,805 | 7,692 |
| Average Daily Population for camps for the calendar year | 4,467 | 4,097 |
| Camp beds meeting the CSA standards | 5,033 | 5,393 |
| Highest one-day population for camps | 4,930 | 4,350 |
| Number of juvenile bookings for the year | 10,526 | 9,353 |
| Percentage of males in detention | 85.9% | 84.2% |
| Percentage of pre-disposition juveniles | 68.9% | 58.4% |
| Total ADP of committed youth | 7,992 | 6,866 |
| % of 707b offenders | 725 | 815 |
| Number of youth on home supervision or alternative confinement | 2,927 | 2,616 |
| Number awaiting transfer to CDCR DJJ | 159 | 84 |
| Number of juveniles receiving psychotropic medication | 1,075 | 1,219 |

CSAC/ 00097

# APPENDIX II

## COUNTIES WITH
## COURT IMPOSED POPULATION CAPS

CSAC/ 00098

| County | Facility Name | Court Imposed Population Cap Reported by County Sep 2005 | Total Facility ADP Reported by County Sep 2005 |
|---|---|---|---|
| Butte | Jail | U | 530 |
| Calaveras | Jail | 65 | 74 |
| El Dorado | Jail | 243 | 201 |
| | So Lake Tahoe Jail | 158 | 119 |
| Fresno | Main Jail | 1064 | 988 |
| | Satellite Jail | 300 | 217 |
| | North Annex Jail | 1296 | 1272 |
| | South Annex Jail | 688 | 629 |
| Kern | Central Receiving | 292 | 186 |
| | Lerdo MaxMed Fac | 374 | 88 |
| | Lerdo Minimum | 800 | 88 |
| | Lerdo Pretrial | 1232 | 1125 |
| Los Angeles | Century Reg Det | 1945 | 226 |
| | Central Jail | 6800 | 6325 |
| | North Co Correctional | 3400 | 4073 |
| | Pitchess East | 1830 | 1710 |
| | Pitchess North | 1600 | 2605 |
| | Twin Towers | 4192 | 3940 |
| Merced | Correctional Fac | U | 604 |
| | Jail | D | 169 |
| Orange | Intake Release Ctr | U | 801 |
| | J A Musick Facility | D | 1224 |
| | Men's Jail | D | 1354 |
| | Women's Jail | D | 342 |
| | Theo Lacy | D | 2807 |
| Placer | Main Jail | 382 | 369 |
| | Minimum Security | 160 | 160 |
| Plumas | Jail | 67 | 49 |
| Riverside | Banning Correctional | 694 | 659 |
| | Blythe Jail | 125 | 102 |
| | Indio Jail | 353 | 331 |
| | Robert Presley | 1081 | 1079 |
| | Southwest Co Det | 1111 | 1099 |

CSAC/ 00099

| | | | |
|---|---|---|---|
| San Bernardino | Glen Helen | 1364 | 1322 |
| | Detention Center | D | 937 |
| | West Valley Det | 3072 | 3530 |
| | | | |
| San Diego | Descanso Detention | D | 376 |
| | East Mesa | D | 497 |
| | George Bailey | D | 1638 |
| | Las Colinas Womens | D | 725 |
| | Central Detention | D | 869 |
| | So Bay - Chula Vista | D | 536 |
| | Vista Facility | D | 263 |
| | | | |
| San Joaquin | Honor Farm | 571 | 438 |
| | Main Jail | 879 | 970 |
| | | | |
| Santa Barbara | Main Jail | 705 | 708 |
| | Honor Farm | D | 247 |
| | | | |
| Shasta | Main Jail | 381 | 385 |
| | | | |
| Stanislaus | Public Safety Center | 0 | 606 |
| | Honor Farm | 0 | 358 |
| | Jail | 396 | 385 |
| | | | |
| Sutter | Jail | 355 | 355 |
| | | | |
| Tulare | Bob Wiley Det Ctr | U | 715 |
| | Men's Corr Fac | D | 301 |
| | Adult Pre-Trial Facility | D | 102 |
| | Jail | 264 | 267 |
| | | | |
| Yolo | Leinberger | 142 | 132 |
| | Monroe Detention | 313 | 294 |

**Source:** *Corrections Standards Authority, Jail Profile Survey, "Court Imposed Caps / Early Releases / ADP for September 2005*

CSAC/ 00100



RESEARCH REPORT

January 2003

# Drug Treatment in the Criminal Justice System: The Current State of Knowledge

Daniel P. Mears
Laura Winterfield
John Hunsaker
Gretchen E. Moore
Ruth M. White

*research for safer communities*

**URBAN INSTITUTE**
Justice Policy Center

CSAC/ 00101

# EXHIBIT D

# TO EXPERT REPORT OF PAUL McINTOSH

# Drug Treatment in the
# Criminal Justice System:
# The Current State of Knowledge

This report is one of an Urban Institute four-part series on drug treatment in the criminal justice system:

Drug Treatment in the Criminal Justice System: The Current State of Knowledge
by Daniel P. Mears, Laura Winterfield, John Hunsaker, Gretchen E. Moore, and Ruth M. White

Voices from the Field: Practitioners Identify Key Issues in Corrections-Based Drug Treatment
by Gretchen E. Moore and Daniel P. Mears

A Meeting of the Minds: Researchers and Practitioners Discuss Key Issues in Corrections-Based Drug Treatment
by Gretchen E. Moore and Daniel P. Mears

Improving the Link Between Research and Drug Treatment in Correctional Settings — Summary Report
by Daniel P. Mears, Gretchen E. Moore, Jeremy Travis, and Laura Winterfield

These reports are available as downloadable PDF files from the Urban Institute: www.urban.org

To receive free email updates on research from the Justice Policy Center, send an email to JPC@ui.urban.org.

CSAC/ 00102



**URBAN INSTITUTE**
Justice Policy Center
2100 M STREET, NW
WASHINGTON, DC 20037
www.urban.org

© 2002 The Urban Institute

Points of view or opinions expressed in this docu-
ment are those of the author(s) alone and do not
necessarily represent the official position or poli-
cies of the National Institute on Drug Abuse, the
Urban Institute, its board, or its funders.

Report design by David Williams

## ACKNOWLEDGMENTS

The authors gratefully acknowledge the funding for this project,
Strong Science for Strong Practice, provided by the National Insti
tute on Drug Abuse (NIDA). Contract #N01DA-1-1104. The NIDA
staff provided considerable support through-out all stages of this
project. Special thanks are extended to Alan Leshner, Jack Stein,
Pete Delany, Bennett Fletcher, and Jane Smither Holland. Glen
Fischer of the Management Assistance Corporation assisted with
the ongoing contractual issues in managing the project and helped
ensure the success of the meeting of practitioners and researchers.
Special thanks is given for the support provided by many Urban
Institute staff, including Adele Harrell, Dionne Davis, Ruth White,
John Hunsaker, and Dave Williams. Finally, we extend our appre-
ciation and thanks to the many criminal justice practitioners and
researchers who provided assistance with and/or participated in
various stages of this project.

# Contents

Executive Summary ...................................................................................... Exec - 1
 Chapter 1. Prison Growth, Drug Abuse, and Treatment in the Criminal Justice System ................ Exec - 2
 Chapter 2. Screening and Assessment for Drug Treatment in the Criminal Justice System ............ Exec - 6
 Chapter 3. Drug Treatment in the Criminal Justice System ........................................... Exec - 10
 Chapter 4. Drug Treatment Effectiveness in theCriminal Justice System .............................. Exec - 14
 Chapter 5. Post-Release Drug Treatment in the Criminal Justice System .............................. Exec - 16
 Chapter 6. Barriers to Drug Treatment inthe Criminal Justice System ................................ Exec - 18


CHAPTER 1. Prison Growth, Drug Abuse, and Treatment in the Criminal Justice System ........... 1-1

INTRODUCTION ................................................................................................. 1-2

INCARCERATION TRENDS ................................................................................... 1-2
 Increases in State and Federal Prison Incarceration ................................................... 1-2
 Increases in State and Federal Prison Incarceration Drug-Related Offenses ......................... 1-3

EXPENDITURE TRENDS ...................................................................................... 1-4
 Expenditures on Corrections............................................................................. 1-4
 Expenditures on Drug Treatment as Proportion of Total Expenditures ............................... 1-4

PREVALENCE OF DRUG USE ............................................................................... 1-5
 Arrest ..................................................................................................... 1-5
 Jail ........................................................................................................ 1-5
 State and Federal Prisons ............................................................................... 1-6
 Drug Abuse and Drug Dependency Disorders .......................................................... 1-6

DRUG TREATMENT IN CORRECTIONS .................................................................... 1-7

PUBLIC SUPPORT FOR DRUG TREATMENT ............................................................... 1-9

KEY RESEARCH QUESTIONS ................................................................................ 1-9


CHAPTER 2. Screening and Assessment for Drug Treatment in the Criminal Justice System ........ 2-1

INTRODUCTION ................................................................................................ 2-2

DEFINING SCREENING AND ASSESSMENT ................................................................ 2-2

SCREENING AND ASSESSMENT IN THE CRIMINAL JUSTICE SYSTEM ................................. 2-2
 Goals ...................................................................................................... 2-2
 Timing ..................................................................................................... 2-3
 History and Types of Assessments ...................................................................... 2-6
 Assessment and Effective Treatment..................................................................... 2-8
 Offender Subgroups: Assessment Issues and Treatment Implications ................................. 2-9

SCREENING AND ASSESSMENT INSTRUMENTS ......................................................... 2-10
 Screening Instruments .................................................................................... 2-11
 Assessment Instruments .................................................................................. 2-15
 Combination Approaches to Screening and Assessment ............................................... 2-17
 Integrating Assessment ................................................................................... 2-18
 Consequences of Ineffective Screening and Assessment .............................................. 2-19

ASSESSMENT PROCEDURES................................................................................. 2-19
 State Assessment Procedures............................................................................. 2-19
 Federal Prison Assessment ............................................................................... 2-20
 Assessment and Procedures for Therapeutic Communities ............................................ 2-21

BARRIERS TO EFFECTIVE SCREENING AND ASSESSMENT ............................................. 2-21
 Administrative and System Issues Impede Assessment ................................................. 2-21
 Inappropriate Use of Assessment Instruments .......................................................... 2-22
 Minimal Assessment of Co-Occurring Disorders ....................................................... 2-22

CSAC/ 00104

Limited Guidance from Research about the "Best" Instruments.........................................2-22

KEY RESEARCH QUESTIONS .........................................................................2-22


CHAPTER 3. Drug Treatment in the Criminal Justice System ...............................3-1

INTRODUCTION............................................................................................3-2

DEFINING TREATMENT ..................................................................................3-2

TREATMENT IN THE CRIMINAL JUSTICE SYSTEM ...............................................3-2
Treatment Timing in the Criminal Justice System ..................................................3-2
Within and between System Differences in Treatment Orientation and Practice...........3-2
Principles of Treatment in the Criminal Justice System ...........................................3-2
The Ideal Drug Treatment Approach in the Criminal Justice System..........................3-3

DRUG TREATMENT MODALITIES AND SERVICES.................................................3-4
Drug Treatment Models...................................................................................3-4
Drug Treatment Programs and Services...............................................................3-4

COST OF DRUG TREATMENT ..........................................................................3-8

DRUG TREATMENT PREVALENCE IN CORRECTIONAL INSTITUTIONS .....................3-8
Prevalence Surveys........................................................................................3-8
Inmates in Drug Treatment Programs in State and Federal Prisons ..........................3-9
Inmates in Drug Treatment Programs in Jails.......................................................3-10
Inmates in Drug Treatment in the Federal Bureau of Prisons ..................................3-10
Treatment and Treatment Settings.....................................................................3-11

TREATMENT PROGRAMMING ISSUES ..............................................................3-12
Treatment Plans and Continuity of Care..............................................................3-12
Maintaining a Drug-Free Environment.................................................................3-13

KEY RESEARCH QUESTIONS ..........................................................................3-13


CHAPTER 4. Drug Treatment Effectiveness in the Criminal Justice System ...........4-1

INTRODUCTION............................................................................................4-2

DRUG TREATMENT EFFECTIVENESS ................................................................4-2
Summary Assessment ....................................................................................4-2
Major Types of Treatment: Pharmacological and Behavioral/Psychosocial ................4-2
Effectiveness of Different Treatment Approaches ..................................................4-3
What Works, What Is Promising, and What Does Not Work .....................................4-3

THE FOUNDATIONS OF EFFECTIVE TREATMENT ...............................................4-4
Target Dynamic/Criminogenic Needs..................................................................4-4
Provide Multimodal Treatment..........................................................................4-5
Incorporate Treatment Responsivity ..................................................................4-5
Address Risk Differentiation.............................................................................4-5
Provide Skills-Oriented and Cognitive-Behavioral Treatment ..................................4-5
Provide Integrated and Comprehensive Treatment ...............................................4-5
Provide Continuity of Care ..............................................................................4-5
Draw on External Sources to Facilitate Completion of Treatment.............................4-6
Apply Appropriate Dosages/Levels of Treatment..................................................4-6
Provide Effective Program Design, Implementation, and Monitoring .........................4-6
Involve Researchers in Program Design, Implementation, and Evaluation ..................4-7

THE FUTURE OF EFFECTIVE DRUG TREATMENT ...............................................4-7
Identifying What Works Best ............................................................................4-7
A Comprehensive Model .................................................................................4-8
Linking Research and Practice..........................................................................4-8

COMPULSORY DRUG TREATMENT ..................................................................4-9

COST-EFFECTIVENESS...................................................................................4-9

METHODOLOGICAL ISSUES ...........................................................................4-9

KEY RESEARCH QUESTIONS ..........................................................................4-11

CSAC/ 00105

**CHAPTER 5. Post-Release Drug Treatment in the Criminal Justice System** ............................... 5-1

INTRODUCTION ............................................................................................... 5-2

REENTRY OF OFFENDERS INTO THE COMMUNITY ............................................... 5-2

MEASURING PROGRAM EFFECTIVENESS ............................................................ 5-4

TO WHAT EXTENT HAVE LINKAGES BEEN DEVELOPED? ....................................... 5-4

METHODOLOGICAL ISSUES ............................................................................... 5-5

KEY RESEARCH QUESTIONS .............................................................................. 5-5


**CHAPTER 6. Barriers to Drug Treatment in the Criminal Justice System** ................................. 6-1

INTRODUCTION ............................................................................................... 6-2

POLITICAL BARRIERS ....................................................................................... 6-2
Declining Public Concern about Drug Abuse ............................................................. 6-2
No Federal Requirements for Coordinated Case Management or Aftercare ........................ 6-2
Lack of Intra- and Inter-Governmental Coordination of Efforts ...................................... 6-2
Prioritization of Bed Space Management Over Drug Treatment ....................................... 6-2
Opposition and Skepticism about the Effectiveness of Drug Treatment ............................ 6-2

RESOURCE BARRIERS ....................................................................................... 6-3
Lack of Funding for and Prioritization of Treatment .................................................... 6-3
Uncertainty and Certainty about How Best to Utilize Scarce Resources ........................... 6-3
A Need for Integrated Community-Based Services ...................................................... 6-3

ASSESSMENT BARRIERS .................................................................................... 6-4
Administrative and System Issues ........................................................................ 6-4
Inappropriate Use of Assessment Instruments .......................................................... 6-4
Minimal Assessment of Co-Occurring Disorders ........................................................ 6-4
Limited Guidance from Research about the "Best" Instruments ...................................... 6-4

ADMINISTRATIVE AND ORGANIZATIONAL BARRIERS ............................................ 6-4
Legislative or Policy Restrictions on Treatment Access ............................................... 6-4
Difficulties in Implementation and Delivery .............................................................. 6-5
Challenges in Institutionalizing Effective Treatment ................................................... 6-5
Overcrowding and Security Issues Compromise Treatment ........................................... 6-5
Limited Treatment Access within Corrections Due to Location ....................................... 6-5
Challenges in Training and Retaining Treatment Staff ................................................. 6-6
Conflicting Treatment and Correctional Cultures ....................................................... 6-6
Privately Run Prisons May Not Prioritize Treatment .................................................... 6-6
Key System Gaps Contribute to Lack of Treatment ..................................................... 6-6

PROGRAMMATIC BARRIERS ............................................................................... 6-7
Limited or Low-Quality Case Management ............................................................... 6-7
Lack of Monitoring or Drug Testing ...................................................................... 6-7
Availability of Drugs in Correctional Settings ........................................................... 6-7
Inappropriate Treatment or Delivery of Treatment ..................................................... 6-7
Client Resistance to Treatment and the Balancing of Rewards and Sanctions .................... 6-7
Insufficient Levels of Treatment and Reentry Preparation ............................................ 6-7
Lack of Treatment Responsivity ........................................................................... 6-8

A COMPREHENSIVE CORRECTIONAL DRUG TREATMENT STRATEGY ........................ 6-8

KEY RESEARCH QUESTIONS .............................................................................. 6-8


REFERENCES .................................................................................................. REF-1

CSAC/ 00106

# Executive Summary

Only 61 percent of state correctional facilities provide substance abuse treatment. Notwithstanding a significant infusion of federal funds to support residential substance abuse treatment in prisons, the percentage of state prisoners participating in such programs has declined from 25 percent in 1991 to 10 percent in 1997. The policy shortfall is clear: Prisoners are not getting the drug treatment programs that would reduce their drug abuse and criminal behavior.

It is clear that we need to understand what happens as correctional agencies bring drug treatment into their systems. There are, perhaps, conflicting expectations, systems constraints, and philosophies. There are yet-to-be-specified roles that federal agencies might play to assist the integration of treatment into corrections.

The goal of this collaboration between the Urban Institute and the National Institute on Drug Abuse was to help inform the development of a research agenda that can address the unique circumstances of the criminal justice environment and the challenges posed by the integration of treatment services and a public health orientation into this environment.

To help achieve this goal, this report presents results from a review of the literature for six different dimensions bearing on drug treatment in the criminal justice correctional system. These dimensions are:

- prevalence of drug abuse needs,
- screening and assessment,
- treatment programs and approaches,
- treatment effectiveness,
- linkages to post-release supervision, and
- barriers to implementing drug treatment.

The literature reviews necessarily were broad in scope. The aim was to highlight research findings, issues, and gaps most relevant to developing research-based strategies for promoting and developing effective correctional drug treatment approaches.

## Incarceration Trends

- Incarceration trends among states and in the federal prison system increased dramatically throughout the past two decades, with a growth of 240 percent in the incarceration rate between 1980 and 1999 to almost 500 per 100,000 residents.

- The state and federal prison system nearly quadrupled over a 20-year time span, from 320,000 in 1980 to 1.3 million in 1999, with 1,179,214 inmates in state prisons and 131,496 inmates in federal prisons.

- Incarceration of drug offenders was by far the leading cause of increased correctional populations, accounting for 33 percent of the overall prison growth between 1980 and 1999.

- In 1980, the drug incarceration rate was 15 per 100,000 adults, but by 1996, the rate had increased to 148, representing approximately a 900 percent increase in a 17-year period.

- The increased drug incarceration rate was largely attributable to increases in drug arrests and to increased incarceration of those arrested for drug offenses. Approximately one-third of the growth in drug incarceration was due to increased arrests, and the remaining two-thirds to increases in the conversion of drug arrests into prison sentences.

- Growth in the incarceration of drug offenders does not necessarily indicate increased demand for drug treatment, but highlights the increasing role of drugs in corrections and the broader context in which drug treatment endeavors are situated.

## Expenditure Trends

- Federal, state, and local expenditures on corrections grew by more than 400 percent from 1982 to 1997, from approximately $10 billion to $45 billion. Expenditures steadily increased for much of the 1980s, before rising more rapidly during the 1990s.

- Incarceration trends were driven primarily by increased drug incarceration rates, thus the increase in correctional expenditures represents a significant investment in the incarceration of drug offenders.

- Consistent and accurate estimates of expenditures on treatment, especially for drug treatment, are not readily available. However, estimates compiled by the Center on Addiction and Substance Abuse indicate that in 1996 less than 5 percent of state prison budgets went toward drug treatment, and that less than 1 percent ($25 million) of the federal prison budget was targeted for drug treatment, including drug abuse education, residential counseling services, and community transitional services.

- Aggregate prevalence estimates mask considerable variation among states. For example, some states report spending less than 1 percent of their correctional budget on treatment, while others report spending up to 22 percent. Many states are not able to separate inmate programming costs from general operations expenditures.

- On a national level, over $3 billion in funds went to drug treatment in 2000, compared with $2 billion to drug prevention and $9 billion to the criminal justice system.

- If international drug control efforts, interdiction, research, and intelligence are included, over $18 billion was spent on drug control efforts in 2000.

CSAC/ 00108

## Prevalence of Drug Use

### Arrests

- The Arrestee Drug Abuse Monitoring (ADAM) Program indicates that at least 50 percent of adult male arrestees test positive for at least one of the NIDA-5 drugs (cocaine, marijuana, methamphetamine, opiates, PCP), with higher prevalence rates for certain sites (e.g., 77 percent in San Antonio).

### Jails

- Among jail inmates in 1996, 74 percent reported past drug involvement, as defined by regular use of drugs, receipt of drug treatment, intravenous use of drugs, and being sentenced for past drug offenses.

- Among convicted jail inmates in 1996 using drugs in the month prior to arrest, 37 percent used marijuana or hashish, 24 percent used cocaine or crack cocaine, 10 percent used stimulants, 9 percent used heroin or opiates, 6 percent used depressants, 5 percent used hallucinogens, and 1 percent used inhalants. Thirty-six percent reported using drugs at the time of their offense.

- Among jail inmates tested for drugs in 1998, 10 percent tested positive for use of one or more drugs.

- Half of all jail inmates in the United States in 1998 were in jails that test for drug use.

### State and Federal Prisons

- Few reliable estimates of the prevalence of drug use, drug abuse, and drug dependency/addiction in jails and state and federal prisons exist. In one study, state officials estimated that 70 to 85 percent of their inmates needed drug treatment, and the Federal Bureau of Prisons has estimated that in 1996, 31 percent of their inmates needed treatment.

- In 1997, 83 percent of state and federal inmates reported ever using any drugs—77 percent for marijuana/hashish, 49 percent for cocaine/crack, 29 percent for hallucinogens, 28 percent for stimulants, 25 percent for heroin/opiates, 24 percent for depressants, and 14 percent for inhalants.

- In 1997, 57 percent of state and federal inmates reported using drugs in the past month—39 percent for marijuana/hashish, 25 percent for cocaine/crack, 9 percent for heroin/opiates, 9 percent for stimulants, 5 percent for depressants, 4 percent for hallucinogens, and 1 percent for inhalants.

- In 1997, 33 percent of state and federal inmates reported using drugs at the time of their offense.

### Drug Abuse and Drug Dependency Disorders

- Few studies systematically provide a rigorous assessment of the prevalence in correctional facilities of drug abuse and drug dependency/addiction disorders, as defined by the American Psychological Association's Diagnostic Statistical Manual, fourth edition (DSM-IV).

- A Bureau of Prisons study conducted in 1991 indicated that 20.9 percent of inmates met the criteria for drug abuse disorder and 30.8 percent for drug dependency disorder, for a combined prevalence of 51.7 percent having either type of disorder.

- The importance of distinguishing between self-reported drug use and clinically defined substance use disorders—such as drug abuse disorder and drug dependency disorder—lies in the fact that self-reported accounts of prior drug use likely overestimate the need for drug treatment. However, there increasingly is evidence that not all individuals are equally likely to become addicted after initial use of a drug. Such dispositions or risks may be reflected in self-reported use statistics, especially those focusing on drug use in the month prior to arrest or at the time of the offense. However, at present, it remains unknown whether or to what extent this is true and, more generally, whether and to what extent self-report statistics overestimate the prevalence of drug addiction.

CSAC/ 00109

## Drug Treatment in Corrections

- There are few precise estimates of drug treatment in correctional settings. In one study conducted in 1996 by the Center on Addiction and Substance Abuse, state officials estimated that while 70 to 85 percent of their inmates needed drug treatment, only 13 percent received any. By contrast, the Federal Bureau of Prisons estimated that while 31 percent of their inmates needed treatment, only 10 percent actually received any.

- According to a national survey of state and federal prison inmates by the Bureau of Justice Statistics, 24 percent of state and federal inmates participated in some type of alcohol treatment or program in 1997. In that same year, 9.7 percent (101,200) of state prison inmates received drug treatment after admission, down from 24.5 percent (169,700) in 1991. Among federal prison inmates in 1997, 9.2 percent (8,100) received drug treatment, a decline from 15.7 percent (8,300) in 1991.

- Of inmates receiving drug treatment in state or federal prisons, approximately half were placed in residential facilities and the other half received counseling, with a small fraction receiving any type of maintenance drug therapy.

- Using recent prison survey data from the Bureau of Justice Statistics, a conservative estimate is that 150,000 inmates in 1997 needed drug treatment but did not receive it. A more realistic and less conservative estimate is that 420,000 inmates needed some form of drug treatment but did not receive it. A more liberal estimate, based on the questionable assumption that 75 percent of the state prison population requires drug treatment in any given year, is that 680,000 inmates needed but did not receive drug treatment in 1997.

- Whether the more conservative or liberal estimates of the treatment need/service gap are relied upon, there is a clear indication that many prison inmates who need treatment are not receiving it. This gap persists and has been increasing despite a considerable infusion of federal dollars into substance abuse treatment. Yet even with such infusions, in absolute numbers, state prisons have decreased drug treatment for inmates, with those receiving drug treatment declining from 169,700 inmates in 1991 to 101,200 inmates in 1997. The decline is significant because it stands in contrast to data indicating that state and federal correctional facilities operating as alcohol/drug treatment institutions rose from 92 in 1990 to 192 in 1995, and that 97 percent of correctional facilities offer drug and alcohol counseling.

## Public Support for Drug Treatment

- Public concern about drug abuse peaked during the late 1980s and then subsequently and dramatically returned to considerably lower levels. In 1989, 38 percent of the American public viewed drug abuse as the single most important problem facing the country. A decade later, only 5 percent of the public expressed this view.

CSAC/ 00110

## Key Research Questions

- Among newly sentenced offenders, how widespread is the need for drug treatment of various kinds? That is, what is the prevalence not only of drug use, but of drug abuse and drug dependency/addiction, for specific types of drugs (heroin, cocaine/crack, alcohol, etc.)?

- What precisely is the gap between treatment need and services in jails and prisons?

- Which types of drug treatment services are most prevalent and why?

- How does the extent of drug abuse/addiction among prisoners compare with other problems, such as lack of education or vocational training, or mental or physical illness?

- What factors determine which offender services are funded?

CSAC/ 00111