# PART 2 OF THE EXPERT REPORT OF PAUL McINTOSH

| EXECUTIVE SUMMARY | Chapter 2. Screening and Assessment for Drug Treatment in the Criminal Justice System |
| --- | --- |

## Screening and Assessment in the Criminal Justice System

- Screening and assessment are separate processes to evaluate an offender's risks, treatment needs, and, if appropriate, a treatment plan. The screening process is a short initial determination of whether a potential problem, such as drug abuse, exists and merits further investigation. The assessment process follows screening and is an in-depth process, often taking several hours and involving professionals trained in assessing specific issues. The goals for screening include:

  — Determine the presence of substance abuse, mental health disorder, and medical conditions.

  — Define major areas of strengths and deficits.

  — Screen out persons with no identifiable problems.

  — Identify individuals with a history of violent offenses/behavior.

  — Identify environmental factors (e.g., residential stability, relationship issues) or other problems (e.g., mental disorders, cognitive deficits) that may undermine success in treatment.

  — Identify minimum level of security or supervision needed to promote public safety.

  — Identify motivation for participation.

  — Identify perceived benefits as well as disadvantages of participation in the program.

  The goals for assessment include:

  — Examine the scope and nature of substance abuse problems.

  — Identify specific psychosocial problems to be addressed in treatment, including mental health disorders.

  — Understand the impact substance abuse has had on the individual, including its influence on criminal involvement.

  — Determine the client's level of maturation and readiness for treatment.

  — Identify specific physical problems to be addressed in treatment planning.

  — Identify the full range of service needs, pursuant to treatment planning.

  — Match participants to particular services.

- Screening and assessment should happen at the earliest point in the criminal justice system because it can help guide the decisionmaking process, including deciding whether a diversionary program, such as a drug court or probation with intermediate treatment sanctions, is appropriate.

- A variety of techniques is needed for a successful screening and assessment process, including actuarial instruments; archival material, such as criminal justice records, previous treatment records, and drug test results; and observation.

- Screening and assessment is not a static process; rather, it involves a continuous process of assessment, interventions, and feedback loops throughout the criminal justice system.

- A continuous process of assessment can greatly enhance the overall efficiency and efficacy of criminal justice operations and ensure that treatment efficacy is enhanced. There are several components to this continuous process.

  — Treatment needs assessments should be in place to determine what type of programmatic intervention is appropriate, including long-term or short-term residential treatment, intensive or moderate outpatient treatment, chemical detoxification, etc. In this capacity, needs assessment acts as a type of sorting mechanism.

  — Readiness for treatment assessments should be implemented to understand better the extent to which clients are motivated for treatment and whether they are likely to benefit from the services offered to them.

  — Comprehensive treatment planning assessments should occur once a client reaches a program to determine how intensive the treatment should be and the areas on which it should focus.

  — Treatment progress assessments should be undertaken periodically to determine whether clients are responding to treatment and whether changes in the intervention should be considered.

  — Treatment outcome assessments are critical to determine the extent of behavioral change, success, and failure.

CSAC/ 00112

## Screening and Assessment Instruments and Treatment Effectiveness

- There currently are three generations of assessments. First-generation assessments refer to "gut feelings" or clinical judgments; they generally fare poorly at predicting offender risk. Second-generation assessments represent an improvement because they are tested standardized instruments; however, they predominately capture historic and unchangeable information. Third-generation assessments include dynamic, or changeable, factors and measure offender need in a standardized way. Many departments still use first-generation assessments.

- Instruments are most effective when the information garnered from them is used for client matching and treatment planning. For example, research has shown that clients appropriately matched to treatment are more motivated than those placed in any available program; they stay longer, experience fewer negative discharges, and perform better on a range of outcomes. Information gathered in the risk, needs, and psychological assessments can be used for this type of matching.

- An ideal approach to treatment includes an assessment of risk predictors, criminogenic needs, and a psychological assessment with a focus on responsivity, exercising discretion and judgment when appropriate.

- There are population subgroups—especially women, offenders with co-occurring disorders, and offenders with infectious diseases such as HIV/AIDS—who have special assessment issues and treatment implications. It is important to identify these groups and assess their specific needs and how they can best be addressed.

- Assessment instruments should be standardized and tested, as well as reliable and valid. Unreliable and invalid instruments result in misidentification of both those who need treatment and those who do not.

- Few studies have compared the effectiveness of screening instruments. One study indicates that the most effective instruments in screening for substance abuse are:
  - Combined Alcohol Dependence Scale (ADS) and Addiction Severity Index (ASI) instruments
  - Texas Christian University Drug Dependence (TCUDD) Screen
  - Simple Screening Instrument (SSI)

  Several instrument combinations work best when screening for co-occurring disorders:
  - either the Brief Symptom Inventory (BSI) or the Referral Decision Scale (RDS) to address mental health symptoms

  AND
  - either the TCUDD Screen, SSI, or the combination of the ADS/ASI-Drug Use section to address substance abuse symptoms.

  Several instrument combinations work best when assessing for co-occurring disorders:
  - either the Minnesota Multiphasic Personality Inventory-2 (MMPI-2), the Millon Clinical Multiaxial Inventory-III (MCMI-III), or the Personality Assessment Inventory (PAI) to examine mental health disorders

  AND
  - the Addiction Severity Index (ASI) to examine areas related to substance abuse.

- Offender information should be linked and shared throughout the criminal justice and substance abuse treatment systems to increase efficiency, aid in analysis and management tasks, and create then carry out effective treatment plans. However, confidentiality laws must be recognized. In addition, agencies must adhere to laws regulating interagency communication, and offenders must sign consent forms at each stage of the criminal justice system.

CSAC/ 00113

## Assessment Practices

- A 1997 Survey of Correctional Facilities (SAMHSA 2000) found that 63.6 percent of jails, 67.1 percent of state prisons, and 86.8 percent of federal prisons provide assessment for treatment need.

- State assessment procedures can vary from state to state and within states. There is little coordinated or standardized information about state-specific assessment tools and procedures. The Federal Bureau of Prisons has a standardized intake and assessment process, using the American Psychological Association's Diagnostic Statistical Manual-IV (1994).

## Barriers to Effective Screening and Assessment

### Administrative and System Issue Impede Assessment

- Multiple and redundant assessments are conducted at various stages of processing.

- Time constraints prevent conducting screening and assessments.

- Information is collected that is not used.

- Staff are not trained adequately on the administration and use of screening and assessment instruments.

- Criminal justice personnel may lack familiarity with mental health and/or substance abuse disorders.

- There may be limited time and resources for codifying existing information, transferring it to various parts of the criminal justice system, or easily accessing existing information.

### Inappropriate Use of Assessment Instruments

- Staff may not complete and use screening and assessment instruments appropriately.

- There may be a lack of consistency in questions and/or documentation to allow reliable analysis of program level needs or outcomes.

- Use of nonvalidated instruments.

- Use of instruments for populations for which they were not designed.

- Use of instruments that do not address criminogenic needs.

- Records may be incomplete, misleading, or mislabeled.

- Traditional subjective "intuitive assessments," or "first-generation assessments," still are used widely, despite demonstration of their ineffectiveness.

CSAC/ 00114

## Minimal Assessment of Co-Occurring Disorders

- The primary barrier to treating co-occurring disorders is the minimal attempts to screen and assess for these disorders.

- Mental health and substance use disorders have a waxing and waning course and may appear in different forms at different points in time. This variability leads to different, and often conflicting, diagnoses at different stages of processing.

- There is considerable symptom interaction between co-occurring disorders, leading to difficulties in interpreting whether symptoms are related to mental illness or substance abuse.

- Individuals in the criminal justice system may anticipate negative consequences related to disclosure of mental health or substance abuse symptoms.

## Limited Guidance from Research about the "Best" Instruments

- Few studies comparatively examine the effectiveness of different types of screening and assessment instruments.

- We lack systematic research on which criminogenic needs most influence future offending.

- Research has not identified the combination of risk, needs, personality types, and responsivity needed for programming to be most effective, and how assessments can be devised that can be used feasibly to assist with decisionmaking.

## Key Research Questions

- How are specific screening and assessment instruments selected for use in correctional settings?

- How, if at all, are the results from screening and assessment used?

- Are the results from screening and assessment helpful in assisting with decisionmaking and, more specifically, with placing offenders into appropriate types and levels of drug treatment?

- What are the major problems in conducting and using screening and assessment of prisoners?

CSAC/ 00115

## Defining Treatment

- The term "treatment" is widely used throughout jails and state and federal prisons, yet a concise, agreed upon definition of "treatment" is rare. Alcohol/other drug abuse treatment can refer to a wide range of services to help offenders change their behavior and life-style and/or medically assist the recovery process to reduce alcohol or drug abuse addiction. Different services are needed based on the type of alcohol or drug abuse, client attitude and mental state, prior drug and treatment history, etc. Some researchers distinguish between "treatment" services, typically intensive services such as residential treatment or counseling, and "non-treatment" services, typically self-help or education groups.

## Treatment in the Criminal Justice System

- Treatment in the criminal justice system can occur at a variety of "impact points" (pretrial, jail, pre-sentencing, probation, prison, parole). The key to effective processing for offenders who need drug treatment is to provide assessments and comprehensive treatment; develop, adhere to, and monitor "treatment plans"; and implement an effective case management plan for post-release supervision and treatment.

- The provision of drug treatment is compatible with the goals of controlling and managing inmates and protecting the public.

- A core set of principles should guide the delivery of alcohol or drug abuse treatment in correctional settings.

  — Treatment should not represent a substitute for punishment or sanctions.

  — Treatment should be universally available as needed for persons with drug treatment needs.

  — Alcohol or drug abuse treatment services should be tailored to the needs of the specific offender, based on a thorough assessment at jail or prison intake.

  — Offender supervision should continue once an individual enters treatment.

  — Offenders should remain accountable to the sentencing judge or probation/parole authorities.

- Offenders entering state or federal prisons are confined to a sentence of at least one year in most states, providing a unique opportunity for providing alcohol and drug abuse treatment services. The range of alcohol and drug abuse programs and approaches should consist of one or more of the following:

  — Comprehensive pregnancy management for alcohol or drug abusers to enable a woman to carry her baby to term while incarcerated. Foster care services may be needed and medical services should be available for both mother and child.

  — Medical treatment for prisoners with chronic and communicable diseases, including TB and HIV/AIDS, should be available in prison.

  — Pharmacotherapy for disorders such as bipolar disorder and major depression should be incorporated into these services.

  — Alcohol or drug abuse treatment should extend across institutional boundaries when offenders are transferred to different correctional facilities, and to the community after release.

  — Special arrangements should be made for alcohol or drug abuse treatment and health care services for offenders in protective custody and administrative segregation.

  — Pre-release group programs and transitional community programming should be offered to all offenders, in particular to those who have been incarcerated for long periods of time.

  — Education about HIV/AIDS and its risk factors should be a critical component of prison programs.

  — Relapse prevention for alcohol or drug abusers should be part of transitional programming.

CSAC/ 00116

## Drug Treatment Modalities and Services

- The primary treatment modalities and services in correctional settings include:
  - — no specialized services.
  - — specialized services for problems other than drug abuse,
  - — drug education and/or drug abuse counseling,
  - — dedicated residential units, and
  - — client-initiated or client-maintained services.

- Research shows that highly intensive residential programs are the most effective in reducing drug and criminal behavior in the long term, yet most prison facilities do not offer this type of treatment, or offer it to only a small percentage of the population. Residential treatment is considerably less likely to be found in jails. Correctional departments blame budgetary constraints (71 percent) and space limitations (51 percent) as two of the major reasons that state and federal systems do not provide more drug treatment.

- The most prevalent types of program models in prisons, according to various surveys, are self-help programs such as Alcoholics Anonymous and Narcotics Anonymous, and education/awareness programs. These types of programs can address large groups at once, require relatively little ongoing investment, and can be staffed by inmates or volunteers.

- The range of treatment approaches and settings in correctional facilities varies tremendously, ranging from low-intensity services, such as education and self-help groups, to high-intensity services, such as those offered in a therapeutic community (TC) setting. These treatment services are not mutually exclusive; indeed, a variety of services matched to an individual's specific needs is likely to be more effective than provision of just one service. The range of treatment programs and services in correctional settings includes:
  - — Detoxification
  - - Self-help groups
  - — Drug testing
  - — Education
  - — Individual counseling
  - — Group counseling
  - - Outpatient drug treatment services

- — Milieu therapy
- — Family therapy
- — In-patient short-term therapy
- — Residential programs
- — Pharmacological maintenance
- — Transitional services

## Cost of Drug Treatment

- A report by the Center on Addiction and Substance Abuse (1998) indicates that it costs $3,500, over and above incarceration costs, to provide residential drug treatment to inmates. The cost would be $6,500 if education, job training, and health care were included. These costs would be substantially offset by increased productivity of offenders who not only do not return to prison but obtain employment. Other research supports the notion that drug treatment is cost-effective, as compared to incarceration without treatment.

## Drug Treatment Prevalence in Correctional Institutions

- Several recent survey sources illustrate the state of knowledge of treatment programs in prisons and jails, with each source providing a different perspective on treatment in incarcerated settings.
  - The 1997 Uniform Facility Data Set (SAMHSA 2000).
  - The Corrections Yearbook 1999: Adult Corrections and the Corrections Yearbook 1999: Jails (Camp and Camp 1999a, b).
  - The 2001 American Correctional Association Survey of the Adult Division of the Department of Corrections (American Correctional Association 2001).
  - The 1996 Center for Substance Abuse Treatment, Treatment Survey of Prison Facilities (Center on Addiction and Substance Abuse 1998).
  - The 1997 Survey of Inmates in State and Federal Correctional Facilities (Bureau of Justice Statistics 1999a).

- A study by the Substance Abuse and Mental Health Services Administration (SAMHSA) found that only 40 percent of correctional facilities (including federal, state, jails, and juvenile facilities) nationwide provided on-site substance abuse treatment, ranging from a low of 16 percent in Mississippi to a high of 71 percent in Delaware. Treatment was defined as detoxification, group or individual counseling, rehabilitation, and methadone or other pharmaceutical treatment.

- According to the Corrections Yearbook 1999, the percent of inmates in a treatment program, as a percentage of all inmates, ranges from a low of 0.8 percent in Louisiana to a high of 68 percent in Alaska. On average, 16 percent of all inmates have experienced treatment, defined as separate unit treatment, addiction groups, or counseling.

- According to the Bureau of Justice Statistics, since 1991 there has been a decrease in participation in professional substance abuse treatment programs in state and federal prisons, but an increase in enrollment in other drug abuse programs, such as self-help or peer groups and drug education class.

- Jails—According to SAMHSA, a total of 34 percent of jails provide "treatment." A majority of jails provide individual (77 percent) or group counseling (64 percent), with 28 percent of jails offering detoxification to inmates. Less than half of the jails used drug testing (42 percent) to monitor offenders. Approximately 36 percent of jails do not provide assessments for drug treatment need.

- State prisons—According to SAMHSA, a total of 61 percent of state prisons provide "treatment." Most state prisons that provided treatment offered individual (90 percent) or group (93 percent) counseling. Family counseling was available in 26 percent of state prisons. Approximately 33 percent of state prisons do not assess for drug treatment need. The vast majority (93 percent) of state institutions provide self-help, 88 percent use drug testing, 83 percent provide education and awareness programs, and only 8 percent of institutions have detoxification capabilities.

- Federal prisons—According to SAMHSA, 93.8 percent of federal prisons provide "treatment." Almost all federal prisons provide group counseling (99.2 percent) and individual counseling (99.2 percent), but only 11.6 percent of federal prisons offer family counseling. A majority of federal prisons also offer what the study refers to as "non-treatment" services. Close to all (86.8 percent) federal prisons assess for treatment need. Approximately 85 percent of federal prisons provide self-help groups, 88 percent use drug testing, 90 percent provide drug education programs, and 23 percent have detoxification capabilities.

## Treatment Programming Issues

- The treatment plan is as important as provision of treatment. Without a plan, treatment can be disjointed, piecemeal, and, ultimately, ineffective. Treatment plans ideally should be:
  - biopsychosocial in nature
  - multidisciplinary in delivery
  - comprehensive in scope
  - driven by ongoing assessments
  - closely monitored.

- Maintaining a drug-free setting is critical for ensuring effective drug treatment, deterring inmates in general, and monitoring treatment. Although there is anecdotal evidence about the high prevalence of drugs and alcohol in correctional facilities, drug tests suggest otherwise. On average, over 95 percent of samples from 41 agencies tested negative (i.e., drug free)..

- Bridging the gap between research and practice requires addressing critical barriers. Research in Residence, a pilot program in New York State, matched researchers with community clinics to assist the clinic implement research-based treatment improvements, yet numerous challenges precluded many improvements from occurring. These challenges may pose more significant barriers to correctional institutions.

## Key Research Questions

- What exactly is the treatment need/services gap?

- Why do correctional facilities choose particular treatment programs? Among the many possible treatment approaches, why take one particular approach? Who makes this decision? Are treatment programming decisions driven primarily by unique, one-time opportunities, legislation, correctional philosophy, or other factors?

- How many facilities evaluate their programs, including screening and assessing potential clients and matching that information to new and improved programs?

- What are the primary challenges to providing drug treatment?

- What are the challenges involved in linking substance abuse treatment to other aspects of correctional operations?

- Are there certain types of treatment that are easier to implement in a prison setting?

- Do correctional administrators stay current with the effectiveness of different treatment models and adjust their programs as information changes?

CSAC/ 00119

| EXECUTIVE SUMMARY | Chapter 4. Drug Treatment Effectiveness in the Criminal Justice System |
| --- | --- |

## Drug Treatment Effectiveness

- Treatment in and out of correctional facilities works across treatment modalities and offenders, and can include a wide range of positive outcomes:
  - decrease relapse and increase times between treatments
  - improve pro-social behavior
  - decrease criminal recidivism
  - decrease high-risk behaviors
  - improve prospects for employment
  - improve family and other social relations

- Although little conclusive research has been done to compare directly treatment effectiveness across treatment modalities, a combination of pharmacological treatment and psychosocial/behavioral therapy typically are effective for most types of drug abuse.

- The most successful treatments include but are not limited to cognitive-behavioral, social learning, incentive-based, and pharmacological approaches. Promising approaches include therapeutic communities and certain types of individualized treatment programming. Unsuccessful programs include boot camps, intensive probation and parole programs, guided group interaction and positive peer culture programs, and shock incarceration.

## The Foundations of Effective Treatment

- Target dynamic/criminogenic needs.

- Provide multimodal treatment.

- Incorporate treatment responsivity.

- Address risk differentiation.

- Provide skills-oriented and cognitive-behavioral treatment.

- Provide integrated and comprehensive treatment.

- Provide continuity of care.

- Draw on external sources to promote completion of treatment.

- Apply appropriate dosages/levels of intervention.

- Provide effective program design, implementation, and monitoring.

- Involve researchers in program design, implementation, and evaluation.

CSAC/ 00120

## The Future of Effective Drug Treatment?

- Researchers are beginning to conduct research that can better identify what treatments, either in isolation or in combination, work best (i.e., are most effective in reducing drug use, criminal behavior, and other negative outcomes, and in increasing positive outcomes, such as education, employment, etc.).

- Comprehensive models of treatment that include multiple interventions and involve continuous assessment and treatment may prove ultimately to be the most effective treatment strategy.

- Although considerable advances in drug treatment have been achieved, few of these advances have been systematically incorporated into correctional practice. Thus, the critical challenge for researchers and practitioners lies in identifying ways in which research and practice can be effectively linked.

## Compulsory Drug Treatment

- Research shows that treatment need not be voluntary to be effective.

- Early criminal justice system intervention can force clients to remain in treatment, resulting in long-term benefits for offenders and more substantial changes in behavior during treatment.

## Cost-Effectiveness

- Different sources agree that drug treatment is cost-effective, with the initial and extra investment in treatment considerably offset by reduced criminal behavior and criminal justice system involvement and by increased employment opportunities. Some estimates indicate that every $1 invested in addiction treatment programs yields between $4 and $7 in reduced drug-related crime, criminal justice costs, and theft. Additional benefits accrue in the form of savings and positive outcomes for families, potential victims, and society.

## Methodological Issues

- Research on drug treatment effectiveness suffers from a wide range of methodological challenges and flaws, including:
  — selection bias
  — measuring drug use vs. drug abuse vs. drug dependency/addiction
  — measuring drug treatment need severity/level
  — measuring recidivism
  — poor data quality generally, including record-keeping and data management issues.

## Key Research Questions

- How does use of illicit drugs intensify or perpetuate criminal activity? How does a reduction in the use of illicit drugs reduce criminal activity?

- What types of treatment approaches work in a jail setting vs. a prison setting?

- What are the primary obstacles to effective treatment in correctional settings?

- What are the unique challenges and programmatic issues involved in treating drug use, drug abuse, and drug dependency/addiction?

- What treatment approaches work best for high-severity drug abusers vs. low-severity drug abusers?

- How should recidivism be measured?

- What factors are most instrumental for preventing relapse?

- What factors are most instrumental for not only preventing relapse but also criminal recidivism?

- What is the relative cost benefit/cost-effectiveness of different treatment approaches?

| EXECUTIVE SUMMARY | Chapter 5. Post-Release Drug Treatment in the Criminal Justice System |
|---|---|

## Reentry of Offenders into the Community

- Although reentry programs vary in the types of services provided and the types of offenders targeted, the main goal of these programs is to reduce recidivism among ex-offenders and help them adjust to life in the community.

- Post-incarceration services range from providing educational and vocational services to programs specifically geared toward drug treatment. The most common post-incarceration services generally include one or more of the following:

    Vocational training and job placement services
    — Life skills programs
    — Family therapy
    — Housing assistance
    — Drug treatment
    — Intensive community supervision

- Some programs offer comprehensive post-release services, including drug treatment, employment and housing assistance, family strengthening services, and physical/mental health services.

## Measuring Program Effectiveness

- Research indicates that post-release services may decrease recidivism and prevent relapse:

    - Overall, clients who receive aftercare services fare significantly better along many dimensions, including recidivism, compared with those who do not receive aftercare.

    - Vocational training and job placement programs appear to have a positive effect on employment for ex-offenders. However, there is evidence that these types of programs are not successful in decreasing recidivism.

    - The increased surveillance and control of Intensive Supervised Probation/Parole (ISP) does not appear to result in reduced recidivism. However, combining drug treatment with ISP may have more positive results.

## To What Extent Have Linkages Been Developed?

- The call for post-release structure, supervision, and treatment of offenders is pervasive in the treatment literature. Nevertheless, many researchers note that post-release supervision is inadequate and that few offenders receive post-release drug treatment or reentry services.

- A major obstacle to developing linkages with post-incarceration supervision and community services is the lack of coordination among correctional institutions, mental health providers, and other aftercare service providers in the community.

- Case managers can play a critical role in assisting with post-release treatment by

    — assessing an offender's needs and ability to remain substance and crime free

    — planning for treatment services and other criminal justice obligations

    — maintaining contact with other criminal justice officials

    — brokering treatment and other services for the offender

    — monitoring and reporting progress to other transition team members

    — providing client support and helping offender with all aspects of treatment and reentry

    — monitoring urinalysis, breath analysis, or other objective tests of substance use

    — protecting the confidentiality of clients and treatment records.

CSAC/ 00122

## Methodological Issues

- The methodological issues involved in evaluating post-incarceration service programs parallel those for evaluating treatment effectiveness, including:
  - selection bias,
  - measuring drug use vs. drug abuse vs. drug dependency/addiction,
  - measuring drug treatment need severity/level,
  - measuring recidivism, and
  - poor data quality generally, including record-keeping and data management issues.

- Selection bias represents a particular challenge when assessing post-release services because many programs rely on the motivation of the offender rather than institutional coercion. Among offenders released from prison, the disappearance/dropout rate from parole and/or treatment can be considerable, resulting in a highly motivated treatment group and, in turn, biasing treatment vs. control group comparisons.

- An additional critical problem is that few studies examine relapse rates for offenders participating in aftercare programs.

- Many studies do not distinguish between aftercare effects versus effects that may result from duration of supervision or from in-prison treatment, offender-level characteristics, or effects due to family or community characteristics.

## Key Research Questions

- Are the linkages between prisons and communities adequate? If not, why?

- How are treatment priorities set for individual offenders as they reenter society?

- What are the major obstacles to providing drug treatment aftercare?

- How effective are reentry and post-release supervision and aftercare programs in reducing recidivism, preventing relapse, and promoting positive outcomes?

- Among existing reentry and post-release programs, which are the most effective?

- What types of reentry and post-release programs work best for which types of offenders, especially for level of drug problem (use/abuse/addiction) and risk of reoffending (prior criminal history)?

- What types of policies will promote and allow for coordination and cooperation among the criminal justice system practitioners, mental health providers, and community service providers?

- How can reentry of violent offenders with drug treatment needs best be managed?

- What are the rates of aftercare attendance among parolees? How does aftercare attendance affect long-term treatment goals?

- What is the overall quality of service provided by aftercare treatment centers?

- Does case management make a positive difference? What elements of case management are most important?

- How does an increase in the prison population, as well as subsequent releases, affect the capacity to implement quality aftercare services?

- How, or to what extent, do factors such as race, sex, family structure, neighborhood conditions, and other contextual factors influence the effectiveness of post-release drug treatment services? How, or to what extent, can they assist with these services?

| EXECUTIVE SUMMARY | Chapter 6. Barriers to Drug Treatment in the Criminal Justice System |

## Political Barriers

### Declining Public Concern about Drug Abuse

- Public concern about drug abuse has declined. In 1989, 38 percent of the American public viewed drug abuse as the single most important problem facing the country. A decade later, only 5 percent of the public expressed this view.

- Public opinion polls show that the public consistently supports rehabilitation and treatment, even as they support "get tough" sanctioning of serious and violent offenders.

### No Federal Requirements for Coordinated Case Management or Aftercare

- Despite infusions of federal funds to states to provide correctional drug treatment, case management and aftercare are not required.

### Lack of Intra- and Inter-Governmental Coordination of Efforts

- Criminal justice actors often duplicate efforts already performed by others within the criminal justice system or others in local and state health and welfare agencies.

- States without treatment resources may contribute to criminal activity and treatment demands in other states.

### Prioritization of Bed Space Management over Drug Treatment

- The lack of commitment from correctional executives and state policymakers poses one of the biggest challenges to providing effective and sustained drug treatment in correctional settings.

### Opposition and Skepticism about the Effectiveness of Drug Treatment

- In general, support for correctional drug treatment faces considerable political opposition. The opposition in part is due to public and political beliefs that drug addiction is not a public health problem but rather is a moral failing of individuals. No one agency has responsibility for promoting drug treatment policies, and political support for treatment frequently is lacking.

- Despite research demonstrating the effectiveness of drug treatment, many legislators and correctional executives believe otherwise and see little reason to support programs that in their view receive little public support.

CSAC/ 00124

## Resource Barriers

### Lack of Funding for and Prioritization of Treatment

- Despite considerable infusions of federal dollars into state drug abuse programs, lack of funding for treatment constitutes a key barrier to treatment. More than 70 percent of state and federal prison administrators cite inadequate funding as the greatest challenge to providing treatment.

- The lack of funding is directly linked to another barrier to correctional treatment—the lack of prioritization of treatment among correctional executives.

- Although these factors affect the amount of drug treatment in prisons, they also substantially affect the quality of treatment.

### Uncertainty and Certainty about How Best to Utilize Scarce Resources

- Despite significant advances in research, information is needed about which programs, including drug treatment, result in the greatest benefits, are the most cost-effective, and can be feasibly implemented in a correctional setting.

- Certain programs that have been shown to be ineffective, or whose effectiveness has not been determined, nonetheless receive considerable ongoing political support.

### A Need for Integrated Community-Based Services

- Most communities do not have the services necessary for diverting offenders from prison or for continuing ex-offender treatment. When services are available, they frequently are not coordinated or easily accessible to offenders. In many instances, potential providers have little incentive to work with offenders. In others, correctional, health, welfare, and other agencies are unwilling or unable to cooperate with one another to provide continuity of treatment.

## Assessment Barriers

### Administrative and System Issues

- Multiple and redundant assessments are conducted at various stages of processing.

- Time constraints prevent conducting screening and assessments.

- Information is collected that can not be easily used.

- Staff are not trained adequately on the administration and use of screening and assessment instruments.

- Criminal justice personnel may lack familiarity with mental health or substance abuse disorders.

- There may be limited time and resources for codifying existing information, transferring it to various parts of the criminal justice system, or easily accessing existing information.

### Inappropriate Use of Assessment Instruments

- Staff may not complete and use screening and assessment instruments appropriately.

- There may be a lack of consistency in questions or documentation to allow reliable analysis of program-level needs or outcomes.

- Non-validated instruments may be used.

- Instruments may be used for populations for which they were not designed.

- Instruments may not address criminogenic needs.

- Records may be incomplete, misleading, or mislabeled.

- Traditional, subjective "intuitive assessments," or "first-generation assessments," still are widely used, despite demonstration of their ineffectiveness.

## Minimal Assessment of Co-Occurring Disorders

- The primary barrier to treating co-occurring disorders is the minimal attempt systemwide to screen and assess for these disorders.

- Mental health and substance use disorders have a waxing and waning course and may appear in different forms at different points in time. This variability leads to different, and often conflicting, diagnoses at different stages of processing.

- There is considerable symptom interaction between co-occurring disorders, leading to difficulties in interpreting whether symptoms are related to mental illness or substance abuse.

- Individuals in the criminal justice system may anticipate negative consequences related to disclosure of mental health or substance abuse symptoms.

## Limited Guidance from Research about the "Best" Instruments

- Few studies comprehensively and comparatively examine the effectiveness of different types of screening and assessment instruments.

- There is little systematic research identifying which criminogenic needs most influence future offending.

- Research has not shown the combination of risk, needs, personality types, and responsivity needed for programming to be most effective, and how assessments can be devised that can be feasibly used to assist with decisionmaking.

## Administrative and Organizational Barriers

### Legislative or Policy Restrictions on Treatment Access

- Legislative or policy requirements frequently limit treatment to inmates who have a lifetime history of substance use or have been convicted of drug sales or drug trafficking, irrespective of their current use pattern. Programs also may be required to exclude violent and/or sex offenders and those involved with prison gangs. The exclusions assume, incorrectly, that all drug-involved offenders have substance abuse problems, that only those offenders with lifetime histories of use need treatment, or that offenders who engage in drug trafficking require treatment.

- Correctional facilities may have policies that limit treatment access by restricting the movement of inmates to facilities with treatment services, even though treatment would be appropriate.

### Difficulties in Implementation and Delivery

- Treatment programs often encounter opposition because they run counter to the established punishment/control culture in correctional settings.

- The involvement of experienced treatment providers is crucial at all stages of implementation, including design and monitoring of both the program and its budget. Without this involvement, programs frequently suffer from a wide range of challenges, including failure to obtain appropriate supplies, placement of inappropriate clients, and an inability to anticipate and address fluctuations in available resources.

- The best designed programs are ineffective if inappropriately delivered, yet many evaluations indicate that program delivery is frequently and significantly compromised.

## Challenges in Institutionalizing Effective Treatment

- Treatment programs too often rely on specific individuals to motivate and sustain them. As a result, when those individuals leave, programming frequently suffers. Sustained and effective treatment requires institutionalizing key aspects of treatment programming, including commitment to treatment, documentation of program policies and procedures, and commitment to hiring trained counselors.

## Overcrowding and Security Issues Compromise Treatment

- Security issues in correctional facilities represent a persistent problem for drug abuse programs. If inmates with different risk classifications are placed in the same program, lower-risk offenders are put at risk and treatment is compromised. However, because of limited general population bed space, treatment programs frequently become a primary source for relieving overcrowding.

- Sometimes treatment is not offered to inmates in high-security facilities due to costs associated with providing treatment in these settings, even though treatment could be beneficial.

## Limited Treatment Access within Corrections Due to Location

- The frequent placement of correctional facilities in remote areas or a limited set of institutions can undermine treatment, making it difficult to attract qualified treatment counselors.

- Treatment programs generally are located in a small number of facilities within state correctional systems. As a result, many inmates are not sent to treatment because of the distance involved. Those placed in treatment frequently are too far away for family members to participate in treatment.

## Challenges in Training and Retaining Treatment Staff

- Effective treatment requires well-trained staff and a certain level of consistency in staffing, yet many programs suffer from both problems.

- Effective treatment is facilitated by mutual understanding among treatment and correctional staff, but few correctional staff are cross-trained in both correctional and treatment orientations.

## Conflicting Treatment and Correctional Cultures

- Many correctional officers do not understand, appreciate, or support treatment, while many treatment providers view correctional philosophies as fundamentally inappropriate, unnecessary, and ineffective. Ultimately, the conflicting correctional and treatment cultures typically work against treatment programming and efficacy. Few institutions directly address this conflict.

## Privately Run Prisons May Not Prioritize Treatment

- Although there are no definitive studies of treatment provision or effectiveness in privately vs. government-run correctional facilities, evidence suggests that privately run facilities do not prioritize treatment, possibly due to a conflict of interest (e.g., a desire to fill bed spaces).

## Key System Gaps Contribute to Lack of Treatment

- Pre-sentencing investigations can highlight the needs of offenders and assist with diversion. Frequently, however, pre-sentencing reports do not focus on or emphasize drug treatment needs.

- One of the major barriers to drug treatment in correctional settings is the fact that need exceeds demand by a ratio of 5 to 1 in state and federal prisons. Diversion to non-incarcerative treatment programs can alleviate this problem, but it often is not supported or is not available.

- Three-fourths or more of offenders with histories of heroin and cocaine abuse relapse within three months of release from prison and engage in criminal activity. The absence of effective drug treatment in prisons, coupled with limited or no aftercare treatment, can contribute both to prison growth and to the demand for correctional drug treatment.

## Programmatic Barriers

### Limited or Low-Quality
### Case Management

- For most treatment programs to be effective, there must be successful coordination of services and transitions from one stage of processing to another. For this reason, case management is an essential part of the treatment process. However, case management frequently is not provided or suffers from several problems. In addition, case management plans rarely are fully developed and often do not include relapse prevention strategies.

### Lack of Monitoring or
### Drug Testing

- Research shows that frequent monitoring and drug testing can significantly reduce relapse and recidivism rates, yet many drug-abusing offenders released from correctional facilities are not monitored closely or tested.

### Availability of Drugs in
### Correctional Settings

- Correctional drug treatment can be significantly undermined by the availability of licit and illicit drugs. Inattention to security issues and control of drug trade can compromise treatment goals and reduce treatment effectiveness.

### Inappropriate Treatment or
### Delivery of Treatment

- Treatment should be based on empirical evidence on what works and for whom, but frequently correctional facilities rely on programs that are ineffective or have not been evaluated. These programs also frequently are not implemented or delivered as they were designed.

### Client Resistance to Treatment and
### the Balancing of Rewards and Sanctions

- Although voluntary participation in treatment is not always necessary for treatment to be effective, it nonetheless can contribute to it and, over the long term, may be necessary to reduce relapse. However, many correctional treatment programs fail to incorporate a system of rewards and incentives, such as linking release to treatment completion.

- Rewards and sanctions constitute effective strategies for engaging inmates in the treatment process. However, arriving at an effective balance of the two can present considerable challenges. As a result, correctional and treatment facilities frequently rely on one or the other or, more generally, emphasize sanctions rather than rewards.

### Insufficient Levels of Treatment
### and Reentry Preparation

- Program completion is one of the major predictors of successful treatment. Inmates must be in treatment long enough—generally 12 to 18 months—to end the physical addiction and to allow the full course of treatment to take effect. Yet many inmates do not complete treatment because of behaviors while in treatment or termination of their sentence. In addition, inmates who complete treatment frequently are transitioned directly into society without any type of reentry programming or development of plans for maintaining continuity of care.

### Lack of Treatment Responsivity

- Few correctional treatment programs provide individualized treatment, yet no single treatment is appropriate for all individuals. Treatment programs generally must meet the needs of individual inmates and accommodate their particular personality, circumstances, and learning style, what sometimes is referred to as "treatment responsivity." Responsivity includes addressing issues such as co-occurring disorders, racial/ethnic and gender differences in both needs and the effectiveness of specific treatment modalities, and cultural competency and differences.

CSAC/ 00128

## A Comprehensive Correctional Drug Treatment Strategy

- There is no one solution to enhancing drug treatment in correctional settings. Rather, for any sustained strategy of correctional drug treatment, a comprehensive and systematic approach holds the most promise.

- A suggested comprehensive strategy should include generating state-level support and commitment, providing appropriate screening and assessment, appropriate treatment, preparation for release, and aftercare. In each instance, there are concrete steps that can be taken to enhance the provision, delivery, and, ultimately, the effectiveness of correctional drug treatment.

## Key Research Questions

- Of the many barriers to correctional drug treatment, which are the most pervasive, the most important in affecting the provision or effectiveness of treatment, and the most amenable to change?

- What are the major barriers to providing effective drug treatment in prisons? What issues have to be addressed to increase effective drug treatment in prisons?

- How prevalent are key barriers to effective drug treatment in correctional systems?

- Which barriers are the most important in affecting the provision or effectiveness of treatment? Which of these are the most amenable to change?

- Do correctional officials perceive that there is a need for more effective drug treatment in correctional settings?

- Are research findings used in the development of policies and programs, and if not, why not?

- What types of policies encourage collaborative efforts to provide drug treatment?

- To what extent are offenders with substance abuse and dependency needs identified?

- To what degree do correctional institutions cross-train correctional and treatment staff? How effective is cross-training in facilitating effective drug treatment?

# CHAPTER 1.
# Prison Growth, Drug Abuse, and Treatment in the Criminal Justice System

Drug use and abuse are widespread among offenders processed through the criminal justice system, including not only those who are arrested but those in jails and state and federal prisons. This fact, coupled with research showing that treatment can be effective in reducing both drug use and criminal behavior, suggests that substance abuse treatment throughout the criminal justice system, and especially in corrections, should be a priority. A corrections environment potentially offers a unique opportunity to provide treatment because the target population is readily available and generally can be in treatment for at least one to two years. Yet drug treatment has not kept pace with the growth in prison populations. This chapter reviews the major facts about the prevalence of drug use, abuse, and dependency/addiction, as well as treatment in state and federal incarceration facilities. To establish the context for understanding the demand and need for drug treatment, the chapter focuses first on incarceration trends and changes in funding for incarceration and treatment. The chapter then turns to a review of what is known about the prevalence of drug use, abuse, and dependency/addiction, as well as the availability of treatment programming and resources. Finally, a brief discussion of public views toward drug abuse is provided.

CSAC/ 00130

## INTRODUCTION

Drug use and abuse are widespread among offenders processed through the criminal justice system. This fact, coupled with research showing that treatment can be effective in reducing both drug use and offending, suggests that substance abuse treatment throughout the criminal justice system, and especially in corrections, should be a priority. Yet drug treatment has not kept pace with the growth in prison populations.

This chapter reviews the major facts about the prevalence of drug abuse and treatment in state and federal incarceration facilities. To establish the context for understanding the demand and need for drug treatment, the chapter focuses first on incarceration trends and changes in funding for incarceration and treatment. It then turns to a review of what is known about the prevalence of drug use and addiction, as well as the availability of treatment programming and resources. Finally, a brief discussion of public views toward drug abuse is provided.

## INCARCERATION TRENDS

### Increases in State and Federal Prison Incarceration

Incarceration trends among states and in the federal prison system increased dramatically throughout the 1990s (Blumstein and Beck 1999; Caplow and Simon 1999). Figure 1-1 charts this growth. After remaining stable throughout most of the 1970s, the number of incarcerated offenders began rising in the 1980s and then rapidly escalated in the 1990s. The result was an annual increase of 5.6 percent in the number of inmates in jail and prison (Beck and Karberg 2001, 1).

Incarceration rates increased as well during the past two decades. Up until the end of the 1970s, the rate per 100,000 residents hovered around 100 (Caplow and Simon 1999, 64). However, as figure 1-2 shows, between 1980 and 1999, the incarceration rate grew by almost 240 percent to a rate of almost 500 per 100,000 residents.

These changes have resulted in a near quadrupling of the prison population over a 20-year time period, rising from approximately 320,000 in 1980 to 1.3 million in 1999 (see figure 1-1). During this same period, the jail population more than tripled, rising from 182,000 in 1980 to 596,000 in 1999 (figure 1-1). Recent estimates—for mid-year 2000—show federal prisons holding 131,496 inmates and state prisons holding 1,179,214 inmates (Beck and Karberg 2001, 1).



**Figure 1-1. Number of Adult Offenders Incarcerated in State and Federal Facilities, 1980 – 1999**

Source: Mumola (2000); Beck (2000).

Prison - Confinement in a state or federal correctional facility to serve a sentence of more than one year, although in some jurisdictions the length of sentence which results in prison confinement is longer.

Jail - Confinement in a local jail while pending trial, awaiting sentencing, serving a sentence that is usually less than one year, or awaiting transfer to other facilities after conviction.



**Figure 1-2. Incarcerated Population per 100,000 Residents**

Source: Bureau of Justice Statistics (1999b); Beck (2000).

Note: Number of sentenced inmates incarcerated under state and federal jurisdiction per 100,000 residents, 1980-1999.

CSAC/ 00131

### Increases in State and Federal Prison Incarceration

### Drug-Related Offenses

Although there are many factors that drove the recent incarceration trends (Caplow and Simon 1999), incarceration of drug offenders was by far the leading cause of increased correctional populations. Analysis of six serious offenses—murder, robbery, assault, burglary, drug offending, and sexual assault—shows that between 1980 and 1996, 45 percent of the overall growth in the incarceration rate for these offenses was driven by incarceration of drug offenders (Blumstein and Beck 1999, 21). If all other crimes were considered, drug incarceration would account for 33 percent of the overall prison growth between 1980 and 1999 (Blumstein and Beck 1999, 22). The reason for this influence can be seen in the changes in the drug incarceration rate: In 1980, the drug incarceration rate was 15 per 100,000 adults, but by 1996, the rate had increased to 148, representing approximately a 900 percent increase in a 17-year period (Blumstein and Beck 1999, 21).

One of the primary drivers of the drug incarceration rate was the combination of increased arrests for drug violations and tougher sentencing for drug crimes. Figure 1-3 charts the increase in arrests for drug violations. During the 1970s the number of arrests remained relatively stable, ranging between 400,000 and 500,000 arrests annually. Adult drug arrests then increased dramatically throughout the 1980s, dipped down from 1989 to 1991, then continued the earlier decade's increase.

The increased drug arrest rates alone would be insufficient to fuel the dramatic increases in drug incarceration rates without conversion of those arrests into prison sentences. As figure 1-4 shows, however, incarceration of drug offenders grew markedly over a 20-year time span, rising sharply from 1988 onward. Indeed, during the same time that drug arrests grew, so, too, did the conversion of drug arrests into prison sentences. Blumstein and Beck (1999, 55) report that the conversion rate of 1992 was 5 times that of 1980. Although this rate declined somewhat during the 1990s, the conversion rate of 1996 was still 3.6 times that of 1980.

In short, increased arrest rates, coupled with increased rates of converting drug arrests into prison sentences, accounted for almost all of the growth in drug incarceration. Drug arrests accounted for approximately one-third of the growth, and conversion of arrests into prison sentences for two-thirds of the growth (Blumstein and Beck 1999, 55).

Growth in the incarceration of drug offenders need not mean that there is a greater need for drug treatment in prisons. However, drug abuse is highly prevalent among drug offenders, as it is among property and violent offenders (Harrison 2000, 2). In addition, the trend toward incarcerating increasing numbers of drug offenders highlights the potentially increasing role of drugs in corrections. It also suggests the broader context in which drug treatment endeavors are situated. Estimates of the extent of drug treatment need will be reviewed in subsequent sections.



**Figure 1-3. Adult Drug Abuse Violations, 1970 – 1999**

Source: Federal Bureau of Investigation (1999).

Note: Drug abuse violations are defined as state or local offenses relating to the unlawful possession, sale, use, growing, manufacturing, and making of narcotic drugs including opium or cocaine and their derivatives; marijuana, synthetic narcotics, and dangerous nonnarcotic drugs such as barbiturates.

**Figure 1-4. Number of Persons in State Corrections for Drug Violations, 1980 – 1998**

Sources: Mumola (2000); Beck (2000).

Note: Drug offenses include possession, manufacturing, trafficking, and other drug offenses.

## EXPENDITURE TRENDS

Given the increases in incarceration in the U.S., it is not surprising that expenditures have increased dramatically and in parallel fashion. This section briefly reviews expenditure treats, emphasizing the allocation of resources to drug treatment. The next section focuses directly on the extent of drug treatment need in correctional settings.

### Expenditures on Corrections

According to the U.S. Bureau of Justice Statistics (2001), federal, state, and local expenditures on corrections grew by more than 400 percent from 1982 to 1997, from approximately $10 billion to $45 billion. As figure 1-5 shows, expenditures steadily increased for much of the 1980s, before rising more rapidly during the 1990s. Given that incarceration trends were driven primarily by the drug incarceration rate (Blumstein and Beck 1999), the increase in correctional expenditures represents a significant investment in the incarceration of drug offenders.

Expenditures on drug treatment in aggregate have been described by the General Accounting Office. Between 1990 and 1998, "total federal drug control spending rose by 64 percent, from about $9.8 billion in 1990 to about $16 billion in 1998" (GAO 1998, 5). The treatment budget increased by 78 percent during this same time period, with approximately $3.2 billion allocated for drug treatment. Of the treatment funds (20 percent of the $3.2 billion), more than half (54 percent) was allocated to the U.S. Department of Health and Human Services (HHS) to support block grants, treatment, and research (GAO 1998, 6). One-third (34 percent) was allocated to the Department of Veterans Affairs for treating veterans and providing inpatient and outpatient care. The remaining funds went to the Health Care Financing Administration, the Department of Education, the Department of Justice, the federal Judiciary, and the Office of National Drug Control Policy (GAO 1998, 7). Of the HHS's $1.7 billion in 1998, close to $1 million went to the Substance Abuse and Mental Health Services Administration (SAMHSA). Most of these monies are used to support block grants to states. One-sixth of HHS's funding went to the National Institutes of Health (NIH) for conducting research on drug and alcohol abuse. The National Institute on Drug Abuse (NIDA), housed within NIH, is required by Congress to allocate 15 percent of its funding to study "the impact of organization, financing, and management of health services on issues such as access and quality of services" (GAO 1998, 8).

### Expenditures on Drug Treatment as Proportion of Total Expenditures

Consistent and accurate estimates of expenditures on treatment, especially for drug treatment, are not readily available. Existing counts frequently rely on definitions of treatment that are not consistently adhered to across states, rendering valid comparisons difficult. Nonetheless, estimates compiled by the Center on Addiction and Substance Abuse (CASA 1998, 11) indicate that in 1996 less than 5 percent of state prison budgets went toward drug treatment, and that less than 1 percent ($25 million) of the federal prison budget was targeted for drug treatment, including drug abuse education, residential counseling services, and community transitional services.

Such estimates mask considerable variation, however. For example, some states report spending less than 1 percent of the correctional budget on treatment, while others report spending up to 22 percent of their budget on treatment (CASA 1998, 162). In addition, many states are not able to disentangle inmate programming costs from general operations expenditures (CASA 1998, 2001).

On a national level, according to the Office of National Drug Control Policy (2001), more than $3 billion in funds went to drug treatment in 2000, compared with $2 billion to drug prevention and $9 billion to the criminal justice system in the same year. Including



Figure 1-5. Federal, State and Local Expenditures on Corrections, 1982 – 1997

Dollars (in billions)

Year

Source: Bureau of Justice Statistics (2001).

international drug control efforts, along with interdiction, research, and intelligence, more than $18 billion was spent on drug control efforts in 2000.

## PREVALENCE OF DRUG USE

Few reliable estimates of the prevalence of drug use, drug abuse, and drug dependency/addiction in jails and state and federal prisons exist. In a study by CASA (1998, 10), state officials estimated that 70 to 85 percent of their inmates needed drug treatment. Similarly, the Federal Bureau of Prisons estimated that in 1996, 31 percent of their inmates needed treatment (CASA 1998, 10).

Prevalence estimates to date have generally relied on self-reports by offenders, who may not wish to reveal the extent of their involvement with illicit substances. Even if they accurately report drug use (in the past year, past 30 days, at arrest, while in prison, etc.), drug use is not the same as drug abuse or addiction. Thus, although drug screens, such as urinalysis, are accurate in detecting recent drug use, they cannot determine the extent to which an individual suffers from a drug abuse disorder or drug dependency (addiction) disorder, as determined by the American Psychological Association's Diagnostic Statistical Manual, fourth edition (DSM-IV). (In this report, "dependency" and "addiction" are interchangeable.)

Other sources of prevalence estimates draw on more sophisticated assessment strategies, yet few have been conducted on a systemwide basis, rendering generalizations to entire criminal justice systems suspect. In a similar vein, it bears emphasizing that much of the drug treatment effectiveness literature relies on a highly heterogeneous definition of the problem condition—that is, drug use / abuse / dependency—as assessed through an equally heterogeneous range of clinical instruments.

Below, some of the primary sources of prevalence estimates of drug use, abuse, and addiction are reviewed. It should be emphasized that regardless of the exact definition of drug use/abuse/addiction, or of the manner in which these are assessed, most sources indicate that the vast majority of offenders are in need of drug treatment. This assessment, coupled with the considerable increase in U.S. prison populations during the past decade, suggests a considerable growth in the demand for drug treatment. As noted above, the supply of any kind of treatment, much less drug treatment, has not kept pace with this demand.

### Arrest

The most accurate information on the prevalence of drug use at arrest comes from the Arrestee Drug Abuse Monitoring (ADAM) Program, a project of the U.S. Department of Justice, which includes conducting urinalysis tests on adult arrestees in 35 cities across the U.S. ADAM data provide information on recent drug use among arrestees; they do not provide information on the prevalence of drug abuse or dependency. Although ADAM provides highly accurate information for the cities in which it is conducted, it is of limited utility for assessing the extent of drug abuse or dependency / addiction in corrections. Nonetheless, it provides a foundation for estimating the starting point of the criminal justice "funnel," which ultimately leads to corrections for the most serious offenders. Specifically, all sites combined report at least 50 percent of adult male arrestees tested positive for at least one of the NIDA-5 drugs (cocaine, marijuana, methamphetamine, opiates, PCP), with the prevalence as high as 77 percent in San Antonio (ADAM 1999).

### Jail

Jail data on drug use, abuse, and dependency suffer many of the problems noted earlier—most notably, inconsistent definitions of drug problems, reliance on self-reports, or no assessment of the prevalence of drug problems. Drawing on data from the *Survey of Inmates in Local Jails, 1996,* and the *1998 Annual Survey of Jails,* the U.S. Bureau of Justice Statistics (Wilson 2000) reports the following facts about drug use and testing in U.S. jails.

- Among all jail inmates in 1996, 74 percent reported past drug involvement, as defined by regular use of drugs, receipt of drug treatment, intravenous use of drugs, and being sentenced for past drug offenses (Wilson 2000, 3).

- Among convicted inmates in 1996, 66 percent reported active drug involvement prior to admission, 55 percent reported drug use in the month prior to their offense, and 36 percent reported drug use at the time of their offense. (Active drug involvement was defined as using drugs in the month prior to the offense, using drugs at the time of the offense, commission of an offense to obtain money for purchase of drugs, having received drug treatment since placement in jail, or having a current drug charge [Wilson 2000, 3].)

CSAC/ 00134

- Among convicted inmates in 1996 using drugs in the month prior to arrest, 37 percent used marijuana or hashish, 24 percent used cocaine or crack cocaine, 10 percent used stimulants, 9 percent used heroin or opiates, 6 percent used depressants, 5 percent used hallucinogens, and 1 percent used inhalants (Wilson 2000, 1).

- Among convicted inmates in 1996, 36 percent reported using drugs at the time of their offense (Wilson 2000, 3).

- Among jail inmates tested for drugs in 1998, 10 percent tested positive for use of one or more drugs (Wilson 2000, 1).

- Half of all jail inmates in the U.S. in 1998 were in jails that test for drug use (Wilson 2000, 4).

### State and Federal Prisons

Some estimates indicate that over half of offenders in state and federal prisons have a diagnosed substance abuse or dependency disorder (Peters et al. 1998; Robins and Regier 1991). According to the U.S. Bureau of Justice Statistics' *Correctional Populations in the United States, 1997* (Mumola 2000), which is based on surveys of state and federal inmates, drug use is as prevalent among prisoners as among jail inmates (see table 1-1).

- In 1997, 83 percent of state and federal inmates reported ever using any drugs—77 percent for marijuana/hashish, 49 percent for cocaine/crack, 29 percent for hallucinogens, 28 percent for stimu-

lants, 25 percent for heroin/opiates, 24 percent for depressants, and 14 percent for inhalants (Mumola 2000, 61).

- In 1997, 57 percent of state and federal inmates reported using drugs in the past month—39 percent for marijuana/hashish, 25 percent for cocaine/crack, 9 percent for heroin/opiates, 9 percent for stimulants, 5 percent for depressants, 4 percent for hallucinogens, and 1 percent for inhalants (Mumola 2000, 61).

- In 1997, 33 percent of state and federal inmates reported using drugs at the time of their offense (Mumola 2000, 61).

### Drug Abuse and Drug Dependency Disorders

Few studies systematically provide a rigorous assessment of the prevalence of drug abuse and drug dependency/addiction disorders, as defined by the DSM-IV. Indeed, although surveys have been conducted on self-reported prior drug use, and although many site-specific investigations have been conducted, there appear to be few if any systematic assessments of the prevalence of abuse and dependency/addiction disorders among jail or state or federal prison populations.

However, for a three-month period, in the summer of 1991, all offenders (N = 1,165) who entered the federal Bureau of Prisons completed the Inventory of Substance Abuse Patterns (ISAP). Using the American Psychological Association's Diagnostic and Statistical Manual, Third Edition, Revised (DSM-III-R) as a guide, 20.9 percent of inmates met the criteria for psy-

| Table 1-1. Drug Use in Month Prior to Arrest Among Inmates in Jails vs. State and Federal Prisons | | |
|---|---|---|
| | Jails | State and Federal Prisons |
| | % Used Drugs in Month Before Arrest | % Used Drugs in Month Before Arrest |
| Any drug | 55% | 57% |
| Marijuana/hashish | 37 | 39 |
| Cocaine/crack | 24 | 25 |
| Heroin/opiates | 9 | 9 |
| Depressants | 6 | 5 |
| Stimulants | 10 | 9 |
| Hallucinogens | 5 | 4 |
| Inhalants | 1 | 1 |

Sources: Mumola (2000, 61); Wilson (2000, 1).
Notes: Jail estimates are for 1998; state and federal estimates are for 1997.

CSAC/ 00135

choactive substance abuse (now termed "drug abuse disorder") and 30.8 percent for psychoactive substance dependency (now termed "drug dependency disorder"), for a combined prevalence of 51.7 percent having either type of disorder (Murray 1991, 35). The criteria for a diagnosis of drug abuse disorder, as well as for drug dependency disorder, are outlined in table 1-2, using the more recent DSM-IV definitions.

The importance of distinguishing between self-reported drug use versus clinically defined substance use disorders—such as drug abuse disorder and drug dependency disorder—lies in the fact that self-reported accounts of prior drug use likely overestimate the need for drug treatment. However, there is increasingly is evidence that not all individuals are equally likely to become addicted after initial use of a drug (see, e.g., Leshner 1998). Some individuals and groups may have a relatively high genetic disposition toward or general risk of addiction, while others may have relatively low risks. Such dispositions or risks may be reflected in self-reported use statistics, especially those focusing on drug use in the month prior to arrest or at the time of the offense. However, at present, it remains unknown whether or to what extent this is true, and, more generally, whether and to what extent self-report statistics overestimate the prevalence of drug addiction.

## DRUG TREATMENT IN CORRECTIONS

Currently, there are few precise estimates of drug treatment in correctional settings. Some sources identify numbers of inmates receiving treatment, but these rarely are specific on the type of drug treatment. In a review by the Center on Addiction and Substance Abuse, state officials estimated that 70 to 85 percent of their inmates needed drug treatment, but that only 13 percent received any. Similarly, the Federal Bureau of Prisons estimated that in 1996, 31 percent of their inmates needed treatment, compared with 10 percent actually receiving it (CASA 1998, 10).

According to the Bureau of Justice Statistics, which drew on a 1997 national survey of state and federal prison inmates, 24 percent of state and federal inmates participated in some type of alcohol treatment or program in 1997 (Mumola 2000, 66). In 1997, 9.7 percent (101,200) of state prison inmates received drug treatment after admission, down from 24.5 percent (169,700) in 1991 (Mumola 2000, 64). In this same year, 9.2 percent (8,100) of federal prison inmates received drug treatment, which represented a decline from 15.7 percent (8,300) in 1991 (Mumola 2000, 64).

Of inmates receiving drug treatment in state or federal prisons, approximately half were placed in residential facilities and the other half received counseling, with a small fraction receiving any type of maintenance drug therapy (Mumola 2000, 64). Close to 20 percent of state and federal inmates participate in self-help group/peer counseling or education programs (Mumola 2000, 64).

| Table 1-2. Drug Abuse Disorder vs. Drug Dependency Disorder | |
| --- | --- |
| **Drug Abuse Disorder** | **Drug Dependency Disorder** |
| A. Pattern of substance use leading to clinically significant impairment or distress, manifested by one (or more) of the following, occurring within a 12-month period: | A. Pattern of substance use leading to clinically significant impairment or distress, manifested by three (or more) of the following within a 12-month period: |
| • Unable to fulfill obligations at work, school, or home. | • Alcohol tolerance. |
| • Use alcohol in physically hazardous situations. | • Alcohol withdrawal. |
| • Legal problems related to alcohol. | • Consume larger amounts than intended. |
| • Continue to use despite these recurrent interpersonal and social problems. | • Persistently and unsuccessfully tried to cut down. |
| | • Spend much time in activities revolving around obtaining, using, and recovering from alcohol. |
| — and — | • Give up or reduce social, occupational, or recreational opportunities because of use. |
| B. Have not met criteria for substance dependence. | • Continue despite knowledge of persistent or recurrent physical and psychological problems. |
| Source: American Psychological Association. 1994. Diagnostic and Statistical Manual–IV. Washington, D.C.: American Psychological Association. | |

CSAC/ 00136

Assuming that the need for drug treatment in state prisons remained proportionally constant between 1991 and 1997, and that in 1991 all inmates who needed treatment were receiving it (24.5 percent), then approximately 150,000 state inmates who needed drug treatment in state prisons in 1997 were not receiving any (based on subtracting 9.7 percent of the 1997 state prisoner population, which is approximately 100,000, from 24.5 percent of the 1997 population, which is approximately 250,000).

This figure (150,000) likely underestimates the drug treatment gap in state prisons significantly, since not all inmates who needed drug treatment in 1991 received it. For example, if one used a 50 percent prevalence estimate as the basis for ascertaining drug treatment need (see table 1-1), then in 1997 approximately 421,000 state inmates who needed drug treatment went without it (522,000 minus 101,200, or 9.7 percent).

A considerably more liberal estimate comes from the Center on Addiction and Substance Abuse (1998), which assumes that 75 percent of state and 31 percent of federal inmate populations are in need of drug treatment. Applying the 75 percent assumption to the 1997 state prisoner population would indicate that approximately 680,000 inmates needed drug treatment but did not receive it. Drawing on the same assumption of a 75 percent need for treatment, figure 1-6 shows the increasing gap in treatment need vs. treatment services resulting from the dramatic increases in prison population growth during the 1990s.

Whether the more conservative or liberal estimates of the treatment need/service gap are relied upon, there is a clear indication that many prison inmates who need treatment are not receiving it. This gap persists and has been increasing, despite a considerable infusion of federal dollars into substance abuse treatment programs. For example, funding for treatment has been provided through the Residential Substance Abuse Treatment (RSAT) State Prisoners Formula Grant Program through the National Institute of Justice, as well as other programs, such as the Violent Offender Incarceration and Truth-in-Sentencing (VOI/TIS) Incentive Formula Grant Program and the Substance Abuse Prevention and Treatment Block Grant Program (CPO 1998). Yet even with such infusions, in absolute numbers, state prisons have decreased drug treatment for inmates, with those receiving drug treatment declining from 169,700 inmates in 1991 to 101,200 inmates in 1997 (Mumola 2000). This decline is significant in part given the dramatic growth in state prison populations,

which in turn were driven by increased drug incarceration rates. The decline also is significant because it stands in contrast to data indicating that state and federal correctional facilities operating as alcohol/drug treatment institutions rose from 92 in 1990 to 192 in 1995, and that 97 percent of correctional facilities offer drug and alcohol counseling (Bureau of Justice Statistics 1997).



**Figure 1-6. Treatment Need in State and Federal Correctional Settings vs. Number of Inmates in Treatment Programs, 1990 - 1996**

Source: Center on Addiction and Substance Abuse (1998).

Note: The number of inmates needing drug treatment is calculated to be 75 percent of the total number of state inmates and 31 percent of the total number of federal inmates for each year based on estimates by the General Accounting Office, Center for Addiction and Substance Abuse, and the Federal Bureau of Prisons. The number of inmates in treatment is estimated from data reported in The Corrections Yearbook (1990-1996) (CASA 1998, 114). The 75 percent estimate likely overestimates the extent of serious substance abuse problems (e.g., drug dependency disorder, as defined by the DSM-IV), but nonetheless echoes many self-report findings concerning the extent of drug use and abuse.

CSAC/ 00137

## PUBLIC SUPPORT FOR DRUG TREATMENT

Although the relationship between drug treatment in correctional facilities and public support for drug treatment is not necessarily direct, examination of changes in public opinion can help provide a broader context in which to situate correctional drug treatment services. As table 1-3 shows, public concern about drug abuse peaked during the late 1980s and subsequently and dramatically returned to considerably lower levels. Specifically, in 1989, 39 percent of the American public viewed drug abuse as the single most important problem facing the country. A decade later, only 5 percent of the public expressed this view. Thus, one might speculate that one reason correctional drug treatment has not kept pace with increased demand is not simply that there has been an exponential growth in the need for drug treatment, but that there is increasingly little public concern about drug abuse.

## KEY RESEARCH QUESTIONS

In reviewing the literature on the prevalence of drug use, abuse, and dependency/addiction in correctional settings, and the availability of drug treatment, it is evident that a number of critical research questions have yet to be addressed. Key research questions that future research should address include the following:

- Among newly sentenced offenders, how widespread is the need for drug treatment of various kinds? That is, what is the prevalence not only of drug use, but of drug abuse and drug dependency/addiction for specific types of drugs (heroin, cocaine/crack, alcohol, etc.)?

- What precisely is the gap between treatment need and services in jails and prisons?

- Which types of drug treatment services are most prevalent and why?

- How does the extent of drug abuse/addiction among prisoners compare with other problems, such as lack of education or vocational training, or mental or physical illness?

- What factors determine which offender services are funded?

| Table 1-3. Public Concern about Drug Abuse, 1988–1999 | |
|---|---|
| | Percent Reporting Drug Abuse as the Single Most Serious Problem Facing the United States |
| 1988 | 11% |
| 1989 | 39 |
| 1990 | 18 |
| 1991 | 11 |
| 1992 | 8 |
| 1993 | 6 |
| 1994 | 9 |
| 1995 | 6 |
| 1996 | 10 |
| 1997 | 17 |
| 1998 | 9 |
| 1999 | 5 |
| Sources: Pastore and Maguire (1999). | |

CSAC/ 00138

# CHAPTER 2.
# Screening and Assessment for Drug Treatment in the Criminal Justice System

Research has shown that not every program works for every person in every setting. Effective screening and assessment is the first step toward providing effective treatment care for incarcerated offenders. For this reason, the screening and assessment process has been called "the first line of defense" in the offender identification process. Because of the high demand and scarce resources for treatment, and because effective treatment can reduce both drug use/abuse and criminal behavior, it is important to identify and target those people with the greatest need for treatment as well as those who will benefit most from treatment. This chapter reviews the screening and assessment process as well as key issues bearing on the effectiveness of this process. Specific topics include defining screening and assessment, including identifying the uses of screening and assessment; reviewing commonly used instruments; describing the screening and assessment procedures used in correctional facilities; and discussing barriers to screening and assessment.

CSAC/ 00139

# INTRODUCTION

Research has shown that not every program works for every person in every setting. Effective screening and assessment is the first step toward providing effective treatment care for incarcerated offenders. For this reason, the screening and assessment process has been called "the first line of defense" in the offender identification process. Because of the high demand and scarce resources for treatment, and because effective treatment can reduce both drug use/abuse and criminal behavior, it is important to identify and target those people with the greatest need for treatment as well as those who will benefit from treatment most.

This chapter reviews the screening and assessment process as well as key issues bearing on the effectiveness of this process. Specific topics include defining screening and assessment, including identifying the uses of screening and assessment; reviewing commonly used instruments; describing the screening and assessment procedures used in correctional facilities; and discussing barriers to screening and assessment.

## DEFINING SCREENING AND ASSESSMENT

Screening refers to the initial determination of a substance abuse, mental health, medical, or other problem. It is a short process, typically completed in 5 to 30 minutes and not requiring staff with expertise or extensive experience in the area. Oftentimes, screening is handled through a self-report, sometimes guided by a counselor, as opposed to an interview or interactive session. For drug treatment, the screening process not only identifies people with drug and alcohol problems, but also screens out those who are unsuitable for treatment.

After an initial screening, those who may need treatment are assessed and matched to treatment programs. Assessment is an in-depth process, often taking several hours and involving substance abuse professionals (Peters and Peyton 1998). During this stage, the needs of the client are explored, including coverage in the following areas: mental health history and status, family and social relationships, medical/health care history and status, and criminal justice history and status.

Effective screening and assessment involves the use of instruments, but these cannot be used alone to assess the client. Screening and assessment instruments must be supplemented by other information garnered from individual interviews and archival material such as criminal justice records, previous treatment records, drug test results, and observations. Physical signs such as dilated or constricted pupils, abnormal eye movements, and elevated or lowered vital signs can indicate alcohol or drug use. These signs can be discovered during a systematic and standardized observational evaluation at both the screening and assessment stages.

## SCREENING AND ASSESSMENT IN THE CRIMINAL JUSTICE SYSTEM

### Goals

Several guides break out the functions of screening and assessment (e.g., Inciardi 1993; Peters and Bartol 1997; Peters and Peyton 1998). The more prominent functions are listed in table 2-1.

For assessment involving substance abuse issues, a different set of functions or goals can be identified. These are listed in table 2-2.

---

**Table 2-1. Selected Goals of Screening**

- Determine presence of substance abuse, mental health disorder, and medical conditions.
- Define major areas of strengths and deficits.
- Screen out persons with no identifiable problems.
- Identify individuals with a history of violent offenses/behavior.
- Identify environmental factors (e.g., residential stability, relationship issues) or other problems (e.g., mental disorders, cognitive deficits) that may undermine success in treatment.
- Identify minimum level of security or supervision needed to promote public safety.
- Identify motivation for participation.
- Identify perceived benefits as well as disadvantages of participation in the program.

Sources: Inciardi (1993); Peters and Bartol (1997); Peters and Peyton (1998).

---

**Table 2-2. Selected Goals of Assessment for Offenders with Potential Substance Abuse Problems**

- Examine the scope and nature of substance abuse problems.
- Identify specific psychosocial problems to be addressed in treatment, including mental health disorders.
- Understand the impact substance abuse has had on the individual, including its influence on criminal involvement.
- Determine the client's level of maturation and readiness for treatment.
- Identify specific physical problems to be addressed in treatment planning.
- Identify the full range of service needs, pursuant to treatment planning.
- Match participants to particular services.

Sources: Inciardi (1993); Peters and Barton (1997); Peters and Peyton (1998).

---

CSAC/ 00140

In addition to screening and assessment, Peters and Bartoi (1997) identify a process called diagnosis, which occurs after screening and before assessment. The goals of diagnosis include identifying the presence of symptoms of mental health and substance abuse and developing a hypothesized psychosocial assessment. Diagnosis helps to determine where to focus treatment (e.g., mental disorder, substance abuse, or both), and allows professional judgments to complement actuarial-based assessments.

Timing

Assessment should occur at the earliest possible stage in the criminal justice system and should be a continuous process. An early assessment can help to guide the person through the system, via pretrial diversion and alternatives to incarceration, including drug courts. Assessment should be a comprehensive and continuous process because treatment itself is a process that is supposed to lead to change. Ideally, assessment precedes, occurs during, and follows interventions. Reassessments are valuable for several reasons (Bonta 1996). First, they protect the public by alerting the criminal justice system to changes in an offender's situation, which may be a sign to change supervision levels and/or intervene. Second, reassessments are an opportunity for the criminal justice system to evaluate its practices and programs and monitor program effectiveness via change in offender attitude, values, behaviors, etc. Figure 2-1 outlines the ideal type of assessment process.

Peters and Bartoi (1997) recommend screening for both mental health and substance abuse problems at the earliest possible point in processing, but not before an offender has reached sobriety (usually through detoxification). Universal screening for *both* mental health and substance abuse should be conducted given the high rates of substance abuse and co-occurring disorders among criminal justice-involved offenders (Peters and Bartoi 1997).

Inciardi (1993) outlines the placement, purpose, and importance of continuous assessment, of varying types, throughout criminal justice processing:

- Treatment needs assessments should be in place to determine what type of programmatic intervention is appropriate—long-term or short-term residential treatment, intensive or moderate outpatient treatment, chemical detoxification, etc. In this capacity, needs assessment acts as a "broad sorting mechanism."

- Readiness for treatment assessments should be implemented to understand better the extent to which clients are motivated for treatment, and whether they are likely to benefit from the services offered to them.

- Comprehensive treatment planning assessments should occur once a client reaches a given program to determine how intensive the treatment should be and on which areas it should focus.

- Treatment progress assessments should be undertaken periodically to determine whether clients are responding to treatment and whether to change an intervention.

- Treatment outcome assessments are also critical to determine the extent of behavioral change, success, and failure.

Treatment screening and assessment can happen at a variety of "impact" points in the system and ideally can help to shape the best system options for the offender. [Discussions of system impact points can be found in reports by the National Institute of Corrections (Carter



Figure 2-1. Comprehensive and Continuous Assessment Process

Sources: Tarter, et al (1991); McLellan and Dembo (1992)

CSAC/ 00141

1991) and Vigdal (1995). In addition, the Center for Substance Abuse Treatment has produced a Criminal Justice System Planning Chart for display, available through the National Clearinghouse for Alcohol and Drug Information at 1-800-729-6686 or 301-468-2600.] For the purposes of this report, we have adapted information from several lists. The system "impact" points and opportunities for intervention and data collection are shown in table 2-3, and the importance of screening and assessment at several of these "impact" points is described below.

*Pretrial*

During the pretrial phase, the largest numbers of potential substance abusers are in the criminal justice system. This can be the best time for intervention and screening because of the ability to gather information about the largest group of people who have had some kind of contact with the law. Critical information about the person should be collected at this phase, including criminal record, alcohol or drug abuse assessment and treatment information, and general history. This information should follow the offender throughout processing. At this stage, information can be used to guide system options, including arraignment, plea bargaining, and the choice of an alternative to prison.

To alleviate prison crowding, a well-planned and monitored pretrial release program can be an effective alternative to prison. Any such program should be based on a careful assessment of the defendant, appropriate treatment and sanctions, and continuous monitoring and evaluation.

*Diversion from Incarceration*

**Drug Courts.** Drug courts have made a major impact in the criminal justice system over the past decade. Currently, there are over 400 drug courts throughout the country aimed at diverting addicted offenders to a different "system," one of drug treatment, monitoring, and criminal sanctions.

Screening and assessment for drug courts provides a structured way for the courts to understand the risks and needs of the participant. A screening and assessment system marks the beginning of the drug court process and helps to integrate diverse information to form a comprehensive picture of each individual participant. It provides the foundation for supporting other drug court functions, including treatment planning, placement in treatment, and identification of the need for other services. It also provides the offender with an orientation to the program, and thus should be structured for the participants to learn about the program and for the program to learn about the participants. At this stage, screening and assessment can be used to assess motivation, commitment to treatment, and "readiness" for treatment.

**Boot Camps.** Boot camps are one alternative for typically young, nonviolent offenders, although the programs are not exclusively for young offenders. Boot camps involve intensive supervision and treatment

| Table 2-3. Impact Points and Their Assessment Implications | |
|---|---|
| **Impact Point** | **Assessment Implications** |
| Pretrial | Screening and assessment can be used with the largest number of potential substance abusers in the system. They can be used to raise awareness of potential problems and to identify the need for resources. |
| Pre-sentencing | Screening and assessment can be used to divert offenders into treatment programs. |
| Drug Courts | A primary diversionary program is a drug court, which provides an alternative, nontraditional form of sanctioning for addicted offenders. Drug courts, which rely on appropriate identification of substance users/abusers, focus on drug treatment and monitoring as well as timely criminal sanctions. |
| Sentencing | Sentencing provides an opportunity to link treatment with sanctioning. |
| Probation | Assessment can provide better case management through identification and treatment of needs. |
| Intermediate Sanctions | As with probation, intermediate sanctions can center around treatment plans even as they include a focus on punishment. |
| Jail/Prison | Screening and assessment assists with monitoring offenders, planning treatment, and providing other special needs while in an incarcerated setting. |
| Post-incarceration | Data about parolees is important for case management, maintaining treatment progress, and transitioning back into the community. |
| Source: Vigdal (1995). | |

programs; they are structured and disciplined programs requiring physical training, work, and treatment. By January 1996, a majority of states (37) offered boot camps as an alternative to incarceration and, at the federal level, the Bureau of Prisons operated two boot camps. Potential participants in boot camps are screened for substance abuse, criminal history, and psychological capacity for the program. Careful matching is critical because the programs focus on techniques such as confrontation, discipline, and behavior modification. Reviews of boot camps have been consistently unfavorable; indeed, according to one review, boot camps are one of the "unmitigated failures" of the new treatment models (Gendreau and Goggin 1997, 273).

TASC. Another popular program is Treatment Alternatives to Street Crime (TASC). This program provides a mix of supervision, treatment, and sanctions and rewards, involving close collaboration with community treatment programs. The TASC program provides screening, assessment, treatment planning, monitoring, urinalysis, and court liaison functions. The program refers a client to a community-based treatment program, monitors the client's progress and compliance, and reports results back to the referring criminal justice agency. TASC programs can help alleviate prison crowding through diversion to treatment, when it is deemed—through careful screening and assessment—to be the most appropriate course of action for the defendant. A 1996 effectiveness study of TASC found that outcomes for all study sites (7) were moderately favorable and confined to a high-risk offender subsample (Anglin et al. 1996).

*Probation, Jail, Prison, and Post-Incarceration/Parole*

Probation. The majority of adjudicated offenders are placed on probation, which is community-based supervision that includes a mix of counseling, surveillance, and support services. According to Vigdal (1995), the role of probation has changed dramatically over the past 30 years, from community correction programs for nonviolent offenders to community correction programs addressing a complex set of needs and risk management for offenders requiring a broad array of specialized services. Today, effective probation programming faces significant challenges due to diminishing resources, funding, and personnel.

Continuous screening and assessment is particularly important for offenders on probation. On one hand, probation officers must monitor increasing numbers of probationers and help address their needs. On the other hand, probation officers must give priority to supervision and compliance with court-ordered sanctions. Maryland's Break the Cycle program, for example, offers frequent testing and sanctions for probationers in addition to enhanced supervision. Other community-based initiatives include Intensive Supervised Probation or Parole (ISPs) (Petersilia 1995). However, the treatment emphasis is not as prominent in ISPs, and study results of ISPs have shown them to be largely ineffective.

Jail. According to a recent Substance Abuse and Mental Health Services Administration (SAMHSA) report (2000), assessment occurs in 63.6 percent of jails in this country. Due to the typically shorter terms of incarceration, many jails offer detoxification and short-term counseling and self-help groups. Jails can also use drug testing as a way to monitor offenders, identify drug problems, and control drug use. According to a Bureau of Justice Statistics report (Wilson 2000), 7 out of every 10 jails in 1998 reported having a drug testing policy, either urinalysis or another test to determine drug use. Sanctions for positive tests were primarily deterrent-based—that is, loss of good time (52.2 percent of jurisdictions), taking privileges away (69.9 percent of jurisdictions)—as opposed to mandatory treatment or other assistance (8 percent of jurisdictions).

Prison. According to the same SAMHSA (2000) report, assessment occurs in 67.1 percent of state prisons and 86.8 percent of federal prisons. Prison provides a unique atmosphere for drug treatment. The offender will most likely be in the prison for a considerable amount of time (typically more than one year in most states), the atmosphere is hypothetically devoid of drugs and alcohol (although this is a concern in many state and federal prisons), and the inmate is away from a criminogenic environment. Comprehensive risk and needs assessment should take place upon entry into the facility and upon release (and, if treatment is provided, throughout treatment). Intake assessment is a standardized process for all federal prisons, but the process varies considerably from state to state.

Post-Incarceration/Parole. The period after incarceration is an extremely crucial and potentially stressful time in an offender's recovery. It is important not only to prepare the person for the transition (relapse prevention), but also to continue the case management and assessment process.

## History and Types of Assessments

### First-, Second-, and Third-Generation Assessments

Both historically and conceptually, there are first-, second-, and third-generation assessments (Bonta 1996). First-generation assessment refers to clinical judgments, or "gut feelings" (Andrews and Bonta 1995). A clinician arrives at a diagnosis based on an information-gathering session that includes a flexible interview, perhaps a psychological test, and a review of files, if available. Several meta-analyses have come to the conclusion that these types of clinical assessments are not accurate and are poor at predicting offender risk (Andrews and Bonta 1998).

A better alternative is the second-generation approach, and the best alternative, to date, is the third-generation approach. Both of these approaches use the actuarial method, using statistical, empirical, and validated assessment batteries. Second-generation approaches are atheoretical and static; that is, they have no theoretical base and primarily capture historical, or unchangeable, items (Andrews and Bonta 1998; Cullen and Gendreau 2000).

Third-generation risk assessments differ from second-generation assessments because of the inclusion of dynamic risk factors and an emphasis on standardization. A 1996 meta-analysis of predictors of recidivism (Gendreau, Little, and Goggin 1996) found that most of the predictors were dynamic in nature; that is, the predictors were changeable attributes of the person. The focus on change is important because it is central to effective treatment; an offender's criminal history cannot be changed, but his or her beliefs, attitudes, and behaviors can.

### Risk, Needs, and Psychological Assessments

There are several types of assessment approaches: risk, need, and psychological assessment (see table 2-4). Risk assessment provides a security function, al-though it also provides treatment implications; needs assessment provides a treatment/matching function; and psychological assessment provides a treatment/matching function. There is no one instrument that can perform all of these functions and capture all necessary information to make an informed decision about treatment.

Risk assessments (or "offender classifications") happen at various points in the correctional system, most commonly at pretrial release and prison intake. Risk assessment instruments attempt to quantify risk and to reveal psychological "types" (i.e., individuals who are predisposed to behavioral problems and crime) (van Voorhis et al. 1997; Andrews and Bonta 1998). Risk assessments thus provide a tool for protecting society and maintaining safety in prison. How likely is it that the offender will escape, commit a new offense, or cause harm to someone while in care or out of care? How likely is it that a given personality "type" will be a disciplinary problem? Risk assessment answers these questions and helps to guide placement of the offender into probation, incarceration, or alternatives to prison. It also helps to assess placement and level of guardianship while in a particular correctional setting.

In addition to these uses, risk assessment should be considered for assisting with appropriate treatment placement. Andrews and Bonta (1998) and others have shown that treatment is optimal when matched appropriately to risk level. For example, there are greater reductions in recidivism for high-risk offenders who are placed in intensive services than for high-risk offenders placed in minimal treatment services. By contrast, low-risk offenders matched with low-intensity programs experience greater reductions in recidivism compared with low-risk offenders in high-intensity programs.

Needs assessment focuses primarily on internal classification, needs in general, and needs for treatment. The "needs principle" (van Voorhis et al. 1997) assumes

| Assessment Focus | Definition | Treatment Implications |
|---|---|---|
| Risk | Risk assessments are offender classifications | Characteristics of people and their circumstances that are predictive of future criminal conduct. |
| Need | Needs assessments address criminogenic and noncriminogenic needs | Treatment services best target those characteristics of higher-risk individuals and their circumstances that, when changed, actually link with variation in criminal conduct. |
| Psychological | Assessing psychological traits to classify for treatment | The most effective styles and modes of treatment service are those matched with the needs, circumstances, and learning styles of individuals ("responsivity"). |

**Table 2-4. Principles of Assessment and Their Treatment Implications**

Source: Bonta (1996).

that institutional settings have a moral obligation to meet certain needs of the inmates, particularly substance abuse counseling, job development, education, family/relationship counseling, and medical assistance.

According to Andrews and Bonta (1998), however, it remains unclear which needs are associated with subsequent criminal behavior. To this end, Andrews and Bonta (1998, 243) distinguish between criminogenic and noncriminogenic needs:

> Criminogenic needs are a subset of an offender's risk level. They are dynamic attributes of the offender that, when changed, are associated with changes in the probability of recidivism. Noncriminogenic needs are also dynamic and changeable, but these changes are not necessarily associated with the probability of recidivism.

The four most common criminogenic needs are antisocial associates, antisocial values or attitudes, history of antisocial behavior, and skill deficiencies, such as poor problem-solving skills, self-management or self-efficacy problems, impulsivity, poor self-control, and irresponsibility (Gendreau, Little, and Goggin 1996). Unfortunately, commonly used needs assessment instruments do not help to identify all of the important criminogenic needs. Even when better needs instruments are available, correctional personnel frequently use them for purposes other than treatment; for example, they may be used to help correctional personnel allocate resources and maintain client records (van Voorhis et al. 1997).

Psychological assessment focuses on placement and treatment matching based on personality and/or behavioral criteria. Psychological evaluations can reinforce risk classifications and add more information for the treatment-matching process, including information about treatment responsivity (Bonta 1996).

Several different psychological instruments typically are used in correctional settings, each resulting in a different personality type classification. For example, in one test, classification includes categories such as "asocial aggressive," "immature dependent," "neurotic anxious," "manipulator," and "situational" (Behavioral Classification System for Adult Offenders, also know as the Adult Internal Management System [Quay 1983]). In another test, profile types are described with nondescript names (Easy, Baker, Able, Charlie, etc.) to aid in determining behavior characteristics without bias. One of the most common is the Megargee MMPI-based Typology (Megargee and Bohn 1979), which is adapted from the Minnesota Multiphasic Personality Inventory (MMPI).

As noted, psychological assessments address the responsivity principle (van Voorhis et al. 1997), that is, they address factors such as intelligence, anxiety, and cognitive maturity, which affect how a person will respond to different treatment approaches. The "responsivity principle" refers to linking these factors to a treatment plan. Bonta (1996) has described the importance of focusing on the responsivity principle:

> Matching on risk and targeting the appropriate criminogenic needs are fundamental to effective rehabilitation, but attention to responsivity factors can serve as a catalyst for treatment. For example, an agency may deal with high-risk offenders who have the same criminogenic needs (substance abuse), but within that group there are individuals differing along such dimensions as anxiety, intelligence, self-esteem, and so on. These factors affect how well the client responds to the style and modes of therapy and necessitate a matching of client characteristics with treatment. It is quite possible that withdrawn and shy clients may respond best when treatment is given on an individual basis, whereas extroverted, self-confident clients may respond well to group therapy format (23).

In addition to risk, targeting criminogenic needs, and responsivity, Andrews and Bonta (1998) emphasize the importance of professional discretion. While the principles of risk, need, and responsivity can provide a fairly objective "picture" of the person, there will always be cases that do not "fit the mold." Andrews and Bonta (1998) suggest that professional judgment should play a role in the assessment. However, this kind of discretion should be undertaken systematically and scientifically. If new patterns begin to arise from this type of assessment, then perhaps new principles of assessment should be created. The principle of professional discretion is, according to Andrews and Bonta (1998), unlike the "indefensible" first-generation approaches, which drew on subjective clinical and/or intuitive assessments and many of which are still used today. Nonetheless, professional discretion constitutes but one part of a comprehensive assessment, albeit one that provides a safeguard against instrument error and allows for the exercise of informed judgment.

*An ideal approach to treatment would include an assessment of risk predictors, criminogenic needs, and a psychological assessment, with a focus on responsivity and the exercise of discretion and judgment where appropriate. In an ideal setting, a treatment provider would collect and use risk, needs, and responsivity information to create a personalized treatment plan.*

Ongoing assessment then would be provided to identify changes in dynamic/criminogenic factors and potential changes in relevant outcomes, such as drug use/abuse and recidivism.

## Assessment and Effective Treatment

Comprehensive assessments are efficient and effective because they are able to isolate human risk, need, and psychological aspects that can be affected by treatment, but assessment only works when the information garnered is used for proper client matching, including attention to the specific needs of certain populations, such as women and offenders with co-occurring disorders or infectious diseases. Specific issues that research shows need to be addressed for treatment to be effective are outlined in table 2-5 and discussed below.

### Client Matching: Who Needs What Type of Treatment?

Effective treatment is premised on identifying those who have treatment needs and addressing their level of risk (Carter 1991). For example, research by McLellan et al. (1983) found that clients appropriately matched to treatment were more motivated than clients placed in any available program. They stayed longer, experienced fewer negative discharges, and, consequently, showed greater improvement. It is particularly important to match the characteristics of the offenders, therapists, and programs. Gendreau (1996, 123) describes the matching process as involving several dimensions, including "matching the treatment approach with the learning style and personality of the offender..., matching the characteristics of the offender with those of the therapist..., and matching the skills of the therapist with the type of program." Information learned through risk, need, and psychological assessments can be used to match clients to treatment.

Table 2-5: Issues for Client Matching and Treatment

- Client has drug and/or alcohol addiction/alcohol dependency.
- Client is ready for treatment, has sufficient time to complete treatment, and will likely complete treatment.
- Client has ability to understand the program/the principles behind the program.
- Assess and treat dynamic factors of the person/address criminogenic needs.

### Treat Those Who Will Complete Treatment

Research in the treatment field shows that program "completers" fare better than "non-completers" on outcomes such as drug relapse and recidivism (Wexler et al. 1992). Therefore, it is most efficient to focus resources on those who may complete treatment. However, relatively little research has focused on the value of assessments for predicting treatment retention in corrections-based programs (Gendreau, Goggin, and Paparozzi 1996). Although there is considerable research about the value of assessment-based classification and treatment placement, there is less evidence about the correlation of these assessments with time in or completion of treatment.

### Treat Those Who Are "Ready for Treatment"

Contrary to conventional wisdom, research shows that coerced treatment can be effective, sometimes even more than voluntary treatment (Leukefeld and Tims 1988). In fact, the traits of addiction often include denial and an inability to recognize a problem; without recognition there can be no "readiness." Thus, those who lack recognition in many ways are prime candidates for intervention (Inciardi 1993). Indeed, biomedical research shows that treatment can be effective even if an offender is not voluntarily participating (NIDA 1999).

However, some research shows that clients who are "ready" for treatment show greater improvement. Peters and Bartoi (1997) list several studies demonstrating the importance of readiness for treatment and its effect on program completion and outcomes. These studies indicate that motivation level is an important predictor of treatment compliance, dropout, and outcome, and is useful in making referrals to treatment services and in determining prognosis. They also show that treatment is likely to be ineffective until individuals accept the need for treatment of mental health and substance abuse problems. In recognition of the importance of treatment readiness, Gorski (1991) has created a Developmental Model of Recovery that breaks down the mental state of readiness into several phases and corresponding tasks for each stage; "readiness" is conceptualized as a series of stages rather than a single state.

### Treat Dynamic Factors

Recent meta-analyses reveal that targeting dynamic, or changeable, factors can lead to the largest reductions in relapse and recidivism (Andrews 1995; Gendreau, Little, and Goggin 1996; Andrews and

CSAC/ 00146

Bonta 1998; Cullen and Gendreau 2000). Assessment instruments thus ideally must be capable of identifying these factors, but they also should include risk and psychological assessment (Bonta 1996), since these can be used to match offenders with appropriate treatment and levels of supervision.

## Offender Subgroups: Assessment Issues and Treatment Implications

### Female Inmates

Although the prevalence of women in prison with substance abuse problems is much less than in the male inmate population, these problems nonetheless require treatment. However, treatment may need to be tailored to meet the particular needs of female inmates. For example, according to Smith (1993), incarcerated women typically are low-income, single heads of households with dependent children, unemployed, from families with histories of incarceration, victims of physical and sexual abuse prior to age 18, with multiple medical problems, such as pregnancy (approximately one-fourth of female inmates entering prison are pregnant), HIV/AIDS, sexually transmitted diseases, and tuberculosis. Such factors can affect participation in and the effectiveness of treatment, especially if left unaddressed.

The majority of assessment instruments have been created for a male population and focus on factors centering around traditional male roles. However, some instruments, such as the Addiction Severity Index, have been modified to address women's needs and to be sensitive to women's relationships and living arrangements. For example, assessment instruments used with women may need to measure parenting skills and responsibility for child care since removal from their role as mother or caretaker may produce feelings of depression and/or guilt, which in turn may affect treatment delivery.

Other concerns include the recognition of alcohol problems, traditional criminal profiles, and psychological and medical differences between men and women (Inciardi 1993). Women may not have faced their abuse problem because they may be less likely to be in the workforce or around people that may pressure them into realizing their problem and seeking treatment. An assessment process can be an unexpected "reality check" that raises awareness about a substance abuse problem. Female alcoholics also have higher rates of depression than either women in the general public or male substance abuse offenders. Finally, there is re-

search that suggests that females process alcohol and drugs differently than males (Inciardi 1993).

### Co-Occurring Disorders: Mental Health and Substance Abuse

Rates of mental health problems and substance abuse problems are much higher among inmates than the general population (Lurigio and Schwartz 2000; Peters and Bartoi 1997). The most common mental disorders among inmates are psychosis, depression, and bipolar disorder. Dennis (1998) reported on the lack of diagnosing co-occurring mental disorders, citing information from the State of Illinois, where only about 6.3 percent of co-occurring mental health problems were reported. By contrast, the literature suggests that over half of people with substance use disorders have co-occurring mental disorders (Kessler et al. 1994) and that over 65 percent of those presenting for treatment have co-occurring mental disorders (Dennis 1998). Other studies (Chulies et al. 1990; Cote and Hodgins 1990; Mirin et al. 1988) show that:

- 75 percent of addicted offenders have histories of depression

- 25 percent of addicted offenders have histories of major depression, bipolar disorder, or atypical bipolar disorder

- 9 percent of addicted offenders are schizophrenic.

The recognition of co-occurring disorders is especially important because of the unique challenges in treatment that offenders with co-occurring disorders present. It can be difficult to determine these multiple problems, not only because of human error and lack of staff expertise and training, but also because the sheer complexity of the problems can make diagnosis difficult even for trained professionals. Peters and Bartoi (1997) describe several prominent challenges:

- Use of alcohol and drugs can create mental health symptoms.

- Alcohol and drug use may precipitate or bring about the emergence of some mental health disorders. Mental health disorders can also precipitate substance use disorders.

- Mental health symptoms may be exacerbated, or worsened, by alcohol or drug use.

- Mental health symptoms or disorders are sometimes mimicked by alcohol and drug use.

- Alcohol and drug use may mask or hide mental health symptoms or disorders that are actually present. Mental health symptoms are often not identified until after a long period of time.

Another challenge when dealing with co-occurring disorders, in addition to proper diagnosis, is what to do with the person once he or she has been identified. Criminal offenders who are also alcohol or drug abusers and have mental disorders need specialized, coordinated treatment. Yet it is common for substance abuse treatment programs not to admit offenders with mental disorders and, conversely, for mental health programs not to admit offenders with substance abuse problems (Vigdal 1995). Programs for people with co-morbid disorders have been called "inadequate," with little to no research to date on the percentage of offenders receiving both substance abuse and mental health treatment (Lurigio and Schwartz 2000).

*Infectious Diseases*

Because of the isolated, often overcrowded settings, prisons can contribute to the spread of infectious diseases, such as HIV/AIDS and tuberculosis (TB), to inmates and ultimately to society. A recent Center on Addiction and Substance Abuse report (CASA 1998) found that HIV infection rates are up to six times higher among inmates compared with the general population. Injection drug users are the highest risk groups in prison. Forty percent of inmates who used drugs in the past month before their arrest had used a needle to inject drugs; by contrast, homosexual contacts only account for 2.2 percent of cases of HIV/AIDS among inmates. Rates of HIV/AIDS are slightly higher among female than male inmates.

Given the risks associated with these types of infectious diseases, all assessments should include questions about primary risk factors for HIV/AIDS, especially given the link between frequent drug use and HIV/AIDS. Notably, however, HIV testing is not mandatory in all systems. Confidentiality regulations and some state laws protect this information. In 1997, all states offered HIV testing, although with different testing criteria. Only 18 states test all entering inmates, most systems (44 out of 52) test based on symptoms or inmate request, and 15 states test high-risk offenders (Maruschak 1999).

Prisons historically constitute high-risk settings for the spread of TB. They frequently are crowded, and the buildings typically are older, with poor ventilation and circulation. However, incidents of TB in prisons have not been disproportionate to the general population for a period of time. In 1992, the number of incidents of TB peaked, due to a resurgence of a new multi-drug resistant strain of TB, MDR-TB. Incarceration provides an opportunity for early detection and treatment of TB. However, a 1992 Centers for Disease Control and Prevention and National Institute of Justice study found that one-third of state and federal systems and one-half of jails did not test for TB (routine skin tests) or include TB in their assessments (Vigdal 1995). When proper screening occurs, it is relatively easy to provide a course of preventive medicine and control the disease in an isolated setting such as a jail or prison.

## SCREENING AND ASSESSMENT INSTRUMENTS

Screening and assessments are conducted using a wide range of instruments, yet to date, little agreement exists about which are best, leading one review to state that development of proper and useful instruments constitutes a critical need (Shearer and Carter 1999).

There are several issues relevant to evaluating and using assessment instruments. They should, for example, be standardized and tested for reliability and validity; that is, they should consistently identify the same condition (e.g., drug dependency), and that condition should be the focus of the assessment (i.e., drug dependency as opposed to simple drug use). In addition, assessment instruments should be adjusted to address variation in gender and race. They must address at least basic demographics and criminal and drug history, and they should address dynamic factors because these factors can be addressed in treatment and can affect change in criminal conduct.

Carter and associates (1991) outline several ways in which assessment instruments can be misused, including allowing the instrument to structure a mechanical approach to what is often a complex problem; conducting supervision and service needs assessments with an instrument that has not been validated; using an instrument that was designed for a different purpose or for populations other than that for which it was designed; and perhaps most important, allowing the instrument to make, rather than guide, decisions.

This chapter does not provide a review of every available screening and assessment instrument because there are literally hundreds in use. [For detailed descriptions of instruments, original citations and references to the creators of the instruments, and/or actual

CSAC/ 00148

instruments, see Boland, Henderson, and Baker (1998); Dennis (1998); Inciardi (1994); and the following CASA web site for a listing of instruments: http://casaa-0031.unm.edu/inst%5Cinst.html).] However, table 2-6 provides an annotated listing of some of the more common instruments in the treatment and correctional literature and in use in jails and correctional facilities across the country.

## Screening Instruments

The screening process should be designed to err on the side of "false-positives" or inclusiveness. Some argue that it is better to include more people at the screening stage and move them forward to the assessment phase, only to be excluded at that phase, than to be excluded at the screening phase because of an inaccurate screen. However, if resources are limited, an institution may place more emphasis on limiting assessments only to those cases in which an initial screen strongly suggests the presence of a substance abuse problem.

In addition to standard self-report screening questions, the initial screen can include biological testing, such as urinalysis, breathalyzers, or blood tests, as an objective way to identify substance use. Other useful techniques, especially when an individual may still be under the influence or in withdrawal (for some drugs), include observing for drug use and using drug recognition techniques.

A survey of drug courts found that the most commonly used instruments for screening were the ASI (Addiction Severity Index), the SASSI (Substance Abuse Subtle Screening Inventory), the MAST (Michigan Alcoholism Screening Test), and the OPI (Offender Profile Index). Inciardi (1993) reported that the CAGE, MAST, and OPI are among the most commonly used for screening in the criminal justice system. (CAGE is short for four questions: Have you ever thought you should Cut down on your drinking? Have you ever felt Annoyed by others' criticism of your drinking? Have you ever felt Guilty about your drinking? Do you have a morning Eye-opener?)

Few studies have undergone a comparative analysis of the effectiveness of screening instruments. Peters and Hunt (2000) wrote a policy brief outlining a study by Peters et al. (2000) of this kind and the implications of the findings. The study consisted of administering eight screening instruments to a sample of 400 prison inmates in Texas in 1996. The chosen screening instruments were:

- Alcohol Dependence Scale (ADS)

- Addiction Severity Index (ASI)—Alcohol Use section
- Addiction Severity Index (ASI)—Drug Use section
- Drug Abuse Screening Test (DAST-20)
- Michigan Alcoholism Screening Test (MAST-short version)
- Substance Abuse Subtle Screening Inventory (SASSI-2)
- Simple Screening Instrument (SSI)
- Texas Christian University Drug Screen (TCUDS)

These instruments were chosen based on several criteria: general acceptance by the research and treatment community; frequency of use; availability (i.e., in the public domain); and applicability to correctional settings (Peters and Hunt 2000). The Structured Clinical Interview for DSM-IV (SCID-IV) was used as "diagnostic criterion measure"; results from the screening instruments were measured against this standard for detection of both substance abuse and substance dependence disorders.

CSAC/ 00149

**Table 2-6a. Common Instruments Used for Clinical and Research Purposes**

| Instrument | Area (X=used, x=used somewhat) | | | | | | | Skill Level | Comments |
|---|---|---|---|---|---|---|---|---|---|
| | Screening | Diagnostic | Placement | Reporting | Tx Plan | Severity | Outcome | | |
| Addiction Severity Index (ASI) (McLellan et al. 1985[[1983, per refs?]]) | x | | x | x | X | X | X | M | Oldest and most widely used, in the public domain, technical support, moderate but well-known psycho-metrics. It does not cover most modern diagnostic criteria and is not fully standardized. |
| Drug Abuse Treatment for AIDS-RISK Reduction (DA-TAR) (Simpson 1992) | | | | x | X | X | X | L | A descendent of DARP, this form has been used for almost a decade in a series of clinical research projects at Texas Christian University and has appeared in several public-domain evaluation handbooks produced by NIDA and others. |
| Form 90 (Miller 1991) | | | | | x | x | X | M | This was one of the main instruments used in Project MATCH and was used to generate many of the clinical reports for its interventions. |
| Global Appraisal of Individual Needs (GAIN) (Dennis 1998) | x | X | X | X | X | X | X | L | The GAIN was designed to serve as a standardized biopsychosocial assessment with integrated components for screening, diagnosis, placement, treatment, planning, outcome monitoring, and research. Variations of this instrument have been used for standardized intake and research projects funded by NIDA, NIAAA, CSAT, and several states. Selected items can be used as a 20-30 minute screening version. Preliminary psychometric and normative data now are available, but no commercial support is available. |
| Individual Assessment Profile (IAP) (Flynn et al. 1995) | | | X | | X | x | X | L | This instrument blended questions from the ASI with other research measures from the Drug Abuse Treatment Outcome Study (DATOS) and was used for centralized intake as part of the DC Initiative and several other studies. |
| Recovery Attitude and Treatment Evaluation (RAATE) (Mee-Lee et al. 1992) | X | x | X | | | x | | L | This was one of the first tools developed for screening and patient placement and has scales that can help inform diagnostic or placement criteria (which it predates) and its usefulness for outcome monitoring is limited because its questions are not time-bound and do not cover service utilization. |
| Treatment Services Review (TSR and Teen-TSR) (Kaminer et al. 1997; McLellan and Dembo 1992) | | | | | X | | X | L | A complementary measure to the ASI, the TSR is designed to track the subsequent behavior and services received each week. It is in the public domain. |

Source: Dennis (1998).

Notes: This is an abbreviated table and does not include juvenile/adolescent instruments or several instruments not mentioned in correctional literature. For complete list and citations, see Dennis (1998, 28-34).

For skill levels, L = low: preprinted questions and responses that can be self- or clerically administered. M = medium: clinical schedule of issues to cover that may require training on critical concepts and limited probing. H = high: requires detailed clinical judgment/ratings and extensive quality assurance in order to achieve reliability

CSAC/ 00150

**Table 2-6b. Common Instruments Used for Clinical and Research Purposes: Single Domain Instruments**

| Instrument | Area (X=used, x=used somewhat) | | | | | | | Skill Level | Comments |
|---|---|---|---|---|---|---|---|---|---|
| | Screening | Diagnostic | Placement | Reporting | Tx Plan | Severity | Outcome | | |
| Alcohol Use Disorders Identification Test (AUDIT) (Babor, de la Fuente, et al. 1992). | X | x | | | | X | | L | Developed by the World Health Organization, this is designed as a screener to identify problem drinkers, including those who might not yet meet diagnostic criteria but are of interest for public health interventions. |
| Beck Depression and Anxiety Inventories (Beck 1990, 1996) | X | | | | | X | X | M | These are among the most widely used measures of depression and anxiety and are commercially supported. |
| Behavioral and Symptom Identification Scale (BASIS 32) (Medical Outcome Study 1997) | X | | x | | | X | X | L | This short battery, which is geared toward mental health populations, measures psychosis, daily living/role functioning skills, relation to self/others, impulsive addictive behavior, and depression. |
| CAGE (Mayfield et al. 1974) | X | | | | | | | H | Although very popular with clinicians and public aid programs, this four-question public domain screener is often unreliable unless it is accompanied by extensive training and quality assurance. |
| Clinical Institute Withdrawal Assessment (CIWA). (Sullivan et al. 1989) | X | x | X | | | X | | H | Clinical rating scale combining physiological symptoms, observations, and self-reported symptoms. Unfortunately, it is focused only on alcohol and may not generalize to other drugs. |
| Drinker Inventory of Consequences (DrInC) (Miller, Tonigan, and Longabaugh 1995) | X | x | | | X | | | L | Although limited to drinking, this scale is particularly useful for identifying the specific problems caused by drinking and can be addressed in treatment. |
| Drug Abuse Screening Test (DAST) (Skinner 1982) | X | | | | | X | X | L | A short screener parallel to the Michigan Alcohol Screening Test (MAST) that is often used to screen for substance abuse and/or to measure change. Unfortunately, it does not map directly on to DSM-IV. |
| Family Environment Scale (FES) (Moos 1974) | | | | | x | X | X | L | This and several subsequent shorter versions are among the most common measure of family functioning and are particularly important in evaluating family therapy or family services. |
| Hamilton Depression Scale (HAM-D) (Hamilton 1967) | X | x | | | | X | X | M | The HAM-D is one of the original dimensional measures of depression. |
| Michigan Alcohol Screening Test | X | | | | | X | | L | The original 25-item public domain versions and several subsequent shorter versions have been used widely for over 20 years, but have only limited correlation with both the frequency of use and measures of dependence. |
| Minnesota Multiphasic Personality Inventory (MMPI and MMPI-2) (Butcher et al. 1989; Hathaway and McKinley 1951) | x | x | | | X | X | | L | A battery of personality measures, including the MacAndrews scale related to substance use and measure related to impulsiveness, stress, and several co-occurring problems. |
| Readiness to Change Questionnaire (RTCQ) (Heather et al. 1991) | X | | X | | X | | | L | The RTCQ is a scale for measuring treatment readiness based on stages of change theory. This version is copyrighted, but can be used at no cost. |

**Table 2-6b. Common Instruments Used for Clinical and Research Purposes: Single Domain Instruments *(continued)***

CSAC/00151

| Instrument | Area (X=used, x=used somewhat) | | | | | | | Skill Level | Comments |
|---|---|---|---|---|---|---|---|---|---|
| | Screening | Diagnostic | Placement | Reporting | Tx Plan | Severity | Outcome | | |
| Substance Abuse Subtle Screening Inventory (SASSI) (Miller 1985) | X | x | | | | | | L | This is a screener that has been used primarily in schools, criminal justice facilities, and obstetricians' offices. It has a scale that facilitates diagnosis for substance use and is commercially supported. |
| Symptom Checklist-90 (SCL-90, SCL 90-R) (Derogatis et al. 1974) | X | x | x | | | x | X | L | One of the oldest psychiatric dimensional measures, the SCL-90 and its commercial cousins (SCL 90-R, Brief Symptom Inventory) are among the most widely used and commercially supported instruments. Although the scales can inform diagnosis, they do not match current criteria (which they predate). |
| Structured Clinical Interview for DSM-III-R (SCID) (Spitzer et al. 1992) | | x | | | | | | M | Primarily a diagnostic and epidemiological interview. Some manuals, software, training, and other support are available. |

Source: Dennis (1998).

Notes: This is an abbreviated table and does not include juvenile/adolescent instruments or several instruments not mentioned in correctional literature. For complete list and citations, see Dennis (1998, 28-34).

For skill levels, L = low; preprinted questions and responses that can be self- or clerically administered. M = medium; clinical schedule of issues to cover that may require training on critical concepts and limited probing. H = high; requires detailed clinical judgment/ratings and extensive quality assurance in order to achieve reliability.

Peters et al. (2000) found that the most effective instruments in screening for substance abuse were the Alcohol Dependence Scale (ADS) and the Addiction Severity Index (ASI) instruments, the Texas Christian University Drug Screen (TCUDS), and the Simple Screening Instrument (SSI) (see table 2-7).

Peters et al. (2000) found that these instruments outperformed the other popular instruments in the screening process on detection of disorders, though all instruments were found to have been reliable. They concluded that there can be considerable variation in screening instruments and their efficacy and that two of the three "most effective" instruments are available free of charge (possible significant savings for systems that are purchasing instruments). Peters et al. also noted that the following factors can help determine the type of instrument that an institution should choose:

- If the primary goal of screening is to reduce inappropriate referrals to treatment ("false positives"), then TCUDS or the ADS/ADI-Drug are best.

- If the goal of screening is to identify the largest number of offenders with substance "dependence" disorders, with less concern for inappropriate referrals to treatment, then the SSI is the most desirable instrument.

- The ADS, TCUDS, and SSI may be self-administered, while the ASI-Drug Use screen was developed for use in an interview setting.

Table 2-7: Effective Screening Instruments

**Effective Instruments**

- Combination of both the Alcohol Dependence Scale (ADS) and the Addiction Severity Index (ASI).
- Texas Christian University Drug Screen (TCUDS).
- Simple Screening Instrument (SSI).

**Recommendations**

- If primary goal is to reduce inappropriate referrals to treatment, then use TCUDS or the ADS/ADI.
- If primary goal is to identify the largest number of offenders with substance dependence disorders, use the SSI.
- The ADS, TCUDS, and SSI may be self-administered, while the ASI-Drug Use screen was developed for use in an interview setting.

Source: Peters et al. (2000).

- For mental health screening, the Beck Depression Inventory (BDI) the Brief Symptom Inventory (BSI), the Referral Decision Scale (RDS), and the Symptom Checklist 90-Revised (SCL-90-R) are among the most common and have been validated for use in detecting mental health symptoms (Peters and Peyton 1998).

Several screening instruments have been created for special populations by modifying current instruments. In particular, traditional men's instruments have been modified for women. For example, the TWEAK was created by modifying the CAGE screener; however, the TWEAK screener was developed specifically for pregnant women. It is one of the few alcohol screening tests that has been developed and validated among women. TWEAK is a five-item scale developed originally to screen for risk drinking during pregnancy. [TWEAK is an acronym for the questions: T = Tolerance: "How many drinks can you hold?" W = Worried: "Have close friends or relatives worried or complained about your drinking in the past year?" E = Eye-openers. "Do you sometimes take a drink in the morning when you first get up?" A = Amnesia (blackouts): "Has a friend or family member ever told you about things you said or did while you were drinking that you could not remember?" K(C) = Cut down: "Do you sometimes feel the need to cut down on your drinking?" (See http://www.niaaa.nih.gov/publications/tweak.htm.)]

Assessment Instruments

There is considerable overlap among screening and assessment instruments (see table 2-6). In some cases, the same instrument or part of the same instrument can be used for screening and as part of the assessment. A sampling of popular assessment instruments are outlined here, grouped categorically.

*Comprehensive Risk and Needs Assessment*

The Wisconsin Uniform Substance Abuse Screening Battery is one of the most comprehensive batteries of tests to match offenders with appropriate interventions. It includes a combination of identification, classification, treatment assessment, personality profiles, and measurements of specific offenders' needs. Its strengths include a recognition of heterogeneous populations, extensive and varied information collection, a computerized alcohol instrument with instant scoring, and the ability to match needs to types of programs.

The Level of Supervision Inventory-Revised (LSI-R) is a risk assessment instrument found to be highly predictive of recidivism among a variety of correctional clients (Andrews and Bonta 1998). The instrument focuses on many dynamic features, or features that can be targeted in treatment. It is one of the few instruments available that has been intentionally designed to measure criminogenic needs (Bonta 1996), and Andrews and Bonta (1998) have described this instrument as the measure with the best predictive validity.

*Probation and Parole*

The Wisconsin Risk Assessment System is the prototype for probation and parole systems (van Voorhis et al. 1997). It has the capability to quickly assess the probability of failure and level of supervision. This classification system has been called the most widely used offender classification system in the United States (Baird, Prestine, and Klockziem 1989), and it is both reliable and quick to complete.

*Readiness for Treatment*

"Readiness for treatment" is an important concept in the screening process. Traditionally, offenders have reported low readiness for treatment (Shearer and Carter 1999). Offenders with low readiness for treatment may need pretreatment interventions to prepare them for treatment. Several popular scales include Circumstances, Motivation, Readiness, and Suitability Scale (CMRS); Stages of Change Readiness and Treatment Eagerness Scale (SOCRATES); and the University of Rhode Island Change Assessment Scale (URICA) (Peters and Peyton 1998). The CTRS scale (Correctional Treatment Resistance Scale) is another scale that currently is being researched.

*Dynamic Factors*

Research highlighting the importance of offender attitude factors (Gendreau, Little, and Goggin 1996) has led to the creation of several new instruments to assess these factors. The LSI-R has one scale (in its risk section) that addressed some of these factors. The Criminal Sentiments Scale-Modified (CSS-M) and the Pride in Delinquency Scale (PID) are two newer scales, which have relatively high reliability and validity, are simple to administer, score and interpret, and can be used in assessment and program evaluation contexts. The Lifestyle Criminality Screening Form (LCSF) is a classification scale to determine risk of recidivism, using four behavioral dimensions of criminality: irresponsibility, self-indulgence, interpersonal intrusiveness, and social rule breaking.

*Risk Assessment*

The Client Management Classification (CMC) is used to determine the proper supervision level and service needs of adult probation, parole, and institution populations. The instrument has separate sections for the parole and probation population and the institution population. This instrument is widely used by the probation and parole system. The CMC interrater reliability is 90 percent and evaluations from users have been positive (Carter 1991). The disadvantage of the CMC is that it is an offender classification system only and does not focus on substance abuse. However, combined with a drug-use inventory, this instrument can provide a comprehensive picture of the offender and his/her needs.

*Drug and Alcohol Abuse*

In the assessment process for drug treatment in general, the ASI (Addiction Severity Index) is the most widely used substance abuse instrument. The ASI assesses an offender's discomfort level in seven problem areas associated with drug use. Although it is very popular, there are drawbacks to the ASI. It does not recommend an intervention strategy, has not been widely used or validated in correctional settings, and may not be sensitive to certain populations, including women and non-opiate-using populations (Carter 1991). A comprehensive report on assessment instruments (Dennis 1998) outlined common instruments and measures that have been used for both clinical and research purposes. According to this report, the ASI was described as one of the oldest and most widely used, in a variety of areas from screening to outcome, although, as noted, the instrument is weak in the areas of modern diagnostic criteria and standardization.

The Drug Offender Profiles (DOPERS) instrument examines the relationship between an offender's drug use and criminal behavior to match him or her with appropriate levels of treatment and supervision. This instrument differentiates between the user-driven criminal and the criminal-driven user, similar to the Bureau of Prison classifications. The former is in the correctional system because of a problem with drugs, the latter is in the system because of his or her criminality, with drugs being an aspect of that criminality. According to the National Institute of Corrections (Carter 1991), a disadvantage of this instrument is the complexity of scoring.

SADD (Short Alcohol Dependence Data) is a shortened version of the original Alcohol Dependence Data (ADD) instrument. This 15-item scale has a narrow focus (alcohol) and has become more popular than the original ADD. It has been used on both male and female offenders, as well as youth males.

ADS is another widely used instrument of alcohol dependence; it was adapted from the larger Alcohol Use Inventory (AUI). The current instrument has only 25 items—a classification system that corresponds with the DSM—excellent internal consistency, and good reliability.

In addition, many of the screening instruments for drug and alcohol use and abuse discussed in the screening section can also be used in the assessment phase. For example, pieces of the ASI can be used to screen offenders, while the complete ASI can be used in the assessment phase (the complete ASI consists of 161 questions). The original 25-item MAST (Michigan Alcohol Screening Test) has been adapted and shortened to the 10-item Brief MAST and the 13-item Short MAST to use in the screening process.

### Addressing Infectious Diseases

The Drug Offender Profile Index (OPI) is one of the only instruments designed to address HIV risk among offenders. The instrument is appropriate for pretrial and post-institutional populations, although validity and reliability evaluations are in progress. The instrument has been accepted by judges and probation officers in several jurisdictions and is undergoing field testing in several urban areas. It identifies drug use patterns and recommends a course of treatment; however, it does not provide detailed individual treatment planning implications.

The AIA Jail/Prison Supplement instrument was adapted from the full AIA (AIDS Initial Assessment), developed by the National Institute on Drug Abuse. The Jail/Prison Supplement collects HIV risk assessment data on those incarcerated any time since the beginning of the AIDS epidemic (circa 1978). This instrument provides supplemental information when used in conjunction with other supervision and/or risk assessment instruments.

### Psychological Assessments

The Symptom Checklist (SCL-90) is designed to measure nine psychopathology disorders, including depression, anxiety, somatization, obsessive-compulsive, paranoid-ideation. It is a self-report, 90-item instrument. This instrument has both high levels of internal consistency and test-retest reliability (Inciardi 1994).

The Minnesota Multiphasic Personality Inventory (MMPI and MMPI-2) includes a wide range of personality measures as well as scales for identifying substance use. It also identifies stress levels and certain traits such as impulsiveness (Dennis 1998).

### Combination Approaches to Screening and Assessment

Peters and Bartoi (1997) present several instrument combinations that may be useful for screening in the criminal justice system, with a focus on detecting co-occurring disorders:

- Either the Brief Symptom Inventory (BSI) or the Referral Decision Scale (RDS) to address mental health symptoms

AND

- Either the Texas Christian University Drug Dependence, Simple Screening Instrument (SSI), or the combination of the Alcohol Dependence Scale (ADS) and the Addiction Severity Index (ASI), Drug Use section to address substance abuse symptoms.

Peters and Bartoi (1997) recommend the following combination of instruments for assessment:

- Either the Minnesota Multiphasic Personality Inventory-2 (MMPI-2), the Millon Clinical Multiaxial Inventory-III (MCMI-III), or the Personality Assessment Inventory (PAI) to examine mental health disorders

AND

- The Addiction Severity Index (ASI) to examine areas related to substance abuse.

Most researchers recommend a self-report instrument for screening and, in some cases, assessing the client. However, there are disadvantages to the self-report method, including misrepresentation by the offender to avoid a "structured environment," falsely reporting mental health problems to receive "perks" such as medications, and the nature of several mental health disorders such as psychoses, paranoia, and schizophrenia, which may lead the offender to report false statements and answers. Therefore, Peters and Bartoi (1997) recommend supplementing the self-report with information from family, clinical observa-

CSAC/ 00155

tion, archival records, drug testing, repeated screening, and assessment.

Because of the sheer quantity of people, limited resources, and new and sometimes confusing research, there has been a movement to institute guidelines for placement and duration in various types of programs. The American Society of Addiction Medicine (forthcoming) is one organization developing criteria. Their manual will provide guidelines for five levels of service ranging from early intervention to medically managed intensive inpatient services. Addiction severity and related problems are broken down for each level, as well as structured guidelines about settings, staff, services, admission, and discharge criteria.

### Integrating Assessment

It is important to manage an offender throughout the criminal justice system as well as between different areas within the system. Several sources have anecdotally described the disconnection between mental health providers, substance abuse providers, and criminal justice agencies. It is common for each to complete separate evaluations, without collaborating about co-occurring disorders and treatment plans. The Center for Substance Abuse Treatment's (CSAT) Treatment Improvement Protocol (TIP) 17 provides extensive information about treatment planning within the criminal justice system. It addresses the complexity of the criminal justice system and system differences among the criminal justice system, alcohol and drug abuse treatment providers, and the mental health system. Each group or system is guided by different goals and philosophical differences. During the past decade, these systems have begun to acknowledge the multidimensional problem of alcohol and drug addiction. Increasingly, there is an understanding that effective drug treatment can result in both reduced drug use and criminal behavior.

Literature in the drug and alcohol treatment field frequently mentions the importance of integrating treatment and criminal justice processing (Downes and Shaening 1993). Just as collaboration has become more popular and accepted within the criminal justice system (e.g., police-probation teams, community prosecution, comprehensive community initiatives), it also has been noticed in substance abuse treatment. CSAT, for example, launched an initiative in 1993 to link substance abuse treatment systems and the criminal justice systems at the state level.

"System integration" means that more than one "system," in this case, criminal justice and treatment,

are working together, organized by a purpose and acting as one unit. In theory, both systems can accomplish more than either system on its own. This new system has been conceived of as a "system for substance abusing offenders" (Downes and Shaening 1993, 2). While Downes and Shaening (1993) acknowledge that some states already have linkages in place, and that some states have "model programs" in place, few states have overcome the challenges of bringing all key players together to make plans and implement an intersystem collaboration. Many states do not collect screening and assessment information, much less transfer it or share it as offenders progress through the criminal justice system. In addition, many states have strict laws and confidentiality guidelines regulating the transfer of information.

A recent CASA report (Dennis 1998) describes the inefficiency of gathering new baseline data at each stage in the system and, in particular, the problem of nonintegrated clinical assessment. The problems center around repeated screening and/or assessment by multiple system actors (e.g., case manager, counselors, social workers, medical and prison intake workers, probation and/or parole officers). Indeed, it appears to be the norm rather than the exception that the same information is collected at different points throughout processing, and that different sources of information collected at one stage of processing will not be used at another. The integrated approach would involve developing an initial base of information that would be incrementally added to at each successive stage.

Although several reports document the importance of assessment databases and continuity of information flow throughout the justice system, little is known about the extent and sophistication of such data exchange. Dennis (1998) recommends that data collection be systematic and that standardized reports be generated on a regular basis. Documented procedures for data collection, including training, quality control procedures, standardized forms, data analysis, etc., are necessary for maintaining useful and transferable reliable data. Automated information systems are preferable to aid in analysis and management tasks.

The level and type of data collected in management information systems (MIS) vary from one state to another. States used computer systems for a variety of functions, from management (e.g., decisions about individual offenders and decisions about facility and system operations), classification determinations, and facilitation of assessments. Some systems simply "cap-

ture" (i.e., collect or warehouse) data while others had more sophisticated analytical capabilities.

Recently, detailed information about the type of needs assessment factors that the 52 correctional systems (50 state systems, the District of Columbia, and the federal Bureau of Prisons) collect became available through a collaborative study by the Association of State Correctional Administrators and the U.S. Department of Justice's Office of Justice Programs, National Institute of Justice, and Bureau of Justice Statistics (1998). As table 2-8 shows, many systems do not collect a wide range of information.

For those systems that do collect needs assessment information, most collect the information in electronic format. However, many collect this information in paper format only. As of 1998, 39 systems collected "type of need" information in electronic format and 6 systems collected it in paper format. However, drug testing information is collected in only 22 systems, and of these only 12 maintain the information electronically, with the remaining 10 maintaining the information in paper format. The lack of drug testing information, as well as access to this information, is especially problematic because it is critical for "developing indicators of how well corrections institutions keep offenders involved in maintaining positive behaviors" (Association of State Correctional Administrators et al. 1998, 98).

Departments are more likely to keep information on classification decisions. Forty-eight departments keep information on security level at admission, 49 document the date of initial classification, and 47 document the classification index or score. Fewer departments keep track of assessment scores such as risk

assessment index or score (37 departments), medical classification index or score (31 departments), or psychological index or score (25 departments).

## Consequences of Ineffective Screening and Assessment

The literature and anecdotal evidence suggests that, due to the recent increases in the past decade in the number of inmates, many states are conducting abbreviated screening and assessments, oftentimes relying on staff with inadequate training or experience. Indeed, only about 60 percent of state prisons and jails conduct a needs assessment process. What should be a structured process for some state prisons is often, in reality, a haphazard and incomplete process. Some correctional facilities are not able to complete a comprehensive battery of screening and assessment tests (including dynamic criminogenic needs) supplemented by interviews, and use this information, in an automated way, to help to guide treatment decisions. Because of the inability to comprehensively assess every individual that enters the correctional system, treatment invariably cannot reach those who most need it or be delivered efficiently. Indeed, improper treatment matching can significantly compromise treatment program integrity and thus effectiveness. This issue is particularly acute in cases involving co-occurring disorders.

## ASSESSMENT PROCEDURES

A 1997 Survey of Correctional Facilities (SAMHSA 2000) found that 63.6 percent of jails, 67.1 percent of state prisons, and 86.8 percent of federal prisons provide assessment for treatment need. Of the few sources of data that we found about assessment procedures, we found little to no data about assessment instruments and procedures in jails, other than drug testing in jails and general jail program information, such as detoxification programs.

### State Assessment Procedures

Screening and assessment procedures can vary from state to state and within states (Inciardi 1993). There is little coordinated, standardized information about state-specific assessment tools and procedures. Indeed, a review of the literature, including consultation with researchers at the National Institute of Corrections (NIC), reveals no specific and exhaustive guides of this type. Several states list their own procedures (on a Website or in a publication), some in gen-

| Data Elements | Number of Systems Not Collecting Specified Information |
|---|---|
| Type of need | 7 |
| Psychological history | 15 |
| Medical condition at admission | 9 |
| Program participation prior to commitment | 32 |
| Tested for drug use at admission | 28 |
| Results of drug tests at admission | 29 |

Table 2-8: State and Federal Corrections Information Systems

Source: Association of State Correctional Administrators (1998, 30).

eral terms and some with more detail. NIC currently is in the process of conducting a 20-state study of tools and procedures, including collecting extensive information and providing technical assistance. The American Correctional Association produced a list of state diagnostic procedures as one of their monthly surveys; however, the information was not uniform or specific about instruments and populations for whom the instruments were used (ACA 2001).

A 1996 Center on Addiction and Substance Abuse's *Treatment Survey of Prison Facilities*, which included 963 state and federal correctional facilities, found that almost all jurisdictions (90 percent) are using more than one type of assessment method to determine the presence and severity of an inmate's substance abuse problem (CASA 1998). Most used self-reports (83 percent) and/or an objective screening instrument (82 percent). Facilities also relied on staff reports (two-thirds), pre-sentence reports (half) and urinalysis (half).

A recent American Correctional Association (2001) survey highlighted the lack of standardized instruments and procedures for diagnosing problems in the state prison systems. The survey showed that information about assessment instruments is not standardized and that within states there can be considerable variation in the types of instruments used. Some of the reported assessment processes include:

- Certified substance abuse counselor assessment, including SASSI and/or MAST

- Review central file and probation officer report; arrest history; self-admission

- Mental health evaluations; urinalysis; Immunoassay or Gas Chromatography Spectrometry

- Assessment tool used as a part of classification process at system entry

- Addiction Severity Index; DSM-IV criteria

- Testing; evaluation; records; self-reporting; observation

- Risk assessment

- Random drug screening

- SASSI; face-to-face with evaluator

Some states reported generic answers, such as "an assessment tool is used as part of the process," while other states listed the specific name of the assessment tool. Information was not provided on who conducts the assessment, when, or how the information is recorded or used.

### Federal Prison Assessment

The Federal Bureau of Prisons (BOP) has a standardized intake and assessment process. Offenders are classified into two groups. The first group includes those who violate laws that prohibit the possession, distribution, or manufacture of illegal drugs, generally called "drug-defined" offenders. These individuals may not need drug treatment, although they may benefit from other treatment, such as drug education, value development, or anger management. The second group includes those who violate laws as a direct result of their drug use, generally called "drug-related" offenders. These individuals are more likely to need drug treatment.

For a three-month period, in the summer of 1991, all offenders ($N = 1,165$) who entered the federal Bureau of Prisons completed the Inventory of Substance Abuse Patterns (ISAP). Using the American Psychological Association's Diagnostic and Statistical Manual, Third Edition, Revised (DSM-III-R) as a guide, 20.9 percent of inmates met the criteria for psychoactive substance abuse (now termed "drug abuse disorder") and 30.8 percent for psychoactive substance dependency (now termed "drug dependency disorder"), for a combined prevalence of 51.7 percent having either type of disorder (Murray 1991, 35). The BOP used this figure to develop and expand its treatment programs. The criteria for a diagnosis of drug dependency disorder, as well as for drug abuse disorder, is outlined in table 1-2 (in chapter 1), using the more recent DSM-IV definitions.

After the survey, BOP established minimum standards for entrance into a variety of prison programs: Drug Abuse Education, Residential Drug Abuse Treatment Programs, Nonresidential Drug Abuse Treatment, and Transitional Services.

In the federal system, an inmate's records are screened at entrance into the facility. If any of the indicators show up on the records—evidence in the Presentence Investigation that alcohol or other drug use contributed to the commission of the instant offense, the inmate received a judicial recommendation to participate in a drug treatment program, or the inmate violated his or her community supervision as a result of alcohol or other drug use—then the inmate is required to participate in a Drug Abuse Education Course. Inmates are interviewed to determine whether they meet

the diagnostic criteria, using the DSM-IV, for an alcohol or drug abuse or dependency disorder. If the following four conditions are met, the inmate is eligible for the residential program:

- Inmate has a DSM diagnosis for alcohol or drug abuse or dependence disorder and a record review supports this diagnosis.

- Inmate has no serious mental impairment that would substantially interfere with or preclude full program participation.

- Inmate signs the Agreement to Participate in the Bureau's Drug Abuse Programs.

- Inmate is within 36 months of release.

At year-end 1999, 47 of the 98 Bureau institutions had implemented the BOP's Residential Treatment Programs. (The Federal Bureau of Prisons has 98 institutions, six regional offices, a central office, three staff training centers, and 28 community corrections offices.) Nonresidential treatment programs, particularly drug counseling, take place at every BOP institution. An inmate is eligible for nonresidential drug-abuse treatment if he or she has a drug problem, minimal time left on his or her sentence, serious mental health problems, or is otherwise unable to participate in a residential treatment program. Nonresidential treatment includes individualized treatment based on an assessment by a licensed psychologist. Treatment can include individual and/or group therapy.

The Bureau is responsible, by law, for treating every "eligible" inmate prior to his or her release from Bureau custody (18 U.S.C. § 3621 (e)). At the close of fiscal year 1998, the Bureau reported meeting the demand for 18,022 "eligible" inmates through residential treatment. Additional staff and resources have helped the Bureau to maintain this 100 percent treatment requirement rate. The Bureau reported that a significant number of inmates volunteer for the residential treatment. One reason for the high volunteer rate is the one-year reduction in sentence incentive offered to inmates for successful completion of a residential drug abuse treatment program.

## Assessment and Procedures for Therapeutic Communities

The Therapeutic Communities of America (TCA) recently produced standards for operating modified therapeutic communities (TC) in prison settings (Criminal Justice Committee of Therapeutic Communities of America 1999). The report recommends examining the inmate's history of substance abuse and criminal activity, and mental health, as well as an ongoing mental health screening capability. These standards:

- Program has written eligibility criteria agreed upon by the sponsoring agency and correction officials to identify participants most likely to benefit from the program.

- Residents conduct outreach activities within the general prison population.

- There is a standardized admission screening and assessment format, which may include interviews with senior program participants.

- Mental health screening conducted by qualified staff.

- The program has the authority to reject inappropriate and unmotivated applicants.

- Staff conducts a thorough biopsychosocial assessment within 10 days of admission, which includes identification of the program participant's strengths and weaknesses.

## BARRIERS TO EFFECTIVE SCREENING AND ASSESSMENT

Despite the critical importance of screening and assessment to efficient and effective criminal justice operations, the vast majority of jurisdictions throughout the United States still rely primarily on "professional judgement" and first-generation assessment instruments (Bonta 1996, 30). The question is, "Why?" Several researchers have reported barriers to screening and assessment (Gendreau and Goggin 1997; Peters and Bartoi 1997; Peters and Hunt 2000). These barriers are classified here into broad categories, specific examples of which are briefly outlined below.

### Administrative and System Issues Impede Assessment

- Multiple and redundant assessments are conducted at various stages of processing.

- Time constraints prevent conducting screening and assessments.

- Information is collected that is not used.

- Staff are not trained adequately on the administration and use of screening and assessment instruments.

- Criminal justice personnel may lack familiarity with mental health or substance abuse disorders.

- There may be limited time and resources for codifying existing information, transferring it to various parts of the criminal justice system, or easily accessing existing information.

Inappropriate Use of Assessment Instruments

- Staff may not complete and use screening and assessment instruments appropriately.

- There may be a lack of consistency in questions or documentation to allow reliable analysis of program level needs or outcomes.

- Use of nonvalidated instruments.

- Use of instruments for populations for which they were not designed.

- Use of instruments that do not address criminogenic needs.

- Records may be incomplete, misleading, or mislabeled.

- Traditional, subjective "intuitive assessments" or "first-generation assessments" still are used widely, despite demonstration of their ineffectiveness.

Minimal Assessment of Co-Occurring Disorders

- The primary barrier to treating co-occurring disorders is the minimal attempts to screen and assess for these disorders.

- Mental health and substance use disorders have a waxing and waning course and may appear in different forms at different points in time. This variability leads to different, and often conflicting, diagnoses at different stages of processing.

- There is considerable symptom interaction between co-occurring disorders, leading to difficulties in interpreting whether symptoms are related to mental illness or substance abuse.

- Individuals in the criminal justice system may anticipate negative consequences related to disclosure of mental health or substance abuse symptoms.

Limited Guidance from Research about the "Best" Instruments

- Few studies comprehensively and comparatively examine the effectiveness of different types of screening and assessment instruments.

- We lack systematic research on which criminogenic needs most influence future offending.

- Research has not identified the combination of risk, needs, personality types, and responsivity needed for programming to be most effective, and how assessments can be devised that can be used feasibly to assist with decisionmaking.

KEY RESEARCH QUESTIONS

This review of screening and assessment in correctional settings indicates that a number of critical research questions have yet to be addressed. Key research questions that future research should address include the following:

- How are specific screening and assessment instruments selected for use in correctional settings?

- How, if at all, are the results from screening and assessment used?

- Are the results from screening and assessment helpful in assisting with decisionmaking and, more specifically, with placing offenders into appropriate types and levels of drug treatment?

- What are the major problems in conducting and using screening and assessment of prisoners?

# CHAPTER 3.
# Drug Treatment in the
# Criminal Justice System

There have been many changes in the criminal justice and treatment systems over the past 20 years. In contrast to the view that "nothing works," researchers now know that treatment can work, but that no single treatment is right for every person. The key to treatment success lies in offering a comprehensive array of programs and then matching individuals and their unique needs to the appropriate treatment. Although drug treatment can be effective, during the past decade fewer and fewer offenders have participated in treatment in residential facilities or through professional counseling, detoxification units, and maintenance drug programs. At the same time, increasing numbers of inmates have participated in other, generally less effective, alcohol or drug abuse programs, including peer counseling groups, self-help groups, and educational programs. This chapter highlights these changes by reviewing literature bearing on several issues: the definition of treatment and how it fits in the criminal justice system; the types of treatment and non-treatment alcohol or drug abuse programs available to prisoners; the cost and availability of these programs in jails and state and federal prisons; the gap between availability and need; briefly, the relative effectiveness of alcohol and drug treatment programs; and barriers to drug treatment programming in correctional settings.

CSAC/ 00161

## INTRODUCTION

There have been many changes in the criminal justice and treatment systems over the past 20 years. In contrast to the view that "nothing works," researchers now know that treatment can work, but that no single treatment is right for every person. The key to treatment success lies in offering a comprehensive array of programs and then matching individuals and their unique needs to the appropriate treatment. Although drug treatment can be effective, during the past decade fewer and fewer offenders have participated in treatment in residential facilities or through professional counseling, detoxification units, and maintenance drug programs. At the same time, increasing numbers of inmates have participated in other, generally less effective, alcohol or drug abuse programs, including peer counseling groups, self-help groups, and educational programs

This chapter highlights these changes by reviewing literature bearing on several issues: the definition of treatment and how it fits in the criminal justice system; the types of treatment and non-treatment alcohol or drug abuse programs available to prisoners; the cost and availability of these programs in jails and state and federal prisons; the gap between availability and need; briefly, the relative effectiveness of alcohol and drug treatment programs; and barriers to drug treatment programming in correctional settings.

## DEFINING TREATMENT

The term "treatment" is widely used throughout jails and state and federal prisons, yet a concise, agreed upon definition of treatment is rare. Alcohol or drug abuse treatment refers to a wide range of services to help the client change behavior and lifestyle, and/or medically assist the recovery process to ultimately break the alcohol or drug abuse addiction and maintain abstinence. Different services are appropriate depending on the type of alcohol or drug abuse, client attitude and mental state, history, etc. Some researchers distinguish between "treatment," such as therapeutic communities or pharmacological programs, and "non-treatment," such as drug abuse education and self-help groups. Non-treatment services are viewed as less targeted than treatment services, but nonetheless can be an important part of drug treatment and/or support for a specific treatment plan.

Despite increased knowledge about "what works" in treatment programming, there is little readily available information about the provision of various types of programming, including what works, in correctional settings. At present, there are no large-scale, standardized assessments that provide detailed information about the type and quality of programs and services, treatment plans, and the characteristics of offenders in the programs.

## TREATMENT IN THE CRIMINAL JUSTICE SYSTEM

### Treatment Timing in the Criminal Justice System

Treatment in the criminal justice system can occur at a variety of "impact points." Different models can occur at pre-trial, jail, and pre-sentencing; can be used as diversion programs; or can be provided with varying degrees of intensity while offenders are on probation or parole or in prison. Once an offender enters the system, he or she will most likely move through several of these impact points. The key to effective processing through the criminal justice system for offenders who need drug treatment is to provide assessments and comprehensive treatment; develop, adhere to, and monitor treatment plans; and implement an effective case management plan for post-release supervision and treatment.

### Within and between System Differences in Treatment Orientation and Practice

There are cultural differences within correctional settings in the guiding goals and philosophies, ranging from a treatment orientation to a punitive/control orientation. More generally, across the criminal justice processing spectrum, and within each stage of processing, views about the competing system goals of deterrence, punishment, and rehabilitation are heterogeneous.

The philosophical differences between and within criminal justice systems can cause friction. However, they also can be used in a supportive way. Recently, there has been an evolution toward more of a shared understanding and partnership between the systems, reinforced by research and funding that shows that drug treatment can assist with long-term public safety goals (Vigdal 1995).

### Principles of Treatment in the Criminal Justice System

A panel of experts convened to produce the Center for Substance Abuse Treatment's *Planning for Alcohol or Drug Abuse Treatment for Adults in the Criminal Justice System,* part of the Treatment Improvement

Protocol (TIP) series by the U.S. Department of Health and Human Services (Vigdal 1995). The result was the development of a set of principles for guiding the delivery of alcohol or drug abuse treatment in correctional settings. The core principles are:

- Treatment should not represent a substitute for punishment or sanctions.

- Treatment should be universally available as needed for persons with drug treatment needs.

- Alcohol or drug abuse treatment services should be tailored to the needs of the specific offender, based on a thorough assessment at jail or prison intake.

- Offender supervision should continue once an individual enters treatment.

- Offenders should remain accountable to the sentencing judge or probation/parole authorities.

The first principle refers to the balance needed between punishment and treatment. In the criminal justice system, the two ideas should be viewed as complementary goals as opposed to two distinct and competing goals (Carter 1991). Treatment is not an "easy way out" for an offender sentenced to prison; it is a way to address a problem while the inmate serves his or her term of incarceration.

The second and third principles refer to the timing and placement of inmates into treatment in the criminal justice system. Treatment ideally should be available to individuals as soon as they come into contact with the criminal justice system. In this context, treatment includes the ability to assess properly all incoming inmates, to match each inmate to the appropriate course of treatment, to create a treatment plan, and to then implement the plan throughout processing.

The fourth principle reinforces the idea that punishment and treatment are not mutually exclusive in the criminal justice system. There is a need to not only assess the inmate for treatment needs, but also to assess the inmate for risk. The offender's risk status should be considered in the placement decision, and supervision should remain a priority while an offender receives treatment.

The final principle focuses on accountability and case-management continuity. The goal is to assist inmates to navigate the system without "falling through the cracks," as well as to ensure that the offender adheres to the prescribed treatment and supervision plan.

## The Ideal Drug Treatment Approach in the Criminal Justice System

Offenders entering state or federal prisons are confined to a sentence of at least one year in most states (New York, California, Florida, and Illinois allow prison sentences of less than one year). This length of confinement suggests that prisons should offer a full range of alcohol and drug abuse treatment services. However, only recently have prisons begun to focus on rehabilitation (Cullen and Gendreau 2000). The new focus on rehabilitation raises the issue of what types of treatment should be implemented in correctional settings. According to Vigdal (1995), the range of alcohol and drug abuse programs and approaches should consist of one or more of the following:

- Comprehensive pregnancy management for alcohol or drug abusers to enable a woman to carry her baby to term while incarcerated. Foster care services may be needed and medical services should be available for both mother and child.

- Medical treatment for prisoners with chronic and communicable diseases, including TB and HIV/AIDS, should be available in prison.

- Pharmacotherapy for disorders such as bipolar disorder and major depression should be incorporated into these services.

- Alcohol or drug abuse treatment should extend across institutional boundaries when offenders are transferred to different correctional facilities, and to the community after release.

- Special arrangements should be made for alcohol or drug abuse treatment and health care services for offenders in protective custody and administrative segregation.

- Pre-release group programs and transitional community programming should be offered to all offenders, in particular to those who have been incarcerated for long periods of time.

- Education about HIV/AIDS and its risk factors should be a critical component of prison programs.

- Relapse prevention for alcohol or drug abusers should be part of transitional programming.

CSAC/ 00163

## DRUG TREATMENT MODALITIES AND SERVICES

This section will address two topics. The first is treatment modalities, or models of treatment delivery within the criminal justice system. The second is treatment services, or the individual components that can be combined in a variety of ways to create a treatment plan. For example, "incarceration without specialized services" is a model of service delivery; this model can consist of a variety of components, including education and vocational courses.

### Drug Treatment Models

There are five main types of treatment models in correctional settings (Brown 1992):

- **Incarceration without specialized services.** This is the most common model available to a drug user in correctional settings. That is, specific drug treatment programming frequently is unavailable for most drug abusers. Instead, offenders who need drug treatment frequently received educational programming, vocational counseling, casework services, and various types of individual or group counseling.

- **Incarceration with specialized services for problems other than drug abuse.** These programs provide specialized services for drug abusers but do not directly target drug abuse problems (e.g., education or literacy programs).

- **Incarceration with drug education and/or drug abuse counseling.** This approach represents the second most common model, according to Brown (1992) and supported by recent (1999) correctional data (Camp and Camp 1999a, b). These data indicate that approximately 70 percent of inmates receiving treatment reported participating in an addiction group or counseling that was provided by institutional staff.

- **Incarceration with dedicated residential units.** These units may exist as distinct programs within a facility or as secure units outside of the correctional complex. Examples of residential treatment programs and therapeutic communities (TC) include the Stay 'n Out program (New York, located inside of the facility) and the Cornerstone program (Oregon, located outside of the facility). In these facilities, staff are either from the correctional department or are contracted with from outside the

department. Some programs employ recovering addicts as staff.

- **Incarceration with client-initiated or client-maintained services.** This approach includes low-cost programs such as AA and NA, and can consist of self-help groups or support services. These programs are located in the majority of federal prisons (84.5 percent), state prisons (92.5 percent) and, somewhat less frequently, jails (59.7 percent) (SAMHSA 2000).

### Drug Treatment Programs and Services

Research shows that highly intensive residential programs are the most effective in reducing drug and criminal behavior in the long term, yet most prison facilities do not offer this type of treatment, or offer it to only a small percentage of the population. Residential treatment is considerably less likely to be found in jails. Correctional departments blame budgetary constraints (71 percent) and space limitations (51 percent) as two of the major reasons for the limited treatment availability (CASA 1998).

The most prevalent types of programs in prisons, according to various surveys, are self-help programs such as Alcoholics Anonymous and Narcotics Anonymous, and education/awareness programs. These types of programs can address large groups at once, require relatively little ongoing investment, and can be staffed by inmates or volunteers.

The term "treatment" is used widely throughout jails and state and federal prisons. Uniformly defining treatment is a difficult task. Many correctional systems may refer to treatment as anything from self-help groups to residential therapy, while other systems may only consider residential treatment and counseling as "treatment." Using a broad definition of treatment, an equally broad range of treatment programs and services are available in correctional settings. Table 3-1 outlines the most common approaches, which then are discussed in more detail below.

Detoxification refers to the physical and emotional removal of drugs from the body. It constitutes the first step to addressing drug and alcohol problems. The procedure occurs predominately in jails because they are often the offender's first contact with the criminal justice system. The process refers to observation, support, and, when necessary, medical treatment associated with detoxifying the body. Although this treatment predominately takes place in jails, many state and federal facilities reported having detoxification centers,

although the centers generally operate below capacity (Peters 1993). Certain drugs can cause dangerous medical conditions such as seizures when leaving the body. Therefore, for drugs such as sedative-hypnotics, alcohol, benzodiazepines and barbiturates, it is recommended that a monitored medical detoxification take place (Vigdal 1995).

Self-help groups operate in almost every state and federal prison and jail in this country. The groups, such as AA and NA, are highly cost-effective. Frequently run by other inmates, they provide group support for recovering addicts. Self-help groups can offer peer support and confrontation of the problem. Some experts do not consider "self-help groups" a form of treatment; however, others in the field do consider such groups as treatment (Vigdal 1995). For offenders with alcohol or drug dependency/addiction, self-help groups ideally should be used in conjunction with or after treatment as a maintenance or reinforcement tool.

Drug testing is an essential part of any treatment program. Vigdal (1995) notes that drug testing in treatment programs can be used as a supervisory device, but that they also can be used as a "therapeutic tool." As a supervisory tool, drug testing provides a way to monitor inmates, keep track of their progress,

and make decisions about their treatment plan. As a therapeutic tool, drug results can be a source of motivation for abstinence for some offenders, a way to prove to themselves and others that they are making progress. Drug testing is often discussed in the context of prison maintenance. Theoretically, drug testing can serve as a deterrent, yet there is little research to demonstrate a deterrent effect.

Education programs are considered "non-treatment" programs by most sources. They are a complement to treatment programs for alcohol or drug abuse offenders, as well as a useful awareness and prevention program for those offenders not involved with alcohol or other drugs. Education topics can include:

- medical effects and consequences of drug use and abuse
- the disease model of addiction (including the signs and symptoms)
- introduction to 12-step programs
- denial and other defense mechanisms
- effects of drugs on families, including co-dependency and issues faced by children of alcoholics

| Table 3-1. Treatment Approaches in Correctional Settings | |
|---|---|
| Type of Treatment | Approach |
| Detoxification | Where possible, remove drugs from system through detoxification as a first step before effective drug treatment can or should be undertaken. |
| Self-help groups | Peer support and problem confrontation in a group setting. |
| Drug testing | Deterrence and maintenance. |
| Education | Raise awareness of and understanding about a variety of topics, ranging from effects of certain drugs to illogical thinking patterns. |
| Individual counseling | Psychological counseling in a one-on-one setting, relying on any of a wide range of psychological approaches/modalities (behavioral, psychoanalytic, etc.) |
| Group counseling | Counseling in a group setting, with a focus on life skills rehearsal, role reversal, and stress management. |
| Outpatient drug-free | Can include a wide range of approaches, including counseling, education, self-help, 12-step, cognitive behavior therapy. |
| Milieu therapy | Intensive counseling and separate living conditions—more intensive than individual counseling but less intensive than therapeutic communities. |
| Family therapy | Therapy for both offender and family. |
| Inpatient short-term | Medical stabilization and focus on behavioral changes. |
| Residential programs | Long-term, isolated, comprehensive therapy including social learning, counseling, and education. |
| Pharmacological maintenance | Medical therapy to address long-term drug use, particularly heroin and alcohol. |
| Transitional services | Relapse prevention services to help with transition into the community. |

CSAC/ 00165

- thinking errors or illogical thinking patterns
- human sexuality (When possible, there should be separate female and male groups. Issues pertaining to the problems experienced by gay men and lesbians may need special attention.).
- HIV/AIDS education
- coping skills
- communication skills.

Several researchers have suggested providing drug education for all prisoners. For those offenders with and without alcohol or drug addictions, education can serve as awareness and prevention (for non-addicted offenders). Education is very low cost and reasonable and can address other issues, such as AIDS, other infectious diseases, and risky behavior.

Counseling (group and individual) is the most common intensive treatment method in prisons (CASA 1998). Individual counseling is one of the least common programs available to inmates, and there is little evidence of its ability to reduce recidivism, although positive psychological changes have been demonstrated (Lipton, Falkin, and Wexler 1992). Group counseling, led by a trained professional, is more common than individual counseling, led by a psychologist, social worker, or perhaps a psychiatrist. If structured well, group counseling can provide a supportive and psychologically safe setting to discuss problems in a group environment. Unfortunately, according to Lipton et al. (1992), the group counseling model in most institutions is unable to overcome the "pro-criminal inmate subculture" within most prisons. Good program structure and a dedicated leader can help to alleviate this problem. Group counseling/therapy can include (Lipton et al. 1992):

- life skills rehearsal
- role reversal
- stress management
- social skill practice
- problem-solving skills training
- relapse prevention
- participation in AA types of groups.

There are many approaches to individual counseling, such as addiction counseling and psychotherapy. The counseling approach fits into a variety of other treatment plans as it was designed to be a component of a comprehensive treatment plan. The four most common counseling and treatment approaches are psychoanalytical strategies, conditioning techniques, social learning models, and cognitive therapies (van Voorhis 1997, 109–185):

- **Psychoanalytical strategies.** Originally defined by Sigmund Freud and later by Walter Toman, this type of therapy addresses the conscious and unconscious thoughts and desires in the mind. The goal of psychoanalytical therapy is to make the person aware of their unconscious ideas and the effect of these ideas on their behavior.

- **Conditioning techniques/behavior modification.** Conditioning techniques are based on the assumption that behavior is learned; thus, problematic behavior is learned behavior that can be targeted for change. This approach deals with the present, whereas the psychoanalytic approach tries to understand and heal the past. Behavior modification deals with stimuli, reward, and punishments to target and change behavior. One common type of modification is contingency management, which uses a voucher based system of positive rewards for remaining in treatment.

- **Social learning models.** These models are designed to provide therapy through observational learning, that is, through observing and imitating others. This process is also known as modeling. Social learning approaches frequently are used in therapeutic communities, where staff members are considered potential models.

- **Cognitive-behavioral therapy.** This approach uses the same "learning processes" that aid in the addiction process to aid in the recovery process as well. Techniques of cognitive-behavioral therapy include recognizing situations associated with drug X, avoiding these situations when appropriate, and coping with a range of problems and problematic behaviors associated with drug abuse. It focuses on the ways that people think and the content of their thinking. Counselors try to teach clients how to change their thinking patterns. This type of therapy can take place in individual and group settings.

According to van Voorhis (1997), these last three therapies (i.e., all but the psychoanalytic approach) provide the best chances of achieving success with offenders.

Outpatient drug-free therapy is a type of treatment that includes aspects of counseling, education, self-help, 12-step groups, and cognitive behavior therapy. The treatment can last several months or more. In an incarcerated setting, this type of therapy is similar to milieu or residential, without the separate living conditions. This type of treatment is recommended for users of drugs other than opiates and those with generally stable, well-integrated lives where there have been only brief histories of drug dependence and criminal behavior.

Milieu therapy incorporates intensive counseling and separate living conditions. The intensity of the program lies between the aforementioned counseling and the therapeutic community. It includes some components of group and individual counseling, peer interaction and "mildly confrontational group sessions" (Lipton et al. 1992). Success rates for milieu therapy are higher than rates for counseling alone, but less than rates for therapeutic communities (Falkin, Wexler, and Lipton 1990). Milieu therapy is best suited for recent multi-drug users with fewer than five years of addiction.

Family therapy is used to offset the effects on the family of criminal behavior. Institutionalization in particular threatens family stability for both the offender and the family, both of whom must adjust to the changing circumstances and additional stress. Therapy must address the individual and the family, since family conditions can contribute to criminal behavior (van Voorhis 1997, 219).

In-patient short-term therapy is a short-term, typically 30-day, intensive treatment plan focusing on medical stabilization (detoxification) and behavioral changes. A combination of medical professionals and counselors run the program.

Residential programs generally are run in separate facilities. They can vary greatly, from the timing to the physical environment to the philosophical approach. Residential programs are part of a continuous treatment plan; the programs usually incorporate post-treatment plans into their design.

Modified from the traditional community setting, therapeutic communities are the most popular and successful types of residential treatment programs in prison. Programs vary, but typically the therapeutic community is long-term, isolated, comprehensive residential program, involving education and therapy. Providers include peer staff (i.e., those who have successfully completed the program), treatment and mental health providers, and educational and vocational coun-

selors. New York's Stay 'n Outmodel was one of the first and most prominent, as well as one of the first to undergo a large-scale evaluation. TCs generally offer a comprehensive array of services and approaches as well as a continuous treatment environment. Although programs vary, many programs contain a three-phased approach to treatment. These stages are incarceration, work release or "transitional TC," and parole or another supervised post-release option. The programs offer comprehensive therapy, focusing on behavioral, cognitive, and emotional aspects of the person, in addition to medical and physical conditions of alcohol or drug abuse.

Pharmacological maintenance is a medically supervised service that involves administration of medication to replace the illicit drug or block its actions. There are several kinds of pharmacological applications. Methadone maintenance is the most common; the client is monitored and counseled while receiving methadone. This type of program is tailored for those addicted to heroin or other opiates for a long period of time (typically more than two years). Several other types of applications include:

- Naltrexone is an opioid antagonist that blocks the effects of opioids such as heroin, thereby discouraging their use. Naltrexone has also been used for alcoholism because it reduces the patient's desire for alcohol when he or she stops drinking.

- Buprenorphine is a medication still in the experimental stage that exhibits mixed opioid-like and opioid-antagonist properties.

- Long-acting opioid maintenance compounds include drug treatments such as LAAM (levo-alpha-acetylmethadol) that overcome the need for the daily clinic attendance required for methadone maintenance.

Transitional services. A key to maintaining treatment success is to provide comprehensive services, particularly during the stressful transition away from prison to the community. Returning to old neighborhoods, old routines, and old friends can often be the catalyst to begin reverting back to "old ways." Transitional services can include things such as "relapse prevention"; this is a strategy to help the alcohol or drug abuser learn about his or her own specific stressors or triggers that contribute to their drug use, as well as about strategies they can use to cope with these

CSAC/ 00167

(Vigdal 1995). Providing transitional services is an integral part of continuous case management.

Diversion programs. Extensive efforts have been made in recent years to divert alcohol or drug-involved offenders away from traditional incarcerated settings, when deemed appropriate. Drug courts have become increasingly popular over the past 5 to 10 years. The premise underlying most drug courts is that drug use represents as much a public health as law enforcement problem (Vigdal 1995). Other alternative programs include the Treatment Alternative to Street Crime program, intensive probation programs, and boot camps. Brown (1992) notes that, in addition to the five widely accepted treatment models for drug abusers in correctional settings, there are alternatives-to-incarceration models as well. The basic models include probation, with a mix of counseling, support, and surveillance (the most typical); surveillance, components of which include house arrest, electronic monitoring, and urinalysis; and diversion, such as programs like TASC.

## COST OF DRUG TREATMENT

A report by the Center on Addiction and Substance Abuse (1998) indicates that it costs $3,500, over and above incarceration costs, to provide residential drug treatment to inmates. The cost would be $6,500 if education, job training, and health care were included. These costs would be substantially offset by increased productivity of offenders who not only do not return to prison but obtain employment. For example, CASA (1998) estimates that there would be $68,800 in savings per inmate, assuming each inmate becomes a law-abiding citizen, avoiding incarceration and health care costs, earning a salary and paying taxes.

The 1992 CALDATA (California Department of Alcohol and Drug Programs) study is another well-known cost-benefit study (Gerstein et al. 1994). Several important findings came out of this report: each dollar spent on alcohol or drug treatment resulted in $7.14 savings to the criminal justice system, mostly due to reduction in crime; treatment reduces drug use and drug-related illnesses; the "time in program" hypothesis was supported (i.e., the more time spent in treatment, the more effective treatment is); and treatment can be effective for everyone, cutting across all demographic groups and risk levels.

## DRUG TREATMENT PREVALENCE IN CORRECTIONAL INSTITUTIONS

### Prevalence Surveys

Information from recent survey sources was gathered to illustrate the state of knowledge of treatment programs in prisons and jails. Each source provides a different perspective on treatment in incarcerated settings. The sources include the following:

- *The 1997 Uniform Facility Data Set* (SAMHSA 2000). In 1997, SAMHSA conducted a special survey of correctional facilities in the United States, including state and federal prisons, jails, and juvenile facilities. The goal of the study was to document the prevalence of treatment in correctional settings and to document the various types of treatment being offered. Previous Uniform Facility Datasets gathered information from all treatment settings, predominantly community-based treatment, and underrepresented correctional institutions. The 1997 data collection effort was the first comprehensive collection targeting correctional institutions. Treatment was defined as including services that attempted to initiate or maintain alcohol or drug abuse recovery, and included a range of approaches, such as individual and group counseling, detoxification, and pharmaceutical treatments. Correctional facilities and researchers sometimes include AA, NA, or other general education or self-help awareness groups as treatment. The SAMHSA study thus relies on a narrower definition of treatment.

- *The Corrections Yearbook 1999: Jails* and *The Corrections Yearbook 1999: Adult Corrections* (Camp and Camp 1999a, b). The yearbook for jails provides data compiled from a survey questionnaire to all jail systems housing more than 200 prisoners in the United States. Information presented about jails refers to the 124 jail systems (265 jails in 33 states) that completed surveys. The yearbook for adult corrections contains data from correctional agencies from all 50 states, the District of Columbia, the Federal Bureau of Prisons, and the Correctional Service of Canada, as well as information from parole and probation agencies. Information referenced in the state and federal prison sections of this report refers to answers from the correctional agencies and the Federal Bureau of Prisons.

- The 2001 American Correctional Association *Survey of the Adult Division of the Department of Corrections* (ACA 2001). A statewide drug treatment intervention survey of the Adult Division of the Department of Corrections (DOC) took place in 2000, with representatives from 42 state prison systems participating in the survey. DOC representatives for each state system answered questions about the state's drug testing, assessment, and treatment practices.

- The 1996 Center for Substance Abuse Treatment, *Treatment Survey of Prison Facilities* (CASA 1998). In 1996, CASA conducted a national mail survey targeting state and federal correctional systems. In total, 963 prison facilities responded to the survey, including 47 states, the District of Columbia, and the Federal Bureau of Prisons. Question topics include assessment, inmates in treatment, and treatment services. Treatment services were described as therapeutic communities, other intensive inpatient/residential, individual, and group counseling self-help, and drug education.

- The *1997 Survey of Inmates in State and Federal Correctional Facilities*, conducted by the Bureau of Justice Statistics (Mumola 1998, 2000). This survey interviewed inmates and asked them questions about their offenses, background, gun possession and use, prior drug and alcohol use and treatment, and services provided in prison, among other things. This source provided an inmate perspective on treatment.

Inmates in Drug Treatment Programs
in State and Federal Prisons

Treatment should target inmates with a legitimate addiction problem. However, the prevalence data about people in treatment provides ambiguous information about addiction. As discussed in the prevalence section, during the past decade, there were increasing numbers of inmates in the correctional system in general, and increasing numbers of people with alcohol or drug abuse problems in the system. Unfortunately, we lack clear, standardized information about the severity of need and corresponding treatment options available.

Data from the *1999 Corrections Yearbook* illustrates the range of service prevalence for inmates in state and federal correctional facilities. The percent of inmates in a treatment program, as a percentage of all inmates, ranges from a low of .8 percent in Louisiana

to a high of 68 percent in Alaska. On average, 16.2 percent of all inmates have experienced treatment defined as separate unit treatment, addiction groups, or counseling.

A 1997 Uniform Facility Data Set (UFDS) survey documented that 99,000 inmates received substance abuse treatment in state prisons; 12,500 inmates in federal prisons received treatment at the time of the survey (SAMHSA 2000). The *1997 Survey of Inmates in State and Federal Correctional Facilities* (Mumola 1998, 2000) defines "treatment" as residential facilities, professional counseling, detoxification units, and maintenance drug programs. This survey found that, in 1997, 9.7 percent (101,728) of state prisoners received treatment since admission. By contrast, in 1991, 24.5 percent (169,700) of state prisoners received some form of drug treatment. Among federal prison inmates in 1997, 9.2 percent (8,100) received drug treatment, a decline from 15.7 percent (8,300) in 1991.

The *1997 Survey of Inmates* (Mumola 1998, 2000) data suggest that treatment programs target inmates who show signs of more intensive drug use. For example, in state prisons in 1997, 9.7 percent of all prisoners participated in drug abuse treatment since admission; 11.5 percent of those inmates who ever used drugs, 13.1 percent of those inmates who used drugs regularly, 14.6 percent of those who used drugs in the month before the offense, and 18 percent of those who used drugs at the time of the offense participated in drug treatment since admission. The numbers are similar for federal prisoners. The trend is similar for non-treatment programs as well (defined as self-help, peer counseling, and education/awareness groups); 20.3 percent of all state prisoners participated in these programs, while 38.0 percent of those that used drugs at the time of the offense participated in these programs. Overall, there has been a drop in participation in professional substance abuse treatment programs since 1991, but an increase in enrollment in other drug abuse programs, such as self-help or peer groups and drug education classes.

The SAMHSA (2000) study found that only 40 percent of correctional facilities (including federal, state, jails, and juvenile facilities) nationwide provided on-site substance abuse treatment, ranging from a low of 16 percent in Mississippi to a high of 71 percent in Delaware. This information is important because it helps to make sense of aggregate state statistics. In state-level surveys, a state could answer that they offer a particular service even if only a few institutions within the state offer it. However, using information

from SAMHSA's institution-level survey, it is possible to identify that only a certain percentage of institutions within the state actually offer the service.

## Inmates in Drug Treatment Programs in Jails

In general, jails are unable to offer the full spectrum of services that longer-term, larger prison facilities are able to offer. Jails have been described as a less than ideal place for treatment because of the frequent turnover and short stays. However, some jails, particularly larger ones, are now offering comprehensive alcohol or drug treatment services. With additional resources, it is possible to provide treatment, or at least begin part of a treatment plan that, with proper linkages, can continue smoothly through the justice system. Detoxification services are among the first services offered to alcohol- or drug-abusing offenders because valid assessments cannot be made without detoxification.

According to the UFDS data (SAMHSA 2000), overall, 34 percent of jails offer drug "treatment." As table 3-2 shows, only 28 percent of jails offer detoxification to inmates. (According to the *1999 Corrections Yearbook*, 50 percent of jail systems housing more than 200 inmates offer detoxification programs.) The first priority for many jails is to monitor offenders. Monitoring through urinalysis or other tests can help to encourage a drug-free environment. According to the literature, maintaining a drug-free environment is a key to successful treatment programs. Yet the UFDS data indicate that fewer than half (42 percent) of jails use drug testing. And 36 percent of jails do not assess offenders for drug treatment needs.

According to the UFDS survey, a majority of jails provide individual (77 percent) or group counseling (64 percent). Family counseling is less prevalent, taking place in only 19 percent of jails. The *1999 Corrections Yearbook* tells a slightly different story: most jails (76 percent) offer group counseling programs, less offer individual counseling (57 percent), and 30 percent of jails offer therapeutic communities.

According to the UFDS survey, some jails offer a variety of "nontreatment" substance abuse services. Over half (60 percent) of jails provide self-help services, such as AA or NA, and many (43 percent) offer education and/or awareness programs. According to the *1999 Corrections Yearbook*, 70 percent of jails offered education programs and 70 percent provided community referral services.

## Inmates in Drug Treatment in the Federal Bureau of Prisons

According to the 1997 UFDS (SAMHSA 2000), 93.8 percent of federal prisons provide "treatment." Almost all federal prisons provide group counseling (99.2 percent) and individual counseling (99.2 percent), with 11.6 percent offering family counseling. Table 3-4 presents information about nontreatment services in federal prisons. Most federal prisons offer what the study refers to as "nontreatment" services. The vast majority (86.8 percent) assess for treatment need and provide drug education (89.9 percent), conduct drug tests (87.6 percent), or offer self-help groups (84.5 percent), but only 22.5 percent have detoxification capabilities.

Almost all federal prisons offer a comprehensive treatment program to qualified inmates. The Bureau of Prisons (BOP) provides a standardized assessment,

Table 3-2. Correctional Facilities Providing Selected Nontreatment Substance Abuse Services, All Correctional Facilities and Jails.

| Selected Substance Abuse Service | Facility Type | |
|---|---|---|
| | All Facilities (N = 7,243) | Jail (N = 3,067) |
| Assessment for treatment need | 63.7% | 63.6% |
| Drug testing | 55.9 | 47.2 |
| AA, NA, other self-help | 57.3 | 59.7 |
| Education/Awareness | 63.2 | 43.4 |
| Detoxification | 15.5 | 28.1 |

Source: Substance Abuse and Mental Health Services Administration. 1998. 1997 Survey of Correctional Facilities, based on the Uniform Facility Data Set (UFDS). Washington, D.C.: U.S. Department of Health and Human Services, Substance Abuse and Mental Health Services Administration, Office of Applied Studies.

placement, and treatment process to all inmates. This process began in 1989 in an attempt to create a continuum strategy for federal prison inmates. Inmates must participate in an alcohol or drug education program if:

- there is evidence in their pre-sentence investigation report that alcohol or drugs contributed to the commission of their instant offense;

- they violated supervised release, parole, conditions of a halfway house placement, or conditions of home confinement based on alcohol or drug use; or

- the sentencing judge recommended that they participate in a drug treatment program during incarceration.

The education program is a comprehensive program; however, those who are identified as needing more treatment are encouraged to participate in either nonresidential or residential drug treatment. Every BOP institution offers nonresidential drug abuse treatment and counseling, including individual and group therapy, seminars, and self-improvement groups. In addition, 47 Bureau institutions have residential, isolated, intensive drug abuse treatment programs. (The Federal Bureau of Prisons has 98 institutions, six regional offices, a Central Office [headquarters], three staff training centers, and 28 community corrections offices.) The residential program is comprehensive, and it follows the offender through treatment in prison to aftercare in the community.

Inmates are also encouraged to volunteer for the residential treatment. The Bureau reports that a significant number of inmates volunteer for the residential treatment. One reason for volunteering is the one-year reduction in sentence incentive offered to inmates for successful completion of a residential drug abuse treatment program.

Treatment and Treatment Settings

In the UFDS survey, a total of 121 federal facilities, 716 state prisons and 1,047 jails reported providing treatment. These numbers represent approximately 94 percent of federal prisons, 61 percent of state prisons, and 34 percent of jail systems. Treatment can be provided in a variety of settings in correctional institutions. The UFDS refers to three treatment settings:

- Substance abuse treatment provided in a specialized unit within the institution, defined as a unit where those receiving substance abuse treatment live separate from the rest of the facility population while sleeping.

- Treatment or counseling in the general facility inmate population, defined as treatment for substance abuse that is provided other than in a specialized treatment unit or in a hospital or psychiatric ward, where the inmate or resident returns to his or her regular bed within the facilities at night.

- Substance abuse treatment provided in a hospital/psychiatric inpatient unit within the institution, analogous to hospital inpatient treatment.

These treatment settings are not mutually exclusive; an institution can provide any combination of treatment in various settings. Results from the survey, presented in table 3-5, show that most federal and state prisons as well as jails rely primarily on general facility

| Table 3-4. Correctional Facilities Providing Selected Nontreatment Substance Abuse Services, All Correctional Facilities and State vs. Federal Prisons | | | |
|---|---|---|---|
| | | Facility Type | |
| Selected Substance Abuse Service | All Facilities (N = 7,243) | State Prisons (N = 1,069) | Federal Prisons (N = 129) |
| Assessment for treatment need | 63.7% | 67.1% | 86.8% |
| Drug testing | 55.9 | 88.4 | 87.6 |
| AA, NA, other self-help | 57.3 | 92.5 | 84.5 |
| Education/Awareness | 63.2 | 82.6 | 89.9 |
| Detoxification | 15.5 | 8.0 | 22.5 |

Source: Substance Abuse and Mental Health Services Administration. 1998. *1997 Survey of Correctional Facilities*, based on the Uniform Facility Data Set (UFDS). Washington, D.C.: U.S. Department of Health and Human Services, Substance Abuse and Mental Health Services Administration, Office of Applied Studies.

CSAC/ 00171

population treatment. The next most popular model in federal prisons is the specialized unit and general facility population treatment (33.1 percent). Only 14.9 percent of state prisons and 9.6 percent of jails offer this mix of settings. Eighteen percent of jails, 15.9 percent of state prisons, and 5.8 percent of federal prisons offer a specialized treatment unit only. Very few prisons or jails offer hospital or psychiatric treatment unit only or the combination of a hospital or psychiatric treatment unit with a specialized unit or general facility.

## TREATMENT PROGRAMMING ISSUES

### Treatment Plans and Continuity of Care

The treatment plan is as important as provision of treatment. Without a plan, treatment can be disjointed, piecemeal, and, ultimately, ineffective. According to Vigdal (1995), treatment plans ideally should be:

- biopsychosocial in nature,
- multidisciplinary in delivery,
- comprehensive in scope,
- driven by ongoing assessments, and
- closely monitored.

The treatment plan includes a client profile (needs, risk, history, etc.) along with the prescribed treatment plan, including goals and objectives. Providers from all

systems—criminal justice, treatment, mental health, and medical—should be involved in the plan and share the information in the plan. To prevent "reinventing the wheel," the plan should be automated and updated as risks and needs change and as progress is made. The plan is crucial for the period of time when the offender moves from the institution to the community.

It is also important for representatives from different services to collaborate. Active linkages should be established and maintained between criminal justice representatives, alcohol or drug treatment representatives, and mental health representatives, among others.

Case management is one way to efficiently supervise the treatment plan. Case management provides a variety of functions. First, it can be the bridge between sometimes competing systems, the criminal justice system and the treatment system. Second, it creates a network of service agencies, both public and private, which in turn creates a greater pool of resources of treatment options. Third, case management ensures continuity; it provides a single point of contact, a "navigator," throughout the system. Vigdal (1995) presents five models. Case management that is provided by

- the justice system
- a treatment agency
- an agency separate from the treatment and justice agencies

### Table 3-5. Correctional Treatment Facilities Providing Each Combination of Treatment Type, by Facility Type

| Treatment Setting | Facility Type | | | |
|---|---|---|---|---|
| | All Facilities (N = 3,027) | Jails (N = 1,047) | State Prisons (N = 716) | Federal Prisons (N = 121) |
| Total, all treatment facilities | 100.0% | 100.0% | 100.0% | 100.0% |
| Specialized treatment unit only | 14.3 | 18.2 | 15.9 | 5.8 |
| General facility population treatment only | 70.6 | 64.6 | 63.4 | 55.4 |
| Hospital or psychiatric treatment unit only | 1.1 | 1.9 | 1.1 | 0.0 |
| Specialized unit and general facility population treatment | 10.0 | 9.6 | 14.9 | 33.1 |
| Specialized unit and hospital/psychiatric treatment unit | 0.8 | 1.3 | 1.0 | 0.0 |
| General facility population treatment and hospital/psychiatric unit treatment | 2.0 | 2.6 | 2.5 | 4.1 |
| Combination of all three settings | 1.2 | 1.8 | 1.1 | 1.7 |

Source: Substance Abuse and Mental Health Services Administration. 1998. 1997 Survey of Correctional Facilities, based on the Uniform Facility Data Set (UFDS) survey, and the 1996 UFDS Survey. Washington, D.C.: U.S. Department of Health and Human Services, Substance Abuse and Mental Health Services Administration, Office of Applied Studies.

Note: Figures may not add to totals shown due to rounding.

CSAC/ 00172

- a coordinator from the justice system who provides consulting services and technical assistance to support existing criminal justice case management

- multidisciplinary groups in the criminal justice system.

### Maintaining a Drug-Free Environment

Although maintaining a drug-free environment in a correctional setting can set the stage for expectations of drug use (zero tolerance), only 29 percent of state and federal prisons are drug free. Many prisons provide free cigarettes to certain or all offenders. More important is the illicit drug trade reputed to be widely prevalent in prisons (Inciardi, Lockwood, Quinlan 1993). It is an issue that journalists and reporters have often addressed, but from an evaluation perspective, few researchers have documented the reality of drug use in prisons, in part because of the extremely sensitive nature of the topic. In fact, statistics about the results of drug monitoring tests portray a very optimistic picture about illicit drug use in correctional facilities.

A CASA (1998) report cites anecdotal evidence about the availability of drugs and alcohol in prisons and jails. A combination of surveillance (searching belongings, "patting down" inmates, exchanging clothes upon admission, and questioning visitors) and drug testing can help to enforce a drug-free environment (CASA 1996 study, cited in CASA 1998).

Although there is anecdotal evidence about the prevalence of drugs and alcohol in correctional facilities, drug tests tell a positive picture. Almost all facilities monitor some inmates by testing for drug use. Urinalysis is the most common tool that is used to screen for drug use and monitor the population. The cost per sample is relatively low, ranging from a few dollars to about $26 in one state (the average cost to test a sample for drugs was $6.91). However, the total cost can be quite high—in 1999, a total of 1,362,753 samples were collected. On average, 95.4 percent of samples among 41 agencies were drug free.

## KEY RESEARCH QUESTIONS

- What exactly is the treatment need/services gap? To date we lack consistent and sufficiently detailed studies identifying how much of various kinds of treatment are available in jails and prisons, and how these have changed over time. Thus, it is difficult to state with a high degree of accuracy what the current treatment need/services gap is.

- Why do correctional facilities choose particular treatment programs? Among the many possible treatment approaches, why one particular approach? Who makes this decision? Are treatment programming decisions driven primarily by unique, one-time opportunities, legislation, correctional philosophy, and/or other factors?

- How many facilities evaluate their programs, including screening and assessing potential clients and matching that information to new and improved programs?

- What are the primary challenges to providing drug treatment?

- What are the challenges involved in linking substance abuse treatment to other aspects of correctional operations?

- Are there certain types of treatment that are easier to implement in a prison setting?

- Do correctional administrators stay current with the effectiveness of different treatment models and adjust their programs as information changes?

# CHAPTER 4.
# Drug Treatment Effectiveness
# in the Criminal Justice System

Research consistently shows that drug treatment can be effective for a range of offenders across a range of treatment modalities. Several longitudinal studies on drug treatment programs, including the Key-Crest program in Delaware and the Amity Program in California, provide strong evidence that drug treatment in prisons as well as aftercare programs in the community reduce recidivism and increase pro-social behavior. In addition, findings from the Drug Abuse Treatment Outcome Study (DATOS), the Treatment Outcome Prospective Study (TOPS), and the Drug Abuse Reporting Program (DARP) conducted over the past 30 years show that treatment can work in "real world" settings. However, many questions remain unaddressed or unanswered, including identification of the precise modalities, and combinations of modalities, that most successfully reduce drug abuse and criminal behavior. In addition, despite recent advances and developments in research, including meta-analytic techniques, there are still considerable methodological flaws in much research on treatment effectiveness.

This chapter outlines the most common positive outcomes for drug treatment, linking these to specific treatment approaches. It then explores the merits of compulsory treatment and identifies factors that influence treatment effectiveness across modalities. Finally, it discusses difficulties inherent in evaluating treatment effectiveness and identifies areas for further research.

CSAC/ 00174

# INTRODUCTION

Research consistently shows that drug treatment can be effective for a range of offenders across a range of treatment modalities. Several longitudinal studies on drug treatment programs, including the Key-Crest Program in Delaware and the Amity Program in California, provide strong evidence that drug treatment in prisons as well as aftercare programs in the community reduce recidivism and increase pro-social behavior (Gaes et al. 1998; Harland 1996). In addition, findings from the Drug Abuse Treatment Outcome Study (DATOS), the Treatment Outcome Prospective Study (TOPS), and the Drug Abuse Reporting Program (DARP) conducted over the past 30 years show that treatment can work in "real world" settings (Cullen and Gendreau 2000; Gaes et al. 1999; General Accounting Office 1998). However, many basic questions remain unaddressed or unanswered, including identification of the precise modalities, and combinations of modalities, that most successfully reduce drug abuse and criminal behavior. In addition, despite recent advances and developments in research, including meta-analytic techniques, there are still considerable methodological flaws in much research on treatment effectiveness (Gaes et al. 1999).

This chapter outlines the most common positive outcomes for drug treatment, linking these to specific treatment approaches. In addition, it identifies key factors linked to treatment effectiveness and explores the merits of compulsory treatment and the issue of cost-effectiveness. Finally, it discusses difficulties inherent in evaluating treatment effectiveness and identifies areas for further research.

## DRUG TREATMENT EFFECTIVENESS

### Summary Assessment

In general, drug treatment can be effective in reducing drug use and criminal behavior. The effectiveness holds whether treatment is provided inside or outside of correctional facilities, and it holds across many, though not all, treatment modalities and offenders (Cullen and Gendreau 2000; Gaes et al. 1999; Lipton et al. 1998). Drug treatment can reduce drug use by 50 to 60 percent and decrease criminal activity by as much as 40 percent, as well as reduce other high-risk behaviors (NIDA 1999). It can also improve prospects for employment (DSHS 1998) and improve family and social relations (Rossman et al. 1999). In short, the most successful drug treatment approaches can do the following:

- decrease relapse and increase times between treatments;

- improve pro-social behavior;

- decrease criminal recidivism;

- decrease high-risk behaviors;

- improve prospects for employment; and

- improve family and other social relations.

## Major Types of Treatment: Pharmacological and Behavioral/Psychosocial

Although research shows that treatment works, which specific treatment approaches work is a more complicated question. The few studies that systematically address this question indicate that pharmacological treatments in combination with psychosocially or behaviorally based approaches work best in treating most drug problems (Crowe and Reeves 1994; Cullen and Gendreau 2000; Gaes et al. 1999; NIDA 2001). However, little conclusive research has been done to directly compare treatment effectiveness across treatment modalities.

There are four main types of pharmacotherapy that work to either block or mimic the effects of the abused drug (Crowe and Reeves 1994):

- Agonists, whose properties and actions mimic the effects of heroin. Examples include Levo-alpha-acetylmethadol (LAAM), Methadone, and Clonidine.

- Antagonists, which block the effects of heroin. Examples include Naltrexone and Buprenorphine.

- Antidipsotropics, which create an adverse reaction to the substance of abuse. An example is Antabuse.

- Psychotropic medications can control various symptoms associated with drug use and withdrawal. Examples include anti-anxiety drugs, antipsychotics, anti-depressants, and lithium.

Behaviorally or psycho-socially based treatments can range from intensive residential and inpatient care to self-help groups and education programs (Cullen and Gendreau 2000). The following are the most common programs:

- in-patient or residential treatment, including therapeutic communities

- out-patient treatment
- self-help programs
- individual/group/family counseling
- behavior modification
- education programs

## Effectiveness of Different Treatment Approaches

Table 4-1 summarizes those treatments that are most effective in treating specific types of drug abuse. For each of four types of drugs—heroin, cocaine, methamphetamine, and alcohol—there are pharmacological and behavioral/psychosocial treatments that can effectively assist with reduction of drug use, although the evidence to date is less conclusive for pharmacological treatment of methamphetamine addiction. In each instance, the most effective treatment generally involves coupling pharmacological and behavioral/psychosocial interventions, especially cognitive-behavioral therapy.

## What Works, What Is Promising, and What Does Not Work

Even when a given treatment has been shown to "work" (i.e., to result in a statistically significant "effect"), it is evident that not all treatments work equally well. For this reason, leading experts view program effectiveness as lying along a continuum, with levels of effectiveness ranging from low to high (Lipton et al. 1998).

| Drug | Treatment |
|------|-----------|
| **Table 4-1. Effective Treatments for Specific Types of Drug Abuse and Addiction** | |
| Heroin | • A combination of medication and psychosocial/behavioral therapy is most effective. |
| | • Medications are effective: LAAM, Methadone, Naloxone, or Naltrexone. |
| | • Other approaches that have proven effective in promoting positive outcomes: |
| |     — Placement in residential treatment or in outpatient treatment or therapeutic community programs can be effective. |
| |     — Cognitive-behavioral therapy and contingency management show promise. |
| |     — Aftercare services and other links to community services may be an important part of addiction recovery. |
| Cocaine | • A combination of medication and psychosocial/behavioral therapy is most effective. |
| | • Although no medications currently are available to treat cocaine specifically, antidepressants, antipsychotics, and lithium are promising treatments for cocaine addiction. |
| | • Other approaches that can be effective: |
| |     — Placement in residential treatment, outpatient treatment, or therapeutic community programs can be effective. |
| |     — Cognitive-behavioral therapy and contingency management show promise. |
| |     — Aftercare services and other links to community services may be an important part of addiction recovery. |
| Methamphetamine | • Psychosocial/behavioral strategies are the most effective. |
| | • Education, support groups, and cognitive-behavioral therapy all show promise in treating methamphetamine addiction. |
| | • Antidepressants may also help alleviate depressive symptoms associated with recent abstinence, but research to date is insufficient to verify effectiveness. |
| | • Aftercare services and other links to community services may be an important part of addiction recovery. |
| Alcohol | • A combination of medication and psychosocial/behavioral therapy is most effective. |
| | • Antabuse provides a strong deterrent to alcohol abuse. |
| | • Brief interventions and counseling show promise in treating alcohol abuse. |
| | • 12-step programs, support groups, and behavioral treatment are promising treatments. |
| | • Aftercare services and other links to community services may be an important part of addiction recovery. |

Sources: Crowe and Reeves (1994); GAO (1998); NIDA (2001); Rossman et al. (1999).

Table 4-2 summarizes treatment programs using the categorization system developed by Lipton et al. (1998). The categories include "successful," "promising," and "unsuccessful," where the primary criterion is recidivism. As inspection of the table shows, the most successful treatments include but are not limited to cognitive-behavioral, social learning, incentive-based, and pharmacological approaches. Promising approaches include therapeutic communities and certain types of individualized treatment programming. Unsuccessful programs include boot camps, intensive probation and parole programs, guided group interaction and positive peer culture programs, and shock incarceration.

## THE FOUNDATIONS OF EFFECTIVE TREATMENT

Significant advances have been made in the area of drug treatment, and considerable research testifies to the potential effectiveness of a diverse range of programs and interventions. Across treatment modalities and various programs, there are a range of factors that comprise the foundation of effective treatment. These factors are listed in table 4-3 and are discussed briefly below. (The discussion draws primarily on recent reviews by Gaes et al. [1999] and Cullen and Gendreau [2000], among others.)

**Table 4-2. The Effectiveness of Different Treatment Approaches in Reducing Recidivism**

Successful
- Behavioral or cognitive-behavioral approaches
- Reinforcement or incentive programs
- Cognitive and social-learning approaches
- Literacy training and GED training programs
- Experiential challenge programs
- Mentoring, as a correctional intervention
- Reality therapy
- Some group counseling programs
- Counseling treatments oriented to family treatment
- Individualized counseling programs
- Methadone programs

Promising
- Therapeutic communities and milieu therapy
- Individualized treatment programming

Unsuccessful
- Shock incarceration programs
- Scared Straight programs
- Restitution programs
- Boot camp programs
- Intensive supervision probation and parole programs
- College coursework programs
- Programs providing training in job-seeking skills and job placement services
- Guided group interaction and positive peer culture programs

Sources: Cullen and Gendreau (2000); Lipton et al. (1998).

**Table 4-3. The Foundations of Effective Treatment**

- Target dynamic/criminogenic needs.
- Provide multimodal treatment.
- Incorporate treatment responsivity.
- Address risk differentiation.
- Provide skills-oriented and cognitive-behavioral treatment.
- Provide integrated and comprehensive treatment.
- Provide continuity of care.
- Draw on external sources to promote completion of treatment.
- Apply appropriate dosages/levels of intervention.
- Provide effective program design, implementation, and monitoring.
- Involve researchers in program design, implementation, and evaluation.

Sources: Cullen and Gendreau (2000); Gaes et al. 1999; NIDA (1999).

CSAC/ 00177

## Target Dynamic/Criminogenic Needs

Research increasingly shows that the most effective programs are those targeting so-called "dynamic" or "criminogenic" needs—that is, factors that both can be changed and have been linked to criminal behavior. Drug use clearly constitutes a criminogenic factor. But there are other criminogenic factors that influence drug use and criminal behavior. Gaes et al. (1999, 363) enumerate the primary factors identified by Andrews (1995) and others (see Cullen and Gendreau 2000):

- pro-criminal attitudes
- pro-criminal associates
- impulsivity
- weak socialization
- below-average verbal intelligence
- risk-taking tendencies
- weak problem-solving skills
- early onset of anti-social behavior
- poor parental practices
- deficits in educational, vocational, and employment skills

As Gaes et al. (1999, 363) emphasize, however, criminogenic needs should not be assumed to exist, but rather should be assessed to see if indeed they do exist. Treatment of a non-condition obviously represents an inefficient allocation of resources, and missed opportunities to provide more effective treatment.

## Provide Multimodal Treatment

Treatment is most effective when it addresses not one but all criminogenic needs (Gaes et al. 1999, 364). This issue is particularly important in contexts where programming is designed to focus primarily on one need rather than all relevant needs. The failure to address all needs can undermine the effectiveness of any given treatment approach. Although detoxification generally is a necessary condition for effective treatment, the same may be true of many other conditions. Thus, a vocational program that does not address drug addiction is likely to be less effective in enhancing an offender's employment prospects or curbing criminal behavior. Similarly, drug treatment approaches that do not address other relevant criminogenic needs may be considerably less effective in reducing drug use or criminal behavior, or in sustaining reductions over the long term (NIDA 1999).

## Incorporate Treatment Responsivity

Tailoring treatment priorities to the needs and learning styles of individuals—what is termed "treatment responsivity"—is increasingly thought to be critical to treatment effectiveness (Cullen and Gendreau 2000), though systematic assessments of this commonsense idea are for the most part lacking (Gaes et al. 1999). Nonetheless, the basic notion is that effective services are those based on individual needs, motivation, and style of learning. Because an individual's needs may change over time, continuing assessment and modification of the treatment program is important.

## Address Risk Differentiation

Research shows that treatment is most effective when the intensity of treatment is adjusted to the risk level of the client. In general, higher risk offenders are more likely to benefit from treatment than lower risk offenders (Gaes et al. 1999, 364). However, some research indicates that high-risk offenders show greater improvements when they receive high-intensity treatment, and that low-risk offenders show greater improvements when they receive low-intensity treatment (Andrews and Bonta 1998).

## Provide Skills-Oriented and Cognitive-Behavioral Treatment

Meta-analyses consistently support the finding that skills-oriented and cognitive-behavioral treatments are more effective than other types of treatment (Gaes et al. 1999). These approaches are particularly suited to addressing the types of values, attitudes, beliefs, and emotional and personality orientations that contribute to a range of negative outcomes, including drug use and criminal behavior (Cullen and Gendreau 2000).

## Provide Integrated and Comprehensive Treatment

The most effective models for reducing drug use and criminal behavior involve providing integrated and comprehensive treatment (Cullen and Gendreau 2000). Unfortunately, the more typical approach historically has consisted of providing treatment in piecemeal fashion, at one stage or another of criminal justice processing, with coordination of efforts between agencies rare. The importance of integrated and comprehensive treatment is suggested by consideration of mental health issues.

Most offenders have a variety of social and mental health problems. Indeed, rates of mental health problems are much higher among jail and prison inmates than in the general population (Lurigio and Schwartz

2000; Peters and Bartoi 1997; Peters and Hills 1997). The most common mental disorders among inmates are psychosis, depression, and bipolar disorders. Despite the prevalence of mental illness among inmates, few correctional institutions assess for mental disorders. In one study, it was estimated that only 6 percent of prison inmates with co-occurring substance and mental disorders were identified (Dennis 1998). By contrast, the literature suggests that more than half of the people with substance use disorders have co-occurring mental disorders (Kessler et al. 1994) and more than 65 percent of those presenting for treatment have co-occurring mental disorders (Dennis 1998). Other studies (e.g., Chiles et al. 1990; Cote and Hodgins 1990) suggest that:

- 75 percent of addicted offenders have histories of depression;

- 25 percent of addicted offenders have histories of major depression, bipolar disorder, or atypical bipolar disorder; and

- 9 percent of addicted offenders are schizophrenic.

The recognition of co-occurring disorders is especially important because of the unique challenges in treatment that offenders with co-occurring disorders present. Peters and Bartoi (1997) describe the most prominent challenges:

- Use of alcohol and drugs can create mental health symptoms.

- Alcohol and drug use may precipitate or bring about the emergence of some mental health disorders. Mental health disorders can also precipitate substance use disorders.

- Mental health symptoms may be exacerbated, or worsened, by alcohol or drug use.

- Mental health symptoms or disorders are sometimes mimicked by alcohol and drug use.

- Alcohol and drug use may mask or hide mental health symptoms or disorders that are actually present. Mental health symptoms are often not identified until after a long period of time.

Criminal offenders who are alcohol or drug abusers and exhibit mental disorders need specialized, coordinated treatment. Yet it is common for substance abuse treatment programs not to admit offenders with mental disorders and, conversely, mental health programs not to admit offenders with substance abuse problems (Vigdal 1995). Programs for people with co-morbid disorders have been called "inadequate," with little to no research to date on the percentage of offenders receiving both substance abuse and mental health treatment (Lurigio and Schwartz 2000).

### Provide Continuity of Care

The best treatments may fail if insufficient follow-up care is not provided. It is therefore critical that offenders continue to receive treatment or some type of aftercare upon release from prison (Cullen and Gendreau 2000; Gaes et al. 1999). Aftercare programs and post-release supervision can provide resources to help prevent relapse and criminal recidivism. Indeed, re-arrest rates are consistently lowered by as much as 50 percent for offenders who complete aftercare programs in the community after treatment in prison (Field 1998; Wexler et al. 1999). In addition, comprehensive monitoring and case management can help hold clients accountable and reduce re-arrest rates (Field 1998).

### Draw on External Sources to Facilitate Completion of Treatment

Research suggests that pressure from external sources—including families, the criminal justice system, employers, and child and family welfare agencies—may lower dropout rates and increase length of time in treatment and program success in general (NIDA 1999). For Treatment Alternatives to Street Crime clients, legal sanctions contributed to a higher-than-usual success rate (Hubbard et al. 1998). In addition, it appears that treatment does not need to be voluntary to work and that, in fact, early intervention by the criminal justice system can play a critical role in preventing drug addiction even when the offender does not want to or is not motivated to participate (Field 1998; NIDA 1999).

### Apply Appropriate Dosages/Levels of Treatment

Treatment generally is thought to be most effective when appropriate dosages/levels are applied, and can be ineffective if too little or too much are applied (NIDA 1999). Although some evidence supports this view, relatively little research has systematically addressed the issue of what constitutes an "appropriate," "effective," or "optimal" dosage/level of treatment (Gaes et al. 1999, 365).

However, across offender types and treatment modalities, one factor, without fail, has a strong impact on treatment success—length of time in treatment. For

most individuals, at least 90 days is required for treatment success and with some individuals, especially those in methadone maintenance, at least 12 months of treatment are required, sometimes with years of follow-up (NIDA 1999).

### Provide Effective Program Design, Implementation, and Monitoring

Any treatment will fail if it is flawed in design or implementation. By contrast, with careful attention to design and implementation, programs can realize their full potential. Although not all treatment programs will be effective, appropriate implementation is essential. In addition, monitoring program operations can identify whether significant modifications have been or need to be made to improve treatment.

More generally, treatment quality generally depends on a range of factors, including organizational factors such as staffing, management, and resources. For example, in a study of the Treatment Alternatives to Street Crime (TASC) program, staff quality was more important to program success than any other organizational factor. Other organizational factors may play a role as well. In Harrison and Martin (2000), administrative commitment to the program, good oversight management, and well-funded implementation budgets were critical for program survival and success.

The quality of the program, not just the staff, is also critical for treatment success. According to several sources (Farabee et al. 1999; Field 1998), a high-quality program should include:

- comprehensive and descriptive screening and assessment tools

- clear and unambiguous program goals and rules of conduct

- strong positive incentives and equally strong negative sanctions

- cross-training and incentives for staff

- involvement of staff in selection of new admissions

- appropriate staff-client ratios

- use of former drug abusers and offenders as treatment staff and mentors.

### Involve Researchers in Program Design, Implementation, and Evaluation

Despite increased interest in and commitment to drug treatment (Lipton 1995), there continues to be a significant lack of involvement of researchers throughout all stages of drug treatment programming. Researchers can provide critical advice on treatment and program design and implementation. They also can help develop the groundwork for generating the types of data necessary to conduct evaluations, without which it becomes impossible to assess whether a given treatment approach is effective (Gaes et al. 1999).

## THE FUTURE OF EFFECTIVE DRUG TREATMENT

### Identifying What Works Best

Significant advances have been made in drug treatment, and considerable research testifies to the potential effectiveness of a diverse range of programs and interventions. However, little is known about the relative efficacy of many programs, or of what combinations of approaches work best. To this end, the National Institute of Alcohol Abuse and Alcoholism currently is undertaking a study aimed at systematically addressing the relative effectiveness of different approaches to treating alcohol addiction. The study, "Combining Medications and Behavioral Interventions" (COMBINE), involves testing different treatment combinations for alcohol addiction, including:

- acamprosate, an experimental pill used widely in Europe that normalizes brain chemical systems and that currently is under Food and Drug Administration (FDA) review in the United States

- naltrexone, an older pill that affects brain circuitry

- intensive cognitive/behavioral therapy, similar to residential therapy or therapeutic communities

- behavior therapy, encouraging patients to join support groups and participate in counseling

Study respondents will receive different combinations of drug and behavior treatments. The goal of the study is to identify precisely which approaches, in interaction with one another, prove most effective—which treatments, either in isolation or in combination, work best (i.e., are most effective in reducing drug use, criminal behavior, and other negative outcomes, and in increasing positive outcomes, such as education and employment). Similar studies have yet to be conducted for both drug and alcohol addiction, but they are precisely the type that researchers indicate are needed to advance scientific knowledge about treatment effectiveness.

## A Comprehensive Model

A hypothetical treatment model, proposed by the National Institute on Drug Abuse and depicted in figure 4-1, could include many different services as part of a comprehensive strategy for drug treatment. This model, which incorporates many of the foundational components of effective treatment identified in the literature (NIDA 1999; Gaes et al. 1999; Cullen and Gendreau 2000), can include pharmacological approaches for treatment or psychiatric disorders when deemed necessary. Treatment matching includes matching the right components of treatment to the person. For example, if the client is in need of "life skills" and management, this component of education and counseling can be added to the plan. Similarly, if the person has relapsed several times before, special attention to relapse prevention interventions could be included in the treatment plan.

(Gaes et al. 1999; Harrison 2000). Although considerable advances in drug treatment have been achieved, few of these advances have been systematically incorporated into correctional practice. Criminogenic needs frequently go unidentified, and even if identified they frequently are not systematically addressed in treatment. Treatment responsivity and continuity of care occurs far less often than research indicates they should. The absence of effective program implementation, monitoring, and evaluation continues to be the norm.

Although the gap may be explained in part by insufficient resources, these alone cannot account for the gap. To be sure, even if correctional institutions were aware of the latest advances in treatment research, it is not clear how many of these advances could be feasibly implemented in most correctional settings. Yet effective treatment is feasible and can be cost-



Figure 4-1. Model of a Comprehensive Treatment Program

Model of a Comprehensive Treatment Program

Source: Adapted from Mercer and Woody (1999).

## Linking Research and Practice

Effective drug treatment depends greatly on reducing the existing gap between research and practice

effective. Thus, the critical challenge for researchers and practitioners lies in identifying ways in which research and practice can be effectively linked.

## COMPULSORY DRUG TREATMENT

Some offenders in drug addiction treatment do not choose to be there, leading to some discussion about whether enforced or coercive treatment can be effective, especially considering that client motivation may play a role in program completion. (There are, of course, potential ethical concerns as well, which are not reviewed here.) In a report on the California Civil Addict Program (CAP) (Anglin 1998), civil commitment for narcotic addiction and methadone maintenance appeared to be an effective intervention when applied appropriately. Although nearly everyone in the CAP treatment became addicted again at some point, they had fewer relapse episodes and when they did relapse, it was for a shorter duration. The CAP treatment group also reported longer non-addicted periods of drug use as well as periods of abstinence between relapse episodes.

Other research shows that treatment ordered by the criminal justice system can also be effective (Hubbard et al. 1998; NIDA 1999). In addition, they found that early criminal justice system intervention can force clients to stay in treatment, resulting in important long-term benefits for offenders and more substantial changes in behavior during treatment.

## COST-EFFECTIVENESS

By most reports, the economic costs of American drug abuse run into the billions (Kauffman and Woody 1995), and substantial benefits and cost reductions for individuals and society may be realized through effective treatment. According to various estimates, drug treatment can be highly cost-effective, with some estimates indicating that every $1 invested in addiction treatment programs yields between $4 and $7 in reduced drug-related crime and criminal justice costs (e.g., jail, processing, incarceration), as well as theft (Caulkins et al. 1997; CASA 1998; GAO 1998; Gaes et al. 1998; Gerstein et al. 1994; NIDA 1999). There are, of course, additional benefits that accrue in the form of savings to drug-addicted individuals and their families, their potential victims, and society as a whole.

## METHODOLOGICAL ISSUES

Despite the abundance of literature on drug addiction treatment and its effectiveness, few studies have undertaken the enormous task of teasing out the causal relationships between program characteristics and treatment success. Although the ideal model may be to have clinical trials in which the timing, dose, and administration can be randomly assigned (Gaes et al. 1998), this ideal has rarely been approximated. In addition, the study of drug addiction treatment effectiveness continues to suffer from a wide range of methodological problems (Gaes et al. 1999, 362). The main problems/challenges include:

- selection bias;
- measuring drug use vs. drug abuse vs. drug dependency/addiction;
- measuring drug treatment need severity/level;
- measuring recidivism; and
- poor data quality generally, including record-keeping and data management issues.

The most commonly reported challenge to research in this area is the fact that offenders may respond to treatment differently based on their addiction level, experience with the criminal justice system, motivation level, amenability to treatment, etc. Therefore, a study of treatment effectiveness must consider both treatment modality and offender characteristics. However, controlling for all relevant offender characteristics frequently is not possible, resulting in biased estimation of treatment effects (GAO 1998; Gaes et al. 1998; Pelissier et al. 1998).

Similarly, processing can introduce bias in studies of effectiveness. For example, according to a report by Gaes et al. (1998), selection bias can make it difficult to determine if the effect of treatment is a result of the treatment or simply of a by-product of a "weeding out" process that screens out offenders least likely to succeed in treatment (Pelissier et al. 1998).

In addition, a wide range of external and internal factors may affect the composition of both the treatment and the comparison groups. Thus, even if relevant controls are introduced, there can still be unmeasured characteristics that influence the assessment of an "effect." And with quasi-experimental designs, in which a control group exists but offenders are not randomly assigned to the treatment or control group, compositional differences can be difficult to address through statistical modeling (GAO 1998).

Although selection bias is of paramount importance when considering the effectiveness of a treatment program, other issues also can reduce the extent to

CSAC/ 00182

which evaluations of treatment can be trusted. One major issue relates to the definition of what is being treated. In some studies, the "problem" is drug use; in others, it is drug abuse; and in still others it is drug dependency/addiction. In each instance, the terms frequently are used interchangeably. Even when they are not, the actual operationalization of the "problem" may nonetheless be similar.

This issue is critical because many programs may be treating entirely different groups. Drug use, for example, can entail a one-time episode of drug involvement, or it can represent a long-standing history of drug involvement. The distinctions are far from academic: According to the American Psychological Association's *Diagnostic Statistical Manual*, fourth edition (DSM-IV), drug use does not rise to the level of a disorder, while drug abuse constitutes a separate disorder from dependency/addiction.

Although the severity of an offender's drug problem would seem to be a critical element in evaluating the effectiveness of a treatment program, this dimension is rarely addressed in the outcome literature except to recommend that more severe cases be sent to more intensive treatment programs (Farabee et al. 1999). We know that treatment effectiveness is greater when offenders are matched to placements that address their risk levels (Andrews and Bonta 1998)—there are greater reductions in recidivism for high-risk offenders who are placed in intensive services than for high-risk offenders placed in minimal treatment services. By contrast, low-risk offenders matched with low-intensity programs experience greater reductions in recidivism compared with low-risk offenders in high-intensity programs.

At present, research focusing on the severity of the problem to be addressed (i.e., drug use / abuse / addiction), as opposed to risk level, remains a conspicuous gap in the extant literature. However, at least one study shows that intensive drug addiction therapy is more successful and cost-effective for those with severe drug addiction problems (Knight, Simpson, and Hiller 1999), while another study makes reference to the fact that outpatient treatment success may be attributed to the relatively low severity of the client's drug abuse problem (Pearson and Lipton 1999). In short, the severity of the drug problem appears to be central to determining which treatment is appropriate and how likely treatment is to be effective, but considerably more research on the issue is needed.

Researchers increasingly recognize the importance of viewing treatment effectiveness in terms of harm reduction—that is, reducing drug use from the level it would have been without treatment (GAO 1998, 15). Yet many studies do adopt this approach but instead assess effectiveness in a dichotomous manner. Further, even where a harm reduction approach is adopted, frequently the failure to adjust findings to reflect compositional differences can render comparisons difficult if not invalid. In addition, there is little agreement about the proper metric for defining equivalent levels of success. For example, in a situation where a drug-dependent user reduces his/her drug use by half and a non-addicted drug user reduces his/her use by half, it is unclear that these reductions should be viewed as equivalent (Pelissier et al. 1998). More generally, some studies rely on different periods of observation (three months, six months, etc.), or do not employ event history (hazard) modeling, ignoring qualitatively distinct differences in risks of recidivism (Pelissier et al. 1998).

There also is a need for development of more objective measures of recidivism. Traditionally, studies testing the effectiveness of drug addiction treatment have relied on self-reported drug use, yet self-reports can significantly understate the true amount of drug use. A review by the General Accounting Office (GAO 1998, 18), using data from the Treatment Outcome Prospective Study (TOPS), showed that only 40 percent of individuals testing positive for cocaine use during a two-year follow-up period reported using in the previous three days. Some research indicates that such biases can be corrected by introducing adjustments to self-reported data (GAO 1998, 18), but few studies do so.

The GAO (1998, 19) study also notes that drug treatment research rarely accounts "for the tremendous variation in program operations, such as differences in standards of treatment, staff level and expertise, and level of coordination with other services." The lack of these types of process measures make it difficult to know whether the presence or absence of positive outcomes results from an ineffective treatment or from ineffective implementation.

Additional sources of biases exist. For example, comparing the recidivism of offenders under intensive supervision with those who are not requires careful attention to ensuring that the offending of both groups is equally likely to be reported or identified. Yet few studies include steps to provide this assurance. The problem is that one would expect offenders who are closely supervised to be much more likely to be caught if they commit a crime. Indeed, in the evaluation of the Opportunity to Succeed (OPTS) program (Rossman et

al. 1999), this discrepancy in supervision, which was part and parcel to the intervention, may have explained why a decrease in drug use and criminal behavior was not experienced by OPTS clients (see also Pelissier et al. 1998).

Other measurement problems arise from poor record-keeping and information management, as well as the lack of consistent and high-quality data collection in general. There is a need for standardized and rigorous program evaluation tools. Data on implementation procedures, goals, objectives, staff, and funding need to be collected in addition to outcome measures, including reductions in drug use and criminality; compliance with supervision requirements; and improvements in family and social relationships (Field 1998).

## KEY RESEARCH QUESTIONS

This review of research on drug treatment effectiveness highlights several glaring gaps in the research literature. In particular, there are several critical questions that should be addressed in future research.

- Research shows that illicit drug use is likely to intensify and perpetuate a criminal career as opposed to initiate it, and that reduced illicit drug use is associated with reduced offending (Harrison 2000, 2). Yet there is much that remains unknown about the precise causal links. Two key questions are: How does use of illicit drugs intensify or perpetuate criminal activity? How does a reduction in the use of illicit drugs reduce criminal activity?

- What types of treatment approaches work in a jail setting vs. a prison setting? (Offenders in jail may require shorter interventions and education programs rather than longer-term phased-in treatment.)

- What are the primary obstacles to effective treatment in correctional settings?

- What are the unique challenges and programmatic issues involved in treating drug use, drug abuse, and drug dependency/addiction?

- What treatment approaches work best for high-severity drug abusers vs. low-severity drug abusers?

- How should recidivism be measured?

- What factors are most instrumental for preventing relapse?

- What factors are most instrumental for not only preventing relapse but also criminal recidivism?

- What are the relative cost benefit/effectiveness of different treatment approaches?

CSAC/ 00184

# CHAPTER 5.
# Post-Release Drug Treatment
# in the Criminal Justice System

Reducing criminal recidivism is a pressing issue for corrections, especially given the rapid growth in corrections during the past decade. Research indicates that 4 out of every 10 prisoners is re-arrested within the first year of release. Post-release supervision and reentry services to ex-offenders constitutes a key mechanism by which to prevent relapse and recidivism. Indeed, some research indicates that re-arrest rates can be lowered within the first year of release by as much as 50 percent for offenders who complete aftercare programs in the community. As a result, correctional institutions are beginning to focus on providing a continuum of treatment and services from incarceration to the community. However, many criminal justice systems still are in the early stages of developing this continuum, and the effectiveness of many programs remains largely unknown. This chapter will review the types of reentry and post-release supervision programs currently available. It will also discuss current program evaluations, methodological issues, and key research questions for future studies.

5-1

CSAC/ 00185

## INTRODUCTION

Reducing criminal recidivism is a pressing issue for corrections, especially given the rapid growth in corrections during the past decade. By some estimates, 4 out of every 10 prisoners will be reincarcerated within the first year of release (Travis et al. 2001). Post-release supervision and reentry services to ex-offenders constitutes a key mechanism by which to prevent relapse and recidivism. Indeed, some research indicates that re-arrest rates can be lowered within the first year of release by as much as 50 percent for offenders who complete aftercare programs in the community (Field 1998; Wexler et al. 1999). As a result, correctional institutions are beginning to focus on providing a continuum of treatment and services from incarceration to the community. However, many criminal justice systems still are in the early stages of developing this continuum, and the effectiveness of many programs remains largely unknown.

This chapter will review the types of reentry and post-release supervision programs currently available. It will also discuss current program evaluations, methodological issues, and key research questions for future studies.

## REENTRY OF OFFENDERS INTO THE COMMUNITY

Reentry and post-incarceration services range from providing educational and vocational services to programs specifically focused on drug treatment. Generally, the primary goal of these programs is to reduce drug use/relapse and recidivism among ex-offenders and help them adjust to life in the community. The most common reentry and post-release services generally include the following:

- Vocational training and job placement services. Provide job skills and create employment opportunities for ex-offenders.

- Life skills programs. Provide training on daily living skills without resorting to violence, drug abuse, or criminal behavior.

- Family therapy. Improve family ties and social relations.

- Housing assistance. Assist ex-offenders with housing issues, including finding and keeping adequate housing.

- Drug treatment. Use of one or more pharmacological, psycho/social, or behavioral therapies.
- Intensive community supervision. Increase contact between offenders and supervising agents. Offenders typically are required to submit to frequent urine tests.

Reentry and post-release programs vary in the types of services provided and the types of offenders targeted. As noted, most focus on reducing relapse and recidivism among ex-offenders and helping them adjust to life in the community. Although some programs involve post-release services, others do not, focusing instead on treatment, training, and education as strategies to assist the offender after release. Table 5-1 provides examples of the primary types of programs available for ex-offenders and the kinds of services each provides.

Most programs focus exclusively on drug treatment, job placement, or education. Programs such as Texas's Project Rio also provide life, family, and basic education training. Notably, however, many programs do not include case management or follow-up treatment or services.

Programs such as New York City's Center for Employment Opportunities (CEO), which is a common model, focus primarily on work, education, and basic life skills training as well as aftercare treatment. The CEO program provides day labor for participants, most of who have been released from boot camp (Finn 1998). The overall mission is to place ex-offenders in permanent, unsubsidized, full-time jobs in the hope that employability will increase stability and decrease recidivism. Participants in CEO receive life skills training, job placement support, and support services—which can include child care, housing, clothing, and driver's education. In addition, the program can pay for half of the employee's wages for eight weeks or more if specific criteria are met.

Other programs focus on providing treatment for substance abuse. In-patient treatment and therapeutic community programs provide 24-hour services for clients, while out-patient services or methadone maintenance programs provide treatment for the offender in the community. Often these programs provide a combination of detoxification, pharmacological treatment, and socio-psychological/behavioral therapies.

The Opportunity to Succeed Program (OPTS) is an example of a program that provides comprehensive post-release services to ex-offenders. According to

Rossman et al. (1999), the OPTS program was designed to reduce substance abuse relapse and criminal recidivism by providing comprehensive aftercare services to felony offenders with alcohol and drug offense histories. The program targeted offenders who were required to serve a minimum of one year of probation/parole; had a history of substance abuse; had completed a substance abuse treatment program while incarcerated or in a court-ordered residential community in lieu of jail; had felony convictions, excluding violent crimes or sex offenses; and were 18 years of age or older. The core services OPTS provided to clients on an as-needed basis included:

- Substance abuse treatment, ranging from 12-step programs to intensive residential placement.

- Employment services that assist clients in finding and maintaining legitimate employment.

- Housing, including adequate, drug-free supportive living situations, such as halfway houses, group houses, and shared apartments to assist clients in avoiding relapse.

- Family-strengthening services, such as parenting classes, family counseling, anger management counseling, and domestic violence counseling.

- Health and mental health services, ranging from regular visits to specialized care when needed.

The OPTS program also provided frequent supervision, contacts, and drug-use monitoring through urinalysis along with graduated sanctions that included incentives/rewards for positive behavior.

Finally, Intensive Supervised Probation (or Parole) (ISP) is designed to provide increased monitoring and control of offenders in the community (Sherman et al. 1997). Elements of ISP can include more frequent contact with the supervising probation or parole officer; the use of electronic monitoring devices; home confinement; more frequent urine tests; and curfew and community service requirements.

**Table 5-1. Matrix of Reentry Programs for Released Offenders***

| Program Title | Male/ Female | Drug | Work | Educ. | Life | Family | Basics | Case Mgt. | Relapse | After- care |
|---|---|---|---|---|---|---|---|---|---|---|
| OPTS | M/F | x | x | | | x | | x | | x |
| Oriana House | M/F | x | x | x | | | | x | | x |
| TPADP | M/F | x | x | x | x | x | | | x | x |
| Corr. Sub. Abuse | M/F | x | | x | | x | | x | x | x |
| DE Life Skills | M/F | | | x | x | x | | | | |
| Project Rio | M/F | x | x | x | x | x | x | | | x |
| RECAP | M/F | x | x | x | | | | | x | |
| CEO | M/F | | x | | x | | x | | | x |
| Safer | M/F | | x | x | | | | x | | x |
| Building Future | M/F | x | x | | | | | | | |
| Project Re Enter | M/F | | x | x | | | | | | |
| DE Mentor | F | | x | x | | x | | | x | |
| Dismas | F | x | x | x | | x | | | | |
| OPTIONS | F | x | | x | | x | | x | | |
| Discovery | F | x | x | | | x | | x | x | x |
| WPA | F | x | x | | | x | | x | | |

Source: Mele (1998, 20).
Notes: OPTS - Opportunity to Succeed Program; TPADP - Turning Point Alcohol and Drug Program; RECAP - Rock County Education and Criminal Addictions Program; CEO - Center for Employment Opportunities; OPTIONS - Opportunities for Prevention and Treatment Interventions for Offenders Needing Support; WPA - Women's Prison Association.

CSAC/ 00187

## MEASURING PROGRAM EFFECTIVENESS

Research indicates that reentry and post-release services may decrease recidivism and prevent relapse. A study of Delaware's Therapeutic Community drug treatment program found that clients who completed the secondary (work release) portion of the program as well as the tertiary (aftercare) portion of the program were significantly more likely to remain drug-free and arrest-free three years after release from prison (Inciardi, Martin, and Surratt 1999). In addition, findings from the Residential Substance Abuse Treatment (RSAT) program for state prisoners consistently indicate that clients who receive aftercare services fare significantly better than those who do not (Harrison and Martin 2000). These findings are mirrored for clients in the AMITY program in California (Wexler et al. 1999) and for clients who received treatment services after completing an in-prison therapeutic community program in Texas (Knight, Simpson, and Hiller 1999). However, few of these and other evaluations provide any basis for determining what components of reentry or post-release services facilitate reduced relapse and recidivism.

Many of the vocational training and job placement programs also report positive outcomes for participants. The Safer Foundation reported that, among those who were employed at 30 days, 58 percent were still employed five months later. The CEO program reports similar results. Although recidivism and relapse rates for these programs have yet to be examined, a meta-analysis by Lipton, Pearson, Cleland, and Yee (1998) did not find that vocational training or job placement programs were successful in decreasing recidivism.

Evaluation of the OPTS program echoes these findings. OPTS, which provides comprehensive services and monitoring, had a positive effect on employment—clients stayed employed for a longer period of time than individuals in the control group (Rossman et al. 1999). In addition, OPTS clients were significantly less likely to use alcohol and marijuana, but use of hard drugs was not statistically different from that of the control group. And while criminal activity for both OPTS clients and the control group declined considerably, OPTS did not appear effective in reducing criminal behavior beyond that of the control group. Indeed, OPTS clients had higher rates of technical violations, most likely the result of closer supervision than a negative outcome. As Sherman et al. (1997) have observed, increased surveillance is often associated with increases in technical violations.

Finally, increased surveillance and control, through Intensive Supervised Probation/Parole (ISP), does not appear to reduce recidivism (Sherman et al. 1997). However, combining drug treatment with ISP may lead to more positive results than either ISP or drug treatment alone.

## TO WHAT EXTENT HAVE LINKAGES BEEN DEVELOPED?

The call for post-release structure, supervision, and treatment of offenders is pervasive in the treatment literature (Gaes et al. 1999; Travis, Solomon, and Waul 2001). Nevertheless, many researchers note that post-release supervision is inadequate and that few offenders receive reentry or post-release drug treatment or services (Crowe and Reeves 1994; Hubbard et al. 1998). In one example, clients in the Treatment Alternatives to Street Crime (TASC) program rarely entered outpatient methadone programs, despite having a high rate of heroin addiction. They also received fewer community services than other clients not referred by the criminal justice system (Hubbard et al. 1998).

A major obstacle to developing linkages with post-incarceration supervision and community services is the lack of coordination between correctional institutions, mental health providers, and other aftercare service providers in the community (Field 1998). According to Field (1998, 16), "The fragmentation of the various functions—arrest, diversion, conviction, probation, revocation, jail, prison and post-prison supervision—undermines the effects of treatment and of other aspects of offenders' rehabilitation"

To address these types of issues, Field (1998) has noted that case managers can play a critical role in assisting with post-release treatment by:

- assessing an offender's needs and ability to remain substance and crime free;

- planning for treatment services and other criminal justice obligations;

- maintaining contact with other criminal justice officials;

- brokering treatment and other services for the offender;

- monitoring and reporting progress to other transition team members;

- providing client support and helping offender with all aspects of treatment and reentry;

- monitoring urinalysis, breath analysis, or other objective tests of substance use; and

- protecting the confidentiality of clients and treatment records.

From this perspective, a case manager's role is to monitor and guide an offender's journey through the criminal justice system and into the community. The case manager also acts as the single point of contact for providing health and social services as well as advocates for appropriate programs and services when needed (Siegal 1998).

Although case management has the potential to overcome many of the barriers created by a fragmented criminal justice system, results from studies on the effects of case management are mixed. Some researchers find that clients with case-management have increased access to drug treatment and are less likely to recidivate, but others have found few, if any, positive outcomes from case management services (Rossman et al. 1999).

The more general issue at present is the lack of aftercare provided to released prisoners. A national evaluation of the National Institute of Justice's (NIJ) Residential Substance Abuse Treatment (RSAT) program found, for example, that few sites provided post-release aftercare (Harrison and Martin 2000, iv). In making decisions about allocation of RSAT funds, NIJ gave preference to programs that focused not only on treatment in prison but also on aftercare. Yet fewer than half of the RSAT-funded programs included provisions for placement in halfway houses, work release programs, or aftercare (Harrison 2000, 20, citing Lipton, Pearson, and Wexler 2000).

## METHODOLOGICAL ISSUES

The methodological issues involved in evaluating post-incarceration service programs parallel those for evaluating treatment effectiveness. These issues include:

- selection bias

- measuring drug use vs. drug abuse vs. drug dependency/addiction

- measuring drug treatment need severity/level

- measuring recidivism

- poor data quality generally, including record-keeping and data management issues.

Selection bias represents a particular challenge when assessing post-release services because many programs rely on the motivation of the offender rather than institutional coercion (Farabee et al. 1999). Among offenders released from prison, the disappearance/drop-out rate from parole and/or treatment can be considerable, resulting in a highly motivated treatment group. The result is an inability to provide appropriate treatment vs. control group comparisons. A related and widespread problem is that participants in reentry and post-release programming may be removed from treatment because of their behavior. The problem again consists of removing those offenders who might fare least well on aftercare, creating the misleading appearance of a more positive effect of reentry services. In reality, only those who displayed the most appropriate conduct completed treatment and, consequently, were included in comparisons with a control group (Pelissier et al. 1998).

There are other critical problems as well. For example, few studies examine relapse rates for offenders participating in aftercare programs. And many studies do not distinguish between effects due to aftercare and effects due to other factors, such as in-prison treatment, duration of supervision, offender-level characteristics, or family or community characteristics.

## KEY RESEARCH QUESTIONS

Given the relatively sparse literature addressing the new and emerging set of reentry and post-release programs, there is an obvious need for increased research on the effectiveness of these programs. Key questions future research should address include:

- Are the linkages between prisons and communities adequate? If not, why?

- How are treatment priorities set for individual offenders as they reenter society?

- What are the major obstacles to providing drug treatment aftercare?

- How effective are reentry and post-release supervision and aftercare programs in reducing recidi-

vism, preventing relapse, and promoting positive outcomes?

- Among existing reentry and post-release programs, which are the most effective?

- What types of reentry and post-release programs work best for which type of offenders, especially for level of drug problem (use/abuse/addiction) and risk of re-offending (prior criminal history)?

- What types of policies will promote and allow for coordination and cooperation among the criminal justice system practitioners, mental health providers, and community service providers?

- How can reentry of violent offenders with drug treatment needs best be managed?

- What are the rates of aftercare attendance among parolees? How does aftercare attendance affect long-term treatment goals?

- What is the overall quality of service provided by aftercare treatment centers?

- Does case management make a positive difference? What elements of case management are most important?

- How does an increase in the prison population, as well as subsequent releases, affect the capacity to implement quality aftercare services?

- How, or to what extent, do factors such as race, sex, family structure, neighborhood conditions, and other contextual factors influence the effectiveness of post-release drug treatment services? How, or to what extent, can they assist with these services?

CSAC/ 00190

# CHAPTER 6.
# Barriers to Drug Treatment
# in the Criminal Justice System

In the past decade, an increasing number of offenders in correctional set-
tings needed and could have benefited from drug treatment. Yet drug treat-
ment, especially *effective* drug treatment, has not kept pace with the
increasing demand. The question is, Why? This chapter addresses that
question by examining a range of barriers both to drug treatment and to *ef-
fective* drug treatment in corrections. These barriers touch on almost all as-
pects of corrections and the administration and provision of drug treatment
to offenders.

CSAC/ 00191

## INTRODUCTION

In the past decade, an increasing number of offenders in correctional settings needed and could have benefited from drug treatment. Yet drug treatment, especially *effective* drug treatment, has not kept pace with the increasing demand. The question is, Why? This chapter addresses this question by examining a range of barriers to drug treatment and to *effective* drug treatment in corrections. These barriers touch on almost all aspects of corrections and the administration and provision of drug treatment to offenders.

## POLITICAL BARRIERS

### Declining Public Concern about Drug Abuse

Although the relationship between drug treatment in correctional facilities and public support for drug treatment is not necessarily direct, examination of changes in public opinion can help provide a broader context in which to situate correctional drug treatment services. As table 1-3 (in chapter 1) shows, public concern about drug abuse peaked during the late 1980s and then subsequently and dramatically returned to considerably lower levels. Specifically, in 1989, 38 percent of the American public viewed drug abuse as the single most important problem facing the country. A decade later, only 5 percent of the public expressed this view.

Thus, one might speculate that one reason correctional drug treatment has not kept pace with increased demand is that there has been decreasing public concern about drug abuse. The decreasing concern does not mean that the public supports only tougher sanctioning. Indeed, public opinion polls show that the public consistently supports rehabilitation and treatment, even as they support "get tough" sanctioning of serious and violent offenders, as was the case during much of the 1990s (Roberts and Stalans 1997).

### No Federal Requirements for Coordinated Case Management or Aftercare

Although drug treatment is required in correctional settings in states that receive federal Residential Substance Abuse Treatment (RSAT) and Violent Offender and Truth-in-Sentencing (VOTIS) funds, the use of case management is not. Similarly, despite the importance of aftercare to effective treatment, few treatment programs include an aftercare component. Yet both case management and aftercare are critical for effective

drug treatment (Inciardi et al. 1992; NIDA 1999; ONDCP 1999).

### Lack of Intra- and Inter-Governmental Coordination of Efforts

Criminal justice actors often duplicate efforts already performed by others within the criminal justice system or others in local and state health and welfare agencies. Assessments and diagnostic reports may be duplicated several times. Once completed, they may not be forwarded to the appropriate parties. The result is an accumulation of costly and unused information that ideally could facilitate treatment placement and planning (Goldcamp et al. 1999). This issue is especially acute as prisoners progress from jails to prisons to parole. Professionals and long-term observers of the criminal justice system have observed that the lack of coordination between the levels of correctional systems represents a lost opportunity to effectively treat offenders in need (ONDCP 1999).

A related issue is that states without treatment resources may contribute to criminal activity and treatment demands in other states. Consequently, practitioners have called for a computerized booking system to monitor offenders across states. Such a system would track assessments, drug testing, and progress through treatment (ONDCP 1999). This information could be shared among police departments, courts, jails, prisons, and all other levels of the justice system.

### Prioritization of Bed Space Management Over Drug Treatment

Correctional population management represents the primary concern to most administrators. Indeed, correctional executives generally view bed space as taking priority over treatment, and some view treatment as contributing to increased management problems, by reducing the number of general bed space slots available (Lipton 1996, 11). The lack of commitment from correctional executives and state policymakers poses one of the biggest challenges to providing not only drug treatment, but effective and sustained drug treatment.

### Opposition and Skepticism about the Effectiveness of Drug Treatment

In general, support for correctional drug treatment in general faces considerable political opposition (Reuter 2001). The opposition in part is due to public and political beliefs that drug addiction is not a public health problem; instead, many view addiction as a moral problem and are even more suspicious when it is

linked to criminal behavior. In addition, despite the creation of the Office of National Drug Control Policy, which operates with a $20 billion budget, federal drug policies are "highly fractionated"—a large number of agencies have responsibility in one form or another for drug policy, but in each instance "drug policy is a minor responsibility and a poorly regarded one" (Reuter 2001, 374).

Despite research demonstrating the effectiveness of drug treatment, many legislators and correctional executives believe that "nothing works" (Cullen and Gendreau 2000), and see little reason to support programs that in their view receive little public support. As Lipton (1996) has noted, "legislators, as well as correctional authorities, are often skeptical about the effectiveness of correctional treatment and reluctant to spend tax dollars on efforts that net no votes and likely, in their minds, to produce little change in behavior" (11). These attitudes have led treatment stakeholders to call for an education campaign targeting essential elected officials (ONDCP 1999).

## RESOURCE BARRIERS

### Lack of Funding for and Prioritization of Treatment

In the past decade, the federal government has provided considerable funding for drug treatment in prisons, through programs such as the Residential Substance Abuse Treatment (RSAT) for State Prisoners Formula Grant Program, the Violent Offender Incarceration and the Truth in Sentencing Incentive (VOI/TIS), the Substance Abuse and Treatment Block Grant Program, and the like (Corrections Program Office 1998; ONDCP 2001). However, despite the considerable infusions of federal dollars into state drug abuse programs, lack of funding for treatment constitutes a key barrier to treatment. Indeed, more than 70 percent of state and federal prison administrators cite inadequate funding as the greatest challenge to providing substance abuse treatment in correctional settings (CASA 1998).

The lack of funding is directly linked to another barrier to correctional treatment—the lack of prioritization of treatment among correctional executives. As Lipton (1996, 11) has noted,

> It is evident that senior State-level correctional executives have another overriding concern [besides drug treatment]: ensuring adequate space to house inmates. Their

budgets reflect that priority: additional prison space takes priority over rehabilitation programs. It is also clear that some correctional officials are in conflict as to where to treat offenders; that is, they need to determine whether resources should be allocated to community-based or prison-based programs.

Although these factors affect the amount of drug treatment in prisons, they also substantially affect the quality of treatment. With fewer funds and a lack of commitment to treatment, substance abuse program delivery and quality can decline significantly (Farabee et al. 1999).

### Uncertainty and Certainty about How Best to Utilize Scarce Resources

Despite significant advances in research, we currently lack precise information about which programs, including drug treatment, result in the greatest benefits, are the most cost-effective, and can be feasibly implemented in a correctional setting (ONDCP 1999). At the same time, certain programs that have been shown to be ineffective, or whose effectiveness has not been determined, nonetheless receive considerable ongoing political support. Thus, on one hand, there is uncertainty about precisely what programs are most beneficial, cost-effective, and feasible in correctional settings; on the other hand, there is certainty among key correctional executives and legislators about the benefits of unproven programs.

### A Need for Integrated Community-Based Services

Some communities have forged linkages among mental health, substance abuse, and criminal justice systems (Field 1998). However, most communities do not have the services necessary for diverting offenders from prison or for continuing ex-offender treatment. When services are available, they frequently are not coordinated or easily accessible to offenders. In many instances, potential providers have little incentive to work with offenders. In others, correctional, health, welfare, and other agencies are unwilling or unable to cooperate with one another to provide continuity of treatment.

CSAC/ 00193

## ASSESSMENT BARRIERS

Despite the critical importance of screening and assessment to efficient and effective criminal justice operations, the vast majority of jurisdictions throughout the United States still rely primarily on "professional judgment" and first-generation assessment instruments (Bonta 1996, 30). The question is, "Why?" Several researchers have reported barriers to screening and assessment (Gendreau and Goggin 1997; Peters and Bartoi 1997; Peters and Hunt 2000). These barriers are classified here into broad categories, specific examples of which are briefly outlined below.

### Administrative and System Issues

- Multiple and redundant assessments are conducted at various stages of processing.

- Time constraints prevent conducting screening and assessments.

- Information is collected that can not easily be used.

- Staff are not trained adequately on the administration and use of screening and assessment instruments.

- Criminal justice personnel may lack familiarity with mental health and/or substance abuse disorders.

- There may be limited time or resources for codifying existing information, transferring it to various parts of the criminal justice system, or easily accessing existing information.

### Inappropriate Use of Assessment Instruments

- Staff may not complete and use screening and assessment instruments appropriately.

- There may be a lack of consistency in questions and/or documentation to allow reliable analysis of program level needs or outcomes.

- Non-validated instruments may be used.

- Instruments may be used for populations for which they were not designed.

- Instruments may not address criminogenic needs.

- Records may be incomplete, misleading, or mislabeled.

- Traditional, subjective "intuitive assessments," or "first-generation assessments," still are widely used, despite demonstration of their ineffectiveness.

### Minimal Assessment of Co-Occurring Disorders

- The primary barrier to treating co-occurring disorders is the minimal attempt systemwide to screen and assess for these disorders.

- Mental health and substance use disorders have a waxing and waning course and may appear in different forms at different points in time. This variability leads to different, and often conflicting, diagnoses at different stages of processing.

- There is considerable symptom interaction between co-occurring disorders, leading to difficulties in interpreting whether symptoms are related to mental illness or substance abuse.

- Individuals in the criminal justice system may anticipate negative consequences related to disclosure of mental health or substance abuse symptoms.

### Limited Guidance from Research about the "Best" Instruments

- Few studies comprehensively and comparatively examine the effectiveness of different types of screening and assessment instruments.

- There is little systematic research identifying which criminogenic needs most influence future offending.

- Research has not shown the combination of risk, needs, personality types, and responsivity needed for programming to be most effective, and how assessments can be devised that can be feasibly used to assist with decisionmaking.

## ADMINISTRATIVE AND ORGANIZATIONAL BARRIERS

### Legislative or Policy Restrictions on Treatment Access

Legislative or policy requirements frequently limit treatment to inmates who have a lifetime history of substance use or have been convicted of drug sales or drug trafficking, irrespective of their current use pattern

(Farabee et al. 1999). Programs also may be required to exclude violent and/or sex offenders and those involved with prison gangs. These exclusions assume, incorrectly, that all drug-involved offenders have substance abuse problems, that only those offenders with lifetime histories of use need treatment, or that offenders who engage in drug trafficking require treatment.

In addition to the above exclusions, there may be policies that limit treatment access by restricting the movement of inmates to facilities with treatment services (Farabee et al. 1999), even though treatment may be indicated and could be effective (Field 1998; NIDA 1999).

### Difficulties in Implementation and Delivery

Implementation represents one of the most formidable challenges to providing drug treatment in corrections. Treatment programs often encounter opposition because they run counter to the established punishment/control culture in correctional settings. For this reason, successful implementation requires counselors who have strong leadership skills and can retain skilled and committed staff (Inciardi et al 1992; Farabee et al 1999).

The involvement of experienced treatment providers is crucial at all stages of implementation, including design and monitoring of both the program and its budget. Without this involvement, programs frequently suffer from a wide range of additional challenges, including failure to obtain appropriate materials and supplies, placement of inappropriate clients, and an inability to anticipate and address fluctuations in available resources (Inciardi et al. 1992).

Unfortunately, even the best designed programs will be ineffective if they are inappropriately delivered. Delivery suffers, for example, when programs rely on inexperienced staff or have too few staff. In addition, insufficient funding can result in misplaced emphasis on certain aspects of treatment to the exclusion of others. The result is compromised and likely ineffective treatment, as well as an inability to evaluate the "true" impact of a specific treatment approach. Many evaluations indicate that program delivery is frequently and significantly compromised.

### Challenges in Institutionalizing Effective Treatment

Treatment programs too often rely on specific individuals to motivate and sustain them (ONDCP 1999). As a result, when these individuals leave, programming frequently suffers. Program operations, for example,

may become inefficient or ineffective, and support for programming may decline. As Lipton (1996) and others have noted, sustained and effective treatment requires institutionalizing several aspects of treatment programming, including commitment to treatment, documentation of program policies and procedures, and hiring of trained counselors.

### Overcrowding and Security Issues Compromise Treatment

Security issues in correctional facilities represent a persistent problem for drug abuse programs (Farabee et al. 1999). If inmates with different risk classifications are placed in the same program, lower-risk offenders are put at risk and treatment is compromised. However, because of limited general population bed space, treatment programs frequently become a primary source for relieving overcrowding (ONDCP 1999).

Many facilities address these problems by denying treatment to high-security inmates in a process called "dumping"—moving difficult inmates to other facilities to avoid correctional disruptions (Farabee et al. 1999). Sometimes treatment is not offered to inmates in high-security facilities due to costs associated with providing treatment in these settings. The result is a failure to provide drug treatment to those who might most benefit from it (NIDA 1999; Wexler et al. 1999).

### Limited Treatment Access within Corrections Due to Location

The frequent placement of correctional facilities in remote areas or a limited set of institutions, as a cost-savings strategy, can undermine treatment. It is sometimes difficult to attract qualified treatment counselors to remote locations and, as a result, these facilities are forced to hire locals who usually lack the qualifications to administer treatment programs (Farabee et al. 1999). In addition, to reduce the cost of establishing a residential facility that can handle the security needs of the highest-risk inmates, treatment programs generally are located in a small number of facilities within state correctional systems, as opposed to all facilities that need them. Therefore, many inmates who need treatment may have to be transported long distances and thus not receive treatment. Those who do are frequently placed far from family and settings in which they may be able to address family issues pertaining to substance abuse (ONDCP 1999).

CSAC/ 00195

## Challenges in Training and Retaining Treatment Staff

Effective treatment requires well-trained staff and a certain level of consistency in staffing (Lipton 1996; Farabee et al. 1999). Yet many programs are lacking in both areas. Often, programs have difficulty attracting well-trained and motivated counselors due to the low pay, the conflict of working within a correctional setting where treatment is not always supported, and the remote location of many prisons. Among well-trained counselors, many may not be trained in the particular treatment modalities that are most effective or that a particular correctional facility uses. When high-quality staff are hired, they frequently leave for better paying or more attractive positions.

Lack of cross-training between treatment counselors and treatment officers has also been observed as a barrier to effective treatment (Farabee et al. 1999). Effective treatment is facilitated by mutual understanding among treatment and correctional staff. The goal of cross-training is to have treatment counselors respect and support the correctional process and, conversely, to have correctional officers understand and support the treatment process, as well as administer treatment sanctions when appropriate.

## Conflicting Treatment and Correctional Cultures

Treatment and control/management of offenders represent two distinct orientations of philosophies toward inmates. Although the two can be compatible, historically they have been viewed otherwise (Lipton 1996). Thus, many correctional officers do not understand, appreciate, or support treatment, while many treatment providers view correctional philosophies as fundamentally inappropriate, unnecessary, and ineffective. Frequently, there are no clear definitions of when a treatment vs. a correctional response is needed (Farabee et al. 1999). Ultimately, the conflicting cultures of correctional and treatment staff typically work against treatment programming and efficacy because correctional goals usually "win" in this exchange (Morrissey, Steadman, and Kilburn 1983). Indeed, few institutions directly address this conflict (Inciardi et al. 1992; ONDCP 1999).

## Privately Run Prisons May Not Prioritize Treatment

Although there are no definitive studies of treatment provision or effectiveness in privately vs. government-run correctional facilities, evidence to date

suggests that privately run facilities do not prioritize treatment (General Accounting Office 1996). The GAO (1996) report, which analyzed five previously conducted studies, concluded there was no clear evidence that privately operated facilities were cheaper or of better quality than their locally or state-run counterparts. One reason for less treatment or lower-quality treatment in private prisons may be an intrinsic conflict of interest: Privately run facilities earn profits by having more "customers" (i.e., inmates), not by removing them from the potential supply of future "customers."

## Key System Gaps Contribute to Lack of Treatment

### Inadequate Pre-Sentencing Investigations

Pre-sentencing investigations can highlight the needs of offenders. In turn, they can affect whether offenders are diverted from correctional settings or whether the drug treatment need is brought to the attention of correctional officials. Frequently, however, pre-sentencing reports do not focus on drug treatment needs or call attention to the need for treatment (ONDCP 1999).

### Lack of Diversion to Drug Treatment Programming

One of the major barriers to drug treatment in correctional settings is the fact that need exceeds demand by a ratio of 5 to 1 in state and federal prisons (CASA 1998). Diversion to available non-incarcerative treatment programs can alleviate this problem, yet diversion often is not supported or is not available. Successful diversion efforts require proactive advocacy from public defenders and the understanding and willingness of prosecutors to access such programs. However, caseloads alone can overburden defenders and prosecutors, and many communities lack the resources to provide treatment locally (ONDCP 1999).

### Failure to Provide Treatment Aftercare

Three-fourths or more of offenders with histories of heroin and cocaine abuse relapse within three months of release from prison and engage in criminal activity (Lipton 1996). The growth in prisons, driven by increased incarceration of drug offenders (Blumstein and Beck 1999), has resulted in an exponential growth in the ex-offender population, few of whom receive any type of treatment. The likely result is a return to criminal behavior and, with tougher sentencing laws, a return to prison. In turn, the absence of effective drug treatment in prisons, coupled with limited to no aftercare treatment, can contribute both to

prison growth and to the demand for correctional drug treatment (ONDCP 1999).

## PROGRAMMATIC BARRIERS

### Limited or Low-Quality Case Management

For most treatment programs to be effective, there must be successful coordination of services and transitions from one stage of processing to another (Field 1998). For this reason, case management is an essential part of the treatment process (Lipton 1996). However, case management frequently is not provided or suffers from several problems. For example, although a ratio of 1 case manager to 25 offenders is ideal, the ratio typically is much higher, with some jurisdictions reporting staff-to-offender ratios of 1 to 300 (ONDCP 1999). In addition, case management plans rarely are fully developed and often do not include relapse prevention strategies (Field 1998).

### Lack of Monitoring or Drug Testing

Research shows that frequent monitoring and drug testing can significantly reduce relapse and recidivism rates, yet many drug-abusing offenders released from correctional facilities are not monitored closely or tested (Farabee et al. 1999; ONDCP 1999). With the enormous expansion of offenders placed on parole (Blumstein and Beck 1999), this issue assumes particular importance because it constitutes a missed opportunity to enhance correctional drug treatment and ultimately to reduce overcrowding in prisons.

### Availability of Drugs in Correctional Settings

Correctional drug treatment can be significantly undermined by the availability of licit and illicit drugs (ONDCP 1999). Inmates in treatment, as well as inmates not in treatment but who have drug abuse problems, frequently have access to drugs. For example, in an evaluation of the Delaware KEY program, Inciardi et al. (1992) noted the ease with which inmates could move, unimpeded, from one building to another and engage in illicit drug trade. The inattention to security issues and control of drug trade in turn compromised treatment goals and reduced the program's effectiveness.

### Inappropriate Treatment or Delivery of Treatment

Treatment ideally should be based on empirical evidence on what works and for whom, but frequently correctional facilities rely on programs that are not effective or have not been evaluated. These programs also frequently are not implemented or delivered as they were designed. Many, for example, do not incorporate key features of effective programs, features that are known to contribute to treatment effectiveness, including case management, continuity of care, inclusion of families in the treatment process, and use of well-trained staff (Field 1998; Lipton 1996; ONDCP 1999).

### Client Resistance to Treatment and the Balancing of Rewards and Sanctions

Because inmates are held against their will and sometimes are forced to enter treatment, they may not be willing to participate in treatment. Although voluntary participation in treatment is not always necessary for treatment to be effective (NIDA 1999), it nonetheless can contribute to it and, over the long term, may be necessary to reduce relapse. However, many correctional treatment programs fail to incorporate a system of rewards and incentives, such as linking release to treatment completion (Lipton 1996). They also do not systematically address the ways in which stigma, from inmates or staff, can contribute to the unwillingness of inmates to participate in treatment or, if in treatment, to participate actively (Farabee et al. 1999; Field 1998).

Rewards and sanctions constitute effective strategies for engaging inmates in the treatment process (Field 1998; Lipton 1996). However, arriving at an effective balance of the two can present considerable challenges (ONDCP 1999). As a result, correctional and treatment facilities frequently rely on one or the other or, more generally, emphasize sanctions rather than rewards (Farabee et al. 1999).

### Insufficient Levels of Treatment and Reentry Preparation

Program completion is one of the major predictors of successful treatment. Inmates must be in treatment long enough—generally 12 to 18 months—to end the physical addiction and to allow the full course of treatment to take effect. Yet many inmates do not complete treatment because of behaviors while in treatment or termination of their sentence (ONDCP 1999). In addition, inmates who complete treatment frequently are transitioned directly into society without

any type of reentry programming or development of plans for maintaining continuity of care.

### Lack of Treatment Responsivity

Few correctional treatment programs provide individualized treatment, and no single treatment is appropriate for all individuals (Cullen and Gendreau 2000; Gaes et al. 1999; NIDA 1999). Treatment programs generally must meet the needs of individual inmates and accommodate their particular personality, circumstances, and learning style, sometimes referred to as "treatment responsivity" (Bonta 1996; Cullen and Gendreau 2000). Responsivity includes addressing issues such as co-occurring disorders, racial/ethnic and gender differences in both needs and in the effectiveness of specific treatment modalities, and cultural competency and differences (Field 1998).

### A COMPREHENSIVE CORRECTIONAL DRUG TREATMENT STRATEGY

There is no one solution to enhancing drug treatment in correctional settings. Rather, for any sustained strategy of correctional drug treatment, a comprehensive and systematic approach holds the most promise. Lipton (1995) has identified key issues that should be addressed in developing a comprehensive treatment strategy in corrections. These issues are presented in table 6-1.

The comprehensive strategy consists of five levels, each of which can be conceptualized as stages that build on one another in stepwise progression. For example, to establish treatment as a priority in corrections, a necessary first set of steps is to obtain support at a state level. Within each level, there are concrete steps that can be taken to enhance the provision, delivery, and, ultimately, the effectiveness of correctional drug treatment.

### KEY RESEARCH QUESTIONS

- Of the many barriers to correctional drug treatment, which are the most pervasive, the most important in affecting the provision or effectiveness of treatment, and the most amenable to change?

- What are the major barriers to providing effective drug treatment in prisons? What issues have to be addressed to increase effective drug treatment in prisons?

- How prevalent are key barriers to effective drug treatment in correctional systems?

- Which barriers are the most important in affecting the provision or effectiveness of treatment? Which of these are the most amenable to change?

- Do correctional officials perceive that there is a need for more effective drug treatment in correctional settings?

- Are research findings used in the development of policies and programs, and if not, why not?

- What types of policies encourage collaborative efforts to provide drug treatment?

- To what extent are offenders with substance abuse and dependency needs identified?

- To what degree do correctional institutions cross-train correctional and treatment staff? How effective is cross-training in facilitating effective drug treatment?

**Table 6-1. A Comprehensive Correctional Drug Treatment Strategy**

**STATE LEVEL (Necessary First Steps)**
- *Alignment* - Align support from all criminal justice agencies.
- *Endorsement* - Obtain the endorsement of key state policymakers.
- *Advisory Board* - Develop an advisory board with key state policymakers.
- *Agreement* - Create a common level of understanding about the mission and goals of treatment.
- *Attention* - Establish a structure for disseminating information about the state's efforts.
- *Evaluation* - Begin establishing process, outcome, and cost-effectiveness evaluation groundwork.

**INSTITUTIONAL LEVEL (Before Programming)**
- *Assessment* - Screen and assess inmates using validated instruments.
- *Diagnosis* - Conduct comprehensive assessments to diagnose accurately inmate needs.
- *Assignment* - Assign inmates to treatment, matched on intensity, duration, primacy of need, and cost.
- *Sequencing* - Sequence treatment according to sentence and time needed for type of treatment.
- *Involvement* - Involve offenders in treatment planning and assessment.
- *Recruitment* - Provide incentives to inmates for participation in treatment.
- *Case Management* - Assign case managers to manage all treatment components.
- *Communication* - Hold regular case conferences with treatment and custody personnel.

**INSTITUTIONAL LEVEL (During Incarceration)**
- *Isolation* - Separate program participants from general population.
- *Environment* - Create clean and safe environments for inmates.
- *Ownership* - Develop a sense of program ownership among inmates.
- *Contact* - Reduce contact between treatment and general population inmates.
- *Rules* - Establish clear rules and consequences for rule violations.
- *Contingency Contract* - Develop contracts with behavioral consequences for rule violations.
- *Reinforcement* - Reinforce prosocial behaviors.
- *Rewards/Sanctions* - Use a system of positive and negative reinforcements.
- *Motivation* - Provide incentives (privileges, jobs, early release) for positive behavior.
- *Role Models* - Employ ex-offenders and inmates as counselors.
- *Teams* - Use teams of rehabilitation counselors and ex-addicts.
- *Confidentiality* - Maintain confidentiality in dealing with sensitive topics.

**INSTITUTIONAL LEVEL (Preparing for Release)**
- *Duration* - Retain participants for the duration needed for treatment to be effective.
- *Continuity* - Establish continuity of care from custody to post-release.
- *Reentry* - Incorporate a reentry phase within the correctional treatment programming.
- *Transition* - Assist with transition from corrections to community-based treatment.
- *Urinalysis* - Conduct frequent (3 or more times per week) urinalysis tests.
- *Understanding* - Evaluate relapse/slips in context and address directly as they occur.
- *Self-Help Groups* - Involve addicts in self-help groups to facilitate continuity of treatment.

**ORGANIZATIONAL LEVEL (Program Characteristics)**
- *Integrity* - Maintain commitment, especially from leadership, in the treatment vision and delivery.
- *Flexibility* - Be open to ways to adapt programming to changing fiscal and administrative conditions.
- *Autonomy* - Limit institutional restrictions and placement of general population inmates.
- *Adaptability* - Operate by cooperating with administration and security structures.
- *Openness* - Encourage access to program and develop outside funding sources and supporters.

Source: Adapted from Lipton (1995).

CSAC/ 00199

# REFERENCES

American Correctional Association. 2001. "Drug Treatment Intervention Summary." *Corrections Compendium* 26(4): 8–23.

American Society of Addiction Medicine. Forthcoming. *Patient Placement Criteria 2 (PPC 2)*. Annapolis Junction, MD: ASAM Publications Distribution.

Andrews, Don A. 1995. "The Psychology of Criminal Conduct and Effective Treatment." In *What Works: Reducing Offending*, edited by J. McGuire. New York: Wiley.

Andrews, Don A., and James Bonta. 1998. *The Psychology of Criminal Conduct*. 2d ed. Cincinnati, OH: Anderson Publishing Co.

———. 1995. *The Level of Supervision Inventory-Revised (LSI-R)*. North Tonawanda, NY: Multi-Health Systems.

Anglin, Douglas M. 1998. "The Efficacy of Civil Commitment in Treating Narcotic Addiction." *Compulsory Treatment of Drug Abuse: Research and Clinical Practice*, NIDA Research Monograph 86: 8–34. Washington, D.C.: National Institute on Drug Abuse.

Anglin, M. D., D. Longshore, S. Turner, D. McBride, James A. Inciardi, and M. Prendergast. 1996. *Studies of the Functioning and Effectiveness of Treatment Alternatives to Street Crime (TASC) Programs, Final Report*. Los Angeles, CA: University of California.

Arrestee Drug Abuse Monitoring (ADAM) Program. 1999. *Annual Report on Drug Use among Adult and Juvenile Arrestees*. Washington, D.C.: U.S. Department of Justice, National Institute of Justice.

Association of State Correctional Administrators, Corrections Program Office, Bureau of Justice Statistics, and the National Institute of Justice. 1998. *State and Federal Corrections Information Systems: An Inventory of Data Elements and Assessment of Reporting Capabilities*. Washington, D.C.: U.S. Department of Justice. August.

Association of State Correctional Administrators, Corrections Program Office, Bureau of Justice Statistics, and the National Institute of Justice. 1998. *State and Federal Corrections Information Systems: An Inventory of Data Elements and Assessment of Reporting Capabilities*. Washington, D.C.: U.S. Department of Justice. August.

Baird, S. Christopher, R. Prestine, and B. Klockziem. 1989. *Revalidation of the Wisconsin Probation/Parole Classification System*. Madison, WI: National Council on Crime and Delinquency.

Beck, Allen J. 2000. *Prisoners in 1999*. Washington, D.C.: U.S. Department of Justice Office of Justice Programs, Bureau of Justice Statistics, NCJ 183476.

Beck, Allen J., and Jennifer C. Karberg. 2001. *Prison and Jail Inmates at Midyear 2000*. Washington, D.C.: U.S. Department of Justice, Bureau of Justice Statistics.

Blumstein, Alfred, and Allen J. Beck. 1999. "Population Growth in U.S. Prisons." In *Prisons*, edited by Michael Tonry and Joan Petersilia (17–61). Chicago, IL: University of Chicago Press.

Boland, Fred J., Katherine Henderson, and Jan Baker. 1998. *Case Needs Review: Substance Abuse Domain*. New York: Queen's University.

Bonta, James. 1996. "Risk-Needs Assessment and Treatment." In *Choosing Correctional Options That Work: Defining the Demand and Evaluating the Supply*, edited by Alan T. Harland. Thousand Oaks, CA: Sage Publications.

Brown, Barry S. 1992. "Program Models." In *Drug Abuse Treatment in Prisons and Jails*, edited by Carl G. Leukefeld and Frank M. Tims. NIDA Monograph 118. Rockville, MD: National Institute on Drug Abuse.

Bureau of Justice Statistics. 2001. *Justice Expenditure and Employment Extracts*. Washington, D.C.: U.S. Department of Justice, Bureau of Justice Statistics. Online: http://www.ojp.usdoj.gov/bjs/glance/exptyp.htm.

———. 1999a. *1997 Survey of Inmates in State and Federal Correctional Facilities*. Washington, D.C.: U.S. Department of Justice, Bureau of Justice Statistics.

———. 1999b. *Correctional Populations in the United States, 1996*. Washington, D.C.: U.S. Department of Justice Office of Justice Programs, Bureau of Justice Statistics, NCJ 170013.

———. 1997. *Census of State and Federal Correctional Facilities, 1995*. Washington, D.C.: U.S. Department of Justice, Bureau of Justice Statistics.

Camp, Camille G. and George M. Camp. 1999a. *The Corrections Yearbook 1999: Adult Corrections*. Middletown, CT: Criminal Justice Institute, Inc.

———. 1999b. *The Corrections Yearbook 1999: Jails*. Middletown, CT: Criminal Justice Institute, Inc.

Caplow, Theodore, and Jonathan Simon. 1999. "Understanding Prison Policy and Population Trends." In *Prisons*, edited by Michael Tonry and Joan Petersilia (63–120). Chicago: University of Chicago Press.

Carter, Diane. 1991. *Intervening with Substance-Abusing Offenders: A Framework for Action.* Washington, D.C.: U.S. Department of Justice, National Institute of Corrections.

Caulkins, J. P., C. P. Rydell, W. Schwabe, and J. R. Chiesa. 1997. "Mandatory Minimum Sentences: Throwing Away the Key or the Taxpayers' Money?" Publication no. MR-827-DPRC. Santa Monica, CA: RAND.

Center on Addiction and Substance Abuse (CASA). 2001. *Shoveling Up: The Impact of Substance Abuse on State Budgets.* New York, NY: The National Center on Addiction and Substance Abuse at Columbia University. January.

——. 1998. *Behind Bars: Substance Abuse and America's Prison Population.* New York: Columbia University.

Chukes, J. A., Elizabeth Von Cleve, Ron P. Jemelka, and Eric W. Trupin. 1990. "Substance Abuse and Psychiatric Disorders in Prison Inmates." *Hospital and Community Psychiatry* 41: 1132–34.

Corrections Program Office (CPO). 1998. *State Efforts to Reduce Substance Abuse among Offenders.* Washington, D.C.: U.S. Department of Justice, Office of Justice Programs, Corrections Program Office.

Cote, Gilles, and Sheilagh Hodgins. 1990. "Co-occurring Mental Disorders among Criminal Offenders." *Bulletin of the American Academy of Psychiatry and Law* 18: 271–81.

Criminal Justice Committee of Therapeutic Communities of America. 1999. *Therapeutic Communities in Correctional Settings: The Prison Based TC Standards Development Project, Final Report of Phase II.* Washington, D.C.: Office of National Drug Control Policy. November.

Crowe, Anne H., and R. Reeves. 1994. *Treatment for Alcohol and Other Drug Abuse.* DHHS Publication No. (SMA) 94-2075.

Cullen, Francis T., and Paul Gendreau. 2000. "Assessing Correctional Rehabilitation: Policy, Practice, and Prospects." *Criminal Justice 2000: Policies, Processes, and Decisions of the Criminal Justice System* 3: 109–176. Washington, D.C.: U.S. Department of Justice.

Dennis, Michael L. 1998. "Integrating Research and Clinical Assessment: Measuring Client and Program Needs and Outcomes in a Changing Service Environment." NIDA Resource Center for Health Services Research: Issue Paper. Rockville, MD: National Institute on Drug Abuse. July.

Dennis, Michael L. 1998. "Integrating Research and Clinical Assessment: Measuring Client and Program Needs and Outcomes in a Changing Service Environment." NIDA Resource Center for Health Services Research: Issue Paper. Rockville, MD: National Institute on Drug Abuse. July.

Department of Social and Health Services (DSHS). 1998. *Net Impact Analysis of Substance Abuse Treatment.* Research and Data Analysis Division Briefing Paper for Washington State, 4.34bp.

Downes, Elizabeth, and Mary Ann Shaening. 1993. "Building Systems: Linking State AOD and Justice Systems." Rockville, MD: Center for Substance Abuse Treatment: TIE Communiqué.

Falkin, G. P., Henry K. Wexler, and Douglas S. Lipton. 1990. *Drug Treatment in State Prisons. Report to the National Academy of Sciences.* New York: Narcotic and Drug Research, Inc.

Farabee, David, Michael Prendergast, Jerome Cartier, Harry Wexler, Kevin Knight, and M. Douglas Anglin. 1999. "Barriers to Implementing Effective Correctional Drug Treatment Programs." *The Prison Journal* 79(2): 150–62. June.

Farabee, David, Michael Prendergast, Jerome Cartier, Harry Wexler, Kevin Knight, and M. Douglas Anglin. 1999. "Barriers to Implementing Effective Correctional Drug Treatment Programs." *The Prison Journal* 79(2): 150–62.

Federal Bureau of Investigation. 1999. *Crime in the United States, 1995 – 1997.* Washington, D.C.: U.S. Department of Justice, Federal Bureau of Investigation. Criminal Justice Information Services (CJIS) Division Uniform Crime Reports. Online: http://www.ojp.usdoj.gov/bjs/glance/drug.htm

Field, Gary. 1998. *Continuity of Offender Treatment for Substance Use Disorders from Institution to Community.* Treatment Improvement Protocol (TIP) Series 30. DHHS Publication No. (SMA) 98-3245.

Finn, Peter. 1998. *Successful Job Placement for Ex-Offenders.* Washington, D.C.: National Institute of Justice.

Gaes, Gerald G., Timothy J. Flanagan, Laurence L. Motiuk, and Lynn Stewart. 1999. "Adult Correctional Treatment." In *Prisons,* edited by Michael H. Tonry and Joan Petersilia (361–426). Chicago: University of Chicago Press.

Gaes, Gerald G., William Rhodes, Scott Camp, Joyce O'Neil, Sue Wallace, and William Saylor. 1998. *TRIAD Drug Treatment and Evaluation Project Six-Month Interim Report.* Washington, D.C.: Federal Bureau of Prisons Office of Research and Evaluation.

Gendreau, Paul. 1996. "The Principles of Effective Intervention with Offenders." In *Choosing Correctional Options That Work: Defining the Demand and Evaluating the Supply,* edited by Alan T. Harland (117–30). Thousand Oaks, CA: Sage Publications.

Gendreau, Paul, and Claire Goggin. 1997. "Correctional Treatment: Accomplishments and Realities." In *Correctional Counseling and Rehabilitation*, 3d ed., edited by Patricia van Voorhis, Michael Braswell, and David Lester (271–80). Cincinnati, OH: Anderson Publishing Co.

Gendreau, Paul, Claire Goggin, and Mario Paparozzi. 1996. "Principles of Effective Assessment for Community Corrections." *Federal Probation* 60 (September): 64–70.

Gendreau, Paul, Tracy Little, and Claire Goggin. 1996. "A Meta-analysis of the Predictors of Adult Offender Recidivism: What Works!" *Criminology* 34: 575–607.

General Accounting Office (GAO). 1998. *Drug Abuse: Research Shows Treatment Is Effective, but Benefits May Be Overstated.* Washington, D.C.: U.S. General Accounting Office.

— —. 1996. *Private and Public Prisons: Studies Comparing Operational Costs and/or Quality of Service.* Washington, D.C.: U.S. General Accounting Office.

Gerstein, D. R., R. A. Johnson, H. J. Harwood, D. Fountain, N. Suter, and K. Malloy. 1994. *Evaluating Recovery Services: The California Drug and Alcohol Treatment Assessment (CALDATA).* Sacramento, CA: California Department of Alcohol and Drug Programs.

Goldcamp, John S., Don M. Gottfredson, and Jeffrey D. Monroe. 1999. *Implementing Local Criminal Justice Strategies: Developing Measures of Performance in 36 Bureau of Justice Assistance Open Solicitation Sites.* Washington, D.C.: U.S. Department of Justice, Bureau of Justice Assistance.

Gorski, T. G. 1991. "Recovery: A Developmental Model." *Addiction and Recovery* 11: 10–14.

Harland, Alan T., ed. 1996. *Choosing Correctional Options That Work: Defining the Demand and Evaluating the Supply.* Thousand Oaks, CA: Sage Publications.

Harrison, Lana. 2000. *The Challenge of Reintegrating Drug Offenders in the Community.* Washington, D.C.: The Urban Institute. *Reentry Roundtable Discussion Paper.*

Harrison, Lana L., and Steven S. Martin. 2000. Residential Substance Abuse Treatment (RSAT) for State Prisoners Formula Grant: Compendium of Program Implementation and Accomplishments. Newark, DE: Center for Drug and Alcohol Studies.

Hubbard, Robert L., James J. Collins, J. Valley Rachal, and Elizabeth R. Cavanaugh. 1988. "The Criminal Justice Client in Drug Abuse Treatment." *Compulsory Treatment of Drug Abuse: Research and Clinical Practice.* NIDA Research Monograph 86: 57–80. Washington, D.C.: National Institute on Drug Abuse.

Inciardi, James A. 1994. *Screening and Assessment for Alcohol and Other Drug Abuse among Adults in the Criminal Justice System.* Treatment improvement protocol (TIP) series, publication no. 7 (SMA) 94-2076. Rockville, MD: U.S. Department of Health and Human Services, Public Health Service, Substance Abuse and Mental Health Services Administration, Center for Substance Abuse Treatment.

— —. 1993. "Classification, Assessment, and Treatment Planning for Alcohol and Drug-Involved Offenders." Rockville, MD: Center for Substance Abuse Treatment: TIE Communiqué.

Inciardi, James, Dorothy Lockwood, and Judith A. Quinlan. 1993. "Drug Use in Prisons: Patterns, Processes, and Implications for Treatment." *The Journal of Drug Issues* 23(1): 119–29.

Inciardi, James A., Steven S. Martin, Dorothy Lockwood, Robert M. Hooper, and Bruce M. Wald. 1992. "Obstacles to the Implementation and Evaluation of Drug Treatment in Correctional Settings: Reviewing the Delaware KEY Experience." In *National Institute on Drug Abuse Research Monograph Series #118: Drug Abuse Treatment in Prisons and Jails*, edited by Carl G. Leukenfeld and Frank M. Tims (176–91). Washington, D.C.: U.S. Government Printing Office.

Inciardi, James A., Steven S. Martin, and Hilary L. Surratt. 1999. *Therapeutic Communities in Prisons and Work Release: Effective Modalities for Drug-Involved Offenders.* Washington, D.C.: National Institute of Justice.

Kauffman, Janice F., and George E. Woody. 1995. *Matching Treatment to Patient Needs in Opioid Substitution Therapy.* DHHS Publication No. (SMA) 95-3049.

Kessler, R. C., K. A. McGonagle, S. Zhao, C. Nelson, M. Hughes, S. Eshleman, H. Wittchen, and K. Kendler. 1994. "Lifetime and 12-month Prevalence of DSM-III-R Psychiatric Disorders in the United States." *Archives of General Psychiatry* 51: 8–19.

Knight, Kevin, D. Dwayne Simpson, and Matthew L. Hiller. 1999. "Three-Year Reincarceration Outcomes for In-Prison Therapeutic Community Treatment in Texas." *The Prison Journal* 79(3): 337–51.

Leshner, Alan. 1998. "Addiction Is a Brain Disease—And It Matters." *National Institute of Justice Journal* 237: 2–6.

Leukefeld, Carl G., and Frank M. Tims, eds. 1988. *Compulsory Treatment of Drug Abuse: Research and Clinical Practice.* Rockville, MD: National Institute on Drug Abuse.

Lipton, David S. 1996. *The Effectiveness of Treatment for Drug Abusers under Criminal Justice Supervision: Presentation at the 1995 Conference on Criminal Justice Research and Evaluation.* Washington, D.C.: U.S. Department of Justice, National Institute of Justice.

——. 1995. *The Effectiveness of Treatment for Drug Abusers under Criminal Justice Supervision.* Washington, D.C.: U.S. Department of Criminal Justice, National Institute of Justice.

Lipton, Douglas S., Gregory P. Falkin, and Harry K. Wexler. 1992. "Correctional Drug Abuse Treatment in the United States: An Overview." In *Drug Abuse Treatment in Prisons and Jails,* edited by Carl G. Leukefeld and Frank M. Tims. NIDA Monograph 118. Rockville, MD: National Institute on Drug Abuse.

Lipton, Douglas S., Frank S. Pearson, Henry K. Wexler. 2000. *Final Report: National Evaluation of the Residential Substance Abuse Treatment for State Prisoners Program from Onset to Midpoint.* Washington, D.C.: U.S. Department of Justice, National Institute of Justice.

Lipton, Douglas S., Frank S. Pearson, Charles M. Cleland, and Dorline Yee. 1998. *The Correctional Drug Abuse Treatment Effectiveness Project (CDATE): Final Report.* New York: National Development and Research Institutes, Inc.

Lurigio, Arthur J., and James A. Schwartz. 2000. "Changing the Contours of the Criminal Justice System to Meet the Needs of Persons with Serious Mental Illness." *Criminal Justice 2000: Policies, Processes, and Decisions of the Criminal Justice System,* vol. 3 (45–108). Washington, D.C.: U.S. Department of Justice.

Maruschak, Laura M. 1999. *HIV in Prisons 1997.* Washington, D.C.: U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics.

McLellan, A. Thomas, Lester Luborsky, George E. Woody, Charles P. O'Brien, and Keith Druley. 1983. "Predicting Response to Alcohol and Drug Abuse Treatments: Role of Psychiatric Severity." *Archives of General Psychiatry* 40: 620–24.

McLellan, Thomas, and Richard Dembo. 1992. *Screening and Assessment of Alcohol and Other Drug-Abusing Adolescents.* Treatment Improvement Protocol series, publication no. 3. Rockville, MD: U.S. Department of Health and Human Services, Public Health Service, Substance Abuse and Mental Health Services Administration, Center for Substance Abuse Treatment.

Megargee, Edwin I., and Martin J. Bohn Jr. 1979. *Classifying Criminal Offenders: A New System Based on the MMPI.* Beverly Hills, CA: Sage Publications.

Mercer, Delinder E. and George E. Woody. 1999. *Therapy Manuals for Drug Addiction.* Manual 3, page 4. Washington, D.C.: National Institute on Drug Abuse.

Mirin, S. M., R. D. Weiss, J. Michael, and M.L. Griffin. 1988. "Psychopathology in Substance Abusers: Diagnosis and Treatment." *American Journal of Drug and Alcohol Abuse* 14(2): 139–57.

Morrissey, Joseph P., Henry J. Steadman, and M. R. Kilburn. 1983. "Organizational Issues in the Delivery of Jail Mental Health Services." *Research in Community and Mental Health* 3: 291–317.

Mumola, Christopher J. 2000. *Correctional Populations in the United States, 1997.* Washington, D.C.: U.S. Department of Justice, Bureau of Justice Statistics, NCJ 177613.

——. 1998. *Substance Abuse and Treatment, State and Federal Prisoners, 1997.* Washington, D.C.: U.S. Department of Justice, Bureau of Justice Statistics.

Murray, Donald W., Jr. 2000. *Correctional Populations in the United States, 1997.* Washington, D.C.: U.S. Department of Justice, Bureau of Justice Statistics.

——. 1992. "Drug Abuse Treatment Programs in the Federal Bureau of Prisons: Initiatives for the 1990s." In *Drug Abuse Treatment in Prisons and Jails,* edited by Carl G. Leukefeld and Frank M. Tims. (NIDA Monograph 118.) Rockville, MD: National Institute on Drug Abuse.

——. 1991. "New Initiatives in Drug Treatment in the Federal Bureau of Prisons." *Federal Probation* 55: 35–41.

National Institute on Drug Abuse (NIDA). 1999. *Principles of Drug Addiction Treatment: A Research-Based Guide.* Bethesda, MD: U.S. Department of Health and Human Services, National Institutes of Health, National Institute on Drug Abuse.

Office of National Drug Control Policy (ONDCP). 2001. *The National Drug Control Strategy: 2001 Annual Report.* Washington, D.C.: Office of National Drug Control Policy.

Pearson, Frank S., and Douglas S. Lipton. 1999. "A Meta-Analytic Review of the Effectiveness of Corrections-Based Treatments for Drug Abuse." *The Prison Journal* 79(4): 384–410.

Pelissier, Bernadette M., Gerry Gaes, William Rhodes, Scott Camp, Joyce O'Neil, Sue Wallace, and William Saylor. 1998. *TRIAD Drug Treatment Evaluation Project: Six-Month Interim Report.* Washington, D.C.: Federal Bureau of Prisons.

Peters, R. 1993. "Drug Treatment in Jails and Detention Settings." In *Drug Treatment and Criminal Justice,* edited by James A. Inciardi (44–80). Newbury Park, CA: Sage Publications.

Peters, Roger H., and Marla Green Bartoi. 1997. *Screening and Assessment of Co-occurring Disorders in the Justice System.* Delmar, NY: The National GAINS Center.

CSAC/ 00203

Peters, Roger H., and Holly A. Hills. 1997. *Intervention Strategies for Offenders with Co-Occurring Disorders: What Works?* Delmar, NY: The Gains Center.

Peters, Roger H., and Michael Hunt. 2000. "Which Substance Abuse Screening Instruments Are Effective for Use with Offenders?" *Suncoast Practice and Research Collaborative* 1(1): 1–4.

Peters, Roger H., and Elizabeth Peyton. 1998. *Guideline for Drug Courts on Screening and Assessment.* Washington, D.C.: U.S. Department of Justice, Office of Justice Programs, Drug Courts Program Office. May.

Peters, Roger H., Paul E. Greenbaum, John F. Edens, Chris R. Carter, and Madeline M. Ortiz. 1998. "Prevalence of DSM-IV Substance Abuse and Dependence Disorders among Prison Inmates." *American Journal of Drug and Alcohol Abuse* 24(4): 573–87.

Peters, Roger H., Paul E. Greenbaum, Marc L. Steinberg, Chris R. Carter, Madeline M. Ortiz, Bruce C. Fry, and Steven K. Valle. 2000. "Effectiveness of Screening Instruments in Detecting Substance Use Disorders among Prisoners." *Journal of Substance Abuse Treatment* 18: 349–58.

Petersilia, Joan. 1995. "A Crime Control Rationale for Reinvesting in Community Corrections." *Prison Journal* 75(4): 479–96.

Quay, Herbert. 1983. *Technical Manual for the Behavioral Classification System for Adult Offenders.* Washington, D.C.: U.S. Department of Justice.

Reuter, Peter. 2001. "Why Does Research Have So Little Impact on American Drug Policy?" *Addiction* 96: 373–76.

Roberts, Julian V., and Loretta Stalans. 1997. *Public Opinion, Crime, and Criminal Justice.* Boulder, CO: Westview Press.

Robins, Lee N., and Darrel A. Regier, eds. 1991. *Psychiatric Disorders in America: The Epidemiologic Catchment Area Study.* New York, NY: Free Press.

Rossman, Shelli, Sanjeev Sridharan, Caterina Gouvis, Janeen Buck, and Elaine Morley. 1999. *Impact of the Opportunity to Succeed (OPTS) Aftercare Program for Substance Abuse Felons: Comprehensive Final Report.* Washington, D.C.: The Urban Institute.

Shearer, Robert A., and Chris R. Carter. 1999. "Screening and Assessing Substance-Abusing Offenders: Quantity and Quality." *Federal Probation* 63(1): 30–35.

Sherman, Lawrence W., Denise Gottfredson, Doris MacKenzie, John Eck, Peter Reuter, and Shawn Bushway. 1997. *Preventing Crime: What Works, What Doesn't, What's Promising.* College Park, MD: University of Maryland.

Siegal, Harvey. 1998. *Comprehensive Case Management for Substance Abuse Treatment.* Publication No. (SMA) 98-3222. Washington, D.C.: U.S. Department of Health and Human Services.

Smith, B. V. 1993. "Special Needs of Women in the Criminal Justice System." Rockville, MD: Center for Substance Abuse Treatment: THE Communiqué, 31–32.

Substance Abuse and Mental Health Services Administration (SAMHSA). 2000. *Substance Abuse Treatment in Adult and Juvenile Correctional Facilities: Findings from the Uniform Facility Data Set 1997 Survey of Correctional Facilities.* Rockville, MD: SAMHSA.

Tarter, Ralph E., P. J. Ott, and Ada C. Mezzich. 1991. "Psychometric Assessment." In *Clinical Textbook of Addictive Disorders,* edited by R. J. Rances and S. I. Miller (XX–XX). New York: The Guilford Press.

Travis, Jeremy, Amy L. Solomon, and Michelle Waul. 2001. *From Prison to Home: The Dimensions and Consequences of Prisoner Reentry.* Washington, D.C.: Urban Institute Press.

van Voorhis, Patricia, Michael Braswell, and David Lester, eds. 1997. *Correctional Counseling and Rehabilitation.* 3d ed. Cincinnati, OH: Anderson Publishing Co.

Vigdal, Gerald L. 1995. *Planning for Alcohol and Other Drug Abuse Treatment for Adults in the Criminal Justice System.* Treatment Improvement Protocol series, publication no. 17. Rockville, MD: U.S. Department of Health and Human Services, Public Health Service, Substance Abuse and Mental Health Services Administration, Center for Substance Abuse Treatment.

Wexler, Harry K., Gerald Melnick, Lois Lowe, and Jean Peters. 1999. "Three-Year Reincarceration Outcomes for Amity In-Prison Therapeutic Community and Aftercare in California." *The Prison Journal* 79(3): 321–36.

Wexler, Harry K., Gregory P. Falkin, Douglas S. Lipton, and Andrew B. Rosenbaum. 1992. "Outcome Evaluation of a Prison Therapeutic Community for Substance Abuse Treatment." In *Drug Abuse Treatment in Prisons and Jails,* edited by Carl G. Leukefeld and Frank M. Tims. NIDA Monograph 118. Rockville, MD: National Institute on Drug Abuse.

Wilson, Doris J. 2000. *Drug Use, Testing, and Treatment in Jails.* Washington, D.C.: U.S. Department of Justice, Bureau of Justice Statistics.

# EXHIBIT E

# TO EXPERT REPORT OF PAUL McINTOSH

CSAC/ 00205



CALIFORNIA BUDGET PROJECT



# STRETCHED THIN
## 2008:
### State Budget Cuts Undermine California's Human Services Programs

August 2008
A Publication of the California Budget Project

CSAC/ 00206

# Acknowledgments

Scott Graves and Brad Magny prepared this report based on a survey of 13 California counties. Much of the credit for this report goes to the county staff who took the time to provide detailed information about county-operated health and human services programs. Special thanks also go to Anastasia Dodson, Graham Knaus, Frank Mecca, and Cathy Senderling-McDonald of the County Welfare Directors Association of California for their valuable assistance at all stages of this project. In addition, MacKenzie Smith was of great assistance in preparing this report for publication. The CBP is solely responsible for the contents of this report.

# California Budget Project

The CBP was founded in 1994 to provide Californians with a source of timely, objective, and accessible expertise on state fiscal and economic policy issues. The CBP engages in independent fiscal and policy analysis and public education with the goal of improving public policies affecting the economic and social well-being of low- and middle-income Californians. Support for the CBP comes from foundation grants, publications, and individual contributions.

CSAC/ 00207

# Table of Contents

Executive Summary
4

Introduction
8

Counties Continue To Face a Funding Squeeze
10

Counties Have Tightened Their Belts in Response to
State Funding Cuts
12

The Funding Squeeze Has Undermined Programs for
Vulnerable Children, Families, and Seniors
16

Conclusion
26

Appendix
27

Endnotes
28

3

CSAC/ 00208

# EXECUTIVE SUMMARY

California's policymakers once again face a budget crisis of significant magnitude. Efforts to balance past state budgets have resulted in substantial cuts to funding for public services. In particular, a number of these reductions have targeted programs that counties operate on the state's behalf and that provide critical services to California's children, families, and seniors.

Policymakers have not – by and large – eliminated services or tightened eligibility requirements in these programs. Instead, the state has left counties in a bind, in essence asking them to do more with less. The state's failure to provide funding for increases in counties' basic operating costs – such as gasoline, rent, and employees' health coverage – adds up to a funding shortfall that now exceeds $1 billion per year when forgone federal funds are taken into account. Because the state's population and the cost of delivering services continue to rise, these cuts contribute to a funding squeeze on county-operated programs. In some cases, counties have used local dollars to help make up for a portion of state funding cuts. However, counties' ability to maintain this funding is eroding as local revenues, particularly property tax and sales tax collections, stagnate due to the turmoil in the housing market and the economic downturn.

The consequences of this funding squeeze are largely hidden from view, particularly in the context of state budget debates. *Stretched Thin 2008* examines what this funding squeeze means for vulnerable children, families, and seniors based on a 13-county survey developed by the CBP and the County Welfare Directors Association of California. This report picks up the story where the original *Stretched Thin* left off in 2004, analyzing the impact of additional funding cuts made between 2004-05 and 2007-08 – cuts that targeted all major county-operated programs except the Medi-Cal Program. *Stretched Thin 2008* makes two key findings:

- First, multiple years of state funding reductions have undermined seven critical human services programs that the counties operate under state guidelines, including programs that assist children and adults who are at risk of abuse or neglect and that help frail seniors and people with disabilities live safely in their own homes.

- Second, counties generally reported positive results in the Medi-Cal Program – the only program that received state funding to support counties' increased operating costs between 2003-04 and 2007-08. This finding suggests that adequate state funding is a crucial component of counties' ability to deliver services effectively and meet program performance goals.

## Counties Continue To Face a Funding Squeeze

The state's chronic budget problems continue to take a toll on county-operated programs, particularly human services programs, which have been deeply affected by state funding cuts in recent years.

- **The state has not provided funding to cover counties' rising operating expenses for most programs since 2000-01.** Inflation affects counties in the same way that it affects families – by eroding the purchasing power of their incomes. Prices that counties pay for fuel, utilities, employee health coverage, and other basic operating costs generally rise each year. Nonetheless, the state has not provided counties with funding to cover their actual operating costs for most human services programs since 2000-01, effectively requiring counties to do more with less. The Governor proposes to continue this policy by eliminating state funding for counties' operating-cost increases in human

4

CSAC/ 00209

services programs in 2008-09. In addition, the Governor proposes to eliminate state funding for counties' operating-cost increases in the Medi-Cal Program for the first time since 2002-03. Under these proposals, counties would receive $1.1 billion ($681.5 million General Fund) *less* to operate these programs in 2008-09 than if state funding increases had been provided each year since 2000-01.

- **The state has directly cut funding for county-operated programs and could make additional cuts in 2008-09.** In addition to generally failing to provide counties with funding for increased operating costs, the state has made a number of direct cuts to funding for county-operated human services programs in recent years. These cuts have hindered counties' ability to maintain adequate staffing levels and to effectively deliver services to eligible Californians. The Governor has proposed additional funding cuts for a number of county-operated human services programs as well as the Medi-Cal Program in 2008-09.

## Counties Have Tightened Their Belts in Response to State Funding Cuts

Rising costs, combined with reductions in state funding, have put mounting pressure on county budgets. In response, counties have tightened their belts by reducing spending on basic operating costs and contracts with community-based organizations. Moreover, staff positions have been eliminated and left vacant, even as programs remain understaffed.

- **Counties have reduced spending on basic operating costs.** Counties have reduced spending on basic operating costs, including overtime, staff training, and information technology support. Surveyed counties reported that they reduced spending on basic operating costs by a total of more than $100 million between 2004-05 and 2007-08.

- **Counties have reduced spending on contracts with community-based organizations.** Many counties depend on community partners to provide services that address clients' multiple needs and extend the reach of state programs that assist vulnerable children, families, and adults. Due to state funding cuts, counties have reduced spending on contracts with community-based organizations, including those that provide services to families in the Child Welfare Services system. Surveyed counties reported that they reduced spending on contracts with community partners by a total of more than $37 million between 2004-05 and 2007-08.

> *On average, counties reported they would need to increase the number of staff in the Child Welfare Services Program by 43.6 percent to meet workload demands. Inadequate staffing levels also are prevalent in the Adoptions, Adult Protective Services, Food Stamp, and Foster Care programs.*

- **Staff positions have been eliminated and left vacant, even as programs remain understaffed.** In each of the seven human services programs included in the survey, at least one county — and generally several more — eliminated positions and/or left positions vacant between 2004-05 and 2007-08. At the same time, counties reported that human services programs lack sufficient staff to meet workload demands. On average, counties reported they would need to increase the number of staff in the Child Welfare Services Program by 43.6 percent to meet workload demands. Inadequate staffing levels also are prevalent in the Adoptions, Adult Protective Services, Food Stamp, and Foster Care programs.

5

CSAC/ 00210

# The Funding Squeeze Has Undermined Programs for Vulnerable Children, Families, and Seniors

Counties have tightened their belts to mitigate the impact of state funding cuts on vulnerable children, families, and seniors. Despite these efforts, county-operated programs have been compromised due to the state's failure to provide adequate funding, according to surveyed counties. State funding cuts have not — by and large — resulted in the complete elimination of services that counties provide to children, families, and seniors. However, by failing to fully fund the cost of these programs, state policymakers have undercut counties' ability to deliver high-quality services and have effectively compelled counties to reduce the scope and breadth of the services provided. The surveys revealed that:

- **Counties' ability to effectively provide services has diminished.** The funding squeeze has diminished counties' ability to effectively provide services and, in many cases, has resulted in service reductions. For example, San Bernardino County reported that it has inadequate staff to conduct outreach and follow-up with families who will adopt hard-to-place children, such as sibling groups and children of color. In addition, Santa Clara County indicated that participants in the California Work Opportunity and Responsibility to Kids (CalWORKs) Program have fewer choices for vocational training and are receiving fewer counseling, mentoring, and other services.

- **Counties are missing opportunities for prevention and case management.** The funding squeeze has left many counties unable to provide adequate preventive services and case management, such as investigating reports of abuse or neglect of children, seniors, and dependent adults. For example, Riverside County reported that, "The undersized workforce [in the Child Welfare Services Program] is unable to progress beyond crisis management, instead moving from one emergency to another." Fresno County stated that Adult Protective Services staff "has had to determine within minutes … how to handle a case. Increased staffing levels would … allow for more detailed investigations and referrals."

- **Counties have difficulty meeting state and federal program requirements.** Many counties reported difficulties meeting state and federal program requirements — an unintended consequence associated with inadequate funding and staffing. One county, for example, reported that services provided through the Adult Protective Services Program "are being rationed" due to an inadequate number of staff relative to demand, leaving the program "clearly out of compliance" with state regulations. Four counties reported that inadequate funding has led to increased error rates in the Food Stamp Program.

- **Counties are unable to maintain adequate community outreach and education efforts.** Counties reported that community outreach and education are inadequate or lacking altogether in several programs, ultimately reducing access to services for eligible individuals and families. For example, nearly 2 million eligible Californians do not receive food stamp benefits. However, Los Angeles County reported that, "We have not been able to do the level of [outreach] needed given the size of the eligible population not currently enrolled" in the Food Stamp Program. In addition, Sacramento County indicated that numerous food stamp outreach activities have been postponed due to budgetary constraints.

> *Counties reported that community outreach and education are inadequate or lacking altogether in several programs.*

CSAC/ 00211

- **Counties commonly experience adverse impacts on other programs and services.** The funding squeeze has led to adverse impacts on other programs and services as costs have been shifted. For example, Tehama County noted that because social workers in the Adult Protective Services Program "do not have time to do preventative services and 'check up' on at-risk individuals, they are not able to assist these individuals before their situation becomes critical." Consequently, "local law enforcement, fire departments, and first responders ... are responding to more 911 calls from clients in crisis."

## Conclusion

California's budget crisis presents policymakers with a difficult dilemma: how to balance the budget, while at the same time protecting vital services. *Stretched Thin 2008* has examined the consequences of resolving that dilemma by continuing to ask public programs to do even more with less. State funding cuts have not — by and large — resulted in the complete elimination of services that counties provide to children, families, and seniors. However, by failing to fully fund the cost of these programs, state policymakers have undercut counties' ability to deliver high-quality services and have effectively compelled counties to reduce the scope and breadth of services provided. The dilemma is not confined to the programs discussed in this report. Across the board — and year after year — state policymakers are asking service providers to tighten their belts. In the short run, this approach helps to close the state's chronic budget gaps. However, *Stretched Thin 2008* demonstrates that this approach has long-term consequences for the quality and quantity of the services provided.

CSAC/ 00212

# INTRODUCTION

In response to California's chronic budget deficits, the state's policymakers have reduced funding for public services and are considering additional cuts in 2008-09 to help close the state's estimated $15.2 billion budget gap. A number of funding cuts have targeted county-operated health and human services programs, which provide critical services to California's vulnerable children, families, and seniors.

Policymakers have not – by and large – eliminated services or tightened eligibility requirements in these programs.[1] Instead, the state has left counties in a bind, in essence asking them to do more with less. The state's failure to provide funding for increases in counties' basic operating costs – such as gasoline, rent, and employees' health coverage – adds up to a funding shortfall that now exceeds $1 billion per year when forgone federal funds are taken into account. Because the state's population and the cost of delivering services continue to rise, these reductions contribute to a funding squeeze on county-operated programs.

In some cases, counties have used local dollars to help make up for a portion of state funding reductions. Statewide, counties used $595 million of their own funds to partially "backfill" state funding cuts to county-operated human services programs between 2001-02 and 2006-07.[2] However, counties' ability to maintain this funding is eroding as local revenues, particularly property tax and sales tax collections, stagnate due to the turmoil in the housing market and the economic downturn.

The consequences of the funding squeeze are largely hidden from view, particularly in the context of state budget debates. *Stretched Thin 2008* examines what this funding squeeze means for vulnerable children, families, and seniors based on a 13-county survey developed by the CBP and the County Welfare Directors Association of California (CWDA).

## The CBP/CWDA Survey

In 2004, three years into the state's current budget crisis, the CBP published *Stretched Thin*, which analyzed the impact of funding cuts on county-operated health and human services programs based on a CBP/CWDA survey of 11 counties.[3] *Stretched Thin 2008* picks up the story where the original *Stretched Thin* left off, analyzing the impact of additional funding cuts made between 2004-05 and 2007-08 – cuts that targeted all major county-operated programs except the Medi-Cal Program. *Stretched Thin 2008* is based on a CBP/CWDA survey of 13 counties – including the 11 counties surveyed in 2003-04 – conducted in late 2007 and early 2008. The survey examined eight health and human services programs that counties operate under state guidelines:

- the Adoptions Program;
- the Adult Protective Services Program;
- the California Work Opportunity and Responsibility to Kids (CalWORKs) Program;
- the Child Welfare Services Program;
- the Food Stamp Program;
- the Foster Care Program;
- the In-Home Supportive Services (IHSS) Program; and
- the Medi-Cal Program.

9

CSAC/ 00213

Counties' responsibility for these programs ranges from evaluating people's eligibility for food stamps and recruiting adoptive families to responding to allegations of child and elder abuse (Appendix A).

The survey included the 11 counties originally surveyed in 2003-04 — Alameda, Butte, Contra Costa, Los Angeles, Orange, Riverside, Sacramento, San Bernardino, Santa Cruz, Sonoma, and Tehama — along with two additional counties — Fresno and Santa Clara. These 13 counties represent a mix of urban, suburban, and rural settings and account for a combined two-thirds (66.9 percent) of the state's population and more than half of the caseload in each of the programs included in the analysis (Figure 1).² The extent to which caseloads have increased or declined varies across counties, sometimes substantially. For example, the number of seniors who receive services through the Adult Protective Services Program more than doubled in Contra Costa County between July 2004 and July 2007 (130.7 percent), but decreased by nearly half (45.3 percent) in Butte County during the same period (Table 1). Despite some significant variations, however, caseloads generally increased in the Adult Protective Services, Food Stamp, Foster Care, IHSS, and Medi-Cal programs, and generally decreased in the CalWORKs and Child Welfare Services programs.



Figure 1: Program Caseloads in Surveyed Counties Make Up More Than Half of Statewide Caseloads

Note: Complete and current county-level data for licensed public adoption agencies are not available for the Adoptions Program.
Source: Department of Health Care Services, Department of Social Services, and UC Berkeley Center for Social Services Research

CSAC/ 00214

| Table 1: Caseload Change Between July 2004 and July 2007 by County and Program | | | | | | |
|---|---|---|---|---|---|---|
| | Adult Protective Services Program | CalWORKs Program | Child Welfare Services Program | Food Stamp Program | Foster Care Program | In-Home Supportive Services Program | Medi-Cal Program |
| California | 9.1% | 8.9% | 5.5% | 9.6% | -4.3% | 19.2% | 0.6% |
| Alameda | 49.7% | 0.6% | -23.9% | 25.5% | -22.2% | 19.1% | 1.3% |
| Butte | 45.3% | 12.0% | -3.7% | 18.4% | 16.9% | 13.0% | -1.4% |
| Contra Costa | 130.7% | 5.5% | -15.5% | 31.8% | -20.8% | 12.3% | 9.3% |
| Fresno | 9.5% | 12.5% | -17.6% | 24.1% | -12.3% | 4.7% | 6.1% |
| Los Angeles | 8.0% | -16.1% | -11.4% | -2.2% | -11.9% | 16.3% | -4.3% |
| Orange | 20.5% | 13.6% | -5.6% | 3.0% | 6.8% | 26.7% | -0.1% |
| Riverside | -7.8% | -1.0% | 20.6% | 19.9% | 30.6% | 42.5% | 10.0% |
| Sacramento | 13.9% | 0.0% | 6.0% | 21.1% | 5.0% | 28.2% | 2.9% |
| San Bernardino | 2.3% | -8.8% | -13.9% | 5.9% | -5.5% | 19.1% | 2.1% |
| Santa Clara | 8.6% | -3.1% | -4.6% | 14.5% | 0.3% | 47.9% | 1.7% |
| Santa Cruz | 116.1% | 9.6% | 18.5% | 36.8% | 15.3% | 20.0% | 12.4% |
| Sonoma | 31.3% | 2.2% | 12.4% | 20.6% | 10.2% | 32.2% | 7.5% |
| Tehama | 3.6% | -3.5% | -2.9% | 15.2% | 48.4% | -1.2% | 5.8% |

Note: Complete and current county-level data for licensed public adoption agencies are not available for the Adoptions Program.

Source: Department of Health Care Services, Department of Social Services, and UC Berkeley Center for Social Services Research

# COUNTIES CONTINUE TO FACE A FUNDING SQUEEZE

The state's chronic budget gaps continue to take a toll on county-operated programs, particularly human services programs, which have been deeply affected by state funding cuts in recent years. The state has not provided funding to cover counties' rising operating costs for most programs since 2000-01. In addition, the state has directly cut funding for county-operated programs and could make additional reductions in 2008-09.

## The State Has Not Provided Funding To Cover Counties' Rising Operating Costs for Most Programs Since 2000-01

Inflation affects counties in the same way that it affects families — by eroding the purchasing power of their incomes. Prices that counties pay for fuel, utilities, employee health coverage, and other basic operating costs generally rise each year. Operating-cost increases reported by counties for health and human services programs included in the 2007-08 survey often were significant.[5] For example:

> *Inflation affects counties in the same way that it affects families — by eroding the purchasing power of their incomes.*

- In Butte County, worker's compensation costs increased by 21.1 percent and health insurance costs by 19.8 percent between 2004-05 and 2006-07.

- In Contra Costa County, retiree health insurance costs rose by 22.1 percent between 2003-04 and 2006-07.

10

CSAC/ 00215

- In Los Angeles County, retiree health insurance costs rose by 52 percent over a three-year period.

- In Orange County, property and casualty insurance costs increased by 82.4 percent and utility costs by 55.3 percent between 2004-05 and 2007-08.

- In Tehama County, fuel costs jumped by 56.6 percent, health insurance costs by 32.8 percent, and workers compensation costs by 21.9 percent between 2004-05 and 2006-07.

Despite these escalating costs, the state has not provided counties with funding to cover actual operating costs for most human services programs since 2000-01.[5] In contrast, the state has provided funding for counties' operating-cost increases in the Medi-Cal Program each year since 2003-04. These adjustments — when provided — allow counties to pay for rising costs, while maintaining core services. While state funding for human services programs has been adjusted to reflect the number of Californians who receive services, these programs have lost ground to rising costs due to the state's failure to provide funding that reflects counties' actual cost of delivering services. In effect, the state has required counties to do more with less, which has undermined service delivery for children, families, and seniors.[7] In addition, this funding shortfall increases the likelihood that counties will fail to meet federal performance standards, putting the state and counties at risk of incurring substantial federal penalties.

Governor Schwarzenegger proposes to continue this policy by eliminating state funding for counties' operating-cost increases in human services programs in 2008-09. In addition, the Governor proposes to eliminate state funding for counties' operating-cost increases in the Medi-Cal Program for the first time since 2002-03. Under these proposals, counties would receive $1.1 billion ($691.5 million General Fund) *less* to operate these programs in 2008-09 than if state funding increases had been provided each year after 2000-01 (Table 2).

| Table 2: Funding for County Operating-Cost Increases Proposed for Elimination in 2008-09 (Dollars in Millions) | | |
|---|---|---|
| Program | State Funds | Total State and Federal Funds |
| Adoptions | $16.8 | $22.1 |
| Adult Protective Services | $16.5 | $20.9 |
| CalWORKs | $250.6 | $250.6 |
| Child Welfare Services | $250.5 | $516.0 |
| Food Stamps | $33.0 | $40.9 |
| Foster Care | $8.2 | $12.5 |
| In-Home Supportive Services | $32.6 | $78.2 |
| Medi-Cal | $32.3 | $64.6 |
| Total | $691.5 | $1,168.7 |

Source: County Welfare Directors Association of California, Department of Health Care Services, and Department of Social Services

11

CSAC/ 00216

## The State Has Directly Cut Funding for County-Operated Programs and Could Make Additional Cuts in 2008-09

In addition to generally failing to provide counties with funding for increased operating costs, the state has made a number of direct cuts to funding for county-operated human services programs in recent years. These cuts have hindered counties' ability to maintain adequate staffing levels and to effectively deliver services to eligible Californians. By 2007-08, the annual impact of program cuts made since 2000-01 totaled:

- $18.0 million ($10.4 million General Fund) in the Adoptions Program;[8]

- $16.7 million ($8.9 million General Fund) in the Adult Protective Services Program;

- $109.5 million for county operation of the CalWORKs Program;[9] and

- $65.6 million ($27.5 million General Fund) for county operation of the Food Stamp Program.[10]

The Governor has proposed additional funding cuts for a number of human services programs as well as the Medi-Cal Program in 2008-09.[11] For example, the Governor proposes to reduce funding by:

- $11.4 million ($6.1 million General Fund) in the Adult Protective Services Program, which translates into a loss of 75 social workers statewide;

- $129.6 million ($83.7 million General Fund) in the Child Welfare Services Program, which would cut approximately 1,000 social workers statewide;

- $34.9 million ($14.4 million General Fund) for county operation of the Food Stamp Program, which is equivalent to approximately 250 eligibility workers statewide;

- $15.4 million ($7.7 million General Fund) for county operation of the IHSS Program; which translates into a loss of 91 social workers statewide; and

- $87.9 million ($43.9 million General Fund) for county operation of the Medi-Cal Program, which would cut more than 650 eligibility workers statewide.

## COUNTIES HAVE TIGHTENED THEIR BELTS IN RESPONSE TO STATE FUNDING CUTS

Rising costs, combined with reductions in state funding, have put mounting pressure on county budgets. In response, counties have tightened their belts by reducing spending on basic operating costs and contracts with community-based organizations. Moreover, staff positions have been eliminated and left vacant, even as programs remain understaffed.

CSAC/ 00217

## Counties Have Reduced Spending on Basic Operating Costs

Counties have reduced spending on basic operating costs, including overtime, staff training, and information technology support.[12] Surveyed counties reported that they reduced spending on basic operating costs by a total of more than $100 million between 2004-05 and 2007-08.[13] For example:

- In Alameda County, overtime costs were reduced by 50 percent and retirement costs by 11 percent in 2006-07.

- In Butte County, funding for staff training was "nearly eliminated" with a 99.2 percent cut in 2004-05.

- In Los Angeles County, computer supply purchases were reduced by 29 percent and information technology support was cut by 35 percent in 2005-06.

- In Orange County, funding for equipment maintenance was cut by 72.1 percent and overtime costs were reduced by 28.6 percent in 2006-07.

- In Riverside County, funding for travel was cut by 14.1 percent and telephone service costs were reduced by 10.0 percent in 2005-06.

## Counties Have Reduced Spending on Contracts With Community-Based Organizations

Many counties depend on community partners to provide services that address clients' multiple needs and extend the reach of state programs that assist vulnerable children, families, and adults. Due to state funding cuts, counties have reduced spending on contracts with community-based organizations, including those that provide services to families in the Child Welfare Services system.[14] Surveyed counties reported that they reduced spending on contracts with community partners by a total of more than $37 million between 2004-05 and 2007-08. For example:

- Butte County reduced or eliminated a number of services provided through the Child Welfare Services Program, including parenting classes and counseling, domestic violence, substance abuse, and psychological evaluation services.

- Los Angeles County eliminated an after-school program and a youth jobs program for children of CalWORKs participants.

- San Bernardino County reduced substance abuse treatment services provided through the Child Welfare Services Program.

- Santa Clara County reduced or eliminated several CalWORKs-related services, including domestic violence counseling, after-school services, rental assistance, and a matching program to encourage CalWORKs families to save. The county noted that, "Many partners have to do more with less."

- Sonoma County reduced or eliminated a number of CalWORKs-related services, including a program to help CalWORKs participants maintain employment and move up the career ladder.

13

CSAC/ 00218

- Tehama County cut funding for substance abuse treatment for high-risk youth as well as for preventive services designed to reduce the number of families who enter the child welfare system.

## Staff Positions Have Been Eliminated and Left Vacant, Even as Programs Remain Understaffed

In each of the seven human services programs included in the survey, at least one county – and generally several more – eliminated positions and/or left positions vacant between 2004-05 and 2007-08.[15] During 2006-07, for example, Los Angeles County left 40 positions vacant in the IHSS Program and Orange County left 48 positions vacant in the Child Welfare Services Program.[16]

At the same time, counties reported that human services programs lack sufficient staff to meet workload demands. On average, counties reported they would need to increase the number of staff in the Child Welfare Services Program by 43.6 percent to meet workload demands (Table 3).[17] Inadequate staffing levels also are prevalent in the Adoptions, Adult Protective Services, Food Stamp, and Foster Care programs. Fresno County, for example, indicated that its Food Stamp Program has experienced "stagnant staffing levels" even as the number of food stamp recipients has increased. "Staff may not have been reduced, but workload increases have not been addressed" due to the state's failure to provide counties with adequate funding. Workload increases, in turn, have "a direct impact on [the] county's ability to maintain error rates below federal standards and provide adequate services to clients. ..." Furthermore, San Bernardino County noted that when positions are left vacant in its Child Welfare Services Program, "the caseload still exists and must be spread to other social workers, exacerbating the difficulty" of providing services to children at risk of abuse or neglect. "This has produced a pattern of hiring, overloading, burnout, and staff leaving the department."

| Table 3: Counties Lack Sufficient Staff To Meet Workload Demands in Human Services Programs | | |
|---|---|---|
| Program | Average Percentage Increase in Staff Needed To Meet Workload Demands in 2007-08* | Number of Counties Reporting |
| Adoptions** | 54.9% | 6 |
| Adult Protective Services | 24.7% | 11 |
| CalWORKs | 12.9% | 10 |
| Child Welfare Services | 43.6% | 9 |
| Food Stamp | 24.2% | 10 |
| Foster Care | 35.4% | 9 |
| In-Home Supportive Services | 13.9% | 11 |

\* Reflects weighted average of counties that responded for each program.
\*\* Ten of the 13 surveyed counties operate the Adoptions Program.

14

CSAC/ 00219

# Has Increased State Funding for CalWORKs and Medi-Cal Allowed Counties To Increase Program Staffing Levels?

In recent years, the state has increased funding that supports the CalWORKs and Medi-Cal programs. Counties received an additional $90 million in 2006-07 and the same amount again in 2007-08 to reflect increased workload and requirements associated with federal reauthorization of the Temporary Assistance for Needy Families (TANF) block grant in 2006. This funding was intended to help counties implement strategies to increase the number of CalWORKs participants meeting federal work participation requirements. In addition, the state provided counties with funding for operating-cost increases in the Medi-Cal Program between 2003-04 and 2007-08. What impact did these funding increases have on counties' ability to adequately staff the CalWORKs and Medi-Cal programs?

## Additional State CalWORKs Funding: Mixed Results

The survey asked counties whether the additional state funding for the CalWORKs Program affected staffing levels.[16] Five counties – Butte, Orange, Riverside, Sacramento, and Santa Cruz – reported that they were not able to increase staffing despite the additional state funding. Three of these counties identified the cost of supporting current staff as an obstacle to adding new staff.[17] For example:

- Butte County stated that staffing could not be increased due to the cost of retroactively increasing salaries as recommended by a compensation study.
- Santa Cruz County was unable to add any positions despite the additional state funding due to "increases in the cost of doing business."

In contrast, six counties – Alameda, Contra Costa, Fresno, Los Angeles, San Bernardino, and Sonoma – were able to increase CalWORKs staffing. However, Fresno County called the increased state funding "minimal" due to "overall cost increases" and the fact that the new funding was effectively offset by prior state funding cuts in the CalWORKs Program. In addition, Sonoma County expressed doubts whether the new CalWORKs funding would be available from one year to the next, stating that it "must be considered one-time-only funding because there is no commitment to continue the funding in future years. If this funding ends and no cost-of-doing-business increases are received there is the likelihood that these additional positions (and others) might be cut." In summary, these results suggest that the additional CalWORKs funding could not be used to its fullest potential, as counties continued to struggle to meet their basic operating costs following years of inadequate state funding.

## State Funding To Cover Operating Expenses in the Medi-Cal Program: Positive Results

The survey asked counties whether receiving annual state funding for increased Medi-Cal operating costs since 2003-04 had affected their ability to meet performance standards and other program goals.[18] Counties generally reported positive results. For example:

- Butte County reported that annual funding increases in the Medi-Cal Program have allowed the county to maintain "consistent staffing levels," which have allowed the county to "minimally meet" state-mandated performance standards. However, no additional "enhancements, innovation or outreach efforts are possible to further improve program goals or outcomes" given funding limitations.
- Los Angeles County stated that, "funding increases have assisted us in meeting our performance standards," although "we have been unable to initiate any outreach and retention activities."
- Riverside County noted that increased state funding has "allowed us to hire additional casework staff, enabling us to move closer to our target staffing level (though still short of our needed goals)."
- San Bernardino County reported that state funding increases have allowed the county to hire additional staff to review Medi-Cal cases "to ensure correct eligibility determinations/benefits" as well as the timely processing of renewals.

These responses suggest that annual state funding increases for counties' operating costs are critical to counties' ability to deliver services effectively and meet program performance goals.

CSAC/ 00220

# THE FUNDING SQUEEZE HAS UNDERMINED PROGRAMS FOR VULNERABLE CHILDREN, FAMILIES, AND SENIORS

Counties have tightened their belts to mitigate the impact of state funding cuts on vulnerable children, families, and seniors. Despite these efforts, county-operated programs have been compromised due to the state's failure to provide adequate funding, according to surveyed counties.[17] State funding cuts have not – by and large – resulted in the complete elimination of services that counties provide to children, families, and seniors. However, by failing to fully fund the cost of these programs, state policymakers have reduced counties' ability to deliver high-quality services and have effectively compelled counties to reduce the scope and breadth of services provided. The surveys revealed that:

- **Counties' ability to provide effective services has diminished.** The funding squeeze has diminished counties' ability to provide services effectively and, in many cases, has resulted in service reductions.

- **Counties are missing opportunities for prevention and case management.** The funding squeeze has left many counties unable to provide adequate preventive services and case management, such as investigating reports of abuse or neglect of children, seniors, and dependent adults. Consequently, vulnerable children and adults are more likely to cycle repeatedly through the Adult Protective Services and Child Welfare Services programs.

- **Counties have difficulty meeting state and federal program requirements.** Many counties reported difficulties meeting state and federal program requirements – an unintended consequence associated with inadequate funding and staffing.

- **Counties are unable to maintain adequate community outreach and education efforts.** Counties reported that community outreach and education are inadequate or lacking altogether in several programs, ultimately reducing access to services for eligible individuals and families.

- **Counties commonly experience adverse impacts on other programs and services.** The funding squeeze has led to adverse impacts on other programs and services as costs have been shifted.

## Counties' Ability to Provide Effective Services Has Diminished

The funding squeeze has diminished counties' ability to provide services effectively and, in many cases, has resulted in service reductions.

### Adoptions Program

The Adoptions Program provides adoption placement services to children who would otherwise remain in long-term foster care. Counties report that their ability to process adoptions promptly and to recruit families for hard-to-place children has been weakened in recent years due to the funding squeeze. For example:

CSAC/ 00221

- Orange County stated that inadequate funding has affected "the ability of the program to recruit and prepare families for adoption of hard-to-place children. Older children and children with complex needs are most affected and must wait longer" for permanent homes.

- San Bernardino County reported that it has "inadequate staff to conduct outreach and follow-up with families who will adopt sibling groups and children of color..." In addition, the county is "no longer able" to fund efforts to focus on adoptions in cases where guardianship, typically with a relative, has already been established.

- Santa Cruz County identified the need to improve recruitment activities to secure placements for "older youth, siblings, [and] children with special needs."

## CalWORKs Program

The CalWORKs Program was implemented starting in 1998, as California's response to federal welfare reform. CalWORKs established a 60-month time limit on the receipt of cash assistance by adults, although not children, and devolved much of the responsibility for program design and implementation to California's 58 counties. The CalWORKs Program shifted the state's focus from income support to moving individuals into the workforce. However, inadequate state funding has resulted in increased wait times for families seeking cash assistance and fewer welfare-to-work services. For example:

- Alameda County noted that, "More often than not, clients' benefits are delayed due to [county] workers' competing priorities." In addition, inadequate staffing levels have had the "net effect of removing the human interface that is vital in creating opportunities for engagement in welfare-to-work activities that may ultimately lead to employment."

- Sacramento County stated that the "Wheels to Work" program, which provides cars to help CalWORKs participants maintain employment, has adequate funding for just 12 vehicles, compared to 30 vehicles when the program started.

- San Bernardino County reported that families are waiting longer to find out whether they are eligible for CalWORKs and that vocational training placements have been reduced.

- Santa Clara County stated that CalWORKs participants have fewer vocational training choices and are receiving fewer counseling, mentoring, and other services that are not linked to core welfare-to-work activities.

- Sonoma County indicated that: "Applicants and participants sometimes have gaps in their work activities because we do not have adequate staff and/or tools to identify them or respond to their immediate needs. Waiting times for supportive services are also impacted by this problem."

## Food Stamp Program

The Food Stamp Program provides monthly benefits that help low-income households purchase the food they need to maintain adequate nutritional levels. The federal government pays the full cost of food stamp benefits for all eligible households, and the federal, state, and county governments share the cost of

17

CSAC/ 00222

operating the Food Stamp Program. Counties reported that the funding squeeze has contributed to delays in processing food stamp applications. For example:

- Contra Costa County reported delays in processing food stamp paperwork – which in turn delays families' receipt of benefits – "due to the extra volume associated with fewer workers."

- Fresno County reported that families have been affected "by longer wait times and full lobbies [and] difficulties in reaching their case workers to ask questions..."

- San Bernardino County indicated that families are waiting longer to find out whether they are eligible for food stamps.

## Foster Care Program

The Foster Care Program provides grants for the more than 80,000 California children who live with a foster care provider. Counties reported that recruitment and retention of foster parents has been impeded in recent years, as have timely and accurate payments to providers. For example:

- Fresno and San Bernardino counties reported an increased likelihood of issuing incorrect foster care payments.

- Orange County stated that it "continues to struggle with having the necessary funding needed in order to recruit and retain foster parents."

- Riverside County indicated that payment delays are common due to "low staffing levels and high caseloads" and that such delays "can impact the quality of life of a foster child."

> *San Bernardino County reported that, "staff have less time to support foster parents and families on their caseload," and that the number of children placed with relatives has declined due to inadequate staffing.*

- San Bernardino County reported that, "staff have less time to support foster parents and families on their caseload," and that the number of children placed with relatives has declined due to inadequate staffing.

- Sonoma County indicated that payments to foster care providers can be delayed up to 60 days due to increased workloads.

## IHSS Program

The IHSS Program provides services that enable low-income blind, disabled, or elderly individuals to remain safely in their own homes as an alternative to out-of-home care. Services provided include assistance with meal preparation, laundry, shopping, bathing, and transportation to medical appointments. Services are provided by workers hired directly by the client in nearly all cases.[73] The IHSS Program has experienced rapidly rising caseloads – increasing by 19.2 percent between July 2004 and July 2007 – due to an aging population and in increase in the number of individuals with severe disabilities who are able to remain in their homes with assistance. Counties reported that the funding squeeze has translated into longer waiting

CSAC/ 00223

periods for enrollment in the program, delays in initiating IHSS services, and limited contact between county social workers and IHSS clients – all of which can lead to individuals being placed in more expensive care settings. For example:

- Fresno County reported that, "Due to staffing shortages and additional program requirements, the time needed to process an application has increased, causing delays in services to clients and a reduction in the number of hours spent in the field to properly assess" clients' needs. Service delays "can result in the loss of the [IHSS] provider or the need for clients to be placed in nursing homes until services can be obtained."

- Los Angeles County stated that IHSS workers "are unable to perform the 'social work' aspect" of their jobs because the focus "is on processing the cases."

- Orange County noted that delays in processing provider changes and payments can lead to a client "losing a potential provider. Without consistent caregivers, some clients are at risk for acute episodes requiring hospitalization or long-term placement."

- San Bernardino County reported "limited contact" between social workers and IHSS clients – in most cases just once per year – because the number of social workers has not kept up with the rising IHSS caseload.

- Santa Clara County reported that IHSS clients sometimes are placed on "waiting lists for services to which they are legally entitled."

## Counties Are Missing Opportunities for Prevention and Case Management

The funding squeeze has left several counties unable to provide adequate preventive services and case management, such as investigating reports of abuse or neglect of children, seniors, and dependent adults. Consequently, vulnerable children and adults are more likely to cycle repeatedly through the Adult Protective Services and Child Welfare Services programs.

### Adult Protective Services Program

The Adult Protective Services Program assists elderly and dependent adults who are functionally impaired, unable to meet their own needs, or who are victims of abuse, neglect, or exploitation.[24] Counties reported they are missing opportunities for prevention and case management due to the funding squeeze, increasing the likelihood that vulnerable seniors and dependent adults will cycle repeatedly through the program.[25] For example:

- Butte County indicated that staff shortages may result in cases being closed sooner than is optimal, and that this circumstance often results in repeat referrals of seniors who are at risk of abuse or neglect.

- Fresno County stated that due to inadequate state funding: "[The] total amount of time spent with a client has decreased. Staff has had to determine within minutes … how to handle a case. Increased staffing levels would … allow for more detailed investigations and referrals."

> Butte County indicated that staff shortages may result in cases being closed sooner than is optimal.

CSAC/ 00224

# How Have Ongoing State Funding Cuts Affected Service Delivery in the 11 Counties That Participated in the 2003-04 Survey?

The 11 counties that participated in the 2003-04 survey were asked whether their ability to provide health and human services in subsequent years had increased, decreased, or stayed the same by 2007-08.[24] Counties reported that their ability to provide services generally decreased or stayed the same. For example:

- In two programs -- CalWORKs and IHSS -- the majority of counties reported a *decreased* ability to provide services since 2003-04. In addition, one-half of counties reported a decreased ability to provide services in the Adult Protective Services and Foster Care programs.

- A majority of counties reported that their ability to provide services had *stayed the same* since 2003-04 in the Adoptions and Medi-Cal programs, the latter of which received state funding for increased county operating costs between 2003-04 and 2007-08.

| Counties' Ability To Provide Services Generally Has Decreased or Stayed the Same Since 2003-04 | | | |
|---|---|---|---|
| | Ability to Provide Services Since 2003-04: | | |
| Program | Decreased | Stayed the Same | Increased |
| Adoptions | 0 | 5 | 2 |
| Adult Protective Services | 5 | 4 | 1 |
| CalWORKs | 8 | 1 | 2 |
| Child Welfare Services | 4 | 2 | 4 |
| Food Stamp | 5 | 5 | 1 |
| Foster Care | 5 | 2 | 3 |
| In-Home Supportive Services | 8 | 2 | 1 |
| Medi-Cal | 2 | 7 | 1 |

Note: The 11 counties that participated in both the 2003-04 and 2007-08 CBP/CWDA surveys were asked how their ability to provide services had changed for each program; however, not every county responded completely. Eight of the 11 counties operate the Adoptions Program.

- For each program, a minority of counties reported an *increased* ability to provide services since 2003-04. However, several of these counties noted that they continue to face difficulties in delivering services despite recent improvements, or that their recent gains are attributable to an infusion of local funds. For example:

  o Alameda County stated that funding for CalWORKs "is still far from that needed to bring caseloads down to manageable levels and to successfully engage and assist clients in becoming self-sufficient."

  o Alameda County also reported that, "Staffing and resource increases [in the Child Welfare Services Program] are primarily due to increased county contribution[s] and external foundation grant funds. ... These small increases do not compensate for the state's failure to meet its basic funding obligations."

  o Santa Cruz County noted that its increased capacity to deliver services in the IHSS Program occurred due to "committing local funds," including using county funds to overmatch funding provided by the state. Despite the increase in the county's ability to provide services, "Caseworker morale has dipped ... due to the need to focus so closely on processing [paperwork] at the expense of other social work services."

  o Sonoma County indicated that, "Even though our ability to provide [CalWORKs] services has increased ... we are still not able to meet the client needs, and the increased services and data workload requirements, especially with no cost-of-doing-business increases."

20

CSAC/ 00225

- Los Angeles County reported diminished "ability to provide case management for high-risk cases," as well as less time to focus on prevention.

- Riverside County noted that recidivism increases when services focus only on short-term crisis intervention: "Since we're unable to do long-term case management, the immediate problem may be solved, but longer-term risk issues can't be dealt with."

- San Bernardino County stated that the number of Adult Protective Services referrals has "increased disproportionately" to the number of social workers: "As a result, APS workers cannot spend as much time with each client as in the past."

- Santa Cruz County noted that inadequate staffing reduces the amount of case management provided, which likely "has an impact on the recidivism rate."

- Sonoma County reported that, "Continued financial constraints mean that APS is able to provide only the essential protections to clients and not able to provide the level of follow-up and case management services that often ensure the client's protection."

## Child Welfare Services Program

The Child Welfare Services Program provides services to abused and neglected children, children in foster care, and their families. Social workers assess families' capacity to care for their own children, help reunite children with their families when it is safe and in the child's best interest to do so, and – when it is not safe – works to find stable families to care for children. However, counties reported that opportunities for prevention and case management are being missed in the Child Welfare Services Program, which increases the risk to vulnerable children.[21] For example:

- Riverside County reported that, "The undersized workforce is unable to progress beyond crisis management, instead moving from one emergency to another" as other critical services are "shunted to second priority due to crushing workloads and the need to provide safety first." The "hidden cost" of this disproportionate focus on crisis management includes "underperforming reunification rates, high re-entry rates, increased time to adoption, [and] poor performance upon emancipation" from the child welfare system.

> *Sonoma County noted that, "By providing less outreach and community education, child protective services becomes a last resort, instead of an early resource that contributes to the prevention of removing children from their families."*

- Santa Cruz County stated that, "Because staffing is below the optimal level needed, we are unable to implement best practice service enhancements, and we cannot provide the intensive level of service that CWS families need in order to fully resolve their issues and avoid recidivism in the CWS system."

- Sonoma County noted that, "By providing less outreach and community education, child protective services becomes a last resort, instead of an early resource that contributes to the prevention of removing children from their families." This county added that, "Large caseloads and unfunded

21

CSAC/ 00226

mandates continue to overload social workers and thereby limit their time spent doing social work to reunify families and find ... solutions for youth who cannot be unified."

- Tehama County reported that, "After providing basic services and [paying] administrative costs, there [are] no other funds to implement programs that will help us to better meet the performance outcomes" for Child Welfare Services.

## Counties Have Difficulty Meeting State and Federal Program Requirements

Many counties reported difficulties meeting state and federal program requirements — an unintended consequence associated with inadequate funding and staffing. One county, for example, reported that services provided through the Adult Protective Services Program "are being rationed" due to an inadequate number of staff relative to demand. On average, according to this county, "we open only about [one-third] of monthly reports that have been determined to be within APS jurisdiction, which is clearly out of compliance with state regulations." In addition:

- Four counties reported that inadequate funding and staffing levels have led to increased errors in the Food Stamp Program

  - One county, for example, reported that some households have been denied food stamps erroneously due to "increased caseload sizes" and the use of less experienced eligibility staff due to the program's high staff turnover.

  - Another county stated that, "quantity is overshadowing quality" as food stamp applications increase. Inadequate staffing levels mean that applications are processed "beyond the required time period with delayed or incorrect eligibility determinations."

- One county noted that annual renewal visits in the IHSS Program are "not being completed in a timely manner" for more than one-fifth of IHSS clients. "Clients that are not seen annually run the risk of not having an adequate amount of hours authorized and are at risk for out-of-home placement."

- Santa Cruz County reported that, "given the financial constraints, it is extremely challenging to effectively comply with all [IHSS] time frames, satisfy quality assurance expectations, and serve clients effectively and efficiently."

- Tehama County stated that social workers in the Adult Protective Services Program "may not be able to meet mandated response times ... but are only able to provide triage services or complete the initial investigation. Other follow-up and case management services must be squeezed in as time allows and may not be as timely or thorough as needed."

## Counties Are Unable To Maintain Adequate Community Outreach and Education Efforts

Counties reported that community outreach and education are inadequate or lacking altogether in several programs, ultimately reducing access to services for eligible individuals and families.

CSAC/ 00227

## Adult Protective Services Program

Counties lack sufficient staff in the Adult Protective Services Program to undertake outreach and education that could help to identify more quickly seniors who are at risk of abuse or neglect. For example:

- Alameda County stated that Adult Protective Services "has no assigned professional support staff to design, plan, and provide community education."

- Los Angeles County reported that, "Outreach and educational efforts are compromised; therefore, abused elders and dependant adults and the general public may not be educated [about] the problem," which reduces the number of individuals who receive protection.

- Orange County indicated that, "APS staff are not available to other community programs to consult and provide their expertise" on dealing with seniors and dependent adults who are risk of abuse.

- Sonoma County noted that it has curtailed community outreach campaigns, including one focused on financial abuse of elders, "due to limited staff time."

- Tehama County reported that Adult Protective Services staff "do not have time to provide much-needed education and awareness presentations on elder abuse to the community."

## Food Stamp Program

Outreach activities could help to enroll many of the nearly 2 million eligible Californians who do not receive food stamps, which are funded entirely by the federal government.[74] However, counties lack sufficient funding to do extensive outreach. In some cases, food banks and other nonprofit organizations attempt to fill in the gap with their own outreach efforts, but these groups also face significant funding limitations.[75] For example:

- Butte County stated that outreach is limited to public service announcements on television "provided at no cost through the local college."

- Los Angeles County indicated that: "We have not been able to do the level of [outreach] needed given the size of the eligible population not currently enrolled in Food Stamps. The lack of cost-of-doing-business [increases] in Food Stamps administration over the last several years has meant that even our current level of outreach may not be sustainable in the future."

- Sacramento County reported that numerous food stamp outreach activities have been postponed due to budgetary constraints.

- Santa Cruz County stated that, "Because of lack of [Food Stamp Program] outreach, the Second Harvest Food Bank has seen an increase in the number of clients that they serve."

- Sonoma County eliminated its "systematic outreach program" in order to "focus on program integrity."

CSAC/ 00228

## Medi-Cal Program

Medi-Cal is California's Medicaid Program. This federal-state program provides health coverage for 6.6 million low-income individuals – including children, parents, seniors, and persons with disabilities – who receive public assistance or meet income and other eligibility criteria. A 2005 statewide survey found that 436,000 Californians under age 65 were eligible for Medi-Cal, but not enrolled.[20] Despite receiving state funding for Medi-Cal operating-cost increases since 2003-04, many counties lack sufficient staff to undertake outreach activities that could help to enroll uninsured Californians who are eligible for Medi-Cal coverage. For example:

- Alameda County reported that, "Without additional staff, we are not able to develop additional outreach sites in the community."

- Los Angeles County reported that, "We have received numerous requests to place staff in additional sites, but are unable to do so due to lack of staffing. … The reduced availability of out-stationed staff at unconventional sites, such as churches and schools, reduces the opportunity to provide health care coverage to the uninsured."

- Riverside County noted that, "Lack of adequate staff has caused us to limit outreach with hospitals, clinics," and community-based organizations.

- Sonoma County reported that: "The loss of out-stationing [of county Medi-Cal staff] has reduced quality of service to clients in outlying areas of the county, especially minor consent applicants who are required by regulation to apply face-to-face. This difficulty of traveling to a central office can reduce access [for] this vulnerable population."

# Counties Commonly Experience Adverse Impacts on Other Programs and Services

The funding squeeze has led to adverse impacts on other programs and services as costs have been shifted.

## Adult Protective Services Program

Inadequate funding for the Adult Protective Services Program has increased the burden on other agencies, including law enforcement and fire departments. For example:

- Alameda County reported that, "Unaddressed and unresolved protection issues can cause dependence on and overuse of emergency services such as 911 response and hospital emergency rooms, driving up police, fire, paramedic, and medical costs."

- Orange County stated that, "When APS services are limited, the burden to intervene in dangerous situations falls on other agencies," including law enforcement and mental health providers.

> Alameda County reported that, "Unaddressed and unresolved protection issues can cause dependence on and overuse of emergency services such as 911 response and hospital emergency rooms."

CSAC/ 00229

- San Bernardino County indicated that, "Cases are handed off to law enforcement earlier because APS workers do not have the time available to do ongoing investigations."

- Tehama County noted that because social workers in the Adult Protective Services Program "do not have time to do preventative services and 'check up' on at-risk individuals, they are not able to assist these individuals before their situation becomes critical." Consequently, "local law enforcement, fire departments, and first responders ... are responding to more 911 calls from clients in crisis."

In addition, funding shortfalls in Adult Protective Services and IHSS have resulted in cost shifting between the two programs, which both serve the frail elderly and people with disabilities. For example:

- Riverside County reported that when IHSS services are not "quickly available and/or IHSS case management consists of a yearly visit," many IHSS clients "worsen and can overburden" the Adult Protective Services Program.

- Santa Cruz County noted that, "There is increased expectation of APS to intervene with IHSS cases since IHSS caseworkers have less time to work with clients and families [in] problem situations or to conduct initial inquiries regarding reports of alleged neglect or abuse by IHSS care providers."

- Sonoma County indicated that when the needs of IHSS clients are not met in a timely manner, those who are "at risk of neglect or abuse are often referred to Adult Protective Services in the interim."

Child Welfare Services Program

Funding shortfalls in the Child Welfare Services Program can inadvertently increase the costs of other agencies as well. For example:

- Riverside County reported that lack of adequate staffing makes it difficult to intervene early in many situations. "Consequently, problems are allowed to fester and magnify. This results in increased needs for mental health interventions, group home placements, individualized education plans, [and] problem situations or as well as] increased runaways, increased placement meetings, and increased law enforcement interventions. Thus, the mental health system, the education system, law enforcement, and [community-based organizations] are all impacted by the increased workload." Moreover, because Child Welfare Services staff are "spread too thin," local law enforcement agencies and emergency rooms "must tie up their resources waiting for [CWS] staff to become available to take custody of a child when necessary."

> *Riverside County reported that, "Problems are allowed to fester and magnify. This results in increased needs for mental health interventions, group home placements, individualized education plans, [and] psychiatric hospitalizations."*

CSAC/ 00230

# CONCLUSION

California's budget crisis presents policymakers with a difficult dilemma: how to balance the budget, while at the same time protecting vital services. *Stretched Thin 2008* has examined the consequences of resolving that dilemma by continuing to ask public programs to do even more with less.

State funding cuts have not – by and large – resulted in the complete elimination of services that counties provide to children, families, and seniors. However, by failing to fully fund the cost of these programs, state policymakers have undercut counties' ability to deliver high-quality services and have effectively compelled counties to reduce scope and breadth of services provided. The 13 counties participating in the 2007-08 CBP/CWDA survey together represent more than half of the caseload in each of the eight programs examined. The survey results were remarkably similar across programs and counties, and suggest that policymakers cannot expect counties to continue to stretch dwindling resources indefinitely. Clearly, county-operated programs that serve hundreds of thousands of California's most vulnerable residents are being compromised by the funding squeeze.

The dilemma is not confined to the programs discussed in this report. Across the board – and year after year – state policymakers are asking service providers to tighten their belts. In the short run, this approach helps to close the state's chronic budget gaps. However, *Stretched Thin 2008* demonstrates that this approach has long-term consequences for the quality and quantity of the services provided.

CSAC/ 00231

| Appendix A: County-Operated Health and Human Services Programs Included in the CBP/CWDA Survey | | |
|---|---|---|
| Program | Purpose | County Responsibility |
| Adoptions | Public adoption agencies provide placement services to children who would otherwise remain in long-term foster care. Twenty-eight California counties have licensed public adoption agencies, including 10 of the 13 counties surveyed for this report. | Counties with licensed public adoption agencies recruit and conduct evaluations of prospective adoptive families and make recommendations to the court regarding adoptive placements. |
| Adult Protective Services | Program assists elderly and dependant adults who are functionally impaired, unable to meet their own needs, or who are victims of abuse, neglect, or exploitation. The state implemented statewide standards for Adult Protective Services in 1999. | Counties are required to respond to and investigate reports of physical abuse, financial abuse, neglect, abandonment, isolation, and abduction of elderly and dependant adults who do not reside in a long-term care facility. Counties must operate a 24-hour emergency response system and provide case management services, such as investigation, monitoring, and linkage to community services. In addition, counties provide emergency shelter care, in-home protection services, clothing, transportation, and other services to abused or neglected elder and dependant adults. |
| CalWORKs | Program provides time-limited cash assistance for eligible low-income families, while helping adult recipients find and retain jobs, enhance their skills, and overcome barriers to employment. CalWORKs was implemented in 1998 in response to the 1996 federal welfare reform law, which created the Temporary Assistance for Needy Families (TANF) block grant to replace the Aid to Families with Dependant Children (AFDC) program. | Counties determine initial and ongoing eligibility, issue cash assistance payments, provide case management services, develop welfare-to-work plans, and provide or arrange for the delivery of employment and supportive services, including mental health and substance abuse treatment and domestic violence services. |
| Child Welfare Services | Program provides services to abused and neglected children, children in foster care, and their families. | Counties respond to reports of abuse, neglect, or exploitation, conduct investigations, conduct needs and risk assessments, arrange for provision of services, recruit and approve foster family homes and homes in which relatives are the caregivers, recommend and arrange placements for children, and work with the judicial system and related service systems to determine children's needs and services. |
| Food Stamp | Program provides monthly assistance that helps low-income households purchase the food they need to maintain adequate nutritional levels. The federal government pays the full cost of food stamp benefits for all eligible households; the federal, state, and county governments share the cost of administering the program. | Counties determine initial and ongoing eligibility and issue food stamps. |
| Foster Care | Program provides grants for children living with a foster care provider under a court order or a voluntary agreement between the child's parents and a county welfare department. | Counties determine initial and ongoing eligibility for federal funding, issue monthly payments, and make decisions regarding the health and safety of children in the foster care system. |
| In-Home Supportive Services | Program provides services that enable low-income blind, disabled, or elderly individuals to remain safely in their own homes as an alternative to out-of-home care. Available services include assistance with meal preparation, laundry, shopping, errands, bathing, transportation to medical and service appointments, and/or paramedical services. | Counties determine initial and ongoing eligibility, assess individuals' service needs, authorize hours of service, and process providers' time sheets. Direct services are provided by workers hired by the client in nearly all cases. |
| Medi-Cal | Program is California's version of Medicaid, a federal-state program providing health coverage to uninsured low-income individuals. Medi-Cal provides health care coverage to children, parents, elderly and blind persons, and persons with disabilities who receive public assistance or meet income and other eligibility criteria. | Counties determine initial and ongoing eligibility for Medi-Cal. |

27

CSAC/ 00232

# ENDNOTES

[1] However, Governor Schwarzenegger has proposed reducing or eliminating services in a number of programs in 2008-09. For example, the Governor proposes to increase eligibility requirements in the Medi-Cal Program and to raise family premiums in the Healthy Families Program, both of which would reduce the number of low-income Californians enrolled in these programs.

[2] California State Association of Counties, *Human Services Funding Deficit: Counties Must Act To Secure Administrative Costs* (May 2008).

[3] See California Budget Project, *Stretched Thin: State Budget Cuts Threaten California's Health and Human Services Programs* (May 2004).

[4] Complete and current county-level data for licensed public adoption agencies are not available for the Adoptions Program.

[5] The survey asked the following: "Please provide a few brief examples of 'non-controllable' overhead costs (e.g., workers compensation, benefits, utility costs, and other cost-of-doing business items) that have increased significantly since FY 2004-05."

[6] The Adoptions and Child Welfare Services programs received state funding to reflect counties' increased operating costs in 2001-02. Funding to reflect increases in counties' general operating costs is generally referred to as a "cost-of-doing-business" increase.

[7] Surveyed counties' assessment of the impact of inadequate state funding on county-run health and human services programs is discussed in a subsequent section.

[8] The data in this bullet and the following three bullets come from *Annual Impact of Cuts to County-Administered Health and Human Services Programs Sustained Since June 2001* (County Welfare Directors Association of California; No date)

[9] This figure reflects cuts in 2002-03 and 2004-05, partially offset by a funding augmentation in 2006-07. In addition, this figure reflects combined federal Temporary Assistance for Needy Families (TANF) block grant and state maintenance of effort funding.

[10] This figure reflects cuts in 2002-03 and 2004-05, partially offset by a funding augmentation in 2006-07.

[11] Although the Legislature has rejected most of the Governor's proposed cuts to health and human services programs, these proposals ultimately could be included in the final 2008-09 budget package.

[12] The survey asked the following: "Please provide for fiscal years 2004-05 through 2007-08 examples of cases in which your county has reduced spending on 'controllable' overhead items (e.g., changed support staffing patterns, renegotiated rental contracts, reduced or eliminated travel) in order to offset higher costs in 'non-controllable' overhead (e.g., workers compensation, benefits, utility costs, other cost-of-doing business items) and to maintain or minimize reductions in caseworker staffing levels in your human services programs."

[13] Nine counties reported examples of decreased spending.

[14] For all programs, the survey asked the following: "For fiscal years 2004-05, 2005-06, 2006-07, and 2007-08, please indicate contracted services that were reduced or eliminated and the dollar amount of each reduction or elimination. Please include *only* those services reduced or eliminated due to lost cost-of-doing-business increases or other state budget cuts." In some cases, counties indicated that contracted services in the CalWORKs Program were eliminated due to the depletion of unspent "performance incentive" funds. Counties received those funds for moving CalWORKs participants from cash assistance into the workforce. The state stopped funding performance incentives in 1999-00.

[15] For all programs, the survey asked the following: "For fiscal years 2004-05, 2005-06, 2006-07, and 2007-08, please indicate the number of approved caseworker FTEs that *have been eliminated* and the number of approved caseworker FTEs that *have not been filled* in your [program] *due to* budget reductions and suspended cost-of-doing business increases."

[16] Counties rarely resorted to layoffs. However, Fresno and Santa Clara counties laid off 14 and four workers, respectively, in the CalWORKs Program in 2004-05.

[17] For all programs, the survey asked the following: "Whether your program has reduced, increased, or left positions vacant, please indicate the approximate number of *active* [program] caseworker FTEs that you think your department *should* have in order to meet current [program] workload demands." These responses were compared to 2007-08 staffing levels reported by each county to calculate the size of the "staffing gap" for each program in each county. County responses were then aggregated to determine the weighted-average staffing gap for each program. Medi-Cal is not included in this analysis because the state provided funding for counties' increased operating costs for this program between 2003-04 and 2007-08

[18] The survey asked the following: "What is the actual and/or anticipated staffing impact of your county's allocation increase from the additional $90 million provided in FY 2006-07 and continued into FY 2007-08?" Eleven counties responded to this question.

[19] Orange County reported that it was not able to add staff in 2006-07 and that, while additional staff were planned for 2007-08, "it is increasingly questionable whether funds will be available to meet this need."

[20] These counties are Butte, Riverside, and Santa Cruz.

[21] The survey asked the following: "Medi-Cal is the one program area that has received cost-of-doing-business increases over the survey time period. How has the receipt of annual funding increases impacted your county's ability to meet statutory Medi-Cal performance standards and other program goals?" Seven counties responded to the question.

CSAC/ 00233

---

[22] The survey asked the following: "To the extent that your program is experiencing inadequate staffing levels and/or has eliminated or reduced contracted or other services due to continued inadequate state funding between fiscal years 2004-05 and 2007-08, (a) Please briefly describe *how program participants are being affected.* (b) Please briefly describe *any other benefits of the program to the community that have been affected.* (c) Please briefly describe *how other programs might have been affected.* (For example, have reductions resulted in a negative impact upon the caseload of other county human services, public health or public safety programs?) Please be as specific as possible."

[23] Contracted service providers or county employees provide services in less than 5 percent of all IHSS cases.

[24] The state implemented statewide standards for the Adult Protective Services Program in 1999.

[25] In the Adult Protective Services Program, case management includes investigating reports of abuse or neglect, opening a case, and helping victims obtain services to help maintain health and safety, such as Medi-Cal health coverage.

[26] For each program, the survey asked the following: "Overall, since last completing this survey in 2004, has your agency's ability to fund and provide the full range of services to eligible persons and program participants, decreased, stayed the same, increased."

[27] In the Child Welfare Services Program, case management includes investigations of abuse or neglect, providing services to prevent children from being removed from the home, and placing a child in foster care.

[28] Half (50 percent) of eligible Californians participated in the Food Stamp Program in federal fiscal year 2005, the third-lowest rate among the 50 states and the District of Columbia. Karen E. Cunnyngham, Laura A. Castner, and Allen L. Schirm, *Reaching Those in Need: State Food Stamp Participation Rates in 2005* (Mathematica Policy Research, Inc. for the US Department of Agriculture, Food and Nutrition Service: October 2007), p. 6

[29] Interview with Jessica Bartholow, director of programs, California Association of Food Banks (December 21, 2007).

[30] UCLA Center for Health Policy Research, *2005 California Health Interview Survey* (January 2007).

CSAC/ 00234

)

Exhibit F

**California Department of Correction and Rehabilitation Division of Adult Parole
Operations- Mentally Ill Parolee Population Report Dated March 28, 2008**

Santa Clara County Trial Exhibit # O

)

Exhibit G

**Fiscal Year 2006 Adult Treatment Cost for the Department of Drug and Alcohol**

Santa Clara County Trial Exhibit # F

and

**Santa Clara Health and Hospital System Mental Health Department Fiscal Year 2008
Adult Full Service Partnership Expenses and County Adult Service Teams**

Santa Clara County Exhibit # G

# EXHIBIT H

# TO EXPERT REPORT OF PAUL McINTOSH

PAROLE REALIGNMENT SURVEY

MAY 1, 2008

| | PAROLEE POPULATION | | | PROBATION | | MENTAL HEALTH | | A&D TREATMENT | | LOW TOTAL | HIGH TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Parolees | LOW | HIGH | LOW | HIGH | LOW | HIGH | LOW | HIGH | | |
| ALAMEDA | 1,874 | $21,185 | $25,187 | $35,000,000 | $40,000,000 | $4,700,000 | $7,200,000 | | | $39,700,000 | $47,200,000 |
| CONTRA COSTA | 816 | $15,897 | $16,753 | $4,461,219 | $5,000,000 | $6,272,000 | $6,272,000 | $2,055,600 | $2,398,200 | $12,808,819 | $13,670,200 |
| LOS ANGELES | 22,239 | $5,441 | $8,723 | $23,000,000 | $54,000,000 | $98,000,000 | $140,000,000 | | | $121,000,000 | $194,000,000 |
| ORANGE | 4,057 | $0 | $0 | | | | | | | $0 | $0 |
| RIVERSIDE | 4,413 | $12,305 | $12,994 | $25,000,000 | $28,000,000 | $17,800,000 | $17,800,000 | $11,500,000 | $11,500,000 | $54,300,000 | $57,300,000 |
| SACRAMENTO | 2,075 | $22,442 | $25,096 | $35,727,679 | $38,195,512 | $5,408,000 | $6,916,000 | $5,430,894 | $6,962,214 | $46,566,773 | $52,073,726 |
| SAN BERNARDINO | 5,620 | $8,541 | $11,210 | $25,000,000 | $27,000,000 | $12,000,000 | $20,000,000 | $11,000,000 | $16,000,000 | $48,000,000 | $63,000,000 |
| SAN DIEGO | 4,750 | $13,766 | $16,611 | $30,400,000 | $36,800,000 | $14,300,000 | $17,200,000 | $20,700,000 | $24,900,000 | $65,400,000 | $78,900,000 |
| SAN FRANCISCO | 725 | $0 | $0 | | | | | | | $0 | $0 |
| SAN MATEO | 934 | $17,739 | $17,739 | $7,568,015 | $7,568,015 | $5,000,000 | $5,000,000 | $4,000,000 | $4,000,000 | $16,568,015 | $16,568,015 |
| SANTA CLARA | 3,208 | $8,712 | $8,712 | $7,800,000 | $7,800,000 | $9,230,000 | $9,230,000 | $10,900,000 | $10,900,000 | $27,930,000 | $27,930,000 |
| VENTURA | 846 | $20,071 | $20,071 | $7,204,106 | $7,204,106 | $4,736,000 | $4,736,000 | $5,040,000 | $5,040,000 | $16,980,106 | $16,980,106 |
| | | | | | | | | | | | |
| TOTALS | 52,155 | | | $201,181,219 | $251,567,633 | $177,446,000 | $234,354,000 | $70,626,494 | $81,700,414 | $449,253,713 | $567,622,046 |

CSAC/ 00246

# URBAN
# COUNTIES
# CAUCUS

Chair
Supervisor Kathy Long
Executive Director
Casey Sparks Kaneko

1100 "K" Street, Suite 101/Sacramento, CA 95814/ (916) 327-7531 FAX (916) 491-4182/urbans@ix.netcom.com

April 10, 2008

TO:        Members of the Urban Counties Caucus Board of Directors

FROM:    Casey Kaneko

RE:        Realignment of State Parolees to County Probation

At its April 2, 2008 meeting the Urban Counties Caucus discussed the Legislative Analyst's (LAO) proposal to realign to counties a segment of the parolee population currently under the supervision of the Department of Corrections and Rehabilitation. The Board Members concurred that they had insufficient information about how this proposal would affect their counties to take a position on it. They directed UCC staff to ask each member county to provide an analysis of local impacts of the proposal so that they could continue the discussion on this matter at the May 21, 2008 Board meeting. Towards that end, please complete the information below and forward it via return e-mail by April 21, 2008.

We understand that the LAO proposal is lacking in significant detail, which makes it difficult to make certain suppositions, such as the level of care and supervision that these parolees would require. Therefore, it would be useful to include in your responses, in attachments if necessary, any assumptions that your county makes in developing its responses. However, for purposes of uniformity, we ask that you assume that seventy percent of the parolees need alcohol and drug treatment services and twenty percent need mental health services. Further, we have included in the relevant sections below methodology developed by Santa Clara County that should be used as a template for Mental Health and Alcohol and Drug Treatment services, inserting your county's own rates.

Included as attachments to this message are two charts. One is from the Analyst and it contains an estimated "Funding Target" for each county. For consistency' sake, counties should assume that they will receive an amount similar to this to pay for the realigned population. That does not mean that the amount will be commensurate with the need. Second, we have asked the Department of Corrections for estimates of how many parolees would be returning to each county under the LAO proposal. If we receive that information in a timely manner we will transmit it to you immediately. In the interim, please use the estimates (based on parolee population) in the attached chart prepared by CSAC staff.

1) Estimated impact on the **Probation Department** assuming the optimal level of services is provided. Please share with us how you define optimal services and what formula you used to

[1] Board of Directors: Chair: Supervisor Kathy Long, Ventura County Vice Chair: Supervisor Roger Dickinson, Sacramento County Treasurer: John Guthrie, Finance Director, Santa Clara County Members: Supervisor Keith Carson, Alameda County; Supervisor John Gioia, Contra Costa County, Supervisor Don Knabe, Los Angeles County; Supervisor Pat Bates, Orange County; Supervisor John Tavaglione, Riverside County; Supervisor Paul Biane, San Bernardino County; Supervisor Greg Cox, San Diego County; Supervisor Carmen Chu, San Francisco County; Supervisor Rose Jacobs Gibson, San Mateo County; Supervisor Liz Kniss, Santa Clara County.

determine cost.

(Low to high range) $_____

What is the caseload size that your county assumes for these offenders?
_____

What is the average length of supervision for these clients that your estimate assumes?
_____

What number of peace officer staff does your estimate assume will be required to supervise this population?
_____

What number of support staff does your estimate assume?
_____

Are you assuming that additional contract providers will be required for things such as drug testing, etc.? If so, please explain.
_____

_____

2) Estimated impact on the Sheriff/Department of Corrections
Given that the revocation process is as yet unspecified, what local law enforcement impacts can be anticipated and/or articulated, with dollar amounts if feasible?

(Low to high range) $_____

3) Estimated impact on the District Attorney
(Low to high range) $_____

4) Estimated impact on the Public Defender and Alternate Public Defender
(Low to high range) $_____

5) Estimated impact on Mental Health Department (including pharmacy)
Please observe the sample methodology suggested by Santa Clara County included below.

   (a) Estimated impact on the Mental Health Department (including pharmacy) based on number of parole clients per LAO estimates.

   Assume 10% of parolees for intensive treatment (FSP):
         e.g., SCC = Cost per client @ $20K each
         e.g., SCC = 3,500 parolees x 10% = 350 @ $20K = $7 Million/year

Board of Directors: Chair: Supervisor Kathy Long, Ventura County  Vice Chair: Supervisor Roger Dickinson, Sacramento County  Treasurer: John Guthrie, Finance Director, Santa Clara County  Members: Supervisor Keith Carson, Alameda County; Supervisor John Gioia, Contra Costa County; Supervisor Don Knabe, Los Angeles County; Supervisor Pat Bates, Orange County; Supervisor John Tavaglione, Riverside County; Supervisor Paul Biane, San Bernardino County; Supervisor Greg Cox, San Diego County; Supervisor Cannen Chu, San Francisco County; Supervisor Rose Jacobs Gibson, San Mateo County; Supervisor Liz Kniss, Santa Clara County.

Assume 10% of parolees for outpatient treatment:
  e.g., SCC = cost per client @ $6K each
  e.g., SCC = 3,500 parolees x 10% = 350 @ $6K = $2,100,000

Pharmacy Cost estimate: Av. Cost/per client _____ Total _____

Total costs (Low to high range) including both intensive and outpatient treatment and pharmacy.
$_____

(b) **What new/expanded service capacity is required to treat adult probation (parolees) with mental illness? Use your county's Mental Health Services Act CSS program costs as basis: Full Service Partnership slots & outpatient slots.**

____% expansion in intensive services (FSP)
____% expansion in outpatient services

6) Estimated impact on County Alcohol and Drug Treatment
    Assume that 70 percent of the parolee population will need services of some sort. Use a "per episode" cost and multiply it by the number of parolees in your county that will need alcohol and drug treatment services (70 percent of the total number of parolees expected to be returned your county). An episode includes the course of treatment from entrance to treatment to discharge and can include various modalities. Santa Clara provided the example below.

    Example:    SCC = Cost per client @ $4,369 each
                SCC = 3,500 parolees x 70% = 2450 x $4369 = $10,704,050 per year

(Low to high range) $_____

County_____

By _____ Phone #_____

Board of Directors: Chair: Supervisor Kathy Long, Ventura County. Vice Chair: Supervisor Roger Dickinson, Sacramento County. Treasurer: John Guthrie, Finance Director, Santa Clara County. Members: Supervisor Keith Carson, Alameda County; Supervisor John Gioia, Contra Costa County; Supervisor Don Knabe, Los Angeles County; Supervisor Pat Bates, Orange County; Supervisor John Tavaglione, Riverside County; Supervisor Paul Biane, San Bernardino County; Supervisor Greg Cox, San Diego County; Supervisor Carmen Chu, San Francisco County; Supervisor Rose Jacobs Gibson, San Mateo County; Supervisor Liz Kniss, Santa Clara County.

**OFFICE OF THE COUNTY COUNSEL**
**COUNTY OF SANTA CLARA**

70 West Hedding Street, 9th Floor
San Jose, California 95110-1770.
(408) 299-5900
(408) 287-4913 (FAX)



Ann Miller Ravel
**COUNTY COUNSEL**

Winifred Botha
Miguel Márquez
Lori E. Pegg
**ASSISTANT COUNTY COUNSEL**

TO:       Workers' Compensation Unit

FROM:    Donna M. Diaz, Lead Deputy County Counsel

RE:       Procedures

DATE:    October 29, 2008

## I.   Documents Sent to Claims

- Documents, with or without enclosures, should be sent to claims electronically.

- If there are no enclosures, the document created in ProLaw should be sent electronically from ProLaw and should not be scanned into ProLaw.[1]  While in ProLaw, select the document from the Events listing and send the document via email, as an attachment in Lotus Notes.  This will allow use of the tracking tool available in Prolaw to confirm when the document is actually sent.

- Enclosures must be scanned into ProLaw, along with the document created in ProLaw and sent as one .pdf file to the client.

- All documents are to be e-mailed after signed by the attorney.  The original signed copy of the correspondence is to be placed in the file.

- The electronic copy of the document should be designated with /s/ on the ProLaw event listing and the /s/ designation should also be placed on the actual document next to the author's name.

- Finally, the date on the final document must match the date in the ProLaw tree.

---

[1] Any documents that we create should not be scanned into ProLaw because scanned documents are pdf files and we cannot cut and paste or manipulate the content of those documents.

Workers' Compensation Unit
Re: Procedures
October 29, 2008
Page 2 of 9

- There are three steps when forwarding documents to claim: (1) the original must be signed by the attorney and the hard copy placed in the file; (2) the /s/ designation must be placed in the ProLaw event listing as well as on the actual document, next to the attorney's name, and (3) the date of the document must correspond to the entry in ProLaw.

Examples:

I.

# CONFIDENTIAL MEMORANDUM
# ATTORNEY-CLIENT PRIVILEGED COMMUNICATION


TO:     James Butler, Claims Adjuster

FROM:  Donna M. Diaz, Lead Deputy County Counsel /S/

RE:     **Viola Hambleton v. County of Santa Clara/Valley Medical Center**

| **Claim No.:** | **DOI:** | **WCAB No.:** |
|---|---|---|
| 9183 | 11/15/2005 | SAL 0115191 |


DATE:  August 28, 2008

II.

We look forward to your usual thorough report.

Very truly yours,

ANN MILLER RAVEL
County Counsel
/S/

YOO-RAH LEE
Deputy County Counsel

Workers' Compensation Unit
Re: Procedures
October 29, 2008
Page 3 of 9

III.



Workers' Compensation Unit
Re: Procedures
October 29, 2008
Page 4 of 9

IV.



Workers' Compensation Unit
Re: Procedures
October 29, 2008
Page 5 of 9

V.

Entries should look like this:

d/Confidential Memo to Client re: settlement authority
s/Confidential Memo to Client re: settlement authority

**II.    Bills**

- The controller requires original billings which have been approved for payment, therefore, bills cannot be sent to the client electronically.

**III.    Medical Addenda**

- The caption on all medical addenda should contain the case name, the claim number and the relevant dates of injury. Please list all claim numbers if there is more than one claim number.

Example:

**MEDICAL ADDENDUM**
**Nancy Bachrach v. County of Santa Clara/Valley Medical Center**
**DOI: 02/28/05, Claim No.: 7302**

| Reports | Date | Served | Filed |
|---------|------|--------|-------|

- As a general rule, there should be one addendum for all cases unless the attorney advises differently. Be sure to ask the attorney handling the claims if more than one addendum is preferred.

- When completing medical addenda please list the date of the report, not the date of service.

- When opening a companion claim do not merge the companion claim to the existing file binder until directed to do so by the assigned attorney.

Workers' Compensation Unit
Re: Procedures
October 29, 2008
Page 6 of 9

## IV.   Calendar Notices

- Please initial and date all calendar notices reflecting that the notice has been entered into ProLaw and Lotus Notes.  Appearances should be entered into ProLaw and Lotus Notes before they are distributed to the attorneys.

## V.   Deposition Transcripts and Subpoenaed Medical Records.

- Make a notation on the transcript or the subpoenaed records reflecting that the records have been logged in.

- Print a copy of the log, attach it to the records or deposition transcript before putting it into the attorney's box.

## VI.   Subpoenas for Records

- Records my be subpoenaed by either the Secretary or Paralegal.

- If there is a need to perform extensive research in order to subpoena records, the task should be handled by a Paralegal.

## VII.   Doctors' Appointments

- If an applicant's attorney schedules a doctor's appointment. do not send a notice of the appointment.  However, it is important to enter the appointment into ProLaw .

- For Agreed Medical Examinations scheduled by Applicant's attorney, please enter information regarding the appointment into ProLaw and send a *reminder notice only.* Do not send an appointment letter.

- Secretaries should remember to diary a  reminder notice in their own diaries to ensure that the date is not overlooked.

## VIII.   Naming Documents in ProLaw

- Consistency in naming documents in the event listing will make it easier to locate and identify documents.

- Examples:,

- "e-mail from_____."

Workers' Compensation Unit
Re: Procedures
October 29, 2008
Page 7 of 9

- "ltaa/re:_____."

- "mtc/re:_____."

- "Deposition Summary/Applicant."

- "settlement analysis and request for settlement authority"

- "medical report from AME Holmboe dated 3/3/83"

- Paralegal/Secretarial Work Requests should reflect the nature of the task assigned so that when reading the events listing in ProLaw, there is enough information on the reference line to allow for the location of particular assignments.

## IX.  Doctors' Letters

- When preparing letters to the doctor, please remember to telephone the doctor's office to see if records will be accepted on a disk.

## X.  Settlement Documents

- When preparing drafts of settlement documents the draft should be put into ProLaw along with any correspondence sent to opposing counsel or to the injured worker. The settlement documents should be designated with a /D/ for draft.

- Once the finalized signed documents are obtained they will be entered into ProLaw with a notation that they are the final stipulations. (/F/)

## XI.  Depositions

- Any scheduling changes to depositions requested by the opposing party must be approved by the assigned attorney. The secretary is the gatekeeper and should inquire about the reason for the requested change, obtain available dates to reschedule the deposition and indicate that this information will be passed on to the assigned attorney who will get back to them.

- Once a deposition is rescheduled, you should go into Lotus Notes and indicate that the originally scheduled deposition has been canceled or rescheduled and indicate, by whom. For example, on the reference line, indicate "cxl by aa or by DMD by MES, etc."

- Remember, when canceling an entry in Lotus Notes, the change will not be saved in the calendar, unless you enter cancelled in the location block. See example below.

Workers' Compensation Unit
Re: Procedures
October 29, 2008
Page 8 of 9

---

**test YL - cancelled - Lotus Notes**

File  Edit  View  Create  Actions  Text  Help

Address http://www.workcompcentral.com/1/news/news_print.htm?token=5ECDF5D48AFA64E5AD40801C642AF179CE3AB68D308676AE35451E24149877944;state=CA&id=8599619efced0ddc4c5ld ▾

| Welcome | Meeting Notice | Donna Diaz - Inbox | Meeting Notice | WCU Calendar - Calendar | test YL - cancelled |

Save and Send Invitations    Save as Draft    Scheduler    Delivery Options...    Actions

Calendar Entry
**Meeting**

| Basics | Meeting Invitations & Reservations | Options |

| Subject: | test YL - cancelled | | Location: | cancelled |
| Begins: | Wed 10/29/2008 | 08:30 AM | Entry type: | Meeting |
| Ends: | Wed 10/29/2008 | 09:30 AM | | |
| Chair: | WCU Calendar/CCO/SCC | | | |
| Sent by: | Yoo-Rah Lee/CCO/SCC | | | |

Description

This is the protected text area of the form

9687 unread document(s) remaining                                                    Office

Workers' Compensation Unit
Re: Procedures
October 29, 2008
Page 9 of 9

- Enter the new deposition date into Prolaw and Lotus notes on the new date.

- Always document your actions in ProLaw, utilizing the case notes. Please enter a case note regarding the cancellation or rescheduling of the deposition and note the name of the person who called, the reason for the change, the date of the request and any other pertinent information.

## XI.  Service of Medical Reports on Lien Claimants

- The Board rules require service of all medical reports on lien claimants. Lien Claimants should receive service unless directed otherwise by the assigned attorney.

DMD:cm:mxn

C:\Documents and Settings\lisa.parkman\Local Settings\Temp\notesA8B553\Memo to WCU2.wpd

Agenda
October 30, 2008
1:00 p.m. Conf Room 1B

I.    Paralegal Staffing assignments

   Lisa -   Bill
         Yoo-Rah
         Matt

   Ursula -  Donna
         Cate

II.   Review of Procedures
   • Subpoenas to be prepared by either Paralegals or Secretaries
   • Training for Secretaries on subpoenas

III.  EAMS - Top 10 Errors