1  JONES & MAYER
   Martin J. Mayer (SB # 73890)
2  Michael R. Capizzi (SB # 35864)
   Kimberly Hall Barlow (SB # 149902)
3  Ivy M. Tsai (SB # 223168)
   3777 North Harbor Boulevard
4  Fullerton, California 92835
   (714) 446-1400; Fax (714) 446-1448
5  e-mail: mjm@jones-mayer.com
   e-mail: mrc@jones-mayer.com
6  e-mail: khb@jones-mayer.com
   e-mail: imt@jones-mayer.com
7
   Attorneys for Intervenor-Defendants
8  SAN DIEGO COUNTY SHERIFF WILLIAM B.
   KOLENDER, ORANGE COUNTY SHERIFF-
9  CORONER SANDRA HUTCHENS, PLACER
   COUNTY SHERIFF EDWARD N. BONNER,
10 BUTTE COUNTY SHERIFF-CORONER PERRY
   L. RENIFF, CALAVERAS COUNTY SHERIFF
11 DENNIS DOWNUM, LOS ANGELES COUNTY
   SHERIFF LEE BACA, SANTA CLARA COUNTY
12 SHERIFF LAURIE SMITH, SAN BENITO COUNTY
   SHERIFF CURTIS HILL, STANISLAUS COUNTY
13 SHERIFF ADAM CHRISTIANSON, MENDOCINO
   COUNTY SHERIFF TOM ALLMAN, TEHAMA
14 COUNTY SHERIFF CLAY PARKER, LASSEN
   COUNTY SHERIFF STEVE WARREN, YOLO
15 COUNTY SHERIFF ED PRIETO, SANTA BARBARA
   COUNTY SHERIFF BILL BROWN, KERN COUNTY
16 SHERIFF DONNY YOUNGBLOOD, SAN MATEO
   COUNTY SHERIFF GREG MUNKS, YUBA COUNTY
17 SHERIFF STEVE DURFOR, CONTRA COSTA
   COUNTY SHERIFF WARREN RUPF,
18 SHASTA COUNTY SHERIFF TOM BOSENKO,
   RIVERSIDE COUNTY SHERIFF STANLEY SNIFF JR.,
19 VENTURA COUNTY SHERIFF BOB BROOKS,
   SOLANO COUNTY SHERIFF GARY R. STANTON,
20 SAN LUIS OBISPO COUNTY SHERIFF PAT HEDGES,
   SUTTER COUNTY SHERIFF JIM DENNEY,
21 LAKE COUNTY SHERIFF ROD MITCHELL,
   GLENN COUNTY SHERIFF LARRY JONES,
22 TUOLUMNE COUNTY SHERIFF JIM MELE,
   FRESNO COUNTY SHERIFF MARGARET MIMS,
23 MONTEREY COUNTY SHERIFF MIKE KANALAKIS,
   MONO COUNTY SHERIFF RICHARD SCHOLL,
24 HUMBOLDT COUNTY SHERIFF GARY PHILP,
   EL DORADO COUNTY SHERIFF JEFF NEVES,
25 MERCED COUNTY SHERIFF MARK PAZIN,
   DEL NORTE COUNTY SHERIFF DEAN WILSON,
26 SAN JOAQUIN COUNTY SHERIFF STEVE MOORE,
   AMADOR COUNTY SHERIFF MARTIN RYAN,
27 INYO COUNTY SHERIFF WILLIAM LUTZE,
   STANISLAUS COUNTY CHIEF PROBATION OFFICER
28 JERRY POWERS, VENTURA COUNTY CHIEF

-1-

1  PROBATION OFFICER KAREN STAPLES,
   SOLANO COUNTY CHIEF PROBATION OFFICER
2  ISABELLE VOIT, SANTA BARBARA COUNTY
   CHIEF PROBATION OFFICER PATRICIA STEWART,
3  BUTTE COUNTY CHIEF PROBATION OFFICER JOHN
   WARDELL, SAN LUIS OBISPO COUNTY CHIEF
4  PROBATION OFFICER KIM BARRETT, CONTRA
   COSTA COUNTY CHIEF PROBATION OFFICER
5  LIONEL CHATMAN, INYO COUNTY CHIEF
   PROBATION OFFICER JIM MOFFETT,
6  SHASTA COUNTY CHIEF PROBATION
   OFFICER BRIAN RICHART, YOLO COUNTY
7  CHIEF PROBATION OFFICER DON MEYER,
   FRESNO COUNTY CHIEF PROBATION OFFICER
8  LINDA PENNER, MARIPOSA COUNTY CHIEF
   PROBATION OFFICER GAIL NEAL, CITY OF
9  WHITTIER POLICE CHIEF DAVE SINGER,
   CITY OF ROSEVILLE POLICE CHIEF JOEL NEVES,
10 CITY OF PASADENA POLICE CHIEF BARNEY
   MELEKIAN, CITY OF ALHAMBRA POLICE
11 CHIEF JIM HUDSON, CITY OF FREMONT
   POLICE CHIEF CRAIG STECKLER, CITY OF
12 GROVER BEACH POLICE CHIEF JIM COPSEY,
   CITY OF SANTA CLARA POLICE CHIEF STEVE
13 LODGE, CITY OF VACAVILLE POLICE CHIEF
   RICH WORD, CITY OF WOODLAND POLICE CHIEF
14 CAREY SULLIVAN, CITY OF SONORA POLICE CHIEF
   MACE McINTOSH, CITY OF PASO ROBLES POLICE
15 CHIEF LISA SOLOMON, CITY OF SAN BERNARDINO
   POLICE CHIEF MICHAEL BILLDT, CITY OF
16 ATWATER POLICE CHIEF RICHARD HAWTHORNE,
   NATIONAL CITY POLICE CHIEF ADOLFO GONZALES,
17 CITY OF DELANO POLICE CHIEF MARK DeROSIA,
   CITY OF MODESTO POLICE CHIEF ROY WASDEN,
18 CITY OF FRESNO POLICE CHIEF JERRY DYER, AND
   CITY OF DELANO CHIEF OF CORRECTIONS GEORGE
19 GALAZA

20

21             IN THE UNITED STATES DISTRICT COURTS

22          FOR THE EASTERN DISTRICT OF CALIFORNIA

23          AND THE NORTHERN DISTRICT OF CALIFORNIA

24   UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

25    PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

26 ┌─────────────────────────────┬───────────────────────────
   │ RALPH COLEMAN, et al.,       │ Case No:  CIV S-90-0520 LKK JFM P
27 │                              │
   │        Plaintiffs,           │ **THREE-JUDGE COURT**
28 └─────────────────────────────┴───────────────────────────

DECLARATION OF EXPERT WITNESS  RICHARD CONKLIN

vs.

ARNOLD SCHWARZENEGGER, et al.,

Defendants.

[F.R.C.P. 24; 18 U.S.C. § 3626(a)(3)(F)]

**DECLARATION OF EXPERT WITNESS RICHARD CONKLIN**

MARCIANO PLATA, et al.,

Plaintiffs,

vs.

ARNOLD SCHWARZENEGGER, et al.,

Defendants.

Case No.:  C01-1351 TEH

**THREE-JUDGE COURT**

I, RICHARD CONKLIN, hereby declare as follows:

1.      I have a Bachelor of Arts in Sociology and Psychology from the California State University, San Diego, which I received in 1968.  I received a Masters in Social Work from California State University, San Diego School of Social Work in 1971.  I am required to renew my license every two years, and I take at least 36 continuing education units every two years as part of the renewal requirement.   I have actively worked in providing and supervising mental health care programs for over 35 years.

2.      I have been employed by the San Diego County Sheriff's Department since 1998.  I started as a mental health clinician, and was then promoted to Chief Mental Health Clinician in March of 1999.  Prior to joining the Sheriff's Department, I worked for the Mental Health Department of the San Diego County Department of Health and Human Services for two years.  During that employment, which commenced in 1996, I worked in the San Diego County jails as a psychiatric social worker, performing the same services as I performed as a mental health clinician for the Sheriff's Department.  The functions of the Mental Health Department providing mental health services in the jail were transferred from the Mental Health Department to the Sheriff's Department in

DECLARATION OF EXPERT WITNESS  RICHARD CONKLIN

1    approximately 1999.

2          3.       I am currently the Detentions Chief Mental Health Clinician for the San

3    Diego County Sheriff's Department.   I was appointed as the Chief Mental Health

4    Clinician in March of 1999.  In this role, I supervise the mental health staff, as well as all

5    clinical case management, diagnostic and inmate behavior management specialty

6    programs, and psychosocial rehabilitation and reentry programs in the Sheriff's Detention

7    Facilities, which houses 5,000 inmates.   I conduct site reviews, needs assessments,

8    program design and implementation of comprehensive mental health, and correctional

9    counseling programs.  I have been a liaison to various departments of the Superior Court

10   and supervised applicable Welfare & Institutions Code procedures governing inpatient

11   mental health care, as well as Penal Code Commitments for restoration of Mental

12   Competency and developmentally delayed inmates. I coordinate with other agencies to

13   provide legal and psychiatric assessments, mental health case management, and social

14   services to inmates or those being released from incarceration. I have provided education

15   and consultation regarding mental health care needs for inmates and released inmates to

16   agencies and community groups.   I establish Memoranda of Agreements and I have

17   developed and overseen academic internships from graduate or professional schools.

18         4.  I co-authored, designed and implemented for the San Diego County Sheriff's

19   Department a Federal Life Skills Grant Project.  This was a $1.3 Million grant designed

20   to teach life skills to jail inmates and help them merge back into their communities.  In

21   this role, I developed and monitored the budget, program policy and procedures,

22   established agreements with community- based partner agencies, drafted and issued

23   annual progress reports to the Department's federal funding source and made program

24   presentations at national conferences.   In addition, between 2003 and 2006, I supervised

25   all correctional counseling functions.  I also provided clinical and administrative

26   management of a Five Million Dollar Board of Corrections Grant under The Mentally Ill

27   Offender Crime Reduction Act.  This program was an intensive community case

28   management program in partnership with the San Diego County Probation Department.

     I also supervised the inpatient multidisciplinary treatment team of social service,

     recreational and occupational therapy staff.

-4-

5.    Prior to my appointment as a Chief Mental Health Clinician, I served for approximately three years as the Senior Psychiatric Social Worker for Forensic Services in the County's Mental Health Department.  My area of responsibility was as inpatient forensic unit social worker providing individual and group psychotherapy to seriously mentally ill inmates, as well as case management and discharge planning for these inmates.   I provided facility representation in accordance with the Lanterman-Petris-Short ("LPS") Act and Welfare & Institutions Code requirements. In addition, I designed, developed and implemented tracking systems for State Hospital patients in custody.

6.    At the same time, I served for approximately three years as the Program Manager for Supporting Adolescents and Families in Recovery at the Vista Hill Foundation in San Diego. I supervised and provided direct services to a family recovery program for adolescents with substance abuse and co-occurring disorders.  Co-occurring disorders involve persons with both a diagnosed mental illness and a diagnosed substance abuse problem.  These patients are typically more complex and difficult to treat than those with only a mental illness or a substance abuse problem.  Some patients have more than two diagnosed disorders.

7.    Prior to my appointment as the Senior Psychiatric Social Worker for Forensic Services and the Program Manager for Supporting Adolescents and Families in Recovery at the Vista Hill Foundation in San Diego I served for approximately one year as the Director of the Behavioral Health Care Center at the Scripps Memorial Hospital in La Jolla. My area of responsibility included directing the administrative and clinical operations of a 30- bed psychiatric inpatient unit. I developed and monitored the inpatient unit budget and took corrective action as indicated. I monitored administrative and clinical operations of a sub-contracted Partial Hospital Program, and I developed and implemented agreements with other entities. I co-directed The Scripps McDonald Center, and adult residential and outpatient recovery center for substance abuse.  I also implemented an adolescent outpatient substance abuse program.

8.    Prior to my appointment as the Director of the Behavioral Health Care Center at the Scripps Memorial Hospital in La Jolla I served for approximately 1 year as

the Chief of Social Work Services and Child and Adolescent Psychiatry Service at the University of California, San Diego. This position included recruiting and supervising clinical social work staff, providing individual and group psychotherapy to seriously mentally ill adolescents and their families and case management and discharge planning and referrals. I provided facility representation in accordance with LPS and Welfare & Institutions Code requirements I was also acted as Field instructor at the San Diego State University.

9.    Prior to my appointment as the Chief of Social Work Services and Child and Adolescent Psychiatry Service in the University of California, San Diego I served for approximately 1 year as the Program Administrator for the St. Louise Psychiatric Partial Hospitalization Program contracted by Psychiatric Management Resources (PMR) in San Jose, California.   My areas of responsibility included establishing a psychiatric Partial Hospitalization Program as an outpatient department of a non-profit hospital.  I directed development of marketing plans and strategies to maximize program development and utilization. I recruited and supervised the Medical Director, and medical and clinical staff. I oversaw development of treatment schedules and program curricula. I established and integrated Utilization Review mechanisms in conjunction with the partner Hospital to ensure compliance with funding and review bodies. I developed and monitored budgets, and analyzed financial results and implemented plans of correction as needed.  I developed client satisfaction measures and monitored client outcomes. I developed contracts and MOUs with non-profit and proprietary organizations.

10.    Prior to my appointment as the Program Administrator for the St. Louise Psychiatric Partial Hospitalization Program I was the Administrative Director for the Institute of Psychiatry and Behavioral Science Programs at the Children's Hospital in San Diego, California. I developed contracts with San Diego County Employee Assistance Program and grant supported foster care programs.   I established interagency contracts and a school site mental health program. I restructured supervisory responsibilities resulting in a 36% reduction is combined clerical/ administrative expenses. I directed the review and revision of the outpatient treatment program and protocols to comply with revised medical necessity definitions and funding constraints. I initiated focused specialty

DECLARATION OF EXPERT WITNESS  RICHARD CONKLIN

clinic programs resulting in improved patient access and volume and 30% reduction is costs. I authored the social services component of the State of California Healthy Start Programs and obtained one of the 40 initially funded implementation grants in California for a three year, $400,000 grant. I served as a site core committee member and supervisor of the social services component of this program.  I implemented the program plan for the development of the Hematology- Oncology Psychosocial program. I developed positions, descriptions, matrix organization, and chaired a multidisciplinary selection committee comprised of University and Hospital Physicians and Mental Health members, I participated in the selection and appointment of the program medical director. I chaired the Hospital Committee of Physicians, Nurses and Administrators to plan the development of a medical-psychiatric unit. I developed pro formas and budget for this 10-bed unit. I participated in the establishment and coordination of the UCSD Child Fellowships and residency program involving 25 psychiatry fellows, residents, medical students and clinical faculty based in the community.   I also negotiated cost share agreements with the University Business Officer and Department Chairman.

       11.    I am a member of the following professional associations: California Council of Community Mental Health Agencies, National Association of Social Workers, Academy of Clinical Social Workers, The Forensic Mental Association of California, Psychiatry and the Law Society, and the American Correctional Health Services Association.  In addition, I serve as the Vice President of the Board of Directors for Mental Health America of San Diego County.

       12.    In my present position, I serve as subject matter expert/advisor to the San Diego County Sheriff, William Kolender, as a member of the Oversight and Accountability Commission ("OAC") which oversees statewide development and oversight of certain components of the Mental Health Services Act, funded under Proposition 63.  For example, there is work group which is focused on co-occurring disorders which hears testimony from subject matters experts like me as to what kinds of programs would be effective to be planned, implemented and funded by the Mental Health Services Act.  Based on that testimony, the work group then authors a paper, presents it to the OAC with recommendation as to what sort of plans and priorities the

DECLARATION OF EXPERT WITNESS  RICHARD CONKLIN

commission ought to set for counties to develop and implement programs.  In addition, as advisor to Sheriff Kolender, I work with him explaining and educating him on some of the technical aspects of psychiatric disorders, of co-occurring disorders, what sorts of programs are effective to assist him in making a decision whether to support the recommendations of that work group or ask for alterations in their recommendations.

13.    I was also appointed to a committee formed in San Diego County to address a white paper put out by a Presidential commission regarding chronic homelessness. San Diego was one of a number of cities throughout the United States that took it upon themselves to put together a local plan to address and end chronic homelessness.  A leadership counsel comprised of community leaders and heads of community agencies County agencies was developed to oversee the process through a committee structure. Two of the committees involved in the effort have Sheriff's Department involvement. One of these is the discharge committee, which is looking at global issues of people who are discharged from any institution in San Diego County, be it a hospital, a jail, a substance abuse treatment facility, anything where somebody is in residence  and they're being discharged, this sub group is looking at and making recommendations about that. I serve on the criminal justice committee which is focused on what issues are particularly relevant to chronically homeless people who are in contact with the criminal justice system.  The centerpiece of that work group is to support the development of a mental health court in the region.  In San Diego County, we are in the process of a establishing a mental health court and would anticipate that the structure would be in place for such a court by July of 2009.  Full implementation of the mental health court program would take approximately six to eight months after that.  A mental health court  could be a particularly beneficial way of addressing non-violent mentally ill offenders because it offers a supervised full service partnership of Assertive Community Treatment, probation and court supervision and wrap-around services.

14.  Among my previous job duties was supervision of the correctional counseling staff in the entire County jail system.  Correctional counseling is a general counseling function that deals with a continuum of jail-based services including providing support, liaison services to community social service agencies for re-entry planning, and referring

-8-

inmates to community agencies for services. These services include assistance to in propria persona inmates, maintaining a law library, coordinating volunteer services, such as Narcotics Anonymous, Alcoholics Anonymous, other volunteers and organizations who come in to provide services to inmates, chaplain services, etc. They also deal with coordinating and scheduling classes with Grossmont Unified School District; they provide liaison to families who may have questions about inmates in custody and what the inmates will be going through.   During the time that I supervised the correctional counselors, we were in a time of transition, so I trained them to do a variety of psychosocial classes, parenting classes, anger management, domestic violence, employment readiness and then re-entry initiatives.   A re-entry initiative is putting together a plan that assesses what an inmate's needs are, what sort of resources he would either need to learn about during the time he is in jail or life skills he might develop, and then providing the inmate at release with referrals to supportive services in the  community so they can obtain those services after release.

15.     The mental health clinician staff at the county jail assists people with completing applications for benefits to help them with housing, living expenses, etc. upon leaving jail. Benefits are not available to inmates in jail. The mental health staff starts the application process for them while they are in custody.  That is a major difference between jails and prisons.   Jail inmates are typically not in custody long enough to obtain birth certificates and identification and get then qualified for benefits and services upon release.   On the other hand, some of the prison- based programs throughout the United States actually get those benefits in place prior to a prisoner's release from custody, and this has been shown to have a positive effect on recidivism.  In my opinion, a very simple alternative to early release would be implementing a prison-based program to get benefits and services in place for prisoners prior to release.

16.     The ability to have benefits in place upon release reduces recidivism. When inmates leave custody and they are homeless, and they are without any income, a large majority will have a propensity towards drug or alcohol abuse.  If they have a disability such as a serious mental disorder, it affects their ability to function and they frequently relapse and commit other crimes. Having benefits in place affects this because it allows a

former inmate to pay for food, clothing and shelter and they are not homeless. They can live in housing where they are not associating with people who are in the depths of addiction or homelessness. Thus, they are less likely to recidivate.

17. In my professional opinion, another viable alternative to a prisoner release order involving release of prisoners from state prison before they complete their sentences is a program modeled after San Diego County's Mentally Ill Offender Crime Reduction ("MIOCR") Act program. The MIOCR Programs were initially funded in 1998 through the passage of AB-1485 and were intended to offer grant opportunities for demonstration projects to reduce costs, crime, and jail crowding associated with mentally ill offenders in local jails. There were approximately 25 initial grants funded by the Legislature and administered by the Board of Corrections. San Diego County Sheriff's Department partnered with the San Diego County Probation Department and was awarded one of the initial three year grants in the amount of $5 Million. The program , which we called the Connections Program, was developed based upon the principals of Assertive Community Treatment (ACT). Those principles are: Client engagement, a single point of accountability, services that are client driven, a focus on strengths (high risk/high support) and a persistent, individualized approach with client employment promoted. Five case management teams were developed. Each team consisted of a sheriff's department mental health clinician (social worker), a Probation Officer (PO) and a Deputy Probation Officer (DPO). In addition, the project teams had two consulting psychiatrists and a shared employment specialist who worked with all of the teams in providing employment counseling and training to various clients in need of those specific services and supports. The San Diego Association of Governments (SANDAG) was retained to do an evaluation of the Program.

18. Enrollees were required to be currently in jail, under formal probation supervision, have a DSM-IV Axis I Diagnosis (Severly Mentally Ill) and a Global Assessment of Functioning (GAF) Score of 50 or less (designates a severe functional impairment). There were five phases of treatment consisting of

- Pre-Release Planning;
- Client engagement and assessment – first three months post release;

DECLARATION OF EXPERT WITNESS  RICHARD CONKLIN

- Support & monitoring – second three months post release;
- Transfer of care – third three month period
- Follow up care or transfer – final three months

19. Our study hypotheses were that

- *Connections* will target mentally ill inmates with extensive needs and criminal history;
- Team members will be committed to the model and satisfied with the implementation and management of the program;
- Clients will receive intensive case management as they re-enter the community;
- Clients will be satisfied with the services they receive;
- *Connections* clients will be integrated into the community and less likely to recidivate after program participation.

20.     We found a high level of client need. Specifically, over half of our enrolled clients were not employed; not looking for work; or had not worked in the last year. Most lacked adequate income to meet basic needs in the thirty (30) days preceding arrest, half were without any health insurance, one third were homeless and a high percentage had evidence of co-occurring disorders.

21.     The program enrolled clients that had serious mental illness as evidenced by their established and documented diagnoses. The most common diagnosis was schizophrenia followed by depression and Bi-Polar Disorder. More than half had a secondary diagnosis of substance abuse or dependence and the average GAF was 42.0, demonstrating a severe functional impairment. Two-thirds had received mental health care in the twelve (12) months prior to arrest-mostly for medication management.

22.     I researched the difference between the outcomes for the treatment as usual group and the people that were in the Connections program. The benefits of this model were demonstrated early in that for the first six months *Connections* Clients' levels of receipt and acceptance of services were higher than that of the comparison group, use of assessment and case management services were also higher as were medication support services and individual, crisis intervention, vocational, and collateral services. This clearly demonstrated the importance of intensive case management, supervision and

support in getting very impaired clients the services they needed. As a result of sufficient supervision and support, 58% successfully completed the ***Connections Program***, and they received significantly more services than the comparison group, obtaining needed case management, medication support, individual counseling, crisis intervention and vocational and collateral services that enabled them to successfully transition out of jail and into community living. The experience in San Diego County with the Connections Program was replicated in the other MIOCR programs developed through the State of California.

23.    Another important aspect of such programs is the extent to which the clients themselves perceive the program to be responsive to their needs and this is key to keeping them involved with the services. In our program, the research revealed that 9 in 10 clients were satisfied with the services they received, consistent attention of the social work/law enforcement team was most often cited as the "best" part of the program and 95% reported improvement in their emotional well-being and more than 80% reported the same regarding improved family relationships and housing status.

24.    Those who completed the program showed statistically significant gains in their overall quality of life and had significantly less bookings and convictions during and six months after program completion. Specifically there was a reduction in alcohol and drug use of 40% and 56% respectively and an average of 26% gain in adequate income for food, clothing, transportation and social needs. Clients also demonstrated significant gains in their feelings of well being related to their living situation, privacy, and life in general, reflecting established living situations and having a sense of comfort and safety. Twenty seven percent (27%) fewer persons in the Connections Program were booked into jail during the time they participated in the program and their average days in jail were 26 days fewer than those in the comparison group. This resulted in significant cost avoidance for the combined criminal justice system departments (law enforcement, jail, courts, prosecution and defense counsels). Finally, the program participants had 13% fewer convictions for new offenses than did the comparison group not receiving this level of service, and supervision and support.

25.    We found the program to be effective by providing multidisciplinary team

1   collaboration between Probation and Sheriff's Department staff Social Workers, intensive
2   case management that was client centered and based on the client's expressed needs and
3   creating and maintaining effective relations with community agencies and their staffs.  In
4   addition, we verified the need for extensive on-going training regarding working with the
5   mentally ill involved in the criminal justice system.

6          26.    Some of the challenges we encountered by the conclusion of the program
7   were our observation that a paradigm shift is needed for the community to treat the
8   mentally ill to prevent their defaulting to the Criminal Justice System.  There remained
9   and remains still, some significant reluctance to engage with the offender population.
10  Staff turnover is disruptive and requires on-going training to maintain the program model
11  integrity and this would need to be addressed in establishing any such future programs.
12  The twelve month program was too short for clients with complex, on-going needs and
13  we found this to be an expressed complaint on the part of both clients and staff who felt
14  the need for longer periods of engagement to maintain the initial gains from the program.
15  We felt that additional emphasis on employment earlier on would improve client
16  vocational choices and facilitate their involvement in establishing a supportive pro-social
17  role.  Some of the ways we felt some of the shortcomings of the program could be
18  addressed would be to establish formal agreements between the county partners, make
19  staff selection a high priority, i.e., staff need to be able to function in a multidisciplinary
20  team and motivated to do so.  Further we note the need to provide intensive and on-going
21  training to maintain program model integrity and to include quality assurance measures to
22  ensure that is accomplished.  There should be time and effort directed to developing
23  teamwork-teambuilding and there should be allowance for reduced Probation caseloads
24  as well as the anticipation and preparation to work with individuals with co-occurring
25  disorders.  Our experience also demonstrated the efficacy of utilizing the Court system to
26  support clients in completing their case plans and with that client accomplishments build
27  self-esteem and success.  With this population of clients having multiple and complex
28  needs, it is important to include wrap-around funds and flexibility since discretionary
    funding is needed for immediate needs and eligibility and other benefits programs are
    seldom immediately available to inmates being released from jail.

27.    One of the things that the original MIOCR program demonstrated was the importance of changing the role of the probation officer to being more like a case management facilitator of services. Our Probation Department and may others saw the importance and the efficacy of that model. When funding ended to pay for separate clinicians, because of the benefits of this model, the San Diego County Probation Department altered its case assignments. They retained the probation officers and deputy probation officers that we had trained in this model, they gave them a reduced caseload, specifically of mentally ill offenders, and they have continued a unit which they called the MIO (mentally ill offender) unit, which specializes in supervision and support for people with serious and persistent mental illness who are on probation.

28.    The San Diego County jail system has a capacity of approximately between 5,000 and 5,500 people. And somewhere between 15 to 26 percent of those in our facilities typically are receiving psychiatric care. Programs like our Connections Program would be suitable for this population, and could help significantly in reducing the long term growth of the population of mentally ill inmates who are in both state and county correctional facilities. The number of mentally ill people in jails is growing. My experience suggests that this is in large part because they are not given the kind of support and supervision in the community, and not engaged in programs, that keep them stable. This view is widely reflected in the literature.

29.    Simply relying on mentally ill releasees to voluntarily locate and pursue mental health care treatment alone, much less the kind of wrap-around supportive treatment of the type implemented in the Connections Program will neither address their mental health care needs nor reduce their risk of re-offending. First of all, there are not sufficient mental health care providers, facilities and resources in San Diego, and this is typical throughout the State. Secondly, the population of people who are under psychiatric care and can function acceptably in society, appreciate the mental health care they receive, and participate in it willingly and fully and the population of those who typically end up in the criminal justice system are not the same. Thus, not all those who need psychiatric care would benefit from services such as the Connections Program, though I believe many would. Those who end up in jail are likely to do so because they

-14-

are not compliant and stable in the community with whatever treatment they may receive. These tend to be the mentally ill patients for whom purely voluntary and/or consumer-run programs such as Dual Recovery Anonymous, Alcoholics Anonymous, and Narcotics Anonymous are insufficient.

30.     For this reason, I believe that programs such as the Connections Program and the type of support that inmates receive in SB 618 programs will be much more effective than purely voluntary programs such as those which may be funded under the Mental Health Services Act. Unfortunately, voluntary programs are much more effective and available to women than with men, because women are more likely to volunteer. Thus, given that the vast majority of both county and state prisoners are men, purely voluntary programs will simply not have the same positive effect in reducing recidivism, though voluntary programming should continue to be offered both in custody and in the community wherever possible.

31.     In 2005, San Diego County District Attorney Bonnie Dumanis recognized that California's high recidivism rate was causing not just public safety risks to the residents of California, but a significant economic burden to our taxpayers. In an effort to stem this unacceptable rate of recidivism in California, District Attorney Dumanis and the San Diego Community Roundtable began researching proven, successful prison rehabilitation and reentry programs throughout the country. As a result, DA Dumanis wrote and Senator Jackie Speier sponsored Senate Bill 618, which authorizes counties to develop a comprehensive multi-agency plan to prepare non-violent offenders for re-entry into their communities upon their release on parole. On October 5, 2006, Governor Arnold Schwarzenegger signed Senate Bill 618 into law.

32.     After two years of meeting and planning together and with an initial budget of $3.3 million dollars, and $3.6 million dollars budgeted for fiscal year 2008/09, San Diego's District Attorney's Office, Community Roundtable, Sheriff's Department, Public Defender's Office, Probation Department and the California Department of Corrections and Rehabilitation (CDCR), including the Parole Division, enrolled the first participants in this multi-agency re-entry program in February of 2007. I was actively involved in the development of the program and recently reviewed the data on the status of the

-15-

1   program for the Sheriff's Department.

2      33.   Unlike any other re-entry program, in SB618, the rehabilitation process starts

3   from the plea of guilty to a stipulated prison sentence.  Upon entry of the plea and

4   voluntary agreement to participate in the program, participants are screened for mental

5   and dental health by the Sheriff's Department.  The Probation Department conducts

6   vocational, literacy and substance abuse assessments.  A Classification Counselor from

7   CDCR begins the classification process, including meeting with the participant while still

8   in local custody and assigning a CDCR number, to minimize the time spent in the

9   Reception Center.  Together with the Prison Case Manager, Probation Officer, and

10  Community Case Manager, and CDCR Classification Officer, the defendant develops a

11  life plan based upon the assessments.  At the time of sentencing, the participant signs a

12  contract agreeing to comply with the conditions of the program, and is sentenced to

13  complete their prison sentence at either the California Institute for Women in Corona or

14  the Richard J. Donovan Correctional Facility in San Diego.  While in prison, the

15  participant works with their dedicated Prison Case Manager to ensure compliance with

16  the life plan, including participating in new vocational programming, substance abuse

17  treatment, education and prison industry.  Six months before release on parole, the

18  participant's Community Case Manager begins working with the participant to arrange

19  treatment, housing, vocational training, education, employment, parenting classes,

20  obtaining a driver's license or visitation rights, and even tattoo removal.  The Community

21  Case Manager will meet the participant at the door of the prison upon release on parole,

22  and for the next eighteen months will work with the parolee and Parole Agent to ensure

23  the participant's successful re-entry into San Diego.  The services will be provided even

24  after discharge from parole.   While the program is not targeted at the mentally ill per se,

25  mentally ill prisoners are allowed to and do participate in the program.

26      34. As of October 29, 2008, results of the program appear extremely promising,

27  and I believe offer a more than viable alternative to reduce the statewide prison

28  population if employed beyond San Diego County.  There are currently 375 participants

    in the program, 70 of whom are female and 305 of whom are male.  The first participants

    were released from prison in November, 2007.  A total of 99 have been released from

-16-

1  prison to date. There are currently 93 active participants living in the community, 21 of

2  whom are female and 72 of whom are male. Three program participants previously

3  released from prison have returned to prison on new violations. Three program

4  participants have returned to prison on parole violations. Thus far, the recidivism rates

5  for those participating is markedly lower than the overall rates for CDCR.

6      35. There are consistently more applicants for the program than spaces available.

7  The first participants were released from prison in November, and the Community Case

8  Managers began working with them. Some participants have already obtained G.E.D.'s

9  and are enrolling in correspondence school to obtain graduate degrees, and the majority

10  of the participants are enrolled in substance abuse treatment. The two prisons involved in

11  the program have started implementing new Vocational Programming that will be

12  available to SB618 participants, as well as other inmates, including Welding, Cabling and

13  Cosmetology. As the program matures, the costs of the initial start up will decrease per

14  inmate. The success will be measured and evaluated for three years by an independent

15  research agency. In San Diego, the ultimate goal is to have 1500 inmates participating in

   the SB618 program at any one time.

16      36. In my opinion, the SB 618 program we developed in San Diego County is a

17  very good program, and it has the potential of being very effective in helping prisoners

18  succeed in re-entering their communities, reducing re-offense rates and reducing prison

19  and jail populations. My observations about implementation of the program are based

20  on my own direct experience and observations due to my participation in creating,

21  implementing and assessing the program. The San Diego model can be replicated in

22  counties throughout California. By assisting participants throughout the time in prison

23  and for 18 months after release, this program, in my opinion, will decrease the rate of

24  recidivism and thus the costs of both victimization and incarceration, while helping to

   reducing the total number of commitments to state prisons.

25      37. My opinion on the impact of a prisoner release order on the success of SB

26  618 is that if State prisoners who would otherwise be enrolled and complete a prison-

27  based rehabilitation program were prematurely discharged from prison and unable to

28  complete the full scope of the prison-based rehabilitation programs, it's conceivable that

-17-

1   they would not do as well, and they would not obtain the full benefit of institution –

2   based rehabilitation.  A person has a life plan developed, a central component of that life

3   plan is to complete rehabilitation programs in the prison facility and then, based on the

4   success of that rehabilitation effort in the institution, they are provided case management

5   and parole supervision to continue those gains in the community once they re-enter. If

6   they get less than the full component of rehabilitation, I would expect they would have

7   benefited less than had they stayed in prison, completed the rehabilitation program and

8   continued the benefit of the case management and community re-entry services. It's akin

9   to not finishing your course of antibiotics. If you take the full course of the antibiotics,

10  you get the full benefit of the prescription.   If you stop prematurely, it's probable you're

    not going to have the benefit of the full prescription.

11          38.     In my opinion, releasing SB 618 participants prematurely and before they

12  have completed their programming before release would have a detrimental impact on the

13  success of SB 618 as a program, and a detrimental impact on both the released inmates

14  and on the community.

15          39.     It is my opinion that any form of prisoner release order which involves

16  early release of prisoners from state prison prior to completion of their sentences less

17  statutory good time credits would have a negative impact on public safety in San Diego

18  County. This opinion is based on my experience with the Connections program and my

19  general professional experience working in corrections and detention facilities.  As I

20  understand it, a proposed order would simply cut short the sentences of those nearing

21  parole without any provision of services before release and without an increase of any

22  kind in services in the community upon release.  This will harm both the inmates and the

23  public.   When adequate services, support, and supervision are provided to an inmate, and

    there is a coherent re-entry plan, people can make a successful transition to the

24  community.   Based on my more than 35 years of experience in delivery of mental health

25  care services, particularly to incarcerated individuals, my reading of the literature, my

26  participation in the creation, implementation and assessment of the Connections Program,

27  observation of the "revolving door" cycle that those who are mentally ill and who do not

28  have access to and engage in appropriate mental health care treatment, failure to

DECLARATION OF EXPERT WITNESS  RICHARD CONKLIN

1   implement good transition and re-entry services jeopardizes public safety by increasing

2   crime and then leads to reincarceration of offenders.

3          40.    Even if a prisoner release order included provision of planning and services

4   for inmates leaving prison that would not impact my opinion on whether a prisoner

5   release order would have a negative impact on public safety because there are multiple

6   steps involved that must be in place.  There must be a plan, services, staffing and

7   necessary funding to actually implement the plan.   To have any genuine impact, the plan

8   must start while the inmate is still in the facility prior to release, and must involve the

9   engagement of the inmate in a re-entry or transition plan that they agree to follow,

10  followed by provision of proper programming in the community.

11         41.    At the present time, the level of funding, availability of programs, and

12  qualified persons to staff those programs in the community is simply not sufficient to

13  handle those who are already in the community and in need of special mental health

14  programs or alcohol and drug programs or programs for people with co-occurring

15  disorders.   These programs simply cannot absorb anywhere near the number of inmates

16  which I would anticipate would be released to San Diego County early.  The corrections

17  mental health services in the jails are being taxed well above the capacity for which they

18  are funded and all of the community health programs in San Diego County are at

19  capacity. There is a significant shortage of psychiatric staff in the community mental

20  health service, and there are waiting lists in all programs.   Moreover, parolees are not

21  eligible for the community mental health programs which current exist in the community;

22  even if they were eligible, there is a significant waiting list for these services.  To

23  compound the problem, existing programs are understaffed and there are insufficient

24  numbers of mental health professionals being trained to develop a work force which is

25  going to be required  for full implementation of the Mental Health Services Act.

26         42.    Thus, even if financial resources were available – by order or otherwise --

27  to increase the number of mental health programs in the County, I do not think

28  community based organizations' mental health programs in the County would be

significantly expanded, and certainly not rapidly enough to make an appreciable

difference in the public safety impacts of a substantial prisoner release.  In addition, San

DECLARATION OF EXPERT WITNESS  RICHARD CONKLIN

Diego County has a charter requirement which limits the number of County employees and requires that above that a number of services be contracted to private businesses. So with that limitation, the process to add new or additional County services is extremely lengthy and would likely take two to three years from initiation to be able to make any meaningful impact on availability of mental health services of the scope likely to be required, even if sufficient funds, staffing and facilities could be secured.

43.    In addition, I believe there would be a negative impact on public safety if a prison population reduction measure was implemented which involves simply releasing parolees from parole supervision. The literature and my experience do not support a notion that parole supervision has no impact on obtaining compliance with parole requirements. Without parole supervision, it is very likely that the existing recidivism rate for parolees would increase. For example, extrapolating from the probation supervision provided in the Connections Program, actual experience with offenders demonstrated that the more the probation officer was in communication with, supporting, counseling and coaching the probationer, the better the probationer did. Enhancing the supervisory and supportive role of parole agents and probation officers alike is likely to lead to overall reduction in crime and recidivism. It is my opinion that simply cutting parolees loose from supervision would reduce the likelihood of them successfully avoided re-offense.

44.    In my opinion, again based on a review of available literature regarding correctional supervision, my experience and personal observations, it is simply insupportable to opine that those proposed to be released do not pose a public safety risk. In order to evaluate the particular risk that an inmate would have to public safety, he would have to be assessed to determine the characteristic of that person being released and what sort of supervision and control would they be subject to in the community. While we cannot say that any particular inmate would never be a risk to public safety, we can certainly say that there is a high risk to public safety from simply releasing prisoners without assessment, planning, programming or appropriate supervision. Criminologists have the ability to assess people and assess the degree of risk that they would pose in the community and prescribe the type and amount of supervision they would need. It is my

opinion that simply releasing prisoners early without regard to the degree of risk they pose, the amount of supervision which may be available to them upon release, and the type of programming which can and should be made available to them to increase their chance of success and reduce their risk of reoffending is irresponsible.  Without proper risk assessment and planning, it is impossible to say that there is no danger to public safety from an early release order.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.  Executed this 30th day of October at San Diego, California.

RICHARD CONKLIN