1  ANN MILLER RAVEL, County Counsel (S.B. #62139)
   THERESA J. FUENTES, Deputy County Counsel (S.B. #208588)
2  OFFICE OF THE COUNTY COUNSEL
   70 West Hedding, East Wing, 9th Floor
3  San Jose, California  95110-1770
   Telephone:  (408) 299-5900
4  Facsimile:  (408) 292-7240

5  Attorneys for Intervenor
   COUNTY OF SANTA CLARA

6

7

8                UNITED STATES DISTRICT COURT

9            FOR THE EASTERN DISTRICT OF CALIFORNIA

10          AND THE NORTHERN DISTRICT OF CALIFORNIA

11     UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

12       PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

13

14  RALPH COLEMAN, et al.,            )   No.  CIV S-90-0520 LKK JFM P
                                      )
15          Plaintiffs,               )   THREE-JUDGE COURT
                                      )
16  v.                                )
                                      )
17  ARNOLD SCHWARZENEGGER, et al.,    )
                                      )
18          Defendants.               )
    _____  )
19                                    )   No.  C01-1351 TEH
    MARCIANO PLATA, et al.,           )
20                                    )   THREE-JUDGE COURT
            Plaintiffs,               )
21                                    )   **INTERVENOR COUNTY OF SANTA
    v.                                )   CLARA'S SUPPLEMENTAL EXPERT
22                                    )   REPORT OF PAUL McINTOSH**
    ARNOLD SCHWARZENEGGER, et al.,    )
23                                    )   Trial Date: November 18, 2008
            Defendants.               )   Time:      1:30 p.m.
24                                    )   Location:  U.S.D.C. Ceremonial Courtroom
    _____  )
25

26  //

27  //

28  //

ANN MILLER RAVEL
County Counsel
County of Santa Clara
San Jose, California

Intervenor County of Santa Clara's
Supp. Expert Report of Paul McIntosh                CIV S-90-0520 LKK JFM P / C01-1351 TEH



1100 K Street
Suite 101
Sacramento
California
95814

*Telephone*
916.327-7500

*Facsimile*
916.441.5507

**Supplemental Report of Paul McIntosh**
***Coleman et al. v. Schwarzenegger* (No. CIV-S-90-0520-LKK-JFM-P (E.D. Cal)**
***Plata et al. v. Schwarzenegger* (No. C01-1351-THE (N.D. Cal)**
**September 24, 2008**

This report is a supplement to my testimony dated August 13, 2008. First, I would like court records to note a correction to my initial testimony. I stated that the cost for annual inpatient mental health treatment as reported by Santa Clara County would be $19,380 (page 5 of written testimony); this reference should have been stated as the cost of *intensive* mental health treatment (to include services such as wraparound care, full service partnerships, and residential care) rather than the cost for *inpatient* mental health treatment.

As indicated in my testimony submitted in August, CSAC administered a short survey to further support the opinions expressed in my testimony regarding the impacts to counties if the court were to order an early release of inmates or institute a prison population cap. This survey was distributed on September 3, 2008 to the county administrative officer (CAO) in 20 counties across the state representing urban, rural and suburban county perspectives.[1] On September 10, 2008, my staff conducted a conference call with survey participants to further explain the purpose of the survey and to answer any questions of the respondents. Counties were given until September 17, 2008 to complete the survey. In total, 14 counties completed the survey.[2]

The survey results further support my position that counties do not currently have the capacity to absorb an additional population, many of whom would require, in order to successfully reintegrate back into our community, some level of social service assistance. Counties would need an infusion of dedicated, ongoing resources to meet the needs of this population. Counties did not express an unwillingness to provide the supportive services and to work to aid in community reintegration; however, it is quite clear that they do not have sufficient resources – both in available staff or funding – to appropriately serve this population and maintain the current service levels being delivered to existing county residents. It is important to note that many counties are not able to adequately serve the needs that exist within their county presently; many jurisdictions are struggling financially and will continue to do so as this year's state budget contained significant cuts to counties' social service delivery system.

There are several common themes that emerged in many of the survey responses that I would like to highlight for the court. They are as follows:

---

[1] Twenty counties surveyed: Alameda, Butte, Calaveras, Fresno, Glenn, Imperial, Kern, Kings, Lassen, Los Angeles, Mendocino, Merced, Orange, Riverside, San Bernardino, San Diego, San Joaquin, Santa Barbara, Shasta, and Tuolumne.

[2] Counties completing survey: Alameda, Butte, Fresno, Glenn, Kern, Lassen, Los Angeles, Riverside, San Bernardo, San Diego, San Joaquin, Santa Barbara, Shasta and Tuolumne.

1. Counties reported that they do not have the capacity to take on additional clients within their mental health and/or alcohol and drug service programs – both inpatient and outpatient – and many are currently unable to meet the needs of their existing population. Many counties have wait times ranging from four days to four months.

2. Some counties have double digit staff vacancy rates, with one county reporting a vacancy rate of twenty percent. Several rural counties stated that they are facing shortages in the clinical professions as clinicians have left the county for positions within state prisons or state hospitals where the pay is higher. Counties are unable to compete with state salaries; this dynamic makes it difficult to recruit and retain staff.

3. Many counties stated that — in addition to mental health, alcohol and drug, and public health programs being impacted by an early release of prison inmates — several other programs would be impacted such as Medi-Cal, CalWORKS, food stamps, child protective services, Workforce Investment Act (WIA) program and County Medical Specialty Programs (CMSP). In addition, it is important to highlight that not every county surveyed has a public hospital within the county. One rural county is preparing to close its only acute psychiatric hospital in January 2009.

4. It would take time to build the necessary infrastructure, even with funding provided. The range estimated by counties varied from two months to several years. Many counties stated that resources would be needed before infrastructure could be built. Many counties have reduced staff levels due to budget cuts.

5. Housing options for released inmates would be difficult to locate in many counties. Numerous counties reported several years wait for Section 8 housing and those counties feared – as well as other counties that did not state a wait time – that released inmates, without proper discharge planning would become homeless, thus requiring more services to become stabilized or, worse, to reoffend.

The results of our recent survey reinforce my belief that counties are resilient, but are struggling mightily to address the needs of their most vulnerable residents today. Without sufficient resources and planning, both those currently utilizing services within the county and any new population added to that caseload, would be at risk and their safety and quality of life — as well as those around them — would be jeopardized. A copy of the individual survey results by county are attached.

Thank you for considering these additional opinions.

Paul McIntosh
CSAC Executive Director

# EXHIBIT A

# TO SUPPLEMENTAL EXPERT REPORT OF PAUL McINTOSH

COUNTY RESPONSES TO SEPTEMBER 2008 SURVEY REGARDING LIKELY IMPACTS OF PRISON INMATE RELEASE

| County | ALAMEDA |
|---|---|
| Mental health impacts | N/A |
| Alcohol and drug | N/A |
| Health System | N/A |
| General Assistance | Of approximately 8,500 GA clients between 50-60% of them have felony and misdeaminor convictions.  We do not know how many are parolees.  We receive no funding to supplement any services. |
| Other programs/service delivery | All shelter, emergency food, general assistance, employment training programs will be impacted. |
| Infrastructure (physical and workforce) | 6-9 months provided funding is made available. |

Page 1 of 28

COUNTY RESPONSES TO SEPTEMBER 2008 SURVEY REGARDING LIKELY IMPACTS OF PRISON INMATE RELEASE

| County | BUTTE |
|---|---|
| Mental health impacts | The impact of early release of state prisoners to Butte County's mental health services is uncertain. Undoubtedly, the caseload will increase. To what extent, it is anyone's guess. Since Butte County's mental health services are funded entirely by non-general fund dollars (realignment and other state/federal revenues), it will not impact the operations of other county departments directly. If caseload increases, it will obviously impact existing clients. |
| Alcohol and drug | The asnwer is basically same as #1. The impact of early release of state prisoners to Butte County's alcohol/drug services is uncertain. Most likely, it will have a greater impact on this program than the mental health system. It is difficult to estimate the caseload increase. Since Butte County's drug/alcohol services are funded entirely by non-general fund dollars, it will not impact the operations of other county departments directly. If caseload increases, it will obviously impact existing clients. |
| Health System | Butte County does not operate clinics or hospitals. The biggest impact will be to private and non-profit hospitals and clinics in Butte County. The impact is unknown. |
| General Assistance | Butte County does not track this number. However, we estimate that 20 or so parolees might be receiving General Assistance. We are not aware of any funding the state provides specifically for parolees. In terms of other county services, we do not track how many parolees receive services. |
| Other programs/service delivery | The biggest concern would be the foreseeable rise in crime rates. This might have a significant impact on the entire criminal justice system including police, sheriff, DA, probation, court, jail, and etc. The financial impact is difficult to quantify. |
| Infrastructure (physical and workforce) | Butte County would not build additional infrastructure. The cost of providing health and human services to additional parolees would come from existing funding. That means that … [Entry ends mid-sentence] |

COUNTY RESPONSES TO SEPTEMBER 2008 SURVEY REGARDING LIKELY IMPACTS OF PRISON INMATE RELEASE

| County | FRESNO |
|---|---|
| Mental health impacts | The Fresno County Department of Behavioral Health reports that an early release of state prisoners would significantly and negatively impact the Fresno County Mental Health Adult Department. The Department has reduced its budget appropriation for core services provided to adults due to the budget shortfall by nearly $26 million and approximately 30% of its workforce in the last 4 fiscal years. In August 2008, the Department was notified of a reduction in the Mental Health Realignment fund account due to declined state sales tax and vehicle license fees. The Department will have to cut another $1.5 million in FY 2008-09 due to the Mental Health Realignment revenue shortfall. In July 2007, the Board of Supervisors adopted the target population policy for the Department to provide mental health services for Fresno County residents. The adopted policy is to serve its priority populations as follows: 1) Medi-Cal clients who meet the State medical necessity criteria, 2) clients who need acute and crisis services, and 3) seriously and persistently mentally ill adults (schizophrenia, bipolar disorders, and major depression). If any released inmate does not meet any of the target population criteria above, they will not be served by the Department. Currently due to budget cuts and the demand for services continuing to increase, the Department's outpatient caseload ratio is higher than most counties in the State, at the ratio of 1 case manager for at least 90 clients. The Department provided services to approximately 14,000 unique/unduplicated count of adult clients in an outpatient basis in FY 2007-08. The Department has lost at least 5 psychiatrists last fiscal year and has not been able to fill its psychiatrist positions with permanent full time psychiatrists. The Department has lost its psychologists and psychiatrists to state prisons and correctional institutions due to the inability to compete for salary compensation offered to psychiatrists and psychologists by state prisons. At this time, the Department has only 4 full time permanent psychiatrists to provide services to nearly 10,000 adult clients in both acute/crisis and outpatient mental health settings. The rest of the psychiatrists are from locum tenen agencies or per diem psychiatrists. Therefore, the Department does not have the capacity nor ability to absorb more clients released from prisons (estimated 20% of 1,266 inmates or 253 inmates from the data provided from the Counties Impact Estimate report). At this time due to the shortage of psychiatrists and no psychologists, the average wait time for new adult clients to be seen for medication evaluation or psychiatrist assessment is 3-4 months. The Department's Realignment programs are not contracted out for services. A few programs funded under the Mental Health Services Act (MHSA) are contracted out but most of these programs have reached their maximum capacity already with a waiting list. |
| Alcohol and drug | The Fresno County Department of Behavioral Health reports that an early release of state prisoners would significantly and negatively impact Fresno County's alcohol and drug programs. The Department of Behavioral Health (DBH), Substance Abuse Services (SAS) Division is responsible for planning, developing, and administering a countywide alcohol and drug prevention and treatment service delivery system. SAS administers alcohol and drug treatment services primarily through contracts with community-based treatment providers. The County runs one outpatient program for women who are pregnant and/or have children. Since 2001, there have been only slight increases in alcohol and drug treatment funding. These small increases have been to Drug Medi-Cal funding, which the majority of released prisoners are not eligible for these services. Funding has remained flat over the last several years while demand for services has increased exponentially. Currently there is a 2-4 month waiting period for residential services due to this funding shortfall. Outpatient services have been able to keep wait times to between a couple of days to a couple of weeks. Many of the clients entering outpatient programs would actually benefit the most from more intensive residential programs. Outpatient services provide a stop gap measure until a residential bed becomes available. For FY 2007-08, the ratio of clients in treatment services to counseling staff was 22:1. Using the estimates provided, Fresno County would expect to get 886 prisoners that need alcohol and drug treatment services. It is assumed that these prisoners would require moderate to intensive treatment services. The average cost to adequately treat each of these prisoners is $5,832. The total cost is estimated at $5,167,152. |
| Health System | The Fresno County Department of Public Health reports that state prisoners who are released and reside in Fresno County may meet eligibility criteria to receive health care under the County indigent health care system. The County contracts with a local health care agency to provide these services. Impact of additional indigent care would be borne by the contracted agency. State prisoners who are paroled and require mental health care services would receive psychiatric and psychological care including medication support from the California Department of Corrections and Rehabilitation Parole Office. State prisoners who are released without parole and individuals completing probation may meet eligibility criteria to receive mental health services from the Fresno County Department of Behavioral |

# COUNTY RESPONSES TO SEPTEMBER 2008 SURVEY REGARDING LIKELY IMPACTS OF PRISON INMATE RELEASE

| County | FRESNO |
| --- | --- |
|  | Health. The Department provides mental health services to patients who are eligible for the Medi-Cal program and patients who are identified as seriously mentally ill. All state prisoners who are released with or without parole who meet 5150 criteria would be assessed by the Crisis Intervention Services Unit of the Department of Behavioral Health. |
| General Assistance | The Fresno County Department of Employment and Temporary Assistance reports that Fresno County does not currently track if General Relief recipients are on parole as this is not a criteria or eligibility. The only information that is requested on criminal convictions is in regards to food stamps and whether the applicant is a convicted drug felon. All of the parolees could potentially be eligible for Food Stamps, CalWorks, Medi-Cal, and/or General Relief if they meet the eligibility requirements for the programs, but without knowing the household income and asset information, it is not possible to determine the number that may qualify. In addition, parolees may have family members who are already receiving public assistance and/or housing assistance. As a worse case scenario, as an indigent adult, it can be assumed that potentially all the released parolees could become eligible for General Relief. If we make an estimate of all 1,266 parolees becoming eligible for General Relief and receiving the maximum grant of $272 per month, this would be an additional $344,352 per month in expense in General Relief grants. Since the program is time limited for employable clients, if the parolees received the maximum grant for 3 months the total impact to the General Fund would be $1,033,056 per year. This impact is higher if any of the clients are deemed incapacited and unemployable as the three month time limit restriction per 12 month period would not apply. In order to serve 1266 new clients, Fresno County estimates that an additional 6 Eligibility Workers would need to be added, with ongoing cost near $650,000. Additional one time costs may also be incurred. Fresno County does not have these funds budgeted and is not currently receiving any funding from the State to supplement services provided to parolees. |
| Other programs/service delivery | The Fresno County Department of Employment and Temporary Assistance reports that all of the parolees could potentially be eligible for Food Stamps, CalWorks, Medi-Cal, and/or General Relief as well as housing assistance through the Housing Authority, if they meet the eligibility requirements for the programs. As a worse case scenario, vocational training and job developers could expect to see an increase as 1,266 parolees descend upon Fresno County looking for emergency assistance and work, depending on their need for job training skills. The number of parolees impacting these training/vocational programs is unknown. If 10% of this number (126) enrolled in our programs, this would require approximately 1 additional Job Specialist to manage the caseload. Adding 1 additional Job Specialist will cost Fresno County an estimated $121,000. Employment opportunities are extremely limited. Fresno County's unemployment rate is currently 10.1% with 50,000 persons actively seeking employment with 5,000 job opportunities available (Workforce Investment Board). It is an employer's market in Fresno County where background checks and drug testing is routinely required. Barriers to employment such as prior convictions make it difficult to successfully become employed. Additionally, Fresno County has inadequate low cost housing and shelter for indigent adults. There is also inadequate food in our pantries/food bank for our current residents. |
| Infrastructure (physical and workforce) | The Fresno County Department of Employment and Temporary Assistance reports that due to Fresno County's high unemployment rate, the State would need to subsidize 100% of the cost for any employment for this population for a substantial period f time until they proved themselves to the employer that it was worth the risk to select them over other potential employees. The State would also need to fund and provide the staff to facilitate the hiring of parolees and monitoring of employment to help the parolees retain their positions. Additionally, any additional impact to the General Relief program would have a negative effect on the County General Fund, removing further resources to fund law enforcement and other General Funded functions. The majority of released parolees with families may qualify for CalWORKS and Welfare to Work training activities unless they were returning to family circumstances that made them ineligible for public assistance such as certain drug felonies or excessive income. Using the same 10% calculation under question #5, if 126 new cases were created by this release, we would need an additional 1 Eligibility Worker to mange the caseload. Adding 1 additional Eligibility Worker will cost Fresno County an estimated $109,000. Chances are that many parolees may have family already on public assistance and they may be added to existing cases. |

COUNTY RESPONSES TO SEPTEMBER 2008 SURVEY REGARDING LIKELY IMPACTS OF PRISON INMATE RELEASE

| County | GLENN |
|---|---|
| Mental health impacts | Health Department: The State of California under funds mental health services in this county and does not pay for services rendered. Our service ratio is currently almost 100 clients per counselor and we have one part time psychiatrist. Waiting lists are less than one week. However, additional inmates under early release would mean that non-crime offending citizens will have to wait for services and services would gravitate towards group therapy rather than one-on-one services. We already are severely limited in our ability to serve the indigent and early release would reduce the indigent caseload (which includes veterans of war) to nothing. In other words, law abiding citizens would be denied services. Currently, released prisoners that require psychiatric hospitalization have wiped out our hospitalization budget for the whole year in one quarter. Corrections has stated they would pick up the costs and have not. This has also eaten up our realignment, leaving us zero flexibility to serve our local community and reduced our ability to match MediCal, further reducing resources. More prisoners would be 110% devastating. The state has already violated their responsibility by shifting costs and burdens to local government to the point they are subjecting themselves to significant liability. |
| | Probation Department: Services through mental health are already extremely limited, if released these inmates would likely not receive any meaningful services. |
| Alcohol and drug | Health Department: ADP programs are under funded and have not received an increase in funding for 10 years. Drug Court and Prop. 36 have been cut. An early release of prisoners into these programs would mean less opportunities for existing residents or perhaps no opportunities at all. |
| | Probation Department: Programs are already impacted and often times people aren't served until a space is available. |
| Health System | Health Department: The number of providers that can see individuals without insurance is close to non-existent. MediCal providers are limited and are currently shrinking due to budget cuts and audits. Pharmacies have already stopped providing services under MediCal due to budget cuts. |
| | Probation Department: It would impact that agency, but not as much as it would impact mental health and drug/alcohol programs. |
| General Assistance | Health Department: To be answered by another department. The state has given us nothing for parolees, owes us money already promised and has wiped out local funding due to false promises. |
| | Probation Department: Unknown |
| Other programs/service delivery | Health Department: We have no employment pool to draw from to increase the number of employees, even if the state paid for it. |
| | Probation Department: There is no housing other than low income apartments which are nearly at capacity, beyond that - unknown. |
| Infrastructure (physical and workforce) | Health Department: 5 to 10 years. We have no local employment pool and recent staffing increases at state prisons has further impacted the employment pool that we can draw from as well as taken employees away from the counties. Corrections has already severely and negatively impacted counties without compensation and any further action would cause impacts beyond our ability to respond to local needs for law abiding residents. In other words, I am being asked to prioritize parolees over non-parolees or individuals that have not been incarcerated. |
| | Probation Department: 1-2 years, provided funding is made available. If not, those systems would likely be unable to support the added bodies. |

# COUNTY RESPONSES TO SEPTEMBER 2008 SURVEY REGARDING LIKELY IMPACTS OF PRISON INMATE RELEASE

| County | KERN |
|---|---|
| Mental health impacts | The community is ill-equipped to receive the portion of the potential early releases that will need services. Of the 1250 potential early releases, we can be certain based on a multitude of prior research, that 20% will be seriously mentally ill. Eighty percent of this 250 will have both mental illness and serious substance abuse and addiction. In addition, research shows that a very high percentage of paroles have substance abuse issues. 1. The County should expect significant increases in capacity by the Parole Outpatient Clinic to provide Psychiatric, therapy and case management services. Given that this is very unlikely to happen, there would be the virtual certainty that individuals having serious mental health and addiction will relapse leading to either inpatient hospitalization or re-incarceration. Kern County Mental Health is not equipped, and does not have the capacity to treat this population. |
| Alcohol and drug | 2. Due to increased inpatient costs and payroll costs, KCMH has 150 less funded positions in this yearâ€™s budget in comparison with last year. Any additional inpatient costs will result in further declines in staffing of our core adult teams that already have twice the caseload level of comparison counties. 3. Public safety will be put at risk, as this population has a higher level of danger to self and others than the population typically treated in the community. This will result in a shift of KCMH resources to pay for inpatient or locked settings for judicially involved individuals, further decimating the ability of KCMH to provide community based services. 4. The Substance Abuse treatment system is experiencing similar declines in ability to provide services. Virtually all services are now focused on Prop. 36 clients. There are no services at this point that are integrated with mental health services and have the intensity necessary to serve this population. |
| Health System | |
| General Assistance | Traditionally, Kern County has a very small General Assistance/Relief population. Currently we serve about 100 GA clients. Approximately 10 (10%) of those receiving GA benefits are parolees and only 3% of the total population are considered employable, the others are totally disabled. We would be able to serve those who may be released early, realizing that only about 6% follow through and are eligible for services. We are likely to see in increase in Medi-cal and most particularly food stamp benefits issued as parolees apply for food stamps or are added to their families cases. However, parolees are not eligible for food stamps if they are drug felons or fleeing felons. However, the Food Stamp program and Medi-cal are largely paid for through Federal and State funds. |
| Other programs/service delivery | |
| Infrastructure (physical and workforce) | |

COUNTY RESPONSES TO SEPTEMBER 2008 SURVEY REGARDING LIKELY IMPACTS OF PRISON INMATE RELEASE

| County | LASSEN |
|---|---|
| Mental health impacts | Lassen County Mental Health Department serves approximately 550 Medi-Cal eligible people whether adults, children or adolescents. The MH Department receives multiple funding streams but primarily rely on EPSDT, Short-Doyle, MHSA and the managed care contract. The Lassen County Health and Social Services Agency is comprised of nine departments of which MH already has one of the most fragile budgets based on delayed and reduced reimbursements, significant cost report settlements, minimal fund balances and resulting cash flow concerns. The MH Department in 07-08â€™ had an operating budget of $ 7.8 million. The case managers serving youth eligible through EPSDT funds have approximately 10:1 case loads for intensive case management. Case managers working with adult populations have larger case loads approximately 25:1. Both adult and children system of care case managers are under the direction of Licensed Clinical Social Workers (LCSWâ€™s) or Marriage and Family Therapist (MFT) in pursuit of licensure. The MH Department employs one FTE psychiatrist and 10 employees as either MFT or LCSW. The LCSW or MFT serve approximately 55:1 ratio if fully staff. Currently 3 FTE LCSW &/or MFT and 2 case management positions are vacant. The MH Department will provide non-emergency assessment within 12 working days of the referral and same day assessments for emergency responses. Historically the no-show rate for assessments and scheduled therapeutic appointments can exceed 25%. Seven additional adult parolees based on the current staff to client ratio is not a insignificant unless the intensity of the services is greater than the average comparables. Areas of concern include: 1. Assumption that eligible parolees meet the criteria of â€œmedical necessityâ€ that otherwise precludes Medi-cal eligibility and related funding for services. An alternative funding stream(s) is necessary if medical necessity is determined. 2. Over the past two years LCSW or MFT positions illustrate approximately a 30% vacancy rate. Continuous vacancies exist. 3. One-three vacant nurse positions exist between Utilization Review Nurse or LVN in the MH Department and the Public Health Department. HSS employees 8 PHN, RN and/or LVN medical positions. 4. Delayed and reduced reimbursements strain cash flow concerns for the fragile MH Department and related fund balances. |
| Alcohol and drug | The Lassen County Alcohol and Drug Department has a gross annual budget of $1.4 million which includes 7 counselors plus administrative support. The Counselors have approximately a 20:1 ratio whether serving Prop 36, Outpatient &/or Post natal services. The Outpatient program serves 115 people including adolescence at any given time. Approximately 40 clients participate in Prop 36/OTP (Outpatient Treatment Program) at any given time. Current waiting list exists for Outpatient Services so an Orientation group was initiated to help maintain sobriety until group therapy or counseling services become available. The average length of time from referral to assessment is 2 weeks unless emergency detoxification. OTP is the only funding stream used to provide residential services. Currently 2 clients received residential treatment services. Points of concern include: 1. Twenty-four additional clients depending on their assessed needs will likely impact residential services. However, residential services will likely be unavailable due to further reductions in Prop 36/OTP. Based on the above ratioâ€™s 1 Substance Abuse Counselor and support staff, office space and support staff is required. 2. The unknown is the required intensity due to likelihood of co-occurring disorders. 3. We do not experience any difficulty recruiting qualified Substance Abuse Counselors. |
| Health System | The Public Health Department employees 6 Public Health Nurses (PHN), Health Educators and support staff. The Environmental Health Department is not included. Current capacities are unmet due to two vacant PHN positions. The following concerns include: 1. Lassen County currently faces difficulty to recruit and retain qualified PHNâ€™s in part due to two State and one Federal prison residing within Lassen County. The State pay scales adversely impact our efforts to assure community health services. Unless the State Department of Corrections or others are willing to engage in strategies to assure â€œpay parity with Host Countyâ€ any further erosion or demand of community health significantly hampers the health of non-incarcerated people and drives up the county recruitment and retention cost. The minimal threshold of public services is currently being threatened short of this proposed policy. This maybe an isolated influence as Lassen is a small rural county with limited economic resources. A proportionate shift of State General Funds supporting institutional care services transferred to the County General Fund based on an agreed upon formula is necessary. The strategy needs to also include other key stakeholders in community health care: i.e.: Hospital and local clinics. 2. Adult vaccination clinicâ€™s and Ryan White related services are available to parolees the same as the general public. |
| General | The General Relief program is budgeted at $403, 385.00 which includes $75,000 reimbursements through approved SSI applications and |

COUNTY RESPONSES TO SEPTEMBER 2008 SURVEY REGARDING LIKELY IMPACTS OF PRISON INMATE RELEASE

| County | LASSEN |
|---|---|
| Assistance | $328,385 of County General Funds. Currently 84 people including 6 parolees receive GR services. Itâ€™s a fair assumption that the majority of the 36 possible parolees will seek GR eligibility. Proportionately a minimum of $72,000 of additional funds is required based upon access to three months of rental reimbursement ($340.00 per month) plus related case management-coordination cost. The unknown is the potential impact on CMSP and whether the county share may increase.   Other county programs can include Cal-works for parolees with families. This will increase the eligibility reviews and employment related monitoring. An approximate case load for and Integrated Case Workers (ICW) is 150:1 if fully staffed. The primary funding is TANF (federal funding stream). The difficulty is the ICWâ€™s are easy to recruit but difficult to retain due to the learning requirements and caseload sizes. Several proposals are incorporated in the current State budget process that may reduce the Cal-Work funding streams or increase requirements. Other potential impacts are Children Protective Services for parolees with families. |
| Other programs/service delivery | Section 8 Housing is provided by Plumas County Housing consortium on behalf of Lassen County. Plumas County receives the Lassen County Section 8 funds to serve both counties. The concern is the waiting list of over 100 people compared to minimal turn-over. For example: the 100th candidate currently ion the waiting list will likely wait three years before services may potentially be offered. Parolees with families may also require assistance by the Children Protective Services for children subjected to neglect or abuse. Assuming 20% of the eligible parolees to Lassen County (7 parolees) represents about a 1/3 rd caseload. |
| Infrastructure (physical and workforce) | The following comments are summarized from the content under the other questions the following is sequential to the questions and not listed by priorities:  1. One–three vacant LCSW or MFT positions $80,000 wages and benefits without over head. The primary issues isnâ€™t reimbursement but rather capacity building if Lassen County continue to be unable to recruit.    2. Public Health nurse positions comparable pay between community care and the Correctional system: i.e.: pay disparity with Host County. Strategies to encourage â€œparity in pay with Host Countyâ€ is necessary as the nurse $83,000 per year wage and benefits without over head. Approximate cost 50% increase = $41, 500 by seven positions = $310,500.  3. Alcohol and Drug Department Substance Abuse Worker $60,000 for wage and benefits without over head. One position is required.  4. Alcohol and Drug Department requires alternative funds for residential services: assumption $70.00 per day for 240 days = $16,800  5. Alternative mental health funds if parolees do not qualify for a â€œmedical necessityâ€. Further independent assessments maybe required for an accurate baseline.  6. Impact on CMSP and CPS is unknown but likely.  7. Section 8 Housing is unavailable due to long waiting list.  8. Impact on Integrated Case Workers (TANF) is minimal.   Total: Excluded #1, 6, 7, 8. $387,300.00 |

COUNTY RESPONSES TO SEPTEMBER 2008 SURVEY REGARDING LIKELY IMPACTS OF PRISON INMATE RELEASE

| County | LOS ANGELES |
|---|---|
| Mental health impacts | **Department of Mental Health** The Los Angeles County Department of Mental Health (DMH) provided services to 196,000 children, transitional age youth, adults and older adults last fiscal year. Calculating an average cost per client would be misleading and unreliable because of the great variation in number and intensity of services provided. While DMH may see some individuals only once, the department also treats many seriously mentally ill individuals who use a full range of high intensity and costly services such as hospitalization, placement in a locked facility, long term case management, conservatorship, use of multiple medications, and crisis response. Similarly, the ratio of case managers, social workers and psychiatrists to clients varies from program to program and from geographic region to region. The department has approximately 4,000 positions and currently there are 670 open positions. It is very difficult to recruit clinicians who are bilingual as needed to meet the diverse cultural needs of the County, including those who are fluent in any of the 13 languages in which DMH is required to provide services. Currently the department has 40 vacancies for psychiatrist positions, 40 vacant psychologist positions and 56 vacant licensed social worker positions.    DMH has crafted a system of care that is regional and that employs directly operated clinics as well as contract agencies in each region.  In total, DMH contracts with 233 providers, 15 freestanding psychiatric hospitals and 91 general acute medical facilities with psychiatric units.  The contract agencies refer clients who cannot be served back to the directly operated clinic in the region if they are at capacity.  The directly operated clinic may, therefore, have a waiting list but this would not apply to a contract agency in the same service area.   There is a great variation in waiting times depending on the type of service needed and the level of acuity of the clients need.   There is no waiting list for crisis services.   The sudden early release of approximately 13,155 prisoners to Los Angeles County, 20 percent or 2,630 of which are projected to immediately require mental health treatment, would overwhelm the California Department of Corrections and Rehabilitation Parole Outpatient Clinics, resulting in a cascading impact on the inpatient and outpatient resources of DMH, including mental health services provided in the County jails. This increased pressure would further strain DMH resources, its ability to maintain a balanced budget and to recruit and maintain clinicians, particularly psychiatrists, to meet the additional mental health service needs. With this large number of prisoners with mental illness being released precipitously to the streets, outpatient clinics, both directly operated and contracted, would not be able to meet the demand for emergency services, resulting in interruptions in medication continuity, increased use of County hospital psychiatric emergency and inpatient resources and increased jail recidivism.  The County Psychiatric Mobile Response Teams would be unable to handle the increased volume of calls and County hospital psychiatric emergency services and inpatient units that are already operating at capacity could be overwhelmed. Outflow from the inpatient units would also be impacted, resulting in increased lengths of stay on costly inpatient units while awaiting capacity in DMH locked and open residential treatment programs. Inmates are not eligible for Medi-Cal and SSI while they are in an institution and may therefore return to the community without any benefits. Indigent clients are treated in the directly operated programs and the release of these individuals would greatly increase the strain on the already overburdened clinics that serve indigents. DMH would most likely see a rationing of services to clients throughout the system as it struggled to serve the new inmate population.  Currently the DMH Jail Mental Health Services (JMHS) is responsible for approximately 1,700 male and female inmates in mental health housing and an average additional 675 inmates in general population housing, many of whom are repeat offenders.  Mental health housing is always at capacity and in order to serve those most in need, JMHS managers daily triage inmates to maximize the use of these resources. Should there be a precipitous release of State prisoners with mental illness, the recidivism rate would increase due to the many newly released prisoners that, without intensive mental health services and supports, would re-offend or violate terms of parole, placing additional pressure on a system that is already operating at or above capacity.    DMH contact: Susan Rajlal    (213) 381-8363    srajlal@dmh.lacounty.gov |
| Alcohol and drug impacts | **Department of Public Health**  Under Parolee Realignment, CSAC estimates that as many as 13,155 parolees may settle in Los Angeles County.  This is consistent with the information that Judge Elwood Lui, Settlement Referee, provided at the June 18, 2008, meeting of the Countywide Criminal Justice Coordinating Committee planning meeting.  In providing an update on the California Prison Overcrowding Lawsuit and the proposed settlement, Judge Lui projected that 13,000 parolees would be released over a three-year period between 2008 and 2011.  Although this timeframe is not clearly stated in CSACâ€™s communications, the Department of Public Health/Alcohol and Drug Program Administration (ADPA) assumes that release would still be true. Using the CSAC projection that 13,155 will settle in Los Angeles County and that 70 percent of those persons will have a history of substance use and or abuse, ADPA estimates that 3,150 new parolees will likely |

COUNTY RESPONSES TO SEPTEMBER 2008 SURVEY REGARDING LIKELY IMPACTS OF PRISON INMATE RELEASE

| County | LOS ANGELES |
|---|---|
| Health system impacts | require treatment annually. ADPA currently provides services to parolees under the Parolee Services Network (PSN). State funding for the PSN is $1.6 million annually, and during FY 2006-07, ADPA served 257 parolees under this program for a six month treatment stay. Using this as the basis for our projection, it costs ADPA $6,167 to serve each parolee. The nature and intensity of services for parolees is significantly higher than what is required for the normal population. Using the estimate of 3,150 parolees entering treatment each year, ADPA would estimate a minimum cost of $19.4 million annually to serve these parolees. ADPA's current treatment network is operating at capacity, with occasional short waiting lists, and cannot serve the projected numbers of additional parolees with existing resources. However, with additional State funding, ADPA would build our infrastructure to serve these new parolees through expanding our network of treatment providers. This significant increase in parolee services would require a commensurate increase in staffing to support our contract management, program monitoring and compliance, and administrative functions. DPH contact: Rose Anne Rodriguez (213) 240-8046 rosrodriguez@ph.lacounty.gov

**Department of Health Services** Because of the lack of information provided about the released parolees, including what percentage have medical needs, it is impossible to be very specific in answering these questions. This response from the Department of Health Services is "system" oriented, reflecting both public and private hospitals, as it is impossible to predict where the patients will show up under Emergency Medical Treatment and Active Labor Act (EMTALA) mandates. EMTALA generally obligates a hospital emergency department (ED) to provide emergency medical treatment until a patient is stabilized, or to transfer the patient to another hospital. Eleven EDs, and in most cases complete hospitals, have closed in Los Angeles County in the last five years alone. Over 2.5 million ED visits are provided by the remaining 74 public and private hospitals with EDs in the County. The EDs and the emergency medical services system have become the point of access for many, leading to an overall crisis in emergency care. Limitations include the shortage of nurses and other technical professionals, which reduces the number of physician specialists willing to be on-call in the EDs, increased waiting times, admitted patients being "boarded" in the ED due to lack of inpatient beds, increased acuity of patients and reduced reimbursement for care. Although it is unclear how many of the early released parolees have medical needs, lack of financial resources may lead them to seek care in public hospitals, increasing already overcrowded EDs. However, the burden will not end at the public hospitals, patients seeking care may very well go directly to the closest ED, which may be a private ED. Under Federal EMTALA laws, all patients must receive care, at least in the form of a medical screening examination and stabilization. Transfers from private to public hospitals are limited due to lack of capacity. Capacity for clinic services is also maximized to the degree possible with many public or public contracted clinics having lengthy wait times for appointments. DHS contact: Carol Meyer (213) 240-8370 cmeyer@dhs.lacounty.gov |
| General Assistance impacts | **Department of Public Social Services** Los Angeles Countys General Relief (General Assistance) Program is funded 100 percent by County funds. The Department of Public Social Services is not aware of the County receives specific funding from the State to supplement the General Relief cash grant or other services for former State prisoners. The County would be significantly impacted by the early release of the projected 13,155 former prisoners because many would be eligible for the General Relief Program. If only 50 percent of the 13,155 former prisoners applied and are determined eligible for General Relief, the County's annual General Relief grant costs would increase by an estimated $12.0 million. Additionally, an immediate release of the over 13,000 former State prisoners potentially eligible for General Relief would severely impact the County's capability to provide timely service to those applying for assistance, as well as to those persons receiving assistance. DPSS contact: Bill Taylor (562) 908-8517 btaylor@dpss.lacounty.gov |
| Other programs/service delivery impacts | **Department of Mental Health** If approximately 2,630 persons with mental illness were provided early release to Los Angeles County, there would be many challenges for DMH in addressing their housing needs. For example, those on parole cannot be served under programs that receive MHSA funding, according to current State guidelines. With the continued erosion of funding for the traditional mental health system, there are few non-MHSA resources for both mental health treatment and housing services. Given the limited non-MHSA resources and the general lack of affordable housing in Los Angeles, the challenges to assist this population would be numerous. They include many of these parolees' not being able to afford rent since an average one-bedroom apartment in Los Angeles County costs approximately $1,000 per month. Should a parolee with mental illness attempt to work to earn money for rent, it can be difficult to obtain employment with a prison record. Parolees can reapply for benefits (SSI, etc.) to help pay rent, but it is a process that can take weeks or even months. However, even with an SSI income, it is very difficult to afford housing unless one lives in an Adult Residential Care Facility |

COUNTY RESPONSES TO SEPTEMBER 2008 SURVEY REGARDING LIKELY IMPACTS OF PRISON INMATE RELEASE

| County | |
|---|---|
| | **LOS ANGELES** |
| | or a subsidized apartment. Although parolees can apply for HUD subsidized housing, such as Homeless Section 8 and Shelter Plus Care, both programs require criminal background checks and, depending on the nature of the crimes, they may be denied. Further, the number of available Homeless Section 8 and Shelter Plus Care vouchers for persons with mental health disabilities is vastly insufficient to meet the current need in Los Angeles County. For example, DMH has its own allocation of Homeless Section 8 and Shelter Plus Care for DMH clients: 500 Homeless Section 8 Vouchers and 597 Shelter Plus Care Vouchers. Aside from subsidized housing, there are few safe, available, affordable apartments in the County, and many apartment owners do not want to rent to someone with housing vouchers or criminal histories.    DMH contact: Susan Rajlal    (213) 381-8363    srajlal@dmh.lacounty.gov

**Department of Community and Senior Services**    The Department of Community and Senior Services has determined that based on an inmateâ€™s conviction(s), if convicted batterers are released, there would be an increased need for Domestic Violence (DV) shelter services, as well as other DV supportive services to aid victims to escape the batterer.    Assuming most of the early-release prisoners are male and if these male prisoners are themselves DV victims, few DV agencies are well-equipped enough to handle large number of male victims appropriately, thus creating a population without access to needed services.    DCSS contact: Vera Castillo (213) 738-4347 ecastillo@css.lacounty.gov    Department of Public Social Services    Los Angeles County contracts to provide substance abuse and treatment services to General Assistance participants through the Countyâ€™s Mandatory Substance Abuse and Recovery Program. Using the estimate that 70 percent of the released prisoners and by extension 70 percent of those eligible to General Assistance would need alcohol or drug rehabilitation, then the Countyâ€™s current General Assistance expenditures would increase by an additional $4.2 million. DPSS contact: Bill Taylor    (562) 908-8517    btaylor@dpss.lacounty.gov |
| **Infrastructure (physical and workforce) needs/impacts** | **Department of Health Services**    Because of the previously noted closure of EDs and hospital services in the Los Angeles County system, it is impossible to ensure that such services could or would expand for this population specifically. The release of additional parolees that have health care needs simply adds a greater burden to an already overwhelmed health care system.    DHS contact: Carol Meyer (213) 240-8370    cmeyer@dhs.lacounty.gov    Department of Mental Health    Many jurisdictions, including Los Angeles County, have already struggled to respond to the mental health needs of those released from local jails and state prisons. Any plan for early release of State prisoners would need to address funding for mental health services for the anticipated 20 percent of new parolees with mental illness. It is important to understand that, for the most part, these are individuals that have not sought traditional clinic-based mental health services either prior to or post prison terms.   Engaging and sustaining these individuals in mental health care has proven extremely difficult.    Programs that have demonstrated successful outcomes with decreased recidivism and psychiatric relapse are those that link to services prior to release, provide an intensive array of wrap around services with 24 hours per day, seven days per week availability for emergencies and special programming, have an on-average client to team member ratio of 15 to 1, and include housing and the attendant supportive services. The level of care provided by the Mental Health Services Act (MHSA) Full Service Partnership (FSP) model provides the best estimate of an average service requirement for this population. Based on our experience with the FSP Program, per person cost would be approximately $16,000 per year, for a total of approximately $42 million annually which includes some funding for supportive services such as a portion of housing costs.    Such a program would take approximately three years to be fully implemented, contingent upon the allocation of adequate funding, recruitment of necessary staff and establishment of appropriate facilities in communities already concerned about our clients as neighbors. One option to address State paroleesâ€™ housing needs is to build more permanent supportive housing. That would take time and is very costly. For example, Los Angeles County currently has $115 million for capital development and operating subsidies through the MHSA Housing Program. It is projected that this amount will fund operating subsidies for at least 20 years and one-third of the cost of capital development (leveraging is required) for approximately 770 supportive housing units.   Proposals for this funding are contingent upon developers being able to put together a complete capital development package and to obtain site control in a County where land costs are high and neighborhood reactions to special needs housing are at times an issue.   Based on prior experience, bringing additional supportive housing projects on line could take from three to five years. DMH contact:  Susan Rajlal    (213) 381-8363 srajlal@dmh.lacounty.gov |

COUNTY RESPONSES TO SEPTEMBER 2008 SURVEY REGARDING LIKELY IMPACTS OF PRISON INMATE RELEASE

| County | |
|---|---|
| | **LOS ANGELES** |
| | **Department of Community and Senior Services**  The Department of Community and Senior Services estimates that an additional 200 to 300 female CalWORKs recipients may seek domestic violence services as result of the early release of State prisoners. This would result in additional estimated costs of $850,000 to $900,000 annually.  Providing shelter services to the 200 to 300 additional female victims of domestic violence would result in additional costs of approximately $840,000 annually. It would take about two years to build the necessary infrastructure to serve male prisoners who are victims of domestic violence, as the current domestic violence contractors do not have the capacity to provide services exclusive to this population. In addition, the County currently does not have any domestic violence shelters to house male victims of domestic violence.   If Los Angeles County was to serve an additional 200 to 300 male victims of domestic violence, the total amount needed to do so would be between $850,000 and $900,000 annually. The funds would be needed to expand the current operations to ensure that domestic violence contractors have the capability to provide services to this new population.  Average shelter costs to provide basic domestic violence shelter services for male victims would be $80,000 annually.  Because the County does not currently fund domestic violence shelters for male victims exclusively, we anticipate the need to establish at least two shelters for this purpose at an estimated cost of $160,000 annually.   DCSS contact: Vera Castillo  (213) 738-4347  ecastillo@css.lacounty.gov |
| | **Department of Public Health**  The DPH/Alcohol and Drug Program Administration estimates that building the necessary administrative and services infrastructure would take approximately 12 months from the time of grant award.  Additional staff would be needed to handle the necessary administrative responsibilities, such as program development, contract administration, and information systems to implement the program in compliance with State requirements. The cost for the administrative responsibilities is estimated to be at least 10 percent of the total program funding, in this case $1.9 million of the total requested funding.  The time estimate also includes the time involved in obtaining internal approval for the additional requested positions needed for administering the project.  Implementation of treatment services requires the following activities: needs assessment, program planning, competitive selection process (request for proposals), contract development, and contract implementation with selected service providers.   DPH contact: Rose Anne Rodriguez  (213) 240-8046  rosrodriguez@ph.lacounty.gov |
| | **Department of Public Social Services**  The Department of Public Social Services estimates increased annual General Relief staffing costs of approximately $4.2 million to address the estimated increase in the GR cash assistance caseload of approximately 6,600 and to provide General Relief Opportunities for Work Program employment services case management for the portion of those we estimate would receive such services.   DPSS contact: Bill Taylor   (562) 908-8517    btaylor@dpss.lacounty.gov |

COUNTY RESPONSES TO SEPTEMBER 2008 SURVEY REGARDING LIKELY IMPACTS OF PRISON INMATE RELEASE

| County | RIVERSIDE |
|---|---|
| **Mental health impacts** | Response **Department of Mental Health:**   39,000 clients were served in FY 07/08. Mental health services are very limited now as a result of several years of budget cuts. Crisis services, medication services and specialized group treatment, plus peer support and limited case management services are provided within the regularly funded programs, it is anticipated that additional cuts will need to be made. Parolees are legally limited from being treated within the new Mental Health Service Act (Prop 63) programs thus their access to the services of the Department are further limited and they must compete for dwindling realignment funded services. Thus 518 additional clients needing ongoing services will only reduce further the services available to any one client, force tighter restrictions on who can be served and increase the time waiting for services.   Currently, the overall cost per client for outpatient mental health services is about $5,100 while intensive programs cost more. It is estimated that the additional parolees would cost a minimum of $2.7 million and as much as $15 million depending on the intensity of their need. Even if funds are available to provide services, expanding services would be problematic as there is a workforce shortage of all mental health professionals. |
| **Alcohol and drug** | Response **Department of Mental Health:**  Over 10,000 clients are provided treatment each year in County substance abuse services including in Prop 36 programs. Currently the residential programs have waiting lists as do the Prop 36 programs while the regular clinic outpatient programs would be expected to develop lengthy waiting lists if an additional 1,814 clients are referred. This is especially true since the Federal government provides the Department the list of priority populations who must be served first (pregnant, parenting women, current intravenous drug users, HIV positive etc). Clinical staff carry caseloads of about 40 clients in outpatient substance abuse services. Riverside is just one of 14 counties who receive Parole Services Network funds for parolees. This funding totals just over $500,000 each year for services to parolees. It does not cover the cost of all parolees currently entering the system. Other referrals come in but are treated through regularly funded services which have the same Federal priorities as described above. Thus current parolees are already seriously impacting the system even without the proposed new parolees. The average cost of services per client in the substance abuse program is $3,725 thus the estimated cost of serving the additional 1,814 parolees would be $6.8 million. |
| **Health System** | Response **Community Health Agency / Department of Public Health:**  County clinics have adequate capacity and medical staff to meet the needs of additional patients. We estimate that 30% or 780 state prisoners would require health services. Health needs of this population typically include infectious disease treatment and prevention for Tuberculosis, Hepatitis B, Hepatitis C, HIV/AIDS and sexually transmitted diseases. Chronic disease management for diabetes, hypertension and other diseases is also needed. Patients are screened to determine eligibility for Medi-Cal, Medicare and Medically Indigent Services Program health coverage. An estimation of uncompensated health care costs for 780 patients coming to the county clinic for two medical visits ($258.00, $129.00 each visit) and a comprehensive laboratory test panel ($50.00) would be $240,000 per year.   The implementation of pre-release health screening, education and discharge coordination with the county departments of public health would facilitate a smooth transition to community based health care. |
| **General Assistance** | Response **Community Health Agency / Department of Public Health:**   The Department does not track whether patients and clients accessing general assistance services are parolees or not. State funding for the HIV/AIDS Transitional Case Management Program is available for state prisoners preparing for parole. This 180-day transitional case management program meets with the parolees 90 days before release and follows them for 90 days after. Because many of these patients have complex needs, the case management services after release could last six months or more. Services include referrals to a health care provider, housing, food and job assistance and case management and support to attend medical appointments, ensure medication is taken and to help keep the patients in a stable living environment. Riverside County HIV/AIDS Program serves both Riverside and San Bernardino County. For FY 2008/09, Riverside County will receive $381,000 in grants funds to serve 121 clients. With the additional parolees we could expect to serve 10-15 additional patients with HIV disease requiring additional minimum funding in the amount of $40,000.

Department of Public Social Services:   During the application/interview process, because it does not affect eligibility, a person is not asked if they are on parole. Therefore, the Department does not identify parolees. If all of the 2,600 individuals released were eligible for General Relief Assistance, the maximum cost per month would be $756,600 plus administrative costs. These costs are entirely funded by |

COUNTY RESPONSES TO SEPTEMBER 2008 SURVEY REGARDING LIKELY IMPACTS OF PRISON INMATE RELEASE

| County | RIVERSIDE |
|---|---|
| | the County General Fund. No additional funding is provided to supplement the services provided. |
| **Other programs/service delivery** | Response  Department of Mental Health:  It is the experience of the Department that parolees are often in need of housing as well as treatment. Substance abuse programs have no housing funding at all while mental health programs have some funding for short term housing and very limited funding for ongoing housing needs. Even when housing can be identified vendors are reluctant to take parolees because of neighborhood reaction and fear. Additionally Sober Living programs although not funded by Substance Abuse, have limited capacity now and are very reluctant to take parolees. Thus parolees needing housing or sober living programs will have great difficulty accessing them. |
| | Department of Public Social Services:   Depending on household circumstances, state parolees may be eligible for CalWORKs (with Welfare to Work services), Food Stamps, Medi-Cal, Medically Indigent Services Program (MISP), In-Home Supportive Service (IHSS), Adult Protective Services (APS), Child Protective Services (CPS) and they could utilize the Emergency Shelter System. Economic Development Agency / Workforce Development:   The Agency operates a parole re-entry program assisting incarcerated and recently paroled inmates of the Banning Correctional Facility with mentoring, case management, individualized career transition planning and employment opportunities.  This population requires special services beyond our main stream delivery system.  The annual cost for operating this program is $95,000. This covers staff person and the associated operating expenses.  The program currently serves 1,800 inmates, both incarcerated and recently released individuals.  The majority of the participants receive generalized services with a much smaller number, 100 to 150 at any given time, receiving intensive case management.  The additional costs for increasing the programâ€™s capacity would be dependent on the number of expected participants and the level of service.  At a minimum, we would need to add at least 1 additional staff person plus operating expenses for a total cost of $190,000 to double the existing programâ€™s capacity. |
| **Infrastructure (physical and workforce)** | Response  Department of Mental Health:  If resources were available it is expected to take up to 18 months to hire staff, rent additional space and to contract for services. Resources need to be spread across the county to reduce the impact on any one program as the need will exist countywide. |
| | Department of Public Social Services:   It is difficult to estimate the amount of time it would take because it is unknown how many would be eligible for services. However, if potentially 2,600 paroleee is potentially 2,600 additional cases to manage. This equates to an additional 14 full caseloads which may require an additional 14 staff members, 14 workstations, and a training class.  Hiring and training staff, establishing or reconfiguring work stations to accommodate staff as well as contracting with entities to assist us in meeting work requirements and assisting with needs yet to be identified could take a year or more.  For homeless assistance, it would depend on the city of re-entry.  A cold weather shelter type approach may be necessary to open up more beds.  An estimated cost of $40.00 per bed, per night may be necessary in order to house an individual. |
| | Child Protective Services (CPS) provides services if available, to parents who are incarcerated. If all 2,600 inmates are released at one time and a significant number have children and are eligible for services via a court approved case plan, it may strain the system if they all seek services at the same time as well as impact the availability of services and funding for those services.  Economic Development Agency / Housing Authority:   Staffing costs â€" One Housing Specialist carries a family caseload of 400.  In order to serve the 2,591 individuals we would require 6.5 Housing Specialists Is.  At approximately $70,000/ Housing Specialist x 6.5 HS 1â€™s = $455,000 per year for staffing costs (including benefits).  Housing Assistance costs â€" If the released prisoners have no income then it is likely that housing assistance funds might be needed for the entire rental amount.  If the current payment standard ($860) is used yearly costs would equal $26,739,120 (2,591 x $860 x 12 months). However, if the average housing assistance payment ($228) for a one bedroom household is used yearly cost would be considerably less at $7,088,976 (2,591 x $228 x 12 months). |

COUNTY RESPONSES TO SEPTEMBER 2008 SURVEY REGARDING LIKELY IMPACTS OF PRISON INMATE RELEASE

| County | SAN BERNARDINO |
| --- | --- |
| | See Attached |



**CSAC Survey – Early Release**

It was difficult to quantify the impacts to program service due the fact that significant detail is lacking such as discharge eligibility or conditions of parolee.

1.  **Please describe how an early release of state prisoners would affect your county mental health department. Please include any information regarding how many clients you serve, cost, the ratio of case managers, social workers and psychiatrists to clients, the length of any waiting lists and the number of vacant positions you have within your county. If you contract out services to community-based agencies please note this information. (Assume 20% of inmates released into your county would require mental health services.)**

The Department of Behavioral Health (DBH) of the County of San Bernardino is responsible for providing mental health services to all age groups, with primary emphasis on treating children, families, and chronically mentally ill adults (in that priority). During our Fiscal Year July 1, 2007 through June 30, 2008 (FY 07-08) we served 37, 497 individuals of which 25,448 (68%) were adults and 12,049 (32%) were youth. These mental health services were provided through 42 county operated facilities and approximately 30 contract providers, public schools, and other community-based settings.

DBH provided approximately 33,810 direct service hours of case management with approximately 118 mental health specialists and social workers. DBH provided 72,688 direct service hours of medication management with approximately 83 psychiatrists, psychiatric technicians and mental health nurses. DBH provided 167,299 direct service hours of mental health services with approximately 187 pre-licensed and licensed clinical therapists and lead therapists. The direct services staff is currently experiencing about a 12% vacancy rate, with the county hiring process currently being slowed down due to state budget and DBH budget constraints. While DBH does not maintain waiting lists for mental health clients, it can take up to several weeks for routine appointments in some clinics, especially for psychiatry.

The projected financial impact for serving an additional 2,905 parolees with 20% (581) needing mental health services of which 10% (58) will need intensive mental health services and 90% (523) will need outpatient is as follows:

Intensive Mental Health Services:

- 58 projected intensive clients X $21,213 average cost/ client = $1,230,354.00
- Outpatient Mental Health Services:
- 523 projected outpatient clients X $12, 203 average cost/client = $6,382,169.00
- Pharmacy Cost Estimate:
- 58 intensive clients plus 523 outpatient clients X $1, 056 average cost per client = $613,536.00

2.  **Please describe how an early release of state prisoners would affect your county alcohol and drug programs. Include any available information regarding cost, county capacity to provide alcohol and drug services, staffing levels and any other pertinent information. (Assume 70% of inmates released into your county would require alcohol and drug treatment services.)**

San Bernardino County has reached capacity in all levels of treatment for clients in need of Alcohol and Drug services. With the expected budget reductions for FY 2008-09, the decrease in funding for

contracted services and County clinics, the early release of new parolees would have a significant and negative impact on Alcohol and Drug Programs.

San Bernardino County currently maintains waiting lists for all residential beds that are 1-2 months in length. The reductions in Outpatient services for FY 2008-09 have created waiting lists for services that are 6-8 weeks long and are increasing. Currently, clients seeking treatment are referred to an outpatient program, for assessment and enrollment. Clients identified as needing residential treatment are directed to call all seven residential programs to be placed on a wait list.

Based on previous assessments for the current parolee population, approximately 80% of the 2034 parolees identified for early release would benefit from residential treatment followed by an outpatient program. San Bernardino County does not have this level of capacity nor the funding to secure this level of treatment. All persons seeking treatment will be impacted by waiting lists of several months (4-6 months approx).

The projected financial impact for serving an additional 2, 034 clients based on an average cost per client of $4, 030 is $8,197,020.

3.  **Please describe how an early release of state prisoners would affect your county health system. Please include any information regarding waiting time at county clinics, shortage of physicians and nurses, costs incurred by treating individuals without any health insurance.**

    No discernable or significant impacts can be quantified at this time.

4.  **How many parolees currently utilize General Assistance services in your county? Are there other county programs utilized by state parolees? Do you receive any funding from the state to supplement the services you provide to parolees?**

    *Transitional Assistance Department*

    417 parolees currently receive General Relief at $265 per person. The state does not provide any resources to supplement General Relief services.

    - At 5%   of estimated parolees      145($265.00) = $38,425
    - At 10%  of estimated parolees      290($265.00) =$76,850.00
    - At 100% of estimated parolees      2900($265.00) =$768,500.00

5.  **Are there any other programs and/or service delivery areas, such as housing, which are not listed above that you believe will be significantly impacted? If yes, please explain. Provide any cost information or estimates, if available.**

    *Workforce Development*

    The County of San Bernardino serves paroles under our Adult and Dislocated Worker programs under the Workforce Investment Act (WIA). The only category tracked by our case management system is "offender." That category counts any individual who is or has been involved with the court system. The category is self-declared – meaning clients are not mandated to provide to provide this information in order to receive WIA services. In addition, the department is fully funded by federal dollars, so any services we provide through the WIA programs would not fiscally impact the county general fund.

*Public Health*

Early release of 2,900 inmates back into San Bernardino County is estimated to have a potential impact of $287,071. This is not an unreasonable estimate since some inmates may not visit the Public Health services, but others may have multiple visits. Other estimates are included at 50%, 10% and 5%.

| | Cost per visit | No of released | Total |
|---|---|---|---|
| | $ 98.99 | 2,900 $ | 287,071 |
| | | | |
| 5% | 145 $ | 14,354 |
| 10% | 290 $ | 28,707 |
| 50% | 1450 $ | 143,536 |

This is estimated anticipating that each inmate would make one clinic visit. The cost per clinic visit is $98.99 and is based on a calculation of various types of clinical services (but is not limited to) AIDS, TB Control, Reproductive Health and immunizations. The calculation includes salaries, benefits, supplies and pharmaceuticals.

*Office of Homeless Services*

Assuming the discharged parolees are not able to secure adequate housing, the Office of Homeless Services' workload will be significantly impacted.

6. **How much time do you estimate it would take to build the necessary infrastructure - both the structural and workforce infrastructure - to serve the additional clients discussed in questions 1 through 5? What resources would be required to build this infrastructure and how much do you estimate it would cost?**

It is estimated that it would take 180 days to assemble the necessary structural and workforce infrastructure to serve the additional clients. Resources required to build the infrastructure would include staffing costs, supplies, and program materials. The current cost to house an inmate has been estimated at over $20,000 per year. The early release of 2900 inmates would thus constitute a cost of over $58 million per year to the County of San Bernardino.

COUNTY RESPONSES TO SEPTEMBER 2008 SURVEY REGARDING LIKELY IMPACTS OF PRISON INMATE RELEASE

| County | SAN DIEGO |
|---|---|
| Mental health impacts | An impact of approximately 600 (20% of 2999) state prisoners on our adult mental health system of care would translate into a 1% increase in unique population served - based on an annual estimate of 46,000 clients over 18 years of age receiving services. Based on current percentage of utilization (duplicated count), 2% of this increase (600) would utilize Case Management services, 26% would utilize Outpatient clinic (County staffed and/or Contracted), 24% would utilize private, fee-for-service mental health providers, 4% would access MHSA Full Service Partnership programs, 27% would utilize our County's emergency psychiatric services, 3% would utilize our County's psychiatric hospital, 6% the private, fee-for-service hospitals, and 3% would utilize Crisis Residential services (contracted). Our current year-to-date mean wait-time for initial assessment is 4.9 days, with a mean YTD wait-time for psychiatric assessment at 8.3 days. |
| Alcohol and drug | Based on the following assumptions: § Statewide Impact: 40,000   § San Diego Impact: 2,999   § 70% in need of AOD treatment: 2,100 § AOD treatment costs: $10,000,000/year (approx.)   The County of San Diego has no vacant capacity to serve new parolees. Existing parolee program maintains nearly a one month waiting list.    It is anticipated that 75% of parolees will need residential treatment (based on needs of current parolee program), and a larger proportion than the general population most likely will be intravenous drug users, which is a priority population for services, allowing them to move to the top of the waiting lists. Without additional capacity, all people seeking residential services in the county could be impacted through significantly longer waiting times (currently range from 2-8 weeks depending on the program, etc.). |
| Health System | For County Medical Services (CMS), estimate anywhere from 1200 to 2400 additional applicants. Total costs would be from $4.8 to $9.6 million. Most of the cost would result from providing medical services.    Other impacts would be increase backlog in application processing. |
| General Assistance | The County of San Diego currently has two parolees on General Relief. Parolees could  potentially be eligible to Food Stamps.  No state funding is received for the General Assistance program. |
| Other programs/service delivery | Food Stamps. Given the current number of parolees on Food Stamps (16) compared to the total FS caseload of more than 20,000 cases we anticipate the FS impact negligible.    Public Health • According to data from the U.S. Department of Justice, Bureau of Justice Statistics, 0.7% of the California prison population had an HIV or AIDS diagnosis in 2006. Using this percentage, of the 2,999 inmates projected to be released to San Diego, 21 are estimated to be people living with HIV/AIDS (PLWH/A).   • Our  AIDS Case Management (ACM) program (which works with inmates/ex-inmates), indicates that almost all inmates released from state prison have no health insurance; a few may have private insurance, but that's rare.  If in prison for more than one year, even those eligible for Medi-Cal must re-apply.   • Based upon service utilization cost data for Ryan White healthcare-related services for PLWH/A (primary care, medical specialty care, dental care, and medical case management [the latter specific to ACM, which serves this population]), the average cost per individual per year is $5,545, or $116,445 for these 21 individuals.   • If treatment for additional health-related needs (mental health, substance abuse, tuberculosis, hepatitis B, hepatitis C, sexually transmitted diseases) is considered, costs could rise to as high as $8,094 per client, or $169,974 for the 21 individuals.   The additional cost projections are based on Ryan White service utilization and cost data, and needs assessment data from the 2006 survey of people living with HIV/AIDS in San Diego County (1,001 total responses), 13% [135] identified as ex-inmates).   ○ Of the 135 ex-inmates responding to the 2006 survey, 59% reported chronic or severe mental illness (vs. 36% total sample), 85% reported a history of drug use (50% specifically reported a history of injection drug use), 17% reported a sexually transmitted disease in the past six months, 34% had hepatitis C, 19% hepatitis B and 2% tuberculosis. Mean monthly income for ex-inmate survey respondents was 25% lower than the total sample. Fifty-three percent reported a being homeless at some time in the past 12 months (vs. 22% of total); 29% were currently homeless (vs. 10% total). |
| Infrastructure (physical and workforce) | Alcohol and Drug Services  Additional alcohol and drug treatment capacity to accommodate the increased demand for services would require the County to competitively procure additional residential and outpatient treatment facilities and programs.  Such a process would take a minimum of 9 months to complete.    County Medical Services  It is  anticipated that three to six  additional staff would be needed to process County Medical Services (CMS) applications.  It would take five to eight weeks to hire and train this staff.  Other programs such as CalWORKs, Food Stamps and Medi-Cal would be able to absorb the additional caseload. |

COUNTY RESPONSES TO SEPTEMBER 2008 SURVEY REGARDING LIKELY IMPACTS OF PRISON INMATE RELEASE

| County | SAN JOAQUIN |
|---|---|
| Mental health impacts | The early release of state prisoners would have a significant detrimental impact on the department's ability to adequately serve current patients, let alone the additional 170 patients (20% of 851 prisoners) this survey projects will require treatment upon return to San Joaquin County. Indeed, an existing shortage of resources seriously challenges the department's ability to provide services to the approximately 13,000 patients expected to be treated this fiscal year. An estimated 8,000 of these patients will be treated on an on-going basis. The annual cost to provide services to the 13,000 patients/year is $66.2 Million, or approximately $5,090 per patient/year. An additional 170 patients would be expected to add a minimum of $865,360 in additional annual operating costs. The most significant factor responsible for the department's challenge to provide services is the inability to compete for staff with the State Department of Corrections and Rehabilitation (CDCR) and the State Department of Mental Health (DMH). Four psychiatrists have resigned and moved on to CDCR and the DMH to benefit from the recent substantial salary increases offered by each. Two other psychiatrists have sought employment in the more lucrative private sector. This has reduced the number of psychiatrists in the department from 19 to 13. During that same period the department has only been able to hire one psychiatrist on a .75 Full Time Equivalent (FTE) basis, bringing current actual FTE to 13.75. These psychiatrists assist the department to provide a full range of community mental health services, including: inpatient (40 beds), crisis services (24/7), medication management (to most of the 8,000 on-going patients), correctional health services (county jail), and child psychiatry services. The department has attempted to make up for the shortage of psychiatrists through the use of costly temporary assignment psychiatrists (locum tenens). As the result of the proximity of state correctional facilities to and within San Joaquin County, and lacking the resources to satisfactorily compete, the department anticipates continued challenges in recruiting and filling these key positions. There are 41 positions currently being held vacant due to the uncertainty of the fiscal environment, i.e., no State budget and struggling economy. While the bulk of services are county operated, the department does have some $14.8 Million in community services contracts with community based organizations. The early release of state prisoners would have a significant detrimental impact on the department's ability to adequately serve current patients, let alone the additional 170 patients (20% of 851 prisoners) this survey projects would require treatment upon return to San Joaquin County. Indeed, an existing shortage of resources seriously challenges the department's ability to provide services to the approximately 13,000 patients expected to be treated this fiscal year. An estimated 8,000 of these patients would be treated on an on-going basis. The annual cost to provide services to the 13,000 patients/year is $66.2 Million, or approximately $5,090 per patient/year. An additional 170 patients would be expected to add a minimum of $865,360 in additional annual operating costs. The most significant factor responsible for the department's challenge to provide services is the inability to compete for staff with the State Department of Corrections and Rehabilitation (CDCR) and the State Department of Mental Health (DMH). Four psychiatrists have resigned and moved on to CDCR and the DMH to benefit from the recent substantial salary increases offered by each. Two other psychiatrists have sought employment in the more lucrative private sector. These resignations have reduced the number of psychiatrists in the department from 19 to 13. During that same period the department has only been able to hire one psychiatrist on a .75 Full Time Equivalent (FTE) basis, bringing current actual FTE to 13.75. These psychiatrists assist the department to provide a full range of community mental health services, including: inpatient (40 beds), crisis services (24/7), medication management (to most of the 8,000 on-going patients), correctional health services (county jail), and child psychiatry services. The department has attempted to make up for the shortage of psychiatrists through the use of costly temporary assignment psychiatrists (locum tenens). As the result of the proximity of state correctional facilities to and within San Joaquin County, and lacking the resources to satisfactorily compete, the department anticipates continued challenges in recruiting and filling these key positions. There are 41 positions currently being held vacant due to the uncertainty of the fiscal environment, i.e., no State budget and struggling economy. While the bulk of services are county operated, the department does have some $14.8 Million in community services contracts with community based organizations. |
| Alcohol and drug | As the result of significant declines in revenues and increased costs, the County's alcohol and drug programs have moved to |

COUNTY RESPONSES TO SEPTEMBER 2008 SURVEY REGARDING LIKELY IMPACTS OF PRISON INMATE RELEASE

| County | SAN JOAQUIN |
|---|---|
| | a strict financial assessment before accepting an individual into treatment. The individual seeking treatment needs to qualify for Drug Medi-Cal, or demonstrate an ability to pay for treatment, including making an advance payment if desiring residential treatment, before being accepted into a treatment program. The decline in funding and the strict financial screening has severely impacted access to treatment services over the last six years (2003-04 through 2008-09). Consequently, the 596 released prisoners (70% of 851 released prisoners) projected to require alcohol and drug treatment in San Joaquin County would be served only if they could demonstrate the ability to pay as described above. After just having been released from prison, aside from those few receiving substantial financial assistance from family or friends, it is unlikely that very many released prisoners would be financially eligible for services. The exception would be those eligible for treatment programs funded by grants, for instance Proposition 36. However, Proposition 36 funding for San Joaquin County has suffered a $1 Million reduction over the last two fiscal years and is not able to provide the level of service most referrals require.   The reductions over the last six years have included a reduction of  $4.2 Million in funding and 152 fewer staff. Most importantly, intakes have diminished from 5,191 in 2003-04 to a projected 2,950 in this fiscal year. This figure represents a reduction of 2,233 intakes of those individuals seeking treatment for substance abuse.   The current year costs to provide alcohol and drug treatment services for approximately 2,950 clients is budgeted to be $8.1 Million, or $2,750 per client/year. An additional 596 alcohol and drug treatment clients would be expected to add a minimum of $1.6 Million in additional annual operating costs. |
| Health System | It is likely that any early release of inmates would impact our county health system, from a public health and direct medical services perspective (Behavioral Health Services impacts outlined in #1 and #2). In general, former state inmates may have diagnosed, or undiagnosed, communicable diseases common in prison settings, including but not limited to HIV, Hepatitis (A, B, C), Tuberculosis (TB), Prison-acquired Staph and MRSA. Providing Public Health services such as case management, contact tracing, and Directly Observed Therapy (DOT) could negatively impact already strained and under- funded services. Using an estimate of 851 prisoners released under this order, if we conservatively estimate only 10% require Public Health Services, an additional 85 cases to manage would require at least 3-4 FTE of new staff to absorb the caseload (Public Health Nurses, Outreach workers), an unfunded impact of $350-400,000 annually. The cost of the DOT regime provided to a drug-resistant TB patient is over $46,000 for the pharmaceuticals alone. For the county medical services, provided through clinics and hospital services at San Joaquin General Hospital (SJGH), many of these released prisoners would be eligible for indigent care under W&I Code 17000 if they meet residency and income requirements. A large number of these former inmates would have both acute and chronic illnesses and would need access to care, and given the limited employment options, would meet county eligibility. If all the 851 released inmates met eligibility and accessed care at the same rate as other medically indigent persons enrolled in the program, the financial impact on the county would be approximately $4.6 to $5.0 million annually. This calculation is arrived at using averages. It is possible a smaller number would access care; it is also possible that given the general medical condition of released prisoners, the high level of chronic conditions and acuity of disease, the estimates of care for this population could be low. For example, for a Hepatitis C patient, a course of treatment, pharmaceutical costs only, can be as high as $10,000. While entry into primary care for an additional 851 persons is difficult to achieve (average wait for a non-urgent appointment for a new patient is 7-10 days), the impact on specialty services are even more of a challenge.  Next available appointments in some specialty clinics are as follows: rheumatology is 6 months; renal clinic is 8 months; orthopedic surgery is 6 months; neurology is 3-4 months; endocrinology is 4-6 months. San Joaquin General Hospital is located in a federally-designated Health Professional Shortage Area (HPSA) and has several areas of the county that are considered Medically Underserved Areas (MUA). Our workforce shortages are especially acute and are outlined in #6 below. |
| General Assistance | a. Unknown â€˜ our estimate is 84  b. Unknown â€˜ possibly IHSS, Cash Assistance, and/or CalWORKs Services  c. No.  Other comments:  Of the 851 paroles, it is estimated that 681 parolees would receive benefits from the County General Assistance Program at an annual cost of approximately $3 million (681 parolees x 12 months x $367/mo.). |
| Other programs/service delivery | The Workforce Investment Act (WIA) program and workforce development program, administered in San Joaquin County by the Employment and Economic Development Department (EEDD), would be negatively impacted by the early release of state |

COUNTY RESPONSES TO SEPTEMBER 2008 SURVEY REGARDING LIKELY IMPACTS OF PRISON INMATE RELEASE

| County | |
|---|---|
| **SAN JOAQUIN** | prisoners. Currently our five (5) One-Stop Career Center facilities (known as WorkNet Centers) see a total of approximately 100 individuals a month that have been released from prison/jail and are looking for employment. In addition to the 100 individuals a month served at the WorkNet Centers, EEDD staff also provides services to approximately 120 parolees every two weeks through the Parole and Community Team (PACT) meetings held at the State Parole Departmentâ€™s facility in Stockton. Because of their unique needs, EEDD staff spends significantly more time working with these individuals to help them find employment. This extra time spent creates a burden on our local workforce development system which has been devastated by budget cuts over the past four years. An increase in the number of parolees seeking employment would be a strain on the WorkNet system. Because San Joaquin County has been targeted to open the first re-entry facility in the State, EEDD has been actively involved in the Stateâ€™s Project New Start. Project New Start is a partnership between the California Department of Corrections and Rehabilitation and the state Workforce Investment Boards, and the purpose is to increase the number of parolees placed into employment and reduce the recidivism rate.    Project New Start would require additional resources from the WorkNet Centers, therefore, an early release of state prisoners may have a negative impact on this Project by increasing the number of parolees that need to be served.    The workforce investment system in San Joaquin County is already serving over 20,000 job seekers per year and has been under stress from budget cuts and a rising unemployment rate that is currently at 10.6%.    The early release of state prisoners would negatively affect the workforce development system, administered in San Joaquin County by the Employment and Economic Development Department (EEDD), would be negatively impacted by the early release of state prisoners.  Currently our five (5) One-Stop Career Center facilities (known as WorkNet Centers) see a total of approximately 100 individuals a month that have been released from prison/jail and are looking for employment. In addition to the 100 individuals a month served at the WorkNet Centers, EEDD staff also provides services to approximately 120 parolees every two weeks through the Parole and Community Team (PACT) meetings held at the State Parole Departmentâ€™s facility in Stockton.  Because of their unique needs, EEDD staff spends significantly more time working with these individuals to help them find employment.  This extra time spent creates a burden on our local workforce development system which has been devastated by budget cuts over the past four years.  An increase in the number of parolees seeking employment would be a strain on the WorkNet system.  Because San Joaquin County has been targeted to open the first re-entry facility in the State, EEDD has been actively involved in the Stateâ€™s Project New Start.  Project New Start is a partnership between the California Department of Corrections and Rehabilitation and the state Workforce Investment Boards and the purpose is to increase the number of parolees placed into employment and reduce the recidivism rate.   Project New Start would require additional resources from the WorkNet Centers, therefore, an early release of state prisoners may have a negative impact on this Project by increasing the number of parolees that need to be served.   The workforce investment system in San Joaquin County is already serving over 20,000 job seekers per year and has been under stress from budget cuts and a rising unemployment rate that is currently at 10.6%.   The early release of state prisoners would negatively affect the workforce investment system in San Joaquin County by increasing the number of parolees needing employment and training services through the WorkNet Centers.  The Workforce Investment Act (WIA) program and workforce development system, administered in San Joaquin County by the Employment and Economic Development Department (EEDD), would be negatively impacted by the early release of state prisoners.  Currently our five (5) One-Stop Career Center facilities (known as WorkNet Centers) see a total of approximately 100 individuals a month that have been released from prison/jail and are looking for employment. In addition to the 100 individuals a month served at the WorkNet Centers, EEDD staff also provides services to approximately 120 parolees every two weeks through the Parole and Community Team (PACT) meetings held at the State Parole Departmentâ€™s facility in Stockton.  Because of their unique needs, EEDD staff spends significantly more time working with these individuals to help them find employment.  This extra time spent creates a burden on our local workforce development system which has been devastated by budget cuts over the past four years.  An increase in the number of parolees seeking employment would be a strain on the WorkNet system.  Because San Joaquin County has been targeted to open the first re-entry facility in the State, EEDD has been |

# COUNTY RESPONSES TO SEPTEMBER 2008 SURVEY REGARDING LIKELY IMPACTS OF PRISON INMATE RELEASE

| County | SAN JOAQUIN |
|---|---|
|  | actively involved in the State's Project New Start. Project New Start is a partnership between the California Department of Corrections and Rehabilitation and the state Workforce Investment Boards and the purpose is to increase the number of parolees placed into employment and reduce the recidivism rate.    Project New Start would require additional resources from the WorkNet Centers, therefore, an early release of state prisoners may have a negative impact on this Project by increasing the number of parolees that need to be served.    The workforce investment system in San Joaquin County is already serving over 20,000 job seekers per year and has been under stress from budget cuts and a rising unemployment rate that is currently at 10.6%.    The early release of state prisoners would negatively affect the workforce investment system in San Joaquin County by increasing the number of parolees needing employment and training services through the WorkNet Centers.    Furthermore, in San Joaquin County, there are 1,165 of General Assistance recipients.  Of this total, 440 are homeless and cannot find affordable housing.  The Human Services Agency anticipates that most of the 681 parolees of the early release program in our County will not be able to locate housing and are not eligible for other housing assistance. |
| Infrastructure (physical and workforce) | a) The primary impact on the health care infrastructure to absorb 851 released prisoners would be in workforce recruitment and retention. The Economic and Workforce Development Council, Business and Workforce Performance Improvement Initiative completed a Regional Allied Health Employment Trends and Opportunities for the Central Valley Region, February 19, 2008.  The report was commissioned to identify unmet employee workforce needs and addressed the following health professions:  Emergency Medical Technicians and Paramedics, Health Information Technicians, Home Health Aides, Medical Assistants, Medical Laboratory Technicians, Medical Transcriptions, Nursing Aides, Pharmacy Aides, Pharmacy Technicians, Physical Therapy Aides, Physical Therapy Assistants, Radiological Technologist, Respiratory Therapists, and Surgical Technologists.    The report indicates that at least 10,000 more employees in these categories will be needed in the Central Valley by 2014. This high number is due to both new job growth and replacement job projections. A further point of interest in this table is that in most cases, salary ranges in the Central Region are slightly below those of the state as a whole.  According to a December 12, 2005 report completed by the Congressional Research Service, the Library of Congress entitled: California's San Joaquin Valley: A Region in Transition, the number of physicians per 1,000 population in the San Joaquin Valley is exceptionally low.  The number of doctors per 1,000/population is one indicator of the availability of health care in a region. For the United States in 2001, there were 2.3 doctors engaged in patient care per 1,000/population.  Total active doctors in the United States were 2.6 per 1,000/population.  The latter figure includes physicians engaged in teaching, research, and administration as well as patient care physicians.  In the San Joaquin Valley, there were 1.3 physicians engaged in patient care per 1,000/population and 1.4 active doctors per 1,000/population in 2001. The State of California in 2001 had 2.2 doctors engaged in patient care per 1,000/population and 2.5 per 1,000/population total.    In August 2008, The San Joaquin Specialty Access Coalition, San Joaquin County, with assistance from The Camden Group, conducted a comprehensive analysis of Physician to Population Ratios in San Joaquin County.  The analysis further demonstrates a significant shortage of physicians in primary care, and medical and surgical specialties and that the shortage will continue to become more acute by 2011.  Using several methodologies, the shortage ranges from a low of approximately 125 physicians to a high of as many as 250 physicians may be needed in the next 5-10 years.  On a per capita basis, the number of Registered Nurses (RN) places the State of California 49th in the nation.  A national sample survey of RNs conducted in 2001, indicated that California has 585 RNs per 100,000/ population - compared with the national average of 798. The state forecast for 2030 predicts that Californians will need 100,000 to 120,000 more nurses than the state will have available to meet health care needs. In 2006, The University of California at San Francisco completed a projection of registered nursing needs for the Central San Joaquin Valley and central Sierras, including the following counties: Alpine, Amador, Calaveras, Fresno, Inyo, Kern, Kings, Madera, Mariposa, Merced, Mono, San Joaquin, Stanislaus, Tulare and Tuolumne counties. The University concluded that there is a substantial shortage of over 3,200 RNs in the Central Valley.   Training time to produce health care professionals and the cost for the training is considerable. RNs at the Associate degree level, require two years of education; 4 years for a BSN degree. Licensed Vocational Nurses (LVN) and Psychiatric Technicians require 1.5 years of education. Physician training, depending on specialty, requires 6-8 years of post-graduate study.    San Joaquin County Health Care Services has |

COUNTY RESPONSES TO SEPTEMBER 2008 SURVEY REGARDING LIKELY IMPACTS OF PRISON INMATE RELEASE

| County | |
|--------|--|
| **SAN JOAQUIN** | experienced considerable difficulties in the recruitment and retention of all levels of health care professionals. The workforce issues are considerable and some long range strategies, such as the development of a medical school at UC Merced, are contemplated. In the short term, we have inadequate health care workforce resources to serve our current population. Resources to serve lower income persons are smaller still. Many physicians in our community will not serve, or strictly limit, self pay or Medi-Cal patients from their practices. Therefore, a disproportionate share of these residents seek care in our clinics, in our emergency department and in our county hospital. The Prison Receiver is in the process of an Environmental Impact Report for a prison hospital near Stockton. It is estimated this new facility would require 3,030 staff. Although staffing matrices have not been provided, San Joaquin County has estimated the additional need for health care professionals to staff this facility would be 200 RNs, 300 LVN/Psych Techs, and 300 health care aides. It is likely that over 300 additional staff would be required, at a minimum, including but not limited to the following categories: Physicians (primary and specialty), Pharmacy (Pharmacist and Pharmacy Technician), Medical Records (Coding, Filing, Abstraction, and Correspondence), Rehabilitation Therapy (Physical/Occupational Therapist and Therapy Aides), Laboratory (Laboratory Technician), and Radiology (Radiology Technician). It is difficult to contemplate how a Medically Underserved Area would be able to absorb both an early release of prisoners and provide staffing for a medical facility nearly twice the size of all current licensed acute care hospital beds in the county combined. CDCR is also opening a 350 (or greater) inmate re-entry facility in the near future that must also be staffed to provide medical and mental health services to inmates. The re-entry facility would add to the infrastructure and service burdens outlined above for early release. b) The primary impact on the workforce investment system infrastructure to absorb 851 released prisoners would be in workforce recruitment. Some personnel and facility accommodations would need to occur to meet the demand created by the early release of state prisoners, the extent to which is currently unknown. Some structural accommodations would need to occur, but the majority of costs would be associated with hiring additional staff to meet the unique needs of the parolee community. Workforce investment would include the hiring of additional case managers and job developers. In addition, training would need to be provided to the newly hired staff that focuses on the unique needs of the parolee community and their families. Marketing and outreach to employers that may hire parolees would also be necessary. A cost estimate would be difficult to determine as it would be based on the number of prisoners released early. The cost of a case manager or job developer would be approximately $90,000 annually, which includes the cost of salaries and benefits plus other costs such as mileage, space/utilities, office supplies, etc. |

COUNTY RESPONSES TO SEPTEMBER 2008 SURVEY REGARDING LIKELY IMPACTS OF PRISON INMATE RELEASE

| County | SANTA BARBARA |
|---|---|
| Mental health impacts | Due to budget constraints, we have been forced to significantly restructure services to address an $8.6 million dollar shortfall. Careful consideration of the redesign of county operated outpatient clinic and contracted services has been carried out based on a current projection of clients requiring services. The addition of a potential pool of 80 new persons with severe mental illness with accompanying social, vocational and housing needs would create a severe burden to an already shaky system.  Total Adult clients served: 3,710 at a cost of $38,527,000 million in FY 07-08  The ratio of clients to care coordinators is 1:57 with the ratio of clients to Psychiatrists at 1:330  There are no formal waiting lists but the average time to the first appointment is 6-8 weeks  The number of Adult Outpatient staff is 76.75 and we have a current vacancy rate of 16%  Services under contract to local agencies total $20,995 million |
| Alcohol and drug | The Alcohol and Drug Program has been forced to significantly restructure services to address a $667,000 shortfall for FY 08-09 with a significant reduction of local trust funds. The duration of treatment programs and the level of services have been reduced. We contract for our community treatment services and local agencies have been forced to eliminate staff. Adding a potential pool of 283 new persons with substance use issues with persistent social, vocational and housing needs would also create a severe burden to an already shaky system. We would assume ten percent would require residential treatment and currently do not have facilities that could accommodate male prisoners. |
| Health System | Without knowing either the demographics or the health status of the 404 prisoners that might be released to Santa Barbara County, it is very difficult to determine the impact to the county health system. Even if all of them require some sort of primary care, absorbing a countyâ€™s six clinics. As a result of changes to our scheduling practices with the implementation of open access scheduling, wait times for appointments in our clinics vary from two days to three weeks for a new appointment. However, same or next day urgent care appointments are available in five of our clinics for patients who need to be seen before being scheduled with their regular physician. The most significant potential impact is financial but, again, that is very difficult to calculate without knowing how many prisoners will use the system, the nature of the medical condition of those that do and their insurance status. Prisoners who are categorically eligible for our Medically Indigent Adult Program (MIA) will pose the most significant financial impact to our department. The average cost of providing clinic based, specialty and hospital services for a patient eligible for MIA is @ $4,400/yr. Patients eligible for the MIA program are those between 21 and 64 years of age who are not categorically eligible for Medi-Cal, are residents of Santa Barbara County, are citizens or Permanent Resident Aliens and who meet certain income and property guidelines. If half of the potential released prisoners are in need of medical care and are MIA eligible, the potential cost to the county would be $880,800.   The average cost of providing clinic services for uninsured residents of the county is @ $635/year. We are not financially responsible for the community based specialty care or hospitalization of these patients so the financial impact for this population is much smaller. However, there is a potential impact to Tobacco Settlement funding for Specialty Care, Emergency Room and In-Patient Hospital care which would further stress the limited funding provided to community physicians and hospitals that care for the uninsured. It is difficult to calculate the impact without knowing the health status of the inmates being released.  It is likely that some portion of those prisoners being released are Medi-Cal or Medicare eligible based on either age, disability or family composition. The revenue generated from visits could offset some of the cost incurred in caring for MIA or uninsured patients in our clinic system. |
| General Assistance | Countywide, we currently have 33 parolees receiving General Assistance (called General Relief in Santa Barbara County) out of 362 active cases, which equates to 9% of our General Relief cases that are parolees. We find that we currently have 15 parolees out of 124 cases in the Santa Maria area, 10 parolees out of 129 cases in the Santa Barbara area, and 8 parolees out of 97 cases in the Lompoc area.  Almost all General Relief recipients, including parolees, qualify for the Food Stamps program, as well.  Social Services receives no funding from the state to supplement the services we provide to parolees; parolees are either eligible for a public assistance program or not. |
| Other programs/service delivery | Specially residential treatment would need to be offered as cited in Question 2.  We would also expect the caseload to increase for job placement/vocational training at the Workforce Resource Centers. Dependign on the composition of the prisoners released (i.e. single female head with children), there may be an impact to CalWorks and child care services. |

COUNTY RESPONSES TO SEPTEMBER 2008 SURVEY REGARDING LIKELY IMPACTS OF PRISON INMATE RELEASE

| County | SANTA BARBARA |
|--------|---------------|
| Infrastructure (physical and workforce) | Mental Health Services: Estimated time to establish admission and treatment service functions would be 60 days. The County would need to retain 2.0 FTE additional case management positions to carry out care coordination and 1.0 FTE Licensed Practitioner to assume Utilization Management duties for 80 new clients. These positions are currently scheduled for elimination in FY 09-10. Alcohol and Drug Services: The County would need to develop a residential substance use treatment facility for men at an estimated cost of $300,000 and would need to establish expanded contracts for community outpatient treatment providers at an estimated cost of $1.284 million and a timeframe of 6-9 months to develop. |

COUNTY RESPONSES TO SEPTEMBER 2008 SURVEY REGARDING LIKELY IMPACTS OF PRISON INMATE RELEASE

| County | SHASTA |
|---|---|
| Mental health impacts | The analysis provided by CSAC was based upon 2006 statistical measures that 375 of the 40,000 prisoners released would be returning to Shasta County and an estimate that 20 percent of those, or 75 prisoners, would require mental health services, however it should be noted that this estimated percentage might not be accurate as research has indicated that the number of prisoners incarcerated with severe mental illness has exploded (Geraghty & Kraus, 1998; Linhorst, D. & Turner, M., 1999; Monahan et al, 2003; Solomon & Draine, 1995). Mental illness is four to five times more prominent in the prison population than the general population (Hartwell, 2004; Pallone 1990). As such the suggestion that 20 percent may need mental health services might be a low number. Further, when there exists co-morbidity of substance abuse and mental illness it exacerbates the problem.  Relative to this discussion is the uncertainty of the status of individuals who may be released if such an order is made. Two general possibilities are: those released by court order will be placed on parole; or those released will not be subject to parole. In the first instance, a majority of the mental health needs of those released would be a state responsibility during the period of parole as all parolee requests for mental health services are referred back to their parole agent and the parole outpatient program, however, questions relative to other costs still exist. These questions include:  o Is the state responsible for covering the cost of:  ï¿§ State mental/medical hospitalization  ï¿§ LPS conservatorship  ï¿§ IMD hospitalization  ï¿§ Court ordered mental health evaluations  ï¿§ Discharge planning  ï¿§ Housing  ï¿§ Transportation to locked facilities  It is the latter case (not released on parole) where the impact would be most felt in the county mental health services delivery and county budget. For this brief we will address two models of care and the cost associated with them. Either or both models could be required:  â€¢ The most successful and comprehensive model of care targets a case ratio of 1 social worker to 15 clients. Services provided should include:  o Housing  o Service Coordination  ï¿§ Mental health assessment  ï¿§ Treatment planning  o Counseling  o Money Management (payee)  o Employment  o Medication Management  o Transportation Training  o Entitlement Support (SSI, Medi-Cal...)  â€¢ The estimated cost is roughly $14,000 per client and is based on what the department budgeted for Prop. 63 full service partners.  â€¢ Traditional outpatient services provided and funded under realignment include:  o Service Coordination  ï¿§ Mental health assessment  ï¿§ Treatment planning  o Medication management  o Referrals to:  ï¿§ Housing  ï¿§ Employment   The estimated cost is roughly $4,500 per client and is based on the departments $18 million (realignment) budget for adults/youth and divided by approximately 4000 clients.  â€¢ Noted Concerns:  o Staffing Shortage  ï¿§ Current realignment budget case load:  â€¢ 1 to 180 adults  â€¢ 1 to 45 youth  ï¿§ The equivalent of 2 full-time Psychiatrist and 20 hour of contracted Child Psychiatry through tele-medicine.  ï¿§ One full-time Nurse Practitioner Shasta County Adult Mental Health Programs currently provided services to 2,363 unduplicated clients. Staff to client caseloads are 1:15 for Full Service Partners â€" MHSA (not available to parolees), 1:60 for Intensive team and 1:250 for community support. Medication support services are offered on a ratio of 1:1,181.  In summary, this possible action has the potential to burden an already overburdened system. |
| Alcohol and drug | Assessing impact of possible 40,000 state prisoner releases (Shasta County Share estimated at 375 inmates). â€" 70% or 263 would require alcohol and drug treatment services. If 263 new potential clients (individuals needing treatment) were to be released into our county we would not have the capacity to serve them with our current staffing and financial resources.  These individuals would, more than likely, have to go on a waiting list.  In addition, as they reached the top of the waiting list and were offered services, it would mean that other individuals who also needed services would not receive treatment.  As of the last week of August, 604 clients were currently being served by treatment programs in Shasta County Alcohol & Drug Programas.  Shasta County treatment programs provided services to 252 (41.7%) of the clients.  Of the 252 clients, 37 were in the Addicted Offender Program (Drug Court), 61 were in the SACPA (Prop 36) program, 41 women were in the Perinatal Day Habilitation program, and 113 were in general outpatient programs.  There are seven other programs throughout the county who provided treatment to 352 additional clients the last week of August.  Two of those programs are residential programs and served 147 clients (Empire Recovery 72, Cornerstone 75).  The other programs provided outpatient treatment: Empire (54), Right Roads/Anderson (108), Right Roads/Burney (23), and Dr. Andrews (20).  While the overall â€¢numbersâ€ in the SACPA program are down right now, SACPA clients are served by all of the programs (Shasta County Alcohol and Drug Programs and the private community providers).  Therefore although the total number of clients served by SACPA in all programs is at 118, down from the 200 it has served in the past, all programs are currently getting more referrals from its other referral sources (mainly Probation and Children and Family Services).  The County-run general treatment programs have already reached their |

COUNTY RESPONSES TO SEPTEMBER 2008 SURVEY REGARDING LIKELY IMPACTS OF PRISON INMATE RELEASE

| County | SHASTA |
|---|---|
| | maximum number of clients. Most of the private providers are having to use or consider a waiting list or refer clients out. The caseloads for each counselor has reached its maximum so that there is seldom time to provide the extra services needed such as case management and the occasional individual appointment. This severely limits the counselorsâ€™ ability to provide optimum care.   The state has proposed a cut in the amount being reimbursed for services by 10%, while the cost to serve clients has continued to increase. However, the requirements for the number of clients per group (minimum of 4 and maximum of 10) has not increased and remain at a number that provides optimum potential for success in treatment. |
| Health System | As a result of an early release of state prisoners, there could be more costs incurred by CMSP if there is an early prisoner release and this overburdens the CMSP system. The result could be an additional risk allocation as was imposed were several years ago where Shasta County paid roughly an additional $300,000 during two fiscal years, but CMSP has quite a fund balance at present.  CSAC may want to talk to Lee Kemper at CMSP about estimating the impact on that system.  Relative to local Public Health clinics, we would anticipate a marginal amount of additional visits for STDs and TB, but probably not financially significant.  There would also be a potential increase in the parolee Hepatitis A/B vaccination program, where Shasta County may incur some marginal increases in costs for staff time to administer the vaccine.  Shasta County does not operate county clinics or a hospital, however some local FQHCs may see an impact as demonstrated by the following local FQHC response:  Shasta Community Health Center  Unless there is a planned discharge from the state prison to Shasta County Mental Health most of these inmates will end up on the streets or low income housing, budget hotels and some may quickly become homeless. It is therefore perfectly conceivable that these inmates will come in contact with our (Shasta CHC) health care system. Most will show up at the primary care clinicianâ€™s door with referral to our over-strapped MH team, particularly our only psychiatrist (at this time). If these inmates are on medications they will quickly need refills so they donâ€™t destabilize and unless SCMH is set up to absorb this the pressure will likely fall on Shasta CHC. Right now Shasta CHC has some capacity for primary care. However, if the inmates have multiple health problems combined with mental health and/or substance abuse, the capacity to address these issues will also depend on additional capacity in the Redding health system, particularly Mental Health (MH) and Substance Abuse (SA) services. If many of these inmates are uninsured this will put a serious strain on an already strained fiscal state at Shasta CHC.   Based on current costs and number of visits, each released inmate who is uninsured will cost around $600 per person on average. Obviously if they have serious health issues this number would be significantly greater. Shasta CHC is already dealing with serious implications of a growing uninsured and this will not help if there are no resources to follow the inmates. Certainly helping them qualify for CMSP or Medi-Cal prior to accessing services would be of great benefit to us.    It is unlikely that this number of patients will require a huge investment in infrastructure or at least physical plant except for perhaps a new medical van that can do outreach to the Homeless inclusive of inmates who are not able to be seen in a medical facility for varied reasons and also those with serious mental illness who are not comfortable in a standard medical facility. The other area of need is support for additional MH and SA services, particularly SA services. This could require an additional medical van and the addition of new staff. A new medical van would cost around $200,000 and an LCSW and case manager, perhaps substance abuse counselor would cost approximately $250,000 per year to fund those services. Additional impacts to our local hospitals would be hard to quantify but inasmuch as this action increases the number of uninsured visits to the local emergency rooms those entities will be financially impacted. |
| General Assistance | If Shasta County received an influx of parolees (or released prisoners) to Shasta County, it will impact General Assistance and other Social Services Programs–CMSP, Med-Cal, and Food Stamps. General Assistance (GA) clients are typically eligible to Food Stamps (FS) and CMSP, so it would be expected to see the same increase in FS/CMSP as in the GA program. Current General Assistance staff handles these additional programs for their clients.  The SSI Advocate will be impacted by an increase in clients, so will the Social Security Office. We will also need to increase our Job Club Services.  Housing is consistently an issue for parolees.   Over the past 5 months Shasta County has averaged 63 new General Assistance clients/cases per month and about 25 percent of the new clients are on parole. The current ongoing caseload for all General Assistance is 292 active cases.  The Parole Agents refer clients to Shasta County if they have no means of support when they are released.  We do not receive any additional funding to serve this population. |
| Other programs/service | Housing will be impacted.   Relative to other county services, Child and Family Services (CFS) will potentially be impacted:  Newly released/paroled parents may want services to be re-established if they still have an open case. Many of the parolees released from |

COUNTY RESPONSES TO SEPTEMBER 2008 SURVEY REGARDING LIKELY IMPACTS OF PRISON INMATE RELEASE

| County | SHASTA |
|---|---|
| delivery | prison are ordered to complete 52 weeks anger management counseling on top of the case plan requirements of their open case. Services to fulfill case plan requirements may include, drug testing, domestic violence classes, anger management groups, parenting classes, drug and alcohol recovery and after care groups. Depending on the case requirements, psychological testing and or parent child assessment may be necessary. Another problem facing most parolees is finding adequate housing without a job or good credit. Seventy percent of newly released parolees are returned to prison within the first thirty days. The most common reason parolee's re-offend, they could not find work or a place to live. There is an estimated three to five parolees released in Shasta County each month who have an open CFS case. These numbers are self reported during Shasta Co. PACT meetings. These numbers may double if the prison system releases 40,000 new parolees within the next year. There could also be an impact to Social Services Adult programs including the IHSS and Public Guardian. We are not able to extrapolate any numbers regarding the IHSS program although this could conceivably have an impact on the Public Guardians Office. Victim services could also be impacted if, by releasing any of these prisoners, a victim needs services earlier than would be required if the prisoner remained in custody for the length of sentence. Public Safety, including Sheriff, District Attorney, and Probation could all be impacted by these early releases based upon the rate of recidivism of the released population. New crimes, the investigation of those crimes by local law enforcement, prosecution, and pre and post sentencing involvement by probation all have the potential of negatively impacting not only how those departments provide services but the cost of providing those services. |
| Infrastructure (physical and workforce) | The majority of the issues discussed here does not seem to require, at least in Shasta County, the building of additional physical infrastructure but rather will require additional monetary resources for workforce infrastructure; staffing, services, and benefits. The addition of new staff to accommodate the increase in caseload may be required in many functional areas to adequately deal with this increase in clients. What is likely to occur however, unless the county receives additional funds to do this, is that these needed services will be provided within our current service model framework, slowing down delivery as status quo staffing levels receive additional caseloads. Quantifiable costs are difficult to extrapolate based upon the limited amount of data available and would be very much affected by the chosen method of dealing with the increase in demand. If workforce levels are not increased, forcing delays in providing service to those in need, and those released are placed on parole and as such are a state responsibility for mental health services, then the monetary costs born by the county could be relatively small. The cost to the citizens of the county who utilize these services may be much greater if service levels and timing is affected. Worst case scenario (highly dependent variables including added workforce infrastructure, high service utilization, high percentages of released prisoners requiring extensive and full service mental health services, heavy utilization of support systems such as housing assistance, General Assistance, CMPS, CalWorks, etc.) would see significant costs to the county and to Shasta County service partners. The extent of how much of those services is reimbursable through state and federal funds will affect the overall cost. Given that Shasta County is currently owed over 11 million dollars from the State across our Health and Human Services Agency (Mental Health – 5.5 million alone, Public Health, and Social Services) it is highly likely that these services will be provided and paid for by the county with county dollars that will not be reimbursed in a timely fashion thus incurring additional costs of lost interest revenue. If costs will be born by county dollars, one recommendation is to require the state to pass through to the counties the equivalent of any monetary savings the state realized by virtue of these early releases. These funds could then be used to offset the increase in costs to the counties for services that will be utilized. Additionally, the variability of costs may depend on the methodology for selection of early release. With the current deficiencies in health care provision in the state prison system as ruled in federal court, if the state is given wide discretion in whom to release, there could be a potential to release those prisoners who have a heavier utilization of medical resources, passing those costs to the local level. This could further impact county and local resources. |

COUNTY RESPONSES TO SEPTEMBER 2008 SURVEY REGARDING LIKELY IMPACTS OF PRISON INMATE RELEASE

| County | TUOLUMNE |
|---|---|
| Mental health impacts | Currently new clients are assessed immediately by TCBHD staff. Once staff determines that the client meets the criteria to receive services, they are assigned to a primary case manager and/or clinician by a TCBHD Program Manager. The average length of time for an adult client to be seen by their assigned primary clinician is 31 days.  The 31 day timeframe assumes the department is fully staffed.  TCBHD serves 1260 active and unduplicated clients, and has the equivalent of 1.3 FTE psychiatrist time, 4 FTE licensed clinicians, 2.5 FTE nurses and 6 case managers to provide these services. Client to clinical staff ratio is 1 clinician for 222 adult clients. Client to case manager ratio is 1 case manager for 111 adult clients. Client to psychiatrist ratio is 1 psychiatrist to 513 adult clients. It is very difficult to recruit psychiatrists to our agency due to lack of resources and lack of local psychiatrists willing to live in a rural community.   TCBHD currently exceeds capacity, and will be unable to absorb the anticipated 64 newly released prisoners moving into Tuolumne County that will need both mental health and drug and alcohol support services (14 needing intensive mental health services, and 50 needing alcohol and drug treatment services) as is evident from the ratio of clients to staff listed above. |
| Alcohol and drug | Tuolumne County Behavioral Health Department (TCBHD), as a dual-diagnosis service agency, has successfully integrated both mental health and alcohol and drug services for Tuolumne County clients. For this reason we are presenting the information requested in the survey above for questions one and two together (avoiding the separation of mental health and alcohol and drug programs when describing services and staffing patterns). TCBHD currently exceeds capacity, and will be unable to absorb the anticipated 64 newly released prisoners moving into Tuolumne County that will need both mental health and drug and alcohol support services (14 needing intensive mental health services, and 50 needing alcohol and drug treatment services) as is evident from the ratio of clients to staff listed above. |
| Health System | Two thirds of hepatitis C patients are from the local inmate population.  The release of additional inmates will significantly increase the management and treatment of hepatitis C patients in Tuolumne County. A slightly higher percentage of HIV and hepatitis C diagnosis are more commonly placed upon local health agencies. Tuberculosis rates are higher in the prison population, and while Tuolumne County has low TB rates, inmate screening would fall upon our Public Health chest screening program, funded by realignment funds. Current statistics show that there is increased wait times at the Countyâ€™s one private hospital emergency facility and medical clinics. However, the wait times are within industry standards.  Because the County has one emergency facility, surge capacity remains a challenge in that many times due to lack of available space patients are treated in the next available hallway.  Those individuals that meet the federal poverty level are most at risk to access to medical treatment. Many physicians in Tuolumne County do not accept Medi-Cal or CMSP. |
| General Assistance | Tuolumne County has no parolees on General Assistance. The CalWORKs and Medi-Cal programs capture information on the location of absent parents and if these absent parents were released and did not return to the home of their children, but returned to the county where their children reside the following is a list of facilities and the number of parolees impacting Tuolumne Countyâ€™s resources:   Sierra Conservation Center â€" 8  Other California prisons â€" 66  Out of state prisons â€" 2    Apart from General Assistance, no other social service programs specifically capture parolee information.  Parolees may utilize the following social services programs:  CalWORKs (CW)  Welfare to Work (WtW)  Food Stamps (NAFS or PAFS)  Medi-Cal (MC)  County Medical Services Program (CMSP)    The above social service programs do not receive additional funding through their allocation to support parolees.  Caseload growth for CW and WtW programs are subsidized by realignment funds.  Caseload growth for NAFS is only available after State close-out and other Department of Social Services programs under spend their allocation.  Caseload growth in the CMSP and GA programs are absorbed through the general operating budget, thereby decreasing funds to other general operating line items |
| Other programs/service delivery | The CalWORKs and Medi-Cal programs capture information on the location of absent parents and if the county were to assume all absent parents released returned to the home of their children the following is a list of the number of parolees impacting Tuolumne Countyâ€™s resources: Sierra Conservation Center â€" 8  Other California prisons â€" 66  Out of state prisons â€" 2    The County has 150 vouchers via the Section 8 Housing Assistance Program. However, there is a 3-year waiting list for the Section 8 Housing Assistance Program.  If the parolees cannot pay for rental housing there is the very real possibility that the individual may become homeless and/or move to another community. Welfare to Work (WTW) is the employment and training services program that is linked to CalWorks assistance for able bodied adults with dependent children. Welfare to Work services includes intensive case management, Job Readiness Workshops, and a variety of activities intended to assist participants to obtain and maintain employment.  In addition the program provides |

COUNTY RESPONSES TO SEPTEMBER 2008 SURVEY REGARDING LIKELY IMPACTS OF PRISON INMATE RELEASE

| County | TUOLUMNE |
|---|---|
| | supportive services for participants including subsidized child care, transportation reimbursement as well as ancillary payments for books, tuition costs, work clothes or shoes, and other necessary items for work or training.    Participants enrolled in the WTW program often have multi, co-occurring barriers to employment including poor work history, lack of education, low literacy, learning disabilities, mental or physical health issues, substance abuse, domestic abuse, criminal backgrounds, lack of transportation and/or homelessness. In addition family members of participants enrolled in the program may be incarcerated, such as a spouse, partner or parent of their child. The early release of prisoners will have a significant impact to the WTW program. Although the WTW program funding does not allow for services for drug felons, other types of parolees and their families may be eligible to services. It is noted that although drug felons do not receive WTW services, they have the potential to impose a negative impact on the work performance measures mandated by the Federal TANF Final Rule regulations resulting in significant financial penalties to the county. Currently, the Tuolumne County WTW program monitors 15 drug felons for work participation hours. This represents 8% of the WTW case load.  If 100% of those being released to the County were to receive WTW services, it is projected to result in an increase in cost to the program of 1 FTE, at a cost of $208,529 (including overhead and supervisory costs) to manage the case load, an average of $35,500 increase in child care costs per month and an increase of $15,265 per month for transportation reimbursement based 25 miles for 20 days in a month per person. The WTW program would also experience a substantial increase in ancillary costs for training or work related items. With the current economic conditions and local labor market service industry jobs, it is unlikely that these individuals would obtain or retain unsubsidized employment with wages and benefits sufficient enough to take them off of the welfare roles. |
| Infrastructure (physical and workforce) | Behavioral Health    It is important to note that over the last three months TCBHD has been gearing up for the closure of Tuolumne County's Acute Psychiatric hospital, which will stop all services beginning in January, 2009. Individuals needing acute inpatient psychiatric treatment will need to be referred to out-of-county facilities.    TCBHD anticipates that the 14 clients newly released from prison would need intensive mental health wrap around services, which would cost a total of $292,500 annually ($20,893 per client). Also, TCBHD anticipates that the 50 clients newly released from prison needing alcohol and drug services will cost our agency a total of $386,700 annually ($7,744 per client). Total estimated costs for all 64 prisoners would be $679,200. TCBHD does not have the additional revenue, or additional professional staff trained and ready to provide specialized services for these newly released prisoners. Health    Four safety net clinics are available to see Medi-Cal, CMSP and the uninsured at discounted rates.  One of those clinics is now closed, creating an increased burden on the remaining clinics.    Social Services    Each of these examples is worst case scenarios if in fact 71 inmates require program services.  Assuming a paroled inmate reunites with a CalWORKs (CW) family, the CW grant may increase by approximately $106.00 per month. Increasing the monthly CW expenditure as follows:  $106.00 x 71 (anticipated parolees) equal $7,526.00 per month. Additionally, a CW recipient is automatically eligible to no cost Medi-Cal and is categorically eligible for Public Assistance Food Stamps (PAFS).  Adding a paroled inmate to the PAFS program may increase the allotment by approximately $116.00 per month.  This would increase the monthly PAFS expenditure as follows: $116.00 x 71 (anticipated parolees) equal $8236.00 per month. In those instances when a parolee does not return to a CalWORKs household the parolee may utilize the CMSP, NAFS and GA programs.  Assuming a parolee with no income applied for GA the allotment issued for 1 person is $340.00 per month, thereby, increasing the monthly GA expenditure as follows: $340.00 x 71 (anticipated parolees) equal $24,140.00 per month.    In addition, the parolee may qualify for NAFS. Assuming a parolee with no income applied for NAFS the allotment issued for 1 person is $176.00 per month, increasing the monthly NAFS expenditure as follows: $176.00 x 71 (anticipated parolees) equal $12,496.00 per month.    Additionally, the parolee may qualify for the no cost County Medical Services Program (CMSP)    Although the administration and assistance costs of the CW, MC and FS programs are in part supported by state and federal funds, the workload impact to existing county Eligibility Worker staff would be significant |