1   STEVEN S. KAUFHOLD (SBN 157195)  skaufhold@akingump.com
    CHAD A. STEGEMAN (SBN 225745)  cstegeman@akingump.com
2   TERESA WANG (SBN 252961)  twang@akingump.com
    GALIT A. KNOTZ (SBN 252962)  gknotz@akingump.com
3   Akin Gump Strauss Hauer & Feld LLP
    580 California, 15th Floor
4   San Francisco, California 94104-1036
    Telephone:    415-765-9500
5   Facsimile:     415-765-9501
6
7   Attorneys for Republican Assembly and Senate
    Intervenors
8
9
10              IN THE UNITED STATES DISTRICT COURTS

11            FOR THE EASTERN DISTRICT OF CALIFORNIA

12           AND THE NORTHERN DISTRICT OF CALIFORNIA

13      UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

14        PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

15

16  RALPH COLEMAN, et al.,                  Case No.: CIV S-90-0520 LKK JFM P

17              Plaintiffs,                  **THREE-JUDGE COURT**

18      vs.

19  ARNOLD SCHWARZENEGGER, et al.,

20              Defendants.

21  MARCIANO PLATA, et al.,                 Case No.:  C01-1351 TEH

22              Plaintiffs,                  **THREE-JUDGE COURT**

23      vs.                                  **TRIAL DECLARATION OF STATE
                                             SENATOR GEORGE RUNNER**
24  ARNOLD SCHWARZENEGGER, et al.,

25              Defendants.

26

27

28

                                       1
    **TRIAL DECLARATION OF STATE SENATOR GEORGE RUNNER**

I, George Runner, testify as follows:

1. I have been a Senator for the State of California representing the 17th Senate District since 2004. The 17th District incorporates portions of the Los Angeles, San Bernardino, Ventura and Kern counties. I began my career in politics running for city council in the City of Lancaster in 1992 and subsequently served as Mayor. In 1996, I was elected to the State Legislature in the Assembly. I served three terms as a State Assemblyman until 2002. This declaration is based on my personal knowledge, and I am prepared to further testify as to its contents.

2. I am testifying in my capacity as an individual intervenor and my testimony represents my own views and beliefs.

3. As a Senator, I co-authored, along with San Bernardino County Supervisor Gary Ovitt, the Safe Neighborhoods Act, which is Proposition 6 on the November 2008 ballot. I drafted Proposition 6 after undergoing thorough discussions with law enforcement groups, victims' advocates and policy experts from all over the State about a measure that would benefit and sustain programs to deter and suppress gang activity and violence in California communities. Proposition 6 is a comprehensive anti-gang and crime reduction measure that will bring more cops and increased safety to our streets and greater efficiency and accountability to public safety programs and agencies that spend taxpayer money.

4. Earlier this fall, I wrote an article titled "21 Reasons to Vote Yes on Prop-6—the Safe Neighborhood Act," which was published on the Fox & Hounds Daily website on September 30th, 2008. This article is also published on the safeneighborhoodsact.com website. This article sets forth my views and beliefs with respect to both Proposition 6 and certain issues before this Court. Attached hereto as Exhibit A is a true and correct copy of the article.

5. My understanding is that, when compared to the incarceration rates of other states, California's incarceration rate (in prisons and jails) per 100,000 residents was 682 in 2005. This rate of incarceration falls within the middle quintile of the 50 states in the United States. At least twenty other states have higher incarceration rates than California. Further, despite public perception about California's rapidly growing prison population, statistics show that California's prison incarceration rate has in fact decreased over the last ten years.

**TRIAL DECLARATION OF STATE SENATOR GEORGE RUNNER**

1    6.    Additionally, because California correctional facilities support more than 30,200 illegal

2    alien prisoners who should be in federal prisons, California Department of Corrections and

3    Rehabilitation ("CDCR") experiences particular strains on its facilities and resources. This number of

4    illegal alien inmates is greater than the number of illegal alien inmates in the next four largest states

5    (Arizona, Florida, New York and Texas) combined.

6    7.    Attached hereto as Exhibit B is a true and correct copy of a memorandum entitled "Who

7    is in Our State Prisons." My staff drafted this memorandum based on information compiled from FBI,

8    CDCR, Bureau of Justice Statistics and Federal Government Accountability Office reports that are

9    publicly available. Exhibit B confirms the statistics discussed in paragraphs 5 and 6 above.

10    8.    Overcrowding in prisons interferes with programming and rehabilitation. However,

11    overcrowding does not prevent the provision of constitutionally adequate health and mental care.

12    California can and does provide adequate care given current resources. I believe that court-appointed

13    *Plata* Receiver Clark Kelso has provided a constitutionally adequate level of inmate health care this

14    year.

15    9.    California's extraordinarily high recidivism rate is largely the cause of current crowding

16    conditions. California is the only state in the nation that sends more offenders to prisons from parole

17    than from court. The high recidivism rate is, in large part, a product of California's move from

18    indeterminate to determinate sentencing in the late 1970's. Under indeterminate sentencing, an inmate

19    was released from prison only upon establishing to the satisfaction of a parole board that he had

20    rehabilitated and was no longer a threat to the public. The burden was on the inmate to successfully

21    complete vocational training or education programs and/ or to establish that he had a job, a place to

22    live, and a plan to success upon release. Under the current determinate sentencing system, an inmate is

23    released when his days served and his accumulation of early release credits equal his sentence.

24    Inmates serving determinate sentences are released, ready or not, without regard to whether they have a

25    plan, a job, or a home, or have succeeded in any prison programs. For many, responsibility and

26    incentives have been eliminated from the system. I believe that more facilities to educate and

27    rehabilitate inmates in carefully monitored programs will lower recidivism as will focused parolee

28    monitoring programs. Moreover, I believe that many non-violent parole violators can serve periods of

3
**TRIAL DECLARATION OF STATE SENATOR GEORGE RUNNER**

1    revocation on GPS-monitored house arrest. In 2006, Governor Schwarzenegger and the State

2    Legislature facilitated a new emphasis on inmate rehabilitation and reintegration back into the

3    community, as evidenced by the passage of Assembly Bill 900. These efforts to help offenders help

4    themselves will result in lower recidivism rates and, consequently, greater public safety as a result of

5    fewer crimes committed but will take time to produce results.

6         10.    Health care costs per inmate (over $12,000 per inmate per year) in California are among

7    the highest in the United States. In fact, prisoners have greater access to medical and mental health

8    care than the average Californian. As I understand it, the California Department of Corrections and

9    Rehabilitation's health care expenditures have increased significantly in the past 8 years from just

10   under $700 million in 2000, to approximately $2.4 billion in 2007. This information is illustrated in

11   Exhibit C, attached hereto, which is a true and correct copy of a graph entitled "CDCR Healthcare

12   Budget, 2000-2008." My staff compiled the data for this graph in July of 2008 from publicly available

13   state statistics.

14        11.    California's prison population has grown at approximately half the pace of California's

15   overall population over the past decade. I understand that California's inmate population has increased

16   by only 8 % between 1998 and 2008, whereas California's general population has increased by 16 % in

17   that same timeframe. Also, during this time, California's total inmate population has grown an average

18   of less than 1 % per year, slower than the composite inmate population growth rate for the other 49

19   states and considerably slower than California's overall population growth. Accordingly, California

20   has a lower prison incarceration rate in 2008 than it did in 1998. Furthermore, I understand that since

21   January 1, 2008, Texas, with 13 million fewer people, had more prison inmates than California.

22   Therefore any public perception that California has had disproportionate growth in rates of

23   incarceration over the past 10 years is mistaken.

24        12.    Attached hereto as Exhibit D is a true and correct copy of a document entitled

25   "California Prisons 1998-2008: Prison Inmate Population has Become More Violent." My staff

26   compiled the data for and drafted this report in July, 2008. This report is based in part on the Pew

27   Center on the States report, "One in 100: Behind Bars in America 2008," published in February of

28   2008. Exhibit D illustrates the data discussed in paragraph 11 above.

---

4

**TRIAL DECLARATION OF STATE SENATOR GEORGE RUNNER**

1    13.    As I understand it, the average annual mortality rate for US residents ages 15-64 was

2    308 per 100,000 residents from 2001-2003.  The average annual mortality rate for state prisoners in all

3    states is 250 per 100,000 prisoners from 2001-2006, whereas California's rate was 213 per 100,000

4    prisoners during the same time period.  These figures indicate that California has one of the lowest

5    prisoner mortality rates within the United States.  At the same time, California's inmates are among the

6    oldest in the country.  This information evidences the provision of constitutional health care.

7    14.    This data is confirmed in Exhibit E, attached hereto, which is a true and correct copy of

8    a document entitled "National and State Prisoner Mortality Rates (California Inmate Mortality – 38[th]

9    Lowest Among States)."  My staff compiled this data and drafted this memorandum in July of 2008

10    using data from the Bureau of Justice Statistics, Data Brief: Medical Causes of Death in State Prisons,

11    2001-2004 (Appendix Table 11), January 2007, and Bureau of Justice Statistics, Death in Custody

12    Statistical Tables: State Prison Deaths, 2001-2006, June 2008.

13    15.    A prisoner release order is not necessary for the provision of constitutionally adequate

14    health and mental care in California prisons.  Moreover, other viable alternatives exist to solve the

15    issue of overcrowding in California prisoners.

16    16.    For example, I introduced Senate Bill No. 1705 (last amended on August 13, 2008)

17    ("SB 1705").  The provisions of SB 1705 are intended to clarify existing language and expedite

18    issuance of a clean bond opinion for the sale of bonds to fund initiatives outlined in Assembly Bill 900

19    ("AB 900").  Implementation of AB 900 should obviate consideration of a prison release order.  SB

20    1705 provides a roadmap to immediately address California's prison overcrowding issues without

21    compromising public safety.  As an alternative to a prisoner release order, this Court should make

22    whatever order is lawful and necessary in order for AB 900 to be fully implemented prior to issuing

23    any prisoner release order.

24    17.    Attached hereto as Exhibit F is a true and correct copy of SB 1705 as last amended by

25    the Senate on August 13, 2008.

26    18.    I have requested that Governor Schwarzenegger take all legal, administrative, or

27    legislative steps necessary to ensure the issuance of bonds to fund the facilities and objectives

28    established by AB 900.

**TRIAL DECLARATION OF STATE SENATOR GEORGE RUNNER**

1    19.    Additionally, CDCR should not have to shoulder the load in housing 30,200 illegal alien

2  prisoners. As I understand it, it costs CDCR approximately $50,000 per year to house each adult

3  inmate. If these illegal alien prisoners were housed in federal prisons, as they should be, California

4  would save over $1 billion a year and considerable space would free up in CDCR institutions. As an

5  alternative to a prison release order, this Court should issue whatever order is lawful and necessary to

6  achieve the remand of illegal alien prisoners to federal custody in order to free up CDCR's resources.

7    20.    Finally, the *Plata* Receiver must have more time to implement his Turnaround Plan of

8  Action which Judge Henderson approved on June 16, 2008. In fact, the current *Plata* Receiver was

9  appointed only earlier this year, on January 23, 2008. As I understand it, the death rate of California

10 prisoners first increased but then dropped almost 30% since the beginning of 2006, when inmate

11 healthcare was seized from state control by the Receiver. This drop is due to the Receivership's

12 success in reducing the number of preventable deaths in state prisons due to inadequate access to care.

13 As an alternative to a prisoner release order, this Court should allow the Receiver to continue the work

14 he is doing in improving the delivery of health care in CDCR institutions.

15    21.    Attached hereto as Exhibit G is a true and correct copy of an article titled "Death rate of

16 California prisoners is down nearly 30% since early 2006," authored by Michael Rothfeld and

17 published in the Los Angeles Times on September 16, 2008.

18    22.    There is no question that early release endangers public safety. For example, early

19 release of prisoners in Los Angeles County jails has led to tragic and dangerous consequences. Since

20 2002, when Los Angeles County jails closed their doors to prisoners due to budget shortages, nearly

21 16,000 inmates were rearrested and charged with new crimes while they were supposed to be in jail.

22 Sixteen of those inmates were charged with murder; a quarter were charged with violent or life-

23 endangering crimes, including robberies, sex offenses, weapons violations, drunk driving incidents,

24 assaults and kidnappings.

25    23.    Attached hereto as Exhibit H is a true and correct copy of an article by Jack Leonard *et.*

26 *al.* titled "Releasing Inmates Early Has a Costly Human Toll," published by the Los Angeles Times on

27 May 14, 2006. This article is illustrative of the points discussed in paragraph 22 above.

28

**TRIAL DECLARATION OF STATE SENATOR GEORGE RUNNER**

1    I declare under penalty of perjury under the laws of the State of California and the United

2    States that the foregoing is true and correct and that this declaration was executed by me this 30th day

3    of October, 2008.

4                                              By: _____

5                                                        George Runner

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                                    7