# EXHIBIT A

21 reasons to vote yes on Prop 6--the Safe Neighborhoods Act | Fox & Hounds Daily          Page 1 of 3



**Home** | **Blog** | **Corner Pub** | **Headlines** | **About Us**

# 21 reasons to vote yes on Prop 6--the Safe Neighborhoods Act



**By George Runner**
*California State Senator representing the 17th Senate District*
Tue, September 30th, 2008

The goal of Proposition 6-The Safe Neighborhoods Act is to curb gang violence in California. This is not an easy task, or one that can be accomplished by simply locking up the bad guys with hopes that they will somehow rehabilitate in prison.

As an author of the measure, I believe the gang solution lies in a comprehensive approach.

That's why I sat down with law enforcement groups, victims' advocates and policy experts from all over the state to craft a measure that would benefit and sustain programs to deter and to suppress gang activity and violence in our communities. Sheriffs, police, district attorneys and probation officers offered their professional insight, culled from many years of first-hand dealings with street gangs.

What follows are provisions of Proposition 6 that law enforcement believes will help fight gangs in California:

Prevention

- It prohibits bails to illegal alien gang bangers. This gives law enforcement a tool for holding gang members who are arrested for gang crimes and who are also in the US illegally. I believe Jamiel Shaw and the Tony Bologna family (killed by illegal alien gang members, respectively) are examples of lives that would have been spared if Prop 6 were already in place.
- It enhances penalties for graffiti by allowing district attorneys to aggregate multiple offenses so that they may be charged as felonies. This will make "taggers" think twice before defacing your property.
- It enhances penalties for gang members who recruit our kids.
- It enhances penalties for gun use in vehicles, including impounding any car used in the commission of a gun crime by the car owner.
- It toughens a law against bringing contraband (such as a weapon) to a prisoner for the purposes of committing a felony.
- It will authorize the courts to decide whether 14- and 15-year old felony gang offenders should be tried as adults.
- It strengthens laws that deal with witness or victim intimidation for court proceedings.



See wher... on No...

Sign up for our free

email address



LEGIS001491

21 reasons to vote yes on Prop 6--the Safe Neighborhoods Act | Fox & Hounds Daily          Page 2 of 3



- It ensures that murderers sentenced to state prison for life do not receive good time credits, making them eligible for early release.
- It makes anyone who lies or conceals evidence to prosecutors or law enforcement an accessory to the crime under investigation.
- It equalizes the penalties for methamphetamine distribution and trafficking to that of cocaine distribution and trafficking.
- It enhances criminal penalties for accessories to violent gang crime.

Intervention

- It creates funding for a Parolee Mentoring and Job Training program for inmates being released from prison on parole so they may succeed upon release from prison. This provision is in response to California's particularly high recidivism rate.
- It assists local enforcement agencies with resources to create and sustain programs that provide athletic and community service alternatives to at-risk kids.

Technical

- It requires gang members to wear Global Positioning Satellite ankle bracelets. San Bernardino and Sacramento County are already using this system to track gang members and solve crimes. I believe the rest of the state could benefit from this modern technology as well.
- It creates a statewide gang registry to allow law enforcement in each county to work closely and seamlessly on gang crimes.

Good Government

- It assists communities that enforce federal compliance by conducting criminal background checks on those who are living in taxpayer-subsidized Section 8 housing. Gang members' encroachment into Section 8 housing brings violence and strife to neighborhoods and it means law abiding citizens (many of them elderly, disabled and single parents) are on waiting lists for years.
- It creates the Early Intervention, Rehabilitation, and Accountability Commission, which will be tasked with evaluating programs aimed at helping kids stay clear of gangs. The last thing we need is another program like LA Bridges that spent $100 million but was absent any success stories. Our kids deserve better.
- It creates the DISARM program, which is designed to allow local law enforcement to focus on the highest risk probationers and ensure compliance with their conditions of probation so the parolees may become responsible, law-abiding citizens.
- It does not create new taxes: Proposition 6 does not ask voters to approve a new tax. Instead it relies on existing dollars and merely asks voters if they believe protecting our neighborhoods is worth the investment of 1 percent of the state's General Fund budget.
- It will protect local law enforcement dollars. This money is always the first on the budget negotiating table year after year. It's time to stop using these precious dollars as bargaining chips and protect what small amount law enforcement receives.
- It authorizes temporary jail facilities in counties that have crowded jails so low-level offenders can be in housed in converted facilities to serve out their full sentences.

Bookmark/Search this post with:

Add new comment    Email this page    Printer-friendly version

## Question

Submitted by Visitor (not verified) on Tue, 10/07/2008 - 23:11.

I have several questions in regards to this proposition. First, when it mentioned who was

LEGIS001492

consulted during the drafting of this proposition, I did not see any mention of social workers, teachers, or those community members in gang affected areas. The people mentioned (law enforcement, prosecutors, probation officers) seem to be involved with "gangs" only after they have done something to warrant becoming involved with the criminal system. As someone who works directly in at-risk communities and who has done a lot of research on gang prevention, I would have offered a lot different perspective on these ideas of prevention as I am sure any front line worker would. I also noticed that Prop 6 specifically strikes community members, nonprofits, etc..from participating on the Juvenile Justice Committee. If the intentions of this prop are to keep our streets safe why would you not want input from the people that are most affected by gangs and those that work directly with this at-risk population? This truly makes me wonder about the true intentions of this proposition.

reply      Email this page

**About Fox & Hounds      Contact Us      Advertise      Privacy Policy**

LEGIS001493

# EXHIBIT B

## Who Is In Our State Prisons?

On almost a daily basis Californians read that our state prison system is too big, too expensive, growing at an explosive pace, and incarcerating tens of thousands of low level offenders who could be effectively treated and returned to our streets as productive citizens.  More often than not, tough penalties under laws like Three Strikes are identified as the cause of alleged unfairness in sentencing and relentless growth within our correctional system. Seldom are facts allowed to intrude into the analysis. Instead, the issues of cost, size of the prison system, and the profile of the inmate population are, through ignorance or design, scrambled and distorted so that the public is misled and confused.

The facts, however, are available. Both the FBI and California Department of Correction and Rehabilitation publish reports, available online, identifying total inmate populations and the offenses for which those inmates were sentenced.

### STATE INCARCERATION RATES, 2005, BY QUINTILE



1

Earlier this year the Pew Institute published One in 100: Behind Bars in America 2008 a decidedly critical evaluation of U.S. prison policy. The report nonetheless correctly identifies California's incarceration rate (prison and jails) as very ordinary with at least 20 other states reporting more inmates per 100,000 residents.

On January 1, 2008 Texas, with 13 million fewer people, had more prison inmates than California. The report in addition demonstrates that California is on the bottom fifth of all states regarding recent growth in prison population. This is because the much discussed explosion in California's recent prison population simply has not occurred. California had 12.5% of the national population as well as 12.5% of the inmates incarcerated in all state prisons.

During the past 10 years (April 30, 1998 through April 30, 2008) California's total inmate population has grown an average of less than 1% per year, slower than the composite inmate population growth rate for the other 49 states and considerably slower than California's overall population growth. Accordingly, California has a lower prison incarceration rate in 2008 than it did in 1998.

### Inmates in California Prisons per 100,000 Residents Since 1998
April 30, 1998 – April 30, 2008



The fact that California's prison population is quite typical in relationship to its overall population was previously reported in Understanding California Corrections (2006), a University of California publication. That report, while critical of prison rehabilitation programs, helps clarity both the relative level of incarceration in California and the demographics of the inmates. It observes that two-thirds of the overall growth in

2

the prison population since 1994 (the year voters approved Three Strikes), is due to crimes against the person (especially robbery, assault, and homicide), whereas only 10% is due to drug related convictions. Moreover, for every 100 serious felonies reported in California there are approximately 40 adult arrests but only five offenders sentenced to state prison.

Indeed few criminal offenders are sent to state prison for a first, second, or even third felony unless they have committed murder, rape, or robbery with a firearm. A federal survey of inmates in state and federal facilities reported that 47% of the inmates in California prisons were violent recidivists while another 33% were non-violent recidivists. Of the 19% percent of inmates who were first time felons most had committed violent crimes against the person. Many California inmates had more than one prior felony conviction including 14% with two prior felony convictions, 25% with 3 to 5 prior felony convictions, 17% with 6 to 10 prior felony convictions, and 12% with 11 or more prior felony convictions. In addition, almost 60% of all inmates were already on parole or probation at the time they committed their most recent felony.

The slow growth and increasingly violent makeup of California's inmate population is at odds with the loud but unsupported claims of opponents of the criminal justice system and in stark contrast to the dire consequences predicted after the passage of "Three Strikes."



Both before and immediately after Three Strikes became California law in 1994, it was widely predicted, in public documents and the media, that California's prison population would explode. Prison population estimates for mid-year 1999 were recalculated by the California Department of Corrections, after Three Strikes passed, and increased from 171,000 to 245,000. Neither estimate was reached. On June 30, 1999, the actual state prison population was 162,000. With the advantage of hindsight, it is evident that the explosion in inmate growth never occurred.

On April 30, 2008 California's inmate population was approximately 170,000, less than the pre- Three Strike prison population estimate for June 30, 1999. Undaunted critics continue to insist that "Three Strikes" has caused explosive growth despite the absence of any basis in fact and irrefutable evidence to the contrary. Equally dubious is the claim that California prisons are filled with low level offenders and drug addicts. The most recent census (12/31/2007) of state prison inmates (California Department of Corrections and Rehabilitation online) reports that 53.1% of men in California's prison were committed for crimes against persons. These offenses are murder, manslaughter, rape, child molestation, kidnapping, aggravated assault and robbery. In addition tens of thousands of inmates committed for other offenses have violent criminal histories including approximately 7,750 inmates, currently incarcerated for different crimes, but previously convicted of one or more felony sex offenses.

**CALIFORNIA STATE PRISON POPULATION (MALE)**

| December 31, 2007 | 160,144 | |
|---|---|---|
| 97% of male inmates are identified by commitment offense.<br>**Commitment Crime** | **Actual Number Of Prisoners** | **Percentage of Total Prison Population** |
| Murder | 22,005 | 13.7% |
| Manslaughter | 3,556 | 2.2% |
| Robbery | 18,920 | 11.8% |
| Assault/Battery or with deadly weapon | 23,273 | 14.6% |
| Rape, child molest and other sex offenses | 14,068 | 9.3% |
| Kidnapping | 2,427 | 1.5% |
| **CRIMES AGAINST PERSONS SUBTOTAL** | **84,997** | **53.1%** |
| Burglary | 12,379 | 7.7% |
| Arson | 409 | 0.3% |
| D.U.I. (with priors OR injury) | 2,320 | 1.4% |
| Escape | 109 | 0.1% |
| Possession of a weapon (Felon in possession) | 6,532 | 3.8% |
| Theft with prior felony conviction(s) | 3,821 | 2.4% |
| Drug manufacture, sale, or possession for sale | 18,711 | 11.8% |
| Lesser offense with serious or violent strike prior(s) | 9,620 | 6.0% |
| **TOTAL** inmates convicted of crimes against persons, serious or violent crimes, or crimes aggravated by prior felony conviction(s) | **138,898** | **86.7%** |

[*]The remaining inmates were not identified by commitment offense (2.7%) or were committed for drug possession or theft related felonies without identifiable aggravating criteria. Nonetheless almost all of these offenders have extensive juvenile and/OR adult records for commission of a wide spectrum of felonies.

4

LEGIS0000050

The minority of inmates, those without a history of crimes against the person, are mostly career criminals with multiple convictions for crimes like residential burglary, sale of drugs or as a felon in possession of a firearm. Many of these offenders have 10 or more felony convictions and extensive juvenile records. Under Proposition 36 a person convicted of felony drug possession is generally not even eligible for incarceration until a third conviction. It is not easy to get into state prison without committing violent or multiple felonies.

The fundamental reason that critics of tough criminal penalties cannot come to grips with the facts is their unshakeable belief that longer sentences inevitably increase prison population. Experience tells us otherwise. In 1993, there were 126,000 robberies in California. In 1999 following the passage of Three Strikes and 10 -20-Life there were 60,000 robberies in California. Critics of Three Strikes quickly proclaimed that the drop in crime was unrelated to California's tougher penalties and just part of a national trend. But according to the FBI's U.S. Crime Index, California established the trend when its crime index dropped from fourth worst in 1993 worst to 29th among all states in 1999.

| Rank | State | Rate |
|---|---|---|
| | **FBI Total Crime Rate per 100,000 for 1993** | |
| 1 | FLORIDA | 8,351.09 |
| 2 | ARIZONA | 7,431.73 |
| 3 | LOUISIANA | 6,846.59 |
| 4 | CALIFORNIA | 6,456.91 |
| 5 | TEXAS | 6,383.62 |
| 6 | HAWAII | 6,276.96 |
| 7 | NEW MEXICO | 6,266.09 |
| 8 | GEORGIA | 6,134.25 |
| 9 | NEVADA | 6,130.13 |
| 10 | MARYLAND | 6,106.49 |
| 11 | WASHINGTON | 5,959.29 |
| 12 | SOUTH CAROLINA | 5,908.38 |
| 13 | OREGON | 3,765.57 |
| 14 | NORTH CAROLINA | 5,632.54 |
| 15 | ILLINOIS | 5,617.50 |
| 16 | ALASKA | 5,567.95 |
| 17 | NEW YORK | 5,551.30 |
| 18 | COLORADO | 5,526.78 |
| 19 | MICHIGAN | 5,452.50 |
| 20 | OKLAHOMA | 5,294.27 |
| 21 | TENNESSEE | 5,239.54 |
| 22 | UTAH | 5,237.37 |
| 23 | MISSOURI | 5,095.41 |
| 24 | KANSAS | 4,975.27 |
| 25 | MASSACHUSETTS | 4,888.95 |
| 26 | ALABAMA | 4,878.77 |
| 27 | DELAWARE | 4,872.14 |
| 28 | INDIANA | 4,817.07 |
| 29 | ARKANSAS | 4,811.84 |
| 30 | NEW JERSEY | 4,810.82 |

| Rank | State | Rate |
|---|---|---|
| | **FBI Total Crime Rate per 100,000 for 1999** | |
| 1 | FLORIDA | 6,205.53 |
| 2 | NEW MEXICO | 5,962.07 |
| 3 | ARIZONA | 5,896.50 |
| 4 | LOUISIANA | 5,746.84 |
| 5 | SOUTH CAROLINA | 5,324.43 |
| 6 | WASHINGTON | 5,255.54 |
| 7 | NORTH CAROLINA | 5,175.41 |
| 8 | GEORGIA | 5,148.54 |
| 9 | TEXAS | 5,031.77 |
| 10 | OREGON | 5,001.59 |
| 11 | UTAH | 4,976.48 |
| 12 | MARYLAND | 4,919.18 |
| 13 | HAWAII | 4,837.47 |
| 14 | DELAWARE | 4,835.01 |
| 15 | TENNESSEE | 4,699.89 |
| 16 | OKLAHOMA | 4,680.92 |
| 17 | NEVADA | 4,653.68 |
| 18 | MISSOURI | 4,578.69 |
| 19 | ILLINOIS | 4,506.60 |
| 20 | ALABAMA | 4,412.33 |
| 21 | ALASKA | 4,363.17 |
| 22 | MICHIGAN | 4,324.78 |
| 23 | MISSISSIPPI | 4,269.81 |
| 24 | NEBRASKA | 4,108.28 |
| 25 | MONTANA | 4,067.88 |
| 26 | COLORADO | 4,065.44 |
| 27 | ARKANSAS | 4,042.77 |
| 28 | OHIO | 3,996.45 |
| 29 | CALIFORNIA | 3,804.99 |
| 30 | INDIANA | 3,765.91 |

The number of robberies and robbery victims were cut in half and the number of robbers sent to prison was cut in almost equal proportion. Similar declines were experienced in the number of homicides and burglaries.

5

LEGIS0000051

**Three Strikes:** California Crime Totals After the First Five Years: 1994–1999

| Offense* | Murder | Rape | Robbery | Burglary | Auto Theft |
|---|---|---|---|---|---|
| **1993** | 4,095 | 11,754 | 126,347 | 413,671 | 319,225 |
| **1999** | 2,006 | 9,443 | 60,027 | 223,828 | 168,465 |
| **Offense Decrease 1993-1999** | (2,089) ↓ | (2,311) ↓ | (66,320) ↓ | (189,843) ↓ | (150,760) ↓ |
| ****Rate Decrease 1993-1999** | 54% ↓ | 25% ↓ | 56% ↓ | 50% ↓ | 51% ↓ |

\*    Source of crime statistics is the California Crime Index (DOJ).
\*\* Rate comparison per 100,000 population for respective years.

    Opponents of tough criminal laws cannot accept that penalties deter crime.  They presume that the same number of people will commit a crime whether the penalty is 5 years, 10 years, or 20 years.  They are wrong. Since 1999, certain offenses with low penalties like vehicle theft have surged while the number of  residential burglaries, which constitute "strikes," have remained lower. When tough penalties contribute to fewer crimes there are also fewer criminals being sent to state prison.



California Inmates Committed to State Prison for Burglary & Vehicle Theft in 1994, 1999, & 2007

6

While penalties for residential (1st degree) burglary increased under Three Strikes (1994) the number of inmates sentenced to prison for residential burglary has declined from 3036 in 1994 to 2036 in 2007. As a consequence, the total number of inmates in California prisons serving sentences for 1st degree burglary has dropped from 9442 (in 1994) to 7056 (in 2007). During the same period of time, the total number of inmates serving sentences for 2nd degree burglary and vehicle theft (non-strike offenses) has increased by more than 3000.

There are many things wrong with our prison system and a need for more investment in early interventions and rehabilitation programs as well as additional facilities. In the last 10 years California has added almost 5 million people to its population but has opened only one new prison. Since 1999 gang crimes including homicides have increased and have been more difficult to prosecute than other crimes. Our prisons are further strained because we are required to house more than 30,000 alien felons, many of them gang involved. They should be in Federal prisons. But for this disproportionate number of alien felon inmates, (more than the total of Texas, New York, Florida and Arizona combined) California's incarceration rate would fall below the national average.



Under the circumstances California's laws and law enforcement have served the public remarkably well. Many people who advocate more offender education and fewer prison cells are, like the path to hell, driven by good intentions. Nonetheless before we begin to release prisoners or reduce criminal penalties in the hope of reducing inmate populations the public is entitled to know who resides in our state prisons and who will be returning to our streets. Armed with the facts most rational citizens will conclude that we need both more books and more bars.

7

LEGIS0000053



| 2006 | New Court Commitments | Parole Violators | Total |
|---|---|---|---|
| CALIFORNIA | 48640 | 89883 | 138523 |
| TEXAS | 42676 | 27457 | 71927 |
| ILLINOIS | 25521 | 14254 | 39887 |
| FLORIDA | 36155 | 134 | 36295 |
| OHIO | 27175 | 4461 | 31866 |

**Number of Sentenced Prisoners Admitted and Released from State Jurisdiction, Year Ending 12/31/2006**

☑ New Court Commitments
■ Parole Violators

Source: Bureau of Justice Statistics - Data Brief: Medical Causes of Death in State Prisons, 2001-2004. Prison/Inmates at Midyear 2007. June 2008.

LEGIS0000054

# EXHIBIT C



CDCR Healthcare Budget, 2000-2008

|  | AB 1740 (2000) | SB 739 (2001) | AB 425 (2002) | AB 1765 (2003) | SB 1113 (2004) | SB 77 (2005) | AB 1801 (2006) | SB 77 (2007) |
|---|---|---|---|---|---|---|---|---|
| Appropriations | $ 585,080,000 | $ 663,783,000 | $ 835,879,000 | $ 907,098,000 | $ 940,763,000 | $ 1,037,722,000 | $ 1,516,637,000 | $ 2,124,612,000 |
| Expenditures | $ 675,603,403 | $ 796,773,467 | $ 879,940,830 | $ 967,821,280 | $ 1,052,375,319 | $ 1,481,424,818 | $ 1,592,394,000 | $ 2,387,320,502 |

☒ Appropriations ■ Expenditures

Sources:
1. California State Controller, CDCR Review Report: Healthcare Delivery System Audit. Aug. 2006.
2. Line Item 5225-002-0001 for AB 1801 (2006) and SB 77 (2007).

LEGIS001494



CDCR Healthcare Budget, 2000-2008

LEGIS001495

Sources:
1. California State Controller. CDCR Review Report: Healthcare Delivery System Audit. Aug. 2006.
2. Line Item 5225-002-0001 for AB 1801 (2006) and SB 77 (2007).

# EXHIBIT D

LEGIS001496

## CALIFORNIA PRISONS 1998-2008
### Prison Inmate Population Has Become More Violent

| Inmate Population by Category | June 30, 1998 | June 30, 2008 | Increase or Decrease |
|---|---|---|---|
| Crimes Against Persons | 66,100 | 90,000 | 23,900 ↑ * |
| Property Crimes | 35,600 | 34,000 | -1,600 ↓ |
| Drug Crimes | 43,800 | 33,000 | -10,800 ↓ |
| Other (or not identified by commitment offense) | 12,700 | 14,000 | 1,300 ↑ |
| TOTAL | 158,200 | 171,000 | 12,800 ↑ ** |

## CHANGES IN COMPOSITION OF PRISON INMATE POPULATION

California's prison population has increased by 12,800 between 1998 and 2008, from 158,000 to 171,000. This 8% increase is far slower than the 16% growth in California's state population during the same period (from 33 million to over 38 million people).

California's incarceration rate is not extraordinarily high. On January 1, 2008, California had fewer prison inmates than Texas and ranked 21th among the states in in overall incarceration (including jails)***

* Crimes against persons include murder, robbery, assault with a deadly weapon, rape, lewd acts with children (oral copulation and sodomy) and kidnapping. Increases in total inmates committed for crimes against persons include 6,300 more for homicide, 2,500 more for child molestation, and 2,400 for robbery.

** "Other" includes injury DUI and arson. The entire increase in this category can be attributed to inmates committed as felons in possession of firearms (which increased from 4,600 to 6,500).

*** Pew Institute "One in 100: Behind Bars in America"

# EXHIBIT E



## National and State Prisoner Mortality Rates*

| Average Annual Mortality Rate, per 100,000 US Residents, Age 15-64, 2001-03 | Average Annual Mortality Rate, per 100,000 State Prisoners, 2001-04 | Mortality Rate, per 100,000 CA Prisoners, 2006 |
|---|---|---|
| 308 | 250 | 225 |

*Bureau of Justice Statistics - Data Brief: Medical Causes of Death in State Prisons, 2001-2004. Prison/Inmates at Midyear 2007. June 2008.
**Federal Receiver Clark Kelso's Plan of Action, June 6, 2008.

LEGIS0000055

# EXHIBIT F

SB 1705 Senate Bill - AMENDED

Page 1 of 21

BILL NUMBER: SB 1705      AMENDED
          BILL TEXT

          AMENDED IN SENATE  AUGUST 13, 2008
          AMENDED IN SENATE  JUNE 18, 2008

INTRODUCED BY    Senator Runner

                    FEBRUARY 22, 2008

    An act to amend Sections 15819.40, 15819.402, 15819.403,
15819.404, 15819.41, 15819.412, 15819.417,
~~15820.901,~~ 15820.903, 15820.911,  ~~15820.913,~~
    and 15820.913  of, and to add Sections 15819.405,
15819.418, 15820.904, and 15820.914 to, the Government Code, to
amend Section 7021 ~~of~~  , and to add Section
3060.3 to,  the Penal Code, and to amend Sections 1970, 1971,
1972, 1973, and 1975 of, and to add Section 1977 to, the Welfare and
Institutions Code, relating to ~~correctional facilities~~
  corrections  , making an appropriation therefor,
and declaring the urgency thereof, to take effect immediately.

          LEGISLATIVE COUNSEL'S DIGEST

    SB 1705, as amended, Runner. Correctional facilities.
    Existing law, the Public Safety and Offender Rehabilitation
Services Act of 2007, requires the Department of Corrections and
Rehabilitation to design, construct, or renovate prison housing
units, prison support buildings, and programming space in order to
add approximately 7,484 beds at specified adult correctional
facilities. The act also authorizes the department to develop
approximately 12,000 new prison beds, including appropriate
programming space, and to acquire land, design, construct, and
renovate reentry program facilities, and to construct and establish
new buildings at facilities under the jurisdiction of the department
to provide medical, dental, and mental health treatment or housing
for  approximately  6,000 inmates, as specified. ~~In
addition, the department is required to complete site assessments at
prison facilities where it intends to construct or renovate
additional prison housing units, support buildings, and programming
space, in order to add approximately 4,000 beds. Further, the act
authorizes the department to construct, establish, and operate
reentry facilities to house approximately 10,000 inmates.~~
    This bill instead would ~~require or authorize the above
activities for up to the number of beds or inmates specified.~~
  remove the limitation on the number of beds that are
required to be constructed at specified facilities, while maintaining
the 12,000 bed maximum, and would delete the word "prison" from the
types of facilities that are affected by the bill and replace it with
"facilities under the jurisdiction of the department." The
bill would authorize the secretary to solicit proposals and enter
into contracts for the study, planning, design, development,
construction, rebuilding, improvement, repair, or any combination
thereof, of facilities specified in the act, through a value-based,
competitive negotiation process, and would require the secretary to
determine the security level of the beds to be added.
    Existing law authorizes the Department of Corrections and

LEGIS001546

*Rehabilitation to return a parolee to prison upon revocation of the parolee's parole, as specified.*

*This bill would require the department to require a parolee to serve a period of revocation on GPS-monitored house arrest in lieu of being returned to prison, if certain conditions are met, as specified. This bill would also make it a felony for a parolee to willfully depart, without authorization, from the designated residence, as specified.*

*Because this bill would create a new crime, it would impose a state-mandated local program.*

Existing law authorizes the State Public Works Board to issue revenue bonds or notes for purposes of financing these projects, as specified. Existing law also provides that funds derived from interim financing, bonds or notes issued for this purpose are continuously appropriated to the board on behalf of the department for purposes of specified prison construction. Existing law authorizes the board to borrow funds for project costs from the Pooled Money Investment Account.

This bill would add acquisition and design as project costs for which the board may borrow funds from the Pooled Money Investment Account. The bill would also provide that preliminary expenditures to develop the scope, budget, programming, and scheduling for a project would be reimbursable from the proceeds of the revenue bonds. The board would be allowed to issue bonds or notes to finance the acquisition of specified projects. The amount of bonds or notes to be sold would be required to include the cost of acquisition of the facilities and other costs related to acquisition of the facilities. Because the bill would authorize additional uses of continuously appropriated funds, the bill would constitute an appropriation.

Under existing law, the amount of revenue bonds or notes to be sold is required to equal certain costs, including interim financing and a reasonable reserve.

This bill, instead, would authorize the amount of bonds and notes to include those items.

Existing law provides that eligible counties that choose to finance a local youthful offender rehabilitative facility with money from this act are responsible for the acquisition, design, construction, staffing, operation, repair, and maintenance of those facilities.

This bill would also require those counties to be responsible for the renovation of those facilities.

The bill would make related conforming changes.

*The California Constitution requires the state to reimburse local agencies and school districts for certain costs mandated by the state. Statutory provisions establish procedures for making that reimbursement.*

*This bill would provide that no reimbursement is required by this act for a specified reason.*

This bill would declare that it is to take effect immediately as an urgency statute.

Vote: 2/3. Appropriation: yes. Fiscal committee: yes. State-mandated local program: ~~no~~ yes .


THE PEOPLE OF THE STATE OF CALIFORNIA DO ENACT AS FOLLOWS:

~~SECTION 1.    Section 15819.40 of the Government Code is amended to read:~~
~~15819.40.    (a) (1) (A) The Department of Corrections and Rehabilitation shall design, construct, or renovate prison housing~~

LEGIS001547

units, prison support buildings, and programming space in order to
add up to 7,494 beds at the following prison facilities:
    (i) Pleasant Valley State Prison.
    (ii) Pelican Bay State Prison.
    (iii) California State Prison, Los Angeles County.
    (iv) Calipatria State Prison.
    (v) Centinela State Prison.
    (vi) Salinas Valley State Prison.
    (vii) Kern Valley State Prison.
    (viii) Wasco State Prison.
    (ix) North Kern State Prison.
    (x) Mule Creek State Prison.
    (B) The department shall complete site assessments at prison
facilities at which it intends to construct or renovate additional
housing units, support buildings, and programming space. The
department may use the funding provided in Section 28 of Chapter 7 of
the Statutes of 2007 to complete these site assessments. After
completing these site assessments, the department shall define the
scope and cost of each project pursuant to subdivision (d).
    (C) The authority contained in subparagraphs (A) and (B) may be
used to develop up to 12,000 new prison beds including appropriate
programmatic space pursuant to paragraph (3) of subdivision (a) and,
together with the funds appropriated in Section 15819.403 for this
purpose, shall constitute the scope of a single capital outlay
project for purposes of calculating augmentations pursuant to Section
13332.11 as described in Section 15819.401.
    (2) Any new beds constructed pursuant to this section shall be
supported by rehabilitative programming for inmates, including, but
not limited to, education, vocational programs, substance abuse
treatment programs, employment programs, and prerelease planning.
    (3) The purpose of beds constructed pursuant to this section is to
replace the temporary beds currently in use, and they are not
intended to house additional inmates. For the purposes of this
section, "temporary beds" shall be defined as those that are placed
in gymnasiums, classrooms, hallways, or other public spaces that were
not constructed for the purpose of housing inmates.
    (b) The Department of Corrections and Rehabilitation may acquire
land, design, construct, and renovate reentry program facilities to
provide housing for up to 6,000 inmates as authorized in Chapter 9.8
(commencing with Section 6271) of the Penal Code and, together with
the funds appropriated in Section 15819.403 for this purpose, this
shall constitute the scope and cost of a single capital outlay
project for purposes of calculating augmentations pursuant to Section
13332.11 as described in Section 15819.401.
    (c) The Department of Corrections and Rehabilitation is authorized
to design, construct and establish new buildings at facilities under
the jurisdiction of the department to provide medical, dental, and
mental health treatment or housing for up to 6,000 inmates and,
together with the funds appropriated in Section 15819.403 for this
purpose, this shall constitute the scope and cost of a single capital
outlay project for purposes of calculating augmentations pursuant to
Section 13332.11 as described in Section 15819.401.
    (d) (1) The reporting requirements set forth in Sections 7000 to
7003.5, inclusive, of the Penal Code, shall apply separately to each
institution or facility. The scope and cost of the project for each
institution or facility shall be established individually by the
State Public Works Board. The amount of the total appropriations in
Section 15819.403 that is necessary for each project shall be
allocated to each institution or facility project. The appropriations
may be allocated based on current estimates. These initial

LEGIS001548

allocations may be adjusted commensurate to changes that occur during
the progression of the projects. As allocations are made or
adjusted, the anticipated deficit or savings shall be continuously
tracked and reported. Once the total appropriation has been
allocated, any augmentation necessary to fund an anticipated deficit
shall be based on the total applicable capital outlay appropriation
in Section 15819.403 and applied to each project allocation as
necessary.
    (2) For each institution, the Department of Corrections and
Rehabilitation shall report to the Joint Legislative Budget Committee
identifying those projects that the department proposes to
undertake, and any support buildings, and programming space to
support up to 12,000 new beds at existing institutions. For each
institution the department shall describe the scope, budget,
schedule, number of beds by security level, along with approximate
square footage of prison support buildings, and programming space to
be constructed or renovated. If after providing these reports, the
committee fails to take any action with respect to each report within
30 days after submittal, this inaction shall be deemed to be
approval for purposes of this section, and the department is
authorized to proceed to design, construct, or renovate prison
housing units, support buildings, and programming space for each
institution for which a report has been approved.
    (3) The department shall notify the Joint Legislative Budget
Committee 45 days prior to the submission of preliminary plans to the
board for each project authorized in this section. If after
providing these notifications, the committee fails to take any action
with respect to each report within 45 days after submittal, this
inaction shall be deemed to be approval for purposes of this section,
and the department is authorized to design, construct, or renovate
prison housing units, support buildings, and programming space for
each institution for which a report has been approved.
    (4) The Department of Corrections and Rehabilitation shall report
quarterly to the Joint Legislative Budget Committee on the
allocations from the appropriations in Section 15819.403 and the
anticipated deficit or savings. Each reentry program facility
authorized under subdivision (b) shall be considered to be a separate
project for reporting purposes pursuant to Sections 7000 and 7003.5
of the Penal Code. Each medical, mental health, or dental building
improvement authorized under subdivision (c) shall be considered to
be a separate project, except that building improvements that have a
related purpose and that are located at the same prison may be
considered one project, for reporting purposes pursuant to Sections
7000 and 7003.5 of the Penal Code.
    SECTION 1.    Section 15819.40 of the
Government Code   is amended to read:
    15819.40.   (a) (1) (A) The Department of Corrections and
Rehabilitation ~~shall~~  may design,
construct, or renovate ~~prison~~ housing units,
~~prison~~ support buildings, and programming space in
order to add ~~approximately 7,484~~  up to 12,000
 beds at ~~the following prison facilities:~~

    ~~(i) Pleasant Valley State Prison.~~
    ~~(ii) Pelican Bay State Prison.~~
    ~~(iii) California State Prison, Los Angeles County.~~

    ~~(iv) Calipatria State Prison.~~
    ~~(v) Centinela State Prison.~~
    ~~(vi) Salinas Valley State Prison.~~

LEGIS001549

SB 1705 Senate Bill - AMENDED

~~(vii) Kern Valley State Prison.~~
~~(viii) Wasco State Prison.~~
~~(ix) North Kern State Prison.~~
~~(x) Mule Creek State Prison.~~
~~(B) — The~~
*facilities under its jurisdiction. The* department shall
complete site assessments at ~~prison~~ facilities at
which it intends to construct or renovate additional housing units,
support buildings, and programming space. The department may use the
funding provided in Section 28 of Chapter 7 of the Statutes of 2007
to complete these site assessments. After completing these site
assessments, the department shall define the scope and cost of each
project pursuant to subdivision (d).
~~(C)~~
   *(B)* The authority contained in ~~subparagraphs~~
*subparagraph* (A) ~~and (B)~~ may
be used to develop ~~approximately 12,000~~ new
~~prison~~ beds including appropriate programmatic
space pursuant to paragraph (2) of subdivision (a) and, together with
the funds appropriated in Section 15819.403 for this purpose, shall
constitute the scope of a single capital outlay project for purposes
of calculating augmentations pursuant to Section 13332.11 as
described in Section 15819.401.
   (2) Any new beds constructed pursuant to this section shall be
supported by rehabilitative programming for inmates, including, but
not limited to, education, vocational programs, substance abuse
treatment programs, employment programs, and prerelease planning.
   (3) The purpose of beds constructed pursuant to this section is to
replace the temporary beds currently in use, and they are not
intended to house additional inmates. For the purposes of this
section, "temporary beds" shall be defined as those that are placed
in gymnasiums, classrooms, hallways, or other public spaces that were
not constructed for the purpose of housing inmates.
   (b) The Department of Corrections and Rehabilitation may acquire
land, design, construct, and renovate reentry program facilities to
provide housing for ~~approximately~~ up to
6,000 inmates as authorized in Chapter 9.8 (commencing with Section
6271) of the Penal Code and, together with the funds appropriated in
Section 15819.403 for this purpose, this shall constitute the scope
and cost of a single capital outlay project for purposes of
calculating augmentations pursuant to Section 13332.11 as described
in Section 15819.401.
   (c) The Department of Corrections and Rehabilitation is authorized
to *design,* construct , and establish new
buildings at facilities under the jurisdiction of the department to
provide medical, dental, and mental health treatment or housing for
~~approximately~~ up to 6,000 inmates and,
together with the funds appropriated in Section 15819.403 for this
purpose, this shall constitute the scope and cost of a single capital
outlay project for purposes of calculating augmentations pursuant to
Section 13332.11 as described in Section 15819.401.
   (d) (1) The reporting requirements set forth in Sections 7000 to
7003.5, inclusive, of the Penal Code, shall apply separately to each
institution or facility. The scope and cost of the project for each
institution or facility shall be established individually by the
State Public Works Board. The amount of the total appropriations in
Section 15819.403 that is necessary for each project shall be
allocated to each institution or facility project. The appropriations
may be allocated based on current estimates. These initial
allocations may be adjusted commensurate to changes that occur during

LEGIS001550

the progression of the projects. As allocations are made or adjusted, the anticipated deficit or savings shall be continuously tracked and reported. Once the total appropriation has been allocated, any augmentation necessary to fund an anticipated deficit shall be based on the total applicable capital outlay appropriation in Section 15819.403 and applied to each project allocation as necessary.

(2) For each institution, the Department of Corrections and Rehabilitation shall report to the Joint Legislative Budget Committee identifying those projects that the department proposes to undertake, and any support buildings, and programming space to support ~~approximately~~ up to 12,000 new beds ~~at existing institutions~~ . For each institution , the department shall describe the scope, budget, schedule, number of beds by security level, along with approximate square footage of ~~prison~~ support buildings, and programming space to be constructed or renovated. If after providing these reports, the committee fails to take any action with respect to each report within 30 days after submittal, this inaction shall be deemed to be approval for purposes of this section, and the department is authorized to proceed to design, construct, or renovate ~~prison~~ housing units, support buildings, and programming space for each institution for which a report has been approved.

(3) The department shall notify the Joint Legislative Budget Committee 45 days prior to the submission of preliminary plans to the board for each project authorized in this section. If after providing these notifications, the committee fails to take any action with respect to each report within 45 days after submittal, this inaction shall be deemed to be approval for purposes of this section, and the department is authorized to design, construct, or renovate ~~prison~~ housing units, support buildings, and programming space for each institution for which a report has been approved.

(4) The Department of Corrections and Rehabilitation shall report quarterly to the Joint Legislative Budget Committee on the allocations from the appropriations in Section 15819.403 and the anticipated deficit or savings. Each reentry program facility authorized under subdivision (b) shall be considered to be a separate project for reporting purposes pursuant to Sections 7000 and 7003.5 of the Penal Code. Each medical, mental health, or dental building improvement authorized under subdivision (c) shall be considered to be a separate project, except that building improvements that have a related purpose and that are located at the same ~~prison~~ institution may be considered one project, for reporting purposes pursuant to Sections 7000 and 7003.5 of the Penal Code.

SEC. 2.    Section 15819.402 of the Government Code is amended to read:

15819.402.    For all projects authorized by this chapter, the board may borrow funds for project costs, including studies, acquisition, design, construction, and construction-related costs from the Pooled Money Investment Account pursuant to Sections 16312 and 16313. Except for preliminary expenditures to develop the scope, budget, programming, and scheduling for a project, project funds expended prior to project approval by the board shall not be reimbursable from the proceeds of the bonds.

~~SEC. 3.    Section 15819.403 of the Government Code is amended to read:~~

~~15819.403.    (a) The board may issue revenue bonds, negotiable~~

LEGIS001551

SB 1705 Senate Bill - AMENDED

~~notes, or negotiable bond anticipation notes pursuant to this part to~~
~~finance the acquisition, design, and construction, and the costs of~~
~~interim financing of the projects authorized in Section 15819.40.~~
~~Authorized costs for acquisition, design, construction, and~~
~~construction-related costs for all projects approved for financing by~~
~~the board shall not exceed one billion eight hundred million dollars~~
~~($1,800,000,000) for subdivision (a) of Section 15819.40, nine~~
~~hundred seventy-five million dollars ($975,000,000) for subdivision~~
~~(b) of Section 15819.40, and eight hundred fifty-seven million one~~
~~hundred thousand dollars ($857,100,000) for subdivision (c) of~~
~~Section 15819.40.~~
~~(b) Notwithstanding Section 13340, funds derived from interim~~
~~financing, revenue bonds, negotiable notes, or negotiable bond~~
~~anticipation notes issued pursuant to this chapter are hereby~~
~~continuously appropriated to the board on behalf of the Department of~~
~~Corrections and Rehabilitation for the purposes specified in Section~~
~~15819.40.~~
~~(c) For the purposes of this section, "construction-related costs"~~
~~shall include mitigation costs of local government and school~~
~~districts and shall be made available pursuant to subdivisions (c)~~
~~and (d) of Section 7005.5 of the Penal Code. It is the intent of the~~
~~Legislature that any payments made for mitigation shall be made in a~~
~~timely manner.~~
~~SEC. 4.   Section 15819.404 of the Government~~
~~Code is amended to read:~~
~~15819.404.  Notwithstanding Section 15819.403, the amount of~~
~~revenue bonds, negotiable notes, or negotiable bond anticipation~~
~~notes to be sold may include the following:~~
~~(a) The cost of acquisition, design, construction or construction~~
~~management and supervision, and other costs related to the~~
~~acquisition, design, and construction of the facilities, including~~
~~augmentations.~~
~~(b) Sums necessary to pay interim financing.~~
~~(c) In addition to the amount authorized by Section 15819.403, any~~
~~additional amount as may be authorized by the board to establish a~~
~~reasonable construction reserve and to pay the costs of financing,~~
~~including the payment of interest during acquisition or interest~~
~~prior to, during, and for a period of six months after construction~~
~~of the project, the cost of financing a debt-service reserve fund,~~
~~and the cost of issuance of permanent financing for the project. This~~
~~additional amount may include interest payable on any interim loan~~
~~for the facility from the General Fund or the Pooled Money Investment~~
~~Account pursuant to Sections 16312 and 16313.~~
     SEC. 3.     Section 15819.403 of the
Government Code  is amended to read:
     15819.403.   (a) The board may issue revenue bonds, negotiable
notes, or negotiable bond anticipation notes pursuant to this part to
finance the  acquisition,  design,  and
construction  , including, without limitation, renovation  ,
and the costs of interim financing of the projects authorized in
Section 15819.40. Authorized costs for  acquisition,
design, construction  ,  including, without limitation,
renovation  , and construction-related costs for all projects
approved for financing by the board shall not exceed one billion
eight hundred million dollars ($1,800,000,000) for subdivision (a) of
Section 15819.40, nine hundred seventy-five million dollars
($975,000,000) for subdivision (b) of Section 15819.40, and eight
hundred fifty-seven million one hundred thousand dollars
($857,100,000) for subdivision (c) of Section 15819.40.
     (b) Notwithstanding Section 13340, funds derived from interim

financing, revenue bonds, negotiable notes, or negotiable bond anticipation notes issued pursuant to this chapter are hereby continuously appropriated to the board on behalf of the Department of Corrections and Rehabilitation for the purposes specified in Section 15819.40.

(c) For the purposes of this section, "construction-related costs" shall include mitigation costs of local government and school districts and shall be made available pursuant to subdivisions (c) and (d) of Section 7005.5 of the Penal Code. It is the intent of the Legislature that any payments made for mitigation shall be made in a timely manner.

SEC. 4.    Section 15819.404 of the
Government Code   is amended to read:
15819.404.   Notwithstanding Section 15819.403, the amount of revenue bonds, negotiable notes, or negotiable bond anticipation notes to be sold ~~shall equal~~  may include
 the following:

(a) The cost of  acquisition,  design, construction
, including, without limitation, renovation,  or construction management and supervision, and other costs related to the acquisition,  design   ,  and construction   ,
including, without limitation, renovation,  of the facilities, including augmentations.

(b) Sums necessary to pay interim financing.

(c) In addition to the amount authorized by Section 15819.403, any additional amount as may be authorized by the board to establish a reasonable construction reserve and to pay the costs of financing, including the payment of interest during acquisition or  interest prior to, during, and for a period of six months after construction of the project, the cost of financing a debt-service reserve fund, and the cost of issuance of permanent financing for the project. This additional amount may include interest payable on any interim loan for the facility from the General Fund or the Pooled Money Investment Account pursuant to Sections 16312 and 16313.

SEC. 5.   Section 15819.405 is added to the Government Code, to read:

15819.405.   (a) Notwithstanding any other provision of law, in order to expedite the implementation of this chapter, the Secretary of the Department of Corrections and Rehabilitation may solicit proposals and enter into contracts for the study, planning, design, development, construction, rebuilding, improvement, repair, or any combination thereof, of facilities specified in this chapter, through a value-based, competitive negotiation process.

(b) The secretary shall determine the security level of the beds to be added pursuant to this chapter.

~~SEC. 6.    Section 15819.41 of the Government Code is amended to read:~~

~~15819.41.   (a) The Department of Corrections and Rehabilitation shall complete site assessments at prison facilities where it intends to construct or renovate additional prison housing units, prison support buildings, and programming space in order to add up to 4,000 beds at existing prison facilities. The department may use the funding provided in Section 28 of Chapter 7 of the Statutes of 2007 to complete the site assessments. After completing these site assessments the department shall define the scope and costs of each project pursuant to subdivision (d). This authorization is in addition to the authorization in subdivision (a) of Section 15891.40. Any new beds constructed shall be supported by rehabilitative programming for inmates, including, but not limited to, education, vocational programs, substance abuse treatment programs, employment~~

LEGIS001553

~~programs, and prerelease planning. The Department of Corrections and~~
~~Rehabilitation is authorized to design, construct, or renovate prison~~
~~housing units, prison support buildings, and programming space in~~
~~order to add up to 4,000 beds at existing prison facilities. This~~
~~authorization is in addition to the authorization in subdivision (a)~~
~~of Section 15819.40. Any new beds constructed shall be supported by~~
~~rehabilitative programming for inmates, including, but not limited~~
~~to, education, vocational programs, substance abuse treatment~~
~~programs, employment programs, and prerelease planning. The authority~~
~~contained in this subparagraph together with the funds appropriated~~
~~in Section 15819.413 for this purpose, shall constitute the scope and~~
~~cost of a single capital outlay project for purposes of calculating~~
~~augmentations pursuant to Section 13332.11 as described in Section~~
~~15819.411.~~
~~    (b) The Department of Corrections and Rehabilitation is authorized~~
~~to design and construct new, or renovate existing buildings at~~
~~facilities under the jurisdiction of the department to provide~~
~~medical, dental, and mental health treatment or housing for up to~~
~~2,000 inmates. This authorization is in addition to the authorization~~
~~in subdivision (c) of Section 15819.40. The authority contained in~~
~~this subparagraph together with the funds appropriated in Section~~
~~15819.413 for this purpose, shall constitute the scope and cost of a~~
~~single capital outlay project for purposes of calculating~~
~~augmentations pursuant to Section 13332.11 as described in Section~~
~~15819.411.~~
~~    (c) The Department of Corrections and Rehabilitation is authorized~~
~~to construct, establish, and operate reentry program facilities~~
~~throughout the state that will house up to 10,000 inmates pursuant to~~
~~Section 6271.1 of the Penal Code, and together with the funds~~
~~appropriated in Section 15819.413 for this purpose, this shall~~
~~constitute the scope and cost of a single capital outlay project for~~
~~purposes of calculating augmentations pursuant to Section 13332.11 as~~
~~described in Section 15819.411.~~
~~    (d) (1) The reporting requirements set forth in Sections 7000 to~~
~~7003.5, inclusive, of the Penal Code, shall apply separately to each~~
~~institution or facility. The scope and cost of the project for each~~
~~institution or facility shall be established by the State Public~~
~~Works Board individually. The amount of the total appropriations in~~
~~Section 15819.413 that is necessary for each project shall be~~
~~allocated to each institution or facility project. The appropriations~~
~~may be allocated based on current estimates. These initial~~
~~allocations may be adjusted commensurate to changes that occur during~~
~~the progression of the projects. As allocations are made or~~
~~adjusted, the anticipated deficit or savings shall be continuously~~
~~traced and reported. Once the total appropriation has been allocated,~~
~~any augmentation necessary to fund an anticipated deficit shall be~~
~~based on the total applicable capital outlay appropriation in Section~~
~~15819.413 and applied to each project allocation as necessary.~~
~~    (2) For each institution, the department shall report to the Joint~~
~~Legislative Budget Committee, identifying those projects that the~~
~~department proposes to undertake, and any support buildings, and~~
~~programming space to support up to 4,000 new beds at existing~~
~~institutions. For each institution, the department shall describe the~~
~~scope, budget, schedule, number of beds by security level, along~~
~~with approximate square footage of prison support buildings, and~~
~~programming space to be constructed or renovated. If after providing~~
~~these                                        reports, the~~
~~committee fails to take any action with respect to each report within~~
~~30 days after submittal, this inaction shall be deemed to be~~
~~approval for purposes of this section, and the department is~~

LEGIS001554

~~authorized to proceed to design, construct, or renovate prison housing units, support buildings, and programming space for each institution for which a report has been approved.~~

~~(3) The Department of Corrections and Rehabilitation shall notify the Joint Legislative Budget Committee 45 days prior to the submission of preliminary plans to the board for each project authorized in this section. If after providing these notifications, the committee fails to take any action with respect to each report within 45 days after submittal, this inaction shall be deemed to be approval for purposes of this section, and the department is authorized to design, construct, or renovate prison housing units, support buildings, and programming space for each institution for which a report has been approved.~~

~~(4) The Department of Corrections and Rehabilitation shall report quarterly to the Joint Legislative Budget Committee on the allocations from the appropriations in Section 15819.413 and the anticipated deficit or savings. Each reentry program facility authorized under subdivision (a) shall be considered to be a separate project. Each medical, mental health, or dental building improvement authorized under subdivision (b) shall be considered to be a separate project, except that building improvements that have a related purpose and that are located at the same prison may be considered one project, for reporting purposes pursuant to Sections 7000 and 7003.5 of the Penal Code.~~

~~SEC. 7.    Section 15819.413 of the Government Code is amended to read:~~

~~15819.413.   For all projects authorized by this chapter, the board may borrow funds for project costs, including studies, design, construction, and construction-related costs from the Pooled Money Investment Account pursuant to Sections 16312 and 16313. Except for preliminary expenditures to develop the scope, budget, programming, and scheduling for a project, project funds expended prior to project approval by the board shall not be reimbursable from the proceeds of the bonds.~~

~~SEC. 8.    Section 15819.414 of the Government Code is amended to read:~~

~~15819.414.   Notwithstanding Section 15819.413, the amount of revenue bonds, negotiable notes, or negotiable bond anticipation notes to be sold may include the following:~~

~~(a) The cost of design, construction or construction management and supervision, and other costs related to the design and construction of the facilities, including augmentations.~~

~~(b) Sums necessary to pay interim financing.~~

~~(c) In addition to the amount authorized by Section 15819.413, any additional amount as may be authorized by the board to establish a reasonable construction reserve and to pay the costs of financing, including the payment of interest during acquisition or interest prior to, during, and for a period of six months after construction of the project, the cost of financing a debt-service reserve fund, and the cost of issuance of permanent financing for the project. This additional amount may include interest payable on any interim loan for the facility from the General Fund or the Pooled Money Investment Account pursuant to Sections 16312 and 16313.~~

SEC. 6.    Section 15819.41 of the Government Code    is amended to read:

15819.41.   (a) The Department of Corrections and Rehabilitation shall complete site assessments at ~~prison~~ facilities where it intends to construct or renovate additional ~~prison~~ housing units, ~~prison~~ support buildings, and programming space in order to add

LEGIS001555

SB 1705 Senate Bill - AMENDED

~~approximately~~ up to 4,000 beds at
~~existing prison~~ facilities *under its jurisdiction*
. The department may use the funding provided in Section 28 of
Chapter 7 of the Statutes of 2007 to complete the site assessments.
After completing these site assessments the department shall define
the scope and costs of each project pursuant to subdivision (d). This
authorization is in addition to the authorization in subdivision (a)
of Section 15891.40. Any new beds constructed shall be supported by
rehabilitative programming for inmates, including, but not limited
to, education, vocational programs, substance abuse treatment
programs, employment programs, and prerelease planning. The
Department of Corrections and Rehabilitation is authorized to design,
construct, or renovate ~~prison~~ housing units,
~~prison~~ support buildings, and programming space in
order to add ~~approximately~~ up to 4,000
beds at ~~existing prison~~ facilities *under its
jurisdiction* . This authorization is in addition to the
authorization in subdivision (a) of Section 15819.40. Any new beds
constructed shall be supported by rehabilitative programming for
inmates, including, but not limited to, education, vocational
programs, substance abuse treatment programs, employment programs,
and prerelease planning. The authority contained in this
~~subparagraph~~ *subdivision* together with the funds
appropriated in Section 15819.413 for this purpose, shall constitute
the scope and cost of a single capital outlay project for purposes
of calculating augmentations pursuant to Section 13332.11 as
described in Section 15819.411.
    (b) The Department of Corrections and Rehabilitation is authorized
to design and construct new, or renovate existing  ,
buildings at facilities under the jurisdiction of the department to
provide medical, dental, and mental health treatment or housing for
~~approximately~~ up to 2,000 inmates. This
authorization is in addition to the authorization in subdivision (c)
of Section 15819.40. The authority contained in this
~~subparagraph~~ *subdivision* together with the funds
appropriated in Section 15819.413 for this purpose, shall constitute
the scope and cost of a single capital outlay project for purposes
of calculating augmentations pursuant to Section 13332.11 as
described in Section 15819.411.
    (c) The Department of Corrections and Rehabilitation is authorized
to construct, establish, and operate reentry program facilities
throughout the state that will house ~~approximately~~
 up to 10,000 inmates pursuant to Section 6271.1 of the
Penal Code, and together with the funds appropriated in Section
15819.413 for this purpose, this shall constitute the scope and cost
of a single capital outlay project for purposes of calculating
augmentations pursuant to Section 13332.11 as described in Section
15819.411.
    (d) (1) The reporting requirements set forth in Sections 7000 to
7003.5, inclusive, of the Penal Code, shall apply separately to each
institution or facility. The scope and cost of the project for each
institution or facility shall be established by the State Public
Works Board individually. The amount of the total appropriations in
Section 15819.413 that is necessary for each project shall be
allocated to each institution or facility project. The appropriations
may be allocated based on current estimates. These initial
allocations may be adjusted commensurate to changes that occur during
the progression of the projects. As allocations are made or
adjusted, the anticipated deficit or savings shall be continuously
traced and reported. Once the total appropriation has been allocated,

LEGIS001556

any augmentation necessary to fund an anticipated deficit shall be based on the total applicable capital outlay appropriation in Section 15819.413 and applied to each project allocation as necessary.

(2) For each institution, the department shall report to the Joint Legislative Budget Committee, identifying those projects that the department proposes to undertake, and any support buildings, and programming space to support ~~approximately~~ *up to* 4,000 new beds ~~at existing institutions~~ . For each institution, the department shall describe the scope, budget, schedule, number of beds by security level, along with approximate square footage of ~~prison~~ support buildings, and programming space to be constructed or renovated. If after providing these reports, the committee fails to take any action with respect to each report within 30 days after submittal, this inaction shall be deemed to be approval for purposes of this section, and the department is authorized to proceed to design, construct, or renovate ~~prison~~ housing units, support buildings, and programming space for each institution for which a report has been approved.

(3) The Department of Corrections and Rehabilitation shall notify the Joint Legislative Budget Committee 45 days prior to the submission of preliminary plans to the board for each project authorized in this section. If after providing these notifications, the committee fails to take any action with respect to each report within 45 days after submittal, this inaction shall be deemed to be approval for purposes of this section, and the department is authorized to design, construct, or renovate ~~prison~~ housing units, support buildings, and programming space for each institution for which a report has been approved.

(4) The Department of Corrections and Rehabilitation shall report quarterly to the Joint Legislative Budget Committee on the allocations from the appropriations in Section 15819.413 and the anticipated deficit or savings. Each reentry program facility authorized under subdivision (c) shall be considered to be a separate project. Each medical, mental health, or dental building improvement authorized under subdivision (b) shall be considered to be a separate project, except that building improvements that have a related purpose and that are located at the same ~~prison~~ *institution* may be considered one project, for reporting purposes pursuant to Sections 7000 and 7003.5 of the Penal Code.

SEC. 7.    Section 15819.412 of the Government Code *is amended to read:*

15819.412. For all projects ~~approved for financing by the board pursuant to Section 15819.41~~ *authorized by this chapter* , the board may borrow funds for project costs, including studies, ~~preliminary plans and working drawings,~~ *design,* construction *, including, without limitation, renovation* , and construction-related costs from the Pooled Money Investment Account pursuant to Sections 16312 and 16313. ~~Project~~ *Except for preliminary expenditures to develop the scope, budget, programming, and scheduling for a project, project* funds expended prior to project approval by the board shall not be reimbursable from the proceeds of the bonds.

SEC. 8.    Section 15819.414 of the Government Code    *is amended to read:*

15819.414. Notwithstanding Section 15819.413, the amount of revenue bonds, negotiable notes, or negotiable bond anticipation notes to be sold ~~shall equal~~ *may include*

LEGIS001557

the following:

(a) The cost of design, construction , *including, without limitation, renovation,* or construction management and supervision, and other costs related to the design and construction , *including, without limitation, renovation,* of the facilities, including augmentations.

(b) Sums necessary to pay interim financing.

(c) In addition to the amount authorized by Section 15819.413, any additional amount as may be authorized by the board to establish a reasonable construction reserve and to pay the costs of financing, including the payment of interest during acquisition or *in terest prior to, during, and for a period of six months after* construction of the project, the cost of financing a debt-service reserve fund, and the cost of issuance of permanent financing for the project. This additional amount may include interest payable on any interim loan for the facility from the General Fund or the Pooled Money Investment Account pursuant to Sections 16312 and 16313.

SEC. 9.  Section 15819.417 of the Government Code is amended to read:

15819.417.  The State Public Works Board may not release any funds pursuant to this chapter until the panel created pursuant to Section 7021 of the Penal Code has certified that conditions listed in that section have been met. The authority provided by this chapter shall expire on January 1, 2014, and no project shall be commenced after that date, but projects already commenced may be completed and financed through the issuance of bonds pursuant to this chapter.

SEC. 10.  Section 15819.418 is added to the Government Code, to read:

15819.418.  (a) Notwithstanding any other provision of law, in order to expedite the implementation of this chapter, the Secretary of the Department of Corrections and Rehabilitation may solicit proposals and enter into contracts for the study, planning, design, development, construction, rebuilding, improvement, repair, or any combination thereof, of facilities specified in this chapter, through a value-based, competitive negotiation process.

(b) The secretary shall determine the security level of the beds to be added pursuant to this chapter.

~~SEC. 11.  Section 15820.901 of the Government Code is amended to read:~~

~~15820.901.  (a) The CDCR, a participating county, and the SPWB are authorized to acquire, design, construct, or any combination thereof, a local jail facility approved by the Corrections Standards Authority (CSA) pursuant to Section 15820.905, or a site or sites owned by, or subject to a lease or option to purchase held by a participating county. The ownership interest of a participating county in the site or sites for a local jail facility must be determined by the SPWB to be adequate for purposes of its financing in order to be eligible under this chapter.~~

~~(b) Notwithstanding Section 15815 of the Government Code, a participating county may acquire, design, construct, or any combination thereof, the local jail facility in accordance with its local contracting authority. Notwithstanding Section 14951, the participating county may assign an inspector during the construction of the project.~~

~~(c) The CDCR, a participating county and the SPWB shall enter into a construction agreement for these projects that shall provide, at a minimum, performance expectations of the parties related to the acquisition, design, construction, renovation, or any combination thereof, of the local jail facility, guidelines and criteria for use~~

LEGIS001558

~~and application of the proceeds of revenue bonds, notes, or bond
anticipation notes issued by the SPWB to pay for the cost of the
approved local jail facility project and ongoing maintenance and
staffing responsibilities for the term of the financing.~~

~~(d) The construction agreement shall include a provision that the
participating county agrees to indemnify, defend, and save harmless
the State of California for any and all claims and losses arising out
of the acquisition, design, and construction of the project. The
construction agreement may also contain additional terms and
conditions that facilitate the financing by the SPWB.~~

~~(e) The scope and cost of these approved local jail facility
projects shall be subject to approval and administrative oversight by
the SPWB.~~

~~(f) For purposes of compliance with the California Environmental
Quality Act (Division 13 of the Public Resources Code (commencing
with Section 210000)), neither the SPWB nor the CDCR shall be deemed
a lead or responsible agency; the participating county is the lead
agency.~~

~~SEC. 13.~~ *SEC. 11.*   Section 15820.903
of the Government Code is amended to read:
   15820.903.  (a) The SPWB may issue up to seven hundred fifty
million dollars ($750,000,000) in revenue bonds, notes, or bond
anticipation notes, pursuant to Chapter 5 of Part 10b of Division 3
of Title 2 (commencing with Section 15830) to finance the
acquisition, design, or construction, and a reasonable construction
reserve, of approved local jail facilities described in Section
15820.901, and any additional amount authorized under Section 15849.6
to pay for the cost of financing.
   (b) Proceeds from the revenue bonds, notes, or bond anticipation
notes may be utilized to reimburse a participating county for the
costs of acquisition, preliminary plans, working drawings, and
construction for approved projects.
   (c) Notwithstanding Section 13340, funds derived pursuant to this
section and Section 15820.902 are continuously appropriated for
purposes of this chapter.
   (d) This section shall become inoperative on June 30, 2017, and no
project may be commenced after that date; however projects that have
already commenced by that date may be completed and financed with
bonds issued pursuant to this chapter.
   ~~SEC. 13.~~ *SEC. 12.*   Section 15820.904
is added to the Government Code, to read:
   15820.904.  In support of this state funding, the Legislature
finds and declares all of the following:
   (a) The county jail system needs more capacity.
   (b) Without increased capacity, public safety throughout the state
may be jeopardized by offenders who either remain in the community
or are released early due to lack of jail capacity.
   (c) By expanding jail capacity, this funding will serve a critical
state purpose by promoting public safety.
   (d) This purpose represents valuable consideration in exchange for
this state action.
   ~~SEC. 14.   Section 15820.911 of the Government
Code is amended to read:~~

~~15820.911.  (a) The CDCR, a participating county, and the SPWB are
authorized to acquire, design, construct, or any combination
thereof, a local jail facility approved by the Corrections Standards
Authority (CSA) pursuant to Section 15820.916, or a site or sites
owned by, or subject to a lease or option to purchase held by a
participating county. The ownership interest of a participating
county in the site or sites for a local jail facility must be~~

LEGIS001559

~~determined by the SPWB to be adequate for purposes of its financing
in order to be eligible under this chapter.~~

~~(b) Notwithstanding Section 15815, a participating county may
acquire, design, construct, or any combination thereof, the local
jail facility in accordance with its local contracting authority.
Notwithstanding Section 14951, the participating county may assign an
inspector during the construction of the project.~~

~~(c) The CDCR, a participating county and the SPWB shall enter into
a construction agreement for these projects that shall provide, at a
minimum, performance expectations of the parties related to the
acquisition, design, construction, renovation, or any combination
thereof, of the local jail facility, guidelines and criteria for use
and application of the proceeds of revenue bonds, notes, or bond
anticipation notes issued by the SPWB to pay for the cost of the
approved local jail facility project and ongoing maintenance and
staffing responsibilities for the term of the financing.~~

~~(d) The construction agreement shall include a provision that the
participating county agrees to indemnify, defend, and save harmless
the State of California for any and all claims and losses arising out
of the acquisition, design, and construction of the project. The
construction agreement may also contain additional terms and
conditions that facilitate the financing by the SPWB.~~

~~(e) The scope and cost of these approved local jail facility
projects shall be subject to approval and administrative oversight by
the SPWB.~~

~~(f) For purposes of compliance with the California Environmental
Quality Act (Division 13 of the Public Resources Code (commencing at
Section 21000)), neither the SPWB nor the CDCR shall be deemed a
lead or responsible agency; the participating county is the lead
agency.~~

   SEC. 13.    *Section 15820.911 of the*
*Government Code*  *is amended to read:*
   15820.911.  (a) The CDCR, a participating county, and the SPWB are
authorized to acquire, design, and construct, a local jail facility
approved by the Corrections Standards Authority (CSA) pursuant to
Section ~~15820.906~~  *15820.916* , or a site
or sites owned by, or subject to a lease or option to purchase held
by a participating county. The ownership interest of a participating
county in the site or sites for a local jail facility must be
determined by the SPWB to be adequate for purposes of its financing
in order to be eligible under this chapter.
   (b) Notwithstanding Section 15815, a participating county may
acquire, design, or construct the local jail facility in accordance
with its local contracting authority. Notwithstanding Section 14951,
the participating county may assign an inspector during the
construction of the project.
   (c) The CDCR, a participating county and the SPWB shall enter into
a construction agreement for these projects that shall provide, at a
minimum, performance expectations of the parties related to the
acquisition, design, construction, or renovation of the local jail
facility, guidelines and criteria for use and application of the
proceeds of revenue bonds, notes, or bond anticipation notes issued
by the SPWB to pay for the cost of the approved local jail facility
project and ongoing maintenance and staffing responsibilities for the
term of the financing.
   (d) The construction agreement shall include a provision that the
participating county agrees to indemnify, defend, and save harmless
the State of California for any and all claims and losses arising out
of the acquisition, design, and construction of the project. The
construction agreement may also contain additional terms and

LEGIS001560

conditions that facilitate the financing by the SPWB.

(e) The scope and cost of these approved local jail facility projects shall be subject to approval and administrative oversight by the SPWB.

(f) For purposes of compliance with the California Environmental Quality Act (Division 13 of the Public Resources Code (commencing at Section 210000)), neither the SPWB nor the CDCR shall be deemed a lead or responsible agency; the participating county is the lead agency.

~~SEC. 15.~~ SEC. 14.  Section 15820.913 of the Government Code is amended to read:

15820.913.  (a) The SPWB may issue up to four hundred seventy million dollars ($470,000,000) in revenue bonds, notes, or bond anticipation notes, pursuant to Chapter 5 of Part 10b of Division 3 of Title 2 (commencing with Section 15830) to finance the acquisition, design, or construction, and a reasonable construction reserve, of approved local jail facilities described in Section 15820.911, and any additional amount authorized under Section 15849.6 to pay for the cost of financing.

(b) Proceeds from the revenue bonds, notes, or bond anticipation notes may be used to reimburse a participating county for the costs of acquisition, preliminary plans, working drawings, and construction for approved projects.

(c) Notwithstanding Section 13340, funds derived pursuant to this section and Section 15820.912 are continuously appropriated for purposes of this chapter.

~~SEC. 16.~~ SEC. 15.  Section 15820.914 is added to the Government Code, to read:

15820.914.  In support of this state funding, the Legislature finds and declares all of the following:

(a) The county jail system needs more capacity.

(b) Without increased capacity, public safety throughout the state may be jeopardized by offenders who either remain in the community or are released early due to lack of jail capacity.

(c) By expanding jail capacity, this funding will serve a critical state purpose by promoting public safety.

(d) This purpose represents valuable consideration in exchange for this state action.

SEC. 16.    Section 3060.3 is added to the Penal Code    , to read:

3060.3.  (a) The Board of Parole Hearings, or a presiding deputy commissioner, upon finding that a person has violated parole, shall require that person to serve a period of revocation on GPS-monitored house arrest in lieu of imprisonment in the state prison if all of the following apply:

(1) The parolee has not violated parole for a felony offense for which he or she is awaiting prosecution.

(2) The parolee has never been convicted of a violent felony, a felony violation of Section 186.22, or a sex offense listed in Section 290.

(3) The parolee has been evaluated by the Department of Corrections and Rehabilitation using COMPAS or another standardized risk assessment tool and has not been found to be violent or of high risk to public safety.

(4) The maximum period of revocation is no greater than 10 months.

(5) The parolee serves the term of revocation in an appropriate residential property, as determined by the board, which is not occupied by any other person on parole.

(6) The parolee agrees not to leave the premises except for

LEGIS001561

*medical or natural emergencies, or as expressly permitted for
employment or drug treatment, and shall at all times wear a GPS or
other monitoring device.*

*(7) The parolee posts a cash or surety bond of not less that ten
thousand dollars ($10,000), which shall be forfeited in the event he
or she leaves his or her residence without the express consent of his
or her parole agent or in response to a verifiable medical or other
emergency. The forfeiture of cash or the surety bond, as described in
this paragraph, and the relief from such forfeiture shall be
governed by the terms of Section 1300*
*et seq. of this code.*

*(8) The parolee is prohibited from earning more than one-half the
credits he or she could earn were he or she returned to prison.*

*(9) The parolee abides by all additional conditions of parole.*

*(b) A parolee on house arrest pursuant to subdivision (a) may be
immediately returned to the custody of the Department of Corrections
and Rehabilitation for the remainder of his or her period of
revocation in the event the parolee violates any condition of parole
or GPS-monitored house arrest or if the monitoring device ceases to
function for any reason.*

*(c) The GPS monitoring system or other equipment necessary to
monitor parolees pursuant to subdivision (a) shall be procured
through a competitive request for proposals (RFP) process, which
shall evaluate factors including cost effectiveness and reliability
of available products.*

*(d) Willful unauthorized departure by the parolee from the
designated residence, except as required as a result of a verifiable
medical or other emergency, even temporarily, is flight from custody,
a felony punishable by imprisonment in the state prison for 16
months, or two or three years.*

*(e) The parolee shall be deemed to have been returned to custody
for purposes of paragraph (5) of subdivision (b) of Section 3000
during the period he or she is on GPS-monitored house arrest.*

SEC. 17.  Section 7021 of the Penal Code is amended to read:

7021.  (a) The State Public Works Board may not release any funds
provided for projects in Section 15819.41 of the Government Code or
Section 6271.1, until a three-member panel, composed of the State
Auditor, the Inspector General, and an appointee of the Judicial
Council of California, verifies that the conditions outlined in
paragraphs (1) to (13), inclusive, have been met. The Legislative
Analyst shall provide information and input to the three-member panel
as it considers whether the conditions have been met.

(1) At least 4,000 beds authorized in subdivision (a) of Section
15819.40 of the Government Code are under construction.

(2) The first 4,000 beds authorized in subdivision (a) of Section
15819.40 of the Government Code include space and will provide
opportunities for rehabilitation services for inmates.

(3) At least 2,000 of the beds authorized in subdivision (a) of
Section 6271 are under construction or sited.

(4) At least 2,000 substance abuse treatment slots established in
Section 2694 have been established, with aftercare in the community.

(5) Prison institutional drug treatment slots have averaged at
least 75 percent participation over the previous six months.

(6) The Department of Corrections and Rehabilitation has
implemented an inmate assessment at reception centers, pursuant to
Section 3020, and has used the assessment to assign inmates to
rehabilitation programs for at least six consecutive months.

(7) The Department of Corrections and Rehabilitation has completed
the Inmate Treatment and Prison-to-Employment Plan, pursuant to
Section 3105.

LEGIS001562

(8) At least 300 parolees are being served in day treatment or crisis care services, pursuant to Section 3073.

(9) The California Rehabilitation Oversight Board (C-ROB), created pursuant to Section 6140, has been in operation for at least one year, and is regularly reviewing the Department of Corrections and Rehabilitation's programs. This condition may be waived if the appointments to the C-ROB have not been made by the Legislature.

(10) The Department of Corrections and Rehabilitation has implemented a plan to address management deficiencies, pursuant to Section 2061, and at least 75 percent of management positions have been filled for at least six months.

(11) The Department of Corrections and Rehabilitation has increased full-time participation in inmate academic and vocation education programs by 10 percent from the levels of participation on April 1, 2007.

(12) The Department of Corrections and Rehabilitation has developed and implemented a plan to obtain additional rehabilitation services, pursuant to Section 2062, and the vacancy rate for positions dedicated to rehabilitation and treatment services in prisons and parole offices is no greater than the statewide average vacancy rate for all state positions.

(13) The Department of Corrections and Rehabilitation has reviewed existing parole procedures.

(b) The provisions of Section 15819.41 of the Government Code and Section 6271.1 shall not authorize construction of facilities until the three-member panel specified in subdivision (a) has certified that the requirements of that subdivision have been met. Those sections shall become inoperative on January 1, 2014. Any projects already underway may continue, and funding for those projects shall remain authorized in order to allow for the issuance of bonds.

(c) The requirements set forth in Section 7021 are contingent upon the Legislature making funds available for the rehabilitation programs set forth in the Public Safety and Offender Rehabilitation Services Act of 2007.

SEC. 18.   Section 1970 of the Welfare and Institutions Code is amended to read:

1970.   (a) For the purposes of this article, "participating county" means any county, or regional consortium of counties, within the state that has been certified to the board by the authority as having satisfied all of the requirements set forth in Section 1975 for financing a local youthful offender rehabilitative facility pursuant to this article.

(b) For purposes of this article, "board" means the State Public Works Board, and "authority" means the Corrections Standards Authority.

SEC. 19.   Section 1971 of the Welfare and Institutions Code is amended to read:

1971.   (a) The Department of Corrections and Rehabilitation, a participating county, and the board are authorized to acquire, design, renovate, or construct a local youthful offender rehabilitative facility approved by the authority pursuant to Section 1975, or a site or sites owned by, or subject to a lease or option to purchase held by a participating county. The ownership interest of a participating county in the site or sites for a local youthful offender rehabilitative facility shall be determined by the board to be adequate for purposes of its financing in order to be eligible under this article.

(b) Notwithstanding Section 15815 of the Government Code, a participating county may acquire, design, renovate, or construct the local youthful offender rehabilitative facility in accordance with

LEGIS001563

its local contracting authority. Notwithstanding Section 14951 of the Government Code, the participating county may assign an inspector during the construction of the project.

(c) The department, a participating county, and the board shall enter a construction agreement for the project that shall provide, at a minimum, all of the following:

(1) Performance expectations of the parties related to the acquisition, design, renovation, or construction of the local youthful offender rehabilitative facility.

(2) Guidelines and criteria for use and application of the proceeds of revenue bonds, notes, or bond anticipation notes issued by the board to pay for the cost of the approved local youthful offender rehabilitative facility project.

(3) Ongoing maintenance and staffing responsibilities for the term of the financing.

(d) The construction agreement shall include a provision that the participating county agrees to indemnify, defend, and hold harmless the State of California for any and all claims and losses arising out of the acquisition, design, renovation, and construction of the local youthful offender rehabilitative facility. The construction agreement may also contain additional terms and conditions that facilitate the financing by the board.

(e) The scope and cost of the approved local youthful offender rehabilitative facility project shall be subject to approval and administrative oversight by the board.

(f) For purposes of compliance with the California Environmental Quality Act (Division 13 (commencing with Section 21000) of the Public Resources Code), neither the board nor the department, shall be deemed a lead or responsible agency. The participating county shall be the lead agency.

SEC. 20.  Section 1972 of the Welfare and Institutions Code is amended to read:

1972.  Upon the receipt by a participating county of responsive construction bids, the board and the department may borrow funds for project costs after the project has been certified pursuant to Section 1970 from the Pooled Money Investment Account pursuant to Sections 16312 and 16313 of the Government Code, or from any other appropriate source. In the event any of the revenue bonds, notes, or bond anticipation notes authorized by this chapter are not sold, the department shall commit a sufficient amount of its support appropriation to repay any loans made for an approved project.

SEC. 21.  Section 1973 of the Welfare and Institutions Code is amended to read:

1973.  (a) The board may issue up to one hundred million dollars ($100,000,000) in revenue bonds, notes, or bond anticipation notes, pursuant to Chapter 5 (commencing with Section 15830) of Part 10b of Division 3 of Title 2 of the Government Code to finance the acquisition, design, renovation, or construction, and a reasonable construction reserve, of approved local youthful offender rehabilitative facilities described in Section 1971, and any additional amount authorized under Section 15849.6 of the Government Code to pay for the cost of financing.

(b) Proceeds from the revenue bonds, notes, or bond anticipation notes may be utilized to reimburse a participating county for the costs of acquisition, preliminary plans, working drawings, and construction for approved projects.

(c) Notwithstanding Section 13340 of the Government Code, funds derived pursuant to this section are continuously appropriated for purposes of this article.

(d) This section shall become inoperative on June 30, 2017. No

LEGIS001564

projects shall be commenced after that date, but projects already
commenced may be completed and financed through the issuance of bonds
pursuant to this article.
  SEC. 22.  Section 1975 of the Welfare and Institutions Code is
amended to read:
  1975.  (a) The authority shall adhere to its duly adopted
regulations for the approval or disapproval of local youthful
offender rehabilitative facilities. The authority also shall consider
cost-effectiveness in determining approval or disapproval. No state
moneys shall be encumbered in contracts let by a participating county
until final architectural plans and specifications have been
approved by the authority, and subsequent construction bids have been
received. The review and approval of plans, specifications, or other
documents by the authority are for the purpose of ensuring proper
administration of moneys and determination of whether the project
specifications comply with law and regulation. The authority may
require changes in construction materials to enhance safety and
security if materials proposed at the time of final plans and
specifications are not essential and customary as used statewide for
facilities of the same security level. Participating counties are
responsible for the acquisition, design, renovation, construction,
staffing, operation, repair, and maintenance of the project.
  (b) The authority shall establish minimum standards and funding
schedules and procedures, which shall take into consideration, but
not be limited to, all of the following:
  (1) Certification by a participating county of project site
control through either fee simple ownership of the site or comparable
long-term possession of the site, and right of access to the project
sufficient to ensure undisturbed use and possession.
  (2) Documentation of need for the project.
  (3) A written project proposal.
  (4) Submittal of a staffing plan for the project, including
operational cost projections and documentation that the local
youthful offender rehabilitative facility will be able to be safety
staffed and operated within 90 days of completion.
  (5) Submittal of architectural drawings, which shall be approved
by the authority for compliance with minimum youthful offender
rehabilitation facility standards and which also shall be approved by
the State Fire Marshal for compliance with fire safety and life
safety requirements.
  (6) Documentation evidencing the filing by a participating county
of a final notice of determination on its environmental impact
report.
  (7) Provisions intended to maintain the tax-exempt status of the
bonds, notes, or bond anticipation notes issued by the board.
  SEC. 23.  Section 1977 is added to the Welfare and Institutions
Code, to read:
  1977.  In support of state funding authorized by this article, the
Legislature finds and declares all of the following:
  (a) Population levels in local juvenile offender facilities across
the state have dramatically increased.
  (b) Although capacity at local juvenile offender rehabilitation
and incarceration facilities has been added during the last decade,
those facilities still face capacity problems, and aging facilities
need to be repaired or replaced.
  (c) Insufficient capacity at local juvenile offender
rehabilitation and incarceration facilities may create risks to the
public safety as well as a loss to the state of potentially
productive members of society.
  (d) By expanding capacity at local juvenile offender

LEGIS001565

rehabilitation and incarceration facilities, this funding will serve
a critical state purpose, which purpose represents valuable
consideration in exchange for this state action.
     SEC. 24.     No reimbursement is required by this act
pursuant to Section 6 of Article XIII B of the California
Constitution because the only costs that may be incurred by a local
agency or school district will be incurred because this act creates a
new crime or infraction, eliminates a crime or infraction, or
changes the penalty for a crime or infraction, within the meaning of
Section 17556 of the Government Code, or changes the definition of a
crime within the meaning of Section 6 of Article XIII B of the
California Constitution.
     ~~SEC. 24.~~  SEC. 25.    This act is an
urgency statute necessary for the immediate preservation of the
public peace, health, or safety within the meaning of Article IV of
the Constitution and shall go into immediate effect. The facts
constituting the necessity are:
     In order to make the necessary statutory changes to implement the
Budget Act of 2008 at the earliest time possible, it is necessary
that this act take effect immediately.

LEGIS001566

# EXHIBIT G

Los Angeles Times: Death rate of California prisoners is down nearly 30% since early 2006   Page 1 of 3



**Los Angeles Times**

http://www.latimes.com/news/science/la-me-prisons16-2008sep16,0,3616031.story
*From the Los Angeles Times*

# Death rate of California prisoners is down nearly 30% since early 2006

**A court-appointed monitor says the drop indicates progress is being made in reducing the number of preventable healthcare-related deaths in the state's prison system.**
By Michael Rothfeld
Los Angeles Times Staff Writer

September 16, 2008

SACRAMENTO — The death rate of California prisoners has dropped 29% since the beginning of 2006, when inmate healthcare was seized from state control, according to a report Monday by a court-appointed overseer.

J. Clark Kelso, the receiver for inmate medical care, said the drop is an indication that his office is succeeding in reducing the number of preventable deaths in state prisons due to inadequate access to care, poor treatment and other factors.

But a prison expert and a lawyer for inmates said the causes of the decline are not totally clear.

In a report to U.S. District Court Judge Thelton Henderson, who is presiding over an inmate lawsuit, Kelso said the number of deaths fell from 73 per 100,000 inmates in the first quarter of 2006, when the receivership took over prison healthcare, to 51 deaths per 100,000 inmates in the second quarter of 2008.

Donald Specter, director of the Prison Law Office, which represents inmates in the case that spawned the receivership, said the "figures don't say too much" because there is no breakdown of which deaths are related to medical care as opposed to other causes.

"I don't know how useful a measure that is of anything," said Specter, who says the state needs to do much more, including reducing overcrowding, to improve medical care. "It could be the age of the population. I just don't know."

The total number of inmate deaths declined from 428 in 2006 to 397 last year, Kelso said.

So far, 186 inmates have died in custody this year.

Kelso said his office will complete a survey in November of how many of last year's deaths could clearly have been prevented, and it probably will be "a very small number." In 2006, about 15% of deaths might have been prevented, the receiver's office said.

In an interview, Kelso said that in reviewing death reports for inmates, his staff found that many

http://www.latimes.com/news/science/la-me-prisons16-2008sep16,0,3382833,print.story       LEGIS001513

died needlessly as a result of not just one mistake but multiple negative factors, including missed diagnoses, errors or general lack of care. But he said that has changed as his office has filled vacancies for doctors and nurses and replaced doctors with poor performance records.

"Doctors and nurses have to usually miss three or four or five times" before an inmate dies, Kelso said. "What we are seeing is that increasingly, they are not missing as often, and that's because we have more people, more eyes, more competent clinicians that are catching things."

Since mid-2005, shortly before the receiver's office was established, 65 prison doctors have been fired or left the system, and 33 are practicing on a restricted basis pending completion of an investigation. The receivership hired 172 doctors, nearly half the number it is authorized to have, between Aug. 1, 2007, and July 31, along with hundreds of nurses.

Joan Petersilia, a criminologist who studies prisons at UC Irvine, said she believes a number of factors might be at work, not all of them connected to the receiver's staff. She said the state had been more frequently segregating gang members and other disruptive prisoners from the rest of the inmate population, which could bring down the number of deaths related to violence.

Prisoners with mental illnesses are also getting their medications more regularly and more often are being isolated from other inmates, she said.

"The inmates sometimes tell me that they feel safer now because they do notice that gang members are being extracted," she said. "That may have something to do with it. It's hard to know what to make of it, but for me, any good sign is a good sign because we see so many trends going in the opposite direction."

The number of lockdowns -- in which inmates are confined to their cells almost exclusively -- could also be contributing to the decrease in deaths, because it tends to reduce violence among inmates. The state has increased lockdowns in the last two years, Petersilia said.

In his report to Henderson, Kelso said the reduction might be seized upon by state officials "who allowed horrific prison conditions to fester" as evidence that his office is no longer needed, and that his efforts to obtain $8 billion for construction of medical facilities might now be derided as unnecessary.

"Nothing could be further from the truth," Kelso wrote, saying the reduction in deaths demonstrates only "preliminary results, not that the work is complete."

michael.rothfeld@latimes.com

---

If you want other stories on this topic, search the Archives at latimes.com/archives.
TMSReprints
Article licensing and reprint options

Copyright 2008 Los Angeles Times | Privacy Policy | Terms of Service
Home Delivery | Advertise | Archives | Contact | Site Map | Help

Los Angeles Times: Death rate of California prisoners is down nearly 30% since early 2006   Page 3 of 3

partners:   ktla··cw   **Noy**

.

# EXHIBIT H



**Los Angeles Times**



http://www.latimes.com/news/local/la-me-jail14may14,0,1011718.story?coll=la-home-headlines
*From the Los Angeles Times*

# Releasing Inmates Early Has a Costly Human Toll

A shortage of jail beds puts career criminals back on the streets, where they often commit new offenses.
By Jack Leonard, Megan Garvey and Doug Smith
Times Staff Writers

May 14, 2006

Mario Moreno should still have been behind bars the night he climbed into the passenger seat of a stolen car with two fellow gang members.

He was carrying a rifle, some cartridges and, in his jacket pocket, a bag of marijuana. "Let's go do this," the car's driver recalled Moreno saying as they headed into the turf of a rival black gang.

They drove by a liquor store at 89th Street and Central Avenue in South Los Angeles. Two older black men were standing outside.

Moreno, 18, aimed his weapon out the driver's-side window and fired. One bullet killed Darrell Dennard, 53, a grandfather who slept in an alley behind a nearby fish market and got by doing odo jobs. He had just bought a lottery ticket. It was about 9 p.m. on Oct. 11, 2004.

If not for a chronic shortage of jail beds in Los Angeles County, Dennard's killer would have been in jail four more months. Moreno had been convicted of possessing a sawed-off shotgun — a felony. A probation officer called him a "danger to the community," and a judge sentenced him to a year in jail, the county maximum. Six days later he was released into a work program. Since his arrest, he had served a total of 53 days.

Moreno joined more than 150,000 county inmates who have been released during the last four years after serving fractions of their sentences. Thousands, like Moreno, committed violent crimes when they would otherwise have been locked up, even with time off for good behavior.

The large-scale releases started in mid-2002, when Sheriff Lee Baca had to make major budget cuts. Unwilling to lay off patrol officers, he chose to close jails.

As a result, nearly everyone now sentenced to 90 days or less is let go immediately. Many others leave after serving no more than 10% of their time, making Los Angeles County Jail sentences among the weakest in the nation.

A Los Angeles Times investigation of early releases since Baca's jail closures began found:

• Nearly 16,000 inmates — more than 10% of those released early — were rearrested and charged with new crimes while they were supposed to be incarcerated.

• Nearly 2,000 of those rearrested were released early a second time, only to be arrested again while they should have been behind bars. Hundreds of those people cycled through jail three or more times. One example of the revolving door: A 55-year-old woman was released early in 2002 on an assault charge, only to be rearrested three days later on suspicion of another assault. Over the next three years, she was released early 15 times and rearrested 19 times when she was supposed to be locked up.

• Sixteen men, including Moreno, were charged with murders committed while they should have been in jail. Nine are awaiting trial; seven have been convicted in the homicides.

• More than a fourth of those rearrested were charged with violent or life-endangering crimes, including 518 robberies, 215 sex offenses, 641 weapons violations, 635 drunk-driving incidents, 1,443 assaults and 20 kidnappings.

Many of these inmates probably would have committed new offenses even if they had served full sentences. But the early releases have given career criminals more time on the streets to commit additional crimes, endangering the public.

Juvenal Valencia, 21, was convicted of assault with a deadly weapon, released early and then cycled in and out of jail twice more after early releases. Prosecutors have now charged him with first-degree murder in a drive-by shooting that

left one man dead and five others wounded. He has pleaded not guilty. At the time of the killing, Valencia had two months left to serve for a probation violation.

In recent years, sheriff's clerks have routinely disregarded sentences handed down by judges. In some cases, inmates are freed despite instructions from a judge that they must serve their full sentences.

"That puts us all in peril," said Los Angeles City Atty. Rocky Delgadillo. "I think criminals have learned from this that there is a way to beat the system.... For many, a few days in jail has become just a cost of doing business."

Los Angeles Police Chief William J. Bratton, who led the Boston and New York police departments before taking over in Los Angeles in late 2002, said the situation has frustrated officers on the street and made policing harder.

"It's an amazing system. I've never seen anything like it," he said. "The police, prosecutors and judges — sometimes even a jury — have made decisions, and you have the ability to arbitrarily undo all of that."

In recent interviews, Baca defended his decision to release inmates early as a "last resort," saying he had little choice but to shut down jail facilities when he had to cut millions of dollars from his budget.

At the time, Baca warned that crime would increase if he weren't given more money. "In a public safety fashion, the net will be cut and the floodgate will be open to more crime," Baca told county supervisors at a 2002 board meeting to which he had brought a thousand supporters.

Now, he says, the public is paying the consequences.

"I knew that there are people in our county jails that are so unstable that even if they're only in there for a minor crime, they're capable of committing a bigger crime," he said. "You just can't predict who that person is going to be, specifically."

A bond measure of up to $500 million to fund improvements to — and expansion of — the jail system is being considered for the November ballot.

But even if the extra millions come through, sheriff's officials say they won't be enough to fix long-neglected jails.

The sheriff has little control over who comes into his jails. In recent years, bookings have steadily increased, partly the result of a jump in arrests by Los Angeles police. And more than a thousand jail beds are regularly taken up by prisoners awaiting transfer to state facilities, a process that takes weeks.

Today, the county has about 19,000 jail beds in use. Baca says he would need at least 30,000 — and additional deputies — to end early release.

**'A Truly Innocent Victim'**

Darrell Dennard was always better at taking care of others than himself. When his grandmother was gravely ill, he stayed with her day and night, bathing and feeding her until she died. But he chose to make his home on the streets of South Los Angeles where he'd grown up, preferring his tidy bedroll to numerous offers of a warm bed.

A little over a week before Moreno killed him, Dennard's mother, Gladys Derrick, visited her son in the alley behind the fish market. She brought travel-size lotions and shampoos and a basket of "all kinds of things he didn't have to cook." He was "always good company," she said.

"It's not very often that you have a truly innocent victim," said LAPD Det. John Skaggs, who investigated the killing. "This of course is that case."

Half a dozen members of Dennard's family were in the Compton courthouse on March 27 to see Moreno sentenced to state prison for voluntary manslaughter, a plea prosecutors said they offered because witnesses wouldn't testify.

Dennard's sister wore a T-shirt printed with her brother's smiling image and the dates marking his life: 9/26/51-10/11/04.

Moreno, a member of one of the county's most notorious gangs, Florencia 13, smiled at his family when he entered the courtroom. A girlfriend powdered her nose. His mother, her hair tied back in two long braids, read a Bible.

Dennard's brother, Howard McZeal, addressed the court.

"I'd like to know why my brother isn't here," McZeal said, his voice cracking. "What did he do to you?"

Moreno stared straight ahead.

Until speaking to a Times reporter shortly before the sentencing, Dennard's family had no idea that his killer had gotten out of jail with months still to serve.

"A gang member arrested with a sawed-off shotgun? That [jail time] was a camping trip to him, a business junket," McZeal said later.

"If that man had still been in jail, Darrell would still be alive."

A Crush of Inmates

A generation ago, no one in Los Angeles got out of jail early.

When beds were full, inmates were housed in hallways, common rooms, the pews of the jail's chapel and anywhere floor space was available. In the summer of 1983, with the building filled to twice its capacity, hundreds of inmates were given four blankets each and slept under the stars on the roof of Men's Central Jail.

By then a class-action lawsuit filed on behalf of inmates by the American Civil Liberties Union was making its way through the court system. A federal court found the overcrowding to be cruel and unusual punishment and ordered the county to stop overloading its jails. At the time, more than 22,000 inmates were being housed in space meant for half as many. County officials, under a federal consent decree, agreed to open new facilities.

In 1988, the judge allowed the county to institute what was to be a temporary solution to the overcrowding: early release.

The number of early releases ebbed and flowed, but by the late 1990s it had slowed to a trickle. Then, in mid-2002, Baca faced two years of budget shortfalls, forcing $167 million in cuts.

County supervisors said they had little choice but to rein in spending. During that time, state and county governments were reeling from losses in tax revenue caused by fallout from the dot-com bust. Other county departments were also hit hard.

"We did what we could to maintain" the sheriff's funding, said Supervisor Yvonne Brathwaite Burke.

Baca was already dealing with a jail system that had lost 5,000 beds in a decade, mostly from earthquake damage. In little more than a year, he closed three more jails and shut down parts of four others, reducing the number of inmates by another 5,000.

The cuts saved more than $50 million. But they also guaranteed a new wave of early releases.

Baca's critics point to "nonessential" pet projects, like rehabilitation programs in the jail, that could have been cut to keep inmates in jail longer.

"That's nice, but that's not our job. Our job is custody," said Los Angeles County Sheriff's Sgt. Paul Jernigan, who works in Men's Central and is one of four candidates running against Baca in the June 6 election.

But the sheriff said these programs amounted to a fraction of the money he needed to save. With cuts down to the bone, he said he faced laying off deputies or closing the jails.

"If you were to ask the community, 'I'll take away five police cars in your neighborhoods or I'll do early release,' " they'll say, 'Don't take away the five radio cars. Now manage your jail the best way you can.' So I did," he said.

In the last two years, Baca's department has benefited from an increase in county revenue from property taxes, fueled by a surging real estate market. More than half the beds closed since 2002 have been reopened. The department has the funds, but not the staff, to reopen the remaining 2,500 beds.

And there is still the problem of aging and outdated facilities at a time of growing pressure to reduce violence among inmates and relieve overcrowding that has continued despite the large-scale early releases.

In Men's Central, cells designed for three inmates are filled with six. Last week, U.S. District Judge Dean D. Pregerson described the practice as "simply not consistent with basic values," noting that inmates did not even have the space to stand up and take a step or two. Pregerson, who oversees the still-open civil rights case on jail conditions, said the situation "should not be permitted to exist in the future."

A Balancing Act

Last year, 32 of California's 58 counties — including Orange, San Diego, San Bernardino and Riverside — released inmates before they had completed their jail sentences.

Los Angeles County, with the largest jail system in the nation, has led the way. In the 3 1/2 years before Baca closed jails, about 10,000 inmates were let out prematurely. In the 3 1/2 years that followed, almost 150,000 were released three or more days early.

LEGIS001518

Los Angeles Times: Releasing Inmates Early Has a Costly Human Toll

With fewer beds, the sheriff has also had to loosen standards on who qualifies for early release.

"By lowering that criteria, you're qualifying more hardened criminals," said Sheriff's Capt. Bill Bengtson.

Until The Times asked for data, sheriff's officials had not tracked how often inmates were rearrested when they would otherwise have been behind bars. In February, the officials hastily conducted an analysis of rearrests before giving the newspaper data on more than 2 million bookings into the jail since 1999.

The Sheriff's Department analysis, which looked at the seven years of data as a whole, concluded that inmates released early were no more likely to re-offend than those who were not.

But The Times found distinct differences when it compared the years before the jail closures with those after. As fewer served full terms, rearrests within 90 days of release increased for all inmates. Those released early after the policy change were more likely to be rearrested within 90 days than inmates who served their full jail time.

The Times analysis also showed that although the number of inmates released early increased 15-fold after mid-2002, arrests of people with time left on their sentences rose about 60-fold, from 266 to 15,775. Rearrests for violent and life-threatening crimes soared from 74 before the jail closures to more than 4,000 since.

Among the perpetrators: Hector Aguilar, who left jail Sept. 1, 2004, with three months left on his sentence for domestic violence. Four days later, he opened fire with an AK-47 assault rifle on a sheriff's patrol car, missing two deputies inside. He pleaded guilty to assault with a deadly weapon and was sentenced to 43 years in state prison.

In deciding which inmates deserve the most time, sheriff's officials try to balance overcrowding against the need to keep dangerous criminals locked up.

The inmate pool for early release is limited to about 10% of the jail population — convicts sentenced by judges to less than a year. The remaining inmates are awaiting trial or transfer to state prison for longer sentences, or are incarcerated for parole violations under a contract with the state.

Since late 2004, a small number of beds — now about 75 — has been reserved for inmates sentenced to jail who have been identified by the LAPD as chronic, dangerous offenders. They do their full time. Occasionally, inmates arrested for specific crimes in specific areas are kept longer. In recent months, for example, sheriff's deputies have cracked down on prostitution in parts of South Los Angeles and Compton. Current guidelines say prostitutes arrested there "shall serve 100% of their sentence, and shall NOT be released [early]."

Guidelines issued by the sheriff spell out which inmates in the 10% pool qualify for early release: Those in jail for manslaughter, sex offenses and child abuse, along with violators of gang injunctions, do all of their time. For nearly all other convictions, inmates serve a fraction of their sentences. Women, who are housed in separate, less crowded facilities, usually do no more than 25%. Men serve no more than 10%.

If jailers had the room, a typical inmate given a year in jail would spend about 243 days behind bars after discounts for good behavior and work. As it is now, an inmate eligible for a 10% release would serve just 24 days.

"That's a disaster," said Los Angeles County Dist. Atty. Steve Cooley. "Obviously, if they aren't in, they can be out committing crimes."

'Get Them Out'

Most of the time, the decision to free an inmate comes down to a simple mathematical calculation. A first-time offender is treated the same as a career criminal. There is no penalty for prisoners who have been rearrested while on early release. Prior convictions for violent crimes are not taken into consideration.

Each day the decision of who goes home early is made in cramped cubicles at the county's Inmate Reception Center. Sheriff's clerks work eight-hour shifts, reviewing inmate files to identify those who meet the sheriff's criteria for early release.

On a recent morning, Pamela Broom's desk was stacked with a dozen or so manila envelopes, filled with paperwork on candidates for early release.

Broom pulled the envelope of Rosa Louise Degraw. A blond, plump face glared from a booking photo. The jail's computer showed that Degraw was serving a 180-day jail sentence for battery and vandalism. With time off for good behavior, she was supposed to serve about four months.

Degraw's sentencing documents contained an explicit directive from the judge: "No early release."

Instead, 33 days after she was booked, Degraw was eligible to go.

    LEGIS001519

"The sheriff says, 'It doesn't mean anything. I've got to get them out of my jails,' " said Broom's supervisor, Greg Sivard.

Degraw had landed in jail after repeatedly violating her probation requirements following a conviction for battery and vandalism. Among her battery victims: her mother.

Broom said she has little time to reflect on whom she is releasing.

"I'd be in a mental ward," said Broom, who finds anywhere from two to 40 inmates each day to release early. "You follow the criteria. You get paid to do your job, not have opinions."

In red ink on the envelope, she marked Degraw free to go.

Two and half hours later, Degraw, 23, pushed her way through a metal jail door onto Bauchet Street in downtown Los Angeles.

She was angry she'd served as much time as she had. Dressed in the same white tank top and blue jeans she had come to jail in, Degraw said she believed she'd serve only 10% of her sentence. Still, she said, the extra time made her want to avoid coming back.

"The longer you make them stay in there and think about it, the chances are less that they'll get out and do something else," she said.

Degraw said she planned to reunite with her 4-year-old son and try again to earn her high school equivalency degree. For the immediate future, she had other plans: "I'm going to drink me a bottle of Southern Comfort today."

**Freed Without a Review**

In 2003, Baca tried to reassure the public about his early-release program.

"It should be clear to those who are listening that we are going to put them in programs and ankle bracelet monitoring," Baca said, appearing on KCET-TV Channel 28's "Life and Times" in April 2003. "They're not just walking out the door with no obligations."

For a few months in 2003, jailers reviewed criminal histories before approving early release. Then they abandoned the effort, saying it was too time-consuming. Since then, inmates have been freed without anyone looking at their full criminal past. Many had long arrest records.

More than 4,400 released early after the jail cuts had been prosecuted for assaults with deadly weapons or seriously injuring people. Today, the department has far fewer inmates on electronic monitoring and other types of supervision than it did in 2001.

Elsewhere, jail officials do more to determine which inmates are likely to endanger public safety. In Portland, Ore., the Multnomah County Sheriff's Department examines the criminal records of inmates so convicts with violent pasts do more time regardless of their most recent offenses.

After questions from The Times, Los Angeles County Sheriff's Chief Marc Klugman said the department would consider once again looking at criminal histories and other factors to determine whether an early release was appropriate.

Baca said judges and prosecutors also bear some responsibility. He said they are well aware that he is releasing inmates early, yet continue to agree to plea bargains that send dangerous offenders to jail instead of prison.

**Creative Sentencing**

In 2002, Vincent Jeffery led sheriff's deputies on a chase through the streets of South L.A., hitting speeds of more than 80 mph, running eight red lights and crashing into a motorist. A deputy said Jeffery, who had a 20-year record and 10 aliases, pulled a gun on him when he tried to make a routine traffic stop.

On Sept. 30, 2002, Los Angeles County Superior Court Judge James R. Brandlin sentenced Jeffery, 36, to two years in County Jail. Eight months later, he was back on the street.

Brandlin, who had called Jeffery a "tremendous risk to public safety," demanded answers in a letter to Baca.

The sheriff had his aides look into the case. Jeffery, Baca wrote back to the judge, had been released properly by sheriff's officials struggling to keep the jail population down.

"While this may not meet with your approval," Baca said, "I sincerely hope that it allays any concerns you have that Mr. Jeffery was incorrectly released." Brandlin declined to comment for this story.

LEGIS001520

As more and more inmates realized that there was little risk of serving full sentences, fewer accepted deals to serve their time under house arrest or through community service. And as alternative sentences dwindled, more pressure was put on the jails.

"You tell a guy now, 'Hey, 30 days Caltrans,' " Cooley said. "He says ... 'You know what. I don't need all that jazz. Give me my time.' "

Cooley said frustrated prosecutors and judges seek creative ways to "beat the sheriff's sentencing system."

Here's how prosecutors and one judge made sure that a defendant served his time.

In September, sheriff's deputies caught Steven Torres strolling through his Compton neighborhood carrying a large glass bong and a small pipe containing drug residue. He was on probation for previously carrying a concealed weapon. A search of his home turned up another handgun — a serious violation.

His probation officer wrote that Torres should "spend a suitable amount of time in local custody" to show him that "criminal behavior will not be tolerated."

At a November hearing, where Torres pleaded no contest, Superior Court Judge Xenophon F. Lang Jr. told him he would "serve 90 actual days in the County Jail" and ordered him to surrender to the jail in January to await sentencing.

In March, at Torres' sentencing hearing, Lang smiled at the bulky defendant before him in handcuffs. The judge reminded Torres of the 90-day sentence he had proposed earlier.

"It appears he has done that," Lang said with a chuckle, ordering Torres released on probation.

**Fatal Consequences**

On Oct. 30, 2003, Jose Rafael Garcia stopped his motorcycle at a red light in East Los Angeles. It was about 9:30 p.m. The 31-year-old father of two had finished a day of construction work and was idling at 3rd Street and Arizona Avenue.

Randy Morones, 33, had been rousted from a jail bed about 2 a.m. It was his 11th day in jail on a drug conviction. He had been sentenced to six months.

In 1999 and again in 2000, he had been convicted of beating a girlfriend and sent to state prison. His latest offense marked his seventh stay in County Jail in four years. Since 1988, he had been convicted of drunk driving four times.

None of this mattered when Morones again came up for early release. Because he had served 10% of his jail time, he was free to go.

Morones left the downtown jail complex about 8:30 a.m. By evening, he was drinking beer at a friend's house. Then he climbed behind the wheel of his 18-foot motor home and headed to his parents' Pico Rivera home, speeding along 3rd Street.

Witnesses said he didn't even hit the brakes as he approached the red light at Arizona. He slammed into Garcia, throwing him more than 130 feet and killing him. Morones ran from the crash site, but witnesses caught and held him until deputies arrived.

In September 2004, a jury found Morones guilty of second-degree murder and gross vehicular manslaughter while drunk. At his sentencing, Morones apologized to Garcia's family: "I wish the Lord took my life instead of an innocent man."

He was sentenced to 20 years to life in state prison.

Galdino Garcia wept when he spoke recently of the crash and his memories of his brother.

A Mexican immigrant, Jose played guitar in Latin rock bands. He spent time riding his motorcycle in the San Gabriel Mountains, telling his family that the rides made him feel like he was "caressed by God."

Galdino Garcia said he blames the justice system as well as Morones.

"I believe in the law, but that was one of my questions: Why did they let him out early?" Galdino said. "They never answered me that question."

*Times researcher Maloy Moore and staff writers Robin Fields and Stuart Pfeifer contributed to this report. Data analysis by Doug Smith and Sandra Poindexter.*

Los Angeles Times: Releasing Inmates Early Has a Costly Human Toll          Page 7 of 7

(INFOBOX BELOW)

Recidivism

After early releases mushroomed in mid-2002. all county inmates were more likely to be rearrested within 90 days after being released. But the rearrest rate almost tripled for those let out early.

| | Before jail closures | After jail closures |
|---|---|---|
| Full term | 13.1% | 18.5% |
| Early release | 7.7% | 20.6% |

Does not include inmates released after Sept. 30, 2005

Source: Los Angeles County Sheriff's Department. Data analysis by Sandra Poindexter

(INFOBOX BELOW)

Free to re-offend

From July 2002 to December 2005. the number of inmates who should have been in jail who were:

| | |
|---|---|
| Released early | 148,229 |
| Rearrested | 15,775 |
| Charged with assault | 1,443 |
| Charged with robbery | 518 |
| Charged with a sex offense | 215 |
| Charged with murder | 16 |

Sources: L.A. County Sheriff's Department; L.A. Superior Court

If you want other stories on this topic, search the Archives at latimes.com/archives.

TMSReprints

Article licensing and reprint options

Copyright 2008 Los Angeles Times | Privacy Policy | Terms of Service
Home Delivery | Advertise | Archives | Contact | Site Map | Help

partners: ktla cw Hoy