STEVEN M. WOODSIDE #58684
County Counsel
ANNE L. KECK #136315
Deputy County Counsel
County of Sonoma
575 Administration Drive, Room 105A
Santa Rosa, California 95403-2815
Telephone: (707) 565-2421
Fax: (707) 565-2624
*swoodsid@sonoma-county.org*
*akeck@sonoma-county.org*

Attorneys for Intervenors THE
COUNTY OF SONOMA, SONOMA
COUNTY SHERIFF/CORONER
WILLIAM COGBILL, SONOMA
COUNTY DISTRICT ATTORNEY
STEPHAN PASSALACQUA,
and SONOMA COUNTY CHIEF
PROBATION OFFICER ROBERT OCHS

IN THE UNITED STATES DISTRICT COURTS

FOR THE EASTERN DISTRICT OF CALIFORNIA

AND THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

| | |
|---|---|
| RALPH COLEMAN, et al.,<br>    Plaintiffs,<br><br>v.<br><br>ARNOLD SCHWARZENEGGER, et al.,<br>    Defendants.<br>_____/ | No.    CIV S-90-0520 LKK JFM P<br><br>**THREE-JUDGE COURT** |
| MARCIANO PLATA, et al.,<br>    Plaintiffs,<br><br>v.<br><br>ARNOLD SCHWARZENEGGER, et al.,<br>    Defendants.<br>_____/ | No. C-01-1351 THE<br><br>**THREE-JUDGE COURT**<br><br>**EXPERT REPORT OF DAVID M.<br>BENNETT (Submitted by Sonoma<br>County Intervenors)**<br><br>Trial Date:  November 18, 2008<br>Time:       1:30 p.m.<br>Ctrm:  USDC Ceremonial Courtroom |

## TABLE OF CONTENTS

Page

I.    INTRODUCTION...................................................................................................1

    A.    QUALIFICATIONS ...................................................................................1

    B.    FOUNDATION OF OPINION....................................................................3

II.   OPINION REGARDING IMPACT OF A PRISON POPULATION CAP..............5

    A.    Adverse Impacts of a Prison Population Cap on Counties............................7

        1.    Impact on Jails..................................................................................7

        2.    Impact on Probation Supervision Services........................................9

        3.    Loss of System Integrity..................................................................10

        4.    Impact on Recidivism......................................................................14

        5.    Impact on Local Programs................................................................15

    B.    Sonoma County's Local Criminal Justice Reform......................................16

        1.    County Investments and Resource Commitments.............................16

        2.    Affect of a Prison Population Cap....................................................17

III.  REMEDIES.........................................................................................................18

    A.    Remedies Must Take Into Account the Causes of Prison Overcrowding.....18

    B.    Available and Effective Remedies..............................................................21

        1.    Support Front-end Community Efforts..............................................22

        2.    Reform Revocation and Sanction Policy..........................................24

        3.    Reduce Length of Supervision.........................................................25

        4.    Fund Community Corrections...........................................................25

        5.    Establish Sentencing Commission....................................................26

IV.   CONCLUSION....................................................................................................27

    Citations.............................................................................................................29

    APPENDICES A, B, C, and D, attached

# EXPERT REPORT OF DAVID M. BENNETT

## I.  INTRODUCTION

### A.  QUALIFICATIONS

1.    I am an independent criminal justice consultant with extensive experience in analyzing and advising local criminal justice systems throughout the United States.  My consulting practice specializes in working with counties that have overcrowded jails, with an emphasis on working to help develop creative and sustainable solutions to jail management.  This is accomplished by taking a 'systems approach' to custody resource management: an approach that examines the myriad factors that impact jail resources, from pre-trial release policies to case processing efficiency and judicial sentencing practices.

2.    My approach is grounded in system-wide data collection and policy review.  It involves the completion of a system 'Needs Assessment.' Working with a jurisdiction's Criminal Justice Council or Jail Committee, I assist in analyzing data on the processing of defendants by the criminal justice system and the detention population, and use the data to formulate jail-capacity projections.  My work includes involvement up to and including pre-architectural planning for jail and court facilities.

3.    The end product of a local system analysis is a Jail Master Plan, which is designed to help jurisdictions take a comprehensive approach to long-term jail management.  I am adept at creating economically feasible solutions to jail overcrowding and at alleviating emergency detention situations.  I am also exceptionally skilled in data compilation and computer analysis.  Overseeing the

1

implementation of the Jail Population Management Plan is another hallmark of my practice.

4.    I have been involved in corrections planning for thirty years and have had a highly successful consulting experience, both independently and for the American Justice Institute and the National Institute of Corrections. I have worked in over 40 states and have advised more than 250 criminal justice systems nation-wide.

5.    I began my career by establishing the Salt Lake County Pre-Trial Services Program, where I worked from 1974 to 1978. In 1978 I began my consulting career. Since then I have worked nation-wide providing a broad range of consulting to county criminal justice systems. I have also been a planner and leader of numerous criminal justice training seminars, through the National Institute of Corrections (NIC) Jails Division and other avenues. My resume is attached as Appendix A.

6.    I was retained in 1988 as an expert witness to help defend the Tooele County, Utah Sheriff as a result of a lawsuit brought about following a jail suicide. In 1989 I was retained as a consultant to a law firm defending the Canyon County, Idaho Sheriff on a suit brought due to jail conditions. I was retained in 1991-92 as a consultant to a lawsuit in Marin County, CA. County counsel retained me to analyze the available alternatives to incarceration and to render an opinion about the size of the proposed new jail. In 2006, I served as an expert witness for Gallatin County MT regarding drug testing.

2

7.      I am co-author of the National Institute of Corrections Jail Center's Jail Capacity Planning Workbook. This document, which was originally released in 1986, has been updated and will soon be re-released.

## B. FOUNDATION OF OPINION

8.      I have been retained by the County of Sonoma as its expert consultant in criminal justice system reform and custody management. Initially, the County retained me in December 2006 to conduct a criminal justice system assessment – a comprehensive study and analysis of the County's criminal justice system. This study resulted in the development and presentation of the Sonoma County Corrections Master Plan, received by the Sonoma County Board of Supervisors on December 11, 2007. A copy of this Master Plan is attached hereto as Appendix C. During the scope of that engagement, I developed a detailed understanding of the County's criminal justice system, established direct working relationships with many County officials, and provided recommendations to reform the County's criminal justice system and assist it in planning for its future detention facility needs.   I am currently under contract with the County for the implementation phase of the Master Corrections Plan. I have recently also been retained by Sonoma County to examine its Juvenile Justice system in order to devise strategies for managing juvenile custody resources.

9.      I am paid by Sonoma County on an hourly basis (usual consulting fee) to serve as its expert witness in the *Coleman* and *Plata* consolidated Three-Judge proceeding brought under the Prison Litigation Reform Act, and have

3

both advised it throughout the different phases of settlement negotiation as well as participated in settlement conferences.

10.    As Sonoma County's expert witness, I have now been asked to render my opinion regarding the anticipated impact a prison population cap would have on counties generally and the County of Sonoma in particular. In addition, I have also been asked to render an opinion regarding the effectiveness of a prison population cap as a method for addressing overcrowding, and whether there are reform alternatives aside from a prison population cap that would better address prison overcrowding.

11.    The opinions I set forth in this report are based on my thirty-five years of experience working with jurisdictions to develop effective custody management strategies. Although the principles of custody management for jails are broadly relevant for state prisons, I would note that I have not toured the California prisons, nor have I been directly engaged in any direct analysis of state prison data.

12.    Documents I have reviewed in preparation for drafting my opinion include: Assembly Bill 900; Governor Schwarzenegger, *Prison Overcrowding State of Emergency Proclamation* (October 2006); Joan Petersilia, Ph.D., *Meeting the Challenges of Rehabilitation in California's Prison and Parole System: A Report from Governor Schwarzenegger's Rehabilitation Strike Team* (December 2007); and the *Independent Review Panel Report on Reforming Corrections, Section 7:* "Inmate/Parolee Population Management." I also reviewed discovery

4

documents provided to me by the Sonoma County Counsel; a complete list of
them is attached as Appendix B.

## II. OPINION REGARDING IMPACT OF A PRISON
## POPULATION CAP

13.    A prison population cap is not a solution to overcrowding.  The
wholesale release of inmates would only shift the crowding problem to the
counties and provide nothing more than temporary relief to the state. This kind
of short-term 'fix' is shortsighted and will, in fact, exacerbate the very real
problems that confront both the state and county systems.  To open the prison
doors and release inmates without the benefit of a state/county systems plan
would only further compromise the systems.  A prison cap outside a coherent
system plan would overwhelm already overburdened local jails; and increased
erosion of system integrity will result in higher failure rates — ultimately
increasing returns to prison.  A comprehensive 'systems approach' is necessary
for any long-term solution.

14.    The fundamental importance of a 'systems approach' to custody
management is clear when we consider that available beds in any correctional
facility have a tendency to become filled, no matter the size.  Jail and prison
crowding is a symptom of the policies and practices of the larger system. Given
this, we cannot build our way out of the problem.  The only viable solution is for
the State to work with the counties toward the kind of comprehensive system
overhaul that can result in mutually sustainable solutions.

15.    The changes that have occurred in the nation's jail and prison
populations over the last twenty-five years provide evidence that shifts in

5

policies alone can bring about dramatic changes in demand. Moreover, reductions in crime do not necessarily translate into a reduced demand on the jail or the prisons. *There is no correlation between crime rates and incarceration rates.* Instead, custody bed usage is driven largely by unstated and often unexamined policies at decision-points along the criminal justice system.

16.     The number of persons incarcerated in jails and prisons, along with the incarceration rate, has increased significantly over the last 30 years. Yet, planners in the 1970's would not have been able to foresee the nationwide policy-shifts that would fuel this growth: the clamp-down on drunk-driving; the adoption of mandatory arrests for domestic violence; the crack cocaine problem, followed, some years later, by the methamphetamine epidemic; and the 'get tough' approach to most drug crimes. Nor could they have anticipated the expansion of mandatory minimum sentencing policies, the adoption of three-strikes-laws, the restrictions on judicial discretion, or the combined effect of de-institutionalization of the mentally ill and the lack of community-based resources to serve them.

17.     The management of limited custody resources — whether they be jail or prison beds — must be shaped by an understanding of the interactive effects of system policies and practices. Sustained remedies to overcrowding can only be achieved through a systems approach: one that addresses system reform across the county-to-state continuum. (See Bennett, NIC, Jail Capacity Planning monograph, in review).

6

## A. Adverse Impacts of a Prison Population Cap on Counties

### 1.   Impact on Jails

18.     One of the likely consequences of mandating a prison population cap on the State of California will be the prisons' inability to accept new or return prisoners sent by local jurisdictions. Closing the front door of the State prisons will result in a *back up of prisoners in local jails*. This has happened on a smaller scale with respect to the State Mental Hospitals - persons ordered transferred to Hospitals often wait several months in jails prior to space being available. This not only increases the number of jail inmates that remain in local custody longer than required, but taxes the resources of local jails required to address the special needs of these inmates.

19.     Last year, approximately 1,200 offenders were held in the Sonoma County Jail en route to California prison custody. Restricted access to the prisons will result in more of these inmates held for longer periods in the county jail. The increased demands of space, personnel, and resources to address these inmates' needs will be substantial (Sonoma County's total jail population is approximately 1,100).

20.     California county jails are not in a position to accommodate new unfunded demands. Thirty-two counties in California have jails with population caps.[1] In 2005, 155,000 sentenced jail inmates were released early in California due to overcrowding. Jail bookings were at a 10-year high in 2005.

21.     Jail Administrators responding to a national survey about the increasing demand on jails cited as primary factors: the large number of

---

[1] California State Sheriff's Association, June 2006, "Do the Crime, Do the Time? Maybe Not, In California: Jail Cell Shortage is Upsetting the Balance."

bookings for drug offenses and violent crime, longer jail sentences, an increase in probation violators, and the increasing fall-out from crowded prisons. [2]

22.     The impact on jails of a prison cap would be *overcrowding and overtaxed services, programs, personnel and other local resources* – prison-overcrowding problems cannot be solved by simply shifting State inmates to county jails.

23.     Jails are already impacted by a diverse population of inmates.  In the Sonoma County Jail, 39% of inmates are in 'hold' status.  This group includes holds for other counties, holds for probation violation processing, immigration holds, holds for CDCR, and other state holds.

24.     Lack of jail space will *force Courts to take other action aside from sentencing* prisoners to time in local jails, due to overcrowding, which will lead to inappropriate pre-trial releases and/or placement of non-qualified defendants on probation, or will result in a failure to sentence/failure to serve time for misdemeanors.

25.     Jail over-crowding also results in the *lack of flexibility* that comes with court-order limits ('caps') on jail usage. The dynamics of a jail, with unpredictable inputs and daily fluctuations in population, requires management flexibility in the form of a few empty beds.  Because of this, a jail is at capacity prior to reaching its design limits.  Beds have to be set aside for classification (a male prisoner cannot be housed in a female bed, nor can a maximum security prisoner be housed in a minimum security bed), and sufficient beds need to be set aside to handle the population during peak periods.

---

[2] National Institute of Justice, "NIJ Survey of Jail Administrators," U.S. Dept. of Justice, May 1995.

26.    Crowding can create serious management problems, and it can compromise the *safety of inmates and staff*, both confined within an increasingly volatile environment.

## 2. Impact on Probation Supervision Services

27.    Probation's *pre-trial supervision services would be weakened* with added system pressures. The impact on supervised 'Own Recognizance' (OR) services will be substantial: lack of space in the jail will cause the court to release an ever-increasing number of defendants on supervised OR. The result will be that Probation will have insufficient resources to ensure that the OR defendants are crime-free and make their court dates. Increase in crime and bench warrants, additional court processes and time, inability to adjudicate cases due to absconding of defendants who should have been in jail, will all be the unfortunate consequences.

28.    There would be a similar *negative impact on probationer supervision*. Caseload sizes are already far above recommended averages. Additional pressure would negatively impact an already burdened system that struggles to provide meaningful services. Any change to policy at the state level must be taken within a systems context that anticipates and addressed these impacts.

29.    The ultimate affect will be a *loss of system integrity*. To avoid far reaching adverse consequences, changes at the state level must be made pursuant to a comprehensive system of change that, at every level, works together to hold offenders accountable and reduce recidivism through meaningful supervision, swift sanctions, and proven rehabilitative services.

3.    Loss of System Integrity

30.    The closing of the front door to the prisons and resulting jail overcrowding, combined with a reduced capacity to locally sentence lower level offenders (such as misdemeanants) will *compromise the criminal justice system's ability to hold offenders accountable*. I anticipate that this will likely result in the loss of system integrity. This loss of system integrity occurs when inmates are not held accountable for criminal behavior, or are turned loose from the jail through emergency 'citation releases,' thereby undermining the deterrent effect of criminal laws. It doesn't take long for this to become common knowledge on the streets. System integrity is compromised when, due to inadequate jail space, there is no guarantee that the sentence rendered will be the sentence served. Once a county heads down this path, it can take years to reverse the public's perception of a broken system.

31.    But crowding-driven releases are not an acceptable method to manage the local offender population — it is evidence of *system failure*. For, not only does this method of release require the Jail Manager to assume something of a judicial role in shortening time served on court ordered sentences, but also it does nothing to protect the community or interrupt the costly cycle of failures-to-appear.

32.    Emergency releases have other unintended consequences. In jurisdictions where forced releases have become the norm for managing the jail population, because of overcrowding due to local or state conditions, the failure-to-appear rate increases exponentially. In fact, national data indicates that defendants released from jail on forced release are more than two times as likely

to have a bench warrant issued because of a failure-to-appear in court, than those released with pre-trial conditions and supervision.[3]

33.    Lane County, Oregon, affirmed these findings in an examination of its own failure-to-appear rates. It found that, in 2002, 22 percent of Circuit Court defendants who were 'force released' from the Lane County Jail failed to report to court. This contrasted with a 10 percent failure-to-appear rate for defendants exiting the jail through the Custody Referee (pre-trial release office), with a pre-trial release agreement.[4]

34.    An analysis of the Sonoma County jail citation release program (used to manage the jail population) showed a 43 percent failure-to-appear rate for both misdemeanors and felonies (more than twice the national average). The re-arrest rate (measured as an arrest for a new crime prior to the disposition of the case for which they were out on release) was 29 percent for the misdemeanors and 50 percent for the felonies.

35.    Sometimes systems respond to crowding by making abrupt changes in policy or practice. This can be a formal decision: as when a district attorney stops prosecuting all non-violent misdemeanors due to a lack of resources; or, in the case of Los Angeles County, when crowding led to a decision to restrict pre-trial jail bookings to only violent misdemeanors and felony defendants who have a high bond set.[5]

36.    But the system also modifies its behavior in response to a lack of jail

---

[3] U.S. Dept. of Justice, Bureau of Justice Statistics, "Pretrial Release of Felony Defendants, 1992," Nov. 1994.
[4] Public Safety Coordinating Council, "FTA Task Force Report," Lane County, Oregon, Nov. 2004 (August, 2005 Update)
[5] Petersilia, Joan, "Profiling Inmates in the Los Angeles County Jails: Risks, Recidivism, and Release Options," National Institute of Justice, US Dept. of Justice, Sept. 2000.

resources in an informal manner. In one jurisdiction law enforcement officers shifted to a cite-and-release policy for most drunk-drivers in response to lack of jail space; in another jurisdiction judges modified sentence length downward: all examples of the negative effect of jail overcrowding.

37.    At a national level we can see the loss of system integrity in the *shrinking proportion of the jail population comprised of sentenced inmates*, and a corresponding increase in the proportion of pre-trial inmates. Since 1990 the relative percentage of pre-trial offenders in jails has increased from 51 percent to 60 percent.[6] Common inefficiencies in adjudication that extend the time to case resolution contribute to this number. In some cases, the sentenced population is literally being squeezed out.

38.    In some jurisdictions, the number of beds available for the sentenced population is so low that they comprise less than 10 percent of the total jail population. The end result is a system that is left to go through the *motions of dispensing justice*, without the means to impose it in the manner that judges order.

38.    To deal with crowding, some counties have resorted to boarding inmates in other counties. Counties in Michigan did this when, over a two-year period, at least ten counties declared jail-crowding emergencies. Even then, crowding continued despite a 17 percent increase in county jail capacity, and a 20 percent drop in arrests over a six-year period. [7]

39.    In some cases, crowding can even lead to *system fragmentation*. An

---

[6] U.S. Department of Justice, Bureau of Justice Statistics, "Prison and Jail Inmates at Midyear 2004," April 2005.
[7] Pretrial Services Resource Center, The Pretrial Reporter, "Governor's Task Force in Michigan points to importance of enhancing pretrial services to address crowding," April/May 2005.

example of this affect is the case of municipalities who break away from county facilities to seek funding for their own jails. This is an imperfect solution: one that can increase system redundancies and costs, and exaggerate case processing disparities.

40.    Importantly, there is another cost to jail overcrowding: a cost borne by the *victims*. For every inmate released from jail early, the victim is impacted. For every inmate released prematurely who is then rearrested for another crime, additional victims are created.

41.    Overcrowding impairs a system's ability and capacity to hold offenders accountable and erodes system credibility. It can also compromise services to lower level/misdemeanor offenders, thereby *increasing the likelihood of future crime*. Failures to provide services/deterrence to lower-level/misdemeanor offenders will prevent system from being able to interrupt the cycle of wrongdoing to prevent future criminal behavior.

42.    Criminal courts, district attorneys, and public defenders could face abruptly *increasing workloads* with no additional resources to manage the system. This ripple effect can have a negative effect on system functioning and undermine local efforts at streamlining the adjudication efforts. Overloaded courts often find it difficult to find the time and resources to even work on system reform efforts. Yet, it is these same efforts that can lead to a more efficient system.

43.    Importantly, it can take a local system many years to recover from sudden and severe jail overcrowding.

13

4.         **Impact on Recidivism**

44.         Release of thousands of ill-prepared and often dangerous offenders
into the community without sufficient re-entry resources can be expected to
result in an increase in recidivism. *Release without attention to the reforms necessary
to interrupt cycles of offending* is simply setting up counties, and the larger system,
for continued failure. Of the prison inmates released each year in California,
about 70% are re-incarcerated within 3 years -- almost two times the national
average. [8] Many of these returns to prison are not for new criminal behavior, but
for a 'technical' violation of supervision. The 3-year return rate to prison for all
adult felons paroled from California State custody after commitment of a new
crime (a new court commitment) range from 24 % for those convicted of
manslaughter to 71% for those convicted of vehicle theft. [9]

45.         Knowledge that Courts cannot impose a jail sentence for
misdemeanors due to lack of space can result in an increase in recidivism due to
lack of consequences (no deterrence). Overcrowding *impairs a system's capacity to
hold offenders accountable and erodes system credibility*. It can also compromise
services to lower level/misdemeanor offenders, thereby increasing the likelihood
of future crime. Failure to provide services/deterrence to lower-
level/misdemeanor offenders will prevent system from being able to interrupt
the cycle to prevent future criminal behavior.

---

[8] Joan Petersilia and Robert Weisberg, "California's Prison System Can't Solve Prison Crisis Alone: Sentencing
Reform Urgently Needed," May 2006, UC Irvine, Center for Evidence-Based Corrections
[9] California Department of Corrections and Rehabilitation Office of Research, "Recidivism Rates within One, Two,
and Three Years Follow-up Periods for All Felons Paroled to California Supervision California Department of
Corrections and Rehabilitation Released from Prison for First Time in 2003, By Principal Commitment Offense,"
April 26, 2007

14

## 5. Impact on Local Programs

46.     Shifting prison offenders to the counties would put an added strain on limited local program resources. It has been noted that approximately 20 percent of inmates released from California prisons to parole have mental health needs, 65% have substance abuse problems, 22% are known gang members, 70% are unemployed, and a large percentage are in need of stable housing. [10]

47.     This would impact both the provision of mental health as well as medical services in local communities, including Sonoma County.

a.     Mental Health needs are significantly under-met in Sonoma County. Currently, there is *no County inpatient psychiatric* medical facility in Sonoma County - the county transports residents to Fairfield, Solano County. Population increase in Solano could cause it to close its doors to Sonoma County residents - then the county would have no location to house persons committed to involuntary psychiatric holds pursuant to California Welfare and Institutions Code Section 5150, or other similar patients.

b.     Community Medical Services are also not prepared to meet the additional *medical costs* of a population that would be returning to the jail. The expense of medications and other medical needs are on a steep upward trajectory and represent a significant cost to counties and the jails they support.

48.     *Local substance abuse programs could not accommodate* a new influx of offenders. Sonoma County already has long waiting lists for entry into alcohol and other drug treatment programs. Maintaining the effectiveness of these programs is of vital importance to rehabilitate members of the community –

---

[10] Joan Petersilia, Ph.D. "Strategic Reform: Implementing Evidence-Based Programs for California Offenders," 2005.

which effectiveness will be undermined by compromising them through increased pressures and populations.

## B.    Sonoma County's Local Criminal Justice Reform

### 1. County Investments and Resource Commitments

49.    Sonoma County has invested and committed immense resources, time and energy to analyze and reform its criminal justice system in a way that will benefit its community as well as reduce the number of persons it sends to state prison. Recidivism and entry into the state prison system can be remedied at least in part at the local level.

50.    I prepared a comprehensive study of Sonoma County's local criminal justice system, collected data on the jail population, case processing, diversion options, sentence alternatives treatment programs, and examined the policies and procedures that guide local decision-making. This full system assessment resulted in a local Master Plan for jail population management. [11]

51.    As a general matter, the Master Plan demonstrates a commitment to addressing issues via "upstream intervention" – starting at the booking phase – intended to shorten the time for completing criminal proceedings, shorten the time in jail, effectively address rehabilitation and treatment issues at an early stage (proven to be more effective), and provide a continuum of effective supervision to reduce recidivism. Sonoma County has engaged me to implement this plan, which will not only have a positive effect on streamlining the County's criminal justice system, but also will reduce the number of persons sent to State prison.

---

[11] The Sonoma County Corrections Master Plan, 2007, Appendix C hereto.

16

## 2. Affect of a Prison Population Cap

52.     A prison population cap and a concomitant shift of offenders from the state to the counties will have a *negative impact on Sonoma County's reform efforts*. These reform efforts are based on assumptions about future jail demands that do not anticipate a significant shift of state prisoners to the county.

53.     Apart from capacity planning, any new unfunded mandate stands to undermine the local reform agenda, which includes dedicating funds to front-end *Pre-Trial Services* to improve system efficiency and jail management efforts.

54.     It would also compromise the county's plans to step jail inmates down from custody to a *Community Corrections Center* according to a risk and needs assessment. A Community Corrections Center (CCC) is a minimum-security residential facility that offers a structured, supervised living environment as a transition from jail to the community. It provides a lower cost option to inmates who can serve their sentence in a minimum security setting while maintaining employment and having the benefit of a range of programs.

55.     The principal goal is to facilitate a successful transition back to the community. Individual case plans are designed to address conditions of supervision, court orders, treatment needs, community safety, and victim restitution. Issues addressed include employment, life skills, and substance abuse. Overcrowding could result in the movement of inmates out of jail based more on emergency management imperatives, rather than a structured approach intended to effect positive behavioral change.

17

## III. REMEDIES

### A. Remedies Must Take Into Account the Causes of Prison Overcrowding

56.    The Corrections System in California neither 'corrects' nor functions as a 'system.' Given prison crowding and high rates of failure there is no doubt that dramatic action needs to be taken. But the option of a prison cap and resultant 'release order' is not designed to reform the system nor the offenders who cycle through it.  This action could do nothing more than delay the next crisis. With no plan for comprehensive reform or full support of counties, a prison cap is a recipe for failure.

57.    Any state prison reform must be presented within a systems context; and it must be backed by the funding necessary to make this change feasible and successful.  For example, an across-the-board mandate to shift prisoners with sentences of up to two years to counties cannot be met by a piecemeal jail expansion effort: all counties or regions must receive the necessary support.

58.    Any strategy for managing California prison overcrowding must address the principal causes of prison growth:

▪  **Rigid sentencing laws**

From 1980 – 1996 national inmate populations increased three-fold.  88% of growth attributed to changes in sentencing policies. Of those "three strikers" who are imprisoned for longer periods than a third felony would typically draw, 57% were given a 25-years-to-life sentence for a nonviolent third offense.  More

18

"third" strikers were serving such a sentence for drug possession than for second-degree murder, assault with a deadly weapon, and rape combined.

The chances of a reported serious index crime in California producing a prison sentence are about 5% - about the national average. Nor is the incarceration rate for California markedly different from the national average: 456 per 100,000 vs. 432 per 100,000 for nation generally. California is also not an anomaly in terms of length of sentence initially imposed on felon's — 3 strikes aside. California is set apart by its failure rate. [12]

- **High Supervision Failure Rates**

California has a 70% return to prison within 3 years; one of highest rates in the country. This reflects lack of meaningful programs, the length of parole supervision, near universal drug testing policies, large supervision caseloads, and the lack of real risk-based sanction guidelines. The return to prison of technical violators within an overcrowded system does nothing that can make a difference. Due to prison overcrowding, many technical violators returning to prison stay for only a few short months: never even leaving the prison reception area.

---

[12] Joan Petersilia & Robert Weisberg, "California's Prison System Can't Solve Prison Alone: Sentencing Reform Urgently Needed," UC Irvine Center for Evidence-Based Corrections, May 2006.

- **Uniform Parole Supervision Lengths**

California is one of only two states where every felon exiting prison is placed on parole: most for uniform three years. In California only 3% of prisoners are released without parole supervision.

- **Lack of Prison Treatment Programs**

Only a fraction of the nearly 2/3 of CA prisoners who have a serious drug problem are accessing treatment.

- **Lack of Support for Community Based Alternatives**

California has no Community Corrections Act to support local alternatives: less expensive and more effective responses to lower level violations and offenses. California is also one of only two states in which local government is the primary source of funding for probation)

- **Inadequate Mental Health Services**

Coleman/Plata focuses attention on the grossly inadequate mental health services in the prisons, but the need for comprehensive mental health services is crucial in the community as well.

- **No Attention to Front-End of System**

There is real sentencing disparity across California counties: 8% of felony convictions out of San Francisco result in a prison sentence; 24% in LA. This is coupled by the lack of Early Case Resolution programs that can expedite case

processing and help manage scare custody resources. There is also no uniform Pretrial Services across counties, which is critical to managing custody resources.

59.    Importantly, any viable solution must reach beyond the prison gates and seek community-based solutions. In the end, a lasting solution depends upon a new level of commitment to Community Corrections: one that acknowledges the importance of a strong front-end assessment, a range of community-based diversion options, meaningful supervision, evidence-based programs, and jails that can provide the 'one empty bed' necessary to ensure swift sanctions and re-establish system integrity.

## B.    Available and Effective Remedies

60.    Prison crowding is a systems problem; it cannot be resolved by releasing state prisoners through the back door or preventing them from coming in the front door. Not only does such a prison population cap fail to solve any problems, but the adverse impacts of such actions on local communities far outweigh any possible benefits. Instead, a sustainable solution can only be developed by a comprehensive approach grounded in policy reform, a new state/county partnership, adequate funding for programs, and a commitment to best practices.

61.    Recommendations for managing the prison population include:

- Support Front-End Community Efforts
- Reform Revocation & Sanction Policy
- Reduce Length of Supervision
- Fund the Community Corrections Continuum

21

■        Establish a Sentencing Commission

These key remedies would have a substantial positive impact on reducing California's prison overcrowding problem. An expanded listing is included in Appendix D.

## 1. Support Front-end Community Efforts

62.      The management of prison resources is inextricably tied to jail population management. No proposed solution to manage prison beds will be effective if the jails cannot deliver the 'one empty bed' needed to handle new offenders. In discussions of prison reform, attention is always given to the need for more beds, but rarely is the need for jail population management measures raised. Informed jail population management, however, is integral to the success of any proposed strategy.

63.      More than 60% of inmates in California jails are in pre-trial status. As part of the California reform initiative, consideration should be given to providing state funds for pilot projects in several counties to test various population management programs that might lead to a statewide initiative. One example is comprehensive Pre-Trial Services.

64.      Comprehensive Pre-Trial programs act as the gatekeeper to the system. Pre-Trial Programs are an indispensable component of an efficient criminal justice system. They conduct risk assessments to guide judicial release decisions; support the early appointment of defense counsel; identify diversion candidates; support early case resolution; monitor pre-trial jail inmates and facilitate bail reviews; and monitor, track and supervise pre-trial defendants.

The benefits can be measure in reduced pre-trial failure, reduced impact on jails, informed decision-making, and expedited case processing. A significant impact for the state of implementing Pre-Trial Services programs is a reduced prison commitment rate. Offenders who are released through a Pre-Trial Services program and address the underlying issues that resulted in their contact with the criminal justice system are, upon conviction, less likely to be sentenced to prison.

65.    County Pre-Trial Services is essential to the early identification of defendants who need specialized services or are good candidates for diversion. The cost of not having this early screening, or the programs to support it, can be seen in the number of mentally ill inmates who are in our jails because there is no where else for police to take them, or because they cannot afford to post bond. Pre-Trial Services should be funded on a pilot basis in several counties (perhaps with Prop. 63 funds) as a first step in moving the state toward universal Pre-Trial Services.

66.    The State has a vested interest in seeing that California jails are optimizing existing resources. Any shift of offenders to counties would rely upon the efficient operation of its jails. And, to the extent that jails are efficiently operated, the state can reduce long-term subsidies to build or buy beds. Jail population management should be part of any system discussion.

67.    Early Case Resolution programs at the county level are an often-overlooked measure to improve system efficiency. I am working with jurisdictions that are realizing substantial improvements in custody efficiency with improved methods for coordinated and expedited case resolution protocols. It is not uncommon for counties who have adopted these practices to resolve 30 percent or more of cases within two weeks of a first appearance court hearing.

23

This improved system processing reaps rewards for the system at all levels. I encourage the State to fund pilot programs for this program.

## 2. Reform Revocation & Sanction Policy

68.    Prison reform must start at the front-end of the system. Controlling the prison population begins in the counties with the response to non-compliance. No prison management plan is complete without a cohesive strategy for probation and parole violations. Too often there are too few local options for responding to non-criminal violations, and prison becomes the consequence of *first* resort.

69.    An effective approach requires access to a continuum of interventions; sanctions that make distinctions based on offender risk; expanded discretion for probation and parole officers; and policies that offer the county flexibility to move offenders along a custody/non-custody continuum.

70.    This approach can be seen in Oregon, which has developed 'structured sanctions' to provide risk-based responses to non-compliance. These management strategies help conserve scarce jail and prison resources, and operate within a policy grid that limits the number of jail and prison days by offense type and risk level.

71.    Structured Sanctions is consistent with evidence-based practices, premised on reserving the most intensive resources for the higher risk offender. In addition, Oregon has put an end to short-term prison sanctions for technical non-compliance (SB 1145). More states are beginning to reconsider the use of prison incarceration for probation non-compliance, and considering limiting

24

prison for violations in which a new crime has been committed or the offender poses a danger to the community.

## 3. Reduce Length of Supervision

72.     Prisons and jails will continue to cycle the same persons through their doors unless we can devise a system of supervision designed to make a difference. Probation and parole departments struggle with unmanageable caseloads and have been put in a position of having to do too little for too many.

73.     Reforming probation and parole requires a new risk-based approach: linking the decision to supervise, the length of supervision and its conditions to risk; and ensuring quality treatment for all high risk offenders.

74.     Supervision reform also requires a new commitment to adequate funding: ensuring a level of funding that can support meaningful supervision on manageable caseloads for all high risk and special needs offenders.  To fully explore the future direction of Probation and explore issues, I recommend the formation of a statewide work group.

## 4. Fund Community Corrections

75.     It is one thing to have the flexibility to move offenders along a continuum—but the programs must be in place.  Prison and jail management depends upon access to community-based alternatives.

76.     *Community Corrections Programs* have been adopted by some states, Oregon, Michigan, Colorado and Minnesota, to name a few, as a way to provide secure funding for counties to develop community-based sanctions, aimed at

reducing prison overcrowding and improving jail utilization. These Programs recognize the necessity of having a continuum of interventions available in the community to structure meaningful responses and conserve scarce custody resources. Funds are managed by local advisory bodies (mandated by legislation), which submit plans to the state for their use. The state provides monies to counties to develop a Community Corrections plan that is then submitted to the state for funding. This allows for local based solutions to be developed that are implemented according to overall state goals.

## 5. Establish a Sentencing Commission

77.     Prison planning is inextricably linked to sentencing policy and as such necessitates its examination. This begins with the creation of a Sentencing Commission, which can collect data and analyze sentencing practices as a first step toward informed review and discussion, as well as to address issues of judicial discretion.

78.     The sentencing disparity across counties in California is just one example of an issue that merits discussion: in San Francisco, 8% of felony convictions result in a prison sentence compared to 24% in Los Angeles.

79.     There are, of course, other options to consider. Some states are reducing or eliminating mandatory minimums sentences; scaling back sentence lengths for non-violent offenders; expediting release considerations; increasing good time credits; expanding judicial discretion; creating presumptive release options linked to in-custody treatment completion; reducing lengths of probation supervision; and broadening the target range for prison diversion under state sentencing guidelines. There also appears to be an emerging consensus about

the diversion of non-violent drug offenders to community-based treatment; and a move to differentiate between violent and non-violent offenders in the use of prison resources.

## IV. CONCLUSION

80.    The strategies presented above are but a *few* examples of remedies available to foster a collaborative state/county approach to achieving the common goal of efficient resource management, and which will be effective in reducing prison overcrowding without the detrimental effects likely to result from a state prison population cap.

82.    In the end, the problem of prison crowding and the conditions it creates is inseparable from a discussion about the fundamental values of the criminal justice system: swift justice, proportionate punishment, and humane treatment. Any remedy – whether instigated by government officials or ordered by the Court – must not undermine these fundamental values, as doing so will cause a deplorable loss of system integrity and corresponding decrease in public safety.

83.    We are also at a juncture where we have new knowledge about practices proven to effect positive change: for example, knowledge which challenges notions about the efficacy of long sentences and a one-size fits all approach; knowledge, which reinforces the need for a comprehensive 'systems approach' to change. A prison population cap is a short-sighted approach that will steer California away from being able to effectuate true reform aimed at long-lasting and beneficial effects not only for prison inmates, but for the public at large.

84.     Inmate populations at both the State and local levels can be managed within a system-wide plan that strives to not just interrupt criminal activity, but to reduce it. This requires creativity and a new collaboration amongst the entire system. The only solution is a policy-based approach that involves counties in a broad reform agenda.

Dated: **15 AUG 08**

David M. Bennett

**Citations:**

Bennett, D.M., and D. Lattin. (in review). *Jail Capacity Planning Guide: A Systems Approach.* National Institute of Corrections.

California State Sheriff's Association, June 2006, "Do the Crime, Do the Time? Maybe Not, In California: Jail Cell Shortage is Upsetting the Balance."

U.S. Dept. of Justice, Bureau of Justice Statistics, "Pretrial Release of Felony Defendants, 1992," Nov. 1994.

Public Safety Coordinating Council, "FTA Task Force Report," Lane County, Oregon, Nov. 2004 (August, 2005 Update)

Petersilia, Joan, "Profiling Inmates in the Los Angeles County Jails: Risks, Recidivism, and Release Options," National Institute of Justice, US Dept. of Justice, Sept. 2000.

U.S. Department of Justice, Bureau of Justice Statistics, "Prison and Jail Inmates at Midyear 2004," April 2005.

Pretrial Services Resource Center, The Pretrial Reporter, "Governor's Task Force in Michigan points to importance of enhancing pretrial services to address crowding," April/May 2005.

Joan Petersilia and Robert Weisberg, "California's Prison System Can't Solve Prison Crisis Alone: Sentencing Reform Urgently Needed," May 2006, UC Irvine, Center for Evidence-Based Corrections

Joan Petersilia, Ph.D. "Strategic Reform: Implementing Evidence-Based Programs for California Offenders," 2005.

The Sonoma County Corrections Master Plan, 2007

1

PROOF OF SERVICE BY MAIL
(Code Civ. Proc. §§ 1013a(3) and 2015.5)

2

3        I am employed in the County of Sonoma, California; I am over the age of 18 years and

4   not a party to the within action; my business address is 575 Administration Dr., Rm. 105A,

5   Santa Rosa, California. I am readily familiar with my employer's business practice for

6   collection and processing of correspondence for mailing with the United States Postal

7   Service.

8        On August 15, 2008, following ordinary business practice, I served the "EXPERT

9   REPORT OF DAVID BENNETT (Submitted by Sonoma County Intervenors)"

10  on the parties in said cause, by placing on that date at my place of business, a true copy

11  thereof, enclosed in a sealed envelope, for collection and mailing with the United States

12  Postal Service where it would be deposited with the United States Postal Service that same

13  day in the ordinary course of business, addressed as follows:

14

15  Steven A. Kaufhold, Esq.                  Paul B. Mello, Esq.
    Akin Gump Straus, et al.                  Hanson & Bridgett LLP
16  580 California St., 15th Floor            425 Market Street, 26th Floor
    San Francisco, CA 94104-1036             San Francisco, CA 94105
17

18

19  Gregg MacClean Adam, Esq.                 Rochelle East
    Natalie Leonard                          Deputy Attorney General
20  Carroll, Burdick, McDonough, LLP         Office of the Attorney General
    44 Montgomery Street, Suite 400          455 Golden Gate Ave, Suite 1100
21  San Francisco, CA 94104                  San Francisco, CA 94102

22

23  Ann Miller Ravel                         Martin J. Mayer, Esq.
    Office of the County Counsel             Kimberly Hall Barlow
24  County of Santa Clara                    Jones & Mayer LLP
    70 West Headding, East Wing 9th          3777 North Harbor Blvd.
25  Floor                                    Fullerton, CA 92835
    San Jose, CA 95110

26

27

28

Lisa Tillman
Deputy Attorney General
Office of the Attorney General
1300 "I" Street
Sacramento, CA 94244-2550

William E. Mitchell, Esq.
Assistant District Attorney
County of Riverside
4075 Main Street, First Floor
Riverside, CA 92501

Michael W. Bien, Esq.
Kathleen Johnson-Silk
Rosen, Bien & Galvan, LLP
315 Montgomery Street, Tenth Floor
San Francisco, CA 94104

Donald Spectre, Esq.
Prison Law Office
1917 Fifth Street
Berkeley, CA 94710

Jeffrey L. Bornstein, Esq.
Kirkpatrick & Lockhart, et al.
55 Second Street, Suite 1700
San Francisco, CA 94105-3493

Claudia Center
The Legal Aid Society
600 Harrison street, Suite 120
San Francisco, CA 94107

Warren E. George, Esq.
Bingahm, McCutchen, et al.
Three Embarcadero Center
San Francisco, CA 94111

Michael P. Murphy, County Counsel
Carol L. Woodward, Deputy County Counsel
Hall of Justice & Records
400 County Center, 6th Floor
Redwood City, CA 94063

Richard Goff
Heller, Ehrman, White & McAuliffe
701 Fifth Avenue
Seattle, WA 98104

Dennis Bunting, County Counsel
Alan Cohen, Deputy County Counsel
Office of the County Counsel
675 Texas Street, Suite 6600
Fairfield, CA 94533

Kelly Duncan Scott, Deputy County
Counsel
Office of the County Counsel
105 East Anapamu St., Rm. 201
Santa Barbara, CA 93101

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct, and that this declaration was executed on August 15, 2008, at Santa Rosa, California.

Sally R. Silveira
Legal Assistant