2. Pending Cases

   a. Overall

   The breakout of pending cases is provided below.





The majority of cases in 'pending' status are in-custody (92%); 8% are in the community. TASC case managers track these cases to program entry, meeting with inmates in the interim while in jail. TASC case managers each have, on average, 14 cases in 'pending' status. (Source: TASC data collection)

b. In-Custody

This graphic breaks out the pending cases in more detail.





Half (50%) of the 'pending' cases that are in-custody are not yet sentenced; 43 (41%) are waiting for treatment (and will remain in jail until a bed is available in a community program); and 9% are serving a sentence. (Source: TASC data collection)

c. Waiting for Treatment

This graphic shows the breakout of TASC 'pending' cases by where they are waiting: in jail or in the community.



**TASC Pending Cases Waiting for Treatment**

10 (19%)

53

43 (81%)

In-Custody

Out-of-Custody

Of those being case managed by TASC while waiting for treatment, 80% are in Jail. This raises the question of what additional services (step-down facility); supervision (pre-trial supervision); or treatment resources (more residential, direct placement into intensive outpatient); could facilitate the release of these persons. (Source: TASC data collection)

### 3. Placed Cases

The next graphic shows the breakout of 'placed' TASC cases by whether they are active in treatment or in aftercare.

## TASC Placed Cases





'Placed' cases (persons who have been admitted to treatment) are fairly evenly divided between those who are still active in treatment and those in Aftercare. The TASC case managers have minimal contact with offenders while in treatment, but track their progress; cases in Aftercare receive, on average, one to two contacts per month (for 3 to 6 months). Each TASC staff has, on average, 47 cases in 'placed' status. Taken together with cases in 'pending' status, each TASC staff is managing an average caseload of 61 persons. (Source: TASC data collection)

E. Treatment Discharge

   1. Incarceration

This graphic shows the percentage of participants, by program, discharged unsuccessfully and returned to custody.



**AODS Discharge Termination Type: Incarceration**

Over a one-year period (from Feb. 2006 to Feb. 2007), SACPA clients had a negative program termination that resulted in incarceration, at approximately two times that of Drug Court and TASC participants. Twenty-three percent (23%) of Drug Court clients were terminated and incarcerated; 40% of SACPA participants; and 21% of TASC clients. Overall, 30% of AODS clients had a negative discharge from treatment that resulted in incarceration. The higher rate of failure for SACPA most likely reflects the lack of routine access to swift jail sanctions for non-compliance; shorter program stays; and a population with comparatively high rates of prior treatment, mental health issues and other complex factors. The higher failure rate for SACPA does not however indicate lack of program value: studies have demonstrated that SACPA

participants have a lower recidivism rate than those who do not participate. (Source: AODS data)

    2.  AODS Program Completion Rate

Program completion rates are shown below.



At 51%, Drug Court had the highest client completion rate.  The SACPA completion rate, at 43%, is higher than the state average SACPA completion rate.  TASC had a 30% completion rate.  The overall completion rate was 38%. An issue is how to increase completion rates for the TASC programs.  (Source: AODS Discharge Data collection)

3. Drug Court Sanctions

This graphic breaks out drug court jail sanctions by time in jail.

# Drug Court Jail Sanctions





Two to Three

Fourteen

Thirty

A review of jail sanctions for the 36 program graduates in 2006 reveals that 90% of these sanctions were short, 2-3 day periods; 8% were 2-week sanctions; and a mere 2% were for a 1-month period. This sparing use of Jail and the emphasis on short and swift sanctions is consistent with the literature on 'what works' for long term success. (Source: Drug Court data)

4. 'Starting Point' Program

    a. Referral Source

        The referral source breakdown for the in-custody treatment program is shown below.



Between June 2006 and June 2007, 32% of inmates who entered 'Starting Point' volunteered for the program. Sixty-six percent (66%) were referred by TASC; 2% were referred by the Probation Department. (Source: Jail Program Data)

b. Release Type

The breakdown of release types for the in-custody treatment program is shown here.



### Starting Point Release Type
### June 2006-June 2007

Legend:
- Program Violation
- Pre-Trial Release
- Prison
- Time Served
- Community Program
- Unknown

Of those inmates who participated in the program from June 2006 to June 2007, 57% transitioned to community treatment. For the other 43% there was no formal transfer to treatment, although some were given referrals to outpatient services. Note: the difference between the total numbers released in this graphic (n=177) and the total admitted (n=219) on the previous graph, is explained by the number still in treatment. (Source: Jail program data)

c. Program Completion

The next graphic shows the percentage of inmates who completed the in-custody treatment program.



**Starting Point Program Completion June 2006-June 2007**

Of the inmates who exited the 'Starting Point' program in FY 2006-07, 29 persons (16%) actually completed the 90-day program. The low number reflects the fact that the program is designed to be a transition to community treatment. The issue for those who do not move on to community treatment is whether they have received a therapeutic level of intervention. The key is in ensuring continuity of treatment. (Source: Jail program data)

F. Treatment Provider and Probation Survey

    1. Program Occupancy

        a. Residential

        This graphic shows the degree to which residential treatment programs operate at full capacity.



**AODS Residential Program Occupancy**

Overall, residential programs are operating at 87% of capacity. This ranges from 79% in Orenda Center, to 93% in Athena House and Henry Oloff. Understanding that few programs achieve 100% occupancy (with client turnover and the need to hold beds for cases in the 'pipeline') these are reasonable occupancy rates. Note: Orenda Center is a composite rate that combines their programs. (Source: Treatment Provider Survey)

b. Outpatient

This graphic shows the degree to which outpatient programs are operating at full capacity.



**AODS**
**Out-Patient Program Occupancy**

Overall, the outpatient program occupancy rate is 76%. This ranges from 44% in Campobello to 98% in Orenda. It should be noted that these rates are based on a one-time inquiry and may vary over time. Note: 'First Step' refers to the 'First Step Prenatal Day Treatment Program' (Source: Treatment Provider Survey)

c. Narcotic Replacement Program

This graphic shows the degree to which Narcotic Replacement programs (methadone) are operating at capacity.

## AODS
## Narcotic Replacement Program Occupancy



These programs have a more fluid, open-ended availability; but according to the programs there is room for more clients. Overall, the usage rate was 53%. (Source: Treatment Provider Survey)

d. Other Programs

This graphic shows the degree to which two separate and different programs (the Interfaith Shelter and TASC) are at capacity.



With 68 persons in its facility this month, the Interfaith Shelter is at 89% of capacity. TASC case management is at 95% of its 475 person capacity. (Source: Treatment Provider Survey and TASC)

e. Summary

The next graphic summarized occupancy rates across program type.

## AODS
## Summary of Program Occupancy



The alcohol and drug programs had an overall 74% occupancy rate. (Source: Treatment Provider Survey)

2. AODS: Clients Entering from Jail

a. Residential

This graphic shows the percentage of clients, by residential program, who are estimated to have entered directly from Jail.

## AODS
## Residential Clients Entering From Jail



Seventy five percent (75%) of Turning Point clients were admitted directly from Jail. Other residential programs had a smaller percentage come directly from in-custody: 5% for Athena House; 27% for Orenda; and 25% for Henry Oloff. (Source: Treatment Provider Survey)

b. Outpatient

This graphic shows the percentage of clients, by outpatient program, who are estimated to have entered directly from Jail.



Ninety-eighth percent (98%) of clients entering CHD outpatient are estimated to have come directly from Jail; 10% of DAAC; 6% of First Step; none for Orenda; and 50% of Indian Health clients. (Source: Treatment Provider Survey)

3. Probationers and TASC clients: Homeless

This graphic breaks-out the percentage of persons estimated to be homeless by supervision caseload type, and by TASC.



Seven percent (7%) of offenders on Intensive Supervision (ISP) are estimated to be homeless; none on Gang supervision; 2% on Sex Offender supervision; 4% on Domestic Violence supervision; and 1% being case managed by TASC. Although the actual number on TASC case management who are homeless is low, case managers estimate that approximately 10% of clients are residing in unsuitable housing for recovery. On the other end of the spectrum, case managers estimate that 19% are in Alcohol and Drug Free Housing. (Source: Probation Officer Survey & TASC Survey)

4. Probationers

 a. Not Fluent in English

 This graphic provides an estimate of the percentage of offenders, by supervision caseload type, who are not fluent in English.



It is estimated that 11% of offenders on Intensive Supervision are not fluent in English; 7% in the Gang unit; 2% on Sex Offender supervision; and 15% on Domestic Violence supervision. (Source: Probation Officer Survey)

b. Serious Mental Health Issue

This graphic provides an estimate of the percentage of offenders, by supervision caseload type, who have a serious mental health issue, and are on psychotropic medication.



It is estimated that 8% of offenders on Intensive Supervision have a serious mental health issue, and that 9% are on psychotropic medications; for those in the Gang unit the estimate is 1% mental health issue/none on medication; for those on Sex Offender supervision mental health issues are unknown, but 6% are on psychotropic medications; and for those on Domestic Violence supervision it is estimated that 10% have a serious mental health issue, and 14% are on psychotropic medications. (Source: Probation Officer Survey)

# Summary of Findings

The data collected on Alternative Programs affirmed that the County is doing many things right. There are multiple jail diversion and jail sentence options, and treatment offerings span a broad continuum. Importantly, programs have many characteristics of effective programs: ones proven to reduce recidivism and sustain positive change.

> ➢ Treatment programs are of adequate to good duration
> ➢ Cognitive-behavioral approaches are employed
> ➢ Staff readily employ rewards as well as sanctions
> ➢ Clients may step-down from residential to outpatient treatment
> ➢ Treatment and intensive supervision are linked
> ➢ Aftercare is available
> ➢ Programs have good occupancy rates
> ➢ Residential programs appear to be serving population with more severe addiction issues than outpatient programs
> ➢ Probationers in need of psychotropic medications appear to be accessing them
> ➢ SACPA and Drug Court have higher than average completion rates
> ➢ The Domestic Violence Court has higher than average 52-week treatment completion rates
> ➢ Jail sanctions for Drug Court are used sparingly
> ➢ Offenders receiving TASC case management have low levels of homelessness

At the same time there are areas that can be strengthened to ensure programs are realizing their full potential.

> ❖ Defendants can self-refer for assessment/treatment
> ❖ High treatment denial rate for self-referral system
> ❖ Lack of access for violent offenders
> ❖ No routine front-end risk and need assessment
> ❖ Not at capacity: Drug Court
> ❖ Underutilized: Education Services Program; County Parole
> ❖ Time to Assessment and Treatment Entry too long
> ❖ Criminal risk does not formally guide program placement
> ❖ Parallel systems of Drug Court and SACPA with different philosophies on jail sanctions
> ❖ Need for continuity of treatment from jail to community

- ❖ Need for more intermediate (intensive outpatient) treatment
- ❖ Too many waiting in Jail for treatment
- ❖ Low utilization of County Parole: Need staffing and program changes for a 'structured' step-down from jail for those being denied
- ❖ Need for more dual diagnosis treatment

We know that realizing the full potential of these programs depends in large part on having a system targets the higher risk offender for the most intensive resources; stops the recycling of the low-risk but high need offenders; and manages offenders in a coordinated way along the continuum. This Report addresses program and system efforts that can ensure a *Continuum of Effective Practices*.