```
 1  JONES & MAYER
    Martin J. Mayer (SB # 73890)
 2  Michael R. Capizzi (SB # 35864)
    Kimberly Hall Barlow (SB # 149902)
 3  Ivy M. Tsai (SB # 223168)
    3777 North Harbor Boulevard
 4  Fullerton, California 92835
    (714) 446-1400; Fax (714) 446-1448
 5  e-mail: mjm@jones-mayer.com
    e-mail: mrc@jones-mayer.com
 6  e-mail: khb@jones-mayer.com
    e-mail: imt@jones-mayer.com
 7
    Attorneys for Intervenor-Defendants
 8  SAN DIEGO COUNTY SHERIFF WILLIAM B.
    KOLENDER, ORANGE COUNTY SHERIFF-
 9  CORONER SANDRA HUTCHENS, PLACER
    COUNTY SHERIFF EDWARD N. BONNER,
10  BUTTE COUNTY SHERIFF-CORONER PERRY
    L. RENIFF, CALAVERAS COUNTY SHERIFF
11  DENNIS DOWNUM, LOS ANGELES COUNTY
    SHERIFF LEE BACA, SANTA CLARA COUNTY
12  SHERIFF LAURIE SMITH, SAN BENITO COUNTY
    SHERIFF CURTIS HILL, STANISLAUS COUNTY
13  SHERIFF ADAM CHRISTIANSON, MENDOCINO
    COUNTY SHERIFF TOM ALLMAN, TEHAMA
14  COUNTY SHERIFF CLAY PARKER, LASSEN
    COUNTY SHERIFF STEVE WARREN, YOLO
15  COUNTY SHERIFF ED PRIETO, SANTA BARBARA
    COUNTY SHERIFF BILL BROWN, KERN COUNTY
16  SHERIFF DONNY YOUNGBLOOD, SAN MATEO
    COUNTY SHERIFF GREG MUNKS, YUBA COUNTY
17  SHERIFF STEVE DURFOR, CONTRA COSTA
    COUNTY SHERIFF WARREN RUPF,
18  SHASTA COUNTY SHERIFF TOM BOSENKO,
    RIVERSIDE COUNTY SHERIFF STANLEY SNIFF JR.,
19  VENTURA COUNTY SHERIFF BOB BROOKS,
    SOLANO COUNTY SHERIFF GARY R. STANTON,
20  SAN LUIS OBISPO COUNTY SHERIFF PAT HEDGES,
    SUTTER COUNTY SHERIFF JIM DENNEY,
21  LAKE COUNTY SHERIFF ROD MITCHELL,
    GLENN COUNTY SHERIFF LARRY JONES,
22  TUOLUMNE COUNTY SHERIFF JIM MELE,
    FRESNO COUNTY SHERIFF MARGARET MIMS,
23  MONTEREY COUNTY SHERIFF MIKE KANALAKIS,
    MONO COUNTY SHERIFF RICHARD SCHOLL,
24  HUMBOLDT COUNTY SHERIFF GARY PHILP,
    EL DORADO COUNTY SHERIFF JEFF NEVES,
25  MERCED COUNTY SHERIFF MARK PAZIN,
    DEL NORTE COUNTY SHERIFF DEAN WILSON,
26  SAN JOAQUIN COUNTY SHERIFF STEVE MOORE,
    AMADOR COUNTY SHERIFF MARTIN RYAN,
27  INYO COUNTY SHERIFF WILLIAM LUTZE,
    STANISLAUS COUNTY CHIEF PROBATION OFFICER
28  JERRY POWERS, VENTURA COUNTY CHIEF
```

-1-

DECLARATION OF EXPERT WITNESS RICHARD WORD

| | |
|---|---|
| 1 | PROBATION OFFICER KAREN STAPLES, SOLANO COUNTY CHIEF PROBATION OFFICER ISABELLE VOIT, SANTA BARBARA COUNTY CHIEF PROBATION OFFICER PATRICIA STEWART, BUTTE COUNTY CHIEF PROBATION OFFICER JOHN WARDELL, SAN LUIS OBISPO COUNTY CHIEF PROBATION OFFICER KIM BARRETT, CONTRA COSTA COUNTY CHIEF PROBATION OFFICER LIONEL CHATMAN, INYO COUNTY CHIEF PROBATION OFFICER JIM MOFFETT, SHASTA COUNTY CHIEF PROBATION OFFICER BRIAN RICHART, YOLO COUNTY CHIEF PROBATION OFFICER DON MEYER, FRESNO COUNTY CHIEF PROBATION OFFICER LINDA PENNER, MARIPOSA COUNTY CHIEF PROBATION OFFICER GAIL NEAL, CITY OF WHITTIER POLICE CHIEF DAVE SINGER, CITY OF ROSEVILLE POLICE CHIEF JOEL NEVES, CITY OF PASADENA POLICE CHIEF BARNEY MELEKIAN, CITY OF ALHAMBRA POLICE CHIEF JIM HUDSON, CITY OF FREMONT POLICE CHIEF CRAIG STECKLER, CITY OF GROVER BEACH POLICE CHIEF JIM COPSEY, CITY OF SANTA CLARA POLICE CHIEF STEVE LODGE, CITY OF VACAVILLE POLICE CHIEF RICH WORD, CITY OF WOODLAND POLICE CHIEF CAREY SULLIVAN, CITY OF SONORA POLICE CHIEF MACE McINTOSH, CITY OF PASO ROBLES POLICE CHIEF LISA SOLOMON, CITY OF SAN BERNARDINO POLICE CHIEF MICHAEL BILLDT, CITY OF ATWATER POLICE CHIEF RICHARD HAWTHORNE, NATIONAL CITY POLICE CHIEF ADOLFO GONZALES, CITY OF DELANO POLICE CHIEF MARK DeROSIA, CITY OF MODESTO POLICE CHIEF ROY WASDEN, CITY OF FRESNO POLICE CHIEF JERRY DYER, AND CITY OF DELANO CHIEF OF CORRECTIONS GEORGE GALAZA | |

IN THE UNITED STATES DISTRICT COURTS

FOR THE EASTERN DISTRICT OF CALIFORNIA

AND THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>Plaintiffs, | Case No: CIV S-90-0520 LKK JFM P<br><br>**THREE-JUDGE COURT** |

-2-
DECLARATION OF EXPERT WITNESS RICHARD WORD

| | | |
|---|---|---|
| 1 | vs. | [F.R.C.P. 24; 18 U.S.C. § 3626(a)(3)(F)] |
| 2 | ARNOLD SCHWARZENEGGER, et al., | **DECLARATION OF EXPERT WITNESS RICHARD WORD** |
| 3 | Defendants. | |
| 7 | MARCIANO PLATA, et al., | Case No.: C01-1351 TEH |
| 8 | Plaintiffs, | **THREE-JUDGE COURT** |
| 9 | vs. | |
| 10-11 | ARNOLD SCHWARZENEGGER, et al., | |
| 12 | Defendants. | |

I, RICHARD WORD, declare as follows:

1. I am the Police Chief for the City of Vacaville, California

2. I have a Bachelor of Science degree in business administration from John F. Kennedy University in Walnut Creek and a master's of public administration from Golden Gate University in San Francisco. I am the immediate past president of the California Police Chiefs Association. I was the president in 2007 and I remain on the board of that organization.

3. I started as a sheriff's cadet in San Francisco in 1982, and then I joined the Oakland Police Department as police officer in 1984. I worked patrol and I worked a street narcotics unit. I was an undercover narcotics buy officer for a while and I also worked as a narcotics detective. In 1989 I was promoted to sergeant, worked in the communications center for a while and then I was promoted to Lieutenant in 1993.

4. My first assignment as a Lieutenant was being the city's jail manager. We had a bed capacity of 320. I ran the Oakland city jail for 2 years. I became a patrol watch commander still as a lieutenant in about 1995 and I was promoted to captain in 1997.

5. As a patrol watch commander I supervised field personnel and managed

events, I supervised critical incidents that occurred and directed resources. I held this position for approximately 2 years until I was promoted to Captain in 1997.

6. When I was running the jail, Oakland typically booked our prisoners and transferred them after a few days to the County. We also held long-term inmates. We had contracts with the State of California and also with the federal government such as the Immigration and Naturalization Service. We had long term inmates in addition to the short term inmates (called prearraignment inmates) who were held up to 96 hours.

7. I was a patrol area watch commander. I had one-third of the city and 24-7 responsibility for that and I supervised about a hundred or so staff. East Oakland was a difficult area because it has the highest number of homicides in the city. About 50 percent of Oakland's homicides occurred then in East Oakland. I held that position for 2 years until 1999.

8. In 1999 I was elevated to the position of Chief of Police of Oakland. I held the position of Chief for the Oakland Police Department until November of 2004. At that point I joined the Vacaville Police Department and have been employed there ever since.

9. As Chief of Police of the Vacaville Police Department I have about 186 staff, police officers, sergeants, lieutenants, dispatchers and evidence technicians under my command. My charge is to ensure our policies are sound and in conformity with the law, that the staff is trained and efficiently deployed. We are watching the taxpayer dollars closely now and responding quickly to emerging crime incidents, working closely with the community to solve any issues they may have of crime or disorder, fear, working with local merchants. In addition, I do nonprofit work in the community which incidentally helps me stay in close touch with the citizens and the concerns and issues they have regarding public safety and police services. Part of my job duties involves anticipating and planning for additional or different police department needs due to factors beyond the control of the City, such as could be presented if a prisoner release order were entered in this case.

10. I have only indirect duties with respect to jails. The Solano County jail is run by the Solano County Sheriff, Gary Stanton and we use his jail to book our prisoners. We do not have a city jail in Vacaville.

DECLARATION OF EXPERT WITNESS RICHARD WORD

11.     There are a total of 116 sworn police officers in the city. I have 16 sergeants, five lieutenants and myself. I have 52 officers assigned to patrol. The others are at different assignments like traffic, detectives, narcotics team and a crime suppression team.

12.     My estimate is that there are about 2,000 parolees in the County of Solano at this time.  CDCR statistics for the year 2007 indicate that approximately 2091 felons were paroled or reparoled to Solano County.  About a third of those parolees reside or work in my jurisdiction. We made 205 parole violation arrests in 2007.

13.     The Vacaville Police Department generally is asked by the state parole officers to make arrests. We conduct a sweep every quarter, develop a target list and then we invite state parole, County Probation and other jurisdictions to participate. Of the 2005 arrests conducted in 2007 some of them were made by our officers and some of them were made by CDCR officers.

14.     Compliance checks on parolees are done once a quarter. We started in 2006 and we knock on the doors where our information tells us a parolee is living. We determine if they in fact live there and if so, we see if there is gang paraphernalia or drug paraphernalia. We also check if they are in compliance with the provisions and requirements of their supervised release. We have about 20 or 30 officers participating in the compliance checks. They last about a day or two but we spend weeks in advance developing our list of people that we want to check. An additional 20 to 30 sworn officers other than Vacaville Police Department participate in the compliance checks. My staff helps me with the planning involved with the quarterly compliance check. We usually have detectives assigned to my crime suppression team that develop the lists and they work with their sergeants and their lieutenant on a particular date it might be best where we can get the most participation. During the compliance checks we also look at probationers and known validated gang members.  We may simultaneously investigate others at these locations if there is information that they are selling drugs or maintaining a house where drugs are sold for example. We are spending most of our time looking at gang members, as we are seeing more and more violence associated with gang membership. There is also overlap, some gang members are on probation, some are on

DECLARATION OF EXPERT WITNESS RICHARD WORD

parole and some people are on parole and probation at the same time. About 25% of the total number that my officers are doing their compliance checks on are parole violators and about 50% are gang members. My crime suppression team gathers this information through informants, contacts with parolees and arrestees, and information which we glean from our records management system. Officers generally ask or run a person after a stop or after an arrest and learn that he or she is on parole.

15. My officers do other tasks other than compliance checks with regards to parolees in the jurisdiction. In terms of crime suppression they are my primary unit and their primary task is parolees, probationers and gang members because these three groups are a source of significant concern and crime in the community. The majority of the crime suppression units' time is focused in the areas where we see a lot of gang crime. But there is a lot of overlap between gang crime, parolee, probationer activity and drug activity.

16. The 205 parole violation arrests in 2007 took place because of arrests for new charges and violations of parole, such as missing a meeting with a parole officer, a dirty urine test, not living where they said they were living or maybe associating with a known criminal which is a violation of the terms of the parole.

17. I have experience with early releases that took place in Alameda County Jail when they exceeded their capacity. I also experienced early releases in Oakland City Jail where we were near to or exceeding capacity at the time and we had to transfer inmates. Since I became Vacaville Police Chief, the Sheriff in Solano County also had to accelerate releases due to capacity issues. They do that up to five days of maximum accelerated release and they look at that on a monthly basis. The Solano County Jail maximum capacity is 1,084.

18. It is my professional opinion that an order from a court directing the release of prisoners from the state prison would adversely affect my department depending on the number of prisoners that are released. Impacts probably would vary from jurisdiction to jurisdiction based on the resources that exist in those jurisdictions.

19. Various factors would affect the degree of impact to law enforcement throughout the State of a court order directing the release of prisoners. A complete

measure of the impacts would depend on the number and magnitude (timing) of a release order, how those particular inmates are chosen, what rationale was used, what type of crimes they were responsible for, their commitment offenses and prior history. I would also want to know whether they are clean and sober, whether they have a house, family support, whether they can read etc, so I can get some sense of their job prospects. Those factors are all relevant and those are always key indicators that suggest recidivism. My experience in Oakland when the inmates and parolees did not have a job is that they were returned to the same environment where there was a lot of drug dealing, negative street behaviors, prostitution and negative peer influences. These things cause them to fall back to their criminal ways.

20. I could not say there would no negative impact to my community or the State as a whole if the order was to be limited to those in prison for nonviolent crimes; those often mean drug dealers or drug users who commit crimes to obtain their drug of choice. They fuel drug markets which lead to violence.

21. The CDCR website states 1,868 people in state institutions were committed from Solano County at the end of 2006. If I assumed that 25 percent were released, that could be 350 to 400 released in Solano County. Perhaps a hundred then would be released to Vacaville.

22. These inmates would have a much greater chance of success, and thus pose a lower risk to public safety, if they completed programming in prison, were given assistance and support in transitioning back into the community, especially for those who have been in prison for a while. Those with lower risk characteristics, clean and sober, having housing and having family support will typically do better on release.

23. Nonetheless, there would still an impact if 100 parolees are released even if these parolees are the least likely to reoffend because it in some ways seems to be a habitual way of life for many of them. People have to work hard nowadays to get to prison, as they usually have many opportunities to change their criminal behavior before they are ultimately sent to prison. They often commit more crimes that they are caught for. There are also problems with drug use in our prisons and out. Even if a prisoner is low level, if he or she is not clean and sober upon release it is going to be a problem. I

would reasonably anticipate that property crime associated with those that want to subsidize their drug habits would likely be increased. Under these circumstances community engagement is a factor that can help reduce and mitigate crime, but cannot eliminate it all together.

24. In the absence of programming, treatment, provision of resources, family support, housing and transitional services, particularly for drug users, 100 additional parolees getting returned to Vacaville would lead to more violent crime and more fear in the community, which translates into people less likely to report crime. That becomes a horrible vicious cycle which I experienced in Oakland. They still have that. In my experience, when there is a loss of public confidence, this causes fear. People leave. People do not want to move into your city. Businesses do not want to stay. And it makes funding a city and city services even more difficult.

25. My opinion on what the impact on public safety would be state wide if the court ordered the release of 40,000 inmates is that we would experience a further drain on an already strained system that lacks services, has declining ratios of police officers, a lack of parole officers, probation and courts that are overwhelmed in many cases. I do not see how this could have a good outcome. I believe negative impacts on public safety could be reduced by providing adequate and targeted programming that is based on needs assessments, however, I understand there are no resources in place for this, and no proposal that such services be provided to those proposed to be released early. There may even be a greater impact in Solano County from a prisoner release order than in some other Counties because Vallejo is the other "large" city in this County, and due to severe financial constraints, it has lost 30% of its police force within the past year.

26. Even a release order that slows down the release to 10,000 state prisoners in 2009 and an additional 10,000 in 2010, would impact public safety in a negative way in addition to normal releases and assuming all other factors remain equal. There is a lack of resources now so that existing lack of resources would be further strained. There are insufficient community resources for those already here with mental health care needs, substance abuse needs and housing needs. We currently have 60 to 100 homeless people living in Vacaville; an influx of parolees released order could double that number.

-8-
DECLARATION OF EXPERT WITNESS RICHARD WORD

Communities, as I have seen in Oakland, will lose confidence in the police. It has a forced multiplier effect which could be more negative than the numbers reflect. My experience in Oakland was painful to see because good people suffered because some even accused the cops of being on the take because they would see people on the corners out of jail within a week. We had limited control and could not keep criminals locked up as much as we wanted to. In order to avoid this kind of outcome, programming and services have to be implemented at the community level, the City and County correctional level, and the State level to bring the numbers of prisoners down by actually addressing their need for services, rather than simply releasing them unsupported into the communities.

27. We are locking up the right people in terms of those that commit violent crimes. But there is a population shift to more and more of those in state institutions have committed violent crime. But the recidivism we are experiencing across the state, 70 percent is the figure I have read and seen over a three year period, seven out of ten reoffend which suggests we are not being smart and we could do better. It is my opinion that focusing on programming and services rather than early release will bring the recidivism rate down and will bring the prison population level down. We also know that people often commit more crimes than what they are ultimately arrested for, so the recidivism rate does not tell the whole story; there are more crimes impacting the communities, and to the extent each and every prisoner gets released three to four months earlier, you both speed up the rate at which these crimes occur, but you also increase the total number of crimes committed by individuals.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed this 30th day of October at Vacaville, California.

RICHARD WORD