court will also have the services of the Pre-Trial program to monitor, track and supervise released defendants.

The other function that the assigned single judge will handle is the taking of pleas generated by the Early Case Resolution program. The recommendation is for the district attorney and public defender each to designate a single (or two) experienced, senior attorneys to review all new arrests daily. The criteria of cases to be considered will be established, and the goal is to negotiate the resolution of as many misdemeanors and lower level felonies the day following arrest. Available discovery will be exchanged, and for felony cases the negotiations may be extended to allow the necessary information to be generated. Where there is a likelihood of an early plea, the case stays in this front-end court.

Probation will also be involved in the post-trial supervision function. Persons who are on probation and charged with a technical violation (non-new criminal charge) of their probation will be considered for resolution using this same process. Defendant's who also have a new charge along with the probation violation will result in a probation officer providing the district attorney, public defender, and the court with recommendations on the resolution of the violations. Once again, the goal is to quickly address issues in the interest of resolving cases up-front.

The goal of the Early Case Resolution (ECR) Program is to expedite the disposition of misdemeanor and lower level felony cases. The mantra is "Same Justice Sooner."

The success of this approach can be measured in saved jail days, reduced adjudication costs, and better outcomes. The move to ECR depends, however, upon a shift in paradigm: From one of accepted continuances to one with a true expectation of swift but fair justice.

The principle benefits of Early Case Resolution are as follows:

- Relieves Crowded Dockets
- Reduces Case Processing Time
- Allows System to Focus Time and Attention on More Serious Cases
- Reduces Impact on Jail, Court and Adjudication Resources
- Builds in Meaningful Review for Alternative Sentencing

➢ Resolve Holds and New Charges at the Same Time

*In the April-June, 2007 Jail snapshot composite, 37% of the inmates were in 'hold' status. (Chapter Two)*

The system should set a priority on the resolution of holds. Where there are both holds and new charges, both should be resolved at the same court hearing.

Sonoma County
Time in Custody by Hold Type

| | |
|---|---|
| All | 90 days |
| Probation | 58 |
| ICE | 102 |
| CDC | 96 |
| Other County | 77 |
| Other State | 149 |
| Other | 158 |

(Chapter Two composite: April to June, 2007)

Where the hold refers to a case waiting transport to a state prison, attention should be given by all sides to take the steps necessary to expedite transfer.

*Of those in 'hold' status in the Sonoma County Jail, 12% were holds for other counties. (Chapter Two)*

For those cases, which are holds for other jurisdictions, the resolution of any underlying local charge should be expedited so that the prisoner can be released to the other county.

➢ Review Policy Regarding Immigration and Customs Enforcement (ICE) Case Processing

*34% of all Holds in the County Jail are ICE Holds. (Chapter Two)*

Sonoma County Jail is significantly impacted by federal immigration hold cases: 141 average daily population, according to the three-month composite Jail snapshot. These cases should be processed according to clear local policies. Local policies should dictate how much weight will be given to low-level local charges; the extent to which local jail will be depended on for sentencing; and the prioritization of deportation in the whole order of events.

*93% of ICE Holds also have local charges. (Chapter Two)*

The fact that the majority of ICE cases have local charges highlights the need to expedite the resolution of these charges. Quick resolution of local charges facilitates ultimate case disposition. And, when federal policy

dictates deportation, there is a clear incentive to quickly resolve local issues.

*Average Time in Custody on an ICE Hold is 102 days. (Chapter Two)*

One of the keys in resolving cases is early case status identification. This requires front-end screening and verification — assisted by a Pre-Trial Intake unit — to be able to coordinate local and federal efforts. Not only does this improve criminal justice processing efficiency, but it impacts local program effectiveness.

It is reported that too often an immigration sweep will result in immediate program termination for clients making progress in local substance abuse treatment. This results in disruption for everyone in the program.

➢ Examine Case Attrition/Dismissal Rates

*In Sonoma County 30% of defendants booked on a felony charge resulted in a felony conviction and 9 percent resulted in a misdemeanor conviction. (Chapter One)*

Sonoma County's conviction rate from booking to disposition does not compare favorably to the national rate. At the national level, 57% of the felony defendants whose cases were adjudicated within one year of arrest were convicted of felonies and 11 percent were convicted of misdemeanors.[11]

*The felony-filing rate in Sonoma County is 49%. (Chapter One)*

The full story of felony filing is told by examining charge attrition. More than half (53%) of cases that was initially arrested as felonies were either reduced to misdemeanors or ended in 'no complaint.' (Following district attorney screening, 42% were reduced to a misdemeanor and 11% resulted in 'no complaint.)

The 'no complaint' group amounted to 563 cases over a one year period.

---

[11] BJS, 'Felony Defendants in Large Urban Counties, 2002,' Feb. 2006.

Sonoma County
'No Complaint' Cases
(N=563)

|  | Misdemeanor | Felony |
|---|---|---|
| Person | 34% | 57% |
| Property | 4 | 16 |
| Narcotics | 5 | 10 |
| DUI | 6 | - |
| Public Order | 47 | 16 |
| Traffic | 4 | 1 |
| Total | 100% | 100% |

*425 Domestic Violence arrests ended in 'no complaint' (Chapter One)*

The majority of 'no complaint' cases were domestic violence cases: 92% of Misdemeanor (Person charge) 'no complaint' cases, and 77% of Felony (Person charge) 'no complaint' cases had domestic violence as their most serious charge.

The bulk of the felony arrests that do not result in a conviction are those cases that are reduced or dismissed by the district attorney at case screening. Only 47 percent of felony arrests are filed as felonies. (An additional 76 misdemeanor arrests resulted in a felony filing which bring the numbers up to 49 percent of felony bookings). Once filed, 62 percent of the felony filings result in a felony conviction and an additional 18 percent are reduced to misdemeanors.

It is recommended that the district attorney work with law enforcement to establish county standards for booking a defendant on a felony as opposed to a misdemeanor, particular emphasis should be placed on domestic violence cases. District Attorney screening will be tightened as a result of the implementation of the Early Case Resolution program.

➢ Streamline Pre-sentence Investigation

The pre-sentence investigation is prepared for all felony cases and for select misdemeanor cases: DUI with injury, vehicular manslaughter, sex offenses, violence, and child endangerment). It is recommended that sentencing occur with 21 days of entrance of plea or finding of guilt for in-custody defendants and 28 days for out of custody defendants. The PSI unit has a Manager with more than 20 years experience and a group of hard-working staff. Five officers are assigned to the courts to provide information to the judges.

*The average time for a PSI is 45.6 days. (Chapter One)*

The pre-sentence investigation process should be streamlined to allow a faster report turnaround. The Probation Department has begun to use a short-form on certain low-level cases where there has been a plea negotiation; this should be expanded.

*It is reported that there can be a 3-4 day delay in getting referral information from the court to the PSI unit. (Sonoma PSI staff)*

Delays in sentencing not only impact the jail, but they can affect treatment outcomes as well, as quick entry into treatment is associated with more positive outcomes.

In a snapshot of TASC clients in 'pending' status we collected several months ago we can see the impact. At the time of the snapshot, TASC had 125 cases in 'pending' status; of these, the majority (92%), were in-custody. And, of those in custody, half had been identified for treatment but were awaiting sentencing.

<u>TASC Pending Cases</u>
(In-custody= 115)

| | |
|---|---|
| Waiting Sentencing | 50% |
| Sentenced, Waiting Treatment | 40 |
| Sentenced, Serving Time | 10 |

**Shorten Time to Complete PSI**

*Time to PSI completion is 43 days (in-custody) and 46 days (out of custody). (Chapter One)*

There should be a different time standard (earlier) for completing the reports of in-custody defendants. The goal should be 21 days for in-custody and 28 days for out-of-custody.

**Build the PSI from the Pre-Trial Report**

The goal of expediting the PSI process will be served by a Pre-Trial program. Comprehensive data collection at the front-end of the system provides a foundation on which to build. The PSI writer can use verified pre-trial information as the starting point for their efforts, eliminating redundancies and improving the quality of the report. This is important because much of the information collected for the PSI is self-report.

**Provide Judges with Risk Information**

Sonoma County's Probation Department will soon be adopting an objective risk instrument to guide its supervision services. This risk information can also represent another level of information to help shape sentencing options and the setting of supervision conditions.

The PSI should begin to note the criminal risk level of the offender (the risk of recidivism as measured by an objective risk instrument, such as the LS-CMI). This information can inform the setting of conditions and be valuable information, especially when considering that the charge level itself (misdemeanor or felony) is not, by itself, a good indicator of risk.

*Misdemeanant and felony defendants in the study sample share a similar profile on several variables. (Chapter One)*

|                      | Misdemeanors | Felons |
|----------------------|--------------|--------|
| Age                  | 34           | 33     |
| Prior bookings (avg.)| 7            | 6      |
| Prior arrests (avg.) | 6            | 7      |

Charge severity is not in itself a reliable indicator of risk for recidivism. This is where the more comprehensive risk assessment becomes valuable.

Some states, such as Utah, are making drug diversion decisions based on risk levels (using the LSI). This involves providing the judge the LSI risk scores at the time of sentencing. We recommend that the practice of providing judges the risk score be considered.

➢ Review Utilization of Diversion and Sentence Alternatives

*Study data shows that 83% of convicted felony offenders in Sonoma County were sentenced to either prison or jail. 53% of felon offenders received a jail sentence, higher than the national average for felons of 28%. (Chapter One)*

Case processing data for Sonoma County shows that jail is the most used sentence option. This may reflect the lack of community-based options for felons (treatment is difficult to access for offenders with violent charges), and lack of a full range of mental health options.

Sonoma County
Distribution of Felony Sentences [12]

|  | Sonoma | National Data |
|---|---|---|
| Prison | 25% | 41% |
| Jail | 53 | 28 |
| Probation | 16 | 31 |
| Work Program | 6 | - |
| Fine | - | - |
| Total | 100% | 100% |

A comparison to national data shows that a higher reliance on jail in Sonoma County is offset by a lower reliance on prison. At the same time, probation is used as a straight sentence at approximately half the national average.

*The study revealed that the average sentence length for misdemeanants was 59 day; 253 days for felons. (Chapter Two)*

Average Jail Sentence Length
(Felony)

| Sonoma | National[13] |
|---|---|
| 261 days | 210 days |

The local system has established a continuum of diversion and alternative sentences. Programs include:

- Adult Diversion Services
  Pre-filing program targets the first-time misdemeanor offender. California Human Development Corporation (CHDC) offers it. (737 enrollments fiscal year 2006/2007)

- Project Intercept
  Program is designed to work with most misdemeanors; referrals are made prior to adjudication. Services provided include counseling, job assistance, and vocational support. It is offered by CHDC. (960 enrollments fiscal year 2006/2007)

---

[12] BJS, 'State Court Sentencing of Convicted Felons, 2002,' May 2005.
[13] BJS, ibid.,

- **Educational Sentencing Program**
  ESP is life skills program offered through CHDC as a sentence condition or sentence alternative. (80 enrollments fiscal year 2006/2007)

- **Deferred Entry of Judgment** (DEJEP)
  DEJEP is a post-plea, substance abuse diversion program, designed to last six months, offered by CHDC.
  (526 enrollments fiscal year 2006/2007)

- **Work Program**
  Alternative sentencing program (in lieu of jail) that substitutes an 8-hour work crew assignment for each day sentenced to jail. Program is overseen by the Probation Department. (There were 940 individuals in this program at the end of June.)

*Thirty-four percent (34%) of misdemeanants who received a jail sentence satisfied their sentence in the work program; only 5% of felons participated in this program. (Chapter One)*

Our case processing study showed 531 individuals referred to Project Intercept over the year. This does not include the other 400+ individuals who entered Project Intercept without first being booked into the Jail.

### Project Intercept Referrals
(By Charge Type)

| | |
|---|---|
| Person | 12% |
| Property | 19 |
| Narcotics | 43 |
| DUI | 1 |
| Public Order | 24 |
| Traffic | 1 |
| Total | 100% |

Other alternative programs available to shorten jail sentences include:

**County Parole**
Inmates, with at least 2 weeks remaining in their sentence, are eligible to apply for release consideration to supervised county parole. Program is run by the Probation Department. (There were 13 individuals in this program at the end of June 2007)

**Secure Community Confinement (SCC)**
Sentenced inmates released early are restricted to their homes by way of an electronic monitoring device. (There were 67 individuals in this program at the end of June 2007. Capacity is 75)

Work Furlough
Sentenced inmates are released to continued work during the day and return to the Jail at the end of the workday.

How these programs are used should be reviewed. They have been built up over time, and the diversity of offerings and how they are applied should be reassessed at this juncture. A committee should be formed to re-examine the various programs. Questions to be asked include: For which populations are the programs available? (Could Project Intercept be made available for more felony offenders, for example); how are offenders assigned?; what are the different pathways to entry (courts or probation); is the existing organizational structure the most efficient?; what do program outcomes indicate about service quality?; etc. The goal is to consider how these options can be used for greatest impact.

Data on these programs was not readily available. Comparisons of populations served (by charge type and level, and legal status) would be a starting point. For misdemeanor offenders it was noted that, for the most part, the populations in one program are similar to another. For some the entryway is the courts (work release) and for others it is probation (county parole). A few issues are mentioned below.

County Parole

That the mechanism is in place for Probation screening for this program, begs the question of what it would take to take fuller advantage of this jail release option.

*At this time there are only 13 inmates out on County Parole. (Probation staff data)*

Catherine Boyd and Ann Batiste, Probation Department personnel who work the early release programs in the Jail, note that the expansion of drug diversion and other options has had the effect of leaving a more complex mix of cases in jail for consideration. Still, these inmates will eventually be released and the question to consider is how to craft a quality transition plan.

At this time, similar to the TASC assessment, the inmate initiates the request for county parole review — instead of having a universal screening process in place.

The re-examination of this program should look at the eligibility criteria (most are rejected); the screening process (staff need 2-3 weeks to

complete a 'mini-PSI'); the profile of those accepted and rejected; the supervision and program resources available for those released; etc.

Work Program (Work Release)

Unlike the low numbers in County Parole, Work Release is serving a large number of individuals.

*On the first of July there were 940 persons in the Work Release program. (Probation Department data)*

Primarily a misdemeanor sentence option, offenders are sentenced by the court and perform one day of labor for each day of their sentence. Offenders are screened by County Probation (Pre-Trial unit) and are assigned to work crews. For those offenders who already hold a full-time job, the time involved to satisfy a 90-day court order can take (by working one 8-hour day each weekend) almost 2-years to complete. Some offenders opt to apply for the 'work furlough' program instead. And, for those who serve their 30-day sentence in jail the actual time served, after good time credits, can be closer to 20 days.

In addition to knowing more about the profile of participants, it would also be instructive to know about treatment involvement. As the county prepares to discuss a DUI court it should examine the manner in which DUI cases (2nd offenders) are now accessing county parole, and how those services might be structured to better compliment other DUI efforts. The quality and continuity of those services should be reviewed.

As an example, DUI inmates who apply for county parole and are accepted are released to a probation officer who supervises the person through the duration of their sentence. But when supervision ends, it just ends. The program is not designed to transition offenders to continued services. The question here, as with all the local efforts, is how to deliver programs in the most cohesive manner.

The community court concept has shown, for example, that work orders combined with service referrals and group sessions is one approach to try an interrupt future re-offending. With minor enhancements a good work program might yield improved outcomes.

➢ Review Short-Term Prison Sentences

*20% of offenders sentenced to prison from Sonoma County received a sentence of 16 months or less. (Chapter One)*

The County may want to take a closer look at this population. Knowing more about the profile of this group and a finer break-out of lengths of stay can be helpful in future discussions with the State. The issue, explored in other states, is whether the lower risk, technical violator who is sentenced to prison for short periods (many for four months or less, we are told) could be accommodated in the county with financial assistance from the state for jail and programming.

## III. Jail Alternative Facility: Community Corrections Center

> Plan an Alternative 'Step-Down' Facility

Sonoma County would benefit from an alternative custody facility that would provide the option to move inmates from custody to the community along a structured continuum: a Community Corrections Center (CCC).

The fact that Sonoma County already has alternative sentence programs in place, and a mechanism, through Probation, to screen cases for step-down from jail, positions it well to move to the next level of jail transition services. A Community Corrections Center would provide a flexible option to reduce pressure on the Jail, provide a structured but lower cost alternative to incarceration, and address (through programs) the issues that underlie offender recidivism. A CCC provides an important interim intervention, between jail and the community: a 'step-out' to a work based and program rich facility.

The goal is to begin to view jail as the 'gateway' to the community. For every felony offender who enters the Jail, planning for eventual release should begin immediately. All felony inmates should be screened for release, and an individualized plan developed, moving them toward release to either the CCC or to county parole. At this time, although most inmates are eligible for release consideration after serving half their sentence, an inmate must request a review. We propose a universal screening of all inmates at the time of sentencing to develop a transition plan.

*Of those booked into the Sonoma County Jail, 53% of misdemeanants and 54% of felons reported they were unemployed. (Chapter One)*

Offenders who serve their time in a Community Corrections Center are expected to either be involved with programming and/or be working in the community during the day. For those who have jobs, this helps ensure that jail time does not contribute to the loss of employment. For the unemployed, significant programming will be offered around developing job skills, as well as finding, interviewing, and maintaining employment.

*Of those misdemeanants sentenced to jail, 34% were ordered to the work program, in lieu of jail. (Chapter One)*

A Community Corrections Center (CCC) can serve as both a Day Reporting Center for low-risk offenders who have program conditions to

satisfy; and as a facility where inmates return in the evening for lock-down, after a day of work in the community.

*43% of misdemeanants sentenced to jail served all their time in jail; 84% of felons sentenced to jail served all their time in jail. (Chapter One)*

A Community Corrections Center can serve many system goals: jail step-down; treatment for those pending residential placement (instead of waiting in a more expensive jail bed); a constructive sanction for those in programs or probation; etc. Services should focus on employment search, cognitive skills, restitution, and substance abuse.

*In Sonoma County, 5% of sentenced felons were court ordered to the work program. (Chapter One)*

A Community Corrections Center represents a lower cost jail population management option.

The nature of the facility, which is program-based and grounded in the transition to community, suggests that consideration be given to having it managed by the Probation Department.

A Community Corrections Center (CCC) prepares inmates for successful transition back to the community. It is a minimum security residential facility that offers a structured, supervised living environment as an alternative to jail. Inmates at the CCC work in the community during the day and then return to the facility for the night.

A CCC provides a lower cost option to jail and extends the limits of confinement. It is based on the philosophy that a structured progression from jail to the community can be effective in reducing risk. It provides a positive and structured environment in which to learn and test new skills and chart a path for the future.

Inmates at a CCC serve the remainder of their sentence while finding employment and having the benefit of a range of programs. The principal goal is to facilitate successful re-entry to the community. Benefits to the system include:

- ❖ Lower cost alternative to Jail
- ❖ Improved Outcomes
- ❖ Added Flexibility in Managing Inmate Population

A Community Corrections Center should be planned as part of a comprehensive 'step-down' strategy for moving inmates along a Custody-to-Community Continuum; *developing tracks out of jail*, based on inmate risk and needs.

A CCC fills a need between the Jail (reserved for the highest security population), and community-based options: such as work crews and community service (for the direct placement or step-down of lower security inmates). The CCC is reserved for the medium to high risk offender.

Target Population
Community Corrections Centers can serve a diverse population, and they can also function as a Day Reporting Center. Foremost, they are designed to serve sentenced jail inmates who transition to the CCC to serve the remainder of a sentence; or jail inmates who, because of their classification level, may be moved directly to the CCC to serve their time. Populations found in these facilities include:

- Jail inmates in last phase of sentence
- Probationers in the CCC on a sanction for a violation of supervision
- Drug Court or other treatment participants at risk of failure
- Pre-Trial inmates (who would be detained in jail without this option)
- Discharged jail inmates in need of voluntary, short-term stabilization
- Prisoners re-entering the community

A CCC can also serve as a Day Reporting Center, providing a hub of services where offenders may be asked to report for daily check-ins, or to access support services, such as computer labs and classes.

Programs
Individual case plans are designed to address conditions of supervision, court orders, treatment needs, community safety, victim restitution, and successful transition back to the community. Issues addressed include employment, cognitive programming and substance abuse. A range of services are commonly offered. These may include:

- Substance abuse treatment
- Mental health evaluation and services
- Cognitive skills classes
- Employment testing and job search assistance
- GED and literacy classes
- Life skills: nutrition, parenting, money management, computer skills

*Residential Treatment*
Some Centers, such as the one in Washington County, Oregon provide longer term residential treatment to a sub-set of the population. In

Washington County, an intensive 90-day treatment program is offered to a co-ed population within the facility.

*Work Programs*
Some Centers have made vocational advancement the centerpiece of their operations. The range of work-related services found in Centers includes:

- Aptitude testing
- Job Search Skill training
- Classroom based vocational skills development
- Occupational skills development
- Center organized or sponsored work projects (day labor)
- Job referrals or placement
- Job Clubs/support groups
- Job support: bus tokens, clothing, etc.
- Job tracking and support

There is much room for creativity in the development of this component of the Center. The importance of this aspect of the program is supported by research showing that inmates who participate in community-based industries projects have reduced recidivism and improved post-incarceration employment retention. [14]

Individualized plans for each CCC inmate should be based on the risk and needs of the offender, and the anticipated length of stay at the Center. For residents with short stays (less than a couple of weeks) the principal goal is to connect them to treatment prior to release. For those with longer stays, the goal is to work with the resident to find employment, engage in treatment, and move into drug and alcohol free housing upon exit.

Administration

Community Corrections Centers can be managed by different agencies. In a Probation model, the CCC is staffed by Corrections Specialists. In either model staff has the responsibility for monitoring the security of the facility, conducting urinalysis tests, and tracking the daily plans of the residents. Residential counselors work with residents to develop individualized plans for services.

Cost

---

[14] Marilyn Moses, "Factories Behind Fences: Do Prison 'Real Work' Programs Work?", National Institute of Justice Journal, Issue: 257, June 2007, U.S. Dept. of Justice