A big advantage to a Community Corrections Center (CCC) is the cost to build and operate one, compared with a jail. By definition, a CCC is a minimum security facility that has dormitory style housing.

It is estimated that *building costs* for a CCC are one-third less than those of a jail. [15] Moreover, the *operating costs* are less: In Washington County, Oregon the per-day cost of operating the CCC is, at $55 per day, half of the per-day jail cost of $109.46. [16]

Other County Community Corrections Centers

The Community Corrections Center model is not as wide-spread as Re-entry facilities/Half-way houses for prisoners. But where they do operate, they present a major management tool for local counties attempting to stretch the limited and expensive jail resource.

Counties with a CCC include:

- Clackamas County, Oregon
- Clatsop County, Oregon
- Lane County, Oregon
- Washington County, Oregon
- Hampden County, Massachusetts
- Suffolk County, Massachusetts
- Davidson County, Tennessee
- Orange County, Florida

Issues to Address in Planning a CCC

There are many policies and procedures to address in planning a Community Corrections Center. Some of these include:

- Eligibility/Ineligible
- Screening procedures
- Range of Populations served (State prisoners, parolees, pre-trial, etc.)
- Required Time in Jail prior to consideration (if any waiting period)
- Length of Stay remaining on sentence to be considered
- Type of Programs to offer
- Job search requirements (number of days to find work, type of work and number of hours required to work)

---

[15] Estimate given by Rosser International. 9-19-07.
[16] The Washington County CCC per day rate for the small number of residents involved in the in-house residential treatment, is $71 per day. (John Hartner, Community Corrections Director, Sept. 2007)

- Urinalysis Testing and monitoring
- Return to Jail, and other Sanctions for non-compliance
- In Facility discipline
- Step-down policies and options from CCC
- Health Care
- Award of Good Time and Work Credits
- Program administration
- Fees and collection of restitution
- Information sharing between agencies
- Data collection
- Program evaluation

➢ Establish 'Tracks' out of Jail based on Risk and Need

A quick assessment of offender risk can guide the level of supervision and treatment received. Just as the Probation Department will be adopting a new, objective risk tool to allocate supervision resources, so too can the step-down from jail be guided by risk levels.

## IV. Alternative to Jail Programs

Sonoma County's commitment to treatment and alternative to jail programs is evident in the strong continuum of programs in place. And, these programs are supported by a group of dedicated professionals who, at all levels of this system, are interested in making a difference.

The fact that Sonoma County has many of the building blocks of a strong system puts it ahead of many other jurisdictions. This strong foundation can be seen in the continuum it has put in place over the years:

- Pre-file and post-file diversion programs
- In-jail substance abuse treatment
- A long-standing Drug Court
- TASC assessment and case management
- Specialized probation caseloads
- FACT team
- Jail discharge planning
- A range of community-based treatment

Moreover, its programs stand out for having staff with many years experience and a true interest in moving offenders toward change. Features such as the use of positive rewards, innovative program offerings, and lifetime aftercare are commendable. Some programs are tackling hard to address issues, such a female trauma.

Given this foundation, Sonoma County is now in a position to ask: How might we optimize these resources? The answer lies in three general approaches:

- Improved Front-End Services: Pre-Trial Services
- Expedited Case Processing
- Extend the Continuum: A Community Corrections Facility
- Strengthen Existing Services

➤ Create Centralized Intake Services

*"Sometimes the quiet ones fall through the cracks." (Discharge Planner on task of identifying inmates who need service)*

Pre-Trial screening, with its emphasis on risk, should be supported by an assessment of offender 'need' (criminal risk factors) as well. This is done by creating a Centralized Intake unit that can quickly provide varying levels of substance abuse and mental health screening and assessment. While these reviews now occur at various places in the system, there is

neither a systematic nor universal approach. A Centralized Intake Unit would provide this.

**Provide universal front-end screening**

Sonoma County is fortunate to have a Treatment Alternative to Street Crime (TASC) program, with staff dedicated to assessment, client advocacy, and case management. Their assessments, conducted for the most part in the jail, are most often initiated by inmate request. In the proposed model, this entryway into treatment would be replaced by a more unified approach. It would join the various efforts of Pre-Trial Services, TASC, and Mental Health staff to provide better up-front case review, and more substantive information to judges to inform the setting of conditions, as well as diversion and sentencing decisions.

Building universal risk and need screening into the front end will also improve assessment efficiency. Under the proposed model, Pre-Trial screening and judicial orders become the driver of further assessments, which can reduce time spent with dead-end cases (don't know case has 'out of county' status, for example). Under the current system of inmate initiated requests, TASC reviews many cases that do not result in acceptance.

<u>TASC Screening & Referral Statistics</u>
(March 2007)

| | |
|---|---|
| Number Screened | 156 |
| Number Accepted | 53 (34%) |
| Number Not Accepted | 103 (66%) |

As can be seen, 66% of the cases screened were not eventually referred for treatment. Front-end screening as part of a Pre-Trial program should fine-tune this process.

**Shift to System-Directed Assessments**

Most TASC assessments are conducted in-custody. And, for the most part, an assessment is initiated by an inmate request.

TASC Assessment: Referral Source

| | |
|---|---|
| Self | 64% |
| Court | 20 |
| Probation | 9 |
| Defense | 4 |
| Other | 3 |
| Total | 100% |

TASC also provides assessments on a walk-in basis in the community. Here the percentage of self-referrals is even higher (75%). And, over half the walk-in cases are rejected for treatment entry.

*Of those defendants who were assessed by TASC, 57% were on pre-trial status, 38% were violation of probation cases, and 5% were sentenced. (TASC data)*

Some of the self-requests for treatment are persons following through on referrals, but most are requesting an assessment in an effort to improve their legal outcome, or because they want to advantage of treatment.

The problem with a system that is inmate driven is that it takes the reins out of the hands of the system. This results in system inefficiency when TASC must review cases that have not been pre-screened and do not, in many instances, meet basic eligibility criteria (inmate is on an out of custody hold, for example). Other persons who might qualify simply fall through the cracks and are not considered.

A more standardized up-front screening will help produce a more efficient and productive process.

**Reassess the Role of Motivation in Client Selection**

*"This program saved my life. But when I started I didn't want to be here. I didn't believe that anything could change. But the man you see today is not the same man who started this program." (Graduate of local treatment program)*

A self-referral system would seem to be a natural way of targeting those who are motivated to change. And, certainly, ultimate success in any program depends upon a person having the desire for a better future. The published studies on the relationship between motivation and outcome are often incomplete: not speaking to the issue of how, not only to measure motivation, but how to foster it.

We know that coerced treatment has been proven to be as effective as voluntary treatment. Using the coercive power of the courts has been

shown to be an effective tool in encouraging treatment entry, retaining clients, and graduating higher numbers (drug court is one example).

The key question is not: 'Is the person motivated'; but 'How do we motivate them?'

*"I have found that clients who entered treatment and didn't want to be here did as well as those who volunteered." (Local Residential Treatment Program Staff)*

Motivating clients is an art, but a basic one for all criminal justice professionals. Probation and Parole departments nationwide are sending staff to trainings to teach them 'motivational interviewing' — the common principles of respectful communication, good listening, positive guidance, and guided goal setting. To see this in action one need only watch Judge Boyd and other Drug Court judges.

Trainings such as this can be helpful to both new and experienced staff. We also encourage jail staff and others to take advantage of these trainings. Communication is the most fundamental and one of the most overlooked aspects of this work.

### Integrate Risk Information into Treatment Planning

The joining of risk and offender 'need' information (criminal risk factors such as substance abuse and mental health needs) provides a framework for targeting scarce resources.

The allocation of resources becomes an important decision: who should be prioritized for the most intensive and expensive resources? Ideally, the most intensive resources should be reserved for those with a high risk for recidivism (or for those who are having a significant impact on the system because of repeat bookings).

As with the pre-trial assessment of risk, the determination of post-trial risk should be guided by objective and validated risk instruments.

Given that the Sonoma County Probation Department will soon be adopting a new risk tool, this is a good time to be talking about how to apply this information. The quantification of risk should provide a starting point for resource allocation. Lower risk offenders can be targeted for diversion or less intensive treatment. Higher risk offenders, in comparison, are the group on which a county would want to focus its most intensive and expensive treatment. Research has shown that the greatest returns are achieved when the most intensive services are reserved for the highest risk offenders.

Although no risk tool is ever a complete substitute for professional judgment, it provides an objective guide for decision-making.

**Develop a Common Case Plan**

The new risk tool that Sonoma County Probation will adopt will not only produce a risk score, but will identify individual risk factors associated with recidivism. This is used to shape the supervision plan. But most offenders are also in treatment. The goal should be to develop a common supervision and treatment plan that outlines offender goals related to individual risk factors. In this way treatment and supervision staff can reinforce and compliment each others efforts.

*Probation Officers and Treatment providers both expressed an interest in improved communication.*

At this time the probation officer has sporadic input into the treatment plan and is not routinely consulted when making modifications (this varies based on caseload type and the relationships that have been established with TASC and other providers).

A core plan with shared goals and expectations, can help keep everyone 'on the same page' — literally. In this way, both parties can reinforce progress in meeting short-term goals and speak with one voice when it comes to rewards and sanctions.

➢ Enhance Existing Treatment Options

*The majority of Sonoma County Probation Officers with Intensive caseloads who were surveyed reported that treatment always, or almost always, available. (Probation Officer survey)*

Probation Officers and treatment providers list the following as needed services.

<u>Local Treatment Needs</u>
(According to Probation Officer & Providers)

- Vocational Training & Employment Services
- Medication for Low Income
- Drug-Free Housing
- More Intensive Outpatient, and Longer than 31 Day Treatment
- Treatment for those Not Yet in Criminal Justice System
- Dual-Diagnosis Treatment and Specialized Expertise in Programs

- Coordinated Funding for Support Services: Childcare, Transport, Housing, etc. And, program funds for support (bus fare, etc.)
- Residential Treatment for Sex Offenders, Spanish, Mentally Ill

*Barriers to treatment and services for offenders that were noted include: funds for treatment, denial for lack of motivation, transportation, and charge. (Probation Officer survey)*

### Make More Intensive Outpatient Treatment Available

Sonoma County has an array of treatment programs that is richer in offerings than many counties. It has also invested considerable resources in residential treatment. This is not unexpected, given the severity of the drugs in use (methamphetamine) and the availability, through SACPA and Drug Court of a good base of outpatient services.

Sonoma County
AODS Treatment Snapshot[17]
(Feb. 6, 2007)

| | |
|---|---|
| TASC | 144 (40%) |
| SACPA | 138 (38%) |
| Drug Court | 58 (16%) |
| Starting Point | 22 (6%) |
| Total: | 362 |

Note: TASC is primarily residential (64%) treatment; SACPA is primarily outpatient (88%); Drug Court is primarily outpatient (86%); and Starting Point is the in-custody substance abuse program.

Both ends of the spectrum of treatment intensity are available: From 1-2 group sessions per week (conventional outpatient), to 26 group sessions per week (Starting Point).

---

[17] This break-out represents AODS programs coded as 'law enforcement' related programs. It does not include out-of-county programs, sometimes accessed, or the broader pool of community, fee-based services.

Sonoma County
AODS Snapshot: Residential vs. Outpatient
(Feb. 6, 2007)

| | | |
|---|---|---|
| Residential | 135 | (37%) |
| Outpatient | 227 | (63%) |
| Total | 362 | (100%) |

Note: Snapshot data reflects the number of criminal justice clients in programs on this day, not program capacity. In-custody participants are included in residential count in this break-out; drug court participant in the outpatient.

Although Intensive Outpatient services make up the majority of treatment resources, these slots are largely dedicated to SACPA and Drug Court clients, ostensibly targeting lower risk populations. The fact that SACPA clients are not supposed to be mixed with other clients represents another complication.

Sonoma County Outpatient Slots
(By Criminal Justice Population Admitted)
(N=227)

| | |
|---|---|
| SACPA | 63% |
| Drug Court | 19 |
| Other | 18 |
| Total: | 100% |

As can be seen in the data above, the bulk of outpatient resource is serving a specific criminal justice clientele (SACPA and Drug Court). And, for undedicated outpatient slots, it is estimated that 98% of outpatient treatment serves those who transition from residential treatment.

There is no good mechanism for direct placement into intensive outpatient from the jail, and there is no formal provision for moving offenders from outpatient to residential treatment.

*One residential treatment provider estimated that 15-30% of clients might be appropriate for intensive outpatient services.*

TASC, which bases its assessments from the Jail, makes the vast majority of their referrals to residential treatment.

TASC Referrals by Type
(Feb. 2006 to Feb. 2007)

| | |
|---|---|
| Residential | 91% |
| Outpatient | 7 |
| Other | 2 |
| Total: | 100% |

(N= 615. Reflects all referrals for which referral type noted)

Of those referred to residential treatment, almost half (47%), are sent to the Turning Point program.

TASC Referrals: By Residential Program
(Feb. 2006 to Feb. 2007)

| | |
|---|---|
| Turning Point | 47% |
| Athena | 14 |
| Orenda Center | 12 |
| Latino Commission | 11 |
| Out of County | 6 |
| Other | 10 |
| Total | 100% |

(N= 560. Reflects all referrals for which residential type noted)

The pathway to residential treatment from TASC is through the Sonoma County Jail. This has actually resulted in cases in which offenders, once released from custody, must return to Jail in order to access residential treatment. It was explained that this is a result of County policy that dictates that residential treatment funds be used only to depopulate the jail, preventing direct community access to these services. But, the unintended consequence is that offenders must at times return to Jail to gain access to residential services. This needs review.

*Half of local outpatient treatment providers estimated that a small percentage of their clients would benefit from more intensive treatment.*

An expanded option of intensive outpatient should be available to help stretch the treatment continuum. Some inmates who exit Starting Point may, after a month or more in treatment, no longer need residential treatment (as originally assessed) but could thrive in a less intensive program.

*It is estimated that 30-40% of inmates in the in-custody Starting Point program have jobs in the community. (Program staff)*

To the extent that intensive outpatient can be used, it helps inmates who are employed to retain their jobs. For those who need the additional stability offered by residential placement, an option that provides Intensive Outpatient and short-term clean and sober housing can be explored.

As a step-down from Jail, Intensive Outpatient services should also be provided in the Community Corrections Center.

### Sonoma County AODS Expenditures
(Fiscal Year 05-06)

| | |
|---|---|
| Detox | 13% |
| Residential | 51% |
| Outpatient | 11% |
| Drug Court | 8% |
| SACPA | 0 |
| TASC | 17% |
| Total: | $4,567,260 |

County funds make up half (50%) of total AODS program revenue in Sonoma County that totals more than $9 million.

### Sonoma County AODS Revenue Sources
($9.7million)

| | |
|---|---|
| County | 50% |
| State | 28 |
| Federal | 18 |
| Fees | 3 |
| Other | 1 |
| Total | 100% |

In the 1970's, Sonoma County had a base of treatment that was primarily Intensive Outpatient. With the increase of methamphetamine use the offender profile has become more complex, but there is still the need to actively use the least restrictive/and less expensive option where possible.

Sonoma County has, in its prenatal program, a good example of an intensive outpatient program. Clients attend sessions five days per week

for at least 3 hours per day. More intensive outpatient, coupled with stable housing, would be an important addition to the continuum.

**Address Treatment Access for Violent Offenders**

*The greatest gap in treatment, noted by Probation Officers with intensive caseloads, was for offenders with violent charges or a history of violence.*

Although outpatient treatment providers in Sonoma County generally indicated they would consider offenders with violence, on a case-by-case basis, residential treatment programs are in a more difficult position. Given the mixed populations of residential programs, a violent charge can be incompatible. However, the need does not disappear and, as is often the case in criminal justice treatment systems, those who pose the greatest public safety threat are often the least able to access care.

More Jail Treatment for Higher Risk Cases

*Probation Officers indicated a need for more treatment in Jail for higher risk offenders. (Probation survey)*

Providing treatment in jail presents unique challenges. Jail classification barriers may prevent some inmates from participating in the Starting Point program. This can be addressed by considering how treatment might be brought to this group in the more secure parts of the jail. Probation Officers indicated a desire for more treatment for this group.

Residential Treatment for Sex Offenders
Probation Officers noted that the majority of sex offenders who were indicated as needing treatment appeared to be accessing treatment, albeit usually on an outpatient basis. The need for more intensive treatment, both in the community and in Jail, was brought to our attention by the Officers. The issue here is how to make residential treatment available where clinically indicated.

*In a review of TASC reason's for rejection, Violence was the most common reason a person was denied entry into treatment. (TASC data)*

One month worth of data was collected to examine the reasons that persons assessed by TASC were turned down for residential treatment.

TASC Reason for Rejection

| | |
|---|---|
| Violence | 38% |
| Out of County* | 27 |
| Owe Money | 12 |
| Psychological Issues | 9 |
| Other | 14 |
| Total | 100% |

* Includes Non-Resident and ICE status.

A look at the kind of violent charges highlights the challenges posed to TASC and the system in accommodating this population. Rejections include offenders charged with: Armed Robbery, Gang involvement, Assault with Weapon, Arson, Firearm possession, child endangerment, and misdemeanor battery.

Review TASC Appeal Process
*Probation Officers with Domestic Violence Caseloads reported that, on average, only 50% of those in need of substance abuse treatment were accessing it. (Probation survey)*

Although TASC assesses domestic violence cases for treatment need, many of these cases are initially denied because of the violent charge. The offender may then appeal the denial and the case is again considered for acceptance. If the offense involved a weapon there is no access to treatment. Of course, these are the very cases that most need attention.

*It was estimated that of those offenders on the Gang Supervision caseload, only 1of 10 persons who needed substance abuse treatment were accessing it. (Probation survey)*

Programs for Gang Members
Although a smaller percentage of offenders on Gang supervision were noted to be in need of substance abuse treatment (10%) by the Probation Officer who supervises this caseload, this group represents a substantial public safety threat, and every effort should be made to link them to treatment, when needed.

*In the Sonoma County case processing study, 10% of defendants with misdemeanor charges, and 19% with felony charges had a gang affiliation.*

<u>Level of Gang Affiliation</u>

|            | *Misdemeanor* | *Felony* |
|------------|---------------|----------|
| Affiliated | 5%            | 5%       |
| Associate  | 39            | 42       |
| Drop-Out   | 6             | 6        |
| Member     | 50            | 47       |

**Continue to Address Issue of Rural Access to Treatment**

*It is estimated that 15 to 25% of treatment program clients reside outside of Santa Rosa. (Treatment providers)*

The provision of services to residents in the more rural areas is an on-going challenge. Some DUI treatment has been made available, but for the most part person in need of treatment need to come into Santa Rosa. With transportation issues to contend with, this presents a real challenge to many clients.

Attempts have been made to bring treatment out to 'The River,' but the lower number of clients in this rural area has not made it cost effective. Creative solutions should continue to be explored, including mobile treatment vans, video conferencing, etc.

➢ Expand Drug Court

*"Drug Court has been a profoundly positive experience for the system. It changed the thinking about treatment and created a common language." (Sonoma County Treatment staff)*

The Sonoma County Drug Court is doing a good job providing a solid base of services. This is a mature Drug Court, in operation for more than 10 years. It has been the beneficiary of strong judicial commitment and an energetic program coordinator. The program has a good core program presented in phases, and is exceptional in offering on-going access to services to graduates — consistent with a chronic care model.

The fact that a single judge handles both the Drug Court and the SACPA Court is also a bonus. By tracking both populations the judge is able to seamlessly move SACPA cases to Drug Court at the point of repeat failure, but short of termination.

The Program has developed a good array of programs: noteworthy is the volunteer literacy counselor (offered by a retired DA), family and relationship counseling, and a 6-week anger management curriculum.

The Program has also been accommodating more serious cases: They have accepted gang members, who are reported as doing well; has no limit on drug charges; and reviews drug sales offenses on a case-by-case basis.

For program graduates, the average length of stay is approximately 12 months.

*At the end of June, 13% of Drug Court clients were SACPA participants.*

The program also does a good job of accessing a range of treatment resources. The Drug Court Coordinator can place participants into residential treatment, usually at initial assessment into the Drug Court.

*At the end of June, 10% of Drug Court participants were in residential treatment.*

Residential treatment is used judiciously, but those who are placed will remain there for 6 months. At this time, all those in residential treatment were females (usually it is mix of males and females), and placed at either Athena House or Turning Point.

Having access to residential has worked well. Clients still attend monthly court sessions, and consideration is given to reducing the overall length of Drug Court participation for those who successfully complete the 6 month period.

*The program sees a positive difference for clients who first attend Starting Point.*

The program coordinator notes that she observes a positive difference in those clients who take advantage of the in-custody Starting Point program while waiting program entry.

### Establish Non-Attorney Staff Positions for Drug Court

The essential work of screening defendants and tracking them into Drug Court is time consuming and requires a specialized skill base. For these reasons we recommend that the District Attorney Office and the Office of Public Defender each have a non-attorney position dedicated to this work. In our experience, drugs courts which have this in place increase numbers served and improve time to program entry. Overall program efficiency and effectiveness is served.

Non-attorney staff support positions soon become indispensable. And, their involvement with the case need not end with screening. Support staff knowledge of the defendant's progress serves to support attorney recommendations.