The staff person in the public defender's office will work with the clients identified and referred by Pre-Trial Services. They will work to motivate clients to accept offers to the program as well as with the attorneys to facilitate their program entry. The staff person in the district attorney's office will work with the individual attorneys, law enforcement, and in some cases with the victim to help facilitate program entry for those qualified defendants.

These non-attorney positions are companion positions and do not replace the Drug Court Coordinator position.

### Achieve Full Drug Court Capacity

*On June 25 the Drug Court program had 70 active clients.*

The Drug Court program was designed to handle 100 clients. At the end of June the census was 70, up from 55 when we started the project.

*52 new cases admitted to the Drug Court in 2006.*

The first goal is to take full advantage of the existing capacity. The second is to expand that capacity to address that potentially eligible population who are still serving time in Jail.

*The Drug Court program graduated around 39 persons last year.*

### Consider Drug Court Treatment and Reporting Tracks

The Drug Court has a well-run program in place and is achieving good completion rates. Given this, the goal should be to make the program available to more individuals.

*Of Drug Court participants who graduated last year, 85% completed the program within one year.*

The program is moving the majority of individuals through the program in a reasonable amount of time. And, unlike some Drug Court programs, it is not holding on to individuals for lengthy terms of 14 months or longer.

At the same time, consideration should be given to the development of treatment 'tracks' of varying intensity, guided by an assessment of criminal risk. In four experimental studies, participants who were high risk for recidivism had better outcomes in drug court when scheduled to attend frequent biweekly judicial status hearings. In contrast, high-risk participants had poor outcomes when this level of contact was reduced.

However, outcomes for low risk offenders were generally equivalent regardless of how often they were required to appear before the court. [18]

**Make More Sanction Options Available for Drug Court**

The Sonoma County Drug Court takes an individualized approach to sanctions. There is no set sanction formula, but offenders know that low level sanctions (increased AA meetings, increased testing, and extra homework assignments) can lead to jail time.

Jail sanctions are used in a measured way. Of the 39 persons who graduated from the program in 2006, 20% did not receive any jail sanctions. Of the total jail sanctions imposed, the break-out by length of jail time is as follows:

**Drug Court Jail Sanctions** [19]
(2006)

| | |
|---|---|
| 2-3 day sanctions | 90% |
| 2 week sanctions | 8% |
| 1 month sanction | 2% |

Unlike the SACPA Court, Drug Court does not use community service as a lower level sanction: staff finds the required paperwork for community service to be cumbersome and time-consuming. This is an area where volunteer assistance might be solicited; or those agencies using community services might consider how screening and placement resources could be pooled.

For those drug court clients with repeat failures though, a more intensive community-based sanction is needed as the final step before jail. We recommend the use of work crews that are supervised by the Probation Department as an intermediate sanction option.

*Drug Court jail sanctions in 2006 resulted in 194 jail bed days.*

Filling out the sanction continuum with work crews provides more options short of jail. And, options which do not disrupt a person's work can help contribute to success. The certainty of a jail sanction is an integral part of program success, and there is evidence that shorter sanctions may be just as effective as longer sanctions. The key appears to be the swiftness and certainty of the sanction, not the duration.

---

[18] Marlowe, Douglas B. et. al, "Matching Judicial Supervision to Client's Risk Status in Drug Court," Crime and Delinquency, Volume 52: Issue 1: (January, 2006).
[19] Sanctions represent number of violations not persons: one person could have multiple violations.

Jail Population Management
Chapter Five
Page 47

> Pursue Development of a DUI Court

The availability of State funding for DUI courts, through the Office of Traffic Safety, has captured the attention of judges and other players in Sonoma County. We support the development of such a Court.

Our case processing data show that, although the majority of defendants booked into jail on new misdemeanor and felony charges do not have prior DUI arrests, there is a small group with a significant background.

*32% of defendants booked into the Sonoma Jail on a felony charge had 2+prior DUI arrests. 22% of felony defendants had 3+ priors.*

Prior DUI Arrests for those Booked

|        | *Misdemeanor* | *Felony* |
|--------|---------------|----------|
| None   | 72%           | 56%      |
| One    | 21            | 11       |
| Two    | 5             | 10       |
| Three+ | 2             | 22       |

(Case processing study data)

The key in developing such a Court is to learn from the lessons of Drug Court. Those same principles should drive the formation of a DUI Court. In the end, careful planning is the key. Issues to address in the planning phase for a DUI Court include:

a) Incentive for defendant to participate
b) Voluntary vs. Mandatory participation (drug courts are, by nature, voluntary)
c) Agreement about target population (High BA, multiple DUI, offenses in quick succession, etc.)
d) Exclusionary Criteria
e) Screening, assessment, and placement
f) Relationship between DUI Court and existing diversion options
g) Comprehensive approach: treatment, court, testing, probation
h) Composition and Role of DUI Team
i) Program Coordinator and Support Positions Needed
j) Sanction policy
k) Anticipated Jail and System Impact
l) Dismissal policy
m) Nature, intensity and duration of treatment
n) Probation Officer caseload size

o) Fees
p) Graduation requirements
q) Plans for Sustained funding
r) Data Collection/Evaluation

The County plans a trip to visit the Orange County, California program. The reviewing of this, and other DUI programs, can be instructive.

The Orange County program has been in operation for more than two years. It has presented data that show low rates of DUI re-arrest/any re-arrest for participants.[20] It is interesting to note that of defendants screened for participation in this program, 53% declined participation or were turned down by the team: speaking to the importance of system incentives. It is also worth noting that the program is modeled like a drug court: those who graduated had been in the program an average of 14 months; received phased treatment comparable to the intensity of an outpatient treatment program; and had to meet comprehensive criteria to graduate, including: no dirty tests for 120 days, stable living environment, employed, support group in place, and relapse prevention curriculum completed.

*In 2006, Sonoma County AODS had close to 2,500 DUI admissions; of these, over 600 were Multiple Offender Program (MOP) participants. (AODS data)*

The number of MOP participants does not include those persons who did not enroll; it is estimated that the total number is closer to 800-1,000.

*Of the MOP participants, it is estimated that the vast majority (90%), are second time offenders. (AODS data)*

### Address Quality of DUI program for 1st Offenders.

As the County considers the formation of a DUI Court it is a good time to reassess the quality of the programming provided. The drug education model has not been proven effective, yet it is the standard approach in most jurisdictions. Sonoma County could lead the way for the State by overlaying cognitive skill/relapse skills training to this model.

➢ Standardize Offender-Based Cognitive Curricula

The Jail and other local programs all offer coursework having to do with life skills, cognitive skills, and other topics. It would be advisable for each program to be familiar with the materials and curriculum used by

---

[20] 'Superior Court of the State of California, County of Orange DUI Court Program,' presented at NADCP Conference, June 15,200.

the others, and to consider where it makes sense to adopt the same materials.

In some cases materials can compliment each other. In other cases it makes sense to try and adopt the same approach. This provides a common language for the defendant as he moves through the system (from jail to day reporting to local programs), allows the lessons to be reinforced at each stage along the continuum, and provides continuity in programming.

➢ Continue to Expand Jail Treatment Offerings

*Sonoma County Jail programs with the largest number of participants: GED courses; Self-Esteem groups; In-Motion classes (stress reduction); Religious groups; and Jail industries. (Sonoma Jail Program data)*

The Sonoma County Jail offers a broad array of programs to inmates. Probation Officers give these programs high marks. With this foundation in place the next place to turn attention to would be the more serious offenders. This would include group sessions for sex offenders and those with dual diagnosis needs.

Consideration could also be given to involving deputies in some of the programming, rotating in as co-facilitators. This is often a valuable experience in terms of broadening perspective and fostering a more cohesive approach to notions of offender reform.

**Design Jail Programs for the Higher Risk/Mentally Ill Inmate**

Programs that the probation officers recommended for adding included: group sessions for sex offenders/violent offenders, and more services for the mentally ill.

*It is estimated that there are 180+ inmates in the jail at any given time have health issues. The number of inmates who might be designated as 'seriously and persistently mentally ill' (SPMI) is estimated, by mental health staff, to be closer to 8%. (Sonoma mental health staff)*

Jail program staff continues to develop new services. One of the most recent being a Pet Assistance Therapy program for the mentally ill, to allow them something to do outside their cells for a period each day. Still, the opportunity to provide more opportunities for this population to spend additional time out of their cells (21 hours per day for the most restrictive unit) should be pursued. A therapeutic step-down program is an important element of transition planning, restoration, and well-being for this population. Certainly, the lack of good recreational opportunities in the main jail is an issue that pertains to the population in general.

*400 inmates took advantage of the Jail's Exit Planning Class over the last fiscal year. (Sonoma Jail Program data)*

Another program that should be considered for expansion is 'Exit Planning'. Inmates now volunteer for the program, and a relatively low percentage of inmates exiting the jail have availed themselves of this resource. Consideration should be given for how to incorporate this into a standard re-entry planning approach.

### Build Cognitive Curricula into Existing Jail Programs

Jail program staff is also talking about grouping programs into core sets of services. This is a good idea, and we would encourage the Jail to take it one step further and center these services in cognitive based programs proven to reduce recidivism. In addition, cognitive approaches can be inserted into existing programs. This is important in order to yield the greatest return: programs such as drug education and talk-centered groups would not, in and of themselves, be expected to sustain long term change.

### Broaden Availability of Starting Point

Now that the Starting Point program is in place, its expansion is limited only by staff and logistics. The recent program expansion to accommodate female inmates is applauded.

*219 inmates were admitted to the Starting Point program from June 2006 to June 2007. Of these, 32% volunteered and 68% had a court order for community treatment. (Starting Point data)*

Although Starting Point is largely serving inmates who have a court order for treatment, more than one-third of inmates volunteer to enter the program. While all inmates should be encouraged to take advantage of in-custody programs, where space is limited the most intensive resource should be reserved for the higher risk/higher need inmate, with Jail and program staff making that determination.

### Review Classification Exclusions for Starting Point

In the interest of making the Starting Point program available to the higher risk offender, the Jail should review classification policies that may exclude inmates in that category. At this time, the program has demonstrated that it can successfully work with a mixed group of inmates.

*Only 11% of inmates participating in Starting Point had to be terminated for non-compliance. (Starting Point data, 2006)*

For those inmates who cannot be housed in the minimum security facility, a discussion should be had about how to bring this program, or elements of it, to the Main Facility.

Ensure Continuity of Treatment for those Exiting Starting Point

*Over the last fiscal year, 16% of inmates who entered Starting Point completed the 90+ day program.*

The Starting Point program was designed as a 'starting point' for community-based treatment. As such, it is not unexpected that a low percentage of participants remained in jail long enough to complete the program.

*Of those discharged from Starting Point over the last fiscal year, 43% exited without certain continuation in treatment. These exits included: time served, termination, pretrial release or bail, other county transfer, and sent to prison)*

Continued treatment is important to reap the full benefit of this program. This is especially important given the low number of inmates who have the opportunity to actually complete the full 90+ day program, and the significance of this minimum threshold to realizing sustained, long-term change.

**Reassess Starting Point Clients at Program Exit**

*60% of persons entering Turning Point residential treatment from the Jail had participated in Starting Point, the in-custody treatment program.*

Although the Starting Point program is designed to move participants into residential treatment, the presumption need not be that this is the universal outcome. Progress in the in-custody program can result in changes that now make the person an appropriate candidate for outpatient treatment. A treatment staff member estimated that 70-80% of the clients exiting Starting Point might be considered appropriate for intensive outpatient services, instead of residential.

*It is estimated that 30-40% of participants in the Starting Point program already have a job in the community.*

To the extent that inmates can be appropriately transitioned to outpatient treatment, and thereby keep their jobs, everyone benefits.

*Continue to Refine Program Data Collection*

The collection of outcome data is also encouraged. It would be instructive to track inmate profile information, length of time in program, whether the person exits the jail to continued treatment, and one to three year recidivism data.

➢ Extend the Detox Continuum

Sonoma County has approximately 200 admissions per month to its detox program. Law enforcement officers can bring persons for short-term holds. Police agencies are charged $50 per admission; as a county facility the sheriff does not pay.

*The average stay is 3-5 days. According to the Detox Manager, the recommended stay would be 5-7 days given the issues that attend meth use.*

It is one of the few remaining social detox models in the state. Operating at lower cost than medical model centers it is, however, dependent on good access to a medical facility. But it can accommodate most individuals. Only around 10% of persons must be transferred to the hospital for care. And, there are always those few persons who are brought directly to the Jail for detox because of complicating issues of violence.

*Approximately 10% of persons who enter the detox center move on to a residential treatment bed.*

The detox center (30 beds) is more than that; it is a program. Persons who come to the detox facility have the opportunity to transition to a 30 day residential treatment program (30 beds), after which they can take advantage of a 6-month outpatient program. For those who do not avail themselves of this, exiting the facility often means an inevitable return.

*It is estimated that 60% of persons admitted to the Sonoma County Detox program have used the service in the past.*

It is a challenge in any community to address the issue of the social inebriate. The solution depends on access to good safe and sober housing and case management, at a minimum. But the sober living options that are available locally are independently run and not regulated. The Sonoma Task Force for the Homeless is taking on tough issues, and this is one point in the system that would benefit from some creative efforts.

*It is estimated that approximately 75% of Detox clients have, at some time, been booked into the Sonoma County Jail.*

The Detox Manager recommends consideration of an incentive-based transition program. Detox clients who agreed to remain at the Detox facility for at least 72 hours would receive transport upon release back home or to available housing. Thinking in terms of incentive-based approaches to stabilization makes sense. For sustained change the other components need to be in place as well.

➢ Make Full Use of Existing Resources

Contracted services are in large part operating at full capacity. Mention has already been made of the untapped capacity in Drug Court.

Another program that could accommodate more individuals is California Human Development Corporation's (CHDC) Educational Sentencing Program (ESD). This program is available as a sentence condition/or sentence alternative. It will accept all misdemeanor and felony offenders sent by the courts. ESP describes itself as a 'life skills' program, but it addresses a broad range of issues, including addiction and anger. The program admitted less than 90 participants last year.

*AODS treatment providers (contracted and non-contracted) are, taken together, operating at approximately 80% of capacity.*

Some non-contracted services also report having untapped capacity; although the barrier for accessing these services can be an inability to pay.

➢ Review Client Fees

*Offenders pay $338 for a TASC assessment, and 25% must be paid before it is conducted.*

Client fee structures and policies should be reviewed on a periodic basis. Care must be taken that fees do not pose a barrier to assessment and treatment — especially for the higher risk client who pose a public safety risk.

*In the one-month TASC rejection study, 12% of clients were denied treatment because of outstanding money owed to TASC.*

This issue was not examined in any detail; but given the study findings a review is recommended.

➢ Continue the Movement from In-House to Contract Programs

In-house (county operated) alcohol and drug services cost more than contracted services. On the face of it, contracted residential treatment appears to cost less than half that of county operated services in Sonoma

County (although per-day contract costs can be less than that program's actual costs; and the financial health of contract programs can depend on attracting and retaining private clients.)

Some jurisdictions have retained in-house services to provide more subsidized care, to offer specialized services not readily available through contracts, or to manage what is considered a core group of services (detox services, for example).

The existing AODS delivery structure (with the county managing the principal detox service, and outpatient and residential provided both in-house and through contracts) reflects the evolution of alcohol and drug service management at the state and county level. The trend has been toward contracted services, making any new services contract based. This makes sense.

The question is whether the county should consider shifting remaining in-house services to contract-based services, as well. Issues to consider include cost, service quality, and client access.

- Strengthen <u>System</u> Factors Associated with 'What Works' Research

    Criminal Justice treatment programs work with a population that has complex and often long-standing issues. Because of this, programs must adopt those practices proven to improve outcomes and reduce re-offending. This means making the most of research, and addressing system issues necessary to support positive program outcomes. These include:

    - Comprehensive Front-End Screening
    - Integrated Information Systems
    - Expedited Case Resolution
    - A Continuum of Quality Treatment
    - A Continuum of Support Services
    - A Continuum of Sanctions
    - Quality Supervision and Case Management
    - One Empty Bed in Jail for Immediate Sanction

- Strengthen <u>Program</u> Factors Associated with 'What Works'

    The research on program effectiveness is at a stage that programs can be designed and delivered according to proven principles regarding 'what works'. Program reductions in recidivism range from an average 10% reduction to a high of 30%. But poorly designed or delivered programs can actually increase recidivism.

Sonoma County programs do not uniformly track recidivism rates, and we recommend this, but discharge and type of completion is collected for report to the State. We requested one-year data for three program categories: Drug Court, SACPA, and TASC referrals.

### Sonoma County AODS Total Discharges
(Feb. 2006 to Feb. 2007)

|  | # Discharged | % |
|---|---|---|
| Drug Court | 78 | 6% |
| SACPA | 628 | 50 |
| TASC | 547 | 44 |
| Overall[21] | 1,253 | 100% |

The discharge numbers show that the Drug Court numbers are dwarfed by the large number of individuals coming through the system on 1210 status (SACPA) or through TASC programs, the later of which are primarily residential.

### Sonoma County AODS Discharge Type
(Feb. 2006 to Feb. 2007)

|  | Completed[22] | Incarcerated |
|---|---|---|
| Drug Court | 51% | 23% |
| SACPA | 43 | 40% |
| TASC | 30 | 21% |
| Overall | 38% | 30% |

N= 1,257
Note: Other discharge types are 'left before complete' (with satisfactory progress or unsatisfactory progress), and 'death'.

Not only does the Drug Court produce better results, in terms of completion rates, but the impact on the jail is less.

**Factor Criminal Risk into Case Management**

Identifying the higher risk offender can help target treatment resources, but it can be used in other ways as well. Risk information can also be used to design different levels of sanctions; deliver varying levels of case management intensity; varying lengths of treatment; and different lengths

---

[21] Overall Discharge number does not include small number of Starting Point discharges.
[22] Discharge data is also broken out by those who Left Before Completion with Satisfactory/Unsatisfactory progress. 45% of all clients in these three AODS groupings met this.

of aftercare. This can improve outcomes and help make the most efficient use of existing resources.

Certainly, TASC case managers are stretched thin now trying to provide quality case management and aftercare services for everyone. At caseloads of 60 or more there is little time for more than one check-in per month in Aftercare for many offenders. The question is whether this low level of intensity can be expected to make a difference. Making distinctions based on risk would allow case managers, like probation officers, to concentrate resources on those who pose the greatest risk. This might mean making some decisions to provide aftercare for lower risk clients in a different manner: group aftercare, for example.

*In March 2007 TASC had 405 open cases, almost evenly split between clients in treatment programs and those being case managed in an Aftercare phase.*

In the interest of cost, group aftercare should be considered as well. Moreover, the benefit of making aftercare a continuation of the treatment program should be considered. That TASC does not have substantive contact with the client during treatment (they do monitor the client's progress) may not foster the continuity of relationship that can be important to success.

### Strengthen the Supervision/Treatment Team

*Probation Officers rate TASC services as Crucial.*

Neither treatment nor supervision alone produces good outcomes. For this reason having a strong collaboration between the two is essential. Sonoma County is ahead of the game by having TASC case management services that can supplement their efforts. A common case plan and a commitment on both sides to keep good communication can yield good results.

### Ensure Minimum 90 days Treatment

Research has shown that treatment must be at least 90 days to have any long-term effect on recidivism reduction. Most of the Sonoma County treatment programs are achieving a reasonable time in treatment.

*Most outpatient and residential treatment in the County is designed as phased treatment, intended to last at least 6 months.*

The county does have a 31-day residential treatment program, and the challenge here is to ensure that all clients exit the program with a plan for treatment continuation. The program is well aware of this and has a phase II of its program that involves 6 months of outpatient. The problem is

that, without a court order to comply, there is often little incentive to continue.

Program duration is directly associated with outcomes. Although there are many factors that affect program outcomes (population served, the ability to sanction, etc.) program length is an important factor.

*Drug Court participants remain in treatment an average 24 days longer than SACPA clients.*

Short-term treatment should be offered as a first phase of an overall plan that strives for 6-9 months of treatment.

### Expedite Entry into Treatment

*The average time to wait for a TASC assessment is 2 weeks or longer.*

Long waits for assessment impact the jail and can have a detrimental affect on treatment. Closing this gap is addressed by having a better front-end information collection (reducing redundant data collection and pre-screening offenders); by expediting case processing in general (the TASC assessment timeline conforms to that of the PSI); and, in adding more assessment resource.

*The average wait for entry into outpatient treatment is 3-7 days; the average time to entry into residential treatment is 6-8 weeks.*

### Treatment Continuity

Participants in the in-custody alcohol and drug treatment program should *not* be moved back into general jail population at the end of the program.

*Not all inmates who exit jail after participating in the Starting Point program leave to continued treatment.*

There should be a mechanism to move successful participants from the jail treatment program to either a community residential or outpatient program in a step-down fashion.

### Cognitive Curricula

Research has shown that a cognitive-behavioral approach is fundamental to sustained reductions in recidivism. This approach addresses the thinking errors and rationalizations related to criminal activity, helps the person identify 'triggers' for relapse or criminal behavior, and works to develop individual strategies for change. It is based in role-playing and activities that help the person practice new behavior. This is in contrast to

programs that simply provide information, are grounded in 'talk therapy,' are designed to boost self-esteem, or that focus primarily or exclusively on environmental deficiencies (jobs, housing, etc.)

*The majority of Sonoma County programs surveyed indicated they are cognitive based.*

Where possible, program curriculum should be shared. Making use of the same cognitive skills curriculum across programs (one designed to specifically address criminal risk factors, for example), would provide continuity of treatment for offenders moving between programs, and offers a common language for treatment providers, probation officers, and offenders alike.

Some programs have been designed specifically for offenders and are worth reviewing. The Starting Point program is using one such program. Others that have been researched and proven effective include the MRT program, and a public domain cognitive program developed by the National Institute of Corrections (NIC).

**Sanction Policies**

Treatment programs are attuned to the need to provide incentives as well as sanctions, and all programs (and probation officers) were able to articulate a list of positive reinforcements used.

*Probation Officers had a wide range of responses to the question of whether treatment programs provided consistent responses to violations.*

The diversity of probation officer responses reflected program variability. Treatment providers noted diverse sanction strategies for first, second and third violations, ranging from warnings to program discharge for first violations. In part, this may reflect the different populations served in these programs. But it is worth more review.

In addition, programs most often noted a 2:1 ratio of sanctions to rewards. Criminal outcome research shows (as is the case in Drug Courts), the value of a higher ratio of rewards to punishments.

*There was interest among a good percentage of Probation Officers to strengthen the communication between themselves and the treatment community.*

**Specialized Services**

Specialized services are often hard to deliver within a system already stretched thin. Sonoma County can therefore be proud of its

accomplishments in providing a higher level of specialized offender services than many county criminal justice systems. These include:

- Specialized Probation Caseloads
- Dedicated Latino treatment
- Female-specific and Prenatal Treatment
- Domestic Violence Court
- Specialized DA Resources
- Vertical Prosecution

Female Offenders

Good work has been done in offering services tailored for particular populations.

*Probation Officers rated the availability of services for Female offenders as Average or Above Average.*

In Sonoma County, 15% of the Jail population is female. This reflects a national trend in increased numbers of female offenders incarcerated. The most recent national figures show that, while mid-year jail populations grew 2.8% from 2005 to 2006, the growth rate for females was almost two times as high

Sonoma County has a good start on addressing female specific issue. It has respected programs like Athena House and DAAC's Prenatal Treatment program.

The field is increasingly devoting attention to specialized assessment and services for female offenders. Most existing services have not paid enough attention to how to tailor their approaches. A start is simply to ensure that all programs provide the opportunity for female only sessions, as part of the larger curricula. Programs and probation offices that offer females an opportunity to form a safe support group report good outcomes.

Spanish-Language Services

A significant issue for Sonoma County is the provision of services for the Latino population. The need is real across all levels of the system.

The PSI unit struggles with the need for interpreters; TASC has one Spanish speaking staff; and SACPA has one Intake worker and one counselor who speak Spanish. There is limited treatment available for Spanish-speaking individuals, and this can lead to, what one probation officer termed 'cookie cutter' services. Spanish speaking domestic violence offenders have access to a bilingual treatment program.