> *building jail beds), results in a cost savings of $17 million. And, this does not factor in the significant reduction in operating costs for the non-jail beds.* [23]

As a result of the Sonoma County systems analysis this Report recommends planning for a multi-purpose Community Corrections Center. One that serve the needs of a sentence alternative for those now in detention; a sanction option for those with impending failure on probation or in outpatient treatment; pre-trial day reporting; and a selective, short-term stabilization option for those discharged from jail. A facility with 300+ beds would serve the county over the coming years. At this point in time the Sonoma County Jail houses 239 minimum security sentenced inmates and 81 medium security sentenced inmates. Shifting all minimum-security offenders and half medium security offenders to a Center would result in a 280-bed need. An additional 80 beds would be reserved as sanction and discharge planning beds. It is anticipated that the court along with Probation will selectively utilize the Center for some persons who the court today is placing on straight probation. Additional work is necessary with all the criminal justice agencies to determine the use of and size of the facility.

Note: For additional information on the Community Corrections Center see the Appendices.

Benchmarks

- Number Admitted (by referral source)
- Percent Successfully Complete
- Percent Rule Violations/Walk-away/New Crime
- Percent Employed at Release
- Percent Stable Housing at Release
- Percent Active in Treatment/Successfully Completed at Release

## V. Applying Evidence Based Practices

Evidence based practices target higher risk offenders and deliver tested services in a manner designed to yield the best outcomes. Recent research demonstrates the cumulative benefit of evidence-based practices.

Based on this research the following recommendations were advanced:

- Target the Higher Risk Offender
- Ensure Minimum Time in Treatment of 90 Days

---

[23] Example assumes per-bed jail construction costs of $100,000, and $50,000 per-bed costs for CCC. (700 beds x $100,000 = $70 million, compared with 350 beds x $100,000 and 350 beds x $50,000 = $53 million)

- Use Objective Risk Assessment Instrument
- Vary Treatment Intensity by Risk Level
- Expedite Entry into Treatment
- Ensure Treatment Continuity
- Make Cognitive Curricula the Centerpiece of Jail Programs
- Review Cognitive Curricula Used Across Programs
- Ensure Swift Sanctions

The average reduction in the expected recidivism rate for alternative programs is approximately 10%. However, programs that are of the highest quality, in terms of best practices, have been shown to reduce the expected recidivism rate by up to 30%.

> *For Sonoma County, building in different assumptions can test the impact of improved program outcomes. Taking the approximately 5,000 persons who were admitted to County alternatives over one-year (diversion, sentencing alternatives, specialty courts, substance abuse treatment) and assuming a 20% failure rate and an average subsequent length of stay in jail of 60 days, one can model different outcomes. For example, the difference between the expected failure rate, and a 30% improvement on that rate (20% recidivism versus 14% recidivism), is the difference between 165 ADP and 115 ADP (a savings of 51 ADP).* [24]

*Allocate Resources Based on Risk*

To have the greatest impact on recidivism, length of supervision and services provided should be clearly linked to an offender's risk level. Research has shown that programs that achieve the greatest reductions in recidivism share common characteristics:

- Allocate resources to higher risk
- Address at least 3 factors that are predicators of criminal behavior (substance abuse, attitudes, peers, employment, etc.)
- Provide treatment of at least 3 months duration
- Provide sufficient treatment intensity (structuring at least 40% of the person's week)
- Offer more rewards than sanctions
- Deliver programs that are cognitive- behavioral in nature
- Ensure staff are well trained
- Ensure program manager is experienced and has direct oversight
- Conduct program evaluations

---

[24] 20% failure rate results in 1000 returns to jail x 60 days =165 ADP; reducing this failure rate by 30% results in a 14% return rate: 700 returns to jail x 60 days = 115 ADP.

Jail Reduction Strategies
Chapter Six
Page 17

Importantly, it has been shown that the quality of the treatment appears to be as important as the content. Not only do the most effective programs triple the reductions in recidivism, but also ineffective programs have been shown to actually increase recidivism. [25]

The significance of targeting the higher risk offender is made clear in research that shows that not only do services for this population provide the greatest public safety return, but that intensive services delivered to low risk offenders can also serve to increase recidivism. [26]

Particular treatment models have been shown to be crucial for realizing long-term gains. Cognitive-behavioral approaches that address criminal thinking and help the person understand triggers for addictive/criminal behavior and develop relapse plans have proven most effective, providing a benefit to the system after accounting for treatment costs, of $ 10,299 per person. [27]

But treatment does not operate in isolation. Effectiveness also depends upon the availability of an empty jail bed to provide a quick sanction in response to program violation. And, the importance of a coordinated system approach has also been demonstrated. For example, outcomes for substance abuse treatment are improved when criminal justice staff works as a team with treatment. [28]

*Develop Coordinated Treatment/Supervision Plans*

The greatest reductions in recidivism are achieved by providing a balance of treatment and supervision. Surveillance-only or sanction-only approaches demonstrate no positive outcome. A review of 23 control-group studies of surveillance-oriented, intensive supervision showed zero positive effect. [29]

Recent research into evidence-based practices, conducted for the Washington State Legislature is instructive. It found that while intensive supervision alone yielded no reductions in recidivism, intensive treatment-oriented supervision resulted in an almost 22 percent reduction in recidivism. After accounting for the cost of supervision and treatment, the system cost benefits per person are estimated to be $11,563. [30]

---

[25] Lowenkamp, Christopher, Latessa, Edward, Holsinger, Alexander, "The Risk Principle in Action: What Have We Learned From 13,676 Offenders and 97 Correctional Programs?" Crime and Delinquency, Vol. 52 No. 1, January 2006.
[26] Ibid, Lowenkamp
[27] Ibid, Aos
[28] NIDA (July 2006)"Principles of Drug Abuse Treatment for Criminal Justice Populations."
[29] Aos Steve, Miller Marna, and Drake Elizabeth (Oct. 2006) ,"Evidence-Based Adult Corrections Programs: What Works and What Does Not," Washington State Institute for Public Policy.
[30] Ibid; Aos.

Research has also shown that it is the swiftness and certainty of the sanction that is important, not the severity. An Oregon Department of Corrections study of sanctions confirmed this in a study that matched offender groups by risk level and delivered sanctions of different types and length. They found similar rates of re-conviction for high-risk offenders regardless of time in jail; for most medium risk offenders longer stays in jail were associated with higher recidivism; and, overall, community sanctions yielded lower reconviction rates.[31]

*Train Staff in Motivational Interviewing*

While most research on evidence-based practices has focused on the properties of effective programs, recent research is paying attention to the *quality of the interaction* between staff and the offender. Evidence suggests that the quality and nature of the interaction is as important as the program itself. This should not be surprising.

As a result, community corrections agencies are taking steps to train staff in motivational interviewing skills. This approach substitutes confrontational interactions with a model in which communication clear, respectful, and constructive.

Research is also finding that the degree of recidivism reduction is associated with other staff-related qualities such as the education and experience of the Director and the degree of staff oversight.

*Strengthen Mental Health Services*

The field has identified some evidence-based practices for the mentally ill. Federal grant dollars for corrections mental health diversion programs now require jurisdictions to build programs in accordance with approaches known to yield sustainable results. These include:

- ❖ Assertive case management
- ❖ Medication management and access
- ❖ Dual-diagnosis treatment
- ❖ Housing placement
- ❖ Vocational training
- ❖ Family Services

---

[31] Oregon Department of Corrections (Sept. 2002), Structured Sanction Study (paraphrased)

Jail Reduction Strategies
Chapter Six
Page 19

The key is to provide an integrated approach. Recent evidence from more than a dozen studies shows that comprehensive, integrated efforts reduce substance abuse, mental health symptoms and re-arrest.[32]

*Jail discharge planning* also holds promise. Providing immediate and concrete assistance is the key. As one example, a recent study found that those persons with mental illness who had Medicaid benefits upon release from jail had, on average, 16 percent fewer subsequent detentions over the following year than those who were released without Medicaid.[33]

*Mental Health Courts* and Assertive Case Management Programs have also demonstrated a real potential to lower the impact on jails and hospitals. A new study on the San Francisco Behavioral Health Court found that, 18-months after program completion, participants had a 39% lower risk of being arrested for a new offense, and a 54% lower risk for committing a violent offense than a comparable group booked into the jail that did not participate in the specialty court.[34]

Untreated mental illness has a tangible effect on jails. Defendants with low-level charges who recycle through the jail (*'frequent fliers'*) are usually individuals who are struggling with chronic and untreated mental illness, homelessness, and other complex issues. In an effort to document the impact of this population on the jail, a county in Oregon (Multnomah County) took a closer look at their top 20 'frequent fliers.' These 20 individuals had spent a combined 12,712 days in jail, or 35% of each year on average behind bars; 30% had a serious psychiatric diagnosis; all had extensive drug records; and the county had spent, on average, $70,000 for booking and jailing each of the top 20 over a five-year period.

## VI. Continued Expansion of Drug Court

One program that incorporates many of the elements of research-based practices is *Drug Court*. A recent analysis of the Multnomah County Drug Court (the second oldest program in the nation) tracked 11,000 drug court eligible offenders over a 10-year period. Results included significantly reduced recidivism for drug court participants up to 14 years after program entry compared to eligible offenders who did not participate. The incidence of re-arrest was reduced by nearly 30% for drug court

---

22. Osher, F.C. (2000), "Co-occurring addictive and mental disorders." In Mental Health, United States, Washington, DC: Center for Mental Health Services, 91-98.

[33] Morrissey, Joseph P. "Medicaid Benefits and Recidivism of Mentally Ill Persons Released from Jail," May, 2006. NCJ 214169

[34] American Journal of Psychiatry, "Effectiveness of a Mental Health Court in Reducing Criminal Recidivism and Violence," 164: 1395-1403, September 2007.

participants. System costs for persons in the drug court were $1,392 less than the costs for 'business-as-usual' cases. [35]

More generally, substance abuse treatment, in its many forms, has been shown over and over to be a good investment. A study of 44 treatment programs in California across 13 counties revealed that for every dollar spent on drug treatment yielded $7 in savings: a collective savings in health, criminal justice, welfare, and work productivity. [36]

<u>Benchmarks</u>

It is recommended that programs begin to collect the kind of detailed information about clients, services, and outcomes that will allow meaningful analysis. In addition to outcome data, a quality control protocol should be developed that is designed to assess the extent to which a program is conforming to evidence based practices (program intensity, ratio of rewards to sanctions, number of crime contributing factors addressed, staff qualifications, use of cognitive models, etc.)

Basic data for tracking outcomes includes the following

- Number of Admissions by Risk Level
- Average length of Stay
- Number of Jail Days Used as Sanctions
- Percent Successful Program Completions
- Re-arrest/Conviction by Exit type and Risk level

## VII. Conclusion

Any attempt to calculate actual jail bed-day savings by improved efficiencies is subject to the caveats already mentioned: the system is dynamic; improvements in processing may lead to an increase in cases adjudicated; and system changes outside a jurisdiction's control may undermine any gains.

The implementation of a successful Community Corrections Center will initially result in persons being sentenced to the facility who would have otherwise been placed on probation. If the proper selection process is used, the persons entering such a facility are those who would have otherwise failed on probation, resulting in new crime and/or violations that return the offender to jail. Thus the presence of the facility will result

---

[35] Finigan, Michael W. et. al, "Impact of a Mature Drug Court Over 10 Years of Operation: Recidivism and Costs (Final Report)," July, 2007, U.S. Dept. of Justice.
[36] The California Treatment Outcome Project (CalTOP) Final Report, Sept. 2002.

in an increase in prisoners incarcerated; however over time the impact will be positive.

Furthermore, experience teaches that it is usually sweeping policy changes that alter the trajectory of upward growth in jails: consider Proposition 36 in California. Even then, other system changes can easily undo any of the realized savings.

Sonoma County has, however, an opportunity to make significant system changes that should go a long way toward managing its jail population. The implementation of these measures should allow it to select a lower end of the growth trend for facility planning.

# Sonoma County
# Corrections Master Plan

## Appendices A-J

# *Appendices*

# Table of Contents

**Appendix A**: Proposed Pre-Trial Program............... 3

**Appendix B**: Probation Officer Survey (Barriers to Treatment)......................................................... 6

**Appendix C**: Probation Officer Survey (Treatment Availability Rating) .............................. 6

**Appendix D:** Probation Officer Survey (Need by Caseload Type) ....................................................... 7

**Appendix E**: Probation Officer Survey (Service Gaps) ................................................................... 8

**Appendix F:** Probation Officer Survey (Jail Program Recommendations).................................... 9

**Appendix G:** Treatment Provider Survey (Unmet Needs) .................................................................. 10

**Appendix H:** Persons Interviewed for Project......... 11

**Appendix I:** Alternative Program Descriptions. 13

**Appendix J:** Forecast Notes ................................ 16

# Appendix A: Proposed Pre-Trial Program
# Sonoma County

## (Budget Estimate)

The budget outlined below is a preliminary estimate of the costs associated with operating a comprehensive Pre-Trial Services program in Sonoma County. This budget should be viewed as a Draft. It is intended only as a starting point for further discussion.

| Administration (3fte) | FTE | Salary | Total |
|---|---|---|---|
| Program Manager: | 1 | $157,000 | $157,000 |
| Clerical 2 | 2 | 76,909 | $153,818 |

| Intake (12fte) | FTE | Salary | Total |
|---|---|---|---|
| Release Assistance Officers | 8 | $118,768 | $950,144 |
| Intake Support | 2 | $ 76,909 | $153,818 |
| Supervisors | 2 | $135,445 | $270,890 |

| Supervision & Tracking (13fte) | FTE | Salary | Total |
|---|---|---|---|
| Supervision Officers | 10 | $118,768 | $1,187,680 |
| FTA Track/ROR Notify | 1 | $76,909 | $ 76,909 |
| UA Testing | 1 | $76,909 | $ 76,909 |
| Supervisor | 1 | $135,445 | $ 135,445 |

| | | | |
|---|---|---|---|
| Staff Total | 28 FTE | | $3,162,613 |
| (Less Existing Staff) | (9 FTE) | | $1,023,426 |
| New Positions | 21 FTE | | $2,139,087 |
| One-Time Cost (risk tool validation) | | | $ 50,000 |
| **TOTAL NEW PROGRAM COSTS:** | | | **$2,189,087** |

# Proposed Pre-Trial Program: Budget Notes

The preliminary budget represents a 24 hour, 7-day per week Pre-Trial program that is fully operational and staffed with sworn peace officers. The staffing anticipates a 600+ per day caseload.

Administration
The *Program Manager's salary* reflects that of the existing Pre-Trial Manager's position. Given the task of implementing a whole new organizational approach to conducting Pre-Trial Services, jurisdictions often decide to create a new position to oversee the entire operation and then go through an open hire process. In this case the Manager's salary would need to be competitive to attract a professional Pre-Trial Manager; one who had operated a comparable sized program within a criminal justice system model.

Intake
The number of *Release Assistance Officers* is based on approximately 55 bookings per day. Two *Intake Support* positions provide assistance in reviewing criminal history databases. For the purposes of this budget these positions have been funded at the level of a clerical worker. The 2fte *Supervisors* are responsible for quality control, reviewing release decisions, attending court sessions, and assisting with other work tasks.

Supervision and Tracking
The 13 staff positions in this unit are based upon an assumed 600+ caseload, divided between high, medium, and low risk cases. One position is targeted for a specialty caseload of mental health clients.

The staff per case ratio is premised on the adoption of a new model of pre-trial supervision: one that shifts from an intensive, high-end probation supervision model (30 cases per officer and field visits), to one that reflects a model more often found in Pre-Trial programs operated by courts across the country. This model is less intensive, and relies on office-based techniques, and emphasizes those specific tasks associated with court appearance and compliance.

Under this model one would not expect defendants to be assigned to treatment programs, nor would defendants be monitored in the field. Under a structured pre-trial risk model, defendants who require such a high level of intensive monitoring may not be appropriate for release.

A pre-trial risk assessment instrument structures supervision intensity, with the lower end of the spectrum (30 cases: now the standard for all pre-trial cases in Sonoma County) reserved for a select group of pre-trial defendants with more complex monitoring and tracking issues: such as the mentally ill, where cross-agency coordination and issues like medication monitoring requires this level of

intensity. Domestic violence cases, with the need for on-going communication with the victim, are another example where smaller caseloads might be warranted.

Under the proposed model, the average caseload would be closer to 50-60 cases: the same as the caseload carried by Sonoma County Probation Officers with intensive or specialized cases.

The Supervision and Tracking unit includes one staff for court date notification, *FTA tracking* and re-scheduling.

The Supervision and Tracking unit includes one *staff for UA testing*. Given the level of testing that is settled on, this resource might need upward modification.

Costs were included for risk tool *validation*. This is the statistical process to test the validity of the risk factors that make up the pre-trial risk tool. An outside consultant with expertise in this area is often hired.

Not Included in the Budget

The cost of automated case tracking *software* varies, depending on the vendor selected, the number of monitors purchased, and whether it includes add-on features such as customized case management programs for other operations, such as drug court and other specialty courts. Sonoma County can decide whether to develop something in-house or to purchase an off-the-shelf product.

A position that was not budgeted was a *Victim Services* Specialist. In some jurisdictions the District Attorney's Victim Services unit provides the support to interview victims of violence as part of the pre-trial review before first appearance. If this is not feasible, then this position would need to be budgeted as well.

*Capital and Operating* expenses are not included.

# Appendix B: Probation Officer Survey (Barriers to Treatment)

SONOMA COUNTY
<u>Barriers to Treatment</u>
(As noted by Probation Officers)

- Lack of money for treatment
- Denied treatment because not motivated/denial of substance abuse issue
- Denied treatment for violence
- Lack of appropriate treatment intensity (sex offenders need residential)
- ICE holds
- Nature of charges makes ineligible for TASC
- Out of custody difficult securing treatment
- Lack of transportation to treatment
- Not a county resident

*Source: Probation Officer Survey (6-07)*

# Appendix C: Probation Officer Survey (Treatment Availability Rating)

SONOMA COUNTY
<u>Probation Officer Rating of Treatment</u>
(Treatment Availability)

- ❖ Female Specific Treatment: Average
- ❖ Spanish Language Treatment: Below Average
- ❖ Dual-Diagnosis Treatment (mentally ill): Poor

*Source: Probation Officer Survey (6-07)*

# Appendix D: Probation Officer Survey (Need by Caseload Type)

## SONOMA COUNTY
### Probationer Access to Alcohol and Drug Treatment
(Percent Caseload Need/Percent Access)

| Caseload Type | % Clients Need Treatment | % Access Treatment |
| --- | --- | --- |
| DV | 85% | 50% |
| DV | 90% | 60% |
| DV | 90% | 70% |
| DV | 60% | 25% |
| Felony | 80% | 75% |
| ISP | 100% | 70% |
| ISP | 100% | 90% |
| ISP | 95% | 50% |
| ISP | 80% | 80% |
| ISP | 95% | 90% |
| Mental Health | 100% | 90% |
| Gang | 10% | 1% |
| Sex Offender | 10% | 8% |

*Source: Probation Officer Survey (6-07)*

# Appendix E: Probation Officer Survey (Service Gaps)

## SONOMA COUNTY
### Probation Officer Input on Treatment

- "Need more treatment between outpatient and long term residential"
- " 31 + day treatment program is too short"
- "It is very difficult to place offenders who do not qualify for TASC into appropriate treatment."
- "Need to raise the intensity of treatment in most programs"
- "Need immediate, frequent, short-term, treatment consequences"
- "Lacking employment and vocational skill training"
- "Need medications for low-income mentally ill"
- " Need residential treatment programs for small percentage of sex offenders"
- "Need drug free housing"
- "It would be nice to have more available services that offer something in between outpatient treatment and long term treatment."
- "Need more long-term treatment; some programs too short."
- "Need safe, secure, short term housing (1 to2 weeks)
- "Better communication with treatment providers: need notification of failure"
- "Need low-cost and no-cost treatment"
- "Need access to child care, family court (mediation)"
- "Psych. Evaluations and medication"
- "Need residential treatment for sex offenders and violent offenders"
- "Residential for Spanish speakers"
- "Need to reduce wait times for treatment and treatment barriers"
- "Some residential treatment has warehouse feel: too many clients"
- "Need in-jail programs for sex offenders"
- "Would like more Starting Point treatment in jail; and need Starting Point at main facility"
- "Medication for defendants with mental health issues"
- "Need substance abuse treatment in jail for Spanish speaking"
- "Would like more focus in jail on job preparation and anger management."

*Source: Probation Officer Survey (6-07)*