# Appendix F: Probation Officer Survey (Jail Program Recommendations)

## SONOMA COUNTY
### Probation Officer Input on Jail Programs

- Additional or increased treatment for drug and alcohol and mental health issues
- Expand Starting Point
- Job training, housing search plan
- Female drug treatment (note: Jail has since added female Starting Point)
- Sex offenders are not able to do AA/NA while in Jail because of classification/housing
- Sex offender group treatment: even holding a group in the lock-down unit bi-weekly might be helpful
- Treatment for Spanish speaking
- Anger management
- Starting Point program at Main Jail

*Source: Probation Officer Survey (6-07)*

## Appendix G: Treatment Provider Survey (Unmet Needs)

Treatment providers were asked, "If additional funds were available, how would the program recommend they be directed?"

- "Need Intensive Outpatient treatment for men"
- " More Cultural activities"
- " Improve access to ancillary services: employment, housing, transportation, and childcare"
- "Better salaries for counselors to reduce turnover"
- "Outpatient services are only offered for clients with Medi-cal, referral from TASC and SACPA or CPS, or with ability to pay.
- "Every day we are turning away clients in outpatient, residential and methadone programs: persons who want treatment but don't have their own funds. People should not be in a situation where the quickest way to get treatment is to commit a crime."
- "Improve curriculum, targeted at a criminal justice population"
- "Need dual diagnosis services and access to opiate detox options."
- "Add staff to reduce client load"
- "Programs are too short"
- "Not enough services available for clients before they get caught"
- "Most clients need mental health services and on-going mental health treatment including individual counseling by a mental health professional. To even get a mental health evaluation for medication can take months"
- "Perhaps hire a vocational counselor"
- "More trainings"
- "Physical facility rehab."

*Source: Treatment Provider Survey (6-07)*

# Appendix H: Persons Interviewed for Project

In the course of this project, Donna and I met with the following individuals — and many more. We appreciate the time they took to meet, and their thoughtful input.

- John Abrahams, Public Defender
- Summer Alston, Probation Department (MH caseload)
- Ann Batiste, Probation Department
- Jo Benwell, DHS, Jail Program Manager
- Catherine Boyd, Deputy Probation Officer IV
- Karen Boyle, Probation Dept. (Bail Investigations)
- Claudia Brennan, Manager of Outpatient Services, AODS
- Nigel Brown, AODS Analyst
- Chief Judge Robert Boyd
- Judy Brubaker, Jail
- Georgia Burland, Court Homeless Protocol Project
- Stacey Carlo, Deputy Probation Officer
- Michelle Carstensen, DV Counselor, DA Office
- Bill Cogbill, Sheriff
- Christine Cook, DA
- Supervising Criminal Judge Elliot Daum
- Maureen Donaghue, Residential Program Manager, AODS
- Art Ewart, Director, Mental Health Services, DHS
- Sheralynn Freitas, Assistant Director, Probation Dept.
- Mario Guerrero, DHS Discharge Planner
- Gino Giannavola, Director AODS
- Ken Hightower, ISD
- Mike Livenspargar, ISD
- Kim Gilmore, ISD
- Andriya Glessner, CHDC
- Dianna Gomez, DA Office
- Christine Cook, DA Office
- Denise Gordon, Court Executive Officer
- Michael Cline, Deputy Court Executive Officer
- Lacey Green, DA Victim Services
- Teresa Guerrero, Probation Dept. Senior Officer (SOR)
- Michele Hoff, Probation Department
- Denise Hunt, Section Manager, DHS

- Gayle Reeder, Probation Dept.
- Sheralynn Freitas, Deputy Director, Probation Department
- Linda Jenkins, Supervisor, Probation Dept. (SOR)
- Mike Kennedy, Mental Health Section Manager, DHS
- Charlie Klipp, Info.Systems Coordinator, Probation Dept.
- Ruth Lincoln, Assistant Director Dept. Health Services
- Angelia Linville, Deputy Probation Officer
- Mike Livenspargar, ISD
- Sean McDermott, Assistant Sheriff
- Sarah Moore, AODS Analyst
- Tom Newell, Manager TASC
- Cammie Noah, Inmate Services Coordinator, Sheriff Dept.
- Bob Ochs, Chief Probation Officer, Probation Department
- Stephen Passalacqua, District Attorney
- Vicci Persons, Sheriff Office
- Debbie Pope, Drug Court Coordinator
- Dr. Steve Rainch, Psychologist
- Gale Reeder, Assistant Probation Director
- Marsh Rose, AODS Counselor, TASC
- Rita Scardaci,Director of Health Services
- Kenny Scott, AODS Counselor, Starting Point Program
- Larry Scoufos, Assistant District Attorney
- Michael Spielman, Director DAAC
- Valerie Starkey, Probation Departmnet
- Linda Suvoy, Assistant Sheriff
- Tammy Thompson, Probation Dept. Supervisor (PSI)
- TASC Case Managers: group meeting
- Bob Turner, Probation Department
- Michael Waldorf, Deputy Officer IV, Probation Dept.
- Derrick West, AODS Analyst
- Judge Carena Wong
- Bob Deis, CAO
- Jennifer Murray, Deputy County Administrator
- Don Schwartz, Analyst
- Terri Saunders, Analyst

# Appendix I: Alternative Program Descriptions

The following is a brief description of the Alternative to Jail Programs in Sonoma County which were referenced in the Master Plan.

## Adult Diversion Services

Adult Diversion Services, managed by the California Human Development Commission (CHDC), is a pre-filing program for first-time misdemeanor offenders. Offenders who participate are provided life skills, counseling, and other treatment and drug education services.

## BASN

Treatment services for State parolees.

## Citation Release

Inmates with low-level charges are released from the Jail by the Sheriff's staff on citation release and told to appear in court. This is a jail population management mechanism.

## County Parole

Eligible inmates who have at least two weeks remaining in their sentence may apply for early release consideration. Those released from jail serve the remainder of their term in the community under probation supervision. The program is managed by the Probation Department.

## Deferred Entry of Judgment (DEJ)

This is a post-plea, substance abuse diversion program for adult misdemeanor and felony drug offenders. The program, designed to last 6 months, is offered to first-time offenders and provides drug education, counseling and treatment. The defendant must enter a plea of guilty prior to participation in the program. The Court then defers entry of judgment contingent upon the defendant's completion of the program. Upon successful completion the Court dismisses the charges against the defendant. The program requires at least 100 hours of drug education and/or counseling, drug treatment (when appropriate), random drug testing, monthly monitoring, case management, etc. The program is operated by the California Human Development Commission (CHDC) and supported in large part by offender fees.

## Domestic Violence Court

This specialty court was started in Sonoma County in 1998 and is a collaborative effort between the District Attorney's Office, Public Defender's Office, Probation Department, the Sheriff's Department, and the Courts. The objective is the early resolution of cases, the provision of

more comprehensive services, and enhanced accountability for the offender. Offenders are mandated to attend a 52-week batterers counseling program and program compliance is monitored through frequent court reviews.

## Drug Court

This specialty court program is designed to treat adults who are charged with non-violent crimes and have a substance abuse problem. A team approach is used to monitor the defendant and to make on-going adjustments to the case plan. The program is a comprehensive, long-term treatment option that provides immediate sanctions for non-compliance. It is a collaborative effort between the District Attorney, Public Defender, Alcohol and Other Drug Services, and the Court.

## Educational Sentencing Program

This is a program offered by CHDC, designed as a condition of sentencing or sentence alternative, and is open to all misdemeanor and felony offenders deemed appropriate by the Court. The program focuses on life skills, as well as addressing issues of addiction, impulse control, and other factors contributing to criminal behavior.

## FACT Program

The program is an intensive, team case management model that provides 24/7 services to up to 50 mentally ill offenders. Funded by the Mental Health Services Act (MHSA) the new program is being modeled on a prior county Forensic Assertive Community Treatment (FACT) program. The program is overseen by the County Mental Health.

## Pre-Trial Supervision

The Probation Department provides pre-trial monitoring and supervision for defendants released from jail prior to trial and referred by the Court.

## Project Intercept

This is a pre-adjudication, sentence alternative designed for most misdemeanor offenders, with referrals approved by the District Attorney. Participants are engaged in an array of programs tailored to their individual needs. The program is operated by the California Human Development Commission (CHDC)

## Residential Treatment

Orenda Center: AODS operates the Orenda Center which has short-term residential treatment and a Detox unit. Some of the residential beds are set aside for exclusive use by an offender population.

Contract Beds: AODS contracts for residential treatment beds in the community with non-profit agencies. Contracts and available services, on a fee-basis, include: Athena House, Turning Point, and Henry Oloff House.

## Outpatient Treatment
Orenda Center: AODS provides outpatient treatment for corrections clients.
Contract and Community Slots: Other resources in the community include: CHDC Outpatient Services; CHDC Intensive Outpatient Treatment; Campobello, DAAC, and Indian Health.

## SACPA (Prop. 36)
SACPA went into effect in California in 2001. The Act requires that drug treatment be offered to any person convicted of a non-violent crime (first or second offense) involving drug possession or being under the influence of drugs, or a drug related violation of probation or parole. State funds support the program.

## Starting Point
This in-custody treatment program is available for inmates who are waiting placement in community residential treatment, or who volunteer for the program. Both AODS and the Sheriff oversee the program.

## TASC
The Treatment Accountability for Safer Communities (TASC) program provides assessment, placement and case management services for offenders. Case management is offered for clients who are waiting treatment placement and then again in an aftercare phase once formal treatment is completed. In the interim, TASC monitors the case. Assessments conducted in the jail, and on a walk-in basis in their office, form the basis for treatment referrals. The service is overseen by AODS.

## Work Furlough
Sentenced inmates are released to work during the day and return to the Jail at the end of the workday.

## Work Program
This is an alternative sentencing program (in lieu of jail) that substitutes an 8-hour work crew assignment for each day sentenced to jail. The program is overseen by the Probation Department.

# Appendix J: Forecast Notes

## Selecting the Key Indices for Forecast Scenarios

Jail forecasting is not an exact science. An examination of the data and an understanding of the assumptions is only the first part of the process.

A willingness to implement new programs along with policies and procedural changes will help to refine the numbers. But there are SO many variables that ultimately will influence the number of people in jail; this can only be used as a guide that needs to be updated regularly.

The steps in selecting indices and constructing a scenario can be described as follows:

1. <u>Constructing Scenarios</u>:
   a. Plot 20-year trend in Admissions and Average Length of Stay (ALOS)
   b. Select an Admissions Rate and ALOS to factor into forecast scenarios based on an examination of averages for each, over various time intervals (20 years, 10 years, 5 years, last year). The goal is to select averages that capture variability seen over the study period. This process of selection brings together the benefit of quantitative information and best professional judgment.
   c. Factor in expected county population growth
   d. Adjust for peaking and classification
   e. Construct Scenarios

2. <u>Selecting a Scenario</u>:
   As a starting point, a county can select the mid-point of a forecast range. In the case of Sonoma, that would be 1725.

3. <u>Testing the Scenario</u>
   Settling on the mid-point of a forecast range depends next on an analysis of factors expected to impact this number: for better or for worse. A county needs to decide whether to increase or decrease the mid-point on the forecast based on this discussion. For Sonoma, one way to look at this is as follows:

*Factors that could increase projected need:*
- Uncertainty regarding prison reform
- Booking Fee policy changes
- Population increase
- Increases in gang activity and corresponding violent crime

> If these changes resulted in a 15% increase in capacity, the county would need to plan for 1983 beds.
>
> *Factors that could help off-set projected need:*
> - Implementation of Pre-Trial Services and Early Case Resolution
> - Community Corrections Center
> - Implementing Quality, Evidence-Based Programs
>
> To manage the Jail at the mid-point forecast, the county needs to take significant steps in implementing new efforts: steps that, taken together will help off-set any expected increases.

We can take a closer look at the major variables that are tracked to document changes in jail use over time: Admission Rates, Average Length of Stay, and County Population. Examining these alone, as well as their relationship, assists in the detection of jail use patterns and trends. For example:

### Admission Rate

One example is the observed changes in Admission Rates. The analysis revealed that Admissions have been relatively flat since 1992 (following the huge drop due to booking fees) until 2003 when an increase in admissions began which has continued through 2007.

One explanation for this may be the changing policies for booking fees. The state is assuming much of the costs that the cities have had the responsibility for, negating the need for individual departments and/or officers to consider the expense when making a decision about whether to book or cite a defendant.
Certainly, the historical data shows the precipitous drop in Admissions when booking fees became a city responsibility in the early 1990's: resulting in a precipitous 20% drop in Admissions (4,000 Admissions).

Standing back and observing the larger trend, one concludes that Admissions are increasing. This fact is reflected in my recommendation for the selection of a mid-range forecast with a higher admissions rate than the system is seeing currently.

### Average Length of Stay

Another trend to attend to is the changes in Average Length of Stay. The analysis reveals that, since 2000, ALOS has been dropping. Again, a jurisdiction should try to determine whether these patterns can be understood in the context of obvious shifts in policy or practice.

In this case, a partial explanation is that, as admissions have increased there are more persons being brought in for minor offenses that stay in

jail for shorter periods of time. Another consideration is that as the jail is always close to the cap, it puts increasing pressure on the Sheriff to cite and release prisoners. While the failure rate is high, these are prisoners who are released in a matter of hours, bringing down the average length of stay.

It is my goal to focus system improvements on reducing the average length of stay. Pre-Trial Services and Early Case Resolution are just two examples of programs that, in combination, will reduce the average length of stay.

Continual monitoring of the data will allow the county to make modifications to the forecasted need over the years. And, the county can work on strengthening the types of data available to inform this analysis. Currently, for example, we do not have good length of stay data by prisoner status. This is a goal of the recommended data warehouse.

In the meantime, for the reasons already stated, I recommend selection of a mid-range forecast.

### Other Factors

Other factors that are considered in making this decision include: evidence of pent-up demand (housing inmates in other facilities, truncated sentences, etc.), changes in program availability, shifts in sentencing philosophy, changes in law enforcement practices, trends in evidence of gangs and offenders with violent charges (that result in longer sentences), changes in the number of judicial staff, etc.

As you can see, the multiple factors do not lend themselves to a formula; and any attempt to quantify the impact of a single program or policy is usually futile. (The exception is shifts in policy, like the booking fee, that represent a uniform and large-scale change.)

It should also be noted that the complex and interactive nature of these variables means that added precision does not necessarily increase jail forecast reliability. As an example adding a break-out of county population by age cohorts does not necessarily add more precision or reliability: for either predicting crime trends, or jail needs. As an example, a study regarding crime trends nationally and in California concluded, with respect to the role of changing age demographics:

> *"It appears that the crime rate decrease in the early 1980's was largely driven by demographics; the number of juveniles (17 years of age and under) and youths (18 to 24 years of age) in peak crime-prone ages decreased markedly. In contrast, it seems that the crime rate decline from*

> *1991 to 1999 had very little to do with demographics since the number of individuals in crime-prone ages changed very little from year to year.*[1]

## Adjusting the Forecast for Peak and Classification

A peak factor is added to jail forecasts to account for the high-end of population counts. We can't build for the absolute peak, but need to work towards an average. This is not an exact science and simply adds an additional number of beds into the equation for the purposes of managing the population.

The classification factor is based on adding a number of beds per classification category to allow for the flexibility needed to house discreet inmate populations. I will continue to discuss these issues with the Sheriff's Office.

## Factoring in Policy Changes

For the reasons stated above, any attempt to model the impact of single programs or policies is doomed to failure. Policies shift and programs change; and no single policy change or new program can be predictably counted on to sustain changes in the jail.

For this reason my focus is on working with counties to adopt population management *strategies* that improve system decision-making, and increase efficiency and effectiveness. Taken together, the adoption of these approaches assist a county in the continuous adjustments needed to manage a jail population.

The importance of these management tools becomes crucial when we consider the possible repercussions of the Prison Reform litigation: there could be profound changes in state policies that will impact the county. For example, if the federal court places a cap on the state prison, not only will it result in the release of a number of prisoners back into the community, that will result in failures that have to be processed by the local system, it also could result in the state backing up prison bound offenders in the county jail system. All of that goes into my thinking for a mid-range forecast with continual monitoring of the situation.

This cuts both ways. On one hand there is the situation discussed above that results in more bookings. However, with the implementation of the Pre-Trial Services and Early Case Resolution programs, there will be fewer failures resulting in fewer defendants being returned to jail. It will take time to realize those savings and it will be at least partially offset by

---

[1] Marowitz, Leonard, "Why Did the Crime Rate Decrease through 1999? (And Why Might it Decrease or Increase in 2000 and Beyond?), Criminal Justice Statistics Center, California Dept. of Justice, Dec. 2000.

the above issue. Again, a mid-range number takes that into consideration and then needs continual monitoring.

The Master Plan recommends a focus on four main areas as a way to impact the Jail: Pre-Trial Services, Early Case Resolution, a Community Corrections Center (CCC), and Evidence-Based Alternatives.

A good example of the difficulty in precise impact analysis is the CCC. Although it is planned as a cost-saving measure, the availability of this new resource can, if the county is not careful, result in net-widening.

The CCC is designed for a number of functions as discussed in the report. Clearly, it will house a number of inmates who are currently housed in North County as well as the Main Jail. *Simply the presence of the facility will result in more persons being sentenced to the CCC than would have otherwise been sentenced to jail.* Included in this group are higher-risk defendants currently placed on probation that if there were such a facility the court and/or probation would require a stay by the defendant.

While there is no doubt that this has implications and might be viewed as net widening, it is not necessarily the case. Many of these clients would have failed probation by either not successfully completing the terms and conditions set forth in their sentencing order and/or by committing new crimes. If there is a more significant intervention and proper structure (CCC), this will reduce the number of failures who would have returned to jail. Once again, it is IMPOSSIBLE to quantify.

Again, putting in place the proper data collection routines, having the proper review of the data by system officials resulting in the necessary adjustment of policies is critical. The implementation of the risk instrument discussed in the report is also necessary to assure that good decisions are made about program placement.

### Selecting a Scenario

In summary, given the pending impact related to **Booking Fees** and the continued upward trend in Admissions, I expect to see Admissions rising.

The other factor that must be given weight is the level of uncertainty regarding the direction the **Prison Reform Litigation** will take, and how this impacts the Jail.

Yet another factor is the upward trend in **Admissions** rates, in addition to the expected increase in **County Population**.

These three aggravating factors would lead to a conclusion to select a higher end of the forecast scenario range.

On the other hand, I do think that we can positively impact the average length of stay by implementing the **Programs/Procedural Changes** recommended. As such, I would begin planning for a mid-point of an Admissions Rate of 4500 and an average length of stay of 22 days resulting in the need for 1,725 beds.

## Sonoma County Alternatives Synopsis

| | Pre-trial | Diversion/Sentence Alternatives | Treatment | Jail Alternatives | Specialty Courts | Adjudication |
|---|---|---|---|---|---|---|
| Target programs | Pre-trial Services | Project Intercept, Adult Diversion Services, Deferred Entry of Judgment (DEJEP), Educational Sentencing program (ES), Work Program, and Secure Community Confinement | In-custody programs, In-Custody treatment (Starting Point), Out-patient, Community Residential, SACPA, TASC | Probation, Jail Step-Down Option, County Parole, Discharge Planning | Drug Court, Domestic Violence Court | Court case processing, Jail utilization |
| How it was evaluated | Release rates*, release types*, FTA and rearrest rates*, release-by-charge*, time in custody*, prior arrests by release type*, domestic violence release processing*, etc. | One-year Admission numbers, *Project Intercept referrals by charge type, ADP in programs | *Treatment snapshot, *Referral analysis, *TASC reason for denial, *Program characteristics (interviews and surveys), *Analysis of gaps and coordination (probation survey), *Starting Point exit data, *Program capacity/adp, Expenditure and revenue source data, DUI admisssion data, Detox admissions and exit types, *Participant profile data, *Participant legal status, *Evidence based practices, Review of state outcome study, TASC caseload size review, Program discharge data, Jail program type and number of participants, etc. | *Referral and acceptance rates for County Parole, review of available probation caseload data, review of available discharge program data | *Jail sanction data (drug court), drug court admissions, adp, profile, discharge status, percent SACPA, percent in residential, *time to entry, number graduates, completion rates, completion within one-year. | *Inmate case processing study: process times (by charge, detained/released, fta/no fta, assignment of counsel, case attrition, filing rate, diversion/sentences, % sentenced to jail, avg. jail sentence length, etc.) |
| Strengths | Supervision services in place, screens for work release eligibility, placed within innovative probation department | Range of services (work release, work furlough, etc.). Numbers served, Specialized alternative (FACT). | Range of treatment, in-custody program, residential, good completion rates for SACPA, TASC, high number of participants also receiving intensive supervision | Progressive probation department, effort to lower caseload size, specialized supervision, provisions in place for jail step-down through County Parole, discharge planning program | Drug Court has comprehensive services, conservative use of jail sanctions, rewards, good treatment intensity, strong court commitment; DV Court has strong involvement of victim services, high level of supervision services, higher than average completion rates. | Vertical prosecution, steps taken for ECR, commitment of system to implement new procedures |

| | Pre-trial | Diversion/Sentence Alternatives | Treatment | Jail Alternatives | Specialty Courts | Adjudication |
|---|---|---|---|---|---|---|
| Weaknessnes | Lacks essential services: No front-end interviewing or assessment of risk, No screening for defense eligibility, No drug court/diversion screening, No routine population review for bail hearings, No FTA investigation, etc. Lack of comprehensive services evident in high pre-trial failure rates. Lack of timely information for pre-trial from courts. No automated case management.   Use of citation releases, system over-reliance on surety releases | Underutilization of some programs, lack of data | Resources not allocated by risk, self-referrals, motivation reason for exclusion, access to residential through jail (some offenders have had to return to custody to access treatment), no planned step-down from Starting Point to intensive outpatient, low relative numbers of intensive outpatient, difficult access to treatment for violent offenders, need for improved continuity for detox, need ensure evidence based practices (risk based, duration, intensity, cognitive), etc. | Lack of objective risk assessment, Underutilization of county parole, inmate initiates request for participation, time to complete pre-sentence investigation, lack of comprehensive data | Drug Court not at capacity, outcome data needed for both courts, of DUI Court in planning phase, limited number of mentally ill served (in FACT program) | Case attrition, case processing times, conviction rate |
| Suggested improvements | Develop comprehensive Pre-Trial Services program. | Make Full Use of County Parole, Expand referrals to some CHDC programs, Review policies that dictate program referrals, develop process and outcome data | Allocate resources by risk, develop common supervision/treatment case plans based on risk factors, build in more intensive outpatient, develop QA program adherence to evidence based practices, train staff in motivational interviewing, examine role of TASC, consider use of common cognitive curricula, ground jail programs in cognitive sessions, develop more in-custody options for mentally ill, collect outcome data | Adopt risk assessment tool, Consider expanded use of short-form PSI, Explore how to more fully use County Parole, improve data collectionld, Build a Community Corrections Center | Fill and expand Drug Court, Make Mental Health Court available for broader population, Establish DUI Court, Evaluate programs | Re-organize court dockets to establish a front-end court(s) to handle all release issues and to receive pleas from the recommended Early Case Resolution Program |
| Expected outcomes | More informed release decision-making, Support Expedited Release, Improve treatment outcomes with earlier ID of clients, Improve pretrial success rates, Reduce impact on Jail | Expedited resolution, improved outcomes, reduced impact on jail | Reduced recidivism, reduced impact on jail | Reduced costs, Improved outcomes, Reduced impact on jail | Reduced recidivism, Reduced jail impact | Relieves crowded dockets, reduces case processing time, reduces impact on Jail |

2

| | Pre-trial | Diversion/Sentence Alternatives | Treatment | Jail Alternatives | Specialty Courts | Adjudication |
|---|---|---|---|---|---|---|
| Potential Impact on jail bed days (1) | Counties with comprehensive and timely Pre-Trial services are less likely to have an overcrowded jail | Availability of comprehensive and timely Pre-Trial Services is correlated with reduced jail crowding | Effective treatment has effect size of 10% - 30% reductions in recidivism; $1 dollar in treatment costs yields $7 in system savings; SACPA has resulted in reductions in expected jail bed usage by 40%, FACT programs and mental health courts have been shown to reduce rearrest by up to 39%. | Effective supervision coupled with quality treatment has been shown to reduce recidivism by 22%; Community Corrections Centers effective at reducing jail pressures and and lower cost (roughly 1/3 less cost to build than a jail, and 1/2 the per day operating cost). | Effective Drug Court programs reduce recidivism by 30% | Early Case Resolution programs positively impact jail: 15% reduction in jail ADP in Orange County, Florida after implementation; Washoe County, Nevada, 41% of felony cases negotiated within 72 hours of arrest, resulting in jail reducttion |
| Data Available | Insufficient Data available. Data available on admissions, number under supervision | Number of Admissions by program, ADP, and limited profile and process data | State data on admissions, demograhics, discharge status, etc. | Number on supervision, number on county parole, number of PSI's discharge data, etc. | | Filing and court data |
| Data Needed to Collect | Full-service program should track: number interviewed, time to interview, release type and rate, outcomes by release type, re-arrest and fta rate, FTA returned to court through pretrial efforts, cases prepared for bail review. | Not Sufficient Data for detailed analysis. Need process data (reason for denial), participante profile data, sanction data (number jail bed days used), ALOS, outcomes | Not Sufficient Data for individual program evalutaion. Enhance available data with risk/classification level, referral type (self, other), court mandata/volunteer, ASAM score, probation status, reason for denial, no-shows, more detailed profile data (legal status, supervision status), sanctions imposed (jail days), restitution collected/not collect, number of pregnant clients give birth to drug-free babies, recidivism data | Not Sufficient Data for detailed analysis. Present more detailed probation profile, process, and outcome data: case closure rates (by supervision level, charge, risk score), violation of probation data (by numbers, type of violation, nature of sanction, number of jail bed days used), probation exit data by percent employed, stable housing, completed treatment, have medication, follow-up recidivism data. | Enhance available data with reason for denial, risk score, time to entry, sanctions (number of jail days used), charge, recidivism | Collect the kind of case processing information presented in the Master Plan in order to track changes in adjudication process times and process |
| Prioritization | High | Moderate | High | High | High | High |

* Data collection efforts designed for Master Plan project
(1) See Chapter 6 of Sonoma County Master Plan for more discussion on anticipated impact of recommended changes

3

## Sonoma County Alternatives: Next Steps

| | Pre-trial | Diversion/Sentence Alternatives | Treatment | Jail Alternatives: Probation, County Parole, CCC | Specialty Courts | Adjudication |
|---|---|---|---|---|---|---|
| Policy & Procedures Review | Form policies and procedures for pretrial interviewing, bail review, fta tracking, etc.; Adopt risk assessment instrument; Develop Centralized Intake model: adopt assessment protocol and instruments; etc. | Review program eligibility policies for each program, toward encouraging expanded use; etc. | Discuss resource allocation based on risk and needs; review procedures for program referral and selection (self-selection, role of motivation); Review TASC policies for program denial; review policies for restitution collection; etc. | Review policies and procedures for Pre-sentence investigation; Create new county parole selection policies and eligibility; Review sanction policies; etc. | Review eligibility, identification, and referral criteria for expansion to drug court. | Review ICE policies and establish local policy for offenders with ICE holds and local charges; Develop policies and procedures for Early Case Resolution. |
| Organization Review | Determine organizational structure. If part of probation, determine if program staff are sworn. Examine how TASC staff might be integrated into Central Intake model | | Review benefit of in-house vs. contracted detox and outpatient/residential services. | Discuss administrative models for CCC | | Re-organize the court's dockets to accommodate a front-end docket(s) for first appearances and ECR pleas. Discuss value of maintaining an integrated data system and taking it to the next level with a Data Warehouse, and who will collect and analyze data |
| EBP Review | Review National Association of Pretrial Services Agencies as well as California Association of Pretrial Service standards for Pre-Trial to form basis of operations, set performance standards, etc. | Establish quality control protocol for on-going staff and program conformance with evidence based practices. | Establish quality control protocol for on-going staff and program conformance with evidence based practices; review curricula used for cognitive sessions; review program duration;etc. | Plan evidence based programs for CCC (treatment, cognitive, etc.); explore vocational/industries add-on; Probation & Treatment work toward development of common case plan based on risk factors; etc. | Expand sanction options with access to work crews, etc. | Examine the programs and referrals to accompany resolution of low-end cases. |
| Further Analysis/Data Collection | Develop data collection protocols | Collect more program specific data to examine the use and outcomes of different diversion options | Analyze reliability and accuracy of substance abuse assessments;Track outcome data | Collect violation of probation data to examine policies and practices (the lack of available data did not allow a more in-depth assessment during the project); Collect more data on county parole cases (selection, acceptance, denial, services received, LOS, outcomes, etc.); collect jail classification data to inform CCC design. | Collect outcome data | Measure the effectiveness of the new front-end docket both for the successful timely release of offenders as well as the resolution of cases |

| | Pre-trial | Diversion/Sentence Alternatives | Treatment | Jail Alternatives: Probation, County Parole, CCC | Specialty Courts | Adjudication |
|---|---|---|---|---|---|---|
| $Funding - Short-Term | Pre-Trial Risk Assesment (consider the value of an integrated risk assesment that serves classification, pretrial, and supervision); Case management tracking software (if needed). | | Jail programs for mentally ill, sex offenders | Train staff in motivational interviewing | Support establishment of DUI Court | Fund few additional positions (as needed) in prosecutor and public defenders office to support Early Case Resolution |
| $Funding - Long-Term | Full-Service Pre-Trial Services program/Centralized Intake | | Support more Intensive Outpatient Treatment, level of need to be based on findings from implementation of new risk/needs instrument | Fund a Community Corrections Center | Expanded Drug Court and Mental Health Court | Strong array of programs and servcies as conditions of sentence |