# EXHIBIT A
# TO DECLARATION OF
# THERESA J. FUENTES
# ISO OPPOSITION TO MIL NO. 6

1  PRISON LAW OFFICE
2  DONALD SPECTER, Bar No. 83925
   STEVEN FAMA, Bar No. 99641
3  E. IVAN TRUJILLO, Bar No. 228790
   SARA NORMAN, Bar No. 189536
4  ALISON HARDY, Bar No. 135966
   REBEKAH EVENSON, Bar No. 207825
5  1917 Fifth Street
   Berkeley, CA 94710
6  Telephone: (510) 280-2621

7  K&L Gates LLP
8  JEFFREY L. BORNSTEIN, Bar No. 99358
   EDWARD P. SANGSTER, Bar No. 121041
9  RAYMOND E. LOUGHREY, Bar No. 194363
   55 Second Street, Suite 1700
10 San Francisco, CA 94105-3493
   Telephone: (415) 882-8200
11

12 THE LEGAL AID SOCIETY –
   EMPLOYMENT LAW CENTER
13 CLAUDIA CENTER, Bar No. 158255
   600 Harrison Street, Suite 120
14 San Francisco, CA 94107
   Telephone: (415) 864-8848
15

ROSEN, BIEN & GALVAN, LLP
MICHAEL W. BIEN, Bar No. 96891
JANE E. KAHN, Bar No. 112239
AMY WHELAN, Bar No. 215675
LORI RIFKIN, Bar No. 244081
LISA ELLS, Bar No. 243657
315 Montgomery Street, 10th Floor
San Francisco, California 94104
Telephone: (415) 433-6830

BINGHAM, McCUTCHEN, LLP
WARREN E. GEORGE, Bar No. 53588
Three Embarcadero Center
San Francisco, California 94111
Telephone: (415) 393-2000

16 Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURTS

17 FOR THE EASTERN DISTRICT OF CALIFORNIA

AND THE NORTHERN DISTRICT OF CALIFORNIA

18 UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

19 PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

| | |
|---|---|
| 20  RALPH COLEMAN, et al., <br> Plaintiffs, <br> 21  vs. <br> 22  ARNOLD SCHWARZENEGGER, et al., <br> Defendants. <br> 23 <br> 24 | No.  Civ S 90-0520 LKK-JFM P <br><br> **THREE-JUDGE COURT** <br><br> **EXPERT REPORT OF BARRY KRISBERG Ph.D.** |
| 25  MARCIANO PLATA ,et al., <br> 26  Plaintiffs, <br> 27  vs. <br> ARNOLD SCHWARZENEGGER, et al., <br> 28  Defendants. | No. C01-1351 TEH <br><br> **THREE-JUDGE COURT** |

1
2
3
4    Dated:  September 8, 2008        By:
5
6                                    _____
                                     EDWARD P. SANGSTER
7                                    ed.sangster@klgates.com
8                                    K&L Gates LLP
                                     Attorneys for Plaintiffs
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

                                     2

## Expert Report of Barry Krisberg, PhD

### I.  Qualifications

I have been the president of the National Council on Crime and Delinquency (NCCD) since 1983. Having just celebrated its 100th anniversary, the NCCD is the nation's oldest and most respected criminal justice research organization. I have been known internationally for my research and expertise on juvenile and criminal justice issues and I am frequently called upon by elected officials, the judiciary, and the media. The NCCD is often asked by governors and legislatures in many states to assist in designing justice programs. Most recently, I worked in Illinois, Texas, and Florida to help rebuild very troubled juvenile corrections systems. I have worked in a variety of roles in California to design and evaluate reforms in the state corrections system. My complete curriculum vitae are presented in Attachment A.

I received my master's degree in criminology and a doctorate in sociology, both from the University of Pennsylvania. I have held several educational posts. I was a faculty member in the School of Criminology at the University of California at Berkeley and as an adjunct professor with both the Hubert Humphrey Institute of Public Affairs at the University of Minnesota and the Department of Psychiatry at the University of Hawaii. I am currently a lecturer in the Legal Studies Department and at the Boalt Hall School of Law at the University of California, Berkeley. Most recently, I gave an advanced seminar for Boalt Hall students on "Legal and Policy Issues in Prisoner Reentry."

In 1979 I was asked by Health and Welfare Secretary Mario Obledo to serve on a Task Force to investigate the over-representation of people of color in California prisons. In the 1990s I was appointed by the Legislature to serve on the California Blue Ribbon Commission on Inmate Population Management. Previously, I was asked by the Legislature to conduct a study on alternatives to prison. More recently I was asked by the California Senate Budget Committee to

1

organize a California Task Force on Prison Crowding. I also was appointed by CDCR to serve on an Expert Panel on Adult Offender Recidivism Reduction Programs.

My memberships have included the Juvenile Justice Committee of the International Association of Chiefs of Police, the National Association of Juvenile Correctional Administrators, and the Association of Criminal Justice Researchers. I was past president and fellow of the Western Society of Criminology and was the Chair of the California Attorney General Bill Lockyer's Research Advisory Committee.

In 1993 I was the recipient of the August Vollmer Award, the American Society of Criminology's most prestigious award. The Jessie Ball duPont Fund named me the 1999 Grantee of the Year for outstanding commitment and expertise in the area of juvenile justice and delinquency prevention.

In 2002, I was appointed to by the California Attorney General to chair an Expert Panel to investigate the conditions in the California Youth Authority. In 2004 I was named in a consent decree to help develop remedial plans and to monitor many of the mandated reforms in the Youth Authority. I am often asked by California counties and the Chief Probation Officers of California to provide training on a range of corrections issues.

I have numerous books and articles to my credit and serve on the editorial board of the prestigious journal *Crime and Delinquency.*

I am frequently called upon by private foundations to assist with the design, implementation, and evaluation of programs—both their own and those of the public sector. The Annie E. Casey Foundation engaged me to assess the effectiveness of their Juvenile Detention Alternatives Initiative, the single largest private program for juvenile justice system reform in the country. The Walter S. Johnson Foundation supported me to lead a Blue Ribbon Commission on California's policy of out-of-state placement of delinquent youth. Baptist Community Ministries

2

has sought my expertise on assessing the needs of troubled youth in the greater New Orleans area, and the Robert Wood Johnson Foundation asked that I prepare a white paper on delinquency and substance abuse. The California Endowment selected me to evaluate a five-county effort to improve mental health services in juvenile detention facilities. The California Endowment has also funded me to lead a 13-city network to reduce gang violence in California. The Irvine Foundation asked me to assess the value of inmate rehabilitation programs at Lancaster State Prison. Several California foundations and the JEHT Foundation funded me to conduct a comprehensive study of California women prisoners. In the late 1990s, the San Francisco Foundation funded me to examine the implementation of a new inmate classification system at San Quentin. I have been regularly consulted by the California Office of the Inspector General, especially on issues relating to the Division of Juvenile Justice (DJJ).

I have supervised NCCD research studies funded by the National Institute of Justice on Early Release in the Illinois Department of Corrections and on the Use of Electronic Monitoring in Oklahoma. I have also been asked by the National Institute of Corrections to provide training to a number of jurisdictions on jail classification systems and to provide assistance to the District of Columbia Department of Corrections. I am regularly consulted by the Special Litigation Unit of the US Department of Justice on investigations under the Civil Rights of Institutionalized Persons Act, and I testified before the National Commission on the Elimination of Prison Rape at their request.

In the past five years, I have served as a joint expert witness in *Farrell v. Cate*, a case that involves a Consent Decree on conditions in the DJJ. In that capacity, I was deposed on April May 19, 2008 and testified in Alameda County Superior Court on April 24 and May 23, 2008. I was also deposed in July 2006 in cases entitled Fonda Whitfield and The Estate of Deon Whitfield v. State of California et al., Case No. Cv-04-2729 GEB (JFM); Allen Feaster and

3

Gloria Feaster and the Estate of Durrell Feaster v. State of California et al., Case No. CV-04-2730 GEB (JFM). The cases stemmed from the January 19, 2004, suicide deaths of two young wards in the same cell, Deon Whitfield and Durrell Feaster at Preston.

II. Expert Opinions

I was retained by the plaintiffs in July of 2008 to be an expert in these proceedings and have reviewed many documents, depositions, interrogatories, and other expert reports and statistical data relevant to the Coleman and Plata proceedings. I have been asked to render an opinion on whether the accelerated release of CDCR inmates would create a danger to public safety. My fee is $300 per hour for work related to these cases.

> **A.    Done properly, a population cap in the California state prison system would not have an adverse effect on public safety.**

My extensive review of the available data reveals that millions of prisoners in other states as well as inmates in numerous California county jail systems have been released early in response to population pressures with no adverse effect on serious crime.  Indeed, the most solid empirical evidence on the experience of other states that have accelerated prisoner release to reduce population is that such releases are uniformly safe and, if done properly, actually reduce crime.

> **1.    All rigorous studies of other state prison systems' early release programs demonstrate that such programs do not endanger public safety**

My opinion is based on a thorough review of empirical research over the past 22 years in states that have accelerated the release of prison inmates. In March of 2007, my colleague Carolina Guzman and I conducted an extensive review of the published literature on early release and public safety. This review utilized the library resources of the National Institute of Corrections, the National Criminal Justice Reference Service, the James Cotton-NCCD Criminal

Justice Collection at Rutgers University, and the Bancroft Library at the University of California Berkeley. This review identified 14 peer-reviewed articles, dissertations, state agency reports, and national studies. These materials covered the period from 1981 to 2004 and covered Canada and the states of California, Washington, Wisconsin, Illinois, Texas, Colorado, Montana, Michigan, and Florida. In addition, one study covered early releases from a large jail in the Northeast U.S. Attachment B includes a brief overview of these 14 studies and the full citation of authors and sources.

Overall, this literature showed that the recidivism rates of prisoners released early were comparable to those who served their full terms. In some instances the recidivism rate among the early release group was lower than those inmates who served their full terms. We found that early release programs actually lowered recidivism rates of released inmates when they were targeted at selected low-risk offenders, especially those convicted of substance abuse or property crimes. Further, early release produced lower rates of recidivism if there were provisions made for community-based supportive services such as housing, employment, or drug treatment. In addition to the recidivism data, virtually all of the studies illustrated that overall crime rates were either stable or declining during the periods when prisoners were being released early. The following discussion reviews some of the specific studies in greater detail.

Washington began accelerating the parole of inmates to reduce prison crowding in 1979. The Legislature mandated that the most serious felons and sexual psychopaths could not be part of the early release program. The research covered 1,674 inmates that were released an average of 6 months early. The comparison group consisted of inmates released in the 12 months before this program. The recidivism rates of the two groups were virtually identical over the next five years. The Washington state crime rate was roughly constant during the period of the early release.

In 1970, the California Department of Corrections selected a cohort of 1,310 inmates who

were eligible for parole. Half of the group members were randomly selected and paroled an average of 6.6 months earlier than their scheduled dates. The CDC researchers found no statistically significant differences between the two groups in terms of returning to prison based on either a new conviction or a parole violation. There was no evidence that this experiment had any effect on the state crime rate.

Colorado immediately released 126 prisoners after the courts ruled that they should have gotten good time credits based on their jail behavior during pre-sentence confinement. There were no statistically significant differences in the re-arrest rates for the accelerated released inmates compared to those who were not released. Again, there was no discernable impact on the Colorado crime rate.

The Montana legislature placed a cap on its prison population in 1993, in part, by decreasing the amount of time served by its prison inmates. The researchers examined inmates who received accelerated good time credits, those sentenced to community-based parole programs, and those who received a regular parole date. The recidivism rates of these offenders were roughly the same as historical Montana recidivism rates. During the period of the prison cap, the crime rate in Montana showed a modest decline.

A Texas study examined a sample of 2,072 prisoners released from the Texas Department of Corrections in 1983. Approximately 29% of these cases were Early Mandatory Releases—inmates selected for release up to 180 days prior to their regular release dates. The researchers found that the return rate to prison was similar for the early release cases compared to others that were released on their regular sentence dates. It was also noted that in 1983, when mandatory release was fully operating, Texas saw the largest drop in 20 years in its state crime rate.

Two studies from Wisconsin followed 1,886 inmates who received mandatory releases after being rejected for parole and another cohort of 892 inmates who were subject to Special Action

6

Release to reduce crowding. In both studies, there was no evidence that releasing selected inmates had any negative effects on recidivism or general public safety. During the course of these programs, the crime rate in Wisconsin declined by over 5% from 1984 to 1988.

With a grant from the National Institute of Justice, the NCCD conducted research on the early release program of the Illinois Department of Corrections (IDOC) that operated from 1980 to 1983. Early releases of up to 90 days were ordered by Governor James Thompson to prevent violence in Illinois's crowded prisons. By 1983, these releases had reduced the average daily population of IDOC by roughly 2,500 inmates. The NCCD study showed that the prisoners who were released early actually had a lower recidivism rate than those released after serving their full terms. Inmates were selected for early releases that were closest to their regular release dates. Wardens were asked to flag cases in which the inmates had presented significant problems while incarcerated. It might be that the early release population possessed a slightly lower risk of re-offending than the group that served their full terms, but the selection of inmates for release process was really driven by how soon inmates would be released anyway.

Illinois's crime rate declined during the years of early release. In 1990 the Illinois Legislature modified the program and actually increased the number of days to 180 by which inmates' sentences could be reduced. The NCCD examined the cases of 4,640 inmates. The early releases had the same recidivism rates as the other released inmates. The later cohort of early-release inmates actually possess lower post-prison failure rates compared to the original group of inmates with accelerated discharges (their releases were advanced to 180 days vs. 90 days). For both cohorts, the majority of subsequent crimes were for nonviolent misdemeanors. Crime rates continued to decline even as early releases were increased in Illinois.

A Michigan Task Force on Jail and Prison Crowding found that the state's crime rate continued to trend downward from 1991 to 2004. The crime drop in Michigan closely paralleled

the national decline in crime during this same period. This was a period in which the Governor had capped the prison population and the county jails were advancing the release of many inmates.

Under court pressures, Florida employed house arrest and intensive supervision for offenders who were otherwise bound for state prisons. Inmates usually served short prison stays of roughly 90 days and then were released to intensive community supervision. With funding from the National Institute of Justice, the NCCD studied 630 offenders in this program, known as Community Control. During an 18-month follow-up period, the offenders in the Community Control Program had a lower rate of recidivism than similar offenders who served prison terms of approximately 9 months. A larger study of Community Control was conducted by the Florida Office of Inspector General. This analysis found that the majority of released prisoners that returned to prison or jail did so because they violated conditions of supervision and not because of new crimes. As with the other jurisdictions mentioned above, Florida's crime rate declined during the period when Community Control was operating.

Research on early parole of jail inmates in Philadelphia showed that adding in community-based drug treatment services increased the proportion of successes among the early released inmates from 66% to 78%. Those who actually completed the drug treatment programs had twice the success rate of those with less than 6 months in treatment. This study showed that while early paroled jails inmates had relatively low recidivism rates, the addition of drug treatment could substantially improve their post-release success rates.

Finally, I found in my March 2007 literature review several studies of offenders who received accelerated parole from Canadian prisons in the mid 1990s. Studies of both men and women prisoners who received early parole showed that they had relatively low post-release failure rates. These offenders did better than comparable inmates who served their full terms, and

8

the subsequent offenses were primarily violations of parole conditions, minor crimes, and overwhelmingly nonviolent offenses.

Others involved in California corrections concur with my opinion. For example, Matthew Cate, the current director of CDCR, testified that corrections experts have indicated that "if done properly," one can reduce the prison population "without negatively impacting crime rates in society."[1] Loren Buddress, Chief Probation Officer for San Mateo County, believes that, given funding to provide appropriate services, "a controlled release of inmates from state prison would not negatively impact public safety."[2] According to Sonoma County Sheriff William Cogbill, putting programs in place would reduce recidivism, and if provided with sufficient funding for programs in conjunction with a prisoner release order, Sonoma County "could mitigate those impacts to public safety to the degree that it wasn't an issue."[3]

> ### 2.    Early release of jail inmates in California has not had an adverse effect on crime rates

There has been extensive use of early release and diversion in California counties in response to court orders to reduce jail overcrowding. Although these practices have not been subject to the rigorous and in-depth research that I have described above, the aggregate data supports the position that early release done properly does not weaken public safety.

I examined data from the Board of Corrections on the extent of releases of jail inmates in California counties due to court orders to manage crowding, and analyzed this data in relations to changes in the crime rates of these counties. For crime rates, I used the FBI's Uniform Crime Reports and looked at the most serious crimes that most criminologists use to examine crime trends and to compare jurisdictions. These offenses include homicide, aggravated assault, forcible rape, robbery, burglary, grand larceny, auto theft, and arson. The FBI uses these offenses

---

[1] Cate Deposition, page53.
[2] Buddress Deposition, pages 50-51.
[3] Cogbill Deposition, pages 36-38 and 39-40.

9

as an index of crime because they are among the most serious offenses, and these crimes have a high probability of being reported by citizens to the police. I will refer to these offenses throughout my report as "serious crimes." Although data on reports for misdemeanors and less serious offenses are less consistently available for all California counties, I examined 10-year trend data from the California Department of Justice on arrests for misdemeanors. From 1997-2006 the California Department of Justice reported that statewide misdemeanor arrests declined from 1,033,196 to 939, 046 – a reduction of 9%. The rate per 100,000 of misdemeanor arrests dropped from 4,011 to 3,260 – a reduction of 18%.[4]

I examined data on individual California counties in releases and the number of crimes, the five-year trends, and the more recent two-year trends. From 1996 to 2006, using 21 counties for which there was complete data, over 1.7 million jail inmates were released due to overcrowding.[5] These were jail inmates that the counties reported to the Board of Corrections (now known as the Corrections Standards Authority) that they had released either via diversion or shorter sentences pursuant to a court order to limit the capacity of their jails. In this same period, the number of serious crimes reported dropped by 18%. During the five years from 2001 to 2006, there were 764, 277 inmates released from 22 counties.[6] The number of reported crimes was largely unchanged in these locales. During the most recent three-year period for which complete data are available (2004-2006), there were 416,767 inmates released in 24 counties due to court orders, but the number of reported crimes declined by 7% in these same counties. [7]

---

[4] (http://stats.doj.ca.gov/cjsc_statsprof06/004A.htm)

[5] Amador, Butte, Calaveras, Eldorado, Fresno, Humboldt, Kern, Los Angeles, Merced, Orange, Placer, San Benito, San Diego, San Joaquin, Santa Barbara, Shasta, Solano, Stanislaus, Tehama, Tuolumne, and Yolo.
[6] Same list as above adding in data from San Mateo.
[7] This group includes also data from Inyo and Ventura.

I also analyzed the trends in individual counties but this showed no consistent relation between the volume of jail release due to court ordered population caps and changes in reported crimes across the counties. For example, from 2002-2004, 13 counties ( Amador, Calaveras, Fresno, Humboldt, Inyo, Los Angeles, Orange, Placer, San Mateo, Santa Barbara, Shasta, Ventura, and Yolo) had an increase in capacity-based releases and a decrease in crime. Another 8 counties (Butte, El Dorado, San Diego, Merced, San Benito, Stanislaus, Tehama and Tuolumne) had a decrease in releases and a decrease in crime. Only 3 counties (Kern, San Joaquin, and Solano) experienced a rise in both releases and crime.

I looked at patterns in the largest counties (Los Angeles, Orange, and San Diego) as well as a number of mid-sized or smaller counties. Here again, no consistent pattern linked changes in crime with increases or decreases in jail releases due to court orders. Put simply, the accelerated release of jail inmates neither lowers the crime rate nor increases it. This finding is entirely consistent with the studies that I reviewed earlier in this report.

At the local level, testimony from corrections professionals supports the inference, drawn from the statistics discussed above, that early releases from local jails have not adversely impacted public safety.  San Diego County has implemented a variety of diversion and early release programs to control the population in its county jails.  William Ingrassia, Commander of the Detention Bureau for San Diego County, was unaware of any specific detriment to public safety caused by these programs.[8]  Sonoma County likewise functions under a population cap. Sheriff Cogbill was unaware of any particular crimes that were committed by inmates who were released early.[9]

      **B.**    **Studies show that if early releases are accompanied by resources for evidence-based programs for this population, there will be a positive effect on public safety**

---

[8] Ingrassia Deposition, pages 55-60.
[9] Cogbill Deposition, pages 23-24.

There is a significant population of people who are safer to society if provided appropriate programs in their communities rather than being warehoused in overcrowded, violent prisons. We can generally identify these inmates who pose a very low risk of recidivism, given proven risk classification tools. Further, there are well-tested assessment tools that can identify and prioritize the treatment needs for individual prisoners. There is a growing body of research identifying program interventions such as Cognitive Behavioral Therapy and Therapeutic Communities that produce measurable progress for inmates with various treatment needs. We can identify the programs, given numerous studies with concrete data showing positive effects on recidivism rates. It is also common sense. A low risk offender will have a better chance of succeeding in the community and becoming a productive member of society if they are enrolled in substance abuse programs or job training programs in the community. Compare this plan to the same convict sitting idle on a tripled bunk in an overcrowded, violent gym with minimal yard time and no work or educational opportunities, consorting with more sophisticated criminals or prison gangs. The CDCR's Expert Panel on Adult Offender Recidivism Reduction Programs (2007) gave numerous examples from states such as Pennsylvania, Ohio and Arizona that are making significant programs in matching appropriate services to offenders as a method of reducing future criminality.

### C. The critics of early release make faulty assumptions about the relationship between correctional practices and public safety.

Arguments against accelerated release generally ignore several key facts. First, it is important that virtually every inmate selected for early release under the programs suggested by Dr. Austin in his expert reports and used in California counties under population caps will be released soon anyway. Most accelerated release programs will shorten the prison stays of inmates by six

months or less.

As the President of John Jay College, Jeremy Travis has reminded us in his book, *But They All Come Back*, all but death row inmates and prisoners with life sentences eventually return to the community. Although it is true that some released inmates will re-offend, being released several months sooner is not likely to have an impact on that fact. A National Research Council report, released in 2007, reviewed studies on the correlates of prisoners who recidivate and suggested that post-release opportunities including employment, housing, and positive family supports can reduce these failure rates  So data on the current recidivism rates of California inmates are not especially relevant to evaluating early release. Further, respected psychologist such as Professor Craig Haney of the University of California, Santa Cruz have argued that prisons actually **debilitate** inmates, increasing their mental health problems and diminishing their abilities to function in the free world.[10] This means that longer prison stays may actually increase recidivism rates. Data from CDCR reviewed by Dr. James Austin suggests that the longer the time served the higher the post-release failure rates.

Second, there is growing evidence that careful selection of inmates for early release can improve the programs' outcomes if there are focused efforts to match inmate's needs to services in the community.  Well designed and implemented programs can actually lower prison populations and advance public safety. The Pew Trusts has recently issued reports illustrating examples of this win-win situation. There are several highly effective risk and needs assessment systems that are available. For example, the NCCD approach known as Correctional Management Classification (CMC) has shown its ability to assist in the community supervision of released offenders in states such as Florida, Wisconsin, and South Carolina. Offenders who were supervised by parole or probation staff trained in CMC had much lower rates of failure than

---

[10] Craig Haney, *Reforming Punishment: The Psychological Limits of Pains of Imprisonment,* Washington, D.C.: American Psychological Association, 2006.

other parolees. There are several valid assessment tools available to CDCR to effectively screen out the high-risk inmates and permit better community supervision.

There is solid evidence that effective services in the period right after discharge can substantially cut down on recidivism. The CDCR's own Expert Panel on Adult Offender Recidivism Reduction Programs offers a blueprint designed by nationally known corrections leaders and researchers that is based on the best available research. Further, a recent report of the National Research Council on Parole, Desistence from Crime, and Community Integration (2007) offers the best evidence-based models for cutting down on post-release crime. The Urban Institute, the Council of State Governments, and the National Institute of Corrections all have tremendous resource materials on properly managing the prison reentry process.

All of these authoritative sources have shown that the provision of transitional housing, access to health care and mental health services, drug treatment, and vocational services can ease the reentry process and reduce subsequent criminality. It is recommended that planning for reentry services occur early in the incarceration period and that offenders leave prison with specific reentry plans.

The critics of early release exploit the image of inmates being randomly dumped into communities without reentry planning or effective services. If early release is accompanied by funding for proven reentry services, it would be a safe and effective population reduction strategy, the cost of which is far less than building and operating more prison and jail beds. Further, community-based reentry programs can be up and running far more quickly. Critics have argued that such services do not presently exist in sufficient quantity at the local level, but there is no logical reason why this community capacity could not be expanded with appropriate state funding and commitment.

Several counties such as Alameda, San Diego, Santa Barbara, San Mateo, and San Francisco

have built sophisticated reentry strategies that merge county and state resources and involve both public and private agencies. These counties offer a range of ideas on how the CDCR could safely manage the early release of inmates. Many of these efforts are currently being researched, but the preliminary reports from the localities have been promising. Most important, these local efforts illustrate that communities have stepped up to better respond to the needs of released inmates.

Alameda County has been operating Project Choice for several years. Current Attorney General Jerry Brown was instrumental in getting this innovative collaboration started when he was Oakland's Mayor. This program is a partnership between the CDCR, several agencies in Alameda County Government in the City of Oakland, as well as a number of community-based organizations such as the Mentoring Center. The goal is to identify offenders in CDCR who will soon be released back to Alameda County and to build individual community support plans for these offenders. The services include job placement, health care, temporary housing, substance abuse services, and peer-counseling. The Oakland Police Department, Alameda Probation Department, and the CDCR Parole Division worked collaboratively to plan and implement the program. Initially begun to reduce the failure rates of offenders released from state facilities, Project Choice also works with inmates released from the county jail.

Santa Barbara County worked with the NCCD to plan and design a community collaboration to assist released inmates from state prisons and the county jail. Funded initially by local philanthropists and the Gerbode Foundation, this program includes a consortium of non-profit organizations and public agencies such as the Santa Barbara Recovery Center. The program staff contact selected low risk inmates in advance of their release (usually 90 days) and begin joint planning with the offender about the needed services when the person returns to Santa Barbara County. Top law enforcement leadership including the Sheriff, the District Attorney, and the Police Chiefs from all major cities has been involved in the program. The Santa Barbara team

works closely with the CDCR Parole Division and was recently funded by CDCR to build and operate a local reentry center that will serve both state and local inmates.

San Mateo County asked the NCCD to assist a multi-agency task force to help the County strengthen its reentry services. This task force was chaired by the Chair of the County Board of Supervisors and included all pertinent county agencies and community-based groups. The initial planning was partially supported by a grant to NCCD from the San Francisco Foundation. Now the services are part of the regular county budget. San Mateo County chose to dedicate a full-time probation officer to assist in reentry planning. The County is attempting to link its rehabilitation programs in the jail to Project Bridge that connects released offenders to similar services in the community. The County is also doing a careful assessment of existing substance abuse service and looking to plug any gaps in these services.

San Diego County has received substantial state and foundation funding to strengthen its local prison reentry services. The San Diego effort is primarily focused on getting released inmates into jobs. There are also a range of supportive services including counseling, health care and housing.

San Francisco has formed an ongoing multi-agency Reentry Council under the leadership of Mayor Gavin Newsome and the Board of Supervisors. The Reentry Council, which has dedicated staffing, also includes the DA, the Sheriff, the Superior Court and the Probation Department. Many community agencies and organizations of formerly incarcerated persons meet monthly to plan new services and to ensure that existing programs for released jail inmates are well-coordinated. The SF Reentry Council has been working hard to reduce barriers to employment for low risk offenders and the Council has paid particular attention to diverting low level offenders from jail sentences.

Besides the reentry programs that I have briefly described above, there are many county jail

systems in California that have responded to court-imposed inmate releases have employed a broad range of programs as safe alternatives to total confinement. Attachment C illustrates the extent of court-imposed releases and lists the sorts of programmatic alternatives that have been employed. The interrogatories gathered from most of the intervenor counties offer detailed policy and procedures being used in these counties for home electronic monitoring, work programs, county parole, or work furlough programs, weekend work programs, house arrest, day reporting programs, and drug treatment placements, to name a few existing alternatives. There is also information from the counties about inmate classification systems that are being used to identify the lower-risk inmates for these alternative programs. A recent report by the Chief Probation Officers of California (2007) entitled, *Adult Services Plan: Serving 18-25 year olds -- Best Practices* contains an range of excellent programs that California probation leadership assert would allow them to divert many offenders from state prison, if funded appropriately.

Third, some skeptics of early release also suggest that modest reductions in sentences will have a significant impact on the deterrent value of the penal system. The research on deterrence by Franklin Zimring and Gordon Hawkins[11] suggests that it is the timely application of penalties, rather than their severity that exerts a real deterrent effect. There is no reliable scientific evidence showing that minor reductions in time served compromise the deterrent value of the penal system.

Reviewing CDCR data reported in *California Prisoners and Parolees* reveals that between 1978 and 2007, the median time served for prisoners who were committed for property crimes and many drug offenses actually went down. The corresponding median time served for violent offenders and serious sex offenders went up during that same time period. But, the state witnessed a drop in crime for both violent and nonviolent offenses. The largest crime decline was

---

[11] Franklin Zimring and Gordon Hawkins, *Deterrence: The Legal threat in Crime Control*, Chicago: University of Chicago Press, 1973.

for burglary. (California Department of Justice 2007, *Crime in California*, Sacramento, California, 2008.)

The extent of time reductions for good behavior for nonviolent offenders has been changed repeatedly. The Legislature has changed the criteria for prison commitments versus sentences to county jails. However, there is no empirical research showing a clear relationship between these sentencing changes and crime rates, especially for the property offenders and minor offenders who would be subject to early release orders. The notion that modest early release will embolden potential offenders is more an "urban legend" than an established fact. Sentences and time served have varied over time, and they vary across jurisdictions. Current penalties are based on political decisions of state officials, not on the science of penology.

### D.   Defendants' expert Dr. Marquart makes significant errors in his report

I have reviewed Dr. James Marquart's expert report of August 14, 2008, and Dr. James Austin's expert report of August 27, 2008. I fully agree with Dr. Austin's criticisms of Dr. Marquart's report, contained in pages five through eight of Dr. Austin's report.

### Concluding Observations

There are a wide variety of methods though which the CDCR could provide some relief for its severe crowding crisis. These approach encompass programs and policies that either divert offenders from admission or re-admissions to CDCR or those measures that would modestly reduce the time served for non-violent and non-dangerous offenders. Both strategies have been safely and successfully employed in a number of other states and in California over the past 25 years. Moreover, many California counties faced with severe crowding and court-mandated capacity limits have successfully diverted or accelerated the releases over 1.7 million jail inmates over the past 10 years. Crime rates went down during that same time frame.

Prison and jail population and recidivism reduction programs can be successful in relieving

18

population pressures and keeping the public safe if they include (1) effective screening through validated risk and needs assessment tools; and (2) the provision of services in the community including transitional housing, mental health and health care, and substance abuse counseling. Under these circumstances the recidivism rates of diverted or released offenders is often lower than for those who complete their regular terms. But, it must be added that the best research does not show public safety problems that have been created by early release programs, even if the community treatment or supervision resources are not increased.

The current recidivism rates of released CDCR prisoners are quite high. Further, there is ample evidence that the level of crowding has contributed to a high level of violence within CDCR's institutions. Both inmates and staff have been victims of this prison violence. Moreover, the present inadequate system of prison mental health care and the idleness of many inmates make it more likely that these recidivism rates will remain high. Thus, the status quo that is made worse by severe crowding is threatening to community safety. A better managed and designed penal system could help California reduce risks to the public.

September 8, 2009

Barry Krisberg, PhD

19