# EXHIBIT C
# TO DECLARATION OF
# THERESA J. FUENTES
# ISO OPPOSITION TO MIL NO. 6

# REPORT OF JAMES AUSTIN, PHD

*Coleman v. Schwarzenegger et al.,*

No. Civ. S-90-0520 LKK

*Plata v. Schwarzenegger et al.,*

No. C01-1351 T.E.H.

AUGUST, 2008

1.  In this report, I demonstrate that California can reduce its prison population without adversely impacting public safety.

2.  Reducing the prison population will require one or two events to occur – a lowering in the number of people being admitted to prison and/or a reduction in the amount of time to serve (also known as length of stay or LOS).  As I explain below, given California's unique prison population, it is possible to divert some people who otherwise would have been incarcerated, and to shorten some sentences, without adversely impacting public safety.

**Basis for My Opinion**

3.  In addition to the matters set forth in my November, 2007 report, I have been asked to render my opinion on whether a "prisoner release order" as defined by the Prison Litigation Reform Act would have an adverse impact on public safety or the operation of a criminal justice system.

4.  The opinions set forth in this declaration are based on my extensive experience studying and researching correction systems, including my recent work on the CDCR Expert Panel on Adult Offender and Recidivism Reduction Programming (hereinafter, "Expert Panel"), on my review of data and documents provided to me by plaintiffs' counsel and counsel for CDCR and the intervenors and on my visits to California State prisons, including, most recently, my expert tour at CSP-Lancaster on November 2, 2007.

5.  In preparation for this report, I have reviewed the same documents that I reviewed in preparing for my November, 2007 report.  I also reviewed additional documents, listed in Appendix A to this Report.  This report is also based on documents

1

and data that I received while working on the Expert Panel, including current population trend data.

    6. I have neither authored any publications nor testified as an expert witness in court since my report of November, 2007. My curriculum vitae and the rate that I am charging plaintiffs for my work on this case has remained the same.

**Background to Overcrowding in California's Prisons**

    7. There is no question that California's prison system is severely overcrowded. As shown in Table 1, the current CDCR institutional population is now at 156,003 male and female prisoners. The CDCR design capacity is only 79,828 indicating a crowding ratio of 197%. The situation would be even more severe if one were to include the 4,400 California prisoners temporarily being housed in out of state private prison systems (Mississippi, Arizona, Oklahoma and Tennessee). Crowding in California's prisons has been a constant condition for many years. Nearly two decades ago in 1990, California's prison population was only 86,942 but the design capacity was 47,221 – or a crowding ratio of 184%.

    8. In 2006 the US Department of Justice reported that California's prisons were more overcrowded than any other states.[1]

    9. A major factor contributing to California's crowding problem is that California has one of the highest recidivism rates in the country when one uses the measure of being returned to prison within three years. According to the Virginia

---

[1] William Sabol, Heather Couture, and Harrison Page. December 2007. *Prisoners in 2006.* Washington, DC: Bureau of Justice Statistics, US Department of Justice.

Sentencing Commission, only Kansas, Utah and Alaska have higher return to prison recidivism rates than California.[2]

10. This was not always the case. In the 1970s California's recidivism rates were much lower. Figure 1 shows how the California return to prison recidivism rate accelerated very rapidly over a relatively short period of time and reached a peak in the late 1980s. It has since slowly declined but remains twice the level it was in the 1970s.

---

[2] Based on information compiled by Rick Kern, Ph.D., Director, Virginia Criminal Sentencing Commission from various state department of corrections and sent to me on August 14, 2008.

8/15/08 EXPERT REPORT OF JAMES AUSTIN, PHD, NOS. CIV S-90-0520, LKK-JFM, C01-1351 TEH

**Figure 1: California's Historical One & Two Year Return to Prison Recidivism Rate with Annual Return to Prison Rate[3]**



[3] This chart is a reproduction of Figure E-1 from Joint Pls. Tr. Ex. 2, Expert Panel on Adult Offender and Recidivism Reduction Programming. 2007, "A Roadmap for Effective Offender Programming in California," ("Expert Panel Report") Appendix E at 88.

4

11. California's return to prison recidivism rate is so high that the US Department of Justice noted that when deleting California from its analysis of national trends, the overall national return to prison recidivism rate drops from 52% to 40%.[4]

12. As will be shown later, over 91,000 admissions to prison in California are parole violators, of which approximately 69,000 are for technical parole violations. Technical parole violators are individuals returned to prison for a violation of their parole supervision conditions, and not for conviction of a crime.     While some of these individuals were arrested for criminal activity, they have not been convicted of a new crime.  Because the rate of technical parole violations in California is so high, more than 1 out of every 3 parole violations in the nation occurs in California.  And when California is deleted from the national data, the percentage of prison admissions that are parole violators for the nation drops from one third to one quarter.[5]

13. The explanation for this trend is that California imprisons more parole violators (not that parolees in California commit more crimes).  A recent study of California's recidivism rates concluded that the three year *re-arrest rate* is similar to many other states. It is the high use of imprisonment for parole violations that produces the high return to prison rate.[6] Moreover, the Sabol and Couture study, a report by Dr. Joan Petersilia, and another report by Blumstein and Beck[7] all conclude that California's

---

[4] Patrick Langan and David J. Levin. June 2002. Recidivism of Prisoners Released in 1994. Washington, DC: Bureau of Justice Statistics, US Department of Justice, p. 8, Table 9.

[5]  William J. Sabol and Heather Couture, June 2008. *Prison Inmates at Midyear 2007*. p. 19. Washington, DC: Bureau of Justice Statistics, US Department of Justice.

[6] Ryan Fischer, "Are California's Recidivism Rates *Really* the Highest in the Nation?  It Depends on What Measure of Recidivism You use." UCI Center for Evidence-Based Corrections, Irvine, California. Vol. 1, September 2005.  Available at http://ucicorrections.seweb.uci.edu/.

[7] Alfred Blumstein and Allen J. Beck, "Reentry as Transient State Between Liberty and Recommitment. " in Jeremy Travis and Christy Visher, Eds., *Prisoner Reentry and Crime in America,* Cambridge, Massachusetts:  Cambridge University Press, 2005.

unique system of imprisoning technical parole violators actually worsens public safety because it disrupts any effort to stabilize both parolees and the communities where they reside.

> "As two leading crime analysts, Alfred Blumstein and Allen Beck, illustrated in a recent study, California's catch and release model of crime control is creating a destructive situation by constantly cycling offenders in and out of prison and their home communities in a way that blurs the distinction between the two and combines the worse elements of each." [8]

14. Another major factor contributing to the increase in California's prison population is the increase in lengths of prison stays for certain types of crimes. The impact of sentencing laws on prison population has been well-documented by the CDCR in its population projection reports and more recently by the Little Hoover Institute. [9]

15. As a result of the high return-to-prison rates and increased sentences, the population of CDCR prisons has steadily increased over the years. However, the most recent report issued this year (CDCR 2008 Spring Adult Population Projection) shows a slight reduction of 3,591 prisoners (or 2%) over the next five years. [10] This slight reduction is the result of lower new court admissions, lower numbers of parole revocations, and shorter lengths of stay. These factors are the same ones cited by the Expert Panel as possible solutions to the crowding situation. But even the CDCR population projection acknowledges the forecasted population reduction is tenuous, is likely to last only a couple of years, and should not be used for long-term planning purposes (see pages 8 and 9 of the Spring 2008 Adult Population Projection). (Indeed,

---

[8] Joan Petersilia, May 2006.Understanding California Corrections. Berkley, CA: California Policy Research Center, University of California.
[9] Little Hoover Institute, 2007. "Solving California's Corrections Crisis: Time is Running Out." Appendix F. Sacramento, CA: Little Hoover Institute
[10] California Department of Corrections and Rehabilitation. Spring 2008 Adult Population Projection. (Undated). Sacramento, CA: CDCR.

the methods used by the CDCR to estimate short-term population reductions are being reviewed by two outside experts to determine the validity of the estimating process.)  In short, it is uncertain whether the population will actually decline and if it does the amount of the decline and the duration of the decline will be minimal.  In any event, even with the projected reduction in population, CDCR's prisons will remain vastly overcrowded.

16. While some degree of overcrowding can be tolerated within a correctional system, there is a point beyond which it becomes very difficult to operate a secure, safe, and humane system for both staff and prisoners.  The overcrowding in CDCR now pervades and adversely impacts all aspects of the operations of the Department, including CDCR's ability to process new prisoners expeditiously, provide adequate medical, mental health and dental care, and provide evidence based programs.[11]  The overcrowding also results in inadequate bed space, causing CDCR to take steps such as converting program space to housing.[12]  Overcrowding also results in increased violence, resulting in the frequent use of lengthy lockdowns.[13]  These responses, which are required to maintain some semblance of order, serve to also exacerbate the difficulty in providing programs and basic medical and mental health services to the prisoner population.[14]

17. There is no reason to believe that the crowding problem will be solved quickly because California has not enacted the systemic reforms necessary to reduce overcrowding.

---

[11] *See, e.g.*, Expert Panel Report at 9-11; Jt. Pls. Tr. Ex. 26 (Receiver's Report re Overcrowding); Jt. Pls. Tr. Ex. 1 (Governor's Emergency Proclamation).
[12] *Id.*, Appendix E, at 91.
[13] *See, e.g.*, Governor's Emergency Proclamation.
[14] *See, e.g.*, Receiver's Report re Overcrowding.

7

Table 1:  Current CDCR Populations and Capacity as of 7/16/08

| Population Status | Number |
|---|---|
| A.  Total CDCR Population | 171,150 |
|  |  |
| B.  Current Institution and Camp Population | 160,334 |
| 1.  Institutions Only | 156,003 |
| 2.  Design Capacity | 79,828 |
| 3.  Percent over design capacity | 195% |
|  |  |
| C.  Other Prison Population Demands |  |
| 1. Projected 5 Year Reduction  – Estimated for Institutions @2% | -3,000 |
| 2. Current County Jail Back-Up – Sentenced to CDCR | 2,000 |
| 3. Prisoners Temporally in Out of State Prisons | 4,400 |
|  |  |
| D.  Total Additional Institutional Prisoners (Current and Projected) Not in CDCR | 3,000 |
|  |  |
| E.  Total Institutional Population to Be Accommodated the Next 5 Years (B1+D) | 159,003 |
|  |  |
| F. Gap between projected Institutional Population and Design Capacity by 2013 (E-B2) | 79,175 |

http://www.cdcr.ca.gov/Reports_Research/Offender_Information_Services_Branch/WeeklyWed/TPOP1A/TPOP1A080716.pdf

**The Relationship between Prison and Public Safety**

18. California can reduce its prison population without adversely impacting public safety.

19. A smaller prison population would not, by itself, cause an increase in crime. It is well known that many states with *higher* rates of imprisonment have *higher* crime rates and, conversely, many states with *lower* incarceration rates have *lower* crime rates. But in general, there is no relationship between crime rates and imprisonment rates.[15] And as will be shown below, moderately lowering the prison population and

---

[15] I conducted an analysis of two US Department of Justice data files containing crime rates and incarceration rates during 2004 by state, and found a correlation coefficient of -.013 which represents no consistent relationship.  Looking at violent crime rates only, there is a positive correlation between violent crime rates and incarceration rates, which means that the states with the highest incarceration rates have the violent crime rates.

8

incarceration rate while using evidence-based models for rehabilitation does not result in higher crime.

20. Similarly, large prison populations do not equal less crime. Recent studies based on individual states and counties have estimated the crime-reduction impact of prison growth to be small or non-existent.[16] Research on crime and incarceration does not consistently indicate that the massive use of incarceration has reduced crime rates.

21. Indeed, some research shows that higher rates of imprisonment may actually serve to increase crime rates. This happens in a variety of ways. For example, increasing imprisonment results in the "churning" of large segments of the largely young male population in and out of prison, which serves to disrupt the community and family structure that would otherwise produce low crime rates.[17] Thus, if a state wishes to reduce its crime rate, it will need to look at other factors other than imprisonment. That is, the best way to lower crime rates is **not** to increase imprisonment rates.

22. Moreover, in overcrowded prison systems such as California's, overcrowding has resulted in a reduction in access to basic education, vocational training and drug rehabilitative rehabilitation programs.[18] It is well-known that if prisoners are properly assessed and assigned to well structured programs, persons who complete those programs have lower recidivism rates.[19] Accordingly, overcrowding in California has impeded the

---

[16] Bruce Western, *Punishment and Inequality in America*. NY: Russell Sage. 2006), James P. Lynch and William J. Sabol, *Did Getting Tough on Crime Pay? Crime Policy Report No. 1*. Washington, DC: Urban Institute, 1997; Available at www.urban.org/publications/307337.html. Don Stemen *Reconsidering Incarceration: New Directions for Reducing Crime*. New York: Vera Institute of Justice. 2007).

[17] Dina Rose and Todd Clear, "The Problem with 'Addition by Subtraction': The Prison-Crime Relationship in Low Income Communities," in Marc Mauer and Meda Chesney-Lind, eds., *Invisible Punishment: The Collateral Consequences of Mass Imprisonment*, NY: The New Press, (2003), pp 181-194; Todd R. Clear, *Imprisoning Communities: How Mass Incarceration Makes Disadvantaged Places Worse*. New York: Oxford University Press. 2007).

[18] *See* Expert Panel Report at 9-11.

[19] *See* Expert Panel Report at 1-2 for a full discussion and referencing of such programs.

State's ability to reduce recidivism. This is why the Expert Panel's first recommendation was to "Reduce overcrowding in its prison facilities and parole office."[20] If the state were able to decrease its prison population, reclaim program space, and reallocate existing resources necessary for effective programming both in the community and in prison, recidivism rates and crime would decline in California.

23. The bulk of the evidence points to three conclusions: 1) The effect of imprisonment on crime rates, if there is one, is small; 2) If there is an effect, it diminishes as prison populations expand (and California's prison population is already greatly expanded); and 3) The overwhelming and undisputed negative side effects of incarceration and crowding far outweigh the potential, unproven benefits of incarceration.

24. According to Professor James Q. Wilson, we have reached a tipping point of "diminishing returns" on our investment in prisons.[21] Wilson reports that judges have always been tough on violent offenders and have incarcerated them for relatively long sentences. However, as states expanded incarceration, they dipped "deeper into the bucket of persons eligible for prison, dredging up offenders with shorter and shorter criminal records."[22] Increasing the proportion of convicted criminals sent to prison, like lengthening time served beyond some point, has produced diminishing marginal returns in crime reductions.

---

[20] Expert Panel Report, p. viii.
[21] James Q. Wilson, "Crime and Public Policy" in James Q. Wilson and Joan Petersilia, Crime ICS Press, Oakland, California 1995, page 489-507.
[22] Wilson, op cit., page 501.

10

25. Other former incarceration advocates such as Professor Dilulio and former US Attorney General Edward Meese are calling for a repeal of mandatory minimum sentencing and challenging the wisdom of a massive imprisonment policy.[23]

26. The lesson for California is that lowering the rate of imprisonment will have a minimal or even a positive effect on crime rates, and will improve its ability to engage many soon-to-be released prisoners in rehabilitative programming.  Specific examples of this phenomenon are presented in the next section.

**Prison Population Reduction Measures in Other Jurisdictions**

*New York*

27. New York state offers the most recent and compelling example of how crime and imprisonment rates can be lowered simultaneously. Like most other states, New York began to experience a drop in its crime rate beginning in 1994.  The reasons for this drop are the subject of several studies all of which are summarized in Blumstein and Wallman.[24]  One common conclusion is that the drop in crime was not precipitated by a surge in imprisonment.

28. The decline in the state's overall prison population was fueled in part by reducing the length of stay for those sentenced to prison. This was achieved by creating programs that allow prisoners to earn more "good time" credits and thus become eligible for parole sooner than originally scheduled.  A report released by the New York State Department of Corrections, estimates that over 24,000 prisoner were released an estimated six months earlier from 1997 through 2006. Those released earlier had

---

[23] Jacob Sullum, "Prison Conversion: After Studying Non-Violent Drug Offenders, A Criminologist Who Once Said "Let 'Em Rot" Now Says "Let 'Em Go", Reasonline, http://www.reason.com. August/September 1999.
[24] Blumstein A and Wallman J (eds). 2000. The Crime Drop In America. Cambridge University Press, Cambridge, UK.

significantly lower recidivism rates, and the crime rate in New York also declined substantially.[25]

29. New York City, where much of the State's total drop in crime occurred, was also implementing its now well-known police practices that focused on "quality of life" arrests. As a result, the city experienced a decline in the number of felony arrests while misdemeanor arrests and jail bookings increased. But because misdemeanants have much shorter lengths of stay in the jail and cannot be sentenced to prison, both the City's jail population and the state prison population declined dramatically.[26] Specifically, the New York City jail population declined from 21,000 to 13,000; the prison population from 71,000 to 63,000 and the probation population from 98,000 to almost 50,000.

30. These reductions in the prison population and rate of imprisonment occurred at the same time as the crime rate was declining. Figures 2 and 3 compare the crime and imprisonment rates for New York with California and Michigan. One could pick any state to compare with New York and it would show the same trend: namely that as New York's rate of imprisonment was declining so too was its crime rates. Other states show the same reduction in crime rates with or without any change in imprisonment rates.

*Nevada*

31. Nevada has recently enacted reforms that reduced its prison population without impacting crime rates.[27]

---

[25] New York Department of Correctional Services, *Merit Time Program Summary, October 1997 – December 2007.*Albany, NY: NYDOC.
[26] For a comprehensive assessment of the New York experience see Michael Jacobson, *Downsizing Prisons: How to Reduce Crime and End Mass Incarceration* (New York: New York University Press, 2005
[27] I am currently employed by the State of Nevada, the Council of State Governments and the PEW Charitable Trust Foundation to provide consultancy services to the state. I am very familiar with data regarding the state's prison population. For a recent summary of the 2007 Nevada reforms, see the July 7, 2008 powerpoint presentation that I made before the Nevada Advisory Commission on the Administration of Justice, The Council of State Governments, Carson City, Nevada.

32. Prior to 2007, Nevada was facing a rapidly expanding prison population fueled in part by an unexpected increase in prison admissions largely form Clark County (Las Vegas). A prison forecast indicated in 2008 that unless steps were taken, the state's prison population would increase from 13,000 prisoners to over 18,000 over the next ten years. Coupled with a worsening economic picture, the state was faced with a growing budget request that would compromise efforts to increase spending on several education and drug prevention initiatives.[28]

33. To address this problem, the state enacted AB 510 in 2007, which increased the amount of "good time" credits a prisoner could earn for good conduct and completion of education and treatment programs. (The law was made retroactive to prisoners who were sentenced in 2000.) The law also provided for probationers and parolees to receive good time credits for satisfactory behavior and compliance with the conditions of probation and parole. The result was that well-behaved prisoners were eligible for parole sooner, and well-behaved parolees were discharged from parole.

34. With the assistance if the U.S. Department of Justice's Bureau of Justice Assistance (BJA), the Parole Board also revised its risk based guidelines to better identify low risk candidates for parole for the purpose of expediting their release. The guidelines were designed to increase paroles for prisoners who have completed programs designed to reduce recidivism rates.

---

[28] *See* CSG Center on Criminal Justice power point dated October 17, 2006



Figure 2: New York versus California and Michigan Incarceration Rates: 1996-2006

Figure 3: New York versus California and Michigan Reported Crime Indexes: 1996-2006

Reported Crimes per 100,000 residents



8/15/08 EXPERT REPORT OF JAMES AUSTIN. PHD. NOS. CIV S-90-0520. LKK-JFM, C01-1351 TEH

35. Finally, the Probation and Parole Division, which supervises all offenders in the community, agreed to develop and implement in coordination with the Parole Board a revocation matrix that would reduce the number of returns to prison for technical violations and the length of stay for technical violations.

36. Since the legislation and new policies took effect in 2007, the prison population reversed its upward arc and has begun a moderate decline (See Figure 4). At the same time the probation population has declined from 14,400 to 13,500 and the probation violation rate had dropped from 47% to 35%. The state also established an Advisory Commission on the Administration of Justice to monitor reported crime, arrests and court dispositions to see what effect the reforms might have on those key indicators. To date there has been no increases in crime, arrests or court filings.[29]

---

[29] See Council of State Governments' power point presentation made to the Nevada Justice Advisory Commission dated July 7, 2008

**Figure 4: Projected and Actual Prison Population For Nevada** [30]



---

[30] The data used to compile this figure was provided to me by the Nevada Department of Corrections.

8/15/08 EXPERT REPORT OF JAMES AUSTIN, PHD, NOS. CIV S-90-0520, LKK-JFM, C01-1351 TEH

*Mississippi*

37. Like many states, Mississippi adopted truth-in-sentencing laws in the mid-1990s requiring inmates to serve at least 85% of their sentence before receiving parole consideration. While many states applied this restriction only to violent offenders, Mississippi brought all offenders under the net. As a result, Mississippi's prison population more than doubled over the last 14 years, from 10,500 to 22,800. In 1994, the Department of Corrections budget was $109.6 million. This year, it stands at $327 million, and state prisons are at 99% of capacity.

38. This year, with the endorsement of Republican Governor Halley Barbour, Mississippi enacted SB 2136, a statute that would allow thousands of nonviolent offenders to become eligible for parole after serving 25% of their sentence. Officials say 4,500 inmates, or 24% of the total population, are covered by the new law. I have been retained by the state of Mississippi to conduct population projections to estimate the effect of the new law. Because the measure is retroactive, about 3,000 inmates – or about 12% of the total population already have met their time-served requirement and are eligible for immediate parole consideration. The parole board is ramping up to conduct hearings and beginning to process cases. The state is beefing up its parole ranks to prepare for the increased demand for supervision. I estimate that the Mississippi prison population will experience a 20% reduction all based on shorter periods of imprisonment.

*California Counties*

39. Several California counties have low numbers of persons sentenced to the CDCR without apparent impacts on crime rates.

40. Table 2 shows the felony prison disposition rates and prison admissions for new convictions in some of the major counties in California. The table demonstrates that there is considerable variation among the counties in both their felony prison disposition rates and prison commitment rates. The statewide felony prison disposition rate in 2005 (the last year reported buy the California Attorney General), is 19%. This number reflects the percentage of felony convictions that resulted in a prison sentence. The most frequent dispositions are probation and probation with a jail sentence (often representing credit for time served in jail awaiting the court's disposition). Riverside, Los Angles and San Bernardino Counties have felony disposition rates that are significantly higher than the state average. Alameda, Contra Costa, and San Francisco Counties have the lowest felony disposition rates. If Los Angeles, Riverside and San Bernardino alone were to match the 19% statewide felony disposition rate, the number of prison admissions for new convictions would drop by 12% statewide.

41. Similarly, the prison commitment rates per 100,000 population as reported by the CDCR in its annual report vary from a low of 51 and 55 per 100,000 population in Contra Costa and San Francisco, to highs of 314 and 300 for San Bernardino and Kern counties. The variations in prison commitment rates are not explained by variations in crime rates. The prison commitment- crime rate ratio as is shown in the last column of Table 2, and it demonstrates that counties with the higher prison commitment rates do not have the higher crime rates. For example, Los Angeles, Riverside, and San Bernardino have much higher prison commitment rates but their crime rates are similar to Contra Costa, San Diego, and San Francisco, which have much lower prison commitment rates.

42. This analysis shows that within California, many counties are maintaining low prison commitment rates -- meaning that they are keeping offenders in the community -- without jeopardizing public safety. What is lacking are statewide initiatives that would help other counties to follow suit.

**Table 2: 2005 Felony Court Dispositions and Commitments by County**

| County | Crime Rate Per 100,000 | Prison Disposition Rate | Prison Commitments per Year | Prison Commitments Per 100,000 Population | Prison Commitment to Crime Rate Ratio |
|---|---|---|---|---|---|
| Alameda | 3,259 | 9% | 1,755 | 114 | .035 |
| Contra Costa | 2,676 | 12% | 529 | 51 | .020 |
| Fresno | 3,088 | 16% | 2,211 | 251 | .081 |
| Kern | 3,135 | 19% | 2,243 | 300 | .096 |
| Los Angeles | 2,532 | 26% | 22,003 | 217 | .086 |
| Orange | 1,661 | 18% | 4,776 | 155 | .093 |
| Riverside | 2,846 | 26% | 5,119 | 274 | .096 |
| Sacramento | 3,712 | 14% | 2,180 | 156 | .042 |
| San Bernardino | 2,673 | 21% | 6,103 | 314 | .112 |
| San Diego | 2,539 | 14% | 4,717 | 154 | .061 |
| San Francisco | 2,776 | 11% | 436 | 55 | .020 |
| Santa Clara | 1,866 | 16% | 2,388 | 136 | .073 |
| Statewide | 2,497 | 19% | 68,366 | 186 | .074 |

Sources: Crime and Court Disposition rates published by the California Attorney General; Prison Commitments and Rate per 100,000 population published by CDCR in its 2005 Annual Report

## Options for California That Will Safely Reduce the Prison Population

43. The size of a prison population is driven by two dynamics – admissions and length of stay (LOS). California can reduce prison admissions and reduce length of stay in a safe and practical manner in four ways: 1) provide evidence-based programming and supervision to technical parole violators instead of returning them to prison; 2) divert low-level offenders to probation and parole instead of prison; 3) provide more avenues for prisoners to earn "good time" credits toward release for good behavior; and 4) provide more avenues for early discharge from parole. Each of these options has been

20

successfully adopted either in California counties or in other states, and has proven to be effective. Further, each of these recommendations were also recommendations made by the Expert Panel.[31] The recommendations made by the Expert Panel (with one exception) were formally endorsed by the CDCR.[32]

44. It is important to note that individuals who would be diverted or released early under these programs are all people who *would otherwise be returned to the community* within several months of the date that these programs would release them. This report does not contemplate releasing any high-risk offenders or anyone who would otherwise remain incarcerated for life. Thus, the normal risks of recidivism among the population who are released from prison in the ordinary course of events also exists here. As explained below, the actual expected *impact on crime rates* from these population reduction measures is negligible, and implementation of appropriate evidence-based programming can further reduce or eliminate any increase in crime.

*Moderately and Selectively Reduce Prison Admissions*

45. There are two major types of prison admissions for the CDCR – new court commitments and parole violators. Any moderate reduction in one or both of these two admission streams will have an associated impact on the prison population.

46. As explained above, California has implemented policies that make its prison admission attributes different than any other state in the US. As shown in Table 3, the number of prison admissions is extremely large (because of the large number of technical parole violators being admitted each year), but the size of the parole technical violator population at any given point is only approximately 20,000 (because the average length

---

[31] Expert Panel Report.
[32] See letter signed by Secretary James Tilton dated September 25,2007 to the Honorable Denise Ducheny and the Honorable John Laird endorsing all but one of the recommendations of the Expert Panel Report.

of sentence for these admissions is just four months). The difference between California and other major states is shown in Table 4 which further highlights the unique attributes of these California admission numbers.

1. Reducing The Number of Technical Parole Violators

47. California can safely reduce its prison population by reducing the number of technical parole violators who are imprisoned.

48. While California currently incarcerates a high percentage of parole violators, this has not always been the case.

49. Prior to 1976, CDCR had a high parole success rate. 75% of released parolees successfully completed their periods of supervision.[33] In the 1980's however, CDCR and the Board of Prison Terms implemented a number of policies that reduced the parole success rate and increased the number of technical parole violators being admitted to prison.[34] One of the most prominent changes was the decision by the BPT to accommodate local county officials by admitting parole violators who otherwise would have remained in the local jail pending their revocation hearing. This was done to help reduce the jail population and jail crowding.[35]

50. Other factors cited by the BPT and CDCR officials that have served to increase parole revocations were 1) a reduction of community treatment resources, 2) increased used of drug testing, 3) decreased ratio of parole agent to parole caseload and

---

[33] James Austin, 1987, "Success and Failure on Parole in California, A Preliminary Evaluation", San Francisco, CA: National Council on Crime and Delinquency, Table 3
[34] James Austin, 1987, "Success and Failure on Parole in California, A Preliminary Evaluation", San Francisco, CA: National Council on Crime and Delinquency
[35] See report by CDCR official Norm Holt. January 24, 1995. "Reducing Parole Revocations By Improved Decision Making: The California Experience." Unpublished Report. and James Austin, 1987. "Success and Failure on Parole in California, A Preliminary Evaluation", San Francisco, CA: National Council on Crime and Delinquency

4) the willingness of the prosecutors to accept a parole revocation in lieu of further prosecution.[36]

### Table 3
### Prison Admissions versus Prison Populations

| Indicator | Prison Admissions | | Current Population | |
|---|---|---|---|---|
| | N | % | N | % |
| Totals | 141,881 | 100% | 171,987 | 100% |
| New Court Commitments | 50,708 | 36% | 108,637 | 63% |
| Parole Violators – Total | 91,173 | 64% | 63,349 | 37% |
| New Court | 21,936 | 16% | 42,768 | 25% |
| Technical Violators | 57,728 | 41% | 15,604 | 9% |
| Technical Violators Reinstated | 11,509 | 8% | 4,977 | 3% |
| Other Key Groups | 18,752 | 13% | 71,243 | 41% |
| Two Strikes | 17,280 | 12% | 37,027 | 22% |
| Three Strikes | 334 | 0% | 8,837 | 5% |
| Life Sentences – Excludes Strikers | 997 | 1% | 23,411 | 14% |

Source: CDCR

### Table 4: Comparisons with Other Major State Prison Systems

| Indicator | Michigan | Texas | California | Illinois | New York | USA |
|---|---|---|---|---|---|---|
| 2007 Prisoners | 50,648 | 172,626 | 176,059 | 45,565 | 63,536 | 1,395,916 |
| 2006 Incarceration Rate | 511 | 683 | 475 | 350 | 326 | 445 |
| | | | | | | |
| 2006 Crime Rate | 3,775 | 4,598 | 3,704 | 3,562 | 2,488 | 3,808 |
| Property | 3,213 | 4,082 | 3,171 | 3,020 | 2,053 | 3,335 |
| Violent | 562 | 516 | 533 | 542 | 435 | 474 |
| Incarceration/Crime Rate Ratio | 0.14 | 0.15 | 0.13 | 0.10 | .17 | 0.12 |
| | | | | | | |
| Total Admissions | 12,813 | 42,807 | 141,881 | 39,477 | 26,942 | 692,303 |
| New Court Commitments | 10,714 | 33,426 | 50,708 | 3,825 | 16,868 | 441,606 |
| Parole Violators | 4,094 | 9,381 | 91,173 | 10,528 | 9,409 | 239,495 |
| % Parole Violators | 32% | 22% | 64% | 27% | 35% | 35% |

Sources: UCR 2006; BJS 2006: Michigan DOC, Texas DCJ, Illinois DOC, New York DCS

51. There are several methods for reducing the number of technical parole violators. In Washington state, state statutes prohibit parole violators from being re-admitted to prison for a technical violation. Instead, technical parole violators can serve up to 60 days of confinement in the local jail. Other states, including Louisiana and

---

[36] James Austin, 1987, "Success and Failure on Parole in California, A Preliminary Evaluation", San Francisco, CA: National Council on Crime and Delinquency,

Texas, have restricted how long a person can be re-incarcerated for a technical parole violation.

52. A second method is to use a "violation matrix," a system that evaluates the severity of the violation and the risk-level of the parolee to determine appropriate sanctions for a parole violation. Using a "violation matrix" lowers parole revocations for low risk parolees who are involved in non-criminal conduct  A number of states now use such a matrix including South Carolina, New Jersey, Oregon, Georgia, Iowa, Kansas, South Dakota, and Texas.[37]

53. A third method is to reduce the period of supervision for parolees who comply with their conditions of parole. Such a policy would serve as an incentive for parolees to behave, and thus reduce violations. As noted above, Nevada has instituted such a law which has reduced the number of both probation and parole violators.

54. Finally, the CDCR could re-institute its own program (successfully implemented in the early 1990s) whereby parole regions would be allocated targets for reducing parole violations which, if achieved, would increase community resources for the agents to use. The model consisted of the following five components:

> "1) Broaden the concept of parole to include some accountability for failures,
> 2) Translate operation concepts into budget concepts.
> 3) Redirect part of the avoided prison expenses to parolee support services,
> 4) Train the revocation decision makers and audit decision processes, and
> 5) Keep decision makers regularly informed of the consequences of their actions."[38]

This effort resulted in about 10,000 fewer parole revocations and 3,000 few prison beds being used in 1993.

---

[37] Personal communication and email from Peggy Burke, Center for Effective Public Policy. August 4-5, 2008.
[38] See Holt. "Reducing Parole Revocations By Improved Decision Making: The California Experience." Unpublished Report by CDCR official.

*Estimated Impact of Reducing Technical Parole Violators*

55. The CDCR Expert Panel estimated that this reform would serve to divert approximately 31,000 of the nearly 70,000 technical parole violations that are being returned to prison.[39] Given that technical parole violators serve an average of 2-4 months in CDCR prisons, it is estimated that the impact on the projected CDCR institution population would be at least 6,500 or as much as 9,500 at any given time.[40]

56. As important as the bed reduction, the diversion of at least 31,000 technical violators from CDCR prisons would have a pronounced impact on the volume of persons being processed at CDCR's crowded reception centers, and would enable CDCR to improve the level care that it provides at those facilities.

57. If effective evidence-based programming were provided to the technical parole violators, the diversion program would likely have no impact on crime rates. Indeed, for many technical parole violators who are low-risk offenders, the evidence suggests that their recidivism rates would be *higher* if they were incarcerated rather than released to a community setting with appropriate programming.[41]

## 2.   Divert Low Risk Prisoners with Short Sentences

58. CDCR could also moderately reduce prison admissions without jeopardizing public safety by diverting low-risk, newly sentenced prisoners who will spend a very short period of incarceration due to their short sentences and credit for jail time (less than 12 months).

---

[39] *See* Expert Panel Report at Appendix E, p. 89.
[40] *See* Expert Panel Report. It should be noted that the estimates of the impact of this and other reforms were originally removed from the draft report by the CDCR. They were later re-instated based on the objection of the Expert Panel members.
[41] *See* Expert Panel Report at 23.

59. As shown in Table 5, there are over 27,000 persons sentenced to the CDCR who were sentenced for a "non-violent" offenses and who do not have a second or third strike against them. A large portion of the population has received a sentence for 16 months.

60. A diversion program would eliminate a short period of imprisonment within the CDCR (during which the prisoner is unlikely to become involved in any meaningful programming), but would not eliminate the period of incarceration in county jails (typically 4-7 months).[42]

*Estimated Impact of Diverting Low Risk Prisoners with Short Sentences*

61. In analysis completed for me by the CDCR, it was determined that the prison population would be lowered by approximately 16,500 within two years of implementing a diversion program for low-risk offenders.[43]    I would lower this estimate by approximately 4,000 to account to other factors that may arise as part of the implementation process (exclusions due to prisoner refusals to participate or designation as a high risk for release to the community).   This would suggest the prison population could be reduced by 12,500 through this reform alone.  Moreover, if the state provided appropriate community-based treatment for individuals diverted from prison, the diversion program would likely have a neutral or positive impact on public safety.  That is because low-risk offenders such as those targeted for such a diversion program have

---

[42] Based on data file forwarded to me by CDCR,  Legislative Estimates Unit, Estimates and Statistical Analysis Section, Offender Information Services Branch.

[43] CDCR Critical Statistical Report Request #1, December 2007,Legislative Estimates Unit, Estimates and Statistical Analysis Section, Offender Information Services Branch.

8/15/08 EXPERT REPORT OF JAMES AUSTIN, PHD, NOS. CIV S-90-0520, LKK-JFM, C01-1351 TEH

higher recidivism rates when incarcerated and lower recidivism rates when provided appropriate, evidence-based programming in the community.[44]

**Table 5**
**Sentenced for FY2006-2007 Persons Sentenced to**
**60 months or less Non-Violent, Non-Lifer, Non-Sex Registrant and Non-Strike Crimes/Sentences**

| Sentence In Months | New Court Prison Admissions | % of total admissions for these crimes |
|---|---|---|
| 8 | 131 | 0% |
| 12 | 88 | 0% |
| 16 | 16,058 | 42% |
| 18 | 28 | 0% |
| 20 | 10 | 0% |
| 24 | 11,450 | 30% |
| Sub-Total | 27,765 | 72% |
| Total | 38,393 | 100% |

Source: CDCR PDF file and analysis dated 12/03/07

3.    Moderately and Selectively Reduce Length of Stay (LOS)

62. California could also safely reduce its prison population by moderately reducing the length of stay of selected prisoners.

63. One of the most repeated research findings published by the US Department of Justice's Bureau of Justice Statistics (BJS) and various states is that increasing or reducing the period of imprisonment has no associated impact on recidivism rates. The BJS reports that the average LOS in the nation's prisons has grown from 20 months in 1994 to 30 months in 2002. This alone accounts for 50% increase in the ADP in the

---

[44] Expert Panel Report at 23.

27

nation's prisons.  The BJS recidivism studies and others show no relationship between time served and recidivism rates.[45]

64. The California CDCR completed an analysis for this author to see if recidivism rates were associated with lengths of imprisonment.  Table 6 shows the relationship between how long persons are incarcerated and recidivism rates in California.  Although the recidivism rates appear to decline slightly, those declines are not statistically significant except for people who serve more than 24 months, and that reduction in recidivism is due entirely to the maturation of the prisoner (older prisoners have lower recidivism rates).  When this study is replicated controlling for age and other related factors, there is no statistically significant difference in recidivism rates by length of stay.  A similar finding was found in the US Department of Justice recidivism studies for 1994 releases of which California participated in and dominates the results by virtue of its large numbers (see Table 7). Moreover, the good time credit programs outlined in this report would only result in a reduction of an average of 4 months of LOS, and nearly all the individuals who would be eligible for such reduction would be serving a sentence of less than 24 months.

65. It should be noted that even very small changes in LOS can produce very large reductions in a prison population.  In California, if all of the 70,000 or so new court commitments spent 30 days less than they do today, the CDCR prisoner population would decline by approximately 5,800 inmates. A three month reduction would drop the population by over 17,000

---

[45] See BJS website for analysis of LOS and Recidivism rates at http://www.ojp.usdoj.gov/bjs/correct.htm.

8/15/08 EXPERT REPORT OF JAMES AUSTIN, PHD. NOS. CIV S-90-0520, LKK-JFM, C01-1351 TEH

Table 6: Three Year CDCR Recidivism Rates for First Releases

| Time Served In Months | Release Year | | | | | |
|---|---|---|---|---|---|---|
| | 2000 | | 2001 | | 2002 | |
| | % Released | % Returned | % Released | % Returned | % Released | % Returned |
| Total | 100.0% | 60.6% | 100.0% | 59.4% | 100.0% | 57.3% |
| 0 – 6 | 15.9% | 66.0% | 16.7% | 63.5% | 17.6% | 61.9% |
| 7 – 12 | 37.0% | 62.6% | 35.5% | 62.7% | 33.1% | 60.1% |
| 13 – 18 | 16.9% | 59.0% | 16.6% | 57.7% | 16.3% | 55.7% |
| 19 – 24 | 11.1% | 58.6% | 10.7% | 57.9% | 11.2% | 55.9% |
| 25 – 30 | 4.8% | 55.6% | 5.1% | 54.0% | 5.0% | 52.4% |
| 31 – 36 | 3.6% | 54.9% | 3.9% | 53.4% | 3.9% | 52.5% |
| 37 – 60 | 7.1% | 53.9% | 7.2% | 49.5% | 7.4% | 49.8% |
| 61 + | 3.5% | 56.1% | 4.2% | 53.5% | 5.5% | 51.0% |

Source: Table 6 is reproduction of Table E-4 from the Expert Panel Report, at Appendix E, p. 92.

Table 7:    Three Year Follow-Up Rate of Re-arrest of State Prisoners (including California) Released in 1994, By Time Served in Prison

| Time Served | 3 Year Re-Arrest Rates |
|---|---|
| 6 Months or Less | 66.0% |
| 7-12 months | 64.8% |
| 13-18 months | 64.2% |
| 19-24 months | 65.4% |
| 25-30 months | 68.3% |
| 31-36 months | 62.6% |
| 37-60 months | 63.2% |
| 61 months or more | 54.0% |

Source: U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, *Prison Statistics*. Online. Available: http://www.ojp.usdoj.gov/bjs/prisons.htm. Accessed: August 1, 2006.

66. The methods that many states use to reduce the LOS are either through good-time credits or parole board decision making. States with indeterminate sentencing use their parole boards to modify LOS. In a determinate sentencing state like California, the

only means for modifying release dates is to allow for the award of special program credits that serve as an incentive to participate in risk reduction programs.[46] Illinois and Indiana are two states that offer such good time credits for most of their inmates.[47]

67. Creating an incentive system where prisoners are rewarded for complying with the facility rules and/or participating in programs that serve to reduce recidivism rates is cost effective and helps protect both institution and public safety.

68. In California there are few incentives for California prisoners to participate in programs or to fully comply with prison rules. Prisoners receive a fixed term which can be reduced by varying amounts by receiving earned credits as set forth in Penal Code §2933.[48] The original intent of the work and education credits was to establish an incentive for participating in designated programs and work assignments. But as over-crowding intensified, the opportunities for such participation both decreased and was unevenly applied.[49]

69. To address this problem the CDCR has become more generous in what qualifies for work incentive credits by creating in 2004 the "Bridging Educational Program" (BEP).[50] The BEP is a 2-4 month in-cell program offered to prisoners at the Reception Centers that awards prisoner good time credits for completing in-cell written

---

[46] In the 1960's, when California had an indeterminate sentencing scheme, Governor Ronald Reagan was able to reduce the prison population by increasing the number of paroles being granted by the Parole Board and increasing emphasis on rehabilitation and treatment. During this period the prison population dropped from 28,000 in 1968 to under 20,000 in 1972 and remained at that level for several years. This practice is still being used by several states (New York, Texas, Nevada, Kentucky, Michigan, and Pennsylvania are states that have increased parole grant rates or have maintained high grant rates for a considerable period of time).

[47] See Illinois and Indiana Department of Corrections web sites at http://www.idoc.state.il.us/ and http://www.in.gov/idoc/
[48] See Expert Panel Report, page 12 for detailed description of allowed good time credits.
[49] See Expert Panel Report, page 12.
[50] See Expert Panel Report, page 12.

assignments. The quality of such services and their impact on recidivism rates is questionable and has not been evaluated.[51] Basically, it is a method for expediting releases by allowing newly admitted prisoners to earn Work Incentive Program (WIP) credits while awaiting a transfer to another facility or release to parole. The percentage of prisoners participating in the Bridging program has accelerated over the past few years.

70. Another method being used by the CDCR to expedite releases is its Conservation Corps Program. Prisoners who work in this program can earn two days off of their sentence for each day in the program as authorized by Penal Code §2933.3. Currently, there are over 4,000 male and female prisoners in the Conservation Corps camps, which is less than three percent of the total institutional population.[52] Expanding these programs would decrease the LOS for prisoners who are not sentenced as a "violent" offender, 2nd striker, or a 3rd striker. (It should be noted that there are prisoners in these three excluded classes who are assigned to the CCCs but are unable to earn the additional good time credits due to existing California law. The 2nd and 3rd strikers plus prisoners classified as serious or violent offenders must serve 80% of their sentences, so the day-for-day earned credits are of less value and are less of an incentive for them to participate in meaningful programs and adhere to the prison rules.)

71. Under current California law and practices, prisoners do not receive full WIP or pretrial credits while in the local jails awaiting transfer to the CDCR. This has resulted in a very complex, cumbersome and expensive bureaucratic system of trying to keep

---

[51] See Expert Panel Report, pages 151 and 177.
[52] *See*
http://www.cdcr.ca.gov/Reports_Research/Offender_Information_Services_Branch/WeeklyWed/TPOP1A/TPOP1Ad080716.pdf

8/15/08 EXPERT REPORT OF JAMES AUSTIN, PHD, NOS. CIV S-90-0520, LKK-JFM, C01-1351 TEH

track of the various forms of earned good time credits which is unique for determinate sentencing states.

72. Each year, tens of thousands of CDCR prisoners receive Work Incentive, Education, Vocational and Conservation Camp Credits. Expanding this program would reduce the prison population, and, if done effectively, reduce recidivism as well.

*Estimated Impact of Lowering LOS*

73. The Expert Panel estimated that an enhanced good time credit program would reduce the CDCR population by at least 17,000. That estimate assumed that at least 50,000 new court commitments and parole violators would receive an average of four months of program credits which would reduce the CDCR institution population by at least 17,000 prisoners. However, that estimate included prisoners outside of the 50% earning class (50% earning class are non-serious offenders who, through earning WIP credits, can reduce their sentence by up to 50%) and did not take into account the effects of diverting short-term sentenced prisoners. If one assumes that only the 50% earning class were to be impacted (57,000 admissions per year), and only half were to be able to receive an average of four months case management plan credits prior to release, the impact on the CDCR institutional population would be 9,500. This estimate would be higher if the diversion of short term new court commitments did not occur.

74. Further population reduction would occur if more prisoners were able to participate in the CCC programs and earn the two-for-one day credit.

75. California's current Work Incentive Program is deeply flawed. CDCR has attempted to maximize the effect of the WIP by creating the Bridging program, noted earlier. Today virtually all newly admitted prisoners are enrolled in the Bridging program

32

to ensure they receive the day for day WIP credits. When visiting the Lancaster facility in 2007, I was told that the Bridging program often consists of prisoners being given "assignments" to read materials or other self help documents. Credit for this work is assumed and is not evaluated to determine what if any progress is being made by the prisoner. It was this lack of structure that led the Expert Panel to recommend that the WIP credits be made statutory which is similar to some other states. Such a change would also eliminate a cumbersome book-keeping process that has resulted in wrongful incarcerations beyond the proper release date.

76. Finally removing the restrictions prohibiting "serious offenders" and 2nd and 3rd strikers from receiving sentence-reducing credits would significantly reduce the average daily prison population. For example, moving up the release dates of such prisoners by an average of four months would lower the prison population by over 3,000. If such prisoners could be placed in the 50% earning class category, the prison population would decline by as much as 37,000 people.[53]  There are a considerable number of prisoners who are not in the 50% earning class but who are low risk and whose further incarceration has no impact on crime rates or recidivism rates.[54]

4.    Early Discharge from Parole

77. Finally the state can safely reduce its prison population by offering good time credits to reduce the period of parole supervision. Similar to the research on LOS and imprisonment, there is no evidence that extending parole supervision for all prisoners serves any public safety value or reduces recidivism. In fact a California study showed no relationship between time on parole (or even the placement of a prisoner on parole)

---

[53] *See* Expert Panel Report, Appendix E, page 93.
[54] Based on CDCR and UCI recidivism data files I have received since 2007.

33

with recidivism rates.[55] The Urban Institute also recently reported that prisoners released with no parole supervision have recidivism rates that are similar to those who are placed on parole.[56.]

78. These research findings suggest that the amount of time a CDCR parolee must spend on parole supervision can be significantly lowered without jeopardizing public safety. This is important in that the population-reduction options listed above will serve to place more prisoners on parole supervision for a longer period of time under current CDCR and Board of Prison Terms policies.

79. In order to reduce the number of parolees, California can implement a policy that accomplishes one or both of the following:

> a. Allows prisoners to earn day for day good time off their parole supervision period for compliance with the conditions of parole (under this situation most prisoners who comply with the conditions of parole would serve no more than six months of supervision ) , and
>
> b. Mandates the discharge of all persons from parole supervision after having demonstrated that the prisoner has remained arrest and violation free for a 12 month period.

80. Under current law, prisoners must complete a period of parole (usually 1-3 years) after discharge from prison.  While state law allows some parolees to be discharged from parole early for good behavior, this option is rarely used and most

---

[55] Dorothy R. Jaman, Lawrence A. Bennett, and John E. Berecochea, *Early Discharge from Parole: Policy, Practice and Outcome*, Sacramento: California Department of Corrections, 1974; Deborah Star, *Summary Parole: A Six and Twelve Month Follow-Up Evaluation*, Sacramento: California Dept. of Corrections Research Unit, 1979.

[56] Amy Solomon, Vera Kachnowski, and Avi Bhati. March 2005. "Does Parole Work?: Analyzing the Impact of Postprison Supervision on Rearrest Outcomes. Washington, DC: Urban Institute.

parolees are not discharged by the BPT even though they have remained arrest and violation free.[57]  Implementing an effective early parole discharge program would both reduce the population of parolees and, concomitantly, reduce the parole revocation rate.

*Estimating the Impact of Early Discharge from Parole*

81. At the time of writing this report, I had only just received data that will enable me to analyze the impact of decreasing the period of parole supervision for persons who remain arrest- and violation-free, and I have not had time to fully analyze this data.

---

[57] See Expert Panel Report, Page 13

8/15/08 EXPERT REPORT OF JAMES AUSTIN, PHD, NOS. CIV S-90-0520, LKK-JFM, C01-1351 TEH

**Impact on the Counties and Public Safety**

82. Two concerns that need to be considered in any attempt to lower (or increase) a prison population are the associated effects on local government and public safety. I have already pointed out a number of studies that show fluctuations in the size of a prison system and the rate of imprisonment are not linked to crime rates, and that releasing some low-risk offenders from prison can *reduce* crime if appropriate programming is provided.

83. In this section of my report, I demonstrate that the three basic reforms I have proposed, if implemented appropriately, would have minimal if any impact on public safety or the administration of justice in the counties. Three counties have been selected to illustrate these effects (Amador, Fresno and Los Angeles). These counties are representative of a large urban county, a medium-sized county, and a small rural county.

84. State-wide there are 1.4 million serious crimes reported each year (the vast majority are property crimes, largely petty theft and fraud), and nearly three million arrests (the largest number are for misdemeanor level crimes). The key attributes of the three counties that I analyzed are shown in Tables 7 and 8. Table 7 shows the number of serious crimes reported to police each year and the number of arrests made by law enforcement agencies.

85. Table 8 shows the flow of persons in and out of the major correctional populations. This table shows that prison admissions and releases constitute a very small percentage of the total flow of adults into the county jails, probation, and prison. For Amador and Fresno, prison admissions and releases constitute only 4-5% of the total admission stream. Los Angeles is higher at 10% but the CDCR flow remains small compared to the numbers of people being booked into the jails or admitted to probation.

36

The last row in Table 9 shows that prison admissions and releases, when added together, represent only 5-6% of the total number of arrests being made each year in each county.

86. Because prison admissions and releases constitute such a small percentage of the total flow of adults into the county jails, probation, and prison, modest changes in the number of persons being admitted and released from the CDCR prison system will have little if any impact on local county criminal justice activities.

A.    *Impact of Diverting Technical Parole Violators Persons with Short Sentences*

87. Implementing a diversion program for technical parole violators and persons with short prison sentences would mean that persons who have violated the terms of their parole, or who committed relatively non-serious offenses, would remain in the community under the supervision of their parole officers rather than being incarcerated in CDCR prisons for an average of 1-4 months.

88. Diversion would not cost the county any more money because the technical parole violators and non-serious offenders would be maintained on parole, not incarcerated in county jail.    (If an arrest had been made for the parolee or offender, those costs would already be incurred and do not reflect additional costs.)  Indeed, there may be some averted costs for the local jails who now house technical violators or low-level offenders for some period of time before they are transferred to CDCR's crowded reception centers.

89. Moreover, the diversion programs would be unlikely to have any effect on public safety.  In all of 2006, only 6 parole violators were sent to prison from Amador county, 516 from Fresno county, and 6,766 from Los Angeles County.  These numbers

37

are so small relative to the counties' populations, that it will likely have no impact at all on crime rates.

90. And as shown in Table 10, assuming that 75% of the targeted group of low-level offenders are diverted from the CDCR and retained in the community, the largest impact on total arrests would be less than 1%. For jail bookings the additional impact in the first year would be less than 1% in Amador and Fresno and 1.3% for Los Angeles.

91. Moreover, as explained above, if a diversion program is implemented simultaneously with providing evidence-based programming, public safety might actually improve because research shows that technical parole violators and low-risk offenders have higher recidivism rates when incarcerated, and lower recidivism rates when provided appropriate evidence-based programming in the community.[58]

**Table 8: Key Population, Reported Crime and Arrests By County -- 2006**

| Attribute | Amador | Fresno | Los Angeles | State |
|-----------|--------|--------|-------------|-------|
| Population | 38,400 | 909,400 | 10,292,700 | 33,900,000 |
| | | | | |
| Reported Serious Crimes | 981 | 44,970 | 338,183 | 1,362,825 |
| Violent | 131 | 4,895 | 65,047 | 194,128 |
| Property | 844 | 39,437 | 269,335 | 1,156,010 |
| Arson | 6 | 638 | 3,801 | 12,687 |
| | | | | |
| Grand Total Arrests | 3,193 | 93,084 | 720,959 | 2,845,879 |
| Adult Arrests | 1,517 | 42,716 | 330,130 | 1,306,515 |
| Felony | 523 | 15,788 | 128,989 | 469,271 |
| Misdemeanor | 994 | 26,928 | 201,141 | 837,244 |
| Juvenile | 159 | 7,652 | 60,699 | 232,849 |

Source: California Attorney General

---

[58] Expert Panel Report at 23.

### Table 9:  Key Correctional Population Attributes by County – 2006

| Attribute | Amador | Fresno | Los Angeles |
|---|---|---|---|
| Prison Admissions | 91 | 2,211 | 22,003 |
|    New Court Commissions | 83 | 1,695 | 15,237 |
|    PVs New Felons | 8 | 516 | 6,766 |
|  |  |  |  |
| Prison Releases | 90 | 2,300 | 22,300 |
|    Total Paroles | 50 | 5,242 | 32,761 |
|    First Paroles | 35 | 1,923 | 21,733 |
|    Re-Paroles | 15 | 3,319 | 11,028 |
|  |  |  |  |
| Prison Population | 197 | 5,221 | 54,777 |
|  |  |  |  |
| Adult Probation | 1,097 | 9,762 | 69,428 |
|    Felony | 385 | 7,473 | 61,122 |
|    Misdemeanor | 712 | 2,289 | 8,306 |
|  |  |  |  |
| Jail Population | 80 | 3,105 | 18,721 |
|    Capacity | 76 | 3,778 | 22,329 |
|    Bookings | 1,846 | 42,732 | 173,000 |
|  |  |  |  |
| Total Adult Correctional  Population | 1,374 | 18,088 | 142,926 |
| Total Adult Admissions | 2,108 | 50,495 | 225,526 |
| % Jail Bookings | 88% | 85% | 77% |
| % Prison Admissions | 4% | 4% | 10% |
| % Prison Releases | 4% | 5% | 10% |
| Prison Admissions + Releases % of Arrests | 6% | 5% | 6% |

Sources:  data provided by CDCR and counsel for the counties

8/15/08 EXPERT REPORT OF JAMES AUSTIN, PHD. NOS. CIV S-90-0520. LKK-JFM, C01-1351 TEH

**Table 10: Estimated Effects of the Diversion of Persons Sentenced to 24 months or less non Violent, Non-Lifer, Non-Sex Registrant and Non-Strike Crimes/Sentences**

| Attribute | Amador | Fresno | Los Angeles | State Wide |
|---|---|---|---|---|
| FY 2006/2007 New Court Admissions | 91 | 2,211 | 22,003 | 50.708 |
| Targeted Sentences of 24 months or less | 22 | 1,366 | 8,881 | 27,765 |
| 25% Discount for risk assessment | 17 | 1,025 | 6,661 | 20,824 |
| % Re-arrested 12 months @35% rate | 6 | 359 | 2,331 | 7,288 |
| % of Total Annual County Arrests | 0.2% | 0.4% | 0.3% | 0.3% |
| % of Jail Bookings | 0.3% | 0.8% | 1.3% | NA |
| Estimated CDCR Prisoner Reduction | 10 | 598 | 3,885 | 12,147 |

*B.      Impact of Moderately Reducing Length of Stay Based on Good Time Credits*

92. Implementing an effective good-time credit program would have the most

direct impact on a prisoner population and the least impact on public safety.  Good time

credit programs have repeatedly been shown to have insignificant impact on public safety

because the expected LOS for any individual prisoner is reduced only moderately, and

only prisoners who are adhering to the rules and regulations of the prison system and who

do not pose high risk to commit serious crimes when released are eligible to participate.[59]

93.  It is also important to note that the effects on the number of people being

released from prison is only temporary and of a very short nature. When the enhanced

good time credit awards are first made there will be a slight increase in the volume of

released prisoners for a short period of time (because the prison will be releasing both

prisoners eligible for release under the old system plus prisoners eligible to be released

under the new good time credit system). But once the initial group of prisoners who have

received the awards have been released, the number of releases declines and returns to

---

[59] Carolina Guzman, Barry Krisberg, and  Chris Tsukida. 2008. "Accelerated Release: A Literature Review". Oakland, CA: National Council on Crime and Delinquency.

the level that existed before implementation of the new program. The increases are thus moderate and short-lived, and would not result in large numbers of persons suddenly being released and overwhelming their local communities.

94. Figure 5 mimics the flow of prisoners released to a particular county both prior to and after a new good-time policy is introduced. In this scenario, under the existing scheme 1,500 prisoners are typically released each month after serving 24 months in prison. When the new "good time" credit program is introduced, there is a four month time frame where there is an overall increase of 1,500 additional prisoners being released. That is because, for four months, the prison releases the 1,500 prisoners it would ordinarily release, plus 1,500 more prisoners who have become eligible for parole four months early due to good time. However, the "surge" of 1,500 extra inmates per month ends four months later, when *all* prisoners are being released pursuant to the good time credit program, and the total number of releases drops back to the steady state of 1,500 per month.

8/15/08 EXPERT REPORT OF JAMES AUSTIN, PHD, NOS. CIV S-90-0520, LKK-JFM, C01-1351 TEH

This page is intentionally left blank

Figure 5: Example of Four Month Good Time Program on Prison Releases

| | | 2008 | | | | | | 2009 | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Admit Month | Jul | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | Jun |
| **24 Month LOS Cohort** | Jul-06 | 1500 | | | | | | | | | | | |
| | Aug-06 | 1500 | 1500 | | | | | | | | | | |
| | Sep-06 | 1500 | 1500 | 1500 | | | | | | | | | |
| | Oct-06 | 1500 | 1500 | 1500 | 1500 | | | | | | | | |
| | Nov-06 | 1500 | 1500 | 1500 | 1500 | 1500 | | | | | | | |
| | Dec-06 | | 1500 | 1500 | 1500 | 1500 | 1500 | | | | | | |
| | Jan-07 | | | 1500 | 1500 | 1500 | 1500 | 1500 | | | | | |
| | Feb-07 | | | | 1500 | 1500 | 1500 | 1500 | 1500 | | | | |
| | Mar-07 | | | | | 1500 | 1500 | 1500 | 1500 | 1500 | | | |
| | Apr-07 | | | | | | 1500 | 1500 | 1500 | 1500 | 1500 | | |
| | May-07 | | | | | | | 1500 | 1500 | 1500 | 1500 | 1500 | |
| | Jun-07 | | | | | | | | 1500 | 1500 | 1500 | 1500 | 1500 |
| **20 Month LOS Cohort** | Jul-07 | | | | | 1500 | 1500 | 1500 | 1500 | 1500 | | | |
| | Aug-07 | | | | | | 1500 | 1500 | 1500 | 1500 | 1500 | | |
| | Sep-07 | | | | | | | 1500 | 1500 | 1500 | 1500 | 1500 | |
| | Oct-07 | | | | | | | | 1500 | 1500 | 1500 | 1500 | 1500 |
| | Nov-07 | | | | | | | | | 1500 | 1500 | 1500 | 1500 |
| | Dec-07 | | | | | | | | | | 1500 | 1500 | 1500 |
| | Jan-08 | | | | | | | | | | | 1500 | 1500 |
| | Feb-08 | | | | | | | | | | | | 1500 |
| | Mar-08 | | | | | | | | | | | | |

43

95. The effects of a good time credit program on the three counties are summarized in Table 11. In this table it is assumed that persons in the 50% earning class will receive an average of four months of credits, which will serve to reduce their period of imprisonment by the same amount. During this four month window (a time during which the inmate would have been incarcerated absent the good time release program), approximately 5% of the released prisoners will be re-arrested or returned to prison for a technical violation.[60] *The good time credit releasees would account for a temporary increase in arrests of less than 1 percent of all arrests occurring in the counties.* Several months after the good time credit program is implemented, even this small and temporary increase in arrests and prison returns will disappear.

**Table 11: Estimated Impact on Public Safety on Good Time Program for Selected Prisoners**

| Attribute | Amador | Fresno | Los Angeles |
|---|---|---|---|
| Total Arrests (historical) | 3,193 | 93,084 | 720,959 |
| Total Jail Bookings (historical) | 1,846 | 42,732 | 173,000 |
| Annual Releases (historical) | 90 | 2,300 | 22,300 |
| Additional Releases with good time program | 9 | 547 | 5,375 |
| % of total releases | 10% | 21% | 24% |
| Additional Arrests @ 5% rate | 1 | 28 | 269 |
| % of total County Arrests | < 1% | < 1% | < 1% |
| % of Total Bookings | < 1% | < 1% | < 1% |

Source: CDCR and California Attorney General Office.

**Benefits to Implementing Population Reduction Measure**

96. The population reduction options listed in this report will have a number of benefits in addition to lowering the size of the current CDCR population

---

[60] This is based on data file sent to me by the CDCR in 2007. The figure will be updated using more comprehensive data files sent to me on August 12, 2008 by the CDCR.

44

97. The population reducing techniques will have the most immediate impact on crowding at CDCR's critical reception centers, which first house any new admissions. In order for any prison system to function properly it is essential that the major reception centers are not severally crowded. In the CDCR, the crowding of the male reception centers is largely a function of the large number of parole violators (especially technical violators) who are being processed each year. By lowering the revocation rate and diverting technical violators from the CDCR, the number of admissions will decline as well as the size of the reception center populations. This will increase the ability of CDCR to effectively screen new inmates for health and mental health concerns, and also for programming needs.

98. The reduced population will also reduce the number of lockdowns caused by overcrowding, which will also increase the ability of CDCR to provide medical and mental health care, and to provide evidence-based programming that will reduce recidivism.

99. Moreover, the population reduction measures outlined in this report will require no additional funding, because it is far less expensive to provide supervision and programming to parolees than to prison inmates.

100.    Finally, the reforms, if implemented correctly, should have no impact on crime rates in California.


Dated August 15, 2008

_(signature)_

James Austin, PHD.

45