# EXHIBIT E
# TO DECLARATION OF
# THERESA J. FUENTES
# ISO OPPOSITION TO MIL NO. 6

**Expert Report of Nancy Dane Peña, Ph.D.**
**Coleman, Plata v Arnold Schwarzenegger**
**August 15, 2008**

I am currently employed as Director of the Mental Health Department (MHD), of the Santa Clara Valley Health and Hospital System (SCVHHS) of Santa Clara County, and have been so employed since December 2000. Prior to becoming Director I served as Deputy Director (1996-2000), Director of Family and Children's Services (1992-1996), Director of Intensive Children's Services (1991-1992), and Director of Acute Services Social Services and Children's Services (1985-1991). Prior to employment with Santa Clara County, I worked as Director of Mental Health Services for Gardner Community Health Center, Inc., in San Jose California.

I have been a licensed Clinical Psychologist since 1980 and have worked in the field of mental health public service delivery continuously for the past 30 years and in Santa Clara County for the past 28 years in a variety of administrative and clinical leadership roles. I have planned and administered a broad range of mental health programs for all ages, and all levels of intensity, including services to youth and adults involved in the criminal justice system.

I have been actively involved in various state-level organizations and currently serve as President of the California Mental Health Directors Association (CMHDA). I also sit on the Board of Directors of the California Institute for Mental Health (CiMH) and the California Mental Health Advocates for Children and Youth (CMHACY). I was appointed to the State Performance Evaluation Advisory Committee, a 20-member committee that has advised the State Department of Mental Health on performance measures for the new Mental Health Services Act; and I serve as Co-Chair of the Statewide Children's System of Care Committee of the Mental Health Directors Association. I currently represent California Mental Health Directors on the "settlement work group" at the request of the court appointed Special Master in the Emily Q v Bonta litigation.

In my current role as Mental Health Director of Santa Clara County, I am responsible for a system that serves approximately 18,000 clients of all ages each year through an extensive network of county operated and contracted providers. The FY 09 budget includes close to $250 million of county, state, and federal funds.

A copy of my professional resume is attached.

I have not been retained or specifically employed to provide testimony in this case, nor do my duties regularly involve giving expert testimony.

Generally, I have written papers and reports that pertain to planning, administration and/or analysis of public mental health issues.

I have not testified as an expert at trial or deposition during the past four years.

I reserve the right to supplement these opinions if more information is provided.

In preparation for rendering an opinion, I have reviewed the following materials:

   a. Santa Clara County Adult Mentally Ill Offender Crime Reduction (MIOCR) Grant Proposal – October, 2006
   b. Santa Clara County Juvenile Mentally Ill Offender Crime Reduction (MIOCR) Grant Proposal – October, 2006
   c. Draft CMHDA Forensics Committee White Paper – July 2008
   d. Santa Clara County Mental Health Services Act, Community Services and Supports Three-Year Plan – December 2006
   e. Santa Clara County FY09 Mental Health Department Approved Budget
   f. CDCR Division of Adult Parole Operations – Mentally Ill Parolee Population Report – March 2008
   g. Santa Clara County Board Transmittal – Public Safety and Justice Committee – December 13, 2007 – Report Back on Department of Corrections Bed Capacities, Closed Housing Units and Vacancy Rates
   h. E-Mail to Gary Graves re: Mental Health Adult Services Costs

**Opinion #1 – The Santa Clara County public mental health system cannot meet the mental health needs of those who would require those services, were an estimated 1500 to 3500 individuals transferred from the State system to Santa Clara County.**

According to the March 2008 CDCR Division of Adult Parole Operations Report on Mentally Ill Offenders, 20% of all California parolees are mentally ill. That means that the number of parolees that would be released to Santa Clara County with significant mental health needs would be between 300-700 individuals. This prevalence data is consistent with the information available on the current County jail population, with the additional data that among those, approximately 75% have a co-occurring substance abuse disorder, and almost all require psychiatric medications.

The CDCR Report goes on to state that even with increased outpatient services, the recidivism rate for less severe mentally ill parolees exceeds 54%, while those with more severe illness have higher recidivism rates (63-75%).  Interestingly, the report goes on to indicate that $4 million in funds have been earmarked for needed enhanced mental health services for 300 parolees:

*" The Legislature set aside $4 Million in CDCR's FY 07/08 budget in Leg Change Item 314 for Wrap Around and Residential Services for Mentally Ill Parolees. DAPO is currently utilizing the $4 Million for FY 2007/08 as regionally disbursed case management dollars at the parole unit level. These monies are being utilized solely for the mentally ill parolee population to provide transitional housing, board and care, and crises care services. DAPO is on schedule to serve 300 parolees by July 1, 2008.."(p. 6)*

The report indicates that $13,333 per year is needed to provide the necessary mental health support for this population, in addition to outpatient and medication visits. In Santa Clara County, the average annual cost of outpatient service is estimated at $4,369. Thus, a standard but necessary enhanced mental health service for one mentally ill parolee for one year is estimated to be $17,702; or $5.3 million for 300 mentally ill parolees and $12.4 million for 700 parolees per year.

Even if the State Parole Outpatient service provided medication and outpatient visits, an estimated $4-8 million per year would be required to provide the basic standard of care needed to prevent rapid cycling recidivism, according to CDCR data. These estimates do not include the cost of in-custody treatment services that would be required as mentally ill parolees re-enter custody.

Currently, the Santa Clara County has experienced a reduction in resources available for basic adult outpatient services. The waiting list for services for those "least ill" adults who qualify for services from the system approached 500 in FY08. Without a significant resource increase accompanying a new influx of parolee referrals, the system would have no recourse but to prioritize and "wait list" parolees according to current system acuity criteria, thereby stretching an already thread-bare safety net and posing a severe risk to community safety. Given the dire local financial situation, it is virtually impossible to fathom anything other than a devastating outcome for many parolees as well as for local mentally ill residents that rely on the limited public resource, if the release of parolees occurred without the accompanying resources to address their basic mental health needs.

**Opinion # 2 - The "revolving door" between jail and the street in Santa Clara County is propelled in large part by untreated mental illness and co-occurring substance abuse disorders. Untreated or inadequately treated new parolees will create a mental health crisis within County custody settings.**

Mentally ill offenders are released to the community from the court system with conditions that include obtaining community mental health and substance abuse assessment and treatment services, or they are released from jail after serving their sentences. In either situation, there are currently inadequate community services and inadequate linkages to services that exist. This situation creates a "log jam" of mentally ill offenders in custody settings that has persisted despite system efforts to make

3

change. For example, in an 11/10/05 "Report-back from the County Executive Regarding Solutions for Reducing the Jail Population," it was noted that "Criminal case filings have increased, most notable are mental health filings." One finding of the report was that there was "a backlog for clinical assessments and treatment beds." It cites the need for more housing options to facilitate timely jail discharge, and the need to "address the waiting list of in-custody clients for THU, outpatient counseling, and residential treatment beds." Unfortunately these same conditions exist today as the system struggles to meet increasing demands with decreasing resources.

Further, a 5/11/06 update to the Board on Jail Task Force findings calls for an emphasis on services to the most vulnerable individuals with high risk of recidivism. It mentions the need for enhanced services to "individuals served through the Mental Health Treatment Court (who) will benefit from a greater level of case management and community resources including treatment, housing and vocational rehabilitation available at the time of release to the community from the court hearing." The report calls for expanded "Dual Diagnosis Jail Aftercare" to include "case management, recovery treatment and medication services for inmates released from jail with mental health issues."

As indicated in the CDCR Report, without intensive treatment, case management, housing and other services, these individuals are at high risk of re-incarceration. While there are mental health services available within the adult custody system, because there are very limited community-based services available that are specifically designed for mentally ill offenders, the crisis spreads into the custody environment.

Several years ago, a "snapshot" review of inmate records showed that 175 inmates who had been diagnosed with serious mental illness and housed in the Main Jail facility represented 1,159 incarcerations. The following data gathered for the County MIOCR grant proposal presented FY50-06 in-custody service data that also demonstrates the impact of mentally ill offenders on the Santa Clara County criminal justice system (CJS):

- Custody Mental Health staff responded to 32,419 crisis referrals;
- Custody mental health psychiatrists and Nurse Practitioners provided 5,463 outpatient visits to inmates;
- 1,323 inmates were admitted to the custody acute psychiatric facility;
- Santa Clara County spent $10.2 million in FY06 on mental health services for mentally ill offenders held in custody, with $1.8 million (18%) going to pharmaceuticals.

Based on data available regarding the number of individuals who are incarcerated each year in Santa Clara County and who receive mental health services during their incarceration, factoring in length of stay (100 days) and recidivism assumptions (1.43 incarcerations per year), it is estimated that between 2,000 and 2,500 individuals with

significant psychiatric needs are incarcerated each year. These individuals are in need of ongoing psychiatric service upon jail release, yet the public mental health system currently serves an estimated 700 mentally ill offenders and access is available only to the most severely ill. Best-case estimates are that significantly less than 30% of those in need are able to access service (only 30% of all calls to the general mental health centralized referral call center are currently referred to services due to limited resources and strict eligibility criteria). Thus, an influx of mentally ill parolees poses a real threat of creating serious overflow problems in jail settings resulting from the unavailability of adequate aftercare resources.

**Opinion #3 – Santa Clara County does not have sufficient housing and non-mental health aftercare services to accommodate an influx of 1500-3500 parolees.**

The County's experience with the nationally renowned Mental Health Treatment Court (MHTC) underscores a recurring theme regarding the housing needs of mentally ill offenders, in the startling evidence that approximately 87% of defendants referred to the MHTC are homeless on entering the program from custody and have no ability to purchase housing. On any given date, there is a list of as many as 50 inmates who have waited from seven to 90 days for transport to residential or other structured housing due to lack of treatment beds (often substance abuse or dual-diagnosed needed).

A new influx of mentally ill offenders into the community would certainly widen the already extensive gap between need and resource, resulting in more untreated individuals and the negative outcomes proven to be the consequence of such a state of affairs, namely: increased recidivism, increased psychiatric hospitalizations and emergency psychiatric crises, increased medical emergency room utilization, homelessness, unemployment, suicide, substance abuse and increased community safety concerns.

Santa Clara County criminal justice stakeholders, and many other providers and advocates participated in the local MHSA planning process, where there was further examination of the unmet mental health needs of mentally ill offenders. The county's MHSA Community Services and Supports Plan identified criminal justice involved mentally ill as one of its nine focal populations, and the approved plan has established a Jail Aftercare and Recovery Services (JARS) intensive wraparound-like model of comprehensive integrated services for 178 individuals. These "Full Service Partnership" services make up the largest adult program in the county's MHSA plan, yet the program will only address the needs of 178 of the most severely mentally ill individuals a year. Additional programs funded through MHSA include Therapeutic Housing

Units (THU's), permanent housing development, and training and education in evidenced-based practices. MHSA funds have also been used to hire a senior manager to oversee a new division of the organization- Housing and Criminal Justice Recovery Services.

While California voters passed Proposition 63 in November 2004 to supplement local funding for mental health services, unfortunately at the same time, Santa Clara County revenue shortfalls have resulted in significant reductions in the MHD budget. In the last three-year period, the MHD has lost close to $45 million in local mental health funding through reductions, and the ability to serve 4,000 clients. Other departments and community based organizations that provide critical substance abuse, housing, employment training and social services have also been hard hit. And still, the County is anticipating further reductions for the next several years that will necessitate continued restrictions to safety net services and who will be eligible for services.

Nancy Pena, Ph.D.
Santa Clara County Mental Health Director